$350.⁰⁰

**LEONARD V. FODERA, ESQUIRE**
Silverman & Fodera, P.C.
1835 Market Street, Suite 2600
Philadelphia, PA 19103

**DAVID ROSENBERG, ESQUIRE**
Handler, Henning & Rosenberg, LLP
1300 Linglestown Road
Harrisburg, PA 17110

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LaDONNA KING**<br>6027 Allegheny Rd, #A-1st Floor<br>Manns Choice, PA 15550<br><br>*Plaintiff,*<br><br>v.<br><br>**MERCK & CO.**<br>**ONE MERCK DRIVE**<br>**P.O. Box 100**<br>**White House Station, NJ 08889**<br><br>*Defendant(s)* | CIVIL ACTION NO. 06-cv-4294.<br><br>**FILED**<br>**COMPLAINT**   By  Mic.  SEP 26 2006<br>   Dep. Clerk<br><br>**JURY TRIAL DEMANDED** |

### PLAINTIFF'S COMPLAINT

Plaintiff, LaDonna King, by and through her undersigned counsel, do hereby aver as follows:

## I.    INTRODUCTION

1.    This case involves the prescription drug VIOXX® ("Vioxx"), generic name for rofecoxib, which was researched, designed, developed, manufactured, marketed, promoted, advertised and sold by defendant Merck & Co., Inc. ("Merck" or "Defendant") for relief of pain and inflammation (swelling and soreness) in adults suffering from osteoarthritis, rheumatoid

arthritis, short-term pain, menstrual pain, and migraine headaches; and in juveniles suffering from rheumatoid arthritis.

2.      At all times relevant to this action, Merck misrepresented the safety of Vioxx and negligently tested, manufactured, advertised, promoted, marketed, and sold Vioxx as a safe prescription medication when, in fact, it had reason to know and did know that Vioxx was not safe for its intended purpose for patients for whom it was prescribed and to whom it was sold; and that Vioxx caused serious medical problems, and in certain patients, catastrophic injuries and deaths.

3.      In the public press, Merck estimates that there were 105 million U.S. prescriptions written for Vioxx from May 1999 through August 2004.  Based on this estimate, Merck estimates that the number of patients who have taken Vioxx in the United States since its 1999 launch is approximately 20 million.  The number of patients outside the United States is undetermined at this time.

## II.      **PARTIES**

4.      Plaintiff, LaDonna King, resides at the address set forth above in the caption. Plaintiff, LaDonna King, ingested Vioxx which contains the active ingredient Rofecoxib which caused him/her to have renal failure in 2002.

5.      At all times relevant herein , defendant, Merck & Company, Inc. (hereinafter "Merck" or "defendant") is a business entity as listed in the caption and is a citizen of the United States, is a citizen of a state other than Pennsylvania and maintains a principal places of business in a state other than Pennsylvania as listed in the caption.

M007C74575

6.     At all material times herein, defendant was, and is, in the business of profiting from the design, manufacture, marketing, distribution and/or sales of the brand-name prescription drug Vioxx (Rofecoxib).

7.     At times relevant and material hereto, defendant has sold, distributed and marketed either directly or indirectly through third-parties or related entities, the pharmaceutical drug Vioxx in the Commonwealth of Pennsylvania.

## III.   JURISDICTIONAL STATEMENT

8.     This Court has jurisdiction pursuant to 28 U.S.C. §1332. Plaintiff hereby avers that the amount in controversy in the above captioned matter exceeds the jurisdictional limits that said controversy arises between citizens of different states as is required by the aforementioned statute in order to invoke the "Diversity of Citizenship" jurisdiction of this Court.  Plaintiff also hereby invokes the pendent jurisdiction of this Court to hear and decide claims arising under state law.

9.     Venue is proper pursuant to 28 U.S.C. § 1391. The defendant has sufficient minimum contacts with Pennsylvania or otherwise intentionally avails itself of the consumer markets within Pennsylvania  through the promotion, sale, marketing and/or distribution of its products in the Commonwealth to render the exercise of jurisdiction by the Pennsylvania courts permissible under traditional notions of fair play and substantial justice.

## IV.   FACTUAL ALLEGATIONS

10.     At all times relevant and material hereto, defendant has conducted continuous and substantial business in the Commonwealth of Pennsylvania.

M007C74576

11.     At all times relevant and material hereto, the defendant Merck acted and gained knowledge itself and by and through its various agents, servants, employees, and/or ostensible agents.

12.     As more particularly pleaded below, plaintiff maintains that the pharmaceutical drug, Vioxx, is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings as to the dangers associated with its use.

13.     At all relevant times, defendant Merck was in the business of developing, researching, selling, distributing, designing, manufacturing, testing, evaluating, licensing, labeling, and/or marketing, either directly or indirectly through third parties or related entities, pharmaceutical drugs including Vioxx.

14.     At all relevant times, defendant Merck did in fact develop, research, sell, distribute, design, manufacture, test, evaluate, license, label, and/or market, either directly or indirectly through third parties or related entities, pharmaceutical drugs including Vioxx.

15.     Merck obtained FDA approval on Vioxx in approximately May, 1999 and began its distribution and sale throughout the United States in approximately May, 1999.  Vioxx is the brand name used by Merck to market and distribute Rofecoxib.

16.     Defendant concealed the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as critical for Merck and safety concerns over hypertension, thrombosis, anemia and/or cardiovascular events would have dramatically impacted Merck's competitive position in the market as compared to its competitor drug Celebrex (Celecoxib), which have been placed into the market by Merck's competitor Pharmacia and Pfizer some three months prior to the launch of Vioxx.

M007C74577

17.     Merck knowingly chose to market this product, despite its knowledge at product launch and its post-marketing data thereafter that use of Vioxx carries significant risk factors. These adverse effects were realized in Adverse Event Reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and one or more studies shortly after market launch which shows statistically significant increases in adverse cardio events among Vioxx users.

18.     During the years 2000-2002, the Plaintiff, LaDonna King, ingested Merck's drug Vioxx for treatment of arthritis / pain symptoms.

19.     As a direct and proximate result of the liability-producing conduct of defendant and the defective and unreasonably dangerous condition of its product Vioxx, the Plaintiff LaDonna King suffered physical injury and damage, including, but not limited to renal failure on or about March 2002.

20.     As a direct and proximate result of defendant's liability-producing conduct and defective product Vioxx: plaintiff has in the past and will in the future experience physical injuries, pain and suffering, loss of enjoyment of life, lost wages, lost earning capacity, medical expenses, medical monitoring expenses, embarrassment and humiliation, fright and apprehension, emotional distress, and other damages all of which are believed to be permanent.

## A.     Vioxx is a Non-Steroidal Anti-Inflammatory Drug ("NSAID") That Selectively Blocks the Production of Cyclooxygenase-2 ("COX-2")

21.     Vioxx is the brand name of Rofecoxib, one of a class of drugs called "prostaglandins," which work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain.

22.     Vioxx belongs to a class of drugs known as non-steroidal anti-inflammatory drugs or "NSAIDs" which are used to reduce pain. NSAIDs generally reduce pain by blocking the

M007C74578

production of an enzyme called prostaglandin G/H synthase, which consists of two similar forms, cyclooxygenase-1 ("COX-1") and cyclooxygenase-2 ("COX-2"). Vioxx is a selective inhibitor of COX-2. Vioxx reduces inflammation and pain by selectively blocking the production of COX-2.

23.     Other, older NSAIDs, which inhibit COX-1 as well as COX-2, also provide effective relief from pain and inflammation. Because COX-1 inhibition can adversely affect the gastrointestinal ("GI") tract, traditional NSAIDs have been associated with potentially serious GI toxicity, including perforations of the gastrointestinal lining of the gut, ulcers, and gastrointestinal bleeding.

24.     In the late 1980's and early 1990's, Merck was facing a crisis because patents on several of its major drugs-including Vasotec, Prinivil, Mevacor, Pepcid and Prilosec-were expiring.

a.     No pharmaceutical company had ever had this many billion-dollar drugs going off patent at approximately the same time.

b.     Merck management even feared that Merck might not survive as an independent company.

25.     In or about the summer of 1992, Merck began a COX-2 research program at the Merck Frosst Centre for Therapeutic Research in Quebec, Canada.

a.     Merck scientists explored the hypothesis that the therapeutic utilities of NSAIDs were due to inhibition of COX-2, whereas much of the toxicity of traditional NSAIDs resulted from inhibition of COX-1.

M007C74579

b.      At the time, Merck management recognized that a drug emerging from this program that reached the marketplace could become a much needed blockbuster. As the company has acknowledged, the race was on to find a selective inhibitor of COX-2.

26.      During 1992, it became clear that both DuPont and Taisho, a Japanese pharmaceutical company, had selective COX-2 inhibitors in development. Almost every one of the almost 300 scientists and support staff in the Merck Frosst Centre for Therapeutic Research worked on the discovery and development of Vioxx. After discarding one compound because it lacked sufficient selectivity for COX-2 and another because metabolic studies raised a question about its potential drug-drug interactions, Merck continued to research and develop the compound that became Vioxx.

27.      On or about December 20, 1994, Merck filed its first investigational new drug (IND) application with the FDA to conduct clinical trials of Vioxx in humans. The intended use of the drug under this IND was to treat osteoarthritis and acute pain.

28.      Following FDA approval of Vioxx in May 1999, Merck distinguished Vioxx as a selective COX-2 inhibitor, which unlike older NSAIDs, does not inhibit COX 1. Merck claimed that, since Vioxx was the most selective COX-2 inhibitor being marketed, it conferred the anti-inflammatory and analgesic benefits of older NSAIDs without their troublesome gastrointestinal toxicity. Accordingly, Merck claimed that Vioxx was the safest NSAID available on the market.

29.      For the more than five years Merck marketed it in the United States, Vioxx was Merck's leading drug for control of acute pain and chronic pain associated with osteoarthritis, rheumatoid arthritis, migraine headaches and dysmenorrheal pain.

M007C74580

30.     In 2003 alone, worldwide sales of VIOXX reached $2.5 billion dollars (U.S.), following the most impressive global sales growth for any drug.  From a marketing standpoint, Vioxx was an unqualified, if not unprecedented, success.  From a public safety standpoint, it was an unmitigated disaster. Vioxx's pre- and post-market history was perpetually plagued with safety concerns that Merck repeatedly ignored, concealed, or downplayed.

31.     The astonishing market success of Vioxx became so central to Merck's fortunes that Edward Scolnick, formerly President of Merck Research Laboratories in Rahway, New Jersey, stated that had the drug failed, Merck would have been a very different company.

32.     Despite the efforts of numerous health care professionals, Merck successfully downplayed and, in certain instances, concealed the fact that Vioxx significantly increased the risk of adverse thrombotic events, including devastating cardiovascular and cerebrovascular injuries such as myocardial infarctions (heart attacks) and strokes, until the drug was recalled in late September 2004.

33.     Because Vioxx, unlike other NSAIDs, inhibited COX-2 and not COX-1, it, among other things, created a homeostatic imbalance that could result in increased aggregation of blood platelets or blood clotting and thereby substantially increased the risk of catastrophic side effects such as heart attacks-both clinically recognized and unrecognized-cerebrovascular adverse events such as ischemic strokes, and other serious injuries.  Merck had reason to know and did know of these serious adverse events occurring in patients who ingested Vioxx.

## B.     Merck Knew of Vioxx's Cardiotoxic and Pro-Thrombotic Effects Before It Was Approved and Marketed

### 1.     Merck's Knowledge Dates From at Least November 1996

34.     Merck sought to market Vioxx as an alternative to older NSAIDs such as aspirin, which had frequently been associated with adverse gastrointestinal side effects.  As early as

M007C74581

November 1996, years before FDA approval of Vioxx in May 1999, Merck recognized that Vioxx, unless taken in conjunction with aspirin, posed a "substantial" risk of "significantly higher rates" of cardiovascular adverse events such as myocardial infarctions, strokes, and transient ischemic attacks because, as a "selective Cox-2 inhibitor", it lacked aspirin's "antiplatelet [i.e., anti-clotting] effect".

35.     In fact, very early in the development program for Vioxx, to demonstrate that it selectively inhibited COX-2, Merck used a platelet aggregation assay to assess its effects on COX-1. That work established that Vioxx did not affect thromboxane production or platelet aggregation because it did not inhibit COX-1. In addition, a Merck-sponsored study found that Vioxx, unlike several other NSAIDs against which it was tested, had no appreciable anti-platelet effect (Protocol 061).

36.     In February 1997, two months later, Merck researcher Briggs Morrison conceded that "without COX-1 inhibition you will get more thrombotic events and kill drug."

37.     Responding to this observation, a Merck colleague, Alise Reicin complained:

> This is a no win situation! The relative risk of [adverse GI events with] even low dose aspirin may be as high as 2-4 fold. Yet, the possibility of increased CV [cardiovascular] events is of great concern (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients-ie those that have already had an MI, CABG, PTCA.? This may decrease the CV event rate so that a difference between the two groups would not be evident. The only problem would be - Would we be able to recruit any patients?

38.     By early 1998, Merck's own clinical investigators, in fact, based on findings from a Merck-sponsored study (Protocol 023), advised the company that by inhibiting COX-2, Vioxx, at the cellular level of blood vessel linings, may alter the homeostatic balance between prostacyclin-a COX-2 platelet inhibitor that dilates blood vessels-and thromboxane-a COX-1

M007C74582

platelet activator that constricts blood vessels-such that it could provoke the creation of blood clots.

39.    In or about May 1998, six months before Merck filed its New Drug Application ("NDA") with the FDA, Merck's Scientific Advisory Board for the drug recommended that researchers "systematically collect data on cardiovascular (CV) events in all clinical trials" for VIOXX.  In issuing this recommendation, the Board noted that some of its consultants were concerned that "[b]ased on data on PGI [prostaglandin] metabolism obtained for Vioxx, it is conceivable that Vioxx could disturb the [endothelium-platelet] interaction to favor platelet aggregation."

40.    On or about November 23, 1998, Merck submitted a New Drug Application ("NDA") to the FDA for Vioxx 12.5 mg and 25 mg tablets to treat the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

41.    On or about May 20, 1999, the FDA approved Vioxx for the relief of the signs and symptoms of acute pain, dysmenorrhea and osteoarthritis, a chronic swelling and painful joint disease affecting one or more joints.

42.    By early 1998, Merck's own clinical investigators, in fact, based on findings from a Merck-sponsored study (Protocol 023), advised the company that by inhibiting COX-2, Vioxx, at the cellular level of blood vessel linings, may alter the homeostatic balance between prostacyclin-a COX-2 platelet inhibitor that dilates blood vessels-and thromboxane-a COX-1 platelet activator that constricts blood vessels-such that it could provoke the creation of blood clots.

43.    In or about May 1998, six months before Merck filed its New Drug Application ("NDA") with the FDA, Merck's Scientific Advisory Board for the drug recommended that

M007C74583

researchers "systematically collect data on cardiovascular (CV) events in all clinical trials" for VIOXX. In issuing this recommendation, the Board noted that some of its consultants were concerned that "[b]ased on data on PGI [prostaglandin] metabolism obtained for Vioxx, it is conceivable that Vioxx could disturb the [endothelium-platelet] interaction to favor platelet aggregation."

44.     Defendant Merck submitted an Application to Market a new Drug for Human Use ("NDA") for Rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-042 by the FDA.

45.     Defendant Merck also submitted an Application to Market a New Drug for Human Use ("NDA") for Rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for oral suspension, at doses of 12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of ost eoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-052 by the FDA.

46.     On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for Rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

47.     At the time the drug was approved by the FDA the labeling for Rofecoxib stated, in the section entitled "Special Studies - Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen

M007C74584

2400 mg daily.  However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

48.    The "Warnings" section of the labeling for Rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding, and Perforation."

49.    Defendant Merck submitted sNDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for Rofecoxib.  In conjunction with the sNDA, Defendant Merck performed the Vioxx GI Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxrn in Patients With Rheumatoid Arthritis: U.S, Cohort."  The VIGOR study was performed from January 6, 1999 through March 17, 2000.

50.    The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MD-0966 50 mg daily compared to patients in the group taking naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

**2)    The VIGOR Study Showed Significant Increases in Cardiovascular Events Occurring in Patients Taking Vioxx as Opposed to Naproxen**

51.    Signs of Vioxx's risk of serious adverse events emerged soon after Vioxx's approval.

52.    On or about November 18, 1999, Merck's senior biostatistician, Deborah Shapiro, provided a tightly controlled, highly confidential interim safety report to the VIGOR study's Data Safety and Monitoring Board (the "DSMB"), which showed that almost twice as many

M007C74585

serious cardiovascular events were occurring among patients taking Vioxx as those taking Naproxen.

53.     VIOXX manifested significantly more cardiovascular toxicity than Naproxen by the sixth week of the VIGOR study.

54.     In or about March 2000, Merck released the results of the VIGOR study.  The study data revealed, among other things, that Vioxx users suffered fives times as many heart attacks than their Naproxen counterparts. In addition, serious cardiovascular events (including heart attacks, ischemic strokes, unstable angina, and sudden unexplained death) were reported for more than twice as many Vioxx as Naproxen patients.

55.     At the time the drug was approved by the FDA the labeling for Rofecoxib stated, in the section entitled "Special Studies - Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily.  However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

56.     On March 9, 2000, shortly after completion of the VIGOR study, Edward M. Scolnick, formerly president of Merck Research Laboratories, concluded that the "CV [cardiovascular] events are clearly there" and stated that Merck should prepare to "make clear to the world" that Vioxx's cardiovascular toxicity "is a class effect" (i.e., an effect of the class of selective COX-2 inhibitors) that is "mechanism based as we worried it was" and as some of the company's consultants had maintained.

57.     Merck ignored the causal relationship between Vioxx and this significantly increased rate of cardiovascular events in the VIGOR study.  Instead, Merck seized upon and

M007C74586

widely and continuously disseminated the post hoc rationalization that the VIGOR study showed that Naproxen reduced cardiovascular risk (i.e., it exerted a "cardioprotective effects"), not that Vioxx posed a serious cardiovascular hazard.

58.     Merck continued to publish and describe that Naproxen had a cardioprotective effect, notwithstanding that Italian Pharmacologist Dr. Carlo Patrono, one of Merck's own consultants and an expert in the platelet effects of cyclooxygenase-inhibiting drugs (whom Merck regarded as "the world's most respected and knowledgeable" scientist in his field), advised Merck in March 2000, that the dramatic cardiovascular effects observed in the VIGOR study could not be attributed plausibly to Naproxen for several reasons.

59.     Furthermore, on or about March 24, 2000, University of Pennsylvania Pharmacologist Dr. Garrett Fitzgerald, then acting as a Merck consultant, advised Merck of a paper in press that included Naproxen among several NSAIDs which, in contrast to aspirin, had no significant effect on the incidence of first non-fatal myocardial infarctions in females in an epidemiological study.

60.     In or about January 2002, a study by Wayne A. Ray, et al. was published in *The Lancet* that disproved Merck's Naproxen theory, concluding that Naproxen and other NSAIDs had not been shown to protect against the risk of coronary heart disease.

61.     After the VIGOR study, evidence of the dangers of cardiovascular and cerebrovascular adverse events associated with Vioxx use continued to surface.

62.     In June of 2000, industry-sponsored studies presented at the European United League Against Rheumatism ("EULAR"), an organization in which Merck is a member and a corporate sponsor, showed that Vioxx use resulted in statistically significant increases in hypertension and myocardial infarctions.

63.     Merck knowingly downplayed and, in certain instances, withheld from publication, the severity of cardiovascular and cerebrovascular risks associated with Vioxx. For example, Merck downplayed this information in connection with the *New England Journal of Medicine's* November 2000 reporting regarding the VIGOR study, authored by Merck sponsored authors.

a.     Three myocardial infarctions, all in the Vioxx group of the VIGOR study, were not included by Merck in the data submitted to the *New England Journal of Medicine's* November 2000 report regarding the VIGOR study;

b.     The three unreported myocardial infarctions in the Vioxx group of the VIGOR study, were known to at least two of the authors at least two weeks before the authors submitted the first of two revisions of the *New England Journal of Medicine's* November 2000 report of the VIGOR study;

c.     The three unreported myocardial infarctions in the Vioxx group of the VIGOR study, were known to at least two of the authors at least four and a half months before the publication of *New England Journal of Medicine's* November 2000 report of the VIGOR study;

d.     At no time after the publication of *New England Journal of Medicine's* November 2000 report of the VIGOR study, did Merck report to the editors of the *New England Journal of Medicine* the three additional myocardial infarctions unreported in the original article published in November, 2000;

e.     At no time after the publication of *New England Journal of Medicine's* November 2000 report of the VIGOR study, did Merck attempt to publicize, disclose or reveal (outside of litigation) in any medical journal including the *New England Journal of Medicine* the three additional myocardial infarctions unreported in the original article published in November, 2000;

Page -15-

M007C74588

f.      On December 29, 2005, the editors of the *New England Journal of Medicine* (Gregory D. Curfman, M.D., Stephen Morrisey, Ph.D. and Jeffrey M. Drazen, MD) published an Editorial entitled "Expressions of Concern: Bombadier et al., "Comparison of Upper Gastrointestional Toxicity or Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis." N Egl. J. Med 200; 343:1520-8."

g.      Prior to the December 29, 2005 article by the editors of the *New England Journal of Medicine* (Gregory D. Curfman, M.D., Stephen Morrisey, Ph.D. and Jeffrey M. Drazen, MD) published an Editorial entitled "Expressions of Concern: Bombadier et al., "Comparison of Upper Gastrointestional Toxicity or Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis." N Egl. J. Med 200; 343:1520-8, there was no public disclosure (outside of litigation) by defendant in any medical journal including the *New England Journal of Medicine* the three additional myocardial infarctions unreported in the original article published in November, 2000.

h.      The fact that the three unreported myocardial infarctions in the Vioxx group of the VIGOR study were not included in the publication of *New England Journal of Medicine's* November 2000 report of the VIGOR study, made certain calculations and conclusions in the article incorrect.

i.      The fact that the three unreported myocardial infarctions in the Vioxx group of the VIGOR study were not included in the publication of *New England Journal of Medicine's* November 2000 report of the VIGOR study, resulted in an understatement of the difference in risk of myocardial infarctions between the Vioxx and Naproxen Groups in the VIGOR study;

j.      Other data on cardiovascular adverse events were deleted from the VIGOR manuscript by defendant, or defendant's employees or agents, two days before it was initially submitted to the *New England Journal of Medicine* on May 18, 2000.

M007C74589

k.      In the December 29, 2005 article by the editors of the *New England Journal of Medicine* (Gregory D. Curfman, M.D., Stephen Morrisey, Ph.D. and Jeffrey M. Drazen, MD) published an Editorial entitled "Expressions of Concern: Bombadier et al., "Comparison of Upper Gastrointestional Toxicity or Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis." N Egl. J. Med 200; 343:1520-8," the editors ask the authors of the publication of *New England Journal of Medicine's* November 2000 report of the VIGOR study, to submit a correction to the *New England Journal of Medicine.*

64.     On or about May 22, 2001, Merck issued a press release through PR Newswire touting and "reconfirm[ing] the favorable cardiovascular safety profile of Vioxx."

65.     In a warning letter it issued four months later, the FDA, severely rebuking Merck, advised that:

> your claim in the [May 22, 2001] press release that Vioxx has a 'favorable cardiovascular safety profile,' is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to Naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDS is misleading; in fact, serious cardiovascular events were twice as frequent in the VIOXX treatment group (101 events, 2.5%) as in the Naproxen treatment group (46 events, 1.1%) in the VIGOR study.

66.     On or about August 29, 2001, the JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukhisjee, et al., showing what Merck had concealed that the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in Merck's trials, including VIGOR, at 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen

M007C74590

users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. *See* Mukhisjee, D., et al., *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, J.A.M.A. 286:8, 954-959, Aug. 22/29, 2001. In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users.

67.     In the JAMA study, the authors stated that "by decreasing PG12 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PG12, potentially leading to an increase in thrombotic cardiovascular events." *Id.* at 957. In a follow-up peer reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor "tips the balance of prostacyclin/thromboxane in favor of thromboxanne, leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M., *Why Do Cyclo-Oxygenase-2 Inhibitors Ca use Cardiovascular Events?*, J.A.C.C., 39:3, Feb. 6, 2002. This is further supported by studies completed at the University of Pennsylvania. Cheng, Y., et al., *Role of Prostacyclin in the Cardiovascular Response to Thromboxanne* A2, JOURNAL OF SCIENCE, v. 296:539-541, Apr. 19, 2002.

68.     One day before, and in anticipation of publication of, the JAMA article, Merck issued a statement claiming: "We have additional data beyond what they cite, and the findings are very, very reassuring. VIOXX does not result in any increase in cardiovascular events compared to placebo."

69.     On or about August 23, 2001, the day after the JAMA article was published, Merck stated in another press release: "The Company stands behind the overall and cardiovascular safety profile of VIOXX."

M007C74591

70.     In or about 2002, the FDA approved an additional indication for the use of Vioxx for the relief of the signs and symptoms of rheumatoid arthritis in adults, which affects more than two million additional Americans.

## C.     Merck Pursued an Aggressive and Misleading Marketing Campaign

71.     Merck persistently failed to advise the medical community and patients of serious cardiovascular and cerebrovascular adverse events occasioned by the use of Vioxx.

72.     Merck's' marketing strategy began in the 1990s.  Merck began to aggressively market and sell Vioxx by falsely misleading potential users such as the consumer Plaintiff and members of the Class about the product and by failing to protect the consumers from serious dangers which Merck knew or should have known would result from the drug's use.

73.     Merck wildly and successfully blitz-marketed Vioxx in the U.S. by undertaking an advertising campaign extolling the virtues of Vioxx in order to induce widespread use of Vioxx.  This direct-to-consumer advertising campaign consisted of advertisements, promotional literature to be placed in the offices of doctors and other health care providers and HMOs, and promotional materials provided directly to potential Vioxx users themselves.

74.     The advertising campaign as a whole sought to create the image, impression and belief that the use of Vioxx was safe, had fewer side-effects and adverse reactions than other pain relief medications and would not interfere with daily life, even though Merck knew that these representations were false.  Furthermore, Merck had no reasonable grounds to believe that any of these representations were true.

75.     Merck engaged in a huge direct-to-consumer marketing scheme and failed to address these serious side effects with consumers until after Vioxx was withdrawn from the

M007C74592

market.   According to reports in the public press, Merck spent an estimated $45 million advertising Vioxx for a mere eight months in 2004.

76.   In the television advertising directed to consumers, Merck advertised Vioxx by having Dorothy Hamill appear on the screen and say:

> It seems like only yesterday.  When I started skating at 8 years old - I never thought I'd experience the thrill of winning a medal.
>
> With all the great memories has come another thing I thought I'd never experience - the pain of osteoarthritis.
>
> Vioxx is here, a prescription medicine for osteoarthritis pain.
>
> With one little pill a day Vioxx can provide powerful super 24 hour  . . . relief.  Vioxx specifically targets only the COX 2 enzyme.
>
> A key source of arthritis pain.  Super.  See our ad in Prevention. People with allergic reactions such as asthma to aspirin - see our ad in Prevention - or other arthritis medicines should not take Vioxx.
>
> In rare cases, serious stomach problems such as bleeding can occur without warning.
>
> Tell your doctor, if you have liver or kidney problems.
>
> For more information [superimpose] 1-888-36VIOXX talk to your doctor about once daily Vioxx for the relief of osteoarthritis pain.
>
> Perhaps my biggest victory is able to plan my day around my life -and not my pain [superimpose] Your results may vary.
>
> Ask your doctor if Vioxx is right for you.
> Vioxx for every day victories.

77.   In print advertisements, Merck advertised Vioxx by picturing Dorothy Hamill accompanying the statement:

> Along with all the great memories has come something I thought I'd never experienced - the pain of osteoarthritis.

Page -20-

M007C74593

The advertisements continued:

VIOXX is here.  24 hour relief of the most common type of arthritis pain, osteoarthritis.
It isn't about going for a medal.  Or feeling like a kid again.  It's about controlling the pain that can keep you from doing everyday things.  And VIOXX may help.  VIOXX is a prescription medicine for osteoarthritis, the most common type of arthritis.

ONE PILL - ALL DAY AND ALL NIGHT RELIEF.

You take VIOXX only once a day.  Just one little pill can relieve your pain all day and all night for a full 24 hours. . . .

VIOXX EFFECTIVELY REDUCED PAIN AND STIFFNESS.

In clinical studies, one daily VIOXX effectively reduced pain and stiffness.  So VIOXX can help make it easier for you to do the things you want to do.  By going for a morning glide on the ice.

TAKE WITHOR WITHOUT FOOD.

VIOXX doesn't need to be taken with food.  So you don't have to worry about scheduling VIOXX around meals.

IMPORTANT INFORMATION ABOUT VIOXX.

People with allergic reactions, such as asthma, to aspirin or other arthritis medicines should not take VIOXX.  In rare cases, serious stomach problems, such as bleeding can occur without warning. Tell your doctor if you have liver or kidney problems, or are pregnant.  Also, VIOXX should not be used by women in late pregnancy. VIOXX has been extensively studied in large clinical trials.  Commonly reported side effects include upper respiratory infection, diarrhea, nausea and high blood pressure.  Report any unusual symptoms to your doctor.  ASK YOUR DOCTOR OR HEALTHCARE PROFESSIONAL ABOUT VIOXX.  CALL 1 800 9MERCK8 FOR MORE INFORMATION, OR VISIT VIOXX.COM.   PLEASE SEE IMPORTANT ADDITIONAL INFORMATION BELOW.

78.     These direct-to-consumer advertisements make absolutely no mention of any risk

of Vioxx's association with cardiovascular disease or cerebrovascular disease, notwithstanding

M007C74594

that Merck had reason to know and, in fact, did know that Vioxx was causally related to serious cerebrovascular and cardiovascular adverse side effects.

79.     At all times relevant, Vioxx had been promoted, marketed, and advertised by Merck directly to consumers and to medical care providers as a safe and effective pain reliever, similar to NSAIDs such as Advil (ibuprofen) and Aleve (naproxen), but without any of the known side effects of other NSAIDs, most notably NSAID-induced GI toxicity. Merck advertised, marketed and promoted Vioxx as a safe alternative that, unlike other NSAIDs, did not damage the mucus membrane of the gut.

80.     Medical care providers and consumers relied on Merck's promises that Vioxx was a safe alternative, easy to use, and perfect for long term use for "all day and all night relief" of pain. As a result, Merck sold millions of prescriptions of Vioxx in the United States.

81.     Sales of Vioxx soared to $2.5 billion dollars in 2003 alone on the strength of the biggest direct-to-consumer marketing campaign ever undertaken by a pharmaceutical company for a prescription medication.

82.     Merck purposefully misrepresented, understated and otherwise downplayed the serious health hazards and risks associated with protracted Vioxx use - precisely the use for which Vioxx was most often prescribed and, in fact, was intended.

83.     Merck through the Vioxx promotional literature, audio conferences, professional meetings, press releases, and advertisements deceived Plaintiff, the members of the Class, potential consumers and the medical community by relaying positive information, including testimonials from satisfied consumers; manipulating the statistics to suggest widespread acceptability and safety of the product; and intentionally understating the known adverse and serious health risks associated with the use of Vioxx.

M007C74696

84.     Merck concealed materially relevant information from potential Vioxx consumers and healthcare providers, and minimized user and prescriber concerns regarding the safety of Vioxx, while knowing that this materially relevant information was critical to the care of the consumers provided by health care providers.

85.     Merck falsely misrepresented, among other things:

      a.     The severity, frequency and nature of adverse health effects caused by Vioxx;

      b.     That adequate testing had been conducted concerning Vioxx; and,

      c.     That accurate information was reported about the adverse events.

**3)     The FDA Issued A Warning Letter on September 17, 2001, Indicating <u>that Merck Had Engaged in "False or Misleading" Promotion of Vioxx</u>**

86.     On or about December 16, 1999, less than seven months after it approved Vioxx, the FDA informed Merck by letter that it had engaged in "false or misleading" promotion of Vioxx.  Specifically, the FDA concluded that Merck misrepresented (1) the drug's "safety profile" by claiming that it was "safer than a placebo" and (2) the drug's efficacy through "unsubstantiated" comparisons to the COX-2 inhibitor Celebrex and other NSAIDs.

87.     Thereafter, Merck's conduct continued to be so egregious that the FDA issued a "Warning Letter" to Merck on or about September 17, 2001 (hereinafter the "Warning Letter"), which demanded that Merck correct the false and misleading messages contained in the promotional campaign for Vioxx, the Vioxx press releases, and the oral representations made by Merck sales representatives to promote Vioxx.  The Warning letter was from Thomas W, Abrams, R .Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and

M007C74596

Communications to Raymond V. Gilmartin, President and CEO of Defendant Merck, relating to

"promotional activities and materials for the marketing of Vioxx (Rofecoxib) tablets."

88.     The Warning Letter stated that Merck had "engaged in a promotional campaign

for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in

the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the

safety profile for Vioxx." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the
> VIGOR study, patients on Vioxx were observed to have a four to five fold
> increase in myocardial infarctions (MIs) compared to patients on the
> comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn
> (naproxen).

89.     The Warning Letter delineated the following misrepresentations made in

six promotional audio conferences presented on behalf of Merck by Peter Holt, M.D., which

were moderated by Merck employees; in Merck press releases; and in oral representations made

by Merck sales representatives to promote Vioxx. According to the Warning Letter:

a.     Merck, its agents, employees and representatives minimized the rate of

myocardial infarctions.  For example, in a June 21, 2000, audio-conference, Merck began the

discussion of the myocardial infarction rates observed in the VIGOR study by stating: "when

you looked at the MI rate, the rate was different for the two groups. The MI rate for VIOXX was

0.4 percent and if you looked at the Naproxen arm it was 0.1 percent, so there was a reduction in

the MI's in the Naproxen group." Merck offered what purported to be a scientific explanation,

when, in fact, it was purely hypothetical. DDMAC wrote that, as Merck knew, it was misleading

to assert:

> that VIOXX does not increase the risk of [heart
> attacks] and that the Vigor finding is consistent with
> Naproxen's ability to block platelet aggregation like
> aspirin.  That is a possible explanation, but you fail

M007C74597

to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that VIOXX may have pro-thrombotic properties.

b.      Merck knew that the promotional statement was false because the reason for the difference between the MI outcomes for the Vioxx users versus the naproxen users had not yet been determined;

c.      Merck carefully excluded from the promotional literature materially relevant information that Vioxx may have pro-thrombotic properties;

d.      DDMAC reprimanded Merck for understating the rate of myocardial infarctions. Merck had claimed that the MI rate was 0.2 percent for naproxen and 0.1 percent for Vioxx, which was completely inaccurate. DDMAC wrote:

> Contrary to [Merck's] claim that there was a higher rate of MIs in the naproxen group compared to the VIOXX group, the MI rate for VIOXX in this subpopulation was 12 MIs among 3877 patients (0.3%) as compared to 4 MIs among 3878 patients (0.1%) for naproxen.

e.      DDMAC reprimanded Merck for falsely claiming that the MI rate associated with the use of Vioxx was "basically the same as" the crude MI rate in the Celebrex study known as CLASS (Celebrex Long-Term Arthritis Safety Study);

f.      DDMAC reprimanded Merck for misrepresenting claims regarding the efficacy of Vioxx as compared to its competitor Celebrex. When publicly comparing the VIGOR study to the CLASS study, Merck failed to inform consumers that the patient populations in the two studies were extremely different. The VIGOR study excluded patients who had angina or congestive heart failure with symptoms that occurred at rest or with minimal activity as well as patients taking aspirin or other antiplatelet agents, all of which, if anything, should have made

M007C74598

Vioxx appear to present less cardiovascular toxicity. The CLASS study did not exclude these patients, therefore, making it more likely that the CLASS trial included patients with a higher risk for myocardial infarctions prior to their ingestion of Celebrex. Nevertheless, Merck improperly compared two studies to misrepresent that Vioxx was more effective and safer than Celebrex;

     g.     Merck failed to point out that the more affordable alternative, naproxen, had been statistically proven to produce half as many myocardial infarctions as Vioxx. These misrepresentations and omissions were made not only at the promotional audio conferences in June of 2000, but also at the annual meeting of the American Society of Health-Systems Pharmacists ("ASHP") in Los Angeles, California, on June 3 through June 6, 2001;

     h.     DDMAC reprimanded Merck for making false statements about the risks of Vioxx therapy in patients who were taking warfarin. For example, at an audio conference on June 16, 2000, Merck stated:

> . . . if you look at the thromboembolic agents, it's very clear that these selective COX 2 inhibitors [of which VIOXX is a member] have the benefit of not having platelet aggregation and bleeding time, and therefore, can be used safely in terms of post-op and with Coumadin.

> This statement is directly contradicted by the precaution in the Product Insert, reprinted in the Physicians Desk Reference ("PDR"), which states: " . . . in post-marketing experience, bleeding events have been reported, predominantly in the elderly, in association with increases with prothrombin time in patients receiving VIOXX concurrently with warfarin."

     i.     DDMAC rebuked Merck for its false and misleading marketing: Merck's promotional audio conferences and sales representative presentations failed to present the serious

M007C74599

and significant risks associated with Vioxx use.   They failed to state that Vioxx is contraindicated in patients who have experienced asthma, urticaria, or allergic type reactions after taking aspirin or other NSAIDS.

90.     On April 11, 2002, the FDA approved a supplemental application for the use of Vioxx (Rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain.  The FDA also approved new labeling, a "Dear Doctor" letter, and a new patient package insert.  The labeling and the "Dear Doctor" letter contained information concerning the results of the VIGOR study.

91.     The revised labeling further states that the administration of Vioxx 50 mg, was associated with a higher incidence of gastrointestinal symptoms as follows:

> **Clinical Studies in OA and RA with Vioxx 50 mg (Twice the highest dose recommended for chronic use)**
>
> In OA and RA clinical trials which contained VIOXX 12.5 or 25 mg as well as VIOXX 50 mg, VIOXX 50 mg OD was associated with a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn, nausea and vomiting), lower extremity edema, hypertension, serious* adverse experiences and discontinuation due to clinical adverse experiences compared to the recommended chronic doses of 12.5 and 25 mg [See DOSAGE AND ADMINISTRATION].

92.     Further, the "Dear Doctor" letter approved in conjunction with the revisions to the Vioxx labeling, outlines the changes to the Vioxx labeling.

93.     The revised "Patient Information" sheet does not add any information about the results of the VIGOR study."

94.     The "Patient Information" sheet is the only written document that is provided to a patient for whom Vioxx is prescribed.

M007C74600

95.   Both the initial labeling and the revised labeling are ineffective because they do not properly advise physicians and patients of the potential gastrointestinal and prothrombotic side effects of Vioxx.

96.   Despite knowledge of the ineffectiveness of the warnings, and despite knowledge that Vioxx may cause serious side effects, Merck has concealed and/or downplayed the dangers associated with Vioxx, and continues to market the drug in the United States and abroad.  In its 2001 Annual Report, for example, Merck states:

> The Company also notes that a number of the federal and state lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to Vioxx  .  .  .   The lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events.  The Company believes that these lawsuits are completely without merit and will vigorously defend them.

97.   Further, in its January 23, 2001 8-K filing with the Securities and Exchange Commission, Merck fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

> "Our results reflect the strength of our growth strategy," Mr. Gilmartin said.   "Our five key products, **VIOXX**, ZOCOR, COZAAR/HYZAAR*, FOSAMAX and SINGULAR, drove Merck's performance for the year created a powerful platform for growth."   These products accounted for 57% of Merck's worldwide human health sales for 2000 and 61% for the fourth quarter.

> "Each of the five medicines offers unique competitive advantages, " Mr. Gilmartin said.  **VIOXX**, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain.   Since its extraordinarily successful 1999 launch, **VIOXX** has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck;s second largest-selling medicine.   In the United States, **VIOXX** now accounts for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to market in this class in the

M007C74601

United States. **VIOXX** achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.

A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR Study. This 8,000-patient gastrointestinal outcomes research study, in which **VIOXX** reduced the risk of serious gastrointestinal complications by half compared to the NSAID naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that **VIOXX** significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

98. Despite the foregoing, Merck continued to represent to consumers that Vioxx is safe, and that any cardiovascular and/or cardiothrombotic side effects are not associated with the drug. Merck has downplayed any potential gastrointestinal side effects of the drug, promoting it is safer and more efficacious than other medications approved for treatment of similar conditions.

99. At all times relevant to this litigation, Merck had a significant market share based upon claims of Vioxx's efficacy, a very aggressive marketing program which included financial incentives to sales teams, infusion of some 700 new sales representatives and a massive direct-to-consumer advertising and physician sampling program.

100. As a result of such marketing, Vioxx gained a significant market share in competition with Celebrex that Merck would not have gained if Merck had not suppressed information about Vioxx and/or made false representations of Vioxx's superiority and efficacy.

101. If Merck had not engaged in this conduct, prescribers such as Plaintiff's prescriber would not have prescribed Vioxx in patients, such as the Plaintiff, would have switched from Vioxx to safer products or would have refrained wholly from any use of Vioxx.

M007C74602

102.    From approximately 1999 through the present, Merck continued to engage in a common scheme in marketing, distributing and/or selling Vioxx under the vise that it was safe and efficacious for persons such as Plaintiff before, during and after Plaintiff experienced his confirmed heart attack.

103.    Plaintiff alleges that the suppression of this information constituted a common scheme by Merck to conceal material information from plaintiff.

104.    Plaintiff alleges that the marketing strategies, including without limitation, the detail and sampling program and direct-to-consumer advertising, of the defendant targeted plaintiff to induce plaintiff to purchase Vioxx.  At the time that Merck distributed, manufactured and marketed Vioxx, defendant intended that plaintiff would reply on the marketing, advertising and product information propounded by Merck.

105.    The actions of Merck in failing to warn of the clear and present danger posed to others by the use of its drug Vioxx in suppressing evidence relating to this danger, and in making deliberate and misleading misrepresentations of fact to minimize the danger or to mislead prescribers and patients as to the true risk, constitutes such clear, blatant and outrageous conduct as to warrant the imposition of exemplary damages against the Merck. Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping profits obtained through its non-disclosure and concealment. Merck's massive advertising and sampling program and gained continued increases in the market share, which enhanced Merck's financial stability to the detriment of its consumers. As a result of Merck's scheme, it reaped more than $2 billion in profit in the year 2000 alone, and appropriated approximately 23 percent share of the market.

M007C74603

### D.   Adverse Events Continued to Occur Because of Vioxx Use, and Merck Continued to Deny Vioxx's Dangers

106.   According to the FDA Adverse Event Reporting System (ERS), through October, 2003, almost 2,000 adverse cardiovascular events were experienced by Vioxx users, including myocardial infarctions, cardiac arrest and cardiac failures.

107.   On October 30, 2002, the Wall Street Journal reported that another study, sponsored by Merck, presented at the annual meeting of the American College of Rheumatology, confirmed an increased "risk of heart attacks in patients taking the pill [Vioxx]."   According to the Wall Street Journal article, within the first 30 days of taking Vioxx, the risk of heart attack was increased 30% as compared to patients taking Celebrex.

108.   In or about November 2003, Merck received preliminary results of a study it had commissioned performed by Merck personnel and Alex Walker, an executive at the Ingenix unit of United Health Group.   The study revealed a statistically significantly greater incidence of myocardial infarction or unstable angina pectoris associated with use of Vioxx compared to the NSAIDs ibuprofen or diclofenac.   The risk did not vary significantly by duration, use, or dose. Merck never revealed the existence, much less the results of this study, prior to its withdrawal of Vioxx from the market in late September 2004.

109.   In August 2004, Health Day News quoted the FDA as finding "this [the study referenced in the Wall Street Journal, *supra.* 54] and other studies cast serious doubt on the safety" of Vioxx and that Celebrex "may be safer."

110.   However, shortly after the August 24, 2004, FDA statement, Peter S. Kim, President of Merck Research Laboratories was quoted as saying that Merck "strongly disagrees" with the findings of this new study.

111.   On August 26, 2004, the Street.com reported:   "Merck Thursday released a detailed critique questioning the studies' significance."

**E.     Merck Finally Withdrew Vioxx from the Market in Response to Preliminary Results from its APPROVe Study**

112.   On or about November 8, 1999, Merck submitted an IND application to the FDA to conduct clinical trials of Vioxx to pursue a claim that Vioxx was effective in preventing colon polyps and ultimately colon cancer.

113.   Merck undertook another clinical study called the Adenomatous Polyp Prevention on Vioxx ("APPROVe") trial of Vioxx, 25 mg/day, to try to demonstrate the drug's effectiveness in preventing colon polyps.

114.   At its first meeting in or about January 2002, the External Safety Monitoring Board ("ESMB") for the APPROVe trial voiced concerns regarding "trends noted in serious adverse clinical events and in thromboembolic events."

115.   On or about September 17, 2004, the ESMB noted that "the trend for excess risk" for heart attacks and strokes "has continued to grow at each meeting over the last 1-2 years." Consequently, the ESMB recommended that participating patients in APPROVe be instructed to discontinue the study treatment.

116.   On or about September 27, 2004, Merck advised the FDA of the ESMB's recommendation.

117.   On or about September 28, 2004, Merck informed the FDA that it was withdrawing Vioxx from the market.

118.   On September 30, 2004, Merck disclosed the outcome of the APPROVe study and announced that it was withdrawing Vioxx from the market after the ESMB overseeing the study recommended that it be halted prematurely because it had implicated the drug in a

M007C74605

statistically significant increased risk of confirmed cardiovascular events-principally heart attacks and strokes-in patients taking Vioxx compared to those ingesting a placebo.

119.    Merck claims that the APPROVe study did not show a difference between the incidence of cardiovascular injuries until after 18 months of exposure. However, Merck has concealed from the public its internal analysis showing that, in fact, there was a higher incidence of such injuries in the Vioxx group in BOTH the 0 to 18 months and 19-36 months exposure periods, when all events reported by the clinical trial investigators are considered. Merck included this data in a January 2005 draft of the APPROVe study, but excluded it from the published version a month later. Thus, contrary to the statements Merck has repeatedly made to the public and the FDA, the APPROVe data actually show that Vioxx is dangerous in both the shorter and longer term users.

120.    Merck's prior claims of Naproxen cardioprotectivity in the VIGOR study are irrelevant to the APPROVe results, and instead APPROVe reinforces the conclusion that the VIGOR results were due to Vioxx cardiovascular toxicity rather than supposed protection by Naproxen.

121.    In APPROVe, the relative risk for adverse cardiovascular events for Vioxx patients already at heightened cardiovascular risk was particularly high. For example, Vioxx patients with a history of symptomatic atherosclerotic cardiovascular disease were approximately 9 ½ times more likely to suffer such events than their placebo counterparts, and those with a history of diabetes were approximately 6 times more likely to experience such events than patients in the placebo arm.

122.    More specifically, APPROVe showed a statistically significant Relative Risk of 2.80 for the cardiovascular events category including fatal and non-fatal MI, sudden death due to

M007C74606

cardiac causes, and unstable angina; and an overall statistically significant relative risk of 1.92 for all events analyzed, including those referenced above, as well as stroke, trans-ischemic attack (TIA), and peripheral thrombotic events.

123.    Relative Risks of this magnitude are almost unheard of in the annals of epidemiology, and they are indicative of both a clear cause-and-effect relationship confirming that Vioxx is a highly hazardous and toxic chemical substance/drug/product. Indeed, the Vioxx Relative Risk of 9.59 is comparable to the Relative Risk for  lung cancer among cigarette smokers versus nonsmokers. *See, e.g.,* Centers for Disease Control, *MMWR* August 27, 1993, indicating Relative Risk of 11.9 for smokers versus non-smokers as to cancers of the trachea, lung and bronchus.

124.    Even at super-therapeutic doses, no other pain reliever of any kind has ever been reported to have a Relative Risk anywhere close to those found for Vioxx and Cardiovascular disease among high risk patients in APPROVe, again distinguishing Vioxx as the most dangerous drug in its class.

125.    Because of the under-diagnosis of the high-risk conditions associated with the most severe risks of Vioxx, the drug inevitably results in its use by the very population most at risk. Patients with prior heart attacks provide a prime example of those at greatest risk of Vioxx' harmful effects, yet who could not be protected from exposure due to under-diagnosis. It is well established and generally accepted that 25 to 30% of all heart attacks are "silent" or "unrecognized" myocardial infarctions (MI's). The Framington Heart Study, 1980; *Harvard University Press,* Cambridge, MA; *Circulation,* 63:500-515; 1981 - *JAMA* 257: 2176-2180; 1987. Thus, large numbers of patients with such unrecognized high-risk backgrounds could not be identified by even the most diligent treating physicians, and these doctors would have no way

M007C74607

to know that such patients had a prior MI that would disqualify them from exposure to Vioxx, another risk factor for MI.

126.    Other under diagnosed conditions are also important. For example,  the prevalence of diabetes is of epidemic proportions in the U.S., and the condition often goes undiagnosed for years. *See, e.g.,* Centers for Disease Control, *MMWR* September 5, 2003, "Prevalence of Diabetes and Impaired Fasting Glucose in Adults-- 1999-2000," indicating that 29% of all diabetes cases are undiagnosed. Chronic atherosclerosis can  remain silent even when the condition has reached a severe stage that would increase the danger of  a drug that promotes cardiovascular disease. All of these undiagnosed, high-risk patients require the imposition of extensive, diagnostic testing that could never be implemented in the real world of cost-conscious medical practice.

127.    In February, 2005, Merck participated in the FDA Arthritis Drug Advisory Committee hearings.

128.    Significantly, the super-elevated Relative Risk described above were known to Merck well before the February 2005 Advisory Panel hearings, yet these Relative Risks were never mentioned during any presentations to the Panel, nor were they ever discussed by Panel members in the published record.

## COUNT I
## NEGLIGENCE

### Plaintiff vs. Merck & Company, Inc.

129.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

M007C74608

130.    Defendant, directly or indirectly negligently manufactured, designed, tested, labeled, packaged, distributed, promoted, marketed, advertised, or sold Vioxx (Rofecoxib) in the stream of commerce, when it knew, or in the exercise of ordinary care, should have known that Vioxx posed a significant risk to Plaintiff's health and well-being, which risk was not known to Plaintiff or her prescriber.

131.    Despite the numerous studies and clinical trials showing an increased risk of cardiovascular side effects, Defendant, Merck & Company, Inc., continued to represent to consumers that Vioxx was safe and that any cardiovascular and/or cardiothrombotic side effects were not associated with the drug. The Defendant also downplayed potential cardiovascular side effects of the drug, promoting it as safer and more efficacious than other medications approved for treatment of similar conditions.

132.    Defendant knew, or in the exercise of reasonable care, should have known, that the aforesaid product was of such a nature that if not properly manufactured, labeled, tested, and inspected before sold, the product was likely to cause injury to the product's user.

133.    At all times material hereto, Defendant had a duty to Plaintiff to exercise reasonable care in the design, testing, labeling, packaging, distribution, promotion, marketing, advertisement, sampling or sale of Vioxx.

134.    Defendant breached its duty and was negligent in its actions, misrepresentations, and omissions toward Plaintiff in that the Defendant:

a.      failed to use reasonable care to design an arthritis drug (Vioxx) that was safe for its intended and foreseeable uses, not defective, and not unreasonably dangerous;

b.      failed to use reasonable care in designing and manufacturing an Vioxx so as to make it safe for its intended uses, not defective, and not unreasonably dangerous;

M007C74609

c.      failed to use reasonable care to adequately warn foreseeable users such as Plaintiff of the dangers of using Vioxx, including, but not limited to adverse cardiac events;

d.      failed to use reasonable care to make reasonable tests, inspections, drug trials, and/or evaluations necessary to discover such defects and unreasonably dangerous conditions associated with defendant's Vioxx;

e.      failed to comply with and/or to use reasonable care to comply with standards of care including accepted industry standards, FDA recommendations, government regulations, statutes, in the design, manufacture, affixing of warnings, and otherwise production and distribution of defendant's Vioxx;

f.      failed to use reasonable care to timely remove and/or recall from the market, retrofit, and/or otherwise prevent the continued contact of Plaintiff or persons like Plaintiff with such defects and unreasonably dangerous conditions of Vioxx;

g.      failed to use reasonable care to investigate and/or use known and/or knowable reasonable alternative designs, manufacturing processes, and/or materials for Vioxx;

h.      failed to use reasonable care to warn Plaintiff of dangers known and/or reasonably suspected to Defendant to be associated with Vioxx;

i.      failed to use reasonable care to make Vioxx safe;

j.      failed to timely use reasonable care to discover the dangerous conditions or character of defendant's Vioxx:

       i.      failed to use due care in the design, testing and manufacturing of Vioxx so as to prevent the aforementioned risks, including myocardial infarction and stroke, to individuals when Vioxx was used as a medication for arthritis and other pain;

M007C74610

      ii.    failed to issue proper warnings regarding all possible adverse side effects associated with the use of Vioxx and the comparative severity and duration of such adverse effects, despite the fact the Defendant knew, or should have known that numerous case reports, adverse event reports, and other data that associated Vioxx with myocardial infarction and stroke;

    k.    failed to conduct adequate pre-clinical testing and post-marketing surveillance to determine the safety of Vioxx;

    l.    failed to provide adequate training and information to medical care providers for the appropriate use of Vioxx;

    m.    failed to warn Plaintiff and healthcare providers, prior to actively encouraging and promoting the sale of Vioxx, either directly, or indirectly, orally, in writing, or other media about the following:

      i.    The adverse side effects associated with the use of Vioxx, including, but not limited to myocardial infarction and stroke; and,

      ii.    The possibility of becoming disabled as a result of using Vioxx, and

    n.    failed to timely develop and implemen t a safer, alternative design of Vioxx, which would meet the same need without the known risks associated with Vioxx and which would not have made the product too expensive to maintain its utility.

    135.    Despite the fact that Defendant knew, or reasonably should have known, that Vioxx caused unreasonable and dangerous side effects, including, but not limited to myocardial infarction and stroke, which many users would be unable to remedy by any means, Defendant continued to promote and market Vioxx to consumers, including Plaintiff, without warning

M007C74611

Plaintiff of these side effects, when safer, alternative pharmaceutical agents for the treatment of arthritis and muscular pain symptoms were available.

136.    Defendant knew or should have known that Vioxx caused unreasonably dangerous risks and serious side effects, of which Plaintiff would not be aware. Defendant nevertheless advertised, marketed, sold and distributed the drug knowing that there were safer methods and products.

137.    As a direct and proximate result of the negligence and breach of Defendant, Plaintiff sustained serious injury.  Defendant owed a duty to Plaintiff to use reasonable care in its actions. Defendant's failure to use reasonable care proximately caused Plaintiff's injuries.

138.    As a direct and proximate result of Defendant's negligence, Plaintiff were harmed as aforesaid.

## COUNT II
## NEGLIGENCE *PER SE*

### Plaintiff vs. Merck & Company, Inc.

139.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

140.    At all times mentioned herein, Defendant had an obligation not to violate the law, in the manufacture, design, formulation, compounding, testing, production, processing, assembling, inspection, research, distribution, marketing, labeling, packaging preparation for use, sale and warning of the risks and dangers of the aforementioned product.

141.    At all times herein mentioned, Defendant violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. Section 301, *et seq.*, related amendments and codes and federal regulations provided thereunder, and other applicable laws, statutes and regulations.

M007C74612

142.    Plaintiff, as a purchaser and consumer of the product, is within the class of persons the statutes and regulations described above are designed to protect, and the injuries alleged herein are the type of harm these statutes are designed to prevent.

143.    Defendant's acts constitute an adulteration and/or misunderstanding as defined by the Federal Food, Drug and Cosmetics Act, 21 U.S.C. § 331, and constitutes a breach of duty subjecting Defendant to civil liability for all damages arising therefrom, under theories of negligence *per se.*

144.    Defendant failed to meet the standard of care set by the applicable statutes and regulations, which were intended for the benefit of individuals such as Plaintiff, making Defendant negligent *per se*: (a) the Labeling lacked adequate information on the use of the drug Vioxx; (b) the labeling failed to provide adequate warnings of severe and disabling medical conditions as soon as there was reasonable evidence of their association with the drug; (c) there was inadequate information for patients for the safe and effective use of Defendant's drug; (d) there was inadequate information regarding special care to be exercised by the doctor for safe and effective use of Defendant's drug; and (e) the labeling was misleading and promotional.

145.    As a result of the violations of the statutes described above, Plaintiff suffered serious injuries and damages, as alleged herein.

### COUNT III
### STRICT LIABILITY
### (Design Defect)

### Plaintiff vs. Merck & Company, Inc.

146.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

M007C74613

147.   Plaintiff ingested Vioxx, a medication that was either manufactured, distributed, sold, prescribed and/or otherwise put into the stream of commerce by the Defendant Merck. The defective condition of Vioxx rendered it unreasonably dangerous, and that said Vioxx was in this defective condition at the time it left the hands of the Defendant.

148.   The Defendant engaged in the manufacture, distribution, sale and/or prescription of pharmaceutical medications. Vioxx, without substantial change in the condition in which it was sold, was a proximate cause of Plaintiff's injuries.

149.   Plaintiff was unaware of the significant hazards and defects in the Vioxx medication. Therefore, the Vioxx medication was unreasonably dangerous in that it was  more dangerous than would be reasonably contemplated by the ordinary user.  During the periods the Plaintiff was taking Vioxx, the medication was being utilized in a manner which was intended by Defendant.

150.   Vioxx was defectively designed because the foreseeable risks exceeded the benefits associated with the design and formulation.

151.   Additionally, Vioxx is defective due to inadequate clinical trials, testing, study, and inadequate reporting regarding the results of same.

152.   Defendant designed, manufactured, and/or placed into the stream of commerce the product, which reached Plaintiff in the same or substantially the same condition in which it was sold.  Upon purchase by Plaintiff, the product in question was represented to be safe and free from latent defects.

153.   Defendant is strictly liable to Plaintiff for designing, manufacturing, and placing into the stream of commerce the product which was unreasonably dangerous for its reasonably

M007C74614

foreseeable uses at the time it left the control of Defendant because of the design defects which were a producing cause of the occurrence in question.

154.    The product in question was defectively marketed by Defendant with respect to its failure to warn, adequately warn, or instruct in the safe use of the product and such defect was a producing cause of the occurrence in question.

155.    Defendant knew, or in the exercise of ordinary care should have known, that the product was defective and unreasonably dangerous to those persons likely to use the product for the purpose and in the manner for which it was intended to be used. Defendant was negligent in the particulars set forth in this and the preceding paragraphs and such negligence was a proximate cause of the occurrence in question.

156.    Defendant owed Plaintiff the duty of reasonable care when they tested, designed, manufacture, and marketed the product in question.  Defendant violated their duty and were negligent in the particulars set forth herein.

157.    Defendant Merck is also strictly liable under Section 402(B) of the Restatement (Second) of Torts in misrepresenting to the public that its product was safe and without defect, which statement and representation was false and involved a material fact concerning the character or quality of the product in question, and upon which misrepresentations the consumer constructively relied, and which constituted a producing cause of the injuries at issue.

158.    At all relevant times, defendant's Vioxx was defective and unreasonably dangerous under section 402(A) Restatement (Second) of Torts 402, and the New Jersey Products Liability Act and applicable Pennsylvania or Minnesota laws and statutes.

159.    Further, each of the above and foregoing acts or omissions of Defendant were more than momentary thoughtlessness, inadvertence, or error of judgment.  Such acts or

M007C74615

omissions constituted such an entire want of care as to establish that the acts or omissions were the result of actual conscious indifference to the rights, safety, or welfare of the person or persons affected.

160.   As a direct and proximate result of defendant's defective and unreasonably dangerous product and its failure to warn plaintiff and others like her of same, plaintiff was harmed as aforesaid.

**COUNT IV**
**STRICT LIABILITY**
**(Failure to Warn)**

**Plaintiff vs. Merck & Company, Inc.**

161.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

162.   Defendant, as manufacturers and suppliers of Vioxx, failed to provide proper warnings regarding all possible adverse side effects regarding the use of Vioxx, as well as the severity and duration of such adverse effects.

163.   Defendant failed to perform adequate testing that would have shown that Vioxx possessed serious potential side effects with respect to which full warnings were needed.

164.   Defendant, manufacturer and suppliers of Vioxx, failed to provide adequate post-marketing warning and instruction because, after Defendant knew or should have known of the risk of injury and deaths from Vioxx, Defendant failed to provide adequate warnings and continued to aggressively promote Vioxx.

165.   As a direct and proximate result of defendant's defective and unreasonably dangerous product and its failure to warn plaintiff and others like her of same, plaintiff was harmed as aforesaid.

M007C74616

## COUNT V
## NEGLIGENT FAILURE TO WARN

### Plaintiff vs. Merck & Company, Inc.

166.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

167.   At all relevant times, defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the pharmaceutical, Vioxx, and in the course of same, directly advertised or marketed the product of FDA, consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of Vioxx.

168.   At all relevant times, Vioxx was under the exclusive control of the Defendant as aforesaid, and was unaccompanied by appropriate warnings regarding all possible adverse side effects and complications associated with the use of Vioxx, dangerous drug-drug interactions and food-drug interactions, and the comparative severity, duration and the extent of the risk of injury with such use.

169.   At all relevant times, defendant has failed to timely and reasonably warn of material facts regarding the safety and efficacy of Vioxx so that no medical care provider would have prescribed, or no consumer would have used, Vioxx had those facts been made known to such providers and consumers.

170.   At all relevant times, defendant failed to perform or otherwise facilitate adequate testing in that such testing would have shown that Vioxx posed serious and potentially life-threatening side effects and complications with respect to which full and proper warning accurately and fully reflecting the symptoms, scope and severity should have been made to medical care providers, the FDA and the public, including the Plaintiff.

M007C74617

171.    At all relevant times, Vioxx, which was researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by Defendant, was defective due to inadequate post-marketing warning and/or instruction because, after Defendant knew or should have known of the risk of serious and potentially life-threatening side effects and complications from the use of Vioxx, Defendant failed to provide adequate warnings to medical care providers, the FDA and the consuming public, including Plaintiff, and continued to promote Vioxx aggressively.

172.    As a direct and proximate result of defendant's defective and unreasonably dangerous product and its failure to warn plaintiff and others like her of same, plaintiff was harmed as aforesaid.

### COUNT VI
### BREACH OF IMPLIED WARRANTY

### Plaintiff vs. Merck & Company, Inc.

173.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

174.    Defendant manufactured, sold, distributed, marketed, and/or promoted Vioxx that was ingested by Plaintiff.

175.    The Vioxx ingested by the Plaintiff was expected to, and did reach them without a substantial change in condition.

176.    Merck and its agents and employees, in manufacturing, selling, distributing, supplying, marketing and/or promoting Vioxx, impliedly warranted that Vioxx was not unreasonably dangerous, and instead warranted that it was of merchantable quality, reasonably

M007C74618

fit and safe for its intended, reasonably foreseeable use as a medication for arthritis and muscular pain.

177.    Merck and its agents and employees, breached these warranties in that Vioxx was not of merchantable quality, was not fit for its intended and reasonably foreseeable use, and was unreasonably dangerous in light of the risk of side effects associated with its use, including, but not limited to myocardial infarction and stroke, and in light of other risks of serious injuries and adverse side effects to foreseeable users.

178.    Merck and  its agents and employees, also failed to provide adequate warnings for Vioxx, rendering it unreasonably dangerous and unfit for the intended and/or reasonably foreseeable purposes of use, in breach of this warranty.

179.    Plaintiff  justifiably  and  detrimentally  relied  upon  the  warranties  and representations of defendant in the purchase and use of Vioxx.

180.    Vioxx, as purchased and ingested by Plaintiff, was formulated,  manufactured, marketed, packaged, labeled by Defendant with implied warranties of merchantability and of fitness for its intended purpose, without risk of permanent damage to the purchaser's and/or consumer's body and health.  Defendant was the seller of, and merchant of Vioxx.

181.    Plaintiff  relied upon defendant's implied warranties and upon the Defendant's skill and judgment, in purchasing and ingesting Vioxx.

182.    Defendant breached these implied warranties to Plaintiff in violation of relevant provisions of the applicable Uniform Commercial Code (a) by manufacturing, marketing, packaging, labeling, and selling products to Plaintiff, with the risk of injuries, including without limitation, strokes and cardiovascular injury, without warning or disclosure thereof by package and label of such risk to Plaintiff or her physicians or pharmacists, and/or without so modifying

M007C74619

or excluding such implied warranties; (b) by manufacturing, marketing, packaging, labeling and selling to Plaintiff the product Vioxx, which failed to control Plaintiff's arthritis and pain and/or suppress Plaintiff's pain in a safe manner and without injuries, including, without limitation, myocardial infarction and/or stroke  and (c) by manufacturing, marketing, packaging, labeling, and selling to Plaintiff, Vioxx, which caused Plaintiff serious physical injury and pain and suffering attendant economic loss.

183.    As a proximate result of Defendant's breach of implied warranties, Plaintiff has incurred and will continue to incur: serious physical injury, pain and suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical and hospital expenses and other expenses related to the diagnosis and treatment thereof, for which Defendant is liable.

184.    As a direct and proximate result of the acts and omissions of the Defendant, Plaintiff ingested Vioxx and suffered serious and permanent injuries, including, in some cases, death.  As a further direct and proximate result of the acts and omissions of Defendant, Plaintiff has been prevented from pursuing her normal activities and employment, have experienced severe pain and suffering and mental anguish, and has been deprived of her ordinary pursuits and enjoyments of life.

185.    As a direct and proximate result of defendant's defective and unreasonably dangerous Vioxx and its breach express warranty, plaintiff was harmed as aforesaid.

## COUNT VII
## BREACH OF EXPRESS WARRANTY

M007C74620

## Plaintiff vs. Merck & Company, Inc.

186. The Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege as follows:

187. Defendant manufactured, sold, distributed, marketed, and/or promoted Vioxx, which were used by Plaintiff, and this drug was expected to, and did reach Plaintiff without a substantial change in condition.

188. Merck and its agents and employees, in manufacturing, selling, distributing, supplying, marketing and/or promoting the drug Vioxx, expressly warranted that the drug was safe and effective as a medication for arthritis and muscular pain.

189. Merck and its agents and employees, breached this warranty in that Vioxx was not safe and effective for its intended, reasonably foreseeable use as a medication for arthritis and muscular pain because of the risk of serious cardiovascular side effects associated with its use and in light of other risks of serious injuries to foreseeable users.

190. Defendant failed to provide adequate warnings for Vioxx, rendering it unreasonably dangerous and unfit for the intended, reasonably foreseeable purposes for which it is used, in breach of warranty.

191. Plaintiff, justifiably and detrimentally, relied upon the warranties and representations of the Defendant in the purchase and use of the product.

192. As a direct and proximate result of the acts and omissions of the Defendant, Plaintiff suffered serious and permanent injuries, including, in some cases, death. As a further direct and proximate result of the acts and omissions of Defendant, Plaintiff has been prevented from pursuing her normal activities and employment, have experienced severe pain and suffering and mental anguish, and have been deprived of their ordinary pursuits and enjoyments of life.

M007C74621

193.    Defendant through a direct-to-consumer advertising campaign, affirmation of fact and promises relating to their products to the FDA, prescribing physicians, and the general public, including the Plaintiff herein, expressly warranted that their product, Vioxx, was effective and safe for its intended use.

194.    These warranties came in the form of: (a) publicly-made written and verbal assurances of safety and efficacy by Merck, its agents, and employees, including but not limited to statements of clinical data that purported to report the incidence of adverse events experienced for the product Vioxx, but which in fact grossly understated such incidence; and (b) advertisements the sole purpose of which was to create demand for Defendant's product, Vioxx, but which failed to warn of the risks inherent to ingestion of Defendant's product, Vioxx or the indications thereof.

195.    At the time of the making of these express warranties, Defendant had knowledge or had reason to know or in the exercise of reasonable care would have known of the purpose for which Vioxx was to be used and warranted same to be in all respects safe, effective and proper for such purpose.

196.    Merck and its agents and employees, drafted the documents and/or made the statements upon which these express warranty claims are based, in so doing, defined the terms of those warranties.

197.    Vioxx did not conform to these express representations in that it was neither safe nor effective as a pain reliever, and it produced serious side effects, including, but not limited to, life threatening injuries such as myocardial infarction and stroke.

198.    As such, the Defendant's pain reliever product, Vioxx, was neither in conformity with the promises, descriptions or affirmations of fact made of this drug by Defendant nor

M007C74622

adequately contained, packaged, labeled, or fit for the ordinary purposes for which such product was to be used.

199. Defendant breached express warranties to Plaintiff in violation of the relevant provisions of the applicable Uniform Commercial Code: (a) by manufacturing, marketing, labeling, and selling a pharmaceutical product to Plaintiff in such a way that misstated the risk of injuries, including, without limitation, strokes and myocardial infarction, without warning or disclosing such risk to Plaintiff or her physician or pharmacist, and/or without so modifying or excluding such erroneous express warranties; (b) by manufacturing, marketing, packaging, labeling, and selling to Plaintiff Vioxx, and failing to provide a safe pain reliever that did not cause injuries, including, without limitation, strokes and myocardial infarction; and (c) by manufacturing, marketing, packaging, labeling, and selling to Plaintiff the product Vioxx causing Plaintiff's serious physical injury and pain and suffering.

200. As a proximate result of Defendant's breach of express warranties, Plaintiff has incurred and will continue to incur: serious physical injury, pain and suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical, hospital, surgical expenses and other expenses related to diagnosis and treatment thereof, for which Defendant is liable.

As a direct and proximate result of defendant's defective and unreasonably dangerous Vioxx and its breach express warranty, plaintiff was harmed as aforesaid.

## COUNT VIII
## MISREPRESENTATION AND SUPPRESSION BY DEFENDANT

### Plaintiff vs. Merck & Company, Inc.

201. Plaintiff restates each and every preceding paragraphs as though set forth fully at length herein.

M007746.23

202.    Defendant misrepresented to Plaintiff and the health care industry the safety and effectiveness of Vioxx and/or fraudulently, intentionally and/or negligently concealed material information, including adverse information regarding the safety and effectiveness of Vioxx.

203.    Defendant made misrepresentations and actively concealed adverse information at a time when the Defendant knew, or should have known, that Vioxx had defects, dangers, and characteristics that were other than that what the Defendant had represented to Plaintiff and the health care industry generally. Specifically, Defendant misrepresented to and/or actively concealed from Plaintiff, the health care industry and consuming public that:

    a.    Vioxx had statistically significant increases in cardiovascular side effects, including with limitation thrombosis, myocardial infarction and sudden onset death, as identified herein which could result in serious injury or death;

    b.    There had been insufficient and/or company-spun studies regarding the safety and efficacy of Vioxx before and after its product launch;

    c.    Vioxx was not fully and adequately tested for the cardiovascular side effects at issue herein;

    d.    Other testing and studies showed the risk of or actual serious adverse risks; and/or that

    e.    There was a greatly increased risk of such cardiovascular events and death; there was a confirmed mechanism by which these thrombotic or cardiovascular events occurred as reporte d in the scientific literature.

204.    The misrepresentations of and/or active concealment alleged were perpetuated directly and/or indirectly by defendant.

M007C74624

205.    Defendant knew or should have known that these representations were false and made the representations with the intent or purpose that Plaintiff would rely on them, leading to the use of Vioxx.

206.    At the time of Defendant's fraudulent misrepresentations, Plaintiff was unaware of the falsity of the statements being made and believed them to be true. Plaintiff had no knowledge of the information concealed and/or suppressed by Defendant.

207.    Plaintiff justifiably relied on and/or was induced by the misrepresentation and/or active concealment and relied on the absence of safety information which the Defendant did suppress, conceal or failed to disclose to Plaintiff's detriment.

208.    Defendant had a post-sale duty to warn Plaintiff and the public about the potential risks and complications associated with Vioxx in a timely manner.

209.    The misrepresentations and active fraudulent concealment by the Defendant constitutes a continuing tort against Plaintiff, whom ingested Vioxx.

210.    Defendant made the misrepresentations and actively concealed information about the defects and dangers of Vioxx with the intention and specific desire that Plaintiff's health care professionals and the consuming public would rely on such or the absence of information in selecting Vioxx as treatment.

211.    As a direct and proximate result of the fraudulent acts and omissions, suppression and misrepresentation of Defendant, Plaintiff suffered injuries and damages.

## COUNT IX
## FRAUD AND MISREPRESENTATION

### Plaintiff vs. Merck & Company, Inc.

212.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

M007C74625

213.   Defendant fraudulently, intentionally, wilfully and wantonly, purposefully, knowingly, recklessly, negligently and/or in fact materially misrepresented both affirmatively and by omission that its Vioxx was of good quality, non-defective, safe for its intended use, merchantable, and fit for its particular purposes.

214.   Defendant intended, knew, and/or should have known that Plaintiff would be induced, by the aforesaid misrepresentations, to use defendant's Vioxx.

215.   In using defendant's Vioxx, Plaintiff justifiably relied on defendant's representations that its Vioxx was of good quality, non-defective, safe for its intended use, merchantable, and fit for its particular purposes.

216.   Defendant's Vioxx was, in fact, defective and unreasonably dangerous, as recited above.

217.   In justifiable and detrimental reliance on the truth of Defendant's representations about the safety of Vioxx, Plaintiff purchased the product and used the product in the manner and for the purpose intended as represented and instructed by Defendant.

218.   The representations, misrepresentations, acts and omissions made by Defendant deprived the Plaintiff and her physicians and other foreseeable users of Vioxx of the opportunity of free or knowing choice as to whether or not to expose themselves to the aforementioned dangers of ingesting Vioxx.

219.   As a direct and proximate result of Plaintiff's lack of awareness of the dangers of Vioxx, caused by the fraudulent acts and omissions of the Defendant, Plaintiff ingested Vioxx and suffered serious and permanent injuries.  As a further direct and proximate result of the acts and omissions of Defendant, Plaintiff have been prevented from pursuing their normal activities

M007C74626

and employment, have experienced severe pain and suffering and mental anguish, and have been deprived of their ordinary pursuits and enjoyments of life.

220.   As a direct and proximate result of defendant's defective and unreasonably dangerous Vioxx as well as its affirmative misrepresentations and omissions, plaintiff was harmed as aforesaid.

## COUNT X
## NEGLIGENT MISREPRESENTATION

### Plaintiff vs. Merck & Company, Inc.

221.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

222.   Defendant, in addition to knowing misrepresentations, made misrepresentations without any reasonable grounds for believing its statements to be true to Plaintiffs, other patients, and the medical and psychiatric communities.

223.   Defendant, through their misrepresentations, intended to induce justifiable reliance by Plaintiff, other patients, and the medical and psychiatric communities.

224.   Defendant, through their marketing campaign and communications with treating physicians, was in a relationship so close to that of Plaintiff and other patients that it approaches and resembles privity.

225.   Defendant owed a duty to the medical community, Plaintiff, and other consumers, to conduct appropriate and adequate studies and tests for all its products, including Vioxx, and to provide appropriate and adequate information and warnings.

226.   Defendant failed to conduct appropriate or adequate studies for Vioxx.

227.   Defendant failed to exercise reasonable care by failing to conduct studies and tests of Vioxx.

228.   As a direct and proximate result of Defendant's negligent misrepresentations. Plaintiff was harmed as aforesaid.

## COUNT XI
## UNJUST ENRICHMENT

### Plaintiff vs. Merck & Company, Inc.

229.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

230.   Defendant accepted payment from Plaintiff for the purchase of Vioxx.

231.   Plaintiff did not receive a safe and effective drug for which they paid.

232.   It would be inequitable for defendant to retain this money because Plaintiff did not in fact receive a safe and effective drug.

## COUNT XII
## PUNITIVE DAMAGES

### Plaintiff vs. Merck & Company, Inc.

233.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

234.   Based upon the above, a jury could conclude that the defendant knew of facts that created a high degree of risk of physical harm to the Plaintiff and that the defendant's deliberately proceeded to act in conscious disregard or indifference to that risk, and therefore that an award of punitive damages is warranted.

**WHEREFORE,** Plaintiff, LaDonna King, demands judgment against Defendant for damages including exemplary damages if applicable to which they are entitled by law, as well as all costs of this action, to the full extent of the law including:

M007C74628

1. judgment for Plaintiff and against defendant;

2. damages in the form of compensatory damages in excess of the jurisdictional limits, trebled on all applicable Counts;

3. physical pain and suffering of the Plaintiff;

4. pre and post judgment interest at the lawful rate;

5. reasonable attorneys' fees and costs and expert fees;

6. a trial by jury on all issues of the case;

7. for any other relief as this court may deem equitable and just;

8. restitution of all purchase costs that Plaintiff paid for Vioxx, disgorgement of Defendant's profits, and such other relief as provided by law;

9. exemplary and punitive damages in an amount in excess of the jurisdictional limits, trebled on all applicable Counts;

10. all Bill of Costs elements; and

11. such other relief this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands that all issues of fact of this case be tried to a properly impaneled jury.

**LEONARD V. FODERA, ESQUIRE**
Silverman & Fodera, P.C.
1835 Market Street, Suite 2600
Philadelphia, PA 19103

**DAVID ROSENBERG, ESQUIRE**
Handler, Henning & Rosenberg, LLP
1300 Linglestown Road
Harrisburg, PA 17110

DATED: _____

M007C74629