## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In re:  Vioxx

PRODUCTS LIABILITY
LITIGATION

*This document relates to*

*Michael Heavrin, et al v. Merck & Co., Inc.*

2:05-CV-00458-EEF-DEK

Only with regard to:
Janice Baum



\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

MDL Case No. 1657

SECTION L

JUDGE FALLON

MAGISTRATE JUDGE
KNOWLES

---

### PLAINTIFF JANICE BAUM'S REQUEST TO DENY
### MERCK, SHARP & DOHME'S AKA MERCK & CO.
### MOTION FOR SUMMARY JUDGMENT AND TO SCHEDULE A TRIAL BY JURY

---

Plaintiff, Janice Baum, admits her initial complaint filed against Merck & Co. through her former legal counsel, Price, Waicukauski, & Riley on October 12, 2004, began with known vascular issues that were well published Vioxx side effects.   Amendments were made over the next several years due to discovered inaccuracies on the part of her previous counsel.   They were also made for additional idiopathic (no known reason or cause) medical conditions made known to Plaintiff that had no explanation apart from her Vioxx usage.   Plaintiff feels that the objectivity of her local treating physicians was compromised by local participation in Merck's financial incentive programs to doctors to prescribe their drugs.   It is public record that Defendant Merck was fined for financial incentives to physicians to prescribe their products.[1] Plaintiff is questioning the integrity of the Boston Medical Group which did test and treat the obviously flawed the contradicted treatment given her symptoms by the prescribing and local follow up physicians,

Plaintiff used Vioxx under the prescription of Fort Wayne, Indiana physicians between December 1999 and ceased suddenly when her previously mysterious medical symptoms (spiking hypertension, drastically narrowed arteries without blockages, abnormal fatigue, etc.) entirely inconsistent with her family and personal history were suddenly reflected in the warnings given Vioxx users.   That dangerous product was removed from the market on September 30, 2004.   Plaintiff had a stay at the Mayo Clinic in November 2003  where reasons for the inexplicable vascular narrowing and neuropathy issues were explored.   No blockages were found that could

1

account for the problem.  That the problem existed was known to treating and examining physicians.
The causation remained a mystery until the Vioxx disclosures came to light.

Plaintiff's symptoms began in early 2000 not too long after beginning the Vioxx therapy regime for neck and shoulder arthritic symptom relief.  Plaintiff was given a cardiovascular treadmill exam to rule out heart issues on May 23, 2002 after experiencing chest pains along with the chronic ongoing and unexplained fatigue.  Nothing significant was shown by that.

Plaintiff's doctors decided it necessary to rule out diabetes as well.  She was experiencing severely discolored feet and lack of feeling in parts of those extremities (neuropathy).    It was discovered that she had embedded  undiscovered glass in her feet.  Her diabetic testing was negative.   Subsequent vascular testing in Fort Wayne, IN., through The Heart Center a/k/a Lutheran Health Network indicated she had decreased circulation in her legs that indicated blockages, but no blockages were found in the Angioplasty given her by a cardiovascular specialist as of late August 2003.

Angio-edema complications from 3 doses of Norvasc used to open Plaintiff's vascular system caused Plaintiff to develop a Bulla (a huge ugly painful blister).  This required nearly 5 weeks of painful treatment at both St. Joseph Hospital's Regional Burn Unit and twice daily painful home treatments. This drug reaction led to Plaintiff's former cardiovascular specialist to refer her to Mayo Clinic in Rochester, MN in November 2003 to the Cardiovascular Center where further invasive exams of both her vascular system & heart.   Such tests revealed significant decreased circulation to her lower extremities.   The Plaintiff swallowed twice a camera to take pictures of her heart,  due to camera malfunction on the first attempt.  That heart exam revealed no "significant" heart damage at that time.

On September 30, 2004, Merck & Co. pulled their popular anti-inflammatory drug, Vioxx, from the market for causing hypertension and vascular issues that were directly linked to myocardial infractions and strokes.   Plaintiff was still taking another prescriptions for Vioxx that was filled in August 2004 on the date Merck & Co. removed Vioxx from the market. Plaintiff called Mayo Clinic the following day to inquire if Vioxx could be the real cause of her "idiopathic vascular" issues and fatigue, but at that time, Mayo Clinic told Plaintiff, "We don't know.  Ask your pharmacist."

Plaintiff's health continued to decline over the course of six years under the care of cardiovascular specialist, Dr. Stephen Reed, of Lutheran Health Network, the new name for The Heart Center beginning in 2009.  During the course of those 6+ years, Plaintiff was referred to other specialists that included Internal Medicine Dr. Ami Kulkarni in 2007 and Pulmonologist, Dr. Vincent Rodriguez in March 2008.  All specialists worked within The Heart Center who labeled her with 11 idiopathic medical conditions.

The Plaintiff 's chronic fatigue in November 2007 indicated need for another cardiovascular stress test that revealed a silent heart attack or myocardial infraction (MI) had occurred.  Plaintiff's newly diagnosed MI caused the Plaintiff to revise her Plaintiff Profile Form to include the missed MI, a known causation of Vioxx

use. During this same time period she was also treated with 16 prescription medications for 11 idiopathic conditions all diagnosed by Lutheran Health Network's 3 treating doctors/specialists. Continuous debilitating fatigue led to a March 2008 sleep study that revealed no Sleep Apnea present but still the need for 2.4 liters of nocturnal oxygen nightly for significant oxygen blood desaturation levels for another unknown cause.

In the six years under the care of local doctors at Lutheran Health Network, Plaintiff frequently brought up her nearly 5 years of documented continuous and intermittent Vioxx use, but all doctors refused to acknowledge her 11 idiopathic medical conditions and nocturnal oxygen requirement could possibly be tied to Merck & Co. Vioxx known to have been removed from consumer use for causing hypertension, vascular, heart disease, myocardial infractions, and strokes.

In late March 2009, Plaintiff learned of a rare condition with all the same symptoms that mimicked her 11 idiopathic medical conditions and also included oxygen treatment as a normal part of routine treatment for this rare condition, *Pulmonary Hypertension* (PH). Local doctors agreed that Plaintiff's symptoms mimicked PH but denied she could have this condition and refused testing for same. All local doctors refused to give Plaintiff a right heart catherization that could have given her peace of mind by at least ruling it out. Plaintiff believes they were clearly influenced by their financial incentivized earlier Vioxx prescribing that led to her escalating medical difficulties.

Subsequently, Plaintiff sought the assistance of a Patient Navigator, Timothy Alderdice, who got Plaintiff immediately scheduled with one of her regular physician's. Dr. Jay Fawver, RPh, MD of Psychiatric Medicine who treats Plaintiff for Attention Deficit Hyperactivity Disorder. Plaintiff sees Dr. Fawver for medication review only, even though he is a psychiatrist. (It's been widely published Plaintiff's Dr. Jay Fawver is Fort Wayne, Indiana's highest paid medical practice to receive "kickbacks" for prescribing prescription drugs from the pharmaceutical industry.) After another prescription drug reaction from a new prescription given by Dr. Fawver, Plaintiff was taken to Lutheran Hospital's ER, and Dr. Fawver requested Plaintiff to be admitted. Plaintiffs blood work didn't fit with admittance criteria of Lutheran Hospital because Plaintiff tested positive for "pot", when Plaintiff knew this was not possible, Instead, Plaintiff was admitted to their "sister" hospital's drug/psychiatric floor for 3 days of observation at St. Joseph Hospital. The dismissing Hospitalist, Dr. Salman Iman, referred her to Boston Medical Center's Dr. Harrison W. Farber, world renowned researcher on Pulmonary Hypertension, based on her visible and documented symptoms of PH and oxygen need. Plaintiff agreed to a personal 5 hour mental health assessment exam that was given on April 30, 2009, after no mental issues were found and no drug abuse was discovered in Plaintiff's blood work upon admission to St. Joseph Hospital. The exam results of "no mental psychosis, mental illness, mental disease, or hypochondria" resulted in the following chain of events Plaintiff firmly believes to be retaliation from her former healthcare providers, the owners of her healthcare providers practices, and the owner of Merck & Co., by majority share holdings, Wells Fargo and their division Wells Fargo Insurance Services:

1.  LHN physician's dismissed Plaintiff as a patient effective July 26, 2009 after receiving MHA results.

2.  Plaintiff was admitted to Lutheran Hospital ICCU on July 26, 2009 with BP 199/117

3.  "Special" LHN doctors gave plaintiff an intentional "coverup diagnosis" on July 27-28, 2009.

4.  LHN doctors told Plaintiff to cancel her previously scheduled Boston RHC appointment because the local procedure found no heart disease or PH.

5.  Plaintiff received her 7/26-28/2009 medical records via fax on August 18, 2009 in the scope of her job.

6.  Records sent via dedicated fax line to Plaintiff stated exactly the opposite of LHN doctor's report to Plaintiff and her family on July 28, 2009 and when Plaintiff was told to cancel Boston appointment.

7.  On August 18, 2009, Plaintiff immediately went unannounced to Lutheran Hospital and acquired paper copies of hospital stay on Aug 18, 2009, confirming "criminal concealment" of medical records.

8.   Plaintiff was tested at Boston Medical Center on August 21, 2009, and tested positive for PH.

9.  Plaintiff's former legal counsel was ordered by Judge Eldon Fallon they had to continue to represent her after Legal Malpractice was shown to exist because plaintiff was never given opportunity to meet legal team in 5 years or to review Plaintiff's medical records prior to final submission to Brown Greer, Merck & Co's out-of-court settlement administrators.

10. Plaintiff was called on September 23, 2009, and told that stress induced hypertension was the direct cause of her PH, and that stress was necessary to avoid worsening PH, a frequently deadly condition.

11. Former legal counsel refused to depose Plaintiff's Boston Medical Center physician during their forced and hostile representation of Plaintiff.

12. Former legal firm deposed a now "hostile and former medical provider" of Plaintiff, Dr. Ami Kulkarni, on November 3, 2009.

13. Dr. Ami Kulkarni's "hostile deposition" was submitted as evidence by Merck & Co. for their second and most recent "Summary Judgment" attempt to have Plaintiff dismissed "with prejudice".

14. Former legal counsel were hostile in their representation of Plaintiff from September 1, 2009-January 15, 2010, when they were dismissed from Plaintiff's representation in mid-January 2010 by Judge Fallon.

15. Plaintiff has maintained Boston Medical Center as her physician's after multiple refusals by her insurance provider, Physician's Health Plan of Northern Indiana, and has traveled to Boston seven times beginning on August 21, 2009.

16. Diastolic Dysfunction, (stiffened heart) was determined by BMC to be primary causation of Plaintiff's PH on July 1, 2010, and Plaintiff was referred to BMC Dr. Eric Awtry on July 2, 2010.

17. Plaintiff had a mandatory phone conference with Judge Fallon and Merck & Co.'s legal team July 1, 2010, where PTO 43 compliance of a "Case Specific Expert Opinion"  was continued  until Sept. 1,

2010, because of her new Boston cardiologist appointment the following day.

18. On Sept 1, 2010, Dr Eric Awtry provided Merck & Co. with his opinion that all else could be ruled out for causation of Plaintiff's newly diagnose PH that Dr. Harrison W Farber determined  as secondary to her undiagnosed heart Diastolic Dysfunction while under local cardiovascular care for six years.

19. Merck & Co. acknowledged receiving Plaintiff's "Case Specific Expert Opinion" and allowed her case to move forward as a stand alone "pro se" claimant until recent developments Plaintiff has uncovered and presented before the Honorable Judge Eldon Fallon.

20. Plaintiff discovered in the course of seeking reasons for her local substandard medical care that she was being both treated and billed as a "mentally delayed Medicaid client" of Plaintiff's employer.

21. Plaintiff filed a police report against two local doctors attributed to her "Mercked Up" medical diagnosis that was directly opposite of world renowned BMC PH researcher and specialist, Dr. Harrison (Hap) Farber in spring 2010.

22. Previously, Plaintiff turned in a former LHN physician' for Medicaid fraud investigation in fall 2009.

23. Plaintiff appeared before Honorable Judge Eldon Fallon in New Orleans on February 24, 2011 vowing to get answers on how and why her medical claims were billed as Medicaid when Plaintiff was Benefits Administrator for her 100% Medicaid funded employer.

24.  Plaintiff was double insured by her employer's Anthem BcBs and her now estranged spouses insurance through his employer, Physician's Health Plan of Northern Indiana.

25. Plaintiff filed complaints with Indiana's Department of Insurance against Anthem BcBs and Physician's Health Plan of Northern Indiana in May, 2011 for denying Plaintiff second opinions and subsequent medical care in Boston and after local doctors would no longer treat her as a patient.

26. Plaintiff filed a major Medical Malpractice case (pro se) on June 6, 2011, naming LHN and her former physician's with the Indiana Department of Insurance, as required per Indiana Insurance Laws.

27. Plaintiff began piecing together the common denominators for her "insurance/Medicaid" issues and became vocal on LinkedIn and Facebook of her discoveries as they fell into place.

28. Plaintiff went to Washington DC in July 2011 to meet with others seeking similar frustrating situations with their own healthcare/insurance issues and talked directly with the US Department of Inspector General's office who investigated Plaintiff's research.

29. Plaintiff filed an official report with local FBI naming Wells Fargo Insurance Services for "Money Laundering" through Medicaid Funds in a well orchestrated strategically planned organization that was directly tied to her employer of 24 years, a pharmacy chain, with a large data base of Medicaid clients in their 26 stores.

30. Plaintiff discovered in review of copies of Plaintiff's medical records submitted to Merck & Co. that her medical records had been tampered with in the US Federal Merck & Co.'s Vioxx Case.

31. Missing were Plaintiff's medical records from her July 26-28, 2009 Lutheran Hospital stay and her followup BMC diagnosis of August 21, 2009\.

32. Plaintiff's missing medical records were in her possession, though clearly missing from submitted evidence to Merck & Co.

33. Those missing records proved Plaintiff's medical malpractice case and the reasons her Boston doctor's determined her "Mercky" Fort Wayne medical diagnosis was merely an intentional "coverup" to make Plaintiff appear to eventually die of natural causes through "criminal concealment" of her true diagnosis.

34. The missing medical records also were clearly intended to make Plaintiff fail in her Vioxx damage claim against Merck & Co.

35. Plaintiff spoke again before Honorable Judge Fallon on March 1, 2012, and reminded him of her promise the prior year to get answers for Plaintiff's "Mercky" local diagnosis and how and why Plaintiff was treated and billed as Medicaid patient.

36. Plaintiff was able to back Ann Oldfather's claim of her remaining Vioxx claimants missing medical records, but Plaintiff had printed copies with her,

37. Plaintiff clearly told Honorable Judge Fallon that her research over the previous year uncovered a clear conflict of interest with Merck & Co.'s primary share holder as Wells Fargo, and Wells Fargo Insurance Services being the insurer behind the entire Vioxx case.

38. Plaintiff filed her own response to her local Medical Malpractice claim on June 6, 2012 with the Allen Superior Courts naming Wells Fargo & Wells Fargo Insurance Services as owners of Lutheran Hospital and Lutheran Health Network.

39. Plaintiff received an over-nighted FEDEX package from Merck & Co., requesting a "Summary Judgment" dated June 6, 2012, the same day Plaintiff served Wells Fargo's local legal team with her response for "Summary Judgment" against "Anonymous Medical Providers

40. All providers named are located in Fort Wayne, Indiana and their medical practice and facilities are owned by Wells Fargo.

41. Plaintiff provided her medical records omitted from her US Federals Merck & Co. lawsuit with undeniable proof of "criminal concealment" of Plaintiff's true medical status.

42. Wells Fargo et al, were named as Defendants by ownership of my former local medical providers

43. Plaintiff had proof medical records were clearly tampered with in a US Federal lawsuit by many involved in local corruption within the healthcare, insurance, banking, and legal systems.

44. Plaintiff had proof of her statement on March 1, 2012, before Honorable Judge Eldon Fallon that her unwanted findings while seeking reasons her own substandard healthcare locally gave Wells Fargo reason to make Plaintiff fail at both her local Medical Malpractice claim and "Janice M Baum, Plaintiff v Merck & Co., Defendants".

45. Plaintiff clearly showed by naming Wells Fargo as defendants in her local Medical Malpractice claim that they are clearly guilty of intentional crimes to prevent Plaintiff(s) from succeeding in Merck & Co. "out of court" settlement agreement where the only winners were really the lawyers paid millions to prevent valid Plaintiffs from winning any monetary award for their damaged health.

46. Wells Fargo had every intention of stopping Plaintiff from becoming the "Whistle Blower" she never intended to become by making her fail at both her Medical Malpractice in Fort Wayne, IN., and her 7 ½ year battle in the US Federal Merck & Co. case, "Janice M Baum, Plaintiff v Merck & Co., Defendants"

47. Plaintiff can clearly show that Wells Fargo's/Merck & Co. "out-of- court settlement" agreement basically ruled out most women from receiving anything in this "fraudulent and tampered with".

48. Plaintiff can clearly show just cause for the entire US Federal Merck & Co. out-of-court settlement agreement to be thrown out of court for the massive fraud within the legal systems of the US Federal Courts and more.

49. Plaintiff can prove the above by her research dating back to four former employers; and two different independent insurance brokers of healthcare plans sold by their very small agencies.

50. Each broker of healthcare plans became millionaires in 1996 and 1997,in separate mergers when their two individual agencies were purchased by Acordia Brokerage of Indianapolis.

51. Two other separate but yet unnamed property & casualty independent brokers in Fort Wayne, IN were also merged with Acordia Brokerage in the late '90's, with long term strategically planned Medicaid fraud and "money laundering" goals.

52. Acordia Brokerage merged with Wells Fargo Insurance Services in 2001, a division of Wells Fargo.

## MEDICAL HISTORY ISSUES

Defendants have "Merckily" raised what they characterized as a "murky" family history.  Plaintiff's mother never suffered from any diagnosed or other form of diabetes.  The mother of seven children, she lived to the age of 81.  Plaintiff's mother's oldest brother (plaintiff's maternal uncle) is still living in Florence, Oregon. He is 94 years old and just stopped teaching college last year due to the academic decision at the community college to discontinue their "Principles of Art" course.  Plaintiff's oldest sister is 68 years old and still actively practicing law in the State of Michigan where she has been a licensed attorney since 1975.  She is also a widely known and translated author who has been listed *inter alia* in *Who's Who in the Midwest*, *Who's Who in the World*, *Who's Who in American Law*, and *Who's Who in America*.  She enjoys excellent health.  Plaintiff did lose two siblings to health conditions, her 17 months older brother, Howard Butler, a popular local police detective, who died in 1993 suddenly at only age 43 with what was diagnosed on his death certificate as "arrhythmic failure as a result of anti-arrhythmic drug therapy."  Her second to the oldest sister, Linda Butler Ragatz died in

the fall of 2005 of colon cancer, nothing the undersigned nor her other siblings have thankfully shown symptoms for.  Ironically, Linda was married to the director of the Fort Wayne, Indiana campus of the Indiana University School of Medicine, Dr. Barth Ragatz, Ph.D.

Plaintiff's third sibling died on September 23, 2009.  Max Eldon Butler had a history of alcohol abuse and stayed "dry" for more than 20 years.  He was also a former cigarette smoker, but quit through hypnosis in the mid 1980's.  However, during that time of non-drinking or non-smoking, Max merely substituted one addictive crutch with another and began using "illegal cigarettes" or marijuana. Max's denial of "smoking" did a toll on his health until he needed a double heart bi-pass in approximately 1995. Following the death of his younger brother, Max resumed drinking alcohol moderately along with smoking up to 7 joints per day.  During his 41 year marriage, Max used his addictions to escape the more than 42+ hospitalizations his wife had for several medical conditions which included "manic depressive disorder" aka "bi-polar disorder" and her eventual diagnosis of "multiple personality disorder".  Sadly, Max not only inhaled the tobacco/marijuana, but he also lived with his wife and 3 kids who all provided him with "second hand smoke".  Plaintiff has never lived with a smoker or smoked cigarettes with the exception of approximately 5 times for tobacco and five times for marijuana where she was accused of not inhaling and "wasting good shit"

On the paternal side of the family, her father did have many health issues that were mainly occasioned by a severe automobile accident he experienced at age 17.  John M. Butler's obituary was actually published in the local paper as he was perceived dead at the scene.  One thankfully stubborn physician refused to give up on him, his heartbeat was restored and he had a long painful recovery.  He was a devoted family man who worked two jobs.  He had life long ramifications from the earlier difficulties and did pass from this world at age 63, from complications of early onset Alzheimer's Disease.  His mother, however, lived just immediately short of her 100th birthday (Isadore Stump Butler Zuercher) who lived from 1890 to November 1989.   Howard Butler, her deceased brother had a similar childhood automobile accident at age 6 that may have contributed to his irregular heart rhythm.  However, Howard Butler it should be noted was a healthy police academy graduate of the FBI Academy at Quantico, Virginia.  His death was sudden and unexpected and it was attributed by examining autopsy physicians to errors in his medical prescription drug therapy.  No family legal action was taken on Howard Butler's death despite the death certificate that practically begged for same. Because the autopsy report was deemed missing from the coroner's office,  Howard's children gave up seeking legal counsel being only 22 & 16 years old.

As regards the Lone Pine report, its author was not the treating physicians who said they could rule out everything but the Vioxx therapy.  The report did not rule out the Vioxx causation but admitted that based on the records its author had examined, could not presently claim it.

It should be noted that Ann Oldfather, the attorney selected by this Honorable Court to assist the pro se and remaining unsettled cases has made this court known that she is in the process of selecting an

Epidemiologist  for these cases where everything has been ruled out save the Vioxx treatment.  The undersigned believes she will benefit from the same expert opinion, because her medical records clearly show the etiology of her onset of severely spiking hypertension, a well published side effect that led to Vioxx being removed from the market on September 30, 2004, for it's causation of vascular related health issues that led to heart disease, heart attack's, strokes, and death.

Respectfully submitted

Janice M Baum, Plaintiff

8716 Woodstream Drive

Fort Wayne,  Indiana 46804

Phone: (260) 466-2568

Date:  July 17, 2012

Revised: July 18, 2012 discovering omission of one deceased brother.

ATTACHED SUPPORTING EXHIBITS

1.  Article from USA today (also found)

2.  Omitted supporting medical records from Lutheran Hospital network & Boston Medical Center

3.  Plaintiff's Notification of "Other Cases" moved to November 1, 2012 and dated May 15, 2012

4.  Plaintiff's Medical Malpractice documents filed on June 6, 2012

STATE OF INDIANA     )         IN THE ALLEN COUNTY SUPERIOR COURT
                         ) SS
COUNTY OF ALLEN     )         CAUSE NO. 02D01-CT1202100

JANICE M. BAUM,               )
                              )
                 Plaintiff     )
                              )
vs.                           )
                              )
ANONYMOUS MEDICAL PROVIDER 1,   )
et al                            )
                 Defendants.   )

| | |
|---|---|
| **Janice M. Baum**<br>**Plaintiff in *pro se***<br>**8716 Woodstream Drive**<br>**Fort Wayne, IN 46804**<br>**(260) 466-2568** | ROTHBERG LOGAN & WARSCO LLP<br>by Jason A. Scheele #23121-53<br>Attorneys for Defendants<br>505 E. Washington Boulevard<br>Fort Wayne, IN 46802<br>(260) 422-9454; |
| | CHARLES W. McNAGNY #9938-02<br>Attorney for Defendants<br>1600 Lincoln Tower<br>116 East Berry Street<br>Fort Wayne, IN 46802<br>(260) 422-4706; 260-422-4708 FAX |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
## FOR PRELIMINARY DETERMINATION
## AND MOTION FOR PARTIAL SUMMARY JUDGMENT

JANICE M. BAUM, in *pro se*, responds to the Defendants "Motion for Preliminary Determination and Motion for Partial Summary Judgment" as follows:

1. It is ADMITTED that Plaintiff filed her "Proposed Complaint" with the Indiana Department of Insurance, as a necessary prerequisite to a filing in courtroom jurisdictions.

2. **Paragraph 2 is admitted. The alleged physician-patient relationships did exist.**

Page 1 of 3

3. **Paragraph 3 is denied as untrue.   The _first_ date Plaintiff saw any of the "anonymous" physicians was July 26, 2009.   The last date was July 28, 2009. Further, as the medical documents have now been obtained, the names of the physicians are known to Plaintiff.**

4. **Paragraph 4 is denied as untrue for the same reasons as those stated in paragraph 3.**

5. **Paragraph 5 is denied as untrue for the same reasons as those stated in paragraph 3 and 4.**

6. **Paragraph 6 is denied because it is contrary to established Indiana case law and for the reason that** Paragraph 6 is denied for the reason that the health issues that were denied by local doctors did exist and were confirmed by top Boston, Massachusetts medical specialists.  Moreover, medical records obtained thereafter (August 18, 2009) revealed that the local doctors did diagnose the condition but had falsely denied same and concealed it from plaintiff out of spite and malice apparently stemming from her questioning of the billing practices of the group.   Due to this connivance and concealment or in the alternative gross negligence of Defendants, Plaintiff did not learn of the condition until August 18, 2009 when she was inadvertently furnished papers by employees of Defendant's medical practice group "Baltes" revealing that the local physicians did know of the denied condition.   Thereafter on August 21, 2009, the formerly denied diagnosis was confirmed by Plaintiff's Boston, Massachusetts physicians.  (See attached Exhibit documents)

7. **Paragraph 7 is denied.**   Moreover, in light of documents subsequently obtained on discovery, Plaintiff is working on amending the document with the state to substitute the "John Doe's" with actual names of the medical providers and to add details gleaned on discovery that were expressly withheld from her in the past.

8. **Paragraph 8 is denied for the reason that there is no valid Statute of Limitations defense and for the evidences displayed in the attached exhibit documents. Further, Indiana case law (_Martin v. Richey,_ 711 N.E.2d 1273, 1279 (Ind. 1999) (failure to diagnose breast cancer))** provides a clear exception to the two year Statute of Limitations When this exception applies, plaintiff may file within two years from the discovery of the malpractice and resulting injury, or from

learning facts that, with reasonable diligence, should have led to such discovery. *Van Dusen v. Stotts*, No. 03S00-9711-CV-631, 1999 WL 463489 (Ind. July 8, 1999). See also *Ledbetter v.Hunter*, 652 N.E.2d 543 (Ind. Ct. App. 1995) (questioning the constitutionality of the statute as it applies to minors).

       **WHEREFORE, for all of these reasons which clearly show that there is a question of fact to be determined by the court, that there is case law extending the Statute of Limitations if there has been concealment, your Plaintiff respectfully requests this Honorable Court to DENY the motion and award costs incurred to her for defense of a Motion that the Defendants, if not their attorney, had to know was frivolous and without merit.**

          **Respectfully submitted,**

**JANICE M. BAUM**
**Plaintiff/Respondent in Pro Se**
**8716 Woodstream Drive**
**Fort Wayne, Indiana 46804**
**(260) 466-2568**

Dated:  May 23, 2012

### CERTIFICATION AND PROOF OF SERVICE PURSUANT TO COURT RULE 4.15

I certify that on this date, May 29, 2012, I served a true copy of the attached documents consisting of Answer to Motion, Brief in Support, and Affidavit in Support upon all counsel of record or on the parties individually if unrepresented by counsel by delivery to their office and leaving same with the receptionist or person in charge:

JANICE M. BAUM (Pro Se)

Page 3 of 3

| STATE OF INDIANA | ) | IN THE ALLEN COUNTY SUPERIOR COURT |
| | ) SS | |
| COUNTY OF ALLEN | ) | CAUSE NO. 02D01-CT1202100 |

| | |
|---|---|
| JANICE M. BAUM, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| ANONYMOUS MEDICAL PROVIDER 1, | ) |
| et al | ) |
| Defendants. | ) |

| | |
|---|---|
| **Janice M. Baum**<br>**Plaintiff in** *pro se*<br>**8716 Woodstream Drive**<br>**Fort Wayne, IN 46804**<br>**(260) 466-2568** | ROTHBERG LOGAN & WARSCO LLP<br>by Jason A. Scheele #23121-53<br>Attorneys for Defendants<br>505 E. Washington Boulevard<br>Fort Wayne, IN 46802<br>(260) 422-9454; |
| | CHARLES W. McNAGNY #9938-02<br>Attorney for Defendants<br>1600 Lincoln Tower<br>116 East Berry Street<br>Fort Wayne, IN 46802<br>(260) 422-4706; 260-422-4708 FAX |

## PLAINTIFF'S AFFIDAVIT IN SUPPORT OF HER RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDIANA DEPARTMENT OF INSURANCE CLAIM

| STATE OF INDIANA | ) |
| | ) ss |
| COUNTY OF ALLEN | ) |

JANICE M. BAUM being first duly sworn attests to the following as testimony she would give in open court under oath that is pertinent to her response to Defendant's Motion for Summary Judgment based on Statute of Limitation allegations:

1. I had been on a treatment regimen of Vioxx manufactured by the Merck Corporation for

several years since 1999.

2. The Vioxx therapy was ordered as an anti-inflammatory for anti-arthritic conditions.

3. I developed extreme fatigue, falling asleep at my desk at my place of employment as a Benefits Administrator in early 2000.

4. Concomitant with the Vioxx treatment I developed vascular cyanosis which led to Dr. Stephen Reed giving me an angioplasty in my lower extremities in August 2009.

5. Allergic reactions to Dr. Reed's drug therapy to open my vascular system led Dr. Reed to refer me for further vascular and heart testing in November 2003 at Mayo Clinic in Rochester, MN.

6. Mayo Clinic's Cardiology Clinic found all tests heart and vascular issues to be inconclusive.

7. Merck and Co. pulled Vioxx from the market on September 30, 2004.

8. The Vioxx side effects which the manufacturer had allegedly concealed from the government regulators and the market included various vascular and heart issues.

9. Mayo Clinic was called by me, the undersigned, immediately to see if Vioxx could have caused my vascular issues and fatigue, but they would not commit to causation. Instead they told me to ask "my registered pharmacist."

10. Symptoms worsened and I became a patient of Dr. Reed's associate, Dr. Ami Kulkarni, who tested me for numerous ailments through other specialists all deemed "idiopathic" ("*arising spontaneously or from an obscure or unknown cause* ") in nature.

11. In March 2008, a sleep study revealed the need for Nocturnal Oxygen use, at 2.4 liters nightly.

12. Dr. Vicente Rodriguez was then added as my pulmonary specialist at Lutheran Health Network in April 2008.

13. The added oxygen led to 2008 "billing questions with my personal medical claims" when I requested to purchase my "oxygen concentrator" as required per my "Anthem Benefits Administrator Handbook".

14. In March 2009 I learned of a condition, "Pulmonary Hypertension", a frequently deadly condition left untreated.

15. With severe hallucinations occurring nightly, in February 2009 and 11 months after adding "nocturnal oxygen" to my medical regime, I finally met Dr. Rodriguez for the

first time and, suspecting the pulmonary hypertension and either wishing to have it ruled out or properly treated, I requested a Right Heart Catheterization from him, which he denied.

16. I further requested an overnight "oxymetry test" with a new "oxygen provider".

17. At this point, I strongly suspected I was being treated as a Medicaid patient when Dr. Rodriguez's staff told me I could never change oxygen providers even though the changed had been pre-approved by both Anthem BcBs as my capacity as Benefits Administrator for my employer and Physician's Health Plan of No. IN.

18. On April 1, 2009, my three Lutheran Health Network specialists all agreed my symptoms mimicked "pulmonary hypertension", but all denied me the necessary Right Heart Catheterization needed to rule out this mostly deadly condition.

19. Annual treatment with Dr. Reed continued until April 1, 2009, when he determined I no longer needed to follow-up with him because Dr. Ami Kulkarni was giving me excellent medical treatment.

20. Dr. Ami Kulkarni referred me to Dr. William Wilson at Ft. Wayne Cardiology for a second opinion with further heart testing.

21. Dr. Wilson told me in early April 2009 that my new and extensive heart tests showed no need for invasive heart testing and especially for a Right Heart Catheterization.

22. Dr. Wilson concluded my heart stress test had significant improvement as compared to my my previous November 2007 heart stress test.

23. I thereafter consulted with a patient navigator (Tim Alderdice) who immediately sent me to my ADHD (Attention Deficit Hyperactivity Disorder) physician (Dr. Jay Fawver, M.D., R.Ph.) also a registered pharmacist) who discontinued all medications to eliminate the possibility that they could cause the severe hallucination symptoms I was experiencing.

24. After this I developed hyperventilation and a "psychotic reaction" to a newly added drug by Dr. Fawver

25. I was advised by the same patient navigator (Tim Alderdice) to go to the Emergency Room at Lutheran Hospital.

26. The patient navigator then went to the head of the hospital (Lutheran) and I was advised that I did not fit the patient profile but I did fit the mental ward profile.

3 of 6

27. I was then placed in a mental ward at St. Joseph Hospital for three painful days in mid-April 2009.

28. Tests at the mental hospital concluded I was psychologically intact and did not have symptoms of mental illness. I was discharged from there on or about April 14, 2009.

29. After spending three painful days in the mental ward, the dismissing hospital (St. Joseph) said they could NOT RULE OUT PULMONARY HYPERTENSION because of three symptoms impossible to fake:

    • My need for nocturnal oxygen;

    • Cyanosis of my lower extremities;

    • Extreme hoarseness and/or frequent lack of voice.

30. At dismissal from St. Joseph Hospital, I was required to agree to a personal 5 hour mental health assessment test orderd by Dr. White. White, the on staff treating psychiatrist.

31. I was administered a personal mental health assessment on April 30, 2009 by a psychologist who Dr. White chose.

32. After I was cleared on the mental health and "hypochondria" aspersions with the April 30, 2009 MHA results, copies were sent to all treating physicians who denied me a Right Heart Catheterization in early April, 2009. (EXHIBIT 1)

33. I was sent the attached letter by Lutheran Hospital, dated June 26, 2009 dismissing me as a patient. (EXHIBIT 2)

34. I was taken to Lutheran Hospitals ER with blood pressure of 199/117.

35. Lutheran Hospital "anonymous staff" were told my former specialists at Lutheran Health Network would no longer treat me effective midnight, July 26, 2009.

36. "Anonymous" staff told me not to worry because they would call in a very good cardiologist "not connected to the big boys" who would give me excellent care.

37. "Anonymous" staff names are now known and will be added to my original complaint filed with the Indiana Department of Insurance.

38. On July 26-28, 2009, my local physicians now included Dr. Thomas Ryan, DO., of Baltes Cardiology Group, brought in by "Anonymous" Lutheran Hospital Staff.

39. Dr. Thomas Ryan informed me in the presence of my daughter and my husband that I was "healthy as a horse" and could discontinue all oxygen therapy.

40. At that time they (the physicians) verbally told me in the presence of my daughter and husband that:
    - I should cancel cancel my Boston appointment
    - There were no signs of pulmonary hypertension
    - There was no evidence of my needing oxygen for any symptoms.

41. On July 28, 2009, upon dismissing me from Lutheran's ICCU, Dr. Ryan told me that no records existed of me needing the oxygen during my 3 day ICCU stay.

42. "Anonymous" signed medical records show exactly the opposite and concurred that the "oxygen alarm" had gone off while hospitalized, though Dr. Ryan denied this. (EXHIBIT 3)

43. I was treated by the physicians "anonymous" and the Baltes Group (Dr. Ryan included) in this case between July 26-2009 to July 29, 2009. (See EXHIBIT 4 billing statement including charges for Dr. Ryan on July 26, 27, and 28, 2009.

44. Not until August 18, 2009, did I receive medical records that conflicted with my July 26-28, 2009 ER admission to Lutheran Hospitals ICCU..removed from necessary records

45. I was in contact with the Baltes Medical Group in connection with my benefits administration position and was speaking with them about receiving records for an employee. I asked the person I spoke with if she could do me a favor and fax me my own records on my dedicated fax line which she did.

46. Upon reading those records on August 18, 2009, I immediately went unannounced to Lutheran Hospital's Medical Records and waited for approximately 276 pages of medical records to be printed for myself.

47. The faxed records sent to me on August 18, 2009 are attached as EXHIBIT 5 to this Supporting Affidavit.

48. On August 21, 2009, I kept my Boston Medical Center appointment with world renowned Pulmonary Hypertension specialist, Dr. Harrison (Hap) Farber.

49. Dr. Farber confirmed on the spot in front of my husband and me that I indeed had Pulmonary Hypertension for a yet to be determined cause.

50. Dr. Farber's diagnosis agreed with "concealed medical records" that were the direct opposite of Dr. Ryan's July 27-28, 2009 statements.

51. A lawsuit was filed in October 2004 against Vioxx maker Merck & Company for my

symptoms and my then attorneys followed necessary legal procedures to gain my documents from Lutheran Hospital, Baltes Medical Group, and Boston Medical Center in October 2009.

52. When my attorney-client relationship did not work out with the former Indianapolis, Indiana law firm for what they felt was lack of necessary medical evidence based on their examination of the records, those same medical records were returned to me.

53. Upon examination in February 2012 of CD/DVD disk provided by my former attorneys that was ultimately submitted as in my now pro se case in the US Federal Courts in Louisiana under Judge Eldon Fallon, I discovered my medical records related to my true diagnosis were conveniently omitted.

54. Those incomplete records were previously supplied to my former attorneys by Lutheran Hospital, The Baltes Medical Group, and Boston Medical Center.

55. The CD supplied my former attorneys which allegedly contained all medical records omitted critical information and was designed, in my opinion, to mischaracterize and conceal actual events that were relevant to my Vioxx case as well as this one now pending before the Indiana Department of Insurance.

56. A true and unedited copy the DVD as supplied from the my former law firm as my complete medical record history is attached to this Affidavit.

Further Affiant sayeth not.

JANICE M. BAUM

Dated: May 28, 2012.

Subscribed and sworn to as true by Janice M. Baum, before me a Notary Public for the County of Oakland, State of Michigan on Monday, after verifying identity of above affiant by appropriate picture identification, to wit her Indiana driver's license.

CONSTANCE E. CUMBEY, Notary Public, Oakland County, Michigan
My commission expires February 28, 2016

STATE OF INDIANA    )               IN THE ALLEN COUNTY SUPERIOR COURT
                          ) SS
COUNTY OF ALLEN    )               CAUSE NO. 02D01-CT1202100

JANICE M. BAUM,                     )

               Plaintiff       )

vs.                             )

ANONYMOUS MEDICAL PROVIDER 1,   )
et al
              Defendants.   )

| | |
|---|---|
| **Janice M. Baum**<br>**Plaintiff in *pro se***<br>**8716 Woodstream Drive**<br>**Fort Wayne, IN 46804**<br>**(260) 466-2568** | ROTHBERG LOGAN & WARSCO LLP<br>by Jason A. Scheele #23121-53<br>Attorneys for Defendants<br>505 E. Washington Boulevard<br>Fort Wayne, IN 46802<br>(260) 422-9454; |
| | CHARLES W. McNAGNY #9938-02<br>Attorney for Defendants<br>1600 Lincoln Tower<br>116 East Berry Street<br>Fort Wayne, IN 46802<br>(260) 422-4706; 260-422-4708 FAX |

## PLAINTIFF'S REPLY BRIEF

**FACTS:** Plaintiff has followed requisite procedures of submitting her Medical Malpractice and intentional concealment claims to the Indiana Department of Insurance. Defendant physicians wish to short circuit the process by having the Allen County, Indiana courts take jurisdiction and declare the matter out of bounds to the State Authority for alleged Statute of Limitations reasons.

They claim the last day of treatment occurred in early April 2009. In actuality, the three doctors rendered their services on July 26-28, 2009. (See **Affidavit Exhibit 5**, Billing Statement from Lutheran Hospital). Furthermore, the doctors and/or their designees either negligently handled the records and/or intentionally concealed same to misrepresent the true facts in the case so as to prevent

the Plaintiff from obtaining a diagnosis of which they already had to know until August 18, 2009, the day she received records on her dedicated fax line at her place of employment as a Benefits Administrator for AWS (Anthony Wayne Services).

As the matter was concealed from her until that time, pursuant to well established Indiana case law, the Statute of Limitations did not work to toll her case until two years after August 18, 2009. Plaintiff filed her complaint with the Indiana Department of Insurance on June 5, 2011, well within two years of learning of the medical malfeasances.

LAW

Quoting verbatun learned defendant's counsel's brief, we read:

> *I. C. 34-18-7-1 provides the relevant statute of limitations regarding this action. The section reads, in relevant part:*
> *"A claim, whether in contract or tort, may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect . . . "*
> *I.C. 34-18-7-1 (b). The statute is an occurrence rule, not a discovery rule, and the two-year period begins to run from the date of the act, omission, or neglect complained of rather than the date it was discovered. Alwood v. Davis, 411 N.E.2d 759 (Ind. App. 1980); see also Hosp. Corp. Of America v. Hiland, 547 N.E.2d 869 (Ind. App. 1989). When the Plaintiffs' claim of medical malpractice is a failure to diagnose, the omission cannot as a matter of law extend beyond the time the physician last entered a diagnosis. Havens v. Ritchry, 582 N.E.2d 792 (Ind. App. 1991). The failure to file a Complaint with the Indiana Department of Insurance within two years of the occurrence of the alleged omission is ordinarily fatal to a plaintiff's claim. Mayfield v. Continental Rehab. Hosp. Of Terre Haute, 690 N.E.2d 738, 741 (Ind. App. 1998).*

All the law that Defense counsel quotes above is distinctly pre-1999, the year that the Indiana Supreme Court held that while facially constitutional, in certain circumstances such as where the mistaken diagnosis could not have been earlier discovered or where there was obstruction of evidence, its application could then be held unconstitutional. In 1999, the Indiana Supreme Court upheld an appellate court's decision to reverse a trial courts' granting of summary disposition in a case where evidence had been withheld. See *Martin v. Richey,* 711 NE 2d 1273, Ind: Supreme Court, 1999

Quoting significantly from Martin (supra), we read:

> *The statute of limitations is also unconstitutional under Section 12 because it requires plaintiff to file a claim before she is able to discover the alleged malpractice and her resulting injury, and, therefore, it imposes an impossible condition on her access to the courts and pursuit of her tort remedy.*

2 OF 5

In this case, Plaintiff has set forth allegations, given her sworn affidavit in support and produced documents that could be interpreted by a finder of fact as "active fraudulent concealment." The documents were withheld from her and from her legal service providers until they were inadvertently furnished to her by employees on August 18, 2009. At that time, she went to obtain the Lutheran Hospital and Baltes Cardiac Group records in their entirety, only to find that the records she had been faxed on August 18th were not included in the official hospital nor Baltes group records. It was clearly something that had been meant to be selectively withheld. Even if negligently omitted rather than selectively withheld, the absence of those records which suggest that indeed the local medical providers did well know of Plaintiff's pulmonary hypertension condition. The July 26-28 representation to her that she had no pulmonary hypertension, no need for oxygen, and no need for her Boston trip for the "second opinion" are at issue. Her local physicians who from the paperwork gleaned from their office on August 18, 2009, were aware of of her true condition, but saw it for reasons probably best known personally to them to contrive for her to forsake all curative measures for same and encouraging her to cancel the very trip where the diagnosis of pulmonary hypertension was medically verified.

In a companion case to *Martin, Van Dusen* the Indiana Supreme Court held that in cases such as this where application of the two years stemming from the diagnosis is unconstitutional, the Plaintiff shall have a full two years from date of discovery to bring action. (Van Dusen as cited in *Shah v. Harris, 758 NE 2d 953* - Ind: Court of Appeals 2001:

> Upon review of Martin's case and the companion case of *Van Dusen, 712 N.E.2d at 491,* the Indiana Supreme Court held that under Article I, Sections 12 and 23 of the Indiana Constitution, the two-year statute of limitations applicable to medical malpractice claims is unconstitutional as applied to plaintiffs such as Martin, who could not have discovered the injury with reasonable diligence within two years of the alleged misconduct. *Van Dusen, 712 N.E.2d at 493; Martin, 711 N.E.2d at 1282, 1284-85.* In order to qualify under this exception, a plaintiff must have "no information that, in the exercise of reasonable diligence, should have led to the discovery of the alleged malpractice and ... resulting condition during the statutory period." *Van Dusen, 712 N.E.2d at 493.* Our supreme court further held in Van Dusen that in such cases where this statute of limitations is unconstitutional as applied, a plaintiff is given a full two-year time period within which to file suit, starting from the time "they discover the malpractice and the resulting injury or facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury." Id.

## CONCLUSION

The extreme steps the Defendants took to conceal evidence, have Plaintiff tested for mental competency for having the temerity to request testing for an extremely serious medical diagnosis that proved to be very real and not a figment of her imagination unquestionably delayed Plaintiff's ability to timely discover the negligence and/or even schemed tortious actions of the Defendants. As concealment was active and not inadvertently discovered by the actions of an office employee who faxed to Plaintiff documents her employers clearly did not wish for Plaintiff and her attorneys to know existed, Plaintiff could not have discovered the matter any earlier than August 18th. The argument that the last treatment and diagnosis was on April 1-3, 2009 is simply not sustainable on intelligent review. As such there is a very real issue of fact that would make summary judgment justifiable either on factual or statute of limitation grounds. Defendant's motion should be denied with costs awardable to Plaintiff Janice M. Baum. The matter clearly belongs with the statutorily authorized state agency Indiana Department of Insurance where it was properly placed by Plaintiff and where it should remain until they have finished their necessary work.

Respectfully submitted,

_____

JANICE M. BAUM, Plaintiff in pro se
8716 Woodstream Drive
Fort Wayne, IN 46804
(260) 466-2568

Dated: May 28, 2012

## CERTIFICATION AND PROOF OF SERVICE PURSUANT TO COURT RULE 4.15

I certify that on this date, May 29, 2012. I served a true copy of the attached documents consisting of Answer to Motion, Brief in Support, and Affidavit in Support upon all counsel of record or on the parties individually if unrepresented by counsel by delivery to their office and leaving same with the

receptionist or person in charge:


_____
JANICE M. BAUM (Pro Se)

**Northeast Indiana Consortium**
**6223 Constitution Dr**
**Fort Wayne, IN 46804**
**Phone: (260) 755-5896**
**Fax: (260) 755-5927**

| | | |
|---|---|---|
| Patient: | **Janice Baum** | Instruments used |
| DOB: | 8/30/51 | MMPI-2 |
| Date of Testing: | | Rorschach |
| Date of Report: | 4/30/09 | |
| Referral Source: | Dr. White | |

Janice is a 57 year old white female who presented for psychological evaluation on 4/30/09; she was referred by Dr. White after an inpatient stay at St. Joe Behavioral Health. She was pleasant to work with and was cooperative with each of the assessment tools. Janice reported that she was admitted to SBH just after Easter Sunday as a result of 'stress-related issues' due to her ongoing medical concerns. She took the drug Vioxx for a number of years and believes that this has left her with a condition called Primary Pulmonary Hypertension. Although she reported having 11 symptoms of this condition, she cannot find a doctor who will verify that this is the condition she is suffering from.

Janice's MMPI-2 results show a valid protocol with no signs of under or over-reporting. There is some indication that she is concerned with her physical body and its functioning; this elevation was not high enough to suggest any pathological over-concern in this area, and is consistent with someone who may have genuine medical issues. In addition to this, her testing pointed to high levels of energy and activation that would be consistent with hypomanic-like symptoms; even so, this elevation is not diagnostic and should be considered only with all relevant history.

Her Rorschach results also reveal a valid protocol and suggest that she was open and cooperative with the test-taking process. There is a good indication that there is some anger or resentment that is present; this could very well be a situational variable that is indicative of her response toward her current life events and the frustrations she has encountered. Along with this, there is a higher than average level of defensiveness that is present; this might also be accounted for by the current situation Janice finds herself in.

There appears to be a preoccupation with the physical body and its functioning. While it may be that this has always been the case for Janice, it is reasonable that her current physical issues have given rise to this finding. As such, the current elevation may be reflective only of Janice's present circumstances and the stress that she is experiencing because of this.

Janice's processing style suggests a strong tendency to examine her social field much less thoroughly than would be desired. Because of this, she may come to conclusions somewhat hastily after paying only cursory attention to details. As such, her information

processing may be ill-considered at times, and may lead to errors of oversight. This variable has the most important implications for the issue at hand, as Janice is at risk for misinterpreting physical symptoms such that she might 'jump to conclusions' rather than carefully and thoroughly considering all possibilities. Even so, given her current medical condition (including her need for oxygen) it would appear as though her concerns are grounded in the external reality of her physical malfunctioning.

The current testing shows no indication of a Somatoform Disorder, and no indication of psychotic or disorganized thought processes.

Tom Dettmer MA, LMHC
Doctoral Intern

(260) 609-7007