UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION L |
| | * | |
| THIS DOCUMENT RELATES TO: | * | JUDGE FALLON |
| THIRD PARTY PAYOR COMMON | * | MAG. JUDGE KNOWLES |
| BENEFIT FEES | * | |
| FILER: Robert E. Arceneaux/Margaret Woodward/ | * | August 10, 2012 |
| Pascal F. Calogero, Jr. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**ERIC H. WEINBERG'S OBJECTION TO THE RECOMMENDATION OF THE
TPP FAC FOR THE ALLOCATION OF COMMON BENEFIT FEES AND COSTS**

MAY IT PLEASE THE COURT:

This objection is respectfully submitted on behalf of the Law Offices of Eric H. Weinberg ("Weinberg") in accordance this Court's order of July 25, 2012.

**I. PROCEDURAL OBJECTION**: **Claimants to the TPP common benefit fund are entitled to procedural due process, including discovery of all relevant data.**

The Third Party Payor ("TPP") Common Benefit Settlement Agreement established a Common Benefit Fee and Expense Fund in the amount of $15,000,000.  In order to simplify and expedite the handling of claims against that fund, the agreement further provided for their referral "to the Honorable Eldon E. Fallon for determination and administration." (Rec. Doc. 63928-3, Exh. C, p. 5).  The agreement reflected a commitment to due process in stating that the Court's awards would issue "upon due consideration by him in accordance with established procedures for notice, objection, and hearing in conformance with Fifth Circuit precedent."  *Id.* (Citations omitted).

As this Court has often observed, at the heart of the procedures established by the Fifth Circuit for the allocation of attorneys' fees is the requirement of transparency.  Transparency in this action, no less than in prior actions, cannot be achieved without the production of data permitting

comparison of the various claims.  Thus, in *In re High Sulfur Content Gasoline Products Liability Litigation,* 517 F. 3d 220, 232 (5th Cir. 2008), Judge Jones noted that: "One cannot . . . compare apples to oranges without knowing what the oranges are. *** After all, '[a]llocation means proportion; how does the share [one] counsel is taking compare to the shares others are getting?' *In re Vitamins Antitrust Litig.*, 398 F.Supp.2d at 234."

Notwithstanding this established precedent, the TPP FAC has urged this Court to foreclose comparative analysis by anyone save the TPP FAC and the Court.  In its June 13, 2012 Recommendation, the TPP FAC "suggest[ed] that the Court implement as streamlined a process as possible." (Rec. Doc. 63928, p.8).  Transparency, in its view, is subject to streamlining.  In connection with its earlier, nonspecific recommendation, the TPP FAC sought and obtained this Court's permission to file "Exhibit D" under seal.  *See,* Order, November 11, 2011.  Exhibit D contained the very materials essential to comparative analysis, namely, the submissions of time, expense, and contribution to the common benefit by all claimants.  Since that time, the TPP FAC has received supplemental materials from various claimants.  The old and new submissions were again submitted to the Court in connection with the June 2012 Recommendation as Exhibit D; and Exhibit D was again submitted under seal.   (Rec. Doc. 63928, p. 6).

The TPP FAC assured the Court that it considered the established precedent for fee awards "in evaluating the applications and making the following recommendations," *Id.,* at 7, but its recommended allocation belies that assertion.  In regard to Weinberg, the TPP noted his submission of $1,165,892 time and expenses, confirmed that such time was not duplicated in the personal injury process nor compensated by TPP clients, and quoted Weinberg's detailed assertion that he was a leader in the TPP litigation, a claim the TPP FAC did not dispute.  After these recitations, the FAC announced its recommended award of fees: zero.  Its recommended reimbursement of common

benefit expenses: zero. *Id.,* at 25-26. The TPP FAC did not give any explanation as to how it arrived at this recommendation, much less how the recommendation comports with established precedent.

By contrast, the TPP FAC recommended for its members almost full lodestar or better. In some instances, it appears, the FAC recommended for its members overlapping compensation for time also submitted as providing common benefit in the personal injury litigation. In other instances, it appears that the FAC may have recommended for its members compensation for time duplicatively compensated by clients. These appearances cannot be confirmed or dismissed without access to the records.

In withholding both the basis for its recommendation and the basis for a comparative analysis, the TPP FAC deprived Weinberg of the ability to make a meaningful objection to its recommendation. Yes, he can reiterate substance of his submissions, and the following section does so. But he cannot demonstrate, in a vacuum of information, the unfairness of an allocation of "zero" as compared to what other claimants were afforded in the recommendation, or whether his lodestar is subject to any multiplier. Consequently, his principal objection to the TPP FAC's recommendation is in its failure to afford the transparency that would permit a fully reasoned objection.

The only justifications offered by the TPP FAC for the "streamlined" elimination of transparency are the "rule of proportionality" and the contractual authority of the Court to make a non-appealable decision. Neither argument is availing against the requirements of due process.

The TPP Common Benefit Agreement essentially embodies a contractual agreement to submit the matter of common benefit attorneys' fees to binding arbitration. Enforceability of such an agreement under the Federal Arbitration Act ("FAA"), 9 U.S.C. §2, depends upon its passing

muster under the rules of law and equity that regulate the formation of contracts. Because Weinberg has an obvious and substantial property interest in the federally-administered $15 million fund, due process requirements attach to the TPP FAC's recommended annihilation of that interest.

The agreement's provision of non-appealability is unconscionable and unenforceable as to attorneys such as Weinberg who neither negotiated nor signed the agreement. *See e.g., Wright v. Universal Maritime Service Corporation,* 525 U.S. 70, 79-81, 119 S. Ct. 391, 396-397 (1998) (questioning the right of the union to waive its members' rights in a collective bargaining agreement). This is particularly true in the present case where the negotiators have demonstrated that their interests are adverse to Weinberg's.

Likewise, the denial of appropriate discovery would amount to an agreement-undermining deprivation of due process. In *AT&T Mobility v. Concepcion,* 131 S. Ct. 1740 (2011), the High Court considered whether the FAA preempted a provision of California law, which would have invalidated an arbitration agreement for failure to permit class arbitration. The court found that the FAA displaced the California law, because the law disfavored arbitration in a way that conflicted with federal law. In reaching that conclusion, the Court expressly distinguished a rule requiring judicially-monitored discovery in arbitration, which would easily pass muster:

> A court might reason that no consumer would knowingly waive his right to full discovery, as this would enable companies to hide their wrongdoing. Or the court might simply say that such agreements are exculpatory– restricting discovery would be of greater benefit to the company rather than the consumer, since the former is more likely to be sued than to sue.

*Id.,* at 1747.

The rules of contract law aside, it is difficult to understand how parties can choose a federal judge as arbiter without also choosing the rules of federal procedure and the substantive law governing the subject matter. The TPP Agreement provides that it "shall be governed by and

construed in accordance with the law of New York." (Rec. Doc. 63928, Exh. C, ¶8.2.1). But in regard to Judge Fallon's award of common benefit fees, it specifically provides for "due consideration by him in accordance with established procedures for notice, objection and hearing in conformance with Fifth Circuit precedent. *Id.,* at ¶5.2.1.

That precedent includes the right to examine data permitting comparative analysis. *In re High Sulfur* strongly condemned the cards-to-the-vest conduct the TPP FAC has exhibited here:

> **Appellants could not compare their awards to those of other attorneys. They were not** furnished with the hours and rates that other attorneys submitted or **informed of the Fee Committee's process, yet such information was essential to enable them to challenge how the Fee Committee valued their work.** *See In re Vitamins Antitrust Litig.*, 398 F.Supp.2d 209, 234 (D.D.C.2005) (lead counsel responsible for fee allocation must "apply a universally fair standard of allocation to all participants, including itself").

517 F. 3d 220, 232.

This Court likewise made available the materials necessary to a comparative analysis in the personal injury litigation. A Joint Motion to Access to documents was filed that included the following:

(4)   access to all fee submissions made by any attorneys or firms who submitted requests for common benefit fees, including any documentation or exhibits submitted in connection therewith;

(5)   access to all time records submitted by attorneys or firms who submitted requests for common benefit fees;

(6)   access to all costs records submitted by attorneys or firms who submitted requests for common benefit fees.

Rec. Doc. 54315.

This Court granted the motion, stating that "[t]he movants are entitled to the requested discovery." Rec. Doc. 56731. This Court's order further provided that there would be reasonable access to the records at Objectors' expense, and that the records would be remain confidential, to be used only

in connection with the litigation. *Id.*  Just as the Court made the FAC produce all relevant materials in connection with the Common Benefit Fee Allocation in the personal injury litigation, subject to confidentiality agreements as appropriate, the same should be done here.

**II.   Weinberg has provided detailed justification for a common benefit award of no less than $1,165,892.61.**

**A.   Weinberg made substantial contributions to the TPP common benefit.**

Weinberg's timely Original Submission to the TPP FAC is attached hereto as Exhibit A.  It appended daily records of 1518 hours of time, all of them entered by Weinberg himself, at a rate of $750/hr., yielding a lodestar of $1,138,500; it further detailed $27,392.61 in expenses, with each entry supported by an invoice.  Weinberg's Supplemental Submission to the TPP FAC, which showed that such time and expenses had not previously been submitted or compensated, is attached hereto as Exhibit B.  Weinberg's Addendum is attached hereto as Exhibit C.  The Addendum noted that several claimants to the TPP common benefit fund appeared to have submitted hours overlapping with previous submissions in the personal injury case; if duplication were allowable, Weinberg noted, he should be credited with an additional 1680 hours of time that benefitted the TPP action, bringing his common benefit lodestar to $2,398,500.

Certifications of Counsel in support of Weinberg's Reply and Objection are attached hereto as Exhibit D.  Additionally, relevant emails are attached, identified in sequence beginning with Exhibit E-1, et seq.

Exhibits A, B, and C  detail Weinberg's work for the common benefit of Vioxx Private TPP plaintiffs.  These submissions demonstrate that Weinberg occupied a leadership role by invitation of members of the TPP FAC.  Devoting considerable time and expertise to the litigation, he made significant and well-recognized contributions to the common benefit.  Most importantly, Weinberg's

contributions have been extensively utilized.   Prior to 2007, Weinberg formulated what is currently the prevailing framework of the Vioxx TPP liability case.  To the present day, he has continued to develop cutting-edge common benefit evidence, principally expert scientific evidence, including proof of a panoply of risks of Vioxx that were not disclosed to Third Party Payors.[1]  Lead and Liason counsel were fully cognizant of this work, and endorsed it.

As a result of Weinberg's early command of the scientific issues, in March of 2008, Lead Counsel confirmed a working partnership in the TPP litigation among Seeger Weiss, Weinberg, and Cohen Placitella & Roth.[2] (*See,* Exhibit E-1).  Weinberg continued to develop and share the broader risk/benefit evidence case against Merck throughout 2008 and 2009.  For example, he provided Lead MDL and New Jersey counsel with a road map to this strategy in July of 2008 (Exhibits E-2 and E-3); met with Lead Counsel and Liaison Counsel at their offices in New York City in September of 2008 to "discuss trial themes and vet liability theories" (Exhibit E-4)[3]; prepared and circulated Guidelines for document review in October of 2008 (Exhibit E-5); provided expert analysis of risk data in the Alzheimer's Studies to Liaison Counsel in November of 2008 (Exhibit E-6); and in late 2008 and early 2009 provided to MDL Lead Counsel work product on a significant risk-issue that had not previously been pursued in the MDL.  (Exhibits E-7, E-8 and E-9).

In January of 2009, Liason Counsel endorsed Weinberg's litigation strategy of broadening the evidence of the risks associated with Vioxx that were relevant to the plaintiffs' purchasing

---

[1] Weinberg is currently counsel to the State of Utah in pending litigation against Merck, and is working for counsel representing the State of Pennsylvania in pending litigation against Merck.

[2] Of the three firms in the "working group" the FAC recommended a $4.7 million fee to Seeger Weiss (all overlapping fees apparently for work on the decertified New Jersey class action), and zero fees to Weinberg and to Cohen Placitella & Roth.

[3] Lead Counsel Christopher Seeger and Liason Counsel David Buchanan attended this meeting, along with their then-partner, Jeffrey Grand.  The agenda was common benefit work.

decisions.[4] (Exhibit E-10).   In February of 2009 Weinberg organized a working meeting of Vioxx TPP counsel in New Jersey, at the request of Liaison Counsel. (Exhibit E-11) The meeting took place in Atlantic City in March of 2009 and was attended by several plaintiffs' counsel representing private TPPs in New Jersey, including Liaison Counsel.  Weinberg arranged and chaired the meeting, created the work guidelines and agenda, and drafted and circulated the minutes of the meeting.

In May of 2009, Weinberg accompanied a biostatistics expert to Melbourne, Australia., where he testified in the Australian Class Action trial.  Weinberg's first-hand view of Merck's assault against this evidence proved invaluable in the further development of the expert and theories of liability to be utilized in the Vioxx Private TPP cases.   Many attorneys in the TPP litigation looked to Weinberg for leadership on proving undisclosed risks of Vioxx.[5] (see Exhibit C).  Joseph Grinstein, Esq. and Mark Schultz, Esq., attorneys who represented plaintiffs in TPP litigation, have each submitted Certifications attesting to the value of Weinberg's work.  They have  no interest in his entitlement to Common Benefit Fees.

By June and July of 2009, it was apparent that few MDL lawyers were working on the TPP cases.  Weinberg made substantial efforts to coordinate with PSC firms in Third Party Payor litigation. He shared theories of liability and expert work product with MDL lawyers and suggested the integration into the MDL of valuable work product that would serve the common benefit of all TPP plaintiffs.[6]  (See Exhibits E-12, E-13, and E-14)

---

[4] David Buchanan of Seeger Weiss was Liason Counsel in New Jersey.

[5] Two lawyers who attended this meeting have provided Certifications in Support of Weinberg's Objection; see Exhibit D.

[6] The FAC recommended substantial awards for work that has not similarly endured.  The value of common benefit work is perhaps best defined by whether that work is actually relied upon by plaintiffs in actual litigation.  By this test, the
(continued...)

Weinberg's workup of a viable theory of liability for Third Party Payor Plaintiffs, which continues to serve as the linchpin of the TPP liability case, merits, at the very least, full compensation.

**B.     The TPP FAC offered no justification for awarding Weinberg less than lodestar.**

The TPP FAC recommended that Weinberg receive no payment for his time, and no reimbursement for his expenses. It assigned no reasons whatsoever for this recommendation. It did not dispute his hours, his expenses, nor his recitation of significant contributions, most of which were well known to members of the TPP FAC.

Several of the FAC's general observations squarely support full compensation of Weinberg. The Recommendation notes with approval the "aggressive" litigation of TPP cases in New Jersey, (Rec. Doc. 63928, p. 2), in which Weinberg took a leading role. It states that client-specific work was discounted; and it notes, with respect to Weinberg, that none of his work fit within that category. *Id.,* at 7, 26. It also notes that none of Weinberg's time was previously submitted in the personal injury action. *Id.,* at 25. A review of Weinberg's detailed time records confirms the entry of TPP work exclusively.

The TPP FAC places the claimants into three "buckets": those who should be well-compensated for "significant substantive TPP common benefit work;" those who received no compensation in the personal injury litigation and should be "reasonably compensated for their TPP common benefit contributions;" and those who "did not contribute meaningfully to the common benefit of TPPS." *Id.,* at p. 8. Because Weinberg clearly belongs in the first bucket, and, equally clearly, cannot be dumped into the last, it appears that the TPP FAC may have placed him into the

---

[6](...continued)
FAC has it backwards, awarding nothing for work that is currently being relied upon by Vioxx plaintiffs.

mysterious second, somehow disqualifying him on account of his having received compensation in the personal injury litigation. It notes that he received $3.5 million in the prior allocation; but it makes no showing how this fact is relevant to the TPP allocation. Given the certification that Weinberg's TPP hours were not previously submitted, it would make no sense to penalize him for his prior compensation in the personal injury litigation, any more than to penalize him for having previously been paid in cases completely outside the Vioxx litigation. Every member of the TPP FAC was likewise compensated in the prior allocation, and this does not seem to have adversely impacted any of their recommendations.

Without sharing any details about the claims against the $15 million dollar fund, the TPP FAC observes that those claims totaled $23 million. *Id.,* at 8. The relatively minor disparity between available funds and overall claims offers no insight into the complete elimination of Weinberg's claim.

Nothing in the recommendation explains the complete dismissal of the claim of an unquestioned leader in the TPP litigation.

  **C. Several factors warrant the application of a multiplier to Weinberg's lodestar.**

The TPP Agreement directs this Court to adhere to Fifth Circuit precedent in making the common benefit fee allocation. That precedent begins with calculation of a lodestar, then, where appropriate, the application of a multiplier. *Forbush v. J.C. Penney Co.*, 98 F.3d 817 (5th Cir. 1996). Adjustment of the lodestar upward or downward depends on the respective weights of the twelve factors expressed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.1974), abrogated on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989):

  (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the

skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the political "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases).

Several of the *Johnson* factors apply to Weinberg's work. He became involved in the TPP cases early, and worked them hard. The TPP FAC recognizes that New Jersey substantially preceded the MDL in TPP litigation. (Rec. Doc. 63928, p. 2). The "several years lull on the TPP front," which the FAC acknowledges, *Id,* was largely restricted to the MDL. Thus, the TPP work in New Jersey served as the template for most of the TPP litigation.

Weinberg, who occupied a central role in the New Jersey efforts, made among the most significant contributions to the overall TPP litigation. He developed much of the scientific theory, which greatly exceeds in novelty and difficulty the administrative work undertaken by claimants for whom the TPP FAC recommends substantially higher compensation. Additionally, Weinberg contributed substantial funds to the development of such evidence, which the FAC has not only disregarded as a multiplier, but proposes not to reimburse.

Weinberg's experience and reputation, and the high quality of his work has already been documented by this Court following extensive proceedings in the personal injury litigation. Such expertise was heavily relied upon in the TPP litigation, and in fact, continues to be relied upon in TPP cases across the country.[7] Such reliance strongly suggests that Weinberg's work contributed substantially to the negotiation of a settlement in the TPP cases.

Unlike most other claimants, Weinberg received no fee for his work from any TPP clients.

---

[7] For example, in pending Government Third Party Payor cases brought by Utah and Pennsylvania, and likely in Kentucky, Mississippi and Alaska; and in a pending consumer class action case in Missouri.

He devoted himself entirely to the common benefit, and therefore is entirely dependent on a just allocation for the compensation of his work.  As a sole practitioner, Weinberg took substantial risks in devoting such extensive efforts to the TPP cases.

Finally, he gave considerable time to the TPP litigation which was submitted but not compensated in the personal injury litigation.  In seeking supplemental submissions, the TPP FAC specifically inquired into client-specific work and prior submission of hours in the personal injury litigation.  Presumably, it intended to exclude *both* categories of time from its recommendations.  The client-specific work, as noted above, was expressly rejected by the FAC. (Rec. Doc. 63928, p. 7). However, it notably omitted from its "threshold observations" any reference to the appropriate treatment of hours previously submitted in connection with the common benefit fee allocation in the personal injury action.  With respect to Weinberg, the Recommendation expressly and accurately notes that his time was not previously submitted.  On the other hand, it has recommended full compensation for some of its members' time which was previously submitted and compensated.

Because Weinberg suspected, even before the Recommendation issued, that other claimants were duplicating previously-submitted time in their TPP claims, he tendered an Addendum which added 1680 hours of previously-submitted time that also benefitted the TPP action, bringing his common benefit lodestar to $2,398,500.   *See,* Exhibit C.   The TPP FAC did not list nor in any way acknowledge this submission.  Nor did it explain how Weinberg's overlapping hours are distinguishable from those of FAC members for which it has recommended a second payment of common benefit fees.  This is one of the significant questions that can only be addressed by reference to the TPP FAC's sealed  Exhibit D.

If the duplicated hours are disallowed for one claimant, they should be disallowed for all. Conversely, if they are allowed for any claimants, they must be allowed for all.  If they are

disallowed, which seems the best approach to an already over-committed fund, they would form the partial basis for a multiplier for Weinberg, who was not fully compensated in the prior allocation for hours that benefitted the TPP common cause.

Arriving at an appropriate multiplier for Weinberg is impossible without access to the other claims, currently under seal. However, considering that claims of $23 million have been made against a fund of $15 million, it appears that the multiplier should be relatively low. Nonetheless, Fifth Circuit precedent calls for weighted compensation of varying contributions. The TPP FAC echoes that call. (Rec. Doc., 63928, p. 8). Weinberg's experience, skill, and contributions to the TPP litigation, together with other *Johnson* factors discussed above, suggest that he belongs in the top tier of claimants, deserving the highest multiplier applied.

In observance of this Court's requirement that Weinberg provide a specific claim, we make the following assumptions:

- all claimants' hours will be restricted to those which were not submitted in the personal injury litigation; in that case Weinberg's hours stand at 1518
- lodestar will establish the starting point of the analysis; Weinberg's lodestar is $1,138,500
- a multiplier of no higher than 1.50 will be applied to the top tier of contributors; Weinberg's adjusted lodestar is $1,707,750
- all documented expenses will be reimbursed in full; Weinberg incurred $27,392.61 in expenses

If any of these assumptions prove incorrect, or if the TPP FAC's Exhibit D reveals other pertinent considerations, we reserve the right to amend our claim. At present, however, it stands at $1,735,142.61.

Respectfully submitted:

/s/ Robert E. Arceneaux                                   /s/ Margaret E. Woodward

_____                        _____
Robert E. Arceneaux, La Bar No. 01199                     MARGARET E. WOODWARD, La. Bar
ROBERT E. ARCENEAUX LLC                                   No.13677
47 Beverly Garden Drive                                   3701 Canal Street, Suite C
Metairie, LA 70001                                        New Orleans, Louisiana  70119
(504) 833-7533 office                                     (504) 301-4333 office
(504) 833-7612 fax                                        (504) 301-4365 fax
rea7001@cox.net                                           mewno@aol.com


Pascal F. Calogero, Jr., La. Bar No. 03802
AJUBITA, LEFTWICH & SALZER, L.L.C.
1100 Poydras Street
New Orleans LA 70163-1950
(504) 582-2300 office
(504) 582-2310 fax
pcalogero@alsfirm.com

Attorneys for Law Offices of Eric Weinberg

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Objection has been served on by U.S. Mail and e-mail, and by upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No.8, on this date, August 10, 2012.


_____s/Margaret Woodward_____

-14-