# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX Products Liability Litigation | * | MDL No. 1657 |
| This Document Relates to: | * | SECTION L |
| State of Utah v. Merck, et al. | * | JUDGE ELDON E. FALLON |
| | * | MAGISTRATE JUDGE KNOWLES |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## STATE OF UTAH'S OPPOSITION TO MOTION TO COMPEL REGARDING DAMAGES

In the guise of a motion to compel, Defendant takes the unusual stance of attempting to dictate the manner in which the State of Utah ("Plaintiff") seeks to prove the amounts to which it is due. Defendant objects to the use of any expert statistical analysis as an aid to the jury. The time honored and traditional manner of objecting to scientific or technical testimony is through an Evidence Rule 702 challenge under *Daubert v. Merrell Dow*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993) and *Kumho Tire Company, Ltd v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed. 2d 238 (1999). Should this matter be remanded to Utah State Court, the proper measure would be governed by the unique structure of Utah Rule 702 which requires expert testimony to meet only a "threshold" showing of reliability.

Before deciding the applicability of expert testimony under Rule 702, the Plaintiff is entitled to the due process afforded under such hearings. Defendant makes no proffer of scientific evidence. Rather, Defendant relies solely upon its interpretation of the opinion in *In re*

1

*Zyprexa Products Liability Litigation,* 671 F. Supp. 2d 397 (2009). When applied to the facts of this case, Judge Weinstein's opinion is not as compelling as represented.

Further, it is highly questionable why Defendant brings this motion at this time. The Court has entered a case management order that reserves questions of damages for resolution after transfer or remand. There has been no motion to change this order. The Plaintiff has the right to rely upon the orders of the court as does Defendant. Needless to say, disclosure of the Plaintiff's damage witnesses will not be due for many months. However, we cite the following facts as a proffer of proof.

A. <u>The Utah Medicaid Database</u>

As the Court knows, Medicaid is a joint State-Federal program designed to provide health care to the very poorest members of society. Because the federal government invests large sums of money, it requires the state to maintain records reflecting when, where and how the money is spent. The Center for Medicaid Services (CMS) oversees that record keeping function. In a federal-state cooperative effort, the Utah Medicaid database (more properly databases) was established. The federal government pays approximately ninety percent of the costs of maintaining the database.

The Utah Medicaid database is not unique from all other CMS databases. Mr. Randy Baker who formerly oversaw that database is familiar with the databases of Montana and Idaho. There is no difference. Mr. Baker has attended conferences and consulted with other CMS approved Medicaid Databases and finds there to be little or no difference throughout the country. A person familiar with one CMS approved database ought to be able with little effort to obtain data from any other CMS approved database.

2

The advantage of the CMS approved databases is that a knowledgeable person may derive a number of reports which can be highly useful both in administering the program and ensuring that the goals of the state and federal government are met. The ability to run reports for this case is critical.

For example, there were approximately 11,627 Utah Medicaid patients who received 70,906 Vioxx prescriptions. In evaluation of this group of patients, our epidemiologist requested information from the database on the diagnosis of each patient as expressed in an ICD-9 code. Those events were hypertension, acute myocardial infarction ("MI"), acute ischemic heart diseases, unstable angina, angina, pulmonary embolism, pulmonary edema, heart failure, occlusion of cerebral arteries, occlusion of precerebral arteries.

It is important to note that using its database the state can determine to the penny the amount it paid for each individual patient. This is not a matter of group proof. It is a matter of reporting to the court the arithmetic involved. To this point of the analysis there are no statistics beyond addition.

However, as this court well knows there is the problem of confounding factors. In other words, not every MI found in the Medicaid database can be attributed solely to the use of Vioxx. The Court has labored diligently with that problem from the very first individual cases brought before it by the Panel. Defendant believes that for the Plaintiff to prevail, it must introduce testimony from every doctor and every recipient among the 11,000 odd Vioxx users. If the Plaintiff was pursing individual cases, medicine would be the relevant science as indeed it was in the individual cases that came before this court. For the Plaintiff to pursue 11,600 individual cases would obviously mean never ending litigation at such cost that could bankrupt all parties to

3

this litigation.

The Plaintiff is not seeking individual damages. It seeks the return of money that it had to pay because the Defendant put a defective drug on the market and made false claims about that drug. By nature, we are looking at damage to our Medicaid fund and not to any individual.

To account for the problem of confounding factors in its Medicaid Database, the Plaintiff turned to actuarial and epidemiological analysis. "Epidemiology is the field of public health that studies the incidence, distribution and etiology of disease in human populations….Epidemiology assumes that disease is not distributed randomly in a group of individuals and those identifiable subgroups, including those exposed to certain agents are at risk of contracting particular disease." *Reference Manual on Scientific Evidence*, Federal Judicial Center (3rd Edition) page 551. "The reliability of expert testimony founded on reasoning from epidemiological evidence is generally a fit subject for judicial notice; epidemiology is a well-established branch of science and medicine and epidemiologic evidence has been accepted in numerous cases." *DuLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 954 (3rd Cir 1990).

A simple example of why it is unnecessary and unscientific to name the victims is sufficient. The Defendant introduced poison into the Plaintiff's fish pond and killed half of the fish. According to the Defendant, for the plaintiff to recover, it must give the names of each of the dead fish. On the other hand, if the Defendant had epidemiological evidence showing that Vioxx had no causal connection to the signature injuries, one would fully expect them to have no objection to its introduction.

In performing epidemiological research the Plaintiff strictly limited itself to procedures approved by the Federal Judicial Center in its *Reference Manual on Scientific Evidence.* (3rd

4

Edition 2011). The Plaintiff's experts performed a "cohort study."

> In cohort studies, researchers define a study population without regard to the participants' disease status. The cohort may be defined in the present and followed forward into the future (prospectively) or it may be constructed retrospectively as of sometime in the past and followed over historical times toward the present. In either case, the researchers classify the study participants into groups based upon whether they were exposed to the agent of interest....In a retrospective study, the researcher will determine the proportion of individuals in the exposed group who develop the disease from available records or evidence and compare that proportion with the proportion of another group that was not exposed.

Id. At 557.

The ultimate goal of such studies is to determine the "Attributable Risk" of exposure to the agent (in this case Vioxx). "In other words, if the association is causal, the attributable risk is the proportion of disease in an exposed population that might be caused by the agent and that might be prevented by eliminating exposure to that agent." Id at 570.

In this case our experts created matching pairs of individuals. There was a set of individuals who received Vioxx (the exposed cohort) and a set of individuals who did not (the unexposed cohort). The patients were matched by diagnosis. In other words, if a Vioxx person had a heart attack prior to initiation of Vioxx, he was matched by a person who did not take Vioxx but who had a heart attack previous to the Vioxx date. The patients were also matched by sex, age (plus or minus five years). As a surrogate, for health status, the state's experts matched individuals with approximately the same amount of Medicaid health care costs for the year prior to the initiation of Vioxx. The assumption is that relatively sick people will use the same amounts of health care. The experts also matched on a propensity score based on the probability of being prescribed Vioxx by a physician based on the data recorded in the database. This resulted in a cohort of approximately 4990 Vioxx patients who could be matched with an equal

number of non-Vioxx patients from the State Medicaid database.

Comparing the costs for the exposed cohort of Vioxx user with the matched cohort of non Vioxx users, the experts estimate that the State has spent, out-of-pocket, more than $81 million dollars in the care of its Medicaid recipients in excess of what it would have spent if the drug had not come to market. This is not a group number. It is the compilation of actual costs paid by the state for individuals demonstrating known results of Vioxx accounting for underlying confounding propensities.

The excess cost paid by the Plaintiff for unmatched cohort of approximately 6637 Vioxx patients was estimated using regression analyses as described in the Reference Manual (pages 303 ff). The parameters of this model are estimated from the matched cohort. Excess costs for the unmatched cohort of Vioxx users is approximately $107 million. This represents the proportional increase in costs paid by the Plaintiff as a result of Vioxx use for the 6637 unmatched Vioxx users.

The actuarial analysis followed by the Plaintiff to reach matching controls and attributable risk is neither new nor novel. Every time a person goes to the drug store and receives a prescription, the pharmacist gives her a sheet on potential side effects. The drug company knows about those side effects because it has done an analysis to determine the statistical probability of that event occurring. Every time a drug company wishes to go to market, it is required to present to the FDA results of double blind randomized clinical trials. These trials are cohort studies similar to the cohorts described above with the exception that the individuals are placed in either the Vioxx use or placebo group randomly. After a drug is on the market, the manufacturer is required to continue to monitor and if necessary conduct further

6

cohort studies.

The clearest example of why drugs should be subjected to retrospective cohort analysis comes from this case. In January 1999, Merck conducted a prospective cohort study which came to be known as Vigor. Merck compared Vioxx users to naproxen users. When Vigor showed greater cardiovascular problems associated with Vioxx than naproxen, the Merck officials attempted to isolate the confounding factor. Unfortunately, they wrongfully concluded that naproxen had cardio-protective properties. The fact remains, however, that cohort analysis, whether a prospective randomized clinical trial or a retrospective study, is the main tool of choice used by the pharmaceutical industry to demonstrate safety and effectiveness of their drugs. It is therefore not unusual that the state would avail itself of the same statistical model and analysis.

Justice Scalia indicated a number of factors to be used in a *Daubert* analysis. First, has the theory or methods been tested? The answer is that matched cohort studies occur every day in the pharmaceutical world. Matched cohort studies have been peer reviewed constantly. One need only look at the federal manual on scientific evidence. The method does have an established rate of error. When it comes time to exchange expert damage testimony, Defendant will see that the damage estimates include a 95% confidence interval that is far above zero. Matched cohort studies such as the one conducted by the state follow the same protocols as any retrospective study performed by a pharmaceutical company. Controlled and matched cohort studies are accepted by the pharmaceutical community. No drug could ever come to market without performing the analysis performed by the state in assessing attributable risk of confounding factors.

7

B. Judge Weinstein's Concerns

In the Mississippi Zyprexa case before Judge Weinstein, there were unique concerns not presented here. (*In re Zyprexa,* 671 F.Supp. 2d. 397 (ED NY 2009).

First, Mississippi produced evidence of overpricing of Zyprexa. Dr. Rosenthal opined that there was a loss of value. "She attempted to quantify the monetary difference between what was represented and paid for and what was received." Id at 426. Obviously, that is not what Utah is attempting to do in this case. Utah wants the money it paid to take care of recipients with clearly defined injuries resulting from Vioxx.

Second, when Dr. Rosenthal attempted to testify as to increased costs for Medicaid people with diabetes, she did not know how many recipients fell into the class. Further, she did not use the Mississippi database to determine actual out of pocket costs. Utah knows to the penny what it paid for each recipient. Utah treats each exposed recipient as an individual and working from actual costs determines the attributable risk of Vioxx exposure on the recipient's injury.

Third, Judge Weinstein was concerned about issues of reliance. Judge Weinstein was concerned with cases alleging fraud or misrepresentation. Individual representation would be made to individual recipients and thus would vary among the members of a class. That, however, is not our case. Our case is not fraud and misrepresentation. It is for false claims.

We again point the court to the Utah Supreme Court decision in *State v. Apotex,* 2012 Utah 36. Reliance and deception are not elements of the False Claims Actions. Further, the state is the party and could collect for false claims regardless of what anyone in Utah knew, should have known or could have known. The Utah Supreme Court clearly stated that the statute

8

"provisions focus on a defendant's knowing submission of false claims."

Judge Weinstein was also worried about proof of individual damages. Again, Utah knows to the penny what it paid for each affected individual. The only question is calculating attributable risk.

C. <u>Utah Law Would Allow Actuarial and Epidemiological Evidence</u>

The Court has indicated that it would hear remand motions prior to engaging in damage discovery. The Plaintiff has always believed the case to have been improperly removed. Should the Court follow its plan of hearing remand motions following fact discovery, there is very little question but that the Utah Courts would allow the Plaintiff to prove attributable risk from its database.

In *Gunn Hill Dairy v. Los Angeles Department of Water,* 269 P.3d 980 (UT App 2012), the court allowed an animal epidemiologist to testify that stray electrical currents affected milk output of a number of affected farms without physically measuring stray current on each property. Under the unique amendments to Utah Rule 702, a proponent of scientific evidence need meet only a "threshold" showing of reliability. The court specifically referred to the *Reference Manual on Scientific Evidence.* Objections to the inadequacy of a study go to the weight of the evidence rather than admissibility.

The Utah Supreme Court has stated that "This threshold study is satisfied if the underlying principles or methods, including the sufficiency of the data and the manner of their application to the facts of the case, are generally accepted by the relevant expert community." *State v. Maestas,* 2012 UT 46 at paragraph 121.

Under Utah's threshold showing law, it seems clear that the trial court would allow

9

testimony of a cohort study from the Medicaid database. This is particularly true when the study methods conform to the federal manual adopted by the Court of Appeals. It would also be true when retrospective cohort studies are performed by pharmaceutical companies every day.

### D. The Evidence Conforms To Utah Substantive Law

We note that the legislature in adopting the Utah False Claims gave instructions on interpretation of all provisions including restitution. The provisions of the act are to "be liberally construed and applied to effectuate the chapter's remedial and deterrent purposes and serve the public interest." Utah Code Annotated 26-20-12. Defendant wants to litigate 11,000 individual cases. In passing the Act, the legislature was not setting up an impossible barrier. At the very least, "liberal construction" would allow the Plaintiff to do a cohort study exactly as would be done by a responsible pharmaceutical company.

This is further supported by Utah substantive damage law. The level of proof to show that a loss has occurred is the normal preponderance of evidence. There is very little doubt in anyone's mind at the present that Utah Medicaid has paid money as a result of damage to its Medicaid recipients. Thereafter, there is a lower burden of proof in establishing the amount of damage. "It is, after all, the wrongdoer, rather than the injured party, who should bear the burden of some uncertainty in the amount of damages." *Atkin Wright & Miles v. Mountain States Tel,* 709 P.2d 330 (Utah 1985).

The Plaintiff knows to the penny how much it has paid for recipients exposed to Vioxx. Under Utah law, if there is uncertainty as to how much risk should be attributed to the drug, that burden rests upon Defendant.

### CONCLUSION

Defendant wishes to compel the Plaintiff not to answer interrogatories but to accept their version of scientific evidence. When damages become at issue under the Court's order, we await the opportunity to present our evidence of cohort studies and attributable risk to the court in a proper Daubert hearing. Until and unless that happens there is nothing to compel.

The Plaintiff is entitled to present its case as it choses and not as Defendant demands. The interrogatory was fully answered and this motion must be denied.

DATED this 12th day of September, 2012.

/S/
Joseph W. Steele
Kenneth D. Lougee
STEELE & BIGGS
5664 South Green Street
Salt Lake City, UT 84123
*Attorneys for Plaintiff*

/S/
Eric H. Weinberg
The Law Offices of Eric H. Weinberg
149 Livingston Avenue
New Brunswick, NJ 08901
*Attorney for Plaintiff*

/S/
Richard W. Schulte (Ohio Bar No. 0066031)
812 E. National Road, Suite A
Vandalia, Ohio 45377
(937) 435-7500
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL RE: DAMAGES has been served on Liaison Counsel, Russ Herman, Phillip Wittmann and Ann Oldfather, by U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 12th day of September, 2012.

/S/
Joseph W. Steele