**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
| | : | **MDL NO. 1657** |
| **IN RE: VIOXX** | : | |
| **PRODUCTS LIABILITY LITIGATION** | : | **SECTION: L** |
| | : | |
| | : | **JUDGE FALLON** |
| | : | |
| | : | **MAG. JUDGE KNOWLES** |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO ALL CASES**

**ORDER & REASONS**

The Court has pending before it the Corrected Motion: (A) To Identify Law Firms

Representing Certain Eligible Plaintiffs in Place of the "John Doe" Defendants; (B) To Add

Federal Employee Health Benefits Act ("FEHBA") and Medicare Advantage Reimbursement

Claims; (C) To Seal That Portion of the Corrected Declaration of Mark D. Fischer, Esq. That

Contains Protected Health Information Under Health Insurance Portability and Accountability

Act of 1996 ("HIPAA"); and (D) For a Preliminary Injunction Imposing a Constructive Trust

and Prohibiting Distribution of Identified Settlement Funds (Rec. Doc. 45429). The Court now

issues this Order and Reasons.

**I.      BACKGROUND & PROCEDURAL HISTORY**

To put this matter in perspective, a brief review of this litigation is appropriate. This

multidistrict products liability litigation involves the prescription drug Vioxx, known generically

as Rofecoxib. Merck, a New Jersey corporation, researched, designed, manufactured, marketed

and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid

arthritis, menstrual pain, and migraine headaches.  On May 20, 1999, the Food and Drug

Administration approved Vioxx for sale in the United States.  Vioxx remained publicly available

until September 30, 2004, when Merck withdrew it from the market after data from a clinical

trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular

thrombotic events such as myocardial infarction (heart attack) and ischemic stroke.  Thereafter,

thousands of individual suits and numerous class actions were filed against Merck in state and

federal courts throughout the country alleging various products liability, tort, fraud, and warranty

claims.  It is estimated that 105 million prescriptions for Vioxx were written in the United States

between May 20, 1999 and September 30, 2004.  Based on this estimate, it is thought that

approximately 20 million patients have taken Vioxx in the United States.[1]

California was the first state to institute a consolidated state court proceeding on October

30, 2002.  New Jersey and Texas soon followed suit, on May 20, 2003 and September 6, 2005,

respectively.  On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("MDL")

conferred MDL status on Vioxx lawsuits filed in various federal courts throughout the country

and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial

matters pursuant to 28 U.S.C. § 1407.  *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352

(J.P.M.L. 2005).  Even after the creation of this federal MDL, many cases remained pending in

the various state courts.

On March 18, 2005, this Court held the first status conference in the Vioxx MDL to

---

[1]For a more detailed factual background describing the events that took place before the
inception of this multidistrict litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565
(E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).

consider strategies for moving forward with the proceedings.  Shortly thereafter, the Court

appointed committees of counsel to represent the parties.  Furthermore, to give transparency to

this litigation, the Court created a web site accessible to all counsel and the public at large.  All

motions, Court orders, opinions, recent developments, a calendar of scheduled events, and

various other matters were posted on this web site.[2]  Throughout the litigation monthly status

conferences were held in open court.  Notice of the meetings were posted on the web site and

were open to all.  Transcripts of these conferences were posted on the Court's web site for those

who could not attend.

Discovery rapidly commenced.  Counsel conducted all aspects of pre-trial preparation,

including document discovery, the taking of depositions, preparation of experts, motions

practice, and to some extent, coordination of federal and state court proceedings.  Millions of

documents were discovered and collated.  Thousands of depositions were taken and at least

1,000 discovery motions were argued.  After a reasonable period for discovery, the Court

assisted the parties in selecting and preparing certain test cases to proceed as bellwether trials.

Additionally, similar trials were scheduled in state court.

This Court conducted six Vioxx bellwether trials.[3]  The first of the bellwether trials took

place in Houston, Texas, while this Court was displaced following Hurricane Katrina.  The five

---

[2]*MDL-1657 Vioxx Products Liability Litigation*, http://vioxx.laed.uscourts.gov/.

[3]*See Plunkett v. Merck & Co.*, No. 05-4046 (E.D. La. Filed Aug. 23, 2005) (comprising both the first and second bellwether trials, as the first trial resulted in a hung jury); *Barnett v. Merck & Co.*, No. 06-485 (E.D. La. Filed Jan. 31, 2006) (third bellwether trial); *Smith v. Merck & Co.*, No. 05-4379 (E.D. La. Filed Sept. 29, 2005) (fourth bellwether trial); *Mason v. Merck & Co.*, No. 06-0810 (E.D. La. Filed Feb. 16, 2006 (fifth bellwether trial); *Dedrick v. Merck & Co.*, No. 05-2524 (E.D. La. Filed June 21, 2005) (sixth bellwether trial).

subsequent bellwether trials took place in New Orleans, Louisiana. Only one of the trials

resulted in a verdict for the plaintiff. Of the five remaining trials, one resulted in a hung jury and

four resulted in verdicts for the defendant. During the same period that this Court was

conducting six bellwether trials, approximately thirteen additional Vioxx-related cases were tried

before juries in the state courts of Texas, New Jersey, California, Alabama, Illinois, and Florida.

With the benefit of experience from these bellwether trials, as well as the encouragement of the

several coordinated courts,[4] the parties soon began settlement discussions in earnest.

The Court appointed Negotiating Plaintiffs' Counsel ("the NPC") to explore and engage

in settlement discussions with Merck. Counsel for Merck and the NPC met together more than

fifty times and held several hundred telephone conferences. Although the parties met and

negotiated independently, they kept this Court and the coordinate state courts of Texas, New

Jersey, and California informed of their progress in settlement discussions.

On November 9, 2007, Merck and the NPC formally announced that they had reached a

Settlement Agreement. *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657

(E.D. La. Nov. 9, 2007) ("Settlement Agreement" or "MSA"), *available at*

http://www.browngreer.com/vioxxsettlement. The private Settlement Agreement established a

pre-funded program for resolving pending or tolled state and federal Vioxx claims against Merck

as of the date of the settlement, involving claims of heart attack ("MI"), ischemic stroke ("IS"),

---

[4]The Court once again expresses its thanks to Judge Carol E. Higbee of the Superior
Court of New Jersey, Judge Victoria Chaney of the Superior Court of Los Angeles County in
California, and Judge Randy Wilson of the 157th Civil District Court of Harris County, Texas
for their efforts in bringing this litigation to completion.

and sudden cardiac death ("SCD"), for an overall amount of $4.85 billion.  *Id.* § "Recitals".[5]

Pursuant to the requirements of federal and state laws creating statutory liens under the Medicare and Medicaid programs, the Settlement Agreement provided that a Lien Resolution Administrator establish "procedures and protocols... to identify and resolve Governmental Authority Third Party Payor/Provider Statutory Liens."  *Id.* §12.1.  The Settlement Agreement sets forth that each enrolled program claimant and the claimant's counsel must jointly and severally "represent and warrant that any and all statutory Liens with respect to any and all Settlement Payments have been satisfied and discharged."  *Id.* § 12.1.2.  Further, "the satisfaction and discharge of any and all Governmental Authority Third Party Providers/Payors statutory Liens must be established to the satisfaction of the Claims Administrator and Merck before any Settlement Payment can be disbursed."  *Id.* § 12.1.3.  Although the Settlement Agreement itself did not establish the same requirements for resolution of non-statutory liens held by private insurers, the Agreement does provide that "satisfaction and discharge of any and all Liens, whether past, present or future, whether known or unknown or asserted or unasserted, with respect to any Settlement Payment are the sole responsibility of the relevant Enrolled Program Claimant."  *Id.* § 12.1.3.

On July 17, 2008, Merck formally announced that the thresholds necessary to trigger funding of the Vioxx Settlement Program would be met.  Merck further advised that it intended to waive its walk away privileges and would commence funding the Vioxx Settlement Program

---

[5]For a more detailed factual background of the various mechanics of the Settlement Agreement, including the provisions for the mandatory resolution of governmental liens, *see In re Vioxx Prods. Liab. Litig.*, 2008 WL 3285912 (E.D. La. Aug. 7, 2008) (denying motions to enjoin disbursement of interim settlement payments).

by depositing an initial sum of $500 million into the Program's account, clearing the way for distribution of interim payments to claimants enrolled in the Program.

On April 14, 2008, AvMed, Inc., and approximately forty-six (46) other insurance companies (the "Plan Plaintiffs") filed suit against BrownGreer, PLC, the Claims Administrator for the Vioxx Resolution Program, U.S. Bancorp, Inc., the Escrow Agent for the Vioxx Resolution Program, and numerous "John Does," individuals unknown to Plaintiffs who received medical benefits from the Plaintiffs attributable to their use of Vioxx and who will claim money from the $4.85 billion settlement fund in this MDL (the "Settlement Fund"), asserting claims under ERISA. Plan Plaintiffs sought disclosure of the names of Vioxx claimants, their health benefit plans, and their claims attributable to their use of Vioxx. Second, Plan Plaintiffs sought the imposition of a constructive trust over a portion of the Settlement Fund in an amount that will reimburse the Plaintiffs for amounts that they paid for medical treatments for Vioxx claimants attributable to their use of Vioxx. Third, the Plaintiffs sought a Temporary Restraining Order and an injunction, suspending the disbursement of funds to the Vioxx claimants until such time as the Court made a final determination as to the Plaintiffs' entitlement to any such funds.

The Court heard oral argument and denied the motion for an injunction in an August 7, 2008 Order & Reasons. *In re Vioxx Prods. Liab. Litig.*, 2008 WL 3285912 (E.D. La. Aug. 7, 2008) ("*AvMed I*"). The Court found that the prerequisites for an injunction were lacking in all respects. The Plan Plaintiffs sought review at the Fifth Circuit, which affirmed the August 7, 2008 Order and Reasons. *Avmed Inc. v. BrownGreer PLC*, 300 Fed. App'x 261 (5th Cir. 2008) ("*AvMed III*"). The Court also issued a second Order and Reasons addressing these matters. *In re Vioxx Prods. Liab. Litig.*, 2008 WL 4681368 (E.D. La. Oct. 21, 2008) ("*AvMed II*"). In

*AvMed II*, the Court, *inter alia*, granted a motion to sever the Plan Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 21 because the claims were improperly joined under Rule 20(a). *See id.* at \*3.

The Court remained cognizant of private lien issues. On January 22, 2009, the parties announced at the monthly status conference an agreement establishing a program to assist with resolving private Vioxx-related lien issues ("the Private Lien Resolution Program" or "PLRP"). The agreement created a voluntary program through which Vioxx claimants could receive a streamlined and expedited resolution of any reimbursement owed to a private lienholder, with the additional benefit of a substantial reduction in the amounts owed pursuant to any liens. (*See generally*, January 30, 2009 Update, http://vioxx.laed.uscourts.gov). The Court authorized the Garretson Group as to administer the program as Lien Resolution Administrator. The Court later approved the PLRP and exercised supervisory authority over it, including issuing Pretrial Order 40, ordering a confidential audit of the program; Pretrial Order 48, ordering the primary attorneys for claimants eligible for the PLRP to notify their clients of the program and the benefits thereof; and Pretrial Order 54, enjoining primary counsel from disbursing the final 15% of settlement funds until counsel certified compliance with PTO 48 and until eligible claimants had a reasonable opportunity to participate in the PLRP. Ultimately, the PLRP resulted in satisfactory resolution of over 25,000 private liens.

## II.     PRESENT MOTION

Despite the success of the PLRP, the Plan Plaintiffs seek leave to amend their complaint to add as defendants twelve law firms which represent claimants who settled with Merck through the Vioxx Settlement Program, who are members of ERISA plans containing reimbursement

language qualifying those plans for eligible relief, and who did not participate in the Private Lien

Resolution Program.  Plan Plaintiffs also seek to add claims for reimbursement under the

Medicare Secondary Payer Act and the Federal Employee Health Benefits Act.[6]

The law firms named as defendants in the proposed amended complaint oppose the

motion to amend.  They argue that the motion for leave to amend is procedurally defective

because it fails to provide information permitting them to respond adequately, such as the

identity of the claimants at issue or the plan language that would entitle Plaintiffs to recover

against those claimants.  The law firms also argue that the Court should deny the motion to

amend because it is untimely; because it would prejudice the law firms; and because the

amendment is futile because it fails to state claims upon which relief could be granted.  Finally,

the proposed Defendants argue that the Court lacks jurisdiction over the underlying settled

Vioxx claims.

## III.    LAW & ANALYSIS

Federal Rule of Civil Procedure 15 governs amendment of pleadings.  Amendment in

these circumstances is only available "with the opposing party's written consent or the court's

leave." Fed. R. Civ. P. 15(a)(2).  "The court should freely give leave when justice so requires."

*Id.*  Nonetheless, "that generous standard is tempered by the necessary power of a district court

to manage a case."  *Schiller v. Physicians Resource Group, Inc.*, 342 F.3d 563, 566 (5th Cir.

2003).  Therefore, a district court has discretion to deny leave to amend under appropriate

---

[6]Plan Plaintiffs initially sought creation of a constructive trust and an injunction
preventing the proposed defendant law firms from distributing settlement funds beyond the lien
amounts to their claimants.  Plan Plaintiffs have since withdrawn that request for relief, as well
as the request to amend as it pertains to a thirteenth law firm initially named.  (Rec. Doc. 48684).

circumstances:

> Although Rule 15 evinces a bias in favor of granting leave to amend, it is not automatic. A decision to grant leave is within the discretion of the trial court. Its discretion, however, is not broad enough to permit denial if the court lacks a substantial reason to do so. In deciding whether to grant such leave, the court may consider such factors as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment.

*In re Southmark Corp.*, 88 F.3d 311, 314-15 (5th Cir. 1996) (quotation and citations omitted).

"[U]nless a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981). But conversely, it is also "appropriate for the court to consider judicial economy and the most expeditious way to dispose of the merits of the litigation." *Id.*

The Court has reviewed the briefs and finds that denying leave to amend is appropriate because the proposed joinder of these new Defendant Law Firms is not the most expeditious way to dispose of the merits of these matters. First, the Court finds that the proposed amendment violates Federal Rule of Civil Procedure 20. The Court previously granted a motion to sever the Plan Plaintiffs' claims pursuant to Rule 21(a). *See AvMed II*, 2008 WL 4681368, at *5-8. As the Court held in *AvMed II*, the Plan Plaintiffs' bring different claims pursuant to different health benefit plan language to pursue liens over funds owed to different claimants in different factual circumstances. *See id.* This diversity between the claims of the individual Plan Plaintiffs meant that the rights to relief asserted did not arise out of the same transactions or occurrences and did not present common questions of law or fact. *See id.* (citing Fed. R. Civ. P. 20(a)). Therefore, the Court recognized the risk of "transform[ing] this litigation into an action against approximately 15,000 defendants, each of whom has entered into a separately negotiated health

plan contract and each of whom has received medical benefits under highly individualized factual circumstances." *See id.* at *8. Accordingly, the Court exercised its discretion to sever the improperly-joined claims of the individual Plan Plaintiffs.

Similar concerns of improper joinder now counsel against the proposed amendment. Although the proposed amendment implicates fewer claims, the claims of each Plan Plaintiff are no less unrelated and no more appropriately joined under Federal Rule of Civil Procedure 20. Thus, the Court would again be forced to sever each Plan Plaintiff's claims and determine against which of the dozen proposed Defendant Law Firms each Plan Plantiff actually has a claim. The proposed amendment is procedurally unworkable, for the same reasons set forth in *AvMed II*, and again poses the risk of expanding this litigation into a procedural morass.

Second, this MDL transferee court is at the very least not an obviously proper venue for these actions. Pursuant to 29 U.S.C. § 1132(e)(2), ERISA claims may be brought "in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found." The proposed amendments would add a dozen defendants from different districts, none of them located in the Eastern District of Louisiana. The proposed Defendant Law Firms represent claimants from all over the country. It is not clear from the record that any of Plaintiffs' plans are administered in the Eastern District of Louisiana. The alleged breaches, if any, are centered on the location of the Defendant Law Firms and their clients. The Court also considers the fact that the. Although the Court supervised the PLRP with respect to active cases, the personal injury actions underlying the proposed amendment have been resolved and stipulations of dismissal filed in this Court. Thus, the opportunities for economies of scale are no longer as apparent. In short, the Court finds that considerations of "judicial economy and the

most expeditious way to dispose of the merits of the litigation" counsel against hosting these disputes in the MDL.  *See Dussouy*, 660 F.2d at 598.

The Court does not express an opinion as to the underlying merits of Plan Plaintiffs' claims, or how or where they should go about pursuing them.  But in its discretion, the Court finds that proposed amendment is not appropriate at this time.

**III.    CONCLUSION**

For the foregoing reasons, IT IS ORDERED that Plan Plaintiffs' motion is DENIED.

New Orleans, Louisiana, this 4th day of December, 2012.

_____
UNITED STATES DISTRICT JUDGE