**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| This Document Relates to All | * | |
| Cases Listed on Exhibit A to Pretrial | * | JUDGE FALLON |
| Order 58, as Amended (the VTE Cases)* | * | MAGISTRATE JUDGE KNOWLES |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MERCK SHARP & DOHME CORP.'S**
**CONSOLIDATED MOTION TO EXCLUDE OPINION TESTIMONY**
**ON GENERAL CAUSATION AND**
**RENEWED MOTION FOR SUMMARY JUDGMENT IN VTE CASES**

More than one year ago, Merck moved for summary judgment in all cases involving

venous thromboembolism ("VTE") events (collectively, the "VTE Cases"), pointing to the

absence of reliable scientific evidence to support general causation.  *See* Rec. Doc. No. 63539.

In response, Plaintiffs requested additional time to marshal evidence of a causal association

between Vioxx and VTE.  *See, e.g.*, January 5, 2012 Order (Rec. Doc. No. 63623).  Plaintiffs

designated and served reports from five experts, Drs. April Zambelli-Weiner, Elizabeth Brooks,

Alex Spyropoulos, Ali Olyaei, and Benedict Lucchesi, and Merck has since deposed each of

them.

None of Plaintiffs' experts have identified valid evidence of general causation.  Indeed,

*all* of the experts who have reviewed the Vioxx clinical trials—Drs. John Kress and Mark

---

\*     By Minute Entry dated August 16, 2012 (Rec. Doc. No. 64077), the Court consolidated the
      Velma Dunn matter (captioned *Singleton v. Merck Sharp & Dohme Corp.*, Civ. A. No. 2:09-
      cv-02413-EEF-DEK) with the other VTE cases listed on Exhibit A to Pretrial Order 58.

Crowther for Merck, and Drs. Zambelli-Weiner, Brooks, and Spyropoulos for Plaintiffs[1]—agree that the placebo-controlled data show no evidence of a causal association between Vioxx and VTE.  *See infra* Part II.B.  Indeed, Dr. Spyropoulos, the only medical doctor Plaintiffs asked to review VTE data from the Vioxx clinical trials, has admitted that:

- No medical organization has concluded that Vioxx causes VTE;[2]

- No peer-reviewed publication has concluded that Vioxx causes VTE;[3]

- No study concludes that Vioxx is associated with a statistically significant risk of VTE compared to placebo;[4] and

- The placebo-controlled clinical trial data—the best data for assessing whether a medication has an association with an injury[5]—show no association between Vioxx and an increased risk of VTE.[6]

---

[1]  Plaintiffs' other two experts, Drs. Olyaei and Lucchesi, did not review the Vioxx clinical trial data with respect to VTE.  *See infra* Parts IV.A & IV.B.

[2]  Q.  Can you identify any medical organization in the world that has concluded that Vioxx or COX-2 inhibitors cause VTE?
A.  At this point, no.  Deposition of Alex C. Spyropoulos  ("Spyropoulos Dep.") 25 (attached as Ex. A).

[3]  Q.  Can you identify any peer-reviewed publication in the world that has concluded that Vioxx or COX-2 inhibitors cause VTE?
A.  At this point, no.  *Id.* at 125.

[4]  Q.  Can you identify any study in which Vioxx was associated with a statistically significant increased risk of VTE compared to placebo?
A.  No, not again as defined by the study.  *Id.* at 137.

[5]  Q.  So is placebo controlled data then the best data for assessing whether a medication has an association, increased or decreased, with an effect?
A.  I think so, yes.  Within the context of a randomized trial that would probably be yes.  *Id.* at 148.

[6]  Q.  Based on the placebo controlled clinical data that you reviewed, was Vioxx associated with an increased risk of VTE?

(footnote continued)

That should be the end of the matter.  But, with no actual data to support general causation, Plaintiffs' experts Drs. Zambelli-Weiner and Brooks manufactured their own "pooled analysis" that they claim supports a link between Vioxx and VTE.  That analysis, however, leaves out the bulk of the placebo-controlled clinical trial data; mixes active-comparator and placebo-controlled trial data; ignores final, expert-adjudicated data in favor of unadjudicated reports; and—despite these manipulations—*still* does not reach statistical significance.  In sum, their analysis simply cannot withstand the scrutiny demanded by *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

Accordingly, Merck moves to exclude Plaintiffs' experts' causation opinions.  Merck also renews its Motion for Summary Judgment in VTE Cases.[7]

## I.    LEGAL STANDARD FOR EXPERT TESTIMONY

Federal Rule of Evidence 702 allows for the admission of scientific, technical, and other expert evidence to "help the trier of fact to understand the evidence or to determine a fact in issue."  Such evidence is admissible only if (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the witness has applied the principles and methods reliable to the facts of the case."  Fed. R. Evid. 702.  Congress enacted the current version of Rule 702 in response to the Supreme Court's opinion in *Daubert*, 509 U.S. 579, which held that trial courts may not admit scientific testimony without

---

(continued footnote)

A.  Based on the clinical data that I reviewed, given the presuppositions of definitions of VTE within, you know, within the data, that the first pass or first review of analysis showed no association between the two.  *Id.* at 144.

[7]   Merck expressly incorporates the arguments and evidence presented in its original Motion for Summary Judgment in VTE cases, including the supporting memorandum, affidavits and exhibits.  Rec. Doc. Nos. 63539 to 63539-16.

first determining that the testimony is both "reliable" and "relevant" to the facts at issue.  *Id.* at 589; *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998); *Black v. Johnson & Johnson (In re Propulsid Prods. Liab. Litig.)*, 261 F. Supp. 2d 603, 605–06 (E.D. La. 2003).

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is "derived by the scientific method" and "supported by appropriate validation—i.e., 'good grounds,' based on what is known."  *Daubert*, 509 U.S. at 590, 592–93.  Scientific testimony is irrelevant, and therefore inadmissible, when there is "too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Plaintiffs have the burden of proving by a preponderance of the evidence that the testimony of their proffered experts is relevant and reliable.  *Moore*, 151 F.3d at 275–76; *In re Propulsid*, 261 F. Supp. 2d at 615.  As the "gatekeeper" of scientific evidence, the trial court has the obligation to ensure those standards are met.  *Daubert*, 509 U.S. at 596; *Moore*, 151 F.3d at 276; *In re Propulsid*, 261 F. Supp. 2d at 605.  As such, the court must make a "preliminary assessment of whether the reasoning or methodology . . . properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 592–93.  In making that assessment, the trial court does not "tak[e] the expert's word for it."  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) (quoting Fed. R. Evid. 702 advisory committee's note (2000 amendments)) (internal quotation marks omitted).  Instead, when expert testimony is demonstrated to be speculative and lacking scientific validity, trial courts *should* exclude it, as courts in the Fifth Circuit routinely do.  *See, e.g.*, *Moore*, 151 F.3d at 279; *Black v. Food Lion, Inc.*, 171 F.3d 308, 313 (5th Cir. 1999); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d at 616.

As described below, the general causation opinions of Plaintiffs' experts are not only speculative and methodologically flawed, they are also—as even Plaintiffs' experts agree—flatly contradicted by the placebo-controlled clinical trials. *See infra* Part II.B.

## II.   THE PLACEBO-CONTROLLED CLINICAL TRIALS SHOW NO ASSOCIATION BETWEEN VIOXX AND AN INCREASED RISK OF VENOUS THROMBOEMBOLIC EVENTS.

### A.   There Were Fewer VTE Events in Patients Randomized to Vioxx Than in Patients Randomized to Placebo.

As Merck detailed in its motion for summary judgment, the question of whether Vioxx is associated with an increased risk of VTE has been examined in multiple randomized, double-blind, placebo-controlled clinical trials, including the twenty-three clinical trials making up the studies contained in the March 2004 Final Pooled Analysis and the three subsequent cancer studies—APPROVe, VICTOR, and ViP.  In these twenty-six placebo-controlled studies involving nearly 22,000 patients and representing approximately 16,000 patient years, there were *fewer* VTE events in patients randomized to Vioxx than in patients randomized to placebo—both numerically (9 to 13) and proportionally (1.1 to 1.6 per 1,000 patient-years).[8]

### 1.   Final Pooled Analysis

On March 22, 2004, Merck provided to the FDA a comprehensive safety analysis of thrombotic events in Phase IIb to Phase V clinical trials of Vioxx, including 23 placebo-

---

[8]   Arterial thromboses, the types of clots that can cause heart attacks and strokes, are fundamentally different from venous thromboembolism.  They have different anatomical structures, pathomechanisms, risk factors, and treatments.  *See* Mem. in Supp. of Summ. J. at 4–6 (Rec. Doc. 63539-1) (attached as Ex. B).  Plaintiffs' experts agree.  Spyropoulos Dep. 97–102; Deposition of Benedict R. Lucchesi ("Lucchesi Dep.") 282–85 (attached as Ex. C) at 82–85, 92–94; Deposition of Ali J. Olyaei ("Olyaei Dep.")  92 (attached as Ex. D).

controlled trials. *See* Rec. Doc. 63539-8 (Summ. J. Ex. G), at 2 ("Final Pooled Analysis")
(attached as Ex. E).

The data from the Final Pooled Analysis show no association between Vioxx and VTE.
To the contrary, this analysis shows that there were ***more*** events in patients taking placebo than
in those taking Vioxx. In the 7,296 patients who used Vioxx, there were a total of *two* VTE
events. Final Pooled Analysis at 32 (Table 14). In the group of 4,848 patients who were
randomized to placebo, there were *four* VTE events. *Id.* Thus, there were more events—both
numerically and proportionally—in patients on placebo than in patients taking Vioxx.

## 2.    APPROVe

The APPROVe study, a large, placebo-controlled, long-term safety study, also revealed
no evidence of risk of VTE with Vioxx use. In the 1,287 patients who were treated with Vioxx
in this study, there were *two* VTE events. In the 1,299 patients on placebo, there were *six* VTE
events. *Id.* (Table 2). In other words, as with the Final Pooled Analysis, these data showed that
there were more events in patients on placebo than there were in patients taking Vioxx.

## 3.    VICTOR and ViP

Similarly, neither of Merck's Vioxx placebo-controlled cancer-prevention trials, ViP and
VICTOR, show any evidence of an increased risk of VTE associated with the use of Vioxx. In
VICTOR, of the 1,167 patients in the Vioxx arm of the study, there were three VTE events, and
of the 1,160 patients in the placebo arm, there was one VTE. Rec. Doc. 63539-10 (Summ. J. Ex.
I), at 365 (Table 3) (attached as Ex. F).

The ViP trial involved over 4,700 patients. *See* Rec. Doc. 63539-11 (Summ. J. Ex. J)
(attached as Ex. G). The median duration of treatment was 4.14 months. During that time, there
were two VTE events in both the similarly-sized placebo and Vioxx arms of the study. *Id.* at
2068 (Table 3).

4.      **Summary of VTE Data from All of the Vioxx Randomized, Placebo-Controlled Trials**

As the chart below—which is also contained in Merck's original motion for summary judgment—plainly shows, the placebo-controlled clinical studies reveal absolutely no evidence of an increased risk of VTE for Vioxx compared to placebo.  In fact, the VTE data trend *in favor* of Vioxx:

| Study | Vioxx and Comparator | Number of Patients | Patient Years | Total VTE Events |
|---|---|---|---|---|
| Final Pooled Analysis | Vioxx | 7296 | 3019 | 2 |
|  | Placebo | 4848 | 2801 | 4 |
| APPROVe | Vioxx | 1287 | 3059 | 2 |
|  | Placebo | 1299 | 3327 | 6 |
| VICTOR | Vioxx | 1167 | 927 | 3 |
|  | Placebo | 1160 | 986 | 1 |
| ViP | Vioxx | 2369 | 1099 | 2 |
|  | Placebo | 2372 | 1102 | 2 |
| **TOTAL** | Vioxx | 12119 | 8104 | **9** |
|  | Placebo | 9679 | 8216 | **13** |

B.      **Plaintiffs' and Defendants' Experts Agree that the Placebo-Controlled Clinical Trial Data Do Not Show Evidence of an Association between Vioxx and VTE.**

There is no disagreement among the experts concerning the placebo-controlled clinical trial data.  All five of the experts who have analyzed these data for evidence of a causal association between Vioxx and VTE—Drs. Kress and Crowther for Merck, and Drs. Zambelli-Weiner, Brooks, and Spyropoulos for Plaintiffs—have arrived at the same conclusion:  the placebo-controlled clinical trial data provide *no evidence of any association*, much less a causal association.  Report of John P. Kress, Rec. Doc. 63539-6 (Summ. J. Ex. E), at 2 (attached as Ex. H); Deposition of Mark A. Crowther ("Crowther Dep.") at 68 (attached as Ex. I); Spyropoulos Dep. 144; Deposition of April Zambelli-Weiner (Vol. I) ("Zambelli-Weiner Dep. (Vol. I)") 85–92 (attached as Ex. J); Deposition of April Zambelli-Weiner (Vol. II) ("Zambelli-Weiner Dep.

(Vol. II)") 290–94 (attached as Ex. K); *see also* Zambelli-Weiner Dep. (Vol. I) Ex. 6 (attached as Ex. L).  As noted above, Dr. Spyropoulos testified that he found "no association" whatsoever between Vioxx and VTE in the clinical trials, and that his opinions were not intended to suggest that causation has been established.  Spyropoulos Dep. 144–46.

While Drs. Zambelli-Weiner and Brooks unjustifiably ignore substantial portions of the placebo-controlled clinical trial data, *see infra* Part III.A, they even come to the same result using only the placebo-controlled clinical trials included in their analysis—a rate ratio that *favors* Vioxx:

|  | Vioxx (N=3758)[9] | Placebo (N=2044) | Rate Ratio |
|---|---|---|---|
| All VTE (DVT + PE) | 7 (0.19) | 5 (0.24) | 0.76 |

Zambelli-Weiner Dep. (Vol. I) 85–92; Zambelli-Weiner Dep. (Vol. II) 290–94; *see also* Zambelli-Weiner Dep. (Vol. I) Ex. 6.  The placebo-controlled clinical trial data pertaining to VTE events—no matter how you look at it—simply do not support general causation.

This is no small matter.  In both the courtroom and the scientific community, placebo-controlled clinical trials are regarded as "the gold standard" for scientific reliability.  *Reference Manual on Scientific Evidence* 338 (Fed. Judicial Ctr. 2d ed. 2000) ("Ref. Man."); *see also Merck & Co. v. Garza*, 347 S.W.3d 256, 263 (Tex. 2011) ("[T]he controlled, experimental, and prospective nature of clinical trials undoubtedly make them more reliable than retroactive, observational studies . . . .") (rendering judgment for Merck in alleged Vioxx-related heart attack

---

[9]  N stands for the number of patients exposed.  A denominator, in this case the number of patients, is essential for calculating the rate of an event—in this case, VTE events—in any given arm of an analysis.

case).  Dr. Spyropoulos explained during his deposition why the medical and scientific

communities view placebo-controlled data as the most reliable form of evidence:

> Q:  Is there a reason why you focused on Vioxx versus placebo data in your report?
>
> A:  I think what's key in any placebo-controlled trial is to establish the baseline for a control group.  So the best way to establish baseline risk is with a placebo-controlled trial, which is why I focused in on the placebo groups.
>
> Q:  So is placebo-controlled data then the best data for assessing whether a medication has an association, increased or decreased, with an effect?
>
> A:  I think so, yes.  Within the context of a randomized trial that would probably be yes.

Spyropoulos Dep. 148.

Dr. Zambelli-Weiner also acknowledged this concept.  She explained that placebo-

controlled data "gives a cleaner signal" of an increased risk because it makes it easier to "isolate

the effect of the . . . specific exposure of interest."  Zambelli-Weiner Dep. (Vol. I) at 65–66.  Dr.

Zambelli-Weiner further identified why relying on data that is not placebo-controlled is

particularly problematic in this context:  the products that Vioxx was compared against in the

clinical studies (namely, other NSAIDs) "could have pro-thrombotic tendencies or

antithrombotic tendencies," which might bias the results.  *Id.*; Zambelli-Weiner Dep. (Vol. II)

261.

In sum, there is no dispute that the placebo-controlled clinical trials reveal no evidence of

an association between Vioxx and VTE—and, in fact, trend in favor of Vioxx.  All of the experts

in this case, Plaintiffs' and Defendant's experts alike, agree on this point.  With no peer-reviewed

publication concluding that Vioxx increases the risk of VTE, no medical organization concluding

that Vioxx increases the risk of VTE, and, most importantly, no evidence from the Vioxx clinical

trial data establishing that Vioxx increases the risk of VTE events, there simply is no reliable evidence of general causation that comes close to passing muster under *Daubert*.

## III.   PLAINTIFFS' EXPERTS' ANALYSIS OF A NARROW SUBSET OF DATA IS DEEPLY FLAWED.

As noted above, only three of Plaintiffs' experts—Dr. Spyropoulos, Dr. Zambelli-Weiner, and Dr. Brooks—reviewed, and therefore have opinions about, the Vioxx clinical trial data. Dr. Spyropoulos acknowledged that the Vioxx clinical trial data do not provide evidence of *any* association, causal or otherwise, between Vioxx and VTE. *See supra* Part II.B.

That leaves Dr. Zambelli-Weiner and Dr. Brooks. With no placebo-controlled clinical trial data establishing a causal link between Vioxx and VTE, *see supra* Part II, Drs. Zambelli-Weiner and Brooks created their own "pooled analysis" of a narrow subset of the available clinical trials. Their analysis was designed strictly for purposes of this litigation and, as described below, plainly engineered from the outset to achieve a result favorable to Plaintiffs. Zambelli-Weiner and Brooks Report ("Zambelli-Weiner/Brooks Rep.") at 20–21 (Table 6), 33 (Table 15) (attached as Ex. M).

Their "pooled analysis" is riddled with methodological errors, disregards core scientific principles, and makes unsubstantiated analytical leaps. More specifically, their analysis: (i) excludes the ***vast majority*** of the Vioxx placebo-controlled data; (ii) relies on raw, unadjudicated event reports rather than on the final, blinded, adjudicated data available for the same studies; (iii) does not reach statistical significance; and (iv) has not been subjected (perhaps for these very reasons) to any form of peer review. Because their analysis is deeply flawed, the causation opinions of Drs. Zambelli-Weiner and Brooks do not satisfy—and indeed, fall well shy of—the standard of scientific reliability demanded by *Daubert* and codified in Federal Rules of Evidence.

**A.**    **Drs. Zambelli-Weiner and Brooks's "Pooled Analysis" Is Scientifically Unreliable Because It Intentionally Excludes Most of the Available Clinical Studies, Including the Majority of the Placebo-Controlled Data.**

Headlining the methodological flaws that render Drs. Zambelli-Weiner and Brooks's analysis scientifically unsound is their decision to exclude some of the largest and most important safety studies in this litigation, including APPROVe,[10] ViP, VICTOR, and *over half* of the studies included in the Final Pooled Analysis of safety data submitted to the FDA on March 22, 2004.  Zambelli-Weiner Dep. (Vol. I) 118–20, 126, 129–30 and Ex. 11 (examining only 9 of the 23 placebo-controlled trials) (attached as Ex. P).  In other words, Drs. Zambelli-Weiner and Brooks decided to exclude the bulk of the placebo-controlled clinical trial data, which they already knew trended in favor of Vioxx.

Instead, Drs. Zambelli-Weiner and Brooks's opinion is drawn exclusively from (i) Phase III studies (ii) that had daily dosing and (iii) that had at least six weeks of patient follow-up. Zambelli-Weiner Dep. (Vol. I) 127–31.[11]  By limiting the data in this way, their "pooled analysis" ignores most of the placebo-controlled data in favor of studies comparing Vioxx, in addition to select placebo-controlled studies, to a grab bag of comparators—naproxen, diclofenac, ibuprofen, nabumetone—all products that Dr. Zambelli-Weiner herself acknowledges

---

[10]    APPROVe, as the Court is aware, is the safety study that (i) led to the withdrawal of Vioxx in 2004, (ii) has been at the heart of plaintiffs' general causation claims from the beginning of this litigation, and (iii) is featured prominently in the complaints of the majority **of these very Plaintiffs** as good evidence for evaluating the issue of general causation.  *See, e.g.*, *Gasio v. Merck Sharp & Dohme Corp.*, Civ. A. No. 2:07-cv-01054-EEF-DEK, Compl. ¶¶ 7–8 (attached as Ex. N); *Heisey-DeWolf v. Merck Sharp & Dohme Corp.*, Civ. A. No. 2:06-cv-09810-EEF-DEK, Compl. ¶¶ 112–24 (attached as Ex. O).

[11]    Drs. Zambelli-Weiner and Brooks could not say how long after they started their work, or even how long before they signed and submitted their expert report, they chose to restrict their analysis in this manner.  Zambelli-Weiner Dep. (Vol. I) 133; Zambelli-Weiner Dep. (Vol. II) 201–03, 206–07, 210.

may actually reduce the risk of VTE.[12]  Using their selection of data, Drs. Zambelli-Weiner and Brooks were able to manufacture rate ratios of 1.49 for DVTs and 3.57 for PEs.  *See* Zambelli-Weiner/Brooks Rep. at 20–21 (Table 6), 33 (Table 15) (showing the rate ratios); *see also id.* at 26–27 (Table 9) (listing the studies included in their "All Controlled Studies" analysis).

There is no sound medical or scientific rationale, however, for excluding the placebo-controlled studies they chose to omit in favor of inferior data.  As referenced above, Drs. Zambelli-Weiner and Brooks freely admit that placebo-controlled data is "cleaner" and better isolates the effect of the exposure than data involving active comparators, which may themselves have anti- or pro-thrombotic properties.  Zambelli-Weiner Dep. (Vol. I) 65–66; Zambelli-Weiner Dep. (Vol. II) 261.  Moreover, Dr. Spyropoulos—Plaintiffs' only expert who reviewed the clinical trial data who is also a medical doctor—testified that the VTE data from APPROVe, VICTOR, and ViP, as well as data from the Final Pooled Analysis, are reliable, relevant, "high quality," and should be included in an analysis of Vioxx and VTE.  Spyropoulos Dep. 150–51, 188–91.  He understands that excluding these clinical trials is just bad science.

Drs. Zambelli-Weiner and Brooks—neither of whom is a medical doctor or remotely experienced in the fields of NSAIDs or VTE—failed to consult with any medical doctor, including Dr. Spyropoulos, when deciding how to design their analysis.  Zambelli-Weiner Dep. (Vol. I) 126–27, 132; Deposition of Elizabeth Brooks ("Brooks Dep.") 11, 69 (attached as Ex. Q).  Instead, as Dr. Brooks explained, they designed their analysis around ***time and budgetary constraints***:

---

[12]  Although Drs. Zambelli-Weiner and Brooks acknowledge the potential anti-thrombotic effects of NSAIDs, they did nothing to investigate whether the comparator NSAIDs might have had a protective effect, pro-thrombotic effect, or a neutral effect like a placebo.  Zambelli-Weiner Dep. (Vol. II) 340–41.

A:  As to whether we determined how to limit the analyses, we had a finite amount of time, and we had an objective that needed to be met in that time.  And because of the voluminous nature of clinical study reports, as I'm sure you understand, we went through what we felt was the most scientific process for reducing that group to a set that was homogeneous enough that it could be tackled in this, in a scientifically credible manner.

Q:  So if I understand what you're saying, you went through a lot of clinical study report synopses and found that there were quite a few, and you didn't have a ton of time to work with, and so you tried to a pick a scientifically reasonable subset of these studies to look at, and that turned out to be the Phase III studies, that not only had daily drug use, but also had an extended duration of time?

A:  Yes.  And those that we could identify from the synopses that we were provided with, which truly until today I did not know was missing so many potential protocols.

Brooks Dep. 42–43; *see also* Zambelli-Weiner Dep. (Vol. II) 215, 253–54.  Designing a scientific analysis around time and budgetary constraints is methodologically unsound on its face and is itself sufficient grounds for the exclusion of these experts' opinions.[13]  But whatever explanation Plaintiffs proffer, excluding well over half of the placebo-controlled clinical data is manifestly unreasonable for any analysis purporting to assess a medicine's safety profile.  *See, e.g.*, *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, 524 F. Supp. 2d 1166, 1175–76, 1179 (N. D. Cal. 2007) (holding that experts may not "cherry-pick[ ]" studies to support a conclusion contradicted by randomized controlled trials).

---

[13]  *See, e.g.*, *United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, No. EP-07-CV-247-PRM, 2010 WL 1645970, at *8 (W.D. Tex. Mar. 24, 2010) (time constraints and other difficulties did not excuse methods that fell short of professional standards); *Galaxy Computer Servs., Inc. v. Baker*, 325 B.R. 544, 561–62 (E.D. Va. 2005) (rejecting expert testimony when expert acknowledged time pressure led him to omit consideration of important data); *Cayuga Indian Nation of N.Y. v. Pataki*, 83 F. Supp. 2d 318, 327 (N.D.N.Y. 2000) (rejecting testimony of expert who "freely admitted" that he did not do a "'complete analysis' . . . due to time and budget constraints").

B.     **Drs. Zambelli-Weiner and Brooks's "Pooled Analysis" Unintentionally Excluded Relevant Safety Data.**

It also is worth noting that Drs. Zambelli-Weiner and Brooks did not actually comply with their own criteria for including studies in their analysis.  Drs. Zambelli-Weiner and Brooks's expert report omitted at least seven (7) clinical trials that would have qualified for their "a priori" restricted criteria.  Zambelli-Weiner Dep. (Vol. I) 127–30 and Ex. 12 (attached as Ex. R).  When questioned about this obvious error, Dr. Brooks described this failure as "truly very concerning":

> A: . . . May I just – I'm just a little bit – you know, when I look at the study report synopses that I was provided with and I look at these lists and I see how many studies I wasn't even aware existed, it's rather concerning. . . .  It's just, I mean, I could continue but, you know, the universe of what I had that was provided to me by counsel is there, and, clearly, that's not everything, and that's truly very concerning for any expert preparing any report like this.
>
> Q: Dr. Brooks, knowing that there are studies out there that you, for whatever reason, were not able to get your hands on, does it make you a little less confident, if you will, in your results that you have in your report?
>
> A: Well, any time there's information that I should have had, it's concerning.

Brooks Dep. 42–43, 63–66.[14]

---

[14]   After it was brought to Drs. Zambelli-Weiner and Brooks's attention that they failed to consider data that their own criteria required, counsel for Plaintiffs provided two new Tables (6b and 8b) that were purportedly created to address these deficiencies.  Zambelli-Weiner Dep. (Vol. II) 288, 301–03 and Exs. 27 (attached as Ex. S), 28 (attached as Ex. T).  Yet, even after supplementing their expert report, there are still Phase III clinical trials missing from their analysis (*i.e.*, Protocol 126).  *Compare* Zambelli-Weiner Dep. (Vol. I) 129 & Ex. 13 (attached as Ex. U) *with* Zambelli-Weiner Dep. (Vol. II) Ex. 34 (attached as Ex. V).  In short, even their own methodology still has not been followed.  *See* Zambelli-Weiner Dep. (Vol. II) 290 ("I do know that there are still missing data.").

Of course, even if Drs. Zambelli-Weiner and Brooks had executed their methodology as they had intended, their analysis would be no more reliable.  It is the many flaws built into their methodology, not their failure properly to adhere to that methodology, that renders their opinions unsound.

> Q:  A proper methodology, Dr. Brooks, would be that you want to look at or at least be able to consider all of the data, correct?
>
> A:  Yeah, I mean, because, again, we would have – we would still have given the limitations I discussed previously, which are time, budget, of course. . . .

Brooks Dep. 65–66.

Notably, even after revising their report to add several studies, their analysis of the placebo-controlled data still does not change with respect to the placebo-controlled data—the rate of VTE remains less for the Vioxx-treated patients than for the placebo-treated patients. Zambelli-Weiner Dep. (Vol. II) 291–94.

**C.     The Use of Unadjudicated Event Reports, Even Where Adjudicated Data Exist, Is Improper and Renders Their Analysis Unreliable.**

In addition to the methodological flaws described above, Drs. Zambelli-Weiner and Brooks also calculate all of their rate ratios using only unadjudicated events, even where final, blinded, and expert-adjudicated data from the same studies are available.  Zambelli-Weiner Dep. (Vol. I) 81, 107, 144; Zambelli-Weiner/Brooks Rep. at 19.  This approach is methodologically unsound and scientifically unreliable.

In clinical studies, field investigators report medical events that they believe may have occurred or were reported in their patients.  Different investigators may report events using different diagnostic criteria or techniques.  In addition, clinical investigators may not be subject matter experts in the area of the reported adverse event, or they may report events based only on second-hand information relayed by patients without conducting medical evaluations or even

reviewing the patients' medical records.  For this reason, clinical studies often incorporate blinded "adjudication committees," teams of subject matter specialists who review certain reported adverse events in a "blinded" fashion—that is, without knowing in which arm of the study the patient participated—to assess what actually occurred.[15]

Drs. Zambelli-Weiner and Brooks are not medical doctors, nor do they have any experience designing, implementing, or critiquing adjudication plans.  Zambelli-Weiner Dep. (Vol. I) 9, 11, 23–27; Brooks Dep. 10–12, 17.  Dr. Spyropoulos, on the other hand—who is both a medical doctor and experienced in the design and implementation of adjudication protocols examining VTE has testified that there is an important distinction between adjudicated and unadjudicated data:

> The adjudication process is a group of, again, experts, content experts within the field that are divested from the actual trial, from the actual company itself, [that] is able through a clear and formalized data collection process to determine whether the outcomes from that particular process or study were what they said they would be in terms of either harm or effect.

Spyropoulos Dep. 55–56.  Adjudicators, he explained, have "a very high level of understanding of the disease process itself, and usually it's from the diagnostic level all the way to the treatment

---

[15]   In May 1998, Merck initiated its Standard Operating Procedure for the Surveillance, Monitoring and Adjudication of Acute Thromboembolic Vascular Events in Clinical Trials of COX-2 Specific Inhibitors ("CV SOP"), a protocol for the adjudication of serious adverse events that were potentially thrombotic in nature.  The purpose of the CV SOP was to standardize the evaluation of cardiovascular serious adverse experiences and to improve diagnostic accuracy among field investigators having different clinical specialties and practices.  Through this adjudication process, independent boards of medical experts conducted detailed medical evaluations, on a blinded basis, to determine by objective, scientific measures the true nature of reported events and whether an event that had been reported in fact occurred.  This process resulted in the identification of "confirmed" cardiovascular adverse events.  *See* Brooks Dep. 18–21, 23, 25, 28–29, 31, 34–35 and Ex. 19 (CV SOP) (attached as Ex. W).

level." *Id.* at 58.  He also described the importance of using adjudicated, rather than

unadjudicated, data when assessing a medicine's risks:

> Q: . . . . Why was it important to you to look at the studies that contained adjudicated data?
>
> A: It was important because the adjudication process is one of the most important steps in determining whether an outcome is pertinent to the study or not.   So this is the clearest manifestation from a methodological point of view that you have a, quote-unquote, clean study in terms of outcomes.   And a lot of times with respect to outcomes, if they're not adjudicated, then you may have a bias towards, quote unquote, dirty data. . . .
>
> Q: So standard criteria used by blinded experts in the field, do you agree that that improves the reliability of clinical trial event data?
>
> A: Methodologically it's the most stringent.  Yes, I do. . . .
>
> Q: Do you agree that adjudicated VTE data are more reliable than investigator reported VTE data?
>
> A: Yes.  So once the data gets to the adjudication process, I would agree with you that adjudicated data is higher quality data than the data from the local level.

*Id.* at 54–55, 62, 68.  Not surprisingly, Dr. Spyropoulos therefore insisted on using adjudicated

data when considering the Vioxx clinical trial data.  *Id.* at 54–55, 66–67; *see also In re Bextra*,

524 F. Supp. 2d at 1175–76, 1178 (disagreement among plaintiffs' experts undermined the

plaintiffs' theory of causation).

Drs. Zambelli-Weiner and Brooks, neither of whom has any medical training or

experience in VTE, defend their use of raw, unadjudicated data on two grounds:  (i) Merck's

adjudication standard operating procedure was not implemented until 1998, and (ii) a supposed

bias exists "against drug-related events in the presence of any confounders."  Zambelli-

Weiner/Brooks Rep. at 19.  However, they offer no reliable scientific support for the notion that

unadjudicated data should be used to the exclusion of *available* adjudicated data, even in a

pooled analysis. Moreover, as Dr. Spyropoulos explained (and as Drs. Zambelli-Weiner and

Brooks conceded), adjudication committees are *blinded* as to which treatment arm the reported

event occurred in expressly to avoid biasing the process in favor of any one arm of the study. In

Dr. Spyropoulos's words:

> Q: Are members of event adjudication committees typically blinded to treatment allocation when adjudicating events?
>
> A: Almost by definition they are.
>
> Q: Is that important?
>
> A: That's extremely important.
>
> Q: Why?
>
> A: Because it limits the bias and confounding of that particular event. We call that – also there are different levels of bias, ascertainment bias, especially in open-label design. But again methodologically, the strictest design is a double-blind design.

Spyropoulos Dep. 62; *see also* Zambelli-Weiner Dep. (Vol. I) 21–22 and Brooks Dep. 21

(admitting they have no evidence that the adjudicators for the peripheral vascular events

committee unblinded themselves while reviewing events for adjudication).

Reliance on investigator-reported data when adjudicated data from the exact same

clinical trials exist is scientifically inappropriate and methodologically flawed. Drs. Zambelli-

Weiner and Brooks's use of raw investigator-generated reports, even when blinded, expertly

adjudicated data exists, renders their analysis manifestly unreliable and is disqualifying under

*Daubert* and Federal Rule of Evidence 402.

### D. Statistically Insignificant Findings Are Not Reliable Under *Daubert*.

Drs. Zambelli-Weiner and Brooks's causation opinion is not only unreliable due to the

methodological flaws outlined above, but also because, in spite of those flaws, the results of their

analysis are *not* statistically significant.  Using investigator-reported events from the narrow

subset of clinical studies described above, Drs. Zambelli-Weiner and Brooks calculated relative

rate ratios—along with confidence intervals—separately for DVT and PE.[16]  As shown in the

table below, ***none*** of their results are statistically significant:

|  | Studies They Chose to Include (Rate Ratio & 95% Confidence Intervals) | Placebo-Controlled Studies They Chose to Include (Rate Ratio & 95% Confidence Intervals) |
|---|---|---|
| DVT | 1.49 (0.65-3.55) | 0.41 (0.08-1.98) |
| PE | 3.57 (0.45-88.23) | 2.18 (0.27-53.86) |

Zambelli-Weiner/Brooks Report 20–21 (Table 6).

   This is important.  ***Statistical significance is a precondition to admissibility***.  Before a

plaintiff can rely on a study result to satisfy his or her burden of proof, that finding must be

statistically significant, meaning that the confidence interval does not include a value of 1.0 or

below.  *See LeBlanc v. Merrell Dow Pharm., Inc.*, 932 F. Supp. 782, 783 & n.3 (study not

---

[16] DVT and PE are manifestations of the same disease process, and, as confirmed by plaintiffs' thrombosis expert, Dr. Spyropoulos, the most scientifically rigorous way to analyze VTE risk is to use a single endpoint:

  Q: Okay.  So the combining of DVT and PE into a single endpoint has become the standard within the research community for the last decade or so?

  A: I would say yes. . . .

  Q: Do you agree that combining DVT and PE together, as you've done in your clinical trials and as you did in your report here, is the standard methodology for assessing the effects of a particular factor on the occurrence of VTE?

  A: I would say yes.

Spyropoulos Dep. 95–96.

statistically significant if confidence interval includes 1.0 or below and summary judgment granted given absence of statistically significant studies); *Brock v. Merrell Dow Pharm., Inc.*, 874 F.2d 307, 312 (5th Cir.) (dismissing case where "plaintiffs did not offer one statistically significant (one whose confidence interval did not include 1.0) study that concludes that Bendectin is a human teratogen"), *modified on reh'g*, 884 F.2d 166 (5th Cir. 1989); *Garza*, 347 S.W.3d at 265 (requiring plaintiffs to present results from two epidemiological studies demonstrating a "statistically significant doubling of the risk" to meet burden on general causation); *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 665 (M.D. La. 2000) (excluding expert's testimony based on absence of "statistically significant . . . epidemiological proof"); *In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 831 (E.D. Tex. 2002) (same).  Here, as the above chart makes clear, each of the confidence intervals dips ***well below 1.0***.  Zambelli-Weiner Dep. (Vol. II) 294 (even when adding in some of the Phase III studies initially excluded, all of the results reached by Plaintiffs' experts remain statistically insignificant).

Relying on statistically insignificant results to support general causation violates a basic tenet of scientific research—if experimental results do not reach this level of statistical significance, it is impossible to determine whether the results were attributable to chance versus a particular cause.  As Dr. Zambelli-Weiner conceded, the medical community commonly describes results where confidence intervals cross 1.0 as statistically insignificant.  Zambelli-Weiner Dep. (Vol. II) 259–60.  Indeed, the use of statistically insignificant evidence would allow plaintiffs to proffer almost any conceivable scientific theory, regardless of whether it is corroborated by reliable scientific evidence.  *See, e.g.*, *Brock*, 874 F.2d at 312; *In re Bextra*, 524

F. Supp. 2d at 1174 (confidence interval including values less than 1.0 "includes results which do not show any increased risk, and indeed, show a decreased risk").

Drs. Zambelli-Weiner and Brooks treat the lack of statistical significance that their analysis yields in the same way they were undeterred by the placebo-controlled clinical trial data—they simply manufacture new data. Drs. Zambelli-Weiner and Brooks compute new, entirely *hypothetical* confidence intervals by assuming that the Vioxx clinical trials included in their analysis underestimated the actual number of reported VTE events by 10- and 30-fold. Zambelli-Weiner/Brooks Rep. at 32–33. By multiplying the actual numbers of events by these imaginary factors of potentially asymptomatic VTE events that were never diagnosed or recorded, Drs. Zambelli-Weiner and Brooks invent new, tightened confidence intervals in order to make it appear that the rate ratios now reach statistical significance.

|  | Studies the Plaintiffs' Experts Selected (Rate Ratio & 95% Confidence Intervals) | Placebo-Controlled Studies the Plaintiffs' Experts Selected (Rate Ratio & 95% Confidence Intervals) |
|---|---|---|
| DVT | 1.49 (0.65-3.55) | 0.41 (0.08-1.98) |
| x 10 | 1.49 (1.15-1.95) | 0.41 (0.25-0.66) |
| x 30 | 1.49 (1.28-1.73) | 0.41 (0.31-0.54) |
| PE | 3.57 (0.45-88.23) | 2.18 (0.27-53.86) |
| x 10 | 3.57 (1.84-7.53) | 2.18 (1.12-4.61) |
| x 30 | 3.57 (2.37-5.51) | 2.18 (1.49-3.36) |

The new numbers of events, of course, are not real. Only the first rows pertaining to DVT and PE reflect events that actually occurred and were reported in the Vioxx clinical trials. Zambelli-Weiner Dep. (Vol. II) 249. The multiplier of 30 comes from the expert report of Dr. Spyropoulos, who opined that "venous thromboembolic events, including DVT and PE, are

oftentimes clinically silent" and "the ratio of symptomatic DVT to objectively verified disease

can be as low as 1:30, with symptomatic venous thromboembolic disease being uncommon even

in very high risk populations."  Report of Alex C. Spyropoulos 6 (attached as Ex. X).

At his deposition, however, Dr. Spyropoulos explained that he could not say with *any*

degree of confidence what the *actual* ratio of symptomatic to asymptomatic VTE events was in

the Vioxx clinical trials and that it would be "pure speculation" to try to do so:

> Q: So, Doctor, moving on, you say in your report that "The ratio of symptomatic DVT to objectively-verified disease can be as low as 1 in 30," right?
>
> A: Correct.
>
> Q: Are you saying that the ratio of symptomatic to asymptomatic VTE events in the Vioxx clinical trials actually was 1 to 30?
>
> A: No.  I said that these are magnifiers that can be applied to programs such as the Vioxx, not necessarily so because we don't know that, that result.
>
> Q: We don't know what the actual ratio was in the Vioxx clinical trials, right?
>
> A: That's correct.
>
> Q: It would be pure speculation to say that it was 30, correct?
>
> A: It would be – it's a magnifier.  It's the upper limit of the magnifier.
>
> Q: And the lower limit is, from the same source that you got the 1 to 30 ratio, is 1 to 2, correct?
>
> A: That's true.  Although I think many of us would – I would – fair to say that the majority of us would disagree of a 2 to 1 ratio, that the most accepted ratios that we would routinely use and have used is about 10 to 1 ratio which is what we've seen, what we've seen historically.

Spyropoulos Dep. 224–25.

Equally important, Dr. Spyropoulos explained that the ratio of symptomatic to

asymptomatic events he references in his report is derived from studies in *surgical* patients, not

the general medical population.  *Id.* at 236.  As Dr. Spyropoulos himself makes clear, estimates derived from surgical patients—who are already at a significantly increased risk of developing VTE—*cannot* be extrapolated to the general medical population, such as the individuals enrolled in the Vioxx clinical trials.  *Id.* at 236–37.[17]

Not surprisingly, Drs. Zambelli-Weiner and Brooks were unable to identify any peer-reviewed medical literature that applies a speculative multiplier to the *actual* number of reported events in order to reach statistical significance.  Zambelli-Weiner Dep. (Vol. II) 304.  This flaw alone renders their causation opinion—and the analysis on which it is built—unreliable.  *See, e.g.*, *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 877–78 (W.D. Tex. 1997) (excluding expert opinion based on a study with a lower-end confidence interval less than one).

### E.      Drs. Zambelli-Weiner and Brooks's "Pooled Analysis" Has Not Been Subjected to Peer-Review.

Finally, in addition to the various flaws detailed above, Drs. Zambelli-Weiner and Brooks's analysis has not been submitted to any medical or scientific journal, presented at any scientific conferences, or otherwise subjected to any form of peer-review.  Zambelli-Weiner Dep. (Vol. I) 79.  "[C]ourts must . . . be especially skeptical of medical and other scientific evidence that has not been subjected to thorough peer review."  *Brock*, 874 F.2d at 313.  This skepticism is rooted in the core Rule 702 concern that expert witnesses employ the same methods in the courtroom that they employ in the laboratory.  *See, e.g.*, *In re Bextra*, 524 F.

---

[17]   Dr. Spyropoulos also concedes that, to the extent a multiplier is useful at all, it relates only to DVT, not PE.  Spyropoulos Dep.  229–33, 241.  Of note, though, on direct examination by Plaintiffs' counsel, Dr. Spyropoulos speculated that a multiplier of 10 could be applied to PE. *Id.* at 299–300.  Based on the totality of his testimony, however, there can be no doubt that Dr. Spyropoulos' opinion is that the multipliers used by Drs. Zambelli-Weiner and Brooks with respect to PE are speculative and do not have a reliable basis in science.

Supp. 2d at 1176 (discounting expert's opinion "developed for the purpose of this litigation") (citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1176 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.")).

This concern is particularly stark where the methods appear to be lawyer-driven, since "the examination of a scientific study by a cadre of lawyers is not the same as its examination by others trained in the field of science or medicine." *Brock*, 874 F.2d at 313 (internal quotation marks and citation omitted). For this reason, courts have routinely rejected supposed expert testimony where, as here, it has not been subjected to peer review. *See, e.g.*, *id.* at 313 (expert evidence was not admissible because, *inter alia*, it "has not been subjected to thorough peer review"); *Lynch v. Merrell-National Labs.*, 830 F.2d 1190, 1195 (1st Cir. 1987) ("Swan's study has never been refereed or published in a scientific journal or elsewhere," and thus, "it could not form the foundation for an expert opinion challenging the scientific consensus" regarding causation.); *Turpin v. Merrell Dow Pharm., Inc.*, 736 F. Supp. 737, 743 (E.D. Ky. 1990) (expert evidence not admissible where "[t]he conclusions . . . have never been referred or published in peer-reviewed scientific journals"). Here, Drs. Zambelli-Weiner and Brooks's analysis was conducted solely for purposes of this litigation at the request of Plaintiffs' attorneys. Zambelli-Weiner Dep. (Vol. I) 11 and Ex. 24 (attached as Ex. Y); Brooks Dep. 10–11.

For all of the reasons described above, Drs. Zambelli-Weiner and Brooks's so-called "pooled analysis" employs a methodology that lacks the indicia of reliability necessary to satisfy *Daubert*, and it should be excluded on that basis. *See Daubert*, 509 U.S. at 590, 592–93 (Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony

is scientifically valid," meaning that such testimony is "derived by the scientific method" and

"supported by appropriate validation—i.e., 'good grounds,' based on what is known.").

## IV.   PLAINTIFFS REMAINING EXPERTS DID NOT REVIEW, AND CANNOT OFFER OPINIONS, ABOUT THE CLINICAL TRIAL DATA.

Plaintiffs' remaining two experts, Dr. Olyaei and Dr. Lucchesi, did not review any of the

available clinical trial data, and their opinions are insufficient to establish general causation.

### A.   Ali J. Olyaei, Pharm.D.

Dr. Ali J. Olyaei, Pharm.D., a Professor of Medicine and Pharmacotherapy at Oregon

Health and Sciences University/Oregon State University, failed to review, and therefore cannot

express opinions about, the Vioxx clinical studies.  Olyaei Dep. 123.  Instead, his opinions are

based on three retrospective observational studies examining potential associations between

NSAIDs and VTEs:  Huerta (2007), Biere-Rafi (2011), and Schmidt (2011).  *Id*. at 126–27.  As

Dr. Olyaei himself concedes, none of these studies establish general causation.

First, the Huerta (2007) study does not provide any data specific to Vioxx.  *Id.* at 132,

137; *see also Benkwith v. Matrixx Initiatives, Inc.*, 467 F. Supp. 2d 1316, 1327–28 (M.D. Ala.

2006) (noting that "careful scrutiny is required when an expert attempts to demonstrate general

causation through analogy to a different, though similar, substance"); *McClain*, 401 F.3d at 1246

("[S]mall differences in chemical structure can sometimes make very large differences in the

type of toxic response that is produced." (internal quotations omitted)).  Second, in the Bierre-

Rafi (2011) study, not only was there no statistically significant increased risk of PE for selective

Cox-2 inhibitors, Dr. Olyaei agreed that this study does not provide evidence of a causal link

between NSAIDs and PE.  Olyaei Dep. 146, 150.  Finally, with respect to the Schmidt (2011)

study—the only publication of the three that even references Vioxx by name—the authors of that

publication ***themselves*** assert that the study does not support a causal inference between NSAIDs

and VTE, and Dr. Olyaei agrees with that conclusion. *Id.* at 150–51, 156–57; *see also Joiner*, 522 U.S. at 145 (affirming exclusion of causation opinion when study authors "were unwilling to say that . . . exposure [to the chemical at issue] had caused [the plaintiff's disease] among the workers they examined"); *LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 100 (5th Cir. 2010) (per curiam) ("The district court properly rejected the studies as supporting causation because the authors of the studies concluded that there was no proof of causation.").

Ultimately, Dr. Olyaei opines only by extrapolating from these limited observational studies that there is "a strong signal" that Vioxx *might* cause VTE, but that one must then investigate the issue further to determine whether the signal can be verified or not:

> Q: But this – but where we stand right now is that there is a signal that will take other people –
>
> A: A strong signal.
>
> Q: Right.  But it will take other people to go and verify whether it's true or not.
>
> A: Yeah.

Olyaei Dep. 158.  In this regard, Dr. Olyaei agrees with Dr. Spyropoulos, who testified that only clinical evidence is capable of establishing general causation:

> Q: Do you agree that if you're trying to determine whether a medication is associated with a particular outcome, particular adverse event, that clinical data, outcome data is required to answer that question because mechanism data, while it can raise a hypothesis, cannot prove a causal association?
>
> A: That's correct.  You need both sides of the equation.  You need biologic plausibility through mechanistic data, and then you need to see the clinical evidence.

Spyropoulos Dep. 34–35; *see also Joiner*, 522 U.S. at 145 (affirming exclusion of causation opinion when study authors "were unwilling to say that . . . exposure [to the chemical at issue] had caused [the plaintiff's disease] among the workers they examined"); *LeBlanc*, 396 F. App'x

at 100 ("The district court properly rejected the studies as supporting causation because the authors of the studies concluded that there was no proof of causation.").  And, as described above, clinical evidence of a causal association between Vioxx and VTE is absent here.  *See supra* Part II.  Because the studies on which Dr. Olyaei bases his opinion either (a) did not examine Vioxx or (b) lack the scientific certainty required to draw firm conclusions, as the authors themselves acknowledge, Dr. Olyaei's opinions fall well short of the required standard of scientific reliability under *Daubert* and should be excluded.

**B.     Benedict R. Lucchesi, M.D.**

Dr. Benedict Lucchesi, whom this Court may recall from his testimony in the *Plunkett* trial, also did not review the Vioxx clinical trial data.  *See* Lucchesi Dep. 282–85.  Rather, Dr. Lucchesi relies on *in vitro* ("test tube") studies to form opinions about *biological plausibility*— i.e., physiological processes by which Vioxx might increase the risk of VTE.  His opinions appear designed to address Plaintiffs' burden to offer a "reliable explanation of the physiological process by which [an agent] causes [the alleged harm]."  *McClain*, 401 F.3d at 1253.

As the Fifth Circuit held in *Allen v. Pennsylvania Engineering Corp.*, *in vitro* studies showing that a drug might have an adverse effect are "the beginning, not the end of the scientific inquiry and prove[] nothing about causation without other scientific evidence."  102 F.3d 194, 198 (5th Cir. 1996); *see also Brock*, 874 F.2d at 313–14; *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 830 (D.C. Cir. 1988).  Extrapolating from *in vitro* experiments to opine on a medicine's effects "is not methodologically sound or accepted."  *Cerna v. S. Fla. Bioavailability Clinic, Inc.*, 815 So. 2d 652, 656 (Fla. Dist. Ct. App. 2002).

Here, not only are Dr. Lucchesi's theories about biological plausibility speculative and unreliable, *see* Lucchesi Dep. *passim*, they are flatly contradicted by the clinical trial data.  *See supra* Part II; *see also Brock*, 874 F.2d at 315 ("[S]peculation unconfirmed by epidemiologic

proof cannot form the basis for causation in a court of law . . . ."); *In re Propulsid Prods. Liab.
Litig.*, 261 F. Supp. 2d 603, 617 (E.D. La. 2003) (rejecting experts' testimony, explaining that
"[t]hey have theories, but they have no proof to support those theories" and that "their theories
have not been tested or subjected to peer review and publication"); *Moore*, 151 F.3d at 276;
*Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 858 (W.D. Tex. 2005).  As Judge Posner
put it:  "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort.  Law
lags science; it does not lead it."  *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996).

Any opinion offered by Dr. Lucchesi's as to causation is, therefore, inadmissible under
*Daubert* and Rule 702 of the Federal Rules of Evidence.

## V.      MERCK IS ENTITLED TO SUMMARY JUDGMENT.

"Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery
and upon motion, against a party who fails to make a showing sufficient to establish the
existence of an element essential to that party's case, and on which that party will bear the
burden of proof at trial.'"  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  The moving party must "'demonstrate the
absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's
case."  *Id.* (emphasis omitted) (quoting *Celotex*, 477 U.S. at 322).  A factual dispute is
"'genuine'" only "'if the evidence is such that a reasonable jury could return a verdict for the
nonmoving party.'"  *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (quoting
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

As described above, Plaintiffs' expert reports fall far short of the level of proof that is
necessary to establish general causation.  The *Reference Manual on Scientific Evidence* provides
that multiple studies are typically, if not always, needed to establish a cause-effect relationship.
Ref. Man. at 377.  Plaintiffs' experts can point to no reliable scientific evidence that there is a

causal link between VTE and Vioxx, much less multiple studies.  The experts' mere say-so is patently insufficient.  *See Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.")

Under these circumstances, MDL courts, including this Court, have granted summary judgment to prescription drug manufacturers and excluded plaintiffs' expert testimony in categories of cases where, after ample opportunity to do so, the plaintiffs could not demonstrate reliable evidence of general causation.  *See, e.g.*, *In re Propulsid*, 261 F. Supp. 2d at 616–18 (granting summary judgment where plaintiffs' experts' testimony on causation was excluded because it was scientifically unreliable and irrelevant); *Beylin v. Wyeth* (*In re Prempro Prods. Liab. Litig.*), 738 F. Supp. 887, 895–96 (E.D. Ark. 2010) (excluding plaintiffs' expert testimony in "estrogen only" cases because experts lacked scientifically reliable evidence that estrogen can cause breast cancer generally) (joint opinion with Hon. Montgomery from D. Minn.); *Kuhn v. Wyeth* (*In re Prempro Prods. Liab. Litig.*), 765 F. Supp. 2d 1113, 1126 (W.D. Ark. 2011) (excluding expert's testimony that short-term use of Prempro causes ductal breast cancer); *In re Norplant*, 215 F. Supp. 2d at 833 (granting summary judgment to manufacturer in cases where there was no evidence to support general causation for claims alleging side effects other than those contained in the product labeling).[18]

For example, in *Propulsid*, the plaintiff sued prescription-drug manufacturers under the Louisiana Products Liability Act, alleging that her use of the drug Propulsid caused her to develop a prolonged QT interval, which placed her at a "risk for sudden death."  261 F. Supp. 2d

---

[18]   *See also* Mem. in Supp. of Summ. J. at 18 n.11.

at 605.  This Court excluded the plaintiff's experts on causation for a host of reasons, including that "their theories ha[d] not been tested or subjected to peer review or publication."  *Id.* at 617. As the Court explained, "[w]ith the exclusion of the plaintiff's experts on causation, the plaintiff lacks an essential element of proof."  *Id.* at 618.  Therefore, the Court granted defendants summary judgment with respect to plaintiff's product-liability claims.

The same disposition must follow here.  As set forth above, Plaintiffs' so-called expert opinions regarding causation are fatally flawed for myriad reasons.  "With the exclusion of the plaintiff[s'] experts on causation, [they] lack[] an essential element of proof."  *In re Propulsid*, 261 F. Supp. 2d at 618.  "Accordingly, summary judgment is appropriate, and the plaintiff[s'] claim[s] should be dismissed."  *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs' experts' general causation opinions should be excluded and summary judgment granted in the VTE Cases.

Dated:   December 24, 2012                    Respectfully submitted,

By: */s/ Dorothy H. Wimberly*
    Phillip A. Wittmann, 13625
    Dorothy H. Wimberly, 18509
    STONE PIGMAN WALTHER
    WITTMANN L.L.C.
    546 Carondelet Street
    New Orleans, LA 70130
    Phone: 504-581-3200
    Fax:    504-581-3361

Defendants' Liaison Counsel

 —and—

    Douglas R. Marvin
    Eva Petko Esber
    M. Elaine Horn
    WILLIAMS & CONNOLLY LLP

725 Twelfth Street, N.W.
Washington, DC 20005
Phone: 202-434-5000
Fax:     202-434-5029

John H. Beisner
Jessica Davidson Miller
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005

ATTORNEYS FOR MERCK SHARP &
DOHME CORP

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Memorandum in Support of Merck Sharp & Dohme Corp.'s Consolidated Motion to Exclude Opinion Testimony on General Causation and Renewed Motion for Summary Judgment in VTE Cases has been served on Liaison Counsel, Russ Herman, Phillip Wittmann, and Ann Oldfather, by U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8C, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 24th day of December, 2012.

<div style="margin-left:50%">

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

</div>