# EXHIBIT A

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
ACTING BY ATTORNEY GENERAL
THOMAS W. CORBETT, JR.

        Plaintiff,

        v.

MERCK & CO., INC.,

        Defendants.

:
:
:
:
:
:
:
:
:
:
:

*273* M.D. 2008

CIVIL ACTION - EQUITY

RECEIVED & FILED
COMMONWEALTH COURT
OF PENNSYLVANIA
2008 MAY 20  A 10: 51

## STIPULATED FINAL JUDGMENT DECREE AND PERMANENT INJUNCTION

AND NOW, Plaintiff, Commonwealth of Pennsylvania ("Commonwealth"), acting by and through Attorney General Thomas W. Corbett, Jr., has brought this action pursuant to the *Unfair Trade Practices and Consumer Protection Law*, 73 P.S. § 201-1 *et seq.*, ("Consumer Protection Law"), having filed a complaint against Merck & Co., Inc. ("Merck"), and the parties having consented to entry of this Stipulated Final Judgment ("Judgment"),

NOW THEREFORE, upon the Judgment of the parties hereto, IT IS HERBY ORDERED, ADJUDED AND DECREED AS FOLLOWS:

**I.**    **FINDINGS**

1.    This Court has jurisdiction over the subject matter of this lawsuit and over all parties.

2.    The terms of this Judgment shall be governed by the laws of the Commonwealth.

3.    Entry of this Judgment is in the public interest and reflects a negotiated agreement among the parties.

1

4.      This Judgment is applicable to Merck and to Merck's agents, employees, representatives, assignees, and successors in interest who have actual or constructive notice of its provisions (hereinafter collectively "Enjoined Persons").

**Definitions:**

a.      "Covered Conduct" shall mean Merck's promotional and marketing practices regarding the prescription drug Vioxx®, as well as Merck's practices related to Data Safety Monitoring Boards, publication of clinical trials, and the support of continuing medical education that were the subject of an investigation by the Signatory Attorneys General under the State Consumer Protection Laws.  "Covered Conduct" shall not include conduct relating to promotion and marketing of the prescription drugs Vytorin® and/or Zetia® and  to publication of clinical trials, practices related to Data Safety Monitoring Boards, and the support of continuing medical education, relating to Vytorin® and/or Zetia®.

b.      "Effective Date" shall mean the date by which all Parties have executed the Consent Judgment.

c.      "FDA Amendments Act of 2007" (or "FDA Amendments Act" or "the Act") shall mean Public Law No. 110-85, which among other things, creates a federal clinical trial registry and results data bank.

d.      "FDA's Guidances for Industry" shall mean documents published by the United States Department of Health and Human Services, Food and Drug Administration (FDA), that represent the FDA's current recommendations on a topic.

e.      "Individual States" and "State" shall mean each Signatory Attorney General who is participating in the Multistate Working Group.

f.      "Joint Venture(s)" shall mean any entity in which Merck maintains a direct and/or indirect ownership interest of 50% or less on the date this Agreement is signed.

2

g.      "Merck" shall mean Merck & Co., Inc. and its United States-based affiliates,

subsidiaries, predecessors, successors, and assigns, but shall not include any Joint Ventures (as

that term is defined in the prior sub-paragraph).

h.      "Multistate Executive Committee" shall mean the Attorneys General and their

staffs representing Arizona, California, Florida, Illinois, Ohio, Oregon, Pennsylvania, Texas, and

Vermont.

i.      Multistate Working Group" ("MSWG") shall mean the Attorneys General and

their staffs representing Arizona, Arkansas, California, Connecticut, Florida, District of

Columbia, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan,

Nebraska, Nevada, New Jersey, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania,

South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington and Wisconsin.

j.      "Parties" shall mean Merck and the Individual States.

k.      "Product" shall mean any prescription drug or biological product manufactured,

distributed, sold, marketed or promoted in the United States in any way.

l.      "Signatory Attorney(s) General" shall mean the Attorney General, or his or her

designee, of each state in the Multistate Working Group.

m.      "State Consumer Protection Laws" shall mean the consumer protection laws

under which the Signatory Attorneys General have conducted their investigation.[1]

---

[1] The States' consumer protection statutes are: ARIZONA - *Consumer Fraud Act,* A.R.S. § 44-
1521, *et seq.*; ARKANSAS - Ark. Code Ann. § 4-88-101, *et seq.,* CALIFORNIA - Bus. & Prof.
Code, §§ 17200 *et seq.,* and 17500 *et seq.*; CONNECTICUT - Conn. Gen. Stat., §§ 42-110a *et
seq.*; DISTRICT OF COLUMBIA - *Consumer Protection Procedures Act,* D.C. Code § 28-3901,
*et seq.*; HAWAII- *Uniform Deceptive Trade Practice Act,* Haw. Rev. Stat. Chpt. 481A and Haw.
Rev. Stat. § 480-2.; FLORIDA - Deceptive and Unfair Trade Practices Act, Fla. Stat. Ch.
501.201 *et seq.*; IDAHO - *Consumer Protection Act,* Idaho Code Section 48-601 *et seq.*;
ILLINOIS - *Consumer Fraud and Deceptive Business Practices Act,* 815 ILCS § 505/1 *et seq.*
(2006 State Bar Edition); IOWA - *Iowa Consumer Fraud Act,* Iowa Code Section 714.16;

3

n.     "Vioxx®" shall mean rofecoxib.

**Paragraph 1:**

The parties have agreed to resolve the issues raised by the Covered Conduct by entering

into this Consent Judgment (hereinafter "Judgment").

(a)     Merck is entering into this Judgment solely for the purpose of settlement, and

nothing contained herein may be taken as or construed to be an admission or concession of any

violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or

wrongdoing, all of which Merck expressly denies. Merck does not admit any violation of the

State Consumer Protection Laws set forth in footnote 1, and does not admit any wrongdoing

that was or could have been alleged by any Attorney General before the date of the Judgment

under those laws. No part of this Judgment, including its statements and commitments, shall

constitute evidence of any liability, fault, or wrongdoing by Merck.

(b)     This Judgment shall not be construed or used as a waiver or limitation of any

defense otherwise available to Merck in any action, or of Merck's right to defend itself from,

---

KANSAS - *Consumer Protection Act*, K.S.A. 50-623 *et seq.*; MAINE - *Unfair Trade Practices Act*, 5 M.R.S.A. § 207 *et seq.*; MARYLAND - *Consumer Protection Act*, Md. Code Ann., Com. Law § 13-101 *et seq.*; MASSACHUSETTS - *Consumer Protection Act*, M.G.L. c. 93A *et seq.*; MICHIGAN - *Michigan Consumer Protection Act*, MCL 445.901 *et seq.*; NEBRASKA - *Uniform Deceptive Trade Practices Act*, NRS §§ 87-301 *et seq.*; NEW JERSEY - *New Jersey Consumer Fraud Act*, 56:8-1 *et seq.*; NEVADA - *Deceptive Trade Practices Act*, Nevada Revised Statutes 598.0903 *et seq.*; NORTH CAROLINA - *Unfair and Deceptive Trade Practices Act*, N.C. Gen. Stat. § 75-1.1 *et seq.*; NORTH DAKOTA - *Unlawful Sales or Advertising Practices*, N.D. Cent. Code. § 51-15-02 *et seq.*; OHIO- *Consumer Sales Practices Act*, R.C. 1345.01, *et seq.*; OREGON - *Unlawful Trade Practices Act*, ORS 646.605 to 646.656; PENNSYLVANIA - *Unfair Trade Practices and Consumer Protection Law*, 73 P.S. § 201-1 *et seq.*; SOUTH CAROLINA - *Unfair Trade Practices Act*, S. C. CODE. ANN. Sections 39-5-10, *et seq.*; SOUTH DAKOTA - *Deceptive Trade Practices Act*, S.D. Codified Laws § 37-24, *et seq.*; TENNESSEE-Tennessee - *Consumer Protection Act*, Tenn. Code Ann. §§ 47-18-101 *et seq.*; TEXAS - *Deceptive Trade Practices - Consumer Protection Act*, Tex. Bus. and Com. Code § 17.47, *et seq.*; VERMONT - *Consumer Fraud Act*, 9 V.S.A. § 2451 *et seq.*; WASHINGTON - *Unfair Business Practices/Consumer Protection Act*, R.C.W. 19.86 *et seq.*; WISCONSIN – Wis. Stat. § 100.18 (Fraudulent Representations).

or make any arguments in, any private individual or class claims or suits relating to the subject matter or terms of this Judgment. This Judgment is made without trial or adjudication of any issue of fact or law or finding of liability of any kind.

(c)     It is the intent of the Parties that this Judgment not be admissible in other cases or binding on Merck in any respect other than in connection with the enforcement of this Judgment.

(d)     No part of this Judgment shall create a private cause of action or confer any right to any third party for violation of any federal or state statute except that a State may file an action to enforce the terms of this Judgment.

(e)     All obligations undertaken by Merck in this Judgment shall apply prospectively, except to the extent permitted by the National Library of Medicine, Merck shall submit, as soon as practicable, clinical trial results to the clinical trial registry and results data bank created by the FDA Amendments Act for all "applicable clinical trials" (as that term is defined by the Act) of FDA-approved Merck Products that were initiated after July 1, 2005.

**Paragraph 2:**

Merck shall register clinical trials and submit results to the registry and results data bank as required by the FDA Amendments Act and any accompanying regulations that may be promulgated pursuant to that Act.

**Paragraph 3:**

Merck shall not make any written or oral claim that is false, misleading or deceptive regarding any FDA-approved Merck Product.

**Paragraph 4:**

Merck shall not make any written or oral promotional claims of safety or effectiveness

5

for any FDA-approved Merck Product in a manner that violates the Food, Drug and Cosmetic

Act, 21 U.S.C. § 301 et seq. ("FDCA"), accompanying regulations, or voluntary agreements with

FDA, as interpreted by the FDA in a writing by the Director of the Center for Drug Evaluation at

the FDA.

**Paragraph 5:**

A written or oral claim made by Merck in connection with a Joint Venture Product which

written or oral claim has not been approved by the Joint Venture shall be subject to the

provisions of Paragraphs 3 and 4.  In no event, however, shall Paragraphs 3 and 4 apply to

Vytorin® or Zetia®.

**Paragraph 6:**

Nothing in this Judgment shall require Merck to:

     i.    take an action that is prohibited by the FDCA or any regulation

promulgated thereunder, or by FDA; or

     ii.    fail to take an action that is required by the FDCA or any regulation

promulgated thereunder, or by FDA. Any written or oral promotional claim subject to this

Judgment which is the same, or materially the same, as the language required or agreed to by the

Director of DDMAC or the Director of the Center for Drug Evaluation or their authorized

designees in writing shall not constitute a violation of this Judgment.

**Paragraph 7:**

Merck agrees to delay direct to consumer ("DTC") television advertising for any Merck

Product indicated for pain relief immediately following such Product's approval by the FDA, if

the Director of the Center for Drug Evaluation at FDA recommends such a delay in writing to

Merck.  Merck's delay would be for the same period as recommended by the Director of the

Center for Drug Evaluation at FDA.

**Paragraph 8:**

Merck agrees to submit all new DTC television advertising campaigns for any Merck Product to FDA for pre-review, wait until Merck receives a response from FDA prior to running the advertising campaign, and to modify such advertising consistent with any written comments received from FDA.

**Paragraph 9:**

Merck's obligations with respect to Paragraph 7 shall remain in effect for ten years following the Effective Date.  Merck's obligations with respect to Paragraph 8 shall remain in effect for seven years following the Effective Date.  With respect to Paragraph 7, Merck shall abide by any such written recommendation as long as the submission of the TV advertising campaign is made within ten years following the Effective Date.  With respect to Paragraph 8, Merck shall abide by any such written recommendation when such submission is made within seven years of the Effective Date.

**Paragraph 10:**

When presenting information in detailing pieces, brochures, booklets, mailing pieces, published journals, magazines, other periodicals and newspapers, and broadcast through media such as radio, television, the Internet, and telephone communications systems, about a Clinical Study that relates to an FDA-approved Merck Product, Merck shall (1) accurately reflect the methodology used to conduct the Clinical Study; (2) shall not present favorable information or conclusions from a study that is inadequate in design, scope, or conduct to furnish significant support for such information or conclusions; and (3) shall not use statistical analyses and techniques on a retrospective basis to discover and cite findings not soundly supported by the study, or to suggest scientific validity and rigor for data from studies the design or protocol of which are not amenable to formal statistical evaluations.

**Paragraph 11:**

When presenting information in detailing pieces, brochures, booklets, mailing pieces, published journals, magazines, other periodicals and newspapers, and broadcast through media such as radio, television, the Internet, and telephone communications systems, about a Clinical Study or analysis of Clinical Studies as evidence of an FDA-approved Merck Product's safety, Merck shall not (1) present information from a study in a way that implies that the study represents larger or more general experience with the drug than it actually does; nor (2) use statistics on numbers of patients, or counts of favorable results or side effects, derived from pooling data from various insignificant or dissimilar studies in a way that suggests either that such statistics are valid if they are not or that they are derived from large or significant studies supporting favorable conclusions when such is not the case.

**Paragraph 12:**

When presenting information in detailing pieces, brochures, booklets, mailing pieces, published journals, magazines, other periodicals and newspapers, and broadcast through media such as radio, television, the Internet, and telephone communications systems, about a Clinical Study or analysis of Clinical Studies as evidence of an FDA-approved Merck Product's safety, Merck shall not (1) present favorable information or conclusions from a study that is inadequate in design, scope, or conduct to furnish significant support for such information or conclusions; (2) use the concept of statistical significance to support a claim that has not been demonstrated to have clinical significance or validity, or fails to reveal the range of variations around the quoted average results; nor (3) use statistical analyses and techniques on a retrospective basis to discover and cite findings not soundly supported by the study, or to suggest scientific validity and rigor for data from studies the design or protocol of which are not amenable to formal statistical evaluation.

**Paragraph 13:**

      (a)     Merck shall comply with the ACCME Standards for Commercial Support, a copy of which is attached hereto as Appendix 1.

      (b)     Any person who acts in a promotional capacity for Merck with respect to an FDA approved Merck Product shall be obligated under his or her contract with Merck, as a condition for any future promotional relationship with Merck, to disclose to CME participants orally and to the CME provider for inclusion in the written materials the existence, nature and purpose of his or her arrangement with Merck when speaking at a CME program if: (i) the Product the speaker promoted for Merck is in the same therapeutic category as the subject of the CME program, and (ii) the CME program occurs within 12 months of the speaker performing work for or receiving compensation from Merck. Such disclosure shall set forth the type of promotional work engaged in by the speaker and the name of the therapeutic category with respect to which such promotion was performed.

      (c)     Merck shall not provide funding for CME when Merck has knowledge at the time the decision to fund the CME is made that a speaker at the CME has also been a promotional speaker in the past 12 months at a Merck-sponsored promotional event related to the class of drugs to be discussed in the CME.

**Paragraph 14:**

      Merck's obligations with respect to CME shall remain in effect for 9 years following the Effective Date. Merck's obligations with respect to Paragraph 13(b) shall only apply to speakers' contracts entered into, amended to extend the contract period, or renewed after the date of this Agreement.

**Paragraph 15:**

All members of any external Data Safety Monitoring Board ("DSMB") constituted by Merck after the Effective Date for a Merck-Sponsored Clinical Trial shall be prohibited from:

    (a)    holding more than $25,000 of Merck stock (exclusive of mutual fund holdings) at the time of DSMB membership;

    (b)    trading in Merck stock during their DSMB service;

    (c)    serving as a clinical trial investigator in the trial being monitored by the DSMB; and

    (d)    consulting for, being employed by, or entering into any future consulting or employment relationships with, Merck while serving on the DSMB, except that DSMB members may (i) concurrently serve on other DSMBs for Merck, and/or (ii) consult for Merck Research Laboratories where the annual aggregate compensation for such non-promotional consulting services does not exceed $15,000.

**Paragraph 16:**

Merck's obligations with respect to DSMB membership set forth in Paragraph 15 shall remain in effect for DSMBs constituted within 7 years following the Effective Date.

**Paragraph 17:**

Merck agrees to enhance further its process for reviewing potential conflicts of interest such that all members of a DSMB shall, prior to service thereon, complete a "competing interests" form which shall include questions regarding consulting arrangements or frequent speaking arrangements with the sponsor; career involvement with a product or technique under study; hands-on participation in the trial; emotional involvement in the trial; intellectual conflicts; involvement in regulatory issues relevant to trial procedures; investment in competing products; and involvement in the publication. The forms shall carry a continued updating

obligation and shall be forwarded to, and reviewed by, the DSMB chair who, in turn, will forward them to the study's Steering Committee chair or other appropriate individual for review and action, as needed, in advance of the first DSMB meeting and on an ongoing basis.

**Paragraph 18:**

Merck shall require all individuals who are named as authors on a Merck-sponsored manuscript reporting the results of a Merck-sponsored study to fulfill the following conditions: (a) the individual shall have made substantial contribution to the conception and design, or acquisition of data, or analysis and interpretation of data; (b) the individual shall have been involved in drafting the article or revising it critically for important intellectual content; and (c) the individual shall have final approval rights of the version to be published.

**Paragraph 19:**

When a large, multi-center group has conducted the research, the manuscript should identify the individuals who accept direct responsibility for the manuscript. These individuals should fully meet the criteria for authorship defined in Paragraph 18 above.

**Paragraph 20:**

By its execution of this Judgment, Commonwealth releases Merck and all of its past and present subsidiaries, affiliates, predecessors and successors (collectively, the "Released Parties") from the following: all civil claims, causes of action, damages, restitution, fines, costs, and penalties on behalf of the Commonwealth under the above-cited consumer protection statutes arising from the Covered Conduct that is the subject of this Judgment.

**Paragraph 21:**

Notwithstanding any term of this Judgment, specifically reserved and excluded from the Release in Paragraph 20 as to any entity or person, including Released Parties, are any and all of the following:

a.     Any criminal liability that any person or entity, including Released Parties, has or may have to the Commonwealth.

b.     Any civil or administrative liability that any person or entity, including Released Parties, has or may have to the Commonwealth under any statute, regulation or rule not expressly covered by the release in Paragraph 20 above, including but not limited to any and all of the following claims:

  i)     Commonwealth or federal antitrust violations;

  ii)    Reporting practices, including "best price", "average wholesale price" or "wholesale acquisition cost;"

  iii)   Medicaid violations, including federal Medicaid drug rebate statute violations, Medicaid fraud or abuse, and/or kickback violations related to the Commonwealth's Medicaid program; and,

  iv)    Commonwealth's false claims violations.

c.     Any liability under the Commonwealth's above-cited consumer protection laws which any person or entity, including Released Parties, has or may have to individual consumers or Commonwealth's program payors of said Commonwealth, and which have not been specifically enumerated as included herein.

**Paragraph 22:**

Within ten (10) days of the Effective Date of this Judgment, Merck shall pay a total amount of fifty eight million dollars ($58,000,000) to be divided and paid by Merck directly to each Signatory Attorney General in an amount to be designated by and in the sole discretion of the Multistate Executive Committee. Said payment shall be used by the States for attorneys' fees and other costs of investigation and litigation, or to be placed in, or applied to, the consumer protection enforcement fund, consumer education, litigation or local consumer aid fund or

revolving fund, used to defray the costs of the inquiry leading hereto, or for other uses permitted by state law, at the sole discretion of each Signatory Attorney General.

**Paragraph 23:**

For the purposes of resolving disputes with respect to compliance with this Judgment, should any of the Signatory Attorneys General have a reasonable basis to believe that Merck has engaged in a practice that violates a provision of this Judgment subsequent to the Effective Date of this Judgment, then such Attorney General shall notify Merck in writing of the specific objection, identify with particularity the provisions of this Judgment that the practice appears to violate, and give Merck thirty (30) days to respond to the notification; provided, however, that a Signatory Attorney General may take any action where the Signatory Attorney General concludes that, because of the specific practice, a threat to the health or safety of the public requires immediate action.

Upon receipt of written notice, Merck shall provide a good-faith written response to the Attorney General notification, containing either a statement explaining why Merck believes it is in compliance with the Judgment, or a detailed explanation of how the alleged violation occurred and a statement explaining how Merck intends to cure the alleged breach.

**Paragraph 24:**

Upon giving Merck thirty (30) days to respond to the notification described above, the Signatory Attorney General shall also be permitted reasonable access to inspect and copy relevant, non-privileged, non-work product records and documents in the possession, custody or control of Merck that relate to Merck's compliance with each provision of this Judgment as to which cause that is legally sufficient in the State has been shown. If the Signatory Attorney General makes or requests copies of any documents during the course of that inspection, the Signatory Attorney General will provide a list of those documents to Merck. Nothing in this

paragraph shall be interpreted to limit the state's Civil Investigative Demand ("CID") or subpoena authority, to the extent such authority exists under applicable state law, and Merck reserves all of its rights with respect to a CID or subpoena issued pursuant to such authority.

**Paragraph 25:**

The State may assert any claim that Merck has violated this Judgment in a separate civil action to enforce this Judgment, or to seek any other relief afforded by law, only after providing Merck an opportunity to respond to the notification described in Paragraph 23 above; provided, however, that a Signatory Attorney General may take any action where the Signatory Attorney General concludes that, because of the specific practice, a threat to the health or safety of the public requires immediate action.

**Paragraph 26**

This Judgment represents the full and complete terms of the settlement entered into by the parties hereto. In any action undertaken by either the Attorneys General, or any of them, or Merck, no prior versions of this Judgment, and no prior versions of any of its terms, that were not entered by the Court in this Judgment, may be introduced for any purpose whatsoever.

**IT IS SO ORDERED, ADJUDGED AND DECREED:**

Dated this _____ day of _____, 2008.

_____
Commonwealth Court Judge

14

**SIGNATURES**

*For The Commonwealth Of Pennsylvania:*

**THOMAS W. CORBETT, JR.**
Attorney General

Thomas M. Devlin
Chief Deputy Attorney General
Health Care Section

Date: May 16, 2008      By: _Nicole L. VanOrder_

Nicole L. VanOrder
Deputy Attorney General
Attorney I.D. No. 86293
Office of Attorney General
Health Care Section
14th Floor, Strawberry Square
Harrisburg, Pennsylvania 17120
Telephone:  (717) 705.6938
Facsimile:  (717) 787.1190

15

*For MERCK & CO., INC.:*

By: _____

Bruce Kuhlik
Executive Vice President & General Counsel
Merck & Co., Inc.

*For LOCAL COUNSEL:*

By: _____

Benjamin R. Barnett
Dechert LLP
Attorney I.D. No. 90752
Circa Centre
2929 Arch Street
Philadelphia, PA 19104
Telephone:  (215) 994-2887
Facsimile:  (215) 994-2222

16

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA     :
ACTING BY ATTORNEY GENERAL     :
THOMAS W. CORBETT, JR.     :
    :
          Plaintiff,     :
    :
        v.     :     _____ M.D. 2008
    :
    :     CIVIL ACTION - EQUITY
MERCK & CO., INC.,     :
    :
          Defendants.     :

## CERTIFICATION

Based upon Pennsylvania's two officer rule in lieu of a Corporate Resolution, the undersigned two (2) corporate officers hereby indicate and certify that the Executive Vice-President and General Counsel, Bruce Kuhlik, is authorized to enter into the above captioned Consent Decree.

IN WITNESS WHEREOF, this Consent may be signed in one or more counterparts and shall be effective as of May 13, 2008.

_Celia A. Colbert_
Celia A. Colbert
Senior Vice President, Secretary and
Assistant General Counsel

_Kenneth Frazier_
Executive Vice President + President, GHH

# APPENDIX 1



# ACCME STANDARDS FOR COMMERCIAL SUPPORT <sup>SM</sup>

## *Standards* to Ensure the Independence of CME Activities

ACCME

## The ACCME Standards for Commercial Support[SM]

*Standards* to Ensure Independence in CME Activities

**STANDARD 1: Independence**

1.1 A CME provider must ensure that the following decisions were made free of the control of a commercial interest. (See www.accme.org for a definition of a 'commercial interest' and some exemptions.)

    (a) Identification of CME needs;
    (b) Determination of educational objectives;
    (c) Selection and presentation of content;
    (d) Selection of all persons and organizations that will be in a position to control the content of the CME;
    (e) Selection of educational methods;
    (f) Evaluation of the activity.

1.2 A commercial interest cannot take the role of non-accredited partner in a joint sponsorship relationship. ⌘

**STANDARD 2: Resolution of Personal Conflicts of Interest**

2.1 The provider must be able to show that everyone who is in a position to control the content of an education activity has disclosed all relevant financial relationships with any commercial interest to the provider. The ACCME defines "relevant" financial relationships" as financial relationships in any amount occurring within the past 12 months that create a conflict of interest.

2.2 An individual who refuses to disclose relevant financial relationships will be disqualified from being a planning committee member, a teacher, or an author of CME, and cannot have control of, or responsibility for, the development, management, presentation or evaluation of the CME activity.

2.3 The provider must have implemented a mechanism to identify and resolve all conflicts of interest prior to the education activity being delivered to learners. ⌘

**STANDARD 3: Appropriate Use of Commercial Support**

3.1 The provider must make all decisions regarding the disposition and disbursement of commercial support.

3.2 A provider cannot be required by a commercial interest to accept advice or services concerning teachers, authors, or participants or other education matters, including content, from a commercial interest as conditions of contributing funds or services.

3.3 All commercial support associated with a CME activity must be given with the full knowledge and approval of the provider.

**Written agreement documenting terms of support**

3.4 The terms, conditions, and purposes of the commercial support must be documented in a written agreement between the commercial supporter that includes the provider and its educational partner(s). The agreement must include the provider, even if the support is given directly to the provider's educational partner or a joint sponsor.

3.5 The written agreement must specify the commercial interest that is the source of commercial support.

3.6 Both the commercial supporter and the provider must sign the written agreement between the commercial supporter and the provider.

**Expenditures for an individual providing CME**

3.7 The provider must have written policies and procedures governing honoraria and reimbursement of out-of-pocket expenses for planners, teachers and authors.

3.8 The provider, the joint sponsor, or designated educational partner must pay directly any teacher or author honoraria or reimbursement of out-of-pocket expenses in compliance with the provider's written policies and procedures.

3.9 No other payment shall be given to the director of the activity, planning committee members, teachers or authors, joint sponsor, or any others involved with the supported activity.

3.10 If teachers or authors are listed on the agenda as facilitating or conducting a presentation or session, but participate in the remainder of an educational event as a learner, their expenses can be reimbursed and honoraria can be paid for their teacher or author role only.

**Expenditures for learners**

3.11 Social events or meals at CME activities cannot compete with or take precedence over the educational events.

**3.12** The provider may not use commercial support to pay for travel, lodging, honoraria, or personal expenses for non-teacher or non-author participants of a CME activity. The provider may use commercial support to pay for travel, lodging, honoraria, or personal expenses for bona fide employees and volunteers of the provider, joint sponsor or educational partner.

**Accountability**

**3.13** The provider must be able to produce accurate documentation detailing the receipt and expenditure of the commercial support. ✖

**STANDARD 4: Appropriate Management of Associated Commercial Promotion**

**4.1** Arrangements for commercial exhibits or advertisements cannot influence planning or interfere with the presentation, nor can they be a condition of the provision of commercial support for CME activities.

**4.2** Product-promotion material or product-specific advertisement of any type is prohibited in or during CME activities. The juxtaposition of editorial and advertising material on the same products or subjects must be avoided. Live (staffed exhibits, presentations) or enduring (printed or electronic advertisements) promotional activities must be kept separate from CME.

- For *print*, advertisements and promotional materials will not be interleafed within the pages of the CME content. Advertisements and promotional materials may face the first or last pages of printed CME content as long as these materials are not related to the CME content they face and are not paid for by the commercial supporters of the CME activity.
- For *computer based*, advertisements and promotional materials will not be visible on the screen at the same time as the CME content and not interleafed between computer 'windows' or screens of the CME content
- For *audio and video recording*, advertisements and promotional materials will not be included within the CME. There will be no 'commercial breaks.'
- For *live, face-to-face CME*, advertisements and promotional materials cannot be displayed or distributed in the educational space immediately before, during, or after a CME activity. Providers cannot allow representatives of Commercial Interests to engage in sales or promotional activities while in the space or place of the CME activity.

**4.3** Educational materials that are part of a CME activity, such as slides, abstracts and handouts, cannot contain any advertising, trade name or a product-group message.

**4.4** Print or electronic information distributed about the non-CME elements of a CME activity that are not directly related to the transfer of education to the learner, such as schedules and content descriptions, may include product-promotion material or product-specific advertisement.

**4.5** A provider cannot use a commercial interest as the agent providing a CME activity to learners, e.g., distribution of self-study CME activities or arranging for electronic access to CME activities. ✖

**STANDARD 5: Content and Format without Commercial Bias**

**5.1** The content or format of a CME activity or its related materials must promote improvements or quality in healthcare and not a specific proprietary business interest of a commercial interest.

**5.2** Presentations must give a balanced view of therapeutic options. Use of generic names will contribute to this impartiality. If the CME educational material or content includes trade names, where available trade names from several companies should be used, not just trade names from a single company. ✖

**STANDARD 6: Disclosures Relevant to Potential Commercial Bias**

**Relevant financial relationships of those with control over CME content**

**6.1** An individual must disclose to learners any relevant financial relationship(s), to include the following information:

- The name of the individual;
- The name of the commercial interest(s);
- The nature of the relationship the person has with each commercial interest.

**6.2** For an individual with no relevant financial relationship(s), the learners must be informed that no relevant financial relationship(s) exist.

**Commercial support for the CME activity.**

**6.3** The source of all support from commercial interests must be disclosed to learners. When commercial support is 'in-kind' the nature of the support must be disclosed to learners.

**6.4** 'Disclosure' must never include the use of a trade name or a product-group message.

**Timing of disclosure**

**6.5** A provider must disclose the above information to learners prior to the beginning of the educational activity. ✖

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
|  | : | MDL NO. 1657 |
| IN RE: VIOXX | : |  |
| PRODUCTS LIABILITY LITIGATION | : | SECTION:  L |
|  | : |  |
|  | : | JUDGE FALLON |
|  | : |  |
|  | : | MAG. JUDGE KNOWLES |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

THIS DOCUMENT RELATES TO ALL GOVERNMENTAL ACTIONS

<u>ORDER & REASONS</u>

The Court has pending before it the Plaintiff's Steering Committee's Emergency Motion

for Order Establishing Escrow Fund for Common Benefit Fees (Rec. Doc. 63560).  The Court

has reviewed the motion, as well as the oppositions and motions to strike filed in response, and

now issues this Order and Reasons.

I.      Background

To put this matter in perspective, a brief review of this litigation is appropriate.  This

multidistrict products liability litigation involves the prescription drug Vioxx, known generically

as Rofecoxib.  Merck, a New Jersey corporation, researched, designed, manufactured, marketed

and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid

arthritis, menstrual pain, and migraine headaches.  On May 20, 1999, the Food and Drug

Administration approved Vioxx for sale in the United States.  Vioxx remained publicly available

until September 20, 2004, when Merck withdrew it from the market after data from a clinical

Case 2:05-md-01657-EEF-DEK   Document 63612   Filed 01/03/12   Page 2 of 7

trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarction (heart attack) and ischemic stroke. Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims. It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004. Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.[1]

California was the first state to institute a consolidated state court proceeding on October 30, 2002. New Jersey and Texas soon followed suit, on May 20, 2003 and September 6, 2005, respectively. On February 16, 2005, the Judicial Panel on Multidistrict Litigation conferred MDL status on Vioxx lawsuits filed in various federal courts throughout the country and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005). Additionally, a number of state and local governments filed suits against Merck seeking to recover amounts paid for Vioxx prescriptions on behalf of their citizens or civil penalties pursuant to state consumer protection statutes. Those suits were transferred to this Court by the JPML. Substantial pretrial discovery has been accomplished, as well as one bellwether trial.

Concurrently and independently, the Department of Justice through the United States Attorney's Office for the District of Massachusetts conducted its own investigation of Merck's

---

[1]For a more detailed factual background describing the events that took place before the inception of this multidistrict litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).

Case 2:05-md-01657-EEF-DEK   Document 63612   Filed 01/03/12   Page 3 of 7

conduct with respect to Vioxx. The record reflects that subpoenas were served on Merck before

Vioxx was withdrawn from the market and before this MDL was created. The independent DOJ

investigation recently culminated in Merck pleading guilty to a criminal charge and agreeing to

pay a substantial civil penalty. In connection with that process, representatives of the National

Association of Medicaid Fraud Units (NAMFCU) and Merck negotiated a pattern settlement

agreement which the fifty states may enter to receive a portion of that civil penalty as

reimbursement for amounts expended on Vioxx through the Medicaid program.

The states fall into three categories relative to the MDL and the NAMFCU settlement.

First, there are numerous states that do not have cases in the MDL and never pursued litigation

against Merck. Those states are not subject to proceedings in the MDL or the PSC's present

motion. Second, there are states who have suits against Merck pending in the MDL. These

litigating states are (or were) equally entitled to participate in the NAMFCU-negotiated

settlements with Merck. The litigating states fall into two subsets: litigating states who have

declined to enter into the NAMFCU settlements, and litigating states who have accepted the

NAMFCU offer. It is this latter group, including New York, Florida, and South Carolina, which

are the subject of the present motion.[2]

The PSC previously filed a broader Motion for an Order Imposing Common Benefit

Obligation Upon the Recovery of Governmental Action Participants seeking a portion of any

recovery in the Governmental Actions pending in this Court to be set aside to compensate

_____

[2]With respect to litigating states not participating in the NAMFCU settlements, the PSC
reports that it has reached voluntary common benefit contribution agreements with the majority
of those states. This is understandable and justifiable because these litigating states apparently
plan to pursue their claims in litigation and will rely on the work product of the PSC.

-3-

attorneys who did work for the common benefit. (Rec. Doc. 62699). The Court ordered that that motion be held in abeyance with a briefing schedule to be set at a later time. (Rec. Doc. 62788). Now, in light of the impending settlement of the Medicaid claims of litigating states through the NAMFCU settlement, including New York, Florida, and South Carolina, the PSC moves for a more specific Order directing 6.5% of those funds into an escrow account for potential payment as common benefit attorneys' fees.

The Court has received oppositions from Merck and from the States of New York, Florida, and South Carolina, as well as correspondence from representatives of NAMFCU. The opponents dispute the Court's jurisdiction to order such an escrow, the PSC's right to common benefit compensation under these circumstances, and the sufficiency of the PSC's showing for an escrow order.

## II.    Law and Analysis

The PSC relies on the well-established common benefit fund doctrine, which the Court has previously addressed at length. *See generally In Re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640 (E.D. La. 2010). Generally, the Court has the authority to set aside a portion of a common fund as attorneys' fees to compensate work that contributed to creation of that fund. The PSC argues that its efforts in the MDL have benefitted litigating states such as New York, Florida, and South Carolina, and therefore a portion of the funds due to be paid to those states by Merck through the NAMFCU settlement process should be held in escrow for an eventual award of common benefit fees.

Merck and the interested states raise a number of arguments in opposition. New York, Florida, and South Carolina argue that the Court lacks jurisdiction over their cases for the

reasons set forth in previously-briefed motions to remand, and that ordering the escrow would violate their sovereign immunity. Both Merck and the states argue that the PSC has failed to make a sufficient showing for an escrow order, which is essentially a form of preliminary injunction.

The relief sought by the PSC necessitates an analysis comparable to that required for a preliminary injunction. Injunctive relief "should only be granted when the movant has clearly carried the burden of persuasion" and shown:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (quotation omitted).

That showing has not been made. At the outset, the Court acknowledges the questions of jurisdiction and state sovereign immunity. However, the Court need not confront those issues because the motion can be decided on another ground. An escrow of funds for a common benefit assessment is appropriate only where the common benefit labor created the settlement fund. The PSC has not sufficiently shown that connection with regard to New York, Florida, and South Carolina, and thus fails on the element of a substantial likelihood of entitlement to a portion *of the NAMFCU settlement funds.*

There is an apparently insurmountable disconnect between the PSC's work in the MDL and the DOJ/NAMFCU settlement fund. Certainly, the PSC and others performed substantial work in the MDL. That common benefit work produced a $4.85 billion master settlement agreement, and those attorneys were accordingly compensated with a portion of the fund created

Case 2:05-md-01657-EEF-DEK   Document 63612   Filed 01/03/12   Page 6 of 7

by their efforts. Now the PSC seeks additional compensation for work in connection with the pending governmental actions, but the fund that the PSC requests be tapped and escrowed is not obviously a result of its efforts. The record reflects that the DOJ/NAMFCU settlement fund was created through a criminal investigation that began before this MDL was created, and through the independent efforts of the United States Attorney's Office for the District of Massachusetts, the Department of Justice, and the NAMFCU negotiating team. Perhaps the PSC's concurrent efforts in civil litigation against Merck brought some facts to light or otherwise facilitated the DOJ/NAMFCU settlement; but it may be impossible to articulate or quantify that causal relationship, and the PSC has not sufficiently shown that the DOJ/NAMFCU settlement is a common fund produced by its efforts.

It may well be, as the PSC argues, that "Government Action Participants who have litigated their claims in the MDL, like Florida, New York, and South Carolina, have benefitted from the work product of the ... PSC, and other common benefit lawyers." (Rec. Doc. 63586 at 2). But the issue here is not one of benefit, but one of nexus. The DOJ/NAMFCU settlement fund does not appear to be a product of any benefit conveyed on the settling states by the PSC's efforts. All fifty states have the option to accept the NAMFCU-negotiated agreement and settle Medicaid-based claims with Merck, regardless of litigating or non-litigating status. If New York, Florida, and South Carolina had never filed suit against Merck and never had an action pending before this Court, they would be in no different position with respect to the NAMFCU settlement. The Court does not find it appropriate to stretch the common benefit doctrine on these facts to order an escrow of funds available to litigating and non-litigating states alike independent of the PSC's efforts. *Cf. United States ex rel. Bogart v. King Pharms.*, 493 F.3d

323, (3rd Cir. 2007) (denying *qui tam* relator's claim for attorneys' fees from recoveries of non-litigating states that settled with defendant independently through NAMFCU-negotiated process)

In short, even assuming jurisdiction and authority to divert a portion of settlement funds directed towards state Medicaid programs under these circumstances, there has not been a sufficient showing that the PSC is entitled to common benefit compensation out of those funds. Likewise, the Court is doubtful of the risk of irreparable injury to the PSC or that the public interest would be served by diverting those funds into escrow

The PSC also requests that the Court "extend the escrow order to all government actions pending in the MDL in which there is a settlement with Merck and the governmental entity has not reached an agreement with the PSC for the payment of common benefit fees," which would address non-NAMFCU settlements between Merck and litigating states or entities. (Rec. Doc. 63586 at 4). The parties have not informed the Court of any non-NAMFCU settlements between Merck and a litigating state, and accordingly that request is premature. At an appropriate time, the Court will set a briefing schedule on that request and the pending fee-related motion.

Accordingly, the PSC's emergency motion (Rec. Doc. 63560) is DENIED.

New Orleans, Louisiana, this 3rd day of January, 2012.

_____
UNITED STATES DISTRICT JUDGE

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA

v.

MERCK & CO., INC.

No. 08-cv-6015

### ORDER

AND NOW, upon consideration of Plaintiff's Motion to Remand, and defendants' responses thereto, along with the Notice of Removal and Supporting Exhibits, it is hereby ORDERED that the Motion is GRANTED.

The Court finds that the claims stated in Plaintiff's Complaint do not arise under the Constitution, laws or treaties of the United States, and therefore do not raise a federal question within the meaning of 28 U.S.C. §§ 1331 and 1441(b). Accordingly, this action is hereby REMANDED to the Court of Common Pleas of Philadelphia County, Pennsylvania. The Clerk shall transmit the original record back to the Prothonotary of the Court of Common Pleas, and shall mark this matter closed.

BY THE COURT:

DATED: _____        _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA

v.

MERCK & CO., INC.

No. 08-cv-6015

### PLAINTIFF COMMONWEALTH'S MOTION TO REMAND
### FOR LACK OF SUBJECT-MATTER JURISDICTION

For the reasons stated in the attached Memorandum of Law, plaintiff Commonwealth of Pennsylvania requests that this Court remand this civil action to the Court of Common Pleas. The sole ground for subject-matter jurisdiction of the federal courts asserted by defendants in the Notice of Removal is federal question jurisdiction. Diversity jurisdiction is unavailable because Plaintiff, as a sovereign state, is not a "citizen" of any state. Defendants concede that Plaintiff's claims are based on state law causes of action, but contend that a disputed issue of federal law confers jurisdiction.

For the reasons stated in the attached Memorandum of Law, the removal was improper and this case should be remanded to state court.

Respectfully submitted,

___/s_____
MARK C. SCHULTZ

COHEN, PLACITELLA & ROTH, P.C.
Attorney ID No. 21650
mschultz@cprlaw.com
2001 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 567-3500

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA

v.

MERCK & CO., INC.

No. 08-cv-6015

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REMAND
## FOR LACK OF SUBJECT-MATTER JURISDICTION AND
## IN OPPOSITION TO DEFENDANT'S MOTION TO STAY

### INTRODUCTION

This Court should grant the Commonwealth of Pennsylvania's (the "Commonwealth") Motion to Remand to the Court of Common Pleas, Philadelphia County, Pennsylvania.   The defendant cannot meet its burden of proving that there is any basis for federal jurisdiction over the claims stated in the Commonwealth's Civil Action Complaint (the "Complaint").  Further, given the absence of federal court jurisdiction, transfer to the MDL before ruling on the plaintiff's Motion to Remand would be inappropriate.

### PROCEDURAL BACKGROUND

The Commonwealth filed its Complaint against Merck & Co., Inc. ("Merck") in the Court of Common Pleas, Philadelphia County, Pennsylvania on December 3, 2008.  The Complaint asserts no cause of action created by federal law.  None of the Commonwealth's state-law claims allege that a violation of the federal Medicaid Act or the Food Drug & Cosmetics Act ("FDCA") gives rise to defendant's liability.

4

Defendant removed this case pursuant to 28 U.S.C. §§1441 and 1446 on December 29, 2008 on grounds that the Complaint raises substantial issues of federal law under 28 U.S.C. §1331 and therefore confers subject matter jurisdiction upon this Court.

**I.      THE EXISTENCE OF MDL PROCEEDINGS DOES NOT CONFER FEDERAL JURISDICTION AND THE DEFENDANT'S MOTION FOR A STAY SHOULD BE DENIED**

As a threshold matter, this Court must decide the issue of jurisdiction before it considers whether the case should stayed, pending a possible transfer to the MDL. *TAP Pharmaceutical Products, Inc.,* 415 F. Supp. 2d at 521; *Rutt v. Prudential Ins. Co. of America,* 1996 U.S. Dist. LEXIS 7132, 6, 9 (E.D. Pa. 1996). "[T]he power to grant a stay is subject to an important limitation: the existence of subject matter jurisdiction." *TAP Pharmaceutical Products, Inc.,* 415 F. Supp. 2d at 521. It is "axiomatic that federal courts are courts of limited jurisdiction. As such, they are under a continuing duty to satisfy themselves of their jurisdiction before proceeding to the merits of any case." *Rutt,* 1996 U.S. Dist. LEXIS 7132 at 6-7. Thus before adjudicating any pretrial matters such as transfer to an MDL, this Court must determine the threshold issue of whether it has the power to do so. *Id.*

It is beyond dispute that, "the existence of current MDL proceedings does not automatically confer subject matter jurisdiction." *Pennsylvania Employees Benefit Trust Fund v. Eli Lilly & Co., et al,* 511 F. Supp. 576, 578, n. 3 (E.D. Pa. 2007). To this effect, a conditional transfer order from the JPML "does not affect or suspend orders and pretrial proceedings in the district court in which the action is pending and does not in any way limit the pretrial jurisdiction of the court." JPML Rule 1.5. Therefore, "granting a

5

stay solely on the existence of a factually-related MDL proceeding, without undertaking an individualized analysis of subject matter jurisdiction, would run counter to established case law, congressional intent, and JPML Rule 1.5, all of which contemplate a district court will act to resolve threshold jurisdictional concerns." *TAP Pharmaceutical Products, Inc.*, 415 F. Supp. 2d at 521.   Thus, this Court must first make an independent review of the plaintiff's complaint to determine whether the defendant can meet its burden of proving that, on the face of the plaintiff's complaint, a federal question is present before considering whether the case should be transferred.. *TAP Pharmaceutical Products, Inc.*, 415 F. Supp. 2d at 521.   As set forth in subsequent sections, the defendant cannot meet this burden.

In the context of assessing the propriety of removal, "determinations of subject matter jurisdiction should be made on an individualized basis" in keeping with Congress' preference for remands based on individualized jurisdictional evaluations and a tolerance for inconsistency. *Id* (citing *Illinois Mun. Ret. Fund v. Citigroup, Inc.*, 391 F.3d 844, 851 (7th Cir. 2004))   Here, the Commonwealth's Complaint does not implicate a contested federal issue nor does it implicate sufficiently substantial federal interest to confer federal jurisdiction.   Rather, the complaint seeks recovery based solely on state law.   Thus, the exercise of federal jurisdiction in the present case would upset the congressionally approved balance of federal and state judicial responsibilities. *Pennsylvania Employees Benefit Trust Fund,* 2007 U.S. Dist. LEXIS 74579 at 8.   Notably, all doubts concerning the propriety of removal are to be resolved in favor of remand.   *ID* (citing *Boyer v. Snap-On Tools Corp.*, 013 F.2d 108, 111 (3rd Cir. 1990)); *Eli Lilly & co., Inc.*, 511 F. Supp. 2d 576

at 580 (citing *Boyer,* 913 F. 2d at 111). Accordingly, and for the reasons set forth below, this Court should grant the Commonwealth's motion to remand.

## II. THE COMPLAINT DOES NOT IMPLICATE A CONTESTED FEDERAL ISSUE

The Defendant, as the removing party, bears the burden of proving that removal is proper. *Dukes v. U.S. Healthcare, Inc.,* 57 F.3d 350, 359 (3d Cir. 1995); *Cartwright v. Thomas Jefferson Univ. Hosp.,* 99 F. Supp. 2d 550, 552 (E.D. Pa. 2000). The removal statutes "must be strictly construed in favor of state court jurisdiction." *Landman v. Borough of Bristol,* 896 F. Supp. 406, 408 (E.D.Pa. 1995). All doubts concerning the propriety of removal are resolved in favor of remand. *Boyer v. Snap-On Tools Corp.,* 913 F.2d 108, 111 (3d Cir. 1990), *cert. denied,* 498 U.S. 1085 (1991); *Barkley v. City of Philadelphia,* 169 F. Supp. 2d 346 (E.D. Pa. 2001); *Apoian v. American Home Products Corp.,* 108 F. Supp. 2d 454, 456 (E.D. Pa. 2000).

Removal to federal court is permitted if a basis for subject matter jurisdiction exists on the face of the plaintiff's complaint. *Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc.,* 415 F.Supp.2d 516, 521 (E.D. Pa. 2005). District courts have original subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. §1331; *Empire Healthchoice Assurance, Inc. v. McVeigh,* 126 S.Ct. 2121, 2131 (2006). "This provision for federal-question jurisdiction is invoked, by and large, by plaintiffs pleading a cause of action created by federal law (*e.g.,* claims under 42 U.S.C. §1983)." *Grable & Sons Metal Products, Inc. v.. Darue Engineering & Manufacturing,* 545 U.S. 308 at 312 (2005). In *Grabel,* the Court set forth standards for a "longstanding, if less frequently encountered variety of federal 'arising under' jurisdiction." 545 U.S. at 312.

7

There is a rare form of "arising under" jurisdiction created if the complaint, under scrutiny, contains state-law based theories of recovery that implicate significant federal issues. *Id.* In other words, federal courts can exercise jurisdiction over causes of action that are created by federal law and those that "turn on substantial questions of federal law..." *Id.*

At the heart of defendant's removal is its claim that the plaintiff's claims, although sounding exclusively in state law, necessarily invoke federal question jurisdiction because the claims implicate and "turn on substantial questions" under the Food, Drug & Cosmetic Act ("FDCA") and federal Medicaid law. In short, defendant claims that these statutes completely pre-empt the state law claims they are properly heard in this Court. As described below Merck is mistaken when it concludes that the *Grable* analysis leads to the conclusion that these statutes imbue plaintiff's complaint with federal questions sufficient to invoke this Court's jurisdiction.

However, before undertaking that analysis, it is important to note that very issue of federal court jurisdiction has been decided by other judges of the Eastern District of Pennsylvania. In its removal petition, Merck failed to bring to this Court's attention the fact that these same contentions it relies upon to invoke this Court's jurisdiction were recently rejected by the Honorable Gene E.K. Pratter when she ruled, in an almost identical case, that Federal subject matter jurisdiction did not exist. *Commonwealth of PA v. Eli Lily & Sons*, 511 F. Supp 2d. 576 (2007). There, the Commonwealth of Pennsylvania filed suit in the Philadelphia County Court of Common Pleas alleging, among other claims, that the defendant pharmaceutical companies caused the submission of fraudulent claims for prescription medications, as well as injuries resulting from the medications' side effects.

8

As Merck has done here, the defendants removed the case and sought a stay of proceedings pending transfer to the pending multidistrict litigation.   Judge Pratter denied the defendants' request for a stay of the proceedings so that she could determine the fundamental question of whether the federal courts had jurisdiction to act.  She then turned to the defendants' claim, identical to those raised here, that the FDCA and Medicaid were sufficiently implicated in the Commonwealth's claims as to create federal question jurisdiction and found them wanting.  In the first instance, the complaint did not, on its face assert any federal bases for liability.  Second, although federal regulatory schemes may be implicated by the claims, given the absent of clear Congressional intent to create an exclusive federal remedy or federal court jurisdiction, the mere presence of such a standard is insufficient to warrant federal question jurisdiction.  511 F. Supp. at 22.  The case was remanded to the court of common pleas.  Following Judge Pratter's analysis, so too should this case be remanded to the state court.

As Judge Pratter described, *Grable*, recognizes a rarer form of "arising under" jurisdiction where a claim satisfies a two-part test.  First, it must appear "from the [complaint] that the right to relief <u>depends</u> upon the construction or application of [federal law]" and involves a contested federal issue.  *Id*. at 313 (emphasis added) (quoting *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199 (1921).  In other words, some issue of federal law, essential for the adjudication of plaintiff's claim, must be disputed.  *Id*. Moreover, that underlying disputed federal issue must be sufficiently "substantial," such that there is a clear indication of "a serious federal interest in claiming the advantages thought to be inherent in a federal forum."  *Id*. at 313.

9

The mere existence of a federal issue is insufficient to confer jurisdiction however. Under *Grable*, the second part of the test is that the "federal issue will ultimately qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of §1331." *Id.* Should the purported federal question fail under either of the foregoing inquiries, there is no federal jurisdiction under §1331.

In discussing these exceptional circumstances to invoke federal jurisdiction over state law claims, the Court emphasized that the federal issue must be substantial, disputed, and critical to the outcome of the case, and that the traditional concepts of federalism should not be violated, even when the case presented such a substantial federal question. When the foregoing analysis is applied to claims brought by sovereign States, it takes on an added dimension. According to the Supreme Court, "considerations of comity make us reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it." *Franchise Tax Board of the State of California v. Construction Laborers Vacation Trust for Southern California et al.*, 463 U.S. 1, n. 22 (1983).

Defendant's removal fails both elements of the *Grable* test. First, the Commonwealth's state law claims do not involve a contested federal issue. Where a complaint seeking the recovery of Medicaid funds "sets forth exclusively state-law causes of action", "there is no question of federal law, substantial or otherwise, to be determined." *TAP*, 415 F.Supp. 516, 524; *Commonwealth of Massachusetts v. Philip Morris, Inc.*, 942 F.Supp. 690, 694 (D. Mass. 1996). The fact that a federally created program, Medicaid, merely serves as the initial source of funds the Commonwealth later seeks to recover does

not necessitate any construction or application of federal law. *Id.*; *Gingerich v. White Pigeon Community Schools*, 736 F.Supp.147 (W.D. Mich. 1990) (finding the receipt and use of federal funds insufficient to confer federal jurisdiction).

The necessity of adjudicating a contested issue of federal law was a critical factor in the Supreme Court's determination that plaintiff's claims created "arising under" jurisdiction in *Grable. Grable*, 545 U.S. 308. *Grable* involved a state-law quiet title action. *Id.* at 310. Plaintiff claimed that the federal government's seizure of his property, and subsequent sale to defendant, was invalid because the IRS had failed to serve proper notice of the seizure under 26 U.S.C. §6335(a). *Id.* at 311. Specifically, plaintiff claimed that Section 6335(a) required personal service and that he was served by certified mail. *Id.* Because of the alleged inadequacy of service, plaintiff contended that the seizure and subsequent sale were improper and that title to the property had not been lawfully transferred. *Id.* Defendant removed the case on grounds that plaintiff's claim arose under federal law as his claim of title necessarily depended on interpretation of the notice statute in federal tax law. *Id.* The district court denied plaintiff's motion to remand, the Sixth Circuit affirmed and the Supreme Court granted certiorari on the jurisdictional question alone. *Id.*

The Supreme Court held that plaintiff's claim warranted federal jurisdiction, primarily because "[w]hether Grable was given notice within the meaning of the federal statute is...an essential element of its quiet title claim, and the meaning of the federal statute is actually in dispute; **it appears to be the only legal or factual issue contested in the case.**" *Id.* at 315 (emphasis added).

As to the second prong of the Grable test, there is no indication that Congress intended to confer federal jurisdiction over state law causes of action implicating the federal statutes involved here, the FDCA and Title XIX of the Social Security Act, which is the federal legislation enabling the Medicaid program. The proposed removal therefore fails both prongs of the Grable test.

The Court's recognition of federal question jurisdiction in quiet title actions depending on construction of federal law put it in venerable company. *Id.* (citing *Hopkins v. Walker*, 244 U.S. 486, 490-91 (1917); *Northern Pacific R. Co. v. Soderberg*, 188 U.S. 526, 528 (1903); *Wilson Cypress Co. v. Del Pozo y Marcos*, 236 U.S. 635, 643-44 (1915)).

There is no line of cases supporting the exercise of federal jurisdiction in State Medicaid recovery actions. To the contrary, most district courts that have addressed the issue, including this Court, have found that removal of such actions fails the first element of the *Grable* test. In fact, as described, this is the precise conclusion reached by Judge Pratter in a virtually indistinguishable case, *Commonwealth of PA v. Eli Lily & Sons* . As is the case here, Judge Pratter held that the pleaded causes of action were state law claims, and that liability under these state claims did not depend on the violation of any federal standard or statute. Judge Pratter further held that the federal "issues" cited by the defendants related to affirmative defenses, and were insufficient to confer federal jurisdiction. As to the second prong of Grable, Judge Pratter also held that Congress did not intend to confer jurisdiction on the causes of action set forth in the complaint. Thus, Judge Pratter concluded that the court had no jurisdiction and removal was improper, she remanded the case to state court despite the pendency of MDL proceedings.

12

In *Philip Morris*, the United States District Court for the District of Massachusetts considered the Commonwealth's motion to remand its causes of action seeking to recover Medicaid funds paid on behalf of Massachusetts citizens suffering from diseases caused by smoking. *Philip Morris*, 942 F.Supp. 690 at 694. The Commonwealth's complaint contained the following state-law based causes of action: the undertaking and violation of a special duty regarding the health effects of smoking; sales of tobacco products in breach of a warranty of merchantability; conspiracy to suppress information regarding the safety of smoking; restitution for injury caused by wrongful conduct; and unjust enrichment from unlawful conduct. *Id.* at 692.

Although sounding exclusively in state law, the defendants asserted that the case invoked federal court jurisdiction because Massachusetts's causes of action were asserted against the backdrop of Title XIX of the Social Security Act, 42 U.S.C. §1396, *et seq. Id.* Title XIX is the federal legislation establishing the Medicaid program. Under Title XIX, the "Federal Government shares the costs of Medicaid with States that elect to participate in the program. In return, participating States are to comply with requirements imposed by the Act and by the Secretary of Health and Human Services." *Atkins v. Rivera*, 477 U.S. 154, 156-57 (1986).

A State electing to participate in the Medicaid program must submit a State plan that, among other things, requires that the State "take all reasonable measures to ascertain the legal liability of third parties…to pay for care and services available under the plan…" 42 U.S.C. §1396a(a)(25). If "legal liability is found to exist", the State must seek reimbursement "to the extent of such legal liability…" *Id.*

13

Critically, Title XIX does not create a cause of action for seeking such reimbursement.  Rather, States electing to pursue liable third parties must do so using state-law based theories.

In support of their assertion of federal jurisdiction, defendants in *Philip Morris* contended that "claims to recover Medicaid expenditures, though they ostensibly are brought exclusively under the cited provisions of Massachusetts law, necessarily involve the enforcement of Title XIX's requirement that Massachusetts pursue liable third parties, and that the claims therefore 'arise under' ... federal law." *Philip Morris*, 942 F.Supp. 690, at 693.

The district court rejected defendants' contention and ordered the case remanded to state court.  According to the court, "[v]indication of the rights that Massachusetts claims under its own statutory and common law will not turn on any construction of federal law. Nor is any proposition of federal law an essential element of any of Massachusetts' claims. **Whether the defendants, as 'third parties' are liable to Massachusetts for costs expended under Medicaid...will be judged by reference to Massachusetts law.**" *Id.* at 694 (emphasis added).

Further, "[t]hough the federal statute requires a State to enforce such third party liability where it may be found, Title XIX does not establish any ground for such liability, nor does it even require that any ground for liability be established by the State." *Id.*

"No obligation is imposed on the State to see to it that 'such a legal liability' does exist.  And where it does exist, **federal law has nothing to say about its proof, and the action to establish the liability may proceed on entirely non-federal grounds.**" *Id.* (emphasis added).

14

The court also found the removal did not meet the second prong of the *Grable* test, stating: "[n]othing in Title XIX suggests that Congress intended that state suits to recover Medicaid funds from liable third parties should be thought of as presenting federal, rather than State, claims. On the contrary, the language of the statute itself shows the congressional intent rather plainly to have been to commit the collection process to those remedies available for such purposes under state law." *Philip Morris*, 942 F.Supp. 690 at 696.

This Court, relying heavily on *Philip Morris*, previously concluded that a Commonwealth Medicaid recovery action presenting legal issues virtually identical to the present case did not present a disputed issue of federal law. In *TAP*, the Commonwealth sued thirty-eight pharmaceutical companies, alleging price setting fraud under state law. *Id.* at 518. The complaint contained the following claims: unjust enrichment; misrepresentation/fraud; and violations of the Commonwealth's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). *Id.* at 519. Like *Philip Morris*, the Commonwealth's state-law claims were presented, in part, against the backdrop of the federal Medicaid Act.

Specifically, the Commonwealth complained that defendant pharmaceutical companies engaged in an unlawful scheme to artificially inflate the average wholesale price ("AWP") of drugs reimbursed under the Medicaid program, the Pharmaceutical Contract with the Elderly ("PACE") and the Pennsylvania Employee Benefit Trust Fund ("PEBTF"). *Id.* AWP is a term derived from federal legislation and was alleged to be part of the formula used by States in setting reimbursement rates for drugs.

This Court held that the Commonwealth's reference to the AWP standard did not raise a substantial federal interest because a court need not construe the term beyond its plain meaning. *Id.* at 525. According to this Court, "a court (be it federal or state) does not need to ascribe any meaning to the words "average wholesale price" for the Commonwealth to prevail. Instead, the Commonwealth must prove the Defendants' conduct was in derogation of state law." *Id.* at 524-25.

Other district courts follow *Philip Morris* in holding that Medicaid recovery actions relying on state-law based theories of recovery fail the first *Grable* prong because they do not depend upon the construction or application of federal law. *State of New York v. Lutheran Ctr. For the Aging, Inc.*, 957 F.Supp. 393 (E.D. N.Y. 1997); *Ieyoub v. American Tobacco Co.*, 1996 WL 544210 (W.D. La. 1996).

Specifically, plaintiff here must prove that defendant's fraudulent marketing practices caused the Commonwealth program payors to pay grossly inflated prices for Vioxx . No federal law will, or ought to be, applied in adjudicating the foregoing claims. Defendant's liability rests entirely on its adherence to, or breach of, duties existing entirely under Commonwealth law. Liability turns on the conduct of Merck and its marketing practices as measured by state law,. There is no liability asserted in the Complaint for merely failing to comply with federal law. This case centers on whether Merck's marketing, promotion and assertions about the safety and efficacy of Vioxx complied with the laws of the Commonwealth of Pennsylvania. The plaintiff's complaint contains neither directly nor indirectly any assertion that a violation of federal law is asserted as a basis for liability.

16

The defendant has thus failed to satisfy the requirements of *Grable*.  The Complaint neither contains nor implicates any disputed issue of federal law.  Further, a complete adjudication of the claims in the Complaint will require no construction or application of federal law.  Thus, there is no contested federal issue and no basis for jurisdiction.

III.        **CONCLUSION**

The party removing a claim filed in state court has the burden of proving that its invocation of federal court jurisdiction is proper.  In evaluating whether the removing party has met this burden, the statute authorizing removal must be strictly construed and all doubts must be resolved in favor of remand.  The defendant here cannot meet this burden of proof.  Neither the FDCA, FDA regulations promulgated under the Act, nor Medicaid gives rise to such preemptive power as to embed plaintiff's state law claims with federal questions that compel resolution by federal courts.  Thus, for the reasons set forth herein, plaintiff respectfully requests that this Court enter an Order remanding the case to the Court of Common Pleas of Philadelphia County.

Respectfully submitted,

__/s_____
MARK C. SCHULTZ

COHEN, PLACITELLA & ROTH, P.C.
Attorney ID No. 21650
mschultz@cprlaw.com
2001 Market Street, Suite 2900
Philadelphia, PA  19103
(215) 567-3500
Counsel for the Plaintiff

## CERTIFICATE OF SERVICE

I, Mark C. Schultz, hereby certify that on January 8, 2009 I caused a true and

correct copy of the foregoing Memorandum of Law in Support of Motion to Remand to be

served electronically via ECF and via first class mail upon the following:

Joseph K. Hetrick, Esquire
Joshua G. Schiller, Esquire
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

        /s_____
        MARK C. SCHULTZ