| | |
|---|---|
| **In re:  VIOXX®** | **\*  MDL Docket No. 1657** |
| | **\*** |
| **PRODUCTS LIABILITY LITIGATION** | **\*  SECTION L** |
| | **\*** |
| | **\*  JUDGE FALLON** |
| **This Document Relates to** | **\*** |
| **Cases Listed on Exhibit A** | |
| | **\*  MAG. JUDGE KNOWLES** |

**\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \***

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO MERCK & CO., INC.'S MOTION TO EXCLUDE
## OPINION TESTIMONY ON GENERAL CAUSATION IN VTE CASES

Merck & Co., Inc. ("Merck") argues that every piece of Plaintiffs' evidence is scientifically unreliable and should be excluded, as should all of its experts. Merck is wrong on the law, the facts and the science. Merck provides no legal authority that supports exclusion of all of Plaintiffs' experts and evidence. Plaintiffs' experts are well qualified and use sound, reliable methodology that could be recreated by any other scientist.  Merck's own expert admits that their methodology is sound. It is the same methodology used by Merck elsewhere, and used by the FDA.  Each of Merck's arguments attacks the weight or credibility of Plaintiffs' evidence, and not the methodology itself.

Merck requests that Plaintiffs' experts be stricken under *Daubert* because they use more than just placebo-controlled trial data from trials that Merck elected to publish, with adjudicated results. Plaintiffs' experts used this data, and more. In all events, this is no cause for a *Daubert* challenge.

Merck complains that Plaintiffs' experts should be stricken under *Daubert* because, it claims, they either do not achieve or they manufacture statistical

1

significance. Plaintiffs' experts **do** achieve statistical significance using approved methods to get there. Even if they didn't, the argument goes to weight, not admissibility.

Plaintiffs' have met the challenge and made a cohesive general causation cases for VTE claims. The science starts at the cellular level and ends with Merck's clinical trial data. Dr. Lucchesi, a research scientist and physician, establishes Vioxx's ability to cause VTE at a cellular and pathophysiological level and he posits a mechanism of action; Dr. Olyaei, a doctor of pharmacology who has followed Vioxx since the 1990s, discusses the pharmacological effects of Vioxx on the venous vasculature, and he illustrates the recognized association between **arterial** cardiovascular events and the **venous** vasculature events; Dr. Spyropoulos, a practicing clinician specializing in hematology, explains how Merck's clinical trials were **not designed** to capture venous thromboembolism ("VTE"); and Drs. Zambelli-Weiner and Brooks, epidemiologist and mathematician, spend hundreds and hundreds of hours with Merck's clinical trial data and **find** an increased risk ratio between Vioxx and VTE.

Moreover, large, peer-reviewed observational studies find almost identical risk ratios between COX-2 inhibitors and VTE to those found by Drs. Zambelli-Weiner and Brooks. Merck's expert Dr. Crowther admits that the editors of well-respected, peer-reviewed journals including *Circulation*, *Annals of Internal Medicine*, and *Thrombosis* believe that there is an increased risk between Vioxx

and VTE.[1]  This cohesion of opinion is the anti-thesis of "junk science," but rather exemplifies congruity of opinion among diverse specialties and sources and is the proof of good science. Accordingly, Merck's Motion to Exclude should be denied.

## I.     The Applicable Legal Principles Discourage Exclusion

### A.  The rejection of expert testimony is the exception, not the rule.

The trial court is the gatekeeper of scientific evidence.  *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 596 (1993).  The trial court looks at qualifications and methodology, **not the conclusions reached**: "In satisfying its 'gatekeeper' duty, the Court will look at the qualifications of the experts and the methodology used in reaching their opinions and not attempt to determine the accuracy of the conclusion reached by the expert.  The validity or correctness of the conclusion is for the fact finder to determine."  Order and Reasons, November 18, 2005, Rec. Doc. 1516, at 7-8 (Fallon, J.) ("Rec. Doc. 1516"). The Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

As to the first question, Merck does not challenge the qualifications of Plaintiffs' experts. A summary of those experts' qualifications follows in Section VI., *infra*.

As to methodology, Merck has put all of its eggs into one basket – its argument that the use of any data other than what Merck published, and then

---

[1]  Deposition of Mark Crowther ("Crowther Dep."), at 16:19-18:24, Rec. Doc. 64211-12.

only placebo-controlled published data, runs afoul of good science and therefore fails under *Daubert*. Merck would posit that there is only one way to prove general causation—by use of its published, placebo-controlled data.  But this simply isn't true. Merck provided no expert epidemiologist to establish that so-called scientific fact. Merck can cite no authority limiting courts to the consideration of only published, placebo-controlled clinical trial data. With all of the resources at its disposal, isn't it curious that Merck supports its core arguments, not with its own retained epidemiologist who did his or her own analysis of Merck's data, but **only by** lawyer-speak?

Merck cites no authority because precedent is against it. The law is that expert testimony need not be based on epidemiologic or case studies to prove causation.  *See Benidi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir. 1995); *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230, 1330 (9th Cir. 1998).

The overarching goal of *Daubert's* gate-keeping requirement is to ensure the reliability and relevancy of expert testimony and to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999). Even under the gatekeeper rule of *Daubert* and its progeny, "the rejection of expert testimony is the exception rather than the rule."  Fed.R.Evid. 702 advisory committee's notes (2000) (citing *Daubert*, 509 U.S. 579); (*Kumho Tire Co. v. Carmichael,* 526 U.S. 137). A court's

role as a gatekeeper does not replace the adversary system. *Wagoner v. Exxon Mobil Corp.*, 813 F.Supp.2d 771, 802 (E.D. La. 2011) (Fallon, J.)(quoting *Daubert*, 509 U.S. at 594). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Wagoner*, 813 F.Supp.2d at 799 (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir.1987)).[2]

### B.  Many of Merck's challenges are either vague or overly broad.

Since Merck's challenges do not address qualifications or methodology, they are what is known as "*Daubert*-like" motions.  This Court has dealt with the issue of *Daubert*-like motions before.  "Generally, in *Daubert* motions, the parties attack the methodology used by the proposed expert or question the expertise of the expert.  Here, at least in most of these motions, the movant questions the interpretation or accuracy of underlying source studies or literature relied on by the expert and suggest that the conclusions drawn or formulated by the expert are flawed."  Rec. Doc. 1516 at 9.

---

[2]  Questions as to the flaws or deficiencies of a study are appropriate for the jury to consider and can appropriately be raised through cross-examination of the experts during trial.  *Wagoner*, 813 F.Supp.2d at 802 (quoting *Daubert*, 509 U.S. at 596).  A court is not to place itself in the middle of the "battle of the experts" or determine during a *Daubert* challenge whether an analysis is correct.  *Id.* (quoting *Garner v. Santoro*, 865 F.2d 629, 644 (5th Cir.1989)).

While it is difficult to parse Merck's challenges, **all** seem to question the interpretation of clinical trial data – Merck looks at different data, or simply interprets the same data differently, but either way reaches a different conclusion.  This Court has held that such testimony is admissible where the parties interpret the same materials differently and reach contrary conclusions, as the Court's role is scrutinize methodology and not conclusions. *Id*. at 56.

Merck raises questions about opinions that look at unadjudicated data, or data from a drug-comparator arm rather than placebo arm. But then Merck also advocates a baby-with-the-bath-water approach when it states in a sweeping fashion that the Court should "exclude Plaintiffs' experts' causation opinions." Rec. Doc. 64211-3 at 3. The undersigned can only assume this means that Merck seeks to exclude all of Plaintiffs' expert opinions *in toto*. For example, after complaining that Drs. Spyropoulos, Zambelli-Weiner and Brooks use more than placebo-controlled clinical trial data, and despite not challenging their other opinions, Merck suggests that everything they have to say should be tossed out.

Merck's challenges as to Drs. Spyropoulos, Zambelli-Weiner and Brooks attack not the experts' qualifications or their methodology but the experts' interpretation of the Merck's clinical trial data, which Merck itself reported in its Clinical Study Reports ("CSRs").[3] Yet, these experts use data created exclusively

---

[3] A clinical study report, as described by the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH), is a core integrated full report of an individual study of any therapeutic, prophylactic, or diagnostic agent conducted in patients.  The clinical and statistical description, presentations, and analyses are integrated into a single report, incorporating tables and figures into the main text of the report or at the end of the text, with appendices containing such information as the protocol, samples care report forms, investigator-related information, information related to the test

by Merck, recorded by Merck, and reported by Merck in its CSRs and to the FDA. Surely if this data was scientifically unreliable, Merck would have never reported it in the first place.  Moreover, Plaintiffs' experts do nothing different from what Merck did in multiple other studies, and in submitting safety signal data to the FDA, *see infra*.[4] These arguments, even if supportable on their facts – which they aren't — still are not *Daubert* motions. They go purely to weight, not admissibility.

## II.   Plaintiffs' Experts Have Presented Proof of General Causation That Is Based on Reliable and Accepted Scientific Methods

### A.   Data from the peer-reviewed literature supports a mechanism by which COX-2 inhibition increases the risk of VTE.

In his Declaration and Report (Rec. Doc. 64092, "Lucchesi Rep."), attached as Exhibit 1, Dr. Lucchesi establishes a mechanism by which COX-2 inhibitors increase the risk of PE or DVT.[5] COX-2 inhibition increases the risk of VTE at a cellular level, by inhibiting the expression of blood products that are anticoagulant and promoting the expression of blood products that are procoagulant.

---

drugs/investigational products including active control/comparators, technical statistical documentation, related publications, patient data listings, and technical statistical details such as derivations, computations, analyses, and computer output. ICH E3, "Guideline for Industry, Structures and Content of Clinical Study Reports," July 1996, http://www.fda.gov/downloads/regulatoryinformation/guidances/ucm129456.pdf.

[4]  *See* Updated Cardiovascular Pooled Analysis, March 22, 2004, Rec. Doc 64211-8, Ex. E to Merck's Memorandum In Support ("Mem. In Supp."), hereinafter "Merck's 3/22/04 Pooled Analysis".

[5]  Lucchesi Rep. at 5.

Thrombomodulin is a protein that inhibits blood coagulation.[6] It is antithrombotic. COX-2 inhibition halts the thrombin-induced formation of active thrombomodulin.[7] Thus, COX-2 inhibition of the production of antithrombotic thrombomodulin results in a prothrombotic effect and promotes deep vein thrombosis or pulmonary embolism.[8] Inhibition of COX-2 also results in the expression of tissue factor, which is the primary initiator of blood coagulation in the vascular endothelium.[9]  Increases in a prothrombotic substance like tissue factor contribute to an increased risk of a prothrombotic state.[10]  COX-2 inhibitors also reduce the expression of tissue factor pathway inhibitor (TFPI), an anticoagulant protein.[11]  Simply put, by decreasing the presence or activation of antithrombotic proteins such as thrombomodulin and TFPI and promoting the expression of prothrombotic tissue factor, the inhibition of COX-2 alters the intrinsic physiological mechanisms that function to maintain the circulating blood in a fluid state, thereby leading to a state that favors the formation of venous thrombosis.[12]

---

[6]  *Id.*

[7]  *Id.*

[8]  *Id.*

[9]  *Id.*

[10]  *Id.*

[11]  *Id.* at 5-6.

[12]  *See generally* Lucchesi Rep.

### B. The peer-reviewed literature shows that arterial and venous thrombosis are a continuum of the same physiologic process.

Vioxx's propensity to increase the risk of events that are arterial in nature – such as myocardial infarctions and strokes – is well documented. In his Declaration and Report (Rec. Doc. 64086, "Olyaei Rep."), attached as Exhibit 2, Dr. Olyaei opines that arterial and venous thrombosis are a continuum of one another.[13] From a pharmacological standpoint, Dr. Olyaei opines that Vioxx increases the likelihood of VTE in both healthy and at-risk patients, just as it has been shown to significantly increase the risk of heart attacks.[14] Arterial and venous thrombi share many of the same pathological mechanisms and characteristics, such as inflammation, elevated levels of coagulations factors, and inherited thrombophilia.[15] Arterial thrombosis and venous thrombosis share many of the same risk factors, including inherited or acquired anti-thrombin III, protein C and S deficiency, old age, arterial occlusive disease, hyperlipidemia, hypertension, cigarette smoking, obesity, diabetes, stroke, hyperhomocystein-amia, Factor V Leiden, and lupus anticoagulant.[16] VTE is a risk factor for arterial embolism, and arterial embolism is a risk factor for VTE.[17] Many drugs

---

[13] *See generally* Olyaei Rep.

[14] *Id.* at 16.

[15] *Id.*

[16] *Id.* at 10-11.

[17] *Id.*

that are risk factors for arterial disease have been recently associated as risk factors for VTE as well.[18]

### C. The Vioxx clinical program was not designed to capture VTE events and as a result there is a systematic under-reporting of VTE events in Merck's clinical trials.

Dr. Spyropoulos completed an in-depth review of the protocols of the Vioxx clinical trial program.  In his Declaration and Report (Rec. Doc. 64087, "Spyropoulos Rep"), attached by Merck as Ex. X, Mem. In Supp., Dr. Spyropoulos opines that the systematic underreporting of VTE events in the Vioxx clinical trial program resulted in systematic underestimation of VTE events in that trial data.[19]  The clinically silent nature of VTE, the lack of a dedicated reporting program, and the potential for systematic underreporting of VTE are all contributing factors that led to a 10-fold to 30-fold underestimation in VTE events.[20] Dr. Spyropoulos further opined that there are biological mechanisms associating COX-2 inhibitors such as Vioxx with venous thromboembolic disease, and there is an established association between arterial cardiovascular events and atherosclerotic disease and venous thromboembolism.[21]  Dr. Spyropoulos concludes that Vioxx is associated with an increased risk of VTE.[22]

---

[18] *Id.*

[19] *Id.* at 6-8.

[20] *Id.*

[21] *Id.* at 1.

[22] *See generally* Spyropoulos Rep.

**D.  A pooled analysis of VTE events shows elevated risk ratios for PE and DVT for Vioxx-exposed patients compared to controls.**

In their Declaration and Report (Rec. Doc. 64088, "Pooled Analysis"), attached by Merck as Ex. M., Mem. In Supp., Drs. Zambelli-Weiner and Brooks report on hundreds and hundreds of hours they spent reviewing and analyzing Vioxx clinical trial data. Merck retained no comparable experts, nor did it have anyone do a comparable project.

Drs. Zambelli-Weiner and Brooks found an elevated rate ratio for vascular events for Vioxx-exposed patients compared to placebo groups in the largest placebo controlled study.[23]  But, Drs. Zambelli-Weiner and Brooks went further and developed the Pooled Analysis to investigate whether a signal existed for Vioxx and VTE across multiple studies. They used standard inclusion and exclusion criteria and pooled the data.[24] Merck used pooled data itself repeatedly (*see infra*), but claims that their use of it renders their science unreliable.  Drs. Zambelli-Weiner and Brooks refused to restrict their analysis to just Merck's published data, as Merck argues they should have done.  It is well established in peer-reviewed literature that Merck's published data was biased towards the null (i.e., biased towards a finding against drug-related events, *see infra*), and for that reason, Drs. Zambelli-Weiner and Brooks used the unadjudicated data

---

[23]  *See generally* Pooled Analysis, referencing Protocol 78.

[24]  *Id*. at 15-19.

reported by Merck's investigators in Merck's clinical trials to obtain a true count of VTE events.[25]

The Pooled Analysis showed elevated risk ratios for PE and DVT, making Vioxx a significant risk factor for VTE.[26]  The systematic underestimation found in the Vioxx clinical trials by Dr. Spyropoulos (and supported by Merck's Dr. Crowther, *see infra)* served as the foundation for assessing the effect of that underestimation in VTEs across all arms of Merck's clinical trials in the Pooled Analysis.[27]  The use of the 10-fold multiplier (a scientifically based foundational assumption) results in a statistically significant increase in the risk of DVT and PE in Vioxx-exposed patients, compared to controls.[28]

### III.   Merck's Has Three Arguments Against Drs. Zambelli-Weiner and Brooks and All Three Arguments Fail to Meet *Daubert* Standards Since They Go To the Weight, Not Reliability, of Their Testimony.

Merck argues that Drs. Zambelli-Weiner and Brooks' report and testimony should be stricken because it is not limited to the published and adjudicated clinical trial data.  The truth is that Drs. Zambelli-Weiner and Brooks would and should be faulted if they only used published and adjudicated data for the reasons discussed below. Merck argues that the only reliable comparator is a placebo-controlled study. The truth is that Merck, the FDA and

---

[25]  *Id.* at 24.

[26]  *Id.* at 25-26.

[27]  *Id.* at 38.

[28]  *Id.*

scientists everywhere routinely use placebo and drug comparators. Merck claims that Drs. Zambelli-Weiner and Brooks' report is not reliable because of a purported failure to reach statistical significance. The truth is that Drs. Zambelli-Weiner and Brooks **did reach** statistical significance for whatever extra merit that may achieve.

### A. Merck's published data is unreliable

#### a. *Merck's published, adjudicated data is biased towards the null and unreliable.*

It is not surprising that Merck's published data does not show an association between Vioxx and VTE because it is well documented that Merck's data is biased.  As Plaintiffs point out in their *Daubert* challenges,[29] Merck's published and adjudicated data is biased towards no association between Vioxx and VTE, just like it was biased towards no association with cardiovascular outcomes.  Criticism of Merck's clinical trial data is well documented in peer-reviewed literature as skewed towards finding no association between Vioxx and any disease outcome, a methodological error known as "bias towards the null":

> . . . [T]he quality of our analysis is limited by the quality of the underlying data. Although the methodological quality of included trials was generally satisfactory, the quality of reporting was often less than optimal and we found discrepancies in the reported number of events between different sources of information for major trials including ADVANTAGE, VIGOR, and APPROVe.  Several trials lacked independent adjudication of events, therefore bias in either direction cannot be excluded, **including bias towards the null owing to non-differential misclassification of events** or assessor bias in trials without independent adjudication.[30]

---

[29] Plaintiffs' Memorandum in Support, Rec. Doc. 64210-2, at 12-13.

[30] "Cardiovascular Safety of Non-Steroidal Anti-Inflammatory Drugs: Network Meta-Analysis." Trelle S, Reichenbach S, Wandel S et al. *British Medical Journal*. 2011; 342:7086.

Bias towards the null due to non-differential misclassification is a common form of information bias.  "Nondifferential misclassification occurs when inaccuracies in determining exposure are independent of disease status or when inaccuracies in diagnoses are independent of exposure status.  This is a common problem resulting from the limitations of data collection.  Generally, nondifferential misclassification bias leads to a shift in the odds ratio toward one, or, in other words, **toward a finding of no effect**."  *Reference Manual on Scientific Evidence* 338 (Fed. Judicial Ctr. 2d ed. 2000) ("Ref. Man.") at 368.

In his review of Merck's clinical trial data, Dr. Spyropoulos found ample evidence of underreporting that would have led to low counts of VTE in the reported, adjudicated data.  Dr. Spyropoulos explained that Merck's inability to capture relevant VTE events would lead to a perceived lack of effect between Vioxx and VTE:

> What I saw in my review of the data was that there appeared to be a signal for VTE, but there was imbedding of VTE within a vascular component, so what I call the potential for imbedding of data, the potential of misdiagnosis of VTE, and then the potential of underreporting of VTE because, again, not having been captured . . by the local investigator, because, again, of the lack of association between this event and the drug itself.

Deposition of Alex Spyropoulos ("Spyropoulos Dep.") at 287:15-288:1, attached by Merck as Exhibit A, Mem. In Supp.

These shortcomings in Merck's clinical program led to a systematic underestimation of VTE events in the Vioxx clinical trials.[31] The best proof of the

---

[31] Spyropoulos Dep, at 289:19-290:1.

infirmities in Merck's published data can perhaps be found in the exhibits to Merck's own Memorandum In Support. As of March 2004, Merck still maintained in Merck's 3/22/04 Pooled Analysis, presented to the FDA, that the bulk of its clinical data showed **no increased cardiovascular risk with Vioxx**: "Taken together, the totality of the data continue to support the conclusions that . . . rofecoxib treatment is not associated with an increase in the risk of cardiovascular events across a broad population of patients compared with placebo or with NSAIDs that do not demonstrate potent and sustained anti-platelet effects . . . ."[32] Yet, Vioxx was pulled off the market just six months later, in September 2004.  Given the serious shortcomings in Merck's published data, it is not only appropriate but necessary to look outside of Merck's published, adjudicated data to search for a safety signal.

b.  *The FDA and Merck routinely use unadjudicated data*

The use of unadjudicated data to assess a safety signal is a common methodology and is used by the FDA.   In May 2012, the FDA sought to understand the cardiovascular ("CV") risk for the diabetes drug Lorcaserin, although the background rate of CV events in the clinical trials was low.[33]   To assess the CV risk**, the FDA used the unadjudicated data from the Phase III clinical trials**.  In its addendum, the FDA stated:

> . . .[t]rials were not designed to capture and evaluate CV events; the
> background risk of CV events was relatively low and there was no

---

[32] Merck's 3/22/04 Pooled Analysis at 3-4.

[33] *See generally* Department of Health & Human Services, "Addendum to the FDA Briefing Document, Endocrinologic and Metabolic Drugs Advisory Committee Meeting," May 10, 2012, attached as Exhibit 3 ("FDA Lorcaserin Addendum").

procedure set up for prospective adjudication.  However, in light of
the recent advisory committee meeting discussion, FDA has
conducted several analyses of the unadjudicated CV adverse events
collected in the Phase III trials.

FDA Lorcaserin Addendum at 1.

The FDA went behind the adjudicated data and conducted a safety
analysis by creating a pre-specified list of terms using standard MedDRA
queries – in other words, the FDA used exactly the same approach as Drs.
Zambelli-Weiner and Brooks used here.[34]  Dr. Zambelli-Weiner stated that,
without uniform adjudication, ". . . the only choice is to look at the unadjudicated
data, and, in fact, that's what FDA does."[35]

Additionally, **_Merck itself looked at unadjudicated data in_**
**_completing its pooled analysis_**.  In Merck's 3/22/04 Pooled Analysis, Merck
states, "Whenever possible, adjudicated data were used in the preparation of this
pooled-analysis, **otherwise investigator reported data were used**.  All
studies had adjudicated data **except** Protocol 068 (RA Dose Ranging Study) and
the Phase IIb/III OA studies (029, 033, 034, 035, 040, 044, 045, and 058) **which**
**antedated the adjudication process**. [Emphasis added]"[36]  Thus, a significant
amount of data reported by Merck to the FDA consisted of investigator reports,
data that has not been subjected to the adjudication process.

---

[34]  *Id*. at 2 and Pooled Analysis at 10-11.

[35]  Deposition of April Zambelli-Weiner, 10/26/12, ("Zambelli-Weiner Dep. 10/26/12"), at 144:6-18,
attached by Merck as Ex. J, Mem. In Supp.

[36]  Merck's 3/22/04 Pooled Analysis at 9.

Moreover, this Court has previously allowed an expert to use raw data from a study as support for his conclusions.[37]  Given that the FDA and Merck both use unadjudicated data in analyses, Merck cannot argue that Plaintiffs' use of the same data is unreliable and junk science.

Merck's published, adjudicated data is a limited set of clinical trial data specifically picked by Merck to allow it to promote Vioxx. Failure to limit one's safety analysis to that data is not the "junk" science in this picture.

### B.  Placebo- controlled data is merely one type of clinical trial data

Drs. Zambelli-Weiner and Brooks consider much of placebo-controlled data in their Pooled Analysis. However, this is not the only data an expert may consider for a safety signal. Merck does not cite even one legal or scientific authority that states that **only** placebo-controlled studies are scientifically reliable in the world of clinical research.  And it is only Merck's attorneys who say it is so. There is no epidemiologist testifying as an epidemiologist for Merck. There is no epidemiologic text or publication cited. Merck's preference for placebo-controlled studies versus comparator studies is an issue regarding the weight of the evidence, not its reliability.

The scientific reliability of a pooled analysis does not rise or fall based on the use of only placebo-controlled data.  Dr. Zambelli-Weiner stated that many sorts of analyses could be undertaken on this same data: "We're talking about pharmaco-vigilance.  The idea is to study a drug as thoroughly and completely as possible.  There are multiple permutations of analyses that could and should be

---

[37]  Rec. Doc. 1516 at 31-32.

done.  We undertook one such analysis."[38]  There are many ways in which Merck's clinical trial data could be analyzed, and Merck itself frequently analyzed its own data just as Plaintiffs' experts have done here.

Indeed, it is Plaintiffs' case that the randomized clinical trial is the true gold standard, and whether that trial compares a placebo or another drug comparator doesn't affect the "gold standard-ness" since the choice of comparator is not the point, rather the randomization and blinded-ness is.  Moreover, most of Merck's clinical trials used comparator controlled data rather than placebo data. An additional infirmity to Merck's placebo-controlled, adjudicated data is that it has been shown by peer-reviewed literature to be unreliable and biased towards the null, meaning that it is designed to show no association between Vioxx and disease. Merck's attempts to use the testimony of Plaintiffs' experts to support its claim that the only reliable data is placebo data is unavailing since all quoted testimony was contextual.

    a.   *The randomized trial is the true "gold standard" of epidemiology.*

The true epidemiological "gold" standard is a randomized clinical trial. A randomized clinical trial may test a drug against placebo or comparator controls, or both – Merck used all of the above in its clinical trials of Vioxx. *The Reference Manual on Scientific Evidence* says the following about the gold standard:

> To determine whether an agent is related to the risk of developing a
> certain disease or an adverse health outcome, we might ideally
> want to conduct an experimental study in which the subjects would

---

[38]  Deposition of April Zambelli-Weiner, 12/6/12, ("Zambelli-Weiner Dep. 12/6/12"), at 241:20-242:1, attached by Merck as Ex. K, Mem. In. Supp. *See also* Pooled Analysis at 11.

be randomly assigned to one of two groups: one group exposed to the agent of interest and the other not exposed.  After a period of time, the study participants in both groups would be evaluated for development of the disease.  **This type of study, called a randomized trial, clinical trial, or true experiment, is considered the gold standard for determining the relationship of an agent to a disease or health outcome**.

Ref. Man. at 338.

Randomized clinical trials frequently test a drug against placebo and active comparator drugs, and sometimes test a drug against placebo and active comparators in the same trial. It is the randomized clinical trial that is the gold standard, a tenet reaffirmed in authority cited by Merck: "[t]he controlled, experimental, and prospective nature of clinical trials undoubtedly make them more reliable . . . ." *Merck & Co. v. Garza*, 347 S.W.3d 256, 263 (Tex. 2011), not a randomized clinical **placebo-controlled** trial.

Merck may question Plaintiffs' experts on cross-examination about which type of gold standard they used.  This is a question that goes to the weight, not the reliability, of the evidence.

> **b.** *The majority of Merck's clinical trials tested against active comparator drugs and ignoring this evidence excludes the bulk of Merck's clinical trial data.*

From a practical perspective, if comparator studies had no value in the world of clinical trials, Merck (and other pharmaceutical companies) certainly would not spend millions of dollars to investigate the safety outcomes of their drugs versus an active comparator drug. According to the FDA, Phase III studies gather information about safety and effectiveness, study different populations

and different dosages, **and use the drug in combination with other drugs.**[39]

It is a sound, accepted and indeed a required methodology to test a drug against

other drugs of the same class. The bulk of Merck's clinical trials tested Vioxx

against active comparators. Merck reported this data in its CSRs and published

on it extensively in peer-reviewed journals. If it is appropriate to consider only

placebo-controlled data when assessing a safety signal, then why did Merck

design the majority of its Vioxx clinical trials to test against comparator drugs?

     If Plaintiffs' experts were to consider only placebo-controlled data, they

would have to exclude the vast majority of Merck's clinical trial data. Merck's

3/22/04 Pooled Analysis submitted by it to the FDA provides the perfect example.

Of the 28 studies Merck analyzed in Table 1, **20 tested Vioxx against an**

**active comparator.**[40] Fourteen of the 28 tested Vioxx against placebo and an

active comparator.[41]  Only eight studies tested Vioxx against placebo only.[42]  Five

studies did not test against placebo at all.[43]

     This is a good spot to note a factual error in Merck's papers. Merck's

3/22/04 Pooled Analysis examines 28 studies – not 26, as stated in Merck's

---

[39] U.S. Food and Drug Administration, Drug Approval Process at 1,
http://www.fda.gov/downloads/Drugs/ResourcesForYou/Consumers/UCM284393.pdf, attached as
Exhibit 16.

[40] Merck's 3/22/04 Pooled Analysis at 10.  Protocols 068, 096, 097, 088 + 089, 098 + 103, 029, 033,
034, 035, 040, 044, 045, 058, 083, 085, 090, 901, 902, 102 + 903, and 136.

[41] *Id*.  Protocols 068, 096, 097, 098 + 103, 029, 033, 040, 044, 045, 058, 083, 085, 090, and 136.

[42] *Id*.  Protocols 078, 091, 126, 118, 120, 121, 125 and 129.

[43] *Id*.  Protocols 088 + 089, 034, 035, 901 and 902.

Memorandum in Support[44] – of which 22 contain a placebo control, not 26 as Merck claims.[45]  However in the next paragraph Merck states that its analysis considered 23 placebo-controlled trials.[46]  It is difficult to understand how Merck can accurately assess its data when it cannot determine how many studies it examined.  Further, Merck cites to its 3/22/04 Pooled Analysis in support of the APPROVe results (Protocol 122), but the APPROVe results were not published in this analysis and Table 2 shows Serious Adverse Events Included in the Thrombotic Cardiovascular Serious Adverse Experience and APTC Combined Endpoints.[47]

Similarly, of the 33 Phase III trials to which Plaintiffs' had some degree of access, only seven tested Vioxx against just placebo.[48]  **Thus, the bulk of the Phase III trials, used to assess drug safety, tested Vioxx against a comparator, not placebo.**  Moreover, the total number of Vioxx patients enrolled in all studies included in Drs. Zambelli-Weiner and Brooks' analysis was 15,393.  If they excluded all studies without a placebo control, they would have examined only 5,512 patients.  Thus, they would have excluded

---

[44]  Mem. In Supp. at 5, Section II(A).

[45]  Merck's 3/22/04 Pooled Analysis at 10, Table 1.

[46]  Mem. In Supp.at 5, Section II(A)(1).

[47]  Mem. In Supp.at 5, Section II(A)(2) and 3/22/04 Pooled Analysis at 12.

[48]  Protocols 078, 091, 120, 121, 126, 161 and 201.

approximately two-thirds of Vioxx patients and a significant amount of the respective data.[49]

Merck uses combined placebo and drug comparator studies when it suits its purposes. Merck frequently pooled placebo and active comparator studies in its analyses. A 2001 FDA Advisory Committee background information document proves that Merck analyzed its data in multiple forms. At one point, it used a meta-analysis that looked at the rate of Vioxx against all endpoints: "To maximize the ability of the meta-analysis to detect a difference between rofecoxib and placebo or nonselective NSAIDs, the most conservative approach was to consider that no NSAIDs are cardioprotective <u>and to consider nonselective NSAIDs and placebo as a single group</u>. Thus, the first analysis was to compare rofecoxib to all comparators and ask if there was any evidence for a difference in risk in the 2 groups."[50] The meta-analysis analyzed the results together, and then broke the results down between naproxen versus Vioxx, non-naproxen NSAIDs versus Vioxx, placebo versus Vioxx, and non-naproxen NSAIDs or placebo versus Vioxx.[51] Of note, Merck said that it was "**valid to combine the results from studies in which the comparator was either a**

---

[49] *See generally* Pooled Analysis, 6-9, and Zambelli-Weiner Dep. 12/6/12, Exs. 27 and 28 (6b Updated Incidence Rates of Adverse Events in Major Controlled Studies of Rofecoxib and 8b Updated Cumulative Unadjudicated Vascular Adverse Events Reported in 14 Placebo-Controlled Major Studies), attached by Merck as Exs. S and T, Mem. In. Supp.

[50] Rofecoxib FDA Advisory Committee Background Information, 1/2/01, Section 4.3.5.4 "Meta-Analysis of the Risk of Thrombotic Cardiovascular Events in Rofecoxib or Nonselective NSAID Users Across all Rofecoxib Clinical Trials Using the Antiplatelet Trialists' Collaboration (APTC) Combined Endpoint," at 93 (MRK-ABW0000917), attached as Exhibit 4.

[51] *Id*. 95 (MRK-ABW0000919).

**non-naproxen nonselective NSAID or placebo**," as this would "provide the most power and precision to identify any difference between rofecoxib and non-naproxen comparators."[52]

Combining placebo and comparator studies is a standard, accepted methodology used by the FDA and Merck, and Merck may not exclude Plaintiffs' experts on this basis.

Excluding comparator studies and data would have resulted in a small safety database that did not analyze the majority of Merck's Phase III clinical trials. In her deposition testimony, Dr. Zambelli-Weiner stated that in order to cast a wide net and develop the largest possible safety database, it was appropriate and necessary to consider both comparator and placebo-based studies when looking for a signal in the Vioxx clinical trials:[53]

> Certainly, particularly in Phase III trials, where you have established therapeutic-like NSAIDs being used in the marketplace, it would be truly imperative to include active comparator control groups. You would want to be able to examine relative efficacy and relative safety as well. So, in the essence of establishing a large safety database, as large as possible, to have adequate numbers to ask the questions you need to ask, it would be appropriate to include all of those . . . The peer-reviewed literature is replete with publications that you can see comparisons to placebo and active comparator and mixed control populations.

Zambelli-Weiner Dep., 12/6/12, at 330:10-332:1.

Merck's argument is that only a tiny subset of clinical data from the Vioxx clinical trials can be reliably used. Merck contends that only the results from

---

[52] *Id.* at 95-96 (MRK-ABW0000919-920).

[53] Zambelli-Weiner Dep., 12/6/12, at 331:10-332:9.

**three** studies, APPROVe, VICTOR and VIP, and Merck's 3/22/04 Pooled

Analysis submitted to the FDA,[54] can be reliably used to find a safety signal

between Vioxx and VTEs. Plaintiffs' Pooled Analysis, on the other hand, was

designed to assess a safety signal relative to Vioxx and VTE, and considered

data from dozens of CSR synopses[55] and protocols.[56] Merck's lack of proof stands

in stark contrast to Plaintiffs' efforts as it did not complete or present a complete

pooled analysis to investigate that same safety signal.[57]

   Note that **both** Plaintiffs and Merck used a pooled analysis, **both**

consider mostly Phase III trials, and **both** consider most of the same trials.

Even with these different criteria, Plaintiffs' Pooled Analysis considers the vast

majority of the data Merck presented to the FDA:  they used 18 of the same

---

[54]  Merck's 3/22/04 Pooled Analysis at 1, 8-9.

[55]  Pooled Analysis at 9-10.  002, 003, 004, 005, 009, 010, 011, 012, 013, 014, 017, 017-10/-20, 018, 020, 021, 022, 023, 027, 028, 029, 029-10, 030, 033, 034, 035, 034-02/035-02, 034-10/035-10, 036, 037, 038, 039, 040, 041, 042, 043, 044, 045, 046, 047, 048, 050, 051, 052, 053, 054, 055, 056, 057, 058, 058 10, 061, 062, 063, 064, 065, 066, 069, 070, 071, 072, 073, 075, 076, 078, 084, 085, 087, 088/089, 090, 091, 095, 101, 102-00 & 903-OA, 114, 122, 136, 201.

[56]  *Id*.  033, 034, 035, 034-02/035-02, 034-10/035-10, 040, 044, 045, 058, 058-10, 078, 085, 088/089, 090, 091, 102-00 & 903-OA.  Additional studies were provided as they rolled in and include 096, 097, 098/103, 120 and 121, and further discussion can be found at Section IV. C. *infra*.

[57]  Although Merck criticizes Drs. Zambelli-Weiner and Brooks for not presenting the APPROVe, ViP and VICTOR data, Merck itself did not include those studies in its 3/22/04 Pooled Analysis to the FDA, likely because those studies were not yet complete – in other words, they were excluded for the same reasons Drs. Zambelli-Weiner and Brooks cited.

 Merck compares Plaintiffs' Pooled Analysis to Merck's 3/22/04 Pooled Analysis and criticizes Drs. Zambelli-Weiner and Brooks for not using an identical process.  As discussed in Section III(B), *supra*, Merck's 3/22/04 Pooled Analysis uses different criteria and analyzed a different endpoint than Plaintiffs' Pooled Analysis.  Merck's Pooled Analysis was designed to assess cardiovascular thrombotic events and considered all Phase IIb through Phase V clinical studies that were at least 4 weeks or more in duration and included a placebo or non-selective NSAID comparator. *See,* Merck's 3/22/04 Pooled Analysis at 8-9.   Plaintiffs' Pooled Analysis was designed to specifically consider VTE.  Merck also considered different exclusion criteria. *Id*. Thus, from the outset the two analyses would not consider all of the same studies.

studies[58] and look at most of the same placebo-controlled studies.[59]  Merck's 3/22/04 Pooled Analysis considers six studies that Plaintiffs' do not, because they are non-Phase III trials.[60]  Thus, of the 28 studies that Merck presented to the FDA, Plaintiffs' Pooled Analysis includes all but four studies that potentially fit *a priori* criteria.[61]

Merck's only review of the Vioxx clinical data comes from Dr. Crowther's "literature review" that considered 15 articles using only Merck's published, placebo-controlled data.  It was rejected for publication by *Circulation, Annals of Internal Medicine*, and *Thrombosis* because the authors believe there is an association of increased risk between Vioxx and VTE.[62]  Dr. Crowther's literature review did not consider any of Merck's dozens of CSRs.[63]

Simply put, it is common to combine placebo and comparator studies when analyzing a safety signal.  Numerous peer-reviewed journals publish studies that combine placebo and active comparator data.[64]  Peer-reviewed publications

---

[58] *See* Exhibit 34 to Zambelli-Weiner Dep., 12/6/12, attached by Merck as Ex. V, Mem. In. Supp.

[59] Exhibit 33 to Zambelli-Weiner Dep., 12/6/12, attached as Exhibit 15.

[60] Merck's 3/22/04 Pooled Analysis at 10.  068, 029, 083, 136, 118 and 125.

[61] Any non-Phase III trial was excluded for falling outside of *a priori* criteria – that includes 068, 029, 083, 136, 118 and 125.  The undersigned did not have access to a full CSR and appendices for 901, 902, 126 and 129 and were thus unable to provide these to Drs. Zambelli-Weiner and Brooks.

[62] Crowther Dep. at 16:19-18:15.

[63] *Id*. at 140:22-143:11.

[64] Engel S, Golm G, Shapiro D, "Cardiovascular safety of sitagliptin in patients with type 2 diabetes mellitus: a pooled analysis," *Cardiovascular Diabetology* 2013, 12:3; Moore A, Makinson G, Li C, "Patient-level pooled analysis of adjudicated gastrointestinal outcomes in celecoxib

examine controlled, randomized trials that use non-placebo control groups. *See generally* Bishoff-Ferrari HA, Orva EJ, Lyons RA, "A Pooled Analysis of Vitamin D Dose Requirements for Fraction Prevention*," NEJM* 2012;367:40-9 (pooling data from 11 double-blind, randomized controlled trials of oral Vitamin D as compared with placebo or calcium alone); Kaiser LD, Melemed AS, Preston AJ, "Optimizing Collection of Adverse Event Data in Cancer Clinical Trials Supporting Supplemental Indications," *Journal of Clinical Oncology*, 2010, 28:5046-5053 (analyzing adverse events from Phase III clinical trials that considered placebo and comparators), attached as Exhibits 7 and 8, respectively.

Dr. Zambelli-Weiner explained that this is a common practice: "[t]he peer-reviewed literature is replete with publications that you can see comparisons to placebo and active comparator and mixed control populations."[65]

In sum, the totality of Merck's defense against Plaintiffs' Pooled Analysis includes three clinical trials that were never completed, a pooled analysis designed to assess the safety of a separate injury category (distinct enough that this Court has outlined a separate set of deadlines), and a literature review that no respectable journal would publish.  In light of the dozens of clinical studies and myriad data that Merck has chosen to ignore, it is Merck's analysis that suffers from methodological shortcomings, not Plaintiffs'.

---

clinical trials: meta-analysis of 51,000 patients enrolled in 52 randomized trials," *Arthritis Research & Therapy* 2013, 15:16, attached as Exhibits 5 and 6, respectively.

[65]  Zambelli-Weiner Dep., 12/6/12, at 331:19-332:1.

    **c.**  *Merck misquotes Plaintiffs' experts regarding placebo-controlled data.*

Merck tries to "sell" its dubious proposition that only placebo-controlled clinical trial data is reliable scientific evidence by using out-of-context quotes from some of Plaintiffs' experts. When fairly considered, this effort is unavailing, or at most goes to weight.

First, at no point does Dr. Spyropoulos state that only studies testing Vioxx against placebo are scientifically reliable.[66] Nor does he state that a study testing Vioxx against a comparator drug is an improper methodology or scientifically unreliable – if so, Merck would not conduct such studies. At no point does he state that comparator-controlled data is bad or poor quality evidence that should not be analyzed, or that it should not be analyzed in conjunction with placebo studies. At no point does Dr. Spyropoulos state or suggest that use of Vioxx is not associated with increased risk of VTE simply because the placebo-controlled trial data does not show an on-the-face association.

To the contrary, Dr. Spyropoulos reviewed many of Merck's major, published placebo-controlled trials – as Merck indicates – and a major point of his report is that the placebo-controlled data does not show on on-the-face association between Vioxx and VTE because the Vioxx clinical program suffered from fundamental shortcomings that resulted in a **systematic**

---

[66] *See generally* Spyropoulos Dep.

**underestimation of VTE events.**[67]  It is his opinion that Vioxx is indeed associated with an increased risk of VTE.[68]  Thus, Dr. Spyropoulos' interpretation of the placebo-controlled data is that it did not appropriately capture VTE events.

As Merck points out, Dr. Spyropoulos explained that he focused on placebo-controlled data because it is the best way to establish the baseline risk for the control group.[69]  It is in this context that he states it is the best data for assessing whether there is an effect between a drug and an association.[70]  For instance, he looked at the VICTOR data to establish the depth and breadth of a baseline estimate from placebo trials, and to establish baseline risks as defined by the trial.[71]  However, he does not state it is the most reliable evidence, as Merck represented.[72]

Dr. Spyropoulos qualifies the results of the placebo-controlled, published data and states that there is not a statistically significant increased risk of VTE as defined by Merck's studies.[73]  Dr. Spyropoulos ultimately says that there is "biologic plausibility, mechanistic plausibility, and enough aspects of data

---

[67] Spyropoulos Rep., at 6-8.

[68] Spyropoulos Dep., at 289:30-290:1.

[69] Spyropoulos Dep., at 148:1-148:15.

[70] *Id.*

[71] Spyropoulos Dep., at 149:9-149:19.

[72] Mem. in Supp., at 9.

[73] Spyropoulos Dep., at 145:11-145:16.

collection that it is highly suggestive, and makes it plausible that if that data was collected in a different way, or with a more careful process, that we may have seen association [in Merck's published data] between Vioxx and VTE."[74]

Merck seeks to exclude studies that consider comparator drugs simply because they are not favorable to Merck.  That is the only reason.  Surely Merck is not really arguing that Merck itself used an unsound methodology when designing its clinical trials.  Since Merck's argument regarding the importance to be placed on placebo-controlled data has nothing to do with the underlying methodology, its *Daubert* motion in that regard should be denied.

### C.   Plaintiffs' clinical and epidemiological evidence reaches statistical significance.

Plaintiffs' experts' opinions are based on statistically significant studies. Plaintiffs' Pooled Analysis reaches statistical significance when the 10-fold multiplier is considered. A multiplier is only necessary because Merck under powered the studies by design and they could never reach statistical significance even with 100% of the events occurring in the Vioxx arm. This is necessarily due to the limited study populations. Use of a multiplier is nothing new.  Both the FDA and peer-reviewed journals use a multiplier to account for underreporting and bias.

Lack of monitoring and detection protocols, according to Dr. Spyropoulos, indicated the possibility of significant detection bias in the clinical trials. Detection bias can occur when a disease outcome is subjected to serious under-

---

[74] Spyropoulos Dep., at 145:17-146:4.

diagnosis or underreporting.  Given the systematic underestimation discussed by Dr. Spyropoulos, Drs. Zambelli-Weiner and Brooks ran a calculation to address a 10-fold and 30-fold underestimation of VTE.  Dr. Spyropoulos stated that a 10-fold multiplier is very reasonable adjustment for Drs. Zambelli-Weiner and Brooks to apply.[75]

It is a common methodological practice to qualitatively and quantitatively address the impact of bias on a study,[76] and using a multiplier is an accepted method that is practiced by the FDA[77] and found in peer-reviewed publications.[78] When estimating systematic under-reporting in cases of foodborne illness, the FDA ran calculations in order to compensate for underreporting.[79]  The number of known cases associated with a hazard was multiplied by factors which were estimated to account for underreporting.[80] The FDA dealt with underreporting by estimating the extent thereof and applying a multiplier, **the same method used by Drs. Zambelli-Weiner and Brooks**.  Similarly, Mondul 2011 was a simulation study designed to test the impact of varying levels of disease

---

[75] Spyropoulos Dep. at 291:2-291:14.

[76] Zambelli-Weiner Dep. 12/6/12, at 248:1-248:13.

[77] Department of Health and Human Services, Food and Drug Administration, Preliminary Regulatory Impact Flexibility Analysis of the Proposed Rules to Ensure the Safety of Juice and Juice Products, 63 Fed. Reg. 24262-63 (May 1, 1998) (to be codified at 61 C.F.R. pts. 101 and 120), attached as Exhibit 9.

[78] Mondul AA, Caffo B, Platz EA. "Minimal detection bias in the inverse association between statin drug use and advanced prostate cancer risk: A simulation study." *Cancer Epidemiol*. 2011 August ; 35(4): e6–e11 ("Mondul 2011"), attached as Exhibit 10.

[79] *Id*.

[80] *Id*.

screening on risk estimates.[81] The authors investigated three scenarios and varied the percentage of users who were screened at a high (65%) and a low (15%) rate.[82] The authors reported these results in Figures 3 and 4.

The Vioxx clinical studies were grossly underpowered to detect a statistically significant difference between the treatment and control arms. Plaintiffs' Pooled Analysis makes this point up front: "Given the rare occurrence of symptomatic venous thromboembolic events and the lack of a routine mechanism for objective identification of symptomatic and asymptomatic thromboembolic venous events, the rofecoxib major studies were underpowered to detect a statistically significant difference between the treatment and control arms."[83] In fact, in order to detect a statistically significant difference, Merck's trials would have required over 60,000 patients – more than 5-times the number of patients included across the major Vioxx trials.[84]

Further, a 2011 epidemiological observational study shows a statistically significant increased risk ratio between Vioxx and VTE.[85]  The Schmidt Study is an epidemiological study that examines data available from the Danish health registry and was sufficiently powered to achieve statistical significance. It shows

---

[81] *See generally* Mondul 2011, *supra.*

[82] *Id.* at 1-2.

[83] Pooled Analysis at 31.

[84] *Id.*

[85] Schmidt M, Christiansen CF, Horvath-Puho E, Glynn RJ, Rothman KJ, Sorensen HT. Non-steroidal anti-inflammatory drug use and risk of venous thromboembolism. Journal of thrombosis and haemostasis : JTH. 2011; 9(7): 1326-33 ("Schmidt Study"), attached as Exhibit 11.

an over two-fold increased risk between VTE and COX-2 inhibitors.[86] Dr. Spyropoulos described the Schmidt Study as a well-designed study with a large database that lends further credence to the results of Drs. Zambelli-Weiner and Brooks.[87]   In comparing the two studies, Dr. Spyropoulos stated, ". . . if you use a fairly well established multiplier of 10 . . . we come out with a rate ratio of 1.5, which is almost identical to the rate ratio seen in the Schmidt Study . . ."[88] The increased risk ratio between Vioxx and VTE in the Schmidt Study is very similar to that observed by Drs. Zambelli-Weiner and Brooks and the studies are mutually corroborative of one another. Dr. Lucchesi also agreed with the results of the Schmidt Study.[89]

Statistical significance does not prove cause and effect – it only suggests that an event is not due to random chance. Statistical significance is but one criterion that may speak to scientific reliability. *The Reference Manual on Scientific Evidence* and peer-reviewed literature acknowledge the shortcomings of statistical significance.  "Statistical significance is a term that speaks only to

---

[86] *Id*. at 1330-31.

[87] Spyropoulos Dep., at 134:8-134:20.  "What I said was actually it was the sentinel study that showed in a well-designed retrospective large database, and again this is, I believe, within a Danish database . . . Denmark has an excellent populational database by which they conduct these kinds of observational studies, so their databases are well respected within the field of epidemiologic thrombotic research. So this is the first sentinel study which, from a methodological point of view, was well conducted, and it was published in a well-respected journal that showed this association."

[88]  *Id*. at 297:19-298:18.

[89]  Deposition of Benedict Lucchesi, 9/26/12 ("Lucchesi Dep."), at 237:6-237:10, attached by Merck as Exhibit C, Mem. In. Supp.

the question of sampling error – it does not address the magnitude of any association found in a study. A study may be statistically significant but may find only a very weak association; conversely, a study with small sample sizes may find a high relative risk but still not be statistically significant."[90] This is precisely the case with Plaintiffs' Pooled Analysis, which shows elevated rate ratios for both DVT and PE despite the small sample size.

Moreover, the value of statistical significance is controversial among epidemiologists: "There is some controversy among epidemiologists and biostatisticians about the appropriate role of significance testing . . . [c]alculation of a confidence interval permits a more refined assessment of appropriate inferences about the association found in an epidemiologic study."[91]

Dr. Zambelli-Weiner's testimony corroborated *The Reference Manual on Scientific Evidence*: "Statistical significance is highly overused and misused in the field of epidemiology and medicine. And for an epidemiologist, we are most concerned with the size and magnitude of an association. Confidence intervals are more informative than p-values, so there's a preference towards using them. They tell you something about the range of possible values."[92]  She went on to explain that she could have achieved statistical significance had she been willing to use a 90 rather than 95-percent confidence interval,[93] but that she did not

---

[90]  Ref. Man. at 359

[91]  *Id*. at 359-60.

[92]  Zambelli-Weiner Dep., 12/6/12, at 306:16-307:16.

[93]  Zambelli-Weiner Dep., 12/6/12, at 304:21-306:4.

want to massage the results for the sole purpose of reaching statistical significance (as she was sensitive to the criticism that epidemiologists often manipulate actual data just to achieve statistical significance):

> I was using conventional thresholds for the report. And, again, because in this case when you're talking about a safety analysis, the size and magnitude of the association is where we're going to be placing our emphasis first. And it's the most important element. There are reasons why studies or analyses don't achieve statistical significance. And lack of statistical significance is not lack of significance . . . you can have a statistically significant finding that is essentially irrelevant or meaningless clinically. And you can have a very important clinically relevant finding that doesn't achieve statistical significance because of limitations of the study design.

Zambelli-Weiner Dep., 12/6/12, at 307:19-308:14.

Ironically, it is Merck that has been criticized for this very manipulation in its marketing of Vioxx, and for manipulating sample size is order to claim that the high rate ratios observed between Vioxx and cardiovascular events were actually "insignificant" and continue marketing Vioxx.[94]

---

[94] Ziliak ST, McCloskey DN, "The Cult of Statistical Significance," *JSM* 2009, Section on Statistical Education: 2302-19, at 2307-08, attached as Exhibit 12. Regarding Vioxx's clinical trials and statistical significance, the authors wrote: "The clinical trial was conducted in 2000 and the findings were published three years later in the Annals of Internal Medicine (Lisse et al. 2003). The scientific article reported "that five [note the number, 5] patients taking Vioxx had suffered heart attacks during the trial, compared with one [note the number, 1] taking naproxen [the generic drug, such as Aleve, given to a control group], a difference that did not reach statistical significance." The signal-to-noise ratio did not rise to 1.96, the 5% level of significance that the *Annals of Internal Medicine* uses as strict line of demarcation, discriminating the "significant" from the insignificant, the scientific from the non-scientific. Therefore, Merck claimed, there was no difference in the effects of the two pills. No difference in oomph, they said, despite a Vioxx disadvantage of about 5-to-1. Then the apparent fraud: the article neglected to mention that in the same clinical trial three additional takers of Vioxx, including the 73-year old woman whose survivors brought the problem to public attention, suffered from heart attacks. Eight in fact suffered or died in the clinical trial, not five. It appears that the scientists, or the Merck employees who wrote the report, simply dropped the three observations . . . **the reasoning is that if you can keep your sample size small enough – by dropping parts of it, for example – you can claim "insignificance," and continue marketing**."

Both *The Reference Manual on Scientific Evidence* and Dr. Zambelli-Weiner agree that the relative risk and magnitude are scientifically important criteria that speak to reliability, and Plaintiffs' Pooled Analysis shows **elevated rate ratios for both DVT and PE**.

## IV.   Drs. Zambelli-Weiner and Brooks' Pooled Analysis Uses Proper Methodology.

### A.  Drs. Zambelli-Weiner and Brooks properly used *a priori* criteria and determined a methodology from the outset.

Drs. Zambelli-Weiner and Brooks used a standard, accepted methodology that could easily be recreated by Merck or any scientist.  They used a pooled analysis, developed from properly set out criteria, established in advance of reviewing Merck's clinical trials. These are known as *a priori* criteria, this is a reliable method, and cannot be critiqued by any epidemiologist (which is presumably why Merck has not hired one to do so).

The peer-reviewed literature shows that performing a pooled analysis yields many advantages.[95] A pooled analysis uses explicit criteria, can be reproduced scientifically, and provides quantitative results. *Id*. at 295. The consistency of findings across study populations using different study methods can be examined in pooled analyses. *Id*. In addition, pooled analyses may reveal previously unrecognized errors or inconsistencies in the data and associations or dose response effects that were either previously unknown or only suggested.  *Id*.

---

[95]  *See generally* Friedenreich CM, "Methods for pooled analyses of epidemiologic studies," Epidemiology 1993, 4:295–302, attached as Exhibit 13.

The peer-reviewed literature explains that a general framework for conducting a pooled analysis entails 1) formulating study inclusion criteria; 2) identifying all potential studies meeting these criteria; 3) obtaining each study's primary data; 4) creating a standardized database; 5) estimating study-specific exposure-disease associations; 6) examining whether the study-specific results are heterogeneous; 7) calculating pooled estimates, if applicable; and 8) conducting sensitivity analyses to evaluate whether the estimates are robust. *Id.* at 296. Drs. Zambelli-Weiner and Brooks did exactly that.  Dr. Zambelli-Weiner explained:

> . . . [W]e set out *a priori* criteria for our analysis that's based on standard practice in terms of investigating a safety signal.  We looked for studies that had daily dosing with some meaningful amount of follow-up.  We also considered only Phase III studies because those are the studies that are designed primarily for the purpose of looking at the efficacy and safety of the drugs.  And I believe they were focused primarily in these areas as we outlined in the report.

Zambelli-Weiner Dep., 10/26/12, at 127:12-23.

Drs. Zambelli-Weiner and Brooks then obtained all studies available to them meeting their criteria and after extracting each relevant study's data, created a standardized database limited to Phase III studies that fit their *a priori* criteria.  Phase III studies are "the best conducted in terms of size, scope, and also a clear and evident adjudication process . . . and methodologically . . . the most stringent criteria is in a Phase III design in terms of the randomization process, the clear inclusionary or exclusionary process, and adjudication

36

process."[96]  They then conducted their statistical analysis.  In other words, they

followed the exact method that hundreds of other scientists have followed when

conducting a pooled analysis.

### B.  Peer-review is not necessary to pass muster under *Daubert*.

There is no requirement that a study be submitted for peer-review to pass

*Daubert*.  "There is no requirement that an expert back his opinion with

published studies that unequivocally support his conclusion; where an expert

otherwise reliably utilizes scientific methods to reach a conclusion, a lack of

textual support goes to the weight, not the admissibility, of the expert's

testimony."  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir.

2007).  "The Supreme Court in *Daubert* made it clear that it is not necessary for

a study to be published in a peer-reviewed journal in order for it to provide a

reliable basis for an expert opinion.  In fact, '[p]ublication (which is but one

element of peer review) is not a *sine qua non* of admissibility.'"  *Wagoner*, 813

F.Supp.2d at 802 (quoting *Daubert*, 509 U.S. at 594).

### C.  Drs. Zambelli-Weiner and Brooks did not intentionally exclude studies and used all available data.

Merck's accusation that Drs. Zambelli-Weiner and Brooks "engineered"

their analysis from the outset to achieve a result favorable to Plaintiffs is

completely groundless. It is contradicted by sworn testimony.  First, any studies

excluded by Drs. Zambelli-Weiner and Brooks were excluded because they did

not fit the *a priori* criteria implemented from the beginning – for instance,

---

[96]  Spyropoulos Dep. at 50:10-20.

studies that were terminated early were not included in the Pooled Analysis. Since APPROVe, ViP and VICTOR were all terminated early when Vioxx was withdrawn from the market, they were not included. Merck knew during the depositions that Plaintiffs' experts excluded studies that were terminated early,[97] yet Merck's ignores the real reasons APPROVe, ViP and VICTOR were excluded and instead ascribes false motives to Plaintiffs' experts.

Dr. Zambelli-Weiner was given the opportunity to respond to Merck's counsel's assertion that she was defrauding the Court with a dishonest analysis. She stated:

> Well, that's just false.  There are plenty of studies that we could have included that would have helped our position – and, in fact, our reanalysis shows that – that if, in fact, we were cherry-picking, there was a lot more we could have done to get higher risk ratios. The fact of the matter is, we set out criteria in advance and we stuck to those criteria, based on the data that was available to us.

Zambelli-Weiner Dep., 12/6/12, at 240:18-241:9.

In fact, if Plaintiffs' experts sought to cherry-pick favorable data, they could have included data from Phase II studies, many of which showed very favorable data to Plaintiffs' claims:  "I believe, if I recall correctly, there were a number of Phase II studies that actually demonstrated increased rates of these outcomes in Vioxx-exposed populations compared to the control population.  So

---

[97]  Merck's  Mem. In Supp. overlooks the fourth *a priori* criteria considered by Drs. Zambelli-Weiner and Brooks, which is that the study must have been completed and not terminated early. Merck knew all four criteria and in fact asked questions about the same during Dr. Zambelli-Weiner's deposition.  Zambelli-Weiner Dep.,12/6/12, at 201:3-9.

certainly that data would have enhanced the picture if . . . that was our objective."[98]

Moreover, this Court well knows the difficulties encountered by Plaintiffs' counsel in accessing Merck's data.  Obtaining a functional copy of the Vioxx Concordance Database and Medwatch data took months and resulted in extensions of PTO 58 deadlines.  During Dr. Brooks' deposition, it became apparent that several studies had not been provided to Drs. Zambelli-Weiner and Brooks, and therefore were not included in their original Pooled Analysis. As a result, Plaintiff's counsel conducted additional discovery and provided Drs. Zambelli-Weiner and Brooks with every new study as they became available with no advance knowledge of whether it would help or hurt.  A chronology of the problems obtaining data is summarized in Exhibit 14.[99] In doing so, they consistently implemented the same *a priori* criteria.  The updated tables were provided to counsel for Merck.[100]  When the additional data was provided, **the signal for Vioxx and VTE became even stronger, and the power of the study increased**.[101]  Plaintiffs incorporated much of Merck's placebo-controlled data.[102]

---

[98]  Zambelli-Weiner Dep., 12/6/12, at 314:14-19

[99]  Letter from Megan J. Hastings to Drs. Brooks and Zambelli-Weiner, December 5, 2012, attached as Exhibit 14.

[101] Zambelli-Weiner Dep. 12/6/12, Exs. 27 and 28 (6b Updated Incidence Rates of Adverse Events in Major Controlled Studies of Rofecoxib and 8b Updated Cumulative Unadjudicated Vascular Adverse Events Reported in 14 Placebo-Controlled Major Studies), attached by Merck as Exs. S and T, Mem. In. Supp.

[102]  *Id.*

Simply put, Plaintiffs' experts could not manipulate their Report with data they did not have, or the results of which they did not know in advance. As Merck points out many times in its Memorandum In Support, Plaintiffs were limited by time constraints, largely due to the inability to obtain Merck's clinical trial data.  Plaintiffs' counsel and Plaintiffs' experts lacked the inclination, the willingness and frankly the time to create a willfully skewed analysis.  Merck has zero evidence to support its allegations.

### D.  Merck did cherry-pick APPROVe, VICTOR and ViP data because those studies are favorable to Merck.

Plaintiffs agree with Merck – studies should not be "cherry-picked" to support a conclusion.  *See, In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, 524 F.Supp.2d 1166, 1175-76 (N.D. Cal. 2007).  Yet that is precisely what Merck is guilty of, not Plaintiffs' experts.  Merck's counsel selectively reports placebo-controlled data in APPROVe, VICTOR, and ViP data because it is favorable to Merck. However, those are hardly the **only** placebo controlled trials it might have chosen.

Dr. Zambelli-Weiner testified critically that Merck was cherry-picking data from the APPROVe study favorable to Merck's position, and stated that data could have been similarly cherry-picked to prop up Plaintiffs' case: "We could cherry-pick individual studies and say, well, if you add them you'll get this, and if you add that one you'll get this.  And there were [Phase] IIb studies that had elevated [VTE] rates and we could see what happens if we add them.  Yes,

we could do that."[103]  She explained how Merck's *ex post facto* selection of one or

two specific studies is different from the methodology she and Dr. Brooks used:

> Q:      And you said at one point that Mr. Tomaselli was cherry-
> picking, I think specifically when he was picking two protocols to
> add together or two numbers to add together.  Could you tell us how
> that is distinguished from what you did?
>
> A:      Well, again . . . we defined a safety database and we
> requested all available data that met that – those criteria.  And we
> analyzed all available data that was given to us.  We presented it in
> multiple forms, rolled up, broken down, sliced it and diced it lots of
> different ways, with the goal of trying to understand what was
> going on.  What we did not do was pick one or two or three
> particular studies and combine them to achieve a certain result.

Zambelli-Weiner Dep., 12/6/12, at 314:20-315:12.

Merck's criticisms of Dr. Zambelli-Weiner and Dr. Brooks are criticisms

that ought to be made against it.

## V.      The Testimony of Drs. Spyropoulos, Olyaei and Lucchesi Is Reliable, Relevant and Admissible.

Merck argues in Part II of Merck's Motion that Dr. Spyropoulos should be

excluded from testifying because, in Merck's view, the clinical trial data does not

show an association between Vioxx and VTE.[104]  Merck argues in Part IV of its

Motion that Drs. Olyaei and Lucchesi did not review the totality of Merck's

clinical trial data, or the totality of the literature, and by extension the totality of

their opinions are insufficient to establish general causation.

Merck cites no authority, in law or in science, in support of the bald

statement that clinical trial data is the only reliable, scientific evidence for a

---

[103]   Zambelli-Weiner Dep.,12/6/12, at 238:20-239:7.

[104]   Mem. In Supp. at 10.

causation opinion. In fact, Dr. Spyropoulos did review many of Merck's placebo-controlled trials and reached an opposite conclusion from Merck's experts. Further, Drs. Spyropoulos, Olyaei and Lucchesi need not review every piece of relevant literature in order to testify. "[T]he fact that an expert has reviewed only some of the available literature raises the possibility that the expert may have reached a conclusion in advance of performing the requisite research." *Wagoner*, 813 F.Supp.2d at 802.

Drs. Spyropoulos, Olyaei and Lucchesi are highly respected in their fields. They reviewed volumes of peer-reviewed, published scientific articles from highly esteemed medical journals. These materials, along with their experience, form the bases for their opinions.  Reviewing scientific journals and offering an opinion based thereon is a tried and true, accepted methodology employed by scientific experts in court proceedings for decades.

### A.  Merck makes no *Daubert* argument with respect to Dr. Spyropoulos' methodology.

Merck mentions Dr. Spyropoulos 37 times in its Memorandum in Support, but at no point does it make any argument as to why Dr. Spyropoulos' methodology should be excluded under *Daubert*.  Merck's assault is directed at the placebo-controlled data and snippets from his deposition, taken out of context and elicited by counsel for Merck during the deposition.  On this basis Merck makes the bald and untrue statement that Dr. Spyropoulos acknowledged that the Vioxx clinical trial data do not provide causal evidence of association between Vioxx and VTE.

To the contrary, Dr. Spyropoulos reviewed many of the placebo-controlled studies and a major finding of his report is that the Vioxx clinical program was not properly designed to capture VTE, and as a result, there is an underestimation of VTE in Merck's reported data.  In both his deposition testimony and his expert report, Dr. Spyropoulos asserted that Vioxx is causally related to the increased risk of VTE: ". . . [the] probable systematic underestimation of VTE events in the Vioxx clinical trials would lead me to the conclusion to a reasonable degree of scientific and medical probability that Vioxx can be associated with an increased risk of VTE."[105]  Dr. Spyropoulos reviewed the same materials as Merck and reached an opposite conclusion, but this does not warrant exclusion of his opinions.   "Although Merck may disagree with the conclusions reached . . . and supporting literature, a disagreement does not amount to improper methodology of scientifically unreliable data."  Rec. Doc. 1516 at 32.

Merck's criticism of Dr. Spyropoulos for not reviewing the totality of placebo-controlled clinical trials holds no water under *Daubert*.  First, the emphasis to be given to placebo-controlled studies is an issue regarding the weight of the evidence and is a question for the jury. *See supra*. Further, reviewing all studies is not a criteria necessary to satisfy *Daubert*. *Wagoner*, 813 F.Supp.2d at 802. Next, Dr. Spyropoulos did not set out to do an epidemiologic study.[106] Instead, he reviewed the Vioxx clinical program as it pertained to VTE,

---

[105] *See generally* Spyropoulos Rep.; *see also* Spyropoulos Dep., at 289:16-290:1.

his area of expertise.[107] From a clinical standpoint, Dr. Spyropoulos "found enough aspects of the capture of outcomes which led me to the conclusions with respect to . . . the probable underestimation of these VTE events, and the fact that if you add a multiplier . . . of anywhere from 2 to 1 to 30 to 1, with a reasonable estimate being 10 to 1 of looking at asymptomatic versus symptomatic events, there appears to be a signal with an increased risk of symptomatic VTE in the entire program."[108] In reaching his opinion that there was an approximate 10-fold underestimation of VTE events, he relied on published, peer-reviewed journals (one article was co-authored by Merck's Dr. Crowther) and his own significant clinical experience.[109]

Merck raised no challenge to Dr. Spyropoulos' methodology – he reviewed dozens of relevant, published, peer-reviewed articles from credible medical journals on Vioxx and VTE, as well as data from Merck's major studies and CSRs. Merck's experts used many of these same materials in forming their opinions. This research, combined with his clinical practice and expertise, forms the basis for his opinions.

> **B.   Merck makes no *Daubert* argument with respect to Dr. Olyaei's methodology.**

---

[106]   Spyropoulos Dep, at 291:2-291:14.

[107]   *Id.*

[108]   *Id.*

[109]   *Id.*

Merck raised no challenges as to the methodology used by Dr. Olyaei. Rather, it attacks his conclusions.  He reviewed dozens of relevant, published, peer-reviewed articles on Vioxx and VTE.  There is nothing speculative or unreliable about this method. Moreover, Dr. Olyaei actively researched and published on Vioxx before being retained as an expert. Dr. Olyaei was entitled to and did rely upon experts in the field of hematology and epidemiology.  He based his opinions on the review of these materials and his training and experience.

As a Pharm.D., Dr. Olyaei's report focuses on the pharmacological effects of Vioxx on VTE. The Declaration of Dr. Olyaei's report states, "from a pharmacological standpoint, it is reasonably likely that Vioxx can be expected to increase the likelihood of occurrences of VTEs in both healthy and at-risk patients, just as it has been shown to significantly increase the risk of MIs."[110] Expert testimony does not have to be based on epidemiologic or case studies to prove causation.  *The Reference Manual on Scientific Evidence* recognizes that toxicology models based on animal studies may be used to determine adverse effects in humans.[111]  Indeed, this Court has flatly rejected such an approach, and has held that in vitro experiments or theories on biologic plausibility can suffice as proof of general causation,[112] and that an expert may testify on mechanism.[113]

---

[110]  Olyaei Rep. at 1.

[111]  Ref. Man. At 413-15.

[112]  *See* Rec. Doc. 1516 at 33-39.

[113]  *Waggoner*, 813 F.Supp.2d at 804 (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988)).

**C.  Merck makes no *Daubert* argument with respect to Dr. Lucchesi's methodology.**

Merck asserts that Dr. Lucchesi does not have a scientifically reliable basis to opine on general causation. That is incorrect.  Dr. Lucchesi cites nearly 40 references in support of his opinion.[114] Moreover, Dr. Lucchesi need not conduct an epidemiologic study in order to offer reliable scientific evidence to the jury. Expert testimony does not have to be based on epidemiologic or case studies to prove causation. *See supra*.

Dr. Lucchesi based his opinion from his half century of clinical and medical experience, and on a thorough review of the scientific literature.  He drew proper and support inferences from the studies he reviewed.  His testimony is relevant and reliable and should be admitted.

**D.  Plaintiffs' experts' methodology was blessed by Dr. Crowther.**

Merck's expert Dr. Crowther approved of the methodology used by Plaintiffs' experts.  He stated that reviewing scientific articles and peer-reviewed articles and expressing opinions therefrom is an acceptable methodology to use in coming to an opinion.[115]  Dr. Crowther specifically endorsed the methodology of Dr. Lucchesi.[116]

Dr. Crowther stated that Dr. Spyropoulos applied the scientific method when reaching his conclusions: ". . . Dr. Spyropoulos definitely followed a

---

[114]  *See* Lucchesi Rep. at 14-16.

[115]  Crowther Dep., at 170:10-172:9.

[116]  *Id.*

46

method."[117] Dr. Crowther also agrees that underreporting of VTE events was likely: "And it's entirely possible, in fact, likely that not every single event was reported . . . [so] if 10 percent of events are underreported, 10 percent of events are underreported."[118] Dr. Crowther stated that a multiplier could be used to address systematic underreporting of VTE events.[119]

Regarding the method used by Drs. Zambelli-Weiner and Brooks, Dr. Crowther agreed that it is an accepted scientific methodology to exclude some studies inconsistent with an analysis, and Dr. Crowther used the same approach in his literature review.[120] Dr. Crowther stated, "as someone who does methodology professionally . . . you want to establish ground rules for the inclusion or non-inclusion of studies and subsequently stick to those ground rules."[121] This is the method used by Drs. Zambelli-Weiner and Brooks. He agreed that the use of a multiplier did not change the ratio between the findings.[122] As a matter of the weight, Dr. Crowther did assert that only adjudicated data from placebo-controlled studies should be used.

---

[117] *Id*. at 254:18-254:20.

[118] *Id*. at 261:25-261:13.

[119] *Id*. at 265:11-266:1.

[120] *Id*. at 234:1-235:19.

[121] *Id*. at 292:11-292:21.

[122] *Id*. at 255:5-255:8.

## VI.    Merck Offers No Criticism of the Qualifications of Any of Plaintiffs' Experts

### A.  Merck does not challenge Dr. Lucchesi's qualifications

This Court has previously found Dr. Lucchesi qualified to testify as an expert in Vioxx trials.[123]   Dr. Lucchesi received a B.S. and a Masters in Physiology from St. John's University in New York City.  He then received a Ph.D. in Pharmacology and a M.D. from the University of Michigan.  He is presently a professor in the University of Michigan's Department of Pharmacology.

He has received numerous awards and honors, and is a member of many medical organizations, sits on several advisory boards and committees, and has authored and co-authored over 390 publications.  He has over 50 years of research, clinical, medical, and pharmacological experience, and the same with regard to basic and clinical research involving diseases of the cardiovascular system, including pathophysiological events associated with arterial and/or venous thrombosis, and the contributory role of pharmacological interventions know to be associated with the development of thromboembolic events.  His research has placed special emphasis on the role of Cox-2 inhibition in the development of arterial/venous thromboembolic events.  He is, without a doubt, one of the leading experts in his field in the world.  In formulating his opinions, Dr. Lucchesi reviewed the scientific information on Vioxx and COX-2 inhibitors,

---

[123] *See* Rec. Doc. 1516 at 33-39.

along with a significant amount of materials.  In addition, his opinion is based on his 50-plus years of clinical experience, training, and education.

### B.  Merck does not challenge Dr. Olyaei's qualifications

Dr. Olyaei received a B.S. in Pharmacy from Oregon State University, and a Pharm.D. from the University of Kansas.  He is board certified as a pharmacotherapy specialist (B.C.P.S.).  He is a Professor of Medicine and Pharmacotherapy at Oregon Health and Sciences University/Oregon State University, Division of Nephrology, Hypertension, and is a Clinical Pharmacotherapist.  He has taught in the areas of pharmacotherapy, medicine, surgery, clinical research, and nursing, and is currently the Medical Director of the Drug Safety & Research Institute.  He has authored 217 publications, including publications on NSAIDs and Vioxx specifically.

### C.  Merck does not challenge Dr. Spyropoulos' qualifications

Dr. Spyropoulos received a B.A. and M.D. from the University of Pennsylvania.  He is an Associate Professor of Medicine in the Division of Hematology and Oncology at the University of Rochester Medical Center and Director of the Clinical Thrombosis Program.  He was recently appointed as the Director of Anticoagulation Services and Clinical Thrombosis of North Shore Long Island Jewish Health System, and as an Associate Professor of Medicine at Hofstra University.  He has 15 years of experience in treating patients with thrombotic disorders.   His clinical and academic focus has been in patients with venous thromboembolic disease.  He has authored almost 100 peer-reviewed publications, over 250 invited national and international presentations on

49

thromboembolic disease, and have been principal investigator, a member of the Steering Committee, or a member of the Data Safety Monitoring Board for multiple international clinical trials in thrombosis. In reaching his opinions, Dr. Spyropoulos reviewed a significant amount of materials. These materials along with his experience, training, and education form the basis for his testimony.

### D. Merck does not challenge Dr. Zambelli-Weiner's or Dr. Brooks' qualifications

Dr. Zambelli-Weiner received a B.A. from Washington & Jefferson College, a Masters in Public Health from Saint Louis University School of Public Health, and a Ph.D. in Epidemiology/Human Genetics from Johns Hopkins University School of Public Health. She completed her post-doctoral training at Johns Hopkins University School of Medicine. She is the founder of Translational Technologies International, LLC, and has more than 15 years of experience in epidemiologic research. In reaching her opinions, Dr. Zambelli-Weiner reviewed a significant amount of materials, along with Merck's CSRs and other data. These materials along with her experience, training, and education form the basis for her testimony.

Dr. Brooks received a B.S. from Stetson University and a Ph.D. in Mathematics from Duke University. Dr. Brooks is a mathematician and health economist and founder of Decision-Driver Analytics, Inc., and has 13 years of experience in the realm of pharmaceutical, biotechnology, and medical device industry research, marketing, and reimbursement. In reaching her opinions, Dr.

Brooks reviewed a significant amount of materials.  These materials along with her experience, training, and education form the basis for her testimony.

## CONCLUSION

For the foregoing reasons, VTE Plaintiffs respectfully request the Court to overrule Merck's Motion to Exclude Opinion Testimony on General Causation.

Respectfully submitted,

/s/ Ann B. Oldfather

_____

Ann B. Oldfather
KBA Bar #52553
Liaison Counsel/Lead Counsel
OLDFATHER LAW FIRM
1330 S. Third Street
Louisville, KY   40208
502.637.7200
502.637.3999  (fax)
aoldfather@oldfather.com
*Counsel for Certain Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiffs' Memorandum in Opposition to Merck & Co., Inc.'s Motion to Exclude Opinion Testimony on General Causation In VTE Cases has been served upon Liaison Counsel, Phillip Wittmann and Russ Herman, by U.S. Mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(C), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 31st day of January, 2013.

/s/ Ann B. Oldfather

_____

Ann B. Oldfather