# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| This Document Relates to All | * | |
| Cases Listed on Exhibit A to Pretrial | * | JUDGE FALLON |
| Order 58, as Amended (the VTE Cases) * | * | MAGISTRATE JUDGE KNOWLES |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### REPLY IN SUPPORT OF MERCK SHARP & DOHME CORP.'S
### CONSOLIDATED MOTION TO EXCLUDE OPINION TESTIMONY
### ON GENERAL CAUSATION AND
### RENEWED MOTION FOR SUMMARY JUDGMENT IN VTE CASES

Plaintiffs' opposition brief is fifty-one pages long.  Yet nowhere in those fifty-one pages do Plaintiffs dispute this one essential, inescapable fact:  The placebo-controlled clinical trial data—data that *Plaintiffs' own experts agree is most reliable* for determining whether a medication has an association with an injury—provides no evidence of any association, much less a causal association, between Vioxx and an increased risk of VTE.  *See* Merck's Mot. 7–10.[1] In nearly 22,000 patients representing approximately 16,000 patient-years, there were actually *fewer* VTE events, both numerically and proportionally, in patients using Vioxx than in patients using placebo.  *See* Merck's Mot. 5.  There is no dispute concerning these data.

---

\*   By Minute Entry dated August 16, 2012 (Rec. Doc. No. 64077), the Court consolidated the Velma Dunn matter (captioned *Singleton v. Merck Sharp & Dohme Corp.*, Civ. A. No. 2:09-cv-02413-EEF-DEK) with the other VTE cases listed on Exhibit A to Pretrial Order 58.

[1]   Merck's opening brief, titled Merck's Memorandum in Support of its Consolidated Motion to Exclude Opinion Testimony on General Causation and Renewed Motion for Summary Judgment in VTE Cases (Rec. Doc. No. 64211-1), is cited herein as "Merck's Mot."

Nonetheless, in a desperate effort to avoid the appropriate legal consequence—namely, that Plaintiffs' claims be dismissed with prejudice for failure to show reliable evidence of general causation—two of Plaintiffs' experts, Drs. Zambelli-Weiner and Brooks, have devised a "pooled analysis" so unsound that Plaintiffs are unable to identify anything in the scientific literature that supports it.

## I.    THE "POOLED ANALYSIS" OF DRS. ZAMBELLI-WEINER AND BROOKS IS METHODOLOGICALLY FLAWED.

Plaintiffs' opposition begins with, and is largely premised on, the fiction that "[e]ach of Merck's arguments attacks the weight or credibility of Plaintiffs' evidence, and not the methodology itself."  Opp'n 1 (Rec. Doc. No. 53232).  That is simply not the case.  As detailed in Merck's opening brief, the methodology employed by Drs. Zambelli-Weiner and Brooks is deeply flawed:

- It excludes the vast majority of the placebo-controlled clinical trial data;

- It is designed and executed based on Plaintiffs' self-imposed time and budgetary constraints, rather than on sound scientific principles;

- It relies on unadjudicated event reports, even though adjudicated data are available; and

- It does not reach statistical significance, a threshold requirement for establishing general causation.

Each of these is a material flaw in *methodology*, not mere disagreement with their conclusions. And because Plaintiffs are unable to defend these methodologies based on commonly accepted scientific practice, this "pooled analysis" must be excluded under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

### A.    The "Pooled Analysis" Is Methodologically Flawed Because It Excludes the Bulk of the Placebo-Controlled Clinical Trial Data.

As detailed in Merck's opening brief, perhaps Drs. Zambelli-Weiner and Brooks's most egregious methodological flaw was their intentional exclusion of most of the available placebo-

controlled clinical trial data. *See* Merck's Mot. 11–13. Among the studies purposefully excluded from this "pooled analysis" are APPROVe, ViP, and VICTOR, as well as eight other placebo-controlled studies.[2] Merck's Mot. 11. Together, these omitted studies include data from approximately 13,000 patients. *See id*. at 6 (describing APPROVe, ViP, and VICTOR); Zambelli-Weiner Dep. Ex. 33 (indicating populations for eight additional excluded studies, which lack asterisks). Rather than pooling together all of the placebo-controlled studies, or even all of the placebo-controlled and active-comparator studies, Drs. Zambelli-Weiner and Brooks instead examine a subset of data that combines some, but not all, active-comparator studies and some, but again not all, placebo-controlled studies.

Plaintiffs do not dispute the fact that this "pooled analysis" keeps out the bulk of the placebo-controlled data. Instead, Plaintiffs seek to justify that exclusion by arguing that:

> (i)   there is no meaningful distinction between placebo-controlled clinical trial data and data from studies using active drug comparators, Opp'n 17–26;
>
> (ii)  it would be inappropriate to consider *only* placebo-controlled clinical trial data, Opp'n 19–26; and
>
> (ii)  pooling placebo-controlled data together with active-comparator data is a "standard analysis" that has been "used by Merck elsewhere, and used by the FDA," Opp'n 1, 11.

On each count, Plaintiffs are wrong, miss the point, or both. There is simply no justification for excluding the data from 11 placebo-controlled trials encompassing over 13,000 patients from an

---

[2]   In their original analysis, Drs. Zambelli-Weiner and Brooks included only 9 of the 23 placebo-controlled studies from the Final Pooled Analysis. Merck's Mot. 11. After learning during their depositions that they had failed to include several studies they intended to include, *see infra* pp. 10–11, Drs. Zambelli-Weiner and Brooks updated their analysis to include six additional studies, Protocols 096, 097, 098, 103, 120, and 121. Merck's Mot. 14 n.14. As of now, they still have failed to include data from 11 placebo-controlled studies in their analysis. Merck's Mot. 6 (describing APPROVe, ViP, and VICTOR); Zambelli-Weiner Dep. Ex. 33 (indicating eight additional excluded studies) (attached as Ex. A).

analysis purporting to assess the risk of using Vioxx (versus not using Vioxx) in developing VTE.

### 1. There are Meaningful Differences Between Placebo-Controlled Data and Active-Comparator Data.

Plaintiffs seek to justify Drs. Zambelli-Weiner and Brooks's exclusion of most of the placebo-controlled clinical trial data by suggesting that there is no meaningful difference between placebo-controlled data and data from studies using *active* drug comparators, such as naproxen, ibuprofen, nabumetone, or diclofenac. Opp'n 17–18. In their words, "it is Plaintiffs' case that . . . *whether [a] trial compares a placebo or another drug comparator doesn't affect the 'gold-standard-ness' since the choice of comparator is not the point*, rather the randomization and blinded-ness is." Opp'n 18 (emphasis added). That claim, however, is expressly contradicted by *The Reference Manual on Scientific Evidence*, the unambiguous testimony of their own experts, and the relevant case law. Indeed, Plaintiffs are unable to cite to a single legal authority or commonly accepted scientific principle that supports their proposition.

The *Reference Manual on Scientific Evidence*—contrary to plaintiffs' suggestion that it draws no distinction between placebo-controlled and active-comparator clinical trial data, and instead is concerned only that the trial is blinded and randomized, Opp'n 18–19— expressly refers to placebo-controlled trials in assessing a link between an agent and an injury:

> To determine whether an agent is related to the risk of developing a certain disease or an adverse health outcome, we might ideally want to conduct an experimental study in which the subjects would be randomly assigned to one of two groups: one group exposed to the agent of interest and *the other not exposed*. . . . *Researchers conducting clinical trials attempt to use study designs that are* <u>*placebo controlled*</u>*, which means that the group not receiving the agent or treatment is given a placebo*, and that use double blinding, which means that neither the participants nor those conducting the study know which group is receiving the agent or treatment and which group is given the placebo.

*Reference Manual on Scientific Evidence* 338 (2d ed. 2000) ("Ref. Man (2d)") (emphasis added); *see also Reference Manual on Scientific Evidence* 555 (3d ed. 2011) ("Ref. Man. (3d)").  In short, the *Reference Manual* contradicts, not supports, Plaintiffs' argument.

Plaintiffs' experts agree that a placebo comparator is "cleaner" and avoids the bias that an active comparator can introduce.  Dr. Zambelli-Weiner herself explained that, unlike placebo, active comparators (in this case, other NSAIDs) "could have pro-thrombotic tendencies or antithrombotic tendencies" that might cause or prevent VTE events, thereby biasing the results of those studies:

> Q: And when you say "placebo-controlled trial," what does "placebo controlled" mean?
>
> A: It means non-active comparator.
>
> Q: And why is a non-active comparator – why does that matter?
>
> A: Well, it certainly gives a cleaner signal.
>
> Q: And when you say "cleaner signal," why do you say "cleaner"?
>
> A: . . . . [I]n this particular situation, they may also have thrombotic effects.  ***So you would be biasing the results.***  It clouds the signal.
>
> ***
>
> Q: I see.  And so when I say that placebo control data is "cleaner," can you tell me again why it is cleaner?
>
> A: Well, you're more able to isolate the effect of the exposure, specific exposure of interest.
>
> ***
>
> Q: Okay.  And what you're saying is other NSAIDs could have prothrombotic tendencies or anti-thrombotic tendencies?
>
> A: Possibly, yes.

Zambelli-Weiner Dep. (Vol. I) 65–66 (emphasis added).

Although Dr. Zambelli-Weiner freely admits to the infirmities of active-comparator trials versus placebo-controlled trial data, neither she nor Dr. Brooks did anything to investigate the anti- or pro-thrombotic effects of the active comparators used in the trials they include in their analysis.  Zambelli-Weiner Dep. (Vol. II) 340–41.  This is no small matter.  If the NSAIDs to which Vioxx was compared might actually *lower* the risk of VTE (again, something that Drs. Zambelli-Weiner and Brooks believe could be the case, but did nothing to investigate), Vioxx could end up with a higher rate of VTE than an active comparator, even though Vioxx has no effect.  *See id*.

Dr. Spyropoulos, the only medical doctor Plaintiffs asked to review the Vioxx clinical trial data, could think of no reason why the placebo-controlled data omitted by Drs. Zambelli-Weiner and Brooks should be excluded from any analysis of Vioxx and VTE; to the contrary, he considers those data to be reliable, relevant, and "high quality."  Spyropoulos Dep. 150–51, 188.  While Plaintiffs suggest that the testimony of their experts on this subject was somehow taken out of context, Opp'n 27, they offer no explanation as to how that is the case.  In reality, their experts' statements on this point were perfectly clear.

Finally, Plaintiffs' argument that the Court should make no distinction between placebo-controlled and active-comparator trials for purposes of determining the proper scope of expert testimony under *Daubert* is directly contradicted by relevant case law.  In *Cloud ex rel. Cloud v. Pfizer, Inc.*, 198 F. Supp. 2d 1118 (D. Ariz. 2001), the plaintiff's expert wanted to testify as to general causation based on a study comparing Zoloft to an active comparator, amitriptylene, rather than based on an evaluation of placebo-controlled data.  *Id.* at 1134.  The court excluded the general causation testimony of the plaintiff's expert, finding that "the study did not evaluate

the relative risk compared to unexposed population (i.e., a group that takes a placebo), which is the general method in which to produce an accurate relative risk." *Id.*

Drs. Zambelli-Weiner and Brooks's analysis is no different. They have excluded from their analysis the bulk of the placebo-controlled clinical trial data in favor of data that is less reliable for assessing general causation. *See supra* pp. 5–6. Specifically, their "pooled analysis" excludes data from APPROVe, ViP, and VICTOR—three large, long-term placebo-controlled trials that together include nearly 10,000 patients—as well as an additional eight placebo-controlled studies comprising another approximately 3,500 patients. *See supra* p. 3. Plaintiffs' characterization of these 11 missing studies as a "tiny subset of clinical data," Opp'n 23, is absurd. The data from these 11 studies alone is 53 percent ***larger*** than the total placebo-controlled dataset used in Drs. Zambelli-Weiner and Brooks's "pooled analysis." *See id.* As Dr. Zambelli-Weiner conceded during her deposition, had she and Dr. Brooks added even just the APPROVe study to their analysis, it would have been enough to shift the pulmonary embolism data in favor of Vioxx. Zambelli-Weiner Dep. (Vol. II) 235–40. Ironically, the APPROVe study—which Plaintiffs now ask the Court to ignore altogether—is the very study that led to the withdrawal of Vioxx from the market in the first place and is prominently featured in most of these very VTE Plaintiffs' complaints. Merck's Mot. 11 n.10. Plaintiffs might believe that vacillating between highlighting, then ignoring, a clinical study depending on how it suits a particular argument is a good litigation strategy, but it is extraordinarily bad science. And *Daubert* exists to prevent precisely this sort of manipulation. *See, e.g.*, *S. Snow Mfg. v. Sno Wizard Holdings, Inc.*, Nos. 06–9170, 09–3394, 10–791, 2011 WL 6296654, at *1 (E.D. La. May 12, 2011) ("The reliability requirement is designed to exclude so-called 'junk science.'").

### 2.      Considering Active-Comparator Data Does Not Justify Excluding Placebo-Controlled Data.

Plaintiffs try to deflect the Court's attention from their arbitrary exclusion of placebo-controlled data by casting this as a debate about whether active-comparator studies also have value or can ever appropriately be pooled together with placebo-controlled trials.  Opp'n 17–26.  They argue that "[t]he scientific reliability of a pooled analysis does not rise or fall based on the use of only placebo-controlled data."  Opp'n 17.  This argument entirely misses the point.

Active-comparator randomized controlled studies do have value; they could be well-suited, for example, to show whether one medication or another is safer for someone at risk of a VTE event.  Such studies cannot show, however, that a medication causes a certain outcome, because, unlike placebo, an active comparator may not be neutral; the active comparator may *reduce* the risk of the outcome.  Indeed, according to Plaintiffs' own experts, the Vioxx active comparators might actually lower VTE risk, making active-comparator studies unreliable indicator's of Vioxx's effect on VTE events.  *See supra* pp. 5–6.

Further, even if the narrow subset of placebo and active-comparator studies that Drs. Zambelli-Weiner and Brooks selected for their "pooled analysis" were just as reliable as data from the complete collection of placebo-controlled trials—which they are not, *see supra* pp. 5–6—Plaintiffs still have failed to articulate any valid scientific principle that justifies the complete exclusion of the vast majority of available placebo-controlled data, data that Plaintiffs' own experts agree is "cleanest" and least susceptible to potential bias, in evaluating whether a drug causes a particular adverse outcome.  If, as Plaintiffs suggest, "[t]he idea is to study a drug as thoroughly and completely as possible," Opp'n 17, ignoring more than half of the placebo-controlled data cannot possibly suffice.

### 3.     Pooling Placebo-Controlled Data with Active-Comparator Data Does Not Justify Excluding Placebo-Controlled Data.

Similarly, Plaintiffs attempt to confuse the matter by suggesting that the issue should turn on whether it is ever appropriate to pool together active-comparator and placebo-controlled trials.  Opp'n 22–26.  Of course that can be done, and has been done many times by Merck, the FDA, and others.  But again, that does not justify the selective exclusion of placebo-controlled clinical trial data encompassing over 13,000 patients.  Indeed, it is at odds with the very purpose of pooling—to increase the power of a study in an effort to lead to more reliable results.  *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1174 (N.D. Cal. 2007) ("Meta-analysis has the advantage of pooling more data so that the results are less likely to be misleading solely due to chance.").

In short, the exclusion of the bulk of the placebo-controlled data is a fatal flaw in Plaintiffs' methodology that simply cannot be explained away.

### B.     Drs. Zambelli-Weiner and Brooks's Analysis Was Compromised by Plaintiffs' Time and Budgetary Constraints.

Plaintiffs take great pains to argue that the results from Drs. Zambelli-Weiner and Brooks analysis were not engineered, going so far as to claim that the criteria employed to exclude studies were designed "*a priori*."  Opp'n 37–40.  That is not the case.  Dr. Zambelli-Weiner acknowledges that she and Dr. Brooks reviewed the Vioxx clinical trials *before* deciding which studies to exclude.  Zambelli-Weiner Dep. (Vol. II) 201–07.  Indeed, as late as only a few weeks prior to the submission of their expert report, Drs. Zambelli-Weiner and Brooks were still considering data from trials they ultimately excluded from their analysis.  *Id.*  In other words, the "*a priori*" exclusion criteria Plaintiffs refer to in their brief, Opp'n 37–40, were not "*a priori*" in any traditional sense.  Having reviewed the clinical studies before excluding them, the experts would have been perfectly aware that the data from the studies they were excluding did not

support their opinions.

While Drs. Zambelli-Weiner and Brooks refuse to concede that they engineered the results, they do concede that they designed their analysis around time and budgetary constraints and that these constraints impacted both the manner in which the analysis was designed and the manner in which it was conducted.  *See* Merck's Mot. 12–13; *see also* Brooks Dep. 42 ("As to whether we determined how to limit the analysis, we had a finite amount of time, and we had an objective that needed to be met in that time."); Zambelli-Weiner Dep. (Vol. II) 213–15, 253–54. This is a methodological flaw that, in itself, is sufficient to exclude expert testimony.  *See, e.g.*, *United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, No. EP-07-CV-247-PRM, 2010 WL 1645970, at *8 (W.D. Tex. Mar. 24, 2010) (time constraints and other difficulties did not excuse methods that fell short of professional standards); *Galaxy Computer Servs., Inc. v. Baker*, 325 B.R. 544, 561–62 (E.D. Va. 2005) (rejecting expert testimony when expert acknowledged time pressure led him to omit consideration of important data); *Cayuga Indian Nation of N.Y. v. Pataki*, 83 F. Supp. 2d 318, 327 (N.D.N.Y. 2000) (rejecting testimony of expert who "freely admitted" that he did not do a "'complete analysis' . . . due to time and budget constraints" (citation omitted)).

To compound matters further, once their exclusion criteria were finally established, Drs. Zambelli-Weiner and Brooks still failed to comply with them.  *See* Merck's Mot. 14–15; Zambelli-Weiner Dep. (Vol. I) 127–30 & Ex. 12.  Under their own "*a priori*" exclusion criteria, at least seven clinical trials were omitted from their original report and, even after supplementing their analysis, some of those studies are still missing.  Merck's Mot. 14 n.14.  This failure renders their already flawed analysis even more suspect.  *See, e.g.*, *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 936, 944 (D. Minn. 2009) ("the fact that the methodologies described in

the study were not the actual methodologies used undermines the reliability of the [study]").[3]

### C. The Use of Unadjudicated Event Reports, Even Where Adjudicated Data Exist, Is Improper and Renders Their Analysis Unreliable.

As with their argument about active-comparator studies, Plaintiffs' attempt to justify Drs. Zambelli-Weiner and Brooks's use of unadjudicated data misses the point. The issue is not that it is never appropriate to use unadjudicated data, but that it is not sound science to favor unadjudicated data over available adjudicated data. *See* Merck's Mot., Part III.C ("The Use of Unadjudicated Event Reports, Even Where Adjudicated Data Exist, Is Improper and Renders Their Analysis Unreliable."). Drs. Zambelli-Weiner and Brooks's opinion is unreliable because their decision to use low-quality unadjudicated data when high-quality adjudicated data exist lacks basis in practice, reason, and law.

Plaintiffs' own expert, Dr. Spyropoulos, recognizes the importance of adjudicating data. Dr. Spyropoulos, who, unlike Drs. Zambelli-Weiner and Brooks, is a medical doctor with experience in adjudication, testified that adjudication is "one of the most important steps" in ensuring that clinical trial data are accurate. Spyropoulos Dep. 54–55. He "agree[d] . . . that adjudicated data is higher quality data than the data from the local level," which he called "dirty

---

[3]  Rather than address the substance of these methodological flaws, Plaintiffs look to lay responsibility elsewhere, referencing "difficulties encountered by Plaintiffs' counsel in accessing Merck's data." Opp'n 39. In reality, all of the Vioxx Phase III studies have been known and available to Plaintiffs for many years. For example, they were identified in Merck's March 22, 2004 FDA submission, which originally was produced to Plaintiffs more than seven years ago, on September 19, 2005, and attached as an exhibit to Merck's motion for summary judgment filed in November 2011. The "additional discovery" Plaintiffs' counsel refer to in their brief, Opp'n 39, culminated in nothing more than Plaintiffs going back and reviewing materials *already* at their disposal. Ltr. from M. Hastings to E. Brooks & A. Zambelli-Weiner 2–3 (Dec. 5, 2012) (faulting the Plaintiffs Steering Committee's for the incomplete dataset provided to Drs. Zambelli-Weiner and Brooks) (Opp'n Ex. 14).

data." *See id.* at 55, 68.  The FDA likewise encourages clinical trial sponsors to establish

adjudication protocols to improve the quality of data.  *See FDA Guidance for Clinical Trial*

*Sponsors: Establishment and Operation of Clinical Trial Data Monitoring Committees* § 3.3, at

7 (2006) (explaining that adjudication committees "help to ensure that the data . . . are as

accurate and free of bias as possible") (attached as Ex. B).[4]

By throwing out more reliable adjudicated data in favor of less reliable unadjudicated

data, Drs. Zambelli-Weiner and Brooks are casting aside the expertise of medical doctors who

specialize in evaluating and diagnosing thrombotic events.  There is no reasonable justification

for doing that, and Drs. Zambelli-Weiner and Brooks offer none.  They could not identify any

problems with Merck's design or implementation of its adjudication protocol.  Zambelli-Weiner

Dep. (Vol. I) 145, 165–66; Brooks Dep. 21–22.  Nor did they identify even a single decision by

any adjudicator that they believe was incorrect.  Brooks Dep. 133 (agreeing that "she did not

know how the adjudication committee adjudicated" the data she reviewed).  Indeed, Dr.

Spyropoulos, who is a medical doctor experienced with adjudication in clinical trials, testified

that Merck's adjudication process was "more than adequate."  *See* Spyropolous Dep. 302.

Drs. Zambelli-Weiner and Brooks's only explanation for ignoring adjudicated data in

favor of unadjudicated data—even where adjudicated data were available—was that Merck's

adjudication process was not in place when the earliest Vioxx trials were conducted.  *See* Opp'n

---

[4]   Notably, Dr. Zambelli-Weiner twice avoided answering whether FDA prefers unadjudicated
      data to adjudicated data.  Zambelli-Weiner Dep. (Vol. II) 251 ("Q. Is it your position that
      FDA prefers unadjudicated data versus adjudicated data? A. I don't think I can speak for
      what the FDA prefers."), 252 ("Q. And is one of the bases for your use of unadjudicated data
      that the FDA has at times preferred unadjudicated data versus adjudicated data? A.  I don't
      recall saying that.").

16.  In effect, Drs. Zambelli-Weiner and Brooks decided that because inferior data was all that was available from *some* trials, *all* of the data had to be inferior.

Plaintiffs are unable to identify even one peer-reviewed article that uses this approach. Instead, they point to instances where Merck or the FDA considered unadjudicated data, ignoring the important distinction that *adjudicated data was not available in those instances*.  Plaintiffs' first example—Merck's March 2004 Final Pooled Analysis—includes unadjudicated data from studies conducted before Merck instituted its adjudication protocol.  Merck's Mot. Ex. E, at 7. But as the text Plaintiffs quote makes clear, Merck used adjudicated data "[w]henever possible." Opp'n 16 (internal quotation marks omitted).  Likewise, in Plaintiffs' Exhibit 3, the FDA explained that it had considered unadjudicated data "[b]ecause the adverse events were not prospectively adjudicated, nor was there a procedure for internal post-hoc adjudication."  FDA, *Addendum to the FDA Briefing Document Endocrinologic and Metabolic Drugs Advisory Committee Meeting* 2 (May 10, 2012) (Opp'n Ex. 3).  Even then, the FDA did not disregard the post-hoc adjudication results, but rather presented them alongside the unadjudicated data.  *Id.* at 6–7.[5]

Not surprisingly, Plaintiffs can find no case law supporting Drs. Zambelli-Weiner and Brooks's decision to ignore available adjudicated data in favor of unadjudicated data.  Plaintiffs cite this Court's *Daubert* ruling concerning Dr. Wayne A. Ray in *Plunkett v. Merck & Co., Inc.*, No. 05-4046 (E.D. La. Filed Aug. 23, 2005).  Opp'n 17 (citing Rec. Doc. No. 1516, at 31–32). But, that case is inapposite.  In *Plunkett*, the Court allowed Dr. Ray's testimony that short-term

---

[5]   Trelle (2011), which was not identified as a basis for any expert's opinion, also notes that "assessor bias in trials without independent adjudication" can result in the overreporting of adverse events.  Opp'n 13.  Of course, disregarding adjudicated data when they exist only serves to exacerbate this problem.

use of Vioxx could cause myocardial infarctions because, among other factors, Dr. Ray

"point[ed] to the raw data of . . . studies as support for his conclusion."  Rec. Doc. No. 1516, at

32 (attached as Ex. C).  But the "raw data" in that instance did not refer to unadjudicated data.

To the contrary, Dr. Ray's report makes clear that he was relying on *adjudicated* data from

VIGOR, APPROVe, and ADVANTAGE.  Ray Rep. 15 n.a, 22 n.b, 23 (attached as Ex. D).

Drs. Zambelli-Weiner and Brooks's decision to use unadjudicated data when

adjudicated data exist is an invalid methodology with no basis in established scientific practice,

logic, or law.  *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) ("[T]he party

seeking to have the district court admit expert testimony must demonstrate that the expert's

findings and conclusions are based on the scientific method, and, therefore, are reliable.").

### D.    Statistically Insignificant Results Are Not Reliable To Establish General Causation Under *Daubert*.

Plaintiffs cite to the *Reference Manual on Scientific Evidence* to support their contention

that an expert need not rely on a statistically significant study to support their theory of general

causation.  *See* Opp'n 32–34 (citing Ref. Man. (2d) at 359).  Remarkably, though, Plaintiffs

ignore binding Fifth Circuit precedent to the contrary, even though it is cited on the same pages

of the *Reference Manual* to which they refer.  *Brock v. Merrell Dow Pharmaceuticals*, 874 F.2d

307 (5th Cir. 1989), is "[t]he leading case advocating statistically significant studies."  Ref. Man.

(2d) 359 n.73; *see also* Ref. Man. (3d) 578 n. 85.  There, the court held that the plaintiffs' failure

to identify a statistically significant study indicated a "lack of conclusive epidemiological proof

[that was] fatal to the [plaintiffs'] case."  874 F.2d at 312–13.

In addition, Plaintiffs cite this Court's *Wagoner* decision six times, yet never reference

that ruling's plain statement of the law:  "An opinion on general causation is inadmissible if it

rests entirely on studies that do not show statistically significant results."  *Wagoner v. Exxon*

*Mobil Corp.*, 813 F. Supp. 2d 771, 800 (E.D. La. 2011); *accord LeBlanc ex rel. LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 99 (5th Cir. 2010) (per curiam) (affirming exclusion of opinion evidence where "some of the studies" relied on by the expert "d[id] not represent statistically significant results," a "common deficienc[y]" that the Fifth Circuit and the Supreme Court "have explained support a district court's exclusion of expert testimony"); *see also* Merck's Mot. 19–20.  Plaintiffs urge no exception to the rule in these cases or argue that they are distinguishable in any way; instead, Plaintiffs simply ignore their inconvenient implications.

In an attempt to remedy the lack of statistical significance generated by their analysis, Drs. Zambelli-Weiner and Brooks arbitrarily multiply by 10 and 30 the number of actual VTE events in their analysis in an attempt to manufacture the statistical significance their analysis fails to achieve on its own.  Plaintiffs claim that a multiplier is appropriate because the Vioxx clinical trials were not designed to detect *asymptomatic* VTE events[6]—i.e., events where the patient experienced no symptoms and that the use of a multiplier to address underreporting "is a common methodological practice" performed "by the FDA and found in peer-reviewed publications."  Opp'n 14–15, 30.  Yet, they fail to identify any legal or scientific precedent accepting the use of a speculative multiplier to establish a statistically significant association between a medication and an injury.  Neither of the two examples they cite supports their argument.

---

[6]   While Dr. Spyropoulos observed that mandatory venography could have been required of all patients in the clinical trials in hopes of detecting otherwise unknowable asymptomatic VTE events, Spyropoulos Dep. 195–96, he also stated that he is not aware of that feature ever having been incorporated into any studies involving anti-inflammatory medications, including in the two Celebrex trials for which he was an investigator.  *See id.* at 245–46. Indeed, he thinks that the Vioxx studies were perfectly adequate, designed properly, and is not critical of them in any way.  *See id.* at 249.

First, Plaintiffs refer to a "preliminary regulatory impact analysis" concerning proposed regulations designed to reduce foodborne illnesses from juice products.  Preliminary Regulatory Impact Analysis and Initial Regulatory Flexibility Analysis of the Proposed Rules to Ensure the Safety of Juice and Juice Products, 63 Fed. Reg. 24,254, at 24,254  (May 1, 1998), (Opp'n Ex. 9).  This impact analysis does not involve the use of hypothetical multipliers to generate statistical significance, but instead to facilitate a cost-benefit analysis of a proposed regulation by roughly estimating the number of juice-related foodborne illnesses not reported to the Center for Disease Control.  *Id.* at  24262–63.  Next, Plaintiffs cite to Mondul (2011), a study that bears no resemblance to Drs. Zambelli-Weiner and Brooks's proffered analysis whatsoever.  Opp'n 30–31 (citing Alison M. Mondul et al., *Minimal Detection Bias in the Inverse Association Between Statin Drug Use and Advanced Prostate Cancer Risk: A Simulation Study*, NIH Pub. Access, Cancer Epidemiol. Author Manuscript 1–14 (Aug. 2011) (Opp'n Ex. 10)).  In Mondul (2011), scientists compared two populations with significantly different rates of PSA screening, the test used to detect prostate cancer—American men (65 percent) and European men (15 percent)—and used estimated values for various other data they used for their analysis.  Mondul, *supra*, at 1–2.  The "simulate scenarios" in this study did not involve the use of multipliers at all, much less using hypothetical multipliers to transform statistically insignificant results into statistically significant results.  *Id.* at 1–2, 4.  These examples are inapposite and do not support the extraordinary leap that Drs. Zambelli-Weiner and Brooks take to manufacture statistical significance.

Even if it were scientifically appropriate to transform a statistically *insignificant* result using actual events into a statistically *significant* result using a hypothetical multiplier, courts reject the use of analytical leaps that lack adequate factual basis.  *See Henricksen v.*

*ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1167–68 (E.D. Wash. 2009) (rejecting an inadequately justified multiplier to approximate benzene exposure as a "leap of faith" (internal quotation marks omitted)).  As Merck has already pointed out, Dr. Spyropoulos readily conceded that it is impossible to know what, if any, multiplier would approximate the number of asymptomatic VTE events that occurred in the Vioxx trials and that multiplying the number of actual events by 30 would be "pure speculation."  Merck's Mot. 22–23 (citing to Dr. Spyropoulos's deposition testimony that the estimated ratio of symptomatic to asymptomatic VTE events in his report is derived from *surgical* patients, who are at a higher risk for VTE than the general medical population that would have been enrolled in the Vioxx clinical studies); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").  Because Drs. Zambelli-Weiner and Brooks's use of speculative multipliers has no scientific basis, conclusions produced using these multipliers also amount to "pure speculation" and must be excluded.

     **E.**    **Because Drs. Zambelli-Weiner and Brooks's Analysis Has Not Been Subjected to Any Form of Peer Review, this Court Should Be "Especially Skeptical" of Its Methodological Rigor.**

While it is true that *Daubert* does not mandate peer review in every circumstance, Opp'n 37, *Daubert* does require that "courts must . . . be especially skeptical of medical and other scientific evidence that has not been subjected to thorough peer review."  *Brock*, 874 F.2d at 313 (affirming exclusion of causation evidence made up of animal studies and statistically insignificant data reanalysis that had not been peer reviewed); *see also Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378–79 (5th Cir. 2010) (affirming exclusion of expert testimony in a pharmaceutical product liability case that lacked support from statistically significant epidemiological studies, had not been subjected to peer review, and lacked general acceptance).

The cases Plaintiffs cite only strengthen the grounds for excluding their experts' general causation testimony. *See* Opp'n 37. In *Knight v. Kirby Inland Marine Inc.*, an expert's opinions were excluded where his analysis, as here, had not been subjected to peer review and was based on statistically insignificant studies. 482 F.3d 347, 354–55 (5th Cir. 2007). In *Wagoner*, the Court allowed reliance on a study that was statistically significant, corroborated by another study the Court deemed reliable, and, other than the absence of peer review, the Court deemed methodologically sound. 813 F. Supp. 2d at 801, 802. That is not the case here.

Here, Drs. Zambelli-Weiner and Brooks excluded the bulk of the placebo-controlled clinical trial data, designed their analysis around time and budgetary constraints, disregarded their conclusions from the placebo-controlled data they did analyze, used unadjudicated rather than adjudicated data, and still failed to arrive at statistically significant findings. Under these circumstances, the fact that Drs. Zambelli-Weiner and Brooks's analysis also has not been subjected to peer review should not only make the Court "especially skeptical" of the Plaintiffs' causation evidence, but erase whatever doubt might remain about whether Drs. Zambelli-Weiner and Brooks's general causation opinions can properly be supported by such a deeply flawed analysis.

## II. THE OPINIONS OF PLAINTIFFS' REMAINING EXPERTS DO NOT ESTABLISH GENERAL CAUSATION.

It is undisputed that Drs. Olyaei and Lucchesi failed to review, and therefore have no opinions about, data from the Vioxx clinical studies. *See* Merck's Mot. 25–28. Plaintiffs argue, however, that Drs. Olyaei and Lucchesi can testify as to general causation anyway because "[e]xpert testimony does not have to be based on epidemiologic or case studies to prove causation." Opp'n 45, 46. Plaintiffs go so far as to assert that this Court, in allowing Dr. Lucchesi to testify in the *Plunkett* trial, "held that in vitro experiments or ***theories on biologic***

*plausibility can suffice as proof of general causation*." *Id.* at 45 (emphasis added).  Needless to say, Plaintiffs' description of this Court's jurisprudence bears little resemblance to the Court's actual ruling.  *See* Rec. Doc. No. 1516, at 39.  In *Plunkett*, unlike what Drs. Olyaei and Lucchesi have done here, Dr. Lucchesi *did* review epidemiological studies and case reports.  Lucchesi Rep. (*Plunkett*) 16–17 (attached as Ex. E).  In fact, Dr. Lucchesi reviewed and considered heart attack data from, among other studies, the APPROVe trial—one of the large, placebo-controlled studies Plaintiffs now ask the Court to ignore.  *Id.* at 43 n.24.

That is entirely different from what Drs. Olyaei and Lucchesi have done for purposes of the VTE cases.  Here, neither has reviewed any of the VTE data from the Vioxx clinical trials, nor do they purport to base their opinions on those data.  *See* Olyaei Dep. 123; Lucchesi Dep. 282–85.[7]  Instead, their opinions are based on theories about biologic plausibility, which the Fifth Circuit has unambiguously found to be, without epidemiologic confirmation, "nothing more than unproven medical speculation lacking any sort of consensus."  *See Brock*, 874 F.2d at 314–15; *see also Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996) (*in vitro* studies are "the beginning, not the end of the scientific inquiry and prove[] nothing about causation without other scientific evidence.").  Indeed, Dr. Olyaei himself seems to appreciate the appropriate limitations on his opinions.  Based on the data he reviewed, his ultimate conclusion was that Vioxx *might* increase the risk of VTE ("a strong signal"), but that such a risk has not been verified.  Merck's Mot. 26–27 (quoting Olyaei Dep. 158).

---

[7]   Plaintiffs do not dispute any of Merck's arguments concerning Dr. Olyaei's reliance on three observational studies, Huerta (2007), Biere-Rafi (2011), and Schmidt (2011).  *See* Merck's Mot. 25–27.

Dr. Spyropoulos—who actually *did* review Vioxx clinical trial data, and found no association between Vioxx and VTE—is similarly limited:

Q.  Okay.  Can you identify any study in which Vioxx was associated with a statistically significant increased risk of VTE compared to placebo?

A.  No.  Not, again, as defined by the study.

Q.  Just so I'm clear, beyond association, are you offering the opinion in this case that Vioxx has been proven to cause VTE?

A.  ***I am not – I'm not saying that at this point we have proof that Vioxx causes VTE***.  ***What I'm saying is that there is biologic plausibility***, mechanistic plausibility, and enough aspects of data collection that is highly suggestive, and makes it plausible that if that data was collected in a different way, or with a more careful process, that we may have seen association between Vioxx and VTE.

Q.  Okay.  So it's your opinion that it's biologically plausibility, correct?

A.  Correct.

Q.  The data we have today doesn't show an increased risk, right?

A.  The way it was collected in the trials, correct.

Spyropoulos Dep. 145–46 (emphasis added).  Plaintiffs' assertion that "Dr. Spyropoulos concludes that Vioxx is associated with an increased risk of VTE," Opp'n 10, is contradicted by his actual testimony.

Plaintiffs cite two cases from courts outside the Fifth Circuit, *Benedi v. McNeil-PPC, Inc.*, 66 F.3d 1378 (4th Cir. 1995), and *Kennedy v. Collagen Corp.*, 161 F.3d 1226 (9th Cir. 1998), for the proposition that epidemiological evidence is not necessary to establish general causation.  Opp'n 4.  Both of these cases, however, have been distinguished by courts on the basis that—in those cases, unlike here—there was no existing body of epidemiological data showing an absence of a causal association.  *See, e.g.*, *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 882 (10th Cir. 2005) (rejecting plaintiff's argument, based on *Benedi* and *Kennedy*,

that epidemiological studies were unnecessary to prove general causation, because in those cases, "unlike the case at hand, there was no body of epidemiological evidence demonstrating the absence of a causal relationship").

Drs. Olyeai and Lucchesi's failure to review the available clinical trial data, and instead to rely on theories about biological plausibility, fails to satisfy the standards established by *Daubert* for experts wishing to testify as to general causation, and any conclusions they wish to offer on that subject should be excluded.

## III.   PLAINTIFFS' FAILURE TO ESTABLISH GENERAL CAUSATION IS FATAL TO THEIR CLAIMS, AND MERCK IS ENTITLED TO SUMMARY JUDGMENT.

Summary judgment should be granted because, with the exclusion of Plaintiffs' experts on general causation, they lack an essential element of proof.  *See In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 616–18 (E.D. La. 2003).  Accordingly, Merck renewed its motion for summary judgment in the VTE cases.[8]  Plaintiffs bear the burden of proving general causation— that that there is a causal relationship between taking Vioxx and VTEs.  *See Knight*, 482 F.3d at 351 ("'General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury.'" (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997)).  Moreover, Plaintiffs must establish the existence of general causation before consideration of specific causation.  "If [a] plaintiff has not demonstrated sufficiently reliable evidence of general causation, her claims fail and there is no need to consider specific

---

[8]   Rather than respond in substance to Merck's request for entry of summary judgment, Plaintiffs filed a Motion For Continued Remand Of Merck's Renewed Summary Judgment Motion In VTE Cases.  As a practical matter, the substantive issues to be resolved by the Court on the *Daubert* motions are dispositive on the matter of summary judgment.

causation." *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 525 (W.D. Pa. 2003) (emphases omitted).

As described above, Plaintiffs' experts' opinions fall short of the level of proof necessary to establish general causation, an essential element of Plaintiffs' claims.  Courts, including this court, have ruled that when plaintiffs' general causation experts are excluded under *Daubert*, summary judgment should be granted as well.  *See, e.g.*, *In re Propulsid*, 261 F. Supp. 2d at 616–18 (granting summary judgment where plaintiffs' experts' testimony on causation was excluded because it was scientifically unreliable and irrelevant); *In re Viagra Prod. Liab. Litig.*, 658 F. Supp. 2d 950, 968 (D. Minn. 2009) (granting defendant's motion for summary judgment "[b]ecause Plaintiffs have failed to produce admissible expert testimony" establishing causation); *Glastetter v. Novartis Pharm. Corp.*, 107 F. Supp. 2d 1015, 1016 (E.D. Mo. 2000) ("[T]he Court concludes that defendant is entitled to summary judgment, because plaintiffs' evidence of causation fails the test for scientific reliability set forth in *Daubert*."), *aff'd*, 252 F.3d 986 (8th Cir. 2001); *Pick v. Am. Med. Sys., Inc.*, 958 F. Supp. 1151, 1179 (E.D. La. 1997) (granting summary judgment where plaintiffs' expert evidence regarding general causation and specific causation were inadmissible); *Sutera v. Perrier Grp. of Am. Inc.*, 986 F. Supp. 655, 667–68 (D. Mass. 1997) (granting summary judgment where expert offers "no testing, peer-reviewed literature or other reliable scientific methodology or basis for his conclusion" that defendant's product caused plaintiff's illness); *Allen*, 102 F.3d at 197 (affirming summary judgment because "not a single scientific study has revealed a link between human brain cancer and EtO exposure"); *Brock*, 874 F.3d at 312–13 (affirming JNOV where "[t]he plaintiffs did not offer one statistically significant . . . study that concludes that Bendectin is a human teratogen" and

concluding that "the lack of conclusive epidemiological proof [was] fatal to the [plaintiffs'] case").

This Court's reasoning in *Propulsid* applies with equal force to the claims presented here. In *Propulsid*, this Court excluded the plaintiff's experts on causation for numerous reasons. 261 F. Supp. 2d at 617. The Court then also entered summary judgment in favor of the defendant. As the Court explained, "[w]ith the exclusion of the plaintiff's experts on causation, the plaintiff lacks an essential element of proof." *Id.* at 618. As set forth above, Plaintiffs' proffered expert opinions regarding general causation are deeply flawed in a variety of ways. "With the exclusion of the plaintiff[s'] experts on causation, [they] lack[] an essential element of proof." *Id.* "Accordingly, summary judgment is appropriate, and the plaintiff[s'] claim[s] should be dismissed." *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs' experts' general causation opinions should be excluded and summary judgment granted in the VTE Cases.

Dated:  February 15, 2012                    Respectfully submitted,

By: _/s/ Dorothy H. Wimberly_
    Phillip A. Wittmann, 13625
    Dorothy H. Wimberly, 18509
    STONE PIGMAN WALTHER
    WITTMANN L.L.C.
    546 Carondelet Street
    New Orleans, LA 70130
    Phone: 504-581-3200
    Fax:    504-581-3361

Defendants' Liaison Counsel

 —and—

    Douglas R. Marvin
    Eva Petko Esber

23

M. Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Phone: 202-434-5000
Fax:    202-434-5029

John H. Beisner
Jessica Davidson Miller
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005

ATTORNEYS FOR MERCK SHARP &
DOHME CORP

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Memorandum in Support of Merck Sharp & Dohme Corp.'s Consolidated Motion to Exclude Opinion Testimony on General Causation and Renewed Motion for Summary Judgment in VTE Cases has been served on Liaison Counsel, Russ Herman, Phillip Wittmann, and Ann Oldfather, by U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8C, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 15th day of February, 2013.

<div style="margin-left: 50%;">

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA  70130
Phone:  504-581-3200
Fax:      504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

</div>