*Exhibits*

# Table of Contents

## MOTION

1:    **PLAINTIFF DENNIS R. Harrison's MOTION TO COMPEL DEFENDANT MERCK TO PROVIDE INITIAL DISCLOSURE TO PLAINTIFF**

(Motion is provided via email/PDF. It is identified as **"Motion – HARRISON"**)

## EXHIBITS

(Exhibits under separate cover  also via email/PDF– i.e. identified as
**"EXHIBITS - HARRISON"**

2:    **EXHIBITS**

Exhibit 1:    Good faith effort certification

Exhibit 2:    Communications of Plaintiff and Merck in re to Discovery

Exhibit 3:    Background

Exhibit 4:    Motion to vacate CTO 64

Exhibit 5:    Notice of Opposition

Exhibit 6:    Alarm & Concern – The making of a nightmare Discovery scenario
              **(PLEASE NOTE content deleted; data redundant exhibit not utilized)**

Exhibit 7:    Plaintiff Hearing in NOLA on 12-14-06

Exhibit 8:    Plaintiff Hearing attachment; Bone/Spine
              Repair/Healing Litigation issues

Exhibit 9:    Opposition Memorandum – excerpts

Exhibit 10:   PSC-1 letter

Exhibit 11:   Plaintiff protests of "one way" Discovery
              **(PLEASE NOTE content deleted; data redundant exhibit not utilized)**

Exhibit 12:   Providing PPF & Interrogatories under protest and duress
              **(PLEASE NOTE content deleted; data redundant exhibit not utilized)**

Exhibit 13:   Understanding a bigger picture by Q/A

## EXHIBIT 1:   GOOD FAITH EFFORT CERTIFICATION

**_Requirement_**:

PTO 17 (IV) (A)  requires the movant conferring in good faith with Merck to resolve the issue.

**"Pre-filing Consultation:**   No motion shall be filed unless it includes a certificate that the movant  has conferred with opposing counsel in a good faith effort to resolve the matter without court action".

> _**Plaintiff sends email to Merck** so that he may **assure the court good faith** and provides **one more opportunity for Merck to comply:**_

_12-18-2012_

Emily

In order to assure the court that we have not been able to resolve the issue regarding Merck providing me with initial disclosure, I would like to assure that is still the case. Please let me know if anything has changed. I remain hopeful that Merck would re-assess the intent and spirit of both PTO 17 and PTO 18 (C) - and how they relate. If I do not hear from you or Dorothy by Wednesday afternoon I will submit the Motion, the notice of hearing, the proposed order, and certify that _we have both_ made a good faith effort to "resolve the matter" without court action.

Also, so that I may coordinate dates with the court for the hearing, please provide three dates in which Merck would be available for the hearing.

Thank you,
Dennis Harrison
MBA/BGS

**_Certification Statement_**:

This is certification of good faith effort to resolve the impasse of Plaintiff, Dennis R. Harrison, and Defendant, Merck & Co., Inc. ("Merck"), in regard to provisioning of Initial Disclosure.

I, Dennis Harrison certify that I have conferred with Merck counsel, in a good faith effort  to resolve the matter of Merck's refusal to provide Rule 26 (a) Discovery (Initial Disclosure) per the Federal Rules of Civil Procedure.

I declare under penalty of perjury subject to 28 U.S.C. § 1746 that all of the foregoing and below is true and correct.  More detail is documented in Exhibit Communications with Merck.

_Dennis R Harrison_

_____

Dennis R. Harrison
February 10, 2013

# EXHIBIT 2:  COMMUNICATIONS
# OF PLAINTIFF AND MERCK IN RE TO DISCOVERY

*Exhibit XX Communications of Plaintiff and Merck in re to Discovery*

Even though Plaintiff did not receive ANY disclosure which Merck had a duty to disclose

without awaiting formal discovery process,  and not withstanding Merck's error in,, or otherwise,

interpreting the Court's intentions to ensure proper Disclosure/Discovery as prescribed in PTO

18C(18), *Plaintiff requested Initial Disclosure.*

Plaintiff requests Discovery – first the *"compass" of Discovery – Initial Disclosure.*

**11/10/2012**
*...  per FRCL[sic] (26) (a) please provide the initial disclosures, and all documents required by the FRCL[sic] which relate to Vioxx and bone/spine issues.* This includes names and addresses of individuals who may have knowledge of the bone/spine allegations, communications with the FDA (they did express concern),  communications with independent research (such as the NJ team that warned PSC-1), communications with Merck paid consultants such as Thomas Einhorn (who told me never to contact him again), mitigation plans "in case any issues arise" per Merck meeting minutes, any testing results in re to bone/spine before or after Merck released Vioxx, any testing, warnings, concerns, etc. on any testing, viewpoints, or proof of due diligence Merck had in re to its impact when used with other medications, any numerical calculations on additional incremental sales attributed to not disclosing or pursuing the bone/spine allegations (which include both healing and potential decrease of bone density), anything which addresses concurrent usage of Vioxx and Fosamax, Merck's various views on animal testing etc. *The above are examples of what I mostly would expect to exist, but are not meant to be all inclusive.*

----- > (note: Plaintiff reminds Merck that he has cooperated fully) < -----

*By virtue of completing the interrogatories and especially the PPF, I have met the FRCL[sic] requirements last year.* In addition I recently provided thousands of electronic files and a great amount of detail in my (approx) seven hour deposition.

----- > (note: Plaintiff reminds Merck that per the FRCP, Merck should have provided Discovery on their own) < -----

*The FRCL[sic] does indicate I am due this even without a discovery request.* The litigation's "front end" no less than, via *its mass tort processing, facilitated Merck to obtain the above type of information before a litigant, especially in re to "other injuries".*

*Merck responds:*

11/15/12

... With respect to your question about initial disclosures, under PTO 17, all parties in the Vioxx MDL are relieved from the requirement to make initial disclosures under Rule 26(a).

*The following are the bullet item categorization of the Plaintiff and Merck's communications. Please see the beginning of the Exhibit XX Communications of Plaintiff and Merck in re to Discovery.*

*Plaintiff requests Merck to evaluate PTO 17, in light of PTO 18 (s.b. 18C) – Plaintif, in this motion, adds bold/italics for emphasis.*

**11-28-2012**

Please also review PTO 18A*[sic]*. It states that my PPF and the Interrogatories satisfy Rule26 (a) as I was my position.... **it states the PSC and DSC were to develop a Profile form for non CV injuries...**

Again (as in PTO 17) the order (PTO 18 (a)*[sic]*) is *the domain of mi/stroke* and certainly could not have been developed or intended to have a damaging impact on "other injuries", as it also may inadvertently have. PTO 17 and PTO 18 should be re-evaluated by the court in view of the result culminating in denial of my Rule (26) rights by Merck, let alone other litigant's also.

The PSC and DSC *(NOTE:* later in this brief noted as the "Discovery team") were supposed to address non mi/stroke cases in this PTO. *Please let me know if you have, or can locate evidence of a good faith effort between the DSC and PSC to develop procedures which would provide the equivalent of Rule 26 for non mi cases.* If procedures were *not developed, please provide the ration*ale why not. If *procedures were developed, please provide* them or where I can locate them.

My belief is that non-mi cases were not addressed, further complicating the issue of *Merck's denial of my Discovery rights and that of many others*.

There are some very serious Discovery mis-steps here which must be rectified. Also with the many civil right violations accumulating and having reached a dangerous inertia this case has civil right errors and violations stamped all over it. If necessary, that will be on my agenda if these issues are not resolved and this case gets on a fair and just track. I would argue that the consequences go beyond "only" my case and the cascading and spiraling events need the highest level of judicial notification possible for the good of the public...

*Merck responds: (NOTE: for clarity of presentation, Merck response comes after the second email (below) which is more affirmative in asking for Discovery Initial Disclosure:*

**11/28/2012**

... Merck likewise cannot agree to your proposals regarding modifications of the Court's pretrial orders.

If you decide to file a motion or motions with the Court addressing the issues above, Merck will respond accordingly.

*Email (2nd of two – preceded the above; order exchanged for clarity) from Plaintiff:*

**11/28/2012**
Ms. Pistilli

This is a second request for the Discovery Information per Rule 26 (a). As per the court's direction we are under obligation to work together to resolve any differences we have, and lacking a solution we have justification to seek resolution by the court. Shall we not come to a resolution on this matter, it is proper for me to seek the court's intervention and I will certify that I have made a good faith effort to resolve the issue.

Merck's refusal to meet Rule 26 (a) requirements calls into question Merck's good faith efforts in the pre-trial proceedings. Merck is fully aware that denying the FRCL Discovery requirements is absolutely fatal to my case. Without proper initial Discovery compliance, virtually all formal future Discovery requests are unreasonably, and undeniably crippled. Merck and I fully understand that I cannot obtain fair application of Justice with my rights to Discovery being denied.

Surely PTO 17 (II) (A) was never intended by the court to provide Merck an unfair, unjust denial of my Discovery rights, nor any other aspects of Discovery, of which I am entitled to.

PTO 17 was created in the spirit of streamlining the MDL proceedings. This includes limiting redundancy, cost control, consistency, and more. The goals of PTO 17 target how information would be exchanged between Merck and the PSC, coordination with other Courts, avoidance of duplicative requests, Request for Admissions, etc. PTO 17 is fair and just in the letter of the law and its spirit for MI, stroke, and possibly for some other CV's. The intent of PTO 17 surely was not meant in the spirit to quash the "non-mainstream" PI's.

As Merck well knows, my case is neither MI, stroke, nor CV. Merck fully understands the MDL proceedings, especially Discovery, have been oriented towards those injuries only. This continues to be the case and disadvantages these cases ("non-mainstream" cases). Merck utilized (abused) its rights to remove and transfer my case fully understanding that my Discovery rights would be unfairly handicapped, and now per Merck's refusal to meet FRCL*[sic]* requirements, no less than unjustly, lethally wound my case.

Merck's refusal of my Discovery rights cannot be justified by the intent of PTO 17. Merck's action to shield itself via PTO 17, is hostile to good faith pretrial cooperation. Further, Merck's actions continue to display an abuse of the powers granted to Merck to remove cases and is supportive of that power being more regulated and monitored. While I had prepared more information in re to the last sentence in support of my second request for disclosure, I placed it after this communique*[sic]* to keep the focus on the immediate question of PTO-17.

Suffice it to say, for now, that a nightmare scenario, that of one way discovery is rearing its unjust head. I expressed this potential catastrophy*[sic]* hurtling towards my case, to the Court, Merck, and PSC when Merck threatened dismissal near two years ago. I agreed to provide the information (PPF and Interrogatories) when the multi-year stay was lifted, and I did provide all of it. Recently I provided a very large amount of electronic information, my deposition, and my Lone Pine witness's deposition. I have only been transparent and I have met all of my obligations. I ask now that Merck do the same and defend on merits not chickery*[sic]*.

In summary, in light of the above I am asking Merck to formally re-evaluate its position on providing me with what I am entitled to. My Discovery, determining who to depose, content of interrogoratories*[sic]*, etc. cannot proceed until Merck complies with rule 26 (a). I only have one opportunity for interrogatories and cannot gain a second without leave of court.

Shall Merck continue to craft PTO 17 unfairly in its own interest to shield vital evidence and information which can lead to proper evidence, I will certify that I have acted in good faith and Motion the court to amend or rescind that order in recognition that it mistakenly quashes my case. The remedy should also apply to all cases not clearly having had the benefit of a PSC and proper-pre trial preparation by the PSC (many, if not most "other injuries).

Please let me know how Merck would like to proceed on this vital Discovery impasse.

Supporting Background

I bring to Merck's attention (below) additional actions by Merck in order to fortify my position in re to Rule (26) (a), the conflict (for "other injuries") with PTO 17 that has ocurred*[sic]*, and Merck's unjust use of such. It is intended to help one understand that Merck has unreasonably utilized procedure not to facilitate a case, but as a harsh tool. This "tool" is not to supplement Merck's defense on the merits, but to supplant them. These actions, among others, continue to accelerate as "practice and pattern", as well as "ill gotten gains" becomes an accepted practice by Merck Corporate. The settlements that Merck Corporate continues to accept, without admitting guilt, are merely a (relatively) minor cost of doing business and encourage reckless behavior rather than inhibit it.

Merck very well understood, and targeted non-mainstream cases, tellingly referred to as "other injuries", into an abyss virtually doomed by procedures which were mass tort oriented for injuries that they did not even have. The same reasoning applies to at least a number of "other injuries" in the MDL.

Merck fully understood it was exercising its right of removal (one common fact) to seek procedural leverage, and certainly not to defend the allegations based upon on the facts. This has become more evident over time for example:

(1) Merck responded, deceitfully, to my formal appeal to the MDL Panel to remain within the venue of NY.

(2) Merck was an attendee at the meeting I had on December of 2006 in which I expressed concern that my injury was not being represented.Merck's position at that meeting was not in good faith.

(3) Merck fully knew and knows that the PSC, a PSC that was a product of an MDL in which Merck supported and (wrongly) forced my case into, would not fairly represent my pre-trial needs. Merck is aware that the PSC absolutely refused to represent my interests as one would expect in an MDL .The PSC view was that "they would not represent my injury", and that "I would have to do so myself. There is sufficient fact and history that Merck knew of the PSC's view before my case was targeted for marginalization and isolation into an unsuitable environment.
(4) The Science of Vioxx/bone healing, and likely bone density is compelling. Merck knew of the issues as early as 1998 (via internal Merck email) and did not make a good faith effort to investigate the issues. Instead, Merck stated it would have mitigation plans "should the need arise". Merck had more than sufficient information

and sources, including its own paid consultant, warning of a major problem. It is reckless to establish a position of "should the need arise", it is more reckless to not even address the issue properly when well past the need arising.

Merck knew, or should have known, that placing my case up into the MDL would isolate and marginalize it. Merck knew that this case would not receive any benefits of an MDL and that Merck itself would maneuver itself into an unfair advantage. REFUSING TO ADHER*[sic]* BY THE FRCL IS ONE MORE SYMPTOM OF MERCK'S ABUSE AND MANIPULATION OF THE COURTs.

### *Plaintiff had hoped that he provided enough rationale and tries yet one more time...*

**Decembr 18, 2012**
In order to assure the court that we have not been able to resolve the issue regarding Merck providing me with initial disclosure, I would like to assure that is still the case. Please let me know if anything has changed. I remain hopeful that Merck would re-assess the intent and spirit of both PTO 17 and PTO i8 (C) - and how they relate. If I do not hear from you or Dorothy by Wednesday afternoon I will submit the Motion, the notice of hearing, the proposed order, and certify that *we have both* made a good faith effort to "resolve the matter" without court action.

Also, so that I may coordinate dates with the court for the hearing, please provide three dates in which Merck would be available for the hearing.

Thank you,
Dennis Harrison MBA/BGS

### *Merck refuses again in spite of many attempts and providing the core logic of this motion. Pro se Plaintiff is of the Merck feels it cannot defend itself on the merits.*

**December 18, 2012**
As we have previously pointed out, the Court's pretrial orders explicitly exempt the parties in this litigation from the initial disclosure requirements of FRCP 26(a). Moreover, Merck has already produced millions of pages of documents and voluminous discovery responses since the start of this litigation. You can work with the PSC and your Liaison Counsel to access those materials if you have not already.

If you decide to file a motion with the Court, Merck will file a written response, and would be available for a hearing or conference with the Court regarding the same at the Court's convenience.

Plaintiff finds it "interesting" that Merck is now bringing up the Document depository. Plaintiff understands that the Document Depository is **NOT applicable for bone/spine** and states so, has communicated it many times in many ways, informal and formal briefs. *Merck waited near one month to use this "red herring" approach.* IF it was a valid response, it would have been *much earlier* in this dialogue.

*Plaintiff's final response on the refusal of Merck for Discovery Initial Disclosure:*

Emily - thank you for getting back to me, I do appreciate it. I can certify that we both sincerely did attempt to agree, thus Merck and I did act with good faith on this issue. We simply agree to disagree. Thank you for providing additional views.

I will provide compelling rationale in the Motion. My formal Discovery efforts would certainly not be complete or useful depending on the Depository. I absolutely require true Initial Disclosure or its substantial equivalent.

In re to the Document Depository, I understand your email indicating that "Merck has already produced millions of pages of documents and voluminous discovery responses since the start of this litigation". However, the question is if ANY significant information is useful for MY DISCOVERY NEEDS, specifically Initial Disclosure relative to bone/spine. Further, does Merck truly take the position that the depository adequately substitutes for Initial Disclosure?

The first PSC (PSC-I) was adamant that they would NOT consider bone issues in their Discovery pursuit. The PSC and DSC, per the FRCL were under obligation to cooperate and work honestly together - the DSC agreed with the PSC. Both groups knew of my Discovery needs at the very latest December 14, 2006 - over six years ago! Therefore I have no reason to believe that the Document Depository is substantially equivalent to Initial Disclosure for my bone repair allegations. I absolutely do wish that the Depository could be used for "Initial Discovery" in re to bone/spine. Unfortunately using the Depository for bone issues is like a dog chasing his tail or chasing the proverbial rainbow.

If there were to be any information in re to bone/spine issues of healing, or even of its potential to contribute to osteoporosis, it would merely be incidental, not followed through and not useful. It is not credible that the same individuals who repudiated their true responsibility to pursue my PI, and who also were the document depository originators, would include usable evidence supportive of the allegations in re to my injury. I just cannot see any credulous argument that bone/spine would be or was properly pursued in the document depository.

Please note additional argument follows. Is anyone able to show otherwise? Could the PSC swear that they included bone issues in their pursuit? Can Merck swear that there is indeed sufficient, proper and complete bone issue information in the Document Depository? If so, that may be a useful proxy for true Initial Discovery - though it likely is not in the format and usability it should be. If Merck does not know if there is the functional and content equivalent of Initial Discovery in the Depository, how could I be directed there? The same (preceding) question is applicable if Merck knows there is virtually no, or a very limited subset of bone/spine information available in the Document depository? What is Merck's position in that regard?

Virtually all aspects of this litigation were very specifically for MI/CV. A reasonable assessment of the proceedings would easily recognize that.

PTO 17/18(C) especially taken together, clearly are supportive of that fact (above). I am certain that the Honorable Judge Fallon had no intention of crippling "other injuries" cases (Discovery) via PTO 17. PTO 17 is indeed useful to apply upon MI/CV for streamlining, efficiency, and preventing redundant requests, however it's applicability is not productive for injuries not in that class such as bone issues. Targeting PTO 17 towards MI/CV is also directly evidenced by PTO 18(C) in which the Honorable Judge Fallon does request the PSC/DSC develop separate procedures from MI/CV for these "other injuries". The PSC/DSC did not do so

- if they did, please let me know. It is difficult to imagine how the PSC and DSC did not understand the malignancy of their omission and neglect.

Merck is unfairly, and not in good faith, denying me a proper Discovery path, basically right at the start of Formal Discovery. Merck is sending me on a wild goose chase by suggesting the Document Depository is a valid proxy for orderly, specific information which is by the FRCL intended to provide me with who/what Merck may use for its defense.

It is a fairly tale, not grounded upon any credible fact, assumption or reference to believe the Document Depository is a valid proxy for my Initial Discovery needs. The FRCL, in several (committee notes) instances states that the Discovery process is not to be used as a weapon, not to waste time, not to unduly burden, etc. - such is the case here.

I absolutely need initial disclosure. Merck has mine in the form of the PPF as per the PTOs, but I do not have initial disclosure or its equivalent from Merck. For that matter, Merck has a virtual library of information from me. I fully complied with Discovery, even though as is documented I have been concerned that my litigation was in jeopardy of one way Discovery violating my Civil Rights, which it now is.

Per the FRCL, whatever Merck does not provide, for example (but not all inclusive) individual names and the reason for each name of potential witness's, Merck cannot use in trial. What should be provided with Initial Disclosure and is not, precludes Merck from using that evidence/person in trial. It would seem that it is also of Merck's benefit to cooperate and abide by complying with its Initial Discovery Responsibilities or it will risk its defense.

When a ship is on a journey, it must point in the right direction. Shall that ship continue in the wrong direction, without correction, it will not arrive in its intended location. As the ship begins its journey, a simple, one degree off is likely not even to be noticeable at first. However, that error over a long journey is magnified all along the way. The longer the journey, the more inaccurate the ship is. The simple one degree error is magnified more and more during the ship's journey and the longer the journey, the more magnified the initial error becomes. The error here is the refusal of Merck to provide initial disclosure. The destination is (are) the depositions and Interrogatories.

It is meaningful that my injury, and many others, would acquire the naming convention of "other injuries". The mere segregation and reference per "other injuries" has a negative connotation. This is also serves to marginalize and isolate "other injuries" and it has.

Initial Disclosure's goals are to provide a proper path for the other stages of Discovery. Proper, thorough, relevant and truly useful interrogatories and depositions cannot be developed without initial disclosure in my case. I simply cannot pursue my litigation without the initial disclosures. The FRCL clearly intends Rule 26 (a), or its equivalent to provide a compass for proper and efficient Discovery requests. Further the information is supposed to be relevant and usable. Besides lacking relevancy, the "millions of pages" are not practical to sort through. In fact simple interpretation of the PSC's stated position means that the depository is virtually worthless for bone issues. There may be a few references to bone repair, but there is not anything at all to support that the depository, for bone healing issues is a substantial equivalent to Initial Disclosure.

I put forth this proposition. I would agree that initial disclosures for my litigation are substantially met IF:

1 - the creators are willing to sign an affidavit that I would author, swearing under oath that they pursued bone healing issues with equal thoroughness as the MI issues and,

2 - they swear that there is useful information for the bone repair issue in the Document Depository and,

3 - in their legal opinion the above is at minimum reasonably equivalent to Initial Disclosure. **OR that**

1 - the creators are willing to sign an affidavit that I would author, swearing under oath that they pursued bone healing issues with equal thoroughness as the MI issues and

2 - can show, without doubt, that that they did in fact pursue the bone repair issue via presenting information in the document depository indicating so. This is whether or not they uncovered incriminating evidence and,

3 - in their legal opinion the above is at minimum reasonably equivalent to Initial Disclosure.

I would suggest that an independent entity, with no stake in the outcome, be the one who determines if the above is met. The above is simply a first view of what could solve this impasse and how to proceed - of course Merck would have input.

Early on I began to notice what I felt was somewhat peculiar events/communications with my litigation. I felt unjustly, via letter of the law (one common fact, which needs to be re-valuated) not the spirit of the law that I was cast into a legally hostile environment. I protested, I formally appealed, I got up when I was unfairly knocked down. I did the best that I could to stop the speeding inertia of unfairness, starting with the removal of my case regardless of valid concerns - expressed informally and formally via objection and appeal. My quest began by visiting NOLA to obtain the pre-trial support which is, ironically, the reason (common Discovery) why PSC's and MDL's exist. I have this thoroughly documented.

Imagine being a litigant, forced to a venue for "common discovery being told things like "we are not pursuing your type of injury," "you have to do it yourself", "no-one wants to represent bone issues", etc. On top of that knowing a "settlement" comes along not accepting your PI and constantly having to swallow one-way Discovery, objecting many times but not once being given a proper or reasonable answer.

It can be shown that my injury was isolated for purpose of marginalization and ultimately hurdled "under the bus" as they say. As Merck was granted power to move and remove cases, I do hold Merck accountable for a knowing abuse of power, and now impeding justice.

Dennis Harison
MBA - BGS


If Merck does not cooperate with Discovery requests, Plaintiff would be forced to look towards other, informal means to gain much of what he should have had the benefit of Initial Disclosure with. Furthermore, the quality and endurance of the data is sub-par. and not a substantial equivalent*.

* Per FRCP Comittee notes "The importance of the materials sought to the party seeking them in preparation of his case and the difficulty he will have obtaining them by other means are factors noted in the Hickman case. The courts should also consider the likelihood that *the party, even if he obtains the information by independent means, will not have the substantial equivalent of the documents the production of which he seeks*". *

## ORIGINAL, SNAPSHOTs OF COMMUNICATIONS OF PLAINTIFF AND MERCK IN RE TO DISCOVERY

### initial disclosure impasse  Inbox

| | |
|---|---|
| **Dennis Harrison** <badbonehealing@gmail.com> | Tue, Dec 18, 2012 at 12:16 AM |

To: "Pistilli, Emily" <EPistilli@wc.com>
Cc: "Wimberly, Dorothy H." <DWimberly@stonepigman.com>, Ann Oldfather <aoldfather@oldfather.com>, mhastings@oldfather.com, Colleen Shields <cms@oldfather.com>, "Michelle L. Chiavene" <mlc@oldfather.com>

Reply | Reply to all | Forward | Print | Delete | Show original

Hello Emily

In order to assure the court that we have not been able to resolve the issue regarding Merck providing me with initial disclosure, I would like to assure that is still the case. Please let me know if anything has changed. I remain hopeful that Merck would re-assess the intent and spirit of both PTO 17 and PTO 18 (C) - and how they relate. If I do not hear from you or Dorothy by Wednesday afternoon I will submit the Motion, the notice of hearing, the proposed order, and certify that **we have both** made a good faith effort to "resolve the matter" without court action.

Also, so that I may coordinate dates with the court for the hearing, please provide three dates in which Merck would be available for the hearing.

Thank you,

Dennis Harrison
MBA/BGS

Per *request of the court in PTO 17*

"No motion shall be filed unless it includes a certificate that the movant has conferred with opposing counsel in a good faith effort to resolve the matter without court action. Such conferences may take place by telephone."

**Dennis Harrison** <badbonehealing@gmail.com>                              Wed, Dec 19, 2012 at 2:21 AM
To: Emily Pistilli <EPistilli@wc.com>
Cc: "Dorothy H. Wimberly" <DWimberly@stonepigman.com>, Ann Oldfather <aoldfather@oldfather.com>,
mhastings@oldfather.com, Colleen Shields <cms@oldfather.com>, "Michele L. Chiavere"
<mlc@oldfather.com>

Reply | Reply to all | Forward | Print | Delete | Show original

Emily - thank you for getting back to me. I do appreciate it. I can certify that we both sincerely did attempt
to agree, thus Merck and I did act with good faith on this issue. We simply agree to disagree. Thank you
for providing additional views.

I will provide compelling rationale in the Motion. My formal Discovery efforts would certainly not be
complete or useful depending on the Depository. I absolutely require true Initial Disclosure or its substantial
equivalent.

In re to the Document Depository, I understand your email indicating that "Merck has already produced
millions of pages of documents and voluminous discovery responses since the start of this litigation".
However, the question is if ANY significant information is useful for MY DISCOVERY NEEDS, specifically
Initial Disclosure relative to bone/spine. Further, does Merck truly take the position that the depository
adequately substitutes for Initial Disclosure?

The first PSC (PSC-I) was adamant that they would NOT consider bone issues in their Discovery pursuit.
The PSC and DSC, per the FRCL were under obligation to cooperate and work honestly together - the DSC
agreed with the PSC. Both groups knew of my Discovery needs at the very latest December 14, 2006 -
over six years ago! Therefore I have no reason to believe that the Document Depository is substantially
equivalent to Initial Disclosure for my bone repair allegations. I absolutely do wish that the Depository could
be used for "Initial Discovery" in re to bone/spine. Unfortunately using the Depository for bone issues is like
a dog chasing his tail or chasing the proverbial rainbow.

If there were to be any information in re to bone/spine issues of healing, or even of its potential to contribute
to osteoporosis, it would merely be incidental, not followed through and not useful. It is not credible that the
same individuals who repudiated their true responsibility to pursue my PI, and who also were the document
depository originators, would include usable evidence supportive of the allegations in re to my injury. I just
cannot see any credulous argument that bone/spine would be or was properly pursued in the document
depository.

Please note additional argument follows. Is anyone able to show otherwise? Could the PSC swear that
they included bone issues in their pursuit? Can Merck swear that there is indeed sufficient, proper and
complete bone issue information in the Document Depository? If so, that may be a useful proxy for true
Initial Discovery - though it likely is not in the format and usability it should be.  If Merck does not know if
there is the functional and content equivalent of Initial Discovery in the Depository, how could I be directed
there? The same (preceding) question is applicable if Merck knows there is virtually no, or a very limited
subset of bone/spine information available in the Document depository? What is Merck's position in that
regard?

PTO 17/18(C) especially taken together, clearly are supportive of that fact (above). I am certain that the Honorable Judge Fallon had no intention of crippling "other injuries" cases (Discovery) via PTO 17. PTO 17 is indeed useful to apply upon MI/CV for streamlining, efficiency, and preventing redundant requests, however it's applicability is not productive for injuries not in that class such as bone issues. Targeting PTO 17 towards MI/CV is also directly evidenced by PTO 18(C) in which the Honorable Judge Fallon does request the PSC/DSC develop separate procedures from MI/CV for these "other injuries". The PSC/DSC did not do so - if they did, please let me know. It is difficult to imagine how the PSC and DSC did not understand the malignancy of their omission and neglect.

Merck is unfairly, and not in good faith, denying me a proper Discovery path, basically right at the start of Formal Discovery. Merck is sending me on a wild goose chase by suggesting the Document Depository is a valid proxy for orderly, specific information which is by the FRCL intended to provide me with who/what Merck may use for its defense.

It is a fairly tale, not grounded upon any credible fact, assumption or reference to believe the Document Depository is a valid proxy for my Initial Discovery needs. The FRCL, in several (committee notes) instances states that the Discovery process is not to be used as a weapon, not to waste time, not to unduly burden, etc. - such is the case here.

I absolutely need initial disclosure. Merck has mine in the form of the PPF as per the PTOs, but I do not have initial disclosure or its equivalent from Merck. For that matter, Merck has a virtual library of information from me. I fully complied with Discovery, even though as is documented I have been concerned that my litigation was in jeopardy of one way Discovery violating my Civil Rights, which it now is.

Per the FRCL, whatever Merck does not provide, for example (but not all inclusive) individual names and the reason for each name of potential witness's, Merck cannot use in trial. What should be provided with Initial Disclosure and is not, precludes Merck from using that evidence/person in trial. It would seem that it is also of Merck's benefit to cooperate and abide by complying with its Initial Discovery Responsibilities or it will risk its defense.

When a ship is on a journey, it must point in the right direction. Shall that ship continue in the wrong direction, without correction, it will not arrive in its intended location. As the ship begins its journey, a simple, one degree off is likely not even to be noticeable at first. However, that error over a long journey is magnified all along the way. The longer the journey, the more inaccurate the ship is. The simple one degree error is magnified more and more during the ship's journey and the longer the journey, the more magnified the initial error becomes. The error here is the refusal of Merck to provide initial disclosure. The destination is (are) the depositions and Interrogatories.

It is meaningful that my injury, and many others, would acquire the naming convention of "other injuries". The mere segregation and reference per "other injuries" has a negative connotation. This is also serves to marginalize and isolate "other injuries" and it has.

Initial Disclosure's goals are to provide a proper path for the other stages of Discovery. Proper, thorough, relevant and truly useful interrogatories and depositions cannot be developed without initial disclosure in my case. I simply cannot pursue my litigation without the initial disclosures. The FRCL clearly intends Rule 26 (a), as is equivalent to provide a compass for proper and efficient Discovery requests. Further the information is supposed to be relevant and usable. Besides lacking relevancy, the "millions of pages" are not practical to sort through. In fact simple interpretation of the PSC's stated position means that the depository is virtually worthless for bone issues. There may be a few references to bone repair, but there is not anything at all to support that the depository, for bone healing issues is a substantial equivalent to Initial Disclosure.

I put forth this proposition. I would agree that initial disclosures for my litigation are substantially met IF:

1 - the creators are willing to sign an affidavit that I would author, swearing under oath that they pursued bone healing issues with equal thoroughness as the MI issues and,

2 - they swear that there is useful information for the bone repair issue in the Document Depository and,

3 - in their legal opinion the above is at minimum reasonably  equivalent to Initial Disclosure.

OR that

1 - the creators are willing to sign an affidavit that I would author, swearing under oath that they pursued bone healing issues with equal thoroughness as the MI issues and,

2 - can show, without doubt, that that they did in fact pursue the bone repair issue via presenting information in the document depository indicating so. This is whether or not they uncovered incriminating evidence and,

3 - in their legal opinion the above is at minimum reasonably  equivalent to Initial Disclosure.

I would suggest that an independent entity, with no stake in the outcome, be the one who determines if the above is met. The above is simply a first view of what could solve this impasse and how to proceed - of course Merck would have input.

Early on I began to notice what I felt was somewhat peculiar events/communications with my litigation. I felt unjustly, via letter of the law (one common fact, which needs to be re-valuated) not the spirit of the law that I was cast into a legally hostile environment. I protested, I formally appealed, I got up when I was unfairly knocked down. I did the best that I could to stop the speeding inertia of unfairness, starting with the removal of my case regardless of valid concerns - expressed informally and formally via objection and appeal. My quest began by visiting NOLA to obtain the pre-trial support which is, ironically, the reason (common Discovery) why PSC's and MDL's exist. I have this thoroughly documented.

Imagine being a litigant, forced to a venue for "common discovery" being told things like "we are not pursuing your type of injury", "you have to do it yourself", "no-one wants to represent bone issues", etc. On top of that knowing a "settlement" comes along not accepting your PI and constantly having to swallow one-way Discovery,  objecting many times but not once being given a proper or reasonable answer.

It can be shown that my injury was isolated for purpose of marginalization and ultimately hurdled "under the bus" as they say. As Merck was granted power to move and remove cases, I do hold Merck accountable for a knowing abuse of power, and now impeding justice.

Thank you,

Dennis Harrison
MBA/BGS

**Current discovery issues** Inbox  Vioxx/Dorothy and Emily

| | |
|---|---|
| **Pistilli, Emily** <EPistilli@wc.com> | Thu, Nov 15, 2012 at 9:25 AM |
| To: Dennis Harrison <badboonehealing@gmail.com> | |

Reply | Reply to all | Forward | Print | Delete | Show original

Mr. Harrison,

I have received your two recent emails from 11/10 and 11/13.  In response to your questions from those emails:

1)  I understand that since sending your first email, you have now received a copy of your deposition transcript. With respect to your questions about corrections to be noted on the errata sheet, as you know, I am not your attorney and cannot give you any advice about what should be included.  However, Merck's position will be that only corrections that are within the limits of FRCP 30(e) will be acceptable, and that the deposition errata process is not an opportunity to supplement the deposition transcript.  Likewise, Merck will object to any errata that are not set forth in a signed written statement, as required by Rule 30.  However, if your statement of deposition errata is otherwise made in accordance with Rule 30, Merck will not object on timeliness grounds if such statement is not submitted until after the 30 day period required by Rule 30.

2)  With respect to Dr. Wise's deposition, I have not yet received that transcript from the court reporter.  In addition, parties are typically not permitted to make copies of the court reporter's transcripts, and each party must order its own copy from the court reporter.  However, in this instance only, I have received special permission from the court reporter to send a copy of Dr. Wise's transcript to you at no charge, and I will do so when we receive it.

3)  With respect to your question about initial disclosures, under PTO 17, all parties in the Vioxx MDL are relieved from the requirement to make initial disclosures under Rule 26(a).

Sincerely,

Emily Pistilli

**Emily Renshaw Pistilli**

**From:** Dennis Harrison
**Sent:** Sunday, November 18, 2012 12:51 AM
**To:** Pistilli, Emily
**Cc:** Wimberly, Dorothy H. ; Ann Oldfather ; mhastings@oldfather.com ; Colleen Shields ; Michelle L. Chiavene
**Subject:** Re: Current discovery issues

Thank you Emily - as mentioned I will look to have the interrogatories (self to Merck) and amendment to you before the operation, and work on the transcripts as soon as I can after the operation.

The operation is scheduled for 11/28 but may be moved back one week. Frankly, I have been stunned that what would seem to be such an easy operation is in fact extremely difficult - especially the restrictions and limitations for 2-3 months after it.

I appreciate your offer of not objecting on timeliness grounds per your statements in re to Rule 30. Of course it is my intention to remain within the boundaries of Rule 30. I am considering alternatively proposing (separate email) something else to work through my concerns about clarification. Of course I don't wish to use the depositions for supplementation, I use the word "extension" in the context of clarification - If you do not agree with my proposal (under separate email), it shall be done specifically as you wish. I am sure there will be ample opportunity in the future to ensure a jury understands the whole context, so please know that I am trying to keep things as orderly as possible to minimize confusion. I have a habit of trying to keep related information contiguous via order as much as possible.

If Merck is able to accept verbal (recorded) errata - I am sure I can do the review significantly faster. I would propose that near immediately after the operation I could create a USB drive with verbal errata. If after reviewing the verbal input, Merck did not find it acceptable or useful, I would then, when possible, provide text. It would seem Merck has nothing to lose and possibly we would be "ahead of the game" a bit.

Under separate email, I also will be providing my rationale on Rule 26(a) and why I very strongly believe that Merck should provide the disclosures which are required by the FRCL but locally excused via PTO 17.

Thank you,

Dennis Harrison
MBA - BGS


**status, requests**

Dennis Harrison <badbonehealing@gmail.com>                                    Sat, Nov 10, 2012 at 11:28 PM
To: Emily Pistilli <EPistilli@wc.com>
Cc: "Dorothy H Wimberly" <DWimberly@stonepigman.com>, Ann Oldfather <aoldfather@oldfather.com>,
mhastings@oldfather.com, Colleen Shields <cme@oldfather.com>, "Michelle L. Chiavene" <mlc@oldfather.com>
Reply | Reply to all | Forward | Print | Delete | Show original

Hello Emily

There are a few items I'd like to go over.

1 - Please forward the transcripts as soon as practical (email/PDF is fine). I will, as somewhat expected, have to undergo a second operation very soon - either this coming Wednesday (11/14) or more likely two weeks from Wednesday. While the hearing process went well, the arthritis and scar tissue need to be removed to get more use of the hand. More importantly, there is a nodule that has to be removed. This is also necessary to prevent rupturing the tendon again. After this second operation, I will need to have what is expected to be one operation on my other hand.

I need to point out that the first operation, and some of the other issues (less so, but also) did in fact cause me to lose three months of any real productivity besides what I was able to do with getting the thousands of files to Merck and the two depositions. As I (believe) I mentioned a concentrated work effort usually is followed by exhaustion. That with depression often keeps me bedridden until I seem to "recharge". I don't believe I have significant heart trouble, however now a days any Dr. checking my heart picks up an irregular heart beat. Except for about 5 years ago (a stress test showing a mild issue), this is new in my lifetime. A couple of months ago I was cleared for the first hand operation via an ultrasound as there was concern with a significant irregular heartbeat.

The recovery from the first operation was difficult well beyond my expectations. As mentioned I did lose near 3 full months. Except for one finger hurt and peck typing on a tablet, it has been near impossible to type, takes inordinately long, and the bit I had to do on a PC was painful, error prone, and frankly exhausting. While at the moment I am not asking for further extension, knowing (now) that the hand operations are somewhat more incapacitating, I am extremely concerned that I will really lose about 2-3 months for each operation (the two more) and that is not timely enough to meet the schedule.

Over the last year+, as I promised, I placed Merck's needs above mine with the very large/thorough efforts such as the interrogatories and PPF. I am concerned that I have not been able to gain the traction as such on what I need to do for prosecuting the case, and there may be a 2nd request for an extension I very much appreciate the first extension, and especially your personal efforts on it. I'll assume that Merck may challenge this and will file a motion if necessary. As said, however, I am grateful for the first extension and Merck's working it out, please know that. The surgeon is amenable to writing/documenting the need.

2 - if the next operation can wait until 11/28 I am hopeful that I can complete an amendment (to include the lumbar failure) which has been 90% completed but suspended for the health issues. I also hope to complete my first set of interrogatories to Merck. Those also were started but also put on hold.

3 - per FRCL (26) (a) please provide the initial disclosures, and all documents required by the FRCL which relate to Vioxx and bone/spine issues. This includes names and addresses of individuals who may have knowledge of the bone/spine allegations, communications with the FDA (they did express concern), communications with independent research (such as the NJ team that warned PSC-1), communications with Merck paid consultants such as Thomas Einhorn (who told me never to contact him again), mitigation plans "in case any issues arise" per Merck meeting minutes, any testing results in re to bone/spine before or after Merck released Vioxx, any testing, warnings, concerns, etc. on any testing,  viewpoints, or proof of due diligence Merck had in re to its impact when used with other medications, any numerical calculations on additional incremental sales attributed to not disclosing or pursuing the bone/spine allegations (which include both healing and potential decrease of bone density), anything which addresses concurrent usage of Vioxx and Fosama, Merck's various views on animal testing etc. The above are examples of what I mostly would expect to exist, but are not meant to be all inclusive.

By virtue of completing the interrogatories and especially the PPF, I have met the FRCL requirements last year. In addition I recently provided thousands of electronic files and a great amount of detail in my (approx) seven hour deposition.

The FRCL does indicate I am due this even without a discovery request. The litigation's "front end" no less than, via its mass tort processing, facilitated Merck  to obtain the above type of information before a litigant, especially in re to "other injuries"

Thank You,

Dennis Harrison
MBA - BGS

# EXHIBIT 3:  BACKGROUND

Following is additional detail of the overall background of Plaintiff's case. Plaintiff very much wishes to emphasize that, from nearly the very start of his case he has expressed concern, and alarm, that his case may have its Discovery needs not fully met, and perhaps not met at all – he refers to it as a "nightmare scenario for Discovery".

Something must have gone astray; 6+ years into his litigation, Plaintiff finds himself having provided nearly all of Merck's Discovery needs, via *twice complying under threat of dismissal, to* the Court's demands to *provide Lone Pine,* as well as the *PPF* and **Interrogatories**. Certainly no Court wishes such an unfair imbalance of fairness for either the Plaintiff or the Defendant. The issue simply just would not exist on its own – something has caused it. Plaintiff feels that it is Merck's manipulation and misinterpretation of this Court's intentions, which is detailed in this Motion, which has caused the situation. Further, Plaintiff feels that Merck, from the very beginning had a pre-meditated "plan" to enable "other injuries" to be legally disadvantaged, unfortunately not in an ethical or "good faith effort" as they are obligated, and possibly their actions may demand a higher level of scrutiny. Plaintiff is not presenting in this Motion, or formally yet in this litigation, but of course is always evaluating "events" and "actions" to comprehend the potential allegations for Merck pre-meditating an unjust environment for "other injuries", using the cardiovascular focus as a veil to hide behind – as they did when Vioxx was taken off of the market.

It is this more holistic view of where we are, and how we arrived here, that Plaintiff feels is very useful in support of his position. Plaintiff's belief is that true Discovery defined by the FRCP

or the court in an equivalence manner was never something Merck wished, and Merck had a role in enabling such a scenario.

Unfortunately, after more than six years in litigation, Plaintiff finds himself with NO, that is zero, formally Discovery – while Merck has obtained virtually a library of formal Discovery unto Plaintiff. Plaintiff feels it is valuable input to the Court to ensure that the issue at hand, formal Discovery fairness and one-way Discovery, is understood in the greater context of the background of the case. For brevity, the items below are in a very limited form. Enough additional information is available in exhibit xx:  CASE BACKGROUND to gain a good sense of the overall environment and situation. It is not necessary to review the Exhibit unless one feels he or she does need additional information. Most of the exhibits are "optional in the sense that they need be considered for additional information at times, but often the subset in the Motion is adequate.

1) Merck withdrew Vioxx from the Market (September 30, 2004) citing *cardiovascular injuries*.

2) Merck did **not** address or cite potential *bone/spine injuries*, though Plaintiff certainly believes that

    they should have as he alleges thousands and thousands of individuals suffered in a similar manner, perhaps not as devastating (or perhaps more in some cases) but simple correlations and basic statistics would support his view. Bone/spine injuries should have been a well known issue, instead of Merck minimizing it, actually totally eliminating it from radar as it hid behind the more shocking revelations of cardiovascular events and deaths.

3) After reading many bonafide articles by prestigious institutions, researchers and surgeons that Vioxx

    was culpable in interfering, very significantly, with bone healing, Plaintiff Dennis Harrison filed suit dated June 26, 2006 In Ulster County, NY. Plaintiff thought to himself "... now so much more makes sense". The suit alleged that *Vioxx, which he utilized in 50mg.(maximum dosage) and for the timeframe nearly the whole of its introduction until it was removed from the*

*market,* was

*causal* in preventing his femur from healing, Plaintiff was confined to hospitals and Nursing homes

for eight months January, 2003 to September 2003.

4) Plaintiff asserts *substantial damage(s)* - personal and financial... when he *was finally discharged,*

he left the hospital merely a shell of his former self, that being what he was right before the event,  and has never regained even ½ the strength he had right before the event.

5) Merck exercised its (abuse of?) power to remove the case to NY Federal District court, then transfer

it to MDL-1657 as a "tag along" case. *His bone/spine case then became constrained in MDL litigation which was squarely focused on cardiovascular injuries.* Plaintiff claims Merck abused its Court granted power to remove and transfer, fully understanding that Plaintiff's "other injury" case would be placed in the wrong venue and subjected to severe unfair handicaps.

6) Cardiovascular continues to be, by far, the *majority* of PIs in MDL-1657 from its beginning. "*Other*

injuries" are defined as "*other cases not claiming a cardiovascular event*". The majority, "*cardiovascular*" was/is the only class substantially benefitting from "Common Discovery". There may have  been some tangent, "spinoff" benefits if an injury had some aspect of cardiovascular  issues, but it is indisputable **that Plaintiff's injury could not benefit, in any reasonable and legally useful manner, from "common Discovery".**

7) The Plaintiff's litigation is in reference to *bone injury (femur not healing) – not cardiovascular.*

8) *Plaintiff's* case is clearly within the "*other cases not claiming a cardiovascular event*".

9) These "other injuries" *did not gain the benefits of the MDL,* nor were their rights of Discovery preserved.

10) The "cardiovascular event" litigants enjoyed proper Discovery, while "other injuries" did *NOT*.

11) Plaintiff objected and appealed to the MDL Panel that his case did not belong in an MDL in which the PSC definitively stated they would not represent his Discovery needs, and a new,

supplementary not in the offering. Other argument was made (Exhibit X MOTION TO VACATE CTO 64 & **EXHIBIT XX: NOTICE OF OPPOSITION**). Plaintiff argues that the case is too different from the "norm" of cases in the MDL (i.e. ***cardiovascular***), was not going to gain the benefits of an MDL, far away from his residence, and may be placed in a legal environment hostile to his PI, ripe for neglect and manipulation of Defendant Merck.

12) Plaintiff, nearly from the very start, ***sufficiently expressed alarm*** that his injury was not being included by the "Discovery team" Please see **EXHIBIT: X ALARM & CONCERN –THE MAKING OF A NIGHTMARE DISCOVERY SCENARIO**

    a) ***Appearing in person Plaintiff presented concerns to the MDL on 12-06-2006.*** At the Hearing, Plaintiff brought sufficient information that should have sensitized the PSC/DSC to incorporate his injury in formal Discovery **(exhibit xx Dec. 14, 2006 Hearing at the MDL)**. There are various ways that the PSC/DSC could have polled the existing litigants to have researched the issue, such as a supplementary question follow-up to all litigants – a perfect opportunity to understand the extent of bone/spine injuries.

    Public Information in re to bone/spine injury through Vioxx is freely available on the Internet. It is from prestigious Universities, Hospitals and hospitals. It is more than sufficient to have warranted suspicion of Vioxx being culpable of Plaintiff's allegations, bone/spine issues of healing, and more. However, this information does not have the caliber of standing that Formal Discovery would have (**please see FRCP Committee notes**)\*. Plaintiff believes that he presented enough information that the Discovery team should have become pro-active, in some manner at least, in understanding of existing Plaintiffs, which could have been accomplished via a few questions in a supplement to the Plaintiff Profile Forms, which it was not.

    Plaintiff has consistently maintained that by the nature of the injury (bone/spine) and the vast majority of cases being cardiovascular in nature, the legal attention in this MDL would not fairly nor adequately be provided.

    b) ***submitted a VACATE REQUEST to the MDL Panel*** and argued that

the PSC-I formally refused to represent his Discovery needs, that his injury was not in the focus of the MDL and warned that his case would be constrained yet not share in the purpose of an MDL (Common Discovery) and that "one common issue" was not

13) Although Plaintiff had in his possession the necessary Lone Pine report, he objected to provide it. Premature Discovery due to the omission and suppression of Vioxx's bone/spine injury potential by Merck. Exhibit xx has excerpts from his "Opposition brief" The court, at the time, did not agree with Plaintiff and ordered Plaintiff to provide Lone Pine, which of course the Plaintiff did. Plaintiff has no hard evidence, but believes the Court had at that time placed greater emphasis on the "screening" purpose of Lone Pine than the concern of Plaintiff that it may also serve as premature Discovery and start the "one-way" Discovery process in gear. However, in retrospect with a more total view, the Plaintiff does feel that the Demands of the Court to provide was, after all, appropriate. That is understandable as it was a difficult His position was that it not only served as a "screening tool" by the litigant, but also was a tool of decision either way.

*Premature, one way Discovery may have began with "Lone Pine" though* Plaintiff understands that the Lone Pine Expert Witness report is also utilized to screen invalid cases from valid cases to "separate the wheat from the chaff". Plaintiff never had an issue with that concept. However, Plaintiff indicated that in his case, unlike the "mainstream" cardiovascular cases, his Lone Pine also served as "early Discovery" and he objected, to providing the Lone Pine report, even though he had it in his possession. Under threat of dismissal by Merck, Plaintiff filed an Opposition Memorandum. However as the Court rejected his argument, of course he subsequently provided the report, still objecting – however abiding by the Court's decision.

14) Plaintiff later objected, vehemently to providing the PPF and Interrogatories. He argued that the issue

clearly was *the true beginning of one-way Discovery* and communicated that to Merck via letter – Exhibit xx "Providing PPF &/Interrogatories under protest and duress". Merck insisted that he provide the PPF or face the devastation of dismissal in which Merck had begun the process of. Plaintiff finally capitulated and provided the PPF and Interrogatories.

A very substantial amount of information provided to Merck was in effect not only one-way Discovery, but also premature, providing undue advantage to Merck and potential bias in general as the "settlement" was administered and Cardiovascular took by far the prominent role. This Motion's facts, issues, and arguments also bring forth and delineate issues that may be of legal significance.

**Plaintiff felt severely pressured** by the short time frame to respond and Merck's aggressive move to dismiss - without dialogue nor even considering that Plaintiff's one-way Discovery was beginning in earnest. *A phone call with the DSC* stating, vehemently "you (i.e. Plaintiff are the only one not willingly providing the PPF...", *a letter by PSC-1* indicating that I would lose all of my rights if I did not comply... and an immediate decision was necessary.

One would wonder – if acting in Good faith, why didn't *Merck attempt to communicate with Plaintiff* instead of going right after dismissal; especially after Merck was well aware of Plaintiff's increasing discomfort in one-way Discovery.

*The answer is that Merck was not, and is not acting in Good Faith Discovery.* Worse, the actions and the timings seem to imply that this deceptive maneuvering was by design not spontaneous chance – i.e. it was part of Merck's overall Discovery "Strategy"'

*Merck was knowledgeable of the predicament any "other injury" would face.* i.e. one way Discovery as Merck ultimately displays its true colors by denying Plaintiff of the Discovery in which he is entitled to. Plaintiff has a view, but not a firm conviction at the time, in reference to the PSC's knowledge and view.

*Merck, by wrongfully looking to dismiss this case,* based upon the presumptuous grounds of Merck beyond reproach in the Discovery process, supplemented by the DSC "You are the only one"... , providing short notice of their intent, not responding to Plaintiff's communications of concern (attachment XX) was aware of the predicament that PTO 17 was placing the Plaintiff in. In fact, Plaintiff would submit that it was part of their warped, unfair strategy to evade this Court's spirit, and letter, of the Court's intention of fair Discovery to all – again as evidenced in PTO 18C

*PPF and Interrogatories were both premature and one-way Discovery*. As Plaintiff also and especially objected to providing the PPF, he was again faced with dismissal. Ultimately, under undue pressure by the DSC, citing the Lone Pine reasoning (for the Court order) Merck again forcibly obtained the PPF and Interrogatories. However, *unlike "Lone Pine", a case cannot be made that the PPF and Interrogatories were to be utilized as "separating the wheat from the chaff",* and Plaintiff again suggests premature and one-way Discovery.

Plaintiff, regardless of the issues he is raising, will *nevertheless acknowledge and does appreciate that the Court and Merck* at that time, worked  with the Plaintiff through a very serious illness as he slowly, but surely as promised, completed both the PPF and Interrogatories in very exacting detail.

Thus, Plaintiff was forced to provide significantly more grievous one-way, early Discovery by way of the PPF and Interrogatories as Merck again entered an order for dismissal. Plaintiff has, many times in many ways including many formal briefs, attempted to bring the one-way, and now also understood to be early Discovery to the forefront. Unfortunately, the "settlement" administration gained, and maintained front stage while his case languished and became increasingly marginalized and isolated, to both his bewilderment and chagrin. Exhibit xx: *"Plaintiff protests about one-way Discovery – excerpts"* has excerpts and sources of the frequent occasions in which he has objected in re to concerns and alarms discussed in this motion.

Among other concerns the Plaintiff has had, the degradation of his case migrating into *"one-way Discovery"* has indeed emerged. The marginalization and isolation of his case has, as Plaintiff had so vehemently expressed alarm, caused his case to suffer and now full fledge one-way Discovery has encroached upon his Discovery rights.

# EXHIBIT 4: MOTION TO VACATE CTO-64

Dennis Richard Harrison                                    October 27, 2006
6a Short Street
Cementon, NY    12414
845-231-3272
Pro Se Plaintiff

## *DOCKET NO. 1657*

### *BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

### *IN RE VIOXX MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION*

### *CONDITIONAL TRANSFER ORDER (CTO-64):  MOTION TO VACATE*

|  |  |
|---|---|
| DENNIS RICHARD HARRISON, | )  In Re: Motion to Vacate CTO-64 |
| Plaintiff, | )  Case No.: 1:06-CV-932 (NAM) (RFT) |
| | )  Brief to Vacate CTO-64 (attached) |
| vs. | )  PSC – Dennis Harrison Emails (attached) |
| MERCK & COMPANY, INC.; | ) |
| Defendant | ) |

## MOTION TO VACATE

On September 28, 2006, the Judicial Panel on Multidistrict Litigation filed Conditional Transfer Order No.64 (CTO-64). Included among the tag-along cases was: Dennis Richard Harrison of 6a Short Street, Cementon, NY 12414, a Pro Se Plaintiff.

I, Dennis Richard Harrison, the plaintiff in the above-captioned manner, hereby moves this court for an order, vacating the above CONDITIONAL TRANSFER ORDER (CTO-64).

While the supporting documentation is provided as an attachment to this Motion to Vacate CONDITIONAL TRANSFER ORDER (CTO-64); some highlights include:

 1 – the FACT that the Plaintiff Steering Committee stunned the Plaintiff by proclaiming that "the PSC is not pursuing your kind of claim for many reasons". ***NOTE: All of the emails between the PSC and the Plaintiff are attached separately.***

 2 - In a separate communication, upon the Plaintiff asking for further clarification, the PSC reiterated "the PSC is not pursuing discovery on your type of injury. You need to do this yourself".

 3 – The heart/CV cases represent the vast majority of Vioxx lawsuits. This case is NOT the "typical" heart/CV case.

 4 - The Plaintiff has severe physical limitations that would greatly inhibit and damage his ability to conduct his case outside of the area in which the case was originally filed.

 5 – Allowing the transfer of this case into the Federal Court system and then into the MDL, in which the PSC refuses to represent each member per its charter (i.e. the Plaintiff), will handicap the Plaintiff to such an extent that it will provide unfair advantage to Merck & Co. Inc. and damage the Plaintiff's ability to properly navigate the pre-trial proceedings.

 6 - Diversity is not sufficient nor fair reason enough for the transfer of this case into the Federal

Court System and then the MDL because of the wide scope of Merck's operations,
compliances, and broad local knowledge. Merck is utilizing Diversity not in relation to its
spirit of meaning, but as a mere technicality to attempt to dominate as many cases as possible and
is surely not arguing Diversity in the sense of real, day to day operations and relationships.

Furthermore, as the brief describes:

While the detail of such failure in gaining legal support is not within the scope of this Brief, unfortunately it
has become apparent that the very nature of the attempts at streamlining the Merck/Vioxx issue(s) have
inadvertently created an environment extremely and unduly biased towards the legal community accepting
mostly, if not only, the heart/CSV cases. This is even true with the legal firms that advertise on their Web Site
that the bone/spine repair issue(s) are one of the reasons why a potential client should contact them.

If this case is allowed to be transferred as per Merck's request, this will continue to damage the public's right
to finally understand the scope of the (alleged) bone/spine repair issue(s) of Vioxx and hence strangle any
attempts for the public seeking proper and fair justice.

For the reasons stated herein, plaintiff respectfully requests this Court to vacate The CONDITIONAL
TRANSFER ORDER (CTO-64), within MDL Docket No. 1657; case NO: 1:06-CV-932 (NAM) (RFT)
and for other and further relief that this Court may deem just and proper.

Dated this 27th day of October, 2006
Respectfully submitted,

Dennis Richard Harrison
(Pro Se) Plaintiff
6a Short Street
Cementon, NY   12414
Telephone: 845-231-327

# EXHIBIT 5:  NOTICE OF OPPOSITION

October 13, 2006 – before 4:00pm

Dennis Richard Harrison
6a Short Street
Cementon, NY   12414
Telephone:  845-231-3272

## DOCKET NO. 1657

### BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

### In RE VIOXX MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

### CONDITIONAL TRANSFER ORDER (CTO-64):  NOTICE OF OPPOSITION

Dear Counsel:

This NOTICE OF OPPOSITION (Docket no. 1657; CTO-64) applies to:

Dennis Richard Harrison
No. 1:06-CV-932, (NAM) (RFT)

Originally filed in the New York State Supreme Court (Ulster County) with the original State Case number of 06-2247, this case was conditionally transferred to the New York Northern Federal District Court by Merck & Co. Inc.; represented by Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, New York, 10004-1482.

The case does not sufficiently meet questions of fact that are common to the actions previously transferred to the Eastern District of Louisiana and assigned to Judge Fallon. There are not sufficient overlapping factual issues; this is evidenced by:

  1 – While this case is NOT the "typical" heart/CSV case - Plaintiff argues heart/CSV represents the bulk and focus.

  2 – the FACT that the Plaintiff Steering Committee has stated that "the PSC is not pursuing your (Plaintiff) kind of claim for many reasons.

  3 – Upon Plaintiff asking for further clarification it was re-iterated that "the PSC is not pursuing discovery on your (Plaintiff) type of injury. You need to do this yourself".

If indeed there were "sufficient overlapping issues", then the PSC would be able and willing to represent Plaintiff's DISCOVERY needs. The spirit of the MDL and the PSC mechanisms is to reduce redundancy of pre-trial proceedings and encourage consistency of rulings, etc. Removing this case to Federal Court does not accomplish this in fact or spirit.

The Plaintiff's case should not have been conditionally transferred, and should be returned to the court in which it was originally filed (NY State Supreme Court – Ulster County). The Plaintiff also argues that "diversity" is not reason enough for the transfer of this case mainly because of the wide scope of Merck's operations, compliances, and broad local knowledge.

In addition, the Plaintiff has severe physical limitations that will greatly inhibit and damage his ability to conduct his case outside of the local area. He would be severely, and unfairly, handicapped being Plaintiff and Lawyer. Note, Plaintiff has attempted to gain legal representation via sufficient documentation and many meetings with lawyers. The Plaintiff has proof of his very concerted and sincere desire to gain legal representation.

The Plaintiff requests that counsel review the case detail and the PSC's refusal to represent Plaintiff's pre-trial proceedings.

Respectfully submitted,

Dennis R. Harrison

# EXHIBIT 6:  ALARM & CONCERN – THE MAKING OF A NIGHTMARE DISCOVERY SCENARIO

After reviewing the exhibits, plaintiff feels that he has more than sufficiently provided examples. Plaintiff has deleted some redundancies and decided that this Exhibit should be deleted in its content. Should more information be required, Plaintiff can do so.

# EXHIBIT 7:   PLAINTIFF HEARING IN NOLA ON 12-14-2006

```
1                      UNITED STATES DISTRICT COURT

2                      EASTERN DISTRICT OF LOUISIANA

3

4
     IN RE: VIOXX PRODUCTS           * Docket MDL 1657-L
5     LIABILITY LITIGATION           *
                                     *   December 14, 2006
6                                    *
                                     *   10:00 a.m.
7

8

9                      PROCEEDINGS BEFORE THE
                       HONORABLE ELDON E. FALLON
10                     UNITED STATES DISTRICT JUDGE

11
     APPEARANCES:
12

13   For the Plaintiffs:        Herman Herman Katz & Cotlar
                                BY: RUSS M. HERMAN, ESQ.
14                                  LEONARD A. DAVIS, ESQ.
                                820 O'Keefe Avenue
15                              New Orleans, Louisiana 70113

16   For the Defendant:         Hughes Hubbard & Reed
                                BY: THEODORE V.H. MAYER, ESQ.
17                              One Battery Park Plaza
                                New York, New York 10004
18
     Also Present:              DENNIS R. HARRISON (pro se)
19                              6A Short Street
                                Cementon, New York 12414
20
     Official Court Reporter:   Toni Doyle Tusa, CCR, FCRR
21                              500 Poydras Street, Room B-406
                                New Orleans, Louisiana 70130
22                              (504) 589-7778

23

24
     Proceedings   recorded   by   mechanical   stenography,
25   transcript produced by computer.
```

2

## PROCEEDINGS

### (December 14, 2006)

1
2
3      THE COURT: We had a conference in this matter that

4 was scheduled to begin at 9:00 and the matter proceeded. I got

5 word from Mr. Harrison that his luggage was either lost or

6 delayed and that he was doing his best to get here as promptly

7 as possible. Counsel were kind enough to wait around. We are

8 now a little after 10:00. I'm happy that Mr. Harrison is

9 present here today.

10      Mr. Harrison.

11      MR. HARRISON: Thank you very much. I have handouts.

12 Do you want to see them?

13      THE COURT: Well, why don't we give them to counsel.

14      MR. HARRISON: It's not as long as it looks. I'm

15 trying to streamline the presentation. This is for the Judge.

16 I just can't tell you how much I appreciate you doing this for

17 me. I was in such a panic over you not getting it.

18      THE COURT: Where did you come from, Mr. Harrison?

19      MR. HARRISON: New York. I took a bus. 36 hours on

20 a bus, it's not a pleasant ride. I'm not doing that again.

21 The airplane only next time.

22      THE COURT: Right. That's a tough thing. I'm

23 delighted you could be with us.

24      MR. HARRISON: I'm very happy everybody was patient

25 enough. That's very professional. I appreciate it.

1        Now, I do have, like I said, some handouts, one
2   to Merck's counsel and one to the PSC. I tried to streamline
3   it, so in one minute I'll tell you what I'm going to do. I'll
4   do a one-minute summary and then a five-minute summary type
5   of thing. The approximate presentation time, for your timing
6   on things, is for 15 minutes.

7        I'm looking at the "Vioxx Bone/Spine
8   Repair/Healing Litigation Issues." I'm looking at that one now.
9   I think the quickest way -- if somebody feels different, let me
10  know -- would be to go over it quickly, the whole thing, so
11  everybody sees the big picture, and then go into discussion.
12  It's tempting to stop me, you know, but then when I stop and
13  halt, stop and halt, it will take everybody longer and they
14  won't see the big picture as easy. The goal of me coming here
15  is basically awareness and education of the very significant
16  bone repair/healing problem of COX-2 inhibitors, Vioxx in this
17  case in particular.

18        I was sent by Merck to the MDL. The PSC, I
19  thought I better make sure that they could handle my interests
20  because it's really mostly about heart. The PSC didn't know,
21  but finally after a few weeks -- I don't know the reasons, but
22  they can't and said -- nicely. Any conversation I ever get
23  into, when I say "can't" or "won't," it's meant to be
24  professional. I'm just trying to explain.

25        Being the case that the PSC cannot in my view

1  represent the bone/spine problems, what I would like to do --
2  and I may be wrong on some things, you just can't do it -- is
3  to request a separate class of lawsuit with a different PSC,
4  making a new PSC; because like I said, I was rejected
5  outright, actually, and actually would be quite nervous about
6  going to the PSC at this time because of that. Again, you
7  know, I've had good talks. I'm not saying anything negative
8  about the PSC. I'm just explaining the facts.
9              I believe, as I have researched as diligently as
10  I can -- I am somewhat limited physically, but a few hours a
11  day I'm able to look on the Internet, anywhere I can,
12  newspapers, anything. I believe there are reasons why the
13  general legal field across the country and the public, too, are
14  not knowledgeable about the bone problem. I'll just say "bone
15  problem" rather than "bone/spine," blah, blah, blah. They are
16  not motivated. The legal representatives across the country in
17  my view are not interested in the bone cases. I believe I know
18  some of the reasons why.
19              I was rejected at least 15 times. I have
20  proof -- not with me, but I have proof of all those rejections,
21  the letters from the lawyers. I did have several lawyers say
22  verbally that they felt I had a very good case, but they
23  couldn't represent me because it would cost about $100,000,
24  things like that. What I have come to understand is I believe
25  it's much, much -- it's less risky and much less money for a

1  legal firm to put at risk if they are into the heart
2  litigation. The bone litigation is just something that would
3  require a lot of work, have more risk, be much more expensive,
4  and from what I can tell so far is that given a heart case --
5  and I'll shorten that. I won't say "heart/cardiovascular."
6  Given a heart case and given a bone case, the lawyers across
7  the country want the heart case because they can cut and paste
8  on the Internet the generic lawsuit that there is.
9          Actually, I did that, too, a little bit because
10  I'm pro se, I think as we all know. I could do a hundred a
11  day, lawsuits, with that cut and paste if I had people's
12  names, then get my lawsuit started; especially, as I'm finding
13  now, since you really don't get into big discovery issues for
14  a long time. I feel lawyers across the country are just --
15  there are so many suits out there because it's so easy, too --
16  not acknowledging the very significant bone problem. I'll show
17  you some evidence on that later. So I'll be asking for a
18  separate class and a separate PSC. I also have a feeling that
19  the PSC is quite challenged with the workload and that could
20  very well be one of the issues why they really did not want to
21  represent me.
22          I also believe strongly that, should we create
23  the separate class, that the statute of limitations -- from
24  what perspective it can be. I'm not a lawyer and I don't know
25  exactly what can be done, but I've seen and read some things.

1   It looks like that there is the ability to formally extend
2   the statute of limitations. I feel for bone cases it should
3   be because when Merck announced the problem and withdrew the
4   drug -- which I stopped immediately, never took one after
5   that -- that they did not acknowledge any problem with bone and
6   spine and almost exclusively people just were not -- I know the
7   clock theoretically started ticking, for the most part, at that
8   time. I know different states have different rules and as to
9   discovery, when did this thing happen, when was it
10  discovered -- not "discovery discovery," but discovered
11  that there was a problem.
12          So I have a feeling that the statuses of people
13  across the country that have had a problem like mine and have
14  not done anything because the lawyers are not motivated to do
15  so -- because of the reasons I gave before -- and they don't
16  know about it. I also believe that many of the cases really
17  would actually be for the elderly because elderly are more
18  likely to break a bone, so they are also more likely to --
19  even if they did know anything, they may go to a lawyer, get
20  turned down like I did and stop pursuing it. I don't think too
21  many people would have pursued it after 15 or 20 rejections
22  like I had.
23          I mean, I did have hints that they thought it
24  was a good case. I have reasons to believe I should continue
25  it. I have the Internet access, and a lot of elderly are just

1    not going to have some of the resources I had to even start it.

2              I'll try to go a little quicker. On the second

3    page on the first handout there -- I'm not going to discuss

4    any detail here, just tell you what I want to discuss after

5    I'm done with this. I want to discuss the heart, which I have

6    already done some of this, the heart discovery versus the bone

7    discovery needs. I have some material -- and it's only maybe

8    one percent of what's out there -- on statements from

9    orthopedic surgeons or R&D people all over the place on the

10   Internet about the bone problem.

11             I would estimate, from what I saw, there's a

12   hundred pro articles that say there is a problem for every one

13   that says there isn't a problem. Even the ones -- when I say

14   there isn't a problem, it's not really the case. The ones that

15   say there isn't a problem say they doubt there's a problem.

16   They don't firmly say it like probably half of the studies,

17   independent R&D studies, some of them very strong in believing

18   that this definitely is an issue. So I would like to discuss

19   can the heart PSC -- is that okay to refer to it like that --

20             THE COURT: Sure.

21             MR. HARRISON: -- to make it easier to keep on the

22   same wavelength? Can they represent the bone issues

23   effectively and fairly, not only for myself? As I continued

24   through this process, I began to understand that there's a

25   public problem here, public awareness, acceptance by the legal

1   field that this is a real problem. So I felt there's this
2   bigger issue, much bigger issue than just Dennis Harrison
3   versus Merck. There's a major public awareness issue that's
4   not being addressed in my view. Everything I say, of course,
5   is alleged or in my view. I put that anywhere I write
6   something. I try to be as good on that as I can.
7           So, then, being everything I have said is
8   hopefully the case -- I mean, people understand it, relate to
9   it -- should a new lawsuit class be created with
10  concentrations on heart now and should one for bone be
11  created? I don't know what the PSC does relative to cases that
12  are nonheart, if there's a miscellaneous. I don't know. The
13  bone issue in my view is so serious that I don't think it
14  could be put in a miscellaneous category and I don't think it
15  could be represented by the PSC.
16          For example, in the discovery process, if a
17  letter is written to Merck requesting information and they
18  don't mention "bone/spine," then the answers aren't going to
19  be relative to bone and spine. It's just going to be for
20  heart. Theoretically, as I take the evidence back to New York
21  -that's how it works, I believe. Pretrial discovery would be
22  here. If I were to have the PSC at today's forum represent me,
23  when I go back to New York it doesn't really help because they
24  never specifically would ask about bone problems. It all would
25  be heart. Again, that's my view. I believe the public needs

1  to be made aware of this in a formal manner.

2          I talked about the statute of limitations. This

3  whole issue has more problems in it than would even first be to

4  me obvious in that there's new COX-2 inhibitor drugs coming to

5  the market and they are not even addressing anything with bone

6  problems, not even testing that I could find. I can't say

7  definitive because I'm not there. It's not even being

8  addressed. So at the same time I see hundreds of articles

9  expressing the problem and I just don't understand why Merck

10  would not or could not -- or whatever -- investigate this

11  issue, let alone the fact that it's an issue Merck is a

12  subject matter expert on the issue, assumedly. Merck has done

13  great things, by the way, but there's a problem here. Again,

14  I'm not meaning to --

15          THE COURT: No, I understand. You have stated your

16  position, Mr. Harrison. As I understand it, you're a pro se

17  litigant. You have filed a suit against Merck. You indicate in

18  your suit that as a result of your taking a COX-2 inhibitor,

19  namely Vioxx, that that has either caused or increased a

20  bone/spine problem. You are concerned that your case is not

21  represented adequately in the litigation by the plaintiff

22  committee because their focus is mainly on cardiovascular and

23  stroke and other circulatory issues, and you want to bring

24  that to the Court's attention and you seek some discussion on

25  that issue.

1          MR. HARRISON: Yes, sir.

2          THE COURT: Let me ask Merck if they have any

3    response first. We'll let Merck respond.

4          MR. HARRISON: Can I sit and rest right here?

5          THE COURT: Sure. Please do.

6          MR. HARRISON: Thank you very much.

7          MR. HERMAN: Your Honor, while Merck is discussing

8    it, first of all, we appreciate Mr. Harrison being here. In

9    September 2006, Chris Seeger received an inquiry from

10   Mr. Harrison regarding discovery of bone issues in the MDL.

11   Mr. Seeger replied in September, thanking Mr. Dennis Harrison

12   for his e-mails, and indicated that the PSC was not pursuing

13   discovery on this type injury and that he should contact

14   Leonard Davis for any Web site information as to what orders

15   had been issued by the Court, et cetera.

16          It was also discussed in the PSC inasmuch as, in

17   the numbers of cases which were MDL'd that the PSC had reviewed

18   and according to plaintiff profile forms, there did not appear

19   initially and there still does not appear a significant number

20   of these types of claims. It may be through ignorance or other

21   circumstance, but to begin the discovery process all over in

22   September of 2006, after a number of trials had been conducted

23   and serious discovery for 18 months, the PSC did not feel it

24   was in a position to conduct the type of intensive discovery

25   that would be necessary.

1          In the 40 years of experience that I have had

2    generally representing injured folks, sometimes the potential

3    claimant is a better lawyer than the lawyers are, and certainly

4    the amount of research and investigation Mr. Harrison has done

5    is significant. I represent to Your Honor the PSC did have a

6    discussion in early September about this issue and did not

7    undertake to proceed with this type of discovery.

8          **MR. DAVIS:** If I may, Your Honor. Leonard Davis from

9    Herman, Herman, Katz & Cotlar. Just to supplement what my

10   partner Russ has said, following the discussions that

11   Mr. Harrison had with Chris Seeger, our office was contacted

12   by Mr. Harrison. We spoke with him on several occasions. I

13   believe we have also written Mr. Harrison and conveyed to him

14   we had PSC meetings and that, in fact, the PSC was not going

15   to pursue or undertake the bone-type issues and that we were

16   more focused on other types of issues, but that he was welcome

17   at any time to get information from the PSC and that we would

18   freely communicate with him. We have had continuing

19   discussions with Mr. Harrison. They have been very cordial,

20   and hopefully they have been helpful.

21         **THE COURT:** Anything from Merck? Any comments?

22         **MR. MAYER:** Your Honor, Ted Mayer for Merck. We

23   certainly respect Mr. Harrison's right to assert claims in this

24   Court and to pursue those to the best of his ability. We do

25   believe strongly that there needs to be just one PSC in this

1    litigation with the authority from the Court to speak on behalf

2    of the plaintiffs, their own clients and others, as the PSC has

3    been very forceful advocates for all of the plaintiffs in

4    this litigation. We believe it's very important to the

5    management of the litigation that there be a single PSC.

6              With regard to the discovery, I want to point

7    out that Merck has produced over 20 million pages of Vioxx-

8    related documents. These are not just heart documents. These

9    are all the Vioxx clinical trials regardless of the particular

10   condition that was being studied in those trials. These are

11   the Vioxx-related custodial trials of hundreds of witnesses

12   regardless of whether they concern the heart or the GI system

13   or the bones or other issues. So that there has been very

14   extensive, very broad discovery, and discovery continues to be

15   ongoing in this Court, but there has already been an

16   extraordinary amount of information produced regarding the

17   science on Vioxx and the marketing of Vioxx.

18             With regard to the statute of limitations, I

19   think the impressive compendium of material that the litigant

20   has brought to this Court shows that, to the extent there is a

21   debate over bone healing issues, it's been a very public

22   debate for many years, very widely written about, and very

23   much out in the public domain and in the literature and in the

24   press for several years. We don't see any basis whatsoever for

25   any relief from the statute of limitations on that.

1          Finally, I would note that there are various
2   other categories of injury where we have a handful or more than
3   a handful of claims that are not CV-type injuries. In this
4   litigation, among the pool of cases before Your Honor, we do
5   intend to pursue discovery in those cases, bring appropriate
6   motions as part of the whittling process, and bring some of
7   those issues before Your Honor in the coming year.
8          **THE COURT:** Mr. Harrison, I understand the issue.
9   Presently, I don't see any issue of creating another
10  plaintiffs steering committee because I don't see any lawyers
11  who want to be on the plaintiffs steering committee for a bone
12  case. I can't force them to be on it. You have a right to
13  represent yourself. Do you know the Court's Web site?
14         **MR. HARRISON:** Oh, yes.
15         **THE COURT:** You have access to that?
16         **MR. HARRISON:** Yes.
17         **THE COURT:** I've been putting everything on the Web
18  site so that you can keep in touch with it. You know what's
19  being discovered. If you have any issues or need any
20  documentation, I want you to feel free to get in touch with
21  the plaintiff liaison counsel and ask them any questions that
22  you need to ask them.
23         You have protected your rights. You have filed
24  a suit. You have interrupted prescription. What's going to
25  happen later on is there's going to be some discovery probably

1  in your specific case. Depositions will be taken of you and of

2  your treating doctor and any expert that you may have. You'll

3  have an opportunity to take any depositions, if you need to

4  take any depositions, and then I'll deal with the matter.

5           I wish that you had had some success in

6  getting counsel because I've tried six of these cases now and

7  I know how complex they can be. I mean legally complex; not

8  necessarily only factually complex but legally complex. It's

9  going to be hard, from your standpoint, to navigate through

10  some of those legal issues without competent counsel to

11  represent you. I'm concerned about that.

12           I don't know what I can do in the civil system.

13  In the criminal system, I can appoint counsel, and they are

14  reimbursed for their time from assets that are created for

15  that purpose, but there are no similar assets available for

16  civil litigation. The Constitution of the United States has

17  not been interpreted by the courts to require representation

18  of people in a civil matter, so the Court doesn't have the

19  same either authority or responsibility.

20           It's more a voluntary basis that either lawyers

21  do it for compensation or they do it for pro bono reasons and

22  they appear as counsel, but it's not going to be possible for

23  me to appoint somebody to represent you at this stage. The best

24  I can do for you is to give you access to the material and see

25  whether there's any additional discovery. If you need any

1   additional discovery, I'll at least consider it. I don't know
2   how I'll rule on it, but I will consider it.
3           MR. HARRISON: Yes, Your Honor, but what you're
4   implying -- which makes sense, too. I do understand that the
5   legal field doesn't want the case and I know why, I believe.
6   I'm talking about the legal field across the country. I would
7   like to show you some of the briefs on some of the articles.
8   This all really started -- my lawsuit was filed in the state
9   of New York in the Supreme Court, Ulster County. I would also
10  be fine with going back to the state. That's no issue.
11  Actually, my first preference would be a PSC to properly and
12  fully represent me. That's actually my first choice. My second
13  choice would be to go back to the state.
14          I'm very, very concerned that if I were to co-
15  exist with the PSC, as it stands today, we could create an
16  environment of fingerpointing. Merck could say, "Well, we gave
17  you that," and the PSC could say, "No. We don't have it.
18  Mr. Harrison needs it," and there would be too much
19          chaos. THE COURT: I understand.
20          MR. HARRISON: That's a little bit dramatic.
21  Although there has been a lot of study that's gone on in
22  journals and it has been published, it perplexes me as to why
23  Merck doesn't have studies themselves -- I don't understand
24  that -- to either firmly and fully deny it, agree, or say they
25  don't know; and then, if they don't know, explain how they will

1  find out about the problem. There may be articles, but I've

2  talked to my doctors and none of them -- none of them -- were

3  aware of this issue. These are surgeons and physicians, and

4  some pretty good surgeons, too. In all cases they said, "Oh,

5  let me see that. Could you send it to me?" I have a surgeon

6  that I saw last week as a checkup and I'll be sending him

7  one, too. I've got several surgeons, as it turned out.

8           Again, I surely don't mind going back to the

9  state if I can't really be represented for whatever reasons in

10  the federal arena. Actually, I do have a brief to vacate the

11  conditional transfer. It might seem confusing to the Court why

12  would Mr. Harrison try to get out of the system and on the

13  other hand try to make the system work better for him on the

14  federal arena. That's simply because of timing. I need to do

15  it concurrently. So if it's rejected, I'm trying to go back to

16  the state. If proper representation, in my view, is rejected,

17  I can go lean on the paperwork, the conditional transfer to

18  vacate that I have done.

19           THE COURT: Mr. Harrison, I don't mean to interrupt

20  you. I do understand your position. I'll make this a part of

21  the record. I'll attach to the discussion the material that

22  you gave me. I do have other matters that I have to get to.

23  You understand.

24           MR. HARRISON: Sure. Sure. I just would request

25  offline -- it doesn't have to be now -- that everybody, if they

1    could look at the excerpts on the supplemental list, just some

2    example excerpts from virtually hundreds of articles on the Web

3    indicating the same problem. So these are very meaningful, and

4    please understand this is maybe one percent, at most, of what's

5    out there. Of course, there's many articles sometimes for one

6    study, so the next day there's a thousand of these that

7    probably refer to 50 studies, but there are multiple studies.

8              THE COURT: Okay.

9              MR. HARRISON: Again, my view is definitely if you

10   take the intersection of people that have broken bones or spine

11   problems, the intersection of that with people on Vioxx -- the

12   surgeons actually like to give Vioxx because it is an effective

13   pain-reliever, which is a part of the COX-2 inhibition whole

14   problem. I'm fine with that. I would just request that my

15   brief to vacate stays -- somehow this influences the brief to

16   vacate, gets me back to the state, if necessary.

17             THE COURT: Okay. Thank you very much. Thank you

18   for coming down.

19             MR. HARRISON: My pleasure. Thank you very much.

20             THE COURT: Have a good holiday season.

21                  Court will stand in recess.

22             THE DEPUTY CLERK: All rise.

23             (WHEREUPON, the Court was in recess.)

24

25

## CERTIFICATE

1
2        I, Toni Doyle Tusa, CCR, FCRR, Official Court
3   Reporter for the United States District Court, Eastern
4   District of Louisiana, do hereby certify that the foregoing is
5   a true and correct transcript, to the best of my ability and
6   understanding, from the record of the proceedings in the
7   above-entitled and numbered matter.

8

9

10                              _____
                                Toni Doyle Tusa, CCR, FCRR
11                              Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 8: Plaintiff Hearing attachment**
**Bone/Spine Repair/Healing Litigation issues**

# Vioxx
## Bone/Spine Repair/Healing Litigation issues

Approximate presentation time 15 minutes; detail likely to require off line or at other MDL meetings. Goals in red are necessary at meeting.

---

# Goals

- Awareness and Education of Bone/Spine repair/healing problems via Cox-2 inhibitors; Vioxx in particular.

- Describe how the existing PSC cannot represent bone/spine healing pre-trial & DISCOVERY.

- Request separate CLASS and separate PSC for bone/spine pre-trial & DISCOVERY.

- Why the public/ general legal field are not knowledgeable/ motivated, and why they should formally be.

- Provide reasons that the Statute of Limitations should be extended for bone/spine.

   Relate to the newer Cox-2 inhibitors seeking USA approval.

- Concurrent Cox-2 inhibitors (e.g. Vioxx)/ bio-phosphates (e.g. FOSAMAX); potential massive disaster?

1

# Vioxx
## Bone/Spine Repair/Healing Litigation issues

1 - Heart/Cardiovascular DISCOVERY vs. Bone/Spine repair/healing DISCOVERY NEEDS.

2 - Bone/Spine — MUCH evidence by Independent Research; <u>where are the drug companies?</u>

3 - Can the existing Heart/CV PSC represent bone/spine issues effectively and fairly?

4 - Should a new LAWSUIT "CLASS" be created?

5 - Public Awareness: Should Public finally be made aware?

6 — STATUTE OF LIMITATIONS: Should it be extended for bone/spine repair/healing issues?

7 — Proposed new Cox-2 inhibitor(s) and existing one: danger ahead; here we go again?

8 - FDA as experienced by this litigant.

# Vioxx
## Bone/Spine Repair/Healing Litigation issues

**1 - Heart/Cardiovascular DISCOVERY vs. Bone/Spine repair/healing DISCOVERY NEEDS:**

a — Allegations of Neglect, Deceit, Fraud; lack of fair warnings and education, etc. are

generally similar in the English meaning; but showing in heart/CV IS not sufficient to prove in bone/spine. Cannot be just generally similar, must also be specific to heart/CV and specific to bone/spine. However, consistency of intent and methods of deceit, neglect, and fraud may be synergistic in the whole.

b - causation: Cox-2 inhibitors heart (recovery esp.) and bone/spine some similarities, but not enough.

c - DISCOVERY by this PSC for Bone/spine repair problems likely to complicate and overburden even more.

d - separate class (and separate PSC) of litigants specifically for bone/spine issues would not complicate issues nor overburden the existing work load of the heart/CV CLASS and PSC. It would provide proper Federal pre-trial and common DISCOVERY. Current status of improper Discovery would encourage appeals, many when the bone/spine issue is commonly known.

**2 - Bone/Spine — MUCH evidence by Independent Research; where are the drug companies?**

a - A LOT HAPPENED TO SUPPRESS AND SUBDUE THE ISSUE; perhaps inadvertently AND also planned. Bone/Spine issues certainly did not and are not receiving fairness.

b - high profile of heart/CV; "lawsuit" templates, relative low cost/risk for lawsuits - has caused legal profession to very much prefer "heart" to "bone/spine". Legal representation nearly impossible to gain.

c — a great deal of Independent Research (IR) and Trials virtually all conclude bone/spine repair problems from Cox-2 inhibitors; Vioxx most often used as the drug mentioned. IR seems to attempt to fill the gap that Merck should have responsibly embraced — *and IR still is! Recent biopsies of corps even!*

d - Merck notified of IR and studies/trials; Merck chooses to deny and ignore and takes no action; also, Merck knowledge of bone repair process, by itself, should have caused it to responsibly test, warn, educate, etc.

e - Merck continues to deny Cox-2 inhibitors, (e.g. Vioxx) MAY cause bone/spine repair/healing issues.

f - Merck motivation to suppress in beginning: n5 at risk; competition; catching up; Celebrex already on market and doing well; short-term profits over long-term responsible ness and steady income; environment ripe for negligence/recklessness; deceit, fraud,. SHORT TERM PROFIT OVER LONG TERM STABILITY! CREATION OF THE "VEIL OF SAFETY"

g - Merck motivation to suppress now: enough heart/CV problems; owning up to bone/spine issues show consistency of motivation and be synergistic with heart/CV allegations. Likely thousands were damaged, maimed, and possibly death. New product(s) at risk.

e. excuses/reasons for not testing would be nothing but lame and designed to extend and buy time! — there are so many ways to test and make retrospective reviews from many resources. Intersection of bone/spine issues and Vioxx usage HAS to be very high. Studies, biopsies statistical analysis has much to offer!

3

# Vioxx
## Bone/Spine Repair/Healing Litigation issues

**3 - Can the existing Heart/CV PSC represent bone/spine issues effectively and fairly?**

    **a -NO**

    **b -** PSC has firmly repudiated confirmation of DISCOVERY representation by litigant Harrison; much time has been lost; litigant extremely concerned if PSC is "forced" to represent; and sees significant issues in a verbal PSC suggestion.

    **c -** PSC could have embraced bone/spine issues and looked for synergies; too late now; potential neglectful environment by this PSC would place bone/spine at great risk.

    **d -** similar general allegations (heart/CV and bone/spine); but litigant, as well as the thousands that SHOULD be seeking informed legal representation, need specific discovery results to bone/spine repair problems.

    **e -** similar heart/CV and bone/spine allegations cannot be passively synergistic; must actively "tie" synergies. Certainly DOES NOT need the same PSC to do so. Same PSC will continue heart/CV bias. Need new PSC to want to drive the bone/spine DISCOVERY.

**4 - Should a new LAWSIUT "CLASS" be created?**

    **a YES;** so, so much evidence is mounting and accelerating — 000's likely impacted. Broken bone and spine problems intersect with Vioxx usage greatly.

    **b -** PSC has already firmly declined to represent bone/spine repair DISCOVERY

    **c -** if PSC now forced to do so, bone/spine may be in "hostile" environment and continue being neglected.

    **d -** having existing PSC and Litigant both doing Discovery will lead to problems of bureaucracy and easily can lead to both PSC and Defense manipulation of environment and responsibilities, finger pointing, "run around", and playing "second fiddle".

    The issue simply will not be litigated properly without focus. 000's most likely involved need focus!

    **e -** avoids problems above; finally facilitates public notification and fair legal representation; may even help existing and proposed Cox-2 inhibitor makers (Merck, Novartis, Phizer) may finally take this issue seriously. "Cleanest" way. Need an enthusiastic new PSC working DISCOVERY as FIRST PRIORITY.

    **f -** if NOT also would require effort to avoid anarchic environment; consistency and MDL charter items items at risk. Additional effort is, incrementally, not significantly more at this point.

    **g -** existing PSC and great number of litigants within MDL experiencing law of "diminishing returns"? This would get worse with increased complexity; especially with thousands of probable additional lawsuits.

# VIOXX
## Bone/Spine Repairf Healin2 Litigation issues

## 5 - Public Awareness: Should Public finally be made aware?

    a - **YES; it is long overdue** — past fairness is at risk; let alone current and future health of public! There is not sufficient means for individual discovery of the bone/spine issues by any means! Fortunately for plaintiff litigant, email article led him to investigate, refusal for legal representation resulted in "pro se", of which so, so many people do not have the resources to do so — especially the elderly and uneducated!

    b - overwhelming Independent Research ("evidence is compelling — time to tell the public").

    c- being so inundated with high profile heart/CV cases; neither public nor legal field understand depth and quantity of damaged individuals.

    d — damaged likely to be in thousands; if not tens of thousands and still not knowing why! QUITE likely more DAILY via existing (Celebrex) and so many more at risk with new products attempting approval.

    e - simple to Complex; delayed healing can be severe, maiming & possibly lead to death. Weak healing can also lead to problems and even death. Some cases of death can be years after — example would be weak cervical fusion required to prevent spine piercing brain and immediately shutting down breathing — weak fusion may not hold up in the litigant's otherwise natural lifetime.

    f - issue is not just pastNioxx but current Phizer/Celebrex and future Arcoxia/Merck and Prexige/Novartis; Incredibly the bone/spine issue(s) are not being addressed in new drug (Cox-2 inhibitor) attempts.

    g - when withdrawn; Merck did not acknowledge or warn of potential bone/spine problem(s); The "WOW" effect has passed - to Merck's benefit and the Public's detriment. The Public and Physicians had no clue!

## 6 — STATUTE OF LIMITATIONS: Should it be extended for bone/spine repair/healing issues?

    a - **YES; certainly; public doesn't know what hit them!**

    b - when Vioxx taken off the market; only Heart/CV given as reason; still no bone/spine warning(s)!

    c - association of problem with Vioxx is neither obvious nor readily derived. Also, after the fact.

    d "clock" has "ticked" very far with the bone/spine issues(s) unjustly concealed.

    e - "clock" should only start when Merck finally acknowledges the possibility and notifies public.

# Vioxx
## Bone/Spine Repair/Healing Litigation issues

**7 — Proposed new Cox-2 inhibitor(s) and existing one: danger ahead; here we go again?**

    **a -** Merck (Anoxia) and Novartis (Prexige) amazingly also don't address the bone/spine issue(s).

    **b -** separate bone/spine repair/healing CLASS will place proper pressure for the "new" drugs to be responsibly treated this time; as well as CELEBREX.

    **c -** does not mean Cox-2 inhibitors can't be marketed — but need fair education and warnings of physicians and consumers; as well as follow-ups, etc. — let alone some reasonable testing!

    **d -** there is a proper market for Cox-2 inhibitors; but must educate and warn when not to take, provide formal follow-ups; etc. and let educated physicians and consumers decide benefit/problem tradeoffs.

    **e -** emerging FOSAMAX issues; SHOULDN'T THERE BE CONCERN ABOUT CONCURRENT USE OF COX-2 INHIBITORS AND FOSAMAX; FOSAMAX STAYS IN BONES UP TO 10-15 YEARS.

**IMPORTANT Special Note:** There is even some evidence that long term use of Cox-2 inhibitors may harm male bones; combine this with evidence and theory that perhaps FOSAMAX, long term, creates denser, but more brittle bones! Both together interfere with the body's natural process of bone/spine repair, healing and/or regeneration. *This may be a recipe for lone term, massive public disaster; yet — incredibly! the drug companies are not even addressing the issue on a hypothetical basis. Immediate study of concurrent FOSAMAX and Cox-2 inhibitor usage, as well as patient follow-ups must be done to protect the public. Independent R&D must play a significant role to reduce/eliminate bias.*

**8 - FDA as experienced by this litigant.**

    **a -** lethargic; beaten down; not aggressive. Reporting system is "anecdotal"

    **b -** incredibly, showed no interest in Independent Research or studies.

    **c -** not interested in actively reviewing records (not conducive to review!)

    **d -** mild reference to Celebrex warning of "bone problem" not understood by FDA; asked litigant to investigate!

    **e -** FDA not helpful at all to litigant Harrison.

# **Supplement to Discussion**

While much, much more detail exists — and litigant Harrison would be very willing to discuss as appropriate, some additional information is provided in the attached to help understand the Independent Research Studies, The PSC/litigant communication, and a sample of the litigant attempting to gain some commercial coverage, including concerns for the public at large. The litigant strews his sentences with "alleged" to ensure that the reader understands that this is what they — only alleged.

- Brief Statements from just some of the many, many articles.

- A full, recent article on some conclusions based upon corpses

Google Web Alert for: **cox-2 bone healing**

**⊡RTHO SuperSite NSAIDs and COX-2 inhibitors impede tendon, bone ...** The upshot: COX-2 inhibitors impair tendon and bone healing. Decreased prostaglandin may impair **bone healing**, and the COX-2 enzyme is critical for ...

---

This once a day Google Alert is brought to you by Google.

- Subsets of communication between the PSC and the litigant Harrison

- The original communication (email) from litigant Harrison to the PSC

- An earlier overview of litigant's attempt **to** gain commercial press coverage

# Just some example excerpts from virtually hundreds of articles:

*February 02, 2005 - IISS Physicians Review Literature on the Safety of COX-2 Inhibitors...COX-2* inhibitors effect fracture healing and spine fusion... should never be used in spinal fusion...

*December 23, 2002 - Bone Fractures... Cox-2* Inhibitors interfere with bone growth and, healing... Researchers at Stanford Univ. University Medical Center... COX-2 inhibitors also impede the new bone growth that normally helps heal a fracture or stabilize a joint implant...

*May 21, 2002 - Journal of Bone and Mineral Research - COX-2 Decreases Bone Healing?* ... mechanical testing revealed that COX-2 inhibitors...reduce bone strength... expression of COX-2 is critical for bone healing. ..essential for fracture healing...the inhibition of prostaglandin synthesis stops normal fracture healing.

*Cox-2: Where are we in 2003? - The role of cyclooxygenase-2 in bone repair - Einhorn TA.*
Professor and Chairman, Department of Orthopedic Surgery, **Boston University Medical Center, Boston, Massachusetts, both nonspecific and specific inhibitors** of cyclooxygenases impair fracture healing - *but that this is due to the inhibition of Cox-2 and not COX-11 Vioxx is a Cox-2 inhibitor.."It's time to tell the public,"* concludes Dr. Thomas Einhorn.

*Journal of Bone Mineral Research 1999 Jun;14(6):969-79...* initial immune response is crucial to fracture healing...

*Reprinted from: www.usatoday.com/news/* "*It's time to tell the public,*" concludes Dr. Thomas Einhorn, Boston University's orthopedic surgery chairman. New research suggests some of the most widely used painkillers may delay healing of *a* broken bone... "If it were my fracture ... to me every day counts," he says. *Vioxx and Celebrex are among the culprits....the makers of Vioxx and Celebrex deny any link.*

*December 2002 New England Journal of Medicine...haven't* lived up to their earlier promise... Even worse, the largest study ever done looking at joint-disease modification, published in the **journal** Arthritis & Rheumatism, found that people using 25 mg *of Vioxx lost 0.27* mm of cartilage in just one year. *That number was expected to be 0.1 mm.*

*"Somehow, this study flew under the radar,"* says **Jason Theodosakis, MD, MS, MPH., author of The Arthritis Cure (St. Martin's Press 2004).** This information **is unlikely to be broadcast by pharmaceutical companies,** he explains: *"It could affect the billions of dollars in sales of the COX-2 inhibitors if people knew they might be destroying cartilage while they're trying to relieve their pain."*

*Komatsubara S et al. Spine 2006; 31:E528-34.* **"High-grade slippage of the lumbar spine in a rat model of spondylolisthesis: effects of cyclooxygenase-2 inhibitor on its deformity"** (shows COX-2 inhibitor led to deterioration of bone healing which worsened vertebral slippage)

*O'Keefe R et al. Ann NY Acad Sci 2006; 1068:532-42.* "COX-2 has a critical role during incorporation of structural bone allografts" (findings indicate that COX-2 dependent PGE2 production in the early stage of bone healing is needed for efficient skeletal repair and is essential for bone allograft incorporation; COX-2 inhibitor (Celecoxib or Ketorolac) reduced bone formation and boney ingrowth)

*Daluiski A et al. Orthopedics. 2006; 29:259-61.* "Cyclooxygenase-2 inhibitors in human skeletal fracture healing" (study indicates that COX-2 is naturally lower **in nonunion fractures that don't heal well, may reduce the bone-forming potential** of precursor cells, and they note that limited use should be made of COX-2 inhibitors in patients with healing fractures since they need to mount an initial immune response in order to achieve fracture healing)

*Li L, et al. Cytokine Growth Factor Rev 2006; 17:203-16.* **"Regulation of bone biology by prostaglandin endoperoxide H synthases (PGHS): a rose by any other name..•"** (this is a review article that includes some discussion of the importance of COX-2 (also known as PGHS-2) in bone fracture repair)

*Hill K et al. Foot Ankle Clin 2005; 10:729-42.* **"**The role of **cyclooxygenase-2 inhibition in foot and ankle arthrodesis" (this article notes that COX-2 inhibitors are valuable to help control postoperative pain but may have deleterious impacts on bone healing in patients undergoing hindfoot arthrodesis)**

*Radi Z and Khan N. Inflamm Res 2005; 54:358-66.* "Effects **of cyclooxygenase inhibition on bone, tendon, and ligament healing"**

# See Other Side for recent article on study from corpses

8



# NSAIDs and COX-2 inhibitors impede tendon, bone and cartilage repair

**NSAIDs are not appropriate for neurogenic pain with no prostaglandin-mediated inflammation.**

*By Matt Hasson*

*ORTHOPAEDICS TODAY INTERNATIONAL 2006; 9:12*

September 2006

INNSBRUCK, Austria — Recent biochemical research suggests that NSAIDs are appropriate for prostaglandin-mediated inflammation, not "neurogenic inflammation" associated with tendinopathy.

The upshot: COX-2 inhibitors impair tendon and bone healing, two leading experts said.

Physicians have typically treated patients with tendinopathy but no inflammation with NSAIDs. However, there are certain chemical and genetic factors that discourage NSAID use in some patients, said Hakan Alfredson, MD, of the University of Umea, Sweden.

"In earlier days, the only information we had to rely on was the information from biopsies," Alfredson said at the 12th ESSKA Congress, here. "And those biopsies showed us irregular fiber structure, high concentrations of matrix, vascular ingrowth but no inflammatory cell traits. But, despite that, we gave these patients tons of NSAIDs.... We wanted to use a new method to try to evaluate whether there was any inflammation in these tendons."

## In vivo microdialysis

Using in vivo microdialysis to study the biochemical properties of affected tendons, Alfredson and his colleagues tested 20 patients with tendinopathy and painful knee function. The control group included 12 patients with normal tendons and no pain. Another arm of the study focused on six patients with jumper's knee. The control group had six patients with normal tendons, Alfredson said.

> **"If you use NSAIDs together with proteins, certain NSAIDs virtually block the protein synthesis in the muscle."**
> **— Hakan Alfredson, MD**

The specialists also assessed patients for prostaglandin E2, which is "essential for a so-called chemical inflammation," Alfredson said. They found that prostaglandin E2 levels did not differ between the chronic painful tendons and the normal, pain-free tendons.

"So, the conclusion from those studies was that there is no prostaglandin-mediated inflammation inside those tendons," he said,

Studying 1,178 knees, Alfredson's group found that several pro-inflammatory cell proteins were not regulated in the tissue, again suggesting no prostaglandin-mediated inflammation in the tendons, Alfredson said.

"It cannot be justified to treat your patients with NSAIDs with this background," Alfredson said. It's also important to remember that certain NSAIDs have negative effects on muscle protein metabolism. So, if you use NSAIDs together with proteins, certain NSAIDs virtually block the protein synthesis in the muscle, so that's another negative factor."

NSAIDs also inhibit tenocytes and, during exercise, decrease blood flow, Alfredson said. Other factors include heavy

9

vascularity and "neurogenic inflammation," as opposed to prostaglandin-mediated inflammation.

## The benefits of prostaglandins

Norwegian specialist Sigbjem Dimmen, MD, also noted the value of prostaglandins, which are "responsible for ensuring balance between bone resorption and bone formation." Decreased prostaglandin may impair bone healing, and the COX-2 enzyme is critical for fracture healing, he said.

Dimmen and his group tested how short-term doses of parecoxib, a COX-2 inhibitor, and indomethacin, a COX-1 inhibitor, affect long-bone fracture healing. The parecoxib and indomethacin groups had lower bone mineral density than the control group,

Also, mechanical testing showed the parecoxib group and control group demonstrated significant differences in all properties, Dimmen said. However, parecoxib proved more detrimental.

"So, our **findings with parecoxib had the higher delay in the fracture** healing than indomethacin, with the assumption **that the COX-2 enzyme is responsible for impaired fracture healing,**" he said.

> **"Never give NSAIDs for stress fractures or for cartilage damage. NSAIDs hate chondrocytes."**
> **— Sigbjorn Dimmen, MD**

No prospective, randomized clinical trials or evidence-based measurements have addressed the effects of NSAIDs and COX-2 inhibitors on long-bone fractures, Dimmen said. Some data show NSAIDs and COX-2 inhibitors cause no nanunions in acetabular fractures, which "might indicate that you can't see any negative effects from NSAIDs or COX-2 inhibitors in fractures-which normally heal well," Dimmen said.

However, he advised colleagues to avoid NSAIDs or COX-2 inhibitors when treating stress fractures or even when repairing cartilage.

"We know that prostaglandins are necessary **for fracture healing,**" Dimmen said. "**We know that COX-2 is critically involved in fracture healing in the first 3 weeks after** a fracture. **And NSAIDs and COX-2 inhibitors both impair** fracture healing.

"**I think one should probably avoid NSAIDs and COX-2 inhibitors in all shock fractures and also other fractures requiring unimpaired fracture healing,**" he added. "Never give NSAIDs for stress fractures or for cartilage damage. NSAIDs hate chondrocytes."

For more information:

- Alfredson H, Dimmen 9, **Non-steriodal anti-inflammatory drugs and tissue healing. Mini symposium.** Presented at the 12th ESSKA Congress and **5th World Congress on Sports Trauma.** May 24-27, 2006. Innsbruck, Austria.

**Copyright ®2006 SLACK Incorporated. All rights reserved.**

**My name is Dennis Harrison.**
Cementon, NY, 12443

email: badboneshvarr.com **(new)**
     badbonehealincahvc.mcom;
     BLOG just started: http://badbonehealing.wordpress.com/

**In Re: Possibly another alleged VIOXX problem on a large scale — the public should be aware!**

Below is a Press Release "article" I created relating to my VIOXX usage and the alleged damage it did to me. I have an active "Pro Se" lawsuit. I believe publishing this article would also be a public service. The statute of limitations is ending - plus Cox-2 inhibitor(s) still exist with many unanswered questions and inadequate warning(s).

Also, there are an accelerating number of lawsuits and scientific evidence of alleged bio-phosphates (for example, Fosamax which MERCK also produces besides Vioxx) problems, — the dreaded DEAD JAW syndrome!

Thus, one cannot help but wonder about concurrent usage of Vioxx and Fosamax in the past or currently Cox-2 inhibitors and Fosamax. These "intelligent speculations" are at worst, potential allegations at this point. I hope to provide public awareness and gain information to provide a SUMMARY REPORT on several issues like these. The intention of this article, access to my Vioxx blog, and the provision of two email IDs is to both provide and collect information. NO detailed user identification data will be within in the SUMMARY REPORT — only summary data and some history excerpts (no user identification). My history summary here is about 2 pages long. A longer version is about 4 pages long (on the Vioxx blog) and includes more detail. Please visit the blog **http://badbonehealing.wordpress.com/** (and hopefully provide a relative amount of your history). I can also email you the 4 page version if you request via one of the two email ids.

I hope you are able to print this — it would be a public service, and from what I can tell, no-one is actively addressing these very important issues with an *eye* towards helping to resolve them, specifically.

Sincerely,

Dennis Harrison


## VIOXX — (allegedly) MORE than breakinj hearts... make no bones about it!

.................................................................. Intro as a "PR" trying to obtain Commercial Press
.................................................................. Several Examples (similar to other attachement, so no need here).

A Merck hired consultant , studying the bone/spine issue, allegedly stated *"it's time to tell the public" and that the "evidence* is *compelling"*. Mr. Harrison questions if that information is included in their recently announced, seemingly self serving study of their internal affairs. Also, one would certainly feel that there was an internal reaction to those independent studies — and that should be in Merck's commissioned internal study...what were they?

The independent R&D tests of Cox-2 inhibition drugs, indicated deleterious impact on bone/spine healing. Allegedly warnings were provided to Merck and *allegedly, Merck just denied/ignored the issue.*

Mr. Harrison alleges that *Merck skillfully, artfully, and successfully planned and created a "veil of safety" perception. Allegedly, this "veil of safety"* contributed very substantially to the thought process that it was one of the safest drugs around. Thus it is alleged; physicians and consumers were skillfully lulled into a false sense of security.

Not having any clue otherwise, Mr. Harrison continued to take VIOXX (he was a long term user — about 5 years, and took the maximum dosage of 50mg) while receiving several very important operations. The Plaintiffs bone/spine operations (other ones without Vioxx usage succeeded) failed. *Routine leg (femur) operations failed, infections and sepsis set in; broken, infected internal hardware had to be removed. Some broken hardware, a significant amount, remains in his body.*

In the NY lawsuit (broken leg (femur)) — he waited, waited, and waited for some bone healing so that he could be operated on and walk again — but it did not happen after almost the eight months (his surgeons and physicians also were not aware of the

11

Vioxx bone/spine repair problem). *Allegedly, surgeons and physicians were not made aware of the problem from Merck (no warnings, no education, etc.).* They seemed puzzled as to why Mr. Harrison's bones were not healing even the minimal amount needed to "maintain an anchor" for the correcting operation(s). Their notes speculate on improper bone healing. Unfortunately, and allegedly the link to Vioxx was purposely not conveyed to them (by Merck).

Thus he *spent almost a year in hospitals and nursing homes for what was supposed to be a routine 3-4 day hospital stay and about 6 weeks recovery!* Mr. Harrison was wheel chair bound, except for *"hopping" around on one foot* and undergoing painful rehabilitation in an attempt to keep him strong enough - while he waited, and waited. Meanwhile, his home life and finances embarked and continued on a steep, downward spiral.

As Mr. Harrison waited and went beyond his medicare allowed days, his confidence was reduced to despair and depression. But he kept *doing what he was asked to by his physicians and physical therapists.* He became desperate and called a well-known surgeon in NJ for help. A method was devised to get around the issue(s) from Vioxx. Far from the plan of record, the most optimal solution (which utilizes bone healing to "anchor" it, as well the ability for the bone to "grow" into the implant) it was basically his only chance to walk and save his leg. The preferred methodology uses interweaved bone growth into the implant for strength and durability instead of glue. However, with glue utilized, it is likely to require replacing much sooner than would have been the case and is not considered as reliable as the plan of record. *Mr. Harrison, with his health declining, hopes at that time he will be strong enough. — and there is to be wary of this.*

However, his trail to recovery was yet laden with more problems that he alleges simply would not have happened, *if the "routine" operations in the beginning had just healed like they were supposed to!* His last few months of hospitalization and nursing home experience (with a very brief time home) *were plagued with excessive bleeding, infection, sepsis (twice) and obviously depression and ever diminishing hope.* He alleges his whole life has been re-arranged, and NOT for *the* better!

## POSSIBLE OTHER PUBLIC CONERNS!

While the following is based on facts, allegations, and "intelligent speculation" — Mr. Harrison raises several other potentially explosive issues that he feels, very strongly must be studied. He feels it is just not responsible, in any way, not to do so.

VIOXX, and all COX-2 inhibitor drugs, work by inhibiting the body's natural response to inflammation and bone repair/regeneration. Mr. Harrison indicates that (1) he *would also have to wonder about other long-term effects on the bones (from Vioxx usage).* Also, it begs other questions. (2) What might be the *impact of FOSAMAX (also produced by Merck!) on bone healing?* It has already been alleged, and there are lawsuits alleging, that it can prevent the jaw from healing after a tooth extraction *(bone dies - the issue is called "Dead Jaw").* (3) This should cause one to question - *what about FOSAMAX's relation to other bones?* (4) Furthermore, *what if some one took VIOXX, or another Cox-2 inhibitor, and FOSAMAX at the same time?* Since both work basically by *interfering* with *the body's natural reaction of bone repair and healthy regeneration -* could the problem be even worse with concurrent use — which did and does exist?

*Also, what other bone problems may develop with the past concurrent (Cox-2 inhibitor VIOXX and FOSAMAX USAGE?) Incredibly, both drugs are/were produced by Merck! Shouldn't Merck (allegedly) have a formal opinion on this by now, as well as some kind of testing and Post Marketing followup? Also, since Celebrex exists today and it is also a Cox-2 inhibitor, what about current concurrent use (Celebrex and Fosamax)? Shouldn't maker of Celebrex (allegedly) also have a formal opinion about this, as well as some kind of testing and Post Marketing followup.*

If you would like to review more of Mr. Harrison's history and gain more thoughts on your situation if similar, please visit the blog - http://badbonehealing.wordpress.com/. There is also a longer, more detailed history, not in the blog — but available by emailing and requesting. Furthermore, if you are a Professionnal or R&D person with an opinion on this matter - please provide input to the blog.

### badbonesahvc.rr - for general bone concerns/history etc. potentially from medication(s)

### badbonehealing@hvc.rr.com - for specific experience with bone/spine healing problem(s) and the use of a Cox-2 inhibitor medication.

Perhaps your emails and BLOG discussions will provide enough useful post-usage information that will *fan the flames of fair warnings, "level the playing field", and encourage proper analysis and industry accountability. It's about time!*

12

## EXHIBIT 9:  OPPOSITION MEMORANDUM - excerpts

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: Vioxx** | * |
| | * **MDL Docket No. 1657** |
| **PRODUCT LIABILITY LITIGATION;** | * |
| | * **SECTION L** |
| **This Document relates to:** | * |
| | * **HONORABLE JUDGE  FALLON** |
| **Docket NO. 17,840** | * |
| | * **MAGISTRATE JUDGE** |
| **Dennis Harrison** | * **KNOWLES** |
| **Pro Se 2:07-cv-00905-EEF-DEK** | * |

**********************************************************************

### OPPOSITION MEMORANDUM
### IN OPPOSITION TO DISMISS DOCKET NO. 17,840
### BY MERCK DEFENDANT LAISON COUNCIL (DLC) ON 2-25-09

...

...

### ARGUMENT

...

b)  ... PSC's discovery theoretically "not limited" to myocardial infarctions and rather (purportedly) that the **PSC conducted "general discovery" is most certainly not true in his case**. The major caveat/exception Plaintiff will clearly show is that **the PSC indicated that his claim was indeed not being pursued by the PSC at all!**

**It is further brought to the attention of the Court that the document depository is indeed not a sufficient**, in any means, reason as to why his SHOW OF GOOD CAUSE should be denied, as he again points out that the PSC, itself, in writing (emails and COURT Transcripts (12-14-06); clearly describes that the **PSC was/is not, in any manner, pursuing any issues related to Bone and Spine Healing.** Certainly any tangential, virtually mistakenly captured information of such would only be minor in nature, certainly not sufficient, unlikely followed through at all or sufficiently, and certainly not substantial. Again **the PSC emphatically indicated (in writing and verbally) that bone and spine cases were not being pursued (pre-trial, Discovery) among other statements, Plaintiff was told he had to do them himself**).

Shall Plaintiff be denied his showing GOOD CAUSE from both not being allowed to be a participant AND the FACT that even the PSC indicated that his claim was not being pursued by the PSC at all, is in affect tantamount to showing why the order was effectively extinguishing all possible cases. Plaintiff would be having his RIGHTS extinguished counter to the order and the court's commentary.

Plaintiff feels that the above arguments are more than sufficient to SHOW GOOD CAUSE, but wishes to supplement them with some specific details.

**Arguments 3 – 7; "As the Court explained":**

(2)  *"[A]t this advanced stage of the litigation"*

**Plaintiff argues that in no way are virtually ANY of the aspects of this litigation "advanced" in re to bone and spine** healing allegations.

...It was further constrained via his **Vacate Motion/Brief (Conditional Transfer Order (CTO-64): Motion to Vacate; 10-27-06)** defeat. Such unfair movement has been the root **of unfair marginalizing Plaintiff's rights for judicial fairness and management.** Virtually from the beginning, Plaintiff argues that his rights to due process of law were inordinately weakened, if not denied, cascading into a myriad of issues which unfairly weakened his ability to move his case forward. **In Motion to Vacate Conditional Transfer Order CTO-64; 10-27-06**

5 – Allowing the transfer of this case into the Federal Court system and then into the MDL, in which the PSC refuses to represent each member per its charter (i.e. the Plaintiff), **will handicap the Plaintiff to such an extent that it will provide unfair advantage to Merck & Co. Inc. and damage the Plaintiff's ability to properly navigate the pre-trial proceedings.**

3 – The heart/CV cases represent the vast majority of Vioxx lawsuits. This case is NOT the "typical" heart/CV case. Furthermore, as is now

quite apparent, the **Plaintiff Steering Committee (PSC) has not the knowledge, focus, nor desire to provide the pre-trial proceedings for all of its members**; that it is chartered to do so (i.e. the Plaintiff), and which is a major basis of the MDL/PSC charter, as well as the reason for the MDL's existence.

5 – ... It would do so by adding a layer of undue complexity and both undefined and **un-agreed upon Plaintiff/PSC/Merck relationships for pretrial proceedings**. Ironically it would also create some degree of overlapping responsibilities and pre-trial proceedings, and thus potential conflicting detail on which to base rulings on, and thus an environment more likely for potential inconsistent rulings – which is counter to the MDL charter. At a minimum it unfairly and unjustly significantly handicaps the Plaintiff, but just as likely would cripple the Plaintiff's case in unnecessary **bureaucracy, uncertain, undefined, and un-agreed upon PSC/Plaintiff/Merck relationships and procedures**. It also provides **an opportunistic atmosphere for purposeful manipulation of pre-trial proceedings and responsibilities**, which would further complicate this case and be another disadvantage for the Plaintiff. This will also be detrimental to the public welfare. **If this case does not fairly proceed, with at least adequate recognition of the (alleged) potential non-heart/CV issues, it proceeds also at the detriment of the public welfare**. Unless the public is enlightened, it is likely that thousands of individuals, harmed, maimed and undoubtedly some deaths, will have been denied proper legal access – let alone had they been properly informed they may have not suffered the additional (alleged) harm from Vioxx.

Uninformed valid potential Plaintiffs are more likely to be elderly for the reasons of physical condition, bone fragility, etc. and much less likely to ever know that they should have had an opportunity to seek justice.

...

...

Certainly such "maturity" would not stand for any issue(s) which were far out of formal recognition of the PSC as well as the court. **Surely allegations not at all recognized as part of Common Discovery, would not be considered "mature" in terms of discovery.**

Further, it would be wrong if any "bell weather cases" were considered to be applicable when <u>no "bell weather cases" included a case of bone and spine issues</u>.

3) *",it is not too much to ask a Plaintiff to  provide some kind of evidence to support their claim that Vioxx caused them personal injury, whether that injury be deep vein thrombosis, a heart attack, an ulcer or some other malady"*

<u>Plaintiff hereby attests/certifies that he indeed has met even the uneven/unfair pre-trial discovery's most burdensome of such requirement regardless</u>.  This is IN SPITE of his arguments (to follow) that <u>he clearly should not have had such "requirements" burdened upon his litigation</u>.  It is further proof that <u>his litigation has strong merit</u>.

## <u>Plaintiff argues that had he been provided broader and further Merck Culpability Discovery; his case would be in a position of vibrancy</u> rather than facing potential dismissal based

upon his provision of detailed Plaintiff Information. Proper Discovery would have likely exposed that **Merck knew or should have known of the potential of bone and spine healing problems**, later to be found likely in Independent Study after Study. Along with what is prevalent on the Internet, including the "Science of Vioxx" and internal Merck memo's dating back to 1998.

MK-0966 (VIOXX™) Project Team Meeting Minutes: April 13, 1998
ATTACHMENTS to the MINUTES

**Bone turnover.** At the recent (1/98) pre-NDA meeting, the FDA asked for information relating to the effect of COX-2 inhibition with VIOXX™ on biochemical markers of bone turnover and/or bone mineral density (BMD). The basis for this request relate to preclinical

data that PGs are produced by osteoblasts and that COX-2 mRNA and PGE2 production are inducible in osteoblasts by cytokines in vitro. Experimentally, mechanical effects to stimulate bone formation can be reduced or blocked by indomethacin and other NSAIDs. It has been proposed that COX-2 plays an important role in this anabolic (bone forming) response to mechanical loading based on the effects of a COX-2 selective inhibitor in rats.

**PROGRAMMATIC REVIEW** Vioxx Program Scientific Advisors* Meeting May 3-May 6. 1998 It seems unlikely that Vioxx will significantly interfere with fracture healing, but should that issue arise, demonstration of intact fracture repair in animals may provide some reassurance regarding safety of high doses.

Plaintiff points out that sufficient wariness of Cox-2 inhibitors should have caused Merck to properly evaluate Vioxx and its theoretical potential of interfering with Cox-2. **Merck resisted proper testing and per USA TODAY even its paid consultant felt "it's time to tell the public"**! while the makers of Vioxx (Vioxx) and Celebrex deny any link.

## Thomas A Einhorn (per USA today – hired as a consultant by Merck) Cox-2: Where are we in 2003? - The role of cyclooxygenase-2 in bone repair - Einhorn TA. Professor and Chairman, Department of Orthopedic Surgery, Boston University Medical Center, Boston, Massachusetts - both non-specific and specific inhibitors of cyclooxygenases impair fracture healing - but that this is due to the inhibition of Cox-2 and not COX-1! Vioxx is a Cox-2 inhibitor. **"It's time to tell the public," concludes Dr. Thomas Einhorn**. Reprinted from: WWW.USATODAY.COM/NEWS - "It's time to tell the public," concludes Dr. Thomas Einhorn, Boston University's orthopedic surgery chairman. New research suggests some of the most widely used painkillers may delay healing of a broken bone... "If it were my fracture ... to me every day counts," he says. **Vioxx and Celebrex are among the culprits....** the makers of Vioxx and Celebrex deny any link.

**From 12-14-06 MDL Status Meeting Transcripts – part II; 10:00**

This whole issue has more problems in it than would even first be to me obvious in that there's new COX-2 inhibitor drugs coming to the market and they are not even addressing anything with bone problems, not even testing that I could find. I can't say definitive because I'm not there. It's not even being addressed. So at the same time I see hundreds of articles expressing the problem **and I just don't understand why Merck would not or could not -- or whatever -- investigate this issue, let alone the fact that it's an issue Merck is a subject matter expert on the issue, assumedly**. Merck has done great things, by the way, but there's a problem here.

One could imagine how much alleged evidence of neglect, deceit, and fraud, as well as general causation, would have come to light. Combined with "expert

witness" having been met, Plaintiff's case would be in very good shape, rather than facing a mistaken and unfair challenge to have it unfairly dismissed.

All of the above would also have greatly facilitated obtaining additional and future more vigorous DAUBERT requirements as needed, **and helped to retain Plaintiffs pretrial rights.**

4) *"Surely if Plaintiff's counsel believe that such claims have merit, they must have some basis for that belief, after all this time it is reasonable to require Plaintiffs to come forward and show the basis for their beliefs and some kind of basic evidence of specific causation."*

Plaintiff again points to the issues **surrounding *the lack of proper discovery of general causation*.** Lack thereof **unfairly placed the Plaintiff in a much disadvantaged position** in both GENERAL and SPECIFIC CAUSATION, as for the most part a physician is more apt to sign when he/she knows that the drug company itself has (virtually) admitted some level of culpability, and that the issues are working their ways through the courts. Many ways described above, and more below and which argue that Plaintiff can SHOW GOOD CAUSE as to why he should NOT PROVIDE such PTO 28 "expert witness"**, NOR any *PTO 28* requirements since they would in affect provide unfair "pre-trial"**

**disclosure.** ... *Again, Plaintiff argues that any provision ... as well as providing unfair pre-trial information to Merck without being provided a case management meeting and unfairly tilting advantage to Merck.*

> 5) **In light of the extensive work already performed in this MDL, this Court has concluded that "it is not too much to ask a Plaintiff to provide some kind of evidence to support their claim that Vioxx caused them personal injury" and there must be some "minimal showing consistent with Rule 26 that there is some kind of scientific basis that Vioxx could cause the alleged injury"" *ID.* at 5-6.**

Plaintiff again points that "extensive work" already performed in this MDL, is surely a misnomer, as **NO WORK has been performed in this MDL for this Plaintiff's issue of bone and spine healing'**.

Further, the PSC actively chose not to reasonably look into the issue. Please note a sample of quotes from some "Plaintiff/PSC emails"

> **From: DH [mailto:dharrison6@hvc.rr.com]**
> Sent: Friday, September 01, 2006 12:40 PM
> To: Seeger, Chris represent my DISCOVERY (1:06cv932 - Harrison vs. Merck)?
> Subject: POSSIBLY AN OPPORTUNITY TO EXPAND DISCOVERY, AND hence patterns
> of neglect, deceit and fraud.can the PSC

> I have a case, filed (Pro Per) in NY Supreme (Ulster County: 06-2247),
> removed to Northern District NY by Merck (1:06CV932) and in the MDL for
> DISCOVERY purposes. **My concern being in the PSC is one of adequate
> DISCOVERY. Since my case is bone/spine, and I may be the only
> one (or one of a few), I don't know if the PSC could really represent
> my DISCOVERY** (with its current scope) needs since the existing orientation of the
> PSC
> **is for heart issues, not bone issues**. I hope, however the PSC can
> adequately represent my discovery needs. **I do feel though, that they would
> have to expand their discovery orientation to include my issue**. I would be

8

> very glad to speak at the next  PSC meeting about it - and actually would
> very much like to....

> **My case could actually be a very important part of the whole
> "big" picture of neglect, deceit, and fraud. The PSC, should they represent
> my DISCOVERY needs, would have ground on expanding their DISCOVERY (i.e. for my
> allegations).** Merck is the one, not I that moved this case to Norther NY
> District and the MDL in Louisiana - so that would also seem to be valid
> reason for the PSC to expand their DISCOVERY. This **would seem to be an
> obvious benefit to the PSC if approached from the right direction with the
> right goals.....**
>
> Another important reason to resolve this very quickly is that the two year
> statute of limitations (in most states) will close out during the end of
> September. **Unless my bone/spine issues from Vioxx are made public like the
> heart issues, that time will expire and people like myself who were
> physically devastated from vioxx during major spine and bone operations -
> won't even know that they could have sued.** Question - can an injunction or
> some type of hold be put on this issue in order to add, say an extra 3-6
> months for the issue of bone/spine repair?


> **----- Original Message -----**
> **From: Seeger, Chris <mailto:cseeger@seegerweiss.com>**
> **To: DH <mailto:dharrison6@hvc.rr.com>**
> **Sent: Friday, September 01, 2006 1:32 PM**
> **Subject: RE: POSSIBLY AN OPPORTUNITY TO EXPAND DISCOVERY, AND hence**
> **patterns of neglect, deceit and fraud.can the PSC represent my DISCOVERY**
> **(1:06cv932 - Harrison vs. Merck)?**
>
> **Thanks for your email Dennis.  I've read it and the release and I've**
> **forwarded it to the PSC for discussion next week.  I'll get back to you as**
> **soon as I can.**

> -----Original Message-----
> **From: DH <dharrison6@hvc.rr.com>**
> To: Seeger, Chris <cseeger@seegerweiss.com>
> Sent: Thu Sep 28 11:41:54 2006
> Subject: Fw: POSSIBLY AN OPPORTUNITY TO EXPAND DISCOVERY, AND hence
> patterns of neglect, deceit and fraud.can the PSC represent my DISCOVERY
> (1:06cv932 - Harrison vs. Merck)?
> Dear Chris:
>
> Please provide me some kind of status on this.
> Thank You,
> Sincerely
> Dennis Harrison

----- Original Message -----
From: "Seeger, Chris" <cseeger@seegerweiss.com>
To: <dharrison6@hvc.rr.com>
Sent: Thursday, September 28, 2006 12:06 PM
Subject: Re: POSSIBLY AN OPPORTUNITY TO EXPAND DISCOVERY, AND hence
patterns of neglect, deceit and fraud.can the PSC represent my DISCOVERY (1:06cv932 -
Harrison vs. Merck)?


>**I don't know what you mean by status.  Dennis, the PSC is not
pursuing your kind of claim for many reasons**....
>

9-28-2006 at 5:06 a.m. The PSC sent me this email:

**Dennis, as I said in my last email, the PSC is not pursuing
discovery on your type of injury.  You need to do this yourself.
We'll help any other way we can.**

------
Sent from my BlackBerry Wireless Handheld --------------------


**From 12-14-06 MDL Status Meeting Transcripts – part II; 10:00**

**PLAINTIFF**

3 to request a separate class of lawsuit with a different PSC,
4 making a new PSC; **because like I said, I was rejected outright,**
5 **actually, and actually would be quite nervous about going to**
6 **the PSC at this time because of that.** Again, you know, I've

11 what the PSC does relative to cases that are nonheart, if
12 there's a miscellaneous. I don't know. **The bone issue in my
view is so serious that I don't think it could be put
in a miscellaneous category and I don't think it
could be represented by the PSC.**

16 For example, in the discovery process, if a
17 letter is written to Merck requesting information and they
18 don't mention "bone/spine," then **the answers aren't going to
be relative to bone and spine. It's just going to be
for heart.** Theoretically, as I take the evidence back to New York --
21 that's how it works, I believe. Pretrial discovery would be

22 here. **If I were to have the PSC at today's forum represent me, when I go back to New York it doesn't really help because they  never specifically would ask about bone problems**.

**THE COURT:** No, I understand. You have stated your
16 position, Mr. Harrison. As I understand it, you're a pro se
17 litigant. You have filed a suit against Merck. You indicate
18 in your suit that as a result of your taking a COX-2 inhibitor,
19 namely Vioxx, that that has either caused or increased a
20 bone/spine problem. <u>You are concerned that your case is not</u>
21 <u>represented adequately in the litigation by the plaintiff</u>
22 <u>committee because their focus is mainly on cardiovascular</u> and
23 stroke and other circulatory issues, and you want to bring that
24 to the Court's attention and you seek some discussion on that
25 issue.

**MR. HERMAN:** Your Honor, while Merck is discussing
8 it, first of all, we appreciate Mr. Harrison being here. In
9 September 2006, Chris Seeger received an inquiry from
10 Mr. Harrison regarding discovery of bone issues in the MDL.
11 Mr. Seeger replied in September, thanking Mr. Dennis Harrison
12 for his e-mails, and indicated that **the PSC was not pursuing discovery on this type injury ...**

**THE COURT:** Anything from Merck? Any comments?

22 **MR. MAYER:** Your Honor, Ted Mayer for Merck. We
23 certainly respect Mr. Harrison's right to assert claims in this
24 Court and to pursue those to the best of his ability. **We do believe strongly that there needs to be just one PSC in this litigation** with the authority from the Court to speak on behalf
2 of the plaintiffs, their own clients and others, as the PSC has
3 been very forceful advocates for all of the plaintiffs in this
4 litigation. We believe it's very important to the management
5 of the litigation that there be a single PSC.

8 **THE COURT:** Mr. Harrison, I understand the issue.
9 Presently, I don't see any issue of creating another plaintiffs
10 steering committee **because I don't see any lawyers who want to
11 be on the plaintiffs steering committee for a bone case.**

Further yet, as stated, IN SPITE of NO WORK being performed in this MDL, Plaintiff was able to gain, such "minimal showing" of specific causation "that there is kind of scientific basis that Vioxx could cause the alleged injury". However, while such scientific basis supports the courts request for "minimal showing", it cannot be considered by itself to be the only

- Merck Internal email - public
- Plentiful Internet availability in re to "SCIENCE OF VIOXX"
- **Prior to 2003, Merck Manual had a very good explanation of how bones heal; it seems to be missing since then; however that seems to support it also**.

(6)  "Here, in spite of having more than one full year" in regard to "no showing at all" and in respect of "basic Lone Pine Information"

While this is technically correct,  it is not correct in its entirety (please first see items a – c followed by argument in item d). Since Plaintiff was

**a – necessarily of healthy hesitancy to provide unfair**

**"pre-trial" information to Merck for reasons which should be**

**obvious. One example causing Plaintiff to have deep suspicion of the**

**potential of manipulation of Merck to physicians for many possible**

**reasons.  Surely, this would have been possible in one year's time frame!**

Plaintiff can provide additional detail of this publicly accessible but hard to find information to the court if necessary. Note that Merck seeks to either neutralize or discredit in this but a small sample of physicians.

**(Highlighted
Naiionai)**
Lawson, Jeffrey
Lindsey, Stephen
**NEUTRALIZED**

MacMillan, James
**DISCREDIT**
Mandel!, Brian
**NEUTRALIZED**

Martin, Richard W.
Moskowitz, Roland
•••

## b – felt it necessary to protect his information as it would then be available to similar manipulation by Merck. Of coure, with real case management (versus none or pseudo), Plaintiff would certainly have been willing to fairly negotiate on fair terms as the court would require.

c – Plaintiff, without case management and finding his environment

increasingly seeming to look to marginalize his case, not with "judicial economy" of

scale, but perhaps as the "square peg" not fitting into the "round hole", and facing

the court under contract as also a Merck Administrator,  felt increasingly

vulnerable and **thus it was necessary for him to protect his**

**rights to the best that he could, already being**

**disadvantaged of proper legal representation**, which Plaintiff

in the past already has much discussed with the court and PSC.

•••

# In other words, Merck stood to benefit greatly from Plainitff submitting "exp witness"/PTO 28 and providing his

information before it was absolutely necessary, i.e. the 30 day cure period. Again he DID gain "expert witness" within the Cure Period, yet until ruling was made, he has chosen to not provide it, feeling it served against his interests, let alone rights - and placed Merck on a "tilted playing field" which was tilted in their favor, again without the protections he had expected and had a right to.

(7)  His rights to a "case management meeting" were not provided and surely could not be considered to be part of **the COMMON DISCOVERY of which he never was part of.** Furthermore, the visit to NOLA by the Plaintiff on 12-14-06 cannot be considered, in any way, Case Management. It was requested by the Plaintiff in order to provide information as to the nature of his case as well as to bring forth knowledge as to why not just Plaintiff but the public at large, and attorneys in specific, were both not aware of the alleged bone and spine healing problems and why such attorneys were not incented to provide legal representation.

While the Plaintiff understands the court's latitude of maintaining "non-mainstream" cases in lieu of "judicial economy of scale", such "judicial economy of scale" clearly did not exist in his case, and **his litigation consequently**

**ended up muttered in irrelevant court proceedings (to**

**his case).**

...

## CONCLUSION

1 – Plaintiff has shown the many unique aspects and nature of his case in

many ways, including the *Lone Star* order and judiciary commentary, and **his**

**need to prevent unfair advantage to Merck which**

**would have amounted to unfair pre-trial** without benefit of case

management and schedule for jury which would drive all actions.

...

Dated:          March 20, 2009                          Respectfully Submitted
                Appxox. 8:30 AM EST

                                                        Dennis R. Harrison
                                                        Pro Se 2:07-cv-00905-EEF-DEK
                                                        6a Short Street
                                                        Catskill, NY
                                                        845-231-3272
                                                        dharrison6@hvc.rr.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing OPPOSITION MEMORANDUM IN

OPPOSITION TO DISMISS DOCKET NO. 17,840 BY MERCK DEFENDANT LAISON

COUNCIL (DLC) ON 2-25-09 has been served on  ...

# EXHIBIT 10: PSC-1 LETTER

## HERMAN HERMAN
## KATZ & COTLAR
—— L.L.P. ——
ATTORNEYS AT LAW
Est. 1942

March 23, 2011

820 O'Keefe Avenue
New Orleans, Louisiana
70113-1116

p: 504.581.4892
f: 504.561.6024
e: info@hhkc.com

hhkc.com

Russ Herman (1942-1997)
Maury M. Herman*
Morton H. Katz*
Sidney A. Cotlar*
Steven J. Lane
Leonard A. Davis*
James C. Klick*
Stephen J. Herman

Brian D. Katz
Soren E. Gisleson

Joseph E. Cain
Jennifer J. Greene†
John S. Creevy
Jeremy S. Epstein†
Edmund H. Knell
Joseph A. Kott, M.D. J.D. (of counsel)

Offices in New Orleans
and Washington, D.C.

**VIA FEDERAL EXPRESS**

Mr. Dennis Richard Harrison
601 W. Brown Street
Iron Mountain, MI  49801

**Re:    In re: Vioxx Products Liability Litigation
        Our File # 27115.0000**

Dear Mr. Harrison:

Please see the attached papers we received on March 23, 2011.  We suggest you supply "generic" medical authorizations to Merck and all prior medical records they requested.

You are in jeopardy of losing all your rights!

Very truly yours,

RUSS M. HERMAN, ESQ.

RMH/jsr
Attachment
cc:   L. Davis, Esq. (via e-mail transmission)
      Robert Johnston, Esq. (via e-mail transmission)
      Andy Birchfield, Esq. (via e-mail transmission)
      Chris Seeger, Esq. (via e-mail transmission)

**Exhibit 11:   PLAINTIFF PROTESTS ONE-WAY DISCOVERY**

After reviewing the exhibits, plaintiff feels that he has more than sufficiently provided examples. Plaintiff has deleted some redundancies and decided that this Exhibit should be deleted in its content. Should more information be required, Plaintiff can do so.

**Exhibit 12:   PROVIDING PPF & INTERROGATORIES UNDER PROTEST AND DURESS**

After reviewing the exhibits, plaintiff feels that he has more than sufficiently provided examples. Plaintiff has deleted some redundancies and decided that this Exhibit should be deleted in its content. Should more information be required, Plaintiff can do so.

# **EXHIBIT 13:  Q/A – UNDERSTANDING A BIGGER PICTURE**

Plaintiff has been presenting his argument in a classical manner and now supplements it with an approach of simple Q/A's to add clarity to the "big picture" and circumstances leading up to his request. "Answers" are provided from the Plaintiff's view and allegations and are not meant to imply or document that an actual Q/A that has occurred. No actual Q/A has taken place – the Q/A is only for the sake of addressing the whole of the situation with enhanced clarity. There are also several supporting exhibits providing additional detail that may be referred to as applicable.

Q)      **Where are we** with Pro Se *Dennis R. Harrison v. Merck & Co., Inc.?*

A)      The case is now in **formal Discovery** since the "settlement" has been administered.

Q)      Are both sides **cooperating?** ... What is the status of Formal Discovery in this case? ... **Is the Pro Se not cooperating?**

A)      **The Pro Se IS**. The Pro Se Plaintiff has, many times, formally and informally expressed concerns about providing information. He even has provided formal argument (Opposition Brief to Order to dismiss, tendered by Merck) claiming that he was being forced to provide Merck with information and getting nothing in return. He says that it is one-way Discovery, and also premature.

Q)      So then, **I assume that Mr. Harrison has not been cooperating** nor providing Initial Disclosure, and other early Discovery Items such as Interrogatories, Medical Records, depositions? Each side, Plaintiff and Defendant requires Initial Disclosure – common sense suggests that, let alone the spirit and the letter of the law.

A)      **Actually, Mr. Harrison has been impeccable in cooperating**. He has provided everything requested of him. This includes **Lone Pine Expert witness**, **Plaintiff profile form**, **First set of Interrogatories**, **Medical authorizations**, **Pharmacy records**, **a very full day of his Deposition resulting in 300 pages of transcripts**, and **several hours with his Lone Pine Expert being deposed**. Oh, he also provided his **computer records, approximately 9,000 files**, of course many versions and duplicates, perhaps several thousand unique files. It was **nearly 10 Gigabytes** of data and quite all encompassing..

1

Q)     **What has Merck provided** in formal Discovery?

A)     <u>Nothing at all.</u> The Discovery team, which includes Merck, and thus Merck DOES SHARE RESPONSIBILITY, did not account, in any way, for his injury. Thus, Merck is hanging onto that and stonewalling Mr. Harrison. Merck is clearly preferring procedure rather than merit to prevail..... sure is starting to make me wonder....

Q)     Oh, so you are telling me that Plaintiff Harrison has been complying after all, even though **all the while protesting that one-way Discovery has been slowly dissolving his case?** The FRCP prevents one-way Discovery, and I understand the Honorable Judge Fallon in MDL-1657 has stated that he will not circumvent (abrogate) the FRCP.

       **So, this is a joke, huh?**

A)     Yes, **Mr. Harrison has complied 100%.** Though he continues to express his views honestly and transparently, he hopes that it is in the best interest of not only himself, but also of the Court to continue to comply.

       He seems to be getting impatient and gaining a feeling that there may be civil rights issues here exploited by Merck's lack of a Good Faith in Discovery, and suggests that it is not necessarily a spontaneous series of events – **in other words as they say, "a method to their madness".**

       **.... and, NO, it is not a joke....** Mr. Harrison states that it is not hard to interpret the two PTO's which fully define Discovery and thus Initial Disclosure. Mr. Harrison says that Merck will ONLY apply a very narrow, strict and incorrect interpretation of its Discovery requests via PTO 17 ONLY. **According to him, Merck is not interested in considering that two PTOs need to be evaluated together**, and that the TRUE Discovery spirit, and actually the letter of the Court just will not even be discussed by Merck.

       Mr. Harrison suggests that Merck must be hiding something to cling so desparately to that data – even risking civil rights and FRCP violations. He also believes that he can reconstruct his documentation and show that Merck knew what it was doing from the beginning – creating an unsuitable legal environment for what they call "other injuries".

       **He goes further and suggests that actually, his bone/spine injury is so prevalent, and so well deceitfully hidden by Merck, that Merck is acting as if it is very nervous about this case getting to trial** – and frankly, Mr. Harrison feels that they should be...

Q)     Did Plaintiff explain his concerns early on, or did he "surprise" everyone?

A)     He has **virtually from the start** protested and appealed the dilemma that he saw this case was methodically being forced into. While he says that it may be callously considered "collateral damage" to some, or that he is "only" being sacrificed for the "good of the whole", as some would suggest – he says that **IT IS his life that has been**

2

**altered** in many devastating ways since his femur didn't heal and he was confined in hospitals and nursing homes, not whomever may feel that way.

He just is plainly determined to go on with the litigation. He even says that he is now too old and has enough health issues**, that he has simply approached the zone of having no fear in continuing on** – similar to the "Egyptian Spring" revolt in which a lot of people expressed that feeling.

Within a few months of entering his suit, Mr. Harrison entered a formal opposition and a vacate brief. **Mr. Harrison's view was that the PSC/DSC (the "Discovery team") repudiated his request for proper Discovery first via email and phone,** then when he visited this Honorable Court on December, 14, 2006 along with reasoning of his concerns and quite a bit of information which is publicly available on the Internet supporting his PI claim.

**Frankly, he convincingly points out that virtually all of his concerns about fair Discovery have come** to pass. He felt, from the beginning that he should document everything, and by gosh, except for a few things, he seems to have it all.


Q)      Why didn't Mr. Harrison get the services of an attorney?

A)      **He did attempt to** – via personal visits and the Internet, many times. He states that **several attorneys told him that they felt he had a good case however that they did not have the financial resources to assume his case and could not take the risk.** Their understanding is the major issue is one of cardiovascular (MI/Stroke) in nature.

Mr. Harrison feels that **the PSC**, doing the "heavy lifting" of Discovery for cardiovascular events in essence **lifts the burden of resources and risk from the Plaintiff attorneys**, and that it actually **was more of an administrative practice than the practice of law** to gain cases and carry them through the expected "settlement" process, which there was of course.

He was noted as saying that in his past profession he had to become very experienced at understanding the issues and presenting arguments and solutions. He claims to have represented technology products for tens of millions of dollars, and up to one billion of sales, and that thing like this were simply normal course of business for his mid-level executive career in which he had been doing great in, and he says, and I can sense it, that he really loved his work.

By the way, he also claims that two of Merck's products, Vioxx and Fosamax effectively

ended his career and devastated his  personal life and his finances. He says that that "Fosamax broke his femur", and that Vioxx stopped the healing process as he was hospitalized and in nursing homes for eight months, literally "hopping" around on one leg. That explanation keeps it simple – as frankly both drugs actually are/were

3

dangerous to bones in general, and Fosamax in addition to Vioxx damage, and stop the healing process. **He says that with the concurrent use of these, he calls them poisons, he really just had no chance, not at all**.

Q)   So, **Merck has what it needs**?

A    **YES**, they have a **virtual library** from him, yet again, he has NOTHING.

Q)   Back to his protests of fairness....  **please sum** them up...

A)   **He has many times suggested that his case did not belong in an MDL in which the DSC/PSC would not be supportive nor sensitive to the needs of his case; that the design and nature of mass tort processing was geared to resolving tens of thousands of cardiovascular cases efficiently and expediently as possible, not his PI; that his PI spent too many years languishing slowly being marginalized and isolated; and that the case has slowly degraded into one way Discovery.**

**His view is that the nature and mass tort oriented procedures of the litigation is ripe to encourage one-way Discovery. He further is of an increasing view that his case has been unfairly marginalized and increasingly isolated via Merck's moves to take advantage of Mass Tort rulings geared for high volume processing requirements for the Cardiovascular injuries, leaving his injury in the cold darkness.**

Q)   Wasn't there formal Discovery applied?

A)   Y**es** there was for **Cardiovascular** cases. **No** there was not for "**other injuries**", especially his bone/spine PI.

Q)   ...and wasn't **there a Plaintiff Steering Committee (PSC) and a Defendant Steering Comittee both responsible** for the fair and balanced Discovery in behalf of **ALL** Plaintiffs?

A)   YES, I mentioned that... the Discovery team was supposed to get together and develop Initial Discovery and general Discovery definitions, procedures, etc. **BUT they never did**, and **it appears that they didn't even tell the Honorable Judge Fallon**.

Q)   What did their **efforts bring** to bear?

A)   For **cardiovascular ONLY**, a very, **very large Document Depository** which is really targeted for **cardiovascular** information. From that there is a "Trial Package" for use in

4

case any case really gets remanded back to a state – and frankly I don't know if that is the case or not.

Q)   **Why can't** the Plaintiff simply use that?

A)   The **Depository**, the home of everything, **does not contain** the Plaintiff's Personal Injury which is an issue with bone healing; the phrase has been coined "bone/spine" to describe this "other injury".

   **Mr. Harrison says it is a ruse** and simply sending him on a wild goose chase by Merck suggesting he go there. **Common sense dictates that if the people CREATING that Depository told him that his case and his injury simply would not be represented by themselves, that there would be nothing substantial in there that would hold up in a court of law.**

   He really is harsh in his views when someone suggests the Depository, and really goes on about how it has been only for cardiovascular, and is like looking for the end of a rainbow, or a dog chasing his tail – he can get quite animated about it, as he is firm in his convictions.

Q)   Why aren't the "**other injuries**", of which one is **"bone/spine" included in... this Document depository**?

A)   The very strict focus of the Document's developers – the PSC via the Discovery team of the PSC and DSC**, did not attempt to Discover any "bone spine" evidence. Mr. Harrrison has a lot of information fully DOCUMENTED that the Discovery team just would not look for bone/spine evidence**.

Q)   Did the Plaintiff **know this**?

A)   **YES**, though it took a bit of time for him to conclude that it was a ruse, just a ruse to waste his time and dwindle his strength and resources. **Many times he objected formerly** – there was initially a Vacate Brief so the case would not be remanded, then Plaintiff made a trip to New Orleans to see the Court (and PSC/DSC) to describe his concerns, it is on the record.

   **The Plaintiff then objected** in providing Lone Pine as he considered much of it as Early Discovery and the beginning of his larger concern, one-way Discovery – he even authored a very substantial Opposition Brief as Merck attempted to dismiss him. Ultimately, the Court demanded the Lone Pine report under the threat of dismissal and admonished the Plaintiff. Of course he obeyed the court.

   **The situation became much more serious later as the Plaintiff initially refused to**

5

**provide the PPF and Interrogatories**, claiming even more vehemently that one-way Discovery, a "nightmare" scenario according to the Plaintiff, emerged.... Merck again submitted a motion for the Plaintiff to be dismissed under the same grounds as the prior one. Plaintiff communicated to Merck that this one-way Discovery had to stop. Getting pressure from Merck, and even some via a letter by the PSC at the time (PSC-I), stating that he would lose all of his rights by not complying. It seemed that there was an impending release of the stay, so Plaintiff did finally submit to the pressure.

Q)   **Did he provide** the PPF and Interrogatories?

A)   **Yes**, as I said, there was an impending "stay" removal and he had thought that he would then be entitled to full Discovery rights.

Q)   **Did he get** his Discovery?

A)   **NO** – Merck refused Initial Disclosure immediately when he asked for it.

Q)   Did he **just accept that?**

A)   **NO** – Merck and Plaintiff are bound to work together so he provided the reasoning that PTO 17 and PTO 18C bring true, total meaning and closure at the time to defining Discovery.

Q)   And did **Merck give him good rationale**?

A)   **NO.** Merck referred to the Doc depository, but Plaintiff has much documented evidence that was not useful.... well, we just described how Mr. Harrison feels about the Depository.

Q)   **So, what** does the litigant, Plaintiff Dennis Harrison **have in return** for having complied, under what seems to be untrue pressure tactics I'll add?

A)   Again, **NOTHING**. **BUT** Merck sure has.... what seems to be a virtual library (Lone Pine, PPF, Interrogatories, medical authorizations, pharmacy records, two depositions, tons of data from his computer...

Q)   What is Plaintiff going to do? I don't understand how Merck could make this happen.

A)   According to Mr. Harrison, it was **manipulation of the rules and not a good faith**

**effort** as they are obligated.

**PTO 17 provided the first** step toward general Discovery rules, but also noted future orders would be coming.

**PTO 18C was the future orders**; it clarified that Discovery was waived only for cardiovascular by assigning the equivalence **FOR CARDIOVASCULAR ONLY** of the PPF/MPF to Discovery – thus no equivalency was ever defined for "other injuries", certainly not "bone/spine".

**It went further acknowledging different needs for "other injuries"** which the Court **requested the Discovery team** to make proper provision for this group.

A)   **Did they?**

Q)   **NO** – not from anything I can find.  – and it would be a ruse by Merck to suggest that PTO 17 would waive them (no corresponding equivalence is established by the Court for "other injuries"). It would **also be a ruse for Merck to suggest the Document Depository** as said, the originators themselves stated that they were not pursuing his PI....

Q)   So, where do we come from here? We seem to have a situation that the **Court was attempting to do the right thing and define Dicovery for all PIs**, but Merck chose to "exploit" what they perceived as a "loophole", as surely they must have known what they were doing?

A)   **Yes, they did**. Plaintiff feels that he can establish that it was by design, not spontaneous or by chance – he feels that Merck was following its plan to isolate and marginalize "other injuries" by suvvocating them from information"

Q)   **Wait, the criminal trial** resulted in Merck having to... is any of that information applicable in this case?

A)   **It very well could be**. Merck marketed the drug for "off label" and was found criminally liable and fined nearly $1B. Anyway, the marketing material may show that Vioxx was marketed for off-label use in the Plaintiff's injury Anklyosing Spondalitis.

**He wants Discovery rights also to that information**, and he certainly has a need to know for his Civil case what might be in there. Also, Plaintiff states that he may even have criminal charges to prosecute, and he is considering that also.

Q)   **Enough for now**, we'll have to see if he is finally, and clearly **granted his wishes – which are?**

A) **Compel Merck to provide Initial Discovery** and **declare several aspects of the pre-trial orders MOOT for his injury**. Plaintiff then would finally be able to conduct a true, and focused Discovery.

Q) So, that's it for now?

A) YES, unless we want to discuss how his use of **Fosamax**, another Merck drug in litigation for allegedly causing fractured femur. Plaintiff says "Fosamax broke his leg, and Vioxx stopped it from healing".

**He spent 8 months in hospitals and nursing homes** and is claiming very significant damages to his own self, his personal life and his finances. He is also considering asking for compensation for about 20 hours per week, on average – for rounding to five years at an attorneys pay level which comes to an additional 5,000 hours at $300/hr = $150,000. Lastly interest on his damage request of $1.5M at 3-5% is about $45,000 to $75,000.

Q) Let's not talk about Fosamax at the time being until we see how things are sorted out....**OK**?

A) **I agree, there are many issues here** – physical damage, personal damage to himself and his divorced wife (now) and adopted daughter, why the Discovery team did not assure his Discovery, Merck's legal "strategy" of red herrings and targeting his case for unfair dismissal may have infringed upon his civil rights, there are the other "other injuries", and who knows what else may be Discovered....