UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re VIOXX PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br><br>*Commonwealth of Pennsylvania by Thomas W. Corbett Jr., Attorney General vs. Merck & Co., Inc.*; Case No. 09-2861 | MDL No. 1657<br><br>SECTION L<br><br>JUDGE ELDON E. FALLON<br><br>MAGISTRATE JUDGE KNOWLES |

**PLAINTIFFS' STEERING COMMITTEE AND GOVERNMENT ACTION LIAISON COUNSEL'S REPLY IN SUPPORT OF ITS MOTION FOR AN ORDER IMPOSING A COMMON BENEFIT OBLIGATION UPON THE RECOVERY OF THE COMMONWEALTH OF PENNSYLVANIA ATTORNEY GENERAL'S CLAIMS ASSERTED AGAINST MERCK, SHARP & DOHME CORP. PENDING IN THIS MDL**

The Plaintiffs' Steering Committee and Government Action Liaison Counsel (collectively "PSC") respectfully submit this Reply in support of their motion to impose an equitable and ratable common benefit obligation on the Commonwealth of Pennsylvania Attorney General's recovery[1]—the settlement of its claims with Merck while pending in this MDL—to avoid unjust enrichment by Pennsylvania or its counsel, and to partially reimburse and compensate the common benefit expenditures and work performed by the undersigned Counsel for the benefit of all litigating AGs in this litigation.

**I.    INTRODUCTION**

The Commonwealth of Pennsylvania (hereinafter, "Commonwealth"), by and through its special private counsel, Cohen, Placitella & Roth, P.C., posit three reasons why the Commonwealth and its private counsel should escape the common benefit obligation in this

---

[1] In this MDL, common benefit assessments have been paid, pursuant to Court order, from the attorneys' fee share of recoveries, rather than from the clients' share. Thus, the Commonwealth would not be paying the common benefit requested, but, rather, its private counsel would.

MDL.  They first argue that the Commonwealth, despite its status as an active litigant with a pending action in this MDL, has sovereign immunity from this Court's application of the common benefit doctrine, because it is beyond this Court's jurisdiction.  Second is the theory that a common benefit order would somehow constitute a "tax" of a state government's property.  The third rationale, directly belied by the facts, is that, despite Commonwealth counsel's appointment to, and involvement in, the work of the MDL Court-appointed Government Action Executive Committee ("GA Committee") and their involvement in the MDL discovery and expert work conducted under GA Committee auspices for the benefit of all AGs, neither the Commonwealth nor its private counsel wanted, used, or benefitted from the extensive governmental entity common benefit work conducted in the MDL.

The Commonwealth's Opposition relies heavily on this Court's January 3, 2012 *Order and Reasons* (Rec. Doc. 63612) regarding the PSC's request for a 6.5% assessment from other AGs' NAMFCU settlement, finding a "disconnect" between the MDL common benefit work and the DOJ/NAMFCU settlement fund.  There is no such disconnect here.  Rather, there is a strong connection between the AG Committee's common benefit work, the PSC's common benefit work and the Pennsylvania settlement reached as a result of, and through Special Master Patrick Juneau's assistance.  (*Order and Reasons*, at p. 3.)

This Reply is respectfully submitted to point out there is no recognized exception or immunity from the common benefit doctrine on the part of government entity beneficiaries.  No case has been cited in the Opposition that limits the common benefit doctrine in this way.  The common benefit doctrine was developed by the Supreme Court as an expression of the district courts' inherent authority and equitable jurisdiction to avoid unjust enrichment in litigation of all kinds, among parties of all kinds, by allocating the cost of a common benefit ratably among its

beneficiaries, whether these beneficiaries are individuals, corporate or other business entities, classes, or otherwise.  *See Sprague v. Ticonic National Bank*, 307 U.S. 161, 166 (1939); *Trustees v. Greenough*, 105 U.S. 527 (1881) (seminal decision imposing common benefit obligation upon the Trustees of the Internal Improvement Fund of Florida, involving Florida State lands).  The Commonwealth claims it cannot or should not be "taxed" by paying its common benefit share.  However, by avoiding this payment it is in reality imposing a tax upon others, unjustly enriching itself at the expense of other government entities, and specifically "taxing" the attorneys and law firms who paid the costs, worked the hours, and made the efforts to develop the factual information and expert opinion that the Commonwealth requested, that the Commonwealth received, and that the Commonwealth thus presumptively utilized to reach its settlement with Merck.

This Reply is accompanied by the factual attestations of attorneys who worked alongside the Commonwealth's private counsel on the Government Entity common benefit undertaking.  The accompanying Declarations are submitted to demonstrate the involvement in, and receipt of work product by, the Commonwealth's private counsel.  These facts refute the claim that common benefit work product was not requested, received, or used for the benefit of the Commonwealth in the settlement reached in this MDL.  The accompanying Declaration of Donald C. Arbitblit ("Arbitblit Declaration"), Declaration of Dawn M. Barrios ("Barrios Declaration"), Declaration of James R. Dugan, II ("Dugan Declaration");  Statement of Shelly A. Sanford ("Sanford Statement"); and Declaration of Russ Herman ("Herman Declaration') are attached hereto as Exhibits A, B, C,  D, and E respectively, and are incorporated herein by reference. Individually and collectively, they defeat the argument of the Commonwealth and its

private counsel that they were disinterested and unengaged in the Government Entity common benefit work, including the Louisiana AG bellwether trial, while this work was being conducted.

These Declarations, and the Declaration of PSC Member Mark P. Robinson (Exhibit F hereto, which proves he paid a $50,000 cost contribution to work for the common benefit of the AGs), also establish and document the substantial financial contributions and significant efforts these attorneys and their firms made to discharge their duties as members of the MDL Court-appointed Government Entity Committee, to conduct common benefit fact discovery, expert development, and bellwether trial work for the benefit of all Government Entity plaintiffs. The out-of-pocket costs of the five declarant firms alone total approximately $955,000.00; the number of hours they spent collectively is approximately 12,074.75. This total does not include the substantial Government Entity-related common benefit work of other PSC members and Lead Counsel. But this Reply is not a fee application; it is intended to set the stage for a common benefit fees/costs application process under which all the costs incurred and work expended for the common benefit of AGs in the Vioxx MDL may be equitably and ratably spread among the beneficiaries. All but the Commonwealth among the litigating AGs agreed to this approach, which is intended to preserve the integrity and efficacy of the common benefit system under which this MDL has operated since its inception. The Commonwealth presumably has paid or will pay its private counsel for the fraction of the effort the Cohen, Placitella firm conducted, yet it does not want to pay its ratable share for the remainder of the work done for its benefit, which its private counsel requested, to which its private counsel had access, and which its private counsel was thus not required to replicate.

II. **THE AUTHORITIES CITED BY THE COMMONWEALTH DO NOT REMOVE THE COMMONWEALTH OR ITS PRIVATE COUNSEL FROM THE AMBIT OF THE COMMON BENEFIT DOCTRINE OR THIS COURT'S EQUITABLE POWER TO ALLOCATE COMMON BENEFIT FEES AND COSTS AMONG ALL BENEFICIARIES.**

The Opposition brief cites a number of cases regarding the immunities and prerogatives of the States, in various factual and procedural contexts.[2] No one is challenging the power and sovereignty of the states to make their own litigation decisions or choose their own counsel. But none of these authorities address, either squarely or by direct analogy, the common benefit doctrine that governs the situation before the Court: that of a private counsel, appearing before this Court on behalf of an AG client, accepting appointment to an official committee for the purposes of conducting AG common benefit work, participating in, obtaining, and utilizing the common benefit work of its committee colleagues, and refusing to pay its ratable share. While the Opposition begins with jurisdictional arguments, claiming that this Court has no jurisdiction over the Commonwealth (based on the assertions in a pending, unadjudicated remand motion), the fact is that the Commonwealth's claims against Merck were resolved while these claims were pending in the MDL, and, as the Opposition acknowledges, were resolved through the active and

---

[2] *See, e.g.*, *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464,470-71 (5th Cir. 1985); *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804,810 (1986); *Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc.*, 415 F. Supp. 2d 516, 521 (E.D. Pa. 2005); *Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc.*, 415 F. Supp. 2d 516, 521 (E.D. Pa. 2005); *Commonwealth of Massachusetts v. Philip Morris, Inc.*, 942 F. Supp. 690, 694 (D. Mass. 1996); *Minnesota v. Pharmacia Corp.*, 2005 WL 27939297 (D. Minn. 2005); *Missouri v. Mylan Laboratories, Inc.*, 2006 WL 1459772 (E.D. Mo. 2006); *Maryland v. Philip Morris, Inc.*, 934 F. Supp. 173 (D. Md. 1996); *Hawaii v. Abbott Laboratories, Inc.*, 2006 WL 3457617 (D. Haw. 2006); *Wisconsin v. Abbott Laboratories*, 390 F. Supp. 2d 815 (W.D. Wisc. 2005); *Louisiana v. American Tobacco Co.*, 1996 WL 544210 (W.D. La. 1997); *City of New York v. The Tobacco Institute, Inc.*, 1997 WL 760502 (S.D.N.Y. 1997); *New York v. Lutheran Center for the Aging, Inc.*, 957 F. Supp. 393,403 (E.D.N.Y. 1997; *Rudolph v. Adamar of NJ, Inc.*, 153 F. Supp. 2d 528, 537 (D.N.J. 2001); *Barton v. Summers*, 293 F.3d 944 (6th Cir. 2002); *Commonwealth v. Janssen Pharmaceutical, Inc.*, 607 Pa. 406, 8 A.3d 267 (2010); *Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012); *Jefferson County v. Acker*, 52 U.S. 423 (1999); *McCulloch v. Maryland*, 17 U.S. 316 (1819); *Fox Film Corp. v. Doyal*, 286 U.S. 123, 128 (1932); *Board of Trustees v. United States*, 20 C.C.P.A. 134, 141-142 (C.C.P.A. 1932).

ongoing assistance of the MDL-appointed special master, Patrick Juneau.[3]  Over the course of this litigation, the MDL court has appointed a number of counsel to specific committees devoted to various aspects of common benefit work, including common benefit work on behalf of the AGs.  As the following section details, the Commonwealth's private counsel sought and was granted appointment by the MDL court to the GA Committee, pursuant to Pre-trial Order No. 44, entered by the MDL court on July 9, 2009.  As the accompanying Declarations attest, the Commonwealth's private counsel was an active member and active participant in the work of this Court-appointed Committee.  Early on in MDL 1657, the court entered the first of a series of common benefit-related orders, which provided, *inter alia*, for timekeeping, expense reporting, committee structures, and common benefit assessments.  The Court's Committee appointment and common benefit orders have been entered, and should be enforced, pursuant to the controlling authority of the Fifth Circuit's landmark decision in *In re Air Crash Disaster at Florida Everglades* (MDL No. 139), 549 F.2d 1006 (5th Cir. 1977), which acknowledged and applied the Supreme Court's common benefit doctrine (as formulated, *inter alia*, in *Trustees v. Greenough* and *Sprague v. Ticonic*) to assure that those counsel designated by the Court to act for the common benefit had a reliable expectation of reimbursement and compensation, from recoveries in the litigation.  As the Fifth Circuit stated:

---

[3] *See* Opposition, pp. 5-6: "As a result of Merck's intransigence, the Commonwealth and Merck engaged in case specific discovery following the lifting of the MDL discovery stay once the NAMFCU settlement was approved. That discovery took place with no assistance from the PSC.  It was during this resumed discovery that the Commonwealth and Merck began in earnest discussing a private mediation to see if a resolution could be reached. At this time Merck and the Commonwealth's counsel met (with absolutely no PSC involvement or input) and engaged in a day of settlement discussions in Pennsylvania.  While some progress was made during those negotiations, there was a subsequent discussion, with Special Master Juneau's consent, between Merck and the Commonwealth about engaging a local Pennsylvania mediator.  After some further progress was made in counsel's negotiation efforts, it was jointly agreed to reach out and ask Special Master Juneau to mediate given the progress the parties had already made and the remaining differences between them.  He agreed and flew to Pennsylvania to do so.  An Agreement was then reached at that session."

> If lead counsel are to be an effective tool, the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation.

*Florida Everglades*, 549 F.2d at 1016.

In contemporary MDLs, the term "lead counsel" extends to all "designated counsel," that is, all counsel appointed to various committees, by the court, in the course of the MDL proceedings. *See, e.g.*, *Manual For Complex Litigation*, § 10.221 (Federal Judicial Center 2004); *see also In re Linerboard Antitrust Litig.* (MDL 1261), 333 F. Supp. 2d 343, 346 (E.D. Pa. 2004). Thus, this Court's early common benefit order, Pre-Trial Order No. 19 (establishing plaintiffs' litigation expense fund to compensate and reimburse attorneys for services performed and expenses incurred for MDL administration and common benefit), entered on August 4, 2005, provided for a contingent percentage assessment to be paid "by all members of the PSC, MDL Committee members and the Court approved State Liaison Committee." PTO No. 19 ¶ 2.f(1). Thus, the Commonwealth's private counsel sought, agreed to, and participated in the MDL under a Committee appointment with a common benefit obligation that corresponded to this appointment already in place, established by the previous pre-trial orders of the MDL Court. None of the authorities cited in the Opposition grapples with or even discusses this scenario.

The Opposition argues that the Commonwealth must have the right and freedom to choose its own private counsel. The undersigned have no quarrel with this proposition: it is a salutary practice for the states to augment their prosecutorial resources with those of private counsel, to conserve the resources of taxpayers while insuring effective prosecution against well-heeled and sophisticated defendants. The fact that private counsel can operate on a contingent basis further conserves state resources. But this principle leads toward, not away from, the propriety and equity of including the Commonwealth's private counsel within the common

benefit ambit.  For if this is not done, the Commonwealth, through its private counsel, will have benefited from the efforts of other private counsel – including other AGs' private counsel – without paying its fair share.  In short, and inescapably, the Commonwealth and/or its private counsel would be enriched at the expense of other states, other private counsel, and other litigants in this MDL.  Under the Supreme Court's common benefit doctrine decisions, under *Florida Everglades*, and under its own series of pre-trial orders, the MDL court has the power and authority to ratably apportion common benefit expenses to insure equitable treatment of all beneficiaries.  Other governmental entities have recognized and acknowledged this equitable principle and obligation by agreement.  Equity would be thwarted if the Commonwealth and/or its private counsel are allowed to "opt-out," *ex post facto*, from an agreement and obligation into which they voluntarily entered, and in which they actively participated.

### III. THE INVOLVEMENT OF PENNSYLVANIA'S COUNSEL IN MDL FACT AND EXPERT DISCOVERY ESTABLISHES THE REQUISITE COMMON BENEFIT NEXUS

The attached accounts of counsel who paid the costs and did the work under this Court's AG-related orders demonstrate the factual and equitable propriety and fairness of imposing a ratable common benefit obligation on the Commonwealth and/or its private counsel.

Dawn M. Barrios was appointed by this Court to serve as Government Entity Liaison, and her firm has expended approximately 1,600 hours on this task, none of which has been compensated to date.  She has incurred Government Entity common benefit expenses totaling approximately $60,000, including a $50,000 assessment contributed to the AG Common Benefit Fund to assist with the expenses that were specifically dedicated to the prosecution of the AG cases, under this Court's Pretrial Order #44.  *See* Exhibit B, at ¶ 2.  Ms. Barrios' firm did not have an AG as an individual client, so all of her firm's work under Pretrial Order #44, and other

directives of the Court, was devoted strictly to the common benefit of all AGs and their counsel. Exhibit B, ¶ 3.

As her Declaration describes, Dawn Barrios, as Liaison for the AGs, conducted regular weekly conference calls, and a number of other meetings, including mediation sessions and brain-storming meetings, together with organizing the periodic AG status conferences which this Court held. Her communications with the Commonwealth's private counsel began in 2009, with Mark Schultz, who was at that time with the Cohen, Placitella & Roth firm. These contacts included in person meetings to organize the AG case, to familiarize AG counsel with the PSC depository and resources, to discuss issues, and plan discovery for all AG cases. As her declaration notes, at least one of the Commonwealth's private counsel attended and participated in approximately 20 conference calls on AG matters, and Pretrial Order #44 named the Commonwealth's private counsel, Mr. Schultz, to the Government Action Executive Committee (*see* Exhibit B, ¶¶ 4-8).

Ms. Barrios' ongoing contact and work with the Commonwealth's private counsel continued despite changes of personnel among those working as private counsel for the Commonwealth: she dealt not only with Mr. Schultz, but with Michael Coren and Harry Roth of Cohen, Placitella & Roth on the Commonwealth's claims, and with Eric Weinberg, who requested and was granted access to the depository and common benefit work product materials, on behalf of the Commonwealth. (*See* Exhibit B, ¶¶ 9-11). The Barrios Declaration provides additional detail in paragraphs 12-37, of the participation by the Commonwealth, through its private counsel, in the Government Entity discovery efforts, and the receipt by the Commonwealth's private counsel of extensive common benefit discovery, including the trial package.

The information requested and received by the Commonwealth was neither insubstantial nor incidental. These included the documents the Commonwealth most wanted from Merck, the "Top Ten" list, which the Commonwealth participated in drafting, and which Merck provided (Exhibit B, ¶ 16). The PSC depository was given to the Commonwealth on a hard drive, which, held over 1 million pages of documents relevant to the Commonwealth alone (Exhibit B, ¶¶ 17-18). The Commonwealth participated in discovery hearings via conference calls with the Court and Merck, the Commonwealth's private counsel attended AG general status conferences with the Court, and attended mediation sessions conducted by MDL Special Master Juneau. The Commonwealth volunteered to be in the very first group of AG cases to go to trial, so it received discovery earlier than other AGs. *See* Pretrial Order #39A, Exhibit B, ¶ 34. The Commonwealth's private counsel participated in crafting the language of Pretrial Orders #39A and #39B, and Mr. Weinberg personally attended at least one meeting to jointly develop experts with members of the PSC and other Government Entity counsel in Houston (*see* Exhibit B, ¶¶ 28 and 34). Ms. Barrios is directly and intimately familiar with the participation of the Commonwealth, through its private counsel, in the ongoing Government Entity discovery and trial preparation efforts, conducted in the MDL, under the auspices of its pretrial orders. Declarant Donald C. Arbitblit, of Lieff Cabraser Heimann & Bernstein ("LCHB"), is also familiar with the Commonwealth's private counsels' involvement, from another perspective- the Commonwealth's involvement in the discovery, pretrial, and trial proceedings in the AG bellwether trial conducted in the MDL, which provided valuable information to all AGs and resulted in a PSC's AG trial package.[4]

---

[4] As the Arbitblit Declaration attests, LCHB alone expended unreimbursed common benefit costs of $461,288.41, which included $263,945 in common benefit assessments, and an additional $47,000 paid directly to Baylor College
*Footnote continued on next page*

Mr. Arbitblit's experience in the Government Entity common benefit bellwether trial project likewise refutes the Commonwealth's counsels' assertion that they were not interested in, and did not care about, this major common benefit project. As Mr. Arbitblit attests:

> 4.      Following the selection of the *State of Louisiana* case as a bellwether for trial, a series of discussions took place between counsel for the various public entities to coordinate the AG plaintiffs' efforts. On July 7, 2009, Pennsylvania's counsel Eric Weinberg sought the deposition transcript of MDL/PSC expert Connie Pechmann, who had testified regarding marketing issues; on July 13, 2009, Mr. Weinberg wrote an email stating, "I am interested in sharing my work product and getting the benefit of others' work product to win these cases." Mr. Weinberg and I informally shared information during this time; for example, on July 23, 2009, Mr. Weinberg sent me a report by David Madigan, Ph.D., a biostatistics expert he had retained; I reviewed the report and informed Mr. Weinberg of certain suggested corrections based on my own knowledge of the facts and my work with multiple MDL/PSC experts on the same issues. (Neither the State of Louisiana nor any other litigant in the MDL cases ultimately used the Madigan report.)[1]
>
> > [1] Relevant biostatistics expert opinions developed in the MDL are included in the trial package.
>
> 5.      The discussions regarding cooperative prosecution of the AG cases resulted in an agreement to adhere to a "Vioxx MDL 1657 Governmental Action Committee Structure." Pursuant to that structure, MDL/PSC counsel and attorneys for the government entities agreed to work cooperatively on the same subcommittees. Of particular relevance to the pending motion, counsel for the Commonwealth of Pennsylvania, Eric Weinberg, was named as Co-Chair of the Experts Committee along with MDL/PSC counsel James Dugan and myself; and Pennsylvania counsel Mark Schultz was named as Co-Chair of the Damages Committee, on which Mr. Weinberg and I were named as Committee members.
>
> 6.      Shortly after the agreement to implement the committee structure, I prepared and circulated to the committee a memorandum identifying the experts that had been retained and/or prepared reports for the PSC as of that time. These included several generic experts from the MDL trial package, which were equally relevant to the AG cases on issues of failure to warn and cardiovascular risk. In addition, the memorandum described several additional expert reports that had already been completed specifically for the AG cases, at substantial expense of time and expert witness fees.

---

*Footnote continued from previous page*
of Medicine for a common benefit expert witness who appeared in the LA AG trial. (Exhibit A, ¶ 2.) The common benefit time contributed by LCHB (likewise unreimbursed) exceeds $2,726,000. *Id.*

7.     The Court ultimately set the *State of Louisiana v. Merck* expert report deadline for November 6, 2009, and extensive reports were submitted at that time. These included the expert reports developed in the MDL specifically for the AG cases, including those of David Kessler, M.D., former Director of the United States Food and Drug Administration; John MacGregor, M.D., a Professor of Cardiology at the University of California at San Francisco; and David Graham, M.D., a Professor of Medicine at Baylor who specialized in the adverse gastro-intestinal effects of pharmaceuticals. Hundreds of unreimbursed hours, and hundreds of thousands of dollars in unreimbursed costs, were spent by the undersigned and other MDL attorneys in the development of these reports. Additional reports of Jerry Avorn, M.D., and Connie Pechmann, were obtained from the MDL trial package developed through the previous work of PSC counsel, and those were submitted on behalf of the State of Louisiana at the same time.

8.     On November 9, 2009, PSC/MDL counsel met with attorneys for the various government entities at the office of PSC/MDL counsel Shelley Sanford, in Houston, Texas. At that time, PSC/MDL counsel described in some detail the expert reports that had been served on behalf of the State of Louisiana three days earlier. Pennsylvania's counsel, Mr. Weinberg and Mr. Schultz, both asked to receive these expert reports that had been prepared and funded by the MDL/PSC. In order to protect the PSC's work product from unauthorized use, government entity counsel were asked to sign a letter agreement not to use "the common benefit expert reports" in the litigation "until and unless an agreement is reached and/or court order is entered regarding the payment of assessments to contribute to the expense of preparing such reports." (Exhibit 3, filed herewith). During the communications regarding cooperative prosecution of the AG cases, Mr. Weinberg had specifically asked whether he would have access to Dr. Kessler, an important witness who had not been identified in the prior phase of the Vioxx litigation. Counsel for the Commonwealth of Pennsylvania signed the agreement not to use the reports without compensating the PSC on December 9, 2009 (*Id*). It is my recollection. . . . that Mr. Dugan's office handled the transmission of the reports to Pennsylvania's counsel:

*  *  *

11.    On June 10, 2010, after the *State of Louisiana v. Merck* trial had concluded, Pennsylvania counsel sought information about the expert evidence submitted in that case. Pennsylvania counsel Mark Schultz set a conference call of the cooperative expert committee for the following day, and Mr. Weinberg sent an email stating, " It would be helpful if possible to get a quick briefing for a couple of minutes on the Louisiana trial expert evidence to start the call tomorrow.

"For example:

1.     The evidence presented on risks/benefits of Vioxx – what was known or knowable, what was not disclosed.

-12-

      2.      Evidence related to comparator therapy, as alternatives to Vioxx.

      3.      The damages evidence

      4.      What experts testified about what issues

      5.      Merck's defenses.

"Thanks."

Thus, the attorneys for Pennsylvania continued to seek the information developed and paid for by MDL/PSC counsel to inform their opinions and assessments of their own case.

The Declaration of James R. Dugan, II (Exhibit C), likewise attests to the request and receipt by the Commonwealth's private counsel of extensive common benefit work product. Mr. Dugan serves as Co-Chair of the Governmental Action Committee established under PTO #44. As his declaration establishes, Mr. Weinberg was appointed to the MDL AG Expert Committee as a Co-Chair with Mr. Dugan, and Mr. Schultz, on behalf of the Commonwealth, Co-Chaired the Damages Committee (Exhibit C, ¶ 8). The AG Committee agreed to set up an MDL Common Benefit Expenses Fund, and that its members would pay assessments into that Fund to defray common benefit expenses. Common benefit assessments were collected in the amount of approximately $6,080 (*see* Exhibit C, ¶ 9 and Exhibit A attached thereto). Mr. Weinberg and Mr. Schultz participated in various MDL AG meetings and conference calls (Exhibit C, ¶ 10) but did not pay in any assessments into the Common Benefit Fund on behalf of the Commonwealth. As Mr. Dugan described in his Declaration,

> 15. On November 9, 2009, PSC/MDL counsel met with attorneys for the various government entities at the office of PSC/MDL counsel Shelley Sanford, in Houston, Texas. At that time, PSC/MDL counsel described in some detail the expert reports that had been served on behalf of the State of Louisiana three days earlier. Pennsylvania's counsel, Mr. Weinberg and Mr. Schultz, both asked to receive these expert reports that had been prepared and funded by the MDL/PSC. In order to protect the PSC's work product from unauthorized use, government entity counsel were asked to sign a letter agreement not to use "the common benefit expert reports" in the litigation "until and unless an agreement is reached

and/or court order is entered regarding the payment of assessments to contribute to the expense of preparing such reports." During the communications regarding cooperative prosecution of the AG cases, Mr. Weinberg had specifically asked whether he would have access to Dr. Kessler, an important witness who had not been identified in the prior phase of the Vioxx litigation. Counsel for the Commonwealth of Pennsylvania signed the agreement not to use the reports without compensating the PSC on December 9, 2009 (*Id*). I handled the exchange of these reports and Mr. Weinberg's signed agreement: (Ex. C)

From: James Dugan [mail to:jdugan@dugan-lawfirm.com] Sent: Friday, December 11, 2009
11:20 AM
To: Mark Schultz; Trudy Bryant
Cc: Douglas Plymale; Shelly Sanford; Don Arbitblit
Subject Re: Vioxx agreement not to use the common benefit expert reports

Trudy, please handle this

Sent from my, iPhone
On Dec 11, 2009, at 10:14 AM, "Mark Schultz"
<mark@mschultzlaw.com>
wrote:

> Here is my signed agreement regarding the LA experts. The original
> has been sent to James Dugan's office. Please forward the expert
> reports to my new address. Thanks
>
>
> Mark C. Schultz
> Schultz Law LLC
> 8 Tower Bridge
> 161 Washington St.
> Suite 400
> Conshohocken, PA. 19428

16. Pennsylvania eventually settled its claims against Merck without trial, and its need to use the PSC-funded expert reports in the litigation was thereby obviated. Nevertheless, Pennsylvania asked to receive those reports, learned their content, and had the opportunity to incorporate those experts' opinions into their own assessment of the cases and any reports that their own experts prepared. Furthermore, Merck obviously knew that the PSC-funded experts could be available for subsequent trials on behalf of Pennsylvania or other AG plaintiffs. Therefore, Pennsylvania voluntarily sought and received a benefit from the PSC expert reports and the availability of these experts, and its claims were settled in the context of these prior developments.

17. The State of Louisiana v. Merck case was tried in April 2010. That case resulted in the Court's Conclusion of Law that "Plaintiff failed to satisfy its burden of proving causation because it did not establish at trial that: had it known different facts about Vioxx (a) the State could have established an exclusive formulary; (b) and the State would have established such a formulary and excluded Vioxx from it." (Findings of Fact and Conclusions of Law, Document 45739, Filed 06/29/10, at 38). Despite this Conclusion adverse to the State, the Court's Findings of Fact validated the opinions of the Plaintiff's experts on certain key issues, including the finding that the weight of the evidence supported the conclusion that Vioxx increased cardiovascular risk, rather than the alternative theory espoused by Merck (Id, at 14-18); and that, as Dr. Kessler had testified, "Merck attempted to neutralize concerns that Vioxx was cardiotoxic." (Id, at 36.) These findings, achieved at the expense of substantial investments of unreimbursed time and cost, inherently and inevitably inured to the benefit of all government entities, including the Commonwealth of Pennsylvania, in the subsequent prosecution and/or settlement of their claims against Merck. Following trial, the expert reports of Plaintiffs witnesses were added, to the MDL trial package made available to governmental litigants.

18. On June 10, 2010, after the State of Louisiana v. Merck trial had concluded, Pennsylvania counsel sought information about the expert evidence submitted in that case. Pennsylvania counsel Mark Schultz set a conference call of the cooperative expert committee for the following day, and Mr. Weinberg sent an email stating, "It would be helpful if possible to get a quick briefing or a couple of minutes on the Louisiana trial expert evidence to start the call tomorrow.

> "For example:
> 1. The evidence presented on risks/benefits of Vioxx-what was known
>    or knowable, what was not disclosed.
>
> 2. Evidence related to comparator therapy, as alternatives to Vioxx.
>
> 3. The damages evidence
>
> 4. What experts testified about what issues
>
> 5. Merck's defenses.
>
> "Thanks."

(Dugan Declaration, ¶¶ 15-18; *see also* Arbitblit Declaration, ¶¶ 8-11.)

PSC Member Shelly A. Sanford was likewise appointed by this Court to the Vioxx Government Action Executive Committee, and made a $50,000 assessment payment into the

Vioxx Government Action Fund, to defray common benefit expenses in the government action cases (Exhibit D, ¶¶ 2-3). Among her significant efforts were two meetings with potential experts and expert materials for the common benefit of the government cases, hosted over multiple days at the Sanford firm in Houston, Texas. (Exhibit D, ¶ 4.) The Commonwealth's private counsel attended and participated in these meetings (Arbitblit Declaration, ¶ 8; Exhibit C, ¶ 15; Exhibit B, ¶ 28).

As the accompanying Declarations by those lawyers most continuously and intimately involved in the AG common benefit work point out, unlike Louisiana (the bellwether AG plaintiff) the Commonwealth eventually settled its claims against Merck without trial. Its need to use the PSC-funded expert reports in the trial against Merck was thereby obviated. Nevertheless, the Commonwealth, through its private counsel, asked to receive those reports, learned their content, and had the ability to incorporate these experts' opinions—many of which established key points regarding Vioxx's defect and Merck liability at the LA AG trial—in their own assessment of the Commonwealth's claims. Furthermore, Merck obviously knew that these PSC-funded experts would be available for subsequent trials, by the Commonwealth or other AG plaintiffs. The Commonwealth therefore voluntarily sought and received a tangible and direct benefit from the PSC expert reports, and ongoing access to these experts, and the Commonwealth's claims were settled in the context of these prior developments. As the foregoing declarations' excerpts establish, there is direct evidence that the Commonwealth's private counsel thought the expert evidence submitted in the LA AG case was quite important (*see, e.g.*, Exhibit A, ¶ 11; Exhibit C, ¶ 18).

The Commonwealth's opposition asserts that it neither wanted nor benefitted from the MDL trial package. However, as the Barrios, Arbitblit, and Dugan declarations describe, the

Commonwealth's private counsel voluntarily sought and received the contents of the depository, a significant portion of the MDL trial package, and expert reports that were requested from PSC counsel in 2009, which did not only set forth the expert's opinions, but also identified dozens of key documents and scientific articles upon which the experts relied, and the particular portions of these documents that were relevant to the issues in the case. Having requested and obtained the MDL/PSC expert reports, having accepted an MDL Committee appointment that carried with it a common benefit obligation (*see, e.g.*, PTO #19), and having sought and agreed to a cooperative committee structure to develop evidence for all the government litigants, it is most reasonable to conclude that the Commonwealth's private counsel expected to benefit, and actually did benefit, from the substantial expenditure of time and money at the other members of the MDL Government Action Executive Committee, and the MDL PSC, incurred to develop them.

## IV.   CONCLUSION

The pending motion by the undersigned asks this Court to exercise its own powers to enforce its own common benefit and case management orders, under the ample authority flowing from controlling decisions of the Supreme Court and the Fifth Circuit. The Opposition styles this effort as a Rule 65 injunction, but the undersigned respectfully submit that, under the specific circumstances presented by the activities of the Commonwealth and its private counsel in the MDL, it is more properly viewed as a case management exercise, pursuant to *Florida Everglades*. This Court may, for example, acting under its previous orders, withhold the compensation of the Commonwealth's private counsel, who have appeared before it, accepted a court appointment from it, and participated in conferences, discovery, and other activities before it, in an amount appropriate to discharge the common benefit obligation of its client.

Dated: February 22, 2013                    Respectfully submitted,


                                            By:    /s/ Russ M. Herman

                                            Russ M. Herman (Bar No. 6819)
                                            Leonard A. Davis (Bar No. 14190)
                                            Stephen J. Herman (Bar No. 23129)
                                            HERMAN, HERMAN & KATZ, L.L.C.
                                            820 O'Keefe Avenue
                                            New Orleans, LA  70113
                                            Telephone: (504) 581-4892
                                            Facsimile: (504) 561-6024

                                            **PLAINTIFFS' LIAISON COUNSEL**

Andy D. Birchfield, Jr., Esquire            Christopher A. Seeger, Esquire
Leigh O'Dell, Esquire                       SEEGER WEISS
BEASLEY, ALLEN, CROW, METHVIN,              One William Street
  PORTIS & MILES, P.C.                      New York, NY  10004
234 Commerce Street                         (212) 584-0700 (telephone)
Montgomery, AL  36103 4160                  (212) 584-0799 (fax)
(800) 898-2034 (telephone)                  **Co-Lead Counsel**
(334) 954-7555 (fax)
**Co-Lead Counsel**


Richard J. Arsenault, Esquire               Thomas R. Kline, Esquire
NEBLETT, BEARD & ARSENAULT                  Shanin Specter, Esquire
2220 Bonaventure Court                      David J. Caputo, Esquire
P.O. Box 1190                               Lisa S. Dagostino, Esquire
Alexandria, LA  71301                       KLINE & SPECTER, P.C.
(318) 487-9874 (telephone)                  1525 Locust Street, 19th Floor
(318) 561-2591 (fax)                        Philadelphia, PA  19102
                                            (215) 772-1000 (telephone)
                                            (215) 772-1371 (fax)


Elizabeth J. Cabraser, Esquire              Christopher V. Tisi, Esquire
LIEFF CABRASER HEIMANN &                    ASHCRAFT & GEREL
  BERNSTEIN, LLP                            2000 L Street, N.W., Suite 400
Embarcadero Center West                     Washington, DC  20036-4914
275 Battery Street, 30th Floor              (202) 783-6400 (telephone)
San Francisco, CA  94111                    (307) 733-0028  (fax)
(415) 956-1000 (telephone)
(415) 956-1008  (fax)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
  MEUNIER & WARSHAUER, L.L.C.
Energy Centre
1100 Poydras Street, Ste. 2800
New Orleans, LA  70163
(504) 522-2304 (telephone)
(504) 528-9973 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS,
  MITCHELL, ECHSNER &
  PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL  32502
(850) 435-7000 (telephone)
(850) 497-7059 (fax)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA  70601
(337)494-7171 (telephone)
(337) 494-7218 (fax)

Dawn M. Barrios, Esq. (Bar No. 2821)
BARRIOS, KINGSDORF
  & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA  70139
(504) 524-3300 (telephone)
(504) 524-3313 (fax)
**Government Action Liaison Counsel
On the Brief**

Arnold Levin, Esquire
Fred S. Longer, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA  19106
(215) 592-1500 (telephone)
(215) 592-4663  (fax)

Shelly A. Sanford, Esquire
SANFORD PINEDO LLP
2016 Bissonnet Street
Houston, TX  77005
(713) 524-6677 (telephone)
(713) 524-6611 (fax)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE
  & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA  92660
(949) 720-1288 (telephone)
(949) 720-1292 (fax)

James R. Dugan, II
THE DUGAN LAW FIRM
One Canal Place
365 Canal St., Suite 1000
New Orleans, LA  70130
**Government Action Co-Chair**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on Liaison Counsel, Ann B. Oldfather, and Phillip Wittmann, by U.S. mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 22nd day of February, 2013.

/s/ *Leonard A. Davis*
Leonard A. Davis