

**COMMONWEALTH OF KENTUCKY**
**SUPREME COURT**

File No. _____

**(Court Of Appeals File No. 2011-CA-000234-MR)**

**JAMES RATLIFF, ON BEHALF OF HIMSELF**                                    **MOVANTS**
**AND ALL OTHERS SIMILARLY SITUATED**

V.                              **MOTION FOR DISCRETIONARY REVIEW**

**MERCK & COMPANY, INC.,**
**n/k/a MERCK SHARP & DOHME CORP.**                              **RESPONDENTS**

\* \* \* \* \* \* \* \*

A copy of this Motion for Discretionary Review was served by mailing same, postage prepaid, to: Susan J. Pope, Esq., Frost Brown Todd, LLC, 250 West Main Street, Suite 2800, Lexington, Kentucky 40507; John H. Beisner, Esq., Jessica D. Miller, Esq., Skadden, Arps, Slate, Meagher & Flom, LLP, 1440 New York Avenue, NW, Washington, DC 20005; Hon. Steven D. Combs, Pike Circuit Court Judge, Hall of Justice, 172 Division Street, Suite 423, Pikeville, Kentucky 41502; Mr. W. David Deskins, Pike Circuit Clerk, Hall of Justice, P.O. Box 1002, Pikeville, Kentucky 41502; Hon. Samuel Givens, Jr., Clerk, Kentucky Court of Appeals, 360 Democrat Drive, Frankfort, Kentucky 40601 on this the 12th day of March, 2012.

RICHARD A. GETTY
and
JESSICA K. CASE

THE GETTY LAW GROUP, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky 40507
Telephone: (859) 259-1900
Facsimile: (859) 259-1909

COUNSEL FOR MOVANTS,
JAMES RATLIFF, ON BEHALF
OF HIMSELF AND OTHERS
SIMILARLY SITUATED

**EXHIBIT D**

## MOTION FOR DISCRETIONARY REVIEW

The Movant, James Ratliff ("Ratliff"), on behalf of himself and all others similarly situated, for his Motion For Discretionary Review pursuant to Kentucky Rule of Civil Procedure 76.20, states as follows:

(a)     The name of the Movant is James Ratliff and his attorneys are Richard A. Getty, Esq. and Jessica K. Case, Esq., The Getty Law Group, PLLC, 1900 Lexington Financial Center, 250 West Main Street, Lexington, Kentucky 40507.  Respondent is Merck & Co., Inc. ("Merck"), whose attorneys are Susan J. Pope, Esq., Frost Brown Todd, LLC, 250 West Main Street, Suite 2800, Lexington, Kentucky 40507; John H. Beisner, Esq. and Jessica D. Miller, Esq., Skadden, Arps, Slate, Meagher & Flom, LLP, 1440 New York Avenue, NW, Washington, DC 20005.

(b)     The date of entry of the Opinion Affirming ("Opinion") entered by the Kentucky Court of Appeals, and ordered to be published, is February 10, 2012.

(c)     No Supersedeas Bond has been executed.

(d)     Movant does not have a Petition For Rehearing or Motion For Reconsideration pending in the Court of Appeals.

(e)     No other party to this proceeding has a Petition For Rehearing or Motion For Reconsideration pending in the Court of Appeals.

(f)     The Movant submits the following clear and concise statement of:

(i)     **Material Facts**:

A.     **Merck Is Put On Notice Regarding The Potential Health Risks Of Vioxx But Chooses To Keep Vioxx On The Market And Attempts To Minimize The Negative Reports Regarding Its Side Effects By Disseminating Misleading Information Regarding The Drug.**

Merck is a foreign corporation with its principal place of business in New Jersey, and is in the business of manufacturing and/or promoting, marketing, and distributing the drug Vioxx.

Merck does business in Kentucky and, between 1999 and 2004, sold Vioxx in Kentucky to tens of thousands of Kentucky consumers. (Record on Appeal ("R."), v. 1, p. 40; Memorandum in Support of Plaintiff's Motion to Certify Class Pursuant To CR 23.01 and CR 23.02 (hereinafter "Memorandum In Support Of Motion To Certify"), p. 2). Vioxx, generically known as Rofecoxib, is a nonsteroidal anti-inflammatory drug ("NSAID"). It was introduced to the market on May 21, 1999. Merck promoted Vioxx as having a safety profile superior to other NSAIDs. (Id.).

In January 1999, however, the Vioxx GI Outcomes Research ("VIGOR") study conducted by Merck itself showed that thrombotic events, including myocardial infarction (heart attack), occurred in more patients in the Vioxx treatment group than in the alternative treatment group. (R., v. 1, p. 41; Memorandum In Support Of Motion To Certify, p. 3). In an attempt to minimize the negative findings of the VIGOR study, Merck took the position that the difference in thrombotic event rates between Vioxx and the alternative drug was due to a cardio-protective effect of the alternative drug. Significantly, however, Merck was aware that there was another explanation for the difference in thrombotic event rates in the VIGOR study's treatment groups – that Vioxx had pro-thrombotic properties, or in other words, that Vioxx increased the risk of a thrombotic event such as a heart attack. (R., v. 1, p. 4; Memorandum In Support Of Motion To Certify, p. 3); see also In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig., 483 F. Supp. 2d 407, 412 (D. N.J. 2007) (Judgment was later reversed and remanded, but facts cited are sound).

On June 29, 2000, Merck submitted the VIGOR data and analysis to the FDA. The FDA concluded that Merck should include data on the Vioxx label about the higher incidence of cardiovascular events observed in the VIGOR study. Id. Studies subsequent to the VIGOR study also suggested a serious increased risk of cardiovascular events in patients taking Vioxx.

2

Despite a mounting body of evidence suggesting that Vioxx materially increased the risk of serious cardiovascular injury in patients taking the drug, Merck elected to engage in promotional activities and disseminate materials for the marketing of Vioxx that were false or misleading, lacking in fair balance or otherwise misleading, while attempting to discredit studies that suggested the continued use of the drug posed a very serious health risk to patients. In general, the statements discredited questions raised about the possibility that Vioxx is pro-thrombotic. Instead of acknowledging the significant health risks associated with Vioxx, Merck instead launched a widespread and vigorous marketing campaign flooding the market with materials misrepresenting the risks of continued use of Vioxx. Numerous press releases issued by Merck stated that Vioxx had an "excellent safety profile" and a "favorable cardiovascular safety profile" – material misstatements given the true extent of Merck's knowledge of Vioxx's risks. In re Merck & Co., Inc., 483 F. Supp. 2d at 412. Based on information and belief, Merck spent in excess of $100 million per year on direct-to-consumer advertising of Vioxx. (R., v. 1, p. 44; Memorandum In Support Of Motion To Certify, p. 6).

In September 2001, the United States Department of Health and Human Services (the "DHHS") issued a second formal eight-page "Warning Letter" in which it criticized Merck for its continual misleading promotional activities. Specifically, the letter referred to promotional Vioxx audio conferences given on behalf of Merck by various sales representatives and doctors. (2001 Warning Letter, attached as Exhibit B to Memorandum In Support Of Motion To Certify; R., v. 1, p. 104). Merck was also accused, among other things, of making unsubstantiated superiority claims, promoting Vioxx for unapproved uses and issuing a false and misleading press release entitled "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx." In the Warning Letter, the DHHS directed Merck to implement a corrective action plan, including

ceasing the misleading promotion of Vioxx and issuing a letter to doctors to correct false information it had disseminated.  (Id.)

Despite the drastic step of a DHHS "Warning Letter," Merck continued its campaign to mislead consumers and to deny the real risks that the continued use of Vioxx posed to those who took the medication.  On August 26, 2004, Merck issued a Press Release stating that it "strongly disagrees" with the conclusions of a study presented at the 20th International Conference of Pharmacoepideminology & Therapeutic Risk Management that found, once again, that the use of Vioxx significantly increased the risk of serious cardiovascular events.  Merck stated that its studies showed "no significant difference in the rate of serious cardiovascular thrombotic events in patients taking Vioxx vs. placebo," and that "[b]ased on all of the data that are available from our clinical trials, Merck stands behind the efficacy and safety, including cardiovascular safety, of Vioxx" – representations spread in the market that Merck knew or should have known were false or misleading.  In re Merck & Co., Inc., 483 F. Supp. 2d at 413.  One month later, however, Merck withdrew Vioxx from the market, finally acknowledging the true dangers of its drug after three years of failing to do so and after receiving the profits generated by Vioxx during those three years.  (Merck, News Release (Sept. 30, 2004), attached as Exhibit C to Memorandum In Support Of Motion To Certify; R., v. 1, p. 114).

Following the withdrawal of Vioxx from the market, the Food and Drug Administration (the "FDA") advised all patients who were currently taking Vioxx to contact their physician for guidance regarding its discontinuation and alternative therapies.

  **B.**   **Jim Ratliff Was Prescribed Vioxx During The Relevant Time Period, And Suffered Monetary Damages As A Result Of Merck's Deceptive Marketing Practices.**

Ratliff is a resident of Pike County, Kentucky who was diagnosed with chronic osteoarthritis in 1994 at the age of 37.  After experimenting with a bevy of anti-inflammatory

drugs, including Daypro and Celebrex, his doctor recommended that he take Vioxx, a drug that was new to the market. In January of 2000, Ratliff began taking Vioxx twice daily. His insurance covered most of the $66.49 price of the drug per month. However, Ratliff still had to pay $5 out-of-pocket each month to fill his Vioxx prescription. (Deposition of James Ratliff ("Ratliff Dep.") 33:21-34:4; R., v. 3, pp. 305-306). Ratliff took Vioxx for three years, spending over $75 to purchase the drug.

Two physicians prescribed Vioxx to Ratliff, and both testified that they relied extensively on the information and materials provided to them by Merck sales representatives in evaluating the health risks of the drug. (Deposition of K.D. Gibson ("Gibson Dep."), 13:14-24, R., v. 3, pp. 345-346; Deposition of J. Pampati, ("Pampati Dep."), 14:11-15:24, R., v. 3, pp. 359-360). The materials provided to these physicians, and other physicians throughout the country, were misleading and deceptive, and minimized the potentially serious cardiovascular side effects of the drug that eventually forced Merck to remove the drug from the market. (See Section A, supra). Once Merck finally removed Vioxx from the market because of the inherent dangers of the drug, all physicians, including Ratliff's doctors, were bound to cease prescribing the drug to their patients. (Gibson Dep. 37:8-11, R., v. 3, p. 555; Pampati Dep., 40:5-9, R., v. 3, p. 369).

After experiencing severe chest pains, labored breathing, lethargy, bleeding, and other uncomfortable side effects, Ratliff discontinued the use of Vioxx in early 2004, months before the drug was removed from the market. Ratliff has since obtained the medical consultation suggested by the FDA, a consultation that cost approximately $180, as well as a screening by a gastroenterologist to assess both his gastrointestinal bleeding and any cardiovascular damage he may have sustained because of his Vioxx use.

The Plaintiff Ratliff brought this case as a class action on behalf of all Kentucky residents who have purchased and taken Vioxx and who, upon the recommendation and advice of the FDA

and Merck, have contacted or will contact their physicians to seek advice regarding their use of Vioxx.  Plaintiff seeks reimbursement for (a) the costs of such medical consultations, including the costs of any diagnostic testing recommended by the class members' physicians; (b) the lost income and related expenses the class members have, or will have to incur in undergoing such examinations and procedures; and (c) the cost of the Vioxx the class members purchased.  Each Plaintiff's claims will not exceed the sum of $75,000 exclusive of interest and costs, and no Plaintiff will seek to recover in this action for any personal injury he may have sustained as a consequence of taking Vioxx as prescribed.  (Class Action Complaint, R., v. 1, at p. 1).

Ratliff's damages of approximately $350 are much too small to pursue in litigation against a company the size of Merck.  His situation mirrors that of several hundred thousand Vioxx users across the Commonwealth.  While his insurance covered most of the cost relating to the purchase of Vioxx, Ratliff was still spending several dollars a month to purchase a drug which had deadly undisclosed side-effects.  The financial harm caused to Ratliff by Merck's misleading marketing practices is relatively small.  However, if his total expenditures are added up and to a class of over approximately 200,000 individuals, the outlay of money is exponentially higher, resulting in a loss in excess of $60.0 million to Kentucky consumers. Seeking redress is impractical on an individual basis, but becomes feasible in the context of a class action, where Ratliff's loss is combined with the loss of others similarly situated.

### C.   Merck's Deliberately Obstructive Litigation Techniques Have Resulted In Excessive Delay In The Progress Of This Class Action Litigation.

Since 2004, when Ratliff filed the underlying action in the Pike Circuit Court, Merck has engaged in obstructive and abusive litigation techniques, making every effort to delay the progress of the litigation and prevent the Plaintiffs in this action from obtaining redress for the injuries they have suffered as a result of Merck's deceptive and manipulative marketing

practices. Merck, a multi-billion-dollar corporation, has personally attacked the integrity of the Circuit Judge, attempted to smear the credibility of the class Plaintiff, and has spent hundreds of thousands of dollars delaying this litigation in an apparent attempt to force the Plaintiff and Plaintiff's counsel to abandon this litigation.

On November 29, 2004, Merck removed the action to Federal Court and also filed a Motion with the Judicial Panel on Multidistrict Litigation ("JPML") seeking to transfer this case to a single court for coordinated pretrial management pursuant to 28 U.S.C. §1407. On January 1, 2005, Ratliff filed a Motion To Remand. After a thorough analysis of the potential value of Ratliff and other potential class members' claims, and based upon its conclusion that Merck failed to show that the damages on each person's claims would exceed the jurisdiction threshold of $75,000, the District Court held that it did not have jurisdiction over this cause of action. On March 3, 2005, Judge Hood entered an Order remanding the action to the Pike Circuit Court.

Ratliff thereafter sought an Order of the Pike Circuit Court certifying the action as a class action pursuant to CR 23.01 and CR 23.02(c). Extensive briefs were filed in support of and in opposition to Ratliff's Motion, and Merck also filed a Motion for Summary Judgment asking that Ratliff's claims be dismissed on various bases. (Motion to Certify Class, R., v. 1, p. 29; Opposition To Motion To Certify Class, R., v. 2, pp. 233).

The Pike Circuit Court, after considering the briefs and oral argument from both sides, entered two separate Orders dated April 1, 2010 – one denying Merck's Motion for Summary Judgment, and one granting Ratliff's Motion to Certify. (April 1, 2010 Order Certifying Class Action, R., v. 6, p. 822.)

Despite the fact that established Kentucky precedent states that Petitions for Writs of Prohibition or Mandamus are not appropriate means for challenging class certification orders,

7

see Garrard County Bd. of Educ. v. Jackson, 12 S.W.3d 686 (Ky. 2000), Merck sought relief

from the April 1, 2010 Class Certification Order by filing a Petition for Writ of Mandamus with

the Court of Appeals, arguing that the Court's decision to certify the Class was in error and

should be reversed.  The Court of Appeals denied Merck's Petition by Order dated July 12, 2010.

(Court of Appeals Order, attached as Exhibit B to Plaintiffs' Motion To Enter Amended Class

Certification Order, R., v. 6, p. 850).  In so ruling, the Court of Appeals relied on both the

holding in Jackson, supra, and upon a finding that Merck had an adequate remedy of appeal

following a final adjudication of the merits.  Id.  Merck further appealed to this Court the Court

of Appeals decision denying the mandamus relief sought by it, which affirmed on the basis of the

Jackson decision, and found that Merck had not demonstrated that it would be irreparably

harmed by the trial court's decision to certify the class.  (2010-SC-000529-MR).

### D.    The Trial Court Enters An Amended Order Certifying Class.

Merck based its Petition for Writ of Mandamus partially upon its argument that the Order

Certifying Class Action failed to make specific findings supporting its ruling and was therefore

inadequate.   At the trial court level, however, Merck objected to the Plaintiffs' Motion To Enter

Amended Order Certifying Class, and attempted to prevent the trial court from amplifying or

clarifying the grounds for its earlier certification decision – in effect whipsawing the trial court in

an effort to prejudice the Plaintiff class harmed by it.  (Plaintiffs' Reply In Support Of Motion To

Reconsider, R., v. 7, p. 1104).

On January 27, 2011, however, the trial court granted Plaintiffs' Motion, and entered an

Amended Order.  See Amended Order, attached at Tab 1.  The Amended Order entered by the

trial court contains a detailed recitation of facts, a description of the class Plaintiff and class

allegations, and a complete Rule 23 analysis, with citation to relevant case law.  Id.  Specifically,

the trial court found that the class is so numerous that joinder of all members is impracticable,

8

that there are questions of law and fact common to the class, that the claims and defenses of the representative parties are typical of the claims and defenses of the class, that Ratliff will fairly and adequately protect the interests of the class, that questions of law and fact common to the class predominate, that a class action is the superior means of adjudicating the claims at issue, and that resolution of the action as a class does not pose any particularly difficult management or administrative problems. Id. Merck appealed from this Amended Order Certifying Class, arguing that common questions of law and fact do not predominate under CR 23.02(c), that class action is not the superior method for adjudication, and that Ratliff is not a typical or adequate representative.

### E.    The Court Of Appeals Orders The Trial Court To Vacate The Amended Order Certifying Class.

The Court of Appeals reversed the trial court, finding that the class members' claims of negligent misrepresentation and unjust enrichment could not satisfy the predominance requirement under CR 23.02(c). See February 10, 2012 Court of Appeals Opinion (hereinafter "Opinion"), at Tab 2. In so doing, however, the Court of Appeals first noted that it agreed with several aspects of the Trial Court's Amended Certification Order:

> Nonetheless, it should first be acknowledged that that we agree with the trial court on several initial points. Indeed, we agree that Ratliff's and the putative class members' claims hinge upon whether Merck knowingly or negligently distributed false or misleading information while VIOXX was on the market. This common question threads through each potential class member's claims. We further acknowledge that predominance does not require that each and every possible issue be common to all class members, but only that common issues *substantially predominate* over those issues which are individual in nature.

> Opinion, p. 10 (emphasis in original, citations omitted).

The Court of Appeals based its ruling that the class members' fraud and misrepresentation claims did not satisfy the predominance requirement under CR 23.02(c) on that fact that, under Kentucky law, the fraud claims each contained the element of reliance:

> In the present case, each of the putative class members would have to show that his or her respective physicians individually relied upon the false or misleading information disseminated by Merck when prescribing Vioxx to them.  It is exactly this type of individualized proof which generally makes class litigation inappropriate in fraud and misrepresentation cases.

Id. at 12.

The Court of Appeals went on to note, however, that in some cases involving fraud or misrepresentation, a "class action may still be appropriate where common issues predominate over individualized questions and arise from a single fraudulent scheme or conspiracy or from identical misrepresentations." Id. at p. 13.

It has been the Movant's contention, in pleadings and on appeal, that Merck used a consistent pattern of deception lasting essentially the entire time that Vioxx was on the market, and that generalized proof could therefore be used to show the elements of fraud and misrepresentation in this case.  The Court of Appeals analogized the Movant's argument to the rebuttable presumption of reliance and causation known in securities litigation under the fraud on the market theory.  The Court declined, however, to extend the fraud on the market theory beyond the scope of securities litigation, noting that other jurisdictions have likewise refused to allow use of the theory in consumer litigation: "[T]he 'fraud-on-the-market' approach has never been recognized in this jurisdiction for a fraud or misrepresentation case." Id. at 15.  The Court concluded that certification with respect to the fraud and misrepresentation claims was therefore inappropriate.

Based on these conclusions, the Court of Appeals ruled that the trial court abused its discretion by entering the Amended Order Certifying Class, and reversed and remanded the matter to Pike Circuit Court with instructions for the Court to vacate its prior order.

### ii)    **The Questions Of Law Involved.**

Ratliff submits that the following questions of law are at issue:

1.  Whether the trial court abused its discretion in finding that common questions of law and fact predominated under CR 23.02(c) with respect to the class members' fraud and misrepresentation claims based on a finding that the consistent pattern and substance of Merck's misrepresentation allowed for generalized proof of reliance with respect to the class members' fraud and misrepresentation claims.

iii)  **Specific Reasons Why The Judgment Should Be Reviewed.**

The Court of Appeals correctly acknowledged that Ratliff's and the putative class members' claims hinge upon whether Merck knowingly or negligently distributed false or misleading information while Vioxx was on the market, and that this common question threads through each potential class member's claims. The Court of Appeals also correctly acknowledged that predominance does not require that each and every possible issue be common to all class members, but only that common issues <u>substantially</u> <u>predominate</u> over those issues which are individual in nature. Opinion, p. 10 (emphasis in original, citations omitted). Movant submits, however, that the Court erred in refusing to allow generalized proof with respect to the element of reliance in connection with the class members' fraud and misrepresentation claims.

The Amended Order Certifying Class Action reversed by the Court of Appeals found that common questions predominate with respect to the claims asserted because "[a]ll of the potential plaintiffs were prescribed Vioxx by doctors who relied on Merck's assertions that it was safe and effective to treat their individual Ailments. All of the potential plaintiffs spent money to purchase Vioxx, and when it was removed from the market all were directed by Merck and the FDA to seek medical consultations relating to their use of the drug." The Court further found that all potential plaintiffs were seeking relief under common law theories of fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment. The Court concluded: "In such circumstances, where the plaintiffs are similarly situated, and seek recovery under

identical theories of law and based on the identical conduct of the defendant, common questions of law and fact predominate, making certification of this action appropriate under CR 23.02." Amended Order, Tab 1, p. 112.

The conclusions of the trial court were supported by the record: 1) Vioxx was a drug that was only available by prescription; 2) Ratliff's doctors both testified that they relied on information provided by Merck sales representatives in evaluating the safety of Vioxx; 3) it was undisputed that individuals who were prescribed the drug had to spend money to obtain it; and 4) it was undisputed that when Vioxx was removed from the market users were directed to seek medical consultations relating to their use of the drug.  The Court of Appeals did not call the veracity of the trial court's conclusions on these points into question, and did not rule that these findings were an abuse of discretion.

Rather, the Court of Appeals found that the trial court abused its discretion in allowing generalized proof of reliance outside the securities fraud context even though the facts in this case clearly weigh in favor of permitting such methods of proof.  Here, the record clearly demonstrated a substantively consistent message being disseminated by Merck throughout the marketplace during the time that Vioxx was on the market: Merck did everything in its power to fraudulently conceal and misrepresent the life-threatening risks associated with the drug, and to characterize it as a safe alternative to traditional NSAIDs.  The trial court found that the uniform dissemination of this message by Merck to the class members' doctors allowed for the generalized proof of reliance.

In so finding, the court analogized the factual scenario to that present in In re Texas Int'l Sec. Litig., 114 F.R.D. 33 (W. D. Okla. 1987), a case involving similar class-wide conduct by the defendant.  There, the court held that the complaint, which alleged that a corporation engaged in a common and continuous course of conduct by issuing a series of reports and statements

12

containing interrelated and cumulative misleading data to the investing public in order to inflate the price of the corporation's stock, sufficiently presented common issues of law with respect to the issues of materiality and scienter to support certification of the class action, despite the fact that the alleged misrepresentations occurred at different times and were contained in different documents during the class period. Id. at 40.

Here, the trial court did not find that the fraud on the market theory was specifically applicable with respect to the class claims at issue in this litigation, but rather concluded that the theory underlying the application of the fraud on the market approach to generalized proof of the element of reliance in securities litigation likewise supported acceptance of generalized proof with respect to the reliance element under the facts present in this consumer litigation.

The fraud on the market theory, established by the Supreme Court's opinion in Basic Inc. v. Levinson, 485 U.S. 224, 241-245 (U.S. 1988), is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

In essence, the fraud on the market theory adopted by the Supreme Court in Levinson, supra, was a judicially crafted remedy to avoid such injustice. Id. at 242 (noting that the presumption of reliance created by the fraud on the market theory provided a practical resolution to the problem of balancing the substantive requirement of proof of reliance in securities cases against the procedural requisites of Civil Rule 23). Here, as in the securities litigation at issue in Levinson, requiring proof of individualized reliance from each member of the proposed plaintiff class effectively prevents consumers affected by a corporate actor's blatant misrepresentations from proceeding as a class on common law fraud claims. Although courts have admittedly been

hesitant to allow such generalized proof of reliance in connection with common law fraud or misrepresentation claims, there is simply no good reason for refusing to adopt the common sense approach already approved by the Supreme Court in the securities context.

This case presents a prime example of an irresponsible corporate citizen – a company that puts a product on the market, becomes aware of a product defect, and then spends millions of dollars attempting to obscure the danger and increase profits. Even after the product – here Vioxx – was pulled from the market, Merck used every bad faith tactic to try to prevent those with claims too small to be brought individually from ever obtaining redress through a class action. Statutory and common laws are designed to prevent this type of activity, and where, as here, thousands of individuals are harmed by the defective product, a class action is an appropriate means of providing redress. The Court should adopt the fraud on the market theory employed by courts in the securities context to avoid an injustice being worked on the several hundred thousand Kentucky consumers put at risk by their use of Vioxx.

Respectfully submitted,

RICHARD A. GETTY
and
JESSICA K. CASE

THE GETTY LAW GROUP, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky 40507
Telephone: (859) 259-1900
Facsimile: (859) 259-1909

COUNSEL FOR MOVANTS,
JAMES RATLIFF AND ALL OTHERS
SIMILARLY SITUATED

jkcpld0472

**EXHIBIT 1**

**PIKE CIRCUIT COURT**
**35TH JUDICIAL CIRCUIT**
**DIVISION II**

**Case No. 04-CI-01493**

JAMES RATLIFF, On Behalf Of Himself
And All Others Similarly Situated

**PLAINTIFFS**

V.

**AMENDED ORDER**
**CERTIFYING CLASS ACTION**

MERCK & COMPANY, INC., A Foreign
Corporation

**DEFENDANT**

\* \* \* \* \* \* \* \*

Upon Motion of the Plaintiff, James Ratliff ("Ratliff" or "Plaintiff"), by counsel, requesting

the Court to enter an Amended Order Certifying Class, and the Court being fully and sufficiently

advised, it is hereby ORDERED that the instant Amended Order Certifying Class Action be

entered into the record of this matter.

**RELEVANT PROCEDURAL BACKGROUND**

On October 27, 2004, Plaintiff Ratliff, individually and on behalf of all others similarly

situated, filed the instant action in this Court against Defendant Merck & Company, Inc.

("Merck"). The Complaint seeks damages for violations of the Kentucky Consumer Protection

Act, fraud, negligence, and unjust enrichment arising from the Defendant's advertising and

marketing of VIOXX® ("Vioxx") to consumers in Kentucky.

Ratliff sought, and on April 22, 2010, received, an Order from this Court certifying the

instant action as a class action pursuant to CR 23.01 and CR 23.02 (c) so that he and other

potential Plaintiffs in Kentucky who are similarly situated may obtain the reimbursement relief

they seek in connection with the claims asserted in the Class Action Complaint. This Amended

ENTERED
PIKE CIRCUIT DISTRICT COURT
JAN 2 7 2011
DAVID ASKINS CLERK
BY: _____ D.C.


EXHIBIT
1

Order Certifying Class Action incorporates that April 22, 2010 Order, and will serve as the operative Class certification Order as this litigation proceeds.

## RELEVANT FACTUAL BACKGROUND AND ALLEGATIONS

Merck is a foreign corporation with its principal place of business in New Jersey, and is in the business of manufacturing and/or promoting, marketing, and distributing the drug Vioxx. Merck does business in Kentucky and, between 1999 and 2004, sold Vioxx in Kentucky to thousands of Kentucky consumers. Vioxx, generically known as Rofecoxib, is a nonsteroidal anti-inflammatory drug ("NSAID"). It was introduced to the market on May 21, 1999. In May 2001, the Federal Food and Drug Administration ("FDA") approved Vioxx for treating primary dysmenorrheal (severe menstrual cramps), managing acute pain in adults, and relieving symptoms relating to osteoarthritis. Merck promoted Vioxx as having a safety profile superior to other NSAIDs. Specifically, unlike traditional NSAIDs, which include aspirin, ibuprofen and naproxen, Vioxx did not cause serious gastrointestinal side effects. Whereas traditional NSAIDs operate by inhibiting two enzymes-cyclooxygenase-1 ("COX-1") and cyclooxygenase-2 ("COX-2"), Vioxx selectively suppresses only COX-2 without affecting COX-1. This is significant because the suppression of COX-1 can lead to the deterioration of the stomach lining and gastrointestinal problems such as perforations and bleeds.[1]

The Plaintiff has alleged that Merck chose to keep VIOXX on the market despite being put on notice regarding the potential health risks, and that Merck attempted to minimize the negative reports regarding the side effects of the drug by disseminating misleading information.

The Plaintiff further alleges that following studies identifying serious side effects, and despite a mounting body of evidence suggesting that Vioxx materially increased the risk of serious cardiovascular injury in patients taking the drug, Merck elected to engage in promotional

---

[1] Detailed factual background taken, in part, from the opinion in In re Merck & Co., Inc. Securities, Derivative & "Erisa" Litigation, 483 F.Supp.2d 407, 412 (D.N.J. 2007).

2

activities and disseminate materials for the marketing of Vioxx that were false or misleading, lacking in fair balance or otherwise misleading, while attempting to discredit studies that suggested the continued use of the drug posed a serious health risk to patients.

The Plaintiff has alleged that Merck put pressure on independent doctors and several of the nation's top medical schools to keep them from discussing evidence of Vioxx's potential safety problems. According to the Plaintiff, Merck's distortions and deceptions regarding the safety of Vioxx began almost immediately after Vioxx was introduced to the U.S. market in 1999, and have pointed out that as early as December, 1999, the U.S. Department of Health & Human Services ("DHHS") objected to promotional materials being disseminated by Merck that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance. The Plaintiff has asserted that despite the DHHS objection, Merck continued to distribute information and engage in conduct designed to distort and misrepresent the safety and efficacy of its drug.

In September, 2001, the DHHS issued a second formal eight-page "Warning Letter" in which it criticized Merck for its continual misleading promotional activities. Specifically, the letter referred to promotional Vioxx audio conferences given on behalf of Merck by various sales representatives and doctors. The letter stated that:

> As a part of its routine monitoring and surveillance program, the Division of Drug Marketing, Advertising, and Communications has reviewed your promotional activities and materials and has concluded that they are false, lacking in fair balance, or otherwise misleading in violation of the Federal, Food, Drug, and Cosmetic Act.

See 2001 Warning Letter, attached to Plaintiff's Memorandum In Support Of Motion To Certify Class as Exhibit B.

The DHHS accused Merck of engaging in "a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx

Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile

for Vioxx." Merck was also accused, among other things, of making unsubstantiated superiority

claims, promoting Vioxx for unapproved uses and issuing a false and misleading press release

entitled "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx." In the Warning

Letter, the FDA directed Merck to implement a corrective action plan, including ceasing the

misleading promotion of Vioxx and issuing a letter to doctors to correct false information it had

disseminated. Id.

The Plaintiff has alleged that despite the DHHS "Warning Letter," Merck continued its

campaign to mislead consumers and to deny the real risks that the continued use of Vioxx posed

to those who took the medication. As the Plaintiffs noted, as recently as August 26, 2004, Merck

issued a press release stating that it "strongly disagrees" with the conclusions of a study

presented at the 20th International Conference of Pharmacoepidemiology & Therapeutic Risk

Management that found, once again, that the use of Vioxx significantly increased the risk of

serious cardiovascular events. Merck stated that its studies showed "no significant difference in

the rate of serious cardiovascular thrombotic events in patients taking Vioxx vs. placebo" and

that "[b]ased on all of the data that are available from our clinical trials, Merck stands behind the

efficacy and safety, including cardiovascular safety, of Vioxx." In re Merck & Co., Inc.

Securities, Derivative & "Erisa" Litigation, 483 F.Supp.2d 407, 412 (D.N.J. 2007). A month

later, however, Merck withdrew Vioxx from the market.

After Vioxx was removed from the market, thousands of individual suits and numerous

class actions were filed against Merck in state and federal courts throughout the country alleging

various products liability, tort, fraud, and warranty claims. On February 16, 2005, the Judicial

Panel on Multidistrict Litigation conferred multidistrict litigation ("MDL") status on Vioxx

lawsuits filed in federal court and transferred all such cases to the United States District Court

for the Eastern District of Louisiana Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407.  See In re Vioxx Prods. Liab. Litig., 360 F.Supp.2d 1352 (J.P.M.L. 2005).  Importantly, only the suits filed in federal court were affected by this transfer order, which left the state court actions against Merck to proceed individually.

On November 9, 2007, Merck entered into a Settlement Agreement ("Agreement") with certain plaintiffs' counsel in order to establish a nationwide settlement program to resolve the personal injury claims of certain individuals who have suffered a heart attack, stroke, or sudden cardiac death resulting from their use of Vioxx (the "Vioxx Claimant(s)").  See Merck, News Release (November 9, 2007), attached to Plaintiff's Memorandum In Support Of Plaintiff's Motion To Certify Class as Exhibit D.  In order for claims to be paid under the Settlement Program, counsel representing Vioxx Claimants must have filed with the relevant court no later than January 15, 2008, a Registration Affidavit for every Vioxx client they represent as primary counsel in a personal injury action, regardless of whether the client suffered a heart attack, ischemic stroke, or sudden cardiac death resulting from Vioxx.  The representative Plaintiff in this action was not registered, as he has not asserted a claim for personal injury relating to his use of Vioxx.

According to the Agreement, a claimant is only eligible to participate in the Settlement Program if he or she has a filed Vioxx lawsuit pending in any jurisdiction or a Vioxx claim that was tolled under the Tolling Agreement established by the MDL Court, and has alleged in his/her lawsuit or tolling paperwork that the Claimant (or the Deceased or minor for whom the Claimant is the Legal Representative) suffered a heart attack, ischemic stroke, or sudden cardiac death as a result of Vioxx ingestion.  See Description of Settlement Agreement, attached to Plaintiff's Memorandum In Support Of Motion To Certify Class as Exhibit E.  It is clear from the face of the Agreement that the representative Plaintiff, and others who are similarly situated,

will not be eligible for recovery under the Agreement because they have not suffered and are not seeking recovery for injuries relating to a heart attack, ischemic stroke, or sudden cardiac death resulting from Vioxx. The claims asserted in this action fall outside the claims settled by the Agreement and are therefore unaffected thereby.

## THE REIMBURSEMENT CLAIMS ASSERTED HEREIN

Following the withdrawal of Vioxx from the market, the FDA issued a Public Health Advisory to advise patients who had taken Vioxx to consult with a physician. Specifically, on September 30, 2004, the FDA advised all patients who were currently taking Vioxx to contact their physician for guidance regarding the discontinuation and alternative therapies. In a press release issued the same day, Merck acknowledged that patients who were currently taking Vioxx "should contact their health care providers to discuss discontinuing the use of Vioxx and possible alternative treatments." See September 30, 2004 FDA Press Release, attached to Plaintiff's Memorandum In Support Of Motion To Certify Class as Exhibit F.

The Plaintiff brings this case as a class action on behalf of all Kentucky residents who have purchased and taken Vioxx and who, upon the recommendation and advice of the FDA and Merck, have or will contact their physicians to seek advice regarding their use of Vioxx. Plaintiff seeks reimbursement for (a) the costs of such medical consultations, including the costs of any diagnostic testing recommended by the class members' physicians; (b) the lost income and related expenses the class members have, or will have to incur in undergoing such examinations and procedures; and (c) the cost of the Vioxx the class members purchased. Each plaintiff's claims will not exceed the sum of $75,000 exclusive of interest and costs, and no plaintiff will seek to recover in this action for any personal injury he may have sustained as a consequence of taking Vioxx as prescribed.

### A.   The Class Plaintiff.

Jim Ratliff is a resident of Pike County, Kentucky. He was diagnosed with chronic osteoarthritis in 1994, at the age of 37. After experimenting with a bevy of anti-inflammatory drugs, including Daypro and Celebrex, his doctor recommended that he take Vioxx, a new drug on the market. In January of 2000, Ratliff began taking Vioxx twice daily. His insurance covered most of the $66.49 price of the drug per month; however Ratliff still had to pay $5 out-of-pocket each month to fill his Vioxx prescription. Ratliff took Vioxx for three years, spending over $75 to purchase the drug. After experiencing severe chest pains and other uncomfortable side effects, Ratliff discontinued use of Vioxx in early 2004, months before the drug was removed from the market. Ratliff has since obtained the medical consultation suggested by the FDA, a consultation that cost approximately $180. Including damages arising from work missed as a result of the medical consultation and other consequential damages, the Plaintiff has alleged that Merck's misleading and deceptive marketing practices resulted in a direct monetary loss to Ratliff of approximately $350.

### B.   The Class Allegations.

The Plaintiff has alleged that by downplaying, concealing, and misrepresenting the safety and risks of Vioxx, Merck failed in its duty to provide the physicians prescribing Vioxx with adequate information to make them so-called "learned intermediaries," thereby leaving them with insufficient knowledge to properly advise and warn the consuming public. The Plaintiff has further alleged that by downplaying, concealing, and misrepresenting the safety and risks of Vioxx, Merck also created and perpetuated a false public perception that there was little or no risk of harm from the use of its product.

The Plaintiff alleges that all Kentucky residents who were prescribed and took Vioxx were given the same false and misleading information and suffered under the same

misconceptions regarding the drug's safety. All Kentucky residents who were prescribed and took Vioxx have been directed by the FDA and by Merck to see their physicians for consultation regarding their use of the drug. The Plaintiff asserts that these residents have incurred expenses related to these consultations and follow-up diagnostic testing recommended by their physicians, as well as additional economic harm, including lost time from work and related expenses, and the loss of the value of the drugs they purchased. Plaintiff brings this action pursuant to CR 23 on behalf of all Kentucky residents who have, since the FDA approval of Vioxx in 1999, taken the drug and who have already undergone and/or will undergo the medical consultation procedure now recommended by the FDA and Merck.

The Plaintiff, on behalf of himself and others similarly situated, seeks a judgment against Merck for Violation of the Consumer Protection Act, fraudulent concealment and/or misrepresentation, negligent and/or grossly negligent misrepresentation, and for unjust enrichment. The Plaintiff seeks to recover on his behalf, and on behalf of all similarly situated Kentucky residents, the economic loss they have and will sustain as a result of the required medical consultations and any follow-up diagnostic testing recommended by their physicians, as well as any income lost or expenses incurred in connection with any such medical procedures, and the costs of the Vioxx they purchased. Furthermore, Plaintiff also seeks to disgorge Merck of the profits it unjustly reaped by virtue of its fraudulent and misleading marketing campaign - by marketing its product as a safer and more effective alternative to other traditional pain medications, it was able to drive the price of its product substantially higher than the price charged for similar medications.

Plaintiff Ratliff is a member of the class he seeks to represent. The members of the class are so numerous that joinder is impracticable and would involve hundreds of thousands of individual litigants. It is estimated that more than 200,000 Kentucky residents have been

8

prescribed and have used Vioxx.  In addition, there are questions of fact or law common to the class that predominates over any questions affecting only individual members.  These predominating questions include, but are not limited to:

      a.      Whether Merck breached its duty to investigate the efficacy of Vioxx, to adequately warn physicians and consumers of the dangers incident to prescribing the drugs, to keep abreast of scientific developments and information concerning these products and to notify the medical profession of any new or additional information concerning the potentially dangerous side effects discovered from its use;

      b.      Whether Merck engaged in a scheme and plan to downplay, obfuscate, misrepresent and conceal material information concerning Vioxx's safety profile and sought to minimize, misrepresent or conceal the truly serious cardiovascular risks that continued use of the drug posed;

      c.      Whether by downplaying, concealing, and misrepresenting the risks of Vioxx, Merck created and perpetuated a false public perception that there was little or no risk of harm from the use of its product; and

      d.      Whether members of the class have suffered any economic loss as a result of Merck's conduct.

The claims of  Plaintiff Ratliff are typical of the claims of the class members in that the Plaintiff and the members of the class purchased and used Vioxx and have undergone and/or will undergo the medical consultation recommended by the FDA and Merck, and have sustained economic losses as a result.  The Plaintiff will fairly and adequately represent and protect the interests of the members of the class, and has retained counsel competent and experienced in class actions.  Finally, given that the individual claims of the potential plaintiffs are relatively small, there is a decreased incentive for the plaintiffs to pursue their claims individually.  In

addition, most of the plaintiffs are individuals with low to median income levels who could not afford to pursue these claims on their own. A class action, which allows these plaintiffs to come together and seek relief en mass, preserves judicial resources and ensures that the plaintiffs are able to obtain legal representation. For these reasons, and as set forth below, the Court finds that a class action is an appropriate method for the fair and efficient adjudication of the claims asserted in the Complaint filed in this action.

## DISCUSSION

**I.    THE PREREQUISITES OF CR 23.01 ARE SATISFIED HERE.**

**A.    The Class Is So Numerous That Joinder Of All Members Is Impracticable.**

Rule 23.01(a) requires that a court find the class is so numerous that joinder is impractical. Whether a number is so large that it would be impracticable to join all parties depends not upon any magic number or formula, but rather upon the circumstances surrounding the case, the ease of identifying its members and determining their addresses, feasibility of making service on them, and their geographic dispersion. There is no precise size or number or class members that ipso facto meets the "numerosity" requirement of CR 23.01. However, common sense suggests that the larger the number of absent class members, the more likely their joinder is impracticable. See Sowders v. Atkins, 646 S.W.2d 344 (Ky. 1983).

The class herein at issue is defined by precise parameters —it consists only of those consumers who: 1.) reside in Kentucky; 2.) purchased Vioxx; and 3.) subsequently were advised to obtain a physician consultation following the removal of Vioxx from the market. These plaintiffs will be identifiable by reference to the databases of IMS Health Incorporated, a pharmaceutical market research company, and, as noted above, are estimated to number in excess of 200,000. With potential plaintiffs numbering in the

hundreds of thousands, joinder of all such potential plaintiffs is impracticable, and a class

is therefore the most appropriate means for bringing these claims.

### B.    There Are Questions Of Law And Fact Common To The Class.

Civil Rule 23.01(b) requires that common questions of law and fact be present among all

class members. This provision does not, however, require that all questions of law or fact be

common.  6 Ky. Prac. R. Civ. Proc. Ann. Rule 23.01 (6th ed. 2007).  The claims asserted in this

action – for violation of the Kentucky Consumer Protection Act, for fraud, and for negligence –

implicate and are predominated by questions of fact and law common to the class.[2]  Common

questions of fact include, but are not limited to, whether Merck engaged in a scheme and plan to

downplay, obfuscate, misrepresent, and conceal material information concerning Vioxx's safety

profile and sought to minimize, misrepresent or conceal the truly serious cardiovascular risks that

continued use of the drug posed; whether by downplaying, concealing and misrepresenting the

risks of Vioxx, Merck created and perpetuated a false public perception that there was little or no

risk of harm from the use of its product; and whether the proposed plaintiffs suffered economic

loss as a result of Merck's actions. The questions of law common to the class are whether

Merck's actions – which were uniform as to each member of the class - amounted to negligent or

fraudulent misrepresentation or violated the Kentucky Consumer Protection Act.[3]

---

[2]    In considering whether there are questions of law and fact common to the class, a Court restricts its inquiry
to the determination of whether a class action is appropriate, and should not consider the probability of
success on the merits of substantive claim. See, e.g., Walsh v. Ford Motor Co., 130 F.R.D. 260 (D.D.C.
1990).  When considering whether to certify a class, a court take the allegations of the merits of the case, as
set forth in the complaint, to be true. Sharif by Salahuddin v. New York State Educ. Dept., 127 F.R.D. 84
(S.D.N.Y. 1989).

[3]    In fact, Merck has admitted, in litigation involving similar consumer protection claims, that common
questions of law and fact were present. International Union of Operating Engineers Local No. 68 Welfare
Fund v. Merck & Co., Inc., 929 A.2d 1076, 1085 - 1086 (N.J. 2007) ("[W]e note that defendant concedes
that there are some common questions. To be sure, there is no disagreement about the fact that, whatever its
specifics, defendant's marketing plan and withholding of adverse information did not vary as among
potential consumers.  Nor is there any difference in the facts as they relate to the FDA warning letters or the
drug's eventual withdrawal from the market.").

11

**C.    The Claims And Defenses Of The Representative Parties Are Typical Of The Claims Or Defenses Of The Class.**

CR 23.01(c) requires that the claims or defenses of the representative and the members of the class be typical. Ratliff's claims are based on Merck's false and misleading marketing campaign related to the drug Vioxx, which resulted in the proliferation of information and materials that proclaimed the safety and efficacy of a drug that in fact was associated with severe, deadly, and undisclosed thrombotic side effects. Hundreds of thousands of other Kentucky consumers were subjected to this same course of conduct, their claims likewise arise from this course of conduct, and these claims are based upon the same legal theories asserted by Ratliff. The only factual differences between the potential class members in this case relate to damages, and, in practice, where the class representatives' claims are such that they will have to prove the same elements as the remainder of the class, then typicality will normally be found despite factual differences between class members. Threshold requirements for "typicality" are not high. <u>See, e.g.</u>, <u>East Texas Motor Freight System Inc. v. Rodriguez</u>, 431 U.S. 395 (1977); <u>Simpson v. Specialty Retail Concepts</u>, 149 F.R.D. 94 (M.D. N.C. 1993); <u>Shipes v. Trinity Industries</u>, 987 F.2d 311(5th Cir. 1993).

**D.    Plaintiff Ratliff Will Fairly And Adequately Protect The Interests Of The Class.**

Under CR 23.01(d), Ratliff will adequately protect the interests of the class members. Plaintiff seeks to certify a class encompassing all Kentucky residents who were prescribed and took Vioxx and who have been subsequently directed by the FDA and Merck to see their physicians for consultation regarding their use of the drug. Each of these individuals has incurred expenses related to these consultations, as well as additional economic harm, including lost time from work and related expenses, and the loss of the value of the drugs they purchased. Ratliff is a member of this group of consumers and possesses the same interests, has suffered the

same injuries, seeks the same economic redress, and his interests are therefore substantially co-extensive with the interests of the Proposed Class.

## II.   UNDER CR 23.02(c), QUESTIONS OF LAW AND FACT COMMON TO MEMBERS OF THE CLASS PREDOMINATE, AND CERTIFICATION OF THIS CLASS IS THEREFORE APPROPRIATE.

Common questions predominate with respect to the claims asserted in this action because there is a common nucleus of facts from which the potential plaintiffs' claims arise. All of the potential plaintiffs were prescribed Vioxx by doctors who relied on Merck's assertions that it was safe and effective to treat their individual ailments. All of the potential plaintiffs spent money to purchase Vioxx, and when it was removed from the market all were directed by Merck and the FDA to seek medical consultations relating to their use of the drug. All of the potential plaintiffs were victims of Merck's fraud upon the market and are entitled to recovery under the Kentucky Consumer Protection Act and common law theories of fraudulent misrepresentation, negligent misrepresentation and unjust enrichment. In such circumstances, where the plaintiffs are similarly situated, and seek recovery under identical theories of law and based on the identical conduct of the defendant, common questions of law and fact predominate, making certification of this action as a class appropriate under CR 23.02. See e.g., Wiley v. Adkins, 48 S.W.3d 20, 23 (Ky. 2001)(noting that under CR 23.02 (c), "[i]t is not necessary that there be a complete identity of facts relating to all members as long as there is a common nucleus of operative facts."); In re Workers' Compensation, 130 F.R.D. 99 (D. Minn. 1990) (noting that an issue will meet class action requirement that common questions predominate when there exists generalized evidence that proves or disproves an element on simultaneous, class-wide basis); In re Texas Intern. Securities Litigation, 114 F.R.D. 33 (W.D. Okla. 1987) (holding that a complaint which alleged that a corporation engaged in a common and continuous course of conduct by issuing a series of reports and statements containing interrelated and

cumulative misleading data to the investing public in order to inflate price of the corporation's stock sufficiently presented common issues of law with respect to issues of materiality and scienter to support certification of class action, despite the fact that the alleged misrepresentations occurred at different times and were contained in different documents during the proposed class period).

The Complaint in this action seeks damages for violations of the Kentucky Consumer Protection Act, fraudulent and negligent misrepresentation, and unjust enrichment. An examination of the elements of these claims demonstrates that each class members' claims will be based on the same theories of law and each class member will offer precisely the same proof to establish Merck's breach of duty. Common questions therefore predominate and class certification is appropriate. See, e.g. Sala v. National R.R. Passenger Corp., 120 F.R.D. 494 (E.D. Pa. 1988).

## III.   A CLASS ACTION IS THE SUPERIOR MEANS OF ADJUDICATING THE CLAIMS HEREIN AT ISSUE.

The second requirement that must be satisfied before an action may be certified under subdivision (c) is that this Court finds that a class action is superior to other methods for the fair and efficient adjudication of this controversy. Wright & Miller, Federal Practice and Procedure (2d ed.), Civil § 1779; Watson v. Shell Oil Co., 979 F.2d 1014 (5th Cir. 1992), on reh'g, 53 F.3d 663 (5th Cir. 1994). Four factors are listed in the subsection for consideration when certification is sought under subdivision (c): (i) the interest of the class in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the

difficulties likely to be encountered in the management of the class action.  No single factor is determinative.  In the instant action, each factor weighs in favor of class certification.

Specifically, where, as here, the monetary value of each Plaintiff's claim is relatively small, it is in the Plaintiff's best interests to pursue their claims as a class.  See, e.g., Deposit Guar. Nat'l Bank of Jackson, Miss. v. Roper, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.").  When one inflicts minor harm across a dispersed population, "the defendant is, as a practical matter, immune from liability unless a class is certified."  Stephen C. Yeazell, Civil Procedure 966 (5th ed. 2000).

The class action device is therefore specifically designed to facilitate the resolution of claims similar to those asserted here - that is, claims with relatively small monetary value that would not be tried on an individual basis but with respect to which there is an incentive to try in the aggregate. Merck has inflicted a relatively small harm across a large group of consumers – through false marketing practices it induced consumers to purchase a product with undisclosed and potentially fatal side effects. As a result, these consumers were harmed to the extent that they expended money in purchasing the product and in seeking the physician consultation subsequently recommended by Merck and the FDA. See Iliadis v. Wal-Mart Stores, Inc., 922 A.2d 710, 714 - 731 (N.J. 2007); Weber v. Goodman, 9 F.Supp.2d 163, 170-71 (E.D.N.Y. 1998) (noting that because of the very real likelihood that class members will not bring individual actions, class actions are "often the superior form of adjudication when the claims of the individual class members are small.").

The Court has further considered that Merck may benefit from having this litigation concentrated in one forum.  Addressing the claims of all Kentucky consumers for economic

harm arising from use of Vioxx in one action will protect Merck from being subjected to the expensive ordeal of continually having to demonstrate its purported innocence at trial. Galloway v. American Brands, Inc., 81 F.R.D. 580 (E.D. N.C. 1978).

**B.      Resolution Of This Action As A Class Does Not Pose Any Particularly Difficult Management Or Administrative Problems.**

The last consideration calls for an evaluation of the management or administrative problems typically associated with class actions. A trial court must compare the administrative difficulties of managing a single class action with those of managing several hundred separate actions. Doe v. Guardian Life Ins. Co. of America, 145 F.R.D. 466 (N.D. Ill. 1992); Mateo v. M/S KISO, 805 F. Supp. 761 (N.D. Cal. 1991); Galloway v. American Brands, Inc., 81 F.R.D. 580 (E.D. N.C. 1978). Speculative management problems should not be considered for purposes of class certification. Day v. NLO, Inc., 811 F. Supp. 1271 (S.D. Ohio 1992); In re Folding Carton Antitrust Litigation, 88 F.R.D. 211 (N.D. Ill. 1980); Riordan v. Smith Barney, 113 F.R.D. 60 (N.D. Ill. 1986) (stating that questions peculiar to each individual member of class may remain after common questions have been resolved, and that this does not dictate conclusion that class action is not permissible).

In fact, denial of class status due to manageability concerns is disfavored and, "will rarely, if ever, be in itself sufficient to prevent certification of a class." Klay v. Humana, Inc., 382 F.3d 1241, 1272-73 (11th Cir. 2004). Complexity is an inherent trait of class litigation, and "[m]any courts have recognized ... that potential management difficulties are not grounds for class denial when justice can be done only through the class action device." Conte & Newberg, § 4:32 at 277. In sum, "courts should be careful not to overemphasize management difficulty considerations when contrasted with judicial economy, small claims access, and deterrence goals of the class device." Id. § 4:45 at 336. See also, e.g., Buford v. H & R Block, Inc., 168 F.R.D. 340, 363 (S.D.Ga. 1996), aff'd, 117 F.3d 1433 (11th Cir. 1997). A court "cannot simply close its

16

doors to ... litigants because their actions present novel and difficult questions. Instead, the court and the parties must use their ingenuity to conduct th[e] litigation in a manner which will guarantee the rights of both sides." In re Antibiotic Antitrust Actions, 333 F.Supp. 278, 289 (S.D.N.Y. 1971).

Here, where common questions of law or fact predominate among plaintiff class of consumers, and the only individual questions relate to damages issues which can be resolved by a class-wide survey, the problems inherent in managing a class action are minimized and class certification is appropriate. In re Gulf Oil/Cities Service Tender Offer Litigation, 112 F.R.D. 383 (S.D.N.Y. 1986).

IT IS THEREFORE ORDERED AND ADJUDGED  that this Order shall incorporate and replace the Order of this Court dated April 22, 2010, which certified this action as a Class Action with such Class being comprised of all Kentucky residents who have purchased and taken VIOXX during the period of May 1999 through September 30, 2004, and who, upon recommendation and advice of the FDA and Merck have or will contact physicians to seek advice regarding their VIOXX use.

Done this 27th day of JAN , 2011.

STEVEN D. COMBS, JUDGE
PIKE CIRCUIT COURT

17

TENDERED BY:

RICHARD A. GETTY
JOE F. CHILDERS
        and
JESSICA K. CASE

GETTY & CHILDERS, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky  40507
Telephone:  (859) 259-1900
Facsimile:  (859) 259-1909

COUNSEL FOR PLAINTIFF
JAMES RATLIFF, On Behalf Of
Himself And All Others Similarly
Situated

## CLERK'S CERTIFICATE OF SERVICE

A copy of the foregoing Amended Order Certifying Class Action was mailed, postage prepaid, to the following on this the _____ day of _____, 2011:

Richard A. Getty, Esq.
Joe F. Childers, Esq.
    and
Jessica K. Case, Esq.
Getty & Childers, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky 40507

Susan J. Pope, Esq.
Frost Brown Todd, LLC
250 West Main Street, Suite 2800
Lexington, Kentucky 40507-1749

Winston E. Miller, Esq.
Frost Brown Todd, LLC
400 West Market Street, 32nd Floor
Louisville, Kentucky 40202

Jessica D. Miller, Esq.
    and
John H. Beisner, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005

_____
CLERK, PIKE CIRCUIT COURT

jkcpld0314

EXHIBIT 2

RENDERED:  FEBRUARY 10, 2012; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

### NO. 2011-CA-000234-MR

MERCK & COMPANY, INC.,
n/k/a MERCK SHARP & DOHME CORP.                    APPELLANT


|  | APPEAL FROM PIKE CIRCUIT COURT |
|---|---|
| v. | HONORABLE STEVEN D. COMBS, JUDGE |
|  | ACTION NO. 04-CI-01493 |


JAMES RATLIFF, ON BEHALF OF HIMSELF
AND ALL OTHERS SIMILARLY SITUATED                  APPELLEES


### OPINION
### REVERSING AND REMANDING

** ** ** ** ** **

BEFORE:  ACREE, CLAYTON, AND WINE,[1] JUDGES.

WINE, JUDGE:  Merck & Company, Inc., n/k/a Merck Sharp & Dohme

Corporation (Merck) appeals from an order of the Pike Circuit Court certifying a

class for a class action lawsuit initiated by James Ratliff, on behalf of himself and

---

[1] Judge Thomas B. Wine authored this opinion prior to his retirement effective January 6, 2012.
Release of the opinion was delayed by administrative handling.

EXHIBIT
2

others similarly situated.[2]  In the underlying lawsuit, Ratliff alleges that Merck

concealed the dangerous side effects of the prescription medication, rofecoxib,

marketed under the name "Vioxx."  Merck argues on appeal that class certification

was inappropriate under CR 23 and seeks a reversal of the class-certification order.

Upon a thorough review of the record and applicable caselaw, we reverse the order

of the Pike Circuit Court.

### Facts and Procedural History

On May 21, 1999, the Food and Drug Administration (FDA) approved

Vioxx for sale in the United States.  Vioxx quickly gained widespread acceptance

among physicians treating patients with arthritis and other conditions causing

chronic or acute pain.  However, Vioxx was withdrawn from the market on

September 30, 2004, after a study was released indicating that Vioxx increased the

risk of cardiovascular thrombotic events, such as heart attack and stroke.  After

Vioxx was withdrawn from the market, the FDA issued a public health advisory to

all Vioxx users to contact their physician regarding the discontinuation of the drug

and alternative therapies.  A flurry of lawsuits ensued in both the state and federal

courts. *See, e.g., In re Vioxx Products Liability Litigation*, 401 F. Supp. 2d 565,

571 (E.D. La. 2005); *Merck & Co., Inc. v. Garza*, 347 S.W.3d 256, 261 (Tex.

2011); *In re Merck & Co., Inc. Securities, Derivative & ERISA Litigation*, 493 F.3d

393, 398 (3rd Cir. 2007).

---

[2] Although an appeal from a class certification order was previously considered interlocutory, such appeals are no longer interlocutory due to the enactment of Kentucky Rules of Civil Procedure (CR) 23.06 by the Supreme Court in January of last year.  Under the new CR 23.06, parties may appeal directly from a certification order.

Ratliff is a resident of Pike County and a former user of Vioxx. He was diagnosed with chronic osteoarthritis in 1994 at the age of thirty-seven. After experimenting with other drugs, including Daypro and Celebrex, his doctor recommended that he try Vioxx, a new non-steroidal anti-inflammatory drug (NSAID) on the market. Ratliff began using Vioxx in January of 2000, twice per day. Although Ratliff's insurance paid for most of the cost of the drug, which was at the time approximately $66 per month, Ratliff contributed about $5 each month out of pocket.

After experiencing severe chest pains, labored breathing, lethargy, bleeding, and other uncomfortable side effects, Ratliff discontinued using Vioxx in early 2004, mere months before the drug was officially removed from the market. Ratliff thereafter spent money, out of pocket, on a medical consultation to determine whether he sustained any cardiovascular injury from using Vioxx. He did not.

In 2004, Ratliff brought the present action on behalf of himself and all Kentucky residents who have purchased and taken Vioxx and who, upon recommendation of the FDA, have contacted or *will contact* their physician seeking advice regarding their use of Vioxx. Ratliff seeks to represent the class of similarly situated individuals, who used Vioxx but have not been diagnosed with specific cardiovascular injuries therefrom. Thus, most of the members of the class

would have low-dollar-amount damages similar to his, which he approximates at $350.[3]

Ratliff alleged in his complaint that Merck "deceived [him] and the members of the proposed class in violation of the Consumer Protection Act by promoting and/or allowing the sale of Vioxx with the use of unfair, false, misleading or deceptive acts or practices." Ratliff contends that although Merck knew of the potentially harmful side effects of the drug as early as 1999, it "undertook to downplay, conceal, obfuscate and mislead physicians and others, including consumers, as to the harmful side effects of the drug, while vigorously promoting the drug's use." Ratliff further maintains that Merck promoted Vioxx as having a superior safety profile to other NSAID's on the market. Ratliff additionally states that the results of a 1999 study were misrepresented to the medical community. He argues that, despite increasing evidence after the 1999 study that Vioxx caused increased risk of cardiovascular injury, Merck continued to disseminate materials discrediting suggestions that Vioxx posed serious health risks.

As a result of these alleged actions and behaviors, Ratliff claims that he and other Kentucky residents purchased Vioxx when they otherwise would not

---

[3] The complaint does not seek compensation for personal injuries or medical conditions caused by taking Vioxx. Rather, the damages sought by Ratliff on behalf of the putative class are those incurred by Vioxx users for diagnostic testing and examination to discover if they had an adverse medical condition related to the use of Vioxx. The putative class, then, contains consumers who required diagnostic testing because they took Vioxx, but needed no actual treatment for any adverse side effects after testing.

have, suffered economic loss connected with the purchase of the drug, and have suffered (and will in the future suffer) further economic losses in connection with medical consultations and procedures, including lost income and other expenses.

As grounds for relief, Ratliff pled in the complaint: (1) violations of the Kentucky Consumer Protection Act (the KCPA); (2) fraudulent concealment and/or misrepresentation; (3) negligent and/or grossly negligent misrepresentation; and (4) unjust enrichment. He sought compensatory damages for reimbursement of the cost of the drug, reimbursement for the cost of the medical exam, and lost wages for lost work-time spent receiving the medical exam for himself and members of the putative class, if certified.

On November 29, 2004, Merck filed an answer in state court, removed the action to federal court, and also filed a motion with the Judicial Panel on Multidistrict Litigation to transfer the case to a single court for pretrial management pursuant to 28 United States Code (U.S.C.) §1407. On January 1, 2005, Ratliff filed a motion to remand to state court. The Federal District Court determined that it did not have jurisdiction over the cause of action because Merck failed to show that Ratliff's damages would exceed $75,000. Thus, the case was remanded to state court on March 3, 2005. *Ratliff v. Merck & Co., Inc.*, 359 F. Supp. 2d 571 (E.D. Ky. 2005).

Ratliff thereafter moved again to have the action certified as a class action pursuant to CR 23.01 and CR 23.02(c). Merck opposed class certification on the grounds that the plaintiffs' causes of action would require individualized

proof not appropriate for a class action such that common issues would not predominate, that Ratliff was not a typical or adequate class representative, and that the proposed class definition was unworkable as far as ascertaining membership in the class. At the same time, Merck moved for summary judgment. After extensive briefing and oral arguments from both sides, the Pike Circuit Court finally entered an order certifying the class on April 2, 2010. The Pike Circuit Court also entered an order denying Merck's motion for summary judgment on that date. Merck then filed a writ of mandamus with this Court to force the circuit court to vacate the order, or, in the alternative, to enter summary judgment in its favor.

This Court denied the writ and the Supreme Court affirmed on the ground that mandamus review was not appropriate for a certification order and that there existed no extraordinary circumstances warranting review of the circuit court's denial of summary judgment. However, the Supreme Court expressed no opinion concerning the review of an appeal stemming from CR 23.06.

After Rule 23 was amended on January 1, 2011, Ratliff moved the court for an amended certification order. The court entered an amended order on January 27, 2011. Merck then appealed from the amended certification order. That appeal was abated by this Court pending the Supreme Court's above ruling in the writ action. The Supreme Court rendered its opinion in *Merck & Co., Inc. v. Combs*, 2011 WL 1104133 (Ky. 2011)(2010-SC-00059-MR), in March of 2011, denying mandamus review of Merck's writ.

-6-

After the Supreme Court's opinion denying mandamus review became final, the Rule 23 appeal before this Court was removed from abeyance. The issue having now been briefed to this Court, it is ripe for review.

## Analysis

After a long and circuitous path, we finally reach the merits of Merck's arguments, raised first via writ and now on appeal through CR 23.06—that a class action is inappropriate under the present circumstances and that Ratliff is an inadequate class representative. On appeal, Merck argues that the amended class-certification order fails to address Merck's evidence that Ratliff's claims do not satisfy the predominance, typicality, and superiority requirements for the certification of a class, and that the amended certification order ignores Merck's arguments that Ratliff is not an adequate class representative.

We review a certification order for abuse of discretion. *Sowders v. Atkins*, 646 S.W.2d 344 (Ky. 1983). In doing so, we recognize that the trial court's more intimate knowledge of the facts places it in a more favorable position to judge whether the requirements for class certification have been met. *Id.* at 346. Indeed, the circuit court is given substantial leeway in determining whether to certify a class because "it possesses the inherent power to manage and control its own pending litigation." *Reeb v. Ohio Dept. of Rehabilitation and Correction*, 435 F.3d 639, 643 (6th Cir. 2006). In determining whether the requirements of CR 23 are met, a lower court should generally accept the substantive allegations of the complaint as true. *See, e.g, Reeb v. Ohio Dept. of Rehabilitation and Correction*,

81 Fed.Appx. 550, 555 (6th Cir. 2003)(Court should not inquire into the merits of the representative's underlying claims, but should accept the allegations in the complaint as true). Nonetheless, despite this general rule, we recognize that a rigorous analysis of whether the merits of Rule 23 have been met will often "entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551, 180 L. Ed 2d 374, 79 USLW 4527 (U.S. 2011).

The prerequisites necessary for the certification of an action as a class action are set forth in CR 23.01. Under CR 23.01,

> one or more members of a class may sue or be sued as representative parties on behalf of all only if (a) the class is so numerous that joinder of all members is impracticable, (b) there are questions of law or fact common to the class, (c) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (d) the representative parties will fairly and adequately represent the interests of the class.

If these prerequisites are met, the trial court may certify the action as a class action so long as one of the requirements of CR 23.02(a), (b), or (c) is satisfied. In the present case, the trial court granted certification under CR 23.02(c). Under this subsection, a class action may be maintained if:

> the court finds that the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

CR 23.02(c).

Numerosity and the presence of common questions of law and fact under 23.01(a) and (b) are not disputed. However, Merck argues that common questions of law and fact do not predominate under CR 23.02(c), that class action is not the superior method for adjudication under CR 23.02(c), and that Ratliff is not a typical or adequate representative under CR 23.01(c) and (d).

We first address the argument by Merck regarding predominance under CR 23.02(c). Merk contends that Ratliff's claims for violation of the KCPA, and for fraudulent and negligent misrepresentation, will require individualized proof such that common questions would not predominate. Merck states that individual proof will be necessary to show that Merck made fraudulent or negligent misrepresentations toward each putative class member or his or her physician through the marketing and sale of Vioxx, that the alleged misrepresentations were received by each putative member's physician, that each putative member's physician relied on such representations in his or her decision to prescribe Vioxx over another drug, and the amount of any damages suffered by each putative member. Thus, Merck argues that common questions do not predominate but, instead, individualized questions predominate.

The trial court found that common questions of law and fact did predominate, stating as follows in its amended certification order:

> [T]here is a common nucleus of facts from which the potential plaintiffs' claims arise. All of the potential plaintiffs were prescribed Vioxx by doctors who relied on Merck's assertions that it was safe and effective . . . . All of the potential plaintiffs spent money to purchase

> Vioxx, and when it was removed from the market all
> were directed by Merck and the FDA to seek medical
> consultations . . . . All of the potential plaintiffs were
> victims of Merck's [alleged] *fraud upon the market* . . . .
> In such circumstances, where the plaintiffs are similarly
> situated, and seek recovery under identical theories of
> law and based on the identical conduct of the defendant,
> common questions of law and fact predominate, making
> certification . . . appropriate[.]  [Emphasis added].

After careful consideration, we must disagree with the trial court.

Nonetheless, it should first be acknowledged that we agree with the trial court on

several initial points.  Indeed, we agree that Ratliff's and the putative class

members' claims hinge upon whether Merck knowingly or negligently distributed

false or misleading information while Vioxx was on the market.  This common

question threads through each potential class member's claims.  We further

acknowledge that predominance does not require that each and every possible issue

be common to all class members, but only that common issues *substantially*

*predominate* over those issues which are individual in nature.  *Wiley v. Adkins*, 48

S.W.3d 20, 23 (Ky. 2001).

The court's order certifies claims made under the KCPA and claims

made for fraudulent misrepresentation, negligent misrepresentation, and unjust

enrichment.  While there are fewer obstacles to a class claim proceeding under the

KCPA, the claims of fraudulent misrepresentation and negligent misrepresentation

require more individualized proof and, thus, pose particular problems for class

certification.

Under the KCPA,

> [a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful [under the Act], may bring [a civil action] in the Circuit Court[.]

Kentucky Revised Statutes (KRS) 367.220(1). Taking the allegations in the complaint as true for the purposes of review, it is clear that Merck's actions would be unlawful under the Act. A Missouri court, analyzing a consumer protection statute nearly identical to our own[4] in a case involving Vioxx, found that the statute required that the plaintiff's economic *loss* resulted from Merck's unlawful practices, but did not require that the plaintiff's *purchase* of Vioxx be caused by the unlawful practice. *Plubell v. Merck & Co., Inc.*, 289 S.W.3d 707, 714 (Mo. App. 2009). Under this interpretation, causation need not be shown with respect to each individual class member's decision to purchase Vioxx, but merely that a loss resulted from the practice. Further, the Missouri court found that the loss may be shown through a "benefit-of-the-bargain" theory that the product or service received (Vioxx) was not worth what the consumer paid for it. *Id.* at 715 (Holding that damages are not measured under the Act by the purchase price of the product in question, but by the difference in value between the product "as represented" and the "actual value" of the product received). A New Jersey court utilized

---

[4] The Missouri statute contains the following language: "Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful . . . may bring a private civil action." V.A.M.S. 407.025(1). The Kentucky statute, KRS 367.220, contains nearly identical language.

similar arguments regarding the certification of a claim under the state's consumer protection act regarding Vioxx. *Kleinman v. Merck & Co., Inc.*, 8 A.3d 851 (N.J. 2009)(Also applying a "benefit-of-the-bargain" theory of value/loss). Interestingly, despite agreeing on the former, each court came to a different conclusion regarding the certification of a class for consumer protection violations brought by purchasers of Vioxx. *Id.; Plubell*, 289 S.W.3d 707.

However, the case we are presented with is not so simple as the cases presented to the courts in *Kleinman* and *Plubell*. Rather, this case involves not only claims under the KCPA (and for unjust enrichment), it also involves state law claims of fraud and misrepresentation. Fraudulent concealment/misrepresentation and negligent misrepresentation pose additional problems because they each contain the element of reliance. *See, e.g. United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999); *Ann Taylor, Inc. v. Heritage Ins. Services, Inc.*, 259 S.W.3d 494 (Ky. App. 2008). In the present case, each of the putative class members would have to show that his or her respective physicians individually relied upon the false or misleading information disseminated by Merck when prescribing Vioxx to them.[5] It is exactly this type of individualized proof which generally makes class litigation inappropriate in fraud and misrepresentation cases. *See, e.g., In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 133-4 (Cal. App. 2nd Dist. 2009)(Holding that the decision to prescribe Vioxx is an individual decision made by a physician based on various factors, and that such individual issues prevailed

---

[5] It is of note that Ratliff's own physician testified he might still prescribe Vioxx, if it was still on the market, in limited cases where the benefits to the patient would outweigh the risks.

over common issues); *In re St. Jude Medical, Inc*, 522 F.3d 836, 838 (8th Cir.
2008)(Fraud cases are generally not certifiable because of individualized questions
of reliance); *Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.*, 319
F.3d 205, 219 (5th Cir. 2003)(Questions of individual reliance typically preclude
class certification).[6]

Nonetheless, we recognize that in some cases involving fraud and/or
misrepresentation, class action may still be appropriate where common issues
predominate over individualized questions and arise from a single fraudulent
scheme or conspiracy or from identical representations. *See, e.g, Klay v. Humana,
Inc.*, 382 F.3d 1241, 1257 (11th Cir. 2004); *Wiley*, 48 S.W.3d at 23. Indeed, fraud
and misrepresentation claims only tend to be uniformly denied for class
certification where there is a "material variation in the representations made [to the
putative class members] or in the degrees of reliance thereupon." *Simon v. Merrill
Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973).

Ratliff alleges a consistent pattern of deception lasting essentially the
entire time that Vioxx was on the market, and thus argues that generalized proof
may be used to show the elements of fraud and misrepresentation in this case. He
argues that any individualized proof necessary would be minimal. This theory
concerning generalized proof regarding Merck's conduct is similar to the
rebuttable presumption of reliance and causation known in securities litigation as

---

[6] Further, class certification is typically not granted in prescription drug cases because of the
individualized inquiries such litigation typically involves. *See, e.g., In re Baycol Products
Litigation*, 218 F.R.D. 197, 204 (D. Minn. 2003)

the "fraud-on-the-market" theory. Indeed, the trial court's order, as drafted and proposed by Ratliff, describes Merck's behavior as "fraud upon the market." Ratliff avers that "[a]ll of the potential plaintiffs were prescribed Vioxx by doctors who relied on Merck's assertions that it was safe and effective to treat their individual ailments." Ratliff further alleges that because every patient in the class must have had a prescription for Vioxx, every patient in the class would have necessarily received a service from his or her physician that was based upon incomplete or inaccurate information. Based upon this theory, Ratliff avers that individualized evidence concerning Merck's representations will not be necessary. Further, he states that any individual questions would be few, and would not overwhelm the common questions of law and fact.

Typically, individual reliance must be shown in fraud and misrepresentation cases. *United Parcel Service Co. v. Rickett, supra; Ann Taylor, Inc. v. Heritage Ins. Services, Inc., supra.* However, as stated, in some fraud actions in securities litigation, elements such as reliance, ascertainable loss and causal nexus, may be presumed under the fraud-on-the-market theory. Under the fraud-on-the-market theory, the United States Supreme Court has adopted a presumption of reliance in the securities fraud context where it is found that a corporate defendant disseminates information or materials into the marketplace that are fraudulent or misrepresentative. *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).

-14-

In the present case, we have a corporate defendant that has allegedly disseminated false, fraudulent, or misrepresentative information into the marketplace. However, while we have sympathy for the users of Vioxx whose physicians may have relied upon such false or incomplete information, the "fraud-on-the-market" approach has never been recognized in this jurisdiction for a fraud or misrepresentation case. Further, every other jurisdiction we found which has been confronted with the theory has rejected it outside of the securities litigation context. *See, e.g., Kaufman v. i-Stat Corp*, 754 A.2d 1188, 1191 (N.J. 2000); *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc*, 929 A.2d 1076, 1088 (N.J. 2007); *Mirkin v. Wasserman*, 858 P.2d 568, 584-95 (CA. 1993); *Southeast Laborers Health and Welfare Fund v. Bayer Corp.*, 2011 WL 5061645 (11th Cir. 2011)(10-13196); *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001)(Rejecting somewhat similar "fraud on the FDA" theory).

For this reason, we decline to recognize a similar theory here. Causation, reliance, and damages are required to be shown on an individual basis. Thus, if the action were tried as a class, after the common questions of Merck's representations in its marketing campaign were decided, the case would essentially fragment into a series of amalgamated "mini-trials" on each of these individualized questions. *Kleinman*, 8 A.3d at 859 ("[T]he benefit of a class action must outweigh the problems of an unmanageable amount of mini-trials that may result after a uniform determination of common questions . . . ."). Further, we find that a

claim of unjust enrichment, which necessitates that a party has conferred a benefit on another for value, requires that the retention of the benefit be inequitable. *See, e.g., Guarantee Elec. Co. v. Big Rivers Elec. Corp.*, 669 F. Supp. 1371, 1380 (W.D. Ky. 1987). Here, since each plaintiff may have had different medical conditions and circumstances at the time they were prescribed the drug, and because each may have experienced different effects from the drug as compared to its risks, a separate risk/benefit analysis would effectively have to be undertaken for each putative class member.

Thus, we find that common questions do not predominate. Further, because these individualized questions would substantially overtake the litigation, and would override any common questions of law or fact concerning Merck's conduct, we find that a class action is not the superior mechanism by which to try these cases. *See, e.g., Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001)("[W]hen the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the 'superior' method of adjudication"). Therefore, class certification is inappropriate under CR 23.02(c) and the trial court abused its discretion by entering a certification order.

Because we find that the class cannot be certified, we do not need to address whether Ratliff is an adequate or typical representative for the class. We reverse and remand to the Pike Circuit Court with instructions for the court to vacate its prior order.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Susan J. Pope
Lexington, Kentucky

PRO HAC VICE FOR APPELLANT:

John H. Beisner
Washington, DC

BRIEF FOR APPELLEES:

Richard A. Getty
Jessica K. Case
Lexington, Kentucky