**PIKE CIRCUIT COURT**
**35TH JUDICIAL CIRCUIT**
**DIVISION II**

**Case No. 04-CI-01493**

**JAMES RATLIFF, On Behalf Of Himself**          **PLAINTIFFS**
**And All Others Similarly Situated**

        **PLAINTIFF'S MOTION SEEKING ENTRY**
**V.**      **OF SECOND AMENDED ORDER CERTIFYING CLASS**

**MERCK & COMPANY, INC., A Foreign**
**Corporation**                                 **DEFENDANT**

```
        FILED
    ANNA G. PINSON

     JAN 1 1 2013

PIKE CIRCUIT DISTRICT COURT
BY:                    D.C.
```

\* \* \* \* \* \*

The Plaintiff James Ratliff, on behalf of himself and all others similarly situated

("Plaintiff"), by counsel, respectfully requests the Court to enter a Second Amended Order

Certifying Class with respect to the class claims arising under the Kentucky Consumer

Protection Act ("KCPA") asserted in Plaintiff's Class Complaint.  Entry of such an Order is

necessary to comply with the ruling of the Kentucky Court of Appeals, which found on February

10, 2012, that common issues did not predominate with respect to the Plaintiff's common law

fraud and misrepresentation claims, and that certification of a class with respect to those claims

was inappropriate.  The Court of Appeals Opinion made no such finding with respect to

Plaintiff's KCPA claim, and entry of an Amended Certification Order certifying a class in

connection with that claim alone is therefore appropriate and necessary to prevent manifest

injustice.[1]  In support of the instant Motion, Plaintiff states as follows:

---

[1]    The Plaintiff requested the Supreme Court to grant discretionary review of the Court of Appeals Order
solely on the issue of whether the Court of Appeals erred in finding that this Court committed abuse of
discretion in certifying the common law fraud and negligence claims.  See Plaintiff's Motion for
Discretionary Review, attached as Exhibit A.  By Order dated November 14, 2012, the Supreme Court
granted discretionary review, and briefing is underway.  See Order granting Discretionary Review, attached
as Exhibit B.

**EXHIBIT I**

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This case arises from Merck & Co., Inc.'s ("Merck") fraudulent and criminal marketing and sales of the drug Vioxx. Merck does business in Kentucky and, between 1999 and 2004, sold Vioxx in Kentucky to thousands of Kentucky consumers. Vioxx is the brand name of rofecoxib, one of a class of drugs called nonsteroidal anti-inflammatory drugs ("NSAIDs"), which work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain.

On May 21, 1999, the Food and Drug Administration ("FDA") approved Vioxx for sale in the United States. Vioxx quickly gained widespread acceptance among physicians treating patients with arthritis and other conditions causing chronic or acute pain. Vioxx was removed from the market in 2004, however, after a study was released indicating that Vioxx increased the risk of cardiovascular thrombotic events, such as heart attack and stroke. After Vioxx was withdrawn from the market, the FDA issued a public health advisory to all Vioxx users to contact their physician regarding the discontinuation of the drug and alternative therapies.

### A.     Thousands Of Law Suits Are Filed Against Merck Alleging Personal And Consumer Injury Following The Withdrawal Of Vioxx From The Market.

After Vioxx was removed from the market, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, securities, consumer, and warranty claims. On November 9, 2007, Merck entered into a Settlement Agreement (the "Agreement") with certain plaintiffs' counsel in order to establish a nationwide settlement program to resolve the personal injury claims of certain individuals who have suffered a heart attack, stroke, or sudden cardiac death resulting from their use of Vioxx (the "Vioxx Claimant(s)"). (Merck, News Release

(November 9, 2007), Exhibit C. The claims asserted in this litigation fall well outside the claims settled by the Agreement and are unaffected by these earlier settlement proceedings.

**B.    Merck Pleads Guilty To Criminal Charges Arising From Its False Marketing Of Vioxx; Agrees To Pay Criminal and Civil Penalties.**

In April, 2012, Merck was sentenced by U.S. District Court Judge Patti B. Saris in Boston to pay a criminal fine in the amount of $321,636,000 after previously pleading guilty to violating the Food, Drug, and Cosmetics Act ("FDCA") for introducing Vioxx into interstate commerce as a misbranded drug. United States of America v. Merck Sharpe & Dhome Corp., Criminal Action No. [to be assigned]; see April 19, 2012 Department of Justice Press Release, "US Pharmaceutical Company Merck, Sharp & Dhome Sentenced In Connection With Unlawful Promotion Of Vioxx," attached as Exhibit D.

In connection with the criminal plea, Merck also entered into a federal civil settlement in November 2011, under which it agreed to pay $628,364,000 to resolve additional allegations regarding off-label marketing of Vioxx and false statements about the drug's cardiovascular safety. Of the total civil settlement, $426,389,000 will be recovered by the United States, and the remaining share of $201,975,000 will be distributed to the participating Medicaid states.

The federal civil settlement resolved allegations asserted in litigation, filed by several states against Merck that was consolidated into In re Vioxx Litigation, MDL No. 1657, to the effect that Merck representatives made inaccurate, unsupported, or misleading statements about Vioxx's cardiovascular safety in order to increase sales of the drug, resulting in payments by the federal government. It also resolved allegations that Merck made false statements to state Medicaid agencies about the cardiovascular safety of Vioxx, and that those agencies relied on Merck's false claims in making payment decisions about the drug. Finally, the civil settlement also recovered damages for allegedly false claims caused by Merck's unlawful promotion of

Vioxx for rheumatoid arthritis. <u>See</u> November 22, 2011 Department of Justice Press Release: "U.S. Pharmaceutical Company Merck Sharp & Dohme To Pay Nearly One Billion Dollars Over Promotion Of Vioxx," attached as <u>Exhibit</u> <u>E</u>.

      As part of the settlement, Merck has also agreed to enter into an expansive corporate integrity agreement with the Office of Inspector General of the Department of Health and Human Services (HHS-OIG), which will strengthen the system of reviews and oversight procedures imposed on the company. Although Vioxx is no longer on the market, this ongoing monitoring of Merck's conduct is aimed to deter and detect similar conduct in the future. <u>Id.</u>

      The sentencing concluded a long-running investigation of Merck's promotion of Vioxx by the federal government after the drug was removed from the market. The case was handled by the Justice Department's Civil Division and the U.S. Attorney's Office for the District of Massachusetts. The investigation was conducted by HHS-OIG, the FBI, the Office of Criminal Investigations for the FDA, the Veterans Administration's Office of Criminal Investigations, the Office of the Inspector General for the Office of Personnel Management, the National Association of Medicaid Fraud Control units, and the offices of the various state attorneys general. <u>Id.</u>

### C. Merck Settles Missouri Consumer Protection Class Action Alleging Claims Similar To Those Asserted In This Litigation.

      In November, 2012, Merck announced it had reached a settlement in <u>Plubell v. Merck</u>, an economic class action lawsuit pending in Missouri state court. <u>Plubell v. Merck</u>, Civil Action No. 04-CV-235817-01, Jackson County, Missouri. The class consists of Missouri consumers who purchased Vioxx, but do not claim any physical injury. There, as here, the class action lawsuit involved claims alleging that Merck's promotion and sale of Vioxx constituted unlawful

and unfair business practices under the Missouri Merchandising Practices Act.[2]  See Settlement Agreement, attached as Exhibit F.

Under the settlement terms, qualifying Missouri consumers of Vioxx may be reimbursed in full for their Vioxx purchases. The common fund settlement provides for payment to class members under two options: (1) a one-time cash payment of $180 to Settlement Class Members who submit a valid claim form with a declaration under oath (but no documentary proof of payment required) or (2) $90 for each month of Vioxx purchases supported by a declaration under oath with documentary proof of payment, such as a letter from the prescribing physician. Id. In addition to paying the claims of qualifying class members, the settlement requires Merck to pay for all costs associated with the notice and administration of the settlement as well as court-approved attorneys' fees and expenses incurred by the Class. Id.

**D.  Plaintiff James Ratliff Was Prescribed Vioxx During The Relevant Time Period, And Suffered Monetary Damages As A Result Of Merck's Deceptive Marketing Practices.**

As discussed in detail, supra, thousands of consumers throughout the United States have brought claims against Merck arising from its deceptive marketing of Vioxx that are similar to those asserted in this litigation.  In each of those cases, as here, the plaintiffs were prescribed Vioxx during the relevant time period, and suffered monetary damages as a result of Merck's fraudulent marketing practices.  Ratliff has a claim arising under the Kentucky Consumer Protection Act that is similar to those belonging to similarly situated class members in Kentucky.

Ratliff is a resident of Pike County, Kentucky who was diagnosed with chronic osteoarthritis in 1994 at the age of 37.  After experimenting with a bevy of anti-inflammatory drugs, including Daypro and Celebrex, his doctor recommended that he take Vioxx, a drug that

---

[2]  The Missouri Merchandising Practices Act is nearly identical to the Kentucky Consumer Protection Act. Compare Mo. Rev. Stat. § 407.010, et seq., with KRS 367.220(1).  See also Kentucky Court of Appeals Opinion, p. 11, fn. 4, attached as Exhibit A-2 (noting that the Kentucky and Missouri statutes contain nearly identical language).

was new to the market. In January of 2000, Ratliff began taking Vioxx twice daily. His insurance covered most of the $66.49 price of the drug per month; however Ratliff still had to pay $5 out-of-pocket each month to fill his Vioxx prescription. (Deposition of James Ratliff ("Ratliff Dep.") 33:21-34:4, excerpts attached as Exhibit G. Ratliff took Vioxx for three years, spending over $75 to purchase the drug.

Two physicians prescribed Vioxx to Ratliff, and both testified that they relied extensively on the information and materials provided to them by Merck sales representatives in evaluating the health risks of the drug. Deposition of K.D. Gibson ("Gibson Dep."), 13:14-24, excerpts attached as Exhibit H; Deposition of J. Pampati ("Pampati Dep."), 14:11-15:24, excerpts attached as Exhibit I. The allegations in this action, as well in those filed throughout the country, are that the information and materials regarding Vioxx that Merck provided to physicians and consumers were misleading and deceptive, and minimized the potentially serious cardiovascular side effects of the drug that eventually forced Merck to remove the drug from the market. Once Merck finally removed Vioxx from the market because of the inherent dangers of the drug, all physicians, including Ratliff's doctors, were bound to cease prescribing the drug to their patients. See Exhibit H, Gibson Dep., 37:8-11; Exhibit I, Pampati Dep., 40:5-9.

After experiencing severe chest pains, labored breathing, lethargy, bleeding, and other uncomfortable side effects, Ratliff discontinued use of Vioxx in early 2004, months before the drug was removed from the market. Ratliff has since obtained the medical consultation suggested by the FDA, a consultation that cost approximately $180, as well as a screening by a gastroenterologist to assess both his gastrointestinal bleeding and any cardiovascular damage he may have sustained because of his Vioxx use.[3]

---

[3]   Although Merck attempts to discredit Ratliff's deposition testimony on this point by insinuating that he did not obtain this consultation, his testimony speaks for itself: "Q: And so, how did you arrive at the figure of

The Plaintiff Ratliff brought this case as a class action on behalf of all Kentucky residents who have purchased and taken Vioxx and who, upon the recommendation and advice of the FDA and Merck, have contacted or will contact their physicians to seek advice regarding their use of Vioxx.  Plaintiff seeks reimbursement for (a) the costs of such medical consultations, including the costs of any diagnostic testing recommended by the class members' physicians; (b) the lost income and related expenses the class members have, or will have to incur in undergoing such examinations and procedures; and (c) the cost of the Vioxx the class members purchased.  Each plaintiff's claims will not exceed the sum of $75,000 exclusive of interest and costs, and no plaintiff will seek to recover in this action for any personal injury he may have sustained as a consequence of taking Vioxx as prescribed.  Amended Class Action Complaint, attached as Exhibit J.

Ratliff's damages of approximately $350 are much too small to pursue in litigation against a company the size of Merck.  His situation mirrors that of several hundred thousand Vioxx users across the Commonwealth.  While his insurance covered most of the cost relating to the purchase of Vioxx, Ratliff was still spending several dollars a month to purchase a drug which had deadly undisclosed side-effects.  The financial harm caused to Ratliff by Merck's misleading marketing practices is relatively small; however, if his total expenditures are added up and applied to a class of over approximately 200,000 individuals, the outlay of money is exponentially higher, resulting in a loss in excess of 60 million dollars to Kentucky consumers. Seeking redress is impractical on an individual basis, but becomes feasible in the context of a class action, where Ratliff's loss is combined with the loss of others similarly situated.

---

$180, do you remember? A: That's what the cost was. Q: Okay.  A: That's what they charged me. I didn't, you know, arrive at anything.  That is what they charged me." See Exhibit G, Ratliff Dep., 57:13-19. Including damages arising from work missed as a result of the medical consultation and other consequential damages, Merck's misleading and deceptive marketing practices resulted in a direct monetary loss to Ratliff of approximately $350.

**E.**    **Merck's Deliberately Obstructive Litigation Techniques Have Resulted In
Excessive Delay In The Progress Of This Class Action Litigation.**

This case presents a prime example of an irresponsible corporate citizen – a company that
puts a product on the market, becomes aware of a product defect, and then spends millions of
dollars attempting to obscure the danger and increase profits.  Even after Vioxx had been pulled
from the market, Merck has used every bad faith tactic to try to prevent those with claims too
small to be brought individually from ever obtaining redress through a class action.  Statutory
schemes such as that contained in the Kentucky Consumer Protection Act are designed to
prevent this type of activity, and where, as here, thousands of individuals are harmed by the
defective product, a class action is an appropriate means of providing redress.

Since 2004, when Ratliff filed this action, Merck has engaged in obstructive and abusive
litigation techniques, making every effort to delay the progress of the litigation and prevent the
putative class members in this action from obtaining redress for the injuries they have suffered as
a result of the Merck's deceptive and manipulative marketing practices.  This case has been
litigated for more than eight years.  Merck, a multi-billion-dollar corporation, has personally
attacked the integrity of the Court, attempted to smear the credibility of the class Plaintiff, and
has spent hundreds of thousands of dollars delaying this litigation in an apparent attempt to force
the Plaintiff and Plaintiff's counsel to abandon this litigation.

On November 29, 2004, Merck removed the action to Federal Court and also filed a
Motion with the Judicial Panel on Multidistrict Litigation ("JPML") seeking to transfer this case
to a single court for coordinated pretrial management pursuant to 28 U.S.C. §1407.  On
January 1, 2005, Ratliff filed a Motion To Remand.  After a thorough analysis of the potential
value of Ratliff's and the other potential class members' claims, and based upon its conclusion
that Merck failed to show that the damages on each person's claims would exceed the

jurisdiction threshold of $75,000, the District Court ruled that it did not have jurisdiction over this cause of action.  On March 3, 2005, Judge Hood entered an Order remanding the action to this Court.

Ratliff thereafter sought an Order of the Court certifying the action as a class action pursuant to CR 23.01 and CR 23.02(c). Extensive briefs were filed in support of and in opposition to Ratliff's Motion, and Merck also filed a Motion for Summary Judgment asking that Ratliff's claims be dismissed on various bases.  This Court, after considering the briefs and oral argument from both sides, entered two separate Orders dated April 1, 2010 – one denying Merck's Motion for Summary Judgment, and one granting Ratliff's Motion to Certify.

Despite the fact that established Kentucky precedent states that Petitions for Writs of Prohibition or Mandamus are not an appropriate means for challenging class certification orders, see Garrard County Bd. of Educ. v. Jackson, 12 S.W.3d 686 (Ky. 2000), Merck sought relief from the April 1, 2010 Class Certification Order by filing a Petition for Writ of Mandamus with the Court of Appeals, arguing that the Court's decision to certify the Class was in error and should be reversed.  The Court of Appeals denied Merck's Petition by Order dated July 12, 2010. In so ruling, the Court of Appeals relied on both the holding in Jackson, supra, and upon a finding that Merck had an adequate remedy of appeal following a final adjudication of the merits.  Id. Merck further appealed to the Kentucky Supreme Court the Court of Appeals decision denying the mandamus relief sought by it.  The Kentucky Supreme Court affirmed on the basis of the Jackson decision, and found that Merck has not demonstrated that it would be irreparably harmed by the trial court's decision to certify the class.

After the Kentucky Supreme Court affirmed, and the matter was remanded to this Court for further consideration, Ratliff sought the entry of an Amended Class Certification Order clarifying the bases for the court's decision to certify.  This Motion was precipitated by the fact

9

that Merck based its Petition for Writ of Mandamus partially upon its argument that the Order certifying Class Action failed to make specific findings supporting its ruling and was therefore inadequate. But Merck objected to the Plaintiffs' Motion To Enter Amended Order Certifying Class, and attempted to prevent this Court from amplifying or clarifying the grounds for its earlier certification decision – in effect whipsawing the Court in an effort to prejudice the Plaintiff class harmed by it. Merck, in essence, sought to have its cake and eat it too – telling the Court of Appeals that this Court had not done its job while telling this Court it could not continue to do its job by exercising its discretion to amplify an interlocutory Order that could be modified or added to at any time before a final Order was entered. See, e.g., Bellarmine College v. Hornung, 662 S.W.2d 847, 849 (Ky. Ct. App. 1983).

Attached to the Plaintiff's Motion to Enter Amended Order Certifying Class was a Proposed Amended Class Certification Order for the Court's consideration or modification. During the hearing on Plaintiff's Motion to Enter Amended Class Certification Order, Merck raised concerns regarding certain language contained in the Proposed Amended Class Certification Order as being conclusory as to the merits of Plaintiff's claims. In response, the Plaintiff represented that the Order would be further amended and submitted to the Court for consideration. Before the necessary edits deleting any allegedly conclusory statements were submitted, the Court entered an Order denying the Plaintiff's Motion to Enter Amended Class Certification Order on December 4, 2010, but approving the Proposed Notice of Settlement submitted to the Court.

Plaintiff filed a Motion to Reconsider this Order as an attempt to clarify the record and provide the trial court with an opportunity to consider the Amended Order submitted as Exhibit A to that Motion. On January 27, 2011, this Court granted Plaintiffs' Motion, and entered an Amended Order. See Exhibit A-1, Amended Class Certification Order ("Amended Order"). The

Amended Order contains a detailed recitation of facts, a description of the class plaintiff and

class allegations, and a complete Rule 23 analysis, with citation to relevant case law. Id.

Specifically, this Court found – with respect to Plaintiff's claims under the KCPA and Plaintiff's

common law claims for fraud, misrepresentation and unjust enrichment – that the class is so

numerous that joinder of all members is impracticable, that there are questions of law and fact

common to the class, that the claims and defenses of the representative parties are typical of the

claims and defenses of the class, that Ratliff will fairly and adequately protect the interests of the

class, that questions of law and fact common to the class predominate, that a class action is the

superior means of adjudicating the claims at issue, and that resolution of the action as a class

does not pose any particularly difficult management or administrative problems.

> **F.**   **As Plaintiffs Have Argued On Appeal To The Kentucky Supreme Court, The Court Of Appeals Erred In Finding That This Court's Decision To Certify Plaintiffs' Fraud and Misrepresentation Claims Was An Abuse Of Discretion.**

On appeal from this Court's Amended Order Certifying Class, numerosity and the

presence of common questions of law and fact under CR 23.01(a) and (b) were not disputed.

Merck argued, however, that common questions of law and fact do not predominate under CR

23.02(c), that class action is not the superior method for adjudication under CR 23.02(c), and that

Ratliff is not a typical or adequate representative under CR 23.01(c) and (d).  Specifically, Merck

argued that this Court abused its discretion in granting class certification with respect to

Plaintiffs' fraud-based claims because individual questions of reliance, causation and damages

existed that would create mini-trials that would proliferate and prevent the predominance,

typicality and superiority requirements for the certification of a class from being met.

The Court of Appeals addressed the argument by Merck regarding predominance under

CR 23.02(c), and reversed this Court, finding that the class members' claims of negligent

misrepresentation and unjust enrichment could not satisfy the predominance requirement under

CR 23.02(c).  See Exhibit A-2, February 10, 2012 Court of Appeals Opinion (hereinafter

"Opinion").  In so doing, however, the Court of Appeals first noted that it agreed with several

aspects of this Court's Amended Certification Order:

> Nonetheless, it should first be acknowledged that that we agree with the trial court
> on several initial points.  Indeed, we agree that Ratliff's and the putative class
> members' claims hinge upon whether Merck knowingly or negligently distributed
> false or misleading information while VIOXX was on the market.  This common
> question threads through each potential class member's claims.  We further
> acknowledge that predominance does not require that each and every possible
> issue be common to all class members, but only that common issues *substantially
> predominate* over those issues which are individual in nature.

Opinion, p. 10 (emphasis in original, citations omitted).

The Court of Appeals based its ruling that the class members' fraud and

misrepresentation claims did not satisfy the predominance requirement under CR 23.02(c) on

that fact that, under Kentucky law, the fraud claims each contained the element of reliance:

> In the present case, each of the putative class members would have to show that
> his or her respective physicians individually relied upon the false or misleading
> information disseminated by Merck when prescribing Vioxx to them.  It is exactly
> this type of individualized proof which generally makes class litigation
> inappropriate in fraud and misrepresentation cases.

Id. at 12.

The Court of Appeals went on to note, however, that in some cases involving fraud or

misrepresentation, a "class action may still be appropriate where common issues predominate

over individualized questions and arise from a single fraudulent scheme or conspiracy or from

identical misrepresentations."  Id. at 13.

It has been the Plaintiff's contention, in pleadings and on appeal, that Merck used a

consistent pattern of deception lasting essentially the entire time that Vioxx was on the market,

and that generalized proof could therefore be used to show the elements of fraud and

misrepresentation in this case.  The Court of Appeals analogized the Plaintiff's argument to the

12

rebuttable presumption of reliance and causation known in securities litigation under the fraud on the market theory. The Court declined, however, to extend the fraud on the market theory beyond the scope of securities litigation, noting that other jurisdictions have likewise refused to allow use of the theory in consumer litigation: "[T]he 'fraud-on-the-market' approach has never been recognized in this jurisdiction for a fraud or misrepresentation case." Id. at 15. The Court therefore concluded that individual questions of causation, reliance and damages defeated class certification of the Plaintiff's fraud and misrepresentation claims.

Based on these conclusions, the Court of Appeals ruled that this Court abused its discretion by entering the Amended Order Certifying Class, and reversed and remanded the matter to this Court with instructions for this Court to vacate its prior order. Importantly, the Court of Appeals did not find that this Court abused its discretion in certifying the proposed class with respect to claims arising under the KCPA. In addition, the Court of Appeals did not consider Merck's arguments with respect to the adequacy of Ratliff as a class representative.

### G. The Court Of Appeals' Opinion Does Not Reverse Class Certification With Respect To Plaintiff's Claims Arising Under The Kentucky Consumer Protection Act.

Importantly, the Court of Appeals' Opinion did not reverse this Court's decision to certify the putative class with respect to the class claim raised under the Kentucky Consumer Protection Act. In fact, the Court specifically concluded that the statutory claim does not have the same problems as the common law claims with respect to class certification because a claim arising under the KCPA does not require proof of causation or reliance, and loss can be proved on a class wide basis under the "benefit-of-the-bargain" rule. See Exhibit A-2, Opinion, pp. 10-11.

In so finding, the Court quoted the statute, concluding that, "taking the allegations in the complaint as true for purposes of review, it is clear that Merck's actions would be unlawful

under the Act." Id., p. 11. As cited by the Court, the language of the KCPA does not contain the element of reliance found in common law fraud claims. See KRS 367.220(1) ("Any person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful [under the Act] may bring [a civil action] in the Circuit Court.").

The Court then analogized the KCPA to the nearly identical Missouri consumer protection statute at issue in Plubell v. Merck, 289 S.W.3d 707, 714 (Mo. Ct. App. 2009), in which the Missouri Court of Appeals affirmed a trial court's certification of a similar class asserting claims under that state's statute based upon a finding that individual questions with respect to causation, reliance, and damages did not exist under the statutory scheme. See Exhibit A-2, Opinion, p. 11. In Plubell, the Missouri Court of Appeals found that the statute required that the consumer's economic loss result from the unlawful practice at issue, but not that the actual purchase of the product be caused by the unlawful practice. The Court noted that: "[u]nder this interpretation, causation need not be shown with respect to each individual class member's decision to purchase Vioxx, but merely that a loss resulted from the practice." The Court further referenced the Plubell opinion in support of its conclusion that the "benefit-of-the-bargain" theory of loss could be applied on a class-wide basis to claims arising under the KCPA. Id. (citing Plubell, 289 S.W.3d at 715, for the proposition that damages are not measured by the purchase of the product in question, but by the difference in value between the product "as represented" and the "actual value" of the product received). The Court also relied upon a New Jersey opinion for its application of the benefit of the bargain method of determining loss with respect to claims arising under the KCPA. See Exhibit A-2, Opinion, p. 12 (citing Kleinmann v.

14

Merck & Co., 8 A.3d 851 (N.J. 2009) (also applying a "benefit-of-the-bargain" theory of value/loss)).

In fact, and as the Court of Appeals decision makes quite clear, the analysis employed by that Court with respect to Plaintiff's fraud and misrepresentation claims cannot apply to a claim arising under the KCPA because, reading the statute on its face, reliance is not an element that must be established with respect to a KCPA claim. Apparently finding that this Court's Amended Certification Order could not be separately considered with respect to each claim, however, the Court of Appeals reversed and remanded the matter to this Court with instructions for this Court to vacate its prior Order. Plaintiff now requests this Court to enter a Second Amended Class Certification Order certifying the proposed class only with respect to the KCPA claims asserted in Appellants' Class Action Complaint – a request that is consistent with the Court of Appeals' Opinion. This Court has full discretion to enter a Second Amended Class Certification Order, and as set forth below, the Proposed Amended Order is sufficient to satisfy the requirements of the Civil Rules.

## **ARGUMENT**

### I.   **ENTRY OF AN AMENDED ORDER CERTIFYING CLASS IS WITHIN THE COURT'S DISCRETION.**

The law in Kentucky is clear: under CR 23.01(1), an Order certifying a class action is interlocutory, and may be modified at any point prior to a final decision on the merits. CR 23.01(1). See also Bellarmine College, supra, at 849 (holding that an order certifying a class representative was merely interlocutory and nonappealable; although the trial court's order complied with CR 54.02 in that it stated it was final and there was no just cause for delay, such recital did not in fact make the order final). Marconi Wireless Telegraph Co. v. United States, 320 U.S. 1, 47-48 (1943) (courts have inherent power to reconsider interlocutory orders and

reopen any part of a case before entry of a final judgment); Coopers & Lybrand v. Livesay, 437

U.S. 463, 469 n.11 (1978) (noting that an order denying class certification may be altered or

amended before the decision on the merits and that because class status may always be altered or

amended, "a district court's order denying or granting class status is inherently tentative."). As

such, this Court is within its discretion to modify the Amended Order Certifying Class Action

entered on January 27, 2011. Plaintiff does not seek to modify the definition of the class, to

change the named class representative, or to include additional claims within the class definition.

Instead, the Plaintiff simply requests this Court to enter an Order setting forth the findings of fact

and conclusions of law supporting the Court's prior decision to certify the class in this action and

to narrow the range of claims certified to include only those arising under the KCPA, which the

Court of Appeals has indicated are appropriate for class certification.

## II.    CLASS CERTIFICATION IS APPROPRIATE WITH RESPECT TO THE CLASS CLAIMS ARISING UNDER THE KENTUCKY CONSUMER PROTECTION ACT.

The prerequisites necessary for the certification of an action as a class action are set forth

in CR 23.01: one or more members of a class may sue or be sued as representative parties on

behalf of all only if (a) the class is so numerous that joinder of all members is impracticable, (b)

there are questions of law or fact common to the class, (c) the claims or defenses of the

representative parties are typical of the claims or defenses of the class, and (d) the representative

parties will fairly and adequately protect the interests of the class. Thus, the requirements for

class certification are numerosity, commonality, typicality, and adequacy of representation by the

class representatives and counsel.

Once the prerequisites for class certification are met, a court may certify the action as a

class action as long as one of the requirements of CR 23.02(a), (b), or (c) is satisfied. In this

case, certification of the class claims arising under the KCPA is appropriate under CR 23.02(c),

which provides that a class action may be maintained if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." CR 23.02(c).

This Court has previously found that all of the claims asserted by Plaintiff satisfy the requirements for numerosity and the presence of common questions of law and fact under 23.01(a) and (b) and that undersigned counsel will adequately protect the interests of the class. Merck did not challenge these findings on appeal, the Court of Appeals did not address them, and Plaintiff will not therefore reiterate its arguments on those points here, presuming them to be established for the purposes of this Motion.

This Court has likewise concluded that Ratliff is an adequate class representative whose claims are typical of those of the class, thereby satisfying the requirements of CR 23.01(c) and (d). Merck did challenge these findings on appeal; however the Court of Appeals did not reach this issue, so Plaintiff herein reiterates that Ratliff is indeed an adequate class representative and that the requirements of CR 23.01(c) and (d) are met.

Finally, this Court previously found that all of the claims asserted by Plaintiff satisfy CR 23.02(c)'s predominance requirement. This finding was overturned by the Court of Appeals only with respect to the common law claims asserted by Plaintiff. For the reasons set forth below, Plaintiff respectfully asserts that this Court should affirm its earlier findings with respect to predominance and superiority in so far as they specifically relate only to the KCPA claim asserted by Plaintiff.

**A.    Ratliff Is An Adequate Class Representative Whose Claims Are Typical Of The Class, Thereby Satisfying The Requirements Of CR 23.01(c) And (d).**

Although this Court has repeatedly found Ratliff to be an adequate class representative whose claims are typical of those of the class, Merck continues to argue that Ratliff is an inadequate representative because the evidence is conflicting whether he has consulted a doctor concerning the risks of Vioxx.

Of course, defendants typically contest the adequacy of the class representatives, but courts have recognized that these statements should be viewed skeptically and they are often rejected.  As the Seventh Circuit succinctly put it in Eggleston v. Chicago Journeyman Plumbers Local Union No. 130, 657 F.2d 890 (7th Cir. 1981), cert. denied, 455 U.S. 1017 (1982):

> It is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified.  When it comes, for instance, to determining whether 'the representative parties will fairly and adequately protect the interest of the class,' or the plaintiffs' ability to finance the litigation, it is a bit like permitting a fax, although with pious countenance, to take charge of the chicken house.

Id. at 895.

The typicality requirement is fairly easily met as long as other class members have claims similar to the named plaintiff:

> [A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.  When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of varying fact patterns which underlie individual claims.

Newberg on Class Actions, § 3.13 at 328-329.

Different individual fact patterns, differences in damage claims, and the prospect that the named plaintiff may be subject to certain defenses does not preclude a finding of typicality.

18

Newberg, § 3.15-3.16. Ratliff's claim under the KCPA is identical to and arises from the exact same course of conduct as those of the other class members – the operative allegations are that Ratliff purchased Vioxx (an undisputed fact common to the proposed class), and that Ratliff suffered an ascertainable loss by purchasing a product with undisclosed deadly side effects (also allegations that are indisputably common to the proposed class). See KRS 367.220(1).

Although Ratliff admittedly occasionally had difficulty remembering the precise circumstances surrounding past events, courts in Kentucky have held that such difficulties should not result in a denial of certification. For example, the United States District Court for the Western District of Kentucky held that "the only issue before a court on a motion for class certification is whether plaintiff is asserting a claim which, assuming its merit, will satisfy the requirements of Rule 23…as such, [a] Rule 23 determination is wholly procedural and has nothing to do with whether a plaintiff will ultimately prevail on the substantive merits of its claim." See Hyland v. Homeservices of Am., Inc., 2008 U.S. Dist. LEXIS 90892 at *10 (W.D. Ky. 2008) (citing Little Caesar Enter. v. Smith, 172 F.R.D. 236, 241 (E.D. Mich. 1997)) (emphasis added). Furthermore, the Court should not conduct an inquiry into the merits of Plaintiff's claims, and should "assume that the substantive allegations of the complaint are true." See Hyland, supra, at 10.

Accordingly, because any alleged inadequacies in Plaintiff's deposition testimony are ultimately an issue of credibility and the merits of his claims, this Court previously properly refused to consider these alleged inadequacies when making its certification decision. All that is required is that (1) Ratliff's claims are common with those of the unnamed members of the class, and that (2) Ratliff will vigorously prosecute his claims through adequate class counsel. See Hyland, supra, at 15. See also Plubell, supra, at 714 (noting that "credibility issues do not make class representatives inadequate as long as their interests do not conflict with the interests of the

putative class and the class is vigorously prosecuted"). Merck has not disputed that Ratliff has

and will vigorously continue to prosecute his claims on behalf of the other class members.

**B.     Common Issues Of Law And Fact Predominate With Respect To Class Claims Arising Under The KCPA.**

Predominance "tests whether proposed classes are sufficiently cohesive to warrant

adjudication by representation," Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997).

Generally, under CR 23.02(c), a trial court must find a sufficient mutuality of interests among the

class members to justify the adjudication in a single action. 6 Kurt A. Phillips, Jr., and David V.

Kramer, Kentucky Practice: Rules of Civil Procedure Annotated Rule 23.02 (6th ed. 2005).

Under this prong, the "commonality" requirement does not require that the common questions be

dispositive of the entire action but only that questions common to the class predominate over

individual issues. Id.; see also Wiley v. Adkins, 48 S.W.3d 20, 23 (Ky. 2001). The

"predominance requirement [of Rule 23] is satisfied unless it is clear that individual issues will

overwhelm the common questions and render the class action valueless." Hyland, supra, at *18

(internal citations omitted, emphasis added).

Moreover, the Sixth Circuit has provided guidance on the types of cases that may be best

suited to Federal Rule of Civil Procedure 23(b)(3) class adjudication, which is analogous to

CR 23.02(b):

> In complex, mass, toxic tort accidents, where no one set of
> operative facts establishes liability, no single proximate cause
> equally applies to each potential class member and each defendant,
> and individual issues outnumber common issues, the district court
> should properly question the appropriateness of a class action for
> resolving the controversy. However, where the defendant's
> liability can be determined on a class-wide basis because the cause
> of the disaster is a single course of conduct which is identical for
> each of the plaintiffs, a class action may be the best suited vehicle
> to resolve such a controversy.
>
> Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1197 (6th Cir. 1988).

The situation described in the aforementioned quote is similar to the one at issue in this case, where Merck's conduct is alleged to have been identical with respect to each proposed class member.

Here, predominance is satisfied because questions of law or fact common to the class predominate over any questions affecting individual members. The overriding common issue in this case is whether Merck's failure to disclose and active concealment of the fact that Vioxx was unsafe constitutes a violation of the KCPA. And in fact, the Kentucky Court of Appeals, accepting the allegations of Plaintiff's Class Action Complaint as true, concluded that Merck's actions in connection with the sale and marketing of Vioxx would indeed be unlawful under the Act. See Exhibit A-2, Opinion, p. 11. The issue of Merck's unlawful conduct is plainly common to the class and easily predominates over all other issues. Further, the individualized proof found by the Kentucky Court of Appeals to defeat the predominance requirement with respect to Plaintiff's common law claims does not exist in the context of a claim brought under the KCPA, and proof of the Plaintiff's KCPA claim does not require individualized proof of causation or ascertainable loss.

The KCPA does not require that an unlawful practice cause a "purchase." Instead, a civil suit may be brought by "[a]ny person who purchases or leases goods primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money, or property, real or personal, as a result of [an unlawful practice]." KRS 367.220(1). "[A]s a result of" modifies "ascertainable loss." It does not modify "purchases or leases." Thus, a plaintiff's loss should be a result of the defendant's unlawful practice, but the statute does not require that the purchase be caused by the unlawful practice. Therefore, the class members are not individually required to show what they would or would not have done had the product not been misrepresented and the risks shown. See Exhibit A-2, Opinion, p. 11. This analysis was

employed by the Missouri Court of Appeals in affirming a trial court's certification of a similar class under a nearly identical consumer protection statute, and was cited with approval by the Kentucky Court of Appeals in reviewing this Court's Amended Order Certifying Class:

> A Missouri court, analyzing a consumer protection statute nearly identical to our own in a case involving Vioxx, found that the statute required that the plaintiffs' economic <u>loss</u> resulted from Merck's unlawful practices, but did not require that the plaintiff's <u>purchase</u> of Vioxx be caused by the unlawful practice. Under this interpretation, causation need not be shown with respect to each member's decision to purchase Vioxx, but merely that loss resulted from the practice.

> <u>Id.</u> (citing <u>Plubell v. Merck & Co., Inc</u>, 289 S.W.3d 707, 714 (Mo. App. 2009). <u>See Exhibit K</u>, <u>Plubell</u> decision.

The KCPA furthermore does not require each plaintiff to prove "loss" by individually showing the cost of alternative therapy. Plaintiff has generally alleged, in the Class Action Complaint, that the product he purchased was worth less than the product he thought he had purchased. Amended Class Action Complaint, ¶ 46 (alleging that Merck unjustly benefitted from its fraudulent marketing of Vioxx. In so alleging, Plaintiff has alleged ascertainable loss under the benefit-of-the-bargain rule, which compares the actual value of the item to the value of the item if it had been as represented at the time of the transaction. <u>See Plubell</u>, <u>supra</u>, at 715 (holding that damages are not measured under the Act by the purchase price of the product in question, but by the difference in value between the product "as represented" and the "actual value" of the product received); <u>Kleinman</u>, <u>supra</u> (also applying a "benefit-of-the-bargain" theory of value/loss). <u>See also Exhibit A</u>-2, Opinion, pp. 11-12, citing <u>Plubell</u> and <u>Kleinman</u> with approval with respect to the application of the benefit of the bargain rule for determining ascertainable loss.

Furthermore, and even if a benefit of the bargain rule does not apply to the question of ascertainable loss under the KCPA, issues surrounding the individualized nature of each class member's loss or damages do not overwhelm the common questions of law and fact at stake in

this case. See, e.g., Hyland, supra, at *18 ("The mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible."). In fact, courts have held that "[c]ommon issues may predominate when liability can be determined on a class-wide basis, even [with] individualized damage issues." In re Scrap Metal Antitrust Litig., 527 F.3d 517, 535 (6th Cir. 2008) (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124 (2001), overruled on other grounds).

### C. A Class Action Is The Superior Means Of Adjudicating Plaintiff's Claims.

The Court of Appeals based its finding that a class action is not the superior means to adjudicate the putative class members' common law claims on its underlying conclusion that individualized questions relating to reliance and causation would overtake the litigation. The Court of Appeals did not make any such finding with respect to this Court's determination of superiority on the Plaintiff's KCPA claim.

The second requirement that must be satisfied before an action may be certified under Rule 23.02(c) is that this Court find that a class action is superior to other methods for the fair and efficient adjudication of this controversy. Wright & Miller, Federal Practice and Procedure (2d ed.), Civil § 1779; Watson v. Shell Oil Co., 979 F.2d 1014 (5th Cir. 1992), on reh'g, 53 F.3d 663 (5th Cir. 1994). Four factors are listed in the subsection for consideration when certification is sought under subdivision (c): (i) the interest of the class in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of the class action. No single factor is determinative. In the instant action, each factor weighs in favor of class certification.

The class action's "historic mission of taking care of the smaller guy" has been widely recognized.  See Marvin E. Frankel, Amended Rule 23 From a Judge's Point of View, 32 Antitrust L.J. 295, 299 (1966) (quotation omitted).  For example, the United States Supreme Court observed that the drafters of the federal class-action rule sought to vindicate "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."  Amchem Prods., supra, at 617.  The Court continued:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.
>
> (Id. at 617 (quotation omitted))

See also Deposit Guar. Nat'l Bank of Jackson, Miss. v. Roper, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.").  When one inflicts minor harm across a dispersed population, "the defendant is, as a practical matter, immune from liability unless a class is certified."  Stephen C. Yeazell, Civil Procedure 966 (5th ed. 2000).

The class action device is therefore specifically designed to facilitate the resolution of claims similar to those asserted here - that is, claims with relatively small monetary value that would not be tried on an individual basis but with respect to which there is an incentive to try in the aggregate.  Merck has inflicted a relatively small harm across a large group of consumers – through false marketing practices it induced consumers to purchase a product with undisclosed and potentially fatal side effects.  As a result, these consumers were harmed to the extent that they expended money in purchasing the product and in seeking the physician consultation

24

subsequently recommended by Merck and the FDA.  See <u>Iliadis v. Wal-Mart Stores, Inc.</u>, 922 A.2d 710, 714-731 (N.J. 2007).

In <u>Iliadis</u>, <u>supra</u>, the plaintiffs alleged that Wal-Mart, in an effort to reduce labor costs and increase profits, systematically declined to honor its contractual promises concerning rest and meal breaks.  Plaintiffs also maintained that Wal-Mart failed to compensate its employees for all time worked by forcing employees to work through meal breaks, by locking employees in retail stores after they had clocked out, and by coercing employees to work off-the-clock.  The plaintiffs sought to certify a class of all current and former hourly employees of Wal-Mart in the State of New Jersey during a nine-year period, a class consisting of approximately 72,000 workers.

In discussing the purpose of the class action device under federal and New Jersey law, the court noted that the class action device "helps to equalize adversaries, a purpose that is even more compelling when the proposed class consists of people with small claims."  The court pointed out that "[i]n such disputes, where the claims are, in isolation, 'too small ... to warrant recourse to litigation,' the class-action device equalizes the claimants' ability to zealously advocate their positions."  <u>Id.</u> ("In short, the class action's equalization function opens the courthouse doors for those who cannot enter alone.").

The court overturned the decision of the court of appeals, which had affirmed the trial court's denial of the plaintiffs' motion to certify a class:

> If each victim were remitted to an individual suit, the remedy could be illusory, for the individual loss may be too small to warrant a suit or the victim too disadvantaged to seek relief.  Thus the wrongs would go without redress and there would be no deterrence to further aggressions.

> (<u>Id.</u> at 720 (citations omitted)).

The class members' "lack of financial wherewithal" is an "important factor" in the superiority analysis. Saldana v. City of Camden, 599 A.2d 582 (N.J. App. Div. 1991). The United States Court of Appeals for the Fifth Circuit has declared that a claim's "negative value" is the "most compelling rationale for finding superiority in a class action." Castano v. Am. Tobacco Co., 84 F.3d 734, 748 (5th Cir. 1998). Because of the very real likelihood that class members will not bring individual actions, class actions are "often the superior form of adjudication when the claims of the individual class members are small." Weber v. Goodman, 9 F. Supp. 2d 163, 170 (E.D.N.Y. 1998).

Here, the potential class plaintiffs are individuals who lack the financial resources of their corporate adversary. The equalizing mechanism of representative litigation allows them to adequately seek redress. This Court cannot ignore the fact that if the proposed class is not certified, hundreds of thousands of aggrieved consumers will not seek redress for Merck's alleged wrongdoing. See Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class action is not ... million[s of] individual suits, but zero individual suits."), cert. denied, 543 U.S. 1051 (2005). As one court proclaimed, "a negative determination may sound the death knell of the action as one for a class of persons or entities." In re Sugar Indus. Antitrust Litig., 73 F.R.D. 322, 356 (E.D. Pa. 1976).

This Court should also consider that Merck will benefit from having this litigation concentrated in one forum. Addressing the claims of all Kentucky consumers for economic harm arising from use of Vioxx in one action will protect Merck from being subjected to the expensive ordeal of continually having to demonstrate its purported innocence at trial. Galloway v. Am. Brands, Inc., 81 F.R.D. 580 (E.D. N.C. 1978).

## CONCLUSION

The class action device is specifically designed to facilitate the resolution of claims similar to those asserted here – that is, claims with relatively small monetary value that would not be tried on an individual basis but with respect to which there is an incentive to try in the aggregate. Merck has inflicted a relatively small harm across a large group of consumers – through false marketing practices made unlawful by the KCPA.

A class action is the only way in which the proposed class Plaintiffs can obtain redress, and the Court should therefore certify the proposed class with respect to the KCPA claim asserted in the Class Action Complaint and enter the tendered Second Amended Order Certifying Class.

## NOTICE OF HEARING

PLEASE TAKE NOTICE that the foregoing Plaintiff's Motion Seeking Entry of Second Amended Order Certifying Class will come on for hearing before Pike Circuit Court at the Court's convenience.

Respectfully submitted,

RICHARD A. GETTY
and
JESSICA K. CASE

THE GETTY LAW GROUP, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky 40507
Telephone: (859) 259-1900
Facsimile: (859) 259-1909

COUNSEL FOR PLAINTIFFS,
JAMES RATLIFF, On Behalf Of Himself
And All Others Similarly Situated

## **CERTIFICATE OF SERVICE**

A copy of the foregoing Plaintiff's Motion Seeking Entry of Second Amended Order Certifying Class was mailed, postage prepaid, to the following on this the 11th day of January, 2013:

Susan J. Pope, Esq.
Frost Brown Todd, LLC
250 West Main Street, Suite 2800
Lexington, Kentucky  40507-1749

Winston E. Miller, Esq.
Frost Brown Todd, LLC
400 West Market Street, 32nd Floor
Louisville, Kentucky  40202

Jessica D. Miller, Esq.
        and
John H. Beisner, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC  20005

jkcpid0636

_____

COUNSEL FOR PLAINTIFFS

28