**EXHIBIT B**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| | * | |
| In re: VIOXX Products Liability Litigation | * | MDL No. 1657 |
| | * | |
| This Document Relates to: | * | SECTION L |
| | * | |
| State of Utah | * | JUDGE ELDON E. FALLON |
| | * | |
| v. | * | MAGISTRATE JUDGE |
| | * | KNOWLES |
| Merck Sharp & Dohme Corp. | * | |
| | * | |
| Civil Action No. 2:06-cv-09336 | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

## PLAINTIFF'S SUPPLEMENTAL ANSWERS TO DEFENDANT'S SECOND SET OF INTERROGATORIES

### Introduction

**Required Interrogatory Answers**

The Court entered a discovery order on November 7, 2012 regarding the production of data and supplementation of responses to defendant's second set of interrogatories, number two and number 5, as modified by the Court. We will address the required data production separately.

**INTERROGATORY NO. 2:** Identify all communications between Merck and any person related to VIOXX that Plaintiff contends is violative of Utah law including date, location, form, content, substance, originator and recipient of each communication.

**INTERROGATORY NO. 5:** For each communication identified in response to Interrogatory number 2, identify the specific statement or omission that you claim renders the communication false or misleading. If identifying an omission, identify the communication or information that you allege Merck should have provided.

1

**REPRESENTATION A**.  **In submitting VIOXX to the Federal Food and Drug Administration, Merck represented that VIOXX was both safe and effective.**

Dates of representation. Merck received FDA approval for the sale of VIOXX in May 1999. The knowledge of Merck Scientists and their statements and omissions to the FDA were most pronounced in the years 1996-1999.

Persons making representations and omissions.   Merck and Merck Laboratories responsible for the new drug submission to the FDA.

Target of representation. Initially the FDA, then the medical community and public in general.

Falsity of the representation.   The representation of safety was false. VIOXX causes cardiovascular events. In making the false representation of safety in its new drug application, Merck employees, management and agents omitted materials which would indicate that warnings of cardiovascular danger should be made with respect to the drug. Merck also omitted all information in its possession which would lead a reasonable person to question the cardiovascular profile of VIOXX.

Material Omissions from the Submission to the FDA.

1.  The completed arthritis studies demonstrated an increase in cardiovascular events in VIOXX as compared to traditional NSAID. *See* Exhibits D and E attached hereto. The VIOXX CV events are attached as Exhibit F. This information was not provided to the FDA.

2.  Study 090, completed prior to drug submission, showed a more than two to one increase in cardiovascular events in a study VIOXX compared with another NSAID Nabumetone and placebo (17 VIOXX-8 Nabumetone-6 Placebo). The study included

4

497 individuals in a six week 1997 trial. This information was omitted in making the submission to the FDA.

Merck, through its paid investigator, John Martin, admitted that the study was not given to the FDA with the new drug submission. *See* Report of John Martin to the Board of Merck, Appendix I, pages 38-39, attached hereto as <u>Exhibit G.</u>

Merck admitted the existence of the 090 study but claimed it "taken out of context." *See* <u>Exhibit B</u>, paragraph 24. The full context of the study is found in the consultation of Shari L. Targum, MD for the FDA. *See* Memorandum dated February 1, 2001, Exhibit A, pages 28-34 (Dr. Targum's context is found on page 34), attached hereto as <u>Exhibit H</u>.

3. Study 085, also completed prior to drug release, also implicated the safety of VIOXX. Dr. Targum concluded that in both 090 and 085 "the trend is against rofecoxib." *Id.* Again, this information was omitted in the application to the FDA at the time VIOXX was approved and placed on the market.

4. Dr. Garret FitzGerald of the University of Pennsylvania specifically warned Merck that VIOXX as with all Cox-2 inhibitors had the potentiality of causing cardiovascular and other health problems in 1996 and 1997. *See* Martin Report page 33, attached hereto as <u>Exhibit I.</u> Those concerns were omitted or downplayed in the submissions to the FDA. The FitzGerald warning was not discussed in Merck's meeting with the FDA Arthritis Advisory Committee Meeting of April 20, 1999. *See* Martin Report, Appendix C, page 22 attached hereto as <u>Exhibit J.</u>

Dr. FitzGerald's concerns as to safety were ultimately found correct. Mr. Martin admits that Merck received and knew of the FitzGerald research but did nothing.

At the time the product was launched, Merck issued a press release dated May 21, 1999. *See* <u>Exhibit B</u>, paragraph 23. At that time, Merck gave a list of expected side effects but did not list the possibility of cardiovascular or renal problems. This omission made the press release false. Merck admits the existence of the press release but claims it taken out of context. *Id.*

5. At the time VIOXX went on the market, Merck was conducting the VIGOR study which was partially unblinded and which had already demonstrated an increase in cardiovascular events. The VIGOR study occurred between January 1999 and March 2000. Those findings were omitted from submissions to the FDA.

   Merck admits that it conducted the Vigor Study but denies that it is taken in context. *Id* at paragraph 28. For the context of the VIGOR study, *see* <u>Exhibit H</u>, pages 4-24. There the FDA concluded, "This is a comparative study using rofecoxib 50 mg daily and naproxen 1000 mg daily in patients with rheumatoid arthritis. A significant difference is seen in the composite of stroke, myocardial infarction, and cardiac death which is unfavorable for rofecoxib; consistent with this result are the time-to-event tables, and myocardial infarction, and (by this reviewer's analysis) cardiovascular death events."

6. Dr. Briggs Morton opined in a February 25, 1997 email that unless patients also received aspirin "you will get more thrombotic events—that is blood clots--,"and kill the drug." Dr. Morrison's concerns were either not communicated to the FDA or were downplayed by Merck. *See* Martin Report, Appendix A, page 36, attached hereto as <u>Exhibit K</u>.

7.  In response to Dr. Morrison's February 1997 email, Dr. Alise Reicin opined with respect to the VIGOR study. It had been suggested that patients in the study be allowed to take low dose aspirin to counter cardiovascular event risk.

> This is a no win situation! The relative risk of [adverse GI event with] even low dose aspirin may be as high as 2-4 fold. Yet the possibility of Increased CV events is of great concern. (I just can't wait to be the one to present those results to senior management. What about the idea of excluding high risk CV patients—ie those that have already had an MI, CABG, PTCA? This may decrease the CV event rate so that a Difference between the two groups would not be evident. The only problem would be —would we be able to recruit any patients.

> *See* Martin Report, Appendix A, page 38, attached hereto as <u>Exhibit L</u> .

Merck admits the existence of the email exchange, does not dispute accuracy of the Dr. Morrison's quotations but claims that they were taken out of context. *See*, <u>Exhibit B</u>, paragraph 47. Dr. Reicin's concerns and their emails were omitted from the submission to the FDA.

8.  It is clear that Merck scientists were discussing the cardiovascular risk of VIOXX, long before it went on the market. They made a number of incriminating statements regarding the possible cardiovascular problem events. Those statements include the following.

Merck consultants suggested that the Company compare the safety of VIOXX to Tylenol owing to Tylenol's placebo like safety perception. This suggestion was rejected by Merck at a consultants Meeting in September and October 24, 1996. The reason for rejection was that Merck did not want to highlight the favorability of Tylenol. Merck omitted this information in its submission to the FDA.

7

Merck admitted that it considered a study comparing VIOXX to Tylenol. However, it claims that this information is taken out of context. *See* <u>Exhibit B</u>, paragraph 46. The meeting regarding a Tylenol study was discussed in Mr. Martin's Report. A portion of Mr. Martin's discussion of the October Meeting can be found in his report, Appendix A, pages 25-35. *See* <u>Exhibit M</u>, attached hereto.

9.   Merck knowingly designed the VIGOR study to limit exposure to cardiovascular events.   Individuals who took aspirin were not allowed in the study.  A November 21, 1997 Merck Memo rejected that suggestion because "there is a substantial chance that significantly higher rates" of cardiovascular problems would be seen in the VIOXX group.   This information was not submitted to the FDA.   *See* Merck Memorandum, dated November 21, 1996, page 5, attached hereto as <u>Exhibit N</u>. Merck admits the existence of the Aspirin Test Memorandum, but claims it taken out of context. *See* <u>Exhibit B</u>, paragraph 121.

**<u>REPRESENTATION B.</u>  The VIGOR study showed higher rates of thromboembolic events when comparing VIOXX Patients with naproxen patients.**

<u>Date of representation</u>.  March 27, 2000 Press Release. *See* Merck News Release, dated March 27, 2000, attached hereto as <u>Exhibit O</u>.

<u>Persons making representations and omissions</u>.  Merck Marketing Department and Merck Scientists.

<u>Target of representations.</u>  The medical community and public in general.

<u>Exact wording of representation.</u>

In addition, significantly fewer thromboembolic events were observed in patients taking naproxen in this GI study which is consistent with Naproxen's ability to block platelet

8

aggregation. The effect on these events had not been observed previously in any clinical studies for naproxen.

An extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-market experience with VIOXX showed no indication of a difference in the incidence of thromboembolic events between VIOXX, placebo and comparator NSAIDS.

Falsity of the representation. The statement is partially or wholly false because the number of heart attacks in the naproxen patients was not consistent with Naproxen's ability to block platelet aggregation. VIOXX was in fact causing the increase in heart attacks. An extensive review of safety data from other completed studies would have found study 090 which did not confirm the safety profile of VIOXX. A complete review would also disclose the ADVANTAGE study which most certainly did not confirm the equivalency of VIOXX, other NSAIDs and Placebo.

Material ommissions.

A. It is true there were "significantly fewer" thromboembolic events in the naproxen arm of the study. In using the broad language, Merck sought to diffuse the communication. If Merck had been accurate, it would have reported at least a 400% increase in the VIOXX patients which after study would have become a 500% increase.

B. "An extensive review of safety data from all other completed and ongoing clinical trials…showed no indication of a difference in the incidence of thromboembolic events between VIOXX, placebo or comparator NSAID." *See* Exhibit O, page 2. This statement is false for the following reasons:

1. Merck's Osteoarthritis studies demonstrated a significant increased risk of cardiovascular events with VIOXX as compared with Non-Naproxen NSAIDS. *See* Exhibits D and E.

2. Merck's osteoarthritis studies demonstrate a significant increase of cardiovascular events associated with VIOXX as compared with non-Naproxen NSAIDS. *See* Exhibit F.

3. Merck had conducted study 090 by the time that VIOXX was submitted to the FDA for approval. Merck admits making the study. *See* Exhibit B, paragraph 24. Contrary to Merck's representations, Study 090 showed at least a two fold increase in cardiovascular events.

4. Merck had completed the 085 trial which did not exculpate VIOXX's propensity to cause CV events. *See* Exhibit H, pages 24-28.

5. Opinion on the naproxen cardio protective thesis was far from universally accepted as stated in the press release. This is true even of Merck upper management. In a March 9, 2000 email, Dr. Edward Scolnick, president of Merck research laboratories acknowledged the existence of cardiovascular events and noted that those events appeared to be "mechanism based as we worries it was." Dr. Scolnick also said that the cardiovascular events "are clearly there." *See* Appendix E, page 9, Martin Report, attached hereto as Exhibit P. Merck admits that Dr. Scolnick sent this email but again argues context. *See,* Exhibit B, paragraph 25. Dr. Scolnick's doubts did not make it into the press release and they were not conveyed to the FDA.

6.   Merck was in possession of the Dr. Garret FitzGerald's study from 1996 and

1999 in which Dr. FitzGerald studied the cardiovascular effects of COX-2 drugs

including VIOXX.  He opined that the COX-2 drugs would increase

cardiovascular events. *See* <u>Exhibit I</u>.

**REPRESENTATION C.  The VIGOR difference in VIOXX cardiovascular event**

**was due to naproxen's cardioprotective properties.** *See* **Martin Report, Appendix G, page**

**5-6, attached hereto as** <u>**Exhibit Q**</u>**.**

<u>Date of Representation.</u>  March 27, 2000.

<u>Persons making representations and omissions.</u>  Product Representatives repeating Merck

Marketing bulletin.

<u>Target of Representation</u>.  Medical doctors.

<u>Falsity of the representation</u>.  The representations of the Merck Product Representatives

were false for the same reasons as the press release of the same date.

**REPRESENTATION D**.  **VIOXX had a "superior" cardiovascular profile.**

<u>Date of representation</u>.  Merck Press Release of March 27, 2000.  *See* <u>Exhibit O</u>.

<u>Persons making representations and omissions.</u>  Merck Marketing and Scientists.

<u>Target of representation</u>.  The medical community and public in general.

<u>Falsity of the representation.</u>  The press release claims that VIOXX had a "superior"

Cardiovascular Safety Profile.  Merck makes the false claim that the increase of cardiovascular

events in the VIOXX patients can be explained by the protective properties of naproxen.  It

further claims that after "an extensive review of safety data from all other completed and

ongoing trials, as well as the post-marketing experience with VIOXX, showed no indication of a

11

difference in the incidence of thromboembolic events between VIOXX, placebo and comparator NSAIDs."

Material omissions.

1. An extensive review of completed studies would have revealed study 090 which most certainly showed a cardiovascular difference between VIOXX and a comparator NSAID. *See* Exhibit H. An extensive review of the prior Merck studies would have disclosed the information found in Exhibits E, F, and O.

2. The ADVANTAGE study comparing VIOXX with naproxen was partially unblinded on March 14, 2000. That study was consistent with the numbers and rates of adverse events found in VIGOR. *See* Martin report Appendix I, pages 54-56, attached hereto as Exhibit R.

3. Lawyer Martin tells a different story as to the affirmative representations that Merck scientist had reviewed all applicable studies and found no difference in the rates of adverse events. Mr. Martin says that cardiovascular data from Protocols 010,085, 090, 068, 096 and 097 were not considered by the unblinded VIGOR team in March 2000. *See* Martin Report Appendix E, page 21, attached hereto as Exhibit S.

4. Merck changed the APPROVe data to show a more favorable cardiovascular profile. As reported in the New York Times, April 24, 2005, Merck officials told the scientists to re-classify a 73 year-old woman's death from myocardial infarction to "unknown." In a related November 2000 email, Dr. Reicin wrote, "I think this should be called unknown cause of death…so we don't raise concerns." Dr. Scolnick wrote in an email that this report "would put us in a terrible situation." *See* Evidence in

Vioxx Suits Shows Intervention by Merck officials, *New York Times* (April 24,

2005), attached hereto as Exhibit T.

The reason why the classification puts Merck in a terrible situation is that including

the death as a heart attack makes the VIOXX patient death in ADVANTAGE

statistically significant and would have required a notification of the FDA.

Merck admits the authenticity of the emails.  *See*, Exhibit B, paragraph 165.

5.   The press release does not reference the FitzGerald study. *See* Exhibit O.

6.   Dr. Scolnick, Merck's research chief sent an email on March 9, 2000.  "it is a shame

but it is a low incidence and it is mechanism based as we worried it was." *See*

Exhibit P.

Merck admits that this email was sent by Dr. Scolnick and does not dispute the

accuracy of Utah's description of the language. *See* Exhibit B, paragraph 25.

**REPRESENTATION E.   Merck confirms the favorable cardiovascular profile of**

**VIOXX.**

Date of Representation. Merck Press Release April 28, 2000.

Persons making representation.  Merck Marketing and Merck Scientists.

Target of representation. The medical community and public in general.

Text of representation.

"In response to speculative news reports, Merck & Co.Inc. today confirmed
the favorable  cardiovascular safety profile of VIOXX (rofecoxib)...Extensive
review from the completed  osteoarthritis trials and on-going clinical trials with
VIOXX, as well as post marketing experience with VIOXX have shown no
difference in the incidence of cardiovascular events, such as heart attacks among
patients taking other NSAIDS and placebo.. .This is the first time this effect of
naproxen to reduce these events has been demonstrated in a clinical study."

*See* Merck News Release, attached hereto as Exhibit U.

13

Falsity of the representation. VIOXX does not have a favorable cardiovascular safety profile. The ADVANTAGE studies as well as study 090 and do demonstrate a difference in the incidence of cardiovascular events when VIOXX is compared to other NSAIDs and/ or placebo. Dr. Scolnick understood the importance of further testing including a test of VIOXX v. Tylenol (which is not NSAID and is not associated with cardiovascular risk.) In an email of April 12, 2000, Dr. Scolnick stated, "I will tell you my worry quotient is high. I actually am in minor agony…WE WILL NOT KNOW FOR SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY." (Capital letters in original.) See Martin Report, Appendix M, page 4, attached hereto as Exhibit V. The study was never done.

Material omission. The statement is not innocent for the reasons stated with respect to the prior press releases and the information found in the submittal discussion above.

### REPRESENTATION F. Cardiovascular safety profile of VIOXX is confirmed.

Date of statement. Merck Press Release of May 1, 2000.

Persons making representation. Merck Marketing and Merck Scientists.

Target of representation. The medical community and public in general.

Full Statement.

In response to speculative news reports, Merck & Co., Inc. confirmed the favorable cardiovascular safety profile of VIOXX (rofecoxib). Extensive review of data from the completed osteoarthritis trials and the on-going clinical trials, as well as post-marketing experience with VIOXX, have shown NO DIFFERENCE (capital letters in the original) in the incidence of cardiovascular events, such as heart attacks, among patients taking VIOXX, other NSAIDs and placebo." Again, Merck claims that naproxen had cardio protective properties.

See Merck News Release, attached hereto as Exhibit W.

Falsity of the representation. VIOXX does not have a favorable safety cardiovascular profile. There is a difference between the cardiovascular profiles of VIOXX, other NSAIDS and placebo.

Material Omissions. The statement was not innocent for the reasons cited above as well as the passage of time in which Merck failed to do studies showing the validity of the Naproxen hypothesis and the cardiovascular profile of VIOXX. Further, by the time of this press release, Merck post hoc evaluation of the "aspirin indicated subgroup " in the VIGOR study had been discarded because the differences in the aspirin indicated group were not significantly different from the group as a whole. *See* Martin Report, Appendix F, pages 15-17 and 54, attached hereto as Exhibit X.

### REPRESENTATION G. Merck confirms favorable safety profile of VIOXX.

Date of representation. Merck Press Release of May 22, 2001.

Persons making representation. Merck Marketing and Scientists.

Target of representation. The medical community and public in general.

Full Statement.

In response to news and analyst reports of data the Company first released a year ago, Merck & Co. today reconfirmed the safety and efficacy safety profile of VIOXX.

Although the VIGOR study was a GI outcomes study and was not designed to show differences in cardiovascular effects, significantly fewer heart attacks were observed in patients taking naproxen (0.1 percent) compared to the group taking VIOXX 50mg (0.5 percent) in this study. There was no difference in cardiovascular mortality between the groups treated with VIOXX or naproxen. Patients taking Aspirin did not participate in VIGOR.

In extensive discussions, the Advisory Committee explored this finding, other studies of VIOXX and possible explanations for this result in VIGOR. In the completed osteoarthritis trials and on-going clinical trials with VIOXX 12.5 mg, 25 mg and 50 mg in 30,000 patients, there was no difference in the incidence of cardiovascular events, such as heart attacks, among patients taking VIOXX, other NSAIDs and placebo.

At the Advisory Committee meeting, Merck scientists said that the VIGOR finding is consistent with Naproxen's ability to block platelet aggregation by inhibiting COX-1 like aspirin, which is use to prevent second cardiac events in patients with a history of heart attack, stroke or other cardiac events. This is the first time this effect of naproxen on cardiovascular events has been observed in a clinical study.

*See* Merck News Release, attached hereto as Exhibit Y.

Falsity of the representation.  Merck repeats the unproven naproxen theory and gives it equal weight with the probability of VIOXX causing cardiovascular events.  Naproxen is not like aspirin in preventing heart attacks.  There was a difference in cardiovascular events between VIOXX, other NSAIDs and placebo.

Material omissions. In addition to the reasons cited above, there was never evidence that naproxen was like aspirin in protecting against heart attacks.  Referring to this press release, the FDA Warning Letter of September 17, 2001 is relevant.  "Additionally, your claim in the press release that VIOXX has a 'favorable cardiovascular safety profile" is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen." *See* Exhibit C, page 6.

**REPRESENTATION H.  Merck Stands behind the overall and cardiovascular safety of VIOXX.  "We review carefully data from our completed studies and clinical use of our products."**

Date of representation.  August 2001.

Persons making representation.  Merck Marketing.

Target of representation.  Medical Doctors.  The representation was made in a Dr. Doctor letter as well as distributed by Product Representatives.  *See* Martin Report Appendix J, page 18, attached hereto as Exhibit Z.

16

Falsity of representation.  The representation is false for the reasons, representations and omissions cited above.

### REPRESENTATION I.  Merck Stands behind Cardiovascular Safety Profile of VIOXX (Rofecoxib).

Date of representation.  Press Release of August 22, 2001.

Persons making representation. Merck Marketing and Merck Scientists

Target of representation.  The medical community and public in general.

Exact Statement.

"Merck believes that VIOXX is an appropriate and efficacious therapy for the relief of the signs of osteoarthritis and the management of acute pain in adults. Merck concurs with the statements made in the Article (Journal of American Medicine)…that "aspirin" and naproxen show greater potential for gastrointestinal toxicity but have a cardioprotective effect. ..The authors say more data are needed on the cardiovascular profile of Cox-2 inhibitors.  However, Merck believes that extensive cardiovascular safety data already exists on VIOXX and that these date— which were not incorporated into the author's analysis—suggest that there is not increase in the risk of cardiovascular events as a result of treatment with VIOXX.

*See* Press Release, attached hereto as Exhibit AA.

This representation was made in response to an article in the *Journal of American Medicine (JAMA)* critical of the cardiovascular safety of VIOXX.  *See* Risk of Cardiovascular Events Associated With Selective COX-2 Inhibitors, August 22/29 2001, attached hereto as Exhibit BB.

Falsity of representation.  The statement is false for the reasons stated with respect to the prior press releases.  In addition, when this statement was made, Merck had not started studies confirming the naproxen hypothesis or the safety profile of VIOXX.

Material omission.  The press release is false for the reasons set out above.   In the JAMA article, Cleveland Clinic foundation had conducted an epidemiological study that found a statistically significant increase in annualized myocardial infarction rates for VIOXX when compared to attack or stroke.  The Journal of American Medical Association warned that

17

VIOXX had twice as many heart attacks and strokes as patients who took naproxen. *See* Exhibit BB. Merck admits the existence of these studies but claims the State takes them out of context. *See* Exhibit B, paragraph 112 and 113.

**REPRESENTATION J. Merck stands firmly behind overall and safety profile of and favorable GI profile of VIOXX.** The Vigor Result "is consistent with the ability of naproxen to inhibit platelet aggregation." This is the only explanation of the higher rates of CV in the VIOXX Vigor Patients.

Dates of representation. August 21, 2001 and thereafter.

Target of representation. Merck Field Representatives and medical doctors. The representations the Field Representatives were to make to medical doctors are set out in a telephone call to a Field Representative by Jo Jerman in response to the JAMA article.

Actual representation to be made to doctor.

"Merck believes that extensive cardiovascular data already exist on VIOXX." These data, including a meta-analysis involving more than 28,000 patients, showed the relative risks of serious CV events were similar with VIOXX and placebo and with VIOXX and 3 widely prescribed NSAIDs, ibuprofen, diclofenac and nabumetone." *Id.* at page 2. "If asked about CV effects, use your CV card. As your piece shows, CV events and cardiovascular mortality rates between VIOXX and NSAIDs, such as ibuprofen, diclofenac, and nabumetone, were similar in OA studies."

*See* Jo Jerman's response to Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors, *JAMA*, August 22, 2001, attached hereto as Exhibit CC.

Material omissions. The message did not include study 090 which showed a marked difference in CV safety. It did not refer to FitzGerald study. Most importantly the "meta-analysis" did not include VIGOR. In presenting the naproxen hypothesis, the message to be delivered is that the hypothesis is the only reasonable explanation for the higher rates of CV in the VIOXX arm of VIGOR.

18

**REPRESENTATION K.** That the unblinding of the APPROVe study was the first information Merck had on the unfavorable cardiovascular profile of VIOXX.

Date of Statement. Press Release of September 28, 2004. *See* Martin Report Appendix Q, page 65, attached hereto as Exhibit DD; Dear Healthcare Provider Letter, attached hereto as Exhibit EE.

Persons making representation. Merck Marketing and Merck scientists.

Target of representation. The medical community and public in general.

Falsity of representation. Starting with study 090 and the FitzGerald paper, Merck had knowledge of the propensity of VIOXX to cause cardiovascular events. VIGOR showed the same propensity which should have been recognized but was replaced with the unproven (and false) naproxen protective theory. The ADVANTAGE trial confirmed that VIOXX causes cardiovascular events. Significant outside scholarly research demonstrated the probable link. The JAMA article showed the doubling of cardiovascular events between naproxen and VIOXX.

**REPRESENTATION L.** "Prior to APPROVe, there was no demonstration of risk of cardiovascular events for patients taking VIOXX compared to patients taking . . . NSAIDS other than naproxen in randomized controlled clinical trials." *See* Excerpt of Prepared Testimony, attached hereto as Exhibit FF.

Person making representation. Raymond V. Gilmartin, President of Merck.

Date of representation: November 18, 2004.

Target of representation. The medical community and public in general.

Falsity of representation. Mr. Gilmartin's statement was false. Study 090 demonstrated heighted CV risks. *See* Exhibit H. The completed arthritis studies demonstrated an increase in cardiovascular events. *See* Exhibits D and E.

The falsity of this statement was understood by Merck scientists about APPROVe. Dr. Scott Reines, a Merck Laboratories Vice President received an email from Merck scientist Dr. Thomas J. Simeon regarding the APPROVe trial date January 23, 2002. : "Tom, if VIOXX is associated with a higher risk of CV events it could be unethical to continue the Polyp trial." *See* Martin Report, Appendix Q, page 15, attached hereto as <u>Exhibit GG</u>. The only reason why the APPROVe cardiovascular data was not available sooner was a deliberate decision in February 2002 to continue the study without looking at the CV data. *Id.* at pages 17-19. Thus, the APPROVe data was not available when Merck did its meta-analysis in the ViGOR submission to the FDA.

**REPRESENTATION M. Direct to consumer advertisement failed to disclose known risks including cardiovascular risks.**

<u>Date of representations.</u> Prior to FDA Warning Letter of July 16, 1999. *See* <u>Exhibit HH</u>.

<u>Persons making representations.</u>   Merck Marketing.

<u>Target of representation.</u> The public in general.

<u>Falsity of representation.</u>  The FDA found a violation of law and required the removal of the advertisement from the market.

**REPRESENTATION N. Unsubstantiated claims as to the safety of VIOXX.**

<u>Date of Representation.</u>  Prior to December 16, 1999, second warning letter from FDA. *See* <u>Exhibit II</u>.

<u>Target of representation.</u> General medical public and general public at large

<u>Falsity of representation.</u> Merck claimed the safety and efficacy of VIOXX without presenting any risk information concerning the contraindications, warnings, precautions or

*See* Article 3. "Reicin et al (2002) Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with Rofecoxib versus non-selective nonsteroidal anti-inflammatory drugs. *American Journal of Cardiology,* 89:204-209, attached hereto as Exhibit RR.

*See* Article 4.  Weir, et al (2003) "Selective COX-2 inhibition and cardiovascular effects. Review of the rofecoxib development program" *American Heart Journal,* 146:591-604, attached hereto as Exhibit SS.

**REPRESENTATION S.**  **"Merck and Co., Inc. stands behind the overall and cardiovascular safety profile of VIOXX."** *See* **Exhibit Z, page 18.**

Date of representation.  August 2001 Dear Health Care Provider letter in response to the JAMA article critical of VIOXX.

Persons making reresentations.  Merck Marketing.

Target of representation.  Medical doctors.

Falsity of reprentation.  The letter is false for the reasons and omissions set forth above.

**REPRESENTATION T.**  **Doctors who claim cardiovascular problems with VIOXX are not to be believed.**

Date of representations.  Beginning in June 2001.

Person making representations.  Susan Baumgartner  (Merck Marketing)

Target of representations.  Medical doctors.

Falsity of representations. The marketing department compiled a list of "problem physicians" prior to the release of VIOXX.  The project was headed by Ms. Susan Baumgartner, a marketing manager.  Ms. Baumgartner had three criteria for inclusion.  First, there were the doctors that were important from a business perspective.  Second, were doctors who either "do

27

not support or are negative toward Merck and/or VIOXX and third, the doctors who provided
support and a strong voice for the competitors.  Merck made significant efforts to keep the
medical profession from hearing alternative views of the safety of VIOXX.  *See* Martin Report,
Appendix K, pages 25-44, attached hereto as Exhibit TT;  and L.M. Sherman Memo, dated
January 23, 2001, attached hereto as Exhibit UU.

   **REPRESENTATION U**.  **The cardiovascular results of the VIGOR study were the
results of naproxen cardioprotection and not VIOXX causation of cardiovascular events.
Cardiovascular events did not need to be placed in the WARNINGS section of the VIOXX
label.**

   Date of Representations.  The submittal of a Merck requested change to labeling was
submitted to the FDA on June 29, 2000.  Merck scientists were in discussions with the FDA
prior to the submission.  Merck scientists had a FDA conference on cardiovascular events on
February 8, 2001.  The label was approved in June 2002.

   Target of representation.   The FDA and the medical community in general.

   Persons making representations and omissions.  Merck Scientists and Merck Marketing.

   Falsity of representation.  On June 29, 2000, Merck submitted an application to the FDA
to include the VIGOR gastrointestinal data and the cardiac date in the VIOXX label.  Merck also
wanted the removal of the class gastrointestinal warning.  The new drug trial submission process
was documented by Mr. Martin.  *See* Exhibit G, page 119.

   Prior to submission of the application, Merck provided the FDA with an extended report
on cardiovascular safety.  That report, like most of Merck's activities highlighted the naproxen
cardio protective theory.  "The March 23 Report concluded that the reduced number of serious
thrombotic adverse events among the naproxen users was 'likely the result of the

cardioprotective effects of naproxen.  With respect to the FitzGerald prostacyclin hypothesis, the report state that, 'although the role of COX-2 inhibitors such as rofecoxib in potentiating a pro-thrombotic state in patients with rheumatoid arthritis cannot be ruled out, this scenario seems less likely." *Id* at page 12.

In response to FDA concerns, Dr. Reicin drafted a clinical Study Report.  "[T]he reduced incidence of cardiovascular events in patients treated with naproxen [was] likely the result of the cardioprotective effects of naproxen, a potent inhibitor of platelet aggregation." *Id* at page 19. Merck also attempted to convince the FDA of the validity of its retroactive aspirin indicated subgroup.  "These data show that a disproportionate amount of the benefit observed with naproxen therapy in the VIGOR study occurred in patients in whom antiplatelet therapy was already indicated." *Id* at page 29.

The FDA reviewers were not impressed with Merck's arguments.  In early February 2001, Dr. M.L. Villalba assessed the cardiovascular data from VIGOR.  She identified factors that in her view suggested the cardioprotective effect of naproxen was not the sole explanation for [the VIGOR trial] findings. *See* FDA transcript, dated February 8, 2001, page 122, attached hereto as Exhibit VV;  Exhibit G, page 86.  There were no prospective placebo-controlled trials to support naproxen's decreased cardiovascular risk. *See* FDA transcript, dated February 8, 2001, page 122, attached hereto as Exhibit VV; Exhibit G, page 86.  The reduction in the number of thrombotic adverse events in the naproxen group relative to the VIOXX group in the VIGOR trial (58%) was greater than the reduction caused by aspirin in studies against placebo (25-30%). *Id* at page 87.  Dr. Villilba believed that the data from Protocols 085, 090 and Advantage trended towards a finding of higher rates of myocardial infarction in VIOXX. *Id* at page 87.  She also did not believe in the validity of the retrospective aspirin analysis. *Id* at page 86.  She

29

recommended that information regarding cardiovascular thrombotic events be added to the VIOXX product label. *Id* at page 89.

Likewise, Dr. Targum concluded that "It would be difficult to imagine inclusion of VIGOR results in the rofecoxib labeling without mentioning cardiovascular safety in the study description without mentioning cardiovascular safety results in the study description as well as the Warnings section." *See* Exhibit H, page 37.

The FDA's Arthritis Advisory Committee met on February 8, 2001. *See* Exhibit VV. The FDA doctors were highly skeptical of the naproxen theory.

The Merck doctors ultimately convinced the FDA that the naproxen theory was the best explanation for the VIGOR and APPROVE results. Merck management in the form of Dr. Scolnick was highly impressed with Merck's presentation on the naproxen of February 8, 2001 theory. By email he told his presentation team. "You were all FANTASTIC. You made them look like graded high school students and you won big huge and completely." *See* Exhibit G, at page 119.

The same day, Merck issued another press release stating that Merck had advanced its position that the disparity in the cardiovascular data was "consistent with naproxen's ability to block platelet aggregation," but also noted that "other explanations were advanced by the FDA reviewer and were discussed with the Advisory Committee." *Id.*

Material omission. Information on Cardiovascular profile of VIOXX was not placed in the WARNINGS section of the label. The label was therefore partially false until VIOXX was

removed from the market in September 2004.

DATED this _12th_ day of December, 2012.

_/S/_____

Joseph W. Steele
Kenneth D. Lougee
STEELE & BIGGS
5664 South Green Street
Salt Lake City, UT  84123

_/S/_____

Eric H. Weinberg
The Law Offices of Eric H. Weinberg
149 Livingston Avenue
New Brunswick, NJ  08901

_/S/_____

Richard W. Schulte (Ohio Bar No. 0066031)
812 E. National Road, Suite A
Vandalia, Ohio 45377
(937) 435-7500

*Attorneys for Plaintiff*