**EXHIBIT E**

We now have Dr. Gilmartin to come, Mr. Gilmartin, Raymond Gilmartin is Chairman and President and Chief Executive Officer of Merck & Company, the maker of Vioxx. He's been the CEO of Merck for the past ten years. Mr. Gilmartin also serves as President of International Federation of Pharmaceutical Manufacturers Association. We look forward to your testimony and thank you for your patience while you heard all the other questions as well as testimony. Would you proceed according to, and you have ten minutes as well.

G    Mr. Chairman, Senator Baucus, Senator Hatch, on behalf of the 60,000 men and women of Merck, I'm pleased to have the chance to come before you to tell you more about who we are and what we stand for.

On the afternoon of September 24, Dr. Peter Kemp, President of Merck Research Laboratories called to alert me to information he had received just that morning, from the independent external board of physicians and scientists monitoring the safety of patients in our approved trial of Vioxx. He told me that there was an increased risk of confirmed cardiovascular events beginning after 18 months of continuous daily treatment in patients taking Vioxx compared to those taking placebo. That call triggered a series of events that led within four days of that call to Merck contacting the FDA to tell them that we were going to withdraw Vioxx from the market.

Our decision to voluntarily withdraw Vioxx was difficult in several ways. Many patients counted on Vioxx and we believed it would have been possible for Merck to continue to market Vioxx with labeling that would incorporate the new data. Vioxx was the only non-steroidal anti-inflammatory medicine, or NSAID, that was demonstrated to provide pain relief similar to high dose NSAIDS and proven to reduce the risk of developing debilitating gastrointestinal side effects compared to those on NSAIDs. This is an important benefit for many who suffered from the pain of arthritis and other conditions. An estimated 15,000 Americans die each year from gastrointestinal bleeding associated with NSAID use.

On another level, however, our decision to withdraw Vioxx was easy. Given the availability of alternative therapies and the questions raised by the data withdrawing Vioxx was consistent with an ethic which has driven Merck's actions and decisions for more than 100 years. Merck puts patients first.

I'd like to make three points clear at the outset. First, the Food and Drug Administration approved Vioxx only after Merck had extensively studied the medicine, and found it to be safe and effective. Merck continued to extensively study Vioxx after it was approved for marketing to gain more clinical information about the medicine.

Second, we have promptly disclosed the results of numerous Merck-sponsored studies to the FDA, physicians, the scientific community and the public, and participated in a balanced scientific discussion of it's risks and benefits.

Third, until approved, the combined data from randomized controlled clinical trials showed no difference in confirmed cardiovascular event rates between Vioxx and placebo and Vioxx and NSAIDs other than Naproxin. When data from the approved study became available Merck acted quickly to withdraw the medicine from the market.

Mr. Chairman, as you know, no medicine is absolutely safe. All medicines have side effects. To determine both its risks and benefits, Merck extensively studied Vioxx before seeking the regulatory approval to market it and we continued to conduct studies after the FDA approved Vioxx. I have provided with this statement a time line of our research and development process to aid in the committee's understanding of the events. Our original drug application to the FDA for Vioxx included data on more than 5,000 patients with osteoarthritis. The clinical trials compared the effects of Vioxx to other non-Naproxin NSAIDs and to placebo. And included data on patients who had been on Vioxx for more than one year. In these studies, there was no difference in the rate of cardiovascular events between Vioxx and placebo, or between Vioxx and non-Naproxin NSAIDs.

Prior to the FDA's approval of vigor, we initiated a study known as Vigor. That study was designed to compare the gastrointestinal safety profile of Vioxx with Naproxin. We chose Naproxin for this study instead of placebo because we intended to test Vioxx in patients with rheumatoid arthritis. It would not have been ethical or practical to subject people suffering from arthritic pain to a placebo for a long time.

We learned the preliminary results from Vigor in March 2000. In the trial there was a higher cardiovascular event rate in patients taking Vioxx than Naproxin. These data were of concern to us. It is important to note that because the Vigor study compared two drugs, Vioxx and Naproxin, and not Vioxx and placebo, it was not possible to make a determination based on the Vigor study alone, whether Naproxin was having a beneficial cardiovascular effect, or whether Vioxx was having a detrimental cardiovascular effect.

To help us evaluate the meaning of the Vigor study, Merck took the step of looking into data from two trials we had already initiated in which patients with memory impairment or Alzheimers were given Vioxx or placebo. We found there was no difference in cardiovascular event rates in these two trials. These data, our earliest clinical data, a pharmacological study that showed that Naproxin had a strong anti-platelet effect similar to aspirin when it is taken regularly, twice a day, as it was in Vigor, led us to conclude that the best explanation for the difference in Vigor was the effect of Naproxin.

We also recognized the value and interest in obtaining additional cardiovascular data on Vioxx. After deliberation with outside advisors, Merck developed and discussed with the FDA a plan to prospectively analyze the cardiovascular event rates from 3 large placebo controlled studies, two of which were already under way. It was information from one of those long term trials, the approved study, that led to Merck's decision to withdraw Vioxx.

In all the debate since we withdrew Vioxx, one important point should not be lost. Merck has promptly disclosed the results of Merck-sponsored studies of Vioxx to the FDA, to physicians, to the scientific community and to the media. By doing so we fostered, both internally and externally a robust scientific discussion of the risks and benefits of Vioxx.

In March 2000, when we received the results of the Vigor study, we promptly issued a news release providing its conclusions, and we submitted its results to the FDA. The cardiovascular results of Vigor were widely reported and discussed at the time. We submitted the initial Vigor results to the New England Journal of Medicine for publication, and presented the data at a major scientific meeting. We also worked diligently with the FDA to review the data and developed revised prescribing information. This revised prescribing information included the cardiovascular data from Vigor, and a cardiovascular precaution.

Since the time of our release of the Vigor study data, there has been a healthy scientific discussion of the safety of Vioxx and other Cox 2 inhibitors. This discussion has occurred within Merck's laboratories and in external scientific forums. Merck supported that discussion. However, when researchers published articles, or gave speeches that presented misleading or inaccurate information about Vioxx, Merck sought to set the record straight about a medicine that provided significant benefits to patients. We are confident that a careful and complete examination of Merck's conduct shows that at all times we acted responsibly and in a manner consistent with Merck's commitment to patient safety and to our rigorous adherence to scientific investigation, openness and integrity.

In light of the history of our detailed examination of the cardiovascular safety of Vioxx, Dr. Kim's September 24 call to me was unexpected. Our clinical data had shown no difference between Vioxx and placebo. Mr. Chairman, Merck believed wholeheartedly in Vioxx. I believed wholeheartedly in Vioxx. In fact, my wife was taking Vioxx, using Vioxx, up until the day we withdrew it from the market.

Much has been made of epidemiological studies conducted over the past few years about Vioxx, and two points are worth noting about these studies. First, because of the design limitations inherent in epidemiological studies, their results must be interpreted with caution. For example, years of epidemiological studies on hormone replacement therapy appeared to indicate that it was heart and cancer protective. In fact, recent well controlled clinical studies have proven the opposite.

Second, the epidemiological data were inconsistent. I have included with this statement a timeline of epidemiological studies involving Vioxx and other NSAIDs that illustrates this point. While epidemiological studies have an important role to play, given their inherent limitations when both an epidemiological studies and randomized controlled clinical studies are available, the randomized controlled clinical trials are the most persuasive evidence. Prior to approve, there was no demonstrated increased risk of cardiovascular events for patients taking Vioxx compared to taking placebo or NSAIDs other than Naproxin in randomized controlled clinical trials. And

we only found an increased risk of cardiovascular events because Merck continued to study Vioxx for a long time period. In fact, Vioxx and aspirin are the only two NSAIDs for which there was significant publicly available long term safety data.

When Dr. Kim contacted me to describe the approved trial findings, Merck acted.

In conclusion, Mr. Chairman, throughout Merck's history it's been our rigorous adherence to scientific investigation, openness and integrity that has enabled us to bring new medicines to people who need them. And I'm proud that we followed that same rigorous scientific process at every step of the way with Vioxx. Mr. Chairman, at this point, I'd be pleased to answer the questions that you or the committee may have.

CG   I'm going to start with Senator Hatch because he has another meeting that he has to go to.

OH   Mr. Gilmartin, uh, some of this you've answered, but just to make it more clear when did Merck first realize that there were increased cardiovascular events associated with Vioxx, what type of follow up action did you take, if you could answer these just briefly, after discovering this trend, and did Dr. Graham's study play a role in your company's decision to withdraw Vioxx from the marketplace?

RG   Dr. Graham study played no role in our decision to withdraw Vioxx. The first definitive data we had, the first data we had that demonstrated that there was a cardiovascular, a higher risk of cardiovascular events of Vioxx against placebo was when we got the call and on September 23, in the evening, and the data on September 24 in the morning, the first time that there was a demonstrated risk in a randomized controlled clinical trial.

OH   That's this year you mean.

RG   That's this year. And that led us to act immediately to withdraw the drug from the market. Now, during this period of time in terms of the Vigor study, when we basically had the finding, not only did we reduce serious GI events by over 50% Naproxin had a lower rate of cardiovascular events than Vioxx did. That caused us, immediately, to start looking at what was going on, was it the case that Naproxin had a lower rate of events? Did Vioxx have a higher rate of events? Or was it chance? So what we did, since we didn't have any placebo data in that trial, we then went to the two Alzheimer's trials that we had under way, two large trials and unblinded them for safety data. And in those two trials, which are elderly patients at a higher risk, we saw no difference between Vioxx and placebo. And from that point, in terms of also looking at the aspirin-like effects of Naproxin, concluded that the weight of the evidence was that Naproxin had a lower rate. That was our conclusion then and that is our conclusion today.

OH   Ok. Now Mr. Gilmartin, you heard the witnesses on the first two panels, they all argued

Gilmartin Vioxx testimony                                4

|    |    |
|----|----|
|    | that your company knew that there was an increased cardiovascular risk for Vioxx even before the drug was approved by FDA. But they say your company ignored the warning signs and ... you have any further... |
| RG | The discussions that they referred to in 1996 about the design of trials was well before there was even a theoretical expectation that there could be a cardiovascular risk with the Cox 2 class. There just wasn't even a theory at that point that that would be possible. So those discussions (blank in tape 3:31:45) expectation that NSAIDs would have a cardio protective effect. That was the belief at the time. Not that Vioxx would have a higher risk. |
| OH | Ok, in your Vigor study, what led your scientists to believe that Naproxin had a cardio protective effect when there was no scientific evidence to support this assumption? |
| RG | Well, the following.  First of all that in a pharmacological study, that Naproxin does have an aspirin like effect if taken twice a day as it was in the Vigor study.  In addition to that, in patients with, you know, an aspirin-like effect with people having a higher risk of cardiovascular events and so on such as people with rheumatoid arthritis, that that effect would be even greater. When you take this all, and also, there are two other NSAIDs in which there had been clinical trials done, that had, that were similar to Naproxin, that showed that there was a cardio-protective effect. So, therefore, taking altogether the weight of the evidence, and also given the fact that we had the placebo data with no difference between Vioxx and placebo, we concluded at that point that the weight of the evidence was that Naproxin lowered the rate of cardiovascular events. |
| OH | And Vigor, which was the Vioxx gastrointestinal outcomes research, |
| RG | yes |
| OH | that's what that means |
| RG | right |
| OH | you actually gave people Vioxx 50 mg once daily? |
| RG | That's correct. It was the highest dose. Twice the |
| OH | recommended dose , and that was compared to a common therapeutic dose of Naproxin, of 500 mg twice daily. Ok. Now, Mr. Gilmartin, one last question. And I'm sure if I don't ask it, one of the others will.  In the New York Times today, are you familiar with that article that appeared today in the New York Times? |
| RG | Yes. |

Gilmartin Vioxx testimony                            5

OH     Ok, could you please talk about the study that is mentioned in today's New York Times and what it indicated about the cardiovascular risk of taking Vioxx.

RG     Well, I haven't seen the results of that study. And that is still, basically, I believe under analysis and I think it is probably, well I think it probably is actually probably completed analysis, I believe it has just been submitted for publication.

OH     I see. So were you aware of this study before?

RG     Only in a general term, but terms, but until these studies are submitted for publication, it's not usual to publish them.

OH     If I could just ask one more? My experience is that having watched this industry for years and years is that Merck is not only a great company, but is a company that has always been concerned with safety and efficacy, and has complied with FDA rules regulations throughout the lifetime of the company, but particularly your tenure. And the fact of the matters is that there are many drugs that have adverse reporting from time to time in various aspects. And that this is something that always has to be sorted out over time. And from what I see, you acted responsibly, and that's what the FDA's Kweder said, that you acted responsibly once you as Chief Executive Officer knew or saw what should be done. I just want to compliment you for that. And having known you for a long time, I know that you would never countenance having a drug that was non-efficacious in the marketplace if you knew better. So this is a very difficult time for you, I know, but I'm gonna compliment you for doing what you did as soon as you knew what to do. And just tell you that I've appreciated your testimony here today.

RG     Well thank you very much Senator. I just might say that it is not only myself in the company that is committed to patient safety, it extends throughout the...

OH     no, I'm aware of that.

RG     And that's why we relentlessly pursued additional studies, we monitored this drug for cardiovascular safety, whenever we found out data, whether unfavorable or favorable, we disclosed it to the public promptly, and we continue to study the drug in order to find the answer.

OH     One last question, as I see it, Vioxx even has some other not contemplated benefits that you've been discovering. Including prostate and some other aspects as well, so this is a drug that still deserves much further evaluation as to whether it can be fully efficacious or not.

RG     I think I'm fortunate at this point, once we had identified or had a known cardiovascular risk, against placebo, that began as we said earlier only after 18 months of continuous use

|    |    |
|----|----|
|    | that the trend started to part, once we made the decision to voluntarily withdraw from the market basically we ended all other trials as well. |
| OH | So that's, no matter whether it has some further efficacy or not. Ok. Thank you Mr. Chairman. Thank you Senator Baucus for allowing me to go first. |
| CG | Mr. Gilmartin, just so we, cause you probably don't know me very well, uh, I want to state in perspective over several years so it's unrelated to what I'm saying now to Vioxx and your company, or even the FDA, what we're about here is trying to make sure that the agencies of government that are set up in this particular instance to protect the public, but I could be saying this about any agency of government, if they're doing what their job is, and particularly what bothers me about the agency that we have before us today, but I could say the same thing about any agency, is, and is fairly consistent throughout government, and a constant concern of mine is that things that should be transparent in government aren't. Or when there's effort on the part of government to keep information suppressed, or people doing what they think ought to be done, their job requires them to do, to not let that information out. And it's really more disturbing in this particular instance because of the scientific process that we all understand over decades, where scientists do their work, and scientists know that that work is going to be subject to peer review and that they ought to be able to substantiate that before other scientists, and in the case of FDA we've seen twice in one year back in February where the anti-depressants causing suicide for young people, we saw a scientist there in FDA that was suppressed and his work kinda covered up. Whatever you want to call it. In that particular instance, they were actually going to tell him what he could say and not say as an example. Or in the case of Dr. Gilbert here, is another example. Because the scientific process itself will answer all the questions that need to be answered. And there's no scientist I know that's afraid to put their work to that sort of test. So it may sound to you, over the last month or two that we're only concerned about your company and Vioxx. We're talking about a process of government here and particularly efforts to keep things from other people. I happen to believe one that of sunshine in government being the best disinfectant. And so I spend a great deal of my time in the Senate of the United States trying to just make government work. I want to thank you for coming and thank you for taking a strong step of recalling Vioxx. I appreciate the cooperation that you and Merck have shown the committee as we've gone down this road. And I have some questions now that will indicate that even regardless of what you've said or even the removal of your drug from the market are matters that are still troubling to me. I'm going to start with this question. And I only have three or four questions. So I'm not going to harangue at you the rest of the afternoon. Dr. Topol of the Cleveland Clinic has estimated the number of heart attacks caused by Vioxx to be about 160,000. Dr. Graham, (and I apologize to you Dr. Graham I just referred to you as Dr. Gilbert, I want the record to show that the previous reference to Dr. Gilbert was meant to be Dr. Graham) while Dr. Graham testified today that nearly 100,000 excess cases of heart attacks, and about 30-40% of those patients probably died, Merck has objected to some of the estimates of the number of heart attacks |

Gilmartin Vioxx testimony                                    7

and strokes associated with Vioxx. What is Merck's estimate of the number of persons that were harmed or died by Vioxx, given the known cardiac risk.

RG   Well, the first thing I should say is that heart attacks and risks occur generally throughout, heart attacks and strokes occur generally throughout the population for a number of risk factors. So the first thing is, because a person is taking Vioxx does not mean that Vioxx caused a heart attack or stroke. Secondly, that in the approved study in which we showed that there was a difference in the risk of cardiovascular events, it did not begin until after 18 months of continuous use and only then did the trend start to depart. Furthermore, the FDA said in their press release which they issued on the same day that we withdrew the drug voluntarily, was that the risk for any one individual of a heart attack or stroke was very small. And so therefore, there is no way to make reliable estimates.

CG   Ok, so that's perfectly alright if that's what you feel that you can't give an estimate. But without your own estimate, how can you object, or Merck object, to other published estimates?

RG   Because all those estimates are just speculation. There's not a way, given, looking at these databases, to arrive at those kinds of estimates.

CG   Isn't it true that Merck sponsored another study, an observational study, under a contract with a company by the name of Internex, which found that patients taking Vioxx were at a 35% higher risk of having an acute cardiovascular event like a heart attack or angina, and that Merck knew about this risk as early as November 2003, and I would refer you to the poster exhibit 46, and 61, is that a fact, and I'd like to have you say yes or now whether or not that's a fact, and why isn't the study on your list of epidemiological studies?

RG   The uh, I can't say yes or no because I don't know what the results of that study are. I would say that the reason it's not on our list of epidemiological studies is because it was just recently submitted for publication and as is our policy, any study that we have, whether favorable or unfavorable, is put into the public domain. That's been our policy and that's been our practice and this study apparently now was submitted for publication will also be in the public domain.

CG   Let me get back to it, because I use the date November 2003 and the study people themselves said that your company was aware of this. Back in November 2003. So now you're answering to me no, you don't know anything about it?

RG   Well I'm saying I don't know what the results of that study are. I'm aware of the fact there was a study under way, I became aware of that as a matter of fact as a result of the lead up to these hearings, but there are a number of studies that we do and at the time that we had the results of these studies we promptly disclosed it. After the data has been fully

|   |   |
|---|---|
|   | analyzed we submit them for publication, we put them out into public forms to healthy debate. You had indicated earlier, Mr. Chairman, the importance of scientific debate. We have contributed to that. We have encouraged that. And this study, when it is ready when it is published will also contribute to that debate as well. |
| CG | And this is my last question. In your testimony you said that the placebo control approved trial convinced Merck to take Vioxx off the market. If as you say Merck was so concerned about the safety of Vioxx, why didn't Merck insist that Vioxx have a label that would notify Vioxx patients of the cardiovascular risk rather than allow patients to be in the dark until April 2002, two years after the risk was known? |
| RG | After the Vigor study, there was data about cardiovascular risk, there was a cardiovascular precaution in it, but that was based on again trial against Naproxin. Against all other data that we had, up until just a few weeks ago from the approved trial, we had a large database of over 28,000 patients comparing Vioxx against placebo, comparing Vioxx against other non-Naproxin NSAIDs, in which we saw no difference in the risk of cardiovascular events between Vioxx, placebo and those other NSAIDs. Furthermore, remarkably, for the first 18 months of the approved trial, in this placebo controlled trial, there was also no difference. If we had ended that trial early, at less than 18 months, we would not have seen a difference in the risk of cardiovascular events. It was only after 18 months that we started to see the trend diverge, and at that point, once we reached statistical significant of that, it was apparent that it was statistically significant, we acted quickly and removed it from the market. I will say, that a trial like a proof is monitored by outside investigators and we do not have access to that data. So it's monitored by an external safety monitoring board, and when they met and looked at the data, that's when they called us on September 23rd, they sent us the data on the 24th, the following Thursday morning we announced the voluntary withdrawal of the drug. |
| CG | Senator Baucus. |
| MB | Mr. Gilmartin, are there any internal studies, trials, whatnot that Merck conducts that it does not make public? |
| RG | No. It's been our policy that all the trials that are associated with the development of a drug and with all the post-marketing studies, those studies have always been published. There are earlier pilot studies that are earlier stage to see whether we can advance with the drug that really have no meaning because those studies may never lead to a drug. Everything that's associated with a drug ... |
| MB | ...discussed those others, you know the smaller ones, with the FDA? |
| RG | Well in the case of the Vioxx, those smaller studies were part of the development of the drug, and those studies were shared with the FDA, they're a part of the new drug approval |

|  |  |
|---|---|
|  | filing and they were also discussed in medical symposiums as well and they're also published. |
| MB | To the best of your knowledge, do other pharmaceutical companies have the same practice? |
| RG | I really can't comment on that, Senator, to me I would really need more specific information. |
| MB | Should the FDA then require it? Or Congress. The appropriate body require it, require that all those studies be public? |
| RG | I think that the industry has moved forward voluntarily to publish study results. It established a website and therefore whether or not there should be legislation to that effect depends on what the nature of that legislation is. |
| MB | Right, but if you think that it's a good idea to publish, make that information public, then why should that just be an automatic requirement? |
| RG | Well, it depends on what the requirement looks like. Like .... the details. But let me just say clearly that there's no issue with the principle at all. And it's a principle that we have followed rigorously throughout our history. We also have voluntarily taken the step of putting the trials that were started, trials that are involved in the development of the drug or trials for post-marketing, we have voluntarily registered those by using clinicaltrials.gov which is the FDA site. And so the idea here is that people have an idea what trials are under way. That site was originally put in place to alert people of trials that were undergoing, for life threatening diseases. We've expanded that so not only is there information about the trial, published information about trials we've done, but also now in the public domain trials that we're doing. |
| MB | Ok, now, you heard the discussion about making the office of drug safety independent of drug approval. Why shouldn't it be independent? |
| RG | Well, our experience with the FDA is that they are very data driven, they are very rigorous, and they're very concerned about patient safety. And as a result of that they are a very effective regulator, very tough regulator. |
| MB | but you heard Dr. Graham voice concerns about whether they're tough enough. Whether they're protective enough of the public interest. |
| RG | Well I can speak from our own experience, is that is that they, and throughout all of Vioxx they were all over, and any concerns about that, they were all over the top of that issue, and we were sharing with them the data that we had and in terms of specifying at |

Gilmartin Vioxx testimony                              10

|    |    |
|----|----|
|    | trial to go forward, or the trials to go forward, to answer the question definitively, we work closely with them in terms of what we want to do and through the protocol and so on. |
| MB | I'm a little curious about why it took so long to change the label though. The label that would eventually said there is a potential cardio problem. That's two years, and frankly I think it was Dr. Kweder who said that she, ordinarily that would take a matter of months. But for some reason, she implied that it was Merck that was dragging it's .... |
| RG | Well, what she said was that the FDA had requested additional data from us and we were complying with that and cooperating |
| MB | Just give us a feeling why it would take two years. Why such a long time |
| RG | Well, it depends on the extent of the data. I think this was a finding that was confounding from the standpoint that we had all this placebo data that showed no difference, and no difference against other non-Naproxin NSAIDs and so I think that there was a very rigorous analysis on both the FDA's part and our part in terms of what, how could one interpret this data, that required additional studies, we met additional requests, and so that was really the reason for the ... |
| MB | my understanding was that the only significant placebo study was the approved study which was delivered later. There was interim smaller studies, but the only really significant placebo study was approved later. |
| RG | It was the only significant long term study that extended out way you know, our other studies had 1 to 2 years in them and that study, but prior to that time, there was as part of the original submission of 5,000 patients, which is a large database to submit for a drug approval, that we had people in that with both cardiovascular risk and without. And so we had placebo data and against non-Naproxin NSAIDs as well and that data did not show any difference in cardiovascular risk. Furthermore, we expanded that with the Alzheimer's trials that we, that I discussed earlier. Which added even more to that database and once again showed no difference in risk. We had, at the point that we were doing the approved trial, we had 28,000 patients ... |
| MB | right, but earlier that is during discussions with the FDA with respect to the label, not only what the label said, but .... warning, I mean it's clear that Merck was aggressively marketing the product, too. Marketing Vioxx, isn't that the case? |
| RG | Well, given all the safety data that we had, and as I said with 28,000 patients worth of trials in effect, in which we saw no difference between placebo and Vioxx and no difference between Vioxx and non-Naproxin NSAIDs, that's a lot of safety data, and our marketing was appropriate. |

Gilmartin Vioxx testimony                  11

MB    Clearly, the United States has the best pharmaceutical industry in the world. Providing wonderful drugs. Served terrific purposes and whenever we have these kinda general discussions with the pharmaceutical industry sometimes the discussion moves into the requirement of patent protection, intellectual property protection, because it costs so much to develop a new drug, and so forth, a lot of dead ends, and some of them aren't dead ends but you need the patent protection to get there. And in light of all that, why should Congress go - the with this I think sufficient patent protection, if you have a different view I'd like to hear that - why should Congress go further, in effect shielding pharmaceuticals from any non-economic damages over $250,000 if there is prior FDA approval of a drug? You heard me as the question earlier, you know in this case, and in many cases down the road, hopefully not too many, there may be some drugs that even though they're approved, are later withdrawn from the market because certain problems occur. Not because of any fault, with respect to the initial approval, but just it turns out, you know, we find out new things we have new data. Why, isn't that a bad idea, to protect people from pursuing their legitimate rights when they're injured by a drug, post approval?

RG    I think if we look to the vaccine industry as one example here is that 30 years ago there were 25 vaccine manufacturers. Today, there are only five. And one of the major reasons why there was a drop off in the number of vaccine manufacturers and not any new entrants are for a number of years there were real issues about product liability. And Congress stepped in to resolve that issue, with the Vaccine Injury Compensation Act, for people who felt that they had been injured by a vaccine, these were just for pediatric vaccines, that they could be compensated for that and that would be the first place that they would go. And that stabilized to a large extent the number of manufacturers that were in. So, given the high risks of drug discovery, and the cost of it and so on, that it was clear in the vaccine industry that there was a negative incentive.

MB    I understand, and I've heard that argument. But that's the vaccine industry. We're talking here about ....market, they're very different

RG    That's true, but I think that that was sort of an experience, that I think we could look to as an analogy, and therefore, I think we have to be concerned about the impact of product liability on the pharmaceutical industry.

MB    Well, I just urge the industry to continue trying to find, the major goal is patient safety and product safety...

RG    ...absolutely..

MB    I have significant questions about that kind of additional seal, frankly, as we try to work our way through the correct balance with tort reform

Gilmartin Vioxx testimony    12

RG    exactly

MB    What have you learned from all this? I asked that question of Dr. Kweder. And she said that we've got to do a better job communicating more data with more people who are becoming more sophisticated about drug approvals and so forth, because people have higher standards now, as well they should, with more data available. What...that's what she learned, I was curious, what what have you learned from all this?

RG    That's a very appropriate question, one certainly we ask ourselves. You know, one of the things that we did of course is look back in great detail in terms of the actions that we took. What were the facts surrounding our actions at every step of the way. And I think that the take aways here which I'm pleased to say I think we've met these standards, I know we met these standards, is first of all, is to study the drug extensively, not only for the pre-market approval, but also to continue studying the drug as we have done. The second thing, it highlights the importance of monitoring the drugs. For, in this case, for cardiovascular events but other side effects as well. And the third one which you touched on, about the publication of clinical, of clinical trial data, prompt disclosure is also very important here. And that is also (talking over)

MB    the positive and the negative trials

RG    the positive and the negative, and probably you could argue more importantly the negative because our disclosure, for example, of the Vigor data, which we did, we received the preliminary results in March of 2000, we issued a press release that same month, we submitted that data to the FDA, we submitted that data to the New England Journal of Medicine that was published by November, we presented that in medical forums, and as a result of that we generated a scientific debate where people had different viewpoints about what was happening as a result of the Vigor results. And as a result of that, it raised the level of concern of everyone, ourselves, the FDA, and that basically caused a continuation of the study of the drug and a relentless effort to find out what is going on here.

MB    What about comparative analysis? Independent comparative drug analysis? Why shouldn't the government set up some independent comparative analysis system?

RG    Well I think that comparative effectiveness or cost effectiveness in terms of whether, basically there's a lot of organizations such as the Health Plans which are already starting to try to look for that kind of information I think as a matter of competitive advantage in the industry that we're all starting doing more of those trials. For example, on our cholesterol lowering drug that we have on partnership with (shireen plow?) We have comparative data on effectiveness against a competitor...

MB    why shouldn't the public have one? Have that data.

Gilmartin Vioxx testimony                    13

RG    Pardon me?

MB    Why shouldn't the public have that, this is from a consumer's point of view?

RG    O absolutely, I think that should be available to the public as well. I think that's absolutely essential. So what I'm saying is we actually sponsored a symposium in conjunction with AARP to bring together experts to talk about how one might go about doing that.

MB    But there is a provision in the Medicare Bill which provided a certain amount, I think 25 or 50 million, something like that, to pay for I forgot if it's FDA or where it was, comparative analysis. Is that a good idea?

RG    It's a good idea to have those kinds of outcomes, I think we have to be careful about how we approach

MB    but the general principle...

RG    ...the general principle

MB    independent comparative analysis makes sense?

RG    well, comparative analyses that come about from the fact that we compete against one another as well, within the industry.

MB    I think you know what I'm saying here. Our whole pharmaceutical industry does not stand in the way, but actually vigorously embraces something like that, because I think that will help the American confidence in the drugs that they're taking, and frankly I think it'll help the pharmaceutical industry because as you know now, the industry does not enjoy the most wonderful reputation that you'd like to have.

RG    Well, as you know, in terms of our actions as a company, in terms of engaging, in terms of trying to achieve these kinds of solutions that are not only in the interests of patient safety, but also access to medicines is something that you know I think you can count on us to be very active in helping on that.

CG    Senator (John) Breaux

JB    Thank you Senator, Mr. Gilmartin, you will have the pleasure of being probably the last person that I will ever ask questions of as a member of Congress over 32 years, this is it. Were there every any, let me ask you something sort of a side question here. You and Senator Baucus were talking about the vaccination companies having a fund that would be going to in case of potential liabilities as being a good thing. Certainly hasn't helped

Gilmartin Vioxx testimony                      14

|    |    |
|----|----|
|    | the availability of vaccinations even though they have that protection. |
| RG | I think that what has happened is that it's stabilized the industry. But it hasn't, has not, but it only covers pediatric vaccines, uh, so there are other factors that I think are important to consider as well. The Institute of Medicine did a study of why aren't there more vaccine manufacturers why aren't there a lot more new entrants, and one of the factors that they pointed to is the fact that the government purchases more than 50% of the vaccines. |
| JB | the government controls the price? |
| RG | and controls the price. And so that's a factor as well. So there are multiple factors here but it's unfortunate that we don't have the same kind of entrepreneurial and scientific activity going on in vaccines that we do in pharmaceuticals. New science. |
| JB | Were there ever any clinical studies done on Vioxx vis-a-vis the potential for cardiovascular incidents? |
| RG | The studies that we did at - the answer is yes. And the approved trial plus the two other trials that we added to it, one for the prevention of prostate cancer, and the other to assess the how we can approve the survival rate for patients that had been treated for colo-rectal cancer, these three trials taken together represented about 24,000 patients, and they were pre-specified not only for those benefits, but also to look for cardiovascular risk. And we worked with the FDA on a protocol to be able to answer that question. And so these were the large placebo controlled trials that were designed to definitively answer the question whether or not there was an increased risk of cardiovascular events with Vioxx compared to placebo. The difficulty that we were able to overcome was that you would have to have an ethical, the trials had to be ethical. And here was a potential benefit, and secondly, in this case, you wanted to be timely. So we took a trial approved that was under way, and rolling patients, and actually a second trial that had started up by the time we finished the protocol, and so therefore, the trial which is a three year trial, started in February of 2000, a month before the preliminary data from Vigor came available, started February 2000, it takes over a year to enroll patients in a trial this size, it was a three year study, it as 8 weeks before the end of that three years when we got the call from the outside investigators that they saw an increased risk of cardiovascular events. So from the time we started the trial to the time that we had the answer is the shortest possible time that we could have had that answer. |
| JB | Now the Vigor study which was Vioxx v. Naproxin, I don't understand how Merck could have concluded in the press release that was released in 2001 confirming favorable cardiovascular safety profile of Vioxx. It seems to me that looking at the Vigor study you're looking at something showed as much as a five times increase and risk of cardiovascular problems for the group taking Vioxx as opposed to the group taking |

Gilmartin Vioxx testimony                                    15

|    |    |
|----|----|
| | Naproxin. Then Merck says this somehow proves that Vioxx has a favorable safety profile? |
| RG | The favorable safety profile referred to the entire profile of the drug, which included its impact on GI events. |
| JB | but the headline says Favorable Cardiovascular Safety Profile. That's the headline. |
| RG | Well, that's also because we had data against placebo, and we had data against other Naproxin NSAIDs. The FDA sent us a letter on that press release. |
| JB | They went crazy. |
| RG | And working with them, over the press release and in terms of responding to descriptions of drugs that were inaccurate that after the exchanges of information and so on, they did not ask us to take any action specific to that press release and the matter's closed. And part of that warning lead to other incidents that they objected to, which was not a critique of our overall marketing practices, but they basically there was a speaker who they felt was not balanced, and we stopped using that speaker, he was using unauthorized slides and also two sales reps and two meetings that they felt were not giving balanced information and those we took action to notify physicians who may have heard those presentations. But there was no action on the press release. |
| JB | I mean, this warning letter is part of the record. I mean this, it's a strong letter. And the second paragraph talks directly about you having engaged in a promotional campaign for Vioxx that minimizes the potential for potentially serious cardiovascular findings. And they ordered you to do some very specific things with regard to those promotional materials. |
| RG | That's right. That's correct. We took that very seriously. Those letters are strongly worded. And in general. And we took action with regard to the speaker, we took action with regard to correcting the situation with the sales reps and the corrective action, as I said was that the speaker had been using unauthorized slides, we stopped using that speaker, and we sent letters to the physicians that may have been exposed either to those sales reps or to the physician, but there was no action requested or required on the press release. |
| JB | Well, I don't know who wrote that press release, but boy, I'd have a serious talk with them. The statement by FDA when Vioxx was approved in 1999 talking about their theoretical concern about the possible cardiovascular problems, and saying that with the available data it's impossible to answer with complete certainty, a larger database will be needed to answer this and other safety comparison questions, what does a Merck do when it gets something like that as part of the approval process. Do they say alright, let's go out |

Gilmartin Vioxx testimony                          16

|    |    |
|----|----|
|    | and conduct some more clinical trials based on exactly on that concern? Or do you not do anything with it? |
| RG | we do large clinical trials and actually monitor them and set up the monitoring process and address that concern. In fact part of the, just some background here about publishing data, is that it was a study that we funded, and it also had Merck authors that had contributed to the theoretical possibilities. Based on the analysis that was done on the theoretical possibility that Cox 2s could have a pro-thrombotic effect. And so that study, which had Merck authors on it, was submitted to the FDA as part of our drug application. That study was also published, and that study was also discussed in scientific forums. So once again, basically searching and looking to find any issues with the drug even with issues that could be seen as negative to us, publishing that data and encouraging that scientific debate. Because of that, we also set up a cardiovascular monitoring of all the trials that we were doing to be, even though it's typically asked for in terms of cardiovascular events, we basically exercised real diligence, extra diligence on top of that to try to find out if there was any issues. |
| JB | Was that the Vigor study? |
| RG | No, the Vigor study was designed really to determine whether or not we were going to have a reduction in the risk of GI events. But the Vigor study was monitored closely by an outside board for cardiovascular events. |
| JB | Who, was it an external group that raised the concerns about the Vigor study? Or was it an approved study? O the external monitoring board in 2004, September this year. |
| RG | yeah, the way these studies are done is you have, as part of the studies, a external safety monitoring board that monitors the safety data in the study. They are independent of us. And we do not have access to the data. And so it was the representative of this board that called us on the evening of September 23, and sent us the data on the morning of September 24, which is the first time that we had seen the safety data and this is, you know, the way that these trials are carried out and then once having had that data and analyzing it to ensure ourselves that the signal was there, that's when we moved very quickly to voluntarily withdraw the drug. |
| JB | Ok, let me just get a final question, just a comment. There's some who argue that well, all these clinical trials are bought and paid for and conducted and structured by the drug companies. And therefore, that's an unfair advantage to FDA, to the government should do all of this, the government should do it. They should have their contractors. I know Merck doesn't do the studies yourselves, contracting with Universities and outside groups to do the clinical trials. But can you comment on the argument that some would make that pharmaceutical companies have such a vested interest they shouldn't be in control of the clinical trials and the tests leading up to approval by FDA of that particular product. |

Gilmartin Vioxx testimony                           17

RG   Well, I believe that the system that we have now works very well. And I think the key, and the reasons why it works, first of all the data, well first of all these are scientists of great reputation and ability and so therefore are not likely in any way to compromise their own integrity, or ethics or scientific standing. Second, the system works in terms of clinical trials because this data is peer reviewed, I mean this has to stand up to scrutiny as to whether or not the trials were done properly, and the protocols have to be proved beforehand, in terms of will it really demonstrate what you're trying to demonstrate. And so, there's a system in place that's a combination of professionalism, a combination of transparency, and a combination of regulatory process here that makes the system work.

CG   Thank you Mr. Gilmartin if you want to stay there you can, I've got a closing administrative stuff.....

Gilmartin Vioxx testimony                18