**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| | : | **MDL NO. 1657** |
| **IN RE: VIOXX** | : | |
| **PRODUCTS LIABILITY LITIGATION** | : | **SECTION:  L** |
| | : | |
| | : | **JUDGE FALLON** |
| | : | **MAG. JUDGE KNOWLES** |
| .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. | : | |

**THIS DOCUMENT RELATES TO:** PENDING VTE CASES

## ORDER AND REASONS

The Court has pending before it two *Daubert* motions, one filed by Merck (Rec. Doc. 64210) and one filed by the VTE Plaintiffs (Rec. Doc. 64211). The Court has reviewed the briefs and the applicable law and heard oral argument, and now issues this Order and Reasons.

## I.    BACKGROUND

To put this matter in perspective, a brief review of this litigation is appropriate. This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib. Merck, a New Jersey corporation, researched, designed, manufactured, marketed, and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States.

Vioxx remained publicly available until September 30, 2004, when Merck withdrew it from the market after data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events, such as myocardial infarction (heart attack) and ischemic stroke. Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging

various products liability, tort, fraud, and warranty claims. It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004. Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States. On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("MDL") conferred MDL status on Vioxx lawsuits filed in various federal courts throughout the country and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005).

Following transfer, one of the first acts taken by this Court was to appoint and organize a Plaintiffs' Steering Committee ("PSC"), which was charged with coordinating and conducting extensive discovery, investigating potential claims, and marshaling supporting evidence. Ultimately, the PSC decided to pursue claims based on heart attacks and strokes, and developed trial packages for those claims. After multiple bellwether trials in this MDL and several trials in state court, the parties negotiated a comprehensive settlement program for claims of myocardial infarction, stroke, and sudden cardiac death. The overwhelming majority of claimants alleging these injuries chose to participate in that settlement program.

The PSC chose not to pursue a different subset of claims: those involving injuries of pulmonary embolism ("PE") and deep vein thrombosis ("DVT"), collectively known as venous thrombotic events ("VTEs"). In April 2009, the Court appointed a separate liaison counsel to coordinate injuries other than heart attack and stroke, including VTEs, and subsequently organized a separate PSC (the "PSC II") for those claims. A few months later, the Court held a case management conference for those cases. At the request of the PSC II's lead counsel, the

Court agreed to defer case-specific discovery in the individual cases held by the PSC II in order to allow the investigation of general causation in the VTE cases.

On November 2, 2011, Merck filed a Motion for Summary Judgment in the VTE Cases. (Rec. Doc. 63539). Merck argued that, in the two years since the appointment of the PSC II, the PSC II had not succeeded at marshalling evidence that Vioxx can cause VTEs. In response, the VTE Plaintiffs filed a Motion to Strike or in the Alternative to Remand Merck's Motion for Summary Judgment in VTE Cases. (Rec. Doc. 63603). Plaintiffs argued that Merck's motion for summary judgment was, in fact, a premature *Daubert* motion, but that regardless, a motion for summary judgment was premature because the parties had not yet completed discovery.

On January 5, 2012, this Court issued an Order (Rec. Doc. 63623) denying Plaintiffs' motion to strike Merck's motion, but continuing the submission of Merck's motion for summary judgment and setting a deadline of May 7, 2012 for the production of expert reports on general causation in VTE case. Subsequently, in Pretrial Order 58, the Court extended that deadline and also set deadlines for rebuttal reports, depositions of expert motions, and *Daubert* motions. At the present time, all those deadlines, as extended by later motions and orders, have passed; both Plaintiffs and Merck have since produced their expert and rebuttal reports, and conducted depositions of expert witnesses. Additionally, both Plaintiffs and Merck have filed *Daubert* motions, which are now before the Court for decision.

## II.   PRESENT MOTIONS

### A.   Merck's Motion to Exclude and for Summary Judgment (Rec. Doc. 64211)

Merck now submits its Consolidated Motion to Exclude Opinion Testimony on General Causation and Renewed Motion for Summary Judgment in VTE Cases. (Rec. Doc. 64211).

Merck moves to exclude all five of Plaintiffs' expert witnesses, bringing no challenge to each witness's qualifications, but rather arguing that methodological flaws are present in each witness's analysis. The majority of Merck's motion focuses on Dr. Zambelli-Weiner and Dr. Brooks, who conducted a Pooled Analysis of certain data from the Vioxx clinical trials and concluded that Vioxx increases the risk of VTEs. Merck argues that the Pooled Analysis was flawed for several reasons: because it excludes some placebo studies in favor of comparator studies, because it is inconsistent with respect to which data it chooses to exclude, because it uses unadjudicated data even where adjudicated data is available, because it involves statistically insignificant findings, and because it has not been subjected to peer review. Merck also argues that summary judgment is appropriate at this time, and that because Plaintiffs' experts cannot withstand *Daubert* challenges, no genuine issue of material fact remains.

In opposition to Merck's motion (Rec. Doc. 64232), the VTE Plaintiffs argue that Dr. Zambelli-Weiner and Dr. Brooks have followed acceptable methods and standards in epidemiology, and provide more specific justification for each of the alleged flaws that Merck lists in its motion. More generally, Plaintiffs argue that Merck's arguments are grounds for cross-examination at trial, rather than grounds for exclusion under *Daubert*. Additionally, in a separate motion, Plaintiffs ask that the Court delay decision on Merck's motion for summary judgment until resolving the *Daubert* motions. (Rec. Doc. 64233).

**B.      Plaintiffs' Motion to Exclude (Rec. Doc. 64210)**

The VTE Plaintiffs submit their Motion to Preclude Certain Testimony of Mark A. Crowther, M.D. and the Testimony of John P. Kress, M.D. (Rec. Doc. 64210). With respect to Dr. Crowther, Plaintiffs bring no general challenge to Dr. Crowther's qualification as an expert

on VTEs, but rather identify certain subtopics that they claim are problematic. Most importantly, Plaintiffs argue that there are methodological flaws in Dr. Crowther's literature review, which concluded that there is no association of increased risk between Vioxx and VTEs. Similarly, with respect to Dr. Kress, Plaintiffs concede that Dr. Kress is a qualified expert in pulmonology and critical care. However, they argue that Dr. Kress lacks expertise in certain other areas, such as epidemiology.

In opposition to Plaintiffs' motion, Merck argues that Plaintiffs are challenging both experts' conclusions, rather than their methodology, and therefore exclusion under *Daubert* is not appropriate. Additionally, Merck disputes claims by Plaintiffs that Dr. Crowther's literature involved improper methodology. Merck also argues that each of its experts is qualified to testify on the specific subject matter that Plaintiffs challenge.

## III.    LAW AND ANALYSIS

### A.    Standard on *Daubert* Motions

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 is in effect a codification of the United States Supreme Court's opinion in *Daubert v. Merrel Dow Pharmaceuticals*, 509 U.S. 579 (1993). In *Daubert*, the Supreme Court held that trial courts should serve as gatekeepers for expert testimony and should not admit such testimony without first determining that the testimony is both "reliable" and "relevant." *Id*. at 589.

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Id*. at 592-93. In *Daubert*, the Supreme Court set forth a non-exclusive list of factors to consider in determining

the scientific reliability of expert testimony. *Id*. at 593-95. These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id*. Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999).

In addition to the five factors laid out in *Daubert*, a trial court may consider additional factors in assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir. 1999). Some of these factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *See, e.g.*, *id*. at 313; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278-79 (5th Cir. 1998); *Christophersen v. Allied-Signal Corp*., 939 F.2d 1106, 1114 (5th Cir. 1991); *Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 678 (W.D. Tex. 2002).

Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert*, 509 U.S. at 593. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and

the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. *Moore*, 151 F.3d at 275-76. The focus is not on the result or conclusion, but on the methodology. *Id*. The proponent need not prove that the expert's testimony is correct, but must prove by a preponderance of the evidence that the methodology used by the expert was proper. *Id*.

The trial court is the gatekeeper of scientific evidence. *Daubert*, 509 U.S. at 596. It has a special obligation to ensure that any and all expert testimony meets these standards. *Id*. Accordingly, it must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology can be properly applied to the facts in issue. *Id*. at 592-93. In making this assessment, the trial court need not take the expert's word for it. *Joiner*, 522 U.S. at 147. Instead, when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it. *Moore*, 151 F.3d at 279.

In satisfying its "gatekeeper" duty, the Court will look at the qualifications of the experts and the methodology used in reaching their opinions and will not attempt to determine the accuracy of the conclusion reached by the expert. The validity or correctness of the conclusions is for the fact finder to determine.

**B.    Analysis**

       **1.    Merck's Motion to Exclude Plaintiffs' Experts**

              **a.    April Zambelli-Weiner, Ph.D., M.P.H., and Elizabeth Brooks, Ph.D.**

Dr. April Zambelli-Weiner received a B.A. from Washington & Jefferson College, an

M.P.H. from the Saint Louis University School of Public Health, and a Ph.D. in epidemiology

and human genetics from the Johns Hopkins University School of Public Health. She is the

founder of Translational Technologies International, LLC, and has more than 15 years of

experience in epidemiological research. Dr. Elizabeth Brooks received a B.S. from Stetson

University and a Ph.D. in mathematics from Duke University. She is the founder of Decision-

Driver Analytics, Inc., and has 13 years of experience in pharmaceutical, biotechnology, and

medical device industry research, marketing, and reimbursement. Merck does not challenge

either Dr. Zambelli-Weiner's or Dr. Brooks' qualifications, and the Court finds them qualified to

testify on their Pooled Analysis of Vioxx clinical trial data.

Merck raises challenges to the methodology of the Pooled Analysis on several separate

grounds. For the purpose of clarity, each of those grounds is analyzed individually below.

### 1.      Use of Comparator Studies

Merck argues that the Pooled Analysis is scientifically unsound because it excludes a

large amount of placebo-controlled trial data, which Merck contends is the most reliable

evidence of causation. Merck emphasizes the fact that Dr. Zambelli-Weiner and Dr. Brooks

designed the Pooled Analysis to include only studies that met specific criteria—for example,

only Phase III trials were included, and studies were disqualified if they involved less than six

weeks of follow-up. Merck argues that this particular set of criteria has the effect of excluding

most placebo data in favor of studies that compare Vioxx to various other comparators.

Merck argues that the use of comparator data, rather than placebo data, is unreliable. Dr.

Zambelli-Weiner herself agrees that placebo-controlled data "gives a cleaner signal" than

comparator data. (Zambelli-Weiner Dep. (Vol. I) at 65:10, Rec. Doc. 64211-13 at 17). The

8

reason for this difference is that active comparators, such as naproxen or ibuprofen, "may also have thrombotic effects," a possibility that "clouds the signal." *Id.* at 65:17-19. In other words, in studies that compare Vioxx to another active drug, rather than a placebo, any difference in VTE rates could be due to the active comparator drug's tendency to *decrease* the risk of VTEs, rather than Vioxx's tendency to *increase* the risk of VTEs. Furthermore, Dr. Zambelli-Weiner testified that she did not investigate whether the active comparators may actually have had an anti-thrombotic effect here. (Zambelli-Weiner Dep. (Vol II) at 340:24-341:18, Rec. Doc. 64211-14 at 39). Thus, Merck argues that Dr. Zambelli-Weiner and Dr. Brooks' use of comparators constitutes improper "cherry-picking" of results and must be excluded under *Daubert. In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007); *see also Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1134 (D. Ariz. 2001) (excluding general causation testimony for several reasons, including the fact that the study relied upon "did not evaluate the relative risk compared to unexposed population (i.e., a group that takes a placebo)"). Additionally, Merck raises an objection to Dr. Zambelli-Weiner and Dr. Brooks' failure to consult with a medical doctor in determining how to design their analysis. (Zambelli-Weiner Dep. (Vol. I) at 127:5-8, Rec. Doc. 64211-13 at 33; Brooks Dep. at 11:5-9, Rec. Doc. 64211-20 at 4).

Merck also objects to Dr. Brooks' admission that time and budgetary constraints were at least part of the reason for the limitations on the clinical studies that she and Dr. Zambelli-Weiner examined. (Brooks Dep. at 42:21-43:16, Rec. Doc. 64211-20 at 12). Merck argues that this fact alone is a reason to exclude the Pooled Analysis. *See, e.g., Galaxy Computer Services, Inc. v. Baker*, 325 B.R. 544, 561-62 (E.D. Va. 2005) (excluding testimony where expert "did not

have adequate time to analyze . . . voluminous financial documents" and admitted that time constraints prevented him from making "many" adjustments that "should have been made").

The VTE Plaintiffs' response is that all of Merck's arguments go to the weight of this testimony, rather than its admissibility. Plaintiffs argue that the data used by their experts included both the placebo and the comparator data, and for good reason. Plaintiffs note that in epidemiology, randomized clinical trials are "considered the gold standard for determining the relationship of an agent to a health outcome or adverse side effect." *Reference Manual on Scientific Evidence* (3d ed.) at 555. Plaintiffs argue that Dr. Zambelli-Weiner and Dr. Brooks rely on exactly this type of "gold standard" data, including both placebo and comparator randomized trials, and therefore, their Pooled Analysis meets the *Daubert* requirements.

Moreover, Plaintiffs argue that comparator data has significant value in gathering information about the safety and effectiveness of drugs—hence its inclusion in Phase III studies, as required by the FDA. (Ex. 16 to Pls.' Opp., Rec. Doc. 64232-17 at 2). They emphasize that the majority of the clinical trials that Merck conducted involved testing Vioxx against active comparators, rather than a placebo. Plaintiffs also argue that if Dr. Zambelli-Weiner and Dr. Brooks had used only placebo data, they would have excluded the vast majority of the Vioxx clinical trial data as a result, since only 8 of the 28 studies that Merck analyzed in its own 3/22/04 Pooled Analysis were placebo-only studies; the other 20 studies were either comparator-only studies or both comparator and placebo studies. Similarly, Plaintiffs argue that Dr. Zambelli-Weiner and Dr. Brooks examined data encompassing 15,393 patients, whereas excluding studies without placebo controls would have limited them to only 5,512 patients. Dr. Zambelli-Weiner testified as to the importance of including comparator studies in order to

establish a sufficiently "large safety database, as large as possible, to have adequate numbers to ask the questions you need to ask." (Zambelli-Weiner Dep. (Vol. II) at 331:6-8, Rec. Doc. 64211-14 at 37). Plaintiffs also cite examples of peer-reviewed journal articles that use both placebo and active comparator data. *See, e.g.*, Heike A. Bishoff-Ferrari et al., *A Pooled Analysis of Vitamin D Dose Requirements for Fraction Prevention*, 367 New Eng. J. Med. 40 (2012) (pooling data from 11 double-blind, randomized controlled trials of oral Vitamin D as compared with placebo or calcium alone).

Finally, Plaintiffs argue that Dr. Zambelli-Weiner and Dr. Brooks did not "cherry-pick" studies to manipulate their analysis into achieving favorable results; rather, they chose their selection criteria *a priori* and then conducted the analysis based on those predetermined criteria.[1] Dr. Zambelli-Weiner testified that she and Dr. Brooks "set out criteria in advance and [they] stuck to those criteria, based on the data that was available to [them]." (Zambelli-Weiner Dep. (Vol. II) at 241:7-241:9, Rec. Doc. 64211-14 at 14). Furthermore, Dr. Zambelli-Weiner testified that the *a priori* criteria actually resulted in the exclusion some of the most favorable results. (Zambelli-Weiner Dep. (Vol. II) at 241:1-6, 314:9-19, Rec. Doc. 64211-14 at 14, 32). Accordingly, Plaintiffs argue that any accusations of "cherry-picking" are ill founded.

The Court agrees with Plaintiffs that Merck's arguments are fodder for cross-examination of Plaintiffs' experts, rather than grounds for excluding their testimony. Merck correctly points

---

[1] Merck disputes this assertion, citing testimony and other evidence indicating that Dr. Zambelli-Weiner and Dr. Brooks were still choosing their selection criteria just a few weeks before the production of their report, and therefore, the criteria were not truly set *a priori*. But as discussed below, Dr. Zambelli-Weiner offers cogent explanations for each of the selection criteria she and Dr. Brooks ultimately decided to use. In light of that fact, Merck's arguments involve credibility determinations and would therefore be more properly raised on cross-examination.

out, and Plaintiffs' own experts readily admit, that placebo-controlled studies are "cleaner" than comparator studies, and clinical researchers prefer placebo data for that reason. *See Reference Manual on Scientific Evidence* at 555. But as Plaintiffs argue, this fact alone does not render the use of comparator studies too unreliable to be admitted under *Daubert*. Furthermore, the Pooled Analysis uses both comparator and placebo data. The fact that it declines to include some available data may weaken its persuasive power, but does not disqualify it from admission at trial.

Furthermore, Dr. Zambelli-Weiner has significant expertise in the field of epidemiology and has provided eminently reasonable justifications for the alleged flaws in the design of the Pooled Analysis. For example, Dr. Zambelli-Weiner justifies the exclusion of studies with relatively short follow-up periods by explaining that a short follow-up period limits a study's ability to detect VTEs. (Zambelli-Weiner Dep. (Vol. I) at 133:17-24, 142:2-12, Rec. Doc. 64211-13 at 34, 37; Zambelli-Weiner Dep. (Vol. II) at 256:20-257:20, Rec. Doc. 64211-14 at 18). She also explains, for instance, that she and Dr. Brooks focused on Phase III trials because they are designed to capture safety information. (Zambelli-Weiner Dep. (Vol. I) at 127:18-23, Rec. Doc. 64211-13 at 33; Zambelli-Weiner Dep. (Vol. II) at 243:4-244:9, Rec. Doc. 64211-14 at 15). Given that Dr. Zambelli-Weiner is a highly qualified expert in epidemiology, the Court will not second-guess these facially plausible explanations for the design of the Pooled Analysis.

A jury may ultimately decide to discredit the Pooled Analysis for the very reasons cited by Merck. But those reasons are not grounds for exclusion under *Daubert* in this case. The Court will not grant Merck's motion to exclude on this basis.

## 2.      Inconsistency of Exclusion Criteria

Next, Merck argues that Dr. Zambelli-Weiner and Dr. Brooks did not properly comply with their own selection criteria. As described above, Dr. Zambelli-Weiner testified that she and Dr. Brooks chose to use only Phase III studies with daily dosing and at least 6 weeks of follow-up. Merck argues that Dr. Zambelli-Weiner and Dr. Brooks inadvertently failed to include a number of studies that meet all three of those requirements—in particular, Merck highlights the exclusion of APPROVe, ViP, and VICTOR. Merck notes that during her deposition, Dr. Brooks testified that the exclusion of the studies of which she was previously unaware was "concerning" to her. (Brooks Dep. at 64:20, 65:12, 65:19; Rec. Doc. 64211-20 at 17).

The VTE Plaintiffs respond by arguing, first, that the Pooled Analysis also included a fourth criterion, which Merck overlooked: the Pooled Analysis used only studies that were fully completed. (Zambelli-Weiner Dep. (Vol. II) at 201:8-9, Rec. Doc. 64211-14 at 4). Because APPROVe, ViP, and VICTOR terminated early when Vioxx was withdrawn from the market, Plaintiffs argue that the exclusion of those studies from the Pooled Analysis was appropriate.

With respect to the remaining studies that were allegedly excluded incorrectly, Plaintiffs refer the Court to counsel's past difficulties obtaining the relevant data, and they note that after it became apparent that certain studies had been neglected, counsel sought to remedy the mistake, providing each new study to Dr. Zambelli-Weiner and Dr. Brooks as soon as possible. Plaintiffs explain that as each new study was provided, Dr. Zambelli-Weiner and Dr. Brooks determined whether to include it in the analysis based on their *a priori* criteria described above, with the end result that "the signal for Vioxx and VTE became even stronger, and the power of the study increased." (Rec. Doc. 64232 at 39). Furthermore, Plaintiffs note that the addition of the new

studies resulted in the inclusion of more placebo-controlled data in the Pooled Analysis, thus helping to cure another of its alleged flaws.

The Court finds Plaintiffs' arguments on this point more convincing. To the extent that Merck objects to the specific criteria for the Pooled Analysis, those issues have already been addressed above. To the extent that certain studies were inadvertently left out of the Pooled Analysis, those problems appear to have been subsequently fixed, and to the extent that they have not, they may be raised on cross-examination.

### 3.    Use of Unadjudicated Data

Merck also argues that Dr. Zambelli-Weiner and Dr. Brooks inappropriately relied on unadjudicated event reports, even where adjudicated data was available. Merck explains the importance of blinded adjudication committees in assessing, accurately and consistently, the occurrence of adverse events during clinical trials. On this point, Merck cites the testimony of Dr. Spyropoulos, who noted that adjudication is a "clear and formalized data collection process" performed by "content experts within the field that are divested from the actual trial, from the actual company itself," with the goal of determining whether outcomes "were what they said they would be in terms of either harm or effect." (Spyropoulos Dep. at 55:21-56:5, Rec. Doc. 64211-4 at 15). Furthermore, Dr. Spyropoulos agreed that adjudicated VTE data, specifically, is more reliable than investigator-reported VTE data. (Spyropoulos Dep. at 68:12-15, Rec. Doc. 64211-4 at 18). Therefore, Merck objects to the use of unadjudicated data in the Pooled Analysis.

In response, Plaintiffs concede that unadjudicated data was used but argue that use of unadjudicated data is appropriate in this case. First, Plaintiffs argue that Merck's adjudicated

data is biased toward the null—in other words, biased in favor of finding that Vioxx is safe. Plaintiffs argue that Merck's clinical trial data has been criticized on these grounds in peer-reviewed literature, including an article that appeared in the *British Medical Journal. See* Sven Trelle et al., *Cardiovascular Safety of Non-Steroidal Anti-Inflammatory Drugs: Network Meta-Analysis*, 342 Brit. Med. J. 7086 (2011). Additionally, Plaintiffs cite Merck's prior representation, included in its own 3/22/04 Pooled Analysis but later discredited, that Vioxx did not increase cardiovascular risks.

Second, Plaintiffs argue that the FDA has chosen to use unadjudicated data in similar circumstances. Plaintiffs cite an addendum to an FDA briefing in which the FDA analyzed unadjudicated adverse events to assess cardiovascular ("CV") risk of the drug Lorcaserin because the Lorcaserin studies "were not designed to capture and evaluate CV events," and specifically, "the background risk of CV events was relatively low and there was no procedure set up for prospective adjudication." (Ex. 3 to Pls.' Opp, Rec. Doc. 64232-4 at 2). Plaintiffs cite Dr. Zambelli-Weiner's testimony that in this case, "where you don't have an adjudication protocol that's set out *a priori* and implemented from the beginning, and you have studies that weren't designed to detect the events that, in fact, you're looking at, the only choice is to look at the unadjudicated data," just as the FDA does. (Zambelli-Weiner Dep. (Vol. I) at 144:12-18, Rec. Doc. 64211-13 at 37). Plaintiffs also argue that Merck's 3/22/04 Pooled Analysis used investigator-reported data where adjudicated data were not available. (Ex. E to Def.'s Mot., Rec. Doc. 64211-8 at 6).[2]

_____

[2] Plaintiffs also argue that this Court has previously allowed the use of "raw data" in a Vioxx trial. (Rec. Doc. 1516 at 31-32). But as Merck argues, that "raw data" was, in fact, adjudicated, so this example is inapposite.

Merck counters Plaintiffs' examples by arguing that in both of those examples, properly adjudicated data was not available at all, whereas Dr. Zambelli-Weiner and Dr. Brooks disregarded adjudicated data in favor of unadjudicated data. Merck's 3/22/04 Pooled Analysis clearly stated that it relied on unadjudicated data only where adjudicated data was unavailable, and the Lorcaserin addendum states that there was neither prospective adjudication nor internal post-hoc adjudication—and even then, the FDA presented the post-adjudication results alongside the unadjudicated data. (Ex. 3 to Pls.' Opp, Rec. Doc. 64232-4 at 2, 7-8).

Again, the Court finds it significant that Dr. Zambelli-Weiner, a highly qualified expert in epidemiology, provides a logical explanation for her use of unadjudicated data. While her and Dr. Brooks' analysis may invite some skepticism on the very grounds that Merck cites, that skepticism must be raised before the fact finder at trial.

### 4.   Lack of Statistical Significance and Use of a Multiplier

Fourth, Merck argues that the results of the Pooled Analysis must be excluded because they do not reach statistical significance. Merck argues that statistical significance is a precondition to admissibility, citing *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307 (5th Cir. 1989), in support of this proposition. The plaintiffs in *Brock* had attempted to show that the drug Bendectin caused birth defects. *Id.* at 308. General causation was contested, and both sides submitted expert testimony in support of their positions. *Id.* A key piece of evidence that the plaintiffs relied on in *Brock* was an epidemiological reanalysis of a previous study. That reanalysis concluded that Bendectin did increase the risk of birth defects, but the confidence interval was from 0.75 to 1.26, and therefore, the results were not statistically significant. *Id.* at 312. Accordingly, the U.S. Court of Appeals for the Fifth Circuit characterized the results as

"inconclusive," and found "the lack of conclusive epidemiological proof to be fatal to the Brocks' case." *Id.* at 313. The Fifth Circuit elaborated: "While we do not hold that epidemiologic proof is a necessary element in all toxic tort cases, it is certainly a very important element. This is especially true when the only other evidence is in the form of animal studies of questionable applicability to humans." *Id.*

If the Pooled Analysis had included only the initial, statistically insignificant results, then the Court's analysis might end there.[3] But that is not the case here, because Dr. Zambelli-Weiner and Dr. Brooks go on to adjust their results for the possibility that the Vioxx clinical trials underestimated the actual number of VTEs that occurred. They make this adjustment based on Dr. Spyropoulos' opinion that there was "probable systematic underestimation" of VTEs during the Vioxx clinical trials by as much as 30-fold. (Spyropoulos Rep., Rec. Doc. 64211-30 at 6). Accordingly, Dr. Zambelli-Weiner and Dr. Brooks apply multipliers of both 30-fold and, more conservatively, 10-fold to the results in each group. (Zambelli-Weiner & Brooks Rep., Rec. Doc. 64211-16 at 32-33). After the multiplier is applied, the confidence intervals for the rate ratios with respect to both DVT and PE no longer dip below one, meaning that they do reach statistical significance.

---

[3] That conclusion is not certain, for two reasons. First, the role of statistical significance is currently being reevaluated in the field of epidemiology, meaning that a reevaluation of *Brock* (a pre-*Daubert* case) may also be appropriate. *Cook v. Rockwell Intern. Corp.*, 580 F. Supp. 2d 1071, 1103 & n.31 (D. Colo. 2006); *see also Reference Manual on Scientific Evidence* (3d ed.) at 579-80. Dr. Zambelli-Weiner's testimony corroborates this point, noting that statistical significance is "highly overused and misused" in her field. (Zambelli-Weiner Dep. (Vol. II) at 304:21-307:16, Rec. Doc. 64211-14 at 30-31). Second, Dr. Zambelli-Weiner testifies that if she and Dr. Brooks had used a 90-percent confidence interval, rather than 95-percent confidence interval, in the Pooled Analysis, then they could have achieved statistical significance. *Id.* Thus, the question would be whether a 90-percent confidence interval on an epidemiological study is acceptable in light of both *Brock* and *Daubert*.

Merck argues that this use of multipliers constitutes inappropriate manipulation of the data and does not save the Pooled Analysis from exclusion. In support of this argument, Merck cites some of Dr. Spyropoulos' deposition testimony emphasizing that while the rate of symptomatic DVT to objectively verified DVT could be as low as 1 in 30, that is merely "the upper limit of the magnifier," with the lower limit being as low as 1 to 2. (Spyropoulos Dep. at 224:18-225:17, Rec. Doc. 64211-4 at 57). Thus, Merck argues that the use of 10- and 30-fold multipliers is speculative. Furthermore, Merck argues that Dr. Spyropoulos' rates were derived from surgical patients, rather than the general medical population, which is a significant distinction. (Spyropoulos Dep. at 236:14-237:18, Rec. Doc. 64211-4 at 60).

Plaintiffs respond by arguing that the use of the multiplier is, in fact, appropriate. With respect to Dr. Spyropoulos' testimony, Plaintiffs emphasize that he stated specifically that a 10-fold multiplier was a reasonable adjustment for Dr. Zambelli-Weiner and Dr. Brooks to apply, particularly with respect to DVT. (Spyropoulos Dep. at 225:11-17, 299:6-17, Rec. Doc. 64211-4 at 57, 76). More generally, Plaintiffs argue that the use of a multiplier is a common methodological practice found in peer-reviewed publications and used by the FDA to compensate for possible underreporting. Because Dr. Spyropoulos opines that underreporting was a problem here, Plaintiffs argue that application of a multiplier to compensate for that underreporting is not only appropriate, but actually called for.

As additional support for their argument, Plaintiffs cite a separate epidemiological study, the Schmidt study. *See* Morten Schmidt et al., *Non-Steroidal Anti-Inflammatory Drug Use and Risk of Venous Thromboembolism*, 9 J. Thrombosis & Haemostasis 1326 (2011). The Schmidt study was an observational study performed using information from the Danish National Patient

Registry. It found a statistically significant association between COX-2 inhibitors and VTEs. Furthermore, the specific risk ratio found in the Schmidt study is very similar to that observed by Dr. Zambelli-Weiner and Dr. Brooks. Even though the Schmidt study did explicitly state that further investigation would be necessary to determine whether the association between NSAIDs and VTEs was causal, Plaintiffs argue that even this one study showing a statistically significant association is sufficient to allow Plaintiffs' experts to survive *Daubert* challenges. *See Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 800-01 (E.D. La. 2011) (Fallon, J.).

The Court acknowledges the validity of the concerns raised by Merck. Nevertheless, it concludes that the reasons offered by Plaintiff offer sufficient grounds to distinguish the Pooled Analysis from the epidemiological study deemed unreliable in *Brock*. Here, a previous epidemiological study has found a statistically significant association between COX-2 and VTE to a 95-percent confidence interval. Moreover, with respect to the application of a multiplier to the data, both Dr. Spyropoulos and Dr. Zambelli-Weiner, who are qualified experts in clinical trials and epidemiology, respectively, agree that at the very least, a 10-fold multiplier with respect to DVTs is justified. And as Dr. Zambelli-Weiner testified, the lack of statistical significance here is relatively close—using a 90-percent confidence interval, which can be acceptable in the field of epidemiology, would have been sufficient to move even the preliminary results into the realm of statistical significance.

Merck's arguments can be raised during cross-examination, and it is highly possible that a jury will choose to discredit the Pooled Analysis for the very reasons Merck cites. But in light of the points raised by Plaintiffs, and particularly the testimony of Dr. Spyropoulos and Dr. Zambelli-Weiner, the Court will not exclude the Pooled Analysis on these grounds.

### 5.      Lack of Peer Review

Finally, Merck argues that exclusion of the Pooled Analysis is warranted because it has not been subjected to any form of peer review. It is clearly established that "courts must . . . be especially skeptical of medical and other scientific evidence that has not been subjected to thorough peer review." *Brock*, 874 F.2d at 313. Furthermore, that skepticism applies with particular force when the studies at issue appear to be lawyer-driven. *Id.* However, as Plaintiffs argue, publication in a peer-reviewed journal is not required for evidence to be admissible under *Daubert*. *See, e.g.*, *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 354 (5th Cir. 2007) (noting that a lack of published studies "goes to the weight, not the admissibility, of the expert's testimony").

The Court believes that the admissibility of Dr. Zambelli-Weiner and Dr. Brooks' testimony may be a close question, particularly if all five factors cited by Merck are looked at in combination with one another. However, as this Court has stated above, Dr. Zambelli-Weiner and Dr. Brooks (as well as Dr. Spyropoulos) are clearly highly qualified. While some of their methodological decisions may depart from entrenched norms, they offer facially reasonable explanations for those departures. The methodology they use may be different from the methodology used by the Defendant's expert, but their methodology appears to be grounded in scientific principles and recognized protocols. The Court will not put itself in the position of second-guessing their expertise. Merck has certainly laid out several grounds for aggressive cross-examination of Dr. Zambelli-Weiner and Dr. Brooks at trial. However, the Court concludes that trial is, in fact, the appropriate stage of the proceedings for the resolution of these

20

issues.

Because Plaintiffs have offered testimony justifying each of the potential problems highlighted by Merck, the ultimate resolution of the question general causation will likely come down to determinations of credibility. Such determinations are most appropriately made by the jury, rather than this Court. Accordingly, the Court will deny Merck's motion to exclude with respect to Dr. Zambelli-Weiner and Dr. Brooks.

**b.      Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A.**

The Court has previously reviewed Dr. Benedict Lucchesi's qualifications as an expert witness in this MDL. (Rec. Doc. 1516 at 33-39). As described in that opinion:

> Dr. Lucchesi received a B.S. and a Masters in Pharmacy from St.
> John's University in New York City. He then received a Ph.D. in
> Pharmacology and a M.D. from the University of Michigan. He is
> presently a professor in the University of Michigan's Department
> of Pharmacology. He has received numerous awards and honors, is
> a member of many medical organizations, sits on several advisory
> boards and committees, and has authored and co-authored 390
> publications.

*Id.* at 38. Dr. Lucchesi has over 50 years of experience in diseases of the cardiovascular system, including research, clinical, medical, and pharmacological experience.

The VTE Plaintiffs offer testimony from Dr. Lucchesi on "Vioxx's ability to cause VTE at a cellular and pathophysiological level," including a specific biological mechanism of action. (Rec. Doc. 64232 at 2). This content is squarely within Dr. Lucchesi's area of expertise, and Merck brings no challenge to Dr. Lucchesi's qualifications. Instead, Merck challenges Dr. Lucchesi's decision to rely on *in vitro* studies, rather than reviewing the Vioxx clinical trial data. The Fifth Circuit has stated that a finding from an *in vitro* study is "the beginning, not the end of scientific inquiry and proves nothing about causation without other scientific evidence." *Allen v.*

21

*Pennsylvania Engineering Corp.*, 102 F.3d 194, 198 (5th Cir. 1996). Accordingly, Merck argues that Dr. Lucchesi's testimony about the causation of VTEs by Vioxx is speculative and unreliable. *See, e.g.*, *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 315 (5th Cir. 1989) ("[S]peculation unconfirmed by epidemiologic proof cannot form the basis for causation in a court of law."). Merck also argues that the clinical trial data contradict Dr. Lucchesi's theories, and that Dr. Lucchesi's failure to review the VTE data from the clinical trials constitutes a methodological flaw. Merck emphasizes that when this Court previously declined to exclude Dr. Lucchesi's testimony, Dr. Lucchesi had reviewed epidemiological studies and case reports, which he has not done in the present case.

Plaintiffs respond that Dr. Lucchesi may provide scientific evidence in support of causation without conducting an epidemiologic study himself. More specifically, they point out that Dr. Lucchesi cites approximately 40 references in support of his opinion. (Lucchesi Rep., Rec. Doc. 64232-2 at 15-17). Furthermore, Plaintiffs cite testimony by Dr. Crowther, one of Merck's experts, stating that Dr. Lucchesi's reliance on peer-reviewed articles is an acceptable methodology. (Crowther Dep. at 171:17-172:9, Rec. Doc. 64211-12 at 44).

The Fifth Circuit in *Allen* made clear that *in vitro* studies are not sufficiently reliable without additional evidence of causation. In that case, there was a lack of epidemiological evidence in support of causation: the court had excluded the plaintiff's epidemiological expert, in part because "numerous reputable epidemiological studies" had already indicated a lack of correlation between the allegedly harmful substance and the relevant disease. *Allen*, 102 F.3d at 197. As such, the *Allen* plaintiffs had only animal studies and cell biology data as evidence in support of causation.

22

Here, in contrast, the Court has already held that Plaintiffs' epidemiological experts are sufficiently reliable to be presented to the jury. As a result, the VTE Plaintiffs do not attempt to rely on *in vitro* studies alone; instead, they present Dr. Lucchesi's expert opinion on biological plausibility alongside epidemiological evidence of causation. Furthermore, with respect to Dr. Lucchesi's specific methodology, the Court agrees with Plaintiffs that it appears to be an accepted metology. As Plaintiffs emphasize, and as Dr. Crowther appears to agree, Dr. Lucchesi reached his conclusions by relying on peer-reviewed articles in his field, as well as his own wealth of research experience in the field of cardiovascular disease. Although the clinical trial data may point to a different conclusion, Plaintiffs' other expert witnesses offer reasonable explanations for why that might be the case. As a result, the Court holds that Dr. Lucchesi's testimony is admissible.

### c. Ali Olyaei, Pharm.D.

Dr. Ali Olyaei received a B.S. in Pharmacy from Oregon State University and a Pharm.D. from the University of Kansas. He is board certified as a pharmacotherapy specialist, and he is a professor of medicine and pharmacotherapy at Oregon Health and Sciences University and Oregon State University. He has authored and made major contributions to over 200 publications, including articles, texts, reviews, and treatises. Additionally, he has taught in the areas of pharmacotherapy, medicine, surgery, clinical research, and nursing, and is currently the Medical Director of the Drug Safety & Research Institute. Merck does not challenge Dr. Olyaei's qualifications to testify as an expert witness on "the pharmacological effects of Vioxx on the venous vasculature" and "the recognized association between arterial cardiovascular events and the venous vasculature events." (Rec. Doc. 64232 at 2).

23

Merck does challenge the basis of Dr. Olyaei's conclusion that Vioxx may cause VTE. Merck explains that Dr. Olyaei relies on three studies to reach this conclusion, and each of these studies has significant limitations: the first does not provide Vioxx-specific data, the second does not find a statistically significant increased risk of PE with the use of NSAIDs, and the third specifically states that further research will be required to determine whether an association between NSAIDs and VTE is causal. Merck notes that Dr. Olyaei himself agrees that these limitations are present, and that further investigation is required to determine whether Vioxx actually causes VTE. During his deposition, he testified that there is a "strong signal" that Vioxx may cause VTE, but that "it will take other people to go and verify whether it's true or not." (Olyaei Dep. at 158:1-7, Rec. Doc. 64211-7 at 41). Merck argues that because of these reservations, Dr. Olyaei's opinion is not sufficiently reliable to be included at trial.

The VTE Plaintiffs respond that Merck improperly attacks Dr. Olyaei's conclusions, rather than his methodology, which consisted of reviewing peer-reviewed articles on Vioxx and VTE, and is not speculative or unreliable. Plaintiffs also reiterate their arguments made with respect to Dr. Lucchesi, stating that Dr. Olyaei can offer proof of causation without relying on epidemiologic studies. Additionally, Plaintiffs emphasize that Dr. Olyaei limits his opinion to pharmacology, the area of his expertise, and transparently indicates that he is testifying only about plausibility by stating that in his opinion, "it is reasonably likely that Vioxx can be expected to increase the likelihood of occurrences of VTEs." (Olyaei Decl., Rec. Doc. 64232-3 at 2).

The Court agrees that Merck's arguments go to the weight of Dr. Olyaei's testimony, rather than its admissibility. As demonstrated above, Dr. Olyaei himself has specified the

limitations on his analysis and conclusions, and this information is appropriate for Merck to use during cross-examination. Furthermore, as the Court noted with respect to Dr. Lucchesi, the presence of epidemiological evidence in this case distinguishes it from previous cases in which evidence of biological plausibility was held to be insufficient to prove causation. Therefore, the Court will deny Merck's motion with respect to Dr. Olyaei.

           d.        **Alex C. Spyropoulos, M.D.**

      Dr. Alex Spyropoulos received a B.A. and M.D. from the University of Pennsylvania. He has 15 years of clinical experience in thrombotic disorders. He is currently a professor of medicine and the director of the Clinical Thrombosis Program at the University of Rochester Medical Center, Division of Hematology and Oncology. He is also a professor at Hofstra University and the Director of Anticoagulation Services and Clinical Thrombosis in the North Shore Long Island Jewish Health System. He has authored approximately 100 peer-reviewed publications and has worked on multiple international clinical trials in thrombosis. Merck concedes that Dr. Spyropoulos is qualified to offer an expert opinion on the protocols of the Vioxx clinical trial program and their ability to detect VTEs.

      Merck cites much of Dr. Spyropoulos's deposition testimony in support of its own arguments, but its main objection to Dr. Spyropoulos's testimony appears to be an alleged contradiction between his deposition testimony and his report. Specifically, Dr. Spyropoulos testified that the clinical trial data do not provide any evidence of an association between Vioxx and VTEs (Spyropoulos Dep. at 144:17-24, Rec. Doc. 64211-4 at 37), and that, while the data is "highly suggestive" that Vioxx causes VTEs, it has not actually proven that Vioxx causes VTEs (Spyropoulos Dep. at 145:17-146:4, Rec. Doc. 64211-4 at 37-38). In contrast, in his report, Dr.

Spyropoulos concludes "with a reasonable degree of scientific and medical probability that Vioxx can be associated with an increased risk of venous thromboembolism." (Spyropoulos Rep., Rec. Doc. 64211-30 at 6).

The Court agrees with the VTE Plaintiffs that taken in context, Dr. Spyropoulos's testimony does not contradict the analysis in his report. In both the deposition testimony and the report, Dr. Spyropoulos is careful to clarify that while the clinical data have not shown that Vioxx causes an increased risk of VTEs, such a relationship is reasonably likely in his opinion, for two main reasons: (1) there is biological plausibility, and (2) certain features of the Vioxx clinical trials meant that underestimation of VTEs was likely. Accordingly, the Court will deny Merck's motion to exclude with respect to Dr. Spyropoulos.

### 2.    Plaintiffs' Motion to Exclude Merck's Experts

#### a.    Mark Crowther, M.D.

Dr. Mark Crowther earned his medical degree from the University of Western Ohio. He did a residency in internal medicine at the University of Western Ontario and a residency in hematology at McMaster University. He then obtained an M.S. in epidemiology and biostatistics at McMaster University, and served as a Clinical and Research Fellow in Medicine and Thromboembolism at McMaster University. He is currently a professor of medicine in the Division of Hematology and Thromboembolism at McMaster University, where he has an active and extensive clinical research practice. The VTE Plaintiffs agree that is qualified to express opinions about VTEs, which are his primary research subject and area of clinical expertise. However, Plaintiffs argue that Dr. Crowther should not be allowed to testify in four distinct subject areas.

### 1.     Absence of COX-2 in Venous Vasculature

First, Plaintiffs argue that Dr. Crowther should be precluded from testifying that there is no COX-2 present in the venous vasculature. Plaintiffs argue that this conclusion is flawed because it is based on two articles, neither of which supports it—as Dr. Crowther himself apparently admits. (Crowther Dep. at 103:12-104:1, 109:3-109:22, Rec. Doc. 64211-12 at 27, 28). Furthermore, Plaintiffs argue that Dr. Crowther's conclusion is illogical, because its logic would require that concluding that COX-2 is also absent from arteries, which no expert would agree to. Merck responds that Plaintiffs are explicitly attacking Dr. Crowther's conclusion, rather than his methodology, which involved reviewing peer-reviewed literature and is therefore reliable under *Daubert*. The Court agrees with Merck. Plaintiffs' criticisms of Dr. Crowther's logic relate more to his conclusion than his methods, and Plaintiffs may raise these points on cross-examination.

### 2.     Literature Review

Plaintiffs also argue that Dr. Crowther should be precluded from testifying about his literature review, in which Dr. Crowther concludes that there is no evidence of a causal relationship between Vioxx and VTEs, for several reasons. First, Plaintiffs note that Dr. Crowther's literature review has been rejected for publication in three journals, and notes that Dr. Crowther testified that "the reviewers imply, in [his] opinion, that there is an association [between COX-2 inhibitors and venous thrombosis]," meaning that "a paper which purports that there is no association is going to have a harder pathway to getting published." (Crowther Dep. at 18:11-15, Rec. Doc. 64211-12 at 6). Plaintiffs argue that while publication in a peer-reviewed journal is not required under *Daubert*, rejection from peer-reviewed journals casts significant

27

doubt on the reliability of Dr. Crowther's analysis. Additionally, Plaintiffs argue that even though the American Society of Hematology did accept the abstract of the literature review for a poster presentation, Dr. Crowther failed to disclose a material conflict of interest when he submitted the abstract for review. (Ex. 3 to Pls.' Mot., Rec. Doc. 64210-9; Crowther Dep. 36:25-37:16, Rec. Doc. 64211-12 at 10).

Next, Plaintiffs raise several more detailed arguments relating to the literature review's methodology. They argue that Dr. Crowther's literature is unreliable because it relies on Merck's reported data, which is itself unreliable. *See, e.g.*, Bruce M. Psaty & Richard A. Kronmal, *Reporting Mortality Findings in Trials of Rofecoxib for Alzheimer Disease or Cognitive Impairment: A Case Study Based on Documents from Rofecoxib Litigation*, 299 JAMA 1813 (2008). Furthermore, Plaintiffs object to Dr. Crowther's use of a software program to extract that data, noting that Dr. Crowther testified that the process took only ten minutes, and that there was no record of the extraction. (Crowther Dep. at 156:6-156:18, 166:15-24, Rec. Doc. 64211-12 at 40, 43). Plaintiffs also argue that Dr. Crowther's literature review uses unreliable methodology because Dr. Crowther did not review Merck's clinical study reports ("CSRs") in compiling it. Furthermore, Plaintiffs argue that the compilation process was unreliable because it misinterpreted certain data—specifically, it made unwarranted inferences that no VTEs had occurred.

Merck responds by disputing Plaintiffs' characterization of the reasons for the rejection of Dr. Crowther's literature review for publication. Merck cites testimony suggesting that the reviewers rejected Dr. Crowther's work for publication mainly because "the journals were uninterested in publishing papers describing a drug which has been withdrawn from the market."

(Crowther Dep. at 14:17-19, Rec. Doc. 64211-12 at 5). Furthermore, Merck emphasizes that the abstract for Dr. Crowther's literature review was published with the American Society of Hematology. Generally, Merck also argues that Dr. Crowther's methodology was scientifically rigorous, and therefore, his literature review is admissible under *Daubert*.

The Court agrees with Merck that Plaintiffs have not pointed to sufficient methodological flaws with Dr. Crowther's literature review to require its exclusion. Rejection for publication in a peer-reviewed journal does not require exclusion under *Daubert*, particularly in the presence of a plausible explanation unrelated to the merits of the work. The more specific issues that Plaintiffs identify are relatively minor and may be raised on cross-examination. The Court will deny Plaintiffs' motion to preclude Dr. Crowther from testifying about his literature review.

### 3.    Mechanisms of Clot Formation

Third, Plaintiffs argue that Dr. Crowther should not be permitted to testify on the relationship among COX enzymes, prostacyclin, and prostaglandins. Plaintiffs argue that Dr. Crowther has claimed to have a lack of expertise on this topic, including a lack of expertise relating to how prostaglandins or prostacyclins promote the expression of thrombomodulin and tissue factor, despite including opinions on this topic in his reports. For instance, Plaintiffs note that Dr. Crowther testified that he would "have to spend time reviewing the literature" in order to explain the specifics of how prostacyclin is synthesized. (Crowther Dep. at 75:7-77:6, Rec. Doc. 64211-12 at 20). Plaintiffs list a number of similar instances in which Dr. Crowther either stated that he was not an expert in the specific subject matter or stated that he would have to review literature to answer the question. (Crowther Dep. at 51:18-23, 52:7-18, 53:13-21, 54:19-55:1, 55:3-12, 62:3-12, Rec. Doc. 64211-12 at 14, 15, 17). Plaintiffs argue that these examples

29

illustrate that Dr. Crowther is substantially less qualified than Dr. Lucchesi and Dr. Olyaei, whom Merck has challenged in its own *Daubert* motion.

Merck responds that Plaintiffs are "missing the point" by suggesting that Dr. Crowther would need "specialized expertise in the intricate operations of prostaglandin pathways" in order to review and offer opinions on scientific literature relating to VTEs. (Rec. Doc. 64234 at 8). Additionally, Merck argues that Dr. Crowther's review included literature of which Dr. Lucchesi was apparently unaware, so Plaintiffs cannot argue that Dr. Crowther's methodology or expertise is unequivocally worse than Dr. Lucchesi's.

The Court agrees that Plaintiffs' arguments do not provide a basis to exclude Dr. Crowther's testimony on this subject area. To the extent that Dr. Crowther disclaims expertise in response to very specific questions on biological mechanisms, that may influence the jury's credibility determinations at trial. Dr. Crowther's conclusions are transparently based on his review of peer-reviewed literature and clinical trial data, and this methodology is eminently sound.

### 4.    Arterial Thrombotic Events

Plaintiffs' arguments here are similar to those on clot formation mechanisms. Plaintiffs contend that Dr. Crowther has stated he does not consider himself an expert on the arterial system and has declined to answer questions on the arterial side of the vascular system. (Crowther Dep. at 85:12-17, 87:5-10, Rec. Doc. 64211-12 at 22, 23). Furthermore, Plaintiffs object that during his deposition, Dr. Crowther declined to provide an opinion on whether Vioxx is a risk factor for arterial vascular events, despite having so indicated in his literature review, and even though this fact is widely known.

30

Again, Merck disputes Plaintiffs' characterization of Dr. Crowther's testimony, noting that Plaintiffs' counsel repeatedly sought an admission from Dr. Crowther that Vioxx poses a risk of heart attacks and other arterial events, and it was in response to these questions that he stated he had not done "the kind of detailed analysis" that would be necessary to support such a conclusion. (Crowther Dep. at 139:9, Rec. Doc. 64211-12 at 36). Merck also emphasizes that it is not offering Dr. Crowther as a general causation expert on the subject of Vioxx and arterial events; rather, it is offering Dr. Crowther as an expert on thromboembolism, a field in which he is a preeminent leader.

Again, Plaintiffs' arguments are grounds for cross-examination rather than exclusion of Dr. Crowther's testimony. Merck does not offer Dr. Crowther as an expert on arterial events; to the extent that Dr. Crowther's literature review contains conclusions on that subject matter, Plaintiffs can use any admissions of a lack of expertise to persuade the jury to discredit him. In sum, Plaintiffs have not identified any significant problems with Dr. Crowther's methodology, and therefore, the Court will deny the motion to exclude his testimony in all subject areas.

### b.      John Kress, M.D., F.C.C.P.

Dr. John Kress received his B.S. from the University of Notre Dame and his M.D. from the St. Louis University School of Medicine. He is board certified in internal medicine, pulmonary medicine, critical care, and anesthesiology. He has over 20 years of experience in these areas and is currently an Associate Professor of Medicine at the University of Chicago. He has contributed to over 100 publications and has given almost 200 presentations in his field. Plaintiffs do not challenge Dr. Kress's qualifications in pulmonary medicine and critical care, and the Court agrees that he is a qualified expert in these fields.

31

Plaintiffs do, however, challenge Dr. Kress's qualifications in epidemiology, hematology, and vascular research at the cellular level, all of which he comments on in his main and rebuttal reports at various times. Plaintiffs argue that Dr. Kress's main expertise is in the area of sedation and anesthesiology in critically ill patients, as this has been the focus of his publications, but he is not an expert on VTEs or NSAIDs. They argue that Merck has not shown that Dr. Kress has expertise in epidemiology, clotting mechanisms, or thrombus formation. Furthermore, Plaintiffs argue that Dr. Kress should not be permitted to offer an opinion on the presence or absence of reliable evidence that Vioxx increases the risk of VTEs, because he himself has not reviewed the literature for that purpose. Plaintiffs argue that they declined to depose Dr. Kress because it is evident from his CV that he lacks the necessary expertise.

Merck responds that Dr. Kress's CV does reflect expertise in relevant subject matter—specifically, Merck notes that Dr. Kress has written a book chapter and given lectures on the diagnosis and treatment of PE, which is a manifestation of the same disease process as DVT.  With respect to epidemiology, Merck argues that Dr. Kress is qualified to testify concerning epidemiological studies because he is a medical doctor. *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 800 (E.D. La. 2011) (Fallon, J.). With respect to clotting mechanisms, Merck argues that Dr. Kress is simply offering an opinion that mere theories of biological plausibility are not sufficient to establish causation. With respect to thrombus formation, Merck argues that Dr. Kress indicates that his opinions are "basic tenets of vascular physiology and pathophysiology," (Kress Rep., Rec. Doc. 64210-10 at 4), and that he was not required to anticipate every potential flaw in his analysis that would have been raised at a *Daubert* hearing. Finally, with respect to the absence of evidence in the medical literature that

32

Vioxx increases the risk of VTEs, Merck argues that Plaintiffs' criticisms are grounds for cross-examination and rest on the assumption that Dr. Kress did not review the literature himself.

Particularly in light of the fact that Plaintiffs did not depose Dr. Kress, the Court agrees with Merck that they have not shown that Dr. Kress's anticipated testimony is sufficiently unreliable to require exclusion under *Daubert*. Dr. Kress is a medical doctor and qualified expert in the field of pulmonology, with experience in PE specifically, and his opinions regarding Vioxx and VTEs are based on reliable methodology. Plaintiffs' arguments may be raised on cross-examination at trial.

## IV.   CONCLUSION

All the expert testimony in this case is sufficiently reliable and relevant to satisfy the standards laid out in *Daubert* and Federal Rule of Evidence 702. Therefore, the Court will deny both sides' motions to exclude with respect to all experts. Merck has also renewed its motion for summary judgment. Because the Court has declined to exclude Plaintiffs' evidence of general causation, the Court will not rule on Merck's motion for summary judgment at this time.

For the foregoing reasons, IT IS ORDERED that Merck's Motion to Exclude Opinion Testimony on General Causation (Rec. Doc. 64211) is DENIED IN PART and CONTINUED IN PART. Specifically, the motion to exclude is denied, and the submission date on the motion for summary judgment is continued with dates to be reset. IT IS FURTHER ORDERED that Plaintiffs' motion to continue submission on Merck's motion for summary judgment (Rec. Doc. 64233) is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Preclude Certain Testimony of Mark A. Crowther, M.D. and the Testimony of John P. Kress, M.D. (Rec. Doc. 64210) is

DENIED.

New Orleans, Louisiana, this 9th day of April, 2013.

UNITED STATES DISTRICT JUDGE