```
 1              IN THE UNITED STATES DISTRICT COURT FOR

 2                 THE EASTERN DISTRICT OF LOUISIANA

 3                          AT NEW ORLEANS

 4

 5

 6

 7

 8   IN RE:  VIOXX PRODUCTS              ) Case No. MDL 1657
     LIABILITY LITIGATION               ) March 20, 2013 "L"
 9                                       ) Motions
     _____)
10

11

12

13                    TRANSCRIPT OF PROCEEDINGS

14              BEFORE THE HONORABLE ELDON E. FALLON

15                 UNITED STATES DISTRICT JUDGE

16

17

18

19

20   SUSAN A. ZIELIE, RMR, FCRR
     Official Court Reporter
21   HB 406
     500 Poydras Street
22   New Orleans, Louisiana 70130
     susan_zielie@laed.uscourts.gov
23   504.589.7781

24

25   Proceedings Recorded by Computer-aided Stenography.
```

```
 1    APPEARANCES:

 2

 3    For the Federal/State           DAWN M. BARRIOS, ESQ.
      Committee:                      Barrios Kingsdorf & Casteix, LLP
 4                                     One Shell Square
                                       701 Poydras Street, Suite 3650
 5                                     New Orleans LA 70139-3650
                                       barrios@bkc-law.com
 6                                     504.524.3300

 7

 8    For the PSC:                    RUSS M. HERMAN, ESQ.
                                       Herman Herman Katz, LLP
 9                                     820 O'Keefe Avenue
                                       New Orleans LA 70113
10                                     504.581.4892

11

      For the Commonwealth of        CHRISTOPHER PLACITELLA, ESQ.
12      Pennsylvania:                 Cohen Placitella & Roth, PC
                                       2001 Market Street
13                                     Suite 2900
                                       Philadelphia PA 19103
14                                     215.567.3500

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              NEW ORLEANS, LOUISIANA; WEDNESDAY, MARCH 20, 2013      08:53:3

 2                            9:00 A.M.                               08:54:0

 3              THE COURT:  Call the next case, please.               09:29:0

 4              CASE MANAGER:  05-1657, in re:  VIOXX Products        09:29:1

 5    Liability litigation.                                          09:29:2

 6              THE COURT:  Counsel, make your appearance for the     09:29:5

 7    record, please.                                                09:29:5

 8              MR. HERMAN:  May it please the Court, good morning,   09:29:5

 9    Judge Fallon.  Russ Herman for the Plaintiffs' Steering        09:30:0

10    Committee, mover in motion.                                    09:30:0

11              MR. PLACITELLA:  Christopher Placitella for the      09:30:0

12    Pennsylvania Commonwealth.  Good morning, Your Honor.          09:30:1

13              THE COURT:  Okay.  This is a motion by the PSC seeking 09:30:1

14    common benefit fees in connection with the Commonwealth of     09:30:1

15    Pennsylvania's claim which was, after some period of time,     09:30:2

16    successfully resolved.                                         09:30:2

17                   I'll hear from the parties.                     09:30:3

18              MR. HERMAN:  May it please the Court, good morning,   09:30:4

19    Judge Fallon.  At the outset, this is not a controversy as     09:30:4

20    between lawyers that Your Honor appointed to the attorney      09:30:5

21    general steering committee in the MDL and liaison counsel that 09:30:5

22    Your Honor appointed in the MDL and the Commonwealth of        09:31:0

23    Pennsylvania.                                                  09:31:0

24                   There has to be a difference here at the outset as 09:31:0

25    between illusion and reality.  The fact is that the fees which 09:31:1
```

```
 1   Your Honor has determined in these and similar cases do not come        09:31:2

 2   from the client, which would be the Commonwealth of                     09:31:2

 3   Pennsylvania.  They come from the contingent fee of the lawyers.        09:31:3

 4            And, in fact, Mr. Placitella, learned counsel who              09:31:3

 5   I have great respect for, and his outside counsel, not members          09:31:4

 6   of the attorney general of Pennsylvania, have a contingent fee          09:31:4

 7   based upon a recovery of eight and a half million dollars.  So          09:31:5

 8   the question really for Your Honor is, can Your Honor impose            09:31:5

 9   upon those attorneys a common benefit fee for work done by these       09:32:0

10   attorneys.                                                              09:32:0

11            It is a different situation than the NAMFCU                    09:32:1

12   situation, which was the federal government dealing with states.       09:32:1

13            I might add that the same attorneys who appear                 09:32:2

14   here to resist a common benefit fee are the same attorneys that        09:32:2

15   claim a common benefit fee in the MDL in the personal injury           09:32:3

16   matter.                                                                 09:32:3

17            Now, let me review very briefly, and I hope                    09:32:3

18   succinctly, the salient facts.                                          09:32:4

19            Ms. Barrios, Ms. Cabraser, Mr. Duggan,                         09:32:5

20   Mr. Robinson and Mr. Sanford were appointed by Your Honor in           09:32:5

21   connection with the AG claims that were in the MDL.  They are          09:33:0

22   out-of-pocket approximately $955,000 in costs.  Their total            09:33:1

23   hours are somewhere, giving the benefit of the doubt to learned        09:33:1

24   counsel opposite, are somewhere between 10,000 and 12,000              09:33:2

25   uncompensated hours.                                                    09:33:3
```

```
1            And I do not include in that liaison counsels'          09:33:3

2    costs or hours which, in fact, are much less important here,    09:33:4

3    because the duty of liaison counsel, among numerous duties, is  09:33:5

4    to protect the sanctity of the MDL from the lawyers' perspective 09:33:5

5    and to protect those that do the work.  The old saying in Texas 09:34:0

6    litigation was damn the mule that won't pull, which meant in    09:34:1

7    effect those that pull and carry the load are entitled to the   09:34:1

8    benefit of the load which they carry.                           09:34:2

9            So I ask these questions:                               09:34:2

10           Did the lawyers for Pennsylvania request and            09:34:3

11   receive expert reports?                                         09:34:4

12           Did they request and receive documents from the        09:34:4

13   depository?                                                     09:34:4

14           Did they volunteer to be the first in the first        09:34:4

15   wave of bellwethers?                                            09:34:5

16           Did they encourage the Louisiana AG bellwether         09:34:5

17   case?                                                           09:35:0

18           Did they benefit by getting reports which they         09:35:0

19   requested of the various science, theories and experts presented 09:35:0

20   in the bellwether trial?                                        09:35:1

21           Did they in the MDL co-chair the attorney general      09:35:1

22   expert committee?                                               09:35:2

23           Did they co-chair in the MDL the attorney general      09:35:2

24   discovery committee?                                            09:35:2

25           Did lawyers Roth, Schultz, Weinberg actively           09:35:3
```

```
 1    participate in the MDL?                                  09:35:3
 2              Did they in part organize a mediation directed by  09:35:3
 3    Your Honor in the MDL?                                   09:35:4
 4              Did they mediate before Special Master Juneau at  09:35:4
 5    the direction of this Court in the MDL?  And did indeed that  09:35:5
 6    special master travel upon request to Pennsylvania as a  09:35:5
 7    convenience to the lawyers for the attorney general in  09:36:0
 8    Pennsylvania?                                            09:36:0
 9              Did Mr. Placitella and his partner sign       09:36:0
10    appearances in the MDL?                                  09:36:1
11              Did Mr. Schultz, a former member of that firm, ask  09:36:1
12    for and was appointed to the executive government committee in  09:36:2
13    the MDL?                                                 09:36:3
14              Was liaison counsel instructed to maintain the  09:36:3
15    depository and that all documents produced by Merck were to be  09:36:3
16    made available in all AG matters?  And did liaison counsel, with  09:36:4
17    time and expense, not only attend all of the hearings in this  09:36:4
18    Court but also maintain and make available those documents?  09:36:5
19              Did this Honorable Court in MDL 1657 issue PTO 39,  09:36:5
20    39-A and B, and PTO 44 to chart the course of the lawyers  09:37:1
21    representing Pennsylvania in the MDL?                    09:37:1
22              Did the lawyers for Pennsylvania formulate the top  09:37:2
23    ten discovery requests, which they asked Merck to produce in the  09:37:2
24    MDL?                                                     09:37:3
25              Did they refuse the NAMFCU settlement?  And have  09:37:3
```

1    all of the other states who were in the MDL agreed to pay a          09:37:4

2    percentage of the fees from that Alaska, Kentucky, Mississippi,       09:37:4

3    Montana and Utah may receive?  And, indeed, aren't those you          09:37:5

4    appointed still laboring in the MDL with numerous discovery           09:37:5

5    requests on a discovery track in the MDL?                             09:38:0

6            Now, if the answers to those questions are yes,              09:38:1

7    then, Your Honor, it is apparent to counsel that the lawyers who      09:38:1

8    have labored and who have produced a benefit for the lawyers in       09:38:2

9    Pennsylvania, who have received a contingency fee from               09:38:3

10   Pennsylvania, should be compensated from the fees from the          09:38:3

11   lawyers from Pennsylvania.  And it is, I believe, Your Honor, an     09:38:4

12   inadvertent mischaracterization to say that this is a               09:38:4

13   Pennsylvania AG issue.  It is outside lawyers for Pennsylvania      09:38:5

14   who are at issue here.                                               09:38:5

15           Now, the recovery, as I understand it, is eight             09:39:0

16   and a half million dollars.  I have no knowledge and at this        09:39:0

17   juncture have done no discovery, and I am not entitled to do         09:39:1

18   discovery, as to the amount of the contingency fee at issue.        09:39:1

19           In the opening statement in Macbeth, the three             09:39:2

20   witches say:  Is foul and foul is fair.  Well, foul is not fair.    09:39:2

21   And, in the common law that developed the theory of unjust          09:39:4

22   enrichment, we civilians know that unjust enrichment is a           09:39:4

23   broad-brush for many terms:  equitable estoppel; that is, civil     09:39:5

24   law equitable estoppel; *actio de verso in rem* -- unjust            09:40:0

25   enrichment in a civilian term; and negotiorum gestor.  This is      09:40:0

1    most like negotiorum gestor, in which the Roman law provided and    09:40:1

2    which the French code and other codes perpetuated, that when one    09:40:2

3    does the work of an absent other, he is entitled to be    09:40:2

4    compensated for the fruits of his labor.    09:40:3

5                    But even were this unjust enrichment in the true    09:40:4

6    pure sense, was there activity here by those that seek a common    09:40:4

7    benefit fee?  Was there not reliance of those who seek a common    09:40:5

8    benefit fee on PTOs 39, 39-A, B, 44?    09:41:0

9                    And, in constant participation in the MDL by    09:41:0

10   attorneys for Pennsylvania who have or will receive a contingent    09:41:1

11   fee, did not the attorneys from Pennsylvania benefit and are now    09:41:2

12   the lawyers that pulled the load under a burden of deficit?  Is    09:41:3

13   it fair?  Is it equitable?    09:41:4

14                   This is not a Rule 65 injunction at all.  What it    09:41:4

15   is simply, under the *Everglades* case, 549 F.2d 1006, a    09:41:5

16   recognition in this circuit that where you produce a benefit    09:42:0

17   you're entitled to be compensated.    09:42:1

18                   Now, it is true that other states, recognizing    09:42:2

19   their obligations, agree to a 6.5 percentage common benefit fee.    09:42:2

20   Which, if it plays out, will be greater.  It won't even    09:42:3

21   compensate the folks you appointed for their costs, but at least    09:42:3

22   it's a recognition of the work that they've done and the fact    09:42:4

23   that the lawyers representing those states also recognize their    09:42:4

24   obligation.    09:42:5

25                   Would it be fair under the circumstances for the    09:42:5

1    lawyers from Pennsylvania, who will receive or have received a          09:42:5

2    contingent fee on eight and a half million dollars, to pay             09:43:0

3    twenty-five percent of that fee for the common benefit of those        09:43:1

4    who have really muscled this case in the MDL?                          09:43:1

5             And so I say to Your Honor, fairness and equity               09:43:1

6    dictate, not that Your Honor establish a percentage at this            09:43:2

7    point, but that the lawyers who represent Pennsylvania are             09:43:3

8    before this Court, they've been before this Court, they've got         09:43:3

9    the benefit of this Court, they've had the benefit of all of the       09:43:3

10   work product, depositions, trial, motions, hearings, mediations,       09:43:4

11   intermediary for resolution, serving as principals on committees       09:43:5

12   including executive committee, the benefit of $999,000 in costs        09:44:0

13   put up by others, isn't it fair or equitable that Your Honor           09:44:1

14   would, under the law and the facts, indicate that a common             09:44:1

15   benefit fee is not payable from this Commonwealth of                   09:44:2

16   Pennsylvania, but the outside lawyers who are not in the AG's          09:44:3

17   office who benefited from the work here should pay some common         09:44:3

18   benefit?                                                               09:44:4

19            And then we can go on to discover what work they              09:44:4

20   did.  They can discover what work was done by this group.  The         09:44:4

21   costs can be validated.  Your Honor will have before you               09:44:5

22   whatever the contingent fee is.  And at that point maybe we can        09:44:5

23   resolve this.  Maybe we can resolve it.                                09:45:0

24            I want to thank learned counsel opposite for                  09:45:0

25   meeting with us last night and discussing on other occasions in       09:45:1

```
 1   attempts to resolve this.  But, in the end, what we've said is       09:45:1
 2   we've agreed to disagree.                                            09:45:2
 3                I thank you, Your Honor.                                 09:45:2
 4           THE COURT:  Let me ask you, before you leave, is this        09:45:2
 5   recovery NAMFCU plus false claims or consumer claims, or is this     09:45:3
 6   no NAMFCU?                                                           09:45:4
 7           MR. HERMAN:  It's no NAMFCU whatsoever.                      09:45:4
 8           THE COURT:  And if he takes the position that the            09:45:4
 9   effect of taxing him will in effect have a chilling effect on        09:45:5
10   lawyers and inhibit the Commonwealth from hiring good lawyers        09:46:0
11   and therefore it does have an effect on the Commonwealth.            09:46:0
12           MR. HERMAN:  Well, if it's chilling to him, it's an          09:46:0
13   igloo for us.  Because we're expected in an MDL to spend a           09:46:1
14   million dollars and 12,000 hours to assist them in their claims?     09:46:2
15   They're in an MDL.                                                   09:46:2
16                Now, maybe then don't like MDLs.  Maybe they don't      09:46:2
17   like being here.  But they're here.  They litigated here.  They      09:46:2
18   appeared here.                                                       09:46:3
19                And Your Honor, what is the effect from my              09:46:3
20   colleagues, not just in this MDL but any MDL?  When you do the       09:46:3
21   work, you pay the dues, and then you say, well, gosh, this is an     09:46:4
22   unfair burden in Pennsylvania.                                       09:46:4
23                Well, maybe Pennsylvania will have to go look for       09:46:5
24   some other lawyers who are willing, who are willing, to accept       09:46:5
25   responsibility in these cases and pay a common benefit fee out       09:47:0
```

1    of their fee.                                                              09:47:0

2              My goodness, is this the only law firm in                       09:47:0

3    Pennsylvania that would be willing to take this case?                     09:47:1

4              THE COURT:  Okay.                                               09:47:1

5              MR. HERMAN:  I don't know, because Mr. Placitella is             09:47:1

6    from New Jersey.  I bet there are New Jersey firms that will              09:47:2

7    take the case.                                                            09:47:2

8              THE COURT:  Let me hear from your opponent.                     09:47:2

9              MR. PLACITELLA:  Thank you, Your Honor.                         09:47:2

10             Let me just say at the outset that any of my                    09:47:3

11   comments are not reflective of how I feel about learned counsel,          09:47:3

12   the great efforts they've put in in preparation for the case in           09:47:4

13   general, and the great respect that I have for them.                      09:47:4

14             But I think, at the end of the day, when you                    09:47:5

15   really look at the facts, you will see that the equities                  09:47:5

16   actually lie not with the PSC but with the Commonwealth.                  09:47:5

17             And it's somewhat uncomfortable to start with the               09:48:0

18   issue of jurisdiction before a Court who has dedicated so much            09:48:0

19   time, resources, effort and heart to the VIOXX litigation to say          09:48:1

20   that we really shouldn't be here.  But I'm here.  I understand            09:48:2

21   that.  That we, a long time ago, filed our motion to remand.              09:48:3

22   Which was repeatedly asserted.  Nevertheless, we participated.            09:48:4

23   I don't deny that.  Because we still had a client to represent.           09:48:4

24             I would argue, however, that, with all due respect              09:48:5

25   to the PSC, I don't really have standing to argue jurisdiction.           09:48:5

```
 1   It wasn't their removal motion.  And the mere existence of the      09:49:0
 2   MDL does not confer subject matter jurisdiction.                    09:49:0
 3              Now, I have briefed or we have briefed extensively       09:49:1
 4   the issue of subject matter jurisdiction, and I don't really        09:49:1
 5   intend to argue that, unless the Court really wants me to do it.    09:49:2
 6         THE COURT:  No.  I have researched it.  I understand.          09:49:2
 7         MR. PLACITELLA:  There are a couple of points, however,       09:49:2
 8   that I think are worthwhile.                                         09:49:2
 9              Seeing that the Court has already ruled in the            09:49:3
10   Kentucky remand motion that the federal -- the FDA, Food, Drug      09:49:3
11   and Cosmetic Act, would not be a basis for subject matter           09:49:4
12   jurisdiction, the only thing that really remains is the issue of    09:49:4
13   Medicaid reimbursement.                                             09:49:5
14              It is worth noting, to point out to the Court in         09:49:5
15   that regard, that on August 20, 2010, the Commonwealth wrote to     09:49:5
16   Your Honor, with copy to all counsel, and to Merck, letting the     09:50:0
17   Court know that we had abandoned our Medicaid claims.  So, in       09:50:1
18   the context of whether there is jurisdiction, really, the only     09:50:1
19   thing before the Court at this point is the Food, Drug and          09:50:2
20   Cosmetic Act, which you've already ruled upon.  And we believe      09:50:2
21   that, in fact, is significant.                                      09:50:3
22              In terms of your ability to deal with attorneys          09:50:3
23   fees, we submit that, if there is no subject matter                 09:50:3
24   jurisdiction, no original jurisdiction, there can't be any          09:50:4
25   supplemental jurisdiction, which is where the attorney fees         09:50:4
```

1    issue comes up.  And, I have cites for that, if the Court would        09:50:5

2    like it.  But I assume that's not necessary.                          09:50:5

3              The one thing that's different than probably every          09:51:0

4    other AG case is that we did not stand alone representing the         09:51:0

5    state of the Commonwealth of Pennsylvania, but the AG's office        09:51:1

6    was intimately involved in the case.  They just didn't hire us        09:51:1

7    and say:  Go to it.  They were on the pleadings.  They were           09:51:2

8    involved in preparations for depositions.  They their self did       09:51:2

9    their own discovery in the consumer fraud case, which they then      09:51:2

10   brought to this case and made part of this case.  So they were       09:51:3

11   not passive.                                                          09:51:3

12             And, in that regard, you have an affidavit from            09:51:4

13   the Attorney General's Office that, in fact, indicates that any      09:51:4

14   fee that the Court would award to the PSC would, in fact, have       09:51:4

15   to be paid by the Commonwealth.                                       09:51:5

16             THE COURT:  Why would that be?                             09:51:5

17             MR. PLACITELLA:  Excuse me?                                09:51:5

18             THE COURT:  Why would that be, if it comes from you?       09:52:0

19             MR. PLACITELLA:  Because that's an obligation that         09:52:0

20   they've undertaken.                                                   09:52:0

21             THE COURT:  They've indemnified you?                       09:52:0

22             MR. PLACITELLA:  That they believe it is their burden      09:52:1

23   to shoulder that, because we stood shoulder to shoulder with the     09:52:1

24   AG.  You can't necessarily separate out what we did versus what      09:52:1

25   the AG's counsel, you know, the AG themselves did.                   09:52:2

1    THE COURT:  You think you got fees for what they did?

2    MR. PLACITELLA:  Do I think I got fees for -- I got

3    fees based upon my contract with them.

4    Now, putting all that aside, and getting just to

5    the matter of equities -- assuming that the Court gets over the

6    subject matter jurisdiction, which I think is significant --

7    when we were forced to be here, with all due respect, as counsel

8    indicated, we didn't just fold our arms.  We continued to

9    represent the Commonwealth.  And we worked hard.  As evidenced

10   by their own submissions, we brought to the attorney generals

11   15 -- 15 -- of our own experts that we either cultivated for

12   trial or consultation.  Including Dr. Madigan, who the Louisiana

13   AG requested that we bring.  And we did that without any

14   demands, because we were part of a, at that point, joint effort.

15   And I believe that their submissions actually

16   support our significant work efforts.

17   Our work product, it should be noted, was then in

18   fact sold by the PSC to other attorney generals, including

19   depositions that I did in the context of the personal injury

20   cases.

21   We have not asked this Court or the PSC or any

22   attorney general to compensate us or the Commonwealth for the

23   work that we did.  And it was significant.

24   The learned counsel cites the *Everglades* case.

25   And the *Everglades* case stands for another significant

1   proposition.  That is that one of equity.  And, in fact, if I          09:54:4

2   quote from the case, the Fifth Circuit says:  Someone who hires        09:54:5

3   and pays his own lawyer is not a free rider if the attorney is a       09:54:5

4   contributor to the final results.                                      09:55:0

5            The district judge recognized this, according to             09:55:0

6   the Fifth Circuit, by excluding from the eight percent                 09:55:1

7   contributions attorneys who continued to be active.                    09:55:1

8            Well, that's what we did.  We didn't just fold up            09:55:2

9   our hands and say:  We're not going to play.  We were forced           09:55:2

10  into a situation we didn't want to be in, and we made a positive       09:55:2

11  contribution.                                                          09:55:3

12           On the flip side, the PSC really had no                      09:55:3

13  involvement whatsoever with the PACE case, which is our case,          09:55:4

14  which was sui generis to almost every other case.  Not a single       09:55:4

15  deposition was taken of Merck by the PSC during the pendency of        09:55:5

16  the AG MDL.  They never attended a single deposition of what           09:56:0

17  went on in the PACE case.                                              09:56:0

18           They say to the Court they're out all of this                09:56:1

19  money because they tried the Louisiana case.  Well, those were         09:56:1

20  Louisiana lawyers representing their clients.  It is not               09:56:1

21  incumbent, respectfully, for the state of Pennsylvania to have         09:56:2

22  to pay that freight.                                                   09:56:2

23           And the real problem is that the Louisiana case,             09:56:3

24  although might it have been beneficial to some other AG's cases,       09:56:3

25  really wasn't beneficial to the Commonwealth.  It wasn't               09:56:4

1   beneficial because that was a Medicaid reimbursement case.  We                09:56:4

2   abandoned that claim.                                                         09:56:5

3            Putting aside the fact that, although they made a                    09:56:5

4   great effort, they did not win, it didn't do anything to advance             09:56:5

5   the case brought by the Commonwealth of Pennsylvania.                         09:57:0

6            Now, one of the issues I think the Court would                       09:57:0

7   look at based on reading some of your prior decisions is, is                  09:57:1

8   there a nexus between the PSC work and the Pennsylvania                       09:57:2

9   resolution.  This case, on behalf of the Commonwealth, is                     09:57:2

10  different than almost every other AG case.  Because, in the                   09:57:3

11  context of the PACE claim, we had to prove different things and               09:57:4

12  we had to amass proofs that had nothing to do with what the PSC               09:57:4

13  did.  And I can go through it briefly just so you can see where               09:57:5

14  the nexus breaks down.                                                        09:58:0

15           One:  Like in other cases, we had to prove VIOXX                     09:58:0

16  causes heart attacks.  We used our own experts for that, not                  09:58:0

17  experts that were brought to us by the MDL.  They were                        09:58:1

18  Dr. Kostis, Dr. Krumholz.  Those were experts that we had                     09:58:1

19  secured in the New Jersey litigation, brought over to the                     09:58:2

20  Pennsylvania litigation.  We didn't use any of their medical                  09:58:2

21  experts.                                                                      09:58:2

22           Then we had to prove that Merck did not tell the                     09:58:2

23  truth about VIOXX.  And that's significant in the context of                  09:58:3

24  PACE.                                                                         09:58:3

25           We used the documents that we got prior to this                      09:58:3

1    case ever starting, and the depositions that I took, and the        09:58:4

2    other lawyers from New Jersey.  We didn't use a single piece of     09:58:5

3    discovery or deposition to amass that proof.                        09:58:5

4            And we used our own experts, Dr. Madigan, who we            09:59:0

5    offered to the PSC, Dr. Graham, who we brought to the PSC.          09:59:0

6            And then we had to prove something in the context          09:59:0

7    of the PACE case which they couldn't prove in Louisiana because     09:59:1

8    Louisiana was a different kind of case.  We had to prove that,      09:59:1

9    had PACE been told the truth about VIOXX, they would have not       09:59:2

10   been allowed to put VIOXX on the formulary.  And we did that.       09:59:3

11   Because PACE, unlike every other case, had a different setup.       09:59:3

12   They had something called the TAC.                                  09:59:4

13           The TAC -- and this is something the PSC does not           09:59:4

14   even know -- the TAC was an advisory group of physicians and        09:59:4

15   experts to PACE, which was a totally state-funded benefit plan      09:59:5

16   for the AG, for the AG.  And the TAC would advise and tell them     10:00:0

17   either you can approve this drug, or you have to limit this         10:00:0

18   drug, or you can't approve this drug.                               10:00:1

19           And so the depositions were taken of the people            10:00:1

20   who ran this program.  And they said:  Hey, we would not have       10:00:1

21   put this on our formulary or we would have restricted its use if    10:00:2

22   we were advised by our advisors.                                    10:00:3

23           So then Merck takes the deposition of our advisor.         10:00:3

24   Who, coincidentally, long after he worked for the state of          10:00:4

25   Pennsylvania, became an expert for the PSC.  He wasn't an           10:00:4

1    expert, so to speak, for us; he was a fact witness.  And what he          10:00:5
2    said is that:  Based upon the information I know now, plus the            10:00:5
3    information that you've given me from Dr. Madigan, your expert,           10:01:0
4    on what happened with the Alzheimer's disease, based upon that,          10:01:0
5    I would have stood on the table and banged the table and no way          10:01:0
6    would I have ever allowed PACE or the state of Pennsylvania to           10:01:1
7    prescribe VIOXX.                                                          10:01:2

8            Now, I submit to you, had all those proofs been                  10:01:2
9    before Your Honor in a trial, and that's how Louisiana came out,         10:01:3
10   you might have come to a very different conclusion.  But that            10:01:3
11   shows you how different Pennsylvania was.  All those proofs that         10:01:3
12   I've lined up for you were not provided in any way by the PSC.           10:01:4

13           We did not use a single deposition that was taken                10:01:5
14   by the PSC.  In fact, during the pendency of the AG cases, I            10:01:5
15   don't think any depositions were taken.  I'm not sure.  But I           10:02:0
16   don't think that they were.                                              10:02:0

17           We did not use any PSC experts, even though we                   10:02:0
18   offered our own to them.  In fact, in order to help them, we           10:02:1
19   asked if we could see their expert reports so we could help fill        10:02:2
20   in the blanks for them, given the fact that we've had extensive         10:02:2
21   experience of our own.                                                   10:02:3

22           And you know what they made us sign?  They made us              10:02:3
23   sign a letter saying, even to read the expert reports, we have          10:02:3
24   to agree that we will not use them unless we agree to pay six           10:02:4
25   percent.  So they knew from the outset the position of the             10:02:5

```
 1   Commonwealth and still accepted the help of the Commonwealth.      10:02:5
 2   They knew that we could not use their expert reports, by their     10:02:5
 3   own dictates.  And the only reason we looked at them was to try    10:03:0
 4   to get a big picture and help.  We never had the option of using   10:03:0
 5   their expert reports that they say they put all this work into,    10:03:1
 6   because by their own dictates we weren't permitted to unless we    10:03:1
 7   agreed to the six percent, which we did not.                       10:03:2
 8          So -- and, although it was offered to us on                 10:03:2
 9   numerous occasions, we refused to use their trial package.  Not    10:03:2
10   because it didn't stand for great work and that they didn't do     10:03:3
11   great work and they're not great lawyers and they shouldn't be     10:03:3
12   applauded for all the things they did.  We didn't use it because   10:03:4
13   we didn't feel we needed it.  We had been down this road before.   10:03:4
14          Now, counsel talked about -- let me just talk              10:03:5
15   about the documents and the database.                              10:03:5
16          The database we received to work through came from          10:03:5
17   the New York AG.  Not the PSC.  How New York had it, got it, I     10:04:0
18   don't know.                                                        10:04:1
19          But -- and then they said:  What about documents?           10:04:1
20   The only documents that I was able to research and find that we    10:04:1
21   got from the PSC were the privilege log documents that they        10:04:1
22   didn't know they had.  In fact, when we asked for them the first   10:04:2
23   time, they couldn't find them.  And, finally, I think somebody     10:04:2
24   in Russ's family actually found the disc and then sent them to     10:04:3
25   us.  And it turns out they weren't in the right format and we      10:04:3
```

```
 1    had to get them in the correct format from Merck anyhow.  So we    10:04:3
 2    got them from Merck in any event.                                  10:04:4
 3              Now, in the context of a mediation, there was a          10:04:4
 4    mediation initiated here.  And we flew down here, and we           10:04:5
 5    participated, and no offer was made on our cases.                  10:05:0
 6              We then had another discussion with Merck in the         10:05:0
 7    context of the NAMFCU case.  But Merck made it a requirement       10:05:1
 8    that, if we wanted to take the NAMFCU money, we had to drop the    10:05:1
 9    PACE case.  That was their requirement.  We said no way.  So       10:05:2
10    their offer remained at zero months later.                        10:05:3
11              So what happened next?  What happened was that,          10:05:3
12    after Mr. Snedden and Dr. Avorn were deposed, Merck changed its    10:05:3
13    tune, because they realized -- this is all the work we did --      10:05:4
14    they realized that they had a problem.  They didn't have the       10:05:5
15    Louisiana issue.  They had an issue where, if they tried their     10:05:5
16    case, one of the foremost authorities in the world was going to    10:06:0
17    get on the stand and say:  I was the one who was advising the      10:06:0
18    Commonwealth, and I would have told them don't buy this stuff,     10:06:0
19    it's no good.                                                      10:06:1
20              And it's at that point that the negotiations             10:06:1
21    started in earnest.  We had private discussions with Merck         10:06:2
22    counsel.  And, ultimately, they agreed to have mediation once      10:06:2
23    again.                                                             10:06:3
24              A number of private mediators were proposed,             10:06:3
25    including Special Master Juneau.                                   10:06:3
```

1    We agreed to Special Master Juneau in great part    10:06:4

2  because I thought -- I don't know if I got contaminated by this    10:06:5

3  -- but in great part because I thought the way he handled things    10:06:5

4  in a contentious area when I was on that witness stand was    10:07:0

5  admirable, principled.  I trusted him.  I think Merck trusted    10:07:0

6  him.  So we did, in fact, select him as our private mediator.    10:07:1

7  He did, in fact, fly up at our expense.  He did, in fact, do a    10:07:2

8  great job.  I still hold him in high regard.    10:07:2

9    But the fact that he had once worked in the    10:07:3

10  context of the VIOXX MDL, I would submit, does not mean that the    10:07:3

11  PSC is responsible in any way for the resolution.    10:07:4

12    I can't discount the fact that all their good work    10:07:5

13  somehow was part of the ocean that moved the ball forward.    10:07:5

14  That, I think, would be disingenuous.    10:08:0

15    But, if you're looking for a nexus, one, I submit    10:08:0

16  it's not here.    10:08:1

17    But two, if you're looking for equity, putting    10:08:1

18  aside the sovereignty issues and the jurisdictional issues, if    10:08:1

19  you're looking for equity, we did pull our weight.  That's what    10:08:2

20  their brief says.  They act like they pulled this all by    10:08:3

21  themselves.  They did not.  They wanted help on theories of    10:08:3

22  liability; we gave it to them.  We gave them PowerPoints.  We    10:08:3

23  gave them experts.  We reviewed expert reports.  We did a lot of    10:08:4

24  things together.  And we're not asking for them to pay us.  Why    10:08:4

25  are they asking us to pay them?  That's a matter of equity.    10:08:4

```
 1   Both people -- both people -- worked together for a common good.    10:08:5
 2   We represented the Commonwealth.  They represented whomever they     10:09:0
 3   represented.                                                         10:09:0
 4              Now, I don't know if there are any particular             10:09:0
 5   issues the Court would like me to address.  I'm sure, if I look      10:09:1
 6   down on my notes, I'm sure I forgot something.  But that's           10:09:1
 7   really the essence of the issues that I wanted to relate to the      10:09:2
 8   Court today.                                                         10:09:2
 9              THE COURT:  All right.                                    10:09:2
10              Let me tell you, both of you all, the way that I          10:09:2
11   see the matter.                                                      10:09:3
12              There are really two issues here.                         10:09:3
13              One involves a fact issue:  Did Pennsylvania seek,        10:09:3
14   use, benefit from, profit from in some, any, no way from the         10:09:4
15   PSC's efforts.                                                       10:09:5
16              And two is whether the Court has authority, namely        10:09:5
17   jurisdiction, over the matter.                                       10:10:0
18              I've always felt, from the standpoint of common          10:10:0
19   benefit, that there's a distinction between class actions and        10:10:1
20   MDLs.                                                                10:10:2
21              I think class actions is a classic case where the        10:10:2
22   attorneys are rendering service to the clients, to the              10:10:2
23   individuals who are or will profit from their work.  They're        10:10:3
24   only hired by one, sometimes two or three representatives, and       10:10:3
25   they work and they profit from maybe fees that they get from        10:10:4
```

```
1   those individuals.  But, for everybody else, they are doing          10:10:5

2   work, and those individuals profit -- along with their               10:10:5

3   representatives -- but they profit from the work of the lawyer.       10:11:0

4             MDLs, it's a little different in the sense that            10:11:0

5   you have principal attorneys and you have PSC and committee          10:11:1

6   attorneys.  And the principal attorneys are the ones who really      10:11:1

7   benefit from the work of the PSC or the work of you and other        10:11:2

8   people who are pulling the load.                                     10:11:3

9             So I never felt that the client in the MDL ought          10:11:4

10  to be taxed twice.  I didn't feel that it was fair to have the       10:11:4

11  principal attorneys get their fees based on contract, and then       10:11:5

12  have the people who do work that the other people profit from,       10:11:5

13  to get in addition to that principal attorney's fees.                10:12:0

14            So I always have felt and feel that, in MDLs, it's        10:12:1

15  fair to take the fee out of the share that the principal lawyer      10:12:1

16  has charged.  Because the beneficiary of the work is really the      10:12:2

17  principal lawyer.  That lawyer, in most instances, if they're        10:12:2

18  not on committees, they sign the person up or assign a paralegal     10:12:3

19  to the census of the cases and say:  Do whatever they ask you to     10:12:3

20  do.  And they go on to the next case.                                10:12:4

21            So I guess, from the question of jurisdiction, I          10:12:4

22  guess the focus has to be on whether or not the attorneys hired      10:12:5

23  by a state are so much part of the state, citizen, attorney          10:13:0

24  general, so to speak, that they have the invisibility cloak or       10:13:1

25  the immunity cloak of the state, is one thing that I have to         10:13:2
```

| | |
|---|---|
| 1 | kind of unravel a little bit. | 10:13:2 |
| 2 | The question of what you did and what they did and | 10:13:3 |
| 3 | whether you helped them or they helped you is really enshrouded | 10:13:3 |
| 4 | in facts.  That's a factual issue.  And the other part is a | 10:13:4 |
| 5 | legal issue.  So I'm going to have to deal with both of them. | 10:13:4 |
| 6 | And, with the factual issue, I know each of you | 10:13:5 |
| 7 | have given me some affidavits, but I think we've got to look | 10:13:5 |
| 8 | into a little bit more closely into probably testimony and | 10:14:0 |
| 9 | documentation to see whether or not -- because if you did more | 10:14:0 |
| 10 | than they did, maybe they're not entitled to anything and maybe | 10:14:0 |
| 11 | you're entitled to something.  If they did work, and you | 10:14:1 |
| 12 | profited from it, or the ocean, as you say, that they created | 10:14:2 |
| 13 | helped create some breeze or tide that helped you, that may be | 10:14:3 |
| 14 | significant.  But I don't know whether I can resolve the factual | 10:14:4 |
| 15 | issues with some factual search.  So I'm going to take that into | 10:14:4 |
| 16 | consideration. | 10:14:5 |
| 17 | The likelihood is that I'm going to either get | 10:14:5 |
| 18 | over the jurisdictional issue or just jump into the factual | 10:15:0 |
| 19 | issue. | 10:15:0 |
| 20 | If I jump into the factual issue, after I get over | 10:15:0 |
| 21 | the jurisdictional issue, then what I would do is appoint a | 10:15:1 |
| 22 | special master to take some facts, and let you all present stuff | 10:15:1 |
| 23 | to him. | 10:15:1 |
| 24 | Russ, Chris was finished.  I just wanted to give | 10:15:2 |
| 25 | you an opportunity to rebut.  Is there anything you have to say? | 10:15:2 |

```
 1          MR. PLACITELLA:  No.  Thank you very much.          10:15:3

 2          MR. HERMAN:  Russ Herman, may it please the Court, for  10:15:3

 3   the Court-appointed Louisiana AG Committee, which is a committee  10:15:3

 4   of the PSC adverse to Pennsylvania.                       10:15:4

 5              On jurisdiction, the Court has independent    10:15:4

 6   jurisdiction and authority over all counsel -- all counsel --  10:15:5

 7   who appear before it.  It's a different question than the pure  10:15:5

 8   jurisdiction question.                                     10:16:0

 9              Those who argue against the jurisdiction of the  10:16:0

10   Court are not absolved of professional responsibility.  Nor can  10:16:0

11   the Court have its inherent authority to regulate counsel and to  10:16:1

12   regulate an MDL be taken away.  No lawyer has a right to the  10:16:2

13   work of others, I agree with that.                         10:16:3

14              No Court should have the right to insist that a  10:16:3

15   lawyer may refuse to share in a common burden.  Best argument of  10:16:4

16   Pennsylvania counsel is that they contributed.             10:17:0

17              Now, as to a factual question, I want to deal with  10:17:0

18   that first.  It may be, after Your Honor -- and I'm not going to  10:17:0

19   recount the discovery, the six bellwether trials and what was  10:17:1

20   done in the MDL PI cases.  It would take too long.  But I will  10:17:2

21   say this:  The same law firm that appears here as an independent  10:17:2

22   counsel to Pennsylvania are also the lawyers in the PI case who  10:17:3

23   claim common benefit work for the work they did in New Jersey.  10:17:4

24   So maybe, factually, after we get into it, we're going to find  10:17:4

25   out that all the work or a major portion of what Pennsylvania or  10:17:5
```

1   what these lawyers say they did in the AG case was really work,                 10:17:5

2   as counsel sort of admitted on the record -- I'll have to read                  10:18:0

3   the transcript -- were experts that they got and participated in                10:18:0

4   in New Jersey, for which counsel was on the stand for three or                  10:18:1

5   four hours before Magistrate Juneau, as were his colleagues,                    10:18:1

6   talking about all the contributions they did, the expert                        10:18:2

7   witnesses, the discovery they knew about that nobody else knew                  10:18:2

8   about, for which they were already compensated.  I don't know,                  10:18:3

9   but I think a fact-intensive investigation will sort it out.                    10:18:3

10          THE COURT:  Didn't they receive fees for the work?                      10:18:4

11          MR. HERMAN:  Yes, they did.  Substantial fees.                          10:18:4

12          MR. PLACITELLA:  Some but not enough.                                   10:18:4

13          MR. HERMAN:  Okay.  Mark that one up.                                   10:19:0

14              They actually put themselves forward to try a                       10:19:0

15   first-wave bellwether case here.                                               10:19:0

16              I don't know whether they withdrew their Medicare                   10:19:1

17   claim for around $66,000 after the Louisiana case was tried and                10:19:2

18   lost.  I don't have the -- I'll have to look at that.                          10:19:3

19              Now, there's a res here.  Your Honor not only                       10:19:3

20   looks at nexus but looks at res.  And the res -- I guess, is a                 10:19:4

21   better pronunciation, R-E-S.  The idea that equity would                       10:19:5

22   militate in favor of private attorneys, who under contract                     10:20:1

23   receive a contingent fee, and then admit that other lawyers                    10:20:1

24   participated with them in getting a particular result and should              10:20:2

25   not be compensated, I don't understand those scales.                           10:20:2

```
 1                    I do remember that Mr. Madigan -- the expert,        10:20:3

 2      Dr. Madigan.  Dr. Graham, I certainly remember him.  I do know     10:20:4

 3      their depositions were taken.                                      10:20:4

 4                    I also know that Mr. Weinberg, who seeks a fee,       10:20:4

 5      who received an -- or will receive a Pennsylvania contingent       10:20:5

 6      fee, said -- he claimed that doctor, the expert Madigan, was the   10:20:5

 7      witness, and therefore he should be compensated in the MI stroke   10:21:0

 8      cases.  And he was.                                                10:21:0

 9                    Counsel says documents.  We were ordered to keep     10:21:1

10      the depository open.  We were ordered to provide documents,        10:21:1

11      trial packages, everything.                                        10:21:2

12                    And counsel said:  My God, we didn't get anything    10:21:2

13      from you, we got it from New York.  Where did New York get it      10:21:2

14      from?  They were in my office for three days, getting documents,   10:21:3

15      designating which documents they wanted.  Had me have Mr.          10:21:3

16      Meunier come over and walk them through the trial package.  Then   10:21:4

17      they asked me what the concepts were.  And took notes.             10:21:4

18                    And, we not only gave them that, we gave them all    10:21:4

19      the hot documents.  We gave them deposition outlines.              10:21:5

20                    So can lawyers from Pennsylvania really say:         10:21:5

21      Well, we didn't get anything from you, we got it from New York?    10:21:5

22      But where did New York get it from?                                10:22:0

23                    I know the depositions that -- there were several    10:22:0

24      hundred, that we boiled down to about 30 or 40 that we had video   10:22:1

25      cuts.  All those went to New York.  And the sister state of        10:22:1
```

1    Florida.  Who made us deal through NAMFCU, with Merck, which
2    meant that we would never get the benefit.
3              Counsel says:  Well, you lost the Louisiana case.
4    Well, that's not the only case.  We lost one case twice.  We
5    lose cases.  I mean, you know, that's what lawyers do, they win
6    and they lose.  And we have scars with the ones we lose.  And,
7    the ones we win, it's sort of a victory that's momentary.
8              But the fact is that winning and losing bellwether
9    cases sets the stage for resolution.  And the work effort that
10   our lawyers did -- and I'm proud of what they did in the AG
11   case, cases, was significant.  And it wasn't just Louisiana.
12   And the million dollars in costs just aren't Louisiana costs.
13   They're costs for carrying the burden throughout the AGs.
14             And I know what equity is.  I understand it.
15             And so, yeah, I think I have a lot of faith in
16   Special Master Juneau, as does the law firms that represent
17   Pennsylvania.  I don't really think it's a jurisdiction question
18   at all.  It's this Court's inherent authority to govern us.  And
19   I believe that, when we look at the professional
20   responsibilities that are laid out by the Federal Bar
21   Association, that are laid out by the American Bar Association,
22   when we look at the ethical considerations laid out, it doesn't
23   really become a matter of professionalism or ethics, because
24   everybody has acted professionally, lived up to their
25   obligations.  It is a question of the Court's inherent

```
 1    recognized authority to manage lawyers and to see that the        10:24:3

 2    conduct of lawyers is treated fairly and that lawyers obey the     10:24:4

 3    directives of the Court even when they disagree with them.  It     10:24:4

 4    pains me to have to be here and argue this.                        10:24:5

 5              And let me say this.  I don't think -- at least          10:24:5

 6    for us -- it's an issue of fees.  In Romeo and Juliet, Mab is a    10:25:0

 7    sort of evil person, and there's a quote that says:  O'er          10:25:1

 8    lawyers' fingers, who straight dream on fees.  We're not           10:25:1

 9    dreaming about any great fees here.  What we're asking for is      10:25:2

10    that the work that we did be recognized.                          10:25:2

11              And, may it please the Court, I think once Your          10:25:2

12    Honor reaches the jurisdiction question, there will have to be     10:25:3

13    fact-finding.  And then Your Honor may decide, Special Master      10:25:3

14    Juneau may decide, hey, folks, your 12,000 hours and your          10:25:4

15    million dollars, hey, doesn't compare with what Pennsylvania       10:25:5

16    did, what its lawyers did, and you're not entitled to any          10:25:5

17    compensation.  You may find that.                                 10:26:0

18              You know, we have the hope and expectancy.  I have       10:26:0

19    no expectancy, but I have great hope.                             10:26:0

20              THE COURT:  All right.  Thank you both.                  10:26:1

21              MS. BARRIOS:  Excuse me, Your Honor.  May I just --      10:26:1

22              MR. PLACITELLA:  For point of clarification, in case     10:26:1

23    the record gets read back to me at some point, the information     10:26:1

24    that came from New York was not their work product.  As I         10:26:2

25    understand it, it was raw data.  Raw data.  A database.  That's    10:26:2
```

30

```
 1    it.  That's my understanding.  I will verify it in the context    10:26:3

 2    of all this.                                                        10:26:3

 3              Two, they were offered experts that went beyond          10:26:3

 4    what happened in the personal injury cases.                         10:26:4

 5              I would look forward, assuming you can get past           10:26:4

 6    the jurisdictional issue -- which I think is not so simple --       10:26:4

 7    the only reason we're here -- we don't want to be here, with all    10:26:5

 8    due respect -- is because we were wrongfully removed and            10:26:5

 9    transferred.                                                        10:26:5

10              But, should we come to that, I think the equity          10:26:5

11    will weigh in our favor.                                            10:27:0

12         THE COURT:  All right.                                        10:27:0

13         MS. BARRIOS:  I'm sorry, Your Honor.  I don't mean to         10:27:0

14    belabor a point, but I wanted to clear up some factual issues.      10:27:0

15              When we gave the AGs the entire depository, we did       10:27:0

16    so on a hard drive.  The counsel for New York said that he would    10:27:1

17    copy it for everyone and distribute it.  So, although they may      10:27:1

18    have gotten it directly from Randy Fox, the source came from the    10:27:2

19    depository in Mr. Herman's office.                                  10:27:2

20              We also provided the trial package to every             10:27:2

21    attorney general who agreed to pay a common benefit.                10:27:3

22    Pennsylvania never did agree to it when we negotiated it with       10:27:3

23    them.  However, Mr. Weinberg, who was counsel for Pennsylvania,     10:27:4

24    is also counsel for two other AGs, and had access to the trial      10:27:4

25    package.  So it wasn't just raw data documents.  It was all the     10:27:4
```

```
 1    material that Mr. Herman described as depo cuts, et cetera.          10:27:5

 2                 Pennsylvania was on at least 20 conference calls        10:27:5

 3    with me and the other AGs, and what we were discussing was           10:28:0

 4    moving forward.  My contribution was to tell them how Your Honor     10:28:0

 5    liked the case moved.  That has to be a benefit to them.  It         10:28:1

 6    boggles my mind that they wouldn't think that they benefited --      10:28:1

 7    and I am not trying to take the work from either, because I'm        10:28:2

 8    following him.  I'm following him and Ms. Cabraser and them          10:28:2

 9    guiding me on how to send it, how to send the information to         10:28:2

10    them.                                                                10:28:3

11                 Every document that Merck supplemented in that          10:28:3

12    depository went to Mr. Herman's office, a copy of the CD to          10:28:3

13    myself.  And every one of those CDs were burned and given to         10:28:4

14    each AG.  So they had the entirety of the raw data and the          10:28:4

15    entirety of our work product.                                        10:28:5

16                 Thank you, Your Honor.                                   10:28:5

17              THE COURT:  Okay.  Thank you very much.                     10:28:5

18                 Anything, Chris?                                         10:28:5

19              MR. PLACITELLA:  No, Your Honor.                            10:28:5

20                 I never saw their work product to this day.             10:28:5

21              THE COURT:  All right.  Thank you very much.                10:29:0

22                 Court stands in recess.                                 10:29:0

23                 (10:28 a.m., proceedings concluded.)                    10:29:0

24

25
```

```
 1                          CERTIFICATE

 2

 3

           I, Susan A. Zielie, Official Court Reporter, do hereby
 4  certify that the foregoing transcript is correct.

 5

 6

                          /S/ SUSAN A. ZIELIE, FCRR
 7                       _____
                              Susan A. Zielie, FCRR
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**$**

**$66,000** [1] - 26:16
**$955,000** [1] - 4:22
**$999,000** [1] - 9:12

**/**

**/S** [1] - 32:6

**0**

**05-1657** [1] - 3:4

**1**

**10,000** [1] - 4:24
**1006** [1] - 8:15
**10:28** [1] - 31:23
**12,000** [3] - 4:24, 10:14, 29:14
**15** [2] - 14:11
**1657** [2] - 1:8, 6:19
**19103** [1] - 2:13

**2**

**20** [4] - 1:8, 3:1, 12:15, 31:2
**2001** [1] - 2:12
**2010** [1] - 12:15
**2013** [2] - 1:8, 3:1
**215.567.3500** [1] - 2:14
**2900** [1] - 2:13

**3**

**30** [1] - 27:24
**3650** [1] - 2:4
**39** [2] - 6:19, 8:8
**39-A** [2] - 6:20, 8:8

**4**

**40** [1] - 27:24
**406** [1] - 1:21
**44** [2] - 6:20, 8:8

**5**

**500** [1] - 1:21
**504.524.3300** [1] - 2:6
**504.581.4892** [1] - 2:10
**504.589.7781** [1] - 1:23
**549** [1] - 8:15

**6**

**6.5** [1] - 8:19
**65** [1] - 8:14

**7**

**701** [1] - 2:4
**70113** [1] - 2:9
**70130** [1] - 1:22
**70139-3650** [1] - 2:5

**8**

**8.5** [1] - 9:2
**820** [1] - 2:9

**9**

**9:00** [1] - 3:2

**A**

**a.m** [1] - 31:23
**A.M** [1] - 3:2
**abandoned** [2] - 12:17, 16:1
**ability** [1] - 12:22
**able** [1] - 19:19
**absent** [1] - 8:3
**absolved** [1] - 25:9
**accept** [1] - 10:24
**accepted** [1] - 18:25
**access** [1] - 30:24
**according** [1] - 15:5
**act** [1] - 21:19
**Act** [2] - 12:11, 12:20
**acted** [1] - 28:24
**actio** [1] - 7:24
**actions** [2] - 22:18, 22:20
**active** [1] - 15:7
**actively** [1] - 5:25
**activity** [1] - 8:6
**add** [1] - 4:13
**addition** [1] - 23:12
**address** [1] - 22:4
**admirable** [1] - 21:4
**admit** [1] - 26:23
**admitted** [1] - 26:1
**advance** [1] - 16:3
**adverse** [1] - 25:3
**advise** [1] - 17:15
**advised** [1] - 17:21
**advising** [1] - 20:16
**advisor** [1] - 17:22
**advisors** [1] - 17:21
**advisory** [1] - 17:13
**affidavit** [1] - 13:12
**affidavits** [1] - 24:6

**AG** [18] - 4:21, 5:16, 6:16, 7:13, 13:4, 13:24, 13:25, 14:13, 15:16, 16:9, 17:15, 18:13, 19:16, 25:2, 25:25, 28:10, 31:14
**AG's** [4] - 9:16, 13:5, 13:25, 15:24
**ago** [1] - 11:21
**agree** [5] - 8:19, 18:23, 25:12, 30:22
**agreed** [6] - 7:1, 10:2, 19:6, 20:21, 20:25, 30:21
**AGs** [4] - 28:13, 30:15, 30:24, 31:3
**aided** [1] - 1:25
**Alaska** [1] - 7:2
**allowed** [2] - 17:9, 18:5
**almost** [2] - 15:14, 16:9
**alone** [1] - 13:4
**Alzheimer's** [1] - 18:3
**amass** [2] - 16:11, 17:2
**American** [1] - 28:21
**amount** [1] - 7:18
**answers** [1] - 7:6
**anyhow** [1] - 19:25
**apparent** [1] - 7:7
**appear** [2] - 4:13, 25:6
**appearance** [1] - 3:6
**appearances** [1] - 6:10
**APPEARANCES** [1] - 2:1
**appeared** [1] - 10:18
**applauded** [1] - 19:11
**appoint** [1] - 24:20
**appointed** [7] - 3:20, 3:22, 4:20, 6:12, 7:4, 8:21, 25:2
**approve** [2] - 17:16, 17:17
**area** [1] - 21:3
**argue** [5] - 11:24, 11:25, 12:5, 25:8, 29:4
**argument** [1] - 25:14
**arms** [1] - 14:8
**aside** [3] - 14:4, 16:2, 21:17
**asserted** [1] - 11:22
**assist** [1] - 10:14
**Association** [2] - 28:21
**assume** [1] - 13:2
**assuming** [2] - 14:5, 30:5

**AT** [1] - 1:3
**attacks** [1] - 16:15
**attempts** [1] - 10:1
**attend** [1] - 6:17
**attended** [1] - 15:16
**attorney** [12] - 3:20, 4:6, 5:21, 5:23, 6:7, 12:25, 14:10, 14:18, 14:22, 15:3, 23:22, 30:21
**Attorney** [1] - 13:13
**attorney's** [1] - 23:12
**attorneys** [15] - 4:9, 4:10, 4:13, 4:14, 8:10, 8:11, 12:22, 15:7, 22:21, 23:4, 23:5, 23:10, 23:21, 26:22
**August** [1] - 12:15
**authorities** [1] - 20:15
**authority** [5] - 22:15, 25:5, 25:10, 28:18, 29:1
**available** [2] - 6:16, 6:18
**Avenue** [1] - 2:9
**Avorn** [1] - 20:11
**award** [1] - 13:14

**B**

**ball** [1] - 21:12
**banged** [1] - 18:4
**Bar** [2] - 28:20, 28:21
**BARRIOS** [3] - 2:3, 29:21, 30:13
**Barrios** [2] - 2:3, 4:19
**barrios@bkc** [1] - 2:5
**barrios@bkc-law. com** [1] - 2:5
**based** [6] - 4:7, 14:3, 16:6, 18:1, 18:3, 23:10
**basis** [1] - 12:11
**became** [1] - 17:24
**become** [1] - 28:23
**BEFORE** [1] - 1:13
**behalf** [1] - 16:8
**belabor** [1] - 30:14
**bellwether** [5] - 5:16, 5:20, 25:18, 26:14, 28:8
**bellwethers** [1] - 5:15
**beneficial** [3] - 15:24, 15:25
**beneficiary** [1] - 23:15
**benefit** [28] - 3:14, 4:9, 4:14, 4:15, 4:23, 5:8, 5:18, 7:8, 8:7, 8:8, 8:11, 8:16, 8:19, 9:3,

9:9, 9:12, 9:15, 9:18, 10:25, 17:14, 22:13, 22:18, 23:6, 25:22, 28:2, 30:21, 31:5
**benefited** [2] - 9:17, 31:6
**best** [1] - 25:14
**bet** [1] - 11:6
**better** [1] - 26:20
**between** [5] - 3:20, 3:25, 4:24, 16:7, 22:18
**beyond** [1] - 30:3
**big** [1] - 19:3
**bit** [2] - 23:25, 24:7
**blanks** [1] - 18:19
**boggles** [1] - 31:6
**boiled** [1] - 27:24
**breaks** [1] - 16:13
**breeze** [1] - 24:12
**brief** [1] - 21:19
**briefed** [2] - 12:3
**briefly** [2] - 4:17, 16:12
**bring** [1] - 14:13
**broad** [1] - 7:23
**broad-brush** [1] - 7:23
**brought** [6] - 13:10, 14:10, 16:4, 16:16, 16:18, 17:4
**brush** [1] - 7:23
**burden** [6] - 8:12, 10:22, 13:22, 25:14, 28:13
**burned** [1] - 31:13
**buy** [1] - 20:17

**C**

**Cabraser** [2] - 4:19, 31:8
**carry** [2] - 5:7, 5:8
**carrying** [1] - 28:13
**Case** [1] - 1:8
**case** [44] - 3:3, 5:17, 8:15, 9:4, 11:3, 11:7, 11:12, 13:4, 13:6, 13:9, 13:10, 14:24, 14:25, 15:2, 15:13, 15:14, 15:17, 15:19, 15:23, 16:1, 16:4, 16:8, 16:9, 16:25, 17:6, 17:7, 17:10, 20:6, 20:8, 20:15, 22:20, 23:19, 25:21, 25:25, 26:14, 26:16, 28:3, 28:4, 28:11, 29:22, 31:5
**CASE** [1] - 3:4
**cases** [14] - 4:1, 10:25,

14:20, 15:24, 16:14,
18:13, 20:4, 23:18,
25:19, 27:8, 28:5,
28:9, 28:11, 30:4
**Casteix** [1] - 2:3
**causes** [1] - 16:15
**CD** [1] - 31:12
**CDs** [1] - 31:13
**census** [1] - 23:18
**certainly** [1] - 27:2
**CERTIFICATE** [1] -
32:1
**certify** [1] - 32:4
**cetera** [1] - 31:1
**chair** [2] - 5:21, 5:23
**changed** [1] - 20:11
**charged** [1] - 23:15
**chart** [1] - 6:20
**chilling** [2] - 10:9,
10:12
**Chris** [2] - 24:23,
31:18
**Christopher** [1] - 3:11
**CHRISTOPHER** [1] -
2:11
**circuit** [1] - 8:16
**Circuit** [2] - 15:2, 15:6
**circumstances** [1] -
8:25
**cites** [2] - 13:1, 14:24
**citizen** [1] - 23:22
**civil** [1] - 7:23
**civilian** [1] - 7:25
**civilians** [1] - 7:22
**claim** [6] - 3:15, 4:15,
16:1, 16:10, 25:22,
26:16
**claimed** [1] - 27:6
**claims** [5] - 4:21, 10:5,
10:14, 12:17
**clarification** [1] -
29:22
**class** [2] - 22:18,
22:20
**classic** [1] - 22:20
**clear** [1] - 30:14
**client** [3] - 4:2, 11:23,
23:8
**clients** [2] - 15:20,
22:21
**cloak** [2] - 23:23,
23:24
**closely** [1] - 24:7
**co** [2] - 5:21, 5:23
**co-chair** [2] - 5:21,
5:23
**code** [1] - 8:2
**codes** [1] - 8:2
**Cohen** [1] - 2:12

**coincidentally** [1] -
17:23
**colleagues** [2] -
10:20, 26:4
**comments** [1] - 11:11
**committee** [7] - 3:21,
5:22, 5:24, 6:12,
9:12, 23:4, 25:2
**Committee** [3] - 2:3,
3:10, 25:2
**committees** [2] - 9:11,
23:17
**common** [17] - 3:14,
4:9, 4:14, 4:15, 7:21,
8:6, 8:7, 8:19, 9:3,
9:14, 9:17, 10:25,
21:25, 22:17, 25:14,
25:22, 30:21
**Commonwealth** [21] -
2:11, 3:12, 3:14,
3:22, 4:2, 9:15,
10:10, 10:11, 11:16,
12:15, 13:5, 13:15,
14:9, 14:22, 15:25,
16:4, 16:8, 18:25,
20:17, 22:1
**compare** [1] - 29:15
**compensate** [2] -
8:21, 14:22
**compensated** [6] -
7:10, 8:4, 8:17, 26:7,
26:24, 27:7
**compensation** [1] -
29:17
**Computer** [1] - 1:25
**Computer-aided** [1] -
1:25
**concepts** [1] - 27:17
**concluded** [1] - 31:23
**conclusion** [1] - 18:9
**conduct** [1] - 29:2
**confer** [1] - 12:2
**conference** [1] - 31:2
**connection** [2] - 3:14,
4:21
**consideration** [1] -
24:15
**considerations** [1] -
28:22
**constant** [1] - 8:9
**consultation** [1] -
14:12
**consumer** [2] - 10:5,
13:9
**contaminated** [1] -
21:1
**contentious** [1] - 21:3
**context** [9] - 12:18,
14:19, 16:10, 16:22,
17:5, 20:2, 20:6,

21:9, 30:1
**contingency** [2] - 7:9,
7:18
**contingent** [7] - 4:3,
4:6, 8:10, 9:2, 9:22,
26:22, 27:5
**continued** [2] - 14:8,
15:7
**contract** [3] - 14:3,
23:10, 26:22
**contributed** [1] -
25:15
**contribution** [2] -
15:11, 31:4
**contributions** [2] -
15:7, 26:5
**contributor** [1] - 15:4
**controversy** [1] - 3:19
**convenience** [1] - 6:7
**copy** [3] - 12:16,
30:17, 31:12
**correct** [2] - 19:25,
32:4
**Cosmetic** [2] - 12:11,
12:20
**costs** [8] - 4:22, 5:2,
8:21, 9:12, 9:21,
28:12, 28:13
**counsel** [30] - 3:6,
3:21, 4:4, 4:5, 4:24,
5:3, 6:14, 6:16, 7:7,
9:24, 11:11, 12:16,
13:25, 14:7, 14:24,
19:13, 20:21, 25:5,
25:10, 25:15, 25:21,
26:1, 26:3, 27:9,
27:12, 28:3, 30:16,
30:23, 30:24
**counsels'** [1] - 5:1
**couple** [1] - 12:7
**course** [1] - 6:20
**court** [1] - 31:22
**COURT** [19] - 1:1, 3:3,
3:6, 3:13, 10:4, 10:8,
11:4, 11:8, 12:6,
13:16, 13:18, 13:21,
14:1, 22:8, 26:9,
29:20, 30:12, 31:17,
31:21
**Court** [33] - 1:20, 3:8,
3:18, 6:5, 6:18, 6:19,
9:8, 9:9, 11:18, 12:5,
12:9, 12:14, 12:17,
12:19, 13:1, 13:14,
14:5, 14:21, 15:18,
16:5, 22:4, 22:7,
22:15, 25:1, 25:2,
25:4, 25:9, 25:10,
25:13, 29:3, 29:11,
32:3

**Court's** [2] - 28:18,
28:25
**Court-appointed** [1] -
25:2
**create** [1] - 24:12
**created** [1] - 24:11
**cultivated** [1] - 14:11
**cuts** [2] - 27:25, 31:1

## D

**damn** [1] - 5:6
**data** [4] - 29:25, 30:25,
31:14
**database** [3] - 19:14,
19:15, 29:25
**DAWN** [1] - 2:3
**days** [1] - 27:14
**de** [1] - 7:24
**deal** [4] - 12:22, 24:4,
25:16, 28:1
**dealing** [1] - 4:12
**decide** [2] - 29:13,
29:14
**decisions** [1] - 16:6
**dedicated** [1] - 11:18
**deficit** [1] - 8:12
**demands** [1] - 14:14
**deny** [1] - 11:23
**depo** [1] - 31:1
**deposed** [1] - 20:11
**deposition** [6] - 15:15,
15:16, 17:2, 17:22,
18:12, 27:19
**depositions** [8] - 9:10,
13:8, 14:19, 16:25,
17:18, 18:14, 27:3,
27:23
**depository** [6] - 5:13,
6:15, 27:10, 30:15,
30:19, 31:12
**described** [1] - 31:1
**designating** [1] -
27:15
**determined** [1] - 4:1
**developed** [1] - 7:21
**dictate** [1] - 9:6
**dictates** [2] - 19:2,
19:5
**difference** [1] - 3:24
**different** [10] - 4:11,
13:3, 16:9, 16:10,
17:7, 17:10, 18:9,
18:10, 23:3, 25:6
**directed** [1] - 6:2
**direction** [1] - 6:5
**directives** [1] - 29:3
**directly** [1] - 30:18
**disagree** [2] - 10:2,
29:3

**disc** [1] - 19:23
**discount** [1] - 21:11
**discover** [2] - 9:19,
9:20
**discovery** [10] - 5:24,
6:23, 7:4, 7:5, 7:17,
7:18, 13:9, 17:2,
25:18, 26:6
**discussing** [2] - 9:25,
31:3
**discussion** [1] - 20:5
**discussions** [1] -
20:20
**disease** [1] - 18:3
**disingenuous** [1] -
21:13
**distinction** [1] - 22:18
**distribute** [1] - 30:17
**DISTRICT** [3] - 1:1,
1:2, 1:14
**district** [1] - 15:5
**doctor** [1] - 27:6
**document** [1] - 31:11
**documentation** [1] -
24:8
**documents** [14] -
5:12, 6:15, 6:18,
16:24, 19:14, 19:18,
19:19, 19:20, 27:9,
27:10, 27:14, 27:15,
27:19, 30:25
**dollars** [5] - 4:7, 7:16,
10:14, 28:12, 29:15
**done** [5] - 4:9, 7:17,
8:22, 9:20, 25:19
**doubt** [1] - 4:23
**down** [5] - 16:13,
19:12, 20:3, 22:5,
27:24
**Dr** [9] - 14:12, 16:17,
17:3, 17:4, 18:2,
20:11, 27:2
**dream** [1] - 29:8
**dreaming** [1] - 29:9
**drive** [1] - 30:16
**drop** [1] - 20:7
**drug** [3] - 17:16, 17:17
**Drug** [2] - 12:10, 12:19
**due** [3] - 11:24, 14:7,
30:8
**dues** [1] - 10:21
**Duggan** [1] - 4:19
**during** [2] - 15:15,
18:13
**duties** [1] - 5:3
**duty** [1] - 5:3

## E

**earnest** [1] - 20:20

**EASTERN** [1] - 1:2
**effect** [6] - 5:7, 10:9, 10:11, 10:19
**effort** [4] - 11:19, 14:14, 16:3, 28:9
**efforts** [3] - 11:12, 14:16, 22:14
**eight** [3] - 4:7, 7:15, 15:6
**either** [4] - 14:11, 17:16, 24:16, 31:7
**ELDON** [1] - 1:13
**encourage** [1] - 5:16
**end** [2] - 10:1, 11:14
**enrichment** [4] - 7:22, 7:25, 8:5
**enshrouded** [1] - 24:2
**entire** [1] - 30:15
**entirety** [2] - 31:14, 31:15
**entitled** [7] - 5:7, 7:17, 8:3, 8:17, 24:9, 24:10, 29:16
**equitable** [4] - 7:23, 7:24, 8:13, 9:13
**equities** [2] - 11:15, 14:5
**equity** [8] - 9:5, 15:1, 21:16, 21:18, 21:24, 26:21, 28:14, 30:10
**ESQ** [3] - 2:3, 2:8, 2:11
**essence** [1] - 22:6
**establish** [1] - 9:6
**estoppel** [2] - 7:23, 7:24
**et** [1] - 31:1
**ethical** [1] - 28:22
**ethics** [1] - 28:23
**event** [1] - 20:1
**Everglades** [3] - 8:15, 14:24, 14:25
**evidenced** [1] - 14:9
**evil** [1] - 29:7
**excluding** [1] - 15:6
**excuse** [2] - 13:17, 29:21
**executive** [2] - 6:12, 9:12
**existence** [1] - 12:1
**expectancy** [2] - 29:18, 29:19
**expected** [1] - 10:13
**expense** [2] - 6:17, 21:6
**experience** [1] - 18:20
**expert** [13] - 5:11, 5:22, 17:24, 17:25, 18:2, 18:18, 18:22, 19:1, 19:4, 21:22,

26:5, 27:1, 27:6
**experts** [12] - 5:19, 14:11, 16:15, 16:16, 16:17, 16:20, 17:3, 17:14, 18:16, 21:22, 26:2, 30:3
**extensive** [1] - 18:19
**extensively** [1] - 12:3

## F

**F.2d** [1] - 8:15
**fact** [24] - 3:25, 4:4, 5:2, 8:22, 12:21, 13:13, 13:14, 14:18, 15:1, 16:2, 17:25, 18:13, 18:17, 18:19, 19:21, 21:5, 21:6, 21:8, 21:11, 22:12, 26:8, 28:8, 29:13
**fact-finding** [1] - 29:13
**fact-intensive** [1] - 26:8
**facts** [5] - 4:18, 9:14, 11:15, 24:3, 24:21
**factual** [8] - 24:3, 24:5, 24:13, 24:14, 24:17, 24:19, 25:16, 30:14
**factually** [1] - 25:23
**fair** [7] - 7:20, 8:13, 8:25, 9:13, 23:9, 23:14
**fairly** [1] - 29:2
**fairness** [1] - 9:5
**faith** [1] - 28:15
**FALLON** [1] - 1:13
**Fallon** [2] - 3:9, 3:19
**false** [1] - 10:5
**family** [1] - 19:23
**favor** [2] - 26:21, 30:11
**FCRR** [3] - 1:20, 32:6, 32:7
**FDA** [1] - 12:10
**federal** [2] - 4:12, 12:10
**Federal** [1] - 28:20
**Federal/State** [1] - 2:3
**fee** [22] - 4:3, 4:6, 4:9, 4:14, 4:15, 7:9, 7:18, 8:7, 8:8, 8:11, 8:19, 9:2, 9:3, 9:15, 9:22, 10:25, 11:1, 13:14, 23:14, 26:22, 27:4, 27:6
**fees** [17] - 3:14, 3:25, 7:2, 7:10, 12:23, 12:25, 14:1, 14:2,

14:3, 22:24, 23:10, 23:12, 26:9, 26:10, 29:6, 29:8, 29:9
**felt** [3] - 22:17, 23:8, 23:13
**Fifth** [2] - 15:2, 15:6
**filed** [1] - 11:21
**fill** [1] - 18:18
**final** [1] - 15:4
**finally** [1] - 19:22
**fingers** [1] - 27:16
**finished** [1] - 24:23
**firm** [3] - 6:11, 11:2, 25:20
**firms** [2] - 11:6, 28:16
**first** [5] - 5:14, 19:21, 25:17, 26:14
**first-wave** [1] - 26:14
**five** [1] - 9:2
**flew** [1] - 20:3
**flip** [1] - 15:12
**Florida** [1] - 28:1
**fly** [1] - 21:6
**focus** [1] - 23:21
**fold** [2] - 14:8, 15:8
**folks** [2] - 8:21, 29:14
**following** [2] - 31:8
**Food** [2] - 12:10, 12:19
**FOR** [1] - 1:1
**forced** [2] - 14:7, 15:9
**foregoing** [1] - 32:4
**foremost** [1] - 20:15
**forgot** [1] - 9:2
**format** [2] - 19:24, 19:25
**former** [1] - 6:11
**formulary** [2] - 17:9, 17:20
**formulate** [1] - 6:22
**forward** [4] - 21:12, 26:13, 30:5, 31:4
**foul** [3] - 7:20
**four** [1] - 26:4
**Fox** [1] - 30:18
**fraud** [1] - 13:9
**free** [1] - 15:3
**freight** [1] - 15:22
**French** [1] - 8:2
**fruits** [1] - 8:4
**funded** [1] - 17:14

## G

**general** [9] - 3:21, 4:6, 5:21, 5:23, 6:7, 11:13, 14:22, 23:23, 30:21
**General's** [1] - 13:13
**generals** [2] - 14:10,

14:18
**generis** [1] - 15:14
**gestor** [2] - 7:25, 8:1
**given** [4] - 18:2, 18:19, 24:6, 31:13
**God** [1] - 27:12
**goodness** [1] - 11:2
**gosh** [1] - 10:21
**govern** [1] - 28:18
**government** [2] - 4:12, 6:12
**Graham** [2] - 17:4, 27:2
**great** [12] - 4:5, 11:12, 11:13, 16:3, 19:9, 19:10, 20:25, 21:2, 21:7, 29:9, 29:19
**greater** [1] - 8:20
**group** [2] - 9:20, 17:13
**guess** [3] - 23:20, 23:21, 26:19
**guiding** [1] - 31:9

## H

**half** [2] - 4:7, 7:16
**handled** [1] - 21:2
**hands** [1] - 11:9
**hard** [2] - 14:9, 30:16
**HB** [1] - 1:21
**hear** [2] - 3:17, 11:8
**hearings** [2] - 6:17, 9:10
**heart** [2] - 11:19, 16:15
**help** [5] - 18:17, 18:18, 18:25, 19:3, 21:20
**helped** [4] - 24:2, 24:12
**hereby** [1] - 32:3
**HERMAN** [9] - 2:8, 3:8, 3:18, 10:7, 10:12, 11:5, 25:1, 26:10, 26:12
**Herman** [5] - 2:8, 3:9, 25:1, 31:1
**Herman's** [2] - 30:19, 31:12
**high** [1] - 21:7
**hire** [1] - 13:7
**hired** [2] - 22:23, 23:21
**hires** [1] - 15:2
**hiring** [1] - 10:10
**hold** [1] - 21:7
**Honor** [28] - 3:12, 3:20, 3:22, 4:1, 4:8, 4:20, 6:3, 7:7, 7:11, 9:5, 9:6, 9:13, 9:21, 10:3, 10:19, 11:9,

14:18
**generis** [1] - 15:14
**gestor** [2] - 7:25, 8:1
**given** [4] - 18:2, 18:19, 24:6, 31:13

12:16, 18:8, 25:17, 26:18, 29:12, 29:13, 29:21, 30:13, 31:4, 31:16, 31:19
**HONORABLE** [1] - 1:13
**Honorable** [1] - 6:19
**hope** [3] - 4:17, 29:18, 29:19
**hot** [1] - 27:19
**hours** [6] - 4:23, 4:25, 5:2, 10:14, 26:4, 29:14
**hundred** [1] - 27:24

## I

**idea** [1] - 26:21
**igloo** [1] - 10:13
**illusion** [1] - 3:25
**immunity** [1] - 23:24
**important** [1] - 5:2
**impose** [1] - 4:8
**IN** [2] - 1:1, 1:8
**inadvertent** [1] - 7:12
**include** [1] - 5:1
**including** [4] - 9:12, 14:12, 14:18, 20:24
**incumbent** [1] - 15:21
**indeed** [2] - 6:5, 7:3
**indemnified** [1] - 13:21
**independent** [2] - 25:4, 25:20
**indicate** [1] - 9:14
**indicated** [1] - 14:8
**indicates** [1] - 13:13
**individuals** [3] - 22:22, 22:25, 23:1
**information** [4] - 18:1, 18:2, 29:23, 31:9
**inherent** [3] - 25:10, 28:18, 28:25
**inhibit** [1] - 10:10
**initiated** [1] - 20:3
**injunction** [1] - 8:14
**injury** [3] - 4:15, 14:19, 30:4
**insist** [1] - 25:13
**instances** [1] - 23:16
**instructed** [1] - 6:14
**intend** [1] - 12:5
**intensive** [1] - 26:8
**intermediary** [1] - 9:11
**intimately** [1] - 13:6
**investigation** [1] - 26:8
**invisibility** [1] - 23:23
**involved** [2] - 13:6, 13:8

**involvement** [1] - 15:13
**involves** [1] - 22:12
**issue** [20] - 6:19, 7:13, 7:14, 7:18, 11:18, 12:4, 12:12, 13:1, 20:14, 22:12, 24:3, 24:4, 24:5, 24:17, 24:18, 24:19, 24:20, 29:6, 30:6
**issues** [8] - 16:5, 21:17, 22:4, 22:6, 22:11, 24:14, 30:14

## J

**Jersey** [6] - 11:6, 16:18, 17:1, 25:22, 26:3
**job** [1] - 21:7
**joint** [1] - 14:14
**Judge** [2] - 3:9, 3:19
**JUDGE** [1] - 1:14
**judge** [1] - 15:5
**Juliet** [1] - 29:6
**jump** [2] - 24:17, 24:19
**juncture** [1] - 7:17
**Juneau** [6] - 6:4, 20:24, 20:25, 26:4, 28:16, 29:14
**jurisdiction** [18] - 11:18, 11:25, 12:2, 12:4, 12:12, 12:18, 12:24, 12:25, 14:6, 22:16, 23:20, 25:4, 25:5, 25:7, 25:8, 28:17, 29:12
**jurisdictional** [4] - 21:17, 24:17, 24:20, 30:6

## K

**Katz** [1] - 2:8
**keep** [1] - 27:9
**Kentucky** [2] - 7:2, 12:10
**kind** [2] - 17:7, 23:25
**Kingsdorf** [1] - 2:3
**knowledge** [1] - 7:16
**Kostis** [1] - 16:17
**Krumholz** [1] - 16:17

## L

**LA** [2] - 2:5, 2:9
**labor** [1] - 8:4
**labored** [1] - 7:8
**laboring** [1] - 7:4

**laid** [3] - 28:20, 28:21, 28:22
**last** [1] - 9:25
**law** [7] - 7:21, 7:24, 8:1, 9:14, 11:2, 25:20, 28:16
**law.com** [1] - 2:5
**lawyer** [7] - 15:3, 23:2, 23:14, 23:16, 25:11, 25:14
**lawyers** [32] - 3:20, 4:3, 5:10, 5:25, 6:7, 6:20, 6:22, 7:7, 7:8, 7:11, 7:13, 8:12, 8:23, 9:1, 9:7, 9:16, 10:10, 10:24, 15:20, 17:1, 19:10, 25:21, 25:25, 26:23, 27:20, 28:5, 28:10, 29:1, 29:2, 29:16
**lawyers'** [2] - 5:4, 29:8
**learned** [5] - 4:4, 4:23, 9:24, 11:11, 14:24
**least** [3] - 8:21, 29:5, 31:2
**leave** [1] - 10:4
**legal** [1] - 24:4
**less** [1] - 5:2
**letter** [1] - 18:22
**letting** [1] - 12:16
**Liability** [1] - 3:5
**liability** [1] - 21:21
**LIABILITY** [1] - 1:8
**liaison** [5] - 3:21, 5:1, 5:3, 6:14, 6:16
**lie** [1] - 11:16
**likelihood** [1] - 24:16
**limit** [1] - 17:16
**lined** [1] - 18:11
**litigated** [1] - 10:17
**litigation** [5] - 3:5, 5:6, 11:19, 16:18, 16:19
**LITIGATION** [1] - 1:8
**lived** [1] - 28:24
**LLP** [2] - 2:3, 2:8
**load** [4] - 5:7, 5:8, 8:12, 23:7
**log** [1] - 19:20
**look** [9] - 10:23, 11:15, 16:6, 22:4, 24:6, 26:17, 28:19, 28:22, 30:5
**looked** [1] - 19:2
**looking** [3] - 21:14, 21:16, 21:18
**looks** [1] - 26:19
**lose** [3] - 28:5, 28:6
**losing** [1] - 28:8
**lost** [3] - 26:17, 28:3, 28:4

**LOUISIANA** [2] - 1:2, 3:1
**Louisiana** [15] - 1:22, 5:16, 14:12, 15:19, 15:20, 15:23, 17:6, 17:7, 18:8, 20:14, 25:2, 26:16, 28:3, 28:11, 28:12

## M

**Mab** [1] - 29:6
**Macbeth** [1] - 7:19
**Madigan** [6] - 14:12, 17:3, 18:2, 27:1, 27:2, 27:6
**Magistrate** [1] - 26:4
**maintain** [2] - 6:14, 6:18
**major** [1] - 25:24
**manage** [1] - 29:1
**MANAGER** [1] - 3:4
**March** [1] - 1:8
**MARCH** [1] - 3:1
**Mark** [1] - 26:12
**Market** [1] - 2:12
**Master** [5] - 6:4, 20:24, 20:25, 28:16, 29:13
**master** [2] - 6:6, 24:21
**material** [1] - 31:1
**matter** [11] - 4:16, 12:2, 12:4, 12:11, 12:23, 14:5, 14:6, 21:24, 22:10, 22:16, 28:23
**matters** [1] - 6:16
**MDL** [32] - 1:8, 3:21, 3:22, 4:15, 4:21, 5:4, 5:21, 5:23, 6:1, 6:3, 6:5, 6:10, 6:13, 6:19, 6:21, 6:24, 7:1, 7:4, 7:5, 8:9, 9:4, 10:13, 10:15, 10:20, 12:2, 15:16, 16:16, 21:9, 23:8, 25:11, 25:19
**MDLs** [4] - 10:16, 22:19, 23:3, 23:13
**mean** [3] - 21:9, 28:5, 30:13
**meant** [2] - 5:6, 28:2
**mediate** [1] - 6:4
**mediation** [6] - 6:2, 20:2, 20:3, 20:21
**mediations** [1] - 9:10
**mediator** [1] - 21:5
**mediators** [1] - 20:23
**Medicaid** [3] - 12:13, 12:17, 16:1
**medical** [1] - 16:19
**Medicare** [1] - 26:15

**meeting** [1] - 9:25
**member** [1] - 6:11
**members** [1] - 4:5
**Merck** [15] - 6:15, 6:23, 12:16, 15:15, 16:21, 17:22, 19:25, 20:1, 20:5, 20:6, 20:11, 20:20, 21:4, 28:1, 31:11
**mere** [1] - 12:1
**Meunier** [1] - 27:16
**MI** [1] - 27:7
**might** [3] - 4:13, 15:23, 18:9
**militate** [1] - 26:21
**million** [6] - 4:7, 7:16, 9:2, 10:14, 28:12, 29:15
**mind** [1] - 31:6
**mischaracterization** [1] - 7:12
**Mississippi** [1] - 7:2
**momentary** [1] - 28:7
**money** [2] - 15:19, 20:7
**Montana** [1] - 7:3
**months** [1] - 20:9
**morning** [3] - 3:8, 3:12, 3:18
**most** [2] - 8:1, 23:16
**motion** [5] - 3:10, 3:13, 11:21, 12:1, 12:10
**Motions** [1] - 1:9
**motions** [1] - 9:10
**moved** [2] - 21:12, 31:5
**mover** [1] - 3:10
**moving** [1] - 31:4
**MR** [19] - 3:8, 3:11, 3:18, 10:7, 10:12, 11:5, 11:9, 12:7, 13:17, 13:19, 13:22, 14:2, 24:25, 25:1, 26:10, 26:11, 26:12, 29:22, 31:19
**MS** [2] - 29:21, 30:13
**mule** [1] - 5:6
**muscled** [1] - 9:3

## N

**namely** [1] - 22:15
**NAMFCU** [8] - 4:11, 6:25, 10:5, 10:6, 10:7, 20:6, 20:7, 28:1
**necessarily** [1] - 13:24
**necessary** [1] - 13:2
**needed** [1] - 19:12

**negotiated** [1] - 30:22
**negotiations** [1] - 20:19
**negotiorum** [2] - 7:25, 8:1
**never** [6] - 15:16, 19:3, 23:8, 28:2, 30:22, 31:20
**nevertheless** [1] - 11:22
**NEW** [2] - 1:3, 3:1
**New** [18] - 1:22, 2:5, 2:9, 11:6, 16:18, 17:1, 19:16, 25:22, 26:3, 27:13, 27:21, 27:22, 27:25, 29:24, 30:16
**next** [3] - 3:3, 20:10, 23:19
**nexus** [4] - 16:7, 16:13, 21:14, 26:19
**night** [1] - 9:25
**nobody** [1] - 26:6
**noted** [1] - 14:17
**notes** [2] - 22:5, 27:17
**nothing** [1] - 16:11
**noting** [1] - 12:14
**number** [1] - 20:23
**numerous** [3] - 5:3, 7:4, 19:8

## O

**O'er** [1] - 29:7
**O'Keefe** [1] - 2:9
**obey** [1] - 29:2
**obligation** [2] - 8:24, 13:19
**obligations** [2] - 8:19, 28:25
**occasions** [2] - 9:25, 19:8
**ocean** [2] - 21:12, 24:11
**OF** [2] - 1:2, 1:12
**offer** [2] - 20:4, 20:9
**offered** [4] - 17:4, 18:17, 19:7, 30:3
**Office** [1] - 13:13
**office** [5] - 9:17, 13:6, 27:14, 30:19, 31:12
**Official** [2] - 1:20, 32:3
**old** [1] - 5:5
**once** [3] - 20:21, 21:8, 29:11
**one** [14] - 8:2, 13:3, 15:1, 16:5, 16:14, 20:15, 20:16, 21:14, 22:12, 22:23, 23:24, 26:12, 28:4, 31:13

**One** [1] - 2:4
**ones** [3] - 23:5, 28:6, 28:7
**open** [1] - 27:10
**opening** [1] - 7:19
**opponent** [1] - 11:8
**opportunity** [1] - 24:24
**opposite** [2] - 4:24, 9:24
**option** [1] - 19:3
**order** [1] - 18:17
**ordered** [2] - 27:9, 27:10
**organize** [1] - 6:2
**original** [1] - 12:24
**ORLEANS** [2] - 1:3, 3:1
**Orleans** [3] - 1:22, 2:5, 2:9
**ought** [1] - 23:8
**out-of-pocket** [1] - 4:22
**outlines** [1] - 27:19
**outset** [4] - 3:19, 3:24, 11:10, 18:24
**outside** [3] - 4:5, 7:13, 9:16
**own** [10] - 13:9, 14:10, 14:11, 15:3, 16:15, 17:3, 18:17, 18:20, 19:2, 19:5

## P

**PA** [1] - 2:13
**PACE** [10] - 15:13, 15:17, 16:10, 16:23, 17:6, 17:8, 17:10, 17:14, 18:5, 20:8
**package** [4] - 19:8, 27:16, 30:20, 30:25
**packages** [1] - 27:11
**paid** [1] - 13:15
**pains** [1] - 29:4
**paralegal** [1] - 23:17
**part** [8] - 6:2, 13:10, 14:14, 20:25, 21:2, 21:12, 23:22, 24:3
**participate** [1] - 6:1
**participated** [4] - 11:22, 20:4, 26:2, 26:23
**participation** [1] - 8:9
**particular** [2] - 22:3, 26:24
**parties** [1] - 3:17
**partner** [1] - 6:9
**passive** [1] - 13:11
**past** [1] - 30:5

**pay** [10] - 7:1, 9:2, 9:17, 10:21, 10:25, 15:22, 18:23, 21:23, 21:24, 30:21
**payable** [1] - 9:15
**pays** [1] - 15:3
**PC** [1] - 2:12
**pendency** [2] - 15:15, 18:13
**Pennsylvania** [43] - 2:12, 3:12, 3:23, 4:3, 4:6, 5:10, 6:6, 6:8, 6:21, 6:22, 7:9, 7:10, 7:11, 7:13, 8:10, 8:11, 9:1, 9:7, 9:16, 10:22, 10:23, 11:3, 13:5, 15:22, 16:4, 16:7, 16:19, 17:24, 18:5, 18:10, 22:12, 25:3, 25:15, 25:21, 25:24, 27:5, 27:20, 28:17, 29:15, 30:22, 30:23, 31:2
**Pennsylvania's** [1] - 3:15
**people** [6] - 17:18, 21:25, 23:7, 23:11
**percent** [4] - 9:2, 15:6, 18:24, 19:6
**percentage** [3] - 7:2, 8:19, 9:6
**period** [1] - 3:15
**permitted** [1] - 19:5
**perpetuated** [1] - 8:2
**person** [2] - 23:17, 29:7
**personal** [3] - 4:15, 14:19, 30:4
**perspective** [1] - 5:4
**Philadelphia** [1] - 2:13
**physicians** [1] - 17:13
**PI** [2] - 25:19, 25:21
**picture** [1] - 19:3
**piece** [1] - 17:1
**PLACITELLA** [12] - 2:11, 3:11, 11:9, 12:7, 13:17, 13:19, 13:22, 14:2, 24:25, 26:11, 29:22, 31:19
**Placitella** [5] - 2:12, 3:11, 4:4, 6:9, 11:5
**Plaintiffs'** [1] - 3:9
**plan** [1] - 17:14
**play** [1] - 15:9
**plays** [1] - 8:20
**pleadings** [1] - 13:7
**plus** [2] - 10:5, 18:1
**pocket** [1] - 4:22
**point** [9] - 9:7, 9:22, 12:14, 12:19, 14:14,

20:19, 29:22, 29:23, 30:14
**points** [1] - 12:7
**portion** [1] - 25:24
**position** [2] - 10:8, 18:24
**positive** [1] - 15:10
**PowerPoints** [1] - 21:21
**Poydras** [1] - 1:21, 2:4
**preparation** [1] - 11:12
**preparations** [1] - 13:8
**prescribe** [1] - 18:6
**present** [1] - 24:21
**presented** [1] - 5:19
**principal** [6] - 23:4, 23:5, 23:10, 23:12, 23:14, 23:16
**principals** [1] - 9:11
**principled** [1] - 21:4
**private** [4] - 20:20, 20:23, 21:5, 26:22
**privilege** [1] - 19:20
**problem** [2] - 15:23, 20:13
**proceedings** [1] - 31:23
**PROCEEDINGS** [1] - 1:12
**Proceedings** [1] - 1:25
**produce** [2] - 6:23, 8:16
**produced** [2] - 6:15, 7:8
**product** [5] - 9:10, 14:17, 29:24, 31:15, 31:20
**PRODUCTS** [1] - 1:8
**Products** [1] - 3:4
**professional** [2] - 25:9, 28:19
**professionalism** [1] - 28:23
**professionally** [1] - 28:24
**profit** [6] - 22:13, 22:22, 22:24, 23:1, 23:2, 23:11
**profited** [1] - 24:11
**program** [1] - 17:19
**pronunciation** [1] - 26:20
**proof** [1] - 17:2
**proofs** [3] - 16:11, 18:7, 18:10
**proposed** [1] - 20:23
**proposition** [1] - 15:1

**protect** [2] - 5:4, 5:5
**proud** [1] - 28:10
**prove** [6] - 16:10, 16:14, 16:21, 17:5, 17:6, 17:7
**provide** [1] - 27:10
**provided** [3] - 8:1, 18:11, 30:20
**PSC** [24] - 2:8, 3:13, 11:16, 11:25, 13:14, 14:18, 14:21, 15:12, 15:15, 16:7, 16:11, 17:4, 17:12, 17:24, 18:11, 18:13, 18:16, 19:16, 19:20, 21:10, 23:4, 23:6, 25:3
**PSC's** [1] - 22:14
**PTO** [2] - 6:19, 6:20
**PTOs** [1] - 8:8
**pull** [3] - 5:6, 5:7, 21:18
**pulled** [2] - 8:12, 21:19
**pulling** [1] - 23:7
**pure** [2] - 8:6, 25:6
**put** [6] - 9:13, 11:12, 17:9, 17:20, 19:4, 26:13
**putting** [3] - 14:4, 16:2, 21:16

## Q

**questions** [2] - 5:9, 7:6
**quote** [2] - 15:2, 29:7

## R

**R-E-S** [1] - 26:20
**ran** [1] - 17:19
**Randy** [1] - 30:18
**raw** [4] - 29:25, 30:25, 31:14
**re** [1] - 3:4
**RE** [1] - 1:8
**reaches** [1] - 29:12
**read** [3] - 18:22, 26:1, 29:23
**reading** [1] - 16:6
**real** [1] - 15:22
**reality** [1] - 3:25
**realized** [2] - 20:12, 20:13
**really** [20] - 4:8, 9:3, 11:15, 11:20, 11:25, 12:4, 12:5, 12:12, 12:18, 15:12, 15:24, 22:6, 22:11, 23:5, 23:15, 24:2, 25:25,

27:20, 28:17, 28:23
**reason** [2] - 19:2, 30:7
**rebut** [1] - 24:24
**receive** [8] - 5:11, 5:12, 7:3, 8:10, 9:1, 26:9, 26:22, 27:5
**received** [4] - 7:9, 9:1, 19:15, 27:5
**recess** [1] - 31:22
**recognition** [2] - 8:16, 8:22
**recognize** [1] - 8:23
**recognized** [2] - 15:5, 29:1, 29:10
**recognizing** [1] - 8:18
**record** [3] - 3:7, 26:1, 29:23
**Recorded** [1] - 1:25
**recount** [1] - 25:18
**recovery** [3] - 4:7, 7:15, 10:5
**reflective** [1] - 11:11
**refuse** [2] - 6:25, 25:14
**refused** [1] - 19:8
**regard** [3] - 12:15, 13:12, 21:7
**regulate** [2] - 25:10, 25:11
**reimbursement** [2] - 12:13, 16:1
**relate** [1] - 22:6
**reliance** [1] - 8:7
**rem** [1] - 7:24
**remained** [1] - 20:9
**remains** [1] - 12:12
**remand** [1] - 11:21, 12:10
**remember** [2] - 27:1, 27:2
**removal** [1] - 12:1
**removed** [1] - 30:8
**rendering** [1] - 22:21
**repeatedly** [1] - 11:22
**Reporter** [2] - 1:20, 32:3
**reports** [7] - 5:11, 5:18, 18:18, 18:22, 19:1, 19:4, 21:22
**represent** [4] - 9:7, 11:23, 14:9, 28:16
**representatives** [2] - 22:23, 23:2
**represented** [2] - 22:1, 22:2
**representing** [4] - 6:21, 8:23, 13:4, 15:20
**request** [3] - 5:10, 5:12, 6:6

**requested** [2] - 5:19, 14:13
**requests** [2] - 6:23, 7:5
**requirement** [2] - 20:6, 20:8
**res** [3] - 26:18, 26:19
**research** [1] - 19:19
**researched** [1] - 12:6
**resist** [1] - 4:14
**resolution** [4] - 9:11, 16:8, 21:10, 28:9
**resolve** [4] - 9:23, 10:1, 24:13
**resolved** [1] - 3:16
**resources** [1] - 11:19
**respect** [5] - 4:5, 11:13, 11:24, 14:7, 30:8
**respectfully** [1] - 15:21
**responsibilities** [1] - 28:20
**responsibility** [2] - 10:25, 25:9
**responsible** [1] - 21:10
**restricted** [1] - 17:20
**result** [1] - 26:24
**results** [1] - 15:4
**review** [1] - 4:17
**reviewed** [1] - 21:22
**rider** [1] - 15:3
**RMR** [1] - 1:20
**road** [1] - 19:12
**Robinson** [1] - 4:20
**Roman** [1] - 8:1
**Romeo** [1] - 29:6
**Roth** [2] - 2:12, 5:25
**Rule** [1] - 8:14
**ruled** [2] - 12:9, 12:20
**RUSS** [1] - 2:8
**Russ** [3] - 3:9, 24:23, 25:1
**Russ's** [1] - 19:23

**S**

**salient** [1] - 4:18
**sanctity** [1] - 5:4
**Sanford** [1] - 4:20
**saw** [1] - 31:20
**scales** [1] - 26:25
**scars** [1] - 28:6
**Schultz** [2] - 5:25, 6:11
**science** [1] - 5:19
**search** [1] - 24:14
**secured** [1] - 16:18
**see** [6] - 11:15, 16:12,

18:18, 22:10, 24:8, 29:1
**seeing** [1] - 12:9
**seek** [3] - 8:6, 8:7, 22:12
**seeking** [1] - 3:13
**seeks** [1] - 27:4
**select** [1] - 21:5
**self** [1] - 13:8
**send** [2] - 31:9
**sense** [2] - 8:6, 23:3
**sent** [1] - 19:23
**separate** [1] - 13:24
**service** [1] - 22:21
**serving** [1] - 9:11
**sets** [1] - 28:9
**settlement** [1] - 6:25
**setup** [1] - 17:10
**several** [1] - 27:23
**share** [2] - 23:14, 25:14
**Shell** [1] - 2:4
**shoulder** [3] - 13:23
**shows** [1] - 18:10
**side** [1] - 15:12
**sign** [5] - 6:9, 18:21, 18:22, 23:17
**significant** [8] - 12:21, 14:6, 14:16, 14:23, 14:25, 16:22, 24:13, 28:11
**similar** [1] - 4:1
**simple** [1] - 30:6
**simply** [1] - 8:15
**single** [4] - 15:14, 15:16, 17:1, 18:12
**sister** [1] - 27:25
**situation** [3] - 4:11, 4:12, 15:10
**six** [3] - 18:23, 19:6, 25:18
**Snedden** [1] - 20:11
**sold** [1] - 14:18
**someone** [1] - 15:2
**sometimes** [1] - 22:23
**somewhat** [1] - 11:17
**somewhere** [2] - 4:23, 4:24
**sorry** [1] - 30:13
**sort** [4] - 26:1, 26:8, 28:7, 29:7
**source** [1] - 30:18
**sovereignty** [1] - 21:17
**Special** [5] - 6:4, 20:24, 20:25, 28:16, 29:13
**special** [2] - 6:6, 24:21
**spend** [1] - 10:13

**Square** [1] - 2:4
**stage** [1] - 28:9
**stand** [5] - 13:4, 19:9, 20:16, 21:3, 26:3
**standing** [1] - 11:25
**standpoint** [1] - 22:17
**stands** [2] - 14:25, 31:22
**start** [1] - 11:17
**started** [1] - 20:20
**starting** [1] - 16:25
**state** [9] - 13:5, 15:21, 17:14, 17:23, 18:5, 23:22, 23:24, 27:25
**state-funded** [1] - 17:14
**statement** [1] - 7:19
**states** [4] - 4:12, 7:1, 8:18, 8:23
**STATES** [2] - 1:1, 1:14
**steering** [1] - 3:21
**Steering** [1] - 3:9
**Stenography** [1] - 1:25
**still** [4] - 7:4, 11:23, 18:25, 21:7
**stood** [2] - 13:23, 18:4
**straight** [1] - 29:8
**Street** [3] - 1:21, 2:4, 2:12
**stroke** [1] - 27:7
**stuff** [2] - 20:17, 24:21
**subject** [5] - 12:2, 12:4, 12:11, 12:23, 14:6
**submissions** [2] - 14:10, 14:15
**submit** [4] - 12:23, 18:7, 21:9, 21:14
**substantial** [1] - 26:10
**successfully** [1] - 3:16
**succinctly** [1] - 4:18
**sui** [1] - 15:14
**Suite** [2] - 2:4, 2:13
**supplemental** [1] - 12:25
**supplemented** [1] - 31:11
**support** [1] - 14:16
**Susan** [2] - 32:3, 32:7
**SUSAN** [2] - 1:20, 32:6
susan_zielie@laed. uscourts.gov [1] - 1:22

**T**

**table** [2] - 18:4
**TAC** [4] - 17:11, 17:12, 17:13, 17:15

**taxed** [1] - 23:9
**taxing** [1] - 10:9
**ten** [1] - 6:23
**term** [1] - 7:25
**terms** [2] - 7:23, 12:22
**testimony** [1] - 24:7
**Texas** [1] - 5:5
**THE** [21] - 1:1, 1:2, 1:13, 3:3, 3:6, 3:13, 10:4, 10:8, 11:4, 11:8, 12:6, 13:16, 13:18, 13:21, 14:1, 22:8, 26:9, 29:20, 30:12, 31:17, 31:21
**themselves** [3] - 13:25, 21:20, 26:13
**theories** [2] - 5:19, 21:20
**theory** [1] - 7:21
**therefore** [2] - 10:11, 27:7
**they've** [7] - 8:22, 9:8, 9:9, 11:12, 13:20, 13:21
**three** [4] - 7:19, 22:23, 26:3, 27:14
**throughout** [2] - 28:13
**tide** [1] - 24:12
**today** [1] - 22:7
**together** [2] - 21:23, 21:25
**took** [2] - 16:25, 27:17
**top** [1] - 6:22
**total** [1] - 4:22
**totally** [1] - 17:14
**track** [1] - 7:5
**TRANSCRIPT** [1] - 1:12
**transcript** [2] - 26:2, 32:4
**transferred** [1] - 30:9
**travel** [1] - 6:6
**treated** [1] - 29:2
**trial** [9] - 5:20, 9:10, 14:12, 18:8, 19:8, 27:11, 27:16, 30:20, 30:24
**trials** [1] - 25:18
**tried** [3] - 15:19, 20:14, 26:16
**true** [2] - 8:5, 8:18
**trusted** [1] - 21:4
**truth** [2] - 16:22, 17:8
**try** [2] - 19:2, 26:13
**trying** [1] - 31:7
**tune** [1] - 20:12
**turns** [1] - 19:24
**twenty** [1] - 9:2
**twenty-five** [1] - 9:2

**twice** [2] - 23:9, 28:4
**two** [6] - 21:16, 22:11, 22:15, 22:23, 30:3, 30:24

**U**

**ultimately** [1] - 20:21
**uncomfortable** [1] - 11:17
**uncompensated** [1] - 4:25
**under** [5] - 8:12, 8:15, 8:25, 9:14, 26:22
**undertaken** [1] - 13:20
**unfair** [1] - 10:22
**UNITED** [2] - 1:1, 1:14
**unjust** [4] - 7:21, 7:22, 7:24, 8:5
**unless** [3] - 12:5, 18:23, 19:5
**unlike** [1] - 17:10
**unravel** [1] - 23:25
**up** [9] - 9:13, 13:1, 15:8, 18:11, 21:6, 23:17, 26:12, 28:24, 30:14
**Utah** [1] - 7:3

**V**

**validated** [1] - 9:21
**various** [1] - 5:19
**verify** [1] - 30:1
**verso** [1] - 7:24
**versus** [1] - 13:24
**victory** [1] - 28:7
**video** [1] - 27:24
**VIOXX** [9] - 1:8, 3:4, 11:19, 16:14, 16:22, 17:8, 17:9, 18:6, 21:9
**volunteer** [1] - 5:14

**W**

**walk** [1] - 27:16
**wants** [1] - 12:5
**wave** [2] - 5:15, 26:14
**WEDNESDAY** [1] - 3:1
**weigh** [1] - 30:11
**weight** [1] - 21:18
**Weinberg** [3] - 5:25, 27:4, 30:23
**whatsoever** [2] - 10:7, 15:13
**willing** [3] - 10:24, 11:3
**win** [3] - 16:3, 28:5, 28:7

**winning** [1] - 28:8
**witches** [1] - 7:20
**withdrew** [1] - 26:15
**witness** [3] - 17:25,
  21:3, 27:7
**witnesses** [1] - 26:6
**world** [1] - 20:15
**worth** [1] - 12:14
**worthwhile** [1] - 12:8
**wrongfully** [1] - 30:8
**wrote** [1] - 12:15

## Y

**York** [9] - 19:16,
  27:13, 27:21, 27:22,
  27:25, 29:24, 30:16

## Z

**zero** [1] - 20:9
**ZIELIE** [2] - 1:20, 32:6
**Zielie** [2] - 32:3, 32:7