1              IN THE UNITED STATES DISTRICT COURT FOR

2                 THE EASTERN DISTRICT OF LOUISIANA

3                         AT NEW ORLEANS

4

5   IN RE:  VIOXX PRODUCTS              ) Case No. MDL 1657 "L"
    LIABILITY LITIGATION               ) March 8, 2013
6                                      ) *Daubert* Motions
    _____    )
7

8

9                    TRANSCRIPT OF PROCEEDINGS

10              BEFORE THE HONORABLE ELDON E. FALLON

11                  UNITED STATES DISTRICT COURT

12

13

14

15

16

17   SUSAN A. ZIELIE, RMR, FCRR
     Official Court Reporter
18   HB 406
     500 Poydras Street
19   New Orleans, Louisiana 70130
     susan_zielie@laed.uscourts.gov
20   504.589.7781

21

22   Proceedings Recorded by Computer-aided Stenography.

23

24

25

```
 1   APPEARANCES:

 2

 3   Plaintiff Liaison Counsel:        ANN OLDFATHER, ESQ.
                                       MEGAN HASTINGS, ESQ.
                                       Oldfather Law Firm
 4                                     1330 South Third Street
                                       Louisville KY 40208
 5                                     502.637.7200

 6
                                       LEONARD DAVIS
 7                                     HERMAN HERMAN KATZ
                                       820 O'Keefe Avenue
 8                                     New Orleans LA 70130
                                       504.581.4892
 9

10   For Merck:                        JOE TOMASELLI, ESQ.          09:07:5
                                       2515 McKinney Avenue
11                                     Suite 1250
                                       Dallas TX 75201
12                                     214.880.9903

13
                                       PAUL BOEHM, ESQ.            09:07:4
14                                     3419 W Shaw Avenue
                                       Fresno CA 93711-3204
15                                     589.276.8078

16
     For Merck:                        DOUGLAS MARVIN, ESQ.
17                                     Williams & Connolly
                                       725 12th Street NW
18                                     Washington DC 20005
                                       202.434.5000
19
                                       DOROTHY H. WIMBERLY, ESQ.
20                                     Stone Pigman
                                       546 Carondelet Street
21                                     New Orleans LA 70130
                                       504.593.0849
22

23

24

25
```

```
 1              NEW ORLEANS, LOUISIANA; FRIDAY, MARCH 13, 2013        08:59:4

 2                           9:00 A.M.                               08:59:5

 3              THE COURT:  Good morning, ladies and gentlemen.      09:05:1

 4                   Go ahead and call the case.                     09:07:1

 5              CASE MANAGER:  MDL 05-1657, in re:  VIOXX Products    09:07:1

 6    Liability litigation.                                         09:07:2

 7              THE COURT:  Counsel, please state your appearances.  09:07:2

 8              MS. OLDFATHER:  Ann Oldfather for the VTE plaintiffs. 09:07:2

 9              MS. HASTINGS:  Megan Hastings for the VTE plaintiffs. 09:07:3

10              MR. DAVIS:  Morning, Your Honor.  Leonard Davis on    09:07:3

11    behalf of Plaintiff's Steering Committee and plaintiffs' liaison 09:07:4

12    counsel.                                                       09:07:4

13              MR. TOMASELLI:  Joe Tomaselli and Tom Boehm for Merck. 09:07:4

14              MR. MARVIN:  Morning, Your Honor.  Douglas Marvin for 09:07:5

15    Merck.                                                         09:07:5

16              MS. WIMBERLY:  And Dorothy Wimberly for Merck.        09:07:5

17              THE COURT:  We are here for the motion on the VTE     09:08:0

18    cases.  The motions really are Daubert issues.                 09:08:0

19                   I've received from the parties depositions.  I   09:08:0

20    have received reports from the experts that are being questioned 09:08:0

21    and that will be a part of this record.  And now I'm hearing    09:08:1

22    oral argument.                                                 09:08:2

23                   Both sides have Daubert issues with the other    09:08:2

24    side's expert, and I've had an opportunity to review all of the 09:08:2

25    documents that they've given to me.  And now I'll hear from the 09:08:3
```

1   parties.                                                              09:08:3

2          MR. BOEHM:   Good morning again, Your Honor.   Paul Boehm   09:08:3

3   for Merck.                                                            09:08:4

4          My partner, Mr. Marvin, was kind enough to                     09:08:4

5   introduce me to the Court, and I was here for the last status         09:08:4

6   conference.   But I've actually been in your courtroom before.        09:08:5

7   About eight years ago, I sat somewhere toward the back of the         09:08:5

8   courtroom a couple of weeks before we started the first VIOXX         09:08:5

9   MDL trial.   We'd come together for about a day and a half to          09:09:0

10  discuss various *Daubert* motions.   And I recall -- and I've since   09:09:0

11  gone back to the transcripts to confirm -- that Your Honor            09:09:0

12  essentially took turns from defense lawyers and then plaintiffs'      09:09:1

13  lawyers.                                                              09:09:1

14         Their experts were all really looking at the same             09:09:1

15  data.   They were all doing similar kind of analyses.   And now       09:09:1

16  they were there quarrelling about the conclusions and not            09:09:2

17  methodology.   And you explained to the parties that that's not       09:09:2

18  what *Daubert*'s about.                                              09:09:2

19         Merck's motion to exclude plaintiffs' experts in              09:09:2

20  this matter is different.   This is not a situation where Drs.        09:09:3

21  Zambelli-Weiner and Brooks have reviewed the right data, taken       09:09:3

22  the right steps and simply arrived at the wrong conclusions.         09:09:4

23         Merck's motion is focused on actual specific                  09:09:4

24  methodological error.   And, Your Honor, I will address three of      09:09:4

25  them today.                                                          09:09:5

1      Number one, the exclusion of placebo controlled

2   data.

3           Number two, reliance on un-adjudicated event

4   reports rather than on available adjudicated data.

5           And finally, Your Honor, the issue of statistical

6   significance.

7           THE COURT:  And you're talking now about the

8   Zambelli-Weiner --

9           MR. BOEHM:  Yes, Your Honor.  I'll start off by

10  focusing on the so-called pooled analysis from Drs. Zambelli and

11  Brooks, and then have some opening comments about the other

12  three experts the plaintiffs have put forward in this matter.

13           Drs. Zambelli-Weiner and Brooks excluded from

14  their pooled analysis 11 placebo controlled studies.  And I

15  listed each of those 11 protocols up on the screen.

16           If you take the patients from all of these 11

17  protocols and add them up, you come to a number that exceeds

18  13,000 patients.  That's more than half of the total available

19  placebo controlled clinical trial data for VIOXX.

20           One study in particular may stand out to Your

21  Honor, Protocol 122.  That's the APPROVe study.  That's not

22  included in their pooled analysis.

23           Your Honor, as you know, that's the study that led

24  to the VIOXX's withdrawal in the fall of 2004.  That's the study

25  that sat at the center of plaintiffs' claims for nearly a

1    decade.                                                      09:11:2

2              That's the study that Dr. Zambelli-Wiener admitted  09:11:2

3    in her deposition, had she included just that one study of the  09:11:3

4    11, it would have flipped the results with respect to pulmonary  09:11:3

5    embolism with respect to their pooled analysis.                09:11:3

6              Plaintiffs don't dispute that they excluded these   09:11:4

7    studies in this analysis.  Their response is:  So what, active  09:11:4

8    comparator data is just as good as placebo controlled data, and  09:11:4

9    they looked at some of that.                                   09:11:5

10             Well, that's wrong, and I want to get to that in     09:11:5

11   just a minute.  But let's just first entertain the argument that  09:11:5

12   active comparator data is just as good as placebo controlled     09:11:5

13   data.                                                          09:12:0

14             Assume that it is, and it's good enough to include   09:12:0

15   in the pooled analysis, and you want to include them, how does  09:12:0

16   that in any way justify or warrant the exclusion of these 11    09:12:0

17   placebo controlled studies, 13,000 patients' worth of placebo   09:12:1

18   controlled data?                                               09:12:1

19             Plaintiffs have this statement in their opposition   09:12:2

20   brief about the importance of looking at all of the data.  In   09:12:2

21   fact, they have a couple of pages that talks about that.  Well,  09:12:2

22   if that's what you want to do, why exclude these data?          09:12:2

23             We asked Drs. Zambelli and Brooks why it was they    09:12:3

24   came to a design that would exclude 11 placebo controlled       09:12:3

25   studies.  And, Your Honor, they had a couple of different       09:12:4

```
 1    explanations.                                              09:12:4

 2                 The first had to do with time and budgetary   09:12:4

 3    constraints, and we don't know if we're going to hear more about  09:12:4

 4    that from Ms. Oldfather today or not.  But the case law is  09:12:5

 5    crystal clear:  Time and budgetary constraints do not excuse  09:12:5

 6    methodological error for purposes of Daubert.              09:13:0

 7                 There's also been a suggestion that           09:13:0

 8    Drs. Zambelli-Weiner and Brooks decided which studies they were  09:13:0

 9    going to include and which studies they were going to exclude  09:13:1

10    ahead of time.  They refer to this as a priori, so-called a  09:13:1

11    priori exclusion criteria.  Well, we asked Drs. Zambelli-Weiner  09:13:2

12    and Brooks about that, too.  And neither of them was able to  09:13:2

13    actually tell us when they arrived at their decisions about  09:13:3

14    which studies to include or exclude.  They just couldn't say,  09:13:3

15    they couldn't remember.  We know from their depositions that  09:13:3

16    they were looking at abstracted data from some of these studies,  09:13:4

17    though, just a couple of weeks before they gave us their report,  09:13:4

18    including the APPROVe study.                               09:13:4

19                 Let's return back up just a moment and talk about  09:13:5

20    this idea that active comparator data and placebo controlled  09:13:5

21    data are really the same thing.  That's just wrong.  Plaintiffs'  09:13:5

22    own experts agree that that's just wrong.                  09:14:0

23                 Dr. Zambelli-Wiener herself, one of the architects  09:14:0

24    of this pooled analysis, testified that placebo controlled data  09:14:1

25    is cleaner for purposes of establishing a baseline risk between  09:14:1
```

1    a product and the possibility of an alleged injury.  She said     09:14:2

2    that using active comparator data -- as Your Honor knows, that     09:14:2

3    that means not a placebo but some other active agent.  In this     09:14:2

4    case, diclofenac, nabumetone or naproxen -- using an active     09:14:3

5    comparator can bias the results, she testified.     09:14:3

6              And the reason is simple.  If you have VIOXX that     09:14:3

7    does nothing, and an active comparator that might actually lower     09:14:4

8    the risk of VTE, then there's going to appear a difference.     09:14:4

9              Dr. Zambelli-Weiner testified that that was in     09:14:5

10   fact a possibility here.  Not just in the abstract, but with     09:14:5

11   respect to these very comparators, that might be happening.  But     09:14:5

12   neither she nor Dr. Brooks did anything to investigate that     09:15:0

13   possibility.     09:15:0

14             Dr. Spyropoulus -- we'll talk about him in a     09:15:0

15   minute -- but he had a lot to say about the Zambelli-Weiner     09:15:1

16   approach to pooled analysis.  And one of the things he said was     09:15:1

17   that the placebo controlled data is the best data to look at to     09:15:1

18   establish baseline absolute risk.     09:15:2

19             Active comparator data can tell you relative risk     09:15:2

20   between two different agents, but not baseline risk.  And that's     09:15:2

21   why you look to that to determine whether or not a product     09:15:2

22   actually causes an injury.     09:15:3

23             The Reference Manual on Scientific Evidence agrees     09:15:3

24   with plaintiffs' experts.  Plaintiffs cited the Reference Manual     09:15:3

25   on Scientific Evidence in their brief but left out the part     09:15:3

```
1    where placebo controlled data is referenced as the data you look    09:15:4
2    to to establish baseline risk.                                       09:15:4
3              And, Your Honor, we've cited the case from Arizona         09:15:4
4    from 2001, Cloud vs. Pfizer.  In that case, plaintiff's expert       09:15:5
5    was trying to advance general causation opinions based on active     09:15:5
6    comparator data, Zoloft versus some other active comparator.         09:16:0
7    And the Court ruled that those opinions were not admissible.         09:16:0
8    Among other errors, it was not appropriate to rely on active         09:16:1
9    comparator data instead of placebo controlled data.                 09:16:1
10             Plaintiffs have offered no scientifically                  09:16:2
11   justifiable explanation for the exclusion of these data.  That      09:16:2
12   is a methodological error.                                           09:16:2
13        THE COURT:  If the placebo controlled data is collected        09:16:2
14   in such a way that it doesn't deal with VTE and its focus is on      09:16:3
15   arteries, what's the situation there?  What part of their           09:16:4
16   argument is that there was no attempt, no program that focused      09:16:5
17   on VTEs so that that data didn't address those issues?             09:16:5
18        MR. BOEHM:  I know the plaintiffs have raised some             09:17:0
19   issues about the power of the studies.                              09:17:0
20        THE COURT:  Yes.                                               09:17:0
21        MR. BOEHM:  They questioned whether or not the studies        09:17:0
22   were counting all of the events.                                    09:17:0
23             As I understand their argument, that really goes          09:17:1
24   to the decision about whether or not you need to use this          09:17:1
25   multiplier.                                                         09:17:1
```

```
 1              Issues about statistical significance.

 2   Plaintiffs' own experts are relying on VIOXX clinical trial

 3   data.   That's what they're relying on for this pooled analysis.

 4   They are simply excluding 11 of them, the placebo controlled

 5   trials.

 6              So, with respect to the exclusion of placebo

 7   controlled data, I don't see how that connects with the idea

 8   that somehow the studies were counting all of the events.

 9              The second issue I wanted to address, Your Honor,

10   has to do with Dr. Zambelli-Weiner and Brooks' reliance on

11   un-adjudicated event reports instead of available adjudicated

12   data.

13              It's worth pausing for a moment to talk about what

14   the adjudication is.   I know that Your Honor's familiar with the

15   concept.

16              Adjudication involves bringing in independent

17   subject matter experts to review reported events to determine

18   whether or not those events actually occurred; and, if so, what

19   they were.   In this case, these would be experts in clotting

20   events.

21              They're blinded.   That's important.   What that

22   means is they don't know when they review a reported event

23   whether or not the patient who had the event was using VIOXX,

24   placebo or something else.   So it requires that they simply

25   apply their objective expertise to make a judgment.
```

1    Dr. Spyropoulus, again, plaintiffs' own expert,

2  testified at length about the importance of adjudication.  He

3  said it was methodologically the most stringent way to conduct a

4  clinical trial.  He called it one of the most important steps,

5  data -- adjudicated data are, quote, more reliable.  He referred

6  to un-adjudicated data as dirty data.

7    And he said that the FDA prefers adjudicated data.

8  That's true.  We've cited for the Court guidance from the FDA on

9  this subject.  The FDA says that adjudication ensures that the

10  data are as accurate and free of bias as possible.

11    Let's talk about plaintiffs' response for just a

12  moment.

13    Your Honor, for a very small number of the

14  earliest VIOXX clinical trials, the adjudication procedure was

15  not yet in place.  So, for those very few studies, adjudicated

16  data is not available.

17    What Drs. Zambelli-Weiner and Brooks are

18  essentially saying is that, because you only have un-adjudicated

19  data available for this small number of studies, we need to use

20  the inferior un-adjudicated for all of the other studies as

21  well.

22    That doesn't make any sense.  As a scientific

23  matter, you use the best data that you have available.

24    Plaintiffs have cited a couple of examples where

25  the FDA or Merck have actually used un-adjudicated data.  But

1   what they failed to note in their brief was that, in each of

2   those instances, un-adjudicated data was being used only because

3   adjudicated data was not available.

4           The use of un-adjudicated data to the exclusion of

5   adjudicated data, data that the scientific community broadly

6   agrees is more reliable, better and more scientifically sound,

7   is a methodological flaw.

8           Let me turn to the issue of statistical

9   significance.

10          From a methodological standpoint, and from a

11  *Daubert* standpoint, statistical significance is a precondition

12  of admissibility.

13          Your Honor would be familiar with the *Brock* case

14  from the Fifth Circuit, which found that experts can't base

15  general causation opinions on statistically insignificant

16  results.  Your Honor came to a similar finding in the *Wagoner*

17  case.

18          *Brock* explains what statistical significance is.

19  It's tied to the idea of confidence intervals.

20          Confidence intervals are the numbers that surround

21  the estimated risk ratio.  The wider those confidence intervals

22  are, the less certainty there is about predicting or quantifying

23  the possibility of a risk.  And, importantly, if the lower end

24  of the confidence interval touches 1.0 or it goes below 1.0,

25  then as a scientific matter that result is statistically

1    insignificant.

2            So let's set aside the exclusion of these 11

3    trials for a moment, and set aside the reliance without

4    scientific justification on un-adjudicated data rather than

5    adjudicated data, and look simply at the results that Drs.

6    Zambelli-Weiner and Brooks came to using their own methodology.

7            This is Table 6 from their report.  Table 6

8    depicts the incident rates for a variety of different events.

9    Again, excluding the studies they excluded and using the

10   un-adjudicated data, these are the numbers they came to.

11           And we're concerned with two of those categories

12   of events because they are the VTEs.  First, deep vein

13   thrombosis.  And, second, pulmonary embolism.

14           And, if you go to the third column, it says:  Rate

15   ratio and 95 percent CI.  And, that 95 percent CI, that means

16   confidence interval.

17           For deep vein thrombosis, the rate ratio they came

18   to is 1.49.

19           But look at the confidence.  On the high end, it's

20   3.55.  On the low end, it's 0.65.  That's well below 1.0.  Not

21   statistically significant.  And, frankly, Your Honor, not even

22   that close.

23           For pulmonary embolism, the risk ratio is 3.57.

24           But look at those confidence intervals.  Look how

25   wide they are.  0.45 all the way up to 88.23.  Not remotely

1   statistically significant.                                           09:23:4

2           Now, plaintiffs have suggested that statistical            09:23:4

3   significance is actually not all that important for purposes of     09:23:5

4   *Daubert*.  That's not true, and we've cited to the case law that    09:23:5

5   establishes that that's not the case.                               09:23:5

6           And I think that, at the end of the day,                    09:24:0

7   plaintiffs' counsel really understands that.  Because Drs.          09:24:0

8   Zambelli-Weiner and Brooks didn't stop here.  They recognized       09:24:0

9   and they admitted in their depositions that these results were      09:24:1

10  not statistically significant.  And so they took the numbers of     09:24:1

11  the actual events, 15, 9, 4, 1, and they multiplied those           09:24:1

12  numbers by factors of 10 and then 30.                               09:24:2

13          So where did they come to the 10 and 30                     09:24:3

14  multiplier?  Well, they get those numbers from, again, the other    09:24:3

15  expert for plaintiffs, Dr. Spyropoulus.                             09:24:4

16          Where does Dr. Spyropoulus get the numbers?  Well,          09:24:4

17  he's relying on a publication that was authored by Dr. Mark         09:24:4

18  Crowther.  Your Honor will be familiar with that name.  We're       09:24:5

19  going to talk about him a little bit later, because he is one of    09:24:5

20  Merck's experts in this matter.                                     09:24:5

21          And, when he saw what they had done with his                09:25:0

22  publication, he prepared a rebuttal report and said that it was     09:25:0

23  scientifically inappropriate to apply these factors in the way      09:25:0

24  that Drs. Zambelli-Weiner and Brooks have tried to do.              09:25:1

25          As an initial matter, if you look at his                    09:25:1

1   publication, it had to do with surgical and hospitalized

2   patients, patients who are already at an increased risk of

3   suffering from a VTE event.  Not ambulatory patients.  Not

4   people who are walking around.  Not the patients who have been

5   enrolled into the VIOXX clinical trials.

6           And, even in those patients, even in the

7   hospitalized and surgical patient population, the ratio,

8   Dr. Spyropoulus agreed, could be as low to 2 to 1.  Not 10 to 1.

9   Not 30 to 1.

10          When we asked Dr. Spyropoulus in his deposition

11   whether or not it would be pure speculation to the apply the 30

12   multiplier to the VIOXX clinical population, he agreed that it

13   would be pure speculation.

14          And when we asked him, well, do you have any data

15   that might tell us what the right ratio would be for the

16   patients who were actually enrolled in the VIOXX clinical

17   trials, he said that he didn't.

18          The multipliers in this case are purely

19   speculative.

20          But, Your Honor, may I submit that, even if they

21   weren't purely speculative, there is no precedent for applying

22   multipliers in this manner, to try to transform a statistically

23   insignificant study result into a statistically significant one.

24          And, as a practical matter, if that were

25   permissible, the concept of statistical significance would cease

1    to have any meaning whatsoever, because you could always come to

2    the right factor by which you should multiply these numbers to

3    shrink the confidence intervals to make it a statistically

4    significant result.  All you have to do is pick the right

5    number.  That's not good science and there's no precedence for

6    it.  It's a methodological error of the highest order.

7                Well, Your Honor, as we noted at the beginning,

8    plaintiffs have three other experts.

9                Dr. Spyropoulus.  We've talked about him, because

10   he basically advocated for all of our criticisms of the Drs.

11   Zambelli-Weiner and Brooks' pooled analysis during his

12   deposition.

13               He, too, looked at the clinical trial data.  He

14   looked at the placebo controlled clinical trials, because he

15   again thought that those were the most reliable data to look to

16   to establish a baseline risk.

17               Dr. Spyropoulus testified that, when he looked at

18   the clinical trials, he couldn't find any association between

19   VIOXX and VTE, much less a causal association.

20               Plaintiffs' other two experts, Dr. Olyaei and

21   Dr. Lucchesi, didn't look at the clinical trials for VIOXX for

22   purposes of evaluating VTE at all.  They looked mostly at the

23   issue of biological plausibility.  And, as Your Honor is aware,

24   under Fifth Circuit jurisprudence, biological plausibility is

25   simply not sufficient to establish general causation without

1    statistically significant epidemiological support.                      09:28:3

2              We could go into more detail about these three              09:28:3

3    experts if Your Honor wishes or if Your Honor has any questions,       09:28:3

4    but I'm inclined to rest on the papers with respect to those          09:28:4

5    three, for the most part.  Because plaintiffs' theory about           09:28:4

6    general causation ultimately rises and falls on the shoulder of       09:28:4

7    Drs. Zambelli-Weiner and Brooks' so-called pooled analysis.           09:28:5

8              And, Your Honor, it falls.  It excluded 11 placebo          09:28:5

9    controlled studies without scientific justification.                  09:29:0

10             They've relied on un-adjudicated event reports,             09:29:0

11   rather than on what everybody in the scientific community agrees      09:29:0

12   is superior data in the form of adjudicated events.                   09:29:1

13             And, finally, the results don't reach the                   09:29:1

14   statistical significance in spite of even all those                   09:29:1

15   methodological errors.  That's a threshold issue under *Daubert*.     09:29:1

16        THE COURT:  What do you say about Lucchesi?                      09:29:2

17        MR. BOEHM:  Your Honor, as I mentioned, Dr. Lucchesi            09:29:2

18   did not review the VIOXX clinical trials.  So he can't comment        09:29:3

19   about those at all.                                                   09:29:3

20             He looked at test tube studies to formulate                09:29:3

21   opinions regarding biological plausibility.                          09:29:3

22             Now, in our view, Your Honor, Dr. Markese's               09:29:4

23   opinions about biological plausibility are completely wrong and      09:29:4

24   misguided.  But we're not making that argument today because        09:29:4

25   this is a *Daubert* motion hearing.                                   09:29:5

1        At the end of the day, Dr. Lucchesi's opinions

2   about what COX-2, where COX-2 might be in the body, and where

3   tissue factor and how tissue factor and thrombomodulin might be

4   affected by VIOXX, are issues for cross examination.

5        Our experts disagree with him about that.  The

6   literature, we believe, disagrees with him and his conclusions.

7   But those are arguments about conclusions.

8        For purposes of *Daubert*, to the extent

9   Dr. Lucchesi wants to say that he's looked at these test tube

10  studies and so that now he can draw conclusions, ultimate

11  conclusions, about general causation, that would be a

12  methodological error.  So, to the extent plaintiffs want to use

13  Dr. Lucchesi to do that, those opinions should be excluded under

14  *Daubert*.

15       Unless Your Honor has any more questions.

16            THE COURT:  No.

17       Let me hear response.

18            MS. OLDFATHER:  Your Honor, we have some supplemental

19  materials that are in the record, but we'd like to just make

20  them handy for reference.  I have a copy for Katy and a copy for

21  the Court.

22            THE COURT:  Do they have a copy?

23            MS. OLDFATHER:  Yes.  I've given them.

24       Just a moment to set up my computer, Your Honor.

25            THE COURT:  Sure.

```
 1              (Pause in proceedings.)                      09:31:4

 2         MS. OLDFATHER:  I have my mouse pad, the Journal of  09:31:4

 3    Medicine, Judge.  I want to get some points for that.   09:32:2

 4         THE COURT:  The thrust of his argument is directed at  09:32:3

 5    the Zambelli-Weiner report.  He feels, apparently, that that  09:32:3

 6    report is the foundation of all the other experts that you  09:32:4

 7    suggest in many instances.  And he's questioning the exclusion  09:32:4

 8    of the placebo controlled reliance on non-adjudicated data and  09:32:5

 9    the statistical significance of the data.               09:33:0

10              How do you see those issues?                  09:33:0

11         MS. OLDFATHER:  Your Honor, Mr. Boehm starts with  09:33:1

12    converting what's a failure to qualify for predefined pooling  09:33:1

13    criteria, and he converts it into attempts to exclude, an  09:33:1

14    affirmative effort to exclude placebo controlled studies, which  09:33:2

15    he knows is not the case.                               09:33:2

16              Dr. Brooks and Zambelli-Weiner's methodology,  09:33:2

17    which was to define in advance those of Merck's clinical study  09:33:3

18    reports that they interpreted to look at, and they are the only  09:33:3

19    one of these witnesses who dialed down into the clinical study  09:33:3

20    reports.  So there was no way that Crowther ever did that, and  09:33:4

21    he admitted that.  He just read published articles.  And we all  09:33:4

22    know about the problems that Merck has had with the integrity of  09:33:5

23    the data that's been reported in their published articles.  09:33:5

24              So they defined in advance that they were going to  09:33:5

25    look at Phase III studies, and they had a reason for that.  They  09:33:5
```

1    had to last a certain period of time.  And this is all explained    09:34:0

2    in their depositions and in their very detailed report, that was    09:34:0

3    one of the criteria.    09:34:1

4            Another one of the criteria was that the study be    09:34:1

5    completed.    09:34:1

6            So I've just been lambasted for the fact that they    09:34:1

7    didn't use APPROVe.  And, amazingly, during their depositions,    09:34:1

8    Merck took the position that APPROVe was completed.    09:34:2

9            All you have to do is read the Bresalier article    09:34:2

10   that says the APPROVe was terminated two months early, because    09:34:2

11   VIOXX was recalled in December 30th of 2004.    09:34:3

12           So this a priori criteria that they defined didn't    09:34:3

13   allow APPROVe to be reviewed, and that was not something they    09:34:4

14   knew in advance when they defined that criteria.    09:34:4

15           That criteria is their methodology.  So, apropos    09:34:4

16   of the comments in chambers, what about that methodology?  What    09:34:4

17   about the methodology of doing a pooled study by predefined a    09:34:5

18   priori criteria that not all clinical studies are going to    09:34:5

19   qualify under?    09:35:0

20           By Merck's own mouth, through Dr. Crowther,    09:35:0

21   Dr. Crowther testified that to, not only is that an acceptable    09:35:0

22   methodology and we have it here in our papers, but he testified    09:35:0

23   that it is the methodology that he himself follows.  He agreed    09:35:1

24   it's an accepted scientific methodology, to exclude some studies    09:35:1

25   that are inconsistent with an analysis.  And he uses that same    09:35:2

```
 1    approach in his literature review.  Quote:  As someone who does    09:35:2
 2    methodology professionally, you want to establish ground rules     09:35:2
 3    for the inclusion or non-inclusion of studies and subsequently     09:35:3
 4    stick to those ground rules.  That's exactly what they did.        09:35:3
 5              And they didn't have no placebo studies.  You            09:35:3
 6    would think they would, from listening to this.  They had 16       09:35:4
 7    studies, and at least nine of them were placebo controlled         09:35:4
 8    studies.  You could see it on the slide that Mr. Boehm set up      09:35:5
 9    there.  There were some comparator studies and there were some     09:35:5
10    placebo controlled studies.  So they didn't exclude all placebo    09:35:5
11    controlled studies.  That is simply erroneous.                     09:36:0
12              And, when it was pointed out that there were some        09:36:0
13    studies that had met their criteria that they had not included,    09:36:0
14    it turned out that was true, they hadn't, because they were not    09:36:1
15    in -- I hate to say this -- the VIOXX concordance database.  And   09:36:1
16    Your Honor knows what problems we had with that.                   09:36:1
17              So we bent over backwards to go get those studies,       09:36:2
18    even though their report had been completed and they had           09:36:2
19    testified.  And we had no idea whether those studies were going    09:36:2
20    to just destroy these experts that we'd spent hundreds of          09:36:3
21    thousands of dollars on, but we asked them to look at these new    09:36:3
22    -- the ones that we could get.  And, we got them from the          09:36:3
23    depository, even though they were in the database.                 09:36:4
24              And you know what happened?  It just continued to        09:36:4
25    move the data downstream to support our position.  More rate       09:36:4
```

1    ratio.  More events that were thrombotic in nature on the venous

2    side.  And we didn't know that in advance.

3              So all of this argument that those things were

4    excluded is not correct.  I don't want to spend all my time on

5    that, Your Honor --

6              THE COURT:  That's okay.  You take the position in

7    answer to that that you did use, or that your experts,

8    particularly Zambelli-Weiner, did use the placebo controlled

9    data?

10             MS. OLDFATHER:  They did.

11                  They didn't use all the CSRs.

12             THE COURT:  Why didn't you use the ones that he said

13   you'd excluded?

14             MS. OLDFATHER:  We did not use the APPROVe, which is

15   the only one he talked about, because it was terminated early

16   and it did not meet their predefined a priori criteria, which is

17   what Dr. Crowther said you had to do.

18             THE COURT:  He said that there were about 13,000

19   claimants that you left out.

20             MS. OLDFATHER:  Judge, there were so many CSRs that

21   were done -- I didn't want to get into this.

22                  We didn't do Phase IV studies.  So placebo

23   controlled Phase IV studies didn't meet the criteria.

24                  They didn't do Phase I and II because those were

25   earlier studies.

1    So we used the placebo control studies that were

2    Phase III that lasted for a requisite period of time and that

3    weren't terminated early.

4    And there is no witness -- I mean, Merck's got all

5    this data, Judge.  Where is their -- why don't they have

6    Zambelli-Weiner coming in with this other data showing what it

7    would do?  Other than just sitting back and throwing stones.

8    When, really, what they are doing is they're quarrelling that

9    this methodology is not an acceptable methodology.  Lawyers can

10   say that?  Why don't we have a witness saying that that's not an

11   acceptable methodology.  We have witnesses that say it is.  We

12   have Crowther.  We have Zambelli-Weiner.  We have Lucchesi.  We

13   have Spyropoulus.  We have Olyaei.  Every single one of them

14   said they read Zambelli-Weiner and Brooks' report and it was an

15   acceptable scientific methodology.

16   And so there is not one methodology expert here.

17   And Your Honor knows that those people come on at times.

18   This is Merck throwing stones through its lawyers

19   because it's an easy sound bite.  They have converted a failure

20   to qualify into an exclusion of all the placebo controlled

21   studies, which is factually erroneous on at least two levels.

22   The other high points on Brooks and

23   Zambelli-Weiner that I heard through Mr. Boehm is not only this

24   confusion of exclusion and failure to qualify but the -- you

25   know, the whole concept of using placebo as if it's something

1    magic.  It's not.                                                    09:39:2

2               VIGOR, which has been at the heart of this               09:39:3

3    litigation, that's not a placebo controlled study.                  09:39:3

4               And, Judge, there's nothing that says that you           09:39:3

5    have to do a pooled analysis to prevail with general causation      09:39:4

6    anyway.  Lawyers come in here all the time, and they certainly      09:39:4

7    did in the *Wagoner* opinion of yours that I read, with nine        09:39:4

8    different studies that are unpooled.  And the Court is looking       09:39:5

9    for one of them that's got statistical significance.                09:39:5

10              So you could pick VIGOR and find statistical             09:39:5

11   significance today for VTE.  It's in the new data that they did     09:40:0

12   not report when they published VIGOR that came out under the        09:40:0

13   expression and concern from the New England Journal of Medicine     09:40:1

14   of 5 to 1 multipliers of venous thrombotic events.  And this is     09:40:1

15   part of the PowerPoint that I'll go through.                        09:40:2

16              But the idea that statistical significance can           09:40:2

17   only be shown with placebo controlled data that's been             09:40:2

18   adjudicated, that's been pooled the way they want it to be         09:40:2

19   pooled, is giving us a bar that's way up here, that they don't     09:40:3

20   ever even meet themselves.  Because they take VIOXX to the         09:40:3

21   market on comparator studies.  They go back to the FDA on          09:40:3

22   pooling that is not all of their data but it's a predefined        09:40:4

23   selection of data.  So these are all litigation standards, no      09:40:4

24   expert coming in here to say that they are reasonable.             09:40:5

25              So what I'd like to do is just buzz through, and I       09:40:5

1   think this is important because -- well, I'll get to, at the    09:40:5

2   end, I'll sum up why I really think it's important, rather than    09:41:0

3   pre -- give the preview on that.    09:41:0

4                But, Judge, if we start with Merck's expert,    09:41:0

5   Dr. Crowther, we begin with the first item of what I call the    09:41:1

6   confluence of all of the proof that pooled together here,    09:41:1

7   without even -- and I'm not running away from statistical    09:41:2

8   significance, but statistical significance is not the be all and    09:41:2

9   end all.  Unless we're going back to *Frye;* you know, either    09:41:2

10  you're in or you're out.    09:41:2

11               This is a gestalt of all of the evidence that    09:41:3

12  comes together to let us say that we are looking at a    09:41:3

13  methodology here and an analysis here that is more than ipse    09:41:3

14  dixit.  It's not just somebody, as Your Honor said, reading tea    09:41:4

15  leaves.  These are because the scientific community believes    09:41:4

16  that VIOXX causes VTEs.  And I'd like to just highlight for the    09:41:5

17  Court all of the ways that we know that that exists.    09:41:5

18               The first way is through Dr. Crowther's own peers.    09:41:5

19  Dr. Crowther's own peers, the editors of three prestigious    09:42:0

20  journals, all say that they believe, according to him, that they    09:42:0

21  believe that VIOXX is related to and causes VTEs.  His peers    09:42:1

22  think so.    09:42:1

23               And his peers rejected the article that Merck    09:42:1

24  wants the jury to consider here.  And they are very prestigious    09:42:2

25  journals.    09:42:2

1          Not only do Dr. Crowther's peers believe that

2   VIOXX can cause VTEs -- and that's the issue that we're here

3   today to explore in general causation and is our proof of that

4   more than, as I say, ipse dixit -- but now we have the Utah

5   Medicaid data that just came in day before yesterday.  I don't

6   imagine that Your Honor's had a chance to see it.  But we have a

7   report from Dr. Tolley that's been filed by the state of Utah

8   that shows a statistical significance, and that's in the

9   supplemental materials that we've filed with the Court at Tab 3.

10          Tab 2 is their original report with their final

11   costs.

12          And at Tab 3 is their report that's based on venus

13   thrombotic events.

14          And their Table 4 and 5, that are I think on about

15   page 3 or 4 of that report, not only show clinical significance

16   -- I'm sorry, statistical significance, Your Honor -- so, if

17   it's the end all and be all statistical significance, here it

18   is -- but it shows statistical significance for thrombotic

19   venous on the venous side of thrombotic events ranging from a

20   rate ratio of 2.11 to 7.5.  Higher than any of the cardiac tests

21   that have gone to juries over and over again.

22          So not only do we have Dr. Crowther's peers, not

23   only do we have the Medicaid analysis from the state of Utah,

24   but Merck has been saying, buried in its papers and in the data

25   that it doesn't turn over, that we now have, to the New England

1    Journal of Medicine, Merck has been saying that there's                09:44:1

2    statistical significance in the relationship between VIOXX and         09:44:1

3    VTEs.                                                                   09:44:1

4              And why I do say that, Your Honor?  I say that               09:44:1

5    because, in VIGOR, in 2000, when they reported only on data that       09:44:2

6    dealt with myocardial infarctions in both study arms, we found         09:44:2

7    out later in 2006 through the New England Journal of Medicine          09:44:3

8    and Dr. Kirkman that Merck also had thrombotic events.                 09:44:3

9              This is Table 3 of what they didn't put out in              09:44:4

10   2000.  Top line is Arterial.  Second line is Thromboembolic            09:44:4

11   venous events, 5 to 1.  Similar patient years.  5 to 1 ratio.         09:44:5

12             Now, they didn't analyze this, Judge.  They didn't           09:45:0

13   go get statistical significance.  They didn't go get us a hazard       09:45:0

14   ratio.  But that hazard ratio is pretty plain.                         09:45:1

15             And this is a little bit of déjà vu.  These two             09:45:1

16   slides are from the VIOXX argument that Mr. Boehm sat here and         09:45:1

17   watched back in 2005, whenever it was, and Mr. Sizemore was            09:45:2

18   arguing about these same things.  And, interestingly enough, he        09:45:2

19   put up this slide, where, if you go down to the second line from       09:45:3

20   the bottom, peripheral thromboses, he's got there's 6 to 1            09:45:3

21   counted off right down there.  So, there it was, sitting out           09:45:4

22   there all this time, for us to go back and see.                        09:45:4

23             Now, they're going to say big deal.  Big deal,              09:45:5

24   VIGOR is a comparator study.  Well, it is a big deal.  People in       09:45:5

25   the real world, if they're not going to take VIOXX, they might         09:46:0

1    take Naproxen.  People in the real world don't just sit there

2    and suffer their pain; they go use a comparator.  So it makes

3    sense to talk about how much more risk do you have from using

4    VIOXX versus what you would have had if you'd used this other

5    one.

6              The placebo, there's nobody that's come in here,

7    Judge -- no scientists, only lawyers -- and said:  Oh, you can

8    only use placebos when you're determining general causation.

9    Nobody has said that.

10             And here, in APPROVe, in APPROVe -- this is a bit

11   of a side trip -- but, in APPROVe, they reported in the APPROVe

12   article the whole section on non-adjudicated data.  And we've

13   just been lambasted by Merck because Dr. Zambelli-Weiner had the

14   nerve, had the nerve, to go into case study reports and get the

15   investigator's opinion of what happened to someone.  And, yet,

16   if you look at the APPROVe article, on the front page, the

17   results, the little tiny thing they put right up at the top,

18   they have a separate finding about the non-adjudicated data for

19   a grouping they're now doing.  They were doing it by APPROVe --

20   this is apropos to Your Honor's question about how things

21   changed and how the count changed so how do you pool all these.

22   Well, all of the sudden, in APPROVe, they're doing a grouping of

23   these three things:  Congestive heart failure, pulmonary

24   embolism and cardiac failure.  This is a Merck report, these are

25   Merck investigators.

1        I don't know why they chose those three things to

2  group.  I don't know why they chose to report the

3  non-adjudicated investigator reported cardiovascular events in

4  this group.  But they did.  There was some reason for it.

5        And guess what?  Statistically significant with a

6  4.61 hazard ratio.  That pulmonary embolism is half of all of

7  our VTEs.  So, right there, you've got, in APPROVe, placebo

8  controlled studies.

9        And then, in VICTOR, they do another switch.  And,

10  now, instead of this group of congestive heart failure,

11  pulmonary embolism and cardiac arrest -- cardiac failure -- now

12  they're reporting the next year in VICTOR on TCVSAEs, which mean

13  Thoracic Cardiovascular Serious Adverse Events.

14        And -- and -- they're beginning to report on what

15  they call the ATTC end points, which is the anti -- I'm sorry --

16  APTC, antiplatelet trialists' collaborator end points, which is

17  a whole other group of conditions.

18        So, as Your Honor mentioned, and as

19  Zambelli-Weiner and Brooks established, it's a moving target to

20  go through over the years what Merck chooses to measure and when

21  they don't.  But, when they came out with their VICTOR data in

22  2007, they show peripheral venous thrombosis and pulmonary

23  embolism in the VIOXX arm that's 3 to 1 of the placebo arm.

24        Merck didn't compute a relative risk hazard ratio

25  or statistical significance, but it's right there in the article

1    in a table on about the fifth page of the article.  This is    09:49:2

2    another déjà vu.  This is again from Mr. Sizemore; and, it's in    09:49:3

3    there, too.  Last highlighted portion.  It appears that the    09:49:3

4    TCVSAE results is statistically significant.  So it is a moving    09:49:4

5    target to try to keep up with what Merck has studied.    09:49:4

6              But, if we don't even have Zambelli-Weiner, if    09:49:5

7    somehow it's only allowed to be placebo, what's wrong with this?    09:49:5

8              And, in addition to all that, Your Honor, there    09:49:5

9    are observational studies that have taken place over the years.    09:50:0

10   And there's one that's in this book that's at Tab No. 1 by    09:50:0

11   Schmidt which shows the statistical significance for the use of    09:50:0

12   VIOXX in eight different scenarios for composite VTEs,    09:50:1

13   unprovoked VTE.  They break that down by adjudicated and    09:50:1

14   non-adjudicated.  And then they break it down further by current    09:50:2

15   and recent use of VIOXX.  So, we have eight different    09:50:2

16   categories, and seven of those categories have statistical    09:50:2

17   significance.  One of which goes up as high as 3.27 relative    09:50:3

18   hazard ratio.    09:50:3

19             So, we have observational studies, we have the    09:50:3

20   peers in the scientific community, and we have major studies    09:50:4

21   sponsored by Merck, before we even get to Dr. Zambelli-Weiner    09:50:4

22   and Dr. Brooks.    09:50:5

23             So then we get to plaintiffs' experts.  And I'll    09:50:5

24   be very quick on this, because I truly think that Merck has    09:50:5

25   conceded that, at the cellular level, they didn't bring anyone.    09:50:5

1    We've got Dr. Lucchesi, eminently qualified.  That 09:51:0

2 is an example of what he is proposing with regard to the 09:51:0

3 relationship between COX-2 and the venous vasculature and the 09:51:1

4 effect, the methodology of the mechanism here. 09:51:1

5    Which is important when we talk about the 09:51:2

6 methodology of the mechanism, and Ms. Hastings will address this 09:51:2

7 on our motion to exclude Dr. Crowther's opinion.  Which, 09:51:2

8 astonishingly, is that there's no COX-2 in the venous 09:51:3

9 vasculature.  That's Dr. Crowther.  We truly think that that is 09:51:3

10 subject to a *Daubert* challenge, and I'll leave more comment on 09:51:4

11 that to Ms. Hastings. 09:51:4

12    We have a form -- we then go to the next level, 09:51:4

13 pharmacologically.  And we have Dr. Olyaei from Oregon State 09:51:5

14 University.  There's been no challenge to Dr. Olyaei. 09:51:5

15    Dr. Olyaei offered a very detailed affidavit with 09:51:5

16 over 30 different paragraphs where he talks about the 09:51:5

17 similarities between the two sides of the vascular system, the 09:52:0

18 arterial and the venous.  Merck's whole argument is that the two 09:52:0

19 shall never meet.  And Dr. Olyaei says:  No, no, in the 09:52:1

20 antiplatelet trials collaboration, we have been studying the 09:52:1

21 same drugs that affect both the clotting on the arterial side 09:52:2

22 and clotting on the venous side; the risk factors have many 09:52:2

23 common elements. 09:52:2

24    We attached with our opposition one of our reply 09:52:2

25 briefs and editorial from the New England Journal of Medicine 09:52:3

09:52:3

1    that just came out about how aspirin is now affecting -- is now

2    known to affect venous thrombus, which they thought was only

3    because of its platelet effect on the arterial side.  They now

4    know that it's much more complicated than that.

5              And, even though the Fitzgerald hypothesis was

6    driven by the platelet affect, and there was no need when we

7    were talking about the arterial side to wonder about all of the

8    enzymes and the prostacyclin and the prostaglandin and what is

9    that doing over on the venous side where the platelets aren't as

10   important, and, just because nobody talked about that, it didn't

11   mean that they felt there was nothing happening over there.  We

12   now know from Dr. Lucchesi and from Dr. Olyaei and a number of

13   other articles that not only is COX-2 on both sides of the

14   vasculature; if you inhibit it on the arterial side, you're

15   going to have a major platelet affect.  But, on both sides,

16   you're going to impede the production of prostacyclin and

17   prostaglandin, and you're going to promote tissue factor, which

18   promotes thrombus, which is going to promote clotting.  So you

19   have a very plausible mechanism that has been established by

20   Dr. Lucchesi and by Dr. Olyaei.

21             And then we have Dr. Spyropoulus, the next level

22   up, who is the clinician.  And Dr. Spyropoulus -- you know,

23   Dr. Spyropoulus ended up testifying that, in his clinical

24   experience, VTEs are underreported; and, if they aren't an end

25   point in the study, they are definitely going to be

1    under-appreciated, because nobody is looking for them and they          09:54:1

2    can be silent.                                                          09:54:1

3              He looked at -- and this is in his deposition and             09:54:1

4    in his report, which is, again, extremely thorough -- he looked         09:54:1

5    at Merck's placebo controlled studies, and they were inadequate         09:54:2

6    and did not count and reflect what in his view was the true             09:54:2

7    number of events.                                                       09:54:3

8              He also referred to his clinical experience.  And,            09:54:3

9    as he is allowed to do, he interpreted an article in the                09:54:3

10   published literature from Dr. Crowther that set forth, according        09:54:4

11   to Dr. Spyropoulus' explanation of it -- which I thought was            09:54:4

12   very logical -- that there is at a minimum a ten-fold up to as          09:54:4

13   high as thirty-fold underreporting of VTE events.  This is a            09:54:5

14   pure battle of the experts between Dr. Crowther and                     09:55:0

15   Dr. Spyropoulus about the under-reporting of VTEs when they are         09:55:0

16   not an end point of a study.  And Dr. Spyropoulus never backed          09:55:0

17   off of it.  And this is in our opposition papers.  He ended up          09:55:1

18   giving an opinion that, in his view, in the VIOXX clinical              09:55:1

19   trials, there's been an underreporting by ten to thirty fold,          09:55:1

20   and that it is appropriate to multiply the observed events if           09:55:2

21   you really want to know how much VTE and DVT was going on out           09:55:2

22   there.  And that ten is very -- a ten fold multiplier, which is         09:55:2

23   what I think the Court was asking us to focus on back in                09:55:3

24   chambers, in his opinion, clinically and scientifically, is            09:55:3

25   appropriate to apply.                                                   09:55:4

1      Now, Judge, under the way I read *Wagoner*, an

2 expert is allowed -- in that case, an expert was allowed to rely

3 on other epidemiologic studies.  Experts are always allowed to

4 interpret articles and scientific journals.  Dr. Spyropoulus is

5 entitled to do that.  And experts are entitled to use other

6 experts' opinions as foundational elements of their opinion.

7      So that is exactly the last step of

8 Drs. Zambelli-Weiner and Brooks' report, with a little asterisk

9 there, and I'll get to that in a moment.

10      Dr. Spyropoulus also buttressed the methodology

11 that was used by Drs. Brooks and Zambelli-Weiner.

12      So then we get to what little there is left to say

13 about Drs. Brooks and Zambelli-Weiner.  Their qualifications,

14 again, are not attacked.  Zambelli-Weiner's been an

15 epidemiologist for 15 years.  Brooks has been in the business

16 for 13.

17      Their rate ratios that they found, using the

18 largest placebo study -- and this is in their report -- was 1.8.

19 It didn't make statistical significance because of the low

20 number, the under-powering.  There aren't enough numbers.  So

21 you can't get to statistically significant, because there aren't

22 enough events.  They have a whole section in their report about

23 you'd need a study with 60,000 people in it to have an

24 adequately powered event for VTEs.  And Merck never set out to

25 do that.  And you can't pool 60,000 of Merck's data because of

1    the inconsistency of the reporting.                        09:57:2

2                    But this is interesting.  Because they found in   09:57:2

3    the largest placebo study a rate ratio, a risk ratio, of 1.8.   09:57:2

4    For adverse renal events, it was 2.0.  Both lacked statistical   09:57:3

5    significance.  But guess what?  One of them ended up in the   09:57:3

6    label.                                                     09:57:4

7                    So Merck doesn't think that a placebo controlled   09:57:4

8    study with statistical significance is required to put a warning   09:57:4

9    out there that there is a relationship between, for some folks,   09:57:5

10   between VIOXX and renal events.  But they do here in this   09:57:5

11   courtroom.                                                 09:58:0

12                    Dr. Zambelli-Weiner said a safety signal was seen   09:58:0

13   as early as 1997 that should have been acted on.  And, as you   09:58:0

14   saw up on the board, when they did their pooled analysis across   09:58:1

15   the comparator and the placebo trials that qualified for their a   09:58:1

16   priori definition, they had an elevated risk ratio for VTE   09:58:1

17   events on VIOXX that ranged 1.49 to 3.57.                   09:58:2

18                    And Mr. Boehm is absolutely correct; that, if you   09:58:2

19   stopped there, the confidence intervals cross 1.  And they cross   09:58:3

20   1 for one reason only, under-powering.  Merck never set out to   09:58:3

21   test this.                                                 09:58:4

22                    And the way that under-powering has been   09:58:4

23   addressed, despite the scoffing, is by using the evidence, which   09:58:4

24   the jury is entitled to believe, that there was a ten to thirty   09:58:4

25   fold underreporting.  That multiplier does not change the rate   09:58:5

1   ratio.  It does not change the hazard risk.  And this is on the

2   second-to-last page of their report where the table is shown

3   with the ten and thirty multiplier.

4           It simply assumes that you've had a large enough

5   study, and that this same discrepancy that is greater than you

6   would expect with chance continues.  And then you're adequately

7   powered.  And then you have statistical significance.  So, I

8   don't think that we live or die with this; but I think that, if

9   it's all we had, it would be enough.

10          I also think that this is an important time, Your

11  Honor, to say -- I don't expect to win on this -- but I do think

12  that statistical significance is more valued by the courts than

13  it is by the real world of science.  And, since what we're doing

14  here is trying to get before the jury what scientists would

15  apply in their give and take, I think that there's some room to

16  be thinking about this.  And nobody better than Your Honor to

17  think about it.

18          I attached an article from that book called *The*

19  *Cult of Statistical Significance*, which is very interesting

20  reading.

21          THE COURT:  I saw that.

22          So, basically, with the statistical significance,

23  it's your approach that the VTEs were under-reported, so the

24  studies were under-powered; therefore, statistical significance

25  is minimized?

```
 1            MS. OLDFATHER:  Is what?                        10:00:2

 2            THE COURT:  Is not necessary or not as valuable.  10:00:2

 3            MS. OLDFATHER:  It's not possible from Merck's -- from  10:00:3

 4    a pooled analysis of Merck's clinical study reports.     10:00:3

 5            If you limit it to just one study, like VIGOR, you  10:00:3

 6    can get it.  Or APPROVe.  For that grouping they did, you can  10:00:4

 7    get it.  It's a smaller number of patients, and you can get  10:00:4

 8    enough of a difference going on there.  And they report those as  10:00:4

 9    statistically significant.  I think that gets us to the jury.  10:00:5

10            I mean, in *Wagoner*, you had nine studies, and you  10:00:5

11    were just trying to find one.  So I think that gets us there.  10:00:5

12            So, you know, Judge, I had a little section I  10:01:0

13    wanted to talk about, because I love the *Wagoner* opinion.  But I  10:01:0

14    imagine -- I imagine you must, too, or you wouldn't have written  10:01:1

15    it.  But it does make a lot of excellent points that apply here.  10:01:1

16    And the only -- I'll just mention a few.                 10:01:1

17            And that is that, it's not our purpose to figure  10:01:2

18    out who is right or wrong.  It's our purpose to decide if this  10:01:2

19    is analysis or ipse dixit.                               10:01:2

20            And isn't it plain that this is analysis?  I mean,  10:01:3

21    isn't it just plain that this is analysis?  They don't have  10:01:3

22    anybody that says it's not.  It's all a quarrel with whether did  10:01:3

23    you look at the right thing; should it have been adjudicated or  10:01:4

24    not adjudicated; should it have been placebo or comparator.  But  10:01:4

25    it's not ipse dixit.  It is indeed all analysis.          10:01:5
```

```
 1              And I had a lot of good things I was going to say      10:01:5
 2     about that; but, in the interest of time, I will just move on to  10:01:5
 3     finishing this up.                                            10:02:0
 4              I wanted to make sure that I had an opportunity to   10:02:0
 5     point out -- and I think I've probably done sufficiently -- that  10:02:1
 6     Merck has got every resource imaginable.  And I don't just mean  10:02:1
 7     money.  I mean, they've got this data.  Why are we only hearing  10:02:2
 8     lawyer arguments?                                             10:02:2
 9              If this is so wrong, why are we not seeing someone   10:02:2
10     that they hired to go look at these CSRs themselves and to go  10:02:3
11     look at that list of all those placebo studies, and see, well,  10:02:3
12     what did we learn from those?  Nobody did that.              10:02:4
13              Judge, do not think that Dr. Crowther did that.     10:02:4
14     Dr. Crowther just read some articles.                        10:02:4
15              And, Zambelli-Weiner, it's 338 hours of what was    10:02:4
16     limited resources.  I mean, that is on a shoe-string budget, to  10:02:5
17     have epidemiologists working for 338 hours.  And you can see the  10:02:5
18     detail and the depth of their report.                        10:03:0
19              So, to sum up, Judge, I gave some thought to this.   10:03:0
20     You know, what I think Merck is doing, as I said in the       10:03:1
21     beginning, is trying to hold us to the perfect case.  That we're  10:03:1
22     supposed to come in here and we're supposed to do absolutely  10:03:1
23     everything right.  Just placebo data.  Make sure we have enough  10:03:1
24     and we've had adequately powered studies that Merck happened to  10:03:2
25     decide over the years.  We should pool all of this, even though  10:03:2
```

```
 1    the end points don't match.  We should ignore that they never      10:03:2

 2    had an end point, ever, for VTEs so we don't worry about           10:03:3

 3    underreporting.  And we should use a double-blind randomized       10:03:3

 4    trial.  And that's the only thing that counts.                     10:03:4

 5              So one of the things I've learned in this case is        10:03:4

 6    about testing hypotheses.  And that's what scientists do; right?   10:03:4

 7    So I figure, okay, I'll do that as a lawyer.                       10:03:4

 8              So my hypothesis that I wanted to test is, what if       10:03:5

 9    they're right about everything?  You know, what if they're         10:03:5

10    right.  They're right that we needed to have placebo, we needed    10:03:5

11    to have adjudicated data, the powering, we only had unlimited      10:04:0

12    resources.  What if they're right?  Should we fail *Daubert* at    10:04:0

13    that point?                                                        10:04:1

14              And so I found my little guy here.  This is my           10:04:1

15    little plaintiff guy, who only has non-adjudicated data.  So       10:04:1

16    he's limping along with that impediment.                           10:04:2

17              But is that really bad?  I mean, this is from            10:04:2

18    Merck's own -- from of Merck's own studies.  This is APPROVe.      10:04:2

19    There was earlier separation of approximately five months          10:04:3

20    between groups in the incidents of non-adjudicated                 10:04:3

21    investigator-reported congestive heart failure.  This is what      10:04:4

22    they published in the New England Journal of Medicine, this        10:04:4

23    horrible non-adjudicated data.  This is a whole section in         10:04:5

24    APPROVe with a heading called Non-Adjudicated Cardiovascular       10:04:5

25    Events.  With a table, for heaven's sakes.  And, the FDA, as Mr.   10:04:5
```

1   Boehm mentioned, uses non-adjudicated data.  Dr. Zambelli-Weiner   10:05:0

2   put that exhibit in with her deposition.   10:05:0

3            Merck has used non-adjudicated data.  The FDA has   10:05:1

4   used non-adjudicated data.   10:05:1

5            Okay, fine, maybe it would be great to use only   10:05:1

6   adjudicated data.  But it certainly goes to weight, that it's   10:05:1

7   just non-adjudicated.   10:05:2

8            So, our poor little guy, he's got other   10:05:2

9   impediments besides just the non-adjudicated data.  According to   10:05:3

10  Mr. Boehm, he was under-powered.  According to Mr. Boehm, he had   10:05:3

11  unlimited resources -- or, sorry -- he had limited resources.   10:05:3

12  Please accept the correction from the author who -- it was late   10:05:4

13  when I typed that.  We should have used every Phase III study   10:05:4

14  that existed, even though we couldn't find them on the VIOXX   10:05:4

15  concordance database.  And we don't use only placebo controlled   10:05:5

16  versus comparator controlled trials.   10:05:5

17            So we've got this poor, beat up and bandaged   10:06:0

18  plaintiff in our case.   10:06:0

19            And this is their gold standard plaintiff.  He's   10:06:0

20  got none of those impediments.  And his little briefcase has got   10:06:0

21  a placebo controlled, double-blind, randomized, significantly   10:06:1

22  significant study in it.   10:06:1

23            Compared to our guy, who is over here, and not so   10:06:2

24  gold standard, plaintiffs' case.  And he's got only a comparator   10:06:2

25  study.  But it's double-blind and randomized, because they have   10:06:2

1    to admit that they are all double-blind and randomized.          10:06:3

2              Now, this is a courthouse.  And our little guy,         10:06:3

3    with all of his bandages and his poor little comparator study,    10:06:4

4    can still come out on the other side with a verdict for the       10:06:4

5    plaintiff.                                                        10:06:5

6              And, if that's the case, that the gold standard         10:06:5

7    that we hear from Merck is not indeed the only standard, because  10:06:5

8    we can still get there even if all of those impediments were in   10:07:0

9    fact the facts in our case.                                       10:07:0

10             And my point is that they aren't.  We don't have        10:07:1

11   just non-adjudicated data.  We have statistical significance.     10:07:1

12   We have it with placebos.                                         10:07:2

13             So my answer is that, even with my poor bandaged        10:07:2

14   crippled little guy, when I test that hypothesis, we should       10:07:2

15   still survive *Daubert*.  And, when we quarrel about whether those 10:07:3

16   facts are true, it's a resounding yes, that we should survive     10:07:3

17   *Daubert* and be able to put this case in front of a jury so that 10:07:4

18   they can decide who they believe.                                 10:07:4

19             Thank you.                                              10:07:4

20        THE COURT:  All right.  Thank you very much.                 10:07:4

21             You want to respond in rebuttal?                        10:07:5

22        MR. BOEHM:  Yes, Your Honor.  Please.                        10:07:5

23             Thank you, Your Honor.                                  10:08:2

24             Couple of big picture points, then I'll dive into       10:08:5

25   some of the specifics.                                            10:08:5

1        First of all, I think that, at one point during
2   Ms. Oldfather's response, she used the word, the term:  Moving
3   target.  That's exactly what we have here.  She spent 90 percent
4   of her time talking about a bunch of stuff that really didn't
5   have anything to do with what her experts in this case did in
6   their reports, talked about in their deposition testimony.  We
7   shouldn't have to shoot at a moving target.
8        Secondly, she said a bunch of things that are just
9   factually incorrect.  And, she was moving pretty quickly, so I
10  don't know if I'll be able to address all of them.  But I'll
11  certainly try my best to address some of them.
12       At the very end, she put up a picture of a
13  bandaged-up guy.  I think he was bandaged basically from head to
14  foot.  I think that was actually a pretty good depiction of the
15  Zambelli-Weiner pooled analysis.  It's not a plaintiff that's
16  walking into the courtroom that is bandaged and bruised and
17  flawed and erroneous.  That's not what we're talking about,
18  although that might be a good argument to the jury.
19       We're applying a *Daubert* analysis, is it
20  methodologically flawed.  And each one of those bandages that
21  she put on that man, that's not a plaintiff, that's the pooled
22  analysis that's all beat up and bandaged and bruised.  And
23  scientifically unreliable.  Methodologically unsound.
24       Let's just talk about some of the specifics.
25       Ms. Oldfather says:  Well, we did look at some of

1    the placebo controlled.  Yeah, they looked at some of the        10:10:3

2    placebo controlled data, and they left out most of it.  And they  10:10:4

3    looked at some of the active comparative data we had, and they    10:10:4

4    left out a bunch of that, too.  That's not good science.          10:10:4

5              THE COURT:  Well, she takes a position that the reason  10:10:4

6    they left it out is that there was no end point study for VTEs    10:10:5

7    and therefore it was not helpful for their analysis.              10:10:5

8              MR. BOEHM:  That's a point that Your Honor raised when  10:11:0

9    I was first standing up here.                                     10:11:0

10             These studies were designed to capture thrombotic       10:11:0

11   events.  Any thrombotic event went through the adjudication       10:11:1

12   process.  Not just arterial, but venous events as well.           10:11:1

13             So I don't think that plaintiffs -- certainly,          10:11:1

14   there's been some suggestion by Dr. Spyropoulus that maybe, by    10:11:1

15   the nature of VTEs themselves, there is a lack of -- maybe you    10:11:2

16   didn't capture every single event.  But, when we asked           10:11:2

17   Dr. Spyropoulus whether or not he would design the studies from  10:11:2

18   the VIOXX clinical trials any differently, he said no.  He's     10:11:3

19   been involved in studies like this on behalf of Pfizer.  He      10:11:3

20   said, yeah, this is exactly what they should have done, I        10:11:3

21   wouldn't change anything.                                        10:11:4

22             So there's not any valid argument here that            10:11:4

23   somehow these studies weren't designed to capture VTE or they    10:11:4

24   were designed in a way somehow to exclude capturing VTEs.        10:11:5

25   That's just not the case.  Any VTEs that's recorded went through 10:11:5

```
 1   and was adjudicated, and that was one of the events that would          10:11:5

 2   have been looked for and captured in all of of these studies.          10:11:5

 3   That's just not true.                                                   10:12:0

 4          THE COURT:  Was that for me to determine in Daubert, or          10:12:0

 5   for a jury to determine at trial?                                       10:12:0

 6          MR. BOEHM:  I don't think there's even a dispute.                10:12:1

 7          THE COURT:  She says that there was a reason for the             10:12:1

 8   excluding of some placebo controlled and that there was some            10:12:1

 9   basis for it.                                                           10:12:2

10          MR. BOEHM:  Yes.  Well, a couple of things.                      10:12:2

11             We've heard a lot of different explanations for              10:12:2

12   why these trials were excluded.  One we heard the most about            10:12:3

13   just now had to do with the fact that APPROVe was terminated            10:12:3

14   early.                                                                  10:12:3

15             And Your Honor knows that history well.                       10:12:3

16          THE COURT:  Right, I know that.                                  10:12:3

17          MR. BOEHM:  That's the study of course that was                  10:12:4

18   withdrawn as there were issues concerning safety that were              10:12:4

19   raised.  And that's why that study was stopped.                         10:12:4

20             For about a decade now, plaintiffs have been                 10:12:4

21   walking into this courtroom, and the first word out of their            10:12:5

22   mouth has been APPROVe.  I may be exaggerating just a little            10:12:5

23   bit, they might have said good morning first.  But APPROVe has          10:13:0

24   been at the center of their claims.                                     10:13:0

25             And, if we had walked in eight years ago and we              10:13:0
```

1    put our experts on and they said:  Hey, the APPROVe study, don't        10:13:0

2    got to look at that study, that was prematurely terminated, it's        10:13:1

3    not reliable for purposes of *Daubert,* I would say some of the        10:13:1

4    heads of the folks who were sitting where Ann Oldfather is        10:13:2

5    sitting now would have exploded.  And it wouldn't have been        10:13:2

6    unjustified.  There is no scientific precedent anywhere with the        10:13:2

7    medical literature, from the FDA or anywhere, to say that:  Oh,        10:13:3

8    look, the study's been terminated because of a safety issue and        10:13:3

9    therefore you shouldn't consider the safety data from that        10:13:3

10   study.  Probably a lot of drug companies in the history of        10:13:4

11   products liability litigation would have liked to have had that        10:13:4

12   as a precedent, but it's not good science.        10:13:4

13          THE COURT:  Of course, that did come up in testimony,        10:13:5

14   as to whether or not it was significant because it was short.        10:13:5

15   It was a shorter term than the normal study would be or than        10:14:0

16   they anticipated the study would be.  And Merck, of course,        10:14:0

17   explained why it was terminated and explained their reason for        10:14:0

18   terminating it.        10:14:1

19          MR. BOEHM:  That's right, Your Honor.        10:14:1

20              And, to your question about whether or not this is        10:14:1

21   for the jury or for Your Honor, for purposes of *Daubert,* this is        10:14:1

22   a *Daubert* issue.  This is a methodological issue.  This goes to        10:14:2

23   how are you going to conduct the study.  And to exclude one of        10:14:2

24   the largest placebo controlled studies, the study that's been at        10:14:3

25   the heart of this litigation, for which there's no precedent for        10:14:3

| | |
|---|---|
| 1 | excluding it, in the law or from the FDA or anywhere else, is a |
| 2 | methodological issue.  That's going to be a point that I think |
| 3 | is going to be much more difficult for a jury to discern and |
| 4 | it's not appropriate for the jury to have to sort through that |
| 5 | kind of issue. |
| 6 | THE COURT:  She takes the position that they did |
| 7 | include some placebo controlled studies.  What's the |
| 8 | significance of some as opposed to not all? |
| 9 | MR. BOEHM:  Well, it's not like they just excluded one |
| 10 | or two.  They have excluded more than half of the available |
| 11 | placebo controlled trials. |
| 12 | With respect to, again, to APPROVe specifically, |
| 13 | then this conversation about how Drs. Zambelli-Weiner and Brooks |
| 14 | decided in advance what studies they were going to include and |
| 15 | exclude, and we of course can't get into their brains, you know, |
| 16 | one thing we do know is that they had a motion for summary |
| 17 | judgment that we filed way back in November 2011.  So they knew |
| 18 | what the data showed.  Plaintiffs have known that for over a |
| 19 | year with respect to placebo controlled trials. |
| 20 | And, then, this is an exhibit from |
| 21 | Dr. Zambelli-Weiner's deposition up on the screen.  This is a |
| 22 | chart that she had put together where she was looking at |
| 23 | abstracted data from various studies just a couple of weeks |
| 24 | before they finalized their report.  We know they were working |
| 25 | on this months before.  We know that from the billing records |

| | |
|---|---|
| 1 | and from their deposition testimony. | 10:16:0 |
| 2 | Just a couple of weeks before we actually get | 10:16:0 |
| 3 | their report, here's this document, Protocol 122.  Your Honor | 10:16:0 |
| 4 | would be familiar with what that number means.  That's the | 10:16:1 |
| 5 | APPROVe study. | 10:16:1 |
| 6 | THE COURT:  Right. | 10:16:1 |
| 7 | MR. BOEHM:  So this suggestion that everything was | 10:16:1 |
| 8 | decided in advance and they weren't even considering data from | 10:16:1 |
| 9 | APPROVe or the other placebo controlled trials is dubious at | 10:16:2 |
| 10 | best. | 10:16:2 |
| 11 | THE COURT:  Now, what's your position that they | 10:16:2 |
| 12 | considered it but excluded it because it was not helpful to | 10:16:3 |
| 13 | them? | 10:16:3 |
| 14 | MR. BOEHM:  Well, again, it's hard to know. | 10:16:3 |
| 15 | We certainly have our doubts about the reason why | 10:16:3 |
| 16 | they excluded this study.  We can say they've not offered any | 10:16:4 |
| 17 | scientifically justifiable explanation for it. | 10:16:4 |
| 18 | She said:  Oh, it's a not a Phase III study. | 10:16:5 |
| 19 | Okay.  So what?  When has that been in any scientific literature | 10:16:5 |
| 20 | from the FDA or anywhere else?  As a matter of scientific | 10:16:5 |
| 21 | methodology, has that been an acceptable criteria for | 10:17:0 |
| 22 | determining whether or not the data should be considered?  It's | 10:17:0 |
| 23 | not.  It's a methodological error. | 10:17:1 |
| 24 | Ms. Oldfather has also talked about the fact that | 10:17:2 |
| 25 | nobody has questioned the methodology to exclude these studies. | 10:17:2 |

```
1    False.  Our experts have questioned it.  Said it's          10:17:3
2    inappropriate.  I don't know that the Court needs expert     10:17:4
3    testimony on this, but they certainly -- you certainly have it.  10:17:4
4           You don't even have it just from our experts;         10:17:4
5    Dr. Spyropoulus was asked about that.  Dr. Spyropoulus testified  10:17:4
6    that you should use the placebo controlled data.  He was asked   10:17:5
7    specifically about APPROVe.  And, he said you should use     10:17:5
8    APPROVe, sure.  He couldn't see any reason why you would want to  10:18:0
9    exclude that.  He is the only medical doctor that plaintiffs    10:18:0
10   have identified as an expert in this matter.  So the only    10:18:0
11   expert, the only medical doctor expert the plaintiffs have    10:18:0
12   brought forward on this subject, has testified you should look   10:18:1
13   at APPROVe.                                                   10:18:1
14          Ms. Oldfather suggested that VIGOR is a study that    10:18:2
15   shows statistically significant results when you look at VTE.   10:18:2
16   Let's look at what the data from VIGOR actually shows, because   10:18:3
17   what she said is not true.                                    10:18:3
18          Here's the VIGOR study.  All peripheral              10:18:3
19   vasculature embolisms.  This includes arterial and venous, not   10:18:4
20   just venous.  6 to 1.  Look at the confidence intervals.  0.00   10:18:4
21   to 1.37.  That's not statistically significant.  Her          10:18:5
22   representation is false on that point.                        10:18:5
23          And, again, it's worth noting Drs. Zambelli-Weiner    10:19:0
24   and Brooks didn't come in and talk about VIGOR.  This is      10:19:1
25   something we've just heard now.  It's not true.  But the second   10:19:1
```

```
 1    point is, we are just hearing it now for the first time.          10:19:1

 2              Ms. Oldfather talked about, at the beginning of          10:19:2

 3    her comments, the fact that Dr. Crowther had submitted his         10:19:2

 4    analysis --                                                        10:19:3

 5              MS. OLDFATHER:  Excuse me, Judge.  I just need to         10:19:3

 6    object.  I don't think we've ever seen this before.                10:19:3

 7              I could be wrong, but I saw some things flash up          10:19:3

 8    at the bottom that I've never seen before either.  And I'm not     10:19:4

 9    -- I don't know where that came from.                              10:19:4

10         MR. BOEHM:  It's a produced document during                   10:19:4

11    litigation --                                                      10:19:4

12         MR. MARTIN:  Your Honor, this is page 15 of Sherry            10:19:5

13    Targum's analysis, who is with the FDA.  This is her analysis of   10:19:5

14    VIGOR that we've seen in these trials for about seven trials, I    10:19:5

15    think it is, VIOXX.  This is the FDA's analysis of VIGOR.  And     10:20:0

16    so that's where it comes from.                                     10:20:0

17         MS. OLDFATHER:  Judge, it's not even been in the              10:20:0

18    Daubert briefing, and I haven't been at every trial.  I provided  10:20:0

19    them with everything ahead of time.  I'm just distressed by        10:20:1

20    this.                                                              10:20:1

21         THE COURT:  We need to supply each other with                 10:20:1

22    information.                                                       10:20:1

23         MR. BOEHM:  If I might, we had no intention when we           10:20:1

24    arrived here to talk about VIGOR or whether or not the results    10:20:2

25    for VTE was statistically significant.  We just heard Ms.          10:20:2
```

1    Oldfather make a representation to the Court.  She suggested    10:20:2

2    that in fact VIGOR did show statistically significant results.    10:20:3

3    So we found that document.    10:20:3

4            MS. OLDFATHER:  I said it wasn't measured.  I didn't    10:20:3

5    say statistically significant.    10:20:4

6            I'm sorry for interrupting, Judge.    10:20:4

7            MR. BOEHM:  The record will speak for itself, but I    10:20:4

8    believe there was that representation.    10:20:4

9            In any event, it's not the case.    10:20:4

10           There's been some conversation about the fact that    10:20:5

11   Dr. Crowther submitted his analysis for peer review.  Unlike    10:20:5

12   plaintiffs' experts, he actually submitted his analysis for peer    10:21:0

13   review.  And it was not accepted by every journal.  It was    10:21:0

14   accepted by the American Society of Hematology for an abstract,    10:21:0

15   but we can get to that in the next part of argument.    10:21:1

16           But let me show you this idea that everybody has    10:21:1

17   already decided that VIOXX causes VTE events and so that's    10:21:1

18   somehow dispositive of this issue.    10:21:2

19           It's true that Dr. Crowther speculated about what    10:21:2

20   might have been behind the thinking of some of the reviewers in    10:21:2

21   deciding not to publish his analysis, but he was asked    10:21:3

22   specifically about whether he actually knew that.  Down at the    10:21:4

23   bottom there, Ms. Oldfather asked:  So are you saying that the    10:21:4

24   peer reviewers of these journals are of the opinion that COX-2s    10:21:4

25   in general and rofecoxib in particular are in fact associated    10:21:5

1    with VTEs?  There's no way I could know that.                     10:21:5

2               That's true, there's nothing in the record to          10:22:0

3    suggest that.  He was speculating about something.                10:22:0

4               There's been a discussion about this Utah Medicaid      10:22:1

5    data.  Your Honor, this is the very first time I've ever heard     10:22:2

6    of it, right now today.  She handed us a binder that I guess       10:22:2

7    includes -- I haven't had an opportunity to read that,            10:22:2

8    obviously.  Have no idea what it says.  Sounds like it's an       10:22:2

9    observational study.  Plaintiffs' experts haven't said a word      10:22:3

10   about it in this matter.                                           10:22:3

11              They also haven't relied on any observational data      10:22:3

12   to try to establish any general causation.                        10:22:4

13              Now, there's also been a discussion by Ms.              10:22:5

14   Oldfather about some kind of miniature pooled analysis within      10:22:5

15   the APPROVe study.  She said that they were looking at all of      10:22:5

16   the events of cardiac failure, heart failure and PE.  And she      10:23:0

17   said that PE stood for pulmonary embolism.                         10:23:0

18              Let's look at what PE really stands for and what        10:23:1

19   they were actually doing in APPROVe.                               10:23:1

20              And, Ms. Oldfather, this is just the published          10:23:2

21   data from APPROVe.                                                 10:23:2

22              Earlier separation between the groups of the            10:23:2

23   non-adjudicated, investigator-reported, congestive heart          10:23:3

24   failure, pulmonary edema or cardiac failure.  Again, just not      10:23:3

25   true.                                                              10:23:4

1          Ms. Oldfather even raised the issue of VICTOR,         10:23:4

2   saying VICTOR -- maybe VICTOR shows something we can hold on to   10:23:5

3   for purposes of *Daubert*.         10:23:5

4          We gave Dr. Zambelli-Weiner all day at her         10:23:5

5   deposition to rely on VICTOR, and she didn't want to.  She chose   10:23:5

6   not to.  Maybe because that was another study that was ended   10:24:0

7   prematurely along with APPROVe.  Hard to know.         10:24:0

8          The Schmidt study from 2011, that's a         10:24:1

9   retrospective observational study.  She said maybe the Schmidt   10:24:1

10  study gives us enough.         10:24:2

11          Number one, Drs. Zambelli-Weiner and Brooks didn't   10:24:2

12  look at the Schmidt study.  That's a pooled analysis that they   10:24:2

13  did.  That's one point.         10:24:2

14          Secondly, let's look to see what the authors in   10:24:3

15  the Schmidt study actually said.  This is in their conclusion:   10:24:3

16  It will fall to future studies to establish whether this   10:24:3

17  association is causal.         10:24:4

18          So they weren't saying there was a causal         10:24:4

19  association.  They were saying you'd have to look at other   10:24:4

20  studies, you'd have to conduct other studies to make that   10:24:4

21  determination.  Presumably actually randomized clinical studies.   10:24:5

22  Essentially the same thing that Dr. Olyaei said and that   10:24:5

23  Dr. Spyropoulus, there may be questions but you have to   10:24:5

24  establish it with actual studies.         10:24:5

25          On the subject of power, whether or not there was   10:25:0

1    enough power.  It's a little bit funny of an argument to make,     10:25:0

2    in my view, given that you've excluded 13,000 patients' worth of    10:25:1

3    data.  They've kept out these 11 studies.  And so, to then walk     10:25:1

4    in here and say:  We just didn't have enough data to make a         10:25:2

5    determination.  Again, if you think that active comparator data     10:25:2

6    is just as good as placebo controlled data, then not why not        10:25:3

7    look at everything?  It's a little hard to have sympathy about      10:25:3

8    the power data when that much of the placebo controlled data,       10:25:3

9    more than half, has been kept out of the pooled analysis.           10:25:3

10            She said:  Well, there's this large placebo               10:25:4

11   controlled study, maybe we should look at that.  That's protocol    10:25:4

12   078.  Your Honor may remember 078, that's one of the Alzheimer's    10:25:4

13   studies.  Let's look at what the data showed from 078.              10:25:5

14            This is Exhibit 14 from Dr. Zambelli-Weiner's              10:26:0

15   deposition.                                                         10:26:0

16            Peripheral vascular events -- look at the top --           10:26:0

17   0.  On placebo, 3.                                                  10:26:2

18            On the issues of statistical significance, if I            10:26:2

19   understood Ms. Oldfather right, she was essentially inviting        10:26:2

20   this Court to overturn Fifth Circuit precedent on the subject of    10:26:2

21   whether or not experts can rely on statistically insignificant      10:26:3

22   results.  I don't think that would be appropriate.  We can get      10:26:3

23   to this in a little bit when we talk about Ms. Oldfather's          10:26:4

24   motion, but let me just reference this point, because Ms.           10:26:5

25   Oldfather raised it.  There's been continued distortion about       10:26:5

1    what Dr. Crowther actually did in his analysis.  And so I'd just    10:26:5

2    rather nip it in the bud.    10:27:0

3                This is from his report.  There's been some    10:27:0

4    suggestion that he only looked at these articles, he just read a    10:27:0

5    bunch of articles.  He didn't actually look at the VIOXX    10:27:1

6    clinical studies that Merck conducted.  That's just false.    10:27:1

7    In addition to the published data referred to above, I'm also    10:27:2

8    aware that Merck conducted all these studies.  He reviewed    10:27:2

9    these, too.    10:27:3

10                Now, Your Honor, just as a final note -- unless    10:27:4

11    Your Honor has any questions about something I might have missed    10:27:5

12    that Ms. Oldfather mentioned -- I would just note that we ought    10:27:5

13    be focused on what Zambelli-Wiener and Brooks actually did.  How    10:28:0

14    did they put this study together?  Was it methodologically    10:28:1

15    sound?  Or was it scientifically unprecedented?    10:28:1

16                It's the latter.  The exclusion of 11 placebo    10:28:1

17    controlled studies, 13,000 patients' worth of placebo controlled    10:28:2

18    data, because it's not a Phase III study or because it was    10:28:2

19    terminated early?  There's no precedence to say that that's    10:28:2

20    scientifically appropriate, and it's not.    10:28:3

21                Reliance on un-adjudicated data.  Well, Ms.    10:28:3

22    Oldfather's response to that was just essentially to wrap a    10:28:3

23    bandage around the leg.  Oh, that's just a bandage.  Well, it's    10:28:3

24    a methodological error and it's not supported by the scientific    10:28:4

25    literature.  And, at the end of the day, it's not statistically    10:28:4

```
1    significant anyway.                                      10:28:5

2            Thank you, Your Honor.                           10:28:5

3        THE COURT:  All right.  Thank you very much.         10:28:5

4            Now it's plaintiffs' turn for questioning the    10:29:0

5    defendant's experts.                                     10:29:0

6        MS. HASTINGS:  May it please the Court, my name is   10:29:2

7    Megan Hastings, and I'm here today on behalf of the Venous  10:30:2

8    Thromboembolism or the VTE plaintiffs.                   10:30:2

9            And, with the Court's permission, I'd like to    10:30:3

10   reserve five minutes for rebuttal.                       10:30:3

11           You've already heard from my co-counsel, Ann     10:30:3

12   Oldfather, and I'm here today to ask to the Court to exercise  10:30:3

13   its gate-keeper function.                                10:30:3

14           I'll be addressing two motions, a motion to      10:30:4

15   preclude certain testimony of Mark A. Crowther, MD, and a motion  10:30:4

16   to preclude the testimony of John P. Kress, MD.  I'm going to  10:30:4

17   outline some of the issues I'm going to raise today.     10:30:5

18           The VTE claims, we are going to ask the Court to  10:30:5

19   exclude Dr. Crowther's literature review.  It contains   10:30:5

20   methodological errors; it has failed peer review on three  10:30:5

21   occasions; and it's further proof that it is inappropriately  10:31:0

22   designed to capture VTE events; it also shows no increased  10:31:0

23   arterial risks associated with VIOXX.                    10:31:0

24           Plaintiffs also ask that Dr. Crowther be precluded  10:31:1

25   from offering testimony in five areas where he specifically and  10:31:1
```

1   repeatedly disclaimed expertise during his deposition.  And                          10:31:1

2   those areas -- and we'll get into that a little bit later -- are                     10:31:2

3   prostaglandin, prostacyclin, the COX-2 pathways, arterial events                     10:31:2

4   and thromboglobulin.                                                                 10:31:2

5                Finally, we are asking that Dr. Crowther be                             10:31:3

6   precluded from misrepresenting two journal articles that he                          10:31:3

7   cited in his expert report, articles by Bishop Bailey and Ost.                       10:31:3

8                And, finally, we will ask that Merck be precluded                       10:31:4

9   from offering Dr. Kress's testimony in this case because, quite                      10:31:4

10  frankly, he has testified outside of his specialty.                                  10:31:4

11               Now, the slide that you're looking at right now is                      10:31:4

12  a slide or is a summary of the discussion section of                                 10:31:5

13  Dr. Crowther's literature review, which I believe is attached at                     10:31:5

14  Tab 9 of the materials that we handed Your Honor.  So this                           10:31:5

15  section contains the conclusions from Dr. Crowther's review.                         10:32:0

16               Specifically, this conclusion, this study, to our                       10:32:0

17  knowledge, is the first to provide reliable estimates of the                         10:32:1

18  risk of VTE in patients receiving rofecoxib compared to placebo.                     10:32:1

19  Data from 15 placebo controlled randomized clinical trials in 14                     10:32:1

20  patient populations found no association between rofecoxib use                       10:32:2

21  and VTE.                                                                             10:32:2

22               We are not challenging Dr. Crowther's conclusion.                       10:32:2

23  We're challenging how he got here.  Because of the methodology                       10:32:3

24  that he used to reach this conclusion, his literature review is                      10:32:3

25  simply not reliable.  I'm going to explain why that is the case.                     10:32:3

1            So let's look at the statistics on Dr. Crowther's            10:32:4

2    literature review.  It's based on 15 journal articles, none of   10:32:4

3    which examine VTE as a primary and a secondary end point.         10:32:4

4            So this might be a good opportunity to kind of            10:32:5

5    refer to some of the statements that Mr. Boehm made about what    10:32:5

6    an end point is.                                                  10:32:5

7            An end point is what the study is looking at, not        10:32:5

8    whether an AE exists.  The study will capture adverse events or   10:33:0

9    refer to adverse events, but the end point itself is what the     10:33:0

10   study designs -- the outcome of the study was designed to         10:33:1

11   achieve.                                                          10:33:1

12           It took Dr. Crowther about ten minutes to complete       10:33:1

13   his analysis.  And, although plaintiffs' counsel requested        10:33:1

14   electronic source data from Dr. Crowther's extraction of the      10:33:2

15   results of these 15 articles, he didn't retain any, and none was  10:33:2

16   ever provided to plaintiffs' counsel.                             10:33:2

17           Now, as far as what Dr. Crowther says is contained       10:33:3

18   within his literature review, he never went beyond what's         10:33:3

19   reported in the 15 journals articles.  So he didn't review any    10:33:3

20   Merck clinical study reports -- and he agreed with this during    10:33:4

21   his deposition -- and he did not go beyond what's reported in     10:33:4

22   the journal articles.                                             10:33:4

23           He also testified that each of the papers he             10:33:5

24   examined looked at both arterial and venous outcomes.  He says    10:33:5

25   that, in each paper, there is a listing of the arterial and the   10:33:5

1  venous outcomes; that those outcomes are contained in a table;

2  and that he and his team went through each table, extracted the

3  relevant venous data; and reported that in his literature

4  review.

5          Now, this is the point where I want to spend some

6  time.  This is a misrepresentation by Dr. Crowther.  Whether it

7  was intentionally or unintentionally, I'm going to show the

8  Court that there is no way that the count that Dr. Crowther

9  obtains in his literature review is accurate.

10          You may recall, he cited eight VTEs in the

11  rofecoxib part and nine in the placebo part.  And, to give the

12  Court an example, I'm going to walk through three journal

13  articles in his review, articles by Hawkey, Laine and Isaacson.

14          So this is an adverse event table that's pooled

15  from the Hawkey article.  I'll leave that up for a moment so the

16  Court can become familiar with it.

17          As you can see, on the left, it lists adverse

18  experience.  And, on the right, it lists placebo and various

19  amounts of the VIOXX administered to each of the arms, 25 and 50

20  milligram doses.

21          Now, the numbers that you are seeing are not a

22  true member.  In this case, they are percentages.

23          So we can see that around 80 to 82 percent,

24  respectively, of the 25 and 50 milligram users who were taking

25  VIOXX had an adverse experience.

1    However, if you go below that and look at the

2  counts, those only sum to 38.2 and 33.3 percent of adverse

3  experiences.

4    So what does that tell us?  That tells us that

5  there is missing data here.

6    And, if you'll notice, this is the only table

7  that's in the article.  That's it.  There's no table that

8  contains an arterial outcome.  There's no table that contains a

9  list of the venous outcomes.

10    So, you will have to forgive me, I did the math,

11  and I don't have the true numbers here.  I believe there were

12  195 participants in the 25 milligram arm and 193 participants in

13  the 50 milligram arm.  If you multiple the percentages and then

14  take the difference between the 80 some percentages and the 30

15  some percentages, you're left with 82 missing events at the 25

16  milligram dosage, 95 missing events at the 50 milligram dosage.

17  That's a total of 177 events.

18    Now, those 177 events could be venous thrombolic

19  events, they may not be venous thrombolic events.  The truth is,

20  we don't know.

21    What we do know is that Dr. Crowther did not go

22  beyond what's reported in the article to ascertain what these

23  events are.

24    So, despite having all of Merck's CSRs, its

25  clinical trial data, any data that he wanted at his disposal,

```
 1   what does he do?  He reports this article as showing zero VTE      10:36:3
 2   events, when the truth is he doesn't know.  You cannot tell the    10:36:4
 3   amount of VTE events that occurred in this underlying trial by     10:36:4
 4   looking at this article itself.                                    10:36:5
 5           Another example, Laine 2004.  Here, again, we have         10:36:5
 6   a table that shows clinical adverse experiences.  And these are    10:36:5
 7   listed as true numbers and not as percentages.                     10:36:5
 8           235 clinical AEs on VIOXX.  However, the table             10:37:0
 9   only details 57 of these events.  And, again, as you can see,      10:37:0
10   the event that details are GI events, edema, hypertension and      10:37:1
11   heart failure.  These events are not arterial events and they're   10:37:1
12   certainly not venous events.  So that's 178 missing events.        10:37:1
13           Again, we know from Dr. Crowther's deposition             10:37:2
14   testimony that he limited his review to the results contained in   10:37:2
15   the article.                                                       10:37:2
16           What does he do?  He again reports this in his            10:37:3
17   table, this article, as representing that there were zero VTE      10:37:3
18   events.                                                            10:37:3
19           Finally, let's look at one more example, Aisn            10:37:3
20   2003.  Twenty-six VTEs occurring on VIOXX.  Only 11 events         10:37:4
21   described, none of them VTE.  That's a difference of 15 events     10:37:4
22   missing.  Yet, again, without going behind the reported data,      10:37:5
23   Dr. Crowther goes ahead and reports these as zero VTE events.      10:37:5
24           So this is a summary slide that looks at all of          10:38:0
25   these events combined.  That's a total of 370 missing adverse      10:38:0
```

1    events.  That's over 20 times the reported events that

2    Dr. Crowther has in his literature review.  That is a

3    significant number.

4              If he really wanted to suss out what was going on

5    and whether there was a real signal of VTE, all he had to do was

6    look behind the results on the clinical study reports and rule

7    out whether these were VTE events.  He didn't do that.  So he

8    has no true account of the number of VTE events that occurred in

9    these studies.  Quite simply, his count is completely off and he

10   doesn't have the proper enumerator.

11             So why is this methodology flawed?  He reports

12   zeros when the articles don't always report hard numbers.  In

13   some of the articles that are contained within his literature

14   review, they simply said there's not much of a difference

15   between placebo and VIOXX arms.  But that's not the same as no

16   events occurring.

17             As we've seen, he reports zero events when the

18   articles don't report all of the events occurred.  He could have

19   reviewed any of Merck's clinical study reports underlying the

20   underlining information, but we know he didn't do that.

21             *General Electric vs. Joiner* says that scientific

22   evidence is irrelevant when there is too great an analytical gap

23   between the data and the opinion proffered.

24             It's hard for me to imagine a greater analytical

25   gap when the data as represented by Dr. Crowther, being 8 and 9

1    VTE events, simply is not the data that exists.

2              Dr. Crowther's peers agreed with us.  His

3    literature review failed peer review, I'm sure in part, for

4    these reasons.  It was rejected for publication by circulation

5    by the *Annals of Hemostasis and Thrombosis*.

6              And Mr. Boehm and I are going to quibble about

7    this, but Dr. Crowther says in his deposition that the peer

8    reviewers, from reading the emails back and forth and by reading

9    their testament, that the peer reviewers suggest an increased

10   risk between VIOXX and VTE.  It's plain and simple, clear as

11   day, there in his deposition.

12             At least one of the journal articles, which is

13   Thrombosis, questions his methodology.  That same journal asks

14   that Dr. Crowther conduct an internal control regarding arterial

15   events, which Dr. Crowther does not do.

16             So let's take a look at that.

17             So the editors of Thrombosis were concerned that

18   perhaps Dr. Crowther's literature review was not appropriately

19   designed to capture VTE events.  And, I'm paraphrasing this

20   excerpt from the emails, but essentially what they say is, if

21   Dr. Crowther went through his literature review and could

22   confirm a significant increase in arterial thrombosis rates, it

23   would basically show that his review was appropriately designed

24   to capture VTE events.

25             On the other hand, failure to confirm an increase

1    in arterial thrombosis rate for rofecoxib treated patients would    10:40:5

2    clearly call into doubt the analyses of the results obtained    10:40:5

3    from VTE thrombosis.    10:40:5

4            Now, as we know, Dr. Crowther did not conduct his    10:41:0

5    review.  That's what he says in his deposition.  However, the    10:41:0

6    body of Dr. Crowther's literature review states that most of the    10:41:0

7    journal articles don't report any arterial events.    10:41:0

8            Moreover, we went through and looked at each of    10:41:1

9    the journal articles, and most of them, with the exclusion of    10:41:1

10   APPROVe, don't find an increased risk for arterial events or of    10:41:2

11   any serious event as between VIOXX.    10:41:2

12           So, if you take Dr. Crowther's literature review    10:41:2

13   as being correct, it essentially proves that VIOXX is not    10:41:3

14   associated with an increased risk of arterial events.    10:41:3

15           In sum, the methodological shortcomings as to Dr.    10:41:3

16   Crowther's literature is that it improperly reports zero VTE    10:41:4

17   events, when in truth Dr. Crowther doesn't know how many VTE    10:41:4

18   events may have occurred because he failed to go behind the    10:41:5

19   articles and count them as events.  He used studies where VTE    10:41:5

20   was not an end point.    10:41:5

21           He failed peer review on three occasions.  His    10:41:5

22   methods were questioned by at least one journal.  And his review    10:42:0

23   doesn't show an increased arterial risk.    10:42:0

24           Now, plaintiffs have agreed in their motion that    10:42:0

25   Dr. Crowther is imminently qualified to offer opinions on venous    10:42:1

1   thromboembolism.  However, in his deposition testimony, on    10:42:1

2   several occasions, Dr. Crowther expressly disavows certain areas   10:42:2

3   of expertise as outside of what he's comfortable testifying   10:42:2

4   about.  These areas include arterial events, prostaglandins,   10:42:3

5   expertise on prostacyclins, expertise on thromodulines and   10:42:3

6   expertise on the COX-2 pathway.  And plain reading of his   10:42:4

7   deposition will show that that is the case.   10:42:4

8            Now, this is -- this slide is pooled from the   10:42:4

9   supplement to Dr. Lucchesi's report; and, as you can see, it's a   10:42:5

10  breakdown of the COX-2 pathway, and it contains some of the   10:42:5

11  substrates and interactions between the various proteins.   10:43:0

12           So, if we take Dr. Crowther at his word, he's not   10:43:0

13  expert in these areas.   10:43:0

14           As you can see, this flowchart starts to get   10:43:0

15  pretty bare pretty quick.  We're getting rid of all the   10:43:1

16  prostaglandins, prostacyclin.  And then we're going to have to   10:43:1

17  get rid of COX-2 enzymes because he didn't say he's comfortable   10:43:2

18  expressing an opinion on the COX-2 pathway, which actually   10:43:2

19  negates his ability to testify on this whole area.   10:43:2

20           The fact is that Merck did not engage a   10:43:3

21  pharmacologist or an expert on the COX-2 pathway.  Or a   10:43:3

22  mechanism expert.  But Dr. Crowther comments on these areas in   10:43:3

23  his reports.   10:43:4

24           It is a threshold requirement that, for an expert   10:43:4

25  to be *Daubert*-proof, he must be properly qualified.  The burden   10:43:4

1    falls to Merck to prove that.                                          10:43:5

2              If Dr. Crowther does not feel that he contains the           10:43:5

3    requisite expertise to express opinions on this area, I don't          10:43:5

4    know who we are to quarrel with him.                                   10:43:5

5              Finally, Dr. Crowther should be precluded from his           10:44:0

6    extrapolation in regard to the Bishop Bailey and the Ost              10:44:0

7    articles in which he eventually says that based upon these            10:44:0

8    articles there's no COX-2 in the venous vasculature.                  10:44:1

9              In his deposition, however, he says that neither            10:44:1

10   of the articles stand for the proposition he expressed.  Neither      10:44:1

11   of the articles say that COX-2 is not expressed in venous             10:44:2

12   segments.                                                             10:44:2

13             The *Black vs. Food Lion* case says that the Court          10:44:2

14   may consider, in assessing the scientific reliability of expert       10:44:2

15   testimony, whether the expert has unjustifiably extrapolated          10:44:3

16   from an accepted premise to an unfounded conclusion and whether       10:44:3

17   the expert has adequately accounted for alternative                   10:44:4

18   explanations.                                                         10:44:4

19             Dr. Crowther's extrapolation from the Bishop Baily          10:44:4

20   articles are incorrect, and here's how I show the Court why that      10:44:4

21   is the case.                                                          10:44:5

22             In the Bishop Bailey article, the author sought to          10:44:5

23   understand whether both arterial and venous segments could           10:44:5

24   express COX-2.  So they took fresh arterial venous segments.         10:44:5

25   They didn't have any COX-2 messenger RNA in them.  And, after a      10:45:0

1    period of time, after they were manipulated, they both expressed    10:45:0

2    COX-2.  So the segments responded identically to the treatment.    10:45:0

3    So that's a little quote from the article itself.  So you've got    10:45:1

4    veins responding similarly to arteries.    10:45:1

5              So, if we hold Dr. Crowther's extrapolation to be    10:45:2

6    true, that from this basis there's no COX-2 that is present in    10:45:2

7    the venous vasculature, you have to hold that the same premise    10:45:2

8    is true on the arterial side.  That would mean that there is no    10:45:3

9    COX-2 in the arterial vasculature for VIOXX-2 inhibits.  And I    10:45:3

10   don't think that anyone in this courtroom who has been involved    10:45:4

11   in this litigation would agree that that is the case.    10:45:4

12             Let's not forget that Dr. Crowther's literature    10:45:4

13   review finds no increase in the risk of arterial events.    10:45:5

14             So, when you take those two facts together, you    10:45:5

15   have to wonder why Merck has paid $4.5 billion in settlements to    10:45:5

16   heart attack and stroke claimants.  There's a serious    10:46:0

17   methodological problem with the methodology he used here.    10:46:0

18             I'm going to briefly touch on Dr. Kress.  The    10:46:1

19   image on the left is taken from Dr. Kress's page on the    10:46:1

20   University of Chicago website.  His residency and board    10:46:1

21   certifications are in internal medicine, pulmonary medicine,    10:46:2

22   critical care medicine and anesthesiology.  He publishes and    10:46:2

23   researches on sedation and anesthesiology and critically ill    10:46:3

24   patients.  He's never published on NSAIDs, on COX-2 inhibitors,    10:46:3

25   on DVTs, cellular biology, pharmacology or epidemiology.    10:46:3

| | | |
|---|---|---|
| 1 | Quite simply, he's testifying outside of his | 10:46:4 |
| 2 | specialty.  He's not a pharmacologist or mechanism expert, the | 10:46:4 |
| 3 | best example of which is seen in his expert report where he | 10:46:4 |
| 4 | discusses the propagation of venous clot, he says begins with a | 10:46:5 |
| 5 | white thrombus, which is platelet-based.  And that is simply | 10:46:5 |
| 6 | wrong.  Not only is it contradicted by plaintiffs' experts, it's | 10:47:0 |
| 7 | contradict by Dr. Crowther's report.  So you can just read the | 10:47:0 |
| 8 | two reports together and see that Dr. Kress is outside of his | 10:47:0 |
| 9 | specialty. | 10:47:1 |
| 10 | He's not a pathophysiology expert.  He's not a | 10:47:1 |
| 11 | hematologist.  He's not an epidemiologist. | 10:47:1 |
| 12 | I believe that Your Honor had dealt with a similar | 10:47:2 |
| 13 | issue in the *Wagoner* case where he had an M.D. there that was | 10:47:2 |
| 14 | offering opinions on epidemiology.  However, in that case, I | 10:47:2 |
| 15 | believe Your Honor found that that M.D. maintained an active | 10:47:3 |
| 16 | research interest in epidemiology.  On the face of Dr. | 10:47:3 |
| 17 | Crowther's CV, we don't have that same interest in epidemiology. | 10:47:4 |
| 18 | So, quite simply, we don't feel that he's qualified to offer | 10:47:4 |
| 19 | these opinions. | 10:47:4 |
| 20 | In sum, we ask, for the aforementioned reasons, | 10:47:4 |
| 21 | that we preclude Dr. Crowther's testimony and the areas that | 10:47:4 |
| 22 | we've indicated, and preclude the testimony of Dr. John Kress. | 10:47:5 |
| 23 | THE COURT:  Okay. | 10:48:0 |
| 24 | MS. HASTINGS:  Thank you. | 10:48:0 |
| 25 | THE COURT:  I'll hear your response. | 10:48:0 |

```
 1              MR. BOEHM:  Mr. Tomaselli, who was so helpful during my      10:48:0

 2   argument, is going to argue.                                            10:48:0

 3              THE COURT:  Okay.                                            10:48:1

 4              MR. TOMASELLI:  Get my day in court, Your Honor.             10:48:1

 5              Good morning.                                                10:48:1

 6              THE COURT:  Good morning.                                    10:48:1

 7              MR. TOMASELLI:  My name is Joe Tomaselli.  I'm with          10:48:1

 8   Goldman Ismail.  You know my partners, Tarek Ismail and Andy            10:48:1

 9   Goldman very well, and they obviously give their regards.               10:48:2

10              THE COURT:  I knew them when they were with another          10:48:2

11   firm.                                                                   10:48:2

12              MR. TOMASELLI:  Yes, sir.                                    10:48:2

13              I've sat behind the bar here for, I believe we're            10:48:2

14   now at seven VIOXX trials.  I've sat behind the bar for all the         10:48:3

15   Daubert hearings.  I've read all of your rulings.  And now is my        10:48:3

16   time.                                                                   10:48:4

17              But I don't think there's any question in this               10:48:4

18   courtroom whether Dr. Crowther and Dr. Kress are qualified to           10:48:4

19   say what they say, and I think those were the comments earlier          10:48:4

20   today.                                                                  10:48:5

21              I want to address -- and I'm very mindful of the             10:48:5

22   Court's time.  So, if the Court has very specific questions,            10:49:0

23   shoot.  Otherwise, I'll keep mine brief to get you on your way.         10:49:0

24              With respect to the literature, there were a few             10:49:0

25   things that were said, and I want to set the record straight on         10:49:0
```

1    them.

2              Number one, they said that Crowther's review took

3    about ten minutes.  Well, once you have all the articles and

4    you're just looking for the number of patient years and the

5    number of zeros or 1s or 2s, that takes about ten minutes to put

6    in the computer to get the results.  What doesn't take ten

7    minutes is, of course, thinking about the study, designing the

8    study, getting all the results from the librarian for all the

9    articles that numbered 13,039.  It's not ten minutes to go

10   through the 13,039 articles that meet the pre-specified

11   criteria.  So to say that Dr. Crowther's analysis took ten

12   minutes is really just a -- is pretty much an exaggeration.

13             Whether Dr. Crowther is qualified to do a

14   systematic literature review, you need only go as far as

15   plaintiffs' own expert, Dr. Spyropoulus, who was questioned:  Do

16   you consider Dr. Crowther to be an expert on systematic reviews

17   of the available published literature?  On the effects of the

18   medications on the occurrence of VTE, he is an expert.  He's an

19   expert.  There's no question about it.

20             And the idea that this is a systematic review of

21   medical literature, of published medical literature.  A lot of

22   the plaintiffs' disagreements with his methodology was, they

23   kept saying he didn't go behind the data.  He didn't go behind

24   the data.  He didn't go ask or to the CSRs to see whether there

25   were any events.  Well, this is a systematic review of published

1    literature.  There is an exact way that you do that; you look at    10:50:4

2    the published literature and you take what you can out of it.    10:50:4

3    That is a very typical -- it's a very typical way of doing a    10:50:4

4    systematic review of the published literature.    10:50:5

5              And then we've heard earlier this morning when Ms.    10:50:5

6    Oldfather said:  And Dr. Crowther didn't look at the CSRs, he    10:50:5

7    actually didn't look at the Merck's clinical trials.    10:51:0

8              Well, that's not true.  As Mr. Boehm put up, at    10:51:0

9    page 5 of his report, he goes through and says:  I actually    10:51:0

10   looked at Merck's clinical data.    10:51:1

11             Now, did he go behind Merck's 80 page review of    10:51:1

12   its own clinical trials and go and see whether the abstracted    10:51:1

13   data by Merck was correct through the clinical study reports?    10:51:1

14   No, he didn't.  He relied on the data, the 80 page report that    10:51:2

15   was submitted to the FDA, with respect to those trials.    10:51:2

16             Now, plaintiffs focused on three of them.  The    10:51:3

17   Aisen 0-3 trial.  Well, that's not actually a Merck protocol.    10:51:3

18   That's Dr. Paul Aisen's.  He's out in La Jolla.  He's an expert    10:51:3

19   on Alzheimer's disease.  And he did his own study with VIOXX.    10:51:4

20   So I guess their complaint is with Dr. Aisen and what he    10:51:4

21   reported.    10:51:4

22             And did Dr. Crowther go and ask Dr. Aisen:  You    10:51:4

23   know, you reported one myocardial infarction in your trial but    10:51:5

24   you didn't record any venous thrombosis events; did you have    10:51:5

25   any?  No, he didn't do that.  Of course, that's not how a    10:51:5

1    systematic review of the published literature is done.  You rely          10:52:0

2    on the published literature.                                               10:52:0

3                    And then there were two other trials that                  10:52:0

4    plaintiffs focused on.                                                     10:52:0

5                    The Hawkey 2000 publication.  Well, that's                 10:52:0

6    actually a Merck protocol.  That's Protocol 045.  And Protocol             10:52:1

7    045 is actually in the 26 trials that Dr. Crowther looked at               10:52:1

8    that's contained on page 5 of his report.  That's one of the 26.           10:52:2

9                    The other study, Laine 04, well, we don't know             10:52:2

10   what that study is.  Well, actually, that's a Merck protocol,              10:52:3

11   too.  That's Study 136.  And guess what?  Study 136 is actually            10:52:3

12   in the 26 trials that are contained within the Merck analysis of           10:52:3

13   that data.  That is -- that is Study 136 that plaintiffs' expert           10:52:4

14   Dr. Zambelli-Weiner had the clinical study report but they                 10:52:4

15   didn't look at.  So we actually know what happened in Study 136.           10:52:5

16   Nobody had any venous events.                                              10:52:5

17                   And that, of course, is in the data that                   10:52:5

18   Dr. Crowther looked at.  That's Exhibit G to plaintiffs' motion            10:53:0

19   for summary judgment that was filed back in 2011.  We can                  10:53:0

20   actually go look at that if that's really -- I'm sorry --                  10:53:0

21   defendant's motion that was filed in November of 2011.                     10:53:1

22           THE COURT:  What's your answer to the fact that he                 10:53:1

23   failed peer review with his --                                             10:53:1

24           MR. TOMASELLI:  That's a great question, Your Honor.               10:53:2

25                   Number one is, he didn't fail peer review.  First          10:53:2

 1    of all, he wrote it up as an abstract for the American Society          10:53:2

 2    of Hematology.  And it was accepted and it was presented as an          10:53:2

 3    abstract at the national meeting of the American Society of             10:53:3

 4    Hematology.                                                             10:53:3

 5                Then, then, he went and said:  Well, I'm going to           10:53:3

 6    go try to publish this manuscript.  And so then he submitted the        10:53:3

 7    manuscript, and that's actually what's been rejected.                   10:53:4

 8                Now, what plaintiffs focused on, or plaintiffs'             10:53:4

 9    counsel focused on, in her argument was that, well, one of the          10:53:4

10    peer reviewers said:  You know, to make this analysis yet even          10:53:5

11    more robust, not just focusing on the venous events, but you            10:53:5

12    could have undertaken analysis of the arterial events and that          10:54:0

13    would have made your analysis yet more robust, at least in that         10:54:0

14    referee's -- Referee No. 2's opinion.                                   10:54:1

15                Well, if I may, Your Honor, the front page of the          10:54:1

16    referee's comments actually says what we need to know.  The             10:54:2

17    plaintiffs' argument was, in their briefs, that this lack of            10:54:2

18    peer review was inadequate scientific rigor and inadequate              10:54:3

19    methodology.  Well, that's not actually what the peer reviewer          10:54:3

20    said.  They said:  It's a well designed and nicely conducted            10:54:4

21    study.                                                                  10:54:4

22                So, in fact, that is the response.  The response           10:54:4

23    is, these peer reviewers said:  Good job, Dr. Crowther, really          10:54:4

24    like your analysis; really interesting; but, yet, VIOXX has been        10:54:5

25    withdrawn from the market, it's off the market now nine years,          10:54:5

1    it may not have all that much interest to practicing clinical

2    physicians.

3              As we stated in our papers, there's a myriad of

4    reasons why papers don't get published.  But the fact is, his

5    abstract was actually accepted by the American Society of

6    Hematology.

7              The interesting thing, I guess, as I sat here

8    today, was that, in plaintiffs' opening brief, they made this

9    huge point about how Dr. Crowther had this conflict of interest

10   that he didn't disclose.  And deposition Exhibit 3, at his

11   deposition when we sat there in October, and it was provided to

12   him, and he says:  Gosh, this is a weird abstract.  I don't

13   really recognize the format, it's not in an ASIS format; I mean,

14   I should have my conflict of interest here; I know I gave it to

15   the American Society of Hematology; maybe there's just a

16   mistake.

17             Well, in our responding brief, we actually gave

18   the Court -- and I believe it's Exhibit C -- the materials from

19   the American Society of Hematology.  Because, Dr. Crowther, he

20   says:  Gosh, that does bother me, I'm going to go ask the people

21   at the American Society of Hematology.  So he does.  And they

22   come back to him say:  Gosh, we have your conflict.  And it was

23   in there in 2011.  So he's scratching his head and thinking:

24   Well, what could that possibly be.

25             So we attached it to our opposition and we write a

```
 1    letter -- or an email, I think it was -- and we say really would    10:56:2
 2    like to inspect that original source for that deposition Exhibit     10:56:2
 3    No. 3 that you wrangled Dr. Crowther over about his conflict of      10:56:3
 4    interest.                                                            10:56:3
 5                Well, not only do we not get a response to that,         10:56:3
 6    but the reply, the conflict of interest, doesn't become what it      10:56:4
 7    was in the original brief, it becomes he had a conflict of           10:56:4
 8    interest.  Well, of course he does.  Everybody would.  To the        10:56:4
 9    extent Drs. Zambelli-Weiner and Spyropoulus submitted whatever       10:56:5
10    they would to a society or to a publication, they would             10:56:5
11    obviously have a conflict of interest, too.  So now it's just he     10:57:0
12    has a conflict of interest.  Well, no dispute there.  But I          10:57:0
13    guess there's no dispute anymore that he actually submitted this     10:57:0
14    conflict of interest.                                                10:57:1
15                One more point with regard to his methodology.  He       10:57:1
16    didn't use studies in his methodology that show an increased        10:57:1
17    risk of arterial events.  So his studies must not be very good,      10:57:2
18    because the studies in it don't even show an increase in             10:57:2
19    arterial events, and that's what this litigation has been about      10:57:2
20    for a decade.                                                        10:57:3
21                Well, it included the APPROVe study.  And, I've          10:57:3
22    sat in seven trials, and every single expert that gets on the        10:57:3
23    stand talks about the APPROVe study.  And he had that in his         10:57:4
24    analysis.                                                            10:57:4
25                Well, no other study showed an increased risk in         10:57:4
```

1    arterial events.  Well, there was a numerical imbalance in

2    VICTOR.  He got that one in there.  In fact, the fall study in

3    2007 has 38 events on VIOXX and 36 on placebo.  Yet again a

4    numerical imbalance.  So this allegation that, well, he didn't

5    include any studies that had an increased risk of arterial

6    events or didn't even pretend to show that there might be an

7    increased risk of arterial events, that's just simply not true.

8              Again, I'm mindful of the Court's time, and so I'd

9    like to just focus on one thing with respect to this argument

10   with respect to his qualifications regarding whether COX-2 is in

11   the venous vasculature.  And I actually had a slide on this that

12   maybe I can find.

13             But their motion at page 7 simply says this, Your

14   Honor:  The problem with his testimony is his invalid conclusion

15   that there is no COX-2 in the venous vasculature.  It's his

16   invalid conclusion that they're arguing with.  And, of course,

17   I'm not going to get into that, because I think we know where we

18   end up there.

19             And with respect to, finally, plaintiff counsel

20   put up a slide that said veins equal arteries.  Well, they're

21   the only people in this litigation that think veins equal

22   arteries.  Every single expert has said veins don't equal

23   arteries.  In fact, they have different risk factors.  They have

24   different causes.  They have different pathophysiologies.  As

25   the Court heard, we talked about arthrosclerosis and plaque and

1   plaque rupture and thrombosis that comes on top of that plaque

2   rupture.  Well, venous events are very different.  It's all

3   about stasis.  And every one of the experts says, you know what,

4   you can't look at arterial events to see if you have an

5   increased risk in venous events; you have to focus on the venous

6   event.  And that's what everybody does.  That's what

7   Dr. Crowther does.  That is what Dr. Kress does.  That's what

8   Dr. Spyropoulus does.  That's what Drs. Zambelli-Weiner and

9   Brooks do.  They're all relying on venous events.  And, to try

10  to say that, well, Dr. Crowther is not qualified to talk about

11  arterial events because he's a venous guy, well, it's a

12  foundational point.

13          The foundation is, there is the difference between

14  veins and arteries.  And, because they're so different -- which

15  everybody, by the way, agrees -- we have to look at the venous

16  events.  And that's what he does.  He does it through a

17  systematic review of published literature and he also does it

18  through the analysis of Merck's clinical trials in the big

19  pooled analysis of 26 studies that was ultimately provided to

20  the FDA.  So he didn't just look at the published peer review

21  data; he said the published peer review data doesn't show an

22  increased risk.  Shows no association.

23          Moreover, all of Merck's clinical trials, the one

24  that Drs. Zambelli-Weiner looked at half of, they don't show an

25  increase.  When you look at all of them, they don't show an

```
 1    increased risk versus placebo.                              11:00:5

 2            THE COURT:  Plaintiffs' position is that there's no end  11:01:0

 3    point target in those articles.                            11:01:0

 4            MR. TOMASELLI:  That's correct.                    11:01:0

 5                The answer to that is, well, that's true with  11:01:0

 6    respect to every single VIOXX article.                     11:01:1

 7                The primary end point of all the VIOXX studies was  11:01:1

 8    efficacy.  Does VIOXX reduce osteoarthritis pain.  Does it  11:01:2

 9    prevent GI bleeding.  Does it reduce the occurrence of colon  11:01:2

10    polyps.  These are the primary end points of the studies.  11:01:3

11    However, every single one of those studies gathered adverse  11:01:3

12    events.                                                    11:01:3

13                And, in fact, as the Court will recall, in 1998,  11:01:3

14    Merck set up the cardiovascular standard operating procedure to  11:01:4

15    take all of these suspected adverse events that may be     11:01:4

16    thrombotic in nature and send them out for adjudication by  11:01:4

17    blinded experts, as Mr. Boehm said.  And these blinded experts  11:01:5

18    were in fact venous thromboembolism experts.  They sent the  11:01:5

19    potential heart attacks to the cardiologist, while they took the  11:02:0

20    potential venous events and they sent those to peripheral  11:02:0

21    vascular experts.  Where did they send them?  Well, McMaster  11:02:1

22    University had two of them.  And that's where Dr. Crowther's  11:02:1

23    from.  And Dr. Spyropoulus worked there, too, for awhile.  I  11:02:1

24    mean, it's the hub of venous thromboembolism data.         11:02:2

25                So the fact is that the primarily end point, we  11:02:2
```

| | |
|---|---|
| 1 | would stipulate, none of these studies have a primary end point | 11:02:2 |
| 2 | of venous thromboembolism.  But neither did these studies have a | 11:02:2 |
| 3 | primary end point of myocardial infarction.  It's always been an | 11:02:3 |
| 4 | analysis of adverse events.  That, ultimately, Merck not only | 11:02:3 |
| 5 | took the adverse events that were looked at by the investigators | 11:02:4 |
| 6 | and coded by the investigators, but they went through the second | 11:02:4 |
| 7 | rigorous analyses of let's look -- let's let experts in the | 11:02:4 |
| 8 | field, blinded as to treatment, say whether an event actually | 11:02:5 |
| 9 | occurred. | 11:02:5 |
| 10 | And so, were these studies designed to detect | 11:02:5 |
| 11 | venous thromboembolism?  No, they weren't.  But, as Mr. Boehm | 11:03:0 |
| 12 | referred to Dr. Spyropoulus, who's also an expert in venous | 11:03:0 |
| 13 | thromboembolism, said:  I did a lot of studies with Celebrex, I | 11:03:1 |
| 14 | did studies with Pfizer, nobody -- nobody with an | 11:03:1 |
| 15 | anti-inflammatory trial would think about putting venograms on | 11:03:2 |
| 16 | legs to test whether there was actually a venous thromboembolism | 11:03:2 |
| 17 | that no one complained of.  That's just not done in trials of | 11:03:3 |
| 18 | anti-inflammatories.  The trial that Merck did with VIOXX, well, | 11:03:3 |
| 19 | those were perfectly, perfectly fine.  Exactly the same thing I | 11:03:3 |
| 20 | did with my Celebrex trials. | 11:03:4 |
| 21 | So could they have?  I mean, Your Honor, could | 11:03:4 |
| 22 | they have set up something with all these different VIOXX trials | 11:03:4 |
| 23 | back in 1995 and 1998 to look at venograms and to try to find | 11:03:4 |
| 24 | whether DVTs were there?  They could have done that, but that's | 11:03:5 |
| 25 | simply not -- that wasn't done, and no one says that that should | 11:03:5 |

```
 1    have been done.                                        11:03:5

 2              Your Honor, with respect to Dr. Kress -- again, I   11:04:0

 3    don't want to take too much of your time.  The man is a      11:04:0

 4    professor of medicine at the University of Chicago, and I'll  11:04:0

 5    leave it at that.  If you have any particular questions about 11:04:1

 6    his qualifications, I'm happy to address those.              11:04:1

 7              THE COURT:  No, I don't.                            11:04:1

 8              One last thing on Crowther.  What's the            11:04:1

 9    significance of the fact that he looked at articles and not the 11:04:1

10    clinical data?                                                11:04:2

11              MR. TOMASELLI:  It's actually that he looked at both. 11:04:2

12    So one analysis was that he did look at the articles.  That was 11:04:2

13    his systematic review to say what does the published literature 11:04:3

14    tell me.                                                      11:04:3

15              His second analysis, which plaintiffs forget       11:04:3

16    about, is on page 5 of his expert report where he says:  I also 11:04:3

17    looked at Merck's Phase II-B through Phase V clinical program  11:04:4

18    and that final pooled analysis that's Exhibit G to defendant's 11:04:4

19    motion for summary judgment that was filed in 2011.  I looked at 11:04:5

20    that, and that has 23 placebo controlled clinical trials on    11:04:5

21    Table 13.  And I looked at all that.  And that isn't all the   11:05:0

22    data that's published.  Again, I did one analysis of published 11:05:0

23    data, but my other analysis was to look at all that raw data   11:05:0

24    from all those trials and I don't see an increased risk there. 11:05:1

25              So, he actually did two things, not one.            11:05:1
```

```
 1          THE COURT:  Okay.                               11:05:1

 2          MR. TOMASELLI:  Okay?                           11:05:2

 3          THE COURT:  Thank you very much.                11:05:2

 4          MR. TOMASELLI:  Thank you, Your Honor.          11:05:2

 5          THE COURT:  Any rebuttal?                       11:05:2

 6          MS. HASTINGS:  Your Honor, I'm very mindful of the  11:05:3

 7    Court's time, so I will make this very brief.         11:05:3

 8              So I believe Mr. Tomaselli said that Dr. Crowther  11:05:3

 9    conducted a systematic review of data by defined criterion,  11:05:3

10    which I just want to point out sounds an awful lot like what  11:05:4

11    Drs. Zambelli-Weiner and Brooks did.                  11:05:4

12              And there's a little bit of confusion going on  11:05:4

13    here.  For purposes of his literature review, he did not review  11:05:4

14    clinical study reports.  He didn't.  Says it in his deposition  11:05:5

15    testimony.                                            11:05:5

16              I believe what Mr. Tomaselli is referring to is  11:05:5

17    that he referred to the pooled data that was submitted to Merck  11:06:0

18    by -- to the FDA by Merck on March 22, 2004.  That is a pooling  11:06:0

19    of the data, and that does contain information from the CSRs.  11:06:1

20    The CSRs are still separate documents that contain very specific  11:06:1

21    breakdowns of all of the events that occurred during the  11:06:2

22    clinical trial.                                       11:06:2

23              With regard to the abstract that was accepted by  11:06:2

24    the American Society of Hematology, it was just that, it was an  11:06:2

25    abstract.  There were thousands of abstracts that were presented  11:06:3
```

1    on poster boards during the course of that -- I'm not quite sure    11:06:3

2    what you'd call it -- maybe a meeting.  So it wasn't the    11:06:4

3    literature review that was accepted, it was merely the abstract.    11:06:4

4              Regarding his conflict of interest, you know, we    11:06:4

5    did receive an email from defense counsel, and we responded,    11:06:5

6    saying that we believed it was pooled from an electronic source.    11:06:5

7    At this point, we've pooled reams of paper from various places.    11:06:5

8    We've done a whole library full of it.    11:07:0

9              Oddly, we responded the day that the opposition    11:07:0

10   was filed.  But I don't know if Merck's counsel was able to get    11:07:1

11   to the email in time.  So we did give them a response about    11:07:1

12   that.    11:07:1

13             My real question is, when the articles that    11:07:1

14   Dr. Crowther looks at for purposes of his literature review do    11:07:2

15   not report all of the events, why does he report them as a zero    11:07:2

16   in his table?  Why doesn't he report that as an NA, not    11:07:3

17   applicable?  Or why doesn't he provide some explanation of why    11:07:3

18   all the events are reported?  Because not -- the article's not    11:07:3

19   containing all of the events is not the same as zero VTEs    11:07:4

20   occurring.    11:07:4

21             And I didn't bring this up during my previous    11:07:4

22   presentation of the motions; but, if the Court was so inclined,    11:07:5

23   the Court can go through and look at the numbers of patients    11:07:5

24   that participated in these studies, and there are huge    11:08:0

25   discrepancies.    11:08:0

1      There are portions where, for example, in one

2   article, the placebo, the number of patients that have

3   participated in the placebo controlled trials and the rofecoxib

4   controlled trials are switched.  And it's like that throughout

5   the entirety of the 15 articles.  That is a serious

6   methodological problem.

7          So not only do we have a completely flawed

8   enumerator that counts zero VTE events, but the truth is we

9   don't know the number of VTE events.  We have a flawed

10  denominator.

11          So the representation that eight events of VTE

12  occurred in the rofecoxib arm and nine events occur in the

13  placebo arm is just completely false.

14          Finally, regarding peer review and some of the

15  statements that Mr. Tomaselli made, I believe he put up a slide

16  that said -- by one of the reviewers -- that this is a well

17  performed methodological trial.

18          What that slide was covering was a statement where

19  the reviewers say that they had a problem either with the

20  clinical significance trial of the trial or the methodology of

21  the trial.  And then one of the reviewers goes on, as we saw, to

22  suggest -- this is the slide, and it's covering up the portion

23  that I'm referring to.  So, if you wanted to go to page 1 of the

24  thrombosis and hemostasis emails, Your Honor can see that for

25  himself.

1          So -- and one of the other reviewers is the one

2    who actually brings to life the point that, if it's not

3    appropriately designed to capture arterial events, it certainly

4    is not appropriately designed to capture venous thromboembolism

5    events.

6          Dr. Crowther himself said that the peer reviewers

7    didn't publish this article in part because they feel that VTE

8    is associated with -- or VIOXX is associated with an increased

9    risk of venous thromboembolism, and that's what plaintiffs have

10   been saying all along.

11         We presented a cohesive case from the cellular,

12   pharmacological, pathophysiological, clinical and

13   epidemiological standpoints, and we hope Your Honor will take

14   that into consideration when making his rulings.

15         Thank you.

16    THE COURT:  Thank you very much.

17         The oral presentations were very good, and they're

18   very helpful to me because of all of the material.  I have reams

19   of material in this case, as you can imagine.  I've been in it

20   since 2005.  So I do appreciate the oral argument.

21         Thank you very much.  The court will stand in

22   recess.

23         (11:09 a.m., proceedings concluded.)

24

25

1                          **CERTIFICATE**

2

3

         **I, Susan A. Zielie, Official Court Reporter, do hereby**
4    **certify that the foregoing transcript is correct.**

5

6
                         **S/ SUSAN A. ZIELIE, FCRR**
7    _____

8                         **Susan A. Zielie, FCRR**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25