**EXHIBIT A**

Ellen R. Westrick
Executive Director
Office of Medical/Legal
U.S. Human Health

Merck & Co., Inc.
P.O. Box 4, WP37C-115
West Point PA 19486
Tel 215 652 3476
Fax 215 652 2178

May 12, 2000
(via FedEx)

 MERCK

Spencer Salis, Pharm. D.
Division of Drug Marketing,
 Advertising and Communications
Food and Drug Administration
HFD-42, Room 17B-20
5600 Fishers Lane
Rockville, MD 20857

Re:  NDA 21-042 VIOXX® (rofecoxib) Tablets
     NDA 21-042 VIOXX® (rofecoxib) Oral Suspension

     <u>COMPLAINT vs. Celebrex (celecoxib): Campaign to Disseminate
     False and Misleading Information about the Safety of VIOXX</u>

Dear Dr. Salis:

This concerns certain promotional activities that are false and misleading. First, Searle and/or Pfizer representatives are broadly using negative analyst reports and news stories about VIOXX in their discussions with physicians. These reports are homemade detail aids that lack fair balance and are otherwise false and misleading. Second, Searle and Pfizer disseminated an unsolicited broadcast fax to a large number of physicians on May 10 and 11, 2000, that seriously misrepresents the safety of VIOXX. These activities represent a broad and orchestrated campaign to falsely call into question the safety of VIOXX. By misbranding VIOXX, Searle and Pfizer misbrand Celebrex. Merck is requesting that DDMAC take immediate action to halt these activities.

*Use of Salomon Smith Barney Report*

The first homemade detail piece is one issued on March 28, 2000, based on an analyst's report from Salomon Smith Barney ("SSB Report"), a copy of which is enclosed as Attachment 1. We have numerous accounts of Searle and/or Pfizer representatives using the SSB Report in discussions with doctors. The copies of the SSB Report are usually hi-lited and often left with physicians. This information has been provided to Merck from physicians throughout the country. The extent to which this report has been used in promotion by Searle and/or


EXHIBIT
Weiner-16
DEBRA J. WEAVER
8 10-05

Spencer Salis, Pharm. D.  
May 12, 2000

Page 2

Pfizer strongly suggests that it's dissemination was condoned by Searle/Pfizer management.

Further evidence of Searle management's apparent involvement in the dissemination of this SSB report is an e-mail message forwarding the SSB Report that was sent to Searle representatives. The subject matter of the e-mail was "Great Report"; the message was "ALL REPS, PLEASE READ AND KEEP IN YOUR RESOURCE BINDER". A copy of the e-mail, which had been left with a physician in Pennsylvania, is enclosed as Attachment 2.

In addition, Merck obtained what is presumed to be a Searle internal document providing direction to Searle representatives on discussion points regarding the VIGOR study for VIOXX and comparative claims. The discussion points are misleading and the comparative claims are unsubstantiated. A copy of this document, which had been provided to a physician in Oregon, is enclosed as Attachment 3.

The use of the SSB Report by Searle and/or Pfizer representatives is false and misleading in the following respects:

- As with most homemade detail aids, the SSB Report lacks fair balance.

- The SSB Report, which includes a discussion of CLASS [the gastrointestinal ("GI") outcomes study with Celebrex], suggests that the results of the study will support the removal of the GI warning from the labeling for Celebrex. Given that the labeling for Celebrex provides that "prospective long-term studies required to compare the incidence of serious, clinically significant upper GI adverse events in patients taking Celebrex vs. comparator NSAIDs have not been performed," Searle cannot promote CLASS.

- The overall tone of the SSB Report calls the safety of VIOXX into question. While an analyst may be entitled to publish such an opinion, a pharmaceutical company certainly cannot disseminate such an opinion as the basis for promoting its own competing product.

*Use of Reuters News Story*

On Thursday evening, April 27, 2000, Reuters News Service filed a report on the results of VIGOR (the "Reuters Story"). A copy of the story is enclosed as Attachment 4. As further evidence of Searle management involvement in the dissemination of this information, Merck has received numerous reports from across the country beginning April 28, 2000, of Searle and/or Pfizer representatives using the Reuters Story in discussions with physicians.

Confidential - Subject To Protective Order

Spencer Salis, Pharm. D.  Page 3
May 12, 2000

As one example of the use of the Reuters Story, Merck attaches an audiotape (Attachment 5A) and transcript (Attachment 5B) of a voicemail message that was provided to Merck by a hospital pharmacist in Yonkers, NY on April 28, 2000. The voicemail message from a Pfizer representative refers the pharmacist to the Reuters/CNBC report and the "problems that they [Merck] have had with their new trial with their cardiovascular facts of causing hyperten... I mean causing congestive heart failure and myocardial infarction." The voicemail message was followed by an anonymous fax of the SSB Report sent to a physician and the pharmacist at the hospital on May 1, 2000.

The use of the Reuters Story by Searle and/or Pfizer representatives is false and misleading in that, as with the SSB Report, the overall tone of the Reuters Story calls the safety of VIOXX into question. It is improper for a pharmaceutical company to disseminate such an article as the basis for promoting its own competing product. By misbranding VIOXX, Searle is misbranding Celebrex. The activities described above demonstrate a continuing pattern and practice of violative behaviors that evidence widespread corporate involvement in and acquiescence with Searle and Pfizer employees' activities. At the very least, it is clear that Searle and Pfizer are unable to control the actions of their field sales representatives, as DDMAC noted in an untitled letter to Searle on April 6, 2000. These practices by the Searle and Pfizer field sales representatives are still continuing.

*Power Fax "Dear Healthcare Provider" Letter*

In addition, the themes from the homemade detail pieces are now appearing in promotional material disseminated by Searle/Pfizer headquarters. Searle and Pfizer faxed a letter on May 10 and 11, 2000, (Attachment 6) to a very large number of physicians around the country. Merck contends that this letter is false and misleading in the following respects:

1. By presenting the VIGOR results for VIOXX only as a "statistically significant increase" in cardiovascular adverse events, the letter fails to reveal material facts, i.e., that the significantly fewer heart attacks observed in patients taking naproxen were consistent with that drug's ability to block platelet aggregation so that the results do not indicate any increase in cardiovascular adverse reaction due to VIOXX. Even if Searle/Pfizer choose not to accept this rationale, the failure to at least acknowledge it in the letter is a failure to reveal material facts in violation of 201(n) of the Food, Drug and Cosmetic Act.

2. The letter is also misleading in discussing only cardiovascular results from the VIGOR study without disclosing that extensive data from the completed osteoarthritis trials and ongoing clinical trials with VIOXX, have shown no

Confidential - Subject To Protective Order

MRK-AAF0007147

Spencer Salis, Pharm. D.  Page 4
May 12, 2000

difference in the incidence of cardiovascular events, such as heart attack, among patients taking VIOXX, other NSAIDs and placebo.

3. The letter taken as a whole suggests that Celebrex causes fewer cardiovascular adverse events than VIOXX. Not only is this comparison presented in a misleading manner as indicated above, but by comparing results from different studies it clearly violates FDA's regulation precluding any safety comparisons absent two adequate and well-controlled studies in the same patient population.

4. The letter discusses a "long-term safety study" (i.e., the CLASS study) as partial support for its conclusion that VIOXX causes more cardiovascular adverse events than Celebrex does, without disclosing that the primary endpoint of the safety study was not statistically significant, thus selectively presenting only positive results from the study.

5. The letter otherwise treats the drugs as interchangeable without disclosing the differences in the approved indications for the products.

*Request for Action by DDMAC*

Merck contends that the activities described above constitute an orchestrated smear campaign against VIOXX that falsely and misleadingly calls into question the safety of VIOXX as demonstrated by substantial evidence. Merck requests that DDMAC take action immediately to halt these false and misleading activities by Searle and Pfizer.

Please call me if you have any questions about this letter.

Sincerely,

*Ellen R. Westrick*

Ellen R. Westrick
Executive Director, Office of Medical/Legal

Attachments 1-6

Confidential - Subject To Protective Order                              MRK-AAF0007148

**EXHIBIT B**

## CONFIDENTIAL

**DATE:**  November 18, 1999

**TO:**  Drs. David Bjorkman, James Neaton, Deborah Shapiro, Alan Silman, Roger Sturrock

**FROM:**  Dr. Michael Weinblatt

**SUBJECT:**  Interim Non-Endpoint Safety Analysis of VIGOR - Unblinded Minutes

---

On November 17, 1999, the Data Safety and Monitoring Board of VIGOR convened to discuss the interim non-endpoint safety analysis of the VIGOR trial. Attending in Boston were Drs. Deborah Shapiro (non-voting), Alan Silman, and Michael Weinblatt. Participating by phone were Drs. David Bjorkman, James Neaton, and Roger Sturrock.

The focus of the discussions were the excess deaths and cardiovascular adverse experiences (AEs) in Group A compared to Group B. At the time of the first interim report (with a cutoff of September 2, 1999) there were 11 deaths in Group A and 6 in Group B. In the present analysis (with a cutoff of November 1, 1999), there were 5 additional deaths all in Group A. Of these 5 deaths, 4 were due to cardiovascular causes.

In the first report, there were 36 and 16 patients with serious cardiovascular AEs in Groups A and B, respectively, while in this analysis there were 52 and 29, respectively. Therefore an additional 16 and 13 patients in Groups A and B, respectively, have had serious cardiovascular AEs since the previous report.

In the first report, there were 32 and 17 patients with cardiovascular AEs that led to discontinuation in Groups A and B, respectively, while in this analysis there were 40 and 17, respectively. Therefore an additional 8 patients all in Group A discontinued due to cardiovascular AEs since the previous report. Please note that discontinuation information is not as current as the serious AE and death data.

The increase in systolic blood pressure in Group A (mean/median increase 4.0/2.5 mmHg) compared to little or no change in Group B was noted as was the increased occurrence of hypertension AEs in Group A.

Dr. Neaton had suggested several additional analyses that were performed prior to the meeting (these are attached for the benefit of the members attending by teleconference). A Cox model examined the occurrence of death, death or serious cardiovascular AE, and death or serious cardiovascular AE or cardiovascular AE leading to discontinuation. These were examined in the entire population and in those patients with a cardiovascular system secondary diagnosis (co-morbidity). The differences between the treatment groups were noted as being significant beyond the level of chance. However, it was also noted that there is no ability in this trial to distinguish between a potentially harmful effect of Treatment A and a cardiovascular protective effect of Treatment B due to its

1

Confidential - Subject to Protective Order
Issued by the District Court of Hidalgo County,
Texas, 139th Judicial District

MRK-GUE0035229

anti-platelet effects. It was also noted that while the trends are disconcerting, the numbers of events are small.

Members were concerned and want to follow up on these data more thoroughly and frequently but did not believe that the trial should be stopped at this time. It was decided that an additional non-endpoint safety analysis will be performed using a December 1 cutoff. The report will be sent to members during the week of December 13 and discussed at a teleconference on December 20, 1999 at 4:00 p.m. EST. The report will focus on deaths and cardiovascular AEs and will consist of counts tables and survival analyses (Cox model) with plots of the three outcomes suggested by Dr. Neaton above. These will be performed on the overall population and on several subgroups, ie, patients with and without cardiovascular system co-morbidities, with and without more significant cardiovascular system co-morbidities (as defined by Alise Reicin for another purpose) and those with and without hypertension as a co-morbidity. Since members cannot retain the previous reports, the prior incidences will be quoted for reference.

Michael Weinblatt, MD

2

Confidential - Subject to Protective Order
Issued by the District Court of Hidalgo County,
Texas, 139th Judicial District

MRK-GUE0035230