# EXHIBIT 1

1

2

3

STATE OF OREGON
Marion County Circuit Courts

MAY 20 2008

FILED

4                    IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                            FOR THE COUNTY OF MARION

6    STATE OF OREGON ex rel HARDY          Case No. 08C16426
     MYERS, Attorney General for the State of
7    Oregon,                               STIPULATED GENERAL JUDGMENT

8                    Plaintiff,

9            v.

10   MERCK & CO., INC.,

11                   Defendant.

12

13          The parties voluntarily enter in this Stipulated General Judgment on the terms and

14   conditions set forth below:

15                                          1.

16   **Definitions:**

17          a.      "Covered Conduct" shall mean Merck's promotional and marketing practices

18   regarding the prescription drug Vioxx®, as well as Merck's practices related to Data Safety

19   Monitoring Boards, publication of clinical trials, and the support of continuing medical education

20   that were the subject of an investigation by the Signatory Attorneys General under the State

21   Consumer Protection Laws. "Covered Conduct" shall not include conduct relating to promotion

22   and marketing of the prescription drugs Vytorin® and/or Zetia® and  to publication of clinical

23   trials, practices related to Data Safety Monitoring Boards, and the support of continuing medical

24   education, relating to Vytorin® and/or Zetia®.

25          b.      "Effective Date" shall mean the date by which all Parties have executed the

26   Consent Judgment.

Page 1 -   STIPULATED GENERAL JUDGMENT
           DAH/dah/#745109 v1 - Oregon Consent Judgment

1      c.      "FDA Amendments Act of 2007" (or "FDA Amendments Act" or "the Act") shall

2  mean Public Law No. 110-85, which among other things, creates a federal clinical trial registry

3  and results data bank.

4      d.      "FDA's Guidances for Industry" shall mean documents published by the United

5  States Department of Health and Human Services, Food and Drug Administration (FDA), that

6  represent the FDA's current recommendations on a topic.

7      e.      "Individual States" and "State" shall mean each Signatory Attorney General who

8  is participating in the Multistate Working Group.

9      f.      "Joint Venture(s)" shall mean any entity in which Merck maintains a direct and/or

10  indirect ownership interest of 50% or less on the date this Agreement is signed.

11      g.      "Merck" shall mean Merck & Co., Inc. and its United States-based affiliates,

12  subsidiaries, predecessors, successors, and assigns, but shall not include any Joint Ventures (as

13  that term is defined in the prior sub-paragraph).

14      h.      "Multistate Executive Committee" shall mean the Attorneys General and their

15
16  staffs representing Arizona, California, Florida, Illinois, Ohio, Oregon, Pennsylvania, Texas, and

Vermont.
17

18      i.      "Multistate Working Group" ("MSWG") shall mean the Attorneys General and

19  their staffs representing Arizona, Arkansas, California, Connecticut, Florida, District of

20
Columbia, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan,
21
Nebraska, Nevada, New Jersey, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania,
22
23  South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, and Wisconsin.

24
      j.      "Parties" shall mean Merck and the Individual States.
25

26

Page 2 -   STIPULATED GENERAL JUDGMENT
      DAH/dah/#745109 v1 - Oregon Consent Judgment

1      k.      "Product" shall mean any prescription drug or biological product manufactured,

2   distributed, sold, marketed or promoted in the United States in any way.

3      l.      "Signatory Attorney(s) General" shall mean the Attorney General, or his or her

4   designee, of each state in the Multistate Working Group.

5      m.      "State Consumer Protection Laws" shall mean the consumer protection laws

6   under which the Signatory Attorneys General have conducted their investigation.[1]

7      n.      "Vioxx®" shall mean rofecoxib.

8                                                    2.

9      The parties have agreed to resolve the issues raised by the Covered Conduct by entering

10

11  [1] The States' consumer protection statutes are: ARIZONA - *Consumer Fraud Act,* A.R.S. § 44-1521, *et seq.*; ARKANSAS - Ark. Code Ann. § 4-88-101, *et seq.,* CALIFORNIA - Bus. & Prof.

12  Code, §§ 17200 *et seq.,* and 17500 *et seq.*; CONNECTICUT - Conn. Gen. Stat., §§ 42-110a *et seq.*; DISTRICT OF COLUMBIA - *Consumer Protection Procedures Act,* D.C. Code § 28-3901,

13  *et seq.*; HAWAII- *Uniform Deceptive Trade Practice Act,* Haw. Rev. Stat. Chpt. 481A and Haw. Rev. Stat. § 480-2.; FLORIDA - Deceptive and Unfair Trade Practices Act, Fla. Stat. Ch.

14  501.201 *et seq.*; IDAHO - *Consumer Protection Act,* Idaho Code Section 48-601 *et seq.*;

15  ILLINOIS - *Consumer Fraud and Deceptive Business Practices Act,* 815 ILCS § 505/1 *et seq.* (2006 State Bar Edition); IOWA - *Iowa Consumer Fraud Act,* Iowa Code Section 714.16;

16  KANSAS - *Consumer Protection Act,* K.S.A. 50-623 *et seq.*; MAINE - *Unfair Trade Practices Act,* 5 M.R.S.A. § 207 *et seq.*; MARYLAND - *Consumer Protection Act,* Md. Code Ann., Com.

17  Law § 13-101 *et seq.*; MASSACHUSETTS - *Consumer Protection Act,* M.G.L. c. 93A *et seq.*;

18  MICHIGAN - *Michigan Consumer Protection Act,* MCL 445.901 *et seq.*; NEBRASKA - *Uniform Deceptive Trade Practices Act,* NRS §§ 87-301 *et seq.*; NEW JERSEY - *New Jersey*

19  *Consumer Fraud Act,* 56:8-1 *et seq.*; NEVADA - *Deceptive Trade Practices Act,* Nevada Revised Statutes 598.0903 *et seq.*; NORTH CAROLINA - *Unfair and Deceptive Trade Practices*

20  *Act,* N.C. Gen. Stat. § 75-1.1 *et seq.*; NORTH DAKOTA -*Unlawful Sales or Advertising Practices,* N.D. Cent. Code. § 51-15-02 *et seq.*; OHIO- *Consumer Sales Practices Act,* R.C.

21  1345.01, *et seq.*; OREGON - *Unlawful Trade Practices Act,* ORS 646.605 to 646.656;

22  PENNSYLVANIA - *Unfair Trade Practices and Consumer Protection Law,* 73 P.S. § 201-1 *et seq.*; SOUTH CAROLINA - *Unfair Trade Practices Act,* S. C. CODE. ANN. Sections 39-5-10,

23  *et seq.*; SOUTH DAKOTA - *Deceptive Trade Practices Act, S.D. Codified Laws* § 37-24, *et seq.*; TENNESSEE-Tennessee - *Consumer Protection Act,* Tenn. Code Ann. §§ 47-18-101 *et seq.*;

24  TEXAS - *Deceptive Trade Practices - Consumer Protection Act,* Tex. Bus. and Com. Code §

25  17.47, *et seq.*; VERMONT - *Consumer Fraud Act,* 9 V.S.A. § 2451 *et seq.*; WASHINGTON - *Unfair Business Practices/Consumer Protection Act,* R.C.W. 19.86 *et seq.*; WISCONSIN – Wis.

26  Stat. § 100.18 (Fraudulent Representations).

Page 3 -   STIPULATED GENERAL JUDGMENT
       DAH/dah/#745109 v1 - Oregon Consent Judgment

1   into this Consent Judgment (hereinafter "Judgment").

2       (a)      Merck is entering into this Judgment solely for the purpose of settlement, and

3   nothing contained herein may be taken as or construed to be an admission or concession of any

4   violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or

5   wrongdoing, all of which Merck expressly denies. Merck does not admit any violation of the

6   State Consumer Protection Laws set forth in footnote 1, and does not admit any wrongdoing

7   that was or could have been alleged by any Attorney General before the date of the Judgment

8   under those laws. No part of this Judgment, including its statements and commitments, shall

9   constitute evidence of any liability, fault, or wrongdoing by Merck.

10      (b)      This Judgment shall not be construed or used as a waiver or limitation of any

11  defense otherwise available to Merck in any action, or of Merck's right to defend itself from,

12  or make any arguments in, any private individual or class claims or suits relating to the subject

13  matter or terms of this Judgment. This Judgment is made without trial or adjudication of any

14  issue of fact or law or finding of liability of any kind.

15      (c)      It is the intent of the Parties that this Judgment not be admissible in other cases

16  or binding on Merck in any respect other than in connection with the enforcement of this

17  Judgment.

18      (d)      No part of this Judgment shall create a private cause of action or confer any

19  right to any third party for violation of any federal or state statute except that a State may file

20  an action to enforce the terms of this Judgment.

21      (e)      All obligations undertaken by Merck in this Judgment shall apply prospectively,

22  except to the extent permitted by the National Library of Medicine, Merck shall submit, as

23  soon as practicable, clinical trial results to the clinical trial registry and results data bank

24  created by the FDA Amendments Act for all "applicable clinical trials" (as that term is defined

25  by the Act) of FDA-approved Merck Products that were initiated after July 1, 2005.

26  / / /

Page 4 -   STIPULATED GENERAL JUDGMENT

1                                        3.

2          Merck shall register clinical trials and submit results to the registry and results data bank

3   as required by the FDA Amendments Act and any accompanying regulations that may be

4   promulgated pursuant to that Act.

5                                        4.

6          Merck shall not make any written or oral claim that is false, misleading or deceptive

7   regarding any FDA-approved Merck Product.

8                                        5.

9          Merck shall not make any written or oral promotional claims of safety or effectiveness

10  for any FDA-approved Merck Product in a manner that violates the Food, Drug and Cosmetic

11  Act, 21 U.S.C. § 301 et seq. ("FDCA"), accompanying regulations, or voluntary agreements with

12  FDA, as interpreted by the FDA in a writing by the Director of the Center for Drug Evaluation at

13  the FDA.

14                                       6.

15         A written or oral claim made by Merck in connection with a Joint Venture Product which

16  written or oral claim has not been approved by the Joint Venture shall be subject to the

17  provisions of Paragraphs 4 and 5.  In no event, however, shall Paragraphs 4 and 5 apply to

18  Vytorin® or Zetia®.

19                                       7.

20         Nothing in this Judgment shall require Merck to:

21               i.       take an action that is prohibited by the FDCA or any regulation

22  promulgated thereunder, or by FDA; or

23               ii.      fail to take an action that is required by the FDCA or any regulation

24  promulgated thereunder, or by FDA. Any written or oral promotional claim subject to this

25  Judgment which is the same, or materially the same, as the language required or agreed to by the

26

Page 5 -   STIPULATED GENERAL JUDGMENT
DAH/dah/#745109 v1 - Oregon Consent Judgment

1   Director of DDMAC or the Director of the Center for Drug Evaluation or their authorized

2   designees in writing shall not constitute a violation of this Judgment.

3                                           8.

4         Merck agrees to delay direct to consumer ("DTC") television advertising for any Merck

5   Product indicated for pain relief immediately following such Product's approval by the FDA, if

6   the Director of the Center for Drug Evaluation at FDA recommends such a delay in writing to

7   Merck.  Merck's delay would be for the same period as recommended by the Director of the

8   Center for Drug Evaluation at FDA.

9                                           9.

10        Merck agrees to submit all new DTC television advertising campaigns for any Merck

11  Product to FDA for pre-review, wait until Merck receives a response from FDA prior to

12  running the advertising campaign, and to modify such advertising consistent with any written

13  comments received from FDA.

14                                          10.

15        Merck's obligations with respect to Paragraph 8 shall remain in effect for ten years

16  following the Effective Date.  Merck's obligations with respect to Paragraph 9 shall remain in

17  effect for seven years following the Effective Date.  With respect to Paragraph 8, Merck shall

18  abide by any such written recommendation as long as the submission of the TV advertising

19  campaign is made within ten years following the Effective Date.  With respect to Paragraph 9,

20  Merck shall abide by any such written recommendation when such submission is made within

21  seven years of the Effective Date.

22                                          11.

23        When presenting information in detailing pieces, brochures, booklets, mailing pieces,

24  published journals, magazines, other periodicals and newspapers, and broadcast through media

25  such as radio, television, the Internet, and telephone communications systems, about a Clinical

26  Study that relates to an FDA-approved Merck Product, Merck shall (1) accurately reflect the

Page 6 -   STIPULATED GENERAL JUDGMENT

1    methodology used to conduct the Clinical Study; (2) shall not present favorable information or

2    conclusions from a study that is inadequate in design, scope, or conduct to furnish significant

3    support for such information or conclusions; and (3) shall not use statistical analyses and

4    techniques on a retrospective basis to discover and cite findings not soundly supported by the

5    study, or to suggest scientific validity and rigor for data from studies the design or protocol of

6    which are not amenable to formal statistical evaluations.

7                                                    12.

8            When presenting information in detailing pieces, brochures, booklets, mailing pieces,

9    published journals, magazines, other periodicals and newspapers, and broadcast through media

10   such as radio, television, the Internet, and telephone communications systems, about a Clinical

11   Study or analysis of Clinical Studies as evidence of an FDA-approved Merck Product's safety,

12   Merck shall not (1) present information from a study in a way that implies that the study

13   represents larger or more general experience with the drug than it actually does; nor (2) use

14   statistics on numbers of patients, or counts of favorable results or side effects, derived from

15   pooling data from various insignificant or dissimilar studies in a way that suggests either that

16   such statistics are valid if they are not or that they are derived from large or significant studies

17   supporting favorable conclusions when such is not the case.

18                                                   13.

19           When presenting information in detailing pieces, brochures, booklets, mailing pieces,

20   published journals, magazines, other periodicals and newspapers, and broadcast through media

21   such as radio, television, the Internet, and telephone communications systems, about a Clinical

22   Study or analysis of Clinical Studies as evidence of an FDA-approved Merck Product's safety,

23   Merck shall not (1) present favorable information or conclusions from a study that is inadequate

24   in design, scope, or conduct to furnish significant support for such information or conclusions;

25   (2) use the concept of statistical significance to support a claim that has not been demonstrated to

26   have clinical significance or validity, or fails to reveal the range of variations around the quoted

Page 7 -   STIPULATED GENERAL JUDGMENT
           DAH/dah/#745109 v1 - Oregon Consent Judgment

1   average results; nor (3) use statistical analyses and techniques on a retrospective basis to discover

2   and cite findings not soundly supported by the study, or to suggest scientific validity and rigor

3   for data from studies the design or protocol of which are not amenable to formal statistical

4   evaluation.

5                                                14.

6          (a)     Merck shall comply with the ACCME Standards for Commercial Support, a

7   copy of which is attached hereto as Appendix 1.

8          (b)     Any person who acts in a promotional capacity for Merck with respect to an

9   FDA approved Merck Product  shall be obligated under his or her contract with Merck, as a

10  condition for any future promotional relationship with Merck, to disclose to CME participants

11  orally and to the CME provider for inclusion in the written materials the existence, nature and

12  purpose of his or her arrangement with Merck when speaking at a CME program if:  (i) the

13  Product the speaker promoted for Merck is in the same therapeutic category as the subject of the

14  CME program, and (ii) the CME program occurs within 12 months of the speaker performing

15  work for or receiving compensation from Merck.  Such disclosure shall set forth the type of

16  promotional work engaged in by the speaker and the name of the therapeutic category with

17  respect to which such promotion was performed.

18         (c)     Merck shall not provide funding for CME when Merck has knowledge at the

19  time the decision to fund the CME is made that a speaker at the CME has also been a

20  promotional speaker in the past 12 months at a Merck-sponsored promotional event related to

21  the class of drugs to be discussed in the CME.

22                                               15.

23         Merck's obligations with respect to CME shall remain in effect for 9 years following the

24  Effective Date.  Merck's obligations with respect to Paragraph 14(b) shall only apply to

25  speakers' contracts entered into, amended to extend the contract period, or renewed after the date

26  of this Agreement.

Page 8 -   STIPULATED GENERAL JUDGMENT
          DAH/dah/#745109 v1 - Oregon Consent Judgment

1                                                    16.

2              All members of any external Data Safety Monitoring Board ("DSMB") constituted

3      by Merck after the Effective Date for a Merck-Sponsored Clinical Trial shall be prohibited

4      from:

5                      (a)       holding more than $25,000 of Merck stock (exclusive of mutual fund holdings)

6      at the time of DSMB membership;

7                      (b)       trading in Merck stock during their DSMB service;

8                      (c)       serving as a clinical trial investigator in the trial being monitored by the DSMB;

9      and

10                     (d)       consulting for, being employed by, or entering into any future consulting or

11     employment relationships with, Merck while serving on the DSMB, except that DSMB

12     members may (i) concurrently serve on other DSMBs for Merck, and/or (ii) consult for Merck

13     Research Laboratories where the annual aggregate compensation for such non-promotional

14     consulting services does not exceed $15,000.

15                                                   17.

16             Merck's obligations with respect to DSMB membership set forth in Paragraph 16

17     shall remain in effect for DSMBs constituted within 7 years following the Effective Date.

18                                                   18.

19             Merck agrees to enhance further its process for reviewing potential conflicts of interest

20     such that all members of a DSMB shall, prior to service thereon, complete a "competing

21     interests" form which shall include questions regarding consulting arrangements or frequent

22     speaking arrangements with the sponsor; career involvement with a product or technique under

23     study; hands-on participation in the trial; emotional involvement in the trial; intellectual

24     conflicts; involvement in regulatory issues relevant to trial procedures; investment in competing

25     products; and involvement in the publication. The forms shall carry a continued updating

26     obligation and shall be forwarded to, and reviewed by, the DSMB chair who, in turn, will

Page 9 -   STIPULATED GENERAL JUDGMENT

1   forward them to the study's Steering Committee chair or other appropriate individual for review

2   and action, as needed, in advance of the first DSMB meeting and on an ongoing basis.

3                                   19.

4       Merck shall require all individuals who are named as authors on a Merck-sponsored

5   manuscript reporting the results of a Merck-sponsored study to fulfill the following conditions:

6   (a) the individual shall have made substantial contribution to the conception and design, or

7   acquisition of data, or analysis and interpretation of data; (b) the individual shall have been

8   involved in drafting the article or revising it critically for important intellectual content; and (c)

9   the individual shall have final approval rights of the version to be published.

10                                   20.

11       When a large, multi-center group has conducted the research, the manuscript should

12   identify the individuals who accept direct responsibility for the manuscript. These individuals

13   should fully meet the criteria for authorship defined in Paragraph 19 above.

14                                   21.

15       By its execution of this Judgment, State of Oregon releases Merck and all of its past and

16   present subsidiaries, affiliates, predecessors and successors (collectively, the "Released Parties")

17   from the following: all civil claims, causes of action, damages, restitution, fines, costs, and

18   penalties on behalf of the State of Oregon under the above-cited consumer protection statutes

19   arising from the Covered Conduct that is the subject of this Judgment.

20                                   22.

21       Notwithstanding any term of this Judgment, specifically reserved and excluded from the

22   Release in Paragraph 21 as to any entity or person, including Released Parties, are any and all of

23   the following:

24        a.     Any criminal liability that any person or entity, including Released Parties, has or

25   may have to the State of Oregon.

26

Page 10 -  STIPULATED GENERAL JUDGMENT

1        b.       Any civil or administrative liability that any person or entity, including Released

2  Parties, has or may have to the State of Oregon under any statute, regulation or rule not expressly

3  covered by the release in Paragraph 21 above, including but not limited to any and all of the

4  following claims:

5          i)     State or federal antitrust violations;

6          ii)    Reporting practices, including "best price", "average wholesale price" or

7  "wholesale acquisition cost;"

8          iii)   Medicaid violations, including federal Medicaid drug rebate statute

9  violations, Medicaid fraud or abuse, and/or kickback violations related to any State's

10  Medicaid program; and,

11         iv)   State false claims violations.

12        c.       Any liability under the State of Oregon's above-cited consumer protection laws

13  which any person or entity, including Released Parties, has or may have to individual consumers

14  or State program payors of said State, and which have not been specifically enumerated as

15  included herein.

16                              23.

17      Within ten (10) days of the Effective Date of this Judgment, Merck shall pay a total

18  amount of fifty eight million dollars ($58,000,000) to be divided and paid by Merck directly to

19  each Signatory Attorney General in an amount to be designated by and in the sole discretion of

20  the Multistate Executive Committee.  Said payment shall be used by the States for attorneys' fees

21  and other costs of investigation and litigation, or to be placed in, or applied to, the consumer

22  protection enforcement fund, consumer education, litigation or local consumer aid fund or

23  revolving fund, used to defray the costs of the inquiry leading hereto, or for other uses permitted

24  by state law, at the sole discretion of each Signatory Attorney General.

25                              24.

26      For the purposes of resolving disputes with respect to compliance with this Judgment,

Page 11 - STIPULATED GENERAL JUDGMENT
DAH/dah/#745109 v1 - Oregon Consent Judgment

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 934-4400 / Fax: (503) 378-5017

1   should any of the Signatory Attorneys General have a reasonable basis to believe that Merck has

2   engaged in a practice that violates a provision of this Judgment subsequent to the Effective Date

3   of this Judgment, then such Attorney General shall notify Merck in writing of the specific

4   objection, identify with particularity the provisions of this Judgment that the practice appears to

5   violate, and give Merck thirty (30) days to respond to the notification; provided, however, that a

6   Signatory Attorney General may take any action where the Signatory Attorney General

7   concludes that, because of the specific practice, a threat to the health or safety of the public

8   requires immediate action.

9        Upon receipt of written notice, Merck shall provide a good-faith written response to the

10   Attorney General notification, containing either a statement explaining why Merck believes it is

11   in compliance with the Judgment, or a detailed explanation of how the alleged violation occurred

12   and a statement explaining how Merck intends to cure the alleged breach.

13                       25.

14        Upon giving Merck thirty (30) days to respond to the notification described above, the

15   Signatory Attorney General shall also be permitted reasonable access to inspect and copy

16   relevant, non-privileged, non-work product records and documents in the possession, custody or

17   control of Merck that relate to Merck's compliance with each provision of this Judgment as to

18   which cause that is legally sufficient in the State has been shown. If the Signatory Attorney

19   General makes or requests copies of any documents during the course of that inspection, the

20   Signatory Attorney General will provide a list of those documents to Merck.  Nothing in this

21   paragraph shall be interpreted to limit the state's Civil Investigative Demand ("CID") or

22   subpoena authority, to the extent such authority exists under applicable state law, and Merck

23   reserves all of its rights with respect to a CID or subpoena issued pursuant to such authority.

24                       26.

25        The State may assert any claim that Merck has violated this Judgment in a separate civil

26   action to enforce this Judgment, or to seek any other relief afforded by law, only after providing

Page 12 -  STIPULATED GENERAL JUDGMENT

1   Merck an opportunity to respond to the notification described in Paragraph 24 above; provided,

2   however, that a Signatory Attorney General may take any action where the Signatory Attorney

3   General concludes that, because of the specific practice, a threat to the health or safety of the

4   public requires immediate action.

5                                              27.

6          This Judgment represents the full and complete terms of the settlement entered into by

7   the parties hereto. In any action undertaken by either the Attorneys General, or any of them, or

8   Merck, no prior versions of this Judgment, and no prior versions of any of its terms, that were

9   not entered by the Court in this Judgment, may be introduced for any purpose whatsoever.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 13 -  STIPULATED GENERAL JUDGMENT
          DAH/dah/#745109 v1 - Oregon Consent Judgment

1    **IT IS SO STIPULATED:**

2              **DEFENDANT'S SIGNATURE AND ACKNOWLEDGMENT**

3         Defendant and its attorney have read and understand this Stipulated General Judgment
     and each of its terms. Defendant admits to the jurisdiction of the Court in this matter and
4    consent to the entry of this Stipulated General Judgment. Defendant agrees to each and every
     term contained herein.
5

6         I, Bruce Kuhlik being first duly sworn on oath, depose and say that I am an officer of
     Merck & Co., Inc. and am fully authorized and empowered to sign this Stipulated General
7    Judgment on behalf of Merck & Co., Inc., and bind the same to the terms hereof.

8    _____
     Bruce Kuhlik
9    Executive Vice President & General Counsel
     Merck & Co., Inc.
10

11        SUBSCRIBED AND SWORN to before me this 13 day of MAY         , 2008.

12   _____
     Notary Public
13   My Commission Expires:
                                       THERESA PISARCZYK
14                                     NOTARY PUBLIC OF NEW JERSEY
                                       MY COMMISSION EXPIRES MAR. 16, 2011
          **Approved as to Form**
15

16   _____
     Nancy M. Erfle
17   OSB #90257
     Schwabe, Williamson & Wyatt
18   PacWest Center
     1211 SW Fifth Avenue, Suite 1900
19   Portland, OR 97204
     Counsel for Defendant Merck & Co., Inc.
20

21            **ACCEPTANCE OF DOJ**

          Accepted this 16th day of May     , 2008.
22

23   HARDY MYERS
     Attorney General
24

25   _____
     David Hart #00275
26   Assistant Attorney General

Page 14 -  STIPULATED GENERAL JUDGMENT

1    This STIPULATED GENERAL JUDGMENT is hereby accepted for entry of
JUDGMENT for all purposes as set forth herein.

2    **IT IS SO ADJUDGED AND ORDERED:**

3    DATED this **20** day of **May** _____ , 2008.

4

5    _____
CIRCUIT COURT JUDGE for Marion County

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 15 -  STIPULATED GENERAL JUDGMENT
DAH/dah/#745109 v1 - Oregon Consent Judgment



STATE OF OREGON } ss
County of Marion
The foregoing copy has been compared
and is certified by me as a full, true and
correct copy of the original on file in my
office and in my custody.
In Testimony Whereof, I have hereunto set
my hand and affixed the seal of the
Court on:
TRIAL COURT ADMINISTRATOR
By

# APPENDIX 1



# ACCME STANDARDS FOR COMMERCIAL SUPPORT <sup>SM</sup>

## *Standards* to Ensure the Independence of CME Activities

ACCME

# The ACCME Standards for Commercial Support[SM]

*Standards* to Ensure Independence in CME Activities

## STANDARD 1: Independence

1.1 A CME provider must ensure that the following decisions were made free of the control of a commercial interest. (See www.accme.org for a definition of a 'commercial interest' and some exemptions.)

(a) Identification of CME needs;
(b) Determination of educational objectives;
(c) Selection and presentation of content;
(d) Selection of all persons and organizations that will be in a position to control the content of the CME;
(e) Selection of educational methods;
(f) Evaluation of the activity.

1.2 A commercial interest cannot take the role of non-accredited partner in a joint sponsorship relationship.⌘

## STANDARD 2: Resolution of Personal Conflicts of Interest

2.1 The provider must be able to show that everyone who is in a position to control the content of an education activity has disclosed all relevant financial relationships with any commercial interest to the provider. The ACCME defines "'relevant' financial relationships" as financial relationships in any amount occurring within the past 12 months that create a conflict of interest.

2.2 An individual who refuses to disclose relevant financial relationships will be disqualified from being a planning committee member, a teacher, or an author of CME, and cannot have control of, or responsibility for, the development, management, presentation or evaluation of the CME activity.

2.3 The provider must have implemented a mechanism to identify and resolve all conflicts of interest prior to the education activity being delivered to learners.⌘

## STANDARD 3: Appropriate Use of Commercial Support

3.1 The provider must make all decisions regarding the disposition and disbursement of commercial support.

3.2 A provider cannot be required by a commercial interest to accept advice or services concerning teachers, authors, or participants or other education matters, including content, from a commercial interest as conditions of contributing funds or services.

3.3 All commercial support associated with a CME activity must be given with the full knowledge and approval of the provider.

**Written agreement documenting terms of support**

3.4 The terms, conditions, and purposes of the commercial support must be documented in a written agreement between the commercial supporter that includes the provider and its educational partner(s). The agreement must include the provider, even if the support is given directly to the provider's educational partner or a joint sponsor.

3.5 The written agreement must specify the commercial interest that is the source of commercial support.

3.6 Both the commercial supporter and the provider must sign the written agreement between the commercial supporter and the provider.

**Expenditures for an individual providing CME**

3.7 The provider must have written policies and procedures governing honoraria and reimbursement of out-of-pocket expenses for planners, teachers and authors.

3.8 The provider, the joint sponsor, or designated educational partner must pay directly any teacher or author honoraria or reimbursement of out-of-pocket expenses in compliance with the provider's written policies and procedures.

3.9 No other payment shall be given to the director of the activity, planning committee members, teachers or authors, joint sponsor, or any others involved with the supported activity.

3.10 If teachers or authors are listed on the agenda as facilitating or conducting a presentation or session, but participate in the remainder of an educational event as a learner, their expenses can be reimbursed and honoraria can be paid for their teacher or author role only.

**Expenditures for learners**

3.11 Social events or meals at CME activities cannot compete with or take precedence over the educational events.

ACCME®

© 2004, 2006,2007 ACCME STANDARDS FOR COMMERCIAL SUPPORT[SM]
PAGE 2 OF 3
182_20070824

3.12 The provider may not use commercial support to pay for travel, lodging, honoraria, or personal expenses for non-teacher or non-author participants of a CME activity. The provider may use commercial support to pay for travel, lodging, honoraria, or personal expenses for bona fide employees and volunteers of the provider, joint sponsor or educational partner.

**Accountability**

3.13 The provider must be able to produce accurate documentation detailing the receipt and expenditure of the commercial support. ⌘

## STANDARD 4. Appropriate Management of Associated Commercial Promotion

4.1 Arrangements for commercial exhibits or advertisements cannot influence planning or interfere with the presentation, nor can they be a condition of the provision of commercial support for CME activities.

4.2 Product-promotion material or product-specific advertisement of any type is prohibited in or during CME activities. The juxtaposition of editorial and advertising material on the same products or subjects must be avoided. Live (staffed exhibits, presentations) or enduring (printed or electronic advertisements) promotional activities must be kept separate from CME.

- For *print*, advertisements and promotional materials will not be interleafed within the pages of the CME content. Advertisements and promotional materials may face the first or last pages of printed CME content as long as these materials are not related to the CME content they face __and__ are not paid for by the commercial supporters of the CME activity.
- For *computer based*, advertisements and promotional materials will not be visible on the screen at the same time as the CME content and not interleafed between computer 'windows' or screens of the CME content
- For *audio and video recording*, advertisements and promotional materials will not be included within the CME. There will be no 'commercial breaks.'
- For *live, face-to-face CME*, advertisements and promotional materials cannot be displayed or distributed in the educational space immediately before, during, or after a CME activity. Providers cannot allow representatives of Commercial Interests to engage in sales or promotional activities while in the space or place of the CME activity.

4.3 Educational materials that are part of a CME activity, such as slides, abstracts and handouts, cannot contain any advertising, trade name or a product-group message.

4.4 Print or electronic information distributed about the non-CME elements of a CME activity that are not directly related to the transfer of education to the learner, such as schedules and content descriptions, may include product-promotion material or product-specific advertisement.

4.5 A provider cannot use a commercial interest as the agent providing a CME activity to learners, e.g., distribution of self-study CME activities or arranging for electronic access to CME activities. ⌘

## STANDARD 5. Content and Format without Commercial Bias

5.1 The content or format of a CME activity or its related materials must promote improvements or quality in healthcare and not a specific proprietary business interest of a commercial interest.

5.2 Presentations must give a balanced view of therapeutic options. Use of generic names will contribute to this impartiality. If the CME educational material or content includes trade names, where available trade names from several companies should be used, not just trade names from a single company.⌘

## STANDARD 6. Disclosures Relevant to Potential Commercial Bias

**Relevant financial relationships of those with control over CME content**

6.1 An individual must disclose to learners any relevant financial relationship(s), to include the following information:

- The name of the individual;
- The name of the commercial interest(s);
- The nature of the relationship the person has with each commercial interest.

6.2 For an individual with no relevant financial relationship(s) the learners must be informed that no relevant financial relationship(s) exist.

**Commercial support for the CME activity.**

6.3 The source of all support from commercial interests must be disclosed to learners. When commercial support is 'in-kind' the nature of the support must be disclosed to learners.

6.4 'Disclosure' must never include the use of a trade name or a product-group message.

**Timing of disclosure**

6.5 A provider must disclose the above information to learners prior to the beginning of the educational activity. ⌘

© 2004, 2006, 2007 ACCME STANDARDS FOR COMMERCIAL SUPPORT<sup>SM</sup>
PAGE 3 OF 3
182_20070824