UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | SECTION  L |
| LITIGATION | * | |
| | * | JUDGE FALLON |
| THIS DOCUMENT RELATES TO: | * | |
| THIRD PARTY PAYOR COMMON | * | SPECIAL MASTER JUNEAU |
| BENEFIT FEES | * | |
| | * | |
| FILER: Robert E. Arceneaux/Margaret Woodward/ | * | May 15, 2013 |
| Pascal F. Calogero, Jr. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**ERIC H. WEINBERG'S MEMORANDUM FOR THE SPECIAL
MASTER REGARDING ALLOCATION OF TPP COMMON BENEFIT FEES**

MAY IT PLEASE THE COURT:

This memorandum is respectfully submitted on behalf of the Law Offices of Eric H.

Weinberg ("Weinberg") in accordance with the Special Master's Scheduling Protocol of April 26,

2013.

I.      **Facts and Procedural History**

On September 20, 2004, Merck withdrew Vioxx from the market after data from a clinical

trial indicated that use of the drug increased the risk of cardiovascular thrombotic events. Thousands

of individual suits and numerous class actions were filed against Merck in state and federal courts

throughout the country alleging various products liability, tort, fraud, and warranty claims.   New

Jersey instituted a consolidated state court proceeding in 2003.   Nearly two years later, this MDL

was formed, and all federal suits were transferred into the MDL.   But numerous actions continued

in state courts, including the consolidated proceeding in New Jersey, in which Weinberg was

actively engaged.   *See* Order and Reasons, 10/19/10, R. Doc. 54040, at 2-3.

On November 7, 2007, Merck and the MDL negotiating panel entered into a global

settlement that resolved the majority of Vioxx personal injury claims.   Claimants proceeding in

state courts were given the option of joining the settlement.  A common benefit fund was established

and special provision was made for state court counsel to participate in the allocation on the same footing as MDL counsel. *Id.,* at 6-10.

In the prior allocation litigation, this Court bore witness to the tension between MDL and non-MDL counsel, as the MDL FAC valued its own and its colleagues' contributions at a considerable premium over those of their state-court counterparts. In Weinberg's case, for example, the FAC recommended an initial allocation of $221,000; it dropped that recommendation to zero after Weinberg lodged an objection. Following a hearing in which Weinberg demonstrated the breadth and value of his work, the FAC settled on a final recommendation of $3.5 million, which the Court approved and awarded. *See* Order and Reasons, 8/9/11, R. Doc. 63195.

As the personal injury cases neared settlement in 2007, work geared up in the Third Party Payor ("TPP") litigation. These actions, filed on behalf of third parties who had paid for the drug and for Vioxx-related injuries and damages, also proceeded both within the MDL and in state courts. As the FAC acknowledges, the "lead TPP case" proceeded in New Jersey. *See* R. Doc. 63928, at 2.[1] However, that class action, *"Local No. 68,"* principally prosecuted by the Seeger firm, did not get very far before the state Supreme Court decertified the class in September of 2007. *Id.* Another class action in California, principally prosecuted by Sobol, likewise failed at the certification level. *Id.,* at 2-3.

Seeger and Sobol commenced TPP settlement negotiations with Merck in early 2009. The settlement for private third party payors, largely finalized over the summer, was announced in September of 2009. The $80 million dollar agreement included $65,000,000 for claimants and their private counsel, and a $15 million dollar common benefit fund which is now to be allocated among common benefit counsel. *Id.,* at 3-4.

---

[1]Within the MDL, little happened on the TPP front. The FAC properly notes that MDL counsel drafted a master complaint and fended off a motion to dismiss by Merck, then experienced "several years lull on the TPP front while the Court addressed the personal injury matters." *See* R. Doc. 63928, at 2. As the TPP litigation approached settlement, the court established a schedule for bellwether trials; but settlement was on the horizon, and MDL counsel had barely commenced work on readying those cases for trial when the final settlement was announced. *Id.*

In all of the TPP litigation, there were no trials and only a handful of depositions, two of which Weinberg second-chaired.  Apart from the two failed certification efforts and the TPP settlement, then, there were few concrete milestones in the private TPP litigation.

Proceeding alongside and beyond the private TPP litigation are governmental claims, principally lodged by states' attorneys general, who like the private third party payors, seek to recover Vioxx damages occasioned to and overpayments made by the states.  The Louisiana AG case was tried to a loss in the MDL in 2010.  Most of the other AG cases are proceeding in the MDL but with their own teams of counsel.  In some of the state cases, the AGs have agreed to share common benefit fees with the MDL leadership.  In others, the MDL leadership is seeking to recover common benefit contributions from resistant counsel.  Because the Louisiana AG action yielded no recovery – and therefore no attorneys' fees – and the recovery of fees from other AG actions is uncertain, Weinberg believes certain MDL leadership included the time spent on the unsuccessful Louisiana AG case in their claims against the TPP common benefit fund, which was meant to be entirely separate.  Weinberg is involved in the Utah and Pennsylvania AG cases, but has not included time spent on those actions in his TPP submissions.

The TPP Common Benefit Fund was created by the 2009 TPP Settlement Agreement, which allotted to Judge Fallon the task of allocating the fund.  The Agreement specifically provided for "due consideration by him in accordance with established procedures for notice, objection and hearing in conformance with Fifth Circuit precedent."  R. Doc. 63928, Exh. C, ¶5.2.1.  The Agreement expressly contemplated the appointment of a FAC including Messrs. Seeger and Herman, and indicated that their recommended plan of allocation "shall be guided by objective measures of Common Benefit Attorneys' contributions, in addition to their subjective understanding of the relative contributions of counsel. . . ."  *Id.,* at ¶5.2.2.

In accordance with the Agreement and this precedent, on August 17, 2011, the Court entered PTO 57 to implement the process for allocation and disbursement.  It appointed Herman, Seeger,

Birchfield, Cabraser, Sobol, and Dugan to the FAC. It directed that they collect from applicants: a description of the common benefit work performed; lodestar information, which was to include an identification of the extent to which any fees or costs had been previously submitted and compensated either by clients or by a court-ordered award; and a description of each applicant's contributions to the common benefit, including any leadership roles or committee appointments. The FAC was to gather and evaluate these submissions, make a preliminary recommendation, allow for comment, and circulate its final recommendations "no later than November 7, 2011." *Id.*

In accordance with the procedures put into place by the Court and the FAC, Weinberg timely submitted his original application with supporting documentation on September 16, 2011, and a Supplemental Application on October 17, 2011. *See* R. Doc. 64044, Exhs. A & B. The FAC, however, did not make a preliminary allocation recommendation until June 13, 2012. *See* R. Doc. 63928. The Court called for objections to be filed by August 10, 2012, and Weinberg timely complied. *See* R. Doc. 64044. Thereafter, he fought for and secured access to the other applicants' submissions, then rendered further comment on the FAC's recommendations, to which the FAC responded. On March 15, 2013, the Court appointed Special Master Juneau to review relevant documents, conduct such further proceedings as he considered necessary, and render a recommendation concerning "the amount the remaining objectors should receive." *See* R. Doc. 64304. Master Juneau directed the parties to submit pertinent documents, file briefs, and participate in a hearing scheduled to commence on May 23, 2013. *See* R. Doc. 64361.

## II.    Weinberg Is Entitled to No less than His Lodestar of $1,165,892.61

Attorneys fees are set in the Fifth Circuit through the lodestar approach, with adjustment according to a list of factors that could result in a multiplier or a downward adjustment. *See Forbush v. J.C. Penney Co.*, 98 F.3d 817 (5th Cir. 1996). Lodestar, then, is the relevant starting point of this Court's inquiry, as Judge Fallon recognized when he discussed the seminal Fifth Circuit case on allocation of common benefit fees:

> The takeaway from *High Sulfur* is that in allocating a fund of attorneys' fees, the Court must conform to "traditional judicial standards of transparency, impartiality, procedural fairness, and ultimate judicial oversight." 517 F.3d at 234. That requires creating a sufficient record, making sufficient factual findings, **considering the time worked and the *Johnson* factors**, providing an opportunity to be heard to all the applicants, and exercising independent judgment in allocating those fees rather than simply rubber-stamping a committee recommendation.

*Id.*, at 26, discussing *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 227 (5th Cir. 2008). While adjustments to the lodestar are certainly appropriate (based upon the *Johnson* factors), it is respectfully submitted that any fee allocation committee bears a heavy burden to justify tossing out lodestar, particularly when it does so for everyone but its own members. Something objective must be relied upon, not merely the committee's subjective view that one attorney's work was not as useful as another's.[2]

The TPP FAC implicitly acknowledged as much in its July, 2012 recommendation, which closely tracked lodestar for favored firms: the Dugan Firm, Hagans Berman, Sobol and Shapiro, Herman Herman Katz and Kotlar, Levin Fishbein, and Lief Cabraser.  *See* Rec. Doc. 63928-1. Seeger Weiss uniquely received a recommendation of more than its lodestar.  *Id.*

While lodestar is certainly not the only basis upon which to fashion an appropriate allocation, Judge Fallon has made clear that purely administrative, "me too," or "monitoring" hours are worth less than hours spent on productive litigation work.  In his allocation of the PI common benefit fund he stated that "there is a hierarchy of value for work that tends to have a greater impact on the litigation and generates more 'common benefit.' Such work deserves greater compensation." Rec. Doc. 63195, at 27.  As demonstrated herein, and as a simple perusal of Weinberg's reported time entries reveal, his hours were spent on actual litigation work – intensive efforts to develop viable theories and evidence to support the TPP claims. Short of actual trial hours, which no one amassed,

---

[2]In the PI fee allocation, Judge Fallon expressly instructed the FAC to "consider devising objective categories for types of work done for common benefit, based on the relative significance of that work in bringing about the ultimate successful resolution of this litigation." R. Doc. 63195, at 16.  Nothing of the sort appears to have been done by the TPP FAC given that it has turned over no documents which demonstrated an objective approach to its recommended allocation, despite an order to turn over all documents upon which it relied.

Weinberg's litigation hours are at the highest echelon of the hierarchy of compensable hours, and not sub-lodestar "soft" hours as contemplated by Judge Fallon.

In short, the TPP FAC's bald subjective statement that Weinberg's work was of "zero" value does not satisfy controlling law. All of his reported hours were for the advancement of the TPP cause by developing and sharing viable theories and evidence to support the claims, and were precisely the kind of hours that should be compensated, at a minimum, at lodestar.

Weinberg's timely Original Submission to the TPP FAC appended daily records of 1518 hours of time, all of them entered by Weinberg himself, at a rate of $750/hr., yielding a lodestar of $1,138,500; he further detailed $27,392.61 in expenses, with each entry supported by an invoice. *See* R. Doc. 64044, Exh. A.

Several details of Weinberg's submissions are particularly noteworthy.  The first, evident on the face of Weinberg's time records, is that he logged his 1518 hours of common benefit time between November 12, 2007 and September 13, 2009; therefore, as he certified,  none of this time related to the by-then concluded personal injury litigation and, more importantly, that time was not submitted in connection with the personal injury common benefit allocation.  *See* R. Doc. 64044, Exhs. A-7 and B.  The same is true of Weinberg's expenses.  *See id.,* Exhs. A-8, and B. Additionally, as the FAC acknowledges, Weinberg received no payment for his work from TPP clients.  *See* R. Doc. 63928-1, at 4.  Third, as the below-discussed emails establish, Weinberg occupied a leadership role by invitation of members of the TPP FAC. Also significant to the Court's comparative analysis is the fact that Weinberg's time was entered by him at the rate approved by this Court in the PI litigation.  By contrast, many of the applicants have submitted substantial amounts of paralegal time and have charged indefensible rates. *See, e.g., infra,* at 23-24, regarding Dugan's submission of time for Plymale, *who was Murray's employee, whose time was also submitted by Murray, and whose time Dugan duplicatively billed **at a substantially higher rate than his employer.***

In the personal injury litigation, this Court saw extensive evidence of Weinberg's command of scientific issues, and the importance of his expertise to the overall litigation.   He carried that expertise forward into the TPP litigation.   He developed common benefit evidence, principally expert scientific evidence, which included proof of a panoply of risks of Vioxx that were not disclosed to Third Party Payors, and evidence of safer and cheaper alternatives to Vioxx which the payors would have purchased had they known of the Vioxx risks.  *See* R. Doc. 64044, Exh. A-1 through 4.

As a result of Weinberg's early command of the scientific issues, in March of 2008 Lead Counsel confirmed a working partnership in the New Jersey TPP litigation among Seeger Weiss, Weinberg, and Cohen Placitella & Roth.  *See* R. Doc. 64044 , Exh. E-1.  Weinberg continued to develop and share the broader risk/benefit evidence case against Merck throughout  2008 and 2009. For example, he provided Lead MDL and New Jersey counsel with a road map to this strategy in July of 2008, *see id.,* Exhs. E-2 and E-3; met with Lead and Liaison Counsel at their offices in New York in September of 2008 to "discuss trial themes and vet liability theories, " *see id.,* Exh. E-4 ;[3] prepared and circulated guidelines for document review in October of 2008, *see id.,* Exh. E-5; provided expert analysis of risk data in the Alzheimer's studies to Liaison Counsel in November of 2008, *see id.,* Exh. E-6; and in late 2008 and early 2009 provided MDL Lead Counsel with his work on a significant risk issue that had not previously been pursued in the MDL, *see id.*, Exh. E-7, E-8, E-9.

In January of 2009, Liaison Counsel endorsed Weinberg's litigation strategy of broadening the evidence of the risks associated with Vioxx that were relevant to the plaintiffs' purchasing decisions.  *See id.,* Exh. E-10.  In February of 2009 Weinberg organized a working meeting of Vioxx

---

[3] Lead Counsel Christopher Seeger and Liason Counsel David Buchanan attended this meeting, along with their then-partner, Jeffrey Grand.  The agenda was  common benefit work.

TPP counsel in New Jersey, at the request of Liaison Counsel. *See id.* Exh. E-11.[4]  It took place in March of 2009 and was attended by several plaintiffs' counsel representing private TPPs, including Liaison Counsel.  Weinberg arranged and chaired the meeting, created the work guidelines and agenda, and drafted and circulated the minutes of the meeting.

 Of the three firms in the New Jersey "working group," the FAC initially recommended a $4.7 million fee to Seeger Weiss and zero fees to Weinberg and to Cohen Placitella & Roth. In its final post-objection recommendation, the FAC increased its recommendation for Weinberg to $450,000 and for Cohen to $122,000; it "reduced" Seeger's recommended award to $3,965,000. *See* R. Doc. 64193.  The disproportionate favoring of Seeger is especially disturbing because of the enormous contribution it attributes to the common benefit from a single decertified class action, which constitutes the overwhelming majority of its TPP hours.

In May of 2009, Weinberg accompanied a biostatistics expert to Melbourne, Australia., where he testified in the Australian Class Action trial.  Weinberg's first-hand view of Merck's assault against this evidence proved invaluable in the further development of the expert and theories of liability to be utilized in the Vioxx private TPP cases.

By June and July of 2009, it was apparent that few MDL lawyers were working on the TPP cases.  Only a handful of depositions were taken in all of the TPP litigation; these were taken outside the MDL in New Jersey.  Weinberg second-chaired two of these depositions. He made substantial efforts to coordinate with PSC firms, sharing  theories of liability and expert work product with MDL lawyers and suggesting the integration into the MDL of valuable work product that would serve the common benefit of all TPP plaintiffs.  *See*  Rec. Doc. 64044,  Exh. E-12, E-13, E-14.

Significantly, the acknowledged "lull" in TPP work within the MDL meant that few MDL lawyers, and therefore most of the TPP FAC, although aware of the fact of Weinberg's ongoing efforts, were unaware of the details or the importance of his work.  Weinberg therefore offered the

---

[4] David Buchanan of Seeger Weiss was Liason Counsel in New Jersey.

FAC multiple means of bridging the gap.  First, he provided extremely detailed time records in his submissions.  *See id.,*  Exh. A.  Second, he provided a substantial sampling of work product.  *Id.* Third, he provided certifications from two among the many attorneys in the TPP litigation who looked to Weinberg for leadership.  Joseph Grinstein, Esq. and Mark Schultz, Esq., prominent attorneys who represented some of the largest plaintiffs in the TPP litigation, each attested to the value of Weinberg's work.  Neither submitted common benefit claims nor had any interest in Weinberg's entitlement to Common Benefit Fees.  *See id.,* Exh. D.

While the FAC may not know as much as it should of Weinberg's contributions, Merck had enough notice in the depositions and in the expert testimony Weinberg shepherded through the TPP action in Australia to perceive its risk in litigating the TPP claims, and correspondingly, its advantage in entering into a global settlement.

Weinberg's workup of a viable theory of liability for Third Party Payor Plaintiffs merits, at the very least, full compensation.  He became involved in the TPP cases early, and worked them hard.  The TPP FAC recognizes that New Jersey substantially preceded the MDL in TPP litigation. *See* R. Doc. 63928, at 2.  The "several years lull on the TPP front," which the FAC acknowledges, was largely restricted to the  MDL.  Thus, the TPP work in New Jersey served as the template for most of the TPP litigation.

Weinberg, who occupied a central role in the New Jersey efforts, ranks among the most significant contributors  to the overall TPP litigation.   He developed much of the scientific theory, which greatly exceeds in novelty and difficulty the administrative work undertaken by those for whom  the  FAC  recommends  substantially  higher  compensation.   Additionally,  Weinberg contributed substantial funds to the development of such evidence, which the FAC has not only disregarded as a multiplier, but proposes not to reimburse.   Weinberg's experience and reputation, and the high quality of his work have already been documented in the PI litigation, and as noted above, may have contributed substantially to the TPP settlement. Unlike most other claimants, he

received no fee for his work from any TPP clients.  He devoted himself entirely to the common benefit, and therefore is entirely dependent on a just allocation for the compensation of his work. As a sole practitioner, Weinberg took substantial risks in devoting such extensive efforts to the TPP cases.

At Judge Fallon's urging, the TPP FAC specifically inquired into the prior submission of hours in the PI litigation. However, it notably omitted from its "threshold observations" any reference to the appropriate treatment of such hours.  *See* R. Doc. 63928, at 7.  With respect to Weinberg, the Recommendation expressly and accurately notes that his time was not previously submitted.  On the other hand, as noted below, the FAC recommended full compensation for some of its members' time which was previously submitted *and compensated*.

Because Weinberg suspected, even before the Recommendation issued, that other claimants were duplicating previously-submitted time in their TPP claims, he tendered an Addendum to the FAC.  It noted that if duplication were allowable, he should be credited with an additional 1680 hours of *his* time, previously submitted in the PI action but benefitting the TPP action, bringing his common benefit lodestar to $2,398,500.  *See* R. Doc. 64044, Exh. C.  He described in detail how his overlapping hours were directly relevant to the issues in litigation of the TPP claims.  In its recommended allocation, the TPP FAC did not list nor in any way acknowledge this submission. Nor did it explain how Weinberg's overlapping hours are distinguishable from those of FAC members for which it recommended duplicative payment.

If the duplicated hours are disallowed for one claimant, they should be disallowed for all. Conversely, if they are allowed for any claimants, they must be allowed for all.

## III.    THE FAC'S EVALUATION OF WEINBERG'S WORK SHOULD BE GIVEN NO WEIGHT

### A.    The TPP FAC has offered no justification for awarding Weinberg less than lodestar.

#### 1.    The FAC's first recommendation

In its first recommended allocation, filed on June 13, 2012, the TPP FAC recommended that Weinberg receive no payment for his time, and no reimbursement for his expenses.  It assigned no reasons whatsoever for this recommendation.   It did not dispute his hours, his expenses, nor his recitation of significant contributions, most of which were, at least in outline, known to members of the TPP FAC.   *See* R. Doc. 63928.

Several of the FAC's general observations in that initial filing squarely supported full compensation of Weinberg.  The Recommendation noted with approval the "aggressive" litigation of TPP cases in New Jersey, *see* R. Doc. 63928, at 2, in which Weinberg took a leading role.   It stated that client-specific work was discounted; and it noted, with respect to Weinberg, that none of his work fit within that category.  *See id.*, at 7, 26.  It also noted that none of Weinberg's time was previously submitted in the personal injury action.  *See id.*, at 25.

In that first recommendation, the TPP FAC placed the claimants into three "buckets": those who should be well-compensated for "significant substantive TPP common benefit work;" those who received no compensation in the personal injury litigation and should be "reasonably compensated for their TPP common benefit contributions;" and those who "did not contribute meaningfully to the common benefit of TPPS."  *Id.,* at 8.   Because Weinberg clearly belonged in the first bucket, and, equally clearly, could not be dumped into the last, it appeared that the TPP FAC may have placed him into the mysterious second.   Then, it somehow disqualified him on account of his having received compensation in the personal injury litigation.   It noted that he received $3.5 million in the prior allocation; but it made no showing how this fact is relevant to the TPP allocation.  Given the certification that Weinberg's TPP hours were not previously submitted, it made no sense to penalize him for his prior contribution to and compensation in the personal injury litigation.  Almost every member of the TPP FAC was likewise compensated in the prior allocation, and this did not seem to have adversely impacted any of their recommended allocations. Indeed, Seeger, for which the TPP FAC has recommended the largest fee of all, received

$36,600,000 in the PI action.

Without sharing any details about the claims against the $15 million dollar fund, the TPP FAC observed that those claims totaled $23 million.  *See id.,* at 8.  An $8,000,000 shortfall does not justify the complete elimination of Weinberg's claim.  Moreover, the alleged inadequacy of the fund was a myth created by the FAC's own exaggerated demands against it; *removal of the FAC's duplicative time would allow for full lodestar compensation of every applicant*.  At any rate, the initial demand-vs.-available funds ratio has substantially diminished, because many of the claimants either abandoned their claims altogether or accepted the FAC's recommended reductions rather than engage in the costly and arduous process of objection.  Nothing in the FAC's initial recommendation explained the complete dismissal of the claim of one of the most prolific workers developing science and strategy, and therefore a leader in the TPP litigation.

### 2.    The FAC's resistence to meaningful comparative analysis.

After the FAC submitted its initial recommendation, Judge Fallon invited objection by any claimant disputing the propriety of the recommendation.  *See* R. Doc. 64011.  Weinberg timely filed his objection on August 10, 2012.  *See* R. Doc. 64044.  In it, Weinberg observed that he could not make the appropriate comparison of his recommended award to others, because the FAC had neither explained its rationale for allocation nor made available the submissions of other claimants; the underlying material on which the FAC had purportedly based its recommendation was contained in its Exh. D, which it had filed under seal.  *See* R. Doc. 64044, at 3.

On Weinberg's repeated requests and motions, *see* R. Doc. 64165-1, the Court directed the FAC to provide access to Exh. D, and it ultimately did so.  However, Weinberg's review of Exhibit D revealed a double-blind: several key claimants *had not submitted their time records to the FAC* in connection with their claims, as required by Court order and FAC-directed process, but had instead simply referred the FAC to time records submitted directly to Phil Garrett.   Weinberg sought review of Mr. Garrett's records so that Weinberg could conduct the necessary analysis.  But

he also questioned the compliance with Court-ordered process of those claimants who had neglected to include their time records as required; he further questioned whether the FAC had even reviewed the time records submitted to Mr. Garrett.  *See* R. Doc. 64165.

The FAC suggested that Weinberg had no need to review Mr. Garrett's records, because, astonishingly, the FAC admitted that *it had not examined the time records submitted to Mr. Garrett. See* R. Doc. 64171.  Thus, the FAC's argument went, any materials which *it* had not considered were "irrelevant" to the allocation, *see id.,* at 2-3, notwithstanding Fifth Circuit precedent, which makes them the unquestioned starting point of any fee allocation.  If Weinberg wished to review the "irrelevant" materials, however, the FAC declared that it had "no objection" provided Weinberg's counsel pursued a method of review likely to cost more than the value of Weinberg's entire claim. *See id.*  Weinberg demurred.  *See* R. Doc. 64176.

On December 4, 2012, the Court directed Mr. Garrett to give Weinberg  direct access to his records.  *See* R. Doc. 64183.  In the December 11, 2012 status conference,  the Court directed Mr. Garrett to provide Weinberg's counsel with a password to his software.  As will be shown below, the Garrett records disclosed multiple and profound irregularities in several favored claimants' requests for common benefit fees.   As will also be shown below, the FAC made no adjustments to its recommendation after the irregularities were disclosed.

### 3.      The FAC's second allocation recommendation.

On December 11, 2012, exactly one week after Judge Fallon opened Mr. Garrett's records to Weinberg, but before Weinberg had had any opportunity to analyze them, the TPP FAC filed a "[Proposed] Decision Distributing Third Party Payor Common Benefit Fund."  *See* R. Doc. 64193. Attached was a "Final Proposed Allocation."  *See* R. Doc. 64193-2.

Although Weinberg had just been given access to significant new material, the FAC had received *no new material* between the first and second recommendation– that is to say, it had received no new materials pertinent to a fee allocation as governed by Fifth Circuit precedent.  The

only new factor at work was the filing of certain objections, and equally important, the non-filing of others, reducing the overall claims against the $15 million fund.   Ten firms objected.   *See*  R. Doc. 64193-1, at 6.  The FAC recommended an increase for half the objectors, including Weinberg; but it made no changes with respect to the Central States Objectors.  *See* R. Doc. 64193-2.

The "Proposed Decision" gave no indication how the FAC had arrived at the recommended increases.  Weinberg's recommended allocation went from 0 to $450,000, and the FAC did not offer any explanation whatsoever how his contribution went from worthless to considerable, nor why it still remained a disproportionate fraction of Weinberg's lodestar.  Purporting to speak for the Court, the FAC-authored "Proposed Decision" declared, "[t]he underlying basis for the Court's conclusion is set forth in the Fee Allocation Committee's Recommendations."  R. Doc. 64193-1, at 6.  This made no sense whatsoever, since the FAC's earlier recommendations were for *different* allocations. It particularly made no sense in regard to Weinberg, for whom an allocation of zero had been recommended.

The new allocation reflected a 5.23% reduction in the recommended allocations to all members of the TPP FAC.  The "Proposed Decision" stated that this reduction was imposed "in order to make up for the shortfall incurred by increasing awards to some objectors."  R. Doc. 64193-1, at 6.   The numbers, however, did not add up.  The 5.23% reduction of FAC fees yielded $569,233.  Added to the $300,000 the first recommended allocation had left uncommitted, the FAC had nearly $900,000 to dispose of.  But the increased awards recommended for objectors came to $1,322,000.  The FAC made up for the unacknowledged shortfall of over $400,000 by reducing the recommended allocation to Seeger Weiss.  Seeger was the *only firm to experience a reduction* apart from the 5.23% applied across the FAC board.   In effect, for reasons which were not disclosed, Seeger was charged with funding the recommended increase to Weinberg ($450,000).  This might explain why Seeger, who relied heavily on Weinberg in the New Jersey TPP litigation, and should be well acquainted with his work, has reportedly denigrated it to his FAC fellows; against all

-14-

evidence, the FAC has reportedly accepted his opinion as unbiased, stating  that "it sought to act selflesslessly."  R. Doc. 64235-2, at 3.   As shown below, its recommendations belie that claim.

### 4.      The FAC's retraction of its allocation recommendation for Weinberg

While the Proposed Decision said nothing for or against Weinberg's work, it specifically declared that if Weinberg refused to abandon his assertion of a right to appeal, the FAC would "re-distribute. . .the allocation" to him ratably back to its members.  *See* R. Doc. 64193-1, at 11.  This "poison pill" paragraph in the Proposed Decision suffers from numerous fatal flaws, which Weinberg has in part addressed to the Court.  R. Doc. 64206, at 8-9.  Weinberg's right of appeal*,* however, is irrelevant to the issue currently before the Court – the appropriate allocation of common benefit fees.

The only true significance of the FAC's poison pill lies in its utter disregard for the appropriate functioning of this or any other fee allocation committee.   PTO 57 appointed the TPP FAC and charged it with the responsibility of recommending an allocation to the Court.  In the order, the Court specifically directed the FAC to gather lodestar information, and descriptions of the applicants' "significant contributions to the common benefit of private TPP efforts in this MDL and/or in related state proceedings."  *Id.,* at 3.   Implicit in these directives was the Court's expectation that the FAC would *base its recommendations* on such pertinent considerations.  In suggesting that Weinberg was entitled to a $450,000 allocation, which the FAC *recommended* to the Court in its fiduciary capacity, it certified to the Court that Weinberg had made at least a $450,000 contribution to the common benefit.

Unbound by this representation to the Court, Mr. Herman later advised Weinberg in writing that the FAC's "offer" had been withdrawn.  The implication was that it would readjust its recommendation for him to zero, a fact that was confirmed in the last conference call with the Special Master.

The FAC has not previously challenged Weinberg's hours, nor his claimed contributions to

the TPP common benefit.  It has merely offered the Court its conclusion that "[a]bsent any information, demonstration, or reason to believe his contributions outweigh those of many others, the allocation to Weinberg is generous."  R. Doc. 64235-2, at 2.

This conclusory allegation misstates both the record and the FAC's obligation to this Court. Weinberg has faithfully reported both his hours and his contributions in accordance with the Court's requirements.  The FAC, in proposing that Weinberg be compensated at 38% of his lodestar, while compensating most of its members at 100% or higher, had an obligation to *justify* that discrepancy by offering some "information, demonstration, or reason to believe" that his contributions underweigh those of many others.  The Court, which has been given no such "information, demonstration, or reason to believe," cannot responsibly and in accordance with due process accept the FAC's unsubstantiated recommendation.

### 5. The FAC's charge of "double-dipping"

The only explanation the FAC has ever offered for reducing Weinberg's recommended allocation came in the form of Mr. Herman's allegation, during an April, 2013 telephone conference with the Special Master, that Weinberg was guilty of "double-dipping."  This charge, it should be noted, came only after Weinberg offered substantial, detailed, and *documented* evidence of double-dipping by members of the FAC, as summarized below.  The FAC, by contrast, has never offered any evidence of double-dipping by Weinberg.  Directed by the Special Master to produce to Weinberg no later than May 6, 2013 any evidence which bore on its recommendations to the Court, the FAC produced nothing.  Therefore, it has waived any claim that alleged double-dipping by Weinberg informed its recommendations.

There has been no double-dipping by Weinberg, as his submissions attest under oath.  The FAC may have gotten that impression from the fact that he is working with the same experts and much of the same data that was used in the personal injury case.  For example, the Alzheimer's paper appended to his TPP submission is a work which has been in progress for many years, and to

which he referred in the PI allocation hearing; but this does not mean that Weinberg is billing again for the *same* work.  Updating his work for the TPP cases has been a particular challenge, which he has doggedly pursued.  The FAC's failure to meet that challenge has produced a string of losses. Weinberg's work in mining the data to discover new material and to develop new theories that would carry the litigation forward has produced discernable results.  For example, in the PI cases, the fact that more patients developed Alzheimer's was considered irrelevant; in the TPP cases, the concealed fact that Vioxx put elderly patients at risk bears significantly on the decisions of payors to purchase the drug.   Weinberg's hours from November 2007 through September 2009 reflected work that deepened the understanding  of and expanded the ability to use the evidence in the private TPP cases– and it went far beyond his or any other work undertaken in the PI cases.

Significantly, Weinberg shared that evidence with MDL counsel, who billed time for studying it.  For example, reference to the time of a *single* attorney within the Lieff Cabraser firm shows that he logged more than $11,000 dollars in time for reviewing Weinberg's work.  *See* R. Doc. 63569, Exh. D, Lieff, Cabraser, at 57, 59, 61, 63-68.  The FAC recommended *full payment* of that and many other such entries repeated throughout favored submissions.  It simply cannot justify paying 100 cents on the dollar to those who *reviewed* Weinberg's work, while recommending that Weinberg receive nothing for *authoring* the work.

Another important component of Weinberg's submission relates to his work in the Vioxx class action trial in Australia in June of 2009 – the only case outside the US to take Merck to judgment.  As counsel in that case reported, they sought help from "a number" of US plaintiffs' counsel, and Weinberg was one of the few to respond.   At his own expense and without compensation, Weinberg traveled across the globe and devoted weeks to the successful trial, which incorporated, among other contributions, his new work with Dr. Madigan on Alzheimer's.  *See* R. Doc. 64044, Exh. A-5.  The FAC's makes no mention of this work in its submissions, suggesting that its *losing* litigation in this country provoked a settlement while Weinberg's *winning* work in

Australia played no part.[5]  This court will note that the TPP settlement was reached in principle almost immediately following the Australia litigation, and finally concluded within three months of it.  The hours and costs for this enormous contribution to the common benefit– like all the rest of Weinberg's time– have never before been submitted for payment.

The charge of double-dipping against Weinberg is fictitious.  His charge of double-dipping by the FAC is real, as shown below.

### B.    The FAC's Recommendations to Others, Which Double, Triple, and in Some Cases Quadruple Compensate for Time Spent, Demonstrate That Weinberg Is Entitled to at Least the Single Compensation of His Lodestar.

Although the Court directed the Special Master to recommend only "the amount that the remaining objectors should receive," rather than a full allocation for all applicants, R. Doc. 64304, at 4, the comparative review required in allocation cases nonetheless demands review of both the FAC's excesses and its deficiencies.  Since the Court is required to allocate a fixed sum, the amount one claimant receives can only be evaluated in relation to what other competing claimants are receiving.  For example, it might be fair for one claimant to "take a haircut" on his allocation, if all other claimants likewise were undergoing a similar shave. But, if other claimants are receiving top dollar, in some cases more than top dollar, then a buzz cut to one is difficult to justify.  The Fifth Circuit has expressly held that in these matters, the Court cannot allocate fees to a given claimant in a vacuum, and without relativity or comparison to the amount competing claimants are due to receive.  *See In re High Sulfur Content Gasoline Products Liability Litigation, supra*, 517 F. 3d at 234 ("One cannot . . . compare apples to oranges without knowing what the oranges are. *** After all, '[a]llocation means proportion; how does the share [one] counsel is taking compare to the shares others are getting?' *In re Vitamins Antitrust Litig.*, 398 F.Supp.2d at 234.").  Accordingly, it is both appropriate and necessary to look at the FAC's other recommendations to determine if Weinberg is being treated equitably. Such a review here reveals that this is not the case, as some claimants are

_____

[5] The Australia Supreme Court ultimately overturned the plaintiffs' judgment, but not until after the TPP settlement.

getting lodestar and mammoth lagniappe, while Weinberg has been given a buzz-cut, ostensibly because there are insufficient funds available to compensate him.

For example, the Levin firm submitted a ledger which included the entire kitchen sink of its non-personal injury time entries, including work on Stratton, mandamus, Snapka, Turner Branch, Becnel, and other matters. Recognizing the clear impropriety of including such entries in its TPP submission, Levin highlighted its TPP time, and noted, "[o]nly highlighted time is included in the current fee petition for third party payor common benefit fees." R. Doc. 64206, Attachment B. The highlighted time sums to a mere 33 hours, a small fraction of the overall ledger. But the FAC took no notice of this essential footnote, having never looked at the ledger. Additionally, Levin, too forgot about its footnote and claimed *all the time on the ledger.* Accordingly, the FAC based the recommended award on the *full ledger lodestar of $658,850, all but 33 hours of which were completely unrelated to the TPP litigation.* Noting that Levin had also *previously submitted and been compensated for this time in the personal injury action*, the TPP FAC recommended a "reduction" in the TPP award to $650,000. *See* R. Doc. 63928, at 19. For the 33 hours devoted to the TPP matter, then, the FAC recommended that Levin be compensated at a rate of $19,709/hr., notwithstanding that the firm has previously been fully compensated for the time.

After Weinberg pointed out this extraordinary defect in the Levin submission, Levin sought to add 2130 hours of work previously submitted – and compensated – in the personal injury action. *See* R. Doc. 64235-5, at 2. According to Levin, the FAC recognized that this work contributed to the TPP settlement and so made its recommendation of compensation almost entirely duplicating the award in the prior case. *Id.,* at 2-3. The FAC submitted this declaration by Levin without comment in its February 1, 2013 Response, *see* R. Doc. 64235-2, as if Judge Fallon had not expressly directed inquiry into such duplication, as if Levin had not concealed such duplication in its submission contrary to the requirements of PTO 57, and as if the FAC had not also concealed the duplication from the Court in its recommendation. As Weinberg has noted, he can identify another

-19-

1680 hours of his time, previously compensated in the personal injury distribution, which likely contributed far more to the TPP settlement. If Levin's hours are duplicated, so must Weinberg's be.

In the case of Seeger Weiss, statements in its submissions are conflicting with regard to whether it was previously compensated for the time submitted for TPP common benefit allocation.[6] Seeger contends that it was not previously compensated for some 8800 hours devoted to the TPP. *See* R. Doc. 64235-4, The FAC supports Seeger's contention that the *Local 68* time was "not considered" in making the personal injury award. *See* R. Doc. 64235-2, at 2. But unlike Seeger, the FAC suggests that some of the TPP time *was submitted in the PI case, but "only" halfway compensated:* Seeger "incurred a total of $9 million in TPP time and submitted less than half of this time in conjunction with the Court's previous common benefit proceedings." R. Doc. 63582, at 3.

Whether Seeger previously submitted some of its time or not, that is, whether the "true" lodestar is $4 million or $9 million, this is a staggering award for a case which did not develop beyond class certification. More significant to the present inquiry is the question how much of that time conceivably served the common benefit– when no experts were developed, no discovery undertaken, and few if any rulings issued that served the TPP litigation as a whole.

This enormous overvaluation of the *Local 68* contribution is exacerbated by the fact that Seeger was not the only firm for which the FAC recommended substantial awards in connection with the failed *Local 68* class action. Lieff Cabraser also logged a considerable number of it hours to the failed action. Even more disturbingly, years after the case had been lost and *months after the TPP case had been settled*, Dugan claimed to have devoted more than 100 hours to "reviewing the

---

[6]In accordance with this Court's guidelines, the submission form inquired of all claimants, "Has the Vioxx MDL Court, or any other Court, already awarded you or your firm common benefit fees for Vioxx TPP-related work?" Seeger answered this question, "No." *See* R. Doc. 64206, Attachment A. However, the form also instructed, "Provide the number of hours and amount of lodestar included in your claimed total TPP common benefit hours and lodestar that you previously submitted for consideration by the Court in conjunction with its prior award of common benefit fees." To this question, Seeger responded that 8,828 hours were previously submitted for a lodestar of $4,202,858.75. *Id.* This represents *all* of the hours submitted in connection with the TPP. The suggestion, then, is that although the hours were previously submitted, they were not previously compensated. In its original recommendation, the TPP FAC states "Seeger Weiss LLP now asks the Court to consider that it had incurred a total of $9 million in TPP time and submitted less than half of this time in conjunction with the Court's previous common benefit proceedings. R. Doc. 63582, at 3.

record"– for what purpose it is impossible to guess.  But the FAC recommended that some $50,000 of such time by Dugan be fully compensated, in addition to the millions for Seeger and substantial award to Lieff Cabaraser.  *See* R. Doc. 63569, Exh. D, Dugan, at 2,4,5, 67-69.

Everyone piled into the *Local 68* bandwagon because it was one of the very few TPP cases litigated anywhere.  But what no one is saying is that the case went nowhere.  After the class certification failed, *Local 68* did not even proceed with its *own* TPP action as a stand alone claim! In all likelihood, this is because in January of 2009, its president was indicted for misuse of union funds– and later convicted. *See* http://www.examiner.com/article/lawmaker-s-nephew-indicted-on-corruption-charges.   The notion that this case in any way served the common benefit, is highly questionable.

Herman logged time for *Local 68*, too, twice or more.  Indeed, the Herman firm doubled up on numerous entries.  That firm calculated its TPP time in two separate exhibits. It formulated "Exhibit 2" by running five separate reports based on its submissions to Garrett. The first report searched for the term "TPP," *see* R. Doc. 64206, Att. C-1, at 1-18; the second for the terms "third party" or "3rd party," *see id*., Att. C-2, at 1-19; the third for "NJ" or "New Jersey," *see id*., Att. C-3, at 1-16; the fourth for "local 68," *see id*., Att. C-4, at 1-1; and the fifth for "AG" or "Attorney General," *see id*., Att. C-5, at 1-32.  Herman then added the time for each of these reports: 163.25, 140.5, 116.5, 5, and 352.5, and submitted 601.75 of the total 777.75 hours[7] for a TPP lodestar compensation of $425,613. It formulated "Exhibit 3" by running the same searches. *See id*., Att. D. The purpose of this second set of reports is not clear. Theoretically, perhaps, Exhibit 3 drew from a different period of time; but in actuality, there is tremendous overlap between the exhibits, both in timekeepers and their time entries for identical dates.  Exhibit 3 produced another 719 hours of time for  compensation of $555,487.50.  *Herman then combined the overlapping Exhibits 2 and 3*

---

[7]The discrepancy in hours is explained by the fact that Herman "only" charged half of the hours appearing on C-5, its AG run. As discussed *infra*, Herman more than made up for this "deduction" by charging many of those hours four times. Moreover, reducing the AG hours by half (even apart from the complication of then multiplying them by four) does not bring the AG time to the zero contemplating by this Court for claims against the TPP fund.

*for a total submission of $981,100.* The TPP FAC "reduced" this claim to $950,000 in its recommendation.

Compounding the error in submitting AG time and expenses for TPP fund reimbursement, Herman submitted many of its AG hours *two, three, or even four times*. As noted above, Herman calculated its hours by running multiple reports, searching for words such as "AG" or "TPP." However, a cursory review of Attachment C(1), which is supposedly the TPP report, shows that the term "AG" or "Attorney General" appears in more than forty entries. When Herman ran its "AG" report, it *repeated* each of those entries. *Compare* R. Doc. 64206, Attachment C-5. The same duplication occurred with virtually *every term* for which Herman searched. Then, when Herman generated its Exhibit 2 from the *same word searches*, for every overlapping date between Exhibits 2 & 3– and there are many– it at least *doubled* its time; *but where the time entries are already duplicated by overlapping searches, Exhibit 3 **quadrupled** those entries*. Attachment E, *en globo*, provided an example of time (1.5 hrs. billed four times by Russ Herman for AG and TPP work on 12/29/08). Because such "AG" time should not have been charged even *once* against the TPP fund, its *quadrupling* is completely unconscionable.

Many other entries are obviously not related to the TPP.   While it impossible due to page limit constraints to list them all, two examples documents the point.  There is a 5/2/2011 entry for RLV, "Draft/revise and finalize FAC opposition to Objectors' motion re: 3rd Party Payors." Since there were no Third Party Payor Objectors at that time, this entry plainly relates to the personal injury litigation, in which the FAC filed such an opposition.   Additionally, in searching for "New Jersey" time, the firm drew up *several years'* worth of time related to the New Jersey PI actions. *See* Rec. Doc. 64206, , Exh. C-3, at 1-9.

The Herman firm selectively responded to Weinberg's criticism.   It contended that it compensated for quadruple-billing some of its time – for example, the combined AG/TPP time– by halving those entries.  *See* R. Doc. 64235-3, at 3.  Weinberg had acknowledged as much in his

criticism. *See* R. Doc. 64206, n. 4. But Herman's math still left much to be desired: the application of a multiplier of 4 to a great deal of time cannot be corrected by dividing some of that time by 2.

More accommodatingly, the firm also adjusted its lodestar downward by $275,000. *Id., at* 10. *But the FAC did not adjust its recommended allocation to the firm by a whit*, making the $275,000 adjustment to Herman's time strictly gratuitous, as it had no apparent bearing on a $950,000 recommendation.

Herman was not the only firm to charge its AG time. Such time appears to be heavily represented in the Dugan entries as well. The TPP settlement was finalized on September 14, 2009, *see* R. Doc. 63928, at 2, although firms like Dugan, which were actively involved in the negotiations, surely knew that the deal was done by mid-summer. As noted above, in late September, October, and November, 2009, firm members entered more than 100 hours of time for items like "discovery," and review of documents from Seeger's *Local 68* case in NJ, which failed at the class certification phase and which been concluded for years. *See* R. Doc. 64206, Attachment E. Considering that the TPP matter had been concluded, such entries clearly relate to the AG litigation, in which the firm was deeply involved.

Nothing in Judge Fallon's orders suggests that any AG time is compensable out of the TPP common benefit fund, nor should it be. Weinberg, who has also been heavily involved in the governmental actions, adhered to this Court's instructions and did not submit AG hours for reimbursement out of the TPP fund. And, to the extent that there is any overlap of TPP and AG hours in what he has submitted (some of his work benefits both private and public TPP claims), he will not seek reimbursement for those hours from any AG common benefit funds.

In addition to inclusion of hours expended on matters other than TPP work, as with Herman's (and most FAC members' submissions), there are also multiple individual entries that are suspicious, such as Mr. Dugan's reported time for the single day of 5/28/09, which totaled *27.5 hours.* S*ee id.* But, using limited space to list these errors would be myopic, as there is a much larger

issue with regard to the Dugan allocation.

Looking at Dugan's single time entries is hardly warranted when it appears that *most of his firm's time is duplicated*.  Up until the settlement of the private TPP litigation, Dugan was a member of the Murray firm.  Consequently, Murray claims that Mr. Dugan's time belongs to it.  *See* R. Doc. 63569, Exh. D, Murray, at 100.  In its submission to the FAC, Murray also observed that Dugan refused to coordinate his submissions for common benefit fees.  Therefore, *it expressly warned the FAC to be on the lookout for duplications in the two firms' submissions*.  *Id.,* at pp. 1-2.

The FAC paid no apparent heed to this warning.  If it had, it would have noted that Dugan submitted 255 hours of time for Plymale, a former employee of Murray, whose time was *also submitted by Murray*.  Worse, Dugan charges Plymale's time at *$545/hr.*, while Murray charges the time for *its employee* at *$400.*   This raises a question about Dugan's charge of his own time at $595/hr. during the period when, as an employee of the Murray firm, he would doubtless have been billed at a considerably lower rate– as Plymale was.  After Murray's heads up, such review ought to have been performed by the TPP FAC, but in spite of Dugan's gross duplication of time and inflation of rates, the FAC recommended an award close to the firm's full lodestar.  Likewise, the FAC proposes to pay both Murray and Dugan for the *same* costs, which may have *already* been reimbursed out of funds Dugan received in the AG litigation.[8]

The FAC noted in its response to Weinberg's criticisms that it "requested that each implicated firm submit a statement to the Court in response to the firm-specific objections."  R. Doc. 64235-2, at 1.  Apparently, some of the "implicated" firms failed to heed the call.  Dugan, for instance, made no response to Weinberg's observation that much of his time clearly related solely to the AG litigation, nor did it respond to the attachment of Mr. Dugan's billing for a single day on which he logged 27.5 billable hours.  Despite Dugan's failure to defend its submission, the FAC was

---

[8] The Special Master will recall that the single item of discovery Weinberg sought in this phase was a report of the use of the $600,000 paid by Merck in the Louisiana AG action (in which Dugan had a prime role, and for which he used the experts claimed as TPP costs).  No information was provided, and it may be presumed that information within its control and withheld by Dugan is adverse to its claim.

apparently unmoved to adjust its recommendation.

## IV.    CONCLUSION

The body of the memorandum addresses the FAC's bewildering lack of justification for denying Weinberg compensation for his significant contributions to the private TPP common benefit.  But bewilderment is strictly of matter of record.  Off the record, Weinberg is neither confused nor surprised.  The FAC has treated Weinberg here just like it did before, making "recommendations" for his allocation that are in reality negotiating numbers, not intended to be a proper evaluation of the value of his work: zero, then $450,000, then zero again, the last expressly characterized as an "offer," not a recommendation to the Court.

The FAC's curious reference to Weinberg's award in the PI case signals its view that he got too much there and so should be penalized in this TPP allocation– in order to make amends to those who, in the FAC's view, received too little in the last round.  But Judge Fallon, in keeping with the TPP settlement agreement, properly called for the fund to be allocated for TPP common benefit work, without regard to the separate PI litigation.

Because there were no US trials and little formal discovery, Weinberg's work developing a viable theory of the case was among the most valuable work that was done in the TPP litigation. Certainly the failed class actions in New Jersey and California contributed nothing more to the common benefit. Yet the FAC has recommended top dollar for that work and for the work of firms that billed, double billed, and in some cases quadruple billed, largely administrative time. If it be true that some hours are worth more than others, Weinberg, who spearheaded the effort to develop evidence to support a viable theory for the TPP litigation, deserves to be compensated at the top of the scale.

Additionally, because the FAC has subjected Weinberg and this Court to a lengthy, unnecessary, and costly process for recovering an appropriate allocation, the costs should be charged in their entirety to the FAC.

Respectfully submitted:


/s/ Robert E. Arceneaux                        /s/ Margaret E. Woodward
_____        _____
Robert E. Arceneaux, La Bar No. 01199        MARGARET  E.  WOODWARD,  La.  Bar
ROBERT E. ARCENEAUX LLC                      No.13677
47 Beverly Garden Drive                      3701 Canal Street, Suite C
Metairie, LA 70001                           New Orleans, Louisiana  70119
(504) 833-7533 office                        (504) 301-4333 office
(504) 833-7612 fax                           (504) 301-4365 fax
rea7001@cox.net                              mewno@aol.com


Pascal F. Calogero, Jr., La. Bar No. 03802
AJUBITA, LEFTWICH & SALZER, L.L.C.
1100 Poydras Street
New Orleans LA 70163-1950
(504) 582-2300 office
(504) 582-2310 fax
pcalogero@alsfirm.com

Attorneys for Law Offices of Eric Weinberg


**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Memorandum has been served on Russ Herman

by  e-mail, and by upon all parties by electronically uploading the same to Lexis Nexis File & Serve

in accordance with Pre Trial Order No.8, on this date, May 15, 2013.


s/Margaret Woodward
_____