UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: VIOXX : | |
| : | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION : | |
| : | SECTION L |
| : | |
| : | JUDGE FALLON |
| : | MAG. JUDGE KNOWLES |
| : | |
| : | |
| THIS DOCUMENT RELATES TO: : | |
| : | |
| THIRD PARTY PAYOR COMMON : | |
| BENEFIT FEES : | |
| : | |

### THE TPP FEE ALLOCATION COMMITTEE'S PRE-HEARING MEMORANDUM

**I.    INTRODUCTION**

Pursuant to the Scheduling Protocol for Third Party Payor ("TPP") Common Benefit Fees of April 26, 2013, the Fee Allocation Committee ("FAC") respectfully submits this pre-hearing memorandum outlining its position for the upcoming May 23, 2013 hearing.

**II.    FACTUAL BACKGROUND**

The September 14, 2009 Third Party Payor and Common Benefit Settlement Agreements created a $65 million fund to compensate certain identified plaintiffs and separately created a $15 million fund to pay common benefit attorneys fees and expenses related to TPP litigation. Following the presentation of the Common Benefit Settlement Agreement, the Court established procedures and deadlines for private TPP common benefit fees.  The Court initiated a process through which a reasonable allocation of these funds could be dispersed for payment of fees and costs from the

Common Benefit Fees and Expense Fund created by the Common Benefit Settlement Agreement by issuing PTO No. 57.[1]

PTO No. 57 was entered on August 17, 2011.  Pursuant to the order, the FAC was established and is comprised of Russ M. Herman, Elizabeth J. Cabraser, Christopher Seeger, Thomas M. Sobol, Andy D. Birchfield, Jr., and James R. Dugan II.  PTO No. 57 also set forth certain guidelines for assessing the relative contribution of each fee applicant for their work claimed to be expended for the common benefit of private TPP plaintiffs and not to reiterate work effort already *specifically* compensated for benefitting personal injury clients.  Applications for TPP common benefit fees were due by September 16, 2011.  The FAC received 26 timely initial submissions on behalf of 30 firms from any firm seeking to recover common benefit fees or costs under the TPP CBF Agreement. Amongst these submissions were those of the present objectors: Eric H. Weinberg (on behalf of the Law Offices of Eric H. Weinberg) and certain remaining "Central States" Objectors (*i.e.*, Hovde Dassow & Deets, Lanier Law Firm, Gary L. Franke & Co., and Ewing McMillin & Willis PLLC).

The Fee Allocation Committee substantively reviewed all submissions and discussed these submissions during multiple phone calls. The Committee decided that it needed additional information from applicants and advised the Court that it would require more time to make a recommendation. The Committee asked all applicants to complete a supplemental form that asked applicants to (i) segregate and report TPP only time and to exclude any client-specific work from their claimed TPP common benefit lodestar, (ii) categorize and describe their common benefit activities, (iii) identify their unreimbursed costs, and (iv) indicate what portion of the claimed TPP

[1]*In re Vioxx Products Liability Litigation,* MDL No. 1657, PTO No. 57 (E.D.La. Sept. 17, 2011).

2

common benefit time, if any, was previously submitted in conjunction with the Court's earlier common benefit proceedings. The Committee informed all applicants via email that the supplemental information had to be completed by Monday, October 17, 2011.

Pursuant to that directive, Eric H. Weinberg, on behalf of the Law Offices of Eric H. Weinberg, submitted his Supplemental Vioxx Third Party Payor Common Benefit Application [Rec.Doc. 63569, Exb. D, Tab 24]. That Supplemental Application stated that Mr. Weinberg purported to have a total TPP common benefit lodestar of $1,138,500.00, and expenses of $27,392.61. All told, Mr. Weinberg sought $1,165,892.61 purportedly for TPP related work. The Weinberg Supplemental Application broke down the time submissions of his solo-practitioner firm as being approximately 70% spent on expert work, 15% spent preparing for depositions, and 15% "spent in coordinating TPP plaintiffs' common efforts and activities." *Id.* The Weinberg Supplemental Application was certified by Mr. Weinberg as being true, accurate and complete. *Id.*

After reviewing the submissions and supplemental material, the FAC consistent with the directives of PTO No. 57 filed its initial Recommendation on November 17, 2011 [Rec.Doc. 63569].[2] Therein, the FAC recognized that the "applicants fall into three buckets: some applicants should be well compensated for significant substantive TPP common benefit work; some applicants were not previously compensated for TPP common benefit work during the Court's earlier common benefit process and should be reasonably compensated for their TPP common benefit contributions; and some applicants did not contribute meaningfully to the common benefit of TPPs." Nov. 17, 2011 Recommendation at 11.

---

[2]On November 8, 2011, the FAC filed a motion to file Exhibit D to its recommendation under seal [Rec.Doc. 63555]. That motion was granted by Order dated November 10, 2011 [Rec.Doc. 63564]. After receiving this order, on November 11, 2011, the FAC re-filed its Recommendation with Exhibit D being filed under seal.

Consistent with Mr. Weinberg's certification that 85% of his time was devoted to experts and preparing for depositions, the FAC observed from Mr. Weinberg's submissions that he purported to have "conducted extensive research into Merck Documents, and medication and scientific information related to Vioxx." *Id.* at 26. The FAC further quoted Mr. Weinberg's submissions addressing his developing a unique risk/benefit theory of Merck's liability, studied adverse bone mineral density effects of Vioxx, analyzed Merck's Alzheimer's Studies, and was co-counsel in a personal injury action in Australia. *Id.*

Mr. Weinberg's time records submitted for TPP purposes bear out the fact that the vast majority of his time between the announcement of the personal injury settlement in November 2007 and the announcement of the TPP settlement in September 2009 (as he concedes approximates 85% of his time) was spent working with two experts, Dr. John Kostis and Dr. David Madigan on matters related to Mr. Weinberg's ongoing analysis of Merck's Alzheimer Studies and Dr. Madigan's testimony in the personal injury action in Australia. Notably, Mr. Weinberg's efforts on these exact same subjects were previously recognized by the earlier FAC and the Court as being related to personal injury matters, and, for which, Mr. Weinberg was allocated compensation from the earlier settlement.[3] *See In re Vioxx Products Liability Litigation*, 802 F.Supp.2d 740, 823 (E.D. La. Aug. 9, 2011)("Mr. Weinberg worked with experts including Dr. John Kostis and Dr. David Madigan. Mr. Weinberg assisted in exposing the fact that the Alzheimer Studies showed a statistically significant risk of cardiovascular events and death by the years 2000 and 2001 . . .").

In connection with the earlier allocation of the award from the personal injury settlement that

---

[3]It is not forgotten that in that earlier setting Mr. Weinberg was engaged in a spurious attempt to use his liability theories to obtain an INVENTORY settlement solely for his client base, contrary to established jurisprudence and antithetical to the intentions of the Court.

FAC made no consideration for TPP work.  Although by court order, all such hours were reported to the Court appointed certified public accountant, that time, as evidenced by PTO 57, was not considered in making the prior allocation.  *See also Vioxx Products Liability Litigation*, 802 F.Supp.2d at 767.  Instead, the qualitative criteria employed to make allocative recommendations rested upon specific considerations related to other classifications.  *Id.*  ("To arrive at this recommendation, the FAC developed its own objective criteria by breaking down each common benefit fee applicant's contribution to the work categories of Key Leadership Roles, Trials, Settlement, Law & Briefing, Settlement Implementation/Post-Settlement Matters, Discovery/Science, Committee Leadership and Participation, Funding, and Case Management.").  TPP work was simply not one of the criteria used to compensate counsel from the personal injury award.  It is plainly evident then that Mr. Weinberg's compensation for work with Drs. Madigan and Kostis, then, as now, was related to personal injury claims.

Accordingly, the FAC found Mr. Weinberg's time falling into the third bucket – no meaningful contribution to TPP claims – and offered him nothing.

After taking in additional evidence, comments and objections, the FAC finalized its Recommendation, which report was filed with the Court on June 13, 2012 [Rec.Doc. 63928].  Again, the FAC recommended that Mr. Weinberg not receive any allocation.  The Court published this Final Recommendation in its order of July 25, 2012, and invited anyone objecting to the Final Recommendation to "file with the Court an objection setting forth the reasons for their objection, describing the amount they feel they should be entitled to, and attaching all available supporting documentation.[4]

---

[4]*See In re Vioxx Products Liability Litigation,* MDL No. 1657, Order (E.D.La. July 25,
(continued...)

Thereafter, objections were filed by several objectors including Mr. Weinberg [Rec.Doc. 64044] and the Central States Objectors [Rec.Doc. 64046].  With the Court's oversight, the FAC was able to resolve all but these two objections.  Upon this impasse, on December 11, 2012, the FAC filed its Notice of Filing of [Proposed] Decision Distributing Third Party Payor Common Benefit Fund [Rec.Doc. 64193].  Following that, certain disputes involving production of time records or the records of Mr. Garrett were resolved, and additional briefing was submitted by the interested parties.

On March 15, 2013, the Court determined that additional review of the TPP common benefit fee allocation was needed by a Special Master.   By order of the Court, Mr. Juneau was appointed Special Master to review the two remaining objections.[5]  Whereupon, the Special Master issued the Scheduling Protocol for Third Party Payor ("TPP") Common Benefit Fees of April 26, 2013, which requested this memorandum and set a hearing on the matter for May 23, 2013.

## III.   POSITION STATEMENT

### A.   The Weinberg Objection Is Misplaced

By his own admission, only 15% of Mr. Weinberg's post-personal injury settlement time was specific to TPP matters.  The remaining 85% of Mr. Weinberg's hours bear no relation to TPP matters.  What the evidence will show is that Mr. Weinberg has consistently engaged in a self-interested frolic pursuing obscure and peripheral issues from the onset of Vioxx litigation, that even after the Personal Injury settlement he continued to pursue his self-indulgences as far away as

---

[4](...continued)
2012)[Rec.Doc. 64011].

[5]*In re Vioxx Products Liability Litigation,* MDL No. 1657, Order at 3 (E.D.La. March 15, 2013)[Rec.Doc. 64304].

Australia, and when he was unsuccessful in obtaining compensation for his time "Down Under" he now attempts to recycle that effort to a secure source of attorneys fees despite its inapposite placement, having never been intended for such purposes in the first instance. The FAC recognized Mr. Weinberg's gambit for what it was, an attempt to parlay Mr. Weinberg's ongoing uncompensated personal injury dalliances into compensable TPP time. Revealed for what it was, the FAC rejected Mr. Weinberg's time completely.

Through the course of negotiations, however, the TPP FAC has recommended an allocation for Mr. Weinberg that more than handsomely compensates his firm for the modest relative contribution he made to TPP-related efforts. The proposed allocation far exceeds the 15% of Mr. Weinberg's relevant lodestar. Yet, Mr. Weinberg wants to recover for all of his lodestar, including that for the 85% his admits is not relevant to TPP work. He is not entitled to such a recovery, as even a cursory review of his time demonstrates:

1)      With his first time entry of November 12, 2007 through February 7, 2008, Mr. Weinberg bills for work developing his Alzheimer's Working Paper. Examples of questionable time records include: 11/12/07 - Prepare letter to Merck counsel regarding production of Bates information regarding FDA-Merck Interactions on Alzheimer's Studies meeting of 4-1-98; 12/10/07 -Revision Alzheimer's Working paper; 4/6-7/08 - Preparation of Powerpoint "Presentation" summarizing overall-risk benefit analysis and Alzheimer's story for Class at Rutgers School of Management and Labor Relations and for use as working template for case.

> *Query:*      How specifically did Mr. Weinberg's Alzeimer's Working Paper benefit the
> TPP claimants?

2)       Prior to the Personal Injury Settlement, Mr. Weinberg had been working with counsel at Slater & Gordon Ltd on the Australian personal injury class action, *Graeme Robert*

*Peterson v Merck Sharpe & Dohme (Australia) Pty Ltd. and Merck & Co, Inc*.  That action resulted in an individual plaintiff verdict of approximately $290,000, which verdict was reversed on appeal.[6] Mr. Weinberg's time records reveal that much of his work with Dr. Madigan during the 2008-2009 timeframe was spent in connection with the preparation of that expert's testimony at the *Peterson* trial.  Mr. Weinberg attended and assisted at that trial.   Examples of Mr. Weinberg's time records demonstrate his work on that personal injury litigation: 10/16/08 - Meeting with Peter Gordon and Dr. Madigan in NYC regarding testimony in Australian Class Action litigation; 12/16/08 - New York City Meeting with Dr. Madigan and Peter Gordon to discuss testimony in Australian Class Action in Melbourne, Australia; 2/26/09 - Receipt and Review of Expert Statements filed in Australian litigation; 5/5/09 - Review Summary of Rheumatology Hot Tub in Australia; 5/7/09 - Travel to Melbourne, Australia with Dr. Madigan for Trial; 5/11-15/09 - Attendance at trial in Peterson v. Merck;[7] 6/12/09 - Email from Brett Spiegel: "a HUGE thanks for all your selfless help on this case."

> *Query*:      How specifically did Mr. Weinberg's preparation of Dr. Madigan to testify at the personal injury trial in Australia benefit the TPP claimants in the United States?

c)      Mr. Weinberg engaged and is still engaged in soliciting or prosecuting work on behalf of state attorney generals.  For example: 5/21/08 - Contact California Attorney General

---

[6]*See Graeme Robert Peterson v Merck Sharpe & Dohme (Australia) Pty Ltd. and Merck & Co, Inc*., VID 570/2010, Full Court of the Federal Court of Australia (Melbourne) (May 10, 2012).  *See generally* http://www.bloomberg.com/news/2012-05-11/merck-australia-s-win-in-vioxx-ruling-is-upheld-by-court.html.

[7]Although Mr. Weinberg attributes his travel to Australia for the Peterson trial as being related to TPP, no such attribution exists for his return trip (which time does not appear in his records).

regarding Merck Complaint; 8/20/09 - Teleconference Joe Couto Pharmaceconomics and Outcomes Research Fellow School of Population Health Thomas Jefferson University regarding damages model in AG cases; 9/1/09 - Emails with Joe Steele and Mark Schultz concerning experts for AG cases.

> *Query:*      How specifically did Mr. Weinberg's work on the Attorney General Cases he was soliciting or working on benefit the TPP claimants?

The FAC intends to prove at the hearing that its conclusions regarding the absence of any meaningful contribution to TPP claims by Mr. Weinberg were well supported.  Without doubt Mr. Weinberg was engaged in significant activity in the time between the Personal Injury Settlement and the TPP settlement.  Unfortunately for him, the mere fact that he had Vioxx related hours can not justify that he be compensated in a case in which his time and efforts were not directed.  Evidently, Mr. Weinberg sensed an opportunity to submit his time for compensation in the TPP case.   He was only to be thwarted with the unremarkable response by the FAC –  those persons most knowledgeable of the value of the contributions to the TPP effort –  that the time he devoted to the matter was at best only modestly helpful.

Fifteen percent of Mr. Weinberg's reported lodestar is $170,775.00.  Mr. Weinberg, by his own admission, has limited himself to that amount.  An amount the FAC continues to dispute.

## B.      The Central States Objection is Misplaced

Five law firms submitted fee applications for pre-settlement work performed on behalf of Central States Southeast and Southwest Area Health and Welfare Fund ("Central States").[8]   The

---

[8]Though these firms in fact represented two TPP clients –  Central States and Central Pennsylvania Teamsters Health Welfare and Pension Fund – the firms received a modest fee for their work from Central Pennsylvania Teamsters.  Thus, the Central States counsel's application for fee and expense from the fund for work performed for both clients has been cast as work for

(continued...)

representation of Central States was principally handled by Audet & Partners and Hovde Dassow & Deets, with support provided by the Lanier Law Firm, PLLC, Ewing McMillin & Willis PLLC, and Gary L. Franke & Co.  The submissions of the Central States counsel (in particular, the Supplemental Vioxx Third Party Payor Common Benefit Application [Docket No. 64046-1 at 147]) did not attempt to clarify efforts undertaken by the Central States counsel for expert work versus deposition work versus bellwether work versus court-appointed managerial work versus settlement work versus bellwether work.  Members of the FAC, however, were generally familiar with the role, work performed, and contributions of certain of the Central States counsel.  For others, review of the submissions and back up time entries confirmed the FAC's general understanding that Central States counsel's claimed common benefit conferred was derivative of their case specific efforts undertaken at their own instance for Central States' benefit.

Audet & Partners submitted $403,762 in lodestar and $49,264 in expenses in support of its common benefit application for compensation from the Vioxx TPP fee and expense fund.  For its part, Hovede, Dassow & Deets submitted a lodestar of $696,600 and $105,573 in expenses.  Review of the applications and time entries for Audet and Hovede Dassow reflects their focus on discovery and pre-trial matters in the specific context of the Central States case.  At some point after the commencement of the Central States case, Audet and Hovede Dassow appear to have reached an agreement with the Lanier Firm to be available in the event that the Central States case would be tried.  The Lanier Law Firm, PLLC submitted $157,615 in lodestar and $0 in expenses for its claimed common benefit contributions.

Beyond the submissions of these three firms, the FAC received submissions from two

---

[8](...continued)
Central States.

additional firms – Gary L. Franke & Co. and Ewing McMillin & Willis PLLC – who also performed work for Central States.  By review of the time submissions for these firms, it appears that Franke and Ewing predominantly worked under the direction of the Audet and Hovede Dassow firms behind the scenes on client-specific issues and discovery particular to the Central States case.  For their efforts, Ewing sought $185,000 in fees and $1,539 in expenses; Franke, in turn, sought $128,297 in fees and $9,522.

All told, the legal team assembled by Audet/Dassow to litigate the Central States claim submitted an aggregate lodestar of $1,571,274 and expenses of $165,898.  The involvement of so many counsel for one client led to a predictable accrual of excess lodestar and costs.[9]  But that did not deter the FAC from recognizing and allocating appropriate value to the team's efforts (Central States was one among several Vioxx TPP plaintiffs that proceeded through active discovery in New Jersey).  However, in the limited fund setting in which the FAC was operating, the Audet/Dassow team's request for nearly 12% of the Vioxx TPP attorney fee and expense fund on account of primarily case-specific efforts for one client could not be supported.

Accordingly, the FAC, mindful of the roles and relative involvement of each of the

---

[9]The FAC noted in its review of underlying time entries the frequent appearance of several senior attorneys from separate Central States firms covering or monitoring routine case events for the same TPP client-case management conferences, conference calls, meetings with the client, etc.  E.g.,Docket No. 64046-1 at 13-16, 43, 46, 117-21 (three, and sometimes four, partners from the Central States law firms attending routine monthly management conferences before Judge Higbee between 2006 and 2007).  Though that arrangement may have been acceptable to Central States-or its counsel under the terms of the co-counsel arrangement that was struck among counsel-the client was not asked to bear that cost; rather, in this limited fund setting, all Vioxx TPP counsel have been asked to assume the cost of those decisions by Central States' counsel.  Relatedly, review of those same entries reflects the inclusion of hundreds of attorney hours by Central States counsel for attendance at case management conferences during times when the attending firms were separately representing and prosecuting Vioxx personal injury claims for individual clients

11

respective member firms of the Central States' counsel (and the relevance of the case and the work performed by Central States counsel to the broader TPP litigation), recommended a gross allocation of $640,000 to these firms, divided as follows: $120,000 to Audet & Partners; $375,000 to Hovede Dassow & Deets; $50,000 to the Lanier Law Firm; $60,000 to Ewing, McMillin & Willis PLLC; and $35,000 to Gary L. Franke & Co.

The Audet/Dassow team did not accept the FAC's initial proposed allocation, and formally objected citing specific issues and concerns that should be considered.  [Docket No. 64046].[10]  Upon further consideration of each firm's submission, as well as their underlying time entries, the FAC provided a revised allocation to Audet & Partners of $240,000.  In so doing, the FAC raised Audet's proposed allocation to slightly more than half of its submitted lodestar and expenses, and brought its allocation roughly in line with that originally proposed to Hovede Dassow.  Audet & Partners accepted the revised proposed allocation and has withdrawn any objection it had to the FAC's allocations.  Attempts by the FAC to reconcile concerns of the remaining Central States counsel, however, have been unsuccessful.

The FAC maintains that its recommended allocation to Central States' counsel reflect appropriate consideration of the benefit conferred by virtue of their efforts.  This was done mindful of the contributions of others, what the Central States counsel's efforts represented in the broader TPP litigation context, and the limited fund setting within which proposed allocations must be made. That the FAC's efforts resulted in a right and just allocation to Central States counsel is best reflected in the fact that the firm with second largest fee and expense application for Central

_____

[10]In recent letters to Judge Fallon, the Central States objectors withdrew their joinder in the objection of Eric Weinberg, but they have nonetheless sought the Court's separate consideration of their applications.  *See, e.g.*, Exhibits "A" and "B" (2/12/2013 letter of Lanier and 2/14/13 letter of Dassow to Judge Fallon).

States-Audet & Partners-has withdrawn any objection, and agrees with the allocation recommended by the FAC for it.

**IV.** **CONCLUSION**

For the reasons set forth above, Mr. Weinberg has not significantly contributed to the resolution of the TPP claims.  He has submitted an inflated lodestar, replete with billings from other matters that are unrelated to TPP claims and/or which reflect time on other matters in which he failed to obtain compensation.  Mr. Weinberg should not be permitted to simply push his unrelated time into the TPP mix and expect to recover full compensation for that time.  The Special Master should agree with and affirm the recommendation of the FAC.

Similarly, the remaining Central States counsel's demand for additional compensation exceeds the amount reasonably due to them given their relative contribution.   The FAC has attempted to compensate the Central States counsel's work effort fairly but within the scope of the work performed by the whole.   The Special Master should agree with and affirm the recommendation of the FAC.

Dated: May 15, 2013                                     Respectfully submitted,

                                                        /s/ Russ M. Herman
                                                        Russ M. Herman
                                                        **Herman, Herman & Katz, L.L.C.**
                                                        820 O'Keefe Avenue
                                                        New Orleans, Louisiana 70113
                                                        Telephone: (504) 581-4892
                                                        Fax: (504) 561-6024
                                                        rherman@hhklawfirm.com

/s/ Elizabeth Cabraser
Elizabeth Cabraser
**Lieff Cabraser Heimann & Bernstein, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Fax: (415) 956-1008
ecabraser@lchb.com

/s/ Christopher A. Seeger
Christopher A. Seeger
**Seeger Weiss LLP**
77 Water Street
New York, NY 10005
Telephone: (212) 584-0700
cseeger@seegerweiss.com

/s/ Thomas M. Sobol
Thomas M. Sobol
**Hagens Berman Sobol Shapiro LLP**
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Telephone: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com

/s/ Andy D. Birchfield, Jr.
Andy D. Birchfield, Jr.
**Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.**
218 Commerce Street
Montgomery, AL 36104
Telephone: (800) 898-2034
Fax: (334) 954-7555
andy_birchfield@beasleyallen.com

14

/s/ James Dugan
James Dugan
**Dugan Law Firm**
One Canal Place
Suite 1000
365 Canal Street
New Orleans, LA 70130
Telephone: (504) 648-0180
Fax: (504) 648-0181

*The TPP Fee Allocation Committee*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Russ Herman, Ann B. Oldfather, and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 15th day of May, 2013.

/s/ Leonard A. Davis
Leonard A. Davis, Esq. (#14190)
Herman, Herman & Katz, L.L.C.
820 O'Keefe Avenue
New Orleans, LA 70113
Ph: (504) 581-4892
Fax: (504) 561-6024
ldavis@hhklawfirm.com

15