UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | SECTION  L |
| LITIGATION | * | |
| | * | JUDGE FALLON |
| THIS DOCUMENT RELATES TO: | * | |
| THIRD PARTY PAYOR COMMON | * | SPECIAL MASTER JUNEAU |
| BENEFIT FEES | * | |
| | * | |
| FILER: Robert E. Arceneaux/Margaret Woodward/ | * | May 28, 2013 |
| Pascal F. Calogero, Jr. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### ERIC H. WEINBERG'S REPLY TO MEMORANDUM BY THE TPP FAC

MAY IT PLEASE THE COURT:

This memorandum is respectfully submitted on behalf of the Law Offices of Eric H. Weinberg ("Weinberg") in response to the memorandum filed by the TPP FAC on May 15, 2013.

In its original brief, the TPP FAC asserted several meritless arguments to oppose Weinberg's requested allocation.  It contends that he has already been paid in the personal injury allocation for the time he expended *post* personal injury settlement.  To the extent that Weinberg did new work, the FAC suggests that he provided no common benefit to the private TPP litigation.   Finally, the FAC argues that the time and expenses he submitted in the private TPP litigation overlap with contributions to the public TPP litigation, or AG actions.

**1. Weinberg's submissions are for new work.**

The FAC dismisses 85% of Weinberg's work out of hand because, allegedly "as he concedes," "the vast majority" of his time "was spent working with two experts, Dr. John Kostis and Dr. David Madigan on matters related to Mr. Weinberg's ongoing analysis of Merck's Alzheimer's Studies and Dr. Madigan's testimony in the personal injury action in Australia." R. Doc. 64398, p. 4.  Weinberg concedes no such thing, and his time records, had the FAC studied them, prove otherwise.  The approximated 85% of Weinberg's time spent working with experts included the

following, not just the two the FAC selected:  Curt Furberg; David Madigan; Patrick O'Connor; David Egilman; Jerry Avorn; Howard Brod (d); John Kostis; Karl Herrup; Bruce Psaty; Harlan Krumholz;Teresa Kauf (d); Mike Schwartz (d); John Colaizzi (d); Mark Rubino (d); Elan Rubinstein (d); David Nash (d); Mark Woodward; Julie Donahue (d); Brennan Spiegel; James Wright; J. Scott Armstrong (d); Kip Piper (d); Dennis Tolley (d); and Joseph Couto (d).  *See* R. Doc. 64044, Exh. A.  The letter "(d)" designates an expert on the issue of damages.  Weinberg's detailed time records show he devoted significant time and effort to expert issues in TPP, far beyond his work with Madigan and Kostis– including the trip to Australia.

As to Drs. Madigan and Kostis, the FAC makes a bizarre argument that, having worked with these experts before on certain subjects [the Alzheimer's studies, as analyzed by Drs. Madigan and Kostis]," R. Doc. 64398, p. 4, he cannot be compensated for additional work on these subjects ever again, even though new and progressive work was done long after the PI settlement, and those subjects were as relevant to the TPP litigation as they were to the PI litigation.[1]

To begin with, the argument is completely disingenuous, for the Vioxx Plaintiffs' Steering Committee ("PSC"), which includes several members of the TPP  FAC,  has actively sought common benefit reimbursement not only for work on the same topics, but for *exactly the same work.* For example, as the Court is well aware, in the Pennsylvania AG action, the PSC has sought a common benefit assessment on the ground that "[t]he Commonwealth and its attorneys were provided a detailed road map and evidence collected and assimilated by the PSC that formed the basis of all claims against Merck." R. Doc. 64205-1, p. 2.  In other words, the PSC is advancing the same work for which it was fully compensated in the PI allocation as a basis for the allocation of

---

[1] Into the quoted text, the FAC inserted n. 3 which states, "It is not forgotten that in that earlier setting Weinberg was engaged in a spurious attempt to use his liability theories to obtain an INVENTORY settlement solely for his client base. . ." R. Doc. 64398, p. 4.  This is an old grudge which *should* have been forgotten because it was a PI issue wiped clean by the prior allocation, it is completely irrelevant  to the TPP litigation, and the FAC has its facts completely wrong. If it is a matter of any concern to the Court, however, Weinberg will be available to explain the matter in full.

common benefit fees to it in the Government TPP actions.  *See, id.* at 2-3, 9.[2]

Aside from this bit of hypocrisy, the FAC's argument that Weinberg should not be paid for new work just because it involved a subject previously worked on is simply wrong. First, the TPP litigation is not entirely different and distinct from the PI litigation; some issues are notably different, but many of the underlying issues are similar. If the Court cannot take judicial notice of this fact, the PSC's own argument that Pennsylvania settled its TPP action on the strength of the PSC's work in the PI litigation should put it to rest. Second, the suggestion that work on the same subject cannot be new enough to warrant common benefit allocation overlooks the significance of the precise contributions which Weinberg– and Weinberg *acting virtually alone* – made to the private TPP litigation. A review of the time records submitted in the TPP allocation shows that no one did the sort of scientific analysis that Weinberg did. The FAC calls his work "obscure." Weinberg calls it essential. The FAC, coasting on its efforts in the PI litigation, tried the Louisiana AG case to a loss before Judge Fallon. Weinberg is determined not to repeat its mistakes.

The TPP litigation, both public and private, involved different causes of action: purchasing decisions rather than personal injuries were at issue. Weinberg's strategy was to expand the liability case by expanding the universe of provable risks of Vioxx, and to develop a damages theory and find experts to support it. The differences between the personal injury case and the third party payor case warranted a change in emphasis and focus. Framing complex issues in complex litigation is Weinberg's *forte*, and as his submissions show, he tackled the new challenges presented by the TPP litigation with enormous discipline, skill, and resolve.

A further, overarching difficulty for the TPP cases was the fact that the plaintiffs pursued a predominately unsuccessful strategy in the PI case. This suggested that in order to win in the TPP

---

[2]Numerous members of the FAC, as pointed out in Weinberg's original memorandum, are also seeking duplicative compensation in this private TPP allocation for the same work performed in the PI litigation and compensated in the PI allocation, because the work allegedly benefitted the private third party payors. As demonstrated in Weinberg's original brief, he has done no such thing. All of the time he has submitted herein has been submitted for entirely *new work*. *See* R. Doc. 64044, Exhs. A-7 and B.

litigation against the same adversary, which was well-armed against the earlier theories advanced by the plaintiffs, plaintiffs' counsel were going to have to develop and improve their strategies. This is exactly what Weinberg set about doing.

His time records show that he performed both legal and medical research to broaden and deepen the theories underlying the TPP litigation. As the FAC is aware, twenty million documents were entered into the Concordance database, many of them after the PI settlement; Weinberg's time records show that he pored through those documents in order to uncover previously-undiscovered material that would support those expanded theories. His time records show that he worked extensively with a number of experts– both new and old to the Vioxx litigation– to adjust the old theories and create new ones, particularly on the most difficult issue presented in the TPP litigation– the issue of damages. His time records show that he took a leadership role in the New Jersey litigation. Emails in his submissions show that he was instated in that leadership role by Seeger, New Jersey Liaison counsel, who is also a member of the TPP FAC. Emails in his submissions show that his work was approved and commended by members of the Seeger firm. *See* R. Doc. 64044, Exhs. E-2-6. His time records show that he shared his work with MDL counsel, and time records submitted by MDL counsel show that *they* billed time for receipt of that shared work product, for which the FAC recommended that *they* be fully compensated. *See* R. Doc. 63569, Exh. D, Lieff, Cabraser, at 57, 59, 61, 63-68. Above all, review of Weinberg's time records shows that his work was diverse, productive, and creative.

The FAC contends that only the 15% of Weinberg's time "spent in coordinating TPP plaintiffs' common efforts and activities" was "specific to TPP matters," and therefore was the only time deserving of *any* compensation. *See* R. Doc. 64398, pp. 3, 6. Then, the FAC contends that its "proposed allocation far exceeds the 15% of Mr. Weinberg's relevant lodestar," which it calculates at $170,775.00. *Id.,* at 7, 9. However, as the Special Master has heard, the FAC's proposed allocation for Weinberg is not $170,775, nor any amount in excess, near or far, but rather zero.

The whole 15% fallacy proposes that Weinberg be compensated (at a zero rate) only for the effort of *sharing* his work, and not for the *work itself.*  Of course the only reason he was in the position of coordinating with other counsel was because he had something valuable to share.  Instead of attacking the scientific value of Weinberg's work on the merits, the TPP FAC simply and wrongly postulates that he has done nothing new, and then poses multiple queries about the utility of various contributions claimed by him.  The FAC's queries reveal only its ignorance of the advances Weinberg delivered to the private TPP litigation. Fortunately for Weinberg, though, the proof is in the pudding.  His work has yielded solid results, as shown in the following section.

**2. Weinberg's work provided substantial common benefit to the TPP litigation.**

The TPP FAC notes that Weinberg spent considerable time on discrete and identifiable projects, and, significantly, *it does not question that Weinberg actually spent the time in the amounts and on the projects he has detailed.*  But it contends that no common benefit inhered in his work because "Mr. Weinberg has consistently engaged in a self-interested frolic pursuing obscure and peripheral issues from the onset of the Vioxx litigation."  R. Doc. 64398, p. 6.  In support of this sharp, unprofessional, and *ad hominem* attack, the FAC has offered not a shred of evidence, but states that the "evidence will show" it to be true.  There will be no evidentiary hearing under the Special Master's revised protocol. But in any case, the evidence could not show that Weinberg wasted 1518 hours of his time in "self-indulgent," and "self-interested frolics" because it is not true.

 Here is a query for the FAC: If this were true, why did the Seeger firm, which already had observed Weinberg's work for years in the PI litigation, run to Weinberg to establish a private TPP working relationship right after its *Local 68* case – in which it had invested four to nine million dollars and on which it had pinned all its TPP hopes – cratered? *See* R. Doc. 64044 , Exh. E-1.

By answering some the FAC's queries, Weinberg can show his contribution to the common benefit. "How specifically," the TPP FAC asks first, "did Mr. Weinberg's Alzeimer's [sic] Working Paper benefit the TPP claimants?"  R. Doc. 64398, p. 6.  As Weinberg explained in his original

-5-

brief, this is one of the elements of the case against Merck which assumed heightened significance in the TPP litigation: in the PI cases, which focused on cardiovascular risks, the fact that more patients developed Alzheimer's was considered irrelevant; in the TPP cases, the concealed fact that Vioxx put elderly patients at risk bore significantly on the decisions of payors to purchase the drug and strengthened the plaintiffs' position.  By developing such analyses, Weinberg was able to change the paradigm from the PI cases to the TPP cases.

Because of the importance of he Alzheimer's working paper, Weinberg attached it to his submission. R. Doc. 64044, Exh. A-4.  Twenty-four pages long when the PI case settled, the attached document is now 100 pages with over 130 citations to Merck documents, medical literature, deposition testimony, and other relevant materials.  As explained in the paper, Merck relied upon its studies to save Vioxx.  Merck persuaded the FDA to accept the Naproxen theory based on the data from these studies. Merck persuaded FDA to let them include interim data from these studies in the VIGOR label.  That was unprecedented, and it was false. If the plaintiffs could destroy these studies, which were so critical to Merck, and which they falsely represented to the FDA, they could win their TPP cases.  So Weinberg decided to do something the PSC had been unable to do– take these studies down.  And he did.

The emerging risk profile of Vioxx was pleaded in the NJ TPP complaints which Weinberg assisted in drafting. And the NJ litigation, as the FAC acknowledges, was years ahead of the MDL, and served as the template for the private TPP actions.  *See* R. Doc. 63928, at 2.  Indeed, issues related to Merck's Alzheimer's studies are among those FAC members logged considerable time simply *reviewing. See, e.g.,* R. Doc. 63569, Exh. D, Lieff, Cabraser, at 61, 63-65 (9.75 hours of review by Mr. Arbitblitt at $775/hr.)

Here, then, are two more queries for the FAC: If Weinberg "consistently engaged in a self-interested frolic pursuing obscure and peripheral issues," why were FAC members still studying his work in the summer of 2009?  And why is their time spent reviewing Weinberg's work fully

-6-

compensable if the creation of that work was a self-indulgent frolic?

For its next query, the FAC notes that Weinberg worked with counsel in Australia on a Vioxx case and traveled to Australia with Dr. Madigan to assist in the trial of that action in May and June of 2009.  Despite quoting trial counsel's "HUGE thanks for all your selfless help on this case," the FAC suggests that Weinberg's involvement was not selfless at all, but that he meant to be paid and would have been paid had the $290,000 verdict not been overturned.[3]  R. Doc. 64398, pp. 7-8. Again, the FAC cites no authority for this supposition, nor can it, because the FAC is dead wrong. There was no fee agreement of any sort between Weinberg and Australian counsel, as the reference to "selfless" help, articulated immediately after the return of a favorable verdict, plainly conveys.

Unable to fathom such a selfless commitment of so much time and money, the FAC queries: "How specifically did Mr. Weinberg's preparation of Dr. Madigan to testify at the personal injury trial in Australia benefit the TPP claimants in the United States?"  *Id.,* at 8.  As noted above, Weinberg had worked with Dr. Madigan for several years to develop new and better theories of liability against Merck, based on thought, study, and documents newly-mined by Weinberg from millions of pages of documents produced in the PI litigation by Merck.  The Australia case offered an invaluable practical opportunity to test their new theories in the courtroom.  Dr. Madigan was paid for his work, but Weinberg was not; he went mainly to protect the witness he had developed over a period of years and to observe how he performed under fire from Merck.

Weinberg had another reason to travel to Australia, however.  As his time entries reflect, he also participated in the trial while Merck presented its case.  Just as Weinberg knew that the plaintiffs had to develop their cases in order to survive in the well-informed world of Vioxx litigation, so he knew that Merck needed to develop its experts and theories on an ongoing basis.

---

[3] The FAC wrongly describes the case as a straight personal injury action.  But the plaintiff represented all members of the Group harmed by Vioxx in Australia.  Significantly, the liability issues common to the Group were NOT overturned.

In the Australia trial, Merck used a US biostatistician, one who would be used again in TPP litigation. By attending the trial, Weinberg gained valuable insights into Merck's changing scientific theories, against which he and Dr. Madigan set to work *after the trial*, as his time entries also show. This work was undertaken for the purpose of producing a benefit to the private TPP actions, which at the time, were the Vioxx cases that were moving forward most aggressively. And as the FAC allows, this movement was occurring in NJ, not in the MDL. At the time of Judge Fallon's March 5, 2009 Vioxx status conference, all private MDL TPP cases remained stayed- "settlement related."

Finally, this Court cannot overlook, as the FAC does, the fact that before the Australian verdict was partially overturned, the plaintiff achieved one of the few Vioxx wins anywhere. The effective testimony by a US expert Merck knew would be used in US TPP cases against a US expert Merck intended to use in US TPP cases had an undeniable impact on settlement, which was announced only a few months later.

Another query for the FAC: How did *Local 68*, which produced little work product beyond a failed attempt at class certification, confer so many millions of dollars more to the common benefit than a case carried to verdict which was favorable at the time the settlement was negotiated?

And a final query for the FAC: How did it fail to notice or mention Weinberg's extensive work with experts on damages? The TPP damage case is entirely different from the PI damage case. This was the single issue on which everything in the TPP litigation had to be started afresh. This is why *85% of Weinberg's time with experts was devoted to that very effort.* This is hardly an obscure point: Weinberg's time record is replete with entries related to a serious, ongoing effort to recruit experts to assist the plaintiffs to develop two major theoretical approaches to damages, and to assist experts in supporting those approaches, which provided the model for *all of the private TPP litigation*. The FAC's omission of any reference to the way Weinberg spent the *majority* of his time undermines completely its decision not to recommend compensation for *any* of his time.

As noted above, Weinberg's work contributed to the verdict in Australia. It likewise played

-8-

a part in another substantial plaintiffs' victory, a $220 million dollar settlement in *Missouri v. Merck,* a consumer class action that rested on claims of fraud similar to those presented in the TPP cases. And Weinberg himself, as the FAC points out, has been tapped to directly represent Attorneys General or to assist in their actions in Pennsylvania, Utah, Florida, New York, Kentucky, Alaska, Mississippi, and Montana. He did not develop these relationships through self-indulgent frolic.

In an allocation recommendation that rubber-stamped the lodestar submissions of so many applicants– and held firmly to them even after the time records were revealed as unreliable– the FAC's treatment of Weinberg is clearly personal and unreasonably punishing. It treated him the same way in the PI litigation, recommending that he be compensated at a rate of $21/hr. before a hearing forced it to adjust upward to full lodestar. This Court will note that the FAC asserts that Weinberg "has consistently engaged in a self-interested frolic. . . from the onset of the Vioxx litigation." In other words, it finds the work he did in the private TPP litigation consistent with that he performed in the PI litigation, in which the FAC made the same rejected criticisms.

**3. Weinberg's minor overlaps of AG time should not reduce his TPP award.**

As this Court is aware, the distinction between the public and private TPP actions relates only to the identity of the plaintiffs. Therefore, for anyone working on both sets of actions, there is a potential for overlap in common benefit work. The overlap, however, was minimized by the timing of the two sets of litigation. After the Vioxx PI settlement, the private TPP cases geared up first in New Jersey. The AG cases followed later. As this Court is also aware, by summer of 2009 the latter actions remained so disorganized that the MDL leadership had not yet been appointed. The private TPP settlement in September of 2009 established a clear temporal dividing line between private and public TPP work, and Weinberg entered no time after the date of the settlement.

There are overlapping private/public entries in the submissions of *every* applicant for TPP funds who worked on both types of cases. In Weinberg's original brief, he noted the multiple

*abusive* overlaps, e.g., in the case of Dugan who appears to have dumped his time for trying the losing Louisiana AG case into his private TPP submission.  *See* Rec. Doc. 64396, at 23.  The FAC suggested that Weinberg committed a like abuse by billing time for "soliciting" AG work out of California, a conclusion it draws from a one-hour time entry on May 21, 2008, "Contact California Attorney General."  R. Doc. 64398, p. 8.  The latter contact derived from the fact that the California case had settled with stipulations that Weinberg sought to review in case they contained useful data.  Thus, instead of "frolicking," Weinberg was engaging in his usual far-reaching attention to detail.  (All of the FAC's specific criticisms of Weinberg's time entries can be answered just as simply, but not within the page limit established by the protocol, nor without documentary appendices, for which the protocol does not provide. Should any of these issues trouble the Special Master, we invite him to put his questions directly to Weinberg.)

Weinberg has sought to allay any possible concerns about his possible overlaps by committing that he will not submit any time for which he is compensated from the TPP fund in future AG common benefit allocations.  *Id*.  He is the *only* applicant to have provided such assurance, and therefore, as he shows in his pending Motion to Quash, the FAC's singling him out for criticism is particularly inappropriate, for he has done the most to avoid replication of time.

## CONCLUSION

The FAC's pleadings and recommendation for Weinberg reveal a personal animosity and bias that has no proper place in these proceedings.  The FAC's proposed allocation has nothing to do with his work.  As in the PI litigation, the FAC is punishing him for not being an MDL "player," a consideration irrelevant to his common benefit contributions, which this Court should not countenance.  For an impartial, knowledgeable, and fair assessment of Weinberg's work ethic and capabilities, this Court should turn, as it has in the past, to Judge Higbee.   Weinberg is entitled to full recovery, in the amount of $1,165,892.

Respectfully submitted:

/s/ Robert E. Arceneaux                    /s/ Margaret E. Woodward

_____                  _____

Robert E. Arceneaux, La Bar No. 01199      MARGARET E. WOODWARD, La. Bar

ROBERT E. ARCENEAUX LLC                    No.13677

47 Beverly Garden Drive                    3701 Canal Street, Suite C

Metairie, LA 70001                         New Orleans, Louisiana  70119

(504) 833-7533 office                      (504) 301-4333 office

(504) 833-7612 fax                         (504) 301-4365 fax

rea7001@cox.net                            mewno@aol.com


Pascal F. Calogero, Jr., La. Bar No. 03802

AJUBITA, LEFTWICH & SALZER, L.L.C.

1100 Poydras Street

New Orleans LA 70163-1950

(504) 582-2300 office

(504) 582-2310 fax

pcalogero@alsfirm.com


Attorneys for Law Offices of Eric Weinberg

-11-

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing memorandum has been served on Russ Herman by e-mail, and by upon all parties by electronically uploading the same to Lexis Nexis File & Serve Advanced in accordance with Pre Trial Order No.8, on this date, May 28, 2013.

s/Margaret Woodward
_____