# EXHIBIT 2

Randy Baker

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3   In re:  VIOXX                  )   MDL No. 1657
         Products Liability         )
 4       Litigation                 )   SECTION L
                                    )
 5                                  )   JUDGE ELDON E. FALLOW
     This Document Relates to:      )
 6                                  )   MAGISTRATE JUDGE
         STATE OF UTAH,             )   KNOWLES
 7                                  )
             Plaintiff,             )
 8                                  )
         vs.                        )
 9                                  )
     MERCK SHARP & DOHME CORP.,     )
10                                  )
             Defendant.             )
11                                  )
     Case No. 09-9336               )
12
13
14                  October 29, 2012
15
16       Videotaped deposition of RANDY BAKER, held
17   in the offices of Steele & Biggs, LLC, 5664 South
18   Green Street, Salt Lake City, Utah, commencing at
19   9:22 a.m. on the above date, before Tamera Stephens.
20
21
22
23
24
25
```

1  things in here that tells me it's not mine.
2     Q    Okay. Do you know who prepared Exhibit 19, or
3  those portions that you don't recognize?
4     A    Well, the first thing, that all these recipient
5  ID numbers have leading zeros because it is supposed to
6  be, I think, a 10-digit number. And -- I can't remember
7  whether it's a 10- or 12-digit number, but I know a lot
8  of them have it. And whenever I do analysis like this,
9  I make sure that it has -- that that leading zero is
10 always taken care of.
11        The second thing that tells me it is not mine
12 is that the diagnosis code is also a text field, and
13 that should be left justified.
14        And the other thing that tells me it is not
15 mine is the provider category service. Any analysis I
16 did, that's a two-digit field in there with a leading
17 zero. And there are no leading zeros in there.
18    Q    Do you know --
19    A    And the third thing -- or the next thing that
20 tells me it's not mine is that I never did analysis with
21 a final claim indicator like this.
22    Q    All right. Do you -- would you have expected
23 that you would have been the person who would have
24 provided the data that would go into Exhibit 19?
25    A    There are others on my staff that could have

Randy Baker

Page 189

```
 1   done it.
 2       Q    Now, in December -- you mentioned you had some
 3   meetings in '05.  This is December 16, '04.  Could it
 4   have been in late December '04 that you were having
 5   those meetings?
 6       A    I don't recall the dates of those meetings.
 7   I'd have to go back and check my calendar.
 8       Q    Okay.  You have a calendar that goes back to
 9   that time frame?
10       A    I'm not sure how far back my calendar goes,
11   but, you know, if it's there...
12       Q    Okay.
13       A    Probably not, now that I think about it.
14   Because I switched over calendar programs about a year
15   and a half ago, and when I did that --
16       Q    Would you have a -- did you have an electronic
17   or hard calendar back in '04?  Or both?
18       A    It was electronic.
19       Q    In what system?
20       A    I think it was just my own.
21       Q    What type of device did you keep it on?
22       A    An earlier generation of a smartphone.
23       Q    What you are saying is you don't know whether
24   or not you did meet in December of '04?
25       A    Right.
```

```
 1      Q    You could have?
 2      A    I don't know.
 3      Q    All right.  I'm asking you, can you rule out
 4    that you met with the Attorney General's office in '04?
 5           MR. BIGGS:  Objection.  It calls for
 6    speculation.
 7           Go ahead.
 8           THE WITNESS:  I -- without trying to re -- go
 9    back and examine my calendar, I don't know that I could
10    say.
11      Q    (BY MR. SALES)  The information contained in
12    Exhibit 19 would have had to come from your office,
13    correct?
14      A    Not necessarily.
15      Q    Okay.  Where else would it come from?
16      A    Well, there are several other people in the
17    Department of Health that had access to the same data.
18      Q    Okay.  Maybe my question was too limiting.
19    When I said "your office," the Medicaid department of
20    the Department of Health --
21      A    Well, there's other people.
22      Q    Okay. Who else at the Department of Health --
23      A    The Medicaid fraud unit.  They are not part of
24    the Medicaid.  They are part of the state Attorney
25    General's office, but they have access to the entire
```

1    data warehouse.
2        Q    All right.  I think we are being too fine here.
3    What I'm asking is, the data contained in Exhibit 19
4    would have had to come from the Medicaid database of
5    Utah, correct?
6        A    Yes.
7        Q    All right.  Whether that was somebody in your
8    office or somebody in the Medicaid fraud office or
9    somebody else in the Department of Health, they would
10   have had access to this information in Exhibit 19?
11       A    Correct.  Correct.
12       Q    And what we do know, this is a document that's
13   been produced by Utah Department of Health.  Do you see
14   that in the lower right-hand corner?
15       A    Yes.
16       Q    All right.  That in December of '04 analysis
17   was being done with regard to Vioxx, Celebrex, Bextra
18   potential claims for Medicaid, correct?
19       A    Uh-huh (affirmative).
20       Q    Is that correct?
21       A    Yes.
22       Q    And as you sit here today, you just don't
23   remember whether or not you had input directly into this
24   document or indirectly in this document, correct?
25       A    Correct.  But I tell you for four reasons I did

1    not produce it.
2        Q    That you didn't actually prepare the document
3    you are saying.
4        A    Correct.  Because this is not my reporting
5    format.
6        Q    Right.  But as you sit here today, do you know
7    who did prepare it?
8        A    No.
9        Q    Who else was in your department in December of
10   '04?
11       A    I believe Scott Ellis and John Bromberger --
12       Q    And they were both actuaries?
13       A    -- and Vance Eggers.  People on that
14   organization chart.
15       Q    That reported to you?
16       A    Yes.
17       Q    All right.  Do you know whether or not they had
18   input with the Attorney General's office in December of
19   '04 putting together this information?
20       A    Scott Ellis was being used by the people in
21   pharmacy under the Bureau of Coverage and Reimbursement
22   Policy to assist them with some of the technical things.
23   Whether or not he actually worked on this, I don't know.
24            I'm sorry.  I don't even recall the --
25       Q    Hold on a second.  Time out.  There's not a

```
 1    Attorney General's office, okay?
 2        A    Okay.
 3        Q    And we will have to take up Mr. Ellis' with
 4    counsel.
 5             Do you know on Exhibit 19 who selected these
 6    diagnosis codes?
 7        A    I do not.
 8        Q    It says that the search or the query is,
 9    "Clients had either Vioxx or Celebrex and had CPT hits
10    for predetermined ICD>9 codes."
11             Do you see that, sir?
12        A    Yes.
13        Q    What does that mean?
14        A    To me what it says is that a previous query had
15    been done to determine who had taken Vioxx or Cel --
16        Q    Celebrex.
17        A    -- Celebrex.  And that they took that list of
18    recipients and queried it against their claim that their
19    diagnosis -- the records related to their diagnosis
20    related to their claims, and anybody who had greater
21    than nine diagnoses, they did a query on that.  And then
22    they matched the two lists.
23        Q    And what does CPT stand for?
24        A    It stands for current physician terminology.
25        Q    Stands for what, I'm sorry?
```

```
 1           MR. BIGGS:  Objection.  Calls for -- well, it
 2   lacks foundation.  And the witness at this particular
 3   time has indicated he doesn't know who produced this
 4   Exhibit 19.
 5           But go ahead.  And you can answer the question.
 6           THE WITNESS:  Please ask it again.
 7      Q    (BY MR. SALES)  Yes, sir.  You can't tell from
 8   Exhibit 19 whether or not someone had some event that
 9   was causally related to taking a particular drug based
10   upon the data in Exhibit 19, correct?
11      A    I cannot just look at this table and make any
12   of those conclusions.
13      Q    Have you ever -- do you recall having
14   discussions or being asked to query the database for
15   certain diagnosis codes related to cardiovascular
16   events?
17      A    Yes.
18      Q    By whom?
19      A    It was done under several things.  I do
20   remember once that -- well, several times.  We did it in
21   relation to pricing of DRG hospital inpatient things
22   because that's where the large cardiovascular cases end
23   up is in the hospital, which is your, you know, large
24   dollars being paid out.  So we were looking --
25      Q    All right.  Let me clarify my question.  I
```

Randy Baker

Page 207

```
 1   indicates how many units were provided in the
 2   prescription, and it's just adding them up.
 3       Q   What is -- do you have any understanding as to
 4   what HICL sequence number is?
 5       A   That is a number found in the drug master.  And
 6   the HICL sequence number means -- I don't understand the
 7   whole numbering system, but I know what it's supposed to
 8   do.  It's representing that the drugs have the same kind
 9   of chemical in them.  So all the drugs that have the
10   same HICL number, you know, are of the same drug class,
11   same chemical elements in them, and so forth.
12       Q   Do you know why the State of Utah Department of
13   Health and/or subdivision of Medicaid wanted Exhibits 19
14   and 20 prepared?
15       A   I do not.
16       Q   And do you know who all they were provided to?
17       A   I do not.  Do not know who prepared them, why
18   they were prepared, or who they were prepared for.
19       Q   But you do know that they were produced by the
20   Department of Health of Utah and were dated in December
21   of '04 and April 5 of 2005 respectively?
22       A   Based upon the assumption that only those
23   people who have access to those data are those people
24   who are privileged to by the department.
25       Q   But you talked about the data was available in
```