## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re:  VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This Document Relates to** | * | |
| **Cases Listed on Exhibit A to Pretrial** | * | |
| **Order 58, As Amended (the VTE Cases)** | * | **MAGISTRATE JUDGE KNOWLES** |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MERCK'S MOTION FOR RECONSIDERATION OF THE
### COURT'S APRIL 9, 2013 ORDER AND REASONS AND INCORPORATED
### MEMORANDUM OF LAW

In its April 9, 2013, Order and Reasons (the "Order"),[1] the Court denied Merck's motion to exclude the testimony of plaintiffs' general causation experts in the remaining thirty (30) venous thromboembolism ("VTE") cases.  Merck respectfully asks the Court to reconsider the Order to correct, at a minimum, two errors.

### INTRODUCTION & SUMMARY

*First*, the Court should reconsider its finding that Drs. Zambelli-Weiner and Brooks could employ a "multiplier" to achieve statistical significance in their "Pooled Analysis" of VTEs in certain Vioxx clinical trials.  This conclusion is flawed for two reasons:  (1) even if a multiplier could be reliably used, it would apply only to cases involving deep vein thromboses ("DVTs"), and not pulmonary emboli ("PEs"); and (2) the data cited in support of using a multiplier could not reliably be applied to the Vioxx clinical trial data because of important differences in the patient populations.

---

[1]    Order and Reasons ("Order") [Rec. Doc. 64341].

In its opinion, the Court concluded that plaintiffs' experts' use of a multiplier was reliable based on "Dr. Spyropoulos's opinion that there was 'probable systematic underestimation' of VTEs during the Vioxx clinical trials by as much as 30-fold."[2]  But Dr. Spyropoulos's testimony was not so sweeping.  Rather, he distinguished between the two types of VTE injuries:  DVTs and PEs.[3]  Dr. Spyropoulos testified that:  the CHEST Guidelines ratios upon which he relied to support the use of a multiplier are "inapplicable" *to PE*; use of a multiplier based on DVT data *for PE* is an "imprecise extrapolation"; and "[he] would actually have to agree with [Merck's counsel] . . . that [he] would be a lot more comfortable using the multiplier in the setting of DVT *versus PE*."[4]  The experts' use of the multipliers for PE injuries, in short, is nothing more than a guess (in lay terms), or a hypothesis (in scientific terms).  It is not reliably based on any data.  Thus, even if the use of multipliers for DVT injuries were sufficiently reliable to satisfy *Daubert*, it would still not be sufficiently reliable *for PE injuries*, which constitute the great majority of remaining cases—26 of the 30.

At bottom, however, use of a multiplier to create statistical significance was not reliable at all in this instance because the multipliers were derived data relating to hospital patients, who are more prone to VTEs than the general population.  Dr. Spyropoulos himself testified that the use of the multipliers as applied to the Vioxx clinical trial data was speculative.[5]  And a re-examination of the record reveals no data, no study, and no other scientific basis to bridge the

---

[2]   *Id*. at 17.

[3]   This point was addressed in Merck's *Daubert* motion [Rec. Doc. 64211-1] at p. 23 n.17.

[4]   Spyropoulos Dep. at 229, 241, 299.

[5]   *Id*. at 225.

analytical gap between the hospital-patient and general populations.  All plaintiffs offer is their experts' *ipse dixit,* which is plainly not enough under *Daubert.*

    ***Second***, the Court should also reconsider its ruling that Drs. Zambelli-Weiner and Brooks reliably excluded the data from the vast majority of placebo-controlled trials from the Pooled Analysis.  This conclusion likewise suffers from two flaws:  (1) it overlooked plaintiffs' lack of any rebuttal evidence that Drs. Zambelli-Weiner and Brooks actually used *a priori* criteria in selecting studies for inclusion in their Pooled Analysis; and (2) it failed to hold the experts to their burden of identifying some ***scientific*** justification for excluding major studies like APPROVe on the supposed basis that they were prematurely terminated.

    In its Order, the Court accepted plaintiffs' arguments that their experts did not engage in "cherry-picking" because they included and excluded studies "based on their *a priori* criteria."[6] But plaintiffs relied solely on the experts' bald assertion to support this claim.  Merck presented the only documentary evidence on this point, and it refuted that assertion.[7]  The documentary evidence showed that, well after the point when the experts would have determined the criteria, they were still examining data from the excluded studies (like APPROVe).  Because the burden is on plaintiffs to establish that the Pooled Analysis is reliable—and, therefore, that the experts based the selection of studies on *a priori* criteria—it was plaintiffs' burden to provide a convincing explanation for the experts' continuing consideration of these data after their supposed adoption of *a priori* criteria.  Instead, they simply rested on their own say-so that these criteria were indeed decided upon in advance.  That cannot suffice.  Because the experts were not

---

[6]    Order at 11, 13-14.

[7]    *See id.* at 11 n.1.

able to provide any explanation for the evidence highlighted by Merck, the Court should have rejected their self-serving claims that the criteria were decided *a priori*.

Even assuming that Drs. Zambelli-Weiner and Brooks applied *a priori* criteria, the Court still erred in finding that their testimony satisfies *Daubert* because they offered no scientific basis for excluding from their analysis the valid, placebo-controlled clinical trial data that has consistently been the foundation of plaintiffs' claims in this litigation. Most startling is their exclusion of APPROVe, the very study that led to the withdrawal of Vioxx from the market.[8] The witnesses claimed that APPROVe and the other Protocol 203 studies were excluded because they were terminated prematurely, but nowhere did they explain ***why*** premature termination would render the data invalid or unreliable, and thus they have provided no scientific rationale for excluding the studies on that basis. In exercising its gatekeeping role, the Court should have demanded more, particularly since the alleged increased risk found by the Pooled Analysis depended on the exclusion of these core studies.

## ARGUMENT

A district court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Malancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. 1981); *S. Snow Mfg. Co., Inc. v. SnoWizard Holdings, Inc.*, No. Civ. A. 06-9170, 2013 WL 392582, at *10 (E.D. La. Jan. 31, 2013). "Rule 54(b) is the proper procedural vehicle to request reconsideration" of interlocutory orders. *See McClung v. Gautreaux*, No. Civ. A. 11-263, 2011 WL 4062387, at *1 (M.D. La. Sept. 13, 2011). "The general practice of courts in this district has been to evaluate Rule 54(b) motions to reconsider

---

[8]   Inclusion of the APPROVe data alone would have shifted the data in favor of Vioxx with respect to pulmonary emboli. Zambelli-Weiner Dep. (Vol. II) at 235-40.

interlocutory orders under the same standards that govern Rule 59(e) motions to alter or amend a final judgment." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, No. Civ. A. 11-2405, 2012 WL 876717, at *1 (E.D. La. Mar. 14, 2012).  Courts in the Eastern District of Louisiana consider four factors in deciding a motion under Rule 59(e):  (1) whether "the motion is necessary to correct a manifest error of law or fact upon which the judgment is based"; (2) whether "the movant presents newly discovered or previously unavailable evidence"; (3) whether "the motion is necessary in order to prevent manifest injustice"; or (4) whether the motion is justified by an intervening change in controlling law."  *S. Snow Mfg. Co.*, 2013 WL 392582, at *11. Importantly, while "considerations similar to those under Rules 59 and 60 inform the Court's analysis," the legal standard for evaluating a motion to reconsider under Rule 54(b) is "less exacting than that imposed by Rules 59 and 60."  *McClung*, 2011 WL 4062387, at *1; *see also, e.g., Harris v. Brush Wellman Inc.*, No. Civ. 104-CV-598, 2007 WL 4200828, at *1 (S.D. Miss. Nov. 27, 2007) (granting motion for reconsideration of *Daubert* and summary judgment ruling), *aff'd sub nom. Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383 (5th Cir. 2009).

Reconsideration is merited under this standard for several reasons.

**I.     THE MULTIPLIERS CANNOT BE APPLIED TO PULMONARY EMBOLISM CASES AND ARE, IN ALL CASES, SPECULATIVE BECAUSE THEY ARE BASED ON HOSPITALIZED PATIENTS.**

The Court should first grant reconsideration because plaintiffs' experts' use of multipliers to attain statistical significance in their findings was not reliable.  Under longstanding Fifth Circuit precedent, statistically insignificant study results are not reliable to establish general causation under *Daubert*.  *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307 (5th Cir. 1989), *modified*, 884 F.2d 166 (5th Cir. 1989), *cert. denied*, 494 U.S. 1046 (1990).  The Zambelli-

Weiner and Brooks Pooled Analysis admittedly lacks statistical significance—unless a multiplier of 10 or 30 is applied.[9]  Drs. Zambelli-Weiner and Brooks applied these multipliers, purportedly based on the report and testimony of Dr. Spyropoulos.  The Court accepted the use of multipliers as reliable, but that ruling was mistaken for two reasons:  First, there is no basis for applying a multiplier to PE injuries; indeed, Dr. Spyropoulos testified that the ratios he relied on for those multipliers are "inapplicable" to such injuries.  Second, the multipliers are, in any event, unreliable as applied to any VTE injury because, as Dr. Spyropoulos also testified, the multipliers are based on data from a population that is very different from the Vioxx clinical trial populations.

### A.    The Multipliers Are Inapplicable To Pulmonary Emboli

First, the Court should reconsider its Order to the extent it holds that application of a multiplier is reliable for analyzing PE injuries in the Pooled Analysis.  In its Order, the Court notes that "both Dr. Spyropoulos and Dr. Zambelli-Weiner, who are qualified experts in clinical trials and epidemiology, respectively, agree that, at the very least, a 10-fold multiplier with respect to DVTs is justified."[10]  The Court was correct—as to DVTs.  But it is undisputed that

---

[9]    *See* Zambelli-Weiner/Brooks Rep. at 32-33.

[10]    Order at 19.  It is worth noting, however, that Dr. Zambelli-Weiner (who is not a medical doctor) offered no independent opinion on this point.  Instead, she relied solely on Dr. Spyropoulos's report as justification for using the multipliers; she did not herself review any of the literature.  In any event, even if the approach were her own, plaintiffs could not satisfy *Daubert* by having Dr. Zambelli-Weiner vouch for the reliability *of her own methodology*. An expert's "self-proclaimed accuracy is insufficient" to establish reliability under *Daubert. Black v. Food Lion*, 171 F.3d 308, 311 (5th Cir. 1999) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999) and *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc) ("The expert's assurances that he has utilized generally accepted scientific methodology is insufficient."); *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, 524 F. Supp. 2d 1166, 1180 (N.D. Cal. 2007) (excluding expert's opinion under *Daubert* based on

(footnote continued)

1128143v1

the 10- and 30-fold multipliers used by plaintiffs' experts are derived **solely** from data relating to DVT, not pulmonary emboli.  ***There are no comparable data for PEs.***  No studies have generated any analogous multiplier relating to asymptomatic PEs—as Dr. Spyropoulos acknowledges.[11]  Dr. Spyropoulos agrees with Merck's expert, Dr. Crowther, that the ratios in the CHEST Guidelines on which he relies for his opinions about the multipliers "are **inapplicable** to asymptomatic PE."[12]  Thus, when asked whether he was offering the opinion that "to determine the number of asymptomatic PE [it was] methodologically proper to multiply the number of symptomatic VTE by either 30 or 10," Dr. Spyropoulos answered, "No."[13]

Dr. Spyropoulos further testified that using the same multiplier for PE and DVT cases would constitute "imprecise extrapolation" from the data.[14]  While the DVT multiplier "may" apply to PE "in theory," Dr. Spyropoulos stated, "we don't have . . . the wealth and the breadth of data to support that [is] necessarily so."[15]  Even when questioned by plaintiffs' counsel, he held to this view:

> Q:    What's your view with regard to whether it's appropriate to use a 10-fold multiplier on the observed pulmonary embolism in the all controlled studies?

---

(continued footnote)

his "primitive extrapolation" from data relating to one dose of Celebrex to support his opinion about a different dose, where expert "failed to identify any scientific support for his method other than his own judgment").

[11]   *See* Spyropoulos Dep. at 226:17-229:5; 230:2-230:24.

[12]   *Id.* at 241:12-17 (emphasis added) ("I would agree with that.  That I agree with him.").

[13]   *Id.* at 229:8-230:1.

[14]   *Id.* at 228:14-229:5.

[15]   *Id.* at 232:1-232:11.

1128143v1

> A:  *I would actually have to agree with [Merck's counsel] in the sense that I would be a lot more comfortable using that multiplier in the setting of DVT versus PE*.  I think in theory we can apply the two components of VTE, but again, *because the majority of data comes from DVT data, I would be much more comfortable in using that multiplier in the DVT setting*.[16]

Put another way:  there is "too great an analytical gap between the data and the opinion proffered" for the opinion to be reliable.  *Joiner*, 522 U.S. at 146; *see also Moore*, 151 F.3d at 279 (noting that "[s]everal post-*Daubert* cases have cautioned about leaping from an accepted scientific premise to an unsupported one").

In short, there is no scientific basis for using a multiplier to supercharge the statistically *in*significant results for PE in the Pooled Analysis into statistically significant results.  Rather, employing a multiplier in PE cases would require the "kind of scientifically unsupported 'leap of faith' which is condemned by *Daubert*."  *Rink, Inc. v. Cheminova*, 400 F.3d 1286, 1292 (11th Cir. 2005) (excluding testimony where expert's transposition of data from other studies was based on "such conjecture and rough approximation" that it lacked the "intellectual rigor" required by *Daubert*).[17]  For these reasons, Merck respectfully submits that the Court should, at the very least, reconsider its ruling and disapprove the use of a "theoretical" and "imprecise extrapolation" from DVT data to PE cases.

---

[16]   *Id.* at 299:6-299:17 (emphasis added).  Pressed by plaintiffs' counsel, Dr. Spyropoulos ultimately gave the desired response—"I think, again, using the same numbers as we have for DVT, and I think 10 to 1 as stated before is a reasonable multiplier to use for both components" —then immediately qualified it again, given the absence of data about PE— "I think *our confidence is less with PE*.  But again, the multiplier should *in theory* apply to both aspects of VTE."  *Id.* at 299:20-300:14 (emphasis added).

[17]   *See also Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1167-68 (E.D. Wash. 2009) (rejecting an inadequately justified multiplier to approximate benzene exposure as a "scientifically unsupported 'leap of faith'" (quoting *Rink*, 400 F.3d at 1292)).

1128143v1

**B.      The Extrapolation of Data from Acute, Post-Surgical, Hospitalized Patients to the General Population Is Unreliable.**

The Court should also reconsider its conclusion that *any* reliance on multipliers is reliable in this case.  The data from which the multipliers were derived concern a different patient population that is more likely to be susceptible to underreported VTEs than the patient populations studied in connection with Vioxx.  Specifically, Dr. Spyropoulos acknowledged that the 1:30 ratio in his report, and the CHEST Guidelines ratio he relies upon for it, derive from data relating to asymptomatic DVTs in ***acute, post-surgical hospitalized patient populations***— populations that carry a much higher risk of VTE than the general population.[18]  The post-surgical hospitalized population is more likely than an ambulatory population to develop VTE because, among other reasons, the clotting process is an integral part of the surgical procedure, and post-surgery immobility alone increases the risk of clotting.   Indeed, according to Dr. Spyropoulos, it is "well established" that "there's a many-fold increased risk [of VTE] on the hospitalized, both medical and surgical populations, than [the non-hospitalized] community," which some studies have quantified as more than 100 times greater.[19]

The Vioxx clinical trials, by contrast, were not conducted in high-risk, acute post-surgical patient populations, but rather in ambulatory, non-hospitalized populations.[20]  Dr. Spyropoulos confirmed that, while there is little data assessing the ratio of symptomatic VTE to asymptomatic

---

[18]    Spyropoulos Dep. at 206:15-19.

[19]    *Id*. at 113:8-21; 112:-14-19; 114:13-24 (stating that he has no basis to disagree with study reporting over 100-fold greater incidence of VTE in hospitalized patients versus non-hospitalized patients).  Dr. Spyropoulos went on to testify that even some portion of the VTE events diagnosed in the ambulatory community can be traced back to a previous hospitalization.  *Id.* at 113:22-114:12.

[20]    *Id.* at 206:20-23; 193:20-194:17.

1128143v1

DVT outside the hospital setting, even the *lower* estimates identified in the CHEST Guidelines—*i.e.*, a ratio of as low as only 1:2 symptomatic VTE to asymptomatic DVT—relate to data from a hospitalized general medical population.[21]  Thus, according to Dr. Spyropoulos, "we don't know what the actual ratio was in the Vioxx clinical trials."[22]  Dr. Spyropoulos has not provided any explanation as to why ratios derived from high-risk, hospitalized, post-surgical populations can be reliably applied to data from Vioxx studies conducted on ambulatory subjects.

In sum, whether the injury alleged is a DVT or PE, there is no scientifically valid basis for application of the 10- and 30-fold multipliers to the adverse event data from the Vioxx clinical trials generally.  For this reason, too, the Court should reconsider its ruling that the experts' use of a multiplier to achieve statistical significance in the Pooled Analysis was reliable.

## II.    THE POOLED ANALYSIS IS UNRELIABLE BECAUSE PLAINTIFFS HAD NO SCIENTIFIC BASIS FOR EXCLUDING KEY STUDIES, SUCH AS APPROVe.

Reconsideration is also proper because plaintiffs' experts did not apply reliable criteria for identifying the studies to be included in their Pooled Analysis.  The record lacks any documentary evidence that the experts adopted criteria before they began to evaluate the data.  Moreover, their own testimony establishes that, well after they had presumably adopted the criteria, they were still evaluating data from the very studies excluded by the criteria.  Neither the experts nor plaintiffs offered a good explanation for that fact.  Even if the criteria were truly *a priori*, plaintiffs' experts had no scientific justification for excluding significant studies, such as APPROVe, the most important study relied on by prior plaintiffs in the Vioxx litigation.

---

[21]  *Id.* at 239:8-239:21.  Application of a 1:2 ratio in the Pooled Analysis would not convert the statistically insignificant data into statistical significance.

[22]  *Id.* at 225:1-7 (emphasis added).

1128143v1

The Court acknowledged these arguments but deferred to the witnesses' expertise as a justification for not requiring a concrete showing that their methods are reliable.  The Court noted that plaintiffs' experts were "clearly highly qualified" and "offer[ed] facially reasonable explanations" for the "departure of their methodologies from entrenched norms."[23]  But *Daubert* requires more.  Whatever an expert's qualifications, the trial court must make an independent assessment of the reliability of her methodology, for "personal opinions, albeit expert, do not suffice as evidence . . . .'"  *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 665 (M.D. La. 2000).[24]  The fact that highly qualified expert witnesses often provide plausible explanations only underscores the importance of a penetrating *Daubert* inquiry—a trial court must look beyond plausible explanations to determine whether the expert's scientific methodology is scientifically reliable according to objective standards.[25]

---

[23]  *See* Order at 20.

[24]  *See also Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996) ("Under the regime of *Daubert* . . . a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.").

[25]  This is because expert evidence, which by definition is outside the realm of an ordinary juror's scope of knowledge, "can be both powerful and quite misleading." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993); *see also Rink*, 400 F.3d at 1291 ("District courts are charged with this gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony." (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002))).   Accordingly, in executing this gatekeeping function under *Daubert,* it is not sufficient for the Court to simply "tak[e] the expert's word for it," or to presuppose that an expert's qualifications assure the reliability of his or her methods.  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) (quoting Fed. R. Evid. 702 advisory committee note (2000 amendments)) (internal quotation marks omitted); *see also Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

These principles dictate exclusion here.

### A.   Plaintiffs Have Not Established that the Criteria Applied by Drs. Zambelli-Weiner and Brooks Were Truly *A Priori*.

First, the Court's Order erred in concluding that plaintiffs' experts employed criteria for including data in their Pooled Analysis that were decided *a priori*.  Plaintiffs relied on the assertions of their experts, which were at odds with the experts' own testimony. The discrepancy required explanation, which the experts did not give.  In the absence of convincing explanation, plaintiffs did not meet their burden under *Daubert*.

It is plaintiffs' burden to establish the reliability of their experts' methodology by a preponderance of the evidence.  *See Moore*, 151 F.3d at 275-76.  An expert does not get past *Daubert*'s gate merely by claiming to have applied a methodology that has general scientific acceptance.  Where the evidence suggests that the expert has worked backwards from a desired result, despite professing adherence to an accepted methodology, a court can and should exclude the testimony as unreliable.[26]  *See, e.g.*, *Caraker v. Sandoz Pharm.*, 172 F. Supp. 2d 1046, 1049 n.5 (S.D. Ill. 2001) (rejecting expert's professed adherence to a particular methodology of forming general-causation opinion as "unimpressive" and an "afterthought, inasmuch as it appears that he already came to a conclusion" under an unreliable methodology before using the methodology embraced in his affidavit); *Rose v. Matrixx Initiatives, Inc.*, No. 07-2404, 2009 WL 902311, at *16 (W.D. Tenn. Mar. 31, 2009) (rejecting expert's claimed adherence to recognized methodology where he had first applied it in litigation "at the request of his attorney for the

---

[26]   Plaintiffs have never disagreed that, in order to rebut the challenge that the selected studies were cherry-picked, their experts must establish that they settled on the criteria for admitting and excluding studies *before* examining the data.  If the criteria are after-the-fact, then the analysis rests on cherry-picked data and is inherently unreliable.

purpose of attempting to satisfy . . . *Daubert*"); *cf. also Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, (6th Cir. 2011) (noting that the district court had rejected an expert's insistence that a methodology that was disclosed for the first time in a supplemental declaration was the methodology that he had used all along when circumstances suggested otherwise).

Here, there is ample reason to doubt plaintiffs' experts' claim that they applied *a priori* criteria in deciding which studies to include.  Drs. Zambelli-Weiner and Brooks asserted that they "set out criteria in advance and . . . stuck to those criteria,"[27] but Merck responded with contrary evidence from the experts' own testimony.[28]  For one thing, Dr. Zambelli-Weiner acknowledged in her deposition that she and Dr. Brooks reviewed the Vioxx clinical trials ***before*** they decided what studies they would include in their analysis.[29]  She also acknowledged that they were still considering data from studies they ultimately excluded from their Pooled Analysis only a few weeks prior to the submission of their report, and the VTE data from the APPROVe trial (as well as data from other trials ultimately excluded from the Pooled Analysis) were included in the spreadsheet Drs. Zambelli-Weiner and Brooks used for tracking adverse event data for the purpose of their analysis.[30]  Having reviewed the clinical studies before excluding

---

[27]   Zambelli-Weiner Dep. (Vol. II) at 241:7-9.

[28]   *See* Order at 11 n.1.

[29]   *See* Zambelli-Weiner Dep. (Vol. II) 201-10.

[30]   *See id.* at 233:6-15.  Dr. Zambelli-Weiner testified:

> Q.     Would you agree that as of July 2012, in the fourth month of your review,
>        you were still looking at more than Phase III studies?
>
> A.     I can't speak for what -- for what [Dr. Brooks] did specifically, because
>        that was her piece of it.  But what I can say is that she was looking at the
>        CSRs [Clinical Study Reports] from these studies.
>
> . . .

(footnote continued)

them, Drs. Zambelli-Weiner and Brooks would have undoubtedly been aware of which studies

supported their conclusions and which did not.  Indeed, the data from several of the placebo-

controlled trials omitted by Drs. Zambelli-Weiner and Brooks were discussed in detail in

Merck's original summary judgment motion (filed in November 2011), which argued that such

data showed no evidence of any increased risk of VTEs with Vioxx treatment.[31]

Neither plaintiffs nor their experts have any explanation for the experts' continued review

of clinical studies that, according to supposedly *a priori* criteria, never should have been part of

their analysis.  When pressed for specificity on when they developed the criteria, and where their

analysis stood at that point, Dr. Zambelli-Weiner could not respond:

> Q.   And what date on the calendar did you come up with your a priori criteria
>       to limit your analysis to Phase III studies?
>
> A.   I couldn't pinpoint a date.
>
> Q.   If a priori means implemented from the beginning, would you agree that it
>       should have been before you started any observations, experience or
>       analysis of the clinical trials?
>
> A.   Not necessarily, in terms of data collection efforts may have been
>       ongoing.  It's an iterative process.  So, in the process of trying to
>       understand what was available and what existed, I can't specifically say
>       that those criteria were set forth before data collection efforts or data
>       management efforts were underway.
>
> Q.   So we previously saw that your first work in this case was on April 19,
>       2012; correct?
>
>       . . .
>
> A.   According to the invoice, yes.

---

(continued footnote)

> Q.   Would you agree that, as of the fourth month of your analysis, Dr. Brooks
>       was extracting data from more than just Phase III trials?
>
> A.   Again, she was obviously looking at the CSRs.

*Id.* at 206:1-7, 206:14-19; *see also id.* at 208:21-210:3; Rec. Doc. 64251 at 9-10.

[31] *See* Rec. Doc. 63539.

1128143v1

. . .

Q. Okay. So how long after April 19, 2012 was it that you came up with your a priori criteria

A. I couldn't recall.

Q. Do you have any idea when you came up with your a priori criteria?

. . .

A. I don't, because we were tasked with different activities. So I can't specifically isolate the time at which we undertook consideration of review of the CSRs and what that would look like.

Q. How long prior to your written report of August 31, 2012 did you come up with your a priori criteria?

. . .

A. I can't recall specifically.[32]

Nor could Dr. Zambelli-Weiner explain why she and Dr. Brooks were still examining APPROVe data (and other soon-to-be excluded data) shortly before completing their report if they had adopted *a priori* criteria that excluded the APPROVe data.[33] Plaintiffs had no explanation either; instead, they relied entirely on the experts' same, self-serving assertion that they adopted the criteria in advance.

In the face of contrary evidence, that unsupported assertion should be disregarded as *ipse dixit*. *See, e.g.*, *United States v. Scholl*, 959 F. Supp. 118, 1192 (D. Ariz. 1997) (noting that "conclusory statements without explanation by the expert can contribute to the jury's misunderstanding of the subject and are subject to exclusion") (citing *United States v. Hall*, 93

---

[32] Zambelli-Weiner Dep. (Vol. II) at 201:14-203:5; *see also id. at* 203:7-203:20, 206:25-207:20; 210:5-9; 241:10-242:1.

[33] *Id.* at 242:17-23. (Q: "Okay. Dr. Zambelli-Weiner, you were still considering having the APPROVe part of your analysis less than a month before you submitted your report; correct?" A: "I can't answer that. I don't recall. Again, I think I've already relayed that data were being collected for numerous reasons.").

F.3d 1337, 1344 (7th Cir. 1996)).  On this basis, too, the Court should have excluded the testimony.

>    **B.**      **The Experts Have Not Provided a Scientifically Valid Explanation for Excluding the APPROVe, ViP and VICTOR Studies.**

Even if Drs. Zambelli-Weiner and Brooks had followed a pre-specified plan for excluding studies from their analysis, reconsideration would still be appropriate because the experts have not offered any scientifically valid explanation for using a methodology that excluded the vast majority of Vioxx placebo-controlled data, including, most notably, data from the APPROVe trial.

As the Court is aware, APPROVe was a blinded, randomized, placebo-controlled clinical trial designed to assess whether Vioxx could help prevent the recurrence of precancerous colon polyps.  *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2010 WL 2649513, at *8 (E.D. La. June 29, 2010) (Fallon, J.).  APPROVe and two additional large-scale, long-term, placebo-controlled trials, known as ViP and VICTOR, were included in a safety protocol (known as "Protocol 203") designed by Merck in consultation with the FDA for the systematic analysis of adjudicated cardiovascular safety data.  *Id.*  In September 2004, APPROVe's external safety monitoring board recommended that the study be terminated early in light of interim data showing that after 18 months of daily use, study participants on Vioxx 25 mg began to experience a gradually increasing rate of confirmed adverse cardiovascular events as compared to study participants on placebo.  *Id.*  Based on this interim safety data from APPROVe, Merck withdrew Vioxx from the market on September 30, 2004.  *Id.*  Since that date, the APPROVe trial has played a pivotal role in this litigation.  Most of the VTE plaintiffs' complaints

prominently feature APPROVe,[34] and this Court has specifically discussed APPROVe in at least thirty written opinions in the Vioxx litigation. *See, e.g.*, Order at 1; *see also In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565, 571 (E.D. La. 2005).

Plaintiffs' experts' failure to adopt criteria that would include APPROVe runs contrary to basic scientific principles and to the testimony of plaintiffs' other experts.  Placebo-controlled trials are regarded as "the gold standard" for scientific reliability by both courts and the scientific community. *Reference Manual on Scientific Evidence* 338 (Fed. Judicial Ctr. 2d ed. 2000); *see also Merck & Co. v. Garza*, 347 S.W.3d 256, 263 (Tex. 2011) ("the controlled, experimental, and prospective nature of clinical trials undoubtedly make them more reliable than retroactive, observational studies") (rendering judgment for Merck in alleged Vioxx-related heart attack case).  Dr. Spyropoulos—who, unlike Drs. Zambelli-Weiner and Brooks is a medical doctor— relied on adverse event data from APPROVe and VICTOR in his report[35] and testified that the VTE data from APPROVe, VICTOR, and ViP are "high quality" and should have been included in an analysis of Vioxx and VTE.[36]  Over the past decade of Vioxx litigation, plaintiffs have never before suggested that the safety data from APPROVe—the data that led to the drug's withdrawal from the market—is invalid or unreliable.  To the contrary, plaintiffs and their causation experts have made the cardiovascular adverse event data from APPROVe the

---

[34]  *See* Merck's *Daubert* Mot. [Rec. Doc. 64211-1] at 11 n.10.

[35]  Spyropoulos Rep. at 4, 5.

[36]  Spyropoulos Dep. at 150-51, 188-91.  The other two medical doctor experts in this matter who reviewed the clinical trial data, Merck's experts Dr. Kress and Dr. Crowther, likewise found it proper to rely on the placebo-controlled data from APPROVe and the other Protocol 203 trials in forming their opinions.  *See* Kress Rep. [Rec. Doc. 63539-6] at 6; Crowther Rep. [Rec. Doc. 64210-3] at 4-5; Crowther Dep. at 269, 292.

cornerstone of their causation theories.[37]

Plaintiffs have no legitimate justification for ignoring data that virtually every plaintiff in the Vioxx litigation has considered critical.  This alone should raise a big red flag regarding the reliability of the Pooled Analysis.  *See In re Bextra*, 524 F. Supp. 2d at 1176 (holding expert's analysis to be unreliable where expert rejected as "inappropriate" studies that did not support his opinion, while plaintiffs' other experts relied on the same studies); *Rimbert v. Eli Lilly & Co.*, No. CIV 06-0874 JCH/LFG, 2009 U.S. Dist. LEXIS 68851, at *70 (D.N.M. July 21, 2009) ("A methodology that inexplicably ignores material facts and relies only on selective evidence does not lead to a reliable opinion.").

To be sure, Drs. Zambelli-Weiner and Brooks argued weakly that they excluded the APPROVe, ViP and VICTOR data from their Pooled Analysis because these studies were "terminated prematurely,"[38] but they never explained why this matters, let alone offer a reference to any scientific literature or accepted scientific principles to support this supposed rationale. Instead, they offer—once again—only their own say-so, which is manifestly insufficient under *Daubert*. *See Moore*, 151 F.3d at 276.  Having provided no scientific reason to explain how early termination could possibly justify excluding what has heretofore been the most relied-upon

---

[37]   It should come as no surprise that the excluded data from the APPROVe trial (as well as the additional excluded placebo-controlled data from VICTOR and ViP) undermines the conclusion of Drs. Zambelli-Weiner and Brooks that Vioxx is associated with an elevated risk of VTE.  Had Drs. Zambelli-Weiner and Brooks added the data from just the APPROVe study to their pooled analysis, that addition alone would have been enough to shift the data in favor of Vioxx with respect to pulmonary embolism.  Zambelli-Weiner Dep. (Vol. II) at 235-40.

[38]   *See* Zambelli-Weiner Dep. (Vol. I) at 156-57 ("I believe the reason that this was excluded was that it was terminated prematurely."); Brooks Dep. at 68:10-69:11 (Q:  "Is it your position that any study that's terminated early should not be used in a safety analysis?"  A: "I would refer that question to Dr. Zambelli-Weiner.").

study in the litigation, plaintiffs fell far short of their burden under *Daubert*. *See In re Bextra*, 524 F. Supp. 2d at 1175-76 (excluding expert testimony where expert "cherry-pick[ed] observational studies that supported his conclusion and reject[ed] or ignor[ed] the great weight of the evidence that contradict[ed] his conclusion").[39]

For this reason too, the testimony should have been excluded, and the Court should reconsider its Order allowing it.

## CONCLUSION

For the foregoing reasons, Merck respectfully requests that the Court grant the motion to reconsider and exclude the testimony of Drs. Zambelli-Weiner and Brooks.[40]

---

[39]   *See also In re Prempro Prods. Liab. Litig.*, 738 F. Supp. 2d 887, 890-92 (E.D. Ark. 2010) (excluding expert who disregarded a large, "generally accepted" clinical study in favor of a few contrary observational studies, and who focused on the results showing increased risk in certain sub-groups within particular studies, while rejecting the findings of no risk in other sub-groups); *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005) (excluding experts' testimony because "both experts ignored or discounted without explanation the contrary epidemiological studies"); *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 850 (W.D. Tex. 2005) (excluding expert who "sifted through the literature to pick and choose positive relative risks" that supported his causation opinion).

[40]   Should the Court decline to reconsider its *Daubert* Order, Merck believes that interlocutory appellate review of that Order is appropriate. Title 28, §1292(b) of the United States Code permits a district court to certify an interlocutory appeal in a civil action where (1) "a controlling question of law" is involved, (2) "there is substantial ground for difference of opinion" about the question of law, and (3) "immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. §1292(b); *Rico v. Flores*, 481 F.3d 234, 238 (5th Cir. 2007). As discussed herein, the Court's application of *Daubert* with respect to plaintiffs' VTE general causation experts is in tension with longstanding Fifth Circuit precedent. Interlocutory appeal would permit a resolution of that conflict, and may materially advance the ultimate termination of Vioxx litigation by allowing a large percentage of the remaining personal injury actions to be disposed of on summary judgment. Merck is prepared to submit additional briefing regarding certification under §1292(b) as necessary.

Dated:   June 3, 2013                    Respectfully submitted,

By:  */s/ Dorothy H. Wimberly*
       Phillip A. Wittmann, 13625
       Dorothy H. Wimberly, 18509
       STONE PIGMAN WALTHER
       WITTMANN L.L.C.
       546 Carondelet Street
       New Orleans, LA 70130
       Phone: 504-581-3200
       Fax:    504-581-3361

       Defendants' Liaison Counsel

   —and—

       Douglas R. Marvin
       Eva Petko Esber
       M. Elaine Horn
       WILLIAMS & CONNOLLY LLP
       725 Twelfth Street, N.W.
       Washington, DC 20005
       Phone: 202-434-5000
       Fax:    202-434-5029

       John H. Beisner
       Jessica Davidson Miller
       SKADDEN, ARPS, SLATE, MEAGHER &
       FLOM LLP
       1440 New York Avenue, N.W.
       Washington, DC 20005

       ATTORNEYS FOR MERCK SHARP &
       DOHME CORP.

1128143v1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Motion for Reconsideration has been served on Liaison Counsel, Russ Herman, Phillip Wittmann and Ann Oldfather, by U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8C, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 3rd day of June, 2013.

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

1128143v1