# EXHIBIT 1



E-SERVICE
51539783
Apr 04 2013
03:53PM
File & ServeXpress

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX Products Liability Litigation | * | MDL No. 1657 |
| | * | |
| This Document Relates to: | * | SECTION L |
| | * | |
| State of Utah v. Merck, et al. | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | KNOWLES |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## NOTICE OF 30(b)(6) DEPOSITION

YOU ARE HEREBY NOTIFIED that, pursuant to the Federal Rules of Civil Procedure, the plaintiff will take the video-taped 30(b)(6) deposition of the person or persons most knowledgeable about Vioxx information given to Utah Medicaid by the Merck Medical Director of the region of the United States to which Utah was assigned from 1997 through 2005.  Under Rule 30(b)(6) you are obligated to make the above designation.

The deponent(s) will produce and bring the following documents to the deposition:

1. All written information given to Utah Medicaid concerning Vioxx from the Merck Medical Director for the region of the United States to which Utah was assigned from 1997-2005.

The deposition will take place on May 3, 2013, beginning at 9:00 a.m., and continuing thereafter until complete, at Hyatt House Branchburg, 3141 U.S. 22, Branchburg, NJ, 08876. You are further advised that the deposition will be taken upon oral interrogatories before a

certified shorthand reporter and videographer pursuant to and for the purposes permitted by the

Federal Rules of Civil Procedure.


DATED this _____ day of April, 2013.


                                        _____/S/_____
                                        Joseph W. Steele
                                        Kenneth D. Lougee
                                        STEELE & BIGGS
                                        5664 South Green Street
                                        Salt Lake City, UT  84123


                                        _____/S/_____
                                        Eric H. Weinberg
                                        The Law Offices of Eric H. Weinberg
                                        149 Livingston Avenue
                                        New Brunswick, NJ  08901


                                        _____/S/_____
                                        Richard W. Schulte (Ohio Bar No. 0066031)
                                        812 E. National Road, Suite A
                                        Vandalia, Ohio 45377
                                        (937) 435-7500

                                        *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing **NOTICE OF 30(b)(6) DEPOSITION** has

been served on Liaison Counsel, Russ Herman, Phillip Wittmann and Ann Oldfather, by U.S.

Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading

the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B),

and that the foregoing was electronically filed with the Clerk of Court of the United States

District Court for the Eastern District of Louisiana by using the CM/ECF system which will send

a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this

_____ day of April, 2013.


                                        _____/S/_____
                                        Joseph W. Steele
                                        Kenneth D. Lougee
                                        STEELE & BIGGS
                                        5664 South Green Street
                                        Salt Lake City, UT  84123

# EXHIBIT 2

E-SERVICE
51545902
Apr 05 2013
08:57AM
File & ServeXpress

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL No. 1657 |
| Products Liability Litigation | * | |
| | * | |
| This Document Relates to: | * | SECTION L |
| | * | |
| *State of Alaska v. Merck & Co., Inc.,* | * | JUDGE ELDON E. FALLON |
| 3:06-CV-00018 | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

## PLAINTIFF'S, STATE OF ALASKA, 30(b)(6) VIDEO DEPOSITION OF THE CORPORATE REPRESENTATIVE OF DEFENDANT, MERCK & CO., INC.

Pursuant to Federal Rules of Civil Procedure, the State of Alaska will take the video-taped 30(b)(6) deposition of the person most knowledgeable as to the topics listed below.  The deposition will take place at a location, date and time to be agreed upon by counsel.  At least seven days before the deposition, Merck shall identify the person most knowledgeable who will speak on its behalf on the topics listed below.

1. The sale, promotion, and marketing of Vioxx in Alaska including, but not limited to, the execution of all strategies outlined in the annual profit plan for Vioxx and/or the A&A Franchise, any business plans related to Vioxx and/or the A&A Franchise, and/or any integrated promotional plans related to Vioxx or the A&A Franchise.

2. The structure of Merck's sales force in Alaska responsible for the promotion of Vioxx including, but not limited to, the number of sales representatives, the organizational structure, and the tactical or strategic plans for the promotion of Vioxx within the State of Alaska.

3.      The training and mentoring of sales representatives responsible for the promotion of Vioxx within the State of Alaska.

4.      The details of the distribution within the State of Alaska of each Dear Doctor letters, Dear Pharmacist letters, Dear Healthcare Provider letters, and PIR letters that in any way concerned Vioxx; including the identity of the recipient, the content of the letter, and the date the letter was sent.

5.      How Merck or its agents determine or estimate the number of individuals in that State of Alaska, or any geographical subdivision that includes Alaska, who were exposed to Merck's print advertisements for Vioxx.

6.      The purpose and effectiveness of Merck's campaign of print advertisements in the State of Alaska or any geographical subdivision that includes Alaska.

7.      The purpose and effectiveness of Merck's campaign of print advertisements to physicians in the State of Alaska or any geographical subdivision that includes Alaska.

8.      How Merck or its agents determine or estimate the number of individuals in that State of Alaska, or any geographical subdivision that includes Alaska, who saw or were exposed to Vioxx television advertisements.

9.      The purpose and effectiveness of Merck's campaign of television advertisements in the State of Alaska or any geographical subdivision that includes Alaska.

10.     The number of Alaska residents who were sent direct to consumer mail pieces concerning Vioxx, how Merck determined the intended recipients of those direct to consumer mailings, the demographics of the intended recipients of each direct to consumer mail piece, and the contents of each direct to consumer mail pieces.

11. The detail and promotional pieces that Merck's sales representatives were permitted to use and/or leave with healthcare providers concerning Vioxx within the State of Alaska.

12. The number of Vioxx package inserts, PPIs and labels and each variation thereof that were distributed within the State of Alaska including those distributed with samples, prescriptions, letters or other correspondence sent to physicians or individuals in Alaska.

13. The uses of information provided by IMS Health Inc. to Merck related in any way to the promotion of Vioxx in the State of Alaska or in any geographical subdivision that includes Alaska.

14. The distribution of Vioxx samples within the State of Alaska including, but not limited to, the number of samples distributed by year, month and strength, the written materials that accompanied the samples, the role the samples played in Merck's promotion of Vioxx and any instructions given by Merck for distribution of said samples.

15. The purpose of the FACTS database and the information it contains on the promotion, marketing and sale of Vioxx within the State of Alaska.

16. The distribution and circulation of each Merck Press Release related to Vioxx within the State of Alaska.

17. The distribution, circulation and/or viewership of the GI benefit video(s) featuring Dr. Lorne Laine within the State of Alaska.

18. The Cardiovascular Card (also referred to as the CV card), the contents thereof and its distribution and use within the State of Alaska.

19. The distribution of the following scientific articles within the State of Alaska: Bombardardier et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and

Naproxen in Patients with Rheumatoid Arthritis," New England Journal of Medicine, 2000; Konstam MA, Weir MR, Reicin A, et al., Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib, Circulation, 2001; Reicin AS, Shapire D, Sperling RS, et al., Comparison of Cardiovascular Thrombotic Events in patients with Osteoarthritis Treated with Rofecoxib Versus Nonselective Nonsteroidal Anti-inflammatory Drugs (Ibuprofen, Diclofenac and Nabumetone), American Journal of Cardiology, 2002; Getz BJ, Krupa D, Bolognese JA, et al., A Comparison of Adverse Renovascular Experiences Among Osteoarthritis Patients Treated with Rofecoxib and Comparator Nonselective Nonsteroids Anti-inflammatory Agents, Current Medical Research and Opinion, 2002; Weir MR, Sperling RS, Reicin A, Gertz BJ, Selective COX-2 Inhibition and Cardiovascular Effects: A review of the Rofecoxib Development Program, American Heart Journal, 2003.

20.    All scientific articles in anyway concerning Vioxx, including the number of articles or reprints, distributed within the State of Alaska and to whom they were distributed.

21.    Merck's marketing of pain efficacy, pain superiority or pain relief of Vioxx compared to other pain relievers within the State of Alaska.

22.    The gross sales of Vioxx within the State of Alaska and the profits Merck obtained from those sales.

23.    Any and all bonus plans or awards related to sales and/or marketing of Vioxx including, but not limited to, bonuses applicable to sales representatives responsible for marketing Vioxx in the State of Alaska as well as the sales representatives' managers up the chain of command.

24.    Any and all bonuses, awards, travel or other incentives offered to physicians or other healthcare providers by Merck related in any way to the promotion or prescribing of Vioxx.

25.    The amounts budgeted and spent by Merck for marketing and promotion of Vioxx within the State of Alaska or any geographical subdivision that includes Alaska from 1998 through 2004.

26.    The amounts budgeted and spent by Merck for marketing and promotion of Vioxx nationwide and globally from 1998 through 2004.

27.    The facts that support Merck's contention that all or any part of Alaska's claim is allegedly barred by the applicable statute of limitations.

28.    Communications with representatives of the State of Alaska about the drug Vioxx and the specific risks Merck was aware of related to Vioxx.

29.    All efforts by Merck to determine whether Naproxen was cardioprotective.

30.    The hiring, by Merck, of Peter Honig from the FDA Office of Drug Safety to become Vice President of Worldwide Product Safety and Quality Assurance for Merck Research Laboratories, the negotiation of Honig's employment with Merck and Honig's role in reviewing Vioxx clinical trial data and/or approving the label change for Vioxx.

31.    Communications with representatives in the State of Alaska about the drug Vioxx and the specific risks Merck was aware of related to Vioxx.

32.    Merck's policies and procedures regarding the release of patient level data from clinical trials for both the United States and Europe.

33.    The study design, study oversight, study protocols, study endpoints, and study results of Protocol 078.

34.    The study design, study oversight, study protocols, study endpoints, and study results of Protocol 136.

/s/ Brian M. Vines
Brian M. Vines
Attorney for Plaintiff

OF COUNSEL

Scott A. Powell, Esquire
Don McKenna, Esquire
Matthew C. Minner, Esquire
Brian M. Vines, Esquire
Hare, Wynn, Newell and Newton, LLP
2025 3rd Avenue North; Suite 800
Birmingham, Alabama 35203
Telephone: 205-328-5330

James E. Fosler, Esquire
Fosler Law Group, Inc.
737 West 5th Avenue; Suite 205
Anchorage, Alaska  99501
Telephone: 907-277-1557

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's, State of Alaska, 30(B)(6) Videotaped Deposition Notice of Merck's Corporate Representative, have been served upon Liaison Counsel, Russ Herman, Phillip Wittmann and Ann Oldfather, by U.S. mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(C) on this 5th day of April, 2013.

/s/ Brian M. Vines
Brian M. Vines
ASB-4419-R77V
Attorney for Plaintiff
Hare, Wynn, Newell & Newton
2025 3rd Avenue North; Suite 800
Birmingham, Alabama  35203
Telephone: 205-328-5330
Fascimile: 205-324-2165
bvines@hwnn.com

# EXHIBIT 3

E-SERVICE
51545950
Apr 05 2013
08:59AM
File & ServeXpress

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| In re:  VIOXX | * | MDL No. 1657 |
| Products Liability Litigation | * | |
| | * | |
| This Document Relates to: | * | SECTION L |
| | * | |
| *State of Montana v. Merck & Co., Inc.,* | * | JUDGE ELDON E. FALLON |
| 2:06-CV-04302 | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

### PLAINTIFF'S, STATE OF MONTANA, 30(b)(6) VIDEO DEPOSITION OF THE CORPORATE REPRESENTATIVE OF DEFENDANT, MERCK & CO., INC.

Pursuant to Federal Rules of Civil Procedure, the State of Montana will take the video-taped 30(b)(6) deposition of the person most knowledgeable as to the topics listed below.  The deposition will take place at a location, date and time to be agreed upon by counsel.  At least seven days before the deposition, Merck shall identify the person most knowledgeable who will speak on its behalf on the topics listed below.

1.      The sale, promotion, and marketing of Vioxx in Montana including, but not limited to, the execution of all strategies outlined in the annual profit plan for Vioxx and/or the A&A Franchise, any business plans related to Vioxx and/or the A&A Franchise, and/or any integrated promotional plans related to Vioxx or the A&A Franchise.

2.      The structure of Merck's sales force in Montana responsible for the promotion of Vioxx including, but not limited to, the number of sales representatives, the organizational structure, and the tactical or strategic plans for the promotion of Vioxx within the State of Montana.

3.      The training and mentoring of sales representatives responsible for the promotion of Vioxx within the State of Montana.

4.      The details of the distribution within the State of Montana of each Dear Doctor letters, Dear Pharmacist letters, Dear Healthcare Provider letters, and PIR letters that in any way concerned Vioxx; including the identity of the recipient, the content of the letter, and the date the letter was sent.

5.      How Merck or its agents determine or estimate the number of individuals in that State of Montana, or any geographical subdivision that includes Montana, who were exposed to Merck's print advertisements for Vioxx.

6.      The purpose and effectiveness of Merck's campaign of print advertisements in the State of Montana or any geographical subdivision that includes Montana.

7.      The purpose and effectiveness of Merck's campaign of print advertisements to physicians in the State of Montana or any geographical subdivision that includes Montana.

8.      How Merck or its agents determine or estimate the number of individuals in that State of Montana, or any geographical subdivision that includes Montana, who saw or were exposed to Vioxx television advertisements.

9.      The purpose and effectiveness of Merck's campaign of television advertisements in the State of Montana or any geographical subdivision that includes Montana.

10.     The number of Montana residents who were sent direct to consumer mail pieces concerning Vioxx, how Merck determined the intended recipients of those direct to consumer mailings, the demographics of the intended recipients of each direct to consumer mail piece, and the contents of each direct to consumer mail pieces.

11.    The detail and promotional pieces that Merck's sales representatives were permitted to use and/or leave with healthcare providers concerning Vioxx within the State of Montana.

12.    The number of Vioxx package inserts, PPIs and labels and each variation thereof that were distributed within the State of Montana including those distributed with samples, prescriptions, letters or other correspondence sent to physicians or individuals in Montana.

13.    The uses of information provided by IMS Health Inc. to Merck related in any way to the promotion of Vioxx in the State of Montana or in any geographical subdivision that includes Montana.

14.    The distribution of Vioxx samples within the State of Montana including, but not limited to, the number of samples distributed by year, month and strength, the written materials that accompanied the samples, the role the samples played in Merck's promotion of Vioxx and any instructions given by Merck for distribution of said samples.

15.    The purpose of the FACTS database and the information it contains on the promotion, marketing and sale of Vioxx within the State of Montana.

16.    The distribution and circulation of each Merck Press Release related to Vioxx within the State of Montana.

17.    The distribution, circulation and/or viewership of the GI benefit video(s) featuring Dr. Lorne Laine within the State of Montana.

18.    The Cardiovascular Card (also referred to as the CV card), the contents thereof and its distribution and use within the State of Montana.

19.    The distribution of the following scientific articles within the State of Montana: Bombadardier et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and

Naproxen in Patients with Rheumatoid Arthritis," New England Journal of Medicine, 2000; Konstam MA, Weir MR, Reicin A, et al., Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib, Circulation, 2001; Reicin AS, Shapire D, Sperling RS, et al., Comparison of Cardiovascular Thrombotic Events in patients with Osteoarthritis Treated with Rofecoxib Versus Nonselective Nonsteroidal Anti-inflammatory Drugs (Ibuprofen, Diclofenac and Nabumetone), American Journal of Cardiology, 2002; Getz BJ, Krupa D, Bolognese JA, et al., A Comparison of Adverse Renovascular Experiences Among Osteoarthritis Patients Treated with Rofecoxib and Comparator Nonselective Nonsteroids Anti-inflammatory Agents, Current Medical Research and Opinion, 2002; Weir MR, Sperling RS, Reicin A, Gertz BJ, Selective COX-2 Inhibition and Cardiovascular Effects: A review of the Rofecoxib Development Program, American Heart Journal, 2003.

20.    All scientific articles in anyway concerning Vioxx, including the number of articles or reprints, distributed within the State of Montana and to whom they were distributed.

21.    Merck's marketing of pain efficacy, pain superiority or pain relief of Vioxx compared to other pain relievers within the State of Montana.

22.    The gross sales of Vioxx within the State of Montana and the profits Merck obtained from those sales.

23.    Any and all bonus plans or awards related to sales and/or marketing of Vioxx including, but not limited to, bonuses applicable to sales representatives responsible for marketing Vioxx in the State of Montana as well as the sales representatives' managers up the chain of command.

24.    Any and all bonuses, awards, travel or other incentives offered to physicians or other healthcare providers by Merck related in any way to the promotion or prescribing of Vioxx.

25. The amounts budgeted and spent by Merck for marketing and promotion of Vioxx within the State of Montana or any geographical subdivision that includes Montana from 1998 through 2004.

26. The amounts budgeted and spent by Merck for marketing and promotion of Vioxx nationwide and globally from 1998 through 2004.

27. The facts that support Merck's contention that all or any part of Montana's claim is allegedly barred by the applicable statute of limitations.

28. Communications with representatives of the State of Montana about the drug Vioxx and the specific risks Merck was aware of related to Vioxx.

29. All efforts by Merck to determine whether Naproxen was cardioprotective.

30. The hiring, by Merck, of Peter Honig from the FDA Office of Drug Safety to become Vice President of Worldwide Product Safety and Quality Assurance for Merck Research Laboratories, the negotiation of Honig's employment with Merck and Honig's role in reviewing Vioxx clinical trial data and/or approving the label change for Vioxx.

31. Communications with representatives in the State of Montana about the drug Vioxx and the specific risks Merck was aware of related to Vioxx.

32. Merck's policies and procedures regarding the release of patient level data from clinical trials for both the United States and Europe.

33. The study design, study oversight, study protocols, study endpoints, and study results of Protocol 078.

34. The study design, study oversight, study protocols, study endpoints, and study results of Protocol 136.

/s/ Brian M. Vines
Brian M. Vines
Attorney for Plaintiff

OF COUNSEL

Kelley L. Hubbard, Esquire
Assistant Attorney General
Post Office Box 201401
Helena, Montana 59620-1401
Telephone: 406/444-2026

Scott A. Powell, Esquire
Don McKenna, Esquire
Matthew C. Minner, Esquire
Brian M. Vines, Esquire
Hare, Wynn, Newell and Newton, LLP
2025 3rd Avenue North; Suite 800
Birmingham, Alabama 35203
Telephone: 205-328-5330

William A. Rossbach, Esquire
Rossbach Hart, PC
401 North Washington Street
Missoula, Montana 59807
Telephone: 406/543-5156

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's, State of Montana, 30(B)(6) Videotaped Deposition Notice of Merck's Corporate Representative, have been served upon Liaison Counsel, Russ Herman, Phillip Wittmann and Ann Oldfather, by U.S. mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(C) on this 5th day of April, 2013.

/s/ Brian M. Vines
Brian M. Vines
ASB-4419-R77V
Attorney for Plaintiff
Hare, Wynn, Newell & Newton
2025 3rd Avenue North; Suite 800
Birmingham, Alabama  35203
Telephone: 205-328-5330

Fascimile: 205-324-2165
bvines@hwnn.com

# EXHIBIT 4

E-SERVICE
51536536
Apr 04 2013
02:35PM
File & ServeXpress

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re: VIOXX Products Liability Litigation

|  |  |
|---|---|
| | * MDL No. 1657 |
| This Document Relates to: | * |
| | * SECTION L |
| JIM HOOD, ATTORNEY GENERAL *ex* | * |
| *rel*., STATE OF MISSISSIPPI | * JUDGE ELDON E. FALLON |
| | * |
| v. | * MAGISTRATE JUDGE |
| | * KNOWLES |
| MERCK & CO., INC. | * |
| | * |
| Civil Action No. 2:05-cv-6755 | * |
| * * * * * * * * * * * * * * * * * * * * * * * * * | |
| | * |

### PLAINTIFF'S NOTICE OF 30 (b)(6) DEPOSITION OF MERCK

**PLEASE TAKE NOTICE** that pursuant to Fed. R. Civ. P. 30 (b) (6), Plaintiff, Jim

Hood, Attorney General of the State of Mississippi, *ex rel*. the State of Mississippi, by and

through its undersigned counsel of record acting as duly-appointed Special Assistant Attorney

General, will take the videotaped deposition (s) of the Defendant as an organization concerning

each of the matters identified in Exhibit A, which is attached hereto. This deposition (s) will take

place at a location, date, and time before the close of fact discovery to be agreed upon by

counsel. The deposition (s) may occur over several days if more than one person is necessary to

provide the information requested. The deposition (s) will be taken will be taken before a

certified court reporter and will be videotaped.

DATED this 4th day of April, 2013.

BY:    /s/ Sheila M. Bossier
SHEILA M. BOSSIER, (LA Bar No. 19491)
**Attorney for JIM HOOD, ATTORNEY
GENERAL,** *ex rel* **THE STATE OF
MISSISSIPPI**

**OF COUNSEL:**

**BOSSIER & ASSOCIATES, PLLC**
P. O. Box 55567
Jackson, MS  39296
Telephone: (601) 352-5450
Facsimile:   (601) 352-5452

Geoffrey Morgan, Esq.
George W. Neville
**OFFICE OF THE ATTORNEY GENERAL**
P. O. Box 220
Jackson, MS  39205
Telephone: (601) 359-3821

Richard A. Freese, Esq.
**FREESE & GOSS, PLLC**
Regions Harbert Center
1901 6th Avenue North
Suite 3120
Birmingham, AL 35203
Telephone: (205) 871-4144
Facsimile:   (205) 871-4104

Shane Langston, Esq.
Rebecca Langston, Esq.
Jessica Murray, Esq.
**LANGSTON & LANGSTON, PLLC**
Post Office Box 23307
Jackson, MS 39225
Telephone: (601) 969-1356
Facsimile: (601) 968-3866

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing has been served on Liaison Counsel by U.S.

Mail and upon all parties by electronically uploading the same to LexisNexis File and Service

Advance this 4th day of April, 2013.

   /s/ Sheila M. Bossier
SHEILA M. BOSSIER, (LA Bar No. 19491)
**Attorney for JIM HOOD, ATTORNEY
GENERAL, *ex rel* THE STATE OF
MISSISSIPPI**

3

# EXHIBIT A

## DEPOSITION TOPICS

In accordance with Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendant

shall designate one or more officers, directors, managing agents, employees, or other sufficiently

knowledgeable persons to testify concerning the following topics:

1.    Any and all communications between any employee, agent, or contractor of Merck and any healthcare provider in the State of Mississippi regarding Vioxx.

2.    Any and all communications between any employee, agent, or contractor of Merck and any government official in the State of Mississippi regarding Vioxx from 1998 to 2006.

3.    Merck's marketing efforts and promotional activities in the State of Mississippi relating to Vioxx, from 1998 to 2006.

4.    Any and all payments by Merck to healthcare providers in the state of Mississippi, relating to the sale, promotion, safety, efficacy or other attribute of Vioxx, from 1998 to 2006.

5.    Any and all documents related to the detailing of Mississippi healthcare providers for Vioxx, from 1998 to 2006.

6.    Merck's compliance with Mississippi regulations, statutes and laws concerning the development, testing, manufacture, approval, monitoring, sales, marketing, advertising, and promotion of Vioxx in the State of Mississippi.

7.    Merck's involvement with any United States investigatory body that conducted an investigation relating to Vioxx, including Congressional committees, the Department Of Justice, the Office of Inspector General of the Department of Health and Human Services, the SEC, State Attorneys General, and State Medicaid Fraud Control Units, during the criminal investigation(s) that led to Merck's guilty plea to one count of misdemeanor misbranding in November, 2011 and sentencing in April, 2012.

# EXHIBIT 5

# 𝔊𝔞𝔯𝔪𝔢𝔯 & 𝔓𝔯𝔞𝔱𝔥𝔢𝔯, 𝔓𝔏𝔏ℭ

### ATTORNEYS AT LAW

141 NORTH BROADWAY
LEXINGTON, KENTUCKY 40507
(859) 254-9351 • Fax (859) 233-9769
www.garmerprather.com

WILLIAM R. GARMER
JEROME P. PRATHER
SEAN E. MOYNAHAN

E-mail: bgarmer@garmerprather.com
jprather@garmerprather.com
smoynahan@garmerprather.com

August 1, 2011

VIA EMAIL: Joseph_Escandon@laed.uscourts.gov
The Honorable Eldon E. Fallon
United States District Court
Eastern District of Louisiana
500 Poydras Street, Room C-456
New Orleans, Louisiana  70130

      RE:    **In Re:Vioxx Products Liability Litigation,** MDL 1657

Dear Judge Fallon:

      The purpose of this letter is to provide the Court with the Commonwealth's proposed scheduling order. The parties were unable to provide a joint-proposal to the Court. Instead, we agreed to provide our individual proposals today and respectfully request that these issues be addressed at the August 4, 2011, Status Conference.

      The centerpiece of the Commonwealth's proposal is a request for this Court to quickly consider and rule on the Commonwealth's motion to remand. Recent events confirm that this issue is ripe for determination. First, an agreement in principle has been reached with the Plaintiffs' Steering Committee regarding access to the trial package and the common-benefit fee for the Commonwealth's CPA claim. Second, Merck's actions confirm that there is no chance for global settlement in the MDL and the Commonwealth has formally rejected the NAMFCU settlement.

      As this Court recognized in February 2010, when "we get to the point where there is no more to be gained from a joint discovery and no more to be gained from an opportunity to globally resolve the matter, then it's time to make a decision on" the "serious" motions to remand. (2/3/2010 Status Conference Transcript, 11:1-8). Respectfully, we have reached that point. Rather than work with the Commonwealth towards resolution, Merck has used the false promise of settlement to delay and now asks this Court to consider dispositive issues prematurely. The only discovery remaining for the Commonwealth is specific to Kentucky and can easily be dealt with in Kentucky state court. Whether Merck improvidently removed this case to federal court should now be decided.

      The Commonwealth's proposal is attached as Exhibit A. Although the proposal provides dates for discovery in this Court, the Commonwealth's desire is for this case to be remanded to

M01SD26076

state court as soon as possible. Below, I provide a detailed explanation of why considering remand is the appropriate next step.

A. Remand is Appropriate Because the Joint Discovery Benefit of the MDL Has Been Exhausted by the Commonwealth.

The Commonwealth has exhausted the avenues for common discovery in the MDL. The Commonwealth heeded the advice of this Court and has reached an agreement in principle with the PSC regarding the trial package. The Commonwealth has also taken advantage of the document repository during the extended stay of these proceedings. Accordingly, the Commonwealth has received the full benefit of the lengthy and voluminous discovery that this Court has overseen for the past six years.

The only discovery remaining for the Commonwealth's CPA claim is Kentucky specific. As laid out in detail in the Commonwealth's letter to the Court on May 31, 2011, the Commonwealth needs discovery only on the specific requests discussed in the letter as well as "Merck's sampling practice in the Commonwealth, specific marketing practices of Merck, the total number of prescriptions provided to citizens of the Commonwealth, and third-party productions related to the circulation of Merck advertisements in the Commonwealth." This Kentucky-specific discovery is not joint-discovery and need not take place in the MDL.

B. Remand is Appropriate Before Dispositive Issues are Considered

Merck cannot dispute that this Court should consider whether federal jurisdiction exists before resolving dispositive issues. As the Supreme Court has stated, "[w]hether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy." *Bell v. Hood*, 327 U.S. 678, 682 (1946); *see also, United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 920 (D.C. Cir. 1999) (stating that Rule 12(b)(1) jurisdictional challenges should be addressed before Rule 12(b)(6) challenges); *Sledge v. United States*, 723 F.Supp. 2d 87, 91-92 (D.D.C. 2009) ("[I]f a court is uncertain as to whether jurisdiction exists, it cannot proceed to consider the merits of the case."). Despite this black-letter law, Merck's proposal insists that the statute of limitations issue should be decided before this Court has considered remand.

The only proposal provided by Merck to the Commonwealth includes a schedule for briefing that would address "Merck's contention that further discovery is inappropriate because the Commonwealth's claims are not legally cognizable." (Merck Proposal p. 3) (attached hereto as Exhibit B). During our meet and confer, Merck's counsel confirmed that they consider the statute of limitations issue relevant to the "scope" of discovery. The Commonwealth asks this Court to consider that requested briefing for what it is–a motion to dismiss.[1]

_____

[1] The Commonwealth presumes that if Merck were successful in its proposed motion for a "protective order," their position would be that the Commonwealth's claim could not proceed on the evidence the Commonwealth already possesses. In other words, that motion is about the ultimate merit of the Commonwealth's claim, not the scope of future discovery.

To be sure, the Commonwealth is not opposed to resolving the statute of limitations' issue, but that issue should be resolved in Kentucky state court. First, as discussed above, the question of federal jurisdiction is precedent. Second, as the Commonwealth described in its March 29, 2011, letter to the Court, the discovery rule is "alive and well" in the Commonwealth and its application is an issue of state law that should be decided by a state court. *Wilson v. Paine*, 288 S.W.3d 284, 285-86 (Ky. 2009). Finally, the question of when the statute of limitations accrued will be one of fact to be ultimately resolved by a jury. *See e.g.*, *Sapp v. CSX Transport, Inc.*, 300 S.W.3d 219, 221 (Ky. Ct. App. 2009).

Merck wants to have its cake and eat it too. Merck's proposed scheduling order would have this Court resolve a dispositive issue that should be resolved at a later date and in a different forum, while delaying the Commonwealth's motion to remand. If Merck insists that this issue be resolved, it should be resolved after this Court determines whether Merck improvidently removed this case.

C. Merck's Recalcitrance and Delay Make Remand the Only Viable Option for Progress.

On November 22, 2010, almost nine months ago, Mr. Beisner proposed a 30-day stay because, in his words, "we may have an avenue to achieve resolution of this litigation." (11/22/10 Status Conference Transcript 11:11-25). Rather than resolution, it appears Merck's only goal has been to delay the MDL and the Commonwealth's claim. At status conference after status conference, we heard that Merck was making progress, but no results were presented. Every time this Court permitted the Commonwealth to move forward, it was met by Merck's delay. Finally, the opportunity to seriously discuss settlement was squandered by Merck's intractable position that the Commonwealth's CPA claim has no value.

1. *Merck Manipulated the NAMFCU Process to Preclude Non-Medicaid Claims.*

As this Court is aware, throughout the winter, spring, and early summer, Merck was unable to reach an agreement regarding the NAMFCU settlement—leading to an ever-extending stay of these proceedings. It is the Commonwealth's understanding that the delay was related to Merck's desire to use the NAMFCU settlement documents to preclude all claims a state may have against Merck. Now that the information has been disseminated to the states, it is clear that acceptance of the NAMFCU settlement precludes all Vioxx-related claims. Although the DOJ and NAMFCU personnel disclaimed any ability to release such claims, Merck has successfully used the NAMFCU process to do just that.

2. *Merck Did Not Respect the July Mediation.*

Arguably, the culmination of this nine-month process was the mediation. The stated purpose of that mediation was to discuss the global settlement of all of the states' claims. During the July 1, 2010, telephonic conference, Mr. Beisner "endorse[d]" Ms. Barrios's idea of a mediation that would attempt to globally resolve all of the states' claims. (7/1/11 Transcript 9:11-10:3, 12:14-25, 13:3-16). The purpose of the mediation was confirmed by the instruction given to the states to come prepared to "discuss amounts, to come to a tentative agreement, and

M01SD26078

to recommend it to the AG." (7/12/11 D. Barrios Email). The given to the states to come prepared to "discuss amounts, to come to a tentative agreement, and to recommend it to the AG." (7/12/11 D. Barrios Email). The mediation was to be one with a "high level of discussion" and no "games were to be played." (*Id*.). It is the Commonwealth's understanding that the same instructions were given to Merck.

In accordance with those instructions, the Commonwealth's lawyers briefed the Attorney General's office on the status of the litigation, received settlement authority, and prepared documents and a position statement to facilitate serious negotiations with Merck. In addition to the Commonwealth, every state went to these lengths and traveled from all over the country, at great expense, to attend the mediation.

Unfortunately, Merck was unwilling to discuss settlement of the states' claims. Merck's position was that the only money available for settlement was the money available through the NAMFCU process (the same amounts available to the non-litigating states). Needless to say, it was not necessary for the states' to travel to New Orleans to learn that Merck was not going to negotiate non-Medicaid claims. After nine months of delaying the Commonwealth's CPA claim, Merck's position appears to be NAMFCU or nothing.

### 3.   *Merck Has Delayed Kentucky-Specific Discovery at Every Turn.*

Merck has repeatedly and consistently delayed the Commonwealth's Court-approved attempts to pursue Kentucky specific discovery. As we pointed out to the Court in the Commonwealth's May 31, 2011, letter, it took almost two months for the Commonwealth to understand Merck's position on the specific discovery requests we provided to Merck on April 11, 2011.

More recently, Merck has delayed the joint scheduling order for over a month. Although an agreement was reached, and confirmed, that the parties would provide the Court with a joint proposal roughly two weeks after the June 22 status conference, Merck waited until July 20 to provide the Commonwealth with a response to the Commonwealth's initial proposal. During the mediation, the Commonwealth was informed that Merck unilaterally decided to postpone negotiations on a joint proposal until after the mediation. Of course, given Merck's position that it would offer no more money than NAMFCU, the Commonwealth is at a loss for how Merck's "preparations" for mediation impeded our joint proposal negotiations.

### 4.   *Merck's Current Proposal is Another Example of Its Desire to Delay; the Commonwealth's Proposal is a Reasonable Alternative*

Having strung the Commonwealth along for nine months only to value the Commonwealth's CPA claim at zero in mediation, the Commonwealth is frustrated that Merck's proposed schedule could drag this litigation far into 2012. First, as the Court can determine for itself, it is difficult to understand what dates Merck is proposing because its proposal fails to

M01SD26079

include a single date.  Instead, it is an inter-connected web of contingent dates and "trigger dates."[2]

Based on the Commonwealth's best estimate and interpretation of Merck's proposed schedule, if this Court ruled on every question presented to it within *one week* of the completion of briefing, the Commonwealth could file its motion to remand sometime in July 2012.  Needless to say, given the burden of this Court's caseload, that is an aggressive estimate.  The Commonwealth believes this case should be ready for trial in July of 2012.  Merck's proposal makes that impossible.

Merck also proposes to delay Kentucky-specific discovery by making it contingent on a determination by this Court that the Commonwealth's response to earlier discovery was "appropriate." (Merck Proposal p. 5).  The Commonwealth sees no need to inject an inevitable future dispute as another "stay" mechanism to delay this litigation.  If Merck has issues with the Commonwealth's discovery responses, we can use the method detailed in the Commonwealth's proposal to present the issue to the Court.  In short, Merck's proposal is a confusing, contingent schedule that will inevitably delay the Commonwealth's claim well into 2012, and likely 2013.

The Commonwealth's proposal speaks for itself, but we consider it to be a reasonable proposal for moving this litigation forward.  The Commonwealth has patiently waited for Merck to negotiate the NAMFCU settlement and has recently been disappointed that Merck was not willing to seriously discuss settlement of all of the Commonwealth's claims.  Accordingly, if this Court determines that it should delay consideration of the Commonwealth's motion to remand, we ask that a schedule similar to the one the Commonwealth proposed be adopted.

### D.   This Case was Improvidently Removed and Should Be Remanded.

The Commonwealth requests this Court to consider its argument that Merck improvidently removed this case to federal court.  Importantly, neither this Court nor the Eastern District of Kentucky has considered whether Merck improvidently removed this case.  At this point, the Commonwealth's claim is in federal court based only on Merck's notice of removal.  That notice asserts two bases for federal jurisdiction, both of which are, quite simply, a stretch.

First, Merck argues the Commonwealth's claim "implicates" issues related to the FDCA. (Merck Notice of Removal ¶ 8).  Setting aside the inaccuracy of that assertion, *Merrell Dow Pharmaceuticals v. Thompson*, 478 US 804 (1986), as affirmed by *Grables & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), held that even explicit FDCA issues are insufficient to confer federal jurisdiction.  Next, Merck suggests there is diversity under CAFA because "it can be inferred" that the Attorney General "intends" to seek restitution on behalf of Kentucky consumers.  (Merck Notice of Removal ¶ 20).  Merck's reliance on the Commonwealth's request for "such other relief as the Court deems appropriate" to support this assertion is tenuous at best.  (*Id.*).  It is "well accepted that a state is the real party in interest when it brings a claim for civil penalties because such awards add only to the state's

---

[2] Besides Merck's insistence to resolve the statute of limitations issue, the other sticking point in our joint-proposal negotiations was Merck's unwillingness to provide hard dates in the proposal.

coffers rather than any individual's bank account." *West Virginia ex rel. Graw v. Comcast Corp.*, 705 F.Supp.2d 441, 447 (E.D. Pa. 2010). Accordingly, the Commonwealth is the only plaintiff and there is no CAFA jurisdiction.

The Commonwealth is confident that once these issues are presented to the Court, it will be clear that Merck's notice of removal is insufficient to establish federal jurisdiction. Given the work the Commonwealth has completed in the MDL, the agreement regarding the trial package with the PSC, and Merck's failure to seriously work towards resolution of this claim, it is appropriate for this Court to consider this issue as soon as possible.

We apologize for the length of this letter, but were compelled to explain to the Court the basis of the Commonwealth's request that remand be quickly considered. Under the scheduling order entered by this Court on June 28, 2010, the Commonwealth's motion to remand would be set for hearing sometime after June 11, 2011. Needless to say, that date has come and gone and the Commonwealth is no closer to having these issues considered.

Thank you for your consideration of these issues.

Very truly yours,

William R. Garmer

Wrg/kng
Cc: Patrick A. Juneau, (via E-mail)
    John Beisner, (via E-mail)
    Ben Barnett, (via E-mail)
    Richard Josephson, (via E-mail)
    Dawn M. Barrios, (via E-mail)
    Andy D. Birchfield, Jr., (via-E-mail)
    Scott Powell, (via E-mail)
    Matt Minner, (via E-mail)
    Don McKenna, (via E-mail)
    Brian Vines, (via E-mail)

M015D2608

# EXHIBIT 6

E-SERVICE
49281264
Feb 04 2013
04:44PM
File & ServeXpress

**COMMONWEALTH OF KENTUCKY**
**FRANKLIN CIRCUIT COURT**
**CIVIL ACTION NO. 09-CI-1671**

COMMONWEALTH OF KENTUCKY, EX REL.
JACK CONWAY, ATTORNEY GENERAL                                    PLAINTIFF

v.

MERCK & CO., INC.                                               DEFENDANT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**NOTICE OF RULE 30.02(6) DEPOSITION OF THE**</u>
<u>**CORPORATE REPRESENTATIVE OF MERCK & CO., INC.**</u>

TO:        Tarek Ismail, Esq.
           Goldman, Ismail, Tomaselli, Brennan & Baum, LLP

DATE:      To be agreed upon by counsel

TIME:      9:00 a.m.

LOCATION:  Hare, Wynn, Newell & Newton, LLP Lexington Office
           200 West Vine Street
           Suite 700
           Lexington, KY 40507


     Please take notice that at the above stated time, date and location, the plaintiff
will, by oral examination, take the testimony of the corporate representative(s) most
knowledgeable or best qualified to testify in this case concerning the areas of inquiry
that follow.  **If Merck intends to designate more than one person to respond the
below areas of inquiry, please advise the Commonwealth, at least one week prior
to the deposition(s), of the name of each deponent, and the areas of inquiry for
which each deponent will give responsive testimony.**

    1.  The sale, promotion and marketing of VIOXX in the Commonwealth of
        Kentucky.

    2.  The structure of Merck's sales-force in Kentucky responsible for the
        promotion of Vioxx, including but not limited to, the number of sales
        representatives, the organizational structure, and the tactical or strategic
        plans for the promotion of Vioxx within the Commonwealth of Kentucky.

3. The training and mentoring of sales representatives responsible for the promotion of Vioxx within the Commonwealth of Kentucky.

4. The distribution and date of each of the Dear Doctor letter, Dear Pharmacist letter, Dear, Healthcare Provider letter, PIR letter, and Letter's online letter, that in any way concerned VIOXX, within the Commonwealth of Kentucky.

5. The circulation, and circulation data, of all Vioxx print advertisements within the Commonwealth of Kentucky.

6. How Merck or its agents determine or estimate the number of Kentucky residents who were exposed to Merck's print advertisements for Vioxx.

7. The number of Kentucky residents who were exposed to Merck's Vioxx television advertisements aired in the Commonwealth of Kentucky Viewing area.

8. How Merck or its agents determine or estimate the number of Kentucky viewers who saw or were exposed to a particular Vioxx television advertisement.

9. The number of Kentucky residents who were sent direct to consumer mail pieces concerning Vioxx; how Merck determines the intended recipients of those direct to consumer mailings; and, the demographics of the intended recipients of each direct to consumer mail piece and the contents of each direct to consumer mail piece.

10. The detail and promotional pieces that Merck sales representatives were permitted to leave with health care providers concerning Vioxx, and the number of each such detail piece that were distributed to health care providers within the Commonwealth of Kentucky.

11. The number of Vioxx Package Inserts, PPIs and labels and each variation thereof, that were distributed within the Commonwealth of Kentucky.

12. Explanation of all spreadsheets Merck has produced regarding its distribution of direct to consumer mailings, Dear Healthcare Provider letters, print advertisements, television commercials, package inserts, patient prescribing information sheets, labels, PIR letters, Letters online letters, and scientific articles.

13. The number of unique Kentucky residents that filled a prescription for Vioxx during the entire time period Vioxx was on the market - broken down by month and year.

14. The distribution of Vioxx samples within the Commonwealth of Kentucky, including but not limited to, the number of samples distributed by year, month and strength, written materials that accompanied the samples, the purpose of the samples, and any instructions given by Merck for distribution of said samples.

15. The FACTS database and the information it contains on the promotion, marketing and sale of Vioxx within the Commonwealth of Kentucky.

16. The distribution and circulation within the Commonwealth of Kentucky of each Merck Press Release related to Vioxx.

17. The distribution, circulation and/or viewership of the GI benefit video(s) featuring Dr. Lorne Laine within the Commonwealth of Kentucky.

18. The Cardiovascular Card (also referred to as the CV Card), the contents thereof and its distribution and use within the Commonwealth of Kentucky.

19. The marketing of Vioxx to people over 60 years of age within the Commonwealth of Kentucky.

20. All scientific articles in anyway concerning Vioxx that were distributed within the Commonwealth of Kentucky for which Merck employees or consultants were either named authors or ghost authors, including but not limited to who wrote what, the scientific basis for the conclusion, and the distribution within the Commonwealth of Kentucky for each article.

21. All scientific articles in anyway concerning Vioxx that were distributed within the Commonwealth of Kentucky, including the number of articles or reprints distributed within the Commonwealth and to whom they were distributed.

22. Merck's espousing of the cardio protective effect of Naproxen, and the basis therefore, both nationally and within the Commonwealth of Kentucky.

23. Merck's marketing of the pain efficacy, pain superiority or pain relief compared to other pain relievers within the Commonwealth of Kentucky.

24. Merck audio conferences and their availability to healthcare providers in the Commonwealth of Kentucky and whether any Kentucky healthcare providers participated.

25. Merck's use of outside vendors or third parties to promote Vioxx and distribute marketing materials within the Commonwealth of Kentucky.

26. The Vioxx label, and all changes thereto during the initial approval phase and subsequent marketing of Vioxx until it was pulled from the market, including,

but not limited to Merck's obligations with regard to the label and warning patients of risks of the drug known to Merck.

27. The hiring, by Merck, of Peter Honig from the FDA Office of Drug Safety to become Vice President, Worldwide Product Safety and Quality Assurance for Merck Research Laboratories, the negotiation of Honig's employment with Merck and Honig's role in reviewing VIOXX clinical trial data and /or approving the label change for Vioxx.

28. The gross sales of Vioxx by Merck within the Commonwealth of Kentucky and the profits Merck obtained from those sales.

29. Any and all bonus plans or awards related to sales and marketing of Vioxx, including but not limited to, bonuses applicable to sales representatives responsible for marketing Vioxx in the Commonwealth of Kentucky as well as the sales representatives' managers up the chain of command.

30. Any and all bonuses, awards, incentives, or travel offered to physicians or other healthcare providers by Merck related in anyway to the promotion or prescribing of Vioxx.

31. The amounts budgeted by Merck for the marketing and promotion of Vioxx within the Commonwealth of Kentucky, or any geographical subdivision that includes the Commonwealth, from 1998 through 2004.

32. The amounts spent by Merck for marketing and promotion of Vioxx within the Commonwealth of Kentucky, or any geographical subdivision that includes the Commonwealth, from 1998 through 2004.

33. The amounts budget and spent by Merck for marketing and promotion of Vioxx, nationwide and globally, from 1998 through 2004.

34. Protocol 78 entitled: The Safety and Efficacy of MK-966 for the Prevention of Alzheimer's Disease in Patient's at Risk. This category includes, but is not limited to: study design, participation by Kentucky residents, informed consent, disclosures to study participants, study oversight, study protocols, study endpoints, and study results.

35. The facts that support Merck's contention that all or any part of the Commonwealth's claim is allegedly barred by the applicable statute of limitations.

36. Communications with representatives of the Commonwealth of Kentucky about the drug Vioxx and the specific risks Merck was aware of related to Vioxx.

37. Merck's settlement with the Department of Justice regarding the sale and promotion of Vioxx.

38. Merck's VMX messaging system and the storage and retention, including all deliberation and decisions regarding storage and retention policies of VMX messages.

39. Merck's policies and procedures regarding the release of patient level data from clinical trials for both the United States and Europe.

40. Merck's reporting and/or release (or that of any company currently associated with Merck) of clinical trial data for Vytorin and the delay in release of said data.

41. Merck's post-marketing safety studies for Vioxx and Januvia.

42. Reports containing Vioxx data that were submitted to FDA relating to Arcoxia and all revisions of such reports, including identity of authors and those making revisions.

Said deposition will be conducted for the purpose of discovery and/or use as evidence in the action before the court reporter or before some other duly qualified officer, in accordance with the Kentucky Rules of Civil Procedure. The oral examination will continue day to day until completed and may be videotaped.

Plaintiff requests that at the place of the taking of the deposition, that the deponent, bring with him/her copies of the documents and things that follow below. **Alternatively, Merck may refer the Plaintiff to documents previously produced that are responsive to said category by providing the Bates numbers of the responsive documents at least one week prior to the scheduled deposition.**

1. Any and all training or mentoring materials given to sales representatives responsible for the promotion of Vioxx in Kentucky.

2. Any and all organization charts that show the structure of Merck's sales-force in Kentucky responsible for the promotion of Vioxx.

3. Any and all documents that evidence or reflect how Merck or its agents determine or estimate the number of Kentucky residents who were exposed to Merck's print advertisements for Vioxx.

4. Any and all documents that evidence or reflect how Merck determines the intended recipients of direct to consumer mailings; and, the demographics of the

intended recipients of each direct to consumer mail piece within the Commonwealth of Kentucky.

5. Any and all documents that evidence or reflect the number of unique Kentucky residents that filled a prescription for Vioxx during the entire time period Vioxx was on the market.

6. Any and all documents that evidence or reflect Merck's efforts market Vioxx to people over 60 years of age within the Commonwealth of Kentucky.

7. Any and all documents that evidence or reflect the Kentucky healthcare providers (names and total number) that participated in Merck audio conferences regarding Vioxx.

8. Any and all documents that evidence or reflect the gross sales of Vioxx by Merck within the Commonwealth of Kentucky and the profits Merck obtained from those sales.

9. Any and all documents that evidence or reflect any and all bonus plans or awards related to sales and marketing of Vioxx including but not limited to, bonuses applicable to sales representatives responsible for marketing Vioxx in the Commonwealth of Kentucky as well as the sales representatives' managers up the chain of command.

10. Any and all documents that evidence or reflect any and all bonuses, awards, incentives, or travel offered to physicians or other healthcare providers by Merck related in anyway to the promotion or prescribing of Vioxx.

11. Any and all documents that evidence or reflect the amounts budgeted by Merck for the marketing and promotion of Vioxx within the Commonwealth of Kentucky, or any geographical subdivision that includes the Commonwealth, from 1998 through 2004.

12. Any and all documents that evidence or reflect the amounts spent by Merck for marketing and promotion of Vioxx within the Commonwealth of Kentucky, or any geographical subdivision that includes the Commonwealth, from 1998 through 2004.

13. Any and all documents that evidence or reflect the amounts budgeted and spent by Merck for marketing and promotion of Vioxx nationwide and globally from 1998 through 2004.

14. Any and all documents that evidence or reflect the facts that support Merck's contention that all or any part of the Commonwealth's claim is allegedly barred by the applicable statute of limitations.

15. Any and all documents that evidence or reflect communications with representatives of the Commonwealth of Kentucky about the drug Vioxx and the specific risks Merck was aware of related to Vioxx.

Respectfully submitted,

**JACK CONWAY**
**ATTORNEY GENERAL**

*Maryell B Mynear*

TODD E. LEATHERMAN
Executive Director
MARYELLEN B. MYNEAR
Litigation Branch Manager
ELIZABETH UNGAR NATTER
Assistant Attorney General
Office of Consumer Protection
Office of the Attorney General
1024 Capital Center Drive; Suite 200
Frankfort, Kentucky 40601
Telephone: 502/696-5389

SCOTT A. POWELL
DON MCKENNA
MATTHEW C. MINNER
BRIAN VINES
Hare, Wynn, Newell & Newton, LLP
2025 3rd Avenue North; Suite 800
Birmingham, Alabama 35203
Telephone: (205) 328-5330
Facsimile: (205) 324-2165

WILLIAM R. GARMER
JEROME P. PRATHER
Garmer & Prather, LLC

141 North Broadway
Lexington, Kentucky 40507
Telephone: 859/254-9351
Facsimile: 859/233-9769

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all parties by electronically uploading the same to LexisNexis File & Serve on this the 4th day of February, 2013.

OF COUNSEL

# EXHIBIT 7

Page 1

COMMONWEALTH OF KENTUCKY

FRANKLIN CIRCUIT COURT


- - -



COMMONWEALTH OF KENTUCKY,:
EX REL. JACK CONWAY,      :
ATTORNEY GENERAL,         :
     Plaintiff,           : CIVIL ACTION NO.
                          : 09-CI-1671
     vs.                  :
                          :
MERCK & CO., INC.,        :
     Defendant.           :


- - -

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Thursday, May 9, 2013

- - -


Videotaped deposition of THOMAS

ROBERT CANNELL, held at DECHERT, L.L.P.,

Cira Centre, 21st Floor, 2929 Arch Street,

Philadelphia, Pennsylvania, commencing at

approximately 8:33 a.m., before Rosemary

Locklear, a Registered Professional

Reporter, Certified Realtime Reporter,

Certified Court Reporter (NJ) and Notary

Public.

1    position?

2        A.    I am president of Merck Canada.

3        Q.    And do you reside in Canada now?

4        A.    I do.  In Montreal.

5        Q.    It's my understanding from your

6    prior depositions with regard to Vioxx, you

7    were the executive marketing director for

8    Merck on Vioxx from February of 2001 until

9    December of 2002; is that correct?

10       A.    That's correct.

11       Q.    And then you were responsible for

12   positioning consumer promotion?

13       A.    That's correct.  In that role in

14   marketing.

15       Q.    Okay.  And then it's my

16   understanding also you had some

17   responsibility for Vioxx in a subsequent

18   position until its withdrawal in September

19   of 2004.

20       A.    That's correct.  In sales

21   leadership positions.

22       Q.    Okay.  And can you give us the

23   benefit of those sales leadership positions?

24       A.    Yes.  So from December of 2002 to

1   been responsible for all products.

2       Q.    Okay.

3            (Exhibit 1 was marked for

4   identification.)

5   BY MR. McKENNA:

6       Q.    I'll give you what I'm marking as

7   Exhibit 1, which is the Deposition Notice

8   for today.

9       A.    Okay.

10           MR. McKENNA:  I didn't bring

11  three copies of the dep -- I've got other

12  copies.  The depo notice I figured you had.

13           MR. GOLDMAN:  Let me just see

14  the one that you're marking.

15           MR. McKENNA:  Okay.

16  BY MR. McKENNA:

17      Q.    Have you had a chance to review

18  this Notice before?

19      A.    I have.

20      Q.    And there are one, two, three,

21  four, eight topics that you're -- you've

22  been designated to give testimony on.  I

23  just want to go through each of those and

24  ask you, do you have knowledge and can you

1   speak to each of those topics?

2            Number one is the sale,

3   promotion and marketing of Vioxx in the

4   Commonwealth of Kentucky.

5            Do you have knowledge about

6   that?

7       A.   I do.

8       Q.   Okay.

9            MR. GOLDMAN:  And just so we're

10  clear for the record, Mr. McKenna, Merck has

11  submitted written objections to a number of

12  the topics, given the breadth and so forth

13  of your Notice, and Mr. Cannell has prepared

14  as best as he could to be able to testify on

15  behalf of Merck with respect to those

16  topics, keeping in mind the nature of our

17  objections and in light of the comments that

18  Judge Shepherd made during the hearing.

19           MR. McKENNA:  Okay.

20  BY MR. McKENNA:

21      Q.   And I know Number 1 is a pretty

22  broad topic.  And is there anybody at Merck

23  that -- that's still an employee of Merck

24  that you know of that might be more

1    knowledgeable than you regarding Topic

2    Number 1?

3         A.    Well, it's so broad, I think if

4    -- as we get into it, I can probably help by

5    for that specific topic kind of indicating

6    who, but -- but it's still so broad that I

7    feel like it could be dozens of people --

8         Q.    Okay.

9         A.    -- depending on the topic.

10        Q.    All right.  Topic 18 is the

11   cardiovascular card, the contents thereof

12   and its distribution and use within the

13   Commonwealth of Kentucky.

14             Do you have knowledge regarding

15   that topic?

16        A.    I do.

17        Q.    And would there be anybody you

18   can think of at Merck that might have more

19   knowledge regarding the cardiovascular card?

20        A.    So perhaps, depending on -- on

21   the questioning and where you want to go, it

22   might be useful also to talk to local sales

23   management or local representatives, but it

24   -- it's still kind of a broad category in

1    terms of where you want to go with it.  So I

2    think I can speak to some parts of it and --

3    and then there might be others who would be

4    useful.

5        Q.    Okay.  Do you have the names of

6    others off the top of your head who might be

7    useful?

8              MR. GOLDMAN:  Objection.  It

9    lacks foundation.

10             THE WITNESS:  Not -- not yet,

11   but I'll -- I'll try to -- sometimes I'll

12   have names for you, I think, depending on

13   the --

14             MR. McKENNA:  Okay.

15             THE WITNESS:  -- the topic.

16             And I'll try to -- if I don't

17   think I'm the person most knowledgeable,

18   I'll try to help in terms of who might be.

19             MR. McKENNA:  Okay.  Fair

20   enough.

21   BY MR. McKENNA:

22       Q.    The next topic is the marketing

23   of Vioxx to people over 60 years of age

24   within the Commonwealth of Kentucky.

Page 15

1              Do you have knowledge regarding

2    that topic?

3        A.    I do.

4        Q.    Okay.

5        A.    And probably same response.

6    Depending on the conversation, there might

7    be others.

8        Q.    Okay.  Topic 23 is Merck's

9    marketing of the pain efficacy, pain

10   superiority or pain relief compared to other

11   pain relievers within the Commonwealth of

12   Kentucky.

13             Do you have knowledge of that?

14       A.    I do.  Same response.  Yeah.

15       Q.    Okay.  29 is any and all bonus

16   plans or awards related to sales and

17   marketing of Vioxx, including but not

18   limited to, bonuses applicable to sales

19   representatives responsible for marketing

20   Vioxx in the Commonwealth of Kentucky as

21   well as the sales representatives' managers

22   up the chain of command.

23             Do you have knowledge regarding

24   that topic?

 1      A.    I do.

 2      Q.    Would you be the person most

 3   knowledgeable regarding that?

 4             MR. GOLDMAN:  Object to the

 5   form.  Overbroad.

 6             THE WITNESS:  It, again, would

 7   be hard to say, depending on -- on where we

 8   went.  I might be -- and we have -- we've

 9   produced a lot of the reference documents so

10   I think we could get through a lot of it,

11   yeah.

12             MR. McKENNA:  Okay.

13   BY MR. McKENNA:

14      Q.    Number 30, any and all bonuses,

15   awards, incentives or travel offered to

16   physicians or other health care providers by

17   Merck related in any way to the promotion or

18   prescribing of Vioxx.

19             Do you have knowledge regarding

20   that?

21      A.    I would say I think I can speak

22   to it.  What I would say is I -- I don't

23   think that actually existed but I think we

24   can get into that when it occurs.  So I just

1   want to be -- try to be precise on the

2   answer.

3        Q.    Okay.   Number 31, the amounts

4   budgeted by Merck for the marketing and

5   promotion of Vioxx within the Commonwealth

6   of Kentucky or any geographical subdivision

7   that includes the Commonwealth from 1998

8   through 2004.

9              Can you speak to that?

10      A.    Same response.  You know, I don't

11  know if it's a question that can be answered

12  but I -- I -- we've thought about it and

13  kind of researched it so I'm prepared to

14  speak to it.

15      Q.    Okay.  And then the last one is

16  the amount spent by Merck for marketing and

17  promotion of Vioxx within the Commonwealth

18  or any geographic subdivision that includes

19  the Commonwealth from '98 through 2004.

20             Can you speak to that?

21      A.    Same -- same response.  Yeah.

22      Q.    Not sure it exists with regard,

23  but you've thought about it --

24      A.    Exactly.

1    had Vioxx, whether it's primary, secondary

2    or tertiary, as their drug?  Because

3    sometimes you have another drug that's your

4    primary drug.

5        A.    That's -- that would be my

6    assumption from looking at this, because I

7    think if it weren't, then they would

8    designate Group B but not Group A or

9    whatever it was.

10        Q.    Okay.  And so just by the fact

11    that it went to all people with

12    responsibility for Vioxx, it certainly went

13    to the sales reps who had responsibility for

14    Vioxx in Kentucky.

15        A.    That would be my impression, that

16    -- that our representatives or other field

17    personnel who were responsible for customers

18    in the Commonwealth would have received

19    this.

20        Q.    And I asked those questions not

21    to be silly, but we're here about

22    Kentucky --

23        A.    I understand.

24        Q.    -- and I just want to confirm

1    that.

2              Now, the data that is on the

3    card, particularly on the third page,

4    cardiovascular thromboembolic adverse events

5    per hundred patient years, and then the

6    chart below it, specific cardiovascular

7    thromboembolic events, there's a box to the

8    right, it says, data are based on nine

9    double-blinded studies in approximately

10   6,000 OA patients actively taking Vioxx,

11   active comparator, or placebo.  Studies

12   lasted from 6 weeks to a maximum duration of

13   86 weeks.  The average duration of treatment

14   was 5.5 months.  So is that the source of

15   the data for both charts here?

16      A.    That's -- you know, and as I

17   mentioned when we were looking at this

18   document, my impression -- and I wouldn't be

19   the expert, but we could find you one, but

20   my impression is that the cardiovascular

21   card was from Phase II and III clinical

22   trials for Vioxx which were part of the New

23   Drug Application.

24      Q.    Okay.  Are you familiar with the

1   applicable, given the new resource, so we

2   could check in April of 2000 and look at

3   field bulletins and answer that.

4            It -- my -- my belief that, is

5   that is probably the truth -- that's

6   probably true, that -- that we issued

7   something to say we're no longer using this

8   card.

9       Q.    Okay.  And why would it -- well,

10  why would Merck direct its reps not to use

11  the CV card after the April 2002 label

12  change?

13      A.    Well, so this card, as all -- as

14  all of our resources for representatives,

15  comes from the data in Phase II and Phase

16  III that were part of the label, but once

17  the VIGOR trial and the two Alzheimer's

18  trials were added, this was no longer kind

19  of the universe of clinical trial data in

20  the label for Vioxx so you would have to

21  make a completely different resource that

22  now reflected those -- those three new

23  studies as well.

24      Q.    Okay.  So you want to reflect all

1              And my answer was, first of

2     all, because the label was substantively

3     different with regards to cardiovascular

4     data and our pieces have to reflect the

5     label, and then I was also mentioning that

6     -- that now we were -- we were showing

7     cardiovascular data in even -- the balanced

8     cardiovascular data in even the primary

9     selling aid.  If that makes sense.

10       Q.    Which would include VIGOR.

11       A.    Which would include VIGOR.

12   That's correct.

13       Q.    After April of 2002.

14            MR. GOLDMAN:  Object to form.

15            THE WITNESS:  After April of

16   2002.

17            MR. GOLDMAN:  Don, whenever

18   you're ready take a break.

19            MR. McKENNA:  Sure.  I'll just

20   finish up on -- on this document.

21            MR. GOLDMAN:  Okay.

22   BY MR. McKENNA:

23       Q.    Would it be inappropriate, then,

24   after April of 2002 for a sales rep to

1    continue to use the cardiovascular card as

2    an obstacle handler?

3        A.    To be positive, I'd want to look

4    at those bulletins and confirm all of this.

5        Q.    Uh-huh.

6        A.    It's -- it's my recollection that

7    -- it's my recollection that after April of

8    2002 representatives were no longer -- were

9    instructed to no longer use this, but I

10   would want to -- if we really wanted to be

11   accurate and specific, I'd want to just look

12   at those April 2002 bulletins to confirm

13   that.

14       Q.    Okay.  Make sure you hear me on

15   the time frame here because I don't want to

16   be confusing.

17             Was the CV card ever halted at

18   any time from, it looks like May of 2000

19   until the label change in April 2002?  In

20   other words, during that time frame, when it

21   came out until the label change, did Merck

22   ever say -- was there a period of time where

23   it wasn't allowed to be used?

24       A.    Might have been.  I don't

1    one document, one copy.  You can look at it.

2    I've got the page tabbed and then we'll do

3    it.

4              MR. GOLDMAN:  Okay.  I'm going

5    to need another copy of this if you're going

6    to use it.

7              MR. McKENNA:  Yeah, I'm going

8    to use it just for that.  You can make a

9    copy at the break.

10             MR. GOLDMAN:  Okay.

11             (Exhibit 10 was marked for

12   identification.)

13   BY MR. McKENNA:

14     Q.    I'm marking Exhibit 10, which is

15   entitled "FDA Advisory Committee Briefing

16   Document, NDA 21-042, Vioxx Gastrointestinal

17   Safety," and I'm going to refer you to Page

18   19 and the part that says, similarly, the

19   sponsor conducted a meta-analysis of CV

20   thrombotic events in the OA database, and

21   the second paragraph under that says, none

22   of these studies were powered to detect

23   differences in serious CV thrombotic events

24   compared to the active comparator but, more

1   importantly, studies involved a different

2   population.

3               I'm going to show you that and

4   just ask you if during your time at Merck

5   you had ever seen that or were aware of it.

6       A.    I just might take --

7       Q.    Sure.

8       A.    -- a quick second just to flip

9   through.

10              Okay.  So I'm sorry.  Could you

11  repeat your question?

12      Q.    My question was, there is a

13  paragraph, it's the short paragraph, under,

14  similarly, the sponsor conducted a

15  meta-analysis.  You see that?  And if you --

16  right underneath, keep going down.

17      A.    Yeah.

18      Q.    One more paragraph down.

19      A.    Okay.

20      Q.    During your time at Merck were

21  you ever aware of that paragraph, which

22  says, none of the studies were powered to

23  detect differences in the serious CV

24  thrombotic events compared to the active

 1    comparator but, more important, the studies

 2    involved a different population?

 3              MR. GOLDMAN:  Objection.  Lacks

 4    foundation.

 5              And can I have a standing

 6    objection to the use of the document on the

 7    lack of foundation?

 8              MR. McKENNA:  Sure.

 9              THE WITNESS:  I -- I don't

10    remember ever seeing this report or -- or

11    hearing -- hearing that statement.

12              The CV card we did send to the

13    FD -- this is an FDA Advisory.  We did send

14    to the FDA, per 2253, at time of first use

15    so we were communicating this document, but

16    I don't remember ever hearing that.

17              MR. McKENNA:  Okay.  We can

18    take a break.

19              MR. GOLDMAN:  Break.

20              MR. McKENNA:  Yeah.  And if you

21    want to make a copy.

22              VIDEO OPERATOR:  We're now

23    going off the record.

24              This concludes Tape Number 2.

1   was likely to use Vioxx?

2       A.    Yeah.  I mean, I -- as I

3   mentioned, I think I can remember seeing

4   grids where all the television shows were

5   mentioned and I would imagine they have

6   demographics but, as I sit here, I don't

7   recall specifically going through that

8   process.

9       Q.    Okay.  Outside of TV and

10  magazines, are you aware of any other forms

11  of promotional materials that would be

12  directed toward elderly individuals likely

13  to use Vioxx specifically?

14              MR. GOLDMAN:  Object to the

15  form.

16              THE WITNESS:  Not -- not that I

17  can think of.

18              (Exhibit 11 was marked for

19  identification.)

20  BY MR. McKENNA:

21      Q.    I'm going to give what you I'm

22  marking Exhibit 11.

23              I'll ask you to identify it,

24  but the cover page says, "Power Against

1    Pain."

2              MR. GOLDMAN:  Don, is this the

3    complete -- is this the complete document,

4    do you know?

5              MR. McKENNA:  From my

6    understanding, it is.

7              MR. GOLDMAN:  And is there --

8    there's some handwritten notes as well on

9    it, on the second page.  And are those

10   yours?

11             MR. McKENNA:  They are not.

12   They were in the database, however we got

13   them.

14             MR. GOLDMAN:  I'm just going to

15   object to the lack of foundation.

16   BY MR. McKENNA:

17      Q.    Ready?

18      A.    Okay.

19      Q.    Can you identify this piece for

20   us, please?

21      A.    So this looks like a selling aid.

22   It's marked on the last page 2001.  It -- it

23   appears to be before -- certainly before

24   April of 2002, but it's hard for me to -- to

1    define the exact time period that it was

2    used.

3         Q.    Okay.  A selling aid to be used

4    with physicians or -- who's the target

5    audience here?

6         A.    This -- this would be a selling

7    aid to be used by representatives and other

8    field personnel with physicians.

9         Q.    Now, I'm going to refer to the

10   Bates numbers down on the bottom.

11        A.    Okay.

12             MR. McKENNA:  For those on the

13   phone, this is MRK-ADW0000810 through 821.

14   BY MR. McKENNA:

15        Q.    On 811 there's a postoperative

16   dental pain study.

17             You see that --

18        A.    Yes.

19        Q.    -- graph?

20             And the title in all caps, in

21   bold is, "Superior Pain Relief Over 6

22   Hours."

23             You see that?

24        A.    Yes.

1    Q.    And -- and it's superior pain

2  relief, is that versus

3  oxycodone/acetaminophen?

4    A.    Correct.

5    Q.    And so the message here is that

6  Vioxx is providing superior pain relief over

7  six hours versus oxycodone/acetaminophen for

8  dental pain; correct?

9              MR. GOLDMAN:  Object to form.

10             THE WITNESS:  In -- in -- in

11  postoperative dental pain and -- right.

12  This is in two separate -- data from two

13  separate studies.

14             MR. McKENNA:  Okay.

15  BY MR. McKENNA:

16    Q.    And so this would have been used

17  by reps in detailing doctors on -- in a

18  nationwide setting?

19             MR. GOLDMAN:  Object to the

20  form.  Lacks foundation.

21             THE WITNESS:  Yeah.  So I'm --

22  you know, the -- what would be helpful is if

23  we had the bulletin that went out with this

24  selling aid so that we really could define

Page 151

1    again the two and really be precise about

2    who was using it and also the time frame.

3              MR. McKENNA:  Okay.

4              THE WITNESS:  So -- but in the

5    absence of that, I think, which would be

6    necessary to really be precise, it's -- it's

7    my impression that -- that this was a

8    selling aid for use by some of our

9    representatives with physicians.

10             MR. McKENNA:  Okay.

11   BY MR. McKENNA:

12      Q.    Without the aid of the bulletin,

13   is there any reason to believe it was not

14   allowed to be used in Kentucky?

15      A.    Not that I know of.  Again, I

16   don't -- I can't be precise without the

17   bulletin but I wouldn't have any reason.

18      Q.    Okay.  All right.  If we'll turn

19   to Page 817 at the bottom, you'll see the 41

20   percent we've been talking about.

21             All right.  There's -- the

22   title of the page is "Safety Profile in

23   Elderly Patients," and it gives an age

24   distribution of OA patients in the Vioxx

1  clinical trials, and 41 percent were 65

2  years and older.

3          Did I read that correctly?

4      A.    That -- that is what it says

5  here.

6      Q.    And my only follow-up question

7  is, is that 41 percent of OA patients, is

8  that representative of the patient

9  population with osteoarthritis that uses

10  Vioxx?  In other words, 45 -- 41 percent of

11  them are 65 and older or is that just the

12  clinical trial number?

13     A.    Yeah.  I -- I understand that

14  kind of gets to what we were talking about

15  before.  So I don't -- I don't know.  I only

16  know that -- that these are the data from

17  Merck-conducted trials and it's just a

18  distribution of patient participation in the

19  clinical trial.

20     Q.    Okay.  And the information

21  provided, being provided here to physicians,

22  is that the osteoarthritis studies didn't

23  show any difference in safety for elderly

24  patients.

```
 1              MR. GOLDMAN:  Objection.  It's
 2    over -- it misstates the document.
 3              THE WITNESS:  So there's --
 4    there's wording here that's also in our
 5    label I think that I referenced before, no
 6    substantial differences in safety were
 7    observed between older and younger patients,
 8    and then greater sensitivity in some older
 9    patients cannot be ruled out.  So it does
10    make -- it makes that statement here and
11    also on the label.
12              MR. McKENNA:  Okay.  All right.
13    BY MR. McKENNA:
14       Q.    And then on the last page, on
15    821, again, as you've pointed out, we've got
16    a copyright of 2001, so we know that this
17    was printed in at least 2001 and/or later.
18              And under, "Selected safety
19    information," let's read through it.  And my
20    question is, there is no mention of
21    cardiovascular risk, is there?
22              MR. GOLDMAN:  Object to the
23    form.
24              THE WITNESS:  I don't see
```

1    BY MR. McKENNA:

2        Q.    We're back from lunch.   And

3    changing topics, one of the topics was, any

4    and all bonus plans or awards related to

5    sales and marketing of Vioxx including, but

6    not limited to, bonuses applicable to the

7    sales representatives responsible for

8    marketing Vioxx in the Commonwealth of

9    Kentucky as well as the sales

10   representatives, managers up the chain of

11   command.   So that's what I want to talk

12   about next.

13       A.    Okay.

14       Q.    Starting with the actual sales

15   reps who would go do the details in the

16   doctor's office, unless they had their

17   higher-up with them, generally do it by

18   themselves, during the time period that

19   Vioxx was on the market can you describe

20   generally what sorts of bonuses were

21   available to them that were related to

22   their, in some component to their sale of

23   Vioxx?

24       A.    Okay.   And -- and let me try to

1    kind of give an overview.  I know we've

2    produced for each year what's called the

3    sales incentive plan.

4        Q.    Okay.

5        A.    So I know we -- we produced it

6    for 1999, which would include the first year

7    that Vioxx was on the market, to -- through

8    the 2004.  And each of those documents is

9    quite a -- quite a thick document.

10       Q.    Thick document.  All right.

11       A.    And then what I'll say is this

12   morning I mentioned all the different types

13   of field-based personnel, so each of them

14   has a different plan in each year.

15       Q.    And it's all outlined in the

16   documents.

17       A.    And it's all outlined in the

18   documents.

19             So I -- it's -- I don't even --

20   I wouldn't know where to start in terms of a

21   high level with all the different types of

22   field personnel and all the different years,

23   but I don't know if there's an area that you

24   would want to go.

1      Q.    So it's called the sales

2  incentive plan.

3      A.    S --

4      Q.    Title of the document?

5      A.    SIP.

6      Q.    SIP.

7      A.    And sales incentive plan is

8  usually how you see it.

9      Q.    Okay.  And is that plan

10  applicable nationwide?

11      A.    That -- that is my recollection,

12  for a given type of -- of field personnel in

13  a given year, that it is a nationwide

14  incentive plan, the SIP plan.

15      Q.    Okay.  Would there be any other

16  plans that were specific to geographic

17  regions that would encompass the

18  Commonwealth of Kentucky that were not part

19  of the overall SIP related to Vioxx?

20      A.    Yeah.  So it's -- so there's --

21  there's a sales incentive plan, you'll see,

22  for all five years, five and a half years.

23  There's in some years something called NMIP,

24  non-monetary incentive plan.  There are

1    sometimes also special incentive plans.  And

2    in some years there's what would be called

3    like discretionary bonus.

4        Q.    Uh-huh.

5        A.    That last one is more

6    administered at a local level.

7              And then even one more level

8    down there are things you'll see referenced

9    sometimes called awards for excellence --

10       Q.    Okay.

11       A.    -- which, again, would be

12   administered more locally.

13             So the first three tend to have

14   national criteria and the next two, the last

15   two, tend to be more locally determined at

16   the region or district level.

17       Q.    Okay.  And so it's my

18   understanding you've produced the plans and

19   what criteria would have to be met to be

20   eligible to earn it.

21       A.    That's right.

22       Q.    Have you seen in reviewing the

23   documents the back end, who actually earned

24   those bonuses within the geographic regions

1   that encompassed the Commonwealth of

2   Kentucky?

3       A.    Oh.

4             MR. GOLDMAN:  Object to form.

5             THE WITNESS:  I understand.

6             I have not -- I have not seen

7   the actual amounts.

8             MR. McKENNA:  All right.

9   BY MR. McKENNA:

10      Q.    Or even names of persons that

11  earned the bonuses.  Do you know if that's

12  been produced?

13      A.    I -- I don't know.

14            MR. GOLDMAN:  And that --

15  that's everything that's been responsive to

16  your document requests, and there's been a

17  process of meet and confer, as you know,

18  Don, so we've produced --

19            MR. McKENNA:  Which I'm not

20  always in.

21            MR. GOLDMAN:  Yeah.

22            So I -- if you have specific

23  requests, I think discovery is over --

24            MR. McKENNA:  Yeah.  My --

1    my --

2              MR. GOLDMAN:  -- but to the

3    extent that there have been requests, we've

4    complied and produced what's responsive.

5              There's no way for Mr. Cannell

6    to know exactly what was produced.

7              MR. McKENNA:  I'm just trying

8    to find, hey, is there something I need to

9    go back to the office and look at that we

10   have?  If he knows the answer to that.  All

11   right.

12             I'd like to mark -- Exhibit 16

13   I've already marked, and it is a document

14   MRK-BRM0007912 through 7915.

15   BY MR. McKENNA:

16     Q.    And the first page says, "Field

17   Incentive Plan," so this is an FIP.  This is

18   another bonus that wasn't listed out yet.

19             Is it different than -- to your

20   knowledge -- this is '99.  Is it equivalent

21   to an SIP or an MIP --

22             MR. GOLDMAN:  Object to the

23   form.

24   BY MR. McKENNA:

```
 1      Q.     -- or is it just something
 2  different?
 3      A.     This is now with -- with --
 4  attached, we've got two different
 5  attachments here, so we've got -- we've got
 6  COX Bulletin 99-034 and then we jump to COX
 7  Bulletin 99-037.  And this Clinical Pharmacy
 8  Remote Speaker Program is something
 9  completely separate so --
10      Q.     The only reason they're together
11  is they were produced together.  And the
12  only page I'm going to ask you questions
13  about is 7912.
14      A.     Okay.  And -- and what I would
15  say is this is when I was --
16            MR. McKENNA:  Somebody produced
17  them together.
18            MR. GOLDMAN:  Well, I can see
19  the Bates number are consecutively --
20  consecutive, but Mr. Cannell can respond.
21            MR. McKENNA:  Sure.
22            MR. GOLDMAN:  Doesn't mean
23  they're all related.
24            MR. McKENNA:  Right.
```

1                    THE WITNESS:  So but it was the

2    third level that I was speaking to.  I guess

3    I -- I spoke to it as a special incentive

4    program, they called it here field incentive

5    program.  But that's --

6                    MR. McKENNA:  Okay.

7                    THE WITNESS:  That's the one

8    that I was -- and we only did that in

9    certain years.  I would have to go back and

10   confirm again but --

11                   MR. McKENNA:  All right.

12                   THE WITNESS:  -- that's what I

13   was thinking of.

14   BY MR. McKENNA:

15      Q.    And in -- it says who it goes

16   to.  So it's nationwide to these different

17   areas; correct?

18      A.    Correct.

19      Q.    And to get this $2,000 bonus, you

20   must achieve a 51 percent share of new

21   prescriptions in the C2-SI market.

22                   For the jury, what is the C2-SI

23   market?

24      A.    So that would be the COX-2

1   selective inhibitor market.

2      Q.    Okay.  And at this time, in '99,

3   isn't it essentially Vioxx and I say

4   Celebrex, you say tomato?

5      A.    That's -- you're -- it is correct

6   that in -- at the time this bulletin was

7   sent, the COX -- the C2-SI market was Vioxx

8   plus Celebrex.

9      Q.    Okay.  So they've got to get it

10  for one month and then maintain their

11  activity and performance levels on other key

12  brands, do the rest of your job as well.

13     A.    That's correct.  And always in

14  full compliance with policy.

15     Q.    Okay.  All right.  So it's just

16  -- it's really an achievement-of-market-

17  share-in-a-particular-month bonus, in a

18  single month.

19             MR. GOLDMAN:  Object to the

20  form.

21             THE WITNESS:  Yeah.  I mean, it

22  -- that's really -- it's -- it's achieving

23  51 percent share by March -- March of 2000

24  and achieving the other metrics they

```
 1   mentioned here and always in full compliance

 2   with policy.

 3              MR. McKENNA:  Okay.

 4              (Exhibit 17 was marked for

 5   identification.)

 6   BY MR. McKENNA:

 7      Q.   I'll give you what I'm marking as

 8   17.

 9              MR. McKENNA:  And it looks like

10   it's to me -- how many pages do you have?

11              MR. GOLDMAN:  Four.  Mine is --

12              MR. McKENNA:  It looks like

13   it's double copied.

14              MR. GOLDMAN:  Yes, mine is.

15              MR. McKENNA:  Yeah.  We can

16   pull off the back two pages because they

17   bear the same Bates number.

18              THE WITNESS:  Okay.

19              MR. McKENNA:  All right.

20   BY MR. McKENNA:

21      Q.   So this is in April of 2000 and

22   it's also a field incentive plan.

23              Is this another one of those

24   special incentives?
```

Page 200

1        A.    I -- I would keep it under my

2    broad categorization under the same bucket.

3        Q.    Okay.

4        A.    I think it's similar to the one

5    we reviewed for '99.

6        Q.    All right.  And this one in 2000,

7    there's two ways to get $2,000, you can get

8    it twice, have at least one month where you

9    get 55 percent of new COXIB share for

10   Vioxx.  So it's new prescriptions --

11       A.    Correct.

12       Q.    -- that are written sometime

13   between April 1st and December 31st.

14             So if you get a month where

15   you've got 55 percent of new COXIB

16   prescriptions, or Vioxx, you can get a bonus

17   for achieving that level.

18       A.    That's what it says here.

19       Q.    All right.  And then during the

20   same time period, if you get a month that

21   goes all the way up to 61 percent of new

22   COXIB prescriptions being Vioxx, you can get

23   another $2,000 bonus.

24       A.    That's correct.  That's what

1    it -- that's what it says here.

2         Q.    And that's both for field

3    representatives who are selling to doctors

4    and it also looks like for hospital

5    representatives as well.

6         A.    And specialty representatives.

7         Q.    And specialty.  Okay.  All right.

8    That's all I have on that one.

9         A.    Should we be keeping them -- but

10   they're -- the extra pages just in the same

11   bundle as that?

12        Q.    We can discard them.  They're

13   just a double copy of the pages.

14        A.    Probably just keep it as that.

15              (Exhibit 18 was marked for

16   identification.)

17   BY MR. McKENNA:

18        Q.    I'll give you what I'm marking as

19   18, which is Bates number MRK-BRM0007858 and

20   7859.

21        A.    I'm okay.

22        Q.    All right.  Help me out here with

23   the lingo.

24              This is a SIP, sales incentive

1   plan.

2         A.     This is the first --

3         Q.     That's one of the documents

4   you're talking about, 1999.

5         A.     This looks like a bulletin that

6   came out actually later in '99.

7         Q.     Okay.

8         A.     There would have been a document

9   issued in late -- in '98 or early '99, the

10  more complete, thick --

11        Q.     Thicker.  Okay.

12        A.     -- document.

13               This sounds like they're giving

14  kind of an update.

15        Q.     Okay.  Under "Bonus Payout," it

16  says, bonus payment is based on PPO and MBO

17  performance.

18        A.     Correct.

19        Q.     Help me with PPO and MBO.  What

20  are those?

21        A.     PPO is percent to plan objective.

22        Q.     Okay.

23        A.     MBO is a term we used in our

24  performance management system called

Page 203

1    management by objective.

2         Q.    Okay.

3         A.    You would say that is your

4    accomplishment versus objectives that are

5    more qualitative in nature.  They're not

6    based on sales, like PPO.

7         Q.    Okay.  And then down under the

8    PPO, each 1 percent increase or decrease in

9    PPO relative to 100 percent means a 5

10   percent increase or decrease in bonus payout

11   relative to target, 90 percent threshold.

12             Can you, as we say in Alabama,

13   get that down where the goats can get it?

14        A.    So -- so every part of the sales

15   organization has a target bonus.

16        Q.    Right.

17        A.    So just for the -- just for the

18   sake of an example, maybe we'll say a target

19   bonus of $8,000 --

20        Q.    Uh-huh.

21        A.    -- that you would get if you --

22   your PPO were 100 percent to plan.

23             And we'll just keep it simple.

24   We'll assume there's not MBO and all this

1   stuff.

2       Q.    Uh-huh.

3       A.    So then if you're 101 percent to

4   plan, this bonus would go up by 5 percent.

5       Q.    Okay.

6       A.    So what would that be?  8,400

7   instead of 8,000.  If you were 102 percent,

8   it would go up by 10 percent, so now you'd

9   be making 8,800.

10      Q.    Got you.

11      A.    That's what the five to one

12  sliding -- or maybe sliding scale is my

13  words.

14              And then if you're below 90

15  percent, there's a threshold.  So I think if

16  you're below 90 percent, what that means is

17  that for that component of the bonus, you

18  don't get a bonus.

19      Q.    You don't get it.  All right.

20              So if I'm -- if my target is to

21  sell 100 widgets, that would be 100 percent;

22  right?  That's what the company said your

23  target is to sell 100 widgets.

24              MR. GOLDMAN:  Object to the

1   form.

2   BY MR. McKENNA:

3       Q.    And using your example, my bonus

4   would be the preset $8,000.

5             But if I sell 101 widgets, I'd

6   get the 8,000 plus 5 percent of that, which

7   would be 8,400?  Okay.  And on up.  For

8   every one percent over the hundred, I'm

9   getting another 5 percent of that 8,000?

10      A.    Yeah.

11      Q.    Okay.

12      A.    And, again, you'll always see

13  it's -- that's assuming full compliance with

14  policy --

15      Q.    Sure.

16      A.    -- or then that would be -- you

17  would not get your bonus.

18      Q.    Speaking of the full compliance

19  with policy, I've heard it said in other

20  depositions if -- if a rep didn't comply

21  with policy but met their sales goals, the

22  company could withhold bonuses.  Is that

23  your understanding?

24      A.     If -- if a representative does

1    seen any of that.

2              MR. McKENNA:  Okay.

3    BY MR. McKENNA:

4        Q.    I'm assuming somewhere there

5    would be a list of hospitals that were

6    enrolled in the VIP Program?

7              MR. GOLDMAN:  Objection to

8    form.  Lacks foundation.  Calls for

9    speculation.

10             THE WITNESS:  There must have

11   been at one time.  I've not seen -- I can't

12   speak to whether those were produced and --

13   and whether those exist.

14             MR. McKENNA:  Okay.

15   Fortunately, we're not going to go through

16   these page by page.

17             (Exhibit 19 was marked for

18   identification.)

19   BY MR. McKENNA:

20       Q.    I'll hand you Exhibit 19, which

21   for those on the phone is P1.0009, the 2001

22   profit plan for Vioxx.

23             MR. GOLDMAN:  Don, you know

24   this was the subject of his previous

1    testimony so I assume you're not going to be

2    re --

3              MR. McKENNA:  There are things

4    I didn't ask about in the previous

5    testimony.

6              MR. GOLDMAN:  Right.  But we're

7    -- I mean, I don't know what you're going to

8    ask him about, but under which topic do you

9    think this falls?

10             MR. McKENNA:  The sale,

11   promotion and marketing of Vioxx in the

12   Commonwealth of Kentucky.

13             MR. GOLDMAN:  Profit plan?

14             MR. McKENNA:  Yeah.

15             MR. GOLDMAN:  So I'll object on

16   that ground, and Mr. Cannell can address

17   your questions, depending on what's asked.

18             THE WITNESS:  Okay.

19   BY MR. McKENNA:

20      Q.   Okay.  Just in general, who puts

21   the profit plan together?

22      A.    So -- so this profit plan

23   document looks like it was issued in -- on

24   September 1st of 2000 --

1      Q.    Correct.

2      A.    -- planning for the 2001 profit

3   plan.

4            Profit plan is, of course, a

5   proposal, as we discussed before, and it is

6   put together by many different headquarter

7   groups.  Often, marketing is assigned with

8   kind of the coordination and development of

9   the plan.

10           Does that answer your question?

11     Q.    It does.

12           If we look at -- I'm looking at

13   the Bates numbers on the bottom -- Page 77,

14   where it says, "Market Share Forecast For

15   Vioxx."  And it has, through August 2000,

16   sales for Vioxx were $1 billion.

17           So that would have been from

18   launch through August 2000?

19     A.    Yeah.  That's a good question.  I

20   could read this as from launch to August

21   2000 or --

22     Q.    From January 1.

23     A.    -- from January to 2000.  I can't

24   tell.  We might find it also in the document

1   but it could be --

2       Q.    All right.  The next sentence

3   says, fueled by physician and consumer

4   promotion, sales for Vioxx are projected to

5   be 1.6 billion in 2000.

6             Did I read that correctly?

7       A.    That's what it says here.

8       Q.    Okay.  So through additional

9   physician and consumer promotion through the

10  end of the year, they expect sales to go up

11  to 1.6 billion.

12      A.    That's what they're proposing in

13  this document on September 1st.

14      Q.    Okay.  Actually, since this is

15  the 2001 profit plan, I guess that's what

16  they're forecasting for 2000.

17            MR. GOLDMAN:  Object to the

18  form.

19  BY MR. McKENNA:

20      Q.    Because this -- as you've said,

21  this is prepared September 2000?  They're

22  giving you data through August of 2000?

23      A.    Oh.  You're -- yeah.  Yeah.  The

24  -- they sold one billion through August

1    2000.  They're thinking the full year

2    2000 --

3        Q.    2000.

4        A.    -- will be 1.6.

5              That actually probably answers

6    our prior discussion.

7        Q.    All right.  Let's look at Page 80

8    together, "Importance of Consumers and

9    Patients."

10             Do you see that heading?

11       A.    I see.

12       Q.    Okay.  The sentence reads, both

13   physician and consumer audits point to the

14   importance of consumer demand in driving

15   both treatment and brand choice decisions

16   within this market.

17             Did I read that correctly?

18       A.    That's what it says here.

19       Q.    And do you agree with that

20   statement?  Consumers asking for Vioxx by

21   name was the goal of the company and really

22   drives brand choice when marketing is done

23   correctly.

24             MR. GOLDMAN:  Object to the

1    form.

2              THE WITNESS:  So -- so -- so

3    getting into the asking for Vioxx by name is

4    kind of too specific.  I mean, later on, in

5    some executions that is -- that is, ask your

6    doctor if Vioxx might be right for you is an

7    execution.

8              I think this is more broad.

9    But certainly with at this time roughly 80

10   million patients in pain, it was important

11   to find a way to motivate those consumers to

12   go see their doctor to get help.  So getting

13   them to visit their doctor to get help for

14   their pain was -- was important.  So I think

15   in that context, I would agree with that.

16             MR. McKENNA:  Okay.

17   BY MR. McKENNA:

18      Q.    The last paragraph there says,

19   pain sufferers exhibit a proactive approach

20   to managing their plan, constantly searching

21   for new/alternative treatments that provide

22   superior relief or enhanced safety.

23   Recognizing this behavioral pattern, DTC --

24   which is direct to consumer; correct?

1      A.    That's correct.

2      Q.    -- communications play a critical

3   role in directing these sufferers to new

4   treatment alternatives.

5            Do you agree that direct-to-

6   consumer marketing is critical to getting

7   people looking to manage their pain to ask

8   for a particular drug?

9            MR. GOLDMAN:  Objection to

10  form.  Overbroad.

11           THE WITNESS:  You know, I --

12  the only thing I'd say, it's my own

13  experience that only some pain sufferers

14  exhibit a proactive approach to managing

15  their pain.  So I'm just not sure I can

16  categorically agree with everything here.

17           And I would say that in some

18  cases, DTC can be very effective in

19  motivating patients to go talk to their

20  doctor about choices for pain.

21           Is that --

22  BY MR. McKENNA:

23     Q.    Direct-to-consumer marketing was

24  certainly something Merck saw as important

1    and budgeted for; right?

2         A.    We -- we -- we thought it was

3    important.  Right.  I'm sorry if I'm not

4    answering your question.

5         Q.    Okay.

6         A.    But it was important because

7    those -- you can't -- they can't treat the

8    patient until they go see their doctor.

9         Q.    Okay.  All right.  If we look at

10   Page 85 under "Strategic Objectives," we're

11   talking about planning for 2001; right?

12        A.    That's right.  September '00, I

13   guess the proposal for 2001.

14        Q.    Okay.  And the first bullet point

15   is to differentiate Vioxx on superior pain

16   relief and GI outcomes in the COXIBs class.

17              Did I read that correctly?

18        A.    That's what it says here.

19              MR. GOLDMAN:  Don, what page

20   was that?

21              MR. McKENNA:  That was 85.

22              MR. GOLDMAN:  Thank you.

23   BY MR. McKENNA:

24        Q.    Going to Page 89, all I'm trying

1    spoke to this morning, I remember the

2    general objective of the VIP Program, but

3    now in the contract pull-through it's hard

4    to speak to.

5        Q.    All right.  I guess with the

6    additional time, sort of a repeat of what

7    we've just gone through.

8             Can you describe for me what

9    involvement, if any, you had in developing

10   the Dorothy Hamill ad campaign?

11       A.    So I was responsible for

12   physician/consumer promotion and I had a

13   team that worked on the Dorothy Hamill

14   elements.

15            I'll admit that I didn't do any

16   real prep on that for this session.  I

17   didn't deem that in the scope.  But -- but I

18   was -- I was overseeing it during the time

19   at least some of the Dorothy Hamill

20   executions were aired.

21       Q.    Okay.  And they were both TV and

22   print spots.  I think we've already

23   discussed that.

24       A.    For Dorothy Hamill.

Page 272

1      Q.     Yes.

2      A.     I remember television.  I don't

3   dispute print.  I just don't remember.

4      Q.     Okay.  And these -- this campaign

5   was a national campaign.

6      A.     That's -- that's my recollection.

7      Q.     It would have definitely included

8   Kentucky.

9      A.     It -- I would think that it would

10  have included viewers in the Commonwealth of

11  Kentucky.

12     Q.     All right.  And from what I've

13  read, the Dorothy Hamill ads were very well

14  received by consumers, and if not the most

15  well-received Vioxx ad that had been run up

16  until the time Dorothy, Dorothy Hamill spots

17  ran.

18     A.     I -- I don't remember at this

19  juncture.  I'm not disputing that.

20     Q.     Sure.

21     A.     I don't remember the comparative

22  analysis.  I -- I recall they were generally

23  well received.

24     Q.     Okay.  And is it your

1    understanding they were Dorothy Hamill ads

2    run both before and after the April 2002

3    label change for Vioxx?

4              MR. GOLDMAN:  Objection to

5    form.  Lacks foundation.

6              THE WITNESS:  I don't remember.

7              MR. McKENNA:  Okay.

8    BY MR. McKENNA:

9        Q.    If -- if it will help you refresh

10   your recollection or maybe -- yeah, that

11   none of the Dorothy Hamill TV or print ads

12   made any reference to the VIGOR data prior

13   to April 2002, do you remember testifying to

14   that in your 2005 deposition?

15             MR. GOLDMAN:  If you --

16             THE WITNESS:  I -- I don't -- I

17   mean, what I can tell you is all those --

18             MR. GOLDMAN:  Let me just

19   object to the form.

20             The question was, do you

21   remember testifying to that in your

22   deposition?

23             And if you're going to show him

24   the deposition, that's --

1              MR. McKENNA:   Sure.

2              MR. GOLDMAN:   Show him the

3    deposition.

4    BY MR. McKENNA:

5        Q.    And if you don't need your

6    deposition because you know that to be the

7    case, you can answer it that way.

8        A.    I don't remember very well the

9    deposition from six or seven years ago.

10       Q.    All right.   Let's make sure I've

11   got the right page number written down.

12             MR. GOLDMAN:   Don, if he has

13   previously testified to it, it's really

14   improper to retread the same ground.

15             What page is it on?

16             MR. McKENNA:   Page 100.

17   BY MR. McKENNA:

18       Q.    And it just says --

19       A.    Oh, I'm sorry.   I should be

20   checking mine so --

21       Q.    -- did any of the TV ads that

22   Merck put on, all aspects of TV up through

23   April 2002 have a warning or discussion of

24   potential cardiovascular risks associated

1    with Vioxx?

2              And you said, I do not recall

3    that any of our TV ads, all of which were

4    approved by the FDA prior to the April 2,

5    2002, referencing the cardiovascular data

6    from VIGOR.

7       A.    I'm sorry.  What number?

8       Q.    Page 100.

9       A.    Oh, just Page 100.

10             And you're asking if I recall

11   giving this testimony?

12      Q.    Yes.

13      A.    Or -- I -- I don't.  No, I

14   don't.  From December of 2005, I don't.

15      Q.    And that wasn't just an

16   out-of-the-blue question.

17             I first asked if any of the

18   Dorothy Hamill ads prior to April of 2002

19   had any of the VIGOR data or CV warnings on

20   them.

21      A.    Uh-huh.

22      Q.    And you said you didn't

23   remember.  And then I asked you, do you

24   recall --

# EXHIBIT 8

Page 1

1              COMMONWEALTH OF KENTUCKY
               FRANKLIN CIRCUIT COURT
2          CIVIL ACTION NO. 09-CI-1671
                    - - -
3    COMMONWEALTH OF            :
     KENTUCKY, EX REL. JACK
4    CONWAY, ATTORNEY GENERAL   :
5        vs.                    :
6    MERCK & CO., INC.          :
7

                    - - -
8              April 30, 2013
                    - - -
9        Oral deposition of Nancy Carol
10   Santanello, taken pursuant to notice,
11   was held at the Law Offices of Dechert
12   LLP, 2929 Arch Street, Philadelphia,
13   Pennsylvania, commencing at 9:00
14   a.m., on the above captioned date,
15   before Kathleen Ruccolo, Professional
16   Reporter and Notary Public in and for
17   the Commonwealth of Pennsylvania.
18
19
20
21
22
             MAGNA LEGAL SERVICES
23           Seven Penn Center
        1635 Market Street, 8th Floor
24          Philadelphia, PA  19103

1                    - - -

2                    (At this time a

3          document was marked for

4          identification as Exhibit No.

5          P-1.)

6                    - - -

7    BY MR. POWELL:

8          Q.     And have you seen this,

9    Doctor?  Have you seen this exhibit?

10         A.     I have.

11         Q.     Okay.  Do you

12   understand that what we are doing

13   today is taking a deposition of,

14   actually, the company itself, and that

15   you are representing the company on

16   the issues identified in number 20 and

17   22?

18         A.     I do.

19         Q.     Okay.  And just for the

20   record, number 20 is:  All scientific

21   articles in any way concerning Vioxx

22   that were distributed within the

23   Commonwealth of Kentucky for which

24   Merck employees or consultants were

Page 18

1    either named authors or ghost authors,

2    including, but not limited to, who

3    wrote what, the scientific basis for

4    the conclusion, and the distribution

5    within the Commonwealth of Kentucky

6    for each article.

7                    Are you prepared to

8    speak on behalf of the company on that

9    topic?

10          A.     I am.

11          Q.     And are you

12   knowledgeable on that topic?

13          A.     I am.

14          Q.     Number 22 is:  Merck's

15   espousing of the cardioprotective

16   effect of Naproxen, and the basis

17   therefor, both nationally and within

18   the Commonwealth of Kentucky.

19                    And are you prepared

20   to speak on behalf of the company on

21   that topic?

22          A.     I am.

23          Q.     And are you

24   knowledgeable on that topic?

```
 1                THE WITNESS:  I'm not
 2         sure what date you are talking
 3         about.
 4  BY MR. POWELL:
 5         Q.     March of 2000.
 6         A.     Well, the study was
 7  unblinded in March of 2000, and, you
 8  know, as far as what the next
 9  occurrence of the information that was
10  put together to report to the FDA, we
11  provided the results of VIGOR, but we
12  had a lot of other information about
13  the mechanism of action of Naproxen.
14         Q.     I understand that.  My
15  question is very simple.  There were
16  no studies that Merck had in its
17  possession that studied the
18  cardiovascular -- cardioprotective
19  effects of Naproxen; isn't that true?
20         A.     We had no clinical
21  trials to look at the cardioprotective
22  effect of Naproxen, but the weight of
23  the evidence did provide us with that
24  assurance that that was what was
```

Page 34

1    working, yes.

2            Q.    Well, you understand,

3    do you not, that the maker of Naproxen

4    has never espoused that it had

5    cardioprotective effects, aren't you?

6                   MR. SALES:  Objection,

7            overbroad.

8                   THE WITNESS:  I would

9            not be able to tell you what

10           the maker of Naproxen has

11           espoused or hasn't espoused.

12   BY MR. POWELL:

13           Q.    Have you previously

14   testified on that issue?

15           A.    I don't actually

16   recall.  I can tell you the Naproxen

17   label clearly shows that it has side

18   effects related to antiplatelet

19   effects; bleeding, bruising.  So, you

20   know, whether the maker has espoused

21   it or not, I wouldn't be able to tell

22   you that.

23           Q.    And there is a black

24   box warning about it causing potential

Page 63

```
 1            anti-inflammatory, antipain,

 2            and also better for the

 3            stomach, along with the

 4            antiplatelet effects,

 5            preventing thrombosis, of

 6            aspirin.

 7   BY MR. POWELL:

 8            Q.    Was that done?

 9            A.    I don't believe that

10   there was a study done, but, you know,

11   this was his initial reaction to

12   looking at the VIGOR study, the data.

13            Q.    He was concerned, was

14   he not, that the fivefold increase was

15   a problem for the company in terms of

16   Vioxx, was he not?

17                  MR. SALES:  Objection

18            to the form.

19   BY MR. POWELL:

20            Q.    Fivefold increase in

21   the CV events of the VIGOR study?

22                  MR. SALES:  Objection

23            to the form, calls for

24            speculation.
```

Page 84

1   Laurenzi is that it is Dr. Patrono's

2   view that the explanation of the

3   fivefold increase in the Vioxx arm of

4   the CV events cannot be attributed

5   solely to the cardioprotective effects

6   of Naproxen; is that right?

7              MR. SALES:  Objection

8        to form, no foundation.

9              THE WITNESS:  I

10        actually don't agree with what

11        you've stated, because we

12        didn't finish reading the rest

13        of the e-mail in which Dr.

14        Patrono apparently, his view

15        is that this is due to chance,

16        which -- the imbalance in

17        events is due to chance, which

18        we had already discussed.  So

19        this again is relaying a

20        conversation between Dr.

21        Laurenzi and Dr. Patrono, and

22        Dr. Patrono's explanation is

23        chance.

24   BY MR. POWELL:

1    BY MR. POWELL:

2            Q.    That wasn't my

3    question.  My question is, what he is

4    reporting are the results that he

5    found, that the NSAIDs didn't have an

6    effect on fatal or nonfatal MIs,

7    right?

8                    MR. SALES:  Objection,

9            misstates the documents.

10                    THE WITNESS:  Yeah, he

11           is basically -- Dr. FitzGerald

12           is basically relaying to

13           Dr. Nies what this particular

14           paper in epidemiology found

15           when they did their analyses.

16   BY MR. POWELL:

17           Q.    And what it found was

18   that NSAIDs didn't have a particularly

19   effective cardioprotective effect,

20   right?

21                    MR. SALES:  Objection,

22           misstates the document.  The

23           document speaks for itself.

24                    THE WITNESS:  So it is

1   moderate osteoarthritis, Tylenol

2   versus Vioxx, with prn low-dose ASA

3   for those judged to need it.  Safety

4   first primary endpoint, and efficacy

5   secondary or co-primary.  Then in all

6   caps Dr. Scolnick writes, we will not

7   know for sure what is going on until

8   we do this study.  Please think hard

9   about the design before the PAC

10  meeting, thanks, Ed.

11              Did I read that

12  accurately?

13         A.    You did.

14         Q.    So at 10:42 at night on

15  April 12th Dr. Scolnick reports, as it

16  relates to rheumatoid arthritis and CV

17  mortality, that we, being himself and

18  others that he is referring to, will

19  not know what is going on until this

20  study is done as it relates to RA and

21  CV mortality.

22              MR. SALES:  Objection

23         to the form.

24  BY MR. POWELL:

Page 126

1    because I know you mentioned it was

2    your judgment or opinion that the

3    rheumatoid arthritis patients did have

4    a higher incidence of CV events,

5    right?

6              A.      They do have higher

7    inflammatory process, and that has

8    been related to a higher thrombo

9    cardiovascular event rate.

10             Q.      And what started this

11   chain of e-mails was Dr. Scolnick

12   reporting about a conversation he had

13   had with John Oates where there was

14   two papers that Mr. Oates had sent --

15   is it Dr. Oates?  Dr. Oates had sent,

16   where there was an increased number of

17   CV deaths, but not out of proportion

18   to other causes in the population,

19   right?

20             A.      That is what is

21   written, yes.

22             Q.      Okay.  So -- and that

23   is carried on through to the point

24   where, at least at 10:42 at night,

1    Health and Marketing.  I'm not exactly

2    sure.

3            Q.      Whether it's US or

4    worldwide, it is marketing?

5            A.      Yes, he was in

6    marketing, exactly.

7            Q.      Okay.  And in that

8    e-mail Dr. Scolnick reports and says,

9    Ray and David, as I'm sure you can

10   both tell, I am pretty agitated over

11   the events related to Stanford and

12   Dr. Frees.  Do you see that?

13           A.      Yes.

14           Q.      Do you have any idea or

15   any information as to what he is

16   referencing there?

17           A.      I don't recall all the

18   particulars.  I remember that there

19   was some event related to Stanford

20   University where Dr. Frees was a

21   faculty, I don't know if he still is,

22   Jim Frees.

23           Q.      Do you know what the

24   concern and agitation stemmed from?

1    didn't hand me anything.  You handed

2    it to counsel.

3              Q.     Oh, all right.  Here it

4    is.

5              A.     Thank you.

6              Q.     I'm handing you number

7    11, and if you'll look at it please,

8    ma'am, and let me know when you are

9    ready.  I think you've seen this one

10   before.

11             A.     It is a big document.

12   Okay.  All right.

13             Q.     Ready?

14             A.     I do remember.

15             Q.     You have seen this

16   document before, haven't you?

17             A.     I have.

18             Q.     This is the FDA warning

19   label that was sent -- I mean warning

20   letter that was sent to Merck in

21   October of 2001, is it not?

22             A.     Looking for the date.

23             Q.     If you look down on the

24   bottom of the first page, a little bit

1    towards the right.

2           A.     Does it say

3    September 17th, '01?

4           Q.     It is.  I can't read --

5    either one or nine, so it is

6    September 17th, 2001.

7           A.     That's what it looks

8    like to me.

9           Q.     Okay.  So the document

10   -- the warning letter was sent from

11   the FDA to Merck September 17, 2001?

12          A.     Right.  This is from

13   the Division of Drug Marketing,

14   Advertising and Communication of the

15   FDA.

16          Q.     Sent to the president

17   of Merck, Mr. Gilmartin, who we've

18   talked about earlier, right?

19          A.     Yes.

20          Q.     And it's concerning

21   Vioxx tablets?

22          A.     Yes.

23          Q.     Okay.  And the first

24   letter -- first paragraph of the

1    letter identifies, this warning letter

2    concerns Merck and Company's

3    promotional activities and materials

4    for the marketing of Vioxx tablets.

5    Specifically, we refer to promotional

6    audio conferences given on behalf of

7    Merck by Peter Holt, M.D., a press

8    release and oral representations made

9    by Merck sales representatives to

10   promote Vioxx.

11                   That is the subject of

12   the warning, correct?

13           A.     That is the first

14   sentence or second sentence, yes.

15           Q.     As part of its routine

16   monitoring and surveillance program,

17   the Division of Drug Marketing,

18   Advertising and Communications has

19   reviewed your promotional activities

20   and materials, and has concluded that

21   they are, number one, false; number

22   two, lacking in fair balance; or

23   three, otherwise misleading, in

24   violation of the Federal Food, Drug

1    and Cosmetic Act, and applicable

2    regulations, correct?

3                    MR. SALES:  Objection

4          to the form.

5                    THE WITNESS:  You read

6          that correctly.

7    BY MR. POWELL:

8          Q.    Okay.  He continues on,

9    from the FDA, you have engaged in a

10   promotional campaign for Vioxx that

11   minimizes the potentially serious

12   cardiovascular findings that were

13   observed in the Vioxx Gastrointestinal

14   Outcomes Research (VIGOR) study, and

15   thus misrepresents the safety profile

16   for Vioxx.  That is the position of

17   the FDA in the letter identified in

18   paragraph number two, correct?

19                   MR. SALES:  Objection

20         to the form, misstates the

21         document.

22                   THE WITNESS:  Yeah,

23         this is actually, again, from

24         the promotional part of the

1           FDA, so it is from the

2           Division of Drug Marketing,

3           Advertising and Communications

4           as written by a Thomas Abrams,

5           and that is what he has

6           written.

7    BY MR. POWELL:

8           Q.    As the position of that

9    division of the FDA?

10          A.     As what he -- I guess

11   it is their position, but it is what

12   he has written in this letter about

13   what we call DDMAC, which is a one --

14   it is not the scientific part of the

15   FDA.  It is the promotional part of

16   the FDA.

17          Q.     And the promotional

18   part, the marketing part of the FDA,

19   states that the promotional campaign

20   of Merck as it relates to Vioxx, that

21   the outcomes of the VIGOR study, that

22   the promotional campaign

23   misrepresented the safety profile for

24   Vioxx, correct?

1               MR. SALES:  Objection,

2        misstates the document.

3               THE WITNESS:  So, I

4        mean, you've kind of taken a

5        little bit from that sentence.

6        Basically, it says that the

7        DDMAC, the promotional part of

8        the FDA, has said that

9        Vioxx -- a campaign for Vioxx

10        that minimizes potentially

11        serious cardiovascular

12        findings observed in VIGOR,

13        and thus misrepresents the

14        safety profile for Vioxx, that

15        is what is written.

16   BY MR. POWELL:

17        Q.    Yes.  Then he gets more

18   detailed and says, specifically, your

19   promotional campaign discounts the

20   fact that in the VIGOR study patients

21   on Vioxx were observed to have a four

22   to fivefold increase in myocardial

23   infarctions compared to patients on

24   the comparator nonsteroidal

1    anti-inflammatory drug (NSAID)

2    Naprosyn (Naproxen), correct?

3              A.    That's what is written.

4              Q.    Okay.  Well, the facts

5    that are contained in that sentence

6    are accurate, are they not?

7                    MR. SALES:  Objection

8         to the form, overbroad.

9                    THE WITNESS:  Sorry,

10        I'm not --

11   BY MR. POWELL:

12             Q.    Specifically, it is

13   accurate -- it is an accurate

14   statement, is it not, Doctor, that in

15   the VIGOR study the patients on Vioxx

16   were observed to have a four to

17   fivefold increase in myocardial

18   infarctions compared to patients on

19   the comparator nonsteroidal

20   anti-inflammatory drug Naprosyn, that

21   is accurate, isn't it?

22             A.    The VIGOR findings were

23   that there was a four to fivefold

24   difference in increase in acute

1    myocardial infarction for Vioxx, as

2    compared to Naproxen, where Naproxen

3    had a lower event rate due to the

4    antiplatelet, antithrombotic effects.

5           Q.      So that statement is

6    accurate, is it not?

7           A.      It's basically stating

8    what the study showed, VIGOR.

9           Q.      Accurate, isn't it?

10          A.      It shows what the

11   study -- the results of the study.

12          Q.      His recitation of the

13   results is accurate, is it not?

14          A.      Yes, it is basically

15   stating what was found in the VIGOR

16   trial.

17          Q.      That is all I was

18   asking you.  What he is stating

19   accurately reflects the findings of

20   the vigor trial, correct?

21          A.      What he's -- yes.

22          Q.      Okay.  The next

23   paragraph, although the exact reason

24   for the increased rate of MIs observed

Page 171

1    in the Vioxx treatment group is

2    unknown, your promotional campaign

3    selectively presents the following

4    hypothetical explanation for the

5    observed increase in MIs.  You assert

6    that Vioxx does not increase the risk

7    of MIs, and that the VIGOR finding is

8    consistent with Naproxen ability to

9    block platelet aggregation like

10   aspirin.  That is a possible

11   explanation, and we've talked about

12   that, haven't we?

13            A.      Uh-huh.

14            Q.      Can you answer

15   affirmatively or negatively?

16            A.      Yes.

17            Q.      But you failed to

18   disclose that your explanation is

19   hypothetical, has not been

20   demonstrated by substantial evidence,

21   and that there is another reasonable

22   explanation that Vioxx may have

23   prothrombotic properties.

24                    First off, let me ask

1    you if you will tell the ladies and

2    gentlemen what prothrombotic

3    properties are.

4              A.     If a drug were to

5    increase thrombus formation, that

6    would be something that would be

7    prothrombotic, so --

8              Q.     I don't want to

9    interrupt you.  Go ahead.

10             A.     So basically, if there

11   were a drug that were to increase the

12   formation of thrombus, thrombin, then

13   that would be prothrombotic.  Vioxx

14   has no effect on thrombin, it actually

15   is neutral.

16             Q.     Here is the question.

17   I haven't gotten there yet.

18             A.     Okay.

19             Q.     When you use the word,

20   thrombus, can you talk about it in

21   terms of lay terms, can you define

22   prothrombotic properties so that I can

23   understand it as a non-physician?

24             A.     Okay.  So there is a

1   balance, and there are platelets in

2   your body, and those platelets could

3   clump or aggregate together, and they

4   could form a clot.  Maybe you would

5   call it a clot, and that clot could

6   cause an acute myocardial infarction.

7          Q.      Thank you.  And in this

8   warning letter, the marketing arm or

9   marketing section of the FDA is

10  critical of Merck for failing to

11  disclose that the Naproxen hypothesis

12  or theory is hypothetical, has not

13  been demonstrated by substantial

14  evidence, and that there might be

15  another explanation, and that is that

16  Vioxx may, indeed, cause an increase

17  in myocardial infarctions, correct?

18              MR. SALES:  Objection

19          to the form, misstates the

20          document, not related to the

21          specific events.

22              THE WITNESS:  So this

23          particular document is talking

24          about two very specific

1              promotional -- one is a

2              promotional audio conference

3              it references, and one was a

4              pharmacist's meeting, is my

5              recollection of what the other

6              one was.  It mentions Dr.

7              Peter Holt in the second

8              sentence, and basically it is

9              talking about two promotional

10             activities.  It is not talking

11             about all Merck's promotional

12             activities.  It is

13             specifically relating to two

14             promotional activities, both

15             of which were fairly

16             circumscribed activities, one

17             at a meeting of pharmacists

18             and one through audio

19             conferences.  That's what it's

20             talking about.

21     BY MR. POWELL:

22             Q.    Also talks about a

23     press release, doesn't it?

24             A.    Well, the press

1   release -- actually, once we explained

2   the press release back to the FDA,

3   they were satisfied with our

4   explanation of the press release.  It

5   was part of a scientific discourse,

6   and no additional remediation was

7   required by the FDA.

8           Q.    In this particular

9   document there were three issues.

10  There was the Peter Holt issue, the

11  press release and the oral

12  representations made by Merck sales

13  representatives in their promotion of

14  the drug, right?

15              MR. SALES:  Objection,

16          misstates the document.

17              THE WITNESS:  So in

18          this particular letter from

19          the part of the FDA that deals

20          with promotional activities,

21          there are three specific

22          issues that they are pointing

23          out to Merck, and one is the

24          audio conference by Dr. Peter

```
 1              Holt, one is the oral

 2              representation at a

 3              pharmacists' meeting, and one

 4              is a press release.  So I said

 5              the press release actually was

 6              part of a scientific

 7              discourse, and the FDA, once

 8              we explained that to them,

 9              they had no further

10              remediation, no problem with

11              that.

12    BY MR. POWELL:

13         Q.    I'm talking about at

14    the time this was written.  We are

15    going to get there, I promise you.

16    You are going to have your chance to

17    make your arguments.

18                   What they are talking

19    about, these three are the press

20    release, Peter Holt and oral

21    representations made by sales

22    representatives to promote Vioxx,

23    right?

24                   MR. SALES:  Objection,
```

```
 1              asked and answered.
 2                    THE WITNESS:  They are
 3              talking about three very
 4              circumscribed, specific
 5              promotional activities.  One
 6              is actually not promotional.
 7              The press release is not a
 8              promotional activity, but they
 9              are discussing three
10              activities, not all of Merck's
11              promotional activities.
12   BY MR. POWELL:
13          Q.    And in the last
14   sentence of that first page, the FDA
15   states that there is another
16   reasonable explanation for the
17   fivefold increase in the Vioxx arm,
18   and that is that Vioxx may have
19   prothrombotic properties, and you
20   described what that is, correct?
21          A.    So, again, this is from
22   the promotional part of the FDA, not
23   the FDA -- when you say the FDA is
24   saying this, it is actually not the
```

1    FDA saying this.  This is the

2    promotional part, DDMAC.

3              Q.      They are not part of

4    the FDA?

5              A.      They are part of the

6    FDA, but they are not the scientific

7    part of the FDA.  They are not engaged

8    in the scientific discussion,

9    actually.  They are not the part that

10   approves products, they are not the

11   part that agrees on labels, they are

12   not the part that has advisory

13   committee meetings.  They are actually

14   looking only very, very specifically

15   at promotional activities.

16             Q.      That wasn't my

17   question.  My question is, the last

18   sentence of the first page, the FDA,

19   whether it is one man in the FDA or

20   one component of the FDA, says that

21   the reasonable explanation for the

22   findings of VIGOR is that VIGOR may

23   have -- Vioxx may have prothrombotic

24   properties, right?

```
 1                    MR. SALES:  Objection,

 2          asked and answered.

 3   BY MR. POWELL:

 4          Q.    You may not like my

 5   question, but if you'll just answer

 6   it.

 7                    MR. SALES:  Are you

 8          just asking whether that is

 9          what it says?

10                    MR. POWELL:  Yes, that

11          is what I'm asking.

12                    MR. SALES:  You've

13          asked that question three

14          times now.

15                    MR. POWELL:  Fine.

16                    MR. SALES:  The

17          document speaks for itself.

18                    MR. POWELL:  When she

19          answers it, we'll move on.

20                    THE WITNESS:  So it

21          says that there is another

22          reasonable explanation that

23          Vioxx may have prothrombotic

24          properties according to the
```

1          non-scientific part of the

2          FDA.

3    BY MR. POWELL:

4          Q.    So that is what it

5    says, correct?

6          A.    That's correct.

7          Q.    All right.  And if you

8    move on to page three of the letter,

9    they state, in the minimization of MI

10   results section.

11         A.    Okay.

12         Q.    Page three?

13         A.    Uh-huh.

14         Q.    The FDA is quoting the

15   promotion of Vioxx where they said,

16   specifically, you state, you being

17   Merck, that Vioxx is a wonderful,

18   effective, selective COX-2 inhibitor

19   that inhibits COX-2 but at the doses

20   used does not inhibit COX-1.  So

21   therefore without the COX-1 inhibition

22   you don't inhibit platelets, you don't

23   prolong bleeding time, and therefore,

24   it cannot be used as a cardiovascular

Page 181

1    protective drug.  Naprosyn, on the

2    other hand, is a wonderful platelet

3    inhibitor, prolongs bleeding time and

4    inhibits platelets identically to

5    aspirin.  Obviously, the binding with

6    Naprosyn is reversible, and with

7    aspirin is irreversible, but the

8    effect on platelets and bleeding times

9    is identical in terms of its effect,

10   and therefore functions as a wonderful

11   drug for cardiovascular prophylaxis.

12   So basically, the MRI -- MI rates are

13   in synch with what we know about Vioxx

14   and what we know about Naprosyn.

15                    That is what they are

16   quoting as Merck promotional, correct?

17                    MR. SALES:  Objection,

18            misstates the document.

19                    THE WITNESS:  Yeah.  So

20            this is actually from

21            Dr. Peter Holt, and Dr. Peter

22            Holt -- I have not listened to

23            the audio myself, but what

24            they are saying is what

1            Dr. Peter Holt, one person

2            that is actually consulting

3            for Merck, not Merck

4            promotional material, that

5            this is what one person said,

6            and Merck remediated this

7            issue.

8    BY MR. POWELL:

9            Q.    If you continue on the

10   FDA says, in fact, the situation is

11   not at all clear.  There are no

12   adequate and well-controlled studies

13   of Naproxen that support your

14   assertion that Naproxen's transient

15   inhibition of platelet aggregation is

16   pharmacodynamically comparable to

17   aspirin, or clinically effective in

18   decreasing the risk of MIs; therefore,

19   your representation that Naproxen

20   prolongs bleeding time and inhibits

21   platelets identically to aspirin is

22   misleading and minimizes the potential

23   seriousness of this finding.

24                   That is what they are

1   telling Merck, correct?

2                MR. SALES:  Same

3           objection, misstates the

4           document.

5                THE WITNESS:  They are

6           referring to the audio

7           conferences in which Dr. Peter

8           Holt presented his -- made his

9           presentation.  This, again, is

10          not representing Merck's

11          promotional activities.  It is

12          one series of audio

13          conferences by Dr. Peter Holt.

14                My understanding is

15          Merck actually stopped having

16          Dr. Peter Holt give

17          presentations and remediated

18          this issue.

19   BY MR. POWELL:

20          Q.    Because the FDA was

21   right?

22                MR. SALES:  Objection

23          to the form.

24                THE WITNESS:  Actually,

1           there is a lot that Dr. Peter

2           Holt said here that I would

3           agree with, but particularly

4           related to, you know, how

5           COX-2 and COX-1 agents work in

6           regard to platelets.  I don't

7           think that everything that

8           Dr. Holt said is incorrect,

9           but I believe that Merck felt

10          that -- they took this

11          seriously and they made a

12          decision to have Dr. Holt no

13          longer give these

14          presentations.

15  BY MR. POWELL:

16          Q.    Because the FDA

17  continues on and says, as you know,

18  talking to Merck, as you know, the

19  reason for the difference between

20  Vioxx and Naproxen has not been

21  determined.  It is also possible that

22  Vioxx has prothrombotic properties.

23  Also, the MI rate that you report for

24  Vioxx is inaccurate.  The MI rate for

1    VIGOR in the VIGOR study was 20 MIs

2    among 4,047 patients (.5 percent), not

3    .4 percent as you stated.

4                    Was the FDA accurate

5    in that statement?

6                    MR. SALES:  Objection,

7         again.

8                    THE WITNESS:  Again,

9         they are referring to one

10        individual, Dr. Peter Holt.  I

11        don't know what he said other

12        than what is actually captured

13        here in this one little

14        section, but Merck took this

15        very seriously and remediated

16        this.  This is what one

17        external consultant was

18        saying, not Merck in its

19        promotional activities.

20   BY MR. POWELL:

21        Q.    Well, that is not the

22   question that I asked.  I asked this

23   question about this sentence:  As you

24   know, the reason for the difference

1    between Vioxx and Naproxen has not

2    been determined.  It is also possible

3    that Vioxx has prothrombotic

4    properties.

5                      Is the FDA accurate in

6    making that statement?

7                      MR. SALES:  Objection

8          to form.

9                      THE WITNESS:  So if you

10         are asking me my personal

11         opinion, that the difference

12         between Naproxen and Vioxx is

13         best explained by Naproxen's

14         antiplatelet effects.

15   BY MR. POWELL:

16         Q.     I'm asking you, on

17   behalf of the company whom you are

18   sitting here on behalf of today, and

19   on behalf of the company can you tell

20   me whether or not it is the company --

21   does the company agree with the FDA

22   that as of the time of this letter

23   being written, in September of 2001,

24   that the reason for the difference

1    between Vioxx and Naproxen has not

2    been determined, and that it is also

3    possible that Vioxx has prothrombotic

4    properties, I want to know if the

5    position of the company says the FDA

6    is right or wrong.

7                    MR. SALES:  Objection

8             to the form.  Outside the

9             scope of the particular topic

10            designated for today.  Go

11            ahead.

12                    THE WITNESS:  This is

13            DDMAC, it's not the scientists

14            from the FDA, but I'm saying

15            as a scientist within Merck, I

16            believe that the best

17            explanation for the difference

18            between Vioxx and Naproxen

19            actually is the antiplatelet

20            effect of Naproxen.  That is

21            my personal belief as a

22            scientist looking at the

23            weight of the evidence.

24    BY MR. POWELL:

1          Q.     What is the position of

2     the company?

3          A.     I believe the company

4     has the same position.

5          Q.     So the company's

6     position is the statement contained in

7     that line is wrong?

8               MR. SALES:  Objection

9          to the form.  That is not the

10         position of the FDA.

11              THE WITNESS:  Yeah, so

12         -- well, I can't agree with my

13         counsel.  So basically, as you

14         probably are aware, the FDA

15         actually considered this

16         question.  There was an

17         advisory committee meeting,

18         there were external

19         consultants, they looked at

20         all the data.  They had all

21         the data.  They had all the

22         cardiovascular data, all the

23         GI data, they looked very

24         carefully at VIGOR, and they

1          recommended -- the advisory

2          committee recommended to

3          Merck -- sorry, to the FDA,

4          that Vioxx be approved for the

5          fourth indication -- it

6          already had three

7          indications -- for the fourth

8          indication, for rheumatoid

9          arthritis, as safe and

10         effective.  That is after

11         seeing the VIGOR data.  Okay.

12              They also put the

13         VIGOR data into the label, and

14         they basically did not say --

15         I don't know exactly what they

16         did or didn't say, but I

17         believe that, you know, the

18         position of the company, my

19         position has been that the

20         difference is due to

21         Naproxen's antiplatelet

22         effects.

23    BY MR. POWELL:

24         Q.     As of September of

1    2001, it was the position of the FDA

2    that the reason for the difference --

3    one possible explanation could be the

4    prothrombotic properties of Vioxx,

5    right?

6             A.     This, again, is a

7    letter from the promotional part, not

8    the scientific part of the FDA.  As I

9    mentioned before, there was a lot of

10   scientific debate, there was media,

11   there were scientific meetings, a lot

12   of discussion about what could have

13   caused the results in VIGOR.

14   Prothrombotic effects of Vioxx, chance

15   we talked about, we talked about the

16   Naproxen effect.  Okay, all of that

17   was out there.  The position of the

18   company was the results were best

19   explained by Naproxen.

20            Q.     And the FDA was taking

21   Merck to task for not promoting Vioxx

22   -- by not promoting and disclosing all

23   of these other issues that were an

24   explanation; isn't that correct?

1              MR. SALES:  Objection,

2         misstates the document once

3         again.

4              THE WITNESS:  This is

5         about audio conferences by

6         Dr. Peter Holt.  Again, the

7         debate was out there on what

8         might have caused the results

9         of VIGOR.  It was well-known,

10        it was well -- you know, very

11        much out in the media and the

12        scientific literature and the

13        scientific discussion.

14   BY MR. POWELL:

15        Q.    You had previously

16   described this as a pretty stern

17   letter, have you not, in prior

18   testimony?

19        A.    I don't remember what I

20   might have said.  I can tell you that

21   I'm not used to Merck getting warning

22   letters.  Okay?  I'm not -- so a

23   warning letter, you know, is something

24   that Merck would take very seriously.

Page 192

1    Whether I said it was stern or not, I

2    wouldn't remember, but certainly --

3              Q.     What's your position

4    now, after looking at it?

5              A.     Merck took the warning

6    letter very seriously, and remediated

7    the issues that the DDMAC part of the

8    FDA pointed out, to the satisfaction,

9    I might add, of DDMAC.

10             Q.     Move on to page six.

11   Talking about the press release.  We

12   have identified -- are you with me?

13             A.     I am.

14             Q.     We have identified a

15   Merck press release entitled, quote,

16   Merck Confirms Favorable

17   Cardiovascular Safety Profile of

18   Vioxx, close quote, dated May 22,

19   2001.  Now, this is some 14 months or

20   so after the VIGOR findings?

21             A.     Sure.  Fourteen,

22   fifteen months, yes.

23             Q.     And they describe the

24   press release, and I'll continue to

1    read, that is also false or misleading

2    for similar reasons stated above.

3    Additionally, your claim in the press

4    release that Vioxx has a, quote,

5    favorable cardiovascular safety

6    profile, close quote, is simply

7    incomprehensible given the rate of MI

8    and serious cardiovascular events

9    compared to Naproxen.

10                    Do you agree with the

11   position and statement I just read?

12                    MR. SALES:  Objection

13        to the form.

14                    THE WITNESS:  You know,

15        this is how it is written.  I

16        actually don't agree with it

17        because, you know, the

18        circumstances of this

19        particular letter is also

20        taking in all the data that we

21        have on the safety of Vioxx.

22   BY MR. POWELL:

23        Q.    So you do not agree

24   that --

```
 1            A.      I agree that --

 2                    MR. SALES:  Wait for

 3            the --

 4                    THE WITNESS:  I agree

 5            that Vioxx has a favorable

 6            cardiovascular safety profile.

 7  BY MR. POWELL:

 8            Q.      You do not agree with

 9  the assertion that the claim that it

10  had a favorable cardiovascular safety

11  profile is simply incomprehensible?

12                    MR. SALES:  Objection

13            to the form, out of context.

14                    THE WITNESS:  I believe

15            that the FDA DDMAC section

16            also agreed, once we explained

17            the context of that particular

18            response.  That press release

19            was in response to a lot of

20            the media and a lot of the

21            discussion that was out there.

22            We didn't have to correct that

23            press release.

24                      - - -
```

# EXHIBIT 9

Confidential - Subject to Protective Order

Page 1

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - ATLANTIC COUNTY
- - -
IN RE:   VIOXX LITIGATION : CASE NO. 619

-----------------------------------------------------

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
- - -
IN RE:   VIOXX LITIGATION :  MDL DOCKET NO. 1657

- - -

CONFIDENTIAL

SUBJECT TO PROTECTIVE ORDER

- - -
August 7, 2007
- - -

Videotape deposition of GILBERT A. BLOCK,

M.D., Ph.D., held in the offices of Dechert LLP,

2929 Arch Street, Philadelphia, Pennsylvania 19104,

commencing at 9:15 a.m., on the above date, before

Linda L. Golkow, a Federally-Approved Registered

Diplomate Reporter and Certified Shorthand Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.
51st Floor
One Liberty Place
1650 Market Street
Philadelphia, Pennsylvania 19103
deps@golkow.com - 877.370.3377

M00F84490I

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 18

1    A.    No.
2    Q.    And you were the clinical monitor for
3  a study called PRAISE; is that correct?
4    A.    That's correct.
5    Q.    All right.
6          And PRAISE was also known by a
7  numerical description, protocol 078, correct?
8    A.    That's correct.
9    Q.    All right.
10          And who came up with the name PRAISE,
11  do you know?
12    A.    I believe I and one of my colleagues
13  came up with it.
14    Q.    Okay.
15          And you were also the clinical
16  monitor for a protocol called 126; is that correct?
17    A.    No, that's not correct.
18    Q.    I'm sorry.  That was Dr. Beck, right?
19    A.    Correct.
20    Q.    Okay.
21          And you were the clinical monitor for
22  a study called protocol 091?
23    A.    That's correct.
24    Q.    And did 091 have an acronym also?
25    A.    No, it did not.

Page 19

1    Q.    Why?
2    A.    I don't think we were able to come up
3  with one, quite frankly.
4    Q.    All right.
5          And the PRAISE study, that was one of
6  the largest studies that Merck ever did with Vioxx,
7  right, in terms of numbers of patients enrolled in
8  the study?
9    A.    I would not know whether or not that
10  was one of the largest studies.
11    Q.    It was certainly one of the largest
12  placebo-controlled studies that Merck ever did with
13  Vioxx, wasn't it?
14    A.    Again, I mean, I don't recall whether
15  that was one of the largest or not.
16    Q.    It was a large study, though, right?
17    A.    Correct.
18    Q.    And what was the purpose of the
19  PRAISE study?
20    A.    The purpose of the PRAISE study was
21  to evaluate whether Vioxx could prevent the
22  development of Alzheimer's disease in patients who
23  were at risk for it with a disorder known as mild
24  cognitive impairment.
25    Q.    Okay.

Page 20

1          By the way, you gave testimony
2  related to Vioxx in November of 2005, correct?
3    A.    Correct.
4    Q.    All right.
5          And do you stand by your testimony?
6    A.    As much as I remember it, yes.
7    Q.    Okay.
8          Have you had an opportunity to review
9  the transcript recently?
10    A.    Yes, I have.
11    Q.    All right.
12          Is there anything in that testimony
13  that you would like to change or revise?
14    A.    I don't recall if there's anything --
15  whether there's anything to be changed or revised.
16    Q.    Okay.
17          I mean, there's nothing that you
18  noted that you wanted to change today as we sit here
19  and you're under oath, correct?
20    A.    I don't recall if there's anything
21  that I noted.
22    Q.    When did you review your transcript?
23    A.    Within the past week.
24    Q.    Okay.
25          Did you make any notes?

Page 21

1    A.    No.
2    Q.    And you're represented today by
3  counsel, correct?
4    A.    I am represented -- my personal
5  attorney is sitting over there.  (Indicating.)
6    Q.    Okay.
7          And what's his name?
8    A.    Jonathan Sack.
9    Q.    Okay.
10          Just checking.
11    A.    Yes.
12    Q.    All right.
13          And you're also represented by Mr.
14  Patryk?
15    A.    Yes, as a former employee of Merck.
16    Q.    Okay.
17          And who is paying Mr. Sack?
18    A.    My understanding is that Merck is
19  paying.
20    Q.    Okay.
21          And did you meet with Mr. Sack and/or
22  Mr. Patryk in preparation for today's deposition?
23    A.    Yes, I did.
24    Q.    All right.
25          How many times did you meet?

6  (Pages 18 to 21)

85fca436-3777-4c65-af85-36788bd57b05

M00F84490K

Confidential - Subject to Protective Order

Page 38

1       A.      I don't know whether or not Western
2   IRB is a for-profit company.
3       Q.      Western IRB is a contract IRB
4   company, right?
5               MR. PATRYK:  Objection to the form.
6               THE WITNESS:  They are a central IRB
7   company.
8   BY MR. WEINBERG:
9       Q.      Okay.
10              They're a company?
11      A.      Correct.
12      Q.      Okay.
13              And they're a company that Merck did
14  business with, right?
15              MR. PATRYK:  Object to form.
16              THE WITNESS:  You'd have to define to
17  me what you mean by "do business with."
18  BY MR. WEINBERG:
19      Q.      Well, did Merck retain Western IRB
20  for the PRAISE study, to your knowledge?
21      A.      Sites without their own IRBs used
22  Western IRB as a central IRB --
23      Q.      Okay.
24      A.      -- for the study.
25      Q.      Okay.

Page 39

1               And who paid Western IRB?
2       A.      Merck would pay the IRB fee to
3   Western IRB.
4       Q.      Okay.
5               And just so that we're clear, what is
6   an IRB?
7       A.      It's an Institutional Review Board.
8       Q.      Okay.
9               And what is the purpose generally of
10  an Institutional Review Board, if you know?
11      A.      The general purpose of an
12  Institutional Review Board is to review the quality,
13  the rationale for the design and conduct of a
14  clinical trial.
15      Q.      Okay.
16              And is it an entity that has as one
17  of its purposes the protection of patient safety?
18      A.      Yes, it does.
19      Q.      Okay.
20              And do you know how much Merck paid
21  Western IRB for the PRAISE study to set up IRBs
22  across the country?
23              MR. PATRYK:  Object to form.
24              THE WITNESS:  Well, firstly, Western
25  IRB didn't set up IRBs across the country.

Page 40

1   BY MR. WEINBERG:
2       Q.      Okay.
3       A.      Western IRB is a central IRB.
4       Q.      Okay.
5       A.      And, secondly, I don't recall whether
6   or not at this time how much was paid for each IRB
7   review for these sites.
8       Q.      All right.
9               So, Western IRB set up one
10  Institutional Review Board for the PRAISE study; is
11  that correct?
12      A.      Western IRB is an Institutional
13  Review Board.
14      Q.      Okay.
15              And did the same people serve on the
16  Institutional Review Board for each of the sites?
17      A.      I would not know that.
18      Q.      Okay.
19              Did you have any contact or
20  interactions with Western IRB?
21      A.      I don't recall the specifics.  I do
22  recall that at one time I did have a teleconference
23  with Western IRB.
24      Q.      Okay.
25              Do you remember what it was about?

Page 41

1       A.      No, I do not at this time.
2       Q.      Did Western IRB review the informed
3   consent in the PRAISE study?
4       A.      Yes.  In the conduct of being an IRB,
5   they would get the consent form.
6       Q.      All right.
7               And did they review amendments to the
8   consent form from time to time?
9       A.      Yes, they would.
10      Q.      And would they tell you or Merck
11  whether they thought the consent forms were
12  appropriate or not?
13      A.      They would communicate back to Merck,
14  and it would be communications and discussions
15  through the legal group that handled consent forms.
16      Q.      And how would Merck, if you know, pay
17  Western IRB?  Let me be more specific.
18              Would Western IRB be paid for each
19  review, from the initial review through each
20  amendment?
21      A.      I don't recall whether or not they
22  were paid for each subsequent review.
23      Q.      Do you know whether Western IRB was
24  on a fixed amount contract or whether it was an
25  hourly rate or a per job rate?

11  (Pages 38 to 41)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 42

1      A.    I don't recall at this time how it
2  worked.
3      Q.    Who negotiated the agreement with
4  Western IRB, do you know?  Who at Merck?
5      A.    I don't recall who or what kind of
6  negotiations were held around that.
7      Q.    Did you sign a contract with Western
8  IRB for the PRAISE study?
9      A.    I don't recall whether or not there
10  was a separate contract that was signed at all.
11      Q.    All right.
12            Did Merck use Western IRB for other
13  studies?
14      A.    Merck used Western IRB, as well as
15  other central IRBs, for studies.
16      Q.    Okay.
17            Did Merck use Western IRB for studies
18  other than PRAISE?
19      A.    I believe Western IRB was also an IRB
20  in other studies.
21      Q.    Okay.
22            What other contract IRBs did Merck
23  use?
24      A.    The only name that I can remember at
25  this time is that there was another one called

Page 43

1  Summit IRB.
2      Q.    Okay.
3            How about an outfit called Shulman
4  Associates?
5      A.    I don't recall at this time whether
6  or not Shulman was used.
7      Q.    All right.
8            Just looking at this list of
9  investigators for 078, other than Western IRB, are
10  any of the IRBs that are listed on this form IRBs
11  that Merck contracted with and paid to perform IRB
12  functions?
13            MR. PATRYK:  Object to form.
14            THE WITNESS:  Again, I'm really not
15  sure what you mean by paid for functions.
16  BY MR. WEINBERG:
17      Q.    Okay.
18      A.    IRB reviews, IRBs at all sites,
19  academic or not, there's an IRB fee.
20      Q.    Right.
21            Did Merck pay all of the IRBs in this
22  study?
23      A.    Yes.
24            - - -
25            (Whereupon, Deposition Exhibit

Page 44

1            Block-2, "MK-0966 Alzheimer's Protocol 078
2            Enrollment Chart" MRK-APC0014978 -
3            MRK-APC0014979, was marked for
4            identification.)
5            - - -
6  BY MR. WEINBERG:
7      Q.    Let me show you what's been marked
8  Exhibit 2.
9      A.    Thank you.
10      Q.    I'll ask you if you've seen this
11  document before.  This is a two-page document.  The
12  Bates Number is APC 0014978.
13      A.    No, I have not seen this in
14  preparation for this.
15      Q.    Okay.
16            Do you recall seeing this document at
17  any time?
18      A.    I don't recall seeing this specific
19  document.
20      Q.    Do you recognize what this document
21  is or what information is conveyed here?
22      A.    Yes, I do recognize it.
23      Q.    All right.
24            What is it?
25      A.    It's an enrollment chart by site and

Page 45

1  investigator telling how many patients had been
2  screened, how many patients met criterion to enter
3  the trial, and how many patients are there in
4  subsequent visits.
5      Q.    Okay.
6            And, so, let's just use the first
7  line, just so that we understand what the document
8  is telling us.
9      A.    Uh-huh.
10      Q.    The study is 078, that's PRAISE,
11  right?
12      A.    Correct.
13      Q.    And the site is 001, right?
14      A.    Correct.
15      Q.    The investigator is the name of the
16  site investigator, in this case, it's Dr. Baumel,
17  right?
18      A.    That's correct.
19      Q.    And the next column is the number of
20  patients screened at that site?
21      A.    That's correct.
22      Q.    That means what?
23      A.    Patients who were evaluated as to
24  whether he or she met the entry criteria to be
25  enrolled in the trial.

12  (Pages 42 to 45)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 46

```
 1    Q.    Okay.
 2          And the next column is "Patients
 3   Enrolled," correct?
 4    A.    Correct.
 5    Q.    And that's what?  What is that
 6   describing?
 7    A.    Those are patients who meet the --
 8   you know, who meet the entry criteria to go into the
 9   trial, who have consented to participate in the
10   trial, and are then randomized to receive study drug
11   or placebo.
12    Q.    And who makes the decision about
13   whether they'll be enrolled in the trial?
14    A.    The decision is made after the
15   investigator at that site evaluates the patient and
16   determines whether he or she is eligible to enter,
17   whether they meet the criteria to enter the study.
18    Q.    The investigator makes the decision?
19    A.    Correct.
20    Q.    Okay.
21          Does Merck review the decision?
22    A.    No.
23    Q.    Okay.
24          Then you've got visit 3, 4, 5 and 6.
25   Just tell us what those refer to.
```

Page 47

```
 1    A.    Those were -- those are planned
 2   visits in the trial.  And this, you know, I don't
 3   know the timing, but those are subsequent visits as
 4   defined by the protocol.
 5    Q.    Okay.
 6          And do you see under -- I'm sorry, at
 7   line 078-19, there's an investigator named
 8   Stoukides, S-T-O-U-K-I-D-E-S?
 9    A.    Yes, I see that.
10    Q.    All right.
11          Do you recall whether there were any
12   problems with Dr. Stoukides' site?
13          MR. PATRYK:  Object to form.
14          THE WITNESS:  No, I don't recall at
15   this time whether there were or not any problems at
16   Dr. Stoukides' site.
17   BY MR. WEINBERG:
18    Q.    Okay.
19          The next document I'm going to show
20   you is -- just to go back to this document.  I'm
21   sorry.
22          Using, again, the first line with
23   Dr. Baumel.  You've got 32 patients who were
24   enrolled at Dr. Baumel's site at the outset of the
25   study; is that correct?
```

Page 48

```
 1    A.    That's correct.
 2    Q.    All right.
 3          And then at visit 3, do you know what
 4   date visit 3 was?
 5    A.    No, I don't recall at this time.
 6    Q.    All right.
 7          Were there --
 8          Were visits set up along a regular
 9   schedule for purposes of this study, every so many
10   days there would be a visit that would be
11   premandated or prespecified?
12    A.    They were set up at a regular
13   schedule.
14    Q.    Okay.
15          Do you have a recollection, Doctor,
16   about what the interim was between visits?
17    A.    No, I don't have a recollection at
18   this time.
19    Q.    Okay.
20          And, so, at visit 3, you had 31
21   patients, correct?
22    A.    Correct.
23    Q.    That means that one patient dropped
24   out of the study?
25    A.    One patient dropped out from the
```

Page 49

```
 1   study.
 2    Q.    Okay.
 3          At visit 4, you had 26 patients,
 4   correct?
 5    A.    Correct.
 6    Q.    And that means that another five
 7   patients dropped out between visit 3 and visit 4 at
 8   that site, correct?
 9    A.    At that time, the less patients are
10   continuing.  Whether they dropped out or whether
11   they met endpoint, you can't tell from this.
12    Q.    And by "endpoint," you mean what?
13    A.    Developed Alzheimer's disease.
14    Q.    Okay.
15          If they develop Alzheimer's disease,
16   would you continue to follow them in the study
17   medically?
18    A.    No.
19    Q.    Okay.
20          If they dropped out, would you
21   continue to follow them in the study?
22    A.    The study, yes, was set up that way.
23    Q.    All right.
24          So, if they had Alzheimer's disease
25   and then later had a heart attack, you would not
```

13 (Pages 46 to 49)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 50

1  record that because you were not following them,
2  correct?
3      A.     The study was not designed to follow
4  people who developed Alzheimer's disease.
5      Q.     Okay.
6           So, just so that we're clear, once
7  the patient reached the primary endpoint, that is,
8  converted to Alzheimer's disease, whether they were
9  on Vioxx or placebo, Merck did not do any further
10  followup with that patient, correct?
11      A.     The study was not designed to follow
12  patients after they had met endpoints.
13      Q.     Okay.
14           So, my question -- so, the answer to
15  my question is --
16      A.     That's correct.
17      Q.     -- yes?
18      A.     Yes.
19      Q.     Okay. All right.
20           Visit 5 for Dr. Baumel's site shows
21  19 patients. So, that means another seven patients
22  either met endpoint or dropped out between visit 4
23  and visit 5, correct?
24      A.     Well, it means that there are less
25  patients continuing at that time.

Page 51

1      Q.     Right.
2           And the reasons why there are less
3  patients would be what? What are the possible
4  reasons?
5      A.     Could be the patient does not want to
6  continue, the patient's caregiver does not want the
7  patient to continue, that it's too much of a burden,
8  that they had a side effect, that they met endpoint.
9  It can be a variety of reasons.
10      Q.     Okay.
11      A.     It could be that the patient has, you
12  know, something else that prohibits him or her from
13  continuing in the study.
14      Q.     Okay.
15      A.     Can't tell from this.
16      Q.     Okay.
17           So, in any case, between visit 4 and
18  visit 5, another seven patients left the study,
19  right?
20      A.     Correct.
21      Q.     And between visit 5 and visit 6,
22  another ten patients left the study, correct?
23      A.     Correct.
24      Q.     And that's just in that site,
25  correct?

Page 52

1      A.     Uh-huh.
2      Q.     All right.
3           So, from the beginning, when 32
4  patients were enrolled, to the end, when 9 patients
5  were left, 23 patients dropped out of 32 at Dr.
6  Baumel's site, correct?
7           MR. PATRYK: Objection to the form.
8           THE WITNESS: There are 23 less
9  patients. I don't know why they're not continuing
10  at the site.
11  BY MR. WEINBERG:
12      Q.     All right.
13           So, from the beginning of the
14  study -- well, is it fair to call patients enrolled
15  the beginning of the study?
16      A.     I call patients screening the
17  beginning of the study.
18      Q.     All right.
19           So, from patients screening to the
20  last visit that's recorded on this document, out of
21  48 patients, 39 left the study for one reason or
22  another, correct?
23           MR. PATRYK: Objection to the form.
24           THE WITNESS: No, that's not correct.
25  BY MR. WEINBERG:

Page 53

1      Q.     Well --
2      A.     I consider the beginning of the study
3  at the time a patient has consented, and then they
4  are screened.
5      Q.     Okay.
6      A.     With regard to patients who are
7  enrolled in randomized, the number is 32.
8      Q.     Okay. All right.
9           So, we'll use the 32. So, from the
10  time patients were enrolled and randomized at Dr.
11  Baumel's site to visit 6, 23 out of 32 patients left
12  the study, correct?
13           MR. PATRYK: Object to form.
14           THE WITNESS: Again, 23 out of 32
15  patients are not continuing in the study for
16  whatever reason.
17  BY MR. WEINBERG:
18      Q.     They're out, they're out of the
19  study, right?
20      A.     They're not continuing, correct.
21      Q.     Okay.
22           Well, let's go to the second one, Dr.
23  Charles and Dr. Blatt, and that's site 078-002. Do
24  you see that?
25      A.     Yes, I do.

14 (Pages 50 to 53)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

**Page 54**

1    Q.    All right.
2          And there you've got 37 patients
3  screened, right?
4    A.    Correct.
5    Q.    26 patients enrolled, right?
6    A.    Correct.
7    Q.    At visit 3, you've lost 2 patients.
8  You're down to 24, right?
9    A.    Correct.
10   Q.    At visit 4, you've lost another 5
11 patients, you're down to 19, correct?
12   A.    Correct.
13   Q.    At visit 5, you've lost another 8
14 patients, you're down to 11, correct?
15   A.    Correct.
16   Q.    And at visit 6, you've lost another 7
17 patients, you're down to 4, right?
18   A.    Correct.
19   Q.    So, from patients enrolled, 26,
20 you've lost 22 by visit 6, 22 out of 26 patients out
21 of the study, correct, at that site?
22   A.    22 out of 26 are not continuing in
23 the trial, correct.
24   Q.    Okay.
25         Dr. Zolnouni, the third line.  You've

**Page 55**

1  got 59 patients enrolled, correct?
2    A.    Correct.
3    Q.    By visit 3, you've lost 9, right?
4    A.    Correct.
5    Q.    All right.
6          And then let's just skip to the end.
7  By visit 6, you've got 7 patients out of 59 that are
8  left in the study, right?
9    A.    Correct.
10   Q.    Okay.
11         And if we go to the second page,
12 Doctor, there's a total.  Do you see that, a bottom
13 line total?
14   A.    Yes, I do.
15   Q.    All right.
16         And, so, in this total, you've got
17 2,424 patients who were screened, right?
18   A.    That's correct.
19   Q.    For the PRAISE study.
20         And you've got 1,137 patients who
21 were enrolled, correct?
22   A.    Correct.
23   Q.    Now, eventually there were more
24 patients enrolled, right?  This is not the final
25 number?

**Page 56**

1    A.    I don't recall right now whether or
2  not this was the final number.
3    Q.    Okay.
4          But in any case, the total number of
5  patients who were left by visit 6 is 199.  Do you
6  see that?
7    A.    There are 199 listed under visit 6,
8  correct.
9    Q.    All right.
10         So, out of 1,137 patients who were
11 enrolled in the study, according to this document,
12 938 out of 1,137 dropped out or left the study or
13 were not in the study by visit 6 for whatever
14 reason, correct?
15   A.    There are this number of patients
16 continuing after whatever time interval this was.
17   Q.    Okay.
18         - - -
19         (Whereupon, Deposition Exhibit
20         Block-3, "Merck 091 - 71100 Corielle"
21         Listing MRK-APE0020702 - MRK-APE0020712
22         was marked for identification.)
23         - - -
24 BY MR. WEINBERG:
25   Q.    The next document is Exhibit 3.  Take

**Page 57**

1  a look at that.  I'm going to ask you if you
2  recognize this document?
3    A.    (Reviewing document.)
4          No, I don't.
5    Q.    Does this appear to you to be a list
6  of patients who were enrolled in protocol 091?
7    A.    I don't know exactly what this list
8  is specifically.
9    Q.    Okay.
10         Do you recognize any of the names of
11 the institutions on this list?  For example, do you
12 see in the very first line it says "Baumel-Eisner
13 Neuromed Institute"?
14   A.    I'm looking through the names on the
15 list.
16   Q.    I'm sorry, Doctor.
17   A.    (Witness reviewing document.)
18         Yes, I recognize the names on the
19 list.
20   Q.    Okay.
21         And were these sites that were set up
22 in study 091?
23   A.    It appears, yes, these were sites in
24 091.
25   Q.    All right.

Confidential - Subject to Protective Order

Page 70

1          And Dr. Raymond Bain, was that one of
2    the people who was unblinded that you just
3    mentioned?
4        A.     I don't recall whether or not Dr.
5    Bain was. He is a statistician also.
6        Q.     All right.
7                A Ph.D.?
8        A.     Yes.
9        Q.     And Dr. Scott Reines, on this e-mail,
10   what was Dr. Reines's role at the time of this
11   e-mail in February of 2002?
12       A.     Dr. Reines was my direct boss, and he
13   was the head of clinical neuroscience.
14       Q.     Okay.
15               And was he an M.D.?
16       A.     That's correct, M.D. and Ph.D.
17       Q.     Okay.
18               And then there's you, Dr. Gilbert
19   Block, correct?
20       A.     Correct.
21       Q.     And you're an M.D., right?
22       A.     M.D. and Ph.D.
23       Q.     M.D. and Ph.D., okay.
24               And what's your Ph.D. in?
25       A.     Reproductive biology, endocrinology.

Page 71

1        Q.     Okay. All right.
2                And the subject line here is "MK0966
3    078 spreadsheets." Do you see that?
4        A.     Yes, I do.
5        Q.     MK-0966 is Vioxx, right?
6        A.     Yes.
7        Q.     And 078 is the PRAISE study, the
8    prevention study, right?
9        A.     That's correct.
10       Q.     Okay.
11               And that's the study for which you
12   were the clinical monitor, right?
13       A.     That was one of the studies, correct.
14       Q.     Okay. Okay.
15               And I'm just going to read the e-mail
16   because it's kind of short. It says, "Hi Mike -
17   Attached are the spreadsheets for MK0966 078.
18               "The first contains a list of all
19   randomized patients and their status as of 31
20   January '02 (per the site patient logs). The
21   patients randomized at site 023 are highlighted. We
22   terminated the study at this site; therefore, every
23   patient has a discon from trial date. In addition,
24   we agreed to perform final study analyses with and
25   without their data?"

Page 72

1                Did I read that correctly?
2        A.     Yes, you did.
3        Q.     Now, does this refresh your
4    recollection at all that one of the sites was
5    terminated in the study?
6        A.     No, actually, it really doesn't.
7        Q.     Okay.
8                Let's just go back to Exhibit 2,
9    Doctor. Okay?
10       A.     Uh-huh.
11       Q.     And can you go down to the line
12   listing for 078-23. Do you see that?
13       A.     Yes, I do.
14       Q.     And that's Dr. Wendt, right?
15       A.     That's correct.
16       Q.     And Dr. Wendt, that's the
17   Neurological Associates of Tucson, right?
18       A.     Yes, it is.
19       Q.     It's right here. Okay?
20       A.     All right.
21       Q.     Dr. Wendt is also in 091, or at least
22   Neurological Associates of Tucson is in 091 as well.
23   Do you see that on Exhibit 3?
24       A.     Yes, I do.
25       Q.     All right.

Page 73

1                Now, once these patients --
2                To your knowledge, once the study was
3    terminated at this site, do you know whether Merck
4    followed the patients?
5        A.     No, I don't believe I do.
6        Q.     Well, let's go back to Exhibit 4.
7    You see it says, "We terminated the study at this
8    site; therefore, every patient has a discon from
9    trial date. In addition, we agreed to perform final
10   study analyses with and without their data."
11               Do you see that?
12       A.     Yes.
13       Q.     Does that ring a bell to you at all
14   or remind you or refresh your recollection at all
15   about whether the data from Dr. Wendt's sites in 078
16   were included in Merck's analysis?
17       A.     From reading the e-mail, it indicates
18   that the patients were discontinued, and the study
19   data were not included, while they were done with
20   and without, as indicated.
21       Q.     Do you know whether the patients --
22               Can you tell from this document
23   whether the patients were followed after
24   discontinuation?
25       A.     No, you can't tell from this

19 (Pages 70 to 73)

85fca436-3777-4c65-af85-36788bd57b05

M00F844919

Confidential - Subject to Protective Order

Page 74

1  document.
2      Q.    Okay.
3            And do you have any reason to believe
4  that they were or weren't?
5      A.    No, I don't have reason to believe
6  one way or another from this document.
7      Q.    All right.
8            Generally, if a site was discontinued
9  from a study, who would follow the patients, if
10 anyone?
11     A.    If a site is discontinued from the
12 study, the patients would be followed by his or her
13 own physician.
14     Q.    All right.
15           Not the investigator?
16     A.    No, not the investigator.
17     Q.    Okay.
18           So, therefore, if a site was
19 discontinued, Merck would not have followup data on
20 the patient either, correct?
21     MR. PATRYK:  Object to form.
22 BY MR. WEINBERG:
23     Q.    Based on common practice?
24     MR. PATRYK:  Same objection.
25     THE WITNESS:  Again, in the case of a

Page 75

1  discontinuation with a discon visit after this, no,
2  I wouldn't have knowledge whether one way or
3  another, but Merck would not, if they're not in the
4  study.
5  BY MR. WEINBERG:
6      Q.    Okay.
7            So, just to be clear, if the site was
8  terminated, the investigator would no longer follow
9  the patient, correct?
10     MR. PATRYK:  Object to form.
11     THE WITNESS:  Well, again, the site
12 -- it says the current study was terminated at the
13 site.
14 BY MR. WEINBERG:
15     Q.    Yes.
16           That means the investigator is no
17 longer going to follow the patients, correct?
18     A.    That means the patient has been
19 discontinued from the study because the site is no
20 longer participating.
21     Q.    All right.
22           And, so, the investigator is not
23 following up with the patient at that time, right?
24     A.    Uh-huh.
25     Q.    And Merck is not following up with

Page 76

1  the patient from that time forward, correct?
2      A.    Except in the course of routine
3  reporting of serious adverse events --
4      Q.    By who?
5      A.    -- two weeks after discontinuation,
6  it would be required to be reported.
7      Q.    All right.
8            So, what about three weeks after
9  continuation?
10     A.    By definition, that was not routinely
11 done.
12     Q.    All right.
13           So, from the date of discontinuation,
14 there could be potentially followup reporting for
15 another two weeks, and then there would be no
16 followup reporting after that time, correct?
17     A.    Correct.
18     Q.    Okay.
19                      - - -
20           (Whereupon, Deposition Exhibit
21     Block-5, "MK-0966 Prot. No. 078 DRAFT
22     MK=0966 Alzheimer's Disease Prevention
23     Study" Excerpt MRK-APE0024963 -
24     MRK-APE0024972, was marked for
25     identification.)

Page 77

1                      - - -
2  BY MR. WEINBERG:
3      Q.    All right.
4            Let me show you what's been marked
5  Exhibit 5, and I'll represent to you this is a
6  document, the Bates Number is APE 0024963 through
7  972.  And the heading of the document is "MK-0966
8  Protocol Number 078 Draft, MK-0966 Alzheimer's
9  Disease Prevention Study."  And the date at the
10 bottom of the document is November 7th, 2003.  Now,
11 that's after you left Merck, correct?
12     A.    Correct.
13     Q.    And have you seen this document
14 before?
15     A.    No.  I don't recall whether or not I
16 saw this document before.
17     Q.    All right.
18           Let me just read what is written on
19 this first page of this document.  It says, "Due to
20 Good Clinical Practice (GCP) violations at Sites 19,
21 23 and 44, relating to issues with protocol
22 noncompliance and incomplete case report form data,
23 the primary efficacy analyses were done with and
24 without the data from these sites.  Since the
25 conclusion from the analyses without the sites was

20 (Pages 74 to 77)

85fca436-3777-4c65-af85-36788bd57b05

M00F844920

Confidential - Subject to Protective Order

Page 78

1 the same as that including all sites, all sites were
2 included in the efficacy and safety presented in the
3 CSR."
4          Did I read that correctly?
5      A.    Yes, you did.
6      Q.    What is good clinical practice?
7      A.    The specific, essentially, rules in
8 which all investigators and companies follow with
9 regard to conduct of a clinical trial.
10     Q.    Okay.
11          And do you know what study this is
12 referring to?
13     A.    This is referring to the PRAISE
14 study, 78.
15     Q.    78, okay.
16          So, we can look at -- we can go back
17 to our list of sites which I'm looking for here.
18 Are you with me, Doctor?  That's Exhibit 2, I
19 believe.
20     A.    Yes, I have it.
21     Q.    Okay.
22          And what is site 19?
23     A.    Site 19 says Stoukides.
24     Q.    Okay.
25          And, so, based upon this document,

Page 79

1 where it indicates that there were GCP violations at
2 site 19, do you see that?
3      A.    Yes.
4      Q.    Does this refresh your recollection
5 that there were violations of some sort related to
6 protocol noncompliance and incomplete case report
7 form data at site 19 with Dr. Stoukides.
8      A.    No, it doesn't refresh my memory.
9      Q.    Okay.
10     A.    I'm reading the same thing that
11 you're reading.
12     Q.    All right.
13          Well, I'm just trying to -- you know,
14 sometimes we don't remember things, and looking at a
15 document helps us remember, and we call that
16 refreshing recollection.  It's kind of a term of
17 art.  So, by showing you this document and then
18 referring back, I'm trying to see if it refreshes
19 your recollection.  If it doesn't, it doesn't, but
20 that's why I'm going through it this way.  Okay?
21     A.    Right.
22     Q.    All right.
23          And how about with respect to site
24 23, which is Dr. Wendt's site.  Does it refresh your
25 recollection about protocol noncompliance at that

Page 80

1 site?
2      A.    No, it doesn't.
3      Q.    And site 44, that's a site for Dr.
4 Cummins.  Do you see that?  078-44.
5      A.    Yes, I do.
6      Q.    And that's a site where there were 51
7 patients enrolled.  Do you see that?
8      A.    Yes, I do.
9      Q.    Okay.
10          So, that was one of the larger sites,
11 correct?
12          MR. PATRYK:  Object to form.
13 BY MR. WEINBERG:
14     Q.    In this study.  You can kind of
15 scroll down.  There were maybe one or two that were
16 bigger, but maybe three.
17          MR. PATRYK:  Same objection.
18          THE WITNESS:  It was one of the sites
19 that enrolled a lot of patients, correct.
20 BY MR. WEINBERG:
21     Q.    Okay.
22          And how many patients were left at
23 Dr. Cummins' site at the end of the study, or I
24 should say, at visit 6?  It's blank, isn't it?
25     A.    Well, the only thing indicated here

Page 81

1 in visit 5, it says 14 patients.
2      Q.    Okay.
3          And at visit 6, it's blank, right?
4      A.    That's correct.
5      Q.    Does that mean zero?
6      A.    I would assume it means zero.
7          MR. PATRYK:  I would caution you not
8 to speculate, Doctor.  Please just testify to your
9 knowledge.
10          THE WITNESS:  I don't know.
11 BY MR. WEINBERG:
12     Q.    Okay.
13          Well, it would be Merck's practice to
14 put in a number there if were there were any
15 patients left at that particular site at visit 6,
16 wouldn't it?
17     A.    Yes.
18     Q.    Okay.
19          And, actually, there are a few other
20 sites where they're blank at visit 6.  Dr. Rovner,
21 see that, 041?
22     A.    Correct.
23     Q.    That's blank.
24          And Dr. Smith's site, 045, that one's
25 blank?

Confidential - Subject to Protective Order

Page 82

1    A.    Correct.
2    Q.    And Dr. Doraiswamy at 046, that one
3  is blank at visit 5, right?
4    A.    Correct.
5    Q.    Okay.
6        So, going back to the Exhibit 5, does
7  looking at this document, Exhibit 5, and looking at
8  the table that we just went through in Exhibit 2,
9  refresh your recollection as to whether there were
10  any noncompliance and incomplete case report form
11  data issues with Dr. Cummins' site?
12    A.    No, again, I don't recall.  All I can
13  do is read what you've handed me.
14    Q.    Okay.
15        And do you recall that Dr. Cummins'
16  site or whether Dr. Cummins' site was shut down in
17  this study?
18    A.    I'm just reading from this.  I can't
19  tell.
20    Q.    Okay.
21        MR. WEINBERG:  Why don't we take a
22  five-minute break because we have to change the
23  tape.
24        THE VIDEOTAPE TECHNICIAN:  This
25  completes Videotape 1.  Off the record at 10:17 a.m.

Page 83

1            - - -
2        (Whereupon, a recess was taken from
3        10:17 a.m. until 10:27 a.m.)
4            - - -
5        (Whereupon, Deposition Exhibit
6        Block-6, Letter 8-8-01 MRK-AFW0012427 -
7        MRK-AFW0012428, was marked for
8        identification.)
9            - - -
10        THE VIDEOTAPE TECHNICIAN:  This is
11  Videotape Number 2.  Back on the record at
12  10:27 a.m.
13  BY MR. WEINBERG:
14    Q.    Okay.
15        Dr. Block, I've handed you what's
16  been marked as Exhibit 6.  This is a letter.  The
17  Bates Number is AFW 0012427.  The date is August
18  8th, 2001.  It's on your letterhead.  It's addressed
19  to Dr. Jeanette Wendt at the Neurological Associates
20  of Tucson in Tucson, Arizona, and it's signed by you
21  on the second page.
22        Have you seen this before?
23    A.    Not in the course of preparation for
24  this.
25    Q.    All right.

Page 84

1        Is that your signature or a photocopy
2  of your signature?
3    A.    Yes, it is.
4    Q.    All right.
5        Do you recall seeing this document at
6  any previous time or authoring the document?
7    A.    No, I don't.
8    Q.    All right.
9        And this is a letter to Dr. Wendt,
10  which says in the first paragraph, "This letter is
11  official notice of termination of your participation
12  in Study 078, entitled 'MK-0966 for the Treatment of
13  Mild Cognitive Impairment and Prevention of
14  Conversion to Alzheimer's Disease,'" correct?
15    A.    That is correct.
16    Q.    All right.
17        And in reading that first paragraph,
18  does it refresh your recollection that Merck
19  terminated Dr. Wendt's participation in study 078?
20    A.    Again, it doesn't recollect my
21  memory.  I'm just reading what you handed me.
22    Q.    Do you recollect whether Dr. Wendt's
23  participation in protocol 091 was terminated at this
24  time or at any time?
25    A.    No, I don't recall --

Page 85

1    Q.    All right.
2        Would it have been stamped --
3    A.    -- whether or not --
4    Q.    I'm sorry.
5    A.    I don't recall whether or not.
6    Q.    Would it have been Merck's standard
7  practice if a site was in violation of the protocol
8  in one study and involved in another to terminate
9  the participation in the other study as well?
10    A.    No.  I don't recall whether or not,
11  what the standard practice was.
12    Q.    Okay.
13        Do you think that Dr. Wendt --
14        Do you have any reason to believe
15  that Dr. Wendt's site continued to participate in
16  protocol 091 after being terminated from protocol
17  078?
18    A.    I don't recall whether or not Dr.
19  Wendt's site continued in 91.
20    Q.    Is it possible that it did continue?
21        MR. PATRYK:  Objection to form.
22        THE WITNESS:  Again, I just don't
23  recall whether or not.
24  BY MR. WEINBERG:
25    Q.    Okay.

22  (Pages 82 to 85)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 86

1       Who would know?
2   A.   I don't know who would know.
3   Q.   Okay.
4       Did you keep a file with letters that
5   you wrote to sites in the studies for which you
6   served as clinical monitor?
7   A.   I don't recall whether a file was
8   kept with everything that was communicated with
9   sites.
10  Q.   Okay.
11       - - -
12       (Whereupon, Deposition Exhibit
13       Block-7, "MK-0966: Prevention of
14       Conversion to Alzheimer's Disease" Undated
15       Draft Memo MRK-ARP0022125 -
16       MRK-ARP0022133, was marked for
17       identification.)
18       - - -
19  BY MR. WEINBERG:
20  Q.   Let me show you what's been marked as
21  Exhibit 7.
22       I'm sorry.  Let's just go back to --
23       MR. PATRYK:  Back to Exhibit 6?
24       MR. WEINBERG:  Yes, 6, please.
25       MR. PATRYK:  Okay.

Page 87

1   BY MR. WEINBERG:
2   Q.   Okay.
3       The second paragraph of the letter
4   specifies what the deviations were, correct, or the
5   noncompliance at the site?
6   A.   It specifies specific issues.
7   Q.   Okay.
8       The third paragraph says that "Merck
9   hereby provides you with the required 60 days'
10  notice of termination," correct?
11  A.   That's correct.
12  Q.   And "Effective October 7, 2001, work
13  on this study will officially terminate at your
14  site."  And "Merck is obligated to notify the FDA
15  and your Institutional Review Board of the
16  termination," right?
17  A.   That's correct.
18  Q.   Okay.
19       And that Institutional Review Board
20  was Western IRB, correct?
21  A.   (Indicating.)
22  Q.   You may, sure.
23  A.   I'd have to look back.
24  Q.   Absolutely.
25  A.   Yes.

Page 88

1       (Witness reviewing document.)
2       That's correct.
3   Q.   All right.
4       Did you send a letter to the FDA
5   notifying them of the termination of this site?
6   A.   I don't recall whether or not I
7   personally sent the letter.
8   Q.   Would you have sent it or would
9   someone else perhaps in regulatory have sent it, do
10  you know?
11  A.   I don't recall.  Typically these
12  things go from regulatory.
13  Q.   Okay.
14       What about the IRB, who would notify
15  the IRB?
16  A.   I don't recall whether or not I
17  personally notify it or whether someone in another
18  group would.
19  Q.   Okay.
20       The last paragraph on this page, and,
21  actually, the last paragraph in the letter says,
22  "Pursuant to the protocol, you are required to bring
23  all patients in for a final close-out visit."
24       Do you see that?
25  A.   Yes.

Page 89

1   Q.   What does that refer to?
2   A.   Final closeout visit refers to
3   bringing patients in and conducting all the
4   necessary medical evaluations as specified in the
5   protocol as if they were -- completed the study or
6   leaving the study.
7   Q.   Okay.
8   A.   So, patients would have physicals,
9   histories, and I assume, you know, everything listed
10  in the protocol.
11  Q.   All right.
12       And by "final close-out visit," does
13  that mean the last visit for the patient with the
14  investigator?
15  A.   Yes.
16  Q.   Okay.
17       And the patient would then be
18  referred back to their primary physician,
19  theoretically?
20  A.   I would be speculating.
21  Q.   Okay.
22       Do you know whether, following all
23  the final closeout visits, the site would be
24  unblinded, the data from the site would be
25  unblinded?

23 (Pages 86 to 89)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 90

1      MR. PATRYK:  Objection to the form.
2      THE WITNESS:  One, I don't know
3  whether or not, but the procedure, standard
4  procedure is that the site would not be unblinded if
5  a study is ongoing.
6  BY MR. WEINBERG:
7      Q.    Would the patients be told what drug
8  they were on, whether it was Vioxx or placebo?
9      A.    No, they would not.
10     Q.    Okay.
11            It says, continuing with that line,
12  "Pursuant to the protocol, you are required to bring
13  all patients in for a final close-out visit,
14  conduct, document and sign all final physical and
15  neurological exams" -- we just talked about that,
16  right?
17     A.    Correct.
18     Q.    -- "and any adverse event causality
19  data yourself.  Your staff is to collect all drug
20  from the patients and ship all drug (used and
21  unused) back to Merck.  Any final payment due to
22  your site will be made upon receipt of all data and
23  resolution of any outstanding discrepancies.  You
24  are also required to maintain all study records in a
25  secure location until Merck notifies you that such

Page 91

1  records may be destroyed."
2            Did I read that correctly?
3      A.    Yes, you did.
4      Q.    Did Merck notify sites that were
5  terminated that records should be destroyed at any
6  time, to your knowledge?
7      MR. PATRYK:  Object to form.
8      THE WITNESS:  Again, I don't know
9  what Merck did or did not with a particular site.
10  Record retention is an FDA requirement, if I
11  remember correctly.
12  BY MR. WEINBERG:
13     Q.    All right.
14            Well, then, why would Merck tell
15  sites that documents -- strike that.
16            Why would Merck notify sites that
17  records may be destroyed?
18     MR. PATRYK:  Objection to the form.
19     MR. SACK:  Objection to the form.
20     THE WITNESS:  Again, I can't speak
21  for that, but I know that sites are required in the
22  conduct of a study to maintain records for a certain
23  period of time until such time as a number of years,
24  I believe, after the drug is approved.  You would
25  have to check the federal regulations on this.

Page 92

1  BY MR. WEINBERG:
2      Q.    To your knowledge, did Merck notify
3  study sites that records should be destroyed?
4      MR. PATRYK:  Objection to form as
5  asked and answered.
6            You may answer it again.
7      THE WITNESS:  No.  Because, again,
8  sites are instructed to follow the regulations.
9  BY MR. WEINBERG:
10     Q.    Okay.
11            Well, why didn't you in this letter
12  tell Dr. Wendt that the records should be maintained
13  pursuant to federal regulations rather than saying,
14  maintain them until we tell you to destroy them?
15     MR. PATRYK:  Objection to the form.
16            You may respond.
17     THE WITNESS:  Again, I'm just reading
18  whatever, "maintain all study records in a secure
19  location until...such records may be destroyed."
20  BY MR. WEINBERG:
21     Q.    Okay.
22            So, do you know how long the records
23  had to be maintained under the law?
24     A.    I don't recall what's in the
25  regulations.  I know it is specified.

Page 93

1      Q.    Okay.
2            So, it was your understanding that
3  Dr. Wendt should go to the regulations or -- strike
4  that.
5            It was your intent in writing this
6  letter to tell Dr. Wendt -- let me strike that
7  question.  Let me rephrase it.
8            Did you know what the regulation was
9  on maintenance of records at the time you wrote this
10  letter?
11     A.    I don't recall whether or not -- at
12  the time I wrote this letter, I don't recall right
13  now whether I knew the specific regulation.
14     Q.    Was maintenance of records a part of
15  good clinical practice, GCP?
16     A.    I don't recall whether or not it's
17  something in the GCP, but I believe it is.
18     Q.    Okay.
19            And did Merck comply with GCP, good
20  clinical practice, in running studies?
21     A.    Yes.
22     Q.    And did Merck expect its
23  investigators to comply with good clinical practice
24  in running studies?
25     A.    Yes.  And as evidenced by this

24  (Pages 90 to 93)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 94

1   letter, that if they were not followed, the site
2   could be terminated.
3         Q.    And the records should be maintained
4   pursuant to regulation, right?
5         A.    Until they're notified that they can
6   be destroyed, as indicated in the letter.
7         Q.    All right.
8               So, why wouldn't you tell the site
9   that you expected them to maintain the records
10  pursuant to good clinical practice and regulation?
11              MR. PATRYK:  Objection.
12              You may respond.
13              THE WITNESS:  Again, I'm using
14  wording here in this, and I can also notice that
15  under the BCC, it also went through Dr. Frank Bigley
16  in legal, so, this might have been the wording I was
17  told to use.
18  BY MR. WEINBERG:
19        Q.    Okay.
20              And who is Frank Bigley?
21        A.    He is a lawyer at Merck, or was at
22  that time.
23        Q.    Okay.
24              Let's go to Exhibit 7.  Do you
25  recognize this document?

Page 95

1         A.    I don't recall.  I didn't recall -- I
2   didn't see this in the preparation for this.
3         Q.    Okay.
4               Do you recall that there was a WCQAR
5   investigator site audit of Dr. Joel Ross' Long
6   Branch, New Jersey site for protocol 078?
7         A.    No, I don't recall that, but that's
8   what the title indicates.
9         Q.    All right.
10              And we looked at Dr. Ross on one of
11  the earlier documents, do you recall?
12        A.    We saw his name on the list, that is
13  correct.
14        Q.    All right.
15              And this document is addressed to
16  you, right, Dr. Gilbert Block?
17        A.    Yes, it is.
18        Q.    And at clinical neurosciences, that
19  was your department, right?
20        A.    Correct.
21        Q.    And what's WCQAR?  What was it?
22        A.    Worldwide clinical quality
23  auditing -- I'm not sure what the R stood for.
24        Q.    What was the role of W -- can we call
25  it W -- well, how did you refer to it?  Did you --

Page 96

1   from day -- in your day-to-day work, did you say,
2   hey, WCQAR contacted me or --
3         A.    No.  QA.
4         Q.    QA?
5         A.    Yes.
6         Q.    Okay.
7               And what was QA's role?  What did
8   they do?
9         A.    QA's role is to go out and routinely
10  audit sites with regard to integrity of data.
11        Q.    Okay.
12              And if there was -- were reports
13  generated -- I'm sorry.  Let me rephrase that.
14              Were reports typically generated by
15  QA after site investigations?
16        A.    Yes.
17        Q.    And were the reports typically sent
18  to the clinical monitor for the study?
19        A.    In this case, it was.
20        Q.    All right.
21              Do you recall receiving, in the
22  course of your regular employment, information like
23  this from QA?
24        A.    I don't recall whether or not, you
25  know, receiving this, but, obviously, I did.

Page 97

1         Q.    Okay.
2               And does this refresh your
3   recollection as to an investigation at this
4   particular site, looking at this document?
5         A.    No.  It doesn't refresh my
6   recollection.  I can just read what's here.
7               (Reviewing document.)
8         Q.    Have you had a chance to look at the
9   document?
10        A.    I've scanned through parts of it.
11        Q.    Okay.
12              And does it refresh your recollection
13  as to the investigation -- I'm sorry -- of the audit
14  of Dr. Ross's site in 078?
15        A.    No, it doesn't refresh my
16  recollection.  Again, I'm just reading what you gave
17  me.
18        Q.    Okay.
19              Let me show you Exhibit 8, please.
20              - - -
21              (Whereupon, Deposition Exhibit
22              Block-8, Letter 2-15-01 MRK-AAF0003689 -
23              MRK-AAF0003690, was marked for
24              identification.)
25              - - -

25 (Pages 94 to 97)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 98

1  BY MR. WEINBERG:
2      Q.    This is a letter dated February 15,
3  2001 from Janet M. Keyser to David LePay, M.D. at
4  FDA. The Bates Numbers are AAF 0003689 to 90. Have
5  you seen this document before?
6      A.    I don't recall whether or not I saw
7  it before.
8      Q.    If you look at the second page of the
9  document, you see under ccs --
10     A.    Yes, I do.
11     Q.    -- there's Russell Katz, the director
12 of the division of neuropharmacological drug
13 products? Do you see that?
14     A.    Yes, I do.
15     Q.    And Dr. Howard Cummins, Dr. Ann
16 Macek, Dr. Angela Bowen at Western IRB, and you, Dr.
17 Gil Block?
18     A.    Yes.
19     Q.    Do you see that?
20     A.    Yes, I do.
21     Q.    All right.
22           So, do you believe that this is a
23 document you would have received in the ordinary
24 course of your employment at Merck in February of
25 2001?

Page 99

1      A.    Yes.
2      Q.    And this is a letter from Janet
3  Keyser, who is the director of QA, correct?
4      A.    That's correct.
5      Q.    All right.
6            And Dr. LePay is at FDA, right, or
7  was at the time?
8      A.    Yes, that's indicated here.
9      Q.    Okay.
10           Would you take a look at the letter,
11 and I'm going to ask if it refreshes your
12 recollection about issues, compliance issues at Dr.
13 Cummins' site?
14     A.    (Reviewing document.)
15           No, it doesn't recollect my memory,
16 but, again, I'm looking at -- and I can read what
17 you gave me.
18     Q.    Okay.
19           And on the second page of the letter,
20 in the last paragraph, I'm just going to go to the
21 last two lines. "It was the decision," do you see
22 that?
23     A.    Yes, I do.
24     Q.    "It was the decision of the Merck
25 project team to terminate both protocols (078 and

Page 100

1  126)" --
2            (Phone interruption.)
3  BY MR. WEINBERG:
4      Q.    I'm going to start it again. Okay?
5      A.    Certainly.
6      Q.    All right.
7            "It was the decision of the Merck
8  project team to terminate both protocols (078 and
9  126) at Dr. Cummins' site. Dr. Cummins and the IRB
10 were informed of this decision to terminate on
11 February 13, 2001 (see attached correspondence)."
12           Did I read that correctly?
13     A.    Yes, you did.
14     Q.    Does that refresh your recollection
15 that Dr. Cummins' site in 078 was terminated by
16 Merck in February of 2001?
17     A.    No. Again, it really doesn't refresh
18 my recollection, but I did read what you gave me.
19     Q.    Okay. All right.
20           And would the patients have been
21 followed after termination of the study by Merck?
22           MR. PATRYK: Objection to form as
23 asked and answered.
24           You can answer again.
25           THE WITNESS: Again, as I indicated

Page 101

1  before, with regard to what I said before about the
2  14-day period, other than that, they would be
3  referred back to his or her physician.
4  BY MR. WEINBERG:
5      Q.    So, is the answer to my question they
6  would be followed for 14 days and then no longer by
7  Merck?
8      A.    If a serious adverse event occurred,
9  it would be reported within the 14-day period as per
10 the protocol.
11     Q.    All right.
12           And if a serious adverse event
13 occurred to a patient who was enrolled at Dr.
14 Cummins' site on day 15, after termination, that
15 would not be reported to Merck, correct?
16     A.    If they were not being followed,
17 that's correct.
18     Q.    How do you know that this site would
19 be aware of their responsibility to report adverse
20 events 14 days after termination?
21           MR. PATRYK: Objection.
22           MR. SACK: Same objection.
23           THE WITNESS: Again, in the course of
24 the conduct of the study, the routine is a serious
25 adverse event that occurs within 14 days, if someone

26 (Pages 98 to 101)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 102

1  is discontinuing the medication, if the site is made
2  aware of it, we are to be notified.
3  BY MR. WEINBERG:
4      Q.    Okay.
5            We've seen now that there were
6  several sites that were terminated based on the
7  documents that I've shown you over the last hour or
8  so.  Would you agree?
9            MR. PATRYK:  Objection to the form.
10           THE WITNESS:  Actually, no, I
11 wouldn't agree.  What you've shown me are two
12 documents with regard to specific sites terminated
13 and one site in which the QA reports says the
14 studies were conducted within good clinical
15 practice.
16 BY MR. WEINBERG:
17     Q.    All right.
18           There were at least three sites that
19 were terminated, right, based on the documents that
20 I showed you?
21     A.    No, I don't believe that's correct.
22     Q.    Well, let's go back.
23           Do you recall Exhibit 5?  That's this
24 one.  (Indicating.)
25     A.    (Witness reviewing document.)

Page 103

1            Yes, I recall Exhibit 5.
2      Q.    All right.
3      A.    But this does not say that three
4  sites were terminated.
5      Q.    It says that there was protocol
6  noncompliance and incomplete case report form data
7  at these three sites, correct?
8      A.    Correct.
9      Q.    And at least two of the sites were
10 terminated, based on the documents that I've shown
11 you, right?
12           MR. PATRYK:  Same objection.
13           You may respond, Doctor.
14           THE WITNESS:  Again, you've shown me
15 documents that two sites were terminated.
16 BY MR. WEINBERG:
17     Q.    Does that mean that if a site was in
18 protocol noncompliance and was submitting incomplete
19 case report form data that Merck would continue to
20 use data from that site in a study and let it keep
21 running?
22           MR. PATRYK:  Object to form.
23           THE WITNESS:  Again, what's indicated
24 here is that there were three sites with
25 noncompliance issues and analyses were done with and

Page 104

1  without the data.
2  BY MR. WEINBERG:
3      Q.    Right.
4      A.    And you've shown me documents for two
5  sites that were terminated.
6      Q.    Right.
7      A.    That's all I can comment on.
8      Q.    So, the third site that's referenced
9  in the document that you're looking on, as far as
10 you know, as you sit here today, was a site that
11 Merck continued to participate in the study, right?
12           MR. SACK:  Objection.
13           MR. PATRYK:  Same objection.
14           THE WITNESS:  I don't recall whether
15 or not the site was continued.
16 BY MR. WEINBERG:
17     Q.    It might have continued?
18           MR. SACK:  Objection.
19           THE WITNESS:  I don't recall whether
20 or not.
21 BY MR. WEINBERG:
22     Q.    Okay.
23           Is there some place where we can go
24 to find out what studies -- what sites in what
25 studies were terminated by Merck instead of having

Page 105

1  to search through millions of pages of documents to
2  find it?
3            MR. SACK:  Objection to the form.
4            MR. PATRYK:  Object to form.
5            THE WITNESS:  Again, I wouldn't know
6  who keeps that list.
7  BY MR. WEINBERG:
8      Q.    Well, when you were the clinical
9  monitor for these studies, did you keep a list of
10 sites that were terminated?
11     A.    There was a list kept.
12     Q.    By whom?
13     A.    I don't recall that I ever kept a
14 specific list of sites terminated or otherwise.
15     Q.    Okay.
16           Wasn't that important information?
17     A.    That information was kept by a
18 variety of people in the groups.
19     Q.    Okay.
20           Did Merck have any kind of a policy,
21 as far as you know, to deal with sites that were in
22 noncompliance with study protocol?
23           MR. PATRYK:  Object to form.
24           THE WITNESS:  I'm not sure what you
25 mean by "policy."

27 (Pages 102 to 105)

M00F84492Z

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 106

BY MR. WEINBERG:

1  BY MR. WEINBERG:
2      Q.    Did Merck have a guideline, a set of
3  instructions for how a clinical monitor running a
4  study should deal with sites that were in
5  noncompliance with the protocol?
6      A.    There are guidelines with regard to
7  doing QA audits of sites for issues, if there are
8  issues that need to be evaluated.
9      Q.    Okay.
10             And, so, it's possible that sites
11  that are in noncompliance may continue in studies,
12  correct?
13      A.    I'm not sure what -- you'd have to
14  define what you're meaning by "noncompliance."
15      Q.    Well, is there any set of guidelines
16  that defines that for you, the clinical monitor, or
17  is it basically a judgment call whether to let them
18  stay or go?
19      A.    There are standard SOPs, standard
20  operating procedures with regard to QA audits.
21      Q.    Okay.
22      Q.    But --
23      A.    I don't recall whether or not -- what
24  the specific directives are in that.
25      Q.    Who made the decision to terminate

Page 107

1  those sites that we looked at, the Cummins site and
2  the Wendt site?
3      A.    That was made in concert between the
4  clinical group and the QA group.
5      Q.    And who in the clinical group was
6  involved in that decision making?
7      A.    I would be involved in the decision
8  making, as well as others.
9      Q.    Anybody else?
10      MR. PATRYK:  From clinical?
11      MR. WEINBERG:  Yes.
12      THE WITNESS:  From clinical, I'm sure
13  that I consulted with my boss.
14  BY MR. WEINBERG:
15      Q.    Dr. Reines?
16      A.    Dr. Reines.
17      Q.    Okay.
18             And would anyone else have been
19  involved in that decision?
20      A.    In which group?
21      Q.    Clinical.
22      A.    I don't recall whether or not anyone
23  else was involved in the decision.
24             - - -
25      (Whereupon, Deposition Exhibit

Page 108

1  Block-9, "Merck Research Laboratories
2  MK-0966 PRAISE Trial" 4-98, Slide Set
3  Excerpt, MRK-AHD0001996; MRK-AHD0002400 -
4  MRK-AHD0002403, was marked for
5  identification.)
6      - - -
7  BY MR. WEINBERG:
8      Q.    All right.  Let me show you what's
9  been marked next.  This is an excerpt, okay, from a
10  document.  It is a very, very long document.  The
11  first page of the document is AHD 0001996, and I've
12  only copied four pages because of the length of the
13  document, but it is about, I believe, about a
14  440-page document.
15      MR. PATRYK:  Just note my objection
16  to using only an excerpt of the document.
17      MR. WEINBERG:  It's too heavy to
18  carry.
19      MR. PATRYK:  Same objection.
20  BY MR. WEINBERG:
21      Q.    First of all, the Bates --
22      MR. WEINBERG:  I said the Bates
23  Number?
24      THE COURT REPORTER:  Yes.
25  BY MR. WEINBERG:

Page 109

1      Q.    The page that we're looking at, the
2  first page is the title page for a meeting that
3  Merck held in Dallas on April 13 and April 14, 1998
4  for the PRAISE trial, correct?
5      A.    Correct.
6      Q.    And were you involved in this
7  meeting?
8      A.    Yes.
9      Q.    And what was the purpose of the
10  meeting?
11      A.    From looking at the date, I assume
12  this is the investigator meeting.
13      Q.    Okay.
14      A.    This is the kickoff meeting, as it
15  were.
16      Q.    All right.
17             And just tell me what happens
18  generally, or if you remember specifically with
19  respect to this meeting, at a kickoff meeting with
20  investigators?
21      A.    Investigator meetings for studies
22  will involve a number of components.  They will
23  involve a review of the rationale for the study, a
24  review of the protocol, the entry criteria, the
25  specific study procedures with regard to monitoring

Golkow Technologies, Inc. - 1.877.370.DEPS

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 110

1 efficacy and safety, any other special requirements
2 of the study, lab collection procedures, review of
3 definitions with regard to adverse events,
4 requirements for adverse event reporting, good
5 clinical practices and specific training, if
6 there're specific scales that are used where staff
7 at the site need to be trained.
8     Q.     Okay.
9            Do you remember this meeting in
10 Dallas?
11    A.     No, I don't remember the meeting.
12    Q.     How were --
13           So, just so that I'm clear, would
14 investigators be invited to this meeting?
15    A.     Investigators and study coordinators.
16    Q.     All right.
17           Would investigator staff be invited
18 to the meeting?
19    A.     Yes.  The study coordinators that I'm
20 referring to are those at the investigator sites.
21    Q.     All right.
22           So, on that list of investigators
23 that we saw, the doctors who were the investigators
24 would be invited to a meeting --
25    A.     Correct.

Page 111

1     Q.     -- such as this?
2            And they were invited to this
3 meeting, correct?
4     A.     Correct.
5     Q.     All right.
6            And also their employees who were in
7 charge of coordinating activities in the study at
8 their sites would be invited as well, correct?
9     A.     Correct.
10    Q.     And would Merck pay for their airfare
11 to come to the study?
12    A.     Correct.
13    Q.     I'm sorry, to come to the meeting?
14    A.     Correct.
15    Q.     And would Merck pay for their hotel
16 rooms?
17    A.     Correct.
18    Q.     And their food?
19    A.     Merck would pay for what was
20 happening at the meeting.
21    Q.     Okay.
22           And the acronym, PRAISE, we can see
23 here, comes from a title called Prevention of
24 Alzheimer's in Society's Elderly, correct?
25    A.     Correct.

Page 112

1     Q.     And the patients that Merck intended
2 to enroll in this study, you mentioned mild
3 cognitive impairment.  Can you tell me a little bit
4 about the kind of patients that Merck intended to
5 and did enroll in this study?
6     A.     The patients in general that were
7 enrolled are those patients who have a documented
8 problem with their memory that has gotten worse and
9 confirmed by a significant other or a caregiver for
10 a minimum period of time, and the patient would,
11 then, also have to meet specific criteria with
12 regard to his or her memory function.  Additionally,
13 the patients would be screened with regard to other
14 medical conditions that might affect evaluation or
15 development of other kinds of memory problems.
16    Q.     All right.
17           And are these patients --
18           Was there a cardiac criteria involved
19 in this study?
20    A.     I don't recall a specific wording,
21 but patients essentially had to be healthy.
22    Q.     Okay.
23           And were patients who were required
24 to take aspirin permitted to be enrolled in this
25 study at this time, in 1998?

Page 113

1     A.     No, not at this time.
2     Q.     Okay.
3            I'm speaking about aspirin prescribed
4 prophylactically to prevent heart attacks and
5 strokes.
6     A.     Yeah.  At the time of the initiation
7 of the study, no.
8     Q.     No, okay.
9            So, when you used the word "healthy,"
10 what are you -- can you describe what you mean
11 relative to some other nonhealthy population, less
12 healthy population?
13           MR. PATRYK:  Note my objection.
14           You may respond.
15           THE WITNESS:  I can take you through
16 the entry criteria in the protocol and show you.
17 BY MR. WEINBERG:
18    Q.     Okay.
19           We may have time to do that.  But I'm
20 just asking for right now, when you said "healthy,"
21 were you referring to cardiovascularly healthy as
22 opposed to patients with some cardiovascular risk
23 factors?
24           MR. PATRYK:  Objection to the form.
25           You may respond.

29 (Pages 110 to 113)

85fca436-3777-4c65-af85-36788bd57b05

M00F844929

Confidential - Subject to Protective Order

Page 114

1          THE WITNESS: No. Again, I'm
2 referring to otherwise generally healthy elderly,
3 without any other clinically relevant medical
4 conditions, who have a documented decline in their
5 memory.
6 BY MR. WEINBERG:
7     Q.    Okay.
8          But in terms of patients who were not
9 on aspirin, not required to take aspirin, those
10 would be patients, as opposed to patients who were
11 required to take aspirin, who had a better
12 cardiovascular health profile?  Is that fair to say?
13         MR. PATRYK: Object to form.
14         THE WITNESS: No, that's not fair to
15 say.  The criteria were patients, essentially, had
16 to be healthy, and we can look at the specific entry
17 criteria.
18 BY MR. WEINBERG:
19    Q.    Well, what was the reason to exclude
20 patients who were on aspirin?  Why were they
21 excluded?
22    A.    Well, there are two basic reasons.
23 Actually, with regard to aspirin, one basic reason,
24 because aspirin in and of itself can cause
25 gastrointestinal side effects.

Page 115

1     Q.    Okay.
2     A.    And that's the one basic reason.
3     Q.    All right.
4          What other cardiovascular criteria
5 were applied?
6     A.    Again, without looking at the
7 specific entry criteria in the protocol, I can't
8 give you specifics.
9     Q.    Okay.
10         Now, I've copied four pages of the
11 document, from Bates pages AHD 0002400 through 2403.
12 The first page is "Good Clinical Practice." Do you
13 see that?
14    A.    Yes, I do.
15    Q.    And it says it's "An international
16 ethical and scientific standard by which clinical
17 trials are designed, implemented and reported to
18 ensure protection of human subjects and data
19 reliability.  A Standard For Quality."
20         Did I read that correctly?
21    A.    Yes, you did.
22    Q.    And what was the purpose of showing
23 this slide to the investigators and others who
24 attended the meeting?
25    A.    It is routine to make sure at

Page 116

1 investigator meetings that investigators are shown
2 what is expected of him or her with regard to good
3 clinical practices for the conduct of the study.
4     Q.    Okay.
5          The next page identifies or refers to
6 some regulations and papers.  Do you see that?
7     A.    Yes, I do.
8     Q.    And it says, "Code of Federal
9 Regulations" for "Institutional Review
10 Boards...Protection of Human Subjects...IND and NDA
11 Applications."
12         Do you see that?
13    A.    Yes, I do.
14    Q.    And does any of that refer to the
15 sponsor's obligations under good clinical practices?
16    A.    I wouldn't know, looking at these
17 specific parts, without reading them, what it says
18 vis-a-vis sponsor versus investigator.
19    Q.    Was Merck required to comply with
20 good clinical practices in the conduct of the PRAISE
21 study?
22         MR. PATRYK: Objection to the form.
23         THE WITNESS: Absolutely.
24 BY MR. WEINBERG:
25    Q.    Okay.

Page 117

1          The next page says, "Global Sources
2 of GCP," good clinical practice.
3          Do you see that?
4     A.    Yes, I do.
5     Q.    The "Declaration of Helsinki - 1964."
6 Do you see that?
7     A.    Yes, I do.
8     Q.    And France, the Bonne Practique
9 Clinique in 1987, and several others, UK, Nordic
10 Council, Japan, EU, that's European Union, right?
11    A.    Correct.
12    Q.    Australia, World Health Organization,
13 International Conference on Harmonization.
14         Do you see all those?
15    A.    Yes, I do.
16    Q.    Did Merck comply with all of those
17 sources of good clinical practice?
18         MR. PATRYK: Objection to form.
19         MR. SACK: Object to form.
20         THE WITNESS: Merck, in the conduct
21 of business, complies with the applicable
22 regulations.
23 BY MR. WEINBERG:
24    Q.    Okay.
25         Including all of these that are on

30 (Pages 114 to 117)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 118

1 the slide that Merck showed to the investigators at
2 the meeting, right?
3    MR. PATRYK:  Same objection.
4    THE WITNESS:  They comply with the
5 applicable regulations where a study is being
6 conducted.
7 BY MR. WEINBERG:
8    Q.   Okay.
9        What was the purpose of showing this
10 slide to the investigators at the meeting?
11   A.   These slides are shown by usually
12 someone from one of the other groups, and this is
13 just to, again, educate them as to good clinical
14 practices and that Merck follows them.
15   Q.   And on the last page that I've copied
16   for you, it says, "GCP Responsibilities Are Shared,
17 Sponsor, Monitor, Investigator."
18   Do you see that?
19   A.   Yes, I do.
20   Q.   Sponsor is Merck, correct, for this
21 study?
22   A.   Correct.
23   Q.   Okay.
24       So, Merck shared the responsibilities
25

Page 119

1 to conduct this study under good clinical practice
2 standards, correct?
3    A.   Correct.
4    Q.   And that included issues in informed
5 consent for the protection of the patients, right?
6    A.   Correct.
7    Q.   And the monitor shares responsibility
8 for good clinical practice, right?
9    A.   Correct.
10   Q.   And who was the monitor in this
11 study?
12   A.   For a particular study in this study,
13 it was me.
14   Q.   So, it was Dr. Gilbert Block?
15   A.   That's correct.
16   Q.   Okay.
17       And you shared responsibility for
18 making sure that the study was done according to
19 good clinical practice, correct?
20   A.   Correct.
21   Q.   And the investigator also has
22 responsibility, right?
23   A.   That's absolutely correct.
24   Q.   Okay.
25   MR. WEINBERG:  The next document

Page 120

1 is...
2        - - -
3        (Whereupon, Deposition Exhibit
4    Block-10, "Medical Affairs Procedures and
5    Policies Manual Merck Research
6    Laboratories Procedure No. 11: Clinical
7    Study Blinding," MRK-AAU0000001 -
8    MRK-AAU0000028, was marked for
9    identification.)
10       - - -
11   MR. WEINBERG:  I only have one of
12 these, unfortunately.
13 BY MR. WEINBERG:
14   Q.   This is a document -- the Bates
15 Number, I'm going to read it and then put it up.
16 I'm going to have to go back and forth on the Elmo,
17 AAU 0000001 through 28.  "Medical Affairs Procedure
18 and Policies Manual, Procedure Number 11:  Clinical
19 Study Blinding."
20       Do you see that on the title page?
21   A.   Yes, I do.
22   Q.   Okay.
23       And have you seen this document
24 before?
25   A.   I have not seen this in preparation

Page 121

1 for the deposition.
2    Q.   Have you seen the document before?
3    A.   I don't recall whether I saw this
4 specific document.
5    Q.   Well, when you were assigned to be --
6 well, let me ask you this question.
7        What was the first clinical study at
8 Merck for which you were assigned to be the clinical
9 study monitor?
10   A.   It was a Parkinson's study back in
11 1988.
12   Q.   Okay.
13       And when you were assigned to be the
14 clinical monitor for that study, how did you know
15 what a clinical monitor should do?
16   A.   Because we were trained on the SOPs.
17   Q.   Okay.
18       So, you were given a book basically,
19 right, a manual, correct?
20   A.   Right, correct.
21   Q.   And the manual told you how to do
22 certain things in the study and what Merck expected
23 of you, right?
24   A.   Correct.
25   Q.   And were you taught about clinical

Golkow Technologies, Inc. - 1.877.370.DEPS

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 122

1  study blinding?
2      A.    Yes.
3      Q.    All right.
4            And how were you taught about
5  clinical study blinding?
6      A.    Well, both through standard operating
7  procedures, training at pharma courses, direct sort
8  of didactic training, hands on, you know,
9  essentially, mentoring.
10     Q.    Okay.
11     A.    So, a variety of routes.
12     Q.    And did you have a binder that you
13 kept in your office with printed materials such as
14 Exhibit 10?
15     A.    Yes, I did.
16     Q.    All right.  Okay.
17           And the date on this document is
18 October 23rd, 1995, right?  Do you see that?
19     A.    Actually, I don't see that.  Where?
20     Q.    It's right above the exhibit sticker.
21     A.    Oh, okay.  Yeah.
22     Q.    Sorry about that.
23     A.    Let me just clarify.  That's why I
24 said I didn't know whether I had seen this.  I
25 didn't know when this was from.

Page 123

1      Q.    Okay.
2            Do you recall getting this in 1995?
3      A.    I don't recall.
4      Q.    Okay.
5            Do you recall generally seeing
6  printed material on clinical study blinding during
7  the course of your employment at Merck?
8      A.    Yes, I do.
9      Q.    Let me ask you to turn to Page 5,
10 0000005.  It says "Policy."  Are you with me?
11     A.    Yes.
12     Q.    Okay.
13           By the way, I'm sorry, just to go
14 back to the first page, there are a couple of
15 signatures on the page and a couple of titles under
16 the signatures.  Do you see that?  It says, "Senior
17 V.P. C.A.R.D.," and then "Senior V.P. Clinical
18 Sciences."  Do you see those?
19     A.    I see the titles listed there.  I
20 can't make out the signatures.
21     Q.    Is that C-A-R-D?  Do you know what
22 that stands for?
23     A.    No, I don't recall exactly.  I would
24 be guessing if I tried to remember.
25     Q.    Okay.

Page 124

1            And you don't recognize the
2  signatures?
3      A.    I can't make them out.
4      Q.    Okay.
5            Do you have any reason to believe
6  that this is not an official manual prepared by and
7  used by Merck in 1995?
8      A.    No.
9      Q.    Have you ever seen another version of
10 a clinical study blinding procedure?
11     A.    I don't recall whether I saw another
12 version of the clinical study blinding procedure.
13     Q.    Okay.
14           So, on Page 5, number I is "Policy."
15 Do you see that?
16     A.    Yes.
17     Q.    Okay.
18           And it says that "All Phase IIb, III,
19 IV and V, (refer to MAPP Number 1 for 'phase'
20 definitions) double-blind clinical trials, sponsored
21 by Merck and Co, Inc. must be conducted under
22 in-house blinding procedures."
23           Did I read that correctly?
24     A.    Yes, you did.
25     Q.    All right.

Page 125

1            And what is MAPP, M-A-P-P?
2      A.    Medical affairs procedures and
3  policies.
4      Q.    Okay.
5            And is that another set of materials
6  that you were provided with in the course of your
7  employment?
8      A.    The MAPP is the collection of all the
9  procedures and policies.
10     Q.    All right.
11           And would this document be included
12 in the MAPP?
13     A.    Yes.
14     Q.    All right.
15           And did you have the MAPP in your
16 office in a binder?
17     A.    Yes, I did.
18     Q.    Okay.
19           And was it updated or revised from
20 time to time?
21     A.    Yes, it was.
22     Q.    All right.
23           And at the time that you left Merck,
24 did you have an updated version of the MAPP in your
25 office?

32 (Pages 122 to 125)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 126

1    A.    I would have.
2    Q.    All right.
3          Did you take it with you or did you
4    leave it behind?
5    A.    Left behind.
6    Q.    Okay.
7          And double-blind clinical trials, is
8    that like the PRAISE study?
9    A.    That's correct.
10   Q.    Okay.
11         And is that like protocol 126?
12   A.    Correct.
13   Q.    And protocol 091?
14   A.    Yes.
15   Q.    The Alzheimer's studies were all
16   double-blind clinical trials, right?
17   A.    That is correct.
18   Q.    And they were phase IV studies,
19   right?
20   A.    No.  They were phase -- they were
21   termed essentially Phase III.
22   Q.    They were Phase III?
23   A.    Yeah.
24   Q.    Because it was a new indication for
25   an existing therapy?

Page 127

1    A.    It was a new indication.
2    Q.    Okay.
3          In other words, these were studies
4    that were done to see if Vioxx could be prescribed
5    to a different patient population than the original
6    NDA was proposed for, correct?
7    A.    No.  These were studies to see if
8    Vioxx could prevent Alzheimer's disease.
9    Q.    Okay.
10   A.    Or Vioxx could slow the progression
11   of Alzheimer's disease.
12   Q.    Right, right.
13         The original -- the NDA was for
14   arthritis.
15   A.    Correct.
16   Q.    And this is for a different purpose.
17   These studies were designed to find out if the drug
18   could work in a different way for a different
19   purpose, right?
20   A.    Correct.
21   Q.    Okay.
22         And it says, "The goal of in-house
23   blinding is to ensure the integrity of Merck
24   clinical trial data."
25         Did I read that correctly?

Page 128

1    A.    Yes, you did.
2    Q.    And then it says, "This is
3    accomplished by assuring that Merck personnel
4    directly associated with the design, monitoring,
5    administration, analysis and eventual registration
6    of the trial are prevented from biasing the outcome
7    by influencing the conduct of the trial or the
8    collection and interpretation of data."
9          Did I read that correctly?
10   A.    Yes, you did.
11   Q.    So, that applied to the Alzheimer
12   studies, right?
13   A.    Yes, it did.
14   Q.    All right.
15         Were you --
16         Did you consider yourself bound by
17   this policy?
18   A.    Yes, because I was directly involved.
19   Q.    Okay.
20         Below, under III, "Background," it
21   says, "Clinical study blinding (also referred to as
22   'masking') conceals the association between
23   subject/patient allocation number and treatment
24   group.  Blinding serves to prevent bias or influence
25   over the conduct of the trial and the collection and

Page 129

1    interpretation of data."
2          Did I read that correctly?
3    A.    Yes, you did.
4    Q.    And, so, does that accurately
5    describe why clinical studies generally are blinded,
6    double blind studies are blinded?
7    A.    Yes.
8    Q.    And did that apply to the Alzheimer
9    studies as well?
10   A.    Yes, it did.
11   Q.    All right.
12         What is an in-house blind at Merck?
13   A.    In-house blinding refers to the fact
14   that there is specific -- that the people involved
15   in the conduct of the trial do not have access to an
16   allocation schedule of who receives what drug, and
17   then an allocation schedule is actually masked, like
18   one of those scratch off things.
19   Q.    Right.
20         And what's the purpose of that?
21   A.    The purpose of that and those -- let
22   me just continue for a second.  There are only a
23   specific number of allocation schedules.  It is
24   documented who has them and where they are kept.
25   And the purpose is to maintain and ensure the

33 (Pages 126 to 129)

85fca436-3777-4c65-af85-36788bd57b05

M00F844933

Confidential - Subject to Protective Order

Page 130

1  integrity of the study and to maintain the blind.
2      Q.    Okay.
3          And does in-house blinding permit
4  anyone at any time for any circumstance to break the
5  blind?
6          MR. PATRYK:  Objection to form.
7  BY MR. WEINBERG:
8      Q.    Let me rephrase that.
9          Are there circumstances in which it
10 is appropriate to break the blind?
11         MR. PATRYK:  Same objection.
12         THE WITNESS:  There are specific
13 circumstances in the conduct of a trial where it is
14 appropriate.
15 BY MR. WEINBERG:
16     Q.    Okay.
17         What are those circumstances?
18         MR. PATRYK:  Are you talking about a
19 specific trial or are you asking him generally an
20 expert witness question?  Because to that extent, I
21 will object to the question as calling for expert
22 testimony.
23         MR. WEINBERG:  No.  I'm asking about
24 Merck policy.  It's not an expert question.
25         MR. PATRYK:  You may respond subject

Page 131

1  to my objection, Doctor.
2          THE WITNESS:  An example of such a
3  circumstance is if someone were to overdose in a
4  particular -- in the course of a study, and with
5  regard to the context -- you know, essentially being
6  able to provide the appropriate medical care and
7  treatment for that person, it would be important to
8  know whether that person was on the study medication
9  or the placebo.  That's one example.
10 BY MR. WEINBERG:
11     Q.    Okay.
12         If a patient has an adverse event
13 like a heart attack in a study, is that an
14 appropriate instance where the patient should be
15 unblinded or would be unblinded?
16         MR. PATRYK:  Object to form.
17         THE WITNESS:  No.
18 BY MR. WEINBERG:
19     Q.    It wouldn't be important, then, to
20 know whether the patient was on study medication or
21 a placebo, for example?
22         MR. PATRYK:  Objection to the form.
23         MR. SACK:  Objection to the form.
24         THE WITNESS:  Again, the point of
25 unblinding in the case of a double-blind study with

Page 132

1  in-house blinding is if knowing exactly what that
2  patient were on would influence the treatment that
3  that patient would receive for that adverse event.
4  So, again, the answer to your question is no.
5  BY MR. WEINBERG:
6      Q.    So, the purpose of the blinding
7  procedures was to protect the patients?
8      A.    The purpose -- no.  That's a
9  mischaracterization.
10         The purpose of the blinding
11 procedures are to protect the integrity and conduct
12 of the trial and remove bias.
13     Q.    Okay.
14         And what does that mean?  When you
15 say "protect the integrity and conduct of the
16 trial," is that referring to the data that are
17 generated in the study?
18     A.    That refers to even the ongoing
19 conduct of a trial.
20     Q.    All right.
21         Does it refer to efficacy data?
22     A.    It refers to the integrity of all the
23 data and the ongoing conduct of a trial.
24     Q.    Does it include the safety data?
25     A.    It refers to the conduct of the

Page 133

1  trial, as I indicated.
2      Q.    Okay.
3          Does it refer to the safety data?
4      A.    It refers to all the data.
5      Q.    So, that's a yes?
6      A.    Yes.
7      Q.    Okay.
8          It would be easier for today, if I'm
9  asking you a question, unless you don't understand
10 it, if you can say yes, to just say yes; is that
11 fair?
12     A.    Where appropriate.
13         MR. PATRYK:  Just note my objection.
14 Let me mention something, too.  While the doctor has
15 been answering, Dr. Egilman has been whispering to
16 you, which is making it difficult for me to listen
17 to the answer.
18         So, Doctor, if you will just wait
19 until the witness is finished and then say whatever
20 you want to say, I'd appreciate it.  Because I don't
21 know about the witness, but I'm having trouble
22 hearing the answer if you're talking while he's
23 answering.  Thank you.
24         MR. WEINBERG:  I'll ask Dr. Egilman
25 to reduce his stage whisper from a roar.

34  (Pages 130 to 133)

85fca436-3777-4c65-af85-36788bd57b05

M00F844934

Confidential - Subject to Protective Order

Page 134

1        MS. CONROY: I'd also like the doctor
2 to speak up a bit. I'm actually having trouble
3 hearing some of his answers.
4        MR. PATRYK: Please speak up.
5        THE WITNESS: Will do.
6        MS. CONROY: Thank you.
7 BY MR. WEINBERG:
8    Q.    Okay.
9        Let me take you to Page 0000007.
10        MR. WEINBERG: By the way, just for
11 the record, Dr. Egilman is talking to me, he's here
12 as my consultant and --
13        MR. PATRYK: He's perfectly entitled
14 to do that, just not while the witness is answering
15 the question.
16        MR. WEINBERG: Let me just finish.
17 We don't intend to be rude to the witness or to you,
18 Counsel. It didn't appear to me that it was an
19 issue, but we'll try and correct the problem.
20        MR. PATRYK: Thank you.
21 BY MR. WEINBERG:
22    Q.    Okay.
23        This is "Definitions of Study
24 Blinding, In-House Blind," right? Do you see that?
25    A.    Yes, I do.

Page 135

1    Q.    Okay.
2        And in the middle, it says, "Blinded
3 allocation schedules." Do you see that? "Blinded
4 allocation schedules are used to conceal the
5 association between subject/patient allocation
6 number and treatment group."
7        Are you with me?
8    A.    That's correct.
9    Q.    Okay.
10        And that's what you were talking
11 about earlier?
12    A.    Yes.
13    Q.    Okay.
14        And "These blinded" allocation -- it
15 says "location," but "These blinded location
16 schedules permit the emergency unblinding of
17 individual allocation numbers, while keeping the
18 association between the remaining allocation numbers
19 and treatment groups concealed," right?
20    A.    Correct.
21    Q.    "This disclosure should only occur if
22 absolutely necessary for the safety of a clinical
23 trial" subject -- subject(s)" patient "patient(s),"
24 right?
25    A.    Correct.

Page 136

1    Q.    And in the next paragraph, where I
2 have highlighted here, it says, "The in-house
3 blind," are you with me, about middle way through
4 the paragraph?
5    A.    Yes, I am.
6    Q.    "The in-house blind is maintained
7 until all subjects/patients have completed the
8 study, the data have been screened for completeness
9 and accuracy, and protocol violators have been
10 identified. If a study is to be conducted under
11 in-house blinding procedures, a statement to this
12 affect should appear in the Data Analysis Section of
13 a protocol," right?
14    A.    Correct.
15    Q.    All right.
16        So, the unblinding and the
17 association between an allocation number and
18 treatment group only occurs in the case where it's
19 absolutely necessary for the safety of a clinical
20 trial subject or patient, right?
21    A.    Yes, as I indicated previously.
22    Q.    Okay.
23        Why wouldn't the fact that a patient
24 in the PRAISE study had a heart attack require in
25 the best interest of the patient's safety that there

Page 137

1 be an unblinding so that the patient can be treated,
2 for example, by prescribing aspirin?
3        MR. PATRYK: Objection.
4        MR. SACK: Objection.
5        MR. PATRYK: Object to form.
6        THE WITNESS: As I indicated
7 previously, if knowing what the patient was on would
8 affect the treatment that he or she would have
9 received in that setting of having a heart attack,
10 as you are bringing up --
11 BY MR. WEINBERG:
12    Q.    Right.
13    A.    -- then it was important to know that
14 with regard to the treatment of that patient at that
15 time, then the blind would be broken.
16    Q.    Okay.
17        And wasn't that the situation back in
18 1998 into 1999, when patients were enrolled in this
19 study and taking Vioxx?
20        MR. PATRYK: Objection to the form.
21        THE WITNESS: No, that's not correct.
22 BY MR. WEINBERG:
23    Q.    Well, wasn't there a company-wide
24 program to monitor cardiovascular events in patients
25 because of the potential that Vioxx could cause

Golkow Technologies, Inc. - 1.877.370.DEPS

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 138

1   heart attacks and strokes?
2              MR. PATRYK:  Object to form.
3              THE WITNESS:  No.  Again, that's a
4   mischaracterization --
5   BY MR. WEINBERG:
6        Q.    Wasn't there a company-wide
7   program --
8              MR. PATRYK:  Pardon me.
9              Were you done with your answer,
10  Doctor?
11             THE WITNESS:  No.
12             MR. WEINBERG:  I'm sorry.
13             MR. PATRYK:  Please continue.
14             MR. WEINBERG:  Go ahead.
15             THE WITNESS:  There was an external
16  adjudication committee monitoring thrombotic events.
17  BY MR. WEINBERG:
18       Q.    What was that committee called?
19       A.    I don't know what the name of the
20  committee was.
21       Q.    Okay.
22             And how were the events getting to
23  that committee?
24       A.    Those events -- well, if they were
25  pre -- they were terms that were identified, and if

Page 139

1   an event occurred, the data would be collected by
2   the medical program monitor, coordinator, excuse me,
3   and it would be sent off to the person responsible
4   for coordinating and putting all the necessary
5   information on that particular patient, and then
6   sending it off to this external adjudication
7   committee.
8        Q.    Okay.
9              So, you mentioned "terms."  What
10  terms are you talking about?
11       A.    I don't recall the specific terms,
12  but, for example, the patient was said to have a
13  heart attack.
14       Q.    Okay.
15             And where were those terms found?
16  Were they in a document?
17       A.    I don't recall exactly where they
18  were maintained.
19       Q.    Do you recall a list of terms called
20  the CRISP list?
21       A.    Yes, I do.
22       Q.    And that was Merck's list of terms
23  for cardiovascular thrombotic events, right?
24       A.    It was a list for thrombotic --
25       Q.    Thrombotic events.

Page 140

1        A.    -- events.
2        Q.    Okay.
3              And the CRISP list was incorporated
4   into a standard operating procedure for Merck,
5   right?
6        A.    I don't recall how it was
7   incorporated, but, yes, there was a procedure.
8        Q.    Okay.
9              And that procedure was put into place
10  when?
11       A.    I don't recall when it was put into
12  place.
13       Q.    Do you recall that it was -- that it
14  was put into place in 1998?
15       A.    No, I don't recall when it was put
16  into place.
17       Q.    Do you recall --
18             If I told you that it was put into
19  place in early 1999, would that ring a bell?
20       A.    Again, I don't recall exactly when it
21  was put into place.
22       Q.    Was it put into place during the
23  conduct, the ongoing conduct of the Alzheimer
24  studies?
25       A.    I don't recall, again, when exactly

Page 141

1   it was put into place.  It was in place, but I don't
2   recall when.
3        Q.    Did it apply to the Alzheimer
4   studies?
5        A.    Yes, it did.
6        Q.    Okay.
7              How did --
8              Did it apply to the Alzheimer studies
9   from their inception?
10       A.    I don't recall if it applied --
11  whether or not it applied at the time this -- and
12  you will have to be specific which study started.  I
13  don't recall.
14       Q.    Any of the studies.
15       A.    I don't recall whether or not, in
16  relationship to those studies, when the CRISP terms
17  were in place.
18       Q.    All right.
19             And what was your understanding of --
20             Well, first of all, are we talking
21  about something that was called a cardiovascular SOP
22  at Merck?
23             MR. SACK:  Objection to the form.
24             MR. PATRYK:  Same objection.
25  BY MR. WEINBERG:

36 (Pages 138 to 141)

M00F84493G

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 142

1    Q.    CV SOP?
2    A.    Again, I don't recall what the SOP
3  was or what it was called.
4    Q.    Do you recall reviewing an SOP that
5  incorporated the CRISP terms?
6    A.    No.  I recall reviewing terms.
7    Q.    But not an SOP?
8    A.    I don't recall reviewing the SOP.
9    Q.    Wouldn't you have been given the SOP,
10  since you were the clinical study monitor for
11  ongoing -- an ongoing large study of elderly
12  patients?
13    A.    Again, you're asking me if I recall
14  receiving it, and I don't recall.
15    Q.    Okay.
16        Would it have been standard practice
17  at Merck for you to have received an SOP that
18  applied to your study?
19    A.    Yes.
20    Q.    Okay.
21        And, so, you would have known at the
22  time at least that you received this SOP that there
23  was a company-wide program to monitor thrombotic
24  events in ongoing clinical studies, right?
25        MR. SACK:  Objection to the form.

Page 143

1        MR. PATRYK:  Same objection.
2        THE WITNESS:  Again, I'm not sure
3  what you mean by "company-wide." And, again, my
4  understanding in recollection is that there were
5  specific terms identified in a specific external
6  adjudication committee.
7  BY MR. WEINBERG:
8    Q.    Okay.
9        So, just to take it back, were you
10  aware that there was a Vioxx -- that there was a
11  program implemented by Merck in the Vioxx -- I'm
12  sorry.  Let me rephrase that.
13        Did you become aware that there was
14  an SOP implemented in the Vioxx program that applied
15  to ongoing or newly started clinical studies to
16  monitor thrombotic events?
17    A.    Again, I'm aware that there was a
18  collection and monitoring by an external
19  adjudication committee of suspected thrombotic
20  events.
21    Q.    Okay.
22        And given that that was in place, why
23  wouldn't Merck unblind a patient who was on Vioxx --
24  I'm sorry.
25        Why wouldn't Merck unblind a patient

Page 144

1  in its study to see whether the patient was on Vioxx
2  or not?
3        MR. SACK:  Objection to the form.
4        MR. PATRYK:  Objection.
5        THE WITNESS:  Again, are you
6  referring to the situation you were describing
7  before?
8  BY MR. WEINBERG:
9    Q.    Yes.
10    A.    And, again, as I stated, if knowing
11  what he or she was on at that time would influence
12  the treatment of that patient for that particular
13  event, that would be done.
14    Q.    But it wasn't done?
15    A.    If knowing what the patient was on
16  would affect what treatment that patient would
17  receive for that adverse event, the patients -- what
18  the patient was receiving would be unblinded.
19    Q.    And would that be true for a
20  myocardial infarction?
21    A.    I think I've answered this, but,
22  again, if knowing for the treatment of that heart
23  attack, the patient coming in with a heart attack,
24  knowing whether that patient was on placebo or study
25  medication would impact what medication that patient

Page 145

1  was treated with at the time, it would be done.  If
2  not, it is not done.
3    Q.    Okay.
4        So, was it important to know, at the
5  time, to your recollection, whether the patient was
6  on placebo or Vioxx if a patient had a heart attack?
7  Was it important to Merck?
8        MR. PATRYK:  Objection to the form.
9        THE WITNESS:  Again, if a patient had
10  a serious adverse event and in terms of treating
11  that serious adverse event it was important to know
12  what that patient was on, that would have been done.
13  BY MR. WEINBERG:
14    Q.    Who made the decision?
15    A.    The decision was made by the monitor
16  in consult with the investigator, and also, for
17  example, if the patient were in a hospital, the
18  investigator would be obviously communicating with
19  the staff at the hospital.
20    Q.    Okay.
21        So, the decision would be made by, in
22  the case of the PRAISE study, you, in consult with
23  the investigator, correct?
24        MR. SACK:  Objection to the form.
25        MR. PATRYK:  Objection to the form.

37  (Pages 142 to 145)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 146

1          THE WITNESS:  In consult with the --
2    BY MR. WEINBERG:
3          Q.     Is that correct?
4          A.     Myself, in consult with the
5    physicians treating the patient --
6          Q.     Okay.
7          A.     -- directly or indirectly.
8          Q.     All right.
9                 So, what happened in the PRAISE
10   study?  Were patients unblinded?  Were patients who
11   had heart attacks unblinded in the PRAISE study?
12         A.     You're asking me did I unblind the
13   patient?
14         Q.     I'm asking you the question I just
15   asked you.  Were patients unblinded after having
16   heart attacks in the PRAISE study, to your
17   knowledge?
18         A.     Are you asking me did I directly
19   unblind because of an AE?
20         Q.     That will be my next question.
21   Answer my first question, if you could.
22         A.     My understanding is that at some
23   point in time, okay, that there was an unblinding
24   that I was not aware of of patients in the trial who
25   met specific -- who had specific events.

Page 147

1          Q.     And was that unblinding --
2                 MR. WEINBERG:  Okay.
3                 THE VIDEOTAPE TECHNICIAN:  This
4    completes Videotape 2.  Off the record, 11:28 a.m.
5                    -  -  -
6                 (Whereupon, a recess was taken from
7          11:28 a.m. until 11:39 a.m.)
8                    -  -  -
9                 THE VIDEOTAPE TECHNICIAN:  This is
10   Videotape Number 3.  Back on the record, 11:39 a.m.
11   BY MR. WEINBERG:
12         Q.     The unblinding that you became aware
13   of was not a patient specific unblinding for
14   purposes of determining treatment for the patient,
15   was it?
16         A.     That was an unblinding to look at
17   events by group.
18         Q.     So, the answer to my question is no?
19         A.     Correct.
20         Q.     All right.
21                And that was the unblinding that you
22   told me earlier had been done by people like Dr.
23   Reicin, right?
24                MR. PATRYK:  Objection.
25   BY MR. WEINBERG:

Page 148

1          Q.     Including Dr. Reicin?
2          A.     I don't believe I mentioned Dr.
3    Reicin's name, but she might have been involved.  I
4    don't recall.
5          Q.     Okay.
6                 There was a group that you were part
7    of that did unblinding, and that occurred after the
8    VIGOR data came in, right?
9          A.     Around the same time, if I remember
10   correctly.
11         Q.     Okay.
12                So, to go back to the question of
13   unblinding for purposes of an individual patient,
14   just so that we're clear, we're talking about a
15   disclosure that should occur "if absolutely
16   necessary" for the safety of a clinical trial
17   subject or subjects or patients, right?
18         A.     Yes, that's what it says.
19         Q.     Okay.
20                So, in the Alzheimer study, when a
21   patient had a heart attack, didn't it make a
22   difference whether the patient was on Vioxx or
23   placebo in terms of the treatment that the patient
24   would get for the heart attack?
25                MR. PATRYK:  Objection, form.

Page 149

1                 THE WITNESS:  I think you're
2    mischaracterizing something.  If someone had a heart
3    attack, whether they were on Vioxx or placebo, he or
4    she would have the same treatment regardless.
5    BY MR. WEINBERG:
6          Q.     Oh, so, you would give a patient who
7    had a heart attack on Vioxx aspirin?
8          A.     If they had a heart attack and
9    they're out of the study and patients and that
10   particular physician uses things to treat patients
11   acutely and chronically, yes.
12         Q.     Would you continue that patient on
13   Vioxx also?
14         A.     The patient was out of the study.
15         Q.     So, if the patient has a heart
16   attack, they're out of the study immediately?
17         A.     Yes.
18         Q.     Do they go back into the study?
19         A.     I don't recall an instance where
20   someone who would have had a serous adverse event of
21   a heart attack being in the study.
22         Q.     All right.
23                Just so that we're clear, patients in
24   the Alzheimer studies who had heart attacks were
25   discontinued from the studies?

38  (Pages 146 to 149)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 150

1    A.    My recollection is that someone who
2  had a serious adverse event that was termed a heart
3  attack was discontinued.
4    Q.    And, so, therefore, the patient would
5  not be unblinded because he or she was no longer
6  receiving Vioxx, correct?
7    MR. PATRYK:  Objection to form.
8    THE WITNESS:  No, that's not what I
9  said.  That's not correct.
10  BY MR. WEINBERG:
11    Q.    Okay.
12    Why would the patient not be
13  unblinded if they were terminated from the study?
14    A.    Because -- couple of reasons.
15    Number one, unblinding would not
16  affect the type of care the patient would receive.
17  So, again, if the patient was on placebo or Vioxx,
18  the treatment is going to be the same.
19    Secondly, they're not unblinded
20  unless absolutely necessary, as indicated in the
21  SOP, so as not to affect the remaining conduct of
22  the study.
23    Q.    Okay.
24    And what was the emergency that
25  justified the unblinding that you became aware of

Page 151

1  subsequently?
2    MR. SACK:  Objection to the form.
3    MR. PATRYK:  Same.
4    THE WITNESS:  Can you clarify your
5  question, please?
6  BY MR. WEINBERG:
7    Q.    Yeah.
8    Was there an emergency that caused
9  Merck to unblind data in the Alzheimer studies
10  subsequently?
11    MR. SACK:  Objection to the form.
12    MR. PATRYK:  Same.
13    THE WITNESS:  No, I'm not aware of an
14  emergency --
15  BY MR. WEINBERG:
16    Q.    Okay.
17    A.    -- that compelled, that essentially
18  led to the unblinding.
19    Q.    Okay.
20    What did lead to the unblinding?
21    MR. SACK:  Objection to the form.
22    THE WITNESS:  My recollection is that
23  thoroughness in terms of looking at events on Vioxx
24  versus placebo in the context of the results from
25  the VIGOR study.

Page 152

1  BY MR. WEINBERG:
2    Q.    Okay.
3    Now, I want to ask you this question,
4  and you can take your time in reviewing the
5  document.  I'd like you to tell me where in Exhibit
6  10 Merck provides for the kind of unblinding that
7  occurred in the Alzheimer studies.
8    MR. PATRYK:  Object to form.
9    THE WITNESS:  Well, again, I can look
10  through the document.
11  BY MR. WEINBERG:
12    Q.    Sure.
13    A.    (Witness reviewing document.)
14    In looking through the document, I
15  think, number one, firstly, this document refers to
16  unblinding at a patient level.  However, it appears
17  that there is something talking about unplanned
18  analyses.
19    Q.    Where is that?
20    A.    You know, I would assume that what
21  you're referring to is what allows an unplanned
22  analysis.
23    Q.    Can you tell me the Bates page?
24    A.    18.
25    Q.    Can you point to where you're

Page 153

1  referring?
2    A.    I'm looking at the third line from
3  the bottom.
4    Q.    Okay.
5    So, let's put it up there and just
6  take a look.
7    Would you read what you're referring
8  to, Doctor?
9    A.    "For both preplanned and unplanned
10  interim analyses, documentation of these procedures
11  by way of inclusion in the protocol, protocol
12  amendment or a separate data analysis plan should be
13  written prior to unblinding."
14    And then it lists a series of
15  guidelines.
16    Q.    Okay.
17    And is there another reference in the
18  document to preplanned and unplanned interim
19  analysis that would tell us what that refers to
20  specifically?
21    A.    In my quick review of going through
22  the document, I don't recall seeing it.
23    Q.    All right.
24    So, this is the only language in the
25  Merck clinical study blinding manual -- I'm sorry, I

39 (Pages 150 to 153)

85fca436-3777-4c65-af85-36788bd57b05

Confidential - Subject to Protective Order

Page 154

1    just want to make sure I got the title right.  Merck
2    "Affairs Procedures and Policies Manual" for
3    "Clinical Study Blinding." What you've just pointed
4    me to is the only language that you think might
5    refer to the unblinding that occurred in the
6    Alzheimer studies?
7               MR. PATRYK:  Objection.
8               THE WITNESS:  No, that's not what I
9    said.  You asked me was there anything in this
10   specific procedure.
11   BY MR. WEINBERG:
12        Q.    Right.
13        A.    And I said yes.  In the context, are
14   there any other documents or other policies and
15   procedures?  I don't know --
16        Q.    Okay.
17        A.    -- whether there are or not.
18        Q.    Fine.
19                     - - -
20               (Whereupon, Deposition Exhibit
21          Block-11, "Minutes of June 23, 1997,
22          MK-966 Study for the Prevention of
23          Alzheimer's Disease Consultants' Meeting"
24          6-27-97 with attachment, MRK-AFW0023615;
25          MRK-AVJ0026417 - MRK-AVJ0026425, was

Page 155

1          marked for identification.)
2                     - - -
3    BY MR. WEINBERG:
4         Q.    Let me show you what's marked 11.
5    This is a memo dated June 27th, 1997.  The Bates
6    Number is AFW 0023615 through 624.
7               Have you seen this document before?
8         A.    Not in the course of preparation for
9    the deposition.
10        Q.    Okay.
11              Do you recall seeing this document at
12   any time during the course of your employment at
13   Merck?
14        A.    Yes.
15        Q.    And this refers to the minutes of A
16   June 23rd, 1997 study for the prevention of
17   alzheimer's disease consultants' meeting, right?
18        A.    Yes.
19        Q.    Okay.
20              Which was attended by you and Dr.
21   Reines and Dr. Chris -- is it Lines?
22        A.    Lines.
23        Q.    And Mr. Shaw Natan and Ms. Denise Rue
24   of neuroscience clinical research, right?
25        A.    Correct.

Page 156

1         Q.    And Frank Liu at BARDS.  What's
2    BARDS?
3         A.    That's the biostatistics group.
4         Q.    Okay.
5               And Dr. Jay Pearson and Dr. Doug
6    Watson in epidemiology, right?
7         A.    Correct.
8         Q.    And then there were some consultants
9    who attended, Dr. Lipton, Richard Lipton.  Do you
10   see that?
11        A.    Yes.
12        Q.    Did you know Dr. Lipton?
13        A.    Yes, I did.
14        Q.    Okay.
15              And did you invite him to attend this
16   meeting?
17        A.    Yes, I did.
18        Q.    All right.
19              And Dr. Walter Stewart, Dr. Barry
20   Baumel, we talked about him earlier, and Dr. Leon
21   Thal.  Do you see that?
22        A.    Yes, I do.
23        Q.    Okay.
24              So, when I asked you earlier was Dr.
25   Baumel a consultant, do you want to take another

Page 157

1    shot at answering that question?
2               MR. PATRYK:  Objection to the form.
3    BY MR. WEINBERG:
4         Q.    Because I think earlier you told me
5    that he wasn't.
6               MR. PATRYK:  Objection.
7               MR. SACK:  Objection.
8               THE WITNESS:  I don't recall what
9    Barry's role is in this, but he was, obviously,
10   involved in this meeting.
11   BY MR. WEINBERG:
12        Q.    Well, it's a consultants' meeting.
13   That's the title of the meeting, right?
14        A.    Right.
15        Q.    Okay.
16              Who prepared this document?
17        A.    Ms. Denise Rue.
18        Q.    Okay.
19              And did she work for you?
20        A.    She reported to me.
21        Q.    Okay.  All right.
22              And why was this meeting held?
23        A.    I would have to read through the
24   document --
25        Q.    Go ahead.

40  (Pages 154 to 157)

85fca436-3777-4c65-af85-36788bd57b05

# EXHIBIT 10

Confidential - Subject to Protective Order

Page 314

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - ATLANTIC COUNTY
-   -   -
IN RE:    VIOXX LITIGATION : CASE NO. 619

------------------------------------------------------

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
IN RE:    VIOXX LITIGATION :   MDL DOCKET NO. 1657

-   -   -

CONFIDENTIAL

SUBJECT TO PROTECTIVE ORDER

-   -   -

October 30, 2007

-   -   -

Continued videotape deposition of GILBERT A.
BLOCK, M.D., Ph.D., held in the offices of Dechert
LLC, 2929 Arch Street, Philadelphia, Pennsylvania
19104, commencing at 9:15 a.m., on the above date,
before Ann Marie Mitchell, a Federally-Approved
Registered Diplomate Reporter, Certified Shorthand
Reporter, Certified Realtime Reporter and Notary
Public.

-   -   -

GOLKOW TECHNOLOGIES, INC.
51st Floor
One Liberty Place
1650 Market Street
Philadelphia, Pennsylvania 19103

M011808448

Confidential - Subject to Protective Order

Page 487

1    Q.    "Two approaches: Primary: On
2  treatment" plus "14 days after therapy
3  discontinuation. Secondary: ITT, regardless of
4  therapy discontinuation. Will be used for both
5  protocol 078 and 091."
6        Do you see that?
7    A.    Yes, I do.
8    Q.    And that was your understanding of
9  what the DAPs provided for, right, in those two
10 studies?
11    A.    I would have to compare this to the
12 final DAP.
13    Q.    Okay. Assuming that -- well, do you
14 have any reason to think that the final DAP is
15 different than this?
16    A.    No.
17    Q.    Okay. In the original draft
18 protocol, we already read the part of the protocol
19 that says "All safety and efficacy analyses will be
20 intent-to-treat."
21        Do you remember that?
22    A.    Yes.
23    Q.    Okay. Do you know why ITT became a
24 secondary analysis in the DAPs for 078 and 091?
25    A.    No.

Page 488

1    Q.    You were not involved in that
2  decision-making process?
3    A.    I don't recall being involved --
4  recall being involved in the decision-making process
5  on that.
6    Q.    Okay. That's all I have on that.
7        I just have a couple more documents.
8        - - -
9        (Deposition Exhibit No. Block-38,
10       E-mail dated 2003-11-03, Bates stamped
11       MRK-AHD0056133 and MRK-AHD0056134, and
12       Deposition Exhibit No. Block-39, Draft
13       Version 2 "Rofecoxib does not delay the
14       onset of Alzheimer's disease: Results from
15       a randomized, double-blind,
16       placebo-controlled study," Bates stamped
17       MRK-AFV0431065 through MRK-AFV0431144,
18       were marked for identification.)
19       - - -
20 BY MR. WEINBERG:
21    Q.    Do you recall after you left Merck
22 being provided with a draft of the paper that was
23 being written about the PRAISE study?
24    A.    Yes, I do.
25    Q.    Okay. And so I'm going to give you

Page 489

1  two documents. One is an e-mail, that's 39. And 38
2  is -- geez, you know, you think I'd learn by now.
3        MR. PATRYK:  What are we up to? I'm
4  sorry. This is 38?
5        MR. WEINBERG:  That's 39.
6        MR. SACK:  39.
7        MR. WEINBERG:  This is 38.
8  BY MR. WEINBERG:
9    Q.    Okay. So have you seen these before?
10    A.    I don't recall seeing these.
11    Q.    Okay. 38 is draft version 2 of the
12 078 paper. Correct?
13    A.    Yes.
14    Q.    And it says, "External author?" And
15 then there's several other authors, including you.
16        Do you see that?
17    A.    Yes.
18    Q.    And everybody except external author
19 is a Merck employee. Right?
20    A.    Correct.
21    Q.    Okay. And do you know who the
22 external author eventually became?
23    A.    I believe it was Dr. Leon Thal.
24    Q.    Okay. And were you involved at all
25 in talking to Dr. Thal about this paper?

Page 490

1    A.    No.
2    Q.    Okay. And do you recall that this is
3  a draft that you looked at?
4    A.    No.
5    Q.    Okay. And 39 is an e-mail, a series
6  of e-mails, actually. It starts with an e-mail from
7  Chris Lines to you, a mailing address of the 078
8  paper to your home addresses. It's actually to you
9  and to Scott Reines.
10       He had left the company also at that
11 point. Right? I'm looking at the second page of
12 the document, Dr. Block.
13    A.    I'm sorry.
14    Q.    That's all right.
15    A.    Yes.
16    Q.    Okay. "I'm mailing drafts of the 078
17 paper to your home addresses for your comments (also
18 to Leon Thal, Steve Ferris, and Louis Kirby)."
19       Who are they, Ferris and Kirby?
20    A.    Ferris and Kirby are two also outside
21 external authors.
22    Q.    Okay. "You should get it next
23 week...can you try to get back" to me "with
24 comments...Thanks, Chris."
25       And then you wrote back to him, "I

45 (Pages 487 to 490)

M011808492

Confidential - Subject to Protective Order

Page 491

1  received it this weekend. I'll have comments back
2  to you by October" -- I'm not sure what that says.
3  20th maybe?
4     A.  20th.
5     Q.  He says, "Don't kill yourself."
6        He says "I'm back...where are your
7  comments?"
8        And you say, "Chris, want a real
9  job??? I had no major comments, just minor wording
10  changes which are of little consequence. I'm in
11  Sweden and will call you Thursday when I return.
12  Best, Gil."
13        Okay? Did I read that correctly?
14     A.  Yes, you did.
15     Q.  Okay. And do you recall that you
16  really had no major comments with respect to the
17  draft?
18     A.  No, I don't recall.
19     Q.  Okay. On the draft, please go to
20  page 1081.
21        By the way, were you involved at all
22  in any of the analyses of the data?
23     A.  No.
24     Q.  Okay. And on the full paragraph on
25  the page, it begins, "To further explore the

Page 492

1  unexpected findings in the primary analysis, we
2  conducted a post hoc analysis to adjust for factors
3  which showed an effect, at a significance level of
4  P" less than "0.10, on progression to AD."
5        Did I read that correctly?
6     A.  Yes.
7     Q.  And you're aware that, in this
8  particular study, there was a statistically
9  significant increase in conversion to Alzheimer's
10  disease for patients on Vioxx as compared to
11  placebo. Right?
12     A.  Yes.
13     Q.  Okay. And that statistically
14  significant difference emerged four months into the
15  study. Correct? That was reported in the paper.
16     A.  I don't recall what it said in the
17  paper.
18     Q.  Okay. It emerged pretty early on.
19  Right?
20        MR. PATRYK: Object to form.
21        THE WITNESS: Again, I don't recall.
22  BY MR. WEINBERG:
23     Q.  Okay. Assuming it emerged pretty
24  early on, there was no monitoring of the relative
25  risk of conversion to Alzheimer's disease early in

Page 493

1  the study. Correct?
2        MR. PATRYK: Object to form.
3        THE WITNESS: Again, the monitoring
4  was as I described before.
5  BY MR. WEINBERG:
6     Q.  Right. So nobody would know at Merck
7  if patients were actually converting to Alzheimer's
8  disease, which is actually what happened?
9     A.  No. Actually, it says, "There was no
10  evidence for an increased effect of rofecoxib in
11  this analysis."
12     Q.  Okay. Well, we're going to get to
13  that part. I'm just on the first part.
14     A.  Well, I'm just reacting to -- you
15  made a -- you stated something that doesn't appear
16  to jive with what I just read in this paragraph.
17     Q.  Right. Well, we're going to get to
18  that.
19        But remember I asked you a couple --
20  about one minute ago, you understand that there was
21  a statistically significant increase in conversion
22  to Alzheimer's disease on Vioxx in this study?
23     A.  Yes.
24     Q.  And you said yes? Okay.
25        And that treatment effect emerged

Page 494

1  early on, within four months, and you said you
2  weren't sure about four months?
3     A.  No. I said I didn't recall.
4     Q.  You don't recall. Okay.
5        And so my question is, how would
6  anyone at Merck have known that at the time that it
7  was happening?
8        MR. PATRYK: Object to form.
9        THE WITNESS: Again, as I stated,
10  reading through this paragraph, it says there is no
11  evidence for an increased effect of rofecoxib in
12  this analysis.
13  BY MR. WEINBERG:
14     Q.  Okay. You're looking at the last
15  sentence. Right?
16     A.  I'm reading through the paragraph in
17  terms of looking at factors and what it says here in
18  the paper.
19     Q.  Okay. Let's go through that.
20        There's some discussion about these
21  post hoc -- a post hoc analysis. Right?
22        What does post hoc analysis mean?
23     A.  It's not predefined.
24     Q.  Okay. So after Merck got the results
25  of the 078 study that said more patients converted

Confidential - Subject to Protective Order

**Page 495**

1  to Vioxx -- converted to -- let me rephrase that.
2       After Merck got the results of the
3  078 study that more patients on Vioxx converted to
4  Alzheimer's than on placebo, Merck did some post hoc
5  analyses that were not prespecified.  Right?
6       A.    Correct.
7       Q.    Okay.  And some of those
8  prespecified -- some of those post hoc analyses are
9  described in this paragraph.  Right?
10      Do you want to read the paragraph?
11      A.    Some of the factors that they looked
12 at are defined.
13      Q.    Okay.  And towards the end of the
14 paragraph, right after the parentheses where it
15 says, "Hazard ratio," it says, "Since the above
16 analyses."
17      Do you see that?
18      A.    Yes.
19      Q.    "Since the above analyses all
20 included patients whether or not they were taking
21 study medication, we also performed a post hoc
22 analysis excluding subjects who were less than 80%
23 compliant with taking treatment, as well as those
24 who were protocol violators, in order to determine
25 whether the effect of rofecoxib," Vioxx, "was

**Page 496**

1  increased in this group with greater time-adjusted
2  exposure to" Vioxx "(as would be expected if the
3  primary findings represented a true effect of"
4  Vioxx).
5       Are you with me so far?
6       A.    Yes.
7       Q.    There was no evidence for an
8  increased risk of Vioxx in this analysis.  And then
9  there's a hazard ratio.
10      Do you see that?
11      A.    Correct.
12      Q.    All right.  So what happened here, do
13 you know, in this post hoc analysis?
14      A.    There was nothing to point out.  And
15 if you look on page 25, it says, "It seems unlikely
16 that the unexpected findings...represent a true
17 effect of rofecoxib."
18      Q.    Right.  Well, that's the opinions of
19 the authors of the paper.  Right?
20      A.    Yes.
21      Q.    But I just want to talk about this
22 data that are being reported here, okay, on page 17
23 of the paper, Bates Number 1081.
24      Because what they did, what Merck
25 did, was to look at, first of all, the relative risk

**Page 497**

1  of conversion to Alzheimer's in the overall study.
2  Right?
3       A.    Correct.
4       Q.    And then they said, well, let's look
5  at the patients who are more faithfully taking the
6  drug, who are compliant.  Right?
7       A.    Yes.
8       Q.    And there was no difference in the
9  relative risk.  Right?
10      A.    Correct.
11      Q.    And that meant that or it was
12 interpreted by the authors to mean that since there
13 was no difference, what they were seeing in the
14 overall group didn't really represent a true effect
15 of the drug.  Right?
16      A.    Yes.  And the remainder of the paper
17 also talks about no effect on other measures of
18 cognition.
19      Q.    Right.  And if this analysis, this
20 80 percent compliance analysis, had disclosed a
21 hazard ratio greater than, statistically
22 significantly greater than the risk in the overall
23 group, then the conclusion could very well have been
24 different.  Right?
25      MR. SACK:  Object to form.

**Page 498**

1       THE WITNESS:  Again, I don't know.  I
2  didn't do the analyses.
3  BY MR. WEINBERG:
4       Q.    Right.  But if you have an analysis
5  of the overall group, and then you look at the
6  people who were taking more of the drug and it comes
7  out the same, the conclusion you reach is what's
8  here in the paper, there's no difference, therefore,
9  there's no treatment effect.  Right?
10      A.    Well, this is --
11      MR. PATRYK:  Same objection.
12      MR. SACK:  Objection to form.
13 BY MR. WEINBERG:
14      Q.    That's what the author is concluding
15 you concluded.  Right?
16      A.    You'd have to look at -- you'd have
17 to do the analyses.
18      Q.    Yes.
19      A.    And this is a conservative analysis.
20 And it states, "Included all included patients
21 whether or not they were taking study medication."
22      Q.    Right.  So --
23      A.    Which were given above and this.  So
24 they did a number analyses.
25      Q.    Okay.  And one of the analyses was to

47  (Pages 495 to 498)

M011808494

Confidential - Subject to Protective Order

Page 499

1  say, is there any greater conversion to Alzheimer's
2  in the people who were taking more of the drug?  And
3  the answer was no, it's the same.  So what we're
4  seeing in the overall group really isn't a treatment
5  effect of Vioxx at all.
6      A.    And other secondary analyses looking
7  at all other aspects of cognition showed no
8  difference.
9      Q.    Okay.  So this 80 percent compliant
10  analysis led to the conclusion that there was no
11  treatment effect of Vioxx.  Right?
12      MR. SACK:  Objection to form.
13      MR. PATRYK:  Objection.
14      THE WITNESS:  In addition to the data
15  that's further on in the paper, that there was a
16  lack of treatment differences across different
17  analyses on other aspects of cognition.
18  BY MR. WEINBERG:
19      Q.    Okay.  And those were all secondary
20  endpoints in the study?
21      A.    Yes.
22      Q.    Okay.  So secondary endpoints were
23  very important to Merck in this study.  Right?
24      A.    Well, these were all part of all
25  endpoints, key secondary endpoints as well the

Page 500

1  primary endpoints.
2      Q.    Right.  What Merck was saying here is
3  the secondary endpoints are actually more meaningful
4  than the primary endpoints.  Right?
5      A.    No.  That's absolutely not correct.
6      Q.    Well, the primary endpoint was it
7  causes Alzheimer's disease.
8      MR. PATRYK:  Objection to form.
9      THE WITNESS:  No, that's not correct.
10  BY MR. WEINBERG:
11      Q.    The primary endpoint --
12      A.    That's not what the paper says.
13      Q.    The primary endpoint of this study
14  was does Vioxx prevent or delay the onset of
15  Alzheimer's disease in patients with mild cognitive
16  impairment.  Correct?
17      A.    The study was designed to look and
18  see whether it delays the onset.
19      Q.    So the answer to my question is yes.
20  Right?
21      A.    No.  The answer to your question is
22  no, there was no difference in terms of the post hoc
23  analyses.
24      Q.    Okay.  Let's go back.  Okay?  Because
25  I just want to make sure that the questions and

Page 501

1  answers are clear.
2      Q.    What was the primary endpoint of this
3  study?
4      A.    The looking at the incidence of AD.
5      Q.    Okay.  In patients with mild
6  cognitive impairment?
7      A.    Correct.
8      Q.    Comparing patients who took placebo
9  to patients who took Vioxx?
10      A.    Correct.
11      Q.    And there was an unexpected finding
12  in this study.  Right?
13      A.    That's correct.
14      Q.    That the risk of developing
15  Alzheimer's disease on Vioxx was actually around
16  46 percent greater in patients on Vioxx than in
17  patients on placebo.  Right?
18      MR. PATRYK:  Object to form.
19      THE WITNESS:  Again, there was a
20  statistically significant difference.
21  BY MR. WEINBERG:
22      Q.    Right.  46 percent greater?
23      A.    There was a statistically significant
24  difference.
25      Q.    Well, are you arguing with the figure

Page 502

1  46 percent?  Because if you are, please look at the
2  paper and tell me if you're wrong.
3      A.    I'm looking at this figure 1.45,
4  which is not statistically significant and
5  different.
6      MR. PATRYK:  Objection.  I'm sorry.
7  Are you finished with your answer?
8      THE WITNESS:  No.  I'm not sure
9  where -- which number you're referring to.
10      MR. PATRYK:  Can we just stop?
11  Somebody needs to put their phone on
12  mute.  We're getting a terrible echo in here.  I
13  don't know if it's the last person that got on the
14  call, but everybody should please mute their phones,
15  because the examiner can't hear what he's asking, I
16  can't hear what the witness is saying and it's
17  getting complicated.  Thank you.
18  Sorry.
19      MR. WEINBERG:  That's okay.
20  BY MR. WEINBERG:
21      Q.    If you need to refer to the paper,
22  please do so.  I don't want you to, you know, guess
23  here.
24  My question is whether on the primary
25  endpoint of the study, that is, does Vioxx delay the

Confidential - Subject to Protective Order

Page 503

1  onset or prevent the onset of Alzheimer's disease in
2  patients with mild cognitive impairment, the results
3  were that patients on Vioxx had a 46 percent greater
4  risk of converting to Alzheimer's disease than
5  patients on placebo?
6      A.   Yeah.  I'm looking for the hazards
7  ratio, if you'll give me a moment, please.
8      Q.   Sure.
9      A.   Yes.  The hazard ratio on the
10 abstract is 1.46.
11     Q.   Okay.  And in the post hoc analysis
12 that Merck -- well, first of all, there were some
13 secondary analyses done, secondary endpoints?
14     A.   There are a series of key secondary
15 endpoints.
16     Q.   Okay.  And so what Merck concluded,
17 what the authors concluded in this paper, was that
18 the finding on the primary endpoint was not a true
19 treatment effect of Vioxx because of the findings on
20 the secondary endpoints.  Correct?
21     A.   Correct.
22     Q.   Okay.  So basically Merck paid more
23 or gave more credence to the secondary endpoints
24 than to the primary endpoint in this particular
25 study in concluding whether Vioxx caused Alzheimer's

Page 504

1  disease.  Correct?
2           MR. PATRYK:  Objection to form.
3           THE WITNESS:  No.  I would not word
4  it that way.  They looked at the totality of all the
5  data --
6  BY MR. WEINBERG:
7      Q.   Okay.
8      A.   -- in that the secondary measures
9  also should have changed --
10     Q.   Uh-huh.
11     A.   -- as they are other measures of
12 cognition.
13     Q.   So if you were to look at the
14 compliant patients, as Merck did, and find no
15 difference in the conversion rate to Alzheimer's,
16 then that would be further support that Vioxx didn't
17 cause Alzheimer's disease?
18     A.   I'm sorry, can you repeat the
19 question again?
20     Q.   Yeah.
21          If you were to look at the compliant
22 patients, as Merck did here on page 17, and find
23 basically the same risk of conversion.
24          Are you with me?
25     A.   Yes, same risk of -- I'm sorry, what

Page 505

1  are you comparing that to again?
2      Q.   Let's go -- let me just make sure
3  that we're clear on this.
4           In the overall group, the relative
5  risk or the risk of developing Alzheimer's disease
6  on Vioxx was increased by 46 percent on Vioxx.
7      A.   Right.
8      Q.   Okay.  And in the group that took
9  more of the drug, the relative risk didn't really
10 change.  Correct?
11     A.   In the -- I'm not sure which group.
12          Are you referring to page 17?
13     Q.   I'm referring to page 17.
14     A.   Yeah.  In those subjects who were
15 more than 80 percent compliant, it was not
16 statistically significant.
17     Q.   And that led to the conclusion in the
18 paper that there was no evidence for an increased
19 effect of Vioxx in this analysis.  Right?
20     A.   That, in concert with the analysis of
21 key cognitive outcome measures used in Alzheimer's
22 disease.
23     Q.   Okay.  Well, that doesn't say -- what
24 I'm reading from on page 17 doesn't say what you
25 just said, doesn't it?

Page 506

1      A.   No.  But I think you have to look at
2  page 18 and page 21 --
3      Q.   Okay.  We can do that.
4      A.   -- for the full statements.
5      Q.   All right.  That's fine.  So I just
6  want to make sure that we're on the same page here,
7  because I want to finish this.  Okay?
8           Once again, page 17.
9           Are you with me?
10     A.   Uh-huh.
11     Q.   "Since the above analyses all
12 included patients whether or not they were taking
13 study medication, we also performed a post hoc
14 analysis excluding subjects who were less than 80%
15 compliant with taking treatment."
16          Did I read that correctly?
17     A.   Yes.
18     Q.   In other words, we're only going to
19 count people who took 80 percent or more of the
20 study medication.  Right?
21     A.   Correct.
22     Q.   Okay.  "As well as those who were
23 protocol violators, in order to determine whether
24 the effect of" Vioxx "was increased in this group
25 with greater time-adjusted exposure to" Vioxx "(as

49 (Pages 503 to 506)

M011808496

Confidential - Subject to Protective Order

Page 507

1 would be expected if the primary findings
2 represented a true effect of" Vioxx.
3         Did I read that correctly?
4    A.   Yes.
5    Q.   All right.  In other words, if you
6 look at the people who are taking more of the drug,
7 you'd expect an even higher risk?
8    A.   Correct.
9    Q.   Okay.  But we didn't see that.
10        That's what you're reporting here.
11 Right?
12   A.   Correct.
13   Q.   And so this supports our position
14 that the primary effect is not a true effect.
15        Do I have it right?
16   A.   This, in concert with the additional
17 analyses discussed on page 18.
18   Q.   Okay.  Now, were you aware that this
19 was a mistake, this calculation of the hazard ratio
20 for the compliant patients?
21   MR. PATRYK:  Object to form.
22   THE WITNESS:  No.
23   MR. WEINBERG:  Okay.  If you'll just
24 indulge me, Robb, I'll be done in five minutes.
25   MR. PATRYK:  Sure.

Page 508

1                  - - -
2         (Deposition Exhibit No. Block-40,
3         E-mail dated 2003-11-03, Bates stamped
4         MRK-AHD0055888 and MRK-AHD0055889,
5         MRK-AHD0056019 and MRK-AHD0056020, was
6         marked for identification.)
7                  - - -
8 BY MR. WEINBERG:
9    Q.   I'll show you what's been marked 40.
10 Now, this is an e-mail from Christopher Assaid to
11 various people at Merck, dated November 3, 2003.
12        Do you see that?  Are you with me?
13        That's the same date as your e-mail
14 saying I have no major comments.  Right?
15   A.   Yes.
16   Q.   Okay.  Have you seen this before?
17   A.   No.
18   Q.   Okay and Dr. Or Christopher Assaid,
19 writes to Ned Braunstein, he's a regulatory guy at
20 Merck.  Right?
21   A.   Yes.  That's correct.
22   Q.   And Alise Reicin, we talked about
23 her?
24   A.   Yes.
25   Q.   And Raymond Bain is the statistician.

Page 509

1         Hester Visser was your successor as
2 the clinical monitor.
3         Do you see that?
4    A.   Yes.
5    Q.   Okay.  And then Chris Lines, do you
6 see him down here?
7    A.   Yes, I do.
8    Q.   Okay.  "In following up on a comment
9 from Alise related to compliance, I discovered a
10 programming error affecting the per-protocol and
11 compliance results in the 078 CSR."  And then he
12 goes on to say that he can provide assurances that
13 everything else is okay.
14        Do you see that?
15   A.   Yes.
16   Q.   And were you aware that what he's
17 talking about here is that the relative risk for
18 compliant patients was not 1.45, but it was 1.72?
19   A.   No, I would not have been aware.  I
20 wasn't at the company.
21   Q.   Okay.  But did you receive the final
22 paper.  Right?
23   A.   I had -- I've had a copy of the
24 published paper.
25   Q.   Okay.  If the difference in the

Page 510

1 compliant patients was actually statistically
2 significantly higher, okay, than in the overall
3 group, that would support the primary results, the
4 results on the primary endpoint.  Right?
5    A.   Not necessarily.
6    Q.   It could, though?
7    MR. PATRYK:  Objection to form.
8 BY MR. WEINBERG:
9    Q.   In other words, if you found what you
10 expected or what you would have expected if it was a
11 true treatment effect, if you found that 80 percent
12 compliant patients had more Vioxx-related
13 Alzheimer's disease, as was -- as would be expected
14 if it was a true effect of rofecoxib, that would
15 change all the conclusions in the paper.  Right?
16   MR. PATRYK:  Objection.
17 BY MR. WEINBERG:
18   Q.   About whether the primary effect was
19 real or not?
20   MR. PATRYK:  Objection to form.
21   THE WITNESS:  Again, no.  In the
22 absence of changes on key secondaries of cognition,
23 which should have gotten worse, no, I would not be
24 able to conclude what you just said.
25 BY MR. WEINBERG:

50 (Pages 507 to 510)

Confidential - Subject to Protective Order

## Page 511

1    Q.    Okay. So you disagree with what's
2  written in the draft here, that if you see more
3  conversion to Alzheimer's in the people who are
4  taking more of the drug as would be expected if the
5  primary findings represented a true effect of the
6  drug, that's wrong?
7    A.    No, that's not what I said.
8    Q.    Okay.
9    A.    I said, you can't look at one piece
10 of data in isolation of all key -- other key
11 secondary measures of cognition, which you would
12 have expected to be worse on Vioxx compared to
13 placebo. And they weren't.
14   Q.    Okay. But you would certainly say
15 that it may be real, wouldn't you?
16   A.    I would say I don't know, because I
17 would expect these other measures to change.
18   Q.    And you wouldn't put patients --
19   A.    So I would use the word that is in
20 the paper, which I think was unexplained.
21   Q.    Okay. And if it was unexplained and
22 you had patients with mild cognitive impairment who
23 were taking your drug, you'd want to let them know,
24 inform them, of the potential risk, wouldn't you?
25       MR. PATRYK: Object to form.

## Page 512

1        THE WITNESS: You're asking me a
2  question post hoc, after a study is done.
3  BY MR. WEINBERG:
4    Q.    No. I'm asking you a question that
5  stands alone.
6        If you, Dr. Block, knew that patients
7  in your study were at risk of converting to
8  Alzheimer's on Vioxx, at risk, you would tell them
9  that they were at risk?
10   A.    If there had been data to support it.
11 And you have data that doesn't necessarily support
12 it.
13   Q.    And you have data that do support it.
14 Right? The primary endpoint data support the
15 conclusion --
16   A.    And --
17   Q.    -- that Vioxx -- let me finish my
18 question.
19       The primary endpoint data support the
20 conclusion that Vioxx causes Alzheimer's disease.
21 Correct?
22       MR. PATRYK: Objection to form.
23       MR. SACK: Objection.
24       THE WITNESS: No.
25 BY MR. WEINBERG:

## Page 513

1    Q.    No?
2    A.    No, it doesn't.
3    Q.    Okay. 46 percent isn't evidence?
4    A.    You are mischaracterizing statistics.
5    Q.    Okay. 72 percent in the patients who
6  take more --
7    A.    You are mischaracterizing --
8    Q.    Wait a minute. Let me finish my
9  question.
10   A.    I haven't -- I haven't finished.
11   Q.    Let me finish my question.
12   A.    I haven't finished.
13   Q.    Okay. Go ahead.
14   A.    You're mischaracterizing a piece of
15 data taken in isolation. You have a statistical
16 test that says there is a difference. You have
17 other tests that show no difference.
18   Q.    So you don't know?
19   A.    That's -- so you asked me, was this
20 established? And I said no.
21   Q.    No, I didn't ask you whether it was
22 established. I asked you if there was an
23 established risk that you didn't know the answer to.
24       What's the answer to that question?
25   A.    No, I don't recall.

## Page 514

1        MR. PATRYK: Objection to form.
2        THE WITNESS: I don't think you asked
3  that question.
4  BY MR. WEINBERG:
5    Q.    Okay. Based on the primary endpoint
6  data, 46 percent increased risk of developing
7  Alzheimer's disease on Vioxx, and based on the post
8  hoc analysis that was first calculated in error in
9  the compliant patient group but that showed a
10 statistically significant increase of conversion to
11 Alzheimer's disease in the compliant patients, isn't
12 that evidence, enough evidence of a risk to warn
13 patients about it?
14       MR. PATRYK: Objection to form.
15       THE WITNESS: No. Again, when you
16 look at the totality of data, what else should have
17 changed which showed no difference between Vioxx and
18 placebo, no, you can't conclude that.
19 BY MR. WEINBERG:
20   Q.    And based on that information, you
21 are comfortable saying there's no risk. Right?
22       MR. PATRYK: Objection to form.
23       THE WITNESS: That's not what I said.
24 BY MR. WEINBERG:
25   Q.    What are you saying?

51 (Pages 511 to 514)

M011808498

Confidential - Subject to Protective Order

Page 515

1     A.    I said it's unexplained.
2     Q.    Which means there may be a risk.
3  Right?
4     A.    There may not be a risk also.
5     Q.    Okay.  Which means that you should
6  tell the patients.  Right?
7           MR. PATRYK:  Object as asked and
8  answered.
9  BY MR. WEINBERG:
10    Q.    If you know the information and you
11 don't know whether the drug is causing Alzheimer's
12 disease but it might, or it's not causing
13 Alzheimer's disease but it might, then you should
14 tell the patients about the risk and let them make
15 an informed decision about whether to take the drug.
16 Correct?
17          MR. PATRYK:  Objection to form.
18          THE WITNESS:  Again, I've already
19 answered it.  You don't have data to fully answer
20 the question.
21 BY MR. WEINBERG:
22    Q.    Right.  So you should tell them that
23 you don't know the answer.  Right?
24          MR. PATRYK:  Object as asked and
25 answered.

Page 516

1  BY MR. WEINBERG:
2     Q.    Yes or no?
3     A.    You can tell them, but you have data
4  one way and data the other way.
5     Q.    Yeah.  And you should tell them
6  about --
7     A.    So you're in a state of clinical
8  equipoise then.
9           VIDEOTAPE TECHNICIAN:  Five minutes.
10 BY MR. WEINBERG:
11    Q.    Clinical equipoise except they are
12 the patients --
13          They are the patients.  Right?
14 They're at risk?
15          MR. PATRYK:  Object to form.
16 BY MR. WEINBERG:
17    Q.    Right?
18    A.    I've already answered it.
19          MR. WEINBERG:  Okay.  I'm done.
20          VIDEOTAPE TECHNICIAN:  Off the
21 record, 2:21.
22             - - -
23          (A recess occurred.)
24             - - -
25          VIDEOTAPE TECHNICIAN:  Back on the

Page 517

1  record, 2:33.
2             - - -
3          EXAMINATION
4             - - -
5  BY MR. PATRYK:
6     Q.    Good afternoon, Doctor.
7           Would you please introduce yourself
8  to the jury?
9     A.    Gilbert Block.
10    Q.    Where do you live, Dr. Block?
11    A.    Haverford, Pennsylvania.
12    Q.    Are you married, sir?
13    A.    Yes.
14    Q.    Do you have any kids?
15    A.    Two.
16    Q.    How old are they?
17    A.    13 and 15.
18    Q.    Dr. Block, are you a medical doctor?
19    A.    Yes.
20    Q.    When did you receive your medical
21 degree?
22    A.    1981.
23    Q.    From where?
24    A.    Case Western Reserve University.
25    Q.    Doctor, are you board certified in

Page 518

1  any particular specialty?
2     A.    No.  I'm board eligible in neurology.
3     Q.    Were you ever board certified?
4     A.    No.
5     Q.    And what is neurology, briefly?
6     A.    Study of the diseases of the nervous
7  system.
8     Q.    Where do you currently work, Doctor?
9     A.    Cephalon, Incorporated.
10    Q.    Where is Cephalon?
11    A.    In Malvern, Pennsylvania.
12    Q.    And what is Cephalon?
13    A.    Cephalon is a small pharmaceutical
14 company.
15    Q.    Could you tell us your position at
16 Cephalon?
17    A.    I am the vice president of clinical
18 neuroscience and clinical pharmacology.
19    Q.    Doctor, you used to work for Merck;
20 is that correct?
21    A.    That is correct.
22    Q.    During what period of time did you
23 work at Merck?
24    A.    Approximately May of 1988 to
25 approximately March of 2002, save for six months in

52 (Pages 515 to 518)

# EXHIBIT 11

1

1          SUPERIOR COURT OF NEW JERSEY

          LAW DIVISION - ATLANTIC COUNTY

2

                    -   -   -

3

4    IN RE:    VIOXX LITIGATION : CASE NO. 619

5    --------------------------------------------------------

6          UNITED STATES DISTRICT COURT

7          EASTERN DISTRICT OF LOUISIANA

8    IN RE:    VIOXX LITIGATION:  MDL DOCKET NO. 1657

9                    -   -   -

10               CONFIDENTIAL

11          SUBJECT TO PROTECTIVE ORDER

12                    -   -   -

13               August 15, 2005

14                    -   -   -

15          Videotape deposition of BARRY J. GERTZ,

16   M.D., Ph.D., held in the offices of Hughes Hubbard &

17   Reed, One Battery Park Plaza, New York, New York,

18   commencing at 9:42 a.m., on the above date, before

19   Linda L. Golkow, a Federally-Approved Registered

20   Diplomate Reporter and Certified Shorthand Reporter.

21                    -   -   -

22

23          ESQUIRE DEPOSITION SERVICES

          1880 John F. Kennedy Boulevard

24               15th Floor

          Philadelphia, Pennsylvania 19103

25               (215) 988-9191

M00S536774

Confidential-Subject To Protective Order

54

1 you knew that what was being said was that if there
2 was a negative effect on gastrointestinal safety
3 when you combined Vioxx and aspirin, it would be
4 increasingly challenging to get reimbursement from
5 managed care organizations; right?
6     A.    The way I interpret this statement is
7 that one would have to take additional effort to
8 educate managed care organizations about the issue
9 that I'm trying to discuss with you here, which is
10 the comparison, the appropriate comparison is Vioxx
11 plus low-dose aspirin compared to a nonselective
12 NSAID plus low-dose aspirin, and that is a challenge
13 to -- I think that is the challenge they are
14 referring to here.
15        MR. KRISTAL:  Move to strike the
16 nonresponsive portion of that answer.
17            - - -
18        (Whereupon, Deposition Exhibit Gertz-6,
19        Memo 11-19-01, "Preliminary Interim
20        Results for the Vioxx Low-Dose Aspirin
21        Endoscopy Study (Protocol 136),"
22        MRK-ABH0005514 - MRK-ABH0005535, was
23        marked for identification.)
24            - - -
25 BY MR. KRISTAL:

55

1     Q.    Let me show you what's been marked as
2 Exhibit 6.  This is a memo dated November 19th, 2001
3 to T. Simon with copies to a number of people
4 including yourself; correct?
5     A.    Memo to Tom Simon.  I am copied on
6 this memo.
7     Q.    So, in the regular course of
8 business, you would have received this memo at the
9 time?
10     A.    That's correct.
11     Q.    And the subject is, "Preliminary
12 Interim Results for Vioxx low-Dose Aspirin Endoscopy
13 Study."  Right?
14     A.    That's the subject of the memo,
15 correct.
16     Q.    "Protocol 136."  Right?
17     A.    Correct.
18     Q.    And Protocol 136 was the study that
19 we've been talking about, was it not?
20     A.    Yes.
21     Q.    So, it's comparing placebo, people
22 who took a sugar pill; people who took just a
23 low-dose aspirin, 81 milligrams; people who took
24 Vioxx and low-dose aspirin, 25 milligrams of Vioxx
25 and low-dose aspirin; right?

56

1     A.    Yes.
2     Q.    And people who took 800 milligrams of
3 ibuprofen three times a day; right?
4     A.    Yes, that's correct.
5     Q.    And the interim analysis that was
6 done at this time, you were told, showed that the
7 people who were taking Vioxx and aspirin had
8 essentially the same rate of gastroduodenal ulcers
9 as the people who were taking ibuprofen; right?
10     A.    They were not statistically
11 different.  There was a small numerical increase in
12 the patients on ibuprofen versus those on Vioxx plus
13 aspirin.
14     Q.    Okay.
15        Now, the hypothesis of Protocol 136
16 would be that the cumulative incidence of ulcers
17 greater than or equal to three millimeters would be
18 higher with ibuprofen than with Vioxx plus aspirin.
19 That was the hypothesis; right?
20     A.    That was the hypothesis to be tested,
21 right.
22     Q.    And that hypothesis was not proven by
23 this study because they were statistically equal.
24 Is that fair to say?
25     A.    That hypothesis was not proven by

57

1 this study.
2     Q.    And that was not a good result for
3 Merck?
4     A.    It was -- again, the issue -- it's
5 not as -- it would have been a better result in the
6 sense that if Vioxx plus aspirin had fewer ulcers
7 than ibuprofen alone, but it then didn't address the
8 other question of relevance for patients who need an
9 NSAID and have to take aspirin.  So, it only
10 addressed -- it was designed to address one
11 question.  It left open still yet another question.
12        MR. KRISTAL:  Move to strike the
13 nonresponsive answer.
14 BY MR. KRISTAL:
15     Q.    My question is, that result was not a
16 good result for Merck; correct?
17     A.    It was the result of the study.  The
18 result studies were -- they were presented and made
19 known.  I don't know what you mean by "not a good
20 result."  If you could explain that to me.
21            - - -
22        (Whereupon, Deposition Exhibit Gertz-7,
23        E-mails, MRK-NJ0214794 - MRK-NJ0214795
24        was marked for identification.)
25            - - -

15 (Pages 54 to 57)

M00535679B

Confidential-Subject To Protective Order

58

BY MR. KRISTAL:

1  Q.    Well, let me hand you what I've
2  marked as Exhibit 7, which is a series of e-mails.
3  If you'd look -- it's two pages; correct?
4  A.    It's two pages.
5  Q.    And it's a printed out chain of
6  e-mails. Fair to say?
7  A.    That's what it appears to be, yes.
8  Q.    Okay.
9        So, I want you to look at the last
10 e-mail on the second page because that's where the
11 chain starts; is that right?
12 A.    That's correct.
13 Q.    And that e-mail was dated November
14 19, 2001 almost at midnight; correct?  11:46 p.m.?
15 A.    That's correct.
16 Q.    And that's the same day as the
17 interim analysis which just showed the results for
18 Protocol 136; correct?
19 A.    November 19th.  It's the same day,
20 yes.
21 Q.    So, you would have received the memo
22 November 19th during the business day, and this is
23 now an e-mail almost at midnight of that same day?
24 A.    That's correct.

59

1  Q.    And it is from Ed Scolnick to Raymond
2  Gilmartin and David Anstice; correct?
3  A.    That's correct.
4  Q.    And these are the top management at
5  Merck; right?
6  A.    Well, Ray Gilmartin was the CEO;
7  David Anstice, the president of U.S. marketing; and
8  Dr. Scolnick was the president of the lab at the
9  time.
10 Q.    Okay.
11       So, Dr. Ed Scolnick, who is the
12 author of that first e-mail, was your boss?
13 A.    Ultimately, yes.  Not my direct boss.
14 Q.    Not your direct boss because he was
15 higher up the chain; right?
16 A.    That's correct.
17 Q.    And David Anstice was the president
18 of the marketing division of Merck; right?
19 A.    He was the president of the marketing
20 division, yes.
21 Q.    And Raymond Gilmartin was the Chief
22 Executive Officer; correct?
23 A.    Correct.
24 Q.    And the subject of the e-mail was the
25 "low dose aspirin endoscopy study."  Right?

60

1  A.    That's correct.
2  Q.    That's the one we've been talking
3  about; right?
4  A.    That's correct.
5  Q.    And the importance of the e-mail is
6  high; right?
7  A.    That's correct.
8  Q.    What Dr. Scolnick said to Mr.
9  Gilmartin and Mr. Anstice was, "Ray and David, Not a
10 good result."  Right?  That's what he said?
11 A.    That's what's written here, yes.
12 Q.    So, at the time the person who was
13 the head of the Merck Research Labs wrote that the
14 results we just looked at from November 19 were "Not
15 a good result."  Right?  Was "not a good result,"
16 that's what he wrote?
17 A.    That's what he wrote.
18 Q.    And then he wrote, "low dose aspirin
19 and vioxx equal almost ibuprofen, higher than
20 aspirin alone."  Correct?  That's what he wrote?
21 A.    That's what he wrote.
22 Q.    And that's what the study showed?
23 A.    The study showed -- there's part in
24 here which is interpretation, there's part in here
25 that reflect results.  The part that reflects the

61

1  results is the low-dose aspirin of Vioxx equal
2  almost ibuprofen and higher than aspirin alone.
3  Q.    That's an accurate summary of what
4  the results showed for Protocol 136; right?
5  A.    What I just said?
6  Q.    Yes.
7  A.    Yes.
8  Q.    Okay.
9        And then the e-mail chain goes
10 through a number of different people, and a week
11 later you were copied on that for your information;
12 correct?
13 A.    Yes.
14 Q.    So, you received Mr. Scolnick's
15 e-mail saying "Not a good result" about a week after
16 it was sent; right?
17 A.    I received a copy of his e-mail about
18 a week later, yes.
19 Q.    So, at the time, the president of
20 Merck Research Labs felt that the result of Protocol
21 136 was not a good result; right?
22 A.    I would say that it appears that his
23 initial impression, as you noted, that evening,
24 having just received the data, his initial
25 impression, he states here, "Not a good result."  I

62

1 don't know exactly what he's fully interpreting or
2 what he has incorporated into his thoughts at that
3 time. All I can say is that it seems that you are
4 referring to his initial impressions of a week
5 before I received this information.
6    Q.    Now, Merck, when it funds a study, is
7 under a certain obligation to publish the study,
8 fair to say, whether the results are good or bad or
9 indifferent?
10    A.    I don't think there's an obligation,
11 but certainly we generally do, yes.
12    Q.    Okay.
13        Part of the reason you do is you
14 don't want to appear to be hiding data. Is that
15 fair to say?
16    A.    I say the reason we do is because
17 it's the right thing to do scientifically.
18    Q.    But one thing that Merck can control,
19 depending on the results of a study, is when a
20 manuscript gets submitted for publication in terms
21 of whether it is done on a rapid track or whether
22 the publication appears years after the study is
23 over; right? That's within Merck's control?
24    A.    Not completely in Merck's control,
25 no.

63

1    Q.    Not completely in Merck's control,
2 but partially in Merck's control?
3    A.    I think it depends on the individual
4 trial.
5    Q.    Okay.
6        So, depending on the individual
7 trial, Merck can control when it reaches the public
8 in the form of a publication. Fair to say?
9    A.    Depending on the study, we can -- we
10 generally put the material out into a scientific
11 meeting relatively quickly, so an abstract is out
12 there, and then we'll publish it somewhat after
13 that.
14    Q.    Now, we saw, and we can go back to
15 the earlier documents, but do you recall when the
16 endoscopy study which became Protocol 136 was being
17 planned, there was a plan for publication in the
18 second or third quarter of 2002?
19    A.    I seem to recall a discussion of a
20 plan for the publication, but I don't recall exactly
21 what date.
22    Q.    Do you have it in front of you?
23    A.    I don't know what page it was on.
24    Q.    It's on Page 11.
25    A.    Page 11, yes.

64

1    Q.    All right.
2        So, at the time when this study was
3 first being planned, there was a plan to publish it
4 in the second or third quarter of 2002; right?
5    A.    That's what this states.
6
7        (Whereupon, Deposition Exhibit Gertz-8,
8        E-mails, MRK-AAC0128698 -
9        MRK-AAC0128699, was marked for
10        identification.)
11        - - -
12 BY MR. KRISTAL:
13    Q.    Let me show you what I'm marking as
14 Exhibit 8, which is another chain of e-mails.
15        And again, this is two pages, is it
16 not?
17    A.    It's two pages.
18    Q.    And the date of the earliest e-mail
19 is August 6, 2003; correct?
20    A.    August 6, 2003.
21    Q.    Right?
22    A.    Yes.
23    Q.    And what's being discussed in this
24 chain of e-mails is the manuscript for Protocol 136
25 that's referred to the Laine, L-A-I-N-E, manuscript;

65

1 right?
2    A.    It actually refers to what I would
3 interpret is actually data from two studies that
4 were put together for a single publication, Protocol
5 436 and 184.
6    Q.    184 was a one-week study; right?
7    A.    I would have to see the date and the
8 details on that.
9    Q.    Now, one of your functions at Merck
10 was to review manuscripts before they were
11 published; is that correct?
12    A.    Not every manuscript, but I did see
13 many manuscripts.
14    Q.    And you were obviously being asked to
15 comment on the manuscript that included Protocol
16 136; right?
17    A.    I believe that's correct.
18    Q.    And on August 7, 2003 you wrote an
19 e-mail to one of the authors, Thomas Simon; right?
20    A.    Yes.
21    Q.    It is, "Memo re: changes to 136/184
22 Laine manuscript." Right?
23    A.    That is the subject, yes.
24    Q.    And what you wrote was, "I am okay
25 with the first two points. However, for point #3;

17 (Pages 62 to 65)

Confidential-Subject To Protective Order

66

1  we can either say this as 52% vs 52% or give the
2  numbers that you have in the table.  It is a matter
3  of emphasis.  I am trying to give this the best face
4  possible that is compatible with the 'truth' of the
5  data.  One can emphasize what one wants - it is not
6  clear from a clinical perspective what any of this
7  means for erosions, so why not try for the some what
8  better appearing message?"
9      Do you see that?
10     A.    I see what you've read, yes.
11     Q.    So, at that time with respect to this
12  manuscript, you were trying to put the best face
13  possible compatible with the "truth" of the data;
14  right?
15     A.    You know, if you want -- it would be
16  best if we had the manuscript and I can understand
17  what this is actually referring to.
18     Q.    My question is, did you write the
19  words, "I am trying to give this the best face
20  possible that is compatible with the 'truth' of the
21  data"?  Did you write that?
22     A.    That is here on my e-mail, yes.
23     Q.    Okay.
24         No reason to believe you weren't
25  trying to do that, right, if that's what you wrote?

67

1      A.    I'm trying to make sure the data are
2  presented in a way "compatible with the 'truth' of
3  the data," as it says here, yes.
4      Q.    Right.
5          Putting the "best face possible" on
6  it is what you wrote; right?
7      A.    That is what is included in here,
8  yes.
9                - - -
10         (Whereupon, Deposition Exhibit Gertz-9,
11         "Ulcer Formation with Low-Dose
12         Enteric-Coated Aspirin and the Effect of
13         COX-2 Selective Inhibition: A
14         Double-Blind Trial," Gastroenterology
15         2004;127:395-402, was marked for
16         identification.)
17                - - -
18  BY MR. KRISTAL:
19     Q.    Now, I'm marking as Exhibit 9 the
20  actual manuscript -- the actual article itself, and
21  this is the article that ultimately appeared in
22  August of 2004, is it not?  Which was based on
23  Protocol 136?
24     A.    (Witness reviewing document.)
25         It appears to be, yes.

68

1      Q.    So, even though you had the interim
2  analysis in November of 2001, this took almost three
3  years to get into publication; right?
4      A.    Well, the interim analysis is not a
5  final analysis.  It is not a full data set.  I don't
6  know if it could have been 6 to 12 months from that
7  point in time that the final data set came in.
8      Q.    So, let's assume it was the end of
9  2002.  It still took --
10     A.    Then clearly for a subspecialty
11  journal like Gastroenterology, it could clearly take
12  up to a year between the time you submit an article,
13  it gets reviewed, it goes out to several reviewers,
14  the results come back from the reviewers, those are
15  debated scientifically between the reviewers and the
16  authors, it may require some discussions with the
17  editor.  I don't recall in this one.  I was not an
18  author on this one, but I'm not surprised at all
19  that from the time it's submitted that it takes a
20  year.
21         Of note, the data were presented at
22  the scientific meeting shortly after the final data
23  set was in, and I don't know the exact date of when
24  the final data set was in.
25     Q.    Merck can choose which journal to

69

1  submit a manuscript; correct?
2      A.    Merck does not make that decision
3  alone.  That would have to be made in concert with
4  someone like an outside investigator like Dr. Laine,
5  for example.
6      Q.    But Merck is aware when manuscripts
7  are being submitted as to the turnaround time, is it
8  not, for how long it might take a different journal
9  to get an article into print?  There are some
10  journals that have fast tracks, and some journals
11  take a long time?
12     A.    Some journals have fast tracks, and
13  some journals take longer than others.
14     Q.    And Merck was aware of that at the
15  time?
16     A.    Aware in a general sense, yes.  To
17  the extent there is an implication that that was
18  involved in the decision of where to choose to
19  publish this, I disagree with that.
20     Q.    Now, you are not trained in
21  neurology, are you?
22     A.    I'm not trained in neurology except
23  to the extent as someone who is trained in internal
24  medicine does see patients with neurologic problems.
25  I'm not a subspecialist in neurology.

**18 (Pages 66 to 69)**

M00S336791

**166**

1  think it would be reported that we think this is due
2  to chance?
3      A.    No. This is a brief summary
4  statement. Again. I don't have the full document.
5      Q.    We're going to look at that in a
6  minute.
7          MR. KRISTAL: Why don't we do this.
8  Why don't we go off the record.
9          THE VIDEOTAPE TECHNICIAN: Off the
10  record, 12:41 p.m.
11          - - -
12          (Whereupon, a luncheon recess was
13      taken from 12:41 p.m. until 1:49 p.m.)
14          THE VIDEOTAPE TECHNICIAN: Back on
15  the record at 1:49 p.m.
16  BY MR. KRISTAL:
17      Q.    Good afternoon. How was lunch?
18      A.    Fine, thank you.
19      Q.    Do you consider yourself to be a
20  scientist?
21      A.    Yes, I do.
22      Q.    Do you consider yourself to be a good
23  scientist?
24      A.    I like to think of myself as a good
25  scientist, yes.

**167**

1      Q.    Do good scientists test hypotheses as
2  part of what they do?
3      A.    As part of the scientific method,
4  yes.
5      Q.    As part of the scientific method, a
6  hypothesis is something that needs to be tested
7  scientifically; is that correct?
8      A.    Could you repeat that?
9      Q.    Sure.
10      A.    It seems to be a tautology, but --
11      Q.    Maybe it is.
12          You start out in the scientific
13  method with a hypothesis; right?
14      A.    Yes.
15      Q.    And then what you do is you design a
16  test that is specifically conducted to either prove
17  or disprove the hypothesis. Is that fair to say?
18      A.    That is fair to say.
19      Q.    Would you agree that the hypothesis
20  that naproxen is cardioprotective has not been
21  scientifically proven?
22      A.    I would say that there's not been a
23  single -- an outcomes trial that proves naproxen to
24  be cardioprotective.
25      Q.    So, the answer to the question is the

**168**

1  hypothesis that naproxen is cardioprotective has not
2  been scientifically proven?
3      A.    I'd say -- there is different levels
4  of proof and different degrees in hierarchy of
5  evidence, and I'd say there's a substantial body of
6  evidence supporting the cardioprotective properties
7  of naproxen. I would not say that there's been a --
8  there's not been a complete demonstration that it's
9  cardioprotective to the extent that I'd go out and
10  -- that it has regula:  approval for something
11  like being cardioprotective.
12      Q.    But the body of evidence that you're
13  talking about is a step removed from claiming
14  scientifically that naproxen is cardioprotective?
15  That's not been proven; right?
16      A.    I think the body of evidence is
17  science -- it's a body of scientific evidence
18  supporting the cardioprotective properties of
19  naproxen, but that is a step removed from the
20  regulatory evidence, you know, regulatory level of
21  proof that's required to, for example, make a claim
22  that naproxen is cardioprotective.
23      Q.    Let me show you what you testified to
24  before. Let me read this first, and then I'll show
25  it to you and see if you are saying the same thing

**169**

1  or something different.
2          On Page 65 of your August 27, 2003
3  deposition -- it's actually Page 66, I apologize,
4  question on line 5.
5          "Question: As we sit here today, do
6  you have an opinion, do you hold an opinion as to
7  whether or not naproxen is a cardioprotective drug?
8          "Answer: It's my personal opinion
9  that naproxen has potent, sustained anti-platelet
10  effect and that that would be expected to show lower
11  event rates, cardiovascular event rates. That's a
12  step yet removed scientifically from claiming that
13  it's, you know, asserting that it's
14  cardioprotective. I don't think that's been
15  proven."
16          Let me show it to you. Are you
17  saying something different today?
18      A.    I don't think anything I said today
19  was different from that statement, if that's what I
20  said in my deposition before.
21      Q.    Okay.
22          Would you agree that the competition
23  that was driving the speed of development to get
24  Vioxx on to the market first continued throughout
25  the time that Vioxx was on the market?

**43 (Pages 166 to 169)**

M00536816

278

1    A.    No.  But we submitted it there
2 because, as is mentioned here, it's the premier
3 cardiology journal, and it was recommended by our
4 external author, Dr. Konstam.
5    Q.    Who was just made an editor of that
6 journal; right?
7    A.    He happened to have just -- that's
8 why I think it was in the forefront of his mind, to
9 make that suggestion.
10    Q.    And it was not originally submitted
11 to the premier cardiology journal, right?  It was
12 submitted to JAMA Express and rejected first?
13    A.    It was rejected from JAMA Express,
14 and the editors suggested that we reconsider going
15 the usual route.
16    Q.    Right, which would have been a much
17 more vigorous peer review.
18    A.    No.  Not more vigorous than
19 Circulation. I don't agree with that.
20    Q.    It says in the e-mail that it would
21 be a much more vigorous peer review if you submitted
22 it to JAMA; right?
23    A.    Dr. Sperling is saying you can
24 anticipate not a more rigorous peer review relative
25 to Circulation. She's saying that she thinks, in

279

1 her opinion, that it would be anticipated a rigorous
2 peer review.  I believe there's a very rigorous peer
3 review system in Circulation, and that's why it's
4 considered a premier cardiology journal.
5        MR. KRISTAL:  Move to strike the
6 nonresponsive response.
7 BY MR. KRISTAL:
8    Q.    Are these your handwritings on this
9 letter?
10    A.    Which letter?
11    Q.    The rejection letter from
12 Circulation.
13    A.    I don't believe so.
14    Q.    One of the comments was --
15    A.    I don't believe that's my
16 handwriting.
17    Q.    Well, you would know best.
18    A.    I don't think so.
19    Q.    One of the comments was, as a major
20 comment -
21    A.    You know, I -- there are some parts
22 that look like my handwriting, and there's other
23 parts that don't.  So, I can't say there's nothing
24 on here that's not my handwriting.  There are some
25 parts that look like it and others that don't.

280

1    Q.    One of the major points of comment by
2 the reviewer from Circulation that was attached to
3 the rejection letter was number 2, that "The authors
4 must state much more explicitly limitations of their
5 own analysis." Right?
6    A.    I'm not sure where you are reading.
7        MR. KLEINBERG:  Number 2.
8        THE WITNESS:  Well, there's Roman
9 numeral i and Roman Numeral ii.
10        MR. KLEINBERG:  Under 2.
11        THE WITNESS:  The headline.  "The
12 authors must state much more explicitly the
13 limitations."  That's what it says.
14 BY MR. KRISTAL:
15    Q.    A subpoint of that is down at the
16 bottom, the last paragraph, "The naproxen story is
17 more controversial than suggested in the
18 discussion."  Right?
19    A.    It states that.
20    Q.    "Thus, no prospective trials have
21 been performed of the cardioprotective effects of
22 NSAIDs, sized appropriately to have the power to
23 detect an impact on real events."  That's what it
24 says; correct?
25    A.    Yes.

281

1    Q.    That's what we were talking about
2 right after lunch, that there had been no
3 prospective trials performed with respect to the
4 cardioprotective effects of naproxen; right?
5    A.    Well, there had been none with
6 naproxen, but probably -- these are US reviewers.
7 There, in fact, had been done prospective studies
8 with two other NSAIDs that are very similar to
9 naproxen, although they are not approved for use in
10 the United States, flurbiprofen and indobufen.  In
11 fact, one of those two is, in fact, approved in
12 countries in Europe, I'm not sure which ones, but
13 major countries, where it is actually approved for
14 use as a cardioprotective agent.  So, while there is
15 no such study for naproxen, there is -- there are
16 studies for other agents that behave similar to
17 naproxen, which is part of the totality of the
18 evidence that we've put together that gave
19 credibility to the naproxen hypothesis.
20    Q.    Right.  But in your mind, for the
21 naproxen hypothesis to be scientifically proven, you
22 would have to do a prospectively designed trial
23 performed to test the hypothesis as to whether or
24 not naproxen is cardioprotective, which was "sized
25 appropriately to have the power to detect and impac

71  (Pages 278 to 281)

M005536844

Confidential-Subject To Protective Order

282

1    on real events." Right?
2         MR. KLEINBERG: Objection to the form
3    of the question. Misstates the witness' testimony.
4    BY MR. KRISTAL:
5         Q.   That would be what you would require
6    as scientific proof.
7         A.   To proceed with telling patients --
8    again, it gets --
9         Q.   I'm not talking about regulatory.
10   I'm talking about scientific proof.
11        A.   Scientific proof. In order to state
12   emphatically that naproxen was a cardioprotective
13   agent would require studies not only like those done
14   with the other drugs I mentioned to you. However,
15   the pharmacologic properties of naproxen were
16   consistent with such a cardioprotective effect.
17   That's always what we have stated.
18        Q.   And you have never stated that it's
19   been scientifically proven that naproxen is
20   cardioprotective?
21        A.   I don't believe I've ever stated
22   that, just what you said.
23        Q.   Because that's not true?
24        A.   Because there's not been all the data
25   together to prove that.

283

1         Q.   Okay.
2              Merck could have conducted that study
3    on naproxen; right?
4              MR. KLEINBERG: Object to the form of
5    the question. You can answer.
6              THE WITNESS: One conceivably could
7    have studied naproxen. Again, you would have to go
8    in and find out what your population you're going to
9    be studying.
10   BY MR. KRISTAL:
11        Q.   Well, whatever the population is,
12   Merck could have either conducted a study to prove
13   or disprove the naproxen hypothesis or funded
14   someone else to do it; right?
15        A.   Well, we felt that conceivably that
16   was an alternative, but I think our feelings were
17   that the way to address the continuing controversy
18   was to get the placebo-controlled studies with Vioxx
19   done and indeed get more data on placebo for
20   Vioxx -- I mean placebo versus Vioxx.
21        Q.   Now, there's also another reviewer,
22   the third reviewer, the last page. One of the
23   comments made by that reviewer was there was no
24   mention of the Topol paper; right? Eric Topol's
25   paper would --

284

1         A.   Can you point to me where it is?
2         Q.   Yes. Number 4. "No mention is made
3    of the recent paper by Mukherjee et al which
4    suggested a increased frequency of cardiovascular
5    events in patients taking either currently available
6    COX-2 antagonists" -- I'm sorry, "in patients taking
7    either currently available COX-2 antagonists." That
8    would be Vioxx and Celebrex; right?
9         A.   I believe that's what he's referring
10   to.
11        Q.   The Mukherjee paper was also
12   co-authored by Topol, Eric Topol?
13        A.   Yes, that's correct.
14        Q.   Eric Topol was someone who Merck
15   consulted with to get advice on various issues
16   related to cardiology; correct?
17        A.   More in the past, but we have -- Dr.
18   Topol has been a consultant for Merck in the past.
19        Q.   Unless -- since he started publishing
20   articles that were critical of Vioxx; correct?
21        A.   No. It doesn't have anything to do
22   with that. It was the areas that we were studying
23   when we were doing a lot of studies with our other
24   cardiovascular active agents, and that was an area
25   that he was really mostly an expert in --

285

1         Q.   And the review --
2         A.   -- extensively involved at that time.
3    But since those drugs were no longer even -- they
4    were no longer in our primary grouping of drugs,
5    they went generic, we weren't doing any further
6    studies with those.
7         Q.   The comment from that reviewer says,
8    "The reports of increased event rates in patients
9    taking celecoxib should be referenced and
10   discussed." Right? So, they wanted some sort of
11   discussion, the reviewer was saying, in your paper,
12   the meta-analysis, about studies that showed the
13   contrary, that showed an increased risk?
14        A.   Well, specifically he's referring to
15   the analysis that was done in the Topol paper. The
16   Topol paper was not a study. The Topol paper was a
17   resynthesis of the data that we presented, as well
18   as Pfizer/Searle presented at the FDA Advisory
19   Committee meeting in February 2001. What he's
20   suggesting -- asking here is that we include
21   reference to comments made in this paper with
22   respect to celecoxib. I don't believe in the actual
23   analysis that was performed and presented at the
24   Advisory Committee meeting if there was any
25   significant difference between celecoxib and their

72 (Pages 282 to 285)

# EXHIBIT 12

## Page 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX,            )
                         )
Products liability litigation,)
                         )
This Document Relates To:    )
                         )
STATE OF LOUISIANA,        )
                         )
          Plaintiff,    )
                         )
vs.                )  Case No. 053700
                         )
MERCK SHARP,            )
                         )
          Defendants.    )
_____)

THE VIDEOTAPED DEPOSITION OF LOREN
LAINE, M.D., was taken on behalf of the Plaintiffs
at 9:14 a.m. on Tuesday, February 2, 2010, at
251 S. Olive Street, Flower Room, Los Angeles,
California, before SERENA WONG, CSR 10250,
Certified Shorthand Reporter for the State of
California.

## Page 3

1  APPEARANCES:
2  FOR THE WITNESS:
3      BY:  JEREMY D. MISHKIN, ESQ.
         MONTGOMERY, McCRACKEN, WALKER &
4        RHOADS, LLP
         123 South Broad Street
5        Avenue of the Arts
         Philadelphia, Pennsylvania 19109
6        (215)772-7246
         jmishkin@mmwr.com
7
8  FOR THE PLAINTIFF:
9      BY:  DONALD C. ARBITBLIT, ESQ.
         SARAH LONDON, ESQ.
         LIEFF, CABRASER, HEIMANN &
         BERNSTEIN, LLP
10       275 Battery Street
11       29th Floor
         San Francisco, California  94111
12       (415) 956-1000
         darbitblit@lchb.com
13
14  FOR THE DEFENDANTS:
15      BY:  TAREK ISMAIL, ESQ.
         KENNETH F. BAUM, ESQ.
16       GOLDMAN, ISMAIL, TOMASELLI, BRENNAN
         BAUM, LLP
         506 Santa Monica Boulevard
         Suite 217
18       Santa Monica, California  90401
         (310) 910-3322
19       tismail@goldmanismail.com
20      BY:  FRANK J. O'HARA
         MERCK & CO., INC.
21       351 N. Sumneytown Pike
         North Wales, Pennsylvania  19454
22       (267)305-4822
         frank_ohara@merck.com
23  ALSO PRESENT:
24      Amy Kostka, Videographer
25

## Page 4

1             I N D E X
2  THE WITNESS      EXAMINED BY        PAGE
3  Loren Laine, M.D.  Mr. Arbitblit      8, 237
4              Mr. Ismail        141
5
6          E X H I B I T S
7  PLAINTIFF'S    DESCRIPTION        PAGE
8    1   E-mail Chain, 9/20/00        20
9    2   Tax Return Documents        21
10   3   MK-0966 Reference PO88C Appendix   31
         3.2.1
11
     4   Memo, 3/9/00            36
12
     5   E-mail chain, 12/8/05        37
13
     6   Memo, 6/12/00            39
14
     7   Letter, 6/30/00            40
15
     8   E-mail, 7/12/00            41
16
     9   Fax, 7/18/00            43
17
     10  Memo, 4/15/00            47
18
     11  E-mail, 12/8/05            49
19
     12  Letter, 2/7/00            51
20
     13  Abstract, MRK-NJ0346580        57
21
     14  Statistical Data Analysis Plan    61
22
     15  E-mail, 5/1/00            68
23
     16  A Large, Prospective Outcomes Study  82
24       Comparing the Effects of Rofecoxib
         a Specific Inhibitor, etc.
25

## Page 5

1          E X H I B I T S
2  PLAINTIFF'S    DESCRIPTION        PAGE
3    17  E-mail, 5/5/00            85
4    18  Comparison of the Effects of    86
         Rofecoxib, a Highly Selective-
5        Inhibitor of COX-2 and Naproxen,
         Etc.
6
     19  E-mail, 12/15/05            87
7
     20  Vioxx Interim Review HH-PAC 5/17/00  89
8
     21  Comparison of Upper Gastrointestinal  91
9        Toxicity of Refecoxib and Naproxen
         In Patients with Rheumatoid Arthritis
10
     22  Reference P088C            96
11
     23  E-mail chain, 7/1/02        103
12
     24  E-mail chain, 8/15/01        111
13
     25  Confirmed Complicated PUBs      120
14       Analysis of Treatment by Baseline
         Steroid Use Interaction
15
     26  E-mail chain, 12/5/01        123
16
     27  Serious Lower GI Clinical Events   128
17       with Non-Selective NSAID or Coxib
         Use
18
     28  Vioxx Stage IV Background Package  130
19
     29  E-mail, 4/26/02            133
20
     30  Ulcer Formation With Low-Dose    134
21       Enteric-Coated Aspirin and
         The Effect of of COX-2 Selective
22       Inhibition
23   31  E-mail, 1/27/04            135
24   32  E-mail, 12/18/03            139
25

Page 126

1  lower GI events without these four patients who
2  had discontinuation only?  And then you actually
3  list five numbers.
12:16  4      A    Yes.
12:16  5      Q    And you did that after having received
6  the treatment group allocation that you requested?
12:16  7      A    It does look like that, yes, I did.
12:16  8      Q    And then you prepared -- after telling
9  -- asking Laurine -- withdraw that.
12:16  10        After asking Laurine to remove those
11  five patients, you received a revised analysis;
12  correct?
12:16  13        MR. ISMAIL:  Objection.  Leading.
12:16  14        THE WITNESS:  I'm not sure when I
15  received it, but I do know I -- obviously at some
16  point I received it.
12:16  17      Q    BY MR. ARBITBLIT:  Look at the first
18  page of the document also dated December 5, 2001
19  at 2:11 p.m.  First, there was -- was that typical
20  of how quickly you could get things analyzed when
21  you called someone at Merck?  That you could send
22  an e-mail at 10:00 in the morning and get a
23  response by 2:00 in the afternoon with the revised
24  analysis?
12:17  25        MR. MISHKIN:  Objection to form.

Page 127

12:17  1        THE WITNESS:  I don't know.  Sometimes
2  obviously, yes.  I don't remember how quickly.
12:17  3      Q    BY MR. ARBITBLIT:  You see on December
4  5 from Qinfen Yu, there's an e-mail saying,
5  "Attached please find tables for the revised
6  analysis end point excluding the five patients as
7  you requested"?
12:17  8      A    Right.
12:17  9      Q    And do you see that there is a table at
10  -- page 7 of 7, there is a reference to four
11  attached tables; correct?
12:18  12      A    Correct.
12:18  13      Q    And the first one is 24 versus 11?
12:18  14      A    Correct.
12:18  15      Q    Instead of 26 versus 14; right?
12:18  16      A    Correct.
12:18  17      Q    And when it was 24 versus 11 in the
18  revised analysis after you received the treatment
19  allocations, the p-value was 0.032; correct?
12:18  20        MR. ISMAIL:  Objection.  Leading.
12:18  21        THE WITNESS:  On this first table, it
22  does have that p-value, .032.
12:18  23      Q    BY MR. ARBITBLIT:  And you then submit
24  an abstract for publication with this data?
12:19  25      A    Yes.

Page 128

12:19  1      Q    27 is an abstract, "Serious Lower GI
2  Clinical Events With Nonselective NSAID or Coxib
3  use:  A Double-Blind GI Outcomes Study Trial of
4  Naproxen v. Rofecoxib."
12:19  5        (The document referred to was marked for
6  identification by the court reporter as
7  Plaintiff's Exhibit 27 and attached hereto.)
12:19  8      Q    BY MR. ARBITBLIT:  Is this the abstract
9  you submitted?
12:19  10      A    I assume it's the one.  It's one I
11  think I sent to you, so it should be the one.
12:19  12      Q    Can you compare this to the table that
13  we were just looking at with the 35 events, and
14  confirm that it has the same relative risk and
15  p-value?
12:19  16      A    It has the same relative risk and
17  confidence intervals and rates, yes.
12:19  18      Q    And does your abstract state in the
19  middle of the page under the methods section that
20  serious lower GI clinical events were assessed
21  blinded to treatment allocation?
12:20  22      A    Yes.
12:20  23      Q    Did you publish the same data in a peer
24  reviewed journal of gastroenterology?
12:20  25        MR. ISMAIL:  Objection to form.

Page 129

12:21  1        THE WITNESS:  Yes.
12:21  2        MR. ARBITBLIT:  Let's go off the
3  record.
12:21  4        THE VIDEOGRAPHER:  We're going off the
5  record.  The time is 12:21 p.m.
12:23  6        (Brief recess.)
12:23  7        THE VIDEOGRAPHER:  We're back on the
8  record.  The time is 12:23 p.m.
12:23  9      Q    BY MR. ARBITBLIT:  Doctor, were you
10  involved in the planning of protocol 136?
12:23  11      A    Can you tell me what protocol 136 is?
12:23  12      Q    The study of Vioxx plus Aspirin versus
13  Ibuprofen 2100 milligrams per day in
14  endoscopically detected ulcers?
12:23  15      A    Yes, I was.
12:23  16      Q    What was your role in that study?
12:23  17      A    I think I was probably the main GI
18  person in terms of helping design and -- design
19  the study and oversee, I guess, a little bit
20  execution, but an analysis.
12:24  21      Q    Did you have an understanding as to why
22  that study was conducted?
12:24  23      A    Well, from my point of view, it was
24  addressing some very interesting points that were
25  quite important to gastroenterologists and people

Page 130

1    who use NSAIDs and Aspirin.
12:24    2    Q    And what were those questions that you
3    were addressing?
12:24    4    A    What's the incidents of ulcers in
5    people who take low dose Aspirin, and what's the
6    effect when you combine low dose Aspirin and a
7    COX-2 selective inhibitor like Rofecoxib together.
12:24    8    Q    Were you involved in selecting the
9    Ibuprofen dose for that study, or was it simply a
10   matter of using a dose that had been chosen
11   before?
12:25   12    MR. MISHKIN:  Objection.
12:25   13    THE WITNESS:  Again, as a
14   gastroenterologist, I wasn't probably the one
15   making that primarily, although it was kind of a
16   standard dose that had been used in these type of
17   studies.
12:25   18    (The document referred to was marked for
19   identification by the court reporter as
20   Plaintiff's Exhibit 28 and attached hereto.)
12:26   21    Q    BY MR. ARBITBLIT:  27 -- 28 is a memo
22   dated March 13, 2001 to the Human Health PAC from
23   the Vioxx Commercialization Team starting at
24   MRK-AAD0134901.
12:26   25    Have you ever seen this document

Page 131

12:26    1    before?
12:26    2    A    I don't believe so.
12:26    3    Q    If you could turn to the page ending in
4    4927. Do you see the paragraph at the bottom,
5    "Third, to dealing with the barrier that Aspirin
6    mitigates the GI benefit of coxib therapy versus
7    traditional NSAIDs, MRL is conducting studies to
8    demonstrate that the GI safety of Vioxx plus low
9    dose Aspirin is superior to the GI safety of
10   Ibuprofen or Ibuprofen plus Aspirin."
12:27   11    Did I read that correctly?
12:27   12    A    You did.
12:27   13    Q    Does that refer to protocol 136 and a
14   potential for an additional follow-on study?
12:27   15    MR. MISHKIN:  Objection.
12:27   16    MR. MISHKIN:  Objection.
12:27   17    MR. ISMAIL:  Form, lacks foundation.
12:27   18    THE WITNESS:  I can't say, but
19   certainly that study would address an issue of GI
20   injury with Aspirin plus COX-2.
12:27   21    Q    BY MR. ARBITBLIT:  Well, your study 136
22   did pertain to Vioxx plus low dose Aspirin against
23   Ibuprofen and placebo; correct?
12:28   24    A    Again, our study did look at Ibuprofen
25   versus Aspirin plus COX-2.  So some of the things

Page 132

1    in here referred to aspects of our study, yes.
2    I'm just not sure what they're referring to here
3    obviously.
12:28    4    Q    The next sentence, "Ideally these
5    studies will be included in the Vioxx label and
6    available for promotion in the U.S. as well as the
7    rest of the world.  These studies will be
8    important to managed care organizations and
9    reimbursement authorities in general because they
10   remove one argument against reimbursing Coxib."
12:28   11    Did I read it correctly?
12:28   12    A    You read it correctly.
12:28   13    Q    Do you understand that to mean that an
14   argument against reimbursing Coxib would be that
15   if you took a Coxib with Aspirin, there was a
16   concern that Aspirin might reduce or eliminate any
17   potential GI benefit?
12:28   18    MR. MISHKIN:  Objection.
12:28   19    MR. ISMAIL:  Objection.  Lack of
20   foundation, calls for speculation.
12:28   21    THE WITNESS:  Right, it says
22   mitigate --
12:28   23    MR. ISMAIL:  Leading.
12:29   24    THE WITNESS:  It says mitigate, so,
25   yes, the idea was that Aspirin -- could Aspirin

Page 133

1    decrease the benefit of COX-2 agent Rofecoxib.
12:29    2    Q    BY MR. ARBITBLIT:  And you conducted
3    the protocol 136; correct?
12:29    4    A    Not myself, but I was involved in it,
5    yes.
12:29    6    (The document referred to was marked for
7    identification by the court reporter as
8    Plaintiff's Exhibit 29 and attached hereto.)
12:29    9    Q    BY MR. ARBITBLIT:  28 -- 29.  I'm one
10   behind or ten ahead at all times.
12:29   11    29 is an e-mail dated April 26, 2002
12   that says, "Just wanted to let you know if you
13   hadn't heard already that we finally froze Vioxx
14   protocol 136 late last night."
12:30   15    Is that consistent with your
16   understanding of when protocol 136 achieved the
17   frozen file status?
12:30   18    MR. MISHKIN:  Objection.
12:30   19    MR. ISMAIL:  Objection.  Form.
12:30   20    THE WITNESS:  I don't remember from the
21   file.  I know I probably received the data later
22   in this year.  It makes sense, some months later I
23   would have received the data.
12:30   24    Q    BY MR. ARBITBLIT:  Do you recall that
25   your article on protocol 136 wasn't published

Page 134

```
        1  until August 2004?
12:30   2      A   I remember it was 2004.  I don't
        3  remember the exact time, but I can accept that.
12:30   4      (The document referred to was marked for
        5      identification by the court reporter as
        6      Plaintiff's Exhibit 30 and attached hereto.)
12:31   7      Q   BY MR. ARBITBLIT:  30 is your article,
        8  "Ulcer Formation with Low-Dose Enteric-Coated
        9  Aspirin and the Effect of COX-2 Selective
       10  Inhibition:  A Double-Blind Trial."
12:31  11      Is that correct?
12:31  12      A   That's correct.
12:31  13      Q   And the cover page says August 24.  If
       14  you look on the next page --
12:31  15      A   It says August 2004.
12:31  16      Q   I'm not doing so well.  Was this
       17  published in August 2004, Doctor?
12:31  18      A   It was.
12:31  19      Q   About a month before Vioxx came off the
       20  market?
12:31  21      A   I don't remember what date that was,
       22  but okay.
12:31  23      Q   September 30, 2004, do you recall that
       24  as being the date that Vioxx came off the market?
12:31  25      A   I don't recall it exactly, but I can
```

Page 135

```
        1  accept that that was the date.
12:32   2      Q   Do you recall that this raised
        3  sensitive issues for Merck?
12:32   4      MR. MISHKIN:  Objection.
12:32   5      MR. ISMAIL:  Objection form.
12:32   6      THE WITNESS:  I don't recall that.
        7  Certainly it suggested that Aspirin plus COX-2 did
        8  clearly mitigate the benefit of the COX-2, yes.
12:32   9      (The document referred to was marked for
       10      identification by the court reporter as
       11      Plaintiff's Exhibit 31 and attached hereto.)
12:32  12      Q   BY MR. ARBITBLIT:  So Exhibit 31 is
       13  another excerpt from your file at pages 970 and
       14  971, an e-mail exchange beginning January 22, 2004
       15  from Eric Maller.  And ultimately, you are copied
       16  on January 27, 2004 on the e-mail string.
       17      Do you see that?
12:33  18      A   Right.  At the top of the page I am.
12:33  19      Q   Do you see that this e-mail says at the
       20  second page from Maller to Steven Averbuch, "This
       21  is a revised manuscript regarding Vioxx protocol
       22  136, the Vioxx Aspirin endoscopy trial that
       23  finished over one and a half years ago but caused
       24  a label change, et cetera, for Vioxx, and to it so
       25  many in the company were sensitive, re the results
```

Page 136

```
        1  and its potential implications for Vioxx."
12:33   2      Did I read that correctly?
12:33   3      A   You did.
12:33   4      Q   Did you have an understanding about
        5  what the potential implications were for Vioxx?
12:33   6      A   Do I have an understanding?
12:33   7      MR. ISMAIL:  Objection to form.
12:33   8      THE WITNESS:  I mean, clearly, it did
        9  suggest that Aspirin plus Rofecoxib increased the
       10  risk, at least based on endoscopic ulcers, to
       11  about the level of a traditional NSAID.
12:34  12      Q   BY MR. ARBITBLIT:  Do you know anything
       13  about when the label was changed to reflect that
       14  study?
12:34  15      A   I'm not sure about that at all.  I
       16  don't know anything other than I remember the
       17  label way back in 2001 related to the VIGOR study,
       18  but I'm not sure about this at all.
12:34  19      Q   On the January 27, 2004, e-mail from
       20  Eric Maller, the first line is, "Ahh, the wheels
       21  turn slowly here"; is that right?
12:34  22      A   It is.
12:34  23      Q   Going back to the VIGOR trial, did you
       24  ever have conversations with Alise Reicin about
       25  the need for speed?
```

Page 137

```
12:34   1      MR. ISMAIL:  Objection to form.
12:34   2      THE WITNESS:  I don't remember that
        3  conversation or conversation about that.
12:35   4      Q   BY MR. ARBITBLIT:  Did you know whether
        5  the planned publication or planned submission to
        6  the New England Journal had been specified in
        7  Merck's files because of its competitive position
        8  against Sorel with Celebrex.
12:35   9      MR. MISHKIN:  Objection.
12:35  10      MR. ISMAIL:  Objection.  Leading, lacks
       11  foundation.
12:35  12      THE WITNESS:  I don't think I have any
       13  knowledge of that, no.
12:35  14      Q   BY MR. ARBITBLIT:  The VIGOR study was
       15  unblinded on March 9, 2000; correct?
12:35  16      A   I don't remember that.  It was sometime
       17  I thought maybe in April, but maybe March.  I
       18  don't remember.
12:35  19      Q   And the paper was submitted for
       20  publication on May 18; correct?
12:35  21      A   In May sometime.  I just remember that,
       22  yes.
12:35  23      Q   So the wheels weren't turning slowly
       24  for VIGOR as they were for 136, were they?
12:35  25      MR. ISMAIL:  Objection.  Leading, lack
```

34  (Pages 134 to 137)

M01461457

Page 138

1    of foundation.
12:35    2         MR. MISHKIN:  Objection.
12:35    3         THE WITNESS:  I can't comment on that.
4    I don't really know.
12:35    5         Q    BY MR. ARBITBLIT:  Well, VIGOR was
6    submitted for publication -- was VIGOR submitted
7    for publication within a month or two of
8    unblinding the data?
12:36    9         A    If your numbers are correct, it would
10   be about two and a half months afterwards.
12:36   11         Q    And was 136 unpublished for a year and
12   a half -- actually, two and a half years from the
13   time the file was frozen in April 2002 until
14   publication in August 2004?
12:36   15         MR. MISHKIN:  Objection.
12:36   16         THE WITNESS:  To be precise, it was
17   submitted -- excuse me.  I first sent a copy of
18   the manuscript to the Merck people to review
19   around the turn of the year 2003.  It was
20   submitted in October, so I would suggest that
21   there was about a -- that means there was about a
22   ten-month period from the time I wrote it up to
23   the time it was submitted.  So I would take a year
24   and a half.  I would say it was a ten-month period
25   of time during which there was back and forth.

Page 139

12:36    1         Q    BY MR. ARBITBLIT:  What's your time
2    frame again, sir?  Could you just clarify that a
3    little bit?
12:37    4         A    Well, I gave them the manuscript
5    sometime around December or January of 2002, 2003.
6    Gastroenterology tells us that the manuscript was
7    submitted in October.  Therefore -- of 2003.
8    Therefore -- in the exhibit you gave me.
9    Therefore, there's about a ten-month lag period
10   there, which I don't know if it's particularly
11   long.  It would be up to others to decide, I
12   suppose.
12:37   13         Q    Do you recall that after the initial
14   submission, there were revisions to the article at
15   the request of the reviewers?
12:37   16         A    Yes, absolutely.
12:37   17         Q    Was one of them a request to take
18   something out because the authors were perceived
19   as trying to make the drug look better?
12:37   20         A    I'd have to look and see.  They did ask
21   us to take one -- a study out, yes.
12:38   22         Which one are you pointing to?
12:38   23         (The document referred to was marked for
24   identification by the court reporter as
25   Plaintiff's Exhibit 32 and attached hereto.)

Page 140

12:38    1         Q    BY MR. ARBITBLIT:  32 is an excerpt
2    from your production of documents with the pages
3    734 through 738.  And this is a December 2003 --
4    December 18, 2003 e-mail concerning protocol 136
5    and the submission to gastroenterology; correct?
12:38    6         A    It is.
12:38    7         Q    And then at major comments on page 736,
8    paragraph 2, "The addition of the one-week
9    endoscopic study of nonselective NSAIDs versus
10   nonselective NSAIDs plus Aspirin significantly
11   weakens the report of the primary three-month
12   study.  A one-week endoscopic study evaluates
13   acute mucosal injury that may not be relevant to
14   the chronic situation.
12:39   15         "Furthermore, the appearance is that
16   this one-week study was added with the purpose of
17   suggesting that NSAID plus Aspirin is more
18   ulcerogenic than Coxib plus Aspirin without
19   actually testing this hypothesis.  I disagree with
20   the authors that this hypothesis cannot be tested
21   directly.  The appearance is one of sponsors
22   trying to make their drug look better, an
23   unacceptable situation.  The one-week study should
24   be removed from the manuscript in order to make
25   the three-month study acceptable for publication."

Page 141

12:39    1         Did I read that correctly?
12:39    2         A    You did.
12:39    3         Q    And did the author say that it appeared
4    -- the appearance was one of the sponsors trying
5    to make their drug look better, an unacceptable
6    situation?
12:39    7         MR. MISHKIN:  Objection.
12:39    8         MR. ISMAIL:  Objection.  Lack of
9    foundation, leading.
12:40   10         THE WITNESS:  We wrote that here, yes.
12:40   11         Q    BY MR. ARBITBLIT:  Did you then submit
12   a revised manuscript?
12:40   13         A    We did.
12:40   14         Q    And eventually it was published in
15   August 2004?
12:40   16         A    That's correct.
12:40   17         MR. ARBITBLIT:  Let's take a lunch
18   break.
12:40   19         THE VIDEOGRAPHER:  We're going off the
20   record.  The time is 12:40 p.m.
12:40   21         (Whereupon a luncheon recess
12:40   22         was taken.)
13:35   23         THE VIDEOGRAPHER:  We are back on the
24   record.  The time is 1:36 p.m.
13:36   25         EXAMINATION

Page 222

1  Naproxen group.
15:19  2  Q   Earlier today plaintiff's counsel
3  showed you a few e-mails that were exchanged
4  between some of the authors as the data that was
5  used for the lower gastrointestinal article was
6  being analyzed.         Do you recall that?
15:20  7  A   I do.
15:20  8  Q   And there was some discussion as to
9  whether certain events would be used in the
10  definition of confirmed lower gastrointestinal --
11  or what qualifies lower gastrointestinal events
12  for this publication.
15:20  13  Do you recall that?
15:20  14  A   I do recall that.
15:20  15  Q   Can you explain for us what was the
16  concern that you folks had as to how to define
17  what a lower gastrointestinal event was and how
18  that was resolved?
15:20  19  THE WITNESS: Sure.
15:20  20  MR. ARBITBLIT: Object to form.
15:20  21  THE WITNESS: Well, basically, I -- I
22  had felt that, again, we were using the term
23  serious lower GI event.  And so we wanted to have
24  something that was analogous to the upper GI, to a
25  physician, a practicing physician, was really

Page 223

15:21  1  clinically serious.
2  In the original VIGOR secondary
3  analysis plan, it was talked about including
4  people who had discontinued -- had a bleed or
5  something else and discontinued their medication
6  only.  And there was a little bit of a holdover in
7  one of our definitions about that.  I had felt
8  that that really wasn't a serious event because if
9  somebody discontinued medication for a minor bleed
10  but didn't get hospitalized, didn't have a drop in
11  hemoglobin, didn't get a transfusion, it really
12  didn't qualify as serious.
15:21  13  So I had been kind of suggesting that
14  we should drop that discontinuation as part of the
15  criteria.  So we did actually do all of the
16  adjudication of events blinded.  So the statement
17  that the review of data was performed blinded to
18  treatment allocation is correct.  But we did have
19  a number of analyses done.  I did feel that the
20  one that was most appropriate was the one that was
21  clinical serious lower GI events, and that's the
22  one that we used in this admittedly post hoc
23  analysis, not a prespecified analysis.
15:21  24  Q   BY MR. ISMAIL: Okay.  Just to make
25  sure we understand what you indicated in your last

Page 224

1  answer.  First there was some suggestion, I
2  believe, in blood counsel that this doesn't reflect a
3  blinded study as it's reported in the article.
4  Were the clinical investigators who were
5  administering the medicines and diagnosing the
6  patients, were they blinded to what treatment the
7  patients were receiving?
15:22  8  MR. ARBITBLIT: Object to form.
9  THE WITNESS: The study as it was being
10  done was clearly blinded, yes.
15:22  11  Q   BY MR. ISMAIL: And was it, I guess,
12  what they call double-blinded where both the
13  patient and the physicians investigating did not
14  know what drugs the patients were getting?
15:22  15  A   Yes, it was double-blind.
15:22  16  Q   And then when the data was being
17  analyzed, what was your principal scientific
18  concern as to defining what events should be
19  considered in the study?
15:22  20  A   Well, we wanted to come up with a --
21  what was a clinically relevant end point, and
22  point that would be meaningful to people, and
23  people would really view as serious and reviewers
24  would review as serious, not just some more minor
25  lower GI bleeding such as just a little bit of

Page 225

1  bleeding from a hemorrhoid that didn't cause any
2  drop in blood count or hospitalization.
15:23  3  Q   Do you believe that the data that is
4  presented in the publication captures a clinically
5  relevant set of serious lower gastrointestinal
6  events?
15:23  7  MR. ARBITBLIT: Object to form.
8  THE WITNESS: I do, and I felt it was
9  certainly much more clinically relevant and
10  meaningful than including people who might have
11  just discontinued without any other sign of
12  serious event or serious bleed.
15:23  13  Q   BY MR. ISMAIL: So the results that are
14  reported here that appear in the abstract show --
15  do they show a statistically significant reduction
16  in the rate of lower gastrointestinal events on
17  Vioxx compared to Naproxen?
15:23  18  MR. ARBITBLIT: Object to form.
15:23  19  THE WITNESS: With that end point, yes,
20  they do.
15:24  21  Q   BY MR. ISMAIL: Do you have -- I don't
22  know.  I didn't get a copy of the exhibit.  The
23  protocol 136 article, the Ibuprofen study.
15:24  24  A   That's the Aspirin article?
15:24  25  Q   Yes, sir.

56  (Pages 222 to 225)

Page 226

15:24  1    A    I do have a copy that I was given, yes.
15:24  2    Q    What exhibit number is that?
15:24  3    A    Is that 30?
15:24  4    Q    Exhibit 30.  Just to orient us back to
       5  what that study was all about, what was the design
       6  of that study?
15:24  7    A    The design was basically to assess
       8  whether -- well, a few things, but people who took
       9  low dose Aspirin alone as compared to people who
      10  took low dose Aspirin plus Vioxx or Rofecoxib as
      11  compared to people who took a traditional NSAID
      12  Ibuprofen, and there was also a placebo group as
      13  well for comparison.
15:25 14    Q    I believe in the right column of the
      15  first page, there's a description as to what would
      16  have been -- let me back up one second.
15:25 17         Was -- is Aspirin considered a NSAID?
15:25 18    A    It is an NSAID, yes.
15:25 19    Q    Does -- can Aspirin alone cause
      20  gastrointestinal complications?
15:25 21    A    Absolutely.  It's well recognized to do
      22  that.
15:25 23    Q    So the protocol 136 had Vioxx plus
      24  Aspirin versus just Ibuprofen?
15:25 25    A    That's correct.

Page 227

15:25  1    Q    And then had you placebo data as well;
       2  right?
15:25  3    A    That's correct.
15:25  4    Q    Did you comment in, I believe it's on
       5  the right column of the first page, as to what
       6  would have been a more apples to apples comparison
       7  of the gastrointestinal risk of these agents in
       8  the article?
15:26  9    A    Right.  Clinically, the most important
      10  question would be among people who take Aspirin
      11  and who need an NSAID, would it be better to --
      12  you know, would there be a difference in the GI
      13  risk associated with Rofecoxib, COX-2 selective
      14  inhibitor versus traditional NSAID.  And that
      15  would be the most clinically relevant question.
      16  But for a number of reasons, we felt we really
      17  couldn't address that question first.  It would be
      18  impractical because we required a placebo group,
      19  because there had been no previous, interestingly,
      20  placebo controlled trials to compare ulcers over a
      21  period like this of 12 weeks.
15:26 22    Q    So does the publication -- and just to
      23  tie up the language that I was referring to, in
      24  the right column on the first page, there's a
      25  paragraph that begins "we therefore"?

Page 228

15:26  1    A    Yes.
15:26  2    Q    Do -- do the authors write, "The most
       3  clinically relevant comparison would be Aspirin
       4  plus Rofecoxib versus Aspirin plus a nonselected
       5  NSAID in-patients requiring low dose Aspirin for
       6  vascular prophylaxis"?
15:27  7    A    We did write that, yes.
15:27  8    Q    And for the reasons you described, that
       9  wasn't the study that you were able to do; right?
15:27 10    A    Right.  In the subsequent sentences, we
      11  explain I think fairly on -- in pretty good detail
      12  why we couldn't do that study ethically or
      13  practically at that time.
15:27 14    Q    So protocol 136 was a comparison of
      15  Vioxx plus an agent that's known to cause
      16  gastrointestinal events against Ibuprofen?
15:28 17    A    And two other groups too, but, yes.
15:28 18         MR. ISMAIL:  Let's go off the record
      19  because I want to get one of the exhibits we
      20  marked earlier.
15:28 21         THE VIDEOGRAPHER:  We're going off the
      22  record.  The time is 3:28 p.m.
15:33 23         (Brief recess.)
15:33 24         THE VIDEOGRAPHER:  We're back on the
      25  record.  The time is 3:33 p.m.

Page 229

15:33  1         (The document referred to was marked for
       2  identification by the court reporter as
       3  Plaintiff's Exhibit 35 and attached hereto.)
15:33  4    Q    BY MR. ARBITBLIT:  Do you have Exhibit
       5  35 in front of you, sir?
15:33  6    A    I do.
15:33  7    Q    What is it?
15:33  8    A    It's a copy of a paper that we wrote
       9  about stratifying the risk of upper GI outcomes
      10  based on the results from the VIGOR study.
15:34 11    Q    Did you -- did counsel this morning
      12  reference this article when you were talking?
15:34 13    A    Yes, we talked about it earlier.
15:35 14    Q    You had mentioned -- go to Exhibit 24.
15:35 15    A    Yes, I have it now.
15:35 16    Q    Okay.  I think you mentioned Exhibit 24
      17  relates to the analysis that eventually ends up
      18  and is part of Exhibit 35?  They're talking about
      19  the same things; right?
15:35 20    A    This relates to risk factor assessment,
      21  which related to writing this paper, yes.
15:35 22    Q    I think you -- there was a discussion
      23  or reference to Dr. Shapiro's e-mail to you.  I
      24  guess it's dated August 14, 2001?
15:36 25    A    Yes.

57  (Pages  226 to 229)

Page 258

```
1   theoretical.  There's animal data that suggested
2   maybe that you will heal more slowly.  The
3   relevance of that is uncertain, but, yes, you may
4   heal more slowly than if you were taking an NSAID
5   or a Coxib.
16:25   6       Q    BY MR. ARBITBLIT:  And you've
7   referenced that data in your own publications,
8   haven't you?
16:25   9       A    Yes, I have.
16:25  10       Q    And you've referenced in the August
11   2004 article about protocol 136; correct?
16:25  12       A    Well --
16:25  13            MR. ISMAIL:  Objection.  Leading.
16:25  14       Q    BY MR. ARBITBLIT:  Can you find that
16:26  15   article among the exhibits?  Exhibit 30.
16:26  16       A    That I specifically said there was an
17   animal model, that neither selective COX-1 nor
18   selective COX-2 induces gastro damage.  That's not
19   exactly what you're asking about.
16:26  20       Q    May I see the document for a moment,
21   please?
16:26  22            At page 00490, did you write,
23   "Alternatively, low dose Aspirin initially could
24   cause small lesions such as erosions that are
25   perpetuated or increased over time by concomitant
```

Page 259

```
1   therapy with a selective COX-2 inhibitor induction
2   of gastric ulcers in animal models is associated
3   with a marked increase in local COX-2 expression,
4   and selective COX-2 inhibitors delay healing of
5   these experimental ulcers similarly to
6   nonselective NSAIDs."
16:27   7            Did I read that correctly?
16:27   8       A    I have to look at it, but --
16:27   9            MR. MISHKIN:  Objection.
16:27  10            THE WITNESS:  As I said, there's no
11   doubt that there were animal models that -- as
12   we've talked about repeatedly now that do suggest
13   that in the animal model, if you have an ulcer and
14   you take a COX-2 or a traditional NSAID, you may
15   not heal as quickly as if you were on placebo or
16   nothing.  So there is no doubt that that
17   hypothesis was out there, and I refer to that
18   here, yes.
16:27  19       Q    BY MR. ARBITBLIT:  Why did you refer to
20   it there?
16:27  21       A    We were in a sense trying to come up
22   with explanations for the synergistic effect of
23   Aspirin plus Rofecoxib in causes ulcers, so we
24   were listing a whole bunch of potential hypothesis
25   to explain it.  I don't know which one, if any, is
```

Page 260

```
1   true.  But those were the things we thought about
2   as a potential explanation.
16:28   3       Q    So is it correct that one of the things
4   you thought about as a potential explanation was
5   that Aspirin would be causing some lesions, and
6   COX-2 inhibition was delaying their healing?
7            MR. ISMAIL:  Objection.  Leading.
16:28   8            THE WITNESS:  I think that's a
9   relatively safe interpretation, yes.
16:28  10       Q    BY MR. ARBITBLIT:  Now, Doctor, have
11   you made any investigation into the toxicity of
12   Vioxx 25 milligrams versus placebo over the many
13   years of your career?
16:28  14       A    Have I made any investigations?
16:28  15            MR. MISHKIN:  Objection.
16:28  16            THE WITNESS:  I'm not sure what you're
17   talking about.
16:28  18       Q    BY MR. ARBITBLIT:  Are you aware of
19   data comparing Vioxx 25 milligrams to placebo for
20   perforations, ulcers, and bleeds?
16:29  21       A    I have not made investigations myself
22   on that to my knowledge, no, if that's what you're
23   asking.
16:29  24            MR. ISMAIL:  I'd like to interject at
25   this point.  Counsel is now over his share of the
```

Page 261

```
1   time for today's deposition.  What is your --
16:29   2            MR. ARBITBLIT:  I'm going to keep going
3   until I'm done.
16:29   4            MR. ISMAIL:  Well, I didn't get the
5   question out.  What is your current contention as
6   to how long you intend to go?
16:29   7            MR. ARBITBLIT:  Until I'm done.
16:29   8            MR. ISMAIL:  That's not an answer.
16:29   9            MR. ARBITBLIT:  Counsel, you passed the
10   witness and you raised -- you introduced him as an
11   expert, and I'm going to cross-examine him as --
12   everything that you raised is now fair game.  It's
13   not about 20 minutes.  It's about everything that
14   you raised through this witness that I am going to
15   approach until I'm done.
16:29  16            MR. ISMAIL:  Well, again, I'm
17   attempting to have a reasonable discussion with
18   you about what -- how long we're going to allow
19   you to continue.  You haven't yet answered my
20   question.  About how long do you intend to go?
16:30  21            MR. ARBITBLIT:  I told you before I
22   started what I expected was at least an hour.  The
23   longer we chat, the longer it's going to take.
16:30  24            MR. ISMAIL:  Of course.  We've gone a
25   half hour.  So what's your current intention?
```

M01461488