# EXHIBIT 13

1

1    SUPERIOR COURT OF NEW JERSEY

2    LAW DIVISION - ATLANTIC COUNTY

3    -   -   -

4    IN RE:   VIOXX LITIGATION : CASE NO. 619

5    -   -   -

6    CONFIDENTIAL

7    SUBJECT TO PROTECTIVE ORDER

8    VOLUME 1

9    -   -   -

10    Monday, August 8, 2005

11    -   -   -

12    Videotaped deposition of PETER HONIG, M.D.,

13    held in the offices of MORGAN LEWIS, LLP, 1701

14    Market Street, Philadelphia, Pennsylvania 19103,

15    commencing at 9:12 a.m., on the above date, before

16    DEBRA J. WEAVER, a Federally Approved RPR, CRR and

17    CSR of New Jersey (XI 01614) and Delaware (No.

18    138-RPR, Exp. 1/31/08), and a Notary Public of New

19    Jersey, Pennsylvania and Delaware.

20    -   -   -

21

22    ESQUIRE DEPOSITION SERVICES

       1880 John F. Kennedy Boulevard

23    15th Floor

       Philadelphia, Pennsylvania 19103

24    (215) 988-9191

25

M00S815767

**14**

1  management position?
2    A.   And to whom do you report, sir?
3    Q.   And to whom do you report, sir?
4    A.   I report directly to Peter Kim, the
5  president of Merck Research Laboratories.
6    Q.   Now, I understand from looking at
7  your curriculum vitae, which is a resume, in a
8  sense, that you joined Merck in February of 2002; is
9  that correct?
10   A.   Yes, sir.
11   Q.   And do you remember when that was in
12 February of 2002?
13   A.   It was at the very end of the month.
14   Q.   And your position at that time was
15 vice president of worldwide product safety & quality
16 assurance?
17   A.   Yes, sir.
18   Q.   And would you describe for us what
19 that position was when you first joined Merck?
20   A.   Sure.  It was overseeing the quality
21 assurance and the pharmacovigilance groups at Merck.
22   Q.   Would you explain what
23 pharmacovigilance is?
24   A.   Pharmacovigilance is the activity
25 that companies are required by regulation to conduct

**15**

1  to monitor the worldwide safety of their products in
2  the marketplace.
3    Q.   And there are also standards and
4  other kinds of agreements that would exceed those
5  regulatory requirements as well, like ICH, other
6  kinds of pharmacovigilance accepted practices; is
7  that correct?
8    A.   Well, ICH is an international
9  convening body, a member -- including members of
10 regulatory authorities, the three major regulatory
11 regions, and they develop standards for drug
12 development, which are adopted into regulations in
13 the regions.  So ICH is not different than the US
14 regulations or the European regulations.
15   Q.   But sometimes those standards exceed
16 the minimum requirements of regulations; is that
17 correct?
18   A.   Not generally, no.
19   Q.   Now, Merck is a pharmaceutical
20 company; is that correct?
21   A.   Yes, sir.
22   Q.   And it's based in New Jersey; is that
23 correct?
24   A.   Corporate headquarters are in New
25 Jersey, yes.

**16**

1    Q.   And is your -- are your offices in
2  New Jersey, sir?
3    A.   No, sir.
4    Q.   Are they in Pennsylvania?
5    A.   Yes.
6    Q.   And Merck is in the business of
7  bringing drugs to the market; is that correct?
8    A.   Yes.
9    Q.   And selling those drugs to the
10 public?
11   A.   Yes.
12   Q.   I'm sorry?
13   A.   Yes.  Yes, sir.
14   Q.   And as a senior manager at Merck, are
15 you aware that Merck has a responsibility to its
16 shareholders to maintain the value of its stock?
17       MR. WIEGMANN:  Objection.
18       MR. TISI:  You may answer.
19       THE WITNESS:  Well, that is, of
20 course, a goal, an objective.
21       But the primary mission of Merck is
22 to bring important medicines to the market to help
23 patients.
24 BY MR. TISI:
25   Q.   But it also has a responsibility to,

**17**

1  essentially, Wall Street; is that fair to say?
2        MR. WIEGMANN:  Objection to the form.
3        THE WITNESS:  We have a
4  responsibility to patients as well as shareholders.
5  BY MR. TISI:
6    Q.   And one of the products that Merck
7  developed and brought to market and sold was a drug
8  called Vioxx, correct?
9    A.   Yes.
10   Q.   And that drug is also called
11 rofecoxib?
12   A.   Rofecoxib is the generally accepted
13 name, yes.
14   Q.   If we use rofecoxib or if we see it
15 in a document, it is the same thing as the drug that
16 is marketed as Vioxx in the United States, correct?
17   A.   Generally speaking, yes.
18   Q.   So if we use those interchangeably,
19 that's okay with you?
20   A.   I would understand that, yes.
21   Q.   And rofecoxib or Vioxx is in the
22 family of drugs known as COX-2 inhibitors; is that
23 correct?
24   A.   Yes, sir.
25   Q.   And can you tell me any other COX-2

M00S815771

Confidential-Subject To Protective Order

**26**

1  presence.
2  Q.   Can you -- can you tell us whether or
3  not there were, during the period of time before the
4  withdrawal of Vioxx, whether or not there were any
5  other drugs at Merck that had a -- that were larger
6  in terms of sales than Vioxx?
7  A.   I am aware that Zocor was also a very
8  large-selling drug.
9  Q.   Do you know whether or not Vioxx
10  was -- had more sales than Zocor?
11  A.   I believe Zocor had considerably
12  larger sales.
13  Q.   So this drug would be at least in the
14  top two drugs that Merck was selling during the '90s
15  and 2000 time frame; is that correct?
16  A.   Again, I'm not -- I -- I can't
17  answer completely that I know the answer to that.
18  It's in the top five for sure.
19  Q.   Okay. Now, Vioxx was marketed for
20  approximately four and a half years; is that
21  correct?
22  A.   That is correct.
23  Q.   Okay. And just so that the jury
24  understands, it was marketed between approximately
25  May of 1999 and September 2004?

**27**

1  A.   It was approved for marketing in the
2  United States by the FDA in 1999, yes.
3  Q.   Actually, my question was to
4  marketing.
5  When was the drug -- it was marketed
6  by Merck between May of '99 and withdrawn by Merck
7  in September of 2004, correct?
8  A.   Again, I can't speak to when it was
9  actually launched into the marketplace.
10  Q.   Now, in September 2004, Vioxx was
11  withdrawn from the market, US market; is that
12  correct?
13  A.   Yes. On September 30th, 2004, we --
14  Merck voluntarily withdrew Vioxx from worldwide
15  markets.
16  Q.   And is there any other company -- and
17  that is actually a question of being part of
18  worldwide safety surveillance. Are you aware
19  that -- that Merck also marketed Vioxx in other
20  countries as well?
21  A.   Oh, yes. It was marketed worldwide.
22  Q.   It was -- was it marketed by Merck?
23  A.   Yes.
24  Q.   Okay. So it wasn't licensed to any
25  other outside company; it was marketed by Merck?

**28**

1  A.   I believe that's the case, yes.
2  Q.   Okay. And, in fact, between other
3  countries, part of what you did in your job was to
4  see what information was being collected, safety and
5  efficacy information was being collected in other
6  countries and incorporating that into the larger
7  knowledge base of your company about Vioxx; is that
8  fair?
9  A.   Well, when I joined the company,
10  my -- it was -- worldwide product safety, again, was
11  primarily responsible for the tracking and
12  evaluation of postmarketing spontaneous reports.
13  You're referring to other data that I
14  was not responsible for.
15  Q.   All right. Then let's limit it to
16  that.
17  A.   Sure.
18  Q.   In terms of worldwide safety
19  surveillance, you would get reports of adverse
20  events from other countries, correct?
21  A.   From the marketplace, yes.
22  Q.   And part of what you did in your
23  position would be to coordinate the collection of
24  data from the postmarketing period from other
25  countries; and that would require you to interface,

**29**

1  for example, with other regulatory agencies
2  throughout the world; is that fair?
3  A.   Well, not me personally. I had
4  expert staff that were responsible for that.
5  Q.   Sure.
6  A.   Yeah.
7  Q.   When I say -- in that context, when I
8  said "you," I didn't mean you did it yourself.
9  A.   Yeah.
10  Q.   But your particular unit or division
11  within Merck was responsible not only for collecting
12  information from the United States, but -- but you
13  had responsibility for collecting information
14  throughout the world?
15  MR. WIEGMANN: Objection to form.
16  BY MR. TISI:
17  Q.   Correct?
18  A.   Postmarketing spontaneous reports
19  from whatever source worldwide would be taken in by
20  Merck and processed and sent to the appropriate
21  regulatory authorities as per regulations.
22  Q.   Right. And it would also be analyzed
23  by Merck in accordance with the desire of the
24  company to do -- act reasonably and prudently in
25  terms of marketing a drug to millions of people?

8  (Pages 26 to 29)

M00581577.1

Confidential-Subject To Protective Order

---

30

1    A.   Merck has standard operating
2 procedures and policies and practices that they
3 follow to make sure that we are in compliance with
4 worldwide regulations and to understand the safety
5 profile of our drugs that are on the market.
6    Q.   Right. And you understand that apart
7 from complying with -- the goal at the end of the
8 day is not just simply to comply with regulations;
9 it's to act as a reasonable company in terms of
10 researching and marketing a drug that you make money
11 from, right?
12    A.   Yes, sir. The primary -- the primary
13 objective there is to understand the safety profile
14 of our drug in the marketplace.
15    Q.   Right. And so whether there was
16 regulations there or not, that would be something
17 that Merck, as a responsible company, would want to
18 do, would be to understand its drug, to understand
19 its safety profile, understand its efficacy profile
20 and market the drug to people in a way that is
21 responsible, correct?
22    A.   Yes. Yes, sir.
23    Q.   Now, getting back to the question
24 that I was asking you, as part of worldwide safety
25 surveillance, did you have -- did you, meaning your

---

31

1 division, have responsibility to go back and try and
2 collect information not only from spontaneous
3 reporting, but also information that would be
4 compiled by other regulatory authorities throughout
5 the world?
6    A.   I don't know if I understand the
7 question. I'm sorry.
8    Q.   All right. Let's say, for example,
9 are you aware of -- I'm probably going to say it
10 wrong -- the EMEA?
11    A.   Oh, of course, yes. It's the
12 European Medicines Evaluation Agency.
13    Q.   And did you interface with the EMEA
14 with regard to Vioxx and collecting information
15 about safety throughout the world?
16    MR. WIEGMANN: Objection to form.
17    THE WITNESS: Did I personally? No.
18 BY MR. TISI:
19    Q.   Did people within your division do
20 that?
21    A.   Again, I can't speak specifically to
22 whether they did or not. But EMEA is the
23 counterpart of the FDA in the United States.
24    Q.   There's also the World Health
25 Organization, correct, and that collects information

---

32

1 about safety?
2    A.   Well, WHO collects information, but
3 it's primarily information that's already been
4 provided to the national regulatory authorities.
5    Q.   But the World Health Organization
6 will -- maintains a database which then compiles
7 information about postmarketing safety? That is
8 another resource for a company such as yours doing
9 research about the efficacy and safety of a drug can
10 go to; is that correct?
11    A.   Primarily the WHO compiles data that
12 have already been submitted to national regulatory
13 authorities, and then they take those and put it
14 into their database.
15    Q.   But my question simply is this:
16 That's another source of information that if your
17 company wanted to go to for information about
18 postmarketing surveillance, it could go to the World
19 Health Organization as well, correct?
20    MR. WIEGMANN: Objection to form.
21    THE WITNESS: What -- what I'm trying
22 to make the point is that it's largely redundant
23 information from data that have already been
24 submitted to national regulatory authorities that
25 are available from the USA, US Freedom of

---

33

1 Information Act and from the Merck databases
2 themselves.
3 BY MR. TISI:
4    Q.   Now, it may be redundant -- it may be
5 a redundant database, but it is a database from
6 which the company could -- could access; is that
7 correct?
8    A.   It is. But it has limited value.
9    Q.   Okay. That's -- and this brings up a
10 point. I understand that your job is to try to
11 give, you know, me answers to questions. But it's
12 sometimes important to understand that you have
13 to -- I'm going to try to listen to your answers --
14    A.   Okay.
15    Q.   -- and try to build off your answers.
16 And I would ask that you listen to my question,
17 because sometimes you may be thinking -- thinking of
18 something different than I'm really trying to ask.
19 So this is a perfect example.
20    My question was simply, is that
21 another source of information that the company has
22 access to --
23    A.   Sure.
24    Q.   -- and the answer would be yes,
25 correct?

---

**9 (Pages 30 to 33)**

M00S815775

78

1  relating to a particular drug, who would that person
2  go to if you had recused yourself from Vioxx?
3          MR. WIEGMANN: Objection to form.
4  BY MR. TISI:
5      Q.    Or any Merck product.
6      A.    They would have -- well, they were
7  fully -- fully autonomous in their
8  decision-making -- or, you know, capabilities, and
9  they worked most closely with the new drug reviewing
10 divisions. They didn't work with me. They worked
11 with their clients and their customers and their
12 partners and their colleagues in these postmarketing
13 assessments for the reviewing division; so the
14 appropriate medical officer in that reviewing
15 division or their management.
16     Q.    Okay. So you would be by -- so what
17 were you recusing yourself from? What kind of
18 things -- if they didn't come to you for substantive
19 information about drugs that were being looked at,
20 why would there be a need to recuse yourself?
21     A.    Well, it's because it's what's
22 expected to be done. I'm still part of the FDA.
23     Q.    But are there any issues, substantive
24 issues, that you would expect -- let me put this --
25 in your position as director, Office of Drug Safety

79

1  at the Food & Drug Administration, does there --
2  from time to time are there issues that come to your
3  level that deal specifically with products that are
4  on the market?
5      A.    Yes, there can be.
6      Q.    What kinds of issues rise up from the
7  ranks to your level while you're in your position?
8      A.    Well, things along the lines of
9  preparing for advisory committees, strategies for
10 dealing with advisory committees, you know, what
11 would be presented at public -- public meetings and
12 things along those lines.
13     Q.    Would labeling come to your -- issues
14 related to labeling?
15     A.    Generally not.
16     Q.    Are there occasions when they do?
17     A.    Generally -- no, I can't recall.
18         Again, labeling is the responsibility
19 and purview of the new drug reviewing divisions.
20     Q.    Now, would issues regarding an
21 increase in reporting rates for adverse events
22 related to a popular drug like Vioxx ever make it to
23 your level?
24         MR. WIEGMANN: Objection to form.
25         THE WITNESS: Again, it's a very

80

1  specific question about reporting rates. Reporting
2  rates are just one of the, you know, analyses --
3  BY MR. TISI:
4      Q.    Sure.
5      A.    -- that would be conducted. I can't
6  imagine that a reporting rate in isolation would
7  come to --
8      Q.    What about a reporting rate --
9          MR. WIEGMANN: Whoa.
10         MR. TISI: I'm sorry. I didn't mean
11 to.
12         MR. WIEGMANN: You're cutting him
13 off.
14         THE WITNESS: And the value of
15 reporting rates is really quite -- quite low. It's
16 one of the tools that safety evaluators would use to
17 conduct their reviews. But in isolation, it's
18 essentially meaningless.
19 BY MR. TISI:
20     Q.    Well, let's talk about in the context
21 of other information that may be discussed.
22         If there were multiple -- if there
23 were other lines of evidence about -- about issues
24 related to safety of a drug that's on the market,
25 those kinds of significant issues would find their

81

1  way to the director's office, correct?
2          MR. WIEGMANN: Objection to form.
3          THE WITNESS: Again, most of the
4  product-specific issues were held -- were managed
5  down at the divisional level.
6  BY MR. TISI:
7      Q.    I'm not asking about management. I'm
8  asking about, would you become aware of them?
9      A.    I may, but not -- not as a routine
10 matter. Hardly as a routine matter, I would say.
11     Q.    Who is it that offered you the
12 position at Merck? And when -- how did you find out
13 you had been -- passed the test and were offered the
14 position?
15     A.    One gets a letter in the mail,
16 basically, with a job offer.
17     Q.    Okay. So nobody contacted you in
18 person?
19     A.    I don't -- again, I don't recall. I
20 mean -- I think I may have gotten a phone call from
21 HR saying that a letter, you know, an offer letter
22 is being extended, that you have a certain amount of
23 time to answer.
24     Q.    Do you have a copy of the offer
25 letter?

M00S815787

Confidential-Subject To Protective Order

```
                                                    82
1       A.    I don't know.
2       Q.    Okay. When did you inform the folks
3   at FDA that you had actually decided to take the
4   job?
5       A.    As soon as I went to Merck, that I
6   would take the job.
7       Q.    You walked out of the office and
8   showed up on work on Monday?
9       A.    Again, I don't recall the exact
10  chronology.
11      Q.    I mean, was there -- I mean, did you
12  give two weeks' notice?
13      A.    I think I did, but I don't -- I don't
14  recall. It's quite a while ago.
15      Q.    Now, when you --
16          MR. TISI: Let's go off the record
17  for a moment.
18          THE VIDEOGRAPHER: We're going off
19  the record. The time is 10:46 a.m.
20          (Recess taken from 10:46 a.m. to
21          10:47 a.m.)
22          THE VIDEOGRAPHER: We're back on the
23  record. 10:47 a.m.
24  BY MR. TISI:
25      Q.    Are you aware, Doctor, that -- are
```

```
                                                    83
1   you aware, as you sit here today, that during the
2   time that you were interviewing with Merck that
3   there were issues that were being discussed relating
4   to the labeling for cardiovascular events as a
5   result of the VIGOR trial?
6       A.    As I sit here today, I am aware of
7   that, yes.
8       Q.    And that would have been a --
9   labeling, to a company, now having sat on the other
10  side of the table, having worked for a company, you
11  realized that labeling is a pretty important issue
12  with respect to a drug that is on the market,
13  correct, to a company?
14      A.    Label -- labeling is the legal
15  document that represents all the available data
16  that's important for prescribers to be aware of,
17  yes.
18      Q.    It's also important for marketing
19  purposes, correct?
20      A.    It is the legal document that serves
21  the basis of promotion and marketing, yes.
22      Q.    So if a -- if a label has a
23  restriction, that makes it more difficult -- it may
24  make it more difficult to actually sell the drug,
25  correct?
```

```
                                                    84
1           MR. WIEGMANN: Objection to form.
2           THE WITNESS: Look, I mean, the label
3   serves as the basis for promotion and advertising
4   the document. So fair balance requires that you put
5   in the benefits as well as the risks.
6   BY MR. TISI:
7       Q.    Right. Right. But in terms of -- in
8   terms of -- that is the document that may -- that
9   marketing uses as how to position a product in the
10  marketplace, correct, how to talk to doctors in the
11  field, how to advertise for a new drug, how to get
12  the message across to people that they should try
13  this drug, all of that springs from what is in the
14  label, correct?
15      A.    The label is the basis of promotional
16  and advertising activities and messages, yes.
17      Q.    So the answer is yes to that, it
18  is -- it is an important document for marketing
19  purposes, correct?
20      A.    Well, it's not -- it's not --
21  marketing is not the primary consumer of a product
22  label. The product label is constructed for
23  professionals to know all about, you know, what's
24  important about a product so they can prescribe it
25  appropriately for their patients.
```

```
                                                    85
1           MR. WIEGMANN: Chris, you're missing
2   your mike and he's having a hard time.
3           MR. TISI: Sorry.
4           MR. HENDERSON: And I object to that
5   last answer.
6           MS. SHIROMA-BENDER: Join.
7   BY MR. TISI:
8       Q.    This is a -- you're aware that this
9   was a drug that was heavily promoted in its
10  direct-to-consumer advertising program, correct?
11          MR. WIEGMANN: Objection to form.
12          THE WITNESS: I have no firsthand
13  knowledge of the promotion practices.
14  BY MR. TISI:
15      Q.    You never saw the -- you never saw
16  any commercial with Dorothy Hamill skating on the
17  ice?
18      A.    I can't -- I can't recall.
19      Q.    You never saw that?
20      A.    I don't play a lot of attention to
21  DTC advertising.
22      Q.    But to the extent there is a
23  direct-to-consumer program for the sale of Merck
24  (sic), the marketing -- the label would form a basis
25  of what information could be shared with the public
```

22 (Pages 82 to 85)

M00S815788

Confidential—Subject To Protective Order

262

1          But the numbers on the page, can you
2   find one slide on there where Vioxx compares
3   favorably to Celebrex?
4          A.    I -- I think they're
5   indistinguishable from each other.
6          Q.    Okay.  And this is a -- this is a
7   compilation that was done by Merck?
8          A.    I don't know the source of this --
9   these data.
10          Q.    Okay.  So if I represent to you that
11   Merck did this analysis, you would say that they
12   have done a totally useless and unscientific
13   analysis of the postmarketing data?
14          A.    It's -- it's of extremely limited
15   contributory value.
16          Q.    Do you know whether or not the FDA
17   had done a similar analysis and came to the same
18   conclusions?
19          A.    I am not aware of that.
20          Q.    Did the company ever tell you when
21   you came in that you -- they had a case of -- a
22   potential case of challenge, dechallenge,
23   rechallenge?
24          A.    Again, I've not -- I don't recall
25   being informed of any particular Vioxx postmarketing

263

1   efforts in that report.
2          Q.    If in the context of looking at the
3   safety profile of Vioxx -- well, first of all, as
4   part of your analysis of safety, would you have
5   expected the company to bring you up to speed about
6   any issues related to Vioxx which, at that time,
7   fair to say, was in the news?
8          MR. WIEGMANN:  Objection to form.
9          THE WITNESS:  Well, again, I did a
10   general overview of all the available evidence.
11   BY MR. TISI:
12          Q.    And who provided you with the
13   evidence?
14          A.    I don't recall exactly, but I looked
15   at the clinical trial data in summary.  I looked at
16   the other available information.
17          Q.    Which clinical trial data did you
18   look at?
19          A.    I don't recall exactly, but --
20          Q.    Did you look at the VIGOR data?
21          A.    Oh, yes.
22          Q.    Did you look at the Alzheimer's data?
23          A.    I looked at the Alzheimer's, the
24   summary data for the Alzheimer's study.
25          Q.    Did you look at any of the smaller

264

1   Phase -- Phase II trials, a or b?
2          A.    I looked -- didn't look at any of the
3   individual data with great scrutiny, individual
4   trial data with great scrutiny, but I did look at
5   the pooled analyses, which I find to be informative.
6          Q.    Okay.  Did you -- what else did you
7   look at?  Did you look at -- you say you didn't --
8   you didn't get any postmarketing surveillance
9   reports from your division.  Anything else you can
10   think of that you looked at?
11          MR. WIEGMANN:  Objection to form.
12          THE WITNESS:  Again, knowing the --
13   the issue of concern, which was not obscure to me, I
14   looked at the data that I felt was most appropriate
15   to address the issue, which are the controlled
16   clinical trial data.  I would not turn to
17   postmarketing spontaneous reports as a robust source
18   of information.
19   BY MR. TISI:
20          Q.    What pool data are you talking about?
21          A.    I don't recall exactly.
22          Q.    Doctor, I'm going to show you another
23   document which I'd like to have marked as Exhibit
24   Number 11 --
25          MR. WIEGMANN:  12.

265

1          MR. TISI:  12, excuse me.  I'm not
2   doing very good with my numbers today, Doctor.
3          (Whereupon, Deposition Exhibit No.
4   Honig-12, Document entitled "Rofecoxib,
5   Dr. Med. Thomas Bold, Worldwide Product
6   Safety & Epidemiology," Bates MRK-ACO
7   0015796-15831, was marked for
8   identification.)
9   BY MR. TISI:
10          Q.    This came out of your file.  And it's
11   the only copy that I have.
12          Could you tell me what that says?
13          A.    This is -- I don't know what it is.
14          The title of it is "Rofecoxib, Dr.
15   med, Thomas Bold, Worldwide Product Safety &
16   Epidemiology."
17          Q.    Would you please take a look at that
18   for a minute.
19          That's another presentation by Dr.
20   Bold where he's looking at reporting rates, among
21   other things, between Celebrex and -- and Vioxx,
22   correct?
23          A.    Among other things, yes.
24          Q.    And that came out of your -- your
25   file.  Do you think you looked at this?

67 (Pages 262 to 265)

344

1                SUPERIOR COURT OF NEW JERSEY

2                LAW DIVISION - ATLANTIC COUNTY

3                        -   -   -

4    IN RE:    VIOXX LITIGATION : CASE NO. 619

5                        -   -   -

6                     CONFIDENTIAL

7              SUBJECT TO PROTECTIVE ORDER

8                      VOLUME 2

9                        -   -   -

             Tuesday, August 9, 2005

10

                         -   -   -

11

12             Continued videotaped deposition of PETER

13   HONIG, M.D., held in the offices of MORGAN LEWIS,

14   LLP, 1701 Market Street, Philadelphia, Pennsylvania

15   19103, commencing at 9:10 a.m., on the above date,

16   before DEBRA J. WEAVER, a Federally Approved RPR,

17   CRR and CSR of New Jersey (XI 01614) and Delaware

18   (No. 138-RPR, Exp. 1/31/08), and a Notary Public of

19   New Jersey, Pennsylvania and Delaware.

20                       -   -   -

21

22             ESQUIRE DEPOSITION SERVICES

             1880 John F. Kennedy Boulevard

23                     15th Floor

             Philadelphia, Pennsylvania 19103

24                  (215) 988-9191

25

M00582467S

**525**

1  patients.

2      Q.    But there was no evidence -- if I'm a

3  patient and I come to you, Doctor, and I say, I

4  understand that this reduces GI bleeds, but -- GI,

5  you know, ulcerations, perforations and bleeds, but

6  what does that mean?  Does that mean it was shown to

7  reduce -- that I'm going to, like, reduce my -- I'm

8  not going to have a bleed and die from my -- what

9  would you -- what would you -- what would you say if

10  I asked you that question?

11      MR. WIEGMANN: Objection.

12      THE WITNESS: I -- I would say, as a

13  physician, that Vioxx is likely to be -- it has been

14  demonstrated to be, across a population, again, less

15  toxic on the GI tract than other available NSAIDs,

16  and I can't guarantee that you're not going to have

17  a bleed on this.

18  BY MR. TISI:

19      Q.    And the studies didn't demonstrate

20  that, did it?

21      A.    Well, it didn't reduce it entirely.

22  It didn't eliminate the GI toxicity entirely, but it

23  had a significant reduction in the GI toxicity.

24      MR. WIEGMANN: Let's take a break

25  now.

**526**

1      MR. TISI: Actually, I would like to

2  go on the label.  If we can just get done with --

3      MR. WIEGMANN: This could be a while,

4  though, right?  We're already about an hour.

5      MR. TISI: I'm not so sure it is

6  going to be that long.  But let's -- can we go a

7  little while longer unless somebody has a real

8  objection to, I mean, if it's a real -- if somebody

9  is really hungry, I'd prefer to kind of get done.

10      THE WITNESS: I need to stretch.

11      MR. TISI: Sure.  Absolutely.

12      THE VIDEOGRAPHER: We're going off

13  the record.  The time is 12:39 p.m.

14      MR. TISI: Can we have an agreement

15  we're not going to discuss --

16      MR. WIEGMANN: We're not going to

17  discuss the label.

18      (Recess taken from 12:37 p.m. to 1:36

19  p.m.)

20      THE VIDEOGRAPHER: We're back on the

21  record.  The time is 1:36 p.m.

22  BY MR. TISI:

23      Q.    Doctor, before we took the break, I

24  had just given you Plaintiff's Exhibit Number 22,

25  which, for the record, is a PowerPoint looking

**527**

1  document, I'll ask you whether it is or it isn't,

2  labeled "Draft Labeling Scenario."  And it's Merck

3  MRK-ACM 0000585 through -- I'm sorry, 593.

4      And I ask you, first of all, is this

5  a document you prepared?

6      A.    I was partly responsible for

7  preparing this, along with Dr. Barry Gertz from

8  clinical research.

9      Q.    This was a collaborative effort?

10      A.    In essence, it was.

11      Q.    And it was put together and developed

12  in the normal course of business -- your business at

13  Merck?

14      A.    Well, it was -- no, it was not

15  developed during the normal course of business or

16  with -- under normal policy and procedure at Merck.

17      Q.    Why is -- why is that?  This was not

18  done in your position as an employee of Merck?

19      A.    Oh, yes, in that -- in that respect

20  it was.

21      But we have labeling processes in

22  place --

23      Q.    That was one --

24      A.    -- and this was -- this was not done

25  in the course of normal labeling processes.

**528**

1      Q.    Was this ever submitted to the Food &

2  Drug Administration?

3      A.    No, sir.

4      Q.    And so in that respect, it was not an

5  informal -- an informal queue for approval, correct?

6  This was never submitted to the FDA for approval?

7      A.    This was never submitted to the FDA.

8  It was never -- it was never brought through normal

9  Merck channels for vetting as a proposed document.

10      Q.    Do you know why it is that you and

11  Dr. Gertz were asked -- did you and Dr. Gertz ask to

12  do this?  How did -- let me rephrase the question.

13      How did this document come into

14  being?

15      A.    Come about?

16      It was -- it was developed during the

17  week that we became aware of the APPROVe trial data.

18  We spent most of that week analyzing the results of

19  APPROVe, trying to understand what the data were and

20  what they meant, conducting additional analyses, at

21  which point Dr. Peter Kim asked Dr. Gertz and myself

22  to at least just put up a straw position on what a

23  label might look like should we were to -- should we

24  desire to try to represent the APPROVe data in the

25  label for Vioxx.

**47 (Pages 525 to 528)**

529

1    Q.    Was there discussion that week as to
2 whether or not Merck would withdraw the drug,
3 re-label the drug or just keep the drug as is? I
4 mean, what was the -- what were the ranges of
5 opinions about it?
6    A.    Well, when we first became aware of
7 APPROVe, it was Friday morning, September 24th, I
8 believe. And we analyzed -- we saw the data, the
9 initial results. We spoke with some -- with the
10 member of the administrative committee who oversaw
11 the data safety monitoring board for APPROVe and for
12 the other outcomes trials.
13    Q.    And who is that? Is it John Baron?
14    A.    That's the name, John Baron from
15 Dartmouth, I believe.
16    Q.    Okay.
17    A.    And we understood -- we tried to
18 ascertain what the position of the DSMB was. We
19 were reviewing the data. We were doing additional
20 analyses on those data. During the course of that
21 weekend, we -- we basically worked the entire
22 weekend and we included discussions with external
23 experts, clinical trial experts, statistical
24 experts, cardiovascular experts, to solicit their
25 opinions on the data.

530

1    Q.    May I interrupt, and I'll let you
2 finish, but I want to go back and ask you a question
3 about what you just testified to.
4         When you said you spoke to the people
5 at the data safety monitoring board to get their
6 opinions, did anybody in the data safety monitoring
7 board, Dr. Baron or anybody else you spoke to,
8 indicate their opinions about whether the drug
9 should be removed from the market?
10    A.    Well, Dr. Baron, I don't think, was
11 on the DSMB. I think he was on the administrative
12 committee.
13    Q.    I'm sorry. You're exactly right.
14 You're exactly right.
15         Did anybody on the administrative
16 committee or anybody with whom you spoke that
17 weekend give -- give -- express an opinion or a
18 point of view about whether the drug needed to be
19 removed?
20    A.    That was never brought up that
21 weekend.
22    Q.    Okay. Did any of them discuss
23 whether or not -- and I'm including, actually, the
24 outside experts, clinical trial, cardiovascular
25 experts you consulted, express an opinion as to

531

1 whether or not these data was consistent with the
2 VIGOR data, which we've been discussing previously?
3 Did anyone bring up the VIGOR data?
4    A.    I don't recall. If it was brought
5 up, it was not a prominent part of the discussion.
6 We were trying to understand what APPROVe was, which
7 was the new data in front of us at that time.
8    Q.    But I think you've made a point over
9 the past couple days that you don't consider any
10 particular piece of data in isolation, you have to
11 look at the totality of the evidence that's out
12 there.
13         And my question is, did -- did
14 anybody bring, in the context of this discussion
15 over the weekend, did anyone ask -- bring to your
16 attention or everybody else's attention, well, okay,
17 now we have APPROVe, and now we have, in the
18 background of all this other data out there, pro and
19 con, and this is what we think? I mean, any
20 discussion about that? Or was this a discussion
21 about APPROVe essentially in a vacuum?
22    A.    That weekend it was primarily a
23 discussion about APPROVe and the -- the data that
24 were coming out of APPROVe.
25         We had been -- we had been, you know,

532

1 reviewing continuously all available data on Vioxx
2 up until that point. The significant new piece of
3 information here, which ultimately led us to
4 withdraw the product, was the APPROVe trial.
5    Q.    If you had had this data -- I'm going
6 to ask you this question: If you had this data in
7 isolation when you joined Merck in 2002, would this
8 have been convincing data in and of itself, without
9 reference to any of the other data that's out there
10 on mechanism, biologic plausibility, et cetera, et
11 cetera, all that stuff, would this have been enough,
12 in your opinion, to warrant a labeling change?
13         MR. WIEGMANN: Objection.
14         THE WITNESS: To warrant a labeling
15 change?
16 BY MR. TISI:
17    Q.    Yes. Alone.
18    A.    Again, I can't speculate as to what
19 it would have or wouldn't have done. if it had
20 came -- come in before or if I had been here before.
21    Q.    Okay. What I am trying to figure out
22 is whether or not the discussion that week dealt
23 with this data against the backdrop of all the other
24 data, or whether or not this data alone was
25 sufficient to take the actions that the company took

48 (Pages 529 to 532)

M005824722

Confidential-Subject To Protective Order

533

1 at the end of September in 19 -- 2004?  Do you
2 understand the question?
3     A.    I do understand the question.
4         And the focus of the analysis --
5 well, clearly the analyses were all around APPROVe
6 and the focus of discussions were around APPROVe.
7     Q.    Okay.  So is it -- is it your
8 position -- was it your position then that APPROVe
9 was the only relevant data that led to the
10 withdrawal of the drug?
11     A.    Well, that is, in fact, the case,
12 yes.
13     Q.    Okay.  So there was no other data
14 that was considered against -- that was the backdrop
15 against which this data was -- was considered?
16     A.    Those were the circumstances as I
17 recall them.
18     Q.    So it is your view that one
19 placebo-controlled clinical trial, which showed a
20 statistically significant doubling of the risk after
21 18 months, is sufficient to -- basis to at least
22 re-label the drug with a black box, at most take the
23 drug off the market?
24     A.    This was the significant new data.
25 We had been accumulating additional information and

534

1 analyzing those data all during -- and continued to
2 study Vioxx all during its lifecycle.  This was the
3 significant new data that led us to that decision.
4     Q.    Right.  You understand, when you say
5 significant new data, it implies, at least to me as
6 the questioner here, that you were considering this
7 data in the background of old data.
8         And what I'm trying to figure out is,
9 is this data alone sufficient, if there was nothing
10 else around it, no VIGOR, no Alzheimer's, no
11 pharmacologic data, no anything, if you had had this
12 data alone, would this have been enough?
13         MR. WIEGMANN: Objection.
14         THE WITNESS: Well, I think I've
15 answered that question.  One takes into account all
16 the available data. But this was the significant
17 new data that led us to our decision.
18 BY MR. TISI:
19     Q.    Okay.  So this data -- just so the
20 record is clear, this data was, in your mind,
21 grafted on top of all the other data that we've been
22 talking about over the period -- the past two days?
23     A.    Well, as -- well, integrating all the
24 available information.  This was new data.
25     Q.    Okay.  But this wasn't the only data

535

1 that you considered?
2     A.    This was the -- this was the basis
3 for our decision to voluntarily withdraw the drug.
4     Q.    All right.  You took us through the
5 weekend.
6         How did this -- when -- when -- you
7 said you were analyzing the data.  Then there came a
8 point of deciding what it is you were going to do
9 about the data.
10     A.    Dr. Kim -- Dr. Kim made it very clear
11 to us that we were going to spend the weekend
12 analyzing the data and that we were not going to
13 talk about the implications of those data.  We
14 wanted to fully understand that, do the appropriate
15 analyses, and then he was going to -- ultimately, he
16 was going to be responsible for making the decision
17 on what to do about those data, obviously, you know,
18 with discussions with us and external -- but he --
19 he made it very explicit that he was going to be the
20 final decision-maker on that and he would inform the
21 CEO.
22     Q.    Who -- who was involved in those
23 weekend discussions?
24     A.    I was.  Dr. Barry Gertz was.  Several
25 other -- several other senior-level management.

536

1     Q.    Who were they?
2     A.    I'm trying to recall for you.
3     Q.    Was Dr. Nies involved?
4     A.    You know, I don't know the answer to
5 that question.
6         Dr. Bain was involved, the head of
7 biostatistics.
8     Q.    Was Dr. Reicin involved?
9     A.    I don't recall.  I don't recall.
10         We -- we had some telecons, so I sort
11 of remember it, it's imprinted in my mind who was in
12 the room.
13         TELEPHONE OPERATOR: Joining
14 conference.
15         MR. KALE:  Bal Kale for plaintiffs
16 Breshears and Smith.
17 BY MR. TISI:
18     Q.    Did -- I'm sorry.
19         And did there come a time when Dr.
20 Kim, and after you all consulted, he kind of
21 expressed a view after looking at the -- the data?
22     A.    Well, after looking at the data and
23 after talking with some external experts -- after
24 we -- after we had exhausted our review and analyses
25 of the data, then discussions turned to exactly what

49  (Pages 533 to 536)

**537**

1 would be the appropriate course of action here.
2 Q. What external consultants did you
3 consult with over that weekend?
4 A. Primarily academic experts.
5 Q. Who might those be?
6 A. People that were familiar with --
7 with coxibs or cardiovascular safety.
8 Q. Who might those have been?
9 THE WITNESS: Again, am I free to --
10 MR. WIEGMANN: You can tell him.
11 THE WITNESS: Okay. I just want to
12 be sure.
13 Dr. Tom Snitzer from Northwestern
14 University, who's a rheumatologist and clinical
15 trial expert; Dr. John Oates from Vanderbilt
16 University, who is a clinical pharmacologist; Dr.
17 Robb Califf, from Duke University, who is a
18 well-known cardiovascular expert. Some others.
19 BY MR. TISI:
20 Q. Any others you can think of?
21 A. Those are -- those are the three that
22 I prominently remember.
23 Q. Was Dr. Konstam there?
24 A. I don't recall. He was involved at
25 some time in the discussions, but I don't recall

**538**

1 whether he was there at that --
2 Q. Did any of the external consultants
3 that you spoke to, Dr. Oates -- let's take them one
4 at a time. Did Dr. Oates say anything -- what, if
5 anything, did Dr. Oates say? What's his view?
6 A. Again, with regards to what, the
7 data?
8 Q. What opinions, if anything, did he
9 express at the time about the data or anything else?
10 A. Dr. Oates was primarily trying to
11 understand the data, so he was offering some
12 suggested additional analyses that could be
13 conducted.
14 Q. And what did he say? What -- what
15 kind of analysis did he say should be conducted?
16 A. I remember Dr. Oates was particularly
17 interested in trying to explore the effects of blood
18 pressure on the cardiovascular risk findings after
19 18 months, this latency that was observed in
20 APPROVe.
21 Q. Did he explain -- well, first of all,
22 did you ever come to learn that the actual curves
23 for -- if you plotted these on a Meier-Kaplan plot,
24 like you did with VIGOR, when the curve started to
25 separate between placebo and Vioxx in the APPROVe

**539**

1 trial?
2 A. I'm sorry. What was the question?
3 Q. Do you know what I'm talking about?
4 Remember we looked before, and I could show you
5 again, actually, I have it in front of you, where we
6 showed you the Meier-Kaplan plot for -- for the
7 VIGOR trial, which was between naproxen and Vioxx.
8 Did you look at any kind of similar
9 plot about when the curves between Vioxx and placebo
10 started to separate in the APPROVe trial?
11 A. Oh, yes, sir.
12 Q. Okay. And would you tell us when the
13 curve started to separate? Did they start to
14 separate at 18 months or had they separated sooner?
15 A. My best understanding was that the --
16 that the increased relative risk only appeared after
17 18 months of --
18 Q. Statistically --
19 A. -- continuous therapy.
20 Q. I'm sorry.
21 Did the statistically significant --
22 is that when the statistically significant relative
23 risk changed or whether or not where the curves
24 started to change? Do you understand what I'm
25 saying?

**540**

1 A. Yeah, yeah, yeah. Visually that's
2 where the curves started to change.
3 Q. Okay. So from your recollection is
4 that the curves between -- when we're talking about
5 the curves, we're talking about the scientific curve
6 that measures the difference between placebo and the
7 number of cases reported, in the placebo arm versus
8 the Vioxx arm only started to separate at 18 months?
9 A. Yeah. I don't know if it's -- I
10 don't know how you represented the scientific
11 curves.
12 But, basically, it's the data plots
13 of the rates of -- of incidence of myocardial
14 infarction -- of cardiovascular events.
15 Q. Okay. Did you ever learn that the --
16 that the actual rates for the APPROVe data, if
17 you're looking at MIs, started to separate earlier
18 than 18 months?
19 MR. WIEGMANN: Objection to form.
20 THE WITNESS: Again, we were -- we
21 were examining the adjudicate -- the confirmed
22 thrombotic cardiovascular events. That was the
23 primary cardiovascular endpoint of the study.
24 BY MR. TISI:
25 Q. No, my question was slightly

**50 (Pages 537 to 540)**

M005824724

553

1  kind of conclusion as to whether or not this study
2  was powered to look at exposures earlier than 18
3  months?
4      A.    Again, it was -- no, I don't know the
5  answer to that.
6      Q.    Okay. All right. Let's go -- so
7  after you discussed the data with -- with your
8  outside consultants and your internal consultants,
9  Dr. Kim then posed a question, now what do we do
10 with the data? We agree that the data is not due to
11 chance. Let's see what we can do about the data.
12 Is that accurate?
13     A.    Well, what are the implications of
14 the -- of the data.
15     Q.    Fair enough. Fair enough.
16            What were the -- what were the
17 implications that were discussed with you and Dr.
18 Kim and Dr. Gertz and the other folks who were
19 involved in the discussions?
20     A.    Well. I can't remember the exact
21 chronology here, but he made it clear that he was
22 going to be making the decision.
23     Q.    Dr. Kim?
24     A.    Yes. And I think he spent -- I know
25 he spent many long hours deciding on that.

554

1            At some point, before the final
2  decision was made, he asked Dr. Gertz and myself to
3  draft labeling considerations.
4      Q.    Why -- why did he go -- do you have
5  any understanding as to why he would have gone to
6  you to assist in drafting a label?
7      A.    Well, it was primarily a matter of
8  both convenience and experience. Dr. Gertz and I
9  had been involved in the discussions over the
10 weekend. We were two of a number -- of a small
11 number of people that were aware of the APPROVe data
12 at that time.
13            This was not a widely-shared piece of
14 information during that weekend. There were
15 literally less than, you know, a dozen or so people
16 that were aware of these data.
17            So he turned to two of his more --
18 two of the people that he trusted to at least draft
19 some labeling considerations for -- for him to
20 consider in making his decision.
21     Q.    But you also had experience with
22 labeling issues from your years at the FDA?
23     A.    Yes, I have experience in -- in
24 labeling issues.
25     Q.    Now, before this time, before the

555

1  last week of September of 2004, had you been
2  involved in any discussions about the appropriate
3  label for Vioxx?
4      A.    I don't recall. I don't think so,
5  no.
6      Q.    Okay. So this would have been the
7  first time that anybody actually reached out and
8  asked your views about what might or might not be
9  appropriate information for a Vioxx label or warning
10 or anything like that?
11     A.    I -- I think that's right. And,
12 again, emphasizing that this was outside of usual
13 practice. It was not a label per se. It was a
14 series of labeling considerations based on the new
15 data.
16     Q.    And one of the things that was -- if
17 you turn to page 2, what does "Base Case (USPC)"
18 stand for?
19     A.    So that was, again, taking everything
20 into consideration, the data from APPROVe --
21     Q.    Well, what does USPC stand for?
22     A.    Oh, I'm sorry. United States product
23 circular.
24     Q.    Okay.
25     A.    So that's --

556

1      Q.    The label?
2      A.    The label for the US.
3      Q.    Okay. And you thought that, based
4  upon the APPROVe data, based upon the information
5  you gleaned from the APPROVe data, that if there
6  were going to be a label change, it would be a
7  change upgrading it from a caution to a warning?
8      A.    We thought that this at this time,
9  with this significant new information, which we
10 thought significantly altered the benefit/risk
11 profile of the drug, that an -- an upgrade to
12 warnings was certainly appropriate, including a
13 black box warning at this time.
14            And this was based in the -- in the
15 context that this was the only data that anybody had
16 for the long-term study of an NSAID. And we were
17 thinking about the availability of alternative
18 therapies and how we could best direct physicians to
19 use an important drug like Vioxx for their patients
20 if they had exhausted other alternatives.
21     Q.    As a person both substantively and
22 procedurally understanding what a warning is, like
23 yourself, if anyone were to stand up in a courtroom
24 anywhere in the country and say a precaution is the
25 same -- functionally the same thing as a warning,

54 (Pages 553 to 556)

M005224728

Confidential—Subject To Protective Order

557

1   you would disagree with that, wouldn't you?
2       A.    Warnings and precautions are explicit
3   sections of the label that are described in the --
4   in the regulations.
5       Q.    Let's see if we can ask -- answer
6   that question.
7            If anyone were to stand up in a
8   courtroom and say, judge, jury, if it's in the
9   precaution, it's the same thing as being in a
10  warning, information in a precaution is the same
11  thing as being in a warning, you, as a regulator,
12  and you as a physician, your experience over the
13  past 20 years, would disagree with that
14  fundamentally, wouldn't you?
15           MR. WIEGMANN:  Objection to form.
16           THE WITNESS:  I think it's a matter
17  of judgment as to whether information goes into a
18  warnings or a precautions.  They're basically a
19  continuum of -- of --
20  BY MR. TISI:
21      Q.    I'm going to ask --
22      A.    -- safety issues.
23      Q.    I'm going to have to ask you to
24  answer my question, which is, if anybody were to say
25  that a warning and a precaution are the same, they

558

1   would be wrong, wouldn't they?
2       A.    Well, again, it's -- I would -- I
3   would not want to overgeneralize there.  Frequently,
4   language is both in the precautions and the warnings
5   for certain issues.
6            It's a matter of judgment as to where
7   it goes, in the warnings or the precautions.  The
8   regulations are generally informative to that, but
9   it's a matter of practice and judgment as to where
10  the information goes.
11      Q.    But a warning is more serious than a
12  precaution?
13      A.    Generally speaking, I would agree
14  with that.
15      Q.    Okay.  And in your -- as a -- as a
16  physician, as a scientist, as a regulator, you would
17  take issue with anybody that says that a warning is
18  the same thing as a precaution, wouldn't you?
19      A.    Well --
20           MR. WIEGMANN:  Objection to form.
21           THE WITNESS:  -- as a -- as a
22  regulator, I don't know that I could say that.
23  BY MR. TISI:
24      Q.    Okay.
25      A.    As a --

559

1       Q.    As a physician and a scientist, a
2   precaution and a warning are two separate and
3   distinct things, aren't they?
4            MR. WIEGMANN:  Objection to form.
5            THE WITNESS:  There -- it's all
6   important information for a prescriber.
7   BY MR. TISI:
8       Q.    Understood.  But they're different,
9   right?
10           MR. HENDERSON:  Object.
11  Responsiveness.
12           MR. WIEGMANN:  Objection to form.
13  BY MR. TISI:
14      Q.    Because if they're same, why talk
15  about elevating it?
16      A.    Well, it's -- it's a matter of
17  prominence.
18      Q.    Okay.
19      A.    It's a matter of prominence.
20           I think your question is, is some
21  information more important than others, and I woul
22  say no to that.
23      Q.    Okay.  But --
24      A.    I think it's a matter of prominence.
25      Q.    Actually, you know, in all fairness,

560

1   my question is what my question is.
2            My question is, is a warning and a
3   precaution, are they two different things?
4            MR. WIEGMANN:  Objection to form.
5            THE WITNESS:  They're both important
6   information about a product.
7   BY MR. TISI:
8       Q.    Is a warning more -- more prominent
9   and more serious than a precaution?
10      A.    Again, I can't over -- I can't
11  generalize that.
12      Q.    So if I came to you as a regulator
13  and said, you know, it's all the same to me, I'd
14  just as soon keep it in the precaution, you'd say
15  fine, because they're the same?
16      A.    Well, in -- in fact, the FDA is
17  moving toward making the sections unified because
18  they frequently can't tell the difference between a
19  warning and a precaution.
20      Q.    I'm asking you -- I'm not asking you
21  what the FDA is going to do in the future, in all
22  honesty, okay.
23           If you have a precaution in a label,
24  and you have a warning in a label, you would agree,
25  would you not, that a warning is more serious to

55 (Pages 557 to 560)

M005824729

565

1  which is why --
2     A.    Again, it's all important information
3  that has to be integrated into the care of an
4  individual in front of you.
5     Some precautions may be more
6  important for the patient in front of you than a
7  warning for another patient.
8     Q.    But it --
9     MR. HENDERSON: Objection.
10  Nonresponsive.
11  BY MR. TISI:
12     Q.    You would -- you would agree with me,
13  Doctor, that in your experience, your research, your
14  understanding, that doctors consider warnings to be
15  the -- if there's a part of the label that they
16  really look at, warnings would be one of them?
17     A.    I would -- I would -- I would hope
18  that physicians are familiar with the entire product
19  profile of the drugs that they're prescribing.
20     MR. HENDERSON: Objection.
21  Nonresponsive.
22  BY MR. TISI:
23     Q.    I know you would hope that. But
24  you've done research, and I've seen it, which
25  indicates that doctors don't always look at the

566

1  entirety of the label, is that correct, about drug
2  interactions, et cetera? You've done a lot of
3  research and speaking about drug-to-drug
4  interactions, haven't you?
5     MR. WIEGMANN: Objection.
6     THE WITNESS: I have done research on
7  drug-drug interactions, yes.
8  BY MR. TISI:
9     Q.    You know -- you know that there are
10  parts of a label that doctors focus on and parts of
11  a label that they give less prominence to, as a
12  practical matter?
13     A.    Yeah. I've not done research on
14  that.
15     Q.    But you know that to be --
16     A.    I've seen -- well, I don't know what
17  parts of the label they -- they read and they don't
18  read. I was look -- I have -- I'm familiar with
19  research that looks at adherence to -- to labeling
20  recommendations. But I don't know what people read
21  and what they don't read or consider important.
22     Q.    But intuitively, you would -- you
23  would agree with me, I assume, that a warning is
24  more likely to be heeded than a precaution or an
25  adverse reaction section of the label?

567

1     MR. WIEGMANN: Objection.
2     THE WITNESS: I have -- I have no
3  basis on which to draw that conclusion.
4  BY MR. TISI:
5     Q.    All right. Let's go to the black box
6  language.
7     Did you draft this language, Doctor,
8  on page 3?
9     A.    Yes. Again, in collaboration with
10  Dr. Gertz.
11     Q.    Okay. The first sentence says,
12  "Chronic use of Vioxx in clinical studies for more
13  than 12 months has been shown to increase the risk
14  of cardiovascular events, including myocardial
15  infarction and non-hemorrhagic CVA."
16     Do you see that first sentence?
17     A.    Yes, sir.
18     Q.    Okay. What -- this indicates
19  "clinical studies" and not "clinical study." What
20  clinical studies are you talking about here?
21     A.    Well, this is primarily -- well, the
22  decision to draft this language was completely based
23  on the results of the APPROVe trial. We -- your
24  question is around the 12 months?
25     Q.    No. My question is around "clinical

568

1  studies." This refers to more than one clinical
2  study; is that correct?
3     A.    It refers to the totality of the
4  placebo and the control -- and the NSAID controlled
5  data that we had.
6     Q.    Okay. And it says, "Chronic use of
7  Vioxx in clinical studies for more than 12 months,"
8  implying, I think -- you choose your words
9  carefully. I've noticed that over the past two
10  days. Is that fair?
11     A.    I'm trying to be precise.
12     Q.    Okay. And you were trying to be
13  precise when you were advising Dr. Kim, correct?
14     A.    I try to give my best judgment when I
15  advise people.
16     Q.    Okay. And the first sentence here
17  uses the phrase "clinical studies," correct?
18     A.    Yes, it does.
19     Q.    And that's plural, correct?
20     A.    Yes.
21     Q.    Okay. And what clinical studies were
22  you referring to other -- well, what clinical
23  studies were you referring to?
24     A.    This is primarily referring to the
25  data -- the APPROVe study. And the language is

Confidential-Subject To Protective Order

573

1    A.    Yes, sir.
2    **Q.    Understands the clinical trials as**
3  **well as anybody?**
4         MR. WIEGMANN:  Objection to form.
5         THE WITNESS:  He, again, is
6  responsible for a large amount of -- of activity
7  within clinical research.
8  BY MR. TISI:
9    **Q.    But understands the Vioxx clinical**
10  **trials as well as anybody, which is why he's one of**
11  **two people who Dr. Kim called together on the -- the**
12  **last week of September, 2004, correct?**
13         MR. WIEGMANN:  Objection to the form.
14  Misstates the testimony.
15         THE WITNESS:  I think it's fair to
16  say that this language. this entire package here.
17  was drafted in a period of less than an hour and a
18  half.  It was an attempt to inform Dr. Kim as to
19  whether or not there could possibly be labeling
20  language developed that would allow for the safe and
21  effective use of the product.
22         This is by no means considered to be
23  a vetted document.  It is by no means to -- to imply
24  or should it be construed that this was done through
25  the usual labeling processes of Merck, which involve

574

1  the experts that are familiar with all the available
2  data to inform labeling statements.
3         It was being done to put forward a
4  straw horse to see whether or not, should -- should
5  it be considered that -- that we should go forward
6  to label this product, we could develop labeling
7  language.  It was basically done to inform Dr. Kim.
8  It was developed in haste, and it was considered and
9  summarily rejected by Dr. Kim as the -- not the
10  appropriate course of action here.
11  BY MR. TISI:
12    **Q.    Now --**
13         MR. TISI:  Move to strike the
14  nonresponsive portion.
15         THE WITNESS:  I think that's a
16  completely responsive answer.
17         MR. TISI:  Well, we'll let the record
18  speak to that.
19  BY MR. TISI:
20    **Q.    But the -- the question that I have,**
21  **Doctor, is you said that this took an hour and a**
22  **half to draft.  But it was after a whole long**
23  **weekend of looking at all the data and consulting**
24  **with experts, correct?**
25    A.    It was a long weekend of looking at

575

1  the APPROVe data.
2    **Q.    And listening to your external and**
3  **internal advisors about the meaning of that data,**
4  **and that's why I asked you these questions, against**
5  **the background of every -- the totality of the**
6  **evidence, correct?**
7    A.    Yes, sir.
8    **Q.    Okay.  So it's not fair to simply say**
9  **you just decided one day to just pick up and draft a**
10  **black box label; it came in the background of having**
11  **spent the entire weekend focused intently on the**
12  **subject of whether or not this drug was capable of**
13  **causing a particular problem; is that fair to say?**
14         MR. WIEGMANN:  Objection.
15         THE WITNESS:  It was -- it was
16  developed after the data had been reviewed for
17  APPROVe and in response to Dr. Kim's request to see
18  whether or not there could be labeling language
19  developed that -- that could allow for the safe and
20  effective use of the label.
21         This is in no way construed to --
22  should be construed to represent the ultimate label
23  that would have been developed should we have
24  decided to go down that course.
25  BY MR. TISI:

576

1    **Q.    I understand your testimony.**
2         **My question, is there anything in**
3  **that first sentence that is inaccurate?**
4    A.    As written, it -- it is inaccurate
5  because the only study that showed an increased risk
6  versus placebo is the APPROVe trial, which showed
7  that the increased risks conferred after 18 months
8  of continuous therapy.
9    **Q.    So you and Dr. -- the two most senior**
10  **trusted people by Dr. Kim provided Dr. -- provided**
11  **Dr. Kim with inaccurate information after having**
12  **reviewed the totality of the evidence for an entire**
13  **weekend?**
14    A.    It's --
15    **Q.    Is that what you're trying to say?**
16    A.    Again, it's not -- it was -- the 12
17  months is the operative word in this sentence, and
18  it was attempting to build in a margin from the 18
19  months.
20    **Q.    Well, I actually would ask you the**
21  **question then, even if it's not the operative word,**
22  **which clinical studies, plurally, are you talking**
23  **about?**
24    A.    Well, there are none.  The only
25  clinical study that showed an increased risk versus

**59  (Pages 573 to 576)**

M00582J4733

Confidential-Subject To Protective Order

577

1  placebo is the APPROVe trial at that time.

2      Q.      Is there any other now?

3      A.      Well, there's the -- for Vioxx or for

4  Celebrex?

5      Q.      For Vioxx.

6      A.      Not to my knowledge.

7      Q.      The next sentence, "As such, Vioxx

8  should be reserved for the treatment of

9  osteoarthritis/rheumatoid arthritis in patients who

10  have failed to respond or are intolerant of" -- "to

11  other anti-inflammatory therapy."

12          That is in terms of using -- that is

13  an attempt to try to make it a second line therapy

14  as opposed to first line therapy, correct?

15      A.      That was the thinking at the time,

16  yes.

17      Q.      And do you think that would have been

18  a reasonable thing to do, given the safety profile

19  of the drug as you described it here in sentence

20  one?

21      A.      Given the fact that alternative

22  therapies were out there, that at that time we were

23  unaware, shared the -- the cardiovascular -- the

24  increase in thrombotic cardiovascular risk, and

25  given the fact that patients are in need of

578

1  treatment for their OA and RA, and given the fact

2  that some patients respond to some therapies and

3  don't respond to others, we thought that Vioxx may

4  be a therapeutic option for those patients who had

5  been unresponsive to other non-steroidal therapy.

6      Q.      And just so -- we talked about this

7  at the very beginning of the deposition yesterday,

8  but the other therapies that you're referring to are

9  both over-the-counter and prescription drugs,

10  correct?

11          MR. WIEGMANN: Objection.

12          THE WITNESS: This was primarily

13  focused on prescription therapies because the

14  over-the-counters are not indicated for chronic use

15  for osteoarthritis and rheumatoid arthritis.

16  BY MR. TISI:

17      Q.      Does that -- does this proposed label

18  say that?

19      A.      This is -- this is a -- this is

20  professional labeling.  So it would be for the

21  management of -- of OA and RA.  The readers -- the

22  readers of this label would understand what -- which

23  drugs are indicated for chronic use for OA and RA.

24          MR. HENDERSON: Object.

25  Nonresponsiveness.

579

1  BY MR. TISI:

2      Q.      Is it your understanding, Doctor,

3  that -- that there are doctors treating arthritis,

4  whether rheumatoid or -- osteoarthritis, who

5  don't treat their patients with aspirin, Motrin,

6  Tylenol, Aleve --

7          MR. WIEGMANN: Objection.

8  BY MR. TISI:

9      Q.      -- as a practical matter?

10      A.      I don't know what, as a practical

11  matter, what physicians are doing out there.

12          I do know what the professional

13  labeling is for -- I do know what the drug facts are

14  for over-the-counter therapies and I know what the

15  professional labeling is for Rx and non -- NSAIDs.

16      Q.      Well, then, why would you ever study

17  in osteoarthritis patients and rheumatoid arthritis

18  patients Vioxx versus naproxen, for example, or

19  Vioxx versus aspirin or Vioxx versus ibuprofen?  Wh

20  would you ever study those if they're really totally

21  different treatments?

22      A.      I'm not sure I understand your

23  question.

24      Q.      Well, you're comparing things --

25  you're comparing -- in your clinical trials, you're

580

1  comparing drugs that are used for the same

2  indication in the real world, are you not, when

3  you're comparing Vioxx against naproxen, if you're

4  comparing Vioxx against ibuprofen, if you're

5  comparing Vioxx against the other NSAIDs you're

6  talking about?  You're comparing against treatment

7  that people use in the real world, aren't you?

8      A.      That physicians use in the real

9  world.

10      Q.      Sure.

11      A.      Full-strength Motrin is prescription

12  for the treatment of --

13      Q.      Right.  But, also, naproxen and

14  Motrin is also prescribed over the counter?  You

15  know that as a physician, don't you?

16          MR. WIEGMANN: Objection to the form.

17          THE WITNESS: Over-the-counter --

18  over-the-counter drugs are not prescribed.

19  BY MR. TISI:

20      Q.      I mean -- well, okay.  All right.

21  Let's -- let's -- I'm going to come down, hopefully,

22  to where the rubber meets the road here.

23          You do know, don't you, that

24  doctors -- you understand that doctors in their

25  regular clinical practice, who were treating

60 (Pages 577 to 580)

M005824734

Confidential—Subject To Protective Order

593

1  and a half. It was basically done for informational
2  purposes to give Dr. Kim a perspective on what
3  components of the label might be -- might have to be
4  written, what the -- what general language might
5  look like. But in no way was this an attempt to be
6  a final product.
7  BY MR. TISI:
8      Q.   No. And I understand your
9  perspective here.
10         But you keep coming back to that it
11  was done in an hour and a half, so I'm going to --
12  I'm going to take -- take your word that it took an
13  hour and a half to draft this.
14         I assume that all along the prior
15  four years, if you wanted to draft a potential black
16  box, or anybody, they could have, in an hour and a
17  half, drafted a potential black box for submission
18  to the FDA, correct --
19         MR. WIEGMANN: Objection.
20  BY MR. TISI:
21     Q.   -- all along -- all along the
22  continuum from the day VIGOR came out through the
23  last -- through September 30th? It doesn't take
24  that long to begin the process of considering a
25  black box, correct?

594

1          MR. WIEGMANN: Objection.
2          THE WITNESS: Again, these were --
3  these were exceptional circumstances.
4  BY MR. TISI:
5      Q.   Oh, okay.
6      A.   We had new data that basically had,
7  in our opinion, altered the benefit/risk profile of
8  the -- of the product.
9      Q.   I'm not talking about the substance.
10         I'm talking about, it doesn't take
11  long to pull together information in order to draft
12  a label?
13     A.   Well, actually, the formal labeling
14  process is fairly labor-intensive.
15     Q.   I'm not talking about the formal
16  labeling process.
17         I'm talking about taking information,
18  drafting a black box, kind of the way you guys did,
19  sat there an hour and a half and hammered it out,
20  right? Not that hard?
21         MR. WIEGMANN: Objection.
22         THE WITNESS: It wasn't done with the
23  intent of developing what at all would be considered
24  final labeling --
25  BY MR. TISI:

595

1      Q.   I understand.
2      A.   -- final proposed labeling.
3      Q.   I understand.
4          MR. WIEGMANN: You're interrupting
5  his -- his answer again. So let's make sure we
6  don't talk over one other.
7          MR. TISI: Thank you very much,
8  counselor. I appreciate it.
9  BY MR. TISI:
10     Q.   Now, you said this took an hour and a
11  half. But this was -- as you said, these were
12  extraordinary times, correct?
13     A.   Again, it was at the request of Dr.
14  Kim to develop a straw labeling position for him to
15  consider in forming his position.
16     Q.   I'm using your words --
17     A.   I have to say that this was --
18  marked, this was done as draft, and Dr. Kim looked
19  at this very, very briefly, and, basically, rejected
20  this as what his -- what he deemed to be an
21  appropriate course of action, which was to take an
22  even more conservative approach and withdraw the
23  product.
24     Q.   Based upon one study?
25     A.   Absolutely.

596

1      Q.   Okay. So one study showing a small
2  risk after 18 months would be enough to take a drug
3  off the market, correct?
4      A.   One properly conducted study with
5  robust findings that withstood -- stood up to
6  appropriate analyses, in our judgment, in Dr. Peter
7  Kim's judgment, was -- was enough to change -- to
8  voluntarily withdraw the drug from the market.
9      Q.   Now -- but I'm going to get back to
10  the question that I asked again, okay.
11         You would agree with me that the
12  week, the last week in September, was a pretty
13  extraordinary week in your -- the course of your
14  career? Would you agree?
15     A.   I've had many extraordinary weeks. I
16  think it was proper to say it was an extraordinary
17  week in the history of Merck & Co.
18     Q.   And at that particular time, you were
19  working, I don't want say 24 hours a day, but you
20  were working long hours; fair enough?
21     A.   I always work long hours.
22     Q.   Okay. This week in particular was a
23  pretty intense week; fair enough?
24     A.   Fair enough.
25     Q.   Okay. You spent all weekend combing

**597**

1  the data, correct?
2      A.   Not me personally.
3      Q.   **Well, you along with others?**
4      A.   A team.  Yes.
5      Q.   **Okay.  And it would be fair to say**
6  **that not a minute of time was wasted during this**
7  **week, because this was some pretty important stuff;**
8  **fair enough?**
9          MR. WIEGMANN:  Objection.
10         THE WITNESS:  I don't know what you
11  would characterize as wasting time.
12  BY MR. TISI:
13     Q.   **Well --**
14     A.   But we weren't all together at all
15  times during the course of that week.
16     Q.   **Because you all had a lot of work to**
17  **do, correct?**
18     A.   We all had a lot of work to do, of
19  course.
20     Q.   **And you're -- and you're a pretty**
21  **senior, important guy at the company, right?**
22     A.   I'm a senior guy in the company.
23     Q.   **Okay.  As is Dr. Gertz?**
24     A.   Yes, sir.
25     Q.   **Okay.  Pretty senior and important**

**598**

1  **guy?**
2      A.   Yes, sir.
3      Q.   **So having two senior and important**
4  **people sit around and draft a label for a couple**
5  **hours was not something that's taken lightly,**
6  **correct?**
7      A.   Not something that was taken lightly.
8  Dr. Peter Kim was off attending to other
9  responsibilities at that time.  This was a relative
10  down time during the week when Peter Kim asked us to
11  at least take a -- stab at what language might
12  look like should we entertain the possibility of
13  trying to keep it on the market with labeling.
14     Q.   **So all the things you had to do that**
15  **week, and there were a lot of things, sitting down**
16  **and taking the time with another senior person**
17  **drafting a label was -- was fairly important in**
18  **terms of considering your range of options; is that**
19  **fair to say?**
20     A.   I would say that we take everything
21  we do seriously.
22     Q.   **Including considerations of whether**
23  **to label a drug and add a warning, correct?**
24     A.   Again, this was an attempt to present
25  an option to Dr. Kim.  It was not attempted in any

**599**

1  stretch of the imagination to be the proposed
2  labeling language.
3      Q.   **Do you know whether the option was**
4  **ever considered, prior to the last week in**
5  **September, to add a warning for cardiovascular risk?**
6      A.   I'm not aware of that.
7      Q.   **Do you know whether that option was**
8  **proposed by the Food & Drug Administration back in**
9  **2001?**
10     A.   I'm not aware of that, except that
11  there's a reference to that in one of the exhibits
12  you showed me before.
13     Q.   **And if the FDA proposed that as an**
14  **option, you would expect the company to take that**
15  **seriously?**
16     A.   I'm sure the -- I'm sure the
17  company -- I wasn't here at the time, but I'm sure
18  the company took everything FDA communicated to them
19  seriously.
20     Q.   **Since you don't know that, you're**
21  **speculating, right?**
22     A.   All I can do is base my assumption on
23  current -- current knowledge, that we take what FDA
24  says extremely seriously.
25     Q.   **Just like Dr. Scolnick did when he**

**600**

1  suggested that they would under no circumstances
2  accept a label proposed by the FDA?
3          MR. WIEGMANN:  Objection.
4  BY MR. TISI:
5      Q.   **Does that sound to you like something**
6  **was being taken seriously?**
7      A.   I can't speak to --
8          MR. WIEGMANN:  Objection.
9  Argumentative.
10         THE WITNESS:  I can't speak to what
11  Dr. Scolnick was intending in the e-mail.
12  BY MR. TISI:
13     Q.   **So what is your -- what is the basis**
14  **of your assumption that in 2001 the company was**
15  **taking the FDA seriously on the issue of warnings?**
16     A.   Again, it's based on my current -- my
17  current experience, my recent experience with the
18  regulatory affairs group and their interactions with
19  the agency.
20     Q.   **And your -- and your experience was**
21  **really -- is really, quite frankly, limited to the**
22  **last week in September where, finally, the shoe had**
23  **really dropped with the APPROVe study, correct?**
24         MR. WIEGMANN:  Objection to form.
25         THE WITNESS:  Well, I think it's most

**65  (Pages  597  to  600)**

Confidential-Subject To Protective Order

645

1 financial decision?
2     A.    Not primarily, no.  Not primarily.
3 It was an opportunity to -- I can't say that there
4 weren't financial benefits to joining, that would be
5 disingenuous, to joining industry, but that was not
6 my prime motivation.
7     Q.    When you went into Merck, what was
8 your first title?
9     A.    I was -- joined Merck as vice
10 president for Worldwide Product Safety & Quality
11 Assurance.
12     Q.    Is that a reasonably senior position?
13     A.    Reasonably.
14     Q.    Now, when was the first time you
15 remember getting involved in anything Vioxx-related
16 while at Merck?
17     A.    I really --
18     MR. WIEGMANN:  Objection to the form
19 of that question.
20 BY MR. HORN:
21     Q.    You can answer.
22     A.    Yeah, I -- I really can't recall
23 any -- any specific time that I got specifically
24 involved.
25     Q.    What was the -- do you remember the

646

1 first thing you ever worked on that was
2 Vioxx-related?
3     A.    No, I don't.
4     Q.    Okay.  Give me -- give me any
5 example, then, of something you can remember that
6 was Vioxx-related that you worked on?
7     A.    That I worked -- that I worked on?
8 Well, you know, the Vioxx -- the Vioxx team was
9 really centered around Vioxx.  I was at a -- at a
10 relatively higher level overseeing an organization
11 that was what I would call a spanning function,
12 meaning responsible for all products and not
13 product-specific issues.
14     For example, the quality assurance
15 group was overseeing many different aspects of
16 quality assurance, clinical quality assurance,
17 laboratory animal quality assurance, good
18 manufacturing practice, compliance with computer
19 validation quality assurance, so those sort of
20 regulatory issues there.
21     The worldwide product safety side
22 was, again, a counterpart to the Office of Drug
23 Safety at the agency where they were basically doing
24 the compliance activities for all the adverse event
25 reporting worldwide to regulatory authorities, and

647

1 then the evaluation of those postmarketing adverse
2 event reports.
3     So this was a -- a spanning function
4 that was -- and then I was the MRL compliance
5 officer as well, which, basically, was looking at
6 compliance with, for example, controlled substances
7 policies and procedures.  We would use controlled
8 substances for laboratory investigation.  I had to
9 make sure we had appropriate SOPs for custodial
10 maintenance of those products so they wouldn't be
11 diverted for -- for abuse and things like that.
12     So that -- that was my role.  It was
13 largely a -- a spanning role.  And so it was working
14 on all products to the point of -- of not being a
15 product-specific focus.
16     Q.    Okay.  That was a real long answer
17 and I appreciate it.
18     A.    I'm sorry.
19     Q.    That's okay.  I understand.  That's
20 fine.
21     If you can't answer this, that's
22 fine, too.  But do you -- do you have a recollection
23 of when the first time you ever worked on something
24 Vioxx-related?
25     A.    Well, again, the Vioxx team was

648

1 primarily focused on Vioxx-related activities.
2     Q.    I understand that.
3     My question was you.
4     A.    I probably remember the -- just being
5 made aware specifically of some of the observational
6 studies that were coming out in -- in that time
7 period between 2002 and 2004.
8     Q.    You said you started Merck around
9 February 2002; is that right?
10     A.    Yes.
11     Q.    Were you aware that -- of the
12 whole -- of the VIGOR study and the VIGOR advisory
13 committee meeting that had taken place?
14     A.    I was aware that an -- an advisory
15 committee had taken place, yes.
16     Q.    And were you -- did you then become
17 aware of the label change that, again, took place in
18 terms of Vioxx after that advisory committee?
19     A.    I became aware of that, yes.
20     Q.    Did you ever get involved at any
21 point about advising anyone or taking any action in
22 terms of label change?
23     A.    No.
24     Q.    Were you ever consulted by anyone at
25 Merck for your advice or ideas of how to handle the

77 (Pages 645 to 648)

M00582247S1

649

1  situation?
2      A.    No.
3      Q.    Were you aware the FDA submitted a
4  draft label to Merck?
5          MR. WIEGMANN: Objection. Asked and
6  answered.
7          THE WITNESS: At the time, no.
8  BY MR. HORN:
9      Q.    When did you first become aware of
10  that?
11      A.    I can't recall when I became aware of
12  that.
13      Q.    Was it around that time or we're
14  talking years later?
15      A.    Oh, no, it was -- it was
16  significantly after that.
17      Q.    So you were not aware there were
18  actual negotiations taking place between the FDA and
19  Merck concerning a label -- a post-VIGOR label?
20      A.    Again, that was not my area of
21  responsibility at the time --
22      Q.    I understand.
23      A.    -- and I -- I took great care to
24  avoid getting involved in FDA negotiations at that
25  time.

650

1      Q.    Okay. Actually, I'm glad you said
2  that because that's my next area.
3          Did you take -- were there any rules
4  about a period of time that you can't go work for a
5  sponsor once you leave the FDA?
6      A.    No. No, no. You can work -- you can
7  go directly to a sponsor from the FDA.
8      Q.    Okay. That's what you did, correct?
9      A.    Yes.
10      Q.    You didn't take a year off or
11  anything?
12      A.    No, sir.
13      Q.    Okay. And are there rules about --
14  withdrawn.
15          When you left the FDA, you said your
16  department was in charge of drug safety; is that
17  right?
18          MR. WIEGMANN: Objection.
19          THE WITNESS: The Office of Drug
20  Safety had responsibilities that I described to you
21  before.
22  BY MR. HORN:
23      Q.    Right.
24      A.    The regulatory authority for drug
25  safety and -- was -- still resided in the reviewing

651

1  divisions. And all the adverse event reports --
2  well, drug safety encompasses clinical trial drug
3  safety --
4      Q.    Sure.
5      A.    -- as well as postmarketing adverse
6  event reports. So the Office of Drug Safety was
7  primarily focused on postmarketing adverse event
8  reports collection and analysis. It was all done in
9  collaboration with the new drug reviewing divisions.
10  And the regulatory authority and the owners of those
11  product labels were the new drug reviewing
12  divisions.
13      Q.    Did you have any restrictions on you
14  when you went to industry about things you could or
15  could not work on?
16      A.    No.
17      Q.    Okay. So there's no regulations that
18  say, you know, you can go there, but you can't work
19  on X, Y and Z because you worked on X, Y and Z while
20  you were at the FDA?
21      A.    Well, within the constraints of not
22  divulging proprietary information about other
23  sponsors' products. When you're in a reviewing
24  division, you see all the data from all the
25  sponsors' development efforts.

652

1          So, for example, if I was working on
2  a Merck product and, you know, they're all --
3  they're all developing in the same area of research,
4  if I see Merck is working on something and
5  GlaxoSmithKline is working on something else and
6  Schering is working on another related product, I
7  would have knowledge of all their development
8  efforts and all the science. So if you choose to go
9  to a company --
10      Q.    I understand.
11      A.    -- from there, you're bound not to
12  disclose information about competitor products.
13      Q.    But aside from that, there's no
14  specific regulation?
15      A.    Not to my knowledge, no.
16      Q.    Okay. Did you know Janet Woodcock
17  while you worked at the FDA?
18      A.    Yes.
19      Q.    Did you know her well?
20      A.    Reasonably well.
21      Q.    Again, we're past -- I'm assuming
22  it's, again, it's a first-name basis, because
23  everybody knows first-name basis at the FDA, so
24  she'd be Janet?
25      A.    You know, I never could bring myself

78 (Pages 649 to 652)

# EXHIBIT 14

CAUSE NO. D-1-GV-05-003021

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| Plaintiff, | ) | |
| VS. | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| MERCK & CO., INC., | ) | |
| Defendant. | ) | 345TH JUDICIAL DISTRICT |

* * * * * * * * * * * * * * * * * *

ORAL VIDEOTAPED DEPOSITION OF

ELIAV BARR, MD

OCTOBER 28, 2009

* * * * * * * * * * * * * * * * * *

ORAL VIDEOTAPED DEPOSITION of ELIAV BARR, MD,

produced as a witness at the instance of the Plaintiff,

and duly sworn, was taken in the above-styled and

numbered cause on the 28 day of October, 2009, from

9:00 a.m. to 5:48 p.m., before S. Arielle Santos,

Certified Shorthand Reporter, Certified LiveNote

Reporter and Notary Public, at the offices of Dechert,

LLP, 2929 Arch St., Philadelphia, PA.

M0DEF78308

30

ELIAV BARR, M.D.

1
2  decision was it that -- for their development of that
3  drug would be dropped?
4      A    Senior management in the research
5  labs. I mean, this was an early development drug.
6  It wasn't, you know Phase II.
7      Q    Was Dr. Scolnick involved in that
8  decision?
9      A    I don't recall.
10     Q    Did you and he ever discuss that
11 matter?
12     A    No.
13     Q    Did the FDA make any request to have
14 further trials of DMP-754 stopped?
15     A    None that I was aware. I don't think
16 -- we actual -- I never actually -- I don't believe I
17 actually started the study there. We were with the
18 joint venture partner. There was another partner,
19 Dupont Merck, and they were doing the early studies.
20     Q    How far along was DMP-754 when it got
21 DMP'd?
22     A    DMP is Dupont Merck Product. Could
23 have been a good drug if it didn't half pharma
24 cytopenia.
25          But it was -- I think it was Phase

31

ELIAV BARR, M.D.

1
2  II A, and rather early in rather Phase II A,
3  probably, if I recall correctly.
4      Q    How long had you been working on that
5  drug?
6      A    So I am going to say about a year and
7  a half.
8      Q    How did you feel about the fact that
9  it got yanked from the market -- or got yanked from
10 development, rather?
11     A    I actually recommended it. It was
12 causing thrombocytopenia.
13     Q    That's low platelet count, and that's
14 dangerous?
15     A    Yes.
16     Q    Because if you have low platelet
17 count you can bleed to death, right?
18     A    Yes, ma'am.
19     Q    To your knowledge you have been with
20 Merck now since 1990 what?
21     A    '95.
22     Q    '95. So 14 years?
23     A    14 years and change.
24     Q    To your knowledge, has the FDA ever
25 directed Merck to pull a drug from the market?

32

ELIAV BARR, M.D.

1
2      A    To my knowledge, they have not. I
3  don't think that Merck has -- that FDA has.
4      Q    As you sit here today in October
5  2009, after 15 years with Merck & Company can you
6  think of a single instance where the FDA told Merck
7  to stop development or to take a drug off the market?
8      A    Just in my discreet period --
9  discreet involvement at Merck, I am not overseeing
10 multiple, multiple drugs. I can tell you for the
11 cardiovascular -- my period in the cardiovascular
12 group, for the period in the vaccines group and for
13 oncology, I have not heard the FDA tell us to stop
14 developing a drug or to take a drug off the market.
15     Q    If the FDA had told Merck to take a
16 drug off the market, do you think that is sort of
17 information that people at Merck would have talked
18 about and you would have heard about?
19          MS. JONES: Object to the
20          form.
21 BY MS. HALPERN:
22     Q    You can answer.
23     A    Sorry. It depends how early in
24 development it is because, for example, if you are in
25 Phase I or Phase II, the number -- it is a small

33

ELIAV BARR, M.D.

1
2  project. Obviously, if it's a drug that is now in
3  Phase III or licensed, I would imagine everyone would
4  hear about it. But the reason why I am saying I
5  wasn't a hundred percent sure, sometimes Phase I and
6  II, these things are -- these drugs fail so often, so
7  I just don't know. And it's never a big deal for
8  Merck.
9      Q    During the time you worked in
10 research, whether at Hopkins, in Michigan or at any
11 time you have been at Merck, have you ever conducted
12 any studies of naproxen?
13     A    Not personally, no.
14     Q    Have you ever supervised anybody
15 conducting studies of naproxen?
16     A    No.
17     Q    To this day, have you ever conducted
18 any studies of naproxen?
19     A    I have not, not personally.
20          Others at Merck have, not me.
21     Q    Let's talk about that. Who at Merck
22 that you are aware of has conducted studies of
23 naproxen?
24     A    There were clinical pharmacology
25 studies that were done -- I am not going to be able

34

ELIAV BARR, M.D.

1
2  to tell you the names, so I can tell you that. And I
3  can tell you based on my experience at the time of
4  the VIGOR trial and the year after. So I know that
5  there were studies of naproxen looking at platelet
6  function. I know there were some trials that had
7  used naproxen as a comparator to rofecoxib and other
8  compounds.
9      Q    With respect to trials of naproxen
10 for platelet function, are you talking about ex vivo
11 studies in test tubes?
12     A    We are talking about the effects of
13 naproxen on clinical platelet parameters, like
14 thromboxane production, like bleeding times and such.
15     Q    Were those studies done on healthy
16 volunteers?
17          What is your understanding how those
18 studies were done?
19     A    Those studies were done in healthy
20 volunteers.
21     Q    So they were given naproxen and the
22 blood was drawn sometime later?
23     A    That is correct -- well, before given
24 the drug and then after.
25     Q    In what year were those studies done?

35

ELIAV BARR, M.D.

1
2  And I will make this easy: In relation to the VIGOR
3  trial, before or after?
4      A    Can I just say before?
5      Q    Before?
6      A    I don't recall the years
7  specifically; but definitely before.
8      Q    All right. What is biologics
9  clinical research?
10     A    So biologics are a group of compounds
11 that are not simple molecules. They might be
12 proteins, they might be vaccines. So they're a more
13 complex kind of constrex.
14     Q    Your current title today is senior
15 director?
16     A    No.
17     Q    What are you today?
18     A    I am vice president.
19     Q    Excuse me. I am so sorry. When did
20 you become a vice president?
21     A    Sorry?
22     Q    When did you become a vice president?
23     A    In 2008 January.
24     Q    Is that the next level up from senior
25 director or steps in between?

36

ELIAV BARR, M.D.

1
2      A    Executive director.
3      Q    When did you become an executive
4  director?
5      A    2006 or '7 -- '6, probably.
6      Q    Is all of this still in the biologics
7  area?
8      A    No. So when I was promoted when I
9  moved to the oncology group.
10     Q    So you became an executive director
11 in oncology?
12     A    No. I became executive director in
13 vaccines. And then when I was offered the job in
14 oncology there was a promotion.
15     Q    Okay. I understand you were very
16 involved in the development of the HPV vaccine; is
17 that right?
18     A    Yes, ma'am.
19     Q    Any other vaccines that you were
20 personally involved in?
21     A    I supervised some doctors who are
22 involved in the Zoster vaccine called ZOSTAVAX.
23     Q    That is a Herpes vaccine?
24     A    It's Varicella Zoster, one of the
25 Herpes families of vaccines.

37

ELIAV BARR, M.D.

1
2      Q    It's not chicken pox, is it?
3      A    No. No. It is the -- the Herpes
4  virus includes chicken pox, and they include the --
5  the adult version of chicken pox, which is Zoster.
6  And it includes Epstein-Barr virus and a mental
7  virus. So the chicken pox vaccine is for kids. The
8  adult vaccine which is considerably more potent, is
9  for adults.
10     Q    Is shingles in that family?
11     A    Shingles is the adult version, yeah.
12 It's the recurrence of chicken pox in an adult. So
13 we kind of divide them in two because they are really
14 quite different vaccines.
15     Q    Doctor, how big is Merck Research
16 Labs? How many employees are there altogether?
17     A    I can't tell you specific number, but
18 I know thousands and thousands, quite a huge
19 organization.
20     Q    Are they all in one place or are they
21 spread in different locations?
22     A    There's two main facilities. But
23 there were -- over the years there have been many
24 satellites located in different parts of the world.
25 So the two main facilities are Rahway, New Jersey and

M0DEF7831T

# EXHIBIT 15

1033

1            SUPERIOR COURT OF NEW JERSEY

            LAW DIVISION - ATLANTIC COUNTY

2              CASE NO. 619

3                - - -

4  IN RE:  VIOXX LITIGATION

5                - - -

6     CROSS-NOTICED IN VARIOUS OTHER ACTIONS

7                - - -

8               VOLUME 4

9                - - -

10      Transcript of the videotaped deposition of

11  BARRY J. GERTZ, M.D., called for oral examination in

12  the above-captioned matter, said deposition taken

13  pursuant to Superior Court Rules of Practice and

14  Procedure by and before DEBRA J. WEAVER, a Federally

15  Approved RPR, CRR and CSR of New Jersey (XI 01614)

16  and Delaware (No. 138-RPR, Exp. 1/31/08), and a

17  Notary Public of New Jersey, Pennsylvania and

18  Delaware, at the offices of HUGHES HUBBARD & REED,

19  LLP, One Battery Park Plaza, New York, New York

20  10004-1482, on Wednesday, September 28, 2005,

21  commencing at 9:32 a.m.

22

23        ESQUIRE DEPOSITION SERVICES

             Four Penn Center

24    1600 John F. Kennedy Boulevard, 12th Floor

         Philadelphia, Pennsylvania 19103

25           (215) 988-9191

M00440995I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1202

1    A.    It may have been because the
2    consideration was that they didn't -- they
3    weren't -- they didn't have -- maybe they didn't
4    have adequate baseline samples in people or that
5    they weren't stored properly.
6        Q.    That would explain why the VIGOR
7    samples weren't examined, but do you know why a
8    prospective study was not performed in patients with
9    rheumatoid arthritis to look at the effect of
10   rofecoxib or Vioxx on thromboxane, A2, metabolites
11   and prostacyclin metabolites?
12       A.    Because the biomarker data would not
13   be as relevant as the planned outcome studies that
14   we did. That's why.
15       Q.    There evolved an explanation for the
16   VIGOR trial, and we've certainly gone through this
17   multiple times, which centered on, from Merck's
18   perspective, a cardioprotection effect of naproxen.
19   Do you recall that?
20       A.    Yes.
21       Q.    And, in fact, in the VIGOR paper,
22   there is made reference to, I believe, three sources
23   that stand for the proposition, three references,
24   that stand for the proposition that somehow naproxen
25   has cardioprotective properties. Do you recall

1203

1    that, from the paper?
2        A.    I don't recall the paper word for
3    word, no, but if -- but we can either look at it or
4    go over them specifically, if you want to raise
5    them.
6        Q.    Yeah. I'm actually going to do both
7    with you.
8        A.    Okay.
9        Q.    The first --
10           MR. HOFFMAN:  Let me mark as
11   Exhibit 129 a copy of the VIGOR paper.
12           (Whereupon, Deposition Exhibit No.
13   Gertz-129, "Comparison of Upper Gastrointestinal
14   Toxicity of Rofecoxib and Naproxen in Patients with
15   Rheumatoid Arthritis, (Bombardier, et al.) The New
16   England Journal of Medicine, 11-23-00, Vol. 343, No.
17   21, 1520-1528, MRK-ABA0001301 - MRK-ABA0001309, was
18   marked for identification.)
19   BY MR. HOFFMAN:
20       Q.    This was a paper that was published
21   in the New England Journal of Medicine, correct?
22       A.    Correct.
23       Q.    The lead author is a Dr. Claire --
24   does she pronounce it Bombardier or Bombardier?
25       A.    Bombardier.

1204

1        Q.    French pronunciation?
2        A.    Yes.
3        Q.    And if we look in the paper where
4    there is a discussion, and it's on page 1526, of
5    this paper talking about the naproxen inhibition to
6    thromboxane, do you see that?
7        A.    Yes, I do.
8        Q.    And clearly that is one of the
9    cornerstones, I believe, of Merck's belief that
10   naproxen is cardioprotective; is that correct?
11       A.    It's one of our -- it's one of the
12   pieces of science that support that naproxen could
13   have cardioprotective effects, yes.
14       Q.    There is a reference made to a paper
15   by a Dr. Van Hecken. Do you see that, sir?
16       A.    Yes. Let me make sure that's the
17   reference.
18       Q.    Reference 28.
19       A.    Yes.
20       Q.    And, by the way, for a doctor to
21   recognize -- when you list various propositions in a
22   journal article like this, for a doctor to know the
23   basis of that opinion, one would look at the
24   reference made to the footnotes, correct?
25           MR. KLEINBERG:  I'll object to the

1205

1    form of that question.
2    BY MR. HOFFMAN:
3        Q.    Do you have an understanding that
4    when you write a scientific paper and you state a
5    proposition, when you put a footnote next to it,
6    that's generally a reference to the source of that
7    proposition?
8        A.    Generally speaking, it's data
9    supporting your statement. If that's what you mean,
10   yes.
11       Q.    And in this paper, you, as a
12   physician, this is the New England Journal of
13   Medicine, this is a medical journal, if you wanted
14   to look and see where the propositions concerning
15   naproxen as having potentially cardioprotective
16   properties come from, you would go to the reference
17   section, correct?
18       A.    Well, not exactly -- this sentence
19   refers strictly to naproxen's biochemical effects on
20   thromboxane and platelet aggregation and the
21   duration of that effect relative to its dosing
22   interval.
23       Q.    And, Doctor --
24       A.    I would expect that to be in the
25   reference. One could glean that from the reference,

44  (Pages  1202  to  1205)

M00440999941

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1206

1 I would think.
2     Q.    And that was one of the arguments
3 made for naproxen having a cardioprotective effect,
4 that it inhibited thromboxane synthesis over
5 95 percent of the dosing cycle, correct?
6     A.    Over 95 percent over 100 percent of
7 its dosing cycle.
8     Q.    So the dosing cycle was
9 500 milligrams given every 8 hours, correct?
10     A.    No. 500 milligrams given every
11 12 hours, twice a day.
12     Q.    Given b.i.d., every 12 hours. The
13 proposition that naproxen has cardioprotective
14 properties is based on the fact, or one of the
15 factors is that during that dosing interval, over
16 the course of that dosing interval, thromboxane
17 levels are inhibited by 95 percent, correct?
18     A.    Thromboxane generation, that's
19 correct.
20     Q.    And there's also platelet aggregation
21 inhibition by 88 percent; is that correct?
22     A.    Correct.
23     Q.    And to look and see where that
24 proposition comes from, one would need to go back to
25 this paper by Anne Van Hecken, et al., correct?

1207

1     A.    Correct.
2     Q.    There's no other source of that
3 information, as you look at this article, other than
4 that paper by Van Hecken, correct?
5     A.    At that time there was no other
6 source. There's -- two other specific labs have
7 documented that subsequently, but at that time, that
8 was the primary source.
9     Q.    My question is, there was no other
10 source of that information listed in this paper
11 other than the Van Hecken article?
12     A.    It's clear there's only a single
13 reference at that time when this was written.
14     Q.    The Van Hecken paper was a paper on
15 which you were a co-author, correct?
16     A.    That's correct.
17     Q.    I'm going to mark that, the Van
18 Hecken paper, as Exhibit 130.
19         (Whereupon, Deposition Exhibit No.
20 Gertz-130, "Comparative Inhibitory Activity of
21 Rofecoxib, Meloxicam, Diclofenac, Ibuprofen, and
22 Naproxen on COX2 versus COX-1 in Healthy
23 Volunteers," (Van Hecken, et al) Journal of Clinical
24 Pharmacology, 2000;40:1109-1120, was marked for
25 identification.)

1208

1 BY MR. HOFFMAN:
2     Q.    This was a paper -- who was Anne Van
3 Hecken?
4     A.    A pharmacologist in the University of
5 Leuven --
6     Q.    This was a paper that --
7     A.    -- or Catholic University. I'm not
8 sure at this point. University of Leuven.
9     Q.    I'm going to ask you to keep your
10 voice up.
11     A.    University of Leuven. She's a
12 clinical pharmacologist.
13     Q.    This was a study looking at the
14 effects in various healthy volunteers of thromboxane
15 metabolites, correct?
16     A.    Correct.
17     Q.    And they were dosed with various
18 either nonspecific or selective COX inhibitors,
19 correct?
20     A.    Correct.
21     Q.    The data for naproxen, if we get to
22 naproxen, because that's the data that you're really
23 referring to or that's being referred to in the New
24 England Journal VIGOR trial, correct? It's the
25 naproxen data that's being referenced, correct?

1209

1     A.    Correct.
2     Q.    If we look at that data, starting on
3 page 1111 of this paper, you see the "Subject
4 Demographics," correct?
5     A.    Yes.
6     Q.    "Subject Demographics," refers to
7 what were the age and other characteristics of
8 patients who were included in the study that was
9 performed to compare various NSAIDs and selective
10 COX-2 -- COX-1 and COX-2 inhibitors, correct?
11     A.    That's correct.
12     Q.    It describes what these patients look
13 like from a demographic perspective.
14     A.    That's correct.
15     Q.    The naproxen data, that stands for
16 the, at least in VIGOR, partially stands for the
17 proposition that naproxen has cardioprotective
18 properties. The number of patients that were
19 actually examined in the Van Hecken paper, of which
20 you were a co-author, was actually eight patients,
21 correct?
22     A.    Correct.
23     Q.    And those eight patients, they didn't
24 smoke for at least two weeks prior to the study,
25 correct?

45   (Pages 1206 to 1209)

M004409995

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1210

1    A.    We'd have to go back to the selection
2    criteria, but that makes -- that would make sense.
3    We wouldn't want to have the variability of
4    different levels of smoking, so we would have
5    probably told everybody not to smoke.
6    **Q.    It said, "Major exclusion criteria in**
7    **the Van Hecken paper were the following:  history of**
8    **peptic ulceration or other major gastrointestinal**
9    **abnormalities, known hypersensitivity to NSAIDs,**
10   **smoking, and use of NSAIDs within 2 weeks prior to**
11   **the start of the study."  Correct?**
12   A.    Correct.
13   **Q.    So these were basically healthy**
14   **individuals that you were looking at, correct?**
15   A.    Yes, healthy.  That's what it says.
16   **Q.    Not people with so-called platelet**
17   **activation syndromes, not people who smoked**
18   **cigarettes, correct?**
19   A.    No. That was not the intent of the
20   study.
21   **Q.    Not people who were diabetic,**
22   **correct?**
23   A.    Not the intent.
24   **Q.    Not people who were hypertensive?**
25   A.    Quite clearly, no, not the intent of

1211

1    the study.
2    **Q.    Not people who one would expect to**
3    **even find advanced atherosclerosis in, correct?**
4    A.    Well, that I don't know.
5    **Q.    Let's see if we can't figure that out**
6    **a little bit more.  The naproxen group, which was**
7    **eight patients, their mean age was 22 years old,**
8    **correct?**
9    A.    Correct.
10   **Q.    So they're young women, correct?**
11   A.    Yes.  We studied women for a very
12   specific reason.
13   **Q.    How many 22-year-old women were in**
14   **the VIGOR trial?**
15   A.    It wasn't the intent of this study.
16   **Q.    My question is very specific.**
17   A.    Zero, I suspect.
18   **Q.    There were very few -- there were**
19   **zero 22-year-old women in the VIGOR trial, correct?**
20   A.    I'd say very few.  They weren't
21   excluded.  They had to be over the age of 18 and any
22   sex.
23   **Q.    The mean age, the age range here, in**
24   **the Van Hecken study, was 18 to 29 years of age,**
25   **correct?**

1212

1    A.    Yes.
2    **Q.    How many 18 to 29-year-olds were in**
3    **the VIGOR trial?**
4    A.    I don't know.  Anybody with
5    rheumatoid arthritis and over the age of 18 could
6    come in.
7    **Q.    None of the patients in the Van**
8    **Hecken trial had rheumatoid arthritis, correct?**
9    A.    That's correct.  It wasn't the intent
10   of the study.
11   **Q.    So whatever conclusions you drew**
12   **about the dosing interval and the effect of naproxen**
13   **were drawn from patients who were basically healthy,**
14   **young women who didn't smoke and didn't have**
15   **rheumatoid arthritis, correct?**
16   A.    Well, if you want yes-or-no answers,
17   the answer is no.
18   **Q.    Well --**
19   A.    The dosing interval is the dosing
20   interval that's in the label of naproxen in patients
21   with rheumatoid arthritis.  The pharmacokinetics of
22   naproxen in patients with rheumatoid arthritis are
23   the same as in healthy volunteers.  We do have that
24   data.
25   **Q.    Here's my question.  The data here**

1213

1    for the thromboxane A2 levels, the metabolites, was
2    gleaned from patients who were healthy, correct?
3    A.    This was a healthy volunteer study.
4    I've said that, yes.
5    **Q.    And they didn't have diabetes?**
6    A.    Healthy volunteer study.
7    **Q.    They didn't have rheumatoid**
8    **arthritis, correct?**
9    A.    Healthy volunteer study.
10   **Q.    So to the extent that you're citing**
11   **this paper as standing for the proposition that**
12   **naproxen is cardioprotective, there's no data that**
13   **one gets from this paper to know whether naproxen is**
14   **cardioprotective in rheumatoid arthritis, correct,**
15   **sir?**
16   A.    Where did I state in here that
17   naproxen was cardioprotective?
18   **Q.    I'm just asking you.  There's nowhere**
19   **from this paper that one would glean that naproxen**
20   **is cardioprotective in rheumatoid arthritis?  Simple**
21   **yes or no.**
22   A.    The answer to that is there is data
23   in here -- the answer is yes, there is data in here
24   to support the cardioprotective effects of naproxen,
25   just as if you did this study with aspirin.

46  (Pages  1210  to  1213)

MDL0409996

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1214

1  Q.  Where in this paper does the word
2  "cardioprotective" appear?
3      A.  It talks about the antiplatelet
4  effects.
5      Q.  I asked you a very specific question.
6  Show me where in this paper the word
7  "cardioprotective" appears in the Van Hecken paper.
8      A.  It does not. It may -- we'll go
9  through the end. I don't know if we addressed it in
10  this study, in this discussion here or not. I don't
11  remember all the -- all the writing in here. But
12  I'm not -- but I don't believe that's a relevant
13  question, but I will try to answer it.
14      Q.  My question is very straightforward,
15  not whether you believe it's relevant or irrelevant.
16      A.  That's why I will try to answer it.
17      Q.  The question is, where in this paper
18  does anybody conclude, Dr. Van Hecken, Dr. Schwartz,
19  Dr. Depre, you, any of these authors, make an
20  assessment, a conclusion, even a speculation that
21  naproxen is cardioprotective?
22      A.  I would have to infer it from the
23  statement here --
24      Q.  I'm not asking you to infer. I'm
25  asking you where is there a statement -- show me the

1215

1  word "cardioprotective" in that paper.
2      A.  It may explain a "sustained...level
3  of inhibition such as observed with aspirin or
4  naproxen," inhibition of COX-1, and it "probably
5  explains why nonaspirin NSAIDs," which don't have
6  that level of inhibition, "are not generally
7  associated with clinically important hemostatic
8  defects."
9      Q.  I haven't heard the word
10  "cardioprotective" come up.
11      A.  And I don't believe we ever said that
12  it was proven to be cardioprotective, but these data
13  would support that assumption -- that association,
14  clearly support that association.
15      Q.  At least in young, healthy,
16  non-rheumatoid patients?
17      A.  That's correct.
18      Q.  There's nothing beyond non-rheumatoid
19  patients in this paper, correct?
20      MR. KLEINBERG:  Objection to the form
21  of the question.
22      THE WITNESS:  This is a study in
23  volunteers, just as studies of most antiplatelet
24  agents have been done in volunteers because you get
25  the same effects, just as you can study aspirin in

1216

1  volunteers.
2  BY MR. HOFFMAN:
3      Q.  Well, sir, the Musliner memo is not
4  volunteers. The Musliner memo from November of 1996
5  is based on actual studies looking at actual
6  cardioprotective effects of aspirin, correct?
7      A.  It also refers to indobufen and
8  flurbiprofen, similarly quoted in here, other NSAIDs
9  with prolonged and sustained COX-1 inhibition.
10      Q.  Well, we're going to get to
11  flurbiprofen and that in a second.
12      A.  Okay.
13      Q.  You told me earlier that you needed,
14  I think, clear evidence before a drug company had a
15  warning concerning a potential adverse effect. Do
16  you remember telling me that, right at the beginning
17  of our deposition?
18      A.  I don't know if the words -- I don't
19  know if I used the exact words "clear evidence." We
20  could go back and, I guess, pull it back and find
21  out exactly what I said, but...
22      Q.  Well, let me ask you this. Do you
23  believe that you need clear evidence before you
24  provide a warning concerning an adverse event?
25      A.  I think you should have a good level

1217

1  of scientific evidence before you include something
2  as a warning.
3      Q.  And yet Merck didn't have good
4  scientific evidence that naproxen was in any way
5  cardioprotective, correct?
6      MR. KLEINBERG:  Object to the form of
7  the question.
8      THE WITNESS:  We didn't have clear
9  evidence that Vioxx had a prothrombotic effect.
10  That's what was relevant for the Vioxx label. What
11  are you asking me to change the naproxen label?
12  BY MR. HOFFMAN:
13      Q.  Here's my question straight up.
14  Merck did not have clear evidence at the time that
15  this VIGOR data was published, there was no clear
16  evidence, there's no prospective, randomized,
17  controlled trial in which one could stand up and say
18  naproxen is cardioprotective, correct?
19      A.  There's no proof of naproxen and
20  that's -- of having -- of being -- reaching the
21  level of proof to call it cardioprotective. That's
22  why every time we have stated it, we've made it
23  quite clear that its biological and pharmacological
24  properties are consistent with a -- are consistent
25  with a cardioprotective effect, recognizing that

47  (Pages 1214 to 1217)

M004409997

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1218

1  others have not done the studies that would reach
2  the level of proof of claiming -- making -- we had a
3  claim it was cardioprotective.
4      Q.    We're going to get to what Merck
5  stated and what they didn't state.  We're going to
6  look at that in the context of these values and
7  standards that we talked about.  But as a general
8  proposition, there was no randomized, controlled
9  prospective trial of naproxen that showed that
10  naproxen, looking at cardiovascular endpoints, not
11  thromboxane levels in healthy women, but
12  cardiovascular endpoints, there was no randomized,
13  controlled, prospective study that showed that
14  naproxen was cardioprotective at the time this VIGOR
15  paper was published, correct?
16      A.    Well, at the time the VIGOR paper was
17  published, there was no evidence that Vioxx was
18  increasing cardiovascular events.  There was no
19  placebo in VIGOR.
20      Q.    I'm asking you --
21      A.    So there was neither evidence.
22  That's the conundrum that the advisory committee had
23  to deal with.
24      Q.    Here's my question.  I'll ask it to
25  you one more time.  It has nothing to do with Vioxx.

1219

1  It has to do with naproxen.  There was no
2  randomized, controlled, prospective clinical study
3  that stood for the proposition that naproxen,
4  looking at cardiovascular endpoints, was
5  cardioprotective at the time the VIGOR trial was
6  published, correct?
7      A.    There was no -- there was no --
8  there's no trial of the nature of which you
9  described.
10      Q.    Now, you are familiar with the FDA,
11  correct, Food & Drug Administration?
12      A.    Yes.
13      Q.    Naproxen wasn't approved as a
14  cardioprotective drug at the time VIGOR was
15  published, correct?
16      A.    I said that.  That's why I said the
17  evidence did not -- did not meet the evidence of
18  proof required to be able to call it a
19  cardioprotective agent.
20      Q.    Okay.  Let's step away from the FDA
21  and let's look at -- you're familiar with various
22  learned societies within medicine.  There must be a
23  society of endocrine -- endocrinologists.  What is
24  the learned society within the field of
25  endocrinology?

1220

1      A.    The Endocrine Society.
2      Q.    The Endocrine Society.  You're
3  familiar, sir, that within the field of cardiology,
4  you've heard of the American Heart Association?
5      A.    Yes.
6      Q.    The American Heart Association makes
7  various recommendations concerning diet, salt
8  intake, blood pressure control and also the use of
9  aspirin.  Are you familiar with that, sir?
10      A.    Yes.
11      Q.    In 2001, when this paper was
12  published, do you know whether the American Heart
13  Association made any recommendation whatsoever that
14  naproxen should be taken as a cardioprotective
15  medication?
16      A.    No, they would never do that.  The GI
17  problems with naproxen alone would be problematic.
18      Q.    Here's my question again.  I'm not
19  asking about GI problems or whether they're
20  problematic.  By the way, GI problems can be
21  problematic with aspirin, correct?
22      A.    Right.  So, that's why they don't
23  recommend it for primary prevention.
24      Q.    Here's my question, for either
25  primary or secondary prevention -- you introduced

1221

1  some new terms here.  Primary prevention would mean
2  to prevent a first heart attack or a first stroke,
3  correct?
4      A.    Yes.
5      Q.    And secondary prevention, a so-called
6  aspirin-indicated population, that's to prevent
7  secondarily a stroke or a peripheral vascular event
8  or a cardiac event in someone who has had a cardiac
9  event or a peripheral vascular event or a heart
10  attack, correct?
11      A.    That's correct.  That's correct.
12      Q.    So do you know, and we can broaden it
13  out under your terms to primary or secondary
14  prevention, do you know whether the American Heart
15  Association at the time that this was published made
16  any recommendations that naproxen should be used as
17  either primary or secondary cardioprotection?
18      A.    No, they did not.  And we never said
19  that they -- we never made that statement to that
20  effect.
21      Q.    I'm not asking you whether you made a
22  statement.  I think what you told me is there was no
23  recommendation by the American Heart Association for
24  using naproxen for either primary or secondary
25  cardioprotection, correct, sir?

48  (Pages 1218 to 1221)

M00409998

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1222

1     A.   That's correct.
2     Q.   **The American College of Cardiology,**
3 **are you familiar with them?**
4     A.   Yes.
5     Q.   **Okay. They are a body that also sets**
6 **forth various guidelines for the treatment,**
7 **prevention, diagnosis of cardiovascular and**
8 **cerebrovascular disease, correct?**
9     A.   That's correct.
10     Q.   **The American College of Cardiology**
11 **made no recommendations in the year 2001 or today**
12 **that naproxen should be used for cardioprotection,**
13 **correct?**
14     A.   That's correct.
15     Q.   **The company that makes the drug**
16 **naproxen, they make no recommendation that naproxen**
17 **should be used for any type of cardioprotective**
18 **function, correct?**
19     A.   Correct. There's no study -- a study
20 has not been done that would elevate it to the level
21 of proof. And there is another reason, but...
22 Patients take -- need to take the naproxen as it's
23 indicated, twice a day, to get that kind of
24 antiplatelet effect.
25     Q.   **And as we sit here today -- well,**

1223

1 there's no recommendation that even if you take
2 naproxen twice a day that it should be used for
3 cardioprotection, correct?
4     A.   I agree, there is none.
5     Q.   **And the American Heart Association as**
6 **we sit here today makes no such recommendation as**
7 **well?**
8     A.   I agree, it does not.
9     Q.   **Merck made a significant scientific**
10 **discovery that naproxen was cardioprotective,**
11 **correct?**
12     A.   Incorrect. We never made the claim
13 that it was cardioprotective. We said that its
14 antiplatelet properties could explain this
15 difference between Vioxx and naproxen in VIGOR We
16 did not make the leap to say that it should be used
17 for cardioprotection. Indeed, the antiplatelet
18 effects of naproxen had been shown over the several
19 years past that to be supported by major
20 antiplatelet laboratories as well as other clinical
21 observations. So that's short of saying that we'll
22 ever get a claim for being cardioprotective,
23 however.
24     MR. HOFFMAN: Move to strike the
25 nonresponsive segment of your answer.

1224

1 BY MR. HOFFMAN:
2     Q.   **Now, the other paper cited was a**
3 **paper by Brochier, do you see that, sir, number 29?**
4 **You mentioned it, the flurbiprofen study.**
5     A.   Yes.
6     MR. KLEINBERG: Is that 129 you're
7 asking him about?
8     MR. HOFFMAN: I'm not asking about
9 any exhibit. I'm asking him about --
10     MR. KLEINBERG: I thought you were
11 referring to a cite.
12     MR. HOFFMAN: I am. I'm asking him
13 about reference number 29 in the VIGOR paper.
14     MR. KLEINBERG: The VIGOR paper. I
15 wasn't clear because there were two papers.
16     MR. HOFFMAN: I'm sorry.
17     THE WITNESS: I see reference 29.
18 BY MR. HOFFMAN:
19     Q.   **That's a paper by Brochier, correct?**
20     A.   Yes, that's correct.
21     Q.   **What's the date of that publication**
22 **by Brochier?**
23     A.   '93.
24     Q.   **That was a paper that you, sir --**
25     (Whereupon, Deposition Exhibit No.

1225

1 Gertz-131, "Evaluation of flurbiprofen for
2 prevention of reinfarction and reocclusion after
3 successful thrombolysis or angioplasty in acute
4 myocardial infarction," (Brochier) European Heart
5 Journal (1993) 14, 951-957, MRK-NJ0146547 -
6 MRK-NJ0146553, was marked for identification.)
7 BY MR. HOFFMAN:
8     Q.   **-- you, sir, had in your file since**
9 **1997, and I've marked as Exhibit 131 the paper by**
10 **M.L. Brochier, "Evaluation of flurbiprofen for**
11 **prevention of reinfarction and reocclusion after**
12 **successful thrombolysis or angioplasty in acute**
13 **myocardial infarction." Do you see that, sir?**
14     A.   Yes.
15     Q.   **That paper had been around for an**
16 **awfully long time before the VIGOR trial was even**
17 **published, correct?**
18     A.   Correct.
19     Q.   **As one looks at that paper, it's a**
20 **paper from France, correct?**
21     A.   Yes.
22     Q.   **Is there any recommendation in this**
23 **country after this paper came out that flurbiprofen**
24 **should be used as a cardioprotective medication?**
25     The American Heart Association, the American College

49 (Pages 1222 to 1225)

# EXHIBIT 16

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


| | | |
|---|---|---|
| IN RE: VIOXX PRODUCTS | * | MDL DOCKET NO. 1657 |
| LIABILITY LITIGATION | * | |
| | * | |
| | * | |
| THIS DOCUMENT RELATES TO | * | AUGUST 14, 2006, 8:30 A.M. |
| | * | |
| | * | |
| GERALD BARNETT V. MERCK | * | CASE NO. 06-CV-485-L |
| & CO., INC. | * | |

* * * * * * * * * * * * * *


VOLUME XI
JURY TRIAL BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFF:        ROBINSON, CALCAGNIE & ROBINSON
                          BY:  MARK P. ROBINSON JR., ESQ.
                          620 NEWPORT CENTER DRIVE
                          NEWPORT BEACH, CALIFORNIA 92660


FOR THE PLAINTIFF:        BEASLEY ALLEN CROW METHVIN
                              PORTIS & MILES
                          BY:  ANDY D. BIRCHFELD JR., ESQ.
                          234 COMMERCE STREET
                          POST OFFICE BOX 4160
                          MONTGOMERY, ALABAMA 36103


FOR THE DEFENDANT:        BARTLIT BECK HERMAN
                              PALENCHAR & SCOTT
                          BY:  PHILIP S. BECK, ESQ.
                               ANDREW L. GOLDMAN, ESQ.
                          54 W. HUBBARD STREET, SUITE 300
                          CHICAGO, ILLINOIS 60601


DAILY COPY

c809ffef-511f-4799-8e69-0b8f578e8533

M007D38908

## Page 2254

1  A.  YES, IT DOES.
2  Q.  WAS YOUR ARTICLE PEER-REVIEWED?
3  A.  YES, IT WAS.
4  Q.  WHAT DOES IT MEAN TO HAVE AN ARTICLE PEER-REVIEWED?
5  A.  THE EDITORS SEND IT OUT TO THE EXPERTS IN THE FIELD TO
6  REVIEW AND COMMENT.  AT THAT POINT IN TIME EITHER -- SOMETIMES
7  THEY CAN SAY "WE'LL ACCEPT THE PAPER"; "WE WON'T ACCEPT THE
8  PAPER"; OR "HERE ARE THE COMMENTS OF OUR REVIEWERS.  PLEASE
9  ADDRESS THESE COMMENTS, AND THEN WE'LL RECONSIDER THE PAPER."
10  Q.  IF YOU TURN, DOCTOR, AND YOU CAN LOOK AT THE SCREEN AGAIN,
11  IF IT'S EASIER -- TO TABLE 2 OF YOUR ARTICLE, CAN YOU TELL THE
12  JURY WHAT THE SUBJECT OF THIS TABLE IS?  WHAT ARE YOU TRYING TO
13  SHOW IN TABLE 2?
14  A.  WE'RE LOOKING AT THE NUMBER ON THE INCIDENTS OF
15  CARDIOVASCULAR EVENTS OR POTENTIAL THROMBOTIC EVENTS IN
16  PATIENTS ON VIOXX COMPARED WITH THE NONSELECTIVE NSAIDS IN OUR
17  OSTEOARTHRITIS STUDIES.
18  Q.  AND DOES THE TABLE LIST THE NUMBER OF PATIENTS WHO HAD
19  TAKEN VIOXX IN THE OA TRIALS, AT LEAST AS TO THAT POINT?
20  A.  THAT'S CORRECT.
21  Q.  AND THAT'S 3,357?
22  A.  CORRECT.  THESE WERE THE INITIAL PHASE IIB, III, STUDIES.
23  Q.  I DON'T THINK THE JURY HAS HEARD ABOUT PHASE IIB, III.
24  WE'VE TALKED ABOUT PHASE II AND PHASE III.  WHAT'S A PHASE IIB,
25  III?

## Page 2255

1  A.  PHASE IIB IS WHERE YOU DETERMINE WHAT THE APPROPRIATE DOSE
2  IS, AND THEN PHASE III ARE YOUR CONFIRMATORY EFFICACY STUDIES.
3  THOSE ARE THE STUDIES BASED UPON WHICH THE FDA USUALLY GIVES
4  YOU YOUR INDICATION.
5      PHASE IIA ARE YOUR FIRST STUDIES THAT INDICATE THAT A
6  DRUG ACTUALLY DOES WHAT YOU WANT IT TO DO, SO THAT IT WORKS, BUT
7  OFTEN YOU DON'T REALLY KNOW THE DOSE.
8  Q.  NOW, BACK TO YOUR TABLE HERE.  YOU HAVE VARIOUS ENDPOINTS,
9  AND WHAT DID YOU REPORT HERE ABOUT THE NUMBER OR A PERCENTAGE
10  OF CARDIAC EVENTS IN THE OA TRIALS?
11  A.  GENERALLY SIMILAR.  IT WAS .54 PERCENT ON VIOXX AND
12  .7 PERCENT, .77 PERCENT ON THE NONSELECTIVE NSAIDS.
13  Q.  SO IT ACTUALLY LOOKS LIKE THERE ARE MORE CARDIAC EVENTS ON
14  THE NONSELECTIVE NSAIDS THAN VIOXX.  IS THAT A CONCLUSION THAT
15  YOU COULD REACH FROM THIS, DR. REICIN?
16  A.  NO, I WOULD SAY THEY WERE SIMILAR.  YES, NUMERICALLY, IT
17  WAS HIGHER ON THE NONSELECTIVE NSAID GROUP; BUT, STATISTICALLY,
18  THERE WAS NO DIFFERENCE BETWEEN THEM.  SO I WOULD SAY THEY WERE
19  SIMILAR.
20  Q.  AND IF YOU LOOKED AT HEART ATTACKS OR MYOCARDIAL
21  INFARCTION, WHAT DO YOU REPORT ABOUT THOSE IN THE OA TRIALS?
22  A.  AGAIN, SIMILAR:  .27, .26 PERCENT.
23  Q.  ON THE LAST PAGE OF YOUR ARTICLE, DOCTOR, YOU WROTE:  "IN
24  SUMMARY, AN ANALYSIS FROM THE VIOXX OSTEOARTHRITIS DEVELOPMENT
25  PROGRAM FOUND NO DIFFERENCE BETWEEN VIOXX COMPARATOR

## Page 2256

1  NONSELECTIVE NSAIDS AND PLACEBO IN THE RISKS OF CARDIOVASCULAR
2  THROMBOTIC EVENTS."  WHAT SIGNIFICANCE, IF ANY, DR. REICIN, DID
3  YOU FIND WHEN YOU REACHED THIS CONCLUSION BACK WHEN YOU WERE
4  ANALYZING THE OA TRIALS?
5  A.  I'M SORRY.  COULD YOU REPEAT THE QUESTION FOR ME.
6  Q.  SURE.  YOU SAID BEFORE THAT ONE OF THE THINGS YOU DID TO
7  TRY TO INTERPRET THE VIGOR RESULTS WAS TO GO LOOK AT THE OA
8  TRIALS TO SEE IF THERE WAS ANY SIGNAL OF A CARDIOVASCULAR
9  PROBLEM IN THOSE; RIGHT?
10  A.  CORRECT.
11  Q.  MY QUESTION TO YOU IS:  WHAT, IF ANY, SIGNIFICANCE DID YOU
12  PLACE ON THE FACT THAT YOU SAW NO SIGNAL IN THE OSTEOARTHRITIS
13  TRIALS?
14  A.  WELL, IF VIOXX WAS INCREASING THE RATE IN THE VIGOR STUDY,
15  THEN YOU MIGHT EXPECT YOU WOULD SEE AN INCREASED RATE VERSUS
16  THE NSAIDS IN THE OA STUDY.  WE DID NOT SEE THAT.  NOW, THEN
17  YOU WOULD BE LEFT WITH, YOU KNOW, WHY?  IT DIDN'T QUITE HOLD
18  TOGETHER.  IS THERE SOMETHING UNUSUAL ABOUT THE RHEUMATOID
19  ARTHRITIS PATIENTS?  IS THERE SOMETHING ABOUT THE DOSE?  THOSE
20  WERE ALL THINGS WE WERE THINKING ABOUT AS WELL.
21  Q.  BUT YOU MENTIONED THAT THERE WEREN'T THAT MANY PATIENTS ON
22  PLACEBO FOR A LONG PERIOD OF TIME IN THE OSTEOARTHRITIS TRIALS.
23  A.  CORRECT.
24  Q.  DID YOU DO ANYTHING TO TRY TO FIND OUT WHETHER THERE WAS
25  PLACEBO DATA WITH RESPECT TO VIOXX THAT WOULD HELP ANSWER THE

## Page 2257

1  QUESTION ABOUT WHETHER VIOXX WAS CAUSING THE HEART ATTACKS IN
2  THE VIGOR STUDY OR WHETHER NAPROXEN WAS PREVENTING THEM?
3  A.  WE WERE UNFORTUNATE IN THAT WE HAD AT THE TIME TWO LARGE
4  ONGOING STUDIES IN PATIENTS WITH ALZHEIMER'S DISEASE OR EARLY
5  ALZHEIMER'S DISEASE.  IT'S CALLED MILD COGNITIVE IMPAIRMENT,
6  WHERE WE WERE STUDYING VIOXX COMPARED WITH PLACEBO IN THESE
7  PATIENT POPULATIONS.  IT WAS ABOUT 2,000 PATIENTS.  AND SO THE
8  STUDIES WERE STILL ONGOING, BUT A DECISION WAS MADE TO
9  PARTIALLY UNBLIND THE DATA, TO UNBLIND SPECIFICALLY THE
10  CARDIOVASCULAR DATA.
11  Q.  BY "UNBLINDING," YOU MEAN --
12  A.  TO LOOK AT WHAT THE CARDIOVASCULAR DATA WERE.  AND THAT
13  DATA WAS VERY, VERY COMFORTING IN THAT IT SHOWED THERE WAS NO
14  DIFFERENCE BETWEEN VIOXX AND PLACEBO IN THE INCIDENTS OF
15  CARDIOVASCULAR EVENTS.  IN AN ELDERLY POPULATION, THE MEAN AGE
16  IN THE STUDY WAS 75.
17  Q.  WERE THE ALZHEIMER'S TRIALS THE MOST COMPREHENSIVE SET OF
18  DATA THAT YOU HAD ON HOW VIOXX DID WITH RESPECT TO
19  CARDIOVASCULAR EVENTS IN A PLACEBO GROUP --
20  A.  YES.
21  Q.  -- COMPARED WITH A PLACEBO GROUP?
22  A.  THAT'S CORRECT.
23  Q.  SO ONE OF THE THINGS THAT YOU DID -- I'LL PUT THIS MAGNET
24  ON.  TELL ME IF THIS IS RIGHT.  YOU REVIEWED CLINICAL TRIAL
25  DATA FROM THE OA AND ALZHEIMER'S TRIALS?

DAILY COPY

c809ffef-511f-4799-8e69-0b8f578e8533

M007D38917

## Page 2258

1 A. THAT'S CORRECT.
2 Q. SO NOW THAT YOU'VE REVIEWED THE RESULTS OF THE OA TRIALS
3 AND THE ALZHEIMER'S TRIALS, AND YOU DON'T SEE ANY SIGNAL OF A
4 CARDIOVASCULAR RISK, WHAT IS YOUR THOUGHT PROCESS THEN?
5 A. SO NOW WE'VE GOT THREE DATABASES. AND YOU'VE GOT VIGOR,
6 WHERE YOU SEE A HIGHER RATE ON VIOXX COMPARED WITH THE NSAID
7 NAPROXEN; YOU'VE GOT OA, WHERE THE RATE ON VIOXX IS SIMILAR TO
8 THE NSAIDS; YOU'VE GOT PLACEBO, WHERE THE RATE ON VIOXX IS THE
9 SAME, SIMILAR TO THE PLACEBO GROUP. SO IF VIOXX IS INCREASING
10 THE RATE OF EVENTS IN VIGOR, WE WOULD EXPECT TO SEE AN
11 INCREASED RATE OF EVENTS ON VIOXX VERSUS PLACEBO. AND WE DID
12 NOT, WHICH, AS I SAID, WAS VERY, VERY COMFORTING DATA.
13       SO NOW YOU'RE LEFT WITH TWO DATABASES WHERE YOU'RE
14 COMPARING VIOXX TO AN NSAID. AND IF IN VIGOR THE NSAID IS
15 REDUCING THE RATE OF EVENTS, THEN YOU'RE LEFT WITH ASKING THE
16 QUESTION WHY YOU DIDN'T SEE THE SAME THING IN THE OA DATABASE.
17 WHY DIDN'T WE SEE A DIFFERENCE BASED ON THE NSAID REDUCING THE
18 RATE DUE TO THE CARDIOPROTECTIVE EVENTS?
19 Q. IN OTHER WORDS -- LET ME INTERRUPT YOU A MINUTE -- IN THE
20 OA DATABASE, YOU HAD OTHER NSAIDS; RIGHT? WHAT WERE THOSE?
21 A. IBUPROFEN AND DICLOFENAC.
22 Q. SO YOU'RE ASKING IF NAPROXEN WAS REDUCING THE INCIDENTS OF
23 HEART ATTACKS IN VIGOR, WHY DIDN'T WE SEE DICLOFENAC AND
24 IBUPROFEN REDUCING HEART ATTACKS IN THE OA TRIALS?
25 A. CORRECT.

## Page 2259

1 Q. SO THEN WHAT DID YOU DO?
2 A. WELL, AROUND THIS TIME, I JUST -- I WAS IN DR. BARRY
3 GERTZ'S OFFICE. HE WAS AT THE TIME THE HEAD OF CLINICAL
4 PHARMACOLOGY, AND I WAS REVIEWING THE DATA WITH HIM AND, YOU
5 KNOW, TOLD HIM WHAT THE QUESTIONS THAT WERE STILL IN MY MIND.
6       AND HE -- WE BOTH KIND OF -- HE KIND OF HAD A AHA
7 MOMENT WHERE HE SAID, "ALISE, THIS DATA ACTUALLY PERFECT FITS
8 THE CLINICAL PHARMACOLOGY DATA THAT WE ALREADY HAVE ON THE
9 DRUG. WE'VE ALREADY SUBMITTED THIS DATA TO THE FDA." HE SAID,
10 "BECAUSE IN TERMS OF ITS EFFECTS ON PLATELET CLUMPING, ON
11 PLATELET AGGREGATION, NAPROXEN, WHEN TAKEN AT THE TYPE OF DOSE
12 YOU USED IN VIGOR, 500 MILLIGRAMS TWICE DAY, ACTUALLY INHIBITS
13 PLATELET CLUMPING TO THE SAME DEGREE ASPIRIN, WHEREAS IBUPROFEN
14 AND DICLOFENAC DO NOT."
15       IT'S ACCEPTED THAT, IN ORDER FOR AN AGENT TO ACT AS A
16 CARDIOPROTECTIVE AGENT, YOU HAVE TO INHIBIT COX-1.
17 Q. THE PLATELETS?
18 A. WELL, AND THEN IT INHIBITS PLATELET AGGREGATION BY AT
19 LEAST 95 PERCENT, AND THAT HAS TO BE MAINTAINED THROUGHOUT THE
20 HIGHER DOSING INTERVAL. SO YOU CAN'T HAVE IT GO UP AND DOWN
21 THROUGHOUT THE DAY. IT HAS GOT TO BE MAINTAINED. AND, IN
22 FACT, ASPIRIN DOES THAT --
23 Q. SO I WANT TO --
24 A. -- AND SO DOES NAPROXEN.
25 Q. WHEN YOU SAY "PHARMACOLOGY DATA," WHAT ARE YOU REFERRING

## Page 2260

1 TO THERE? WHAT IS PHARMACOLOGY, FIRST OF ALL?
2 A. THESE ARE STUDIES THAT ARE DONE TO LOOK AT WHAT A DRUG
3 DOES IN THE BODY, HOW IS IT ABSORBED INTO THE BODY, HOW IS IT
4 ELIMINATED FROM THE BODY, AND WHAT ARE THE ACTIONS THAT THE
5 DRUG HAS WHILE IT'S IN SOMEONE'S BODY?
6       SO THESE WERE STUDIES WHICH WERE DONE IN HUMANS,
7 WHERE PATIENTS WERE GIVEN THE DRUG, AND THEN WE LOOKED AT THE
8 EFFECTS OF THOSE DRUGS ON CERTAIN THINGS IN PATIENTS.
9 Q. WOULD YOU MIND STEPPING DOWN, DOCTOR?
10       MR. GOLDMAN: IS THAT OKAY, JUDGE?
11       THE COURT: YES.
12 BY MR. GOLDMAN:
13 Q. I'VE PUT UP A BOARD THAT COMES FROM AN ARTICLE, AND IT'S
14 ALSO CONTAINED IN ONE OF THE MINUTES TO YOUR PROJECT TEAM
15 MINUTES, AND IT'S CALLED "PLATELET INHIBITION OF NAPROXEN
16 VERSUS OTHER NSAIDS." CAN YOU EXPLAIN TO THE JURY WHAT THIS IS
17 AND WHY IT WAS SIGNIFICANT, IF AT ALL, TO YOU, BACK AT THE TIME
18 YOU WERE INTERPRETING THE VIGOR RESULTS?
19 A. THIS WAS A STUDY WHERE PATIENTS WERE -- THESE WERE
20 ACTUALLY SUBJECTS. THEY DIDN'T -- THEY WEREN'T SICK PATIENTS.
21 THEY CAME INTO THE STUDY AND THEY WERE DOSED WITH ONE OF THESE
22 THERAPIES FOR FIVE DAYS. AND THEN THEY CAME IN ON DAY SIX AT
23 THE TIME THAT THEY WOULD TAKE THEIR NEXT DOSE.
24       SO FOR VIOXX, IT WAS 24 HOURS AFTER THEY HAD TAKEN
25 THEIR LAST DOSE; FOR PATIENTS ON DICLOFENAC OR IBUPROFEN, IT

## Page 2261

1 WOULD HAVE BEEN EIGHT HOURS AFTER THEY HAD TAKEN THEIR LAST
2 DOSE; AND FOR PATIENTS ON NAPROXEN, IT WOULD HAVE BEEN 12 HOURS
3 AFTER THEY HAD TAKEN THEIR LAST DOSE.
4       SO -- AND WHAT WE ARE MEASURING HERE IS INHIBITION OF
5 CYCLOOXYGENASE-1.
6 Q. THAT'S COX-1?
7 A. THAT'S ON THIS AXIS. AND THEN ON THE HORIZONTAL AXIS,
8 IT'S SEVERAL TIME POINTS. SO AT BASELINE, THAT'S BEFORE
9 PATIENTS GET ANY STUDY DRUG. AND YOU CAN SEE EVERYBODY IS AT
10 ABOUT ZERO PERCENT INHIBITION OF COX-1. AND THEN THEY CAN'T
11 COME IN ON DAY SIX. THAT'S AFTER FIVE DAYS OF DOSING AND AT
12 ZERO HOURS. THAT'S RIGHT BEFORE THEY ARE SUPPOSED TAKE THEIR
13 NEXT DOSE. SO THEY STILL HAVE DRUG ON BOARD.
14       THEY DO A MEASUREMENT THERE FOR COX-1 INHIBITION, AND
15 THEN THEY DRAW -- THEY DOSE THEM, AND THEN THEY DRAW THEIR
16 BLOOD AGAIN AT TWO HOURS AFTER DOSING, FOUR HOURS AFTER DOSING,
17 AND EIGHT HOURS AFTER DOSING. AND YOU CAN, IN THE BLOOD,
18 MEASURE THE INHIBITION OF COX-1. AND WHAT YOU CAN SEE DOWN
19 HERE IS PLACEBO HAS A HEART. AND YOU SEE, OVER TIME, NO
20 INHIBITION OF COX-1. YOU CAN SEE VIOXX HERE IN THE TRIANGLES.
21 AND YOU CAN SEE THAT VIOXX ALSO HAS NO INHIBITION OF COX-1. IT
22 GOES ALONG WITH THE FACT THAT IT SELECTIVELY INHIBITS COX-2.
23 MELOXICAM --
24 Q. IS THAT MOBIC?
25 A. THAT'S MOBIC -- ALSO DOES NOT INHIBIT COX-1 IN THIS ASSAY.

11 (Pages 2258 to 2261)

DAILY COPY

c809ffef-511f-4799-8e69-0b8f578e8533

M007D38918

## Page 2262

1  DICLOFENAC, WHICH IS RIGHT OVER HERE, YOU CAN SEE AT ZERO HOURS
2  YOU GET ABOUT -- THIS IS ABOUT EIGHT HOURS AFTER THEY TOOK
3  DOSE, ABOUT 20 PERCENT INHIBITION OF COX-1 -- GETS UP TO ABOUT
4  40 OR 50 PERCENT, NEVER GETS UP TO 95 PERCENT INHIBITION, AND
5  THEN IT STARTS TO COME BACK DOWN.
6      AND IBUPROFEN -- THAT'S KNOWN AS ADVIL WHEN IT'S SOLD
7  OVER THE COUNTER -- YOU CAN SEE THAT A TROUGH -- THAT'S BEFORE
8  THEY TAKE THEIR NEXT DOSE, YOU ONLY GET ABOUT 50 PERCENT OF
9  INHIBITION OF COX-1. YOU DO GET UP TO 90 PERCENT BUT ONLY FOR
10  ABOUT TWO TO FOUR HOURS, BETWEEN TWO OR FOUR HOURS, AND THEN
11  YOU COME BACK DOWN. SO ALTHOUGH IBUPROFEN GETS UP TO 95
12  PERCENT INHIBITION, IT'S NOT MAINTAINED OVER THE WHOLE DOSING
13  INTERVAL.
14      ON THE OTHER HAND, HERE IS NAPROXEN, AND THE PATIENTS
15  HERE, REMEMBER, HAVEN'T TAKEN A NAPROXEN IN 12 HOURS: AND YET
16  WHEN THEY COME IN, THEY ARE STILL UP AT 95 PERCENT INHIBITION
17  OF COX-1, AND THAT'S MAINTAINED THROUGHOUT THE WHOLE DOSING
18  INTERVAL. AND SO IF YOU ACTUALLY TESTED THEM FOR THE WHOLE 24
19  HOURS, YOU WOULD ACTUALLY SEE IN THE NAPROXEN PATIENTS 95
20  INHIBITION OF CYCLOOXYGENASE-1.
21  Q.  THANK YOU, DOCTOR. AGAIN, HOW DID NAPROXEN'S INHIBITION
22  OF COX-1 IN THE NEIGHBORHOOD OF 95 PERCENT COMPARE TO ASPIRIN?
23  A.  THIS IS WHAT YOU WOULD SEE WITH ASPIRIN. THE DIFFERENCE
24  IS THAT, WITH ASPIRIN, YOU CAN ACTUALLY TAKE A DOSE AND EVEN
25  TWO OR THREE DAYS LATER SEE -- YOU CAN SEE 95 PERCENT

## Page 2263

1  INHIBITION OF COX-1.
2      WITH NAPROXEN, YOU HAVE TO TAKE 500 MILLIGRAMS TWICE
3  A DAY AND TAKE THAT CONTINUOUSLY IN ORDER TO SEE THE
4  INHIBITION.
5  Q.  IS THAT THE DOSE THAT WAS IN THE VIGOR STUDY?
6  A.  YES, IT WAS.
7  Q.  SO I'M GOING TO PUT ANOTHER MAGNET UP CALLED "REVIEW
8  PHARMACOLOGY DATA ON NAPROXEN." I PUT "SPRING OF 2000." IS
9  THAT A FAIR TIME FRAME?
10  A.  YES. IT WAS ALL WITHIN THE SAME COUPLE OF -- YOU KNOW,
11  COUPLE-OF-WEEK PERIOD.
12  Q.  DID YOU ALSO, DR. REICIN, LOOK AT THE MEDICAL LITERATURE
13  TO SEE IF THERE IS ANY EVIDENCE THAT NAPROXEN OR ANY OTHER
14  NSAIDS COULD PROVIDE CARDIOPROTECTION OR BE BENEFICIAL TO THE
15  HEART?
16  A.  YES, WE DID. SOME OF THAT LITERATURE I HAD HAD PREVIOUSLY
17  AND, AGAIN, DID OTHER SEARCHES THIS TIME AS WELL.
18  Q.  CAN YOU TURN, DOCTOR, TO DEFENSE EXHIBIT 548, AND I'LL
19  JUST MARK THIS FOR IDENTIFICATION PURPOSES ONLY. SO I PUT UP
20  ON THE SCREEN AN ARTICLE CALLED "EVALUATION OF FLURBIPROFEN"
21  WHAT IS THAT?
22  A.  FLURBIPROFEN IS ANOTHER NONSELECTIVE NSAID.
23  Q.  -- "FOR PREVENTION OF REINFARCTION AND REOCCLUSION." WHAT
24  DO THOSE TERMS MEAN?
25  A.  REINFARCTION MEANS ANOTHER HEART ATTACK. SO THESE WERE

## Page 2264

1  PATIENTS WHO WERE COMING IN WITH A HEART ATTACK. SO
2  REINFARCTION, ANOTHER HEART ATTACK.
3  Q.  "AFTER SUCCESSFUL" --
4  A.  AND REOCCLUSION MEANS THEIR ARTERY CLOGGED UP, RECLOGGED
5  UP.
6  Q.  "AFTER SUCCESSFUL THROMBOLYSIS"?
7  A.  THROMBOLYSIS. THAT MEANS LYSING THE CLOT OR BREAKING THE
8  CLOT APART WITH DRUGS.
9  Q.  "OR ANGIOPLASTY IN ACUTE MYOCARDIAL INFARCTION." WAS THIS
10  AN ARTICLE THAT YOU HAD SEEN BEFORE AND YOU HAD READ AGAIN
11  AFTER THE VIGOR RESULTS?
12  A.  YES.
13  Q.  CAN YOU EXPLAIN TO THE JURY WHAT THIS STUDY SHOWED AND WHY
14  IT WAS SIGNIFICANT TO YOU?
15  A.  PATIENTS WHO CAME INTO THE HOSPITAL AND WERE HAVING A
16  HEART ATTACK, OR ABOUT TO HAVE A HEART ATTACK, AND WERE GOING
17  TO REQUIRE THAT THEY TRIED TO ABORT THE HEART ATTACK BY OPENING
18  UP THE ARTERY WERE RANDOMIZED TO EITHER PLACEBO OR TO
19  FLURBIPROFEN. THIS NSAID. NOW, I HAVE TO -- AND THEY WERE NOT
20  GIVEN ASPIRIN. THIS STUDY COULD NEVER BE DONE AGAIN, BECAUSE
21  IT IS STANDARD OF CARE TO TREAT THESE PATIENTS WITH ASPIRIN.
22      BUT AT THAT POINT IN TIME, IT WAS NOT. THEY TOOK
23  THESE PATIENTS. THEY GAVE THEM EITHER A PLACEBO OR AN NSAID,
24  FLURBIPROFEN, AND THEN THEY FOLLOWED THEM FOR SIX MONTHS. AND
25  WHAT THEY FOUND WAS THAT THOSE PATIENTS ON FLURBIPROFEN, AN

## Page 2265

1  NSAID, YOU KNOW, VERY POTENT NSAID, HAD SIGNIFICANT REDUCTION
2  IN HEART ATTACKS OVER THAT SIX-MONTH PERIOD COMPARED WITH
3  PLACEBO. SO THE FLURBIPROFEN APPEARED TO BE PREVENTING HEART
4  ATTACKS.
5  Q.  IF YOU TURN, IF YOU WOULD JUST LOOK ON THE SCREEN TO TABLE
6  3 OF THIS ARTICLE, THE TABLE IS CALLED "TOTAL NUMBER OF EVENTS
7  AT SIX MONTHS," AND "PATIENTS FREE OF SYMPTOMS AT SIX MONTHS."
8  AND THEN THE FIRST ENTRY IS "REINFARCTION." IS THAT LIKE A
9  SECOND HEART ATTACK?
10  A.  CORRECT.
11  Q.  AND HOW MANY PATIENTS HAD A SECOND HEART ATTACK IN THIS
12  STUDY?
13  A.  ON FLURBIPROFEN, THERE WERE SEVEN PATIENTS WHO HAD A
14  SECOND HEART ATTACK; VERSUS PLACEBO, THERE WERE 24.
15  Q.  SO LET ME JUST MOVE THIS FOR A MINUTE. SO IF WE LOOK AT
16  THE RESULTS OF THE FLURBIPROFEN, F-L-U-R --
17  A.  F-L-U-R-B-I-P-R-O-F-E-N. I THINK THAT'S SOLD AS SOMETHING
18  CALLED ANSAID.
19  Q.  SO I THINK IN THIS STUDY, THERE WERE HOW MANY EVENTS OF
20  REINFARCTION IN FLURBIPROFEN, DID YOU SAY?
21  A.  SEVEN.
22  Q.  AND HOW MANY ON PLACEBO?
23  A.  24.
24  Q.  AND DOES THAT MEAN THAT THE PLACEBO WAS CAUSING MORE HEART
25  ATTACKS?

12 (Pages 2262 to 2265)

c809ffef-511f-4799-8e69-0b8f578e8533

Page 2266

1  A. YOU ASSUME, PLACEBO IS A SUGAR PILL, YOU ASSUME THAT THAT
2  IS NEUTRAL AND THAT THE FLURBIPROFEN IS REDUCING THE NUMBER OF
3  HEART ATTACKS.
4  Q. AND THEN IN THE VIGOR STUDY. HOW MANY HEART ATTACKS
5  OCCURRED IN THE NAPROXEN ARM?
6  A. IN THE FINAL ANALYSIS, THERE WERE FOUR.
7  Q. AND HOW MANY HEART ATTACKS OCCURRED IN THE VIOXX ARM?
8  A. IN THE FINAL ANALYSIS, THERE WERE 20.
9  Q. SO DOES THAT MEAN, JUST LOOKING AT VIOXX VERSUS NAPROXEN,
10 THAT VIOXX WAS CAUSING HEART ATTACKS?
11 A. WELL, AGAIN, JUST LOOKING AT VIGOR, WE COULDN'T SAY ONE
12 WAY OR THE OTHER. BUT WHEN WE LOOKED AT THE TOTALITY OF DATA,
13 LOOKED AT THE FACT THAT VIOXX DID NOT INCREASE THE RATE
14 COMPARED TO PLACEBO IN ALZHEIMER'S, DIDN'T INCREASE THE RATE
15 COMPARED TO THE NSAIDS IBUPROFEN AND DICLOFENAC, IT DIDN'T
16 MAXIMALLY INHIBIT PLATELET AGGREGATION, THE TOTALITY OF THE
17 DATA WAS MOST CONSISTENT WITH NAPROXEN DECREASING THE RATE IN A
18 MANNER SIMILAR TO WHAT FLURBIPROFEN HAD DONE IN THE STUDY THAT
19 WAS DONE WITH THE PATIENTS WHO WERE HAVING HEART ATTACKS.
20 Q. DID YOU ALSO REVIEW A STUDY ABOUT AN NSAID CALLED
21 INDOBUFEN?
22 A. THERE WERE ACTUALLY SEVERAL STUDIES THAT WE REVIEWED ON
23 INDOBUFEN. IT'S A BIT OF AN UNUSUAL NSAID. IT INHIBITS COX-1
24 VERY POTENTLY AND IS ACTUALLY SOLD IN A FEW COUNTRIES IN EUROPE
25 AS AN ANTI-PLATELET AGENT, AS A CARDIOPROTECTIVE AGENT.

Page 2267

1  Q. AND I'LL MARK FOR IDENTIFICATION PURPOSES ONLY DEFENSE
2  EXHIBIT 549, WHICH I WILL PUT UP. AND THIS IS AN ARTICLE CALLED
3  "INDOBUFEN IN THE PREVENTION OF THROMBOEMBOLIC COMPLICATIONS IN
4  PATIENTS WITH HEART DISEASE."
5      CAN YOU TELL THE JURY WHAT THIS STUDY SHOWED? DO YOU
6  REMEMBER THIS STUDY, DR. REICIN?
7  A. I DO REMEMBER THIS STUDY. I PROBABLY JUST HAVE TO REVIEW
8  IT QUICKLY.
9      THIS WAS ACTUALLY A STUDY THAT WAS LOOKING AT
10 PATIENTS WHO WERE AT RISK OF HAVING WHAT WE CALL "EMBOLIC
11 EVENTS." THEY HAD A DISEASE OF THE HEART CALLED ATRIAL
12 FIBRILLATION. YOU CAN ACTUALLY GET BLOOD CLOTS IN THE HEART,
13 AND THEN THOSE BLOOD CLOTS CAN BREAK OFF AND CAUSE HEART
14 ATTACKS.
15     OFTEN YOU WOULD PUT THOSE PATIENTS ON ASPIRIN OR
16 ACTUALLY OTHER EVEN STRONGER ANTI-PLATELET AGENTS, SUCH AS
17 WARFARIN, TO PREVENT THEIR BLOOD FROM CLOTTING. AND INSTEAD,
18 THEY PUT THESE PATIENTS ON INDOBUFEN, OR PLACEBO. THEY FOUND
19 THAT THOSE PATIENTS WHO WERE ON INDOBUFEN HAD A SIGNIFICANT
20 REDUCTION IN EMBOLIC EVENTS COMPARED WITH THOSE PATIENTS ON
21 PLACEBO.
22 Q. AND HERE IN THE ABSTRACT UNDER "RESULTS," IT REFERS TO A
23 REDUCTION OF 65 PERCENT IN THE RISK OF A PRIMARY EVENT. IS
24 THAT THE REDUCTION?
25 A. THAT'S CORRECT.

Page 2268

1  Q. YOU MENTIONED, DOCTOR, THAT ONE OF THE THINGS YOU DID
2  AFTER VIGOR CAME OUT WAS TO LOOK AT THE VIGOR STUDY ITSELF TO
3  SEE IF THERE WAS ANYTHING UNUSUAL ABOUT IT. DID YOU ALSO
4  ANALYZE INFORMATION ABOUT BLEEDING, WHETHER NAPROXEN CAUSED
5  MORE BLEEDING THAN VIOXX IN TERMS OF NOT GI BLEEDS BUT MINOR
6  BLEEDS.
7  A. YES, WE DID. ONE OF THE SIDE EFFECTS OF ASPIRIN IS YOU
8  CAN GET -- REMEMBER I SAID ASPIRIN PREVENTS PLATELETS FROM
9  CLUMPING. AND THERE IS A REASON THAT WE WANT OUR PLATELETS TO
10 CLUMP. IF YOU'RE SHAVING AND YOU NICK YOURSELF, YOU WANT THE
11 BLOOD TO STOP. AND PLATELETS ARE WHAT ARE INVOLVED WITH THAT.
12 SO PATIENTS WHO ARE ON ASPIRIN CAN HAVE AN INCREASE IN MINOR
13 BLEEDING EVENTS, SUCH AS NOSEBLEEDS, OR THEY BRUISE MORE
14 EASILY. SO WE LOOKED FOR NON-GI BLEEDING EVENTS IN THE VIGOR
15 STUDY AS WELL.
16 Q. WHAT DID YOU FIND?
17 A. WE FOUND THAT THE RATE OF THESE SMALLER BLEEDING EVENTS
18 WAS HIGHER ON THE NAPROXEN GROUP THAN IT WAS ON THE VIOXX
19 GROUP, WHICH WAS -- WOULD HAVE BEEN CONSISTENT WITH NAPROXEN
20 HAVING ANTI-PLATELET EFFECTS SIMILAR TO ASPIRIN.
21 Q. WE'RE GOING TO TALK ABOUT THE FDA ADVISORY COMMITTEE IN A
22 LITTLE WHILE, BUT DID YOU PREPARE OR PARTICIPATE IN A PROCESS
23 OF PREPARING MATERIALS FOR THE ADVISORY COMMITTEE TO REVIEW IN
24 FEBRUARY OF 2001?
25 A. YES. THE FDA CALLED A PUBLIC ADVISORY COMMITTEE TO REVIEW

Page 2269

1  THE VIGOR RESULTS, AND I PARTICIPATED IN THAT MEETING AND
2  PARTICIPATED IN PUTTING TOGETHER A BACKGROUND PACKAGE FOR THE
3  ADVISORS.
4  Q. IF YOU COULD TURN, DOCTOR. TO DEFENSE EXHIBIT 353, WHICH
5  IS THE BACKGROUND PACKAGE THAT MERCK SUBMITTED TO THE FDA.
6      MR. GOLDMAN: WHICH WE OFFER INTO EVIDENCE.
7      MR. ROBINSON: NO OBJECTION.
8      THE DEPUTY CLERK: WHAT WAS THAT NUMBER?
9      THE COURT: LET IT BE ADMITTED.
10     MR. GOLDMAN: 353.
11 BY MR. GOLDMAN:
12 Q. I WANT TO JUST DIRECT YOUR ATTENTION TO ONE PAGE IN THIS
13 SUBMISSION, DOCTOR, AND IT'S ON PAGE 811. I CULLED IT OUT ON
14 THE SCREEN, IF THAT'S EASIER. AND HERE YOU'RE TALKING ABOUT
15 ADDITIONAL EVIDENCE FOR ANTI-PLATELET EFFECTS OF NAPROXEN IN
16 VIGOR.
17     SO TO BACK UP. ARE YOU EXPLAINING THE VIGOR STUDY
18 HERE TO THE ADVISORY COMMITTEE?
19 A. WE HAD -- WE HAD PRESENTED THE DATA FROM THE VIGOR STUDY.
20 THE GI DATA, THE CARDIOVASCULAR DATA, AND HERE WE WERE
21 PRESENTING SOME OF THE ADDITIONAL ANALYSES, INCLUDING THOSE
22 ANALYSES OF THE NON-GI MINOR BLEEDING EVENTS.
23 Q. AND HERE IT SAYS, "IN VIGOR, NAPROXEN WAS ASSOCIATED WITH
24 A HIGHER INCIDENCE OF MINOR BLEEDING EVENTS RELATIVE TO VIOXX
25 2.7 VERSUS 1.9 PERCENT." AND THEN IT CONTINUES AND SAYS, "THE

13 (Pages 2266 to 2269)

DAILY COPY

c809ffef-511f-4799-8e69-0b8f578e8533

M007D38920

## Page 2270

1 LARGEST DIFFERENCES BETWEEN NAPROXEN AND VIOXX OCCURRED IN
2 THOSE EVENTS TYPICALLY ASSOCIATED WITH ANTI-PLATELET EFFECTS,
3 SUCH AS" -- HELP ME OUT.
4 A.  ECCHYMOSIS. IT'S JUST A FANCY TERM FOR BRUISING.
5 Q.  -- "AND" --
6 A.  EPISTAXIS, WHICH IS A MEDICAL TERM FOR NOSEBLEEDS.
7 Q.  SO WHAT SIGNIFICANCE TO YOU, IF ANY, DR. REICIN, WAS IT
8 THAT WHEN YOU SAW IN THE VIGOR TRIAL THAT WERE MORE MINOR
9 NOSEBLEEDS AND BRUISING IN THE NAPROXEN GROUP OF PEOPLE VERSUS
10 THE VIOXX GROUP OF PEOPLE?
11 A.  IT WAS ANOTHER -- IT WAS AN INDICATION IN THIS PATIENT
12 POPULATION THAT NAPROXEN WAS ACTING SIMILAR TO ASPIRIN.  AND IN
13 FACT, IF YOU -- WE WENT BACK AND LOOKED AT THE NAPROXEN LABEL,
14 AND IN THE NAPROXEN LABEL, IT SAYS THAT NAPROXEN CAN INCREASE
15 BLEEDING TIME, WHICH IS SOMETHING THAT YOU SEE IN THE ASPIRIN
16 LABEL.
17 Q.  DID MERCK ALSO TURN TO ITS CONSULTANTS, OUTSIDE
18 CONSULTANTS, TO DISCUSS THE VIGOR TRIAL AND SEE WHAT THEIR
19 INTERPRETATION OF THE RESULTS WAS?
20 A.  YES, EXTENSIVELY.
21 Q.  CAN YOU TELL THE JURY A LITTLE BIT ABOUT WHEN THOSE
22 MEETINGS WERE AND GENERALLY WHAT TYPE OF MEETINGS MERCK HELD IN
23 THE YEAR 2000 TO DISCUSS THE VIGOR TRIAL?
24 A.  WELL, WITHIN THE FIRST TWO WEEKS, OBVIOUSLY WE SHARED THE
25 RESULTS WITH THE STEERING COMMITTEE.  THAT'S THE OUTSIDE GROUP

## Page 2271

1 OF EXPERTS WHO WERE THE AUTHORS ON THE PAPER, HAD HELPED DESIGN
2 THE STUDY, HAD OVERSEEN THE CONDUCT OF THE STUDY.  SO WE SHOWED
3 ALL OF THEM THE RESULTS.
4       WE ALSO, IN THOSE FIRST FEW WEEKS, MET WITH SEVERAL
5 CONSULTANTS, WHO WERE KIND OF EXPERTS IN THE FIELD OF
6 PROSTAGLANDIN BIOLOGY, PEOPLE SUCH AS DR. FITZGERALD AND
7 DR. CARLO PATRONO, DR. JOHN OATES.
8       AND THEN OVER THE SUMMER AND EARLY FALL -- MAYBE IT
9 WAS EARLY FALL -- WE HAD A SERIES OF CONSULTANT MEETINGS.  WE
10 HAD ONE CONSULTANT MEETING WHERE WE BROUGHT IN A GROUP OF
11 WELL-KNOWN CARDIOLOGISTS; ANOTHER ONE WHERE WE BROUGHT IN SOME
12 OF THE SAME PROSTAGLANDIN EXPERTS AND SOME ADDITIONAL -- AN
13 ADDITIONAL ONE AS WELL; AND THEN A THIRD MEETING THAT HAD
14 RHEUMATOLOGISTS AND EPIDEMIOLOGISTS.
15 Q.  AND AT THESE MEETINGS -- DID YOU ATTEND THESE MEETINGS,
16 DOCTOR?
17 A.  I ATTENDED ALL OF THEM.
18 Q.  AT ANY OF THESE --
19 A.  ACTUALLY, THERE WAS ONE OTHER ONE.  MERCK HAS A BOARD OF
20 SCIENTIFIC ADVISORS.  THEY LOOK AT ALL OF OUR SCIENCE. I WAS
21 NOT AT THAT MEETING.  ALAN NIES PRESENTED AT THAT MEETING.
22 Q.  DR. REICIN, IN ANY OF THE MEETINGS THAT YOU HAD WITH THESE
23 OUTSIDE CONSULTANTS THROUGHOUT 2000, DID ANY OUTSIDE CONSULTANT
24 EVER SUGGEST TO YOU THAT, BASED ON THE VIGOR RESULTS, MERCK
25 OUGHT TO WITHDRAW VIOXX FROM THE MARKET?

## Page 2272

1 A.  OH, ABSOLUTELY NOT.
2 Q.  DID ANY OF YOUR CONSULTANTS SAY TO YOU THAT MERCK SHOULD
3 HAVE A BLACK-BOX WARNING IN THE LABEL ABOUT CARDIOVASCULAR
4 EVENTS?
5 A.  NO, ABSOLUTELY NOT.
6 Q.  WHAT WAS YOUR SENSE ABOUT THE MAJORITY VIEW OR THE -- I'M
7 SURE THERE WASN'T A CONSENSUS AND EVERYBODY AGREED ACROSS THE
8 BOARD, BUT WHAT WAS THE MAJORITY VIEW ABOUT WHAT THE REASON WAS
9 FOR THE DIFFERENCE IN HEART ATTACKS IN THE VIGOR TRIAL?
10 A.  I THINK THE MAJORITY VIEW WAS THAT THE TOTALITY OF DATA --
11 BECAUSE IT REALLY IS A WHOLE SERIES OF DATA POINTS, NOT JUST
12 ONE -- THAT THE TOTALITY OF DATA WAS MOST CONSISTENT WITH
13 NAPROXEN ACTING AS A CARDIOPROTECTIVE AGENT IN THE VIGOR STUDY.
14 THERE WERE OTHER HYPOTHESES THAT WERE RAISED, HOWEVER, AS WELL.
15 Q.  DO YOU REMEMBER -- LET ME ASK YOU YOUR VIEW.  WHAT DID
16 YOU, DR. REICIN, FEEL AFTER YOU REVIEWED ALL THE DATA, THE
17 TOTALITY OF THE DATA THAT WE JUST TALKED ABOUT, THE OA TRIAL,
18 THE ALZHEIMER'S TRIALS, THE STUDIES THAT YOU LOOKED AT, THE
19 PLATELET INHIBITION FOR NAPROXEN, THE BLEEDING RESULTS THAT WE
20 SAW IN VIGOR. WHAT DID YOU THINK BACK THEN, BASED ON THE DATA
21 THAT YOU HAD REVIEWED, ABOUT WHAT WAS CAUSING THE DIFFERENCE IN
22 HEART ATTACKS IN THE VIGOR TRIAL?
23 A.  I THOUGHT IT WAS MOST CONSISTENT WITH NAPROXEN HAVING A
24 CARDIOPROTECTIVE EFFECT.  IF VIOXX WAS CAUSING HEART ATTACKS, I
25 THOUGHT YOU WOULD HAVE SEEN AN INCREASED RISK IN THE

## Page 2273

1 ALZHEIMER'S STUDIES AND YOU WOULD HAVE SEEN AN INCREASED RISK
2 IN THE OSTEOARTHRITIS STUDIES.  AND WE DIDN'T SEE THAT.
3 Q.  THE JURY MAY RECALL SEEING AN E-MAIL -- AND MR. ROBINSON
4 REFERRED TO IT IN HIS OPENING STATEMENT -- FROM DR. SCOLNICK,
5 MARCH 9 OF 2000.  AND I'LL PULL IT UP.  IT'S ADMITTED ALREADY
6 AS P1.132.
7       THE COURT:  AFTER THIS, COUNSEL, LET'S TAKE A BREAK
8 WHEN WE GET TO A POINT.
9       MR. GOLDMAN:  DO YOU WANT TO DO IT NOW, JUDGE?
10       THE COURT:  WHENEVER YOU WANT.
11       MR. GOLDMAN:  LET'S FINISH THIS E-MAIL AND WE'LL TAKE
12 A BREAK.
13 BY MR. GOLDMAN:
14 Q.  THIS IS AN E-MAIL FROM DR. SCOLNICK TO YOU AND OTHERS,
15 MARCH 9, 2000, AND THE SUBJECT IS VIGOR.  AND HE SAYS A NUMBER
16 OF THINGS IN THE E-MAIL.  I THINK THE THINGS THAT MR. ROBINSON
17 POINTED OUT IN OPENING STATEMENT HAD TO DO WITH THE CV EVENTS
18 ARE CLEARLY THERE.  DO YOU SEE THAT HERE?
19 A.  YES, I DO.
20 Q.  AND THEN FURTHER DOWN: "IT IS A SHAME, BUT IT IS A LOW
21 INCIDENCE AND IT IS MECHANISM-BASED. AS WE WORRIED IT WAS."
22 AND THERE IS MORE TO THE E-MAIL.  BUT I WANT TO ASK YOU ABOUT
23 THOSE PARTICULAR SECTIONS FOR NOW.
24       DID YOU UNDERSTAND THAT, ON MARCH 9 OF 2000,
25 DR. SCOLNICK WAS CONCERNED THAT WHAT HE WAS SEEING IN THE VIGOR

DAILY COPY

c809ffef-511f-4799-8e69-0b8f578e8533

M007D38921

# EXHIBIT 17

CAUSE NO.  D-1-GV-05-003021

THE STATE OF TEXAS ) IN THE DISTRICT COURT
     Plaintiff,  )
  VS.          ) TRAVIS COUNTY, TEXAS
              )
MERCK & CO., INC.  )
     Defendant.  )345th JUDICIAL DISTRICT


* * * * * * * * * * * * * * * * * * * * *

ORAL VIDEOTAPED DEPOSITION OF

DOUGLAS WATSON, Ph.D.

NOVEMBER 13, 2009

* * * * * * * * * * * * * * * * * * * * *


ORAL VIDEOTAPED DEPOSITION OF DOUGLAS

WATSON, Ph.D., produced as a witness at the

instance of the Plaintiff and duly sworn,

was taken in the above-styled and numbered

cause on the 13th day of November, 2009,

from 9:29 a.m. to 6:04 p.m., before Michelle

L. Gray, RPR, CSR, in and for the State of

Pennsylvania, reported by machine shorthand,

at the offices of Dechert, LLP, One Cira

Center, Philadelphia, Pennsylvania, pursuant

to the Texas Rules of Civil Procedure and

the provisions stated on the record or

attached herein.

M00EF90989

214

1  difference?
2      So power is something that you
3  think about in advance of having
4  knowledge of those things.  Once you've
5  done a comparison and seen a statistical
6  significant difference, it's a moot point
7  as to whether the power was sufficient in
8  advance or not.  You know, you've already
9  demonstrated a statistically significant
10  difference.  And so power is no longer a
11  relevant consideration.
12  BY MS. KENNEDY:
13      Q.    Is there a, in the field of
14  epidemiology, a standard with respect to how
15  many patients, how much power, you would need
16  to conduct a study of whether or not a drug
17  has prothrombotic properties?
18          MS. JONES:  Object to the form.
19          THE WITNESS:  It's designed --
20  making determinations about study power
21  is one that's, you know, done on a
22  case-by-case basis.  And it depends on a
23  number of factors.  And typically I've
24  seen studies be powered anywhere from
25  80 percent, what they call 80 percent

215

1  power, up to 95, even greater power.
2      And it really just sort of
3  depends on the study and the situation,
4  the amount of resources one has, what the
5  implications for that level of power
6  on the study size and your ability to
7  conduct the study, how certain you want
8  to be about the results, et cetera.
9  BY MS. KENNEDY:
10      Q.    Did Merck have enough
11  information from the VIGOR study to draw
12  conclusions about the effects of Naproxen?
13          MS. JONES:  Object to the form.
14          THE WITNESS:  By -- I'm sorry.
15  By "enough information," you mean what?
16  BY MS. KENNEDY:
17      Q.    Well, you are aware that Merck
18  drew some conclusions regarding the effects of
19  Naproxen after the VIGOR study, are you not?
20      A.    With respect --
21          MS. JONES:  Object to the form.
22          THE WITNESS:  I am, with
23  respect to the cardiovascular results,
24  yes.
25  BY MS. KENNEDY:

216

1      Q.    Okay.  And one of the
2  conclusions that Merck drew from the VIGOR
3  study was that Naproxen reduced the risk for
4  cardiovascular thrombotic events?
5          MS. JONES:  Object to the form.
6          THE WITNESS:  Well, we drew
7  that conclusion based upon the results of
8  the VIGOR study, and also based upon the
9  results of other analyses that we did and
10  other pieces of information that we --
11  that we had and were able to obtain.
12  BY MS. KENNEDY:
13      Q.    Is it your opinion that, if you
14  take the VIGOR study alone, that that is
15  enough information to draw a conclusion
16  regarding cardioprotective effects of Vigor --
17  I mean Naproxen?
18          MS. JONES:  Object to the form.
19          THE WITNESS:  Just the VIGOR
20  study by itself, no, I don't think you
21  could conclude that.  I think you need
22  other information.
23  BY MS. KENNEDY:
24      Q.    Can you explain the results of
25  VIGOR in terms of the disparity in

217

1  cardiovascular adverse events on the Vioxx
2  arm, on the one hand, and the Naproxen arm on
3  the study on the other hand?  Can that be
4  explained by a cardioprotective effect of
5  Naproxen?
6      A.    Yes, it could be.
7      Q.    Can it be explained 100 percent?
8          MS. JONES:  Object to the form.
9          THE WITNESS:  Well, I -- I'm
10  not sure whether you can ever explain
11  anything -- you mean with 100 percent
12  certainty?
13  BY MS. KENNEDY:
14      Q.    Actually, that was a bad
15  question.
16      A.    Is that what you mean?
17      Q.    Let me rephrase it.
18          The conclusion -- one of the
19  conclusions that was being drawn from the
20  VIGOR study was that Naproxen was providing a
21  cardioprotective effect for the folks that
22  were taking Naproxen in that study; is that
23  right?
24          MS. JONES:  Object to form.
25          THE WITNESS:  Yes, that's

MODEF91043

250

1  We did not combine men and women.
2      Q.     Did you account for obesity?
3      A.     No, we did not.
4      Q.     Was this particular study
5  presented to any other journals before it was
6  published in the Journal of Rheumatology?
7      A.     I'm sorry, I don't recall.
8      Q.     You can set that aside, please,
9  Doctor.
10             The second study that you did
11  with respect to the General Practice Research
12  Database had to do with the lower risk of
13  thromboembolic cardiovascular events with
14  Naproxen among patients with RA; is that
15  right?
16      A.     Yes.
17             (Document marked for
18      identification as Exhibit 915.)
19  BY MS. KENNEDY:
20      Q.     And I've marked Exhibit 915 and
21  I'll ask you if that's the paper that resulted
22  from your study?
23      A.     Yes, it is.
24      Q.     And this indicates that it's a
25  case-controlled study.  What's the difference

251

1  between that and a cohort study?
2      A.     In a cohort study you collect a
3  group of patients according to certain
4  criteria.  And then you follow them over time
5  to see if they have the outcomes of interest
6  or not and relate that to any -- to whatever
7  the exposure is you are interested in.
8             In a case-controlled study you
9  start out by identifying just the cases.  And
10  then you select some controls.  And then in
11  both groups you look back in time to see if
12  they had an exposure prior to the diagnosis.
13      Q.     An exposure to Naproxen prior to
14  the diagnosis?
15      A.     Correct.
16      Q.     Okay.  When you do a
17  case-controlled study, are you looking at a
18  particular disease or diagnosis rather than
19  trying to compare two different populations?
20      A.     Yes.  Typically -- well,
21  typically, you are interested in looking at
22  some factor that -- that is related to the --
23  your case definition, whatever that is.
24      Q.     And in this -- in this paper,
25  you identified 809 cases that met your

252

1  criterion for inclusion -- criteria?
2      A.     Yes.  We identified -- out of a
3  larger population of patients with rheumatoid
4  arthritis, we looked to see how many of them
5  had had an MI during the study period or a
6  thrombotic cardiovascular event during the
7  study period.  And we found 809 such patients.
8      Q.     Are your conclusions based on
9  those 809 cases?
10      A.     Well, they are based on the
11  comparison between those 809 cases and the
12  controls that we selected for those cases.
13      Q.     And did you have to do anything
14  to adjust for the different populations from
15  which these -- these cases and those controls
16  came?
17      A.     We adjusted for a large variety
18  of factors.  The cases and controls all came
19  from the same population, from the original
20  17,000 or so rheumatoid arthritis patients
21  that met the criteria for initial
22  consideration.
23      Q.     And those 17-or-so-thousand RA
24  patients -- actually, 16,937; is that right,
25  if you look under results on the very first

1  page?  I'm just making sure I'm with you,
2  Doctor.
3      A.     Yes.
4      Q.     From those, you excluded folks
5  who had a variety of conditions, and those are
6  discussed under your subjects and methods on
7  the next page; is that right?
8      A.     Well, if you look at Table 1, it
9  gives you an idea of what we did.  We -- we
10  looked in the entire GPRD database, which is
11  millions of patients, over a specified period
12  of time to find people who had a diagnosis of
13  rheumatoid arthritis.
14             Then we applied exclusion
15  criteria listed there, age, prior event, other
16  medical exclusions, use of certain types of
17  anticoagulant drugs, et cetera.  And what we
18  ended up with was 16,937 patients.
19             We then looked amongst them to
20  see how many of them had one of the events
21  that we were looking for.  And they made up
22  the 809 cases.
23      Q.     Okay.
24      A.     We then -- we then selected
25  controls for those cases.  And we ended up

M00EF91052

254

1  with 2,285 controls.  So the analysis included
2  those 809 cases plus the 2,285 controls.
3      Q.     Was the result that you reached,
4  that current Naproxen use was associated with
5  -- well, let me back up.
6          Based on the analysis that you
7  just described, with those 809 cases, what was
8  the conclusion that you reached in your paper?
9      A.     The primary conclusion was that
10  when looking at all thromboembolic events, as
11  we had defined them, people who were exposed
12  to Naproxen were about 40 percent less likely
13  to have had one of those thromboembolic events
14  than people who were not.
15          And by -- when I say "exposed,"
16  I mean having had a prescription for Naproxen
17  within the past 30 days.
18      Q.     And when you say approximately
19  40 percent less likely, you are basing that on
20  the .61 odds ratio?
21      A.     Yes.  In Table 3.
22      Q.     Okay.  And you found that rate
23  to be statistically significant?
24      A.     Yes.
25      Q.     And that would include men and

255

1  women, and -- of various ages -- all of that
2  would be included in your .61 --
3          MS. JONES:  Object to the form.
4  BY MS. KENNEDY:
5      Q.     -- odds ratio; is that right?
6      A.     That would include all cases and
7  all controls.  And it's an adjusted estimate,
8  which means that it's adjusted for potential
9  confounders that were considered in the
10  analysis and that were found to contribute
11  significantly to the model that estimated the
12  effect.
13      Q.     And is that appropriate, to use
14  these various different cases and adjust those
15  confounding conditions?
16          MS. JONES:  Object to the form.
17          THE WITNESS:  Yeah, that's
18  standard accepted practice in
19  epidemiological studies.  That's how you
20  conduct case control analysis, using
21  logistic regression modeling.
22  BY MS. KENNEDY:
23      Q.     Using what?
24      A.     Logistic regression modeling.
25      Q.     And is it accepted in

256

1  epidemiological practice to use a disparate
2  population from which to draw your cases?
3          MS. JONES:  Object to the form.
4          THE WITNESS:  I wouldn't
5  characterize this population as
6  disparate.  They -- they all had
7  rheumatoid arthritis.  And we excluded a
8  number of people with various factors
9  that we think might complicate the
10  interpretation.  And so we ended up with
11  a pretty homogenous group, actually.
12          And then for those factors that
13  still varied amongst patients, like age
14  and gender, we adjusted with commonly
15  accepted statistical methods.
16  BY MS. KENNEDY:
17      Q.     So you can take a population and
18  adjust for age and other confounding
19  conditions, and compare those populations in a
20  valid epidemiological analysis?
21      A.     Yes, you can.
22          (Document marked for
23  identification as Exhibit 916.)
24  BY MS. KENNEDY:
25      Q.     Let me hand you what I'm going

257

1  to mark as Exhibit 916, Doctor.  And I believe
2  this is a draft of the paper we were just
3  discussing; is that correct?
4      A.     Yes.
5      Q.     Have you seen this before today?
6      A.     Yes.
7      Q.     Okay.  Is any of this
8  handwriting yours?
9      A.     Yes.
10      Q.     On the front page, is that your
11  handwriting?
12      A.     Yes.
13      Q.     And then contained within the
14  document, like on Page 2, for example, where
15  you inserted "use," the word "use," is that
16  your handwriting?
17      A.     Yes.
18      Q.     Whose handwriting is it at the
19  top of the page on the page ending 298?
20      A.     That's Harry Guess' handwriting.
21      Q.     And, again, his handwriting on
22  page ending in 00 just a few more pages in?
23      A.     Yes, on the bottom right.
24      Q.     And his comment on this page to
25  your paper is:  "That may not go over well

M0DEF91053

# EXHIBIT 18

Page 247

1          IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

2                        AT INDEPENDENCE

3

4     MARY PLUBELL and TED IVEY,

5     on behalf of themselves and

6     all others similarly situated,

7                              Plaintiffs,

8

9          vs.                        No. 04 CV 235817-01

10    MERCK & CO., INC.,

11                             Defendant.

12

13

14

15

16

17    VIDEO CORPORATE DESIGNEE DEPOSITION OF DR. DOUGLAS WATSON

18                           VOLUME II

19             Taken on behalf of the Plaintiffs

20                        June 8, 2011

21                     Saundra Tippins, CCR

22

23             (The deposition began at 8:33 a.m.)

24

25

Page 445

1          A     With regard to cardiovascular event rates.

2          Q     Well, what I'm asking you, though, is Merck

3    may have had a different interpretation of the results, but

4    Dr. Ray and the others who authored it concluded that there

5    was an absence of protective effect of naproxen or other

6    NSAID's on the risk of coronary heart disease, correct?

7          A     That's his conclusion.  My interpretation of

8    the -- of what's written there is that that's in comparison

9    with patients who don't use NSAID's.

10         Q     And again, I'm not asking for your

11   interpretation.  I'm asking you to confirm that one of the

12   conclusions set forth in this article was the absence of a

13   protective effect of naproxen or other NSAID's on the risk

14   of coronary heart disease, correct?

15         A     Yes.  That was their interpretation.  There

16   were other similar studies in which there were protective

17   effects of naproxen shown.

18         Q     Again, doctor, if you would, if you'd just

19   answer my question, we can get this deposition done.

20         The conclusion that was drawn by Dr. Ray and the

21   other doctors who authored this article was that there was

22   an absence of protective effect of naproxen or other

23   NSAID's on the risk of coronary heart disease, correct?

24         A     That was his conclusion regarding the primary

25   analysis of the study.

Page 449

1   that I've showed you, it refers to an editorial that

2   Dr. Vane had published in Science; is that correct?

3           A    Yes.   That's what it says on the subject line.

4           Q    Do you remember being made aware of this --

5   this article?

6           A    I don't specifically recall it, although I'm

7   sure I read it because I read everything that was published

8   in this subject area.

9           Q    Now, if you would, in the email prepared by

10  Alan Nies to John Oates, in the second to last paragraph he

11  States, In terms of the possibility that naproxen may offer

12  cardio-protection based on its potent antiplatelet effects,

13  he refers to Ray, et al. 395:118, for failure to detect a

14  reduction in MI among naproxen users.  Did I read that

15  correctly?

16          A    Yes.

17          Q    And again, we had just looked at that.  That

18  was Ray's article in January of 2002, where he concluded

19  that there was an absence of a protective effect of

20  naproxen on the risk of coronary heart disease, correct?

21          A    Yes.  And Dr. Nies also refers to three

22  studies in the Archives of Internal Medicine that came out

23  shortly thereafter that were similar to Dr. Ray's and that

24  found that naproxen was in fact cardio-protective.

25          Q    And in those studies, did any of them indicate

Page 450

1    that naproxen had cardio-protective effect that would

2    reduce the risk of cardiovascular events by 50 percent?

3         A    I believe -- I believe some of them did.

4    There were a number of studies published over several

5    years, and the estimates of the effect, you know, varied

6    quite a bit, as it typically the case with epidemiologic

7    studies.

8         Q    Is it your testimony that you believe that the

9    studies that are referenced here, that one or more of them

10   indicated that naproxen had a cardio-protective effect to

11   the magnitude of reducing cardiovascular events by

12   50 percent?

13        A    Yes, I believe the study that we published

14   showed that.

15        Q    Well, and let's put the study, Dr. Watson,

16   that Merck published, and let's put that one aside.  Are

17   you -- were you aware of any other study, a non-Merck

18   study, that indicated that the cardio-protective effect of

19   naproxen could reduce cardiovascular risks by 50 percent?

20        A    I don't recall the results of all the various

21   studies.  It's important to remember that every estimate of

22   reduction in percent of events also has some variability

23   around it, usually expressed as a confidence interval, and

24   so, you know, when you interpret the results, you don't

25   just look simply at the -- at the point estimate or the

Page 451

1    50 percent or 40 percent or whatever the number that came

2    out of the analysis was, but you also consider the

3    confidence interval which tells you what the true range

4    might be if you were to repeat the study a number of times.

5              And so, you know, in small studies you might see a

6    very large effect, but you may also have a wide confidence

7    interval that, you know, shows that the effect could be

8    different from that.  So without looking at all the

9    specific studies, I can't, you know, directly answer your

10   question.

11              MR. STUEVE:  I move to strike the answer

12   as nonresponsive.

13        Q    (By Mr. Stueve) In this paragraph it states,

14   in particular, the recent studies in the Archives of

15   Internal Medicine.  Which particular studies was he

16   referring to there?

17        A    He's referring to the one that we did and the

18   one that was done by Dr. Solomon from Harvard and the one

19   that was done by Dr. Rahme from Canada.

20        Q    And Dr. Solomon's study did not reflect that

21   naproxen had a cardio-protective effect that would reduce

22   CV's by 50 percent, correct?

23        A    I don't recall the point estimate or the

24   confidence interval for that study.

25        Q    And Dr. Rahme's study did not indicate that

# EXHIBIT 19

DOUGLAS WATSON  7/27/2011

Page 460

1        IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

                      AT INDEPENDENCE

2                        - - -

3   MARY PLUBELL and TED IVEY,

    on behalf of themselves and

4   all others similarly situated,

5                           Plaintiffs,

6           vs.                      NO. 04 CV 235817-01

7   MERCK & CO., INC.,

                      Defendant.

8

9

10

11

12

13

14

15

16

17           VIDEO CORPORATE DESIGNEE DEPOSITION

18               OF DR. DOUGLAS WATSON

19                    VOLUME III

20         Taken on behalf of the Plaintiffs

21                 July 27, 2011

22           Maureen E. Broderick, RPR

23

24         (The deposition began at 8:56 a.m.)

25

Page 487

1           Vioxx was that it was similar to placebo and
2           similar to the NSAIDs that we had compared it
3           with except for naproxen.
4                MR. STUEVE:  Move to strike the answer as
5           nonresponsive.
6      BY MR. STUEVE:
7           Q    Prior to APPROVe, what is Merck's position
8      as to what information it had in its possession that
9      showed that Vioxx had an increased risk of
10     cardiovascular events?
11               MR. SALES:  Objection; asked and answered.
12          He did answer that question.
13               You can answer it again.
14               THE WITNESS:  I mean, that was the
15          information we had.  I'm not -- I don't
16          understand what was not adequate about my
17          answer.
18     BY MR. STUEVE:
19          Q    Was there any information in Merck's
20     possession prior to the APPROVe results that showed
21     that Vioxx had an increased risk of cardiovascular
22     events?
23               MR. SALES:  Same objection.
24               You can answer it again.
25               THE WITNESS:  Well, again, in the VIGOR

DOUGLAS WATSON  7/27/2011

Page 488

1          study and in the meta analyses that we had

2          done, when we compared the rates of

3          cardiovascular events with Vioxx to what we saw

4          in patients that had received naproxen, we saw

5          a difference in which the rate was higher in

6          the Vioxx group.

7               However, when we looked at the rates in

8          the Vioxx groups when we compared them to other

9          NSAIDs and with placebo, the rates were not

10         different.

11              And so, therefore, our conclusion was that

12         the -- that it was naproxen that was causing

13         the difference where we saw one.

14     BY MR. STUEVE:

15         Q    That is not my question.

16              Prior to APPROVe, what information

17     did Merck have in its possession that showed that

18     Vioxx had an increased risk of cardiovascular

19     events?  I'm going to ask it one more time.

20              MR. SALES:  Objection; asked and answered.

21              You can answer it again.

22              THE WITNESS:  I'm sorry.  I don't have

23         anything to add to my previous answers.

24     BY MR. STUEVE:

25         Q    You need to answer my question, sir.

Page 535

```
 1        Q     Why don't we do that.  From the time of
 2   publication of the study that you performed and
 3   authored, which was after the VIGOR results, are you
 4   aware of any study that directly addressed and
 5   showed that the fivefold increase in heart attacks
 6   in the VIGOR study could be explained by the alleged
 7   cardio-protective effect of naproxen?
 8        A     Well, I'm struggling with the -- your
 9   statement "that directly addressed the fivefold
10   difference in the VIGOR study," et cetera.
11               So I mean, again, the best I can
12   answer the question is that there were studies done
13   by ourselves and others to look at the effects of
14   naproxen on cardiovascular events.
15               In some cases, those studies involved
16   Vioxx; in some cases they didn't.  I mean, whether
17   the intent of the authors of those studies was to,
18   quote, directly address the fivefold difference seen
19   in the VIGOR study, et cetera, et cetera, I don't
20   know.  You know, it wasn't written in the paper that
21   way, but it possibly could have been.
22               There was obviously a lot of interest
23   around this time frame as to what were the effects
24   of NSAIDs on cardiovascular events, because the
25   results of VIGOR opened a huge scientific debate in
```

Page 536

```
 1   an area in which there was very little information
 2   previously.  So there was lots of interest in this
 3   question.
 4              MR. STUEVE:  Move to strike the answer as
 5         nonresponsive.
 6   BY MR. STUEVE:
 7      Q    Is it fair to say that you're not aware of
 8   any published study that directly addressed the
 9   fivefold increase in heart attacks and concluded
10   that that difference could be or should be
11   attributable entirely to naproxen; you're not aware
12   of any such study, correct?
13              MR. SALES:  Objection; misstates prior
14         testimony.  It was responsive.  It was asked
15         and answered.
16   BY MR. STUEVE:
17      Q    Go ahead and answer that question.
18              MR. SALES:  You can answer it again.
19              THE WITNESS:  I've answered the question
20         as best I can.  I'm sorry I can't do any better
21         than the way I've answered it.
22   BY MR. STUEVE:
23      Q    Well, I'm asking you to answer my
24   question, sir.
25      A    I did.
```

Page 581

```
 1              MR. STUEVE:  Objection; vague.
 2              THE WITNESS:  Yes, it did concern us.
 3    BY MR. SALES:
 4         Q    Plaintiffs' counsel asked you some
 5    questions about Dr. Ed Scolnich and showed you a
 6    couple of e-mails in which right after the results
 7    came out he said it was mechanistic based and he
 8    showed you an e-mail where he said he was in minor
 9    agony.
10              Do you remember those e-mails?
11         A    Yes, I do.
12         Q    First of all, who is Ed Scolnich?
13         A    At the time he was president of Merck
14    research labs.
15         Q    Where is Dr. Scolnich now?
16         A    I don't know where he is.  But he's
17    retired from the company.
18         Q    Do you have an understanding that Dr.
19    Scolnich was previously deposed in the Vioxx
20    litigation?
21         A    Yes, I understand that.
22         Q    What did Merck do after the VIGOR study
23    results came out to try to understand what those CV
24    results meant?
25         A    Well, we did a variety of things.  We
```

1    didn't know at first what exactly they meant and,

2    you know, we concentrated our efforts on whether

3    there was any evidence that Vioxx increased the risk

4    of cardiovascular events or that naproxen decreased

5    it.

6                    And so we -- first we looked within

7    the VIGOR study itself to see if -- well, let me

8    back up.

9                    So we looked at the naproxen labeling

10   which indicated that naproxen affects platelets, the

11   cells in the blood that promote clotting, and that

12   people taking naproxen could have increased bleeding

13   because their body is impaired.

14                   We seen that.  We looked at the rates

15   of bleeding events like nose bleeds and easy

16   bruising and stuff in the VIGOR study and saw that

17   there was an increase of those sorts of events in

18   the naproxen group, indicating that naproxen might

19   be affecting the clotting, preventing clotting in

20   that group.

21                   We conducted a study in which we

22   looked at the ability of naproxen to affect

23   platelets and bleeding time in healthy human

24   volunteers.  And we also looked at whatever other

25   Vioxx data we had, including the data from our

Page 583

1    Alzheimer studies in which Vioxx was being compared

2    to placebo to see if there was any indication of a

3    -- or a sugar pill to see if there was any

4    indication of an increased risk with Vioxx versus

5    sugar pill.

6         Q    Did you also go back and reexamine all the

7    other Vioxx clinical trials?

8         A    Yes, we did.  And we also looked in the

9    literature to see if there was evidence that other

10   NSAIDs might be able to prevent cardiovascular

11   events by inhibiting clotting, and noted that there

12   were was an instance of that with a drug that had

13   been demonstrated in 1994.

14        Q    After doing all that, were you, Merck and

15   Dr. Scolnich relieved?

16        A    Yes.  We --

17             MR. STUEVE:  Hold on.  Object to the form

18        of the question as compound, also calls for

19        speculation on the part of this witness as to

20        what Mr. Scolnich may have believed.

21             THE WITNESS:  Well, I personally was

22        relieved.  And I can say that other members of

23        the project team that I worked with felt

24        relieved that we understood what was going on

25        in the VIGOR study.

DOUGLAS WATSON  7/27/2011

Page 592

1    at the placebo control data from the Alzheimer's

2    program we also looked at all the data that we had

3    for Vioxx compared with active NSAID comparisons --

4    comparators in our clinical trials.

5                    And other than when studying -- when

6    comparing Vioxx to naproxen, we saw no difference in

7    cardiovascular events when patients treated with

8    Vioxx.

9        Q    What would you have expected if there was,

10   indeed, Vioxx causing heart attacks in the VIGOR

11   study, what would you have expected to see in the

12   other clinical trials Vioxx versus Advil or other

13   NSAIDs?

14       A    Well, I would have expected to see the

15   same thing there, and in particular in the placebo

16   control data.  And that's why I said that was one of

17   the most reassuring things to me was to see that in

18   the Alzheimer's studies there was no indication of

19   an increased risk or rate with Vioxx.

20       Q    So to be clear, while there was not -- and

21   you were asked a lot of questions about this -- not

22   a naproxen versus placebo existing clinical trial,

23   can you tell the jury whether there was sufficient

24   or substantial evidence in Merck's mind that

25   naproxen being cardio-protective was the best

Page 593

1   explanation for the CV results of the VIGOR study?
2          MR. STUEVE:  Object to the form of the
3       question.
4          THE WITNESS:  Yes.  I can say that based
5       on all that, all the information that we had,
6       including all the Vioxx data that we had, that
7       we felt very comfortable that naproxen was
8       the -- effects of naproxen was the best
9       explanation for the VIGOR study.
10  BY MR. SALES:
11      Q    You were asked about whether naproxen's
12  manufacturer advertised naproxen as
13  cardio-protective.  What did the manufacturer of
14  naproxen say in its label about whether naproxen had
15  the ability or the risk of increase in bleeding when
16  taking naproxen?
17      A    I don't recall the exact wording, but it
18  said something to the effect that patients may
19  experience prolonged bleeding from, you know, for
20  example, minor cuts or scrapes.
21      Q    What does that mean to you as a scientist
22  with regard to whether or not naproxen could be
23  cardio-protective?
24      A    Well, aspirin, which has been demonstrated
25  to be cardio-protective, acts by prolonging

DOUGLAS WATSON  7/27/2011

Page 594

1    bleeding, inhibiting platelets and prolonging

2    bleeding.  So it makes sense that if another drug

3    did the same thing, that there was the potential for

4    it to be cardio-protective as well.

5         Q    Earlier on in your deposition a long time

6    ago you were asked about a Dr. Michael Weinblatt who

7    served as chair of the Data Monitoring Safety Board

8    for the VIGOR study; is that correct?

9         A    Correct.

10        Q    Can you tell the jury what the Data

11   Monitoring Safety Board is?

12        A    It's -- I believe it's called the Data and

13   Safety Monitoring Board.  That's a Board of outside

14   experts, meaning people who are not Merck employees,

15   typically experts in clinical medicine and clinical

16   research, who examine the data in a blinded fashion

17   from ongoing clinical trials in order to sort of

18   monitor the progress of the trial and see if any

19   information is emerging that would cause one to want

20   to make any modifications to the trial or stop the

21   trial because of safety reasons or for overwhelming

22   benefit reasons, et cetera.

23                    (Exhibit Watson-2 was marked

24                     for identification.)

25   BY MR. SALES:

Page 599

```
 1    infarction by up to one-third as compared with the
 2    effects of rofecoxib.  In the VIGOR trial naproxen
 3    is compared with rofecoxib, was associated with
 4    implausibly large 80 percent with a 95 percent
 5    confidence interval, lower risk of myocardial
 6    infarction.  If naproxen does have a substantial
 7    anti-platelet effect, then the lower end of this
 8    confidence interval is not too dissimilar to the
 9    upper end of the confidence interval for the effects
10    of aspirin in a low risk setting.
11                    Did I read that correctly?
12         A    Yes, you did.
13         Q    So what did Dr. Patrono say in 2003 as
14    opposed to the information shown to you by
15    plaintiffs' counsel with regard to whether naproxen
16    is acting cardio-protective?
17              MR. STUEVE:  I'm going to object to the
18         question as vague and ambiguous, also the
19         document speaks for itself.
20              THE WITNESS:  Well, Dr. Patrono was saying
21         in 2003 that there was evidence that naproxen
22         had -- could have cardio-protective effects.
23         There was evidence that other drugs in the same
24         class might also have that, and those effects
25         could be the explanation for the VIGOR finding.
```

Page 600

1    BY MR. SALES:

2        Q    Dr. Patrono's article, is that consistent

3    with the conclusion that Merck had reached?

4        A    Yes, that's entirely consistent with what

5    we had been saying for a couple years prior to this

6    publication.

7        Q    You were also asked about Dr. Garrett

8    Fitzgerald.  Did Dr. Fitzgerald write in the

9    scientific literature about the cardio-protection

10   effect of naproxen as well as his Fitzgerald

11   hypothesis?

12       A    Yes, he did.

13                    (Exhibit Watson-4 was marked

14                    for identification.)

15   BY MR. SALES:

16       Q    Dr. Watson, is Exhibit 4 to your

17   deposition an article written by Dr. Patrono,

18   Coller, Fitzgerald, Hirsh and Roth in Chest Magazine

19   in 2004?

20       A    Yes.

21       Q    Are you familiar with this article?

22       A    Yes, I am.

23       Q    I'll ask you to turn to the page that's

24   listed on the lower left-hand corner as 246S.

25       A    Okay.

# EXHIBIT 20

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX Products Liability Litigation | * | MDL No. 1657 |
| | * | |
| This Document Relates to: | * | SECTION L |
| | * | |
| All Government Actions | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | KNOWLES |
| ******************************************* | * | |

### RESPONSES AND OBJECTIONS OF MERCK & CO., INC.
### TO GOVERNMENT ACTION PLAINTIFFS' FIRST SET OF
### MASTER INTERROGATORIES

Merck & Co., Inc. ("Merck"), by and through its attorneys, responds and objects to the

Government Action Plaintiffs' First Set of Master Interrogatories to Defendant Merck (the

"Interrogatories") as follows:

### PRELIMINARY STATEMENT

By agreement of the parties,[1] Merck has previously responded to these Requests with

respect to the claims of the Louisiana Attorney General.  In addition, Merck incorporates herein

by reference its September 15, 2005 responses to the Plaintiffs' Steering Committee's First Set

of Interrogatories,[2] which Merck's counsel previously shared with counsel for the Government

---

[1] *See* June 19, 2009 email from Douglas Plymale to Brian Anderson and June 19, 2009 email from Dawn
Barrios to Brian Anderson.

[2] As well as Merck's Mar 01, 2006 Supplemental Responses to Plaintiffs' Steering Committee's First Set
of Interrogatories, and Oct 12, 2006 Second Supplemental Responses to Plaintiffs' Steering Committee's
First Set of Interrogatories.

records concerning sales of Vioxx to individual recipients.

## INTERROGATORY NO. 12:

**Identify each agreement and/or contract with Minnesota Multistate Contracting Alliance for Pharmacy (MMCAP) for VIOXX.**

## RESPONSE TO INTERROGATORY NO. 12:

Merck objects to this Interrogatory on the grounds that it seeks information that is not related to the claims or defenses of any party or to the subject matter involved in this action, nor reasonably calculated to lead to the discovery of admissible evidence, insofar as it is not limited to the relevant Government Programs.

Subject to and without waiving its objections, Merck states that it will produce responsive, non-objectionable information or documents in the form kept in the regular course of Merck's business.

## INTERROGATORY NO. 13:

**What was Merck's gross income earned from the sale of VIOXX, by calendar quarter and by Government Entity?**

## RESPONSE TO INTERROGATORY NO. 13:

Merck objects to this Interrogatory to the extent it is duplicative of Interrogatory No. 10 of Plaintiffs' Steering Committee's First Set of Interrogatories and therefore cumulative and unduly burdensome. Merck objects further to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to the term "gross income." Merck objects further to this Interrogatory on the grounds that it seeks information that is not related to the claims or defenses of any party or to the subject matter involved in this action, nor reasonably calculated to lead to the discovery of admissible evidence.

- 18 -

Subject to and without waiving its objections, Merck states that it does not maintain state-specific revenue information for Vioxx.

## INTERROGATORY NO. 14:

For each calendar quarter and National Drug Code for VIOXX, please state the WAC, AWP, AMP, and Best Price.

## RESPONSE TO INTERROGATORY NO. 14:

Subject to and without waiving its objections, Merck incorporates its response and objections to Interrogatory No. 42, *infra*. Further responding, Merck states that Best Price information for Vioxx, which is relevant to State Medicaid programs, is attached hereto as Appendix "B". Further responding, Merck states, on information and belief, that only Florida[4] had a Supplemental Rebate Agreement with respect to Vioxx. That rebate agreement was based on AMP for part of the relevant time period and WAC for the remainder of the relevant time period, and therefore AWP is not relevant to Florida Medicaid. Information regarding the AMP and WAC for Vioxx during the relevant time period the Florida Supplemental Rebate Agreement was in effect is attached hereto as Appendix "C.1."

## INTERROGATORY NO. 15:

Please state whether agents and representatives of Merck presented any written materials or other communications that mentioned VIOXX to Government Programs, including but not limited to Drug Utilization Review Board members and pharmacy staff, between 1999 and 2004 and, if so, identify all of the documents, records, and other materials given to them.

## RESPONSE TO INTERROGATORY NO. 15:

Merck objects to this Interrogatory on the ground that it is overly broad.

---

[4] As well as Louisiana.

- 19 -

987206v.1

M01340493O

re-produce previously-produced, Vioxx-related FACTS data (including call notes) and Merck

Profile Forms ("MPFs") associated with physicians who prescribed Vioxx in the states

represented by the Government Action Plaintiffs, and Merck refers Plaintiffs' counsel to such re-

produced data.

## INTERROGATORY NO. 23:

**Please state whether VIOXX Representatives of Merck ever used "The Cardiovascular Card" or quoted, and/or summarized the information on "The Cardiovascular Card" in the course of communicating with any of the persons listed in your Response to Interrogatory No. 18 or other Health Care Providers.  If so, please state separately for each such person, by Government Entity:**

      **a)**      **the date of each such communication;**

      **b)**      **the identity of the parties to the communication;**

      **c)**      **the substance of each such communication, and,**

      **d)**      **the identity of each and every document or record that discusses, records, and/or makes reference to these communications.**

## RESPONSE TO INTERROGATORY NO. 23:

Subject to and without waiving its objections, Merck states that it has conducted an

investigation to identify the Merck employees who had significant responsibility with respect to

the Government Entities and Merck is providing, attached hereto as Appendix "E" to these

responses, a list of those employees (including Government Affairs Executives, National

Account Executives, Customer Managers, Regional Business Directors, and Regional Medical

Directors) who held such positions during the relevant time frame and Merck states that it has

produced or will produce responsive, non-objectionable documents from the custodial files of

these individuals.

Further responding, Merck states that, pursuant to Pretrial Order No. 21, Merck has

previously produced responsive, non-objectionable case-specific information, to the extent it

987206v.1

M01340493B

exists, as part of its standard Field Activity Customer Tracking System ("FACTS") production

obligations in the MDL, including millions of Vioxx-related call notes. Merck states that it has

also produced an extract containing a national sample of hundreds of thousands of randomly-

selected Vioxx-related call notes from all fifty states and the District of Columbia.

In addition, subject to ongoing discussions with Plaintiffs' counsel, Merck has agreed to

re-produce previously-produced, Vioxx-related FACTS data (including call notes) and Merck

Profile Forms ("MPFs") associated with physicians who prescribed Vioxx in the states

represented by the Government Action Plaintiffs, and Merck refers Plaintiffs' counsel to such re-

produced data.

## INTERROGATORY NO. 24:

**Please state whether, with respect to each Government Entity, agents and employees of Merck developed a sales and marketing plan for the Government Entity and the Government Programs; and whether a marketing plan was specifically devised for any Government Entity or Government Program, or not, please describe Your efforts to promote, distribute and sell VIOXX to the Government Programs between 1999 and 2004.**

## RESPONSE TO INTERROGATORY NO. 24:

Merck objects to this Interrogatory on the grounds that it is overly broad, vague and

ambiguous, particularly with respect to the phrases "a sales and marketing plan" and "efforts to

promote, distribute and sell Vioxx."

Subject to and without waiving its objections, Merck states that non-objectionable

documents containing information responsive to this Interrogatory have been or will be

produced, including but not limited to the professional promotional materials for Vioxx,

identified at Bates range MRK-P 0000001-0011470, and Profit Plans for 1999-2004, identified at

Bates range MRK-AAO 0000001-0000213.

- 28 -

987206v.1

M013404939

the states represented by the Government Action Plaintiffs.

**INTERROGATORY NO. 38:**

　　**Please state, separately and for each Government Entity, the amount budgeted by Merck for promotion of VIOXX in the political subdivisions represented by the Government Entity for each quarter, and please state, separately and for each Government Entity, the amounts spent each quarter.**

**RESPONSE TO INTERROGATORY NO. 38:**

　　Subject to and without waiving its objections, Merck states that the Vioxx promotional campaign was a national campaign directed at a national marketplace, and as such, there were no funds or allowances of funds specifically budgeted for advertising in the states represented by the Government Action Plaintiffs.  However, Merck states that certain information responsive to this Interrogatory is included in Merck's prior productions, including but not limited to Profit Plans for 1999-2004, identified at Bates range MRK-AAO 0000001-0000213.

　　Further responding, Merck states that it has conducted an investigation to identify the Merck employees who had significant responsibility with respect to the Government Entities and Merck is providing, attached hereto as Appendix "E" to these responses, a list of those employees (including Government Affairs Executives, National Account Executives, Customer Managers, Regional Business Directors, and Regional Medical Directors) who held such positions during the relevant time frame and Merck states that it has produced or will produce responsive, non-objectionable documents from the custodial files of these individuals.

**INTERROGATORY NO. 39:**

　　**Please identify all communications between Merck and the Center for Medicare and Medicaid Services ("CMS," formerly known as the Health Care Finance Administration or "HCFA") concerning VIOXX.**

987206v.1

M013404951

**communications concerning VIOXX with respect to each Government Entity and Health Care Providers within the jurisdiction of each Government Entity.**

**RESPONSE TO INTERROGATORY NO. 43:**

Merck objects to this Interrogatory on the grounds that it is compound, overly broad, unduly burdensome, vague and ambiguous, and to the extent it seeks information or documents that are not relevant to the claims or defenses of any party or to the subject matter involved in this action, nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its objections, Merck states that the subject matter of this Interrogatory has been the topic of extensive prior discovery and negotiations between Merck's counsel and Plaintiff's Liaison Counsel (in both the MDL and the New Jersey Coordinated Litigation) and is the subject of ongoing discussions between counsel for Merck, Plaintiff's Liaison Counsel, and counsel for the Government Action Plaintiffs. In particular, Merck refers counsel to Merck's response to Interrogatory No. 31 of the Plaintiffs' Steering Committee's First Set of Interrogatories, which Merck's counsel previously shared with counsel for the Government Action Plaintiffs, and to the databases identified therein.

In addition, Merck states that it has previously made productions of Vioxx-related information from certain databases, which productions are readily accessible by counsel for the Government Action Plaintiffs, and Merck is providing, attached hereto as Appendix "A" to these responses, a list of Merck's database productions, together with a brief description of the data included, the size of the production, and the corresponding Bates ranges.

Further responding, Merck states that a large volume of data from relevant Merck databases and systems is available in the Merck Profile Forms ("MPFs"), which were produced consistent with Merck's obligations under MDL Pretrial Order Nos. 18, 18A, 18B and 18C

- 44 -

987206v.1

M013404955

(governing production of Merck Profile Forms) and Pretrial Order No. 21 (governing production of data from Merck's Field Activity Customer Tracking System ("FACTS")).  In addition, subject to ongoing discussions with Plaintiffs' counsel, Merck has agreed to re-produce previously-produced Vioxx-related FACTS data (including call notes) and Merck Profile Forms ("MPFs") associated with physicians who prescribed Vioxx in the states represented by the Government Action Plaintiffs.

Notably, Merck's MPF productions provide a broad array of information concerning particular plaintiffs and their prescribing physicians and/or sample providers, including documents and data relating to the distribution of Dear Doctor/Healthcare Professional letters and Professional Information Request ("PIR") responses; sales representative detail and sample activity; retention of prescribing physicians and/or sample providers as clinical investigators, consultants, or Merck Speakers, including attendance at Merck-sponsored speaker programs; designation of prescribing physicians and/or sample providers as "thought leaders" by Merck; various payment information to prescribing physician and/or sample providers and the affiliated "entity" in which he or she practices, including any honoraria and grant payments thereto; contacts and communications from anyone relating to plaintiffs, including calls to Merck's National Service Center and any adverse event reporting data concerning plaintiffs communicated to Merck's Worldwide Product Safety (and supporting documentation, including MedWatch forms); and comprehensive advertising information relating to the media outlets of both plaintiffs and their prescribing physician and/or sample providers.

987206v.1

M01340495 6

# EXHIBIT 21

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| In re: VIOXX Products Liability Litigation | * | MDL No. 1657 |
| | * | |
| This Document Relates to: | * | SECTION L |
| | * | |
| All Government Actions | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | KNOWLES |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## GOVERNMENT ACTION PLAINTIFFS' FIRST SET OF MASTER INTERROGATORIES TO DEFENDANT MERCK & CO, INC.

TO:   Merck and Company, and its attorneys:
      Phillip A. Wittmann, Esq.
      Stone, Pigman, Walther, Wittmann, L.L.C.
      546 Carondelet Street
      New Orleans, Louisiana 70130-3588
      Merck & Co, Liaison Counsel

PLEASE TAKE NOTICE THAT, pursuant to Federal Rules of Civil Procedure 33(a) and PTO 39, the Government Action Plaintiffs, through Plaintiffs' Liaison Counsel, propound the following Master Interrogatories to Defendant Merck & Co, Inc.

Each interrogatory, as provided by law, shall be answered fully and separately in writing under oath, unless it is objected to, in which event the reasons for the objection shall be stated.  The answers are to be signed by the person making them, and the objections signed by the attorney making them.  Answers to these interrogatories, or objections in lieu thereof, shall be served within 30 days from the service of this document, as provided by PTO 39.

1

23. Please state whether VIOXX Representatives of Merck ever used "The Cardiovascular Card" or quoted, and/or summarized the information on "The Cardiovascular Card" in the course of communicating with any of the persons listed in your Response to Interrogatory No. 18 or other Health Care Providers.  If so, please state separately for each such person, by Government Entity:

   a) the date of each such communication;

   b) the identity of the parties to the communication;

   c) the substance of each such communication, and,

   d) the identity of each and every document or record that discusses, records, and/or makes reference to these communications.

24. Please state whether, with respect to each Government Entity, agents and employees of Merck developed a sales and marketing plan for the Government Entity and the Government Programs; and whether a marketing plan was specifically devised for any Government Entity or Government Program, or not, please describe Your efforts to promote, distribute and sell VIOXX to the Government Programs between 1999 and 2004.

25. Please identify per Government Program and describe per Government Program all records, documents, and/or materials that describe or discuss this plan and Your efforts to implement the plan.

26. For the period of 1999 through 2004, identify all medications (by NDC code, brand name and/or generic name) other than VIOXX, available either over the counter or by prescription, that were available in the arthritis or analgesic market

# EXHIBIT 22

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| In re: VIOXX Products Liability Litigation | * | MDL No. 1657 |
|  | * |  |
| This Document Relates to: | * | SECTION L |
|  | * |  |
| All Government Actions | * | JUDGE ELDON E. FALLON |
|  | * |  |
|  | * | MAGISTRATE JUDGE |
|  | * | KNOWLES |
|  | * |  |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## GOVERNMENT ACTION PLAINTIFFS' FIRST SET OF MASTER DOCUMENT REQUESTS TO MERCK & CO, INC.

TO:     Merck and Company, and its attorneys:
        Phillip A. Wittmann, Esq.
        Stone, Pigman, Walther, Wittmann, L.L.C.
        546 Carondelet Street
        New Orleans, Louisiana 70130-3588
        Merck & Co, Liaison Counsel

PLEASE TAKE NOTICE THAT, Pursuant to Rule 34 of the Federal Rules of Civil Procedure and PTO 39, the Government Action Plaintiffs, through Plaintiffs' Liaison Counsel, propound the following Master Document Requests to Defendant Merck & Co., Inc to produce for inspection and copying the documents and materials described below in accordance with the Definitions and Instructions set forth below, and PTO 39.

1

28. All documents concerning the reach and frequency and effectiveness of efforts to promote VIOXX within the political subdivisions of each Government Entity and, separately, to any Government Health Program.

29. All documents concerning performance reviews of VIOXX Representatives relating to their work within the political subdivisions of each Government Entity and, separately, to the Government Health Programs including, but not limited to, field trip reports, sales performance reviews, personal performance grids, year end reviews, and year end employee input forms.

30. All documents concerning the compensation, in any form, of VIOXX Representatives who worked within the political subdivisions of each Government Entity or with any Government Health Program.

31. All training, motivational and promotional materials concerning VIOXX You provided to VIOXX Representatives who worked within the political subdivisions of each  Government Entity or who promoted VIOXX to any Government Health Program,  including, but not limited to, sales guides, scripts, sales instructions, broadcast voice-mails, sales aids, detail aids, visual aids, and information bulletins.

32. All documents concerning the dissemination, distribution and availability of the following items to VIOXX Representatives who worked within the political subdivisions of each Government Entity or who promoted VIOXX to any Government Health Program:  (a) obstacle responses concerning VIOXX, (b)  materials  concerning  "Obstacle JeopardXX,"  (c)  materials  concerning

"Dodgeball: VIOXX," (d) materials concerning the "Cardiovascular Card" or "CV Card"; and (e) the "V-Squad/Be the Power" videos.

33. All documents concerning communications relating to VIOXX between Merck and Health Care Providers working within the political subdivisions of the Government Entities, including but not limited to "Dear Doctor" and/or "Dear Health Provider" letters, call notes, materials from educational meetings and seminars, and documents concerning Professional Information Requests.

34. All documents concerning communications relating to VIOXX between Merck and Government Health Programs working within the political subdivisions of the Government Entities, including but not limited to "Dear Doctor" and/or "Dear Health Provider" letters, call notes, materials from educational meetings and seminars, and documents concerning Professional Information Requests.

35. All documents concerning the targeting of Health Care Providers and/or Government Health Programs working within the political subdivision of the Government Entities for the promotion of VIOXX, including, but not limited to, documents concerning Top 50 A & A Target lists and Victory 50 Target lists.

36. All documents concerning the targeting of Government Health Programs working within the political subdivision of the Government Entities for the promotion of VIOXX.

17

# EXHIBIT 23

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: | MDL DOCKET NO. 1657 |
| VIOXX PRODUCTS LIABILITY LITIGATION | SECTION L |
| | JUDGE FALLON |
| | MAG. JUDGE KNOWLES |
| THIS DOCUMENT RELATES TO ALL CASES | |

RESPONSE OF DEFENDANT MERCK & CO., INC. TO
PLAINTIFF STEERING COMMITTEE'S FIRST SET OF
<u>INTERROGATORIES TO DEFENDANT MERCK & CO., INC.</u>

Merck & Co., Inc. ("Merck"), by its attorneys, hereby responds and objects to Plaintiff Steering Committee's First Set of Interrogatories to Defendant Merck & Co., Inc. (the "Interrogatories"). The responses set forth below are provided in good faith and are based upon information Merck has gathered to date; Merck may, and reserves the right to, supplement these responses with different or additional information in the future.

<u>PRELIMINARY STATEMENT</u>

Merck is presently pursuing its investigation and analysis of the facts and law relating to this case, and has not completed discovery or preparation for trial. The responses set forth herein are given without prejudice to Merck's right to produce evidence of any subsequently-discovered facts, documents, or interpretations thereof, or to modify, change or amend its responses. The information set forth herein is true and correct to Merck's best knowledge as of this date, and is subject to correction for errors, mistakes, or omissions. The

Civil Procedure 33(d), Merck refers PSC to those documents for such information, including the dates, "description," and "purpose" of those letters, which speak for themselves.

(i)      Merck states that it voluntarily withdrew VIOXX® from the market worldwide on September 30, 2004.

## INTERROGATORY NO. 10:

Please provide the following financial data available regarding Merck and Vioxx.

(a)     Merck's gross sales of all drugs for each year between 1999 and 2004;
(b)     Merck's gross sales of Vioxx for each year between 1999 and 2004;
(c)     Net income from all sources for each year between 1999 and 2004;
(d)     Net profits attributable to the sale of Vioxx for each year that Vioxx was on the Market;
(e)     Net profits attributable to the sale of Vioxx by State of sale (including the District of Columbia, Puerto Rico, and the Virgin Islands), for each year that Vioxx was on the market;
(f)     Total assets as of 2005 or the last year when such data is available;
(g)     Cash on hand as of 2005 or the last year when such data is available;
(h)     Current assets as of 2005 or the last year when such data is available;
(i)     Current liabilities as of 2005 or the last year when such data is available;
(j)     Equity as of 2005 or the last year when such data is available; and
(k)     Long term debt as of 2005 or the last year when such data is available (1) Short term debt as of 2005 or the last year when such data is available.

## RESPONSE TO INTERROGATORY NO. 10:

Subject to and without waiving its objections, Merck responds as follows:

(a)     Merck objects to subparagraph (a) of this Interrogatory on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited to VIOXX®.  Subject to and without waiving its objections, Merck states that its gross sales are reflected in Merck's 10-K and 10-Q filings, and in its annual reports, which are being produced in response to PSC's Requests for Production Nos. 7 and 10.  Pursuant to Federal Rule of Civil Procedure 33(d), Merck refers PSC to those documents for such information.

- 17 -

(b)     Merck states that its gross U.S. sales of VIOXX®, minus discounts and rebates, for each year between 1999 and 2004 are as follows:

| | |
|---|---|
| 1999: | $402.9 MM |
| 2000: | $1,630.6 MM |
| 2001: | $1,653.9 MM |
| 2002: | $1,680.1 MM |
| 2003: | $1,537.5 MM |
| 2004: | $1,123.6 MM |

(c)     Merck objects to subparagraph (c) of this Interrogatory on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited to VIOXX®.  Subject to and without waiving its objections, Merck states that its net income is reflected in Merck's 10-K and 10-Q filings, and in its annual reports, which are being produced in response to PSC's Requests for Production Nos. 7 and 10.  Pursuant to Federal Rule of Civil Procedure 33(d), Merck refers PSC to those documents for such information.

(d)     Subject to and without waiving its objections, Merck states that it does not track "net profits attributable to the sale of Vioxx" and therefore has no information responsive to subparagraph (d) of this Interrogatory.

(e)     Merck objects to subparagraph (e) of this Interrogatory on the grounds that it is overly broad and seeks information that is not within the scope of proper Master Discovery.  The information requested by this subparagraph is more appropriately included, if at all, in case-specific discovery.  Subject to and without waiving its objections, Merck states that it does not maintain state-specific revenue information for VIOXX® and therefore has no information responsive to subparagraph (e) of this Interrogatory.

786811v.1

M001355259

(f)-(l)  Subject to and without waiving its objections, Merck states that information concerning Merck's assets, liabilities, equity, and debt is reflected in Merck's 10-K and 10-Q filings, and in its annual reports, which are being produced in response to PSC's Requests for Production Nos. 7 and 10.  Pursuant to Federal Rule of Civil Procedure 33(d), Merck refers PSC to those documents for such information.

Further responding, Merck states that documents containing information responsive to this Interrogatory have been or will be produced in response to PSC's Request for Production No. 120.  Pursuant to Federal Rule of Civil Procedure 33(d), Merck refers PSC to those documents for such information.

INTERROGATORY NO. 11:

Please identify the person(s) most knowledgeable of the gross sales and net profits related to Vioxx during the years that Vioxx was on the market.

RESPONSE TO INTERROGATORY NO. 11:

Merck objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to the term "most knowledgeable."  Subject to and without waiving its objections, Merck states that Robert McMahon, Vice President, USSH A&A FBG is knowledgeable about VIOXX® sales and profits.

INTERROGATORY NO. 12:

Between 1990 - 2005, did Merck belong to any pharmaceutical manufacturer's trade organization or association such as PHARMA [sic]?  If your answer is "yes," please identify each such organization or associations, giving its name, address and state the years you were a member.

786811v.1

M001355260

# EXHIBIT 24

1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
2   ********************************************************************

3
    IN RE:  VIOXX PRODUCTS            MDL No. 1657
4   LIABILITY LITIGATION              Section: "L"
                                      New Orleans, Louisiana
5                                     Wednesday, August 12, 2009

6
    ********************************************************************
7

8      TRANSCRIPT OF ATTORNEY GENERAL TELEPHONE CONFERENCE PROCEEDINGS
            HEARD BEFORE THE HONORABLE ELDON E. FALLON
9                 UNITED STATES DISTRICT JUDGE

10

11
    APPEARANCES:
12
    FOR THE PLAINTIFFS
13  LIAISON COMMITTEE:              HERMAN, HERMAN, KATZ & COTLAR
                                    BY:  LEONARD A. DAVIS, ESQ.
14                                  820 O'Keefe Avenue
                                    New Orleans, LA 70113
15

16

17  FOR LOUISIANA
    ATTORNEY GENERAL:              DUGAN LAW FIRM
18                                 BY:  JAMES R. DUGAN, II, ESQ.
                                   650 Poydras St., Suite
19                                 New Orleans, LA 70130

20

21  FOR THE DEFENDANTS
    LIAISON COMMITTEE:             SKADDEN
22                                 BY:  JOHN H. BEISNER, ESQ.
                                   1440 New York Avenue, N.W.
23                                 Washington, D.C. 20005

24

25

1                  P R O C E E D I N G S

2              (THURSDAY, JANUARY 22, 2009)

3                  (STATUS CONFERENCE)

4

5       (IN CHAMBERS.)

6           THE COURT:  I have before me first a motion to compel

7   production.  The parties have favored me with extensive briefs on

8   the issue.  In essence the plaintiffs seek production of all

9   documents, data and information produced by Merck or the voluntary

10  or involuntarily concerning the governmental investigation

11  initiated by any governmental entity, including the United States

12  Senate, the FDA, United States Department of Justice, any state

13  Attorney General that related to the development, manufacture,

14  testing, marketing, sales or distribution of Vioxx.

15          Plaintiff takes the position that these are relevant

16  documents, that they have been already produced, and it would

17  simply be easy for the defendants to reproduce those documents,

18  which they already have in their either data bank or facility.

19          The defendants take the position that the documents come

20  in various forms, one is in response to criminal investigations,

21  grand jury investigations, some of which are privileged or in order

22  to get them certain burdens have to be met.

23          Also they take the position that a lot of the documents,

24  if not all of them, have been already produced to the plaintiffs

25  and that they are in the plaintiffs' data bank and also have the

4

 1   facilities in that connection for searching documents.  They in

 2   essence feel it's overbroad, overburdensome, and not a proper

 3   request.

 4          Both sides have written extensively to me on those

 5   matters and submitted the matter to me.  I am familiar with the

 6   case, I've been dealing with it now for a number of years.  We've

 7   had over nine million documents produced thus far in the

 8   litigation, six trials, a number of trial packages prepared.

 9          I do agree with the defendants that it's overbroad.  I

10   think that the plaintiff attorney generals need to look at the

11   trial package, need to look at what is available to them from the

12   databank of the plaintiffs in this case.  There may or may not be

13   some additional documents that might be germane, but I think this

14   is just too broadly stated and not proper.  So I am going to deny

15   the motion.

16          Secondly, I want to talk with you all about trial dates.

17   Give me some realistic feelings on it.  Jim, where are you with the

18   discovery part, are you ready to put on your case?

19          MR. DUGAN:  Your Honor, I need basically -- James Dugan

20   on behalf of the Louisiana Attorney General's office.

21          We're moving forward on the discovery.  I needed three

22   things to get my case to trial, the call notes, which is a database

23   and records of what the sales reps told the doctors in reference to

24   Vioxx and also shows what sales reps told the states P&T Committee,

25   which is a pharmacy and therapeutics committee, which takes a look

M014663969