**EXHIBIT E**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX Products Liability Litigation | * MDL No. 1657 |
| This Document Relates to: | * SECTION L |
| State of Utah | * JUDGE ELDON E. FALLON |
| v. | * MAGISTRATE JUDGE |
| Merck Sharp & Dohme Corp. | * KNOWLES |
| Civil Action No. 2:06-cv-09336 | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFF'S SECOND SUPPLEMENTAL ANSWERS TO DEFENDANT'S SECOND SET OF INTERROGATORIES

The State of Utah supplements its discussion of the general reasons why every communication from Merck lacked veracity. In addition to the FDA questioning the naproxen cardio-protective theory, that theory was openly challenged and published in the *American Heart Journal*, 2003:146: 561-2. Merck concluded that the "effects in Vigor May be influenced by a putative antithrombotic of naproxen." The *Journal* stated "Nevertheless, the findings [the increased cardiovascular events in Vioxx VIGOR patients) leave us uncertain of the cardiovascular effects of the COX-2 inhibitors." *See* Matters of the heart: Assessing the cardiovascular safety of new drugs, *American Heart Journal*, 2003:146: 561-2, attached hereto as Exhibit A.

The *Journal* further stated, "Establishing a drug's safety after observing an adverse signal within an active-controlled study, such as VIGOR depends upon either clarifying the impact of the comparator (compared with placebo) or independent analysis of the impact of the

1

investigated drug against placebo. Without such evidence, the results of findings such as that in VIGOR cannot be definitively interpreted."

Merck did not heed this warning.

**Representation A:** "All though there was significant difference between rofecoxib and placebo groups in overall mortality based upon the total number of deaths in all 3 protocols [the Alzheimer studies—Protocols 078, 091, 126] combined, there were no notable trends in the data."

**Date of representation:** December 18, 2001

**Person making representation:** Robert E. Silverman

**Form of Representation:** Letter from Robert E. Silverman, M.D., Ph.D., Senior Director, Regulatory Affairs, Merck & Co., to Dr. Jonca Bull, M.D., FDA, attached hereto as Exhibit B.

**Target of Representation:** Initially the FDA, ultimately the medical profession and the general public including the Utah Medicaid population.

**Representation in Detail**

1. Merck conducted three studies involving Alzheimer's disorder or early onset dementia. The FDA requested further information as to cardiovascular events in those studies. Dr. Silverman responded to the FDA inquiry. *Id.* In Exhibit A, Dr. Silverman states, "The small numeric differences between rofecoxib and comparators in overall mortality, although statistically significant in one program in favor of rofecoxib and in the other against rofecoxib, are most consistent with chance fluctuations."

2

2. "Although there is a small imbalance in cardiovascular deaths between the 2 groups in the Alzheimer's disease studies, MRL (Merck Research Laboratories) does not agree with the Agency that there is a trend against rofecoxib for cardiovascular mortality (10 vs. 6 events, p=).21). The data presented in the July 2001 SUR demonstrate that there is no cardiovascular event in the Alzheimer's disease program. In fact, if there is any trend in the data on cardiovascular events, it is in favor of rofecoxib over placebo."

## Reasons why representations were false.

1. Merck knew as early as the unblinding of the Vigor study, that there was an imbalance between cardiovascular events for patients on Vioxx as opposed to comparator drug.

2. Merck designed the Alzheimer's studies using the industry standard "Intent to treat." However, the data presented to the FDA discarded all events happening more than 14 days after the discontinuation of the medication. *See* Madigan, et al, attached hereto as Exhibit C. This study was peer reviewed in the *American Heart Journal* Volume 164, Number 2.

3. "The ITT (Intention to Treat) analysis revealed a highly significant tripling or quadrupling of the CVT mortality in patients who had been randomized to receive rofecoxib in these studies." *Id.*

4. The Alzheimer studies reveal that an ITT analyses would have demonstrated that rofecoxib causes a statistically significant increase in cardiovascular deaths and events as early as April 2002. Contrary to Dr. Silverman's statements, confirmed cardiovascular deaths became statistically significant in June 2001. *Id.*

5. An independent evaluation of the intention to treat from studies 078 and 091 demonstrates that there were 6 heart disease deaths in the comparator drug arm and 21 heart disease deaths in the Vioxx arm. Total mortality was 57 deaths in the Vioxx arm as compared with 29 deaths in the comparator drug arm of the study. *See* Reporting Mortality Findings in Trials of Rofecoxib for Alzheimer Disease or Cognitive Impairment, *JAMA* April 16, 2008, attached hereto as Exhibit D.

6. When non-Merck scientists conducted a review of the Protocol 078 participants, they observed a one hundred percent increase of cardiovascular events after discontinuation of the study medications. *See* Editor's Correspondence, Research Letters, *Archives of Internal Medicine*, December 13/27, 2010, attached hereto as Exhibit E.

7. Randomized controlled trials of pooled Merck Data as of December 2000, demonstrated a trend towards increased cardiovascular risk as early as December 2000. *See* Pooled Analysis of Rofecoxib Placebo-Controlled Clinical Trial Data, *Archives of Internal Medicine*, November 23, 2009, attached hereto as Exhibit F.

**Representation B:** Studies show that the "incidence of cardiovascular events among patients taking Vioxx was similar to the incidence of cardiovascular events among those taking placebo and those taking non-steroidal anti-inflammatory drugs other than naproxen."

**Persons making representation**: Peter S. Kim and Alise Reicin

**Date of represeentation**: December 30, 2004

**Where representations made:** *See* Rofecoxib, Merck, and the FDA, Letter to the Editor, *New England Journal of Medicine*, attached hereto as Exhibit G.

<u>Target of representation:</u> Initially, Merck made the representation to the medical profession and thereafter the national public including Utah.

<u>Falsity of representation:</u> The representation is false because Vioxx causes cardiovascular events at rates greater than placebo and other NSAIDS.

1. Naproxen's theoretical cardio-protective effect "would be unlikely to exceed that of aspirin, at a 25 percent reduction of heart attacks. Instead, in the VIGOR trial, there was a 500 percent increase in heart attacks." This makes any "naproxen hypothesis" of cardio protection mathematically indefensible." *See* Rofecoxib, Merck, and the FDA, Response to Letter to the Editor, *New England Journal of Medicine*, attached hereto as Exhibit H.

<u>Representation C:</u> In the APPROVe Trial, there was risk of cardiovascular events until after eighteen months of continuous use of Vioxx. Specific Representations:

A. "In a post hac analysis, the difference between the two groups in the incidence of thrombotic events was evident in the second 18 months of the study, whereas the event rates were similar for the first 18 months." *See* Breasiler, RS, Quan H, et al, Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial. *N Engl J Med* 2005: 352: 1092-1102 at 1097. John Martin Report Appendix R, page 91 – 101, attached hereto as Exhibit I.

B. "There is a significant increased risk for confirmed thrombotic cardiovascular events with rofecoxib 25 mg daily compared with placebo, beginning only after 18 months of continuous treatment." 3/15/05 APPROVe Trial abbreviated Clinical Study Report, Cardiovascular Safety Report, MRK-18940100731, at 0742 (submitted with

5

6/06/05 letter from P. Huang to B. Harvey (FDA). MRK-S0420050996. *See* John Martin Report Appendix R, page 3-4, attached hereto as Exhibit J.

C. "As previously reported, in the base study, there was an increased relative risk for thrombotic cardiovascular events, such as heart attack and stroke, beginning after 18 months of treatment in the patients taking Vioxx compared to those taking placebo." *See* 5/11/06 Merck press release "Merck Announces Preliminary Analysis of Off-Drug Extension of APPROVe Study," attached hereto as Exhibit K.

**Time Representations were made:**   April 21, 2005; June 6, 2005; and May 11, 2006.

**Targets of Representations:** Medical Professionals and the general public; the FDA; and the General Public.

**Person's Making Statements:** Merck scientists and statisticians; Merck Scientist R. Huang; and Merck Public relations department.

**Falsity of the Statement:** The Statements are false because Vioxx caused cardiovascular events in individuals with less than 18 months continuous use. The statements were intentionally false because:

    A.    Merck statistician Dr. Deborah Ng was tasked in November 2004 to "model" the data from APPROVe. The intent of this assignment was to present additional evidence that Merck did not know of the presence of cardiovascular events until APPROVe was unblended. The data was modeled using a SAS computer-modeling program. *See* John Martin Report, Appendix R, pages 119-124, at pages 119-120, attached hereto as Exhibit L. She summarized her results in a memorandum dated, January 27, 2005. She prepared several models but

6

settled on a Cox proportional hazards model using a single covariate of treatment time. *Id* pages 121-122, attached hereto as Exhibit M. Mr. Martin represents that this chart "shows the hazard ratio plot resulting from that model for the confirmed thrombotic endpoints in the APPROVe trial. Mr. Martin reproduces Dr. Ng's model on page 122 of the Martin Report. It is reproduced below.

Figure 7

Estimated Relative Risk With 95% Confidence Interval for Confirmed Thrombotic Events in APPROVe Trial – Cox Proportional Hazards Model With Treatment"Time As the Factor"[9]



The two straight Horizontal dotted lines on the chart indicate the points along the vertical axis where the risk of Vioxx is equal to that of placebo (at 1) and twice that of placebo (at 2.) *Id* page 123 at 280. The solid line represents the relative risk of experiencing a thrombotic event associated with Vioxx relative to placebo at each point in time shown on the horizontal access. The two curved lines represent the upper and lower bound of the 95% confidence interval for the relative risk. *Id* page 123.

Looking solely at the lower confidence boundary, we find that the risk of cardiovascular events exceeded the risk of placebo no later than 200 days (6.6 months). It has clearly separated at 300 days (less than 10 months).

In sum, Merck's statistician concluded that the best explanation was Figure 7. This was included in her report to the company of January 27, 2005. However, Merck preferred to use statistics based upon the flawed assumption that Vioxx cardiovascular risk did not change over time. Those statisticians, Merck management and Merck scientists writing for the NEJM did not consider her work as relevant to the risks of taking Vioxx for less than 18 continuous months of treatment. *Id* page 124.

B.  Merck ignored its own expert on the issue of risk before 18 months of continuous treatment. Merck hired Dr. Scott Zeger, chairperson of the Department of Biostatistics at Johns Hopkins University to review Dr. Ng's work. Dr. Zeger communicated in a January 1, 2005 email to Merck officials. His conclusions include:

2. There is reasonably compelling evidence that the relative risk is not constant over time.

5. Avoid attempting to conclude that the data prove there is no elevated risk until 18 months. The confidence intervals can not (sic) rule out 1.5-2.0 as early as 6 months. *See* Martin Report Appendix R, page 135, attached hereto as Exhibit M.

Merck had Dr. Ng's work and Dr. Zeger's comments prior to making the statements complained of above.

<u>Representation C:</u> Merck's Data Shows no ill effects until after 18 months of exposure to the drug.

<u>Where Made:</u> *NEJM* April 2005. *See* Exhibit I.

<u>Target Audience</u>: Medical Doctors and the public.

<u>Representation made by</u>: Merck scientists

<u>Falsity:</u> Merck used an inappropriate statistical measurement. Merck presumed "that the hazards ratio for the events at issue is constant over time, such that, for example, the risk of experiencing a cardiovascular event on Vioxx relative to the risk of experiencing a cardiovascular event on placebo at any given point in time is roughly the same throughout the trial." Martin Report, pages 30-31. This erroneous statistical measurement relating to the calculation of relative risk was submitted to the FDA on June 6, 2005. The erroneous statistics formed the basis for the March 2005 *NEJM* article.

Merck claims that the statistical error was not discovered until May 2006. *See* Martin Appendix R, pages 127-128, attached hereto as Exhibit N.

"To check the analysis that had been performed, Mr. [Thomas] Cook (a Merck statistician) wrote his own programs for analyzing the data, ran his programs on the data, and compared his results to the preliminary results that had been obtained in early May 2006. When Mr. Cook performed the test of the proportionality of hazards on the combine on-and-off drug data from the APPROVe Trial, he noticed the result he obtained differed from the one that had been obtained in the preliminary analysis. This led Mr. Cook to the discovery that the program he had written and the program that had been used for the preliminary analysis used different methods for testing the proportionality of the hazards: while Mr. Cook's program used the Logarithm of Time Test, the program that his MRL colleagues had used for the preliminary May 11, 2006 analysis used the Linear Time Test. *Id.*

Upon follow up, it was determined that the same statistical error had been presented to the FDA on June 6, 2005 and was included in the March 2005 *NEJM* article.

On May 30, 2006, Merck issued a press release. *See* Exhibit O attached hereto. Merck confessed to the inappropriate statistical method. However, "Merck believes that this correction

9

does not change the results of the APPROVe study, in which an increased relative risk for confirmed thrombotic cardiovascular events for VIOXX compared to placebo was observed beginning after 18 months of continuous daily treatment."

The *NEJM* received letters critical of the statistical approach used by Merck. After much correspondence between the critical doctors, the Journal and Merck (Martin 195-231), the journal published a correction in the June 2006 edition. *See* Correction attached hereto as Exhibit P. That correction removed references to the former language. "The increased relative risk became apparent after 18 months of treatment; during the first 18 months; the event rates were similar in the two groups." The journal deleted this statement in its entirety.

This *NEJM* statement that relative risk of cardiovascular events in the Vioxx and placebo arms of the study during the first 18 months was, of course false, because Dr. Ng had noted and Dr. Zener confirmed that the relative risk occurred as early as six months into the treatment.

DATED this 28th day of February, 2013.

/S/
Joseph W. Steele
Kenneth D. Lougee
STEELE & BIGGS
5664 South Green Street
Salt Lake City, UT 84123

/S/
Eric H. Weinberg
The Law Offices of Eric H. Weinberg
149 Livingston Avenue
New Brunswick, NJ 08901

/S/
Richard W. Schulte (Ohio Bar No. 0066031)
812 E. National Road, Suite A
Vandalia, Ohio 45377
(937) 435-7500

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing PLAINTIFF'S SECOND SUPPLEMENTAL ANSWERS TO DEFENDANT'S SECOND SET OF INTERROGATORIES TO PLAINTIFFS has been served on Liaison Counsel, Russ Herman, Phillip Wittmann and Ann Oldfather, by U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 28th day of February, 2013.

/S/
Joseph W. Steele
Kenneth D. Lougee
STEELE & BIGGS
5664 South Green Street
Salt Lake City, UT 84123

11