**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION  L |
| | * | |
| THIS DOCUMENT RELATES TO: | * | JUDGE FALLON |
| THIRD PARTY PAYOR COMMON | * | MAG. JUDGE KNOWLES |
| BENEFIT FEES | * | |
| FILER: Robert E. Arceneaux/Margaret Woodward/ | * | June 27, 2013 |
| Pascal F. Calogero, Jr. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**ERIC WEINBERG'S OPPOSITION**
**TO THIS COURT'S JUNE 21, 2013 SHOW CAUSE ORDER**

MAY IT PLEASE THE COURT:

This memorandum is respectfully submitted on behalf of Eric H. Weinberg and the Law Offices of Eric H. Weinberg ("Weinberg") pursuant to this Court's June 21, 2013 order to show cause why he should not held in contempt of this Court.

**I.      STATEMENT OF THE CASE**

A full, fair adjudication of the serious charge of contempt against Weinberg requires a detailed outline of the facts and procedural history underlying Mr. Weinberg's actions taken in regard to production of the documents sought by the FAC.  Given the gravity of a contempt charge, Weinberg offers this detailed, but succinct, exposition of the entire history of the issue of his time records, from the beginning of this proceeding through present.

Consistent with its prior practice in common benefit fee allocation disputes, on March 15, 2013, this Court appointed Patrick Juneau as Special Master to "submit a written recommendation of the amount that the remaining objectors [to the TPP FAC's recommendation] should receive. *See* Rec. Doc. 64304, at 4.  Special Master Juneau scheduled a conference call between all the parties for April 24, 2013, in order to discuss the creation of a protocol which would be followed by him to

prepare his report. *See* Exhibit 1.

At the conference call, at least the following persons participated: Special Master Juneau, Margaret Woodward, Robert Arceneaux, Robert Dassow, Lenny Davis, Russ Herman, and Christopher Seeger. The first issue that was discussed was whether there was any requested discovery. Woodward stated that the only discovery needed by Weinberg was documentation of the disposition of $600,000 paid by Merck as costs in the La. AG case, and whether any of it went to private counsel. Russ Herman stated that it was his belief that the funds were not paid to private counsel, but went to the La. Attorney General (a fact which he promised to document in a letter which was never supplied). For its part, the only discovery that was requested by the TPP FAC was a deposition of Weinberg. This led to a general discussion of how many depositions would be taken of the various parties, the ultimate resolution of which was a decision by Special Master Juneau that there would be no depositions. *See* Exhibit 2, at § 3.

Rather, there would be a "trial by ambush." The Special Master explained that his use of this term did not imply anything anything unfair, but simply that the trial would occur in the absence of any pre-trial discovery. No one formally objected to this procedure. And, critically, the TPP FAC did not ask for any production of documents, such as any time records from Weinberg. The Special Master stated details would be set down in a forthcoming scheduling protocol. *See Id*.

The protocol was issued on April 26, 2013. It reflected the procedure the Special Master had outlined during the telephone status conference – joint filing of pertinent documents by May 1, 2013 (this deadline was subsequently extended to May 5, 2013), simultaneous filing of briefs on the merits on May 15, 2013, and filing of witness lists on May 17, 2013. He also fixed the hearing date for the trial as May 23, 2013, at which time each side would be given no more than 4 hours to present their case. *See* Rec. Doc. 64361.

The parties complied with this protocol. The documents list (the preparation of which was spearheaded by Robert Arceneaux, who also physically compiled the documents) was filed on May

5, 2013. *See* Rec. Doc. 64378.  A CD-Rom with all the pertinent documents, prepared by Arceneaux, was also sent via federal express to the Special Master and all the parties on that date.  The parties' briefs were filed on May 15, 2013. *See* Rec. Docs. 64396, 64397, and 64398. Witness lists were filed on May 17, 2013.  *See* Rec. Docs.  64405, 64406, and 64408.

In the interim, on May 13, 2013, the TPP FAC served a subpoena duces tecum on Weinberg, demanding him to produce at the May 23, 2013 trial the following documents:

> All records of time spent on any Vioxx Related Matter from February 2005 to present for any attorney, paralegal, law clerk, or member of your firm. As used herein, the term "Vioxx Related Matter" includes any type of Vioxx litigation related activity worked on (e.g., personal injury, third-party payor, Attorney General, etc.).  The records should include for each entry an identification of the individual performing such activity, a description of the activity performed, the date the activity was performed, and any other information identifying the work performed and who performed the specific activity.

Rec. Doc. 64395.

Thereafter, on May 20, 2013, Weinberg and the FAC wrote to the Special Master informing him that they had mutually agreed, with his permission, to submit the matter on briefs, thus removing the necessity for the scheduled May 23, 2013 hearing. *See* Exhibit 3. They proposed that the parties would simultaneously file reply briefs on May 28, 2013, after which time the case would be considered submitted. *See Id.*

The next day, Weinberg filed a partial Motion to Quash the FAC's subpoena duces tecum. *See* Rec. Doc. 64412. In his pleading, Weinberg stated that he had already produced to the FAC all records regarding his common benefit activities with regard to the Personal Injury Litigation and the private TPP litigation, and accordingly did not oppose the subpoena as to those records since they had already been delivered to the FAC in both PDF and hard-copy formats. See Rec. Doc. 64412-1, at 2. The only thing at issue was production of common benefit time expended in AG litigation, which Weinberg argued was not relevant, burdensome to compile on short notice, and could not be used for impeachment during the hearing because the FAC had certified to Special Master Juneau during

a phone conference that it already had in its possession all the documents it intended to use for impeachment purposes.  *See id.*

Later that afternoon of May 21, Special Master Juneau issued two rulings via e-mail.  First, he cancelled the May 23, 2013 hearing, and ordered that the case would be submitted upon the filing of ten-page reply briefs by the parties no later than May 28, 2013.  *See* Exhibit 4.  Second, he stated that:

> With regard to the Motion to Quash filed on behalf of Eric Weinberg, the TPP FAC may file a reply brief and such brief must be filed no later than 5:00 p.m. on Thursday, May 23, 2013.  The issues submitted in the Motion to Quash will be decided by the Special Master after consideration of the filed briefs.

Exhibit 5.

The FAC filed its opposition to the Motion to Quash on May 23, 2013.  *See* Rec. Doc. 64419. The reply briefs on the merits were filed by the parties on May 28, 2013. See Rec. Doc. 64422 and 64424.  The case before the Special Master was thus submitted and the record closed.

At that point, Weinberg had every reason to believe that there was nothing to be done.  While there had been a subpoena that called for document production at a trial, the FAC agreed to cancel that trial, and agreed to submit the matters on briefs.  Those briefs were filed. The case was submitted. The record was closed. The issue of the documents was under submission to Special Master Juneau, who indicated he would rule on it along with the merits when he had read all the briefs. It looked, reasonably, like the subpoena was a moot issue.

On June 10, 2013, Special Master Juneau issued a Revised Protocol. In it, he stated that even though the parties had waived a hearing, he needed to ask certain persons questions in order for him to properly resolve the case and make his recommendation to this Court. *See* Rec. Doc. 64439. Accordingly, he ordered certain persons to appear before him on June 20, 2013. *See Id.*

Margaret Woodward immediately contacted the Special Master in order to inquire as to whether she should cancel a long-planned trip to the remote regions of Africa. She was told not to

cancel the trip, as no lawyer would be allowed to ask questions, either on direct or cross examination of the witnesses. She also inquired about the subpoenaed documents, and was told that the documents were not important to the Special Master for the proceeding he envisioned on June 20, 2013, clearing the way for her trip to Zambia. *See* Exhibit 6.  Thereafter, on June 12, 2013, the Special Master confirmed what he had told Ms. Woodward in an e-mail, where he stated that the following:

> The purpose of this hearing is for me to ask questions and get clarification on certain issues.  **The case is considered submitted by the respective parties** and I would, therefore, not have any examination of the witnesses by the parties.

Exhibit 7 (emphasis added).

Even though the case was submitted, Weinberg was served on June 10, 2013, with an order of this Court dated June 6, 2013 denying his Motion to Quash. Rec. Doc. 64437. This order was surprising.  The record was closed as far as the parties were concerned, as they could no longer submit any evidence.  The only thing remaining to be done was to respond to the few questions to be propounded by Special Master Juneau.  Also, Special Master Juneau had indicated that he would be ruling on the Motion to Quash along with the merits of the case, further creating the reasonable impression that the subpoena for all practical purposes was moot.

Nonetheless, when this Order was received on June 10, 2013, Weinberg immediately began to prepare to produce the requested documents. In denying the Motion to Quash, this Court acknowledged that "compliance with the subpoena may require Weinberg to incur certain expenses," and ordered Weinberg to keep records of time and expenses incurred as a result of the subpoena for possible future reimbursement. *See* Rec. Doc. 64437, at 4.  Its assessment was correct. While Weinberg had already produced to the FAC **all** of this common benefit time in Personal Injury and private TPP litigation, he had not submitted any of it with regard to AG litigation.  In order to produce the records, Weinberg put his office staff on mobilization to generate the materials he would need to review and verify AG time. Meanwhile, during those days, he was personally engaged in first-chairing important Vioxx depositions in AG litigation in the Utah case, and had a family emergency

requiring his attention.  Also, he had to prepare for and attend the June 20 proceeding in New Orleans, which also impaired his ability to produce an instant response to the subpoena. *See* Exhibit 8, at ¶¶ 6-15.

While progress was being made to compile the AG records for production, and Weinberg was juggling as many balls in the air as he possibly could, the FAC was completely silent.  After this Court's denial of the Motion to Quash, he did not receive any word from the TPP FAC about the documents until June 17, 2013.  On that date, in a 1:55 p.m. e-mail to Margaret Woodward, the FAC did not set a new date for production, but merely inquired when the TPP might expect production. *See* Exhibit 9. As Ms. Woodward is in Africa, the undersigned immediately replied that while he was aware that Weinberg's office was compiling the records, he was not aware when this would be completed, and would make inquiry and report. *See* Exhibit 10.  The FAC wrote back, merely asking to "[p]lease keep us advised. We are anxious to receive the materials as soon as possible." *See* Exhibit 11. The undersigned wrote back that he would comply. *See* Exhibit 12.

Consistent with this promise, and unaware of any deadline that the TPP FAC was imposing on production, other than "as soon as possible," the undersigned wrote to the FAC on June 18, immediately after hearing from his client, that progress was being made, but due to his absence from the office for Vioxx depositions, his need to comply with a court ordered expert report schedule in those cases, and his travel to New Orleans to answer Special Master Juneau's questions on June 20, 2013, he would not be back in his office able to devote full attention to the production until the beginning of the following week. Thereafter, he would work diligently to have the documents on June 28.  *See* Exhibit 13.

Weinberg was never informed that his progress was not acceptable, or that the FAC wanted the records by June 20th.  Weinberg's first notice of a June 20 "deadline" was the FAC's filing on June 19th – *after* he was *en route* to New Orleans for the June 20 hearing – which filing took the position that the FAC considered his failure to produce the records by June 20 as contemptuous, and asked

for an expedited ruling to this effect.  *See* Rec. Docs. 64448, 64449.

The undersigned immediately prepared an opposition to the Motion for Expedited Consideration, *see* Rec. Doc. 64452, but did not prepare and file an opposition to the Motion for Contempt itself, which, as filed, was set for hearing on *July 10, 2013. See* Rec. Doc.64448-4. Since there were only a few hours left in the day, the undersigned decided that this Court would be better served with his pleading addressing why there was no exigency to the Motion for Contempt, rather than a pleading addressing Mr. Weinberg's position on the merits, and his defenses, to the contempt charge.

When the undersigned filed his opposition, he did not know that this Court had already ruled on the FAC's Motions for Expedited Hearing (granted) and Motion for Contempt (granted in part). *See* Rec. Doc. 64451.  Apparently, at the time it ruled, this Court did not have the benefit of Weinberg's Opposition, to which was attached the e-mail thread concerning the production of the documents, including the FAC's June 17 e-mail, which did not suggest that the documents were wanted or needed by a specific date, but merely that they were desired "as soon as possible."

While this Court had already issued an order on June 19, the undersigned did not receive it until sometime **after 1:00 pm on June 20**, **after he returned from the June 20 hearing**.  There, he found that he had received via e-mail a Notice of Service of a copy of an order of this Court dated June 19. This notice from File and Serve arrived by e-mail at 9:39 am, almost forty minutes *after* the June 20 proceeding had begun.  *See* Exhibit 14. The timestamp on the Order shows it was not received by File and Serve until June 20, at 9:38 am, again almost 40 minutes *after* the commencement of the hearing.  *See* Exhibit 15.  Accordingly, while the hearing was in progress neither the undersigned nor Weinberg knew of the June 19 order and this Court's ruling that he was required under penalty of contempt to produce documents at that hearing. *See* Exhibit 2, at ¶ 4,

The FAC, however, apparently was aware of the Order, but **did not** provide a copy to the undersigned.  It referred to the order during the proceeding, and made the statement that your Honor

had states that if Mr. Weinberg did not produce the documents at the June 20 proceeding, he would be found in contempt. *See* Exhibit 16, at 4-5. The undersigned, unaware of any such order, viewed this comment as an overstatement of what this Court stated in denying the Motion to Quash.

Nonetheless, out of an abundance of caution, the undersigned did, at the June 20 hearing, attempt to make a record to explain what had been done to that point about the records subject to the subpoena, an explanation that was denominated as a "partial return." With regard to common benefit time,[1] there were only three categories of cases that are covered by the subpoena: (1) Personal Injury cases, (2) TPP cases, and (3) AG cases. This is so because **Weinberg has not done common benefit work in any other type of Vioxx case**. The undersigned stated on the record of the June 20th hearing that as to categories (1) and (2), the FAC has long had Weinberg's complete common benefit time records sought in the subpoena. *See* Exhibit 16, at 6-7. There can be no doubt of this because the FAC **itself supplied copies of these records to Weinberg** in response to discovery ordered by this Court in the PI Litigation and in the TPP litigation. Weinberg had no additional time to report in these categories, and accordingly, in making his "partial return" he was certifying that there was no unreported time for either PI or TPP common benefit work for which he could provide additional records to the FAC. The final category – AG time – involved the records that Weinberg had yet to produce. These are the records that were being compiled in New Jersey, a process that had begun when this Court denied Weinberg's Motion to Quash, but which was very nearly complete.

While this explanation was called a "partial return," and was all the undersigned could do as the records for categories 1 and 2 were in his office (and already in the possession of the FAC in any event), and the records for category 3 were in New Jersey, the "partial return" was not done because of knowledge that this Court had entered an order requiring Weinberg to respond to the subpoena

---

[1]This Court has already interpreted the scope of subpoena as only applying to common benefit time, and as excluding time spent that only benefit private clients. Private time was not required to be maintained. *Cf.* PTO 6, regarding PI time records ("No time spent on developing or processing any case for an individual client (claimant) will be considered or should be submitted."). This Court has stated that the subpoena only applied to records Weinberg has obliged to maintain (which would exclude non common-benefit time). *See* Rec. Doc.64451, at 2 ("The TPP FAC's request comprises time records that Weinberg was already obligated to keep.").

by June 20.  Indeed, neither the undersigned nor his client had any such knowledge.  Rather, the "partial return" was made in an effort to keep the FAC and the Court apprised of the status of things, what it could expect to receive, and when – in short, the partial return was made in a good faith attempt to avoid any more controversies, misunderstandings, or further litigation about the records. It demonstrates that neither Weinberg or his counsel had any disrespect for the orders of this Court and were doing everything they could to be cooperative, even though they believed they were not then compelled to make the "partial return."

On the afternoon of June 20, shortly after the undersigned received the June 19 order, he received from the FAC a Motion to Set Hearing to Find the Law Firm of Eric Weinberg in Contempt, or -Alternatively to Strike.  *See* Rec. Doc. 64454. He immediately called Weinberg to inform him of these developments, and reached him as he was preparing to board his flight back to New Jersey. Their knowledge of this Court's June 19 order compelled them to conclude that, even though they had previously believed there was no deadline for production, but that the FAC only wanted the documents "as soon as possible," they were obliged to attempt to purge any alleged violation of this Court's June 19 order.  It was imperative to do whatever it took to get the AG records complete and served upon the FAC as fast as could be accomplished, no matter the Herculean effort required, the expense, or the sacrifice of time needed in ongoing litigation. *See* Exhibit 8, at ¶ 20.

On June 21, this Court entered a show cause order why Weinberg should not be held in contempt, and set it for hearing on July 1, 2013. *See* Rec. Doc. 64459.  Weinberg's opposition was due July 26, 2013, but this deadline was extended by the Court by one day at its June 25, 2013 status conference.

The AG "Manhattan Project" paid off, and the AG records were ready by June 24. On that date, the undersigned delivered by hand to Leonard Davis a CD-Rom containing all of the records that were listed in the subpoena. The cover letter that accompanied the CD-Rom explained that there were three categories of documents. 1 was common benefit PI time; 2 was common benefit TPP time,

and 3 was common benefit AG time. All the records for categories 1 and 2 on the CD were byte for byte copies of what the FAC had previously given to Weinberg in discovery, and so were records that the FAC already had in its possession for a long, long time. The category 3 time, AG common benefit time, only commenced after the TPP settlement, and so there could be no double-dipping of entries in this group with categories 1 and 2. *See* Exhibit 17.

This entirety of this factual backdrop sets the stage for consideration of whether Weinberg should be held in contempt of this Court. When the TPP FAC's misleading curtain is pulled back, Weinberg believes that this Court will see that he is not.

## II.   ARGUMENT

### A.   General standards with regard to contempt for violation of a subpoena

FRCP 45(e) provides in part that, "[f]ailure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued." Whether "to hold a nonparty in contempt under Rule 45(e) is within the discretion of the Court," and is not mandatory even if there is a technical violation. *In re Xenos Yuen*, 2013 WL 1703887, *2 (Bankr.Tex. 2013), citing *In re 400 Walnut Assoc., L.P.*, 475 B.R. 217 (Bankr. Pa. 2012). Accordingly, a court should not find contempt, even if an order is violated, if there is an "adequate excuse." *Mattie T. v. Johnston,*, 74 F.R.D. 498, 501 (D.C. Miss. 1976).

The burden of proof is on the mover, and it is high. "Under this rule, [while bad faith is not an element], a party moving to hold another party in contempt must demonstrate by clear and convincing evidence that the alleged contemnor violated the court's prior order." *Food Lion, Inc. v. United Food and Commercial Workers Intern. Union, AFL-CIO-CLC*, 103 F.3d 1007, 1016 (D.C.Cir. 1997).

### B.   Weinberg has adequate justification for his alleged failure to comply with this Court's June 19 order.

Due process requires that a person charged with contempt be given the basic requirements

of due process, *i.e.*, adequate notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

> Although the contempt involved in this case was civil in nature and served mainly the purpose of the other litigant, the basic requirements of due process – adequate notice and proper hearing – were still required. *United States v. Boe*, 491 F.2d 970 (8th Cir. 1974); *Philippe v. Window Glass Cutters League*, 99 F.Supp. 369 (W.D.Ark.1951).

> Like any civil litigant, a civil contemnor is . . . clearly entitled to those due process rights, applicable to every judicial proceeding, of proper notice and an impartial hearing with an opportunity to present a defense . . .. Certainly the history of contempt litigation, . . . prescribes extreme care and insistence on the full indicia of due process in contempt cases . . .. *Brotherhood of Locomotive Firemen & Enginemen v. Bangor & Aroostook R. Co.*, 127 U.S.App.D.C. 23, 380 F.2d 570, 581-582, *cert. denied*, 389 U.S. 327, 88 S.Ct. 437, 19 L.Ed.2d 560 (1967). *Accord, Gialde v. Time, Inc.*, 480 F.2d 1295 (8th Cir. 1973); *Consolidation Coal Co. v. Local No. 1784*, 514 F.2d 763 (6th Cir. 1975); *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1947); *Cooke v. United States*, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925).

*Fisher v. Marubeni Cotton Corp.*, 526 F.2d 1338, 1342 (8th Cir. 1975).

Implicit within the concept of due process as it relates to contempt is an ability to comply with the court order that underlies a contempt charge.  "A contempt order is not proper if the contemnor is unable to comply with the order he or she failed to obey."  *Pierce v. Vision Investments, Inc*. 779 F.2d 302, 310 (5th Cir. 1986), citing *United States v. Bryan*, 339 U.S. 323, 330, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950).

> [I]nability to comply with a subpoena is a defense to the contempt charge. *United States v. Bryan*, 339 U.S. 323, 330, 70 S.Ct. 724, 94 L.Ed. 884 (1950); *United States v. Thompson*, 319 F.2d 665, 670-671 (2d Cir. 1963); 1 Wright, *Federal Practice and Procedure* § 279 at 568-569 (1969). *Cf. Maggio v. Zeitz*, 333 U.S. 56, 69-77, 68 S.Ct. 401, 92 L.Ed. 476 (1948); *Brotherhood of Locomotive Firemen and Enginemen v. Bangor & Aroostook Railroad Co.*, 127 U.S.App.D.C. 23, 380 F.2d 570, 581-582, *cert. denied*, 389 U.S. 327, 970, 88 S.Ct. 437, 463, 19 L.Ed.2d 560, 461 (1967); *Parker v. United States*, 153 F.2d 66, 70 (1st Cir. 1946).

*Desmond v. Hachey*, 315 F.Supp. 328, 332 (D.C. Me. 1970).  *See also Williams v. Iberville Parish School Bd.*, 273 F.Supp. 542, 545 (E.D.  La. 1967) ("The fact remains that defendants have not violated Section II(d) as yet because they have obviously not yet had time to comply.").

Also, it is axiomatic that the service of an order at a time that is too late to afford a reasonable opportunity for compliance cannot give rise to a finding of contempt. For example, a subpoena served by a Pennsylvania court (the correct one) at about 1:45 p.m. in connection with a deposition set to commence at 1:30 p.m. that same day provided a nonparty witness an "adequate excuse" for not appearing at deposition on that day, precluding the court from holding the witness in contempt, even though the witness had been provided actual notice of such deposition by an invalid subpoena served one week earlier by a Georgia, rather than a Pennsylvania, district court. *See Kupritz v. Savannah College of Art & Design*, 155 F.R.D. 84, 88-89 (D.C. Pa. 1994).

**1.  Weinberg was not heard prior to the issuance of this Court's June 19 order.**

The Docket Sheet of this Court shows that its June 19th order, Rec. Doc. 64451, was issued prior to Weinberg's filing his Opposition to the FAC's Motion for Expedited Consideration of its Motion for Contempt, Rec. Doc. 64452. Accordingly, it appears this Court issued its ruling without the benefit of his argument, or more importantly, the evidence attached to his opposition, which included the e-mail chain with the FAC about providing documents in response to the subpoena. While there is no doubt that this Court is authorized to issue emergency *ex parte* orders, the statement in its June 19 order that failure to produce the records on June 20 *would* result in a finding of contempt should not have been made without an opportunity for Weinberg to present a defense. This is one of the reasons this Court should reconsider its June 19 order.

**2.  Weinberg did not have time to comply with, or notice of, this Court's July 19 order until after the time for compliance passed.**

Weinberg did not have time to comply with this Court's June 19 order. As explained above, he had no knowledge that the FAC was seeking document production on June 20 until it filed its Motion for Contempt on June 19. Weinberg only learned of the order after he had begun his travel to New Orleans. The last word he had received from the FAC was a June 17th e-mail that merely stated that it wished to be kept informed about the progress that was being made because it wanted

the documents "as soon as possible." Even had he learned of the June 19 order the instant it was issued, it would have been impossible for him to comply. One portion of the requested records was not yet ready for delivery, and in order to have them ready, his presence in New Jersey was required. Yet, he was under order to appear in New Orleans on the morning of June 20.

More importantly, even had the records been ready for delivery, Weinberg was not served with, and did not receive a copy of, this Court's June 19 order until it was too late to comply. *See e.g.*, *Kupritz v. Savannah College of Art & Design*, *surpa*. The Order was not served until 9:39, forty minutes after the proceeding of the 20th had begun. While at the proceeding the FAC made reference to the order, it did not offer a copy of it, and the undersigned had no indication that such an order was issued, since he had checked his e-mail prior to the commencement of the hearing and saw no such order.

Nonetheless, as explained above, Weinberg's counsel did make a "partial return" at the hearing. He explained that the **all** fee records related to both common benefit Personal Injury time and common benefit private TPP time were already in the FAC's possession. The only thing that had yet to be produced was common benefit AG time. *See* Exhibit 16, at 6-7. This good faith attempt to do all that could be done should be considered by this Court as an indication that there was no contempt of this Court's orders afoot, but rather every attempt at compliance was being made out of respect for them, even for orders that Weinberg and his counsel did not know existed.

### 3. Weinberg acted on advice of counsel.

While advice of counsel is not a defense to contempt, it can be considered as a mitigating factor in deciding what sentence should be imposed. *See United States v. Goldfarb*, 167 F.2d 735, 735 (2d Cir. 1948), citing *Eustace v. Lynch*, 80 F.2d 652 (9th Cir. 1935) ("Even advice of counsel is not a defense to an act of contempt, although it may be considered in mitigation of punishment."). Accordingly, when a party has failed to honor a subpoena because of advice of counsel, a court may decline to punish him and require only that the documents be produced. *See Mattie T. v. Johnston*,

74 F.R.D. 498, 502 (D. C. Miss. 1976) ("[W]hen a party has failed to honor a subpoena because of advice of counsel, the courts are often reluctant to punish the subpoenaed party and only require that the documents be produced. *E.g., Steamship Co. of 1949, Inc., v. China Union Lines, Hong Kong, Ltd.*, 123 F.Supp. 802, 805 (S.D.N.Y.1954); *Virginia Metal Products Corp. v. Hartford Accident and Indemnity & Co.*, 10 F.R.D. 374, 375 (S.D.N.Y.1950).").  *See also  Colorado Mill & Elevator Co. v. American Cyanamid Co.*, 11 F.R.D. 306, 307 (D.C. Mo. 1951) (Where witness who had been ordered by court to produce documents for inspection, refused to do so on advice of counsel who sincerely believed that documents should not be produced because they contained immaterial and somewhat confidential matters intermingled with other matters, witness would not be punished for contempt.).

Weinberg acted on advice of counsel. *See* Exhibit 2, at ¶ 5,  Given the information counsel had, Weinberg was instructed to prepare the records as quickly as possible, but that there was no time limit running, because there was no trial to which the subpoena could relate, and Special Master Juneau had informed them that the records were not relevant to the proceeding he had called for June 20.  Moreover, counsel relied on the e-mails from the FAC that **never** gave a time for production, and merely stated that the FAC wanted the records "as soon as possible," implying that the progress that was being made toward production was acceptable to the FAC.

### 4.    Weinberg has purged his alleged contempt.

"[P]urging the [civil] contempt eradicates any effect of a violation."  *Marshall v. Whittaker Corp., Berwick Forge & Fabricating Co.*, 610 F.2d 1141, 11145, (3rd Cir. 1979). "[T]here can be no finding of contempt if it has been shown that the alleged contemnor has been 'reasonably diligent and energetic in attempting to accomplish what was ordered.'"  *Leser v. U.S. Bank Nat. Ass'n*, 2011 WL 1004708, *10  (D.C. N.Y. 2011), quoting *Equal Employment Opportunity Comm'n v. Local* 638, 753 F.2d 1172, 1178 (2d Cir.1985).

Weinberg engaged in more than an "energetic" effort to produce the documents required by

the subpoena. On June 24, long before the June 28 date he had predicted, he was able to deliver to the FAC the AG time records, which was done on a CD-Rom that also contained the other time records the FAC already had in its possession – ALL common benefit Personal Injury litigation time and ALL common benefit private TPP time.

**5.    The FAC is estopped to deny Weinberg's adequate justification defense.**

The FAC is in no position to argue that Weinberg should have known that he had to produce the documents by June 20.  It **never** communicated to Weinberg that it needed the documents for any particular date, much less the June 20th proceeding.   Weinberg reasonably believed that the documents were not required for this hearing given the conversation between Ms. Woodward and Special Master Juneau about that very issue. Further, the first and only demand the FAC made about the documents was the June 17 e-mail, which merely asked that it be kept informed about the progress of their compilation, as it wanted them "as soon as possible."   This is not the action of someone who either believes he has the right to documents by June 20, or even necessarily wants them by that date.   Waiting until June 19th to file a Motion for Contempt further belies its complaint that it wanted and needed the documents earlier.   Had the FAC demanded the documents on a specific date before it filed its Motion for Contempt, Weinberg could have tried to comply, or it could have come to this Court to seek protection. But the FAC did nothing, until on June 17th it stated that it wanted the documents "as soon as possible," and then, without attempting further contact with Weinberg, simply moved for contempt.

A subpoena must have a return date. *See* FRCP 45(a)(1)(A)(iii) (Subpoena must "command each person to whom it is directed to do the following *at a specified time and place*:... produce designated documents." (Emphasis added).  When the original subpoena was rendered moot by the cancellation of the May 23, 2013 trial, which was the specified time and place for compliance,  at a minimum the FAC should have set a new return date, in writing, and not simply filed a Motion for Contempt at a time when compliance with its demand was physically impossible.

-15-

Moreover, the FAC took no steps to preserve the validity of or to continue its subpoena, which expired when the May 23 hearing was cancelled.  This is grounds alone for this Court to recall its June 6 ruling on the ground of mootness.  As one court has observed:

> As a general rule, the continuance nullifies the subpoena. *** The parties or the court, however, may take action to continue the subpoena to the new date.  *** Absent such action, the continuance of the proceeding nullifies the subpoena and renders a motion to quash the subpoena moot.

> In the present case, the continuance nullified the October 2006 Subpoena because neither the district court nor Respondent's counsel took any action to continue it to the new hearing date. This Court therefore should have denied the Motion to Quash as moot. This Court finds that the Order was based on a manifest error of fact and law and that reconsideration is warranted.

*Gaudin v. Remis*, 2007 WL 294130, *3 (D.C. HI. 2007).  *See also Gulf Oilfield Production Co. v. Hoover Production Co.*, 2011 WL 1321607, *3 (E.D.La.2011) ("[I]n light of the presiding Judge's continuance of the trial, the motion, insofar as it seeks to quash the trial subpoenas of both Bradbury and Brothen, are moot."); *Compton v. Torch, Inc.*, 2000 WL 622604, *4 (E.D.La. 2000) , *aff'd* 277 F.3d 1373 (5th Cir. 2001) ("Defendant seeks to quash the Trial Subpoena issued on Torch's corporate representative requesting testimony and production of documents. The continuance of the Trial has nullified this subpoena, and thus renders this motion MOOT."); *Pushko v. Klebener*, 2007 WL 2671263, *4 (M.D. Fla. 2007)(trial subpoenas "nullified by virtue of the continuance of the trial for which they were issued[.]").

In *Manufacturer's Life Ins. v. Tullis*, 1992 WL 125394 (E.D.La. 1992), the Court appeared to reach a different conclusion.  After a trial had been continued, it held on a Motion to Deem Trial Subpoenas Continuing that, "[a] subpoena represents a continuing duty to appear and does not expire upon its stated date. *Blackmer v. United States*, 284 U.S. 421, 433 (1932); *United States v. Snyder*, 413 F.2d 288, 289 (9th Cir.1969); *Shulton v. Optel Corp.*, 126 F.R.D. 80, 81 (S.D.Fla.1989)."

On closer examination, *Tullis*, and more importantly the law upon which it relied, actually supports the view that the subpoenas at issue lost their force when the May 23, 2013 trial date was

cancelled.  In *Blackmer*, the Supreme Court found that a subpoena continued to have effect despite a continuance because of a federal statute then existing:

> **The subpoena contained the usual provision that the witness was 'not to depart the court without leave of the court or district attorney.**' Cf. Rev. Stat. s 877, U. S. C., tit. 28, s 655 (28 USCA s 655). It was the duty of the petitioner to respond to the subpoena and to **remain in attendance until excused by the court or by the government's representatives**.

284 U.S. 421, 443, 52 S.Ct. 252, 257 (emphasis added).  *Snyder* and *Shutlon*, the other two cases cited in Tullis, both apply *Blackmer* to Rule 45, even though the statute relied on in *Blackmer* no longer exists.

However, in this case, a continuance is not at issue. The parties, including the FAC which had issued the subpoena, **cancelled** the trial, and instead agreed to submit the matter on briefs.  This is precisely the kind of release that *Blackmer* said was required to terminate a subpoena. When the FAC abandoned the trial, it "excused" Weinberg's return on the trial subpoena, to use the language of *Blackmer*.[2] There was no subpoena after that point for him to comply with, the issue of whether it should be quashed was moot, and this Court should now so recognize by reconsidering and vacating its order of June 19th, or at least it should refuse to enforce the subpoena.[3]

---

[2] The trial date cannot be unlinked from the subpoena, for a subpoena cannot result in the a blanket order to produce documents, as can a Rule 34 Motion to Produce.  "Discovery under Rule 34, F.R.Civ.P., and Rule 45, F.R.Civ.P., differs [in that] while Rule 34 is invoked merely to inspect documents prior to trial, Rule 45 is utilized to compel production of documents for use at depositions or the trial." *Continental Coatings Corp. v. Metco, Inc.*, 50 F.R.D. 382, 384 (D.C. Ill. 1970).

[3] Any argument by the FAC that the June 6 denial of Motion to Quash is the equivalent of an order to produce would be wrong.  To the contrary, the June 6 order cannot be the subject of a motion for contempt, because it had no date in it by which production was due.  To hold a party in contempt, the district court "must be able to point to a decree from the court which 'set[s] forth in specific detail an unequivocal command' which the party in contempt violated." *Ferrell v. Pierce*, 785 F.2d 1372, 1378 (7th Cir.1986) (quoting *H.K. Porter Co. v. National Friction Prods.*, 568 F.2d 24, 27 (7th Cir.1977))." *Stotler & Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir.1989). See also *Hornbeck Offshore Services, L.L.C. v. Salazar*, 713 F.3d 787, 792 (5th Cir.  2013) ("A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *citing Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir.1995)."); *Akzo Nobel Inc. v. U.S.*, 478 Fed.Appx. 126, 135 (5th Cir. 2012), *citing Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d 380, 383 (5th Cir.1999) ("The judicial contempt power-a potent weapon-should not be used if the court's order upon which the contempt was founded is vague or ambiguous.").

      **6.**    **The June 19 order is predicated upon factual misrepresentations which induced this Court to err, justifying reconsideration of the June 19th order, or at the least mitigation of Weinberg's alleged contempt.**

Of importance to the Court in its June 19th ruling was the time between the day the subpoena was originally served and the June 28 proposed return date. *See* Rec. Doc. 64451, at 2. However, there were intervening events that should be considered. After the subpoena was served on May 13, 2013, Weinberg promptly filed his Motion to Quash on May 21. *See* Rec. Doc. 64412.[4] On that same date, Special Master Juneau ordered that he would rule on the Motion in due course, after briefing was complete. *See* Exhibit 5. Nothing transpired for several weeks, during which time the case was under submission and the record was closed, awaiting Master Juneau's decisions. Accordingly, there was no reason for Weinberg to produce documents in response to what he believed was a moot subpoena – no one could possibly have known that there would be any future "hearing" of any nature or that the record would be reopened. Then, on June 10, Weinberg received notice of this Court's June 6 ruling on his Motion to Quash, and also received Special Master Juneau's revised protocol ordering a "hearing" for the purpose of questioning certain witnesses.[5] Co-

---

[4] Practice comment C45-26 to FRCP 45 states that, "[w]hile technically there is no automatic stay of compliance upon the mere making of a motion to quash a subpoena, there is a general understanding that compliance may be withheld until the court rules on the motion."

[5] In correctly understanding the nature of the proceeding contemplated by Special Master Juneau, semantics make a difference. While the FAC has called it a "hearing" in its attempt to convince this Court that it would somehow have the ability to use the subpoenaed records to further its defense, the transcript of the June 20 proceeding shows otherwise. As the Special Master stated at the June 20th proceeding:

> And the purpose of this hearing today -- I say hearing, it's more informational from my standpoint -- is to not have an actual hearing as was originally contemplated, because the matter is submitted. I asked for this conference or hearing today so that I could receive and ask questions, because I got to have clarification as to what I appreciate the factual issues are in the case and to give the parties an opportunity to answer those questions and give me some elaboration on those issues.
>
> So, as contrary to what we all know as trial lawyers as a standard matter of cross examination, so forth, that's not what we're here to do. It's for clarification purposes for me to best understand as best I can what the submissions are and so forth.

Exhibit 16, at 2-3. Accordingly, the Special Master disavowed that it was a hearing, and that introduction of evidence, or making new arguments, was not "what we're here to do." The ONLY purpose of the proceeding was for the parties to answer HIS questions, not to use documents to make new ones of their own, as he considered the matter under

(continued...)

counsel Margaret Woodward immediately contacted Special Master Juneau to inquire whether a planned family trip to the remotest regions of Africa should be cancelled to attend the June 20th proceeding, and was told that she should go to Africa because there would be no direct or cross examination of the witnesses by counsel, and that they would only be subject to questioning by the Special Master himself.  See Exhibit 6.  Nonetheless, and despite the later confirmation by Special Master Juneau that the hearing's scope was extremely limited to his questions only, *see* Exhibit 7, (which underscored to the undersigned that the requested documents could in no way be relevant to the June 20 proceeding), Weinberg immediately instructed his office to begin to prepare a rapid response to the subpoena within the limits of the demands of the other litigation that was actively ongoing in Vioxx cases. *See* Exhibit 8, at ¶¶ 11-15.

While this Court correctly points out that there were two weeks between its June 6 order and the June 20 proceeding before the Special Master, the following facts are also important.  A two week delay in producing documents in this case is hardly novel.  The very first fee discovery dispute between Weinberg and the PI FAC was a motion filed by Weinberg to receive access to certain records in the FAC's possession, Rec. Doc. 55315, and the FAC did not make those records available until Dec. 10, 2010, *see* Rec. Doc. 57606, 12 days after this Court ordered it to do so, *see* Rec. Doc. 56731 (Nov. 29, 2010 Order ).  In the TPP fee discovery dispute, at an October 11, 2011 status conference, the FAC was ordered to produce certain records, which it subsequently did not do, thereby necessitating the filing of a Motion to Produce on Nov. 9, 2012. *See* Rec. Docs. 64165, 64170.  Even though the request for production was unopposed, Weinberg did not receive the documents until Dec. 13, 2012.  *See* Exhibit 18.  And more importantly, in all previous discovery disputes, the parties worked together cooperatively, with no need for Court intervention once the Court ruled on whether production was due. That is why the e-mail of June 17, only seven days after service of the order denying the Motion to Quash, was not construed as one seeking to impose a

---

[5](...continued)
submission.

deadline, much less an imminent June 20 deadline, when it merely stated that the FAC wished to be kept informed about the progress in producing the records because it was anxious to receive them "as soon as possible." The e-mail exchange was not combative; it did not contain any hint of a deadline or threat of contempt. Had the FAC made known at any time, but certainly by June 17, or even June 18, that it would seek to impose a June 20 deadline, some reasonable effort at accommodation could have been worked out or the issue resolved. But, it was not until June 19, when Weinberg was *en route* to New Orleans, that he received notice that the FAC was seeking a contempt citation, a change in outward course taken at a time when the FAC must have known that Weinberg could not possibly comply because he would be on his way to New Orleans.

Finally, also important to this Court's June 19 ruling was its conclusion that "Weinberg's failure to produce this evidence during the Special Master's hearing would be prejudicial to the ability of the TPP FAC to rebut Weinberg's objection to the FAC's recommended allocation." *See* Rec. Doc. 64451, at 2. Again, with all due respect to this Court, it appears the Court must not have known that was no "hearing" before the Special Master.  The time records had no relevance to the FAC's ability "to rebut Weinberg's objections" at the June 20th hearing. The record before the Special Master was closed; the parties had submitted the case for decision by joint consent when they agreed to cancel the hearing for which the documents had originally been subpoenaed. At that time, the FAC made the conscious choice to forego the documents by its decision to submit the case on briefs, thus cancelling any trial where the documents would or could be used. And, **no one knew then that there would be any more hearings before the Special Master in this matter**. So, the FAC had to understand that its decision to cancel the hearing made the subpoena moot, as least as far as proceedings before the Special Master were concerned.

When the Special Master issued his subsequent order for certain persons to appear before him to answer questions, this did not open the door to the use of the subpoenaed documents. The Special Master made clear in his order that the purpose of the proceeding was extremely limited in scope, and

the parties were to answer his questions, not present testimony reflecting their own arguments or agenda. *See* Exhibit 7. He also advised Ms. Woodward to go to Africa as the documents were not relevant. *See* Exhibit 6. The Special Master reiterated the limited parameter of the June 20th proceeding at its opening, where he pointed out that it would be improper to actually call it a "hearing." *See* note 5, *supra*. To underscore that the proceeding was not an evidentiary hearing, the Special Master refused to entertain objections. *See* Ex 16., at 13. And, he concluded the hearing with the following statement, indicating that the absence of any documents, such as the time records, had no impact on him or did not hamper his fact finding mission: "Just for the purpose of the record, this has accomplished what I wanted to accomplish, which was to get my clarification of issues that are here." Exhibit 16, at 89. Accordingly, the subpoenaed records could not be used at this proceeding to further the FAC's case, which had long been submitted and the record closed, and were not needed by the Special Master in considering the limited areas of inquiry he posed to the parties. The FAC was simply not prejudiced.

> **7.    The subpoena was an illegal attempt to conduct discovery in contravention of the Special Master's protocol, and therefore should be given no effect.**

"It is a proper defense to a petition for a contempt order for failing to obey a subpoena to establish that the requirements of Rule 45 which govern the validity of a subpoena were not met." *Doble v. U. S. District Court*, 249 F.2d 734 (9th Cir. 1957), quoted in *In re Shur*, 184 B.R. 640, 641 (Bkrtcy. N.Y. 1995), and *In re Johnson & Johnson*, 59 F.R.D. 174, 177 (D.C. Del.1973).

> The invalidity of the court order allegedly violated is always a defense to civil contempt. *McLean v. Central States, Southeast and Southwest Areas Pension Fund*, 762 F.2d 1204, 1210 (4th Cir.1985); *In re Timmons*, 607 F.2d 120, 124 (5th Cir.1979); *Blocksom & Co. v. Marshall*, 582 F.2d 1122, 1124 (7th Cir.1978); *Application of Johnson & Johnson*, 59 F.R.D. 174, 177 (D.Del.1973). This rule is to be expected, since the only purpose of civil contempt is to benefit the other party, and no one should benefit from an order that should not have been issued in the first place.

*Hecht v. Don Mowry Flexo Parts, Inc.*, 111 F.R.D. 6, 13 (D.C. Ill. 1986). As the Fifth Circuit has expressed the rule:

> An order of civil contempt cannot stand if the underlying order on which it is based is invalid, for its only purpose is to secure compliance with the order. Once the order is decreed invalid, compliance is no longer required. *See United States v. United Mine Workers*, 1947, 330 U.S. 258, 294-95, 67 S.Ct. 677, 696, 91 L.Ed. 884, 913; *Cliett v. Hammonds*, 5 Cir. 1962, 305 F.2d 565, 570.

*In re Timmons*, 607 F.2d 120, 124 (5th Cir.1979), cited in *Abell v. Frank*, 625 F.2d 653, 656 (5th Cir. 1980). *See also ITT Community Development Corp. v. Barton*, 569 F.2d 1351, 1356 (5th Cir. 1978) ("It is a well established principle that an order of civil contempt cannot stand if the underlying order on which it is based is invalid.").[6]

Even if the validity of the subpoena was not a proper issue to consider in connection with this motion  for contempt, Weinberg has asked this Court to reconsider its ruling of June 6 denying his Motion to Quash.  Accordingly, for the reasons that follow, that ruling should be vacated, and the subpoena should be quashed.

"It ought be recognized that subpoenas are not available to circumvent discovery cutoffs." Wright, Miller, Marcus, Kane, Steinman, 8A Fed. Prac. & Proc. Civ. § 2108 at n 20 (3d ed.).

> [W]hile subpoenas can be used to compel the production of documents at trial, they cannot be used "as a means to engage in further discovery."). *BASF Corp. v. Old World Trading Co.*, No. 86 C 5602, 1992 WL 24076, at *2 (N.D. Ill. Feb. 4, 1992). See also *United States v. Watchmakers of Switzerland Info. Ctr. Inc.*, 27 F.R.D. 513 (S.D.N.Y.1961) (quashing trial subpoena, in part, on the basis that the party seeking production knew of the existence of the documents and could have discovered same through pretrial discovery); *Pitter v. American Express Co.*, No. 82 Civ. 7451, 1984 WL 1272, at * 6 (S.D.N.Y. Nov. 27, 1984) (finding that "shotgun" production demands at trial "are an impermissible substitute for orderly discovery.").

*American Honda Finance Corp. v. Salyer*, 2006 WL 2594543, *1 (S.D.Miss. 2006).  *See also Williamson v. Horizon Lines LLC*, 248 F.R.D. 79, 83 (D.C. Me. 2008) ("The Court will not accede to Horizon Lines' request that it issue a Rule 45 subpoena to obtain documents it could have obtained during the discovery process."); *Pushko v. Klebener*, 2007 WL 2671263, *3 (M.D. Fla. 2007), quoting *Nicholas v. Wyndham Int'l, Inc.*, No. 2003 WL 23198847, at *2 (D.C. Vi. 2003) ("Rule 45

---

[6]The rule in criminal contempt cases is not the same. *See Timmons, supra.*

subpoenas have been held to generally constitute discovery, 'and, therefore, are subject to the same time constraints that apply to all of the other methods of formal discovery.'); *Dodson v. CBS Broad. Inc.,* 2005 WL 3177723, *1 (S.D.N.Y. 2005) ("Rule 45 [t]rial subpoenas [duces tecum] may not be used ... as means to engage in discovery after the discovery deadline has passed." (internal quotation marks omitted; alterations in original)); *Mortg. Information Services, Inc. v. Kitchens*, 210 F.R.D. 562, 568 (D.C. N.C. 2002) (" [T]he Court holds that service of a Rule 45 subpoena duces tecum upon a party opponent is appropriate when done prior to the close of the discovery period. Because the subpoena duces tecum was not timely served in this case, Defendant's Motion for a Protective Order will be granted and the subpoena will be quashed."); *Alper v. United States*, 190 F.R.D. 281, 284 (D.C. Mass. 2000) ("[T]o allow a party to continue with formal discovery ... after the discovery deadline unnecessarily lengthens [the] discovery process, and diverts the parties' attention, from the post-discovery aspects of preparing a case for Trial." (internal quotation marks omitted; first alteration in original)); *Marvin Lumber and Cedar Co. v. PPG Industries, Inc.*, 177 F.R.D. 443, 445 (D.C. Minn. 1997) ("[T]o allow a party to continue with formal discovery – that is, discovery which invokes the authority of the Court – whether in the guise of Rule 45, or any other discovery methods recognized by Rule 26(a)(5), after the discovery deadline unnecessarily lengthens the discovery process, and diverts the parties' attention, from the post–discovery aspects of preparing a case for trial." ).

The FAC's subpoena was an untimely attempt at discovery, rendering it invalid under Rule 45. At the first status conference, the parties were given free reign to ask for whatever discovery they wanted. The FAC did **not** ask for Weinberg's time records, but rather asked only for a deposition. This led to the Special Master's ruling that there would be **no** discovery, and instead there would be what he jokingly referred to as a "trial by ambush."  See Exhibit 2, at ¶ 3.  Had the FAC wanted time records, it was incumbent upon it during that conference to inform the Special Master that it sought such, and he could have set up a procedure for discovery, which was the charge given him by this

Court. Instead, the FAC said nothing about wanting records. Rather, at the second status conference, it stated that it already had in its possession all the impeachment evidence it needed. Yet, it still issued its subpoena, which was flatly contrary to the protocol established by the Special Master for trial on this case. As every one of the numerous cases cited in the this section holds, a Rule 45 subpoena issued in these circumstances constitutes discovery. Special Master Juneau presided over the discovery aspects of this case, did not receive a request for time records, and ultimately decided that there would be no discovery. This Court should not allow the use of the Rule 45 subpoena to circumvent the orderly processes that Special Master Juneau had ordained with regard to how this matter would be tried. The FAC's attempt to do so is contemptuous of and undermines the Special Master's authority.

### 8.    The Alternative Motion to Strike is not at issue, and has no merit.

This Court's June 21 order commands Weinberg to appear and show cause why he should not be held in contempt and to pay fees and costs. It does not set the TPP FAC's alternative request for Motion to Strike for hearing. However, even if it did, the request should not be granted. FRCP 37(b)(2)(A)(iii) permits striking of pleadings "in whole or part" as a sanction for failing to comply with an order for production obtained under Rule 34. Striking a pleading under Rule 37 is not a permissible Rule 45 contempt sanction for failure to comply with subpoena duces tecum. *Daval Steel Products, a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1364 (2d Cir. 1991).

## III.   CONCLUSION

Weinberg never acted in defiance of the authority of this Court or its orders, as they were reasonably interpreted by he and his counsel. Had the FAC ever, at any point prior to the 11th hour, informed him that it wanted the documents on June 20, the issue would been promptly addressed, either through an amicable resolution or by seeking assistance from this Court. Instead, the only message he received before the request for contempt was a request to keep the FAC informed about the document production, as it wanted the records "as soon as possible." That request was fully

complied with.  Weinberg had no way to know he was being perceived as uncooperative, but was instead led to believe the opposite. And, he certainly had no intention of disrespecting the authority of this Court when he legitimately believed he was cooperating with the FAC, exactly as had been done in prior document productions. Now that he has produced the documents, the rule for contempt should be denied, especially since the subpoena under which he did so was moot due to the cancellation of the trial and invalid as violative of Special Master Juneau's discovery orders,. "Adequate cause" for the alleged violation of this Court's orders has been shown.  Accordingly, he has shown ample cause why he should not be found in contempt.

Respectfully submitted:

/s/ Robert E. Arceneaux
Robert E. Arceneaux, La Bar No. 01199
ROBERT E. ARCENEAUX LLC
47 Beverly Garden Drive
Metairie, LA 70001
(504) 833-7533 office
(504) 833-7612 fax
rea7001@cox.net

MARGARET E. WOODWARD, La. Bar No.13677
3701 Canal Street, Suite C
New Orleans, LA  70119
(504) 301-4333 office
(504) 301-4365 fax
mewno@aol.com

Pascal F. Calogero, Jr., La. Bar No. 03802
AJUBITA, LEFTWICH & SALZER, L.L.C.
1100 Poydras Street
New Orleans LA 70163-1950
(504) 582-2300 office
(504) 582-2310 fax
pcalogero@alsfirm.com

Attorneys for Law Offices of Eric Weinberg and Eric H. Weinberg

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No.8, on this date, June 27, 2013.


s/ Robert Arceneaux