```
 1                IN THE UNITED STATES DISTRICT COURT FOR

 2                   THE EASTERN DISTRICT OF LOUISIANA

 3                            AT NEW ORLEANS

 4

 5

 6

 7

 8   IN RE:  VIOXX PRODUCTS          ) Case No. MDL 1657 "L"
     LIABILITY LITIGATION            ) June 20, 2013
 9                                   ) Motions
     _____)
10

11

12
                     TRANSCRIPT OF PROCEEDINGS
13
              BEFORE SPECIAL MASTER PATRICK JUNEAU
14

15

16

17

18

19

20   SUSAN A. ZIELIE, RMR, FCRR
     Official Court Reporter
21   HB 406
     500 Poydras Street
22   New Orleans, Louisiana 70130
     susan_zielie@laed.uscourts.gov
23   504.589.7781

24

25   Proceedings Recorded by Computer-aided Stenography.
```

EXHIBIT 16

1          NEW ORLEANS, LOUISIANA; THURSDAY, JUNE 20, 2013          08:49:3

2                    8:50 A.M.          08:59:1

3          SPECIAL MASTER JUNEAU:  For the purposes of the record,          08:59:1

4    we're here in VIOXX products liability litigation, MDL 1657,          08:59:1

5    Section L, Judge Eldon Fallon, Magistrate Judge Knowles.          08:59:2

6          I'm Patrick Juneau, court-appointed special          08:59:3

7    master, to handle an issue which has been referred to me to          08:59:3

8    gather information, factual data, and to give a report and          08:59:4

9    recommendation to the court regarding common benefit fees and          08:59:4

10   the third-party payer aspect of this litigation.          08:59:5

11          I'd like to let the record clearly reflect that          08:59:5

12   I've previously filed a protocol in this matter to be followed          09:00:0

13   regarding submission of documents in this hearing.  It was          09:00:1

14   agreed upon by the parties, that they were going to submit the          09:00:1

15   matter on the briefs and the submissions, and I'm formally          09:00:1

16   making all of their submissions a part of the record.          09:00:2

17          And the purpose of this hearing today -- I say          09:00:2

18   hearing, it's more informational from my standpoint -- is to not          09:00:3

19   have an actual hearing as was originally contemplated, because          09:00:3

20   the matter is submitted.  I asked for this conference or hearing          09:00:4

21   today so that I could receive and ask questions, because I got          09:00:4

22   to have clarification as to what I appreciate the factual issues          09:00:5

23   are in the case and to give the parties an opportunity to answer          09:00:5

24   those questions and give me some elaboration on those issues.          09:00:5

25          So, as contrary to what we all know as trial          09:01:0

1   lawyers as a standard matter of cross examination, so forth,      09:01:0

2   that's not what we're here to do.  It's for clarification         09:01:1

3   purposes for me to best understand as best I can what the         09:01:1

4   submissions are and so forth.                                     09:01:2

5              So how we're going to proceed is I'm going to          09:01:2

6   allow -- I'd asked just certain parties to be here, and I'm       09:01:2

7   going to call and go through the questions and have an            09:01:3

8   interchange between myself and those individuals to enlighten me  09:01:3

9   as to what I appreciate the decisions I've got to make to         09:01:3

10  SPECIAL MASTER JUNEAU.  I just want to do that in a thorough      09:01:4

11  manner.                                                           09:01:4

12             And, if you looked at all the voluminous amount of     09:01:4

13  material and you just looked at that, it would have been a        09:01:4

14  futile task.  It wouldn't have any reasonable articulation of a   09:01:5

15  basis to report to the court.  So that's the purpose of this      09:01:5

16  hearing.                                                          09:02:0

17             But, while we're here in that regard, why don't we     09:02:0

18  just each of you come up and make an appearance for the record    09:02:0

19  so we'll know who everybody is here.                              09:02:0

20             Starting with you, Mr. Seeger.                         09:02:1

21        MR. SEEGER:  Good morning, Mr. Juneau.  Chris Seeger,       09:02:1

22  Seeger Weiss.                                                     09:02:1

23             With me is Dave Buchanan from my firm.                 09:02:1

24        MR. DAVIS:  Good morning, Special Master.  I'm Leonard      09:02:2

25  Davis from the law firm Herman Herman Katz.                       09:02:2

1          My partner, Mr. Herman, is downstairs in the Pools

2  status conference, and that's why he's not here.  But he will be

3  up and I expect him to be here, just so the Court's aware of

4  that.

5          MR. DASSOW:  Morning, Your Honor.  Rob Dassow, Hoyde

6  Dassow & Deets, for the central states folks.

7          MR. WEINBERG:  Good morning, Special Master.  Eric

8  Weinberg.

9          SPECIAL MASTER JUNEAU:  Mr. Weinberg, how you doing?

10          MR. WEINBERG:  Good.

11          MR. ARCENEAUX:  Morning, Special Master.  Robert

12  Arceneaux and --

13          SPECIAL MASTER JUNEAU:  Chief, you don't need to get

14  up.

15          MR. ARCENEAUX: -- Pascal Calagero, counsel for Mr.

16  Weinberg.

17          SPECIAL MASTER JUNEAU:  Mr. Davis.

18          MR. DAVIS:  If I may.  Just so that our record is

19  clear, as a matter of housekeeping, on June the 19th, Judge

20  Fallon issued an order with respect to a subpoena that had been

21  issued.  Specifically in that order, the court was dealing with

22  a subpoena issue to Mr. Weinberg that had a return date some

23  time ago, and there had been a motion to quash that was denied.

24          In Judge Fallon's order, which is record docket

25  64451, the court stated that, if Mr. Weinberg does not produce

```
 1   the time records at the Special Master's hearing beginning on    09:03:5

 2   Thursday June 20 at 9 a.m., the court will hold him in contempt.  09:03:5

 3              It's about five after 9 right now, and we have         09:04:0

 4   received no documents.                                            09:04:0

 5              I just want the record to reflect that.  Thank         09:04:0

 6   you.                                                              09:04:0

 7        SPECIAL MASTER JUNEAU:  Mr. ARS know.                        09:04:1

 8        MR. ARCENEAUX:  I don't know if I need to say anything,      09:04:1

 9   Your Honor.  That matter is before Judge Fallon.                  09:04:1

10              But I would like to, I guess for the purpose of        09:04:1

11   completeness, introduce -- although not physically -- but        09:04:2

12   introduce by reference the several exhibits I filed yesterday     09:04:2

13   afternoon in opposition to the fax motion for expedited           09:04:2

14   consideration, which were emails between myself and Mr. Davis     09:04:3

15   regarding the course of conduct about when the documents would    09:04:3

16   be produced.  And I believe they show that we were in good faith  09:04:4

17   and complying with the fax request as to when the documents       09:04:4

18   would be produced.                                                09:04:5

19        SPECIAL MASTER JUNEAU:  Let me ask both of you this          09:04:5

20   question.  I saw some motions and pleadings going back and        09:04:5

21   forth; but it's very clear to me that that's a matter to be       09:04:5

22   addressed to Judge Fallon, because those motions are pending      09:05:0

23   before him; correct?                                              09:05:0

24        MR. ARCENEAUX:  Correct.                                     09:05:0

25        SPECIAL MASTER JUNEAU:  You certainly have a right to        09:05:0
```

1   put on this record that that matter is pending.  And that's what   09:05:0

2   you're doing, Mr. Davis?   09:05:1

3            And you've responded?   09:05:1

4        MR. ARCENEAUX:  Yes.   09:05:1

5        SPECIAL MASTER JUNEAU:  And all of your respective   09:05:1

6   rights, I'm sure, are preserved before the court to make   09:05:2

7   whatever presentations you all think are appropriate.  It's not   09:05:2

8   for me to make any kind of determination one way or another.   09:05:2

9   I'm aware of the issue.   09:05:3

10       MR. ARCENEAUX:  Yes.   09:05:3

11       SPECIAL MASTER JUNEAU:  I saw that.  And I do   09:05:3

12   understand.   09:05:3

13       MR. DAVIS:  Thank you, Special Master.   09:05:3

14            I just wanted to put on the record where we were   09:05:3

15   at this point and time.   09:05:3

16       SPECIAL MASTER JUNEAU:  That's fine.   09:05:4

17       MR. ARCENEAUX:  And, for the sake of the completeness   09:05:4

18   of the record, I suppose, since he is calling for a return on   09:05:4

19   the subpoena, I should note that there are three items in the   09:05:4

20   subpoena that we need to produce.   09:05:5

21            One are Mr. Weinberg's personal injury common   09:05:5

22   benefit time records which have already been produced to the   09:05:5

23   fact and there will be nothing additional.  So those documents   09:06:0

24   were produced a long time ago in connection with the PI   09:06:0

25   litigation.   09:06:0

```
1              His time record with regard to the TPP litigation,    09:06:1

2   which have been produce to the file and are part of the Exhibit    09:06:1

3   D, and there will be nothing additional forth coming from those    09:06:1

4   records.                                                           09:06:2

5              His third part of the subpoena is his records for      09:06:2

6   TPP.                                                               09:06:2

7         SPECIAL MASTER JUNEAU:  You mean, there are other           09:06:3

8   issues we don't handle?                                           09:06:3

9         MR. ARCENEAUX:  Yes.  And it's that third category of       09:06:3

10  time records, Mr. Weinberg's response to their request for his    09:06:3

11  common benefit AG time that we have not yet produced, but are in  09:06:4

12  the process of compiling.                                         09:06:4

13        MR. DAVIS:  Just so our record is clear, the subpoena       09:06:4

14  did not ask for categories.  It asked for all records, number     09:06:5

15  one.                                                              09:06:5

16             And, secondly, what I'm not asking for is just a       09:06:5

17  return on the subpoena.  I'm asking for compliance with the       09:06:5

18  Court's orders.                                                   09:06:5

19        SPECIAL MASTER JUNEAU:  Let me ease the pain for both       09:07:0

20  of you.  This is not a matter before me.  You all are nice,       09:07:0

21  articulate lawyers.  I don't want to say I don't care; but        09:07:0

22  you've got a very competent federal judge who'll address all of   09:07:1

23  that.  We have enough on our plate here today.                    09:07:1

24             I'm interested in getting clarification for me.        09:07:2

25  And I asked and I appreciate the appearance of all three          09:07:2
```

1    parties.                                                                09:07:2

2             MR. ARCENEAUX:  In that regard, does Mr. Dugan need to          09:07:2

3    make an appearance?                                                     09:07:3

4             SPECIAL MASTER JUNEAU:  Mr. Dugan walked in.                    09:07:3

5                 Make your appearance for the record, please.               09:07:3

6             MR. DUGAN:  Good morning, Your Honor.  James Dugan.            09:07:3

7             SPECIAL MASTER JUNEAU:  I'd asked Mr. Weinberg and Mr.          09:07:4

8    DAS so and Chris Seeger, after my extensive review of this              09:07:4

9    voluminous amount of material, for my purposes, I wanted to talk        09:07:5

10   to those three people to give me some background information            09:07:5

11   that I thought was necessary to clarify this record.                    09:07:5

12                And, with that thought in mind, let me call up Mr.         09:08:0

13   Weinberg.                                                               09:08:0

14                Mr. Weinberg, you'd be able to speak right there           09:08:1

15   from that podium.  That would be fine.                                  09:08:1

16            MR. WEINBERG:  Yes, sir.                                        09:08:1

17            SPECIAL MASTER JUNEAU:  First of all, I need to swear           09:08:1

18   everybody in that's going to be testifying.                             09:08:2

19                Would you rise your right hand, please.                    09:08:2

20                ERIC WEINBERG, being first duly sworn, testified           09:08:2

21   as follows:                                                             09:08:2

22             SPECIAL MASTER JUNEAU:  Just for the record, Mr.              09:08:2

23   Weinberg, give us your name, your professional address and who          09:08:3

24   you are.                                                                09:08:3

25            MR. WEINBERG:  Sure.                                           09:08:3

1          Eric Weinberg.  I operate my own practice, law

2   offices of Eric Weinberg, 149 Livingston Avenue in New

3   Brunswick, New Jersey.

4          SPECIAL MASTER JUNEAU:  Now, Mr. Weinberg, I just

5   called you first because you're one of the objectors to the

6   allocation that's being proposed insofar as it applies to you.

7              I have read all of your commissions.  Let me run

8   through several questions that I have regarding this matter in

9   as far as it may involve you.

10             First of all, I need to confirm when you got

11   involved in this TPP litigation and what your role is.

12             First of all -- because it's been some reference,

13   and it's replete throughout a lot of these submissions here,

14   there was a litigation called the Local 68 class action.  I saw

15   that.  Were you counsel, or what was your participation in that

16   matter?

17          MR. WEINBERG:  I had no participation in that matter.

18          SPECIAL MASTER JUNEAU:  According to the record I see,

19   that litigation was apparently -- I use the word led, but

20   spearheaded, I guess -- by Mr. Seeger.  Do you have any

21   knowledge of that one way or the other, or you don't know?

22          MR. WEINBERG:  I was aware that that case was pending

23   in New Jersey while it was pending.  It was running parallel to

24   the personal injury cases that I was involved in beginning in

25   2004.  I knew that the Seeger firm was lead counsel in that

1    case.  And I was aware that the case had been certified by Judge    09:10:4

2    Higbee as a class.  That the appellate division had upheld her    09:10:5

3    order and that the Supreme Court of New Jersey decertified the    09:10:5

4    class in September of 2007.  And I became involved in working    09:10:5

5    with Chris Seeger and Dave Buchanan the following month.    09:11:0

6            We had a meeting --    09:11:1

7        SPECIAL MASTER JUNEAU:  When was that?    09:11:1

8        MR. WEINBERG:  In October 2007.  I was of counsel at    09:11:1

9    the time to the firm of Cohen Placitella & Roth.  And Chris and    09:11:1

10   Dave came down to our offices in Red Bank, New Jersey to talk    09:11:2

11   about working together on individual TPP cases after the Local    09:11:2

12   68 case had been decertified.  There was no more class action,    09:11:3

13   so that litigation then became individual third-party payer    09:11:3

14   cases.  And they came down.    09:11:4

15       SPECIAL MASTER JUNEAU:  And your contact or association    09:11:4

16   with the Placitella firm was what of what time?    09:11:4

17       MR. WEINBERG:  Of counsel to the firm.  I had my own    09:11:5

18   practice in New Brunswick.  Placitella and I were of counsel on    09:11:5

19   a few hundred personal injury cases.  I'd worked with Placitella    09:12:0

20   on a few other cases.  We have a longstanding professional    09:12:0

21   relationship.  So I was of counsel to the firm.    09:12:1

22       SPECIAL MASTER JUNEAU:  Now, reading these documents,    09:12:1

23   it's clear to me that TPP cases that have been filed in this    09:12:1

24   MDL; are you aware of that?    09:12:2

25       MR. WEINBERG:  Yes.    09:12:2

1    SPECIAL MASTER JUNEAU:  And, according to my review of    09:12:3

2    the document, there was a committee established per direction of    09:12:3

3    the court to lead that type of litigation in the MDL.  Are you    09:12:4

4    aware of that?    09:12:4

5    MR. WEINBERG:  I'm aware.    09:12:4

6    SPECIAL MASTER JUNEAU:  And the name that I picked out    09:12:4

7    of those documents to head up to committee was a purchase claims    09:12:5

8    committee.  Does that sound right?    09:12:5

9    MR. WEINBERG:  It sounds right.    09:12:5

10    SPECIAL MASTER JUNEAU:  Now, were you a member of that    09:12:5

11    committee?    09:13:0

12    MR. WEINBERG:  No, sir.    09:13:0

13    SPECIAL MASTER JUNEAU:  Did you have any relationship    09:13:0

14    or involvement with that committee?    09:13:0

15    MR. WEINBERG:  I did in the sense that as I -- when I    09:13:1

16    got into working with the Seeger firm and third-party payer    09:13:1

17    beginning in October of 2007, my focus was on developing at    09:13:2

18    first the liability case, which was a different case than the    09:13:3

19    personal injury case.  A broader case than the personal injury    09:13:3

20    case.    09:13:3

21    And then, later -- well, actually, early on and    09:13:3

22    even later, working on proof of damages in the third-party payer    09:13:4

23    cases and finding and developing expert witnesses on both    09:13:4

24    fronts.    09:13:5

25    Along the way, I had interactions with lawyers who    09:13:5

1   were on that Purchase Claims Committee.  I had interactions with      09:13:5

2   Dave Buchanan, who, as I understood it, had involvement in the      09:13:5

3   MDL, basically saying what's going on in the MDL, let's work      09:14:0

4   together, I'm making a lot of progress, what experts are you      09:14:0

5   developing, what theories are you developing, what is going on      09:14:1

6   there.      09:14:1

7                I got very little feedback, frankly.      09:14:2

8                Later on, in 2009 --      09:14:2

9           SPECIAL MASTER JUNEAU:  I'm not sure I understand.      09:14:2

10  What do you mean, you got very little feedback?  What you do you      09:14:2

11  mean?      09:14:3

12          MR. WEINBERG:  What I mean is I didn't hear about any      09:14:3

13  work that was going on in the MDL.  Substantive work.      09:14:3

14          SPECIAL MASTER JUNEAU:  Okay.      09:14:3

15          MR. WEINBERG:  And, later on, towards I believe it was      09:14:3

16  2009, I had interactions with a lawyer named Dan Arbitblit from      09:14:4

17  Lieff Cabraser, who I believe was on the committee.      09:14:4

18          SPECIAL MASTER JUNEAU:  According to the records, it      09:14:5

19  looks like she was.      09:14:5

20          MR. WEINBERG:  And we had worked together on science      09:14:5

21  and expert issues in the litigation.  So we had interactions      09:15:0

22  with how can we put this all together.      09:15:0

23               I went through, Special Master, I went through in      09:15:0

24  preparation to answer your questions as much of the history as I      09:15:1

25  could put together, and we now have emails.  Years ago, it was      09:15:1

1    letters; and, now we have emails, and they're easier to track.    09:15:2

2    So I went through my emails to refresh my recollection about    09:15:3

3    these interactions.    09:15:3

4              And I had substantial interactions -- well, I had    09:15:3

5    several interactions with these folks up to the time that the    09:15:4

6    case was --    09:15:4

7              MR. DAVIS:  I just wanted to make an objection.    09:15:5

8              SPECIAL MASTER JUNEAU:  I'm not taking objections.    09:15:5

9              Go ahead.    09:15:5

10             MR. WEINBERG:  So, to answer your questions, I did have    09:15:5

11   interactions with them focused on developing the theories and    09:15:5

12   the experts in the litigation.    09:16:0

13             Because I was doing that work in New Jersey where    09:16:0

14   there was a coordinated litigation under Judge Higbee's orders.    09:16:0

15   And my intention was to put the best evidence from both the    09:16:1

16   federal and the New Jersey case together on behalf of our mutual    09:16:2

17   clients.    09:16:2

18             So, yes, I did have interactions.    09:16:2

19             SPECIAL MASTER JUNEAU:  All right.    09:16:3

20             Now, we talked about that committee, that    09:16:3

21   appointed committee, the Purchase Claims Committee.  Were you    09:16:3

22   ever specifically assigned any work by that committee?    09:16:4

23             MR. WEINBERG:  No.  Because I was not litigating my    09:16:4

24   cases in the federal court.    09:16:4

25             SPECIAL MASTER JUNEAU:  Have you filed any third-party    09:16:5

```
 1    payer cases where you're listed as counsel of record?          09:17:1

 2          MR. WEINBERG:  Yes.                                       09:17:2

 3          SPECIAL MASTER JUNEAU:  And how many of those?            09:17:2

 4          MR. WEINBERG:  Filed one case in New Jersey.  And Cohen   09:17:2

 5    Placitella, too, which I was of counsel, filed I believe -- I   09:17:2

 6    believe there were five.  Four or five cases filed.            09:17:3

 7          SPECIAL MASTER JUNEAU:  Chris is his name, as I recall    09:17:3

 8    from a prior hearing.                                           09:17:4

 9          MR. WEINBERG:  Yes.                                       09:17:4

10          SPECIAL MASTER JUNEAU:  It's his firm that is listed as   09:17:4

11    counsel.                                                        09:17:4

12          MR. WEINBERG:  Yes.                                       09:17:4

13          SPECIAL MASTER JUNEAU:  When were the whole collection    09:17:4

14    of cases filed?                                                 09:17:5

15          MR. WEINBERG:  2008.                                      09:17:5

16          SPECIAL MASTER JUNEAU:  Have you tried any of these TPP   09:17:5

17    cases.                                                          09:18:0

18          MR. WEINBERG:  The VIOXX cases?                           09:18:0

19          SPECIAL MASTER JUNEAU:  Yeah.                             09:18:0

20          MR. WEINBERG:  No, sir.                                   09:18:0

21          SPECIAL MASTER JUNEAU:  There was a settlement, as I      09:18:1

22    recall, in 2009 in the VIOXX case.  Had you tried any VIOXX     09:18:1

23    cases for any client at that time?                             09:18:2

24          MR. WEINBERG:  No, sir.                                   09:18:2

25          SPECIAL MASTER JUNEAU:  There was a lot of discussion     09:18:2
```

 1   in this case, and the submissions had to do with settlement.          09:18:3
 2   Were you in any extent involved in the negotiating of                 09:18:3
 3   third-party payer settlement that was announced in 2009?              09:18:4
 4            MR. WEINBERG:  No, sir.                                       09:18:5
 5            SPECIAL MASTER JUNEAU:  Do you know who were the lead         09:18:5
 6   negotiators on that issue in this case?  From the plaintiff's         09:18:5
 7   side?                                                                 09:18:5
 8            MR. WEINBERG:  Well, I've read the pleadings.                 09:19:0
 9                 So, from the pleadings, I know that Chris Seeger         09:19:0
10   and Tom Sobal -- or at least that's what was in the pleadings --      09:19:1
11   were involved in negotiating the settlement.                          09:19:1
12                 In addition, because the Seeger firm and I were         09:19:1
13   co-counsel, we had an affiliated interest in cases, I got a           09:19:2
14   phone call from Mr. Seeger on June 25th of 2009.  It was to me,       09:19:3
15   Chris Placitella and a couple of other partners in the                09:19:4
16   Placitella firm, advising that a settlement had been reached in       09:19:4
17   principle.  And, because there were cases up for trial                09:19:5
18   management, and then it took some time to confect the details of      09:19:5
19   the settlement.  But the basics had been put into place in late       09:20:0
20   June of 2009.                                                         09:20:0
21            SPECIAL MASTER JUNEAU:  You had clients that                 09:20:1
22   participated in that settlement?                                      09:20:1
23            MR. WEINBERG:  Yes.                                          09:20:1
24            SPECIAL MASTER JUNEAU:  And did your clients                 09:20:1
25   participate in that settlement?                                       09:20:1

1    MR. WEINBERG:  They did.                              09:20:1

2    SPECIAL MASTER JUNEAU:  I assume, if they participated,  09:20:1

3  you recommended the settlement to them?  Or am I incorrect on  09:20:2

4  that?                                                    09:20:2

5    MR. WEINBERG:  On the case that I filed, I was        09:20:3

6  co-counsel with the Cohen Milstein firm.  It was their client.  09:20:3

7  We filed it in New Jersey.  We were co-counsel.  So I wasn't  09:20:3

8  involved in the discussions with the client.  But they settled,  09:20:4

9  so I assume that it was recommended to them.  I can't speak  09:20:4

10  directly to that.                                       09:20:4

11        And same thing on the CPR cases, Cohen Placitella  09:20:4

12  cases.                                                  09:20:5

13    SPECIAL MASTER JUNEAU:  Now, in this VIOXX matter, were  09:20:5

14  you personally involved in handling personal injury cases aside  09:21:0

15  from the TPP cases?                                     09:21:1

16    MR. WEINBERG:  I was involved in handling personal   09:21:1

17  injury cases which were settled in the settlement that brought  09:21:1

18  us ultimately down here the last time we were before you.  09:21:2

19    SPECIAL MASTER JUNEAU:  Right.  That's why I'm asking  09:21:2

20  the question.                                           09:21:2

21    MR. WEINBERG:  Yes.                                   09:21:2

22    SPECIAL MASTER JUNEAU:  You represented many          09:21:3

23  plaintiffs, as I recall, in that case.                  09:21:3

24    MR. WEINBERG:  I did.  My firm filed about 270 or so  09:21:3

25  cases, claims.                                          09:21:4

1    SPECIAL MASTER JUNEAU:  You're going to have to help me

2  with these numbers in some of the questions I had.

3          According to my review of some of your

4  submissions, it looked like you submitted time it looks like

5  from November of 2007 through the settlement period.

6          Am I correct about that?

7     MR. WEINBERG:  Yes.

8     SPECIAL MASTER JUNEAU:  So we've got about a 22 month

9  period of time there, as I look at it.

10    MR. WEINBERG:  Right.

11         I had submitted time in the personal injury cases

12  up to the date of the settlement in the personal injury cases,

13  which was November of 2007.  And so, when Judge Fallon ordered

14  that time be submitted in connection with the third-party payer

15  cases, I submitted time from that point.  So I didn't submit

16  personal injury time; I submitted third-party payer time from

17  November of 2007 forward.

18         In fact, there had been some work, not much, but

19  there had been some work in October of 2007 which started when

20  we had that meeting down in Red Bank, New Jersey with Chris

21  Seeger, Dave Buchanan, I think Jeff Grant from their firm was

22  there, to get going on the third-party payer cases.  But I

23  didn't submit that time.

24         I started in November of 2007.  And I ended when

25  the date -- when the settlement was formally announced, when it

```
 1    was done, in September of 2009.                          09:23:3
 2             SPECIAL MASTER JUNEAU:  As I appreciate your      09:23:4
 3    submissions, during that 22 month span, it looks like you 09:23:4
 4    submitted approximately $1,500 in common benefit time for 09:23:4
 5    consideration of what you did on TPP work; am I correct about 09:23:5
 6    that?                                                     09:24:0
 7             MR. WEINBERG:  That is correct.                  09:24:0
 8             SPECIAL MASTER JUNEAU:  Now, were you doing other VIOXX 09:24:0
 9    activities during that same 22 month period of time?      09:24:0
10             MR. WEINBERG:  With respect to the personal injury 09:24:0
11    cases --                                                  09:24:1
12             SPECIAL MASTER JUNEAU:  Any kind of VIOXX work other 09:24:1
13    than TPP.                                                 09:24:1
14             MR. WEINBERG:  Yes.                              09:24:1
15             With respect to the personal injury cases, there 09:24:1
16    were the administrative issues with respect to resolving the 09:24:1
17    individual claims.                                        09:24:2
18             There was no substantive work going on.  Those   09:24:2
19    cases were over.  But we had to file claims and so forth.  And 09:24:2
20    so that was being done.  Mainly clerical work in my office.  I 09:24:3
21    didn't submit any of that time because it wasn't related to 09:24:3
22    this.                                                     09:24:3
23             Towards the end of the period of time, there were 09:24:4
24    some overlap in terms of there was interest -- Seeger firm was 09:24:4
25    interested, others were interested in representing states, 09:24:5
```

```
 1   attorneys general.  I was interested in that.  The Cohen        09:24:5

 2   Placitella firm was interested in that.                         09:25:0

 3                   That work really started effectively in the summer  09:25:0

 4   of 2009.  So there was a little bit of overlap but not much.    09:25:0

 5                   But the issues were very similar, the liability  09:25:1

 6   issues.  For example, proving that a third-party payer was      09:25:1

 7   deceived, in my view, was not limited to Merck's failure to     09:25:2

 8   disclose cardiovascular risk.  That was the issue in the injury  09:25:2

 9   cases.                                                          09:25:3

10                   In my view, there were other statistically      09:25:3

11   significant risks that my experts had identified, and others had  09:25:3

12   identified, from VIOXX that we could prove and that we could    09:25:3

13   prove Merck knew about and that we could prove Merck didn't tell  09:25:4

14   anybody about.  For example, conversion to Alzheimer's disease  09:25:4

15   in a major placebo controlled study.  So we expanded the        09:25:5

16   universe of risks that were the subject of the cases.  Because,  09:25:5

17   whereas in an injury case, the issue was:  Did they warn about a  09:25:5

18   heat attack, plaintiff had a heart attack, failure to warn.     09:26:0

19                   In the third-party payer cases, our clients were  09:26:0

20   making purchasing decisions about VIOXX:  Should we buy VIOXX as  09:26:1

21   opposed to Aleve or Ibuprofen or some other drug.  And so the   09:26:1

22   overall risk picture was relevant to that purchasing decision.  09:26:1

23                   And I would say, honesty, that I took the lead in  09:26:2

24   the entire litigation.  In the MDL, when you look at the MDL and  09:26:3

25   what was going on in the MDL and you look at what was going on   09:26:3
```

```
 1   in New Jersey, I took the lead in developing that broader risk        09:26:4

 2   benefit profile, with the support and acknowledgment of my            09:26:4

 3   colleagues, including the Seeger firm.  They were well aware.         09:26:5

 4            SPECIAL MASTER JUNEAU:  That's what I'm trying to get         09:26:5

 5   to.                                                                    09:26:5

 6            When you say that's what it was for, were you                09:27:0

 7   doing this work at the direction of the Seeger firm, or somebody      09:27:0

 8   else?  What do you mean by with the support of?                       09:27:0

 9            To me -- let me be candid with you, that's what             09:27:1

10   I'm trying to find out about this case.  Everybody in this room       09:27:1

11   has been in multiple party cases and they all have plaintiff          09:27:1

12   steering committees, liaison committees or whatever it is, and        09:27:2

13   there's an elaborate -- normally, an elaborate system you go          09:27:2

14   about the assignment of work so you'll have some control about        09:27:3

15   who is doing what.  It's not for me from Lafayette, Louisiana,        09:27:3

16   to submit time to what I'm doing in VIOXX, and I know that's not      09:27:4

17   contemplated.                                                         09:27:4

18            So my question to you, what direction or                    09:27:4

19   assignment or for any of that work was coordinated or directed        09:27:5

20   by these lead counsel in these cases?                                 09:27:5

21       MR. WEINBERG:  When we started working together in                09:28:0

22   October of 2007, the issue of how these cases were going to be        09:28:0

23   litigated was on the table.  This was no mystery to Chris Seeger      09:28:0

24   or Dave Buchanan or anybody.                                         09:28:1

25            And within a week or so of that first meeting in            09:28:2
```

1    October of 2007 in Red Bank, we served -- I served Dr. Madigan's    09:28:2

2    report.  You've seen his name.  He's a biostatistician who    09:28:3

3    analyzed Merck's data on Merck in the personal injury cases.    09:28:4

4    That was October 9 of 2007.  That day, I sent his report to    09:28:4

5    Chris and Dave.  David thought it was an excellent report.    09:28:4

6           And, in his report, Dr. Madigan reported not only    09:28:5

7    on cardiovascular risks but on some other risks.  He reported    09:28:5

8    on, for example, the conversion to Alzheimer's disease.    09:29:0

9           So our discussions in terms of prosecuting these    09:29:0

10   cases -- and you have to understand, Special Master, that we    09:29:0

11   were in the process of not only expanding the case and    09:29:1

12   developing the case but of finding clients.  When Local 68 was    09:29:1

13   decertified, there was no more class.  It was cratered.  And, in    09:29:2

14   order to have a litigation that was going to be meaningful to    09:29:2

15   clients and to attorneys, that was going to generate recoveries    09:29:3

16   and fees, we needed individual clients.  And so we began that    09:29:3

17   process.    09:29:3

18          That work was the focus of the litigation in terms    09:29:4

19   of liabilities, in terms of experts from 2007 into 2008    09:29:4

20          In 2008, Judge Higbee entered orders in the    09:29:5

21   coordinated New Jersey litigation.  Mr. Buchanan was appointed    09:29:5

22   liaison counsel to the litigation.  There were case management    09:30:0

23   orders.  There were case management conferences.  There were    09:30:0

24   meetings with counsel.    09:30:0

25          Were there formal committees appointed in New    09:30:1

1    Jersey?  No.  Just like in the personal injuries cases, it was          09:30:1

2    not done that way.                                                      09:30:1

3                    But was there substantive work going on with the        09:30:2

4    knowledge and approval of the Seeger firm that ended up being           09:30:2

5    liaison counsel?  Absolutely.  Absolutely, yes.  It's in here.          09:30:2

6    It's in the submissions.                                                09:30:3

7                    And that work continued up to and including             09:30:3

8    September of 2009.  And it continues to this day in the attorney        09:30:3

9    general cases.                                                          09:30:4

10                   So, to answer your question, were there                 09:30:4

11   committees?  No.  Was there an understanding that this work was         09:30:4

12   going on?  Absolutely.                                                  09:30:5

13                   Were there meetings amongst counsel to talk about       09:30:5

14   how these issues were going to be litigated?  Absolutely.               09:30:5

15                   Was there a coordinated litigation under the            09:30:5

16   auspices of the court?  Absolutely.                                     09:31:0

17                   Was there liaison counsel in New Jersey?  Yes.          09:31:0

18                   Did the work continue, my work continue with the        09:31:0

19   knowledge and approval of liaison counsel?  Yes.                        09:31:1

20                   I was never told to stop.  I was never told:            09:31:1

21   Don't do that, it's worthless.  I was never told:  You're              09:31:1

22   frolicking.  I was never told:  You're wasting time.                    09:31:2

23                   That work went on, and it was productive.               09:31:2

24                   And it's difficult to stand here again in this          09:31:2

25   context.  And I don't like pointing fingers at anybody.  I'm            09:31:3

1    here to defend myself, as you know.                          09:31:3

2              I want to make one point about Dr. Madigan,        09:31:4

3    because his name came up in the last go-round.               09:31:4

4              SPECIAL MASTER JUNEAU:  I've seen it.              09:31:4

5              MR. WEINBERG:  So last time I was accused of trying to  09:31:5

6    get paid for Dr. Madigan's work when it was too late.  His  09:31:5

7    report was served a month before the personal injury settlement.  09:31:5

8              Now, I'm being accused of trying to get paid for  09:31:5

9    Dr. Madigan's work because it was too early.  It happened before  09:32:0

10   these cases.                                                 09:32:0

11             Dr. Madigan wrote a report that was served on     09:32:0

12   Merck in October of 2007.  I continued to work with him -- the  09:32:1

13   proof is here -- and with other experts on a variety of issues  09:32:1

14   through the end of this litigation.                          09:32:2

15             There was a time where he was asked to testify in  09:32:2

16   Australia.  We worked to modify his report.  We expanded his  09:32:2

17   report.                                                      09:32:3

18             SPECIAL MASTER JUNEAU:  How did that come about, when  09:32:3

19   he was asked?                                                09:32:3

20             MR. WEINBERG:  I was contacted by the Lenier firm, who  09:32:3

21   was contacted by counsel Slader Gordon in Australia.  They had  09:32:3

22   seen Dr. Madigan's report and were impressed by it.  It was a  09:32:4

23   good piece of work, it was a good analysis.  And they were  09:32:4

24   interested in him.                                           09:32:4

25             And so an attorney in Mark Lenier's firm sent me a  09:32:5

1    note and said:  Would you be willing to talk to the Slader    09:32:5

2    Gordon firm down in Melbourne, Australia; they want to work with    09:32:5

3    Dr. Madigan.    09:33:0

4              I contacted them.  I asked Dr. Madigan it he was    09:33:0

5    interested, and he said yes.  They were interested in working    09:33:0

6    with him.    09:33:0

7              They came up to New Jersey in early 2009.  Their    09:33:1

8    trial was scheduled for May of 2009, so it was within this    09:33:1

9    period of time.    09:33:1

10              I thought it was a great opportunity, frankly, for    09:33:1

11    our third-party payer cases.  Because, when we served Madigan's    09:33:2

12    report in October 2007, personal injury cases settled a month    09:33:2

13    later.  We never saw Merck's defense to Madigan.  They never    09:33:3

14    served expert reports rebutting or contesting what Madigan had    09:33:3

15    put into his report.  So, here we are moving forward in    09:33:3

16    third-party payer and, I have an opportunity to flush out how    09:33:4

17    Merck would defend against Madigan.  In a case where there were    09:33:4

18    no depositions taken, but where Dr. Madigan to do a new report.    09:33:4

19              So we worked together.  We expanded the issues in    09:33:5

20    his report.    09:33:5

21              The report that was served in October of 2007 was    09:34:0

22    not the end.  It have the beginning.    09:34:0

23         SPECIAL MASTER JUNEAU:  There was personal injury    09:34:0

24    litigation in Australia?    09:34:0

25         MR. WEINBERG:  In Australia.    09:34:1

```
1              I had no stake in that case.  I had no fee
2   interest in that case.  But I certainly had an interest in
3   seeing how the issues we had raised in Madigan's report would
4   play out in a courtroom before a finder of fact.
5              And I certainly had an issue, an interest, in
6   seeing how Merck would defend Dr. Madigan's opinions and what
7   expert they would call.
8              And I had an interest in participating in
9   developing the cross examination of that expert.  Who happened
10  to be, as it turned out, an expert who had testified in the US.
11  He was from the University of Florida.
12             So we worked up a new report.  We expanded
13  Dr. Madigan's report, he expanded his report.  It went from 40
14  pages to 60 pages.  We focused more on some different studies.
15  We added a whole bunch more documents that he relied on.  It was
16  a fluid process.
17             So that's, to answer your question, I did work on
18  that case, along the way, parallel to the third-party payer
19  cases.
20             SPECIAL MASTER JUNEAU:  Here's my question.  I noted
21  that.  And, according to the time you submitted for
22  consideration of common benefit compensation, was work you did
23  in that -- that you've articulated in an Australian personal
24  injury litigation; correct?
25             THE WITNESS:  Yes, sir.  Absolutely.
```

1    SPECIAL MASTER JUNEAU:  And a considerable part of that     09:35:3

2  time was time you spent working with this Dr. Madigan, who you     09:35:3

3  described in that litigation; correct?     09:35:3

4    MR. WEINBERG:  Yes.     09:35:4

5    SPECIAL MASTER JUNEAU:  Did anybody from this purchase     09:35:4

6  committee of the MDL ask you or did you get prior approval to do     09:35:4

7  that work and participate in that activity in Australia and     09:35:5

8  insofar as that committee was concerned?     09:35:5

9    MR. WEINBERG:  Well, again, I wasn't involved in the     09:36:0

10  Purchase Claims Committee.  And I have no idea what they did     09:36:0

11  because I never saw any work product from that work committee.     09:36:0

12    As far as I knew, the litigation here was not     09:36:1

13  moving forward, because I never -- I asked.  But I never saw any     09:36:1

14  work product.     09:36:1

15    However, I had conversations with the Seeger firm     09:36:1

16  about the Australia litigation.     09:36:2

17    In fact, with respect to the expert that Merck was     09:36:2

18  going to call, which we learned about in April or so, or maybe a     09:36:2

19  little bit earlier of 2009, I reached out to Dave Buchanan and     09:36:3

20  Jeff Grant:  Hey, they're going to call this guy, Ron Marks, do     09:36:3

21  we have anything on him?  They sent me his -- I'm sorry, I don't     09:36:4

22  think we had a deposition on Marks.     09:36:4

23    But there was no mystery about what I was doing.     09:36:5

24    And, after that conference, after that trial, I     09:37:0

25  sent the Seeger firm the testimony.     09:37:0

```
 1              Just to take a step back.  I went down to        09:37:0
 2    Melbourne with Dr. Madigan to work with him, to prepare with   09:37:1
 3    him, to prepare the cross, on my dime.  At my expense.  I spent  09:37:1
 4    a lot of time and a lot of money into this issue, and I wanted   09:37:2
 5    to make sure that it was done the right way, because he was    09:37:2
 6    going to testify in every case.                                09:37:2
 7              And so, in Australia, in the federal case, it was    09:37:3
 8    tried before a judge, no jury.  And the way they do it there   09:37:3
 9    with experts is different than how we do it here.  They had    09:37:4
10    what's called a biostatistics week.                            09:37:4
11              So, on the Monday of the biostatistics week during   09:37:4
12    the trial, Dr. Madigan -- there was another biostatistician for  09:37:5
13    the plaintiffs and Dr. Marks for the defendants all came to the  09:37:5
14    court.                                                         09:37:5
15              The judge had read their records and he had a       09:38:0
16    series of questions that he wanted answered.  He put the experts  09:38:0
17    in a room -- no lawyers -- to work out what they agreed on and   09:38:0
18    what they didn't agree on.  What they agreed on was out of the   09:38:1
19    case.  What they didn't agree on was still at issue.           09:38:1
20              When that process was done -- that's called a       09:38:1
21    conclave -- he brings the experts into the courtroom.  The     09:38:2
22    lawyers are on either side and the experts are sitting at a    09:38:2
23    table in front of the judge.  He then asks them questions.     09:38:2
24              After that's done, the lawyers -- first, the cross   09:38:3
25    examination is done and then the direct is done.  And that     09:38:3
```

```
 1    process is called hot-tubbing.  That's what it's called in       09:38:3

 2    Australia.                                                         09:38:4

 3              And, during this process, the experts can talk to        09:38:4

 4    one another.  They can raise objections to what each other says.   09:38:4

 5    And it's all done in front of the judge.                           09:38:4

 6              This is all transcribed.  And the transcripts from       09:38:4

 7    these proceedings were given to the Seeger firm when I got them    09:38:5

 8    in June of 2009.                                                   09:38:5

 9              So, to the extent that you're asking me, did the         09:38:5

10    Purchase Claims Committee know, I don't know.  I assume they did   09:39:0

11    because I had conversations with people on that committee from     09:39:0

12    time to time.  But it was --                                       09:39:0

13              SPECIAL MASTER JUNEAU:  Let me -- the bottom line of     09:39:1

14    what I'm asking you, 50 states in that union, you have a case      09:39:1

15    that's filed in New Jersey or California, and the court appoints   09:39:1

16    people who are in charge of a marshalling the litigation through   09:39:2

17    the courts.  Seems to me that if someone's going to be doing       09:39:2

18    work in the prosecution of the litigation, they don't launch off   09:39:3

19    and do what they think is appropriate, even though in their own    09:39:4

20    mind they think it may be appropriate.  There's got to be some     09:39:4

21    coordination between the activities of the court-appointed         09:39:5

22    people and the people doing the work.                              09:39:5

23              I just want to try to find out what that interplay      09:39:5

24    was between you and the people who had the responsibility of       09:39:5

25    marshalling this case.                                             09:40:0
```

1    MR. WEINBERG:  I had discussions and emails with the    09:40:0

2  Seeger firm, Dave Buchanan, who was liaison counsel appointed by  09:40:0

3  the court, about going to Australia, about preparing for    09:40:1

4  testimony.  They were well aware of it.  And, as far as I knew,  09:40:1

5  they endorsed it and approved it.  There was no objection to it.  09:40:1

6    By the way, Dr. Madigan at that point had been    09:40:2

7  retained by the Seeger firm in another litigation, Celebrex    09:40:2

8  litigation.  He'd been retained by the Seeger firm in three    09:40:2

9  other mass tort cases.    09:40:3

10    So they were well aware of the value of    09:40:3

11  Dr. Madigan and well aware of the importance of vetting the    09:40:3

12  issues, the liability and expert issues, in a trial.  It could    09:40:4

13  have been anywhere.  It happened to be in Australia.  And it was  09:40:4

14  okay.  And so I went.  And it turned out to be a highly useful  09:40:4

15  and productive exercise.    09:40:5

16    In fact, after Dr. Madigan testified, we talked    09:40:5

17  about how and what he needed to be looking at based on what we  09:41:0

18  learned in that trial.  You always learn in a deposition or in a  09:41:0

19  trial, and that happened here.  And that was to the benefit of  09:41:1

20  all plaintiffs in the litigation, because Dr. Mad began was    09:41:1

21  going to be an expert for all plaintiffs in the litigation.    09:41:1

22    SPECIAL MASTER JUNEAU:  Let me switch to another    09:41:2

23  subject that's of interest to me.    09:41:2

24    I notice, in looking at the submissions, in the    09:41:3

25  time submissions, it includes time spent for writing a 100-page  09:41:3

```
 1    article on VIOXX.                                            09:41:3

 2            MR. WEINBERG:  Yes.                                  09:41:4

 3            SPECIAL MASTER JUNEAU:  Am I right about that?       09:41:4

 4            MR. WEINBERG:  Yes.                                  09:41:4

 5            SPECIAL MASTER JUNEAU:  Who approved that?           09:41:4

 6            MR. WEINBERG:  I sent that early draft of that paper to  09:41:4

 7    Chris Seeger in 2007.                                       09:41:4

 8                 Excuse me?                                      09:41:5

 9            MR. SEEGER:  You want to talk to me, or you want to  09:41:5

10    talk to the special master?                                 09:41:5

11                 I have no problem addressing that.             09:42:0

12            MR. WEINBERG:  I just heard a snicker behind me.     09:42:0

13            MR. SEEGER:  I was talking to my colleague.          09:42:0

14            MR. WEINBERG:  I sent that to Mr. Seeger in 2007.    09:42:0

15                 I continued to --                              09:42:1

16            SPECIAL MASTER JUNEAU:  You sent it to him after you  09:42:1

17    did it?                                                     09:42:1

18            MR. WEINBERG:  I sent him an early draft of that     09:42:1

19    document.                                                   09:42:1

20                 And that document was not -- that document, which  09:42:1

21    I've submitted to the court, was a way for me to put together  09:42:2

22    all of the relevant evidence and the relevant documents to prove  09:42:3

23    the overall theory of liability in the case.                09:42:3

24                 It had -- I don't know -- by the end, it had 140  09:42:4

25    citations, most of which were Merck documents.  And that    09:42:4
```

1   information was shared early, middle and late.  So that was work    09:42:5

2   product to which anybody could refer to find the documents that    09:42:5

3   proved the point, the liability point, that was the central    09:43:0

4   focus of the litigation.    09:43:1

5            And that was endorsed by the Seeger firm, and was    09:43:1

6   going to be used by every firm that had a third-party payer    09:43:2

7   case.    09:43:2

8            SPECIAL MASTER JUNEAU:  We have somebody that lives in    09:43:2

9   Seattle, Washington, who decided they had done a lot of work on    09:43:2

10   the internet, and they'd done a lot of research into this matter    09:43:3

11   involving VIOXX.  And they decided on their own that they wanted    09:43:3

12   to issue an article, and they write a 100-page article.  And    09:43:4

13   they subsequently send that to the liaison counsel, and they get    09:43:4

14   it.  Are you saying, would you think that anybody like that    09:43:5

15   should be compensated by the Common Benefit Fund?    09:43:5

16            MR. WEINBERG:  It depends.    09:44:0

17            SPECIAL MASTER JUNEAU:  Let's get specific.  Let's talk    09:44:0

18   about, if that would have happened in this case, what would you    09:44:0

19   think about that?    09:44:1

20            MR. WEINBERG:  If you're taxing about somebody who is    09:44:1

21   just not involved in the litigation at all, and wrote -- and on    09:44:1

22   their own wrote something -- that they somehow had access to    09:44:1

23   Merck's internal documents and were able to cite to those    09:44:1

24   internal documents in support of points, like you knew about the    09:44:2

25   conversion risk to Alzheimer's disease, you knew about the risk    09:44:2

1    of the blood pressure issues, you knew about how you hid the

2    ball on the intention to treat cardiovascular risk data.

3              And, by the way, this document was shared with

4    experts, too.  This was the document that was used to inform my

5    experts, our experts, Dr. Madigan and Dr. Eagleman and other

6    experts.  This was not something that I sat in a room and wrote

7    and didn't share with anybody.

8              This was work product that was summarized a whole

9    bunch of work.  And it was shared with my colleagues and it was

10   shared with the experts, to inform them.

11             So, if your question to me, Special Master, is, if

12   somebody in Seattle put together what I put together and gave it

13   to me so that I could use it with my colleagues and my experts,

14   because it contained information that I didn't know but that was

15   relevant to the case, yes, they would be entitled to common

16   benefit.

17             And nobody has said and nobody can say that what I

18   did was not relevant because it was used.  And it's being used

19   today.

20        SPECIAL MASTER JUNEAU:  Let me shift a little bit to

21   another subject that I noted.

22             I noticed in the application you submitted, it

23   looks like you had pretty close to about 70 percent of the

24   hours -- and I looked at the 1500 hours we talked about -- for

25   expert work you were doing on the TPP case.  Would you agree

1     with that generally?

2            MR. WEINBERG:  A lot of work on experts, absolutely.

3     That was my focus.

4            SPECIAL MASTER JUNEAU:  So that's about 1,000 hours in

5     that 22 month period for working with, coordinating with,

6     whatever it is, with experts.

7                  And, first of all, that time spent, that 1,000

8     hours, all that work was done with regard to experts on the TPP

9     cases?

10           MR. WEINBERG:  Oh, yes.  Absolutely.

11                 And may I say, Special Master?

12           SPECIAL MASTER JUNEAU:  Sure.

13           MR. WEINBERG:  That work included not just

14    communicating with experts or sending them information or

15    vetting theories or framing issues, but also on the how do you

16    get to that point?  How are you able to have that conversation

17    with an expert?  It takes a lot of work.

18                 So I think that time was all focused on learning,

19    weeding through.

20                 You know, the irony here is, we were all on the

21    same team.  We all had a common opponent.  We had 20 million

22    pages of documents.  And I'm not the only one who did the work.

23    I had a lot of respect for Dave Buchanan, he's one of the most

24    talented lawyers I've ever seen.  And he did great work.  And I

25    don't being up here pointing fingers.  But fingers have been

```
 1    pointed at me.  It took a lot of time and a lot of work to do          09:47:2

 2    that expert work.  And there are precious few lawyers in this          09:47:2

 3    field who can do it as well as I do it.  And I'm not demeaning         09:47:3

 4    anybody by saying that.  There are some people who are better         09:47:4

 5    than me.  But I'm in that top tier and I did that work.                09:47:4

 6          SPECIAL MASTER JUNEAU:  Let me ask you something.  You           09:47:4

 7    brought the question a minute ago, you're talking about                09:47:5

 8    Dr. Madigan's expenses.  There was some controversy about that        09:47:5

 9    earlier.                                                              09:48:0

10          I'm not sure that I'm in full command of that.                  09:48:0

11    Are you saying you paid expenses?  I'm not sure I understand          09:48:0

12    what your position was of that.                                       09:48:0

13          MR. WEINBERG:  On?                                              09:48:0

14          SPECIAL MASTER JUNEAU:  The payment of expenses that            09:48:0

15    were submitted and the charges of Dr. Madigan.                        09:48:1

16          MR. WEINBERG:  Yeah.  Most of Dr. Madigan's expenses           09:48:1

17    were in the personal injury litigation.                               09:48:2

18          He was working on some other VIOXX cases.  He was              09:48:2

19    working on a shareholder litigation case.                             09:48:3

20          And you'd have to ask Dr. Madigan why.  But we did             09:48:4

21    a lot of work together, and we continue to do a lot work, and he      09:48:4

22    bills me as he sees fit.  I provide him with a lot of work, with      09:48:5

23    a lot of my work.  So there weren't a lot of dollar expenses in       09:48:5

24    this litigation, but there was a lot of time.                         09:48:5

25          SPECIAL MASTER JUNEAU:  You paid a portion or all of           09:49:0
```

```
 1   it?                                                              09:49:0
 2         MR. WEINBERG:  I did, yes.                                  09:49:0
 3         SPECIAL MASTER JUNEAU:  Huh?                                09:49:0
 4         MR. WEINBERG:  Yes.                                         09:49:0
 5         SPECIAL MASTER JUNEAU:  And do you remember what that       09:49:0
 6   total or have any idea?                                          09:49:0
 7         MR. WEINBERG:  I don't.                                     09:49:1
 8         SPECIAL MASTER JUNEAU:  I also noted, it looked like,       09:49:1
 9   some of the time submissions, you'd spent time managing the TPP  09:49:1
10   litigation.  That wasn't by the appointment, so I'm wondering    09:49:2
11   where you got the word managing.                                 09:49:3
12         MR. WEINBERG:  Well, again, there was coordinated          09:49:3
13   litigation in New Jersey by order of the judge that basically    09:49:3
14   came into play, came into place in 2008.  So we worked           09:49:4
15   collaboratively from 2007 into 2008.                             09:49:4
16               As the litigation progressed, from 2008 into 2009,   09:49:5
17   there was more cohesiveness amongst the attorneys representing   09:49:5
18   the plaintiffs.  And I took a leading role, with the approval of 09:50:0
19   the Seeger firm, in putting together meetings, in putting        09:50:0
20   together agendas, in defining issues, in leading the             09:50:1
21   discussions, in bringing folks together, in writing the minutes  09:50:1
22   of the meetings.  All with a view towards moving the litigation  09:50:2
23   forward.                                                         09:50:2
24               So did I have a formal appointment in the state      09:50:2
25   court?  No.  There were no formal appointments in the state      09:50:3
```

```
 1    court.                                                         09:50:3
 2          SPECIAL MASTER JUNEAU:  But you had liaison counsel.      09:50:3
 3          MR. WEINBERG:  We had liaison counsel.                    09:50:3
 4             And I was -- to me one, of the ironies here is         09:50:3
 5    that I was -- we had a collaboration.  We were partners in this 09:50:4
 6    litigation.  And they know that.  And so the work that I did was 09:50:4
 7    not, you know, in a vacuum or a mystery to anybody.  I took the 09:50:5
 8    bull by the horns and did the work that I did, trying to move   09:50:5
 9    the case forward.  And part of that was management.  Yes, sir,  09:51:0
10    absolutely.                                                     09:51:0
11          Special Master Juneau:  The other question -- and you'd   09:51:1
12    brought it up earlier -- you talked about your association of   09:51:1
13    counsel status with the Cohen Placitella law firm.             09:51:1
14          MR. WEINBERG:  Yes.                                       09:51:2
15          SPECIAL MASTER JUNEAU:  And that you'd worked with them   09:51:2
16    with and coordinated with them on this litigation you all were  09:51:2
17    handling.                                                       09:51:3
18             Looking at the submissions that I saw, the Cohen       09:51:3
19    Placitella firm accepted the Committee's recommendation of      09:51:4
20    $122,000.  That's right at 70,000 in time and 52,000 in         09:51:4
21    expenses.                                                       09:51:5
22             If I look at your contention that you're making        09:52:0
23    here, it's a considerable degree, as much as twenty times       09:52:0
24    greater.  What's the distinction between you and the Cohen      09:52:0
25    Placitella firm as far as importance of level of activity and   09:52:1
```

```
 1    participation in this litigation?                                09:52:1
 2              MR. WEINBERG:  I think it's probably my hours are -- I  09:52:1
 3    I'm not sure what the multiplier is.                             09:52:2
 4              But, first of all, I did more work.  I spent more      09:52:2
 5    time on the case.                                                09:52:2
 6              I was not only primarily responsible but               09:52:3
 7    oftentimes solely responsible for identifying liability experts  09:52:3
 8    and developing liability experts and working with them.  So,     09:52:4
 9    from 2007 to 2009, I was the -- I was working with Dr. Madigan.  09:52:4
10    I was working with Dr. Eagleman.  I was working with             09:52:5
11    Dr. O'Connor.  I didn't -- I brought Madigan into the            09:52:5
12    litigation.  I did not bring Dr. Eagleman into the litigation.   09:52:5
13    But, in the TPP cases, I had the most interaction with him       09:53:0
14    directly consistently over time.  Dr. O'Connor was a bone        09:53:1
15    expert, I brought him into the litigation.  I brought Dr. Harrin 09:53:1
16    into the litigation.  I brought Dr. Spiegel into the litigation. 09:53:1
17    And so I spent time on liability work and on developing the      09:53:2
18    liability work that the CPR firm didn't do.                      09:53:2
19              On the damage side of the case, we worked              09:53:3
20    collaboratively.  So they identified damage experts, I           09:53:3
21    identified damage experts.                                       09:53:4
22              SPECIAL MASTER JUNEAU:  To me, that's a law firm.      09:53:4
23              MR. WEINBERG:  Yes.                                    09:53:4
24              SPECIAL MASTER JUNEAU:  And you were of counsel,       09:53:4
25    associate, partnership, it's law firm kind of doing work here in 09:53:5
```

```
 1   the collective sense.  What I'm saying is it looks like we're        09:53:5

 2   splitting activities between an entity there, the Cohen firm.        09:54:0

 3           MR. WEINBERG:   Well, it's two separate firms.  I           09:54:0

 4   mean, we have -- I had an of counsel relationship with them.        09:54:0

 5   I'm no longer of counsel to the firm.                               09:54:1

 6           But I've had my own practice since 198.  I've done          09:54:1

 7   my own cases.  I've found my own experts.  I'm developed my own     09:54:2

 8   experts.  I've been in MDLs, I've been in state court               09:54:2

 9   litigation.  I've been in major mass tort litigations.  I've        09:54:3

10   brought great experts to the table.  I've developed science        09:54:3

11   issues.  I've developed science issues.  I've focused on the        09:54:3

12   liability issues.  That's what I did here.  And I did it in the     09:54:3

13   cases because that's what I do.  If you're in the case, you do      09:54:4

14   it.  Yes, we were affiliated.  I was of counsel to them.  But I     09:54:4

15   did -- I did the work that I did because it needed to be done.      09:54:4

16   And there was very little overlap with Cohen Placitella on most     09:54:5

17   of that work.                                                       09:55:0

18           On some, yes.  Some, yes.  There was a lawyer at            09:55:0

19   Cohen Placitella name Mark Schultz.  Talented guy.  We worked on    09:55:0

20   damage issues together.                                             09:55:1

21           SPECIAL MASTER JUNEAU:  Would you say, gross numbers of     09:55:1

22   magnitude, you've done 20 times more work than that firm that      09:55:1

23   you were of counsel to?  And the people in this litigation?        09:55:2

24           MR. WEINBERG:  In terms of gross numbers, I haven't         09:55:2

25   looked at time.  But I know that I did substantially more --        09:55:2
```

1  and, again, you're asking me to sort of quantify what somebody

2  else did.  I'm a little uncomfortable about that.

3          SPECIAL MASTER JUNEAU:  I admit that, too.

4          MR. WEINBERG:  Yes, absolutely.  I took the lead in

5  putting the case together.  Absolutely.

6          SPECIAL MASTER JUNEAU:  Mr. Weinberg, what I went

7  through just my assessment of what things I needed to clarify --

8  and I've really gotten answers to what some of the questions

9  that I was concerned about and I'm not looking for the

10  Gettysburg Address here -- but if there's something short that

11  you want to talk to me that you think is significant about, what

12  we haven't talked about.  I've read the briefs.  I hate to say

13  I've even read all of the submissions that have been made and

14  we've gotten to this point.

15          MR. WEINBERG:  Thank you.  I'll be brief.  I think I've

16  covered some of this already.

17              I was not involved in the Local 68 case.  That was

18  a class action certification that was decertified by the supreme

19  court in 2007.

20              A month later, Chris Seeger, Dave Buchanan, I

21  believe Jeff Grant, came to Red Bank.  We met with Chris

22  Placitella, I believe Harry Roth from the firm was there, about

23  forming an alliance of a three-firm partnership essentially to

24  bring cases in litigation of these third-party payer cases.

25              The work that was the focus of those cases was

1    different and much more expansive than what had been the focus

2    of personal injury cases.  It was a new case.

3                    And I went to work -- and this is the way that I

4    was raised and this is what I do -- I went to work on -- yes, I

5    had worked with Dr. Madigan before, but we needed to expand.  We

6    needed to look at, as I laid out to you before, the different

7    hypotheses, the different liability theory.  We needed to

8    identify damage experts.

9                    The point was made in the pleadings about damage

10   experts that the Seeger firm had recruited.  And they had a

11   couple of damage experts that they had talked about.  But they

12   didn't appear after October of 2007.  They weren't -- those

13   experts were not put up.  They were not available, For whatever

14   reason.  We had to find new ways of approaching this case.

15                   And, from October of 2007 to September of 2009, I

16   did that, with the full knowledge and agreement of my

17   colleagues, I thought, with the knowledge and agreement of

18   liaison counsel.

19                   And I think the work was productive.  There was no

20   wasted time.

21                   When you look at my hours -- and I'm going to make

22   this point very delicately.  I looked at hours that have been

23   submitted by my colleagues in this case where they're asking to

24   be paid for time that they were already paid for.  Or they're

25   asking to be paid for 27 and a half hours in a day.

1    By the way, that was no typo.  It was a submission    09:58:4

2    of 27 and a half hours in a day, and this Committee submitted a    09:58:5

3    pleading to this Court that said that was a typo.  It was not a    09:58:5

4    typo.  Because the 27 and a half hours in that day were not --    09:58:5

5    was not billed as one entry.  There were about a dozen entries.    09:59:0

6    And, when I went through them after I had been challenged and    09:59:0

7    given nothing, and I went through their time -- because I know    09:59:0

8    what I did -- I found maybe a dozen entries; and, when you total    09:59:1

9    them up for a day, it was 27 and a half hours.  And there were    09:59:1

10   other days of 20 and 18 and 19 hours.  And I'm looking at this    09:59:2

11   time and I'm saying to myself:  I worked hard on this case; I    09:59:2

12   worked alongside my colleagues, I did good work; the expert I    09:59:2

13   developed, they've recruited in four other mass torts; and I get    09:59:3

14   nothing?  And my time is worth nothing?    09:59:3

15        And they went to pull out some time entries and    09:59:3

16   say --    09:59:4

17        SPECIAL MASTER JUNEAU:  What do you mean when you say    09:59:4

18   nothing?    09:59:4

19        MR. WEINBERG:  They recommended me zero.    09:59:4

20        SPECIAL MASTER JUNEAU:  The original recommendation was    09:59:5

21   what?    09:59:5

22        MR. WEINBERG:  Zero.    09:59:5

23        SPECIAL MASTER JUNEAU:  The original recommendation    09:59:5

24   that you got from the Committee was zero?    09:59:5

25        MR. WEINBERG:  Zero, nothing, none.  I think the word    10:00:0

```
 1   was none.                                                    10:00:0

 2            SPECIAL MASTER JUNEAU:  As you sit here today, the   10:00:0

 3   recommendation is zero; is that right?                       10:00:0

 4            MR. WEINBERG:  Zero.  Nothing.                       10:00:0

 5            There was a point in time where they put -- they    10:00:0

 6   made a recommendation, which had a poison pill to it, either I 10:00:1

 7   took it or within a week it would revert back into the fund. 10:00:1

 8            SPECIAL MASTER JUNEAU:  Run that by me again.        10:00:2

 9            MR. WEINBERG:  Okay.                                 10:00:2

10            The original recommendation was none.  Nothing.     10:00:2

11   For my 1500 hours of work.                                   10:00:2

12            There was then, you know, some back and forth       10:00:3

13   filings and so forth.                                        10:00:3

14            And, in December of 2012, the fee committee         10:00:3

15   submitted its new recommendation allocation to the court.  And, 10:00:3

16   in that recommendation, they recommended that I get $450,000. 10:00:4

17            SPECIAL MASTER JUNEAU:  That's why I asked you that  10:00:4

18   question.                                                    10:00:4

19            MR. WEINBERG:  Yes, sir.                             10:00:4

20            Which was 30 odd percent or whatever of my          10:00:5

21   loadstar.                                                    10:00:5

22            But it was a recommendation that had a poison pill  10:00:5

23   in it.  The poison pill was:  If I didn't accept it in a week, 10:00:5

24   it was pulled off the table and went back into the fund.     10:01:0

25            And so I guess that happened; because, today, I'm   10:01:1
```

1    looking at back to zero for my time.

2            SPECIAL MASTER JUNEAU:   I was just getting the sequence

3    of events.

4            MR. WEINBERG:   So the point I was making was, you've

5    got my time records.   I did the best I could to --

6                My counsel has pointed out to me that, in March,

7    Mr. Herman sent an email revoking all prior offers.   So we're

8    back to zero.

9            SPECIAL MASTER JUNEAU:   Okay.

10            MR. WEINBERG:   All right?

11                But I looked at their time.   Why?   Well, you know,

12    you're challenged and what do you do?   When they tell you you're

13    worth nothing, what do you do?   And I looked at their time.   And

14    I'm not going to use the term that I would use if we were

15    sitting in bar somewhere about some of their time entries.   But,

16    when you look at my time, and you compare it to what they

17    submitted and what this fee committee has approved, it's a

18    travesty.

19                I'm entitled to be paid for the work that I did.

20    I didn't have my hand out, begging anybody.   I did the work.   I

21    was either assigned or approved to do the work.   It was work

22    that was going to benefit my colleagues.   And, you know, I'm

23    here to ask you to give me my loadstar.

24            SPECIAL MASTER JUNEAU:   Okay.

25            MR. WEINBERG:   And one other point.

1           If there were some pro rata reduction across the           10:02:4

2    board for everybody, I'd take it.  I'm not -- there's a term           10:02:4

3    that my grandmother used to use, chazzer.  It's a Yiddish term.           10:02:5

4    Basically means that pig.  I'm not a pig.  Never been a pig.           10:02:5

5    I'm here because I need to be treat fairly, and I'm asking you           10:03:0

6    to treat me fairly.           10:03:0

7           Thank you.           10:03:0

8           SPECIAL MASTER JUNEAU:  Thank you very much for your           10:03:0

9    time.           10:03:1

10           Mr. Dassow.           10:03:1

11           Last time I saw you was at a convention in           10:03:1

12    Chicago, I believe.           10:03:1

13           MR. DASSOW:  Yes.           10:03:2

14           SPECIAL MASTER JUNEAU:  Want to raise your right hand,           10:03:2

15    please.           10:03:2

16           MR. DASSOW:  Sure.           10:03:2

17           ROB DASSOW, being first duly sworn, testified as           10:03:2

18    follows:           10:03:2

19           SPECIAL MASTER JUNEAU:  Give us your name and your           10:03:2

20    professional status.           10:03:3

21           MR. DASSOW:  Sure.  It's Rob Dassow, Hoyde Dassow &           10:03:3

22    Deets in Indianapolis, Indiana.  201 West 103rd Street, Suite           10:03:3

23    500.  And we practice in Indianapolis.           10:03:4

24           SPECIAL MASTER JUNEAU:  That's it.           10:03:4

25           You heard kind of what I'm kind of looking for,           10:03:4

```
 1   it's just I have a litany of kind of questions I've gone        10:03:5
 2   through, Mr. Dassow.                                            10:03:5
 3              And the reason I wanted to incorporate you into      10:03:5
 4   this discussion we're having here today is there's a group      10:04:0
 5   called the central states cases made up of multiple law firms,  10:04:0
 6   and your firm is one of the firms.                              10:04:1
 7              MR. DASSOW:  That's correct.                          10:04:1
 8              SPECIAL MASTER JUNEAU:  As I looked at the submissions 10:04:1
 9   of the firms, there was obviously some of those firms that are  10:04:2
10   claiming more activity than in other firms.  And we have some   10:04:2
11   that are apparently removed from the discussion today; am I      10:04:3
12   correct about that?                                             10:04:3
13              MR. DASSOW:  That's correct.                          10:04:3
14              There are the Hoyde Dassow & Deets, my firm;          10:04:4
15   Lenier law firm, Mike's firm; Ewings firm, Frank's firm; and the 10:04:4
16   firm that is no longer or has basically settled I guess with the 10:04:5
17   FAC would be the Audet law firm.                                10:04:5
18              SPECIAL MASTER JUNEAU:  Audet.  I wanted to make sure  10:04:5
19   my recollection is correct.                                     10:05:0
20              MR. DASSOW:  That's correct.                          10:05:0
21              SPECIAL MASTER JUNEAU:  Let me just kind of run through 10:05:0
22   it.  It's going to be short, but I have some very precise        10:05:0
23   questions.                                                      10:05:0
24              First of all, I got to ask this question, it is       10:05:0
25   the same thing that applies to Mr. Weinberg.                    10:05:1
```

```
1              I take it that neither you or any of your law      10:05:1
2    group were involved in that Local 68 litigation?            10:05:1
3              MR. DASSOW:  No, sir.                              10:05:2
4              SPECIAL MASTER JUNEAU:  Now, there were TPP cases that  10:05:2
5    were filed in this MDL action; you're aware of that?        10:05:4
6              MR. WEINBERG:  Yes.                                10:05:4
7              SPECIAL MASTER JUNEAU:  And, again, there was a    10:05:5
8    committee that he was established by the court in the MDL to  10:05:5
9    handle certain aspects of the case, and you heard me refer to  10:05:5
10   that earlier as a Purchase Claims Committee.  You are aware of  10:05:5
11   that?                                                        10:06:0
12             MR. DASSOW:  Yes.                                  10:06:0
13             SPECIAL MASTER JUNEAU:  Are you a member of that   10:06:0
14   committee?                                                   10:06:0
15             MR. DASSOW:  I was not a part of that.             10:06:1
16             And I don't believe any of our group was part of  10:06:1
17   that committee.  I don't believe that Mark was part of that in  10:06:1
18   any fashion.                                                 10:06:1
19             SPECIAL MASTER JUNEAU:  To your knowledge, was either  10:06:1
20   you or any part of your group ever assigned any work by that  10:06:2
21   committee in this TPP litigation?                            10:06:2
22             MR. DASSOW:  In the MDL?                           10:06:3
23             SPECIAL MASTER JUNEAU:  In the MDL.                10:06:3
24             MR. DASSOW:  In the MDL, we were not assigned any work,  10:06:3
25   as far as I know.                                            10:06:3
```

1      SPECIAL MASTER JUNEAU:  Were they assigned you any work

2  in any capacity?

3      MR. DASSOW:  I don't believe so.  I believe all of the

4  work stems from the New Jersey litigation.

5      SPECIAL MASTER JUNEAU:  All the work that your group

6  was concerned with, the central states group, you say was in the

7  New Jersey litigation; correct?

8      MR. DASSOW:  Correct.

9      SPECIAL MASTER JUNEAU:  Any of your group have filed

10  actual TPP cases?  Any of the central states' group, have any of

11  those filed TPP cases where they're listed as counsel of record.

12      MR. DASSOW:  Oh, yes.

13      Central states is one of the unions that we

14  represented which has 270,000 members.  All of our group

15  appeared on behalf of them in New Jersey.

16      There's also called central Pennsylvania.  We also

17  appeared in that case.  They're both pending in New Jersey.

18  Wasn't quite as large.  But central states was obviously

19  significant, it had 270,000 plus members.

20      SPECIAL MASTER JUNEAU:  As I looked at the submissions,

21  it looked like there's five firms.  The Audet firm, your firm,

22  the Lenier firm, the Ewing firm and a fellow named Gary Franco

23  did this jointly.  It was like -- use the word joint venture.

24      MR. DASSOW:  It was a team.

25      SPECIAL MASTER JUNEAU:  Collectively represented these

1   respective cases that you all filed; right?                    10:08:2

2           MR. DASSOW:  Correct.                                   10:08:2

3           SPECIAL MASTER JUNEAU:  So there are five law firms     10:08:3

4   involved.                                                      10:08:3

5               And I guess there were some arrangements           10:08:3

6   internally made as to the allocation of work within the five  10:08:3

7   firms, who was going to do what, when, where, to avoid any     10:08:4

8   duplication of unnecessary efforts.                            10:08:4

9           MR. DASSOW:  Absolutely.  I think that, in             10:08:5

10  coordination, it was essentially Rick Meadow, who I believe you 10:08:5

11  know, and myself and Evan Janice, and we would have calls with 10:08:5

12  Mark.  And then kind of go down from there.                    10:09:0

13              Mr. Frank was the closest contact to the client to 10:09:0

14  coordinate damages and such.  Mr. Euwing did the same thing.   10:09:0

15  Mr. Ewing had a trial against Merck Medco, which on behalf of  10:09:1

16  the state of Ohio, and was extremely familiar with the workings 10:09:1

17  of the P&D committees and things like that.  So he was kind of 10:09:2

18  delegated do that.                                             10:09:2

19              But he had -- I think verdict was like $11 million 10:09:2

20  against Merck Medco.                                           10:09:3

21              So, essentially, in short, it was delegated        10:09:3

22  between Rick, Mark, myself.  And we all agreed and had calls as 10:09:3

23  to who was going to do what.                                   10:09:4

24              As far as I'm concerned, there was absolutely no   10:09:4

25  duplication of work.                                           10:09:4

```
1        SPECIAL MASTER JUNEAU:  And, I take it, you all worked    10:09:5
2   some sort of arrangement internally within the five firms, if a  10:09:5
3   fee comes in, how that was to be divide in the event of          10:10:0
4   recovery?                                                        10:10:0
5        MR. DASSOW:  Yeah.  It was loosely; because, obviously,    10:10:0
6   we filed the complaint while Local 68 was going on.  Central     10:10:0
7   States and Central Penn were filed I believe in September of     10:10:1
8   '06.  So fairly on in New Jersey.  It was one of the earlier     10:10:1
9   case.  And Dave or Chris may know better than I do.  You know, I  10:10:2
10  would say it was one of the first six of the ten cases filed.    10:10:2
11          From the outset, we had a group going and we had        10:10:3
12  talked, and obviously Mark had been fairly successful.  And I    10:10:3
13  think that the court wanted the Lenier law firm as part of it.   10:10:3
14          So, yeah, we had a lose arrangement, depending on       10:10:4
15  if it was going to settle, we'd try the case.  Pretty much       10:10:4
16  typical of what we always do.                                    10:10:5
17       SPECIAL MASTER JUNEAU:  I'm familiar with this because     10:10:5
18  of other cases.  But I know, in the MDL, certainly in this MDL,  10:10:5
19  established a very meticulous detailed procedure by submission   10:11:0
20  of common benefit submissions submitted.  I'm pretty sure there  10:11:1
21  was a CPA, Mr. Garrett, receives a tally.  And he goes through   10:11:1
22  an analysis of the submissions.  The administration of that is   10:11:2
23  to get everything front-end loaded so you don't have to wait to  10:11:3
24  the end to find out what the claims are.  If there's disputes,   10:11:3
25  you can handle those at the front-end of the litigation.         10:11:3
```

1          I didn't see -- is there any submissions of any of    10:11:4

2    the Central State firm submissions to that MDL-designated entity    10:11:4

3    that that firm was to receive that and allocate that?  If I'm    10:11:5

4    wrong about that, tell me.    10:12:0

5          MR. DASSOW:  No.  I think you're correct.  We, as an    10:12:0

6    ongoing basis, similar to -- for instance, I'm liaison counsel    10:12:0

7    for BioMed, and there's a standing order that we're going to    10:12:0

8    submit them -- I believe it's quarterly or whatever we put in.    10:12:1

9          That was not contemplated, that the New Jersey    10:12:1

10   time was submitted to the MDL on an ongoing basis.  If that's    10:12:1

11   your question.    10:12:2

12         SPECIAL MASTER JUNEAU:  My question is, is there any    10:12:2

13   common benefit time?  In this MDL, that's established a very    10:12:2

14   elaborate pretrial procedure, that time is to be submitted    10:12:2

15   specifically to a designated CPA, who then goes about the    10:12:3

16   analysis of recording and analyzing that data in an ongoing    10:12:4

17   basis as these times are being record.    10:12:4

18         I'm just saying, just based on what I'm looking    10:12:4

19   at, I didn't see where any of the Central State firms have made    10:12:5

20   any submissions in conformity with that directive.  If I'm in    10:12:5

21   error about that, let me know.    10:13:0

22         MR. DASSOW:  No.  With regard to the TPP, because it    10:13:0

23   was litigated in New Jersey, I think you're correct, that we did    10:13:0

24   not on an ongoing basis ever submit time and expense reports --    10:13:1

25   if that's what you're asking -- until --    10:13:1

1          SPECIAL MASTER JUNEAU:  Well --                      10:13:1

2          MR. DASSOW:  -- until the final PTO.                 10:13:1

3          SPECIAL MASTER JUNEAU:  -- we're here in the re:  VIOXX   10:13:2

4   product liability MDL docket number where we have an issue of a   10:13:2

5   Common Benefit Fund.                                        10:13:2

6               So this court, early on, seized upon the        10:13:2

7   procedure -- which makes sense -- to establish an orderly   10:13:3

8   process of receiving time submissions so they could be weighed   10:13:3

9   as it goes on.                                              10:13:4

10              And I'm just saying, when I just looked at what I   10:13:4

11  saw through these submissions, I didn't see those kind of   10:13:4

12  submissions to those firms.  I was trying to understand it.   10:13:5

13         MR. DASSOW:  Yeah, that's correct.                   10:13:5

14         SPECIAL MASTER JUNEAU:  Either you or any part of your   10:13:5

15  group, did anybody try a TPP case, do you know, involving VIOXX?   10:14:0

16         MR. DASSOW:  Did we try a TTP case involving VIOXX?   10:14:1

17  No, there was never --                                      10:14:1

18         SPECIAL MASTER JUNEAU:  Did you actually proceed with a   10:14:2

19  trial of any third-party payer cases involving VIOXX?       10:14:2

20         MR. WEINBERG:  Involving VIOXX?                       10:14:2

21         SPECIAL MASTER JUNEAU:  Yeah.                         10:14:2

22         MR. WEINBERG:  No, sir.  The case was settled while we   10:14:2

23  were preparing for trial.                                   10:14:3

24         SPECIAL MASTER JUNEAU:  Were either you or any member   10:14:3

25  of the Central States group involved in negotiating of the TPP   10:14:3

1    settlement that was eventually effectuated in the case?    10:14:4

2         MR. DASSOW:  No.  We were not part of the committee or    10:14:4

3    the folks that settled the case.    10:14:5

4              I know there were discussions with -- I mean,    10:14:5

5    loosely, with us to let us know.    10:14:5

6         SPECIAL MASTER JUNEAU:  Any clients that were involved?    10:14:5

7         MR. DASSOW:  Well, we were the trial case directed by    10:15:0

8    Judge Higbee to get geared up and going.  And so we were    10:15:0

9    obviously heavily engaged.  I mean, that's our time, getting    10:15:0

10   ready for trial.    10:15:0

11        SPECIAL MASTER JUNEAU:  Did the Central States group    10:15:1

12   represent clients who participated in the settlement that had    10:15:1

13   been negotiated in the TPP case?    10:15:2

14        MR. WEINBERG:  Sure.  Both.    10:15:2

15        SPECIAL MASTER JUNEAU:  And were those firms    10:15:2

16   respectfully paid by the individual clients, I would assume?    10:15:2

17        MR. DASSOW:  The Central States has not paid any of our    10:15:2

18   expenses or any attorney fees whatsoever.    10:15:3

19        SPECIAL MASTER JUNEAU:  By any client?    10:15:3

20        MR. DASSOW:  Central Penn, which is the second client,    10:15:3

21   paid $5,000 in fees to the whole group.  That is all that we've    10:15:4

22   been compensated for at this point.    10:15:4

23        SPECIAL MASTER JUNEAU:  You have some sort of fee    10:15:4

24   arrangement with these people or what?    10:15:5

25        MR. DASSOW:  We do.  But, without divulging, you know,    10:15:5

```
 1   attorney-client privilege, there were discussions with regard to    10:15:5
 2   the fee and --                                                      10:16:0
 3           SPECIAL MASTER JUNEAU:  Sounds like you might have made      10:16:0
 4   a bad deal.                                                         10:16:0
 5           MR. DASSOW:  Well, no.  Not necessarily.  I can tell        10:16:0
 6   you that.                                                           10:16:1
 7           SPECIAL MASTER JUNEAU:  Looking at the records that I       10:16:3
 8   saw from the Central State group, looks like the bulk of the        10:16:3
 9   submissions for the work done by the -- those five firms was        10:16:4
10   done by two firms.  The one being your firm, and the other one      10:16:4
11   being the Audet firm, was the other firm.  Is that generally        10:16:5
12   correct?                                                            10:16:5
13           MR. DASSOW:  Well, when you say the firm, Suzanne           10:16:5
14   Scoven was the only lawyer that essentially -- I don't want to      10:17:0
15   say hired -- but appointed to do work for Audet.  No one else in    10:17:0
16   the Audet firm did any work whatsoever.                             10:17:0
17               So it was only Suzanne Scovin's time that was on        10:17:1
18   there that you see.                                                 10:17:1
19               So, to say it was the firm, I think that doesn't       10:17:1
20   really categorize it properly.  I think it was just Suzanne's       10:17:2
21   time and expense, and that's it.                                    10:17:2
22               But you're accurate to say that it was the bulk of     10:17:2
23   the work was done by my firm, as well as Suzanne's time was         10:17:2
24   significant.                                                        10:17:3
25           SPECIAL MASTER JUNEAU:  The reason I'm asking the          10:17:3
```

1    question is because it looked like the bulk of that, but then it          10:17:3

2    looks like they have entries where we'd have three or four                 10:17:4

3    people from a multitude of firms attending conferences and so              10:17:4

4    forth.  And you've got a coordinated effort to do something like           10:17:4

5    that.  It struck me like there was a lot of people on the camel            10:17:5

6    at the time, you know?                                                     10:18:0

7              MR. DASSOW:  With all due respect, I completely --               10:18:0

8              SPECIAL MASTER JUNEAU:  Wasn't there?                            10:18:0

9              MR. DASSOW:  I wasn't there.                                     10:18:0

10             I mean, you've got to get ready for trial.  You've               10:18:0

11   got to have all the folks together to figure out who is going to           10:18:1

12   do what.  I mean, we're all trial lawyers.  We know what it                10:18:1

13   takes to get ready.  And it's hard to do without being in the              10:18:1

14   same room.                                                                 10:18:2

15             I mean, I think our time is extremely reasonable.                10:18:2

16   If you look at, you know, comparatively, if you've got five or             10:18:2

17   six lawyers working on a trial case, vis-a-vis -- don't even               10:18:3

18   know the number -- 20 lawyers working on some other aspect of              10:18:3

19   the TPP case, I mean, I think that there's significant overlap             10:18:4

20   there.                                                                     10:18:4

21             SPECIAL MASTER JUNEAU:  I'd like to get specific with            10:18:4

22   you, and then I'm going to give you a chance to say what you               10:18:4

23   need to say.                                                               10:18:5

24             MR. DASSOW:  Sure.                                               10:18:5

25             SPECIAL MASTER JUNEAU:  As I look at the records that            10:18:5

1   were submitted to me, this committee is recommending a total of          10:18:5

2   $760,000 to the Central State firms collectively.                        10:19:0

3              If you go down and look at where we are today, of             10:19:2

4   that break down of that money, that committee had recommended            10:19:2

5   $240 to the Audet firm.  Which was, I said, the two firms, as I          10:19:3

6   saw, your firm and that firm, looks like you were doing most of          10:19:4

7   work.  And I understand what your explanation was.                       10:19:4

8              And that Audet firm apparently has accepted what              10:19:5

9   that allocation was?  I'm just trying to get --                          10:19:5

10      MR. DASSOW:  That's correct.  It's my understanding                  10:20:0

11  that, I believe it was Chris and Bill worked out, along with             10:20:0

12  Suzanne, what they thought that they would settled for with              10:20:0

13  regard to the Common Benefit Fund, and did that on their own.            10:20:1

14  And there's a number of dynamics I believe working there as to           10:20:2

15  why they did that.                                                       10:20:2

16      SPECIAL MASTER JUNEAU:  Do you think that the                        10:20:2

17  allocation to the Audet firm was not correct?  Or appropriate?          10:20:2

18  I'll put it that way.                                                    10:20:3

19      MR. DASSOW:  I think that Mr. Audet thinks it's                      10:20:3

20  appropriate.                                                             10:20:3

21             I do think it's appropriate?                                 10:20:3

22      SPECIAL MASTER JUNEAU:  Obviously, he made that choice.             10:20:4

23      MR. DASSOW:  No.  From my perspective, I don't think               10:18:0

24  that was reasonable for what Suzanne did, no.                            10:20:4

25      SPECIAL MASTER JUNEAU:  And from -- in the                          10:20:5

```
 1   recommendation of that split, because there was a division of    10:20:5
 2   that split, was to your firm was what?  375?                      10:20:5
 3            MR. DASSOW:  That's correct.                             10:21:0
 4            SPECIAL MASTER JUNEAU:  And, as I appreciate it, that's  10:21:0
 5   where we stood today?                                             10:21:0
 6            MR. DASSOW:  Well, essentially, collectively, we're at   10:21:0
 7   500.                                                              10:21:1
 8            SPECIAL MASTER JUNEAU:  For the group?                   10:21:1
 9            MR. DASSOW:  For the Lenier and Dassow and Frank, it's   10:21:1
10   essentially $545,000, my understanding.  Which would include, I  10:21:1
11   believe that there's somewhere in 110 to $120,000 in expenses    10:21:2
12   that is included in that number.                                 10:21:2
13                 I think our gross number --                        10:21:3
14            SPECIAL MASTER JUNEAU:  Tell me, just in a general       10:21:3
15   sense, Mr. Dassow, what do you think if you perceive a mistake    10:21:3
16   to have been made or an error to have been made in the           10:21:4
17   allocation to the Central States, what's that basic error?  What 10:21:4
18   was failed to be considered or analyzed or accounted for?        10:21:5
19            MR. DASSOW:  I think it's very straightforward.  We      10:22:0
20   were directed by Judge Higbee to try the case.  We had filed the 10:22:0
21   case in September of 2006, and essentially sent out discovery    10:22:0
22   requests for submissions.  And the case was stayed pending       10:22:1
23   Chris's case with 68.                                            10:22:1
24                 As soon as 68 cast decertified, we were            10:22:1
25   essentially on deck, if you will, ready to go with our case.     10:22:2
```

1    And we were directed by Judge Higbee to do all the work.  We

2    were appointed trial counsel.  You know, we were with Dave at

3    every single CMC.  I've been at every CMC along with everybody

4    else.

5              I think that our benefit to all the folks is

6    completely undervalued because I think with our team

7    specifically -- I mean, I'll be frank, with Lenier was ready to

8    step in and try the case after his successes, I think that was

9    significant pressure on the Merck folks with a large damage case

10   coming in as a single case.

11             I believe that our damages at that point, just for

12   Central States, would have been in excess of 12 or $13 million

13   in our losses.  And potentially could have had punitive damages

14   and treble.

15             So all of our work goes towards the trial case.  I

16   think that significantly has more value than, quote, research or

17   document review.  Which a lot of folks --

18         SPECIAL MASTER JUNEAU:  You're talking about just the

19   type of work?

20         MR. DASSOW:  Yeah, I think it's the type of work.

21             Do I think it's necessary to do research and

22   review documents?  No question.  It's the underpinnings of a

23   case.

24             On the other hand, I don't know how you could

25   categorize actually being ready to try case and prepping a case

```
 1    for trial in the same basket, if you will, as, you know,         10:23:5

 2    associates doing research and reviewing documents.               10:23:5

 3              We had no associates working on this case.  We did     10:24:0

 4    not bill for any associates and we did not submit associate      10:24:0

 5    time.  Evan Janice may in fact be an associate.  I think he's a  10:24:0

 6    partner, but however Mark works it out.  These are very          10:24:1

 7    sophisticated lawyers that I worked with.  And it's all attorney 10:24:1

 8    time.  We submitted no paralegal time.  Zero.  We did not -- I   10:24:2

 9    did not submit any of my partner's time, and it would have been  10:24:2

10    hundreds of hours because they were part of this.  You bounce    10:24:3

11    things off.  We did not submit any of that time.                 10:24:3

12              So it's all, you know, high level 20-plus year         10:24:3

13    lawyers doing work, and that's what we submitted.                10:24:3

14              One other aspect, if you will, is that it doesn't      10:24:4

15    make any difference which firm, but there are a number of firms  10:24:4

16    that billed out and submitted to this Court for time for         10:24:5

17    paralegal time in excess of $250.  Law clerk time -- law clerk   10:25:0

18    -- of $300 an hour.  Associates, $450 an hour.  Partners with    10:25:0

19    less experience obviously than Rick Meadow or Dave Ewing.  I     10:25:1

20    mean, collectively, we've tried hundreds of cases.  And all of   10:25:1

21    us put in time and an hourly of rate of $450 an hour, where      10:25:2

22    there's folks that have hundreds of hours for an associate who's 10:25:2

23    got three years of experience at $450 an hour.  That's where I   10:25:3

24    think it's, frankly, if you're asking me what's not fair, that's 10:25:3

25    not fair.                                                        10:25:3
```

1            There's a firm in Indianapolis that put in $650 an          10:25:3

2      hour and was paid for $650 an hour.                                10:25:4

3            SPECIAL MASTER JUNEAU:  Repeat that again.                    10:25:4

4            MR. DASSOW:  There was a firm in Indianapolis that was       10:25:4

5      paid at an hourly rate of $650 an hour, which was approved.        10:25:5

6                  And, you know, we put in -- Rick Meadow, whose          10:25:5

7      tried the cases, he submitted time out of New York City for        10:25:5

8      $450.                                                              10:26:0

9                  I think we're extremely reasonable and not billing     10:26:0

10     out at a high rate.  We certainly could have submitted -- you      10:26:0

11     know, if we went with $650 an hour, for example, that would have   10:26:0

12     been another 400,000 that we would have submitted to this court.   10:26:1

13     We didn't do that.  So I think that's why the time we've           10:26:1

14     submitted is not only accurate, it was extremely beneficial.       10:26:1

15     And it's very, very reasonable of what we put in, simply by        10:26:2

16     sixth grade math, by the multiplier.  And the folks that worked    10:26:2

17     on this, no associates, no paragraph legal time.  I mean, my       10:26:3

18     paralegals had hundreds of hours horses.  Maybe that's my own      10:26:3

19     fault, but we wanted to be conservative with what we did.          10:26:3

20           SPECIAL MASTER JUNEAU:  That's why I asked the                10:26:4

21     question.                                                          10:26:4

22                  Is there anything else?  You're here.  I know you      10:26:4

23     came a long way.  I just wanted to give you an opportunity to      10:26:4

24     express yourself.                                                  10:26:4

25                  I understood exactly what you've said.                10:26:5

```
 1              MR. DASSOW:  I do appreciate everything that the FAC,   10:26:5

 2   what they did.  We fully appreciate the work that was done with   10:26:5

 3   Local 68.  I think very highly of the folks next to me.  I think  10:27:0

 4   that our group thinks highly.                                     10:27:0

 5              The bottom line is, we believe that, across the        10:27:1

 6   board, the value of our work equates to those of the Fee          10:27:1

 7   Committee and the work done by those folks.  And I think the      10:27:1

 8   proof is in the pudding, frankly, that we were extremely          10:27:2

 9   conservative about what we put in.                                10:27:2

10              I've already touched on the hourly rate.  I think      10:27:3

11   that that's a significant part.                                   10:27:3

12              If you'd just let me check my notes for one second     10:27:3

13   and I won't bother you with anything else.                        10:27:3

14              (Pause in proceedings.)                                10:27:4

15              MR. DASSOW:  I wanted to reiterate that there was      10:27:4

16   something in what the FAC submitted with regard to you with       10:27:5

17   regard to Audet and Dassow in their submission.  Like I told      10:27:5

18   you, Mr. Audet had nothing to do with it, his firm had nothing    10:28:0

19   to do with it, other than Suzanne Scovin.  So I'm not sure why    10:28:0

20   it was categorized that way.  I think more appropriately it       10:28:1

21   would have been Dassow Lenier or something like that.  But I      10:28:1

22   wanted to point that out again to you, that who is driving the    10:28:2

23   train.                                                            10:28:2

24              That's all I have.                                     10:28:2

25              SPECIAL MASTER JUNEAU:  Thank you very much for coming. 10:28:2
```

```
 1                  Mr. Seeger.  You want to raise your right hand?        10:28:3

 2                  CHRIS SEEGER, being first duly sworn, testified as     10:28:3

 3       follows:                                                          10:28:3

 4            SPECIAL MASTER JUNEAU:  Give us your name.                    10:28:4

 5            MR. SEEGER:  Chris Seeger, Seeger Weiss, 77 Water            10:28:4

 6       Street, New York, New York.                                       10:28:4

 7                  May I make maybe just a very brief comment?            10:28:5

 8            SPECIAL MASTER JUNEAU:  Sure.                                 10:28:5

 9            MR. SEEGER:  I just want to note that many of the            10:28:5

10       emails -- I know you're not dealing with this but we do have a    10:28:5

11       record -- that were referred to by Mr. Weinberg were in fact not  10:28:5

12       produced to us.                                                   10:29:0

13            SPECIAL MASTER JUNEAU:  What?                                 10:29:0

14            MR. SEEGER:  Many of the emails by Mr. Weinberg where        10:29:0

15       he was authorized to do this or that were not produced in the     10:29:0

16       discovery that was supposed to be produced so I don't have them   10:29:1

17       here this morning.  To point out any inaccuracies, I just wanted  10:29:1

18       to point that out for the record.                                 10:29:1

19            SPECIAL MASTER JUNEAU:  Let me roll through my series        10:29:1

20       of questions.                                                     10:29:2

21                  I need just a little background, as I asked the        10:29:2

22       other people, about the TPP litigation and your role.            10:29:2

23                  Were you counsel -- I ask you because it's replete     10:29:3

24       throughout all the pleadings -- about that Local 68 class         10:29:4

25       action.                                                           10:29:4
```

```
 1              MR. SEEGER:  Yes, Your Honor.                    10:29:4

 2              SPECIAL MASTER JUNEAU:  Just give us a little    10:29:4

 3   background to sort of put all of this into perspective.    10:29:4

 4              MR. SEEGER:  In fact, it's my pleasure to do that. 10:29:4

 5   Local 68 actually started out as a different case.  It was filed 10:29:5

 6   -- it was a plumbers and pipe fitters case filed in 2002.  It 10:29:5

 7   was in front of a different judge, in Middlesex, New Jersey. 10:29:5

 8              Just to put it in context, VIOXX did not even come 10:30:0

 9   off the market until December 2004.  So we were a little ahead 10:30:0

10   of the game.  Dave Buchanan and I handled that case.  It went 10:30:1

11   before a judge in Middlesex County, and he dismissed the    10:30:1

12   complaint and he dismissed our consumer fraud case.         10:30:1

13              The case was then at some point, as cases built, 10:30:1

14   the cases were centralized in Atlantic County.  We refiled a new 10:30:2

15   third-party payer case, Local 68, alleging -- using, attempting 10:30:2

16   to use and successfully to this day -- and no court has reversed 10:30:3

17   us on it -- using the New Jersey Consumer Fraud Act as a way to 10:30:3

18   -- as the law of the land.  In other words, to apply to all  10:30:4

19   plaintiffs and all states.                                  10:30:4

20              And what the allegation was that, because it was a 10:30:4

21   New Jersey Consumer Fraud Act, to detur bad conduct, Merck was a 10:30:5

22   New Jersey defendant, that should law should extend to all 50 10:30:5

23   states.                                                     10:30:5

24              Now that ruling, by the way, I would like to say, 10:30:5

25   has not been disturbed by the New Jersey supreme court or any 10:30:5
```

1    court.  That is still good law, that New Jersey Consumer Fraud           10:31:0

2    Act claims can apply to New Jersey defendants.  And, in fact,           10:31:0

3    made the very possibility of Mr. Weinberg getting involved in           10:31:0

4    the third-party payer case possible, because all claims were           10:31:1

5    tolled by my case.                                                      10:31:1

6              Remember, VIOXX came on the market in 2004.  Mr.              10:31:1

7    Weinberg, by his own admission, didn't even get involved until         10:31:2

8    2008, I think is when he filed a case with his name on it.  His        10:31:2

9    claim would have been barred had it not been for our case              10:31:2

10   keeping those claims alive.                                            10:31:3

11             And, yes, Dave Buchanan and I were lead counsel.             10:31:3

12   I was liaison counsel in New Jersey with Dave.                         10:31:3

13             SPECIAL MASTER JUNEAU:  So those cases started when?         10:31:3

14   2000 --                                                                10:31:4

15             MR. SEEGER:  2002 was the first case, was the plumbers       10:31:4

16   and pipe fitters.                                                      10:31:4

17             SPECIAL MASTER JUNEAU:  You all were lead counsel?           10:31:4

18             MR. SEEGER:  Or liaison counsel as it's referred to in       10:31:5

19   New Jersey.                                                            10:31:5

20             SPECIAL MASTER JUNEAU:  Those cases were filed by your       10:31:5

21   firm?                                                                  10:31:5

22             MR. SEEGER:  By my firm.                                     10:31:5

23             SPECIAL MASTER JUNEAU:  In that litigation, was there a      10:32:0

24   court appointment?  Was there some capacity that you had in that       10:32:0

25   case?                                                                  10:32:0

1      MR. SEEGER:  To be honest with you, we were liaison

2  counsel in New Jersey, no question about that, which applies to

3  everything.

4          I don't think there was an official court

5  appointment until the class was certified.

6          Once the class was certified by Judge Higbee, our

7  firm, Seeger Weiss, was appointed liaison counsel.  Or was it

8  lead counsel?  Class counsel.  In 2005.

9      SPECIAL MASTER JUNEAU:  Was there any other

10  appointments, leadership appointments and so forth, made in that

11  litigation?

12      MR. SEEGER:  No.

13          In fact, Special Master Juneau, an important

14  point.  I mean, I really don't want to stand up here tooting our

15  own here.  I think it's pretty clear what my firm did in the

16  VIOXX litigation.  But there was a mention in the opinion

17  written by Judge Higbee where she certified a nationwide class

18  against Merck referencing that there is no firm more

19  knowledgeable in the country than Seeger Weiss in handling this.

20          And also noting that the depository -- which I

21  really would like to clear up at this moment.  I mean, there

22  were many references by Mr. Weinberg sending them to Seeger

23  Weiss.  Everybody in the country sent everything to Seeger Weiss

24  because we hosted the depository, both in the third-party payer

25  case and in the personal injury case.  So everybody sent

```
1    everything to us.  We had everything.                      10:33:1

2              But I didn't read everything personally in that  10:33:2

3    depository, I will tell you that.                          10:33:2

4         SPECIAL MASTER JUNEAU:  I know, after reading all the 10:33:2

5    documents, there was a lot of activity, an enormous amount of 10:33:3

6    activity in that 68 case.                                  10:33:3

7              The briefing, the research, who was involved in  10:33:3

8    that?  Your firm on the one hand?  What firm?              10:33:4

9         MR. SEEGER:  We had other firms assisting us.  Mr.    10:33:5

10   Herman's firm was assisting us.                            10:33:5

11             If the case went to trial and we were successful 10:33:5

12   after the supreme court, we intended to try the case.      10:34:0

13             Mr. Lavine's firm, Arnold Lavine's firm was      10:34:0

14   involved.                                                  10:34:0

15             We had a firm -- I forget the name of this firm --10:34:0

16   but John Keith, who is a local New Jersey lawyer, assisted us 10:34:0

17   extensively in document review, culling documents, specifically 10:34:1

18   to be used in the case.  Not at his own pleasure for theories 10:34:1

19   not being pursued.  He did it specifically for issues to be 10:34:2

20   litigated in the case.                                     10:34:2

21             There were a number of firms.  Off the top of my 10:34:2

22   head, I don't know if I can remember.  Maybe Dave can slip me a 10:34:2

23   note if I left somebody out.                               10:34:3

24        SPECIAL MASTER JUNEAU:  You were appointed liaison    10:34:3

25   counsel in the New Jersey case?                            10:34:4
```

1      MR. SEEGER:  Yes, sir.                                  10:34:4

2      SPECIAL MASTER JUNEAU:  Obviously, the activities of    10:34:4

3  document review and discovery and all that, that was handled and  10:34:4

4  coordinated through your office?                               10:34:5

5      MR. SEEGER:  Yes, sir.                                  10:34:5

6      SPECIAL MASTER JUNEAU:  In the face of all of that      10:34:5

7  litigation -- and, look, I don't like these appointments and   10:34:5

8  nobody likes being in the courtroom.  It's just one of the     10:35:0

9  hazards of the profession.  Was any of the objectors involved in  10:35:0

10  any of that phase that we're talking about in that case?       10:35:1

11      MR. SEEGER:  Yeah.                                      10:35:1

12          And I would like to make this comment.              10:35:1

13      SPECIAL MASTER JUNEAU:  Tell me what they did or what   10:35:2

14  they didn't do.                                                10:35:2

15      MR. SEEGER:  Mr. Dassow is an honorable man.  And we're  10:35:2

16  disagree -- I'm going to be honest with you -- the Fee Committee  10:35:2

17  disagrees on how much what Mr. Dassow did to benefit the       10:35:2

18  litigation.  But Mr. Dassow was involved in the third-party    10:35:3

19  payer litigation.  I can tell you that.                        10:35:3

20          I don't know about the others on his team.  But I   10:35:3

21  know what he did.  And he's a good lawyer and he did some work.  10:35:3

22          I think some of it was duplicative in the sense     10:35:4

23  that others were doing it.  Like, for example, Mr. Dassow did  10:35:4

24  have a case going to trial.  By my estimate, there were maybe  10:35:4

25  six to a dozen cases moving to trial at that time.  But so there  10:35:5

1    is ultimately a disagreement on what the amount is.                10:35:5

2            But I don't question anything that's come out of           10:35:5

3    his mouth.  I understand how he sees, and there's a                10:36:0

4    disagreement, and this why you're there to decide.                10:36:0

5            Mr. Weinberg is a very different story.  I heard           10:36:0

6    him make a reference about us Chris Seeger and Dave Buchanan       10:36:1

7    meeting with him in Red Bank, New Jersey.  Now, that is           10:36:1

8    absolutely an incorrect statement.  We met with Chris            10:36:1

9    Placitella.  Chris Placitella brought Eric Weinberg in.  So, if  10:36:2

10   he sat in that room that day, he was sitting at the pleasure of  10:36:2

11   Chris Placitella that day.  I did not invite Eric Weinberg.      10:36:3

12           In fact, I had no idea Eric Weinberg -- to be            10:36:3

13   honest with you, I had no idea Eric Weinberg did anything in the 10:36:3

14   third-party payer case.                                          10:36:4

15           The expert he refers to, Madigan, never submitted       10:36:4

16   a report in the third-party payer case.                          10:36:4

17           SPECIAL MASTER JUNEAU:  Never submitted a report to     10:36:4

18   what?                                                            10:36:4

19           MR. SEEGER:  In any third-party payer case.             10:36:4

20           So, when Eric makes a comment about:  Oh, I was         10:36:5

21   criticized that Madigan's report was too late in the personal   10:36:5

22   injury case and it was too early in the third-party payer case, 10:36:5

23   you know, it's a funny thing, he's actually right.  It was      10:36:5

24   unusable.  Because Madigan's report came out so late by the time 10:37:0

25   in the personal injury litigation -- I think the case was       10:37:0

1    already settled -- so it was never used in the litigation.    10:37:1

2                    In the third-party payer litigation, my firm, and    10:37:1

3    I believe it was Dave Buchanan specifically, asked Don Arbitlit    10:37:1

4    over at Elizabeth Cabraser's office:  Take a look at what    10:37:2

5    Weinberg's been working on, take a look at Madigan's report and    10:37:2

6    see if there's any use in this thing for the third-party payer    10:37:2

7    litigation.    10:37:3

8                    Now, I was reminded of this because I just    10:37:3

9    recently asked Elizabeth to refresh my recollection.    10:37:3

10        SPECIAL MASTER JUNEAU:  Cabraser, you are talking    10:37:3

11   about?    10:37:3

12        MR. SEEGER:  Yes.  Elizabeth Cabraser.  I'm sorry.    10:37:3

13                   And there was an email written to me, which I'm    10:37:4

14   more than happy to share with you or anybody in the courtroom,    10:37:4

15   reminding me of how useless the report that Eric Weinberg worked    10:37:4

16   on with Dr. Madigan was with regard to the third-party payer    10:37:5

17   litigation.  And it was used nowhere by anybody in the    10:37:5

18   third-party payer litigation.  Not even Mr. Dassow who just    10:37:5

19   testified he was getting a case ready for trial.    10:38:0

20                   So, when you asked me what's my recollection of    10:38:0

21   what the objectors did, that's the best recollection I can give    10:38:0

22   you right now.    10:38:0

23                   I can go into more detail, but I think that's a    10:38:0

24   general overview.    10:38:1

25        SPECIAL MASTER JUNEAU:  Let's talk about the experts    10:38:1

1    for a minute.  What involvement and what experts were used in          10:38:1

2    the TTP litigation?  Who arranged that?  Who did it and who did         10:38:2

3    they use?                                                               10:38:3

4             MR. SEEGER:  There was only one expert that ever              10:38:3

5    submitted an affidavit, a report or did anything in third-party        10:38:3

6    payer litigation.  And I can't remember his first name but his         10:38:4

7    last name is Kelly.  I remember him as Dr. Kelly.                       10:38:4

8                 He assisted us, Dave and I, when we argued the            10:38:4

9    class certification hearing in New Jersey in getting that class        10:38:5

10   certified.                                                             10:38:5

11                Now, remember, everybody was watching to see what         10:38:5

12   was going to happen with Local 68 at that point.  Mr. Weinberg         10:38:5

13   war not doing third-party payer work in 2005, and he wasn't            10:38:5

14   doing it in 2004, and he wasn't doing it in 2006.  He sat back         10:39:0

15   and watched to see how our case made its way through the court.        10:39:0

16                Local 68 gets certified in 2005.  Merck appealed.         10:39:1

17   It went up to the appellate division.                                  10:39:1

18                I argued the class certification, by the way, in          10:39:1

19   front of Judge Higbee with my partner Dave Buchanan.  It went to       10:39:2

20   the appellate division.  We lost some time briefing.  I argued         10:39:2

21   the appeal.  Eric Weinberg was not on our time.  Nowhere to be         10:39:2

22   found anywhere in third-party payer at this point.  I argued the       10:39:3

23   appeal.  We won at the appellate division level.  They upheld          10:39:3

24   what Judge Higbee's ruling was, was a nationwide class certified       10:39:3

25   against Merck applying New Jersey law to all 50 states.                10:39:4

1        Think about the hammer, you know, potentially.  If    10:39:4

2   we're going to talk about what pushes the ball over a goal line   10:39:4

3   in litigation, that was a case that, if it was upheld by the   10:39:5

4   supreme court of New Jersey -- and I'm going to address that in   10:39:5

5   a second -- would have been a 15 to $20 billion dollar hammer   10:39:5

6   over Merck's head.  And, if you call any defense lawyer involved   10:39:5

7   with the Merck representation to this court, they will tell you   10:40:0

8   that was what they were worried about.   10:40:0

9        Case goes up to the supreme court of New Jersey.   10:40:0

10  Merck briefs everything.   10:40:1

11       Brief point No. 1 for Merck was Judge Higbee erred   10:40:1

12  and the appellate division erred in applying New Jersey to all   10:40:1

13  50 states.  Merck's argument was each state's law should apply   10:40:2

14  to damages where the plaintiff was located.  A lex loci theory.   10:40:2

15       We argued no, because it was a statute designed to   10:40:2

16  deter bad conduct by New Jersey citizens, New Jersey law should   10:40:3

17  apply.   10:40:3

18       The supreme court ruled that the case failed on   10:40:3

19  predominance, and they never touched the conflicts of law issues   10:40:4

20  in those cases.  Which we spent most of our time briefing and   10:40:4

21  thinking that was going to be the big issue.  They said there   10:40:5

22  were individual issues.  And, because they were individual   10:40:5

23  issues, the case was decertified.  Leaving standing the Consumer   10:40:5

24  Fraud Act being applied to all 50 states against the New Jersey   10:40:5

25  defendant.  An incredibly significant ruling for anybody at that   10:41:0

```
 1   point who wanted to get involved in the third-party payer      10:41:0
 2   litigation.                                                     10:41:0
 3               Without which, they would have all been gone.  I   10:41:0
 4   mean, it's just the fact.  Most of those cases would have been  10:41:1
 5   gone.                                                           10:41:1
 6               And, if we hadn't had a class action pending since  10:41:1
 7   2003, the statute of limitations would have been blown for most 10:41:1
 8   of the guys who came after us.  And I don't say that in any     10:41:2
 9   disparaging way towards Mr. Dassow and his group, because, as I 10:41:2
10   said, I know what they did.                                     10:41:3
11               But that's how the third-party payer came about,   10:41:3
12   and that's how Mr. Weinberg got involved in 2008.              10:41:3
13          SPECIAL MASTER JUNEAU:  Let me ask you, there are        10:41:3
14   submissions.  You all had a depository; did you not?            10:41:4
15          MR. WEINBERG:  Oh, yes, sir.  We had one at Seeger       10:41:4
16   Weiss.                                                          10:41:4
17          SPECIAL MASTER JUNEAU:  Who maintained the depository,   10:41:4
18   who paid for it and who did all that?  I know what a depository 10:41:4
19   was.                                                            10:41:5
20          MR. SEEGER:  The depository, ultimately, when the MDL    10:41:5
21   was created, it was put in Mr. Herman's office, my office, Mr.  10:41:5
22   Birchfield had one and there might have been one other in       10:42:0
23   California.                                                     10:42:0
24               Prior to the MDL creation, it was housed at Seeger  10:42:0
25   Weiss, and it was hosted by Dave Buchanan who is here today.    10:42:1
```

 1          I'm being corrected.  See, now, I'm not good on

 2   technical issues.  But I'm just being corrected, is that we

 3   hosted the depository for everybody but everybody had remote

 4   access to our servers.

 5          SPECIAL MASTER JUNEAU:  You all were the central

 6   location.

 7          MR. SEEGER:  Yes.

 8          Now, on the cost plus -- I'm glad you asked this

 9   -- I think this was costing over a million dollars a year just

10   on the cost of the licenses that were provided and the equipment

11   that was there and the people that were needed to just maintain

12   this breast.  Not the lawyers sitting in the chairs.  It was

13   over a million dollars a year just to host that.

14          Am I close on that?  Did you want to clarify?

15          MR. BUCHANAN:  David Buchanan for the record.

16          And we did host an electronic repository that was

17   accessed remotely through several different sites around the

18   country; from Mr. Herman's office, Mr. Birchfield's office, out

19   in California Robinson Calcagnie.

20          All the data was housed on our servers.  We hired

21   the consultants, got the licensing, built the system, paid the

22   telecom and absorbed those costs principally throughout the

23   seven to eight years that we did that.

24          Comparably, I'm in other litigations right now

25   were you're spending $750,000 to $1 million dollars for that

```
 1    type of service.  That's what we're trying to analogize.  I've        10:43:3
 2    never been able to fully pull those costs together.                   10:43:3
 3              SPECIAL MASTER JUNEAU:  The funding of those costs --        10:43:3
 4              MR. BUCHANAN:  Was by the firm.                             10:43:4
 5              MR. SEEGER:  Was by the firm, Seeger Weiss.                  10:43:4
 6                   Up until the creation of the MDL, it was Seeger        10:43:4
 7    Weiss that funded the maintenance of that depository.                  10:43:5
 8                   After that time --                                     10:43:5
 9              SPECIAL MASTER JUNEAU:  After that time then.                10:43:5
10              MR. SEEGER:  Then we had the PSC.  People contributed       10:43:5
11    and some of those costs were handled and offset by the MDL.            10:43:5
12              SPECIAL MASTER JUNEAU:  Were any of the people who are      10:44:0
13    presently in the courtroom contributors to that cost?                 10:44:0
14              MR. SEEGER:  I'm pretty confident that Mr. Weinberg         10:44:0
15    didn't.                                                                10:44:1
16                   I don't know if Mr. Dassow did.  I believe that --     10:44:1
17    if Rob Dassow says that he contributed, I believe he did.             10:44:1
18              SPECIAL MASTER JUNEAU:  I talked about trials.  I've        10:44:2
19    asked that for everybody.                                             10:44:3
20                   Has your firm or any other firm actually tried a      10:44:3
21    VIOXX case?  A TPP case.                                              10:44:4
22              MR. SEEGER:  Nobody tried a TPP case anywhere in the       10:44:4
23    country up until the point the case settled.  I'm not really         10:44:4
24    sure what's happened since then.  I believe there was an AG          10:44:5
25    case.                                                                 10:44:5
```

1      So I don't believe any TTP cases have been tried                    10:44:5

2  anywhere.                                                               10:44:5

3      My firm was involved in several personal injury                    10:44:5

4  cases.                                                                  10:45:0

5      SPECIAL MASTER JUNEAU:  You did try a VIOXX case?                   10:45:0

6      MR. SEEGER:  Oh, yeah.  I tried the Hummelstown case                10:45:0

7  twice, unfortunately.  But with a good result the second time.         10:45:0

8      And also, in the insurance case that Mark Lenier                    10:45:1

9  tried, we were pro hoc in that case as we assisted, but in a           10:45:1

10  back room capacity.  We were more behind the scenes.                   10:45:1

11      SPECIAL MASTER JUNEAU:  I asked the question earlier of            10:45:2

12  everybody about the settlement negotiations.  Who was involved         10:45:2

13  in the settlement negotiations of that package, if you will, of        10:45:2

14  the TPP cases?                                                         10:45:3

15      MR. SEEGER:  I don't have a very firm recollection on              10:45:3

16  the first day I got a call from Doug Marvin, who was lead              10:45:3

17  counsel representing Merck, about when -- I don't know exactly         10:45:3

18  the day he called me and said:  Let's talk about third-party           10:45:4

19  payer.  Because the call came from Merck.                              10:45:4

20      I can tell you, it was a short time after the                      10:45:4

21  decertification of the Local 68 decision.  And it was, you know,       10:45:5

22  kind of -- I don't recall exactly, but we were -- I guess some         10:45:5

23  of this, I can talk about now.  Because a lot of things that           10:46:0

24  happened are very confidential.  Buy we were in the process, I         10:46:0

25  believe, of already negotiating on the personal injury                 10:46:0

1    settlement, which ultimately resulted in the $4.85 billion

2    dollar settlement.  It was some time in that timeframe I first

3    got the call from Doug.  And I believe it was actually after we

4    had concluded the third -- I'm sorry -- the personal injury

5    notions.

6              Anyway, to maybe simplify this, I was negotiating

7    with Doug Marvin for a significant amount of time before Tom

8    Sobal came in, and before the actual deal was actually concluded

9    in 2009.  Because there was a lot of back and forth.  I mean,

10   there was, you know, it was is obviously a desire by Merck --

11   and I have to tell you this because it's only based upon my

12   understanding of what drove the settlement -- there was no

13   trial, no third-party payer trial that drove Merck to the

14   settlement table.  They were too far away.

15             And, if you think about it this way, once the

16   class was decertified, you could ask anybody that represented a

17   third-party payer, if you didn't have Aetna or Guardian, you had

18   relatively small damages.  Many of the third-party payers had

19   about 150, $200,000 in damages.  Or maybe they had a half

20   million in damages.

21             But, even though those lawyers were gearing up

22   their cases for trial on the third-party payer case, they were

23   about to spend a million dollars on what ultimately might be a

24   $500,000, million dollar, million and a half result.

25             So what really drove Merck to the table was the

```
 1    fact that they had just -- we had, Mr. Herman and I and Arnold      10:47:3

 2    Lavine and the negotiating committee had concluded a $4.85          10:47:3

 3    million on the personal injury side, and Merck wanted to begin      10:47:4

 4    to clean up everything else.                                        10:47:4

 5                 And the next step was to get rid of their              10:47:4

 6    third-party payer.                                                  10:47:5

 7                 And then was to get rid of the AG litigation.          10:47:5

 8                 And then, ultimately -- which still hasn't been        10:47:5

 9    resolved but at some point will be -- the consumer fraud            10:47:5

10    litigation on behalf of the consumers.  And that is how it          10:47:5

11    actually progressed.                                                10:48:0

12         SPECIAL MASTER JUNEAU:  Let's talk about that, because         10:48:0

13    it came up earlier today.                                           10:48:0

14                 You were actually present in the settlement            10:48:0

15    negotiations?                                                       10:48:0

16         MR. SEEGER:  I was the sole negotiator up until Tom            10:47:1

17    Sobal got involved.                                                 10:48:1

18                 And there was a reason he got involved, which I        10:48:1

19    can go into if you're interested.                                   10:48:1

20         SPECIAL MASTER JUNEAU:  Was there any discussions, was         10:48:2

21    it an issue or was it an assertion, PowerPoint or whatever you      10:48:2

22    want to call it, by Merck about anything to do with the             10:48:2

23    Australian litigation?                                              10:48:3

24         MR. SEEGER:  No, no.                                           10:47:1

25                 By the way, I want to put a little footnote for        10:48:3
```

1    the answers because I don't want the record to be unclear.  I        10:48:3

2    was negotiating alone, but I was always talking to my                10:48:4

3    colleagues.  I was talking to Mr. Herman and Andy Birchfield.        10:48:4

4    So they knew what I was doing.  And Arnold Levine.  They knew        10:48:4

5    what I was doing and we were consulting and talking.                 10:48:4

6             THE COURT:  One of the other issues that came up, you       10:48:5

7    contacted Mr. Weinberg.  There were time submissions about an        10:48:5

8    article that he had written, I'll call it the 100-page article.      10:49:0

9    Was any of that ever discussed or was it an item of importance,      10:49:0

10   minor or otherwise?                                                  10:49:1

11            MR. SEEGER:  No.                                            10:47:1

12            SPECIAL MASTER JUNEAU:  To any settlement negotiations?     10:49:1

13            MR. SEEGER:  Mr. Weinberg had a tendency to prepare         10:47:1

14   lots of things.                                                      10:49:2

15            He prepared documents and presentations about bone         10:49:2

16   density.  Nobody litigated a bone density claim in VIOXX.            10:49:2

17            He prepared documents about the progression about          10:49:3

18   Alzheimer's, which is what I think that article was he wrote.  I     10:49:3

19   don't understand what use that would have in this litigation         10:49:3

20   because nobody brought a claim for progression of Alzheimer's.      10:49:3

21            Now, did he discover that the Alzheimer's studies          10:49:4

22   revealed a cardiovascular problem with the drug?  No, he did        10:49:4

23   not.  That was done long before Mr. Weinberg, as far as I know,     10:49:4

24   was even involved in the case.  I know that my partner was          10:49:5

25   working on that project long before Mr. Weinberg got involved in    10:49:5

1      the case.

2              When Mr. Weinberg stands up here and says to this

3      court that this article was useful to everybody because it

4      marshalled internal documents and studies by Merck, that's also

5      a ridiculous statement because we had already tried a number of

6      cases and we already had those documents.  And we'd actually had

7      already won a couple of those trials without the assistance of

8      Mr. Weinberg.

9              So no.  As to the article -- to the honest with

10     you, I think I personally became cognitive of it -- maybe it was

11     sent to me at some point -- but I personally became aware of it

12     in this fee proceeding we're in right now.  That's when I became

13     aware of the fact that he drafted a 135-page article outlining

14     Merck's bad conduct in the Alzheimer's disease.

15             As for Australia, you know, again, because Mr.

16     Weinberg liked to work on things -- I often have described him,

17     and if you brought in the lawyers from the case, you would hear

18     they would say what I often said about him is he likes to chase

19     everything that glitters.

20         SPECIAL MASTER JUNEAU:  Everything that what?

21         MR. SEEGER:  Everything that glitters is important to

22     Mr. Weinberg.

23             Although he thinks everything he did was the most

24     important thing in the litigation, I want to just say this to

25     you, Special Master, because it's a common sense point.  Any

```
 1    trial lawyer that would allow an expert like Dr. Madigan to be       10:51:0
 2    hauled to another country, in another tribunal, to be exposed to     10:51:1
 3    cross examination before I've had a chance to use him in a trial     10:51:1
 4    in the United States, needs to have his head examined.  I would      10:51:2
 5    never authorize Mr. Weinberg or anybody taking an expert that we     10:51:2
 6    have cultivated or he has cultivated in a litigation and take        10:51:3
 7    him to Australia or Japan or Germany or anywhere else to be          10:51:3
 8    marched out in a tribunal and being cross examined or questioned     10:51:4
 9    on the record before I've had a chance to use him a trial in the     10:51:4
10    United States or on behalf of clients who have cases in the          10:51:4
11    United States.  So what he says about Australia makes no sense.      10:51:5
12              And my final on that is it is this.  The letter           10:51:5
13    that he submits by Slater Gordan thanking him for all the work       10:51:5
14    he did.  And I would thank Mr. Weinberg, too, if he worked for       10:51:5
15    me for free                                                          10:52:0
16              But the letter thanking him notes that he went            10:52:0
17    over there and e did all this work at his own experience.  And       10:52:0
18    that's exactly the way that work should remain.  At Mr.              10:52:0
19    Weinberg's own expense.  Because it wasn't authorized and he         10:52:1
20    decided to do it.                                                    10:52:1
21              I don't know what Mr. Linear told him.  Mr. Linear        10:52:1
22    was not in a leadership role anywhere.  And I have the ultimate      10:52:1
23    respect for Mark Lenier.  But he wasn't.                            10:52:2
24              SPECIAL MASTER JUNEAU:  You spoke about the Central       10:52:2
25    States' work, and you acknowledged your view of Mr. Dassow.  And    10:52:4
```

 1   I think you specifically said where the area of disagreement was            10:52:5

 2   and you articulated that.  I want to come back to negotiations.            10:53:0

 3                Was anything in the negotiations about -- was that            10:53:0

 4   an item in the negotiations, his firm was involved or not?            10:53:0

 5                MR. SEEGER:  No.            10:47:1

 6                And as much as I do think that Rob Dassow did that            10:53:1

 7   work and is a great lawyer, it never came up in my discussions            10:53:1

 8   with Merck that they had any concern about any cases going to            10:53:2

 9   trial.            10:53:2

10                Not just Mr. Dassow.  My cases that I was            10:53:2

11   personally involved, I don't think they were afraid of those            10:53:2

12   either.            10:53:2

13                Because they were afraid of the aggregation of            10:53:2

14   those claims in a class action.  Because the aggregation of            10:53:3

15   those claims was a 15 -- potentially trebled, $15 billion            10:53:3

16   verdict against Merck.            10:53:4

17                When that got broken up by the supreme court, I            10:53:4

18   don't think -- I personally don't think and we can talk to Merck            10:53:4

19   lawyers -- I personally do not think that was a driving force at            10:53:4

20   trials.  Even my cases.            10:53:5

21                SPECIAL MASTER JUNEAU:  Let me ask you these questions.            10:53:5

22   Mr. Dassow made the point that, in the submissions by these            10:53:5

23   eclectic groups of lawyers, there was no paralegal time, extra            10:54:0

24   time submitted.            10:54:0

25                Was that a factor taken into consideration on this            10:54:1

```
 1   allocation process?                                        10:54:1

 2          MR. SEEGER:  You know, it was.                      10:54:1

 3              And, again, doing this in the abstract, I can only  10:54:1

 4   give you have an abstract response to it.                  10:54:2

 5              We tried to look at buckets that were set forth by  10:54:2

 6   Judge Fallon in the personal injury litigation, and they were  10:54:2

 7   kind of generalized.  It was -- the bottom line was, did this  10:54:3

 8   conduct enure to the common benefit and did it push the ball  10:54:3

 9   over the goal line.  Is that the thing that helped -- and  10:54:3

10   although -- is that one of the things that contributed to the  10:54:4

11   ball going up the goal line.                               10:54:4

12              So we looked at document review.  We looked at  10:54:5

13   everything in that context:  Paralegal time, secretarial time if  10:54:4

14   it was submitted.  Many lawyers didn't submit it; but, if it was  10:54:5

15   submitted, we looked at it.                                10:54:5

16              And, obviously, in my mind, sitting here right  10:54:5

17   now, when I look at a time submission, I don't weigh paralegal  10:54:5

18   time like I do attorney time.                              10:55:0

19              And that doesn't mean -- having said that, that  10:55:0

20   doesn't mean than somebody can't go through somebody's hours and  10:55:0

21   say:  Well, in this case, you counted 10 hours for the     10:55:0

22   paralegal.  It might be that, in that case, it made sense to do  10:55:1

23   that.                                                      10:55:1

24              Do I view paralegal time like I do attorney time I  10:55:1

25   do not.  And I don't view document review like I do trying a  10:55:1
```

 1    case or handling a *Daubert* motion, things like that.                    10:55:2

 2              SPECIAL MASTER JUNEAU:  There was another issue.  I             10:55:2

 3    think it was Mr. Weinberg raised the issue about the recordation         10:55:2

 4    of hours in this matter.  Twenty-seven hours or some large               10:55:3

 5    number of what was a precautionary element or effort that was            10:55:4

 6    made by this fee allocation committee in analyzing all of those          10:55:4

 7    timesheets from Mr. A all the way to Ms. Z.                              10:55:5

 8              MR. SEEGER:  Well, I can tell you that lot of time was         10:47:1

 9    spent on that.  And were things missed?  Obviously.  That was            10:56:0

10    and that is in -- if there was, I'm not aware even sitting here          10:56:0

11    right now.                                                               10:56:0

12              I'm told that there was instance where somebody                10:56:1

13    billed 27 hours.  It was brought to that person's attention and         10:56:1

14    it has been corrected.  Mr. Weinberg doesn't seem satisfied with        10:56:1

15    the explanation.  I get that.                                            10:56:1

16              Were mistakes made?  There's always the                       10:56:2

17    possibility of that.                                                     10:56:2

18              I can tell you that we spent an inordinate amount              10:56:2

19    of time going through time records.  We probably missed things.         10:56:2

20              But we tried to get the general feel, obviously,              10:56:2

21    as best we can, for what's going on.  And that's why those              10:56:3

22    buckets assist.  Because those buckets look at not just counting        10:56:3

23    hours, but they look at were those hours valuable.  You know,           10:56:3

24    again, did it make a contribution to the case.                          10:56:4

25              You know, we had only the fee committee an                    10:56:4

1    individual who didn't have any third-party payer involvement and    10:56:4

2    didn't get or request a fee in the third-party payer litigation,    10:56:5

3    Andy Birchfield.  I think he was brought in almost like an    10:56:5

4    outside -- a person who knew the litigation but had an    10:56:5

5    outsider's view of the third-party payer litigation.    10:57:0

6            So, is it possible that they got -- they'd have    10:57:0

7    some gotcha moments where somebody made a mistake?  Absolutely.    10:57:0

8    They should be corrected.  And, in any case where someone had    10:57:1

9    billed 27 hours in a day, they shouldn't get paid for that day    10:57:1

10   obviously.  That's a mistake if they can't explain it.  These    10:57:1

11   are obviously calls to be made by you.    10:57:2

12           SPECIAL MASTER JUNEAU:  On the last series of questions    10:57:2

13   I have, in Mr. Weinberg's case, there is a zero allocation for    10:57:2

14   some discussions, et cetera.  And there's a subsequent    10:57:3

15   communication analysis, and it's $450,000.  Apparently, that was    10:57:4

16   rejected, I would assume, and comes back with a zero allocation.    10:57:5

17   Your comments or thoughts about that.    10:57:5

18           MR. SEEGER:  You know, he got a zero because I couldn't    10:57:5

19   recall, and nobody on the committee could really point to    10:58:0

20   anything that Mr. Weinberg did that that was truly third-party    10:58:0

21   payer related.    10:58:1

22           It was, we believed that all of the work he now    10:58:1

23   claims, he was more than compensated for as an objector on the    10:58:1

24   personal injury side.    10:58:1

25           Having said that -- and as I've heard his    10:58:2

1   testimony and I've looked at documents -- it appears he has          10:58:2

2   attend meetings.  That he has attended meetings.  And that there    10:58:2

3   may be some work there.                                             10:58:3

4            I will just say this.  And whatever the Special            10:58:3

5   Master and judge Fallon's ruling is, we abide by it,               10:58:3

6   respectfully.  But I will say this.  It is a little odd to me      10:58:4

7   that the guy who had -- Chris Placitella's firm had the clients.   10:58:4

8   Chris Placitella's firm is the firm we spoke to.  They brought     10:58:4

9   him in.  Chris Placitella's firm put in a fee application and      10:58:5

10  expenses of total of $122,000.  And Eric Weinberg dwarfs that      10:58:5

11  number by a multiple.  And I don't understand how the guy that     10:59:0

12  brought him in -- you know, unless Mr. Weinberg is really that     10:59:1

13  fantastic were they just simply say:  Eric, you take this over     10:59:1

14  and do it -- I don't see how that happened.                        10:59:1

15           And I'll you something else.  I do have specific          10:59:2

16  recollection of meetings with Chris Placitella's firm and a        10:59:2

17  gentleman in that firm by the name of Mark Schultz, who I and      10:59:2

18  Dave interacted with on working on a damages model for the         10:59:3

19  third-party payer litigation.  And I don't have any recollection   10:59:3

20  of Mr. Weinberg in that.  Doesn't mean he didn't sit in the room   10:59:3

21  quietly.  I don't, as it's been several years, but I don't have    10:59:4

22  an understanding of him making any substantial contribution in     10:59:4

23  that respect.                                                      10:59:4

24           So, you know, is zero the right number, sitting           10:59:4

25  here right now?  At the time of the fee committee, I thought       10:59:5

```
 1    zero was right number because I couldn't and I still really      10:59:5
 2    can't recall anything he did.                                    10:59:5
 3              But if I give any credence to anything that he         11:00:0
 4    said today, that he was in the meetings and I was in those       11:00:0
 5    meetings, yeah, there's probably some time that should be        11:00:0
 6    credited.                                                        11:00:0
 7              Do I think 450,000?  No.  Did I support that as an     11:00:0
 8    offer?  I did.  Because are people here that have been really    11:00:1
 9    litigating the case since 2002, 2003 and 2005 that haven't been  11:00:1
10    paid.  So, in order to resolve it and to avoid the time that     11:00:2
11    we're all putting in right now, I approved, as did my colleagues 11:00:2
12    on the committee, in an offer to settle the case and put it      11:00:2
13    aside.  But he wants more.                                       11:00:3
14         SPECIAL MASTER JUNEAU:  Mr. Seeger, same thing as all       11:00:3
15    the other people being here, is there anything you want to add   11:00:3
16    that you think that's pertinent?  I have coated what I think is  11:00:4
17    pertinent to me, but there may be some things that I didn't      11:00:4
18    fully exhaust.  I want to give you that opportunity.             11:00:5
19         MR. SEEGER:  I'm not going to spend time talking about      11:00:5
20    Seeger Weiss.  But, again, I think I just need to highlight for  11:00:5
21    you, Special Master, and the record, a couple of items.          11:00:5
22              One is, Mr. Weinberg, by his testimony today, says    11:01:0
23    he spent 1,000 hours or more on doing some of the percentages,   11:01:0
24    working with experts.                                            11:01:0
25         SPECIAL MASTER JUNEAU:  Working with experts.               11:01:0
```

1      MR. SEEGER:  One of those experts was Madigan.

2           My firm has hired Dr. Madigan.  And he's not a

3  cheap expert.  And I guess the big question I have, and I don't

4  know if we ever got an answer to it other than I can't tell you

5  what Dr. Madigan charges me, is how do you have 1,000 hours of

6  expert time, most of the time is spent with this one expert in

7  Madigan, and you only spent $25,000 in expense?  There is just a

8  fundamental disconnect on that point.  Because, even if you say

9  Dr. Madigan works for 400 bucks an hour, and he discounted his

10  time by 50 percent, you don't get to $25,000.  So there is a big

11  inconsistency on that.

12           I'll look at my -- I will also point out that much

13  of what Mr. Weinberg said about his authority in his reference

14  to emails, that we never saw, that were supposed to be produced

15  and weren't.  So I can't respond to what he says that Chris

16  Seeger -- a multiple of times, he said:  Chris Seeger knew I was

17  doing this; Dave Buchanan knew I was doing.  And, in my view,

18  this was important work.  And, in my view, this was important

19  work.  And that is the problem with Eric Weinberg in this

20  litigation.  And, in any litigation, I think people should be

21  aware of.  Because what really matters here wasn't what was in

22  my view as the leader of the litigation; what mattered was what

23  was in his view was important to do.

24           I've reviewed in connection with his submissions

25  here a PowerPoint that must have taken 100 hours to put together

1   on VIOXX and bone density, and you will not find one case that                    11:02:3

2   settled on that basis here.  Not one nickel of the $4.85 billion                  11:02:4

3   fund went to pay anybody with a bone density or anybody with a                     11:02:4

4   progression of Alzheimer's claim.                                                 11:02:5

5              So, Special Master, I would sit down on this                           11:02:5

6   point, you tell me, somebody tell me that any of that advanced                    11:02:5

7   the ball in the litigation.                                                       11:02:5

8              Thank you for your time.                                               11:02:5

9         MR. WEINBERG:  I have to respond to his --                                  11:03:0

10        MR. SEEGER:  I'm not done, actually.  I'm not done.                         11:03:1

11             Sorry, Special Master.  Could you give me just one                     11:03:1

12  moment?                                                                           11:03:2

13             (Pause in proceedings.)                                                11:03:2

14        MR. SEEGER:  I'm just reminded by Mr. Herman, my                            11:03:2

15  co-counsel and member of the Fee Committee, that we had four --                   11:03:4

16  I just, for the record -- I think this is in are papers -- but                    11:03:4

17  that we had four in-person fact committee meetings and we had                     11:03:4

18  over a dozen telephone conferences, in addition to the work we                    11:03:5

19  did on our own, which was reviewing thousands of pages of                         11:03:5

20  documents.  I do believe that's in our submissions to Your                        11:03:5

21  Honor, but I just want it on the record.                                          11:04:0

22             I know that he wants to stand up and address the                       11:04:0

23  discovery dispute.  I'm not arguing the discovery motion.  I'm                    11:04:0

24  simply noting for the record that documents we asked produced                     11:04:1

25  prior to today were referred to by Mr. Weinberg, and we don't                     11:04:1

```
 1    have them.                                                    11:04:1

 2            SPECIAL MASTER JUNEAU:  I'm going to let you get up,   11:04:1

 3    but I'm going to make it clear to everybody and I want to get it  11:04:2

 4    clear to both of you all, I'm not involved in that issue.  You  11:04:2

 5    have probably one of the brightest and most articulate and    11:04:3

 6    dedicated federal judges in the United States, whose got that.  11:04:3

 7    He takes that stuff serious.  He takes his order serious.  And  11:04:3

 8    he's going to address you all on that.  I ain't addressing it.  11:04:4

 9            If there's one thing you want to say, but don't       11:04:4

10    get into the merits.  It's not before me.                     11:04:4

11            MR. ARCENEAUX:  The document, the emails that Mr.     11:04:4

12    Weinberg -- first of all, I have two things to say.  One of    11:04:5

13    which is directly addressed to you, Special Master.           11:04:5

14            You may recall the very first telephone               11:04:5

15    conversation, we had addressed whether there was any outstanding  11:05:0

16    discovery that anybody wanted.  And nobody ever asked for any  11:05:0

17    emails.  I want you just to remember that the only discovery   11:05:0

18    that was asked for was by us, a letter regarding what happened  11:05:1

19    to the $600,000 that was paid in costs in the state attorney   11:05:1

20    general matter tried by Mr. Dugan, which we never got a response  11:05:2

21    to.  And Mr. Herman saying he wanted to depose Mr. Weinberg.   11:05:2

22    That was all the discovery that was discussed before you.      11:05:2

23    That's my first point.                                         11:05:3

24            Second, the emails that he referred to are E-1        11:05:3

25    through 14 attached to our submission.  These are not emails   11:05:3
```

1    they don't have.

2              Email No. 1, for example, from Mr. Weinberg --

3    from Mr. Seeger to Mr. Weinberg, that says:  Eric, we already

4    have a working group, you are a part; us, Placitella firm and

5    you.  In my view, we don't know of any others.

6              MR. SEEGER:  What's the date on that?

7              MR. ARCENEAUX:  The date is March 2008.

8              SPECIAL MASTER JUNEAU:  If it's in the record, I got

9    it.

10             MR. SEEGER:  Yeah.  You can consider.

11             SPECIAL MASTER JUNEAU:  If it's not in the record, you

12   all will get a full opportunity to address that to the court.

13   Believe me.

14             Gentleman, that has concluded what I was looking

15   for.  I will appreciate you -- Mr. Dassow.

16             MR. DASSOW:  I just wanted to clarify one thing that

17   Chris said.

18             In July 2008, and prior to that frankly, but on

19   the record, Judge Higbee selected the Central States.  There

20   were other cases, as Chris said, that were put up.  But at that

21   point Judge Higbee selected only Central States.  And I wanted

22   to just clarify that for the record.

23             SPECIAL MASTER JUNEAU:  Just for the purpose of the

24   record, this has accomplished what I wanted to accomplish, which

25   was to get my clarification of issues that are here.

1        I'm going to get this transcript.  I'm going to        11:06:5

2   take this matter under advisement.  I'm going to go about the        11:06:5

3   arduous task of formulating an opinion and report to Judge        11:06:5

4   Fallon.  I know he has before him now the issues that you all        11:07:0

5   are talking about on the motions.  And you all can address that        11:07:0

6   in due course.        11:07:0

7        Thank you all very much.        11:07:1

8        (11:10 a.m., proceedings concluded.)        11:08:1

9

10

11                          CERTIFICATE

12

13

        I, Susan A. Zielie, Official Court Reporter, do hereby
14   certify that the foregoing transcript is correct.

15

16

                        /S/ SUSAN A. ZIELIE, FCRR
17                     _____
                          Susan A. Zielie, FCRR
18

19

20

21

22

23

24

25