|  |  |
|---|---|
| In re:  VIOXX® | *   MDL Docket No. 1657 |
|  | * |
| PRODUCTS LIABILITY | *   SECTION L |
| LITIGATION | * |
|  | *   JUDGE FALLON |
| This Document Relates to | * |
| Cases Listed on Exhibit A |  |
|  | *   MAG. JUDGE KNOWLES |
| * * * * * * * * * * * * * * * * | * |

### VTE PLAINTIFFS' MEMORANDUM IN OPPOSITION
### TO MERCK'S MOTION FOR RECONSIDERATION
### OF THE COURT'S APRIL 9, 2013 ORDER

Two months after this Court issued its April 9, 2013 ruling that all of Plaintiffs' experts pass the reliability standard articulated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), Merck Sharp & Dohme Corp. ("Merck") asks the Court to reconsider its ruling.  Merck provides no "new" reason other than a disagreement with the Court's conclusion.  Merck does not present new law or new evidence that suggests this Court – which has heard many *Daubert* challenges in the Vioxx litigation and otherwise – has committed manifest error.  Merck filed over 1,400 pages in support of its *Daubert* motion, and the Court considered all of the arguments Merck makes here. Motions for reconsideration are not favored by the courts as they are often no more than another bite at the same apple and hence a waste of judicial time and resources. Indeed, that is even more true with competent counsel as represent Merck here, who did not overlook one argument nor leave one stone unturned. Merck's Motion for Reconsideration ("Merck's Motion") should be denied.

**ARGUMENT**

I.    **Merck Cannot Meet the Standard for Reconsideration.**

The Fifth Circuit has set a high standard to justify reconsideration, one that Merck is unable to meet. To modify an interlocutory order, the moving party must show 1) an intervening change in controlling law; 2) the availability of new evidence not previously available; or 3) the need to correct a clear error of law or prevent manifest injustice.[1] Modification of an interlocutory order under F.R.C.P. 54(b) is allowed only under specific circumstances. *See, e.g., Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989)(reconsideration allowed if "to correct manifest errors of law or fact or to present newly discovered evidence"); *Helena Laboratories Corp. v. Alpha Scientific Corp.*, 483 F. Supp. 2d 538, 539 (E.D. Tex. 2007) aff'd, 274 F. App'x 900 (Fed. Cir. 2008) (reconsideration denied where the court previously rejected defendant's argument). As one court has held in the context of a Rule 59 reconsideration, "[w]hatever may be the purpose of Rule 59(e), it should not be supposed that it is intended to give an unhappy litigant one additional chance to sway the judge." *Nationwide Mut. Fire Ins. Co. v. Pham*, 193 F.R.D. 493, 494 (S.D. Miss. 2000).

The *Southern Snow* standard cited by Merck similarly holds that granting a motion for reconsideration must "serve the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *S. Snow Mfg. Co., Inc. v. SnoWizard Holdings, Inc.*, 2013 WL 392582 (E.D. La.

---

[1] *In re Benjamin Moore & Co.*, 318 F.3d 626, 629 (5th Cir. 2002), *eTool Dev., Inc. v. Nat'l Semiconductor Corp.*, 881 F. Supp. 2d 745, 749-50 (E.D. Tex. 2012)

Jan. 31, 2013) at *10; *See, also, Helena Laboratories,* 483 F.Supp.2d at 539, quoting *Waltman,* 875 F.2d at 473.

The real point of *Southern Snow* is made in this excerpt where the revisiting of already decided issues is discouraged:

> . . . [granting motions for reconsideration] must be exercised sparingly in order to forestall the perpetual reexamination of orders and the resulting burdens and delays. Further, the decision of the district court to grant or deny a motion for reconsideration will only be reviewed for an abuse of discretion . . . . importantly, Rule 54(b) motions, like those under Rules 59(e) and 60(b), are not the proper vehicle for rehashing evidence, legal theories, or arguments. . . . [i]t is well settled that motions for reconsideration should not be used . . . to re-urge matters that have already been advanced by a party . . . . [w]hen there exists no independent reason for reconsideration other than mere disagreement with a prior order, reconsideration is a waste of judicial time and resources and should not be granted.

*S. Snow Mfg. Co*, at *10-11 (internal quotation marks omitted).

Thus, district court opinions "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *eTool Dev.*, 881 F. Supp. at 749, quoting *Helena Laboratories*, 483 F.Supp.2d at 539. It is clear that the Fifth Circuit only allows a motion for reconsideration of an interlocutory order in the narrowest of circumstances – to allow a party to correct manifest errors of law or fact, or to present newly discovered evidence. Otherwise, such motions are denied.[2]

---

[2] *See generally T-M Vacuum Products, Inc. v. TAISC, Inc.,* 2008 WL 2785636 (S.D. Tex. 2008) *aff'd sub nom. T-M Vacuum Products v. Taisc, Inc.,* 336 F. App'x 441 (5th Cir. 2009); *Martinez v. Bohls Equip. Co.*, 2005 WL 1712214 (W.D. Tex. 2005); *Goldman v. Hartford Life & Acc. Ins. Co.*, 2006 WL 861016 (E.D. La.

Merck has not met and cannot meet any element of this exacting standard. Merck has not presented any newly discovered evidence which would warrant a reconsideration of the Court's opinion, nor has Merck pointed to any element, either of fact or of law, which was not before the Court at the time of the briefing, the arguments and the Court's determination.

As to manifest injustice, the Fifth Circuit has cautioned that "any litigant considering bringing a motion to reconsider based upon [manifest injustice] should evaluate whether what may seem to be a clear error of law is in fact simply a point of disagreement between the Court and the litigant." *Atkins v. Marathon LeTourneau Co.*, 130 F.R.D. 625, 626 (S.D. Miss. 1990).

Merck simply does not agree with the Court. Although Merck argues the Court should reconsider its order to correct at least "two errors," the fact is that it can show no error, no clear error and no manifest error. There has been no change in intervening law, no new evidence, and no evidence of error or injustice – Merck simply recycles the two main arguments it made before.

---

2006); *Vlasek v. Wal-Mart Stores, Inc.*, 2008 WL 167082 (S.D. Tex. 2008); *Brown v. Mississippi Co-op Extension Serv.*, 89 F. App'x 437, 439 (5th Cir. 2004); *Triton Tech of Texas, LLC. v. Nintendo of Am. Inc.*, 2012 WL 2036411 (E.D. Tex. 2012); *eTool Dev., Inc., supra*; *Kellogg Brown & Root Int'l, Inc. v. Altanmia Commercial Mktg. Co. W.L.L,* 2009 WL 514054 (S.D. Tex. 2009); *Templet v. HydroChem Inc.*, 367 F.3d 473, 481 (5th Cir. 2004*); Valles v. Frazier*, 2009 WL 4639679 (W.D. Tex. 2009).

4

It is a drain on the Court's (and Plaintiffs') time and resources[3] to revisit the same issues raised in Merck's previous *Daubert* briefings without any intervening changes of law or fact. Merck's Motion cannot meet the Fifth Circuit's requirements for reconsideration and should be denied.

## II.   Merck's Motion Is Not Timely.

Merck filed its Motion for Reconsideration on June 3, 2013, fifty-five (55) days after the Court issued its *Daubert* ruling on April 9, 2013. Merck waited nearly two months to file its Motion.  As Merck points out, "[t]he general practice of courts in this district has been to evaluate Rule 54(b) motions to reconsider interlocutory orders under the same standards that govern Rule 59(e) motions to alter or amend a final judgment." *Waste Mgmt. of La., LLC v. River Birch Inc.*, 2012 WL 876717, at *1 (E.D. La. 2012).  A Rule 59(e) motion must be filed no later than 28 days after the entry of the judgment. F.R.C.P. 59(e).   Rule 59(e)'s standards are applied to motions for reconsideration of interlocutory orders. *T-M Vacuum Products, Inc. v. TAISC, Inc.*, 2008 WL 2785636 at *2 (S.D. Tex.2008) *aff'd sub nom. T-M Vacuum Products v. Taisc, Inc.*, 336 F. App'x 441 (5th Cir.

---

[3]  It is worth noting for emphasis that these motions are so discouraged that the Fifth Circuit allows the district courts to impose Rule 11 sanctions in those cases where a motion for reconsideration is filed merely to reiterate arguments previously presented in other motions.  *Atkins v. Marathon LeTourneau Co.*, 130 F.R.D. 625, 626-27 (S.D. Miss. 1990).  In *Atkins*, the defendant filed a motion for reconsideration that presented no newly discovered evidence, nor any fact or law that was not already presented to the court, and in essence, reargued its previous motion.  *Id*.  The court held that "[s]uch activity is unwarranted by any rule, written or otherwise, governing procedure in this Court," and that the defendant's motion was frivolous. *Id*. at 625-26.  Accordingly, the court imposed sanctions.

2009). Thus, Merck's filing would not have been timely under Rule 59(e), and it should be rejected here for that reason.

The Fifth Circuit has made clear that motions for reconsideration should be filed promptly. The Fifth Circuit allowed a motion for reconsideration filed 43 days after a ruling, but only "in an abundance of caution." *Kellogg Brown & Root Intern., Inc. v. Altanmia Commercial Marketing Co., W.L.L.,* 2009 WL 514054, *5 (S.D. Tex. 2009). This Motion was filed more than ten full days even after that benchmark, and a full four (4) weeks after Rule 59(e)'s deadline.

Here, Merck has presented no extraordinary circumstances to justify a two-month delay in filing its Motion (see, *for example, Standard Quimica De Venezuela v. Cent. Hispano Int'l, Inc.,* 189 F.R.D. 202, 205 (D.P.R.1999)). Further, it is time to move these cases to resolution and to prepare the VTE cases for possible bellwether trials. Merck instead seeks to move backwards. Merck's Motion should be denied on the basis of timeliness.

### III.   Plaintiffs Adequately Responded to Both of Merck's Claimed Grounds of Error.

In the interest of judicial economy, Plaintiffs will not reargue the arguments previously presented from December, 2012, through March, 2013 – indeed, this Court has already heard all of Merck's arguments before. Merck's *Daubert* arguments had as their centerpiece the two arguments rehashed here: the claimed error in the use of a multiplier[4] and the claimed error in failing to

---

[4] *See* Memorandum in Support of Merck's Consolidated Motion to Exclude Opinion Testimony on General Causation and Renewed Motion for Summary Judgment in VTE Cases ("Mem. In. Supp."), Rec. Doc. 64211-3, at 18-23.

use only placebo-controlled clinical trial data[5]. These two issues already constituted the bulk of Merck's *Daubert* Motion[6] and they now constitute nearly the entirety of Merck's Reply brief.[7] While Merck presents nothing new, several misrepresentations in Merck's Motion deserve the Court's attention.

### A. Merck misrepresents Dr. Spyropoulos' testimony.

Just as it did in the *Daubert* briefing, Merck tries to make its case by taking deposition testimony out of context and by focusing solely on testimony elicited by Merck's counsel. Merck bristles at Dr. Spyropoulos' statement that the Vioxx clinical program suffered from a systematic underrepresentation of VTE, and it argues extensively in its Motion that Dr. Spyropoulos misinterpreted the findings.

First, Merck's argument again goes to the weight of the evidence rather than its admissibility. Second, Merck ignores that Dr. Spyropoulos draws his figures not only from the Guyatt article, ***and also from other medical literature and from his experience as a clinician***. He explains that the "1 to 2" and "1 to 30" figures are the lower and upper bounds of the range of "reported

---

[5] *Id*. at 5-15.

[6] *Id*. at 5-15 and 18-23.

[7] *See generally* Reply in Support of Merck's Consolidated Motion to Exclude Opinion Testimony on General Causation and Renewed Motion for Summary Judgment in VTE Cases, Rec. Doc. 64251.

to unreported" VTE, and states that "[u]sually and historically it's been 1 to 10."[8]
He largely draws this opinion from different sets of guidelines from three different years: "[i]n the previous iteration of the [CHEST] guidelines in both 2008 and 2004 and 2001, you will find the 10 to 1 ratio quite consistently. " *Id.* at 236:2-4. Regarding the CHEST guidelines, he goes on to state:

> . . . many of us would -- I would -- fair to say that the majority of us would disagree of a 2 to 1 ratio, that the most accepted ratios that we would routinely use and have used is about 10 to 1 ratio which is what we've seen, what we've seen historically . . . when looking at the previous guidelines that have been established using objectively verified outcomes, and looking at the conclusions that would come up to the basis for those guidelines, using mostly unigraphic data, and we have quite a bit of unigraphic data that shows us that ratio is approximately 1 to 10 of what we call symptomatic versus verified disease, for the most part.[9]

Dr. Spyropoulos specifically states that the multiplier ***should*** apply to PE as well as DVT. *Id.* at 299:20-300:1. He stated that in most studies, most VTE that are captured are DVT, which is dictated by the natural disease process of VTE. *Id.* at 229-230. He went on to explain:

> I think what we do know is that DVT and PE are subcomponents of the same disease process, so I think most of us are comfortable in extrapolating whatever ratio we have for one aspect of the disease we can apply to the other . . . . whatever objective testing establishes the baseline risk, and usually it's

---

[8] Deposition of Alex Spyropoulos ("Spyropoulos Dep.") at 235:20-21, attached by Merck as Exhibit A, Mem. In Supp.

[9] Spyropoulos Dep. at 225:8-226:5.

>DVT, then the multiplier can likely equally be applied to either DVT or PE.

*Id.* at 228:20-229:16.

Finally, Dr. Spyropoulos debunks Merck's argument that the multiplier can only be used for a surgical versus a medical population.[10]

### B. Merck ignores Dr. Zambelli-Weiner's testimony.

Merck's rehashed argument that Drs. Zambelli-Weiner and Brooks rigged their *a priori* criteria to manipulate the results again falls flat. Merck accuses Drs. Zambelli-Weiner and Brooks of forming their *a priori* criteria after reviewing placebo-controlled clinical trials that, in Merck's view, hurt Plaintiffs' case.[11] Counsel for Merck states "[n]either plaintiffs nor their experts have any explanation for the experts' continued review of clinical studies that, according

---

[10] Regarding the multiplier of 10, Dr. Spyropoulos explains that many of the estimates are derived from a medical population, and he rejects the idea promoted by Merck that these figures are all from post-surgical population: ". . . again, the lower estimates of those numbers are mostly from the general medical population. The upper estimates were from general surgical populations. However, also the estimates were based on, again, using different comparators, either ultrasonography, which would give you lower estimates because of their decreased ability to detect distal events, versus venography, which would give you the upper ends because of their increased ability to give you distal events. I would also disagree with statement number one. Again, in my field in the medical patient population that I'm well versed, there's absolute evidence that shows you asymptomatic events are clinically relevant." *Id.* 239:17-240:9.

[11] It is worth noting that the much-maligned Drs. Brooks and Zambelli-Weiner added multiple studies that fit their *a priori* criteria as soon as they got the data *without knowing whether it would help or hurt the outcome.* Moreover, counsel suspects that using *all* placebo-controlled data regardless of phase may show statistically significant general causation, but, of course, Merck only wants to use *certain* placebo-controlled data.

9

to supposedly *a priori* criteria, never should have been part of their analysis."[12] Merck then states, ". . . Dr. Zambelli-Weiner could not explain why she and Dr. Brooks were still examining [excluded placebo-controlled data] shortly before completing their report if they had adopted *a priori* criteria that excluded [that] data."

Not only do the witnesses have an explanation, but they provided it to Merck. Merck knows precisely why Plaintiffs' experts were "still reviewing" this data. In fact, counsel for Merck directly asked Dr. Zambelli-Weiner this question in her deposition, and she provided an answer. She explained that she and Dr. Brooks were reviewing Medwatch reports in an attempt to compile a database of unadjudicated events:

> Q: Would you agree that during July 2012, you and/or Dr. Brooks were undertaking a detailed review and extraction of adverse events for more than Phase III trials?
>
> A: I would agree to that, with the caveat that if you look down a few more bullets, you'll see other activities, such as "create list of patients with SAEs by protocol for cross-reference with MedWatch files." We were undertaking other activities that required extraction of data from other protocols that wasn't necessarily related to the analysis that we presented in our report.[13]

---

[12] Merck's Motion at 14.

[13] Deposition of April Zambelli-Weiner, 12/6/12, ("Zambelli-Weiner Dep. 12/6/12"), at 209:2-13, attached by Merck as Ex. K, Mem. In. Supp.

And Merck's counsel again heard the answer to this question during Plaintiffs' counsel's exam:

> Q: Now, what I'd like to do at this point, Doctor, is to give you an opportunity to talk about any confusion the Court might have with regard to why non-Phase III CSRs or adverse events were ever looked at in detail by you or Dr. Brooks if, indeed, you had *a priori* criteria for the epidemiologic analysis that was limited to Phase III studies. Could you address that, please?
>
> A: Yes. We were undertaking an analysis of MedWatch files and we were attempting to reconcile MedWatch files with data from the clinical study reports. So we had the need to abstract data from non-Phase III clinical study reports.
>
> Q: And is the -- can you just tell us briefly what the MedWatch project was, what was the purpose of that?
>
> A: Yes. We were interested to see if we could also conduct an analysis of the MedWatch files and to see how they matched up with the clinical study reports. We spent quite a bit of time doing that, only to find out that, in fact, there were incredible amounts of MedWatch files that were missing and that we, in fact, could not -- could match up very few to the data that was in the clinical study reports.
>
> Q: And I believe if you look at page 19 of your report right here, the MedWatch project is discussed.
>
> A: Yes.
>
> Q: And was there anything about the MedWatch project that was limited to Phase III studies?
>
> A: No.[14]

---

[14] Zambelli-Weiner Dep., 12/6/12, at 317:3-319:5.

Similarly, Merck's second-time-around argument that APPROVe was eliminated supposedly because the experts were engaged in data manipulation also falls flat. Merck's counsel asked Dr. Zambelli-Weiner on direct exam about excluding the APPROVe study:

> Q:     Dr. Zambelli-Weiner, I'm going to put it to you that the reason you did not include the APPROVe study in your analysis in Table 15 was that because you knew that if you included the APPROVe study, it would change your analysis to favor Vioxx?
>
> A:     Well, that's just false. There are plenty of studies that we could have included that would have helped our position – and, in fact, our reanalysis shows that – that if, in fact, we were cherry-picking, there was a lot more we could have done to get higher risk ratios. The fact of the matter is, we set out criteria in advance and we stuck to those criteria, based on the data that was available to us.[15]

In case Merck missed this extensive discussion in Dr. Zambelli-Weiner's deposition, Plaintiffs also pointed to this testimony in their Opposition.[16] Merck can cross examine Drs. Brooks and Zambelli-Weiner on this point and attack their motives before the jury, but the fact remains that they have a facially valid justification for their analysis, and Merck could find no expert (other than their counsel) who would charge Drs. Brooks and Zambelli-Weiner with the transgressions it levels here.

Merck complains that the APPROVe study cannot possibly be excluded by *a priori* criteria because APPROVe was used for so many other purposes, both in

---

[15]  Zambelli-Weiner Dep., 12/6/12, at 240:18-241:9.

[16]  Plaintiffs' Memorandum In Opposition to Merck's Motion to Exclude Opinion Testimony on General Causation in VTE Cases, Rec Doc. 64232, at 37-40.

this litigation and otherwise. It is interesting that Merck presents no expert nor any literature condemning the actual *a priori* criteria actually used by Drs. Brooks and Zambelli-Weiner. It is also interesting that Merck's counsel chose not to pursue the logic behind the *a priori* criteria with Dr. Brooks or Dr. Zambelli-Weiner. Had they done so, they might have learned that including such studies risks biasing the efficacy or safety estimates, particularly when patient-level information for the full follow-up time is not available. Merck is left with the **absence of proof** which it might have obtained, given all of its resources, had there been any merit to its argument.

Merck has heard many times why certain studies were included and why others were excluded from the Brooks and Zambelli-Weiner analysis. Yet despite having received clear answers, Merck obfuscates the truth and implies to the Court, again, that Plaintiffs' experts carefully manipulated their results.

Merck's arguments have already been ruled on by this Court. Merck's Motion shows "no independent reason for reconsideration other than mere disagreement with a prior order" and thus "reconsideration is a waste of judicial time and resources and should not be granted." *S. Snow Mfg. Co.*, 2013 WL 392582 at *10-11.

## IV.     The Only New Evidence Favors Plaintiffs.

In fact, it is Plaintiffs, not Merck, who offer the only new data. In March, 2013, the State of Utah, utilizing Medicaid data, found a statistically significant association between Vioxx and VTE, with a relative risk of 7.50 for VTE among

13

Vioxx users with no history of cardiovascular disease.[17] Interestingly, Utah found a stronger association between Vioxx and VTE than between Vioxx and cardiovascular events. Plaintiffs' case, not Merck's, has become stronger by virtue of a new study proving a statistically significant causative relationship between Vioxx and the occurrence of VTE.

## CONCLUSION

For the forgoing reasons, Defendant Merck's Motion should be denied.[18]

---

[17] *See* Plaintiff's Second Supplemental Answer to Interrogatory No. 8 of Defendant's Second Set of Interrogatories to Plaintiff, Rec. Doc. #64291.

[18] Merck states in a footnote it will seek interlocutory appellate review under 28 U.S.C. §1292(b) should the Court deny reconsideration. An interlocutory appeal is appropriate only under exceptional circumstances and must meet all three mandatory criteria, which courts construe narrowly. An interlocutory appeal may only be certified when 1) "a controlling question of law" is involved, (2) "there is substantial ground for difference of opinion" about the question of law, and (3) "immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. §1292(b). Other federal circuits have held that a *Daubert* ruling is fact intensive and not a pure question of law and thus is not appropriate for immediate interlocutory appeal. *See generally State Fire & Cas. v. Sunbeam Products, Inc.*, 1:08-CV-1506-SEB-DML, 2010 WL 2903856 (S.D. Ind. July 21, 2010). Moreover, from a practical perspective, an appeal will only cause further delay and detriment to the VTE Plaintiffs, who did not make it in the master settlement and have been waiting years for resolution to their claims. If an interlocutory appeal is certified, they will wait even longer, particularly given that the Court will likely grant a stay pending a ruling on the appeal. Plaintiffs are prepared to submit additional briefing should Merck request certification under §1292(b).

Respectfully submitted,

/s Ann B. Oldfather
Ann B. Oldfather
KBA Bar #52553
Liaison Counsel/Lead Counsel
OLDFATHER LAW FIRM
1330 S. Third Street
Louisville, KY   40208
502.637.7200
502.637.3999  (fax)
aoldfather@oldfather.com
*Counsel for Certain Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing VTE Plaintiffs' Opposition to Merck's Motion for Reconsideration of the Court's April 9, 2013 Order has been served upon Liaison Counsel, Phillip Wittmann and Russ Herman, by U.S. Mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(C), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 16th day of July, 2013.

/s Ann B. Oldfather
Ann B. Oldfather