# Exhibit 1

Expert Report of David Madigan, PhD

IN RE:  VIOXX Products Liability Litigation

MDL NO. 1657, CIVIL ACTION NO. 2:06-CV-09336
*The State of Utah v. Merck*

E<small>XPERT</small> R<small>EPORT OF</small> P<small>ROFESSOR</small> D<small>AVID</small> M<small>ADIGAN</small>, P<small>H</small>.D.

**Contains Confidential Material
Subject to Protective Order**

Dated July 12, 2013

## 1.   INTRODUCTION AND SUMMARY OF OPINIONS

1.      I am Professor and Chair of Statistics, Interim Executive Vice-President of Arts and Sciences, and Dean of the Faculty of Arts and Sciences at Columbia University in New York City.  I am a practicing statistician with considerable experience working in both academia and with the pharmaceutical industry and government in the area of drug safety, including clinical trials, observational studies, and drug safety surveillance.  I have been asked by counsel for plaintiffs in the above-captioned litigations to opine on statistical issues relating to the cardiovascular safety of Vioxx.

2.      The opinions I present in this Report may be summarized as follows:

(a)      In February 1998, after concerns were raised about Vioxx's cardiovascular risk, Merck conducted an internal meta-analysis that attempted to quantify Vioxx's cardiovascular risk. While several aspects of the analysis actually served to *mask* Vioxx's cardiovascular risk, the analysis still revealed an adverse cardiovascular signal against Vioxx with reference to a neutral comparator.

(b)      In March of 2000, Merck announced results of the VIGOR trial, a large gastrointestinal outcomes trial that revealed a substantial adverse cardiovascular signal against Vioxx compared with naproxen.  Despite the fact that the study's protocol called for the exclusion of patients at high risk for adverse cardiovascular events, the cardiovascular safety results *still* showed that patients on Vioxx were twice as likely to suffer adverse cardiovascular events (as defined in the protocol), and, in particular, five times more likely to suffer myocardial infarction ("MI") than patients receiving naproxen.  Merck, however, presented the results in a way that, in my view, was scientifically misleading.

(c)      In reporting VIGOR's cardiovascular results, Merck advanced the hypothesis that the difference in adverse cardiovascular events, and in MIs, in particular, observed between arms in VIGOR was likely due entirely to a putative cardio-protective effect

of naproxen, rather than a cardiotoxic effect of Vioxx (the "naproxen hypothesis"). In support of the naproxen hypothesis, Merck stated that, in a post-hoc analysis, it had discovered that 4% of the VIGOR population were actually at high risk for cardiovascular events, and had been enrolled in the study in violation of the protocol. Merck indicated that their post-hoc analysis of this subgroup supported the naproxen hypothesis by explaining how naproxen could demonstrate the degree of cardioprotection observed in VIGOR, despite the brevity of the trial and the pre-screening of its population for cardiovascular risk ("the 4% hypothesis"). My analysis demonstrates that the 4% of the population Merck identified in its public statements failed to evince a cardiovascular risk statistically significantly difference from the remaining 96% of the VIGOR population, and that the 4% hypothesis does not support the naproxen hypothesis.

(d)     In the wake of the VIGOR trial, Merck publicly claimed that "[a]n extensive review of the safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx showed no indication of a difference in the incidence of thromboembolic events between Vioxx, placebo, and comparator NSAIDs [non-steroidal anti-inflammatory drug]."[1]  I review Merck's placebo-controlled and non-naproxen NSAID-controlled data, and conclude that these data cannot support Merck's claim that they showed "no indication of a difference in the incidence of thromboembolic events" between Vioxx and non-naproxen comparators (placebo and non-naproxen NSAIDs, mostly diclofenac and ibuprofen). Specifically, my analyses demonstrate:

- In the wake of VIGOR, there were too few non-naproxen controlled data to determine whether or not Vioxx meaningfully increased cardiovascular risk. Instead, after VIGOR, these data contained few events and patients years, and, therefore, the "chances of missing," i.e. failing to detect, a significant adverse cardiovascular signal attributable to Vioxx was, in the words of Merck statistician James Bolognese, "very good." Accordingly, the absence of a cardiovascular signal in these data could not be interpreted as evidence that Vioxx posed the same risk as either placebo or the non-naproxen NSAIDs to which Vioxx was compared.

- While Merck statisticians performed analyses to determine the "chance of missing" a meaningful adverse cardiovascular signal in the placebo-controlled and non-naproxen NSAID-controlled data (the results of which showed, in accord with my own analyses, that the chances of missing such a signal were too high to support Merck's claims), some Merck personnel have recently testified that these attempts to measure the robustness and precision of the non-naproxen comparator data were not meaningful, and that they later (but only subsequent to their initial public statements about the reassuring absence of a signal in these data) developed a "Bayesian" analysis that they found reassuring. I conclude that this analysis was not relevant to, and did not answer, Merck's concerns about the "chance of missing" a signal in the non-naproxen comparator data. Indeed, interpreting this analysis in the same way Merck claims reassured it about Vioxx's safety actually impugns the "naproxen hypothesis."

- With respect to the non-naproxen NSAID data, other problems skewed them towards showing no difference in cardiovascular risk, thus, rendering them incapable

[1] PX 10 (Fanelle) at MRK-AFI0103658.

of supporting Merck's claims about Vioxx's safety. Much of these data compared Vioxx to diclofenac, a drug Merck had reason to believe was actually cardiotoxic; showing that Vioxx is no different in terms of cardiovascular risk (although the data were not powerful enough to say even this much) from a drug that is cardiotoxic does not support the claim that Vioxx has a safe cardiovascular profile.

- Likewise, with respect to Merck's placebo-controlled data, drawn mostly from its Alzheimer's studies, other problems apart from the small amount of data available undermined the strength of Merck's claim that these data affirmed Vioxx's cardiovascular safety. The Alzheimer's trials were rife with "competing risks," events that would disproportionately eliminate at-risk Vioxx patients from the study, thus biasing the cardiovascular results towards showing an absence of a difference. For instance, significantly more patients on Vioxx discontinued therapy or dropped out of the study altogether because they experienced high blood pressure and edema. Merck's analysis did not account for adverse events patients experienced after they discontinued, and thus it did not include patients who suffered adverse cardiovascular events after they dropped out because, for instance, they started experiencing high blood pressure as a result of taking Vioxx. Similarly, in Merck's largest Alzheimer's study by far, significantly more Vioxx patients "converted" to Alzheimer's disease than patients on placebo. These patients were not followed after "conversion;" thus, the Vioxx arm was disproportionately deprived of at-risk patients. This was yet another competing risk for which Merck's analysis failed to account. Merck also performed analyses that demonstrated Vioxx patients in the Alzheimer's trials faced a significantly greater risk of death; thus, as with other "competing risks" in these trials, because patients taking Vioxx tended to die more than those taking placebo, the Vioxx arm was deprived of potential adverse cardiovascular events. Despite all of these issues, the Alzheimer's trials did in fact show an adverse cardiovascular signal against Vioxx, as discussed below.

- Merck reported results of these analyses using a post-hoc endpoint, called the "APTC" endpoint that, again, understated Vioxx's cardiovascular risk and failed to give a "pure" measure of Vioxx's cardiotoxicity.

- Thus, to quote Merck's outside consultant Scott Zeger, Merck repeatedly presented what was actually an "absence of evidence" as "evidence of absence."[2]

(e)     Merck's pre-specified analysis of the Company's pooled placebo-controlled trials in patients with osteoarthritis and rheumatoid arthritis, an analysis that would have provided the most meaningful measure of Vioxx's risk in the population for whom the drug was indicated, shows that Vioxx posed a significantly greater cardiovascular risk than placebo in arthritic populations. Even putting to one side the fact that such an analysis was pre-specified, Merck employees observed, and were told by others, that the placebo-controlled arthritis data was qualitatively different in terms of cardiovascular risk from the company's Alzheimer's data – the only other source of placebo controlled data for Vioxx. Thus, it was important for Merck to separately analyze these data to determine whether they supported Merck's claim that Vioxx posed no greater cardiovascular risk than placebo. Indeed, Merck,

---

[2] PX 628 at MRK-AFO0273769.

apparently recognizing the salience of such an analysis, conducted it, at least, soon after the drug was withdrawn, using data available as early as mid-2002. The results of this analysis show a statistically significant increase in adverse cardiovascular events against Vioxx. Notwithstanding that, as described above, these data were biased towards showing an absence of cardiovascular risk associated with Vioxx, my own analysis reveals that this pooled analysis would have revealed an adverse cardiovascular signal against Vioxx as early as October 21, 2000.

(f)     My analysis of Merck's pre-specified ITT ("intent-to-treat," which includes patients both on and off drug) cardiovascular mortality endpoint in the Alzheimer's trials, shows that Vioxx significantly increases the risk of cardiovascular mortality in Alzheimer's patients. Yet, Merck reported analyses only with respect to the part of these data that were favorable to it. For patients in the combined 078 and 091 studies, the two largest Alzheimer's studies, my ITT analysis shows a statistically significant increase in cardiovascular mortality against Vioxx as of September 29, 2000. When the third Alzheimer's trial (which was small and was stopped prematurely)[3] is combined with the two central Alzheimer's studies, my ITT analysis shows a statistically significant increase in cardiovascular mortality against Vioxx as of June 2001. Merck's own ITT analyses conducted in early 2001 demonstrated that patients taking Vioxx were more likely to die overall than those who were taking placebo.[4] Those same analyses also demonstrated that discontinuation of Vioxx was actually associated with risk of death, and, indeed, patients who discontinued Vioxx actually had a *higher* risk of death than those who remained on the drug.[5] Moreover, Merck had concluded that cardiovascular death was one of the causes of death "driv[ing]" the imbalance in all-cause death in the Alzheimer's studies.[6] Accordingly, Merck's analyses demonstrated that an analysis of ITT cardiovascular death data was critically important to understanding Vioxx's true cardiovascular risk in the Alzheimer's population, yet it was not presented.

(g)     In my opinion, the analyses described in paragraph (f), above, would have indicated to Merck that Vioxx's cardiovascular risk persisted after drug discontinuation, and that any analysis that ignored events occurring in patients after discontinuation of therapy would fail to reflect Vioxx's true cardiovascular risk. Accordingly, Merck should have adjudicated and analyzed all cardiovascular events in the Alzheimer's trials, both off drug and on drug, fatal and non-fatal events. Indeed, for the one cardiovascular endpoint with respect to which off drug-events were adjudicated, cardiovascular mortality, Merck *did* find a statistically significant difference against Vioxx, as discussed above. My analysis of investigator-reported cardiovascular events, the only data with respect to which an ITT analysis may be performed in the Alzheimer's trials, also yields an adverse cardiovascular signal against Vioxx.

(h)     About one year before Vioxx was withdrawn, Merck received the results of an epidemiological study it commissioned showing that Vioxx increased cardiovascular risk across a broad spectrum of patient populations. The results of that study were not publicly reported until after Vioxx was withdrawn.

## 1.2    Qualifications and Compensation

---

[3] MRK-AHD0003811.
[4] PX 295 at MRK-JAK0013201.
[5] *Id.* at MRK-JAK0013198.
[6] PX 31 at MRK-JAF0019843.

4

3.       I received my bachelor's degree in Mathematical Sciences from Trinity College Dublin in 1984 and was awarded the College's gold medal. In 1990, I received a Ph.D. in Statistics, also from Trinity College. I have worked in the past for KPMG, SkillSoft, University of Washington, AT&T Labs, and Soliloquy Inc. From 2005 to 2007, I was Professor of Statistics and Dean of Physical and Mathematical Sciences at Rutgers University.  Prior to serving as Dean, I was Director of the Rutgers University Institute of Biostatistics. I am an elected Fellow of both the Institute of Mathematical Statistics and the American Statistical Association, and was the 36th most cited mathematician worldwide from 1995-2005. I was an Institute of Mathematical Statistics Medallion Lecturer in 2009.  I served as the Editor of *Statistical Science*, 2008-2010, the highest impact journal in statistics.

4.       I have published more than 100 technical papers on Bayesian statistics, biostatistics, pharmacovigilance, statistical graphics, Monte Carlo methods, computer-assisted learning, information retrieval, and text mining. Within the last five years, I have consulted for Boehringer-Ingelheim, Jarvik Heart, Novartis, Pfizer, Sanofi-Aventis, Takeda, and Wyeth on a variety of issues, many related to clinical trials. I participated in the statistical design and analysis of pain studies at the University of Washington and the Fred Hutchinson Cancer Research Center, both in Seattle, and served as a statistical consultant to multiple internal and external clients, particularly while I was director of the Institute of Biostatistics at Rutgers University.

5.       I also serve as an investigator in the Mini-Sentinel project. Mini-Sentinel is a pilot project sponsored by the FDA to inform and facilitate development of a fully operational active surveillance system, the Sentinel System, for monitoring the safety of FDA-regulated medical products. Since 2010, I have led the Mini-Sentinel Working Group on case-based methods in active surveillance. In addition, I am the methods lead for the Observational Medical Outcomes Partnership, a public-private partnership between the FDA and the pharmaceutical industry. The partnership is conducting a multi-year initiative to research methods that are feasible and useful to analyze existing healthcare databases to identify and evaluate safety and benefit issues of drugs already on the market.

6.       I am a member of the FDA's Drug Safety and Risk Management Advisory Committee (DSaRM). DSaRM advises the FDA Commissioner on risk management, risk communication, and quantitative evaluation of spontaneous reports for drugs for human use and for any other product for which the FDA has regulatory responsibility. From 2010 to 2011, I was a member of a sub-committee of the FDA Science Board charged with reviewing the Center for Drug Evaluation and Research's pharmacovigilance program.

7.       Further information concerning my background, training, and experience, including a complete list of my publications, is reflected in my curriculum vitae, a copy of which is attached as Exhibit A.  A list of the deposition and trial testimony I have provided in the last four years is attached as Exhibit B.

8.       For my services, I am being compensated at the rate of $500 per hour. My compensation is not contingent on the outcome of this matter.  The approach I have taken to this work would have been the same had Merck hired me to carry out these analyses.

## 1.3    Data Sources

9. The data that I analyzed mostly came from Merck in several forms including SAS data files (i.e., Merck data files that are stored in the SAS corporation's proprietary format). I used the computer language Perl and the statistical software JMP and R to extract relevant data and conduct statistical analysis, respectively. As I continue to review the data (or review newly provided data), I reserve the right to supplement and refine my report.

## 1.4 Statistical Methods

10. Unless otherwise stated and where relevant, all analyses in this report include all randomized patients that took at least one dose of study medication. For confirmed serious thrombotic adverse events and for investigator-reported cardiovascular events, following Merck's methodology, I calculated hazard ratios using Cox proportional hazards models with treatment as the sole covariate and with stratification by study block (OA, RA, etc.) for analyses involving more than one block. However, following Merck's practice, if there were fewer than 11 events in either study arm,[7] the rate ratio was computed with the use of the binomial distribution.[8] Rather than alternating between the terms "hazard ratio" and "rate ratio" I use the term "relative risk" throughout. I also computed Kaplan-Meier estimates of the cumulative event rates over time. Kaplan-Meier plots show the cumulative event rates over time for different study arms, dealing in an appropriate manner with patients that drop out during a study. Because the event rates become unstable when there are few patients remaining in the study, I truncate the Kaplan-Meier plots when fewer than 10% of the patients remain in either treatment arm.[9] Note that all the statistical analyses used individual patient-level data and did not utilize pooling of summary information as is common in many meta-analyses; the Cochrane Collaboration considers individual patient-level meta-analysis as the "gold standard."[10]

11. A typical results table in this report will appear as follows:

| Study Block | LPO | Vioxx | | Placebo | | Relative risk & 95% CI | p-value |
|---|---|---|---|---|---|---|---|
| | | N | PYR | N | PYR | | |
| all 21 trials | 11/24/03 | 32 | 1304 | 6 | 692 | 2.8 (1.2,7.4) | 0.01 |

12. The "relative risk" is the multiplicative change in risk due to Vioxx. Thus, relative risks greater than one indicate that the risk with Vioxx is greater than the corresponding risk with placebo. Relative risks less than one indicate lower risk with Vioxx. The numbers in each row of such tables are as follows:

---

[7] Merck's APPROVe study followed this approach. Some earlier studies required 11 events in total.

[8] Rothman, K.J., et al., MODERN EPIDEMIOLOGY, at 254 (3d ed. 2008).

[9] MRK-AAD0197519 at MRK-AAD0197521 (Pocock, S.J., et al., *Survival plots of time-to-event outcomes in clinical trials: good practice and pitfalls*, 359 The Lancet at 1686, 1688 (2002)).

[10] *About IPD meta-analyses*, COCHRANE.ORG, http://ipdmamg.cochrane.org/about-ipd-meta-analyses.

(a)      the two "N"s represent the numbers of patients experiencing the particular event in the Vioxx arm and the placebo arm respectively;

(b)      the two "PYR"s represent "patient years at risk" in the two arms. For example, a patient starting Vioxx on January 1, 1999 and maintaining contact with a study through December 31, 2000 would contribute 2 years to the PYR total for Vioxx. PYR factors into the statistical calculations. For a given number of events, a larger PYR dilutes the risk estimate. For example, if Arm A of a study reported 10 events in 100 patient years at risk while Arm B reported 10 events in 200 patients years at risk, then, despite having the same number of events, Arm A has a higher relative risk;

(c)      the "relative risk" is a "point estimate" of the true relative risk; in other words, it represents the relative risk for the particular patients in the particular studies in question. However, we wish to make an inference about the entire population of Vioxx and placebo recipients. The "true" relative risks in the population are unknown. However, statistical methods enable us to use the patients in the Vioxx trials to make precise probabilistic statements about the true relative risk in the population. Hence, associated with each point estimate is a "95% confidence interval" for the true relative risk. This means that 95% of such intervals contain the true relative risk (although we do not know if the interval we constructed contains the true relative risk). In particular, if the lower end of a 95% confidence interval for a relative risk exceeds one, we can be confident that the true relative risk exceeds one. For example suppose a particular confidence interval for the relative risk of some adverse event on Vioxx compared to placebo is (1.1, 2.3). Because the lower end of this interval exceeds one, and since 95% of confidence intervals contain the true relative risk, we are fairly confident that the Vioxx risk is higher than that of placebo. The upper end of the interval, 2.3 in this case, provides an upper bound on plausible values for the true relative risk. The true relative risk might be bigger than 2.3, but since the 95% confidence interval does not contain values bigger than 2.3, the data suggest otherwise;

(d)      finally, the "p-value" provides another insight into the true relative risk. In the example above, the point estimate of the relative risk is 2.8. If the Vioxx and placebo posed identical risks of cardiovascular thrombotic events ("CVT"), the true relative risk would be 1. The p-value is the probability of observing a point estimate as far away from 1 as 2.8 is, if in fact the true relative risk is 1. Thus, the smaller the p-value, the more "significant the result." In this particular case, the p-value is only 0.01. So, if in fact the true relative risk is 1, there is only a small chance (1 in a hundred) that a pooled group of studies like these would deliver a point estimate so far away from 1. This makes the "hypothesis" that the true relative risk is 1 seem quite implausible. In many contexts, scientists consider a p-value less than 0.05 as "statistically significant" evidence that the true relative risk is different from 1, although this particular threshold may be too high when analyzing a potentially fatal health risk from a non-life saving drug.

13.      Where applicable, I also employ a Cox model. This is a specific type of statistical time-to-event model and relates the "hazard function" to potential risk factors. The hazard function represents the instantaneous failure rate at a moment in time. A Cox model provides a way to model how the hazard function relates to other factors, such as treatment. The proportional hazards assumption is the assumption that the factors have a multiplicative effect on the hazard. For example, if taking a drug halves your hazard at day 10, it also halves your

7

hazard at day 20, or at any other time. For every fitted Cox proportional hazards model (or "Cox model") on complete datasets, I checked the proportionality assumption using a standard test based on the scaled Schoenfeld residuals.[11]

14.     The studies I have examined were not designed to study the cardiovascular effects of Vioxx. As a consequence, many of these studies will lack statistical power to detect even substantial differences between Vioxx and the comparators. Statistical power refers to the ability of a study to detect, for example, a difference between treatment and control, when one exists. Studies with small numbers of patients often have very little power – an observed relative risk far from 1, for example, could in fact be consistent with random variation. Thus, in general, absence of a statistical signal (i.e., a small p-value) in any given study should be interpreted cautiously. Such an absence could be due to a lack of a true signal, but it could also be the case that there is a true signal but the study failed to detect it (i.e. a "Type II error"). As the late Dr. Harry Guess, a prominent Merck statistician, noted back in February 2000 "with safety, unlike efficacy, one cannot dismiss these just because the result is not statistically significant."[12] In a similar vein, Liu[13] points out that "a non-significant result regarding safety does not prove that the test drug is safe." Writing more generally, Gardner and Altman point out that "clinically important effects may be statistically non-significant."[14] This point is explored thoroughly below.

15.     I will refer throughout to "on drug" and "intention-to-treat" (ITT) analyses. Merck's on drug analysis generally only included events that occurred while a patient is taking a drug, or up to 14 days after cessation of treatment. Thus, for example, an adverse event occurring 15 days after cessation of treatment would not be included in a Merck on drug analysis. An ITT analysis, by contrast, considers all events regardless of whether the patient is on treatment or not. Friedman et al. define intention-to-treat as follows:

> The *intention-to-treat* principle states that all participants randomized and all events, as defined in the protocol, should be accounted for in the primary analysis . . . . [a]ny deviations from pure intention-to-treat offer the potential for bias and should be avoided, or at a minimum presented along with a strict intention-to-treat analysis. [15]

16.     While there are situations where an ITT approach is not appropriate (see, for example, Madigan, 1999),[16] ITT does represent the standard methodology for clinical trials: "In practice, clinical study results are analyzed following the intention-to-treat principle."[17] Lachin

---

[11] MRK-AQI0002496 (Grambsch, P. & Therneau, T., *Proportional hazards tests and diagnostics based on weighted residuals*, 81 Biometrika, 515-26 (1994)).

[12] MRK-AGU0007003.

[13] Liu J, *Rethinking statistical approaches to evaluating drug safety*, 48 Yonsei Med J. 895-900 (2007).

[14] Gardner, M.J. & Altman, D.G., *Confidence intervals rather than P values: estimation rather than hypothesis testing*, 292 British Medical Journal 746-750 (1986).

[15] Friedman, L.M., et al., FUNDAMENTALS OF CLINICAL TRIALS, at 346 (4th ed. 2010).

[16] Madigan, D. (1999). Bayesian Graphical Models, Intention-to-Treat, and the Rubin Causal Model. In *Proceedings of Uncertainty-99, The Seventh International Workshop on Artificial Intelligence and Statistics*, 123-132.

[17] ENCYCLOPEDIA OF BIOPHARMACEUTICAL STATISTICS (2d Ed.), Chow, S-C (ed.), at 245.

(2000)[18] describes biases that can arise with on drug analyses. The principal concern is with so-called "subset selection bias." For example, it could be the case that the people who stop taking the active treatment (and hence are no longer included in the analysis) differ in their characteristics from patients that continue, thereby potentially biasing any estimate of a treatment effect. Lachin emphasizes that this concern exists "even when criteria for the post-hoc exclusions are stated a priori in the protocol."[19]   Of course, a true intention-to-treat analysis requires that every effort be made to follow patients post-randomization regardless of compliance. ITT analyses are especially important in the context of Vioxx because, as discussed in detail below, Merck had evidence that the effect of the drug persisted long after a patient stopped taking the drug, and thus on drug analyses underestimate the true effect. Where relevant, and unless otherwise stated, all analyses done in this report include all randomized patients that took at least one dose of study medication, which is a modified form of an intent-to-treat analysis ("mITT"). ITT was pre-specified for safety analyses for many of the Vioxx studies. For example, the data analysis plan for study 068 states that the "ITT approach will be the primary and only analysis for safety."[20] Similarly the DAP for the low back pain studies (120 and 121) states that "the ITT approach will be the primary and only analysis for safety endpoints."[21]

17.     In what follows, I will make a distinction between "investigator-reported" adverse events and "adjudicated" or "confirmed" adverse events. Investigator-reported events refer to adverse events reported by site investigators as part of the normal operation of a clinical trial. Per Merck's standard operating procedure, some of these events are further considered by an independent panel of adjudicators. The panel examines the evidence provided by the site investigator and decides (via majority vote) whether the evidence is sufficient to "confirm" the reported event as an adjudicated/confirmed cardiovascular thrombotic event. Note that events for which the panel deems the evidence insufficient are not confirmed and hence do not get included in counts of adjudicated events. From a safety perspective, this practice is not conservative. Because Merck failed to adjudicate non-fatal adverse cardiovascular events occurring off-drug, an ITT analysis of cardiovascular events is possible only with investigator reported events.  My analyses using investigator reported events follow the pre-specified CVT endpoint for adverse cardiovascular events, unless otherwise specified.

18.     Merck's "Standard Operating Procedure for the Surveillance, Monitoring, and Adjudication of Acute Thrombotic and Embolic Vascular Events and Deaths in Clinical Trials of COX-2 Specific Inhibitors" (hereafter referred to as the SOP) describes the process by which Merck adjudicated certain investigator-reported events and allocated events deemed to be thrombotic to one of 12 categories. This process aimed to provide standardized data for pooled analyses and, crucially, provided a specific definition of a cardiovascular thrombotic event. The specific events included in the definition are:

Acute MI
Unstable Angina Pectoris

---

[18] Lachin, *Statistical Considerations in the Intent-to-Treat Principle*, 21 *Controlled Clinical Trials* 167-189 (2000).
[19] *Id.* at 174.
[20] MRK-AVK0001949 at MRK-AVK0002513.
[21] MRK-ARN0036769 at MRK-ARN0036782.

Sudden and/or Unexplained Death
Resuscitated Cardiac Arrest
Cardiac Thrombus
Pulmonary Embolism
Peripheral Arterial Thrombosis
Peripheral Venous Thrombosis
Ischemic Cerebrovascular Stroke
Stroke, unknown mechanism
Cerebrovascular Venous Thrombosis
Transient Ischemic Attack

19.     As mentioned above, except for deaths, Merck only adjudicated adverse events that began within 14 days of the last study medication. Since Merck's adjudication process cannot provide the requisite ITT data, an ITT analysis required use of investigator-reported thrombotic events as primary endpoint events. The SAS data files that I analyzed describe adverse events using one of two controlled vocabularies, CRISP or MedDRA. Two experienced cardiologists, Drs. Kostis and Krumholz, provided me with lists of CRISP and MedDRA terms that encode the endpoints in the above list. Dr. Kostis is Chairman of the Department of Medicine at the Robert Wood Johnson Medical School in New Brunswick, NJ. Dr. Krumholz is the Harold H. Hines, Jr. Professor of Medicine and Epidemiology and Public Health (Cardiology) at Yale University. Specifically, they each coded the endpoints independently and worked together to resolve differences. Subsequently Dr. Krumholz, working with his Yale colleague Dr. Joseph S. Ross, noticed some minor inconsistencies between the CRISP and MedDRA terms and updated the lists. I provide the lists of CRISP and MedDRA terms that represent their collective final determinations as Appendix A. Note that the intention of this exercise was to faithfully encode Merck's definition of a cardiovascular thrombotic event.

20.     I note that Merck also used investigator reported events in many of its own analyses. For example, a February 14, 2000 email from Dr. Capizzi to Drs. Reicin and Shapiro calls for the presentation of unadjudicated and adjudicated events and adds "if nothing is going on, we can always bury the *adjudicated* analysis in the Appendix."[22]  On at least one occasion, Dr. Shapiro provided an analysis of investigator-reported events at the specific request of Dr. Reicin.[23]

21.     Merck's SAS data files label some adverse events as "serious." Merck only adjudicated serious events. I have not restricted my analyses to serious events. There are four reasons I have taken this approach. First, some surprising events are not tagged as serious, for example, three myocardial infarctions in 078. Second, while the FDA does provide a definition of a "serious event,"[24] some medical judgment is required to apply the definition and it is unclear

---

[22] PX 347 (emphasis added) at MRK-AAB0059993.

[23] PX 338.

[24] The FDA provides that a serious adverse event includes any of the following:
   1. results in death,
   2. is life-threatening,
   3. requires inpatient hospitalization or prolongation of existing hospitalization,
   4. results in persistent or significant disability/incapacity,
   5. is a congenital anomaly/birth defect,

that the requisite documentation to support such a judgment was always present. Third, Merck itself sometimes analyzed all "thromboembolic cardiovascular adverse event experiences" in the OA trials regardless of whether the events were designated as "serious."[25]  Fourth, Merck promised to look at all of the data, and ignoring what is subjectively determined to be a "non-serious" cardiovascular event may impede the investigation as to whether Vioxx is cardiotoxic.

## 2   MATERIALS RELIED ON

22.   A list of the materials I relied upon in forming my opinions is attached as Exhibit C.

## 3   VIOXX BACKGROUND

23.   Vioxx was a non-steroidal anti-inflammatory drug ("NSAID") designed to treat pain and inflammation.[26]  "Traditional" NSAIDs, such as ibuprofen and aspirin, inhibit not only the synthesis of COX-2, an enzyme associated with pain and inflammation, but COX-1, an enzyme that helps promote the formation of the natural mucus lining that protects the stomach, as well.[27]   Accordingly, prolonged use of traditional NSAIDs carry the risk of harmful gastrointestinal side-effects.[28]   Vioxx belonged to a class of NSAIDs known as COX-2 inhibitors, which, as the name indicates, inhibit COX-2 without inhibiting COX-1 to the same extent as traditional NSAIDs, thereby, in theory at least, treating the symptoms of pain and inflammation, but reducing the incidence of harmful gastrointestinal side-effects.[29]

24.   The possibility that Vioxx carried cardiovascular side effects was raised before Merck learned the cardiovascular results of VIGOR in 2000.   In December 1997, the International Consensus Meeting on the Mode of Action of COX-2 Inhibition considered adverse events.[30]  The executive summary stated, "although gastric intolerance was the most obvious [adverse event], renal and cardiac toxicity were important and a probable link between these two phenomena had been established. It is therefore important to monitor cardiac side effects with selective COX-2 inhibitors." [31]   Thereafter, Merck personnel expressed concerns that Vioxx might increase CVT risks to patients. In a Merck-sponsored study (Protocol 023), Dr. Garret FitzGerald and colleagues reported that Vioxx suppressed PGI2 production while leaving the metabolite for thromboxane uninhibited.  By early 1998, Merck scientists, while recognizing that the "clinical implications of partially inhibiting the production of PGI2 without inhibiting

---

6. requires intervention to prevent permanent impairment or damage, or

7. "other serious (important medical events)" that "may jeopardize the patient and may require medical or surgical intervention to prevent one of the other outcomes."

http://www.fda.gov/safety/medwatch/howtoreport/ucm053087.htm, as accessed, July 8, 2013.
[25]MRK-NJ0180248-250.

[26] MRK-00420000774 at MRK-00420000797.

[27] MRK-ANK0039034.

[28] MRK-AHY0361017 at MRK-AHY0361020.

[29] Ogilvy00509.

[30] MRK-ABK0311052.

[31] *Id.* at MRK-ABK0311053.

thromboxane generation systemically are unknown," declared that "[t]hese findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV) events."[32]   A January 1998 email from Dr. Guess to Merck employee George Williams and others stated "Hence, it is biologically plausible that specific cyclooxygenase-2 inhibitors could predispose to thrombotic events in a way that other drugs do not."[33]   A January 2000 email from Michael Gresser concerning stroke risk in Vioxx patients stated "actually if our worst fears concerning the prostacyclin business have any foundation in reality they could have a higher incidence."[34]   Professor John Oates, in a letter to Dr. Edward Scolnick dated August 13, 1999, raised specific concerns about potential thrombotic consequences of COX-2 inhibition.[35]   Similarly, the May 3-6, 1998 Scientific Advisor's Meeting called for "systemic examination of coronary ischemic events in the clinical trials with Vioxx and other MRL COX-2 inhibitors."[36]   McAdam, et al., later provided a detailed account of the prostacyclin/thromboxane issue.[37]   The Scientific Advisory Board recommended that Merck conduct a number of studies in order to help resolve these concerns, but Merck declined to conduct these studies.[38]   Likewise, Drs. Oates, Patrono and FitzGerald also recommended that Merck conduct specific studies in order to help elucidate Vioxx's cardiotoxic potential, but Merck declined to perform these studies as well.[39]   Later, in March 2000, when Dr. Scolnick first reviewed the results of the VIGOR trial, he acknowledged that "[t]he CV [cardiovascular] events are clearly there . . . it is mechanism based as we worried it was.   Oates and Alan [Nies] and Barry [Gertz] were right about the metabolite meaning ie [sic] urine Pg [prostaglandin] data."[40]

# 4   DR. DOUGLAS WATSON'S 1998 EPIDEMIOLOGY STUDY

25.   In 1998, Merck scientist Douglas Watson conducted an epidemiological study involving Vioxx in an early attempt to characterize the cardiovascular safety of Vioxx. This study, despite the fact that its design actually *masked* Vioxx's cardiovascular risk, gave rise to a meaningful and important adverse cardiovascular signal against Vioxx. The results of this study were not disclosed before Vioxx was withdrawn from the market.

26.   Dr. Watson's study compared three groups of patients: (1) patients participating in completed and ongoing Vioxx trials (including both patients taking Vioxx as well as patients taking other NSAIDs and patients taking placebo in other Merck trials) with (2) placebo patients

---

[32] Final Results of an Analysis of the Incidence of Cardiovascular SAEs in the Phase IIb/III VIOXX Osteoarthritis Clinical Trials, February 2, 1998, MRK-AAD0046029, at MRK-AAD0046033033.

[33] PX 750 at MRK-AAD0046033.

[34] MRK-SHAA0654100 at MRK-SHAA0654107.

[35] PX 713.

[36] PX 665 at MRK-AEI0002739.

[37] McAdam B.F. et al., *Systemic biosynthesis of prostacyclin by cyclooxygenase (COX-2): The human pharmacology of a selective inhibitor of COX-2*, 96 PNAS 272-277 (1999).

[38] PX 665 at MRK-AEI0002739.

[39] *See, e.g.*, PX 421; PX 535; FitzGerald Tr. at 91:9-96:11; Oates Tr. at 34:9-35:15; 74:3-77:12.

[40] PX 439.

from previously completed studies of Merck's drugs Fosamax and Proscar and (3) with cardiovascular incidence rates described in population-based epidemiological studies.[41]

27.    Watson's study concluded: "Based on this analysis, the CVD SAE incidence rates in trials of Vioxx appear roughly consistent with what would be expected in the general population, and there is no clear evidence of consistently elevated risk compared to age-adjusted placebo controls from PROSCAR and FOSAMAX trials." Merck's own analyses demonstrate, however, that the study *does* provide clear evidence of elevated cardiovascular risk on Vioxx. Table 7 of the study report shows the adjusted rate ratio for women is 2.16 with a 95% confidence interval of (1.14, 3.94). This is statistically significant.

28.    I note that women are at elevated risk for arthritis, the condition for which Vioxx was largely prescribed.[42] Indeed, 80% of the patients enrolled in VIGOR were female.[43] Thus, in my opinion, an adverse cardiovascular signal observed amongst women is of interest.

29.    Indeed, Merck observed this cardiovascular signal in Watson's 1998 epidemiological study despite the fact that the trial was designed in a way that would actually mask any cardiovascular signal:

(a)    Watson combined Vioxx data with other NSAID and placebo data into a single arm, when he compared it with the placebo data from the PROSCAR and FOSAMAX trials, thereby diluting any cardiovascular signal.

(b)    In addition, cardiovascular adverse event reports from the Vioxx studies were reviewed to "verify the classification of the given diagnosis," whereas the reports for the PROSCAR and FOSAMAX comparator studies were not adjudicated.[44] This almost certainly serves to further bias the results in favor of Vioxx, as the review can only serve to decrease the number of events on Vioxx.

(c)    This was not a randomized comparison and made no adjustments for potential confounders. The patients in the Vioxx trials differed in myriad ways from the patients in the PROSCAR and FOSAMAX trials.  For example, *all* the patients in the included Vioxx trials had arthritis; presumably a modest (and certainly smaller) fraction of the comparator patients had arthritis. Of the patients in the Vioxx trials, 4.1% had coronary artery disease or angina at baseline as compared with 5.6% of the comparator patients.  1.6% of the Vioxx patients had a previous MI as compared with 2.4% of the comparator patients. To the extent that the placebo patients in Watson's meta-analysis had greater baseline risk for adverse cardiovascular events (because, for instance, history of prior cardiovascular disease was more common in that population), this would further bias the comparison in favor of Vioxx.

30.    Given these limitations, the fact that this study did generate a signal of cardiovascular toxicity should have raised significant concerns within Merck.

---

[41] MRK-SHAA0839162 at MRK-SHAA0839178.
[42] *NHIS Arthritis Surveillance*, CDC.GOV, http://www.cdc.gov/arthritis/data_statistics/national_nhis.htm.
[43] PX 329 at MRK-AQI0008905.
[44] PX 749 at MRK-AOG0008345-6.

# 5    VIGOR

31.    Merck presented the VIGOR cardiovascular results in a manner that was non-standard and obscured the cardiovascular risk posed by Vioxx. Moreover, Merck's 4% hypothesis – its claim that between-arm differences in cardiovascular risk were disproportionately distributed in 4% of the VIGOR population retrospectively identified as candidates for aspirin prophylaxis – which the Company used to support its naproxen hypothesis, was not scientifically valid or supportable. My analyses show that there is no evidence the risks observed in each subgroup are different from one another, and thus no basis for claiming that this subgroup analysis highlighted the cardioprotective effect of naproxen in VIGOR. Indeed, Merck's own internal analyses and conclusions concerning the 4% hypothesis corroborate mine. Finally, Merck conducted an epidemiological study to help quantify naproxen's cardioprotective effect in an RA population. Despite the fact that this analysis was designed in a way that would cause it to likely overstate naproxen's beneficial effect, the analysis showed that any such benefit could most likely account for only part of the risk difference observed in VIGOR.

## 5.1    VIGOR and Merck's Presentation of the VIGOR Data

32.    The Vioxx Gastrointestinal Outcomes Research (VIGOR) trial was the single largest Vioxx trial in terms of number of patients. The 12-month trial[45] enrolled 8,076 rheumatoid arthritis patients, randomly assigning the patients to either 50mg of Vioxx daily or 500mg of naproxen twice daily. VIGOR began before Vioxx was approved by the FDA but concluded after the approval.[46] Because it was the largest study of Vioxx during the time Vioxx was on the market (and, in fact, the largest ever),[47] the trial's cardiovascular safety data, and the interpretation of it espoused by Merck, is of critical importance in assessing Vioxx's risk.

33.    Table 1 shows an analysis of investigator-reported CVT events in VIGOR and Figure 1 shows the corresponding Kaplan-Meier curves showing early and persistent separation of the Vioxx and naproxen curves. These analyses show a significant increase in CVT events for the Vioxx arm of the study as compared with the naproxen arm. Table 2 shows an analysis of confirmed events, the results of which likewise show a significant increase in CVT events against Vioxx.

**Table 1**. Investigator-Reported CVT events using all available data.

|  | Vioxx | | Naproxen | | | |
|---|---|---|---|---|---|---|
| Study Block | N | PYR | N | PYR | Relative risk & 95% CI | p-value |
| VIGOR | 63 | 3247 | 22 | 3220 | 2.8 (1.8,4.6) | 0.00002 |

---

[45] According to the VIGOR paper (PX 109, defined below), the trial had average follow-up per patient of nine months.

[46] I note that VIGOR was not an ITT study and therefore I do not present an ITT analysis.

[47] Vioxx was on the market from May 21, 1999 to September 29, 2004.

**Table 2**. Confirmed CVT events using all available data. N denotes the number of events.  PYR denotes the patient years at risk.

| Study Block | Vioxx | | Naproxen | | Relative risk & 95% CI | p-value |
|---|---|---|---|---|---|---|
| | N | PYR | N | PYR | | |
| VIGOR | 41 | 3253 | 18 | 3222 | 2.3 (1.3,3.9) | 0.004 |



Kaplan–Meier Curves for IR CVT in VIGOR

**Figure 1**. Investigator-Reported CVT events using all available data. Kaplan-Meier curves for VIGOR.

34.      There were also significant imbalances between the two study arms for a number of specific investigator-reported adverse events – see Table 3.

35.      Merck published some of the results of the VIGOR trial in the *New England Journal of Medicine* on November 23, 2000. ("The VIGOR paper").[48]  According to the VIGOR paper, confirmed myocardial infarctions ("MIs") occurred in 0.4% of the Vioxx patients versus 0.1% of the naproxen patients, yielding a statistically significant relative risk of 4.0 against Vioxx. Merck later disclosed that an additional three heart attacks had occurred in the Vioxx arm, making the MI rate 0.5% on Vioxx versus 0.1% on naproxen, for a statistically significant relative risk of 5 against Vioxx.

---

[48] PX 109 (C. Bombardier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecxib and Naproxen in Patients with Rheumatoid Arthritis,* 343 N. Engl J Med 21, 1520-1528 (2000)).

**Table 3**. Investigator-Reported adverse events in VIGOR. N denotes the number of events. PYR denotes the patient years at risk.

| Adverse Event | Vioxx | | Naproxen | | Relative risk & 95% CI | p-value |
|---|---|---|---|---|---|---|
| | N | PYR | N | PYR | | |
| Myocardial infarction | 23 | 3260 | 9 | 3225 | 2.5 (1.2,5.8) | 0.01 |
| Hypertension | 359 | 3105 | 208 | 3134 | 1.7 (1.5,2.1) | $2 \times 10^{10}$ |
| Edema | 240 | 3121 | 161 | 3134 | 1.5 (1.2,1.8) | 0.00007 |

### 5.1.1   How did Merck Represent the VIGOR Study?

36.    In a March 27, 2000 press release announcing the VIGOR results, Merck stated,

"[S]ignificantly fewer thromboembolic events were observed in patients taking naproxen in this GI outcomes study, which is consistent with naproxen's ability to block platelet aggregation. This effect on these events has not been observed previously in any clinical studies for naproxen. Vioxx, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects . . . . Patients using low-dose aspirin, which also blocks platelet aggregation, were excluded from the GI outcomes study. Vioxx does not interfere with the ability of low-dose aspirin to block platelet aggregation.

\*\*\*

At therapeutic doses, Vioxx works by selectively inhibiting COX-2 without inhibiting COX-1; non-selective NSAIDs like naproxen inhibit both COX-1 and COX-2. Medicines like aspirin and naproxen that significantly inhibit COX-1 block platelet aggregation and therefore have the potential to provide cardioprotection. An extensive review of the safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx showed no indication of a difference in the incidence of thromboembolic events between Vioxx, placebo and comparator NSAIDs.[49]

37.    Below, I examine Merck's claim that "[a]n extensive review of the safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx showed no indication of a difference in the incidence of thromboembolic events between Vioxx, placebo and comparator NSAIDs," and conclude that it is not supported by the data.

---

[49] PX 10 (Fanelle).

16

38.     Likewise, on May 24, 2000, Merck issued another press release concerning the VIGOR results.  In support of its claim that VIGOR's cardiovascular results were "consistent with naproxen's ability to block platelet aggregation," Merck advanced what I will refer to as the "4% hypothesis."

> In VIGOR there was no difference in cardiovascular mortality and the incidence of strokes between the groups treated with Vioxx or naproxen.  As previously reported, significantly fewer heart attacks were seen in patients taking naproxen (0.1 percent) compared to the group taking Vioxx (0.4 percent in this study).
>
> The reduction in heart attacks is consistent with naproxen's ability to block platelet aggregation by inhibiting COX-1.  This effect on platelet aggregation is similar to low-dose aspirin, which is used to prevent second cardiac events in patients with a history of heart attack, stroke or other cardiac events.  Patients taking low-dose aspirin did not participate in VIGOR although 4 percent of patients enrolled in the study did meet the criteria for use of aspirin to prevent second cardiac events.  Among the 96 percent of patients in VIGOR who were not candidates for low-dose aspirin for such cardioprotection, there was no significant difference in heart attack rates -- 0.1 percent among patients taking naproxen and 0.2 percent among patients taking Vioxx.[50]

39.     Below, I examine the 4% hypothesis and find it to be unsupported by the data.

40.     The VIGOR paper presents the results of the VIGOR studies in non-conventional ways that favor Vioxx. Concerning myocardial infarction, the VIGOR paper reports a relative risk of 0.2. More typically, when reporting clinical trials comparing an active treatment with a comparator, the relative risk represents the risk on the active treatment divided by the risk on the comparator. In this case, Vioxx presented a relative risk of 5 rather than the more benign-sounding 0.2.[51]  The paper also reports "the rate of death from cardiovascular causes was 0.2 percent in both groups.  Ischemic cerebrovascular events occurred in 0.2 percent of the patients in each group." Both statements, although technically true, leave the reader with the distinct impression that VIGOR's negative CVT findings confine themselves to myocardial infarction. In actual fact, with regard to investigator-reported CVT events, 63 occurred in the Vioxx arm versus 22 in the naproxen arm (relative risk = 2.8, p-value=0.0002).  Even focusing on confirmed events, the results are statistically significant. According to the Clinical Study Report for VIGOR,[52] 41 confirmed events occurred in the Vioxx arm, against 18 in the naproxen arm.  I compute an estimated relative risk of 2.26 (95% CI 1.30, 3.93) and a p-value of 0.004 for confirmed CVT.

---

[50] PX 331 at MRK-SHAA0010425.

[51] Indeed, Merck appears to have gone out of its way to present the cardiovascular safety as demonstrating naproxen's benefit, rather than Vioxx's risk, in other public communications. *Compare* PX 83 (draft "standby statement" stating that it "is unclear at this time whether the difference in CV SAEs [in VIGOR] is due to an effect of Vioxx, of naproxen, or both," and explaining that Vioxx "decreases levels of prostacyclin, another prostaglandin that prevents platelet aggregation and dilates blood vessels") *with* PX 85 (final version of that same standby statement sent three days later mentioning only naproxen's putative cardioprotective effect).

[52] MRK-00420012526 at MRK-00420013585.

41.     A draft of the VIGOR manuscript, dated May 11, 2000, included a more thorough presentation of the CVT data: "The higher rate of serious cardiovascular events was due to an increase in the rate of thromboembolic events (2.12 vs. 1.13 per 100 patient years; relative risk 0.53, 0.35 – 0.83)" and went on to report that "the absolute risk reduction of 0.99% for thromboembolic events indicates that 101 patients would need to be treated with naproxen instead of rofecoxib to avoid one serious thromboembolic event in 1 year," although this latter statement was already deleted in the tracked changes.[53]  In my opinion, Merck should have provided these data, which would have been important in interpreting the VIGOR results. While some Merck personnel apparently understood the helpfulness of these data, in my view, the Company's ultimate decision not to present them obfuscated the import of the VIGOR data from a scientific perspective.

42.     The published VIGOR paper failed to include a Kaplan-Meier plot for the pre-specified CVT endpoint even though this was included in an April 2000 presentation to the Scientific Advisory Board[54] and in a July 5, 2000 memo[55] from Dr. Shapiro to Dr. Reicin.

43.     In addition, Merck did not include all of the myocardial infarctions ("MIs") when it presented the VIGOR study for publication in the *New England Journal of Medicine*. In 2005, after Vioxx had been withdrawn from the market Gregory Curfman, an editor at the NEJM, wrote an "Expressions of Concern," and a "Reconfirmation of an Expression of Concern," regarding the VIGOR study after litigation led to the discovery that Merck did not provide all of the events.[56]

## 5.2    Merck's Reaction to VIGOR

44.     After VIGOR, Merck personnel initially concluded that Vioxx was likely cardiotoxic.[57]  In order to support the drug, Merck personnel, under the direction of Dr. Edward Scolnick, supposedly looked at all of the study data then at Merck's disposal.[58]  As discussed more fully below, at the time this review was undertaken, those data did not, and could not, support Merck's claim that there was no difference in cardiovascular risk between Vioxx and non-naproxen comparators in its completed and ongoing clinical trials.  Moreover, while Merck

---

[53] MRK-AAD0120092 at MRK-AAD0120107-108.

[54] PX 117 at MRK-ABC0026031.

[55] MRK-AAC0023819 at MRK-AAC0023822.

[56] MRK-AHD0107911 (Curfman et al, *Expression of Concern: Bombardier et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis,"* 353 N Engl J Med 2813-2814 (2005)); MRK-AHD0107969 (Curfman et al., *Expression of Concern Reaffirmed*, 10 N. Engl. J. Med. 1056 (2006)).

[57] PX 439.

[58] Scolnick Tr. at 153:2-159:11; *see also* Scolnick Tr., June 1, 2005 MRK-SHAA9639167, at 166:19-22 (After VIGOR "I wanted them to look at all our other clinical trial data again and was really struggling with trying to find a way to get more placebo-controlled data." ); Scolnick Tr., Aug. 16, 2005, MRK-SHAA0640172, at 1197:10-19 (After VIGOR, "We were immediately analyzing all our clinical trial data ..."); Scolnick Tr., January 30, 2003 TRANS 000016, at 286:19-23 ("We took those results [from VIGOR] seriously ... and we began to examine all of the other clinical data we had available to us on Vioxx, to try to discern which possible explanation for the VIGOR results was the correct explanation.").

18

did have in place a strategy for a meta-analysis and periodic review of cardiovascular risks in the COXIB projects,[59] as explained below, Merck did not effectively conduct its meta-analyses. In some instances, data that should have been included in the meta-analysis was inexplicably omitted. In other instances, useful data in Merck's possession was just ignored.

45.     Meanwhile, Merck advanced its naproxen hypothesis, issuing the 4% hypothesis to support it in the near term, and undertook the epidemiological study described in Section 5.2.2 below to shore up that support.[60]

### 5.2.1   The 4% Hypothesis

46.     As explained above, Merck's 4% hypothesis purports to explain how, in VIGOR, naproxen could demonstrate a dramatic degree of cardioprotection in a population screened for cardiovascular risk by showing that the supposed cardioprotective effect of naproxen was highlighted in the subset of VIGOR patients most in need of cardioprotection.

47.     As explained in paragraph 38, Merck stated in a May 24, 2000 press release that "[p]atients taking low-dose aspirin did not participate in VIGOR although 4 percent of patients enrolled in the study did meet the criteria for use of aspirin to prevent second cardiac events. Among the 96% of patients in VIGOR who were not candidates for low-dose aspirin for such cardioprotection, there was no significant difference in heart attack rates – 0.1 percent among patients taking naproxen and 0.2 percent among patients taking Vioxx." The published paper contains similar language, also articulating the 4% hypothesis.

48.     However, I conducted analyses examining "heterogeneity" of the relative risks of each of the subgroups described in paragraph 47.[61] These analyses measure whether there is a statistically significant difference between the risks observed in each group. The results of my analyses showed that relative risks for cardiovascular events generally, and for MI specifically, do not differ significantly between the two subgroups. In other words, there is no statistically meaningful difference in cardiovascular risk between the groups.[62] As a result, the 4% hypothesis may not be used to support Merck's naproxen hypothesis.

49.     Merck conducted internal analyses that corroborate my own. On March 27, 2000 (nearly two months before Merck issued its press release setting forth the 4% hypothesis), Merck statistician Deborah Shapiro emailed an analysis of cardiovascular risk in the 4% of the VIGOR population indicated for aspirin prophylaxis under FDA rules, as described in Merck's May 24, 2000 press release and elsewhere.[63] This analysis showed that the relative risk was

---

[59] PX 612 at MRK-SHAA1253346-47 (Sept. 9, 2000 "Statistical Data Analysis Plan for Meta-Analysis of Cardiovascular Event Rates in COXIB Projects"); MRK-AAD0046104, MRK-AAD0046109 (Oct. 13, 2000 Memo "Thrombotic CV Events DAP"); MRK-AFL0003978, MRK-AFL0003984 (Aug. 5, 2002 memo, "Periodic Update Strategies for Pooled Analysis of CV events in COXIB projects").

[60] PX 753 at MRK-ABY0023693.

[61] I compared the risk ratios in each group using a statistical program called OpenEpi.

[62] PX 329 at MRK-AQI0008942.

[63] PX 922.

statistically significantly different from one in the aspirin indicated subgroup,[64] but not statistically significant in the remaining 96% of the VIGOR population that were not indicated for aspirin prophylaxis under FDA rules (although later analyses,[65] showed that in fact it was statistically significant in both sub-groups).[66] Nevertheless, Dr. Shapiro confirmed that "[t]he relative risks are consistent throughout (no significant treatment by subgroup interaction . . . .)."[67]

50. The conclusions made by Merck statisticians reviewing the "FDA Rules" subgroup data in the wake of VIGOR comport with my own.

51. Merck performed numerous additional analyses of the "FDA Rules" subgroup, and each time confirmed that tests for heterogeneity showed no difference between the risks observed in the aspirin indicated and non-indicated subgroups.[68]

52. In addition to presenting the results of the "FDA" aspirin indication rules, which formed the basis of Merck's 4% statement, Dr. Shapiro also presented an analysis using a broader set of rules for aspirin indication, adding patients with a history of any type of CVD, atherosclerosis or three or more of the five risk factors age, smoking, increased cholesterol, diabetes mellitus, and hypertension.[69] Merck scientist Dr. Eliav Barr (the only cardiologist who worked on Vioxx from May 2000 through at least January 2001)[70] explained that the FDA's exclusion of certain terms from its aspirin indication "was a really dumb thing to do, because these folks have a very very high incidence of coronary and cerebrovascular disease."[71] The subgroup he specified included terms he apparently felt were more "reasonable indications for aspirin." In that analysis, the trend observed in the "FDA Rules" analysis was actually *reversed* for investigator reported events: the estimated relative risk of Vioxx versus naproxen just *missed* significance in the aspirin indicated group, but *was* significant in the aspirin non-indicated subgroup. Thus, to the extent Merck's 4% statement was motivated by interpreting nominal significance in one group and non-significance in the other as meaningful, that motivation was undercut by the results of this analysis, which, applying this interpretation, would tend to negate the claim that the difference between Vioxx and naproxen was stronger in the subgroup actually in need of cardioprotection.

53. Merck's outside consultants' conclusions about Merck's 4% hypothesis likewise agree with my own. For example, at an October 18, 2000 consultants meeting, all three of Merck's outside consultants agreed that it was "misleading to emphasize" the 4% hypothesis.[72]

54. Internally, Merck personnel had concerns about language suggesting no effect in the non-aspirin indicated population: "Eliav [i.e., Dr. Eliav Barr] thinks we need to tone down

---

[64] *See* MRK-AWC0017802-803 (FDA aspirin indications in bold).

[65] MRK-AAX0001417 at 1422; MRK-00420027875 at 7896.

[66] *Id.*

[67] *Id.*

[68] PX 745; PX 922; MRK-ACW0017768; MRK-SHAA1926210.

[69] MRK-ABH0017880 at MRK-ABH0017888.

[70] Barr Tr. at 76:8-11.

[71] MRK-AWC0017802.

[72] PX 330 at MRK-SHAA0643768.

the wording and say the difference was 'much less pronounced.'"[73]  A later email from Dr. Barr to Dr. Braunstein and others referring to the aspirin non-indicated group remarked, "[t]here was a reduction in events which cannot be ignored, otherwise we lose credibility."[74]  A track-changed draft of the VIGOR paper focusing on the same issue remarked "I think this is a stretch for a post-hoc analysis- there is considerable overlap in the CI's."[75] A later insertion in the same draft remarks, "give me a break one barely has enough power (with just 21 events) to detect an overall difference with so few events so you probably have high 'power' to see a nonsignificant result in the low risk group when you break up the overall results into a high risk and low risk group," a reference to the fact that with the small overall number of events in the low risk group, the probability of seeing a statistically significant Vioxx-naproxen difference is diminished. Dr. Barr testified, "But -- so, for me, it meant that there wasn't -- that these -- that the effects were not different between those two groups, but, again, that wasn't really what I was looking -- was interested in."[76]  Dr. Reicin provided similar testimony.[77]

### 5.2.2   The GPRD Study

55.   *After* publicly announcing the naproxen hypothesis, Merck conducted an observational study that attempted to quantify the alleged cardioprotective effect of naproxen in VIGOR. The results of this study showed that, to the extent naproxen had any cardioprotective effect at all, the magnitude of that effect could not account for all the difference in cardiovascular risk observed in VIGOR.

56.   Because VIGOR used an active comparator (i.e., naproxen) rather than a placebo, the causal interpretation of the results requires an assessment of the possible cardioprotective effects of naproxen. However, I am not aware of any scientific study that claims a cardioprotective effect of naproxen that would be large enough to account for the imbalance reported in Table 1. Roche, a manufacturer of naproxen, reported to the Reuters news agency in April of 2000: "To our knowledge, naproxen does not prevent heart attack or stroke."[78]  Even today, the US Agency for Healthcare Research and Quality states, "[n]aproxen is associated with neutral CV risk relative to placebo."[79]  In advance of the VIGOR results, Merck personnel stated they did not believe naproxen, even if cardioprotective, would yield a risk reduction of the magnitude observed in VIGOR. [80]  Notwithstanding this, Merck undertook the study described in paragraph 55 to support its naproxen hypothesis.

---

[73] MRK-AAD0019572 at MRK-AAD0019586.

[74] MRK-AAB0062117.

[75] MRK-AAB0103832 at MRK-AAB0103843.

[76] Barr Tr. at 152:24-153:4.

[77] Reicin Tr. at 258:4-259:6.

[78] MRK-AKO0002528 at MRK-AKO0002530 (Pierson, "Merck's Vioxx seen facing FDA scrutiny on heart attacks," *Reuters News,* April 27, 2000).

[79] Agency for Healthcare Research and Quality, *Analgesics for Osteoarthritis: An Update of the 2006 Comparative Effectiveness Review,* Comparative Effectiveness Review 38, at 10 (2011), *available at,* http://effectivehealthcare.ahrq.gov/ehc/products/180/795/Analgesics-Update_CER-38_20111007.pdf.

[80] *See, e.g.,* PX 317 at MRK-AAB0059517; PX 320; Reicin Tr. at 81:4-82:13.

57.     Dr. Douglas Watson and co-authors published the results of this study (*Archives of Internal Medicine*, 2002; 162:1105-1110) in May 2002, and it purported to show a protective cardiovascular effect of current-use naproxen OR=0.61, 95% confidence interval (0.39, 0.94), p=0.03, supposedly supporting the "naproxen hypothesis."

58.     However, Merck's own internal analysis of Watson's study shows that any cardioprotective effect naproxen may have had in the VIGOR trial could explain only part of the observed between-arm difference in cardiovascular risk in that trial.[81]  Specifically, Merck concluded that, even assuming a cardioprotective effect of naproxen of the magnitude reported by Watson, VIGOR still showed an additional 45% increase in risk for CVT events with Vioxx.[82]

59.     A December 5, 2001 presentation to the Merck "Human Health PAC" group from the Company's Arthritis and Analgesia Core Franchise Team makes this conclusion clear, showing that even allowing for the 39% cardiovascular risk reduction from naproxen reported in the UK GPRD study conducted by Merck's Dr. Watson, naproxen alone could not explain the VIGOR study results. [83]  The presentation states that "the potential contribution of Vioxx to VIGOR CV outcome is 45%," in sharp contrast to Merck's earlier press releases, which stated that "[t]he reduction on heart attacks is consistent with naproxen's ability to block platelet aggregation by inhibiting COX-1." [84]

60.     Moreover, as a consequence of unusual design choices, Watson's GPRD Study possibly overestimated naproxen's cardioprotective effect.  Observational studies are notoriously malleable and small changes in analytic choices can change study conclusions significantly.[85]  For this reason, it is especially important that observational studies be preceded by a study protocol; deviations from that protocol undermine the scientific integrity of the study.  Dr. Watson's study did have a protocol,[86] but the published study failed to follow that protocol in several ways.

61.     For example, the published paper used a "backward stepwise" procedure to select variables for inclusion in the conditional logistic regression that yielded the odds ratio above, whereas the protocol called for a variable screening procedure that removed variables with a p-value exceeding 0.2.  The published paper included medical comorbidities that occurred less than or equal to six months before the index date whereas the protocol called for inclusion only if the event occurred less than or equal to 90 days prior to the index date.  For cardiovascular disease variables, the published paper required a recorded diagnosis or a prescription "at any time more than 30 days prior to the index date," whereas the protocol called for 365 days prior to study start or thereafter.  Any of these post-hoc choices could have skewed the results in Vioxx's favor and at the very least destroy the scientific integrity of the GPRD study.

---

[81] PX 349 at MRK-AOJ0006962-965.
[82] *Id.* at MRK-AOJ0006965.
[83] *Id.* at MRK-AOJ0006962.
[84] *See, e.g.*, PX 10 (Fanelle); PX 331.
[85] *See, e.g.*, Madigan, D., Ryan, P.B., and Schuemie, M., "Does design matter? Systematic evaluation of the impact of analytical choices on effect estimates in observational studies." *Therapeutic Advances in Drug Safety*, DOI: 10.1177/2042098613477445.
[86] MRK-ABY0024769.

## 6      Vioxx and Non-Naproxen Comparators

62.      As explained above, Merck claimed that its review of the safety data from its clinical trials showed no difference in cardiovascular safety between both (1) Vioxx and non-naproxen NSAIDs and (2) Vioxx and placebo. I will use the term "non-naproxen comparator" to include both in what follows.

63.      The placebo component of Merck's non-naproxen safety data was "driven largely" by the data from its Alzheimer's trials, while the non-naproxen NSAID controlled data was driven by its osteoarthritis ("OA") trials.[87] As discussed, in both cases, Merck's review of its safety data relied on "on drug," as opposed to ITT data, for its conclusions concerning cardiovascular safety.[88]

64.      My review of the record reveals, and my independent analysis confirms, that Merck's clinical trial data was incapable of meaningfully demonstrating that there was no difference between Vioxx and non-naproxen comparators. As Merck's own outside statistical consultant, Professor Scott Zeger, explained, Merck's claim to the contrary misrepresented an "absence of evidence" as "evidence of absence."[89]

65.      Specifically, Dr. Zeger, writing in 2005 and referring to the OA and Alzheimer's programs, wrote that "these data could not establish that the relative risk was close to 1.0 with any certainty."[90] Mr. Bolognese, the Merck statistician who helped lead the cardiovascular safety data review Merck referenced in its press releases testified that he did not dispute this point.[91] Likewise, Dr. Carlo Patrono, another outside consultant to Merck, reviewing the Company's non-naproxen data, told Merck scientists, "No data are comforting as there are very few events. Period."[92] And, similarly, Merck consultant John Oates testified that the "early [Alzheimer's] data" did not "yet have the power" to detect an adverse cardiovascular signal for Vioxx, and "it was only after you got out to a later time point," the point at which the Alzheimer's trials finally had enough events to approach the kind of power required to detect meaningful cardiovascular signals, "that, all of a sudden, the risk of Vioxx became evident," just as it eventually did in the APPROVe trial.[93] My analyses support these outside consultants' conclusions.

66.      Moreover, with respect to both the placebo-controlled and non-naproxen NSAID controlled data sets, Merck failed to report the results of its pre-specified analyses of these data, choosing instead to report post-hoc endpoints that diluted Vioxx's adverse cardiovascular safety signal. My analysis of Merck's data in fact shows a statistically significantly increased cardiovascular risk associated with Vioxx as compared with both placebo and non-naproxen NSAIDs.

---

[87] *See* PX 610.
[88] MRK-AGU0003701 at MRK-AGU0003708.
[89] PX 628 at MRK-AFO0273769.
[90] *Id.*
[91] Bolognese Tr. at 214:2-6.
[92] PX 721 at MRK-ACF0009166.
[93] Oates Tr. at 152:2-10.

67.     Turning first to Merck's arthritis data, I examine, as Merck did, "statistical power," which addresses the question of whether enough data are available to detect differences of various significant magnitudes, and conclude, as Merck did, that the "chance of missing" meaningful differences in cardiovascular risk in these data (considering the non-naproxen NSAID and placebo-controlled data separately, as Merck did) was "very good." I also conclude that other analytic concerns, including the fact that a substantial majority of the data was diclofenac-controlled while Merck's consultants had provided the Company with evidence that diclofenac was cardiotoxic, served to bias Merck's arthritis data towards finding no difference in the incidence of adverse cardiovascular events, making Merck's reliance on these data for the proposition that Vioxx posed no increased cardiovascular risk scientifically unreasonable. Finally, I examine the pooled placebo-controlled data from the arthritis studies using Merck's pre-specified CVT endpoint and find, as Merck's later analyses revealed, that, notwithstanding that these data were biased towards showing no difference in cardiovascular risk, they evince a significant adverse cardiovascular signal with respect to Vioxx.

68.     I next turn to Merck's Alzheimer's trial data and conclude that, as with the arthritis data, they were underpowered (i.e., there was simply not enough data available in these trials) to detect meaningful differences in the incidence of adverse cardiovascular events, especially in the wake of the VIGOR trial. Accordingly, Merck's claim that these data failed to show a difference in cardiovascular risk between Vioxx and placebo was clinically and empirically meaningless, since the absence of a difference in these data could not rule out substantial increases in cardiovascular risk associated with Vioxx use. Indeed, as the data began to accumulate in the Alzheimer's trials and their statistical power began to improve, an affirmative adverse cardiovascular signal against Vioxx became apparent. I also conclude that various "competing risks," including discontinuation, death, and conversion to Alzheimer's disease, as well as the violation of the assumption of "non-informative discontinuation" (the assumption that discontinuation is unrelated to the risk of suffering an adverse event) with respect to Vioxx, also skewed the on drug Alzheimer's data on which Merck relied towards showing no difference in cardiovascular risk. Again, I conclude that these facts make Merck's reliance on these data to support Vioxx's cardiovascular safety unreasonable.

69.     I next review Merck's choice of the Antiplatelet Trialists' Collaboration ("APTC") endpoint, an endpoint that mixes thrombotic and bleeding events (and was designed, not to measure cardiovascular risk, but to weigh the risk and benefit of antiplatelet therapy), to report its cardiovascular safety data from both its arthritis and Alzheimer's trials and conclude this choice was illegitimate.

70.     Finally, I return to the Alzheimer's trials to review the mortality data from those trials available to Merck, which yielded a decisive adverse cardiovascular safety signal against Vioxx as early as September 29, 2000.

## 6.1    Introduction to Type II Error and Power

71.     In order to understand at least part of the reason why the supposed absence of a signal in these data was not meaningful, it is first essential to introduce the concepts of "type II error" and "power." Together, these concepts address the question asked several times by Merck personnel during the Company's review of the cardiovascular safety data from its clinical trials:  are the placebo-controlled data and/or non-naproxen-controlled NSAID data robust

24

enough such that we can be reasonably sure that our failure to observe a difference in cardiovascular events between Vioxx and comparator in these data reflects the true absence of a clinically meaningful difference between Vioxx and comparator, or, instead, is the failure to observe such a difference simply a function of the inadequacy (small size, for instance) of the data in question?  Merck's statisticians answered this question, as set forth below.  In short, "power" can be used, and was used by Merck, to quantify "the chance of missing" a clinically meaningful result in the placebo-controlled and non-naproxen NSAID controlled data.

72.    Even as Merck issued press releases touting the absence of a difference in cardiovascular risk between Vioxx and comparator in its non-naproxen data sets as reassuring evidence that Vioxx posed no more cardiovascular risk than either placebo or comparator NSAIDs (see paragraphs 36 through 38, above), the Company concluded from its analyses performed immediately after VIGOR unblinding and in the months thereafter that the chance of missing a clinically significant cardiovascular signal in these data were "very good."

73.    My analyses of these data confirm Merck's conclusion that they lacked power to detect meaningful and important cardiovascular safety signals in these data, especially in the wake of the VIGOR trial's unblinding.  As I explain below, it would have been exceedingly difficult to observe differences in cardiovascular events *smaller* than the between-arm difference observed in VIGOR.  I am concerned about differences smaller than the net difference observed in VIGOR because, as explained above, even assuming naproxen has cardioprotective properties (a claim that medical science still does not support),[94] the VIGOR result was well out of range of the known cardioprotective effect of proven anti-platelet therapies like aspirin. Thus, even assuming naproxen exerted at least *some* cardioprotective effect in the VIGOR trial, as Merck claimed it did, it would be important to consider the possibility that Vioxx's cardiotoxic propensities also made some contribution to the overall observed difference in VIGOR.  For instance, Watson's generous estimate of the cardioprotective effect of naproxen in an RA population still left a 45% increase attributable to VIOXX (whereas the *net* difference in between-arm cardiovascular risk observed in VIGOR was 126%).  Indeed, given the large number of people taking Vioxx at the time Merck conducted these analyses,[95] even a 25% increase represents a significant public health hazard.

74.    Merck appears to have been attuned to this concern, as it also investigated power to detect risks smaller than those observed in VIGOR. Deborah Shapiro, for example, wrote a computer program to calculate the power to detect 30%, 40%, 50%, 60%, and 70% reductions in cardiovascular risk on placebo in the Alzheimer's trials (which corresponds to power to detect a 42%, 67%, 100%, 150%, and 230% increase, respectively, on the Vioxx arm).[96]  Likewise, when Merck was considering various designs for its abandoned cardiovascular outcomes study, it thought to design a study capable of excluding a potential increased cardiovascular risk on Vioxx as small as 20%.[97]

---

[94] N. Bhala, et al., *Vascular and upper gastrointestinal effects of non-steroidal anti-inflammatory drugs: meta-analyses of individual participant data from randomised trials*, The Lancet, doi:10.1016/S0140-6736(13)60900-9 (May 30, 2013).

[95] MRK-SHAA3558968, at MRK-SHAA3558982.

[96] MRK-AAB0120451.

[97] PX 498 at MRK-SHAAM0110529.

75.     "Type II error," also called a "false negative," occurs when one concludes on the basis of experimental results failing to demonstrate an effect that there is no effect when an effect is really there, but the experiment has simply failed to detect it. Statisticians may also describe type II error as an erroneous failure to reject the "null hypothesis." An experiment's type II error rate, denoted by the Greek letter $\beta$ (beta), is a function of a variety of factors including the magnitude of the effect size being measured, the size of the data sample available, and the criterion for statistical significance used in the experiment.

76.     "Power" refers to the ability of a study to detect an effect (e.g., an adverse cardiovascular effect of Vioxx) when one is truly present. It is equivalent to $1-\beta$. Thus, if the type II error rate in a study is 20%, the study is said to have 80% power. As the size of the effect (in this case, cardiovascular risk) you are trying to measure decreases, so does the trial's power. In other words, as the size of the effect decreases, so does your confidence that your failure to observe a signal actually means it is not there (as opposed to being a case of type II error). The same is true of the sample size (the number of data points collected) in the experiment: as it decreases, so does power.

77.     To illustrate by example, suppose in a particular patient population, the yearly risk of a CVT event is 1%. In other words, for every 100 patients observed for a year, one would expect to see 1 CVT event. This is approximately the rate observed amongst placebo patients in the arthritis trials. Now further suppose that Vioxx doubles the risk of a CVT event. So, for Vioxx patients, one would expect to see 2 CVT events for every 100 patients observed for a year. Thus, in a one-year study with 100 patients on Vioxx and 100 patients on placebo, one would expect 2 CVT events in the Vioxx arm and 1 CVT event in the placebo arm. This difference alone, although consistent with the actual underlying rate, would not reach statistical significance – in fact the p-value would be around 0.6, far from the nominal significance level of 0.05. This absence of significance means the data are consistent with there being no true difference between Vioxx and placebo. Thus, in this case, the small number of patients in the study prevents one from identifying the true underlying difference in risk. If there were 10,000 patients per arm, however, one would expect to observe 200 CVT events in the Vioxx arm and 100 CVT events in the placebo arm, a highly significant difference with a p-value of less than 0.0000001. This illustrates one of the central concepts in statistical power: if in truth there is an elevated risk of a certain magnitude (a doubling in this case), the probability of finding the risk (in the sense of finding a statistically significant difference) depends on the size of the trial (both in terms of numbers of patients and duration of observation).

78.     To further illustrate this concept: because one would need an adequate number of events to be able to detect a true difference or absence of a difference between Vioxx and comparator, Merck itself recognized that it would need to enroll approximately 15,000 patients followed for 18 months (22,500 patient years) in a non-inferiority study with a 20% margin.[98]

79.     The probability of finding the risk in an experiment (i.e., the experiment's "power") also depends on the magnitude of the risk. If Vioxx *triples* the risk of a CVT event, then with, for example, 1,000 patients per arm one would expect 30 CVT events in the Vioxx arm and 10 CVT events in the placebo arm, and a p-value of 0.001. Thus a 1,000 patient per arm trial might fail to "find" a doubling, but would likely find a tripling.

---

[98] PX 349 at MRK-AOJ0006958.

80.     A last detail that a power calculation must account for concerns of intrinsic randomness in the actual number of events: even if the true expected number of events is say 1 per 100 patient-years, the actual number for any given group of patients might be 0, or 1, or 2, or even 3 or more.

81.     Of course, Merck's experienced statisticians were familiar with these statistical concepts. In her deposition, Dr. Shapiro described power as follows: "What it means is that if – when you say that you believe that there's going to be, for example, a 50 percent reduction in a certain kind of effect, that if that's the truth, then in, say, nine times out of ten you will observe that if that's the truth. So that's the idea of power." [99] Or, Mr. Bolognese: "Statistical power is the probability of observing a statistically significant difference, given a certain value of the truth." [100]

82.     Power can thus be used in advance of a trial to determine how many patients one will have to enroll to detect the results of interest.  If no statistically significant result was observed in the trial (or meta-analysis), power can also be used *after* the trial has concluded to determine the chances that the trial simply failed to detect the result of interest (e.g., because the trial was too small)[101] for different candidate levels of the true effect size.  In other words, power can be used to determine the type II error rate in a trial showing no difference between comparators, thus indicating how much weight one ought to place on the failure to observe the clinically meaningful effect in question. Many standard biostatistics textbooks provide power calculations pursuant to a non-significant result.[102] [103]

## 6.2     The Cardiovascular Safety Data From Merck's Arthritis Studies Did Not Support the Company's Claim that Vioxx Posed no Greater Cardiovascular Risk than Comparators

83.     As explained above, Merck placed considerable weight on its internal non-naproxen comparator cardiovascular safety data, which it cited in press releases[104] and other

---

[99] Shapiro Tr. at 21:13-22.

[100] Bolognese Tr. at 40:12-41:8.

[101] In this case, "detection" means observing a difference in cardiovascular events of a particular magnitude to a statistically significant degree (i.e., observing a difference of magnitude $x$ with 95% confidence).

[102] Rosner, B., Fundamentals of Biostatistics, at 381-82, 625 (7th ed.); DeVeaux, et al., Stats, Data, and Models, at 513 (3d ed. 2011); Winer, B.J., et al., Statistical Principles in Experimental Design, at 20 (3d ed.); *see also* Chalmers T.C., et al., *A method for assessing the quality of a randomized control trial*, 2 Controlled Clin Trials. 31-49 (1981).

[103] This is not to be confused with "retrospective power," a term that refers to the power calculations that attempts to measure the power an experiment had to detect a non-significant relative risk actually observed. In the example in paragraph 77 where the experiment had only 100 patients per arm, this would amount to asking what the experiment's power was to detect a doubling with significance. Such an analysis simply restates a question already answered by the calculated p-value. The power calculations I am referring to could just as well have been done before the study and make no use of the estimated relative risk from the study.

[104] PX 10 (Fanelle) ("An extensive review of the safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx showed no indication of a difference in the incidence of thromboembolic events between Vioxx, placebo and

public statements, as well as a number of published meta-analyses of the OA studies, including Konstam, et al., (2001),[105] Reicin, et al., (2002),[106] and Weir, et al., (2003).[107]  For example, a Vioxx "timeline" on Merck's website referring to the Konstam et al. paper states that the "analysis demonstrated that Vioxx was not associated with excess cardiovascular thrombotic events compared with either placebo or non-naproxen NSAIDs."[108]  Bresalier et al. (2004), reporting the results of the APPROVe trial, reference Konstam et al. and Weir et al. and state, "[i]n aggregate, previous randomized controlled trials comparing rofecoxib with placebo or conventional NSAIDs other than naproxen have not demonstrated an increased cardiovascular risk associated with rofecoxib use."

84.    As Merck's outside consultants observed (and Merck statisticians conceded in their deposition testimony),[109] the Company's arthritis data were underpowered to detect meaningful differences in cardiovascular safety. In other words, the probability of observing a false negative, of failing to observe a signal that is really there, was quite high because there were too few data – too few patients and too few events.  Moreover, 70 percent of the data comprising Merck's non-naproxen NSAID data compared Vioxx with diclofenac,[110] an NSAID that Merck, as early as March 24, 2000 (three days before the first press release announcing the VIGOR results),[111] had reason to believe increased cardiovascular risk compared to placebo. Thus, even assuming Merck could interpret the absence of an observed difference between Vioxx and non-naproxen NSAID comparators as demonstrating statistical equivalence of risk (which it could not because of the small amount of data in these trials) Merck could not have been comforted by the observation that Vioxx was similar in risk to a cardiotoxic drug.

85.    Moreover, notwithstanding questions about the robustness of the non-naproxen NSAID data to support the non-inferiority of Vioxx in terms of cardiovascular safety, Merck failed to provide a complete report of the arthritis studies. In actual fact, the studies do demonstrate the cardiovascular toxicity of Vioxx. I explore both of these issues in what follows.

---

comparator NSAIDs."); PX 331 at MRK-SHAA0010425 ("In the completed osteoarthritis trials . . . there was no difference in the incidence of cardiovascular events.  In addition, in the ongoing clinical trials with Vioxx, as well as post-marketing experience with Vioxx, there is no difference in the incidence of cardiovascular events, such as heart attack, among patients taking Vioxx, placebo, or other NSAIDs."); MRK-ADI0011233 ("We already have additional [non-naproxen comparator data] . . . and the findings are very, very reassuring . . . . Vioxx does not result in any increase in cardiovascular events compared to placebo.").

[105] MRK-AIY0088951 (Konstam et al., *Cardiovascular thrombotic events in controlled clinical trials of roefecoxib*, 104 Circulation 2280-2288 (2001)).

[106] MRK-SHAA2917891 (Reicin et al., *Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs*, 89 Am. J.  Card., 204-209 (2002)).

[107] MRK-SHAA3322531 (Weir et al., *Selective COX-2 inhibition and cardiovascular effects: A review of the rofecoxib development program*, 146 American Heart Journal 591-604 (2003)).

[108] MRK-AIU0225235 at MRK-AIU225252

[109] *See, e.g. supra*, at ¶ 65.

[110] PX 611 at MRK-ABK0460849.

[111] *See, e.g.*, PX 87; MRK-AAB006058-59; MRK-ABK0494756; MRK-ACF0003791-93; MRK-ACF0003955-57.

### 6.2.1   Power in the Arthritis Studies

86.    Merck's arthritis trials compared Vioxx to both placebo and non-naproxen NSAIDs.  Based on the analyses presented below, I conclude that both pools of data were underpowered to detect meaningful differences in cardiovascular risks between Vioxx and comparator.  Accordingly, any claimed absence of a significant difference in cardiovascular risk disfavoring Vioxx in these data could not have been reasonably interpreted as evidence that there in fact was no difference in risk between Vioxx and comparator.  Notably, despite the fact that the placebo controlled arthritis data were underpowered, these data *did* show a statistically significant difference in cardiovascular risk against Vioxx.

87.    Table 4 below shows the power (i.e., the probability of correctly finding a statistically significant difference) for different potential values of the true relative risk in the **placebo-controlled arthritis studies**. A relative risk of 1.25, for example, corresponds to a 25% risk increase on Vioxx; a relative risk of 1.5, corresponds to a 50% increase, and so on. Each row includes studies completed three months prior to the specified date to allow time for Merck to prepare the trial database for analysis. Merck's "Table 13" refers to the collection of arthritis studies in the 2003 safety update report. I note, and Merck statisticians have acknowledged in their testimony, that clinical trials typically require a power of 80-90% or even higher.[112]

**Table 4**. Power for **Vioxx versus placebo in the arthritis studies** using different combinations of true relative risk and patient years of observation per study arm assuming as a background rate the placebo rate as of each date from Merck's Table 13 of the 2003 CVT Safety Update Report.

| True Relative Risk<br><br>Date | 1.25 | 1.5 | 1.75 | 2.0 |
|---|---|---|---|---|
| March 27, 2000<br>Press release | 6% | 10% | 18% | 27% |
| September 15, 2000<br>Cutoff for FDA<br>Advisory Comm.<br>Presentation | 5% | 10% | 18% | 27% |
| November 23, 2000<br>VIGOR paper<br>published | 6% | 12% | 21% | 32% |
| May 30, 2002<br>OA/RA Trials in<br>Merck's Table 13 | 6% | 12% | 20% | 30% |

---

[112] Bolognese Tr. at 48:7-17.

| Complete | | | | |
|---|---|---|---|---|

88.    For the calculations in Table 4 (and in Table 5, below), I used a standard formula from Rosner's textbook,[113] analogous to the formula Dr. Shapiro used to perform her March 16, 2000 calculation of power in the Alzheimer's trials.[114] I also calculated the power two other ways – using a Monte Carlo procedure taking patient years at risk into account and via a Cox model-based procedure (alluded to by Mr. Bolognese)[115] using the powerSurvEpi package in R, but the numbers never varied by more than 1-3%.

89.    The studies in Table 4 had low power to detect even a doubling of cardiovascular risk on Vioxx.

90.    Table 5 below shows the power for the **non-Naproxen NSAID controlled arthritis studies**. Each row includes studies completed three months prior to the specified date.

**Table 5**. Power for **Vioxx versus non-naproxen NSAID** using different combinations of true relative risk and patient years of observation per study arm assuming as a background rate the non-naproxen NSAID rate as of each date from Merck's Table 13 of the 2003 CVT Safety Update Report.

| True Relative Risk / Date | 1.25 | 1.5 | 1.75 | 2.0 |
|---|---|---|---|---|
| March 27, 2000 Press release | 12% | 34% | 62% | 83% |
| September 15, 2000 Cutoff for FDA Advisory Comm. Presentation | 16% | 46% | 77% | 93% |
| November 6, 2001 Konstam published | 16% | 45% | 75% | 93% |
| May 30, 2002 OA/RA Trials in Merck's Table 13 Complete | 16% | 44% | 74% | 92% |

---

[113] Rosner, *supra*, n. 102 at 382.
[114] MRK-AAB0120451.
[115] PX 336.

91.    The studies in Table 5, examining Vioxx versus non-naproxen NSAID, had insufficient power to detect anything less than a doubling of the risk.

92.    The Reicin meta-analysis included 8 placebo-controlled trials completed by 1998. As late as the APPROVe paper in 2005, Merck pointed to these studies as evidence of the cardiovascular safety of Vioxx.[116] However, these studies only had 28% chance of detecting a doubling of the risk. Even the entire collection of arthritis trials, concluding with protocol 136 in 2002 had unacceptably low power to detect anything less than a doubling of the risk. In other words, Merck could not rely on the absence of a signal from these studies for the proposition that Vioxx posed no more risk than comparators.

93.    Even apart from Merck's calculations of the arthritis and Alzheimer's studies' power to detect Vioxx's cardiovascular risk, the central importance of power in the interpretation of studies with null findings was widely apparent to Merck personnel and their consultants in other contexts, as well.[117]

94.    Merck personnel explicitly calculated power for CVT in the OA studies. A May 1, 2000 email from James Bolognese to Dr. Alise Reicin and Dr. Deborah Shapiro computed the power to detect rate reductions of 75%, 50% and 40% in the OA studies as 9%, 5%, and 5%, respectively, from a supposed Vioxx MI rate of 0.5%.[118] The next day he computed power of 72%, 29%, and 18% for the same reductions with respect to a supposed 2.0% Vioxx CVT rate.[119]  As Bolognese himself explains in his email, these analyses show that "the chance of missing a true reduction in CV events in the Phase III OA studies" was "very good."[120]

95.    Dr. Shapiro, referring to PX336, acknowledged there is a large chance of missing a true effect in the OA studies.  She testified that Bolognese's analysis showed "that there's a very large chance, even if there's a true effect in the OA population, that there's a large chance of missing that."[121]  Mr. Bolognese provided similar testimony.[122]

### 6.2.2   Bayesian Red Herrings

96.    Merck personnel, including Dr. Alise Reicin[123] and Dr. Deborah Shapiro,[124] have recently testified that, notwithstanding their internal calculations of type II error in the OA trials showing that the chance of failing to observe a meaningful cardiovascular signal was high, "Bayesian calculations" designed and performed by Merck statistician Dr. Saurabh Mukhopadhyay (also called Saurabh Mukherjee) reassured them that the absence of a

---

[116] MRK-AFN00116510 at MRK-AFN0116511.
[117] PX 620; PX 640; MRK-AFO0266483.
[118] PX 336.
[119] *Id.*
[120] *Id.*
[121] Shapiro Tr. at 183:21-195:3.
[122] Bolognese Tr. at 38:13-39:22.
[123] Reicin Tr. at 164:2-12; 435:11-436:2.
[124] Shapiro Tr. 238:9-239:9.

cardiovascular signal in the OA data[125] was meaningful. These analyses addressed the question whether given the OA results how likely was it that the VIGOR results would have been as extreme as they were against Vioxx (or more so) and vice versa.[126] Dr. Mukhopadhyay concluded that for three different CV endpoints there was a modest probability of such an event, with probabilities ranging from 0.002 to 0.067. I do not believe this calculation provides a "better way" of asking power questions, as Shapiro recently testified.[127] Indeed, these calculations provide no insight into power in the OA trials or any other scientifically relevant questions concerning Vioxx's cardiovascular risk. Even Dr. Mukhopadhyay seems to believe that the analysis is essentially uninformative. In a recent email, Dr. Muhkopadhyay confirmed that these calculations showed the CV results from the VIGOR and OA trials were inconsistent, but explained that they "do not tell you why the trials might be inconsistent. In fact, there are so many reasons for the trials to be inconsistent that one cannot tell conclusively what the reason or reasons for the inconsistency might be."[128] He confirmed this was his conclusion at the time he performed the Bayesian analysis in question. I concur with his conclusion.

97.     It is important to understand that Dr. Mukhopadhyay's analyses are "non-standard," in the sense that they are not well-established and widely used to answer statistical questions.  In my experience as a statistician, I have never seen an analysis like Dr. Mukhopadhyay's used for the purpose of declaring the absence of a signal meaningful.  Dr. Mukhopadhyay's methodology was ad hoc and untested, and, as Dr. Mukhopadhyay himself acknowledged, incapable of yielding useful information about Vioxx's cardiovascular risk.[129]

98.     More importantly, however, these Bayesian calculations are tangential to the real question of interest here, that is, the question posed by Dr. Alise Reicin in March 2000: "what was the chance that we would miss a true 50% reduction [or reduction of other biologically meaningful magnitudes] in events in the Alzheimer's and in the OA studies?" This is a power question. Tables 4 and 5, as well as Merck's own power calculations, show that the arthritis studies lacked power to detect important differences in cardiovascular risk. As a consequence, it was inappropriate to use the arthritis studies to provide any reassurance about the cardiovascular

---

[125] I have not seen any documentary evidence that such analyses were performed with respect to the Alzheimer's data.

[126] PX 608; PX 949.

[127] Shapiro Tr. at 238:9-14.  Note that Dr. Shapiro, however, could not explain "why a Bayesian analysis makes more sense" to perform after the conclusion of a trial than a power calculation. Shapiro Tr. at 247:15-21.

[128] MAD000001 (email dated May 18, 2013 from Dr. S. Mukherjee to Adam Wierzbowski); MAD000215-230 (email dated May 17, 2013 from A. Wierzbowski to Dr. S. Mukherjee, and attachments (PX 605 and 608)).

[129] This contrasts with the recent testimony of several Merck employees, including, Drs. Shapiro, Barr, and Reicin, who suggested that the Bayesian calculations represented an accepted and preferred method for testing the statistical import of a signal or absence thereof in a set of data. Shapiro Tr. at 238:16-22 ("When you actually have the results you look at" Bayesian analyses of the kind Mukhopadhyay performed); Barr Tr. at 144:3-14 ("To me . . . I'm familiar with this Bayesian analysis . . . that was what I was actually interested in," although Dr. Barr later admitted he never saw the results of such analysis and then reversed course saying the Bayesian analyses were "tangential to what I was interested in." (Barr Tr. at 146:6-11)); Reicin Tr. at 164:7-12 (Bayesian analyses, not power analyses, address the "real issue").

safety of Vioxx. It is clear to me that the Bayesian calculations cannot and do not answer this critical question.[130] Indeed, Bolognese testified that these analyses are "not about Type II error or power," they are about "whether these two sets of data come from the same underlying distribution."[131] It appears from the record that Bolognese did not believe that these analyses adequately answered, substituted for, or preempted questions about type II error and power because he performed a power calculation to determine the "chance of missing" an adverse cardiovascular signal in the OA trials the very next day after receiving the results of the Bayesian calculations from Dr. Muhkopdhyay.[132]

99. Moreover, because, as discussed in more detail below, Reicin received power calculations on March 16, 2000 (just days after VIGOR's unblinding) showing that there was 46% chance of missing a true adverse cardiovascular effect in Alzheimer's trials (the data Merck claimed was *most* reassuring), one wonders why, upon receiving the Bayesian calculations in December of 2000,[133] she did not immediately ask that the Bayesian calculations be performed for the Alzheimer's data in order to resolve the concerns raised by the March 16, 2000 power calculations.

100. Finally, one can also apply the Bayesian calculations in the manner Merck appears to advocate to readily impugn the naproxen hypothesis. Based on the testimony of Shapiro and Reicin cited above, I assume Merck will argue that the Bayesian analyses show Vioxx is not cardiotoxic, since, if VIGOR represented Vioxx's true increased cardiohazard, these particular calculations show that one would not likely observe the OA results. One can apply the same logic to compare the VIGOR and ADVANTAGE trials, another trial in which Merck compared Vioxx and naproxen, but which, unlike VIGOR, apparently failed to show a difference in cardiovascular risk between the study arms.[134] Thus, transposing Merck's logic to the comparison of these two studies, one can test the naproxen hypothesis: If VIGOR represents, as Merck claims, the cardioprotective effect of naproxen, one would expect to observe a *consistent* cardioprotective result in the ADVANTAGE trial. I thus replicated the consistency calculations as described in PX 605 and, following Dr. Mukhopadhyay's methodology, found that the confirmed CVT event rate in ADVANTAGE is as inconsistent with that in VIGOR (probability = 0.003 in either direction) as the OA studies are. In other words, to the extent Merck claims Dr. Mukhopadhyay's analyses showed that the inconsistency between the OA and VIGOR cardiovascular results shows that it is unlikely that the VIGOR result could be attributed to an effect of Vioxx, one would have to conclude that the inconsistency between the ADVANTAGE and VIGOR cardiovascular results shows that it is *just as unlikely* that the VIGOR result could be attributed to an effect of naproxen. Accordingly, it must be the case that either (1) the very methodology Merck claims assured it that the supposed absence of a signal in its non-naproxen data meant Vioxx was safe *also* shows that its naproxen hypothesis (the basis for its claims about safety) was improbable, or that (2) the methodology itself is flawed (as Dr. Mukhopadhyay apparently believes and did believe during his tenure at

---

[130] Note that Dr. Mukhopadhyay's analysis, unlike, say, Bolognese's power analysis, does not focus on a range of possible risk increases on Vioxx, so it cannot even purport to show whether the OA data are inconsistent with cardiovascular risk increases on Vioxx less than a doubling.

[131] Bolognese Tr. at 87:11-17.

[132] PX 608.

[133] PX 949.

[134] MRK-AHN0022317 at MRK-AHN0022323.

Merck), and cannot support Merck's claim that the absence of a difference in its OA dataset is comforting.

### 6.3    Diclofenac as a Comparator in the Arthritis Trials

101.    Because the majority of Merck's non-naproxen NSAID data compared Vioxx with diclofenac, a drug Merck had reason to believe was cardiotoxic, Merck could not, in my opinion, rely on the supposed absence of a signal in these data to support its claim that Vioxx presented no increased cardiovascular risk relative to non-naproxen NSAIDs.

102.    If one is interested in investigating the cardiovascular safety of a drug, it makes little sense to test that drug against another drug that you have reason to believe could be cardiotoxic.    It makes even less sense to claim that the results of this comparison are "reassuring" when those results suggest that the two drugs pose roughly equivalent cardiovascular safety risks (assuming, of course, the comparison's power allows you to even make that claim in the first instance).    Yet, this is precisely what Merck did when it presented its non-naproxen NSAID comparator data, 70% of which was drawn from studies controlled by diclofenac.[135]

103.    On March 24, 2000, three days before Merck issued its first press release announcing the VIGOR results, Merck consultant Dr. Garret FitzGerald emailed Merck scientist Dr. Alan Nies, forwarding the results of an as-yet unpublished study by Luis Garcia-Rodriguez of the effect of various NSAIDs on the rate of myocardial infarction.[136]    Apart from concluding that naproxen did not significantly affect MI rates,[137] the study also concluded, according to FitzGerald, that "diclofenac tended to be worse 1.66 (0.99-2.76)."[138]    However, the individual results for each of the NSAIDs, including diclofenac, were never presented in the final Garcia-Rodriguez article published later the same year.[139]    Merck knew these individual results would not be published.[140]

104.    Another Merck consultant, Dr. Carlo Patrono, a study author, provided Merck with unpublished estimates of the effect of individual NSAIDs on MI with results stratified by current use greater than two months and current use greater than one year.[141]    The former

---

[135] PX611 at MRK-ABK0460849.

[136] PX 87.

[137] MRK-ABK0428132 (a March 29, 2000 memo discussing unpublished Garcia-Rodriguez data; Jim Bolognese wrote in the top corner "ASA protective of cv events – NSAIDs not." Len Oppenheimer, another Merck statistician and Bolognese's supervisor, wrote, "Jim, A pretty sad paper – Len").

[138] MRK-ABK0494756; MRK-ACF0003791-93; MRK-ACF0003955-57; PX 87.

[139] MRK-ABK0307174-80.

[140] MRK-AFQ0009865.

[141] MRK-ACF0003791-93; MRK-ACF0003955-57; MRK-AAB0006080-105.

analysis estimated MI risk for diclofenac at 1.8 (1.2-2.6); the latter at 1.7 (1.0-2.8). Note that the non-naproxen NSAID trials were almost all less than one year.[142]

105.    Accordingly, even assuming Merck could have interpreted its non-naproxen NSAID data as showing other NSAID comparators were similar to Vioxx (which it could not), because the majority of the data used a comparator Merck had reason to believe was cardiotoxic, Merck should not, and could not, have taken comfort from such an analysis.

## 6.4    Evidence of Cardiovascular Risk in the Arthritis Studies

106.    While evidence available to Merck showed that its non-naproxen NSAID data was underpowered and biased by diclofenac, the Company's arthritis data nevertheless yielded an adverse cardiovascular signal against Vioxx. Merck had plans to pool its placebo controlled arthritis data -- data which provides a highly relevant measure of Vioxx's cardiovascular risk in the population most likely to take the drug -- and an analysis per Merck's plans shows a significant increase in adverse cardiovascular events against Vioxx. Likewise, Merck's non-naproxen NSAID data shows a statistically significant increase in investigator reported adverse cardiovascular events.

### 6.4.1    CV Risk in Placebo Controlled Arthritis Trials

107.    Merck failed to disclose the results of its prespecified analysis pooling OA and RA arthritis placebo controlled data, an analysis which was the most relevant measure of Vioxx's cardiovascular risk. Analyses of these data pursuant to at least three different Merck-created strategies show that Vioxx was associated with a significant increase in cardiovascular risk versus placebo in arthritis patients – the population to whom Vioxx was predominantly prescribed. Evidence available to Merck suggests that such an analysis should have been performed. Indeed, such an analysis *was* performed using data available to Merck as early as May 2002; this analysis showed a statistically significant increase in cardiovascular risk adverse to Vioxx, but, to my knowledge, it was never disclosed.

108.    Below, I explain why it would have been evident to Merck that a pooled analysis of the placebo controlled arthritis studies ought to be performed, and then detail the results of such an analysis according to different Merck strategies, showing that each one yields a significant and important adverse cardiovascular signal against Vioxx.

### 6.4.1.1 A Pooled Analysis of Merck's Placebo Controlled Arthritis Data Should Have Been Reported Because it Provided a Highly Relevant Measure of Vioxx's Real Word Cardiovascular Risk, was Pre-specified, and Behaved Differently From the Rest of the Placebo Controlled Data

109.    There are three reasons Merck should have reported an analysis of its pooled placebo controlled arthritis data. First, Merck had planned to perform such an analysis in the fourth quarter of 2001. Second, placebo-controlled data provides the best measure of a drug's safety or efficacy, and, with respect to Vioxx, helps resolve any ambiguities surrounding the interpretation of VIGOR resulting from that trial's use of an active comparator. Moreover,

---

[142] *Id.*

because Vioxx was primarily prescribed for treatment of the symptoms of arthritis, placebo controlled data in an arthritic population would give the most meaningful measure of Vioxx's real world cardiovascular risk.  Third, around the time its planned analysis was to be performed, Merck actually observed that the on drug arthritis data behaved differently from the rest of its placebo controlled data (i.e., the Alzheimer's data), and, accordingly, should have analyzed and reported these on drug data separately.

110.    Vioxx was most commonly used to treat patients with arthritis[143] and "OA [Osteoarthritis] plus RA [Rheumatoid Arthritis] . . . captures [the] largest segment of [the] chronic use population, covering [a] broad spectrum of CV risk, and therefore [has] the greatest relevance to clinical practice."[144]  In designing a Vioxx versus placebo study comparing the incidence of heart attacks and strokes, "[i]deally, you'd go into patients with osteoarthritis and rheumatoid arthritis and you'd put them on Vioxx or placebo."[145]

111.    Merck's pre-VIGOR "Analysis Strategy for the Incidence of Serious Thromboembolic Events in COX-2 Specific Inhibitor Program" pre-specified a pooled analysis of placebo controlled OA and RA studies in the fourth quarter of 2001.[146]  Merck actively considered studies of its COX-2 inhibitors in combined OA and RA populations[147] and, in fact, carried out pooled OA and RA cardiovascular analyses on multiple occasions.[148]  I also note that Merck frequently relied on pooled analyses of arthritis trials of at least four weeks duration to examine various issues related to Vioxx: "we used the pooled analyses as one of the important pieces of evidence to understand how Vioxx compared to placebo and other drugs."[149]

112.    Apart from the fact that a pooled analysis of Merck's placebo-controlled arthritis trials was pre-specified, an additional rationale obviously motivating such an analysis is that a placebo-controlled comparison in the patient population most relevant to practice would resolve any ambiguity in interpreting the VIGOR result stemming from that trial's use of an active comparator.[150]

113.    Because VIGOR had an active rather than placebo control, Merck argued, "it was not possible to make a determination, based on the VIGOR study alone, whether naproxen was having a beneficial cardiovascular effect, or whether Vioxx was having a detrimental

---

[143] TRANS 0005035, at 237, 288.

[144] MRK-ABH0022309 at MRK-ABH0022313.

[145] MRK-SHAA0799987 at MRK-SHAA0800174.

[146] PX 333 at MRK-AAB0059400 (providing for a placebo analysis of "block 2," composed of Merck OA and RA studies).

[147] PX 618 at MRK-AFO0021489 and PX 349 at MRK-AOJ0006986

[148] MRK-ZAF0001251.rtf, MRK-ZAF0000194.rtf, MRK-ZAF0000198.rtf, MRK-ZAF0001088.rtf.

[149] TRANS 0005035 at page 204-205.

[150] In fact, insofar as naproxen represented an existing well-established alternate therapy to Vioxx, VIGOR provided important safety data of direct relevance to clinical practice. Nonetheless, I will focus here on placebo-controlled trials.

cardiovascular effect."[151] In the context of VIGOR, Merck acknowledges the central role of the placebo-controlled trial:

> "[T]he best way to understand the absolute safety of a medicine is to compare it to placebo, which is a sugar pill, and which should act neutral . . . . You don't know [in VIGOR] if VIOXX was increasing the rate of heart attacks or naproxen was decreasing the rate of heart attacks. And the thing that could help you out is if you knew what VIOXX looked like versus placebo, a sugar pill which you know would be neutral."[152]

114.    The notion that randomized placebo-controlled trials represent a gold standard is well supported by the scientific literature but also frequently emphasized by Merck personnel:

- "a carefully designed and conducted, a placebo-controlled trial, randomized controlled trial, is the gold standard approach to answering the question of whether you have a small increased risk on top of a relatively common background,"[153]

- "placebo controlled trials are really the gold standard and provide us with a much different level of evidence,"[154]

- placebo-controlled trials are "considered by . . . [b]asically the industry and the FDA and most everyone" as the gold standard for studying drugs,[155]

- "Merck had accrued placebo-controlled data, which the scientists within Merck all agreed was the gold standard for what we were trying to understand about the cardiac effects of Vioxx."[156]

115.    Yet another reason to perform a pooled analysis of the arthritis placebo controlled data is that these data, in Merck's analyses, trended in a different direction than Merck's remaining placebo controlled data (i.e. the Alzheimer's data), and, therefore, should have been analyzed separately. Even if standard statistical heterogeneity tests did not prohibit a pooling of arthritis and non-arthritis studies, such analyses ought to have been done, at the very least as a type of sensitivity analysis.

116.    Merck personnel observed that the Company's on drug placebo-controlled arthritis data behaved differently from its on drug placebo-controlled Alzheimer's data. An August 2001 email from Briggs Morrison to Shapiro, Reicin, and others shows that at least some Merck personnel were aware that the OA and RA results ought to have raised concerns. Morrison observed that in Merck's rheumatoid arthritis trials and osteoarthritis trials, Vioxx

---

[151] MRK-ABI0013863 at MRK-ABI0013866 (former Merck CEO Ray Gilmartin's testimony before the Senate Finance Committee, November 18, 2004).

[152] MRK-SHAA0813314 (Alise Reicin, *Humeston v. Merck*, Trial Tr. January 31, 2007), p. 1876.

[153] TRANS 0003052 (Peter Honig Deposition, August 8, 2005), pp. 293-94.

[154] MRK-SHAA0636047 (Nancy Santanello Deposition, August 10, 2004), p. 64.

[155] MRK-SHAA0571914 (Alan S. Nies Deposition, March 2, 2005), pp. 183-84.

[156] MRK-SHAA0525027 (Laura Demopoulos Deposition, February 17, 2006), p. 16.

showed a relative risk of 1.78 and 1.53, respectively, versus placebo.[157]   In the placebo controlled Alzheimer's data, meanwhile, the relative risk was approximately 0.68.  Morrison asks "RR's are qualitatively different in RA/OA vs Alz  . . . . Is alz [Alzheimer's] the outlier?"  Moreover, Morrison observes that the relative risks observed in the placebo-controlled arthritis data closely approximate the naproxen-controlled arthritis data, which showed relative risks of 1.74 and 1.5 in RA and OA, respectively, against Vioxx.  Morrison remarks, "[i]t is striking how consistent the RR is in RA for rofe[coxib] vs placebo and rofe[coxib] vs nap[roxen]; the same is true in OA (is OA non-nap NSAIDs the outlier?). It seems to me an equally reasonable interpretation is that it is rofe[coxib] vs any comparator."  Finally, he observed a relative risk of 0.79 for non-naproxen-NSAID controlled OA trials.

117.   Morrison comments on a particular statement in a draft of the Konstam et al. meta-analysis, namely, that there was "no evidence that Vioxx was associated with excess CV events compared with either placebo or non-naproxen NSAIDs," and writes, in light of his observations, "that seems wishful thinking, not a critical interpretation of the data." Nevertheless that statement appears in the published version of the paper.

118.   In my opinion, the data triggering Morrison's observations make it even more critical and important to pool the placebo-controlled arthritis data, as Merck had prespecified, to further investigate whether placebo controlled data in the very population to whom Vioxx was to be marketed had a prothrombotic effect.

119.   Indeed, Morrison was not alone in concluding that these data impelled a separate analysis of the placebo-controlled arthritis data.   A peer reviewer of the Konstam et al. manuscript also commented on the difference between the RR in the OA and RA studies and the RR in the Alzheimer's studies. [158]  However, the peer reviewer could not have known that Merck's original, pre-specified plan was to analyze the OA and RA studies in a pooled study block[159] and that the Alzheimer's studies were added to the "pool" only after Merck had unblinded the results in March 2000.[160]   Equally, the reviewer would not have known the Alzheimer's data as presented obscured a significant CVT problem evident in those studies. Internally, Merck routinely considered pooled OA and RA analysis. [161]

120.   Likewise, in a review completed in March 2001, FDA statistician Qian Li noted that the relative risk ratios for the OA and RA indications were in the opposite direction from the Alzheimer's indication.[162]   In a similar vein, on May 16, 2002, the APPROVe ESMB also noted that in pooled analyses of Vioxx clinical trials, the hazard ratio for APTC events for Vioxx versus placebo "varied between the Alzheimer trials and the other (primarily arthritis) trials."[163]

## 6.4.1.2 Merck's Placebo Controlled Arthritis Data Shows a Significant Difference in Adverse Cardiovascular Events Against Vioxx

---

[157] PX 610.

[158] MRK-ACC0000028.

[159] PX 342.

[160] MRK-AAB0000975.

[161] *See, e.g.,* MRK-ACD0101888, zaf0001088.rtf, zaf0000198.rtf, and zaf0000194.rtf.

[162] FDACDER008400 at FDACDER008416.

[163] PX 644 at MRK-AFO0258926.

121.    I examine Merck's pooled placebo-controlled arthritis data using three different strategies for pooling such data, based on the ways in which Merck internally grouped it.  I conclude that each strategy generated from internal Merck documents shows that Vioxx is associated with significantly increased cardiovascular risk versus placebo in the arthritis data, the data that were most relevant to assessing Vioxx's real world cardiovascular risk.  Merck itself observed such an elevated risk after performing an analysis of its placebo controlled arthritis data.[164]  To my knowledge, Merck never shared that analysis, though it had performed it in preparation for an upcoming meeting with regulators.[165]

122.    I have scientific concerns about Merck's reliance on "on drug" analysis of Vioxx clinical trials. However, for the arthritis studies, given their short-term nature, the "on drug" events are sufficient to demonstrate increased risk, and these studies gathered very limited data about subsequent events. Therefore I will essentially follow Merck's approach to this analysis. Three particular documents guide my approach: (1) Merck's 2003 Rofecoxib Cardiovascular Combined-Analysis Update[166]; (2) the Bolognese analysis of January 2005;[167]  and (3) Merck's January 1999 Merck's "Analysis Strategy for the Incidence of Serious Thromboembolic Events in COX-2 Specific Inhibitor Program" ("The 1999 Plan").[168]

123.    Merck's "Table 13" of the 2003 CV Combined-Analysis Update tabulated cardiovascular events in the OA and RA studies.  Merck's Table 13, which contained placebo-controlled Vioxx studies of at least four weeks duration, omitted study 10 and study 17 as well as the placebo-controlled Vioxx studies that also included Celebrex arms (112, 116, 219, 220). The four studies with Celebrex arms were omitted "because they did not provide comparisons of Vioxx to nonselective NSAIDs" (Combined-Analysis Update, page 5). However, these studies did have placebo arms.  I do not know why studies 10 and 17 were omitted.  Neither Bolognese nor Dr. Edward Scolnick were able to explain the omission of these six studies from the CV Updates in their previous depositions.  Since the CV Combined-Analysis Update calls for the inclusion of placebo-controlled studies of at least four weeks duration, all six of these studies should have been included under Merck's Statistical DAP for the Meta-analysis of cardiovascular events.[169]  Therefore, I include them in my primary analysis. I also report a secondary analysis where I omit these studies.

---

[164] PX 624.

[165] *Id.*; Bolognese Tr. at 190:8-23.

[166] MRK-AFV0363600.

[167] PX 348.

[168] PX 333.

[169] Sept. 9, 2000 "Statistical Data Analysis Plan for Meta-Analysis of Cardiovascular Event Rates in COXIB Projects," MRK-AFL0004983, MRK-AFL0004986-4987; Oct. 13, 2000 Memo "Thrombotic CV Events DAP," MRK-AAD0046104, MRK-AAD0046109; Aug. 5, 2002 memo, "Periodic Update Strategies for Pooled Analysis of CV events in COXIB projects," MRK-AFL0003978, MRK-AFL0003984.

Table 13
Relative Risk and Associated 95% CI
TCVSAE Endpoint
Results Tabulated by Rofecoxib Studies
Placebo Controlled Data Set

| Study Block | Study No. | Rofecoxib | | | Placebo | | | Relative Risk[§] (95% CI) |
|---|---|---|---|---|---|---|---|---|
| | | N | Cases/PYR[†] | Rate[‡](95% CI) | N | Cases/PYR[†] | Rate[‡](95% CI) | |
| RA | PN 068 | 332 | 2/49.05 | 4.08 (0.49, 14.73) | 168 | 0/24.46 | 0.00 (0.00, 15.08) | |
| | PN 096 | 459 | 4/97.01 | 4.12 (1.12, 10.56) | 301 | 0/58.02 | 0.00 (0.00, 6.36) | |
| | PN 097 | 612 | 0/136.55 | 0.00 (0.00, 2.70) | 299 | 0/62.14 | 0.00 (0.00, 5.94) | |
| | 098+103 | 219 | 0/54.87 | 0.00 (0.00, 6.72) | 221 | 1/56.21 | 1.78 (0.05, 9.91) | |
| | All RA | 1622 | 6/337.48 | 1.78 (0.65, 3.87) | 989 | 1/200.83 | 0.50 (0.01, 2.77) | 3.57 (0.43, 164.23) |
| OA | PN 029 | 378 | 3/45.60 | 6.58 (1.36, 19.23) | 145 | 0/16.32 | 0.00 (0.00, 22.61) | |
| | PN 033 | 446 | 2/65.69 | 3.04 (0.37, 11.00) | 69 | 1/9.45 | 10.59 (0.27, 58.99) | |
| | PN 040 | 486 | 1/72.37 | 1.38 (0.03, 7.70) | 74 | 0/10.67 | 0.00 (0.00, 34.57) | |
| | PN 044 | 381 | 4/154.02 | 2.60 (0.71, 6.65) | 177 | 0/52.01 | 0.00 (0.00, 7.09) | |
| | PN 045 | 388 | 3/156.97 | 1.91 (0.39, 5.59) | 194 | 3/60.96 | 4.92 (1.01, 14.38) | |
| | PN 058 | 174 | 1/21.08 | 4.74 (0.12, 26.43) | 52 | 0/6.14 | 0.00 (0.00, 60.07) | |
| | PN 083 | 98 | 0/20.95 | 0.00 (0.00, 17.61) | 100 | 0/21.16 | 0.00 (0.00, 17.43) | |
| | PN 085 | 424 | 1/61.31 | 1.63 (0.04, 9.09) | 208 | 0/27.88 | 0.00 (0.00, 13.23) | |
| | PN 090 | 390 | 5/56.26 | 8.89 (2.89, 20.74) | 196 | 0/26.92 | 0.00 (0.00, 13.70) | |
| | PN 136 | 399 | 1/95.36 | 1.05 (0.03, 5.84) | 816 | 0/200.79 | 0.00 (0.00, 1.84) | |
| | All OA | 3564 | 21/749.62 | 2.80 (1.73, 4.28) | 2031 | 4/432.29 | 0.93 (0.25, 2.37) | 2.84 (0.97, 8.38) |
| ALZ | PN 078 | 723 | 38/1360.87 | 2.79 (1.98, 3.83) | 728 | 36/1550.97 | 2.32 (1.63, 3.21) | |
| | PN 091 | 346 | 4/292.48 | 1.37 (0.37, 3.50) | 346 | 12/366.52 | 3.27 (1.69, 5.72) | |
| | PN 126 | 380 | 6/185.70 | 3.23 (1.19, 7.03) | 376 | 5/191.47 | 2.61 (0.85, 6.09) | |
| | All ALZ | 1449 | 48/1839.04 | 2.61 (1.92, 3.46) | 1450 | 53/2108.96 | 2.51 (1.88, 3.29) | 1.03 (0.70, 1.53) |
| OTH | PN 118 | 102 | 0/14.52 | 0.00 (0.00, 25.41) | 58 | 0/8.42 | 0.00 (0.00, 43.83) | |
| | PN 120 | 252 | 1/27.72 | 3.61 (0.09, 20.10) | 128 | 0/13.77 | 0.00 (0.00, 26.79) | |
| | PN 121 | 210 | 0/23.35 | 0.00 (0.00, 15.80) | 100 | 0/10.85 | 0.00 (0.00, 34.00) | |
| | PN 125 | 89 | 0/23.39 | 0.00 (0.00, 15.77) | 83 | 0/21.73 | 0.00 (0.00, 16.98) | |
| | PN 129 | 8 | 0/3.47 | 0.00 (0.00, 106.43) | 9 | 0/4.38 | 0.00 (0.00, 84.16) | |
| | All | 661 | 1/92.44 | 1.08 (0.03, 6.03) | 378 | 0/59.15 | 0.00 (0.00, 6.24) | - |
| ALL COMBINED | | 7296 | 76/3018.58 | 2.52 (1.98, 3.15) | 4848 | 58/2801.23 | 2.07 (1.57, 2.68) | 1.26 (0.89, 1.78) |

OA = Osteoarthritis, RA = Rheumatoid Arthritis, ALZ = Alzheimers Studies, OTH = Other Studies
[†] Patient-years at risk.
[‡] Per 100 patient-years.
[§] Relative risk to placebo using Cox model where the number of cases is at least 11; otherwise, relative risk is a ratio of rates.

**Figure 2.** Merck's "Table 13" from the 2003 Safety Update Report (MRK-AFV0363599)

124.    In Merck's "Table 13" of the 2003 CV Combined-Analysis Update, Merck stated it included all serious confirmed thrombotic events in studies where an adjudication process was in place, and all investigator-reported thrombotic events in studies where an adjudication process was not in place. I proceed in this manner, including also the confirmed events from the Celebrex studies and all three events from protocols 10 and 17 (two transient ischemic attacks and one acute myocardial infarction during the placebo-controlled phase of 17). Table 6 (third row) and Figure 3 (Kaplan-Meier curves) show the analysis of the complete collection of 21 trials. The estimated risk ratio is 2.75 and the difference between Vioxx and placebo is statistically significant at conventional levels (i.e., a p-value of 0.05 or below). The OA and RA

40

trials, taken as a whole, clearly show that in arthritis patients, Vioxx is associated with an increased risk of cardiovascular thrombotic events.

**Table 6**. CVT events in the OA and RA trials. LPO denotes the date of the "last patient out" in the collection of trials considering only the placebo-controlled phase of mutli-phase trials. N denotes the number of events.  PYR denotes the patient years at risk.

| | | Vioxx | | Placebo | | | |
|---|---|---|---|---|---|---|---|
| Study Block | LPO | N | PYR | N | PYR | Relative risk & 95% CI | p-value |
| The 1999 plan | 7/21/00 | 10 | 427 | 1 | 252 | 5.2 (1.0, 130.1) | 0.05 |
| Merck "Table 13" | 2/5/02 | 27 | 1087 | 5 | 633 | 3.1 (1.3,9.2) | 0.01 |
| all 21 trials | 11/24/03 | 32 | 1304 | 6 | 692 | 2.8 (1.2,7.4) | 0.01 |

125.    Row two of Table 6 (labeled "Merck 'Table 13'") restricts the analysis to only those trials that Merck included in its Table 13 – the results are qualitatively similar, showing a highly significant cardiovascular risk associated with Vioxx.

126.    Under Merck's January 1999 plan for the analysis of CV events (referenced above), adjudicated events in specific OA and RA trials were to be pooled in "Block 2." These trials were OA studies 083, 085, and 090, along with RA studies 096, 097, 098, and 103. Row one of Table 6 shows the analysis of these studies, which is also statistically significant.

127.    Note that the point estimates for the relative risks using each of these three approaches is quite high, 5.2, 3.1, and 2.8, respectively.  Thus, despite the modest power in these data to detect risk increases of the magnitude observed in VIGOR or smaller, they were able to reveal substantially larger adverse cardiovascular signals against Vioxx.

128.    Prior to the APPROVe study, Merck's standard statistical practice was to employ a Cox model whenever there were at least 11 events *in total* (see, for example, MRK-AFV0363608). Applying the eleven-events-in-total rule to Table 6 (i.e. using Cox models) makes little qualitative difference. I note that using a Cox model, the OA studies alone in Merck's Table 13 do not reach statistical significance (RR=2.84 (0.97,8.38)). However, using a binomial-based approach (see Section 1.3) in place of the Cox model yields statistical significance (RR=2.93 (1.11,10.31)). Whether these intervals include one or just fail to include one is not especially important here; the point is that despite the short duration and small size of these studies (i.e., their low power), the safety signal in the OA studies *alone* should have caused great concern.



**Figure 3**. Kaplan Meier Curves for the OA and RA studies

129.     Next, I consider analyses Merck should have performed pooling all available OA and RA placebo-controlled data at various points in time (i.e. I break down my analysis of all 21 trials, above, by different time points, using only those studies that would have been available at that time). I consider the studies that had *concluded* (as measured by last-patient-out, i.e., the date of the last patient visit) by December 31st of each year from 1997 through 2004. For the multi-phase studies I am using the last-patient-out date of the placebo-controlled phase.[170] Table 7 shows the results. Certainly by the end of 2000, an ominous trend had emerged, especially in light of the VIGOR results available to Merck by early March 2000, as by that time, the relative risk for adverse cardiovascular events on Vioxx just barely misses statistical significance.

130.     As a sensitivity analysis, Table 8 shows analysis of the OA and RA studies using two other possible approaches. Merck "Table 13" + IR includes all the events included in Merck's "Table 13" plus investigator-reported events for the studies not included in Merck's "Table 13" (i.e., 10, 17, 112, 116, 219, and 220), whereas my previous analyses included only confirmed events from the omitted studies. "Confirmed+IR" includes all the confirmed events in the OA and RA studies plus investigator-reported events off-drug in those studies, and investigator-reported events in the non-adjudicated studies. The results are qualitatively the same as those presented above and paint a disturbing picture of the CVT effects of Vioxx. The point is that no matter how you view the placebo-controlled arthritis data, an adverse cardiovascular signal against Vioxx emerges.

---

[170] At least in some cases, Merck analyzed placebo-controlled phase data while the later phases proceeded. *See, e.g.,* MRK-AFO0034918; MRK-AWC0001803.

**Table 7**. OA and RA. Temporal Analysis of CVT events. N denotes the number of events. PYR denotes the patient years at risk. The studies included in each year are: **1997**: 10, 17, 29, 33, 40; **1998**: 44, 45, 58; **1999**: 68, 85, 90; **2000**: 83, 96, 97, 98, 103, 112, 116; **2002**: 136; 2003: 219, 220.

| End Date for Study | Vioxx | | Comparator | | Relative risk & | |
|---|---|---|---|---|---|---|
| inclusion | N | PYR | N | PYR | 95% CI | p-value |
| 31-Dec-1997 | 9 | 207 | 1 | 50 | 2.4 (0.4,56.0) | 0.4 |
| 31-Dec-1998 | 17 | 539 | 4 | 169 | 1.4 (0.5,4.8) | 0.6 |
| 31-Dec-1999 | 25 | 706 | 4 | 248 | 2.2 (0.8,7.5) | 0.1 |
| 31-Dec-2000 | 31 | 1173 | 5 | 475 | 2.4 (1.0,6.9) | 0.06 |
| 31-Dec-2001 | no additional data | | no additional data | | | |
| 31-Dec-2002 | 32 | 1268 | 5 | 676 | 3.4 (1.4,9.8) | 0.005 |
| 31-Dec-2003 | 32 | 1304 | 6 | 692 | 2.8 (1.2,7.4) | 0.01 |

**Table 8**. OA and RA. CVT events using Merck's events.

| Definition | Vioxx | | Comparator | | Relative risk & | |
|---|---|---|---|---|---|---|
| | N | PYR | N | PYR | 95% CI | p-value |
| Merck "Table 13" + IR | 31 | 1304 | 6 | 692 | 2.7 (1.2,7.2) | 0.02 |
| Confirmed + IR | 29 | 1304 | 7 | 692 | 2.2 (1.0,5.4) | 0.06 |

131.    In 2005, Merck performed a pooled analysis of the placebo controlled arthritis data – data which had been available to Merck since mid-2002 – and observed a statistically significant increase in adverse cardiovascular events associated with Vioxx.[171]  On January 21, 2005, Merck statistician James Bolognese submitted an analysis of CVT events in the OA and RA studies in Merck's Table 13 of Merck's 2003 Rofecoxib Cardiovascular Combined-Analysis Update (i.e., not including 10, 17, and the Celebrex studies) to Ned Braunstein and others.[172] He reported that "Rofe[coxib] OA & RA seem numerically different from other coxib data (etori[coxib] and valde[coxib]) & from non-arthritic rofe[coxib] data for TCVSAE [thrombotic CV serious adverse event] events." He showed that for the OA studies in Merck's Table 13 (i.e., excluding protocol 10 and the celecoxib studies) plus the "Other" studies in Merck's Table 13, the RR estimate is 3.21 with a 95% confidence interval of (1.11, 9.25). The "Other" studies are protocols 118, 120, 121, 125, and 129 and make a modest contribution to Bolognese's calculation. In fact, as Merck recognized, omitting the "Other" studies and employing

---

[171] PX 624

[172] *Id.*

43

Bolognese's statistical method[173] yields an RR estimate of 3.0 and a 95% confidence interval of (1.04, 8.82).[174]

132.   These findings were circulated and discussed within Merck. Bolognese's results were shared with Merck's entire "core team" and some of its executives, who were members of the "champions team."[175] In addition, Bolognese's calculations were discussed at meetings preceding the FDA advisory Committee meeting on February 16, 2005.[176] Bolognese testified that his calculations showed a "statistically significant" increase in thrombotic CV events in Merck's placebo-controlled osteoarthritis and rheumatoid arthritis studies.[177]

133.   As far as I know, Merck never made Bolognese's calculations public and never published the Merck Table 13 pooled analyses data upon which these calculations were based.[178] Moreover, although Bolognese was asked to perform this analysis in preparation for an upcoming meeting with the FDA Advisory Committee, I have seen no evidence that it was shared with the Committee.

134.   Merck's internal placebo-controlled arthritis data made clear long before Bolognese's 2005 analysis that Vioxx increased cardiovascular risk in that population.  The VIGOR paper[179] was published on November 23, 2000, and stated that an earlier paper and "unpublished data" "revealed similar rates of myocardial infarction in all groups," but failed to report CVT events more generally. In fact, all the OA and RA studies that concluded in 2000 had concluded by November 23. The cumulative data at that time revealed a Vioxx estimated risk of 2.6 CVT events per 100 patient years at risk as compared with a placebo estimated risk of 1.1 events per 100 patient years at risk, a risk ratio of 2.4, and a close to statistically significant difference between Vioxx and placebo. This could have been made clear in the VIGOR paper.

135.   Reicin, et al.,[180] looked at investigator-reported CVT events but only for six relatively early placebo-controlled OA studies (protocols 029, 033, 040, 044, 045, and 058) in addition to two active comparator-controlled studies (protocols 034 and 035). In fact, at the time the Reicin et al. paper was submitted (July 2, 2001), the completed placebo-controlled OA studies included protocols 10, 083, 085, 090, 112, and 116, and the estimated relative risk was 1.9 with a 95% confidence interval of (0.7, 6.5).  This contrasts with Reicin's estimated RR of 0.94 (0.31, 2.92). When the Weir et al paper was submitted (May 13, 2002), the completed OA studies also included protocol 136, and the estimated relative risk was in fact 3.1 with a 95% confidence interval of (1.2, 10.7).  This contrasts with Weir et al.'s estimated RR of 1.06 (0.34, 3.23). In

---

[173] Contrary to Merck's usual practice, Bolognese's calculations did not employ Cox models.

[174] MRK-AFO0269248.

[175] TRANS 0005035 at 254:5-22.

[176] TRANS 0005035 at 321:11-322:10.

[177] Bolognese Tr. 192:18-23.

[178] TRANS 0005035 at page 319:8-320:3.

[179] PX 109.

[180] MRK-AAB0016187 (A. Reicin, et al., *Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with Rofecoxib versus nonselective nonsteroidal antiinflammatory drugs. (Ibuprofen, Diclofenac and Nabumetone,* 89 Am. J. Cardiol. at 204-209 (2001)).

short, the meta-analyses of the OA studies distorted the analysis by failing to include all the relevant data.[181]

136.    I note that when Merck reported cardiovascular thrombotic events in studies that pre-dated adjudication, its analyses departed from the pre-specified definition in a variety of ways. For example, Table 21 in the FDA Advisory Committee background document includes angina pectoris, coronary vasospasm, and coronary artery disease. The 2003 SUR also includes coronary artery disease and angina pectoris. I note that on October 4th, 2001, Merck cardiologist DiBattiste said in an email to Truitt, Shapiro, and Barr "angina and angina pectoris are two of the more abused diagnoses in cardiology practice."[182] A February 3, 2003 email from Jennifer Ng to Amarjot Kaur notes angina pectoris as a discrepancy between the data analysis plan for protocol 203 and the SOP.[183]

### 6.4.2    CV Risk in Non-Naproxen NSAID-Controlled Arthritis Trials

137.    On a number of occasions Merck presented comparisons of Vioxx with non-naproxen NSAIDs in the arthritis trials – for example, the Konstam meta-analysis and the 2003 CV Safety Update Report. These analyses purport to show a lower rate of cardiovascular events on Vioxx as against the NSAID comparator using APTC events (Konstam) and a modest and non-significant increased rate when using CVT events (2003 SUR, Table 16). In fact, using the CVT definition specified in the CV SOP, my analysis shows a statistically significantly increased CVT risk on Vioxx as compared with non-naproxen NSAIDs in the arthritis trials – see Table 9. This risk was statistically significant as early as December 31, 1999.

**Table 9.** Investigator-reported CVT events in NSAID-controlled arthritis trials using all available data. N denotes the number of events. PYR denotes the patient years at risk.

| | Vioxx | | Non-Naproxen NSAIDs | | | |
|---|---|---|---|---|---|---|
| **Study Block** | **N** | **PYR** | **N** | **PYR** | **Relative risk & 95% CI** | **p-value** |
| Osteoarthritis | 55 | 2791 | 14 | 1439 | 2.14 (1.18, 3.89) | 0.01 |

### 6.5    The Cardiovascular Safety Data From Merck's Alzheimer's Studies Did Not Support the Company's Claim that Vioxx Posed No Greater Cardiovascular Risk than Placebo

138.    Merck relied heavily on the absence of a cardiotoxicity signal in its placebo controlled data, driven overwhelmingly by its Alzheimer's trials,[184] to bolster the claimed safety

---

[181] MRK-ADY0006153 (M. Weir, et al., *Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program,* 146 Am. Hrt. Jour., 591-604 (2003)).

[182] PX 351.

[183] MRK-AFL0024099.

[184] The Alzheimer's trials consist of protocols 078, 091, and 126. Protocol 078 was by far the largest with a combined 2,601 patient years. Next came protocol 091, with a combined 659

of Vioxx. For example, Eliav Barr testified that "obviously the placebo-controlled data provides a clean examination of rofecoxib versus placebo, and the presence or absence of a signal, particularly in the Alzheimer's trial was – was important."[185]   Merck consultant Dr. Marvin Konstam, in a presentation to the FDA after VIGOR was withdrawn, stated that "the most valuable data are the placebo controlled data."[186]   Likewise, the Weir, et al., meta-analysis concludes that "the placebo-controlled Alzheimer trials showed that rofecoxib had a CV safety profile comparable to placebo." In several press releases, starting from March of 2000 through August 2001, Merck cited to both the OA and RA and Alzheimer's data as "confirming" the absence of a CVT risk, and therefore, supporting the hypothesis that naproxen's "cardioprotective effect" explained the result in VIGOR.[187] The Konstam, et al., meta-analysis notes that in their Vioxx-placebo comparison, the majority of the patients came from the Alzheimer's studies "whose populations included predominantly elderly, male patients." Remarkably, the paper states that these data "are most reassuring that there is no evidence for any increased risk of CV thrombotic events with rofecoxib." The Weir, et al., meta-analysis concludes that "the placebo-controlled Alzheimer trials showed that rofecoxib had a CV safety profile comparable to placebo."

139.   Like Merck's placebo-controlled arthritis data, Merck's placebo-controlled Alzheimer's data were not sufficiently robust to support the proposition for which Merck cited them: that there was no difference in cardiovascular risk between Vioxx and placebo. First, as I will demonstrate below, the Alzheimer's data were underpowered to detect meaningful differences less than a doubling in cardiovascular events; and the data were not adequately powered to detect even a doubling in cardiovascular risk until approximately March of 2001 (one year after Merck's March 27, 2000 press release), the same time Merck began to observe *an affirmative* adverse safety signal in its Alzheimer's mortality data, driven by cardiovascular death (discussed below). Second, the Alzheimer's trials were rife with "competing risks," such as conversion to Alzheimer's disease and death, that would tend to drown out an adverse cardiovascular signal on Vioxx. Accordingly, Merck could not rely on the supposed absence of a significant difference in the incidence of adverse cardiovascular events between Vioxx and placebo to support its claim that Vioxx posed no more cardiovascular risk than placebo.

140.   Moreover, as with the arthritis data, Merck failed to report pre-specified analyses that in fact did demonstrate a clear signal of cardiotoxicity in the Alzheimer's trials. Indeed, when Merck finally presented the actual results of its interim analyses of cardiovascular risk in

---

patient years.  Protocol 126 was canceled early and had only 378 patient years. *See, e.g.,* MRK-AHY0364795-MRK-AHY0364796.

[185] Barr Tr. at 72:7-15; *see also id.* at 70:10-13 ("the placebo-controlled trials were really quite important in providing those – that – defining that evidence for us").

[186] MRK-PUBLIC0000590 at MRK-PUBLIC0000865 to MRK-PUBLIC0000866.

[187] *See, e.g., supra,* n. 104; *see also*  PX 258 at MRK-PRL0000115 ("An extensive review of safety data from all other completed and ongoing trials, as well as the post-marketing experience with Vioxx, showed no indication of a difference in the incidence of thromboembolic events between Vioxx, placebo and comparator NSAIDS."); PX 236 at MRK-AKU0066190 ("Extensive review of data from the completed osteoarthritis and on-going clinical trials with Vioxx, as well as post-marketing experience with Vioxx, have shown no difference in the incidence of cardiovascular events, such as heart attack, among patients taking Vioxx, other NSAIDs and placebo.").

the Alzheimer's trials, it presented the results of its "on drug" analysis only, which it knew skewed results in Vioxx's favor.

### 6.5.1   Power in the Alzheimer's Studies

141.   Merck's internal analyses revealed the limited power of the Alzheimer's studies to rule out a meaningful increase in cardiovascular risk on Vioxx as compared with placebo.  For example, an email[188] from Shapiro to Reicin and others on March 16, 2000 computes power in the Alzheimer's data as only 54% for a 50% reduction.  Equivalently, she observed there is a 46% chance "that you could miss a 50% reduction."

142.   Shapiro also calculated the power of the Alzheimer's data to detect other apparently meaningful magnitudes of difference in between-arm adverse cardiovascular events, from reductions of 30% (corresponding to an approximately 43% increase in risk on Vioxx) to 70% (corresponding to more than a tripling of the risk on Vioxx) on the placebo.[189]  The results of the analyses show that for cardiovascular risk increases smaller than a doubling, the chance of missing a signal was as high as 81% (to detect a 43% increase in risk) to a 65% chance of missing (for a 66% increase in risk on Vioxx).  Recall that Merck concluded that, after accounting for (a generous estimate of) the putative cardioprotective effect of naproxen in VIGOR, there was still a 45% unexplained risk increase that could be due to Vioxx's cardiotoxic effects.[190]  Thus, Merck knew it should have been looking for risk increases smaller than a doubling (and perhaps especially around 45%) in order to rule out an increased cardiovascular risk on Vioxx and support the Company's oft-repeated claim that Vioxx posed no greater cardiovascular hazard than placebo.

143.   Moreover, even for increases larger than a doubling, but smaller than a 333% risk increase on Vioxx, Shapiro's analysis showed that the power of the Alzheimer's data still fell well short of the 80% to 90% level that is standardly used as a measure of adequate robustness to reliably detect absence of an effect.[191]

144.   Merck's outside consultants likewise agreed that the Alzheimer's data were too few and too small to be able to rule out meaningful adverse cardiovascular effects of Vioxx or to support the claim that Vioxx's cardio-hazard was equivalent to placebo.  Again, Professor Zeger explained that "there were only a total of . . . 32 and 40 events in the Alzheimer program.  Hence, the relative risk confidence intervals mostly ranged on the order of +- [plus/minus] 50% of the estimated value.  Hence, these data could not establish that the relative risk was close to 1.0 [indicating equivalence of cardiovascular risk – i.e. cardiovascular neutrality] with any certainty, even in comparison of the lower dose (25) to placebo or non-naproxen NSAID."[192]

---

[188] PX 337.

[189] MRK-AAB0120451.

[190] PX 349 at MRK-AOJ0006965.

[191] *See* Bolognese Dep. Tr. at 48:7-17; D. Altman, *Statistics and Ethics in Medical Research III How large a sample?"* 281 BMJ, at 1336-1338 (1980).

[192] PX 628 at MRK-AF00273769.

145.     Likewise, at an October 30, 2000 meeting, Merck's outside consultants told Merck that the placebo controlled data had "no power to see 30% increase/decrease."[193] Again, Dr. Carlo Patrono told Merck, "No data are comforting as there are very few events. Period." And, Merck consultant Dr. John Oates testified that the "early [Alzheimer's] data" did not "yet have the power" to detect an adverse cardiovascular signal for Vioxx, and "it was only after you got out to a later time point that," the point at which the Alzheimer's trials finally had enough events to approach the kind of power required to detect meaningful cardiovascular signals, "that, all of a sudden, the risk of Vioxx became evident," just as it eventually did in the APPROVe trial. [194] [195]

146.     Again, my analyses quite clearly illustrate Dr. Oates' assessment, and confirm that the Alzheimer's data lacked sufficient power to rule out meaningful increases in cardiovascular risk on Vioxx as compared with placebo, especially in the wake of the VIGOR trial. Table 10 shows the power to detect different true relative risks at various critical timepoints. Even power to measure a true doubling of the risk only begins to approach standard thresholds of 80% or 90% as of March 16, 2001 (and, even then, power is not quite adequate). Thus, the Alzheimer's trials were not powered to detect a difference in cardiovascular events of the magnitude observed in VIGOR until almost a year after its March 27, 2000 press release announced that Merck's review of its placebo controlled data showed "no indication of a difference" in cardiovascular risk between Vioxx and placebo. The power to detect meaningful increases in cardiovascular risk less than a doubling of the risk remains inadequate throughout. Thus the absence of a signal in any Alzheimer's analysis at best suggests that Vioxx might not more than double the risk of CVT events, but provides no scientifically reliable assurance vis-à-vis potential smaller increases. Moreover, by the time the Alzheimer's trials accumulated enough data to detect a doubling of risk, Merck had already begun to affirmatively observe an adverse cardiovascular signal in the data, as detailed below.

---

[193] PX 695 at MRK-AF00273769.

[194] Oates Tr. at 152:2-10.

[195] Juni, et al., (P. Juni et al., *Discontinuation of Vioxx*, 365 The Lancet 23, 26 (2005)), point out that the APPROVe trial was underpowered to adequately detect differences in cardiovascular risk for the first 18 months of the trial. MRK-AFO00279697. Dr. James Neaton, an outside consultant to Merck and member of the APPROVe safety monitoring board, similarly said, "at the outset of Approve [sic] it was felt that there would be limited power in Approve to detect a difference in CVD endpoints over the entire follow-up period." JDN02378.

48

**Table 10**.  Approximate power for different combinations of true relative risk at different time points using Shapiro's procedure outlined in PX 337 and MRK-AAB0120451.

| True Relative Risk Date | 1.25 | 1.5 | 1.75 | 2.0 |
|---|---|---|---|---|
| March 11, 2000 Analysis of Cardiovascular Events in the Alzheimer's trials[196] | 5% | 15% | 29% | 46% |
| September 15, 2000 Cutoff for FDA Advisory Comm. Presentation | 8% | 23% | 45% | 67% |
| March 16, 2001 Labeling cutoff | 10% | 29% | 55% | 77% |
| November 6, 2001 Konstam published | 11% | 34% | 63% | 84% |
| Conclusion in 2003 | 13% | 39% | 69% | 89% |

147.     As with the arthritis studies, I also calculated the power two other ways – using a Monte Carlo procedure taking patient years at risk into account and via a Cox model-based procedure (alluded to by Mr. Bolognese[197]) using the powerSurvEpi package in R, but the numbers never varied by more than 1-3%.

148.     To highlight the inadequate power in the Alzheimer's trials, significant compliance problems existed in those studies generally, and in 078 in particular. Only 10.9 percent of the patients on Vioxx and 16.2 percent of patients on placebo remained on their study drug for the entire study period.  Only 61 percent of patients on Vioxx took at least 80 percent of their assigned tablets, and 25.8 percent of these patients took the drug less than 60 percent of the time.[198] Likewise, Merck recognized that few Vioxx patients, only about 40%, actually completed the study on drug.  Merck statisticians questioned the integrity of the results in light of this finding, asking "[h]ow valid are the results given the low study completion rate

---

[196] *See, e.g.*, PX 5 (Reines).
[197] PX 336.
[198] MRK-I2690008544 at MRK-I2690008591-92, MRK-I2690008629, MRK-I2690008662.

'on drug' of 40.4%."[199]   Moreover, 078 was prematurely terminated 11 months prior to its scheduled end.  All these concerns point towards diminished power.

### 6.5.2  "Competing Risks" and "Informative Censoring"

149.    The Alzheimer's trials were also rife with competing risks, especially affecting protocol 078, the largest, by far, of the three Alzheimer's trials, having approximately the same number of patients enrolled as the remaining two combined, and more than four times the number of patients as protocol 091 and more than six times the number of patient years as protocol 126.[200]   A "competing risk" is an event *other than* the event of interest that disproportionately affects one arm of the study in a way that deprives the observer of the opportunity to observe an event of interest that might have otherwise occurred.   In the Alzheimer's studies, and in 078 in particular, three types of events *other than* adverse cardiovascular events caused significantly more at-risk Vioxx patients to discontinue (either drug therapy or the study altogether), thus depriving the Vioxx arm of potential adverse cardiovascular events: (1) discontinuation due to adverse events, particularly hypertension and edema; (2) conversion to Alzheimer's disease; and (3) death.

150.    Treatment discontinuation due to adverse events generally occurred at a higher rate on Vioxx patients than for placebo patients in the Alzheimer's trials (RR=1.36, p=0.0007), potentially biasing cardiovascular safety findings in favor of Vioxx.

151.    Of particular importance, significantly more Vioxx patients discontinued due to hypertension and edema than placebo patients (RR=2.73, p=0.02).   Merck's own consultants expressed concern that hypertension associated with Vioxx might be connected to the increased incidence of cardiovascular events observed in VIGOR, and instructed Merck to "monitor BP" closely.[201,202]   Because Merck's meta-analysis of placebo-controlled data analyzed only events occurring while a patient was "on drug," a cardiovascular event suffered by a patient who discontinued (again, either therapy, or even the study altogether) because they were experiencing high blood pressure while on Vioxx would have been ignored.

152.    Similarly, the study protocol for protocol 078 discontinued patients that reached the primary endpoint, conversion to Alzheimer's disease.   In protocol 078, significantly more patients on Vioxx converted to Alzheimer's disease than patients on placebo.   Specifically, 107 Vioxx patients converted to Alzheimer's disease, and were therefore discontinued from the study, compared with 82 patients on placebo.   Furthermore, patients who converted were significantly older at baseline than those who did not (average age 76.4 versus 74.8, p=0.0004) and were thus at higher risk of experiencing a CVT event.   Again, in my view, this competing

---

[199] PX 296.

[200] MRK-AHY0364796.

[201] *See, e.g.*, PX 330; PX 721.

[202] I note that in the Alzheimer's studies, blood pressure "spikes" were associated with increased risk of CVT events. Patients with spikes (any post-baseline systolic blood pressure greater than 160 mmHg or diastolic blood pressure greater than 100 mmHg) had a 28% higher rate of CVT events (investigator-reported, ITT) than those without. Furthermore, 28.6% of Vioxx patients experienced a blood pressure spike whereas only 22.8% of placebo patients experienced a spike, a statistically significant difference. *See, e.g.*, MRK-AGO0028236.

risk was problematic, as it disproportionately "deprived" the Vioxx arm of potential cardiovascular events on drug. Merck employees specifically noted that conversion to Alzheimer's disease was a risk that competed with the risk of adverse cardiovascular events in Vioxx patients.[203]

153.    Moreover, as discussed below, Merck's analyses also revealed that Vioxx patients in the Alzheimer's trials were significantly more likely to die than patients on placebo (61 deaths on Vioxx versus 34 deaths on placebo, RR= 1.91, p=0.003).  Furthermore, patients who died were significantly older at baseline than those who did not (average age 78.2 versus 74.9, p<0.0001) and were thus at higher risk of experiencing a CVT event.  Again, as with other competing risks, because this risk disproportionately affected Vioxx patients, it created a risk that the Vioxx arm was being disproportionately "deprived" of cardiovascular events, thus biasing any comparison of cardiovascular risk towards finding no difference.

154.    The existence of substantial competing risks in the Alzheimer's trials significantly handicapped Merck's analysis of its placebo-controlled data – a handicap that could have been at least partially mitigated by an ITT analysis of these data.  Such an analysis performed with investigator reported data, as I explain below, shows a statistically significant increase in cardiovascular risk against Vioxx in the Alzheimer's trials.  In any event, Merck could not, and should not, have pointed to the data from these studies as demonstrating that Vioxx posed no more cardiovascular risk than placebo, when so many competing risks in the Alzheimer's trials worked to bias the data towards finding no result.

155.    Additional problems also biased the Alzheimer's trials towards finding no difference in terms of cardiovascular events.  As discussed in more detail below, at least as of May 1, 2001, Merck learned that the "assumption of non-informative drug discontinuation" – the assumption that drug discontinuation has no effect on your risk of experiencing an adverse event – was violated with respect to mortality in the Alzheimer's trials, and that, indeed, "patients who discontinued [Vioxx] had greater risk of death than those who stayed on [Vioxx]."[204] The assumption of non-informative discontinuation is one of the key analytic assumptions underlying the statistical analyses of randomized controlled clinical trials.  As Dr. Chen testified, violation of non-informative censoring means that discontinuation is not "independent of the event you're going to observe,"[205] that "probably this assumption is not right, and the validity of the conclusion [of the on drug analysis], that is something in question," and that the "validity of these results from this [on drug] report could be impacted."[206]  Merck scientist Patrick Davish reported similar concerns in the context of the APPROVe study.[207]

156.    The violation of "non-informative censoring" potentially biases results in favor of Vioxx insofar as cardiovascular events experienced after drug discontinuation are more likely to be in the Vioxx arm, which Merck analyses revealed was the case for, at a minimum,

---

[203] MRK-AFO0266137 at MRK-AFO0266138.
[204] PX 295 at MRK-JAK0013198.  Indeed, Merck internally concluded that the difference in all-cause mortality was driven, in part, by cardiovascular death.  PX 31 at MRK-JAF0019843.
[205] Chen Tr. at 118:10-12.
[206] Chen Tr. at 123:12-22.
[207] MRK-AFV0400668.

mortality.[208] Moreover, this concern is amplified by my previous peer-reviewed finding (published with colleagues in the *Archives of Internal Medicine*) that in Study 078, the cardiovascular risk persisted after Vioxx discontinuation.[209] Baron et al. also concluded "Study data are compatible with an early increase in [cardiovascular] risk that persists for one year after stopping treatment."[210] An internal memorandum from 2001 also raises concerns about non-informative censoring with regard to the primary endpoint.[211]

157.    The assumption of non-informative discontinuation was violated in yet another way in the Alzheimer's studies. Merck designed all three of the Alzheimer's studies as ITT studies and collected follow-up data regardless of whether the patient was continuing to take the study medication. This follow-up, however, was incomplete. For example, in 078, only 16.1% of the Vioxx patients completed the full 48 months of study participation as against 20.2% of the placebo patients.[212] Again, this violates the assumption that discontinuation is distributed at random, and, again, works to bias the studies in Vioxx's favor.

158.    Finally, starting in the aftermath of VIGOR, Study 078 was repeatedly unblinded leading to questions about study integrity. A February 2002 email[213] from Scott Reines to Alise Reicin and others states, "[o]ur experience with the Alzheimer's data has shown that it's virtually impossible to maintain true in-house blinding at the group level once we do the analyses."

159.    In my opinion, these issues skewed Merck's on drug Alzheimer's trial data towards finding no difference in cardiovascular risk between Vioxx and placebo, and constitute yet another reason that these data cannot support Merck's claim that Vioxx posed no more cardiovascular risk than placebo.

## 6.6    Merck's Use of the APTC Endpoint Also Confounded the Company's Analyses of Its Non-Naproxen Comparator Data

160.    Despite the existence of a standard operating procedure and a pre-specified definition of a CVT event, when Merck finally reported the results of its analyses of cardiovascular risk of Vioxx versus non-naproxen NSAID comparators, it did so using a post-hoc endpoint, called the "APTC" endpoint that, again, understated Vioxx's cardiovascular risk and failed to give a "pure" measure of Vioxx's cardiotoxicity.[214]

161.    The Antiplatelet Trialist's Collaboration ("APTC") endpoint was developed by researchers and practitioners interested in weighing the cardioprotective properties of aspirin (prevent thrombotic adverse events) against its risks (inducing adverse bleeding events) in order to assess whether to recommend prophylaxis for groups at various risks for thrombotic

---

[208] PX 295 at MRK-JAK0013198.

[209] J. Ross et al., *Persistence of Cardiovascular Risk After Rofecoxib Discontinuation?* 170 Arch. of Int. Med., at 2035-2036, (2010).

[210] J. Baron, et al., *Cardiovascular events associated with rofecoxib: final analysis of the APPROVe trial*, 372 The Lancet, at 1756-1764 (2008).

[211] MRK-JAF0017856, MRK-JAF0017857 at MRK-JAF0017860, MRK-JAF001787.

[212] MRK-I2690008544 at MRK-I2690008627.

[213] MRK-AFO0115744.

[214] *See, e.g.*, PX 334; MRK-SHAA1596832 at MRK-SHAA1596837; MAK00300.

events.[215]  As Deborah Shapiro testified, the APTC endpoint "was a mix of what would be both a benefit and a risk, hemorrhagic stroke is a risk for aspirin."[216]  Thus, the APTC endpoint was never designed as a pure measure of cardiovascular risk.

162.     Despite internal concerns about the appropriateness of the APTC endpoint to assess cardiovascular risk (see below), by October 2000, Merck had decided upon APTC events as the primary endpoint for its pooled clinical study analyses of cardiovascular events. At that time, Merck scientists "recognized that inclusion of bleeds in the primary [APTC] endpoint could reduce assay sensitivity to detect negative effects of COXIBs since Vioxx has been shown to reduce GI bleeds."[217] Merck also acknowledged that APTC "[i]ncludes 'bleeding' endpoints which mixes risk/benefit (could be seen as a pro since this could work in our favor)."[218] Crucially, this discussion concerning switching endpoints from the pre-specified CVT definition in the SOP takes place *after* Merck analyzed data from at least 10 arthritis studies, as well as VIGOR and the March 2000 unblinding of the Alzheimer's studies 078 and 091. Dr. Shapiro testified[219] that "our consultants all wanted us to use option 2 [APTC] because then we could be compared - we could compare our results to outside data, the aspirin trials" although it is unclear why such a comparison to a known cardioprotective drug would be useful.  She further testified that "we still did option 1 [CVT] as a second - we still did that analysis" but Merck failed to report this analysis in the EULAR and Konstam publications.[220]

163.     Moreover, the APTC endpoint had not been included in the original program-wide cardiovascular monitoring protocol the VIGOR safety monitoring board made Merck finalize before allowing them to unblind VIGOR.[221]   This alone undermines the scientific integrity of the APTC endpoint in subsequent Vioxx analyses. Noting in March 2004 the APTC endpoint's "'exclusion' of relevant endpoints," Merck's Dr. Barry Gertz asked, "[s]hould we be gently pulling them away from the APTC endpoint as the be all and end all?" Alise Reicin responded: "I think [Barry Gertz's] point is valid . . . ."[222]

## 6.7     Evidence of CV Risk in the Alzheimer's Studies

164.     While, in the wake of the VIGOR trial, Merck's Alzheimer's data was underpowered to detect meaningful differences in adverse cardiovascular events, and while the trials remained afflicted by competing risks and the violation of the non-informative assumption of discontinuation, which worked to skew the on drug data from these trials towards showing no difference in the incidence of CVT, these trials nevertheless yielded an adverse cardiovascular signal against Vioxx.

---

[215] Ross, et al., *Pooled Analysis of Rofecoxib Placebo Controlled Clinical Trial Data: Lessons for Postmarket Pharmaceutical Safety Surveillance*, 169 Arch. of Int. Med. 1976-1984. (2009).
[216] Shapiro Tr. at 207:8-11.
[217] MRK-AQI0006159 at MRK-AQI0006168.
[218] MRK-ADD0137223 at MRK-ADD0137225.
[219] Shapiro Tr. at 205:23.
[220] *See,e .g.,* MRK-SHAA1596832 at MRK-SHAA1596837; MAK00300.
[221] PX 136; PX 795.
[222] MRK-AFO0240034 at MRK-AFO0240035.

165.    First, I examine Merck's prespecified ITT mortality endpoint, which, according to Merck's own analyses showed that (1) Vioxx significantly increased the risk of death in the Alzheimer's studies, (2) the assumption of non-informative drug discontinuation (that drug discontinuation is unrelated to the risk of experiencing an adverse event) was violated with respect to mortality and that, indeed, patients who discontinued Vioxx had a greater risk of death than those who remained on Vioxx, and (3) the elevated risk of death on the Vioxx arm of the Alzheimer's studies was, in part, driven by cardiovascular death. In my opinion, Merck's analyses demonstrated that an ITT analysis of cardiovascular death data was of critical importance to understanding Vioxx's true cardiovascular risk. After reviewing these ITT data, Merck created a new endpoint rather than disclose the ITT analyses.

166.    Second, even putting aside the fact that Merck pre-specified ITT analyses of its safety data, Merck's analyses described in the preceding paragraph would have highlighted the necessity of performing an ITT analysis of cardiovascular mortality. In my opinion, based on the mortality analyses the record reveals Merck had in hand, any competent investigator would attempt to determine whether the difference in the incidence of cardiovascular mortality follows the same trend as all cause mortality and becomes significant as against Vioxx in the ITT data. My analysis of Merck's mortality data in the Alzheimer's trials shows that Vioxx significantly increases the risk of cardiovascular mortality in Alzheimer's patients. For patients in the combined 078 and 091 studies, the two largest Alzheimer's trials, my ITT analysis shows a statistically significant increase in cardiovascular mortality against Vioxx as of September 29, 2000. When protocol 126, the prematurely halted study, is combined with the two central Alzheimer's studies, my ITT analysis shows a statistically significant increase in cardiovascular mortality against Vioxx as of June 2001.

167.    Finally, in my opinion, these analyses would have indicated to Merck that Vioxx's cardiovascular risk persisted after drug discontinuation, and that any analysis that ignored events occurring in patients after discontinuation of therapy would fail to reflect Vioxx's true cardiovascular risk. Accordingly, Merck should have adjudicated and analyzed all cardiovascular events in the Alzheimer's trials, both off drug and on drug, fatal and non-fatal events. An analysis of investigator reported CVT events, the only data for which an ITT analysis of CVT is possible, shows that Vioxx is associated with a significant increase in cardiovascular risk.

### 6.7.1   The Alzheimer's studies were ITT studies

168.    As discussed above, Merck designed all three of the Alzheimer's studies to collect follow-up data regardless of whether the patient was continuing to take the study medication. This design facilitates an "intention-to-treat" or "intent-to-treat" (ITT) analysis.

169.    Merck's Data Analysis Plan (DAP) for 078[223] called for an ITT analysis as well as an on drug analysis that ignores events occurring more than 14 days after cessation of study medication:

> Two approaches will be used for AE [adverse event] summary. First, a primary analysis will include all AEs when patients are on treatment and up to 14 days following discontinuation of test therapy. Second, a summary based on intention-

---

[223]PX 14 at MRK-AFS0002006.

to-treat will include all AEs regardless of on or off study therapy. Each safety subsection will present the on drug results followed by the respective ITT results.

170. The DAPs for 091 and 126 contain substantially similar language calling for an ITT analysis of safety.[224]

171. Merck also referred to 078, 091, and 126 as "ITT designs in which patients were encouraged to remain in the study whether or not continuing study medication."[225] Merck statistician Deborah Shapiro in a January 2001 email to Eliav Barr, Alise Reicin, Ned Braunstein and others refers to the Alzheimer's studies as "true ITT and data were collected long after discon[tinuation]."[226] Gilbert Block testified that ITT was the pre-specified analysis for the Alzheimer's studies.[227]

172. Merck's published reports of the Alzheimer's studies generally provide an "on drug" analysis and fail to report an ITT analysis. However, potential mechanisms exist whereby Vioxx could cause cardiovascular adverse events beyond a 14-day limit. Dr. Steven Nissen of the Cleveland Clinic made a similar point at the joint meeting of the FDA's Arthritis Advisory Committee and the FDA's Drug Safety and Risk Management Advisory Committee in February 2005 (page 188): "[A] cardiovascular hazard, if this is a pro-atherogenic therapy, is going to persist quite a while after you stop the drug." More recently, Baron et al.[228] state: "For chronic disease endpoints, such as myocardial infarction and stroke, we cannot assume that a high risk will dissipate within a few weeks of the end of treatment. If a drug has lingering effects or needs a latent period before an effect becomes evident, then an on-treatment analysis can provide only an incomplete picture of its toxicity." Consequently, I believe that on drug analyses, while of interest, are insufficient concerning the primary questions about Vioxx's safety, which is what Merck knew or should have known at the time given its inclusion of ITT for safety analyses.

173. It is apparent that some Merck scientists held a similar viewpoint. Deborah Shapiro, wrote in an email "it is traditional and considered valid to do true ITT cardiovascular trials and we typically would not delete events that occurred >14 days after the last dose of study therapy."[229] As noted above, Gilbert Block previously testified that ITT was the pre-specified analysis for the Alzheimer's studies. In early 2004, the APPROVe external safety monitoring board (ESMB) specifically asked Merck for ITT safety data from the Alzheimer's studies. It is unclear if the ESMB ever received these safety data. A transcript of the 2005 FDA Advisory Committee Meeting indicates that several panelists were disturbed by the absence of ITT data.[230] There was consensus that these data were important to understanding CV safety and should have been provided. Finally, in the original protocols for 078 and 091, ITT was the only specified analysis of safety and efficacy.[231] Though later amendments to the 078 protocol kept

---

[224] *See* PX 362.

[225] MRK-S0420050655 at MRK-S0420050656.

[226] PX 353.

[227] MRK-SHAA0498564 at MRK-SHAA0498768-69.

[228] Baron, et al., *supra*, n. 210.

[229] PX 352; PX 353.

[230] 2005-4090T1.pdf, p. 188 at http://www.fda.gov/ohrms/dockets/ac/05/transcripts/2005-4090T1.pdf.

[231] PX 13; PX 39.

ITT for efficacy and added on drug for safety, ITT results always remained in the protocol and were required to be presented along with on drug results. I note that because of incomplete follow-up, ITT has the potential to dilute any statistical signals[232]. This implicit conservativeness provides even more reason to find the results I present below alarming.[233]

### 6.7.2   All-Cause Mortality in the Alzheimer's Studies

174.   In early 2001, Merck observed a statistically significant imbalance in mortality against Vioxx in its Alzheimer's trials.  Specifically, Merck observed that patients taking Vioxx were more than twice as likely to die on Vioxx than they were on placebo.[234]  Merck also observed that "patients who discontinued [Vioxx] had greater risk of death than those who stayed on [Vioxx]."[235]  Additionally, Merck observed that the "imbalance in death in ALZ studies was driven by," among other things, "an imbalance in CV death."[236]  In my opinion, these observations alone would have indicated to Merck that Vioxx's cardiovascular risk persisted after drug discontinuation, and that any analysis that ignored events occurring in patients after discontinuation of therapy would fail to reflect Vioxx's true cardiovascular risk.

175.   Merck's analyses of all-cause mortality in early 2001 are important for at least three reasons.  First, all-cause mortality is itself relevant to cardiovascular risk, as a number of Merck scientists observed.[237]  Second, as discussed above, the imbalance in all-cause mortality (specifically, the fact that more than twice as many Vioxx patients were being eliminated from the Alzheimer studies than placebo patients) constituted a significant "competing risk" in Merck's analysis of CVT in the Alzheimer's trials with substantial potential to bias the results of this analysis towards showing no difference; this should have led Merck to doubt the claim that the Alzheimer's trials showed no difference between Vioxx and placebo in risk for cardiovascular events, generally.  Third, because Merck concluded that the risk of death was elevated in the Vioxx arm of the Alzheimer's trials and persisted long after drug discontinuation, and also concluded that the imbalance in death rates was driven, in part, by an imbalance in CV death, Merck should have analyzed cardiovascular death off drug.  Such analysis would have

---

[232] Friedman, *supra*, n. 15 at 145.

[233] Baron, et al., *supra*, n. 210, concluded that in the context of the APPROVe study, the risk of certain cardiovascular events persists for one year after stopping treatment. Specifically, Baron et al. report that "During the first year off treatment, 23 [APTC] events took place in the rofecoxib group and 12 in the placebo group (unadjusted HR (hazard ratio) 1.95, 0.97-3.93)." Ross, et. al., *supra*, n. 208, report similar cardiovascular risk persistence in Study 078. Furthermore, by contrast with the published on drug analysis of Bresalier et al., Baron et al.'s analysis that accounts for all recorded events, both on- and off-drug, shows no evidence of a delay in the onset of a Vioxx-associated risk after the start of treatment.

[234] *See, e.g.*, PX 25 at M RK-JAK0000973; PX 295.

[235] PX 295 at MRK-JAK0013198.

[236] PX 31 at MRK-JAF0019843.

[237] PX 306 (Chen et al., *Monitoring mortality at interim analyses while testing a composite endpoint at the final analysis,* 24 Controlled Clinical Trials 16-27 (2002))

demonstrated, as discussed below, that Vioxx patients faced a significantly greater risk of cardiovascular death than placebo patients.[238]

176.    The all-cause mortality endpoint considers all deaths regardless of the cause of the death. One attraction of the endpoint is that it requires no clinical judgment and is, in that sense, a "hard" endpoint. I note that in other contexts[239] Merck has relied on all-cause mortality as a primary endpoint.

177.    Merck assumed that the all-cause mortality endpoint was independently relevant to measuring cardiovascular risk. Eliav Barr, in preparation for Merck's February 2001 meeting with the FDA to discuss the VIGOR results, proposed a meta-analysis consisting of "all death, MI, and CVA," one analysis using confirmed events with another using investigator reported events, "instead of the APTC endpoint."[240] He stated, "[t]here can be no questions asked about an ALL DEATH substituting for CV Death in the endpoint."[241] Likewise, an early protocol for Douglas Watson's GPRD study included an all-cause mortality endpoint.[242]

178.    Moreover, because the Alzheimer's studies involved older patients than were enrolled in many of the other studies, the Alzheimer's studies had substantially higher mortality rates than many of the other studies, thus improving the studies' power to detect a true difference in mortality between Vioxx and placebo. Thus, the Alzheimer's studies presented a useful opportunity to examine risk of mortality, especially cardiovascular mortality, associated with Vioxx.

179.    At least as of January 29, 2001, Merck personnel observed an imbalance in death in the ITT Alzheimer's studies data. In an email to several senior Merck scientists, Deborah Shapiro observed "the [mortality] count not excluding late deaths was 30 rofe to 10 placebo." In what appears to be a contemporaneous document, judging from the mortality count, Scott Reines specifically observed, that in protocols 078 and 091 combined, there were "more CV deaths on Vioxx."[243] To evaluate these deaths, Merck conducted both on drug and ITT analyses

---

[238] Commenting on the all-cause mortality imbalance in the Alzheimer's studies, Merck has argued that "there was no pattern suggesting the deaths had any connection to Vioxx; some of the deaths were caused by car accidents, poisonings, infections and other causes that are not related to Vioxx." MRK-SHAA25451064-68 at MRK-SHAA25451066. Since Vioxx patients converted to Alzheimer's at a higher rate than placebo patients, it is not clear to me how Merck can rule out a possible causal effect of Vioxx.

[239] See e.g., Pedersen, et al., Follow-up study of patients randomized in the Scandinavian simvastatin study (4S) of cholesterol lowering, 86 American Journal of Cardiology, 257-262, (2000).

[240] PX 353.

[241] Id. (emphasis in original).

[242] MRK-AAD0054994.

[243] PX 12. In handwritten comments Reines states that "Alise [Reicin] looked @ 078 + 091 - more on [adverse cardiovascular events] on Vioxx but [using the] APTC [endpoint], less on Vioxx, but more CV deaths on Vioxx." I discuss Merck's post-hoc use of the APTC endpoint above. Here, a Merck employee appears to acknowledge the APTC endpoints dilutive effect on cardiovascular risk.

of all-cause mortality, and then broke these deaths down by body system, "focus[ing] on categories with discrepant distribution," including cardiovascular deaths.[244]

180.    On March 21, 2001, Merck performed an unblinded analysis of deaths in 091, both on drug (9 vs. 2) and ITT (14 vs. 3), leading to Chen's April 7, 2001 unblinded analysis of deaths in 078 and 091.[245]   Chen's ITT analyses reported a statistically significant increased mortality rate in both 091 and 078 individually and combined, whereas on drug deaths, while elevated, were not statistically significant.

181.    In preparation for the April 11, 2001 VIGOR advisory meeting, Merck prepared an analysis of ITT deaths in all three Alzheimer's studies showing 41 deaths on Vioxx and 24 on placebo.[246] On-drug deaths were listed as 25 on Vioxx and 12 on placebo (14 on placebo if the extension phase of 091 is counted). A summary circulated shortly thereafter shows 41 deaths on Vioxx and 22 deaths on placebo (both on and off drug), and, like the aforementioned report, 25 deaths on drug for Vioxx and 12 on placebo.[247]   That summary also lists ITT cardiovascular deaths as 16 on Vioxx versus 8 on placebo.[248]

182.    Merck scientists recognized that these differences in ITT mortality were significant, and, indeed, that Vioxx was associated with twice as many deaths as placebo in the Alzheimer's studies.  In reaction to Dr. Chen's March 2001 analyses of mortality, Scott Reines remarked in an email to Alise Reicin that "The good news here is that the on drug survival rate is not significantly different between Vioxx and placebo in Protocol 078 [again, the largest of the three studies by far].  ITT rates do differ significantly . . . ."[249]   Reicin responds by saying that ITT analysis should not be the primary safety analysis unless it was prespecified as primary.[250] Dr. Raymond Bain, a leading unblinded statistician working on the Alzheimer's trials, responded to Dr. Reicin, stating that "the supportive ITT approach provides additional information and maintains more of the randomized patients;" Dr. Bain also recited the Data Analysis Plans for the Alzheimer's protocols, noting that ITT analysis was designated as part of the safety analysis.[251]   Dr. Bain also noted, "the mortality hazard rate ratio of [Vioxx] to placebo was 2.31 (95% CI 1.09, 4.91) for the ITT analysis and 2.04 (95% CI 0.81, 5.12) for the "On Drug" analysis," and that, "[a]lthough the 'On Drug' analysis was not 'statistically significant' the estimated 2-fold increase in mortality requires evaluation."[252]

183.    Two and half months later, Dr. Bain reviewing a Safety Update Report to be filed July 12, 2001 with the FDA, remarked upon the absence of ITT mortality data.[253]   Once again, Dr. Reicin raises an issue with the inclusion of ITT analyses, this time in the Alzheimer's trials clinical study reports, once again she asks whether the data analysis plans "specify that ITT

---

[244] MRK-AFS0005860.

[245] MRK-ACR0040000; MRK-AAX0000710.

[246] MRK-AAD0122952 at MRK-AAD0122955.

[247] PX 364 at MRK-ACR0014749-53.

[248] *Id.*

[249] PX 25 at MRK-JAK0000974.

[250] *Id.*

[251] *Id.* at MRK-JAK0000974.

[252] *Id.* at MRK-JAK0000973.

[253] PX 34.

would be done for safety."[254]   Shortly after this exchange, Reicin announced that she and Merck scientist Scott Korn, "based on 'good clinical judgement [sic]'" had developed an entirely new endpoint: they would include deaths that occurred greater than 14 days after the cessation of study therapy if the "SAE [serious adverse event] which caused the death started within the 14 day window . . . ."[255]

184.   As explained above, when Merck developed the protocols and data analysis plans for the Alzheimer's trials, Merck prespecified ITT analyses for adverse safety events.[256]   As indicated by Dr. Bain's exchange with Dr. Reicin, while some Merck scientists recognized that the analyses set forth in the protocols and DAPs should be reported in connection with the interim mortality analyses in order to avoid the introduction of bias,[257] their advice was ignored. Moreover, when planning their interim mortality analyses, Merck intended, at least internally, to do ITT analyses for "all events, all patients" on the combined Alzheimer's data.[258]

185.   In my view, the endpoint Merck used to report mortality in its July 12, 2000 SUR (Merck called this the "On Drug SUR" endpoint), which Merck crafted after it had already unblinded the Alzheimer's mortality data, was illegitimate. The endpoint was not prespecified, appearing nowhere in the protocols. Moreover, even assuming it is legitimate to develop an endpoint post-hoc in order to communicate as much relevant information as possible, the endpoint Merck chose failed to communicate highly relevant information about the persistence of Vioxx's risk off-drug. Indeed, Dr. Chen had already observed by this point that "the assumption of non-informative drug discontinuation may not be true," and that "patients who discontinued [Vioxx] had greater risk of death than those who stayed on [Vioxx]." Thus, Merck's decision to rely on an endpoint that ignored these realities was scientifically unsound.

186.   The post-hoc On Drug SUR endpoint favored Vioxx remarkably well, as demonstrated in the table below (see Figure 4). This table was reproduced from an internal Merck presentation prepared by Ray Bain, titled "Summary of Mortality Analyses Vioxx Alzheimer's Disease, which summarized mortality data available to Merck at least as of the time it submitted its July 12, 2000 SUR."[259]   Only two kinds of death events are analyzed therein: all-cause mortality and cardiovascular death. The all-cause mortality data is reported along three endpoints: (1) ITT; (2) On-Drug; and (3) On-Drug SUR. In each of the five data pools, an unmistakable and obvious trend emerges with respect to the all-cause mortality data: the p-value of the difference against Vioxx is least significant using the On Drug SUR endpoint, substantially more significant using the On Drug endpoint, and substantially more significant using the ITT endpoint. For instance, in the pooled analysis of all three trials, a p-value of 0.026 is observed for the difference in On-Drug SUR all-cause mortality. As one moves to On Drug, that p-value almost halves (p = 0.015). But, as one moves from On Drug to ITT, the p-value becomes 0.001 –1/15 the size of the On Drug p-value and 1/26 the size of the On Drug SUR p-value. Again, this trend occurs in every one of the data pools, apart from protocol 126 alone.

---

[254] *Id.* at MRK-ARP0046935.

[255] *Id.* at MRK-ARP0046934.

[256] MRK-AFW0016006 at MRK-AFW00160023 - 24; MRK-AFW0016058 at MRK-AFW0016078.

[257] PX 25; PX 27.

[258] PX 27 at MRK-JAK0016071.

[259] PX 362.

With respect to protocols 078 and 091 individually, no significant difference is observed using the On Drug SUR endpoint, whereas significant differences are observed in the ITT endpoint.

Mortality Analyses: Results

| Protocol | Type | Outcome | MK-0966* | Placebo* | p-value (log-rank) | Crude Ratio** |
|---|---|---|---|---|---|---|
| 091 | On Study | All-Cause:0-12 | 13/346 (0.042) | 3/346 (0.009) | 0.010 | 4.67 |
| | On Study | All-Cause:0-15 | 15/346 (0.039) | 8/346 (0.020) | 0.142 | 1.95 |
| | **On Drug** | **All-Cause:0-12** | 9/346 (0.030) | 2/346 (0.006) | 0.028 | 5.00 |
| | On Drug | All-Cause:0-15 | 9/346 (0.030) | 4/346 (0.011) | 0.049 | 2.72 |
| | On Drug-SUR | All-Cause | 14/346 (0.046) | 8/346 (0.022) | 0.056 | 2.09 |
| | On Drug-SUR | CV | 3/346 (0.010) | 3/346 (0.008) | 0.xx | 1.25 |
| 078 | On Study | All-Cause | 21/723 (0.018) | 9/732 (0.007) | 0.015 | 2.57 |
| | **On Drug** | **All-Cause** | 13/721 (0.013) | 7/729 (0.006) | 0.10 | 2.17 |
| | On Drug-SUR | All-Cause | 15/721 (0.015) | 9/729 (0.008) | 0.12 | 1.87 |
| | On Drug-SUR | CV | 5/721 (0.005) | 2/729 (0.002) | 0.19 | 2.50 |
| 126 | On Study | All-Cause | 4/382 (- - -) | 4/376 (- - -) | - - - | - - - |
| | **On Drug** | **All-Cause** | 3/381 (- - -) | 3/376 (- - -) | - - - | - - - |
| | On Drug-SUR | All-Cause | 4/381 (0.024) | 3/376 (0.018) | 0.66 | 1.33 |
| | On Drug-SUR | CV | 2/381 (0.012) | 1/376 (0.006) | 0.55 | 2.00 |
| 078+091 | On Study | All-Cause | 34/1069 (0.023) | 12/1078 (0.008) | <0.001 | 2.87 |
| | On Drug | All-Cause | 22/1067 (0.017) | 9/1075 (0.006) | 0.008 | 2.83 |
| 078+091+126 | On Study | All-Cause | 38/1451 (0.023) | 16/1454 (0.009) | 0.001 | 2.56 |
| | **On Drug** | **All-Cause** | 25/1448 (0.017) | 12/1451 (0.007) | 0.015 | 2.43 |
| | On Drug-SUR | All-Cause | 33/1448 (0.022) | 20/1451 (0.012) | 0.026 | 1.83 |
| | On Drug-SUR | CV | 10/1448 (0.007) | 6/1451 (0.004) | 0.21 | 1.75 |

\* Number of events/number included in the analysis with the event rate per patient-year of follow-up in parentheses
\*\* Ratio (MK-0966/Placebo) of mortality event rates (per patient-year of follow-up)

**Figure** 4. Mortality and cardiovascular mortality analysis in the Alzheimer's trials from a presentation by Dr. Bain.

187.    With respect to cardiovascular mortality, Bain's presentation only shows results for the most favorable endpoint, On Drug SUR. Looking at this data and knowing that "imbalance in death in ALZ studies was driven by an imbalance in CV death,"[260] Merck would have had every reason to believe that cardiovascular mortality would follow the same trend as all-cause mortality, and that the statistical comparisons would become more significant against Vioxx using on drug and even more significant using ITT endpoints. Under such circumstances, it is my opinion that it is essential to investigate cardiovascular mortality along the ITT endpoint, especially in view of the fact that, as Bain admitted in his testimony, the Company had previously thought it important to perform, and did, in fact, perform, such analyses.[261]

188.    Table 11 shows that, consistent with Merck's 2001 interim analysis, there was a significant imbalance in all-cause mortality between Vioxx and placebo at the conclusion of the Alzheimer's studies in 2003. Figure 5 shows the corresponding KM curves.

---

[260] PX 31 at MRK-JAF0019843.

[261] Bain Tr. at 245:14-17 ("there was an interest in clearly understanding the event rate specifically to cardiovascular mortality"), *id.* at 234:23-236:3 (testifying that, at least before the submission of the VIGOR SUR, Merck did in fact analyze cardiovascular mortality on an ITT basis).

189.     An external Data and Safety Monitoring Board (DSMB) would surely have been alarmed at the developments in Figure 5. A DSMB is "an impartial group that oversees a clinical trial and reviews the results to see if they are acceptable. This group determines if the trial should be changed or closed.[262]" The National Institutes of Health guidelines on data and safety monitoring[263] state "The establishment of the data safety monitoring boards (DSMBs) is required for multi-site clinical trials involving interventions that entail potential risk to the participants." The original protocol for 078 called for a DSMB but Merck never put this in place. The record indicates that "Merck['s] clinical practice in large, long-term trials" during the time Vioxx was being developed and while it was on the market was to implement "an external Data and Safety Monitoring Board (DSMB)," which would "conduct[] unblinded interim safety analyses through the duration of the study."[264]

**Table 11.** Alzheimer's Studies all-cause mortality. N denotes the number of events.   PYR denotes the patient years at risk.

|  |  | Vioxx | | Placebo | |  |  |
|---|---|---|---|---|---|---|---|
| **Study Block** | **LPO** | **N** | **PYR** | **N** | **PYR** | **Relative risk & 95% CI** | **p-value** |
| 078+091 | 4/23/03 | 57 | 2061 | 29 | 2209 | 2.1 (1.3, 3.3) | 0.001 |
| all 3 trials | 4/23/03 | 61 | 2256 | 34 | 2408 | 1.9 (1.3, 2.9) | 0.002 |



**Figure 5.** Alzheimer's Studies ITT all-cause mortality.

[262] http://www.cancer.gov/dictionary?cdrid=522956.

[263] http://grants.nih.gov/grants/guide/notice-files/not98-084.html.

[264] http://www.webwire.com/ViewPressRel.asp?aId=34866#.UdV8sD5gZ4k.

### 6.7.3    Cardiovascular Mortality in the Alzheimer's Studies

190.    In view of the fact that Merck recognized its on drug analyses were flawed, that the risk of death was elevated in the Vioxx arm of the Alzheimer's trials and persisted long after drug discontinuation, and that the imbalance in death rates was driven by an imbalance in CV death, I now turn to an analysis of ITT cardiovascular mortality, an analysis that, in my opinion, was obviously essential to assessing Vioxx's true cardiovascular risk in the Alzheimer's trials. To summarize, I conclude that an ITT analysis of patients in the combined 078 and 091 studies, the two largest Alzheimer's studies (which Merck often analyzed separately, given that 126 was canceled prematurely)[265] shows a statistically significant increase in cardiovascular mortality against Vioxx as of September 29, 2000.  For all three of the Alzheimer's trials combined, my ITT analysis shows a statistically significant increase in cardiovascular mortality against Vioxx as of June 5, 2001.

191.    Since Merck did adjudicate all deaths in the Alzheimer's trials, it is possible to conduct an ITT analysis of *confirmed* cardiovascular mortality.[266]

192.    Table 12 shows such an analysis, providing estimated relative risks for (1) 078 and 091 combined (indicated by *) and (2) for all three Alzheimer studies combined at various timepoints. Together with co-authors, I published these findings on the *American Heart Journal* in 2012.[267]  I also calculate ITT cardiovascular mortality for additional dates here, showing the dates each analysis first achieves statistical significance, cutoff dates for internal Merck interim analyses of mortality, and the dates Merck submitted various responses to the FDA concerning mortality in the Alzheimer's studies.  I use the same methodology[268] and underlying data here that was peer-reviewed and published in the *AHJ*.

193.    I have also included December 11, 2000 as a relevant timepoint because this date appears on a screenshot of Merck's "Cardiovascular Card" posted on the Merck website.[269]  This card provides "total mortality" and "cardiovascular mortality" rates in the OA trials.  The Cardiovascular Card suggests, based on the OA data, that Vioxx poses 1/11 the risk of NSAIDs with respect to "total mortality" and 1/8 the risk of NSAIDs with respect to cardiovascular mortality.  In my opinion, it would have been highly informative to also show the mortality data from the Alzheimer's studies available to Merck on that date.

---

[265] *See, e.g.*, PX 364; PX 362

[266] I note that Merck criticized my previous analyses of investigator-reported events and claimed it had subjected such events to a more "accurate" and "rigorous" procedure that yielded events that "were confirmed by . . . blinded external adjudicators as thrombotic." Merck Statement on Article in The Archives of Internal Medicine Involving VIOXX, November 23, 2009, *available at*, http://www.evaluategroup.com/Universal/View.aspx?type=Story&id=200709, accessed July 12, 2013. My analysis of cardiovascular mortality, however, does focus on confirmed events, since, in the case of mortality, it is possible to do so on an ITT basis.

[267] Madigan, et al., *Under reporting of cardiovascular events in the rofecoxib Alzheimer Disease Studies,* 164 American Heart Journal 186-193, (2012).

[268] Martin, D. and Austin, H. *An efficient program for computing conditional maximum likelihood estimates and exact confidence limits for a common odds ratio,* 2 Epidemiology 359-362 (1991).

[269] MRK-99420024841 at MRK-99420025460.

194.    Keep in mind that throughout this period (and indeed throughout the time Vioxx was on the market), Merck maintained that there was no connection between the imbalance in deaths observed in the Alzheimer's trials and Vioxx's cardiovascular risk.[270] Table 12 refutes this claim, showing that an adverse cardiovascular signal was evident in the Alzheimer's mortality as of September 15, 2000, the cutoff for Merck's second pooled analysis of its placebo and non-naproxen NSAID data, respectively.   As early as this cutoff date, cardiovascular mortality is highly imbalanced against Vioxx, with the relative risk just barely missing the nominal 0.05 level of significance in both the 078+091 endpoints and in all three trials combined.

**Table 12.**  Confirmed ITT CVT deaths in the Alzheimer's studies as of significant dates. PYR denotes the patient years at risk. N denotes number of confirmed CVT deaths.

| | Rofecoxib | | Placebo | | RR & 95% confidence interval | p-value |
|---|---|---|---|---|---|---|
| Protocol | N | PYR | N | PYR | | |
| **09/15/2000 – Cutoff for Interim Analysis of Non-Naproxen Comparator Data** | | | | | | |
| 078 | 5 | 908 | 1 | 967 | 4.22 (0.98, 29.1) | 0.055 |
| 091 | 3 | 364 | 1 | 378 | | |
| 126 | 0 | 38 | 0 | 40 | | |
| 078+091+126 | 8 | 1310 | 2 | 1385 | 4.22 (0.98, 29.1) | 0.055 |
| **9/29/2000 – Significant Difference in 078+091** | | | | | | |
| 078 | 6 | 928 | 1 | 988 | 4.75 (1.13,32.2) | 0.031 |
| 091 | 3 | 367 | 1 | 381 | | |
| 126 | 0 | 44 | 0 | 46 | | |
| 078+091+126 | 9 | 1416 | 2 | 1339 | 4.75 (1.13,32.2) | 0.031 |
| **12/11/2000 – Date of the Printout of Merck's Website Touting Low Cardiovascular Mortality on Vioxx in the OA Trials** | | | | | | |
| 078 | 7 | 1025 | 2 | 1095 | 3.53 (1.02, 15.9) | 0.046 |
| 091 | 3 | 373 | 1 | 387 | | |
| 126 | 0 | 93 | 1 | 94 | | |
| 078+091+126 | 10 | 1490 | 4 | 1576 | 2.64(0.85, 9.71) | 0.097 |
| **03/16/2001 – Cutoff for Merck's Interim Analyses of Mortality in the Alzheimer's Trials** | | | | | | |
| 078 | 7 | 1140 | 2 | 1220 | 3.53 (1.02, 16.0) | 0.045 |
| 091 | 3 | 373 | 1 | 387 | | |
| 126 | 0 | 172 | 1 | 174 | | |

---

[270] PX 372 at MRK-AJA0012095.

| 078+091+126 | 10 | 1685 | 4 | 1781 | 2.58 (0.84,9.71) | 0.097 |

**06/5/2001 – Significant Difference in All Three Alzheimer's Trials**

| 078 | 9 | 1227 | 2 | 1318 | 4.26 (1.28, 18.8) | 0.016 |
| 091 | 3 | 373 | 1 | 387 | | |
| 126 | 0 | 195 | 1 | 197 | | |
| 078+091+126 | 12 | 1795 | 4 | 1903 | 3.18 (1.07, 11.4) | 0.037 |

**7/12/2001 – Merck Submits its 2001 Safety Update Report (claims there is no pattern in the mortality data suggesting causality)**

| 078 | 9 | 1264 | 2 | 1360 | 4.26 (1.28, 18.8) | 0.015 |
| 091 | 3 | 373 | 1 | 387 | | |
| 126 | 0 | 172 | 1 | 174 | | |
| 078+091+126 | 12 | 1832 | 4 | 1945 | 3.19 (1.07, 11.5) | 0.037 |

**9/26/2001 – The FDA's First Request for Mortality Data in the Alzheimer's Studies (Merck reports only On Drug SUR data for each of the three trials separately, showing no significant difference)**

| 078 | 11 | 1335 | 3 | 1440 | 3.74 (1.29, 13.2) | 0.013 |
| 091 | 3 | 373 | 1 | 387 | | |
| 126 | 0 | 195 | 1 | 198 | | |
| 078+091+126 | 14 | 1903 | 5 | 2025 | 2.99 (1.11, 9.25) | 0.030 |

**10/19/2001 - Merck's Second Response to the FDA's Request for Mortality Data (again, Merck submits only On Drug SUR data)**

| 078 | 11 | 1357 | 3 | 1464 | 3.74 (1.29, 13.2) | 0.013 |
| 091 | 3 | 373 | 1 | 387 | | |
| 126 | 0 | 195 | 1 | 198 | | |
| 078+091+126 | 14 | 1925 | 5 | 2049 | 2.99 (1.11, 9.25) | 0.030 |

**12/5/2001 –FDA's Third Request for Mortality Data (in response, Merck denies any connection between the imbalance in death against Vioxx and cardiovascular risk)**

| 078 | 12 | 1398 | 4 | 1510 | 3.22 (1.21, 9.88) | 0.018 |
| 091 | 3 | 373 | 1 | 387 | | |
| 126 | 0 | 195 | 1 | 198 | | |
| 078+091+126 | 15 | 1966 | 6 | 2094 | 2.67(1.06, 7.50) | 0.037 |

**04/11/2002 Date the Vioxx Label Approved (which discusses VIGOR and Alzheimer's data)**

| 078 | 14 | 1503 | 4 | 1625 | 3.65 (1.40, 11.1) | 0.007 |
| 091 | 3 | 373 | 1 | 387 | | |

| 126 | 0 | 195 | 1 | 198 | | |
|---|---|---|---|---|---|---|
| 078+091+126 | 17 | 2071 | 6 | 2211 | 2.97 (1.22,8.37) | 0.015 |
| | | | | | | |
| **Completion (April 2003)** | | | | | | |
| 078 | 17 | 1689 | 4 | 1823 | 4.29 (1.68, 12.8) | 0.001 |
| 091 | 3 | 373 | 1 | 387 | | |
| 126 | 0 | 195 | 1 | 198 | | |
| 078+091+126 | 20 | 2257 | 6 | 2408 | 3.57 (1.48,9.72) | 0.004 |

195.    Merck performed interim analyses with cutoff dates of September 15, 2000, and March 16, 2001. For all three Alzheimer's studies combined, as of September 15, 2000, there were 8 confirmed CVT deaths on rofecoxib vs. 2 on placebo, RR = 4.22, p = 0.055. As of March 16, 2001, 10 confirmed CVT deaths were reported on rofecoxib vs. 4 on placebo, RR = 2.58 p = 0.097. By April 11, 2002, the date major new rofecoxib labeling was approved following VIGOR (which mentioned both the VIGOR and Alzheimer's trial data), 17 confirmed CVT deaths had been reported on rofecoxib vs. 6 in placebo, RR = 2.97, p = 0.015, on an ITT basis.

196.    At the conclusion of all the trials, 20 confirmed CVT deaths were reported on rofecoxib vs. 6 CVT deaths on placebo, RR = 3.57, p = 0.004 in the ITT populations in all three Alzheimer's studies combined. In Protocols 078 and 091, the Alzheimer's studies whose data were pooled and reported in rofecoxib labeling approved in April 2002, there were 20 confirmed ITT CVT deaths on rofecoxib vs. 5 on placebo, RR = 4.29 p = 0.001. In the ITT population in Protocol 078, 17 confirmed CVT deaths were reported on rofecoxib vs. 4 on placebo, RR = 4.59, p = 0.003.

197.    As discussed, when Merck developed the protocols and data analysis plans for the Alzheimer's trials, Merck prespecified ITT analyses for adverse safety events.[271] As discussed above, while some Merck scientists recognized that the analyses set forth in the protocols and DAPs should be reported in connection with the interim mortality analyses in order to avoid the introduction of bias, their advice was ignored.[272] Moreover, when planning their interim mortality analyses, Merck intended, at least internally, to do ITT analyses for "all events, all patients" on the combined Alzheimer's data.[273]

198.    Also as previously discussed, Merck crafted an illegitimate and entirely new endpoint after reviewing the mortality data and concluding that the ITT analysis was unfavorable to Vioxx. It was this endpoint that Merck consistently reported to the FDA in the Company's safety update reports and miscellaneous responses to agency inquiries.[274]

---

[271] PX 14 at MRK-AFS0002007; PX 40 at MRK-AWC0008801.
[272] *See, e.g.,* PX 25; PX 26; PX 357.
[273] PX 27 at MRK-JAK0016071.
[274] *See, e.g.,* PX 363.

199.    On July 12, 2001, Merck's Safety Update Report to the FDA[275] listed the On Drug-SUR deaths (reporting them as 33 on Vioxx and 20 on placebo). Merck did not report a relative risk. Of considerably greater significance, Merck failed to include the ITT death analysis entirely.   Merck's draft Safety Update Report in May 2001 *had* included "off-drug" deaths in Protocol 078 - 22 patients died on Vioxx vs. 10 on placebo.[276] However, on June 3, 2001 Alise Reicin's track changes indicated that she deleted all references in the May 2001 draft Safety Update Report to "off-drug" deaths in the Alzheimer's studies and urged that only deaths occurring within 14 days of discontinuation be counted and reported.[277]

200.    After the submission of the VIGOR SUR in July 2001, the FDA ultimately issued a series of requests calling for statistical analyses of all-cause and cardiovascular mortality in the Alzheimer's trials.   The SUR had reported only adverse events, including mortality, that occurred in the Alzheimer's trials on or before March 16, 2001.  Despite the fact that the FDA's request came more than 6 months after this cutoff date, Merck chose not to report additional deaths in their responses.   Moreover, despite internal recognition that the FDA's request called for ITT data,[278] Merck conducted the requested analyses only on the 53 "On Drug SUR" deaths it had already reported in the July 2001 SUR.  Ray Bain testified that he made the decision to report analyses of only these deaths because he didn't "want to confuse them [the FDA]."[279]

201.    Merck received the FDA's first request for Alzheimer's mortality data on September 26, 2001.[280]  The FDA requested that Merck, "provide time to event plots for all deaths and for cardiovascular deaths in the Alzheimer's studies."[281]  It appears that Merck understood the FDA request to call for the pooled Alzheimer's death data.[282]  Merck' pooled data, even under their "On Drug SUR endpoint," would show a statistically significant difference in all-cause mortality where none was present in the un-pooled data, and a less favorable result for cardiovascular mortality.[283]   Accordingly, Merck reported the requested analyses for each study separately.[284]  Across the board, no analysis performed in this submission showed a statistically significant imbalance in mortality events adverse to Vioxx. As of the date of this submission, there were 50 deaths on Vioxx versus 28 on placebo (RR=1.9, 95% CI (1.2, 3.0), p=0.007) in the ITT population.

202.    Two weeks after submitting its response, on October 19, 2001, Merck received yet another request from the FDA for "Kaplan-Meier estimates for all-cause mortality and cardiovascular mortality for the three Alzheimer's studies combined."[285]  Upon receiving this request, Bain forwarded it to Josh Chen, stating, "[a]s expected, the FDA is requesting a plot of

---

[275] *Id.* at MRK-01420145913.
[276] PX 936 at MRK-AAD0121397.
[277] *Id.*
[278] PX 368; PX 369.
[279] Bain Tr. at 281:5.
[280] PX 138.
[281] *Id.*
[282] *See* PX 371.
[283] PX 472.
[284] PX 138.
[285] *Id.* at MRK-AAC0067689.

all three studies combined."[286]   Merck was now forced to acknowledge that there was a statistically significant imbalance in all-cause mortality, though its use of the On Drug SUR endpoint allowed it to conceal the high degree of significance in this imbalance and to conceal the significant imbalance in cardiovascular mortality completely.

203.    Senior Merck scientists held a meeting on November 6, 2001 meeting in order to plan their response to the FDA's October 19, 2001 request, at which Dr. Bain's slide-deck, Figure 4, above, was presented.[287]   In addition to presenting the chart shown in Figure 4, Bain's presentation repeatedly cites to the portion of the Alzheimer's protocols and DAPs calling for the performance of ITT analyses in connection with adverse events.[288]   Despite having all the data in Dr. Bain's presentation at hand, when Merck submitted its response to the FDA's October 19 request, it once again reported only On Drug SUR data.   At that time, there were 51 deaths on Vioxx versus 28 on placebo (RR=1.9, 95% CI (1.2, 3.0), p=0.006) in the ITT population.   There were 14 cardiovascular deaths on Vioxx and 5 on placebo in all three Alzheimer's trials, with a RR of 2.9 and a p-value 0.03, in that population.

204.    On December 5, 2001, the FDA sent a final query to Merck about mortality in the Alzheimer's studies and asked if the "safety monitoring board and the IRB overseeing these studies are aware of the excess in mortality in the Vioxx 25mg group as compared with placebo."[289]   On December 18, 2001, Merck informed the FDA that "if there is any trend in the data on cardiovascular events, it is in favor of Vioxx over placebo." At that time, there were 53 deaths on Vioxx versus 29 on placebo (RR=1.9, 95% CI (1.2, 3.1), p=0.004 and the RR for *confirmed CVT* deaths in all three trials was 2.67, 95% CI (1.06, 7.50), p=0.037, in the ITT population.

205.    The 2003 Rofecoxib Cardiovascular Combined-Analysis Update included only on drug analysis and concluded "the data continue to support the lack of a prothrombotic effect with Vioxx." In fact, as of June 10th, 2003, there were 61 deaths on Vioxx versus 34 on placebo (RR=1.9, 95% CI (1.3, 2.9), p=0.002, and the RR for confirmed CVT deaths was 3.57, 95% CI (1.48, 9.72), p=0.004, in the ITT population.

---

[286] PX 371 at MRK-AGU0006520.
[287] PX 35.
[288] *Id.* at MRK-AAC0043607-609.
[289] PX 372 at MRK-AJA0012094.



**Figure 6**. ITT Confirmed Deaths in 078+091+126. The p-value associated with the difference was below 0.05 from June 5, 2001 onwards.

### 6.7.4   CVT Analysis in the Alzheimer's Studies

206.    The mortality analyses would have indicated to Merck that Vioxx's cardiovascular risk persisted after drug discontinuation, and that any analysis that ignored events occurring in patients after discontinuation of therapy would fail to reflect Vioxx's true cardiovascular risk. Accordingly, Merck should have adjudicated and analyzed all cardiovascular events in the Alzheimer's trials, both off drug and on drug, fatal and non-fatal events. The only ITT analysis it is possible to perform with respect to CVT must use investigator reported data. I perform that analysis below. I note that in December 2003, the FDA requested analysis of investigator-reported CV events in the Alzheimer's studies and such analyses were conducted.[290]

207.    My Table 13, below, displays the combined CVT analysis for studies 078 and 091 combined as well as for all the three Alzheimer's studies. Figure 7 shows the Kaplan-Meier curves for all three studies.

---

[290] MRK-AFO0289839 at MRK-AFO0289840.

**Table 13**. Alzheimer's Studies Investigator-Reported CVT events using all available data (ITT). N denotes the number of events. PYR denotes the patient years at risk.

| Study Block | LPO | Vioxx | | Placebo | | Relative risk & 95% CI | p-value |
|---|---|---|---|---|---|---|---|
| | | N | PYR | N | PYR | | |
| 078+091 | 4/23/03 | 86 | 2190 | 77 | 2337 | 1.3 (1.0, 1.8) | 0.069 |
| all 3 trials | 4/23/03 | 97 | 1997 | 70 | 2140 | 1.4 (1.0, 1.8) | 0.049 |



**Figure 7**. Kaplan Meier Curves for the Alzheimer's studies

208. Table 14 shows a temporal analysis for the Alzheimer's studies showing data from concluded studies. Table 15 shows analysis that includes all events that occurred by the specified date, even if the study was still ongoing.

**Table 14.** Alzheimer's trials. Temporal Analysis of Investigator-Reported CVT events using all available data from concluded studies.

| End Date for Study inclusion | Vioxx | | Comparator | | Relative risk & 95% CI | p-value |
|---|---|---|---|---|---|---|
| | N | PYR | N | PYR | | |
| 31-Dec-2000 | 13 | 369 | 14 | 381 | 1.0 (0.5,2.1) | 0.9 |
| 31-Dec-2001 | 24 | 562 | 21 | 579 | 1.2 (0.7,2.1) | 0.3 |
| 31-Dec-2002 | no new data | | no new data | | | |
| 31-Dec-2003 | 97 | 2190 | 77 | 2337 | 1.4 (1.0,1.8) | 0.049 |

The studies included in each year are: 2000: 91; 2001: 126; 2003:78.

**Table 15.** Alzheimer's trials. Temporal Analysis of Investigator-Reported CVT events using all available data.

| End Date for Event inclusion | Vioxx | | Comparator | | Relative risk & 95% CI | p-value |
|---|---|---|---|---|---|---|
| | N | PYR | N | PYR | | |
| 31-Dec-1998 | 4 | 83 | 1 | 84 | 3.7 (0.5,100.5) | 0.2 |
| 31-Dec-1999 | 25 | 714 | 25 | 745 | 1.0 (0.6,1.8) | 0.9 |
| 31-Dec-2000 | 62 | 1503 | 52 | 1588 | 1.3 (0.9,1.8) | 0.2 |
| 31-Dec-2001 | 86 | 1942 | 70 | 2069 | 1.3 (1.0,1.8) | 0.08 |
| 31-Dec-2002 | 96 | 2175 | 76 | 2323 | 1.4 (1.0,1.8) | 0.049 |
| 31-Dec-2003 | 97 | 2190 | 77 | 2337 | 1.4 (1.0,1.8) | 0.049 |

209.    Table 15 more closely accords with the data as Merck would have seen them, since, as demonstrated at length above, Merck performed interim analyses of 078 and 091 on a number of occasions.  Indeed, as discussed above, Merck performed interim analyses at more frequent intervals than I've shown here.

210.    Since, again, except for deaths, off-drug events were not adjudicated, my ITT analysis above focuses on investigator-reported CVT events (as did Merck's analysis to support its cardiovascular safety claims in the wake of VIGOR).[291]   Another possibility is to use confirmed events plus off-drug investigator-reported CVT events, although this excludes CV events that Merck failed to submit for adjudication. Figure 8 shows the corresponding KM curves. The estimated RR is 1.25 with a 95% confidence interval of (0.89, 1.75). Since a Cox model fails the proportionality test here (but not for the IR CVT analysis above), I report a binomial-based RR estimate.

---

[291] *See, e.g.,* MRK-AAB0085871; MRK-AFS0009330; MRK-AFS0009341.

**Figure 8.** Kaplan Meier Curves for the Alzheimer's studies. Confirmed CVT events plus investigator-reported off-drug events

211.   In 2000, while the DAPs were under development, Dr. Bain had provided Dr. Reicin the adverse events for studies 078 and 091.[292]   As noted in Table 16, below, an examination of all of the CVT events, including the ITT events, showed Vioxx presented a significant risk.

**Table 16.** Adverse events pulled from CTS database, March 15, 2000.[293]

|  |  | **(A) Vioxx** | **(B) Placebo** | **RR & 95% CI** | **p-value** |
|---|---|---|---|---|---|
| All Cardiovascular AEs | 078 | 114/644 | 78/650 | 1.5 (1.1, 1.9) | 0.004 |
|  | 091 | 30/346 | 10/346 | 3 (1.5, 6.0) | 0.001 |
|  | 078+091 | 144/990 | 88/996 | 1.6 (1.3, 2.1) | 0.00006 |
| Hypertension | 078 | 64/644 | 35/650 | 1.8 (1.2, 2.7) | 0.002 |
|  | 091 | 12/346 | 2/346 | 6.0 (1.4, 26.6) | 0.007 |
|  | 078+091 | 76/990 | 37/996 | 2.2 (1.5, 3.3) | 0.0001 |

---

[292] MRK-AAB0085871.

[293] MRK-AFS0009330 (078 data); MRK-AFS0009341 (091 data).

212.     I note that it was *after* this point that Merck chose to use the APTC endpoint to report Vioxx cardiovascular safety data.

## 6.8   Alzheimer's Summary

213.     Although Merck relied heavily on its Alzheimer's data to support the Company's claim that Vioxx posed no greater cardiovascular risk than placebo, these data did not support that claim.

214.     In the wake of the VIGOR trial, the Alzheimer's data were underpowered to detect differences in cardiovascular risk of magnitudes the record indicates Merck and its consultants believed were clinically important and meaningful.  Indeed, the Alzheimer's data were not powered to detect a difference in cardiovascular events of the magnitude observed in VIGOR until March 16, 2001, almost a year after Merck issued its initial reassuring press release. In addition, Merck's Alzheimer's data was rife with biases and competing risks.  Significant imbalances in discontinuations due to adverse events (especially due to blood pressure and edema events), mortality, and conversion to Alzheimer's disease all "deprived" the Vioxx arm of the Alzheimer's studies of potential adverse cardiovascular events, skewing the data towards showing an absence of a difference. Accordingly, Merck's statements touting the supposed absence of a difference in cardiovascular events between Vioxx and placebo in these data misrepresents an absence of evidence as evidence of absence.

215.     Additionally, Merck's reliance on the APTC endpoint was illegitimate.  It was chosen after Merck conducted interim analyses of its non-naproxen comparator data, and, because it was not designed as a "pure" measure of cardiovascular risk, it would tend dilute any difference in the incidence of adverse cardiovascular events.

216.     Moreover, in my opinion, Merck consistently misrepresented the message of the Alzheimer's studies by failing to report an ITT analysis called for in Merck's own protocols and DAPs. Instead of reporting its interim data along pre-specified endpoints, Merck simply invented a new endpoint, "On Drug SUR," *after* it learned that the ITT endpoint was unflattering for Vioxx. This is likewise scientifically improper.

217.     As of October 2, 2001, the day the Konstam meta-analysis was submitted, the RR for CVT events in the Alzheimer's studies was 1.35 with a 95% confidence interval of (0.98, 1.89). As of May 13, 2002, the day the Weir meta-analysis was submitted, the estimated RR for CVT events in the Alzheimer's studies was 1.32 with a 95% confidence interval of (0.97, 1.80).

218.     Merck's own analyses reinforced the need for ITT analyses of cardiovascular events, especially mortality, in the Alzheimer's trials.  Merck's analyses demonstrated that (1) Vioxx significantly increased the risk of death in the Alzheimer's studies, (2) that the assumption of non-informative discontinuation (that discontinuation is unrelated to the risk of experiencing an adverse event) was violated with respect to mortality and that, indeed, patients who discontinued Vioxx had a greater risk of death than those who remained on Vioxx, and (3)  that the elevated risk of death on the Vioxx arm of the Alzheimer's studies was, in part, driven by cardiovascular death.   Accordingly, Merck had reason to suspect that an ITT analysis of cardiovascular death would have revealed that the risk of cardiovascular death persisted after drug discontinuation, as, in fact, my analyses confirm it did.

219.     In my opinion, Merck's analyses showing that the non-informative assumption of discontinuation was violated, coupled with the knowledge that discontinuations due to hypertension, edema, and other vascular disorders were elevated in the Vioxx arm, would have led conscientious and cautious scientists to perform an ITT analysis of cardiovascular events generally (putting aside that they were pre-specified). My analysis of investigator reported events on an ITT basis (the only ITT analysis of CVT possible with the Alzheimer's data) shows that Vioxx is associated with a significant increase in cardiovascular risk.

220.     Merck's limited and selective use of Alzheimer's trial data contradicts its public comments and the testimony of Dr. Edward Scolnick. After VIGOR, Merck promised that it would look at all of the data and report it all no matter what it states.[294] Merck did not do that with respect to the omitted trial data and the ITT data from the Alzheimer's trials.

221.     Merck also misrepresented the risks in the Vioxx label. March 16, 2001, was the cutoff date for the U.S. labeling approved on April 11, 2002. The tally of confirmed CVT deaths in 078 plus 091 assumes a particular importance in this labeling. Based on combined safety data from these two studies, the label approved in April 2002 stated, "in these same placebo controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for Vioxx versus placebo." These represented the *on drug* confirmed cardiovascular deaths as of March 16, 2001. In fact the ITT confirmed cardiovascular deaths as of March 16, 2001 were 10 vs 3 with an estimated RR of 3.5 and an associated p-value of 0.045. As of the date of the labeling approval, i.e., April 11, 2002, the ITT confirmed cardiovascular deaths were actually 17 vs 5 for Vioxx versus placebo, with an estimated RR of 3.7 and a p-value=0.007. Merck did have additional death information available at least in December 2001, but did not report the additional deaths to the FDA until after the labeling change approval. At the conclusion of studies 078 and 091, confirmed CV thrombotic deaths were 20 vs 5, Vioxx to placebo, with an estimated RR of 4.3 and a p-value of 0.001. As far as I know, Merck never reported *any* of these ITT analyses to the FDA, even though the Data Analysis Plan for 078 clearly called for ITT.

222.     The APPROVe paper (Bresalier et al., NEJM, 2005) reported that the AD studies "did not demonstrate an excess of cardiovascular events associated with Vioxx therapy." This is not supported by the data.

---

[294] *See, e.g.*, MRK-SHAA1839474; Scolnick Tr., June 1, 2005 MRK-SHAA9639167, at 166:19-22 (After VIGOR "I wanted them to look at all our other clinical trial data again and was really struggling with trying to find a way to get more placebo-controlled data." ); Scolnick Tr., Aug. 16, 2005, MRK-SHAA0640172, at 1197:10-19 (After VIGOR, "We were immediately analyzing all our clinical trial data ..."); Scolnick Tr., January 30, 2003 TRANS 000016, at 286:19-23 ("We took those results [from VIGOR] seriously ... and we began to examine all of the other clinical data we had available to us on Vioxx, to try to discern which possible explanation for the VIGOR results was the correct explanation.").

# 7    THE INGENIX STUDY

223.    In 2003 Merck received the initial results of an epidemiological study of the cardiovascular safety of Vioxx and other NSAIDs.[295] Table 17 shows some of the key findings of the study:

**Table 17**.  Key findings of the Ingenix epidemiological study. MI is myocardial infarction. ACS is acute coronary syndrome. Current use drug against current use comparator.

| Endpoint | Drug | Comparator | Relative risk & 95% CI |
|----------|------|------------|------------------------|
| MI | Vioxx | Ibuprofen/Diclofenac | 1.30 (1.0,1.7) |
| ACS | Vioxx | Ibuprofen/Diclofenac | 1.31 (1.1, 1.6) |
| MI | Naproxen | Ibuprofen/Diclofenac | 1.22 (1.0, 1.5) |
| ACS | Naproxen | Ibuprofen/Diclofenac | 1.14 (1.0, 1.4) |

224.    Thus, the study shows a statistically significant elevated risk of both MI and ACS for current-use Vioxx as compared with current-use Ibuprofen and Diclofenac. The study also shows an elevated risk associated with naproxen, as opposed to the cardioprotective effect hypothesized in VIGOR.

225.    I note that the endpoints in the Ingenix study were confirmed by chart review. Since this review was apparently unblinded, the potential for the study to be biased in favor of Vioxx is a concern, especially given the low levels of reproducibility observed in the re-review.[296]

226.    To the best of my knowledge, these results were never published and in fact were never communicated to anyone outside the Company prior to the withdrawal of Vioxx.

# 8    APPROVe

227.    The Adenomatous Polyp Prevention on Vioxx (APPROVe) trial was the largest placebo controlled study of Vioxx.  At its September 17, 2004, meeting the APPROVe external safety monitoring board recommended early termination of the study because of an imbalance in confirmed cardiovascular events between Vioxx and placebo, leading to Merck's withdrawal of the drug from the market worldwide on September 30, 2004.

228.    Table 18 shows an ITT analysis of investigator-report cardiovascular thrombotic events in APPROVe. Figure 9 shows the corresponding Kaplan-Meier curves. Baron et al. report confirmed thrombotic events in APPROVe as 76 on Vioxx and 46 on placebo with a hazard ratio of 1.70, 95% confidence interval (1.18, 2.46). For myocardial infarctions, Baron et al. report 34 events on Vioxx versus 18 on placebo with a hazard ratio of 1.94, 95% confidence interval (1.09, 3.43).

---

[295] MRK-AFS0011532
[296] MRK-ABY0086773

**Table 18**. ITT Investigator-Reported CVT events using all available data. N denotes the number of events. PYR denotes the patient years at risk.

| Study Block | Vioxx | | Placebo | | Relative risk & 95% CI | p-value |
|---|---|---|---|---|---|---|
| | N | PYR | N | PYR | | |
| APPROVe | 72 | 5706 | 48 | 5829 | 1.5 (1.1,2.2) | 0.02 |



**Figure 9**. ITT Investigator-Reported CVT events using all available data. Kaplan-Meier curves for APPROVe

229.    A key point here is that these CVT safety results are similar to the OA and RA and Alzheimer's CVT safety data. APPROVe and Alzheimer's in particular are similar – see Figure 10.

75



**Figure 10**. ITT Investigator-Reported CVT events using all available data. Kaplan-Meier curves for Alzheimer's and APPROVe

230.    The results of the APPROVe study were presented in two key papers – Bresalier, et al., and Baron, et al., Both papers generally appear to present the findings in a straightforward and clear fashion, and conclude that the use of Vioxx is associated with increased cardiovascular risk.

231.    As late as 2005, the APPROVe paper,[297] citing earlier studies, states that eight double-blind placebo-controlled OA studies "reported similar rates of thrombotic cardiovascular adverse events with Vioxx, placebo, and various nonselective NSAIDs." In fact, as Table 6 above shows, the OA and RA studies (completed in 2003) yielded a relative risk estimate of 2.8 and statistical significance. The OA studies alone yielded a relative risk estimate of 2.9 and statistical significance.

# 9      Efficacy in Study 078

## 9.1    Compliance Analysis in the Alzheimer's Study 078

232.    Merck engaged in a sequence of actions to downplay the finding in 078 that Vioxx is associated with an increased risk of conversion to Alzheimer's disease.

---

[297] MRK-SHAA1818672 (Bresalier, R.S. et. al., *Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial.* 352 NEJM 1092-1102, (2005)).

233.    On June 16th, 2003 an email[298] from Christopher Assaid described an analysis of efficacy based on various levels of compliance (50%, 75%, and 85%) and concluded that none of these subgroups had a different result than the overall analysis."[299] Merck submitted the first summary of study 078 to FDA in July 2003.[300] At that time, the Per Protocol and Dose Response/80% analyses were consistent with the primary efficacy finding, suggesting no evidence of a dose response and hence undermining the thesis that Vioxx causes Alzheimer's disease. Similarly a draft of the 078 paper reported no difference between the primary efficacy endpoint and the Dose Response analysis.[301]

234.    On November 4, 2003, Christopher Assaid discovered and reported via email a programming error[302]. The effect size in the 80% compliant group is in fact 1.72 and statistically significant (p=0.002). This is a larger effect size than that of the pre-specified ITT analysis which showed an estimated effects size of 1.46 (p=0.011), directly supporting the thesis that Vioxx causes Alzheimer's disease.

235.    The draft paper was revised by early December to remove all discussion of the dose response analysis.[303] Merck submitted their final CSR on 078 to FDA on December 17, 2003, along with a Combined Safety Report for Studies 078 and 091.[304] The cover letter states there are no meaningful differences from July.  Merck changed Table 15 to Table 35; Table 35 includes the new statistically significant dose response data. Melanie Griffis from FDA called Merck "on or about" February 12th, 2004 and left a message asking for the track changes from the July submission to the December submission.[305] Merck crafted a letter[306] dated March 12, 2004, and sent the track changes to the FDA.[307] The cover letter states that "none of the changes resulted in a modification of the overall conclusions derived from the study result."

236.    Merck's dismissal of the changes as unimportant conflicts with their decision to conduct the analysis in the first place.

237.    FDA asked Merck for an explanation of the conversion data. Ultimately, a meeting was scheduled for September 27, 2004. Merck postponed the meeting , due to the withdrawal of Vioxx from the market.[308] It was rescheduled to January 7, 2005. The powerpoint presentation prepared by Merck for both meetings omit any mention of the dose response analysis.[309] A February 1, 2005 email from Assaid[310] says the dose response story "dropped out

---

[298] MRK-APE0016848
[299] MRK-ARP0133951
[300] MRK-I2220004818
[301] MRK-AAC0139936
[302] MRK-AHD0055888
[303] MRK-AHD0022761
[304] MRK-I2690008225; MRKI2690008230; MRK-I2690008544
[305] MRK-AAD0384813
[306] MRK-AAF0015398
[307] MRK-AFV0449748
[308] AAF0017452
[309] MRK-AAF0017362; MRK-AAF0017366; MRK-ARP0006819
[310] MRK-ARP0105927

77

of our main messages for interactions with the FDA by the time we had the consensus meeting in September" (a meeting which in fact did not take place until January).

## 8.2     Efficacy in Alzheimer's Study 078

238.     Study 078 was designed to determine whether Vioxx would prevent clinically diagnosed Alzheimer's Disease in patients with Mild Cognitive Impairment. Protocol 078 was adequately powered to assess the primary endpoint of clinically diagnosed Alzheimer's Disease. It was a large, long term, placebo controlled study. Protocol 078 was a true ITT Study for both efficacy and safety. Merck designed the study to detect a 33% percent reduction in clinically diagnosed Alzheimer's Disease in patients on Vioxx as compared with placebo.[311] The Merck biometrician, Christopher Assaid, prepared a Powerpoint that discusses the design and the negative findings in Study 078.[312]

239.     Merck enrolled patients beginning in April 1998; the study was originally designed to continue for two years, but was extended for four years. It was the first study of a Cox-2 inhibitor in patients with Mild Cognitive Impairment.[313]

240.     Despite concerns about study integrity,[314] Merck conducted unplanned, interim analyses of unblinded safety data from Study 078 on multiple occasions including March 2000, September 2000, and March 2001.[315]

241.     Merck submitted the Data Analysis Plan for Study 078 to FDA in December 2002 (to the Neuropharmacology Division of FDA) and in January 2003 (to the Arthritis and Analgesia Division.)[316] The FDA suggested a change in the analysis but Merck persuaded FDA to accept Merck's statistical analysis plan.[317] The DAP states that the primary endpoint is "clinically diagnosed Alzheimer's disease." The DAP calls for three "supportive analyses:" a per protocol analysis, an analysis of investigator diagnosis of AD, and "All Dementia." The DAP presents several "Other Efficacy Endpoints" along with associated planned statistical analyses including two scores based on the Selective Reminding Test (SRT), the summary score from the Mini-Mental State Examination (MMSE), the summary score from the ADAS-Cog neuropsychological test, and two scores from the Clinical Dementia Rating (CDR) test. The DAP states that other endpoints "will be summarized." There are no "secondary endpoints" defined in the DAP.

242.     The efficacy data from Study 078 were formally unblinded in May 2003 and Merck then conducted the pre-specified primary, supportive and other analyses of the Study 078 data.[318] The final hazard ratio was 1.46 (95% CI (1.09, 1.94), p=0.01), greater than the effect the sponsor anticipated and in the opposite direction to that hoped for. My analysis of the SAS data

---

[311] MRK-AHD0101257; MRK-0140029802

[312] MRK-AHD0101257

[313] Block Deposition 160:18 to 161:2; Thal et al, *Neuropsychopharmacology*, 2005, 1-12.

[314] MRK-ACR0014501 Gertz; MRK-AFV0297727 Nessly; MRK-NJ0136865 Reines

[315] MRK-I2690008544

[316] MRK-AFV0043956, MRK-AFV0043960

[317] MRKAFV0140104 at 110

[318] MRK-ARP0137370

for 078 indicate that the primary efficacy endpoint, clinically diagnosed Alzheimer's Disease, reached statistical significance by December 1999. The risk of AD was disclosed to the FDA in July 2003.[319]  Figure 11 shows the accumulation of Alzheimer's diagnoses over time.



**Figure 11.** ITT Confirmed Conversions to Alzheimer's Diease in 078. The p-value associated with the difference was below 0.05 from December 4th, 1999 onwards.

243.    Merck designed Study 078 with a planned two-tailed analysis.[320] From the outset of the study the "alternative" hypothesis was that Vioxx might alter the risk of Alzheimer's Disease, either by increasing the risk or by decreasing the risk.

244.    Merck conducted Study 078 in conformity with Good Clinical Practice and was responsible for the safety of the study subjects.[321] Merck removed the external committees charged with efficacy and safety monitoring shortly after the Study began.[322] The senior Clinical Study Committee in the company (the Clinical Development Oversight Committee, or CDOC)

---

[319] MRK-I2220004818
[320] Thal et al.; Reines Deposition 54:19 to 55:21
[321] Block deposition 116:19 to 23, 118:16 to 119:20; MRK-AHD0001996
[322] MRK-I2690000512; MRK-I2690000517

specifically approved the Study with a Data Safety Monitoring Board – thus the Study was conducted in violation of the recommendations of senior scientists in the Company.[323]

245. As indicated above, the DAP did include pre-specified "supportive" and "other" analyses and, in fact, these are either consistent with the primary analysis or statistically non-significant. A June 12th, 2003 "preliminary report" from Assaid[324] to Dr. Kim and other senior managers reports on "key secondary endpoints," including the "other efficacy endpoints" (except for the CDR scores) and the three "supportive analyses." Table 19 below summarizes the findings.

**Table 19**. A summary of Assaid's June 12th, 2003 analysis of efficacy in 078.

| DAP Category | Pre-Specified Endpoints | Favors Placebo? | Statistically Significant? |
|---|---|---|---|
| Other | SRT-Summed Recall | Yes | No |
| Other | SRT-Delayed Recall | No | No |
| Other | MMSE | No | No |
| Other | ADAS-Cog | Yes | No |
| Other | CDR-Sum of Boxes | Yes[¶] | No |
| Supportive | Per-protocol | Yes | Yes* |
| Supportive | Investigator-reported AD | Yes | Yes |
| Supportive | All-dementia | Yes | Yes |

[§]Not reported in Assaid (nor reported in Thal)
[¶]Not reported in Assaid but Thal reports p=0.058
*Initially reported as p=0.055 but corrected November 3rd, 2003

All three "Supportive Analyses" are statistically significant against Vioxx. The DAP, referring to the supportive analyses, states "In order to evaluate the robustness of the findings from the primary efficacy analysis, the following supportive analyses will be performed." The supportive analyses were never mentioned in letters from Merck to FDA and were never reported in the published literature.

---

[323] Reines Exhibit 16, MRK-ABP0003541-614; Reines Exhibit 17 MRK-ABP0003859-939; Reines Exhibit 18 MRK-AHF0072575-690; Reines Exhibit 19 MRK-ABP0008950-9158; Reines Exhibit 20 MRK-ABK0329511-696; Reines Exhibit 21 MRK-ABP0018562-741.
[324] MRK-ACM0000386

246.    A July 29th, 2003 Merck to FDA cover letter[325] states that the negative finding "was not confirmed by subsequent analyses." It later adds "The unexpected difference for rofecoxib compared with placebo was not confirmed by the secondary measures which found no statistically significant or clinically meaningful differences between treatment groups." The primary Merck author testified, however, that dementia, one of the three Supportive Analyses, is a wider endpoint than clinically diagnosed Alzheimer's Disease, and that Dementia is an endpoint that measures memory and cognition. In my analysis of the SAS data, Dementia was statistically significant against Vioxx by December of 1999.[326]

247.    The Merck articles discussing Study 078 both report no differences/ confirmation from analysis of "secondary endpoints," the papers do not mention the "Supportive Analyses" or report the data/analyses, which are all consistent with the existence of a true effect, omit a dose response analysis also consistent with true effect, and omit other post hoc analyses by Assaid consistent with true effect. Statements in these publications and other documents, including Merck's regulatory submissions, suggesting there were no measures consistent with the primary analysis are not correct, based on Merck's analyses of the data.[327]

248.    It is of interest that the FDA Medical Review dated October 8, 2004, of the efficacy data reported by Merck in July of 2003 includes this statement by the Medical Review Officer: "the results of the primary efficacy analysis remain worthy of serious consideration, as they strongly suggest that administering Vioxx to patients with Mild Cognitive Impairment could be associated with an adverse outcome."[328]

249.    Merck provided their consultants with a synopsis of the Protocol for Study 078 and the Consultants advised Merck to do an interim efficacy analysis for planning purposes after one year of treatment on the secondary hypotheses which included CDR.[329]

250.    I note than a May 2013 retrospective analysis of Utah Medicaid database by Dr. Dennis Tolley shows a doubling of the rate of Alzheimer's diagnosis in patients on Vioxx v. not on Vioxx.[330]

## 10.    Conclusion

251.    In my opinion, Merck's public statements concerning Vioxx's cardiovascular safety – that the drug posed no more cardiovascular risk than placebo or non-naproxen NSAIDs, that naproxen's cardioprotective effect was the most likely explanation for the imbalance in cardiovascular events observed in the VIGOR trial, and other like statements identified in this Report – were not supported by the evidence available to Merck (indeed, often

---

[325] MRK-AAF0012268
[326] Lines Deposition 73:11 to 18; 131:11 to 24
[327] Thal et als; Aisen P, Thal L, Ferris S., et al., Rofecoxib in Patients with Mild Cognitive Impairment: Further Analyses of Data from a Randomized, Double-Blind Trial. Current Alzheimer Research, 2008, 5, 73-82
[328] FDACDER003071
[329] MRK-AFW0023615
[330] Dennis Tolley Analysis

flatly contradicted by that evidence) and were not grounded in reasoned and rigorous scientific testing.

252.    Even before Merck received FDA approval to market Vioxx, a Merck observational study demonstrated a rather increased cardiovascular risk associated with Vioxx among female patients – a population of interest given their disproportionate susceptibility to arthritis – in a placebo-controlled data set. In my opinion, these data should have been disclosed and were highly relevant to an assessment of Vioxx's cardiovascular risk.

253.    Merck's statements about VIGOR obscured the substantial adverse cardiovascular signal observed in the trial, and, as even Merck's outside consultants told them, Merck's 4% hypothesis, which it used to support its naproxen hypothesis, was "misleading," or not supported by the data. Merck observed no statistically significant difference in cardiovascular risk between those patients who ostensibly required cardioprotection and those who did not. Thus, Merck's claim that its 4% hypothesis supported the naproxen hypothesis by highlighting the cardioprotective effect of naproxen in a population requiring such cardioprotection was not supported by the Company's own analysis.

254.    In presenting its review of the Company's non-naproxen comparator data as "reassuring" evidence that Vioxx posed no more cardiovascular risk than either placebo or the non-naproxen NSAIDs to which Vioxx was compared, Merck consistently presented an absence of evidence as evidence of absence. Merck's non-naproxen comparator data lacked statistical power to detect meaningful increases in cardiovascular risk – increases of magnitudes the record reveals Merck itself acknowledged were worrisome – and were beset by confounders that skewed the data towards showing an absence of effect, diluting Vioxx's cardiovascular risk signal. The Company's own analyses confirmed these facts, yet Merck persisted in touting these data as evidence of Vioxx's safety. This is not sound scientific practice.

255.    Meanwhile, analyses of pooled placebo controlled arthritis data and ITT analyses of cardiovascular safety data in the Alzheimer's trials which were not only pre-specified, but which, based on evidence available to Merck, would have been of obvious importance in assessing Vioxx's true cardiovascular risk, demonstrate quite clearly that Vioxx is cardiotoxic. In my view, no conscientious investigator would have failed to perform these analyses. Instead, Merck concocted endpoints after it repeatedly viewed interim data and failed to report unflattering data in violation of basic principles of scientific practice. Merck's reported analyses of Vioxx's cardiovascular safety were thus a moving target.

256.    In sum, Merck, despite its public pronouncements to the contrary, never developed evidence sufficient to rebut the significant adverse cardiovascular signal raised in VIGOR. Indeed, the data in Merck's possession reaffirmed Vioxx's cardiovascular toxicity.

257.    Merck's reporting of the efficacy data from Protocol 078 similarly failed to accurately report the totality of the data, including prespecified analyses that supported the finding on the primary endpoint of the study.

I reserve the right to amend, edit, and supplement my opinions upon review of additional information.

Signed this 17th day of July, 2013

By: _____

     David Madigan, Ph.D.

**Appendix A.  CRISP and MedDRA terms that encode the SOP definition of Thrombotic Event (provided by Drs. Kostis, Krumholz, and Ross)**

| MedDRA® Terms | | CRISP Terms |
|---|---|---|
| acute coronary syndrome | ischaemic stroke nos | acute anterior myocardial infarction |
| acute myocardial infarction | lacunar infarction | acute myocardial infarction |
| angina unstable | myocardial infarction | arterial embolism |
| aortic embolism | myocardial reinfarction | arterial thrombosis |
| aortic thrombosis | myocardial rupture | asystole |
| arterial embolism limb | obstetrical blood-clot embolism | cardiac arrest |
| arterial embolism nos | papillary muscle infarction | cardiac thrombosis |
| arterial thrombosis limb | pelvic venous thrombosis | cardiogenic shock |
| arterial thrombosis nos | peripheral embolism nos | cerebral infarction |
| arteriovenous fistula thrombosis | phlebothrombosis | cerebral ischemia |
| atrial thrombosis | pulmonary embolism | cerebrovascular accident |
| brain stem infarction | pulmonary infarction | deep vein thrombosis |
| brain stem ischaemia | pulmonary microemboli | electromechanical dissociation |
| cardiac arrest | pulmonary thrombosis nos | embolic stroke |
| cardiac ventricular thrombosis | reversible    ischaemic    neurological deficit | embolism |
| cardio-respiratory arrest | silent myocardial infarction | endocardial thrombus |
| carotid arterial embolus | spinal artery embolism | lacunar infarction |
| carotid arterial thrombosis | subclavian artery embolism | myocardial infarction |
| cerebellar artery thrombosis | subclavian artery thrombosis | myocardial infarction complication |
| cerebellar infarction | subclavian vein thrombosis | myocardial reinfarction |
| cerebral artery embolism | sudden death | myocardial rupture |
| cerebral artery thrombosis | superior sagittal sinus thrombosis | non-q-wave myocardial infarction |
| cerebral infarction | thromboembolism | pulmonary embolism |
| cerebral ischaemia | thrombosed varicose vein | pulmonary infarction |
| cerebral thrombosis nos | thrombotic stroke | pulmonary thrombosis |
| cerebral venous thrombosis | transient ischaemic attack | q-wave myocardial infarction |
| cerebrovascular accident | transverse sinus thrombosis | sudden death |
| coronary artery embolism | vena cava embolism | superior vena cava thrombosis |
| coronary artery insufficiency | vena cava thrombosis | unstable angina |
| coronary artery thrombosis | venous embolism nos | thromboembolic stroke |
| deep vein thrombosis | venous thrombosis deep limb | thromboembolism |
| embolic stroke | venous thrombosis limb | transient ischemic attack |

| iliac artery embolism | venous thrombosis nos limb | venous thrombosis |
|---|---|---|
| iliac artery thrombosis | venous thrombosis superficial limb | ventricular fibrilliation |
| interventricular septum rupture | ventricle rupture | ventricular thrombus |
| intracardiac thrombus | ventricular asystole | vertebrobasilar insufficiency |
| ischaemic stroke | ventricular fibrilliation | |
| | vertebrobasilar insufficiency | |

Exhibit A

# David Madigan

david.madigan@columbia.edu

http://www.stat.columbia.edu/~madigan

Tel: (212) 851-2131

## Curriculum Vitae
## June 1, 2013

## Education

Trinity College Dublin, Ph.D., Statistics, 1990. Dissertation "An investigation of weights of evidence in the context of probabilistic expert systems." K. R. Mosurski, Advisor.

Trinity College Dublin, B.A. (Mod.), Mathematical Sciences, 1984, First Class Honours.

## Employment History

2013: Interim Executive Vice-President for Arts and Sciences, Columbia University

2007- : Professor, Chair (2008-2014), Department of Statistics, Columbia University.

2005-2007: Dean, Physical and Mathematical Sciences, Rutgers University

2003-2004: Director, Institute of Biostatistics, Rutgers University

2001-2007: Professor, Department of Statistics, Rutgers University.

2000-2001: Vice President, Data Mining, Soliloquy, Inc.

1999-2000: Principal Technical Staff Member, AT&T Labs-Research.

1990-1999: Assistant/Associate Professor, Department of Statistics, University of Washington.

1989-1990: Information Technology Consultant, KPMG, Ireland.

1986-1989: Technology Manager, Peregrine Expert Systems Ltd., Ireland.

1985-1986: Expert System Consultant, SkillSoft, Ireland.

1984-1985: Actuarial Associate, Hibernian Life Assurance, Ireland.

## Honors

2012: Elected Fellow of the American Association for the Advancement of Science.

2009: Institute of Mathematical Statistics Medallion Lecturer.

2006: Elected Fellow of the Institute of Mathematical Statistics.

2005: 36th Most Cited Mathematician in the World, 1995-2005, ISI Thomson.

1999: Elected Fellow of the American Statistical Association.

1995: University of Washington Distinguished Teaching Award.

1984: Gold medal awarded by the board of Trinity College Dublin.

1980: Trinity College Dublin, Entrance Scholarship in Mathematics.

## Research Grants:

Principal Investigator on FNIH/Observational Medical Outcomes Partnership grant to Columbia University, "Methods for Active Drug Safety Surveillance," 2009-2013.

Co-Principal Investigator on National Instutes of Health grant "Improving Pediatric Trauma Triage Using High Dimensional Data Analysis," R01 GM87600-01, 2010-2013.

Principal Investigator on sub-contract from FDA Award HHSF223200910006I to Harvard Pilgrim Healthcare, "Mini-sentinel," 2010-2011.

Investigator on Department of Homeland Security grant "Center for Dynamic Data Mining" to Center for Discrete Mathematics and Theoretical Computer Science (DIMACS), Rutgers University, 2006-2009, $2,400,000 total.

Principal Investigator on National Science Foundation grant "Bayesian Methods for Large-Scale Applications" to Columbia University, DMS-0505599, 2005-2009, $150,000 total.

Principal Investigator (with Shlomo Argamon) on National Science Foundation grant "Community resources for author identification" to Rutgers University, CNS-0454126, 2005, $56,019 total.

Principal Investigator on Knowledge Discovery and Dissemination (KD-D) grant to DIMACS "Author Identification," 2004, $250,000 total.

Co-Principal Investigator on National Science Foundation grant "Monitoring Message Streams" to DIMACS, Rutgers University, KDI-0087022, 2002-2008, $1,500,000 total (annual renewal).

Investigator on National Science Foundation grant "Computational and Mathematical Epidemiology" to DIMACS, Rutgers University, ITR-0205116, 2002-2007, $2,750,000 total.

Principal Investigator on National Science Foundation grant "Bayesian Data Analysis for Digital Traces" to Rutgers University, DMS-0113236, 2001-2004, $245,000 total.

Principal Investigator (with Steen Andersson and Michael Perlman) on National Science Foundation grant "Graphical Markov Models" to the University of Washington, DMS-9704573, 1997-2000, $313,722 total.

Principal Investigator (with Steven Tanimoto) on grant from National Science Foundation to University of Washington: "Use of Online Assessment in Forming and Coaching Learning Groups," 1996-1999, $600,501, CRLT-9616532.

Principal Investigator on National Science Foundation grant "Computing Environments for Graphical Models" to the University of Washington, DMS-92111629, 1992-1996, $65,000 total.

Principal Investigator on Subcontract to the University of Washington under National Institutes for Health Phase II SBIR grant "TALARIA: Multimedia tools for cancer pain education" to Mathsoft, Inc., 1995-1997, $750,000 total (UW Subcontract, $231,652).

Principal Investigator on Subcontract to the University of Washington under National Institutes for Health Phase I SBIR grant "An intelligent tutoring system for biostatistics" to Statistical Sciences, Inc., 1994-5, $80,853.

David Madigan, CV, June 1 2013, Page 3

Principal Investigator on National Institutes for Heath SBIR Phase I grant "A Multimedia Teaching and Reference Tool for Cancer Pain" to Statistical Sciences, Inc., 1993-1994, $50,000 total.

Investigator (20%) on Quantum Health Resources Grant "Knowledge-based Systems for Bone Marrow Transplant Long Term Follow-up" to the Fred Hutchinson Cancer Research Center, 1993-94, $1m (C. Richard Chapman, P.I.).

Investigator (and author) on Department of Energy Phase I SBIR grant "An intelligent tutoring system for statistics" to Statistical Sciences, Inc., 1993-4, $75,000.

Investigator (10%) on Robert Wood Johnson Foundation grant to the Department of Family Medicine, University of Washington (Sharon Dobie, PI), 1995-1999.

Investigator (5%) on American College of Clinical Pharmacy grant to the Department of Family Medicine, University of Washington (Allan Ellsworth, PI), 1995-1996.

## Refereed Publications:

1. Schuemie, M., Ryan, P., DuMouchel, W., Suchard, M.A., and Madigan, D. (2013). Interpreting observational studies - why empirical calibration is needed to correct p-values. *Statistics in Medicine*, to appear.

2. Simpson, S., Madigan, D., Zorych, I., Schuemie, M.J., Ryan, P.B., and Suchard, M. (2013). Multiple self-controlled case series for large-scale longitudinal observational databases. *Biometrics*, to appear.

3. Price, K. L., Xia, H.A., Lakshminarayanan, M., Madigan, D., Manner, D., Scott, J., Stamey, J., Thompson, L. (2013). Bayesian Methods for Design and Analysis of Safety Trials. *Pharmaceutical Statistics*, to appear.

4. Letham, B., Rudin, C., McCormick, T.H., and Madigan, D. (2013). An interpretable stroke prediction model with using rules using Bayesian analysis. *Twenty-Seventh AAAI Conference on Artificial Intelligence (AAAI-13) Late Breaking Paper*, to appear.

5. Letham, B., Rudin, C., and Madigan, D. (2013). A supervised ranking approach to sequential event prediction. *Machine Learning*, 10.1007/s10994-013-5356-5.

6. Ryan, P., Suchard, M.A., Schuemie, M., and Madigan, D. (2013). Learning from epidemiology: Interpreting observational studies for the effects of medical products. *Statistics in Biopharmaceutical Research*, DOI:10.1080/19466315.2013.791638.

7. Mittal, S., Madigan, D., Cheng, J., and Burd, R. (2013). Large-scale Bayesian parametric survival analysis. *Statistics in Medicine*, to appear, DOI: 10.1002/sim.5817.

8. Madigan, D., Ryan, P., Schuemie, M., Stang, P., Overhage, M., Hartzema, A., Suchard, M.A., DuMouchel, W., and Berlin, J. (2013). Evaluating the impact of database heterogeneity on observational studies. *American Journal of Epidemiology*, DOI: 10.1093/aje/kwt010..

9. Madigan, D., Ryan, P.B., and Schuemie, M.J. (2012). Does design matter? Systematic evaluation of the impact of analytical choices on effect estimates in observational studies. *Therapeutic Advances in Drug Safety*, 4, 53-62.

10. Ryan, P.B., Madigan, D., Stang, P.E., Overhage, J.M., Racoosin, J.A., Hartzema, A.G. (2012). Empirical Assessment of Analytic Methods for Risk Identification in Observational Healthcare

Data: Results from the Experiments of the Observational Medical Outcomes Partnership. *Statistics in Medicine*, **30**, 4401-4415.

11. Suchard, M., Simpson, S.E., Zorych, I., Ryan, P., and Madigan, D. (2013). Massive parallelization of serial inference algorithms for generalized linear models. *ACM Transactions on Modeling and Computer Simulation*, 23:1-17.

12. Madigan, D., Sigelman, D., Mayer, J.W., Furberg, C.D., Avorn, J. (2012). Under-reporting of cardiovascular events in the rofecoxib Alzheimer studies. *American Heart Journal*, doi:10.1016/j.ahj.2012.05.002.

13. Harpaz, R., DuMouchel, W., Shah, N.H., Madigan, D., Ryan, P., and Friedman, C. (2012). Novel data mining methodologies for adverse drug event discovery and analysis. *Clinical Pharmacology & Therapeutics*, doi:10.1038/clpt.2012.50.

14. Maclure, M., Fireman, B., Nelson, J.C., Hua, W., Shoaibi, A., Paredes, A., and Madigan, D. (2012). When should a distributed system for active medical product surveillance use case-based designs for safety monitoring?. *Pharmacoepidemiology and Drug Safety*, **21**, 50-61.

15. McCormick, T., Madigan, D., Raftery, A.E., and Burd, R.S. (2012). Dynamic model averaging for logistic regression. *Biometrics*, **68**:23-30.

16. McCormick, T., Rudin, C., and Madigan, D. (2012). A hierarchical model for association rule mining of sequential events: an approach to automated medical symptom prediction. *Annals of Applied Statistics*, **6**, 652-658.

17. Oquendo, M.A., Baca-Garcia, E., Artes, A., Perez-Cruz, F, Galfalvy H.C., Blasco-Fontecilla, H., Madigan, D., Duan, N. (2011). Hypothesis Generation in the 21st Century. *Molecular Psychiatry*, to appear.

18. Smith, R.T., Merriam, J.E., Sohrab, M.A., Pumariega, N.M., Barile, G., Blonska, A.M., Haans, R, Madigan, D., and Allikmets, R. (2011). Complement Factor H 402H Variant and Reticular Macular Disease. *Archives of Ophthalmology* 129(8):1061-1066.

19. Madigan, D., Mittal, S., and Roberts, F. (2011). Efficient sequential decision making algorithms for container inspection operations. *Naval Research Logistics*, **58**, 637-654.

20. Zorych, I., Madigan, D., Ryan, P., and Bate, A. (2011). Disproportionality methods for pharmacovigilance in longitudinal observational databases. *Statistical Methods in Medical Research*, doi: 10.1177/0962280211403602.

21. Rudin, C., Salleb-Aouissi, A., Kogan, E. and Madigan, D. (2011). Sequential Event Prediction with Association Rules. *Proceedings of the 2011 Conference on Learning Theory (COLT)* (30%).

22. Madigan, D. and Ryan, P. (2011). What can we really learn from observational studies? The need for empirical assessment of methodology for active drug safety surveillance and comparative effectiveness research. *Epidemiology*, 22 (5), 629-631.

23. Balakrishnan, S. and Madigan, D. (2010). Priors on the variance in sparse Bayesian learning: the demi-Bayesian lasso. In: *Frontiers of Statistical Decision Making and Bayesian Analysis: In Honor of James O. Berger* by Ming-Hui Chen, Peter Müller, Dongchu Sun, and Keying Ye.

24. Caster, O., Noren, G.N., Madigan, D., and Bate, A. (2010). Large-Scale Regression-Based Pattern Discovery: The Example of Screening the WHO Global Drug Safety Database. *Statistical Analysis and Data Mining*, **3**, 197-208.

25. Ross, J.S., Madigan, D., Konstam, M.A., Egilman, D.S., and Krumholz, H.M. (2010). Does Rofecoxib cardiovascular risk persist after discontinuation? *Archives of Internal Medicine*, **170**, 2035-2036.

26. Cheng, J. and Madigan, D. (2010). Bayesian Approaches to Aspects of the Vioxx Trials: Non-ignorable Dropout and Sequential Meta-Analysis. In: *Handbook of Applied Bayesian Analysis*, Oxford University Press, 51-68.

27. Ross, J.S., Madigan, D., Hill, K.P., Egilman, D.S., Wang, Y., Krumholz, H.M. (2009). Pooled analysis of Rofecoxib placebo-controlled clinical trial data: Lessons for post-market pharmaceutical safety surveillance. *Archives of Internal Medicine*, **169**, 1976-1985.

28. Burd, R. and Madigan, D. (2009). An evaluation of the impact of injury coding schemes on mortality prediction in pediatric trauma. *Academic Emergency Medicine*, **16**, 639-645.

29. Pearson, R.K., Hauben, M., Goldsmith, D., Gould, A.L., Madigan, D., O'Hara, D.J., Reisinger, S., and Hochberg, A. (2009). Influence of the MEDDRA hierarchy on pharmacovigilance data mining results. *International Journal of Medical Informatics*, 78, e97-e103.

30. Hochberg, A., Hauben, M., Pearson, R.K., O'Hara, D., Reisinger, S., Goldsmith, D.I., Gould, A.L., and Madigan, D. (2009). An Evaluation of Three Signal Detection Algorithms Using a Highly Inclusive Reference Event Database. *Drug Safety*, 32, 509-525.

31. Burd, R.S., Ouyang, M., and Madigan, D. (2008). Bayesian logistic injury severity score (BLISS): A method for predicting mortality using ICD-9 codes. *Academic Emergency Medicine*, 15(5), 466-475.

32. Caster, O., Noren, G.N., Madigan, D., and Bate, A. (2008). Large-scale regression-based pattern discovery: The example of the WHO drug safety database. *KDD Workshop on Mining Medical Data,* to appear.

33. Naik, P., Wedel, M., Bacon, L., Bodapati, A., Bradlow, E., Kamakura, W., Kreulen, J., Lenk, P., Madigan, D., and Montgomery, A. (2008). Challenges and Opportunities in High-Dimensional Choice Data Analysis." *Marketing Letters*, 19 (3), 201-213.

34. Balakrishnan, S. and Madigan, D. (2007). Algorithms for Sparse Linear Classifiers in the Massive Data Setting. *Journal of Machine Learning Research,* **9**, 313-337, 2007.

35. Balakrishnan, S. and Madigan, D. (2007). LAPS: Lasso with Partition Search. *Proceedings of the IEEE International Conference on Data Mining,* 415-420, 19% acceptance rate.

36. Hauben, M., Madigan, D., Reisinger, S., Hochberg, A., and O'Hara, D. (2007). Data Mining in Pharmacovigilence: Computational Cost as a Neglected Performance Parameter. *International Journal of Pharmaceutical Medicine*, **21**, 319-323.

37. Hauben, M., Reich, L., Gerrits, C.M., and Madigan, D. (2007). Spontaneous Reporting of Hyperkalemia and The Randomized Aldactone Evaluation Study. *Drug Safety*, **30**, 1143-1149.

38. Eyheramendy, D. and Madigan, D. (2007). A Bayesian feature selection score based on Naive Bayes models. In: *Computational Methods of Feature Selection*, H. Liu and H. Motoda, Editors, 277-294.

39. Madigan, D., Mittal, S., and Roberts, F. (2007). Sequential decision making algorithms for port of entry inspection: overcoming computational challenges. *Proceedings of 2007 Intelligence and Security Informatics Conference*, 1-7.

40. Rolka, H., Burkom, H., Cooper, G.F., Kulldorff, M., Madigan, D., and Wong, W-K. (2006). Issues in Applied Statistics for Public Health Bioterrorism Surveillance using Multiple Data Streams: Research needs. *Statistics in Medicine*, **26**, 1834-1856.

41. Eyheramendy, S. and Madigan, D. (2007). A Flexible Bayesian Generalized Linear Model for Dichotomous Response Data with an Application to Text Categorization. In: IMS Lecture Notes - Monograph Series, Volume 54, *Complex datasets and inverse problems: tomography, networks and beyond*. Regina Liu, William Strawderman & Cun-Hui Zhang, Editors, 76-91.

42. Balakrishnan, S. and Madigan, D. (2006). Decision Trees for Functional Variables. *Proceedings of the IEEE International Conference on Data Mining*, 798-802, 20% acceptance rate.

43. Genkin, A., Lewis, D.D., and Madigan, D. (2007). Large-scale Bayesian logistic regression for text categorization. *Technometrics*, **49**, 291-304.

44. Dayanik, A., Lewis, D.D., Madigan, D., Menkov, V., and Genkin, A. (2006). Constructing Informative Prior Distributions from Domain Knowledge in Text Classification, *Proceedings of the 29th Annual International ACM SIGIR conference*, 493-500 (18.5% acceptance rate).

45. Anand, S., Madigan, D., Mammone, R., Pathak, S. and Roberts, F. (2006). Experimental Analysis of Sequential Decision Making Algorithms for Port of Entry Inspection Procedures. In S. Mehrotra, D. Zeng, H. Chen, B. Thuraisingham, and F-X Wang (eds.), Intelligence and Security Informatics, *Proceedings of ISI-2006, Lecture Notes in Computer Science #3975,* Springer-Verlag, New York, 2006.

46. Balakrishnan, S. and Madigan, D. (2006). A One-Pass Sequential Monte Carlo Method for Bayesian Analysis of Massive Datasets. *Bayesian Analysis*. **1**, 345-362.

47. Madigan, D., Ju, W., Krishnan, P., and Krishnakumar, A.S. (2006). Location estimation in wireless networks: A Bayesian approach. *Statistica Sinica*, 16, 495-522.

48. Madigan, D., Vardi, Y., and Weissman, I. (2006). Extreme value theory applied to document retrieval from large collections. *Information Retrieval*, **9**, 273-294.

49. Hauben, M., Madigan, D., Gerrits, C., and Meyboom, R. (2005). The role of data mining in pharmacovigilance. *Expert Opinion in Drug Safety.*, **4**(5), 929-948.

50. Madigan, D., Genkin, A., Lewis, D.D., and Fradkin, D. (2005). Bayesian multinomial logistic regression for author identification. *Proceedings of the 25th International Workshop on Bayesian inference and Maximum Entropy Methods in Science and Engineering (MaxEnt 05)*, 509-516.

51. Madigan, D., Genkin, A., Argamon, S., Fradkin, D., and Ye, L. (2005). Author identification. *Proceedings of CSNA/Interface 05*.

52. Eyheramendy, S. and Madigan, D. (2005). A Novel Feature Selection Score for Text Categorization. *International Workshop on Feature Selection for Data Mining*, 1-8, 24% acceptance rate.

53. Madigan, D. (2005). Statistics and Data Mining. In: *AMS-DIMACS Discrete Methods in Epidemiology*, James Abello and Graham Cormode (Editors), 21-24.

54. Hanks, S. and Madigan, D. (2005). Probabilistic temporal reasoning. In: *Handbook of Temporal Reasoning in Artificial Intelligence*, M. Fisher, D. Gabbay, and L. Vila, Editors, Elsevier B.V., 315-342.

55. Madigan, D., Elnahrawy, E., Martin, R.P., Ju, W., Krishnan, P. and Krishnakumar, A.S. (2004). Bayesian Indoor Positioning Systems. *Proceedings of IEEE Infocom*, 1217-1227 (17% acceptance rate)

56. Madigan, D. (2005). Bayesian data mining for surveillance. In: *Spatial and Syndromic Surveillance for Public Health* (Andrew Lawson and Ken Kleinman, Editors), 203-221.

57. Madigan, D. (2004). Statistics and the war on spam. In: *Statistics: A Guide to the Unknown*, Deb Nolan (Editor), 135-147.

58. Fradkin, D. and Madigan, D.. (2003). Experiments with random projections for machine learning. In *Proceedings of KDD-03, The Ninth International Conference on Knowledge Discovery and Data Mining*, 517-522.

59. Ridgeway, G. and Madigan, D. (2003). A sequential Monte Carlo Method for Bayesian analysis of massive datasets. *Journal of Knowledge Discovery and Data Mining*, **7**, 301-319.

60. Eyheramendy, S., Lewis, David D., and Madigan, David (2003). On the naïve bayes model for text classification. In *Proceedings of The Ninth International Workshop on Artificial Intelligence and Statistics*, C.M. Bishop and B.J. Frey (Editors), 332-339.

61. Madigan, D., Vardi, Y., and Weissman, I. (2003). On retrieval properties of samples of large collections. In *Proceedings of The Ninth International Workshop on Artificial Intelligence and Statistics*, C.M. Bishop and B.J. Frey (Editors), 265-270.

62. Madigan, D. and Ridgeway, G. (2003). Bayesian data analysis for data mining. In *Handbook of Data Mining*, N. Ye (Ed.), 103-132..

63. Cohen, A., Madigan, D., and Sackrowitz, H.B. (2003). Effective directed tests for models with ordered categorical data. *Australian and New Zealand Journal of Statistics*, **45**, 285-200. 2003 Best Paper Award.

64. Mangione, S., Yuen, E., and Madigan, D. (2003). Asthma in Philadelphia schools. *Chest*, **124** (4): 141S.

65. Mangione, S., Yuen, E., and Madigan, D. (2003). Asthma and tobacco: A survey of 65 Philadelphia middle schools. *Chest*, **124** (4): 141S-142S.

66. Dunbar, P.J., Madigan, D., Grohskopf, L.A., Revere, D., Woodward, J., Minstrell, J., Frick, P.A., Simoni, J.M., and Hooton, T.M. (2003). A two-way messaging system to enhance antiretroviral adherence. *Journal of The American Medical Informatics Association*, **10**, 11-15.

67. Ridgeway, G. and Madigan, D. (2002). Bayesian analysis of massive datasets via particle filters In *Proceedings of KDD-02, The Eighth International Conference on Knowledge Discovery and Data Mining*, 5-13.

68. Madigan, D., Raghavan, N., DuMouchel, W., Nason, M., Posse, C., and Ridgeway, G. (2002). Likelihood-based data squashing: A modeling approach to instance construction. *Journal of Data Mining and Knowledge Discovery*, **6**, 173-190.

69. Tanimoto, S., Carlson, A., Husted, J., Hunt, E.B., Larsson, J., Madigan, D., and Minstrell, J. (2002). Text Forum Features for Small Group Discussions with Facet-Based Pedagogy. *Proceedings of CSCL2002, Computer Supported Cooperative Learning*.

70. Hoeting, J., Raftery, A.E., and Madigan, D. (2002). A method for simultaneous variable and transformation selection in linear regression. *Journal of Computational and Graphical Statistics*, **11**, 485-507.

71. Liu, R., Madigan, D., and Eyheramendy, S. (2002). Text classification for mining aviation inspection reports. In: *Statistical Data Analysis based on the L1-norm and Related methods.* Birkhauser Statistics for Industry and technology, Y. Dodge editor, 379-392.

72. da Silva, C.Q., Zeh, J., Madigan, D., Laake, J., Rugh, D., Baraff, L., Koski, W., and Miller, G. (2001). Capture-recapture estimation of bowhead whale population size estimation using photo-identification data. *Journal of Cetacean Research and Management,* **2**, 45-61.

73. Levitz, M., Perlman, M.D., and Madigan, D. (2001). Separation and Completeness Properties for AMP Chain Graph Markov Models. *Annals of Statistics,* **29**, 1751–1784.

74. Church, L., Oliver, L., Dobie, S., Madigan, D., and Ellsworth, A. (2001). Analgesia for colposcopy: A double-blind, randomized comparison of ibuprofen and benzocaine gel for colposcopic analgesia. *Obstetrics and Gynecology,***97**, 5-10.

75. Andersson, S.A., Madigan, D., and Perlman, M.D. (2001). An alternative Markov property for chain graphs. *Scandinavian Journal of Statistics,* **28**, 33-85.

76. Glusker, A.I., Dobie, S.A., Madigan, D., Rosenblatt, R.A., Larson, E.H. (2000). Differences in fertility patterns between urban and rural women in Washington state, 1983-1984 to 1993-1994. *Women and Health,* **31**, 55-70.

77. Kanungo, T., Haralick, R. M., Baird, H. Stuetzle, W., and Madigan, D. (2000). A statistical, nonparametric methodology for document degradation models validation. *IEEE Transactions on Pattern Analysis and Machine Intelligence,* **22**, 1209-1223.

78. Dobie, S.A., Hart, G., Glusker, A., Rosenblatt, R., and Madigan, D. (2000). Reproductive health services in rural Washington state: Scope of practice and the potential of medical abortions. *American Journal of Public Health.,* **90**, 624-626.

79. Madigan, D. and Nason, M. (2000). Statistics perspectives on data and knowledge. *Handbook of Knowledge Discovery and Data Mining,* Oxford University Press.

80. Nason, M. and Madigan, D. (2000). Sampling. *Handbook of Knowledge Discovery and Data Mining,* Oxford University Press.

81. Madigan, D., Raghavan, N., DuMouchel, W., Nason, M., Posse, C., and Ridgeway, G. (2000). Instance construction via likelihood-based data squashing. *Instance Selection and Construction, A Data Mining Perspective,* H. Motoda and H. Liu (Eds.), Kluwer, 209-226.

82. Hoeting, J.A., Madigan, D., Raftery, A.E., and Volinsky, C.T. (1999). Bayesian model averaging – a tutorial. *Statistical Science,* **14**, 382-401.

83. Dobie, S.A., Hart, G., Glusker, A., Madigan, D., Larsen, E.B., and Rosenblatt, R. (1999). Abortion services in rural Washington State, 1983-1984 to 1993-1994: availability and outcomes. *Family Planning Perspectives,* **31**, 241-245.

84. Condliff, M.K., Lewis, D.D., Madigan, D., and Posse, C. (1999). Bayesian mixed-effects models for recommender systems. *Proceedings of SIGIR-99 Workshop on Recommender Systems.*

85. Madigan, D. (1999). Bayesian Graphical Models, Intention-to-Treat, and the Rubin Causal Model. In *Proceedings of Uncertainty-99, The Seventh International Workshop on Artificial Intelligence and Statistics,* 123-132.

86. Golinelli, D., Madigan, D., and Consonni, G. (1999). Relaxing the local independence assumption for quantitative learning in acyclic directed graphical models through hierarchical

partition models. In *Proceedings of Uncertainty-99, The Seventh International Workshop on Artificial Intelligence and Statistics*, 203-208.

87. Ridgeway, G., Madigan, D., and Richardson, T. (1999). Boosting Methodology for Regression Problems. In *Proceedings of Uncertainty-99, The Seventh International Workshop on Artificial Intelligence and Statistics*, 152-161.

88. Ridgeway, G., Madigan, D., Richardson, T., and O'Kane, K. (1998). Interpretable Boosted Naïve Bayes Classification  In *Proceedings of KDD-98, The Fourth International Conference on Knowledge Discovery and Data Mining*, 101-104.

89. Andersson, S.A., Madigan, D., Perlman, M.D., and Richardson, T. (1998). Graphical Markov Models in multivariate analysis. In *Multivariate Analysis, Design of Experiments, and Survey Sampling*, Subir Ghosh (Ed.), Marcel Dekker Inc.

90. Draper, D. and Madigan, D. (1997). The scientific value of Bayesian statistical methods. *IEEE Intelligent Systems and their Applications*, **12**, 18-21.

91. Madigan, D. and York, J. (1997). Bayesian methods for estimating the size of a closed population. *Biometrika*, **84**, 19-31.

92. Glymour, C., Madigan, D., Pregibon, D., and Smyth, P. (1997). Statistical themes and lessons for data mining. *Journal of Data Mining and Knowledge Discovery*, **1**, 11-28.

93. Volinsky, C.T., Madigan, D., Raftery, A.E., and Kronmal, R.A. (1997). Bayesian Model Averaging in Proportional Hazard Models: Predicting Strokes. *Applied Statistics* **46**, 433-448.

94. Andersson, S.A., Madigan, D., Perlman, M.D., and Triggs, C.M. (1997). A graphical characterization of lattice conditional independence models. *Annals of Mathematics and Artificial Intelligence*, **21**, 27-50.

95. Madigan, D., Mosurski, K., and Almond, R.G. (1997). Explanation in belief networks. *Journal of Computational and Graphical Statistics*, **6**, 160-181.

96. Andersson, S.A., Madigan, D., and Perlman, M.D., (1997). A characterization of Markov equivalence classes for acyclic digraphs. *Annals of Statistics*, **25**, 505-541.

97. Raftery, A.E., Madigan, D., and Hoeting, J. (1997). Accounting for model uncertainty in linear regression. *Journal of the American Statistical Association*, **92**, 179-191.

98. Madigan, D., Keim, M, and Lewis, D.D. (1997). Bayesian information retrieval. *Proceedings of the Sixth International Workshop on Artificial Intelligence and Statistics*, 303-310.

99. Andersson, S.A., Madigan, D., and Perlman, M.D. (1997). On the Markov equivalence of chain graphs, undirected graphs, and acyclic digraphs. *Scandinavian Journal of Statistics*, **24**, 81-102.

100. Madigan, D., Raftery, A.E., Volinsky, C.T., and Hoeting, J.A. (1996). Bayesian model averaging. In*: Integrating Mulitple Learned Models (IMLM-96)*, P. Chan, S. Stolfo, and D. Wolpert (Eds.), 77-83.

101. Raftery, A.E., Madigan, D., and Volinsky, C.T. (1996). Accounting for model uncertainty in survival analysis improves predictive performance. In: Bernardo, J. M., Berger, J. O., Dawid, A. P. and Smith A. F. M., (eds.), *Bayesian Statistics V*, Oxford University Press, 323-350.

102. Andersson, S.A., Madigan, D., and Perlman, M.D. (1996). An alternative Markov property for chain graphs. In *Proceedings of the Twelfth Annual Conference on Uncertainty in Artificial Intelligence*, Eric Horvitz and Finn Jensen (Eds.), Morgan Kaufmann Publishers, Inc., San Mateo.

103. Schaffner, A., Madigan, D., Hunt, E., Graf, E., Minstrell, J., and Nason, M. (1996). Benchmark lessons and the world wide web: Tools for teaching statistics. In: D. Edelson and E. Domeshek (Eds.) *Proceedings of ICLS 96. Association for the Advancement of Computing in Education,* 480-484.

104. Madigan, D. and Almond, R.G. (1996). On test selection strategies for belief networks. In *Learning from Data: Artificial Intelligence and Statistics V*, D. D. Fisher and H. Lenz (Eds.), Springer Verlag, 89-98 (20% acceptance rate for plenary papers).

105. Glymour, C., Madigan, D., Pregibon, D., and Smyth, P., and (1996). Statistical inference and data mining. *Communications of the ACM*, **39**, 35-41.

106. Madigan, D., Andersson, S.A., Perlman, M.D, and Volinsky, C.T. (1996). Bayesian model averaging and model selection for Markov equivalence classes of acyclic digraphs. *Communications in Statistics - Theory and Methods*, **25**, 2493-2519.

107. Hoeting, J.A., Madigan, D., and Raftery, A.E. (1996). A Method for Simultaneous Variable Selection and Outlier Identification in Linear Regression, *Journal of Computational Statistics and Data Analysis*, **22**, 251-270.

108. Madigan, D., Chapman, C.R., Gavrin, J., Villumsen, O., and Boose, J.H. (1995). Repertory hypergrids for large-scale hypermedia linking. *International Journal of Human-Computer Studies*, 43, 465-481.

109. Madigan, D., Gavrin, J., and Raftery, A.E. (1995). Eliciting prior information to enhance the predictive performance of Bayesian graphical models. *Communications in Statistics - Theory and Methods*, 24, 2271-2292.

110. Madigan, D. and York, J. (1995). Bayesian graphical models for discrete data. *International Statistical Review*, 63, 215-232.

111. Andersson, S.A., Madigan, D., Perlman, M.D., and Triggs, C.M., (1995). On the relation between conditional independence models determined by finite distributive lattices and by directed acyclic graphs. *Journal of Statistical Planning and Inference,* **46**, 25-46.

112. York, J., Madigan, D., Heuch, I., and Lie, R.T. (1995). Estimation of the proportion of congenital malformations using double sampling: Incorporating covariates and accounting for model uncertainty. *Applied Statistics*, **44**, 227–242.

113. Madigan, D., and Chapman, C.R. (1995). Multimedia tools for cancer pain education. In: *Medical Multimedia*, C. Ghaoui and R. Rada (Eds.), Intellect, Oxford, 121–136.

114. Haynor, D. and Madigan, D. (1995). Bayesian approach to differential diagnosis with use of Monte Carlo technique. *Radiology*, **197**, 425S.

115. Hanks, S., Madigan, D., and Gavrin, J. (1995). Temporal reasoning in probabilistic knowledge-based systems. In *Proceedings of the Eleventh Annual Conference on Uncertainty in Artificial Intelligence*, Philippe Besnard and Steve Hanks (Eds.), Morgan Kaufmann Publishers, Inc., San Mateo, 111-119.

116. Madigan, D., Chapman, C.R., Gavrin, J., Villumsen, O., and Boose, J.H. (1994). Repertory Hypergrids: An Application to Clinical Practice Guidelines. *Proceedings of the ACM European Conference on Hypermedia Technology*, 117–125.

117. Almond, R, Bradshaw, J.M., and Madigan, D. (1994). Reuse and sharing of graphical belief network components. In *Selecting Models from Data: Artificial Intelligence and Statistics IV*, P. Cheeseman and W. Oldford (Eds.), Springer Verlag, 113-122.

118. Madigan, D., York, J.C., Bradshaw, J.M., and Almond, R.G. (1994). Bayesian graphical models for predicting errors in databases. In *Selecting Models from Data: Artificial Intelligence and Statistics IV*, P. Cheeseman and W. Oldford (Eds.), Springer Verlag, 123-132.

119. Madigan, D., Raftery, A.E., York, J.C., Bradshaw, J.M., and Almond, R.G. (1994). Strategies for graphical model selection. In *Selecting Models from Data: Artificial Intelligence and Statistics IV*, P. Cheeseman and W. Oldford (Eds.), Springer Verlag, 91-100.

120. York, J.C. and Madigan, D. (1994). Markov chain Monte Carlo methods for hierarchical Bayesian expert systems. In *Selecting Models from Data: Artificial Intelligence and Statistics IV*, P. Cheeseman and W. Oldford (Eds.), Springer Verlag.

121. Madigan, D., Chapman, C.R., Gavrin, J., Villumsen, O., and Boose, J.H. (1994). Modularized Maintenance for Hyperlinking: An Application to Clinical Practice Guidelines. *Proceedings of the AAAI-94 Workshop on Indexing and Reuse in Multimedia Systems*, 126–140.

122. Kanungo, T., Haralick, R. M., Stuetzle, W., and Madigan, D. (1994). Document Degradation Models: Parameter Estimation and model validation. In *Proc. of Int. Workshop on Machine Vision Applications*, Kawasaki, Japan, 552-557.

123. Madigan, D. and Raftery, A.E. (1994). Model Selection and accounting for model uncertainty in graphical models using Occam's window. *Journal of the American Statistical Association*, **89**, 1535–1546.

124. Madigan, D. (1993). A note on equivalence classes of directed acyclic independence graphs. *Probability in the Engineering and Informational Sciences*, **7**: 409–412.

125. Bradshaw, J.M., Chapman, C.R., Sullivan, K.M., Almond, R.G., Madigan, D., Zarley, D., Gavrin, J., Nims, J., and Bush, N. (1993). KS-3000: Applying DDUCKS to bone-marrow transplant patient support. *Proceedings of the Sixth Annual Florida AI Research Symposium (FLAIRS '93)*, Ft. Lauderdale, FL, April, 78–83.

126. Bradshaw, J.M., Madigan, D., Richards, T., and Boy, G.A. (1993). Emerging technology and concepts for computer-based training. *Proceedings of the Sixth Annual Florida AI Research Symposium (FLAIRS '93)*, Ft. Lauderdale, FL, April, 89–95.

127. Bradshaw, J.M., Richards, T., Fairweather, P., Buchanan, C., Guay, R., Madigan, D.,and Boy, G.A. (1993). New directions in computer-based training in aerospace. *Proceedings of the Fourth International Conference on Human Machine Interactions and Artificial Intelligence in Aerospace*. Toulouse, France.

128. Bradshaw, J.M., Chapman, C.R., Sullivan, K.M., Boose, J.H., Almond, R.G., Madigan, D., Zarley, D., Gavrin, J., Nims, J. and Bush, N. (1993). KS-3000: An application of DDUCKS to bone-marrow transplant patient support. *Proceedings of the Seventh European Knowledge Acquisition for Knowledge-Based Systems Workshop (EKAW-93)*. Toulouse and Caylus, France, 57-74.

129. E.A. Kiely, Madigan, D., P.C. Ryan and M.R. Butler (1991). Ultrasonic imaging for extracorporeal shockwave lithotripsy: Analysis of factors in successful treatment. *British Journal of Urology*, **66**: 127–131.

130. Madigan, D. and Mosurski, K. (1991). An extension of the results of Asmussen and Edwards on collapsibility in contingency tables. *Biometrika*, **77**: 315–319.

## Refereed Publications–Submitted:

131. Schuemie, M.J., Trifirò, G., Coloma, P.M., Ryan, P.B. and Madigan, D. (2012). Detecting long-term adverse drug reactions in longitudinal observational data. *Epidemiology*, submitted.

132. McCormick, T.H., Rudin, C. and Madigan, D. (2011). Predicting medical conditions with Bayesian hierarchical rule modeling. Proceedings of the 6th INFORMS Workshop on Data Mining and Health Informatics (DM-HI 2011. P. Qian, Y. Zhou, C. Rudin, eds.

133. Rudin, C., Letham, B., Kogan, E. and Madigan, D. (2011). A learning theory framework for association rules and sequential event. *JMLR*, under revision.

134. Brookhart, M.A., Ryan, P., Madigan, D., Sturmer, T. (2011). An Empirical Comparison of Different Implementations of a Standardized New User Design For Drug Safety Surveillance. *Pharmacoepidemiology and Drug Safety*. Under revision.

135. Simpson, S., Madigan, D., Zorych, I., Schuemie, M.J., Ryan, P.B., and Suchard, M. (2012). Multiple self-controlled case series for large-scale longitudinal observational databases. *Biometrics*, under revision.

136. Pickering, W.H., Madigan, D., McCarter, R.J., and Burd, R.S. (2009). Evaluating relative importance of injury groupings on in-hospital mortality.

137. Madigan, D., Hauben, M., Vallarino, C., Patadia, V., Gerrits, C., and Simpson, S. (2011). The self-controlled case series method applied to a claims database for detection of signals in pharmacovigilance: A pilot study. Submitted.

138. Ryan, P.B., Reich, C., Welebob, E., Overhage, J.M., Stang, P.E., Hartzema, A.G., Racoosin, J.A., Scarnecchia, T., Madigan, D. (2011). Managing data quality for an active surveillance system. *Medical Care*, Submitted.

## Patents:

139. Ju, W., Krishnakumar, A.S., Krishnan, P., and Madigan, D. (2008). Method and apparatus for positioning a set of terminals in an indoor wireless environment. US PTO # 7403784.

## Other Publications:

140. Caster, O., Noren, N., Madigan, D., and Bate, A. (2013). Logistic regression in signal detection: another piece added to the puzzle. Clinical Pharmacology & Therapeutics, to appear.

141. Schuemie, M.J., Ryan, P.B., Suchard, M., Shahn, Z., and Madigan, D. (2013). Discussion of "An estimate of the science-wise false discovery rate and application to the top medical literature" by Jager and Leek, *Biostatistics*.

142. Caster, O., Noren, N., Madigan, D., and Bate, A. (2013). Logistic regression in signal detection: another piece added to the puzzle (letter). *Clinical Pharmacology & Therapeutics*, to appear.

143. Ryan PB, Madigan D, Stang PE, Marc Overhage J, Racoosin JA, Hartzema AG. (2013) Response to Comment on 'Empirical assessment of methods for risk identification in healthcare data'. *Statistics in Medicine*, Mar 15;32(6):1075-7. doi: 10.1002/sim.5725.

144. Hauben, M., Madigan, D., Reisinger, S., Hochberg, A., and O'Hara, D. (2008). Effects of Stratification on Three Pharmacovigilance Data Mining Algorithms.

145. Madigan, D., Ryan, P., Simpson, S.E., and Zorych, I. (2010). Bayesian methods in pharmacovigilance (with discussion). In: J. M. Bernardo, M. J. Bayarri, J. O. Berger, A. P. Dawid, D. Heckerman, A. F. M. Smith and M. West (eds), Bayesian Statistics 9, Oxford University Press, 421-438.

146. Hauben, M., Madigan, D., Patadia, V., Sakaguchi, M., van Puijenbroek, E. (2010). Quantitative signal detection for vaccines. *Human Vaccines*, 6, 1.

147. Madigan, D. and Gelman, A. (2009). Comment on "What is Statistics," *American Statistician*, **63**, 114.

148. Madigan, D. (2007). Introduction to the LARS chapter. Volume celebrating Efron's 60th birthday.

149. Bilker, W., Gogolak, V., Goldsmith, D., Hauben, M., Herrera, G., Hochberg, A., Jolley, S., Kulldorff, M., Madigan, D., Nelson, R., Shapiro, A., Shmueli, G. (2006). Accelerating Statistical Research in Drug Safety, Letter to the Editor (peer-reviewed), *Pharmacoepidemiology and Drug Safety*, **15**, 687-688.

150. Dayanik, A., Genkin, A., Kantor, P., Lewis, D.D., and Madigan, D. (2005). DIMACS at the TREC 2005 Genomics Track. TREC 2005.

151. Madigan, D. and Stuetzle, W. (2004). Statistics graduate education. Discussion of "The future of statistics" *Statistical Science*, **19**, 3, 408.

152. Madigan, D. (2003). Sparse Bayesian classifiers for text categorization. *Proceedings of the International Statistical Institute*.

153. Madigan, D. and Ridgeway, G. (2003). Discussion of "Least Angle Regression" by Efron, Hastie, Johnstone, and Tibshirani. *Annals of Statistics*.

154. Madigan, D. and Ridgeway, G. (2002). Discussion of "Chain graph models and their causal interpretations" by Lauritzen and Richardson. *Journal of the Royal Statistical Society (Series B)*.

155. Chaudhuri, S., Madigan, D., and Fayyad, U.M. (2000). KDD-99: The Fifth ACM SIGKDD International Conference on Knowledge Discovery and Data Mining. *SIGKDD Explorations*, 1, 49-51.

156. Madigan, D. (1999). Discussion of "Bayesian data mining in large frequency tables" by Bill DuMouchel. *The American Statistician*, **53**, 198-200.

157. Richardson, T., Ridgeway, G., and Madigan, D. (1999). Discussion of Bump Hunting in High-Dimensional Data by Jerome Friedman, *Statistics and Computing*, 9, 150-152..

158. J.W. O'Kane, G. Ridgeway, and D. Madigan (1999). Statistical Analysis of Clinical Variables to Predict the Outcome of Surgical Intervention in Patients with Knee Complaints.

159. Higdon, D. and Madigan, D. (1998). Discussion of paper by Lavine in *Bayesian Statistics, VI*, 381-382.

160. Nakamura, Y., Chabal, C., Chapman, C.R., Dunbar, P.J., Madigan, D., and Minstrell, J. (1997). FABLE: A computer-based tool for teaching geriatric pain management skills. In *Proceedings of the Annual Conference of the American Pain Society*.

161. Madigan, D., Perlman, M.D, and Volisnky, C.T. (1995). Bayesian model averaging and model selection for Markov equivalence classes of acyclic digraphs. *Proceedings of Workshop on Model Robustness and Model Uncertainty*, Bath, England, http://www.isds.duke.edu:80/conferences/bath/abstracts.html.

162. York, J. and Madigan, D. (1993). Discussion of the paper by Smith and Roberts, *Journal of the Royal Statistical Society (Series B)*, **55**, 88.

163. Madigan, D. (1993). What's next? Contribution to *Statistical Science* discussion of two papers on graphical models, **8**:261–263.

164. Madigan, D. (1995). Discussion of the paper by Draper *Journal of the Royal Statistical Society (Series B)*, **57**, 85..

165. Madigan, D. (1995). Discussion of the paper by Chatfield *Journal of the Royal Statistical Society (Series A)*, **158**, 458-459.

166. Madigan, D. (1995). Editorial for special issue of the *International Journal of Human-Computer Studies* on Knowledge-Based Hypermedia, **43**, 279.

167. Clarkson, D.B., Donnell, D., Minstrell, J., Hunt, E., Madigan, D., and Traynor, C. (1994). Vital: An intelligent tutoring system for statistics. *American Statistical Association, Proceedings of Section on Statistical Education*, 88-93.

168. Dunbar, P.J., Madigan, D., Lam, A.M., and Matta, B.F. (1994). A hypermedia instruction tool for teaching retrograde jugular venous cannulation. Multimedia Scientific Exhibit at the 1994 Meeting of the American Society of Anesthesiologists, San Francisco, CA.

169. Madigan, D. (1989). Microcomputer research at the Meath hospital. *Irish Medical Times*, **21** (34), 14-15.

170. Madigan, D. (1989). Expert systems in government. *Irish Computer*, 22-24.

## Book and Software Reviews:

171. Madigan, D. (2002). A review of "Principles of Data Mining" by Hand, Mannila, and Smyth. *SIAM Review*, **44**, 501-502.

172. Madigan, D. (2001). A review of "Probabilistic Networks and Expert Systems" by Cowell, Dawid, Lauritzen, and Spiegelhalter. *Journal of the American Statistical Association,* **96**, 1524.

173. Madigan, D. (1994). A review of MIM: graphical modelling software. *Statistics and Computing*, 4, 33–39.

174. Madigan, D. (1994). A review of "Graphical models in applied multivariate statistics" by Joe Whittaker. *Networks*, **24**,125.

## Unpublished Technical Reports:

175. Egilman, D., Madigan, D., and Druar, N.M. (2011). A Drug Trial Gone Wrong: Excess Death and Injury Among Study Volunteers in an Unmonitored Alzheimer's Drug Study.

176. Eyheramendy, S., Genkin, A., Ju, W-H., Lewis, D.D., and Madigan, D. (2003). Sparse Bayesian classifiers for text categorization. *JICRD*.

177. Ju, Wen-Hua, Madigan, David, and Scott, Steven (2002). On Bayesian learning of sparse classifiers.

178. Madigan, D. (1998). Combining probability distributions: A Review. Statistical Sciences Inc. Research Report.

179. Schaffner, A., Madigan, D., Clarkson, D.B., Donnell, D., Hunt, E.B., Keim, M., Minstrell, J., Nason, M., and Volinsky, C.T. (1996). Facet-based learning for statistics.

180. Schaffner, A., Madigan, D., Hunt, E.B., and Minstrell, J. (1996). Virtual benchmark instruction.

181. Madigan, D., Hunt, E., Levidow, B., and Donnell, D. (1995). Bayesian graphical models for intelligent tutoring systems.

182. Madigan, D. (1992). Temporal Reasoning with Probabilities: A Review. Statistical Sciences Inc. Research Report Number 7.

183. Madigan, D. (1992). Approaches to Explanation in Bayesian Networks. Statistical Sciences Inc. Research Report Number 8.

184. Carlsen, J.C., Madigan, D. and Bradshaw, D. (1992). Music expectancy and its measurement. UW Department of Music Technical Report.

## Selected Invited Presentations:

IMA New Directions Summer School, University of Minnesota, June 2013.

McGill University, Department of Epidemiology, Biostatistics & Occupational Health, "Are Observational Studies Any Good?" February 2013.

Brown University, Department of Biostatistics, "Are Observational Studies Any Good?" November 2012.

Pfizer Inc., New York, "Are Observational Studies Any Good?" November 2012.

Yale University, Department of Biostatistics, "Are Observational Studies Any Good?" November 2012.

University of Montreal, Canada, "Are Observational Studies Any Good?" October 2012.

Rutgers University, Department of Statistics, "Are Observational Studies Any Good?" October 2012.

Carnegie Mellon University, Department of Statistics, "Are Observational Studies Any Good?" October 2012.

Yale University, Department of Statistics, "Are Observational Studies Any Good?" October 2012.

SAMSI Opening Workshop on Data-Driven Decisions in Healthcare, "A Predictivist Approach to Observational Analyses in Healthcare," SAMSI, August 2012.

Atlantic Causal Inference Conference, "Big-Data-Driven Medicine," Baltimore, May 2012.

Interface 2012, "Massive Parallelization of Serial Inference Algorithms for a Complex Generalized Linear Model," Houston, TX,  May 2012.

IMA Meeting on User-Centered Modeling, "Big-Data-Driven Medicine," Minneapolis, May 2012.

New York City Center for Innovation Through Data Intelligence, "Big-Data-Driven Medicine," New York City, April 2012.

University of Texas at Austin, "High-Dimensional Pharmacoepidemiology," Austin TX, April 2012.

ENAR Spring Meeting, "High-Dimensional Pharmacoepidemiology," Washington DC, April 2012.

Institute of Medicine Meeting on Healthcare Data, "High-Dimensional Pharmacoepidemiology," Washington DC, March 2012.

Wharton Business School, "Statistical Methods for Drug Safety Surveillance: Big Data to the Rsscue?" Philadelphia, December 2011.

New Paradigms in Clinical Trial Methodology Symposium, "Medicine meets Big Data," Research Triangle Park, NC, November 2011.

Drug Information Association Annual Meeting, "OMOP – A Summary of the Findings," Chicago, June 2011.

Drug Safety Research Unit 6th Biennial Conference - Signal Detection & Interpretation in Pharmacovigilance, London, "Signal Detection Methods," June 2011.

New York Machine Learning Meet-up, New York, "Bayesian model averaging – new tricks for an old dog," May 2011.

Café Science public lecture, New York, "How safe are your prescription drugs?" May 2011.

PhRMA/FDA Statistical Leaders Conference, Washington DC, "Bayesian methods in active surveillance," April 2011.

AcademyHealth, Electronic Data Methods Forum Symposium, Washington, DC, "OMOP Initial Findings," April 2011.

North Carolina State University, "Drug Safety", April 2011

DIA Computational Science Meeting, Washington DC, "Self-controlled methods for analyzing recurrent events in large-scale longitudinal data," March 2011.

Department of Mathematics and Statistics, Bowling Green State University, "Active Surveillane for Drug Safety," Bowling Green, OH, December 2010.

Second Annual Princeton Day of Statistics, "Active Surveillane for Drug Safety," Princeton, NJ, October 2010.

Workshop on Recent Advances in Bayesian Computation, "Big Bayesian Logistic Regression," Singapore, Septmeber 2010.

Joint Statistical Meetings, "The Observational Medical Outcomes Partnership," Vancouver, Canada, August 2010.

Sparsity Workshop, University of Bristol, "Sparse methods in drug safety," Bristol, U.K., June 2010.

Valencia 9 International Meeting on Bayesian Statistics, "Bayesian methods in pharmacovigilance," Benidorm, Spain, June 2010

CRiSM Workshop on Model Uncertainty, "Sequential Bayesian Model Averaging," Warwick, U.K., May 2010

Data Mining and Nonparametric Statistics conference, "Active Surveillane for Drug Safety," Columbus, OH, May 2010.

International Society for Pharmacoepidemiology, mid-year meeting, "Observational Medical Outcomes Partnership: Methods Update," Raleigh, NC, April 2010.

Department of Statistics, Harvard University, "Active Surveillane for Drug Safety," Cambridge, MA, March 2010.

Frontiers of Statistical Decision Making and Bayesian Analysis (in honor of Jim Berger), "Active Surveillance for Drug Safety," San Antonio, March, 2010.

American Society for Microbiology Biodefense Meeting, "A cross-species analysis of the CDC anthrax vaccie safety data," Baltimore, February, 2010.

DIMACS 20th Anniversary Conference, "Drug safety, port security, and anthrax: A DIMACS medley." New Jersey, November, 2009.

DIA 2nd Annual Conference on Signal Detection and Data Mining, "The OMOP Project." New York, November 2009.

Keynote Speaker at 11th Annual Johnson & Johnson Statistics Conference, "Post-marketing drug safety surveillance: new developments," New Jersey, October, 2009.

CDC Annual Anthrax Vaccine Research Meeting, "Correlates of protection, the bridge from animals to humans." September 2009.

Joint Statistical Meetings, "Sequential Bayesian Model Selection," Washington, DC, August 2009

IMS Medalion Lecture, WNAR Conferece, "High Dimensional Bayesian Classifiers," Portland, Oregon, June 2009.

Quality and Productivity Research Conferece, "High Dimensional Bayesian Classifiers," IBM Watson, June 2009.

Taft Competitive Lecture, University of Cincinatti, "How safe are your drugs?." May, 2009

Department of Biomedical Informatics, Columbia University, "Shrinkage methods for drug safety," New York, March 2009.

Roche Global Safety Science Meeting, "Logistic regression for drug safety," Vienna, Austria, February 2009.

Department of Statistics, Rice University, "Shrinkage methods for drug safety," Houston, TX, January 2009.

Department of Statistics, University of Illinois, "Shrinkage methods for drug safety," Champaign, IL, December 2008.

Drug Information Association Signal Detection and Data Mining workshop, "Shrinkage methods for drug safety," Washington DC, November 2008.

DIMACS Port Security Wokshop, "Efficient sequential decision making algorithms for container inspection operations," New Jersey, November 2008.

Psychiatry Institute, Columbia University, "Data mining and the drug development process: Safety," New York, September 2008.

Institute of Mathematical Statistics Annual Meeting, "High Dimensional Bayesian Classifiers," Singapore, July 2008.

International Conference on Machine Learning and Data Mining, half day tutorial, "Text Mining," Beijing, China, June 2008.

International Conference on Machine Learning and Data Mining, "Data mining and the drug development process: Safety," Beijing, China, June 2008.

International Indian Statistical Association Annual Meeting. "Data mining and the drug development process: Safety," University of Connecticut, May 2008.

10th Annual Symposium on Statistics in Psychiatry, "High-dimensional Bayesian classifiers," New York University, May 2008.

Brooklyn Law School, "Secrets of Vioxx: Lessons for Drug Safety," April 2008.

Columbia University, Department of Applied Mathematics, "High-dimensional Bayesian classifiers," April 2008.

NIH/NIAID, "Secrets of Vioxx: Lessons for Drug Safety," March 2008.

CDC Anthrax Vaccine Correlate of Protection Meeting, "Predictive modeling building for correlates of protection, " March 2008.

Tenth Annual Winter Workshop, Bayesian Model Selection and Objective Methods, University of Florida, "High-Dimensional Bayesian Classifiers," January 2008.

University of Pennsylvannia Wharton Business School, "Secrets of Vioxx: Lessons for Drug Safety in the Drug Development Process," December 2007.

University of Washington Department of Biostatistics, "Secrets of Vioxx: Lessons for Drug Safety in the Drug Development Process," November 2007.

Annual meeting of the International Society of Pharmacovigilance, Bournemouth, UK, "How to Shrink in Pharmacovigilance." October, 2007.

SIAM Conference on Mathematics for Industry, Philadelphia, PA, "Pharmacovigilance: new methods needed." October, 2007.

U. Penn Invitational Choice symposium, Philadelphia, PA,  "Statistical Analysis: Bigger and Bigger," June 2007.

Midwest Biopharmaceutical Statistics Workshop, Muncie IN, "Bayesian post-marketing drug safety surveillance," May 2007.

Yale University, "Lasso Logistic Regression: Recent Developmentsm" April, 2007.

ENAR Annual Meeting, Atlanta GA, "Bayesian post-marketing drug safety surveillance," March 2007.

Duke University, "Lasso Logistic Regression: Recent Developments" November, 2006.

CDC Anthrax Vaccine Research Program Seventh Annual Investigator's Meeting, "Non-Human Primate Study," Atlanta, GA, October 2006.

UCLA Undergraduate Statistics Program, "Localization in Wireless Networks", two-day practicum, June 2006, Los Angeles.

Classification Society of North America Annual Meeting, "The Power of the Prior," May 2006, New Jersey.

Workshop on The Science of Learning and the Teaching of Math and Science, "Facet-Based Learning," May, 2006, Rutgers University.

Data Mining in Pharmacovigilence, April 2006, Pfizer, New York City

Data Mining in Pharmacovigilence, March 2006, DIA Meeting, Washington, DC

University of Chicago, "Sparse Bayesian Classification", February 2006.

Data Mining in Drug Safety, February 2006, DIMACS Workshop

Bayesian Statistics VIII, June 2006, Valencia, Invited talk. (declined due to conflict)

Drug Information Association Tutorial on Data Mining for Pharmacovigilence, Washington D.C., January 2006.

CDC Anthrax Vaccine Research Program Sixth Annual Investigator's Meeting, "Non-Human Primate Study: Interim Report," Atlanta, GA, October 2005.

NISS Workshop in Honor of Jon Kettenring, Better Data Analysis with Prior Knowledge, September 2005.

SAMSI Workshop on Homeland Scurity and National Defence, Statistical Methods for Authorship Attribution, SAMSI, September 2005.

Mitre Workshop on the Significance of Bioinformatics to National Security, Washington D.C., June 2005

Plenary Address, Graybill Conference, "Text Mining," Colorado, June 2005.

Google, New York, "Text mining," April 2005

Princeton University, "Online logistic regression," March 2005

American Statistical Association, Florida Chapter, Annual Meeting, "From Sewage to Guns: 20 Years of Statistical Consulting", February 2005.

Florida State Unversity, "The statistical analysis of text data", February 2005

MCMSki Workshop, Bormio, Italy, "Text categorization", January 2005.

M2004 SAS Data Mining Conference, "Text mining", October, 2004

Pacific Northwest National Laboratory, "Bayesian Model Selection", October, 2004

Bell Labs, "Bayesian Location Estimation", October, 2004

JSM, Toronto, "Bayesian Location Estimation", August, 2004

Bertinoro, Italy, Workshop on the Mathematics of Web Search, "Statistical Analysis of text Data", June 2004.

Wharton Business School, "Bayesian text categorization," April 2004.

DIMACS Workshop on Data Mining and Epidemiology, "Data Mining: An Overview", March 2004.

Columbia University, "Statistical methods for the analysis of textual data", September 2003.

University of Aalborg, Denmark, "Bayesian graphical models for location determination", September 2003

SAMSI, "Statistical methods for the analysis of textual data", September 2003.

ISI, Berlin, "Text Categorization", August 2003.

DIMACS Working Group on Data Mining and Epidemiology, "Analysis of Hospital Discharge Data", May 2003.

Johns Hopkins University, "Text categorization", May 2003

North Carolina State University, "Text Categorization", May 2003

Cleveland Clinic, "Graphical Markov Models", December, 2002.

IBM TJ Watson, "Text Categorization", November, 2002

Educational Testing Service, "Sequential Monte Carlo Methods for Massive Datasets", November, 2002

University of Connecticut, "Text Categorization", September, 2002

IMS Annual Meeting, Banff, Canada, "Retrieval properties of large collections," July, 2002.

IMS Annual Meeting, Banff, Canada, "Bayesian analysis of hidden Markov models," July, 2002.

Keynote Speaker, 22nd International Symposium on Forecasting, Dublin, "Bayesian analysis of hidden Markov models", June 2002.

Bayesian Statistics VII, June 2002, Valencia, Invited discussion.

Duke University, "Text Categorization", May 2002.

University of California, Irvine, "Text Categorization", April 2002.

University of Southern California, "Text Categorization", April 2002.

New York University, "Bayesian analysis of hidden Markov models", April 2002.

DIMACS Epidemiology Workshop, "Some aspects of adverse events detection." March 2002.

Temple University, "Text Categorization", April 2002.

Haifa Winter Workshop on Computer Science and Statistics, Technion, Haifa, Israel, "Bayesian Analysis of Hidden Markov Models." December, 2001.

Haifa Winter Workshop on Computer Science and Statistics, University of Haifa, Israel, "Likelihood-based Data Squashing." December, 2001.

Columbia University, Graphical Models and Bayesian Networks: A History. October, 2001.

SCILS, Rutgers University, Bayesian statistical methods for digital traces, April, 2001.

Bell Labs, Data warehousing and reporting: a case study, January, 2001.

Rutgers University, Graphical Markov Models, December, 2000.

University of Washington. Data squashing. November 2000.

Royal Statistical Society Annual Meeting, University of Reading. Graphical Models and Bayesian Networks: A History. September, 2000.

University of Chicago Business School. Data squashing. November 1999.

Joint Statistical Meetings, August 1999, Baltimore. "Bayesian data mining in large frequency tables."

UW Mathday Plenary Speaker. Data in-Garbage out: How to twist the truth with statistics. March 1999.

Bell Labs, Bayesian Model Selection. January 1999.

Seventh International Workshop on AI and Statistics, Florida. Bayesian Graphical Models, Intention-to-Treat, and the Rubin Causal Model. January, 1999.

Bayesian Statistics VI, June 1998, Valencia, Invited discussion.

Bellcore, "Bayesian Collaborative Filtering" June 1998.

Cambridge University, Statistical Laboratory, "Noncompliance in clinical trials," October 1997.

Isaac Newton Institute for Mathematical Sciences, Cambridge, UK "Bayesian model averaging," October 1997.

Trinity College Dublin, "Bayesian model averaging," October 1997.

UW/Microsoft Data Mining Institute, "Bayesian model averaging," July 1997.

KDD-97, "Graphical models," August 1997.

"The World-Wide Web as a Statistical Producer," Derry, Northern Ireland, "Statistical Analysis of Web-Generated Data," April 1997.

International Association for Statistical Computing, Pasadena, CA, "Graphical Markov Models for Chain Graphs," February 1997.

Sixth International Workshop on AI and Statistics, Florida, "Bayesian Information Retrieval," January, 1997.

Royal Statistical Society, Special Session sponsored by the Research Section, Invited Talk, "Dealing with model uncertainty," September, 1996.

ETS, Princeton, New Jersey, August 1996, "Bayesian model averaging."

Joint Statistical Meetings, August 1996, Chicago. "Bayesian information retrieval."

First European Conference on Highly Structured Stochastic Systems, Rebild, Denmark, May 1996.

INFORMS (formerly ORSA-TIMS) meeting, May 1996, Washington DC, "New developments in Bayesian model averaging."

Departments of Philosophy and Statistics, Carnegie-Mellon University, Invited talks, May 1996.

ENAR meetings, Richmond, VA, and ISDS, Duke University, "Model Selection and Averaging with Biostatistics applications," March 1996, invited.

Department of Mathematical Sciences, University of Alaska at Fairbanks, February 1996, invited.

NIPS Conference, Vail, Colerado December 1995, "Bayesian model averaging and model selection for Markov equivalence classes of acyclic digraphs"

Model Uncertainty Workshop, Bath, England, June 1995, "New developments in Bayesian model averaging."

Algebraic Methods in Multivariate Statistics, Oberwolfach, Germany, July 1995.

Workshop on Maximum Entropy and Bayesian Methods, Sante Fe, July 1995, "New developments in Bayesian model averaging."

Department of Psychology, UW, Facet-based Learning for Statistics, April, 1995

Fifth International Workshop on Artificial Intelligence and Statistics, Florida, Plenary Talk, "Test selection for graphical models," January 1995.

Department of Statistics, UW, Facet-based Learning for Statistics, December, 1994

European Conference on Hypermedia Technology, Edinburgh, Scotland, September 1994, "Repertory hypergrids: An application to clinical practice guidelines."

Bell Communications Research, August 1994, "Repertory hypergrids for hypermedia."

Bell Laboratories, August 1994, "Model Uncertainty" .

IMS Meeting, June 1994, Chapel Hill, "Computations for Bayesian graphical models."

Bayesian Statistics V, June 1994, Valencia, "Improving the predictive performance of Bayesian graphical models."

The Seventh Annual Florida Artificial Intelligence Research Symposium, May 1994. "Building Bayesian models for intelligent tutoring systems."

Joint Statistical Meetings, August 1993, San Francisco. "Accounting for Model Uncertainty."

First ACM Workshop on Multimedia in Medical Education, August 1993, Anaheim. "Multimedia tools for Cancer Pain Education."

Bayes Factors and Sensitivity Analysis Workshop, Febuary 1993, UCLA. "Bayesian graphical models."

Society for Medical Decision Making, October 1992, Portland, Oregon. "Bayesian Statistics."

Joint Statistical Meetings, August, 1992, Boston. "Model Selection and Accounting for Model Uncertainty in Graphical Models using Occam's Window."

The Second International Conference on Music Perception and Cognition, February, 1992, Los Angeles. "Development of a Data-based Expectancy Model."

## Scholarly Service Activities:

### Scholarly Journals

Editor, *Statistical Science*, 2011-2013.

Editor-in-Chief, *Statistical Analysis and Data Mining*, 2013-2015.

Editor-in-Chief, *Statistical Science*, 2008-2010 (Impact Factor 3.523, highest in Statistics).

Editorial Board, *Therapeutic Innovation and Regulatory Science*, 2013-

Editorial Board, *International Journal of Occupational and Environmental Health*, 2012-

Advisory Board, Wiley Interscience Review Series (WIRES) On Data Mining And Knowledge Discovery, 2008-

Editorial Board, *Foundations and Trends in Machine Learning*, 2007-

Senior Associate Editor, *Advances in Disease Surveillance*, 2005-.

Advisory Board, *Bayesian Analysis,* 2004-2006.

Action Editor, *Journal of Machine Learning Research*, 2003-2006.

Associate Editor, *Journal of Computational and Graphical Statistics*, 1997-2002.

Associate Editor, *Journal of the Royal Statistical Society (Series B)*, 1995-1999.

Editor of special issue of the *International Journal of Human-Computer Studies*: "Knowledge-based hypermedia," 1995.

Editorial Board for the *Handbook of Knowledge Discovery and Data Mining,* 1997-2000.

Editorial Board for the *Journal of Data Mining and Knowledge Discovery*,1996-2004.

### Professional Societies

Chair, Ad-Hoc IMS Committee to select the editor-in-chief of the *Statistical Science*, 2012.

IMS representative to the steering committee for the International Year of Statistics, 2013.

Program Chair, Statistical Learning and Data Mining Section, American Statistical Association, 2009-2010.

Chair, ISBA Constitution and Bylaws Committee, 2009-2014

Program Chair, Institute of Mathematical Statistics, 2005.

Member, Ad-Hoc IMS Committee to select the editor of the *Annals of Applied Statistics*, 2006.

Member, Ad-Hoc ISBA Committee to select the editor of *Bayesian Analysis*, 2006.

Elected Member of the ISBA Board (International Society Bayesian Analysis), 2005-2006.

Program Chair, Statistical Computing Section, American Statistical Association, 2003-2004.

## Conferences

Chair, Organizing Committee for International Year of Statistics Capstone Workshop, 2012-13.

Member, Senior Program Committee, KDD-2011.

Member, Program Committee, 2nd International Conference on Algorithmic Decision Theory, DIMACS, 2011

Co-Chair, BioSurveillance 2007: NSF BioSurveillance Workshop: Systems and Case Studies.

Student Awards Chair, KDD-2004, *The ACM SIGKDD International Conference on Knowledge Discovery and Data Mining.*

Member of the Organizing Committee for the National Syndromic Surveillance Conference, 2003, 2004.

Member of the KDD-2003, *The ACM SIGKDD International Conference on Knowledge Discovery and Data Mining,* Best Paper Award Committee, 2003.

Program Chair, KDD-1999, *The ACM SIGKDD International Conference on Knowledge Discovery and Data Mining.*

Program Chair, AISTATS-07, *Sixth International Workshop on Artificial Intelligence and Statistics*, 1997.

Member of the program committee for Association for Computing Machinery Special Interest Group on Infromation Retrieval Annual Conference (ACM SIGIR)-2002, 03, 04.

Member of the program committee for KDD-95, 96, 97, 98, 99, 00, 01, 02, & 2004 Knowledge Discovery in Databases.

Member of the program committee for UAI-95, 96, 97, 98, 99, 02, 03 & 04, the Annual Conference on Uncertainty in Artificial Intelligence.

Member of the program committee for AISTATS-95, 97, 99, 01, 03 & 05, the International Workshop on Artificial Intelligence and Statistics.

Member of the program committee for IDA-01, Intelligent Data Analysis.

Co-organizer, Worskhop on Learning in Graphical Models, NIPS, Colorado, December, 1995.

Co-Chair for Institute of Mathematical Statistics/National Science Foundation Graphical Models Summer Workshop, 1997.

Member of the program committee for Florida Artificial Intelligence Research Symposium (FLAIRS) 1996 & 1997 Uncertain Reasoning in Artificial Intelligence Track, Florida.

**Government**

Member, FDA Advisory Committee on Drug Safety and Risk Management, 2011-2014.

NIH Panel member, Special Emphasis Panel/Scientific Review Group 2012/10 ZRG1 PSE-B (02) M, May 2012.

Member, NAS-NRC Committee on Massive Data, 2010-2011.

Member, FDA Science Board – CDER sub-committee, 2010-2011.

Science Foundation Ireland Mathematics Review Panel, March, 2005, October 2005, February 2006, November 2006, March 2007.

National Science Foundation Artificial Intelligence and Cognitive Science Review Panel, 2004

National Science Foundation Statistics Review Panel, 2003, 2004, 2007

Member of the Institute of Medicine Committee to Review the CDC Anthrax Vaccine Safety and Efficacy Research Program, 2000-2002.

**Other**

External Review Committee for Statistics (Chair), Carnegie Mellon University, 2013.

Member, DIMACS Advisory Board, 2013-

Member, Advisory Board, University of Maryland "Development and Evaluation of Search Technology for Discovery of Evidence in Civil Litigation." 2011-2014.

Co-Organizer of Summer 2011 Undergraduate "Explorations in Statistics" camp, 30 students.

Member, Advisory Board, Command, Control, and Interoperability Center for Advanced Data Analysis, A Department of Homeland Security Center of Excellence, 2010-

External Review Committee for Biostatistics, Columbia University, May 2012

External Review Committee for Statistics, Harvard University, April 2010.

External Review Committee for Statistics (Chair), Duke University, 2009.

External Review Committee for Statistics, University of North Carolina, 2008.

Editorial Board, ASA-SIAM Series on Statistics and Applied Probability, 2006-2008.

Series Editor, Chapman and Hall Computer Science and Data Analysis Series, 2002-present

External Examiner for PhD Dissertation of Susanne Bottcher, Aalborg University, Denmark, June 2004.

External Examiner for PhD Dissertation of Bo Thieson, Aalborg University, Denmark, September 1996.

## Recent Consulting Activities:

Consultant, Aris Global, 2012.

Consultant, Emergent Biosolutions, 2012-2013.

Consultant, Pharmaceutical Development Group, Inc., 2012.

Consultant, DaVita Inc., 2010.

Consultant, Boehringer Ingelheim, 2010.

Consultant, Foundation for the NIH, OMOP, 2009-

Consultant, CDC Anthrax Vaccine Research program, 2005-2010.

Consultant, Skarven Enterprises/Boeing, 2003-2012.

Consultant, Wyeth Pharmaceutical, 2006, 2008-09.

Consultant, Novartis Inc., 2006-2008.

Consultant, Takeda Inc., 2008, 2011.

Consultant, Pfizer Inc., 2007-2008.

Consultant, Adready Inc., 2008.

Consultant, Jarvik Heart Inc., 2009-.

Consultant, GSK Inc., 2009.

Advisory Board, mediGuard/Quintiles, 2007-2011.

Consultant in litigation related to Actos, Celebrex, Depakote, Fosamax, Ibuprofen, Pradaxa, Raptiva, Silzone, Seroquel, Texaco versus Ecuador, Tysabri, Vioxx, Vytorin, Yaz/Yasmin.

## PhD Committee Chairmanships:

1. Jeremy C. York, Dissertation Title: " Bayesian Methods for the Analysis of Misclassified or Incomplete Multivariate Discrete Data." PhD Awarded 1992. Winner of the Savage Outstanding Dissertation Award. Currently employed at amazon.com, Seattle.

2. Jennifer Hoeting, Dissertation Title: "Accounting for Model Uncertainty in Linear Regression." PhD Awarded 1994 (joint with Adrian Raftery). Currently Professor at Colorado State University.

3. Chris Volinsky, Dissertation Title: " Bayesian Model Averaging in Censored Survival Models." PhD Awarded 1997 (joint with Adrian Raftery). Currently employed at AT&T Laboratories - Research.

4. Andrew Schaffner, Dissertation Title: "Tools for the Advancement of Undergraduate Statistics Education." PhD Awarded 1997. Currently Associate Professor at California Polytechnic State University, San Luis Obispo.

5. Michelle Keim, Dissertation Title: "Bayesian Information Retrieval." PhD Awarded 1997. Currently employed at Detectent, San Diego.

6. Cibele daSilva, Capture-recapture methodology for bowhead whales. PhD Awarded 1999.

7. Greg Ridgeway, Learning Massive Bayesian Networks. PhD Awarded 1999. Currently employed at National Insitute of Justice.

8. Susana Eyheramendy, Text categorization. PhD Awarded 2003. Currently Assistant Professor, Department of Statistics, Pontificia Universidad Catolica de Chile.

9. Ivan Zorych, Location estimation in wireless networks, PhD Awarded 2005 (NJIT/Rutgers). Currently Research Scientist at Columbia University.

10. Aimin Feng, Bayesian methods for post-marketing drug safety surveillance, PhD Awarded 2006 Currently employed at Novartis.

11. Denise Chang, Individualized hospital report cards, PhD Awarded 2006. Currently employed at Sanofi-Aventis.

12. Suhrid Balakrishnan, Algorithms and Applications for Classifiers of Massive and Structured Data Problems, PhD Awarded 2007. Currently employed at AT&T Labs Research.

13. Jerry Cheng, Bayesian Methods for Non-Standard Missing Data Probems, PhD Awarded 2010. Currently Assistant Professor, UMDNJ/Rutgers.

14. Shouhou Zhou, Bayesian Predictive Model Selection Criteria, PhD Awarded 2010. MD Anderson.

15. Shawn Simpson, Self-controlled methods for postmarketing drug safety surveillance in large-scale longitudinal data, PhD Awarded 2011. Currently Assistant Professor at Columbia University

Current: Ed Cheng, Zach Shahn

## PhD Committee Memberships:

### UW PhD Reading Committees
Mayumi Adachi, Department of Music
Denise Draper, Department of Computer Science
Geof Givens, Department of Statistics
Steven Lewis, Department of Statistics
Heike Blossey, Department of Statistics
Jeremy York, Department of Statistics (Chair)
Jennifer Hoeting, Department of Statistics (Chair)
David Bradshaw, Department of Music
Craig Donovan, SIPhD
Dan Hershman, Department of Music
Tapas Kanungo, Department of Electrical Engineering

### UW PhD Committees
Carlos Diaz Avalos, Department of Statistics
Lang Wu, Department of Statistics
Renato Assuncao, Department of Statistics
Dave Higdon, Department of Statistics
Brian Hopkins, Department of Mathematics
Shili Lin, Department of Statistics
Brian Lockyear, Department of Computer Science
Badr al Badr, Department of Electrical Engineering
Tapas Kanungo, Department of Electrical Engineering
Michael Heeley, Business School
Kyung-Im Sung, Department of Electrical Engineering

### Rutgers PhD Committees
William McLoughlin, Department of Chemistry
Francis Mendez, Business School, RU Newark
Qi Xia, Department of Statistics

Pai-Hsi Huang, Department of Computer Science
Yihua Wu, Department of Computer Science
Aynur Dayanik, Department of Computer Science
Dmitriy Fradkin, Department of Computer Science
Ying Sun, School of Communication, Information and Library Studies
Jun Li, Department of Statistics
Yong Wang, Department of Genetics

### Rutgers MS Committees
Saumitr Pathak, Department of Electrical and Computer Engineering

### Columbia PhD Committees
Lucy Robinson, Department of Statistics
Jane Paik, Department of Statistics
Mladen Laudanovic, Department of Statistics
Ragna Haraldsdottir, Department of Statistics
Tyler McCormick, Department of Statistics
Kamiar Rahnama Rad, Department of Statistics
Pannaga Shivaswamy, Department of Computer Science
Xiaoyan Wang, Department of Biomedical Informatics
Anil Raj, Department of Applied Physics and Applied Mathematics
Ivor Cribben, Department of Statistics
Ying Liu, Department of Statistics


## Teaching:

### Columbia University
Applied Statistical Methods (W2025), Spring 2012, Spring 2013
Introduction to Statistical Methods (W3005), Fall 2012
Statistical Consulting, Fall 2008, Spring 2009, Fall 2009, Spring 2010, Fall 2010, Spring 2011
Data Mining, Fall 2008
Applied Statistics (G6101-2): Fall 2007 - Spring 2008.
Introduction to Statistical Reasoning (W1001): Spring 2010, Fall 2010.

### Rutgers University
Bayesian Data Analysis: Fall 2002, Spring 2003, Spring 2004, Spring 2006
Data Mining: Spring 2001, Spring 2002, Fall 2003, Fall 2004.
Computing and Graphics in Applied Statistics (486): Fall 2001.
Mathematical Statistics (583): Spring 2003.
Mathematical Statistics (384): Spring 2007.

### University of Washington
Introductory Statistics (311): Spring 1992, Fall 1992, Winter 1994, Spring 1995, Fall 1995, Spring 1997
Mathematical Statistics (341): Fall 1991, Winter 1991
Mathematical Statistics (342): Spring 1991

Introductory Statistics for Social Scientists (361-2): Fall-Winter 1998-9
Statistics for Engineers (390): Fall 1990, Spring 1993, Fall 1994, Winter 1995, Spring 1996
Stochastic Processes (396): Spring 1992
Mathematical Statistics (481): Fall 1993
Scientific Computing (535): Winter 1996, Winter 1997
Graphical Models (592): Fall 1991, Winter 1994, Spring 1995 (overload)
Statistical Consulting (598): Winter 1991, Fall 1992, Spring 1993

## University Service:

### Columbia Service Activities
Chair, Provost's Faculty Committee on Online Learning, 2013-
Chair, Columbia Shared Research Computing Policy Advisory Committee, 2011-
Executive Committee, Columbia Institute for Data Sciences and Engineering, 2012-
Member, Search Committee for Biostatistics Chair, 2012.
Member, Advisory Committee, Institute for Statistics and the Brain, 2012-
Member, Review Committee for Biostatistics Department, 2011.
Executive Committee, School of Continuing Education, 2011-2014
Chair, Arts and Science Committee on Classroom Technology, 2011-2
Member, Task Force on Benefits, 2010-2011.
Member, Provost's Committee on Retirement, 2011-2.
Member, Arts and Sciences Space Committee, 2009-
Chair, Search Committee for Dean of the School of Continuing Education, 2008.
Ad-hoc promotion committees (2)

### Rutgers Service Activities
Lecturer in workshop for high school teachers on Mathematics in Homeland Security, DIMACS, 2007.
Member of the Faculty of Arts and Sciences Transition Team, 2006.
Member of the Faculty of Arts and Sciences Budget Reduction Committee, 2005-06.
Member of the Faculty of Arts and Sciences Appointments and Promotions Committee, 2003-04.
Member of Organizing Committee for DIMACS Special Focus on Data Mining, 2001-.
Member of Organizing Committee for DIMACS Special Focus on Epidemiology, 2002-.
Co-Organizer of the DIMACS Working Group on Adverse Event and Disease Reporting, Surveillance, and Analysis.
Chair, DIMACS Associate Director Search Committee, 2005-06.
Member, Rutgers University Computer Coordinating Council, 2005-

### UW Service Activities
Chair of the Department Computing Committee, 1994-1999.
MS Applied Exam Committee, 1991-1999 (chair in 1993)
PhD Applied Exam Committee, 1993 (reader in other years)
Graduate Program Director, 1998-1999
UW Advisory Board on Accountability, 1998-1999
Seminar Series on Graphical Models, 1990-1991 (with Russell Almond)

Multivariate Analysis and Graphical Models of Association (MAGMA) Seminar Series, 1993-1994, 1996 (with Michael Perlman)

Seminar Co-ordinator, 1991-1992 (including PNWSM)

Director of Consulting, 1993-1994

Mathday Lecture, 1994, 1995, 1997, & 1998

College of Arts and Sciences Distance Learning/Instructional Technology Task Force, 1996

College of Arts and Sciences Graduation Committee, 1996-1998.

UW Distinguished Teaching Award Committee, 1996 and 1997.

Chair, Review Committee for UW Math Science Computing, 1996.

Exhibit B

# EXHIBIT B

*Graeme Robert Peterson v. Merck*
Federal Court of Australia, Melbourne, Australia
Vioxx and Cardiovascular Risk
Trial Testimony: May 12-15, 2009

*Chevron v. The State of Ecuador*
Washington, D.C.
Comments on the Expert Report of Dr. George Easton'
International Arbitration Testimony; April 10, 2009

*Pfizer Securities Litigation.*
U.S. District Court, Southern District of New York,
No. 04 Civ. 09866
Celebrex and Cardiovascular Risk.
Deposition Testimony: June 11, 2009
Daubert Testimony: October 20-22, 2009

*Andersen v. St. Jude Medical, Inc.*
Ontario Superior Court of Justice,
No. 00-cv-195906CP
A Statistical Evaluation of the AVERT Silzone Heart Valve Study
Toronto, Canada
Trial Testimony: June 21-22, 2010

*Plaintiffs v. Astra Zeneca*
New York, NY
Seroquel and Weight Gain
Deposition Testimony: March 3, 2011

*Merck ERISA Litigation*
U.S. District Court, District of New Jersey
MDL 1658; 3:05 cv 01151-SRC-TJB;3:05 cv 02369-SRC-TJB
Vioxx and Cardiovascular Risk.
Deposition Testimony: May 11, 2011

*Plubell v. Merck & Co., Inc.*,
Circuit Court of Jackson County, Missouri No.
04-cv-235817
Vioxx and Cardiovascular Risk
Deposition Testimony: September 27 & 28, 2011 and January 10, 2012

1

*Plaintiffs v. Bayer*
Yasmin and YAZ
MDL Number 2100.
Deposition Testimony: October 13, 2011

*In re Schering Plough Corp. Sec. Litig/ENHANCE Securities Litig.*; *In re Merck & Co., Inc.*
*Vytorin/Zetia Sec. Litig.*
U.S. District Court, District of New Jersey
No. 08-397; No. 08-2177
Vytorin and the ENHANCE clinical trial
Deposition Testimony: November 22, 2011

*Raptiva Litigation*
Superior Court for the State of California for County of Alameda,
RG10-494957
Deposition Testimony: December 14, 2011

*Hunt v. McNeil Consumer Healthcare*
United States District Court for the Eastern District of Louisiana
No. 2:11-cv-00457-JTM-KWR
Ibuprofen Litigation
Deposition Testimony: June 22, 2012

*Fosamax Litigation*
United States District Court for the District of New Jersey,
No. 3:11-cv-05304
Deposition Testimony: December 7, 2012; Trial Testimony: April 15, 2013

*Kentucky v. Merck & Co., Inc.*
Franklin Circuit Court, Commonwealth of Kentucky,
No. 90-CI-1671
Vioxx and Cardiovascular Risk
Deposition Testimony: May 3, 2013

Exhibit C

# Documents Relied Upon

## Exhibits

- PX 5, 7, 10, 12, 13-16, 25-29, 31, 33-35, 39, 40, 41, 50, 62, 80, 83, 85, 87, 95-96, 103, 105, 109, 114, 117, 124-127, 132-134, 136-138, 149, 218, 233, 236, 244, 251, 254, 258, 268-270, 276, 293-297, 298, 298A, 299-304, 305, 305A, 306-311, 317, 319, 320, 323-324, 329-330, 331, 332-337, 338, 339, 342, 347, 348, 349-350, 351, 352, 353, 356, 357, 358-360, 362-374, 376-377, 380, 383, 395, 410, 413, 415, 417-420, 423-426, 429, 431-433, 435-436, 438-446, 448, 452-455, 460-462, 466-468, 470-472, 475, 525-526, 532, 539-540, 545, 604-646, 665, 677-684, 695, 713, 721, 745, 749-750, 753, 763, 766, 795, 922, 936, 949

## Deposition and Other Transcripts

- Deposition Transcript of Joshua Chen dated March 1, 2013
- Deposition Transcript of Deborah Shapiro dated March 6, 2013
- Deposition Transcript of Raymond Bain dated March 21, 2013
- Deposition Transcript of Garret FitzGerald dated April 23, 2013
- Deposition Transcript of James Bolognese dated May 8, 2013
- Deposition Transcript of John Oates dated May 16, 2013
- Deposition Transcript of Eliav Barr dated May 21, 2013
- Deposition Transcript of Alise Reicin dated June 7, 2013
- Deposition Transcript of Block, 160:18 to 161:2, 116:19 to 23, 118:16 to 119:20
- Deposition of Reines, 54:19 to 55:21
- Deposition of Lines, 73:11 to 18; 131:11 to 24

## News

- News articles including, but not limited to:

  - Elyse Tanouye & Robert Langreth, *Time's Up: With Patents Expiring on Big Prescriptions, Drug Industry Quakes – Top Firms Gird for Onslaught From Generics, Scramble to Develop New Products*, THE WALL STREET JOURNAL, August 12, 1997

  - Kristine Conner, *Garret FitzGerald, Renaissance Man*, PENN MED., Spring 2001

  - Interview: Merck CEO Ray Gilmartin (PBS NewsHour broadcast October 29, 2004) (transcript)

- o  Heather A. Davis, *When Good Drugs Turn Bad*, PENN CURRENT, November 4, 2004

- o  *Results Mixed on Merck's New Painkiller* (Fox News broadcast November 13, 2006)

- o  *Science and Mission at Risk:  FDA's Self Assessment: Hearing Before Subcommittee on Oversight and Investigations of the H. Comm. on Energy and Commerce,* 110th Cong. (January 29, 2008) (Testimony of Dr. Garret A. FitzGerald)

- o  Press Release, NSAIDs and Cardiovascular Risk Explained, According to Studies from the Perelman School of Medicine, (May 2, 2012), http://www.uphs.upenn.edu/news/News_Releases/2012/05/risk/

- o  *Merck Statement on Article in The Archives of Internal Medicine Involving VIOXX* (November 23, 2009), http://www.evaluategroup.com/Universal/View.aspx?type=Story&id=200709

## Bates Stamped Documents

- CAL0000432
- FDACDER008400
- FITZG-000387
- FITZG-001778
- FITZG-002319
- FITZG-002563
- FITZG-002566
- GFITZ-1658 000001
- GFITZ-1658 000002
- GFITZ-1658 000040
- GFITZ-1658 000086
- GFITZ-1658 000088
- GFITZ-1658 000093
- GFITZ-1658 000106
- GFITZ-1658 000126
- GFITZ-1658 000322
- GFITZ-1658 000334
- GFITZ-1658 000374
- GFITZ-1658 000388
- GFITZ-1658 000431

- GFITZ-1658 000434
- GFITZ-1658 000438
- GFITZ-1658 000792
- GFITZ-1658 000976
- GFITZ-1658 001100
- GFITZ-1658 001144
- GFITZ-1658 001200
- GFITZ-1658 001247
- GFITZ-1658 001277
- GFITZ-1658 001432
- GFITZ-1658 001485
- GFITZ-1658 001518
- GFITZ-1658 001899
- GFITZ-1658 002172
- GFITZ-1658 002181
- GFITZ-1658 002226
- GFITZ-1658 002245
- GFITZ-1658 002341
- GFITZ-1658 002351
- GFITZ-1658 002383
- GFITZ-1658 002402
- GFITZ-1658 002425
- GFITZ-1658 002429
- GFITZ-1658 002431
- GFITZ-1658 002465
- GFITZ-1658 002484
- GFITZ-1658 002488
- GFITZ-1658 002494
- GFITZ-1658 002533
- GFITZ-1658 002613
- JDN02378
- MAD000001
- MAD000215
- MAD002057-2074
- MAD002075-2076
- MAD002077-2078
- MAD002047-2056
- MAK00300
- MRK- ACF0002700
- MRK- ACF0003791
- MRK-00420000774
- MRK-00420012526
- MRK-00420018237
- MRK-00420018254

- MRK-01420115559
- MRK-1420167097
- MRK-1420167265
- 2000 NEMJ 000028
- MRK-420013584
- MRK-99420024841
- MRK-99420025460
- MRK-AAA0000862
- MRK-AAA0002509
- MRK-AAA0002566
- MRK-AAA0002593
- MRK-AAA0002688
- MRK-AAA0002756
- MRK-AAA0003306
- MRK-AAA0017198
- MRK-AAA0017214
- MRK-AAA0017231
- MRK-AAA0017381
- MRK-AAA0017391
- MRK-AAA0017611
- MRK-AAA0033476
- MRK-AAA0056487
- MRK-AAB0000821
- MRK-AAB0000975
- MRK-AAB0006080
- MRK-AAB0010561
- MRK-AAB0016187
- MRK-AAB0023576
- MRK-AAB0032751
- MRK-AAB0056491
- MRK-AAB0059397
- MRK-AAB0059492
- MRK-AAB0059510
- MRK-AAB0059993
- MRK-AAB0060021
- MRK-AAB0060252
- MRK-AAB0060258
- MRK-AAB0060340
- MRK-AAB0060447
- MRK-AAB0060638
- MRK-AAB0060658
- MRK-AAB0060919
- MRK-AAB0061643
- MRK-AAB0061716

- MRK-AAB0061800
- MRK-AAB0062117
- MRK-AAB0063672
- MRK-AAB0063679
- MRK-AAB0064361
- MRK-AAB0069342
- MRK-AAB0079297
- MRK-AAB0085871
- MRK-AAB0095638
- MRK-AAB0101594
- MRK-AAB0103832
- MRK-AAB0120451
- MRK-AAB0123125
- MRK-AAC0001654
- MRK-AAC0001663
- MRK-AAC0009608
- MRK-AAC0010092
- MRK-AAC0010273
- MRK-AAC0014464
- MRK-AAC0022439
- MRK-AAC0023819
- MRK-AAC0025973
- MRK-AAC0041016
- MRK-AAC0043604
- MRK-AAC0046594
- MRK-AAC0046632
- MRK-AAC0046675
- MRK-AAC0046677
- MRK-AAC0046712
- MRK-AAC0046713
- MRK-AAC0046714
- MRK-AAC0046860
- MRK-AAC0053171
- MRK-AAC0053835
- MRK-AAC0055638
- MRK-AAC0055642
- MRK-AAC0056638
- MRK-AAC0067677
- MRK-AAC0069659
- MRK-AAC0074588
- MRK-AAC0081214
- MRK-AAC0084661
- MRK-AAC0088387
- MRK-AAC0095534

- MRK-AAC0095651
- MRK-AAC0097104
- MRK-AAC0097495
- MRK-AAC0104891
- MRK-AAC0106849
- MRK-AAC0107269
- MRK-AAC0107975
- MRK-AAC0114291
- MRK-AAC0131504
- MRK-AAC0131829
- MRK-AAC0140348
- MRK-AAC0142751
- MRK-AAC0143004
- MRK-AAC0155109
- MRK-AAC0163386
- MRK-AAC0164402
- MRK-AAC0164883
- MRK-AAC0164902
- MRK-AAC0165144
- MRK-AAC0165507
- MRK-AAC0165510
- MRK-AAC0165545
- MRK-AAC0168688
- MRK-AAC0178440
- MRK-AAC0183599
- MRK-AAC0189816
- MRK-AAC0190076
- MRK-AAD0014229
- MRK-AAD0016931
- MRK-AAD0016942
- MRK-AAD0019572
- MRK-AAD0019783
- MRK-AAD0022288
- MRK-AAD0022987
- MRK-AAD0032864
- MRK-AAD0046029
- MRK-AAD0046104
- MRK-AAD0046109
- MRK-AAD0046595
- MRK-AAD0046618
- MRK-AAD0046654
- MRK-AAD0046671
- MRK-AAD0046671
- MRK-AAD0046709

- MRK-AAD0046731
- MRK-AAD0046787
- MRK-AAD0054994
- MRK-AAD0055039
- MRK-AAD0055169
- MRK-AAD0055387
- MRK-AAD0086535
- MRK-AAD0088708
- MRK-AAD0091118
- MRK-AAD0107004
- MRK-AAD0112627
- MRK-AAD0120092
- MRK-AAD0122952
- MRK-AAD012442
- MRK-AAD0137223
- MRK-AAD0153075
- MRK-AAD0163775
- MRK-AAD0175269
- MRK-AAD0197519
- MRK-AAD0201276
- MRK-AAD0207339
- MRK-AAD0213764
- MRK-AAD0239621
- MRK-AAD0274608
- MRK-AAD0283439
- MRK-AAD0356476
- MRK-AAD0384813
- MRK-AAD0405964
- MRK-AAD0405996
- MRK-AAD0421366
- MRK-AAD0421748
- MRK-AAD0441677
- MRK-AAD0492741
- MRK-AAD546625
- MRK-AAF0003308
- MRK-AAF0004103
- MRK-AAF0004103
- MRK-AAF0005350
- MRK-AAF0005536
- MRK-AAF0015398
- MRK-AAX0000710
- MRK-AAX0001417
- MRK-AAX0002587
- MRK-AAX0004170

- MRK-AAX0009059
- MRK-AAZ0004638
- MRK-AAZ0007066
- MRK-ABA0002988
- MRK-ABA0009600
- MRK-ABA0010768
- MRK-ABA0011178
- MRK-ABA0028222
- MRK-ABA0035605
- MRK-ABA0045057
- MRK-ABA0050046
- MRK-ABA0050161
- MRK-ABA0050403
- MRK-ABA0050408
- MRK-ABC000003
- MRK-ABC0000068
- MRK-ABC0002065
- MRK-ABC0002197
- MRK-ABC0006394
- MRK-ABC0006396
- MRK-ABC0006405
- MRK-ABC0006407
- MRK-ABC0006410
- MRK-ABC0006422
- MRK-ABC0013427
- MRK-ABC0016726
- MRK-ABC0016735
- MRK-ABC0022825
- MRK-ABC0024673
- MRK-ABC0026002
- MRK-ABC0026436
- MRK-ABC0026499
- MRK-ABC0027128
- MRK-ABC0027786
- MRK-ABC0034908
- MRK-ABC0037091
- MRK-ABC0050063
- MRK-ABC0052006
- MRK-ABC0052177
- MRK-ABC0052193
- MRK-ABC0052199
- MRK-ABD0001705
- MRK-ABD0001710
- MRK-ABD0001721

- MRK-ABD0001988
- MRK-ABF0001581
- MRK-ABH0014002
- MRK-ABH0014093
- MRK-ABH0014364
- MRK-ABH0016219
- MRK-ABH0016219
- MRK-ABH0016219
- MRK-ABH0017386
- MRK-ABH0017387
- MRK-ABH0017398
- MRK-ABH0017406
- MRK-ABH0017410
- MRK-ABH0017716
- MRK-ABH0017838
- MRK-ABH0017858
- MRK-ABH0017880
- MRK-ABH0022309
- MRK-ABH0022313
- MRK-ABH0024288
- MRK-ABH0026550
- MRK-ABI0002384
- MRK-ABK0002641
- MRK-ABK0011940
- MRK-ABK0025697
- MRK-ABK0026211
- MRK-ABK0073968
- MRK-ABK0074988
- MRK-ABK0080779
- MRK-ABK0100900
- MRK-ABK0104408
- MRK-ABK0108441
- MRK-ABK0159455
- MRK-ABK0187614
- MRK-ABK0205258
- MRK-ABK0280237
- MRK-ABK0297365
- MRK-ABK0307174
- MRK-ABK0311052
- MRK-ABK0317795
- MRK-ABK0333383
- MRK-ABK0363858
- MRK-ABK0428132
- MRK-ABK0428276

- MRK-ABK0448613
- MRK-ABK0460833
- MRK-ABK0460838
- MRK-ABK0463305
- MRK-ABK0468077
- MRK-ABK0494756
- MRK-ABO0000441
- MRK-ABS0146743
- MRK-ABS0295238
- MRK-ABS0369681
- MRK-ABS0388796
- MRK-ABS0449820
- MRK-ABS0461574
- MRK-ABT0000639
- MRK-ABT0015885
- MRK-ABT0022639
- MRK-ABT0022723
- MRK-ABT0068727
- MRK-ABT0079348
- MRK-ABW0001267
- MRK-ABW0003801
- MRK-ABW001257
- MRK-ABW0018026
- MRK-ABX0022685
- MRK-ABX0027010
- MRK-ABY0014109
- MRK-ABY0022511
- MRK-ABY0023690
- MRK-ABY0024769
- MRK-ABY0025039
- MRK-ABY0025119
- MRK-ABY0057471
- MRK-ABY0057552
- MRK-ABY0063251
- MRK-ABY0065686
- MRK-ABY0069293
- MRK-ABY0074496
- MRK-ABY0074496
- MRK-ABY0084294
- MRK-ABY0086773
- MRK-ABY0089911
- MRK-ABY0098274
- MRK-ABY0110954
- MRK-ABY0120497

- MRK-ABY0134849
- MRK-ABY0139633
- MRK-ABY0153362
- MRK-ABY0164123
- MRK-ABY0180065
- MRK-ABY0180952
- MRK-ABY0180955
- MRK-ABY0182922
- MRK-ABY0194317
- MRK-ABY0199805
- MRK-ABY0199807
- MRK-ABY0199809
- MRK-ABY0199813
- MRK-ABY0199813
- MRK-ABY0201465
- MRK-ABY0204860
- MRK-ABY0215490
- MRK-ACC0000027
- MRK-ACC0011150
- MRK-ACC0024645
- MRK-ACC0055701
- MRK-ACC0055703
- MRK-ACC0095512
- MRK-ACC0106934
- MRK-ACD0083809
- MRK-ACD0101888
- MRK-ACF0000097
- MRK-ACF0001772
- MRK-ACF0002607
- MRK-ACF0002685
- MRK-ACF0002700
- MRK-ACF0002808
- MRK-ACF0003784
- MRK-ACF0003791
- MRK-ACF0003955
- MRK-ACF0004015
- MRK-ACF0004015
- MRK-ACF0004768
- MRK-ACF0005697
- MRK-ACF0007104
- MRK-ACF0009163
- MRK-ACG0000827
- MRK-ACH0002676
- MRK-ACO0032130

- MRK-ACO0032232
- MRK-ACO0032300
- MRK-ACO0032310
- MRK-ACO0144804
- MRK-ACQ0000406
- MRK-ACR0007849
- MRK-ACR0007849
- MRK-ACR0009066
- MRK-ACR0009295
- MRK-ACR0014501
- MRK-ACR0015318
- MRK-ACR0040000
- MRK-ACS0000522
- MRK-ACS0004704
- MRK-ACT0000711
- MRK-ACT0008038
- MRK-ACT0017722
- MRK-ACV0015135
- MRK-ACV0020238
- MRK-ACV0020567
- MRK-ACV0020639
- MRK-ACV0021038
- MRK-ACW0002360
- MRK-ACW0007119
- MRK-ACW0014983
- MRK-ACW0046066
- MRK-ACW0047668
- MRK-ACX0012388
- MRK-ADF0001058
- MRK-ADF0005351
- MRK-ADF0006098
- MRK-ADF0010458
- MRK-ADF0017925
- MRK-ADF0022266
- MRK-ADG0027491
- MRK-ADG0035463
- MRK-ADI0006867
- MRK-ADI0009254
- MRK-ADI0010978
- MRK-ADI0011233
- MRK-ADJ0009895
- MRK-ADJ0033457
- MRK-ADJ0034668
- MRK-ADJ0037331

- MRK-ADJ0039026
- MRK-ADJ0041803
- MRK-ADJ0049376
- MRK-ADK0006157
- MRK-ADL0001533
- MRK-ADL0001545
- MRK-ADL0001554
- MRK-ADL0006458
- MRK-ADL0007853
- MRK-ADL0008857
- MRK-ADL0008978
- MRK-ADL0010049
- MRK-ADL0065211
- MRK-ADL0080841
- MRK-ADL0084685
- MRK-ADL0085558
- MRK-ADM0184223
- MRK-ADO0040848
- MRK-ADW0024695
- MRK-ADW0024695
- MRK-ADW0024699
- MRK-ADY0002029
- MRK-ADY0006153
- MRK-AEE0000793
- MRK-AEF0000465
- MRK-AEF0000653
- MRK-AEG0015642
- MRK-AEG0020372
- MRK-AEG0036484
- MRK-AEG0049189
- MRK-AEG0053166
- MRK-AEG0063933
- MRK-AEG0063961
- MRK-AEG0064968
- MRK-AEG0066210
- MRK-AEG0066323
- MRK-AEG0066797
- MRK-AEG0068172
- MRK-AEG0069124
- MRK-AEG0073395
- MRK-AEG0078785
- MRK-AEG0091998
- MRK-AEG0091998
- MRK-AEH0004316

- MRK-AEH0013189
- MRK-AEH0016465
- MRK-AEI0002734
- MRK-AFI0005045
- MRK-AFI0010754
- MRK-AFI0012664
- MRK-AFI0026120
- MRK-AFI0026227
- MRK-AFI0026239
- MRK-AFI0070814
- MRK-AFI0100058
- MRK-AFI0100392
- MRK-AFI0103123
- MRK-AFI0115639
- MRK-AFI0115899
- MRK-AFI0116225
- MRK-AFI0118168
- MRK-AFI0160205
- MRK-AFI0184898
- MRK-AFI0184899
- MRK-AFI0185980
- MRK-AFI0186607
- MRK-AFI0189725
- MRK-AFI0282895
- MRK-AFJ0000204
- MRK-AFJ0013414
- MRK-AFJ0017533
- MRK-AFK0050855
- MRK-AFK0085499
- MRK-AFK0085574
- MRK-AFK0175167
- MRK-AFK0177023
- MRK-AFK0179335
- MRK-AFK0179517
- MRK-AFK0181884
- MRK-AFK0181896
- MRK-AFK0198785
- MRK-AFK0198836
- MRK-AFK0198837
- MRK-AFK0198877
- MRK-AFK0224433
- MRK-AFK0230691
- MRK-AFL0003978
- MRK-AFL0003984

- MRK-AFL0004983
- MRK-AFL0004984
- MRK-AFL0004986
- MRK-AFL0024099
- MRK-AFL0060239
- MRK-AFL0110950
- MRK-AFN0006559
- MRK-AFN0029046
- MRK-AFN0029051
- MRK-AFN0029071
- MRK-AFN00116510
- MRK-AFO0007473
- MRK-AFO0007496
- MRK-AFO0015474
- MRK-AFO0015482
- MRK-AFO0021449
- MRK-AFO0023534
- MRK-AFO0034918
- MRK-AFO0042970
- MRK-AFO0059018
- MRK-AFO0059252
- MRK-AFO0060420
- MRK-AFO0060498
- MRK-AFO0097626
- MRK-AFO0102151
- MRK-AFO0102693
- MRK-AFO0115744
- MRK-AFO0115748
- MRK-AFO0115984
- MRK-AFO0116016
- MRK-AFO0180331
- MRK-AFO0189027
- MRK-AFO0189484
- MRK-AFO02373766
- MRK-AFO0240034
- MRK-AFO0258921
- MRK-AFO0260566
- MRK-AFO0260964
- MRK-AFO0263032
- MRK-AFO0263033
- MRK-AFO0266137
- MRK-AFO0266152
- MRK-AFO0266483
- MRK-AFO0266660

- MRK-AFO0269248
- MRK-AFO0273766
- MRK-AFO0274224
- MRK-AFO0275585
- MRK-AFO00279697
- MRK-AFO0289100
- MRK-AFO0289839
- MRK-AFO0298251
- MRK-AFO0299804
- MRK-AFQ0009865
- MRK-AFS0000619
- MRK-AFS0000930
- MRK-AFS0001987
- MRK-AFS0001987
- MRK-AFS0002831
- MRK-AFS0004081
- MRK-AFS0004182
- MRK-AFS0005860
- MRK-AFS0006374
- MRK-AFS0007386
- MRK-AFS0007558
- MRK-AFS0007974
- MRK-AFS0008795
- MRK-AFS0009330
- MRK-AFS0009341
- MRK-AFS0010598
- MRK-AFS0011338
- MRK-AFS0011532
- MRK-AFS0012258
- MRK-AFS0012269
- MRK-AFS0012595
- MRK-AFS0013678
- MRK-AFS0015546
- MRK-AFS0016097
- MRK-AFS0016142
- MRK-AFS0023342
- MRK-AFS0023778
- MRK-AFS0025693
- MRK-AFV0011823
- MRK-AFV0044029
- MRK-AFV0145961
- MRK-AFV0146080
- MRK-AFV0146123
- MRK-AFV0210573

- MRK-AFV0210573
- MRK-AFV0299008
- MRK-AFV0350813
- MRK-AFV0363599
- MRK-AFV0363600
- MRK-AFV0363607
- MRK-AFV0363845
- MRK-AFV0375884
- MRK-AFV0386848
- MRK-AFV0387741
- MRK-AFV0398311
- MRK-AFV0399546
- MRK-AFV0400668
- MRK-AFV0417410
- MRK-AFV0432613
- MRK-AFV0432698
- MRK-AFV0432727
- MRK-AFV0458860
- MRK-AFV0511304
- MRK-AFW0016006
- MRK-AFW0016058
- MRK-AGG0002185
- MRK-AGO0028236
- MRK-AGO0029504
- MRK-AGO0049734
- MRK-AGO0107791
- MRK-AGS0000567
- MRK-AGT0002774
- MRK-AGT0002776
- MRK-AGT0002784
- MRK-AGT0002789
- MRK-AGT0002793
- MRK-AGT0002794
- MRK-AGT0007108
- MRK-AGT0007403
- MRK-AGT0014385
- MRK-AGU0003336
- MRK-AGU0003701
- MRK-AGU0006292
- MRK-AGU0006480
- MRK-AGU0007003
- MRK-AGV0016564
- MRK-AGV0021318
- MRK-AGV0134450

- MRK-AGV0134459
- MRK-AGV0138562
- MRK-AHD0003811
- MRK-AHD0010489
- MRK-AHD0055888
- MRK-AHD0099494
- MRK-AHD0107911
- MRK-AHD0107969
- MRK-AHE0002920
- MRK-AHE0002964
- MRK-AHE0043602
- MRK-AHE0056009
- MRK-AHE0057143
- MRK-AHF0064930
- MRK-AHN0022317
- MRK-AHN0025599
- MRK-AHO0012016
- MRK-AHO0012173
- MRK-AHO0141155
- MRK-AHO0141159
- MRK-AHO0156444
- MRK-AHO0156451
- MRK-AHO0156568
- MRK-AHR0006393
- MRK-AHR0009546
- MRK-AHR0028084
- MRK-AHR0029815
- MRK-AHR0082479
- MRK-AHR0091702
- MRK-AHR0105708
- MRK-AHR0106266
- MRK-AHV0000635
- MRK-AHY0013746
- MRK-AHY0125281
- MRK-AHY0361017
- MRK-AHY0364511
- MRK-AHY0364795
- MRK-AHY0364796
- MRK-AID0000383
- MRK-AIN0001235
- MRK-AIP0014156
- MRK-AIU0224104
- MRK-AIU0283140
- MRK-AIX0003956

- MRK-AIY0001073
- MRK-AIY0003037
- MRK-AIY0086740
- MRK-AIY0088951
- MRK-AIY0126466
- MRK-AIZ0000972
- MRK-AJA0004061
- MRK-AJA0005240
- MRK-AJA0092876
- MRK-AJA0154162
- MRK-AJA0167404
- MRK-AJA0225688
- MRK-AJA0235523
- MRK-AJE0035363
- MRK-AJJ0084896
- MRK-AKO0002528
- MRK-AKO0006008
- MRK-AKO0010299
- MRK-AKO0019792
- MRK-AKU0078302
- MRK-AKU0078304
- MRK-AKU0129762
- MRK-ALU0024001
- MRK-AMN0005765
- MRK-AMX0051764
- MRK-AMX0052121
- MRK-AMX0056406
- MRK-ANG0007077
- MRK-ANK0035630
- MRK-ANK0039034
- MRK-ANR0001902
- MRK-ANR0006742
- MRK-ANR0012262
- MRK-AOG0008338
- MRK-AOJ0005778
- MRK-AOJ0006938
- MRK-AOJ0050935
- MRK-AOR0007745
- MRK-AOR0148191
- MRK-AOY0018357
- MRK-AOZ0000997
- MRK-APB0001138
- MRK-APE0016848
- MRK-APE0059774

- MRK-APS0035821
- MRK-APS0035848
- MRK-APS0038213
- MRK-APT0048674
- MRK-AQI0002496
- MRK-AQI0005925
- MRK-AQI0005928
- MRK-AQI0005928
- MRK-AQI0006159
- MRK-AQI0006414
- MRK-AQI0008418
- MRK-AQI0008465
- MRK-AQI0008466
- MRK-AQI0008895
- MRK-AQI0009944
- MRK-AQI0012778
- MRK-AQO0175497
- MRK-AQY0002539
- MRK-ARF0022940
- MRK-ARN0036769
- MRK-ARP0057946
- MRK-ARP0105927
- MRK-ARP0105927
- MRK-ASW0005746
- MRK-AUY0006801
- MRK-AVJ0005720
- MRK-AVJ0005720
- MRK-AVJ0005761
- MRK-AVJ0096850
- MRK-AVK0001949
- MRK-AVK0092723
- MRK-AWC0001803
- MRK-AWC0017802
- MRK-AWC0019572
- MRK-AWC0041861
- MRK-AWC0042145
- MRK-AWC0077767
- MRK-AWC0109670
- MRK-AWC0117249
- MRK-CORPORATE_002204
- MRK-FDACDER 003071
- MRK-FDACDER 008400
- MRK-FDACDER 008417
- MRK-FDACDER 010625

- MRK-GAR0022296
- MRK-GAR0022316
- MRK-GAR0023675
- MRK-GUE0017779
- MRK-I2690008544
- MRK-I2690008629
- MRK-I2690008662
- MRK-I8940096240
- MRK-IMKN0002463
- MRK-IMKN0002466
- MRK-JAB0000646
- MRK-JAF001787
- MRK-JAF0008957
- MRK-JAF0015491
- MRK-JAF0016264
- MRK-JAF0017856
- MRK-JAF0017857
- MRK-JAF0019099
- MRK-JAF0022121
- MRK-JAF0022127
- MRK-JAF0022132
- MRK-JAF0022134
- MRK-JAF0022149
- MRK-JAF0022164
- MRK-JAF0022395
- MRK-JAF0025848
- MRK-JAG0002112
- MRK-JAH0001339
- MRK-JAK0000965
- MRK-JAK0000973
- MRK-JAK0008113
- MRK-JAK0009709
- MRK-JAK0012553
- MRK-JAK0013198
- MRK-JAK0015947
- MRK-JAK0016070
- MRK-JAK0054349
- MRK-JAK0054365
- MRK-JAK0054368
- MRK-JJX0001935
- MRK-JRAA0000655
- MRK-JRAA0000690
- MRK-N0520018572

- MRK-N0520018573
- MRK-NJ0017794
- MRK-NJ0120258
- MRK-NJ0121088
- MRK-NJ0124436
- MRK-NJ0127596
- MRK-NJ0179628
- MRK-NJ0180248
- MRK-NJ0190204
- MRK-NJ0190944
- MRK-NJ0272460
- MRK-NJ0315892
- MRK-NJ0350300
- MRK-NJ0363443
- MRK-NJ0382450
- MRK-PKLBAA0005943
- MRK-PLBAU0000999
- MRK-PRL0000122
- MRK-PRL0000246
- MRK-PUBLIC0000590
- MRK-PUBLIC0000865
- MRK-SAC0137151
- MRK-SAG0003284
- MRK-SHAA0161377
- MRK-SHAA0482801
- MRK-SHAA0493852
- MRK-SHAA0493928
- MRK-SHAA0493937
- MRK-SHAA0493959
- MRK-SHAA0493973
- MRK-SHAA0494035
- MRK-SHAA0494816
- MRK-SHAA0494966
- MRK-SHAA0498564
- MRK-SHAA0525027
- MRK-SHAA0536086
- MRK-SHAA0541069
- MRK-SHAA0541700
- MRK-SHAA0542558
- MRK-SHAA0543937
- MRK-SHAA0544745
- MRK-SHAA0544994
- MRK-SHAA0545084
- MRK-SHAA0558564

- MRK-SHAA0568855
- MRK-SHAA0568911
- MRK-SHAA0569085
- MRK-SHAA0569117
- MRK-SHAA0571914
- MRK-SHAA0572268
- MRK-SHAA0572302
- MRK-SHAA0572308
- MRK-SHAA0572320
- MRK-SHAA0572344
- MRK-SHAA0572403
- MRK-SHAA0572473
- MRK-SHAA0572522
- MRK-SHAA0572525
- MRK-SHAA0572541
- MRK-SHAA0572543
- MRK-SHAA0572554
- MRK-SHAA0572555
- MRK-SHAA0572582
- MRK-SHAA0572599
- MRK-SHAA0572963
- MRK-SHAA0573065
- MRK-SHAA0573068
- MRK-SHAA0573408
- MRK-SHAA0573412
- MRK-SHAA0573422
- MRK-SHAA0573517
- MRK-SHAA0573584
- MRK-SHAA0573694
- MRK-SHAA0573712
- MRK-SHAA0573714
- MRK-SHAA0573765
- MRK-SHAA0573818
- MRK-SHAA0611246
- MRK-SHAA0636047
- MRK-SHAA0638073
- MRK-SHAA0638505
- MRK-SHAA0639099
- MRK-SHAA0639167
- MRK-SHAA0639651
- MRK-SHAA0640172
- MRK-SHAA0640485
- MRK-SHAA0640491
- MRK-SHAA0640668

- MRK-SHAA0642993
- MRK-SHAA0654100
- MRK-SHAA0799987
- MRK-SHAA0803896
- MRK-SHAA0813314
- MRK-SHAA0819994
- MRK-SHAA0821804
- MRK-SHAA0821893
- MRK-SHAA0829402
- MRK-SHAA0833527
- MRK-SHAA0837771
- MRK-SHAA0838808
- MRK-SHAA0839079
- MRK-SHAA0839162
- MRK-SHAA0839208
- MRK-SHAA0853941
- MRK-SHAA0854009
- MRK-SHAA0854117
- MRK-SHAA0857638
- MRK-SHAA0881726
- MRK-SHAA1216201
- MRK-SHAA1251996
- MRK-SHAA1253013
- MRK-SHAA1253250
- MRK-SHAA1253273
- MRK-SHAA1253297
- MRK-SHAA1253370
- MRK-SHAA1253373
- MRK-SHAA1253377
- MRK-SHAA1253381
- MRK-SHAA1253382
- MRK-SHAA1253506
- MRK-SHAA1253509
- MRK-SHAA1253515
- MRK-SHAA1253518
- MRK-SHAA1253519
- MRK-SHAA1253523
- MRK-SHAA1253550
- MRK-SHAA1253606
- MRK-SHAA1256163
- MRK-SHAA1503785
- MRK-SHAA1504169
- MRK-SHAA1536879
- MRK-SHAA1596832

- MRK-SHAA1660003
- MRK-SHAA1691317
- MRK-SHAA1754201
- MRK-SHAA1755081
- MRK-SHAA1818672
- MRK-SHAA1816472
- MRK-SHAA1832553
- MRK-SHAA1839474
- MRK-SHAA1848396
- MRK-SHAA1849905
- MRK-SHAA1858981
- MRK-SHAA1925362
- MRK-SHAA1947699
- MRK-SHAA1948548
- MRK-SHAA1974587
- MRK-SHAA1978957
- MRK-SHAA1979888
- MRK-SHAA1983316
- MRK-SHAA1984012
- MRK-SHAA1984123
- MRK-SHAA1984202
- MRK-SHAA1985012
- MRK-SHAA1997784
- MRK-SHAA2011723
- MRK-SHAA2013217
- MRK-SHAA2013259
- MRK-SHAA2013390
- MRK-SHAA2013410
- MRK-SHAA2013442
- MRK-SHAA2014252
- MRK-SHAA2014259
- MRK-SHAA2018011
- MRK-SHAA2018688
- MRK-SHAA2039895
- MRK-SHAA2039898
- MRK-SHAA2041302
- MRK-SHAA2088024
- MRK-SHAA2139426
- MRK-SHAA2300552
- MRK-SHAA2301459
- MRK-SHAA2308837
- MRK-SHAA2308837
- MRK-SHAA2313185
- MRK-SHAA2357566

- MRK-SHAA2357571
- MRK-SHAA2508616
- MRK-SHAA2540802
- MRK-SHAA2541626
- MRK-SHAA25451065
- MRK-SHAA2587936
- MRK-SHAA2592642
- MRK-SHAA2597610
- MRK-SHAA2697674
- MRK-SHAA2722247
- MRK-SHAA2917891
- MRK-SHAA2925350
- MRK-SHAA2993045
- MRK-SHAA3205716
- MRK-SHAA3205977
- MRK-SHAA3205979
- MRK-SHAA3209842
- MRK-SHAA3322531
- MRK-SHAA3558968
- MRK-SHAAM0103436
- MRK-SHAAM0103437
- MRK-SHAAM0103443
- MRK-SHAAM0103449
- MRK-SHAAM0103454
- MRK-SHAAM0110499
- MRK-SO11938-952
- MRK-SO420050655
- MRK-YAC0000508
- MRK-YAD0000603
- MRK-ZAF0000194
- MRK-ZAF0000198
- MRK-ZAF0001088
- MRK-ZAF0001251
- MRK-ZIR0002716
- MRK-ZIR0002819
- OATES-000505-624
- OATES-001510-530
- OATES-1658 000032
- OATES-1658 000625
- OATES-1658 000882
- OATES-1658 000887
- OATES-1658 000967
- OATES-1658 001080
- OATES-1658 001226

- OATES-1658 001230
- OATES-1658 001245
- OATES-1658 001300
- OATES-1658 001332
- OATES-1658 001362
- OATES-1658 001365
- OATES-1658 001369
- OATES-1658 001385
- OATES-1658 001389
- OATES-1658 001458
- Ogilvy00509
- STI0021430-573
- TRANS 000016
- TRANS 0000116
- TRANS 0002975
- TRANS 0003052
- TRANS 0005035
- zaf0001088.rtf
- zaf0000194.rtf
- zaf0000198.rtf
- MRK-APE0016848
- MRK-ARP0133951
- MRK-I2220004818
- MRK-AAC0139936
- MRK-AHD0055888
- MRK-AHD0022761
- MRK-I2690008225
- MRKI2690008230
- MRK-I2690008544
- MRK-AAD0384813
- MRK-AAF0015398
- MRK-AFV0449748
- AAF0017452
- MRK-AAF0017362
- MRK-AAF0017366
- MRK-ARP0006819
- MRK-ARP0105927
- MRK-AHD0101257
- MRK-0140029802
- MRK-AHD0101257
- MRK-ACR0014501

- MRK-I2690008544
- MRK-AFV0043956
- MRK-AFV0043960
- MRKAFV0140104 at 110
- MRK-ARP0137370
- MRK-AFV0297727
- MRK-NJ0136865
- MRK-I2220004818
- MRK-AHD0001996
- MRK-I2690000512
- MRK-I2690000517
- MRK-ABP0003541-614
- MRK-ABP0003859-939
- MRK-AHF0072575-690
- MRK-ABP0008950-9158
- MRK-ABK0329511-696
- MRK-ABP0018562-741
- MRK-ACM0000386
- MRK-AAF0012268
- FDACDER003071
- MRK-AFW0023615

## Academic Articles/Texts

- Baron, et al., *Cardiovascular events associated with rofecoxib: final analysis of the APPROVe trial*, 372 The Lancet 1756-1764 (2008)

- Bauer, et al., *Upper Gastrointestinal Tract Safety Profile of Alendronate*, 160 Archives of Internal Medicine 517-525 (2000)

- Bhala, et al., *Vascular and upper gastrointestinal effects of non-steroidal anti-inflammatory drugs: meta-analyses of individual participant data from randomised trials*, The Lancet, doi:10.1016/S0140-6736(13)60909-9 (2013)

- Black, et al., *Randomized Trial of Effect of Alendronate on Risk of Fracture in Women with Existing Vertebral Fractures*, 348 The Lancet 1535-42 (1996)

- Bombardier, et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*. 343 N Engl J. Med 1520-1528 (2000)

- Bresalier, et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, 352 (11) N Engl J. Med 1092-1102 (2005)

- Burleigh, et al., *Cyclooxygenase-2 Promotes Early Atherosclerotic Lesion Formation in LDL Receptor-Deficient Mice*, 105 Circulation 1816-1823 (2002)

- Chalmers, et al., *A Method for Assessing the Quality of a Randomized Control Trial*, 2 Controlled Clinical Trials 31-49 (1981)

- Cheng, et al., *Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2*, 296 Science 539-541 (2002)

- Chow (Ed.), Encyclopedia of Biopharmaceutical Statistics, p. 245.

- Curfman et al, *Expression of Concern:  Bombardier et al., Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," N Engl J Med 2000;343:1520-8*, 353 N Engl J. Med 2813-2814 (2005)

- Curfman et al., *Expression of Concern Reaffirmed*, N Engl J. Med 10.1056 (2006)

- DeVeaux, et al., *Stats, Data, and Models*, 3d ed. 513 (2011).

- Feldman, et al., *Effects of Vesnarinone on Morbidity and Mortality in Patients with Heart Failure*, 329 No. 3 N Engl. J Med. 149-155

- FitzGerald, et al., *Analysis of Prostacyclin and Thromboxane Biosynthesis in Cardiovascular Disease*, 67 No. 6 Circulation 1174-1177 (1983)

- Friedman, et al., Fundamentals of Clinical Trials (4th edition). Springer, p. 281.

- Gardner  and D.G. Altman, *Confidence Intervals Rather than P Values: Estimation Rather than Hypothesis Testing*, 292 British Medical Journal 746-750 (1986)

- Hermann, et al., *To the Heart of the Matter: Coxibs, Smoking, and Cardiovascular Risk,"* 112 Circulation 941-945 (2005)

- Juni, et al., *Correspondence Author's Reply*, 365 The Lancet 26-27 (2005)

- Juni, *Risk of cardiovascular events and rofecoxib: cumulative meta-analysis*, The Lancet (2004)

- Konstam, et al., *Cardiovascular thrombotic events in controlled clinical trials of rofecoxib*, 104 Circulation, 2280-2288 (2001)

- Lachin, *Statistical Considerations in the Intent-to-Treat Principle*, 21 Controlled Clinical Trials 167-189 (2000)

- Liu, *Rethinking Statistical Approaches to Evaluating Drug Safety*, 48 No. 6 Yonsei Med Journal 895-900 (2007)

- Madigan, *Bayesian Graphical Models, Intent-to-Treat, and the Rubin Causal Model*, (1999)

- Madigan, et al., *Does design matter? Systematic evaluation of the impact of analytical choices on effect estimates in observational studies*, Therapeutic Advances in Drug Safety 1-10 (2013)

- Madigan, et al., *Under reporting of cardiovascular events in the rofecoxib Alzheimer Disease Studies,* 164 American Heart Journal 186-193 (2012)

- Martin and H. Austin, *An efficient program for computing conditional maximum likelihood estimates and exact confidence limits for a common odds ratio*, 2 Epidemiology 359-362 (1991)

- McAdam, et al., *Systemic biosynthesis of prostacyclin by cyclooxygenase (COX-2): The human pharmacology of a selective inhibitor of COX-2*, 96 PNAS 272-277 (1999)

- Oates, *Cardiovascular Risk Marker and Mechanisms in Targeting the COX Pathway for Colorectal Cancer Prevention*, 4 Cancer Prev Res. 1145-1148 (2011)

- Pedersen, et al., *Follow-Up Study of Patients Randomized in the Scandinavian Simvastatin Survival Study (4S) of Cholesterol Lowering*, 86 Am J Cardiol 257-262 (2000)

- Reicin, et al., *Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs*, 89 American Journal of Cardiology 204-209 (2002)

- Rosner, *Fundamentals of Biostatistics* (7th ed.)

- Ross, Editor's Correspondence: *Persistence of Cardiovascular Risk After Rofecoxib Discontinuation*," 170, No. 22 Arch Intern Med. 2035-2036 (2010)

- Ross, et. al., *Pooled Analysis of Rofecoxib Placebo-Controlled Clinical Trial Data: Lessons for Post-Market Pharmaceutical Safety Surveillance*, 169(21) Arch Intern Med. 1976–1985 (2009)

- Rothman and S. Greenland, *Modern Epidemiology*, Lippincott Williams & Wilkins, , 2nd edition 254-5 (1998)

- Stevenson, *Diagnosis, prevention, and treatment of adverse reactions to aspirin and nonsteroidal anti-inflammatory drugs*, J Allergy Clin. Immunol., 617-622 (1984)

- Thal, *A Randomized, Double-Blind, Study of Rofecoxib in Patients with Mild Cognitive Impairment*, 30 Neuropsychopharmacology 1204 (2005)

- Tonino, et al., *Skeletal Benefits of Alendronate: 7-Year Treatment of Postmenopausal Osteoporotic Women*, 85, No. 9 The Journal of Clinical Endocrinology & Metabolism 3109-115 (2000)

- Velentgas, et al. *Cardiovascular Risk of Selective Cyclooxygenase-2 Inhibitors and other Non-Aspirin Non-Steroidal Anti-Inflammatory Medications*, 15 Pharmacoepidemiology and Drug Safety 641-652 (2006)

- Watson and P. M. Shenoi, *Drug-induced epistaxis*?, 83 Journal of the Royal Society of Medicine 162-164 (1990)

- Watson, *Lower Risk of Thromboembolic Cardiovascular Events With Naproxen Among Patients With Rheumatoid Arthritis*, 162 Arch Intern Med 1105 (2002)

- Weir, et al., *Selective COX-2 inhibition and cardiovascular effects: A review of the rofecoxib development program.* 146 American Heart Journal 591-604 (2003)

- Winer, et al., *Statistical Principles in Experimental Design*, 3d ed. (1991)

- Thal et als; Aisen P, Thal L, Ferris S., et al., *Rofecoxib in Patients with Mild Cognitive Impairment: Further Analyses of Data from a Randomized, Double-Blind Trial. Current Alzheimer Research*, 2008, 5, 73-82

## Other Documents

- NCI Dictionary of Cancer Terms, http://www.cancer.gov/dictionary?cdrid=522956

- NIH POLICY FOR DATA AND SAFETY MONITORING,
  http://grants.nih.gov/grants/guide/notice-files/not98-084.html

- Statement by Merck & Co., Inc., Regarding the Fracture Intervention Trial (FIT) with
  FOSAMAX (alendronate sodium) and Incidence of Atrial Fibrillation,
  http://www.webwire.com/ViewPressRel.asp?aId=34866#.UdV8sD5gZ4k

- Cochrane Individual Participant Data (IPD) Meta-analysis Methods Group (see
  http://ipdmamg.cochrane.org/about-ipd-meta-analyses)

- What is a Serious Adverse Event? (see
  http://www.fda.gov/safety/medwatch/howtoreport/ucm053087.htm)

- Hearing before the Committee on Finance, United States Senate, November 18, 2004

- NHIS Arthritis Surveillance, CDC.GOV, http://www.cdc.gov/arthritis/data_statistics/
  national_nhis.htm

- Dennis Tolley Analysis