# Exhibit 3

Expert Report of David A. Kessler

IN RE:  VIOXX Products Liability Litigation

MDL NO. 1657, CIVIL ACTION NO. 2:06-CV-09336

*The State of Utah v. Merck*

<u>**EXPERT REPORT OF DAVID A. KESSLER**</u>

**QUALIFICATIONS**

1.  My name is David A. Kessler, M.D.  I received my M.D. degree from Harvard Medical School in 1979 and my J.D. degree from the University of Chicago Law School in 1978.  I did my pediatrics training at Johns Hopkins Hospital.

2.  I was appointed in 1990 by President George H. W. Bush as Commissioner of the United States Food and Drug Administration ("FDA") and confirmed by the United States Senate.  I served in that position also under President William Jefferson Clinton until February 1997.

3.  I have taught food and drug law at Columbia University Law School.  I have testified many times before the United States Congress on food, drug, and consumer protection issues under federal and state law.  I have published numerous articles in legal, medical, and scientific journals on the federal regulation of food, drugs, and medical devices over the last thirty years.  I have had special training in pharmacoepidemiology at Johns Hopkins Hospital.  My resume, including a list of my published books and articles, and address is included and attached hereto in Appendix A.  Cases in which I have appeared as a witness in the last four years and my fees in those cases are attached hereto in Appendix B.  A glossary of terms defined in this report is attached hereto in Schedule 1.

4.  As Commissioner, I had ultimate responsibility for implementing and enforcing the United States Food, Drug and Cosmetic Act ("FDCA").  I was responsible for overseeing five Centers within the FDA.   They included, among others, the Center for Drug Evaluation and Research and the

Center for Biologics Evaluation and Research.  In addition to those duties, I placed high priority on getting promising therapies for serious and life-threatening diseases to patients as quickly as reasonably possible.  I introduced changes in the device approval process to ensure that it met high standards.  During my tenure as Commissioner, the FDA announced a number of new programs, including the regulation of the marketing and sale of tobacco products to children; nutrition labeling for food; user fees for drugs and biologics; preventive controls to improve food safety; measures to strengthen the nation's blood supply; and the MEDWatch program for reporting adverse events and product problems.  I created an Office of Criminal Investigation within the agency.

5.  I have served in numerous academic medical positions including Professor of Epidemiology, Biostatistics, and Pediatrics.

6.  Throughout this report, references to my experience include my past tenure as the FDA Commissioner, clinical experience as a physician, medical director of a New York City teaching hospital, Professor of Epidemiology, Biostatistics, and Pediatrics, teaching experience in food and drug law and public health, author of scholarly medical journal articles on drug and device law, and membership of the board of directors of two pharmaceutical companies and one device company.  I am the chairman of the compliance committee of two of those companies.

7.  In addition to the materials cited herein, I have reviewed and considered additional documents provided to me in Appendix C to this report.  Based on a review of the materials, and my training and experience, I have a number of opinions that are detailed below.

8.  I have been asked by Plaintiffs' to submit a report in *The State of Utah v. Merck.* My opinions focus on FDA rules and regulations, and the responsibilities of Merck in connection with the development and commercialization of Vioxx.  I have previously submitted reports in state attorneys general cases involving Vioxx.  I focus in this report on the issues that are relevant to

the pending matter, where the State of Utah has asked me to only opine on what obligations Merck had, both with regard to FDA's requirements and independent of the FDA, regarding Vioxx in light of the information that was known to Merck at the time, in the context of the claims asserted in this action.

## OVERVIEW OF REPORT

9. The following is an overview of my report:[1]

   a.      Practical realities prohibit the FDA from being the only guarantor of safety;

   b.      The duties of a pharmaceutical company are based not only on FDA laws and regulations, but also on the risks and signals presented by a drug about which the company knew or was required to investigate before marketing a drug;

   c.      As early as 1997, Merck had a safety signal with Vioxx that raised a concern about VIOXX and required Merck to investigate the cardiovascular risk of the drug;

   d.      Based on the evidence in Merck's possession prior to its decision to market Vioxx, there was a "safety signal" for adverse thrombotic events that should have resulted in a more thorough investigation and resolution of Vioxx's cardiovascular risk before filing the NDA and prior to marketing;

   e.      Post-marketing, the safety issues surrounding Vioxx continued, as additional clinical data showed that Vioxx was associated with an increased risk of cardiovascular events; and

   f.      After approval, notwithstanding the risk of increased cardiovascular events, Merck publicly presented only a selective and incomplete account of Vioxx's safety.

## INDEPENDENT OF FDA APPROVAL, A PURVEYOR OF A DRUG HAS RESPONSIBILITY FOR THE SAFETY OF ITS PRODUCT

10. It is the purveyor of a drug that is responsible for the safety of its product.

11. FDA regulation of a drug cannot anticipate and protect against all safety risks to individual consumers.   Even the most thorough regulation of a product may fail to identify potential problems presented by the product.

12. As I have written and testified about before the United States Congress, the FDCA grants the FDA substantial authority over the approval, labeling, and promotion of pharmaceutical products.

---

[1] For a complete list of opinions, please see the entire report.

But, in my opinion, nothing in the FDCA, or in the FDA's implementing regulations, relieves a manufacturer of its duty to act according to the company's internal knowledge about a product and its potential risks.

13. It was my opinion while Commissioner of the FDA, and remains to this day, that the two systems of state consumer protection (including potential product liability) and federal food and drug regulation should and do operate in a complementary but independent manner.

14. As the Supreme Court has recently ruled, generally, state law imposes responsibilities on pharmaceutical companies to create products that are "reasonably safe," a duty that can be satisfied by the "presence and efficacy of a warning to avoid an unreasonable risk of harm from hidden dangers or from foreseeable uses." *Mutual Pharmaceutical Co. Inc. v. Bartlett*, 570 U.S. ___ (2013), Slip. Op. at 19 (internal citations omitted); *Hill v. Searle Labs*, 884 F.2d 1064, 1068 (8th Cir. 1989) ("FDA regulations are generally minimal standards of conduct…"); *Wells v. Ortho Pharm. Corp.*, 788 F.2d 741, 746 (11th Cir. 1986) ("An FDA determination that a warning is not necessary may be sufficient for federal regulatory purposes but still not be sufficient for state tort law purposes."); *Feldman v. Lederle Lab.*, 125 N.J. 117, 121 (N.J. 1991); *Vautour v. Body Masters Sports Indus.*, 147 N.H. 150, 153-54 (2001).

15. Deposition testimony in this case supports my opinion that independent of FDA approval, Merck was responsible for the safety of Vioxx.

16. Merck's Senior Director of Regulatory Affairs Robert E. Silverman testified on June 19, 2013:

> Q. And you mentioned in your answer – part of your answer what regulatory – regulatory authorities deem necessary. Would you agree with me that regardless of regulatory approval, let's take the FDA – FDA approval, Merck has an independent duty to understand the safety of its products?
>
> …
>
> A. The – the answer to your question simply is yes….

(Silverman Tr. 17:12-25).

4

\*        \*        \*

Q. And you would agree with me that notwithstanding the FDA's view, Merck has its own obligations to not market drugs that it doesn't think are safe enough or effective enough for their intended use?

A. Absolutely.

...

A. We absolutely – it's a guiding principle that we don't put drugs on the market that we feel are not – not a – don't have an appropriate benefit/risk relationship, but at the end of the day, we don't – we don't make the decisions about whether we could sell a drug or not – whether we could sell a drug. We can withdraw a drug.

(Silverman Tr. 87:18-88:13).

\*        \*        \*

Q. In the various phases you mentioned, you would agree that you're looking at both safety and efficacy?

A. Always hand-in-hand.

(Silverman Tr. 17:8-11).

17. Merck's CEO and Chairman from 1994 until 2006 Raymond V. Gilmartin testified on June 12, 2013:

Q. Is it the company's responsibility that a drug it produces is safe?
...
A. It's the company's responsibility because – basically to study the drug in terms of what its safety profile is because, you know, every drug has side effects.

(Gilmartin Tr. 76:18-77:3).

18. A fundamental problem the FDA faces is that, by necessity, drugs are approved on the basis of less-than-perfect knowledge.  As I previously stated in an Amicus Curiae brief, which was later quoted by the Supreme Court, "[T]he FDA, which is tasked with monitoring thousands of drugs on the market and considering new drug applications, faces significant resource constraints that limit its ability to protect the public from dangerous drugs." *Mutual Pharmaceutical Co. Inc. v. Bartlett*, 570 U.S. ___ (2013), Slip. Op. at 5 (Sotomayor, J., dissenting) (quoting Br. of Former FDA Comm'rs Dr. Donald Kennedy and Dr. David A. Kessler as Amici Curiae in Support of Respondent, *Mutual Pharmaceutical Co. Inc. v. Bartlett*, No 12-142, 570 U.S. ___ (February 20, 2013); *see also* Kessler & Vladeck, *A Critical Examination of the FDA's Efforts To Preempt*

*Failure-To-Warn Claims*, 96 Geo. L. J. 461, 463 (2008).[2] Risks that are rare, appear as common illnesses, have long latency periods, result from drug interactions, or have adverse impacts on subpopulations, may go undetected in clinical testing. However, if a drug company has reason to know that the risks of a drug may result in adverse events, it has a responsibility to investigate them and to inform physicians and health care providers.

19. Generally, the FDA does not test drugs nor conduct clinical trials. It can approve a company's drug application or take steps to withdraw a drug that is on the market. Prior to 2007, the FDA's "tools" were relatively crude. Once a drug was on the market, the FDA could take steps to withdraw a drug, but it could not order a drug company to conduct a clinical trial or change the drug's label. In these instances, the FDA was left to "negotiate" with the drug company.[3] As Dr. Sandra L. Kweder, Deputy Director of the Office of New Drugs for the FDA, testified on March 1, 2005, before the U.S. Congress Committee on Health, Education, Labor, and Pensions:

> Q. On the clinical trial, the FDA cannot order a company to do a clinical trial, is that correct?"
>
> A. That is correct.

(Hearing, March 1, 2005, FDA's Drug Approval Process: Up to the Challenge?, S.Hrg. 109-67, at 24).

---

[2] Merck documentation supports the fact that the FDA faced resource constraints. In an email dated April 6, 2001, Dr. Scolnick stated that "I am going in 2 weeks to an FDA Science Board [I] am on and [I] have been asked to give a talk on how they can keep their scientists up to date. I have already told them I think their review system is anachronism because they cannot possibly keep up with the science given their hiring constraints." PX829 MRK-SHAA0839904 at 9905.

[3] The FDCA was amended in 2007. "For the first time, it granted the FDA statutory authority to require a manufacturer to change its drug label based on safety information that becomes available after a drug's initial approval." *Wyeth v. Levine*, 555 U.S. 555, 567 (2009). Also, authority was granted allowing the FDA to require further studies and clinical trials. As summarized by the FDA, "Section 505(o)(3) of the Act authorizes FDA to require postmarketing studies or clinical trials at the time of approval or after approval if FDA becomes aware of new safety information…. In some cases, FDA may be concerned about a risk and believe that it is serious, but may not know enough about the risk to determine how to address the risk in labeling and what information would be appropriate to include. In such a case, FDA can require a postmarketing study or clinical trial to obtain more information. U.S. Dep't of Health and Human Servs., Food and Drug Admin., *Guidance for Industry: Postmarketing Studies and Clinical Trials – Implementation of Section 505(o)(3) of the Federal Food, Drug, and Cosmetic Act*, at 3-4 (April 2011).

20. Once a drug is approved, the FDA's regulations make clear that a drug company has a duty to warn and modify labeling without delay when hazards emerge with one of its drugs. 21 C.F.R. § 201.57(e) (1999). The regulations permit a drug company to make labeling changes, and take other steps to inform physicians and patients of emerging risks, without advanced approval from the FDA.[4] Such responsibility is intended to complement, not undercut, the FDA's job of protecting consumers from dangerous drugs.

21. Drug companies have an obligation to revise a label "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." 21 C.F.R. § 201.57(e) (1999); *see also* 21 C.F.R. § 201.57(e) (2002)(same).

22. Manufacturers have superior resources that are or should be committed to overseeing the safety of the drugs they market. As a result, manufacturers invariably get safety information before the FDA does and have access to information that is not available to the FDA. Company scientists and physicians also develop impressions and understanding of a drug's potential safety profile that may be more informed than the FDA's.

23. Thus, what a drug company knows about a drug and what the FDA knows may be different.

24. The duties of a pharmaceutical company are based not only on FDA laws and regulations, but also on the risks presented by a drug about which the company knew, should have known, or should have investigated. Merck's responsibility for the safety of its product and the adequacy of its warnings exists regardless of what the FDA did or did not do.

---

[4] On September 30, 2004, Merck announced "a voluntary worldwide withdrawal of VIOXX…" MRK-SHAA0166422. See also MRK-AFF0000040, at 40; MRK-AFJ0008607.

25. As Commissioner of the FDA from 1990 through 1997, I can attest that the responsibility of drug sponsors have been in force for decades.

## SAFETY SIGNALS ASSOCIATED WITH VIOXX PRIOR TO MERCK'S SUBMISSION OF THE NEW DRUG APPLICATION

26. It is my opinion that before Merck submitted its new drug application ("NDA") for Vioxx to the FDA, Merck knew that Vioxx posed a risk of thrombotic events (blood clotting that can lead to heart attacks or strokes) and failed to adequately investigate those risks.

27. On October 10, 1996, in a research management committee update evaluating a placebo-controlled high-dose study of Vioxx in Rheumatoid Arthritis (hereinafter referred to as "Protocol 017"), Merck officials wrote, "Adverse events of most concern were in the cardiovascular system (e.g. MI, unstable angina....)." MRK-ABC0048699 at 8706.[5]   A table listing patients with non-fatal, serious clinical adverse experiences in Protocol 017 submitted to the FDA (Table E-152 of Merck's Integrated Safety Summary dated October 26, 1998) showed three thrombotic events (acute myocardial infarction, unstable angina, and pulmonary embolism) in Vioxx-treated patients and no thrombotic events in placebo-treated patients. MRK-AKU0083901 at 4223-26. While the dosage in this study involved a higher daily dose than was recommended in the drug's labeling, adverse events at a higher dose may portend safety signals at lower doses.

28. During May 1996 through January 1997, Merck carried out Protocol 023, a double-blind, placebo-controlled safety and pharmacokinetic study of Vioxx.  In that study, a decrease was noted in the production of PGIM in urine, one of two metabolites of prostacyclin.[6]   Merck also noted that Vioxx "had no effect on systemic thromboxane," which is involved in promoting platelet aggregation and clotting.   MRK-ABC0009946 at 9949. See also MRK-18940044483.

---

[5] Citations to the record were provided by counsel.
[6] Attached hereto in Schedule 2 is a chart reflecting the metabolic pathways of cyclooxygenase, including prostacyclin.

Internally, Merck knew that "[t]hese findings raised a concern about the potential for VIOXX to cause cardiovascular thrombotic events." *Id.* In addition, as discussed below, Merck's external advisors, Drs. FitzGerald, Oates, and Patrono, each independently proposed additional research to further examine this important issue.

29. On October 24, 1997, Dr. Garret FitzGerald, a professor of cardiovascular medicine at the University of Pennsylvania and a paid consultant for Merck from at least 1994 through 2004, suggested doing research to "investigate the cox2 pgi phenomeno[n]" highlighted by Protocol 023. MRK-ACK0012586; FITZG-000001; PX418 MRK-SHAA0568855. Dr. FitzGerald suggested randomizing patients with peripheral vascular disease "to low dose aspirin or the cox2 inhibitor" to "nail the site of drug impact on pgi as cleanly as you can hope to do in a patient population." PX418 MRK-SHAA0568855. See also MRK-NJ0051533, at 33. He also proposed "measur[ing] pgi metabolites in mouse urine" and "cross[ing]...IP [inducible protein] deficient mice with apoE [apolipoprotein] def[icient] mice and evaluat[ing] the effects of pgi on atherogenesis." *Id.*

30. In his deposition dated April 23, 2013, Dr. FitzGerald testified that "Merck did not provide resources to do any of these studies." FitzGerald Tr. 37:19-42:21.

31. In a letter to Dr. Alan Nies dated October 27, 1997, Dr. John Oates, a professor of pharmacology at the University of Vanderbilt, Chairman of Merck's Scientific Advisory Board from at least 1997 until 2002, and a paid consultant for Merck, proposed "further investigations of the implications of MK996 inhibition on prostacyclin biosynthesis on experimental models in which there is exaggerated platelet activation and platelet-vessel wall interaction. Further, a secondary consideration would be to examine circumstances in which Cox 2 might be the predominant source of prostaglandin in the endothelium." PX419 MRK-SHAA0482801; PX420 MRK-SHAA0572302; Oates Tr. 8:19-10:10, 11:7-12:2. See also MRK-NJ0152620.

32. Merck declined to do the study suggested by Dr. Oates. PX421 MRK-SHAA0573065.

33. Similarly, Dr. Carlo Patrono, a professor of pharmacology at Universita G. D'Annunzio and paid consultant for Merck from at least 1998 through 2002, wrote to Merck on September 28, 1998, concerning "the potential cardiovascular implications of COX-2 expression and inhibitions." PX421 MRK-SHAA0573065 at 3066; MRK-ABA0002965.   Because of the cardiovascular implications, Dr. Patrono proposed a study of patients with "unstable angina with biochemical and clinical end-points."   PX421 MRK-SHAA0573065 at 3067.   After the results of VIGOR (described below), Dr. Patrono again contacted Merck concerning future studies and suggested: "(a). it's not realistic to design a RCT [randomized clinical trial] or observational study with adequate statistical power to detect a small difference (one way or the other) between V[ioxx] and N[aproxen] in terms of serious CV events.   (b). it would be feasible to design a relatively small study with biochemical end-points to answer the question does inhibiting the COX-2 component of vascular PGI2 production translate into measurable platelet activation in a high risk setting."   PX447 MRK-IMKN0002463 AT 2464; *but see* ¶57.   As of May 29, 2002, Merck had not undertaken this study suggested by Dr. Patrono.   MRK-ACT0035511.

34. On December 30, 1997, Merck scientist Douglas Watson ("Watson"), discussing Protocol 023, wrote, "These findings raised concern about the potential for Vioxx to predispose to cardiovascular (CVD) thrombotic events..."   MRK-AWC0021637 at 1640-41.   See also MRK-ABS0037036, at 40.

35. On January 2, 1998, Merck scientist Harry Guess, discussing an upcoming "presentation at the Jan[uary] 7 CDOC on the analysis of CVD events in the MK-966 Phase IIb/III program," wrote to Douglas Watson and others, "As you recall, the reason why there is some concern about CVD events is that by inhibiting cyclooxygenase-2 without inhibiting cyclooxygenase-1, one is at least partially inhibiting an anticlotting and vasodilating substance (PGI2) WITHOUT inhibiting a potent vasoconstrictor (thromboxane).   This combination is not found with other drugs; conventional NSAIDs would also inhibit thromboxane.   Hence, it is biologically plausible that

specific cyclooxygenase-2 inhibitors could predispose to thrombotic events in a way that other drugs do not." PX750 MRK-AVJ0005720 at 5720-21.

36. On February 2, 1998, Merck scientist Douglas Watson internally reported a statistically significant relative risk of 2.16 [95% CI, 1.14, 3.94] for thrombotic cardiovascular serious adverse events in women based on patients in the pooled Vioxx-comparator-placebo osteoarthritis trials versus pooled Fosamax-placebo study patients (hereinafter referred to as "Watson Analysis"). PX432 MRK-SHAA0572320 at 2333. See also MRK-NJ0272249 at 50, 61. Watson stated that "[t]he overall incidence for women was elevated compared to FOSAMAX placebo controls." *Id.* at 2321. The value of comparing the incidence in pooled Vioxx-comparator-placebo osteoarthritis trials to pooled Fosamax-placebo study patients resided in the large number of "person years at risk," which according to Watson was over 14,500 person years at risk. *Id.* at 2335. Nonetheless, Watson dismissed the elevated relative risk by suggesting that the Fosamax pooled population had an atypically low risk of cardiovascular disease. *Id.* at 2321. On December 3, 1997, Merck's Cardiovascular Task Force discussed whether the Fosamax pooled study patients were appropriate controls for the Watson Analysis and proceeded with the study.[7] MRK-ABY0199809. The Watson Analysis also included a comparison of the pooled Vioxx-comparator placebo osteoarthritis trials versus data from the Cardiovascular Health Study. PX432 MRK-SHAA0572320 at 2321. The "Plan to Evaluate the Incidence of Cardiovascular SAES in the Phase IIb/III Vioxx (MK-0966) Osteoarthritis Clinical Trials" did not include comparison to, nor

---

[7] In his deposition on May 22, 2013, Watson testified:

Part of the reason that we chose the Fosamax and Proscar study populations was because of the size of those study populations, we knew we had clinical trial data from people in those studies for long periods of time, which was helpful, and there were quite a few of them, and we also knew that they were approximately the right age range to compare with the folks that we were studying in the Vioxx program. So, you know, for those reasons they seemed like good data sets to do our comparisons with."

(Watson Tr. 57:19-59:4).

reference to, the Cardiovascular Health Study.   MRK-AWC0021637.   This comparison was undertaken as a post hoc analysis.

37. On April 17, 1998, Merck officials wrote to the FDA that "[t]he clinical implications of partially inhibiting the production of $PGI_2$ without inhibiting thromboxane generation systemically are unknown but any untoward effects should be revealed by the long term safety and efficacy trials with [Vioxx]." MRK-ABK0025697 at 5793.

38. Based on my experience and understanding of the FDA's regulations, the Watson Analysis, having been an "analysis of any other data or information relevant to an evaluation of the safety and effectiveness of the drug product...derived from clinical investigations," should have been submitted to the FDA as part of Merck's NDA dated November 23, 1998.  21 C.F.R. § 314.50 (d)(5)(iv) (1999).  Prior to approval, Merck did not submit the Watson Analysis to the FDA.

39. On April 13, 1998, Merck scientist Dr. Alan Nies, in preparation for Merck's Scientific Advisory Board ("SAB") meeting, prepared a write-up for the meeting that would be held the next month. Dr. Nies wrote, "[T]he finding of an effect of COX-2 inhibition on the excretion of PGIM was entirely unexpected...To assess the potential implication of these biochemical findings on cardiovascular health, the clinical team and epidemiology have analyzed the blinded VIOXX database for serious cardiovascular events.  The analysis does not suggest a concern.  An initial look at the unblinded safety data from the Phase III comparison study vs. diclofenac (approximately 1300 patients followed for 6 months) also does not indicate an excess of cardiovascular events in patients treated with VIOXX™.  Additional analyses will be performed on unblinded data when available." PX431 MRK-SHAA0568911 at 8920-21. See also MRK-AGG0002839 at 858-68; MRK-AIR0041448 AT 457-58. Dr. Nies' write-up did not present to the SAB that the relative risk in women was 2.16 in the Watson Analysis.

40. On May 3-6, 1998, Merck's SAB noted that Vioxx may inhibit prostacyclin, an inhibitor of platelet aggregation. The SAB commented to Merck that this possibility could increase the risk of cardiovascular disease. The SAB stated "By removing this potent inhibitor of platelet aggregation, the probability that a coronary plaque rupture would lead to myocardial infarction or ischemic ventricular fibrillation is enhanced. More information is clearly needed to address these hypotheses and the other questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality." PX433 MRK-SHAA0572403 at 2407. See also MRK-AEI0002734 at 738-739. The SAB stated, "It is therefore proposed that coronary events be predetermined endpoints in all future controlled trials with Vioxx....Furthermore, it is proposed that these endpoints be assessed by a uniform set of criteria so that meta-analysis of coronary and cerebral vascular events from all these trials can be performed." See PX433MRK-SHAA0572403 at 2408.

41. Merck's SAB suggested that Merck could examine this issue further using the Folts canine model in animal research. *Id.* at 2410. Merck's SAB also suggested studying Vioxx to assess the "consequences of loss of prostacyclin in a condition of increased platelet activation," including in such conditions as cigarette smokers. *Id.* at 2411. The SAB articulated that these types of studies "are part of the scientific intelligence gathering appropriate to the development of any truly novel pharmacological entity, and should be addressed in parallel with the conclusion of the process of acquisition and analysis of the data that will place the drug in the hands of patients." *Id.* at 2411. See also MRK-AEI0002742 (Pg.1.0386). As of May 24, 2000, Merck had not undertaken these additional studies. MRK-AKU0055949; MRK-ACC0046677; MRK-SHAA0544386 at 4498-4500 (Gertz Tr. 1145:8-23 (9/28/2005)).

42. Data submitted by Merck to the FDA in October 1998, revealed that the incidence of thromboembolic cardiovascular adverse experiences in osteoarthritis patients in six-week studies was 0.2 percent in placebo treated patients versus 0.8 percent in 25mg qd Vioxx treated

patients and 0.7 in 12.5 mg qd Vioxx treated patients.  MRK-05420124073 at 401-03; MRK-AAC0036776 at 7396.   In six-month studies of osteoarthritis patients, the incidence of thromboembolic events was 0.8 percent in placebo versus 1.0 in 25 mg qd treated patients and 1.2 in 12.5 mg qd treated patients.  *Id.* at 7397.

43. Based on this data, the FDA medical reviewer stated, "With the available data, it is impossible to answer with complete certainty whether the risk of cardiovascular and thromboembolic events is increased in patients on rofecoxib.  A larger database will be needed to answer this and other safety comparison questions."  MRK-ADI0005375 at 5479.

44. Nonetheless, Merck reassured the public after Vioxx's approval that the drug was safe.  In a press release dated March 27, 2000, shortly after the conclusion of the VIGOR trial (as discussed below), Merck stated that "[a]n extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx, showed no indication of a difference in the incidence of thromboembolic events between Vioxx, placebo and comparator NSAIDs."  PX43 MRK-AKO0006008 at 6009.  See also 03/27/00 Merck press release, "Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes study with VIOXX," MRK-AKO0002522-23.

45. At the December 2000 Annual Merck Business Briefing, Dr. Edward Scolnick ("Dr. Scolnick"), President of Merck Research Laboratories from 1985 through the end of 2002, told analysts that "cardiovascular issues in VIGOR even at this point compared to where we were when we first got the data are unambiguously related to a decrease in the events in the naproxen arm and not an increase in the Vioxx arm of the study and are unrelated to blood pressure or renal effects...."  MRK-ACU0000402 at 1:53:12-1:53:32; Scolnick Tr. 15:5-16:19 (May 31, 2013).

46. The following year, on August 21, 2001, Merck stated to *Bloomberg News* in response to a pending publication in the *Journal of the American Medical Association*, "We already have

additional data beyond what they cite, and the findings are very, very reassuring. VIOXX does not result in any increase in cardiovascular events compared to placebo." MRK-AHE0002987.

## MERCK SHOULD HAVE RESOLVED THE RISK OF THROMBOTIC EVENTS BEFORE MARKETING VIOXX

47. There is no evidence that Merck resolved the risk of thrombotic events, indicated in the section above, prior to submitting its NDA to the FDA on November 23, 1998 or prior to extensive marketing and promotion of Vioxx beginning May 1999.

48. Despite the SAB recommendation in 1998 that possible risk of adverse cardiovascular events should be "addressed in parallel with the conclusion of the process of acquisition and analysis of the data that will place the drug in the hands of patients," (PX433 MRK-SHAA0572403 at 2411), Merck did not conduct additional experiments recommended by Drs. FitzGerald, Oates, Patrono, or the SAB (summarized above), and, as late as January 12, 2000 Merck's plan was not to do formal statistical analyses of cardiovascular risk, and the "descriptive analyses" that were contemplated would not be done "for another year yet."  PX317 MRK-AAB0059510 at 9517.

49. The long-term studies (ranging from 26-86 weeks) that Merck conducted on Vioxx prior to submission of its NDA did not resolve the potential risk of thrombotic events because 1) such long term studies were designed without a placebo arm; 2) the numbers of adverse cardiovascular events were too small to determine whether there was a cardiovascular risk of VIOXX; and 3) patients at highest risk for cardiovascular events were excluded.  *See* MRK-ADI0005375 at 5478-79.

50. Merck's intended use of Vioxx included the use for "relief of the signs and symptoms of osteoarthritis...."  MRK-99420021411.  See also 08/23/01 Merck press release, "Merck Stands Behind the Cardiovascular Safety Profile of VIOXX," MRK-AAZ0000248.  It is well established that excess weight contributes to the development of osteoarthritis.  This is a population that is

especially prone to the cardiovascular disease that is associated with the metabolic consequences of increased body fat.

51. Merck's marketing and promotion launch was unprecedented in Merck's history.  David W. Anstice, Merck President of Human Health for the Americas, called Vioxx's introduction the company's "biggest, fastest, and best prescription drug launch ever."  MRK-ACZ0009097.

52. Merck engaged in widespread direct to consumer marketing.  Based on "celebrity, morning, and music" and "created for 'It's a Beautiful Morning,'" Merck "activated 1MM consumers" with an investment of "$65MM."  MRK-ABI0008139 at 8197, 8199.

53. Independent of FDA approval, it is my opinion that Merck had a responsibility to investigate and resolve the question of cardiovascular safety prior to marketing Vioxx.  This responsibility was heightened by the extent of Merck's planned direct-to-consumer marketing and promotional practices, which would lead to its wide-spread use.  Large numbers of patients can be seriously affected due to widespread use of a drug, and where the risk is of a very serious medical nature.

**MERCK FAILED TO DISCLOSE INFORMATION OF THROMBOTIC RISK IN THE VIGOR STUDY THAT WOULD HAVE BEEN PERTINENT TO PATIENTS, DOCTORS, AND HEALTHCARE PROVIDERS**

54. In January 1999, Merck commenced the Vioxx Gastrointestinal Outcomes Research ("VIGOR") trial.  The VIGOR trial compared the gastrointestinal safety of Vioxx against naproxen in rheumatoid arthritis patients.  The results were unblinded in March 2000.  As of July 5, 2000, the adjudicated data showed 20 acute confirmed myocardial infarctions in the Vioxx arm of the trial compared to only 4 in the naproxen arm.  MRK-AAC0023818 at 3823.

55. In public statements and in a published *New England Journal of Medicine* paper dated November 23, 2000, entitled "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," Merck repeatedly asserted that the difference in the

16

incidence of heart attacks in the naproxen and Vioxx treated arms of the study were likely due to the possibility that naproxen is cardioprotective (the "naproxen hypothesis"). MRK-AIQ0002337 at 2343-44; MRK-SHAA1739141 at 9143. See also Bombardier C, Laine L, Reicin A, et al. "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," N EngJ Med. 200;343:1520-28.

56. Internally, Merck's scientists voiced their concern about the naproxen hypothesis, including Dr. Scolnick, who stated less than a month after receiving the VIGOR results, "[M]y worry quotient is high. I actually am in minor agony." PX613 MRK-SHAA1253302. See also 04/12/00 email from E. Skolnick to A. Reicin, MRK-ABC0033809. Dr. Scolnick at the time proposed a 10,000 v. 10,000 patient study with "safety first primary endpoint" and stated, "WE WILL NOT KNOW FOR SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY." See also 04/12/00 email from E. Skolnick to A. Reicin, MRK-ABC0033809. *Id.* (emphasis in original). That study was not done. Dr. Scolnick stated again in January 2001 that "there is no way to prove that in patients with rheumatoid arthritis that ALL of the difference between Vioxx and naproxen is due to the benefit of naproxen." PX825 MRK-ACR0008985 (emphasis in original).

57. On or before June 2001, in analyzing the "pros" and "cons" of conducting cardiovascular outcomes studies, Merck's Dr. Alise Reicin ("Dr. Reicin"), wrote in a slide presentation that one of the "cons" was that "[d]emonstration of a CV difference would likely be due to a COX-2 CLASS effect but would put VIOXX at [an] extreme disadvantage to Celebrex and negate existing OA and Alzheimer['s data." PX932 MRK-ACR0015318 at 5336. See also undated draft slide presentation, "Future Plans," MRK-ABH0002007 at 15 (attached to 06/21/01 email from A. Reicin to E. Senlnick et al., MRK-ABH0002006.

17

58. As noted earlier, it is my opinion that Merck should not have engaged in marketing without resolving the risk of thrombotic events.  After the release of the VIGOR data, Merck continued to market Vioxx notwithstanding the drug's increased thrombotic risk.

**AS OF MARCH 2000, THERE WERE LIMITATIONS IN THE OA AND ALZHEIMER'S CLINICAL TRIAL DATA THAT SHOULD HAVE QUALIFIED ANY STATEMENT THAT THERE WAS NO DIFFERENCE IN CARDIOVASCULAR SAFETY BETWEEN VIOXX AND NON-NAPROXEN COMPARATORS**

59. On January 5, 2005, Dr. Scott Zeger's (a Merck biostatistics consultant) office faxed Dr. Phillip L. Huang (of Merck Regulatory Affairs) comments which stated, "At the end of VIGOR, what was true is that there was strong evidence from the OA and Alzheimer programs that the relative rate of CV events comparing VIOXX to placebo was not as large [as] the value 2.38 estimated in VIGOR for VIOXX 50 vs Naproxen.  However, there were only a total of 48 and 20 events on VIOXX and its comparators in the OA program and 32 and 40 events in the Alzheimer program. Hence the relative risk confidence intervals mostly ranged on the order of +- 50% of the estimated value.  Hence, these data could not establish that the relative risk was close to 1.0 with any certainty, even in comparison of the lower dose (25) to placebo or non-Naproxen NSAID.  This is not a criticism, only a  statement of the reality that very large trials are necessary to provide strong evidence of safety." PX628 MRK-AFO0273766 at 3769.

60. In his deposition testimony, dated May 8, 2013, Merck statistician James Bolognese, when asked if he disputed Dr. Zeger's conclusion, stated that he did not.  Bolognese Tr. 212:21-214:6.

61. In an email dated May 1, 2000, Bolognese was asked by Dr. Reicin "what the chance was that we would have missed seeing a true reduction in CV events in Phase III OA studies?"  PX336 MRK-AAB0061643 at 1644.  Bolognese responded "[V]ery good.  [P]ower for detecting (at alpha=0.05, 2-tailed) those reductions from 0.5%/yr is about 9%, 5%, and 5% respectively. [S]ince power's less than 50%, observed reductions of those magnitudes would not have been close to significant." *Id.* at 1643.

18

62. In an email dated March 16, 2000, Merck's Director of Clinical Biostatistics Dr. Deborah Shapiro stated to Dr. Reicin, "[Y]ou asked what was the chance that we would miss a true 50% reduction in events in Alzheimer's and in the OA studies…For Alzheimer's, I used the total vascular event rate as the underlying rate which you are looking for a 50% reduction from…There is a sizeable chance, 46%, that you could miss a 50% reduction.  But that is in terms of significance of the difference between groups.  This means that there is a 46% chance that the pvalue for difference in the 2 groups would be >0.05."  PX337 MRK-AGT0002794.

63. In her deposition testimony, dated March 6, 2013, Dr. Shapiro confirmed that in the case of the Alzheimer's data, there was a "sizeable chance" that a true effect would be missed.  Shapiro Tr. 189:13-193:2.

64. In my opinion, both in my experience as FDA Commissioner and as a physician, when statisticians state that there is a "sizeable" chance of missing a true effect, such information is highly relevant to understanding whether there was a difference in cardiovascular risk between Vioxx and comparators.   If there is a sizeable chance of missing a true effect, that would undermine one's confidence in relying on any assertion that there is no difference in cardiovascular risk.

**MERCK'S MARKETING AND PROMOTION PRESENTED A SELECTIVE PICTURE OF VIOXX WHICH MISREPRESENTED THE DRUG'S SAFETY.**

65. Merck's marketing agenda "in order to maximize growth" was based on "develop[ing] strategies to…[d]emonstrate that COX-2 inhibitors…have a similar cardiovascular profile compared with placebo and non-naproxen NSAIDs." MRK-ABT0078672 at 8695-96.[8]

66. The FDCA and applicable regulations require that advertisements "present a true statement of information in brief summary relating to side effects, contraindications … and effectiveness."  21

---

[8] Attached hereto as Schedule 3 is a list of drugs the FDA considers NSAIDs.

C.F.R. § 202.1(e) (1999); *see also* 21 U.S.C. § 352 & (a),(n).   Under the regulations, an advertisement does not present a true statement if the advertisement is "false or misleading with respect to side effects, contraindications, or effectiveness" or "fails to present a fair balance between information relating to side effects and contraindications and information relating to effectiveness of the drug...." *Id.* Merck minimized Vioxx's risk of myocardial infarctions.   As noted by the FDA's Director of the Division of Drug, Marketing, Advertising and Communications, Dr. Thomas Abrams, in a September 17, 2001 letter (hereinafter referred to as the "DDMAC letter") to Merck's President and CEO, Raymond V. Gilmartin, "You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen)."   PX596 MRK-SHAA0528646.   See also 09/17/01 FDA Warning Letter from T. Abrams to R. Gilmartin, MRK-AAF0007777; MRK-ABH0003277.   The FDA was "aware of six promotional audio conferences, presented on behalf of Merck" that were in "violation of the Act." *Id.* at 8648.   See also 09/17/01 FDA Warning Letter from T. Abrams to R. Gilmartin, MRK-AAF0007777 at 79; MRK-ABH0003277 at 79.

67. As noted by the FDA in the DDMAC letter, Merck minimized the rate of MIs in the "VIGOR study by your comparison of this rate to the rate of MIs observed for Celebrex (celecoxib) in the Celebrex Long Term Arthritis Safety Study (CLASS)." *Id.* at 8649.   See also 09/17/01 FDA Warning Letter from T. Abrams to R. Gilmartin, MRK-AAF0007777 at 80; MRK-ABH0003277 at 80.   Such comparison was inappropriate because the VIGOR study excluded certain groups of patients who had cardiovascular disease, in contrast to the Celebrex study. *Id.*   See also

09/17/01 FDA Warning Letter from T. Abrams to R. Gilmartin, MRK-AAF0007777 at 80; MRK-ABH0003277 at 80.

68. Merck advanced unproven theories regarding Vioxx's safety.  As the FDA noted in the DDMAC letter, addressing Merck, "[Y]our promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs.  You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin.  That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties." *Id.* at 8646.  See also 09/17/01 FDA Warning Letter from T. Abrams to R. Gilmartin, MRK-AAF0007777; MRK-ABA0003277.  According to the FDA, "[T]here are no adequate and well-controlled studies of naproxen that support your assertion that naproxen's transient inhibition of platelet aggregation is pharmocodynamically comparable to aspirin or clinically effective in decreasing the risk of MIs." *Id.* at 8648.  See also 09/17/01 FDA Warning Letter from T. Abrams to R. Gilmartin, MRK-AAF0007777; MRK-ABA0003277 at 79.

69. Merck made unsubstantiated superiority claims.  As noted by the Food and Drug Administration in the DDMAC letter, Merck's suggestion that "COX-2 inhibitors, including Vioxx, have an overall safety profile that is superior to other NSAIDs is misleading because such an advantage has not been demonstrated....Furthermore, your claim that the VIGOR and CLASS trials 'show once again that they are safer than non-steroidals' is also misleading because it implies that the results of the VIGOR trial...can be applied to the entire class of NSAIDs." *Id.* at 8650.  See also 09/17/01 FDA Warning Letter from T. Abrams to R. Gilmartin, MRK-AAF0007777 at 81; MRK-ABA0003277 at 81.

70. As noted by the FDA in the DDMAC letter, Merck's minimizing "potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile." *Id.* at 8647. See also 09/17/01 FDA Warning Letter from T. Abrams to R. Gilmartin, MRK-AAF0007777 at 78; MRK-ABA0003277 at 78.

71. In a response dated October 1, 2001, Merck stated "Unexpectedly, in the VIGOR study, there was a significant between-group difference in the incidence of acute myocardial infarction: 0.1% for naproxen and 0.5% for Vioxx. While the Company recognizes that there are at least three possible explanations for this finding – an effect of naproxen, an effect of Vioxx, or chance – the weight of evidence clearly supports the position that the difference reflects a cardioprotective effect of naproxen." PX601 MRK-AFT0007691 at 7692. See also 10/01/01 letter from D. Anstice to T. Abrams, MRK-AFT0007691-99.

72. On October 24, 2001, representatives from Merck and the FDA met to discuss the DDMAC letter and Merck's response. MRK-SHAAM0106624. In addition, during his deposition dated June 19, 2013, Robert Silverman testified that four representatives from the FDA participated in the meeting not to specifically discuss the DDMAC letter, but rather the particular "relevance of the science and the medicine...the substantive issues." Silverman Tr. 68:7-71:4. One of the FDA representatives was Dr. Robert Temple, Director of the Office of Medical Policy. *Id.* Mr. Silverman wrote notes about the meeting, and testified during his deposition that he was "trying to verbatim recit[e] this message exactly, my recollection of [the] exact words that Dr. Temple used." Silverman Tr. 73:6-24. The notes indicate that Dr. Temple told Merck privately that the naproxen hypothesis was "[n]ot implausible but hardly proven," and that the "magnitude of Naproxen effect would be greater than ASA effect." PX1006 MRK-ACD0118964. Silverman also noted that Dr. Temple's "lack of total enthusiasm for the Naproxen theory was clear." *Id.* The

notes indicate that Dr. Temple told Merck privately "we have serious concerns that VIOXX may have negative effects." *Id.*

73. Despite the FDA's serious concerns about Vioxx's negative effect, Merck publicly continued to state that the naproxen hypothesis was the likeliest explanation for the VIGOR results and not any cardiovascular risk caused by Vioxx.  On April 18, 2002, during a conference call, Merck spokesperson Mark Stejbach stated with regard to the April 11 label change, "[A]lso in the label now are the results of – the safety results of two large placebo control studies in a large elderly population.  And in that study we saw no difference between Vioxx and placebo in on the rate of cardiovascular.  In fact numerically, Vioxx was even a little lower. But this is very reassuring and we think it is part of the body of evidence that supports our belief that the effect seen in VIGOR were the results of the anti-platelet effect of naproxen." [sic] Thompson StreetEvents Final Transcript, MRK – Q1 2002 Merck Earnings Conference Call, at 6 (April 18, 2002).  Similarly, on October 30, 2003, Dr. Reicin stated, "In [Merck's] placebo-controlled randomized trials, we have found no significant difference between Vioxx and placebo."  MRK-APP0000287 at 0288.

74. In my opinion, Merck's presentation of cardiovascular risk data in its promotional "Cardiovascular Card" was also misleading and lacked fair balance.  Merck's Cardiovascular Card was introduced on April 28, 2000.  MRK-AAR0007383.  See also 04/28/00 Bulletin for Vioxx: NEW RESOURCE: Cardiovascular Card (No. COX 00-028), MRK-AAR0038843-48.  In a bulletin to all field personnel with responsibility for Vioxx, Merck announced the availability of a tri-fold pamphlet containing data that would ensure that its field "would be well prepared to respond to questions about the cardiovascular effects of Vioxx." *Id.* As summarized by staff of the U.S. House of Representatives Committee on Government Reform on May 5, 2005, and with which I agree, according to the Cardiovascular Card, patients on Vioxx were 11 times less likely to die and 8 times less likely to die from heart attacks and strokes than patients on standard anti-inflammatory drugs.  In addition, the risk of MIs was less than half of that for patients taking placebo and identical to

23

that of patients receiving anti-inflammatory drugs.   MRK-AAR0019055 at 9057-58.   The Cardiovascular Card did not present the cardiovascular risk data from the VIGOR study which, as the FDA noted in its DDMAC letter, observed a four to five fold increase in MI's compared to patients on another non-steroidal.  MRK-AAR0019055;  See also 09/17/01 FDA Warning Letter from T. Abrams to R. Gilmartin, MRK-AAF0007777; MRK-ABA0003277.

75. In my opinion, Merck's Cardiovascular Card also presented only a selective picture of Vioxx because it failed to recognize cardiovascular risk from Merck's other more recent clinical trials. Data from Clinical Protocol 085 were known to Merck in 1999.  Data from Clinical Protocol 090 were known to Merck in February 2000.  Data from Clinical Protocol 083 were known to Merck in September 2000.  MRK-ABP0015218 at 5363, 5368.  Merck did not include the results of clinical protocols 083, 085 and 090 in discussing the risk of thromboembolic events in the Cardiovascular Card.  The failure to include these three studies resulted in an incomplete picture of cardiovascular risk.  Had these studies been included, the relative risk of serious thrombotic cardiovascular events in osteoarthritis trials would have been 1.80 compared with Merck's reported relative risk of .94 in published studies.   MRK-ACD0122214 at 2239; MRK-SHAA2513738 at 3741.

76.  Two further concerns about the Cardiovascular Card, based on my experience, are that Merck continued to use the Cardiovascular Card through April 11, 2002, but (1) did not add additional data concerning mortality such as it became available, including the interim results of the Alzheimer's trials; and (2) did not indicate on the Card in discussing the osteoarthritis studies that there was a "very good chance" of missing a true effect.  MRK-SHAA0504998 at 5265 (Cannell Tr. 268:13-20 (12/15/2005)); PX336 MRK-AAB0061643 at 1643; *see* ¶61.

77. Soon after the VIGOR results were known to the company, on April 14, 2000, Merck had identified as "Marketing needs:...Rapid publication and communication at opinion leader events

of phase III OA results demonstrating comparable incidence of thromboembolic events with VIOXX, placebo and NSAID comparators." MRK-ABI0002269 at 2307.

78. Merck also identified as a need to "[e]stablish that VIOXX®/Coxibs do not increase the risk of thromboembolic events due to their unique [mechanisms of action.]" *Id*. at 2308.

79. On January 8, 2001, approximately one month after publication of the VIGOR results, at an internal Worldwide Human Health Marketing ("WHHM") Competitive Assessment Task Force, Merck stated in a slide presentation that one of its objectives was to "[c]ontinue to neutralize any perceived safety (hypertension/edema, CV) concerns." MRK-AHY0263590 at 3592.   That strategy to "neutralize" the "perceived CV Safety Concerns" involved the publication of articles by the company's scientists and outside consultants.  The use of the word "neutralize" suggests, in my opinion, that Merck was countering perceptions of cardiovascular risk and doing so without proper consideration of the drug's safety.

80. Merck's strategy to "neutralize" perceptions of cardiovascular risk included the publication of several papers, a letter to the editor, abstract submissions and meta-analyses regarding cardiovascular risk. *Id*. at 3596-97.

81. Merck's scientific communications strategy included "plans for abstracts, presentations, and peer reviewed publications" that focused on key safety messages, including the key message that "VIOXX does not increase the thromboembolic risk of patients compared to non-naproxen, non-selective NSAIDS." MRK-AAD0106697 at 6791.

82. In my opinion, Merck's marketing and promotion of Vioxx, including the Cardiovascular Card and the promotional activities identified in the DDMAC Letter presented a selective picture of Vioxx which misrepresented the drug's safety.

**MERCK'S REPORTING OF ALZHEIMER'S STUDY DATA**

83. As of April 8, 2001, and documented in a memorandum by Merck scientist, Joshua Chen, Merck stated that patients taking Vioxx in Protocol 091, had a statistically significant "greater chance to die across all of the four age and gender categories" when employing an intention to treat ("ITT") analysis.  Chen also reported that in Protocol 078 that "males aged 75 or older had the highest risk of death... Age, Gender and Treatment were all statistically significant," and "the hazard ratio between [Vioxx] and placebo was 2.55."  Merck also stated that the combined ITT analysis "indicated that survival was worse for patients receiving Vioxx."   PX298 MRK-ACR0014708 at 4713-14, 4716; MRK-AAX0000752 AT 56, 57, and 59 (P 1.0079).. From Kaplan-Meier plots, the increased risk of death was noted after six months follow-up since treatment. *Id.* at 4712; MRK-ACR0014708; MRK-AAX0000752 at 59.  On April 1, 2001, Scott Reines stated in an email to Dr. Reicin regarding an interim mortality analysis for Protocol 078, "The good news here is that the on drug survival rate is not significantly different between VIOXX and placebo in Protocol 078.  ITT rates do differ significantly, and point estimate favors placebo even for the on drug analysis." PX25 MRK-JAK0000973 at 0974.

84. On that same day, Dr. Reicin responded to Scott Reines and Raymond Bain: "While I think it makes sense to do ITT and On-drug for safety analyses, unless you prespecified what would be primary upfront, the On-drug should be considered primary.  For the entire development program, our safety analyses included AEs/Deaths within 14 days of the last dose of study therapy." *Id.*

85. On April 2, 2001, Raymond Bain responded to Dr. Reicin that "both the 'on drug' and ITT analysis will be presented.  The DAP states that 'All patients who are randomized will be included in the safety analysis'.  The DAP also states that 2 approaches will be used for the AE summary: 'First, a primary analysis will include all AEs when patients are on treatment and up to 14 days

following discontinuation of test therapy.   Second, a summary based on intention-to-treat approach will include all AEs regardless of on or off study therapy.'" *Id.* at 0973.

86. On June 20, 2001, Dr. Reicin wrote, "Y[o]u are correct that we decided as a team with input from senior management that we decided to present only on drug data – that has been the standard for the entire rofecoxib development program.  Did the DAP specify that ITT would be done for safety?  If not, I would think that the CSR would focus on 'on drug' with the ITT as a sensitivity anal[y]sis in the appendix rather than in the body of the CSR (which is I believe how we handled the VIGOR GI safety data.)" PX33 MRK-AAB0066242.

87. The approved DAP for Protocol 091, dated June 22, 2000, stated, "Two approaches should be used for AE summary.  First, a primary analysis will include all AEs when patients are on treatment and up to 14 days following discontinuation of test therapy. Second, a summary based on intention-to-treat approach will include all AEs regardless of on or off study therapy." PX358 MRK-AWC0008774 at 8801. Similarly, the approved DAP for Protocol 078 dated May 25, 2000, stated, "Two approaches will be used for AE summary.  First, a primary analysis will include all AEs when patients are on treatment and up to 14 days following discontinuation of test therapy.  Second, a summary based on intention-to-treat approach will include all AEs regardless of on or off study therapy."  MRK-AFW0009752 at 9775.

88. On June 20, 2001, Dr. Reicin wrote in an email with a subject line "Review: VIGOR safety update report (SUR)," that "Scott [K]orn and I based on 'good clinical ju[dg]ment' thought we should include deaths which may have occurred more than 14 days after the last dose of study therapy if the SAE which caused the death started within the 14 day window (we couldn[']t be accused of cutting potentially important events – ie an MI that results in death 3 weeks later)." PX34 MRK-ARP0046934.

89. Merck's clinical safety update report to the FDA dated July 6, 2001 reported cardiovascular events in the Alzheimer's trials "in patients with a fatal or non-fatal adverse experience on-drug or within 14 days of last dose." PX363 MRK-01420145856 at 5913. See also 07/12/01 Safety Update Report (date-stamped 07/06/01); MRK-01420145856 AT 863-64, 913. In the safety update report, Merck reported deaths using the newly modified on-drug methodology noted by Dr. Reicin on June 20, 2001.

90. In my opinion, based on my experience and pursuant to applicable standards, Merck should have reported the Alzheimer's clinical study data as set out in its data analysis protocols in its safety update reports to the FDA using the two approaches, both prespecified on-drug and ITT analysis. PX25 MRK-JAK0000973; PX358 MRK-AWC0008774; MRK-AFW0009752; *see also* International Conference on Harmonisation ("ICH") *Harmonised Tripartite Guideline Statistical Principles For Clinical Trials E9*, Section 5.1 Prespecification of the Analysis (February 5, 1998).[9]

91. On September 26, 2001, the FDA requested that Merck, "provide time to event plots for all *deaths and for cardiovascular deaths in the Alzheimer's studies.*" PX369 MRK-AFS0000795 at 0797. See also 09/26/01 email from B. Gould to R. Silverman, MRK-ACD0013906 (attaching facsimile, MRK-ADC0013907). On October 4, 2001, Merck reported only the endpoint described in paragraph 88 – no analysis performed in the submission showed a statistically significant imbalance in mortality events adverse to Vioxx. MRK-JAG0047513. Had Merck reported the ITT (or "on study") endpoint, it would have reported significant differences in ITT, all-cause mortality for Protocols 078 and 091 (p-values of 0.015 and 0.010 respectively) and nonsignificant results for Protocol 126. PX138 MRK-AAC0067677; PX362 MRK-AFS0001968 at 1975.

---

[9] Document last accessed on July 10, 2013, *available at* http://www.ich.org/fileadmin/Public_Web_Site/ICH_Products/Guidelines/Efficacy/E9/Step4/E9_Guide line.pdf ("When designing a clinical trial the principal features of the eventual statistical analysis of the data should be described in the statistical section of the protocol.").

92. On October 19, 2001, the FDA requested that Merck "provide the Kaplan Meier estimates for all cause mortality and cardiovascular mortality for the three Alzheimer's studies combined." PX371 MRK-AGU0006520 at 6522.   Merck reported the three Alzheimer's studies combined Kaplan-Meier estimates (p-value 0.026).   PX362 MRK-AFS0001968 at 1975; MRK-01420163678.   Had Merck reported the ITT (or "on study") results, the p-value would have been 0.001.   PX362 MRK-AFS0001968 at 1975.

93. The importance of including both on-drug and ITT analyses is reinforced because Merck, as of May 1, 2001, noted that patients who had discontinued Vioxx had a greater risk of death than those who stayed on Vioxx, that "the assumption of noninformative drug discontinuation may not be true,"[10] and that any results from on-drug analysis "need to be carefully interpreted." PX295 MRK-JAK0013198.

94. In my opinion, for the reasons set forth above, Merck had an obligation to investigate and uncover evidence of adverse cardiovascular events.[11]   The evaluation of adverse events may differ based on which studies are included and which endpoints are utilized in the analysis. Because it is difficult to assess the causal nature of serious, common adverse events once a drug is on the market, it is the responsibility of a pharmaceutical company to scrutinize clinical data for evidence of potential problems and to present a full range of potential analyses.

**MERCK DELAYED ISSUING ANY STRONGER WARNINGS ON VIOXX'S LABEL**

95. On June 29, 2000, approximately two months after learning the VIGOR trial results, Merck submitted a revised label to the FDA, which attributed the difference in cardiovascular adverse

---

[10] Bain Tr. 238:13-16 (March 21, 2013) (when the assumption of noninformative drug discontinuation is violated that means that discontinuation of therapy has a "bearing...on your risk of having that event").

[11] On December 11, 2001, Merck announced that it was going to conduct a long term cardiovascular safety study.   PX859 MRK-SHAA0150290 at 0292.   On March 12, 2002, Merck cancelled that study. PX464 MRK-AJA0004061.

events in the VIGOR trial to the "known anti-platelet effects of naproxen." MRK-SHAA0824139 at 4159. See also 06/29/00 letter from D. Erb to FDA (CDER) attaching 06/29/00 supplemental New Drug Application, MRK-00420008018. On March 2, 2001, Merck submitted a proposed, revised label stating that "naproxen may decrease platelet aggregation." MRK-AAD0106697 at 6832.

96. In my opinion, Merck's proposed labeling changes to the FDA on June 29, 2000 and March 2, 2001, were inadequate attempts to explain Vioxx's cardiovascular risk. Merck continued to promote an unproven theory that naproxen was cardioprotective.

97. On October 15, 2001, following Merck's proposed labeling, the FDA proposed that Merck include in the Warning section of Vioxx's label the statement that "VIOXX should be used with caution in patients at risk of developing cardiovascular thrombotic events such as those with a history of myocardial infarction and angina and in patients with pre-existent hypertension and congestive heart failure." MRK-ADM0086831 at 6858. See also 10/15/01 email from B. Gould to R. Silverman, MRK-AAX0008560 (attaching draft label); MRK-NJ0439283 at 309.

98. Merck did not accept the FDA's proposed changes. Rather, Merck engaged in repeated negotiations regarding Vioxx's labeling from October 2001 to April 2002. As discussed below, Merck officials privately acknowledged that the label negotiations would be difficult and that they would resist the FDA's proposal to include language in the Warning section of Vioxx's label regarding cardiovascular events.[12]

---

[12] Merck officials saw a difference between a "warning" and a "precaution" in a drug's label. Robert Silverman testified on June 19, 2013 that the difference between the warning section of the label and the precaution section of the label was that:

> [W]arnings generally reflect information that the FDA wants potential prescribers to have that they think may have a significant impact on their decision whether or not to use the medication in patients. They identify characteristics of the patients or characteristics of the drug. Precautions tend to say these are things that...may not

99. In October 2001, after receiving the FDA's proposed changes, Dr. Scolnick wrote to David

Anstice, Merck's President of Human Health for the Americas, "Be assured we will not accept this

label.  [I]f we need to we will ask to go to an advisory committee meeting[.]"  Mr. Anstice

responded, "We knew it would be UGLY and it is.  We'll fight back and see where we get[,]" to

which Dr. Scolnick replied "it is ugly cubed, thye [sic] are bastards."  MRK-ABW004799.

100.    One month later, on November 8, 2001, Dr. Scolnick wrote to Bonnie Goldmann, Merck's

Executive Director of Regulatory Affairs, and Douglas Greene, Executive Vice President of Clinical

Sciences, "[I] assure you [I] will NOT sign off on any lable [sic] that had a cardiac warning."

PX835 MRK-ACR0009287.[13]  See also 11/08/01 email from E. Scolnick to D. Greene and B.

Goldman, MRK-ACR009287.

---

rise to a reason to not use the drug but they are things that prescribers and patients
should be aware might be associated with the use of the drug and they should be on
alert for those things."

(Silverman Tr. 122:15-123:22).

In 2006, the FDA amended the existing labeling requirements by integrating the "Warnings"
and "Precautions" sections into a single section and merging subsections of the
"Precautions" section into other areas of the label.  *See* 71 Fed. Reg. 3922 at 3932 (Table
6), 3987 (Jan. 24, 2006).  The amendment "made it easier for health care practitioners to
access, read, and use information in prescription drug labeling. The revisions will enhance
the safe and effective use of prescription drug products and reduce the number of adverse
reactions resulting from medication errors due to misunderstood or incorrectly applied drug
information."  *Id.* at 3922.  Indeed, the amendment also required that the "Highlights of
Prescribing Information" at the front of the label include "Warnings and Precautions."  21
C.F.R. § 211.56(d)(1) (2006).

[13] With regard to labeling changes, the process of getting a label approved is a negotiation between
the FDA and the drug manufacturer.  Robert E. Silverman testified on June 19, 2013:

Q. If we take away the word as the qualifier, be it a discussion or a negotiation,
would you agree with me that this process of changing the label after VIGOR was a
back and forth process between Merck and the FDA?

A. Certainly was a back and forth process, but I'm compelled to say at the end of the
day it's the agency who decides where we end up, and it's -- and it's -- okay.

(Silverman Tr. 165:12-22).

\*      \*      \*

101.    A few months later, on February 25, 2002, Dr. Scolnick stated, "To ALL:  If you get this label it will be an Al Michaels quote: 'Do you believe in miracles?'  But a 2002 version.  Just plain terrific!"  PX836 MRK-ACR0009297.  In his deposition dated May 31, 2013, Dr. Scolnick testified, when questioned about his February 25 statement, that "[i]t is fairly clear from this that the label that I am talking about now must be much better than the prior label…"  Scolnick Tr. 303:12-304:5.

---

Q. I understand at the end of the day the agency has to agree to the final label, but Merck has the ability to talk to them and persuade them?

…

A. To engage and -- and present our point of view and -- and to discuss that, no question about it. That's part of the process.

(Silverman Tr. 165:23-166:8).

Raymond V. Gilmartin testified on June 13, 2013:

Q. And the data is provided to the manufacturer?

A. The data is provided by the pharmaceutical manufacturer and the FDA basically evaluates, analyzes that data and, through an interaction with the manufacturer, comes to a conclusion about what the data says and what can be said about the drug.

(Gilmartin Tr. 80:2-10).

Finally, Dr. Sandra Kweder testified on March 1, 2005:

Q. I think it was in 2002 when the larger study was done on Alzheimer's patients that was given to you and you said there was a delay in getting a warning on labels after that.  What caused the delay?

A. Well, what caused the delay is that we don't have the authority to tell a company, this is how your label has to look.  This is the language that needs to go into your label.  Here is where it goes, end of story.  We have to negotiate with the company the specific language of how things should be worded, placement, those kinds of things.

*      *      *

Q. How about changing labels?  You don't have authority to change label, correct?

A.  We do not have the authority to require a specific label change.  Most of the time, I have to say, the discussion with companies about changes in labels doesn't take as long as it took for that particular one [VIOXX].  Usually, you know, it is just a matter of a few back-and-forths and just getting the language right and making sure it is clear.  It is usually not a problem.

(Hearing, March 1, 2005 *FDA's Drug Approval Process:  Up to the Challenge?,* S.Hrg. 109-67, at 24).

102.    When the label was approved on April 11, 2002, the Warning section did not contain the FDA's proposed language on cardiovascular effects.   MRK-ABH0022920 at 2935-36; see also 04/11/02 approved Vioxx product label, MRK-ABH0022028 at 36; see supra, at ¶97.

103.    In my opinion, Merck's conduct as to the drug's labeling was consistent with the company's objective to "neutralize" the cardiovascular risks that were associated with Vioxx. See e.g., MRK-ABW0004799, MRK-AAD0106697 at 6726-28, PX411 MRK-ABI00008659 at 8674, MRK-AHY0263590 at 3592; MRK-AHU263588-615.

104.    It is the responsibility of the purveyor of a drug to expeditiously assure that a drug's label adequately informs physicians and health care providers of a drug's safety and risks.   It is my opinion that Merck failed to do that.   In my opinion, the delay in labeling combined with the information described above, failed to provide physicians with accurate information about the safety and cardiovascular risk of Vioxx.   Merck should not have engaged in marketing Vioxx without resolving the risk of thrombotic events.   After the release of the VIGOR data, Merck continued to market Vioxx notwithstanding the drug's increased thrombotic risk.

**THE APPROVE TRIAL**

105.    On September 30, 2004, Merck withdrew Vioxx from the market.   MRK-SHAA0166422.   See also 09/30/04 Merck press release, "Merck Announces Voluntary Worldwide Withdrawal of VIOXX," MRK-AFJ0008607.   Minutes from the Board of Directors meeting on September 28, 2004, indicate that the External Safety Monitoring Board (ESMB) for the APPROVe trial "which was responsible for monitoring the ongoing safety of the trial...noted an increased relative risk for confirmed cardiovascular events beginning after 18 months of treatment in the patients administered VIOXX relative to those administered placebo" and recommended that Merck stop the study.   PX874 MRK-AAV0000075 at 0076.   See also Minutes of 09/28/04 Merck Board of Directors meeting, MRK-AAV000075.   In my opinion, the results of APPROVe reinforced the fact

that the cardiovascular safety signal and risk present prior to submitting the NDA was present and unresolved the entire time the drug was on the market.

**CONCLUSION**

106.    In conclusion, as set forth in more detail above:

        a.    Practical realities prohibit the FDA from being the only guarantor of safety;

        b.    The duties of a pharmaceutical company are based not only on FDA laws and regulations, but also on the risks and signals presented by a drug about which the company knew or was required to investigate before marketing a drug;

        c.    As early as 1997, Merck had a safety signal with Vioxx that raised a concern about VIOXX and required Merck to investigate the cardiovascular risk of the drug;

        d.    Based on the evidence in Merck's possession prior to its decision to market Vioxx, there was a "safety signal" for adverse thrombotic events that should have resulted in a more thorough investigation and resolution of Vioxx's cardiovascular risk before filing the NDA and prior to marketing;

        e.    Post-marketing, the safety issues surrounding Vioxx continued, as additional clinical data showed that Vioxx was associated with an increased risk of cardiovascular events; and

        f.    After approval, notwithstanding the risk of increased cardiovascular events, Merck publicly presented only a selective and incomplete account of Vioxx's safety.

July 17, 2013

David A. Kessler, M.D.

# SCHEDULE 1

### Glossary of Defined Terms[1]

1. Folts Model:  Developed by Dr. John D. Folts in 1976.  Originally a model of repetitive thrombus formation, or cyclic flow reductions (CFRs), in stenosed coronary arteries of open-chest, anesthetized dogs, but has also been used with rabbit femoral or carotid arteries.
   Source:  Shaker A. Mousa, *In Vivo Models for the Evaluation of Antithrombotics and Thrombolytics*, in ANTICOAGULANTS, ANTIPLATELETS, AND THROMBOLYTICS, 34 (Mousa ed., Humana Press 2d ed. 2010)

2. Kaplan-Meier (Analysis):  a method of calculating survival of a patient population in which the  increments are the actual survival times of the patients.
   Source:  Stedman's Medical Dictionary (28th ed. 2005).

3. Pharmacodynamics:  The study of uptake, movement, binding and interactions of pharmacologically active molecules at their tissue site(s) of action.
   Source:  Stedman's Medical Dictionary (28th ed. 2005).

4. Pharmacoepidemiology:  the study of the distribution of determinants of drug-related events in populations, and the application of this study to efficacious drug treatment.
   Source: Stedman's Medical Dictionary (28th ed. 2005).

5. Prostacyclin: A potent natural inhibitor of platelet aggregation and a powerful vasodilator.
   Source: Stedman's Medical Dictionary (28th ed. 2005).

6. p-(value):  Symbol for probability; when followed by the sign for "less than" (<), this indicates that a test statistic, e.g., a chi-square (?2) test, gives a result unlikely to occur by chance.
   Source:  Stedman's Medical Dictionary (28th ed. 2005).

7. Thromboxane:  The formal parent of the thromboxanes; prostanoic acid in which the -COOH has been reduced to –CH3 and an oxygen atom has been inserted between carbons 11 and 12.
   Source:  Stedman's Medical Dictionary (28th ed. 2005).

8. Thromboxanes: A group of compounds, included in the eicosanoids, formally based on thromboxane, but with the terminal COOH group present; biochemically related to the prostaglandins and formed from them through a series of steps involving the formation of

---

[1] Prepared by counsel at Bernstein Litowitz Berger & Grossmann LLP at the request of David A. Kessler.

an endoperoxide (an O-O bridge between carbons 9 and 11 in the prostaglandins) by a cyclooxygenase, followed by a rearrangement (catalyzed by thromboxane synthase) that inserts one of the two oxygen atoms between carbons 11 and 12, leaving the other still bridging carbons 9 and 11.  Thromboxanes are so named from their influence on platelet aggregation and the formation of the oxygen-containing six-membered ring (pyran or oxane). Like the prostaglandins, individual thromboxanes (abbreviated TX) are designated by letters (A, B, C, etc.) and subscripts indicating structural features. .
Source:  Stedman's Medical Dictionary (28th ed. 2005).

# SCHEDULE 2

## Metabolic Pathways of Cyclooxygenase

(continued on next page)[1]

---

[1] Prepared by counsel at Bernstein Litowitz Berger & Grossmann LLP at the request of David A. Kessler.

## SCHEME 7.  CYCLOOXYGENASE PATHWAY II



Arachidonic acid

PGG$_2$

6-keto-PGE$_1$

PGH$_2$

PGI$_2$

TXA$_2$

6-keto-PGF$_{1\alpha}$

12-HHT

TXB$_2$

6,15-Diketo-13,14-
Dihydro-PGF$_{1\alpha}$

12-KHT

2,3-Dinor-6-keto-PGF$_{1\alpha}$
(PGI-M)

2,3-Dinor-TXB$_2$

2,3-Dinor-6,15-Diketo-
13,14-Dihydro-20-COOH-
PGF$_{1\alpha}$

11-Dehydro-TXB$_2$

13,14-Dihydro-15-keto-TXB$_2$

2,3-Dinor-11-Dehydro-TXB$_2$

MRK-ADL0005541

# SCHEDULE 3

COX-2 Selective Non-steroidal Anti-inflammatory Drugs (NSAIDs) and Prescription and Over-the-Counter (OTC) Non-selective NSAIDs Approved Under New Drug Application (NDA) Abbreviated New Drug Application (ANDA)[1][2]

## COX-2 Selective NSAIDs

| Chemical Name | Brand Name |
|---|---|
| Celecoxib | Celebrex |
| Valdecoxib | Bextra |
| Rofecoxib | Vioxx |

## Non-selective NSAIDs

| Chemical Name | Brand Name |
|---|---|
| Diclofenac | Cataflam, Voltaren, Arthrotec (combination with misoprostol) |
| Diflunisal | Dolobid |
| Etodolac | Lodine, Lodine XL |
| Fenoprofen | Nalfon, Nalfon 200 |
| Flurbiprofen | Ansaid |
| Ibuprofen | Motrin, Motrin IB, Motrin Migraine Pain, Advil, Advil Migraine Liqui-gels, Ibu-Tab 200, Medipren, Cap-Profen, Tab-Profen, Profen, Ibuprohm, Children's Elixsure, Vicoprofen (combination with hydrocodone), Combunox (combination with oxycodone) |
| Indomethacin | Indocin, Indocin SR, Indo-Lemmon, Indomethegan |
| Ketoprofen | Oruvail, Orudis, Actron |
| Ketorolac | Toradol |
| Mefenamic Acid | Ponstel |
| Meloxicam | Mobic |
| Nabumetone | Relafen |
| Naproxen | Aleve, Naprosyn, Anaprox, Anaprox DS, EC-Naproxyn, Naprelan, Naprapac (copackaged with lansoprazole) |
| Oxaprozin | Daypro |
| Piroxicam | Feldene |
| Sulindac | Clinoril |
| Tolmetin | Tolectin, Tolectin DS, Tolectin 600 |

---

[1] Copied from FDA website (http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformation forPatientsandProviders/ucm103420.htm), Page Last Updated: 11/27/2012.

[2] Prepared by counsel at Bernstein Litowitz Berger & Grossmann LLP at the request of David A. Kessler.

Appendix A

# APPENDIX A

## Resume of David A. Kessler

(continued on next page)

# DAVID A. KESSLER

| | |
|---|---|
| 1969-1973 | AMHERST COLLEGE, Amherst, Massachusetts<br>Bachelor of Arts, *magna cum laude* (B.A. Independent Scholar, 1973) |
| 1973-1979 | HARVARD MEDICAL SCHOOL, Boston, Massachusetts<br>Doctor of Medicine (M.D. 1979) |
| 1975-1977 | UNIVERSITY OF CHICAGO LAW SCHOOL, Chicago, Illinois<br>Doctor of Law (J.D., 1978), Harvard Law School, 1977-1978 |
| 1984-1986 | NEW YORK UNIVERSITY GRADUATE SCHOOL OF BUSINESS<br>ADMINISTRATION (Manhattanville), Purchase, New York<br>Advanced Professional Certificate in Management |

## EMPLOYMENT

| | |
|---|---|
| | UNIVERSITY OF CALIFORNIA, SAN FRANCISCO |
| 2003-present | Professor of Pediatrics, Epidemiology and Biostatistics |
| 2003-2007 | Dean, School of Medicine<br>Vice Chancellor of Medical Affairs |
| 1997-2003 | YALE UNIVERSITY SCHOOL OF MEDICINE<br>Dean<br>Professor of Pediatrics, Internal Medicine, and Public Health |
| 1990-1997 | UNITED STATES FOOD AND DRUG ADMINISTRATION<br>Commissioner |
| 1984-1990 | THE HOSPITAL OF THE ALBERT EINSTEIN COLLEGE OF<br>MEDICINE<br>Medical Director |
| 1986-1990 | COLUMBIA UNIVERSITY<br>Julius Silver Program in Law, Science and Technology<br>Lecturer on Law |
| 1982-1984 | MONTEFIORE MEDICAL CENTER<br>Special Assistant to the President |
| 1981-1984 | UNITED STATES SENATE COMMITTEE ON LABOR AND HUMAN<br>RESOURCES, Consultant to the Chairman |

David A. Kessler                                                    Page 2

HONORARY DEGREES

1992    AMHERST COLLEGE, Amherst, Massachusetts
        Doctor of Science *honoris causa*

1992    GEORGE WASHINGTON UNIVERSITY, Washington, D.C.
        Doctor of Science *honoris causa*

1993    PHILADELPHIA COLLEGE OF PHARMACY AND SCIENCE, Philadelphia,
        Pennsylvania, Doctor of Science *honoris causa*

1993    DICKINSON COLLEGE OF LAW, Carlisle, Pennsylvania
        Doctor of Laws *honoris causa*

1995    ALBANY MEDICAL COLLEGE, Albany, New York
        Doctor of Science *honoris causa*

1997    NORTHEASTERN UNIVERSITY, Boston, Massachusetts
        Doctor of Science *honoris causa*

1998    MOUNT SINAI SCHOOL OF MEDICINE, New York, New York
        Doctor of Humane Letters *honoris causa*

1998    COLGATE UNIVERSITY, Hamilton, New York
        Doctor of Science *honoris causa*

1998    YALE UNIVERSITY, New Haven, Connecticut
        Master of Arts *privation*

1999    CONNECTICUT COLLEGE, New London, Connecticut
        Doctor of Humane Letters *honoris causa*

2001    DICKINSON COLLEGE, Carlisle, Pennsylvania
        Doctor of Science, *honoris causa*

2001    UNION COLLEGE, Schenectady, New York
        Doctor of Laws, *honoris causa*

2002    UNIVERSITY OF LOUISVILLE, Louisville, Kentucky
        Doctor of Public Service, *honoris causa*

2005    STATE UNIVERSITY OF NEW YORK, Syracuse, NY
        Doctor of Science, *honoris causa*

David A. Kessler                                                    Page 3

<u>HONORS</u>

NATIONAL ACADEMY OF SCIENCES, Public Welfare Medal, Honorary Member

INSTITUTE OF MEDICINE, Member

AMERICAN SOCIETY OF CLINICAL ONCOLOGY
Distinguished Service Award for Scientific Achievement

AMERICAN ACADEMY OF ARTS AND SCIENCES, Fellow

PHI BETA KAPPA, Amherst College

UNIVERSITY OF CHICAGO LAW REVIEW, Associate Editor

2008 PUBLIC HEALTH HERO AWARD, UC Berkeley

SIGMA XI, The Scientific Research Society of North America

BARNARD COLLEGE Barnard
Medal of Distinction

CASPAR PLATT AWARD, The University of Chicago Law School

HARVARD BLODGETT AWARD IN BIOLOGY, Amherst College

WHITING FOUNDATION GRANT-IN-AID for research at
Sloan-Kettering Institute

NATIONAL SCIENCE FOUNDATION FELLOWSHIP (declined)

JOHN WOODRUFF SIMPSON FELLOWSHIP, awarded by Amherst
College for the study of medicine

ALVAN T.--VIOLA D. FULLER AMERICAN CANCER SOCIETY
JUNIOR RESEARCH FELLOW (declined)

NATIONAL INSTITUTES OF HEALTH TRAINING FELLOWSHIP
RECIPIENT for physiology research at the Marine Biological Laboratory,
Woods Hole, Massachusetts

PHI DELTA THETA SCHOLARSHIP
DISTINGUISHED PUBLIC SERVICE AWARD
The George Washington University School of Medicine and Health Sciences

David A. Kessler                                                                                     Page 4

UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION
Special Citation

AMERICAN SOCIETY OF PUBLIC ADMINISTRATION
National Capitol Area Chapter
President's Award for Outstanding Achievement

AMERICAN FEDERATION FOR AIDS RESEARCH (AmFAR)
Sheldon W. Andelson Public Policy Achievement Award

THE WOODROW WILSON AWARD FOR DISTINGUISHED
GOVERNMENT SERVICE Johns Hopkins University

HAL OGDEN AWARD
Association of State and Territorial Directors of Health Promotion and
Public Health Education and the U. S. Centers for Disease Control

NATIONAL ORGANIZATION FOR RARE DISEASES (NORD)
Outstanding Service to the Public Health Award

MARCH OF DIMES
Franklin Delano Roosevelt Leadership Award

CHILDREN'S HOSPITAL NATIONAL MEDICAL CENTER
Children's Research Institute Award of Academic Excellence

AMERICAN HEART ASSOCIATION
National Public Affairs Special Recognition Award for Food Labeling

ISRAEL CANCER RESEARCH FOUNDATION
President's Award

INSTITUTE FOR ADVANCED STUDIES IN IMMUNOLOGY AND AGING
Lifetime Public Service Award

AMERICAN LUNG ASSOCIATION
Special Recognition Award

UNIVERSITY OF CHICAGO ALUMNI ASSOCIATION
Professional Achievement Award (Washington, D.C. Chapter)

U. S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
Secretary's Award for Excellence in Public Service

David A. Kessler                                                              Page 5

NATIONAL KIDNEY CANCER ASSOCIATION
Progressive Leadership Award

JOHNS HOPKINS UNIVERSITY SCHOOL OF PUBLIC HEALTH
Dean's Medal

AMERICAN CANCER SOCIETY
Medal of Honor

AMERICAN HEART ASSOCIATION
Meritorious Achievement Award

WORLD HEALTH ORGANIZATION Pan
American World Health Organization World
No Tobacco Day Award

AMERICAN HEART ASSOCIATION
National Public Affairs Special Recognition Award for Tobacco

PROFESSIONAL ACHIEVEMENT CITATION, University of
Chicago Alumni Association

PENNSYLVANIA HOSPITAL Molly
and Sidney N. Zubrow Award

AMERICAN LUNG ASSOCIATION OF CONNECTICUT
Humanitarian Award

AMERICAN COLLEGE OF PREVENTIVE MEDICINE
Special Recognition Award

ASSOCIATION OF AMERICAN MEDICAL COLLEGES AND THE ROBERT
WOOD JOHNSON FOUNDATION
David E. Rogers Award for Improving Health and Healthcare of the American
People

JACOBS INSTITUTE OF WOMEN'S HEALTH
Excellence in Women's Health Award

NARAL PRO-CHOICE AMERICA
Lifetime Achievement Award

THE ASSOCIATION OF STATE AND TERRITORIAL CHRONIC DISEASE
PROGRAM DIRECTORS
Joseph W. Cullen Award for Outstanding Contributions to Chronic Disease
Prevention and Control

David A. Kessler                                          Page 6

THE COLLEGE OF WILLIAM & MARY LAW SCHOOL
2005 Benjamin Rush Medal

INTERNSHIP & RESIDENCY

1981-1982     SENIOR ASSISTANT RESIDENT, Department of Pediatrics,
              The Johns Hopkins Hospital

1980-1981     ASSISTANT RESIDENT, Department of Pediatrics,
              The Johns Hopkins Hospital

1979-1980     INTERN, Department of Pediatrics,
              The Johns Hopkins Hospital

ACADEMIC APPOINTMENTS

2003-         UNIVERSITY OF CALIFORNIA, SAN FRANCISCO
present       Professor of Pediatrics
              Professor of Epidemiology and Biostatistics

1997-         YALE UNIVERSITY
2003          Professor of Pediatrics
              Professor of Internal Medicine
              Professor of Public Health

1990-         ALBERT EINSTEIN COLLEGE OF MEDICINE
1997          Department of Pediatrics
              Department of Epidemiology and Social Medicine
              Associate Professor of Pediatrics
              Associate Professor of Epidemiology and Social Medicine

1988-         ALBERT EINSTEIN COLLEGE OF MEDICINE
1990          Department of Epidemiology and Social Medicine
              Assistant Professor

1986-         COLUMBIA UNIVERSITY SCHOOL OF LAW
1990          Julius Silver Program in Law, Science and Technology
              Lecturer on Law

1982-         ALBERT EINSTEIN COLLEGE OF MEDICINE
1990          Department of Pediatrics
              Assistant Professor

David A. Kessler                                                          Page 7

SPECIAL STUDY

June            JOHNS HOPKINS SCHOOL OF HYGIENE AND PUBLIC HEALTH
1987            Graduate Summer Program in Epidemiology - Pharmacoepidemiology

June            YALE SCHOOL OF ORGANIZATION AND MANAGEMENT
1985            Advanced Management Studies in Health Care Management

1977-1978       HARVARD LAW SCHOOL, Special Student


RESEARCH EXPERIENCE

Summers         SLOAN-KETTERING INSTITUTE FOR CANCER RESEARCH
1970-1972       Division of Drug Resistance, New York, New York Research Asst

Summer          MARINE BIOLOGICAL LABORATORY, Woods Hole, Massachusetts
1972            Physiology course

1974-1975       CHILDREN'S HOSPITAL MEDICAL CENTER
                Department of Surgical Research, Boston, Massachusetts
                Research Associate

Summer          DEPARTMENT OF HEALTH, EDUCATION and WELFARE
1976            Office of the General Counsel, Chicago, Illinois
                Law Clerk


VISITING COMMITTEE

1992-1994       UNIVERSITY OF CHICAGO LAW SCHOOL

UNIVERSITY ACCREDITATION

2008-           WESTERN ASSOCIATION OF SCHOOLS AND COLLEGES,
                Chair of LLU Accreditation Committee


SPECIAL PROJECTS

1982-1988       THE ROBERT WOOD JOHNSON FOUNDATION
                Program for Hospital Initiatives in Long-Term Care,

1989-1990       THE PEW CHARITABLE TRUSTS
                THE ROBERT WOOD JOHNSON FOUNDATION
                Program to Strengthen Hospital Nursing Co-Director

David A. Kessler                                                    Page 8

<u>CORPORATE ADVISORY POSITIONS AND COMMITTEES</u>

2008 -          TPG,
                Senior Advisor

2007            GOOGLE HEALTH ADVISORY COUNCIL

2007            REVOLUTION HEALTH GROUP
                Medical Advisory Board

2007            PERSEUS LLC
                Advisory Board

2003 -          FLEISHMAN HILLARD INTERNATIONAL COMMUNICATIONS
                International Advisory Board

2000 – 2003  PERSEUS-SOROS BIOTECHNOLOGY FUND Scientific Advisory Board


<u>ADVISORY COMMITTEES</u>

2007            THE RHODES TRUST, THE RHODES SCHOLARSHIPS
                Chair, California Selection Committee

2006            CENTER FOR THE ADVANCED STUDIES ON AGING, UNIVERSITY OF
                MIAMI External Advisory
                Group

2005 -          BROAD MEDICAL RESEARCH PROGRAM
                Advisory Board

2005 -          CLINTON SCHOOL OF PUBLIC HEALTH, UNIVERSITY OF ARKANSAS
                FOR MEDICAL SCIENCES
                National Advisory Board

2003            HEINZ AWARDS (HEINZ FAMILY FOUNDATION)
                Awards Juror

2003            MARCH OF DIMES
                Chair, Prematurity Campaign in Northern California

2002 – 2004  CENTER ON ALCOHOL MARKETING AND YOUTH AT GEORGETOWN
                UNIVERSITY Advisory Board

David A. Kessler                                                    Page 9

2001 -          UNIVERSITY OF CHICAGO   LAW REVIEW
                Editorial Advisory Board

2000 – 2005     JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION
                Oversight Committee

2000            GOVERNOR'S BLUE RIBBON COMMISSION ON MENTAL HEALTH,
                STATE OF CONNECTICUT
                Honorary Chair

2000 -          FILM AID INTERNATIONAL, INTERNATIONAL RESCUE COMMITTEE
                Advisory Board

1999            WORLD HEALTH ORGANIZATION
                Expert Panel on Tobacco

1997            ADVISORY COMMITTEE ON TOBACCO AND PUBLIC HEALTH
                (Co-Chairman with C. Everett Koop)

1993            GOVERNMENT UNIVERSITY INDUSTRY ROUNDTABLE
                National Academy of Sciences

1990            ADVISORY COMMITTEE ON THE FOOD AND DRUG ADMINISTRATION
                Chairman, Drugs and Biologics Subcommittee

1988 – 1989     NATIONAL ADVISORY COUNCIL ON HEALTH CARE TECHNOLOGY
                ASSESSMENT, Department of Health and Human Services, Washington, D.C.
                Chairman, Patient Outcomes Subcommittee


PRIOR FEDERAL COMMITTEE MEMBERSHIPS

        WHITE HOUSE COMMISSION ON PRESIDENTIAL SCHOLARS

        NATIONAL COUNCIL ON SCIENCE AND TECHNOLOGY
        Committee on Health, Safety and Food R&D, Vice Chair

        INSTITUTE OF MEDICINE
        Forum On Drug Development and Regulation

        INSTITUTE OF MEDICINE
        AIDS Roundtable

        NATIONAL TASK FORCE ON AIDS DRUG DEVELOPMENT

David A. Kessler                                                    Page 10

OFFICE OF SCIENCE AND TECHNOLOGY POLICY Federal Coordinating Council for Science, Engineering and Technology Committee on Life Science and Health Biotechnology Research Subcommittee, Member ex officio

BOARDS OF DIRECTORS

Current:

AMHERST COLLEGE BOARD OF TRUSTEES

ELIZABETH GLASER PEDIATRIC AIDS FOUNDATION
Chairman, Board of Directors

NATIONAL CENTER FOR ADDICTION AND SUBSTANCE ABUSE COLUMBIA UNIVERSITY

INTERNATIONAL PARTNERSHIP FOR MICROBICIDES Past:

Past

1999-2007   HENRY J. KAISER FAMILY FOUNDATION

2005-2007   INDEPENDENT CITIZENS OVERSIGHT COMMITTEE OF THE

CALIFORNIA INSTITUTE FOR REGENERATIVE MEDICINE

2003-2006   DOCTORS OF THE WORLD

1997-2003   YALE-NEW HAVEN HOSPITAL

1999-2003   CONSUMERS UNION

2000-2002   NATIONAL COMMITTEE FOR QUALITY ASSURANCE

2000-2003   NEW YORK COUNTY HEALTH SERVICE REVIEW ORGANIZATION

1985-1986   COMPREHENSIVE MEDICAL REVIEW ORGANIZATION

FELLOWSHIP

YALE COLLEGE Fellow,
Calhoun College

David A. Kessler                                                                Page 11

<u>LECTURESHIPS</u>

THE REGIS J. FALLON LECTURE SERIES ON HEALTH AND LAW
University of Chicago

GRAYSON DISTINGUISHED LECTURE
Southern Illinois University School of Law

WEINBERG SYMPOSIUM LECTURE
Harvard Medical School

THE THOMAS B. FERGUSON LECTURE
Society of Thoracic Surgeons

GEORGE E. ALTMAN, M.D. LECTURE
Beth Israel Hospital

BETH AND RICHARD SACKLER LECTURE
University of Pennsylvania

MARTIN W. WITTE LECTURE
Newport Beach Public Library and Newport Beach Public Library Foundation

HERBERT L. ABRAMS LECTURE
Harvard Medical School

GEORGE GOODMAN LECTURE
State University of New York at Stony Brook

EVNIN LECTURE
Princeton University, Woodrow Wilson School

BOYARSKY LECTURE
Law, Medicine, and Ethics, Kenan Ethics Program, Duke University

CHARTER LECTURE
The University of Georgia

GARDERE & WYNNE LECTURE
Health Law and Policy Institute, University of Houston

DISTINGUISHED LECTURE IN NATIONAL SERVICE
University of Miami

TENTH ANNUAL JOHN O. VIETA, MD LECTURE
Lenox Hill Hospital

David A. Kessler                                                                          Page 12

HARPER FELLOWSHIP LECTURE
Yale Law School

DR. JAMES STEWART KAUFMAN MEMORIAL LECTURE
The Mt. Sinai Health Care Foundation

DULCY B. MILLER MEMORIAL LECTURE
Smith College

JEAN MAYER LECTURE IN NUTRITION AND FOOD POLICY
Tufts University

HENRY BARNETT DISTINGUISHED LECTURESHIP
Albert Einstein College of Medicine

MARTIN A. CHERKASKY DISTINGUISHED LECTURESHIP
Robert Wagner Graduate School of Public Service New York
University

ALPHA OMEGA ALPHA DISTINGUISHED LECTURESHIP
Cornell Medical School--New York Hospital

ST. GEORGE SOCIETY LECTURESHIP
Johns Hopkins Medical School

GOVERNOR WINTHROP ROCKEFELLER DISTINGUISHED LECTURESHIP
University of Arkansas Medical School

MOLLY AND SIDNEY N. ZUBROW LECTURE
Pennsylvania Hospital

LEROY HOECK M.D. DISTINGUISHED LECTURESHIP
Children's Hospital National Medical Center

JULES AND JANE HIRSH HEALTH POLICY ADDRESS
George Washington University

JOHN S. LATTA LECTURESHIP
University of Nebraska Medical School

PAUL K. SMITH MEMORIAL LECTURE
George Washington University

WOLK HEART FOUNDATION LECTURE
Colgate University

David A. Kessler                                                    Page 13

HASTINGS LECTURE
Association for the Advancement of Medical Instrumentation
National Heart, Lung and Blood Institute

INSTITUTE OF MEDICINE 25TH DISTINGUISHED LECTURESHIP University
of Washington

RALPH CAZORT LECTURESHIP
Meharry Medical School

DAVID M. IFSHIN MEMORIAL LECTURE
Potomac, Maryland

CHARLES C. LEIGHTON MEMORIAL LECTURE
Leonard David Institute of Health Economics
University of Pennsylvania

D. W. HARRINGTON LECTURE State
University of New York At Buffalo School of
Medicine and Biomedical Sciences

SAMUEL RUBIN LECTURE FOR THE ADVANCEMENT OF LIBERTY
Columbia University

LEO S. WEIL MEMORIAL LECTURE
Tulane Medical Center, Touro Infirmary,
and Louisiana State University School of Medicine

THOMAS PARRIN LECTURE
University of Pittsburgh School of Public Health

DAVID PACKARD LECTURE
Uniformed Services University of the Health Sciences

NORMAN E. ZINBERG LECTURE
Harvard Medical School

JOHN H. ERSKINE LECTURE
St. Jude's Children's Research Hospital

MARTIN V. BONVENTRE MEMORIAL LECTURE
The Brooklyn Hospital Center

PURVES LECTURE
Woodbridge Library, Woodbridge, Connecticut

David A. Kessler                                                Page 14

VISITING SCHOLAR LECTURE University of
Oklahoma - Board of Regents Oklahoma Scholar
Leadership Extension Program

J. ROSWELL GALLAGHER LECTURER
Society of Adolescent Medicine

KATHERINE BOUCOT STURGIS LECTURESHIP
American College of Preventive Medicine

HELMUT SCHUMANN LECTURE
Dartmouth-Hitchcock Medical Center

50TH ANNIVERSARY COMMUNICATION LECTURE
Centers for Disease Control and Prevention

5TH JAMES BORDLEY III MEMORIAL LECTURE
Mary Imogene Bassett Hospital

TURNER LECTURE
University of California

MARIE SHULSKY MEMORIAL LECTURE ON HEALTH AND
SOCIAL RESPONSIBILITY
Fifth Avenue Synagogue, New York, New York

GERTRUDE AND G.D. CRAIN, JR. LECTURE SERIES
Medill School of Journalism, Northwestern University

GEORGE ARMSTRONG LECTURE
Ambulatory Pediatric Society

ARCO FORUM OF PUBLIC AFFAIRS
Institute of Politics, John F. Kennedy School of Government
Harvard University

PAUL LEVINGER LECTURE AND PROFESSORSHIP PRO TEM IN THE
ECONOMICS OF HEALTH CARE Brown University

ARNOLD J. SCHWARTZ MEMORIAL HEALTH LECTURE
Robert F. Wagner Graduate School of Public Service New York
University

RONALD ALTMAN MEMORIAL LECTURE
Festival of Arts, Books and Culture, Cherry Hills, New Jersey

David A. Kessler                                                          Page 15

> SAMUEL MARTIN, M.D. III MEMORIAL LECTURE Division of
> General Internal Medicine and Leonard Davis Institute University of
> Pennsylvania
>
> CARL J. MARTINSON, M.D. MEMORIAL LECTURESHIP ON HEALTH
> PROMOTION AND DISEASE PREVENTION University of Minnesota
>
> LEONARD SILK MEMORIAL LECTURE Mt.
> Desert Island Biological Laboratories
>
> CALDWELL LECTURE
> American Roentgen Ray Society
>
> RICHARD H. DENT LECTURE St.
> George's School
>
> ROBERT T. WONG DISTINGUISHED PROFESSORSHIP
> University of Hawaii, Manoa

COMMUNITY/PUBLIC SERVICE AWARDS

> NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED
> PEOPLE
> Montgomery County Chapter
> Person of the Year
>
> LEAGUE OF WOMEN VOTERS, NEW YORK
> Carrie Chapman Catt Award
>
> COMMON CAUSE
> Public Service Achievement Award
>
> AMERICAN ACADEMY OF PEDIATRICS
> Excellence in Public Service
>
> BUSINESS WEEK
> Best in Public Service
>
> GEORGE ORWELL AWARD FOR HONESTY AND CLARITY
> IN PUBLIC LANGUAGE
> National Conference of Teachers of English

David A. Kessler                                        Page 16

ANTI-DEFAMATION LEAGUE OF B'NAI BRITH
Man of Achievement Five Towns, New York

GOLDEN SLIPPER CLUB OF PHILADELPHIA
Golden Slipper Award

NATIONAL FATHER'S DAY COMMITTEE
Father of the Year Award

UNITED SENIORS HEALTH COOPERATIVE
Seniors Advocate Award

NATIONAL ASSOCIATION OF GOVERNMENT COMMUNICATORS
Communicator of the Year Award

NATIONAL CONSUMERS LEAGUE
Trumpeter Award

THE INTERNATIONAL PLATFORM ASSOCIATION
George Crile Award

AMERICAN LUNG ASSOCIATION of New York
Life and Breath Award in Public Health

CONSUMER FEDERATION OF AMERICA
Philip Hart Public Service Award

CAMPAIGN FOR TOBACCO FREE KIDS
Distinguished Service Award

MEDICAL SOCIETY OF NEW YORK, 1st District Branch
Public Service Award

ONCOLOGY NURSING SOCIETY
Public Service Award

PUBLIC VOICE FOR FOOD & HEALTH POLICY
Special Recognition Award for Advancing the Consumer Interest in Food and
Agriculture Policy

David A. Kessler                                                    Page 17

ATTENDING PEDIATRICIAN

2003-present   UNIVERSITY OF CALIFORNIA, SAN FRANCISCO MEDICAL
               CENTER

1997-2003      YALE-NEW HAVEN HOSPITAL

1982-1990      BRONX MUNICIPAL HOSPITAL CENTER

1982-1990      NORTH CENTRAL BRONX HOSPITAL

1982-1990      MONTEFIORE MEDICAL CENTER

1982-1990      HOSPITAL OF THE ALBERT EINSTEIN COLLEGE OF MEDICINE


COMMUNITY ACTIVITIES

               SCARSDALE SCHOOL DISTRICT, Scarsdale, New York

1986-1990      Legislative Affairs Advisory Committee
1988-1990      Buildings and Facilities Advisory Committee

1990           SCARSDALE STUDENT TRANSFER EDUCATION PLAN, Board of Trustees


CERTIFICATIONS

               NATIONAL BOARD OF MEDICAL EXAMINERS AMERICAN

               BOARD OF PEDIATRICS (Recertified 1997, 2002)

GENERALINFORMATION

Address:                                     Office Phone:
     2715 Steiner Street                          (415) 929 1121
     San Francisco, CA 94123

Married:                                     Born:
     Paulette Kessler

     Two children – Elise and Ben                 May 31, 1951

David A. Kessler                                                           Page 18

MEDICAL LICENSURE

    California
    Connecticut (non-active)
    Maryland (non-active)
    New York (non-active)

PUBLICATIONS

    Books

        Kessler, David A., A QUESTION OF INTENT: A GREAT AMERICAN
        BATTLE WITH A DEADLY INDUSTRY, Public Affairs (Hardcover 2001)
        (Paperback 2002)

        Kessler, David A. THE END OF OVEREATING: TAKING CONTROL OF
        THE INSATIABLE AMERICAN APPETITE, Rodale, 2009 (pub in 10
        countries

    Edited Books

        Eisdorfer, Carl, Kessler, David A., Spector, Abby (eds.), CARING FOR THE
        ELDERLY: RESHAPING HEALTH POLICY, Johns Hopkins University Press,
        1989. Includes chapter by Coombs, C., Eisdorfer, C., Feiden, K., and Kessler,
        D.A. "Lessons from the Program for Hospital Initiatives in Long-Term Care."

    Articles

        Halme, Dina J. and Kessler, David A., "FDA Regulation of Stem Cell-Based
        Therapies", NEW ENGLAND JOURNAL OF MEDICINE, 355 (16): 1730-1735
        (October 19, 2006)

        Kessler, David A., "Alcohol Marketing and Youth: The Challenge for Public
        Health," JOURNAL OF PUBLIC HEALTH POLICY, 26(3):292-295 (Autumn
        2005)

        Kessler, David A., "The Tobacco Settlement," NEW ENGLAND JOURNAL OF
        MEDICINE, 337:1082-1083 (October 9, 1997)

        Kessler, David A., Wilkenfeld, J.P., Thompson. L.J. "The Food and Drug
        Adminstration's Rule on Tobacco: Blending Science and Law," PEDIATRICS,
        99(6):884-887 (June 1997)

        Kessler, David A., Natanblut, Sharon L., Wilkenfeld, Judith P., Lorraine,
        Catherine C., Mayl, Sharon Lindan, Bernstein, Ilisa B.G. and Thompson, Larry,
        "Nicotine Addiction: A Pediatric Disease," JOURNAL OF PEDIATRICS,
        130:518-524 (April 1997)

David A. Kessler                                                            Page 19

Kessler, David A., Barnett, Philip S., Witt, Ann, Zeller, Mitchell R., Mande, Jerold R. and Schultz, William B., "The Legal and Scientific Basis for FDA's Assertion of Jurisdiction Over Cigarettes and Smokeless Tobacco," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 277:405-409 (February 5, 1997)

Kessler, David A., Hass, Arthur E., Feiden, Karyn L. , Lumpkin, Murray and Temple, Robert, "Approval of New Drugs in the United States: Comparison with the United Kingdom, Germany and Japan," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 276:1826-1831 (December 11, 1996)

Kessler, David A., Witt, Ann, Barnett, Philip S., Zeller, Mitchell R., Natanblut, Sharon, Wilkenfeld, Judith, Lorraine, Catherine C., Thompson, Larry J. and Schultz, William B., "The Food and Drug Administration's Regulation of Tobacco Products," NEW ENGLAND JOURNAL OF MEDICINE, 335:988-994 (September 26, 1996)

Silverman, Barbara G., Brown, S. Lorie, Bright, Roslie A., Kaczmarek, Ronald G., Arrowsmith-Lowe, Janet B., Kessler, David A., "Reported Complications of Silicone Gel Breast Implants: An Epidemiologic Review," ANNALS OF INTERNAL MEDICINE, 124:744-756 (April 15, 1996)

Kessler, David A., "Nicotine Addiction in Young People," NEW ENGLAND JOURNAL OF MEDICINE, 333:186-189 (July 20, 1995)

Kessler, David A., "Accelerating the Approval of Drugs for Life-Threatening and Serious Diseases," SCIENTIFIC AMERICAN, 272:48-52 (March 1995)

Kessler, David A., Rose, Janet L., Temple, Robert J., Schapiro, Renie and Griffin, Joseph, "Therapeutic Class Wars: Drug Promotion in a Competitive Marketplace," NEW ENGLAND JOURNAL OF MEDICINE, 331:1350 (November 17, 1994)

Kessler, David A., Merkatz, Ruth B., Schapiro, Renie, "A Call for Higher Standards for Breast Implants," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 270:2607-2608 (December 1, 1993)

Kessler, David A., Siegel, Jay P., Noguchi, Philip D., Zoon, Kathryn C., Feiden, Karyn L., and Woodcock, Janet, "Regulation of Somatic Cell Therapy and Gene Therapy by the Food and Drug Administration," NEW ENGLAND JOURNAL OF MEDICINE, 329:1169-1173 (October 14, 1993)

Merkatz, Ruth B., Temple, Robert, Sobel, Solomon, Feiden, Karyn, Kessler, David A., and members of the working group on Women in Clinical Trials, "Women in Clinical Trials of New Drugs: A Change in FDA Policy," NEW ENGLAND JOURNAL OF MEDICINE, 329:292-296 (July 22, 1993)

David A. Kessler                                                      Page 20

Kessler, David A. for the Working Group, "A New Approach to Reporting Medication and Device Adverse Effects and Product Problems," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 269:2765-2768 (June 2, 1993)

Kessler, David A., Taylor, Michael A., Maryanski, James H., Flamm, Eric L., and Kahl, Linda S., "The Safety of Foods Developed by Biotechnology," SCIENCE, 256:1747-1749 (June 26, 1992)

Kessler, David A., "The Basis for the FDA's Decision on Breast Implants," NEW ENGLAND JOURNAL OF MEDICINE, 326:1713-1715 (June 18, 1992)

Kessler, David A., "Communicating to Patients About Their Medication," NEW ENGLAND JOURNAL OF MEDICINE, 325:1650-1652 (December 5, 1991)

Kessler, David A., "Drug Promotion and Scientific Exchange," NEW ENGLAND JOURNAL OF MEDICINE, 325:201-203 (July 18, 1991)

Kessler, David A. and Pines, Wayne L., "The Federal Regulation of Prescription Drug Advertising and Promotion," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 264:2409-2415 (November 14, 1990)

Kessler, David A., "The Federal Regulation of Food Labeling: Promoting Foods to Prevent Disease," NEW ENGLAND JOURNAL OF MEDICINE, 321:717-725 (September 14, 1989)

Kessler, David A., "The Regulation of Investigational Drugs," NEW ENGLAND JOURNAL OF MEDICINE, 320:281-288 (February 2, 1989)

Kessler, David A., Pape, Stuart, and Sundwall, David, "The Federal Regulation of Medical Devices," NEW ENGLAND JOURNAL OF MEDICINE, 317:357-366 (August 6, 1987)

Kessler, David A., "Food Safety: Revising the Statute," SCIENCE, 223:1034-1040 (March 1984)

Kessler, David A., "Regulating the Prescribing of Human Drugs for Nonapproved Uses Under the Food, Drug and Cosmetic Act," HARVARD JOURNAL OF LEGISLATION, 693-760 (1978)

Kessler, David A., "Implementing the Anticancer Clauses of the Food, Drug and Cosmetic Act," THE UNIVERSITY OF CHICAGO LAW REVIEW, 44:817-850 (1977)

Kessler, David A., Langer, Robert S., Pless, Naomi A., and Folkman, Judah, "Mast Cells and Tumor Angiogenesis," INTERNATIONAL JOURNAL OF CANCER, 18:703-709 (November 15, 1976)

David A. Kessler                                                    Page 21

Kessler, David A., "Experimental Activation of the Herpes Virus Associated with the Lucke Renal Adenocarcinoma of the Leopard Frog, Rana Pipiens," unpublished thesis, Amherst College (1973)

Editorials

Kessler, David A., Myers, Matthew, "Beyond the Tobacco Settlement," NEW ENGLAND JOURNAL OF MEDICINE, 345:535-537 (August 16, 2001) (editorial)

Kessler, David A., "Cancer and Herbs," NEW ENGLAND JOURNAL OF MEDICINE, 342 (23):1742-43 (June 8, 2000) (editorial)

Koop, C. Everett, Kessler, David A., Lundberg, George D., "Reinventing American Tobacco Policy - Sounding the Medical Community's Voice," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 279:550-552 (February 18, 1998) (editorial)

Kessler, David A., "Addressing the Problem of Misleading Advertising," ANNALS OF INTERNAL MEDICINE, 116:950-951 (June 1, 1992) (editorial)

Published Speeches

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD AND DRUG LAW JOURNAL, 52:1-5, presented at the Food and Drug Law Institute's 39th Annual Educational Conference, Washington, D.C. (December 10-11, 1996)

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD AND DRUG LAW JOURNAL, 51:207-216 (1996), presented at the Food and Drug Law Institute's 38th Annual Educational Conference, Washington, D.C. (December 12-13, 1995)

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD AND DRUG LAW JOURNAL, 50:327-334 (1995), presented at the Food and Drug Law Institute's 37th Annual Educational Conference, Washington, D.C. (December 13-14, 1994)

Kessler, David A., "Statement on Nicotine-Containing Cigarettes," TOBACCO CONTROL, 3:148-158 (1994)

David A. Kessler                                                         Page 22

Kessler, David A., "Issues in Approving Drugs for AIDS Treatment," REGULATORY AFFAIRS, 6:189-200 (1994), presented at the Institute of Medicine's 25th anniversary lecture series, Seattle, Washington

Kessler, David A., "FDA's Revitalization of Medical Device Review and Regulation," BIOMEDICAL INSTRUMENTATION AND TECHNOLOGY, May/June 1994:220-226, presented at the AAMI/NIH Cardiovascular Science and Technology Conference, Rockville, Maryland (December 10, 1993)

Kessler, David A., "Harmonization," PHARMACEUTICAL ENGINEERING, 14:38-40 (January/February 1994), presented at the Second International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use, Orlando, Florida (October 27, 1993)

Kessler, David A. "The Academic/Industry Interface: The Risks of Scientists Becoming Entrepreneurs," HOPKINS MEDICAL NEWS, Fall 1993:58

Kessler, David A., "Controlled Release and Rational Drug Development," presented at the Controlled Release Society Meeting, July 27, 1993, FOOD AND DRUG REPORTS, 4:9 (1993)

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD DRUG COSMETIC LAW JOURNAL, 48:1-10 (1993), presented at The Food and Drug Law Institute's 35th Annual Educational Conference, Washington, D.C. (December 8, 1992)

Kessler, David A., "Reinvigorating the Food and Drug Administration," FOOD TECHNOLOGY, 46:20 (August 1992), presented at the Annual Meeting of Institute of Food Technologists, New Orleans, LA (June 20-24, 1992)

Kessler, David A., "A Challenge for American Pharmacists," AMERICAN PHARMACY, 33-36 (January 1992)

Kessler, David A., "Remarks--1991 Annual DIA Meeting," DRUG INFORMATION JOURNAL (October 1991)

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD DRUG COSMETIC LAW JOURNAL, 46:773-779 (November 1991), presented at the Association of Food and Drug Officials' Annual Conference, Grand Rapids, MI (June 17, 1991)

Kessler, David A., "Restoring the FDA's Preeminence in Regulation of Food," FOOD DRUG COSMETIC LAW JOURNAL (May 1991)

Kessler, David A., "Remarks Upon Taking the Oath of Office," JOURNAL OF THE ASSOCIATION OF FOOD AND DRUG OFFICIALS, 55:7-10 (April 1991)

David A. Kessler

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," <u>FOOD DRUG COSMETIC LAW JOURNAL,</u> 46:21-26 (January, 1991), presented at the Food and Drug Law Institute's 33rd Annual Educational Conference, Washington, D.C. (December 11, 1990)

Appendix B

## APPENDIX B

Prior Testimony and Fee Rate

As of July 9, 2013, Dr. David Kessler testified at trial or deposition in the following cases over the last five years:

- *Elmore v. Gorsky*, No. 2012CCV-61916-1 (Tex. Dist. Ct. filed Oct. 2, 2012)
- *Wells v. Allergan, Inc.* No. 12-973 (W.D. Okla. filed Sept. 4, 2012)
- *In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2187 (S.D.W.V. filed July 15, 2010)
- *SB v. Ortho-McNeil-Janssen Pharm., Inc. (In re Risperdal Litig.)*, No. 100503629 (Pa. Ct. Com. Pl. filed May 27, 2010)
- *In re Yaz & Yasmin (Drospirenone) Marketing, Sales Practices & Prods. Lib. Litig.*, MDL No. 2100 (J.P.M.L. filed July 30, 2009)
- *IBEW-NECA Local 505 Health & Welfare Plan v. Smithkline Beecham Corp. (In re Flonase Antitrust Litig.)*, No. 08-3301 (E.D. Pa. filed July 14, 2008)
- *Pharmathene, Inc. v. Siga Techs., Inc.*, No. 2627 (Del. Ch. filed Dec. 20, 2006)
- *Commonwealth v. Merck & Co.*, No. 09-1671 (Ky. Cir. Ct. filed Sept. 28, 2009)
- *State v. Merck & Co.*, No. 05-3700 (E.D. La. filed Aug. 5, 2005)
- *Commonwealth Care Alliance v. AstraZeneca Pharm. L.P.*, No. SUCV2005-269 (Mass. Super. Ct. filed Jan. 25, 2005)
- *Smith & Nephew, Inc. v. N.H. Ins. Co.*, No. 04-3027 (W.D. Tenn. filed Dec. 17, 2004)
- *In re Neurontin Marketing, Sales Practices & Prods. Liab. Litig.*, MDL No. 1629 (D. Mass. filed June 9, 2004)
- *Brown v. Am. Brands, Inc.*, No. 711400 (Cal Super. Ct. filed June 10, 1997)

As of July 9, 2013, Dr. David Kessler provided sworn expert statements in the following cases over the last five years:

- *DePuy ASR Hip System Cases*, No. CJC-10-4649 (Cal. Super. Ct. filed Dec. 22, 2010)
- *Cordero v. Endoscopy Ctr. of S. Nev. LLC (In the Matter of Endoscopy Ctr. & Associated Businesses)*, No. 08-A-558091-C (Nev. Dist. Ct. filed Feb. 28, 2008)

Dr. Kessler's billing rate for this matter is $1,000/hour.

Appendix C

**APPENDIX C:**

Additional Documents Relied Upon and Considered

**Plaintiffs' Exhibits**

PX 25

PX 33

PX 34

PX 43

PX 138

PX 263

PX 295

PX 298

PX 317

PX 336

PX 337

PX 348

PX 358

PX 362

PX 363

PX 369

PX 371

PX 411

PX 418

PX 419

PX 420

PX 421

PX 427

PX 431

PX 432

PX 433

PX 447

PX 464

PX 548

PX 596

PX 601

PX 613

PX 628

PX 750

PX 825

PX 829

PX 835

PX 836

PX 859

PX 874

PX 932

PX 1006

**Bates Stamped Documents**

FDACDER 003158

FITZG-000001

MRK-01420093083

MRK-01420163678

MRK-01420167265

MRK-99420021411

MRK-AAB0006328

MRK-AAB0062173

MRK-AAC0023818

MRK-AAC0036776

MRK-AAC0046674

MRK-AAC0051928

MRK-AAC0164903

MRK-AAC0171335

MRK-AAD0017495

MRK-AAD0106697

MRK-AAD0153075

MRK-AAD0226839

MRK-AAF0005014

MRK-AAF0008106

MRK-AAR0007383

MRK-AAR0019055

MRK-AAR0021509

MRK-AAW0000366

MRK-AAX0000752

MRK-AAX0002413

MRK-ABA0002965

MRK-ABA0004431

MRK-ABC0009946

MRK-ABC0044407

MRK-ABC0048699

MRK-ABH0022920

MRK-ABI0002269

MRK-ABI0008139

MRK-ABK0025697

MRK-ABK0170583

MRK-ABK0312961

MRK-ABK0436556

MRK-ABK0436557

MRK-ABK0437640

MRK-ABO0000257

MRK-ABP0015218

MRK-ABP0015899

MRK-ABS0415816

MRK-ABT0078672

MRK-ABW0000581

MRK-ABW0001178

MRK-ABW0004799

MRK-ABW0010182

MRK-ABX0002367

MRK-ABY0134640

MRK-ABY0199809

MRK-ACC0000419

MRK-ACC0024645

MRK-ACC0024646

MRK-ACC0024653

MRK-ACC0046677

MRK-ACD0053764

MRK-ACD0063882

MRK-ACD0067848

MRK-ACD0122214

MRK-ACI0013201

MRK-ACI0013202

MRK-ACI0013226

MRK-ACK0012586

MRK-ACO0011030

MRK-ACR0009721

MRK-ACR0034285

MRK-ACT0035510

MRK-ACT0035511

MRK-ACU0000402

MRK-ACZ0009097

MRK-ADI0005375

MRK-ADM0086799

MRK-ADM0086800

MRK-ADM0086831

MRK-ADO0040792

MRK-ADY0006153

MRK-AFI0130591

MRK-AFI0130592

MRK-AFK0203537

MRK-AFL0003978

MRK-AFL0088463

MRK-AFO0293941

MRK-AFW0009752

MRK-AGU0010675

MRK-AGV0015452

MRK-AHD0108092

MRK-AHE0002987

MRK-AHN0048910

MRK-AHO0005433

MRK-AHY0263588

MRK-AHY0263590

MRK-AID0015993

MRK-AIN0001235

MRK-AIQ0002337

MRK-AIX0011566

MRK-AKU0055948

MRK-AKU0055949

MRK-AKU0072451

MRK-AKU0073054

MRK-AKU0083901

MRK-APP0000287

MRK-AWC0003447

MRK-AWC0021637

MRK-EC1SUR019876

MRK-I2690007833

MRK-I8940077723

MRK-I8940080062

MRK-JAG0004746

MRK-JAG0047513

MRK-LBL0000063

MRK-OS420000002

MRK-OS420045657

MRK-OS420124072

MRK-PUBLIC0000351

MRK-PUBLIC0000590

MRK-PUBLIC0001128

MRK-PUBLIC0001692

MRK-S0420000029

MRK-SHAA0166422

MRK-SHAA0504998

MRK-SHAA0536119

MRK-SHAA0541700

MRK-SHAA0544386

MRK-SHAA0564682

MRK-SHAA0824139

MRK-SHAA1303894

MRK-SHAA1365277

MRK-SHAA1365325

MRK-SHAA1365329

MRK-SHAA1534009

MRK-SHAA1571477

MRK-SHAA1739141

MRK-SHAA2513738

MRK-SHAA2605270

MRK-SHAA2988675

MRK-SHAA3328936

MRK-SHAAM0106624

MSD-REG0116004

MSD-REG0117049

MSD-REG0118311

MSD-REG0120212

MSD-REG0121612

NEJM 000001

TOPOLE 0000322

MRK-AFF0000040

MRK-AFJ0008607

MRK-18940044483

MRK-NJ0051533

MRK-NJ0152620

MRK-ABS0037036

MRK-ABS0037040

MRK-NJ0272249

MRK-NJ0272250

MRK-NJ0272261

MRK-AGG0002839

MRK-AGG0002858-68

MRK-AIR0041448

MRK-AIR0041457-58

MRK-AEI0002734

MRK-AEI0002738-739

PX433MRK-SHAA0572403

PX433MRK-SHAA0572408

MRK-AEI0002742

MRK-05420124073

MRK-AKO0002522-23

MRK-AAZ0000248

MRK-ABC0033809

MRK-ABH0002007

MRK-ABH0002015

MRK-ABH0002006

MRK-AAF0007777-80

MRK-ABH0003277-80

MRK-AFT0007691-99

MRK-AAR0038843-48

MRK-AAX0000752

MRK-AAX0000756-57

MRK-AAX0000759

MRK-ACR0014708

MRK-AAX0000752 at 59

MRK-01420145856

MRK-01420145863-64

MRK-014201458913

MRK-ACD0013906-07

MRK-00420008018

MRK-AAX0008560

MRK-NJ0439283

MRK-NJ0439309

MRK-ACR009287

MRK-ABH0022028

MRK-ABH0022036

MRK-AHU263588-615

MRK-AFJ0008607

MRK-AAV000075

**Deposition Testimony**

Raymond P. Bain, March 21, 2013

James A. Bolognese, May 8, 2013

Garret A. FitzGerald, April 23, 2013

Raymond V. Gilmartin, June 12, 2013

John A. Oates, May 16, 2013

Edward M. Scolnick, May 31, 2013

Deborah Shapiro, March 6, 2013

Robert E. Silverman, June 19, 2013

Douglas J. Watson, May 22, 2013

**Federal Regulations**

21 C.F.R. § 201.57 (1999)

21 C.F.R. § 201.57 (2002)

21 C.F.R. § 202.1 (1999)

21 C.F.R. § 202.1 (2002)

21 C.F.R. § 314.50 (1999)

21 C.F.R. § 314.50 (2002)

21 C.F.R. § 211 (2006)

21 U.S.C. § 352 (1999)

21 U.S.C. § 352 (2002)

21 U.S.C. § 355 (1999)

21 U.S.C. § 355 (2002)

Federal Register: December 22, 2000 (Vol. 65, No. 247).

Federal Register: January 24, 2006 (Vol. 71, No. 15).

**Journal/News Articles**

Fosbol et al., Cause-Specific Cardiovascular Risk Associated with Nonsteroidal
Antiinflammatory Drugs Among Healthy Individuals, Circulation (Jun. 8, 2010).

Kaplan et al., NSAIDs and acetaminophen: Effects on blood pressure and hypertension, Wolters
Kluwer Health (May 1, 2012).

Kessler & Vladeck, A Critical Examination of the FDA's Efforts To Preempt Failure-To-Warn
Claims, 96 Geo. L. J. 461, 463 (2008).

Madigan et al., Under-reporting of Cardiovascular Events in the Rofecoxib Alzheimer Disease
Studies, American Heart Journal, Vol. 164, No. 2 (August 2012).

Psaty et al., Reporting Mortality Findings in Trials of Rofecoxib for Alzheimer Disease or
Cognitive Impairment, Journal of the American Medical Association, Vol. 299 No. 15
(2008).

Solomon et al., COX-2 Selective Inhibitors: Adverse cardiovascular effects, Wolters Kluwer
Health (May 9, 2013).

9

Trelle, et al., Cardiovascular safety of non-steroidal anti-inflammatory drugs: network meta-analysis, BMJ Research (Jan 11, 2011).

Bombardier, et al., Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, N EngJ Med. 200;343:1520-28.

**Miscellaneous**

Celebrex December 2008 Label.

DOJ Plea Agreement (November 7, 2011).

Hearing, March 1, 2005 FDA's Drug Approval Process: Up to the Challenge?, S.Hrg. 109-67, at 23.

International Conference on Harmonisation ("ICH") Harmonised Tripartite Guideline Statistical Principles For Clinical Trials E9, Section 5.1 Prespecification of the Analysis (February 5, 1998).

Sequence of Events with Vioxx, since opening of IND, obtained from www.fda.gov.

Thompson StreetEvents Final Transcript, MRK - Q1 2002 Merck Earnings Conference Call (April 18, 2002).

U.S. Dep't of Health and Human Servs., Food and Drug Admin, Guidance for Industry: Postmarketing Studies and Clinical Trials – Implementation of Section 505(o)(3) of the Federal Food, Drug, and Cosmetic Act (April 2011).

U.S. Dep't of Health and Human Servs., Food and Drug Admin., Guidance for Industry: Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products—Content and Format (October 2011).

Br. of Former FDA Comm'rs Dr. Donald Kennedy and Dr. David A. Kessler as Amici Curiae in Support of Respondent, *Mutual Pharmaceutical Co. Inc. v. Bartlett*, No 12-142, 570 U.S. ___ (February 20, 2013).

**Case Law**

Feldman v. Lederle Lab., 125 N.J. 117, 121 (N.J. 1991).

Hill v. Searle Labs, 884 F.2d 1064, 1068 (8th Cir. 1989).

Kordel v. U.S., 335 U.S. 345 (1948).

Mutual Pharmaceutical Co. Inc. v. Bartlett, 570 U.S. ___ (2013), Slip. Op.

Vautour v. Body Masters Sports Indus., 147 N.H. 150, 153-54 (Nov. 5, 2001).

Wells v. Ortho Pharm. Corp., 788 F.2d 741, 746 (11th Cir. 1986).

Wyeth v. Levine, 555 U.S. 555, 567 (2009).