# Exhibit 5

Expert Report of Harry C. Boghigian

IN RE:  VIOXX Products Liability Litigation

MDL NO. 1657, CIVIL ACTION NO. 2:06-CV-09336

*The State of Utah v. Merck*

## EXPERT REPORT OF HARRY C. BOGHIGIAN

Contains Information Designated as Confidential

Pursuant to Protective Order

TABLE OF CONTENTS

Pages

I.     INTRODUCTION ................................................................................................ 1

II.    MY QUALIFICATIONS AND BACKGROUND ............................................... 1

III.   SCOPE OF MY ASSIGNMENT ........................................................................ 5

IV.    SUMMARY OF MY OPINIONS ....................................................................... 7

V.     MARKETING PHARMACEUTICAL DRUGS ................................................. 8

    A.     Product Life Cycle ................................................................................... 8

    B.     The Value and Importance of Clinical Differentiation ......................... 11

    C.     Tools Used To Market a Pharmaceutical Drug ..................................... 12

        a)     Key Opinion Leaders ................................................................. 12

        b)     Key Constituents and Managed Care ......................................... 14

        c)     Clinical Studies .......................................................................... 14

        d)     Sales Force ................................................................................. 15

        e)     Product Samples ......................................................................... 16

        f)     Top of Mind ............................................................................... 16

|  |  | g) | Public Relations and Publication Strategy | 18 |

| | D. | Keys to Marketing Success | 19 |

VI. THE MARKET OPPORTUNITY FOR VIOXX ............................................................ 22

VII. MERCK'S DRUG PATENT CLIFF ............................................................................ 28

VIII. VIOXX MARKET INTRODUCTION IS SECOND TO CELEBREX CAUSING INCREASED PRESSURE ON MERCK TO ACHIEVE REVENUE GOALS .............. 30

IX. MERCK'S STATED GOALS FOR VIOXX .................................................................. 32

X. MERCK MARKETED VIOXX AS POSSESSING THE IDEAL PRODUCT PROFILE ...................................................................................................................... 34

XI. BASED ON VIOXX'S MARKETED PROFILE, MERCK FORECASTED SIGNIFICANT REVENUE ........................................................................................ 36

XII. THE PROMOTIONAL RESOURCES THAT DROVE VIOXX SALES ...................... 38

XIII. THE IMPACT OF VIGOR ON THE MARKETING OF VIOXX ................................ 44

A. Merck Learns the Preliminary Results of VIGOR in March of 2000.................. 44

B. Merck Re-Doubled Its Marketing Efforts for Vioxx Following the VIGOR Results and the FDA Advisory Committee Meeting ............................................. 45

XIV. VIOXX'S LABEL WAS CRITICALLY IMPORTANT TO ITS COMMERCIAL VIABILITY ................................................................................................................. 50

A. The Contents of a Drug's Label Are Extremely Important to Sales..................... 50

B. If the Vioxx Launch Had Been Delayed Due to Further Research to Determine Its CV Risk and Appropriate Label, Vioxx Would Not Have Been Able to Compete with Celebrex and Would Not Have Been Commercially Viable ............................................................................................. 53

C. If Vioxx Had Been Launched With A Warning It Would Not Have Been Commercially Viable ............................................................................................. 54

D. Vioxx Would Not Have Been Commercially Viable With A Black Box Warning.................................................................................................................. 60

a) Black Box Warnings ................................................................................. 60

b) Analyst Reports Quantifying Sales for Vioxx upon Its Possible Reintroduction to the Market with a Black Box Warning are

Instructive as to Potential Sales of Vioxx with a Black Box Warning.................................................................................................. 63

      c)    If Vioxx Had a Black Box Warning Either at Launch or Following VIGOR, Its Market Would Have Been Severely Contracted, Sales Would Have Been Devastated, and Vioxx Would Not Have Been Commercially Viable ............................................................................... 65

   E.    Merck's Post-VIGOR Label ................................................................... 68

      a)    Merck Wins the VIGOR Label Battle ...................................................... 70

XV.   IF THE GI BENEFIT OF VIOXX WAS NEGATED WITH THE REQUIRED USE OF ASPIRIN TO COUNTER VIOXX'S PROTHROMBOTIC RISK, IT WOULD NOT HAVE BEEN A FIRST LINE DRUG FOR A MAJORITY OF PATIENTS .......................................................................................................... 71

XVI.  CONCLUSION ............................................................................................... 73

## I.      INTRODUCTION

1.      I, Harry C. Boghigian, have been retained by Plaintiffs' Counsel in the above-captioned litigation to provide my opinions and views based on my expertise and the materials I have reviewed in this case.

2.      I have been asked to provide opinions on, among other things, the marketing, promotion, sales plans, and related efforts of Merck with respect to Vioxx®, and how Vioxx would have performed in the market under different scenarios.  This report contains my opinions and the factual bases for those opinions about which I may testify, reference data or other information I considered in forming those opinions, and my qualifications.

3.      In the event additional documents or materials are presented after the submission of my report related to the subject matter addressed in this report, I reserve the right to respond to any such submission.  I further retain the right to issue a supplementary report as a result of information disclosed or produced after the submission of this report.

4.      I understand that I may be called to testify at trial in this litigation.  If called upon, I am prepared to testify about my background, qualifications, and experience, as well as the issues set forth in this report.

## II.     MY QUALIFICATIONS AND BACKGROUND

5.      I am a pharmaceutical executive with over forty years of domestic and international experience in the portfolio management, commercialization, and marketing of pharmaceutical products.  My current work focuses on Pharma Consultants LLC ("Pharma") and PBN PHARMA LLC ("PBN").

6.      In 2001, I founded Pharma, a consulting firm start-up, assisting small-to-medium-sized healthcare companies and advertising agencies in all areas of pharmaceutical sales and marketing.

7.      In 2003, I co-founded PBN, a research and development healthcare company. The company owns a number of patents and is focused on the development, licensing, and commercialization of prescription and over-the-counter products. PBN recently launched its first product and is developing a line of all natural and organic over-the-counter dermatology products for infants, toddlers, and young children.

8.      I began my career in the pharmaceutical industry in 1971 as a sales representative with Hoffmann-La Roche, one of the top ten global pharmaceutical research and development companies. At Hoffmann-La Roche, I called on physicians, pharmacists, nurses, and ancillary healthcare personnel in offices, hospitals, and medical centers. I was responsible for the sales of a number of prescription pharmaceutical products, clinical laboratory services, and medical education learning programs over a wide geographical area in the northeast.

9.      After earning the President's Achievement Award three times for outstanding sales at Hoffmann-La Roche, I was promoted in 1982 to Division Sales Manager with responsibility for overseeing and managing twelve sales representatives covering the west coast of Florida. I served in that capacity until I was promoted in 1984 to the corporate offices in New Jersey as Manager of Marketing Research. In that position, I was responsible for a group of analysts supporting the primary and secondary market research needs of several product teams.[1] I also developed, directed, and executed market research studies and created product forecasts on marketed and pipeline products.

10.      In late 1986, I was promoted to Regional Sales Director at Hoffmann-La Roche. In that position, I was responsible for ten division sales managers and approximately 120 sales

---

[1] Primary market research includes surveys, questionnaires, and focus groups – any vehicle that is designed to create data. Secondary market research is any research conducted on data that is already in existence that was collected by other people or for other purposes. Audits, government statistics, and research papers are examples of pre-existing data.

representatives who executed marketing strategy and achieved dollar and prescription goals.  I also interfaced with various product marketing teams to assist in the development of product strategies and tactics.

11.    In 1998, I was first named Product Director, and then several months later named Group Product Director, at Hoffmann-La Roche, with marketing and pipeline product responsibility for several therapeutic areas, products, and product directors.  As Product Director and Group Product Director, I was responsible for the success of marketed products and the development of pipeline products domestically and internationally.  I was responsible for creating the strategies, tactics, and promotional messages for the products, as well as forecasting sales revenues and profit targets.  In addition, I was responsible for managing the first industry co-promotion agreement, which became the new industry model.

12.    My international experience at Hoffmann-La Roche included positions as Global Business Director from 1989 to 1991 for several marketed and developmental compounds, and Senior Vice President and General Manager of the Canadian division from 1991 to 1994.  As Global Business Director, I was responsible for coordinating the marketing for both new product introductions and currently-marketed products in the U.S., France, Germany, Italy, the United Kingdom, and Japan.  As Senior Vice President and General Manager for the Canadian division, I was responsible for reorganizing that division and growing it three-fold.  I restructured the entire organization, launched three new products, and increased sales of currently-marketed products.

13.    Also while at Hoffmann-La Roche, I held the position of Vice President of Southern Business Operations from 1995 to 1996, in which I was responsible for approximately 60% of the U.S. revenues and an operating budget of $130 million.  I was also responsible for reorganizing, along with two other key executives and the president, the entire Business

3

Organization of Hoffmann-La Roche in the United States. In that role, we restructured the U.S. organization from a centralized to a decentralized organization with twenty profit-and-loss business units responsible for optimizing the sales and marketing in their respective geographies.

14.     Beginning in 1995, I was appointed a member of the Operating Committee which managed the short and long term business of the U.S. organization. This group made all final decisions regarding development of new products, product portfolio management, resource allocation, sales goals, promotional expenses, and profit targets for each product and the U.S. operation in total. I also served on a number of additional executive committees which are listed on my CV and which contributed to the ongoing success of the company.

15.     I was appointed Vice President of U.S. Marketing for Hoffmann-La Roche from 1997 to 2000, with responsibility for a $2.3 billion portfolio of products and a product marketing budget in excess of $343 million. In this role, I led a team of marketing professionals that increased revenue 20% annually.

16.     In 2001, I was promoted to Vice President of Business Operations for Hoffmann-La Roche. In that capacity I, with one other colleague, managed the entire Hoffmann-La Roche Business Operation.

17.     While at Hoffmann-La Roche, I was involved with over forty products in various stages of development and commercialization, including blockbuster drugs.[2] My experience included preparing five- and ten-year long-range forecasts and management of a number of very successful co-promotion arrangements, including the first co-promotion arrangement in the history of the industry.

---

[2] A "blockbuster drug" is a term coined by the media to describe products that achieve $1 billion or more in sales annually.

18.     I have testified as an expert witness in numerous litigations, including the case entitled *Janssen Pharmaceuticals, Inc. et al., v. Watson Laboratories, Inc., et al.*, U.S. District Court, District of New Jersey, Civil Action No. 08-5103 (SRC).[3]

19.     I have a Bachelor of Science Degree from the University of New Hampshire Whittemore School of Business and have attended a number of Executive Business Programs at several of Europe's leading business schools, including INSEAD Institute of Business Administration in Fontainebleau Cedex, France and IMD Business School in Lausanne, Switzerland. In addition, I have attended a number of medical educational training programs on numerous therapeutic areas of product development.

20.     Further details concerning my background, training, and experience are contained in my Curriculum Vitae, which is attached as Exhibit A. A list of deposition and trial testimony I have provided in the last four years is attached as Exhibit B.

## III.    SCOPE OF MY ASSIGNMENT

21.     I have been retained by Plaintiffs' Counsel to provide expert testimony related to the analgesic and anti-inflammatory market and the marketing, promotion, sales plans, and related efforts of Merck with respect to Vioxx.

22.     Vioxx is a Cox-2 inhibitor that was developed by Merck and marketed by Merck from May 1999 until September 29, 2004, when Merck withdrew Vioxx from the market. Vioxx was initially approved by the U.S. Food and Drug Administration (the "FDA") for relief of the signs and symptoms of osteoarthritis ("OA"), the management of acute pain in adults, and treatment of primary dysmenorrhea. Additionally, in April 2002, it was approved by the FDA for the relief of the signs and symptoms of rheumatoid arthritis ("RA") in adults; in April 2004, it

---

[3] *Janssen Pharmaceuticals, et al., v. Watson Laboratories, Inc., et al.*, 2012 WL 3990221 (D.N.J.).

was approved for the acute treatment of migraine attacks, and on September 8, 2004, it was approved for the relief of the signs and symptoms of juvenile RA in children 2 years of age or older.  Merck maintained during the time period from May 1999 through September 29, 2004 that the primary clinical advantage of Vioxx was the reduction of gastrointestinal ("GI") adverse effects – specifically the reduction of perforations, ulcers, and bleeding ("PUBs") commonly associated with non-steroidal anti-inflammatory drugs ("NSAIDs"), while being as safe and effective in the relief of pain as NSAIDs.

23.     In connection with this report, I have reviewed information from a variety of sources, including documents produced in the course of the litigation, academic literature, and information from publicly-available sources.  A list of the documents and information I have considered in preparing this report is appended as Exhibit C.

24.     If I am called to testify as an expert witness in this litigation, I expect to provide testimony addressing the subject matters discussed below, including, but not limited to, the life cycle stages of a pharmaceutical product, including commercialization, marketing, sales, promotion, and development; strategies to extend a product franchise, such as line extensions and new dosage forms; and/or any other subject matter that I address in any submission I make in connection with these litigations.

25.     In forming my opinions set forth in this report, in addition to the materials listed in Exhibit C, I considered and relied upon my education, background, training, and extensive experience as a pharmaceutical executive.  It is my belief that based upon my education, training, and experience, I am qualified as an expert to give the opinions included in this report.

26.     I am being compensated at the rate of $695 per hour for my work in these cases. My compensation is not contingent on the outcome of this matter.  The approach I have taken to

this work would have been the same had I been retained by Merck or any of the Defendants employees in this matter.

## IV.    SUMMARY OF MY OPINIONS

27.    Based on the materials I have reviewed and my background and expertise, it is my opinion:

1)    Prior to 1999, there was a substantial marketing opportunity for Vioxx – if Vioxx could be marketed as safe for patients – in an unsatisfied market for an effective analgesic and anti-inflammatory that reduced GI complications associated with traditional NSAIDs;

2)    Because a number of Merck blockbuster drugs faced patent expiration, the financial success of Vioxx was critical to Merck's financial condition and stock price;

3)    Unfavorable side effects, such as an increased risk of serious cardiovascular ("CV") events, would undermine the commercial viability[4] of Vioxx;

4)    Celebrex was the most successfully launched pharmaceutical product in the history of the pharmaceutical industry, creating steep competition for Vioxx when it was launched;

5)    Vioxx was the most successful pharmaceutical launch in Merck history and the first Merck product to reach blockbuster status in such a short period of time;

---

[4] "Commercial viability" is defined as the ability of a product to compete effectively in the marketplace and create a return on investment.  Specifically, in this instance, I define it as development and marketing of a product that will address a medical need and will return the cost of development in a short period of time, allowing the product to generate revenues to support the corporate infrastructure and additional research and development of new products for marketing by the company.  In order to be "commercially viable," a product must come out in favor of benefits in a cost/benefit analysis.

6)  Merck aggressively promoted Vioxx and continued to do so very successfully after the Vioxx Gastrointestinal Outcome Research ("VIGOR") trial results;

7)  Merck's promotion of Vioxx throughout the time period from May 1999 through September 29, 2004 was supported by a large budget;

8)  Vioxx was marketed for the treatment of arthritis, which occurs largely in the elderly population – the population most susceptible to CV events;

9)  Losing elderly patients with CV risks as potential customers would have impacted Vioxx sales severely, leaving only the significantly smaller short-term or acute pain patient segment of the market;

10) Vioxx's drug label was critical to its marketing success and commercial viability;

11) If the Vioxx launch had been delayed to conduct further research to determine its CV risks, Vioxx would not have been commercially viable because Vioxx would not have been able to compete with Celebrex;

12) Vioxx would not be commercially viable with a CV Warning or with a Black Box CV Warning on its label at launch, or with a Black Box CV Warning following VIGOR;

13) If aspirin had to be taken concomitantly with Vioxx for cardio-protection and effectively counteracted any CV risk of Vioxx, but eliminated the main GI benefit for which Vioxx was marketed, Vioxx would not have been a first line drug for a majority of patients.

## V.   MARKETING PHARMACEUTICAL DRUGS

### A.   Product Life Cycle

28.     Prescription pharmaceutical products, like Vioxx, have a product life-cycle that includes four stages – an introduction or launch, growth, maturity, and the retirement or decline stage.   "With the market realities of competing products in the same pharmacologic class, development of new products intended to treat the same condition, and generic competition, drug companies typically manage lifecycle issues to optimize product value.  A number of strategies have been used to maximize the marketing life of a drug product."[5]

29.     The most critical stages of the lifecycle are the introductory and growth stages. During this time, new drugs may be rushed to the market to increase their value and competitiveness.[6]  With pharmaceutical companies promoting early use of new drugs and influencing physicians to prescribe new drugs,[7] physicians normally develop a perception of the product in the first six months to a year.  Following the launch, a company wants to extend the growth stage for as long as possible in order to achieve maximum revenues.

30.     Prior to approval by the FDA, key strategies must be developed for a drug and approved by senior management.  This is a critical element in the marketing of a prescription product.  These strategies provide the short and long-term strategic direction for the product.  If

---

[5] Richard W. Pollock and Gordon R. Johnston, *A Comparison of Product Development, Lifecycle, and Approval Pathways:   Brand   vs.   Generic   Products*, PHARMACY   TIMES,   at   4,   *available   at* https://secure.pharmacytimes.com/lessons/200205-01.asp.

[6] Lasser KE, Allen PD, Woolhandler SJ, Himmerlstein DU, Wolfe SM, Bor DH. Timing of New Black Box Warnings and Withdrawals for Prescription Medications.  *J Am Med Assoc.* 2002; 287(17):2215-2220 at 2219 (noting that "[d]rug firms may rush new drugs to market because of concerns about patent life, a desire to mold prescribing habits prior to the market entry of competitors, and hopes for a fast 'ramp-up' in sales that will encourage investors and increase stock prices"); *see* Melody Petersen, *Pushing Pills With Piles of Money; Merck and   Pharmacia   in   Arthritis   Drug   Battle*,   N.Y.   TIMES,   Oct.   5,   2000,   *available   at* http://www.nytimes.com/2000/10/05/business/pushing-pills-with-piles-of-money-merck-and-pharmacia-in-arthritis-drug-battle.html?pagewanted=all&src=pm; *see also* Hurwitz MA and Caves RE. Persuasion or Information? Promotion and the Shares of Brand Name and Generic Pharmaceuticals. *J Law Econ.* 1988;31(2):299- 320.

[7] Lasser, Allen, Woolhandler, Himmerlstein, Wolfe, and Bor, *supra*, at 2219 (noting that "[t]he pharmaceutical industry promotes the early use of new drugs, and influences physicians' adoption of such drugs"); *see also* Jones MI, Greenfield SM, Bradley CP. Prescribing New Drugs: Qualitative Study of Influences on Consultants and General Practitioners. *BMJ.* 2001 Aug. 4;323:1-7; Peay MY and Peay ER. The Role of Commercial Sources in the Adoption of a New Drug. *Soc Sci Med.* 1988; 26(12):1183-1189; *see also* Stross JK. Information Sources and Clinical Decisions. *J Gen Intern Med.* 1987;2:155-159.

the strategy is solid and well researched, the desired results can not only be achieved, but even exceeded.

31.     In order to determine these key strategies, pharmaceutical companies will usually create a "life-cycle plan" for a new product.[8] A product's life-cycle plan identifies each particular stage and provides insight into the dynamics of the market, which is beneficial in deciding the positioning and strategy for the brand, allowing a company to maximize the commercial value of the product.[9] The life-cycle plan defines the goals, objectives, strategic positioning, patent protection and/or strategy, value proposition,[10] line extensions or plans to market additional products within the same class, and a detailed timeline of the clinical development plan.[11] It identifies the value of the product in a number of therapeutic indications, including sales forecasts and resource expenditures. This information is important when deciding the positioning and strategy for the brand, as it allows the company to maximize the commercial value of the product.

32.     An experienced marketing organization, like Merck, will develop a product life-cycle plan for a drug, which will include a detailed timeline of the clinical development plan, and which will identify the value of the molecule in a number of therapeutic indications.[12]

---

[8] Pollock and Johnston, *supra*, at 4 (noting that "[w]ith the market realities of competing products in the same pharmacologic class, development of new products intended to treat the same condition, and generic competition, drug companies typically manage lifecycle issues to optimize product value").

[9] Kesselheim AS. Rising Health Care Costs and Life-Cycle Management in the Pharmaceutical Market. *PLOS Med.* 2013 Jun;10(6):e1001461, at 1 (noting that "[t]he term 'life-cycle management' refers to the practice of brand-name manufacturers seeking to further extend the market exclusivity periods for their drugs to maintain revenue streams").

[10] "Value proposition" is what distinguishes a product from the competition, i.e., features, benefits and advantages of the drug versus competitive products. These features include clinical outcomes, safety, and efficacy.

[11] *See* Elzinga D and Hopfield J, Achieving Marketing Excellence, in *Driving Towards Marketing Excellence*, at 2-6; *see also* Kesselheim *supra*, at 1 (discussing "evergreening" strategies to extend market exclusivity).

[12] In the 1990s, Merck outlined a number of indications it planned to research for Vioxx, such as efficacy in treating chronic pain, acute and prophylaxis migraine, Alzheimer's disease, and chemoprevention.  MRK-SHAA3174518 at

33.     The most important aspect of the life-cycle plan is an ongoing assessment of the market and development of strategies and tactics that will ensure a successful product life-cycle. To become the number one product in a therapeutic class, pharmaceutical marketing organizations formulate and implement plans that outline the direction and development of the particular product over the entire life-cycle.

**B.     The Value and Importance of Clinical Differentiation**

34.     In my opinion, the number one success factor for pharmaceuticals "is a unique superior product; a differentiated product that delivers unique benefits and superior value to the customer."[13] "The definitions of 'unique and superior' and 'benefit' are constructed from the customer's perspective – so they *must be based on an in-depth understanding of customer needs, wants, problems, likes, and dislikes.*"[14]

35.     Based on my experience, the success of a pharmaceutical product is measured by a company's ability to orchestrate a development and commercialization plan that will turn the scientific differences into meaningful, clinically differentiating features, as well as achieve the quantitative (i.e., sales and prescriptions) and qualitative (physician and patient perceptions) objectives for the product.  A product must be differentiated from the competition in order to be successful.  The degree of differentiation is usually a barometer of whether the product will rise to blockbuster status or just be another product in the therapeutic class.[15]

---

MRK-SHAA3174610;   MRK-SHAA3174180   at   MRK-SHAA3174279;   MRK-SHAA3135870   at   MRK-SHAA3135874; MRK-SHAA3151080 at MRK-SHAA3151084-MRK-SHAA3151085, MRK-SHAA3151091.

[13] Robert G. Cooper, *Winning at New Products: Accelerating the Process from Idea to Launch* at 84 (3d ed. 2001).

[14] *Id.* at 85-86.

[15] Elzinga D and Rodgers L.   Building a Differentiated Brand Positioning, in *Driving Towards Marketing Excellence,* at 18 (noting that "[c]reating a compelling, relevant, and differentiated brand positioning can often mean the difference between blockbuster and blasé market performance").

**C.      Tools Used To Market a Pharmaceutical Drug**

36.     Typically, during the pre-approval and approval stages, and market introduction, the marketing team will develop a formal pre-marketing plan with strategies, tactics, timelines, revenue forecasts, and budgets.[16] The plan is executed, and the marketing of the product should begin during that same timeframe.[17]

37.     Tactical elements are designed and then adopted to execute the key strategies. There are a number of tactics utilized by pharmaceutical companies, including: an appropriately-sized sales force, product samples, formulary packets, public relations, product marketing, clinical studies and publications, and pricing.[18]

**a)      Key Opinion Leaders**

38.     In order to promote or market a drug, the clinical team and the marketing group will identify thought leaders or key opinion leaders ("KOLs") for the product.[19]   KOL

---

[16] *See* Anita Loffler, The Role of Marketing, Biotech Ventures Course, April 11, 2004, at 16-21.

[17] *Id.* at 15 (noting that "[s]trategic marketing and its incorporation throughout the drug development process is a key to the success of new product development at both biotechnology and pharmaceutical companies").

[18] Bleil L, Kleger M, Malhotra R, Zaharudin A., And You Thought a Product Only Launches Once, in *Driving Towards Marketing Excellence*, at 48 (noting that "[p]harmaceutical companies excel at launching new brands. Companies make substantial investments over many years to understand market opportunities, develop compelling marketing strategies, and optimize sales force deployment to ensure a successful launch"), at 51 (noting that "[i]ncumbents will also need to develop a clinical trial and/or phase IV trial strategy to bolster support for each of the messages. For each message, data should be continually developed in order to create 'purposeful noise' in the marketplace. By releasing multiple publications over time, the incumbent's messages will become more visible and credible to the market"); *see* Chimonas S, Brennan TA, Rothman DJ. Physicians and Drug Representatives: Exploring the Dynamics of the Relationship. *J Gen Intern Med.* 2007 February; 22(2): 184–190; Loffler, *supra*, at 15-21; Impacts of Pharmaceutical Marketing on Healthcare Services in the District of Columbia, prepared by The George Washington University School of Public Health and Health Services (hereinafter "Impacts of Pharmaceutical Marketing"), at 20-21.

[19] Loffler, *supra*, at 17, 20.  Bleil, Kleger, Malhotra, and Zaharudin, *supra*, at 53.

development is typically done early on, prior to market introduction of the product.[20] The objective is to identify national thought leaders and provide them clinical experience with the product.[21] This may take the form of engaging them as clinical investigators to conduct clinical studies for submission with the New Drug Application ("NDA") or to generate studies to educate and increase awareness in the medical community.[22] These studies are then published in medical journals.[23] The belief is that if these investigators have a favorable experience with the product, they will adopt the product into their medical practice and ultimately influence their colleagues.[24]

39.     KOLs are extremely important to the development of a new product. The more prestigious the advocate, the more influential he or she will be for recruiting a number of physicians.

40.     Typically, many of the KOL physicians are invited to become consultants to the pharmaceutical company and serve as speakers and advisors.[25] The company will involve them in clinical discussions and clinical studies,[26] and the clinical team will create a product advisory group around a select few KOLs.  The formation of such a group ideally leads to conditioning the market with information about the product, both informally and formally through the

---

[20] Loffler, *supra*, at 17, 20.

[21] Bleil, Kleger, Malhotra, and Zaharudin, *supra*, at 53.

[22] *Id.* at 53; John Mack, Developing Win-Win Key Opinion Leader Relationships, PHARMA MARKETING NEWS, at 4, http://www.news.pharma-mkting.com/pmn210-article01.pdf (noting that "[p]harmaceutical companies must also provide thought leaders with research opportunities that could lead to increased influence within the medical community").

[23] Impacts of Pharmaceutical Marketing, *supra*, at 20-21.

[24] Mack, *supra*, at 4.

[25] Carl Elliott, *The Secret Lives of Big Pharma's 'Thought Leade*rs.' THE CHRONICLE REVIEW – THE CHRONICLE OF HIGHER EDUCATION, Sept. 12, 2010 at 2, *available at* http://chronicle.com/article/The-Secret-Lives-of-Big/124335.

[26] *See id.* at 2.

publication of clinical papers in peer-reviewed medical journals.[27]  These clinical papers are used by the sales force when making sales calls to reinforce the unique selling properties of the product.

### b)    Key Constituents and Managed Care

41.    The next step in the marketing of a drug is for a pharmaceutical company to identify the key constituents to whom they will promote the drug including physicians, pharmacists, hospitals, managed care organizations ("MCOs"),[28] pharmacy benefit managers ("PBMs")[29] and patients.  Occasionally, a company may see a need to convince third-party payers to add the new drug to their approved list of reimbursed products.[30]  Since a significant number of patients are covered by some form of prescription plan, it can be critical for a product to secure third-party reimbursement.  Historically, pharmaceutical companies have expended significant effort in convincing MCOs and PBMs to endorse their products and add them to their formularies.  The PBMs and MCOs usually negotiate a reimbursement rate that includes a rebate or chargeback from the manufacturer.[31]

### c)    Clinical Studies

42.    A successful clinical study is an important factor in promotion.  A successful clinical study supports differentiation of the product from the competition, which leads to the

---

[27] See Bleil, Kleger, Malhotra, and Zaharudin, *supra*, at 48-57; Kirk Nielson, *Why Early Clinical Trial Conditioning Might Just Be the Change You Need!*, NEXT GENERATION PHARMACEUTICAL., Issue 18, *available at* http://www.ngpharma.com/article/Why-early-clinical-trial-conditioning-might-just-be-the-change-you-need.

[28] *See* Bleil L, Leclerc O, Malhotra R, Payne M. Creating a Winning Payor Strategy, in *Driving Towards Marketing Excellence*, at 58-68.

[29] *See id.*

[30] *See id.* at 68 (noting "that manufacturers who are able to successfully implement innovative managed-markets strategies are able to benefit from improved bottom-line results, either in terms of rebate optimization or improved access").

[31] *See id.* at 60-62; *see* PBM Fiduciary Duty and Transparency, PRESCRIPTION POLICY CHOICES, http://www.policychoices.org/pharmacy_benefit_managers.shtml.

strategic positioning of the product, and allows the sales and marketing representative to communicate information to physicians to encourage them to change their prescribing habits. A pharmaceutical company's goal is to find and verbalize a sales message that its drug is more effective than other products, and to support that message with clinical evidence.

43.     Importantly, if there is no clinical evidence to support scientifically compelling differences, the sales message is driven purely by marketing which is guided by the company's best assessment as to what might change prescriber's perceptions in the absence of underlying clinical evidence.

### d)     Sales Force

44.     A pharmaceutical company strives to have a sufficiently sized sales force to reach the targeted medical and ancillary audiences with a defined frequency. The sales force is trained to communicate the features and benefits of their products in comparison to alternative therapies and to provide clinical samples if requested. The "share of voice"[32] is directly related to the number of sales representatives and the number of targeted physicians "detailed" (visited) with a defined frequency.

45.     Field representatives are usually equipped with multiple promotional tools. These tools may be brochures (generally referred to as "sales aids"), which complement the representatives' efforts to deliver specific sales messages. The brochures may include reprints that document the clinical efficacy and safety of the product, file cards, and dosage cards that provide full prescribing information. These brochures, in addition to medical posters and branded product "leave-behinds," will serve as constant drug-specific reminders to the prescribing physicians.

---

[32] Share of voice relates to the amount of promotion a company is placing behind the marketing of their product. Share of voice is important because it is an indication of how often the physician is exposed to the product in name and/or message.

### e)      Product Samples

46.      Product samples are a critical element of the promotional mix for the sales representative.  Physicians like to provide patients with a sample of the product they prescribe. There are several objectives for dispensing a sample to a patient.  First, it allows the physician to immediately treat the condition.  Second, it potentially allows the patient time to determine if there are any unwarranted side-effects.  Finally, it allows time to have the prescription filled. Physicians will almost universally accompany a product sample with a prescription for the product.  Product samples increase the likelihood that a specific product will be prescribed for the patient and the sales representative will therefore register a product sale.[33]

### f)      Top of Mind

47.      "Top of mind" means that a certain drug is the first that comes to a physician's mind when considering treatment of a malady, and is extremely important.[34]  Physicians will usually associate a patient type with a specific drug.  The more patient types a physician can associate with a product, the greater the opportunity for the company to register prescriptions. An effective promotional campaign will ensure "top of mind" association for the physician when attempting to identify a product for a patient's particular illness.

48.      Product promotion to create "top of mind" status can take many tactical forms. For instance, pharmaceutical companies have adopted the practice of conducting peer selling

---

[33] Adair RF and Holmgren LR. Do Drug Samples Influence Resident Prescribing Behavior?  A Randomized Trial. *Am J of Med.* 2005; 118:881-884.

[34] Farris PW, Bendel NT, Pfeifer PE, Reibstein DJ.   Marketing Metrics: 50+ Metrics Every Executive Should Master.  (10th ed. 2008) at 14, 36.

programs, group selling programs, speaker programs, medical education events, and thought leader development programs.[35]

49.     Peer selling programs are designed to bring small groups of physicians together in a roundtable discussion format.  These roundtable group events usually include at least one or two physicians who currently prescribe the product.  The objective is to have physicians share their experiences and influence the attendees.

50.     A group selling program is another forum in which a group of physicians is invited to listen to a physician or moderator who presents the features and benefits of the product and then exchanges clinical experiences.

51.     Speaker programs are typically local programs where a physician addresses a group of colleagues and presents an overview of a particular pharmaceutical product, as well as that physician's personal experience with the product.  The speakers are often physicians specifically trained on the product to influence the prescribing behavior of their colleagues.

52.     Medical education programs are part of a strategy that can be adopted by a pharmaceutical company to extend its message to key audiences.[36]  Medical education can take different formats, including satellite programs at medical conventions, medical meetings, and/or teleconferences.  These programs are usually created and hosted by medical universities or institutions that have been licensed and accredited to provide CME (continuing medical

---

[35] *See* Impacts of Pharmaceutical Marketing *supra*, at 18-20; *see also* Bleil, Kleger, Malhotra, and Zaharudin, *supra*, at 53.

[36] *See* Bleil, Kleger, Malhotra, and Zaharudin, *supra*, at 53 (noting that "[o]nce the incumbent brand has a clearly defined competitive product position and value proposition for each segment, the incumbent must develop a strategy to get its message to physicians, patients and other stakeholders," which "can help physicians become more comfortable with the incumbent's product").

education) credits to physicians. The pharmaceutical company provides an educational grant, and the university creates the content.[37]

53.     Pharmaceutical companies also utilize scientific and educational programs to disseminate information to healthcare professionals.[38] There they establish a company booth and disseminate product information and/or engage physicians in interactive programs.

54.     All of these programs are focused on attempting to drive "top of mind," which will result in more prescriptions.

### g)     Public Relations and Publication Strategy

55.     Pharmaceutical companies have increasingly used the services of public relations firms to complement their marketing efforts.[39] Public relations firms are skilled in the use of the media to disseminate product information to further enhance awareness of a product and its attributes. One tool used by public relations firms is press releases that may identify new indications, broader positioning within a therapeutic class, or other information considered noteworthy. In addition, many public relations companies develop entire campaigns to highlight the product feature and benefits.

---

[37] *See* Duke University Office of Continuing Medical Education Frequently Asked Questions, http://cme.mc.duke.edu/modules/docme_faqs/index.php?id=2, last accessed July 8, 2013.

[38] Pollock and Johnston, *supra*, at 4 (noting that "[p]harmaceutical companies frequently support scientific and educational programs to provide information to healthcare professionals").

[39] *See* Nemser E and Quigley D, Addressing Threats Before a Brand is in Crisis, in *Driving Towards Marketing Excellence*, at 76, 78; *see also* Elliot Ross, *How Drug Companies' PR Tactics Skew the Presentation of Medical Research*, THE GUARDIAN, May 20, 2011, *available at* http://www.guardian.co.uk/science/2011/may/20/drug-companies-ghost-writing-journalism; *see also* Brendan I. Koerner, *First, You Market the Disease...Then You Treat It*, THE GUARDIAN, July 30, 2002; Carl Elliot, *Pharma Goes to the Laundry: Public Relations and the Business of Medical Education*, HASTINGS CENTER REPORT 34, no. 5 (2004):18-23.

56.     A publication strategy is also usually adopted by pharmaceutical and biotech companies when promoting products.[40] This plan is typically developed several years prior to product approval.   The challenge is to time the release of information to coincide with the approval process of a new product into the marketplace.[41] This strategy attempts to create awareness within the medical community, prior to product approval, that a new treatment or indication is being studied and will be available in the near future.[42] This is sometimes referred to as "conditioning" the market.[43]

57.     The ongoing release of publications keeps the product in front of the physician and continues to provide new information on the product further entrenching its features and benefits.[44]

**D.     Keys to Marketing Success**

---

[40] *See* Bleil, Kleger, Malhotra, and Zaharudin, *supra*, at 53 (noting that "[o]nce the incumbent brand has a clearly defined competitive product position and value proposition for each segment, the incumbent must develop a strategy to get its message to physicians, patients, and other stakeholders[,]" including a publications strategy).

[41] Kirk Nielson, *supra*.

[42] Gary Tyson and Kuyler Doyle, Preparing the Market for a New Drug with an Effective 'Medical Affairs Launch,' PHARMACEUTICAL COMMERCE, March 24, 2010, *available at* http://pharmaceuticalcommerce.com/index.php?pg=brand_communications&%20articleid=1965http://pharmaceutic alcommerce.com/index.php?pg=brand_communications & articleid=1965 ("[P]reparing the marketplace for new product launch can drive increased awareness at launch and increase the probability of success," and "[p]roper market conditioning through medical affairs activities can have a real impact on increasing product awareness at launch....").

[43] Nielson, *supra* ("The idea of 'Market Conditioning' is hardly new; brand marketing teams have been conducting upstream initiatives prior to launch for years in an attempt to better prepare a therapeutic marketplace (base of treating physicians) for the entry of a new drug.   If past results are any indication, successful conditioning efforts have significantly improved the early uptake of a new drug at launch, and are equally capable of minimizing a growing number of enrollment challenges.").

[44] Bleil, Kleger, Malhotra, and Zaharudin, at 51 ("[D]ata should be continually developed in order to create 'purposeful noise' in the marketplace.   By releasing multiple publications over time, the incumbent's messages will become more visible and credible to the market.").

58.     There are many factors that must be planned and well executed to establish a brand leader in a drug therapeutic category.[45] The performance of a pharmaceutical product is measured by the organization's ability to orchestrate a successful development and commercialization plan that will turn any scientific differences into meaningful clinically differentiating features and achieve the quantitative and qualitative objectives for the product.[46]

59.     At the very outset of development of a drug, the development of a clinical team is paramount.  Without the clinical team there is no product submission.  The team is responsible for bringing together all the disciplines in a timely fashion to move the product through the various phases of product development.[47]

60.     Once the drug passes both Phase I and Phase II testing, it is clear that the product has market potential and marketing becomes increasingly involved in ensuring that the large Phase III clinical studies will provide the optimal product label.  Working with marketing, the clinical design team develops the clinical studies to provide the efficacy and safety parameters that will optimize the product label.[48]

---

[45] *Id.* at 51 ("Pharmaceutical drugs are complex to sell since multiple stakeholders must be convinced in the selling process: physicians, patients, insurance companies, GPOs, and pharmacists influencing drug formularies.  For each of these audiences, incumbents need to develop a compelling value proposition.").

[46] *Id.* at 50-51 ("In a competitive market, market leaders need to strike the right balance between market growth and competitive positioning to protect market share.  Core brand messages need to focus on (or at least include) promoting product characteristics that are relevant and, preferably, superior to the competitor's product…In addition, another source of clinical differentiation may be the possibility of a broader label.  This can take the form of an additional indication, a change to the recommended dosing regimen, or other label dimensions.  While the purpose of this strategy is to develop an advantage over the competition in the claims that can be promoted, this strategy is typically a multi-year effort.").

[47] *See id.* at 49 ("Once priority areas are identified, senior management needs to dedicate resources.  One successful model is a core cross-functional team acting as a project management office and supported by cross-functional sub-teams.").

[48] *See id.* at 49, 51.

61.     The most crucial element in a product's FDA approval is the product label.  This determines what can be promoted about the product and the features and benefits it offers the patient versus competitive products.  This is called the "value proposition" – i.e., what is this product going to offer that other products cannot and at what price?

62.     The two most critical elements of a product's label are the efficacy statements and the safety profile of the product.  Products that have superior efficacy but deficient safety claims versus competitive products have a very short life-cycle and rarely achieve their expected potential.  A company wants to present a product that is competitively superior in outcomes but poses no greater risk than competitive products.  Ideally, they want to promote a product that will have superior efficacy and safety.

63.     In the pharmaceutical industry there is tremendous pressure to bring a product to market within a certain time frame with the desired label.[49]  The hope is that the clinical work is sufficient to provide the label the company needs to maximize the product's potential in the market.  If the FDA does not approve the desired label the forecast is in jeopardy and the profits potentially reduced or forfeited.

64.     There is no guarantee that a product will ever get approved by the FDA.  The risks are enormous due to the capital requirements necessary for development and market launch.  A wrong decision on a product opportunity can have devastating effects on a company and its ability to survive.

---

[49] *See* Lasser, Allen, Woolhandler, Himmelstein, Wolfe, and Bor, *supra*, at 2219 (noting that "[d]rug firms may rush new drugs to market because of concerns about patent life, a desire to mold prescribing habits prior to the market entry of competitors, and hopes for a fast 'ramp-up' in sales that will encourage investors and increase stock prices"); *see also* Petersen, *supra*, ("While drug companies once waited for sales of a new drug to gradually take off, they now must sell as much of a drug as possible, just as soon as it hits pharmacy shelves.  If not, they risk disappointing the very expectant stock analysts on Wall Street.").

65.     Based on my review of the materials in this case, internal Merck documents reveal a marketing process for Vioxx that was cognizant of the foregoing and that utilized the promotional tactics outlined above.  As set forth below, it is clear that a significant amount of marketing time and effort, utilizing the above marketing strategies and tactics, was expended to make sure that Vioxx sales would ramp-up very quickly and that it would be able to compete with Celebrex as well as other NSAIDS.

## VI.    THE MARKET OPPORTUNITY FOR VIOXX

66.     Based on my review of the relevant facts and circumstances, it is my opinion that prior to 1999 there was a great marketing opportunity for Vioxx in an unsatisfied market, if Vioxx could be marketed as a safe and effective analgesic and anti-inflammatory drug.

67.     A number of clinical studies found a statistically increased incidence of GI injuries in patients taking chronic NSAID[50] therapy as far back as at least 1986.[51]  As traditional NSAIDs caused a statistically significant amount of GI events, a product with similar efficacy for pain reduction while reducing GI side effects had great appeal.

68.     Cyclooxygenase-2 inhibitors ("Cox-2") were promoted to selectively inhibit the Cox-2 enzyme and were believed to reduce GI toxicity.[52]  A significant marketing opportunity

---

[50] The very first NSAID or irreversible Cox-1 inhibitor was aspirin or acetylsalicylic acid.  It was commercialized in a tablet form in 1915.  The more popular class of NSAID prescription drugs was led by the introduction of Motrin (ibuprofen) in 1974 and followed globally by several additional products.

[51] *See* Azzaroli F, Lisotti A, Calvanese C, Turco L, Mazzella G.  Chronic NSAIDS Therapy and Upper Gastrointestinal Tract – Mechanism of Injury, Mucosal Defense, Risk Factors for Complication Development and Clinical Management, *New Advances in the Basic and Clinical Gastroenterology*, April 2012, *available at* http://www.intechopen.com/books/new-advances-in-the-basic-and-clinical-gastroenterology, at 150.    Henry D, Dobson A, Turner C.  Variability in the Risk of Major Gastrointestinal Complications From Nonaspirin Nonsteroidal Anti-inflammatory Drugs. *Gastroenterology*. 1993 Oct;105(4):1078-88 at 1078 ("Since 1986, a large number of publications have reported on the association between use of non-aspirin non-steroidal anti-inflammatory drugs (NANSAIDs) and the development of peptic ulcer complications.  The literature on aspirin is older and only a few epidemiological studies have been published during this period.").

[52] *See* MRK-AMX0046921.

existed for the Cox-2 inhibitor market, since it was believed that Cox-2 inhibitors would cause less gastrointestinal distress than existing NSAIDs.[53]

69.     Merck viewed this market for Vioxx as large and mostly untapped.  To exploit this market opportunity, Merck chose to develop rofecoxib (a Cox-2 inhibitor with the trade name Vioxx) with the goal that it would become a blockbuster drug.[54]

70.     In 1999, Merck defined the U.S. market for Vioxx as 78.5 million patients across a variety of conditions.[55]  Of those 78.5 million total patients, 42% took prescription NSAIDs.[56]

71.     This was a highly unsatisfied market and physicians switched medications frequently.[57]  Merck understood at the time of the launch of Vioxx, that physicians believed that all NSAIDs were quite similar and concern about NSAID GI-related side effects caused physicians to continually change their prescribing behavior.[58]

72.     Merck's research revealed that, with respect to the pain market by condition, approximately 43% of the targeted market patients experienced pain requiring short-term treatment, while approximately 56% suffered from chronic pain.[59]  In Table A, below, Merck illustrated the various categories or sources of products used by the 55% of patients in the U.S. market who took either a prescription or an over-the-counter NSAID by primary medication.[60]

---

[53] *See* MRK-AGV0007069 at MRK-AGV0007069 and MRK-AGV0007071; *see also* MRK-AKO0014400 at MRK-AKO0014410.

[54] Merck estimated that it would cost $469 million in development and pre-launch expenditures before they would be able to generate any sales of Vioxx.  David Anstice Tr. 1412:8-24, January 29, 2007; MRK-SHAA0812968 at MRK-SHAA0813101.

[55] MRK-SAG0035492 at MRK-SAG0035503-504.

[56] *See id.* at MRK-SAG0035503.

[57] *See* MRK-AKO0014400 at MRK-AKO0014404-405, 409, 411.

[58] *See* MRK-ADF0009094 at MRK-ADF0009097; *see also* MRK-AKO0014400 at MRK-AKO0014416-417.

[59] *See* MRK-SAG0035492 at MRK-SAG0035506-507.

[60] *See id.* at MRK-SAG0035506.

Table A:[61]



73.     As can be seen in Table B below, the largest market for chronic pain treatment

was comprised of 21 million OA patients.[62]  The second largest population needing treatment for

chronic pain consisted of 13 million lower back pain patients.  The acute pain market represented

about 34 million patients.   Acute pain patients typically take medication for much shorter

durations than chronic pain patients.  While Merck would market Vioxx to all of these patients,

---

[61] *Id.*

[62] *See id.* at MRK-SAG0035504.

the greatest financial opportunities based on revenue potential were patients who suffered from chronic pain,[63] had a history of GI adverse effects, or were not satisfied on their current therapy.

Table B:[64]



# Market Overview
# Pain Market By Condition

- The pain market is comprised of 78.5 million patients across a variety of conditions
- Because of the variety of conditions that result in pain, physicians tend to categorize patients as either acute or chronic



\* Includes patients with lower back pain only
Source:   Merck Market Research, Monitor Analysis, Household Conditions Study, Pain Segmentation Study, Pain Diary Study                13

74.    Since there were numerous product options from which physicians could choose, the commercial viability of Vioxx was dependent on a product profile and label that would appeal to the vast majority of physicians and patients when deciding on a product for the

---

[63] Patients with chronic pain include patients suffering from OA and RA.

[64] *Id.*

treatment of chronic or acute pain. While the effectiveness in treating pain was crucial to physicians and patients, safety significantly influenced the decision making process.[65]

75.     Physicians had many product alternatives to treat pain,[66] and the following chart, Table C, reveals the prescription drug alternatives that were available in the late 1990s for treating pain and inflammation associated with arthritis and other causes.[67]

Table C:[68]



---

[65] *See id.* at MRK-SAG0035505.

[66] *See* MRK-AJT0043511 at MRK-AJT0043560. Ibuprofen and naproxen had been prescribed to millions of patients for more than 35 years. Most physicians felt comfortable prescribing these products since these products had a long history of use and had been approved for sale as over-the-counter medications.

[67] *See* MRK-SAG0035492 at MRK-SAG0035505.

[68] *Id.*

76.    Table D, below, provides a historical accounting of the total prescription market for NSAID products and NSAID sales for the period 1992-1997.[69]  While Table D shows that the total prescription market for NSAIDs had been relatively flat, with the introduction of the new class of Cox-2 inhibitor drugs, the analgesic and anti-inflammatory market was expected to expand, bringing back unsatisfied patients and those who were not obtaining adequate relief.[70]

Table D[71]:



# Market Overview
## Products:  NSAIDs

- The NSAID market is large but fragmented, with many competitors
- Increasing awareness of NSAID toxicity has led to prescribing of safer NSAIDs (i.e., Relafen, Arthrotec)
- Idiosyncratic effect of both efficacy and tolerability leads to frequent product switching
- Physicians choose among a preferred subset available to NSAIDs, regardless of pain condition





Source:   Merck Market Research, Monitor Analysis, Household Conditions Study, Pain Segmentation Study, Pain Diary Study
          1998 Vioxx Situational Analysis (IMS & NDTI databases)

19

---

[69] *Id.* MRK-SAG0035510.

[70] *See id.*

[71] *Id.*

77.     NSAID sales were flat at that time because the majority of these products were generic and priced significantly lower than branded counterparts.[72] The introduction of the Cox-2 inhibitor class of drugs was expected to expand the flat analgesic and anti-inflammatory market from approximately $1.7 billion in generics in 1997, to a market that could grow exponentially with the premium pricing of branded Cox-2 inhibitors. Since prescription generic drugs sold for a fraction of the brand price (ibuprofen and naproxen represented 60% of total prescriptions and cost approximately $.30/day),[73] conversion of generic prescriptions to a premium-priced Cox-2 inhibitor would increase dollar sales more than seven-fold with Vioxx priced at $2.30/day.[74]

78.     This was a unique opportunity for Merck, which sought to capitalize on a highly unsatisfied market of patients being prescribed low priced generic NSAID products by switching them to Vioxx, a premium priced branded product.[75] Vioxx would potentially generate significant revenues that would ultimately help offset the revenue shortfall Merck faced over the next several years due to other drug patent expirations.

## VII.   MERCK'S DRUG PATENT CLIFF

79.     Based on my review of the relevant facts and circumstances, and my understanding of the industry, during the time period from May 1999 through September 29, 2004, Merck's business prospects and prospective financial condition were dependent upon

---

[72] *See* MRK-ADF0009094 at MRK-ADF0009097-098; *see also* MRK-SAG00035492 at MRK-SAG0035503.

[73] *See* MRK-ADF0009094 at MRK-ADF0009097.

[74] *See* MRK-ACZ0084624 at MRK-ACZ0084857.

[75] *See* PX414; MRK-ANK0006365 at MRK-ANK0006365-67; MRK-ANK0006774 at MRK-ANK0006774-75. Having recognized the market opportunity that Cox-2 inhibitor products presented at that time, Merck also began developing its second Cox-2 inhibitor, Arcoxia (etoricoxib). Merck planned on duplicating a strategy previously employed by the drug company Pharmacia, by building a franchise and ideally positioning and promoting each Cox-2 inhibitor to capture a greater share of the entire market. MRK-AOI0006081 at MRK-AOI0006098.

establishing Vioxx as a blockbuster drug, because a number of Merck's older blockbuster products were on the verge of patent expiration.

80.   In the early 2000s, a number of Merck products would lose patent protection in the United States and worldwide.[76] These products included Pepcid and Vasotec in 2000; and Mevacor, Prinivil/Prinizide, Vaseretic, and Prilosec in 2001.[77] In the aggregate, domestic sales of these products represented 22% of Merck's pharmaceutical business.[78] Revenues on Merck's drugs facing patent expirations were expected to decline by $3 billion per year by mid-2002,[79] and beyond that year the revenue declines would grow even greater as additional Merck products faced patent expiration.[80]

81.   Therefore, Merck faced the prospect of a downward spiral of billions of dollars of revenue if it was not successful introducing new products and driving them to blockbuster status in the early 2000s.  Merck's internal five and ten year long range plans from 1998 and 2001 reflect that the company faced an impending massive revenue shortfall, which put significant pressure on management to introduce new products as quickly as possible and drive revenues on marketed products higher.[81]

---

[76] *See* Merck & Company 10-K Annual Report 12/31/1999 at 7.

[77] *See id.*

[78] *See id.*  Merck was dependent upon a small portfolio of drugs (five key drivers) to generate 70-80% of pharmaceutical revenues.

[79] MRK-SHAA2547726.

[80] Zocor (simvastatin), a multi-billion dollar product with $5.2 billion in sales in 2004, would lose exclusivity in 2006. Merck & Company Annual Report 2005 at 24; Merck & Company Annual Report 2004 at 23.

[81] MRK-SHAA3174518 at MRK-SHAA3174518- 20; MRK-SHAA3167216 at MRK-SHAA3167216- 31.

82.    At the Vioxx Launch meeting in May 1999, David Anstice, then-President of Human Health for the Americas, stated that "I have had no higher priority than being absolutely certain Vioxx realizes its full winning potential."[82]

83.    Also in May 1999, Dr. Edward Scolnick, then-President of Merck Research Laboratories, stated that Merck would have been a "completely different company"[83] if it could not have made Vioxx a commercial success given the number of patents on drugs that were set to expire.

84.    It is clear from the materials that I reviewed, that Merck needed to make Vioxx a blockbuster drug to help close the anticipated revenue gap caused by the loss of market exclusivity on Merck's older drugs.

## VIII.  VIOXX MARKET INTRODUCTION IS SECOND TO CELEBREX CAUSING INCREASED PRESSURE ON MERCK TO ACHIEVE REVENUE GOALS

85.    Not only did Merck seek to ramp Vioxx to blockbuster status quickly, it sought to do so despite competitor Celebrex, a selective Cox-2 inhibitor product very comparable to Vioxx that entered the market several months earlier with a significant amount of publicity and promotion.[84]

86.    Celebrex was the most successfully launched pharmaceutical product in the history of the industry, creating steep competition for Vioxx when it was launched.[85]

---

[82] PX888 at MRK-ABI0004489.

[83] PX805.

[84] In 1999, Cox-2 inhibitors were introduced to the market. Celebrex (celecoxib) was the first Cox-2 inhibitor approved in the United States, ushering in a new class of drugs for patients suffering with arthritis and the management of pain. MRK-AMX0046921. Vioxx was approved by the FDA on May 20, 1999, indicated for relief of signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. MRK-AGB0000319. On March 23, 2001, Pharmacia announced the filing of a new drug application for the approval of the third Cox-2 inhibitor, which became known as Bextra (valdecoxib). MRK-ADJ0023725. It was approved for marketing by the FDA in November 2001. MRK-EAI0013825.

[85] PX414 at MRK-SHAA0161378; see http://www.nihcm.org/pdf/DTCbrief.pdf.

87. The "First Mover Advantage" is a well-documented concept in marketing and promotional literature.[86] Normally, being first in a market with a product that is offering superior benefits has distinct advantages. In my experience, if a drug company introduces a product that offers benefits superior to the competition, it has the opportunity to displace competitors and capture incremental market share.

88. Recognizing that the first product to enter the market will normally capture the greatest share, Merck was driven to accelerate the development of Vioxx.[87] For every month Merck could reduce Vioxx's development time and shorten the time between Vioxx's and Celebrex's entry to market, the potential for Vioxx to capture a greater share of the patient population was increased. Merck was in a pursuit to bring Vioxx to market first, since Merck estimated the negative effect on Vioxx revenues for entering the Cox-2 market second at $611 million.[88]

89. Because of the First Mover Advantage, the development plan for Vioxx was compressed and accelerated in an attempt to beat Celebrex to market or minimize the gap between launches.[89] Merck successfully reduced this gap to approximately six months.[90]

90. Ultimately, Celebrex launched first in January 1999, and entered into a highly unsatisfied market seeking new treatments for pain due to symptoms of osteoarthritis and rheumatoid arthritis.[91] In 1999, Celebrex was successful in capturing an estimated 15% of the

---

[86] Lieberman MB, Montgomery DB, *First-Mover Advantages* Research Paper No. 969 STANFORD BUSINESS LIBRARY 1987.

[87] MRK-AAD0088760 at MRK-AAD0088762-64, MRK-AAD0088777, MRK-AAD0088783.

[88] MRK-AAD0088760 at MRK-AAD0088823-24.

[89] MRK-AAD0088760 at MRK-AAD0088762-64, MRK-AAD0088777, MRK-AAD0088783.

[90] *See* MRK-AGB0000319.

[91] *See* MRK-ADN0039800 at MRK-ADN0039803-04.

NSAID market.[92]  Vioxx, launched second, captured a share of 4% in the first seven months it was on the market in 1999, growing to 15% of market share after 15 months on market.[93]

91.     Because Vioxx entered the Cox-2 market second, Merck needed to heavily promote Vioxx as having superior features and benefits in comparison to Celebrex.

92.     In the pharmaceutical industry, based on my experience, physicians consider a drug's safety and efficacy to be the two most important criteria when choosing a drug for their patients.  By contrast, Merck's acknowledgment of any unfavorable side effects, such as a greater risk of serious CV events, would severely undermine the commercial viability of Vioxx.

93.     In the case of Vioxx and Celebrex, both products were positioned as comparable,[94] with Vioxx being perceived among physicians (based on certain patient feedback) as more efficacious.[95]  Perceived product differentiation was key.  The greater the product differentiation in meeting patient needs, the greater the chance for driving sales.  Merck, unable to claim the superior efficacy or safety of Vioxx, promoted secondary benefits, such as once-daily dosing and lack of sulfur sensitivity.  Merck also employed a significant amount of marketing and promotion to drive Vioxx sales.[96]

## IX.     MERCK'S STATED GOALS FOR VIOXX

94.     Merck's Cox-2 inhibitor products represented a multibillion dollar franchise opportunity to help it through the difficult period during which several of its blockbuster

---

[92] MRK-AAO0000073 at MRK-AAO0000078.

[93] *Id.*; PX 647 at MRK-ADJ0004776 ("In the product's first seven months, U.S. physicians wrote more than 5 million prescriptions.  That adds up to a 44 percent share of the new U.S. Prescriptions written in its class."); MRK-AAO0000073 at MRK-AAO0000077-78.

[94] MRK-AKO0014400 at MRK-AKO0014437.

[95] MRK-ARF0137919 at MRK-ARF0137982.

[96] *See* MRK-ADF0009094 at MRK-ADF0009105-106; *see* MRK-ACZ0080821 at MRK-ACZ0080845.

products would lose patent exclusivity, eliminating approximately $3 billion worth of sales by the middle of 2002.[97]

95.    Merck's stated goals were not changed with the introduction of Celebrex, but remained to become the number one Cox-2 inhibitor franchise.[98] Merck's stated goal was to become the premier franchise in the Cox-2 inhibitor class,[99] and to remain the largest dollar-generating pharmaceutical company in the industry.

96.    The primary business objective for the launch of Vioxx was to pass Celebrex in total prescriptions by 18 months post-launch.[100] Merck even featured the drug on its 1999 Annual Report to shareholders, reflecting the importance of Vioxx to Merck at that time.[101]

97.    Merck's 1999-2003 Business Plan states that Vioxx would be the cornerstone of Merck's Cox-2 inhibitor franchise and would be the preferred Cox-2 inhibitor due to its superior Cox-2 inhibitor specificity, efficacy compared to high doses of NSAIDS, and convenient once-daily dosing.[102]

98.    In my opinion, Merck's acknowledgement of any unfavorable side effects such as a greater incidence of cardiovascular events, or lack of GI benefits, would have caused doubt in the minds of physicians as to the safety and efficacy of the drug, and would have created a significant marketing advantage for the competition. As I will outline in more detail below,

---

[97] MRK-SHAA2547726.

[98] See MRK-SAG0035492; PX564 at MRK-ACD0072730; see MRK-ADF0009094 at MRK-ADF0009105-108.

[99] MRK-ADN0116691 at MRK-ADN0116693.

[100] PX564 at MRK-ACD0072730; MRK-AFV0480225 at MRK-AFV0480231 (noting that David Anstice stated that Merck was concerned profits would fall if it did not compete effectively with Pfizer Inc.'s similar arthritis drug Celebrex).

[101] See PX647.

[102] MRK-ADF0009094 at MRK-ADF0009105.

Merck could not achieve its goals for Vioxx if physicians and patients were informed by Merck that use of Vioxx caused an increased risk of serious cardiovascular events.

## X. MERCK MARKETED VIOXX AS POSSESSING THE IDEAL PRODUCT PROFILE

99. In my opinion, the ideal product profile for Vioxx would have been one that provided comparable or superior pain efficacy to NSAIDs and had a safer GI side effect profile.

100. The clinical profile Merck created and marketed for Vioxx met this market need and stated that:

- Vioxx would have "analgesic and anti-inflammatory efficacy comparable to existing NSAIDs (non selective dual COX inhibitors) such as diclofenac, the current market leader;"[103]

- Vioxx would be the "first highly selective COX-2 inhibitor introduced" and "subsequent COX-2 inhibitors will have no clear advantage over [Vioxx];"[104]

- The "overall incidence of side effects associated with [Vioxx] will be low" and "no new side effects not currently associated with traditional NSAID therapy will be reported for [Vioxx];"[105]

- Vioxx would "be dosed once daily;"[106]

- At "clinically effective doses [Vioxx] will not produce unanticipated renal pathology or toxicity;"[107]

---

[103] PX413 at MRK-SHAA0837792.

[104] Id.

[105] Id.

[106] Id.

[107] Id.

- At the time of release "data will be available demonstrating [Vioxx] therapy is superior to commonly used NSAIDS in terms of GI lesions (erosions and ulcers) measured by endoscopy trials. Subsequent data will show differences in GI toxicities are significant in the clinical setting."[108]

- Because of the "excellent tolerability profile of [Vioxx], dosage can be adjusted upward to increase efficacy without a significant loss of the tolerability benefit."[109]

101.    Merck's profile for Vioxx highlighted that it would provide "more relief for more patients with a unique combination of Strength, Safety and Simplicity,"[110] within 45 minutes and lasting for up to 24 hours.[111] In addition, it would demonstrate GI safety compared to NSAIDs and  have no effect on platelet function or bleeding time.[112] Further, Vioxx was not a sulfonamide, and therefore would not be contraindicated in patients with sulfa allergies, adding to its attractiveness as a chronic medication.[113]

102.    In my opinion, the product profile Merck used to promote Vioxx possessed all the attributes necessary to propel Vioxx to blockbuster status. Merck used the profile to promote product messages to physicians that addressed their needs and those of their patients.[114] This profile became the basis for the promotional message Merck developed and executed, and it was used with thousands of physicians who prescribed millions of prescriptions for Vioxx.[115]

---

[108] *Id.* at MRK-SHAA0837792-93.

[109] *Id.* at MRK-SHAA0837793.

[110] MRK-ADN0039800 at MRK-ADN0039805.

[111] *Id.*; PX570 at MRK-AAW0000085.

[112] MRK-ADN0039800 at MRK-ADN0039805.

[113] *Id.*; PX570 at MRK-AAW0000073.

[114] MRK-ADN0039800 at MRK-ADN0039805.

[115] *See* MRK-AJB0052380; *see also* MRK-AGZ0036829; PX98 at MRK-AAD0361723; MRK-AKO0014400 at MRK-AKO0014447; MRK-SHAA0038563 at MRK-SHAA0038575.

103.    In my opinion, Merck's legacy in the industry at the time as a highly respectable company, and its history in the anti-arthritic market, contributed to physician confidence that Merck was communicating an accurate and dependable message on the efficacy and safety of Vioxx.

## XI.    BASED ON VIOXX'S MARKETED PROFILE, MERCK FORECASTED SIGNIFICANT REVENUE

104.    In my experience, the process for forecasting potential revenue for a prescription drug is a methodical and analytical approach that focuses on a number of elements and variables. The first step is to segment the overall market based on the anticipated indication(s) and FDA approved label for the drug, i.e., the maximum market potential.

105.    In determining the market potential, it is important to estimate the number of patients that will ultimately develop the illness or the condition for which the product was designed, and how large the market will grow during a product's period of patent exclusivity.

106.    The next step is to identify other factors that impact market potential.  These factors include: the existing competitive products in the market, the attitude of physicians and consumers, and the profile of competitive products in the pipeline. The forecast must also identify any high risk patient populations that would not be candidates for the drug.  In my experience, if the product profile is not sufficiently differentiated from the competition based on clinical outcomes (i.e., patients do better on this drug than others in randomized controlled clinical trials), it will fail to achieve any level of prominence in the therapeutic category.

107.    The main questions a forecast addresses are how the drug's profile differs and what efficacy and safety advantages it provides in comparison to competitive products or future entries.  The better the product profile is, the greater the opportunity to capture a larger share of the market.  The profile needs to clearly identify those patients who will benefit from the drug as well as those patients who are not viable candidates.

108.   Forecasts are developed to assure that budgeted promotional expenditures are sufficient to achieve forecasted sales goals, and determine the profitability of the product. Merck developed a number of profit plans that projected significant revenues and profits for Vioxx, assuming Merck could market it using the foregoing ideal product profile.

109.   It is clear that Merck spent a significant amount of effort estimating the revenue potential for Vioxx, as was documented in the internal Merck report, "The Road to Victory."[116] This document reveals numerous assumptions, not only on the number of patients, but also on present and future competitive products, as well as the impact of managed care and the promotional effort needed to establish Vioxx as the leading Cox-2 inhibitor in the market.[117]

110.   As stated above, Merck's strategy and goal was to differentiate Vioxx from Celebrex based on Cox-2 inhibitor specificity, superior GI safety compared to NSAIDs, efficacy equivalent to high doses of NSAIDs, and once-daily dosing convenience.[118] An analyst report on August 2, 2000, stated that "Vioxx sales are forecast at $1.95B in 2000 and $5.15B in 2004. However, if MRK could muster a superior label versus Celebrex on the safety front, our Vioxx sales forecast could increase dramatically," which underscores the importance of Vioxx having a superior label to Celebrex.[119]

111.   By utilizing this differentiating strategy, Merck drove Vioxx sales to blockbuster status worldwide in less than 18 months.[120]

---

[116] *See* MRK-SAG0035492.

[117] *See id.*

[118] MRK-SHAA2075715 at MRK-SHAA2075718.

[119] MRK-ACW0002937 at MRK-ACW002939.

[120] David Anstice called Vioxx's launch the company's "biggest, fastest, and best prescription drug launch ever." MRK-ACZ0009097.

112.    In 2000, sales in the United States surpassed Merck's pre-launch goal of $1.2 billion by almost $500 million.

113.    Based on my review, Vioxx was one of the most successfully launched pharmaceutical products in history, and the first Merck product to reach blockbuster status in such a short time.[121]

## XII.    THE PROMOTIONAL RESOURCES THAT DROVE VIOXX SALES

114.    Vioxx was launched in May of 1999, and was quickly adopted among numerous physicians.    Table E, below, illustrates the adoption of Vioxx in weekly new prescriptions compared with competitors in this therapeutic area.    Vioxx had achieved a trend line that, by April 7, 2000, had almost closed the gap on Celebrex.    In my opinion, Merck expended a significant amount of marketing resources to achieve this performance, as outlined in this section.

---

[121] *See* MRK-SHAA0038563 at MRK-SHAA0038579; DDBP_0016003; *see also* MRK SHAA0656200 at MRK-SHAA065203 ("Strong media outreach contributed to the most successful launch in Merck history.").

Table E:[122]



**Weekly NRxs - Selected Competitors**

In Week 48, NRxs for Vioxx® are 94% of the NRxs for Celebrex (up 1%). NRxs for both Vioxx® and Celebrex remain below ibuprofen and naproxen.

Source: IMS NPA Plus 7

115.    Merck planned an extensive promotional campaign to launch Vioxx.  An internal document entitled "Road to VICTORY In It To Win It," and the remarks at the Vioxx launch meeting by David Anstice, reveal the level of commitment Merck was dedicating to support the success of Vioxx.[123]

116.    The marketing tactics Merck employed included a sales force equipped with samples, direct physician promotion, non-personal promotion, consumer programs, medical marketing programs, grants, medical school programs, managed care programs, public relation programs, discounts, and rebates to managed care.[124]

---

[122] MRK-ABI0008370 at MRK-ABI0008376.

[123] *See* MRK-SAG0035492 at MRK-SAG0035492-608; PX888 at MRK-ABI0004488-99.

[124] MRK-ADN0039800 at MRK-ADN0039822-23, MRK-ADN0039831.

117.    Internal Merck documents reveal that it was focused on promoting Vioxx as the most efficacious and safest Cox-2 inhibitor on the market, even though other internal Merck documents reflect that there was no clinically-based evidence to support such claims, and that there were critical unanswered questions about the CV safety of Vioxx.[125]  At this time, "the benefit of being Cox-2 specific l[ay] solely in the realm of safety; traditional NSAIDS [we]re believed to provide comparable efficacy to the currently marketed COXIBs."[126]

118.    This is noteworthy because, as mentioned above, Vioxx promotion focused on its efficacy versus competitive products; GI safety, which differentiated Vioxx from the NSAIDs; once-a-day dosing; and the lack of sulfonamide reaction.  Not only did Merck develop and test these key promotional messages, but it identified the physician specialties, and the priority physicians within those specialties, that offered the greatest sales potential for the short term.[127]

119.    In my opinion, Merck committed significant financial resources to develop the strategies and tactics to drive sales of Vioxx.

120.    In 1999, the proposed annual expenses exceeded $92 million, excluding the cost of the sales force,[128] and approached $160 million in total expenditure.[129]  Merck budgeted millions of dollars for samples, health education, representative sales aids, incentive programs for representatives, promotional literature, consumer marketing programs, public affairs,

---

[125] MRK-SAG0035492 at MRK-SAG0035547, MRK-SAG0035549-550; MRK-ADG0009638 at MRK-ADG0009641, MRK-ADG0009643-45; MRK-SHAA2075715 at MRK-SHAA2075718; MRK-SHAA0529061 at MRK-SHAA0529073-77; MRK-ADN0039800 at MRK-ADN0039820-21; DDBEP_0019822 at DDBEP_001987; DDBEP_0023665 at DDBP_0023668; MRK-AKO0014400 at MRK-AKO0014434.

[126] MRK-AKO0014400 at MRK-AKO0014410.

[127] MRK-SAG0035492 at MRK-SAG0035541-45.  These physicians are referred to in the industry as early adopters.  They are the most likely to try new products first.

[128] MRK-SAG0035492 at MRK-SAG0035606.

[129] MRK-AKO0014400 at MRK-AKO0014483.

managed care, market research, and professional relations groups' support programs.[130]   An average of $3 million per month was spent on health education and learning programs for physicians alone.[131]   Merck also established for Vioxx the largest consultant program ever held in support of a Merck product, with more than 560 potential physician advocates.[132]

121.   The nearly $160 million in total expenditure Merck committed to the launch of Vioxx was very large, in my opinion, and was considered extraordinary in comparison to the cost of other product launches at the time.   Due to the pressure that Merck was under once it lost the race to the market with Celebrex, it devoted substantial resources to marketing to catch up to its competitor.

122.   In order to win the market battle against Pfizer/Pharmacia's Celebrex, Merck had to be on the attack.   Both Pfizer/Pharmacia and Merck knew that they had products competing in the same marketplace for the same massive potential revenues.   Neither company wanted to lose the battle.[133]   Accordingly, Merck put significant amounts of money and personnel behind the launch and marketing of Vioxx to saturate the marketplace with promotion.   The promotional noise[134] Merck created in its launch of Vioxx made it possible for the pharmaceutical giant to drown out the competition.

---

[130] MRK-SAG0035492 at MRK-SAG0035606.

[131] PX888 at MRK-ABI0004493.

[132] PX888 at MRK-ABI0004490-91.

[133] "The battle for market share of the Cox-2 inhibitors between the two companies was intense with reports of the two companies spending tens of millions of promotional dollars to capture market share. One doctor stated shortly after Vioxx was approved he saw an increase in free Celebrex samples and 'one resident carrying a box of Celebrex samples the size of a small microwave oven." Petersen, *supra..*

[134] "Promotional noise" in the industry relates to share of voice. This level of promotion would allow physicians to be exposed to the Vioxx message at almost every turn in their daily practice.

123.     Specifically for Vioxx, Merck employed 3,800 sales representatives[135] at a cost of $63.3 million in 1999,[136] and directed them to deliver 1.6 million details[137] and to provide stock bottles of Vioxx to 25,000 physicians for 375,000 patients (seventeen million units), in an effort to successfully launch Vioxx.[138]

124.     Merck's promotional expenditures were significant throughout its time on the market.[139] The company spent approximately $341 million in 2000, approximately $270 million in 2001 ($56 million in samples alone) and approximately $172 million in 2002,[140] as illustrated in Table G below.   In 2000, Merck spent approximately $131 million in direct-to-consumer ("DTC") advertising, almost doubling the amount Pfizer/Pharmacia spent for Celebrex in that year.[141] Promotional spending in the subsequent years increased for the sales representatives as well, with details to physicians reaching 6 million.[142]

125.     In fact, "Merck spent $67 million in consumer advertising Vioxx between January and April 2000, the highest…DTC…advertising spend of any drug in that period."[143]   In a span

---

[135] PX888 at MRK-ABI0004492.

[136] MRK-AKO0014400 at MRK-AKO0014483 (2001-2005 Business Plan citing $63.3 million for personal promotion in 1999).

[137] MRK-AKL0022840. The term "details" refers to physician calls made by the Merck sales representatives.

[138] PX888 at MRK-ABI0004492.

[139] *See* PX583 at MRK-SHAA0529097.

[140] MRK-ABW0001459 at MRK-ABW0001628; MRK-ADB0094192 at MRK-ADB0094220

[141] MRK-ABW0001459 at MRK-ABW0001628; Bradford WD, Kleit AN, Nietert PJ, Ornstein S. The Effect of Direct to Consumer Television Advertising on the Timing of Treatment. *Economic Inquiry*. 2010; 48(2):306-322 at 307.

[142] MRK-ABW0001459 at MRK-ABW0001664.

[143] Prescription Drugs and Mass Media Advertising. THE NATIONAL INSTITUTE FOR HEALTH CARE MANAGEMENT RESEARCH AND EDUCATIONAL FOUNDATION (Sept. 2000) *available at* http://www.nihcm.org/pdf/DTCbrief.pdf.

of 4 months, Merck had already spent 86% of what Pfizer/Pharmacia would spend in that entire calendar year on Celebrex DTC marketing.[144]

126.    Consumer marketing was highly productive for Merck, allowing it to achieve a return of $4 for every $1 of DTC advertising spent ($7:1 in 2003), with a proven ability to drive a strong call to action[145] that exceeded category norms.[146]   In 2000, Merck's level of DTC spending for Vioxx led the industry, ranking number one in spending with a budget of $160.8 million.[147]   The next closest drug product expenditure on DTC spending totaled $107.5 million.[148]   Merck's DTC spending on Vioxx in 2000 surpassed the DTC spending for consumer products such as Budweiser ($146 million), Pepsi ($125 million), and Nike ($78.2 million).[149]

127.    In 2001, Merck spent an additional $130.5 million on DTC advertising on Vioxx.[150]   At that time, it was "the prescription brand most advertised to consumers."[151]

128.    Vioxx DTC advertising generated a significant return on investment, especially since DTC advertising led to a high volume of new drug prescriptions.[152]   In fact, some

---

[144] Bradford, Kleit, Nietert, and Ornstein, *supra*, at 307.

[145] "Call to action" is defined as the consumer or patient taking some type of action as a result of the exposure to the advertisement.  It could be telling a friend, calling a physician, or making an appointment with a physician and asking for a prescription for the product.

[146] PX386 at MRK-SHAA2785600; MRK-AOI0006081 at MRK-AOI0006091; MRK-ADN0116691 at MRK-ADN0116696.

[147] MRK-AAC0138571.

[148] *Id.*

[149] *Id.* at MRK-AAC0138572.

[150] MRK-AKC0023331.

[151] *Id.*

[152] Lasser, Allen, Woolhandler, Himmelstein, Wolfe, and Bor, *supra*, at 2219 (noting that "[d]irect-to-consumer drug advertising…generates a high volume of new drug prescriptions"); *see also* Basara LR, The Impact of a Direct-to-Consumer Prescription Medication Advertising Campaign on New Prescription Volume. *Drug Information Journal*. 1996;30:715-729.

(including myself) believe that consumer ads for Vioxx seduced many patients for whom the drug might not have been necessary or safe to obtain prescriptions of Vioxx.[153]

129.  The financial resources expended to drive the sales of Vioxx from launch in 1999 through 2004 totaled over $1.19 billion, as documented in Table G below.

| Table G: Promotional Expenses 1999-2004 Millions/Dollars | | | | | | |
|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
| Marketing Expenses | 157.1[154] | 341.5[155] | 269.6[156] | 172[157] | 137[158] | 111.9[159] |

130.  The level of promotional effort Merck committed to Vioxx resulted in a significant share of voice, if not the highest in its pharmaceutical category.

## XIII.  THE IMPACT OF VIGOR ON THE MARKETING OF VIOXX

### A.    Merck Learns the Preliminary Results of VIGOR in March of 2000

131.  In my opinion, promotion, marketing, ingenuity, skillful planning, and proper timing were effective tactics that propelled Vioxx to blockbuster status.  Merck's marketing of Vioxx became more complicated, however, in March of 2000, when Merck internally learned the preliminary results of the VIGOR trial.[160]  The VIGOR trial was designed to measure the gastrointestinal safety of Vioxx as compared to naproxen in arthritis patients.  The VIGOR results revealed in a large clinical trial a higher incidence of heart attacks in patients taking

---

[153] Arnold M, *DTC: The First 10 Years*, MM&M: MEDICAL MARKETING & MEDIA, April 2007, at 41.

[154] MRK-AAO0000073 at MRK-AAO0000116.

[155] MRK-ABW0001459 at MRK-ABW0001628.

[156] *Id.*

[157] MRK-ADB0094192 at MRK-ADB0094220.

[158] *Id.*

[159] MRK-SHAA2986372 at MRK-SHAA2986395 (Aug. 2004 Estimated Actual).

[160] PX43.

Vioxx – four to five times greater than the patients taking naproxen.[161]  On February 8, 2001, an

FDA Advisory Committee Meeting to discuss these results took place.

**B.    Merck Re-Doubled Its Marketing Efforts for Vioxx Following the VIGOR Results and the FDA Advisory Committee Meeting**

132.    Based on my review, it is my opinion that Merck aggressively promoted Vioxx and continued to do so very effectively after learning the VIGOR results.[162]

133.    Vioxx was marketed for the treatment of arthritis, which occurs largely in the elderly population – the population most susceptible to CV events.[163]

134.    Yet, following both the March 2000 preliminary results of VIGOR and the February 2001 FDA Advisory Committee Meeting, Merck continued to promote the safety of Vioxx to physicians, and publicly proclaimed Vioxx's safety.

135.    For example, on March 27, 2000, Merck issued a press release stating that an "extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx, showed no indication of a difference in the incidence of thromboembolic events between Vioxx, placebo and comparator NSAIDs."[164]

---

[161] PX43 at MRK-AKO0006009; PX109 at MRK-ACW0049303.

[162] *See* MRK-SHAA0656200 at MRK-SHAA0656203 (noting that part of the "aggressive media campaign" included the fact that "Vioxx was highlighted in articles reaching a total of more than two billion – almost 10 times per person").

[163] What is Rheumatoid Arthritis? Fast Facts: An Easy-to-Read Series of Publications for the Public, U.S. DEP'T OF HEALTH AND HUMAN SERVS., www.niams.nih.gov/Health_Info/Rheumatic_Disease/rheumatoid_arthritis_ff.pdf, December 1999, accessed July 2, 2013; Handout on Health: Osteoarthritis, U.S. DEP'T OF HEALTH AND HUMAN SERVS., www.niams.nih.gov/Health_Info/Osteoarthritis/default.asp#2, July 2010, accessed July 2, 2013; Statistical Fact Sheet 2013 Update, Older Americans & Cardiovascular Diseases, AM. HEART ASS'N, www.heart.org/idc/groups/heart-public/@wcm/@sop/@smd/downloadable/ucm_319574.pdf, last accessed on July 2, 2013.

[164] PX43.

136.   Further, Merck instructed its sales force to use the *New Resource Cardiovascular Card* it created to promote the purported CV safety of Vioxx.[165]   That card was presented to sales representatives on April 28, 2000,[166] after the preliminary VIGOR results were learned by Merck, and provided a step-by-step process for handling questions from physicians regarding the VIGOR results.   This CV card, which was a tri-fold pamphlet, among other things excluded the VIGOR trial results and under the featured headline "Overall Mortality Rates," indicated that patients on Vioxx were 11 times less likely to die than patients on standard anti-inflammatory drugs, and 8 times less likely to die from heart attacks and strokes.[167]

137.   Also on April 28, 2000, Merck issued a press release stating that "extensive review of data from the completed osteoarthritis trials and on-going clinical trials with Vioxx, as well as post-marketing experience with Vioxx, have shown no difference in the incidence of cardiovascular events, such as heart attack, among patients taking Vioxx, other NSAIDs and placebo."[168]

138.   Additionally, Merck created a VIGOR question and answer sheet for internal use as a result of an article published in the *New England Journal of Medicine* in November of 2000. The question and answer sheet reinforced the Merck message that "the reduced incidence of heart attacks among patients taking naproxen was consistent with naproxen's ability to block platelet aggregation."[169]

---

[165] MRK-ACI0012824.

[166] MRK-ACI0012824; MRK-ACI0012826.

[167] MRK-ACI0012826 at MRK-ACI0012828; MRK-ADH0020853 at MRK-ADH0020856.

[168] PX236; *see also* PX583 at MRK-SHAA0529070, MRK-SHAA0529073, and MRK-SHAA0529079--80; MRK-ARF0004792 at MRK-ARF0004793, MRK-ARF0004799.

[169] MRK-ADI0002614 at MRK-ADI0002838-46.   Naprosyn (naproxen) was one of the most prescribed NSAIDs at its peak.   It was introduced in 1976 as a prescription product for the treatment of pain associated with arthritis and inflammation.   Naproxen-Patient   Information   Sheet,   FOOD   AND   DRUG   ADMIN.,

139.   On February 8, 2001, almost a year after receiving the preliminary results of the VIGOR study, the FDA conducted an Advisory Committee Meeting.   The FDA Advisory Committee concluded that clinicians should be informed that the VIGOR trial "showed an excess of cardiovascular events in comparison to naproxen."[170]

140.   On this same day, Merck issued a press release again, reiterating that the "VIGOR finding is consistent with naproxen's ability to block platelet aggregation by inhibiting COX-1 like aspirin, which is used to prevent second cardiac events in patients with a history of heart attack, stroke or other cardiac events."[171]

141.   Internally, on the day following Merck's presentation to the FDA Advisory Committee and the issuance of the above press release, Merck sent a bulletin to "all field personnel with responsibility for VIOXX."[172]  The bulletin instructed the sales force to "stay focused on the EFFICACY messages for VIOXX."  Merck instructed them not to discuss the results of the VIGOR study, but rather to have physicians submit written questions to the company's medical services department.[173]

142.   Following the FDA Advisory Committee Meeting, Merck, determined to continue to aggressively market Vioxx, instructed its field force to "Put Project A&A XXceleration into overdrive..."[174]  Under this program, Merck provided additional direction to its field staff on the

---

http://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/UCM 164733.pdf.  Naproxen was never marketed as a product possessing antiplatelet properties.  To my knowledge, large randomized clinical trials were never done to determine whether or not naproxen possessed antiplatelet properties, and if it had been documented that naproxen had antiplatelet properties, this certainly would have been promoted as a product with a significant advantage over competitive NSAIDs.  Naproxen was never promoted in this way.

[170] MRK-AAC0083124 at MRK-AAC0083332-33.

[171] PX277 at MRK-ACW0022304.

[172] MRK-AUX0001805 at MRK-AUX0001805-06.

[173] Id.

[174] MRK-AAR0030351 at MRK-AAR0030352.

Patient Efficacy Assessment Kit – a sample program to increase sales of Vioxx.[175] Project XXceleration was designed to drive sales by reinforcing the efficacy of Vioxx and focusing on the targeting, messaging, and advocate development for Vioxx.[176]

143.   On May 22, 2001, Merck issued a press release promoting the cardiovascular safety of Vioxx and explaining away the difference in cardiovascular events in VIGOR on the cardio-protective effect of naproxen, claiming that it had the ability to block platelet aggregation like aspirin.[177]

144.   In September of 2001, Merck introduced "Project Offense," which was yet another program designed to deliver the efficacy message multiple times to top prescribers.[178]

145.   Throughout this period, the sales force was provided with a number of tools to assist them in handling physician confrontations regarding adverse effects of Vioxx.[179] The "Obstacle Response Guide" contained a series of bulletins that had been provided to the sales force to address specific physician confrontations.[180] For example, Obstacle Response #38 dealt with the question of cardiovascular events linked to the use of Vioxx and Celebrex and suggested that a response to physicians could be that in "clinical OA trials for Vioxx reported in our package insert, the incidence of MI was less than 0.1% with Vioxx."[181]

---

[175] MRK-ADH0012509.

[176] MRK-H10STM001118; MRK-ACZ0021370 at MRK-ACZ0021376.

[177] PX251 at MRK-AJB0055611.

[178] PX594; MRK-H10STM001118 at MRK-H10STM001119.

[179] MRK-AUS0009860 at MRK-AUS0009863-64.

[180] The Obstacle Response Guide also dealt with GI and other issues.  For example, Obstacle Response #28 provided information to sales representatives on the higher incidence of PUBs in patients prescribed traditional NSAIDs versus Vioxx.  MRK-ACZ0072063 at MRK-ACZ0072064-66.

[181] MRK-AUS0009860 at MRK-AUS0009863.

146.   In my opinion, based on these promotional and marketing materials, it is clear that starting at least from the preliminary results of VIGOR in March of 2000, Merck took an aggressive offensive position in drowning out any claims that Vioxx may cause a higher incidence of cardiovascular events than traditional NSAIDs.

147.   Furthermore, the FDA Advisory Committee Meeting in February of 2001 did not slow Merck's marketing of Vioxx. Instead, Merck launched a number of programs to accelerate the drug's promotion and sales.

148.   Following both the announcement of the preliminary VIGOR results and the February 2001 FDA Advisory Committee Meeting, Merck continued to promote the safety of Vioxx and established objectives to neutralize any voice or source that would suggest that cardiovascular issues were associated with Vioxx. Merck undertook every effort to assure that its thought leaders and speakers communicated to the medical community and the general public that Vioxx was safe and that the completed Vioxx studies confirmed the drug's safety.

149.   In my opinion, the high level of promotional noise created by Merck following the VIGOR results prevented any concern over CV issues from significantly impacting sales of Vioxx. Specifically, promotional expenditures, as referenced above, continued to be budgeted at tens of millions of dollars. There was no slowing of the marketing or promotion of Vioxx. Instead, U.S. Vioxx sales increased from $420 million in U.S. sales in 1999, ultimately reaching $2.79 billion in worldwide sales in 2003.[182]

150.   In my opinion, it is because Merck's marketing and promotion were so effective in countering and drowning out negative publicity surrounding the VIGOR results that sales of

---

[182] MRK-AKO0000945 at MRK-AKO0000986; MRK-SHAA1953998 at MRK-SHAA1954003.

Vioxx continued to climb.  In fact, despite the VIGOR results, Vioxx reached $2 billion in sales faster than any other drug in Merck's history.[183]

## XIV.   VIOXX'S LABEL WAS CRITICALLY IMPORTANT TO ITS COMMERCIAL VIABILITY

### A.      The Contents of a Drug's Label Are Extremely Important to Sales

151.    In my opinion, Vioxx's drug label was critical to its marketing success and commercial viability.  In my experience, a product's label is the most important element in the promotion and marketing of a product.[184]

152.    Negative labeling can severely impact the sales potential for a product.  In situations where comparable drugs are available, physicians will not prescribe a product with a greater incidence of side effects and will choose the product with the superior safety profile.  A product's label is designed to inform physicians about all aspects of the drug to enable physicians to customize its usage to patient needs.

153.    The most important factors in choosing a medication are the drug's efficacy and its safety profile.  The physician balances a product's efficacy against its safety (e.g., adverse events), ultimately choosing the drug that offers the patient the optimal combination of both.  In the case of analgesics and anti-inflammatories, the primary goal is to provide pain relief while maintaining safety.

154.    The product label is intended to enable the physician to quickly assess the efficacy and safety of a product.  It is organized by category to provide clinical information the physician needs to prescribe the optimal product.  The FDA has stated that "[a]lthough patients

---

[183] MRK-SHAA0162499 at MRK-SHAA0162518.

[184] *See* Transcript of Adam Schecter, April 5, 2013, at 48:18-21 (noting that from a marketing perspective, the information contained in the product label is important); MRK-ACZ0050829 at MRK-ACZ0050830; MRK-ADM0108261.

may obtain useful information from prescription drug labeling, its primary purpose is to give healthcare professionals the information they need to prescribe drugs appropriately."[185]

155.    Aside from the Indication(s) section of the label, the critically important areas from a marketing standpoint are the Warnings and Contraindications sections. It is here that a physician can determine whether the benefits outweigh the risks associated with the drug. The more clarity and specificity provided in these sections, the more informative it is for the physician in deciding which product to prescribe.

156.    At the launch of Vioxx, as well as the time that Merck was negotiating a label change with the FDA following the results of VIGOR, the Precautions and Warnings sections of the label were separate (the two sections have since been combined by the FDA[186]).[187] As of April 2001, and through September 29, 2004, the Code of Federal Regulations required a drug's "Warnings" section of the label to "describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur."[188] Additionally, the labeling was required to "be revised to include a warning as soon as there [was] reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved."[189] By contrast, as of April 2001 and through the end of September, 2004, the "Precautions" section of the label was required to "contain information regarding any special care to be exercised by the practitioner for safe and effective use of the drug, e.g., precautions

---

[185] Kremzner M, Osborne S. Presentation – An Introduction to the Improved FDA Prescription Drug Labeling. U.S. FOOD AND DRUG ADMIN. http://www.fda.gov/Training/ForHealthProfessionals/ucm090801.htm.

[186] 21 C.F.R. § 201.57(c)(6) (2013); Press Release, FDA Announces New Prescription Drug Information Format to Improve Patient Safety, U.S. FOOD AND DRUG ADMIN. (Jan. 18, 2006), http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2006/ucm108579.htm (last visited July 12, 2013).

[187] 21 C.F.R. § 201.56(d)(1) (2001).

[188] Id. § 201.57(e) (2001).

[189] Id.

not required under any other specific section of the labeling."[190] Also under this section, patients were required to be given information "concerning . . . the concomitant use of other substances that may have harmful additive effects."[191]

157. During the time period from May 1999 through September 29, 2004, the "Warnings" section of the label communicated information about a medicine's important side effects and what to do about them. This section was meant to serve as a notice to be cautious in prescribing or taking the medication, but did not necessarily indicate serious danger to any patient ingesting it. An analogy to this might be a traffic light at an intersection. If a person driving an automobile approaches an intersection and the light is yellow the information transmitted by that yellow light is "use caution." The driver needs to decide to proceed or stop. If the risk is not perceived to be great, the driver may decide to proceed.

158. Robert Silverman, M.D., Ph.D., currently designated by Merck with the title "Distinguished Scientist, Global Regulatory Affairs," testified that Warnings "generally reflect information that the FDA wants potential prescribers to have that they think may have a significant impact on their decision whether or not to use the medication in patients. They identify characteristics of the patients or characteristics of the drug;" "when you put something in warnings, it rises to the level of giving the prescriber information that may…in fact rise to the level where a practitioner should carefully consider whether this drug should be used in patients for which you've written the warning, whether that's a particular patient population or particular attribute of the patient or a particular event."[192] Dr. Silverman acknowledged that the Warnings

---

[190] *Id.* § 201.57(f)(1) (2001).

[191] *Id.* § 201.57(f)(2) (2001).

[192] Silverman Tr. at 123:5-12; 124:9-20, June 19, 2013. Silverman testified that, by contrast, precautions "would tend to suggest that they may not rise to a reason to not use the drug but they are things that prescribers and patients should be aware might be associated with the use of the drug and they should be on alert for those things"; they are

section of the label could have a "significant impact" on a physician's desire to prescribe a drug in contrast to the Precautions section of the label which provides physicians with things they should be "on the alert for."[193]

159.    A Warning can be bolded for emphasis. If the Warning is in bolded print it communicates an even greater risk, indicating that the medication should possibly be avoided if the patient is in a high risk group.[194]

160.    A Black Box Warning ("BBW") at the beginning of the label expressly informs the physician that there is sufficient reason to believe there is an increased risk of serious harm, that the harm is life-threatening, and that avoidance of the medication will eliminate the risk. This is the strongest level of safety warning the FDA can include in a product label.[195] In the driving analogy, a BBW would be the equivalent of the light changing from yellow to red – the driver is going to make every effort to stop at the intersection because failure to stop will significantly increase the risk of a collision.

> **B.**    **If the Vioxx Launch Had Been Delayed Due to Further Research to Determine Its CV Risk and Appropriate Label, Vioxx Would Not Have Been Able to Compete with Celebrex and Would Not Have Been Commercially Viable**

161.    Celebrex was one of the most successfully launched pharmaceutical products in the history of the industry, creating steep competition for Vioxx when it was launched.

---

"something that you want to make sure practitioners know so if they go ahead and use this drug in patients, they should be on lookout for something that…might happen or…might not happen that they otherwise would expect." Silverman Tr. at 123:15-22; 124:3-9, June 19, 2013.

[193] Silverman Tr. at 122:24-123:22, June 19, 2013.

[194] *See Guidance for Industry – Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content an Format,* U.S. FOOD AND DRUG ADMIN. at 8 (October 2011), http://www.fda.gov/downloads/Drugs/Guidance/ucm075096.pdf.

[195] Cheng, CM, Guglielmo BJ, Maselli J, Auerbach AD. Coverage of FDA Medication Boxed Warnings in Commonly Used Drug Information Resources. *Arch Intern Med.* 2010 May 10; 170:831-3, at 831.

162.    As explained above, the development plan for Vioxx was compressed and accelerated in an attempt to beat Celebrex to market or minimize the gap between launches.[196] Merck successfully reduced this gap to approximately six months.

163.    If the launch of Vioxx had been delayed, even by a few months, to further research and determine Vioxx's CV risk, the delay would have only solidified Celebrex's market entrenchment.[197]  In my opinion, that delay would have made it extremely difficult for Vioxx to effectively compete with a product that was largely comparable in efficacy.[198]  Assuming that further CV risk research would have resulted in a CV Warning or BBW for Vioxx at a time when Celebrex did not have a CV Warning or BBW, the market for Vioxx during the time period from May 1999 through September 29, 2004 would be decimated and Vioxx would not have been commercially viable.

### C.    If Vioxx Had Been Launched With A Warning It Would Not Have Been Commercially Viable[199]

164.    In my opinion, informing physicians of an increased risk of CV events for Vioxx at the outset of its launch would have had a serious impact on sales, destroying the commercial

---

[196] *See* MRK-AAD0088760 at MRK-AAD0088762-64, MRK-AAD0088777, MRK-AAD0088783.

[197] *See* PX414 at MRK-SHAA0161378.

[198] While there are hypothetical marketing scenarios that could have evolved if Merck had further researched and understood (and disclosed) the true cardiovascular risks of Vioxx prior to its launch (including Merck developing the drug with certain restrictions to patient types, the duration of treatment, and dosage, or Merck focusing the clinical research on other possible indications), I find those scenarios very unlikely.  In any of these cases the market opportunity would have been severely curtailed for Vioxx and it is most likely that Merck would have decided to cease its development.

[199] I understand that Plaintiffs will offer expert opinion testimony in this case that Vioxx should not have been marketed by Merck at all given the unresolved increased CV risk it created and the availability of other pain relief medications.  My analysis here examines a different issue – how much Vioxx sales would have been impacted if it was launched and marketed with a Warning.  It is my opinion that had a Warning or BBW been required from the outset, Vioxx would not have been commercially viable.

viability of Vioxx. A Warning label would have caused Merck to severely curtail its very extensive marketing and promotion, including its DTC advertising.[200]

165.     Any Warning relating to the increased risk of CV events on Vioxx would negatively impact physicians' initial prescribing habits and cause a significant loss of sales.[201]  A Warning from the outset would have caused Merck to lose elderly patients with CV risk as potential customers, impacting Vioxx sales severely and leaving only the significantly smaller short–term or acute pain patient segment of the market. [202]

166.     Additionally, while the RA population is the arthritis population with the highest CV risk,[203] physicians, with numerous product choices with better safety profiles, likely would not have prescribed Vioxx with a Warning on its label to arthritis patients generally if Vioxx contained a Warning, since studies have found that patients with inflammatory arthritis, which includes both OA and RA patients, have a greater risk of heart disease as compared to the

---

[200] The Code of Federal Regulations restricts the type of advertising a drug manufacturer may do for a product that has a boxed warning with regard to "reminder advertisements." 21 C.F.R. § 202.1(e)(i) (2001).

[201] MRK-ADG0009638 at MRK-ADG0009660; PX411 at MRK-ABI0008674; PX592 at MRK-ADN0095918; PX833 at MRK-ACR0009278; see PX835; Cheung A, Sacks D, Dewa CS, Pong J, Levitt A. Pediatric Prescribing Practices and the FDA Black-box Warning on Antidepressants. *J Dev Behav Pediatr.* 2008 Jun;29(3):213-5 at 213-5 (noting that studies strongly suggest an association between FDA warning and a decrease in prescribing rates in antidepressant prescriptions for children).

[202] Some of Merck's internal analyses estimated the drop in sales if a CV Warning label were to be adopted after launch. One Merck estimate indicated that a Warning on the Vioxx label regarding the increased risk of CV events would cause Vioxx sales to drop by 50%. PX411 at MRK-ABI0008674; MRK-AKO0001163 at MRK-AKO0001179. Another such analysis estimated that if Vioxx had a CV Warning on its label after launch there would be an 18% decrease in sales. MRK-ADM0080285 at MRK-ADM0080308.

[203] MRK-ABH0022309 at MRK-ABH0022312; MRK-AGR0000666 (concluding that "in this large prospective cohort of women, participants with rheumatoid arthritis had a significantly increased risk of myocardial infarction...compared with those without rheumatoid arthritis"); Maradit-Kremers H, Corwson CS, Nicola PJ, Ballman KV, Roger VL, Jacobsen SJ, Gabriel SE. Increased Unrecognized Coronary Heart Disease and Sudden Deaths in Rheumatoid Arthritis; A Population-Based Cohort Study. *Arthritis Rheum.* 2005 Feb;52(2):402-11 at 402 ("Patients with RA have a significantly higher risk of CHD when compared with non-RA subjects. RA patients are...more likely to experience unrecognized MI and sudden cardiac death. The risk of CHD in RA patients precedes the ACR criteria-based diagnosis of RA, and the risk cannot be explained by an increased incidence of traditional CHD risk factors in RA patients.").

general population.[204]   Columbia University School of Medicine rheumatologist Dr. Jon T. Giles

states that, "[i]nflammation[,] regardless of where it comes from[,] is a risk factor for heart

disease.   So it is not surprising that people with inflammatory arthritis like RA, lupus, and

psoriatic arthritis have more cardiac events."[205]

167.   Specifically with respect to RA, studies have found that patients with RA have a

higher risk of cardiovascular disease and are more likely to experience unrecognized MI and

sudden cardiac deaths as compared to non-RA patients.[206]   Before prescribing a drug that

increases the CV risk in the RA patient population, physicians would consider other safer

available alternatives.   Merck internally identified a number of competitors to Vioxx for each

type of pain or treatment for which Vioxx was developed and approved.[207]   Merck's own

analysis shows that physicians had numerous product choices to prescribe to their patients.

168.   Given the alternatives available, a Warning would strongly discourage physicians

from prescribing Vioxx to patients that had chronic pain, OA, RA, and other patients who had a

history of heart disease – even if Vioxx was being prescribed for a short period of treatment.

---

[204] Studies have found that both OA and RA patients have higher cardiovascular risk.  MRK-AIY0077582 at MRK-AIY0077582 ("National survey data suggest that, on average, US adults with OA have a high prevalence of cardiovascular risk factors.  These findings highlight the need to consider patients' comorbidities when selecting the appropriate treatment options."); MRK-AAD0054352 at MRK-AAD0054352, MRK-AAD0054359 (noting "the importance of inflammation as an important risk indicator for CVD and mortality in RA" as well as "[t]he positive impact of disease activity reducing treatment on CVD risk and survival" and stating that "[e]fficient control of the inflammation seems to be of importance not only to reduce joint destruction but also to alter mechanisms of importance for atherothrombogenesis in favorable direction"); see MRK-AAD0275650.

[205] Dorothy Foltz-Gray, *Arthritis Today: Why People With Arthritis Are at Greater Risk for Heart Disease*, Arthritis Foundation, undated, http://www.arthritistoday.org/about-arthritis/arthritis-and-your-health/heart-disease/protect-your-heart-4.php (last visited July 12, 2013).

[206] *See* Maradit-Kremers, Corwson, Nicola, Ballman, Roger, Jacobsen, and Gabriel, *supra*; *see* Press Release, European League Against Rheumatism, "Rheumatoid Arthritis is a Risk Factor for Cardiovascular Disease," June 13, 2008, *available at* http://www.eurekalert.org/pub_releases/2008-06/elar-rai061308.php (last visited July 12, 2013).

[207] MRK-AJT0043511 at MRK-AJT0043560-61.

169.    Physicians would have significant concerns prescribing a product that could do more harm than good.  As there were a number of alternative medications for the treatment of OA, RA, and acute pain, physicians would choose a product with less toxic side effects.  If Vioxx were launched with a CV Warning, the competition – in particular Pfizer/Pharmacia – would have taken advantage of the Warning and reinforced to physicians that there is no need to prescribe a product that could result in an increase in cardiac events when other alternatives (including, Celebrex) were free of such a Warning.

170.    Chart H below, titled "Consumer Market Map for VIOXX," which Merck developed after VIGOR, reveals a plan to target patients with chronic and acute pain regardless of a patient's CV risks or history of cardiovascular disease.  Chart H would have been significantly altered if Vioxx was required to have a Warning at the outset related to increased CV events, including myocardial infarctions.

CHART H[208]

## Consumer Market Map for VIOXX

| | | | Proactive = 8.9 MM | | Passive = 18.7 MM | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | High Interest in New Pain Med = 5.5 MM | Low Interest in New Pain Med = 3.4 MM | High Interest in New Pain Med = 8.4 MM | Low Interest in New Pain Med = 10.3 MM |
| Chronic / Recurrent = 27.6 MM | RX = 12.5 MM | Arthritis = 7.6 MM | Primary = 8.6MM 51% definitely will ask | | | Shared Spill-over = 10.3 MM |
| | | LBP/ Other Pain = 4.9 MM | | | | |
| | OTC = 15.1 MM | Daily = 5.4 MM | Arthritis = 3.6 MM | | | |
| | | | LBP/Other = 1.8 MM | | | |
| | | PRN = 9.7 MM | Arthritis = 4.1 MM | Secondary = 5.4MM 31% definitely will ask | | |
| | | | LBP/Other = 5.6 MM | | | |
| Acute = 20 MM | | | Non-Target / Non-Spillover = 49.6 | | | |
| No Med / Alternative Treatment = 32.5 MM | | | | | | |
| Narcotic as Primary Treatment = 6.0 MM | | | | | | |

171.    If the Vioxx product label received a CV Warning prior to launch, Chart H would not have included patients with chronic pain, or a good portion of the recurrent patients as primary targets, which represented 12.5 million prescriptions.    Furthermore, the portion representing the passive population would not be requesting Vioxx and likely would not be included in Chart H.   Rather, only a small population of potential patients that could be treated with Vioxx would remain – namely the "prns" (patients that needed this specific medication for

---

[208] MRK-SHAA2757579 at MRK-SHAA2757586.

whatever reason) and over-the-counter patients, along with any spillover from prescribing to additional patients.[209]

172.    Instead of prescriptions for Vioxx totaling approximately 105 million during the period May 20, 1999 – September 29, 2004, if Merck had launched Vioxx with a CV Warning, prescriptions would have totaled far less for the following reasons:

- Safer alternatives available in the marketplace;

- Competitive products with comparable efficacy;

- Price would be greater than the vast number of additional options, the majority of which were generic or over-the-counter;

- Vioxx would not be used for OA and RA patients, so loss of the chronic market;

- Fear of adverse effects;

- Physician safety concerns.

173.    Given the foregoing, in my opinion, Vioxx would not have been commercially viable if it had a CV Warning on the label at launch, as it would then likely have only been prescribed (and thus sold) to patients in low doses for short periods of time, and only when that patient presented little or no risk factors for cardiovascular events, as there were a number of alternative treatments that physicians had been prescribing for years.    While none of the alternative treatments were perfect, they did not have CV Warnings in the drug label.

174.    Given that Celebrex had been on the market for several months and did not have a CV Warning on its label, any Warning for CV risk would have greatly discouraged Merck from launching Vioxx as a second drug to market given the high marketing and promotional costs involved.

---

[209] The impact of a bolded Warning on Vioxx's label would also have caused fewer patients to be proactive as a result of DTC advertising, assuming that DTC advertising was even continued.

175.   If Vioxx was approved with a CV Warning, it would have positioned the drug essentially as a competitor to short-term analgesics such as Aleve and Advil,[210] but at a much higher cost and only with a physician's prescription.  A cost/benefit analysis would not have favored marketing Vioxx.  Thus, Merck likely would never have marketed the drug as it would not have been commercially viable.

### D.   Vioxx Would Not Have Been Commercially Viable With A Black Box Warning

176.   In my opinion, a BBW would have destroyed Vioxx's commercial viability whether at launch or following the results of VIGOR.

#### a)   Black Box Warnings

177.   Black Box Warnings are not common in the industry.  They are the strongest warning the FDA can apply to a label short of contraindicating the product in certain patient populations.  BBWs are requested by the FDA and appear on the drug label when there is a need "to call attention to serious or life-threatening risks."[211]

178.   Products with BBWs are found in almost every class of drugs.  However, BBWs are more frequently seen in drugs that are used in serious life-threatening diseases, such as HIV and cancer-related therapies where the risk of death from the underlying patient disease or

---

[210] The NSAID class did not have any Warning in its labeling as a class prior to the Vioxx issues related to CV events; however, the FDA requested changes in the labeling of the entire class of NSAIDs in 2005 as a consequence of the withdrawal of Vioxx and subsequent clinical data regarding NSAIDs and Cox-2 inhibitor drugs. *See Public Health Advisory – FDA Announces Important Changes and Additional Warnings for COX-2 Selective and Non-Selective Non-Steroidal Anti-Inflammatory Drugs (NSAIDSs)*, U.S. FOOD AND DRUG ADMIN., April 7, 2005, http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm150314.htm (last visited July 12, 2013); *see also* MRK-AFN0113411.

[211] "A Guide to Drug Safety Terms at FDA," U.S. FOOD AND DRUG ADMIN., November 2012, at 1, http://www.fda.gov/downloads/ForConsumers/ConsumerUpdates/ucm107976.pdf (last visited July 12, 2013); Cheng, Guglielmo, Maselli, Auerbach, *supra*, at 831.

condition is high. BBWs will likely influence if and how a drug is prescribed, particularly when alternatives without BBWs exist.[212]

179. A BBW is placed at the beginning of the product label. Once added to the product label, it needs to be present in the patient information circular. A drug company is required to provide a BBW on all promotional materials, including DTC advertising, which further discourages physicians from prescribing the drug, further reducing market potential and sales.

180. While representatives are always required to provide fair and balanced information to their physicians regarding both the benefits and side effects of a product, it would be essential to provide this fair and balanced information in the case of a product with a BBW. Such fair and balanced information necessarily means that the representatives increase awareness of the dangers of the drug in their promotions.

181. In my opinion, a BBW is almost equivalent to a Contraindication in the product label,[213] which would essentially prohibit physicians from prescribing Vioxx to patients with a history of heart disease. Physicians want to know the appropriate patients to whom they should be prescribing a drug.[214] A BBW is, in many ways, *loudly proclaiming* to physicians that this product has serious consequences, and therefore physicians and patients should beware.

---

[212] *See* Panagiotou OA, Contopoulos-Ioannidis FG, Papanikolaou PN, Ntzani EE, Ioannidis JP. Different Black Box Warning Labeling for Same-Class Drugs. *J Gen Intern Med.* 2011 Jun;26(6):603-10; *see also* Cheng, Guglielmo, Maselli, and Auerbach, *supra*, at 831-33.

[213] *See* Blair Wilbert, *Louisiana Drug Utilization Review Education: Black Box Warnings*, January/February 2010, at 5, 6, *available at* http://new.dhh.louisiana.gov/assets/medicaid/mpbm/2010Jan-Feb.pdf.

[214] *See id.* (noting that "[m]edications with black box warnings require more patient-specific evaluation prior to use and intense monitoring from physician after prescribing" and "a new boxed warning…may have severe detrimental effects on the medication's place in the market, as physicians are less likely to prescribe a medication with a new, serious warning").

182. A BBW can result in sharply decreased sales of a drug previously marketed without a BBW.[215] For example, use of atypical antipsychotics dropped more than 50% after a BBW for increased mortality in dementia–affected elderly was released for those drugs (the percentage drop was limited due to the safety advisory "exclusively appl[ying] to an unapproved 'off-label' use of the drugs" and "potential treatment substitutes" possibly carrying safety risks which were eventually the subject of safety alerts themselves).[216] This decline started within one month after the BBW was issued and persisted afterwards. A similar decline in sales was observed for droperidol, a drug approved to reduce the incidence of nausea and vomiting associated with surgical and diagnostic procedures that was widely used off-label as an anti-psychotic for sedating patients, which received a black box warning for QT prolongation.[217] "As a result of this black box warning, the use and sale of droperidol was decreased – many clinicians became reluctant to use droperidol, and many hospitals removed the drug from their formulary. There was a 10-fold decrease in the sales of droperidol in the year after the black box warning."[218] Additionally, in 2004, the FDA required a BBW for all antidepressants regarding

---

[215] Panagiotou, Contopoulos-Ioannidis, Papanikolaou, Ntzani, and Ioannidis, *supra*, at 607.

[216] *Id.*; Dorsey RE, Rabbani A, Gallagher SA, Conti RM, Alexander C. Impact of FDA Black Box Advisory on Antipsychotic Medication Use. *Arch Intern Med.* 2010;170(1):96-103 at 101.

[217] Even with a BBW, droperidol was the least expensive alternative by cost. Halloran K and Barash PG. Inside the Black Box: Current Policies and Concerns with the United States Food and Drug Administration's Highest Drug Safety Warning System. *Current Opinion in Anaesthesiology.* 2010, 23:423-427 at 426.

[218] Habib AS, Gan TJ. Pro: The Food and Drug Administration Black Box Warning on Droperidol is not Justified. *Anesthe Analg* 2008 May; 106:1414-7 at 1414; Jacoby JL, Fulton J, Cesta M, Heller M. After the Black Box Warning: Dramatic Changes in ED Use of Droperidol, *Am J. Emerg. Med.* 2005; 23:196 (noting that "[o]ur survey clearly indicates that the black box warning on droperidol has dramatically decreased its use in the ED, often to agents perceived to be less effective"); Habib AS, Gan TJ. The Use of Droperidol Before and After the Food and Drug Administration Black Box Warning: a Survey of the Members of the Society of Ambulatory Anesthesia. *J of Clinical Anesthesia* 2008 20: 35-39 at 35 ("For PONV prophylaxis, the choice of droperidol as a first-line agent decreased from 47% to 5% after the black box warning appeared (P less than 0.0001). Similarly, for treatment of established PONV, the choice of droperidol decreased from 38% to 8% (P less than 0.0001)). Panagiotou, Contopoulos-Ioannidis, Papanikolaou, Ntzani, and Ioannidis, *supra*, at 603-10; *see* http://www.drugs.com/pro/droperidol.html#indications; *see also* http://www.fda.gov/safety/medwatch/safetyinformation/safetyalertsforhumanmedicalproducts/ucm173778.htm; *see also* http://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/UCM096273.

their use in children due to the tendency of antidepressants to cause suicidal tendencies.[219] "There was a 58% drop in antidepressant use among children and adolescents with depression since the FDA added a black box warning in 2004."[220]

183.   Given the foregoing, drug companies fear altering the label of their drugs to include a BBW.[221]

> **b)   Analyst Reports Quantifying Sales for Vioxx upon Its Possible Reintroduction to the Market with a Black Box Warning are Instructive as to Potential Sales of Vioxx with a Black Box Warning**

184.   Following the withdrawal of Vioxx, several analysts quantified the market for Vioxx if it was to be reintroduced to the market with a BBW on its label.  However, this reintroduction to the marketplace would have occurred following the results of the Celebrex APC Cancer Trial released in 2004 (which demonstrated a higher risk of myocardial infarctions), and which led to Celebrex receiving a BBW from the FDA for both cardiovascular and gastrointestinal risks.  Accordingly, the analysts' hypothetical scenario assumed Vioxx would re-enter a market in which Celebrex had no clear safety advantage.

185.   If Vioxx had been launched with a BBW or stayed on the market following VIGOR with a BBW, these analyst estimates are instructive as to what the market would have been for Vioxx in that scenario, i.e., but it is a scenario in which Vioxx and Celebrex both have BBWs, and thus Celebrex has no competitive safety advantage over Vioxx, meaning competition is not robust.  If Vioxx had been marketed with a BBW, while Celebrex did not have a BBW,

---

[219] The label was updated in 2007 to include young adults up to 24 years old during their initial treatments.

[220] Panagiotou, Contopoulos-Ioannidis, Papanikolaou, Ntzani, and Ioannidis, *supra*; Cheung, Sacks, Dewa , Pong, Levitt, *supra*, at 215 ("[R]ates of prescriptions for antidepressants in patients newly diagnosed with depression in September 2005 was 58% less than what was predicted based on historical trends prior to the FDA warning.  The results...strongly support the belief that a clinically meaningful proportion of patients treated by physicians who were aware of the warning discontinued or were not offered antidepressant medications subsequent to the warning.") (internal citation omitted).

[221] Panagiotou, Contopoulos-Ioannidis, Papanikolaou, Ntzani, and Ioannidis, *supra*.

Celebrex would have had a clear advantage in terms of marketing based on safety, and revenue estimates for Vioxx would be substantially lower than those projected by analysts in 2005. In my opinion, since there would have been safer alternatives to Vioxx, Vioxx with a BBW would have been the medication of last resort during the time period from May 1999 through September 29, 2004, and thus the market for the drug would be virtually non-existent.[222] Accordingly, while these analyst predictions are instructive, it is my opinion that the market for Vioxx with a BBW would have been a fraction of these estimates for the reintroduction of the drug.[223]

186.    In 2005, numerous analysts noted that if Vioxx were re-introduced to the market with a BBW, projections for its sales potential would be a fraction of sales prior to withdrawal, with estimates of potential sales ranging from $100 million to $500 million.[224] Even if analysts

---

[222] Following the results of the Celebrex APC Cancer Trial, Celebrex received a BBW from the FDA for both cardiovascular and gastrointestinal risks. PDR, Thomson Healthcare, PHYSICIANS' DESK REFERENCE 2007, (61st ed.) (2007), http://www.pdr.net/drug-summary/celebrex?druglabelid=532. The resulting decline in Celebrex sales is instructive as to what would have happened to Vioxx sales if it would have been given a BBW earlier. In 2004, which was the final calendar year that all three products were on the market, worldwide sales of Vioxx was $2.5 billion, while Celebrex and Bextra recorded sales of $3.3 billion and $1.3 billion, respectively. Vioxx was withdrawn in September 2004, and Bextra was withdrawn in April 2005. Despite the fact that it had lost all of its other COX-2 inhibitor specific competition, once Celebrex received a BBW, Celebrex prescriptions in the United States plunged 40 percent, (see MRK-SHAAM0098511 at MRK-SHAAM0098516), and worldwide sales dropped from $3.3 billion in 2004 to $1.73 billion in 2005. See MRK-AFV0479912 at MRK-AFV0479915. The market for Cox-2 inhibitors in the United States contracted substantially after the withdrawal of Vioxx and Bextra. Sales worldwide prior to the removal had been estimated to be around $8 billion. The impact of Black Box labeling not only reduced the sales of the product but also reduced the size of the market for Cox-2 inhibitors.

[223] The Celebrex APC Cancer Trial is the main intervening event between Vioxx's label change following VIGOR and the potential reintroduction of Vioxx to the market in 2005 that could substantially affect estimates as to the market for Vioxx with a BBW.

[224] Merrill Lynch estimated that if Vioxx "was returned to the market, we think Vioxx sales would be a small fraction of $2.5B previously because there would be severe restrictions on use. As a result, we are not sure that Vioxx could even generate 10% or $250M in sales, in a few years." MRK-SHAAM0041767 at MRK-SHAAM0041767. Sun Trust stated, "We are currently considering Vioxx's return to the US market – in a much more limited fashion – in 4Q05. We estimate Vioxx can reach $125 million in sales in 2006, and $325 million in 2007." MRK-SHAAM0041759 at MRK-SHAAM0041759. Equity Research stated that "we now forecast that Vioxx will re-enter the market in 3Q '05. For '05, we forecast worldwide Vioxx revenues of $155M ($95M in the US, $60M ex-US), growing to $357M in 2009." MRK-SHAAM0041763 at MRK-SHAAM0041765. Citigroup estimated "Vioxx sales ramping to $275 MM in 2009," stating that "we now forecast limited Vioxx sales of $200 MM in 2006, $225 MM in 2007, $250 MM in 2008 and $275 MM in 2009." MRK-SHAAM0041785 at MRK-SHAAM0041786. FBR stated that "[s]hould the FDA decide that reintroduction of Vioxx is plausible, we estimate

did not quantify the amount of sales, their predictions were bleak.[225]

187.   If Vioxx had been reintroduced in 2005 to a market in which Celebrex would have had a BBW, the average analyst estimated market potential for Vioxx (calculated using the specific analyst estimates provided) would have been approximately $250 million. While this $250 million market is instructive as to what the market would have been for Vioxx if it had received a BBW during the time period from May 1999 through September 29, 2004, in my opinion, that estimate would have to be substantially decreased if during the time period from May 1999 through September 29, 2004 Celebrex had no BBW and thus would have been the clear choice for a prescribing physician for almost every patient.

> c)   **If Vioxx Had a Black Box Warning Either at Launch or Following VIGOR, Its Market Would Have Been Severely Contracted, Sales Would Have Been Devastated, and Vioxx Would Not Have Been Commercially Viable**

188.   In my opinion, physicians would not have perceived Vioxx with a BBW to be a "first line drug"[226] – rather, it would have been reserved as a last resort for patients whose treatments failed on other medications.

---

product revenues of $300 million to $400 million." MRK-SHAAM0041795 at SHAAM0041796. Bernstein research stated, "VIOXX, if it reenters, is in our view a more damaged brand than Celebrex. Absent broad bandwidth to the consumer, we see the brand as impossible to resurrect. We'd expect $100M – neighborhood sales at very high per-pill prices." MRK-SHAAM0041804 at MRK-SHAAM0041806. Credit Suisse "forecast 'steady state' Vioxx sales in 2007 of $145MM." MRK-SHAAM0041821 at MRKS-SHAAM0041821. Harris Nesbitt estimated that if Vioxx was allowed to return to the market with a label that put it at a significant disadvantage to Celebrex on the issue of CV risk, it "peg[ged] the Vioxx opportunity in the US in the $500 million range in 2006, should the company relaunch the brand." MRK-SHAAM0041811 at MRK-SHAAM0041813.

[225] William Blair believed that "[i]f Vioxx were to return to the market, it appears to us that it would be for a limited market (revenue) and with increased costs, leading to limited economic upside." MRK-SHAAM0041833 at MRK-SHAAM0041834. CIBC stated that "[t]he Committee suggested that Vioxx could be re-introduced, but we believe that this possibility should it occur, will not lead to significant commercial sales." MRK-SHAAM0041799 at MRK-SHAAM0041800. Morgan Stanley stated that "[i]f MRK does reintroduce the product, we believe sales would be relatively modest compared with historical levels." MRK-SHAAM0041769 at MRK-SHAAM0041771. UBS noted, "If Vioxx re-enters the US, we see its commercial potential as limited...The 'relative re-labeling' of products will play an important role. We assume that even if Vioxx is re-launched, it will have a worse label relative to CV risk than Celebrex, truly rendering it the last ditch option." MRK-SHAAM0041774 at MRK-SHAAM0041774, MRK-SHAAM0041778. Goldman Sachs wrote that "[w]hile Vioxx may return to the market, the labeling will be very restrictive....[m]ake less preferable, 2nd or 3rd choice...." MRK-SHAA0049635 at MRK-SHAA0049635-36.

189.     If Vioxx had a BBW, physicians would also be concerned with the potential legal liability of prescribing a product with an inferior safety profile where there are many additional safer product options that could address the patient's needs.   Vioxx, as a result, would be classified as a second or third line product since the risks would outweigh the benefits.[227]

190.     If Vioxx had a BBW, it would have eliminated the largest segment of the market – the elderly with arthritis and the patient population with a history of heart disease.  Patients over 65 would likely have the greatest incidence of heart disease and some form of arthritis.[228] Therefore, the target market for Vioxx would no longer be interested in purchasing Vioxx, as physicians would be more likely to prescribe other drugs that were considered safer than Vioxx for those patients with CV risk.  Due to the number of product alternatives available during the time period from May 1999 through September 29, 2004  that did not contain a similar Warning or risk, there would have been options other than Vioxx for patients, and therefore a severe reduction in sales of Vioxx.  OA and RA are not life-threatening diseases, and there are a number

---

[226] "First line drugs" are drugs that physicians use first when a patient presents with a specific illness.  It is normally the drug with which the physician has the most experience and confidence prescribing.

[227] Panagiotou, Contopoulos-Ioannidis, Papanikolaou, Ntzani, and Ioannidis, *supra*, at 603 (noting that "BBWs can have an impact on drug sales because of marketing prohibitions, increased litigation and negative media attention").

[228] In 1999, 9.3 million patients 65 years and older had heart disease, with 14.8 million who had hypertension and 2.5 million who had a stroke.  Summary Health Statistics for U.S. Adults: National Health Interview Survey, 1999, CDC, Series 10, No. 212, 08/2003.  In 2004, 11.0 million patients 65 years and older had heart disease, with 18.0 million who had hypertension and 3.2 million who had a stroke.  Summary Health Statistics for U.S. Adults: National Health Interview Survey, 2004, CDC, Series 10, No. 228, 05/2006.  "Heart disease" includes coronary heart disease, angina pectoris, heart attack, or any other heart condition or disease.  In 1999, 10.6 million patients 65 years and older had arthritic symptoms.  Summary Health Statistics for U.S. Adults: National Health Interview Survey, 1999, CDC, Series 10, No. 212, 08/2003.  "Arthritis symptoms" includes patients with pain, aching, stiffness, or swelling in or around a joint that persisted on most days for at least a month during a period of 12 months.  In 2004, 17.5 million patients 65 years and older had an arthritis diagnosis, and 16.2 million patients 65 years and older had chronic joint symptoms.  Summary Health Statistics for U.S. Adults: National Health Interview Survey, 2004, CDC, Series 10, No. 228, 05/2006.  An "arthritis diagnosis" includes patients who had been told by a doctor or health professional that they had some form of arthritis, rheumatoid arthritis, gout, lupus, or fibromyalgia.  "Chronic joint symptoms" includes patients with pain, aching, stiffness, or swelling in or around a joint (excluding back and neck) that first began more than 3 months prior to the survey.

of alternate treatment options for these conditions that do not carry Warnings of an increase in risk of cardiac events.

191.    Under a BBW, even the perception of risk to those taking Vioxx would be greatly increased in the physician's mind.  This would further deter the physician from prescribing Vioxx to other potential segments of the patient population.

192.    With a BBW for CV risk at launch, it is clear that sales of Vioxx would have been virtually nonexistent, since OA and RA patients would have had additional options for their pain relief.  Why would doctors prescribe a product that increases a patient's chances of having a heart attack when there are other safer treatment options for pain relief?[229]  In light of the significantly reduced market, coupled with the legal liability the drug would now carry, compounded by the large marketing budget Vioxx required to succeed, it is my opinion that if Vioxx had received a BBW at launch, it would have represented negative revenue to Merck and would not have been commercially viable.

193.    A BBW for Vioxx as a result of the VIGOR trial would have had a devastating impact on the product, given that there were other safer alternatives in the marketplace, as was recognized by Merck's own Board of Directors when they withdrew Vioxx in 2004.[230]  Given these safer alternatives, there would no longer have been reason to market the drug given its increased cardiovascular risk profile.  In my opinion, if Vioxx had received a BBW following the VIGOR results, the sales of Vioxx would have been reduced by well over 90%,[231] likely

---

[229] While some patients currently taking the medication would request their physician allow them to remain on Vioxx, physicians would propose switching their patients to a different product rather than expose their patients to an additional risk.

[230] PX874 at AAV0000076 ("given the availability of alternative therapies, and the questions raised by the data, Mr. Gilmartin advised that management had determined that a voluntary withdrawal was the appropriate course to take").

[231] An internal Merck analysis stated that if CV safety issues were perceived as Vioxx specific during the time period from May 1999 through September 29, 2004 , the sales impact would be a loss of 90% of all patients with

resulting in Merck discontinuing its promotion of the product and withdrawing it from the market altogether given the marketing and promotional costs involved with keeping Vioxx on the market.

194. Simply put, given the foregoing, the effect of a BBW on Vioxx's label, whether at launch or following the results of the VIGOR trial, would have been catastrophic to sales given the reduction in marketable population and the availability of alternative options, destroying Vioxx's commercial viability.

### E.    Merck's Post-VIGOR Label

195. In my opinion, the results of the VIGOR trial presented a major obstacle for Merck with respect to labeling. It was imperative that Merck prevent or minimize any labeling that could potentially warn physicians that Vioxx was prothrombotic.[232]  David Anstice testified that the marketing department of Merck informed him that the location and wording of the VIGOR results in the label would determine the impact on sales.[233]  If successful in minimizing the labeling impact, Merck had the opportunity to increase its sales by 25%.[234]  By contrast, a Warning would surely have deterred, if not prevented, physicians from prescribing Vioxx.

196. A label change with a Warning would have caused Merck to inform physicians of the label change, and the FDA would probably have required a letter to be sent to all physicians

---

CV risk factors, and could have a substantial spillover effect to patients without CV risk due to negative promotion by the competition.  PX408 at MRK-ABX0006699.

[232] *See* PX411 at MRK-ABI0008674.

[233] Anstice Tr. at 378:20-379:20. David Anstice testified that "A warning is...something that has been observed in the past and therefore, may occur in the future and then you, the prescriber, should be attentive to it...A precaution is something which some data suggest may possibly occur but there isn't hard or strong evidence that it will, so the data are ambiguous, equivocal..." Anstice Tr. at 75:19-76:6. Using this definition, including the VIGOR results in the Precaution section of the label would allow information on VIGOR to be interpreted by physicians as not supported with any evidence that would cause concern allowing Merck to continue to market and promote Vioxx without restrictions or concerns about the increase in CV events.

[234] PX411 at MRK-ABI0008674.

informing them of the changes. In addition, Merck's promotion would have needed to acknowledge the increased risk of cardiac events and all DTC advertising would have had to include statements regarding the increased cardiac risks. Physicians would have hesitated to prescribe Vioxx for acute pain (i.e., its approved indications for primary dysmenorrhea and acute treatment of migraine attacks), since the risks and cost versus alternative medications would outweigh the benefits of prescribing Vioxx. Managed care would likely have refused to reimburse Vioxx unless a patient had tried other medications and failed. This would have necessitated physicians taking the time to draft a letter requesting that managed care reimburse the cost of the drug.

197. During the negotiations with the FDA on the VIGOR labeling, Merck recognized the effects of a Warning label. In an email from Wendy Dixon to Raymond Gilmartin, Dixon stated that "[t]he revised label will not remove GI risk from the Warnings section and CV balance will be included, perhaps a [sic] with strong language. Our ability to continue to provide a strong branded message in DTC will be affected by the outcome of the label negotiations. These events have slowed coxib penetration into the A&A market to date."[235] In a November 2001 email, Dr. Scolnick communicated to a colleague that he "[would] not sign off on any label that had a cardiac warning."[236] In a November 21, 2001 email, David Anstice wrote that, "We do not want VIOXX to have a negative label versus Celebrex and valdecoxib if that is a possibility..."[237]

198. Merck noted that as long as all Cox-2 products had comparable labels, Vioxx would remain competitive and could promote its messages of efficacy, safety, and once-a-day

---

[235] MRK-AKO0003264 at MRK-AKO0003264.

[236] PX835.

[237] PX379 at MRK-ABX0016404.

dosing.[238]   However, Merck estimated that a cardiovascular class label would still have an undesirable $590 million dollar impact on sales.[239]  A Warning label specific to Vioxx would have had a substantially greater impact on sales.

### a)      Merck Wins the VIGOR Label Battle

199.    As explained above, the financial risks associated with listing negative adverse effects in the Warning section of the Vioxx label were clear at the time of the VIGOR results.  It was therefore in Merck's financial interest to do everything in its control to prevent the label from including a CV Warning as a result of the VIGOR results.[240]

200.    Following the VIGOR trial the FDA proposed the following Warning statement for inclusion in the Vioxx product label:

> Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events such as those with a history of myocardial infarctions and angina and in patients with pre-existent hypertension and congestive heart failure.[241]

201.    It was the FDA's initial position that the information should be included in the Warnings section of the Vioxx label where it would have prominence and provide an adequate "warning" to physicians.

202.    Merck resisted any label with a CV Warning.  The FDA ultimately conceded in April of 2002.[242]  After two years, Merck and the FDA agreed to a label change that would address the VIGOR results only in the Precautions section of the label.[243]

---

[238] *See* MRK-ADM0003086 at MRK-ADM0003094-95, MRK-ADM0003124.

[239] MRK-ADG0009638 at MRK-ADG0009660.

[240] MRK-ADG0009638 at MRK-ADG0009660; PX411 at MRK-ABI0008674; PX592 at MRK-ADN0095918; PX833; PX835.

[241] MRK-AKU0075571 at MRK-AKU0075595.

[242] *Id.*; PX393.

203. In my experience, with any label change, negative language can be offset by positive language that is also added to the label. For Vioxx, the approval of the RA indication and the modifications of the warning statements on GI safety made to the label in 2002, allowed Merck to market Vioxx as safer than naproxen in terms of GI risk and as safe for use by patients with rheumatoid arthritis. In essence, Merck was able to offset any negative results of VIGOR contained now only in the Precautions section, with new efficacy and safety information.[244] Merck continued to perform clinical studies to seek approval for additional indications, such as for the acute treatment of migraines, which further reinforced the safety, effectiveness, and versatility of Vioxx to physicians.

204. The outcome of the label negotiation was internally described as a "miracle" for Merck.[245] A CV Warning label would have eliminated patients with chronic pain and potentially anyone who did not adamantly request to be prescribed the drug. Instead, Merck continued to market and promote its Vioxx product profile to the same patient population it marketed to prior to the VIGOR results.

## XV. IF THE GI BENEFIT OF VIOXX WAS NEGATED WITH THE REQUIRED USE OF ASPIRIN TO COUNTER VIOXX'S PROTHROMBOTIC RISK, IT WOULD NOT HAVE BEEN A FIRST LINE DRUG FOR A MAJORITY OF PATIENTS

205. Vioxx was marketed primarily for its reduced GI harm. However, if a patient needed to take aspirin for CV safety while taking Vioxx the GI benefit would be negated.[246] As

---

[243] MRK-AKU0075571 at MRK-AKU0075595. This label change also included the new indication for the treatment of rheumatoid arthritis. PX 393 at MRK-ABX0026188-89.

[244] MRK-ADS0000216 at MRK-ADS0000218.

[245] PX836.

[246] A study conducted by Merck in November 2001, called Protocol 136, concluded that the "incidence of ulcers in the rofecoxib plus aspirin group was higher than the aspirin group." PX632 at MRK-JAF0013185.

the addition of aspirin would eliminate the GI benefits of Vioxx, it would not have been a first line drug for a majority of patients.

206.   While Merck claimed that there was a significant unmet medical need for pain relief with less GI side effects, in fact, "only ~5% of patients fell into the high–gastrointestinal–risk category for which [Vioxx] w[as] scientifically and economically justified."[247]

207.   This suggests that Merck's claimed unmet medical need for high-risk GI events patients was overblown. Merck had incentive, however, to build up this unmet medical need – if Vioxx was not addressing the unmet GI medical need there might not have been a need to market it in the first place.[248]

208.   Since Vioxx did not possess antiplatelet properties, the FDA required Merck to include a bolded statement in the label: "Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis."[249] This bolded statement was followed by the following statement: "Therefore, in patients taking VIOXX, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis."[250]

---

[247] PX522 at 19. The message to physicians was that NSAID-related gastropathy was the 15th most common cause of death in the US, next to AIDS, and that from 25-50% of NSAID users develop gastroduodenal ulcers. MRK-AKO0014400 at MRK-AKO0014447. Since the withdrawal of Vioxx, further research has failed to confirm a safety advantage of Vioxx over NSAIDs in terms of complicated upper or lower GI events. MRK-SHAA1559128.

[248] Marketing and promotion certainly had an impact in driving the increase in Vioxx prescriptions beyond the percentage of patients that were in the high-risk category for GI events. Merck estimated that 20 million patients in the United States had taken Vioxx between May 1999 and August 2004, with an undetermined number overseas. MRK-ADB0059604.

[249] MRK-AHE0011858 at MRK-AHE0011869, MRK-AHE0011872; MRK-SHAA1659921 at MRK-SHAA1659923.

[250] MRK-AHE0011858 at MRK-AHE0011872.

209.   However, the results of Protocol 136 showed that patients who took aspirin as a prophylaxis along with Vioxx were actually at a greater risk for GI ulcerations than aspirin alone.[251]

210.   Accordingly, in my opinion, if aspirin had to be taken concomitantly with Vioxx and could effectively counteract an increased risk of cardiovascular events caused by Vioxx, because it would eliminate the main GI benefit for which Vioxx was marketed, it would destroy its potential first line drug status for a majority of patients.

## XVI.  CONCLUSION

211.   Merck's aggressive promotion of Vioxx as the "best in class" among Cox-2 inhibitors, drove sales.   Merck itself recognized the financial vulnerability of Vioxx if cardiovascular risks were stated in any Warning in the Vioxx label.

212.   It is my opinion that if Vioxx was marketed from the outset with a Warning the drug would never have been commercially viable.

213.   It is also my opinion that Vioxx would not have been commercially viable with a BBW.

---

[251] PX697 at OATES-1658_001385 ("[t]he incidence of ulcers in the rofecoxib plus aspirin group was higher than the aspirin group (14.70% vs 8.59%, p=0.024)."

I reserve the right to amend my opinions based on new information as it becomes available to me.

Signed this 17th day of July, 2013

By: _Harry C. Boghigian_

Harry C. Boghigian

# Exhibit A

# HARRY C. BOGHIGIAN

Page Four

- Revitalized the Roche/Glaxo co-promotion arrangement for Zantac and Ceftin. The most successful co – promotion arrangement in pharmaceutical history.


**ROCHE LABS**, Nutley, NJ
**Product Director**
Developed strategic plans for marketed products and new brands in gastroenterology, cardiology, infectious disease, and CNS.
- Coordinated clinical development for Roche/Glaxo co-promotion of Zantac and Ceftin.
- Spearheaded successful physician and pharmacy educational symposia that ran across the country for three years.
- Responsible for long-term revenue projections and evaluating licensing and acquisition candidates.

**Regional Sales Director**
- Directed 120 sales representatives with responsibility for 11 products and $215 million annual sales.
- Controlled an operating budget of $8 million.

**Manager, Market Research**
- Directed a team of analysts to uncover opportunities, strategies and messages for existing and new prescription brands.

**HOFFMANN-LA ROCHE,** Nutley, NJ
**Division Sales Manager,** West Coast Florida
- Managed twelve sales representative covering gulf coast of Florida.
- Launched Rocephin (the #1 injectable antibiotic).

**Sales Representative,** MA, NH & ME
- A consistent record of exceeding sales quotas.  Received President's Achievement Award four times.  Highest company sales award.
- Responsible for selling pharmaceuticals, educational training materials (ROCOM) and clinical laboratory services. (RCL)
- Established first clinical laboratory drawing station in New England.


## EDUCATION

Bachelor of Science, Whittermore School of Business, University of New Hampshire


### Post Graduate Courses

Executive Business Program
Insead, European Institute of Business Administration, Fontainebleau Cedex, France

Rising To Leadership Challenge
London Business School, London England

Type II Diabetes in the 90's
Harvard Medical School, Cambridge, Massachusetts

Executive Leadership Program
IMD, Lausanne, Switzerland

# HARRY C. BOGHIGIAN

Page Five

Leading Organizational Change & Renewal
Harvard Business School, Cambridge, Massachusetts

Pharmacology and Pharmacodynamics of CNS Acting Drugs
University of Rochester Medical School, Rochester, New York

Infections and Treatments of the Nineties
Baylor College of Medicine, Houston, Texas

Pharmaceutical Marketing
Dartmouth College, Tuck School of Business, Hanover, New Hampshire

## PROFESSIONAL ASSOCIATIONS

Healthcare Marketing Council, International Executive Guild
UNH Whittemore School of Business & Economics Judge for Paul J. Holloway Business Plan Competition
Chemist Club

## ADVISORY BOARDS

University New Hampshire Alumni

**Kay Hanson**

| | |
|---|---|
| **From:** | Kenneth Lougee |
| **Sent:** | Monday, July 15, 2013 7:54 PM |
| **To:** | Eric H. Weinberg |
| **Cc:** | Kay Hanson |
| **Subject:** | RE: FW: Madigan final securities report/reliance doc |

Eric,

Of course our interest is in the Medicaid population.  Number of state wide deaths is of less concern than in a consumer protection state.  Merck won't have the nerve to do so but they could argue that they saved us money by killing our folks.

Nevertheless, Utah has about .9% of the nation's population—could extrapolate from there.

We don't know how many Medicaid people they killed.  For example, Tolley doesn't know if an individual is dead—all he can tell is that they discontinued Medicaid.  It is possible to use standard genealogical tools to try and figure out who died but we have yet to do so.

It's like I said earlier today.  It would be nice if the Medicaid database told us which of our people was overweight, smoked, had a history of heart attacks in the family or had high cholesterol.  The records just are not there.

Again, it is not  as important to Utah to attribute deaths—it is enough that there were deaths on Vioxx.

KDL

**From:** Eric H. Weinberg [mailto:ehw@erichweinberg.com]
**Sent:** Monday, July 15, 2013 7:29 PM
**To:** Kenneth Lougee
**Subject:** FW: FW: Madigan final securities report/reliance doc

fyi is our number 64,000?  seems low compared to the other states.

**From:** David Madigan [mailto:davidbmadigan@gmail.com]
**Sent:** Monday, July 15, 2013 9:27 PM
**To:** Eric H. Weinberg
**Subject:** Re: FW: Madigan final securities report/reliance doc

Here's a draft section on excess deaths. I need the prescription numbers for Utah.

On Mon, Jul 15, 2013 at 9:22 PM, David Madigan <davidbmadigan@gmail.com> wrote:
here you go...

On Mon, Jul 15, 2013 at 9:17 PM, Eric H. Weinberg <ehw@erichweinberg.com> wrote:
thanks - can you send the whole ppt?

**From:** David Madigan [mailto:davidbmadigan@gmail.com]
**Sent:** Monday, July 15, 2013 9:06 PM
**To:** Eric H. Weinberg
**Subject:** Re: FW: Madigan final securities report/reliance doc

here's the excess death slide from Kentucky

On Mon, Jul 15, 2013 at 8:59 PM, Eric H. Weinberg <ehw@erichweinberg.com> wrote:

---

**From:** Eric H. Weinberg
**Sent:** Monday, July 15, 2013 6:33 PM
**To:** 'Kenneth Lougee'; Kay Hanson
**Subject:** Madigan final securities report/reliance doc

<<BLBG-#734617-v1-Madigan_Reliance_List_Final.docx>> <<BLBG-#734431-v1-Madigan_Report_FINAL.DOCX>>

**Kay Hanson**

| | |
|---|---|
| **From:** | Eric H. Weinberg <ehw@erichweinberg.com> |
| **Sent:** | Monday, July 15, 2013 8:33 PM |
| **To:** | Brett Van Benthysen; Kay Hanson; David Wales; Brian Vines |
| **Cc:** | Kristin Meister; Kenneth Lougee |
| **Subject:** | RE: Vioxx Expert Disclosures |

Thanks Brett.

I've been in touch with Dr. Woodward. He is happy to work with me again, but needs your okay. Would you kindly let him know?

Best,

Eric

**From:** Brett Van Benthysen [mailto:brett@blbglaw.com]
**Sent:** Monday, July 15, 2013 7:06 PM
**To:** Kay Hanson; Eric H. Weinberg; David Wales; Brian Vines
**Cc:** Kristin Meister; Kenneth Lougee
**Subject:** RE: Vioxx Expert Disclosures

Kay,

Attached is the combined PDF of the Kessler report. This contains Appendices A-C and Schedules 1-3.

**From:** Kay Hanson [mailto:Kay@sjatty.com]
**Sent:** Monday, July 15, 2013 5:30 PM
**To:** Eric H. Weinberg; David Wales; Brian Vines
**Cc:** Brett Van Benthysen; Kristin Meister; Kenneth Lougee
**Subject:** Vioxx Expert Disclosures

Counsel –

I am missing some disclosures for each of the experts we are handling as follows:

Woodward – CV and a list of deposition and trial testimony (Exhibits A and B to his report);
Boughigian – CV, list of articles and prior testimony and hourly rates;
Zipes – CV, hourly rates; and
Kessler – Appendix A and B to his report.

If any of you can provide us with this information, I would appreciate it.

Thanks.

Kay D. Hanson
Paralegal
5664 South Green Street
Salt Lake City, UT 84123
(801) 266-0999

1

kay@sjatty.com

*This communication may be attorney-client privileged or otherwise confidential. If you are not the intended recipient, please delete this message and notify the sender of this error.*

**From:** David Wales [mailto:davidw@blbglaw.com]
**Sent:** Monday, July 15, 2013 3:22 PM
**To:** Kay Hanson; Brian Vines; Eric H. Weinberg; Kenneth Lougee
**Cc:** Brett Van Benthysen; Kristin Meister
**Subject:** RE: Vioxx - Boghigian

From a very quick read I am concerned about one change, that appears to have been mechanically made throughout the report. That is changing "Class Period" to "1997 through September 29, 2004." That is not correct in the context of this report, and perhaps other reports. Boghigian is a marketing expert who is testifying about the marketing and promotion of vioxx, which was during the class period – May 1999 through September 2004. He can't be opining on the marketing of vioxx before it was approved and started to be sold. The references to promotion and marketing of vioxx outside of the class period – which is identical to the dates vioxx was on the market -- must be switched back. You obviously shouldn't use the term class period, but the dates must be the dates that vioxx was on the market. We will carefully review and follow up with you on the reports. Dvaid

**From:** Kay Hanson [mailto:Kay@sjatty.com]
**Sent:** Monday, July 15, 2013 4:52 PM
**To:** David Wales; Brian Vines; Eric H. Weinberg
**Cc:** Kenneth Lougee; Brett Van Benthysen; Kristin Meister
**Subject:** RE: Vioxx - Boghigian

Counsel –

Here is the regular and red-lined report of Boghigian.

Kay D. Hanson
Paralegal
5664 South Green Street
Salt Lake City, UT  84123
(801) 266-0999
kay@sjatty.com

*This communication may be attorney-client privileged or otherwise confidential. If you are not the intended recipient, please delete this message and notify the sender of this error.*

**From:** David Wales [mailto:davidw@blbglaw.com]
**Sent:** Monday, July 15, 2013 2:16 PM
**To:** Kay Hanson; Brian Vines
**Cc:** Kenneth Lougee; Eric H. Weinberg; Brett Van Benthysen; Kristin Meister
**Subject:** RE: Vioxx - Kessler Report

Kay:  As I mentioned to Eric, I am traveling on business this week and would appreciate if you could include Brett Van Benthysen and Kristin Meister of my office on future e-mails. I have included them on this e-mail. Thanks, David

**From:** Kay Hanson [mailto:Kay@sjatty.com]
**Sent:** Monday, July 15, 2013 4:01 PM
**To:** David Wales; Brian Vines
**Cc:** Kenneth Lougee; Eric H. Weinberg
**Subject:** Vioxx - Kessler Report

Counsel –

I have attached a final red-line version and no red-line version of Kessler's expert report.

Kay D. Hanson
Paralegal
5664 South Green Street
Salt Lake City, UT  84123
(801) 266-0999
kay@sjatty.com


*This communication may be attorney-client privileged or otherwise confidential.  If you are not the intended recipient,
please delete this message and notify the sender of this error.*

**Kay Hanson**

| | |
|---|---|
| **From:** | Eric Weinberg <eweinberg55@gmail.com> |
| **Sent:** | Monday, July 15, 2013 8:52 PM |
| **To:** | Kenneth Lougee |
| **Cc:** | Eric H. Weinberg; Kay Hanson |
| **Subject:** | Re: Vioxx Expert Disclosures |

Hare Wynn

Sent from my iPhone

On Jul 15, 2013, at 10:40 PM, Kenneth Lougee <Kenneth@sjatty.com> wrote:

> Who is Matt Minner?  Hare Wynn?  He is not with David Wales' group is he?
>
> Kay is ready to stay late Wednesday.
>
> I'll get Madigan securities report done in the morning.  Do you want me on the phone with Kessler?
>
> Joe might go home tomorrow.
>
> KDL
>
> **From:** Eric H. Weinberg [mailto:ehw@erichweinberg.com]
> **Sent:** Monday, July 15, 2013 8:33 PM
> **To:** Brett Van Benthysen; Kay Hanson; David Wales; Brian Vines
> **Cc:** Kristin Meister; Kenneth Lougee
> **Subject:** RE: Vioxx Expert Disclosures
>
> Thanks Brett.
>
> I've been in touch with Dr. Woodward.  He is happy to work with me again, but needs your okay.  Would you kindly let him know?
>
> Best,
>
> Eric
>
> **From:** Brett Van Benthysen [mailto:brett@blbglaw.com]
> **Sent:** Monday, July 15, 2013 7:06 PM
> **To:** Kay Hanson; Eric H. Weinberg; David Wales; Brian Vines
> **Cc:** Kristin Meister; Kenneth Lougee
> **Subject:** RE: Vioxx Expert Disclosures
>
> Kay,
>
> Attached is the combined PDF of the Kessler report.  This contains Appendices A-C and Schedules 1-3.
>
> **From:** Kay Hanson [mailto:Kay@sjatty.com]
> **Sent:** Monday, July 15, 2013 5:30 PM

1

**To:** Eric H. Weinberg; David Wales; Brian Vines
**Cc:** Brett Van Benthysen; Kristin Meister; Kenneth Lougee
**Subject:** Vioxx Expert Disclosures

Counsel –

I am missing some disclosures for each of the experts we are handling as follows:

Woodward – CV and a list of deposition and trial testimony (Exhibits A and B to his report);
Boughigian – CV, list of articles and prior testimony and hourly rates;
Zipes – CV, hourly rates; and
Kessler – Appendix A and B to his report.

If any of you can provide us with this information, I would appreciate it.

Thanks.

Kay D. Hanson
Paralegal
5664 South Green Street
Salt Lake City, UT  84123
(801) 266-0999
kay@sjatty.com

*This communication may be attorney-client privileged or otherwise confidential.  If you are not the intended recipient, please delete this message and notify the sender of this error.*

**From:** David Wales [mailto:davidw@blbglaw.com]
**Sent:** Monday, July 15, 2013 3:22 PM
**To:** Kay Hanson; Brian Vines; Eric H. Weinberg; Kenneth Lougee
**Cc:** Brett Van Benthysen; Kristin Meister
**Subject:** RE: Vioxx - Boghigian

From a very quick read I am concerned about one change, that appears to have been mechanically made throughout the report.  That is changing "Class Period" to "1997 through September 29, 2004."  That is not correct in the context of this report, and perhaps other reports.  Boghigian is a marketing expert who is testifying about the marketing and promotion of vioxx, which was during the class period – May 1999 through September 2004.  He can't be opining on the marketing of vioxx before it was approved and started to be sold.  The references to promotion and marketing of vioxx outside of the class period – which is identical to the dates vioxx was on the market -- must be switched back.  You obviously shouldn't use the term class period, but the dates must be the dates that vioxx was on the market.  We will carefully review and follow up with you on the reports.  Dvaid

**From:** Kay Hanson [mailto:Kay@sjatty.com]
**Sent:** Monday, July 15, 2013 4:52 PM
**To:** David Wales; Brian Vines; Eric H. Weinberg
**Cc:** Kenneth Lougee; Brett Van Benthysen; Kristin Meister
**Subject:** RE: Vioxx - Boghigian

Counsel –

Here is the regular and red-lined report of Boghigian.

Kay D. Hanson
Paralegal
5664 South Green Street
Salt Lake City, UT  84123
(801) 266-0999
kay@sjatty.com


*This communication may be attorney-client privileged or otherwise confidential.  If you are not the intended recipient, please delete this message and notify the sender of this error.*


**From:** David Wales [mailto:davidw@blbglaw.com]
**Sent:** Monday, July 15, 2013 2:16 PM
**To:** Kay Hanson; Brian Vines
**Cc:** Kenneth Lougee; Eric H. Weinberg; Brett Van Benthysen; Kristin Meister
**Subject:** RE: Vioxx - Kessler Report

Kay:  As I mentioned to Eric, I am traveling on business this week and would appreciate if you could include Brett Van Benthysen and Kristin Meister of my office on future e-mails.  I have included them on this e-mail.  Thanks, David

**From:** Kay Hanson [mailto:Kay@sjatty.com]
**Sent:** Monday, July 15, 2013 4:01 PM
**To:** David Wales; Brian Vines
**Cc:** Kenneth Lougee; Eric H. Weinberg
**Subject:** Vioxx - Kessler Report

Counsel –

I have attached a final red-line version and no red-line version of Kessler's expert report.

Kay D. Hanson
Paralegal
5664 South Green Street
Salt Lake City, UT  84123
(801) 266-0999
kay@sjatty.com


*This communication may be attorney-client privileged or otherwise confidential.  If you are not the intended recipient, please delete this message and notify the sender of this error.*

**Kay Hanson**

| | |
|---|---|
| **From:** | Eric H. Weinberg <ehw@erichweinberg.com> |
| **Sent:** | Tuesday, July 16, 2013 4:09 AM |
| **To:** | Kenneth Lougee; Kay Hanson; Diane Weinberg; Leslie Davis-Primo; Patty Borgstedt |
| **Subject:** | Emailing: report of david kessler md.pdf |
| **Attachments:** | report of david kessler md.pdf |

<<report of david kessler md.pdf>>
Note he references Appendix C cases he has appeared in and expert fees.
I think there is an MDL Order that governs expert reports.

Fees, CVs, and recent testimony must be provided.


Your message is ready to be sent with the following file or link
attachments:

report of david kessler md.pdf


Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file
attachments.  Check your e-mail security settings to determine how attachments are handled.

**Kay Hanson**

| | |
|---|---|
| **From:** | Eric H. Weinberg <ehw@erichweinberg.com> |
| **Sent:** | Tuesday, July 16, 2013 4:09 AM |
| **To:** | Eric H. Weinberg; Kenneth Lougee; Kay Hanson; Diane Weinberg; Leslie Davis-Primo; Patty Borgstedt |
| **Subject:** | RE: Emailing: report of david kessler md.pdf |

Sorry Appendix B referenced in Paragraph 3.

-----Original Message-----
From: Eric H. Weinberg
Sent: Tuesday, July 16, 2013 6:09 AM
To: 'Kenneth Lougee'; Kay Hanson; Diane Weinberg; Leslie Davis-Primo; Patty Borgstedt
Subject: Emailing: report of david kessler md.pdf

Note he references Appendix C cases he has appeared in and expert fees.
I think there is an MDL Order that governs expert reports.

Fees, CVs, and recent testimony must be provided.

Your message is ready to be sent with the following file or link
attachments:

report of david kessler md.pdf

Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file
attachments.  Check your e-mail security settings to determine how attachments are handled.

**Kay Hanson**

| | |
|---|---|
| **From:** | Brian Vines <bvines@hwnn.com> |
| **Sent:** | Tuesday, July 16, 2013 6:15 AM |
| **To:** | Kay Hanson |
| **Cc:** | Kenneth Lougee; Eric H. Weinberg |
| **Subject:** | Re: Vioxx - Kessler Report |

Gentlemen,

A few comments.  "Patents" is misspelled on the 3rd line of paragraph 42.

I noticed he took out the more detailed complaints about the NEJM article.  Paragraphs 40-51 in the KY/LA report.  Is there a reason we don't want to add that back into this report--it is good evidence on a false rep both for your false claims case and our consumer protection claim.  That said, I know he had some concerns about the endpoints and the removal of this may be related to that.

The 6th line in paragraph 73 has a sentence that begins "And in that study...."--seems to be a typo, doesn't make sense.

What do you think about adding back in paras 64-81 from the KY/LA report.  A few paragraphs from this are in the securities report, but a majority are missing.

Call me if you have any questions.

Brian



Brian Vines  *A t t o r n e y*
BIRMINGHAM   LITTLE
ROCK   LEXINGTON
1-800-568-5330

On Jul 15, 2013, at 4:01 PM, Kay Hanson <kay@sjatty.com> wrote:

Counsel –

I have attached a final red-line version and no red-line version of Kessler's expert report.

Kay D. Hanson
Paralegal
5664 South Green Street
Salt Lake City, UT  84123
(801) 266-0999
kay@sjatty.com

*This communication may be attorney-client privileged or otherwise confidential.  If you are not the intended recipient, please delete this message and notify the sender of this error.*

<Red-lined Kessler Report (00310576).DOCX><Kessler Report w-o red-line (00310672).DOCX>

Exhibit B

# EXHIBIT B

## Trial Testimony in the Last Four Years

*Eli Lilly and Co. v. Actavis Elizabeth LLC et al.*
U.S. District Court, District of New Jersey, No. 07-3770 (DMC) (MF)
May 27, 2010

*UCB Manufacturing, Inc. v. Tris Pharma, Inc., et al.*
Superior Court of New Jersey Chancery Division, Middlesex County Docket,
No. MID-L-200-10
December 14, 2010

*Allergan, Inc. v. Barr Laboratories, Inc., et al.*
U.S. District Court, District of Delaware, No.09-333-SLR-MPT (Consolidated Action)
February 4, 2011

*Pronova Biopharma Norge AS v. Teva Pharmaceuticals USA, Inc. et al.*
U.S. District Court, District of Delaware, No. 09-286-SLR-MPT
April 6, 2011

*AstraZeneca Pharmaceuticals LP and AstraZeneca UK Ltd v. Anchen Pharmaceuticals, Inc. et al.*
U.S. District Court, District of New Jersey,
Nos. 10-cv-1835 (JAP)(TJB), 10-cv-4203 (JAP)(TJB), 11-cv-2484  (JAP)(TJB), 10-cv-4205 (JAP)(TJB), 10-cv-4971 (JAP)(TJB), 10-cv-05519 (JAP) (TJB), 11-cv-2483 (JAP)(TJB)
October 13, 2011

*Endo Pharmaceuticals Inc., et al. v. Watson Laboratories, Inc. et al.*
U.S. District Court, District of Delaware, No. 10-138 (GMS)
February 9, 2012

*Schering Corp. v. Apotex, Inc. and Apotex Corp.*
U.S. District Court, District of New Jersey, No. 09-6373 (PGS) (TJB)
April 16, 2012

*Janssen Pharmaceuticals, Inc. et al. v. Watson Laboratories, Inc. et al.*
U.S. District Court, District of New Jersey, No. 08-5103 (SRC)
June 5, 2012

*Allergan, Inc. and Duke University v. Apotex Inc. et al.*
U.S. District Court, Middle District of North Carolina,
Nos. 1:10-CV-681, 1:11-CV-298, CV1:11-CV-650
November 20, 2012

*Cadence Pharmaceuticals, Inc. and SCR Pharmatop v. Paddock Laboratories Inc. et al.*
U.S. District Court, District of Delaware, No. 11-733-LPS
July 9, 2013


## Deposition Testimony in the Last Four Years:

*Adams Respiratory Therapeutics, Inc., et al. v. Perrigo Co. et al.*
U.S. District Court, Western District of Michigan, Southern Division, No. 1:07-CV-0993-GJQ
November 4, 2009

*Smithkline Beecham Corporation d/b/a GlaxoSmithKline v. Barr Laboratories, Inc.*
U.S. District Court, District of Delaware, No. 08-112-SLR
November 23, 2009

*Forest Laboratories, Inc., et al. v. Lupin Pharmaceuticals, Inc. et al.*
U.S. District Court, District of Delaware, No.08-21-GMS-LPS Consolidated
January 15, 2010

*Medeva Pharma Suisse A.G. and Procter & Gamble Pharmaceuticals, Inc. v. Roxanne Laboratories, Inc.*
U.S. District Court, District of New Jersey, No. 07 CV 5165 (FLW) (TJB)
January 27, 2010

*Endo Pharmaceuticals, Inc. & Penwest Pharmaceuticals Co. v. Impax Laboratories, Inc. et al.*
U.S. District Court, District of New Jersey, No. 09-cv-831-KSH-PS
February 26, 2010

*Janssen Pharmaceuticals, Inc. et al. v. Watson Laboratories, Inc. et al.*
U.S. District Court, District of New Jersey, No. 08-5103 (SRC)
August 25, 2010

*Eli Lilly and Company and the Trustees of Princeton University v. TEVA Medicines Parenteral Medicines, Inc. et al.*
U.S. District Court, District Of Delaware, No. 08-335 (GMS)
September 8, 2010

*UCB Manufacturing, Inc. v. Tris Pharma, Inc. et al.*
Superior Court of New Jersey, Chancery Division, Middlesex County, No. MID-L-200-10
November 29, 2010

*Allergan, Inc. v. Barr Laboratories, Inc. et al.*
U.S. District Court, District of Delaware, No. 09-333-SLR-MPT
January 5, 2011

*Alcon Research, Ltd., et al. v. Barr Laboratories, Inc.*
U.S. District Court, Southern District of Indiana (Indianapolis), No. 1:09-cv-00026-RLY-JMS
January 14, 2011

*Pronova Biopharma Norge AS v. Teva Pharmaceuticals, et al.*
U.S. District Court, District of Delaware,
Nos. 09-304-SLR-MPT, 09-286-SLR-MPT, 09-305-SLR-MPT
February 10, 2011

*Bayer Schering Pharma AG & Bayer Healthcare Pharmaceuticals, Inc. v. Lupin, Ltd. and Lupin Pharmaceuticals, Inc.*
U.S. District Court, District of Nevada, No. 2:10-CV-0166-KJD-RJJ
April 27, 2011

*Sunovion Pharmaceuticals Inc. v. TEVA Pharmaceuticals USA, Inc. et al.*
U.S. District Court, District Of New Jersey, No.09-1302 (DMC)(MF)
May 18, 2011

*Alcon Research, Ltd. v. Barr Laboratories Inc. et al.*
U.S. District Court, District of Delaware, No. 09-0318-LDD
May 26, 2011

*Merck & Co., Inc., and Merck Sharp & Dohme Corp. v. Sandoz Inc.*
U.S. District Court, District of New Jersey, Nos. 2:10-cv-01625, 2:10-02308-SRC-PS
July 1, 2011

*AstraZeneca Pharmaceuticals LP and AstraZeneca UK Ltd v. Anchen Pharmaceuticals, Inc. et al.*
U.S. District Court, District of New Jersey.
Nos. 10-cv-1835 (JAP)(TJB), 10-cv-4203 (JAP)(TJB), 11-cv-2484  (JAP)(TJB), 10-cv-4205 (JAP)(TJB), 10-cv-4971 (JAP)(TJB), 10-cv-05519 (JAP) (TJB), 11-cv-2483 (JAP)(TJB)
July 19, 2011

*Bone Care International LLC and Genzyme Corporation v. Roxane Laboratories, Inc. et al.*
U.S. District Court, District of Delaware, No. 09-cv-285 (GMS) (consolidated)
August 19, 2011

*Endo Pharmaceuticals Inc. et al. v. Watson Laboratories, Inc. et al.*
U.S. District Court, District of Delaware, No. 10-138 (GMS)
October 26, 2011

*Pfizer Inc. et al. v. Teva Parenteral Medicines, Inc. et al.*
U.S. District Court, District of Delaware, No. 10-cv-37 (GMS)
November 2, 2011

*Schering Corp. v. Apotex, Inc. and Apotex Corp.*
U.S. District Court, District of New Jersey, No. 09-6373 (PGS) (TJB)
December 13, 2011

*Pfizer Inc., Pharmacia & Upjohn Company LLC and Pfizer Health AB v. Impax Laboratories, Inc./Mylan, Inc. and Mylan Pharmaceuticals, Inc./Sandoz Inc.*
U.S. District Court, District of New Jersey, Nos. 08-CV-2137 (DMC)(JAD), 10-CV-3246 (DMC)(JAD), 10-CV-3250 (DMC)(JAD) (consolidated)
June 19, 2012

*Allergan Inc. and Duke University v. Apotex Inc. et al.*
U.S. District Court, Middle District of North Carolina,
Nos. 1:10-CV-681, 1:11-CV-298, CV1:11-CV-650
July 17, 2012

*GlaxoSmithKline (f/k/a SmithKlineBeecham Corporation) v. Anchen Pharmaceuticals, Inc. et al.*
U.S. District Court, District of Delaware, No.11-cv-046 (RGA) (MPT) (consolidated)
August 3, 2012

*Gilead Sciences, Inc. and Emory University v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries, Ltd.*
U.S. District Court, Southern District of New York, No. 08-CV-10838 (RJS)
August 24, 2012

*Purdue Pharma, L.P. et al. v. Ranbaxy Inc. et al.*
U.S. District Court, Southern District Of New York, No. 1:11-CV-07104
August 31, 2012

*Prometheus Laboratories Inc., v. Roxane Laboratories Inc., et al.*
U.S. District Court, District Of New Jersey, Nos. 11-0230 (FSH) (PS), 11-1241 (FSH) (PS)
October 10, 2012

*Prometheus Laboratories Inc. v. Roxane Laboratories Inc.*
U.S. District Court, District Of Maryland, No. 11 CV 2466
March 7, 2013

*Cadence Pharmaceuticals, Inc. and SCR Pharmatop v. Paddock Laboratories, Inc. et al.*
U.S. District Court, District Court of Delaware, No. 11-733-LPS
June 22, 2013

*The Estate of Serlander Faye, et al. v. Pfizer Inc. et al.*
Superior Court of the State of California, County of San Bernardino, Rancho Cucamonga Court
Case No. CIVRS1202062
June 24, 2013

# HARRY C. BOGHIGIAN

7 Tudor Place                                                    23850  Via Italia Circle Suite 406
Randolph, NJ 07869-2020                                          Bonita Springs, Florida 34134
Cell: 973-476-6591                                               Office: 239 221-8351
E-Mail: Hcbog@pharmaconsultantsllc.com                          E-Mail: Hcbog@aol.com

Policy level Senior Executive and Operating Officer with extensive experience in general management, sales, marketing, direct to consumer advertising, strategic planning and business execution.  Demonstrated record of accomplishment in exceeding business targets and producing impressive business results.  A driving passion for delivering incremental value.  Strong analytical skills with broad experience in developing and leading high performance teams.  A creative, high energy, versatile and action oriented business leader providing broad perspective, change leadership and desired outcomes.

## EXPERIENCE

PBN PHARMA LLC, Chicago, IL                                                      2003-
**President**

PHARMA CONSULTANTS LLC, Randolph, NJ                                             2001-
**President**

ROCHE PHARMA, INC., Nutley, NJ                                                   1995-2001
**Vice President, Business Operations**
**Vice President, Marketing**
**Vice President, Southern Business Operations**

HOFFMANN-LA ROCHE, Toronto, Canada                                              1991-1994
**Sr. Vice President & General Manager, Roche Pharmaceuticals, Canada**

HOFFMANN-LA ROCHE, Basel, Switzerland                                           1989-1991
**Group Director & Global Business Representative**

ROCHE LABS, Nutley, NJ                                                          1984-1989
**Product Director**
**Regional Sales Director**
**Manager, Market Research**

HOFFMANN-LA ROCHE, Nutley, NJ                                                   1971-1984
**Division Sales Manager,** FL
**Sales Representative,** MA, NH, ME

## ACCOMPLISHMENTS

- Significant general management and operations experience.
- Recognized Industry leader in field sales and marketing.
- Proven track-record of leadership inspiring people to over-achieve.
- Created and built high performance teams and enhanced organizational structure.
- Consistently identified and developed hidden revenue opportunities into development and commercialized prescription products.
- Revitalized the most successful co-promotion arrangement in history of the pharmaceutical industry.
- Consistently applauded for achieving revenue and profit targets.
- Successfully managed small and large pharmaceutical organizations.
- Significant experience in integration of corporate acquisitions.

# HARRY C. BOGHIGIAN

Page Two

PBN PHARMA LLC, Chicago, IL
**President**
Research & Development Company focused on the marketing, licensing and divestiture of patented prescription and over-the-counter healthcare products covering a wide range of therapeutic areas PBN has a number of patented and patent pending products in various stages of development. Therapeutic areas include skin care, pain management and drug delivery systems. PBN introduced its first product in 2011..

PHARMA CONSULTANTS LLC, Randolph, NJ
**President**
Specializing in developing and consulting on strategies and tactics for prescription, OTC, and healthcare related products. Custom work servicing advertising agencies, biotech, pharmaceutical and health related companies and expert reports for international law firms on behalf of their clients.

ROCHE PHARMA, INC., Nutley, NJ
**Vice President Business Operations**
Profit and Loss responsibility for Business Operations representing Eastern half of United States with revenues in excess of $1 billion and 55% of corporate revenues.  Managed a $130 million operating budget and refined execution of product strategies and tactics.  Established expectations for hiring, managing, training and personal development of a 900 member field sales organization located within 10 regional business unit offices.  Served as a member of the Business Operating Group, Business Strategic Forum, Strategic Alignment Steering Committee, Business Planning Process Committee and SB / Roche Steering Committee, Transformation 2000 Task Force.

- Driving force in Sales Force Transformation 2000 Project resulting in record productivity for managers and representatives.
- Recognized outpatient opportunities for prescribing of Rocephin IV and IM in Michigan, New York and Ohio resulting in three million dollars in incremental revenue and basis for national strategy to be implemented fourth quarter 2001.
- Achieved record levels in new prescription growth with Xenical (42.5%) and Tamiflu (74.6%) by implementing strategy of high frequency call activity and diverse programs on a limited target audience.
- Created Business Development Specialist to focus on non-traditional business customers capitalizing on untapped markets.
- Established enhanced focus on customer service with representative and account managers, resulting in several million dollars in incremental revenue.
- Developed and promoted three Business Unit Directors to Vice President.

**Vice President U.S. Marketing**
Corporate officer with total responsibility for re-building and reenergizing the marketing department, development of market strategies, 5 year revenue plans, and consulting with President and CEO on status of pharmaceutical business.  Responsible for $2.3 billion portfolio of products.  Sales increased 20% annually.

- Reorganized and staffed Marketing Intelligence, Career Training and Development, Sales Administration, Marketing, Promotion and Communications Department.
- Created and staffed first New Product Development & Planning, Consumer Marketing Leadership Center, Strategic Product Life Extension Group and Promotional Budget Management Departments.
- Directed hiring 60 high-grade individuals within 18-month period resulting in a First Class fully resourced Marketing Department totaling 270 full time and 45 full time contract employees in print department.
- Developed and implemented innovative strategies which delayed generic competition of Ticlid for 18 months representing an incremental $175 million in revenues.
- Created Marketing Operating Committee that successfully oversaw day-to-day operations of product marketing teams and service departments resulting in greater efficiencies and program synergies.
- Created and implemented extensive communication program and vision of "Becoming the Most Formidable Marketing Department in the Industry."

# HARRY C. BOGHIGIAN

Page Three

- Supervised the development of standards for numerous job functions related to budget and brand-lifecycle management.
- Developed comprehensive five-year revenue plans and strategies for major brands and presented them to Chairman and CEO.
- Successfully launched Posicor, Tasmar, Versed Syrup, Rocephin AOM, and Xenical (then the third most successful launch in pharmaceutical history).  Oversaw Tamiflu launch plans.
- Supervised operating budget in excess of $50 million and promotional budgets of over $343 million resulting in a $12 million savings the first year and a $22 million savings in second year.
- Primary Care revenues grew 20% annually in '97 and '98 closing revenue gap of $250 million due to Posicor withdrawal from market and delay in Xenical introduction.
- Developed strategies and tactics, which slowed generic erosion of products off patent and provided $10.5+ million in incremental revenues.
- Directed development of Klonopin to Zydis Drug Delivery System - launching 4Q 2001. Estimate first twelve months revenue at $55 million.

**Vice President – Southern Business Operations**
One of four senior executives that created and executed a new pharmaceutical business model for U.S. pharmaceutical business.  Successful achievement of aggressive revenue and profit targets.

- Successfully launched five new products in 12 months and achieved revenue targets of $1.3 billion, a 16% increase.
- Installed and staffed twenty business unit offices across U.S.
- Created and implemented job descriptions, performance expectations and standards for entire pharmaceutical business operations group.
- Convinced senior management to add 56 incremental representatives in seven southern states with net return of $3 to 1. Became model for national expansion.

**HOFFMANN-LA ROCHE**, Toronto, Canada
**Sr. Vice President and General Manager Roche Pharmaceuticals Canada**
General manager of pharmaceutical business responsible for sales, marketing, regulatory affairs, new business development, medical, professional services, federal and provincial government affairs, pricing, health economics, contracting, revenue growth, business expenses and profit and loss.  Sales increased 82%.

- Hired new head of marketing and sales and reorganized management team.
- Created and chaired Marketing Board, a body of five department heads responsible for success of pharmaceutical business.
- Oversaw development of strategies and tactics resulting in successful launch of Mobiflex, Inhibace and Mannerix.
- Increased Rocephin sales 25% by hiring health economist and instituting a contracting program for hospitals.
- Successfully increased overall sales 82%.
- Integrated Syntex Pharmaceutical into Roche Organization resulting in a new company budget of $225 million and reorganized sales force.

**HOFFMANN-LA ROCHE**, Basel, Switzerland
**Group Director & Global Business Representative**
Responsible for revenue forecasts strategies and tactic of marketed and developmental compounds in cardiovascular, metabolic, gastrointestinal, central nervous system and oral anti-infectives.

- Responsibility for development worldwide Xenical lifecycle forecast and US market development plans.
- Convinced global R&D to spend additional $9.5 million in two additional arms of the phase three studies of Xenical resulting in an incremental $50 million.

# Exhibit C

**List of Relied on Materials**

**Deposition Exhibits**

| Exhibit No. |
|---|
| PX 37 |
| PX 43 |
| PX 96 |
| PX 98 |
| PX 109 |
| PX 227 |
| PX 236 |
| PX 251 |
| PX 277 |
| PX 256 |
| PX 346 |
| PX 379 |
| PX 386 |
| PX 393 |
| PX 408 |
| PX 411 |
| PX 413 |
| PX 414 |
| PX 522 |
| PX 564 |
| PX 570 |
| PX 583 |
| PX 592 |
| PX 594 |
| PX 596 |
| PX 601 |
| PX 632 |
| PX 645 |
| PX 647 |
| PX 648 |
| PX 649 |
| PX 650 |
| PX 651 |
| PX 652 |
| PX 653 |
| PX 654 |
| PX 655 |
| PX 656 |
| PX 657 |

| PX 658 | |
|--------|--|
| PX 659 | |
| PX 660 | |
| PX 661 | |
| PX 662 | |
| PX 663 | |
| PX 664 | |
| PX 665 | |
| PX 666 | |
| PX 667 | |
| PX 668 | |
| PX 669 | |
| PX 670 | |
| PX 671 | |
| PX 672 | |
| PX 673 | |
| PX 674 | |
| PX 675 | |
| PX 676 | |
| PX 677 | |
| PX 678 | |
| PX 679 | |
| PX 680 | |
| PX 681 | |
| PX 682 | |
| PX 683 | |
| PX 684 | |
| PX 697 | |
| PX 749 | |
| PX 750 | |
| PX 751 | |
| PX 752 | |
| PX 753 | |
| PX 754 | |
| PX 755 | |
| PX 756 | |
| PX 757 | |
| PX 758 | |
| PX 759 | |
| PX 760 | |
| PX 761 | |
| PX 762 | |
| PX 763 | |
| PX 764 | |
| PX 765 | |

| PX 766 |
|--------|
| PX 767 |
| PX 768 |
| PX 769 |
| PX 770 |
| PX 771 |
| PX 772 |
| PX 773 |
| PX 774 |
| PX 775 |
| PX 776 |
| PX 777 |
| PX 778 |
| PX 779 |
| PX 780 |
| PX 781 |
| PX 805 |
| PX833 |
| PX835 |
| PX836 |
| PX874 |
| PX888 |

## Statutes

21 C.F.R. § 201.56(d)(1) (2001)

21 C.F.R. § 201.57(c)(6) (2013)

21 C.F.R. § 201.57(e) (2001)

21 C.F.R. § 201.57(f)(1) (2001)

21 C.F.R. § 201.57(f)(2) (2001)

21 C.F.R. § 201.57(e)(i) (2001)

## Bates-stamped Documents

DDBEP_0009200-07
DDBP_0015964-978
DDBP_0035210-259

DDBP_0044256-57
FDACDER001464-66
FDACDER001467-69
FDACDER004169-184
MRK-AAA0030199
MRK-AAB0004452-4561
MRK-AAB0069345-46
MRK-AAC0051453-56
MRK-AAC0052248
MRK-AAC0053171-3231
MRK-AAC0055642-45
MRK-AAC0063502-03
MRK-AAC0065829-835
MRK-AAC0066447-49
MRK-AAC0066501-04
MRK-AAC0070537-541
MRK-AAC0074599-4620
MRK-AAC0083124-3368
MRK-AAC0160550-56
MRK-AAC0168688-8704
MRK-AAC0176851-6910
MRK-AAD0076243
MRK-AAD0079039-079
MRK-AAD0079118-124
MRK-AAD0082951-52
MRK-AAD0087890-894
MRK-AAD0088760
MRK-AAD0093866-69
MRK-AAD0093882-88
MRK-AAD0093951-53
MRK-AAD0212705
MRK-AAD0235358
MRK-AAD0375318-371
MRK-AAF0007145-161
MRK-AAF0007788-7802
MRK-AAO0000001-034
MRK-AAO0000035-072
MRK-AAO0000073-118
MRK-AAR0010111-126
MRK-AAR0012310-332
MRK-AAR0019769-772
MRK-AAR0019773-786
MRK-AAR0033237-243
MRK-AAR0073265-296
MRK-AAV0000033-35
MRK-AAV0000041-42
MRK-AAW0000052-0186
MRK-AAW0000192
MRK-AAX0002432-445
MRK-AAX0002587-590
MRK-ABC0000206

MRK-ABC0017378-7416
MRK-ABD0001756-762
MRK-ABD0002793-2834
MRK-ABH0014114-18
MRK-ABI0000771-72
MRK-ABI0001176-186
MRK-ABI0001471-484
MRK-ABI0001741-761
MRK-ABI0002760-782
MRK-ABI0002784-86
MRK-ABI0002837-854
MRK-ABI0008659-683
MRK-ABI0009490
MRK-ABI0011181-1237
MRK-ABI0016928-979
MRK-ABK0077352-365
MRK-ABK0489433-34
MRK-ABO0000454-57
MRK-ABS0399305
MRK-ABT0004674-681
MRK-ABW0000001-0142
MRK-ABW0001101-177
MRK-ABW0001459-1995
MRK-ABW0002015-17
MRK-ABW0002068-094
MRK-ABW0002605-08
MRK-ABW0003552-56
MRK-ABW0003557
MRK-ABW0003780-81
MRK-ABW0003782-84
MRK-ABW0004736
MRK-ABW0005215-225
MRK-ABW0005518-548
MRK-ABW0007165-7234
MRK-ABW0008875-77
MRK-ABW0011184-86
MRK-ABW0011191-95
MRK-ABW0011403-414
MRK-ABW0011492-96
MRK-ABW0011577-78
MRK-ABW0011662-66
MRK-ABW0011778-782
MRK-ABW0012152-53
MRK-ABW0012258-261
MRK-ABW0012589-592
MRK-ABW0014170-73
MRK-ABW0014176-79
MRK-ABW0014720-22
MRK-ABW0018469-477
MRK-ABW0018648
MRK-ABW0800024-031

MRK-ABX00063928-937
MRK-ABX0016403-404
MRK-ABX0023993-94
MRK-ABX0026188-192
MRK-ABX0028316-332
MRK-ABX0032612-654
MRK-ABX0049073-077
MRK-ABX0061219-220
MRK-ABX0061265-1389
MRK-ABX0077456
MRK-ABX0084244-246
MRK-ABY0000468-472
MRK-ABY0002197-99
MRK-ACB0004855-864
MRK-ACB0005735-759
MRK-ACB0010878-0903
MRK-ACB0010963-970
MRK-ACB0013410-428
MRK-ACB0018462-8570
MRK-ACB0033062-63
MRK-ACB0037464-68
MRK-ACC0138571
MRK-ACD0000670-75
MRK-ACD0072710-746
MRK-ACI0008524-25
MRK-ACI0011148-159
MRK-ACI0012401-419
MRK-ACJ0000564-573
MRK-ACJ0000574-583
MRK-ACJ0000584-588
MRK-ACJ0000629-688
MRK-ACR0009278-79
MRK-ACT0021849-867
MRK-ACW0003291
MRK-ACW0022303-05
MRK-ACX0007252-273
MRK-ACX0014553-565
MRK-ACX0027855-880
MRK-ACY0001137-39
MRK-ACZ0004265-280
MRK-ACZ0007648-674
MRK-ACZ0007693-7700
MRK-ACZ0015449-460
MRK-ACZ0067184
MRK-ACZ0096689-6756
MRK-ADA0005691-5704
MRK-ADA0007601
MRK-ADA0012047-055
MRK-ADA0016992-17030
MRK-ADA0024925-960
MRK-ADA0024992-25039

MRK-ADA0029300-323
MRK-ADA0034761-773
MRK-ADA0035309-329
MRK-ADA0037004-022
MRK-ADA0038573-8601
MRK-ADA0038602-660
MRK-ADA0038661-8706
MRK-ADA0038710-772
MRK-ADA0038773-8859
MRK-ADA0050440-0512
MRK-ADA0057409-420
MRK-ADA0058133
MRK-ADA0066419-464
MRK-ADA0066465-6528
MRK-ADA0067198-7203
MRK-ADA0067433-34
MRK-ADA0070433-444
MRK-ADA0070823-872
MRK-ADA0077154-156
MRK-ADA0094268-272
MRK-ADB0002216-222
MRK-ADB0014928
MRK-ADB0030586-596
MRK-ADB0048990-49017
MRK-ADB0051121-136
MRK-ADB0056939-993
MRK-ADB0057053-064
MRK-ADB0057567-578
MRK-ADB0057940-952
MRK-ADB0059242-255
MRK-ADB0068431-441
MRK-ADB0093336-3403
MRK-ADB0094192-4226
MRK-ADB0095101-5309
MRK-ADB0096763-6831
MRK-ADB0109819
MRK-ADC0022249-270
MRK-ADF0005430
MRK-ADF0005441
MRK-ADF0009094-9125
MRK-ADF0014787-4823
MRK-ADF0018568-8623
MRK-ADF0018918-941
MRK-ADF0046262-68
MRK-ADG0009420-21
MRK-ADG0009638-668
MRK-ADG0014170-73
MRK-ADG0030345-46
MRK-ADG0033592-3618
MRK-ADG0054348-4401
MRK-ADG0058344-378

MRK-ADH0012509-510
MRK-ADH0019583
MRK-ADH0020853-859
MRK-ADH0036265
MRK-ADI0001910-14
MRK-ADI0018923-29
MRK-ADJ0009895-9935
MRK-ADM0003086-3127
MRK-ADM0003846-867
MRK-ADM0003921-941
MRK-ADM0004366-4401
MRK-ADM0020081-097
MRK-ADM0031049-088
MRK-ADM003921-941
MRK-ADM0040828-850
MRK-ADM0047418-471
MRK-ADM0052147-187
MRK-ADM0080285-0432
MRK-ADM0087418-7503
MRK-ADM0133234-272
MRK-ADM0143306-07
MRK-ADM0143308-09
MRK-ADM0183622
MRK-ADN0000001
MRK-ADN0000792
MRK-ADN0000841
MRK-ADN0000900
MRK-ADN0002565-571
MRK-ADN0002859-873
MRK-ADN0003597-3631
MRK-ADN0003663-3735
MRK-ADN0004267
MRK-ADN0004435
MRK-ADN0004441
MRK-ADN0004974-05009
MRK-ADN0005520-559
MRK-ADN0006423-446
MRK-ADN0006627-643
MRK-ADN0009760-68
MRK-ADN0009769-782
MRK-ADN0009833-844
MRK-ADN0009848-894
MRK-ADN0010041-062
MRK-ADN0014798-4809
MRK-ADN0016973-17043
MRK-ADN0025543-556
MRK-ADN0027557-7607
MRK-ADN0027750-780
MRK-ADN0034604-613
MRK-ADN0035382
MRK-ADN0035395

MRK-ADN0035691
MRK-ADN0038238
MRK-ADN0039800-835
MRK-ADN0040010
MRK-ADN0063887-3908
MRK-ADN0063909-918
MRK-ADN0083686-6768
MRK-ADN009515-9941
MRK-ADN0095914-941
MRK-ADN0104125-149
MRK-ADN0110155-0231
MRK-ADN0113977-78
MRK-ADN0114029-030
MRK-ADN0114031-058
MRK-ADN0116691-6712
MRK-ADN0123963-979
MRK-ADN0135618-627
MRK-ADN0140042-050
MRK-ADN0162007-031
MRK-ADN0171519-520
MRK-ADN0171521-548
MRK-ADN0171549-552
MRK-ADN0182686-696
MRK-ADN0206209
MRK-ADN0207062
MRK-ADN0207063-074
MRK-ADO0013528
MRK-ADO0023551-3672
MRK-ADO0049503-586
MRK-ADO0104464-65
MRK-ADO0104466-470
MRK-AEH0014446-455
MRK-AFI0017386-7403
MRK-AFI0036540
MRK-AFI0041841
MRK-AFI0044569-596
MRK-AFI0044998-99
MRK-AFI0174637
MRK-AFI0182292-93
MRK-AFI0209513-14
MRK-AFI0210648-655
MRK-AFI0254745-760
MRK-AFI0275211-257
MRK-AFJ0011104-09
MRK-AFO0146169-180
MRK-AFO0301701
MRK-AFO0320236
MRK-AFT0007691-7740
MRK-AFX0002548-551
MRK-AGB0000319-342
MRK-AGO0025863