## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Vioxx | *  MDL Case No. 1657 |
| | * |
| PRODUCTS LIABILITY | *  SECTION L |
| LITIGATION | * |
| | *  JUDGE FALLON |
| *This document relates to* | * |
| | *  MAGISTRATE JUDGE |
| ***Dennis R. Harrison v. Merck Sharp & Dohme Corp.,*** | *  KNOWLES |
| **2:07-cv-00905-EEF-DEK** | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT MERCK SHARP & DOHME CORP.'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendant Merck Sharp & Dohme Corp. respectfully moves this Court to enter summary judgment pursuant to Federal Rule of Civil Procedure 56 in Defendant's favor on all of Plaintiff Dennis Harrison's claims.  Merck is mindful of the fact that Mr. Harrison has, on various occasions, advised the Court that he is currently experiencing health issues, and is not able to address issues in this litigation expeditiously.  For several months now, we have carefully considered the timing of filing this motion, in light of Mr. Harrison's health, and have ultimately concluded that, unfortunately, we cannot determine whether there may be any date that is more propitious than any other.  While Mr. Harrison has indicated that he needs time to conduct discovery against Merck, we note that two of the three grounds on which this motion is based do not require any such discovery.  If we are right on either of these two points,  much time and expense on discovery would be saved by all parties.  Finally, we appreciate that, given the state of his health, Mr. Harrison may need  additional time to respond to this motion, well beyond the normal timetable for briefing that has governed this MDL proceeding.  Nevertheless, Merck

1132872v1

submits this motion at this time so that the dispositive issues are framed for Mr. Harrison to address, and for the Court to consider, in due course.

## I.     BACKGROUND

Mr. Harrison suffers from a long history of disabling medical conditions pre-existing his use of Vioxx by many years.  In his Complaint, which he filed *pro se* on June 26, 2006, Mr. Harrison alleges that he suffered a broken femur on or about January 11, 2003, that the femur "did not heal correctly because of Vioxx . . . , and that efforts to fix the leg continued to fail and lead to a multitude of significant problems." *See* Ex. 1 (Compl.) ¶¶ 1, 11, 14.[1]

Summary judgment is appropriate as to Mr. Harrison's claims for three independently dispositive reasons:  First, Mr. Harrison can procure no evidence that he actually suffered the injury that he alleges in his Complaint—that is, there is no medical evidence that the healing of his femur fracture was insufficient or unduly prolonged in any fashion.[2]  Second, there is no scientific evidence that Vioxx interferes with bone healing in humans.  Finally, Mr. Harrison's claims are barred by New York's statute of limitations because he filed suit more than three years after the discovery of his alleged injury.  Each of these points is discussed in detail below.

---

[1]     All exhibits referenced herein are attached to Defendant's Statement of Material Facts As To Which There Is No Dispute, filed contemporaneously with this Motion.

[2]     Several years after he filed his Complaint, Mr. Harrison attempted to attribute additional alleged injuries to his Vioxx usage, including what he calls the "failure" of a 2001 spinal surgery and an undiagnosed wrist fracture or "disfigurement."  Neither of these alleged injuries is referenced in his Complaint or *Lone Pine* report (served in April 2009).  In his Plaintiff Profile Form ("PPF"), Mr. Harrison concedes that his 2003 femur-related injury is the "only allegation in this litigation," but notes that he would like the other alleged injuries to be considered "informally," including in connection with any settlement discussions.  Ex. 2 (Harrison PPF) at 5.  For purposes of resolving this Motion, Merck submits that these belatedly asserted injuries should not be considered at all.

1132872v1

A.    **General Medical History**

Dennis Harrison is a sixty-year old gentleman who has suffered from numerous debilitating medical conditions for the past several decades. Mr. Harrison's doctors have frequently characterized his medical history as a "long and complicated" one. *See* Ex. 3 (selected records from Benedictine Hospital) at 25-28; Ex. 4 (selected records from the New Hampshire NeuroSpine Institute) at 18; Ex. 5 (selected records from Paul B. Donovan, M.D.) at 508-11; 610-13.  Most significantly, in his 20s, Mr. Harrison was first diagnosed with ankylosing spondylitis. Ex. 6 (excerpts from Dennis Harrison deposition) at 53:1-19.  Ankylosing spondylitisis a degenerative form of inflammatory arthritis affecting the spine and major weight-bearing joints.  It can typically involve disabling inflammatory episodes and abnormal bone formation, leading to severe curvature of the spine and bony fusion of the hips, shoulders, jaw, and chest, as well as inflammation of the eyes. *See* Ex. 7 (Declaration of Nicholas Blavatsky, M.D.) ¶ 9.  The progression of Mr. Harrison's ankylosing spondylitis has been "very aggressive," causing dysfunction in his spine and in almost every major joint area in his body. Ex. 4 at 25.

In the mid-1990s, Mr. Harrison's condition began to deteriorate significantly and rapidly. In 1995, at age 42, Mr. Harrison underwent successive surgeries for total hip replacement in both hips due to "severe arthritic changes" and joint space narrowing consistent with ankylosing spondylitis. *See* Ex. 8 (selected records from the Hospital for Special Surgery) at 3, 18-19; Ex. 9 (selected records from Ridgewood Orthopedic Group) at 5; Blavatsky Decl. (Ex. 7) ¶ 10.  In 1998 and 1999, pain and stiffness in his spine and neck became increasingly severe.  At this time, he noted that "my neck is in constant, severe pain; my neck is immobile . . . stiff and sore 24 hours a day…constant pain, stiffness, & soreness—all day and night . . . ." Ex. 10 (selected records from the Social Security Administration) at 89-90.  Ultimately, his condition led Mr.

3

1132872v1

Harrison to seek social security benefits for total disability in 1998—five years before the femur fracture at issue in this matter, and before Vioxx was even available on the market. Blavatsky Decl. (Ex. 7) ¶ 11; Ex. 4 at 25; Ex. 10 at 89-98, 15; Ex. 11 (selected records from James L. Wise, M.D.) at 5-6. By November 1998, when he stopped working, he was noted to have lost seven and a half inches of height due to his condition. Ex. 10 at 89; Ex. 12 (selected records from Capital Region Orthopaedic Group) at 70.

In October 1999, Mr. Harrison underwent extensive cervical fusion surgery to treat increasing spinal deformity due to his ankylosing spondylitis. Ex. 12 at 18-20. This procedure involved the placement of a large metal plate at the back of his skull extending down to the C6 vertebra, so that his skull was mechanically fused to his cervical spine, resulting in extremely limited range of motion of the neck and head. Blavatsky Decl. (Ex. 7) ¶ 16. Less than two years later, in January 2001, Mr. Harrison underwent a second extensive spinal fusion surgery (reported to be 14 or more hours in duration), again aimed at correcting the curvature of his spine caused by his ankylosing spondylitis (sometimes known as a "hunchback" deformity). *See id.* ¶ 17; Harrison Tr. (Ex. 6) at 99:3-22; Ex. 12 at 28-32. During this second surgery, rods were inserted on both sides of his spinal column with accompanying screws and wires at almost each level of the spine, so that at this point, only seven of his twenty-four vertebral segments were left without instrumentation. Blavatsky Decl. (Ex. 7) ¶ 17; Ex. 12 at 28-32.

Mr. Harrison has since had multiple additional surgeries relating to his ankylosing spondylitis, including bilateral knee replacement and recent hand surgeries, and he has been told that he will need to have total replacement of both shoulders in the future. Ex. 13 (selected records from Orthopedic and Sports Medicine Specialists of Green Bay) at 90-91, 249-51; Ex. 9 at 8; Harrison Tr. (Ex. 6) at 140:10-143:24. In a May, 2003 certification provided to the Social

4

Security Administration, Mr. Harrison noted of his ankylosing spondylitis that his doctors had told him "there is no hope for disease reversal."[3]  Ex. 10 at 143.

In addition to his surgeries, Mr. Harrison's ankylosing spondylitis has been treated with numerous medications and procedures throughout the years, many of which carry risks of serious side effects—including medications and procedures that unquestionably have weakened his bones, and impaired their natural ability to regenerate, as well as medications that have increased his susceptibility to infection.  Most notably, for the past 20 years, Mr. Harrison has been treated with what one of his doctors called "massive" doses of prednisone, a corticosteroid medication which carries many well-known serious side effects, including prolonged healing, increased susceptibility to infection, hyperglycemia, and weakening of bones.  *See* Blavatsky Decl. (Ex. 7) ¶¶ 26, 27, 34; Ex. 9 at 10; Ex. 8 at 88-91.  Because of these potential side effects, several of his doctors have attempted to wean him off prednisone, and have counseled him about the risks of long term use.  *See* Ex. 14 (selected records from The Valley Hospital) at 44 ("Prednisone is definitely not the way to prevent [his ankylosing spondylitis  symptoms].  These patients do have difficulty healing[] but worse in the spine . . .  For long standing disease. I have urged him that he cannot be on prednisone.  [H]e cannot go intermittently with it.");  Ex. 12 at 2-3 ([H]e has also got a problem with prednisone usage because that makes the bones even weaker.");  Ex. 11 at 5-6 ("He certainly needs to decrease steroid use.").  Despite these warnings, Mr. Harrison has

---

[3]    Mr. Harrison's medical picture has been further complicated by a series of unfortunate accidents.  In addition to the fall causing his 2003 femur fracture, and a subsequent fall down stairs several weeks later that re-fractured his femur, which are discussed in detail in Section I.B *infra*, Mr. Harrison suffered an accident with falling machinery in a hardware store in the fall of 2000 (about a year after his first spinal surgery), which led to increased numbness in his neck. Ex. 12 at 72; Ex. 4 at 5-6.  Then, in February 2002, about a year after his second spinal surgery, Mr. Harrison was involved in a car accident, which caused a further decline in his back and spine symptomology, and appears to have caused the breakage of one of his spinal support rods.  Ex. 12 at 1-12.

rejected the attempts to decrease his prednisone usage. Not only has he steadfastly continued on prednisone, but he sometimes self-adjusts to a higher dose against express contrary medical advice. Ex. 14 at 357 ("despite speaking to him multiple times pt ↑ prednisone to 20mg every other day w/in days of leaving hospital"); Ex. 11 at 21-22 ("Unfortunately, he has increased his prednisone."); *id.* at 25 ("[S]elf adjustment of prednisone. We discussed again the concerns with continued use of prednisone and his osteopenia . . . .").

In connection with both of his 1995 hip replacement surgeries, Mr. Harrison received prophylactic radiation treatment to reduce the occurrence of additional abnormal bone formation in those joints. *See* Ex. 15 (selected records from Bellin Health) at 154-55; Ex. 10 at 62-63. Such treatment also contributes to compromised bone quality.[4] Blavatsky Decl. (Ex. 7) ¶ 33.

Starting in approximately 1998 through the time of his femur break in 2003, Mr. Harrison's ankylosing spondylitis was also treated with methotrexate, a form of chemotherapy that carries the risk of increased susceptibility to infection and anemia. Ex. 10 at 21; Ex. 3 at 25-28; Ex. 5 at 405-07; Blavatsky Decl. (Ex. 7) ¶ 34. In 2010, he was treated with infusions of Remicade, a biologic medication that also increases susceptibility to infection. Ex. 15 at 142, 185-87. Records suggest that at some point in time Mr. Harrison was treated with gold salts (a common treatment for rheumatoid arthritis), which reportedly caused him to develop nephropathy (kidney disease). Ex. 10 at 11.

Not surprisingly, Mr. Harrison has used a range of pain medications throughout the years to manage his ankylosing spondylitis symptoms, including various NSAIDs. *See* Harrison Tr. (Ex. 6) at 67:7-67:15; Ex. 4 at 16; Ex. 8 at 88-91. From approximately April 2000 to September

---

[4]    These radiation treatments were repeated for his June 2003 hip and femur surgery, and his bilateral knee replacements, discussed further *infra. See* Ex. 9 at 10-11; Ex. 13 at 88-89.

2004, Mr. Harrison was prescribed Vioxx, typically at a 50mg daily dose. [5]  *See* Ex. 16 (selected

pages from plaintiff-provided medical records) at 6.  During the time he took Vioxx, he

continued to take a number of additional pain medications, including the NSAIDs ibuprofen (in

"very high" doses) and Indocin, as well as Tylenol #4, oxycontin, and prednisone.[6]  *See* Ex. 12 at

1-3.

Mr. Harrison suffers from a number of additional medical conditions, some of which are

noted to be interrelated with his ankylosing spondylitis  (and/or the treatments for his ankylosing

spondylitis) and some independent.  By 1998, he had been diagnosed with osteoporosis, for

which he was prescribed Fosamax.  *See* Ex. 10 at 18, 21, 261-62 ("Indication: Osteoporosis.

Findings: Below normal bone mineralization; questionably increased risk of developing

osteoporotic fracture."); Ex. 12 at 1-2 ("[T]he guy has got thin bone, he has got osteoporosis, he

has also got a problem with prednisone usage because that makes bones even weaker."); Ex. 5 at

405-07.  In the 1990s, he suffered from episodes of iritis (inflammation of the iris) relating to his

AS.  *See* Ex. 10 at 10; Ex. 12 at 70-71.  From at least the 1980s through the present, he has

suffered from chronic anemia, also thought to be related to his ankylosing spondylitis.  *See* Ex.

12 at 68-69, 74-76; Ex. 4 at 16-17; Ex. 18 (selected records from Gustavo Morel, M.D.) at 7-8.

In 2009 or 2010, he was diagnosed with IgG kappa monoclonal gammopathy of unknown

significance (known as "MGUS"), a blood disorder that carries an increased risk of developing

the blood cancer multiple myeloma.  *See* Ex. 15 at 37-38; Harrison Tr. (Ex. 6) at 117:1-120:22.

---

[5]     Mr. Harrison has testified that Vioxx was effective for treating his pain.  Harrison Tr.
(Ex. 6) at 66:10-67:3 ("[I]t was a wonderful pain pill.  It was that.").

[6]     In addition to his extensive list of pain medications, Mr. Harrison took other medications
which had their own potential side effects.  These included Imipramine for the treatment of
depression, Klonopin for the treatment of anxiety, and Procrit for the treatment of anemia. Ex. 17
(selected records from Rehabilitation Hospital of the Cape and Islands) at 4-5; Ex. 12 at 1.  He
also continued to take methotrexate during this period, as discussed *supra.* Ex. 12 at 1.

Mr. Harrison has also had a number of episodes of chronic infection, suggesting an increased susceptibility to infection. *See* Blavatsky Decl. (Ex. 7) ¶ 34. His anemia, as well as his prednisone and methotrexate usage, exacerbates this predisposition to chronic infection. Blavatsky Decl. (Ex. 7) ¶¶ 34, 27.

In addition to an infection in his femur and hip area following the 2003 fracture that is at issue in this lawsuit (discussed in detail *infra*), Mr. Harrison has suffered several bouts of systemic sepsis (two in 2003 and one in 2009), and he developed a chronic biofilm staph infection of the knee following his 2009 knee replacements that persisted through 2012 or later. Ex. 10 at 76-77; Ex. 19 (selected records from St. Joseph's Hospital Wayne) at 2-3, 13-14, 39-40; Harrison Tr. (Ex. 6) at 158:13-20; Ex. 5 at 105-06; Ex. 13 at 252-53, 2-4, 244-47, 28; Ex. 15 at 1-3, 49, 185-87; Blavatsky Decl. (Ex. 7) ¶ 27. As a result of the 2009 infection, Mr. Harrison's physicians considered amputating his leg at the knee; and it was ultimately recommended that he remain on lifetime antibiotic treatment. Ex. 13 at 244-47; Harrison Tr. (Ex. 6) at 131:21-137:7.

**B.      The January 2003 Broken Femur: The Crux of Mr. Harrison's Complaint**

On January 9, 2003, as a result of an accident while walking on ice, Mr. Harrison fractured his right femur at the point where the bone met the prosthetic hip inserted in his 1995 hip replacement. The fracture was noted to be markedly displaced, spiral, and comminuted, meaning that many fragments of bone separated from each other. Ex. 3 at 16-18; *see also* Blavatsky Decl. (Ex. 7) ¶ 21. At the time of his accident, Mr. Harrison reported to emergency personnel that he was injured slipping on ice outside his home (in upstate New York), falling forward and landing directly on his right hip, and feeling a "snap."[7] Ex. 3 at 01-02, 06-07. He

---

[7]      In contrast to the contemporaneous description of the accident contained in his medical records, years later Mr. Harrison asserts that instead of his fall on the ice breaking the femur,

was admitted to Benedictine Hospital, and underwent surgery the following day with Dr.

William Null for an "open reduction and internal fixation of the right femur with a plate, screws

and cerclage wires." *Id*. at 16.  Because an internal fixation procedure was used, Mr. Harrison

did not require a cast, but he did require crutches.  Blavatsky Decl. (Ex. 7) ¶ 22.  He was

discharged home from the hospital on January 13, 2003. Ex. 3 at 16.

Ten days later, Mr. Harrison returned to see Dr. Null for follow up and removal of his

stitches.  Mr. Harrison's recovery appeared to be on track.  His right femur fracture was in correct

anatomical alignment, and he had "good range of motion" without any observed abnormalities.

Ex. 10 at 38.  Dr. Null specifically noted that the right femur was "healing." *Id.*  The only

problem observed by Dr. Null was Mr. Harrison's failure to follow the instructions to avoid

bearing weight on his right leg.  Dr. Null noted that Mr. Harrison had been placing

approximately 30%-40% of his weight on his right leg, against instructions. *Id.*  Dr. Null

cautioned Mr. Harrison about the importance of not bearing weight on his leg:  "My biggest

concern is the weightbearing.  I told him that he really needs to be off the leg more; ***otherwise,***

***this is going to fail*.**  *Id.* (emphasis added).

Mr. Harrison apparently did not follow this advice.  His failure to use crutches as

instructed continued. *Id.* at 39.  About a week or so after the favorable examination in which his

fracture had been observed to be healing, Mr. Harrison slipped and fell down the stairs while

running quickly to the door. *Id.*  Although Mr. Harrison observed that his leg started swelling

after this accident, he did not seek medical attention or even notify his physician.  Rather, he

---

Fosamax (a different Merck medication) caused his femur to spontaneously fracture, thereby
causing his fall. *See* Harrison Tr. (Ex. 6) at 201:9-204:11.  Notwithstanding the fact that Mr.
Harrison's femur fracture was not the type of "atypical" fracture that have been allegedly linked
to certain medications, Mr. Harrison has a separate lawsuit against Merck pending in New Jersey
state court relating to the femur fracture and his Fosamax usage. *Id.* at 209:3-7; 212:14-19.

9

appeared at the doctor's office two and a half weeks later, on February 20, with a swollen right

leg with notable deformities. *Id.* Radiographs taken that day indicated that Mr. Harrison had

"torn 2 of the 3 cerclage wires" used in his January surgery, and that one of the screws was also

angulated about 20 degrees. *Id.* Dr. Null's impression at that visit was (1) "Refracture of the

right femur," and (2) "Failure of fixation, secondary to trauma."[8] *Id.* Dr. Null was concerned

that Mr. Harrison's femur repair "may continue to fail without proper fixation," and he noted that

the best course of treatment may be the placement of a new long-stem prosthesis, which would

require extensive surgery. *Id.*

Five days later, on February 25, 2003, Mr. Harrison was admitted to the Albany Medical

Center to undergo a revision surgery on his right femur, performed by Dr. Paul Hospodar on

February 28, 2003. Ex. 20 (selected records from Albany Medical Center) at 1-2. During the

surgery, Dr. Hospodar found that the location of the femur fracture was acutely infected with

what was later determined to be enterococcus fecalis bacteria. *Id.* Thus, rather than proceed

with the revision surgery, Mr. Harrison's surgeon immediately turned his attention to treating the

infection. Dr. Hospodar removed all of the hardware (the wires, plate and screws) from the

original January surgery, and replaced the hardware with an antibiotic impregnated cemented

"spacer," intended as an interim measure to help clear the infection. *Id.* at 1-2, 28-29; *see*

Blavatsky Decl. (Ex. 7) ¶ 26. Mr. Harrison was also placed on a six week course of intravenous

---

8       Although the contemporaneous medical records clearly note the occurrence of a fall
down the stairs resulting in the refracture of his femur, years later Mr. Harrison denies that any
such fall took place. Rather, he describes a small, uneventful stumble: "I was walking down the
stairs, I did . . . have this little jerk motion and the crutch fell down the stairs." Harrison Tr. (Ex.
6) at 219:10-15. Based on this recast version of events, Mr. Harrison contends that the "little
jerk" was a result of poor healing: "I strongly feel that the poor healing kind of was starting to
let go and kind of like did you fall before or after." *Id.* at 220:1-5. Notwithstanding the medical
records documenting an x-ray and physical exam that showed a "healing" right femur fracture
prior to his fall on the stairs, Mr. Harrison contends that "it never was healing right." *Id.* at
220:6.

antibiotic treatment, and he was discharged to a nursing home on March 5, 2003, where he remained for the next several months to receive treatment for his infection and because of his decreased ability to ambulate. Ex. 20 at 2, 202-03; Ex. 12 at 21-23; Ex. 21 (selected records from Albany County Nursing Home) at 14, 350. Records from the nursing home indicate that after a return visit to the Albany Medical Center on March 13, 2003, Mr. Harrison reported that "[t]hey wanted to operate [to] take out the spacer," but "[he] told them [he] was not ready for an operation yet." Ex. 21 at 323.

By May, 2003, Mr. Harrison's infection appeared to be cleared, and he began discussing revision surgery for his femur and hip with Dr. Hospodar. *See* Ex. 12 at 15-16. Dr. Hospodar planned to schedule the surgery for June, pending one additional aspiration to check for lingering infection. *Id.* However, the follow-up aspiration was never scheduled, *id.* at 17, and the relationship between Dr. Hospodar and Mr. Harrison had begun to sour. On May 16, when Mr. Harrison returned to his nursing home from an office visit with Dr. Hospodar, he "verbalized disappointment and frustration with the doctor." Ex. 21 at 335. A few days later, Mr. Harrison requested that copies of his medical records from Dr. Hospodar be faxed to him so that he could get a second opinion. *Id.* By May 23, Mr. Harrison had determined that he would receive treatment in New Jersey from Dr. Pizzurro, the orthopedic surgeon who had performed his original right hip replacement in 1995. *Id.* at 335-36. He initially planned to travel to New Jersey to see Dr. Pizzurro on May 29. *Id.* at 337. However, that plan was delayed when his transportation fell through, and he was not able to schedule an appointment to see Dr. Pizzurro until late June. *Id.* at 339. Although Dr. Pizzurro had not yet examined Mr. Harrison or Mr. Harrison's records or offered any opinion as to his treatment options, Mr. Harrison told his nursing home personnel definitely on June 3 that he will be having surgery in New Jersey with

11

Dr. Pizzurro. *Id.* Around this same time, on June 5, 2003, Mr. Harrison apparently had a falling

out with the staff at Dr. Hospodar's office, leading the doctor to discharge Mr. Harrison from his

practice. Ex. 12 at 17 ("He has been quite belligerent to our staff . . . . We will continue to treat

him for at least the next 30 days or until he transfers his care to someone else.").

Ultimately, on June 23, 2003, Mr. Harrison was admitted to Valley Hospital in

Ridgewood, New Jersey under the care of Dr. Pizzurro. There he underwent course of pre-

operative radiation to prevent unwanted bone growth from surgery, and then on June 27, he had

surgery with Dr. Pizzurro for removal of his antibiotic prosthetic spacer, revision of his right

total hip replacement, and a cemented proximal femoral replacement. Ex. 9 at 10-11, 15, 30. He

was discharged from Valley Hospital to a rehabilitation facility on July 2, 2003. Ex. 10 at 44-46.

Though he was noted to be up and ambulating with a walker at the time of his discharge from

Valley Hospital, Ex. 14 at 13, Mr. Harrison's recovery from the June 27 surgery was

complicated by two episodes of sepsis unrelated to his earlier femur infection, one in July

stemming from a urinary tract infection and the other in September stemming from an infected

catheter. *See* Harrison Tr. (Ex. 6) at 158:17-20; 238:8-240:20; Ex. 5 at 449-51; Ex. 9 at 14; Ex.

19 at 13-14. By October 2003, Mr. Harrison had returned home, and within a week or two of

that he had resumed normal activities such as driving a car and shopping in a store. Ex. 19 at 12;

Harrison Tr. (Ex. 6) at 240:21-242:11. On December 10, 2003, Mr. Harrison reported to Dr.

Pizzurro that "overall he [wa]s very happy with [the] results [of his surgery.]" Ex. 9 at 11.

## C.    Procedural History of Mr. Harrison's Litigation

On June 26, 2006, Mr. Harrison filed his Complaint in New York state court, alleging

that Vioxx interfered with the healing of his right femur, broken in January 2003. *See* Ex. 1 ¶¶ 1,

11. Merck removed Mr. Harrison's lawsuit to federal court, and the case was transferred into

12

this MDL, over Mr. Harrison's objections.[9]  *See* Case No. 2:07-cv-00905-EEF-DEK, Rec. Doc.
1.

Shortly after his case was transferred into this MDL, Mr. Harrison inquired as to how he
could gain access to the document depository maintained by the Plaintiffs Steering Committee
("PSC") in the Vioxx litigation.  *See* Pretrial Order ("PTO") 25 (Rec. Doc. 11576) at 1.  In July
2007, in response to Mr. Harrison's inquiries, the Court issued PTO 25, which granted access to
the PSC's depository for the purposes of conducting document review.  *Id.*  Since then, Mr.
Harrison has had access to the millions of pages of documents produced by Merck in this
litigation.

On November 9, 2007, the Court issued PTO 28 (Rec. Doc. 12962), which imposed
certain discovery obligations in Mr. Harrison's case.  By its terms, the Order applied to cases,
like Mr. Harrison's, in which plaintiffs did not assert a myocardial infarction, stroke, or sudden
cardiac death.  PTO 28 at 1.  Among other requirements, PTO 28 required such plaintiffs to
produce a PPF and executed authorizations for the collection of medical records, certain medical
and pharmacy records, and a Rule 26(a)(2) case specific expert report (sometimes referred to as a
"*Lone Pine*" expert report).  *See* PTO 28 ¶II(A).  In Mr. Harrison's case, these materials were
due by July 2008.  *See* May 30, 2008 Order & Reasons (Rec. Doc. 14567) at 6.  By November
2008, Merck had not received any PTO 28 materials from Mr. Harrison.  Accordingly, pursuant
to Section II.D of PTO 28, Merck notified Mr. Harrison that it intended to seek dismissal of his
case if he did not cure his deficiencies, and ultimately in February 2009, Merck filed a motion

---

[9]    Mr. Harrison filed a motion to vacate the Judicial Panel on Multidistrict Litigation's
initial transfer order in October 2006, arguing that his lawsuit should not be included in the MDL
because it was not a "heart/CV" case.  *See* Ex. 22 (Harrison "Brief To Vacate" Conditional
Transfer Order) at 6.  The JPML denied his motion.  *See* Feb. 8, 2007 Transfer Order (Rec. Doc.
10001) at 1.

1132872v1

for an order to show cause why Mr. Harrison's case should not be dismissed. *See* Rec. Doc.

17840. Mr. Harrison opposed Merck's motion, arguing that because his lawsuit did not allege a

cardiovascular injury, the discovery requirements of PTO 28 should not apply to him, even

though the language of the Order said otherwise. *See* Tr. of Mar. 27, 2009 Hearing (Rec. Doc.

62718-3) at 5-6. At a hearing on March 27, 2009, the Court addressed Mr. Harrison by phone

and specifically directed him to produce his *Lone Pine* expert report or face dismissal of his case.

*See id.* at 6-7.

Mr. Harrison thereafter provided a *Lone Pine* report,[10] but by November 2010, he had

still failed to provide any of the other materials required by PTO 28, including a PPF and

authorizations for the collection of medical records. Merck again notified Mr. Harrison under

PTO 28 ¶II.D that it intended to seek dismissal of his case if he did not cure his deficiencies, and

Merck specifically requested that Mr. Harrison provide executed medical records

authorizations—a basic prerequisite in any typical personal injury action—so that it could collect

Mr. Harrison's medical records. *See* Merck's Feb. 10, 2011 Mot. to Show Cause (Rec. Doc.

61683) at 2-3. In response, Mr. Harrison re-asserted his argument that the PTO 28 requirements

should not apply to him because of the nature of his alleged injury, and he produced a partially

completed PPF and partially completed answers to interrogatories. From these documents, he

purposefully omitted key information, such as the names of his prescribing physicians and

information about his personal and family health history, and he did not provide the required

records collection authorizations. *See id.* at 3. Thus, Merck was unable to collect any medical

records relating to Mr. Harrison. Nor had Mr. Harrison provided any medical records of his

own. In February 2011, therefore, based on Mr. Harrison's affirmative refusal to provide

---

[10]     *See* discussion of *Lone Pine* report at section III.A, *infra.*

discovery materials, Merck again filed a motion for an order to show cause why his case should

not be dismissed under PTO 28. *See id.* Mr. Harrison sought and received several extensions to

his time to respond to Merck's motion, primarily based on delays caused by his ongoing health

problems. *See, e.g.*, Ex. 23 (Aug. 30, 2011 email from Harrison to Pistilli) at 1. Over the course

of many months thereafter, Mr. Harrison finally provided the materials required by PTO 28,

ultimately providing his completed PPF in September 2011, over three years after it was due.

*See* Ex. 2. Accordingly, Merck withdrew its motion. *See* Rec. Doc. 63471.

On May 15, 2012, the Court entered PTO 58, which set discovery deadlines for the

remaining cases in the Vioxx litigation. *See* Rec. Doc. 63842. With respect to Mr. Harrison's

case, the PTO 58 deadlines originally called for the close of fact discovery on November 1, 2012

and the submission of expert reports by plaintiff on November 16, 2012. *Id.* At Mr. Harrison's

request (and with Merck's consent), these deadlines were extended several times, ultimately

settling on deadlines of April 1, 2013 for completion of all fact discovery, April 18, 2013 for

submission of expert reports by plaintiffs, and May 17, 2013 for submission of expert reports by

Merck. *See* Rec. Doc. 64236. Notwithstanding the expert disclosure deadline in his case which

passed on April 17, 2013, Mr. Harrison has not served any expert reports. Merck served the

report of its expert, Dr. Blavatsky, on May 17, 2013, the deadline for defendant's expert

disclosures.[11] *See* Blavatsky Decl. (Ex. 7).

---

[11]     Expert testimony is required for Mr. Harrison to meet his burden of proving medical
causation in this case, and therefore, summary judgment is appropriate at this point based solely
on Mr. Harrison's failure to designate an expert within the time frame set by this Court. *See,
e.g.*, *Nealy v. U.S. Surgical Corp.*, 587. F. Supp. 2d 579, 586 (S.D.N.Y. 2009) (applying New
York law) ("Expert medical opinion evidence is usually required to show the cause of an injury
or disease because the medical effect on the human system of the infliction of injuries is
generally not within the sphere of the common knowledge of the lay person." (internal quotation
marks omitted)); *see also In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 616-18
(granting summary judgment where plaintiff's experts were excluded because with that

15

## II.    LEGAL STANDARD

Summary judgment should be granted whenever it becomes apparent that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the . . . Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). A party moving for summary judgment may discharge its burden to support the motion "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322. The burden of production then shifts to the nonmoving party to introduce specific facts showing there is a genuine issue for trial. *Id.* at 322-24; *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Moreover, "conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

---

exclusion, the plaintiff "lack[ed] an essential element of proof"). Although Mr. Harrison has indicated in correspondence with the Court and with Merck that he intends to seek a stay or an extension of the case management deadlines in his case, he has never filed a motion seeking such relief.

1132872v1

"The issue of whether a suit is time-barred is a question of law, which properly may be resolved at the summary judgment stage," so long as "there are no genuine issues of material fact in dispute." *In re Vioxx Prods. Liab. Litig.*, 522 F. Supp. 2d 799, 804 (E.D. La. 2007) (quoting *In re Minn. Mut. Life Ins. Co. Sales Practices Litig.*, 346 F.3d 830, 835 (8th Cir. 2003)).

## III.   ARGUMENT

### A.   Mr. Harrison Has Not Asserted A Cognizable Injury:  There is No Evidence of "Inadequate" or Unduly Prolonged Healing of Mr. Harrison's Femur Fracture.

The basis of Mr. Harrison's lawsuit is his claim that his January 2003 broken femur did not heal adequately as the result of his Vioxx use.  Ex. 1 ¶¶ 1, 14.  Yet there is no evidence in the record to support the allegation that he has actually suffered the injury he alleges, let alone to establish that Vioxx caused that injury.  The repair of his right femur and hip prosthesis was ultimately successful, *see, e.g., id.* ¶ 32, Ex. 9 at 11, and there is no evidence in the record that the healing of his femur was inadequate or unduly prolonged, particularly in light of the course of events established by the contemporaneous medical records.

Mr. Harrison fractured his femur on January 9, 2003 and he had surgery the following day. *See* Ex. 3 at 16-18.  The surgery involved an internal fixation procedure and the insertion of certain hardware. *Id.*  By January 23, 2003, based on x-rays and an examination conducted by his surgeon, Dr. Null, Mr. Harrison's fracture was demonstrably healing.  Ex. 10 at 38.  The only concerns expressed by Dr. Null was Mr. Harrison's failure to comply with instructions to avoid weightbearing, and his concern that such noncompliance would result in the procedure failing. *Id.*

Subsequent records reveal that Mr. Harrison continued his course of noncompliance, continued to avoid using his crutches as instructed, experienced a fall down the stairs which resulted in the refracture of his original injury, and failed to seek timely medical treatment. *Id.* at

17

Case 2:05-md-01657-EEF-DEK   Document 64510   Filed 07/25/13   Page 18 of 30

39. As a result, on February 20, 2003, Dr. Null concluded that Mr. Harrison had sustained a "Refracture of the right femur," and that his internal fixation was failing "secondary to trauma." *Id.* Dr. Null was concerned that Mr. Harrison's femur repair "may continue to fail without proper fixation," and he noted that the best course of treatment may be the placement of a new long-stem prosthesis, which would require extensive surgery. *Id.*

No medical professional has refuted these contemporaneous conclusions reached by Dr. Null.[12] Instead, Mr. Harrison—who has no medical training of any kind, *see* Harrison Tr. (Ex. 6) at 274:11-275:3—asserts years after the fact that the healing of his femur was disrupted by the use of Vioxx, an assertion that is contradicted by the medical records. The contemporaneous medical records from January 9, 2003 through February 20, 2003, do not support any conclusion that Mr. Harrison's bone healing was inadequate; according to these records, the fracture was healing appropriately until he re-fractured his femur when he slipped and fell down the stairs. On February 20, 2003, Dr. Null concluded that Mr. Harrison had re-fractured his femur. Although the subsequent repair and healing of that second fracture, including two bouts of sepsis acquired during the process, consumed another six months, it is clear that the length of this time bore no relationship to the rate that Mr. Harrison's bones were healing. *See* Blavatsky Decl. (Ex. 7) ¶¶ 32-35. When Mr. Harrison presented on February 28, 2003 for a revision surgery to repair his refractured femur, Dr. Hospodar discovered that Mr. Harrison had developed a bacterial infection in the relevant area. Ex. 20 at 1-2. Thus, medical efforts turned at that point toward eradicating the infection. That process took several months and involved a two-step procedure:

---

[12]     As discussed in more detail *infra*, Mr. Harrison's purported *Lone Pine* expert, Dr. Wise, did not examine or treat Mr. Harrison at the time of his femur fracture or during the healing process thereafter, nor did he recall reviewing Mr. Harrison's medical records from this period. Wise Tr. (Ex. 24) at 34:5-35:9; 48:17-49:6. Dr. Wise did not dispute these findings of Dr. Null; indeed, there is no indication that he was even aware of Dr. Null's conclusions when he signed Mr. Harrison's *Lone Pine* report. *Id.*

First, a temporary antibiotic-laden spacer was inserted to help clear the infection, followed by a multi-week course of intravenous antibiotics.  Once the infection was resolved, Mr. Harrison underwent the subsequent surgery to install the permanent orthopedic hardware for his hip and femur, which remains in place today.  Blavatsky Decl. (Ex. 7) ¶¶ 25-26.  Although there was some additional delay between when Mr. Harrison's infection cleared and when he was able to schedule his revision surgery, that was due to Mr. Harrison's decision to transfer his medical care from Dr. Hospodar in Albany to Dr. Pizzurro in New Jersey.  None of these facts relate to any alleged insufficiency in bone healing.  There is no evidence in the contemporaneous medical records indicating that any of his treating doctors viewed his healing process as inexplicably prolonged.  *See id.* ¶ 32.

As discussed above, Mr. Harrison has not submitted a Rule 26(a)(2) trial expert report as set forth in PTO 58, but he did previously submit a "*Lone Pine*" report pursuant to PTO 28.  This document was authored entirely by Mr. Harrison, but signed by one of his physicians, Dr. James Wise, in 2008.  *See* Harrison Tr. (Ex. 6) at 262:4-264:2; Ex. 25 (Nov. 28, 2008 Letter from Harrison to Wise).  Like the medical records, this document also presents no evidence of the existence of Mr. Harrison's alleged femur healing injury.  Dr. Wise, a rheumatologist, did not treat Mr. Harrison for his femur fracture; Mr. Harrison's first visit to Dr. Wise was not until November of 2003, many months after his final femur/hip surgery in June 2003.  *See* Ex. 24 (excerpts from the deposition of James Wise, M.D.) at 33:8-34:14; 24:16-25:17.  Though Dr. Wise signed a statement (drafted by Mr. Harrison) that he believed that a "reasonable degree of medical probability does exist in Mr. Harrison's case," that Vioxx caused the injury alleged, Dr. Wise did not express any opinion as to whether Mr. Harrison *had actually experienced* any insufficient bone healing in his femur.  *See id.* at 48:17-49:6.  Instead, he acknowledged at his

19

deposition that his understanding of Mr. Harrison's alleged bone healing injury was based entirely on Mr. Harrison's own representations. *Id.* Moreover, Dr. Wise's own treatment notes, which generally reference the history of the 2003 femur fracture, subsequent infection and related surgeries, do not mention any lack of bone healing, and he does not remember any specific instances when Mr. Harrison discussed any inadequate bone healing with him.[13] *Id.* at 49:7-50:1. Similarly, none of the other medical records produced for Mr. Harrison from 2003 make any mention of inadequate or delayed bone healing. Indeed, it is noteworthy that Mr. Harrison attempted to have his surgeon Dr. Pizzurro sign the report that Mr. Harrison had prepared, but Dr. Pizzurro declined to do so. Harrison Tr. (Ex. 6) at 268:17-18.

Mr. Harrison has the burden of proof to establish that he actually suffered the injury he alleges—an essential element of his claims against Merck. *See, e.g., Luna v. Am. Airlines,* 676 F. Supp. 2d 192, 198-99 (S.D.N.Y. 2009). While all inferences are to be drawn in his favor at the summary judgment stage, "[]for a reasonable inference to be drawn, . . . the summary judgment record must contain some sort of evidentiary basis to support the inference." *Congress Square Ltd. P'ship v. Polk*, Civ. Action No. 10–317, 2011 WL 83714, at *13 (E.D. La. Mar. 4, 2011) (Fallon, J.). Here, there is simply no evidence in the record upon which any such inferences could be reasonably drawn. Mr. Harrison's own unsupported assertions of an injury cannot defeat summary judgment. *See RSR Corp.*, 612 F.3d at 857. And not only are Mr.

---

[13]     The document signed by Dr. Wise is unreliable for numerous additional reasons and should be disregarded. Beyond the fact that Dr. Wise did not review any of Mr. Harrison's medical records (including the February 2003 records from Dr. Null documenting non-compliance with weight-bearing restrictions and the fall down the stairs) and did not recall doing any independent research to verify the information contained in the document authored by Mr. Harrison, Wise Tr. (Ex. 24) at 46:7-46:16; 48:7-48:16, he also testified that he interpreted the phrase "reasonable degree of medical probability" in that document to mean only "more than just pure chance." *Id.* at 47:9-47:22. Dr. Wise also did not express any opinion about the other alleged injuries Mr. Harrison has recently advanced, *i.e.*, the failure of his 2001 spinal surgery or his gradual wrist fracture or disfigurement. *See id.* at 56:12-57:4.

20

Harrison's assertions unsupported, they are contradicted by the contemporaneous statements he made to his treating physician at the time of his alleged injury. *Compare* Ex. 10 at 39 (Dr. Null in February 2003: "He also told me that 2-1/2 weeks ago he ran quickly to the door, because he thought his wife was having some trouble outside, and slipped and fell down the stairs. Since that time, he has noted swelling on the lateral aspect of his leg.") *with* Harrison Tr. (Ex. 6) at 218:21-220:15 (Nine years later, Mr. Harrison in October 2012: " . . . I was going down the stairs and I—I didn't fall down the stairs. I would have known that and that certainly would have hurt. But I believe he had written in his notes that I fell down the stairs. I didn't fall down any stairs."). It is well established that a nonmovant cannot defeat summary judgment by contradicting, without explanation, the nonmovant's previous statements in an attempt to manufacture a disputed material fact issue. *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223 (5th Cir. 1984); *see also Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236-37 (7th Cir. 1991) ("We have consistently held that a genuine issue of material fact cannot be established by a party contradicting his own earlier statements unless there is a plausible explanation for the incongruity.") .

On a motion for summary judgment, if the burden of proof at trial rests on the non-movant, "the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case." *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Celotex*, 477 U.S. at 322); *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986) ("If the moving party can show that there is no evidence whatever to establish one or more essential elements of a claim on which the opposing party has the burden of proof, trial would be a bootless exercise, fated for an inevitable result but at continued expense for the parties, the preemption of a trial date that might have been used for other litigants waiting

21

impatiently in the judicial queue, and a burden on the court and the taxpayers.").   In sum, between 2003 and 2006, no medical professional diagnosed, documented, or in any way commented upon any alleged delay in the healing of Mr. Harrison's femur.  The diagnosis of such an alleged delay comes solely from Mr. Harrison—a litigant with no medical training or expertise and someone who is not qualified to offer such an opinion.  Here, given the absence of any evidence in the medical records that Mr. Harrison actually experienced a cognizable injury, the absence of any opinion from an orthopedist that Mr. Harrison actually experienced any delay in the healing of his femur (or, indeed from any medical expert who actually reviewed Mr. Harrison's medical records or treated him for his femur fracture), and the fact that the doctor who did treat Mr. Harrison's femur refused to sign an opinion that any injury was attributable to Vioxx, he cannot meet his burden of proof at trial, and summary judgment should be granted.

**B.      There Is No Scientific Evidence That Vioxx Interferes with Bone Healing in Humans.**

Even if Mr. Harrison could support his claim that the healing of his femur was somehow "inadequate" (which he cannot), he cannot adduce any competent scientific evidence that Vioxx interferes with bone healing in humans.  The use of NSAIDs (the broader class of anti-inflammatory medications), including selective Cox-2 inhibitors (the subclass of NSAIDs that includes Vioxx), both before and after surgery is standard practice.  *See* Blavatsky Decl. (Ex. 7) ¶ 28.  While very few studies have been performed in humans to evaluate bone healing in relation to NSAIDs or selective Cox-2 inhibitors, the scientific literature relating to this question that does exist does not support a conclusion that Vioxx interferes with bone healing in humans.

With respect to Vioxx specifically, there have been two human studies relating to this question:  one investigating its effect on union of bone following spinal fusion surgery, and one investigating its effect on bone mineral density ("BMD").  The study involving spinal fusion

22

patients (Reuben *et al.* 2005 ) reported a retrospective review of 434 patients taking Vioxx, Celebrex (another Cox-2 selective NSAID) or ketorolac (a traditional, nonselective NSAID) on the incidence of non-union of bone following spinal surgery. *See* Blavatsky Decl. (Ex. 7) ¶ 29 and Ex. C thereto. After short term use (five days following surgery), there was no difference in the incidence of non-union for Vioxx compared to no NSAID use. *Id.* The authors therefore concluded that the short-term perioperative administration of Vioxx, Celebrex, or low-dose ketorolac "had no significant deleterious effect on nonunion." *Id.*

Regarding BMD (which is a different marker than bone healing, though also relating to bones), in its clinical trial program for Vioxx, Merck conducted what was known as Protocol 083, a randomized, prospective clinical study conducted in 305 patients with osteoarthritis to evaluate the effects of Vioxx and ibuprofen versus placebo on biomarkers of BMD and bone turnover. *See* Blavatsky Decl. (Ex. 7) ¶ 30 and Ex. D thereto. The results of that study did not show any clinically significant effects on bone between treatments. *Id.*[14] Thus, the available human data (from reliable, controlled clinical trials) does not suggest that Vioxx impairs bone healing or even leads to decreases in bone mineral density levels. Blavatsky Decl. (Ex. 7) ¶ 30.

---

[14]   In 2003, Murphy *et al.* reported the results of this study in an abstract presented at EULAR (the conference of the European League Against Rheumatism). *Id.* The authors observed that there is a conflicting body of literature derived from laboratory animal studies on this topic, some of which suggests a possible association between NSAIDs (that is, the class of NSAIDs generally, not specific to cox-2 inhibitors or to Vioxx in particular) and the delay or inhibition of bone healing, while others suggest no effect. *See* Blavatsky Decl. (Ex. 7) ¶¶ 28, 30, and Ex. C thereto at 507, 510. However, as these authors also point out, "[i]t is difficult to extrapolate data from animal studies to humans due to the differences in pharmacokinetics between species," and human studies are necessary to provide reliable evidence of a clinically relevant effect. *See* Blavatsky Decl. (Ex. 7) ¶¶ 28, and Ex. C thereto at 507; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) ("In order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans."). Moreover, there are methodological flaws with these animal studies in particular that detract from their reliability, including the administration of NSAIDs at doses greater than those approved for acute pain. Blavatsky Decl. (Ex. 7) Ex. C at 507.

Based on the existing body of scientific knowledge on this topic, Mr. Harrison is not able to adduce reliable scientific support for his argument that Vioxx interfered with the healing of his femur fracture.  It is also worth noting that at no point did any of Mr. Harrison's doctors who treated his femur injury attribute any ill effects to Vioxx, even when Mr. Harrison later approached them to express this opinion.  Indeed, as Dr. Pizzurro (the surgeon who performed the June 2003 surgery) noted, by 2008, Mr. Harrison was on "a mission to prove that Vioxx caused him his bone problem." Ex. 9 at 24.  Tellingly, though Mr. Harrison asked Dr. Pizzurro to sign the *Lone Pine* report he authored, Dr. Pizzurro declined.  *See* Harrison Tr. (Ex. 6) at 267:22-270:7.  Instead, as discussed above, that report was signed by Dr. Wise, who did not play any role in the treatment of Mr. Harrison's femur fracture, did not review any of Mr. Harrison's medical records relating to that injury, and did not recall reviewing any of the literature relating to Vioxx and bone healing prior to signing that document.  In brief, with no scientific basis to support Mr. Harrison's theory of medical causation, summary judgment should be granted for Merck.

### C.   Mr. Harrison's Claims are Time-Barred by New York's Three-Year Statute of Limitations.

Lastly—and independently fatal to his lawsuit—the applicable New York statute of limitations bars Mr. Harrison's claims against Merck because he did not file his lawsuit until months after the three-year limitations period had expired. [15]  Under New York law, product liability causes of action are subject to a three year statute of limitations. N.Y. C.P.L.R. §214-c.

---

[15]   Consistent with the choice-of-law analysis applied by this Court in previous Vioxx decisions, the applicable substantive law in this case is that of New York—the state where Mr. Harrison resided when he was prescribed Vioxx, when he ingested Vioxx, and when he was allegedly injured by the drug. *See In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 897, 905-06 (E.D. La. 2007); *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 455-58 (E.D. La. 2006); *In re Vioxx Prods. Liab. Litig.*, 448 F. Supp. 2d 741, 749 (E.D. La. 2006).

24

1132872v1

The statute of limitations for a claim of injury allegedly caused by the "latent effects" of exposure to a substance begins to run "from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier." *Id.* §214-c(2). The term "discovery" as provided for in the statute refers to the "discovery of the physical condition and not . . . the more complex concept of discovery of both the condition and the nonorganic etiology of that condition." *Matter of N.Y. Cnty. DES Litig.*, 678 N.E.2d 474, 478 (N.Y. 1997). In other words, the date of discovery is not "dependent upon the discovery of the **cause** of the injury," *Hedlund v. Cnty. of Tompkins*, 652 N.Y.S.2d 877, 879 (App. Div. 1997) (emphasis added); rather the limitations period begins to run when the plaintiff discovered or should have discovered the "primary condition on which the claim is based." *DES Litig.*, 678 N.E.2d at 475; *see also Searle v. City of New Rochelle,* 742 N.Y.S.2d 314, 316 (App. Div. 2002) ("A plaintiff's cause of action for damages resulting from exposure to toxic substances accrues when the plaintiff begins to suffer the manifestations and symptoms of his or her physical condition, *i.e.* when the injury is apparent, not when the specific cause of the injury is identified."); *Scheidel v. A.C. & S., Inc.,* 685 N.Y.S.2d 829, 831 (App. Div. 1999) ("The time period is, therefore, triggered by something less than a plaintiff's full awareness that he or she has been injured as the result of exposure to a toxic substance." (citing *Sweeney v. Gen. Printing, Inc.*, 621 N.Y.S.2d 132, 133 (App. Div. 1994))).

In this lawsuit, Mr. Harrison alleges that because of Vioxx, his January 9, 2003 femur fracture "did not heal and all its related implanted hardware 'broke apart' internally and was rendered useless." Ex. 1 ¶14. This failure of the hardware, he alleges, occurred by about the third week after his initial femur surgery, and was due to the alleged "inadequate bone healing."

25

*Id.* ¶ 27.  (Medical records indicate that the "broken" hardware was visible in x-rays on February 20, 2003.  Ex. 10 at 39.)  Mr. Harrison further alleges that at the time of his second operation (on February 28, 2003), his surgeon was unable to complete a femur repair because he encountered a "massive infection," also allegedly attributable to Vioxx because "broken bones left un-repaired are very susceptible to severe infection."  Ex. 1 ¶ 15.  According to Mr. Harrison, "[t]his would not have occurred had the routine operation (in Kingston[, NY on January 10, 2003]) . . . had sufficient bone repair."  *Id.*  In his PPF, he similarly argued that his femur became infected because the orthopedic hardware did not affix to his bone due to a lack of healing, which he attributes to Vioxx.  Ex. 2 at 54.  At his deposition, he testified that at the time of the second surgery (February 28, 2003), Dr. Hospodar "theorized that over that time frame infection came in because the bones just were not—they broke at the second or third week.  Things fell apart and infection crept in over those couple of weeks."  Harrison Tr. (Ex. 6) at 224:1-224:10.[16]  Mr. Harrison further alleged in his Complaint, though this is not reflected in the medical records, that he then spent several additional months in a nursing home between the second operation in February 2003 and the third operation in June 2003 "waiting for adequate bone repair," and that Dr. Hospodar "refused to operate" on him during this time "because of the problem of still having inadequate bone repair."  Ex. 1 ¶¶ 18, 29; *see also* Harrison Tr. (Ex. 6) at 228:8-228:24; 229:17-230:5.[17]  Mr. Harrison's own assertions, therefore, establish that he was well aware of

---

[16]     Notably, the "second or third week" coincides with the accident on the stairs that is noted in Mr. Harrison's medical records.  And, given that Mr. Harrison did not seek medical treatment for several weeks, any infection would have occurred during that period.  Moreover, the likelihood of any such infection occurring was exacerbated by Mr. Harrison's pre-existing anemia and his ongoing use of methotrexate and prednisone.  No infection of any kind was observed on January 23rd, only a "healing" femur fracture.  *See* section I.B *supra*.

[17]     The actual medical record belies these assertions.  Dr. Hospodar's records contain no reference to inadequate bone healing.  The records only document time spent waiting for the infection to clear prior to revision surgery.  *See* Ex. 12 at 15-16.  Moreover, while Dr. Hospodar

1132872v1

what he alleges was inadequate bone healing (and its alleged consequences, such as the hardware

"failure" and infection) by, at the latest, the time of his second operation on February 28, 2003

(the one that discovered an infection). The statute of limitations, therefore, began to run by

February 28, 2003 at the latest, and expired in February 2006. Yet Mr. Harrison did not file this

lawsuit until the end of June 2006. Accordingly, his claims are time-barred.[18]

In his PPF and at his deposition, Mr. Harrison explained that he did not actually come to

believe that Vioxx was responsible for his alleged inadequate bone healing until well after it

occurred. At some point after Vioxx was taken off the market (in September 2004), he

"happened to notice an article on the Internet" relating to Vioxx and bone healing, after which

point he began to research the issue, and he then determined that Vioxx had caused his alleged

injury.[19] Ex. 2 at 11; *see* Harrison Tr. (Ex. 6) at 256:20-257:5. But New York law is clear:

---

was apparently ready in May to schedule a surgery for Mr. Harrison pending one last check on
whether his infection had cleared, Mr. Harrison decided to transfer his care to a different doctor
in a different state who was unavailable to perform the final revision surgery until June 27, 2003.
*Id.* at 16-17; Ex. 9 at 10-11; Ex. 21 at 337-45.

[18]   His other supposed allegations regarding wrist fracture and/or disfigurement and the
"failure" of spinal surgery were discovered even earlier, in 2002. *See* Ex. 2 at 5.

[19]   New York law offers plaintiffs in toxic tort cases an alternative limitations period of one
year measured from the date of discovery of the cause of the injury, where discovery of the cause
of the injury occurs no later than five years after the discovery of the injury, and the plaintiff is
able to prove that "technical, scientific or medical knowledge and information sufficient to
ascertain the cause of [the] injury had not been discovered, identified or determined prior to the
expiration of the period within which the action or claim would have been authorized." C.P.L.R.
214-c(4); *see Burger v. Union Carbide Corp.*, 758 N.Y.S.2d 381, 382 (App. Div. 2003). But
even this exception does not save Mr. Harrison's claim. The burden is on the plaintiff "to aver
evidentiary facts showing that th[is] exception . . . applies." *Burger*, 758 N.Y.S.2d at 382
(quoting *Pompa v. Burroughs Wellcome Co.*, 696 N.Y.S.2d 587, 590 (App. Div. 1999)). The
articles and other materials cited by Mr. Harrison in his *Lone Pine* report that he believes support
of his claims, many of which date from *before* the time of his injury and were widely reported,
make it apparent that this exception does apply in his case. *See* Ex. 25 at 15, 18, 21 (citing
numerous articles from 2002 and 2003). In other words, to the extent that Mr. Harrison believes
these sources support his theory of medical causation (which they do not), they were equally
available to him at the time of his injury in 2003 as they were after the Vioxx withdrawal. No

discovery of the alleged *cause* of the injury is "not relevant"—"the limitations period begins to run when the plaintiff discovered or should have discovered the 'primary condition on which the claim is based,'" in this case, the allegedly inadequate healing of the January 2003 femur fracture. *Scheidel,* 685 N.Y.S.2d at 831 (quoting *DES Litig.*, 678 N.E.2d at 475). Moreover, the fact that, as Mr. Harrison emphasizes in his Complaint, he continued to suffer the effects of the alleged inadequate bone healing until at least the time of his third surgery on June 29, 2003, *see* Ex. 1 ¶¶ 21, 26, 32, does not prolong the statute of limitations. The limitations period began to run from the time that the alleged injury was or should have been first discovered, not from the time it was remedied. *See DES Litig.*, 678 N.E.2d at 475. Therefore, even assuming Mr. Harrison could adduce competent evidence to show that the healing of his femur was inadequate or that Vioxx played a role in any inadequate healing, which he cannot, his claims against Merck are foreclosed by New York's statute of limitations.

---

scientific discovery has come to light in the intervening years to substantiate Mr. Harrison's theory of causation, and therefore, the C.P.L.R. 214-c(4) exception is inapplicable here.

## CONCLUSION

For the foregoing reasons, Merck's Motion for Summary Judgment should be granted,

and Plaintiff Harrison's claims dismissed with prejudice.

Dated:  July 22, 2013

Respectfully submitted,

By: _____

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

—and—

Douglas R. Marvin
M. Elaine Horn
Emily Renshaw Pistilli
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax:    202-434-5029

Attorneys for Merck Sharp & Dohme Corp.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Motion for Summary Judgment has been served on Plaintiff Dennis Harrison by email and by Federal Express at:

> 601 W. Brown Street
> Iron Mountain, MA 49801

I also hereby certify that the above and foregoing Motion for Summary Judgment has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, upon Liaison Counsel Ann Oldfather by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 22nd day of July, 2013.

Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

1132872v1