UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Case No. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | SECTION L |
| LITIGATION | * | |
| | * | JUDGE FALLON |
| *This document relates to* | * | |
| | * | MAGISTRATE JUDGE |
| *Dennis R. Harrison v. Merck Sharp & Dohme Corp.,* | * | KNOWLES |
| *2:07-cv-00905-EEF-DEK* | * | |
| | * | |

*******************************************************************

### DEFENDANT MERCK SHARP & DOHME CORP.'S LR56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO DISPUTE

Pursuant to LR56.1, Defendant Merck Sharp & Dohme Corp. ("Merck"), by undersigned counsel, hereby submits the following statement of material facts as to which there is no genuine issue to accompany its Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56:

1. Plaintiff Dennis Harrison filed his Complaint against Merck, *pro se*, in the Supreme Court of Ulster County, New York, on June 26, 2006. Compl. (attached hereto as Ex. 1) at 1.[1]

2. In his Complaint, Mr. Harrison alleges that he suffered a broken femur on or about January 11, 2003, that the femur "did not heal correctly because of Vioxx . . . , and that efforts to fix the leg continued to fail and lead to a multitude of significant problems." *See* Ex. 1 ¶¶ 1, 11, 14.

3. Subsequent to the filing of his Complaint, Mr. Harrison has attempted to attribute several additional alleged injuries to his Vioxx usage, including what he calls the "failure" of a

---

[1] A Table of Exhibits is appended as Appendix I hereto for ease of reference.

2001 spinal surgery and an undiagnosed wrist fracture or "disfigurement." *See* Harrison Plaintiff Profile Form ("PPF") (attached hereto as Ex. 2) at 4-5. In his PPF, Mr. Harrison concedes that his 2003 femur-related injury is the "only allegation in this litigation," but notes that he would like the other alleged injuries to be considered "informally," including in connection with any settlement discussions. Ex. 2 at 5.

### General Medical History

4. Mr. Harrison's doctors have noted his medical history to be "long and complicated." *See* Benedictine Hospital records (selected pages attached hereto as Ex. 3) at 25-28; New Hampshire NeuroSpine Institute records (selected pages attached hereto as Ex. 4) at 18; Paul B. Donovan, M.D. records (selected pages attached hereto as Ex. 5) at 508-11; 610-13.

5. In his 20s, Mr. Harrison was first diagnosed with ankylosing spondylitis. Tr. of Oct. 23, 2012 deposition of Dennis Harrison ("Harrison Tr.") (excerpts of transcript attached hereto as Ex. 6) at 53:1-19.

6. Ankylosing spondylitis is a degenerative form of inflammatory arthritis affecting the spine and major weight-bearing joints, which can typically involve disabling inflammatory episodes and abnormal bone formation, leading to severe curvature of the spine and bony fusion of the hips, shoulders, jaw, and chest, as well as inflammation of the eyes. *See* Declaration of Nicholas Blavatsky, M.D. (attached hereto as Ex. 7) ¶ 9.

7. The progression of Mr. Harrison's ankylosing spondylitis has been noted to be "very aggressive," causing dysfunction in his spine and in almost every major joint area in his body. Ex. 4 at 25.

8. In 1995, at age 42, Mr. Harrison underwent successive surgeries for total hip replacement in both hips due to "severe arthritic changes" and joint space narrowing consistent

1132873v1

with ankylosing spondylitis. *See* Hospital for Special Surgery records (selected pages attached hereto as Ex. 8) at 3, 18-19; Ridgewood Orthopedic Group (selected pages attached hereto as Ex. 9) at 5; Blavatsky Decl. (Ex. 7) ¶ 10.

9. In 1998, Mr. Harrison noted on a medical form submitted to the Social Security Administration that "my neck is in constant, severe pain; my neck is immobile . . . stiff and sore 24 hours a day…constant pain, stiffness, & soreness – all day and night . . . ." Social Security Administration records (selected pages attached hereto as Ex. 10) at 89-90.

10. Mr. Harrison sought social security benefits for total disability relating to his ankylosing spondylitis beginning in 1998. Blavatsky Decl. (Ex. 7) ¶ 11; Ex. 4 at 25; Ex. 10 at 89-98, 15, 66; James L. Wise, M.D. records (selected pages attached hereto as Ex. 11) at 5-6.

11. Medical records from November 1998 noted that Mr. Harrison had lost seven and a half inches of height due to his condition. Ex. 10 at 89; Capital Region Orthopaedic Group (selected pages attached hereto as Ex. 12) at 70.

12. In October 1999, Mr. Harrison underwent extensive cervical fusion surgery to treat increasing spinal deformity due to his ankylosing spondylitis. Ex. 12 at 18-20. This procedure involved the placement of a large metal plate at the back of his skull extending down to the C6 vertebra, so that his skull was mechanically fused to his cervical spine, resulting in extremely limited range of motion of the neck and head. Blavatsky Decl. (Ex. 7) ¶ 16.

13. In January 2001, Mr. Harrison underwent a second extensive spinal fusion surgery (reported to be 14 or more hours in duration), again aimed at correcting the curvature of his spine caused by his ankylosing spondylitis. *See* Blavatsky Decl. (Ex. 7) ¶ 17; Harrison Tr. (Ex. 6) at 99:3-22; Ex. 12 at 28-32. During this second surgery, rods were inserted on both sides of his spinal column with accompanying screws and wires at almost each level of the spine, so

1132873v1

that only seven of his twenty-four vertebral segments were left without instrumentation. Blavatsky Decl. (Ex. 7) ¶ 17; Ex. 12 at 28-32.

14.     Mr. Harrison has since had additional surgeries relating to his ankylosing spondylitis, including bilateral knee replacement and recent hand surgeries, and he has been told that he will need to have total replacement of both shoulders in the future. Orthopedic and Sports Medicine Specialists of Green Bay records (selected pages attached hereto as Ex. 13) at 90-91, 249-51; Ex. 9 at 8; Harrison Tr. (Ex. 6) at 140:10-143:24.

15.     In a May, 2003 certification provided to the Social Security Administration, Mr. Harrison noted of his ankylosing spondylitis that his doctors had told him "there is no hope for disease reversal." Ex. 10 at 143.

16.     Mr. Harrison suffered an accident with falling machinery in a hardware store in the fall of 2000 (about a year after his first spinal surgery), which led to increased numbness in his neck. Ex. 12 at 72; Ex. 4 at 5-6.

17.     In February 2002, about a year after his second spinal surgery, Mr. Harrison was involved in a car accident, which caused a further decline in his back and spine symptomology, and appears to have caused the breakage of one of his spinal support rods. Ex. 12 at 1-12.

18.     For the past 20 years, Mr. Harrison has been treated with what one of his doctors called "massive" doses of prednisone, a corticosteroid medication which carries many well-known serious side effects, including prolonged healing, increased susceptibility to infection, hyperglycemia, and weakening of bones. *See* Blavatsky Decl. (Ex. 7) ¶¶ 26, 27, 34; Ex. 9 at 10; Ex. 8 at 88-91.

19.     Several of his doctors have attempted to wean him off prednisone, and have counseled him about the risks of long term use. *See* The Valley Hospital records (selected pages attached hereto as Ex. 14) at 44; Ex. 12 at 2; Ex. 11 at 5-6.

20.     Mr. Harrison has continued on prednisone, and he sometimes self-adjusts to a higher dose against express contrary medical advice. Ex. 14 at 357; Ex. 11 at 21-22, 25.

21.     In connection with both of his 1995 hip replacement surgeries, Mr. Harrison received prophylactic radiation treatment to reduce the occurrence of additional abnormal bone formation in those joints. *See* Bellin Health records (selected pages attached hereto as Ex. 15) at 154-55; Ex. 10 at 62-63. These radiation treatments were repeated for his June 2003 hip and femur surgery, and his bilateral knee replacements. *See* Ex. 9 at 10-11; Ex. 13 at 88-89. Such treatment can also contribute to compromised bone quality. Blavatsky Decl. (Ex. 7) ¶ 33.

22.     Starting in approximately 1998 through the time of his femur break in 2003, Mr. Harrison's ankylosing spondylitis was also treated with methotrexate, a form of chemotherapy that carries the risk of increased susceptibility to infection and anemia. Ex. 10 at 21; Ex. 3 at 25-28; Ex. 5 at 405-07; Blavatsky Decl. (Ex. 7) ¶ 34.

23.     In 2010, he was treated with infusions of Remicade, a biologic medication that also increases susceptibility to infection. Ex. 15 at 142, 185-87.

24.     Records indicate that at some point in time Mr. Harrison was treated with gold salts, which reportedly caused him to develop nephropathy. Ex. 10 at 11.

25.     Mr. Harrison has used a range of pain medications throughout the years to manage his ankylosing spondylitis symptoms, including NSAIDs. *See* Harrison Tr. (Ex. 6) at 67:7-67:15; Ex. 4 at 16; Ex. 8 at 88-91.

26.     From approximately April 2000 to September 2004, Mr. Harrison was prescribed Vioxx, typically at a 50mg daily dose. *See* plaintiff-provided medical records (selected pages attached hereto as Ex. 16) at 6. Mr. Harrison has testified that Vioxx was effective for treating his pain. Harrison Tr. (Ex. 6) at 66:10-67:3.

27.     During the time he took Vioxx, he continued to take a number of additional pain medications, including the NSAIDs ibuprofen and Indocin, as well as Tylenol #4, oxycontin, and prednisone. *See* Ex. 12 at 1-3.

28.     In addition to his pain medications, Mr. Harrison took other medications during this time, including Imipramine for the treatment of depression, Klonopin for the treatment of anxiety, and Procrit for the treatment of anemia. Rehabilitation Hospital of the Cape and Islands records (selected pages attached hereto as Ex. 17) at 4-5; Ex. 12 at 1. He also continued to take methotrexate during this period. Ex. 12 at 1.

29.     By 1998, Mr. Harrison was diagnosed with osteoporosis, for which he was prescribed Fosamax. *See* Ex. 10 at 18, 21, 261-62; Ex. 12 at 1-2; Ex. 5 at 405-07.

30.     In the 1990s, he suffered from episodes of iritis (inflammation of the iris) relating to his ankylosing spondylitis. *See* Ex. 10 at 10; Ex. 12 at 70-71.

31.     From at least the 1980s through the present, he has suffered from chronic anemia, also thought to be related to his ankylosing spondylitis. *See* Ex. 12 at 68-69, 74-76; Ex. 4 at 16-17; Gustavo Morel, M.D. records (selected pages attached hereto as Ex. 18) at 7-8.

32.     In 2009 or 2010, he was diagnosed with IgG kappa monoclonal gammopathy of unknown significance (known as "MGUS"), a blood disorder that carries an increased risk of developing the blood cancer multiple myeloma. *See* Ex. 15 at 37-38; Harrison Tr. (Ex. 6) at 117:1-120:22.

33. Mr. Harrison has also had a number of episodes of chronic infection: In addition to an infection in his femur and hip area following the 2003 fracture that is at issue in this lawsuit (discussed *infra*), Mr. Harrison has suffered several bouts of systemic sepsis (two in 2003 and one in 2009), and he developed a chronic biofilm staph infection of the knee following his 2009 knee replacements that persisted through 2012 or later. Ex. 10 at 76-77; St. Joseph's Hospital Wayne records (selected pages attached hereto as Ex. 19) at 2-3, 13-14, 39-40; Harrison Tr. (Ex. 6) at 158:13-20; Ex. 5 at 105-06; Ex. 13 at 252-53, 2-4, 244-47, 28; Ex. 15 at 1-3, 49, 185-87; Blavatsky Decl. (Ex. 7) ¶ 27.

34. As a result of the 2009 infection, amputation of his leg below the knee was considered, and it was recommended that he remain on lifetime antibiotic treatment. Ex. 13 at 244-47; Harrison Tr. (Ex. 6) at 131:21-137:7.

35. Predisposition to chronic infection can also be exacerbated by anemia, as well as by prednisone and methotrexate usage. Blavatsky Decl. (Ex. 7) ¶¶ 34, 27.

36. Mr. Harrison has never been diagnosed with a heart attack, stroke, congestive heart failure, peripheral artery disease, or any venous thromboembolism. *See* Harrison Tr. (Ex. 6) at 148:17-150:3.

### The January 2003 Broken Femur

37. On January 9, 2003, Mr. Harrison fractured his right femur at the point where the bone met the prosthetic hip inserted in his 1995 hip replacement. The fracture was noted to be markedly displaced, spiral, and comminuted, meaning that many fragments of bone separated from each other. Ex. 3 at 16-18; *see also* Blavatsky Decl. (Ex. 7) ¶ 21.

38. At the time of his accident, Mr. Harrison reported to emergency personnel that he was injured slipping on ice outside his home (in upstate New York), falling forward and landing directly on his right hip, and feeling a "snap." Ex. 3 at 01-02, 06-07.

39. He was admitted to Benedictine Hospital, and underwent surgery the following day with Dr. William Null for an "open reduction and internal fixation of the right femur with a plate, screws and cerclage wires." Ex. 3 at 16. Because an internal fixation procedure was used, Mr. Harrison did not require a cast, but he did require crutches. Blavatsky Decl. (Ex. 7) ¶ 22. He was discharged home from the hospital on January 13, 2003. Ex. 3 at 16.

40. Ten days later, Mr. Harrison returned to see Dr. Null for follow up and removal of his stitches. His right femur fracture was noted at that time to be in correct anatomical alignment, and he had "good range of motion" without any observed abnormalities. Ex. 10 at 38. Dr. Null specifically noted that the right femur was "healing." *Id.*

41. Dr. Null also noted that Mr. Harrison had been placing approximately 30%-40% of his weight on his right leg, against instructions. *Id.* Dr. Null cautioned Mr. Harrison about the importance of not bearing weight on his leg: "My biggest concern is the weightbearing. I told him that he really needs to be off the leg more; otherwise, this is going to fail." *Id.*

42. On February 20, 2003, Mr. Harrison again visited Dr. Null. *Id.* at 39. At that visit, he reported to Dr. Null that about a week or so after the favorable examination in which his fracture had been observed to be healing, he had slipped and fell down the stairs while running quickly to the door. *Id.* Although Mr. Harrison observed that his leg started swelling after this accident, he did not call and notify his physician. *Id.*

43. At the February 20 visit, Dr. Null observed that Mr. Harrison's right leg was swollen, with notable deformities. *Id.* Radiographs taken that day indicated that Mr. Harrison

1132873v1

had "torn 2 of the 3 cerclage wires" used in his January surgery, and that one of the screws was also angulated about 20 degrees. *Id.* Dr. Null's impression at that visit was (1) "Refracture of the right femur," and (2) "Failure of fixation, secondary to trauma." *Id.* Dr. Null was concerned that Mr. Harrison's femur repair "may continue to fail without proper fixation," and he noted that the best course of treatment may be the placement of a new long-stem prosthesis, which would require extensive surgery. *Id.*

44. Five days later, on February 25, 2003, Mr. Harrison was admitted to the Albany Medical Center to undergo a revision surgery on his right femur, performed by Dr. Paul Hospodar on February 28, 2003. Albany Medical Center records (selected pages attached hereto as Ex. 20) at 1-2. During the surgery, Dr. Hospodar found that the location of the femur fracture was acutely infected with what was later determined to be enterococcus fecalis bacteria. *Id.* Dr. Hospodar removed all of the hardware (the wires, plate and screws) from the original January surgery, and because of the infection, replaced the hardware with an antibiotic impregnated cemented "spacer," intended as an interim measure to help clear the infection. *Id.* at 1-2, 28-29; *see* Blavatsky Decl. (Ex. 7) ¶ 26.

45. Mr. Harrison was placed on a six week course of intravenous antibiotic treatment for the infection, and he was discharged to a nursing home on March 5, 2003, where he remained for the next several months. Ex. 20 at 2, 202-03; Ex. 12 at 21-23; Albany County Nursing Home records (selected pages attached hereto as Ex. 21) at 14, 350.

46. Records from the nursing home indicate that after a return visit to the Albany Medical Center on March 13, 2003, Mr. Harrison reported that "[t]hey wanted to operate [to] take out the spacer," but "[he] told them [he] was not ready for an operation yet." Ex. 21 at 323.

9

47. Records reflect that by May, 2003, Mr. Harrison's infection appeared to be cleared, and he began discussing revision surgery for his femur and hip with Dr. Hospodar. *See* Ex. 12 at 15-16. Dr. Hospodar planned to schedule the surgery for June, pending one additional aspiration to check for lingering infection. *Id.*

48. On May 16, when Mr. Harrison returned to his nursing home from an office visit with Dr. Hospodar, he "verbalized disappointment and frustration with the doctor." Ex. 21 at 335. A few days later, Mr. Harrison requested that copies of his medical records from Dr. Hospodar be faxed to him so that he could get a second opinion. *Id.*

49. By May 23, Mr. Harrison had determined that he would receive treatment in New Jersey from Dr. Pizzurro, the orthopedic surgeon who had performed his original right hip replacement in 1995. *Id.* at 335-36. He initially planned to travel to New Jersey to see Dr. Pizzurro on May 29. *Id.* at 337. This plan was delayed when his transportation fell through, and he was not able to schedule an appointment to see Dr. Pizzurro until late June. *Id.* at 339. Although Dr. Pizzurro had not yet examined Mr. Harrison or Mr. Harrison's records or offered any opinion as to his treatment options, Mr. Harrison told his nursing home personnel definitely on June 3 that he will be having surgery in New Jersey with Dr. Pizzurro. *Id.*

50. Dr. Hospodar's records reflect that around this same time, on June 5, 2003, Mr. Harrison apparently had a falling out with the staff at Dr. Hospodar's office, leading the doctor to discharge Mr. Harrison from his practice. Ex. 12 at 17.

51. On June 23, 2003, Mr. Harrison was admitted to Valley Hospital in Ridgewood, New Jersey under the care of Dr. Pizzurro. There he underwent course of pre-operative radiation to prevent unwanted bone growth from surgery, and then on June 27, he had surgery with Dr.

1132873v1

Pizzurro for removal of his antibiotic prosthetic spacer, revision of his right total hip replacement, and a cemented proximal femoral replacement. Ex. 9 at 10-11, 15, 30.

52. He was discharged from Valley Hospital to a rehabilitation facility on July 2, 2003. Ex. 10 at 44-46. He was noted to be up and ambulating with a walker at the time of his discharge from Valley Hospital. Ex. 14 at 13.

53. Mr. Harrison's recovery from the June 27 surgery was complicated by two episodes of sepsis unrelated to his earlier femur infection, one in July stemming from a urinary tract infection and the other in September stemming from an infected catheter. *See* Harrison Tr. (Ex. 6) at 158:17-20; 238:8-240:20; Ex. 5 at 449-51; Ex. 9 at 14; Ex. 19 at 13-14.

54. By October 2003, Mr. Harrison had returned home, and within a week or two of that he had resumed normal activities such as driving a car and shopping in a store. Ex. 19 at 12; Harrison Tr. (Ex. 6) at 240:21-242:11. On December 10, 2003, Mr. Harrison reported to Dr. Pizzurro that "overall he [wa]s very happy with [the] results [of his surgery.]" Ex. 9 at 11.

**Procedural History of Mr. Harrison's Litigation**

55. On June 26, 2006, Mr. Harrison filed his Complaint in New York state court, alleging that Vioxx interfered with the healing of his right femur, broken in January 2003. *See* Ex. 1 ¶¶ 1, 11. Merck removed Mr. Harrison's lawsuit to the United States District Court for the Northern District of New York, and in February 2007, the case was transferred into this MDL. *See* Case No. 2:07-cv-00905-EEF-DEK, Rec. Doc. 1.

56. Mr. Harrison filed a motion to vacate the Judicial Panel on Multidistrict Litigation's initial transfer order in October 2006, arguing that his lawsuit should not be included in the MDL because it was not a "heart/CV" case. *See* Harrison "Brief To Vacate" Conditional Transfer Order (attached hereto as Ex. 22) at 6. The Panel denied his motion in February 2007,

1132873v1

finding that Mr. Harrison's case (as well as the cases of other plaintiffs who had opposed transfer to the MDL) involved "common questions of fact" with actions that had previously been transferred to the MDL. *See* Feb. 8, 2007 Transfer Order (Rec. Doc. 10001) at 1.

57. Shortly after his case was transferred into this MDL, Mr. Harrison inquired as to how he could gain access to the document depository maintained by the Plaintiffs Steering Committee ("PSC") in the Vioxx litigation. *See* Pretrial Order ("PTO") 25 (Rec. Doc. 11576) at 1. In July 2007, in response to Mr. Harrison's inquiries, the Court issued PTO 25, which granted access to the PSC's depository for the purposes of conducting document review. *Id.*

58. On November 9, 2007, the Court issued PTO 28 (Rec. Doc. 12962), which imposed certain discovery obligations in Mr. Harrison's case. Among other requirements, PTO 28 required such plaintiffs to produce a PPF and executed authorizations for the collection of medical records, certain medical and pharmacy records, and a Rule 26(a)(2) case specific expert report (sometimes referred to as a "*Lone Pine*" expert report). *See* PTO 28 ¶II(A). In Mr. Harrison's case, these materials were due by July 2008. *See* May 30, 2008 Order & Reasons (Rec. Doc. 14567) at 6.

59. By November 2008, Merck had not received any PTO 28 materials from Mr. Harrison. Accordingly, pursuant to Section II.D of PTO 28, Merck notified Mr. Harrison that it intended to seek dismissal of his case if he did not cure his PTO 28 deficiencies, and ultimately in February 2009, Merck filed a motion for an order to show cause why Mr. Harrison's case should not be dismissed. *See* Rec. Doc. 17840. Mr. Harrison opposed Merck's motion, arguing that because his lawsuit did not allege a cardiovascular injury, the discovery requirements of PTO 28 should not apply to him. *See* Tr. of Mar. 27, 2009 Hearing (Rec. Doc. 62718-3) at 5-6. At a hearing on March 27, 2009, the Court specifically directed Mr. Harrison to produce his

*Lone Pine* expert report or face dismissal of his case, and Mr. Harrison thereafter provided the report. *See id.* at 6-7.

60. Because by November 2010, Mr. Harrison had failed to provide any of the other materials required by PTO 28, including a PPF and authorizations for the collection of medical records, Merck again notified Mr. Harrison under PTO 28 ¶II.D that it intended to seek dismissal of his case if he did not cure his PTO 28 deficiencies. Merck specifically requested that Mr. Harrison provide executed medical records authorizations so that it could begin to collect Mr. Harrison's medical records. *See* Merck's Feb. 10, 2011 Mot. to Show Cause (Rec. Doc. 61683) at 2-3.

61. In response, Mr. Harrison re-asserted his argument that the PTO 28 requirements should not apply to him because of the nature of his alleged injury, and he produced a partially completed PPF and partially completed answers to interrogatories. From these documents, he purposefully omitted key information, such as the names of his prescribing physicians and information about his personal and family health history, and he did not provide the required records collection authorizations. *See id.* at 3.

62. In February 2011, therefore, based on Mr. Harrison's affirmative refusal to provide discovery materials, Merck again filed a motion for an order to show cause why his case should not be dismissed under PTO 28. *See id.* Mr. Harrison sought and received several extensions to his time to respond to Merck's motion, primarily based on delays caused by his ongoing health problems. *See, e.g.*, Aug. 30, 2011 email from Harrison to Pistilli (attached hereto as Ex. 23) at 1.

63. Over the course of many months thereafter, Mr. Harrison finally provided the materials required by PTO 28, ultimately providing his completed PPF in September 2011. *See*

Ex. 2. Merck then withdrew its motion to dismiss Mr. Harrison's case based on his PTO 28 compliance. *See* Rec. Doc. 63471.

64. On May 15, 2012, the Court entered PTO 58, which set discovery deadlines for the remaining cases in the Vioxx litigation. *See* Rec. Doc. 63842. With respect to Mr. Harrison's case, the PTO 58 deadlines originally called for the close of fact discovery on November 1, 2012 and the submission of expert reports by plaintiff on November 16, 2012. *Id.*

65. At Mr. Harrison's request (and with Merck's consent), these deadlines were extended several times, ultimately settling on deadlines of April 1, 2013 for completion of all fact discovery, April 18, 2013 for submission of expert reports by plaintiffs, and May 17, 2013 for submission of expert reports by Merck. *See* Rec. Doc. 64236.

66. Notwithstanding the expert disclosure deadline in his case which passed on April 17, 2013, Mr. Harrison has not served any expert reports. Merck served the report of its expert, Dr. Blavatsky, on May 17, 2013, the deadline for defendant's expert disclosures. *See* Blavatsky Decl. (Ex. 7).

67. The *Lone Pine* report previously submitted by Mr. Harrison in this litigation was authored entirely by Mr. Harrison, but signed by one of his physicians, Dr. James Wise, in 2008. *See* Harrison Tr. (Ex. 6) at 262:4-264:2; Tr. of Nov. 1, 2012 Deposition of James Wise, M.D. ("Wise Tr.") (excerpts of transcript attached hereto as Ex. 24) at 44:9-12; Nov. 28, 2008 Letter from Harrison to Wise (Harrison *Lone Pine* report) (attached hereto as Ex. 25).

68. Dr. Wise, a rheumatologist, did not treat Mr. Harrison for his femur fracture; Mr. Harrison's first visit to Dr. Wise was not until November of 2003, many months after his final femur/hip surgery in June 2003. *See* Wise Tr. (Ex. 24) at 33:8-34:14; 24:16-25:17. Dr. Wise did not express any opinion as to whether Mr. Harrison had actually experienced any insufficient

1132873v1

bone healing in his femur. *See id.* at 48:17-49:6. Instead, he acknowledged at his deposition that his understanding of Mr. Harrison's alleged bone healing injury was based entirely on Mr. Harrison's own representations. *Id.*

69.   Moreover, Dr. Wise's own treatment notes, which generally reference the history of the 2003 femur fracture, subsequent infection and related surgeries, do not mention any lack of bone healing, and he does not remember any specific instances when Mr. Harrison discussed any inadequate bone healing with him. Wise Tr. (Ex. 24) at 49:7-50:1.

70.   Dr. Wise did not review any of Mr. Harrison's medical records (including the February 2003 records from Dr. Null documenting non-compliance with weight-bearing restrictions and the fall down the stairs) and did not recall doing any independent research to verify the information contained in the document authored by Mr. Harrison. Wise Tr. (Ex. 24) at 46:7-46:16; 48:7-48:16.

71.   Dr. Wise testified that he interpreted the phrase "reasonable degree of medical probability" in that document to mean only "more than just pure chance." Wise Tr. (Ex. 24) at 47:9-47:22.

72.   Dr. Wise also did not express any opinion the alleged "failure" of Mr. Harrison's 2001 spinal surgery or his "gradual" wrist fracture or disfigurement. *See* Wise Tr. (Ex. 24) at 56:12-57:4.

73.   Mr. Harrison attempted to have his surgeon Dr. Pizzurro sign the report that Mr. Harrison had prepared, but Dr. Pizzurro declined to do so. Harrison Tr. (Ex. 6) at 268:17-18.

74.   Dr. Pizzurro noted in 2008 that Mr. Harrison was on "a mission to prove that Vioxx caused him his bone problem." Ex. 9 at 24.

## Clinical Studies Relating to Vioxx and Bone Healing

75. In 2005, Reuben et al. reported a retrospective review of 434 patients taking Vioxx, Celebrex (another Cox-2 selective NSAID) or ketorolac (a traditional, nonselective NSAID) on the incidence of non-union of bone following spinal surgery. *See* Blavatsky Decl. (Ex. 7) ¶ 29 and Ex. C thereto. After short term use (five days following surgery), there was no difference in the incidence of non-union for Vioxx compared to no NSAID use. *Id.* The authors therefore concluded that the short-term perioperative administration of Vioxx, Celebrex, or low-dose ketorolac "had no significant deleterious effect on nonunion." *Id.*

76. In its clinical trial program for Vioxx, Merck conducted what was known as Protocol 083, a randomized, prospective clinical study conducted in 305 patients with osteoarthritis to evaluate the effects of Vioxx and ibuprofen versus placebo on biomarkers of BMD and bone turnover. *See* Blavatsky Decl. (Ex. 7) ¶ 30 and Ex. D thereto. In 2003, Murphy *et al.* reported the results of this study in an abstract presented at EULAR (the conference of the European League Against Rheumatism). *Id.* These authors reported that they observed no clinically significant effects on bone between treatments. *Id.*

Dated: July 22, 2013

Respectfully submitted,

By /s/ Dorothy H. Wimberly
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:   504-581-3361

Defendants' Liaison Counsel

1132873v1

—and—

Douglas R. Marvin
M. Elaine Horn
Emily Renshaw Pistilli
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax:    202-434-5029

Attorneys for Merck Sharp & Dohme Corp.

1132873v1

## APPENDIX I – TABLE OF EXHIBITS

| Exhibit 1 | Complaint |
|---|---|
| Exhibit 2 | Harrison Plaintiff Profile Form (dated Sept. 20, 2011) |
| Exhibit 3 | Selected records from Benedictine Hospital |
| Exhibit 4 | Selected records from the New Hampshire NeuroSpine Institute |
| Exhibit 5 | Selected records from Paul B. Donovan, M.D. |
| Exhibit 6 | Excerpts from the deposition of Dennis Harrison (Oct. 23, 2012) |
| Exhibit 7 | Declaration of Nicholas Blavatsky, M.D. |
| Exhibit 8 | Selected records from the Hospital for Special Surgery |
| Exhibit 9 | Selected records from Ridgewood Orthopedic Group |
| Exhibit 10 | Selected records from the Social Security Administration |
| Exhibit 11 | Selected records from James L. Wise, M.D. |
| Exhibit 12 | Selected records from Capital Region Orthopaedic Group |
| Exhibit 13 | Selected records from Orthopedic and Sports Medicine Specialists of Green Bay |
| Exhibit 14 | Selected records from The Valley Hospital |
| Exhibit 15 | Selected records from Bellin Health |
| Exhibit 16 | Selected pages from plaintiff-provided medical records |
| Exhibit 17 | Selected records from Rehabilitation Hospital of the Cape and Islands |
| Exhibit 18 | Selected records from Gustavo Morel, M.D. |
| Exhibit 19 | Selected records from St. Joseph's Hospital Wayne |
| Exhibit 20 | Selected records from Albany Medical Center |
| Exhibit 21 | Selected records from Albany County Nursing Home |
| Exhibit 22 | Harrison "Brief To Vacate" Conditional Transfer Order (Oct. 27, 2006) |

1132873v1

| Exhibit 23 | Aug. 30, 2011 email from Harrison to Pistilli |
| --- | --- |
| Exhibit 24 | Excerpts from the deposition of Dennis Harrison (Nov. 1, 2012) |
| Exhibit 25 | Nov. 28, 2008 Letter from Harrison to Wise (Harrison PTO 28 "*Lone Pine*" report) |

1132873v1

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Statement of Material Facts has been served on Plaintiff Dennis Harrison by email and by Federal Express at:

> 601 W. Brown Street
> Iron Mountain, MA 49801

I also hereby certify that the above and foregoing Statement of Material Facts has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, upon Liaison Counsel Ann Oldfather by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 22nd day of July, 2013.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone: 504-581-3200
Fax:    504-581-3361
dwimberly@stonepigman.com
Defendants' Liaison Counsel

1132873v1