# THE SUPREME COURT OF ULSTER COUNTY

## STATE OF NY

| | |
|---|---|
| Dennis Richard Harrison | ) |
|         Plaintiff, | ) |
|     vs. | ) |
| Merck & CO., Inc., a New Jersey Corporation. | ) |
|       Defendant | ) |

**PERSONAL INJURY COMPLAINT** FOR:

1.  HARM DUE TO NEGLIGENCE

2.  HARM DUE TO FRAUDELENCE & DECEPTION

Case No.: 06-2247

**FILED**
12H 01 M

JUN 26 2006

NINA POSTUPACK
ULSTER COUNTY CLERK

Dated this 26th day of June, 2006

Dennis Richard Harrison – Plaintiff in Pro Per

COLLEEN J. BONDAR
Notary Public, State of New York
Reg. No. 01BO6098023
Qualified in Ulster County
Commission Expires September 2, 20 07

1

1.    The Plaintiff, Dennis Richard Harrison, is currently a permanent resident of New York and was so at all times herein mentioned in regard to the allegations. Plaintiff alleges that he suffered a broken leg (femur) that did not heal correctly because of Vioxx (a major, lucrative drug produced by the Defendant), and that efforts to fix the leg continued to fail and lead to a multitude of significant problems. Plaintiff also alleges that Defendant & Co. knew of the problem, but was negligent, deceitful and fraudulent in order to protect its lucrative drug.

2.    Merck & Co., (Defendant) is, and at all times material to this action was, a corporation organized, existing and doing business under and by virtue of the laws of the State of New Jersey, with its principal office located at One Defendant Drive, Whitehouse Station, New Jersey. Defendant is, and at all times material to this action was, authorized to do business and was engaged in substantial commerce and business under the laws of the State of NY.

8.    Defendant includes any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers and organizational units of any kind, their predecessors, successors and assigns and their present officers, directors, employees, agents, representatives and other persons acting on their behalf.

9.    Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the defendant was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification and authorization of the defendant and its directors, officers and/or managing agents.

.10.    At all times material to this action, Defendant designed, researched, developed, tested, redeveloped, studied, investigated, manufactured, created, sterilized, packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or to inform users regarding the risks pertaining to, and assuaged concerns about their pharmaceutical Vioxx.

## SUMMARY OF EVENTS LEADING TO ALLEGATIONS

11.    The Plaintiff broke his leg on or about January 11, 2003.

12.    The Plaintiff continued to take Vioxx (before, during, and after the broken leg). He had taken it from within a few months of product introduction (5/99) to product withdrawal (9/2004) uninterruptedly, **NEVER** being aware, nor were any of his physicians or surgeons, that it put each orthopedic operation at great risk.

13.    Prior to the broken leg, the Defendant had many warnings (from independent research studies) that anyone undergoing bone/spine repair, especially operations, **SHOULD NOT TAKE VIOXX**. Much independent study, plus suspicion by Defendant of this problem of VIOXX preventing adequate bone repair should of and was not revealed by Defendant, either in warnings or investigation.

14.    The leg, operated upon immediately in Kingston, NY, did not heal and all its related implanted hardware "broke apart" internally and was rendered useless. This was because no-one (surgeon, physician, Plaintiff) suspected that the cause of inadequate bone repair was Vioxx. If Defendant had adequately warned surgeon, physician, or Plaintiff, Vioxx would not have been used, and the operation would have had adequate bone repair, avoiding the problems, despair and the turmoil to follow.

15.    A second operation (in Albany, NY) was done as soon as possible. Rather than being able to fix the leg, the Albany surgeon found massive infection (broken bones left un-repaired are very susceptible to severe infection). Both the ruined hardware from the inadequate bone repair and a previously implanted right hip were both

1   removed as both were unusable (the hip from the infection). This would not have occurred had the routine operation (in Kingston) right before (the second one in Albany) had sufficient bone repair.

16.   The Plaintiff was then tentatively scheduled to have a third operation to fix the broken leg in about 6 to 8 weeks. Adequate bone repair (for another operation) was expected within about 6-8 weeks, the same amount of time that plaintiff was placed on Vancocymin. Unexpectedly, the bone still did not repair adequately.

17.   Plaintiff placed on Vancocymin for another 6 weeks, mostly as an extra degree of safety since the bone had not repaired sufficiently and the time was available. The surgeon continued to wait for the adequate bone repair to do the third operation – and it still did not too appear.

18.   After this time, Plaintiff had spent almost 14 weeks hospitalized and in a nursing home, waiting, and waiting for adequate bone repair. The 3-day hospital routine and 6 week recovery was spiraling out of control because of the inadequate bone repair from the use of Vioxx.

19.   Four to Six more weeks  again this time WITHOUT the use of Vancocymin passed to allow (and hope) that there would be sufficient bone repair. The Plaintiff was declared infection free. He had received two separate (month apart) tests for infection; BOTH providing the result that the Plaintiff was free of infection! Still, all that was left was adequate bone healing, which was not happening because of the continued use of Vioxx – unfortunately, because of Defendant's deception, no-one suspected Vioxx as the issue.

20.   In desperation, Plaintiff called a NJ surgeon who had originally done the right hip. It was agreed by the surgeon that not enough bone was being generated. The NJ surgeon could only offer an operation, which bypassed the need for adequate bone repair, but indeed was not optimal - not of the choosing that would normally be the case. The method was to utilize extreme amounts of glue. Please note for future reference, "glued", (cemented) operations also create more of a chance of infection.

21.   The operation in NJ (the third one in total for the leg) was performed on June 29, 2003. This is the earliest date that could be considered that the inadequate bone growth was not a complete impediment to at least somewhat adequate surgery so that Plaintiff could finally walk (after being about 120 days in Albany in a wheel-chair and only walking by "hopping" on one foot with the help of a "walker". All of this unnecessary time (because of Vioxx) was just a miserable, brutal, unproductive time that took its toll greatly on creating family tension and estrangement. Plaintiff was too far to receive sibling visits, and his wife, besides the husband/wife relationship suffering greatly, was not able to visit more than once or twice a month because of a 7-year-old child.

22.   Many complications, which never would have happened if the bone had just healed routinely like it should have in the beginning – except for the impact of Vioxx developed. Two cases of Sepsis (August and October) and severe bleeding in NY and then NJ added to this un-ending nightmare.

23.   At the end of September, 2003, (about eight and one-half months after the broken leg!) Plaintiff was finally approved to go home (but alone and separated from his wife and daughter) His progress since then has been slow, and unsteady. He is now, much, much weaker than before the events started, and in spite of pain medications generally uncomfortable or in pain most of each and every day. He cannot walk greater than one-hundred feet without the use of a cane, and even then has a great deal of discomfort. He loses balance often, and is quite nervous about falling down, and possibly going though a similar ordeal.

24.   Before the above (i.e. broken leg and ensuing complications) occurred, Plaintiff was well on his way to recovery from past operations, except one (Lumbar), which had also failed because of inadequate bone repair. The correcting operation (15 dangerous hours) was being scheduled and pre-testing started BEFORE the broken leg occurred. Initially the broken leg was considered just a nuisance that would delay this all important (and critical for a decent way of life) operation. But as a simple, routine operation (i.e. the leg) grew into a long, brutal

3

nightmare it was indefinitely delayed. Plaintiff is now too weak to receive the type of operation that he was being scheduled to get, and because of his recent nightmare with the leg, is now very psychologically and emotionally too nervous about getting through it alive and not paralyzed.

25.     Defendant, in choosing to hide, deceive, and fraudulently sell Vioxx caused the very inadequate bone repair that cascaded into a multitude of events, and has severely and irreparably damaged Plaintiff's life. As will be explained more below, Plaintiff had been doing so well before the operations started to fail, he had expected to return to his (about) $120,000 annual salary and bonus (present day average compensation of the position is about $150,000) executive career. Plaintiff's life was damaged in many other ways, which will be explained.

## DETAIL OF EVENTS LEADING TO ALLEGATIONS

26.     On January 11, 2003 or about, Plaintiff broke his right leg (femur) in front of his house. As will be shown, the issue of inadequate bone repair, alleged to be the fault of an undisclosed side affect of VIOXX, **did not end until at a minimum of June 29, 2003** in a last ditch effort to "go around the issue of inadequate bone repair", save Plaintiff's leg, and allow him to walk again. Many more complications, which would not have occurred if only the first routine operation had succeeded (i.e. the bone had healed correctly), as it should have except for VIOXX use, were to come. A simple, routine and relatively quick recovery operation had snowballed into an eight-month nightmare with many complications and a sub-optimal operation finally gaining some control upon the situation, though more – and very life-threatening issues were yet to come.

27.     After the broken leg he was immediately operated on in Kingston, NY in what was expected to be a routine and successful operation. Plaintiff had a history of several successful orthopedic operations without any complications, and there was no reason to suspect any complications in this routine operation. After three days hospitalized, he was sent home for about a 6-week recovery. However, around the third week, the hardware failed due to inadequate bone healing. The internal hardware was irreparably broken apart and was completely useless. This is consistent with the (to follow) findings, well before the operation, that VIOXX prevents proper bone/spine healing, especially becoming a problem in the third and fourth weeks, as well as longer-term recovery and use of VIOXX. Defendant, along with other issues, deceitfully suppressed this problem. Because of this bone/spine repair issue, the surgeon did not have an answer as to why the hardware came apart so readily.

28.     The Plaintiff was sent to Albany, NY to have the leg operated on again. Unfortunately the operation unveiled significant infection from the unhealed broken bone, and BOTH the internal hardware for the leg AND a prior operation (right hip replacement) were removed as they had been ruined.

29.     In Albany Plaintiff was treated for about 8 weeks with Vancomycin. Because the bone still had not healed, he was treated for another 6 weeks on Vancomycin. It was not known why his bone had not repaired itself sufficiently to proceed with the next (3rd) operation that was needed. Then, with two tests, one month apart, he was declared infection free, **HOWEVER** the bone still had not healed enough to operate (some healing was needed to act as an "anchor" to the new implants. After another 4-6 weeks, the surgeon refused to operate on Plaintiff because of the problem of still having inadequate bone repair (fact of inadequate bone repair is in surgeon notes). At that time, Plaintiff had spent 120 days in the Albany County Nursing home, waiting, and waiting, for enough bone to heal.

30.     Plaintiff, in a desperate move, called a NJ surgeon (150 miles each way). The surgeon agreed to see him (with no transportation available Plaintiff had to take a taxi, crumpled in the back seat). The surgeon agreed that there was not enough bone growth, and could offer only to use massive amounts of glue to get around the issue - and at least allow the Plaintiff to walk. A large amount of glue does allow infection to set in easier; furthermore "glued" operations are not expected to last as long as the ingrown bone growth method, which was more up to date.

4

Thus, the operation was in effect sub-optimal to the preferred newer method. It was the view by the NJ surgeon that the bone was just not going to grow back enough, so he recommended this approach. Plaintiff had prior experience with the NJ surgeon and had 100% faith in his judgment.

31.     The third leg operation was thus performed in NJ. However after returning back to NY for two weeks of therapy (in local NY hospital), Plaintiff developed Sepsis. Two more weeks in the hospital dealing with the Sepsis (which kills approximately 1 out of 4 individuals presenting it). Plaintiff was then sent home. However, this time the leg began to bleed to such a degree that the visiting nurse called Plaintiff's primary physician who placed him back in the local NY hospital. After over a week, it was decided that Plaintiff should go back to NJ and have the operation cleansed, and hopefully if no infection, sutured up. When Plaintiff went to NJ, wound was improving. However, he was sent to a NJ nursing home (Wayne, NJ) and given six more weeks of Vancocymin to be safe. He did relatively well considering what he had been through. However on the next to last day, he developed a second case of sepsis! Sent to a N.J. hospital for treatment he spent another two weeks dealing with this bout of sepsis before going home in the end of September 2003. He has since spent a couple of years "recovering" from this ordeal, much weaker than he was before it started. Again, this could have been avoided if only the bone had healed sufficiently not only in the beginning, but somewhere along the way!

32.     Thus, from January 11, 2003 or about, through, at a minimum, June 29, 2003 and quite possibly longer, Mr. Dennis Richard Harrison ("Plaintiff") suffered greatly, and directly, from inadequate bone healing of his broken right leg (femur). This inadequate bone healing was caused by his use of VIOXX, developed, manufactured and distributed by Defendant, The inadequate bone healing was, in fact, the result of a severe problem, yet not warned of by Defendant. In fact Defendant chose to ignore many independent test warnings, a warning by its own paid consultant, and general industry wariness of NSAIDs in general including the new class of COX-2 drugs (of which Vioxx is a member). Defendant also ignored Independent testing results and the many warnings to Defendant of the problem(s) of inadequate bone/spine healing.

# INTRODUCTION TO VIOXX AND DEFENDANT'S NEGLIGENT AND FAUDELENT BEHAVIOR

33.     Defendant fraudulently induced consumers to purchase its pharmaceutical Vioxx (also known as Rofecoxib) by advertising questionable, unproven benefits and concealing and trivializing known and possible deadly and life altering risks, of which inadequate bone healing was one.

34.     Vioxx is a selective Cox-2 inhibitor, a non-steroidal anti-inflammatory drug (NSAID) that is not in the class of "life saving" drugs. Instead it is a so-called "super aspirin" intended to treat chronic pain associated with osteoarthritis and general short-term pain. In May of 1999, the FDA approved VIOXX to provide treatment of chronic and short-term pain. Independent testing showed that VIOXX could cause serious side effects unknown to most consumers and physicians (including inadequate bone/spine repair). Defendant had never taken any action to inform or warn consumers or physicians of the bone/spine repair issue, though finally it did take Vioxx off of the market for other reasons, with allegations very similar to those in this litigation. This litigation brings to light and holds Defendant accountable for its refusal to credibly investigate and disclose Vioxx's dangers of inadequate bone repair before putting it on the market, nor following through after it was on the market.

35.     Defendant lulled physicians and consumers into believing Viox had a great, proven safety profile. Defendant used overly aggressive marketing tactics in order to exaggerate Vioxx's benefits and convey an overall assurance to the public and physicians as to Vioxx's great safety. The image it successfully gave to consumers and physicians alike, as a very safe drug no doubt helped Defendant continue to suppress a growing evidence of safety issues – suspected even before the FDA approval, and becoming more obvious as time went by. In heavy competition with the recently FDA approved "Celebrex", Defendant rushed through clinical trials to get VIOXX

onto the market. Defendant ignored several credible warnings, and its own general suspicions of which it should have had (especially due to general industry "wariness" of Cox-1 and Cox-2 inhibitors), and maintained the issue below the "radar" of the FDA as long as possible, then delaying further to physicians and consumers. To assist in showing the court the consistency of Defendant's intents, it is also noted that even with many other issues, Defendant also ignored flaws in the original clinical studies in hopes to gain FDA approval. Defendant saturated the market with false, deceptive and fraudulent information about Vioxx. Defendant developed a scorch the earth policy of profit over reasonable public safety in order to get their most likely highly profitable drug, Vioxx, to market, and to catch up, and hopefully surpass their main competitor, Celebrex.

36.     In April 2002, the FDA ordered Defendant to change their labeling information to include warnings of the potential and serious side effects of VIOXX. Though Defendant had continued to market Vioxx as extremely safe and create this image of a very safe drug, many clinical studies conducted after Vioxx was put on the market indicated otherwise. If only Defendant had merely included warnings and/or even appropriate physician education of the bone/spine repair issue at this time, the Plaintiff would not have consumed VIOXX during the time in question, and he would have avoided all of the problems and brutal "recoveries" of his "recovery". Defendant should have used this as an opportunity to at least warn of the possibility of bone/spine repair issues, but due to its highly successful effort in suppressing that issue, apparently decided not to add any more fuel to fire which was starting to rage. Instead, Merck revved up its marketing engine to saturate the market.

37.     On or about September 30, 2004, Defendant pulled Vioxx from the market after a safety monitoring board overseeing a study of the drug recommended that the study be halted because of an increased risk of serious cardiovascular events, including heart attacks and strokes, among study patients taking Vioxx compared to patients receiving placebo.

38.     The Plaintiff, and all of his surgeons and physicians were, at all material times, ignorant about the true facts and about the possibility of severe impacts and the likelihood of these severe impacts. Plaintiff, and his surgeons and physicians, relied upon Defendant's false and deceptive marketing in utilizing or recommending Vioxx, and the Plaintiff has been harmed by these violations.

39.     Defendant, in spite of these several and very real and relevant indications should have caused it to act in a responsible manner. At a very minimum, Defendant should have at least warned, and educated physicians and patients of this potential side affect. More responsibly Defendant should have at least investigated them in a reasonable manner, rather than merely ignore them.

40.     Because of Defendant's negligence, fraudulent behavior, and deception, Plaintiff suffered a very inordinate amount of pain and suffering, had a previously planned operation (lumbar – considered critical) delayed indefinitely, spent a total of 8 months in hospitals and nursing homes plus a very extended "recovery" (instead of the usual, expected few days and 6 weeks recovery). The plaintiff also endured, needlessly because of the inadequate bone healing due to Vioxx, osteomyletis, two bouts of sepsis, a "sub-optimal" femur operation (an alternate method of surgery, sub-optimal in nature, but allowing Plaintiff to at least walk again). Finally Plaintiff suffered, and continues to suffer severe personal, family, and financial hardships. All this from a simple operation gone awry because of the irresponsible negligence, skillful deception, fraudulent sale of Vioxx, and its "scorch the earth" policy of finally getting Vioxx FDA approval and gaining access to the market which was, at the time, being led by Celebrex, another Cox-2 inhibitor. All of Defendant's irresponsible actions (and inactions) were driven by placing profits of this very lucrative drug over reasonable safety of the unsuspecting consumers, a certain amount of which were certain to suffer from the side affects which Defendant did not even warn about!

41.     In addition to independent testing and warnings to Defendant, Defendant had more than enough information, and especially due to the nature of its business – and the nature of the drug it was developing, had sufficient "wariness" of the issue that it should have investigated AND provided adequate warning and education.

42.     Also, it should be noted that more recent testing and follow-up from Vioxx use, substantially confirms that in fact Vioxx could, and does cause inadequate bone repair. This was especially dangerous in surgery, which utilized fixed implants.

43.     Plaintiff had been taking VIOXX several months from the day of its introduction to the market (05/1999) through the very day in which it was finally withdrawn from the market by Defendant (09/04). After Defendant pulled VIOXX from the market and as allegations and facts of the wave of massive lawsuits became known, the Plaintiff was spurred to research, especially because he was a very long term user of the drug. With the Plaintiff's research on VIOXX initially in a general manner, he eventually narrowed his research mostly specific to the issue of inadequate bone/spine repair – (of which he accumulated significant industry and personal documentation). The Plaintiff thus became aware of why his "pre-VIOXX" orthopedic operations succeeded, and why most, if not all of his "post-VIOXX" operations (including and especially his leg operation) failed either immediately or in an unjustified period of time because of inadequate bone/spine repair. Furthermore, his findings highly correlate, in timing and substance the medical notes and words of several (three) of his surgeons concerning inadequate bone repair.

44.     The Plaintiff has sufficient clinical and symptomatic evidence, as well as medical documentation (three surgeons agreeing on inadequate bone repair) to correlate the facts of the VIOXX bone/repair issue with his specific events, and the timing of these events. Furthermore, the Plaintiff's allegations are wholly consistent with many independent tests of VIOXX (done outside of Defendant) as well as one Defendant paid consultant at a minimum.

45.     Defendant was sufficiently warned by several very credible sources, and also should have had more than adequate concern regardless (since there was general industry "wariness" of BOTH COX-2 and COX-1 suppressive drugs). Defendant, for reasons of pure profit over reasonable safety, simply ignored these warnings, and suppressed them in order to continue it's quest to obtain FDA approval and get the drug (VIOXX) finally to market, so that it could finally compete with CELEBREX which was already on the market. CELEBREX was viewed by Defendant as Vioxx's major competitor. Besides severe financial setbacks, further delays of FDA approval of VIOXX might have ceded the market to CELEBREX. Defendant took the chance that the additional incremental profits would more than cover the costs of the inevitable legal litigation, which would surely occur.

46.     At least one other operation (lumbar – prior to the leg operation) was done in MA. It also, per surgeon's notes, failed because of inadequate bone repair). This litigation does not allege Vioxx as the cause for the inadequate bone repair in the lumbar operation, but it is stated for reasons of chronological history. This litigation concerns his broken right leg "femur" which did not heal correctly because of inadequate bone repair (from the use of VIOXX), the eight months of a brutal "recovery" (actually a waiting time for "sufficient bone healing" to allow for the "final" operation), the several operations in which he eventually needed, and the personal, financial and family damages he suffered greatly.

# GENERAL ALLEGATIONS APPLICABLE
## TO ALL CAUSES OF ACTION

### Background of "NSAIDs"

47.     The pharmaceutical drug at issue in this litigation is "Vioxx", a brand name for the drug's primary component Rofecoxib. Defined chemically, Rofecoxib is methylsulfonyl, phenyl and furanone. As a drug Vioxx is a non-steroidal anti-inflammatory drug, or NSAID.

48.     Although NSAIDs as a group are common drugs, Vioxx was a new type of NSAID, and was only the second approved version in a class of these drugs commonly referred to as "Cox-2 inhibitors." Normal NSAIDs work to relieve pain by blocking the body's production of prostaglandins, chemicals that are believed to be associated with the pain and inflammation of injuries and immune reactions. The enzyme cyclo-oxygenase 1 and cyclo-oxygenase 2, commonly referred to as Cox-1 and Cox-2.

49.     While traditional NSAIDS, like ibuprofen, inhibit both of these enzymes, drugs like Vioxx were unique as they inhibited only the second enzyme, Cox-2. Defendant systematically touted that because of this change, Vioxx would have a lower incidence of side effects than other NSAIDS while still providing treatment that was just as effective. Defendant successfully stood behind its artfully and deceitfully developed perceived "veil of general and overall safety" (especially over traditional NSAIDs, and utilized this as a major part of their Marketing strategy.

50.     Let it also be known, that it was suspected, even before FDA approval, that the major problem of inadequate bone repair from NSAIDS was actually mostly from COX-2 inhibition. In fact, the traditional Cox-1 drugs (also called non-specific Cox inhibitors) work differently as they inhibit both Cox-1 (mostly) and Cox-2 (to various degrees) were not felt to be as much of a threat in causing inadequate bone repair. In other words, it was generally perceived that the major issue relative to inadequate bone repair was from Cox-2 inhibition, and not nearly as much as Cox-1.

### Competition in the NSAID Market

51.     VIOXX was approved for use by the FDA in May, 1999, a year AFTER its main competitor drug, "Celebrex," was approved for use. Although the makers of these drugs originally contemplated competing with other NSAIDs, such as aspirin or Alleve, the similarities between the two drugs, including the perception of increased safety over traditional NSAIDs pushed the makers to compete with each other.

52.     To combat the competition Defendant was especially aggressive in its advertising campaign for VIOXX. Through direct to consumer advertisements, press releases, promotional conference calls, sales pitches, and traditional advertisements, Defendant manipulated (including withheld) information given to physicians to exaggerate Vioxx's benefits and to conceal its deadly risks. This includes the concealment of the concerns that were expressed to it by several independent studies, which indicated inadequate bone/spine repair (all of which Defendant simply ignored without any follow-up).

53.     To increase sales and promote brand name recognition of Vioxx, Defendant launched a large-scale direct-to-consumer advertising campaign for the drug in 1999. Defendant was the first pharmaceutical company to run a full-length television spot including both brand name and indication in it In fact the cost of advertisements was astronomical and Vioxx had approximately $160.8 million worth of direct-to-consumer advertising in 2000. The drug tagline as "Vioxx. For everyday victories." As is also alleged, Defendant underplayed known side effects and completely disregarded warnings of potentially serious complications in these commercials. This was also true in the case of inadequate bone repair. Defendant could simply have warned not to take the medication while undergoing bone/spine operations or substantial bone repair.

54.     Defendant went further in promoting the drug by making unsubstantiated superiority claims against other NSAIDs on the market and minimizing potentially very serious and/or fatal drug interaction warnings. Again, Merck kept tuning its perceived "veil of safety" and lulling consumers and physicians into a false sense of security.

55.     Defendant also sponsored publications by researchers and physicians extolling the numerous untested benefits of Vioxx. Defendant represented that Vioxx was potentially helpful in treating several different

symptoms and diseases, despite the fact that Vioxx had never been tested in those areas. Defendant also pushed Vioxx for unapproved uses including the prevention of cancer, the treatment of Alzheimer's disease, and gout. These implications and suggestions continued to contribute to the perceived "viel of safety" in which Defendant so successfully created and continued to refine. That viel, by its nature, would have a tendency to create less suspicion in physicians and consumers than should normally be the healthy tendency. In short, Defendant concealed, manipulated and misrepresented material information bearing on Vioxx's safety and efficacy for the off-label uses it marketed.

56.      In 2001, the United States Food and Drug Administration (FDA), prompted by Defendant's aggressive marketing campaign, wrote a very explicit warning letter to Defendant regarding Vioxx. In that letter the FDA stated that Defendant had engaged in an advertising campaign that "minimized potentially serious cardiovascular findings..." The FDA further stated that Defendant's advertisements were promoting Vioxx for "unapproved uses and unapproved dosing regimen(s)" The letter went on to state that Defendant was "minimizing the potential risks and misrepresenting the safety profile for Vioxx..." Finally, the FDA stated that Defendant's misrepresentations were "particularly troublesome" because the FDA had already warned Defendant in an untitled letter to cease misrepresenting the safety profile of Vioxx. The FDA concluded that Defendant's promotional activities and materials were in violation of the Federal Food, Drug, and Cosmetic Act and applicable regulations. That safety profile, of which Defendant so skillfully and deceitfully created and refined, became a highly valuable marketing asset in its own right, thus contributing to the sale of Vioxx, and Merck was just not going to let it slip away without a fight, even if Defendant was on the wrong side of the law – it was merely viewed as a business decision.

57.      Both Vioxx and its competitor were marketed as being free from side effects that were commonly associated with other NSAIDs. However, the studies performed after Vioxx was on the market (in and around 2000 and 2001) showed that many of the side effects commonly associated with other NSAIDs were also associated with Vioxx. These side effects could occur without warning and the chances of occurrence increased with the length of time a patient took the drug. **Note that these warnings to Defendant were at least 1-2 years before the Plaintiff suffered from the incomplete healing during the leg operations.**

58      Despite these indications from research, the competition in the marketplace remained strong. Defendant did not change the labeling to include the scientific conclusions. Finally, in April 2002 the FDA ordered Defendant to change the Vioxx labeling to include these new warnings. Specifically, the FDA forced Defendant to include these warnings regarding stomach ulcers, liver and kidney damage. Defendant did its best to minimize the damage, and of course did not include any warnings of inadequate bone/spine repair.

59.      In the year 2000 Annual Report Defendant shows its desire and will to heavily promote Vioxx. Vioxx had already become Defendant's second largest selling product, and (per the report) 50% of new prescriptions in the Cox-2 class were for Vioxx, despite that Vioxx was second to the market.

60.      At the same time the year 2000 report shows that Defendant's blatant disregard for the safety of Vioxx. In the report Defendant acknowledged that the "FDA Arthritis Committee recommended that the gastrointestinal study results, as well as the data on certain cardiovascular events be included in the labeling" of Vioxx. However, Defendant's comment to this recommendation was simply that the FDA is not obligated to accept the recommendations of its advisory committees." Again, despite studies and recommendations, Defendant was not inclined to promote the safe use of its product through truthful labeling.

61.      In the 20001 annual report, the importance of Vioxx to Defendant's financial success becomes even clearer. Again, Defendant touted Vioxx as its second largest selling product, and it went on to state that Vioxx was the product leader that year for Cox-2 inhibitors (surpassing Celebrex in the marketplace). Defendant went on in that report to state that Vioxx "exceeded the $2 billion dollar sales mark faster than any other product in Defendant's history," and that the drug was available in 68 markets around the world.

### Side Effects of Vioxx

62.    Despite Defendant's blatant mislabeling and false advertising, there have been numerous adverse event reports and studies into side effects of Vioxx. As is clear from the FDA letters, these side effects have been consistently disregarded and minimized to both doctors and consumers. Defendant's desire to promote the growth of its blockbuster product, combined with market competition in the area fostered the lack of information about Vioxx.

63.    The findings and results of the Vioxx Gastrointestinal Outcomes Research (VIGOR) study are well known and will not be repeated here.

64.    In May of 20002, a report published in the **Journal of Bone and Mineral Research revealed that Vioxx might also impede bone repair. That study stated that Vioxx, and other Cox-2 inhibitors; reportedly assist (and are necessary) in the bone healing process. More testing from the past and present continually converge to the same conclusion. Exhibits (A) and (B) have relevant excerpts from actual. Though numerous** report/excerpts are available in this exhibit, there are in fact, many, many more available, with from what this Plaintiff in pro per can see at least over 95% concluding that Vioxx does indeed inhibit bone growth. The number 95% is the best estimate from this Plaintiff in Pro Per, and is in fact purposely conservative. The Plaintiff in Pro Per, actually feels the number is higher than 95%, but scales it back to be more conservative. Of the ones NOT coming to a firm conclusion, they do not, for the most part represent the opposite, but are less committed or a bit difficult to interpret their findings. Furthermore, if one reads these reports with the timing of the Plaintiff's ordeal(s) in mind, they correlate each other to an extreme that leaves little doubt in one's mind.

65.    Other research has found significant side effects of Vioxx to include serious stomach problems such as intestinal bleeding, serious allergic reactions, serious kidney problems and severe liver problems. Further, and most alarmingly, this research concludes that the longer a patient takes Vioxx, the more likely some of these side effects are to develop. (Plaintiff used Vioxx for almost all of the entire time it was available).

66.    On September 30, 2004, Defendant pulled Vioxx from the market after a safety monitoring board overseeing a study of the drug recommended that the study be halted because of an increased risk of serious cardiovascular events, including heart attacks and strokes, among study patients taking Vioxx compared to patients receiving placebo.

## ADDITIONAL GENERAL BACKGROUND - PLAINTIFF

67.    The Plaintiff's background is useful, and even generally necessary to understand a significant portion of the Plaintiff's scope of damages through his highly successful background, his work ethnic, his family and personal life, and history of continuous work.

68.    The Plaintiff had a history of Anklyosing Spondalitis (A/S) for approximately 25 years (A/S typically "burns out" in that type of timeframe. In most cases of A/S the patient leads a relatively normal life and is able to work throughout his/her lifetime. The Plaintiff, and his physicians, over the years were very aware of his condition, monitored and treated it regularly, and both the physicians and Plaintiff considered the A/S very well controlled. Plaintiff, except for one instance of two hip replacements, never missed any work at all from his condition. His future looked so bright, but was interrupted sharply and abruptly a few months after starting Vioxx.

69.    The Plaintiff earned his BA and MBA in the 1970s.  The 2nd and only other child in a family of five children, to go to college and also graduate school, he has, from the time he was very young, displayed only a

10

good consistent work ethnic. He earned 100% of his expenses for schooling and all of its related expenses as well as recreation and clothing. In spite of working very significantly (15-20 hours per week) during semesters and full time between semesters, Plaintiff earned very high grades in both undergraduate (B.A.) and graduate (M.B.A.) schooling. In his M.B.A. program, he was elected to Beta Gamma Sigma, which represents the top 95% of students. He worked immediately after graduating, never letting more than a few weeks go by between school and work or switching careers.

70.    In 1979 he began working at AT&T (later Lucent Technologies). By the time he needed to go on disability in the latter 1990s, he was being compensated approximately $120,000 annually, and was enjoying much and continued success at every position he held within the company. Right until his last day of work, Plaintiff was considered a very valuable executive with an extremely bright future - either inside or outside of the company. Plaintiff worked in a field of technologies, which was, and remains, in high demand for employees. Plaintiff truly enjoyed his work and was always willing to work extra hours (executives do not get overtime pay) or do whatever it took to ensure the the project or product's success. He was, indeed, consistently a good name for himself and was both respected and liked by his subordinates, peers, and management. He never had a poor, or even just a fair review, and was consistently very highly rated. He never missed any significant time at work (except for hip replacements mentioned herein).

71.    In the mid 1990's while still enjoying much success at work, both of the Plaintiff's hips fused and had to be replaced with artificial hips. Note that A/S is a disease of fusion. **Thus Plaintiff has a tendency OF fusion, NOT the lack of FUSION (which was caused by VIOXX)**, further adding to his argument of Vioxx as the cause of his sudden reversal of events.

72.    Plaintiff went back to work immediately after the timely recovery of the hip replacements (both were very successful and did not have any complications). He was extremely eager to get back to work and did not take any time more than was needed, though he could have.

73.    After over two years of working again, in which the Plaintiff resumed his very successful, and enjoyable, career; it seemed that his disease may indeed be "burning" out (a very common, if not expected, stage of the disease). He was doing extremely well at work, NEVER missed any days because of A/S, and enjoyed a very happy and rewarding life. He was feeling very well. He and his wife decided to further enrich their lives by adopting a 10 month-old baby. The Plaintiff was so sure the worst of his disease was behind him, he did not worry, from a physical or financial view that a new baby in the family (he was about 42 and his wife 43) would be a hardship in any way. The baby was brought into the family in February of 1996.

74.    Plaintiff and family moved (Lucent Technologies transfer) to Salem MA in 9/1996. Plaintiff continued his career successes and in the year of 1997/1998 earned nearly $120,000. Soon after Vioxx was available (around 5/99) Plaintiff's rheumatologist suggested that Plaintiff utilize VIOXX instead of the standard NSAID treatments he had. Plaintiff had not had any problems with the traditional NSAIDS, but both the rheumatologist and the Plaintiff were caught up in the unjustified and overactive "hype" Defendant stormed Vioxx to the market with.

75.    In 10/99 Plaintiff required a major cervical fusion in MA. It was never understood why the cervical fusion was necessary, only the explanation that the Plaintiff's head was collapsing. In no way is Plaintiff alleging in this litigation that the use of Vioxx was responsible for the operation, it is only noted for chronological purposes.

76.    Plaintiff also required a very  significant Lumbar Spine operation while still in MA. A total Lumbar Fusion was accomplished (in MA) in January of 2001. Plaintiff, with the highly successful cervical operation, and the expected Lumbar success, began to feel very optimistic and was not only expecting, but also personally planning very much to get back to work. He felt that the newest issues, which had suddenly and by

11

surprise came upon him, were (would be) solved, and since he generally was in good health otherwise, it would be possible to return to work. He had hoped to work at least until age 62; longer if he felt good enough.

77.    Quite unfortunately, and though not the subject of this litigation nor the object of these allegations, the lumbar operation failed because of inadequate bone repair, and BOTH of the supporting rods broke. Without going into more detail here, the failed lumbar operation caused severe complications which still exist today, and the Plaintiff has had some cervical symptoms re-appear over the last 1-2 years (increasingly). Plaintiff's hopes of continuing his career and re-assuming his bright future were again put on hold. However, Plaintiff, motivated mostly by his desire to go back to work, did make the extremely difficult decision to undergo another long and dangerous operation in order to correct the Lumbar failure (due to inadequate bone repair). With a successful lumbar operation to correct the failed rods, Plaintiff expected that he would be able to go back to work. Again, at the time, his health otherwise was very good.

78.    Unfortunately, the untimely broken leg ('femur') in January of 2003 caused a delay of the new lumbar operation, which was in an active planning stage, with several of the pre-testing and evaluations either done or scheduled. At the time (of broken leg) the surgeon and the Plaintiff simply planned to address the lumbar operation (expected to be about 15 hours long!) after the leg was healed (again, which was always expected to be quite routine). The delay of the lumbar operation was in essence from Vioxx use because of the indefinite delay from the broken leg, which just would not heal during the first routine operation, or the enough to anchor the "correcting" operation. The failure of the Lumbar operation, while from inadequate bone repair, was in MA and not in the venue of this court. Only the delay of the lumbar operation, not the cause of or reason of failure, should be considered in this litigation. However, it has to be mentioned because the delay of the lumbar operation was a result of the broken leg problems.

79.    As stated the failure of the broken leg (femur) to ever have sufficient bone growth placed the very important lumbar operation on indefinite hold. As it stands today, Plaintiff's general health, relatively poor for such an ordeal, creates substantial concern about Plaintiff's ability to undergo a long and dangerous operation to correct the Lumbar issue, so he (because of the broken leg), quite likely has missed his opportunity to have it fixed. Thus, in effect, the broken leg, and specifically the failure to heal (due to Vioxx) stopped the Plaintiff's progress in its track, left him significantly weaker (he also had two sepsis attacks because the leg did not heal as it should have earlier on). Plaintiff is considerably weaker than he was before he broke his leg, and for the first time ever, feels that he will not be able to return to work. As the Albany spinal surgeon stated -- "how many times can you keep doing major operations on a person?" This leads to another area of depression (e.g. lack of adequate hope).

80.    The above notes on the cervical and lumbar operations are not the reasons for this litigation. However, they are important to establish Plaintiff's past and how that related to what was to happen (with the broken leg). By stating the timing of the use of Vioxx and both the need and/or impact of spinal surgery (cervical and lumbar), Plaintiff is merely stating the facts of the past in chronological order. Litigation is only about the issues surrounding Vioxx and the broken leg and both the events it caused, ( negative ones) or prevented (such as Lumbar correction). Plaintiff, by stating facts, is only attempting to help understand and establish a pattern that may or may no be perceived as relevant. If felt appropriate, any potential litigation, for any reason whatsoever, not specifically excluding or including Vioxx issues, would be held in the state of MA where those operations took place and where the statute of limitations begins on discovery.

## PLAINTIFF'S ALLEGATIONS

81.    Plaintiff (Dennis Richard Harrison in Pro Per) brings this action on behalf of himself, who, since 1999, purchased and used the prescription medication Vioxx right up until the time it was pulled from the market. This includes before, during, and after each operation. Defendant had more than sufficient warning to investigate the

issue, or at the very least warn or the possibility of inadequate bone healing. Had Defendant at least issued reasonable warnings, Plaintiff would not have suffered the pain and suffering from his femur that just would not heal adequately enough to either be cured or to be sufficient for another correcting femur operation. Also as mentioned above would have avoided much suffering, while benefiting greatly from the "lumbar" correction which he needed to get back to work. Defendant's negligence, fraud and deception caused the events described.

## FIRST CAUSE OF ACTION

### *Negligence*

82.     Plaintiff incorporates by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth in this paragraph.

83.     Defendant had a duty to be truthful with consumers, including the Plaintiff. Defendants had a duty to manufacture, market, distribute, sell, or otherwise place in the stream of commerce its products such that they were free from defect, particularly that which is alleged herein.

84.     Plaintiff alleges that Defendant breached its duty to Plaintiff. Defendants' negligence, which, constituted the direct and proximate cause of the damages sustained by the named Plaintiff consist of, among other things;

    (a)    Failing to exercise reasonable care in the design, manufacture, inspection, testing and distribution of VIOXX;

    (b)    Designing, manufacturing, inspecting and distributing Vioxx when they knew or should have known that Vioxx posed serious risks and was accompanied by serious side effects;

    (c)    Failing to warn about the dangers associated with Vioxx as alleged herein; and

    (d)    Negligently failing to inform Plaintiff of the fact that Vioxx was associated with elevated risks of certain side effects (including inadequate bone repair) and was otherwise defective as alleged herein.

85.     As a direct and proximate cause of Defendant's failure to supply appropriate warnings for the drug Vioxx, Plaintiff ingested Vioxx, and suffered great pain and suffering, estrangement of family and personal loss, a very significant delay (or more likely prevention) of a very important operation that was needed to correct a prior lumbar fusion – which per Surgeon notes, was ruined by lack of inadequate bone healing. The delayed, or most likely prevented correcting operation was needed to be able to go back to work. (Plaintiff also now has the dilemma of knowing that he may not make it through the operation, by death or paralysis, but on the other hand has also been warned that lack of this operation could eventually result in extremely weak legs and possibly even paralysis). Plaintiff currently does experience extremely weak legs of a level many times than was the case before his femur/vioxx ordeal; and now must walk with a cane if the distance is about 100 feet or more), quite likely an early need for nursing help, and very substantial economic loss. Moreover, as a proximate and direct result of Defendant's breach, Plaintiff has been severely damaged physically, and emotionally well into the future. By reason of the foregoing.

13

## SECOND CAUSE OF ACTION

### *Fraudulence & Deceit*

86.    Plaintiff incorporates by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth in this paragraph.

87.    At all times herein mentioned, Defendant had an obligation not to violate the law, in the manufacture, design, formulation, compounding, testing, production, processing, assembly, inspection, research, distribution, marketing, labeling, packaging, preparation for use, sale and warning of the risks and dangers of Vioxx.

88.    Defendant manipulated its advertising to exaggerate Vioxx's benefits and to conceal the drug's true risks (including inadequate bone repair). It also told consumers Vioxx was safe and approved for long-term use. Defendant told consumers these claims were scientifically proven and justified while the truth was just the opposite. Defendant failed to advise consumers that the use of Vioxx would increase the risk of myocardial infarction. Further it failed to disclose severe side effects like kidney and liver damage, stomach problems including intestinal bleeding and the risks of non-bacterial meningitis.  Further, despite research and studies that stated the contrary, Defendant advertised Vioxx as being free from side effects normally associated with NSAID drugs. Such deceptive advertising was the major factor in developing a "veil of safety" concept in the minds of consumers, unfortunately creating an atmosphere of feeling that all is fine and accounted for, and very much minimizing the healthy skepticism and cautiousness that should normally be the case, especially when in fact there were so many areas of concern hidden by Defendant which should have been disclosed.

89.    In effect, the public, and the Plaintiff in particular, became a "testing" ground for both short term and long term effects of which Defendant did not adequately test and/or account for.

90.    Defendant failed to disclose in its direct to consumer advertising and failed to accompany Vioxx with warnings that fully disclosed the severity and likelihood of an adverse event, condition, effect or reasonable suspicion of an adverse event of the drug  (e.g. ignored warnings of inadequate bone repair and did not reasonably warn of the possibility, and did not even follow-up on the issue).

91.    Defendant falsely an deceptively represented to, and knowingly omitted, suppressed and concealed material facts from, the FDA, including but not limited to the FDA's advisory committee members, regarding Vioxx's safety and efficacy, its uses and manner of use Defendant advertised directly to consumers.

92.    Defendant falsely and deceptively represented to, and knowingly omitted, suppressed and concealed material facts from, physicians and the medical community regarding Vioxx's safety and efficacy. Including promoting audio conferences wherein that the FDA called false and misleading.

93.    Defendant's acts constitute an adulteration and/or misbranding as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.C.  331.

94.    Additionally, Defendant failed to meet the standard of care set by the following regulations, which were intended for the benefit of individuals such a s Plaintiff as follows:

A.    The labeling lacked adequate information on the use of Vioxx [21 C.F.R. Section 201.56(a) and (d)];

B.    There was inadequate information for patients for the safe and effective use of Vioxx }[21 C.F.R. 201.57(f)(2)];

14

C.  There was inadequate information regarding special care to be exercised by the doctor for the safe and effective use of Vioxx [21 C.F.R. 201.57 (f) (1)];; and

D.  The labeling and promotion of Vioxx was misleading and [21 C.F.R. 201.56(b)].

95.  Plaintiff, as a purchaser and consumer of Vioxx, is within the class of persons the statutes and regulations described above are designed to protect.

96.  Defendant's above-alleged conduct constituted unfair, deceptive, fraudulent and unlawful business practices. Defendant's fraudulent, false; deceptive and misleading acts and practices alleged herein had a major tendency to deceive Plaintiff and his surgeons, physicians.

97.  Defendant derived profits and material gains as a direct and proximate result of the unlawful, deceptive and fraudulent representations herein alleged. As a result of the above-described conduct, Defendant has been unjustly enriched in profits, income and ill-gotten gains at the expense of the plaintiff and the other consumers who purchased and consumed Vioxx in reliance upon Defendant's false, deceptive and fraudulent business practices.

98.  As a direct and proximate result of Defendant's unfair methods of competition, plaintiff suffered injuries in fact, ascertainable loss and damage. Plaintiff is therefore entitled to equitable relief.

## PRAYER FOR RELIEF

Plaintiff prays as follows against Defendant of behalf of himself:

## ON BOTH CAUSES OF ACTION:

a.  That the Court grant restitution to Plaintiff in the amount of $1,500,000 (total for both causes of action) for the allegations set forth.

b.  Pre-judgment and post judgment interest on all damages as is allowed by law;

c.  Fees and expenses pursuant to Code of Civil Procedure !1021.5; and

d.  Such other and further relief as the Court deems just and proper.

Dated: June 26, 2006

Plaintiff Dennis Richard Harrison in Pro Per *Se* #1.

_Dennis R. Harrison_

COLLEEN J. BONDAR
Notary Public, State of New York
Reg. No. 01BO6098023
Qualified in Ulster County
Commission Expires September 2, 20 07

_Colleen V Bondar_
10/26/06

## DEMAND FOR JURY TRIAL

The above Plaintiff hereby demands a trial by jury in this action.

Dennis Richard Harrison,  Plaintiff in Pro Per
6a Short Street; Cementon, NY     12414-6913
Telephone:  845-231-3272  (HOME)
email      dharrison6@hvc.rr.com
Dated: June 26, 2006

Plaintiff Dennis Richard, Harrison in Pro Per

_Dennis R. Harrison_   *Se* -DH.

_Colleen V Bondar_ 10/26/06

COLLEEN J. BONDAR
Notary Public, State of New York
Reg. No. 01BO6098023
Qualified In Ulster County
Commission Expires September 2, 20 07

15

2

# EXHIBIT A

Dennis Richard Harrison
Vioxx Products Liability Litigation, MDL No.
1657
Harrison, Dennis R. v. Merck & Co. Inc
2:07-cv-00905-EEF-DEK

601 W Brown Street
Iron Mountain, MI    49801

906-221-5906
914-500-6874

Please use both email ids:
badbonehealing@gmail.com
badbonehealing@att.net

®
IN RE: Vioxx® PRODUCTS
LIABILITY LITIGATION

MDL Docket No. 1657

Plaintiff or Claimant: **Dennis R   Harrison**

## AMENDED AND SUPPLEMENTAL PLAINTIFF PROFILE FORM

This Amended and Supplemental Plaintiff Profile Form ("ASPPF") is to be completed and served pursuant to the requirements of Pre-Trial Orders ("PTOs") 28 and 29.

Other than in Sections I (C) and VIII, those questions using the term "You" should refer to the person who used Vioxx. Please use the Additional Information pages, located at the end of this form, as necessary to fully answer these questions. Sources of Information must be completed by each plaintiff who used Vioxx or their personal representative. Section VIII must be completed by loss of consortium plaintiffs.

If you are completing this questionnaire in a representative capacity, please respond to all questions with respect to the person who used Vioxx, unless the question instructs you otherwise. Those questions using the term "You" refer to the person who used the Vioxx, unless you are instructed otherwise. If the individual is deceased, please respond as of the time immediately prior to his or her death, unless a different time period is specified. In filling out this form, please use the following definitions:

(1) **"health care provider"** means any hospital, clinic, medical center, physician's office, infirmary, medical or diagnostic laboratory, or other facility that provides medical, dietary, psychiatric, mental, emotional or psychological care or advice and any pharmacy, counselor, dentist, X-ray department, laboratory, physical therapist or physical therapy department, rehabilitation specialist, physician, psychiatrist, osteopath, homeopath, chiropractor, psychologist, therapist, nurse, herbalist, nutritionist, dietician or other persons or entities involved in evaluation, diagnosis, care and/or treatment;

(2) **"document"** means any writing or record or any type, however produced and whatever the medium on which it was produced or reproduced, and includes, without limitation, the original and any non-identical copy (whether different from the original because of handwritten notes or underlying on the copy or otherwise) and all drafts of papers, letters, telegrams, telexes, notes, notations, memoranda of conversations or meeting, calendars, diaries, minutes of meetings, interoffice communications, electronic mail, message slips, notebooks, agreements, reports, articles, books, tables, charts, schedules, memoranda, medical records, X-rays, advertisements, pictures, photographs, films, accounting books or records, billings, credit card records, electrical or magnetic recordings or tapes, or any other writings, recordings, or pictures of any kind of description.

**I.**   **CASE INFORMATION**

A. Name of person completing this form:   **Dennis Richard Harrison**

B. Please state the following for the civil action or claim which you filed:

1.   Case caption:   **Vioxx Products Liability Litigation, MDL No. 1657**
                     **Harrison, Dennis R. v. Merck & Co. Inc**

2.   Case No.:   **2:07-cv-00905-EEF-DEK**

3.   If Tolling Claimant, set forth the date you executed your Notice of Tolling Agreement

4.   Please state the name, address, and telephone number of the principal attorney representing you. If you are not represented by an attorney in this case, please state "none"

Firm name:                  **- N O N E -**

City, State and Zip Code:

Telephone number:          **906-221-5906 or 914-500-6874**

C. If you are completing this questionnaire in a representative capacity (e.g., on behalf of the estate of a deceased person, or a minor, or incapacitated person), please complete the following:

I am completing this by and for myself; providing info for the record.

1.   Your name:   **Dennis Richard Harrison**

2.   Social Security Number:   **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**

3.   Any other names used or by which you have been known, including but not limited to maiden name:   **not applicable**

4.   Street Address:   **601 W. Brown Street**

5.   City, State and Zip Code:   **Iron Mountain, MI, 49801**

6.   If you are serving in a representative capacity, state which individual or estate you are representing, and in what capacity you are representing the individual or estate:   **N/A**

7.   If you were appointed as a representative by a court, state the:

Court   **N/A**          Date of Appointment   **N/A**

8.   Your relationship to deceased or represented person or person claimed to be

3

injured:  **SELF**

9.  If you represent a decedent's estate based on a decedent's death, state the date of death of the decedent and the address of the place where the decedent died:  **N/A**

D. Claim Information:

1.  Identify each bodily injury you claim resulted from your use of Vioxx:

a) <u>**Right Femur did not heal because of Vioxx**</u> – I had been on Vioxx 50 mg. daily for approximately 4 years before the incident - and from then until taken off the market. All during the time of the broken femur (prior, during, after) I was on the same 50 mg. of Vioxx. There was no warning or precaution in re to bone/spine healing. <u>**NO physician or surgeon had any reservations about using Vioxx before the operation or during recuperation – it simply was not an issue on anyone's radar. A bone/spine MUST have adequate inflammation during the first month in order to heal adequately. Since I took Vioxx, proper healing did not take place.**</u> There may also be the additive affect of Fosamax, another Merck product, which is also deleterious to bones on a long term basis and I had had Fosamax for about five years at that point. **The lack of healing caused approximately eight months in hospital(s) and nursing home(s), estrangement with wife and my very young daughter, pain and suffering, financial difficulties, loss of self esteem, etc.** Because of the non-union (healing) I was confined eight months in hospital/nursing homes, several operations, having to "hop around" on one leg, and two sepsis attacks near the end of confinement. **After being released from confinement, I was simply never the same person physically in any way. I came out much less of a person, physically, mentally, emotionally than I went in.** Whereas before the injury if I was on the floor, I could get up; ever since being released I cannot. I could walk without a cane before, after the injury I needed a cane; before the broken femur, my right ankle was straight and did not affect my walking; after the operations my right ankle angles to the right in a manner which places undue pressure on it making it very painful to walk.

One will often hear how an older person breaks a leg and the outlook from a mortality rate is not very good. My whole life, I never really understood this. Though I am not "old" (and only about 50 when the femur fractured), **I NOW UNDERSTAND** this. **I now understand how a fractured femur or hip can put someone in a deadly tailspin, life threatening events creating even more life threatening events. I NOW UNDERSTAND** why the mortality rate is as high as it is for what seems like "only" a broken leg.

b) <u>**Vioxx ruined a spinal fusion operation intended to improve body geometry including being straighter and taller**</u> - I had never had any issues, again none at all -  with any orthopedic (hip replacements, cervical fusion) operation before taking Vioxx; this was the **VERY FIRST OPERATION** that failed, and the **VERY FIRST OPERATION, that I had while on Vioxx.**

I had been doing substantially better over the last year+ (year 2000)W both the surgeon (**Dr. Frank Rand – Boston, MA**) and myself confident that this would be a successful (fusion) operation. I decided that I would go back to work after giving this mostly elective operation enough time to have proven itself successful. I had really looked forward to this operation, even asking the same surgeon if it was feasible to be done a bit sooner. He decided it was better to be conservative and wait a bit. The cervical fusion had been 100% successful (again, Vioxx was not utilized), all symptoms had disappeared, my energy level was high, my pain level was increasingly lower. A successful operation, expected by the surgeon, and both of us knowing how well I always recuperated certainly seemed to be in the cards. In addition to continuing to feel much better (possibly I had gone past the early phases of Fosamax pain/soreness), the spinal fusion would make me straighter, a bit taller, and in general improve body geometry. A successful operation certainly would have been better for my self-image also, which was important from a work perspective also.

4

c) **Vioxx was responsible for fracturing and/or severely disfiguring my wrist.**
There are no other explanations for this – I **NEVER had any issues, none at all, with either wrist.**
For no obvious reason of disease or accident, and happening so slowly over time, my right wrist
somehow and slowly became disfigured. My wrists were always fine – I never had any issues at all
with either of them. I never hurt or injured either one of them. It was approximately 1½ years after I
began taking Vioxx that it became obvious it had either broken over time or became disfigured over
time. At one point a rheumatologist (Dr. Trice – NH) attempted to alleviate the pain with an
injection. Pain was an on-off significant pain. **The deformity makes me very much less dexterous
and agile, and does nothing for one's self image.** Additionally, though not severe, the pain is at
times significant.

When Vioxx was taken off the market and I began to understand why my femur did not heal, I
noticed the Vioxx insert made reference to wrist fracture. I had never seen this warning, or had been
provided the warning by any physician. The "warning" seems more like a "by the way" statement
than a real warning. It is almost as if the manufacturer used the short, unclear statement to help
provide some cover for a problem which they knew existed, possibly general bone mineralization as
I later realized, but did not want to publish clearly. **There can be no doubt that if Merck had
indicating that Vioxx can decrease bone mineralization and/or prevent stress fracture
healings, that sales of Vioxx would have been crippled.**

> "This information is unlikely to be broadcast by pharmaceutical companies, he
> explains: **"It could affect the billions of dollars in sales of the COX-2 inhibitors** if
> people knew they might be destroying cartilage while they're trying to relieve their
> pain." JASON THEODOSAKIS, MD, MS, MPH., AUTHOR OF THE ARTHRITIS
> CURE (ST. MARTIN'S PRESS 2004).

Merck had hoped to get away without addressing the bone issues, but "just in case" they put the
unclear, short, vague statement in the insert for potential use in a bone/spine case(s) should the issue
raise to any significant knowledge.

The disfigurement (and fracture) happened so slowly that in no way would I have been able to
associate it with the Merck "pseudo-warning".

2. Identify the date(s) that you claim each injury occurred:

**Femur:** Mid-January, 2003; Femur fracture. This is currently the only allegation in the litigation.
However, I would like the following (spine fusion failure, wrist fracture) to be considered in this
litigation however possible, including informally at possible "settlement" discussion. If not, I would
intend to amend the existing litigation as it gets remanded back to NY.

**Spine fusion failure:** Early 2002 the spinal fusion operation failed - the 2nd rod finally broke. The
surgeon in Albany felt that the 2nd Rod had an incomplete low quality fusion so it had taken longer to
fail. February 2001 the first rod broke (in about 3 weeks) from the spinal operation to correct "body
geometry". The surgeon (Dr. Rand – NE Baptist, Boston, MA) had no explanation and felt that it would
be ok as at the time the unbroken rod seemed to be fine.

**Wrist damage:** Mid to late 2002 my wrist had on-off pain. Not until more than one year later (early
2003), when I was in physical therapy from the broken femur (Albany County Nursing Home – Albany,
NY) was it suddenly became obvious that it was very disfigured. It happened so slowly it was not
associated with anything, especially since the pain was on-off.

5

3.  Who diagnosed the conditions?

The broken femur was obvious via x-rays; Several surgeons (**Dr. Null – Kingston, NY; Dr. Hospodar, Albany, NY; Dr. Pizzurro, Bergen County, NJ**) were involved in the several operations and waiting for the (part of the) bone to regenerate to anchor the operation.

Spinal Operation issues by the original surgeon (**Dr. Frank Rand – Boston, NE Baptist**) and 2nd opinion by two other surgeons (**Dr Cristiello -Bergen County, NJ**), **Dr. Carl – Albany Medical Center; Albany, NY**)).

Wrist issue was evaluated by a rheumatologist (**Dr. James Trice – Henniker, NH**) – it was "only" pain at the time so beyond a shot of cortisone to relieve the pain (which didn't) that is all that was done.

4.  Did you ever suffer the same type of injury(ies) prior to the date(s) set forth in Section I (D) (2)? Yes _____     No  **X**  with commentary

**NO – I NEVER had an issue with bone or spine healing before Vioxx usage.**

**Never fractured or even sprained any bones in my life before the above.**

It should be noted that **each** surgeon and physician had every reason to believe that each operation would be successful – no medications, nor pre-existing conditions were thought as being deleterious or risking the operation. I understand that Merck successfully, or perceived as such, used that approach with MI/Stroke; it even became embedded in the settlement's net award as "points deducted". Merck may look to use such strategy here. IF Merck choses such a strategy of confusion and red herrings, it is certainly even more reason why I should not have been given Vioxx during the operation and recuperation. Nor did any surgeon have any idea that Fosamax itself could complicate issues and inhibit healing. Though there are never guarantees in operations, and though of course I signed the standard waivers, **never were any views expressed, that any operation would likely be anything but successful.** A common theme for all of them is that they did not know about the Vioxx healing issue. Nor, obviously did they know about the issues with Fosamax. In fact upon my questioning one of the surgeons he indicated that he was under the impression, from Merck, that all of the "issues" with the first generation Cox-1 inhibitors were resolved.

**Unlike the MI/Stroke "settlement", I do not feel a jury, hearing all the facts, would agree with Merck should Merck attempt that tact. There is simply too much evidence showing how my life changed so adversely coinciding so precisely with the introduction of these drugs.**

*If "yes,"* please specify each prior injury, when it occurred and who diagnosed each prior injury at that time:

Do you claim that your use of Vioxx worsened a condition that you already had or had in the past? Yes _____      No  **X**    ?  **with commentary**

**However - the introduction of Vioxx worsened an environment that apparently was developing from the increasing years of Fosamax usage.** By the time the femur fractured I had been on Fosamax for five years. I had been a very active person with a very well managed arthritic condition until Fosamax began to reverse that; then Vioxx entered my life doing nothing but setting me up for worse times. Fosamax stops proper/natural bone regeneration and also inhibits the healing process; it was responsible for the fracture of

6

the femur in the first place. **BOTH DRUGS are detrimental to bone/spine tissue**. The longer Fosamax is taken the more likely that the above will happen. Vioxx added significant fuel to the fire. **Fosamax was responsible for breaking the femur, and Vioxx was primarily responsible for the lack of healing.** However, Fosamax can be implicated for healing issues also, especially as it had been taken about five years at the time and it is well known that it does not leave the bones for years after taking it. **Between the two drugs, I simply never had a chance.**

Approximately one year before taking Vioxx, I was placed on Fosamax as a "preventive" measure **(Rheumatalogist Matthew Heller – N. Shore Center for Arthritis & Research, Peabody, MA)**. I initially was impressed with this office; however as I later discovered Merck and physicians often utilized "seed studies" in which the patients did not even know they were being utilized as subjects. I believe that this Rheumatalogist, describing himself as a "researcher", prescribed Fosamax to me under the theory that it "must" be good for my bones; when in fact at worse I "might" have had some Osteopenia, but I did not have Osteoporosis, and Merck should not have been encouraging Fosamax for Osteopenia – especially on a long term basis. Before Fosamax was prescribed my soreness was really not that difficult to deal with. I was not significantly limited, in fact hardly at all. I worked full time – even frequently additional hours, and was very busy around the house and doing something virtually every weekend. Before Fosamax, though I had arthritis, I was not much more limited than when I was in my twenties and thirties.

**I was extremely perplexed - in less than a few months after beginning to take Fosamax as I went from a person who was managing his arthritis extremely well, not missing work from it - to being in such severe pain that I could not work.** Again, this happened in only a few months after beginning Fosamax. Recently, a warning has been added to Fosamax that it may cause significant pain when beginning "treatment" - which is consistent with what I experienced. I can describe it best as pain upon pain, dramatically adding to what I had as I then quickly went from it being manageable to it being excruciating most of the time.

*If "yes,"* set forth the injury or condition; whether or not you had already recovered from that injury or condition before you took Vioxx; and the date of recovery, if any:

*Again, I was doing quite well and the arthritis was being managed well, until I began taking Fosamax, and then Vioxx. Physicians and surgeons were not knowledgeable of the deleterious nature of these drugs to bone structure. I had never broken nor even sprained any bone before Vioxx.*

E. Are you claiming damages for any psychological, psychiatric or other mental or emotional problem as a consequence of using Vioxx?  Yes **X**  No _____

I certainly had been depressed more than at any time in my life, and to this day it still haunts me.

*If "yes,"* describe each kind of injury you allege you suffered and when you allegedly suffered it:

Depression and damage to self esteem. Most pronounced during and immediately after the eight months in hospitals and nursing homes, but it is something that will just never leave me. I will always wonder what my life would have been like had I not been introduced to BOTH Vioxx and Fosamax. I was doing so well at work and **many of my peers have gone on to be very high level executives, there is no reason why I should not have.** Though I maintain a reasonable relationship with my daughter, though now long distance, I have never regained the very close

7

relationship I had with my daughter – frankly, that breaks my heart and can severely depress me at times. I feel that with the confinement and the issues after it, I missed out on some of the most formative years of her life, and she was denied a loving active father during that same time. Even when I was still in NY (i.e. before moving to Michigan) we lost some of that special closeness of father-daughter ONLY after the eight months when I was confined away from her for the first time. I have never been the same, neither physically nor emotionally. As mentioned above, the effects of the injury, having to walk with a cane, not being able to get up from the ground, difficulty in getting up from a chair, feeling frail rather than relatively strong as I once was; all of that just adds to lower self esteem than I certainly thought I would have at this point in my life. Instead of feeling like a reasonably strong man of 50 at the time (58 now) and as a physically very capable father, I have (and continue to) feel like a frail parent who's child may be embarrassed about. Instead of knowing that I could not work as I once did, I dwell on the extremely bright future that I had, and the career, and financial, position, I would be in at this time.

*Also if "yes, "* did you seek treatment for these injuries?

Yes   **X with commentary**         No _____

*If "yes,"* provide:

1.  Name and address of each person who treated you:

> I asked my family physician (**Dr. Donnovan – Kingston, NY**) for something for depression. I found myself too often depressed and dwelling of the past before Vioxx (and Fosamax) usage. I tried several things such as anti-depression and anti-anxiety. Perhaps they took the edge off, but I will always wonder and feel depressed from a future that should have been.

2.  Condition(s) for which treated:   ____     **depression; anxiety**

3.  When treated:     From:          **within a few months of being released from confinement**

4.  Medications prescribed for each such condition:  **Celexa; Zymbalta; Zoloft; increased Klonopin**

> *Also if "yes,"* state whether you have experienced or been treated for any psychological, psychiatric or other mental or emotional problem prior to the physical injury you claim from Vioxx, including but not limited to panic attacks, anxiety, post traumatic stress disorder, depression, thoughts of hurting yourself or other people, schizophrenia, bipolar disorder, personality disorders (e.g., obsessive compulsive, paranoid, borderline, histrionic, other), generalized anxiety disorder, social phobia/anxiety disorder, post-traumatic stress disorder, depression, mania, poor sleep, poor concentration, suicidal thoughts/attempts, and drug abuse.  Yes _____  No  **X with commentary**

> **When I was scheduled for my mid-90's hip replacement I too often became claustrophic at night. This affected sleeping (and wasn't a comfortable feeling). I was prescribed Klonopin and imipramine to attempt to alleviate the issue.** Other than that, and even with that, I had always considered myself an even going, rational, logical and normal person without psychological issues.

8

*If "yes,"* state:

5. Name and address of each person who treated you:

   Name

   Address (if not otherwise provided)

6. Condition(s) for which treated:

7. When treated:   From:                 To:

8. Medications prescribed for each such condition:


## II.   <u>VIOXX® PRESCRIPTION INFORMATION</u>

A. Who prescribed Vioxx for you?

Prescribed from April, 2000 to the day it was taken off of the market.

Prescribed by each family Dr. My generall approach to medications was to have the rheumatalogists work with my general Dr. so the general Dr. could be in effect the "gate keeper". There was minimal exception to that.

1: Vioxx first prescribed by **Dr. Harry Rae - 20 Granite State Court, Brewster, MA 02631**

2: General physician  **Dr. Belson – 10 Bridge Street, Henniker, NH** in consult with rheumatologist

3: **Dr. James Trice - 280 Pleasant Street, Concord, NH**

4: **Dr. Paul Donovan (27 Grand Street, Kingston, NY)**

5: Also prescribed while I was in the following institutions for nearly 8 months:

**Ne Baptist Hospital, Boston, MA** (spinal fusion which failed while on Vioxx and Fosamax)

**Rehabilitation Hospital of the Cape & Islands, East Sandwhich, MA**

**Benedectine Hospital, Kingston, NY** (initial femur operation which failed while on Vioxx and Fosamax)

**Albany Medical Center, Albany, NY** (to repair the first femur operation)

**Albany County Nursing Home, Albany, NY** (to recover from failed femur operations and have therapy while I waited for enough bone growth for corrective surgery.

**Valley Hospital, Wayne, NY** (where final (3rd) femur operation was done via GLUE).

**Kingston Hospital, Kingston, NY** (rehabilitation; 1st sepsis attack – source urinary)

**In NJ (Dr. Joseph Pizzurro; there had been thoughts in Kingston that he should debride, etc. the femur; however after getting to NJ the surgeon felt that it should be left alone, observed, and sent me to a NJ nursing home (below).**

9

**Wayne Nursing home, Wayne, NY** (2nd sepsis attack – source from PIC line; came after 3rd femur operation – source urinary)

**Wayne Hospital** (treatment of 2nd sepsis attack)

As one can see (again), I went from a well managed condition, very active, and a very successful career to so quickly being strewn into a situation in which no-one could quite grasp. Again, no-one knew of that Vioxx was working against me, even while I continued to be taking it full strength! Again also, Fosamax, which I had been taking for five years when the femur broke, certainly does not help bone heal.

B. On which dates did you begin to take, and stop taking, Vioxx?

April, 2000 until it was withdrawn. Full permitted strength (50 mg.); daily; consistently used each day for the entire time. Prior to this date (Oct/1999) – 6 months before Vioxx was introduced, I had a cervical fusion. **Notably, without Vioxx interfering with healing, it was 100% successful.** I was in the hospital for less than 2 days and recuperated without any complications at all. Such was the case in anything pre-Vioxx. The first operation that I had was while on Vioxx was a spinal operation about 15 months later (Jan/2002).

C. For what condition were you prescribed Vioxx?

**Arthritis/Anklyosing Spondalitis**

D. Did you receive a prescription for Vioxx? Yes **X**  No _____

*If "yes,"* set forth the name(s) and address(es) of each pharmacy where you filled each Vioxx prescription:   **This was provided in the matrix I provided to Merck. Also, I provided a copy of the prescription records.**

   1.   Did you renew your prescription for Vioxx? Yes  **X**  No _____

      *If "yes,"* how many times?

   **Faithfully every month; when hospitalized it was also taken daily.**

E. Did you receive any samples of Vioxx? Yes _____   No **X**

*If "yes,"* for each provider, provide the following:

   1.   Identify the full name and address of person who provided you a sample of Vioxx:

   2.   Identify how many tablets of each dosage were provided:

   3.   Identify each date samples of each dosage were provided:

HarrisonD-PlProfileForm-    00010

F. Which form of Vioxx did you take (check all that apply)?

    _____   12.5 mg Tablet (cream, round, MRK 74)
    _____   12.5 mg Oral Suspension
      **X**    25 mg Tablet (round, yellow, MRK 110) – **2x daily (for the first year or two)**
    _____   25 mg Oral Suspension
      **X**    50 mg Tablet (round, orange, MRK 114) - 1x daily

G. How many times per day did you take Vioxx?  **Mostly the 50 daily; in the beginning I had some prescriptions for 2 times daily at 25mg.**

H. Have you reviewed any written, televised or internet-based advertising or labeling materials regarding Vioxx? Yes  **X**_____     No

*If "yes,"* state which written, televised or internet-based advertising or labeling materials you reviewed regarding Vioxx and when you reviewed such materials.

Quite a bit after Vioxx was taken off of the market I happened to notice an article on the Internet, I don't remember exactly which one. **It indicated that Vioxx had been implicated in many studies, I found scientific explanations, and I noticed** – and always wondered  (or maybe I knew) <u>WHY THE SECTION FOR HOW BONES HEAL WAS TAKEN OUT OF THE MERCK MANUAL ABOUT THE TIME OF MOST CONCERN</u> for interrupting/damaging/ruining the bone (and spine) healing process. Then it "all" started to make sense. I not only began to research Vioxx, but also the science of Fosamax. I began to feverishly attempt to understand not only the femur non-healing issue, but how could my life possibly take such a downward slide. **What happened to me – why did I go from a very active, relatively healthy and strong individual working full time and having a very successful career – to quickly the severe pain and soreness I now understand to being from Fosamax.** The horrendous pain, pain above pain began within a few months of taking Fosamax and incredibly forced me from a career that I held dear). I had a history of healing very quickly, then what seemed all of a sudden I had a femur that didn't heal at all and eventually was "glued" together so I could walk again after nearly 8 months in hospitals/nursing homes.

I read and analyzed hundreds of articles, scientific explanations, internal Merck emails, anything I could get my hands on. I am a technical/scientific oriented person and an extremely large amount of information in re to Vioxx, the methodology on how bones heal, etc. and even began to suspect Fosamax could have a part in it – especially since both medications impact the natural bone healing process. I discovered that Merck denied the issue of Vioxx and bone healing. Though I suspected some implication of Fosamax in my situation(s), I could not find anything solid enough to ensure additional litigation was responsible. **However, I now believe that I have sufficient reason and have done due diligence in re to Fosamax to either amend my litigation or file another suit.**

I have accumulated quite a bit of information available authored by highly regarded medical institutions, journals, physicians, surgeons, and even at least one college professor. I also have internal Merck emails, the title of a very suspicious one (below) that was denied entrance into PSC evidence due to "attorney-client" privilege, and information from a retired Merck scientist. There are also statements from NJ Scientists that had approached Merck after the year 2000 BUT were repudiated by Merck. – and reportedly Merck began a campaign to discredit any studies indicating bone/spine <u>issues from Vioxx.</u>

HarrisonD-PlProfileForm-   00011

**Merck is asking what kind of material did I locate so the best way I can answer this is by examples. This litigation is not MI/Stroke and I should be reserving most of it for the coming Discovery; besides it being so large. However, I'll provide some samples at this point.**

The samples are from past work in an effort, put on hold when I got ill:

    a) amending the existing litigation to include the spinal failure;

    b) preparing to file separate Fosamax litigation.

**The samples below were NOT cultivated during the time of my illness and do not represent any additional work except very minor copying and pasting from work done before my illness.** As communicated to Merck, the PSC, and the court – the illness has made it extremely difficult to do any true work at this time. *Please disregard things such as "attachment", or "exhibit number" as they are part of the structure of the additional litigation which had been under development before the illness.*

---

Document 581 of 1,947

| | |
|---|---|
| BATES_RANGE | : MRK-AAD0225909-MRK-AAD0225909 |
| ATTACH_INFO | : Attached to MRK-AAD0225908-MRK-AAD0225908 |
| PRIV_CLAIM | : Attorney-Client Privilege |
| DATE | : 05/22/02 |
| AUTHOR | : Lahner, Joanne* |
| RECIPIENT | : OSTIC Correspondence; DeTora, Lisa M. |
| DESCRIPTION | : Document reflecting a request for legal advice and opinions regarding Risk Factors for Fracture in Patients with Rheumatoid Arthritis study issues.. |
| W_HELD_REDAC | : Entire document. |
| SM_REC | : GRANTED |
| BOX_NUM | : 2 |
| FOLDERNO | : 2 |

---

**Some more samples, but certainly not inclusive:**

### Text enclosed in – > and < – is by Plaintiff Dennis Harrison

*– > When approached by even its own paid scientist/surgeon in 2000* – Dr. Thomas Einhorn (within Exhibit #x), Merck simply again chose to ignore the issue. < – –

 – > From Attachment (B) < –   …"**It's time to tell the public**"…    The role of COX-2 in bone repair … have been shown to **(adversely affect bone repair)**… *this is due to the inhibition of Cox-2 and not COX-1!* Vioxx is a Cox-2 inhibitor Thomas A Einhorn - Professor and Chairman,  Einhorn TA. – Professor & Chairman, Department of  Orthopedic Surgery, Boston  University Medical Center…

### – > Exhibit #x:  Animal Testing and Merck's inconsistency < –

– > * Note Merck **dismisses** animal studies; < –

"The bottom line is that Merck chose not to work with Dr. O'Connor to study this potential issue.  When he began to publish papers about delays in bone fracture healing in rats (which generated some publicity), *Merck created a PR campaign to demean the impact of the data* because it was from animal

12

studies, not human studies" (see exhibit xx).

It appears that Vioxx may contribute to three inter-related problems. *First,* Vioxx may cause <u>decrease in bone mineral density</u>, which leads to osteoporosis. *Second,* osteoporosis is a condition that may increase the risk of both low trauma and high trauma fractures. *Third,* Vioxx may <u>delay the healing of fractures, resulting in non-unions.</u>

**-- > ** <u>Now Note Merck **embraces** animal studies:</u> < --**

Although a previous clinical test showed that Vioxx increased the likelihood of heart ailments, *the company <u>relied on animal studies</u>, including those performed on African green monkeys, as the basis for claims that the drug was safe",*

Despite having test results "from over 8,000 humans that the drug was killing people," *Merck continued to use animal studies to justify continuing to sell Vioxx,* said Dr. John Pippin, a cardiologist and consultant to PCRM

Alise Reicin, Merck's vice president of clinical research, was quoted in *USA Today* as saying that Merck did not have any human test data confirming that naproxen helped to prevent blood clotting, *so the company relied on animal studies.*

**_ > *** <u>Merck again **re-asserts** the value of animal studies</u> < --**

*Bone Mineral Density as well as bone healing:* In addition to the issues of bone-spine healing, recently discovered evidence (internal Merck email - exhibit #2) that Bone Mineral Density issues in re to Vioxx were also of a concern to Merck. Merck understood the very real possibility including BMD issues, but chose to investigate only *(via animal study) "should that issue arise".* Merck later contradicted itself at the height of Vioxx's popularity and profit, and instead actively chose to discredit the Scientific Community pleading with Merck to acknowledge the danger (exhibit x).

_ > And one example of an email: < --

--> *Internal Merck documentation  MK-0966 (VIOXX™) Project Team Meeting Minutes: April 13, 1998 ATTACHMENTS to the MINUTES Suzanne M. Pemrick, Ph.D. ATTACHMENT #1; Dr. Alan Nies' Writeup for Meeting of Board of Scientific Advisors in 1998* acknowledged further issues in addition to bone/spine healing problems from Vioxx. Merck admitted (exhibit #x) a very real potential of general bone/spine damage and bone mineral density issues < --

"Bone turnover...Experimentally, mechanical effects to stimulate bone formation can be reduced or blocked by indomethacin and other NSAIDs. *It has been proposed that COX-2 plays an important role* in this anabolic (bone forming) response to mechanical loading based on the effects of a COX-2 selective inhibitor in rats".

"....European consultants have raised the issue of the effect of COX-2 inhibition on cartilage health because of the impression that some NSAIDs, notably indomethacin, may increase the rate of destruction of articular cartilage in patients with osteoarthritis. The basis for this impression is not firm. *We are not planning to perform any experiments on joint cartilage in vitro."*

13

HarrisonD-PlProfileForm-     00013

-- > *Merck consciously chose to experiment on an unsuspecting public* to see what would happen and if plaintiff asks – what does "should that issue arise" mean? Further, what would "some reassurance" mean? Surely this cannot be a company interested in "patient safety first"? < –

-- > *Merck continues to understand the concern and gloss over it:* < --

In 1999 (April 20), Merck and the FDA, in meeting (ARTHRITIS ADVISORY COMMITTEE; REVIEW OF NDA #21-042; FDA   CENTER FOR DRUG EVALUATION AND RESEARCH) to discuss "the general safety and tolerability profile for rofecoxib"

-- > Plaintiff points out that Merck utilized animals to basically justify the efficacy and relevant tolerance of Vioxx – thus it is inconsistent to actively discredit animal studies as noted above and in exhibit (xxxx). Furthermore, continuing to acknowledge that there may be a problem with healing aspects – a Dr. Wilson comments: < --

"And as is also known, during episodes of inflammation, ulcerations, infections, there's an up-regulation of the level of COX-2. And it's suggested that the function of COX-2 in this situation is to promote healing and to promote elimination of any infectious agent....And in rabbits there was an increase in the incidence of incomplete ossification" .

-- > Merck again acknowledges the danger of bone healing and Vioxx, yet just continues to gloss over it with no significant action plan. < –

I.  Have you had discussions with any doctor about whether your claimed injury(ies) set forth in Section I (D), above, is related to the use of Vioxx? Yes   **X**  No_____

*If "yes,"* provide the following:

1.  Identify the doctor(s) with whom you had such discussions.

It is obviously easier to gain specific causation support when the general causation is the fait de compli. I faced a very substantial disadvantage and hurdle not faced by the typical MI/Stroke victim/litigant. Namely, Merck while not technically admitting to wrong doing, by the very nature of the "settlement" for all practical purposes essentially verified the suspicions an increasing number of physicians had in re to MI/Stroke – essentially as said a fait de compli via the withdrawal of Vioxx and the "settlement". Many physicians were thus relatively at ease with minimum/no risk to agree that Vioxx was the cause for those that required specific causation. Myself, not having such a substantial advantage of a fait de compli, (compared to a MI/Stroke litigant) in the case of bone/spine had to prove not only specific causation, but also general causation which was not "admitted" to by the virtue of a "settlement". Also, having my case in an MDL for several years with injuries not represented by a PSC who said "I had to do it myself" placed great, unfair advantage to Merck. I did not have the discovery resources, nor the advantage of having any physician knowing that Merck had "settled" in re to the injury class I was in. Here are the physicians – most talk was incidental. Discussions were mostly based upon me attempting to understand what knowledge was common to a physician. My conclusion was/is that physicians and surgeons were in the dark and that now they are beginning to understand after all these years – not because of Merck, but because of word of mouth, etc. The full extent of the danger, however, I do not believe is understood by an average physician, though I hope it would be by now by most surgeons.

14

Dr. Paul Donovan (Oncologist/Dr. was in effect the "gate keeper", Kingston, NY)

Dr. James Wise (Rheumatalogist, Kingston, NY)

Dr. Cristiello (2nd opinion Surgeon; Bergen County, NY)

Dr. Pizzurro (Surgeon; Bergen County, NY)

I am not sure if I had discussions of more than a word or two with Dr. James Grace (Surgeon, Green Bay) and Dr. Mark Davis (Rheumatalogist, Green Bay).

Address (if not otherwise provided) *(If discussed with more than one doctor, please provide details in the Additional Information page located at the end of this form)*

**Addresses provided**

J.  State whether you requested that any doctor or clinic provide you with Vioxx or a prescription for Vioxx. Yes    No  X

K.  Were you given any written instructions or warnings regarding the use of Vioxx?
    Yes  X   No

*If "yes,"* state:

1.  When the written instructions or warnings were given:  **with most prescriptions**

2.  A description of the written warnings or instructions (e.g., package insert, patient product information, pharmacy handout, etc.):  **package insert; pharmacy printout**

3.  Identify each person or entity from whom you received the warnings or instructions:

    **Each pharmacy** had either an insert or pharmacy printout; in the hospitals or nursing homes no person nor handout was provided.

4.  Approximate date you received the written instructions or warnings: **each prescription**; dates are on the records from the pharmacies.

5.  Summary of instructions/warnings received:

    **I read the insert – we all know how the inserts are written; certainly not consumer oriented.** I did not notice anything at all in re to bone/spine healing. Later on, I remember reading about potential blood pressure and/or MI. However, I had regular physician visits and felt that it was being monitored – much as one was supposed to be monitored with blood tests while taking Cox-1 inhibitors.

L.  What other medications (including aspirin), if any, were you taking at the same time you were taking Vioxx?

    Fosamax, Tylenol #4, oxycontin,  imipramine, prednisone on/off at 10mg per day; zantac and/or equivalent. Tylenol #4 was decreased when oxycontin was taken; Tylenol #4 was increased when I decided to stop taking oxycontin (I felt that Tylenol #4 did not create a dependency; however I was concerned with oxycontin). I had taken Methrotexrate for one year upon the view of a rheumatologist; however I did not feel that I needed it and I discontinued it.

M. What other medications (including, but not limited to, aspirin, ibuprofen, naproxen, and Celebrex) have you taken for osteoarthritis, rheumatoid arthritis, or pain relief, and when did you take them?

**Most of the anti-inflammatories at one point or the other over the years.** Separately (i.e. not taken concurrently) from Cox-1 inhibitors or Vioxx, I occasionally tried aspirin. I also had regular Tylenol on occasion but ensured between Tylenol #4 and Tylenol I did not take more than the permitted amount of acetomephin.

1. Do you believe you ever experienced gastrointestinal problems or other adverse side effects from any or all of these other medications? *If "yes,"* list the type of adverse side effect, the medication you were taking and the date(s) on which you experienced the adverse side effect.

**NO** – not in the sense of real problems; I had occasional heartburn but nothing serious. However, in 2009 I possibly had a severe gastrointestinal reaction to Naproxyn which was rectified.

2. Did you believe you experienced any of the adverse side effects listed in your answer to the preceding question while taking Vioxx? *If "yes,"* set forth which adverse side effect you experienced, when, what treatment you received for the adverse side effect, and who prescribed that treatment.     **NO**

N. On what date, and in what city and state, did you first experience any symptoms you believe are related to the injury(ies) alleged in Section I (D) and what were those symptoms?

Related to the injury – I would have to say in the Spring time of 2002; in NH before moving to NY until the femur actually fractured I had severe pain in my legs – frankly I don't remember if it was both or one of them; Regardless I now attribute these to Fosamax. **Fosamax was responsible for breaking the femur (as well as inhibiting healing); and Vioxx was responsible for stopping it from healing (as well as recent understandings that Vioxx could have contributed to bone mineralization issues – thus Vioxx could have contributed to the broken leg itself in addition to stopping the healing process; and Fosamax surely did not help the healing process).**

**Mid-January, 2003 in Kingston NY is when the femur broke.** I had merely assumed that I must have slipped in the snow. I had never broke any bones, etc. in my life and I was shocked – always thinking, no matter having arthritis, that my bones were strong as over all of the years; falling or slipping never created any problems, none at all. I never understood how my leg could buckle and twist as it had; the breakage (on x-rays) just seemed so much more than it should have been – how could I have fallen that hard? I was always felt it strange that it seemed to buckle first and then I fell. I never had any issues of falling and/or breaking before and it was a shock. When I had fallen over the years on-off like a normal person might, I never was hurt and got right up. **The femur just seemed to snap into two pieces like a chicken wing bone. I now strongly believe that the femur broke, and in such a complete manner because of Fosamax. Also, I had the "traditional" symptoms of severe leg pain for nearly one year before the fracture. <u>Fosamax broke it; Vioxx stopped it from being fixed.</u>**

16

O. Were there any witnesses to the symptoms identified in Section I (D)? *If "yes,"* state their names, addresses, phone numbers and relationships to you.

**No witness to the actual fracture.** I was, however, taking my seven year old daughter to the bus stop when the femur was fractured  She saw me down but did not see me fall. My ex-wife and her Mother knew that I was suffering severe leg pain for many months leading up to the broken femur. They watched me night after night not be able to sit or stand for more than a few minutes as I tried to eat supper. I used to have a meal; sit for five minutes; stand for some minutes and then "run"  to the couch when the meal was over.

P.  When did you first contact a doctor or healthcare professional concerning the injury you allege in Section I (D) and whom did you contact?

When it fractured, **immediately** – the ambulance was called right away and I went **to Benedectine Hospital in Kingston, NY.**

**Before the fracture; as noted above when I began to feel severe leg pain, which I now understand was** several surgeons had been consulted

Dr. Faille – Concord, NH (1st opinion before moving; felt broken rod was beyond him); mid-2002

Dr. Carl – Albany, NY (2nd opinion – willing and ready to fix broken rods); Sept/2002

Dr. Cristiello – Ridgewood, NJ (spinal surgeon; discovered the 2nd broken rod); Aug/2002

Dr. Pizzurro – Ridgewood, NJ  (orthopedic surgeon; 2nd opinion); Aug/2002

Q.  If you were taken to a doctor or health care facility for the injury(ies) alleged in Section 1(D) state the name and address of the persons, police department, fire department, emergency medical workers, or ambulance company that took you to the doctor or health care facility.

**Kingston Ambulance took me to Benedectine Hospital in Kingston.**

HarrisonD-PlProfileForm-      00017

III.   **PERSONAL INFORMATION OF THE PERSON WHO USED VIOXX®**

**A.** Last name:                **Harrison**

   First name:               **Dennis**

   Middle name or initial:   **Richard**

**B.** Any other names used of by which you have been known, including but not limited to maiden

   name:

**C.** Social Security Number:  **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**

**D.** Driver's license number:  **973 908 176**   State issuing your license:  **NY**  .

**E.** Date and place of birth:  **November 19, 1952 – Passaic, NJ**

**F.** Sex: Male  **X**

**G.** Current street address:     **601 W. Brown Street, Iron Mountain, MI, 49801**

**H.**  Identify each other address at which you have resided during the last ten (10) years, and list
when you started and stopped living at each one *(if you have not resided at another address in
the last ten (10) years please state "none. ")*:

| Address (Most current first) | Dates of Residence From: | To: |
|---|---|---|
| **Iron Mountain** | **11/09** | **current** |
| **Kingston, NY** <br> **Catskill, NY** <br> **Hurley, NY** | **06/09** <br> **05/06** <br> **05/04** | **10/09** <br> **05/09** <br> **05/06** |
| **Kingston, NY** <br> **Henniker, New Hampshire** <br> **S. Dennis, Cape Cod, MA** | **07/02** <br> **08/01** <br> **07/99** | **04/04** <br> **06/02** <br> **07/01** |

**I.**  Identify each high school, college, university or other educational institution (except grade
school) you have attended, the dates of attendance, courses of study pursued, and diplomas or
degrees awarded:

| Institution | Dates Attended | Courses of Study | Diploma & Degrees |
|---|---|---|---|
| **Boonton High School** <br> **Boonton, NJ** | **1966-1970** | **College Preparation** | |
| **Montclair State College** <br> **Montclair, NJ** | **1970-1974** | **Mathematics; Business Computer** | **BS - Mathematics** |
| **Rutgers University** <br> **Newark, NJ** | **1976-1977** | **Finance Marketing** | **MBA** <br> **Beta Gamma Sigma** |

18

J.  Employment Information.

    1.  Current employer (if not currently employed, **last employer**):

       Name of employer:        **Bank of America (temporary assignment)**

       Address:               **Kingston, NY**

       Dates of employment:     From: **02/2009**     To:  **04/2009**

       Occupation/Job duties:    **Tax Preparer**

    2.  List the following for each employer you have had in the last ten (10) years (not including any employer listed in Section III (J) (1) above):

      a) Name of employer:     **Formisano Bakery**  (laid off)

         Address:              **Saugerties, NY**

         Dates of employment:    From: **10/2008**   To: **11/2008**

         Occupation/Job duties:   **Clerical in a Bakery; Order taking; etc**

      b) Name of employer:     **Shire Reeve**  (quit)

         Address:              **Wall Street, Kingston, NY**

         Dates of employment:    From: **01/2007**   To: **07/2007**

         Occupation/Job duties:   **Guard**

K.  Military Service Information

    1.  Have you ever served in any branch of the U.S. Military?

       Yes \_\_\_\_ No  **X**

       *If "yes,"* please state:

      a.  What branch and the dates of service:     \_\_\_\_

      b.  Were you discharged for any reason relating to your physical, psychiatric or emotional condition?

         Yes       No

         *If "yes,"* state what that condition was:

    2.  Have you ever been rejected from military service for any reason relating to your health or physical condition?

       Yes \_\_\_\_ No  **X**

HarrisonD-PlProfileForm-   00019

*If "yes,"* state what that condition was:

3. Have you ever served in the military overseas?
   Yes _____ No **X**

   *If "yes,"* state location and dates:  _____

## L. Insurance/Claim Information

1. Have you ever filed a worker's compensation claim? Yes _____   No **X**

   *If "yes,"* please state: a.  Year claim was filed:

   b.  Court/State where claim was filed:

   c.  Claim/docket number, if applicable:

   d.  Nature of disability:  _____

   e.  Period of disability:  _____

   f.  Benefits received, if any:

   g.  Identify the full name and address of the entity most likely to have records
       concerning your claim: _____

   *(If necessary, to describe more than one claim, please provide details in the Additional
   Information page located at the end of this form.)*

2. **Have you ever filed a social security disability claim (SSI or SSD)?**

   Yes  **X** No _____

   *If "yes,"* please state: a.  Year claim was filed:          **1999**

   b.  Where claim was filed:                    **MA**

   c.  **Nature of disability:**  Arthritis per the history I have provided above and here. I did not know that the culprit in such a swift reversal of my relatively good health and well managed disease would be Fosamax, then later Vioxx. I had merely assumed that like my brother (near 10 years older), I would be fine and work until normal retirement age – or perhaps a few years earlier if I wished to as at the time, my marriage and finances were fine.

   d.  **Period of disability:**  Short term disability (company) began very soon after beginning Fosamax and suddenly having the worse pain/soreness than I ever had in my life. The general pain/soreness had improved substantially in a few months and I would have been able to return to work had I not begun to then have severe, debilitating pain in my neck. As an increasing amount of information comes out about Fosamax, I believe that Fosamax was a cause, or certainly a major contributory factor. However, whether or not it was related to

   20

Fosamax, the cervical issue was treatable and was 100% successful after the cervical fusion. Again, I felt very hopeful in going back to work. By the time of the operation could be scheduled it was past time allowed for short term disability, thus requiring me to file for SS Disability. As above explains, I felt that I would return to work after but one more operation on my spine for body geometry improvements. That became an ill fated operation which I allege was due to Vioxx; the lack of proper bone healing was confirmed by Dr. Carl (Albany, NY). Getting tests for the corrective operation which were fine, then right before scheduling the operation, my femur broke. As said, it did not heal primarily because of Vioxx, and possibly with Fosamax contributing to the healing issue(s). The above explains how the one-two punch of Fosamax and Vioxx cast me into a confusing world of increasing disability and I was never able to return to my career in spite of a great deal of hope. I squashed from the concurrent long term use of Vioxx and Fosamax and what it wrought upon my life.

**e. Benefits received, if any:** Currently a bit greater than $2,000 per month from SS. I also receive a bit under $2,000 per month from Lucent Technologies. That entire amount (from Lucent) is assigned to my ex-wife and daughter. Also to note, of the $2,000 per month that I receive $315 is assigned to my ex-wife and daughter.

**f.** Identify the full name and address of the entity most likely to have records
concerning your claim:                    **Kingston, NY Medicare/SS**

*(If necessary, to describe more than one claim, please provide details in the Additional Information page located at the end of this form.)*

**3.** Have you ever been denied life insurance or medical insurance for reasons relating to your medical or physical condition? Yes_____  No  **X**

*If "yes,"* state when, the name of the company and the company's stated reason for denial:

**4.** *(Answer this question if you are claiming damages for mental or emotional distress.)* Have you ever been denied life insurance or medical insurance for reasons relating to your mental or emotional condition? Yes _____  No  **X**

*If "yes,"* state when, the name of the company and the company's stated reason for denial:

**5.** Has any insurance or other company provided medical coverage to you (either directly or through a group including any employer of yours) or paid medical bills on your behalf at any time, beginning ten (10) years before your alleged injury through the present? Yes  **X**   No_____

*If "yes,"* then as to each company, separately state:

| | |
|---|---|
| Name of the company: | **Lucent Technologies; AT&T** |
| Address of the company: | **Whippany NJ (Lucent);  Basking Ridge NJ (AT&T)** |
| The account/policy number or designation: | **Travelers; Prudential; United Health Care and its various forms of POS's; Medicare** |
| Dates of coverage: | **I was covered my entire career.** |

21

When claim was made:  Over the many years of course there was claims in addition to those in this litigation. I received regular check-ups as I was diagnosed with anklyosing spor.dalitis. My condition was very well managed and taken very seriously. I was also very active as is important in Anklyosing Spondalitis.

6.  Have you ever been out of work for more than thirty (30) days for reasons related to your health? Yes **X**  No _____

> *If "yes," identify the date you were out of work and the reason(s).*

When: _____  **4/95**  To:  **09/95**

Reason:   Hip Replacements in the mid 1990s due to fusion of the hips. Note the disease was one of additional fusion, not the lack of fusion. Note further that the lack of fusion for my femur is what the litigation is primarily about. In that regard, during the cervical operation, BEFORE Vioxx, I asked my surgeon (**Dr. Frank Rand – Boston, MA**) if he thought that there would be any problem with the fusion. He felt that though there were no guarantees, he did not expect any issues and that he did expect a successful fusion. In fact, he joked a bit about the anklyosing spondalitis, indicating to the effect that "I fused very well!".

Went back to work and worked without any other issues at all at work or home. I hardly missed any work except for an occasional cold, I had no other pain/soreness except what I was used to and frankly, the arthritis seemed to be getting  better. The hip replacements went fine and I worked for several more years without any incidence and limited pain/soreness. I became very active again and worked around the home and yard nearly every weekend. **All that changed very soon after taking Fosamax, then Vioxx – the history is above and below.**

In regards to work. I had a very successful and it was coalescing around technology. Starting as a programmer, then a project manager I had a great deal of highly successful Information Technology experience. I then became interested in the hardware, software, and network aspects of these converging technology. I decided to become extremely knowledgeable, and valuable inside and outside the company, by transferring every 2-3 years into related/converging areas. I then moved into Computer Product Management (and Planning), Cell phone Infrastructure Product Management (and Planning, Architecture, and Product Evolution), and lastly (before disability) broadband Product Management (and Planning, etc.). **At each position I gained an increasing knowledge and love for my career which was progressing very well. I was on the cusp of becoming a valuable resource in the sense of having very good business and technical knowledge of the company's core and converging competencies, as well as being very valuable to the outside.**

7.  Have you ever filed a lawsuit or made a claim, other than in the present suit, relating to any bodily injury? Yes **X**  No _____

> *If "yes," please provide the following:*

When the lawsuit or claim was made:     Approx. mid-2002; Attorney Andrea
                                        Amodeo-Vickery; 24A Broad Street, Nashua, NH

Court in which such action was filed:   Henniker, NH _____

Case caption:                           NOTE: I would have to get details; I do not
                                        have them now. **PLEASE LET ME KNOW how
                                        Merck would like to proceed on this item.**

Case name:

Civil action/Docket No.:

Brief description of claims asserted:      Back seat in car accident. Not hit hard but felt
a bit of back pain. Lawyer took the case; however – BECAUSE of the findings of the surgeon in

22

Albany (**Dr. Carl**); i.e. rod, and thus spinal operation failed because of incomplete healing. Those findings, the same findings which in effect supports this Vioxx case (i.e. incomplete bone healing), ironically negated the case (in the eyes of the lawyer). Attorney would not take the case to court and dropped the client (myself) because of incomplete bone healing finding. I took the case myself and negotiated a settlement ($35,000) with the insurance company (State Farm).

M. Have you ever been convicted or plead guilty of a crime? Yes _____   No  **X**

   *If "yes,"* identify where, when, and the crime:_____

## IV.   **FAMILY INFORMATION**

A. List for each marriage the name of your spouse; spouse's date of birth (for your current spouse only); spouse's occupation; date of marriage; date the marriage ended, if applicable; and how the marriage ended (i.e. divorce, annulment, death):

**Patricia M. Harrison (maiden Napolitano);** born 05/05/1951; Hospital Volunteer Coordinator; married 06/1987; separated immediately after being discharged from the near 8 months of hospitals/nursing homes from the broken femur in 10/2003; divorced 08/2010

B. Has your spouse filed a loss of consortium claim in this action? Yes          No  **X**

C. Has any parent, grandparent, child, or sibling ever been diagnosed with a problem or condition relating to the same organ or organ system identified in your answer to Section I(D)? Yes _____ No  **X**

*If "yes,"* identify each such person below and provide the information requested.

1. Name: _____

   Current age (or age at death): _____

   Type of problem or condition: _____

   Age at problem or condition: _____

   If applicable, cause of death: _____

2. Name: _____

   Current age (or age at death): _____

   Type of problem or condition: _____

   Age at problem or condition: _____

   If applicable, cause of death: _____

23

D. Provide the full name, address and age of each of your children. If you had no children, state *"none."*

Sarah Jane Harrison age 16

E. If you are claiming the wrongful death of a family member, list any and all heirs of the decedent who have standing to assert a wrongful death claim.   **N/A**

F. If you are bringing a survivor cause of action, state whether you have been appointed as the decedent's personal representative authorized to prosecute the decedent's claims, and when and by whom you were so appointed:   **N/A**

## V.   CURRENT MEDICAL CONDITION

A. Do you currently suffer from any physical injuries, illnesses or disabilities other than those you alleged are the result of your use of Vioxx in Section I (D)?
Yes  **X**  No  _____

*If "yes,"* please state the following for each injury, illness or disability:

1. Identify the injury, illness, or disability, their symptoms and date of onset:

Anklyosing Spondalitis; diagnosed 1980; mostly soreness in the morning; virtually no limitations from the time first diagnosed until shortly after taking Fosamax. Well controlled; stayed very active and exercised. I would like to repeat that I worked full time for 20+ years before I needed to go on disability (and several years before my career) very soon after beginning Fosamax. Between Vioxx issues and the contribution/complications of Fosamax, I was never able to get back to work. Anemia from the arthritis. No other chronic illness. However, I was recently diagnosed with MGUS and am being monitored as there is a one in one hundred chance of it turning into Multiple Mylenoma. Lastly, I had bi-lateral knee replacement. The left knee became infected. Though it was assumed cured; it was not and returned as a chronic bio-film staph infection. This chronic infection has frequent acute attacks and has made it very difficult for me to even complete normal tasks.

2. By whom first diagnosed:

Diagnosis of Anklyosing Spondalitis was made in 1980 by a Dr. group in Morris Plains, NJ – I think the Dr's name was Dr. Barry. In that year, I had begun working (the year before actually) for AT&T. Even though I had some early morning soreness, it did not limit me in any way. I mowed lawns, played basketball and baseball, built fences, did yard work almost every weekend, paved driveways, etc. I was in my 2nd year of working at AT&T and would work near 20 more years before retiring several months after taking Fosamax which as noted above, added to "normal" arthritis pain to a severity I certainly never felt.

Of note, when I had a full, complete physical from the group's internist, I was told how "perfect" shape I was in, the arthritis being considered very minor, and that "I should just keep doing what I was doing".

## VI.   MEDICAL BACKGROUND

A. Height:   **5' 6";**

B. Current Weight:   **172**

C. Weight at the time of the injury, illness or disability described in Section I (D):   **160**

HarrisonD-PlProfileForm-   00024

D. Prescription Medicines

1. To the best of your knowledge, state whether you used any of the following from ten (10) years prior to the date of the injury you allege in Section I (D) through the present, check all medications you have used, state the first and last dates you took the medication, and identify the doctor that prescribed the medication.

| Medication | Date First Taken | Date Last Taken | Prescribing Doctor | Reason for Prescription |
|---|---|---|---|---|
| Angiotension Converting Enzyme ("ACE") Inhibitors' Altace: | | | | High blood pressure: |
| | | | | Heart disease: |
| Aceon: | | | | Cardiomyopathy: |
| Accupril: | | | | Previous heart attack: |
| Monopril: | | | | Enlarged heart: |
| Lotensin: | | | | |
| Capoten | | | | Diabetes: |
| Vasotec | | | | |
| Prinvil | | | | Other: |
| Zestril | | | | |
| Univasc | | | | |
| Mavik | | | | |
| Other - **Lisiniprol** | 2003? | current | Donovan (NY) | **Borderline; only 1-2 per week** |
| Other: | | | | |
| Angiotension II Receptor Antagonists ("ARBs"): Cozaar: | | | | High blood pressure: |
| | | | | Heart disease: |
| Diovan | | | | Cardiomyopathy Previous heart attack |
| Avapro | | | | Enlarged heart Kidney problems |
| Micardis | | | | Diabetes |
| Atacard | | | | Other |
| Other | | | | |
| | | | | |
| | | | | |
| Beta Blockers: | | | | High blood pressure: |
| Inderal: | | | | Heart problems: |
| Lopresser: | | | | Previous heart attack: |
| Toprol: | | | | Recurrent chest pain: |
| Sectral: | | | | Migraine headaches: |
| Corgard: | | | | Eye problems: |
| Coreg: | | | | Panic disorders: |
| Tenormin: | | | | Social phobias: |
| Timoptic: | | | | Other: |

25

| Medication | Date First Taken | Date Last Taken | Prescribing Doctor | Reason for Prescription |
|---|---|---|---|---|
| Betoptic: | | | | |
| Brevibloc: | | | | |
| Betapace: | | | | |
| Viskin: | | | | |
| Other: | | | | |
| Calcium Channel Blockers: | | | | Recurrent chest pain: |
| Norvasc: | | | | Heart problems: |
| Procardia: | | | | Raynaud's phenomenon: |
| Calan: | | | | Migraine headaches: |
| Cardizem: | | | | Esophageal (throat) spasm: |
| Plendil: | | | | Other: |
| Cardene: | | | | |
| Sular: | | | | |
| Other: | | | | |
| Alpha Blockers: Cardura: | | | | High blood pressure: |
| Minipress: | | | | Benign prostatic hypertrophy (BPH): |
| Hytrin: | | | | Heart problems: |
| Other: | | | | Other: |
| Diuretics: Hydrodiuril: | | | | High blood pressure: |
| Hygroton: | | | | Edema in legs (fluid): |
| Microx: | | | | Heart problems: |
| Lozol: | | | | |
| Lasix (furosemide): | 2005 | current | Donovan | mild/occasional use; on avg perhaps a couple of times every month or two; Total less than 2 – 3 per mth to equal about 15 – 20 per YEAR. |
| Demadex: | | | | |
| Dyazide: | | | | |
| Aldactazide: | | | | |
| Moduretic: | | | | |
| Other: | | | | |

HarrisonD-PlProfileForm-   00026

| Medication | Date First Taken | Date Last Taken | Prescribing Doctor | Reason for Prescription |
|---|---|---|---|---|
| Central Alpha Agonists: | | | | High blood pressure: |
| Catapres: | | | | Other' |
| Ten ex: | | | | |
| Aldomet: | | | | |
| Wytensin: | | | | |
| Other: | | | | |
| Other (please list): (can include combination pills, or any other pill thought be to prescribed for high blood pressure): | | | | |
| Heart Medications: (other than ACE Inhibitors, ARBs, or high Blood pressure medications already listed above) Digoxin (lanoxin): | | | | |
| Amrinone: | | | | |
| Primacor: | | | | |
| Other: | | | | |
| Anticoagulants: | Most Operations | Most Operations | Each sur geon | Blood clot (DVT): |
| Coumadin | | | | Atrial fibrillation: |
| (warfarin): | | | | Previous heart attack: |
| Heparin or Low Molecular | | | | Prolonged hospitalization: (see OTHER in first column) i |
| Weight Heparin: | | | | |
| Other: **Took Coumadin when in Albany Nursing home; blood tested daily; blood was considered too "thick"; told I had 5x the average chance of a heart attack. This was when I was taking Vioxx and is consistent with the Vioxx MI withdrawal & litigation. Later; after last operation on femur; had virtually un-controlled bleeding for several weeks.** | | | | Embolism (PE): |
| | | | | Heart valve problems: |
| | | | | Other: |

27

| Medication | Date First Taken | Date Last Taken | Prescribing Doctor | Reason for Prescription |
|---|---|---|---|---|
| Aspirin:<br>81mg:   x<br>325mg: _____<br><br>Number of times taken each day - **ONCE** | **2006** | **current** | **Donovan** | Prevention for heart attack:<br>Prevention for stroke and/or transient ischemic attack (TIA):<br><br>Rheumatoid arthritis:<br>Other pain syndromes:<br>Rheumatic fever:<br>Osteoarthritis:<br>Previous heart or other surgery:<br><br>Other:  **Normal prevention** |
| Anti-Platelet Medications:<br>(other than aspirin)<br>Plavix:<br>Apo-Dipyridamole:<br>Ticlid:<br>Other: | | | | Heart surgery:<br>Heart attack:<br>Catherization:<br>Stenting:<br>Chest pain at rest:<br>Other: |
| Cholesterol Lowering Drugs:<br>Lipitor:<br><br>Zocor:<br>Pravachol:<br>Lescol:<br>Colestid:<br>Niacin:<br>Lopid:<br>Other: | | | | |
| Pain Medications: Advil:<br><br>Motrin:<br>Naproxen (can be sold as "Naprosyn"):<br>Aleve:<br>Tylenol (acetaminophen) Actu<br>Indocin (indomethacin):<br>Migraine medications (e.g., Imitrex):<br>Other: **MOST of Cox-1 Inhibitors; please see Reasons to the right -- >** | | | | I have had pain medication in increasing dosages. It was quite minor until the whole condition worsened after the Fosamax/Vioxx debacle which together basically debilitated me me. Tylenol #4 was a mainstay at low/mid dosage until as mentioned the Fosamax/Vioxx period in my life. In 2003 began also taking Oxycontin. Decided to take myself off of it about 5 years later (the oxycontin). Had Over the years nearly every type of Cox-1 inhibitor. **At one time or another I have had most of the Cox-1 inhibitors.** |

28

| Medication | Date First Taken | Date Last Taken | Prescribing Doctor | Reason for Prescription |
|---|---|---|---|---|
| Hormone Replacement Therap Prempro: | | | | |
| Premarin: | | | | |
| Other: | | | | |
| Rifampin: | | | | |
| Theophylline: | | | | |
| Methotrexate: **X** | **Spring/2002** | **Fall/2003** | **Trice – Concord,NH** | **For a relatively short time. Again, introduced after Fosamax/Vioxx period that changed my life. NH Rheumatalogis wanted to try it; I did not feel it was useful and decided to discontinue it when I moved to NY.** |
| Diet Drugs or Diet Supplemer Phen-Fen: | | | | |
| Other: | | | | |
| Herbal Remedies or Suppleme Kava: | | | | |
| Ginseng: | | | | |
| Ginko Biloba: | | | | |
| St. John's Wort: | | | | |
| Sal Palmetto: | | | | |
| Other: | | | | |

29

HarrisonD-PlProfileForm-   00029

| Psychiatric Medications | (Only answer these questions if you are claiming damages for mental or emotional distress. If you are not claiming such damages, please go the next question below). | | | |
|---|---|---|---|---|
| Medication | Date first taken | Date last taken | Prescribing Doctor | Reason for Prescription |
| Antidepressants: | | | | Depression: |
| | | | | Chronic fatigue syndrome: |
| | | | | Bipolar disorder: |
| | | | | Generalized anxiety disorder: |
| Asendin: | | | | Panic disorder: |
| Anafranil: | | | | Poor concentration: |
| Adapin: | | | | Suicidal thoughts or attempts: |
| Ludiomil: | | | | Alcohol or drug abuse: |
| Vivactil: | | | | Personality disorders: |
| Surmontil: | | | | Schizophrenia: |
| Elavil: | | | | Eating disorders: |
| Endep: | | | | Other: |
| Norpramin: | | | | |
| Pertofrane: | | | | |
| Imipramine:  X | Mid 90's | Early 2000s | Neil Block, NJ | Mid 1990's for claustrophobia related to operations; I had never had a prior operation. |
| Janimine: | | | | |
| Tofranil: | | | | |
| Aventyl: | | | | |
| Pamelor: | | | | |
| Other: Selective Serotonin Reuptake Inhibitors (SSRIs): Prozac: | | | | |
| Paxil: | | | | |
| Zoloft: | | | | |
| Celexa:        X | Mid 2000s | Late 2000s | Donovan | After femur fracture; depression |
| Luvox: | | | | |
| Other: Monamine Oxidase Inhibitors (MAOIs): Nardil: | | | | |
| Parnate: | | | | |
| Other: | | | | |
| Zoloft        X | 09/2009 | Current | Donovan | Depression/anxiety; after divorce filed |
| Cymbalta     X | N/A | N/A | N/A | Depression/anxiety; before divorce Insurance did not cover Cymbalta and I Did not take it. |

30

| Medication | Date First Taken | Date Last Taken | Prescribing Doc | Reason for Prescription |
|---|---|---|---|---|
| Anti-Anxiety Medications:<br>Benzodiazepines:<br>Xanax:<br>Librium:<br>Klonopin:      X<br>Tranxene: | 1995 | current | Dr. Neil Block (NJ) | Depression:<br>Chronic fatigue syndrome:<br>Bipolar disorder:<br>Generalized anxiety disorder:<br>Panic disorder:<br>Poor concentration: |
| Valium:<br>Dalmame:<br>Paxipam:<br>Ativan:<br>Serex:<br>Centrax:<br>Other: | | | | Suicidal thoughts or attempts:<br>Personality disorders:<br>Alcohol or drug abuse:<br>Schizophrenia:<br>Eating disorders:<br>Other:<br>Claustrophia     X<br>Anxiety     X |
| Anti-Psychotic Medications: Haldol:<br>Risperdal:<br>Zyprexa:<br>Clozaril:<br>Leponex:<br>Geodon:<br>Other: | | | | Schizophrenia:<br>Other: |
| Anti-Convulsant Medications:<br>Tegretol:<br>Depakote:<br>Other: | | | | Schizophrenia:<br>Seizure disorder:<br>utner: |
| Lithium: | | | | Bipolar disorder:<br>Other: |

31

HarrisonD-PlProfileForm-     00031

2.  List each any other prescription medicine not identified in Section VI (D) (1) you have taken regularly in the last ten (10) years, identifying the medication and the condition for which it was prescribed.

Medication      **Tylenol #4**

Condition for which prescribed

Pain; had to increase dosage after stopping Vioxx as I no longer trusted any Cox inhibitors on a long term basis.

Medication      **Oxycontin**

Condition for which prescribed

Pain; put on Oxycontin to replace Tylenol #4. Rehab. hospital in East Sandwich, Cape Cod made a mistake. Believed that I was having liver problems from Tyl #4; when difference in readings was merely from blood transfusions. Stayed on it for a few years. While on it decreased Tylenol #4; however when I had to stop taking Vioxx I was on both for a while. I then decided I did not need both, and Oxycontin is by far the worse of the two in re to becoming dependent, so I discontinued Oxycontin

Medication      **Over the years I have taken Zantac, Omeprazole and Prilosec (of course one at a time depending on how insurance would cover it).**

Condition for which prescribed

Preventative from anti inflammatories

E.  Smoking/Tobacco Use History: *(Check the answer and fill in the blanks applicable to your history of smoking and/or tobacco use.)*

___Current smoker of cigarettes____ ; cigars___; pipe tobacco___; or user of chewing tobacco/snuff __ .
1.  Amount smoked or used: on average ____per day for____ years.
___ Past smoker of cigarettes___; cigars__ ; pipe tobacco __ ; or user of chewing tobacco/snuff __ .
2.  Date on which smoking/tobacco use ceased: _____
3.  Amount smoked or used on average ____per day for____ years.
**X**  Never smoked cigarettes, cigars, pipe tobacco, or used chewing tobacco/snuff.

F.  Drinking History:

1.  Do you now drink or have you in the past drank alcohol (beer, wine, whiskey, etc.)?
Yes  **X**  No _____

*If "no," go Section G below.*

32

*If "yes,"* check the following box which represents your greatest alcohol consumption over an extended (6 months or greater) period within the last 10 years:

```
_____ 1-5 drinks per week
_____ 6-10 drinks per week
_____ 11-14 drinks per week
_____ 15 or more drinks per week
  X   Other (describe)          2-3 drinks per month
```

Check the following box which represents your weekly alcohol consumption for the month prior to the time that you sustained the injuries alleged in the complaint:

```
_____ 1-5 drinks per week
_____ 6-10 drinks per week
_____ 11-14 drinks per week
_____ 15 or more drinks per week
  X   Other (describe)          2-3 drinks per month
```

G. Caffeine History:

1. Do you now or have you in the past consumed caffeinated beverages (coffee, tea, sodas, etc.)?
   Yes  X  No _____

   *If "yes,"* check the following box which represents your greatest caffeine consumption over an extended (6 months or greater) period within the last 10 years:

```
  X   1-5 drinks per week
_____ 6-10 drinks per week
_____ 11-14 drinks per week
_____ 15 or more drinks per week
_____ Other (describe)
```

   Check the following box which represents your weekly caffeine consumption for the month prior to the time that you sustained the injuries alleged in the complaint:

```
  X   1-5 drinks per week
_____ 6-10 drinks per week
_____ 11-14 drinks per week
_____ 15 or more drinks per week
_____ Other (describe)
```

H. Illicit Drugs:

1. Have you ever used (even one time) any illicit drugs of any kind within one (1) year before, or any time after, you first experienced any alleged Vioxx-related injury? Yes ____ No  X

   *If "yes,"* identify each substance and state when you first and last used it.

33

I.    To the best of your knowledge, have you or your parents, grandparents, children or siblings ever experienced, or been told by a doctor or other healthcare professional, that you/they have, may have or had any of the following (check all that apply)?

_____ Abdominal aortic aneurysm (AAA disease)
_____ Alcoholism (as to you only, if applicable)
_____ Allergic reaction to medication
_____ Amputations (as to you only, if applicable)
_____ Aneurysm
__x__ Atherosclerosis (blocked or narrow arteries)
_____ Atrial fibrillation
_____ Bipolar Disorder (as to you only, if applicable)
_____ Bleeding/clotting disorders (hemophillia, Von Willibrands disease, scurvy, other)
_____ Blood in stool or dark/black stools
__x__ Cancer (lung, colon, liver, breast, other)
_____ Carotid stenosis (neck arteries)
__x__ Chest pain/angina (at rest or with exertion)
_____ Chronic Fatigue Syndrome
_____ Chronic obstructive pulmonary disease/COPD
_____ Congenital heart disease
__x_ Congestive heart failure
_____ Corpulmonale
_____ Coronary heart disease
_____ Deep vein thrombosis/DVT/blood clot in lower legs
_____ Dermatomyositis
__x_ Diabetes
_____ Eating disorders (anorexia, bulimia) (as to you only, if applicable)
_____ Endocarditis
_____ Esophagus problems (strictures, achalasia, Barrett's esophagus, difficulty swallowing, other)
_____ Eye hemorrhages
_____ Fibromyalgia
_____ Glaucoma
_____ Gout
__x_ Heart attack/MI/myocardial infarction
    Heart murmur
    Heart valve problems (pulmonary hypertension, mitral valve prolapse, aortic/mitral valve regurgitation, aortic/mitral stenosis, bicuspid aortic valve, other)
    Heartburn/ reflux/ esophageal reflux disease/ GERD
__x__ Hernia (strangulated or incarcerated)
    Herpes (as to you only, if applicable)
__x__ High blood pressure/hypertension
__x__ High total cholesterol, high LDLs (bad cholesterol), or low HDLs (good cholesterol)
__x__ High triglycerides
    HIV/AIDS (as to you only, if applicable)
    Hodgkins disease/ non-Hodgkin's lymphoma
    Hypoxia (low oxygen saturation)

34

HarrisonD-PlProfileForm-    00034

Intestinal obstruction (not including constipation)

**X** Irregular heart rhythm (palpitations, tachycardia, bradycardia, atrial fibrillation, skipped beats, other)

**X** Kidney disease

Leukemia

Liver disease (hepatitis B/C, cirrhosis, cysts, other)

Lupus

Obesity (as to you only, if applicable)

Osteoarthritis

**X** Pancreatitis

Panic Disorder

Peptic ulcer disease

Peripheral vascular disease

Pulmonary embolism/blood clot in the lung

Rheumatic fever (as to you only, if applicable)

**X** Rheumatoid arthritis

Seizure disorder

Shortness of breath not associated with vigorous exercise

Sickle cell anemia/ sickle cell trait

Silent MI

**X** Sleep apnea

**X** Stomach problems (ulcers, perforations, bleeding)

**X** Stroke

**X** Swelling/edema/fluid in legs ankles (other than in pregnancy)

Syphilis (as to you only, if applicable)

Thyroid disorder and/or goiter

**X** Transient ischemic attack/TIA

Tuberculosis

**J.** *If you responded "yes" to any of the above,* please identify/state the condition, the individual affected, the date of onset (as to you only, if applicable), any medication prescribed to treat the condition (as to you only if applicable), and the name of the physician or other person who made the diagnosis or informed the individual of the condition and their address if not provided in the accompanying list (as to you only, if applicable).

**1.** Condition: **Anklyosing Spondalitis; questionable/borderline HBP; Sleep Apnea; Minor edema as described above; possible but not confirmed bout of pancreatitis induced from Naproxyn**

Patient name: **Dennis Harrison**

Onset date and medication: **As described above**

Name and address of physician or other person: **As described above**

35

2. Condition:          **Cancer – skin; Arthritis; stent for blockage; M. Mylenoma, Stroke (TIA)**

   Patient name:     **Robert B. Harrison (father)**

   Onset date and medication:

   Name and address of physician or other person:

3. Condition:          **Angina; Congestive heart failure; MI; HBP, High triglycerides; irregular heart rhythm; sto (blockage?), edema**

   Patient name:     **Alive V. Harrison (mother)**

   Onset date and medication:

   Name and address of physician or other person:

4. Condition:          **Cancer (passed away) – breast, bone; Hernia**

   Patient name:     **Robert Harrison (brother)**

   Onset date and medication:

   Name and address of physician or other person:

5. Condition:          **Cancer – prostrate; anklyosing spondalitis**

   Patient name:     James Harrison (brother)

   Onset date and medication:

   Name and address of physician or other person:

6. Condition:          **Cancer – breast; HBP; High cholesterol**

   Patient name:     Patricia Harrison (sister)

   Onset date and medication:

   Name and address of physician or other person:

7. Condition:          **Cancer – skin; HBP; High cholesterol; kidney stones**

   Patient name:      Michael Harrison (brother)

   Onset date and medication:

   Name and address of physician or other person:

HarrisonD-PlProfileForm-    00036

K. Please indicate whether you have ever received any of the following treatments or diagnostic procedures:

1. Surgeries (other than abortion), including but not limited to the following, and specify for what condition the surgery was performed: open heart or bypass surgery, pacemaker implantation, vascular surgery, IVC filter placement, carotid (neck artery) surgery, lung resection, or intestinal surgery.

**Surgeries as stated above (and below)– no other surgeries except tonsils when young.**

| Surgery | Condition | When Performed | Treating Physician | Hospital | Misc. – added By litigant/patient |
|---|---|---|---|---|---|
| Bi-Lateral Hips | A/Spondalitis | 6/95 (left) | Dr. Pelliccci | NY Hosp Spec Surg. | **No complications** |
| | A/Spondalitis | 8/95 (right) | Dr. Pizzurro | Valley Hosp; NJ | **No complications** |
| Cervical Fusion | Fusion needed; reason and condition not determined. | Oct. 1999 | Dr. Rand | NE Baptist, Boston, MA | **No complications; Happened about 6-9 months after being placed on Fosamax.** |
| Spinal Fusion | A/Spondalitis | Jan. 2001 | Dr. Rand | NE Baptist Boston, MA | **Complications; Incomplete fusion – litigation alleges from Vioxx** |
| Femur Fracture | Reason and Condition not determined. | Jan  2003 Feb  2003 June 2003 | Dr. Null Dr. Hospodar Dr. Pizzurro | Benedectine, Kingston, NY Albany, NY Valley, NJ | **Complications; NO fusion – litigation alleges from Vioxx** |
| Knee replacement | Osteoarthritis or A/Spondalitis; | Jan  2010 | Dr. Grace | Bellin, Green Bay, WI | Right knee; no Complications

Left knee; became Infected - likely in Hospital. |

2. Treatments/interventions for heart attack, angina (chest pain), or lung ailments, including but not limited to the following: cardiac catheterization, angioplasty (balloon), stenting, and electroconversion.

-NONE-

3. Have you had any of the following tests performed: chest X-ray, CT scan, MRI, angiogram, EKG, echocardiogram, TEE (trans-esophageal echo), bleeding scan, endoscopy, lung bronchoscopy, carotid duplex/ultrasound, MRI/MRA of the head/neck, angiogram of the head or neck, CT scan of the head, echocardiogram, bubble/microbubble study, EKG, Holter monitor.   **YES**

*If "yes,"* answer the following:

Each of the orthopedic operations had a battery of tests. Simple X-rays; Cat Scans; MRI's. They are well documented in the records which are being obtained.

| Diagnostic Test | Condition | When | Treating Physician | Hospital |
|---|---|---|---|---|
| Left hip repl. | x-rays; ultrasound; EKG | 6/95 | Dr. Pellicci | NY Hosp Spec Surg. |
| Right hip repl. | x-rays; ultrasound; EKG | 8/95 | Dr. Pizzurro | Valley Hospital, NJ |
| Cervical fusion | x-rays; MRI's; Catscan's. EKG | Oct  1999 | Dr. Rand | NE Baptist, Boston, MA |
| Spinal fusion | x-rays; MRI's; EKG Catscan's; angiogram; | Jan   2001 | Dr. Rand | NE Baptist, Boston, MA |
| Femur fracture | x-rays; MRI's; EKG Catscan's | Jan   2003 Feb  2003 June 2003 | Dr. Null Dr. Hospodar Dr. Pizzurro | Benedectine, NY Albany, NY Ridgewood, NJ |
| Knee replacement | x-rays; EKG; ultrasound | Jan   2010 | Dr. Grace | Bellin, Green Bay, WI |

38

L. Have you ever participated in any clinical trials or studies relating to any drugs or treatments for any medical conditions? Yes_____ No  X

*If "yes," please identify:*

1. Name of the trial or study: _____

2. Sponsor of trial or study: _____

3. Drug or treatment studied: _____

4. Purpose of the drug or treatment studied: _____

5. Name and address of the investigator in charge of your care and treatment in the trial or study: _____

6. The dates you participated in the trial or study:

## VII.   WAGE LOSS INFORMATION AND OTHER MONETARY LOSS CLAIMS

A. Are you making a claim for loss of wages? Yes  X  No_____

*If "no," then* go to Section VII (B).

1. State the total amount of time you have lost from work as a result of any condition that you claim or believe was caused by your use of Vioxx and the amount of income that you claim you lost. _____

2. State your total earned income (including salary, bonus, and benefits) for each of the last ten (10) years.

**Have not worked in gainful employment for the last 10+ years; Claim is based upon likely earnings which was interpolated from last several years worked. Please see the interrogatories in which I described the damages sought.**

**A request for income has been submitted by Merck. Income consists only of Social Security Disability, Lucent Technologies Disability, and in 3 separate years a very, very small amount as I worked part time and temporarily as a guard, in a bakery (clerical), and as a tax preparer. All work, I would like to note, is a far cry from when I was a mid-level executive at Lucent Technologies with the highest year salary + bonus = to about $125,000.**

HarrisonD-PlProfileForm-        00039

As noted above; these have been formally requested by Merck.

| Year | Income |
|------|--------|
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |

40

B. Have you paid or incurred any medical expenses that are related to any condition that you claim or believe was caused by your use of Vioxx and for which you seek recovery in the action you have filed?

Yes ___  No  X **(I have, but they are minor and I will include them in the total prayer for relief)**

*If "yes,"* state the total amount of such expenses at this time: $ _____

C. Has your insurer, or any other entity or person, paid or incurred any medical expenses that are related to any condition that you claim or believe was caused by your use of Vioxx and for which you seek recovery in the action you have filed?

Yes _____   No  X

*If "yes,"* state the total amount of such expenses at this time: $ _____

D. Please provide an itemized statement of the nature and amount of damages you are claiming.

**If this applies to the overall and/or total damages (potential wages lost; emotional, pain, suffering, etc.) please see the interrogatories.**

E. Please identify all persons not identified elsewhere in this ASPPF who you believe possess information relevant to your claims in this matter and for each, state his or her name, address, telephone number and a description of the information you believe he or she possesses.

**I have certainly attempted to provide everything that is requested here. This includes individuals who possess relevant information. If more information is yet needed, please let me know.**

## VIII. <u>PERSONAL INFORMATION OF LOSS OF CONSORTIUM</u>

This is not being claimed ONLY because of the personal nature and situation of getting an ex-spouse involved. Accordingly, we shall pass on this aspect. However, we wish it to be generally known, that YES, indeed – the damage done by Vioxx, and Fosamax was certainly substantial and involved personal matters. And, YES, indeed the disaster of near 5 years of Vioxx, and near 7 years of Fosamax impacted our marriage in ways one would have to experience to understand. And, YES – they were very damaging to the marriage; let alone a seven year old who had depended so much on her physically capable father and who had that taken away from her in many ways.

*If you are a representative or loss of consortium plaintiff, please provide your personal responses to these questions.*

A. Last Name: _____

First Name: _____

Middle Name or Initial:

41

B. Any other names used or by which you have been known, including but not limited to maiden name:

C. Social Security Number:

D. Driver's license number:          State issuing your license:

E. Date and place of birth: _

F. Sex: Male          Female

G. Current street address and date began residing at this address:

_____

| City | State | Zip Code |

H. Identify each other address at which you have resided during the last ten (10) years, and list when you started and stopped living at each one:

| Address | Dates of Residence | |
|---|---|---|
| | From: | To: |
| | | |
| | | |
| | | |

42

I.  Identify each high school, college, university or other educational institution (except grade school) you have attended, the dates of attendance, courses of study pursued, and diplomas or degrees awarded:

| Institution | Dates Attended | Course of Study | Diplomas & Degrees |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

J.  Employment Information.

Current employer (if not currently employed, last employer):

Name

Address

Dates of employment

Occupation/Job duties K. Date and place of marriage:

L.  Have you ever been convicted or plead guilty of a crime? Yes            No

If "yes," where, when, and the crime:_____

43

IX.   **LIST OF MEDICAL PROVIDERS AND OTHER SOURCES OF INFORMATION**

> I provided a detailed matrix describing requested names/address's so that all records could be retrieved, etc. My understanding is that since that time (approx. April/2011) Merck has been gain the information, records, etc. that they need. If I am missing something, or if ANY source of information provides Merck with a difficult time, please contact me and I will work to straighten it out. Please bring any problem to my attention and I will rectify the situation. **Unless I hear otherwise, I will assume that the information provided to Merck via the matrix of providers (as well as in several other areas such as Lone Pine, Interrogatories, this documents, etc.) meets the needs of Merck.**

EACH PLAINTIFF OR CLAIMANT, AS THE CASE MAY BE, IS REQUIRED TO PRODUCE ALL MEDICAL RECORDS FROM ALL HEALTHCARE PROVIDERS WHOSE IDENTITY IS REQUESTED BELOW PURSUANT TO (a) PTO 28, SECTION II(A)(6), REGARDLESS OF WHETHER PLAINTIFF OR CLAIMANT IS REQUIRED TO RESPOND TO THIS AMENDED AND SUPPLEMENTAL PROFILE FORM UNDER SECTION II(A)(3), AND (b) PTO 29, SECTION II(A)(2).

List the following:

A. Your current family and/or primary care physician:

| Name | Address | Approximate Dates of Treatment From: | To: |
|---|---|---|---|
| Dr. James Batti (general) | 1711 S Stephenson Ave Iron Mountain, MI 49801-3648 | 12-2009 | Current |
| Dr. Morelle (hematologist) | 1711 S Stephenson Ave Iron Mountain, MI 49801-3648 | 12-2009 | Current |
| Dr. James Grace (surgeon; knees) | 2223 Lime Kiln Rd Green Bay Green Bay, WI 54311 | 01-2010 | Current |
| Dr. Mark Davis (rheumatologist) | 2223 Lime Kiln Rd Green Bay Green Bay, WI 54311 | 01-2010 | Current |

HarrisonD-PlProfileForm-      00044

B. To the best of your ability, identify each of your *other* family and/or primary care physicians from 1995 to the present.

| Name | Address | Approximate Dates of Treatment From: | |
|------|---------|------|------|
| Dr. Neil Block | 60 Dutch Hill Road Orangeburg, NY  10962 | 1990 | 1995 |
| Dr. Frank Straccia | 331 Highland Avenue Salem, MA  01970 | 1995 | 1999 |
| Dr. Harry Rae | 20 Granite Street State Court Brewster, MA  02631 | 1999 | 2002 |
| Dr. Roger Belson | 10 Bridge Street Henniker, NH  03242 | 2002 | 2003 |
| Dr. Paul Donovan | 27 Grand Street Kingston, NY  12401 | 2003 | 2009 |

C. Each hospital, clinic, or healthcare facility where you have received inpatient treatment or been admitted as a patient from 1995 to the present.

**THE HOSPITALS, etc. ARE NOTED SEVERAL TIMES ABOVE**

| Name | Address | Treatment Dates | Reason for Treatment |
|------|---------|-----------------|----------------------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

HarrisonD-PlProfileForm-    00045

D. Each hospital, clinic, or healthcare facility where you have received outpatient treatment (including treatment in an emergency room) from 1995 to the present.

**Again, please note - THE HOSPITALS, etc. ARE NOTED SEVERAL TIMES ABOVE**

| Name | Address | Treatment Dates | Reason for Treatment |
|------|---------|-----------------|----------------------|
|      |         |                 |                      |
|      |         |                 |                      |
|      |         |                 |                      |

E. Each physician or healthcare provider, not already listed in Sections IX (A) and IX (B) above, from whom you have received treatment from 1995 to the present.

**I believe that I have listed and detailed as many as I can think of.**

| Name | Address | Specialty | Approximate Dates of Treatment From: | To: |
|------|---------|-----------|--------------------------------------|-----|
|      |         |           |                                      |     |
|      |         |           |                                      |     |

F. Each pharmacy that has dispensed medication to you from 1995 to the present.

**These have all – except for Ipswich, MA been provided in the matrix which was submitted to Merck and clearly noted as such within the matrix. If anything else is needed, please Let me know, but really I can't think of any more.**

46

HarrisonD-PlProfileForm-      00046

*Please note – I did forget Ipswich, MA*; however in case it matters I was not on either Vioxx nor Fosamax at the time. All other medicines were among those listed.

| Name | Address | Approximate Dates Pharmacy Used | |
|---|---|---|---|
| | | From: | To: |
| Walgreen's | Address and time per location | | |
| CVS | Address and time per location | | |
| Henniker Pharmacy | Address and time per location | | |
| **Ipswich, MA**<br><br>**Rite Aid?** | Central Avenue, Ipswich | **1996** | **1997** |

47

**X.   DOCUMENTS AND THINGS**

Please indicate if any of the following documents and things are currently in your possession, custody, or control, or in the possession, custody, or control of your lawyers by checking *"yes"* or *"no."* Where you have indicated *"yes,"* please attach the documents and things to your responses to this fact sheet. If not attached, please indicate why not.

A. A copy of all prescriptions for Vioxx, receipts, physician or office records, drug containers, packaging and other records that show the period during which you have taken Vioxx, the dosage of Vioxx and the frequency with which you took Vioxx.
Yes  **X**  No _____

B. If you have been the claimant or subject of any worker's compensation, Social Security or other disability proceeding, all documents relating to such proceeding.
Yes ___  No  **X** __       **I don't have; Merck has requested.**

C. All diagnostic tests or test results for any disease, illness or conditions as detailed in this PPF.
Yes ___  No  **X** _       **I don't have; Merck has requested.**

D. Copies of all documents from physicians or other healthcare providers identified in this PPF.
Yes ___  No  **X** _       **I don't have; Merck has requested.**

E. All documents constituting, concerning or relating to product use instructions, product warnings, package inserts, pharmacy handouts or other materials distributed or provided to you when your prescriptions for Vioxx were filled.
Yes ___  No  **N/A**       **Vioxx insert and pharmacy printouts; I no longer have.**

F. Copies of all advertisements or promotions for Vioxx received or seen before filing this action.
Yes ___  No  **N/A**       **I must have viewed such, however I cannot recall and I do not have any of the advertisements or promotions.**

G. Executed authorizations signed and undated in the forms appended hereto, in following manner:
Yes  **X**  No

**Update – Merck had received non-generic form requirements from quite a few places; Merck sent them to me and I emailed/PDF'd them as well as sending the originals back to Merck. I have authorized and sent them all out as quickly as possible.**

- If you are claiming damages for lost earnings or earning capacity, execute authorization forms #s 1-5 as provided on the court's website at http://vioxx.laed.uscourts.gov/Forms/Forms.htm
- If you are not claiming damages for lost earnings or earning capacity, execute authorization forms #s 1-3 and #5 as provided on the court's website at http://vioxx.laed.uscourts.gov/Forms/Forms.htm

48

H. If you claim you have suffered loss of earnings or earning capacity, all documents that evidence your income/earnings for each of the last ten (10) years.

Yes ___ No X (have (out of state at the moment) earnings statements I am basing annual interpolations of what I was earning **before** I went on permanent disability in 1999 for; one must use that to understand the income I lost because I was never able to return to work because of Vioxx. **Please see the interrogatories for the damages of wage loss I am claiming. Also, Merck has requested from IRS.**

I. If you claim any loss from medical expenses, copies of all bills from any physician, hospital, pharmacy or other health care provider and statements and explanations of benefits from your health care insurer or plan.

Yes ___ No ___ **N/A**

J. Copy of all written communications, whether written or electronic (including email, communications as part of internet "chat rooms" or e-mail groups), with others not including your counsel, regarding Vioxx, your injuries or this case.

**This has now been fully discussed in the Interrogatories to Merck.** If that is not adequate; please let me know how I may rectify the situation to provide that information to Merck which is necessary to judge the merits of the case.

Yes ___ No X   **Please see note above.**

K. Copies of letters testamentary, letters of administration, powers of attorney, guardianship or guardian *ad I item* orders or other documents relating to your status as plaintiff if you are suing and/or are completing this PPF and the Authorizations on behalf of another individual.

Yes ___ No ___ **N/A**

L. Decedent's death certificate (in death case).

Yes ___ No ___ **N/A**

M. Report of autopsy of decedent (in death case).

Yes ___ No ___ **N/A**

N. All photographs, drawings, slides, movies, day-in-the-life films, or videotapes, edited and unedited, taken by anyone, in your possession, the possession of your attorney or experts, or any other person acting on your behalf, relating to plaintiffs injuries, limitations or damages, and which are not privileged work product or otherwise not discoverable.

Yes ___ No ___ **N/A**

O. All documents relating to Vioxx in plaintiffs possession or control that were generated, published or disseminated by or obtained from Merck, whether or not it originated at Merck, that were in plaintiffs possession prior to the date on which plaintiff filed his/her Complaint in this action.

Yes ___ No ___ **N/A**

P. All documents in plaintiffs possession or control, prior to the date on which plaintiff filed his/her Complaint in this action, discussing alleged risks of Vioxx or any other COX-2 inhibitor drugs, or any alleged health impact, including, but not limited to, newspaper articles, scientific studies, health and fitness publications, union or other organizational newsletters, bulletins, or brochures.

Yes ___ No ___ **N/A**

Q. All documents in plaintiffs possession or control, prior to the date on which plaintiff filed his/her Complaint in this action, concerning any guidelines, procedures, requirements, recommendations, protocols, instructions, warnings or precautions for the use of Vioxx or any other COX-2 inhibitor drugs.
Yes_____ No _____     **N/A**

R. All documents in plaintiffs possession or control, prior to the date on which plaintiff filed his/her Complaint in this action, relating to any support or information group, including internet sources, concerning Vioxx or any other COX-2 inhibitor drugs, including, but not limited to, communications from you, or received by you from such groups concerning Vioxx or other COX-2 inhibitor drugs.
Yes ____ No_____     **N/A**

S. All documents in plaintiffs possession or control, prior to the date on which plaintiff filed his/her Complaint in this action, concerning Vioxx or any other COX-2 inhibitor drugs distributed by public or private organizations, including without limitation, the American Nursing Association, the Food and Drug Administration, the Center for Disease Control, the American Medical Association, the American Heart Association, the National Institutes of Health, the Occupational Safety and Health Administration, or NIOSH.
Yes ____ No_____     **N/A**

T. Any videotape or sound recordings that have been broadcast on television or radio, or any newspaper, magazine or other published document wherein plaintiff has discussed Vioxx or any aspect of the alleged incident or injury that forms the basis of this action.
Yes ____ No _____     **N/A**

U. Any and all product insert data sheets, marketing materials, promotional materials, advertisements, packaging information, labels, bottles, boxes, samples, labeling fact sheets or informational sheets provided to plaintiff by any prescribing physician, pharmacy or other healthcare provider, or any other materials provided by any prescribing physician, pharmacy, or other healthcare provider, or anyone else prior to the date on which plaintiff filed his/her Complaint in this action, and relating to Vioxx, CELEBREX®, or BEXTRA®.
Yes ____ No _____     **N/A**

V. Each and every document in plaintiffs possession or control, prior to the date on which plaintiff filed his/her Complaint in this action, including but not limited to magazine or newspaper articles, brochures, material from internet sites, videotapes (including videotapes of news or other television programs), or audiotapes (including tapes of news or other radio or television programs), that mentions, refers to or relates to Vioxx and that was made available to plaintiff or reviewed by plaintiff prior to ingesting Vioxx.
Yes ____ No _____     **N/A**

HarrisonD-PlProfileForm-     00050

W. All non-privileged documents reflecting communications between plaintiff and any other person or entity, prior to the date on which plaintiff filed his/her Complaint in this action, and relating to, referring to, or regarding the allegations of the Complaint, Merck, Vioxx or any injury you claim resulted from plaintiffs use of, or exposure to, Vioxx.

Yes _____  No _____  **N/A**

X. Each and every document that evidences any communication between plaintiff and any doctor, any employer, any defendant, any federal or state agency, or any other person (other than your attorney) regarding the incident made the basis of this suit or your claims in this lawsuit.

Yes _____  No      **N/A**

Y. All entries in personal diaries, calendars, journals, logs, appointment books, date books, or similar materials plaintiff kept or continues to keep from January 1, 1995 to the present which relate or refer to plaintiffs medical care, medical condition, or employment and not prepared at the direction of your attorney.

Yes _____  No _____  **N/A**

Z. Have you prepared personal diaries, calendars, journals, logs, appointment books, date books, or similar materials at the direction of your attorney(s)?

Yes _____  No _____  **N/A**

51

# ADDITIONAL INFORMATION

I am adding some additional information based upon what I was going to put in the above – however, I could see that it would become unwieldy and may detract from ting information to Merck that they need to go farther with records, etc.  Unlike the MI/Stroke cases, for which many parts of this PPF were designed for (to ultimately mass process a mass tort), my case is one of the most unique in the MDL-1657 and much of what I want to say is not asked for.

## An Overall perspective including some ordering of events:

1 – I was managing the disease very well; working full time – often extra hours; not needing any time off except for a cold; no limiting issues at work; could walk any distance without a cane; and doing much at home and in the yard also. I had recently accepted a transfer to MA from NJ in order to broaden my knowledge of the coming convergence of several technologies (computers, wireless cell, broadband). I had planned several transfers in order to understand how these existing and coming technologies all fit together, and I would be in a great position for future assignments/promotions.

2 – I had been seeing a general physician at the time (Dr. Frank Straccia – Salem, MA) and decided to begin seeing a rheumatologist as I had in the past – his name was Dr. Mathew Keller). Frankly, I did not feel a real need to see a rheumatologist as I was feeling fairly well, however, I felt that it was best so that I would stay on top of the arthritis and continue to manage it very well. I had always made sure I was covering all basis possible and always included rheumatologist since being diagnosed in order to manage the condition. I did not get the feeling that the general physician felt it necessary at all, but again, I just thought I should do it.

3 – The rheumatologist began providing me Celebrex and Fosamax; I gave up on Celebrex within a couple of months as it did not seem as good as even several of the Cox-1's I had (however, later on when Vioxx came out, I did find that to be very helpful for pain). I had been taking Fosamax also. It had been in my body a couple of months before creating the "caustic" effect of absolute soreness virtually in my whole body. I had arthritis for sure, but all of a sudden I had not felt anything like this. I felt that it must be from the arthritis accelerating and did not even associate it with Fosamax. I just could not believe how fast I seemed to be getting worse, when now what happened to me seems to be consistent with what one hears in Fosamax. My rheumatologist (Dr. Mathew Keller – Salem, MA) also did not associate Fosamax with the sudden agonizing pain. I was getting worse, not better, nor even close to being the same, as I was taking Fosamax. The pain was absolutely agonizing and there was damage to come which, as is more evident now from Fosamax usage, is not that uncommon. I began temporary disability in June of 1998; and then about four months later I lost several inches of height. All of a sudden, instead of just a stiff neck without pain, my neck bones crumbled – also consistent with recent Fosamax knowledge/allegations/lawsuits and science of Fosamax with more general bone destruction than was realized to even several years ago. The neck was successfully fused as I was not on Vioxx at the time, and likely because Vioxx had not been introduced, it healed 100%.

52

The initial burst of what I would refer to (now that it is known) as Fosamax "introductory caustic" pain was so severe and so rapid I felt that the time had come upon me quickly to go on disability – a decision I felt I had to make as it was getting dangerous to drive and the pain was making it difficult to sleep, etc. Quality of life simply was shattered.

3 – after perhaps 3-4 months the caustic pain abated. At that point I was considering going back to work, but then the neck pain began and it became extremely severe; about 6 months after beginning Fosamax, for the first time in my life I had severe neck pain. I had neck stiffness before, but no real pain; I was told that the operation was matter of life or death by the Boston NE Baptist Center (Dr. Frank Rand).

4 – after the cervical fusion (NOT ON VIOXX – that was about six months away) I was recovering very, very well and the operation was considered 100% successful. Possibly because my body had gotten use to the caustic effects from Fosamax I was feeling increasingly well, just about as good as right before I began Fosamax and had to go on disability. I felt well enough that I began to target returning back to work as long as everything continued to get better. The surgeon suggested a spinal fusion for cosmetic and "body geometry" reasons – it actually was technically considered elective at the time. Since I just had been doing so well with the operation and the hips in the mid 1990's, I felt that a spinal operation, to improve body geometry would be the icing on the cake, and then I could return to work. I was feeling better and better, and I did not feel the need to gain a rheumatologist at the time so I put that off for a bit. I had just moved to Cape Code, MA and after the cervical operation, I did not feel the need for a rheumatologist immediately0. I was almost back to pre-disability in feeling well and being very active; snow shoveling, doing yard work, long car rides to visit relatives resulted in no issues, etc.). I even went back to NJ where I had worked in wireless and set up some meetings with my boss and the VP who I also had worked for. I wanted them to see that I was doing very well as I could chose to return to Lucent Technologies should everything continue to go right. Note, I had a wealth of experience and I did not need my career to be withiun Lucent, but thought I'd start the process.

**Unfortunately the spinal fusion ultimately failed – the first failed operation, notably while I was then on Vioxx!** At that point, I decided it had been a good thing I had not started working again, and that I would have to see what happened, aware it could take time.

5 – The spinal operation failed first by one supporting rod breaking within one week which the surgeon had absolutely no rationale for. The 2nd rod broke sometime after a minor auto accident. Later on it had been diagnosed as breaking because the very slight bump likely knocked the Rod from the poor and incomplete fusion.

6 – I Began having severe pains in legs – after 2 checkups (one in Bergen Conty, NJ – Dr. Cristiello), and the 2nd in Alabny, NY (Dr. Carl), it was determined that both rods had broken. It was assumed that was the cause of pain, though I had no pain in my legs before the operation which failed I allege because of Vioxx. This was in the summer of 2002.

7– In the summer/fall of 2002, I was being scheduled for a corrective operation for the failed spinal operation. *OK, at that point, I felt that all I had to do was get it fixed, and I could return to work as except for that, I was still doing fairly well – though the legs were often in excruciating pain that was, it was thought, to be from the rods breaking and would be fixed.* Moving was no problem as we had done it several times. Extensive testing and general health

53

HarrisonD-PlProfileForm-        00053

showed no reason why a successful fusion should not work (MRIs, Catscan, Bone Scan, ec.). I began to again have hope of returning to work – but needed the corrective surgery and some time to go by to make sure it would be ok.

8- Looking back in time, now with much knowledge of Vioxx and Fosamax, I can understand the leg pain turned out to be the typical onset (recently being acknowledged) for Fosamax Femur Fracture. In January of 2003, the femur fractured as in the photos (x-rays) ones sees as atypical femur breakage. The corrective spinal operation was thus put on hold until I recovered from what was thought was going to be a relatively easy recovery of one week in the hospital and several months at home.

9– However, the femur did not heal. No-one could explain it at the time. Now it is clear that Fosamax was causal in the fracture, and Vioxx was causal in the non-union. Both were also contributory to the whole event (i.e. fracture and non-healing). Vioxx was the reason, or at a minimum a major contributory factor.  Fosamax, which is another Merck drug may have made the situation worse as it was in the body so long by then, and the bone regeneration had, as the mode Fosamax action is, basically stopped.  **With the evidence of Vioxx and bone/spine healing (as well as decreased bone mineralization), and long term usage of Fosamax, _I simply never had a chance._ Vioxx by itself would have stopped the healing; with Fosamax I simply had no chance.**

10 – Lawsuit was submitted for Vioxx only because no association was made with Fosamax by myself nor anyone at the time. This is why Fosamax is just now becoming an issue in my litigation with Merck, and why, if it cannot be addressed informally within the context of Vioxx, I will need to file Fosamax specific litigation also.

**NOTE**
Several surgeons were involved in the several operations and waiting for the (part of the) bone to regenerate to anchor the operation. Before, during and after the operation to fix it there was no infection. This is important to note as when the first operation, in Kingston NY to fix the femur was accomplished there was no infection. After the hardware did not stay in place because the bone never even began to heal, infection set in. The infection was diagnosed during the 2nd operation by the surgeon in Albany. The issue of the bone not regenerating sufficiently for a corrective operation (the 3rd operation for the femur) after the infection had cleared was observed by the NY Surgeon at several intervals via x-ray.

**NOTE**
NEVER had an issue with bone or spine healing before Vioxx usage. While on Vioxx (and Fosamax) I had two Rods break which was the hardware for a spinal fusion and "geometry improvement" operation. The surgeon felt confident even after the first Rod broke (within 3 weeks; again that critical time period) that the operation would be successful even after the first Rod broke, but when the second Rod broke the operation was ruined. A NY surgeon documented that the bone did not heal sufficiently for the proper healing of the hardware. The NY surgeon, as one of the NY surgeons for the femur, did not understand why it would happen. The point I am making is that no surgeon nor physician had the view that any operation would likely be anything but successful. A common

HarrisonD-PlProfileForm-      00054

theme for all of them is that they did not know about the Vioxx healing issue. Nor, obviously did they know about the issues with Fosamax. In fact upon my questioning one of the surgeons he indicated that he was under the impression, from Merck, that all of the "issues" with the first generation Cox-1 inhibitors were resolved.

## NOTE
I certainly had been depressed more than at any time in my life, and to this day it still impacts me. I had been someone who had his arthritic condition under control, I was working full time not needing to take sickness days for arthritis (and hardly any sick days), and I was relatively physically active working around the yard and home during most weekends. Within such a short timeframe I went to severe cervical and general pain (shortly after I began taking Fosamax) which no less than forced me to go on short term disability, then full time.  The story is told above but I wanted to point out that the suddenness and intensity of the problems created were, and are, certainly hard to cope with.

## NOTE
I am concerned that there may be an attempt to utilize the minor use of Prednisone to add an element of "confusion" and a red herring against my case as it is an anti-inflammatory. However

1 – Since Vioxx was deleterious to the bone healing process, obviously it should not have been taken on top of any other anti-inflammatories. Vioxx by itself was very effective in anti-inflammatory powers, and Vioxx in itself causes bones/spine not to heal properly, if at ll. Merck knew about potential issues with Vioxx and bone healing; Merck was negligent in not pursuing potential Vioxx and bone repair (and damage) issues. Merck had an obligation to investigate the issue (which it did not do) even that much more since it was well known that orthopedic surgeons and physicians would seek to control pain after an operation, and other anti-inflammatories were

2 – it was a low dose (10mg) daily;

3 – notably it did not affect the cervical fusion operation fusion nor a hip replacement which needed part of the hip to graft into bone;

4 – I was taken off of it when sent to Albany for the 2nd femur operation and since it does not remain in the body (like Fosamax for example) it was not responsible for the months and months of waiting for bone to re-generate enough to receive an operation;

5 – no physician or surgeon had any concern of its usage though it had been on the market for many, many years;

Almost all of the anti-inflammatories at one point or the other. I believe that I was on Lodene when I had the cervical fusion and there was absolutely no problem. Though Cox-1 inhibitors can impact/delay healing, they are not nearly as dangerous as major strength Cox-2 inhibitors such as Vioxx which actually stops the healing process. Even Merck's own paid consultant – Thomas Einhorn  both non-specific and specific inhibitors of cyclooxygenases impair fracture healing - but that this is due to the inhibition of

HarrisonD-PlProfileForm-        00055

<u>Cox-2 and not COX-1! Vioxx is a Cox-2 inhibitor</u>. **"It's time to tell the public,"** **concludes Dr. Thomas Einhorn. REPRINTED FROM:** <u>**WWW.USATODAY.COM/NEWS**</u> "It's time to tell the public," concludes Dr. Thomas Einhorn, Boston University's orthopedic surgery chairman. **New research suggests some** **of the most widely used painkillers may delay healing of a broken bone... "If it were** **my fracture ... to me every day counts," he says. Vioxx and Celebrex are among the** **culprits.... the makers of Vioxx and Celebrex deny any link.**

56

HarrisonD-PlProfileForm-     00056

# FOSAMAX ADDENDUM

The introduction of Vioxx worsened an environment that was developing from the many years of Fosamax usage. Left on its own, the anklyosing spondalitis would most likely have followed the normal course of events with that form of arthritis, and the normal course does not include the sudden, debilitating, omnipresent aspects, healing issues, stress fracture, etc. The normal course is a life inconvenienced, but certainly not devastating. Normally one with anklyosing spondalitis lives a life being able to work, travel, etc. **It is known that both drugs are deleterious to bone/spine health, especially when taken on a long term basis, at full strength also. The combination of Vioxx and Fosamax broadly and devastatingly ruined my opportunities for a normal life.**

**Fosamax stops proper/natural bone regeneration and also inhibits the healing process. The** longer Fosamax is taken the more likely that the above will happen. Vioxx added very significant fuel to the fire. **Fosamax was responsible for breaking the femur, and Vioxx was substantially and primarily responsible for the lack of healing.** However, Fosamax can be implicated for healing issues also, especially as it had been taken about five years at the time. Again, I do not think I had a reasonable, if any at all, chance.

Approximately one year before taking Vioxx, I was placed on Fosamax as a "preventive" measure. Though I did have soreness from the arthritis, I was not significantly limited and I lived a rather typical active life.  I worked full time – even frequently additional hours, and was very busy around the house and doing something virtually every weekend. On an overall basis, though I had arthritis, I was not much more limited than when I was in my twenties and thirties.

I was extremely perplexed - in less than a few months after taking Fosamax I went from a person who was managing his arthritis extremely well, not missing work from it - to being in such severe pain that I could not work. Again, this happened in only a few months after beginning Fosamax. Recently, a warning has been added to Fosamax that it may cause significant pain when beginning "treatment" which is consistent with what I experienced.

**Within a few months after beginning Fosamax, I began to experience pain and soreness more than anything I had ever had.** It became such a difficult proposition to get safely to work and back, besides my work effort now suffering greatly, I had to go on disability. I had hoped, of course after 20+ years, that I would return to my well paying management career and extremely rewarding job. I was responsible for several Product and Strategic Planning and Architecture (near) executive positions in the field of communications (wireless and broadband) and computer technology. Frankly I loved my work and always felt that I would be able to work at least until I was 62. In fact, and it is extremely NOTEWORTHY, I have a brother who has the same arthritic condition that I have had (anklyosing spondalitis). A couple of years ago he retired at age 62. His profile was virtually identical to mine, UNTIL I began on Fosamax AND Vioxx (both being Merck drugs). The difference between us what the he had never taken Vioxx nor Fosamax at the time! His disease continued to be under control very well, while mine went from very well controlled to so severe I had to leave a career that I loved.

I had hoped, and mostly assumed, that the pain/soreness would subside and perhaps I was having a severe attack. I went on short term disability hoping to go back to work. About six months after going

HarrisonD-PlProfileForm-    00057

on "short term" disability, which was approximately 8-9 months after beginning Fosamax - I began to have severe neck pain. Oddly enough, the initial pain (after beginning Fosamax) was much better, but now my neck pain was unbearable. I went to see a surgeon in Boston. Within less than one year after beginning Fosamax, I had cervical damage which, according to the surgeon should have killed me. The surgeon had no explanation for the reason why the cervical damage occurred – none at all. At the time, it was not known by surgeons and physicians, that Fosamax could damage bone structures and taken long enough even the healing process. I then had a 100% successful cervical fusion. After having the fusion declared complete, and having 100% of my symptoms gone, I was very eager (it is in the medical records) to have the spinal operation and very hopeful to get back to work in much better condition than when I left work for temporary disability (which would become permanent as when my femur broke, from the Fosamax, I was never the same person).

Prior to the cervical operation, the surgeon recommended an optional operation to straighten the spine a bit – basically to help correct "body geometry". While in the hospital, the day after the cervical operation (I was out of the hospital in two days) I asked the surgeon if the operation was complicated. He stated that "I can almost do it myself in less than two hours". It seemed like an easy decision to me and he was nothing but very confident about doing the spinal fusion.

With what was to become a wonderfully successful cervical operation, I decided to get the spinal operation which would help my body geometry. In fact, I began to really look forward to it, and was feeling increasingly well. With the pain now increasingly better (Fosamax initial pain is indicated as being usually temporary, and it was for (temporary) me and now the cervical operation behind me, I began having high hopes of returning to work. I felt that I was now on the right track and the worse was behind me  My rheumatalogist recommended I replace the Cox-1 I was on (I believe it was Lodine at the time) with Vioxx as it was supposed to be much better on the stomach – which I do believe it was.

**Unfortunately I was then on Vioxx before, during and after the spine operation and within 3 weeks one Rod broke, and less than one year later the second one broke** and I lost the body geometry improvements and gradually the pain became intense in my right leg. At that point I needed to have a corrective spinal operation and I was being given the necessary physical exams, and passing them all without any issues that would prohibit the operation. I was being tentatively scheduled for the operation - however , my right femur broke just about one – two months before the operation. **Notably at that time having faithfully taken Fosamax for  about five years**. The femur fracture was "oblique" and I had the signature severe pain in my legs for many months before the femur did fracture. The femur breakage led to the failed series of operations, two sepsis attacks, and approximately eight months in hospitals and nursing homes.

Frankly, I was never the same person when I was released from confinement. The way I felt, and after all I was through, in a relatively short time, I did not at that time think I could work again. **The situation had gone from such hope to quite a bit of depression, if not despair. I had missed eight months of my 8 year old daughter's youth and became separated from my wife at the time – leading to an eventual divorce.**

58

HarrisonD-PlProfileForm-      00058

## CERTIFICATION

I declare under penalty of perjury subject to 28 U.S.C. § 1746 that all of the information

provided in this Profile Form is true and correct to the best of my knowledge, that I have

completed the List of Medical Providers and Other Sources of Information appended hereto,

which is true and correct to the best of my knowledge, that I have supplied all the documents

requested in part X of this declaration, to the extent that such documents are in my possession,

custody, control or access, or in the possession, custody, control or access of my lawyers, and that

I have supplied the authorizations attached to this declaration.

_Dennis R Harrison_
Signature

_Dennis R. Harrison_     _Sept. 20, 2011_
Print Name                        Date



3

# Prehospital Care Report

4- 9838859

| | | AGENCY CODE | VEH. NO. |
|---|---|---|---|

DATE OF CALL: 0 4 1 0 3   RUN NO.: 0 3 1 0 0 9   AGENCY CODE: 0 3 5 4 C   VEH NO: 2 6 0 1 N

**Name:** Dennis Harrison
**No.:** 31 Janet St
Kingston NY 12401
**Ph:** 339-2827

**Agency Name:** Mohonk Fire Department
**Dispatch Information**
**Call Location:** 33 Dr... St

| | MILEAGE |
|---|---|
| END | |
| BEGIN | |
| TOTAL | (3) |

**LOCATION CODE:** 5 1 5 0 1

| USE MILITARY TIMES | |
|---|---|
| CALL REC'D | 07:38 |
| ENROUTE | 07:40 |
| ARRIVED AT SCENE | 07:43 |
| FROM SCENE | 08:05 |
| AT DESTIN | 08:19 |
| IN SERVICE | 08:20 |
| IN QUARTERS | |

**Age:** 50   M/F: M
**Physician:** Dr Donovan

**CALL TYPE AS REC'D:**
☑ Emergency
☐ Non-Emergency
☐ Stand-by

**COMPLETE FOR TRANSFERS ONLY**
Transferred from ☐ ___
☐ No Previous PCR
☐ Unknown if Previous PCR
Previous PCR Number ☐-☐☐☐-☐

**CARE IN PROGRESS ON ARRIVAL:** ☐ None ☐ Citizen ☐ PD/FD ☐ Other First Responder ☐ Other EMS

**MECHANISM OF INJURY:**
☐ MVA (✓ seat belt used →) ☑ Fall of Sit...
☐ Struck by vehicle   ☐ Unarmed assault
☐ GSW ☐ Machinery
☐ Knife

☐ Extrication required ____ minutes
Seat belt used? ☐ Yes ☐ No ☐ Unknown
Seat Belt Use Reported By ☐ Crew ☐ Patient ☐ Police ☐ Other

**CHIEF COMPLAINT**

**SUBJECTIVE ASSESSMENT** Pt fund lying on (R) side in a standards. pt
Severe (R) Hip Pain   regards slipping on ice, falling forward, landing on his (R) side.
Pt complains of severe pain in (R) hip + upper (R) leg. Pt reports

**PRESENTING PROBLEM**
if more than one checked, circle primary
- ☐ ...y Obstruction
- ☐ ...ratory Arrest
- ☐ Respiratory Distress
- ☐ Cardiac Related (Potential)
- ☐ Cardiac Arrest
- ☐ Pain (R_)

- ☐ Allergic Reaction
- ☐ Syncope
- ☐ Stroke/CVA
- ☐ General Illness/Malaise
- ☐ Gastro-Intestinal Distress
- ☐ Diabetic Related (Potential)

- ☐ Unconscious/Unresp.
- ☐ Seizure
- ☐ Behavioral Disorder
- ☐ Substance Abuse (Potential)
- ☐ Poisoning (Accidental)

- ☐ Shock
- ☐ Head Injury
- ☐ Spinal Injury
- (Fracture/Distocation)
- ☐ Amputation

- ☐ Major Trauma
- ☐ Trauma-Blunt
- ☐ Trauma-Penetrating
- ☐ Soft Tissue Injury
- ☐ Bleeding/Hemorrhage

- ☐ OB/GYN
- ☐ Burns
- **Environmental** ☐ Heat ☐ Cold
- ☐ Hazardous Materials
- ☐ Obvious Death

| PAST MEDICAL HISTORY | VITAL SIGNS | TIME | RESP | PULSE | B.P. | LEVEL OF CONSCIOUSNESS | GCS | R | PUPILS | L | SKIN | STATUS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ None | | 7:45 | Rate: 24 ☐Regular ☐Shallow ☐Labored | Rate: 92 ☐Regular ☐Irregular | 3/each | ☑Alert ☐Voice ☐Pain ☐Unresp. | 15 | ☑Normal ☐Dilated ☐Constricted ☐Sluggish ☐No-Reaction | ☑Normal ☐Dilated ☐Constricted ☐Sluggish ☐No-Reaction | ☐Unremarkable ☐Pale ☐Cool ☐Warm ☐Moist ☐Dry ☐Cyanotic ☐Flushed ☐Jaundiced | C U P S |
| ☐ Allergy to: Indoor... ☐ Hypertension ☐ Stroke ☐ Seizures ☐ Diabetes ☐ COPD ☐ Cardiac ☐ ...r (List) ☐ Asthma | | 8:19 | Rate: 20 ☐Regular ☐Shallow ☐Labored | Rate: 82 ☐Regular ☐Irregular | 146 | ☑Alert ☐Voice ☐Pain ☐Unresp. | 15 | ☑Normal ☐Dilated ☐Constricted ☐Sluggish ☐No-Reaction | ☑Normal ☐Dilated ☐Constricted ☐Sluggish ☐No-Reaction | ☐Unremarkable ☐Pale ☐Cool ☐Warm ☐Moist ☐Dry ☐Cyanotic ☐Flushed ☐Jaundiced | C U P S |
| previous Trauma Current Medications (List): see above Roxicet | | | Rate: ☐Regular ☐Shallow ☐Labored | Rate: ☐Regular ☐Irregular | | ☐Alert ☐Voice ☐Pain ☐Unresp. | | ☐Normal ☐Dilated ☐Constricted ☐Sluggish ☐No-Reaction | ☐Normal ☐Dilated ☐Constricted ☐Sluggish ☐No-Reaction | ☐Unremarkable ☐Pale ☐Cool ☐Warm ☐Moist ☐Dry ☐Cyanotic ☐Flushed ☐Jaundiced | C U P S |

**OBJECTIVE PHYSICAL ASSESSMENT** extensive trauma history w/ bilateral hip replacements, rods in
norr. + lumbar spine. PE→ Pt is Alert x3, obvious severe pain. PEARL, ØTM.
lu > clear + equal bilaterally, abd soft, obvious deformity to (R) pelvis + upper R
**COMMENTS** femur. ⊕ shortening + external rotation of the left (R) leg. + motor neo x4. L3 sec
cap refill x4. Rx as per flow sheet. Pt's anxiety level ↓ after morphine, but he
reports ∅ change in pain. Pt tol RN Hosp w/ report

**TREATMENT GIVEN**
- ☑ Moved to ambulance on stretcher/backboard
- ☐ Moved to ambulance on stair chair
- ☐ Walked to ambulance
- ☐ Airway Cleared
- ☐ Oral/Nasal Airway
- ☐ Esophageal Obturator Airway/Esophageal Gastric Tube Airway (EOA/EGTA)
- ☐ EndoTracheal Tube (E/T)
- ☑ Oxygen Administered @ 6 L.P.M. Method NC
- ☐ Suction Used
- ☐ Artificial Ventilation Method ____
- ☐ C.P.R. in progress on arrival by: ☐ Citizen ☐ PD/FD/Other First Responder ☐ Other
- ☐ C.P.R. Started @ Time ▶ ____ Time from Arrest Until C.P.R. ▶ ____ Minutes
- ☐ ...Monitored (Attach Tracing) [Rhythm(s)] ____
- ☐ Defibrillation/Cardioversion No: ____ Times ☐ Manual ☐ Semi-automatic

**Medication Administered (Use Continuation Form)**
- ☑ IV Established Fluid N/S   Cath. Gauge 1 8
- ☑ Mast Inflated @ Time ____
- ☐ Bleeding/Hemorrhage Controlled (Method Used) ____
- ☑ Spinal Immobilization Neck and Back
- ☑ Limb Immobilized by ☑ Fixation ☐ Traction
- ☐ (Heat) or (Cold) Applied
- ☐ Vomiting Induced @ Time ____ Method ____
- ☐ Restraints Applied, Type ____
- ☐ Baby Delivered @ Time ____ In County ____
  ☐ Alive ☐ Stillborn ☐ Male ☐ Female
- ☐ Transported in Trendelenburg position
- ☐ Transported in left lateral recumbent position
- ☐ Transported with head elevated
- ☐ Other ____

**DISPOSITION (See List)** Benedictine   DISP. CODE: ___   CONTINUATION FORM USED: YES

**IN CHARGE:** FFO Machiavre   **DRIVER'S NAME:** Henry Naeden

| NAME | | NAME | |
|---|---|---|---|
| ☑ EMT ☐ EMT ☐ AEMT # 1152060 | | ☐ CFR ☐ EMT ☐ AEMT # | ☐ CFR ☐ EMT ☐ AEMT # |

REV. 1986 NEW YORK STATE DEPARTMENT OF HEALTH   AGENCY COPY/WHITE   RESEARCH COPY/YELLOW   HOSPITAL PATIENT RECORD COPY/PINK   EMS 500 (11/89) provided by NYS-EMS PROGRAM   DOH 3293 (6/94)

# MLSS — MOBILE LIFE SUPPORT SERVICES, INC.

**69 DICKSON STREET ● PO BOX 471**
**NEWBURGH, NY 12551**

## PARAMEDIC REPORT

| PATIENT NAME | AGE | RACE | WEIGHT | | PCR # | DATE |
|---|---|---|---|---|---|---|
| Dennis Harrison | 50 | C | 90 KG | | F-7830859 | 1/9/03 |

**TYPE EMERGENCY SERVICES AT SCENE**  ☐ NONE  ☑ FD

**TREATMENT PRIOR TO ARRIVAL**  None  ER #

| MENTAL STATUS | SPEECH | SENSORY/MOTOR | RESP. | BREATH SOUNDS | NECK VEINS | ABDOMEN | GCS | CAPILLARY REFILL |
|---|---|---|---|---|---|---|---|---|
| ☑ Alert/Oriented | ☑ Normal | ☑ Normal | ☑ Normal | ☑ Normal | ☐ Flat | ☑ Normal | Eyes 4 / 4 | ☑ Normal |
| ☐ Disoriented | ☐ Slurred | ☐ Sensory Loss | ☐ Shallow | ☐ Rales | | ☐ Tender | Verbal 5 / 5 | ☐ Delayed |
| ☐ Responds to Voice | ☐ Abbreviated | ☐ Motor Loss | ☐ Deep | ☐ Rhonchi | ☐ Normal | ☐ Rigid | Motor 6 / 6 | ☐ None |
| ☐ Responds to Pain | ☐ None | ☐ Location: | ☐ Labored | ☐ Wheeze | | ☐ Distended | Total 15 / 15 | ___ Secs |
| ☐ No Response | | | ☐ Absent | ☐ Absent L.R. | ☐ Distended | ☐ Pmq | | |
| | | | ☐ Agonal | ☐ Diminish L.R. | | RUQ  LUQ | | |
| | | | | | | RLQ  LLQ | | |

**MEDICATIONS (DOSAGE & COMPLIANCE)**
Vioxx          Potassium     Oxycontin
Til 4          Prednisone    Procret
Imipramin     Fosomax

**PARAMEDIC IMPRESSION**
(R) Hip Displacement

**ALLERGIES:** Inderin
☐ NO KNOWN ALLERGIES

| TIME | LOC | BP | Pulse | Resp. | TREATMENT/PROCEDURE/EKG | RESPONSE |
|---|---|---|---|---|---|---|
| | | | | | Arrive on Scene | |
| 744 | A | syncope | 92 | 24 | PT Assessment | |
| 746 | | | | | Extricate from structure | |
| 756 | | | | | PT Fully Immobilized on Spineboard | |
| 805 | A | 156/84 | 88 | 22 | Begin Transport — O2 NC 6LPM | |
| 807 | | | | | IV Established (R)AC 18ga NS kvo | |
| 809 | | | | | CMC — request & recieved order for 5mg morphine | |
| 812 | | | | | 5mg Morphine IV | |
| 814 | A | 146/p | 82 | 20 | Arrive @ Benedictine | |
| | | | | | PT TOT RN Hyatt w/ report | |
| | | | | | No pain relief from morphine | |

| PARAMEDIC NAME (PRINT) | NYS ID # | PARAMEDIC SIGNATURE |
|---|---|---|
| Ted Marchiorra | 152000 | |
| MEDICAL CONTROL PHYSICIAN NAME (PRINT) | M.C. FACILITY | MEDICAL CONTROL PHYSICIAN SIGNATURE |
| Dr. Furman | Benedictine | x |

| CONTROLLED SUBSTANCE DESTROYED | DRUG NAME | QUANTITY | DATE | DRUG DESTROYED WITNESS SIGNATURE | ID# |
|---|---|---|---|---|---|
| | Morphine | 5mg | 01/9/03 | Karen Hyatt RN | |

White – Service Copy     Canary – Quality Improvement Copy     Pink – Chart Copy     Goldenrod – Research Copy

*admit*

*1/13*

# BENEDICTINE
## H O S P I T A L

### EMERGENCY DEPARTMENT REPORT

PATIENT NAME:                HARRISON, DENNIS
MEDICAL RECORD NUMBER:       33-69-63
ACCOUNT NUMBER:              000341944
DATE OF ADMISSION:           01/09/03
DATE OF DISCHARGE:             / /
EMERGENCY PHYSICIAN:         RUSSELL FIRMAN, M.D.
FAMILY PHYSICIAN:
ROOM NUMBER:                 EMR

CHIEF COMPLAINT:             Right hip pain.

HISTORY OF PRESENT ILLNESS:  The patient is a 50-year-old white male
who presents to the emergency department with hip pain.  He fell on
ice.  He landed directly onto his right hip.  He felt a snap.  He
received 5 mg of morphine in the pre-hospital setting.  The patient
said that he had bilateral hip replacements with one in the early
1990's, and the right hip was replaced in 1995 in New Jersey.  The
patient has pain of a 9 out of 10 upon arrival.  There is no back pain
or belly pain associated with this.  There is no chest pain or
shortness of breath.  He did not have a syncopal episode.  No
lightheadedness or dizziness.  He said he was just walking and slipped
on ice when this occurred.  He is normally on OxyContin for pain in
his neck as he has a cervical spine tumor.  He denies any neck pain
currently.  No modifying factors.  It feels better when he is laying
still.

REVIEW OF SYSTEMS:           At least eight other systems are
reviewed and found to be negative in addition to those reviewed above.

PAST MEDICAL HISTORY:        Cervical spine tumor for which he is
being cared for in Albany.  Hip replacements bilaterally.  Rods in the
back.  Prostate disease.

PAST FAMILY/SOCIAL HISTORY:  No alcohol or tobacco use.

CURRENT MEDICATIONS:         Vioxx, Tylenol with codeine, Imipramine,
Klonopin, prednisone, Fosamax, OxyContin, Procrit.

ALLERGIES:                   Indocin.

15 MARY'S AVENUE   KINGSTON, NEW YORK   12401   914 338.2500   FAX: 914 334.4737

PATIENT NAME:             HARRISON, DENNIS
MEDICAL RECORD NUMBER:   33-69-63
ACCOUNT NUMBER:         000341944
DATE OF ADMISSION:      01/09/03

**PAGE 2**

PHYSICAL EXAMINATION:      Vital signs as per the emergency department record.  PERRLA.  EOMI.  No head trauma.  Spine nontender.  The back is nontender.  Lungs are clear and equal bilaterally.  Heart has a regular rate and rhythm.  Abdomen is soft, benign, and nontender.  The right proximal thigh is swollen with an obvious hematoma present, and there is pain on any palpation of the right greater trochanter and over the proximal femur.  The knee is nontender.  Skin is warm and dry with no DVT.  Pulses are intact.  Capillary refill is less than two seconds.  The patient is well hydrated and nontoxic appearing.  No depression.  No cellulitis.  No lymphadenopathy.  Cranial nerves are intact.  Cerebellar exam is negative.  There are good pulses to the right lower extremity which are slightly shortened.  No compartment syndrome.

DIAGNOSTIC TESTING:       Electrolytes are normal except for a glucose of 117, BUN of 26, $CO_2$ of 30, calcium of 8.3.  The hemoglobin is 9.1.  White blood cell count is 12.8.  Platelet count 572,000.  X-ray of the pelvis, right hip, and right femur showed there to be a fracture starting at the mid shaft of the right stem replacement running obliquely down below the stem through the femur.

DIAGNOSIS:        1.     Acute right femur fracture.
                2.     Mild hyperglycemia.

PLAN OF CARE:        The patient was given 10 mg of morphine IV, and I have consulted Dr. Null at 0950 and asked him to evaluate the patient.  The patient requested treatment and services here at the hospital and his definitive care here.  The patient's pain will be reassessed.  He was re-examined several times to make sure that a compartment syndrome does not develop or any expanding hematoma.  Condition at the time of consultation with Dr. Null is stable.

RF/ddi/eb
D:01/09/03
T:01/09/03
BY:0792
7A/14YFL/J:5687
XZ:#7805687.193

U:000792

RUSSELL FIRMAN, M.D.



**BENEDICTINE**

**H O S P I T A L**

### DISCHARGE SUMMARY

PATIENT NAME:                    HARRISON, DENNIS
MEDICAL RECORD NUMBER:           33-69-63
ACCOUNT NUMBER:                  000341944
DATE OF ADMISSION:               01/09/03
DATE OF DISCHARGE:               01/13/03
ATTENDING PHYSICIAN:             WILLIAM NULL, M.D.


ADMITTING DIAGNOSIS:             Fracture of right femur.

HISTORY OF PRESENT ILLNESS:   A 50-year-old white male with a history
of ankylosing spondylitis and bilateral total hip replacements, who
fell on the ice, on the day of admission, suffering a fracture to his
right femur below the hip prosthesis.  The patient was admitted for
definitive treatment.

PHYSICAL EXAMINATION:            On admission, the right leg was
significantly shortened and swollen, externally rotated.
Neurovascular status intact.

X-rays showing a spiral comminuted fracture at the base of the right
femur, right femoral prosthesis.

HOSPITAL COURSE:                 On the day of admission, the patient
went seen by medicine and cleared medically for surgery.  He was taken
to the operating room on the following day where he had an open
reduction and internal fixation of the right femur with a plate,
screws and cerclage wires.  Postoperative course was essentially
unremarkable.  Maintained for 48 hours on prophylactic IV Ancef.  He
was started on physical therapy for transfers and ambulation on weight
bearing of the extremity.  He was discharged to home.  Follow up in
the office in 10 days for removal of his stitches.


WN/ddi/ci/zh
D:02/18/03                        _____
T:02/18/03                        WILLIAM NULL, M.D.
BY:0470
7D/15ZMK/J:1048
XZ:#7931048.2I3

U:000470


MARY'S AVENUE   KINGSTON, NEW YORK   12401   914 338 . 2500   FAX: 914 334 . 4737

HarrisonD-BenedictineHMR-        00016

3403A



# BENEDICTINE
## H O S P I T A L

**HOSPITAL REGULATION: All positive & important findings shall be recorded.**

### PRE-OP HISTORY & PHYSICAL

PATIENT NAME:              HARRISON, DENNIS
MEDICAL RECORD NUMBER:     33-69-63
ACCOUNT NUMBER:            000341944
DATE OF ADMISSION:         01/09/03
ATTENDING PHYSICIAN:       WILLIAM NULL, M.D.

ADMITTING DIAGNOSIS:       Fractured right femur.

CHIEF COMPLAINT:           Pain, right leg.

HISTORY OF PRESENT ILLNESS:  This is a 50-year-old white male with a
history of ankylosing spondylitis and bilateral hip replacements who
slipped and fell on the ice on the day of admission suffering an
injury to his right leg.  He was seen in the Benedictine Hospital
emergency room where x-rays revealed a displaced fracture of the right
femur just below the right total hip prosthesis.  The patient is now
being admitted for definitive operative intervention.

PAST MEDICAL HISTORY:      Significant for ankylosing spondylitis
and anemia.

PAST SURGICAL HISTORY:       Bilateral total hip replacements and
spinal fusion both cervical and lumbar.

MEDICATIONS:               Prednisone 20 mg q.o.d., Fosamax 70 mg
q. week, Klonopin 2 mg p.o. h.s., Vioxx 25 mg p.o. b.i.d., imipramine
30 mg q.h.s., Celexa 20 mg q.d., OxyContin 40 mg t.i.d., Prinivil 10
mg q.d.

**ALLERGIES:**                  .

SOCIAL HISTORY:            He lives with his wife.  He does not
drink or smoke.

FAMILY HISTORY:            Ankylosing spondylitis.

REVIEW OF SYSTEMS:         Confined primarily to right hip pain
today.

MARY'S AVENUE   KINGSTON, NEW YORK   12401   914 338 . 2500   FAX:  914 334 . 4737

HarrisonD-BenedictineHMR-    00017

PATIENT NAME:            HARRISON, DENNIS
MEDICAL RECORD NUMBER:   33-69-63
ACCOUNT NUMBER:          000341944
DATE OF ADMISSION:       01/09/03

**PAGE 2**

PHYSICAL EXAMINATION:          A well developed, well nourished white
male in obvious distress.  Head is normocephalic, atraumatic.  Pupils
equal, round, reactive to light and accommodation.  Extraocular
movements are intact.  Throat is clear.  Tongue is midline.  Neck is
rigid with minimal motion.  HEART:  S1 and S2 normal without murmurs.
Lungs are clear bilaterally.  Abdomen is soft and nontender.  Bowel
sounds are normoactive.  Examination of the right leg shows
significant swelling with shortening of the right leg in external
rotation.  There is crepitus and pain with range of motion.
Neurovascular status intact right lower extremity.

X-rays, AP and lateral, of the right femur show a comminuted
transverse fracture just below the tip of the prosthesis of the right
femur.

PLAN:                    Patient admitted for an ORIF of his
right femur.  He will require a plate with wires above and screws
below.  The procedure, complications, risks, and benefits were
explained to the patient.  Dr. Dominski will see the patient in
medical consultation.  May consider preoperative transfusion for the
anemia.


WN/ddi/ei
D:01/10/03                       _____
T:01/10/03                       WILLIAM NULL, M.D.
BY:0470
WH/14ZLS/J:5841
AZ:#7995841.1A3

U:000470



HarrisonD-BenedictineHMR-   00018

3403A



# BENEDICTINE

## H O S P I T A L

### CONSULTATION REPORT

| | |
|---|---|
| PATIENT NAME: | HARRISON, DENNIS |
| MEDICAL RECORD NUMBER: | 33-69-63 |
| ACCOUNT NUMBER: | 000341944 |
| DATE OF ADMISSION: | 01/09/03 |
| DATE OF CONSULTATION: | 01/09/03 |
| CONSULTANT: | PAUL DONOVAN, M.D. |
| ATTENDING PHYSICIAN: | WILLIAM NULL, M.D. |

The patient was seen in consultation at the request of Dr. Null on 01/09/03. The patient is a 50-year-old male who has been under my care for management of multiple medical problems including ankylosing spondylitis, anemia. Who fell on the street today, and he has now developed a fracture of the right femoral shaft. The patient is now admitted under Dr. Null's service for orthopedic management of the fracture. I have been asked to evaluate and assess the patient's general medical status prior to surgery.

The patient has a long and complicated medical, hematological, and orthopedic history. Approximately 20 to 25 years ago the patient developed ankylosing spondylitis. For ten years he was placed on medical management. In 1997 he had a fusion of the neck bones as part of disease process. In 1995 both hips were replaced at the hospital for special surgery, one done there and one done in New Jersey. Both were very successful. Approximately 3-1/2 years ago he developed some headaches. He has had over the years an eight inch decrease in height. His neck has decreased in size. He had a cervical fusion performed at New England Baptist Hospital in Massachusetts. He unfortunately was involved in a major car accident in February, 2002, almost a year ago. He developed headaches and neck pain since then. He also had a lumbar spine vertebra collapse and had surgery done 1-1/2 years ago at the New England Baptist Hospital again, moderately successful. He has had continued low back symptomatology. His left leg tends to be numb.

He has been followed by a number of physicians over the years, particularly in New Hampshire. He came to the Hudson Valley area in approximately August, 2001. He has been under my care for general medical problems and anemia since that time. From the hematological perspective he underwent a bone marrow aspiration biopsy on 09/10/02, and the findings showed dyserythropoiesis consistent with refractory anemia, underlying bone remodeling and focal reticulin fibrosis.

 MARY'S AVENUE   KINGSTON, NEW YORK   12401   914 338 . 2500   FAX: 914 334 . 4737

PATIENT NAME:                    HARRISON, DENNIS
MEDICAL RECORD NUMBER:          33-69-63
ACCOUNT NUMBER:                 000341944
DATE OF ADMISSION:              01/09/03

**PAGE 2**

Chromosome analysis was unremarkable.  The patient has been receiving
Procrit injections on a weekly basis, dose of 60,000 units per week.
He maintains a hemoglobin generally in the range of 9.5 to 10 grams.
His most recent ones have been in the range of 9 to 9.5 grams.  Blood
work in August revealed a normal renal function with a BUN of 31,
creatinine 1.1.  Electrolytes essentially unremarkable.  Chemistry
profiles were normal.

MEDICATIONS:                    Have included in the past prednisone 20
mg every other day, Fosamax 70 mg weekly, Klonopin 2 mg nightly, Vioxx
25 mg p.o. b.i.d., imipramine 30 mg h.s., Celexa 20 mg a day.  He has
also been on OxyContin 40 mg three times a day.

Other medications have included folic acid 1 mg a day, Prinivil 10 mg
a day.

**ALLERGIES:**                      **Indocin causes headaches.**

SOCIAL HISTORY:                 Wife is alive and well.  He is now
disabled, but he used to work for AT&T and Lucent.  Nonsmoker, social
drinker.  He has had transfusions in the past.

FAMILY HISTORY:                 His brother has ankylosing spondylitis.
His mother had diabetes, arthritis, and heart disease.  His father had
multiple myeloma, arthritis, and heart disease.

In reviewing his records, he has been on prednisone in the past.
There is also a reference to osteoporosis, calcified aortic valve,
ankylosing spondylitis as noted, chronic anemia as noted.

Because of the sheer complexity of his back problem and increasing
symptomatology; namely pain down the left leg, numbness, and
suggestion of weakness, he underwent a number of ancillary studies.
He was offered the choice of going back to New Jersey where he had his
original surgery or going to the Center for Joint Diseases in
Manhattan where he also had previous surgery.  Finally he opted for
Albany Medical Center and has seen Dr. Carl in the department of
orthopedics, who has discussed with the patient the issue of further
spinal surgery in the not too distant future.

REVIEW OF SYSTEMS:              He denies any chest pains, angina,
palpitations.  No cough, no sputum, no shortness of breath.  His
appetite has been good.  No nausea, no vomiting, no diarrhea.  No
dysuria, no frequency.  No fever, no chills.  Chronic back pain,
numbness down the left leg, pains in the hips.  No seizures, no loss
of consciousness, no migraine headaches.  No skin problems, no
pruritus.  He does have some shortness of breath due to limitation of



PATIENT NAME:                    HARRISON, DENNIS
MEDICAL RECORD NUMBER:          33-69-63
ACCOUNT NUMBER:                 000341944
DATE OF ADMISSION:              01/09/03

**PAGE 3**

chest function secondary to ankylosing spondylitis.  No blurred
vision, no diplopia, no tinnitus, no vertigo.

PHYSICAL EXAMINATION:
VITAL SIGNS:  Blood pressure 134/80, pulse 76 per minute, respiratory
rate 20 per minute, temperature 96.
HEENT:  Head normocephalic.  Mild pallor noted.  Nonicteric.  Pupils
equal, reactive to light and accommodation.
NECK:  Rigid.  No cervical adenopathy.  Trachea midline.  Thyroid not
enlarged.  Jugular venous pressure not elevated.
LUNGS:  Essentially clear to percussion and auscultation.
HEART:  Regular sinus rhythm.  No murmurs, rubs, or gallops.
ABDOMEN:  Soft.  Liver and spleen not palpable.
EXTREMITIES:  No clubbing, cyanosis, or edema.
NEUROLOGICAL EXAMINATION:  Detailed neurological examination, as the
patient is in traction because of the fractured right femur.

LAB DATA:                       Hemoglobin 9.1 grams, white count
12,800, platelet count 572,000.  BUN 26, creatinine 1.0, electrolytes
unremarkable.  The calcium was 8.3.  A complete liver profile was not
done.  PT, PTT unremarkable.  EKG: normal sinus rhythm.  X-ray of the
pelvis: fracture of the proximal shaft of the right femur.

IMPRESSION:                  1.      Fracture, right femur.
                             2.      Ankylosing spondylitis.
                             3.      Anemia.
                             4.      Osteoporosis.
                             5.      Calcified aortic valve.

RECOMMENDATIONS:             Patient is anemic and recommend
transfusion of two units of packed cells.  He may require further
units of packed cells depending upon blood loss during surgery.  I
understand he will be having spinal anesthesia.  Therefore,
cardiopulmonary status should not be a problem.  I have reviewed all
his medications and would like to continue all of them at this time.
He is on chronic pain medication OxyContin 40 mg every 8h., and I
would like to continue same.  He is also on a number of medications
for anxiety, depression.  I will also continue the same.  Will hold
his methotrexate at this time.  Will follow medically with you.

Please call me if there are any medical problems during his current
hospital stay.



PATIENT NAME:              HARRISON, DENNIS
MEDICAL RECORD NUMBER:    33-69-63
ACCOUNT NUMBER:           000341944
DATE OF ADMISSION:        01/09/03

**PAGE 4**

Thank you for asking me to see the patient in consultation.


PD/ddi/pa
D:01/09/03
T:01/09/03                _____
BY:6475                   PAUL DONOVAN, M.D.
7N/14Z7S/J:5771
XZ:#7955771.193



HarrisonD-BenedictineHMR-    00028

4

## Surgical Neurology Professional Association

Ronald J. Faille, M.D.
Theodore R. Jacobs, M.D.
N. Ross Jenkins, M.D.
Jennifer C. Kernan, M.D.

Brian E. Snow, PA-C
David C. Molind, PA-C
Joseph T. Kearns, PA-C

*Main Office*

8 Prospect Street
North Two Specialty Suite
Nashua, NH 03060
(603) 882-1300
fax (603) 882-5025

4 Elliot Way, Suite 303
Manchester, NH 03103
(603) 669-3838
fax (603) 626-0103

246 Pleasant Street
Memorial Bldg., S-107
Concord, NH 03301
(603) 225-6674
fax (603) 225-2140

March 28, 2002

RE: Harrison, Dennis R.
DOB: 11/19/52

Chief Complaint:  Neck and back pain

History of Present Illness:   This is a very pleasant right-hand-dominant 49-year-old male patient seen in consultation at the request of his rheumatologist Dr. Trice.  Patient describes history of back pain and neck pain over many years secondary to his ankylosing spondylitis.  On February 10, 2002 he was a restrained rear-seat passenger in a vehicle hit to the right front and since that time has had return of some of his neck pain and stiffness and low back pain and stiffness which was relieved to a great degree through surgery approximately 5-6 years ago when he underwent a "total cervical fusion".  He has also undergone a lumbar and lower thoracic fusion both secondary to his ankylosing spondylitis.

Past Medical History is also significant for rheumatoid arthritis, osteoporosis, bilateral total hip arthroplasties, chronic microcytic anemia.

Review of Systems:  He complains of neck pain and stiffness. He denies any weakness, paresthesias or radiation of pain to his upper or lower extremities.  He denies any changes in bowel or bladder control.  He denies any Valsalva effect.  He denies any headaches but does describe occasional lancinating pain along his left scalp and just superior to his left ear.

Medications:  Include Procrit injection weekly, prednisone 20 mg. q.o.d., Vioxx 25 mg. b.i.d., Axid 150 mg. b.i.d., Fosamax 10 mg. q.d., Prinivil 10 mg. q.d., imipramine 10 mg. tablets 3 p.o. q.h.s., OxyContin 40 mg. b.i.d., clonazepam 2 mg. q.h.s.

Allergies:  To Indocin (anaphylaxis).

Family History: Very pleasant 49-year-old gentleman who is on retirement disability, lives at home with his wife and plans on

Re: Harrison, Dennis R.
DOB: 11/19/52

March 28, 2002    2

moving to New York in the next few months where he is originally from. His surgeries have taken place at hospitals in New York and New Jersey and New England Baptist.

Physical Exam: Vital signs are as follows: BP 120/85, pulse 80, respirations 16. This gentleman has a somewhat cachectic appearance with severe kyphosis of the C-spine and upper T-spine and flattening of the lumbar lordosis, severely limited C-spine ROM. both rotation and flexion/extension. Cranial nerves II-XII are intact. HEENT: No abnormalities are noted. There is a well-healed posterior cervical scar approximately 15 cm. in length. Upper extremities: Strength is 5/5 over the left upper extremity, 4+ to 5/5 on the right upper extremity. He complains of right elbow and right wrist pain which is long-standing and unchanged. Sensation is intact throughout. DTRs are 2+ with spread throughout. Negative Hoffmann's. Lower extremity strength is 5/5 throughout. DTRs are 2-3+/4 at the knees, 2+/4 at the ankles; negative clonus. Toes are downgoing to Babinski. Patient is able to rise, stand on his toes and his heels. Examination of the lumbar area is remarkable for approximately 35-40 cm. long lower thoracic lumbar wound which is well-healed and once again flattening of the lumbar lordosis. No other abnormalities are noted. No SI joint discomfort is noted. Romberg is negative. Finger-to-nose is intact. Lungs are clear to auscultation. Heart: Regular rate and rhythm.

Assessment: Ankylosing spondylitis, chronic degenerative changes.

Plan: Patient was evaluated by Dr. Faille who recommended that it would be more appropriate for the patient to continue to seek his care in a major medical center given his multiple chronic medical issues and lack of focal extremity complaints at this time, and the fact that his symptoms have been actually improving since his MVA back in February. He is to call with any questions or problems.

Joseph T. Kearns, PA-C


Ronald J. Faille, M.D.

JTK/mer
wp46675.001
cc: James Trice, M.D.

BLAIR MEDICAL ASSOCIATES, P. A.
230 SOUTH STREET
MORRISTOWN, NEW JERSEY 07960

PHONE 201 · 539-2488

HILLEL BEN-ASHER, M. D.
DAVID S. LERMAN, M. D.
DAVID WIDMAN, M. D.
BARRY R. ZITOMER, M. D.

DAVID WIDMAN, M. D.
DIPLOMATE, AMERICAN BOARD OF
INTERNAL MEDICINE & RHEUMATOLOGY

July 11, 1988

Stephen Krasnica, M. D.
101 Madison Avenue
Morristown, New Jersey 07960

Re: Dennis Harrison

Dear Steve:

Mr. Harrison was re-evaluated and is somewhat improved on Feldene
but still has marked symptomatology.

I have asked him to speak to you again in the coming week
regarding his anemia, and I would appreciate if you could forward
his blood tests as I did not do any today, in anticipation of his
upcoming appointment with you.

I have mentioned the therapeutic possibility of trying Azulfidine
which has been used to some extent in European literature on
ankylosing spondylitis-type patients. I have again outlined
that this is still in a formative stage and not major indicated
therapy. Nevertheless, in view of his aggressive disease and the
fact that gold has not been shown to be effective in this disorder,
it certainly could be considered. I also hope that his anemia has
no other underlying etiology, and perhaps this should also be
pursued.

Sincerely,

David Widman, M. D.

DW:bws

BARRY A. REITER, M.D.
STEPHEN M. SCHREIBMAN, M.D., P.A.
STEVAN ADLER, M.D.
PROFESSIONAL ASSOCIATION
MEDICAL ONCOLOGY/HEMATOLOGY

88 MAPLE AVENUE
MORRISTOWN, NEW JERSEY 07960
TELEPHONE (201) 267-9543
PLEASE REPLY TO DENVILLE ADDRESS

35 WEST MAIN STREET
DENVILLE, NEW JERSEY 07834
TELEPHONE (201) 625-3666

July 25, 1991

David Widman, M.D.
95 Madison Avenue
Morristown, N.J.  07960

RE:  Dennis Harrison

Dear Dave:

    Mr. Harrison was seen in our office for long standing
microcytic anemia.  The patient has ankylosing spondylitis.
Our evaluation suggests that the patient has anemia of chronic
disease.  He has iron stores in his bone marrow.  Because
his peripheral smear had some target cells, I repeated the
hemoglobin electrophoresis and it was normal.  I don't feel
that the patient needs iron.  An erythropoetin level was
ordered but it is still pending.  I don't feel there is
anything that can be done for his anemia.  However, we might
try eryhtropoetin if his blood levels are low.  The patient
was instructed to see you regarding continued follow-up.

                                  Thank you,

                                  Barry Reiter, M.D.

BR:sg

cc:  Dr. Krasnica

# Surgical Neurology Professional Association

Ronald J. Faille, M.D.
Theodore R. Jacobs, M.D.
N. Ross Jenkins, M.D.
Jennifer C. Kernan, M.D.

Brian E. Snow, PA-C
David C. Molind, PA-C
Joseph T. Kearns, PA-C

*Main Office*

**8 Prospect Street**
North Two Specialty Suite
Nashua, NH 03060
(603) 882-1300
fax (603) 882-5025

4 Elliot Way, Suite 303
Manchester, NH 03103
(603) 669-3838
fax (603) 626-0103

**246 Pleasant Street**
Memorial Bldg., S-107
Concord, NH 03301
(603) 225-6674
fax (603) 225-2140

March 28, 2002

James M. Trice, M.D.
280 Pleasant Street
Concord, NH    03301

RE:  Harrison, Dennis R.
DOB: 11/19/52

Dear Jim,

Enclosed find a history and exam on this very complicated man. Clearly his care at this time is beyond the scope of my practice.

I strongly recommended that he seek help in Boston or New York, depending on his preference.  He appreciates the situation and will pursue his care elsewhere.

Sincerely yours,

Ronald J. Faille, M.D.

RJF/mer
wp46675.002

MAR-25-02 12:14 AM   JAMES.M.TRICE                665 225 8525          P.05

July 25, 2001

HARRISON, DENNIS

49-year-old white male who comes in for evaluation of ankylosing spondylitis.

**HPI:**   This 49-year-old white male tells me that he was first diagnosed with ankylosing spondylitis in his early 20's and it has been a very aggressive disease since onset. He had severe spine disease and actually had problems with subluxation of the upper spine into the occiput to the point that he needed a cervical fusion done in 1999. He has also had bilateral hip replacements done in 1995. He has ongoing problems with pain and swelling in his shoulders, his knees, and in his hands and right wrist. He tells me he has lost about 15 lbs. in the last six months. He has also had problems with iritis in the past although he is not aware of any trouble with cardiac or lung difficulties. He has also had problems with osteoporosis, anemia, and sleep apnea. Because of his spinal problem the question has been raised as to whether he might actually have in addition to the ankylosing spondylitis RA.

**ROS** is otherwise unremarkable.

**PMH:**   Surgeries: Status post the cervical fusion and hip procedures as mentioned above. Lumbar fusion was also done in January of this year. Allergies: Indocin causes problems. His current medications include Axid, Vioxx, Fosamax, Prinivil, Amoxicillin, Imipramine, Tylenol 4, Clonazepam, Oxycontin, and Prednisone. His only other medical problem has been hypertension.

**SOCIAL HISTORY:**   He is a non-smoker, non-drinker.

**FAMILY HISTORY:**   His brother has spondylitis. He has retired from AT&T and

**EXAM:**   On PE he is a frail appearing white male who looks much other than his chronological age who is in no distress. His BP was 120/70 in the right arm seated. Pulse was 90 per minute and regular. Skin revealed no significant rash. HEENT exam unremarkable. Lungs were clear to auscultation. Heart: Regular rate and rhythm. There is a II over VI systolic murmur at the left sternal border, no diastolic murmur was noted. Abdomen not examined. The neurovascular exam was normal. Joint Exam: He had no swelling or pain in the DIP joints. There is 2+ swelling and tenderness in the IP joint of the right thumb. The rest of the IP joints reveal no swelling or pain. There is 2+ swelling and tenderness in the right first MCP joint. The rest of the MCP joints reveal no swelling or pain. There is 3+ synovial thickening and 2+ tenderness in the right wrist. The right wrist reveals 60 degrees of flexion and 40 degrees of extension. Left wrist revealed 80 degrees of flexion and extension without pain. Elbows revealed full ROM without pain. The shoulders were markedly abnormal with only 50 degrees of abduction, 30 degrees of external rotation, 20 degrees of internal rotation. Hips revealed full ROM without pain. The knees revealed 20 degree flexion contractures with further flexion to 100 degrees. There is quite a bit of proliferative synovitis and effusions in the knees. The ankles, midfoot and MTP joints are non-tender. There was some fuseiform swelling of the left second toe. His cervical and lumbar spine revealed no significant motion.

**IMPRESSION:**   1) Ankylosing spondylitis.
   2) Peripheral joint arthropathy. The degree of synovitis is surprising here and certainly raises the possibility of rheumatoid disease as does his cervical spine subluxation into the foramen magnum which required decompressive surgery.
   3) Hypertension.
   4) Weight loss. I suspect this is probably secondary to his active arthropathy.

**PLAN:**   Screening lab studies are pending including HIV, hepatitis B and C serologies and thyroid profile. Provided these were negative or normal, we will start him on Methotrexate 10 mg. a week, folic acid 2 mg. a day. I refilled his Oxycontin 40 mg. tabs one q.12.h., #60. and Klonopin 100 tabs, 1 mg., two at bedtime. That one had 5 refills. Follow up with me will be in eight weeks.

JMT/aew

8/22/01 Tlc pt. reg ref Oxycontin 40 mg. ÷ 12h. #60 org. Smc

HarrisonD-NHNeuroSpineInt-          00025

5

**Grand Street Medical Associates**
39 Grand Street
Kingston, New York 12401

**Paul B. Donovan, M.D.**
Hematology & Oncology Medicine
Office 845-334-9920
Fax 845-334-9894

Date: 4/9/09

Name _Dennis Harrison_   Acct # _____

Height _____ Weight _175_ Temp _98_ Pulse _104_ Respiration _18_ BP _125/70_

History Form of _____ Reviewed.

**Interim History:** _Went to the clinic on 4/8/09 → took cbwd weekly_

Per Dr. Donovan: Blood Drawn For _Fever to 101° one week ago_ Initials_____

**New Problems:** _____

**Medications:** ☐ No Change _Coreul one (1) by tee — is real_
_left mildly come of fever_

**Family Hx:** ☐ No Change ☐ _____

**Social Hx:** ☐ No Change ☐ _Intermittent fever_

**REVIEW OF SYSTEMS**

| General | ☑ W _175_ | ☑ Fevers | ☑ Sweats | ☐ Weakness |
| Skin | ☐ Rash | ☐ Ulcers | ☐ Hair loss | |
| HEENT | ☐ Headache | | ☑ Pain | ☑ Double Vision |
| | ☑ Visual Loss | ☑ Blurring | | |
| | ☑ ↓ Hearing | ☑ Vertigo | ☑ Tinnitus | |
| | ☑ Nasal Drainage | ☑ Bleeding | | |
| | ☑ Sore Throat | ☑ Oral Ulcers | ☑ Teeth | ☑ Dryness | ☐ Hoarseness |
| Resp. | ☑ Chest Pain | ☑ SOB | ☑ Cough | ☑ Sputum |
| Card. | ☑ Palpitations | ☑ Angina | ☑ Edema | ☑ PND |
| GI | ☑ Indigestion | ☑ Dysphasia | ☑ Melana | ☐ Constipation | ☑ Diarrhea |
| | ☑ Appetite | ☑ Rectal Discomfort | | ☑ Nausea | ☑ Vomiting |
| GU | ☑ Dysuria | ☑ Hematuria | ☑ Oliguna | ☑ Nocturia | ☐ Menstral Irreg. |
| MS | ☑ Arthragias | ☑ Myalgias | ☑ Joint Swelling | ☐ Back Pain |
| Endo | ☐ | _No polyuria_ | | _No polydip_ |
| Neuro/Psych | ☑ Paresthesia | ☑ Dizziness | ☑ Weakness | ☑ Syncope | ☑ LOC |
| | ☑ Headache | ☑ Depression | ☑ Seizure | ☑ Limb Weakness |

**Data Reviewed**

☑ CBC, Coag   ☐ Chemistry   ☐ X-rays   ☐ NM Scans   ☐ MRI/CT   ☐ Sonogram   ☐ Consultations

☐ Other ☐ _____ _Hgb = 10.7/3.4_

## PERTINENT POSITIVES AND NEGATIVES

**General** – wn/wd, ill appearing, acute, chronic; obese, thin, pale, florid  *appears in good health*

**Lymph Nodes** – cervical, axillary, inguinal  *no cervical nodes or inguinal*

**HEENT**
- Eyes-sclerac jaundiced, hemorrhage, PERLA  *not icteric*
- Ears – decreased hearing, tympanic membrane
- Nose – mucosa, septum  *no swelling*
- Throat – erythema, exudates, ulcers tonsils
- Mouth – dryness, tongue, gums, teeth  *no gum*

**Neck** – JVD, thyroid, ↓↑ trachea deviated salivary glands  *JVP i thyroid Tach*

**Chest** – clear to ausculation, breath, sounds tachypnea, hyperapnea  *Clear to P & A*

**Breast** – asymmetry, masses, tenderness nipple changes

**Heart** – rhythm irregular, murmers, vessels, carotid bruit, decreased pulses  *RSR (no m) no rubs or gallops*

**Abdomen** – hepatomegaly, splenomegaly, tenderness, bowel sounds, enlarged tympanitic, ascites  *no hepa or spleno*

**Rectal** – hemorrhoids, erythema, masses stool guiac, prostate  *N/A*

**Genitalia** – lesions, masses  *N/A*

**Extremities** – edema, clubbing, cyanosis  *no clubbing cyanosis or edema*

**Skin** – rash, ulcers, neri, nail abnormalities / petechiae, purpura  *no petechia purp*

**Neuro** – obtundation, disorientation weakness, movement, abnormality tremor, dysphagia  *no focal defect 2) ↑*

**Impression/Diagnosis** _1) Sepsis/Infection  low grade_

**Plan** _878 80  no surgery or removal_

**FU** _V81  whatever he can afford_

**Signature** _____

**Evaluation / Management Elements**
_____ 1 Prob Focused
_____ 2 Exp Prob Focud
_____ 9 Detailed

All Comprehensive
Complexity: ☐ Minimal  ☐ low
           ☐ Moderate  ☐ High

Time Element _____

**NH**
**Oncology-Hematology** PA

December 6, 2001

DENIS B. HAMMOND, MD

ROBERT J. FRIEDLANDER, JR., MD

CHARLES H. CATCHER, MD

DANNY M. SIMS, MD

FREDERICK M. BRICCETTI, MD

DOUGLAS J. WECKSTEIN, MD

PETER H. CROW, MD

J. MICHAEL MALONEY, PA-C

GARRICK L. JOHNSON, PA-C

ELIZABETH M. HAMLIN, A.R.N.P.

❖

253 Pleasant Street, Suite 301

Concord, NH 03301-2596

Tel. (603) 224-2556

FAX (603) 226-5821

❖

Additional Offices:

Hooksett (603) 622-6484

Exeter (603) 778-0636

Laconia (603) 527-2905

Derry (603) 421-2130

❖

NH WATS (800) 339-6484

Roger Belson, MD
PO Box 526
Henniker NH  03242 0526

**RE:   Dennis Harrison**        **DOB:  11 / 19 / 52**

Dear Dr. Belson:

I had the pleasure of seeing Dennis Harrison today in clinic regarding his chronic anemia.   I know you are familiar with his history but I will summarize it here for our records.

Mr. Harrison is a 49-year-old man with a long history of ankylosing spondylitis.  He first was told that he had a severe anemia about 10-15 years ago when he was living in New Jersey. He underwent a workup for GI blood loss which was unrevealing, but was placed on iron nonetheless. He was ultimately referred to a hematologist who performed a bone marrow biopsy.  It indicated that his anemia was most likely related to his rheumatologic condition.  No other intervention was undertaken.

Mr. Harrison remained anemic over the course of the next ten years.  He noticed that his counts seemed to improve when he was on prednisone for his arthritic symptoms.  He never had complete resolution, however.  In the setting of this, he moved first to Massachusetts and now to New Hampshire.  He was seen by Dr. James Trice in September.  I don't have the lab reports available to me but your notes indicate that blood work revealed a white count of 16, hematocrit of 25 and an MCV of 65.  His platelet count was 620, sed rate was 101, C-reactive protein was 199, ferritin was 394, folic acid was greater than 20, $B_{12}$ was 990.   His reticulocyte count was 2.3%.  Other tests included negative hepatitis viral panel, rheumatoid factor and thyroid studies.  He is being referred to us because of his persistent anemia.

In clinic today, Mr. Harrison reports feeling fairly well.  His arthritic pain is under good control - he has been taking methotrexate and prednisone for it.  He denies any significantly increased shortness of breath.  His energy level has been poor.  He denies any nausea, vomiting or weight loss.  He has had no fevers or chills.  ECOG performance status is 2-3.  Review of systems is otherwise negative.

*"Caring for patients for over 25 years"*

## NH
## Oncology-Hematology PA

December 6, 2001
Roger Belson, MD
Page 2

RE:   **Dennis Harrison**          **DOB:  11 / 19 / 52**

### PAST MEDICAL HISTORY:
1. Anemia as outlined above.
2. Ankylosing spondylitis for which he has had bilateral hip replacements in 1995 and a back fusion.
3. Obstructive sleep apnea.
4. Ulcer between his eyes from his CPAP machine.
5. Calcified aortic valve.
6. Osteoporosis.

### MEDICATIONS:      Methotrexate 12 mg once a week, prednisone 20 mg every other day, Fosamax, Vioxx 50 mg a day, Imipramine 30 mg a day, OxyContin 40 mg twice a day, Tylenol N0. 4 twice a day, folic acid 2 mg a day, Klonopin 2 mg a day, multivitamin once a day, vitamin C 2-3 a day, calcium and magnesium, supplemental glucosamine and milk of magnesia.

### ALLERGIES:  **Indocin causes headaches.**

### SOCIAL HISTORY:   He lives in Henniker with his wife.  He used to work for AT&T and Lucent but is now disabled.  He has never been a smoker. He drinks only rarely.  He had blood transfusions with his surgeries but denies any other history of HIV or hepatitis risk factors.

### FAMILY HISTORY:   His brother has ankylosing spondylitis.  His mother had diabetes, arthritis and heart disease.  His father has multiple myeloma, arthritis and heart disease.

### PHYSICAL EXAM:   General, no apparent distress.  Pupils are equally reactive to light and accommodation, extraocular movements are intact, nose and ears without masses, oropharynx clear.   Neck is rigid, no lymphadenopathy, trachea midline, no thyromegaly.  Lungs are clear to auscultation and percussion.   Heart is regular, nondisplaced PMI. Abdomen is soft, nontender, not distended with good bowel sounds, no hepatosplenomegaly.  Lymphadenopathy, no palpable axillary or inguinal lymph nodes.  Extremities, warm with no edema, nontender calves, good femoral and pedal pulses.

### LABORATORY DATA:      White count is 12.6, hematocrit 28.2, platelets 665, MCV of 70.  My review of the smear shows normal appearing white cells.  His red cells are notably undersized.  Platelets are increased in number.

# NH
# Oncology-Hematology PA

December 6, 2001
Roger Belson, MD
Page 3

**RE:   Dennis Harrison**          **DOB:  11 / 19 / 52**

**ASSESSMENT AND PLAN:**   Mr. Harrison is a 49-year-old man with ankylosing spondylitis.  He has had a long-standing anemia.  Extensive workup through Dr. Trice's office revealed a minimally elevated but inappropriate reticulocyte count, normal ferritin $B_{12}$ and folate levels, elevated sed rate and C-reactive protein.

It certainly is likely that Mr. Harrison's anemia is due to his rheumatologic condition — this can cause either marrow suppression or peripheral destruction of cells.   He is on several medicines which also could aggravate the problem - foremost among these would be methotrexate. Clearly, his problem predated the use of this drug, however.

I have sent off a series of labs, including an erythropoietin level. We will see what they show and discuss it further when he comes back to see me in several weeks. The use of exogenous erythropoietin could be a way to address this problem.

Thank you very much once again for involving us in Mr. Harrison's care. Please feel free to call with any questions or problems.

Sincerely,

*P Crow*

Peter H. Crow, MD
phc/lb

cc:   James Trice, MD
      280 Pleasant Street
      Concord NH  03301

D: 12/06/01          T: 12/07/01

THE KINGSTON HOSPITAL

**DISCHARGE SUMMARY**

Copy for DONOVAN,PAUL (MD)
MRUN=26-70-02
Acct #=10512835
Admit Date=07/10/2003
Discharge Date=07/18/2003

Name=HARRISON,DENNIS
DOB= 11/19/1952      Sex=M
Loc/Svc=/3BMED
**FINAL REPORT**
==========================================================
DIAGNOSIS:  1. Sepsis, possible infected right lower leg.  2. Anemia.
3. Ankylosing spondylitis.

PRINCIPAL PROCEDURES:  1. IV antibiotics.  2. Transfusion of packed
cells.  3. CT scan of the abdomen and pelvis.  4. CT scan of the right
femur.

CONSULTATIONS: Infectious Disease consultation, Dr. Tack.

CONDITION ON DISCHARGE:  Stable but guarded.

MEDICATIONS ON DISCHARGE:  Folic acid 1 mg. day, Protonix 40 mgs. a day,
Klonopin 2 mgs. hs. Methotrexate 12.5 mgs. weekly every Tuesday,
Prednisone 20 mgs. every other day, Celexa 20 mgs. po daily, Vioxx 50
mgs. a day, Docusate one tablet nightly.  Augmentin 875 mgs. po b.i.d.
Oxycodone 10 mgs. po q4h p.r.n.  OxyContin 40 mgs. po b.i.d.

A 50 year old white male who was currently in the Rehabilitation Center
at the Kingston Hospital after having been admitted there on 07/10/03
and on the evening of 07/09 developed a fever. He had previously been
well with no particular problems. He did have the onset of low grade
temperature. Cultures were taken and he was placed on Ancef. During the
early hours of 07/10 he developed a temperature to 39 degrees, felt
poorly. Blood pressure dropped. IV fluids were started and the patient
was immediately transferred to the Medical Floor.  On the Medical floor
he was initially treated with IV fluids, steroids, were increased and
the patient was placed on IV Primaxin.

The patient's current medications and his history of rheumatological and
orthopedic problems are delineated in great detail in the History and
Physical and will not be repeated further.

SOCIAL HISTORY, FAMILY HISTORY, REVIEW OF SYSTEMS:  See the Admitting
Note.

PHYSICAL EXAMINATION:  Initially his blood pressure was somewhat low,
80/50, height 5' 5", weight 160 pounds, pulse 73 per minute.  Head is
normocephalic, Pupils equal and reactive to light and accommodation.
Neck; unable to rotate because of prior surgery. Lungs are clear to
percussion and auscultation. Heart RSR, no murmurs, thrills or gallops.
Abdomen is soft, liver and spleen is not palpable.  Extremities; no
clubbing or cyanosis.  Examination of the right thigh revealed it to be
swollen compared to the left with some oozing from a previous surgical

Page 2

THE KINGSTON HOSPITAL

**DISCHARGE SUMMARY**

Copy for DONOVAN,PAUL (MD)

Name=**HARRISON,DENNIS**
DOB= 11/19/1952      Sex=M
Loc/Svc=/3BMED
**FINAL REPORT**

MRUN=26-70-02
Acct #=10512835
Admit Date=07/10/2003
Discharge Date=07/18/2003

=======================================================================
wound.

CLINICAL IMPRESSION: 1.  Sepsis, source unknown.  Possibly the right leg
area.    2 Ankylosing spondylitis.  3. Anemia.

LAB DATA:  Initial blood work on the medical floor from 07/11 revealed a
Hgb. of 8.5 grams, a white count of 16,800, and a platelet count
452,000. The BUN was 21, creatinine 0.9, electrolytes were with a sodium
of 137, potassium 5.3, chloride 106, $CO_2$ of 27, calcium 8.2, total
protein 5.4 grams, albumin 2.5 grams, alk. phos. 88, bilirubin 0.4.

The patient underwent an ultrasound guided aspiration of the right thigh
collection on 07/14.   Chest x-ray on 07/10; no infiltrates. CT scan of
the abdomen and pelvis on 07/11; gallbladder physiologically distended,
stomach partially distended. Contrast liver, spleen, adrenals and
pancreas grossly unremarkable. Images of the right pelvis showed an air
fluid level in the soft tissue collection that is lateral to the gluteus
medius muscle and anterior to the gluteus maximus and may involve
portions of the musculature. This asymmetry is on the right side.

DIFFERENTIAL DIAGNOSIS includes hematoma, seroma, possibly superimposed
abscess.  An air fluid level is described which extends inferolaterally,
anterolaterally to the hip prosthesis.  However, there is also extensive
artifact noted from the bilateral hip prosthesis as well as spinal
hardware, small bilateral pleural effusions. CT scan of the right femur
showed two low attenuation collections that are noted throughout the
prosthetic shaft and laterally at the level of the vastus musculature
immediately beneath skin clips.  This suggests hematoma, seroma, again
infection chemically ruled out.

The patient was immediately stabilized on the Medical Floor. He was on
IV Primaxin 500 mgs. stat and 500 q6h. He was continued on all of his
previous medications.  Initially he was on Lovenox 40 mgs. sub-Q q day.
He continued to receive Methotrexate 12.5 mgs. on a weekly basis.  He
then underwent a CT scan of the abdomen and pelvis and also a CT scan of
the right femur. The results of which have been enumerated above.  Again
he was started on IV SoluCortef because he had been on Prednisone as an
outpatient orally and it was felt that he was in shock secondary to
infection. Hence the rationale for increasing the dose of SoluCortef.

He was also seen by Dr. Mark Tack who concurred with the use of IV

Page 3

### THE KINGSTON HOSPITAL

**DISCHARGE SUMMARY**

Name=**HARRISON,DENNIS**
DOB= 11/19/1952      Sex=M
Loc/Svc=/3BMED
**FINAL REPORT**

**Copy for DONOVAN,PAUL (MD)**
MRUN=26-70-02
Acct #=10512835
Admit Date=07/10/2003
Discharge Date=07/18/2003

====================================================================

antibiotics and raised the question of infection at this previous
surgical site.

Efforts to document infection were not successful as the aspiration from
the area did not reveal any growth.  None the less the CT scan findings
were all persuasive and it was Dr. Tack's recommendation that he should
again be seen by his orthopedic surgeon with the view to possibly
debride the area, removing the fluid collection and in fact making sure
that there was no pus or infectious collection of fluid. In that whole
area.

Because of anemia the patient was transfused with packed cells, Lovenox
was discontinued on 07/13.  Efforts were then made to contact his
orthopedic surgeon in New Jersey, Dr. Pizzurro, who did the right total
hip replacement on 06/27/03.  He agreed to see the patient within the
next several days.  As it would not be feasible to have any orthopedic
surgeon see the patient during his current hospital stay it was decided
that it was a reasonable course to discharge the patient on po Augmentin
on 07/18, with a view to being seen soon afterwards by his orthopedic
surgeon in New Jersey.  It was understood that the orthopedic surgeon
would then take the appropriate action in terms of any further invasive
procedures or re-evaluation of the surgical site area and that this
would be under his directive when the patient saw him in New Jersey.
The patient was advised to call if he had any significant fever or
chills during that interval.

LONG TERM PROGNOSIS: Guarded given the shear complexities of the medical
problems.

Signed By= _____
Dictated By=DONOVAN,PAUL (MD)          Date: 07/30/2003
Text Status=**FINAL**

Transcribed By=WALTON,KATHY             Date: 08/04/2003
cc: DONOVAN,P; TACK,M; PICKARD,L

THE KINGSTON HOSPITAL

**HISTORY & PHYSICAL**

Copy for DONOVAN,PAUL (MD)

Name=HARRISON,DENNIS
DOB= 11/19/1952      Sex=M
Loc/Svc=/3BMED
**FINAL REPORT**

MRUN=26-70-02
Acct #=10573996
Admit Date=04/08/2004
Discharge Date=04/09/2004

========================================================================
**\*\* REVISED on 05/19/2004 1331 by THC \*\***
A 51 year old white male who has a long and complicated history
including multiple admissions because of recurring osteomyelitis over
the right thigh area, seen in the ER with a history of low grade fever,
increasing pain over the left thigh area.


The patient felt he was getting an infection and because of his
long-term history and the fact that he has known osteomyelitis in the
right leg, it was felt that he should be admitted after having been
evaluated by the ER physician for IV antibiotics.


The patient has been on long term Cipro 500 mgs. po b.i.d.  He is now
admitted for IV Primaxin and at the same time will undergo CT scan of
the abdomen and pelvis as well as CT scan of the right thigh.


HISTORY OF PRESENT ILLNESS:  The patient was last admitted in the end of
December and early January for a three day admission following a bout of
fever which proved not to be associated with his right leg
osteomyelitis.  His previous admission have been detailed to a great
extent, and they are extremely complex as they relate to the orthopedic
system, particularly in terms of infection involving the right leg.  The
patient was unfortunate in 01/03, as he fractured his right femur.
Initial surgical repair was done by Dr. Null at the Benedictine
Hospital. Unfortunately poor healing occurred and he was then
transferred to Dr. Hosbinder in Albany. He had further surgery with the
removal of an infected bone, various wires and accouterments, and also
he hip prosthesis on 02/03.  He was then in a nursing home for about two
months receiving IV Vancomycin.


He then returned to his Orthopedist in New Jersey, Dr. Bazzura, who had
done his original hip surgery in 1995 on the right side.  On results of
that evaluation he underwent further surgery on 06/26/03, with revision
of the right total hip arthroplasty, with further orthopedic procedures
including replacement of the bone and antibiotic impregnated·
Methacrylate.  He then returned to the Kingston Hospital to the Rehab·
Center under Dr. Pickard and was doing well in the Rehab. Center when on
07/10/03 he developed a fever of 104, with chills, hypotension and was
then placed on the medical floor.  He was hospitalized from 07/10/03 to
07/18/03 and was placed on IV antibiotics. He also required a
transfusion of packed cells.  Serial CT scans and radiological studies
were then done of the right femur. Ultimately the patient was advised to
return to New Jersey to his Orthopedist in that state. He continued to

Page 2

THE KINGSTON HOSPITAL

**HISTORY & PHYSICAL**

Name=HARRISON,DENNIS
DOB= 11/19/1952      Sex=M
Loc/Svc=/3BMED
**FINAL REPORT**

Copy for DONOVAN,PAUL (MD)
MRUN=26-70-02
Acct #=10573996
Admit Date=04/08/2004
Discharge Date=04/09/2004

================================================================
have some intermittent problems with drainage from the wound and then
eventually he was seen by Dr. Pizurra on 08/05/03.  He spent several
months including a stay in a nursing home in Wayne New Jersey, where
again he was on six weeks of Vancomycin.

He then had further problems and as he was about to leave he had a
further fever spike and was re-hospitalized again, and was given two
further weeks of antibiotics. He was ultimately discharged from his
physician's in New Jersey and returned to live locally in the Hudson
Valley Area. He was seen by me on 10/17/03 and has been followed locally
here for the last six months. Because of the complexity of his
underlying problem he has been seen by Dr. Froude, Infectious Disease,
Dr. Wise from Rheumatology. Dr. Froude felt that he should continue on
Cipro 500 mgs. po b.i.d. on a continuing basis.  He was seen by Dr.
Wise with a view for any further therapy for his underlying ankylosing
spondylitis, and to readdress the issue of further steroid therapy.  He
has been seen Dr. Wise on an intermittent basis. Efforts to reduce his
steroids have not been successful.

The patient has a 25 year history of ankylosing spondylitis.  In the
past he had a cervical fusion of C1,C2, following subluxation in the
year 2000.  He also had a lumbar fusion done in 2001. He also had a high
bred total hip arthroplasty done in 1995. He also had a left high grade
total hip replacement by Dr. Pleigi at the Hospital for Special Surgery
in NYC prior to that.  He has also had back fusion in the past.

He is disabled. He used to work at ATT.  He is separated from his wife,
non-smoker, non-drinker.  His Hgb. has remained essentially stable at
approximately 10 grams.  He has had transfusions in the past.  He has
also been on Procrit in the past. Initially it was felt that the Procrit
helped the anemia but after awhile it became clear that the Hgb. was
staying around approximately ten grams even off Procrit.

His other problems include osteoporosis, history of iritis in the past.
Known history of ankylosing spondylitis.  Chronic pain and problems
related to the right leg, history of mild hypertension.  Renal function
unremarkable.

He has a long complicated list of medications and these include Vioxx 50
mgs. a day, Prednisone 10 mgs. a day. Prior to that he was on Cipro 500
mgs. po b.i.d.  OxyContin 4 mgs. b.i.d., Oxycodone 10 mgs. every four
hours p.r.n., Fosamax 70 mgs. weekly.  Celexa 20 mgs. po b.i.d.  He has

Page 3

THE KINGSTON HOSPITAL

**HISTORY & PHYSICAL**

Name=**HARRISON,DENNIS**
DOB= 11/19/1952        Sex=M
Loc/Svc=/3BMED
**FINAL REPORT**

Copy for DONOVAN,PAUL  (MD)
MRUN=26-70-02
Acct #=10573996
Admit Date=04/08/2004
Discharge Date=04/09/2004

=========================================================================
been on Methotrexate in the past for his rheumatological condition, but
is not taking this medication presently.

REVIEW OF SYSTEMS:  No cough, no phlegm or shortness of breath. No
angina, no palpitations or chest pain. Appetite has been good, no nausea
or vomiting, no diarrhea or abdominal complaints. No constipation. No
dysuria or frequency. No hematuria. No headache or seizure or loss of
consciousness.   No tinnitus or vertigo. No diplopia or blurred vision.
Chronic right leg pain, worse in the last few weeks, associated with a
temperature. Chronic back pain.  No polyuria, polydipsia, or heat
intolerance.

PHYSICAL EXAMINATION:   The patient's blood pressure is 170/90, pulse
100 per minute, respiratory rate 20 per minute, temperature 37.7.

Head is normocephalic.  Pupils are equal and reactive to light and
accommodation.  Not icteric no pallor.

NECK: Fixed, very little movement.   Trachea midline.   Thyroid not
enlarged.  Jugular venous pressure not elevated. No cervical adenopathy.

LUNGS: Clear to percussion and auscultation.

HEART: RSR, no murmurs, thrills or gallops.

OROPHARYNX:  No evidence of Candidiasis. Tongue well-papulated, no
mucosal lesions seen.

EARS AND NOSE: Unremarkable.

HEART: RSR, no murmurs, thrills or gallops.

ABDOMEN: Soft, liver and spleen not palpable. No tenderness or guarding.

RECTAL: Deferred.

EXTREMITIES:  No clubbing,  cyanosis or edema.  Right lower extremity;
some evidence of increase in size, minimal skin changes present.  Some
pain, tenderness over the wound area.

IMPRESSION:  1.   Sepsis, rule out bacterial infection, rule out
recurring osteomyelitis.  2.   Ankylosing spondylitis.  3. Anemia.

Page 4

## THE KINGSTON HOSPITAL

**HISTORY & PHYSICAL**

**Copy for DONOVAN,PAUL (MD)**
MRUN=26-70-02
Acct #=10573996
Admit Date=04/08/2004
Discharge Date=04/09/2004

Name=**HARRISON,DENNIS**
DOB= 11/19/1952        Sex=M
Loc/Svc=/3BMED
**FINAL REPORT**
========================================================================

PLAN OF THERAPY:  The patient is now admitted for IV Primaxin. He will also have a CT scan of the abdomen and pelvis and a CT scan of the right upper extremity.

The patient's management is complicated by the fact that he wishes to leave the hospital relatively soon for an important business engagement in terms of selling and buying a house. I will review CT scans of the abdomen and pelvis and the thigh, and make an appropriate decision at that point.

     Signed By= _____        Date: 04/08/2004
     Dictated By=DONOVAN,PAUL (MD)
     Text Status=**REVISED FINAL**

Transcribed By=WALTON,KATHY                          Date: 04/09/2004
cc: **DONOVAN,P**

AUG-20-2007  15:05        KINGSTON HOSPITAL                    845 331 7860    P.02

## THE KINGSTON HOSPITAL

**HISTORY & PHYSICAL**                                    **Demand Copy**

Name=HARRISON,DENNIS                                     MRUN=26-70-02
DOB= 11/19/1952      Sex=M                               Acct #=10796468
Loc/Svc=/MDSG                                            Admit Date=12/20/2006
**FINAL REPORT**                                        Discharge Date=12/24/2006
==================================================================
HISTORY AND PHYSICAL
DOA:  12/20/2006

HISTORY OF PRESENT ILLNESS:  This is a 54-year-old white male who has
multiple complex medical problems, who was admitted to the Kingston
Hospital on the afternoon of 12/20/2006 with a three-day history of
epigastric distress, nausea, intermittent vomiting, and some loose bowel
movements.  The patient states that he has not eaten any solid food for
the last three days and when he does eat he gets abdominal discomfort
and pain with a sensation of vomiting.  He has also had a tendency to
diarrhea, but not having very many loose bowel movements in terms of the
quantity of stool, but has been going to the bathroom on a very frequent
basis with small bowel movements.  Because of the fact that he is not
eating with abdominal discomfort and nausea, the patient is now admitted
to the Kingston Hospital for further evaluation and management.

Chemistry profiles on admission showed BUN 27 and creatinine 0.9.
Sodium was 139, potassium 5.4, chloride 104, and $CO_2$ 31.  Calcium was
9.3, total protein 7.4 grams, albumin 3.1 grams, alkaline phosphatase
71, bilirubin 0.2, SGOT 18, SGPT 23, and glucose was 99.  Hemoglobin was
9.5 grams, hematocrit 28.9, white count 12,100, and platelet count
603,000.  Differential was unremarkable.  The patient will now be
admitted for IV fluids.  I have also asked Dr. Dodd and Dr. Steckman to
see the patient, and they have already seen the patient when he had been
admitted one and half years ago to the Kingston Hospital.

In the intervening time, the patient will continue on his present
medications:
Klonopin 1 mg twice a day.
Tylenol No. 4 one to two tablets every four hours p.r.n.
Feldene 20 mg a day.
Lisinopril 10 mg a day.
Prednisone 10 mg a day.
Nexium 40 mg a day.
OxyContin 40 mg every eight hours.

The patient has a very long complicated orthopedic history.  He has a
known history of ankylosing spondylitis with a fusion of both cervical
and lumbar spine, and he has also had bilateral total hip replacements.
In January 2003 following trauma he fractured his right femur.  He
underwent surgical repair of the fracture.  Postoperatively, it has
difficulty with healing.  There was also question of infection.  He was
then transferred to Albany Medical Center and then had extensive surgery
on the right hip.  At that time, with removal of infected bones and hip
prosthesis was also removed.  There was further orthopedic
reconstruction and eventually he required rehabilitation and had two
months of an IV vancomycin.  In June 2003, he had revision of the right
total hip replacement and also had a proximal femoral modular
replacement, and he was then given antibiotic-impregnated methacrylate.



Page 2

## THE KINGSTON HOSPITAL

**HISTORY & PHYSICAL**                                **Demand Copy**
                                                      MRUN=26-70-02
Name=**HARRISON,DENNIS**                              Acct #=10796468
DOB= 11/19/1952      Sex=M                            Admit Date=12/20/2006
Loc/Svc=/MDSG                                         Discharge Date=12/24/2006
**FINAL REPORT**
=============================================================================
He was then started on ambulation with weightbearing.  He was
transferred to the Kingston Hospital for rehabilitation.  While in the
Kingston Hospital he had a very high fever and was then transferred to
the medical service.  He was then on the medical service, had extensive
evaluation, but eventually was discharged.

The patient's last admission to the Kingston Hospital was on July 29th
2005 through August 2008 when at that time, he was admitted with fever,
and he was given IV fluids and antibiotics and was transfused with two
units of packed cells.  At that point, he was felt to have sepsis,
source unknown.  He also had a superimposed Clostridium difficile
infection.  He was discharged and managed on an outpatient basis with
oral antibiotics, and he has done very well over the last year and half
in terms of infections.

In reviewing his past history, it is noteworthy he has a history of
ankylosis spondylitis for many years.  He has seen Dr. James Wise in the
past.  He was also being considered for the use of Enbrel.  He had been
seen by Dr. Froude in the past and the issues rose as to whether he
should be on long-term antibiotics alternating Cipro and Augmentin
because of his history of osteomyelitis in the past.  At this point in
time, he is not on any long-term antibiotic care.  At the same time, he
does not appear to have had any recurrence of his osteomyelitis.

SOCIAL HISTORY:  He is disabled.  He used to work at AT&T.  He is
separated from his wife.  Nonsmoker and nondrinker.

In reviewing his medical records, his hemoglobin generally has been in
the range of 9 to 10 grams.  He has been on Procrit and Epogen in the
past, but this did not appear to be helping to any great degree, and he
has now been off Procrit for the past one year.  His most recent blood
work, done about three weeks ago, revealed hemoglobin 9.6 grams,
hematocrit 32, white count 14,400, and platelet count 408,000.  Bone
density study in April of this year showed osteopenia.  24-hour urine
revealed only 81 mg for 24 hours.  Most recent chemistry profiles have
been relatively normal with BUN of 30 and creatinine 1, and electrolytes
have been unremarkable.

He has also been seen in the past by Dr. Christiana, and on March of
2006 he underwent a stress echocardiogram and this revealed a normal
stress echocardiogram at 95% maximum predicted heart rate.  CT scan of
the abdomen and pelvis in August 2005 showed nonspecific colitis of the
sigmoid colon.  Chest x-ray on July 2005 was unremarkable.

The patient also has a history of osteoporosis and had been on Fosamax
for his GI symptomatology, and he is also on steroids and nonsteroidal
anti-inflammatory agents, which makes Fosamax difficult to administer
because of GI side effects.  He also has a history of chronic back

Page 3

## THE KINGSTON HOSPITAL

**HISTORY & PHYSICAL**

Demand Copy

Name=**HARRISON,DENNIS**
DOB= 11/19/1952      Sex=M
Loc/Svc=/MDSG
**FINAL REPORT**

MRUN=26-70-02
Acct #=10796468
Admit Date=12/20/2006
Discharge Date=12/24/2006

==========================================================================

problems, history of mild hypertension, and he also has issues with pain because of his major orthopedic procedures in the past.  He has also been on methotrexate for his rheumatological condition.

As stated earlier, he has undergone multiple orthopedic procedures over the last 10 years; some of them treated locally here in Kinston, but the majority of them have been done either in Albany Medical Center or in New Jersey.

REVIEW OF SYSTEMS:  The patient's major problems at this time are GI in nature.  His weight has been relatively stable 178 pounds, although his weight has not been taken at that time of this admission.  No obvious blood loss.  No hematemesis, no melena.  The rest of the GI symptomatology is covered in the opening paragraph.  No dysuria, no frequency, and no hematuria.  Denies any chest pain, angina, or palpitations.  No cough, no purulent sputum, although he has a history suggestive of recent sinus infection.  No headache, no seizure, and no loss of consciousness.  No migraine attacks.  No diplopia, no blurred vision, no tinnitus, or no vertigo.  No polyuria, no polydipsia, and no heat intolerance.  No history of psoriasis or eczema but has some erythema in the groin area suggestive of fungal infection.  No fever, no chills, and no constitutional symptoms.  Chronic back pain throughout. Chronic right hip pain, on analgesics.  No acute joint swelling.

PHYSICAL EXAMINATION:  General:  The patient is alert and oriented.

Vital Signs:  Blood pressure 142/82, height 5 feet and 5 inches.  Weight is recorded as 172 pounds; it was 178 pounds in the office.  Temperature was 36.9.

HEENT:  Head normocephalic.  Pupils are equal and reactive to light and accommodation.  Nonicteric.  No pallor.  Mouth unremarkable.  Nose and ears normal.

Neck:  Limited movement of the neck because of arthritis.  Trachea midline.  Thyroid not enlarged.  Jugular venous pressure not elevated. No cervical adenopathy.

Lungs:  Clear to percussion and auscultation.  No rales or rhonchi heard.  No axillary adenopathy.

Heart:  Regular sinus rhythm.  No murmurs, rubs, or gallops.

Abdomen:  Soft.  No evidence of ascites.  Liver and spleen not palpable. Epigastric discomfort noted on palpation.  Bowel sounds are normal.

Rectal:  Deferred.

AUG-20-2007 15:06        KINGSTON HOSPITAL                    845 331 7860    P.05

## THE KINGSTON HOSPITAL

**HISTORY & PHYSICAL**                                      **Demand Copy**

Name=**HARRISON,DENNIS**                        MRUN=26-70-02
DOB= 11/19/1952       Sex=M                      Acct #=10796468
Loc/Svc=/MDSG                                  Admit Date=12/20/2006
**FINAL REPORT**                              Discharge Date=12/24/2006
======================================================================
Extremities:  No clubbing or cyanosis.

IMPRESSION:
Abdominal pain with nausea and vomiting with associated dehydration.
Ankylosing spondylitis with severe back involvement.
Anemia, chronic, multifactorial in origin.
History of osteomyelitis.

PLAN OF THERAPY:  The patient is admitted for IV fluids.  IV Zofran
given for nausea and vomiting.  Stools for Clostridium difficile have
been ordered.  GI consultation with Dr. Steckman and Dr. Dodd.  The
patient may require transfusion of packed cells.

The differential diagnosis in terms of her abdominal discomfort include
gastritis, gastroenteritis, and peptic ulcer disease.  Of note, the
patient is on several agents, which can cause gastric acidity and
gastric discomfort, mainly prednisone and Feldene.  Both of these have
been given because of his arthritis.  The patient is also on IV fluids
and IV Zofran.

PD/CBS/mt Job#22968


     Signed By=
     Dictated By=DONOVAN,PAUL (MD)                Date: 12/20/2006
     Text Status=**FINAL**

Transcribed By=CHODKIEWICZ,THERESA H              Date: 12/22/2006
cc: DONOVAN,P


TOTAL P.05