## ALBANY MEDICAL CENTER HOSPITAL
### NEW SCOTLAND AVENUE
### ALBANY, NY 12208

## TRANSFER DISCHARGE SUMMARY

**NAME:**   HARRISON, DENNIS                              **MED. REC#:**   1879639

**ATTENDING MD:**   PAUL HOSPODAR, M.D.         **ADMISSION DATE:**   02/25/2003
**DATE OF BIRTH:**   11/19/1952                         **DISCHARGE DATE:**   03/05/2003

**ADMISSION DIAGNOSIS:** Right periprosthetic femur fracture.

**DISCHARGE DIAGNOSIS:** Status post removal of hardware, antibiotic spacer placement, as well as cerclage vying _____ of right prosthetic femur fracture.

**HISTORY OF PRESENT ILLNESS:** The patient is a 50-year-old gentleman with a long history of ankylosing spondylitis with multiple orthopedic surgeries. The patient previously had three procedures in his right hip region. He has also had bilateral total hip arthroplasties as well. He had some spine surgery.

**PAST MEDICAL HISTORY:** Significant for ankylosing spondylitis as well as osteoporosis and osteoarthritis and anemia.

**PAST SURGICAL HISTORY:** Bilateral total hip arthroplasties in 1995, cervical fusion in 1999, lumbar fusion in 2000, open reduction internal fixation of the right femur two months ago.

**MEDICATIONS:** Include:
1. Vioxx.
2. Oxycontin.
3. Klonopin.
4. Imipramine.
5. Celexa.

**ALLERGIES:** Indocin.

**PHYSICAL EXAMINATION:** *At time of admission is documented in his chart.* HEENT: Left eye with some slight ptosis. HEART: Regular rate and rhythm. S1, S2. CHEST: Clear to auscultation bilaterally. ABDOMEN: Positive bowel sounds. Soft, nontender, nondistended. EXTREMITIES: Pain with range of motion of his right fib deformity and the right hip as well. Sensation was intact throughout upper as well as lower extremities and there is no pain with any range of motion of any other joints other than his right hip.

**HOSPITAL COURSE:** The patient was admitted to the Orthopedic Surgery Service. He was seen by the Nutrition Service in order to optimize his nutrition. He was taken to the Operating Room on 2/28/03 and underwent removal of hardware and open reduction internal fixation and placement of antibiotic spacer. The patient tolerated the procedure well without any complications at all. At the time of surgery there was noticed to be some grossly purulent fluid near the site of his fracture and there was some loose femoral components as well noted. The patient therefore underwent removal of hardware as well as I&D and the patient had the placement of an antibiotic spacer. He was seen by Dr. Ellis Tobin's Infectious Diseases Service and was started on Ancef awaiting full culture data. The culture showed good enterococcus as

### ALBANY MEDICAL CENTER HOSPITAL
### TRANSFER DISCHARGE SUMMARY

**NAME:** HARRISON, DENNIS
**MED. REC.#** 1879639

well as enterococcus fecalis and so the patient was started on some vancomycin. He also had a chest CT done to rule out any sort of metastatic lesions at all. That was normal as well as a bone scan that was done which showed simply some lesions which were probably old healing rib fractures. The patient had a PICC line placed and he was started on vancomycin with his trough level to be checked weekly. The level will be maintained between 10 and 15 and the patient will receive 6 weeks of IV vancomycin.

**DISCHARGE MEDICATIONS:** The patient will be continuing on these medications at the time of discharge:
1. Oxycontin 40 mg p.o. t.i.d.
2. Vancomycin 1 gm IV q.12h. with trough levels to be checked two times a week as well as previously noted.
3. Protonix 40 mg p.o. q.d.
4. PICC line flushes as per protocol with statin levels taken.
5. Lortab 1-2 tablets p.o. q.4-6h. p.r.n. with a maximum daily dose of Tylenol 4,000 mg from all sources.
6. Ortho bowel regime.
7. Coumadin to maintain an INR between 1.5 and 2.0 for deep vein thrombosis prophylaxis.
8. Celexa 20 mg p.o. q.d.
9. Imipramine 30 mg p.o. q.h.s.
10. Klonopin 2 mg p.o. b.i.d.
11. Vioxx 50 mg p.o. q.d.

**DISCHARGE INSTRUCTIONS:** The patient was doing well at the time of discharge. He had no complaints. His wound has remained clean, dry and intact and he will continue with some rehabilitation as well. The patient will continue to be nonweightbearing with posterior precautions to his right lower extremity.

**FOLLOW UP:** The patient will be followed by Dr. Hospodar of Capital Region Orthopedic Group at 489-2666 as well as Dr. Ellis Tobin's Infectious Disease Service as well.


PAUL HOSPODAR, M.D.                    Date:

SHENBAGAMURTHI/ds
D: 03/05/2003
T: 03/05/2003
Job #: 276734
Doc. #: 64208

cc:

ALBANY MEDICAL CENTER HOSPITAL
NEW SCOTLAND AVENUE
ALBANY, NY 12208

REPORT OF OPERATION

**NAME:**   HARRISON, DENNIS          **MED. REC#:**   1879639
**DATE OF BIRTH:**                    **CHART LOCATION:**CS/CS06:R
**SURGEON:**   PAUL HOSPODAR, M.D.    **OPERATION DATE:**   02/28/03

**ASSISTANT:** SRIDHAR DURBHAKULA, M.D.
          J.MARTIN LELAND, M.D.

**PREOPERATIVE DIAGNOSIS:** Infected nonunion of right hip periprosthetic fracture, right femur.

**POSTOPERATIVE DIAGNOSIS:** Infected nonunion of right hip periprosthetic fracture, right femur.

**OPERATION:** 1. Removal of infected total hip replacement. 2. Takedown of nonunion, right femur. 3. Removal of hardware, right femur. 4. Open reduction internal fixation, right femur. 5. Insertion of antibiotic cemented spacer, right femur.

**ANESTHESIA:**

**PROCEDURE:** The patient was taken to the operating room and placed in supine position. General anesthesia was then induced. The patient was then carefully positioned in the left lateral decubitus position, care was taken to pad the neck in its position since the patient has ankylosing spondylitis and is fused from the cervical spine to his position. After he was placed in the left lateral decubitus position, right hip was prepped and draped in usual sterile fashion. Foley was placed prior to the start of the case.

At this point the incision was opened up directly over the previous incision, carried down through the subcutaneous tissues. The fascia was split in the direction of its fibers. It should be noted that a large pocket of pus and fluid was then encountered. This was sent for culture. Tissue samples were also sent for pathology and for culture.

At this point the wound was thoroughly irrigated and debrided. Once this was performed the fracture was encountered. All loose hardware was removed from the femur proximally and distally with the plate, wires and screws being removed. At this point the cement in the intramedullary was removed using the Oscar device as well as backcutting backbiters, curets and splitting curets. At this point the femoral hip component was removed and the cement was removed from the proximal part of the femur as well. The cup which was found to be well fixed was removed using the circumferential bone cutting device. Once the cup was circumferentially cut, it was the easily removed with minimal bone loss. At this point the entire wound was thoroughly irrigated. Once this was performed, all the devitalized bone was removed. At this point, in a custom made mold, an antibiotic spacer was made with a Rush rod and three packs of cement. The fracture was then held reduced and the Rush rod and cement spacer were impacted into place. This gave good fixation of the fracture. Two cerclage titanium wires, Zimmer, were tightened around the bone to give an open reduction internal fixation to the bone. This was found to give excellent support and alignment of the bone. At this point the wound was thoroughly irrigated again and drains were placed deep, carried out proximally and laterally. The wound was then closed in layers. The vastus lateralis was tacked down back over its posterior attachment.

03/04/2003 10:39 AM  chart copy                                    1 of 2

## ALBANY MEDICAL CENTER HOSPITAL
### REPORT OF OPERATION

NAME: HARRISON, DENNIS
MED. REC.#: 1879639

The fascia was closed with #1 Vicryl and subcutaneous tissue closed with #0 and 2-0 Vicryl sutures.   The skin was closed with surgical clips.

The patient was then placed in abduction brace and carefully moved to hospital bed. Postoperative x-rays showed good alignment of the fracture, good placement of the spacer. At this point the patient was extubated and transferred from the operating room to the recovery room in good condition without incident.


PAUL HOSPODAR, M.D.                               Date:

HOSPODAR/
D: 02/28/03
T: 03/03/03
Job #: 275868
Doc. #: 63894

cc:   PAUL HOSPODAR, M.D.

03/04/2003 10:39 AM chart copy                                     Page 2 of 2

HarrisonD-AlbanyMCMR-     00029

### ALBANY MEDICAL CENTER HOSPITAL
### NEW SCOTLAND AVENUE
### ALBANY, NY 12208

### TRANSFER DISCHARGE SUMMARY

**NAME:**   HARRISON, DENNIS

**MED. REC#:**   1879639

**ATTENDING MD:**   MARC FUCHS, M.D.
**DATE OF BIRTH:**   11/19/1952

**ADMISSION DATE:**   03/12/2003
**DISCHARGE DATE:**   03/13/2003

**ADMISSION DIAGNOSIS:** Rule out wound infection

**DISCHARGE DIAGNOSIS:**  Rule out wound infection

**HISTORY OF PRESENT ILLNESS:**  The patient is a 50 year old male, who approximately two weeks ago underwent removal of an infected right total hip arthroplasty with placement of an antibiotic impregnated spacer.  He was discharged to a nursing home after an unremarkable hospital course. He is seen in the office on the day of admission. He has complained that he had been feeling ill. His right leg is somewhat swollen, although there was no erythema, and no drainage. There was some induration. The attending, who evaluated the patient was concerned that he might have a new abscess or infection and sent to the Emergency Department for evaluation and possible admission for surgical debridement.  The patient denies any fevers, chills or sweats. His appetite is fine. He has not felt otherwise ill.  He has had no shortness of breath, or chest pain. He has had no productive cough. He has had no dysuria.

**PAST MEDICAL HISTORY:**
1.    Ankylosing spondylitis

**PAST SURGICAL HISTORY:**
1.    Bilateral total hips
2.    Removal of the right total hip arthroplasty two weeks ago
3.    Cervical fusion
4.    Lumbar fusion
5.    Open reduction and internal fixation of the right femur.

**MEDICATIONS:** Oxy-Contin, Protonix, Celexa, Imipramine, Klonopin, Vioxx, Vancomycin

**ALLERGIES:** No known drug allergies

**PHYSICAL EXAMINATION:** On admission, the patient was afebrile. His vital signs were stable. In general, he appeared well in no acute distress and nontoxic. HEENT: Normocephalic and atraumatic. Extraocular muscles are intact.  Mucous membranes are moist. Cervical spine was nontender with decreased range of motion secondary to his fusion. He had no jugulovenous distention. Lungs were clear to auscultation bilaterally. His heart was regular rate and rhythm, S1/S2 with no murmurs. His abdomen is benign with good bowel sounds, soft nontender, and nondistended. The right lower extremity did have some swelling. It was indurated along the lines of the wound. There was no discharge from the wound. The staple line was clean. There was some swelling extending grossly throughout the leg down to the calf. He had a negative Homans' sign and he was neurovascularly intact distally.

**ALBANY MEDICAL CENTER HOSPITAL**
**TRANSFER DISCHARGE SUMMARY**

NAME: HARRISON, DENNIS
MED. REC.# 1879639

**LABORATORY DATA:** White blood cell count 18.8, with only 3 band, 77 segs. He had a normal Profile I with a BUN of 21, and creatinine of 0.8. UA was negative.

Lower extremity duplex scan which was negative for deep venous thrombosis. His sedimentation rate was approximately 120.

**HOSPITAL COURSE:** The patient was brought into the Emergency Department. He was evaluated by Infectious Disease, Dr. Tobin, who felt that he had no obvious evidence of any infection. He felt that he had normal postoperative swelling.

In addition, a CT scan contrast of the right lower extremity was obtained, which showed no obvious evidence of abscess. Once these studies were reviewed, it has been decided that the patient could be discharged back to his nursing care facility. The patient will be discharged with the following instructions:

1.     Continue to be allowed to shower and should pat the wound dry after showers
2.     Non-weightbearing on the right lower extremity.
3.     Hip precautions will be in place, avoiding flexion past 90 degrees or adduction past the midline.
4.     TEDS hose on both lower extremities

**DISCHARGE MEDICATIONS:**
1.     Oxy-Contin 40 mg p.o. t.i.d.
2.     Protonix 40 mg p.o. q.d.
3.     Celexa 20 mg p.o. q.d.
4.     Imipramine 30 mg p.o. q.d.
5.     Klonopin 1 mg p.o. q.a.m. and 2 mg p.o. q.p.m.
6.     Vioxx 25 mg p.o. q.d.
7.     Vancomycin 1 gram IV q 12 hours
8.     Imipramine 20 mg p.o. q.h.s. and this will be given in place morning Imipramine dose, which was discontinued on this admission.

**FOLLOW UP:** The patient will follow-up with Dr. Paul Hospodar at the Capital Region Bone and Joint Center in approximately one week at 489-2666. Follow-up at his regularly scheduled appointment with Dr. Tobin of Infectious Disease Service, who is located across the street from St. Peter's Hospital on New Scotland Avenue.

MARC FUCHS, M.D.                    Date:

PHELAN/dg
D: 03/13/2003

141:a

* 66 DAY ADMISSION

## ALBANY COUNTY NURSING HOME/ANN LEE HOME
### BIMONTHLY PHYSICIAN VISIT FORM

Name: _DENNIS HARRISON_    Rm.# _SP-16_

Nursing checklist  _ms_ / Initial    _5-2-03_ / Date

| | Area | Yes | No | Physician Comment |
|---|---|---|---|---|
| a | Artificial hydration/nutrition | | ✓ | |
| b | Central line/venous access | | ✓ | Picc bled 4/30/03 |
| c | Decubiti | | ✓ | |
| d | Urinary Catheter | | ✓ | |
| e | Physical Restraint  2 SIDERAILS ↑ FOR POSITIONING | ✓ | | |
| f | Behavior | | ✓ | |
| g | Psychotropic medication | ✓ | | |
| h | Weight Gain/Loss  APRIL 166  MAY 165 | ✓ | | |
| i | D.N.R. Status | | ✓ | |
| j | Health Care Proxy | | ✓ | |

Subjective: _Doing well - no new problem. PICC line H/C'd 2 days ago_

Objective: _Alert. Comfortable. No c/o pain. Says Klonopin is doing wonders. Heart & lungs clear - no edema. S/P ® hip surgery. Meds - no changes from last visit except ↑ Klonopin. Labs BMP 4/03 Hct 8-3/15.9 (or would)_

Assessment: _① periprosthetic femur fracture. Ankylosing spondylitis - S/P bilateral THR. Osteoporosis. Anemia_

Plan: _Continue Assess & care. Other Dx's_

Physician Signature: _____    Date: _5/2/03_

| Date | Time | Dept | |
|------|------|------|---|
| 1330 | 3/12/03 | Nsg | Phone call recieved from Dr. Hospedin's office to see resident - for edema + reddness Rt hip - Msleattery RN |
| 1430 | | | To A via ambulance - Msleattery RN |
| 3/12/03 | 1730 | Nsg | Res. admitted to AMCH ED x. re infected hip. — AKoHackel RN |
| 3/12/03 | 1900 | Nsg | Family wife made aware of res. being admitted to AMCH. — AKoHackel RN |
| 3/13/03 | 2200 | Nsg | Resident back from amch. Vanco given @ 12 Noon late. Next dose @ 12 mN. Wife aware that pt is back from amch. cont NWB RLE + posterior hip precautions. — msmullen RN |
| 3/14/03 | 0015 | NSG | Vancomycin 750mg hung. flushed per protocol. ® leg - ↓ edema / redness. 96⁵ 96·24 110/60 oxycontin 40mg per order for pain control. Res to bed - skin dry / intact. Bibasc up |
| | 0630 | | Slept fair, well. c/o slight. n G. breakthrough pain Mtlg |
| 3/14/03 | 1200 | Dsg | Discussed c̄ Dr. Elkam that pt had returned on 3/13 @ 2000 from AMC, explained per pt "They wanted to operate, debe out the space, the infection is in the space." "I told them I was not ready for an operation yet." Per paperwork from AMC pt is to follow up up c̄ Dr. Hispondler in one week, order written for F/U c̄ Dr. Hisponder. Vanco level from 3/11. 14.50. Dr. Elum aware. — E. Heckman RN |
| 3/14/03 | 3/14/03 | OT | Res seen this date c̄ to hospital stay. No functional changes noted - Res will continue on current OT treatment plan + OT goals. — (indry) RN |
| 3/14/03 | 1500 | Nsg | Pt. has rash on his face, states that in the past he has used hydrocortisone cream c̄ good results. Call next out to Dr. Belanger NP, order given for Hydrocortisone cream 1% to face. BID. E. Heckman RN |
| 3/14/03 | 2200 | Nsg | VS 96-9. Cont on Vanco. IVMB via Picc line Res. OOB & was assisted go to bed. NWB to ® leg. Hydrocortisone cream to face applied as ordered. — AKoHackel |
| 3/14/03 | 2200 | Nsg | |

Harrison

(Cont from front of page)

| Date | Time | Dept | |
|------|------|------|---|
| 5/12/03 | 1515 | RN | so he will be receiving 1160z Skim milk TID plus 8oz Ensure c fiber @ 8pm. Will add ITRS fiber powder to morning T.I.D. to maintain consistent fiber intake as resident reports his bowels are quite regular despite medication ↓. Suggestion in MD book to consider MVI c Fet to replace last nutrition he will no longer receive in supplements. Resident's weight will be monitored monthly to reassess for changes. M Bradbury RD |
| 5/14/03 | 1000 | NSG | Dr. Elmin, order rec'd for Klonopin 0.5mg po in am and 1.0 mg QHS x30days; for anxiety may give Klonopin 0.5mg po BID x30days (refer to Dr. Emalanka's note) —E. Kwita Rn |
| 5/16/3 | 1000 | NSG | RESIDENT PICKED UP FOR TRANSPORT TO OUT PATIENT VISIT WITH DR. HOSPODAR —J Glauber RN |
| | 1330 | NSG | RESIDENT RETURNED FROM OUTPATIENT OFFICE VISIT, VERBALIZING HIS DISAPPOINTMENT & FRUSTRATION WITH THE DOCTOR. REQUESTING COPIES OF ALL NOTES THAT WERE SENT BACK. SOCIAL WORKER PAGED. —J Glauber RN |
| 5/19/03 | 0900 | NSG | Dr. Elmin order rec'd for CBC c diff, Sed rate, C-reactive protein (quantitative), fax results to (518)489-5933 —E. Kwita Rn |
| 5/20/03 | 1015 | NSG | MDS charting—resident has no problems c short & long term memory, is able to make needs known has no change in ADL function is continent of B/B —E. Kwita Rn |
| 5/20/03 | 1500 | SS | Discharge planning-Dennis required that his records from Dr. Hospodar be faxed to him so he can get a second opinion. A release was sent to the doctor's office. He also needs xrays which he will have to pick up at the doctor's office. —Mary Br Hu |
| 5/21/03 | 0900 | NSG | Dr. Elmin, order rec'd for Amoxicillin 2Gms 1hr before dental procedure 5/24/03 & Dilantin level Q3 months —E. Kwita Rn |
| 5/23/03 | 0945 | NSG | Dr. Elmin Dilantin level D/c —E. Kwita Rn |
| 5/23/03 | 1050 | SS | MDS charting: Dennis is alert and responsive. He is oriented, oriented to all three spheres. He is able to make all of his needs known. Dennis memory is intact. He has independent decision making skills. He establish his own goals. Dennis does not forget mood at this time. He is working towards discharge. He plans on going to a doctor in New Jersey to get a second opinion. He hopes the doctor puts him in the hospital for surgery and he would not come back to the nursing home. |

Harrison

ALBANY COUNTY NURSING HOME
INTERDISCIPLINARY PROGRESS NOTE

Resident Name: Harrison, Dennis
Unit: SPILe

| Date | Time | Dept | |
|------|------|------|---|
| 5/23/03 (con't) | 1050 | SS | con't. He will call and talk to doctor about possible admission to facility closer to home. He will let worker know when decision is made. Both of us are in process of getting his medical records from Dr. Alexander so he can bring to appointment. ——— Mary Bin Gen |
| 5/23/03 | 1315 | NSG | D. Belanger NP in, read PT/INR 21.0/3.28, order rec'd to hold Coumadin tonight, call for PT/INR in am 5/24, if INR greater than 3.00 call MD, if INR less than 3.00, restart Coumadin @ 4.0mg po Q evening. E Kuttie |
| 5/23/03 | 2200 | NSG | Coumadin held as per order. No c/o— A Kostachuk |
| 5/24/03 | 0500 | NSG | Noted - Coumadin held. Will monitor J. Stevison RN |
| 5/24 | 12⁰⁰ | NSG | Results blood work PT 30.8 INR 2.09 Coumadin will resume today per results. ——— E Valente ? |
| 5/25/03 | 0630 | NSG | No acute distress noted this shift. Medicated x1 for pain ——— Suzyanne ? |
| 5/26/03 | 1200 | NSG | Addendum for 5/24/03 - Lab was unable to draw TIBC and iron. Will draw on next draw date. SS E Valente |
| 5/27/03 | 1420 | SS | Discharge Planning: Dennis is stating that he is leaving on Thursday when he goes to New Jersey for doctor appointment. He does not feel that he should come all the way back if that doctor is the one doing the surgery. He states he will either be hospitalized after appointment or he will stay at his sister's house. He would like his records to be given to him to give to his doctor. Dennis will pick up x-rays and records from Dr. Hospadine. He spoke to his doctor's nurse about these arrangements and prescriptions that would be needed. ——— Mary Bin Gen |

Revised 2/01/02

| Date | Time | Dept | |
|------|------|------|---|
| 5/27/03 | 1400 | NSG | 1000 PT- 19.9, Warin 1.64 INR - 2.87. Dr. Bellanger NP made aware), no changes (order rec'd - E. Rutter RN) |
| 5-28-03 | 1300 | nsg | Dr. nelus in rec'd order FeSO4 + colace, renewed oxycontin order x 4 days + discharge for am ————— C Sandunong |
| 5/28/03 | 1425 | SS | Discharge Planning. Worker and nurse met with resident this morning to discuss discharge noted in discharge plann. section. Worker spoke with Judy from Dr. Pizzuto's office about his plan for discharge and not returning to this facility. She was concerned that he has a place to go as it was just an appointment and nothing would be decided tomorrow. Worker explained that he was planning on going to sister's house if necessary. Worker will tell resident that he will be staying at his sister's not the hospital. She also stated that Doctor can refer him to a medical doctor for any prescription that he may need. Judy required that his medical records come with him and a list of medication. Worker spoke with Dennis about the above. He will call his sister to make arrangements. He did not want worker to call as he would rather do it himself. ———— Mary Ra... RN |
| 5/29/03 | 0800 | SS | Discharge Planning. Dennis decided that he is not going home today. He stated that his ride fell through as his brother can not drive that distance without falling asleep at the wheel. Dennis stated he also now feels he needs to be in a nursing home as he is unsafe at home. He wants to get a list of nursing homes by Dr. Pizzuto's office in Ridgewood, New Jersey. Dennis and worker are going to call the doctor's office and try to make arrangements for placement in another nursing home. ———— Mary Ra... |
| 5/29/03 | 1110 | SS | Discharge Planning. Worker met with Dennis and he made some phone calls to New Jersey to arrange nursing home placement. Dennis also called his sister (who was going to call) a nursing home that her doctor is part of to see if she can get him there. He plans to leave on Sunday to go to the nursing home for a few weeks until his/his surgery. Worker spoke to his doctor's office to cancel appointment for today. She stated he will not have surgery until test results come in and doctor is away next week. Dennis needs to set up a new appointment. He is waiting to hear back from nursing home. ———— Mary Ra... RN |

Harrison

ALBANY COUNTY NURSING HOME
INTERDISCIPLINARY PROGRESS NOTE

Resident Name: DENNIS HARRISON
Unit: JP-16

| Date | Time | Dept | |
|------|------|------|---|
| 5/30/03 | 1445 | SS | Discharge Planning: Dennis' doctor called back and stated that doctor would not order any test until he saw Dennis and had all of his xrays and medical records. This was explained to him. He is going to wait until next week before going to New Jersey. A nursing home bed is being looked into. Worker was told that he will need an out of state pass before he can go to any nursing home in New Jersey. The pass was being faxed to worker for Dennis to complete. He is trying to get his aspiration done next week so he can have it before he sees his doctor for the appointment. Nursing staff has been trying to set up this appointment. MaryBmcun |
| 6/2/03 | 1030 | NSG | Dr. Suw w, order rec'd for appt ē Dr. Hosoodar 6/5/03 @ 830 am for Rt hip aspiration. Cephalexin 500 mg ↑ po BID X14 days ē hydrocortisone 1% cream to (R) clavicle area BID X14 days, res c/o sore (L) nipple area sl. reddened and swollen, Odrainage E Ruth R |
| 6/2/03 | 2230 | Nsg | T 97.3. Started on Keflex for (L) nipple lesion. Hydrocortisone cream applied to face + (R) clavicle area. c——— A KoStackler ē |
| 6/3/03 | 0730 | NSS | T—96.2 Con't on Keflex for (L) nipple infection. Ødrainage area sl. reddened. No complaints or ill indicator. J. Allmanberg |
| 6/3/03 | 1210 | Nsg | T 97², con't on Keflex for (L) nipple infection area sl. red, Ødrainage. Manifless checks swung this writer met ē res who called his sister Patty. Patty states was caring some and will be here until he has his doctor appt and surgery. Sister Patty will transport him down to NJ. Einfo ——— E Ruth RN |

Harrison

| Date | Time | Dept | |
|------|------|------|---|
| 6/3/03 | 1420 | SS | Discharge Planning: Dennis plans on going to his sister on next Wednesday. He is attempting to set up Dr/wts appointment with Dr Pizzinger the 11th of June. Doctor is on vacation this week and his first available appointment was Jun 24th however Dennis asked the nurse to squeeze him in. He feels the doctor will see him and put him in the hospital and do surgery right away. Worker got nurse on phone to him that doctor stated he will not hospitalize, they will he would not have an appointment + he will not make any decisions until he sees Dennis his medical records were had and got. Dennis said he will stay with his sister until his surgery. Worker spoke to sister and she is aware that he may not have appointment until the 24th so it may be awhile that Dennis is staying with her. She stated Dennis could stay with her as long as needed. She was going to see about renting a hospital bed for him. There is a stairmaster to bring him up stairs and the rest is on level. She will come with his wife to transport him.   Maribeth Lee |
| 6/3/03 | 1230 | LJ | Res. afeb. g clo Pm - Sob. Res W/ 20 b/2 - P. Res oobl/ed to -)c Res w/g time will g risfer no nell T0/ c sk A+ |
| 6/4/03 | 0620 | NSC | T-961 cont. on Cephalexin for Infection (L) nipple Ch Screened. med. c Lortab 5/500 iT Cl'o pn nain pain.   Bittel en |
| 6/4/03 | 1000 | NSG | Dr Cleveland on Keflex for (L) nipple infection, denies pain @present, P-96°, 0 del rec'd. Got FeSO4 liquid BID - Elustik l. |
| 6/4/03 | 2215 | NSG | Res. Cont on Keflex for (L) nipple infection T-96.7. Q pain/discomfort. Res. is for outpat appt in AM.   A Kostackalon |
| 6/5/03 | 0100 | NSG | T-969. cont on Keflex for infection (L) nipple area cont. c Clo "pressure".   Bittel cen |
| 6/5/03 | 1200 | NSG | T-977, Keflex for (L) nipple infection, denies discomfort C present, left @ 0730 for 0830 appt c Dr Hospodar w/ hip aspiration, physicians office called - stated hip aspiration could not be done due to scheduling error on his office, was returned, verbally upset over events of this morning, states he wants to "get this done |

ALBANY COUNTY NURSING HOME
INTERDISCIPLINARY PROGRESS NOTE

Resident Name: DENNIS HARRISON
Unit: SP-16

| Date | Time | Dept. | |
|------|------|-------|---|
| | | | now", call placed to AM Center to attempt to schedule hip aspiration, Albany Med not able to schedule until 10-14 days from now, call placed to SPHospital, appt rec'd for June 10th @ 0930 with res needing to be there @ 0830, SPH radiology also states resident must be off coumadin for 5 days before procedure, call placed to Dr. Elum, Physician made aware, order rec'd to hold coumadin until hip aspiration done 6/10/03, res made aware and is full agreement c appt, clinic made aware, res is bed @ present — E. Ruck R |
| 6/5/03 | 2230 | NSG | T 97-2. Keflex for infection (L) nipple. Ø dis comfort noted. — A Koffaekel R) |
| 6/6/03 | 0300 | NSG | cont. on Keflex for infection (L) nipple area c c/o "soreness". Presently c/o pain (L) knee - med. c Lortab 5/500 # per reg for pain. Better (P) |
| | 0650 | | T-95¹ reports Lortab c/o effective. still has pain (L) knee. Better (P) |
| 6/6 | 1000 | NSG | Dr. Elum reviewed PT eval also c/s'd order |
| 6/6/03 | 2300 | NSG | T 98.2 Cont on Keflex for nipple infection. no c/o noted — A Koffaekel R) |
| 6/7/03 | 0600 | NSG | T 96 Ø acute distress noted denied @ c/o discomfort. cont on antibiotic. Denies pain for L/der East pain |
| 6/7 | 1300 | NSG | Temp 97⁴ Keflex as ordered no redness or drainage from Left nipple skin intact. |
| 6/7/03 | 2200 | NSG | Cont. on Keflex for (L) nipple infection. T 97.2 A Koffaekel R) |

Harrison

| Date | Time | Dept | |
|------|------|------|---|
| 6/8/03 | 0515 | Rad | T-97$^5$ (L) nipple w/o redness or edema, skin intact, medicated c̄ Lortab 5/500 x 2 for c/o generalized pain c̄ good effect, continues on abx.    M. Aldous, RN |
| 6/8 | 1800 | N36 | Temp 97$^2$ S/L Keflex c̄ apparent side effects.    CC Celeste RN |
| 6/9-03 | 1500 | nsg | Day. S/H. Keflex for (L) nipple infection (L) T-98$^4$ Ø c/o discomfort from (L) nipple - Lortab given for c/o joint pain    R. Sanderson |
| 6/9/03 | 2200 | N Sg | Remains on Keflex for (L) nipple infection Ø c/o discomfort. PT = 14.8 INR = 1.53. Coumadin is on hold for hip aspiration on 6/10/03 @ 0830. at SPH.    A Kottackal RN |
| 6/10-03 | 1400 | nsg | Day. 9/14 Keflex for (L) nipple infection (L) T-98$^4$ Ø c/o of pain or discomfort from nipple. (R) hip aspiration completed @ SPH.    R. Sanderson |
| 6/10/03 | 1415 | N Sg | Addendum note = 1215 Was returned from SPH, bandaid over (R) hip aspiration site, intact c̄ small old bld drainage, able to move all extremities c̄ difficulty, no c/o pain or discomfort. Stable area around site, skin pink color good, skin w/o    E. Kurtyka RN |
| 6/10/03 | 1440 | S.S. | Discharge Planning: worker and Dennis, went to the business office yesterday afternoon and called his United Healthcare insurance company to see how much they will pay toward his cost of care and medical needs. Dennis was told they would pay 100% of medicare cost as long as he was eligible. Dennis decided he will stay in the nursing home until his surgery is done. He will make appointment with Dr. Pinkul and go see him and will call on return from appointment to nursing home to see how Gray with his girls as she changed behind and over afraid they could not handle him. May be. him ___ |
| 6/10/03 | 2130 | N Sg | T. 97.8. Cont on Keflex for (L) nipple infection. No c/o pain/discomfort noted from (R) hip aspiration.    A Kottackal RN |

ALBANY COUNTY NURSING HOME
INTERDISCIPLINARY PROGRESS NOTE

Resident Name: Harrison, Dennis
Unit: _____

| Date | Time | Dept | |
|------|------|------|---|
| 6/11/03 | 0940 | Nsg | Dr. Elrin in, order rec'd for renewal Klonopin 0.5mg BID po x 30 days — E. Rivta RN |
| 10/11/03 | 1400 | Nsg | Day 10/14 Keflex for (L) nipple infection Ō c/o pain in discomfort —— C. Serdision |
| 6/11/03 | 2200 | NSg | T 97.2 Remains on Keflex for (L) nipple infection. Ō c/o offered. —— A. Kollackal RN |
| 6/12/03 | 0530 | | T 97.4 remains on Keflex for (L) nipple inf. Ō c/o, Quiet night —— C. Sasision LPN |
| 6-12-03 | 1430 | Nsg | T 97.4 Day 11/14 Keflex + (L) nipple Ōinfection Ō Ō c/o pain or discomfort from nipple. Tortair given for c/o joint pain —— C. Serdision |
| 6/12/03 | 2350 | | Pt has not been in — H. see nurse Ō good nurse; Pt ontinue has out x1. —— ā    of  14 — |
| 6/13/03 | 0900 | Nsg | Dr. Elrin in, examined resident (R) hip aspiration site and (L) nipple, no change in orders rec'd — E. Rivta R |
| 6/13/03 | 2200 | NSg | T 96.6 Remains on Keflex for (L) nipple infection No c/o offered. —— A. Kollackal RN |
| 6/14/03 | 1100 | NSg | T 96 Remains on Keflex for Lt nipple infection area slightly purified no redness noted. Ō c/o pain or discomfort. —— C. Caresski |
| 6/14/03 | 2250 | NSg | T 97.1. Remains on Keflex for (L) nipple infection Ō redness or swelling. —— A. Kollackal RN |
| 6/ /03 | 1100 | NSg | T 96.8 Day 13/14 Keflex (L) nipple infection Ō redness or swelling no complaints — E. Caresski |
| 6/15/03 | 2230 | NSg | T 97.7. Remains on Keflex for (L) nipple infection Ō redness or swelling —— A. Kollackal RN |
| 6/16/03 | 0915 | Nsg | T 97.4, Keflex for (L) nipple infection Dr. Elrin in order rec'd for Prednisone 20mg PO QD (ēē noor) x 1 wk then re-eval for joint pain — E. Rivta RN —— |

Harrism

| Date | Time | Dept | |
|------|------|------|---|
| 1150 | 6/16/03 | Nsg | Talked to resident, he told this writer that he is going to see physician in N.J. on 7/11/03 @ 1720 for ortho followup, resident also states that his family will be transporting him to appt and returning him to this facility - E. Kurtz, R |
| 6/16 | 2300 | Nsg | T-96.7   A tot   complete. C. Ster. RCW |
| 6/17/03 | 0645 | Nsg | T-96.6 Ab completed. Resd r Pont pain. Medicated c Tortab (500) r tabs as ordered c ansrelief. _____ RN |
| 6/18/03 | 0200 | Nsg | Resident requested Tortab r (500) for all over pain. Tortab r (500) given PO c good effect @ 0200 c No pain relief. _____ to restore. Comfortable @ this time. Medicated c |
| 6/18/03 | 0800 | Nsg | Resident announced plans to travel to New Jersey to an MD appt. scheduled for 1130 this A.M. Resident states he plans to take taxi to New Jersey to MD office where his wife or sister will pick him up to appt. & will transport him back to ACNH. Extended discussion r Nsg administration & administrator results in conclusion that Mr. Harrison, being quite able to make his own decisions, is able to attend MD appt in N.J. r understanding his safety as he is able to verbalize to us a solid plan that is favorable for his safe return. Dr. Elum called & TO received for LOA to NJ MD appt, resident to return today or no later than tomorrow. Overnight meds provided to cover resident in case LOA is extended up til tomorrow. Mr. Harrison has x-rays, etc. that he has kept in his own possession to provide to MD at appt. _____ J. Harrand RN Sup |
| 6/18/13 | 19a | Nsg | Res returned TO SP via "limosine" Res o food r m II FO c/o Pain. Res took own meds @ 1600 r coumadin. Coudad 2 4.5 = r 90 given as ord. Res had dinner upon arrival. Res to bed @ Pres-r Time. will ret c dr B |
| 6/18/13 | 2230 | JC | Res med C 2NS 2x c/o Pain disc. r mem? po gen? TAmb Res TO 90 m9-3 _____ c _____ LPN |
| 6/19/03 | 04:00 | Nsg | Resident c/o Chest pain - VS 130/94, 80, 20 T 96.0 - Malox given per request c effect. Resting in bed @ this time - M. Luther? LPN |

ALBANY COUNTY NURSING HOME
INTERDISCIPLINARY PROGRESS NOTE

Resident Name: Harrison, Dennis
Unit: S.R.

| Date | Time | Dept | |
|------|------|------|---|
| 6-19-03 | 1400 | nsg | Ø c/o Chest pain this shift. Mylanta given for c/o nausea c̄ good effect ——— C Sanderson |
| 6/19/03 | 2245 | -y | res c̄ Ø c/o C.P. Ø c/o SOB. res c/o feeling tired and some. res also gu Ho c̄ down time. T/ 650 x1 c̄ good relief. res Tol Po med. Q void x4. res on Telephone most of afternoon. Ø c/o N/V —— c̄ ———— |
| 6/20/03 | 0400 | N 98 | No c/o further chest pain. Requested T/ 650mg for gen. discomfort given c̄ effect —— DKoHackal |
| 6-20-03 | 1000 | nsg | Dr. Elem attended. rec'd order for discharge on Monday 6-23-03 to Ridgwood hosp. ——— C Sanderson |
| 6/20/03 | 1440 | SS | Discharge Planning: Dennis is being discharged to Ridgewood Hospital on Monday morning. He will be having his surgery on Friday the 27th. He plans on taking the bus to Ridgewood N.J. Writer suggested that family take him instead as bus may be uncomfortable but he rather take the bus. He called the bus company and arranged for his transportation. He said he will take taxi to bus terminal. Discharge form and copy of meds given to him. He will have a bag breakfast to go with him to eat on bus. A urinal will be sent with him also. ——— Mary Bun Iyler |
| 6/20/03 | 2245 | -y | As per res. "wife will be picking up on Mon ~0900. Will report. res c̄ c/o H/a x2 T/ 650.y PO x2. res c̄ good relief. res Tol Po med. —— c̄ d r |
| 6/20/03 | 0845 | Nsg | Dr. Elem in look 6/19/03 reviewed D change order —— C̄ Kieth Rn |
| 6/23/03 | 0920 | SS | Discharge Planning: Dennis is going to New Jersey with his wife and brother instead of by bus. They will pick him up at 10:00. ——— Mary Bun Iyler |

HarrisonD-AlbanyCountyNH-    00344

Harrison

| Date | Time | Dept | |
|------|------|------|---|
| 6/13/03 | 1700 | SS | Discharge Plan: Dean left with wife to go to the |
| | - | | Doctor and hospital in Richmond, New York. He is discharged |
| | | | from the nursing home at this time. Mary Russell |
| 6/23/03 | 9005 | SS | Discharge Planning: Wafer call Dr. Coss this office reviewed |
| | | | him that Dean's left for his appointment Mary Russell |

# COUNTY OF ALBANY
## DEPARTMENT OF RESIDENTIAL HEALTH CARE FACILITIES

NAME _Dennis Harrison_                DATE _6/20/03_

## DISCHARGE INFORMATION

DOCTOR WHO WILL CARE FOR
YOU AFTER DISCHARGE:
Dr. Pizzuro
85 So. Maple Avenue
Ridgewood, N.J. 07456
201  445-2830

Dr. Cassidy
828 Arcadia Rd
Blds.
201 825-3933

SPECIAL CARE INSTRUCTIONS: Adirondak trailways 7:30 am to
Ridgewood, N.J. taxi to bus terminal.
bag. lunch will be provided
urinal will go with resident
went with wife instead of the bus.

MEDICATION USE: See medex

HOME CARE REFERRALS: Dennis is going to be discharged to
Ridgewood   Hospital on June 24th. He will have surgery on June 27th and
will return here

PIA: No money in account

Reviewed By:

_Mary Ann Glen_
ACNH Staff Member

With:

_Dennis R. Harrison_
Resident or Representative

Dennis Richard Harrison
6a Short Street
Cementon, NY    12414
845-231-3272
Pro Se Plaintiff

October 27, 2006

### *DOCKET NO. 1657*

### *BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

### *IN RE VIOXX MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION*

### *CONDITIONAL TRANSFER ORDER (CTO-64):  BRIEF TO VACATE*

|  |  |
|---|---|
| DENNIS RICHARD HARRISON, | ) In Re: Brief to Vacate CTO-64 |
| | ) Case No.: 1:06-CV-932 (NAM) (RFT) |
| Plaintiff, | ) |
| vs. | ) |
| MERCK & COMPANY, INC.; | ) |
| Defendant | ) |

### BRIEF TO VACATE

**Background – filing, removing, transfer, opposition:**

On September 28, 2006, the Judicial Panel on Multidistrict Litigation filed Conditional Transfer Order No.64 (CTO-64). Included among the tag-along cases was: Dennis Richard Harrison of 6a Short Street, Cementon, NY 12414, a Pro Se Plaintiff.

The Plaintiff originally filed this case with the New York State Supreme Court (Ulster County) and was assigned State Case number 06-2247. The Complaint was promptly served.

M009825458

1    On July 31, 2006 Merck & Co., ("Merck") removed this action to the United States District Court for the
2    Northern District of New York. Merck stated that it intended to seek the transfer of the action to the
3    Multidistrict Litigation, *In Re Vioxx Marketing, Sales Practices and Products Liability Litigation* in the
4    Eastern District of Louisiana ("MDL-1657"). It was assigned Federal Case No. 1:06-CV-932
5    (NAM)(RFT).

6

7    On September 28, 2006; represented by Hughes Hubbard & Reed LLP, One Battery Park Plaza, New
8    York, New York, 10004-1482, the case was indeed conditionally transferred to the Multidistrict Litigation,
9    *In re Vioxx Marketing, Sales Practices and Products Liability Litigation* in the Eastern District of
10   Louisiana ("MDL-1657") pursuant to the "tag-along" procedure contained in the MDL Rules.

11

12   On October 13, 2006 a NOTICE OF OPPOSITION (Docket no. 1657; CTO-64) was filed by the Pro Se
13   Plaintiff Dennis Richard Harrison, BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT
14   LITIGATION. In accordance with Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict
15   Litigation, 199 F.R.D. 425, 435 (2001), the conditional transfer order was stayed pending a Motion and
16   Brief to Vacate the Conditional Transfer Order by meeting the filing requirements and providing it to the
17   Panel office by October 30, 2006.

18

19   **Reasons and rationale that the Conditional Transfer order should be vacated**:
20   As will also be described, the true intentions and spirit of Diversity of Citizenship are not met.
21   Furthermore, Merck has stated, but has not shown, by any means, that the Federal courts have any subject
22   Matter jurisdiction via similar complaints which the NY State Supreme Court (Ulster County) cannot equal
23   or exceed. In fact, as will be explained, the Plaintiff alleges that Merck is in fact using the Federal court
24   system to create a neglectful atmosphere for any complaint other than the almost standard heart/CV case.

25

M009825459

1    The Plaintiff further alleges that Merck is attempting to avoid many additional thousands of lawsuits for
2    non-heart/CV cases by shadowing and overwhelming these non-heart/CV cases via strictly emphasizing
3    the heart/CV cases at the expense of these "similar cases", which are not being exposed to proper scrutiny.
4    While Merck continues to litigate heart/CV cases, this Plaintiff alleges that Merck's strategy for non-
5    heart/CV cases is to bury them in irrelevant pre-trial proceedings, restrict their pre-trial capabilities, and
6    create a hostile and confusing atmosphere for these "non-conforming" cases.

7

8    Without the detail needed for very accurate estimating, one can however attempt to gain some insight as to
9    what Merck has to gain financially from such a strategy. This Plaintiff attempts to do so by making
10   assumptions somewhat similar to the heart/CV estimates, even though they vary significantly. For example
11   for each 1,000 non-heart/CV cases Merck is successful in derailing and crippling, they could be saving
12   approximately 250 million dollars to one billion dollars. With a reasonable estimate of perhaps at least
13   10,000 non-heart/CV cases (and specifically the bone/spine repair issue cases) one could interpolate a
14   potential savings of two and a half to ten billion dollars. These estimates swing largely, similar to the heart-
15   CV potential liability estimates. However, obviously it is a potentially large incremental amount, which
16   would be very substantial well beyond its absolute terms, as it is "on top" of the potential current heart/CV
17   liability estimates.

18

19   Merck's stated goal in removing this case was so that it could then transfer the case to the MDL (1657) for
20   coordinated pretrial proceedings. However, this Plaintiff will adequately show that Merck's "stated logic"
21   of doing so is not the real motivation for this non-heart/CV case. Ironically, for non-heart/CV cases the
22   MDL process is fertile grounds for actually being counter intuitive and counter productive to its charter
23   and goals. This easily creates a very substantial disadvantage to the non-heart/CV Plaintiff. Furthermore, a
24   vast amount of potential litigants continue not to understand what has happened to them and what their
25   legal options are. The mechanisms of the MDL are, in these non-heart/CV cases, working to a very

1  significant disadvantage to those potential litigants in understanding the potential non-heart/CV issue(s),
2  and if they have a valid case to seeking legal representation for. And in the current environment of the
3  legal field favoring almost exclusively the heart/CV cases the pro se Plaintiff can expect to finding
4  significant unfair roadblocks which must be remedied for a level playing field.

5

6  As will be shown, the intent of coordinated pretrial proceedings and Discovery will not provide a fair pre-
7  trial arena for this Plaintiff because of the PSC's position. Furthermore, as will also be shown, removing
8  and transferring this case is not only an unfair advantage to Merck and a severe handicap to the Plaintiff,
9  but it is unfair to the public at large in a very significant manner.

10

11  Though Merck states otherwise, the case does not sufficiently meet questions of fact that are common to
12  the actions previously transferred to the Eastern District of Louisiana and assigned to the
13  Honorable Judge Fallon. There are not sufficient overlapping factual issues; this is evidenced by:

14      1 – the FACT that the Plaintiff Steering Committee stunned the Plaintiff by proclaiming that "the
15      PSC is not pursuing your kind of claim for many reasons". No additional detail was provided. This
16      clearly and frankly acknowledges this case as not having the same or even similar enough pre-trial
17      proceedings requirements, including coordinated Discovery. . *How could it be conceivably*
18      *possible to indicate that the Plaintiff's case is represented within "coordinated pre-trial*
19      *proceedings", when the most important entity for doing so, the PSC, refuses to represent those*
20      *same pre-trial proceedings for the Plaintiff?*

21

22  Incidentally, the plaintiff, a bit wary of the PSC because the plaintiff had become increasingly
23  aware of the general and consistent non-disclosure of non-heart/CV issue(s) decided to contact the
24  PSC and ensure that his pre-trial proceedings and Discovery needs would indeed be represented
25  satisfactorily. If it was to be the case, the Plaintiff was more than happy to remain in the MDL, as

CONDITIONAL TRANSFER ORDER (CTO-64): BRIEF TO VACATE - 4

M009825461

indicated in his initial email contact to the PSC. Though the Plaintiff was supposed to have an answer within a week, after five weeks Plaintiff he still had no answer, in spite of several requests for a status. Finally, the answer was provided that he would not be represented. In fact, the PSC, though always given appropriate identifying information and seemingly (at first) interested in the Plaintiff's case, seemed confused as to who the Plaintiff even was as the Plaintiff finally was able to extract an answer. It did seem as though there was no desire to notify the Plaintiff of his situation, which of course could have devastated his case. Thus, the Plaintiff naturally is very wary of any communications or answers from the PSC.

2 - In a separate communication, upon the Plaintiff asking for further clarification, the PSC reiterated "the PSC is not pursuing discovery on your type of injury. You need to do this yourself".

This obviously indicates that the charter of the MDL process to provide streamlining, reduce redundancy, and render consistent rulings is not being met and there are no plans nor willingness to do so. The MDL concept is not being supported properly or sufficiently in the Plaintiff's case. If indeed, as Merck (allegedly) falsely claims, there were "sufficient overlapping issues", then the PSC would be able, willing and cooperative in representing the Plaintiff's pre-trial proceedings and Discovery needs. Since the Plaintiff's allegations would significantly broaden the scope of the PSC's discovery rights, and be extremely useful in understanding and providing the broader multi-issue/prolems associated with Vioxx and the consistency , methodology, and strategy of Merck in Vioxx cases (pre and post marketing).The Plaintiff remains perplexed as to why the PSC has maintained their position. The spirit of the MDL and the PSC mechanisms are to reduce redundancy of pre-trial proceedings and encourage consistency of rulings, etc. Removing this case to Federal Court and on through to the MDL does not accomplish this, neither in practice or spirit. In fact, the Plaintiff's case would specifically not be fairly or

M0009625462

aggressively represented by "coordinated pre-trial proceedings"!

3 – The heart/CV cases represent the vast majority of Vioxx lawsuits. This case is NOT the "typical" heart/CV case. Furthermore, as is now quite apparent, the Plaintiff Steering Committee (PSC) has not the knowledge, focus, nor desire to provide the pre-trial proceedings for all of its members; that it is chartered to do so (i.e. the Plaintiff), and which is a major basis of the MDL/PSC charter, as well as the reason for the MDL's existence.

4 - The Plaintiff has severe physical limitations that would greatly inhibit and damage his ability to conduct his case outside of the area in which the case was originally filed. This is unfairly detrimental to the Plaintiff. He would be severely, and unfairly, handicapped. Plaintiff pleads with the court to understand that the true meaning and spirit of diversity is not met by Merck. Merck has merely utilized it as a means to unfairly handicap the Plaintiff. Note, Plaintiff is obviously aware of his physical limitations, and has attempted very aggressively to gain legal representation. The Plaintiff has proof of his very concerted and sincere desire to gain legal representation.

5 – Allowing the transfer of this case into the Federal Court system and then into the MDL, in which the PSC refuses to represent each member per its charter (i.e. the Plaintiff), will handicap the Plaintiff to such an extent that it will provide unfair advantage to Merck & Co. Inc. and damage the Plaintiff's ability to properly navigate the pre-trial proceedings. It would do so by adding a layer of undue complexity and both undefined and un-agreed upon Plaintiff/PSC/Merck relationships for pretrial proceedings. Ironically it would also create some degree of overlapping responsibilities and pre-trial proceedings, and thus potential conflicting detail on which to base rulings on, and thus an environment more likely for potential inconsistent rulings – which is counter to the MDL

M009825463

charter. At a minimum it unfairly and unjustly significantly handicaps the Plaintiff, but just as likely would cripple the Plaintiff's case in unnecessary bureaucracy, uncertain, undefined, and un-agreed upon PSC/Plaintiff/Merck relationships and procedures. It also provides an opportunistic atmosphere for purposeful manipulation of pre-trial proceedings and responsibilities, which would further complicate this case and be another disadvantage for the Plaintiff. This will also be detrimental to the public welfare. If this case does not fairly proceed, with at least adequate recognition of the (alleged) potential non-heart/CV issues, it proceeds also at the detriment of the public welfare. Unless the public is enlightened, it is likely that thousands of individuals, harmed, maimed and undoubtedly some deaths, will have been denied proper legal access – let alone had they been properly informed they may have not suffered the additional (alleged) harm from Vioxx.

Uninformed valid potential Plaintiffs are more likely to be elderly for the reasons of physical condition, bone fragility, etc. and much less likely to ever know that they should have had an opportunity to seek justice.

Because of the efforts it has taken this Pro Se Plaintiff to protect his rights and gain representation (though Pro Se) he has become familiar with the many legal representation refusals to tolerate,

and both the need, desire and ability for Internet access/usage, as well as deep analysis and organization. It may be that the elder population, which likely would be a majority for this type of allegation (bone/spine issue(s) is inadvertently being discriminated against for proper and fair legal representation. The very class of consumers that are likely to be most impacted from the alleged bone/spine repair issue(s) of Vioxx, are also likely to be the least capable and able to protect their rights and gain proper legal representation. This Plaintiff requests that at least this be considered both from the point of view of the public welfare, as well as possible age discrimination.

M0098254B4

Consequently, for the reasons above, the public would remain oblivious and unaware of the bone/spine repair issue(s) of (allegedly) Vioxx if the Plaintiff is not permitted to fairly process his case. The Plaintiff certainly hopes that his case alone is not the determinant of this public welfare and age discrimination issues, but it currently appears that the public otherwise would not get the timely and critical mass of knowledge needed, including and currently especially from this case, to obtain justice for the many (likely in the thousands) of cases that would qualify for litigation. At risk is the continuing consumer oblivion, as well as the legal field bias against the (alleged) non-heart/CV issue(s) regarding the bone/spine repair issue(s) specifically. This will continue to be "flying under the radar" at the public's expense and (allegedly) Merck's benefit.

6 - Diversity is not sufficient nor fair reason enough for the transfer of this case into the Federal Court System and then the MDL because of the wide scope of Merck's operations, compliances, and broad local knowledge. In real terms, Merck operates more than sufficiently to at least implicitly be considered a corporate citizen. Merck is utilizing Diversity not in relation to its spirit of meaning, but as a mere technicality to attempt to dominate as many cases as possible and is surely not arguing Diversity in the sense of real, day to day operations and relationships. Not returning this case to where it was submitted provides undue and uncalled for advantages to Merck at the expense of the pro se Plaintiff. It is not consistent with the intentions of the MDL environment, nor the real intentions of Diversity in moving a case from State to Federal jurisdiction.

While the detail of such failure in gaining legal support is not within the scope of this Brief, unfortunately it has become apparent that the very nature of the attempts at streamlining the Merck/Vioxx issue(s) have inadvertently created an environment extremely and unduly biased

M009825465

1   towards the legal community accepting mostly, if not only, the heart/CSV cases. This is even true
2   with the legal firms that advertise on their Web Site that the bone/spine repair issue(s) are one of
3   the reasons why a potential client should contact them

5   If this case is allowed to be transferred as per Merck's request, this will continue to damage the
6   public's right to finally understand the scope of the (alleged) bone/spine repair issue(s) of Vioxx
7   and hence strangle any attempts for the public seeking proper and fair justice. Furthermore, the
8   law firms and public have been so consumed by the heart/CV issue(s) that they are not properly
9   aware that Merck never even acknowledged the alleged bone/spine repair issues and are not
10  properly incented to seek fair justice.  Upon request, more information can be provided on this
11  topic.

14  **Plaintiff's requests and pleading to this Court to vacate The CONDITIONAL TRANSFER**
15  The Plaintiff's case should not have been conditionally transferred, and should be returned to the court in
16  which it was originally filed (NY State Supreme Court – Ulster County). The spirit and actual operational
17  aspects of the MDL process are not being met. Furthermore, the true intent of diversity is not relevant
18  because of the scope of Merck's business, practices and local knowledge. Nor is subject matter expertise.

20  The Plaintiff requests that counsel thoroughly evaluate this brief and his case detail, the PSC's refusal to
21  represent Plaintiff's pre-trial proceedings, and the potential negative aspects to the public that are likely to
22  result should this case be unfairly and unnecessarily hampered. This is a leading edge case for its
23  allegations (bone/spine repair problems from Vioxx), and cannot afford anything but a distinctly clear, fair,
24  and level playing field.

M009825466

For the reasons stated herein, plaintiff respectfully requests this Court to vacate The CONDITIONAL TRANSFER ORDER (CTO-64), within MDL Docket No. 1657; case NO: 1:06-CV-932 (NAM) (RFT) and for other and further relief that this Court may deem just and proper.

Dated this 27th day of October, 2006
Respectfully submitted,

Dennis Richard Harrison
(Pro Se) Plaintiff
6a Short Street
Cementon, NY    12414
Telephone: 845-231-3272

CONDITIONAL TRANSFER ORDER (CTO-64): BRIEF TO VACATE - 10

M0098 25467

**Pistilli, Emily**

| | |
|---|---|
| **From:** | Dennis Harrison [badbonehealing@gmail.com] |
| **Sent:** | Tuesday, August 30, 2011 10:53 PM |
| **To:** | Pistilli, Emily |
| **Cc:** | Wimberly, Dorothy H.; Ann Oldfather; abo@oldfather.com |
| **Subject:** | mail with additional authorizations received |

Hello Emily

I received your mail today in which some of the medical information requested must be in non-generic forms as you were notified by the suppliers. I trust that you did not have any issues with the rest.

I will certainly have them back by the time that you requested as it is obviously a minor amount of work. If it helps to expedite things, I can sign, scan, and then email them to you as high quality PDF attachments.

Also, please note that the pharmacies on the list are included in the pharmacy records that I sent to Merck in the past so you should be able to refer to them also - if that helps. If there are any significant gaps, that is either because of a hospital/nursing home visit or a mistake which I would need to correct.

Since I am sending out this email, I would like to discuss a few other things.


## Interrogatories and PPF

**As you know, I have completed and sent the Interrogatories to Merck. I am working on the PPF and will have it fairly soon.** I am nearly completed with the first draft. Please remember that the PPFs submitted in February, while omitting some information due to the issue of 2-way Discovery, does have quite a bit of information in it also.

Due to the knee infecction, which has now turned chronic (i.e. biofilm), I am able to work only at a much reduced rate. I frequently have fevers and virtually every day and evening feel very poorly. I have an appointment with the University of Wisconsin towards the end of September which hopefully can address this issue with some finality. I am very hopeful that their (advertised) cutting edge treatments can do something about it.


## Interrogatories - Harrison to Merck

After I am finished with the PPF, I will working on and sending Merck my first set of interrogatories for Merck to answer. They will be detailed and of use to all. I have sources of input including Merck internal emails, a former Merck Scientist, the meeting I had in NOLA, many well respected studies from renown institutions, public statements from surgeons - including one that was a Merck hired consultant who was quoted with clear implications of Vioxx as deleterious to the bone healing issue. Further, the Merck hired consultant indicated that the issue was with Cox-2 content, not Cox-1 content (most Cox-1 inhibitors have a small amount of Cox-2 inhibitor also). The interrogatories will be specific and detailed. I am adding this to the letter as Merck may wish to begin to understand (within Merck) who was involved in the 1990's and early 2000's and is familar with Vioxx development, the issues of concern in re to bone/spine, and who in Merck may have been in contact with the FDA in regards to bone/spine issues of which the FDA did express concern of and which were not followed up by Merck.

## FOSAMAX and thoughts about TOLLING

I would appreciate a few moments discussing Fosamax. Though I had suspected (as you know) that Fosamax ● been at minimum a major contributing factor of the femur breakage, I had not until recently, felt that ●ough evidence existed to bring more litigation. I did not, and do not, wish to litigate anything that is not both reasonable and has sufficient merit.

Not until the FDA communication on October/2010 (below) did I feel that there was indisputable merit in a second lawsuit, this one for breaking the femur (mainly). Besides some speculation, I was simply not going to file additional litigation until I felt certain that it was not questionable and that it would not waste the court's or Merck's time. I now feel it is appropriate.

FDA Drug Safety Communication: Safety update for osteoporosis drugs, bisphosphonates, and atypical fractures

**Safety Announcement**
**Additional Information for Patients**
**Additional Information for Healthcare Professionals**
**Data Summary**

**Safety Announcement**

**[10-13-2010]** The U.S. Food and Drug Administration (FDA) is updating the public regarding information
● ........................................

Thus I am approaching the timeframe where I need to decide to either  (1) formally include an amendment for Fosamax into the Vioxx litigation, (2) informally look to discuss it with Merck shall there be any view towards settlement discussions or (3) submit separate litigation for Fosamax.

I had (and still do) hope that reasonable, rationale settlement discussions with Merck would negate the necessity to file another lawsuit and instead address the Fosamax issue(s) informally as part of the whole femur issue. If Merck does have any view of such a settlement discussion as a possibility and would be willing to toll my Fosamax statute of limitation rights, I would be willing to do so if the terms are satisfactory to both parties. This would seem to have advantage to both Merck and myself. For one, I would not need to so meticulously stay with each step of the litigation and all of the research and communications it involves (as described in the interrogatories), though I believe that I would be more effective the "2nd time". If not, that is ok also but I would appreciate Merck's view on it so that I may proceed one way or the other.

**Please let me know if Merck would be amenable to toll my rights for the statute of limitations for submitting a Fosamax lawsuit so that we can perhaps miminize its overall impact to anyone involved.**

As always, thank you.

Sincerely,

● ●nis Harrison
MBA – BGS
2:07-cv-00905-EEF-DEK

James L. Wise, M.D.

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX                    MDL DOCKET NO. 1657
PRODUCTS LIABILITY LITIGATION   SECTION L

                                JUDGE FALLON
                                MAGISTRATE JUDGE
                                KNOWLES

THIS DOCUMENT RELATES TO:

Dennis R. Harrison v Merck Sharp & Dohme Corp.,
2:07-cv-00905-EEF-DEK
==================================================


        EXAMINATION BEFORE TRIAL OF JAMES L. WISE,

        M.D., a Non-Party Witness, held at 1:00 p.m.

        at 14 Pearl Street, Kingston, New York, on

        November 1, 2012 and time before a

        Notary Public of the State of New York.

James L. Wise, M.D.

## Page 2

```
 1   A P P E A R A N C E S :
 2
 3   DENNIS R. HARRISON, Plaintiff
 4   Pro Se via telephone
 5
 6
     WILLIAMS & CONNOLLY, LLP
 7        Attorneys for Merck Sharp & Dohme Corp.
          725 Twelfth Street, N.W.
 8        Washington, D.C. 20005
 9   BY: EMILY RENSHAW PISTILLI, ESQ.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1
 2              STIPULATIONS
 3         IT IS HEREBY STIPULATED, by and between the
 4   Attorneys for the respective parties hereto as follows:
 5         That all rights provided by the C.P.L.R., and Part
 6   221 of the Uniform Rules for the Conduct of Depositions,
 7   including the right to object to any question, except as
 8   to form, or to move to strike any testimony at this
 9   examination is reserved; and in addition, the failure to
10   object to any question or to move to strike any
11   testimony at this examination shall not be a bar or
12   waiver to make such a motion at, and is reserved to, the
13   trial of this action.
14         That this deposition may be sworn to by the witness
15   being examined before a Notary Public other than the
16   Notary Public before whom this examination was begun,
17   but the failure to do so or to return the original of
18   this deposition to counsel, shall not be deemed a waiver
19   of the rights provided by Rule 3116 of the C.P.L.R., and
20   shall be controlled thereby.
21         That the filing of the original of this deposition
22   is waived and that a copy of this examination shall be
23   furnished to the attorney for the witness being examined
24   without charge.
```

## Page 4

```
 1   JAMES L. WISE, M.D., a Non-Party Witness in this case,
 2   was duly sworn and testified as follows:
 3         THE COURT REPORTER:  Please state your name for
 4   the record.
 5         THE WITNESS:  James L. Wise, W-i-s-e.
 6         THE COURT REPORTER:  Please state your address.
 7         THE WITNESS:  78 Maiden Lane, Kingston New York,
 8   12401.
 9   EXAMINATION BY
10   MS. PISTILLI:
11   Q.    Dr. Wise, I'm Emily Pistilli from Williams and
12   Connolly.  I am here representing Merck in this matter.
13   And we met just a minute ago off the record.  I wanted
14   to introduce myself on the record.  Do you understand
15   you are here today to testify about your treatment of
16   Mr. Dennis Harrison?
17   A.    Not, this is not my understanding.
18   Q.    What is your understanding?
19   A.    My understanding is that Mr. Harrison has a
20   legal action against Merck because he believes that the
21   use of the medicine Vioxx caused him medical harm.
22   Q.    That's correct.  And I'm going to be asking you
23   some questions about your records from Mr. Harrison and
24   also some questions about a document you signed relating
```

## Page 5

```
 1   to Mr. Harrison's lawsuit.  So I think we are in
 2   agreement about what we are here for today.  And you
 3   understand that you are not a defendant in the lawsuit.
 4   Correct?
 5   A.    I understand.
 6   Q.    Just the general rules for a deposition here.
 7   If you do not understand any question I ask you and you
 8   would like me to rephase it, just go ahead and ask me
 9   and I will be happy to rephrase it or say it again.  If
10   you would like a break at any time, just speak up and we
11   can do that at any time.  And is there any reason,
12   sitting here today, that you know of that you would be
13   unable to give complete and accurate testimony?
14   A.    There is no reason.
15   Q.    The most important thing for the court reporter
16   is that just both of us need to give oral questions and
17   oral answers.  And so if you shake your head or nod your
18   head, as long as you say yes or no or whatever the
19   answer is as well.  The other thing is we should both
20   try to avoid speaking over one another so that she gets
21   the whole question down and then the whole answer down.
22   So I will try to do that.
23   A.    Okay.
24   Q.    Have you ever had a deposition taken before?
```

James L. Wise, M.D.

**Page 22**

1 which is the copy your office produced to us.
2 (Defendant's Exhibit 4 was marked for ID)
3 A. Can I bring up something? I forgot to bring
4 over the other, the folder chart. If you want me to, it
5 would take me about five minutes to get it. What I did
6 was copy from the electronic medical record system.
7 Q. I think I can ask you some questions about this
8 document that would maybe clear that up. Are there, in
9 this document, which is the chart that you produced to
10 Merck's record collection agency, are there pieces of
11 paper that were copied for this that were not included
12 in the stack that you brought today?
13 A. That is correct.
14 Q. What part of the chart did those additional
15 pieces of paper come from? Let me ask a different
16 question.
17 A. Yes.
18 Q. Can you tell me just how a chart would be
19 organized in your office?
20 A. On top of that stack is the history form that we
21 mail out to patients before they are seen for the first
22 time. And if there is records from other physicians or
23 facilities, they would be in the chart. And if there is
24 lab work that I ordered, it would have been in that

**Page 23**

1 folder.
2 Q. Okay. Let me mark this so we are clear. We are
3 talking about Exhibit 4.
4 A. You want me to get my original chart?
5 Q. I don't think it's necessary. I'm going to ask
6 you a question and just clear it up on the record. I am
7 handing you Exhibit 4. If you flip to the back page,
8 it's a certification by the custodian of records. And
9 it looks like that's signed by you?
10 A. Correct.
11 Q. In June of 2011. Is that right?
12 A. Yes.
13 Q. Do you remember putting these records together?
14 A. I didn't put them together myself.
15 Q. Sorry. How did these records get put together?
16 A. I have two people working on the chart. Two
17 lovely ladies. And one of them did it.
18 Q. Did they copy the entire chart at that time?
19 A. They would have copied the entire chart.
20 Q. So this packet that was sent to Merck's record
21 collection agency in June of 2011 would include all the
22 pieces of paper that were in your medical chart at that
23 time?
24 A. That is correct.

**Page 24**

1 Q. Aside from the phone messages that you pointed
2 out to me in this stack of paper you brought with you
3 today, is there anything else you would expect would be
4 in this stack of paper that you brought with you today
5 that would not be in this chart?
6 A. No, there should not be.
7 Q. And the stack of paper that you brought with you
8 today, is that something you printed out from your
9 online electronic medical records?
10 A. Yes, this morning.
11 Q. I think that's fine.
12 A. Okay.
13 Q. So there may be a slightly different format, but
14 you expect the contents should be the same?
15 A. Should be the same.
16 Q. Thank you. And if you look at Exhibit 4 that's
17 in front of you, which is the copy of the chart you had
18 sent to us, you mentioned that the first document there
19 is a Patient History Form. Is that right?
20 A. Yes.
21 Q. Is that something you mail out in advance to
22 patients?
23 A. That's correct.
24 Q. Just so we are clear, looks to me like the first

**Page 25**

1 four pages?
2 A. That's correct it's a four page.
3 Q. Okay. Is that something that you mail to new
4 patients?
5 A. That is correct.
6 Q. And do they complete it themselves prior to your
7 first appointment or is that the idea?
8 A. I am hoping that they did.
9 Q. Is that what you ask of them?
10 A. Yes.
11 Q. And it looks like this one is dated November 10,
12 2003. Do you see in the --
13 A. That would have been the date of the
14 appointment.
15 Q. Okay. So would November 10, 2003 have been your
16 first appointment with Mr. Harrison?
17 A. I believe so. I don't remember.
18 Q. As far as you know, this form, was it filled out
19 by Mr. Harrison?
20 A. I presume that it was.
21 Q. If you flip to page 2 -- let me point out
22 something. There is the numbering on the individual
23 documents that you sent to us. If you look at the very
24 bottom, there is a new series of numbers our people put

7 (Pages 22 to 25)

Page 26

1    there called Bates numbers. I will probably refer to
2    those. It is usually clearer. We are on page 2 of the
3    patient history form and also page 2 of the Bates
4    numbers. If you look up at the top, in the
5    Rheumatologic Arthritis History Section. And on the
6    right side, there is a X next to the condition,
7    Ankylosing Spondylitis.
8    A.    That's correct.
9    Q.    Sorry if I pronounced that incorrectly.
10   A.    Pretty close.
11   Q.    If I refer to that as AS, can we do that for
12   purposes of this deposition?
13   A.    Sure.
14   Q.    Is this a condition that Mr. Harrison suffered
15   from?
16   A.    Yes.
17   Q.    Is that a condition that you treat in your
18   practice?
19   A.    Yes, it is.
20   Q.    Can you just give us a brief description of that
21   medical condition?
22   A.    It is an inflammatory arthritis that involves
23   the spine and can involve peripheral joints.
24   Q.    Are there any known causes of that condition?

Page 27

1    A.    No, we do not know the cause of the condition.
2    Q.    What are the symptoms of that condition?
3    A.    It's pain, stiffness, loss of mobility of
4    joints, often swelling of joints.
5    Q.    What are some of the effects it can have on
6    somebody's activities of daily living?
7    A.    It can certainly impair them.
8    Q.    Can it cause problems with mobility and that
9    type of thing?
10   A.    Yes, it can.
11   Q.    Is there a range of severity you see with this
12   condition?
13   A.    As with all medical conditions, there can be a
14   range of severity.
15   Q.    Do you recall how severe the condition was in
16   Mr. Harrison's case.
17   A.    I would consider his severe.
18   Q.    And if you look at the bottom of this page under
19   the section, previous operations?
20   A.    Yes.
21   Q.    There are a number of operations listed there.
22   The first three are bilateral hip, cervical fusion and
23   lumbar fusion. Do you see that?
24   A.    The top one is, I presume that's bilateral hip

Page 28

1    fused. Underneath there. Cannot really read the first
2    part of it. Spine. It is hard to read. I would have
3    clarified with him when I saw him initially.
4    Q.    The second one, I will represent to you, says
5    cervical fusion. And is that a surgery you were
6    familiar with? I'm actually looking on the left hand
7    column. The left is typed and the right hand side is --
8    A.    I'm sorry. Got it. On the left hand side says
9    bilateral hip. The second one appears to be cervical
10   and then fusion.
11   Q.    And so when Mr. Harrison came to see you, he had
12   a number of surgeries. Is that right?
13   A.    That's correct.
14   Q.    Are these types of surgeries, in your
15   experience, things that are typically sometimes
16   necessary for patients with AS?
17   A.    It is not unique to AS. These are all fairly
18   common surgeries.
19   Q.    You were not involved in any of the surgeries
20   listed on this sheet. Right?
21   A.    No, I was not.
22   Q.    If we just flip one more page over, on page 3?
23   A.    Yes.
24   Q.    And the first chart there is medications. Is

Page 29

1    that right?
2    A.    That's correct.
3    Q.    And the first medication listed there is Vioxx.
4    Do you see that?
5    A.    Yes.
6    Q.    And you did not give Mr. Harrison the Vioxx
7    prescription that's referenced here. Is that correct?
8    A.    That's correct.
9    Q.    Did you ever prescribe Vioxx to Mr. Harrison?
10   A.    I don't remember.
11   Q.    Would your records reflect it if you prescribed
12   Vioxx to Mr. Harrison?
13        MR. HARRISON: I can answer that, if you
14   like.
15   A.    Hopefully, they would.
16   Q.    Okay. If there is nothing in your records
17   referencing a Vioxx prescription written by you, would
18   you take that to mean that you did not prescribe Vioxx
19   to Mr. Harrison?
20   A.    Yes.
21        MR. HARRISON: I would like to interject
22   with an explanation.
23        MS. PISTILLI: Go ahead.
24        MR. HARRISON: Yes. My general family

8  (Pages 26 to 29)

James E. Wise, M.D.

Page 30

1  doctor, Dr. Donovan, prescribed everything. He was the
2  gatekeeper. I saw Dr. Wise in checkups and to make sure
3  to continue Vioxx or did he have a different idea. Dr.
4  Donovan counted on Dr. Wise --
5          MS. PISTILLI: Mr. Harrison, sorry. I will
6  cut you off just because -- you will have your
7  opportunity. Sorry. I should have been more clear when
8  I said go ahead. Just the way this deposition has to be
9  organized, I will ask Dr. Wise the questions. If there
10  are things you need to ask him at the end, that will be
11  your turn to do so.
12          MR. HARRISON: Okay.
13          MS. PISTILLI: Thanks.
14  Q.  The other thing I wanted to ask you about, up at
15  the top, the third medication down listed is 20
16  milligrams, that looks like pred to me?
17  A.  Yes.
18  Q.  Do you take that to mean prednisone?
19  A.  Yes.
20  Q.  And if you see, there's an asterisk next to it.
21  And if you go down to the bottom of the chart, next to
22  the asterisk it says, used to be a lot more. Do you see
23  that?
24  A.  Yes, I do.

Page 31

1  Q.  What are some of the side effects of prednisone
2  usage?
3  A.  There are a lot of side effects.
4  Q.  Does prednisone have any effect on bones?
5  A.  Yes, it can.
6  Q.  And what effect can it have on bones?
7  A.  It can cause loss of calcium in bones.
8  Q.  Does it cause loss of bone density?
9  A.  They'd be related.
10  Q.  And are potential side effects from prednisone,
11  are the risks for the side effects increased at higher
12  doses?
13  A.  That's correct.
14  Q.  Is 20 milligram of prednisone considered a high
15  dose?
16  A.  It's a moderate dose.
17  Q.  Okay. There is another note just under that
18  medication chart says, I feel osteoporosis and
19  collapsing neck was from this. Do you see that?
20  A.  Yes.
21  Q.  Do you remember discussing anything related to
22  that topic with Mr. Harrison?
23  A.  Do I remember? No. I do not.
24  Q.  At the point when you were treating Mr.

Page 32

1  Harrison, did you feel that prednisone use had affected
2  his bones or his spine?
3  A.  I didn't know.
4          MR. HARRISON: I didn't hear that. Can you
5  repeat the question.
6          (Question and answer read)
7  Q.  I will flip forward two pages to the Bates
8  number 5.
9  A.  Yes.
10  Q.  This document is also dated 11-10-2003. Is that
11  right?
12  A.  That's correct.
13  Q.  And so would this have been the electronic
14  record of that first visit that you had with Mr.
15  Harrison?
16  A.  I believe that's the first visit. It looks like
17  the first visit.
18  Q.  Why does it look like the first visit?
19  A.  I have more complete information in there than I
20  would typically on a followup visit.
21  Q.  Okay. And under medical history?
22  A.  Yes.
23  Q.  Toward the end is listed osteoporosis. Do you
24  see that? Toward the end of that line.

Page 33

1  A.  Yes, I do.
2  Q.  How would you have made the determination that
3  he had osteoporosis?
4  A.  By history.
5  Q.  In other words, by what he had communicated to
6  you?
7  A.  That's correct.
8  Q.  And then just the next section down is surgical
9  history?
10  A.  Yes.
11  Q.  Starting on the first line of that, at the end
12  of that first line?
13  A.  Yes.
14  Q.  There is a note. ORIF, R femur, 1/03. What is
15  that language referring to?
16  A.  If there is a fracture of a long bone, like the
17  femur, that is an open reduction, meaning it was surgery
18  where they had to open up and expose the bone and then
19  internal fixation. Various kinds of hardware that hold
20  things together.
21  Q.  Okay. Is this relating to surgery that Mr.
22  Harrison had following a breakage of his right femur in
23  January 2003?
24  A.  Correct.

9 (Pages 30 to 33)

## Page 34

1  Q.  And then the second, just after that it says,
2  infected hardware, 3-03, with replacement of hardware
3  6-03. Do you see that?
4  A.  Yes.
5  Q.  So these events that you are noting in the
6  surgical history here had already transpired when you
7  began treating Mr. Harrison. Is that right?
8  A.  Yes.
9  Q.  And were you involved in any of that treatment?
10  A.  No, I was not.
11  Q.  Do you have an understanding of what happened
12  with respect to those procedures that Mr. Harrison had?
13  A.  No more than what's here. I don't have any
14  independent memory.
15  Q.  That was going to be my next question. Did you
16  review any of the medical records from Mr. Harrison's
17  other doctors relating to that treatment?
18  A.  I don't remember.
19  Q.  Would you have noted that, typically, in your
20  records or included that, any correspondence, in your
21  records?
22  A.  Not necessarily.
23  Q.  And same question. Do you remember speaking to
24  any of his other doctors about this treatment relating

## Page 35

1  to those procedures?
2  A.  Do I remember events from 2003? No, I do not.
3  Q.  Moving on -- well, actually, one more question
4  on that.
5      As far as you remember, did you have any other
6  sources of information relating to that femur breakage
7  and the following surgeries, other than what Mr.
8  Harrison told you?
9  A.  I don't remember if I did or did not.
10  Q.  And if you just flip one more page over, about
11  the middle of the page. There is an assessment?
12  A.  Yes.
13  Q.  And the assessment relates -- up at the top
14  there is a subtitle, spondylitis ankylosing?
15  A.  Yes.
16  Q.  Says the patient has long standing AS, fusion of
17  the spine and some peripheral joint problems. Do you
18  see that?
19  A.  Yes.
20  Q.  In that third to the last line in the middle it
21  says, he certainly needs to decrease steroid use. Do
22  you see that?
23  A.  Okay. The next to the last line.
24  Q.  I know. There is a it's a teeny bit --

## Page 36

1  A.  I got you.
2  Q.  I didn't want to be inaccurate.
3  A.  I see what you are referring to.
4  Q.  What was your concern there regarding the
5  steroid use?
6  A.  Steroids, like a lot of medicines, can be
7  associated with a number of side effects. And you are
8  always interested in what are the least amount necessary
9  is.
10  Q.  Were you concerned about any specific side
11  effects at that time?
12  A.  I don't remember.
13  Q.  If you flip to Bates page 8, and it looks like,
14  if you look at the top, this note is from a visit on
15  February 1, 2005. Is that correct?
16  A.  That's correct.
17  Q.  Again, down at the bottom under the assessment,
18  the first thing noted is, the patient's major problems
19  of 2003 with infected orthopedic hardware has quieted.
20      Was it your understanding that he was no longer
21  being treated for that issue at this time?
22  A.  I can't remember.
23  Q.  Okay. On the last line of this page, the last
24  two lines it says, I don't think he is a candidate for

## Page 37

1  biologic since his AS is not presently very active and,
2  especially, his tendency to infection.
3      What were you referring to relating to his
4  tendency to infection there?
5  A.  The history is in 2003, he had infected hardware
6  from treatment for right femur fracture.
7  Q.  And did you consider him to have tendency toward
8  infection because he had suffered that infection in
9  2003?
10  A.  Well, he had a significant infection in 2003.
11  Q.  Okay. Can you just explain briefly the
12  relationship between a potential for infection and a
13  biologic medication that you are discussing there?
14  A.  Biologic agents are medical interventions. They
15  can compromise the immune system.
16  Q.  So if you were concerned about infection in
17  someone as an issue, you would be hesitant or cautious
18  about using a biologic agent?
19  A.  Yes.
20  Q.  Is that what you were referring to in this note
21  here?
22  A.  Yes.
23  Q.  If you would skip forward to Bates 16. This
24  looks like a visit that is from May 15, 2006. Is that

James L. Wise, M.D.

Page 38

```
 1    right?
 2    A.    That's correct.
 3    Q.    And again, under assessment?
 4    A.    Yes.
 5    Q.    The second to last line.  There is a note.  His
 6    DEXA shows osteopenia?
 7    A.    Yes.
 8    Q.    Can you first tell us briefly what a DEXA is?
 9    A.    It is an abbreviation for an imaging technique
10    to measure bone density.
11    Q.    Okay.  His DEXA imaging showed osteopenia in
12    this case.  Is that right?
13    A.    That's correct.
14    Q.    How does osteopenia relate to osteoporosis?
15    A.    In measuring bone density, there are three
16    ranges.  One is a statistically derived normal range, a
17    statistically derived osteopenic range, and then a
18    osteoporosis range.
19    Q.    And osteoporosis is more severe than osteopenia?
20    A.    That's correct.
21    Q.    So at this point, does he have osteoporosis?
22    A.    He has osteopenia.
23    Q.    And then continuing on on page 25.
24    A.    Okay.
```

Page 39

```
 1    Q.    And again, down at the bottom -- sorry.  Let me
 2    just put on the record up at the top, it looks like this
 3    is a record from a visit on July 24, 2008?
 4    A.    Correct.
 5    Q.    And down at the bottom under assessment it says,
 6    Dennis states he is doing better with the use of
 7    naproxen.  However, the improvement is as likely due to
 8    self-adjustment of prednisone.  We discussed again the
 9    concerns of continued use of prednisone and osteopenia,
10    as well as other corticosteroid ADR's?
11    A.    Yes.
12    Q.    And you say his improvement was likely due to
13    his self-adjustment of prednisone.  What was your
14    understanding of what happened there?
15    A.    I don't remember independently.
16    Q.    Just based on what you see in this note, what
17    would that note have referred to?
18    A.    That he self-adjusted the dose of prednisone.
19    Q.    That he would have raised the dose of
20    prednisone?
21    A.    Raised it, lowered it.  I guess the concern here
22    would be that he raised it.
23    Q.    The concern would be that he raised the dose of
24    prednisone?
```

Page 40

```
 1    A.    Right.
 2    Q.    And then when you say we discussed again the
 3    concern with continued use of prednisone with
 4    osteopenia, what was the specific concern there with
 5    respect to continued used of prednisone and osteopenia?
 6    A.    Well, loss of calcium from the bone, less bone
 7    density.
 8    Q.    So a continuation or a worsening of the
 9    condition.  Is that right?
10  · A.    That's correct.
11    Q.    And then flip forward to 33.  If you look at the
12    top visit, it looks like a visit of August 24, 2009?
13    A.    Correct.
14    Q.    If you want to flip through a few pages, because
15    what I will ask you, it appears to me that this is the
16    last record you have in this chart of an office visit
17    that you had with Mr. Harrison?
18    A.    I believe that is correct.
19    Q.    It looks like to you that this would have been
20    the last office visit with Mr. Harrison.  Is that right?
21    A.    Yes.
22    Q.    And did he leave your practice around that time?
23    A.    I don't know.
24    Q.    Okay.  Do you have any independent recollection
```

Page 41

```
 1    of him actually leaving your practice?
 2    A.    I vaguely remember that he moved from the area.
 3    Q.    Okay.  And what contact did you have with him
 4    after this visit?
 5    A.    I don't remember independently.
 6    Q.    And in Exhibit 3, which is the stacked papers
 7    you brought with you, it looks like Exhibit 3 contains
 8    phone messages that would have come into your office, as
 9    opposed to Exhibit 4, which does not look like it
10    contains phone messages.
11    A.    That may be the case.
12    Q.    If a phone message had come into your office
13    from Mr. Harrison at any time during your treatment,
14    would it have typically been put in the electronic
15    records?
16    A.    I try to include most phone conversations.  If
17    they are cursory and have nothing to do with my medical
18    care, I often do not put it in.
19    Q.    And so aside from what is reflected in Exhibit
20    3, which may include some phone messages, and the chart
21    also in Exhibit 4, which is similar to what's in Exhibit
22    3, do have any independent recollection of contacts that
23    you had with Mr. Harrison since the time of your last
24    office visit?
```

11 (Pages 38 to 41)

James L. Wise, M.D.

## Page 42

1 A. No, I do not.
2 Q. I will just state before we move on to a
3 different topic, I don't have that much on the other
4 topic, and it's all I have. So we can take a short
5 break or keep going. I didn't want to launch into it if
6 anyone wants one.
7 A. I'm okay.
8 MR. HARRISON: Okay.
9 MS. PISTILLI: I would like to mark Exhibit
10 5 for ID.
11 (Defendant's Exhibit 5 was marked for ID)
12 Q. This is what's been marked as Exhibit 5, and if
13 you just take a look at it, it's a document dated
14 November 28, 2008 up at the top right. Is that correct?
15 A. Yes.
16 Q. If you flip to the back page of the document I
17 just handed you, Bates page 24, is that your signature
18 in the middle of the page?
19 A. Yes.
20 Q. It looks like it's dated 12-11-2008. That is
21 your signature?
22 A. That's correct.
23 Q. And did you -- do you have a copy of this
24 document that you brought with you today?

## Page 43

1 A. Yes, I do.
2 Q. Can I take a look at that to make sure that they
3 are similar?
4 (Counsel examines the document)
5 Q. The copy that you brought with you, how did you
6 have possession of that copy that you brought with you?
7 A. From you via Mr. Kellar.
8 Q. Via your attorney?
9 A. Yes.
10 Q. Did you retain a copy of that document that you
11 had signed independently?
12 A. Not that I could locate.
13 Q. And did you search your office files for it?
14 A. I looked for it. I could not find it.
15 Q. And when did you first see this document?
16 A. Independently, I don't remember. That is my
17 signature and it's dated then, so it was in that time
18 period.
19 Q. So sometime in the time period of December,
20 2008. Is that right?
21 A. November to December, yes.
22 Q. And how did you receive this document at that
23 time period?
24 A. I don't remember exactly. However, I have a

## Page 44

1 vague memory Mr. Harrison actually delivered it.
2 Q. Your memory is that Mr. Harrison delivered it in
3 person?
4 A. It's a vague memory.
5 Q. Do you have a memory of any conversation you had
6 with him about it?
7 A. There must have been a conversation. I don't
8 remember the conversation.
9 Q. Do you know who prepared this document?
10 A. I believe Mr. Harrison prepared it.
11 Q. Did you have any role in preparing it?
12 A. No, I did not.
13 Q. Did Mr. Harrison ask you for your signature on
14 the document?
15 A. Yes, he must have.
16 Q. Did he tell you why he was asking for your
17 signature?
18 A. I don't independently remember.
19 Q. Did he tell you anything about his lawsuit at
20 that time?
21 A. I have vague memories of Mr. Harrison referring
22 to pursuing a lawsuit. I don't remember details.
23 Q. Did you ask Mr. Harrison how he had prepared
24 this document?

## Page 45

1 A. I don't remember.
2 Q. When Mr. Harrison asked you to sign it, did you
3 sign it at that time or did you sign it some time later?
4 A. I don't remember.
5 Q. Did he give you any additional materials aside
6 and -- actually, let me back up.
7 If you turn to the last page, it's 24 pages?
8 A. Right.
9 Q. Is that right?
10 A. That's correct.
11 Q. Did you receive all 24 pages that are in this
12 stack from Mr. Harrison, as far as you recall?
13 A. I can't say that I recall.
14 Q. Did he give you any materials other than this
15 packet at the time of this request?
16 A. I don't remember.
17 Q. You do not remember one way or the other?
18 A. Right.
19 Q. Did you have any materials in your files that he
20 would have given you?
21 A. No.
22 Q. Would you retain those materials if he had given
23 them to you?
24 A. Not sure.

12 (Pages 42 to 45)

James E. Wise, M.D.

Page 46

1  Q.    Did you read each of these 24 pages before you
2  signed it?
3  A.    I don't remember.
4  Q.    How long did it take you to review this document
5  before you signed it?
6  A.    I don't remember.
7  Q.    Did you do any additional research on your own
8  aside from what's contained in this document at the time
9  that you signed it?
10  A.    Talking about events four years ago. I don't
11  remember.
12  Q.    Did you do anything to verify that the
13  information contained within this document was accurate?
14  A.    I don't remember that being the case.
15  Q.    You do not remember doing that?
16  A.    No.
17  Q.    Do you know whether Mr. Harrison asked any of
18  his other physicians to sign this same report?
19  A.    I don't know.
20  Q.    Why did you decide to sign this document?
21  A.    Because I thought -- I obviously reviewed it. I
22  don't believe I would have signed it without reviewing
23  it. And I believe that Mr. Harrison presented a
24  timeline of events that seemed to suggest an association

Page 47

1  between many medical problems he had and the use of the
2  medication. And then he also included independent
3  information.
4  Q.    Let's turn to page 24.
5  A.    24?
6  Q.    Yes. In the middle of that paragraph, there is
7  a heading called "reasonable degree"?
8  A.    Yes.
9  Q.    The second sentence says, in the case of Mr.
10  Harrison and his allegations in regard to his right
11  femur and based upon the information provided here and
12  in my records, it would appear his lack of sufficient
13  femur, healing correlates with a reasonable degree of
14  medical probability from his use of Vioxx.
15    Do you see that?
16  A.    Yes, I do.
17  Q.    What was your interpretation of the phrase,
18  reasonable degree of medical probability, that was used
19  here?
20  A.    Well, in this document he presented a timeline
21  and associations that seemed to be more than just
22  pure chance. That's how I would define reasonable.
23  Q.    With respect to materials Mr. Harrison presented
24  to you in this packet, was it a timeline of events

Page 48

1  regarding Vioxx usage and his alleged injuries that were
2  the primary basis of your opinion?
3  A.    Well, that certainly raised the question. There
4  being an association. And then he presented independent
5  medical information that also advised as to possible
6  complications between Vioxx and healing.
7  Q.    And are you referring to in this document
8  excerpts of medical articles that he has pasted into
9  here?
10  A.    That's correct.
11  Q.    Did you independently review any of those
12  articles?
13  A.    I don't remember.
14  Q.    Did you do any medical research at the time
15  relating to the topic of Vioxx and bone healing?
16  A.    I don't remember.
17  Q.    Again, you did not treat Mr. Harrison directly
18  for his femur fracture that he is referencing in that
19  paragraph that you signed on page 24 of this report. Is
20  that right?
21  A.    That is correct.
22  Q.    Do you have any opinion as to whether Mr.
23  Harrison actually experienced any insufficient bone
24  healing in his femur?

Page 49

1  A.    I generally accept histories from patients as
2  being accurate.
3  Q.    So you were basing that on your understanding of
4  Mr. Harrison's history coming from Mr. Harrison. Is
5  that right?
6  A.    That is correct.
7  Q.    In your records that we reviewed a little
8  earlier, you discussed the 2003 fracture and the
9  following surgeries. Do you remember that?
10  A.    Well, you asked me what ORIF meant.
11  Q.    Yes. You mentioned infected hardware in your
12  notes?
13  A.    That's correct.
14  Q.    And you did not mention any lack of bone healing
15  in your notes. Is that correct?
16  A.    Yes.
17  Q.    Is there a reason why that would not have been
18  reflected in your records?
19  A.    It probably was not mentioned initially when I
20  saw him.
21  Q.    Prior to receiving this report, this document
22  from Mr. Harrison, had he mentioned to you that he felt
23  his bones, his femur had not healed sufficiently?
24  A.    Do I remember specific times when he might have

## Page 50

1 mentioned that?  No.
2 Q.    If he had mentioned that to you in connection
3 with his treatment by you, would you have included that
4 in your medical records?
5 A.    Not necessarily.
6 Q.    Do you believe that the infection in Mr.
7 Harrison's femur could have been the cause of the
8 hardware failure that he experienced in the area of that
9 fracture?
10 A.    That can be a cause.
11 Q.    Is an infection alone, like the one Mr. Harrison
12 had, enough to cause the types of complications that Mr.
13 Harrison had following his right femur breakage?
14 A.    Well, an infection in any joint replacement is a
15 very serious problem and often results in a fair degree
16 of morbidity, long-term antibiotics and often removal of
17 the hardware ultimately.
18 Q.    Those are the things that happened in Mr.
19 Harrison's case.  Is that right?
20 A.    From his history, yes.
21 Q.    And it's Mr. Harrison's position in this
22 litigation that his hardware that was initially inserted
23 to fix the femur fracture failed prior to any infection
24 developing in his leg and the failure of the hardware

## Page 51

1 caused the infection to develop.  Do you have any
2 opinion as to whether Mr. Harrison's leg became infected
3 prior to the hardware failing or whether the hardware
4 failed prior to infection beginning?
5 A.    I do not know.
6 Q.    You do not have any opinion?
7 A.    No.
8 Q.    Is it your opinion that Vioxx contributed to
9 insufficient bone healing in Mr. Harrison's femur?
10 A.    From the information presented, yes.
11 Q.    And the information presented, by that are you
12 referring to this?
13 A.    The document put together by Mr. Harrison.
14 Q.    And is there any other basis on which you are
15 basing that opinion?
16 A.    As I said before, he presents a timeline where
17 it certainly raises the question of there being a
18 relationship and then the additional medical information
19 showing that there can be a problem with healing and
20 Vioxx.
21 Q.    Again, referring to the information that was
22 provided within those 24 pages that Mr. Harrison
23 provided you?
24 A.    That is correct.

## Page 52

1 Q.    Do you feel the infection in Mr. Harrison's
2 femur is a more likely cause of his hardware failure and
3 complications than the usage of Vioxx?
4 A.    I'm unclear as to what is meant by hardware
5 failure.
6 Q.    Mr. Harrison in his lawsuit refers to -- let me
7 back up.  There was -- the records in this case reflect
8 that Mr. Harrison had a piece of orthopedic hardware
9 inserted to fix the femur, and he also had hardware in
10 his right hip that was close to the femur breakage from
11 his prior hip replacement.  Is that consistent with your
12 memory of the situation or consistent with the records?
13 A.    Well, with the records.  Not my memory.
14 Q.    Okay.  And Mr. Harrison's allegations relate to
15 what he calls the failure of that hardware.
16 A.    I think it's more than just the failure of the
17 whole procedure.
18 Q.    Fair enough.  And the question that I was trying
19 to ask you before, do you think it is more likely that
20 the infection was the cause of the failure of the
21 procedure than Vioxx being the cause?
22 A.    I don't know.  I was not in attendance during
23 the time that he had this problem.
24 Q.    So you do not have an opinion on that one way or

## Page 53

1 the other?
2 A.    It certainly did not help him.
3 Q.    The infection did not help?
4 A.    Right.
5        MR. HARRISON: I want that to be one of the
6 things that I talk about at the end.  It has to be.
7        MS. PISTILLI: I will continue.
8        MR. HARRISON: Yes.  I thought that was
9 misleading.  I thought that was very misleading.  I
10 object to form.
11        MS. PISTILLI: Your objection is noted.
12 Q.    If Mr. Harrison's other physicians who treated
13 his femur breakage and subsequent surgeries relating to
14 his femur and hip expressed an opinion as to the cause
15 of Mr. Harrison's complications following the femur
16 breakage, would you defer to their medical opinion?
17 A.    I would be interested in it.
18 Q.    Would you want to hear what they had to say
19 based on their care of Mr. Harrison for that specific
20 issue?
21        MR. HARRISON: I object, but continue?
22 A.    At this point, not particularly.
23        MR. HARRISON: Was form duly noted?
24        MS. PISTILLI: Yes, sir.

Page 54

1  Q.   Do you believe long-term prednisone usage plays
2  a role in the complications following his right femur
3  breakage?
4  A.   Not sure.
5  Q.   You do not have an opinion one way or the other?
6  A.   I don't know.
7  Q.   Does prednisone make someone using prednisone
8  more susceptible to infections?
9  A.   It's one of the problems with prednisone or
10  corticosteroids.
11  Q.   And is it possible that Mr. Harrison's
12  prednisone usage could have exacerbated the infection in
13  this case?
14  A.   A lot of things are possible.  I don't know.
15  Q.   Does the underlying AS condition, would that
16  play any role -- could that have played any role in the
17  complications Mr. Harrison experienced following his
18  femur breakage?
19  A.   Unlikely.
20  Q.   Other than signing this report marked as Exhibit
21  5, I believe, have you ever recorded in writing your
22  opinions regarding Vioxx and Mr. Harrison's femur
23  complications?
24  A.   I don't believe so.

Page 55

1  Q.   Is it correct there is no mention in your
2  medical records about Mr. Harrison that you thought that
3  Vioxx could have played a role in interrupting his femur
4  healing?
5  A.   I didn't make any comment in that regard.
6  Q.   Why not?  Why would that have not been recorded?
7  A.   Not sure.  Do not remember.
8  Q.   The document that you signed that we've marked
9  as -- I will double check here -- Exhibit 5?
10  A.   Yes.
11  Q.   Relates only to the injury to Mr. Harrison's
12  right femur and the complications that -- the surgeries
13  following that.  Is that correct?
14       MR. HARRISON:  Could you repeat that?
15       MS. PISTILLI:  I would like to ask it
16  better anyway.
17       MR. HARRISON:  Okay.
18  Q.   The document you signed, Exhibit 5, relates only
19  to the injuries that Mr. Harrison is alleging,
20  specifically as to his right femur?
21  A.   No.  He also lists lumbar fusion.
22  Q.   And just if you turn back to page 24, and the
23  paragraph that you signed?
24  A.   Yes.

Page 56

1  Q.   The sentence in the middle, in the case of Mr.
2  Harrison's allegations in regard to his right femur,
3  based on the information provided here and in my
4  records, it would appear his lack of sufficient femur
5  healing to correlate with a reasonable degree of medical
6  probability from the use of Vioxx.  Do you see that?
7  A.   Yes.
8  Q.   By signing this document, were you intending to
9  offer an opinion for any other injury aside from his
10  right femur allegations?
11  A.   I don't remember.
12  Q.   And Mr. Harrison made allegations in his
13  litigation that Vioxx caused his 2001 lumbar fusion
14  surgery to fail, that Vioxx caused his wrist to slowly
15  fracture and/or disfigure over time, and Vioxx
16  potentially caused him to develop osteoporosis, if he
17  does have osteoporosis.  My question to you is, are you
18  offering any opinion regarding those three injuries?
19  A.   I have no independent recollection of those
20  issues you just mentioned.
21  Q.   You do not have an opinion as to whether Vioxx
22  played a role in any of those injuries?
23  A.   I don't have an opinion one way or the other.
24  Q.   Do you have an opinion one way or the other as

Page 57

1  to whether Mr. Harrison actually suffered those
2  injuries?
3  A.   I don't have any independent recollection right
4  now of those particular problems.
5  Q.   Okay?
6  A.   I have no independent recollection of it.
7  Q.   Do you have any opinion as to -- are you
8  expressing any opinion that he did or did not suffer
9  those injuries?
10  A.   I am not expressing an opinion because, as I
11  said, I don't have an independent recollection of those
12  issues.
13  Q.   Got it.
14  You do not hold yourself out as an expert in the
15  safety of Vioxx medication, do you?
16  A.   I am not an expert specifically in the use of
17  Vioxx.
18  Q.   Have you ever performed a study on the safety of
19  Vioxx or participated in any studies regarding Vioxx?
20  A.   I don't believe so.
21  Q.   Have you ever published any articles relating to
22  Vioxx?
23  A.   No.
24       MR. HARRISON:  Objection to form on the

From:     Dennis Harrison;                               11/28/2008
              6a Short Street
              Catskill NY,    12414
              845-231-3272; dharrison6@hvc.rr.com

To:       **Dr. James L. Wise, M.D.**
             **Rheumatalogist**
             **78 Maiden Lane**
             **Kingston, NY   12401**

**Dear Dr. Wise:**

As you know a bit of, I have been involved (2+ years) in litigation with Merck Inc. (only) in re to allegations for lack of proper warnings in re to Vioxx and the alleged impact of bone/spine healing. In addition to this cover letter, I am enclosing much supporting information. I felt it best to take the time to properly outline the details of renown research institutions, my overall good health, prior orthopedic successes, Vioxx ingestion, event timing, etc.

The current Vioxx litigation is now going through a step to separate <u>potential valid claims from those without any merit</u> at all. This means basically <u>REASONABLE POTENTIAL OF CAUSATION</u> versus not reasonable. It is not definitive and per the courts, is one more step in providing a streamlining of the process and negotiations to continue to take place on a private basis as much as possible without court intervention.

Merck litigation continues to strive towards private "settlement", and I am more than open to that concept when approached fairly. As I will repeat several times, it did not, does not, and will not involve any physicians or surgeons, who, per my view, absolutely were note provided the information that they needed.

**I am requesting a review of what I have diligently, with only honesty and fairness, spent a great deal of effort on, and shall you find it acceptable, I am requesting a signature (last page of Attachment A) on a REASONABLE and/or CONTRIBUTORY view in regard to Vioxx (a Cox-2 inhibitor) and the inadequate bone repair I experienced. This is NOT requesting you to provide a 100% definitive view.** You know me well and I assume that by now understand that I feel blessed with only the finest care by ALL of my physicians and surgeons. In fact, it remains quite remarkable in today's day and age. I struggled if I was "allowed" to state this, but frankly I feel that the "truth trumps" and I ought to be allowed to state that which is frankly, quite true. Also, in that regard to ensure the objectivity of my research, you will find that I have signed a claim of a 100% honest view of all of the detailed information I am providing, and a 100% waiver of any liability for any physician or surgeon involved in my care, and of course this includes yourself.

It is important to note, and it is in my records – I DID NOT have any infection AT all; either <u>going into</u> the initial operation at Benedectine, <u>during</u> the operation, <u>nor even during the first month</u> of what was entirely expected to be a routine recovery. The femur hardware had come apart well before any evidence at all of any infection. Also, please remember that <u>I did not (and do not)</u> have Osteoporosis. I was in very good physical condition and my medical care continued to be outstanding. I stress the above to **ensure the issue of infection is not confused with** that which came significantly **AFTER** the first femur operation (Kingston) which very unexpectedly went from a routine operation with no complications to one that ended in inadequate healing and broken hardware. The infection, and it is documented, **came significantly after that.**

Regardless, even if one were inclined to healing issues, which all of my records clearly indicated was **not the case (pre-Vioxx)**; the evidence in the attachments clearly would call for STOPPING it during fracture or orthopedic operation recovery. Merck provided no such warning, that is FACT, and neither the physicians, surgeons, nor the patients themselves had any reason to be suspicious of the issue. Please remember the terms of the signature I am requesting and shall repeat: **REASONABLE – CONTRIBUTORY.** As you will see well respected, and renowned, Independent Research (subset attached) clearly indicates the issue of utilizing a Cox-2 inhibitor such as Vioxx, and how it (allegedly) interferes with bone and spine healing. It is vital to know that:

        **1 – without question, and again it is documented, <u>until Vioxx was introduced</u> I had been a VERY <u>QUICK</u> person to recover.** Each of my operations without Vioxx was 100% successful and I recovered very quickly

1

M013804358

(near record time several times I was told). The plain FACT is that the exact opposite was the case with the introduction of Vioxx in the marketplace and my use of it.

   2 - I did not, and DO NOT, have Osteoporosis. Nor did I (or do I) drink or smoke.

   3 - I never had any issues or complications with any orthopedic operation <u>before</u> Vioxx use, <u>even the very major cervical fusion (Boston) highly dependent upon proper fusion</u> which was <u>only</u> 13 months before the first issue with healing problems (the RODs). Also, though the signature I am requesting here is in regard to the broken femur, "oddly" enough the very first "preview" of bone healing issues was the lumbar operation, documented in Albany, NY. It was the very first operation in which Vioxx was ingested. Of course, that operation (lumbar) is not the issue here (i.e. issue here is femur), it is only provided for reference. Also, my records DO SHOW that other than arthritis, I have been in otherwise **excellent health, I DO NOT have Osteoporsis** and have tested recently (twice) with BMD indicating mild-mid range Osteopenia, which of course is now 5+ years after the issue of the broken femur. As is well established, Osteoporosis would thus not be indicated at the time of the broken femur, as it simply does not improve. Today's medical efforts are to slow its progress.

   **4 – the acute inflammatory stage of a bone-spine fracture or operation is the first few weeks; that is when the Osteoclasts and Osteoblasts, stimulated by Prostglandalin "go to work".** The highly potent Prostglandalin inhibiting impacts of Cox-2 inhibitors are now documented to significantly impact the healing process. Many Independent Research studies, by <u>renowned institutions</u> consistently now come to this conclusion.

   5– physicians and surgeons were also not informed by Merck. Merck just did not, and will not yet even merely take a position on it.

   6– **within the last year, Merck has reached a private settlement in re to MI/stroke issues. Those issues were so vast and growing, nearly 200,000 individuals were impacted it was a responsible thing to do; and as you know Vioxx has been taken off of the market.** The research I have spoken of includes among many other very respectable institutions - <u>Hospital for Special Surgery, Stanford, Boston Medical, Washington University, Section of Spinal Surgery - Cleveland Clinic Foundation,</u> etc. Apparently, Merck continues not to take a position, either way, on the bone and spine "issue", and now I and my family suffer for it.

   7 – My understanding is that Merck retains the right to "settle" inside or outside of the settlement terms ANYONE it wishes to.

   8 –  As stated, I am <u>not requesting a definitive view</u> – in fact, obviously in spite of all of the independent research but the fact that Merck just will not yet maintain a formal position on the issue – pro or con -  a definitive view cannot be readily obtained. One must look upon the overall timing of events in order to provide that REASONABLE view. I believe that the FACTS speak for themselves - my **otherwise very good health, the timing** of my Vioxx ingestion, the events, the past and future circumstances, and how I so **rapidly and unexpectedly** turned from a **very good healer, into a poor healer,** was impeccably timed with the introduction of Vioxx in the market. It is just so **CONTRARY** as to how I had been doing in orthopedic operations and in general the very good health, except for arthritis that I had been in.

Thus, if you feel a **REASONABLE view is appropriate,** and it involves **NOT** one single surgeon nor physician, please kindly sign. Of course, I am inclined to a reasonable private settlement as seems to be the general wishes of Merck itself. A reasonable view of causation <u>may</u> allow this and permit me to get it out of the court system entirely, but only time will tell.

If you have any questions at all, please do not hesitate to contact me at your convenience. Thank you for you time and consideration in this and in the care you have provided me.

Sincerely


Dennis Harrison


2

M01380/4359

I certify all of the above/below items to be true. I am asking surgeon/physician signature as to REASONABLE PROBABILITY based upon what I am providing in the letter/attachments The signatures may or may not rely on other information. Not one single physician or surgeon has been even considered in my litigation and that shall remain so, period. In understanding the reluctance now a days for any signature, which I can understand – I hereby nevertheless again specify that NOT ONE SINGLE PERSON, physician, surgeon, physical therapist, or otherwise medically or non-medically related individual is implicated. Further, the signature below shall be considered as now and permanently holding all said individuals and not within the scope of the litigation. This is a complete release of all claims to third parties mentioned above should they feel the need, and even if they should not feel the need!

_____     __/__/ __
        Dennis Richard Harrison

## REASONABLE DEGREE

The Vioxx litigation requirements which the litigants needs to obtain from their physicians requires a **REASONABLE** degree of medical probability that Vioxx caused the injury claimed by the litigant. In the case of Mr Harrison and his allegations in regard to his right femur, and based upon the information provided here and in my records, it would appear his lack of sufficient femur healing to correlate with a **REASONABLE** degree of medical probability from his use of Vioxx Folowing the pagragraph of which the court, at this time requires a medical opinion includes the attestations that the request of 26(a)(2) (below) require.

Based upon that which Mr. Harrison has brought to my attention, and my knowledge of him as I have explained, I believe that a **REASONABLE**  degree of medical probability does exist in Mr. Harrison's case.

_____

**Dr. James L. Wise, M.D.**
**Rheumatalogist**
**78 Maiden Lane**
**Kingston, NY   12401**

A Rule 26(a)(2) case specific expert report from a medical expert attesting (i) to a reasonable degree of medical probability that the Plaintiff or Claimant suffered an injury and (ii) that Vioxx caused the injury.  The case specific expert report must include (i) an explanation of the basis of the attestation that Vioxx caused the Plaintiff or Claimant to suffer the injury, (ii) an identification of any other causes that were considered in formulating the opinion, (iii) a description of the specific injuries allegedly suffered; (iv) a description of the specific medical findings that support the diagnosis of those injuries; and (v) and identification of all documents relied on by the expert in forming his opinions.

### REASONABLE degree as indicated

i – Explanation via correlation of Vioxx usage, event timing  and overall operation(s) failure/success
ii – No clinical or symptoms of infection not documented as causation for bone not healing either in
(failure) KINGSTON (BENEDECTINE), (failure) ALBANY MEDICAL CENTER and of course not
   during the successful RIDGEWOOD, NJ Operation.
iii – Injury well documented; fractured femur
iv – Medical findings of broken femur; also inadequate bone healing in X-Rays
v – Ridgewood Records, records as indicated in this letter certified by Mr. Harrison, attachments

3

M01380-0360

# Attachments

### A - _REASONABLE_ degree discussion

_Signature of Reasonable View – **last page**_

Purpose: to re-familiarize the history.

### B – Independent Research

Several articles high points quoted form well known institutions and research centers.  One will find one after another converging on the same reasons of how cox-2 inhibition will interfere with bone and spine healing.

### C – Science of Vioxx and bone/spine healing

Explanation of the bone healing process from published literature.

### D – Chronology; Dennis Harrison – overall health, Vioxx ingestion, timing of events for the following:

* Note that all operations WITHOUT Vioxx usage succeeded; ALL WITH Vioxx failed

| | | |
|---|---|---|
| 1 -  Left hip (HSS - NYC, NY) | SUCCESSFUL | no Vioxx usage |
| 2 - Right hip (RIDGEWOOD VALLEY - NJ) | SUCCESSFUL | no Vioxx usage |
| 3 - Cervical fusion  (NE BAPTIST- Boston, MA) | SUCCESSFUL | no Vioxx usage |
| 4 - Lumbar fusion (NE BAPTIST – Boston, MA) | ----FAILURE---- | Vioxx UTILIZED |
| 5 - Broken femur (1st op; Kingston, NY) | ----FAILURE---- | Vioxx UTILIZED |
| 6 - Femur op (RIDGEWOOD VALLEY, NJ) | ----SUCCESS---- | bone regeneration need bypassed – Dr. Pizzurro technique. |

4

MO1380361

## ATTACHMENT A - *REASONABLE degree discussion*

Please let me start, with a subset of several of the attachments just to quickly re-familiarize the history, as well as provide some highlights from just a very small amount of Independent Research, which is available. More detail follows in the actual attachments.

Note that all operations **WITHOUT** Vioxx usage succeeded; ALL **WITH** Vioxx failed

| From Attachment (D) – *Chronology& History* | | |
|---|---|---|
| 1 - Left hip (HSS) | SUCCESSFUL | no Vioxx usage   5/95 |
| 2 - Right hip (RIDGEWOOD VALLEY) | SUCCESSFUL | no Vioxx usage   7/95 |
| 3 - Cervical fusion  (NE BAPTIST) | SUCCESSFUL | no Vioxx usage   10/99 |
| 4 - Lumbar fusion (NE BAPTIST) | ----FAILURE---- | Vioxx UTILIZED  1/01 |
| 5 - Broken femur "routine op." (1ˢᵗ op; Kingston, NY) | ----FAILURE---- | Vioxx UTILIZED  2/03 |
| 6 - 3ʳᵈ femur op (RIDGEWOOD VALLEY) | ----SUCCESS---- | bone regeneration need bypassed |

The timing of my Vioxx ingestion, the Independent Research of many very well known institutions (**Hospital for Special Surgery (HSS), Stanford University, Boston Medical University**, and many more), as well as the "**SCIENCE OF COX-2 and BONE HEALING**" should help provide the information that has been unfortunately maintained "under the radar" and within "muddy waters" by Merck.

5

M01360 4362

**From Attachment (B)** - *Independent Research*



..."*It's time to tell the public*"... Einhorn TA. – Professor & Chairman, Department of Orthopedic Surgery, Boston University Medical Center...*this is due to the inhibition of Cox-2 and not COX-1! Vioxx is a Cox-2 inhibitor.*



**FEBRUARY 02, 2005 - HSS PHYSICIANS REVIEW LITERATURE ON THE SAFETY COX-2 INHIBITORS -** ... we can conclude that the use of NSAIDs/COX-2 inhibitors effect fracture h and spine fusion...specifically, administration of NSAIDs/COX-2s should be delayed for three to four weeks fracture healing and should never be used in the case of spinal fusion... we can conclude that the use of NSAIDs/COX-2 inhibitors effect fracture healing and spine fusion



Journal of Bone and Mineral Research - *COX-2 inhibitors Decrease Bone Healing...*

O'Keefe R et al. Ann NY Acad Sci 2006; 1068:532-42. - "COX-2 has a critical role during incorporation of structural bone allograft" (findings indicate that COX-2 dependent PGE2 production in the early stage of bone healing is needed for efficient skeletal repair and is essential for bone allograft incorporation; COX-2 inhibitor (Celecoxib or Ketorolac) reduced bone formation and bony ingrowths)

STANFORD UNIVERSITY   Researchers Show COX-2 Inhibitors Interfere With Bone Growth, Healing Bone Fractures...*Cox-2 Inhibitors interfere with bone growth and, healing...*

JOURNAL OF CLINICAL INVESTIGATION: David Douglas NY (Reuters Health)...**Essential Role in Bone Repair;** Dr. Regis J. O'Keefe told Reuters Health that "during fracture healing, stem cells around the area of the broken bone need to differentiate, or turn into bone cells. Our studies show that the enzyme **COX-2, which is inhibited by nonsteroidal antiinflammatory drugs and the coxibs, is necessary for this process of bone cell differentiation.**" ... "While it was initially thought that COX-2 was only important in inflammation, our studies establish COX-2 as a critical and necessary factor for normal bone repair," Dr. O'Keefe said. J Clin Invest 2002;109:1405-1415

The next attachment sub-sets describes the process of bone – spine healing. Note the extremely critical time frame of the first few weeks I was taking Vioxx (first operation in Kingston, NY), had NO infection, and was in otherwise very good health. Even the failed RODS – the first was within 3-4 weeks (also) and the 2nd via tests was determined to be from inadequate healing which finally broke the last ROD. Notably, that was the first operation which failed, and the **FIRST** one in which I had been taking Vioxx. Note the cervical operation only one year before the lumbar was 100% successfully fused, and out of hospital in less htan 48 hours.

**From Attachment (C)** - *Vioxx and bone healing- Science of Vioxx*

**Thomas A Einhorn** - Professor and Chairman, **Department of Orthopedic Surgery, Boston University** Medical Center, Boston, Massachusetts, USA: *Arthritis Res Ther* 2003, 5:5-7doi:10.1186/ar607 Prostaglandins... known to mediate inflammation and shown to have effects on bone formation and resorption, are essential in bone repair... are important mediators of bone repair, and cyclooxygenases are required for prostaglandin production ... The role of COX-2 in bone repair has received recent attention because drugs that inhibit prostaglandin production have been shown to inhibit experimental fracture healing. **Please note that Thomas A. Einhorn was a paid consultant for Merck.**

6

M01390433

**Attachment (C) - continued**

## Principles of bone healing - IAIN H. KALFAS, M.D., F.A.C.S.

*Department of Neurosurgery, Section of Spinal Surgery, Cleveland Clinic Foundation, Cleveland, Ohio*

BONE HEALING PROCESS: process of bone graft incorporation in a spinal fusion model is similar to the bone healing process that occurs in fractured long bones…Healing occurs in three distinct but overlapping  stages: 1) the early inflammatory stage; 2) the repair stage; and 3) the late remodeling stage.9,13 In the inflammatory stage, a hematoma develops within the fracture site during the first few hours and days. Inflammatory cells (macrophages, monocytes, lymphocytes, and polymorphonuclear cells) and fibroblasts infiltrate the bone under prostaglandin mediation. This results in the formation of granulation tissue, ingrowth of vascular tissue, and migration of mesenchymal cells. The primary nutrient and oxygen supply of this early process is provided by the exposed cancellous bone and muscle. The use of antiinflammatory or cytotoxic medication during this 1st week may alter the inflammatory response and inhibit bone healing. The early inflammatory stage may be adversely altered by the administration of anti-inflammatory agents.

### Effects of Nonsteroidal Anti-Inflammatory Drugs on Bone Formation and Soft-Tissue Healing
*Laurence E. Dahners, MD and Brian H. Mullis, MD*

Dr. Dahners - Professor, Dpt. of Orthopaedics, University North Carolina School of Medicine, Chapel Hill, Dr. Mullis is Resident, Department of Orthopaedics, University of North Carolina School of Medicine.
Nonsteroidal anti-inflammatory drugs continue to be prescribed as analgesics for patients with healing fractures even though these drugs diminish bone formation, healing, and remodeling. Inhibition of bone formation can be clinically useful in preventing heterotopic ossification in selected clinical situations …. When fracture healing or spine fusion is desired, nonsteroidal anti-inflammatory drugs should be avoided. Some nonsteroidal antiinflammatory drugs have a positive eff on soft-tissue healing; they stimulate collagen synthesis and can
increase strength in the early phases of repair during skin and ligament healing. Cyclooxygenase-2 inhibitors have an adverse effect on bone healing and may have an adverse effect on ligament healing.

(NOTE: by Dennis Harrison – note all of the above indicating that the inflammatory phase is required to stimulate healing process). Vioxx is among the most powerful cox-2 anti-inflammatory).

The current Vioxx litigation, of which I am "pro se", is now going through a process to separate <u>potential</u> valid claims from <u>no reasonable reason to suggest causation</u> meleterious claims. I am providing significant information from the actual experience(s), Independent Research, and the "SCIENCE OF VIOXX". I understand that time has gone by and my records are large enough that it would take one hours and hours to review it all. Therefore, this seems like the most expeditious approach, and of course your opinion would then be based with it as input. <u>I am signing that all that I am explaining to be true to the very best of my knowledge</u>, and understand that your decision would then be viewed within the context of which I say is sworn to be true.  I am providing Independent Research results (capsulated) because Merck has taken no position on the bone and spine healing problems alleged.  I especially need a <u>REASONABLE</u> view, as unlike the mi/stroke issues admitted too by Merck; Merck has never acknowledged that (nor taken any position in which I can find) which has become increasingly evident by Independent Research and Medical Authorities.

_____
Dennis Harrison

7

M01380/4364

# SUMMARY

While there may be some redundancy here, it is important to IMMEDIATELY discuss some FACTS, of which I will also sign below to certify they come from my actual experience, extensive review and knowledge of the situation.

1 - This litigation does NOT involve anyone else but Merck. I have only had the finest of medical treatment. yourself included..

2 - I had NO infection before the broken femur, none discovered during the operation – even with the bone exposed as much as could possibly be - and

NO clinical or symptoms of infection during or within the first month of the "routine operation". Not immediately before nor even a cold or fever almost several years before the broken femur. Not even during my highly successful prior operations in NE Baptist! NO infection during the operation, NO infection during recovery in the hospital, none at home, and not even in at least the first 4-5 weeks after the first operation.

3 – The first operation on the fractured femur was considered routine, NO infection was present, and full/quick recovery was expected. Operation had no complications, no fever, and was considered a success.

4 – The broken hardware was discovered via X-Ray, approximately one month after the operation. Even at that time, I felt perfectly FINE, no fever, just fine… the hardware apparently held up long enough till the typical time noted that cox-2 inhibitors would begin to ruin hardware via insufficient or non-existent bone healing (3-4 weeks because of suppressing so effectively the critical inflammatory time frame). There was STILL no infection; neither clinically nor symptomatically. I felt fine and had not one occurrence of fever - except for what had seemed to be a bit of a protruding "bump" - I really felt that I was well on my way to recovery.

5 – EVEN when the hardware destruction was found via x-rays (4th week about) to have completely come apart, again, NO FEVER, NO INFECTION - no clinical or symptoms at all, not even the VERY day I arrived in Albany, for again, what was expected to be a routine operation, still. Albany was very confident, and so was I. It was felt a few days there, and I would be on my way home. All pre-op testing WENT FINE.

6 – After about 2-3 days/evenings in Albany, of which again I felt FINE, the very evening of the operation for the very first time, felt a bit feverishy. That seems to be when infection had started, after a couple of weeks of broken hardware, allegedly from inadequate bone healing - in Kingston..

7 – Number (6) above was verified at the second operation, much to the surprise of all. Even THEN, even THEN, it was just considered as simple as 6 weeks of Vaucocymin, and then resuming the operation!

8- I do NOT SMOKE or DRINK; two things that are known can inhibit healing. My medication, except for VIOXX was no different than the highly successful operations I had in the past. I remained in otherwise very, very good health.

9 – I DID NOT, and DO NOT have Osteoporosis. As you know, one does not recover form Osteoporosis, recent testing over the last few years showed mild-midrange Osteopenia, which of course likely was not even the case 5+ years ago!

This implies that my bones were very likely even stronger back then, as bones don't get stronger after the normal decline all humans begin. Furthermore, there was wide open and exposed bones, several times of course and not one surgeon in the many operations either felt nor commented on a potential issue.

11 – After 6 weeks of Vancomycin and 2-3 weeks of NO antibiotic treatment, I was declared infection free. I then spent another 2 months waiting, waiting, waiting for even minimal bone growth that would have allowed the operation (3rd) to proceed in Albany. For futher referral later, at the very end of the ordeal BOTH Sepsis attacks where verified as NOT from the right femur. The first was from the urinary tract, the second was from the PIC line. Several tests, and even a very sophisticated nuclear radiographic one could find NO infection in that right femur,

M01380A385

period. I had a LOT of time for sufficient bone growth without a trace of infection, and several times (1st and 2nd operation); the ONE common issue: Vioxx use. All the time, Merck just never even acknowledged the issue, though Merck certainly should have.

12 – Be it known for the records, SINCE the operation. I have taken three very hard falls, very hard, and neither fractured nor broke any bone. All operations held up also. My bones are darn good CONSIDERING. And certainly, all surgeons, having direct access and view, have never expressed a concern during such view or post operation recovery concerns. My bone strength was never considered a concern, not in one single operation.

13 - Please remember – this request has several KEY words – **REASONABLE, CONTRIBUTORY.** We are not referring to definitive proof or decision. **This is not a MURDER CASE.** The bar to jump over is **NOT beyond** a shadow of a reasonable doubt. Also, the decision of litigation is NOT based upon this, **it is "only" to be able to continue with it or not; period.**

The signature page (last page of this attachment) simply attempts to "separate the **REASONABLE CAUSE FROM THE NOT REASONABLE**, period, it is not definitive.. Shall I gain your signature, I will simply be allowed to continue the litigation. This is <u>NOT</u> like a criminal case seeking "reasonableness beyond a shadow of a doubt"; it requires a REASONABLE view, based upon the overall cirsomstances, timing, etc.

My pre-Vioxx history was one of 100% success and very quick recoveries, including a life saving cervical fusion (C1-C2 subluxation) in which I was out of the hospital in 48 hours! The post-Vioxx operations, except the last one which bypassed the need for "bone anchoring" by using large amounts of glue - were all failures. The records show that I had been doing increasingly well until the failures; including the failed rods which are not part of this litigation now - it had been as if a miracle was occurring!

**I contacted my NJ surgeon (Dr. Pizzurro) under very adverse circumstances.** I was over 150 miles, one way, and needing a trusted, open, and creative surgeon to discuss my options. I explained that **ALBANY MEDICAL CENTER** seemed to have no answers on how to proceed. I did not have sufficient bone growth and it was not improving. The ALBANY SURGEONs did not understand why, and provided no options except to keep waiting and waiting to see if healing would take place. I had not been given any reason to hope for such healing. So much time had transpired that I had run out of Medicare benefits.

## From Attachment (D) – *Surgeons*

**Dr. Null** – Kingston, NY;  Dr. Null had completed the first operation. There was no infection, bone quality was fine and it was considered a routine operation. This "routine" operation failed in approximately three weeks, which is the timeframe often noted as critical for the inflammatory process to initiate bone repair and of course Vioxx was taken throughout.

**Dr. Hospodar** – Albany Medical Center, NY; Via x-rays, felt that the second operation was routine and the hip would also be saved. The 2nd operation was about 5 weeks after the first operation. Dr. Hospodar discovered the infection which had set in **AFTER the failure of the first operation.** He constantly kept rescheduling the corrective surgery, indicating that the consistent lack of bone healing which prevented the necessary "anchoring" of the hardware; even well after infection was **verified** gone. Many x-rays continued to confirm that, and any infection was ruled out several times.

**Dr. Carl** – Albany Medical Center, NY – not right femur per se but here for reference; was of the opinion that "inadequate bone healing" was the underlying reason for the lumbar operation failure – the two broken rods; the second of which was first noted by Ridgewood (Dr. Cristiello) at the time I had just moved to NY and had spent at least a year in increasing pain. I had been in otherwise excellent health.

9

M01380/4386

Because of physical location, even though I had requested at first to be sent to NJ (Dr. Pizzurro), I was advised that it was only a routine operation, and that I should not risk the long drive. However, after 6 months of complications from the first failed operation, the second operation, and then no options given me as the infection was readily cured, YET NO BONE REGENERATION as expected took place, I really felt I needed to get you involved, no matter the distance. As the records show, I had been a very "quick recovery" kind of person; for example out of the hospital in NE Baptist after a very successful cervical fusion, etc.. There was no **apparent reason** why the first femur operation should not have healed, all were taken by quite a surprise. Had this operation succeeded as it certainly should have, then the rest of this documentation and this request would be moot. Dr. Pizzurro's involvement towards the end  allowed me to walk for the first time in about 7 months, and very likely saved my leg from amputation

Approximately one month later after the first femur operation had unexpectedly failed and the hardware had come apart); I was referred to Albany Medical Center by Kingston. There had been NO INFECTION discovered clinically or symptomatically before, during, or within the FIRST MONTH of the failed femur operation. Of course by then I had also become very well versed on how to take care of myself after an operation.

The timing of my Vioxx ingestion, the Independent Research of many very well known institutions (HSS, Stanford University, Boston Medical University, and many more), and the "SCIENCE OF COX-2 and BONE HEALING" I believe will help provide the information that has been unfortunately maintained "under the radar" and within "muddy waters" by Merck.

Hopefully what I provide will help you in your view of REASONABLE probability. I need a signature that Vioxx, one in the vane of a contributory, reasonable probability (not definite statement) could have very well likely contributed to preventing my right femur from healing. It is not a definitive view or comittment by yourself.

It is very important to understand that this litigation involves ONLY Merck and myself; not one single surgeon or physician, and we know that I have had to have quite a few involved. I have had only high regards for my surgeons/physicians including yourself.

A major premise is that surgeons and physicians, even the orthopedic manual(s) did not even contain any warning from Merck. It has been **very well documented** that Merck had trained its sales force in the practice of "dodge ball", in which they were taught how to avoid questions and change the subject.

## DETAIL

**Nov-Dec -- working with Albany Medical Center** on spine testing to correct Lumbar Operation. Albany verified what Dr. Cristiello in NJ, had discovered, indeed now the second rod had broken. The surgeon in Albany (Dr. Carl) felt, and wrote that the ultimate cause of the broken rods was from inadequate bone healing. Again, it had not been known in the general medical community in re to Vioxx -- bone -- spine healing. I was doing fine through the pre-ops and passing all tests with no issues and almost through them. I was NOT diagnosed with Osteoporosis.

The bottom line was that they felt that inadequate bone healing was responsible for the failed rods, but of course, the bone -- spine repair problems of Vioxx were still not disclosed/known in even a cautionary way to the medical community.  An operation -- 15 hours in total, was being planned; perhaps divided into two operations. Except for the excruciating pain, otherwise I was feeling well. I had no colds, no fevers, was being regularly monitored and for future reference, had no trace of infection at all. I was passing all of the pre-opt testing and was in the process of scheduling the corrective operation.

**FEMUR FRACTURE INTERRUPTS LUMBAR CORRECTION:** femur fracture considered a "routine" operation; Initial **fracture - no infection before operation, during the operation, in recovery, at the two week first checkup, nor even when it was discovered in the 4th week that the hardware had failed. All the time of course, I was on Vioxx. The routine operation was taking a turn for the worse...**
January 13th, 2003 -- fractured femur; Operated on at Benedectine Hospital, immediately. Had suggested to Benedectine emergency I be brought over to NJ but they were against it because of the long ride and felt it

10

MD1304367

may pose danger to me. Operation was on the same day it was broken; no problem during the operation, no infection, it was considered routine and I was discharged within a few days. There were **no complications, no fever,** and I did fine in recovery. **Two week check-up was fine;** no problem with hardware and I felt fine – no fever, no complication.
Was feeling ok again, another two weeks went by and I had the 2nd post-op checkup; this time it was found that the hardware had completely come apart. Still no sign of infection, and otherwise I felt ok, no fever.

**Dr. Null in Kingston, NY was very nervous – he seemed visibly shaken - about what happened and immediately referred me to Albany Medical Center.** I mentioned perhaps going to NJ, but this time it was felt that since I was preparing a spinal operation in Albany, that was the recommendation. Again, no correlation could be made to Vioxx as it was still not warned, nor even precautionary statements, issued. Obviously I was quite upset and in discomfort, but otherwise felt fine. Even then, I felt that we could merely re-do the operation, and then I could get on with the correcting Lumbar Operation, which obviously would experience delay.

**Albany reference by Kingston Benedectine Hospital (Dr. Null) after the first failed femur operation; no infection or fever had been clinically or symptomatically encountered; but urgent need to fix failed hardware.**

About one week later (approx. 4-5 weeks after the initial operation), I was sent to Albany Medical Center for another operation – there had not been any clinical or symptoms of fever/infection. Ironically, I said hello to some of the same people that I had been working with (i.e. on the Lumbar preparation). Seeing the spine surgeon along the way, I said "looks like we have to wait a bit..." – I felt otherwise and this was still just a routine blip in the road.... The orthopedic surgeon indicated that they could remove the hardware, fix the femur, and save the hip replacement. Even then, it still appeared to be routine!

After about a 2 day wait before the scheduled operation, I distinctly remember the evening before the operation that I was not feeling so well – that was the first time since the ordeal started! I felt a bit feverish for the first time in approximately two years or so. Apparently the infection was finally beginning to set into the failed hardware. That was the first time I had felt that way in a long time (i.e. had not been sick, fever, etc. – and it is worthy to note that I never had fever/infection even through the major problems from the failed lumbar operation; allegedly because of Vioxx also). No-one at all had expected a problem and felt, again, that it would be routine. During the operation, it was found that I had an infection where the fracture was and it also caused the right hip to be taken out. I was put on Vancomycin for 6 weeks with the full expectation that after that time frame, I would be getting another operation. It was felt that I had gotten infected after the initial operation hardware failed and some time had gone by.(3-4 weeks after the very first operation it apparently failed; and then about a week for the infection to set in); **which turns out to be the critical time that inflammation is necessary,** and which while taking Vioxx, apparently did not occur (i.e. the necessary inflammatory process was inhibited excessively by Vioxx).

**Albany – antibiotic treatment went well, infection ruled out, operation was to be scheduled.**

After the anti-biotic treatment of 6 weeks, I was given a couple of weeks completely off of Vancocymin to ensure that that infection would "stay away", and to provide some additional time for bone growth for "anchoring". I was tested for infection and the results were negative. However, there was surprise that there had been sufficient bone growth. The surgeon had intended on scheduling the "final" operation. Had the minimal bone growth occurred, there would have been an operation scheduled. Not having that, and wanting to be sure the infection would not come back, though I was declared infection free, I was put back on Vancoymcin for another 6 weeks. Tested again after that 6 weeks I still had no trace of infection. **That meant that I had gone about 2.5 to 3 months without any infection at all (no fevers, feeling fine otherwise, etc.) and STILL not sufficient bone growth, hardly even a faint view of any.** This time they did not even bother with any preventive Vancoymycin and as I continued to wait, X-rays continued to show that bone growth was just not occurring. All this time I had been on Vioxx! **No-one knew that there HAD BEEN a growing body of Independent Research on cox-2 inhibitors, especially Vioxx,** which were all converging on the issue of cox-2 and its powerful anti-inflammatory affects, inhibited, and even stops bone growth as the inflammation process is necessary for proper bone healing.

Again and again, **ALBANY** just had no answer as to why I would not heal. At the time, and apparently to this day, the issue (not even mild cautionary thoughts) of inhibiting/stopping bone healing from Vioxx was NOT acknowledged by Merck. Thus, the orthopedic community, nor most anyone except potential suspicion by research

11

M013804388

oriented universities (besides Merck) had knowledge of the problem. Nor had physicians or consumers been even mildly, let alone properly, cautioned. Allegedly, Merck simply avoided the issue, and let the waters remain "muddy". Merck simply allowed an air of both concealment and confusion to exist, while it hailed the great safety profile of its Cox-2 inhibitor in re to Cox-1 (early NSAIDs); which also later became very much challenged.

Bottom line in Albany: about four months in Albany; wheel-chair bound and only walking by "hopping" on one foot with the help of a "walker"; undergoing very difficult physical therapy for the time to come when I may be operated on, let alone to keep my strength. All of this unnecessary time (because of Vioxx) was just a miserable, brutal, unproductive time that took its toll greatly on creating family tension and estrangement

Not having adequate bone healing, and thus Albany Medical Center unwilling to operate upon me because of that - I was not being offered any viable solution.. My leg appeared to be at risk of being amputated. I desperately called NJ for consultation. The bone and spine repair problems I encountered, were just plainly not understood, no explanation was provided at all!

Ridgewood, NJ -- office consultation, bone growth issue (insufficient/lacking for "anchoring") confirmed; new approach devised by Dr. Pizzurro with bypassing the need for adequate bone growth in that area , and problem addressed in a new way! At our review, Dr. Pizzurro agreed with the Albany assessment that the bone was not healing, and felt that it would
not. At the time, no-one, no surgeon or physician in Kingston or Albany, nor myself had any view of associating the use of Vioxx with the lack of healing. As you know from the past, I had been a quick healer. In fact, in Boston, NY – the site of the successful (100%) cervical fusion in NE Baptist in which I was out of the hospital within 36 hours – from major c1-c2 fusion!; and please note that I was not on Vioxx at the time, as it was not even on the market!

Of course, as the NJ records indicate, the operation was highly successful, and I was walking quickly. Remember, this operation utilized major amounts of glue, as Dr. Pizzurro correctly felt that the bone was not, and would not grow enough to anchor the new hardware. Albany had, as I said, refused to utilize glue, and just continued to wait for adequate bone regeneration - but offered no alternative, re-assurance nor hope! Albany knew that the bone was not growing, yet I had no options there. If it had it not been for Dr. Pizzurros' method, I cannot imagine anything except the loss of my right leg.

Taking all the above together – but please discuss with me any questions or concerns that you may have if necessary - I would then ask if you would consider signing the REASONABLE view of Vioxx causing, or at least contributing to the perplexing array of events, in which no-one was able to, at the time, correlate the bone healing problems with Vioxx.

12

M013804369

## ATTACHMENT B – Independent Research

Following are several articles high points quoted form well known institutions and research centers. One will find one after another converging on the same reasons of how cox-2 inhibition will interfere with bone and spine healing.

Please again keep this in mind – in all ops where Vioxx was not taking – the healing was very quick and 100% successful, with NO complications.

In all ops where I had vioxx; each failed because of inadequate bone repair.

**FEBRUARY 02, 2005 - HSS PHYSICIANS REVIEW LITERATURE ON THE SAFETY OF COX-2 INHIBITORS - COX-2 inhibitors effect fracture healing and spine fusion... should never be used in spinal fusion...**

HOSPITAL FOR **SPECIAL SURGERY**

... we can conclude that the use of NSAIDs/COX-2 inhibitors effect fracture healing and spine fusion...specifically, administration of NSAIDs/COX-2s should be delayed for three to four weeks in fracture healing and should never be used in the case of spinal fusion... we can conclude that the use of NSAIDs/COX-2 inhibitors effect fracture healing and spine fusion...specifically,    for three to four weeks in fracture healing and should never be used in the case of spinal fusion...

... many patients and physicians have been left trying to sort out the facts. In response, Hospital for Special Surgery convened a physician panel on December 17, 2004 to review the literature on three controversial areas in the use of COX-2 inhibitors-acute pain management, cardiac problems, **and bone healing and fusion.**

HSS Physicians Review Literature on the Safety of COX-2 Inhibitors

Joseph M. Lane, MD - Attending Orthopaedic Surgeon, Hospital for Special Surgery
Professor of Orthopaedic Surgery, Weill Medical College of Cornell University

Joseph A. Markenson, MD - Professor of Clinical Medicine, Weill Medical College of Cornell University
Attending Physician, Hospital for Special Surgery

Michael K. Urban, MD, PhD  - Associate Attending Anesthesiologist, Hospital for Special Surgery

### COX-2: Bone Healing/Spinal Fusion: Dr. Lane

The effect of COX-2 inhibitors on fracture healing has been studied in comparative models. A group at the University of Rochester showed that COX-2 knockout mice had profoundly compromised bone healing and smaller bone nodules and did not respond to growth factors that would stimulate bone healing in normal animals [14]. In addition, several studies have shown that celecoxib, rofecoxib, and indomethacin (a traditional NSAID) either delay or inhibit fracture healing in rats [15],[16]. Another study found that COX-2 inhibitors decreased the strength of fracture healing at 21 days[17].

The effect of NSAIDs and COX-2 inhibitors on spinal fusion has also been studied. A controlled rabbit study showed a decrease in fusion rates with indomethacin and no statistical difference with celecoxib[18]. A human retrospective study showed that the non-union rate was related to the dosage of Toradol (a traditional NSAID) and that the patients who took Toradol had five-times the rate of non-union than those that did frail patient population; and the lack of randomized controlled human studies.

13

# STANFORD UNIVERSITY

### Researchers Show COX-2 Inhibitors Interfere With Bone Growth, Healing

Researchers at Stanford University Medical Center have found that selective COX-2 inhibitors - a class of medications widely prescribed for painful inflammatory conditions such as osteoarthritis and rheumatoid arthritis - interfere with the healing process after a bone fracture.



**ORTHOPAEDICS TODAY INTERNATIONAL 2006; 9:12** - "And those biopsies showed us irregular fiber structure, high concentrations of matrix, vascular ingrowths but no inflammatory cell traits. But, despite that, we gave these patients tons of NSAIDs. … We wanted to use a new method to try to evaluate whether there was any inflammation in these tendons." In vivo micro dialysis...*Decreased prostaglandin may impair bone healing, and the COX-2 enzyme is critical for fracture* healing, he said. Dimmen and his group tested how short-term doses of parecoxib, a COX-2 inhibitor, and indomethacin, a COX-1 inhibitor, affect long-bone fracture healing. The parecoxib and indomethacin groups had lower bone mineral density than the control group..."

**KOMATSUBARA S ET AL. SPINE 2006; 31:E528-34.** - "High-grade slippage of the lumbar spine in a rat model of spondylolisthesis: effects of cyclooxygenase-2 inhibitor on its deformity" (shows COX-2 inhibitor led to deterioration of bone healing which worsened vertebral slippage)

**O'KEEFE R ET AL. ANN NY ACAD SCI 2006; 1068:532-42.** - "COX-2 has a critical role during incorporation of structural bone allograft" (findings indicate that COX-2 dependent PGE2 production in the early stage of bone healing is needed for efficient skeletal repair and is essential for bone allograft incorporation; COX-2 inhibitor (Celecoxib or Ketorolac) reduced bone formation and bony ingrowths)

**LI L, ET AL. CYTOKINE GROWTH FACTOR REV 2006; 17:203-16.** - "Regulation of bone biology by prostaglandin endoperoxide H synthases (PGHS): a rose by any other name..." (this is a review article that includes some discussion of the importance of COX-2 (also known as PGHS-2) in bone fracture repair)

**DALUISKI A ET AL. ORTHOPEDICS. 2006; 29:259-61.** - *"Cyclooxygenase-2 inhibitors in human skeletal fracture healing"* (study indicates that COX-2 is naturally lower in nonunion fractures that don't heal well, may reduce the bone-forming potential of precursor cells, and they note that limited use should be made of COX-2 inhibitors in patients with healing fractures since they need to mount an initial immune response in order to achieve fracture healing)

**HILL K ET AL. FOOT ANKLE CLIN 2005; 10:729-42.** "The role of cyclooxygenase-2 inhibition in foot and ankle arthrodesis" (this article notes that COX-2 inhibitors are valuable to help control postoperative pain but may have deleterious impacts on bone healing in patients undergoing hind foot arthrodesis)

14

**COX-2: WHERE ARE WE IN 2003? - THE ROLE OF CYCLOOXYGENASE-2 IN BONE REPAIR - EINHORN TA. PROFESSOR AND CHAIRMAN, DEPARTMENT OF**



**ORTHOPEDIC SURGERY, BOSTON UNIVERSITY MEDICAL CENTER, BOSTON, MASSACHUSETTS** - both non-specific and specific inhibitors of cyclooxygenases impair fracture healing - but that this is due to the inhibition of Cox-2 and not COX-1! Vioxx is a Cox-2 inhibitor. "It's time to tell the public," concludes Dr. Thomas Einhorn. REPRINTED FROM: WWW.USATODAY.COM/NEWS - "It's time to tell the public," concludes Dr. Thomas Einhorn, Boston University's orthopedic surgery chairman. New research suggests some of the most widely used painkillers may delay healing of a broken bone... "If it were my fracture ... to me every day counts," he says. Vioxx and Celebrex are among the culprits.... the makers of Vioxx and Celebrex deny any link.

---

**DECEMBER 23, 2002 - BONE FRACTURES** - *Cox-2 Inhibitors interfere with bone growth and, healing... Researchers at Stanford Univ. University Medical Center...COX-2 inhibitors also impede the new bone growth that normally helps heal a fracture or stabilize a joint implant...*

---

**MAY 21, 2002 - JOURNAL OF BONE AND MINERAL RESEARCH - COX-2 DECREASES BONE HEALING?** - mechanical testing revealed that COX-2 inhibitors...reduce bone strength...expression of COX-2 is critical for bone healing...essential for fracture healing...the inhibition of prostaglandin synthesis stops normal fracture healing. *So, our findings with parecoxib had the higher delay in the fracture healing than indomethacin, with the assumption that the COX-2 enzyme is responsible for impaired fracture healing," he said.*

**"Never give NSAIDs for stress fractures or for cartilage damage. NSAIDs hate chondrocytes." — Sigbjørn Dimmen, MD**

NOTE: though the first generation NSAIDS suppress both cox-1 (almost exclusively) and cox-2 (minor); the bone and spine healing process is dependent on mostly the cox-2 enzyme; not the cox-1 enzyme that....

15

## ATTACHMENT C – Science of Vioxx and bone/spine healing

Though BOTH the SCIENCE OF COX-2 inhibitors and increasing INDEPENDENT RESEARCH indicated the very real potential of COX-2 inhibitors interfering with bone/spine healing - NO SURGEONS, NO PHYSICANS, AND NO CONSUMERS were warned. All that had to be done was simply provide sufficient warning and information that one should NOT take Vioxx during the inflammatory phase which the body needs to launch the series of events (osteoclasts and osteoblasts) absolutely critical for proper bone/spine repair and healing.

The extremely effective suppression of that same inflammatory process (by Vioxx) which was the same reason of why Vioxx was so effective as a pain reliever (from inflammation), was (allegedly via MUCH INDEPENDENT RESEARCH and SCIENCE) also the reason for non-fusion and poor and/or non-existent bone healing. Much depends on exactly when Vioxx was taken, it is the ACUTE INFLAMMATORY PROCESS in which the "call to renegerate bone repair/healing). That very critical period is within the first 3-4 weeks of the bone/spine repair. Merck allegedly knew this, but decided NOT to warn of the possibility. Instead, as it pursued a very "muddy" picture of the original cox-1 (which had some anti-healing affect, but the real issue was the 2nd generation cox-2 inhibitors such as Vioxx (especially due to its superior effectiveness).

It should be noted, and it still does not have explanation, that the last time I have been able to find the description of bone and spine healing in any Merck Medical Manual was in 2003. Frankly, and this is the view of myself,  the timing seems to be consistent with the increasingly realization of the magnitude of the problem.

### D. Harrison synthesis:

This is a very simple explanation of the bone healing process: After a broken bone, the normal mode of the body is to recognize inflammation, send out OSTEOCLAST cells to take away dead and damaged bone tissue, and then send in OSTEOBLASTS to start to lay down the foundation that becomes bone. **The bone/spine absolutely NEEDS the INFLAMMATION process to start healing. There is an initial 3-4 week "window" - if healing, allegedly because of VIOXX, does not ensue, it is very, very likely that  it will NOT happen.** VIOXX was very good as far as relieving pain based upon inflammation because it very effectively suppressed inflammation as its main mode of action for pain relief (I have read it is about 9x the cox-2 inhibitor effectiveness than Celebrex!).

### From the 2003 Merck Manual - How Bones Heal (not found in latter manuals)

Fractures heal in three overlapping phases: inflammation, repair, and remodeling. Healing begins immediately with the **inflammatory phase.** In this phase, damaged soft tissue, bone fragments, and lost blood caused by the injury are removed by cells of the immune system. The region around the fracture becomes swollen and tender as cell activity and blood flow increase. The inflammatory phase reaches peak activity in a couple of days, but takes weeks to subside. This process accounts for most of the early pain people experience with fractures.

The **repair phase** begins within days of the injury and lasts for weeks to months. New repaired bone, called the external callus, is formed during this phase. When first produced, the callus has no calcium; it is soft and rubbery and cannot be seen on an x-ray. This new bone is neither strong nor stable, so that during this period the fractured bone can easily collapse and become displaced (that is, slip out of its proper place). At 3 to 6 weeks, the callus calcifies and becomes much stiffer and stronger and becomes visible on x-rays.

The **remodeling phase** (in which the bone is built back to its normal state) lasts many months. The bulky external callus is slowly resorbed and replaced by stronger bone; in this phase, the normal contours and architecture of the bone are restored. It is not likely that the bone will fracture again during this phase; however, people may experience mild pain with exertion.

16

M01380/4373

## Bone Healing Process

The process of bone graft incorporation in a spinal fusion model is similar to the bone healing process that occurs in fractured long bones.[4] Fracture healing restores the tissue to its original physical and mechanical properties and is influenced by a variety of systemic and local factors. Healing occurs in three distinct but overlapping stages: 1) the early inflammatory stage; 2) the repair stage; and 3) the late remodeling stage.[9,13] In the inflammatory stage, a hematoma develops within the fracture site during the first few hours anddays. Inflammatory cells (macrophages, monocytes, lymphocytes, and polymorphonuclear cells) and fibroblasts infiltrate the bone under prostaglandin mediation. This results in the formation of granulation tissue, ingrowth of vascular tissue, and migration of mesenchymal cells. The primary nutrient and oxygen supply of this early process is provided by the exposed cancellous bone and muscle. The use of antiinflammatory or cytotoxic medication during this 1st week may alter the inflammatory response and inhibit bone healing.

During the repair stage, fibroblasts begin to lay down a stroma that helps support vascular ingrowth. It is during this stage that the presence of nicotine in the system can inhibit this capillary ingrowth.[11,23-25] A significantly decreased union rate had been consistently demonstrated in tobacco abusers.[2,3,6] As vascular ingrowth progresses, a collagen matrix is laid down while osteoid is secreted and subsequently mineralized, which leads to the formation of a soft callus around the repair site. In terms of resistance to movement, this callus is very weak in the first 4 to 6 weeks of the healing process and requires adequate protection in the form of bracing or internal fixation. Eventually, the callus ossifies, forming a bridge of woven bone between the fracture fragments. Alternatively, if proper immobilization is not used, ossification of the callus may not occur, and an unstable fibrous union may develop instead.

Fracture healing is completed during the remodeling stage in which the healing bone is restored to its original shape, structure, and mechanical strength. Remodeling of the bone occurs slowly over months to years and is facilitated by mechanical stress placed on the bone. As the fracture site is exposed to an axial loading force, bone is generally laid down where it is needed and resorbed from where it is not needed. Adequate strength is typically achieved in 3 to 6 months.

Although the physiological stages of bone repair in the spinal fusion model are similar to those that occur in long bone fractures, there are some differences. Unlike long bone fractures, bone grafts are used in spinal fusion procedures. During the spinal fusion healing process, bone grafts are incorporated by an integrated process in which old necrotic bone is slowly resorbed and simultaneously replaced with new viable bone. This incorporation process is termed "creeping substitution."[17,20] Primitive mesenchymal cells differentiate into osteoblasts that deposit osteoid around cores of necrotic bone. This process of bone deposition and remodeling eventually results in the replacement of necrotic bone within the graft.

The most critical period of bone healing is the first 1 to 2 weeks in which inflammation and revascularization occur. The incorporation and remodeling of a bone graft require that mesenchymal cells have vascular access to the graft to differentiate into osteoblasts and osteoclasts. A variety of systemic factors can inhibit bone healing, including cigarette smoking, malnutrition, diabetes, rheumatoid arthritis, and osteoporosis. In particular, during the 1st week of bone healing, steroid medications, cytotoxic agents, and nonsteroidal antiinflammatory medications can have harmful effects. Irradiation of the fusion site within the first 2 to 3 weeks can inhibit cell proliferation and induce an acute vasculitis that significantly compromises bone healing (SE Emery, unpublished data). Bone grafts are also strongly influenced by local mechanical forces during the remodeling stage. The density, geometry, thickness, and trabecular orientation of bone can change depending on the mechanical demands of the graft. In 1892, Wolff first popularized the concept of structural adaptation of bone, noting that bone placed under compressive or tensile stress is remodeled. Bone is formed where stresses require its presence and resorbed where stresses do not require it.[22,31] This serves to optimize the structural strength of the graft. Conversely, if the graft is significantly shielded from mechanical stresses, as in the case of rigid spinal implants, excessive bone resorption can potentially

17

M01360-4374

occur and result in a weakening of the graft. This potential disadvantage of instrumentation needs to be balanced with the beneficial effects that spinal fixation has on the fusion process.

## Thomas A Einhorn (per USA today – hired as a consultant by Merck)

Professor and Chairman, Department of Orthopedic Surgery, Boston University Medical Center, Boston, Massachusetts, USA; *Arthritis Res Ther* 2003, 5:5-7doi:10.1186/ar607

Keywords: bone repair, cyclooxygenase-2, fracture healing, non-steroidal anti-inflammatory drugs, prostaglandins

## Abstract

Prostaglandins are important mediators of bone repair, and cyclooxygenases are required for prostaglandin production. Data from animal studies suggest that both non-specific and specific inhibitors of cyclooxygenases impair fracture healing but that this is due to the inhibition of COX-2 and not COX-1. Although these data raise concerns about the use of COX-2-specific inhibitors as anti-inflammatory or anti-analgesic drugs in patients undergoing bone repair, clinical reports have been inconclusive. Because animal data suggest that the effects of COX-2 inhibitors are both dose-dependent and reversible, in the absence of scientifically sound clinical evidence it is suggested that physicians consider short-term administration or other drugs in the management of these patients.

## Introduction

Bone repair is a complex process involving the participation of several cell types, signal transduction pathways and biochemical events [1]. Because it is initiated by a skeletal injury, which induces an inflammatory response, chemical mediators of inflammation are also involved in this process [2]. Prostaglandins, a class of compounds known to mediate inflammation and shown to have effects on bone formation and resorption, are essential in bone repair [3].

Prostaglandin synthesis is initiated with the release of arachidonic acid from membrane phospholipids. The subsequent conversion of arachidonic acid to prostaglandin $H_2$ ($PGH_2$) is catalyzed in two steps by cyclooxygenase [4]. Synthase enzymes then convert $PGH_2$ to specific prostaglandins such as $PGD_2$, $PGE_2$, $PGF_2\alpha$, prostacyclin and thromboxane. Thus, cyclooxygenase activity is essential for normal prostaglandin production and is the rate-limiting enzyme in the synthetic pathway. The two recognized forms of this enzyme, cyclooxygenase-1 (COX-1) and cyclooxygenase-2 (COX-2) are encoded by two separate genes [5,6]. COX-1 is constitutively expressed by many tissues and functions as a so-called 'housekeeping' enzyme maintaining homeostatic levels of prostaglandins for the normal function of several organs, in particular the stomach [7]. In contrast, COX-2 is induced by an array of stimuli including inflammation, injury and mechanical stress [8,9].

The role of COX-2 in bone repair has received recent attention because drugs that inhibit prostaglandin production have been shown to inhibit experimental fracture healing [10-12]. Non-steroidal anti-inflammatory drugs (NSAIDs) are among the most commonly prescribed drugs worldwide and are indicated in the treatment of several forms of arthritis, menstrual pain and headache. Their ability to decrease inflammation by inhibiting cyclooxygenase has improved the quality of many people's lives but their use has been limited by gastrointestinal side effects such as dyspepsia, abdominal pain, and, in some instances, gastric or duodenal perforation or bleeding. The development of COX-2 inhibitors (coxibs) was a response to the need for drugs that inhibit prostaglandin production without side effects [13]. Because most NSAIDs inhibit COX-1 and COX-2 with almost equal potency, it was hoped that the development of COX-2-selective drugs would be better tolerated and equally efficacious in managing inflammation. However, whereas the selectivity of this group of

M013504375

compounds might allow inflammation to be inhibited with minimal effects on certain homeostatic mechanisms, their role in bone metabolism and repair remains unclear.

## PRINCIPLES OF BONE HEALING;  IAIN H. KALFAS, M.D., F.A.C.S.
*Department of Neurosurgery, Section of Spinal Surgery, Cleveland Clinic Foundation, Cleveland, Ohio*

### BONE HEALING PROCESS
The process of bone graft incorporation in a spinal fusion model is similar to the bone healing process that occurs in fractured long bones.4 Fracture healing restores the tissue to its original physical and mechanical properties and is influenced by a variety of systemic and local factors. Healing occurs in three distinct but overlapping stages: 1) the early inflammatory stage; 2) the repair stage; and 3) the late remodeling stage.9,13
In the inflammatory stage, a hematoma develops within the fracture site during the first few hours and days. Inflammatory cells (macrophages, monocytes, lymphocytes, and polymorphonuclear cells) and fibroblasts infiltrate the bone under prostaglandin mediation. This results in the formation of granulation tissue, ingrowth of vascular tissue, and migration of mesenchymal cells. The primary nutrient and oxygen supply of this early process is provided by the exposed cancellous bone and muscle. The use of antiinflammatory or cytotoxic medication during this 1st week may alter the inflammatory response and inhibit bone healing.

---

## Chapter 7
### Impaired Joint Mobility, Muscle Performance, and Range of Motion Associated With Fracture (Pattern G)
*Joshua A. Cleland, PT, DPT, PhD, OCS; Matthew B. Garber, PT, DSc, OCS, FAAOMPT*

### *Physiology*

## BONE MAINTENANCE AND REMODELING

Although bone growth is completed when skeletal maturity is reached, remodeling of bone continues throughout life. Skeletal maintenance is achieved by simultaneous breakdown and renewal of new bone during the remodeling process. Osteoclasts remove bone while osteoblasts produce new bone. During early adulthood, the rates of bone resorption and bone formation are in equilibrium. The normal remodeling process is dependent upon a number of factors including quantities of calcium and phosphorus, sufficient amounts of vitamins (A, $B_{12}$, C, and D) and the proper amount of growth hormones.[2] However, after the third decade of life, the amount of bone resorbed begins to exceed the amount of bone being formed. This results in a steady decrement of skeletal mass.[5]

Effects of Nonsteroidal Anti-Inflammatory Drugs on Bone Formation and Soft-Tissue Healing Laurence E. Dahners, MD and Brian H. Mullis, MD

Dr. Dahners is Professor, Department of Orthopaedics, University of North Carolina School of Medicine, Chapel Hill, NC.
Dr. Mullis is Resident, Department of Orthopaedics, University of North Carolina School of Medicine.

*Reprint requests: Dr. Dahners, University of North Carolina School of Medicine, Campus Box 7055, 3153 Bioinformatics Building, Chapel Hill, NC 27599-7055.*

*Nonsteroidal anti-inflammatory drugs continue to be prescribed as analgesics for patients with healing fractures even though these drugs diminish bone formation, healing, and remodeling. Inhibition of bone formation can be clinically useful in preventing heterotopic ossification in selected*

19

M01380476

*clinical situations. In this regard, naproxen may be more efficacious than the traditional indomethacin, and short-term administration is as effective as long-term. When fracture healing or spine fusion is desired, nonsteroidal anti-inflammatory drugs should be avoided. Some nonsteroidal anti-inflammatory drugs have a positive effect on soft-tissue healing; they stimulate collagen synthesis and can increase strength in the early phases of repair during skin and ligament healing. Cyclooxygenase-2 inhibitors have an adverse effect on bone healing and may have an adverse effect on ligament healing. Therefore, further investigation is necessary to confirm that traditional nonsteroidal anti-inflammatory drugs may be preferable for the healing of collagenous tissues.*

## Bone healing and spinal fusion

JULIE G. PILITSIS, M.D., PH.D., DAVID R. LUCAS, M.D., AND SETTI R. RENGACHARY, M.D.
*Department of Neurosurgery, Wayne State University, Detroit, Michigan*

### REPAIR OF BONE

There are three main phases following fracture in the bone repair process: 1) the early inflammatory stage; 2) the repair stage; and 3) the remodeling stage.11,17 The early inflammatory phase comprises the first 2 weeks postinjury and is initiated after hemorrhage caused by vascular injury and the subsequent development of a hematoma. Infiltration of inflammatory cells and of fibroblasts into the area then occurs (Fig. 1 *upper*). These events lead to vascularization of the area and the formation of granulation tissue (that is, procallus). The repair phase is characterized by the formation of a callus. It begins with continued vascular ingrowth, secretion of osteoid, and the presence of fibrocollagenous fibers. A temporary callus consisting of cartilage is produced at the site of injury (Fig. 1 *center*). This initial union develops in the first 4 to 6 weeks and has limited strength; thus, internal/external immobilization of the fracture/fusion site is often appropriate.31 Osteoblasts continue to be active and replace cartilage with the cancellous bone forming a bridge between the fractured fragments (Fig. 1 *lower*). Cancellous bone may then be converted to compact bone as osteoid deposition continues. In the remodeling phase the process may occur over months to years and consists of restoring the fractured bone to its normal size, shape, and strength.31 Adequate strength usually develops by 6 months. A variety of factors may limit proper bone healing. The early inflammatory stage may be adversely altered by the

administration of anti-inflammatory agents.

## Effect of anti-inflammatory agents on the integration of autogenous bone graft and bovine bone devitalized matrix in rats1 Roberto Antoniolli da SilvaI, Djalma José FagundesII, Andréia Conceição Milan Brochado Antoniolli SilvaIII, Karin Ellen SistiIV, Themis Maria Milan Brochado de CarvalhoIV, Daniel Nunes e SilvaV

## ABSTRACT

Purpose: To study the repair of bone defect filled with autograft or bovine bone devitalized matrix in rats under anti-inflammatory action. Methods: Two hundred and forty Wistar rats were distributed to two groups of 120 animals each. A 2mm-diameter defect was created in the femoral diaphysis. Animals of Group I had the bone defect filled with autograft and those of Group II, with bovine bone devitalized matrix. Animals of each group were redistributed to four subgroups according to the intramuscular administration of anti-inflammatory drug or saline solution: A – diclofenac sodium; B - dexamethasone; C - meloxicam; D - saline solution. Evaluation periods were 7, 14 and 30 days. Histological evaluation cnsisted of quantifying the inflammatory process, the bone neoformation, the collagen formation and the presence of macrophages. Results: Animals of Group I did not show significant difference considering inflammatory reaction. Significant and progressive increase of bone neoformation was observed in both groups. The animals that received meloxicam and autograft showed less collagen formation at 14 and 30 days. The number of macrophages was higher in Group II than in Group I. The animals treated with dexamethasone and saline solution did not show statistically significant difference.Conclusions: Diclofenac sodium and meloxicam delayed bone graft repair and dexamethasone did not interfere in it.

20

M01380437

**Quotes:**
**COX-2 Appears to Play An Essential Role in Bone Repair**

By David Douglas NEW YORK (Reuters Health) Jun 19 - Mouse studies indicate that cyclooxygenase-2 (COX-2) is needed for bone repair, researchers report in the June issue of The Journal of Clinical Investigation.

Senior author Dr. Regis J. O'Keefe told Reuters Health that "during fracture healing, stem cells around the area of the broken bone need to differentiate, or turn into bone cells. Our studies show that the enzyme COX-2, which is inhibited by nonsteroidal antiinflammatory drugs and the coxibs, is necessary for this process of bone cell differentiation."

Dr. O' Keefe, from the University of Rochester Medical Center in New York, and colleagues compared normal mice with transgenic mice that lacked the gene for either cyclooxygenase-1 (COX-1) or COX-2.

Healing of stabilized tibia fractures in the COX-2 deficient mice was significantly delayed compared to those of COX-1 deficient mice or the wild-type controls. In vitro studies indicated that bone nodule formation was reduced by 50% in the COX-2 deficient mice, which also showed significantly reduced levels of cbfa1 and osterix, two genes necessary for bone formation.

The defect in bone nodule formation was corrected by the addition of prostaglandin E2. Furthermore, addition of bone morphogenic protein 2 enhanced cbfa1 and osterix in cultures from COX-2 deficient and wild-type mice. The effects of these agents were additive, indicating, write the investigators, "that COX-2 is involved in maximal induction of osteogenesis."

"While it was initially thought that COX-2 was only important in inflammation, our studies establish COX-2 as a critical and necessary factor for normal bone repair," Dr. O'Keefe said.

J Clin Invest 2002;109:1405-1415

21

## ATTACHMENT D - chronology

A chronology of my operations which highlight that all orthopedic operations in which I did NOT take Vioxx succeeded; and all orthopedic operations in which I DID take Vioxx and of which depended on bone growth FAILED.

**The following general chronology is importanty to assist in establishinng at least a reasonable correlation in Vioxx usage and the success/failure of orthopedic operations over time.**

1 - Left hip (HSS, NYC, NY)                   SUCCESSFUL     no Vioxx usage (5/95)
2 - Right hip (RIDGEWOOD VALLEY, NJ)          SUCCESSFUL     no Vioxx usage (7/95)
3 - Cervical fusion  (NE BAPTIST, Boston, MA) SUCCESSFUL     no Vioxx usage (10/99)
4 - Lumbar fusion (NE BAPTIST, MA))           ----FAILURE----  Vioxx UTILIZED (1/01)
5 - Broken femur (1ˢᵗ op; Kingston, NY)        ----FAILURE----  Vioxx UTILIZED (2/03)
6 - Femur op (RIDGEWOOD VALLEY, NJ)           ----SUCCESS----  bone regeneration need
                                                               bypassed;

1 - In mid-1995 my left hip was replaced at HSS. To this day it remains successful and well seated.

2 - In mid-1995 my right hip was replaced in Ridgewood, NJ. Not only was it 100% successful; I was able to leave the hospital in record, or at least near record time. I never had any clinical or symptom issue(s) with the hip, the cup fused in perfectly,  and it was well seated.. Bone condition was noted during the operation as EXCELLENT.

3 - After I moved from NJ - I had two operations at Boston NE Baptist – fist, a cervical fusion operation which was 100% successful and required major fusion when Vioxx was not yet on the market – I was able to leave the hospital with 48 hours, and incredibly the physical therapist felt I was doing so well, he wanted me to leave even before 24 hours of the operation!

4 -- Then the second operation, within ONLY 13 months after the highly successful cervical fusion, was by the same surgeon. It was actually an "optional" surgery and was meant to merely correct simple geometry (i.e. straighten me out). It seemed to work for a few weeks, then a ROD broke -- however it remained seemingly successful and I enjoyed over 6 months of being relatively straight, doing increasingly better, and planning on being able to return to my career. With the highly successful cervical operation well behind me, and ONLY the "body geometry" correction lumbar one ahead of me, Later, as the 2ⁿᵈ rod broke, the "geometry" returned to abnormal (I was no longer "straightened"), and severe pain drove me to NJ (Ridgewood, DR. Pizzarro and Dr. Cristiello). I was then referred to Albany, who confirmed the second broken rod. and with extensive testing, determined that inadequate bone healing had prevented the success of the operation.

The first two operations above required time off from my career and I returned promptly. I had never missed any time at all from arthritis in the 15 years up to that point; nor missed anytime from arthritis during the next 3 years until, suddenly requiring a cervical FUSION operation. The surgeon could not explain why the cervical bone issues had had taken place and offered no reason. Later testing shows, I did not have Osteoporosis at the time, and of course, as mentioned, fusion was 100% successful per the records.

**My operations had been so successful, that I was planning on returning to work in a career of which I enjoyed thoroughly, and that I had for 20 years been on record as being highly successful and happy with. Apparently all I needed was that ONE more operation – the lumbar one which was to "straighten" my back and as the NE BAPTIST SURGEON commented; improve my general body geometry. I was well on my way to a significant recovery(s) and my arthritis was increasingly under control. However, the future was not to be**

22

kind to me, as (allegedly) the "wonder" arthritis drug, Vioxx came to market, I was put on it and kept on it, and my world was to go from such vast improvement to miserable failure(s). I had expected a continuation of my past highly successful and very quick recovery operations and with the expectation that I would be successful and be able to return to work in a timely manner.

5 – After the failed fusion and even adequate bone healing for a corrective operation, in spite of Albany Medical (Dr. Hospodar) fully expecting the opportunity for the correction operation, the bone continued not to heal. Per prior information provided in this documnetaion, I was able to gain the intervention of Dr. Pizzurro's in NJ (RIDGEWOOD).

After thorought evaluation and x-rays, Dr. Pizzurro determined that my right femur, initially just considered (by KINGSTON BENENEDECTINE and then ALBANY MEDICAL CENTER, a routine operation to fix – had first failed fusion, then even though expected to provide enough bone regeneration to permit hardware/bone "anchoring", it was just not going to happen. His evaluation and x-rays confirmed what had been suggested in Albany, that my bone was just not healing enough to embark on an operation. Dr. Pizzurro confirmed my worst fear at the time as you stated - "the bone just simply is not likely to heal enough, if at all".

6 - Because of his correct diagnosis but desire to find a way to help me, I am able to walk today!

**At the time Merck still had not warned the medical community, so it was Dr. Pizzurro's clarity of judgement and decisive action that saved my leg, period!**

Merck continued not to pursue the Vioxx/Cox-2 inhibitor problem of interfering with proper bone/spine repair, and though Independent research had been and continued to provide evidence and explain the SCIENCE OF VIOXX, **Merck just continued to deny the problem and did not even exercise proper judgement in pursing the allegations. NO SURGEONS, NO PHYSICANS, AND NO CONSUMERS were warned of what was (allegedly) obvious – simply that one should NOT take Vioxx during the inflammatory phase which the body needs to launch the series of events (osteoclasts and osteoblasts) absolutely critical for proper bone/spine repair and healing.** The extremely effective suppression of that same inflammatory process (by Vioxx) which was the same reason of why Vioxx was so effective as a pain reliever (from inflammation), was (allegedly) also the reason for non-fusion and poor and/or non-existent bone healing. Merck, allegedly knew this, but decided NOT to warn of the possibility. Instead, it pursued a very "muddy" picture of the original cox-1 whose overall "safety profile issues" was "addressed").

23

M013804380

I certify all of the above/below items to be true. I am asking surgeon/physicia
PROBABILITY based upon what I am providing in the letter/attachments Th
information. Not one single physician or surgeon has been even considered ii
In understanding the reluctance now a days for any signature, which I can un
that NOT ONE SINGLE PERSON, physician, surgeon, physical therapist, or
individual is implicated. Further, the signature below shall be considered as now and permanently holding all said
individuals and not within the scope of the litigation. This is a complete release of all claims to third parties mentioned
above should they feel the need, and even if they should not feel the need!

_Dennis R. Harrison_      11 29 05
Dennis Richard Harrison

## REASONABLE DEGREE

The Vioxx litigation requirements which the litigants needs to obtain from their physicians requires a
REASONABLE degree of medical probability that Vioxx caused the injury claimed by the litigant. In the
case of Mr Harrison and his allegations in regard to his right femur, and based upon the information provided
here and in my records, it would appear his lack of sufficient femur healing to correlate with a
REASONABLE degree of medical probability from his use of Vioxx Folowing the pagragraph of which the
court, at this time requires a medical opinion includes the attestations that the request of 26(a)(2) (below)
require.

Based upon that which Mr. Harrison has brought to my attention, and my knowledge of him as I have
explained, I believe that a REASONABLE degree of medical probability does exist in Mr. Harrison's case.

_James L Wise MD_    12·11·08
Dr. James L. Wise, M.D.
Rheumatalogist
78 Maiden Lane
Kingston, NY   12401

A Rule 26(a)(2) case specific expert report from a medical expert attesting
(i) to a reasonable degree of medical probability that the Plaintiff or
Claimant suffered an injury and (ii) that Vioxx caused the injury. The
case specific expert report must include (i) an explanation of the basis of
the attestation that Vioxx caused the Plaintiff or Claimant to suffer the
injury, (ii) an identification of any other causes that were considered in
formulating the opinion, (iii) a description of the specific injuries allegedly
suffered; (iv) a description of the specific medical findings that support the
diagnosis of those injuries; and (v) and identification of all documents
relied on by the expert in forming his opinions.

### REASONABLE degree as indicated

i – Explanation via correlation of Vioxx usage, event timing  and overall operation(s) failure/success
ii – No clinical or symptoms of infection not documented as causation for bone not healing either in
(failure) KINGSTON (BENEDECTINE), (failure) ALBANY MEDICAL CENTER and of course not
during the successful RIDGEWOOD, NJ Operation.
iii – Injury well documented; fractured femur
iv – Medical findings of broken femur; also inadequate bone healing in X-Rays
v – Ridgewood Records, records as indicated in this letter certified by Mr. Harrison, attachments

3