UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This Document Relates to | * | |
| Cases Listed on Exhibit A to Pretrial | * | |
| Order 58, As Amended (the VTE Cases) | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

MERCK'S REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR RECONSIDERATION OF
APRIL 9, 2013 ORDER AND REASONS

Four things are wrong with Plaintiffs' Opposition.[1]

First, in an effort to defend the use of a multiplier to create statistical significance, the Opposition does not fairly and accurately quote Dr. Spyropoulos's testimony.  To be sure, he stoutly defends the reliability of the scientific data supporting the use of a multiplier in connection with Deep Vein Thromboses ("DVTs").  But he cannot, and does not, say the same for the data regarding Pulmonary Emboli ("PEs").  Indeed, he admitted that the data do not support use of a multiplier for PEs.  Only by ignoring much of his testimony and quoting other testimony using an ellipsis—one that omits ***ten lines' worth of concessions*** that the multipliers would constitute "imprecise extrapolation" and would not be "methodologically proper" as applied to PEs—can Plaintiffs assert that "Dr. Spyropoulos specifically states that the multiplier

---

[1] VTE Plaintiffs' Mem. in Opp'n To Merck's Motion for Reconsideration of the Court's April 9, 2013 Order [Rec. Doc. 64483] ("Opp'n").

*should* apply to PE as well as DVT."[2]  Because there is no reliable data to support the use of a multiplier in PE cases, Plaintiffs cannot prove a causal relationship between Vioxx and PE injuries.

Second, Plaintiffs' effort to justify the use of a multiplier even for DVTs is equally meritless, for they attack a straw man.  Merck argued that all of the data upon which Dr. Spyropoulos relies to support the use of multipliers is skewed, because it comes from ***hospitalized*** patient populations, who have an inherently greater risk for venous thromboemboli ("VTE").[3]  The relevant population with respect to the Vioxx clinical trials and the Zambelli-Weiner and Brooks Pooled Analysis is, however, the general population, not hospitalized patients.  Inexplicably, the Opposition asserts that Merck's objection to the data on which Dr. Spyropoulos relies is that it came exclusively from a *subset* of hospitalized patients (*i.e.*, post-surgical patients).  Plaintiffs have not responded to the objection Merck *did* make and, therefore, do not even address the point that the extrapolation of data from a hospitalized population to the non-hospitalized general population is biased and unreliable.

Third, in seeking to justify the exclusion of certain studies—most notably, the APPROVe study—from the Pooled Analysis, the Opposition misstates a critical fact.  Plaintiffs now claim that exclusion of APPROVe and other studies terminated prior to conclusion was justified because such data risked "biasing the efficacy or safety estimates, particularly when ***patient-level information for the full follow-up time is not available***."[4]  But this justification has no warrant, because follow-up data *are* available from the APPROVe study.  With no scientifically sound

---

[2]  *Id*. at 8 (emphasis in original).

[3]  *See* Merck's Motion for Reconsideration [Rec. Doc. 64435] ("Mot. Recons.") at 9-10.  The term "VTE" includes both PE and DVT.

[4]  Opp'n at 13 (emphasis added).

explanation for excluding APPROVe, the Pooled Analysis is therefore fundamentally flawed.

Fourth, Merck's motion was timely. There is no time limit on motions to reconsider interlocutory orders, and the Court's Order merits reconsideration in light of the implications it has for multiple pending cases.[5]

## I. THE USE OF MULTIPLIERS TO PROVE THAT VIOXX CAUSES VTE INJURIES IS NOT SUPPORTED BY RELIABLE SCIENTIFIC DATA.

The expert testimony of Drs. Zambelli-Weiner and Brooks that Vioxx causes PE and DVT injuries depends on the use of multipliers to achieve statistical significance—without the multiplier, there is no evidence of risk. But the use of these multipliers is unreliable because: (1) Plaintiffs' own expert acknowledged that a multiplier cannot reliably be used for PE; and (2) the multipliers were derived from data relating to a different patient population that is uniquely prone to PEs and DVTs. Plaintiffs' responses to these two points lack merit.

### A. There Is No Sound Basis For Applying a Multiplier *in PE Cases*.

Dr. Spyropoulos testified that the ratios on which the multipliers are based "are inapplicable to asymptomatic PE," and that using the same DVT-based multiplier for PEs constitutes "imprecise extrapolation" from the data.[6] The Opposition states flatly that "Dr. Spyropoulos specifically states that the multiplier *should* apply to PE as well as DVT,"[7] and

---

[5] Plaintiffs also argue that reconsideration is improper because there have been no "intervening changes in law or fact." *See* Opp'n at 5. But the Court has not required such changes in ruling on motions for reconsideration in this litigation. *See In re: Vioxx Prods. Liab. Litig.*, 230 F.R.D. 473, 475, 478 (E.D. La. 2005). Because clear error is a basis for reconsideration, as Plaintiffs acknowledge, *see* Opp'n at 2, Merck respectfully submits that reconsideration is proper.

[6] Spyropoulos Dep. at 241:12-17; 228:14-229:5.

[7] Opp'n at 8 (emphasis in original). The Opposition chides Merck for ignoring that Dr. Spyropoulos did not just rely on the CHEST guidelines ("the Guyatt article"), but also "*other medical literature and from his experience as a clinician.*" *Id*. at 7 (emphasis in original). But the Opposition does not identify that "other medical literature," nor does it cite to Dr.

quotes his testimony in this way:

> I think what we do know is that DVT and PE are subcomponents of the same disease process, so I think most of us are comfortable in extrapolating whatever ratio we have for one aspect of the disease we can apply to the other. . . . whatever objective testing establishes the baseline risk, and usually it's DVT, then the multiplier can likely equally be applied to either DVT or PE.[8]

This excerpting of his testimony is selective and misleading. The actual testimony is as follows (with the portions quoted by Plaintiffs in italics and the portions edited out in bold):

> Q. **So are you aware of any basis, any study, any data whatsoever that suggests that to determine the number of asymptomatic PE, one should multiply the number of symptomatic VTE by 30?**
>
> A. **I'm not aware from PE, you know, as a component of VTE.** *I think what we do know is that DVT and PE are subcomponents of the same disease process, so I think most of us are comfortable in extrapolating whatever ratio we have for one aspect of the disease we can apply to the other.* **Although you're right, it's an imprecise extrapolation. You have much more data in terms of objective verification using DVT based objective testing.**
>
> Q. **Okay. I want to be very sure I understand your sworn testimony. Are you offering the opinion that to determine the number of asymptomatic PE, that it is methodologically proper to multiply the number of symptomatic VTE by either 30 or 10?**
>
> A. **No. No. What I'm saying is that if** *whatever objective testing establishes the baseline risk, and usually it's DVT, then the multiplier can likely equally be applied to either DVT or PE.* **So the fact is that the majority of VTE events in any study situation will be DVTs, okay, by virtue of the natural history and natural course of disease. Only about maybe 1 in 10 events will be PEs. So what you just said will usually apply to DVTs, not**

---

Spyropoulos's testimony where he might have done so; the Opposition refers only to three iterations of the CHEST guidelines. *Id*. at 8.

[8] *Id*. at 8-9.

> **PEs.  But it doesn't necessarily exclude PEs, it's just that the data has really been formed from DVTs.**
>
> Q.  **The data that generated this 1 to 30 statistic –**
>
> A.  **Is from DVTs**.[9]

Plaintiffs' slicing and dicing of the testimony edits out:

- Dr. Spyropoulos's concession that he is "not aware" of data that would support the use of a multiplier for PEs;

- Dr. Spyropoulos's concession that "it's an imprecise extrapolation" as to PE and that there are "much more data in terms of objective verification using DVT";

- The question asking whether "it is methodologically proper to multiply the number of symptomatic VTE by either 30 or 10," and Dr. Spyropoulos's answer of "No.  No."; and

- Dr. Spyropoulos's further concession that the multiplier "will usually apply to DVTs, not PEs" and that "the data has really been formed from DVTs."

Plaintiffs also ignore the other concessions made by Dr. Spyropoulos elsewhere in his deposition and cited by Merck—that he agrees with Merck's expert that the data "are inapplicable to as*y*mptomatic PEs;" that he "agree[s] with [Merck's counsel] in the sense that I would be a lot more comfortable using that multiplier in the setting of DVT versus PE;" that "the majority of data comes from DVT data, I would be much more comfortable in using that multiplier in the DVT setting;" and "we don't have . . . the wealth and the breadth of data to support" the application of the multipliers with respect to PEs.[10]

Based on this record, no reliable basis exists to justify use of a multiplier for PEs.  Dr. Spyropoulos's concession that it is not "methodologically proper" to use a multiplier for PE should be dispositive by itself.  *See, e.g.*, *Port Auth. of N.Y. & N.J v. Affiliated FM Ins. Co.*, 245

---

[9]  Spyropoulos Dep. at 228:14-330:4 (emphasis added).

[10]  *Id.* at 241:12-17 ("I would agree with that.  That I agree with him."); 299:10-17; 229:2-5; 232:4-11.

F. Supp. 2d 563, 569 (D.N.J. 2001), *aff'd*, 311 F.3d 226 (3d Cir. 2002) (finding that expert testimony was unreliable, and thus inadmissible, where plaintiff's own expert conceded that determinations made as to past asbestos conditions based upon present dust sampling testing were either "unreliable, inadvisable, or unsupportable"). Especially in combination with the rest of his testimony denying the reliability of applying a DVT-based multiplier to PEs specifically, Dr. Spyropoulos's confessions of the methodological infirmities of such a multiplier compel exclusion under *Daubert*.

Plaintiffs proceed as if the issue were summary judgment, and it were sufficient that there was a snippet of testimony from Dr. Spyropoulos's deposition to support Plaintiffs' position, even if he effectively concedes Plaintiffs' position over and over. Merck is asking the Court to reconsider a *Daubert* ruling, however, and on a *Daubert* motion, the Court must assess the scientific reliability of the data on which Dr. Spyropoulos relies, as well as the scientific rigor with which he used the data, including whether he makes too great an analytical leap from the data to his conclusions. *General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997); *Black v. Food Lion*, 171 F.3d 308, 311 (5th Cir. 1999) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999). The highly edited snippets quoted by Plaintiffs do not satisfy that standard.

### B. Applying Multipliers Based On Hospitalized Patients To The Non-Hospitalized Vioxx Clinical Trial Populations Is Unreliable.

Any use of the multipliers is, in any event, unreliable (both as to PEs and DVTs) because the multipliers used by Drs. Zambelli-Weiner and Brooks to achieve statistical significance in their Pooled Analysis are based solely on data derived from *hospitalized* patients—both post-surgical hospitalized patients and non-surgical patients in the "general medical" hospitalized population.[11] Because hospitalized patients are more prone to develop VTEs, there is an

---

[11] The former group account for the higher multipliers in the CHEST guidelines; the latter
6

obvious potential for bias in extrapolating DVT data for hospitalized patients to non-hospitalized subjects. Plaintiffs miss the distinction (and the point), arguing that Dr. Spyropoulos has "debunk[ed]" the "argument that the multiplier can only be used for a surgical versus medical population."[12] But this response attacks an argument that Merck did not make.

Merck argued in its opening brief that the multipliers are derived from data relating to hospitalized populations, and should not be extrapolated to a non-hospitalized population.[13] Merck takes no position in this *Daubert* proceeding on whether multipliers derived from a post-surgical subset of the hospitalized population can reliably be applied to the medical subset of the hospitalized population. Dr. Spyropoulos acknowledged that the "surgical" and "medical" populations are both *hospitalized* populations, testifying that "there's a many-fold increased risk [of VTE] on *the hospitalized*, both medical and surgical populations, than [the non-hospitalized] community."[14] Indeed all the data upon which he relies—even the lower ratio of 2:1 for symptomatic to asymptomatic DVTs—are derived from *hospitalized* populations.[15]

There is no scientifically valid basis for applying ratios derived from high-risk, hospitalized populations to the data from the Vioxx clinical trials, which involved non-hospitalized, ambulatory subjects at much lower risk for experiencing VTEs. In a *Daubert*

---

group, for the lower multipliers. *See* Spyropoulos Dep. at 236:5-22.

[12]  Opp'n at 9.

[13]  *See* Mot. Recons. at 9-10.

[14]  Spyropoulos Dep. at 113:8-21; 112:-14-19; 114:13-24 (stating that he has no basis to disagree with study reporting over 100-fold greater incidence of VTE in hospitalized patients versus non-hospitalized patients). Dr. Spyropoulos went on to testify that even some portion of the VTE events diagnosed in the ambulatory community can be traced back to a previous hospitalization. *Id.* at 113:22-114:12.

[15]  *Id.* at 236:14-237:18.

proceeding, the burden is on Plaintiffs to establish the reliability of that extrapolation, and they have not done so.

*   *   *

For all of these reasons, the use of a multiplier was not reliable. Accordingly, Merck respectfully asks that the use of the multipliers be struck. In the alternative, Merck asks that the Court to limit the admissibility of the multipliers and the Zambelli-Weiner and Brooks Pooled Analysis to those cases where the plaintiff alleges a DVT injury, as opposed to a PE injury.

## II.  PLAINTIFFS' RATIONALE FOR EXCLUDING THE APPROVe STUDY DATA IS FACTUALLY MISTAKEN.

Even assuming that Drs. Zambelli-Weiner and Brooks applied *a priori* criteria to the selection of studies that constitute their Pooled Analysis,[16] it cannot satisfy *Daubert* because they offered no scientific basis for excluding the safety data from APPROVe. That data has been the foundation of plaintiffs' claims in this litigation, and the Court therefore has reason to examine with particular care whether the explanation given now for excluding the data from the experts' analysis is scientifically warranted, or merely opportunistic.[17]

---

[16]  The Court, however, should not assume that Drs. Zambelli-Weiner and Brooks used *a priori* criteria. They did not. As explained in Merck's Motion, they were still reviewing data from studies that they would ultimately exclude from their Pooled Analysis shortly before their export report was submitted. *See* Mot. Recons. at 12-16; Opp'n at 9-11. Plaintiffs argue that the experts were still examining this data in an effort to "compile a database of unadjudicated events." Opp'n at 10-11. Beyond this purported excuse (which Plaintiffs themselves tepidly characterize as "facially valid," *see id.* at 12), Plaintiffs offer no explanation of the other facts cited by Merck—*i.e.*, the fact that the experts had reviewed the Vioxx clinical trials before they selected their criteria, *see* Mot. Recons. at 13, and that Dr. Zambelli-Weiner could not even give a ballpark estimate as to when the criteria were decided, *id.* at 14-15. Plaintiffs still lack any objective evidence—for example, a document recording the *a priori* criteria and the day they were established—and in light of the circumstantial evidence suggesting that the criteria were fashioned *post hoc*, this failure of proof renders the analysis unreliable.

[17]  To be clear, given the value of placebo-controlled data for examining safety issues, it was scientifically suspect for Drs. Zambelli-Weiner and Brooks to omit from their Pooled Analysis *any* of the available placebo-controlled data from the Vioxx clinical trials. But their

Drs. Zambelli-Weiner and Brooks' only explanation for the exclusion of the APPROVe data is that the APPROVe study (along with the other Protocol 203 studies, ViP and VICTOR) was "terminated prematurely."[18] They gave no explanation beyond this conclusory statement *why* excluding the data on that ground was scientifically valid. Plaintiffs attempt to deal with this deficiency now in two ways. First, Plaintiffs try to shift the burden of proof, arguing that Merck did not come forward with evidence showing the *un*reliability of the premature-termination criterion.[19] Second, Plaintiffs assert (without any evidence in support) that, had they been asked, Drs. Zambelli-Weiner and Brooks would have testified that "including such studies risks biasing the efficacy or safety estimates, *particularly when patient-level information for the full follow-up time is not available*."[20] But, in fact, such information is available. Follow-up of patients in APPROVe continued for a full year or more after they came off treatment, with adverse events recorded throughout that period of time.[21] *See, e.g.*, MRK-S0420112017-132 (May 2006 submission to the FDA of APPROVe off-drug extension data) (attached hereto as Ex. 1), at MRK-S0420112020, 022. Plaintiffs' latest argument is irrelevant, in any event, because nothing in the record suggests that Drs. Zambelli-Weiner or Brooks subscribe to it; rather,

---

omission of the data from APPROVe is particularly troublesome considering the central role APPROVe has occupied in the withdrawal of Vioxx and the past decade of Vioxx litigation.

[18] *See* Zambelli-Weiner Dep. (Vol. I) at 156-57; Brooks Dep. at 68-69.

[19] That burden rests with Plaintiffs, not Merck. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998) (en banc) (burden on proponent of the expert evidence).

[20] Opp'n at 13 (emphasis added).

[21] APPROVe was approximately two months shy of its planned completion at the time that Vioxx was withdrawn from the market, and its original protocol called for fourteen days of patient follow-up after the discontinuation of treatment. At the time of withdrawal, however, the protocol was amended to call for follow-up of all randomized participants for at least one year off treatment. *See* Baron, *et al.*, *Cardiovascular Events Associated with Rofecoxib: Final Analysis of the APPROVe Trial*, 372 Lancet 1756-64 (2008).

Plaintiffs purport to speak for them after the fact.[22]

Because Plaintiffs' experts had no sound basis to support the scientific reliability of their criteria, the Pooled Analysis does not pass muster under *Daubert* and must be excluded.

## III.   MERCK'S MOTION WAS TIMELY

Plaintiffs devote a substantial portion of their brief to arguing that Merck's motion was not timely filed because the Court should import the 28-day deadline associated with motions brought under Rule 59(e) (which relates to reconsideration of final judgments) to the consideration of a motion brought under Rule 54(b) (which relates to the reconsiderations of non-final interlocutory orders, like the one at issue here).[23]  This argument is incorrect.  While the substantive standards for reconsideration under Rule 59 may guide courts in addressing motions brought under Rule 54(b), courts in this Circuit (including in the cases cited in Plaintiffs' brief) have repeatedly recognized that unlike Rule 59, Rule 54(b) does not contain any time limit for motions to reconsider interlocutory orders.  *Livingston Downs Racing Assoc., Inc. v. Jefferson Downs Corp.*, 259 F. Supp. 2d 471, 475 (M.D. La. 2002) ("[U]nlike Rule 59(e), Rule 54(b) does not contain any kind of time limit."); *Waste Mgmt. of La., LLC v. River Birch, Inc.*, Civ. Action No. 11–2405, 2012 WL 876717, at *2 (E.D. La. Mar. 14, 2012) ("Although Rules 59 and 60 set forth specific time frames during which reconsideration may be sought, Rule 54 sets forth no such limitation."); *Kellogg, Brown & Root Int'l, Inc. v. Altania Comm. Mktg. Co.*, Civ.

---

[22]   Plaintiffs' own expert gives reason enough to doubt the validity of the criteria for inclusion in the Pooled Analysis and Drs. Zambelli-Weiner and Brooks' exclusion of the placebo-controlled data from APPROVe and the other Protocol 203 studies, ViP and VICTOR.  Dr. Spyropoulos—who, unlike Drs. Zambelli-Weiner and Brooks is a medical doctor—relied on adverse event data from APPROVe and VICTOR in his report, Spyropoulos Rep. at 4, 5, and testified that the VTE data from APPROVe, VICTOR, and ViP are "high quality" and should have been included in any analysis of Vioxx and VTE, Spyropoulos Dep. at 150-51, 188-91.

[23]   *See* Opp'n at 5.

Action No. H–07–2684, 2009 WL 514054, at *5 (S.D. Tex. Mar. 2, 2009) ("The [Rule 59(e)] deadline, however, does not apply to motions for reconsideration of interlocutory orders."); *T–M Vacuum Prods., Inc. v. TAISC, Inc.*, Civ. Action No. H-07-4108, 2008 WL 2785636, at *2 (S.D. Tex. July 16, 2008) (same). Rather, Rule 54(b) provides for the revision of an interlocutory order "at any time before the entry of a judgment," Fed. R. Civ. P. 54(b), and a motion under Rule 54(b) is proper "so long as the motion is not unreasonably delayed." *Kellogg, Brown & Root*, 2009 WL 514054, at *5.

Merck did not make the decision to seek reconsideration lightly. The issues raised in Merck's Motion, and particularly the question of whether the multipliers can be reliably applied to achieve statistical significance with respect to PEs, are dispositive in a large percentage of the remaining cases in this litigation. Rather than draining additional resources from the Court and the parties as attention turns to discovery in individual cases, it is more efficient for these legal issues to be thoroughly addressed prior to the preparation of these remaining cases for trial.[24]

---

[24] Finally, Plaintiffs brandish an analysis of Utah Medicaid claims data undertaken by an expert witness retained by plaintiffs in the Vioxx attorneys general litigation, and suggest that their "case" has now been bolstered by the emergence of this report. Opp'n at 13-14. This expert has not been disclosed or deposed in the MDL, and this data, of course, is irrelevant to any assessment of the reliability of Plaintiffs' experts under *Daubert* because none of their experts have relied on it in forming their opinions offered here. It is simply alleged expert evidence without a sponsor.

**CONCLUSION**

For the foregoing reasons, as well as those set forth in its Motion, Merck respectfully requests that the Court grant the Motion to Reconsider and exclude the testimony of Drs. Zambelli-Weiner and Brooks. In the alternative, the Court should bar Drs. Zambelli-Weiner and Brooks' testimony about the Pooled Analysis and the multipliers in those cases where plaintiff alleges a PE.

Dated:   August 6, 2013                        Respectfully submitted,

By: */s/ Dorothy H. Wimberly*
    Phillip A. Wittmann, 13625
    Dorothy H. Wimberly, 18509
    STONE PIGMAN WALTHER
    WITTMANN L.L.C.
    546 Carondelet Street
    New Orleans, LA 70130
    Phone: 504-581-3200
    Fax:    504-581-3361

    Defendants' Liaison Counsel

   —and—

    Douglas R. Marvin
    Eva Petko Esber
    M. Elaine Horn
    WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, N.W.
    Washington, DC 20005
    Phone: 202-434-5000
    Fax:    202-434-5029

    John H. Beisner
    Jessica Davidson Miller
    SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
    1440 New York Avenue, N.W.
    Washington, DC 20005

    ATTORNEYS FOR MERCK SHARP &
    DOHME CORP.

1134610v1

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing Reply in Support of Merck's Motion for Reconsideration has been served on Liaison Counsel, Russ Herman, Phillip Wittmann and Ann Oldfather, by U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8C, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 6th day of August, 2013.

                                                         */s/ Dorothy H. Wimberly*
                                                         Dorothy H. Wimberly, 18509
                                                         STONE PIGMAN WALTHER WITTMANN L.L.C.
                                                         546 Carondelet Street
                                                         New Orleans, LA  70130
                                                         Phone:  504-581-3200
                                                         Fax:     504-581-3361
                                                         dwimberly@stonepigman.com

                                                         Defendants' Liaison Counsel