# Exhibit B

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX Products Liability Litigation | * | MDL No. 1657 |
| | * | |
| This Document Relates to: | * | SECTION L |
| | * | |
| State of Alaska v. Merck, et al. | * | JUDGE ELDON F. FALLON |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | KNOWLES |
| | * | |
| | * | |

*************************************************************************

### FIRST AMENDED COMPLAINT

Plaintiff, the State of Alaska ("the State" or "Alaska"), alleges for its First Amended Complaint as follows:

### NATURE OF THE ACTION

1.     This is a civil action brought by the State of Alaska for violations of Alaska's Unfair Trade Practices and Consumer Protection Act, AS 45.50.471, *et seq.* ("the Act") against Merck & Co., Inc. ("Defendant" or "Merck").

2.     The State alleges that Defendant violated the Act in connection with its development, marketing, distribution, promotion, and sale of Vioxx. Specifically, Defendant used an unfair and deceptive promotional campaign for Vioxx directed at consumers, health care professionals, and state agencies. Defendant made unfair and deceptive statements either through affirmative representations or omissions of material fact related to the side effects and efficacy of Vioxx.

## PARTIES AND JURISDICTION

3.     Plaintiff Alaska brings this action, by and through its Attorney General, for violations of Alaska's Unfair Trade Practices and Consumer Protection Act, AS 45.50.471, *et seq.*

4.     The State is authorized to bring this lawsuit by virtue of AS 44.23.020, 45.50.501, and 45.50.551.

5.     Defendant is a global pharmaceutical company incorporated under the laws and statutes of the State of New Jersey with its principal place of business being One Merck Drive, WS3 AB-05, Whitehouse Station, New Jersey.  Merck is licensed to and does conduct business in Alaska.

6.     At all times material to this complaint, Defendant transacted business within the State of Alaska by, among other things, advertising, soliciting, selling, promoting, marketing, and distributing the pharmaceutical product known as Vioxx to physicians, healthcare providers, consumers, and other purchasers in Alaska.   Therefore, Defendant is subject to personal jurisdiction pursuant to Alaska's Long Arm Statute, as codified in AS 09.05.015.

7.     The Superior Court for the State of Alaska, Third Judicial District at Anchorage, has subject-matter jurisdiction based upon AS 45.05.501 and 45.50.551, which provide remedies to redress Defendant's conduct and authorizes the State of Alaska to bring this action.

8.     Because the State of Alaska is not a citizen for purposes of diversity jurisdiction, no federal court can exercise subject-matter jurisdiction over this case by virtue of diversity of citizenship. *State of Alaska v. K&L Distributors, Inc.*, 318 F.2d 498, 498 (9th Cir. 1963); *Tex. Dept. of Hous. & Cmty. Affairs v. Verex Assurance, Inc.*, 68 F.3d 922, 926 (5th Cir. 1995).

9.     The State of Alaska asserts a claim only under state law.  Accordingly, no federal

court can exercise subject-matter jurisdiction over this case by virtue of federal-question jurisdiction because the claim does not "arise" from federal law nor is federal law "a necessary element" of the State's claim for relief. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001); *Nevada v. Bank of America Corp.*, 672 F.3d 661, 674-76 (9th Cir. Mar. 2, 2012).

10.     Venue is proper in The Superior Court for the State of Alaska, Third Judicial District at Anchorage pursuant to Section 45.50.501 of the Alaska Statutes and Rule 3 of the Alaska Rules of Civil Procedure because some of Defendant's unlawful acts and practices that give rise to this Complaint arose in this judicial district and the Defendant is doing business in this judicial district.

### FACTUAL ALLEGATIONS

11.     All practices, acts, and omissions alleged herein to have been committed by Defendant were committed by Defendant's officers, directors, employees, or agents, who, at all times, acted on behalf of Defendant and whose practices, acts, and omissions were authorized and/or ratified by Defendant.  Accordingly, Defendant is liable under doctrines of vice-principal, respondeat superior and agency as those terms are defined and applied under the laws and statutes of Alaska.

### A.     Scientific Background

12.     Vioxx® is the brand name of rofecoxib, a nonsteroidal anti-inflammatory drug ("NSAID") used in the treatment of arthritis and other acute pain.

13.     At all times relevant herein, Merck developed, marketed, distributed, promoted and sold Vioxx.

14.     NSAIDs act by preventing the formation of cyclooxygenases, which reduce

3

inflammation which results in pain relief.

15.    There are two types of cyclooxygenases, COX-1 and COX-2.  COX- 1 is involved in the production of protective prostaglandins responsible for the maintenance of normal gastro-intestinal mucosa, and the production of thromboxane, which promotes platelet aggregation and blood vessel constriction.  COX-2, a major source of prostacyclin which inhibits platelet aggregation and promotes blood vessel opening or dilation.

16.    Traditional NSAIDs, like aspirin, reduce pain sensations by inhibiting both COX-1 and COX-2 enzymes.

17.    Vioxx is different from traditional NSAIDs in that it only inhibits COX-2.

18.    But by inhibiting only COX-2, Vioxx causes an imbalance between the enzymes that promote platelet aggregation and blood vessel constriction without the mediating effect of platelet inhibition and dilation. This imbalance leads to serious cardiovascular and neurovascular problems, including heart attack, stroke and thromboembolic events.

19.    Because of its unique chemical make-up, Vioxx is more cardiotoxic than other COX-2 inhibitors.

**B.    Merck Needed a New Blockbuster.**

20.    Merck first announced that it was developing a COX-2 specific inhibitor in May 1996.  At the time it began advance promotion of the drug, Merck faced patent expirations on some of its most successful drugs including Mevacor, Pepcid, and Prilosec that had represented more than $4 billion in U.S. drug sales.  Merck needed a "blockbuster" drug to offset the loss of revenue streams due to imminent patent expirations.

21.    Similarly, Merck faced a significant competitive threat from Monsanto and Pfizer, two other pharmaceutical companies that together were developing another COX-2 inhibitor,

Celebrex.  Celebrex was slated to go to market months ahead of Vioxx.

### C.   Merck Knew of the Cardiovascular Risk of Vioxx Long Before it Withdrew Vioxx From the Market.

#### 1.   Early Evidence

22.     Before Vioxx was put on the market, Merck had ample evidence that Vioxx caused cardiovascular events.

23.     On November 21, 1996, an internal Merck memorandum suggested that, because participants in a gastrointestinal outcome study would not be permitted to use aspirin during the study "there is a substantial chance that significantly higher rates" of cardiovascular problems would be seen in Vioxx patients.

24.     On February 25, 1997, Merck scientist Briggs Morrison sent an internal e-mail about the design of a gastrointestinal outcome study.  In that e-mail, Morrison suggested that trial participants be allowed to take aspirin to avoid flagging the cardiovascular risks of Vioxx.  Unless patients in the Vioxx group could take aspirin, he warned, "without COX-1 inhibition [i.e., aspirin] you will get more thrombotic events and kill drug [sic]."

25.     Merck researcher Alise Reicin responded in an internal Merck e-mail that Merck was in:

> ... a no win situation! The relative risk of [adverse GI events with] even low dose aspirin may be as high as 2-4 fold. Yet, the possibility of increased CV [cardiovascular] events is of great concern (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients — i.e., those that have already had an MI, CABG, PTCA?  This may decrease the CV event rate so that a difference between the two groups would not be evident. The only problem would be -- Would we be able to recruit any patients?

26.     Coincident with the approval of Vioxx in 1999, a University of Pennsylvania

cardiologist, Garret A. FitzGerald, M.D., presented research that Merck was aware of hypothesizing that inhibiting COX-2 would lead to the prevention of production of prostaglandin, the primary cyclooxygenase product in endothelium, a slick layer of cells that prevents interaction between blood cells and vessel wall to help regulate blood flow, coagulation, and smooth vascular tissue.

27.     Two other early studies of Vioxx, study 085 and 090, revealed that Vioxx caused a greater incidence of cardiovascular events compared to other NSAIDs.

## 2.     VIGOR Results Confirm CV Risk

28.     In late 1996, Merck began to plan a large-scale, long-term, double-blind study of gastrointestinal toxicity in patients taking Vioxx or naproxen to treat arthritis. This study came to be called the Vioxx Gastrointestinal Outcomes Research study ("VIGOR").

29.     Merck designed VIGOR to minimize the number of cardiovascular events by excluding patients with known heart problems from the study. In the event cardiovascular events occurred among the study population, Merck designed the reporting system to record them.

30.     Merck knew the results of VIGOR in March 2000. The results showed that Vioxx patients suffered significantly more blood clot related problems. The heart attack rate in the Vioxx group appeared to be four times as high as the naproxen group. (Later analysis would show it to be five times as high.)

31.     Merck also designed VIGOR to minimize the number of gastrointestinal events.

32.     In March 2000, Dr. Scolnick, the Merck research chief, recognized the results of VIGOR involved risk inherent in Vioxx. In a March 9, 2000, e-mail with the subject line "Vigor," Dr. Scolnick said the results showed that the cardiovascular events "are clearly there." In an acknowledgment that Vioxx's own mechanism was at least partially at fault for the heart

data, he wrote: "It is a shame but it is a low incidence and it is mechanism based as we worried it was."

33.     Dr. Scolnick wrote that he wanted other data available before the results were presented publicly, so "it is clear to the world that this" was an effect of the entire COX-2 class, not just Vioxx. The research chief recalled some of his greatest hits that also had side effects but were big sellers. In Vioxx, he wrote, "We have a great drug and like angioedema with vasotec and seizures with primaxin and myopathy with mevacor there is always a hazard. The class will do well and so will we."

34.     Neither VIGOR nor earlier studies conducted by Merck (the "osteoarthritis studies") were designed to assess the cardiovascular effect of Vioxx and other NSAIDs. Because VIGOR was a particularly robust study in number of patients and duration, well-grounded conclusions concerning the cardiovascular effects of Vioxx could be drawn from the study. VIGOR enrolled more patients than in all of the prior osteoarthritis studies combined. VIGOR's median duration (9 months) was considerably longer than the length of the osteoarthritis studies (more than three-fourths of the patients in these studies were enrolled for either six weeks or six months). VIGOR also included a blinded, expert adjudication to confirm the nature and seriousness of all cardiovascular-related adverse events, while the earlier osteoarthritis studies did not.

35.     At no point before September 30, 2004, did Merck inform the public in Alaska that Vioxx caused an increased risk for cardiovascular events.

### D.     Merck Manipulated Study Design to Further Its Marketing Goals.

36.     Although Merck knew of the increased CV risk posed by Vioxx, it designed its studies to minimize both CV events and GI events.

37.     As mentioned earlier, when discussing the increased CV risks of Vioxx, Dr. Reicin suggested in a 1997 email that they exclude patients with a high risk of CV events from Vioxx studies.

38.     Consistent with Dr. Reicin's suggestion, the VIGOR study excluded patients who had experienced a "cerebrovascular event" within two years of the study or a myocardial infarction or a coronary bypass within the year prior to enrollment in the study.  Also, parties taking prophylactic aspirin were excluded from the study, which meant that anyone with a past history of cardiac events was excluded.

39.     Merck also designed the studies to insure a low incident rate of GI events as compared to the NSAIDS on the other side of the study.

40.     Also, Merck failed to consider the effect of the steroids taken by 56% of the patients enrolled in the VIGOR study and its effect on the GI events recorded.

41.     Besides designing the studies to minimize CV and GI events, Merck also designed studies as marketing tools to reach doctors.

42.     Merck did extensive market research to determine how to design studies to best influence doctors to prescribe Vioxx.

43.     In January 1999, before the approval and launch of Vioxx, Merck's marketing division conceived the ADVANTAGE clinical trial.  Physician-investigators, participants, and institutional review board members were told that the purpose of the ADVANTAGE trial was to measure the gastrointestinal safety of Vioxx.

44.     Merck's actual goal of ADVANTAGE was for investigators to gain experience with Vioxx prior to and during the critical launch phase in order to seed the industry with the use of Vioxx in lieu of other treatments or drugs.

8

### E.   Merck Knew that Vioxx's GI Benefit and Efficacy Was No Greater than Other NSAIDS.

45.   Merck was also aware that Vioxx's GI benefit was not as good as they touted the GI benefits to be to the citizens of Alaska.

46.   For one, the VIGOR study only shows a GI benefit of statistical significance between individuals who are taking Vioxx and Naproxen as well as steroids.

47.   In a study known as Study 069, the GI benefits of Vioxx were only seen in the first month of use.  For long term users, there was no GI benefit.

48.   In other studies, Merck used artificially high doses of NSAIDS to skew the GI benefits of Vioxx.  For example, early studies used 2,400 milligrams of ibuprophen in a comparison to 50 milligrams of Vioxx even though early studies showed that 400 milligrams of ibuprophen was equivalent to 50 milligrams of Vioxx for pain relief.

49.   Merck also touted Vioxx as more efficacious than other comparable NSAIDs when the pain relief was, at most, equivalent.

### F.   Merck Conducted a Lengthy, Purposeful Campaign of Misrepresentations to Minimize the CV Risk of Voixx and Maximize Vioxx's Alleged Benefits to the Public.

50.   Beginning no later than April 2000, and continuing until Vioxx was pulled from the market in 2004, Merck engaged in a campaign to suppress, misrepresent, and conceal adverse cardiovascular data concerning Vioxx, including adverse data from VIGOR, in its communications to doctors, healthcare programs, and consumers in Alaska.  Furthermore, Merck misrepresented the gastrointestinal and efficacious benefits of Vioxx.  Described below are a few examples of Merck's conduct that comprised its on-going pattern of unfair, deceptive, fraudulent and illegal conduct.

1.   **Merck Representatives Provided False and Misleading Information to Healthcare Providers and Programs that Treated Alaskans.**

51.   Merck undertook a campaign to counter each new revelation or analysis of the VIGOR cardiovascular data by providing healthcare providers and healthcare programs with distortions of those data.  Until Vioxx was removed from the market in 2004, Merck directed all of its sales representatives with responsibility for selling Vioxx ("sales reps") to provide misinformation to healthcare providers about the cardiovascular safety information from VIGOR, gastrointestinal safety information, and efficacy claims.

52.   Merck called these directives to its sales reps "Obstacle Responses."  These directives included scripts the sales reps were required to follow to overcome the "obstacles" to Vioxx sales.  The Obstacle Responses directed the sales reps not to deviate from Merck's script or to go beyond the limited information set out in the Obstacle Response when responding to concerns.

53.   Using these Obstacle Responses, Merck successfully barraged doctors with its message that Vioxx was safe and effective.

54.   Each of Merck's Obstacle Responses and similar communications, which were national in application, were transmitted to Merck's representatives in Alaska and surrounding states.  Merck's sales reps, in turn, communicated the information Merck designated, and only that information, to doctors who treated Alaskan patients and other healthcare providers that affected the treatment of Alaskan patients.

55.   In an April 28, 2000, Obstacle Response, Merck directed its sales reps to use a newly developed "Cardiovascular Card" to "respond to questions [from physicians] about the cardiovascular effects of VIOXX."  However, this Cardiovascular Card was misleading to physicians because it contained no information from VIGOR.  It dealt only with the much

10

smaller scale, shorter duration, less rigorous osteoarthritis studies. The Cardiovascular Card, therefore, was intended to divert doctors' attention from VIGOR's negative results to the less valid cardiovascular safety data from the osteoarthritis studies.

56.     Merck also provided its sales reps with a "Roadmap to the CV Card." In the "Roadmap," Merck instructed its sales reps "[t]o ensure that the physician agrees that the cardiovascular events seen with VIOXX in OA [osteoarthritis] clinical trials were low and similar to diclofenac and nabumetone [two other NSAIDs]." This sales presentation did not use valid comparisons or address VIGOR's finding of Vioxx's increased cardiovascular risks.

57.     In another Obstacle Response dated May 1, 2000, Merck directed sales reps to respond to doctors' questions about Vioxx's cardiovascular risks, by giving only the percentage of patients in the Vioxx and naproxen groups in VIGOR who had had a heart attack (.5 percent and .1 percent, respectively), and omitting material facts: the number of patients enrolled in the study (over 8,000); the number of patients who had had a heart attack; and a measure of either the high statistical significance of these findings or the relative risk (a five-fold increase for Vioxx if all the patients who had a heart attack were counted). The sales reps were also told to guide the doctor through less valid and more favorable data from the osteoarthritis studies described on the Cardiovascular Card.

58.     On May 22, 2001, citing the cardiovascular data from VIGOR, The New York Times published an article that discussed some doctors' concern with the cardiovascular safety of Vioxx. On May 24, 2001, Merck sent its sales reps an Obstacle Response addressing this article. Again, Merck directed its sales reps to limit their answers to doctors' questions about VIGOR to the percentage of Vioxx and naproxen patients in VIGOR who had had a heart attack.

59.     The sales reps were instructed to use their Cardiovascular Cards to show the data

from the osteoarthritis studies.  They were directed to tell doctors that the incidence of heart attack in these smaller, generally shorter studies was less than 0.01 percent with Vioxx and that cardiovascular mortality in 6,000 patients (without identifying the studies, which appear to have been the osteoarthritis trials) was Vioxx 0.1, NSAIDs 0.8 and placebo 0.

60.    On August 21, 2001, Merck communicated to all sales reps responsible for selling Vioxx in response to an article in the Journal of the American Medical Association ("JAMA"), which analyzed the cardiovascular data from VIGOR.  The JAMA article reported that the incidence rate of serious cardiovascular thrombotic events in the Vioxx group, compared to the naproxen group, was highly statistically significant.  The article compared the incidence of heart attacks among the VIGOR Vioxx group to the rate of heart attacks suffered by patients receiving a placebo in a very large meta-analysis and found it was statistically significant.  The authors urged doctors to exercise caution in prescribing Vioxx for patients at risk of cardiovascular disease.

61.    In its August 21, 2001, communication, Merck directed its sales reps when responding to questions doctors might raise concerning the JAMA article to use the May 1, 2000, Obstacle Response, which limited its information about the VIGOR study to the percent of patients in the Vioxx and naproxen groups who had had a heart attack.

62.    Merck's message to doctors and healthcare providers was unequivocal: Merck had the data it needed to evaluate Vioxx's cardiovascular risk, and its data "suggest[ed] that there is no increase in the risk of cardiovascular events as a result of treatment with Vioxx."  This statement was based on data from a purported internal Merck meta-analysis involving 28,000 patients, though the supporting data were not publicly available. The only data from VIGOR included in Merck's response to the JAMA article was the same information previously given

12

concerning the <u>percentage</u> of VIGOR subjects who suffered heart attacks.

63.     Merck also informed its sales reps, and by extension prescribing doctors and healthcare providers, that the difference in the rate of heart attacks between Vioxx and naproxen patients "is consistent with the ability of naproxen to inhibit platelet aggregation" i.e., that naproxen acts in a manner similar to aspirin to prevent the blood from clotting and causing thromboses.    There were, however, no adequate studies to support this hypothesis, and the magnitude of the effect Merck claimed for naproxen's supposed anti-platelet properties exceeded that seen in the literature for any other anti-platelet agents.

64.     Merck also issued a "General Bulletin" sometime after September 17, 2001, which instructed its sales reps to respond to doctors' questions concerning the cardiovascular outcomes from VIGOR, and specifically, the higher rate of heart attacks for Vioxx than naproxen, by refusing to discuss VIGOR because it was not reflected on the label. Instead sales reps were to show doctors the results from the osteoarthritis studies, the same studies that were on the Cardiovascular Card.

65.     On September 17, 2003, Merck issued another Obstacle Response directing how its sales reps were to respond to doctors' questions about an abstract presented at the 2003 annual meeting of the American College of Rheumatology.    The abstract concerned a study funded jointly by Merck and Harvard University which showed that (a) the use of Vioxx increased the adjusted relative risk of cardiovascular events over the use of Celebrex, a competing NSAID, or no NSAID, (b) the most common dosage of Vioxx was associated with the highest risk, and (c) the risk may be highest in the first ninety days of Vioxx treatment, which could adversely affect new prescriptions and new sales.    The Obstacle Response directed the sales reps to respond to questions about the <u>cardiovascular</u> findings in the 2003 abstract by stating:   "First, Doctor, let me

say that based on all of the data that are available, Merck stands behind the overall efficacy and safety profile of Vioxx." This statement was misleading because it suggested that Merck had a valid basis for believing in the cardiovascular safety of Vioxx and that the doctor need not worry about the potential for increased serious cardiovascular thrombotic adverse events in prescribing Vioxx for patients, including patients with established coronary artery disease.

66.     The Obstacle Response warned sales reps not to deviate from Merck's script and directed the sales reps to say, "Doctor, let me review the cardiovascular effects section of the VIOXX label," but omitted material elements of the label. It mentioned the total number of patients in the study (Vioxx and naproxen groups combined, preventing the doctor from making even a gross assessment of relative risk), the median age of the patient population and duration of the study, the raw number of cardiovascular thrombotic events for the two treatment groups, and the number of deaths in each group due to cardiovascular thrombotic events along with the assertion that these mortality data were "similar between the treatment groups." The Obstacle Response omitted material information from the Vioxx label, such as:

- VIGOR excluded patients with a predisposition to developing serious cardiovascular problems;

- VIGOR showed a statistically significant greater incidence of serious cardiovascular events in Vioxx patients as opposed to naproxen patients largely due to a difference in the incidence of heart attacks between the groups; and

- the information about VIGOR, as well as two other studies, "should be taken into consideration and caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease."

Moreover, the Obstacle Response omitted any mention of heart attacks.

67.     Barely one month before Merck pulled Vioxx from the market, it issued its final Obstacle Response on August 26, 2004, in response to a presentation of information from a massive observational study of Vioxx's cardiovascular safety at the August 2004 International

14

Society for Pharmaco Epidemiology Conference. This study estimated that Vioxx had contributed to 27,785 acute heart attacks and sudden cardiac deaths among Americans who had taken the drug between 1999 and 2003. The August 26, 2004, Obstacle Response varied little from the one Merck issued in September 2003, other than the addition of the statement that, "Based on all of the available data, VIOXX remains an excellent choice for your appropriate patients." But Merck did not identify which patients were inappropriate for VIOXX or indicate that additional information was available on which the physician could base that decision.

68. Merck's sales reps that called on doctors that treated Alaskan patients received all of the company's Obstacle Responses concerning Vioxx and other communications about how to respond to doctors' questions relating to the cardiovascular safety profile of Vioxx. These sales reps communicated the messages contained in those documents to doctors treating Alaskans in accordance with the company's instructions and directions described above.

69. Merck also presented this false and misleading information to the members of the Pharmacy and Therapeutics Committee in Alaska.

### 2. **Merck Sponsored and Disseminated False and Misleading Scientific Articles**

70. Merck engaged in an elaborate scheme to create or publish scholarly articles under fake or ghost authors in order to further develop support for Vioxx®. These articles appeared in medical journals and other industry publications including the Journal of the American Medical Association.

71. Merck also misrepresented the incidence of heart attacks suffered by Vioxx patients in the VIGOR study in a November 2000 article that had two Merck employees among its authors and was published in the highly regarded, widely circulated, peer-reviewed,

professional journal New England Journal of Medicine ("NEJM").

72.    In March 2000, Merck received data from VIGOR showing that twenty Vioxx patients had suffered heart attacks thus far in the study, while only four naproxen patients had had heart attacks during the same period.  Initially, the draft of the article concerning VIGOR contained a table entitled "CV" events showing numbers of heart attacks.  However, two days before the article was submitted to the NEJM, the data was deleted, and the draft was submitted with a blank table.  Later drafts, and the final article, reported only seventeen of the twenty heart attacks among the Vioxx patients in the VIGOR study.

73.    Thus, though the two Merck employees who were authors of the article were aware of the additional three heart attacks among the Vioxx group no later than July 2000, after five drafts, the final, published version of the article inexplicably failed to include them.

74.    Because three of the heart attacks suffered by Vioxx patients were excluded, the article misrepresented the extent of the relative risk of heart attacks among Vioxx patients as compared to naproxen patients.

75.    Due to Merck's omission of the actual number of heart attacks among the Vioxx group, doctors who read this article were deprived of this material and critically important safety information that would have informed their professional judgment concerning the treatment to prescribe for their patients.

76.    Merck sent thousands of copies of this article and others to doctors in Alaska.

### 3.    Merck Intimidated Academics

77.    Another example of Merck's effort to suppress true information as to Vioxx's risks is its threats of retaliation against Dr. Gurkirpal Singh when he raised concerns about the cardiovascular safety of Vioxx.  Dr. Singh is a highly regarded Stanford University medical

researcher experienced in the types of gastrointestinal issues raised by Vioxx and other pain relievers in its class.

78.    In 1999, Merck contracted with Dr. Singh to give lectures and speeches to doctors discussing Vioxx's benefits. After hearing about Vioxx's cardiovascular safety risk as identified in VIGOR, Dr. Singh sought additional data from Merck. Merck did not provide him with such data.

79.    Subsequently, Dr. Singh raised his concerns about the cardiovascular safety of Vioxx during his Merck-sponsored presentations to doctors.  Dr. Singh's primary scientific contact at Merck described these presentations as "balanced" and stated that his negative information about Vioxx was "scientifically accurate."

80.    Merck's Senior Vice-President for Medical and Scientific Affairs reacted to Dr. Singh's presentation by telephoning Dr. Singh's supervisor, a medical professor at Stanford, to complain that Dr. Singh was making irresponsible public statements about Vioxx's cardiovascular effects. The Merck Vice President implied there would be repercussions for the professor and the university if Dr. Singh did not stop making these statements.

81.    The Merck Vice President further pressured Stanford, instructing a Merck employee to "[t]ell Singh that we've told his boss about his Merck-bashing" and "should it continue, further actions will be necessary (don't define it)."  Following Merck's heavy-handed attempt to suppress a presentation that Merck itself had acknowledged as "balanced" and "scientifically accurate," Dr. Singh terminated his relationship with Merck.

82.    The Merck Vice President made similar calls to officials at other university medical schools with staff who had also publicly raised questions about the cardiovascular safety of Vioxx.

### 4.     **Merck Issued and Disseminated False and Misleading Press Releases**

83.     Merck marketed Vioxx as a safe and effective pain reliever, while diminishing and concealing its increased cardiovascular risk.   Using various wording, Merck's press releases consistently told consumers that Merck had confidence in Vioxx's safety profile.

84.     For example, in May 2001, despite the results of the VIGOR study, Merck stated that "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx."   In April 2002, Merck also told the public that the significance of VIGOR and two other studies was "unknown."

85.     Thousands of Alaska citizens and doctors were exposed to these false and misleading press releases.

### 5.     **Merck Sent False and Misleading Information Directly to Doctors and Consumers**

86.     Merck reiterated its assurance of Vioxx's cardiovascular and gastrointestinal safety and efficacy in letters it sent to individual doctors and patients, including those who reside in Alaska, omitting material information about Vioxx's increased risk of serious cardiovascular thrombotic events, including heart attacks.

### 6.     **Merck Conducted a False and Misleading Advertising Campaign**

87.     Merck's massive direct-to-consumer advertising campaign was aimed at having consumers ask their doctors specifically for Vioxx.   These ads, which ran in national magazines, failed to provide consumers with material information about Vioxx's cardiovascular dangers and misrepresented the gastrointestinal safety and efficacy.   Merck, therefore, encouraged individuals to take Vioxx, including patients with established coronary artery disease.

88.     Prior to 2002, Merck's advertisements for Vioxx that appeared in popular magazines and in journals directed at physicians contained no reference to the findings from

18

VIGOR that patients taking Vioxx were at a five-fold increased risk of suffering a heart attack as compared to patients on naproxen and that Vioxx patients' increased risk of experiencing a serious cardiovascular thrombotic event was highly statistically significant.

89.     In 2002 and 2003, Merck disseminated advertisements in popular national magazines which, although they referred to VIGOR, failed to allude in any way to the increased risk of serious cardiovascular thrombotic adverse events, and especially to heart attacks, associated with Vioxx. The minimal information about serious cardiovascular thrombotic events they contained was not adequate to put patients with established coronary artery disease on notice that taking Vioxx could be very dangerous for them.

90.     The total extent of information related to cardiovascular thrombotic events in these later advertisements consisted of, on the front of the advertisement, a recommendation that patients tell their doctors if they had a history of angina, heart attack or blood clots (variously described as clots in the heart or clots in the body); and on the back of the advertisement, a reiteration of this recommendation, which sometimes came toward the bottom of a long list of ailments that should be mentioned to a doctor, and a statement that serious but rare side effects included heart attacks and similar serious events. But this latter statement failed to communicate the relative risk of heart attack if the patient took Vioxx instead of another effective, readily available drug.

91.     For over five years Merck continued to market and promote Vioxx within Alaska without adequately disclosing the dangerous side effects and true comparative safety profile.

92.     Merck conducted its unfair methods of competition and unfair and deceptive acts in an attempt to bolster sales of Vioxx.

93.     For the entire period of time Vioxx was on the market, Merck's advertisements

19

and promotional activities misrepresented Vioxx's cardiovascular safety, gastrointestinal benefit, and efficacy and failed to include information then known to Merck.

94.     Merck intended for healthcare professionals, state agencies and consumers in Alaska to rely upon its advertising and promotional activities of Vioxx.

95.     Merck's advertising and promotional activities of Vioxx had the capacity and tendency to deceive regarding Vioxx's cardiovascular safety, gastrointestinal benefit, and efficacy.

96.     All of Merck's conduct was completed during the applicable statute of limitations.

97.     Furthermore, because of Merck's concerted and intentional campaign to hide the truth about Vioxx, Alaska could not have known of Merck's false and misleading conduct until, at the earliest, Vioxx was pulled from the market on September 30, 2004.

**COUNT I**

**(Violations of the Alaska Unfair Trade Practices and Consumer Protection Act)**

98.     Plaintiff hereby realleges and incorporates by reference all previous allegations herein.

99.     Defendant's acts and practices were unlawful as that term is described in AS 45.50.471(a) in that Defendant used unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

100.     Defendant represented to the State, to physicians in Alaska, and to the public in Alaska that Vioxx had characteristics, uses, and benefits that it did not have. AS 45.50.471 (b)(4).

101.     Defendant advertised Vioxx with an intent not to sell it as advertised. AS 45.50.471 (b)(8).

102.    Defendant engaged in conduct creating a likelihood of confusion or of misunderstanding and which misled, deceived, or damaged buyers of Vioxx, including the State of Alaska, healthcare providers in Alaska, and Alaskans in general. AS 45.50.471(b)(11).

103.    Defendant used and employed deception, fraud, and misrepresentation to further the sales of Vioxx. Defendant knowingly concealed, suppressed, and omitted one or more material facts with the intent that others rely on the concealment, suppression, and omission in connection with the sale and advertisement of Vioxx. AS 45.50.471(b)(12).

104.    By committing the acts alleged above, defendant has violated AS 45.50.471.

### PRAYER FOR RELIEF

WHEREFORE, the State of Alaska demands judgment as follows:

1.      That the Court enter an Order permanently enjoining Merck from further acts in violation of AS 45.50.471;

2.      For civil penalties pursuant to AS 45.50.551(b) of $25,000 for each separate violation of the Unfair Trade Practices and Consumer Protection Act;

3.      For costs and attorneys' fees;

4.      For prejudgment interest;

5.      For post judgment interest; and

6.      For all other relief deemed just and equitable by the Court.

Respectfully submitted,

/s/ Scott A. Powell

21

OF COUNSEL

Scott A. Powell
Donald P. McKenna
Matthew C. Minner
Brian M. Vines
HARE, WYNN, NEWELL & NEWTON, LLP
2025 Third Avenue North, Suite 800
Birmingham, AL  35203
205-328-5330
Fax:  205-324-2165

James E. Fosler
Fosler Law Group, Inc.
737 West 5th Avenue; Suite 205
Anchorage, Alaska  99501
907-277-1557