# Exhibit A

1  William A. Rossbach
   ROSSBACH HART BECHTOLD, PC
2  401 North Washington Street
   Missoula, MT 59802
3  Telephone (406) 543-5156
   Fax No. (406) 728-8998
4
5  E. Craig Daue, Esq.
   BUXBAUM, DAUE & FITZPATRICK, PLLC
6  228 West Main, Suite A
   P.O. Box 8209
7  Missoula, MT 59807
   Telephone: (406) 327-8677
8  Fax No.: (406) 829-9840
9  Attorneys for Plaintiff
10
11        MONTANA FIRST JUDICIAL DISTRICT COURT,
12                  LEWIS & CLARK COUNTY
13  THE STATE OF MONTANA,        )   CV-06-07-H-DWM
14  *ex rel* MIKE McGRATH,       )
    Attorney General,            )   Cause No.  ADV-2005-899
15                               )
                                 )   **COMPLAINT**
16        Plaintiff,             )
                                 )
17        -vs-                   )
                                 )
18  MERCK & CO., INC.,           )
                                 )
19        Defendant.             )
                                 )
20  _____)
21        The State of Montana, by and through the Attorney General of Montana, Mike
22  McGrath, asserts the following claims against Merck & Co., Inc. (Merck)
23                  **I. NATURE OF THE CLAIM**
24        This is a civil action for damages and civil penalties for violations of the Montana
25  Food Drug and Cosmetic Act, the Montana Consumer Protection Act, and the other causes
26  of action stated herein.  The action is brought by the Montana Attorney General in the
27  exercise of his common law and statutory powers.  At all times relevant, Defendant Merck
28  knew and had reason to know that its drug, Vioxx, was not safe for its intended purpose; that

1   Vioxx put users at risk for cardiovascular injuries and could cause potentially fatal

2   myocardial infarctions, both obvious and silent, as well as other adverse cardiovascular

3   events, including ischemic strokes and death.  Merck also knew that Vioxx was no more

4   effective than other traditional, and much less expensive, non-steriodal anti-inflammatory

5   drugs commonly available for treatment of acute and chronic pain and knew that, except in

6   a very few patients with severe gastrointestinal problems, the use of Vioxx was neither

7   medically nor financially justified.  Despite this knowledge, Merck misrepresented the safety

8   of Vioxx and manufactured, advertised, promoted, marketed, and sold Vioxx as a safe

9   prescription medication when it knew that was not true.  Moreover, Merck misrepresented

10  the effectiveness of Vioxx in comparison to other non-steriodal anti-inflammatory drugs and

11  misrepresented and over-promoted its use when it was not medically justified.   As a

12  consequence of Merck's false advertising, promotion, and marketing of Vioxx and other

13  misrepresentations, the State of Montana and its private citizens and corporate entities were

14  injured and damaged and caused to spend money on Vioxx that was not medically justified

15  and that actually caused cardiovascular injuries, disability, and death.

16  **II. DEFENDANT'S CONDUCT**

17  1.       The human body naturally produces two forms of cyclo-oxygenase enzymes

18  (COX-1 and COX-2) that contribute to and are associated with inflammation and pain. Non-

19  steriodal anti-inflammatory drugs (NSAIDs) have the potential to relieve pain and

20  inflammation by inhibiting the production of these enzymes.  Many NSAIDs have been

21  developed for human use since aspirin was first formulated in 1897. Traditional NSAIDs like

22  aspirin, ibuprofen, and naproxen reduce pain and inflammation by inhibiting production of

23  both COX-1 and COX-2 enzymes.

24  2.       Merck developed Vioxx during the 1990s.  Vioxx is in the class of NSAIDs

25  known as COX-2 inhibitors.  COX-2 drugs inhibit the production of the COX-2, but not the

26  COX-1 enzyme. COX-2 inhibitors tend to create less irritation to the stomach and intestines

27  than the earlier NSAIDs that inhibit both COX-1 and COX-2.   However, although they

28  reduce     gastrointestinal     irritation,     Vioxx and other COX-2 drugs also increase

1   cardiovascular risk. As shown below, Merck has known this since early in its development
2   of Vioxx. Nevertheless, because of the competition with other companies for market share
3   for treatment of acute and chronic pain and particularly arthritis, Merck wanted to get Vioxx
4   onto the market as quickly as possible.

5          3.      Dr. Alan S. Nies, a Merck scientist who led the Vioxx development program
6   in the 1990's, developed a plan in 1996 to expedite federal approval of Vioxx because of fear
7   that Celebrex, a competing drug by Pfizer, would get approval first. Dr. Nies' 1996 plan
8   identified the Celebrex market goal of late 1998 and set the same goal for Vioxx. The
9   document also noted an "accelerated and compressed" drug development strategy by
10  beginning some clinical studies before others were finished.

11                        **Before Obtaining FDA Approval, Merck Knew That
                          Vioxx Increased the Risk of Heart Attacks.**
12

13         4.      Even while it was working to expedite approval of Vioxx, Merck knew very
14  early that Vioxx lacked the beneficial anti-platelet effects of aspirin and aspirin-like NSAIDs.
15  At the site of an injury, blood platelets clump together to help form a clot and prevent the loss
16  of blood. When blood clots form inside arteries supplying blood to the heart or brain, heart
17  attacks and strokes can occur. Aspirin and certain other NSAIDs reduce platelet aggregation
18  and the formation of clots, thereby reducing the risk of heart attack and stroke in many
19  patients.

20         5.      In 1996, a Merck employee discussing a proposed trial to compare Vioxx to
21  other NSAIDs stated that if patients receiving Vioxx in the trial were not allowed to take
22  aspirin, "there is a substantial chance that significantly higher rates" of cardiovascular
23  problems would occur in the patients taking Vioxx.

24         6.      Merck official, Briggs Morrison, stated in a February 25, 1997, e-mail that
25  unless patients taking Vioxx in the trial also took aspirin, "you will get more thrombotic
26  events and kill [the] drug."

27         7.      In a 1997 e-mail addressing the subject of whether patients taking Vioxx in the
28  trial should also take aspirin, Merck scientist, Alise Reicin, stated that "the possibility of

**COMPLAINT** - Page 3

1   increased CV [cardiovascular] events is of great concern." Ms. Reicin suggested that patients

2   with a high risk of cardiovascular problems be excluded from the trial so that the increased

3   rate of cardiovascular problems in the group taking Vioxx "would not be evident."

4        8.    By April 1998, Merck scientists had also learned that COX-2 inhibitors, such

5   as Vioxx , reduce the production of prostacyclin, a naturally occurring compound in the body

6   that prevents blood platelets from clumping together. Merck, therefore, knew that Vioxx not

7   only lacks the beneficial anti-platelet effect of aspirin and certain other NSAIDs, it also

8   disables one of the blood vessels' main defenses against the clumping of platelets.

9        9.    In 1998, Merck sought patent protection for a way to reduce cardiovascular

10   problems in COX-2 inhibitors such as Vioxx.  Merck obtained a patent for such a drug, or

11   combination of drugs, in September 1999 from the World Intellectual Property Organization.

12        10.    Before Vioxx was approved for sale in the United States, Merck knew that it

13   contributed to the aggregation of blood platelets, putting users at risk for adverse

14   cardiovascular effects, and knew that it could cause potentially fatal myocardial infarctions,

15   both obvious and silent, and cerebrovascular events such as ischemic strokes and death.

16        11.    Merck received approval from the Federal Food and Drug Administration

17   (FDA) in May 1999 to sell Vioxx in the United States for the treatment of osteoarthritis and

18   acute pain in adults.

19
20
**After Obtaining FDA Approval, Merck Knew of Additional
Evidence That Vioxx Increases the Risk of Heart Attacks**

21        12.    In 1999, Merck initiated a study of Vioxx titled "Vioxx Gastrointestinal

22   Outcomes Research," or VIGOR.  In March 2000, the results of VIGOR showed that patients

23   in the study taking Vioxx suffered heart attacks at a rate 4 times higher than patients taking

24   the older NSAID naproxen.  Later analysis of the VIGOR data revealed that the rate was

25   actually 5 times higher.

26        13.    On March 9, 2000, Dr. Edward Scolnick, a senior Merck research official, sent

27   an e-mail acknowledging that cardiovascular events caused by Vioxx "are clearly there," and

28   that the cardiovascular effect "is mechanism based as we worried it was."

14.    In 2000, Merck officials issued a "Confidential Memorandum of Invention." In that document, they stated that because Vioxx might cause cardiovascular problems, Merck should consider applying for a patent on combining Vioxx with another drug that would protect against cardiovascular problems from blood clots.

15.    In March 2001, Merck filed a patent application for a drug combining Vioxx with a thrombaxane synthase inhibitor to help protect against the clotting problems caused by Vioxx.  The application lists Dr. Edward Scolnick as the primary inventor.

16.    Although Merck sought patent protection for ways to lessen the cardiovascular risks of Vioxx, it never produced such drugs.  Instead, Merck continued to manufacture and market Vioxx as a stand alone drug.

17.    In June of 2000, pharmaceutical industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck was a member and a corporate sponsor, showed that Vioxx use resulted in statistically significant increases in hypertension and myocardial infarction.

18.    In the journal *Pharmacy Today*, Merck publicly denied the validity of the results of the studies presented at the June 2000 EULAR study, especially with respect to the hypertension problems identified in that study.

### Merck Publicly, and By Direct Communication to Prescribing Doctors, Made False and Misleading Statements about the Safety and Efficacy of Vioxx

19.    The results of the VIGOR trial were announced to the public on March 27, 2000, and were published in the *New England Journal of Medicine* on November 23, 2000. The VIGOR trial showed that patients receiving Vioxx were 5 times more likely to suffer a heart attack than those who received the older NSAID naproxen.

20.    To counteract this adverse information, Merck improperly pooled  internal unpublished data to produce a misleading promotional device, titled the "Cardiovascular Card," which misrepresented the true risk of adverse cardiovascular events of Vioxx compared to traditional NSAIDs. On April 28, 2000, Merck issued a bulletin instructing its salespeople to use this Cardiovascular Card (CV Card) if doctors asked them about

cardiovascular risks of Vioxx.  Instead of telling doctors the truth Merck knew about the cardiovascular risk shown in the VIGOR study, the bulletin required salespeople to point doctors to charts which listed "Overall Mortality Rates" purporting to show that patients on Vioxx were 11 times less likely to die than patients on other NSAIDs and were 8 times less likely to die of heart attacks and strokes.  Merck told its salespeople to use the CV Card to "[e]nsure that the physician agrees that the cardiovascular events seen with Vioxx in OA clinical trials were low and similar to [other NSAIDs]."

21.     The April sales bulletin instructed salespeople never to raise the subject of cardiovascular risks of Vioxx when talking to doctors.  Merck treated questions by doctors about the cardiovascular risks of Vioxx as "obstacles."  The April 28, 2000, Merck bulletin states: "The Cardiovascular Card is an obstacle handling piece and should only be used with physicians in response to their questions regarding the cardiovascular effects of Vioxx."  Merck told its salespeople never to leave a CV Card with a doctor or allow a doctor to make a copy of the card.

22.     On February 8, 2001, the FDA conducted an Arthritis Advisory Committee meeting at which questions about the safety of Vioxx were extensively reviewed.  At the meeting, Merck presented a large, pooled analysis of all Vioxx trials.  In response, FDA officials told the advisory committee that pooling data from different studies to assess safety, as Merck was doing, was fundamentally flawed.

23.     The FDA Arthritis Advisory Committee concluded that doctors should be told that the VIGOR study showed "an excess of cardiovascular events in comparison to naproxen."

24.     The next day, contrary to the FDA Arthritis Advisory Committee recommendation, Merck sent another emergency bulletin to its salespeople stating: "DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE . . . OR THE RESULTS OF THE . . . VIGOR STUDY."  The bulletin further ordered salespeople to "[s]tay focused on the EFFICACY message for Vioxx."

**COMPLAINT - Page 6**

1    25.    The bulletin referred to its contents as "Updated Obstacle Responses," and

2    closed by reminding salespeople: "<u>Do not proactively discuss the Advisory Committee</u>

3    <u>Meeting or VIGOR.</u>"

4    26.    On May 22, 2001, the *New York Times* published an article raising questions

5    about VIGOR and the cardiovascular safety of Vioxx. The very same day, Merck issued a

6    press release responding to the *New York Times* article. The press release stated: "Merck

7    Confirms Favorable Cardiovascular Safety Profile of Vioxx." The press release referred to

8    the pooled data from pre-approval studies and claimed that: "there was no difference in the

9    incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx, other

10   NSAIDs and placebo."

11   27.    A day later, in response to the unfavorable press, Merck sent another

12   emergency bulletin to its field sales staff, once again instructing them to counter the *Times*

13   article by displaying the CV Card and highlighting data on the card suggesting that Vioxx

14   was safer than other NSAIDs. It advised its sales representatives to tell doctors that Merck's

15   data showed that cardiovascular mortality was actually 8 times less than other NSAIDs.

16   28.    In July 2001, an article in *WEB MD* quoted an FDA Study stating: "[T]he

17   study found that Vioxx cut the occurrence of ulcers and other gastrointestinal problems by

18   half compared with the over-the-counter NSAID Aleve. But the study showed that people

19   taking Vioxx had four times the risk of a heart attack."

20   29.    In response, Merck's spokeswoman, Christine Fanelle, replied that the "risk

21   was negligible," and that "it appeared to increase the risk of a heart attack because Aleve, like

22   aspirin, actually reduces heart attack risks."

23   30.    On August 22, 2001, the *Journal of the American Medical Association* (JAMA)

24   published an article authored by cardiologists Eric J. Topol, M.D., Debarata Mukherjee,

25   M.D., and Steven E. Nessen, M.D. of the Cleveland Clinic Foundation entitled, "Risk of

26   Cardiovascular Events Associated with Selective Cox-2 Inhibitors." The JAMA article

27   reported the Cleveland Clinic's evaluation of two randomized trials of more than 15,000

28   patients, comparing Pfizer's Celebrex in a study called CLASS and Merck's VIGOR Study

**COMPLAINT** - Page 7

1  involving Vioxx. The Cleveland Clinic reported that: "[T]he annualized myocardial

2  infarction rates for COX-2 inhibitors in both VIGOR and CLASS were significantly higher

3  than that in the placebo group . . . ."

4      31.    The day before the JAMA article was published, Merck issued a statement

5  claiming: "We have additional data beyond what they cite, and the findings are very, very

6  reassuring. Vioxx does not result in any increase in cardiovascular events compared to

7  placebo."

8      32.    On that same day, Merck executive, Jo Jerman, also delivered a voice mail to

9  company field representatives reassuring them and instructing them again to  use the CV

10  Card if asked about cardiovascular effects, reminding them that the card showed that

11  cardiovascular mortality rates were similar for Vioxx and other NSAIDs.

12      33.    On August 23, 2001, the day after the JAMA article was published, Merck

13  stated in another press release: "The Company stands behind the overall and cardiovascular

14  safety profile . . . of Vioxx."

15      34.    Each time there was any public concern raised about the safety of Vioxx,

16  Merck responded by instructing its field staff to focus on using the misleading CV Card to

17  overcome any hesitation or concerns by the prescribing doctors.

18      35.    In a 2001 direct letter to doctors, Merck seriously understated the heart risks

19  faced by patients taking Vioxx.  Merck reported that, in patients taking Vioxx in the largest

20  clinical trial of the drug ever, only 0.5 percent had incurred "cardiovascular events," or heart

21  and circulation problems.  In fact, 14.6 percent of the Vioxx patients had cardiovascular

22  problems while taking the drug, according to Merck's own report on the study to federal

23  regulators.  In addition, 2.5 percent had serious problems, like heart attacks.

24      36.    On September 17, 2001, the FDA issued a WARNING LETTER to Merck

25  stating that: "[Y]our claim in the press release that Vioxx has a 'favorable cardiovascular

26  safety profile,' is simply incomprehensible, given the rate of MI and serious cardiovascular

27  events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior

28  to other NSAIDS is misleading . . . ." The WARNING LETTER also makes the following

1  statements about Merck's promotion of Vioxx.

2  [T]he Division of Drug Marketing, Advertising, and Communications
3  (DDMAC) has reviewed your promotional activities and materials and has
   concluded that they are false, lacking in fair balance, or otherwise misleading
4  in violation of the Federal Food, Drug, and Cosmetic Act.

5                                    .   .   .   .

6  You assert that Vioxx does not increase the risk of MIs and that the VIGOR
   finding is consistent with naproxen's ability to block platelet aggregation like
7  aspirin.   That is a possible explanation, but you fail to disclose that your
   explanation is hypothetical, has not been demonstrated by substantial evidence,
8  and that there is another reasonable explanation, that Vioxx may have pro-
   thrombotic properties.

9                                    .   .   .   .

10 Your minimizing these potential risks and misrepresenting the safety profile
   for Vioxx raise significant public health and safety concerns.   Your
11 misrepresentation of the safety profile for Vioxx is particularly troublesome
   because we have previously, in an untitled letter, objected to promotional
12 materials for Vioxx that also misrepresented Vioxx's safety profile.

13                                   .   .   .   .

14 The promotional audio conferences identified above, arranged by, and
   presented on behalf of, Merck were false or misleading in that they minimized
15 the MI results of the VIGOR study, minimized the Vioxx/Coumadin drug
   interaction, omitted important risk information, made unsubstantiated
16 superiority claims, and promoted Vioxx for unapproved uses and an
   unapproved dosing regimen.
17
18                                   .   .   .   .

19 Your suggestion that COX-2 inhibitors, including Vioxx, have an overall
   safety profile that is superior to other NSAIDs is misleading because such an
20 advantage has not been demonstrated.   In fact, in the VIGOR study the
   incidence of serious adverse events was **higher** in the Vioxx treatment group
21 than in the naproxen treatment group . . . .

22                                   .   .   .   .

23 Your audio conferences are misleading because they promote Vioxx for
   unapproved uses . . . .   Your claim is misleading because it suggests that Vioxx
24 is effective for the treatment of rhemuatoid arthritis when this has not been
   demonstrated.
25
                                     .   .   .   .
26 Your promotional audio conferences are also misleading because they suggest
   that Vioxx is safe and effective for other unapproved uses such as the
27 prevention of cancer and invasive cancer, and for the treatment of Alzheimer's
   disease and gout.
28

**COMPLAINT - Page 9**

1

. . . .

2       The promotional activities and materials described above minimize the
3    potentially serious cardiovascular findings that were observed in the VIGOR
     study, minimize the Vioxx/Coumadin drug interaction, omit crucial risk
     information associated with Vioxx therapy, contain unsubstantiated
4    comparative claims, and promote unapproved uses.

5  (COX-2 Notebook 2, Tab 58.)

6       37.    Neither the adverse journal and newspaper articles nor the FDA criticisms did

7  anything to hinder Merck's aggressive marketing of Vioxx.  In the Fall of 2001, Merck

8  launched Project Offense to increase Vioxx market share, focusing on efficacy to divert

9  attention from the safety concerns.  Project Offense included instructions to field sales staff

10  on how to address physician safety concerns, advising them again to review the entire CV

11  Card with doctors, and point out to them Merck's data which purported to show that Vioxx

12  was actually safer than other NSAIDs.

13                  **Merck Resisted Changes Recommended by the FDA to
                    Warn about Heart Attack Risks in Vioxx Labeling**
14

15       38.    After the VIGOR study, the FDA recommended that the label for Vioxx be

16  changed to add a warning which included a statement that:   "The risk of developing

17  myocardial infarction in the VIGOR study was five fold higher in patients treated with Vioxx

18  50 mg (0.5%) as compared to patients treated with naproxen (0.1%) . . . ."  Merck objected

19  to the change recommended by the FDA.

20       39.    On February 15, 2002, the FDA recommended that the Vioxx label include a

21  Kaplan-Meier curve to graphically show a worsening of cardiovascular risks as the length

22  of exposure to Vioxx increased.  Merck again objected.

23       40.    In addition to the misleading CV Card, Merck developed a number of other

24  materials designed to misrepresent the safety and efficacy of Vioxx. It produced a videotape

25  to train its salespeople to view doctors' concerns about Vioxx's heart risks as '"obstacles" to

26  be avoided or dismissed.

27       41.    Merck produced a training document titled "Dodge Ball Vioxx," consisting of

28  12 pages of statements or questions a salesperson might receive from a doctor about the

**COMPLAINT - Page 10**

cardiovascular safety of Vioxx.  The last 4 pages of the document contain the single word "DODGE!" in capital letters.

### Merck Attempted to Suppress and Refute Research Showing That Vioxx Increases the Risk of Heart Attacks

42.     Two months after Vioxx went on the market in 1999, Nancy Santanello, head of Merck's epidemiology department, wrote an e-mail about "physicians to neutralize:"  Her email states:  "Attached is the complete list of 36 physicians to neutralize with background information and recommended tactics.  You will notice that some have already been 'neutralized'."  That e-mail also identified a previous e-mail which had a subset of the 36 physicians "we would like to get involved in Merck clinical research" and that the e-mail's recipient should "be aware of our most challenging (and also most vocal) national and regional physicians."

43.     During 1999, Merck paid Dr. Gurkipal Singh of Stanford University Medical School up to $2,500 for giving talks to other doctors supporting the use of Vioxx.  Dr. Singh gave 40 talks over 7 months.  Dr. Singh became concerned about the cardiovascular risks of Vioxx after the VIGOR study was completed.  Dr. Singh repeatedly asked Merck for the VIGOR data so he could analyze them for himself.  When Dr. Singh persisted in his requests, Merck warned him that there would be serious consequences if he didn't stop.  In 2000, Dr. Singh began to publicly express his concern about the cardiovascular risks of Vioxx.

44.     A dossier of Dr. Singh's activities regarding Vioxx was prepared for Merck senior vice president, Dr. Louis Sherwood.  On October 28, 2000, Dr. Sherwood called Dr. Singh's boss, Stanford Medical School professor Dr. James Fries, and hinted that there would be repercussions for Stanford if Dr. Singh continued making public statements about the cardiovascular risks of Vioxx.

45.     In January 2001, Dr. Fries wrote to former Merck CEO, Ray Gilmartin, complaining that Dr. Sherwood had called him to try to get him to make Dr. Singh stop saying negative things about Vioxx in lectures.  Sherwood warned that if Dr. Singh didn't stop bashing Vioxx, he would "flame out" and "there would be consequences for [Dr.

1   Sherwood] and Stanford."

2       46.     Merck sponsored a study of Vioxx by several doctors, including Dr. Daniel

3   Solomon and Dr. Jerry Avorn. Merck scientists helped develop the study protocol and signed

4   off on all aspects of the study design. However, when the study showed an increased risk of

5   heart attacks with Vioxx, Merck required one of the study's coauthors, who was an employee

6   of Merck, to remove her name from the study. Although it funded the study and approved

7   its design, Merck publicly discredited the study in May 2003, claiming that there were

8   "serious limitations to the analysis."

9                    **Merck Deleted Data About Heart Attacks From an Article in**
                     ***The New England Journal of Medicine*, Causing the Article to be**
10                              **Incomplete and Deceptive**

11      47.     In November 2000, an article reporting on the VIGOR study, an important

12  clinical trial of Vioxx, was published in *The New England Journal of Medicine. The New*

13  *England Journal* is one of the world's most prestigious and influential medical journals. The

14  VIGOR study was financed by Merck and produced information about heart attacks suffered

15  by study participants who took Vioxx and by those who took naproxen instead of Vioxx.

16  Throughout its marketing campaign for Vioxx, Merck relied on the VIGOR article in *The*

17  *New England Journal* to support its claim that Vioxx was safe.

18      48.     The VIGOR study showed that 20 of the participants taking Vioxx had heart

19  attacks compared to only 4 of the participants taking naproxen. Although at least 2 of the 3

20  lead authors of the article that appeared in *The New England Journal* knew several months

21  before the article was published that there were 20 heart attacks among the participants

22  taking Vioxx, the article reported that 17, not 20, of the Vioxx participants had heart attacks.

23      49.     Electronic records show that two days before the article was submitted to *The*

24  *New England Journal* for publication, a Merck editor deleted information about 3 of the heart

25  attacks in the Vioxx participants. The data deleted by Merck made Vioxx appear less risky

26  in the article than the VIGOR trial actually proved that it was. Merck knew that, by deleting

27  data about heart attacks, the article would present an incomplete, inaccurate, and deceptive

28  picture of the true risk of taking Vioxx.

**COMPLAINT - Page 12**

50.   The editors of *The New England Journal* have publicly stated that the information deleted by Merck calls into question "the integrity of the data" appearing in the article, and have called for the article's authors to submit a correction.

**Merck Pressured Doctors to Prescribe Vioxx,
and Urged Patients to Ask For It, Even Though it Was Far More
Dangerous and Expensive than Other Equally Effective Drugs**

51.   Studies by the Mayo Clinic, the Veterans Affairs Department, and the Kaiser Permanente organization showed that Vioxx is no more effective in relieving pain than other NSAIDs such as aspirin, ibuprofen, and naproxen which can be purchased without a prescription at a fraction of the cost of Vioxx.

52.   Only a small percentage of people who took Vioxx were at high risk of stomach bleeding if they took NSAIDs that blocked COX-1 and COX-2.  However, Merck promoted Vioxx to doctors and patients as a drug of first choice in treating pain.  Thus, although the majority of people who took Vioxx did not need, or benefit from, Vioxx's reduced effect on the stomach, all people who took Vioxx were exposed to a five-fold increase in the risk of heart attacks.

53.   All Vioxx sold in Montana cost many times more than generic aspirin, ibuprofen, and naproxen.  Furthermore, a combination of a generic NSAID, such as ibuprofen or naproxen, with a drug that protects the stomach, such as Prilosec, is almost as safe for the stomach as Vioxx, with no increased heart attack risk.

**Merck Aggressively Marketed Vioxx to the Public and to Doctors**

54.   Despite knowing before and after FDA approval that Vioxx caused increased cardiovascular risk, Merck has aggressively marketed Vioxx from the beginning.

55.   When Merck launched its marketing campaign for Vioxx in 1999, it hired 700 new salespeople to market the drug to doctors and eventually assigned over 3,000 salespeople to promote Vioxx in face-to-face discussions with doctors.

56.   Merck put its salespeople through intensive training exercises to persuade doctors to prescribe Vioxx and provided numerous incentives to Merck salespeople for increasing the share of Vioxx that any doctor prescribed.

**COMPLAINT** - Page 13

57.    Salespeople were instructed to use the systems and techniques it had taught them to convince doctors that Vioxx was a safe and effective pain reliever. On information and belief, it is alleged that Merck salespeople used some or all of the required sales tactics to induce Montana doctors to prescribe Vioxx to Montana citizens.

58.    On October 3, 2001, Merck launched a direct-to-consumer advertising campaign for Vioxx with television ads featuring Olympic skater Dorothy Hamill. These ads ran repeatedly in Montana. The ads failed to warn consumers that Vioxx increased the risk of cardiovascular problems.

59.    Merck's Vioxx advertising and marketing campaign as a whole sought to create the image, impression, and belief that Vioxx was safe for adults and had fewer side-effects and adverse reactions than other pain relief medications. Merck had no reasonable grounds to believe that these representations were true. Merck purposefully misrepresented, understated, and otherwise downplayed the serious health hazards and risks associated with Vioxx.

60.    Merck's false and misleading promotion induced the State of Montana, Montana corporations, and Montana citizens to purchase Vioxx in many instances where it provided no benefit over other less risky and less expensive drugs.

61.    Merck's false and misleading promotion persuaded Montana doctors to prescribe Vioxx in many instances where they would not have done so if Merck had provided them with complete and accurate information it knew about the efficacy and cardiovascular risks of Vioxx.

62.    Merck's misleading and false advertisements, promotional materials, and public statements were extremely successful in building the market for Vioxx. It contributed to Vioxx reaching $2 billion in sales faster than any drug in Merck's history. Vioxx sales in 2003 alone were $2.5 billion.

63.    Merck estimates that there were 105 million U.S. prescriptions written for Vioxx from May 1999 through August 2004. Based on this, Merck estimates that 20 million people have taken Vioxx in the United States since 1999.

**COMPLAINT - Page 14**

## COUNT I

### The Montana Food, Drug, and Cosmetic Act:
### False and Misleading Advertising

64.     Since 1947, the sale of drugs within Montana has been regulated by the Montana Food, Drug, and Cosmetic Act (Montana FDCA), Mont. Code Ann.§50-31-101, et seq.

65.     The Montana FDCA prohibits false or misleading advertising of drugs within the State.  Mont. Code Ann.§50-31,501(1,5).  A drug advertisement is "deemed to be false if it is false or misleading in any particular."  Mont. Code Ann.§50-31-107(1).  A drug advertisement is also deemed to be misleading if it fails to reveal material facts about the consequences which may result from using the drug in the manner in which the advertisement suggests that it be used.  Mont. Code Ann.§50-31-107(2).

66.     The Montana Legislature has charged the Attorney General with the duty to bring appropriate proceedings in court to remedy violations of the Montana FDCA. Mont. Code Ann.§50-31-505.

67.     In violation of the Montana FDCA, Merck's advertisements made false and misleading claims to doctors and the public in Montana about the effectiveness of Vioxx.

68.     As a result of Merck's violation of the Montana FDCA, the State and its citizens, corporations, and other business entities have been damaged and are entitled to all the remedies and damages provided by law.

## COUNT II

### Deceit

69.     Plaintiff repeats and realleges the paragraphs above as if set forth fully herein.

70.     In Merck's advertising and promotional materials, in its marketing tactics in face-to-face meetings with doctors, in its press releases, and in its public advertisements, Merck made suggestions of fact that Merck knew were not true.  Such conduct constitutes deceit under Mont. Code Ann.§27-1-712.

71.     Merck, in its face-to-face meetings with doctors, in its press releases, and in

1 | public advertisements, suppressed facts about the cardiovascular dangers of Vioxx such that
2 | Montana doctors and the public were misled about its dangers.  Such conduct constitutes
3 | deceit under Mont. Code Ann.§27-1-712.

4 |     72.    As a result of Merck's violation of Mont. Code Ann.§27-1-712, the State and
5 | its citizens, corporations, and other business entities have been damaged and are entitled to
6 | all the remedies and damages provided by law.

7 | <center>**COUNT III**</center>

8 | <center>**Unfair Trade Practices and Consumer Protection Act Claim**</center>

9 |     73.    Plaintiff repeats and realleges the paragraphs above as if set forth fully herein.

10 |     74.    In the course of business, Merck misrepresented and/or omitted material facts
11 | about the safety and effectiveness of Vioxx.  Merck misleadingly claimed that Vioxx was
12 | safe and was as, or more, effective than traditional NSAIDs in treating chronic pain, that it
13 | did not cause or contribute to any cardiovascular problem greater than any other NSAIDs,
14 | and that Vioxx use should not be limited to patients with gastrointestinal problems who could
15 | not use other NSAIDs.

16 |     75.    Merck systematically suppressed and concealed material information it
17 | developed or otherwise knew about the adverse cardiovascular effects of Vioxx and engaged
18 | in a mis-information and dis-information campaign to conceal the truth.

19 |     76.    Merck systematically sought to discredit or cast doubt upon scientific studies
20 | and reports and the work of scientists which concluded that Vioxx caused or contributed to
21 | adverse cardiovascular effects.

22 |     77.    Merck systematically engaged in a false and misleading marketing and
23 | advertising campaign to over-promote the use of Vioxx.

24 |     78.    Merck's conduct, as described above, constitutes unfair and deceptive practices
25 | in violation of Mont. Code Ann. § 30-14-103.

26 |     79.    As consequence of Merck's violation of Mont. Code Ann.§30-14-103, the
27 | State, its citizens, corporations, and business entities have been injured and suffered damages
28 | and are, therefore, entitled to all the damages and remedies provided by law.

<center>**COUNT IV**</center>

<center>**Unjust Enrichment and Restitution**</center>

80.     Plaintiff repeats and realleges the paragraphs above as if set forth fully herein.

81.     Merck engaged in a systematic campaign to over-promote the use of Vioxx, claiming it was safe from any adverse cardiovascular effects and was as, or more, effective than traditional, significantly less expensive NSAIDs for treating pain and inflammation.

82.     Merck knew that Vioxx causes or contributes to cardiovascular disease and myocardial infarction in users and is no more effective than much cheaper and safer non-steriodal, anti-inflammatory drugs.

83.     Merck had a duty to the State Montana and to the citizens, corporations, and business entities of the State to disclose all material facts about its products and to refrain from over-promoting or falsely promoting its products as safe and more effective than traditional non-steriodal, anti-inflammatory drugs when it knew that was not true.

84.     As a result of Merck's breach of this duty and the misleading suppression of the truth about Vioxx, Merck has sold millions of dollars of unnecessary and over-priced Vioxx to the State of Montana and its citizens, which likely caused adverse cardiovascular effects to the citizens of the State of Montana.

85.     Merck has been unjustly enriched by its false, deceitful, and misleading conduct to the extent that the citizens of the State of Montana and the State of Montana have unknowingly paid excessive costs for Vioxx when they could have purchased significantly less expensive traditional pharmaceuticals that would have been equally effective and without the severe cardiovascular risks of Vioxx.

86.     As a result of Merck's conduct, the State of Montana and its citizens have suffered substantial economic damages and are entitled to damages and all other available remedies.

WHEREFORE, the State of Montana, by and through Attorney General Mike McGrath, prays as follows:

1.      That the Court adjudge and decree that Merck has engaged in the conduct

1    alleged herein.

2        2.    That the Court adjudge and decree that Merck's advertising and promotion of

3    Vioxx was false and misleading in violation of the Montana FDCA.

4        3.    That the Court adjudge and decree that Merck violated Mont. Code Ann. §27-

5    1-712 and that the State of Montana and its citizens were damaged thereby.

6        4.    That the Court adjudge and degree that such conduct is unlawful and in

7    violation of Mont. Code Ann. § 30-14-103.

8        5.    That the Court, pursuant to Mont. Code Ann. § 30-14-142, assess civil

9    penalties of $10,000.00 against Merck for each violation of Mont. Code Ann. § 30-14-103

10   complained of herein.

11       6.    That the Court, pursuant to Mont. Code Ann. § 30-14-131, enter an order

12   restoring to the State and to the citizens of the State all monies acquired by Merck by means

13   of its unlawful practices.

14       7.    That the Court order Merck to pay restitution which would restore the State of

15   Montana and the citizens of the State of Montana the financial position that they would have

16   enjoyed absent Merck's false representations and over-promotion of Vioxx.

17       8.    That the Court order Merck to disgorge all unjust profits from the sale of Vioxx

18   to the citizens of the State of Montana and the State of Montana.

19       9.    That the Court award the State of Montana its attorneys fees and costs.

20       10.   That the Court order such other and further relief as the Court deems just,

21   necessary, and appropriate.

22   //

23   //

24   //

25   //

26   //

27   //

28   //

**COMPLAINT** - Page 18

1

Dated this 23d day of December, 2005.

2

MIKE McGRATH

3

Attorney General
PAMELA D. BUCY

4

Assistant Attorney General
P.O. Box 201401

5

Helena, MT 59620-1401
Tel.: 406-444-2026

6

7

8

BY:

E. CRAIG DAUE

9

Special Assistant Attorney General
BUXBAUM, DAUE & FITZPATRICK, PLLC

10

P.O. Box 8209
Missoula, MT 59807

11

Tel.:  406-327-8677

12

13

BY:

14

WILLIAM A. ROSSBACH
Special Assistant Attorney General

15

ROSSBACH HART BECHTOLD, PC
401 North Washington, Box 8988

16

Missoula, MT 59807
Tel.:  406-543-5156

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT - Page 19**

1

## DEMAND FOR JURY TRIAL

2      Plaintiff demands trial by jury of all issues of fact in this case.

3    Dated this 23d day of December, 2005.

4                          MIKE McGRATH
                           Attorney General
5                          PAMELA D. BUCY
                           Assistant Attorney General
6                          P.O. Box 201401
                           Helena, MT 59620-1401
7                          Tel.: 406-444-2026

8

9                    BY:  _____
                           E. CRAIG DAUE
10                         Special Assistant Attorney General
                           BUXBAUM, DAUE & FITZPATRICK, PLLC
11                         P.O. Box 8209
                           Missoula, MT 59807
12                         Tel.:  406-327-8677

13

14

15                   BY:  _____
                           WILLIAM A. ROSSBACH
16                         Special Assistant Attorney General
                           ROSSBACH HART BECHTOLD, PC
17                         401 North Washington, Box 8988
                           Missoula, MT 59807
18                         Tel.:  406-543-5156

19

20

21

22

23

24

25

26

27

28

**COMPLAINT** - Page 20