Exhibit B



LEXISNEXIS® FILE & SERVE
E-SERVICE
44138809
May 8 2012
5:24PM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | * | MDL No. 1657 |
| | * | |
| | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| This document relates to: | * | |
| *State of Montana ex rel Steve Bullock* | * | MAGISTRATE JUDGE KNOWLES |
| *v. Merck, et al.*  Civil Action No. 06-4032 | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### FIRST AMENDED COMPLAINT

The State of Montana, by and through the Attorney General of Montana Steve
Bullock, asserts the following claims against Merck & Co., Inc. (Merck)

### I.  NATURE OF THE CLAIM

This is a civil action for violations of the Montana Unfair Trade Practices and
Consumer Protection Act.  The action is brought by the Montana Attorney General
Steve Bullock, in the exercise of his common law and statutory powers.  At all times
relevant, Defendant Merck knew and had reason to know that its drug, Vioxx, was not
safe for its intended purpose; that Vioxx put users at risk for cardiovascular injuries,
including but not limited to fatal myocardial infarctions, both obvious and silent, as well
as other adverse cardiovascular events, including ischemic strokes and death.  Merck
also knew that Vioxx was no more effective than other traditional, and much less

-1-

expensive, non-steriodal anti-inflammatory drugs commonly available for treatment of

acute and chronic pain and knew that, except in a very few patients with severe

gastrointestinal problems, the use of Vioxx was neither medically nor financially

justified.  Despite this knowledge, Merck misrepresented the safety of Vioxx and

advertised, promoted, marketed, and sold Vioxx as a safe prescription medication when

it knew that was not true.  Moreover, Merck misrepresented the effectiveness of Vioxx

in comparison to other non-steriodal anti-inflammatory drugs and misrepresented and

over-promoted its use when it was not medically justified.

## II.  DEFENDANT'S CONDUCT

1.      The human body naturally produces two forms of cyclo-oxygenase

enzymes (COX-1 and COX-2) that contribute to and are associated with inflammation

and pain.  Non-steriodal anti-inflammatory drugs (NSAIDs) have the potential to relieve

pain and inflammation by inhibiting the production of these enzymes.  Many NSAIDs

have been developed for human use since aspirin was first formulated in 1897.

Traditional NSAIDs like aspirin, ibuprofen, and naproxen reduce pain and inflammation

by inhibiting production of both COX-1 and COX-2 enzymes.

2.      Merck developed Vioxx during the 1990s.  Vioxx is in the class of NSAIDs

known as COX-2 inhibitors.  COX-2 drugs inhibit the production of the COX-2, but not

the COX-1 enzyme.  COX-2 inhibitors tend to create less irritation to the stomach and

intestines than the earlier NSAIDs that inhibit both COX-1 and COX-2.  However, although they reduce gastrointestinal irritation, Vioxx and other COX-2 drugs also increase cardiovascular risk.  As shown below, prior to the FDA's approval of Vioxx®, since early in the development of Vioxx, officials at Merck knew that Vioxx® could cause harmful cardiovascular events, such as heart attacks.  Nevertheless, because of the competition with other companies for market share for treatment of acute and chronic pain and particularly arthritis, Merck wanted to get Vioxx onto the market as quickly as possible.

3.     Dr. Alan S. Nies, a Merck scientist who led the Vioxx development program in the 1990's, developed a plan in 1996 to expedite federal approval of Vioxx because of fear that Celebrex, a competing drug by Pfizer, would get approval first.  Dr. Nies' 1996 plan identified the Celebrex market goal of late 1998 and set the same goal for Vioxx. The document also noted an "accelerated and compressed" drug development strategy by beginning some clinical studies before others were finished.

**Both Before Obtaining FDA Approval and After It Was On the Market,
Merck Knew That Vioxx Increased the Risk of Cardiovascular Events,
But Consistently Misrepresented to the FDA and the Public What It Knew**

4.     While it was working to expedite approval of Vioxx, Merck learned very early that Vioxx lacked the beneficial anti-platelet effects of aspirin and aspirin-like NSAIDs.  At the site of an injury, blood platelets clump together to help form a clot and

prevent the loss of blood.  When blood clots form inside arteries supplying blood to the

heart or brain, heart attacks and strokes can occur.  Aspirin and certain other NSAIDs

reduce platelet aggregation and the formation of clots, thereby reducing the risk of heart

attack and stroke in many patients.

5.      In late 1996, Merck planned a large-scale, long term, double-blind study of

gastrointestinal toxicity in patients taking Vioxx or naproxen to treat arthritis.  This

study, Merck's largest, came to be called the Vioxx Gastrointestinal Outcomes Research

study ("VIGOR").

6.      Merck planned to conduct  VIGOR to obtain information regarding

clinically meaningful gastrointestinal events and to develop a large controlled database

for overall safety assessment.  The study compared patients who took Vioxx with

patients who took naproxen.

7.      A November 21, 1996 memo by a Merck official shows that the company

wanted VIGOR  to prove Vioxx was gentler on the stomach than older painkillers but

already knew that Vioxx posed significant cardiovascular risk.  To show that Vioxx was

gentler on the stomach, the Vioxx patients were not allowed to take aspirin but Merck

knew "there is a substantial chance that significantly higher  rates of cardiovascular

problems would be seen in the Vioxx group," according to the memo.

8.      A similar view was expressed in a February 25, 1997 e-mail by a Merck

-4-

official, Briggs Morrison.  He opined that unless patients in the Vioxx group also got

aspirin, "you will get more thrombotic events: - that is, blood clots – "and kill [the]

drug."

9.      In response, Dr. Alise Reicin, now a Merck vice president for clinical

research, stated that "the possibility of increased CV [cardiovascular] events is of great

concern."  Ms. Reicin suggested that patients with a high risk of cardiovascular

problems be excluded from the trial so that the increased rate of cardiovascular

problems in the group taking Vioxx "would not be evident."

> This is a no win situation!  The relative risk of [adverse GI event with]
> even low dose aspirin may be as high as 2-4 fold.  Yet, the possibility of
> Increased CV [cardiovascular] events is of great concern (I just can't wait
> to be the one to present those results to senior management!).  What about
> the Idea of excluding high risk CV patients – ie those that have already had
> an MI, CABG, PTCA?  This may decrease the CV event rate so that a
> difference between the two groups would not be evident....

10.     By April 1998, Merck scientists had also learned that COX-2 inhibitors,

such as Vioxx , reduce the production of prostacyclin, a naturally occurring compound

in the body that prevents blood platelets from clumping together.  Merck, therefore,

knew that Vioxx not only lacked the beneficial anti-platelet effect of aspirin and

certain other NSAIDs, it also disables one of the blood vessels' main defenses against

the clumping of platelets.

11.    Prior to seeking FDA approval for Vioxx Merck also knew of the potential for dangerous cardiovascular side effects associated with Vioxx® through internal studies such as  Study 090 that was conducted in 1998. The results of Study 090 were not disclosed to the FDA during the FDA approval process or the public at the time of the product launch. Study 090 concluded that Vioxx® users were six times more likely to suffer severe cardiovascular events than non-Vioxx® users.

12.    Before Vioxx was approved for sale in the United States, Merck thus knew that it contributed to the aggregation of blood platelets, putting users at risk for adverse cardiovascular effects, and knew that it could cause potentially fatal myocardial infarctions, both obvious and silent, and cerebrovascular events such as ischemic strokes and death.

13.    On November 23, 1998, Merck submitted a New Drug Application for Vioxx to the FDA and did not reveal what it knew about cardiovascular risk.  The FDA, by its Arthritis Drugs Advisory Committee ("the Advisory Committee") granted expedited review of Merck's Vioxx application.

14.     In January 1999, Merck commenced the Vioxx® Gastrointestinal Outcomes Research ("VIGOR") study, which compared Vioxx® to naproxen, the active ingredient in brand-name pain relievers such as Aleve and Naprosyn.

15.    On May 21, 1999, Merck issued a press release that announced that the

United States Food and Drug Administration (FDA) had approved Vioxx for the relief of osteoarthritis pain, menstrual pain, and other forms of acute pain. The press release included a list of common side effects, but did not include reference to cardiovascular risks.

16.    Before it received FDA approval to market Vioxx, Merck engaged in a pre-release marketing campaign to bolster consumer interest and orders. That campaign conveyed the message that Vioxx provided safe and effective pain relief, while omitting any mention of what Merck knew of the cardiovascular risks.

17.    In June 1999, Merck released Vioxx for sale in the U.S. This release was accompanied by the largest direct-to-consumer marketing campaign in history. Merck's Vioxx marketing message was that Vioxx provided safe and effective pain relief, while omitting any mention of the cardiovascular risk known to Merck.

18.    Merck spent more than $161 million dollars on direct-to-consumer marketing in 2000 to disseminate its message, and more than $100 million in each of the following four years. In the year 2001, Vioxx was the most heavily advertised drug to consumers in the United States. Merck's false and misleading Vioxx marketing campaign prompted the FDA to issue several warning letters to Merck between 1999 and 2001.

19.    One month after product launch, on July 16, 1999, the FDA's Division of

-7-

Drug Marketing, Advertising, and Communications ("DDMAC") issued a letter to

Merck warning that its advertisements failed to provide adequate risk information.

DDMAC informed Merck that certain Vioxx promotional materials were "lacking in

fair balance or otherwise misleading." DDMAC concluded that the materials violated

the FDCA and its implementing regulations, and it urged Merck immediately to cease

these representations.

      20.    On December 16, 1999, DDMAC issued another letter to Merck stating

that its promotional pieces entitled, "TEN REASONS WHY VIOXX IS BETTER

THAN CELEBREX" and "Vioxx vs. Celebrex Poem," were "false or misleading

because they contain misrepresentations of Vioxx's safety profile, unsubstantiated

comparative claims, and are lacking in fair balance." DDMAC observed that Merck's

claim that Vioxx is safer than placebo in the incident rate of gastroduodenal ulcers "is

in direct contrast with the approved product labeling (PL)" which showed that there

was an increased risk of ulcers with Vioxx as compared to placebo. DDMAC

"object[ed] to this claim because it minimized the GI warning associated with Vioxx

and is inconsistent with the data in the PL."

      21.    With respect to Merck's "TEN REASONS WHY VIOXX IS BETTER

THAN CELEBREX," DDMAC noted several unsubstantiated and "misleading"

comparative claims of Vioxx with Celebrex, including the assertion that Vioxx was

more effective and safer than Celebrex, even though "such has not been demonstrated by substantial evidence."

22.    DDMAC's letter noted that Merck's promotional materials failed to include a "fair balance with respect to the content and presentation of risk information related to the use of Vioxx."  DDMAC categorically stated that, in these materials, Merck had "not presented any risk information concerning the contraindications, warnings, precautions, or adverse events associated with Vioxx's use."

23.    In March 2000, Merck made public the results, but not the data, of the VIGOR study that showed that Vioxx patients suffered fewer stomach problems than the naproxen group, but significantly more blood-clot-related problems, as Merck anticipated in the 1996-97 internal documents.  Specifically, the heart attack rate for Vioxx users in the VIGOR study appeared to be four to five times higher than for users of other NSAIDs, confirming what Merck already knew about Vioxx.

24.    Dr. Scolnick, Merck's research chief, recognized the VIGOR results arose from Vioxx's inherent risks rather than naproxen's cardio-protective properties.  In a March 9, 2000 e-mail with the subject line "VIGOR," Dr. Scolnick said the results showed that the cardiovascular events "are clearly there."  In an apparent acknowledgment that Vioxx's own mechanism was at least partially at fault for the heart data, he wrote "it is a shame but it is a low incidence and it is mechanism based

as we worried it was."

25.    Dr. Scolnick did not want to publish the VIGOR study results until Merck could find other data to make it "clear to the world that this" was an effect of the entire COX-2 class, not just Vioxx.  Instead, Merck adopted the strategy of claiming that the lower cardiovascular risk for naproxen was due to the cardiac protective effect of that NSAID.

26.    Despite the warnings from the FDA and despite its knowledge of the VIGOR results, Merck continued to issue false and misleading press releases concerning the safety of Vioxx, including a March 27, 2000 press release that stated, "[a]n extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx, showed no indication of a difference in the incidence of thromboembolic events between Vioxx, placebo and comparator NSAIDs."  This release and all press releases referred to hereinafter were intended to reach health care providers and health care consumers throughout the United States, including Montana, without limitation, and did in fact reach Montana providers and consumers.

27.     In that  press release on March 27, 2000, Merck emphasized Vioxx®'s superior GI safety profile and attempted to explain away the cardiovascular risks:

        S]ignificantly fewer thromboembolic events were observed in patients taking

naproxen in this GI outcomes study, which is consistent with naproxen's ability to block platelet aggregation. This effect on these events had not been observed previously in any clinical studies for naproxen. Vioxx®, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects." -Merck Press Release Dated March 27,2000

and falsely made claims about cardiovascular safety:

[a]n extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx®, showed no indication of a difference in the incidence of thromboembolic events between Vioxx®, placebo and comparator NSAIDs.   Merck Press Release Dated March 27,2000

28.    In 2000, Merck officials issued a "Confidential Memorandum of Invention." In that document, they stated that because Vioxx might cause cardiovascular problems, Merck should consider applying for a patent on combining Vioxx with another drug that would protect against cardiovascular problems from blood clots.

29.    In April 2000, Merck responded to news reports that Vioxx might have cardiovascular risks by denying that any such risks existed:  "Extensive review of data from the completed osteoarthritis trial and on-going clinical trials with Vioxx . . .  have shown no difference in the incidence of cardiovascular events, such as heart attack, among patients taking Vioxx . . ."  (emphasis in original)

30.    In June of 2000, pharmaceutical industry-sponsored studies presented at

-11-

the European United League Against Rheumatism (EULAR), an organization in which Merck was a member and a corporate sponsor, showed that Vioxx use resulted in statistically significant increases in hypertension and myocardial infarction.

31.    In the journal *Pharmacy Today*, Merck publicly denied the validity of the results of the studies presented at the June 2000 EULAR study, especially with respect to the hypertension problems identified in that study.

32.    In October 2000, Merck sent its cardiovascular data from the VIGOR trial to the FDA for review.  This was the first time that Merck made the cardiovascular data gathered during VIGOR available to anyone without ties to Merck.

33.    In November 2000, Merck published the results of its VIGOR trial in the NEW ENGLAND JOURNAL OF MEDICINE.  The article, written by Merck employees and by academics who received consulting contracts and research grants from Merck, made only a vague reference to cardiovascular incidents and did not fully report the statistical incidence of cardiovascular complications seen in the study.  In fact, as shown below, adverse data was left out of the reported results in order to skew the conclusions.

34.    Merck's 2000 Annual Report falsely claimed that Merck's new compounds, including Vioxx, "possess better qualities than any of their predecessors brought forward in a like time span because we have been able to analyze and test them in more detail."  And on January 23, 2001, Merck issued a press release referencing

strong results from the VIGOR study.

35.   In February 2001, 19 months after Vioxx went on the market, the FDA issued a Memorandum on the Vioxx cardiovascular safety data gathered during VIGOR.  In this Memorandum, the FDA concluded that there "is an increased risk of cardiovascular thrombotic events, particularly [heart attack], in the [Vioxx] group compared with the naproxen group."  The FDA considered and rejected each of the defenses raised by Merck to explain the statistically significant increase of cardiovascular incidents among Vioxx users.

36.   Merck responded to the FDA's Memorandum with a false press release announcing its confidence "that the data presented today supports the excellent safety profile of Vioxx" and that "in the completed osteoarthritis trial and on-going clinical trials with Vioxx . . . there was no difference in the incidence of cardiovascular events, such as heart attacks among patients taking Vioxx, other NSAIDs and placebo." (emphasis in original).

37.   In February 2001, the FDA also noted that Merck should add a cardiovascular warning to its VIOXX packaging since "it would be difficult to imagine inclusion of VIGOR results in the [Vioxx] labeling without mentioning cardiovascular safety results in the study description as well as the Warnings sections."

38.   On February 8, 2001, the FDA's Arthritis Advisory Committee ("AAC")

-13-

held a public hearing to consider Merck's request to include the positive GI results

from the VIGOR study in its Vioxx labeling.  During the AAC hearing, Alise Reicin,

Executive Director of Clinical Research at Merck Research Laboratories, explained to

the panel, "when you review the results of VIGOR in isolation you don't know whether

the imbalance of cardiovascular events was caused by a decrease in events on a COX-2

selective inhibitor."  She falsely claimed that naproxen was likely responsible for the

difference in cardiovascular events observed in users of the two drugs.

39.    Merck falsely "reconfirmed the favorable cardiovascular safety profile of

VIOXX" in a May 28, 2001 press release and in a similar press release on June 13,

2001.

40.    In March 2001, Merck filed a patent application for a drug combining

Vioxx with a thrombaxane synthase inhibitor to help protect against the clotting

problems caused by Vioxx.  The application lists Dr. Edward Scolnick as the primary

inventor.

41.    Although Merck sought patent protection for ways to lessen the

cardiovascular risks of Vioxx, it never produced such drugs.  Instead, Merck continued

to manufacture and market Vioxx as a stand alone drug.

42.    In January 1999, shortly before the approval and launch of Vioxx®,

Merck's marketing division had conceived the ADVANTAGE clinical trial. Physician-

-14-

investigators, participants, and institutional review board members were told that the purpose of the ADVANTAGE trial was to measure the gastrointestinal safety of Vioxx®.

43.    Merck's actual goal of ADVANTAGE appears to have been for investigators to gain experience with Vioxx® prior to and during the critical launch phase in order to seed the industry with the use of Vioxx® in lieu of other treatments or drugs.  However, that study, like the VIGOR study, revealed serious cardiovascular risk, including fatalities.

44.    Internal e-mails show Merck's attempts to cover up the fatalities that occurred during its ADVANTAGE study.  In particular, Merck officials told scientists to re-classify a 73-year-old woman's death from myocardial infarction to "unknown." In a related e-mail from November 2000, Dr. Reicin wrote, "I think this should be called an unknown cause of death . . . so we don't raise concerns."  Dr. Scolnick, Merck's head scientist from 1985 – 2005 also stated in an e-mail that including any of the deaths in the final report would "put us in a terrible situation."

45.    In October 2003, more than three years after its completion, Merck reported the results of the flawed ADVANTAGE study in the Annals of Internal Medicine.  Although the report stated that five patients taking Vioxx had suffered heart attacks, the report failed to mention three additional heart-related deaths.

-15-

46.     On September 30, 2004, the Center for Drug Evaluation and Research of the Food and Drug Administration issued a Memorandum concluding that Vioxx has adverse cardiovascular effects, which were evident as early as the 2000 VIGOR study: "Rofecoxib increases the risk of serious coronary heart disease defined as acute myocardial infarction and sudden cardiac death. . . . The observation of an increased risk was first noted with the VIGOR trial, where a 5-fold difference in risk was found between high-dose rofecoxib and naproxen.  The manufacturer attributed this difference to a never before recognized protective effect of naproxen.  To explain a 5-fold difference, naproxen would have had to be one of the most potent and effective cardio-protectants known.  Three cohort studies and the present nested case-control study found no evidence of cardio-protection with naproxen.  The three case-control studies that reported a protective effect were misleading.  When analyzed in a manner comparable to the present study, no protective effect is shown."

47.     Vioxx was finally pulled off the market after Merck's own clinical trial, APPROVe (Adenomatous Polyp Prevention on Vioxx), confirmed what researchers had been saying for years, that Vioxx significantly increases the risk of thrombotic events.  APPROVe was a multi-center, randomized, placebo-controlled, double-blind study to determine the effects of three years of treatment with Vioxx for the prevention of recurrence of colorectal polyps in patients with a history of colorectal adenomas.

-16-

The trial started in 2000, enrolled 2,600 patients and compared patients taking 25 mg of Vioxx to patients taking placebo.

48.     Merck ended the trial after three years when numerous patients taking Vioxx for at least eighteen months experienced adverse cardiovascular events.  By the eighteenth month, forty-five patients taking Vioxx experienced a confirmed serious thrombotic event, compared with only twenty-five patients taking placebo.

**Merck Publicly, and By Direct Communication to Prescribing Doctors,
Made False and Misleading Statements about
the Safety and Efficacy of Vioxx**

49.     The results of the VIGOR trial were announced to the public on March 27, 2000, and were published in the *New England Journal of Medicine* on November 23, 2000.  The VIGOR trial showed that patients receiving Vioxx were 5 times more likely to suffer a heart attack than those who received the older NSAID naproxen.

50.     Recognizing the critical need to counteract this adverse information in its direct marketing to doctors, Merck improperly pooled  internal unpublished data to produce a misleading promotional device, titled the "Cardiovascular Card," which misrepresented the true risk of adverse cardiovascular events of Vioxx compared to traditional NSAIDs.

51.     On April 28, 2000, Merck issued a bulletin instructing its salespeople to

use this Cardiovascular Card (CV Card) if doctors asked them about cardiovascular risks of Vioxx.  Instead of telling doctors the truth Merck knew about the cardiovascular risk shown in the VIGOR study, the bulletin required salespeople to point doctors to charts which listed "Overall Mortality Rates" purporting to show that patients on Vioxx were 11 times less likely to die than patients on other NSAIDs and were 8 times less likely to die of heart attacks and strokes.  Merck told its salespeople to use the CV Card to "[e]nsure that the physician agrees that the cardiovascular events seen with Vioxx in OA clinical trials were low and similar to [other NSAIDs]."  The Cardiovascular Card was used in falsely marketing Vioxx directly to Montana health care providers.

52.     The April sales bulletin instructed salespeople never to raise the subject of cardiovascular risks of Vioxx when talking to doctors.  Merck treated questions by doctors about the cardiovascular risks of Vioxx as "obstacles."  The April 28, 2000, Merck bulletin states: "The Cardiovascular Card is an obstacle handling piece and should only be used with physicians in response to their questions regarding the cardiovascular effects of Vioxx."  Merck told its salespeople never to leave a CV Card with a doctor or allow a doctor to make a copy of the card.

53.     As described previously, on February 8, 2001, the FDA conducted an Arthritis Advisory Committee meeting at which questions about the safety of Vioxx

-18-

were extensively reviewed.  At the meeting, Merck presented a large, pooled analysis of all Vioxx trials.  In response, FDA officials told the advisory committee that pooling data from different studies to assess safety, as Merck was doing, was fundamentally flawed.

54.    The FDA Arthritis Advisory Committee concluded that doctors should be told that the VIGOR study showed "an excess of cardiovascular events in comparison to naproxen."

55.    The next day, contrary to the FDA Arthritis Advisory Committee recommendation, Merck sent another emergency bulletin to its salespeople stating: "DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE . . .OR THE RESULTS OF THE . . . VIGOR STUDY."  The bulletin further ordered salespeople to "[s]tay focused on the EFFICACY message for Vioxx."

56.    The bulletin referred to its contents as "Updated Obstacle Responses," and closed by reminding salespeople: "Do not proactively discuss the Advisory Committee Meeting or VIGOR."

57.    On May 22, 2001, the *New York Times* published an article raising questions about VIGOR and the cardiovascular safety of Vioxx.  The very same day, Merck issued a press release responding to the *New York Times* article.  The press release stated:  "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx."

-19-

The press release referred to the pooled data from pre-approval studies and claimed that: "there was no difference in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx, other NSAIDs and placebo."

58.    A day later, in response to the unfavorable press, Merck sent another emergency bulletin to its field sales staff, once again instructing them to counter the *Times* article by displaying the CV Card and highlighting data on the card suggesting that Vioxx was safer than other NSAIDs.  It advised its sales representatives to tell doctors that Merck's data showed that cardiovascular mortality was actually 8 times less than other NSAIDs.

59.    In July 2001, an article in *WEB MD* quoted an FDA Study stating:  "[T]he study found that Vioxx cut the occurrence of ulcers and other gastrointestinal problems by half compared with the over-the-counter NSAID Aleve. But the study showed that people taking Vioxx had four times the risk of a heart attack."

60.    In response, Merck's spokeswoman, Christine Fanelle, issued a press release  that the "risk was negligible," and that "it appeared to increase the risk of a heart attack because Aleve, like aspirin, actually reduces heart attack risks."

61.    On August 22, 2001, the *Journal of the American Medical Association* (JAMA) published the results of a meta-analysis of the cardiovascular safety of Vioxx authored by cardiologists Eric J. Topol, M.D., Debarata Mukherjee, M.D., and Steven

E. Nessen, M.D. of the Cleveland Clinic Foundation entitled, "Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors." The JAMA article reported the Cleveland Clinic's evaluation of two randomized trials of more than 15,000 patients, comparing Pfizer's Celebrex in a study called CLASS and Merck's VIGOR Study involving Vioxx. The Cleveland Clinic reported that: "[T]he annualized myocardial infarction rates for COX-2 inhibitors in both VIGOR and CLASS were significantly higher than that in the placebo group . . . ."

62.   The day before the JAMA article was published, Merck issued a statement claiming:  "We have additional data beyond what they cite, and the findings are very, very reassuring. Vioxx does not result in any increase in cardiovascular events compared to placebo."

63.   On that same day, Merck executive, Jo Jerman, also delivered a voice mail to company field representatives reassuring them and instructing them again to  use the CV Card if asked about cardiovascular effects, reminding them that the card showed that cardiovascular mortality rates were similar for Vioxx and other NSAIDs.

64.   On August 23, 2001, immediately after the JAMA article was published, Merck stated in another press release:  "The Company stands behind the overall and cardiovascular safety profile . . . of Vioxx"  falsely adding that "there is no increase in the risk of cardiovascular events as a result of treatment with Vioxx."

-21-

65.    Each time there was any public concern raised about the safety of Vioxx, Merck responded by instructing its field staff to focus on using the misleading CV Card to overcome any hesitation or concerns by the prescribing doctors.

66.    Merck asked to run a rebuttal to the JAMA article, emphasizing the cardiovascular safety profile of Vioxx, but JAMA refused.  Merck then sent false "Dear Doctor" letters to thousands of physicians nationwide, including in Montana, that "strongly supported the cardiovascular safety profile" of Vioxx.

67.    In that direct letter to doctors, Merck misrepresented the heart risks faced by patients taking Vioxx.   Merck reported that, in patients taking Vioxx in the largest clinical trial of the drug ever, only 0.5 percent had incurred "cardiovascular events," or heart and circulation problems.  In fact, 14.6 percent of the Vioxx patients had cardiovascular problems while taking the drug, according to Merck's own report on the study to federal regulators.  In addition, 2.5 percent had serious problems, like heart attacks.

68.    Merck also sent "Dear Patient" letters to thousands of consumers nationwide, including in Montana,  identified from a prescription database, that misrepresented the risk of "heart attacks and strokes" and emphasized that Vioxx was "innovative, effective and safe."

69.    On September 17, 2001, the FDA issued a WARNING LETTER to Merck

stating that: "[Y]our claim in the press release that Vioxx has a 'favorable cardiovascular safety profile,' is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDS is misleading . . . ."

70.     The Warning Letter to Raymond Gilmartin, President and CEO of Merck, demanded that Merck correct false and misleading statements made in the course of its Vioxx promotional campaign.

> You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile of Vioxx.  Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drugs (NSAID), Naprosyn (naproxen).

71.     The Letter also cautioned, "Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns.  Your misrepresentation . . .  is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile."  The FDA also warned Merck that its recent press releases "confirming the favorable cardiovascular safety profile of Vioxx" were "simply incomprehensible" given the rate of heart attacks and "serious cardiovascular

-23-

events compared to naproxen."

72.     The 2001 Warning Letter set forth a list of specific misrepresentations

made by and/or on behalf of Merck about Vioxx and these are quoted below.

> [T]he Division of Drug Marketing, Advertising, and Communications
> (DDMAC) has reviewed your promotional activities and materials and has
> concluded that they are false, lacking in fair balance, or otherwise
> misleading in violation of the Federal Food, Drug, and Cosmetic Act.
>
>                           .   .   .   .
>
> You assert that Vioxx does not increase the risk of MIs and that the
> VIGOR finding is consistent with naproxen's ability to block platelet
> aggregation like aspirin.  That is a possible explanation, but you fail to
> disclose that your explanation is hypothetical, has not been demonstrated
> by substantial evidence, and that there is another reasonable explanation,
> that Vioxx may have pro-thrombotic properties.
>
>                           .   .   .   .
>
> Your minimizing these potential risks and misrepresenting the safety
> profile for Vioxx raise significant public health and safety concerns.  Your
> misrepresentation of the safety profile for Vioxx is particularly
> troublesome because we have previously, in an untitled letter, objected to
> promotional materials for Vioxx that also misrepresented Vioxx's safety
> profile.
>
>                           .   .   .   .
>
> The promotional audio conferences identified above, arranged by, and
> presented on behalf of, Merck were false or misleading in that they
> minimized the MI results of the VIGOR study, minimized the
> Vioxx/Coumadin drug interaction, omitted important risk information,
> made unsubstantiated superiority claims, and promoted Vioxx for
> unapproved uses and an unapproved dosing regimen.

. . . .

Your suggestion that COX-2 inhibitors, including Vioxx, have an overall
safety profile that is superior to other NSAIDs is misleading because such
an advantage has not been demonstrated.  In fact, in the VIGOR study the
incidence of serious adverse events was **higher** in the Vioxx treatment
group than in the naproxen treatment group . . . .

. . . .

Your audio conferences are misleading because they promote Vioxx for
unapproved uses . . . .  Your claim is misleading because it suggests that
Vioxx is effective for the treatment of rhemuatoid arthritis when this has
not been demonstrated.

. . . .

Your promotional audio conferences are also misleading because they
suggest that Vioxx is safe and effective for other unapproved uses such as
the prevention of cancer and invasive cancer, and for the treatment of
Alzheimer's disease and gout.

. . . .

The promotional activities and materials described above minimize the
potentially serious cardiovascular findings that were observed in the
VIGOR study, minimize the Vioxx/Coumadin drug interaction, omit
crucial risk information associated with Vioxx therapy, contain
unsubstantiated comparative claims, and promote unapproved uses.

73.     Neither the adverse journal and newspaper articles nor the FDA criticisms

did anything to hinder Merck's aggressive marketing of Vioxx.  In the Fall of 2001,

Merck launched Project Offense to increase Vioxx market share, focusing on efficacy

-25-

to divert attention from the safety concerns. Project Offense included instructions to field sales staff, including the field staff serving Montana, on how to address physician safety concerns, advising them again to review the entire CV Card with doctors, and point out to them Merck's data which purported to show that Vioxx was actually safer than other NSAIDs.

**Merck Resisted Changes Recommended by the FDA to
Warn about Heart Attack Risks in Vioxx Labeling**

74.     After the VIGOR study, the FDA recommended that the label for Vioxx be changed to add a warning which included a statement that: "The risk of developing myocardial infarction in the VIGOR study was five fold higher in patients treated with Vioxx 50 mg (0.5%) as compared to patients treated with naproxen (0.1%) . . . ." Merck objected to the change recommended by the FDA.

75.     On February 15, 2002, the FDA recommended that the Vioxx label include a Kaplan-Meier curve to graphically show a worsening of cardiovascular risks as the length of exposure to Vioxx increased. Merck again objected.

76.     In addition to the misleading CV Card, Merck developed a number of other materials designed to misrepresent the safety and efficacy of Vioxx. It produced a videotape to train its salespeople to view doctors' concerns about Vioxx's heart risks as "'obstacles" to be avoided or dismissed.

-26-

77.     Merck produced a training document titled "Dodge Ball Vioxx," consisting of 12 pages of statements or questions a salesperson might receive from a doctor about the cardiovascular safety of Vioxx.  The last 4 pages of the document contain the single word "DODGE!" in capital letters, instructing its sales people nationwide, including those serving  Montana how to misrepresent by omission the safety profile of Vioxx.

### Merck Attempted to Suppress and Refute Research Showing That Vioxx Increases the Risk of Heart Attacks

78.     Two months after Vioxx went on the market in 1999, Nancy Santanello, head of Merck's epidemiology department, wrote an e-mail about "physicians to neutralize:"  Her email states:  "Attached is the complete list of 36 physicians to neutralize with background information and recommended tactics. You will notice that some have already been 'neutralized'."  That e-mail also identified a previous e-mail which had a subset of the 36 physicians "we would like to get involved in Merck clinical research" and that the e-mail's recipient should "be aware of our most challenging (and also most vocal) national and regional physicians."

79.     During 1999, Merck paid Dr. Gurkipal Singh of Stanford University Medical School up to $2,500 for giving talks to other doctors supporting the use of Vioxx.  Dr. Singh gave 40 talks over 7 months.  Dr. Singh became concerned about the

cardiovascular risks of Vioxx after the VIGOR study was completed.  Dr. Singh

repeatedly asked Merck for the VIGOR data so he could analyze them for himself.

When Dr. Singh persisted in his requests, Merck warned him that there would be

serious consequences if he didn't stop.  In 2000, Dr. Singh began to publicly express

his concern about the cardiovascular risks of Vioxx.

80.     A dossier of Dr. Singh's activities regarding Vioxx was prepared for

Merck senior vice president, Dr. Louis Sherwood.  On October 28, 2000, Dr. Sherwood

called Dr. Singh's boss, Stanford Medical School professor Dr. James Fries, and hinted

that there would be repercussions for Stanford if Dr. Singh continued making public

statements about the cardiovascular risks of Vioxx.

81.     In January 2001, Dr. Fries wrote to former Merck CEO, Ray Gilmartin,

complaining that Dr. Sherwood had called him to try to get him to make Dr. Singh stop

saying negative things about Vioxx in lectures.  Sherwood warned that if Dr. Singh

didn't stop bashing Vioxx, he would "flame out" and "there would be consequences for

[Dr. Singh] and Stanford."

82.     Merck sponsored a study of Vioxx by several doctors, including Dr.

Daniel Solomon and Dr. Jerry Avorn.  Merck scientists helped develop the study

protocol and signed off on all aspects of the study design.  However, when the study

showed an increased risk of heart attacks with Vioxx, Merck required one of the

-28-

study's coauthors, who was an employee of Merck, to remove her name from the study. Although it funded the study and approved its design, Merck publicly discredited the study in May 2003, claiming that there were "serious limitations to the analysis."

### Merck Deleted Data About Heart Attacks From an Article in *The New England Journal of Medicine*, Causing the Article to be Incomplete and Deceptive

83.    As noted, in November 2000, the article reporting on the VIGOR study was published in *The New England Journal of Medicine*.  *The New England Journal* is one of the world's most prestigious and influential medical journals.  As previously described, the VIGOR study was financed by Merck and produced information about heart attacks suffered by study participants who took Vioxx and by those who took naproxen instead of Vioxx.  Throughout its marketing campaign for Vioxx, Merck relied on the VIGOR article in *The New England Journal* to support its claim that Vioxx was safe.

84.    The VIGOR data showed that 20 of the participants taking Vioxx had heart attacks compared to only 4 of the participants taking naproxen.  Although at least 2 of the 3 lead authors of the article that appeared in *The New England Journal* knew several months before the article was published that there were 20 heart attacks among the participants taking Vioxx, the article reported that 17, not 20, of the Vioxx participants had heart attacks.

-29-

85.     Electronic records show that two days before the article was submitted to *The New England Journal* for publication, a Merck editor deleted information about 3 of the heart attacks in the Vioxx participants.  The data deleted by Merck made Vioxx appear less risky in the article than the VIGOR trial actually proved that it was.  Merck knew that by deleting data about heart attacks, the article would present an incomplete, inaccurate, and deceptive picture of the true risk of taking Vioxx.

86.     The editors of *The New England Journal* have publicly stated that the information deleted by Merck calls into question "the integrity of the data" appearing in the article, and have called for the article's authors to submit a correction.

**Merck Aggressively Marketed Vioxx to the Public and to Doctors Misrepresenting the Safety and Effectiveness of the Drug**

87.     Despite knowing before and after FDA approval that Vioxx caused increased cardiovascular risk, Merck  aggressively marketed Vioxx from the beginning.

88.     When Merck launched its marketing campaign for Vioxx in 1999, it hired 700 new salespeople to market the drug to doctors and eventually assigned over 3,000 salespeople to promote Vioxx in face-to-face discussions with doctors.

89.     Merck put its salespeople through intensive training exercises to persuade doctors to prescribe Vioxx and provided numerous incentives to Merck salespeople for increasing the share of Vioxx that any doctor prescribed.

-30-

90.    Salespeople were instructed to use the systems and techniques it had taught them to convince doctors that Vioxx was a safe and effective pain reliever.  On information and belief, it is alleged that Merck salespeople used some or all of the required false marketing tactics when it directly contacted Montana doctors treating Montana citizens.

91.    On October 3, 2001, Merck launched a direct-to-consumer advertising campaign for Vioxx with television ads featuring Olympic skater Dorothy Hamill. These ads ran repeatedly in Montana.  The ads omitted to warn consumers that Vioxx increased the risk of cardiovascular problems.

92.    Merck's Vioxx advertising and marketing campaign as a whole sought to create the false image, impression, and belief that Vioxx was safe for adults and had fewer side-effects and adverse reactions than other pain relief medications.  Merck had no reasonable grounds to believe that these representations were true.  Merck purposefully misrepresented, understated, and otherwise downplayed the serious health hazards and risks associated with Vioxx.

### COUNT ONE — UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT CLAIM

93.    Plaintiff repeats and realleges the paragraphs above as if set forth fully herein.

-31-

94.     In the course of business, Merck misrepresented and/or omitted material facts about the safety and effectiveness of Vioxx. Merck misleadingly claimed that Vioxx was safe and was as, or more, effective than traditional NSAIDs in treating chronic pain, that it did not cause or contribute to any cardiovascular problem greater than any other NSAIDs, and that Vioxx use should not be limited to patients with gastrointestinal problems who could not use other NSAIDs.

95.     Merck systematically suppressed and concealed material information it developed or otherwise knew about the adverse cardiovascular effects of Vioxx and engaged in a mis-information and dis-information campaign to conceal the truth.

96.     Merck systematically sought to discredit or cast doubt upon scientific studies and reports and the work of scientists which concluded that Vioxx caused or contributed to adverse cardiovascular effects.

97.     Merck systematically engaged in a false and misleading marketing and advertising campaign to promote the use of Vioxx.

98.     Merck's conduct, as described above, was intended to and directed to health care providers and consumers and the public at large in Montana and constitutes unfair and deceptive practices in violation of Mont. Code Ann. § 30-14-103.

WHEREFORE, the State of Montana, by and through Attorney General Steve Bullock, prays as follows:

1.     That the Court adjudge and decree that Merck has engaged in the conduct alleged herein.

2.     That the Court adjudge and degree that such conduct is unlawful and in violation of Mont. Code Ann. § 30-14-103.

3.     That the Court enter its Order permanently enjoining Merck from further acts in violation of Mont. Code Ann. § 30-14-103.

4.     That the Court, pursuant to Mont. Code Ann. § 30-14-142, assess civil penalties of $5000.00 against Merck for each violation of Mont. Code Ann. § 30-14-103 complained of herein.

5.     That the Court award the State of Montana its attorneys fees and costs.

6.     That the Court order such other and further relief as the Court deems just, necessary, and appropriate.

Dated this __8th_ day of May, 2012.

> STEVE BULLOCK
> Attorney General
> JIM MOLLOY
> Assistant Attorney General
> P.O. Box 201401
> Helena, MT 59620-1401
> Tel.: 406-444-2026
>
>
> BY: /s/ William A. Rossbach
>      WILLIAM A. ROSSBACH

-33-

Special Assistant Attorney General
ROSSBACH HART, PC
P.O. Box 8988
Missoula, MT 59807-8988
Tel.:  406-543-5156

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands trial by jury of all issues of fact in this case.

Dated this 8th  day of May, 2012.

> STEVE BULLOCK
> Attorney General
> JIM MOLLOY
> Assistant Attorney General
> P.O. Box 201401
> Helena, MT 59620-1401
> Tel.: 406-444-2026
>
>
> BY: /s/ William A. Rossbach
>     WILLIAM A. ROSSBACH
>     Special Assistant Attorney General
>     ROSSBACH HART, PC
>     P.O. Box 8988
>     Missoula, MT 59807
>     Tel.:  406-543-5156