# Exhibit E



44138809

May 8 2012
5:24PM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY | * | MDL No. 1657 |
| LITIGATION | * | |
| | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| This document relates to: | * | |
| *State of Montana ex rel Mike McGrath* | * | MAGISTRATE JUDGE KNOWLES |
| *v. Merck & Company*, Civil Action No. 06-4302 | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT
## AND ULLR 7.6E CERTIFICATE

The State of Montana, by and through the Attorney General of Montana Steve Bullock, hereby moves this Honorable Court for leave to amend the original complaint filed by his predecessor, Attorney General Mike McGrath in the State District Court for Lewis and Clark County, Montana. Attached hereto is General Bullock's proposed Amended Complaint brought in the exercise of the Attorney General's common law and statutory powers, alleging that Merck engaged in unfair and deceptive trade practices regarding the marketing and sale of Vioxx to citizens of the State of Montana in violation of the Montana Unfair Trade Practices and Consumer Protection Act, Montana Code Annotated § 30-14-101 *et. seq.*

General Bullock seeks leave to amend the State's prior pleadings in order change the caption to reflect that he is now the duly elected Attorney General and to narrow the scope of this action and to limit his claims against Merck to only those provided in the Montana Unfair Trade Practices and Consumer Protection Act. Because this amendment will eliminate all claims for restitution or reimbursement, Merck will not suffer any prejudice as a result of this amendment but instead will benefit both in terms of less discovery and less potential liability exposure from the reduced claims and narrower focus of the relief sought by the State.

1

Because the Rules of Civil Procedure provide that leave to amend shall be freely granted and for the reasons set forth it his Memorandum in Support of Motion for Leave to Amend, General Bullock respectfully urges the Court to grant this Motion.

In accordance with the provisions of ULLR 7.6E, undersigned counsel hereby certifies that Merck was provided a copy of the proposed Amended Complaint on approximately April 11, 2012, and that counsel for Merck has been contacted for the purpose of seeking consent for the filing and granting of this Motion for Leave and that counsel has not yet agreed to consent.

DATED this 8th day of May, 2012

/s/ William A. Rossbach
William A. Rossbach
ROSSBACH HART, P.C.
P.O. Box 8988
Missoula, MT 59807-8988
Telephone: (406) 543-5156
Telefax: (406) 728-8878
bill@rossbachlaw.com

### CERTIFICATE OF SERVICE

**I** hereby certify that the above and foregoing Motion has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, upon Liaison Counsel Ann Oldfather by e-mail, and upon all parties by electronically uploading same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 8th day, 2012.

_/s/_ Bruce Kingsdorf
Bruce Kingsdorf


44138809

May  8 2012
5:24PM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | * | MDL No. 1657 |
| | * | |
| | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| This document relates to: | * | |
| *State of Montana ex rel Mike McGrath* | * | MAGISTRATE JUDGE KNOWLES |
| *v. Merck & Company*, Civil Action No.  06-4302 | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION</u>
## <u>FOR LEAVE TO AMEND COMPLAINT</u>

### INTRODUCTION

This matter arises out of a Complaint filed December 28, 2005, in the First Judicial District Court for the State of Montana, Lewis and Clark County.  In its complaint Montana asserted four causes of action based on state statutory and common law, including the Montana Unfair Trade Practices and Consumer Protection Act, the Montana Food, Drug and Cosmetic Act, Unjust Enrichment, and Deceit.  The State very pointedly and intentionally did not allege violations of the Montana False Claims Act or seek reimbursement for false claims made to Medicaid.

Before service on Merck could be effectuated, on March 1, 2006, Merck appeared and removed the case to the United States District Court for the District of Montana (Helena Division). Despite Montana's intentional omission of a false claims count, in its removal papers Merck alleged that it was entitled to removal because the claims implicated federal questions of law in the interpretation of the federal Food, Drug and Cosmetic Act and federal Medicaid laws.  Exhibit A, Notice of Removal, at 3.

The State of Montana moved the next day to remand, arguing that its claims were all based

exclusively on state law and that because resolution of the claims did not require interpretation of any federal laws there was therefore no jurisdiction in the District Courts of the United States. However, before the District Court in Montana could rule on the remand, the matter was transferred to this MDL.  On November 20, 2007, the State of Montana renewed its Motion to Remand in this MDL.

Because its remand motion has never been heard and because the State has reached agreement with the Plaintiff Steering Committee to pay a portion of any future recovery into the common benefit fund, the State now has access to the full MDL database and to the work product and "trial package" of the PSC.  Therefore the State has determined that to expedite its remand back to the courts of the State of Montana and to forego any further "common discovery," it should amend its complaint to precisely limit its claims to those provided by the state's Unfair Trade Practices and Consumer Protection Act, just as Kentucky has done.

## ARGUMENT

The plain policy of the federal rules is to permit liberal amendment to facilitate determination of claims on the merits.  As the leading Supreme Court decision long ago made clear,

> [i]n the absence of any apparent or declared reason ~ such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.- the leave sought should, as the rules require, be 'freely given.'

*Foman v. Davis*, 371 U.S. 178,182 (1962).

In the Fifth Circuit, case law re-affirms that Federal Rule of Civil Procedure 15(a) requires the court to grant leave to amend "freely." Lyn-*Lea Travel Corp. v. Am. Airlines,* 283 F.3d 282, 286 (5th Cir. 2002).  As the Fifth Circuit has held, "the language of this rule 'evinces a bias in favor of granting leave to amend."  Id. (quoting *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc*., 690

F.2d 1157, 1162 (5th Cir. 1983).

While the power to grant leave to amend is within the discretion of the district court, the discretion to deny amendment is restricted. As the Fifth Circuit in *Dussouy v. Gulf Coast Investment Corporation* explained:

> 'Discretion' may be a misleading term, for [R]ule 15(a) severely restricts the judge's freedom, directing that leave to amend 'shall be freely given when justice so requires.' It evinces a bias in favor of granting leave to amend. The policy of the federal rules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading. Thus, unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial.

660 F.2d 594, 597 (5th Cir. 1981).

As the Supreme Court has held, Rule 15(a) requires a court denying leave to state its reason for doing so. *Foman,* 371 U.S. at 182 (finding that unexplained refusal "is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules").

In the instant case, although the factual allegations have been expanded to a limited degree based on what has been learned in this litigation since the case was filed in 2005, the causes of action or claims for relief have been reduced from four to a single claim under the Montana Unfair Trade Practices and Consumer Protection Act. The proposed amendment thus does not change the substance of the action but only narrows the grounds for recovery. In *Dussouy v. Gulf Coast Investment Corporation*, 660 F.2d, at 599 (5th Cir. 1981) amendment was allowed even where it added a new theory of recovery. Thus, it would be entirely disingenuous for Merck to claim now that it is somehow unduly prejudiced by an amendment that substantially reduces its potential financial exposure and the amount of discovery it would need to conduct to defend itself. By the State dropping all claims for restitution or reimbursement, the discovery burden on both parties will

be substantially reduced and remand and trial on the merit should be facilitated.

Likewise, Merck cannot claim it would be somehow prejudiced by the State's delay in seeking amendment because any delay has not been due to any actions by the State. Amendment, as noted above, should actually speed resolution of this case by expediting transfer back to the State of Montana and eliminating considerable needless discovery on the issue of restitution and reimbursement. Moreover, delay alone is not sufficient grounds for denying a motion for leave to amend. *Mayeaux v. Louisiana Health Service and Indemnity Co.,* 376 F.3d 420, 427 (5th Cir. 2004) ("And, we know that delay alone is an insufficient basis for denial of leave to amend: The delay must be undue, i.e., it must prejudice the nonmoving party or impose unwarranted burdens on the court.") Indeed, the burdens on this Court and the transferee courts in Montana will be greatly reduced by this amendment to narrow and focus the State's claims.

## CONCLUSION

Based on all the foregoing, the State of Montana, through Attorney General Steve Bullock, respectfully urges this Court to grant its Motion for Leave to Amend the original complaint.

DATED this 8th day of May 2012

        /s/ William A. Rossbach
        William A. Rossbach
        ROSSBACH HART, P.C.
        P.O. Box 8988
        Missoula, MT 59807-8988
        Telephone: (406) 543-5156
        Telefax: (406) 728-8878
        bill@rossbachlaw.com

## CERTIFICATE OF SERVICE

**I** hereby certify that the above and foregoing Motion has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, upon Liaison Counsel Ann Oldfather by e-mail, and upon all parties by electronically uploading same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 8th day of May, 2012.

/s/ Bruce Kingsdorf

Case 2:05-md-01657-EEF-DEK   Document 64529-2   Filed 08/08/13   Page 10 of 57



44138809

May 8 2012
5:24PM

# EXHIBIT A

W. Scott Mitchell
Kyle A. Gray
Holland & Hart LLP
401 North 31st Street, Suite 1500
P. O. Box 639
Billings, MT 59103-0639
Telephone: (406) 252-2166
Fax: (406) 252-1669

FILED
BILLINGS DIV.

2005 FEB 1   PM 12 38

PATRICK E. DUFFY, CLERK

BY _____
DEPUTY CLERK

ATTORNEYS FOR DEFENDANT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | | |
|---|---|---|
| THE STATE OF MONTANA, *ex rel* MIKE McGRATH, Attorney General, | ) ) ) ) | No.: CV 06 07 - H DWM |
| Plaintiff, | ) ) | Judge D MOLLOY |
| vs. | ) ) | **NOTICE OF REMOVAL OF** |
| MERCK & CO., INC. | ) ) | **DEFENDANT MERCK & CO., INC.** |
| Defendant. | ) ) | |

PLEASE TAKE NOTICE that Defendant Merck & Co., Inc. ("Merck"), through undersigned counsel, hereby removes the above-captioned action from the District Court for the First Judicial District in Lewis & Clark County, Montana to the United States District Court for the District of Montana, pursuant to 28 U.S.C. §§ 1331 and 1441. In support of its removal, Defendant respectfully states as follows:

1.      This action involves allegations regarding the prescription drug Vioxx®. An MDL proceeding has been established in the United States District Court for the Eastern District of Louisiana (Fallon, J.) for coordinated pretrial proceedings of Vioxx-

related actions under 28 U.S.C. § 1407. Two other suits filed by the state attorneys general of Louisiana and Mississippi alleging similar claims against Merck are already pending in that MDL proceeding,[1] and Merck intends to seek the transfer of this action to that MDL proceeding as well.

2.    On December 28, 2005 the State of Montana ("the State") commenced this action in the District Court for the First Judicial District in Lewis & Clark County, Montana, against Merck, captioned *State of Montana ex rel. McGrath v. Merck & Co., Inc.*, No. ADV-2005-899. A true and correct copy of Plaintiff's Complaint is attached as Exhibit A.

3.    Merck has not been served with a copy of the Complaint ("Compl."). Accordingly, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b).

4.    Venue is proper in this Court pursuant to 28 U.S.C. § 89(c), because it is the "district and division embracing the place where such action is pending." *See* 28 U.S.C. § 1441(a).

5.    No previous application has been made for the relief requested herein.

6.    Merck will promptly (a) file a true and correct copy of this Notice of Removal with the Clerk of Court for the District Court for the First Judicial District in Lewis & Clark County, Montana in accordance with 28 U.S.C. § 1446(d); and (b) serve Plaintiff's counsel with a true and correct copy of this Notice of Removal, in accordance with 28 U.S.C. § 1446(d).

---

[1]    The two state attorney general actions are *Foti v. Merck*, No. 05-3700 (E.D. La.) (Louisiana) , and *Hood v. Merck*, No. 05-6755 (E.D. La.) (Mississippi).

2

## I.  ALLEGATIONS AND REQUESTED RELIEF

7.      Plaintiff's complaint alleges that Merck violated the Montana Food, Drug,

and Cosmetic Act, Mont. Code Ann. § 50-31-101, *et seq.*, because its "advertisements

made false and misleading claims to doctors and the public in Montana about the

effectiveness of Vioxx." (Compl. ¶ 67.)  The State also alleges that Merck committed

"deceit" under Mont. Code Ann. § 27-1-712 by making "suggestions of fact that Merck

knew were not true" and "suppress[ing] facts about the cardiovascular dangers of

Vioxx."  (*Id.* ¶¶ 70-71.)  Additionally, the State alleges that Merck misrepresented,

omitted, and suppressed material facts about the safety and efficacy of Vioxx in

violation of Montana's Unfair Trade Practices and Consumer Protection Act, Mont.

Code. Ann. § 30-14-103 ("UTPCPA").  (*Id.* ¶ 74-79.)  Lastly, the State alleges that

Merck has been unjustly enriched due to its misleading conduct.  (Compl. ¶ 81-86.)

8.      The State seeks civil penalties of $10,000 against Merck for each alleged

violation of deceit under Mont. Code Ann. § 30-14-103; restitution for the State of

Montana and the citizens of the State of Montana; disgorgement of alleged unjust

profits from the sale of Vioxx to the citizens of the State of Montana and the State of

Montana; attorneys' fees and costs; and "such other and further relief as the Court

deems just, necessary, and appropriate." (Compl., Prayer for Relief.)

## II.  FEDERAL QUESTION JURISDICTION

9.      This Court has federal question jurisdiction over this matter pursuant to

28 U.S.C. § 1331, because the State's claims directly implicate two areas of federal

law: the Food, Drug & Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, which

regulates prescription drug manufacturers' public and promotional statements about

prescription drugs; and federal Medicaid law, which determines both which drugs a

3

state must cover under its Medicaid program and the limited circumstances under which it can decline to pay for such drugs. *See* 42 U.S.C. §§ 1396r-8(d)(1)(B), (d)(4). Thus, this action may be removed to this Court pursuant to 28 U.S.C. § 1441.

10.     The Supreme Court has recognized that federal question jurisdiction exists over claims that are asserted under state law if the state law claims implicate substantial federal questions. *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 125 S. Ct. 2363, 2369 (2005). *See also Hopkins v. Walker*, 244 U.S. 486, 490-491 (1917); *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1025 (N.D. Cal. 2005).

11.     As the Supreme Court explained in *Grable*, the test for whether a federal court should hear a case under this doctrine is not whether the federal statute provides a parallel private right of action, but whether the "state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." 125 S. Ct. at 2368. In *Grable*, the Supreme Court concluded that federal question jurisdiction existed because the plaintiff's state law claim was premised on the failure of a government agency to fulfill its responsibilities as defined by federal law. Thus, federal question jurisdiction existed because the meaning of the federal law was an essential element of the state law claim. *Id.* The same is true here.

12.     First, the claims in this case are implicitly premised upon alleged violations of the *federal* Food, Drug & Cosmetic Act ("FDCA") – namely that Merck illegally promoted an unsafe drug for public use and failed to warn doctors, state regulators, and consumers of risks in violation of FDCA rules and regulations.

4

13.    Under the FDCA, the Food and Drug Administration ("FDA") is tasked with approving drugs for human use and determining the necessary warnings manufacturers must include with their products. 21 U.S.C. § 393(b).  The FDCA charges the FDA to ensure that "drugs are safe and effective" for their intended uses, *id.* § 393(b)(2)(B), in part by "promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products." *Id.* § 393(b)(1).  The FDA is vested with the authority to promulgate regulations to enforce the FDCA, which are codified in the Code of Federal Regulations, 21 C.F.R. § 200 *et. seq.*; 21 U.S.C. § 371(a).

14.    To accomplish this mandate, the FDA maintains a Center for Drug Evaluation and Research ("CDER").  The CDER oversees the drug companies' development, testing and research, and manufacture of drugs.  The staff of approximately 1,800 examines clinical and other testing data generated by drug companies to assess a drug's benefits against its risks and to make an approval decision. The CDER also regulates prescription drug advertising, including the Package Inserts that outline benefit and risk information, and monitors marketed drugs for unexpected health risks that may require public notification, a change in labeling, or removal of the product from the market.  Under federal law, even claims in promotional labeling or advertising must be consistent with approved labeling.  21 C.F.R. § 202.1(e)(4) (2005).

15.    For these reasons, Plaintiff's allegations related to Merck's promotion of Vioxx will necessarily require the Court to interpret the meaning of the FDCA and its attendant regulations.  This is evident from Plaintiff's complaint, which includes extensive quotes from a letter that the FDA sent Merck regarding the contents of its

marketing materials for Vioxx (Compl. ¶ 36), and several allegations regarding
Merck's interactions with the FDA over Vioxx labeling. (*See id* ¶¶ 38-39.)

16.     Second, Plaintiff's claim for recovery of monies spent by the State of
Montana on Vioxx necessarily implicates federal laws and regulations related to
Medicaid.[2]

17.     Plaintiff's refund claims on behalf of the state of Montana implicate
substantial questions of federal law under the federal Medicaid statute because they
depend on the interpretation and application of federal statutory provisions that govern
what can be included in or rejected from State Medicaid formularies, including
Montana's, and because federal funds comprise the majority of Montana Medicaid
Program's funds – the money at issue in this lawsuit.[3]

18.     The federal Medicaid program authorizes federal money grants to states to
provide medical assistance to low-income individuals. 42 U.S.C. § 1396 *et seq.*; 42
C.F.R. § 430.10 *et seq.* "Although participation in the program is voluntary,

---

[2]     While plaintiff has assiduously avoided using the word "Medicaid" in the
Complaint, the state attorney general's request for reimbursement of funds spent by the
*state* for Vioxx is obviously a request for recovery of Medicaid funds, as other state
attorney generals' similar complaints readily admit. *See* Compl., *Foti v. Merck*, No. 05-
3700 (E.D. La.) (Louisiana) (seeking damages, in part, for the purchase price paid by
the State of Louisiana's Medicaid program for Vioxx prescriptions); Compl., *Hood v.
Merck*, No. 05-6755 (E.D. La) (Mississippi) (seeking damages, in part, for the purchase
price paid by the State of Mississippi's Medicaid program for Vioxx prescriptions);
Compl., *Alaska v. Merck*, No. 3:06-CV-00018 (TMB) (D. Alaska) (seeking damages
primarily for the purchase price paid by the State of Alaska's Medicaid program for
Vioxx prescriptions ).

[3]     For fiscal year 2004 (October 1, 2003 to September 30, 2004), for example,
federal funds accounted for 72.85% of Montana's Medicaid financing. *See Federal
Financial Participation in State Assistance Expenditures; Federal Matching Shares for
Medicaid, the State Children's Health Insurance Program, and Aid to Needy Aged,
Blind, or Disabled Persons for October 1, 2003 Through September 30, 2004*, 67 Fed.
Reg. 69,223, 69,224, Nov. 15, 2002, *available at*
http://www.aspe.hhs.gov/health/fmap04.htm.

6

participating States must comply with certain requirements imposed by the Medicaid Act . . . and regulations promulgated by the Secretary of Health and Human Services." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990). In Montana, the Medicaid program is administered by the Department of Public Health and Human Services. *See* http://www.dphhs.mt.gov/programsservices/medicaid.shtml; 42 C.F.R. § 431.10(b)(1) (requiring states to designate "a single State agency . . . to administer or supervise the administration of the [Medicaid] plan").

19.     Federal law expressly requires states, subject to certain narrow exceptions, to reimburse FDA-approved prescription drugs of any manufacturer that has entered into and complies with a rebate agreement with the Secretary of Health and Human Services. 42 U.S.C. § 1396r-8(d)(4)(B). Thus, Montana is required under federal law to reimburse companies for drugs, such as Vioxx, if the manufacturer complies with federal requirements.

20.     The only time a state can exclude from its formulary a covered outpatient drug subject to a rebate agreement is "with respect to the treatment of a specific disease or condition for an identified population . . . if, based on the drug's labeling . . . the excluded drug does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome of such treatment for such population over other drugs included in the formulary and there is a written explanation (available to the public) of the basis for the exclusion." 42 U.S.C. § 1396r-8(d)(4)(C). But even in such a situation, a state cannot deny coverage altogether; rather, it must condition such reimbursement on prior authorization, meaning that the state may require that it approve the drug's dispensation before it is dispensed. *Id.* § 1396r-8(d)(4)(D). And even a decision to require prior authorization must satisfy federally

7

mandated requirements. *Id.* §§ 1396r-8(d)(4)(E), (d)(5). Thus, every step a state takes with regard to coverage of an FDA-approved drug is subject to strict federal mandates.

21.     In short, because the Montana Medicaid program operates within this overarching federal regulatory framework, Plaintiff's claims alleging that Merck's conduct concerning Vioxx caused the State of Montana to spend money on Vioxx for which the state now seeks a refund necessarily turns on substantial questions of federal Medicaid law.

22.     Other courts have applied *Grable* and recognized that federal jurisdiction exists over actions, like this one, in which plaintiffs' state law claims are premised on violations of the FDCA and cases in which plaintiffs seek reimbursement of Medicaid expenditures. For example, in *In re Zyprexa Products Liability Litigation*, 375 F. Supp. 2d 170 (E.D.N.Y. 2005), the court asserted federal question jurisdiction over state-law claims brought by the state of Louisiana involving a manufacturer's marketing of a prescription drug and the state of Louisiana's payments for that drug under Medicaid, finding that the state attorney general's claims involved "a core of substantial issues [that were] federally oriented." *Id.* at 172-73.

23.     Similarly, in a recent case involving Medicaid drug pricing, the court in *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022 (N.D. Cal. 2005), held that federal jurisdiction was proper under *Grable* because the plaintiff's state law claims against pharmaceutical manufacturers for allegedly overcharging plaintiff for Medicaid drugs presented substantial questions of federal law. In concluding that the Medicaid drug pricing issues merited federal jurisdiction, the court observed that one measure of evaluating substantiality is "the importance of the federal issue." *Id.* at 1027. The court noted that "[u]nder this approach, the following issues have been

8

found to be substantial: those that directly affect the functioning of the federal government, those in an area reserved for exclusive federal jurisdiction, and those that impact a complex federal regulatory scheme." *Id.*

24.    As set forth above, Plaintiff's claims here implicate two complex federal regulatory schemes: the federal FDCA and federal Medicaid law. Accordingly, as in *Grable, Zyprexa,* and *Astra USA*, Plaintiff's allegations will necessarily require the Court to address substantial questions of federal law, and the Court therefore has federal question jurisdiction over this matter.

25.    WHEREFORE, Defendant gives notice of the removal of the above-captioned action now pending in the District Court of the First Judicial District, Lewis & Clark County, Montana, captioned *The State of Montana, ex rel Mike McGrath, Attorney General, v. Merck & Co., Inc., Cause No. ADV-2005-899,* to this Court.

Dated this /st day of March, 2006.

W. Scott Mitchell
Kyle A. Gray
Holland & Hart LLP
401 North 31st Street
Suite 1500
P. O. Box 639
Billings, Montana 59103-0639

ATTORNEYS FOR DEFENDANT

9

## CERTIFICATE OF MAILING

This is to certify that the foregoing Notice of Removal was mailed to the

following persons by United States mail, postage prepaid on the date herein.

> William A. Rossbach
> Rossbach Hart Bechtold, PC
> 401 North Washington Street
> Missoula, MT  59802
>
> E. Craig Daue
> Buxbaum, Daue & Fitzpatrick, PLLC
> 228 West Main, Suite A
> P. O. Box 8209
> Missoula, MT  59807

DATED this _1st_ day of March, 2006.

_W. Scott Mitchell_

3521572_1.DOC

10



LEXISNEXIS® FILE & SERVE
44138809
E-SERVICE
May  8 2012
5:24PM

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX PRODUCTS LIABILITY   *   MDL No. 1657
LITIGATION   *
  *   SECTION L
  *
  *   JUDGE ELDON E. FALLON
This document relates to:   *
*State of Montana ex rel Steve Bullock*   *   MAGISTRATE JUDGE KNOWLES
*v. Merck, et al.*  Civil Action No. 06-4032   *
  *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## FIRST AMENDED COMPLAINT

The State of Montana, by and through the Attorney General of Montana Steve

Bullock, asserts the following claims against Merck & Co., Inc. (Merck)

### I.  NATURE OF THE CLAIM

This is a civil action for violations of the Montana Unfair Trade Practices and

Consumer Protection Act.  The action is brought by the Montana Attorney General

Steve Bullock, in the exercise of his common law and statutory powers.  At all times

relevant, Defendant Merck knew and had reason to know that its drug, Vioxx, was not

safe for its intended purpose; that Vioxx put users at risk for cardiovascular injuries,

including but not limited to fatal myocardial infarctions, both obvious and silent, as well

as other adverse cardiovascular events, including ischemic strokes and death.  Merck

also knew that Vioxx was no more effective than other traditional, and much less

-1-

expensive, non-steriodal anti-inflammatory drugs commonly available for treatment of

acute and chronic pain and knew that, except in a very few patients with severe

gastrointestinal problems, the use of Vioxx was neither medically nor financially

justified.  Despite this knowledge, Merck misrepresented the safety of Vioxx and

advertised, promoted, marketed, and sold Vioxx as a safe prescription medication when

it knew that was not true.  Moreover, Merck misrepresented the effectiveness of Vioxx

in comparison to other non-steriodal anti-inflammatory drugs and misrepresented and

over-promoted its use when it was not medically justified.

## II.  DEFENDANT'S CONDUCT

1.      The human body naturally produces two forms of cyclo-oxygenase

enzymes (COX-1 and COX-2) that contribute to and are associated with inflammation

and pain.  Non-steriodal anti-inflammatory drugs (NSAIDs) have the potential to relieve

pain and inflammation by inhibiting the production of these enzymes.  Many NSAIDs

have been developed for human use since aspirin was first formulated in 1897.

Traditional NSAIDs like aspirin, ibuprofen, and naproxen reduce pain and inflammation

by inhibiting production of both COX-1 and COX-2 enzymes.

2.      Merck developed Vioxx during the 1990s.  Vioxx is in the class of NSAIDs

known as COX-2 inhibitors.  COX-2 drugs inhibit the production of the COX-2, but not

the COX-1 enzyme.  COX-2 inhibitors tend to create less irritation to the stomach and

intestines than the earlier NSAIDs that inhibit both COX-1 and COX-2.  However, although they reduce gastrointestinal irritation, Vioxx and other COX-2 drugs also increase cardiovascular risk.  As shown below, prior to the FDA's approval of Vioxx®, since early in the development of Vioxx, officials at Merck knew that Vioxx® could cause harmful cardiovascular events, such as heart attacks.  Nevertheless, because of the competition with other companies for market share for treatment of acute and chronic pain and particularly arthritis, Merck wanted to get Vioxx onto the market as quickly as possible.

3.     Dr. Alan S. Nies, a Merck scientist who led the Vioxx development program in the 1990's, developed a plan in 1996 to expedite federal approval of Vioxx because of fear that Celebrex, a competing drug by Pfizer, would get approval first.  Dr. Nies' 1996 plan identified the Celebrex market goal of late 1998 and set the same goal for Vioxx. The document also noted an "accelerated and compressed" drug development strategy by beginning some clinical studies before others were finished.

**Both Before Obtaining FDA Approval and After It Was On the Market,
Merck Knew That Vioxx Increased the Risk of Cardiovascular Events,
But Consistently Misrepresented to the FDA and the Public What It Knew**

4.     While it was working to expedite approval of Vioxx, Merck learned very early that Vioxx lacked the beneficial anti-platelet effects of aspirin and aspirin-like NSAIDs.  At the site of an injury, blood platelets clump together to help form a clot and

-3-

prevent the loss of blood.  When blood clots form inside arteries supplying blood to the heart or brain, heart attacks and strokes can occur.  Aspirin and certain other NSAIDs reduce platelet aggregation and the formation of clots, thereby reducing the risk of heart attack and stroke in many patients.

5.     In late 1996, Merck planned a large-scale, long term, double-blind study of gastrointestinal toxicity in patients taking Vioxx or naproxen to treat arthritis.  This study, Merck's largest, came to be called the Vioxx Gastrointestinal Outcomes Research study ("VIGOR").

6.     Merck planned to conduct  VIGOR to obtain information regarding clinically meaningful gastrointestinal events and to develop a large controlled database for overall safety assessment.  The study compared patients who took Vioxx with patients who took naproxen.

7.     A November 21, 1996 memo by a Merck official shows that the company wanted VIGOR  to prove Vioxx was gentler on the stomach than older painkillers but already knew that Vioxx posed significant cardiovascular risk.  To show that Vioxx was gentler on the stomach, the Vioxx patients were not allowed to take aspirin but Merck knew "there is a substantial chance that significantly higher  rates of cardiovascular problems would be seen in the Vioxx group," according to the memo.

8.     A similar view was expressed in a February 25, 1997 e-mail by a Merck

-4-

official, Briggs Morrison.  He opined that unless patients in the Vioxx group also got aspirin, "you will get more thrombotic events: - that is, blood clots – "and kill [the] drug."

9.   In response, Dr. Alise Reicin, now a Merck vice president for clinical research, stated that "the possibility of increased CV [cardiovascular] events is of great concern."  Ms. Reicin suggested that patients with a high risk of cardiovascular problems be excluded from the trial so that the increased rate of cardiovascular problems in the group taking Vioxx "would not be evident."

> This is a no win situation!  The relative risk of [adverse GI event with] even low dose aspirin may be as high as 2-4 fold. Yet, the possibility of Increased CV [cardiovascular] events is of great concern (I just can't wait to be the one to present those results to senior management!).  What about the Idea of excluding high risk CV patients – ie those that have already had an MI, CABG, PTCA?  This may decrease the CV event rate so that a difference between the two groups would not be evident....

10.   By April 1998, Merck scientists had also learned that COX-2 inhibitors, such as Vioxx , reduce the production of prostacyclin, a naturally occurring compound in the body that prevents blood platelets from clumping together.  Merck, therefore, knew that Vioxx not only lacked the beneficial anti-platelet effect of aspirin and certain other NSAIDs, it also disables one of the blood vessels' main defenses against the clumping of platelets.

-5-

11.     Prior to seeking FDA approval for Vioxx Merck also knew of the potential for dangerous cardiovascular side effects associated with Vioxx® through internal studies such as  Study 090 that was conducted in 1998. The results of Study 090 were not disclosed to the FDA during the FDA approval process or the public at the time of the product launch. Study 090 concluded that Vioxx® users were six times more likely to suffer severe cardiovascular events than non-Vioxx® users.

12.     Before Vioxx was approved for sale in the United States, Merck thus knew that it contributed to the aggregation of blood platelets, putting users at risk for adverse cardiovascular effects, and knew that it could cause potentially fatal myocardial infarctions, both obvious and silent, and cerebrovascular events such as ischemic strokes and death.

13.     On November 23, 1998, Merck submitted a New Drug Application for Vioxx to the FDA and did not reveal what it knew about cardiovascular risk.  The FDA, by its Arthritis Drugs Advisory Committee ("the Advisory Committee") granted expedited review of Merck's Vioxx application.

14.      In January 1999, Merck commenced the Vioxx® Gastrointestinal Outcomes Research ("VIGOR") study, which compared Vioxx® to naproxen, the active ingredient in brand-name pain relievers such as Aleve and Naprosyn.

15.     On May 21, 1999, Merck issued a press release that announced that the

-6-

United States Food and Drug Administration (FDA) had approved Vioxx for the relief of osteoarthritis pain, menstrual pain, and other forms of acute pain.  The press release included a list of common side effects, but did not include reference to cardiovascular risks.

16.    Before it received FDA approval to market Vioxx, Merck engaged in a pre-release marketing campaign to bolster consumer interest and orders. That campaign conveyed the message that Vioxx provided safe and effective pain relief, while omitting any mention of what Merck knew of the cardiovascular risks.

17.    In June 1999, Merck released Vioxx for sale in the U.S.  This release was accompanied by the largest direct-to-consumer marketing campaign in history. Merck's Vioxx marketing message was that Vioxx provided safe and effective pain relief, while omitting any mention of the cardiovascular risk known to Merck.

18.    Merck spent more than $161 million dollars on direct-to-consumer marketing in 2000 to disseminate its message, and more than $100 million in each of the following four years.  In the year 2001, Vioxx was the most heavily advertised drug to consumers in the United States.   Merck's false and misleading Vioxx marketing campaign prompted the FDA to issue several warning letters to Merck between 1999 and 2001.

19.    One month after product launch, on July 16, 1999, the FDA's Division of

-7-

Drug Marketing, Advertising, and Communications ("DDMAC") issued a letter to Merck warning that its advertisements failed to provide adequate risk information. DDMAC informed Merck that certain Vioxx promotional materials were "lacking in fair balance or otherwise misleading." DDMAC concluded that the materials violated the FDCA and its implementing regulations, and it urged Merck immediately to cease these representations.

20.     On December 16, 1999, DDMAC issued another letter to Merck stating that its promotional pieces entitled, "TEN REASONS WHY VIOXX IS BETTER THAN CELEBREX" and "Vioxx vs. Celebrex Poem," were "false or misleading because they contain misrepresentations of Vioxx's safety profile, unsubstantiated comparative claims, and are lacking in fair balance." DDMAC observed that Merck's claim that Vioxx is safer than placebo in the incident rate of gastroduodenal ulcers "is in direct contrast with the approved product labeling (PL)" which showed that there was an increased risk of ulcers with Vioxx as compared to placebo. DDMAC "object[ed] to this claim because it minimized the GI warning associated with Vioxx and is inconsistent with the data in the PL."

21.     With respect to Merck's "TEN REASONS WHY VIOXX IS BETTER THAN CELEBREX," DDMAC noted several unsubstantiated and "misleading" comparative claims of Vioxx with Celebrex, including the assertion that Vioxx was

-8-

more effective and safer than Celebrex, even though "such has not been demonstrated by substantial evidence."

22.     DDMAC's letter noted that Merck's promotional materials failed to include a "fair balance with respect to the content and presentation of risk information related to the use of Vioxx."  DDMAC categorically stated that, in these materials, Merck had "not presented any risk information concerning the contraindications, warnings, precautions, or adverse events associated with Vioxx's use."

23.     In March 2000, Merck made public the results, but not the data, of the VIGOR study that showed that Vioxx patients suffered fewer stomach problems than the naproxen group, but significantly more blood-clot-related problems, as Merck anticipated in the 1996-97 internal documents.  Specifically, the heart attack rate for Vioxx users in the VIGOR study appeared to be four to five times higher than for users of other NSAIDs, confirming what Merck already knew about Vioxx.

24.     Dr. Scolnick, Merck's research chief, recognized the VIGOR results arose from Vioxx's inherent risks rather than naproxen's cardio-protective properties.  In a March 9, 2000 e-mail with the subject line "VIGOR," Dr. Scolnick said the results showed that the cardiovascular events "are clearly there."  In an apparent acknowledgment that Vioxx's own mechanism was at least partially at fault for the heart data, he wrote "it is a shame but it is a low incidence and it is mechanism based

as we worried it was."

25.    Dr. Scolnick did not want to publish the VIGOR study results until Merck could find other data to make it "clear to the world that this" was an effect of the entire COX-2 class, not just Vioxx.  Instead, Merck adopted the strategy of claiming that the lower cardiovascular risk for naproxen was due to the cardiac protective effect of that NSAID.

26.    Despite the warnings from the FDA and despite its knowledge of the VIGOR results, Merck continued to issue false and misleading press releases concerning the safety of Vioxx, including a March 27, 2000 press release that stated, "[a]n extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx, showed no indication of a difference in the incidence of thromboembolic events between Vioxx, placebo and comparator NSAIDs."  This release and all press releases referred to hereinafter were intended to reach health care providers and health care consumers throughout the United States, including Montana, without limitation, and did in fact reach Montana providers and consumers.

27.     In that  press release on March 27, 2000, Merck emphasized Vioxx®'s superior GI safety profile and attempted to explain away the cardiovascular risks:

S]ignificantly fewer thromboembolic events were observed in patients taking

-10-

naproxen in this GI outcomes study, which is consistent with naproxen's ability to block platelet aggregation. This effect on these events had not been observed previously in any clinical studies for naproxen. Vioxx®, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects." -Merck Press Release Dated March 27,2000

and falsely made claims about cardiovascular safety:

[a]n extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx®, showed no indication of a difference in the incidence of thromboembolic events between Vioxx®, placebo and comparator NSAIDs.   Merck Press Release Dated March 27,2000

28.    In 2000, Merck officials issued a "Confidential Memorandum of Invention."  In that document, they stated that because Vioxx might cause cardiovascular problems, Merck should consider applying for a patent on combining Vioxx with another drug that would protect against cardiovascular problems from blood clots.

29.    In April 2000, Merck responded to news reports that Vioxx might have cardiovascular risks by denying that any such risks existed:  "Extensive review of data from the completed osteoarthritis trial and on-going clinical trials with Vioxx . . .  have shown no difference in the incidence of cardiovascular events, such as heart attack, among patients taking Vioxx . . ."  (emphasis in original)

30.    In June of 2000, pharmaceutical industry-sponsored studies presented at

-11-

the European United League Against Rheumatism (EULAR), an organization in which Merck was a member and a corporate sponsor, showed that Vioxx use resulted in statistically significant increases in hypertension and myocardial infarction.

31.     In the journal *Pharmacy Today*, Merck publicly denied the validity of the results of the studies presented at the June 2000 EULAR study, especially with respect to the hypertension problems identified in that study.

32.      In October 2000, Merck sent its cardiovascular data from the VIGOR trial to the FDA for review.  This was the first time that Merck made the cardiovascular data gathered during VIGOR available to anyone without ties to Merck.

33.     In November 2000, Merck published the results of its VIGOR trial in the NEW ENGLAND JOURNAL OF MEDICINE.  The article, written by Merck employees and by academics who received consulting contracts and research grants from Merck, made only a vague reference to cardiovascular incidents and did not fully report the statistical incidence of cardiovascular complications seen in the study.  In fact, as shown below, adverse data was left out of the reported results in order to skew the conclusions.

34.     Merck's 2000 Annual Report falsely claimed that Merck's new compounds, including Vioxx, "possess better qualities than any of their predecessors brought forward in a like time span because we have been able to analyze and test them in more detail."  And on January 23, 2001, Merck issued a press release referencing

-12-

strong results from the VIGOR study.

35.    In February 2001, 19 months after Vioxx went on the market, the FDA issued a Memorandum on the Vioxx cardiovascular safety data gathered during VIGOR.  In this Memorandum, the FDA concluded that there "is an increased risk of cardiovascular thrombotic events, particularly [heart attack], in the [Vioxx] group compared with the naproxen group."  The FDA considered and rejected each of the defenses raised by Merck to explain the statistically significant increase of cardiovascular incidents among Vioxx users.

36.    Merck responded to the FDA's Memorandum with a false press release announcing its confidence "that the data presented today supports the excellent safety profile of Vioxx" and that "in the completed osteoarthritis trial and on-going clinical trials with Vioxx . . . there was no difference in the incidence of cardiovascular events, such as heart attacks among patients taking Vioxx, other NSAIDs and placebo." (emphasis in original).

37.    In February 2001, the FDA also noted that Merck should add a cardiovascular warning to its VIOXX packaging since "it would be difficult to imagine inclusion of VIGOR results in the [Vioxx] labeling without mentioning cardiovascular safety results in the study description as well as the Warnings sections."

38.    On February 8, 2001, the FDA's Arthritis Advisory Committee ("AAC")

-13-

held a public hearing to consider Merck's request to include the positive GI results

from the VIGOR study in its Vioxx labeling.  During the AAC hearing, Alise Reicin,

Executive Director of Clinical Research at Merck Research Laboratories, explained to

the panel, "when you review the results of VIGOR in isolation you don't know whether

the imbalance of cardiovascular events was caused by a decrease in events on a COX-2

selective inhibitor."  She falsely claimed that naproxen was likely responsible for the

difference in cardiovascular events observed in users of the two drugs.

39.    Merck falsely "reconfirmed the favorable cardiovascular safety profile of

VIOXX" in a May 28, 2001 press release and in a similar press release on June 13,

2001.

40.    In March 2001, Merck filed a patent application for a drug combining

Vioxx with a thrombaxane synthase inhibitor to help protect against the clotting

problems caused by Vioxx.  The application lists Dr. Edward Scolnick as the primary

inventor.

41.    Although Merck sought patent protection for ways to lessen the

cardiovascular risks of Vioxx, it never produced such drugs.  Instead, Merck continued

to manufacture and market Vioxx as a stand alone drug.

42.    In January 1999, shortly before the approval and launch of Vioxx®,

Merck's marketing division had conceived the ADVANTAGE clinical trial. Physician-

investigators, participants, and institutional review board members were told that the purpose of the ADVANTAGE trial was to measure the gastrointestinal safety of Vioxx®.

43.     Merck's actual goal of ADVANTAGE appears to have been for investigators to gain experience with Vioxx® prior to and during the critical launch phase in order to seed the industry with the use of Vioxx® in lieu of other treatments or drugs.  However, that study, like the VIGOR study, revealed serious cardiovascular risk, including fatalities.

44.     Internal e-mails show Merck's attempts to cover up the fatalities that occurred during its ADVANTAGE study.  In particular, Merck officials told scientists to re-classify a 73-year-old woman's death from myocardial infarction to "unknown." In a related e-mail from November 2000, Dr. Reicin wrote, "I think this should be called an unknown cause of death . . . so we don't raise concerns."  Dr. Scolnick, Merck's head scientist from 1985 – 2005 also stated in an e-mail that including any of the deaths in the final report would "put us in a terrible situation."

45.     In October 2003, more than three years after its completion, Merck reported the results of the flawed ADVANTAGE study in the Annals of Internal Medicine.  Although the report stated that five patients taking Vioxx had suffered heart attacks, the report failed to mention three additional heart-related deaths.

-15-

46.     On September 30, 2004, the Center for Drug Evaluation and Research of

the Food and Drug Administration issued a Memorandum concluding that Vioxx has

adverse cardiovascular effects, which were evident as early as the 2000 VIGOR study:

"Rofecoxib increases the risk of serious coronary heart disease defined as acute

myocardial infarction and sudden cardiac death. . . . The observation of an increased

risk was first noted with the VIGOR trial, where a 5-fold difference in risk was found

between high-dose rofecoxib and naproxen.  The manufacturer attributed this

difference to a never before recognized protective effect of naproxen.  To explain a

5-fold difference, naproxen would have had to be one of the most potent and effective

cardio-protectants known.  Three cohort studies and the present nested case-control

study found no evidence of cardio-protection with naproxen.  The three case-control

studies that reported a protective effect were misleading.  When analyzed in a manner

comparable to the present study, no protective effect is shown."

47.     Vioxx was finally pulled off the market after Merck's own clinical trial,

APPROVe (Adenomatous Polyp Prevention on Vioxx), confirmed what researchers

had been saying for years, that Vioxx significantly increases the risk of thrombotic

events.  APPROVe was a multi-center, randomized, placebo-controlled, double-blind

study to determine the effects of three years of treatment with Vioxx for the prevention

of recurrence of colorectal polyps in patients with a history of colorectal adenomas.

-16-

The trial started in 2000, enrolled 2,600 patients and compared patients taking 25 mg of Vioxx to patients taking placebo.

48.    Merck ended the trial after three years when numerous patients taking Vioxx for at least eighteen months experienced adverse cardiovascular events.  By the eighteenth month, forty-five patients taking Vioxx experienced a confirmed serious thrombotic event, compared with only twenty-five patients taking placebo.

### Merck Publicly, and By Direct Communication to Prescribing Doctors, Made False and Misleading Statements about the Safety and Efficacy of Vioxx

49.    The results of the VIGOR trial were announced to the public on March 27, 2000, and were published in the *New England Journal of Medicine* on November 23, 2000.  The VIGOR trial showed that patients receiving Vioxx were 5 times more likely to suffer a heart attack than those who received the older NSAID naproxen.

50.    Recognizing the critical need to counteract this adverse information in its direct marketing to doctors, Merck improperly pooled  internal unpublished data to produce a misleading promotional device, titled the "Cardiovascular Card," which misrepresented the true risk of adverse cardiovascular events of Vioxx compared to traditional NSAIDs.

51.    On April 28, 2000, Merck issued a bulletin instructing its salespeople to

-17-

use this Cardiovascular Card (CV Card) if doctors asked them about cardiovascular risks of Vioxx.  Instead of telling doctors the truth Merck knew about the cardiovascular risk shown in the VIGOR study, the bulletin required salespeople to point doctors to charts which listed "Overall Mortality Rates" purporting to show that patients on Vioxx were 11 times less likely to die than patients on other NSAIDs and were 8 times less likely to die of heart attacks and strokes.  Merck told its salespeople to use the CV Card to "[e]nsure that the physician agrees that the cardiovascular events seen with Vioxx in OA clinical trials were low and similar to [other NSAIDs]."  The Cardiovascular Card was used in falsely marketing Vioxx directly to Montana health care providers.

52.    The April sales bulletin instructed salespeople never to raise the subject of cardiovascular risks of Vioxx when talking to doctors.  Merck treated questions by doctors about the cardiovascular risks of Vioxx as "obstacles."  The April 28, 2000, Merck bulletin states: "The Cardiovascular Card is an obstacle handling piece and should only be used with physicians in response to their questions regarding the cardiovascular effects of Vioxx."  Merck told its salespeople never to leave a CV Card with a doctor or allow a doctor to make a copy of the card.

53.    As described previously, on February 8, 2001, the FDA conducted an Arthritis Advisory Committee meeting at which questions about the safety of Vioxx

-18-

were extensively reviewed.  At the meeting, Merck presented a large, pooled analysis of all Vioxx trials.  In response, FDA officials told the advisory committee that pooling data from different studies to assess safety, as Merck was doing, was fundamentally flawed.

54.    The FDA Arthritis Advisory Committee concluded that doctors should be told that the VIGOR study showed "an excess of cardiovascular events in comparison to naproxen."

55.    The next day, contrary to the FDA Arthritis Advisory Committee recommendation, Merck sent another emergency bulletin to its salespeople stating: "DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE . . .OR THE RESULTS OF THE . . . VIGOR STUDY."  The bulletin further ordered salespeople to "[s]tay focused on the EFFICACY message for Vioxx."

56.    The bulletin referred to its contents as "Updated Obstacle Responses," and closed by reminding salespeople: "Do not proactively discuss the Advisory Committee Meeting or VIGOR."

57.    On May 22, 2001, the *New York Times* published an article raising questions about VIGOR and the cardiovascular safety of Vioxx.  The very same day, Merck issued a press release responding to the *New York Times* article.  The press release stated:  "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx."

-19-

The press release referred to the pooled data from pre-approval studies and claimed that:  "there was no difference in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx, other NSAIDs and placebo."

58.    A day later, in response to the unfavorable press, Merck sent another emergency bulletin to its field sales staff, once again instructing them to counter the *Times* article by displaying the CV Card and highlighting data on the card suggesting that Vioxx was safer than other NSAIDs.  It advised its sales representatives to tell doctors that Merck's data showed that cardiovascular mortality was actually 8 times less than other NSAIDs.

59.    In July 2001, an article in *WEB MD* quoted an FDA Study stating:  "[T]he study found that Vioxx cut the occurrence of ulcers and other gastrointestinal problems by half compared with the over-the-counter NSAID Aleve. But the study showed that people taking Vioxx had four times the risk of a heart attack."

60.    In response, Merck's spokeswoman, Christine Fanelle, issued a press release  that the "risk was negligible," and that "it appeared to increase the risk of a heart attack because Aleve, like aspirin, actually reduces heart attack risks."

61.    On August 22, 2001, the *Journal of the American Medical Association* (JAMA) published the results of a meta-analysis of the cardiovascular safety of Vioxx authored by cardiologists Eric J. Topol, M.D., Debarata Mukherjee, M.D., and Steven

-20-

E. Nessen, M.D. of the Cleveland Clinic Foundation entitled, "Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors." The JAMA article reported the Cleveland Clinic's evaluation of two randomized trials of more than 15,000 patients, comparing Pfizer's Celebrex in a study called CLASS and Merck's VIGOR Study involving Vioxx. The Cleveland Clinic reported that: "[T]he annualized myocardial infarction rates for COX-2 inhibitors in both VIGOR and CLASS were significantly higher than that in the placebo group . . . ."

62.     The day before the JAMA article was published, Merck issued a statement claiming:  "We have additional data beyond what they cite, and the findings are very, very reassuring. Vioxx does not result in any increase in cardiovascular events compared to placebo."

63.     On that same day, Merck executive, Jo Jerman, also delivered a voice mail to company field representatives reassuring them and instructing them again to  use the CV Card if asked about cardiovascular effects, reminding them that the card showed that cardiovascular mortality rates were similar for Vioxx and other NSAIDs.

64.     On August 23, 2001, immediately after the JAMA article was published, Merck stated in another press release:  "The Company stands behind the overall and cardiovascular safety profile . . . of Vioxx"  falsely adding that "there is no increase in the risk of cardiovascular events as a result of treatment with Vioxx."

-21-

65.     Each time there was any public concern raised about the safety of Vioxx, Merck responded by instructing its field staff to focus on using the misleading CV Card to overcome any hesitation or concerns by the prescribing doctors.

66.     Merck asked to run a rebuttal to the JAMA article, emphasizing the cardiovascular safety profile of Vioxx, but JAMA refused.  Merck then sent false "Dear Doctor" letters to thousands of physicians nationwide, including in Montana, that "strongly supported the cardiovascular safety profile" of Vioxx.

67.     In that direct letter to doctors, Merck misrepresented the heart risks faced by patients taking Vioxx.   Merck reported that, in patients taking Vioxx in the largest clinical trial of the drug ever, only 0.5 percent had incurred "cardiovascular events," or heart and circulation problems.  In fact, 14.6 percent of the Vioxx patients had cardiovascular problems while taking the drug, according to Merck's own report on the study to federal regulators.  In addition, 2.5 percent had serious problems, like heart attacks.

68.     Merck also sent "Dear Patient" letters to thousands of consumers nationwide, including in Montana,  identified from a prescription database, that misrepresented the risk of "heart attacks and strokes" and emphasized that Vioxx was "innovative, effective and safe."

69.     On September 17, 2001, the FDA issued a WARNING LETTER to Merck

stating that: "[Y]our claim in the press release that Vioxx has a 'favorable

cardiovascular safety profile,' is simply incomprehensible, given the rate of MI and

serious cardiovascular events compared to naproxen. The implication that Vioxx's

cardiovascular profile is superior to other NSAIDS is misleading . . . ."

70.     The Warning Letter to Raymond Gilmartin, President and CEO of Merck,

demanded that Merck correct false and misleading statements made in the course of its

Vioxx promotional campaign.

> You have engaged in a promotional campaign for Vioxx that minimizes
> the potentially serious cardiovascular findings that were observed in the
> Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus,
> misrepresents the safety profile of Vioxx.  Specifically, your promotional
> campaign discounts the fact that in the VIGOR study, patients on Vioxx
> were observed to have a four to five fold increase in myocardial
> infarctions (MIs) compared to patients on the comparator non-steroidal
> anti-inflammatory drugs (NSAID), Naprosyn (naproxen).

71.     The Letter also cautioned, "Your minimizing these potential risks and

misrepresenting the safety profile for Vioxx raise significant public health and safety

concerns.  Your misrepresentation . . .  is particularly troublesome because we have

previously, in an untitled letter, objected to promotional materials for Vioxx that also

misrepresented Vioxx's safety profile."  The FDA also warned Merck that its recent

press releases "confirming the favorable cardiovascular safety profile of Vioxx" were

"simply incomprehensible" given the rate of heart attacks and "serious cardiovascular

-23-

events compared to naproxen."

72.    The 2001 Warning Letter set forth a list of specific misrepresentations

made by and/or on behalf of Merck about Vioxx and these are quoted below.

> [T]he Division of Drug Marketing, Advertising, and Communications
> (DDMAC) has reviewed your promotional activities and materials and has
> concluded that they are false, lacking in fair balance, or otherwise
> misleading in violation of the Federal Food, Drug, and Cosmetic Act.
>
> .   .   .   .
>
> You assert that Vioxx does not increase the risk of MIs and that the
> VIGOR finding is consistent with naproxen's ability to block platelet
> aggregation like aspirin.  That is a possible explanation, but you fail to
> disclose that your explanation is hypothetical, has not been demonstrated
> by substantial evidence, and that there is another reasonable explanation,
> that Vioxx may have pro-thrombotic properties.
>
> .   .   .   .
>
> Your minimizing these potential risks and misrepresenting the safety
> profile for Vioxx raise significant public health and safety concerns.  Your
> misrepresentation of the safety profile for Vioxx is particularly
> troublesome because we have previously, in an untitled letter, objected to
> promotional materials for Vioxx that also misrepresented Vioxx's safety
> profile.
>
> .   .   .   .
>
> The promotional audio conferences identified above, arranged by, and
> presented on behalf of, Merck were false or misleading in that they
> minimized the MI results of the VIGOR study, minimized the
> Vioxx/Coumadin drug interaction, omitted important risk information,
> made unsubstantiated superiority claims, and promoted Vioxx for
> unapproved uses and an unapproved dosing regimen.

. . . .

Your suggestion that COX-2 inhibitors, including Vioxx, have an overall
safety profile that is superior to other NSAIDs is misleading because such
an advantage has not been demonstrated. In fact, in the VIGOR study the
incidence of serious adverse events was **higher** in the Vioxx treatment
group than in the naproxen treatment group . . . .

. . . .

Your audio conferences are misleading because they promote Vioxx for
unapproved uses . . . . Your claim is misleading because it suggests that
Vioxx is effective for the treatment of rhematoid arthritis when this has
not been demonstrated.

. . . .

Your promotional audio conferences are also misleading because they
suggest that Vioxx is safe and effective for other unapproved uses such as
the prevention of cancer and invasive cancer, and for the treatment of
Alzheimer's disease and gout.

. . . .

The promotional activities and materials described above minimize the
potentially serious cardiovascular findings that were observed in the
VIGOR study, minimize the Vioxx/Coumadin drug interaction, omit
crucial risk information associated with Vioxx therapy, contain
unsubstantiated comparative claims, and promote unapproved uses.

73.     Neither the adverse journal and newspaper articles nor the FDA criticisms

did anything to hinder Merck's aggressive marketing of Vioxx. In the Fall of 2001,

Merck launched Project Offense to increase Vioxx market share, focusing on efficacy

to divert attention from the safety concerns.  Project Offense included instructions to field sales staff, including the field staff serving Montana, on how to address physician safety concerns, advising them again to review the entire CV Card with doctors, and point out to them Merck's data which purported to show that Vioxx was actually safer than other NSAIDs.

### Merck Resisted Changes Recommended by the FDA to Warn about Heart Attack Risks in Vioxx Labeling

74.     After the VIGOR study, the FDA recommended that the label for Vioxx be changed to add a warning which included a statement that:  "The risk of developing myocardial infarction in the VIGOR study was five fold higher in patients treated with Vioxx 50 mg (0.5%) as compared to patients treated with naproxen (0.1%) . . . ."  Merck objected to the change recommended by the FDA.

75.     On February 15, 2002, the FDA recommended that the Vioxx label include a Kaplan-Meier curve to graphically show a worsening of cardiovascular risks as the length of exposure to Vioxx increased.  Merck again objected.

76.     In addition to the misleading CV Card, Merck developed a number of other materials designed to misrepresent the safety and efficacy of Vioxx.  It produced a videotape to train its salespeople to view doctors' concerns about Vioxx's heart risks as "'obstacles" to be avoided or dismissed.

-26-

77.    Merck produced a training document titled "Dodge Ball Vioxx,"
consisting of 12 pages of statements or questions a salesperson might receive from a
doctor about the cardiovascular safety of Vioxx.  The last 4 pages of the document
contain the single word "DODGE!" in capital letters, instructing its sales people
nationwide, including those serving  Montana how to misrepresent by omission the
safety profile of Vioxx.

### Merck Attempted to Suppress and Refute Research Showing That Vioxx Increases the Risk of Heart Attacks

78.    Two months after Vioxx went on the market in 1999, Nancy Santanello,
head of Merck's epidemiology department, wrote an e-mail about "physicians to
neutralize:"  Her email states:  "Attached is the complete list of 36 physicians to
neutralize with background information and recommended tactics. You will notice that
some have already been 'neutralized'."  That e-mail also identified a previous e-mail
which had a subset of the 36 physicians "we would like to get involved in Merck
clinical research" and that the e-mail's recipient should "be aware of our most
challenging (and also most vocal) national and regional physicians."

79.    During 1999, Merck paid Dr. Gurkipal Singh of Stanford University
Medical School up to $2,500 for giving talks to other doctors supporting the use of
Vioxx.  Dr. Singh gave 40 talks over 7 months.  Dr. Singh became concerned about the

cardiovascular risks of Vioxx after the VIGOR study was completed.  Dr. Singh

repeatedly asked Merck for the VIGOR data so he could analyze them for himself.

When Dr. Singh persisted in his requests, Merck warned him that there would be

serious consequences if he didn't stop.  In 2000, Dr. Singh began to publicly express

his concern about the cardiovascular risks of Vioxx.

80.    A dossier of Dr. Singh's activities regarding Vioxx was prepared for

Merck senior vice president, Dr. Louis Sherwood.  On October 28, 2000, Dr. Sherwood

called Dr. Singh's boss, Stanford Medical School professor Dr. James Fries, and hinted

that there would be repercussions for Stanford if Dr. Singh continued making public

statements about the cardiovascular risks of Vioxx.

81.    In January 2001, Dr. Fries wrote to former Merck CEO, Ray Gilmartin,

complaining that Dr. Sherwood had called him to try to get him to make Dr. Singh stop

saying negative things about Vioxx in lectures.  Sherwood warned that if Dr. Singh

didn't stop bashing Vioxx, he would "flame out" and "there would be consequences for

[Dr. Singh] and Stanford."

82.    Merck sponsored a study of Vioxx by several doctors, including Dr.

Daniel Solomon and Dr. Jerry Avorn.  Merck scientists helped develop the study

protocol and signed off on all aspects of the study design.  However, when the study

showed an increased risk of heart attacks with Vioxx, Merck required one of the

-28-

study's coauthors, who was an employee of Merck, to remove her name from the study. Although it funded the study and approved its design, Merck publicly discredited the study in May 2003, claiming that there were "serious limitations to the analysis."

### Merck Deleted Data About Heart Attacks From an Article in *The New England Journal of Medicine*, Causing the Article to be Incomplete and Deceptive

83.    As noted, in November 2000, the article reporting on the VIGOR study was published in *The New England Journal of Medicine*. *The New England Journal* is one of the world's most prestigious and influential medical journals. As previously described, the VIGOR study was financed by Merck and produced information about heart attacks suffered by study participants who took Vioxx and by those who took naproxen instead of Vioxx. Throughout its marketing campaign for Vioxx, Merck relied on the VIGOR article in *The New England Journal* to support its claim that Vioxx was safe.

84.    The VIGOR data showed that 20 of the participants taking Vioxx had heart attacks compared to only 4 of the participants taking naproxen. Although at least 2 of the 3 lead authors of the article that appeared in *The New England Journal* knew several months before the article was published that there were 20 heart attacks among the participants taking Vioxx, the article reported that 17, not 20, of the Vioxx participants had heart attacks.

-29-

85.     Electronic records show that two days before the article was submitted to *The New England Journal* for publication, a Merck editor deleted information about 3 of the heart attacks in the Vioxx participants.  The data deleted by Merck made Vioxx appear less risky in the article than the VIGOR trial actually proved that it was.  Merck knew that by deleting data about heart attacks, the article would present an incomplete, inaccurate, and deceptive picture of the true risk of taking Vioxx.

86.     The editors of *The New England Journal* have publicly stated that the information deleted by Merck calls into question "the integrity of the data" appearing in the article, and have called for the article's authors to submit a correction.

### Merck Aggressively Marketed Vioxx to the Public and to Doctors Misrepresenting the Safety and Effectiveness of the Drug

87.     Despite knowing before and after FDA approval that Vioxx caused increased cardiovascular risk, Merck  aggressively marketed Vioxx from the beginning.

88.     When Merck launched its marketing campaign for Vioxx in 1999, it hired 700 new salespeople to market the drug to doctors and eventually assigned over 3,000 salespeople to promote Vioxx in face-to-face discussions with doctors.

89.     Merck put its salespeople through intensive training exercises to persuade doctors to prescribe Vioxx and provided numerous incentives to Merck salespeople for increasing the share of Vioxx that any doctor prescribed.

-30-

90.    Salespeople were instructed to use the systems and techniques it had taught them to convince doctors that Vioxx was a safe and effective pain reliever.  On information and belief, it is alleged that Merck salespeople used some or all of the required false marketing tactics when it directly contacted Montana doctors treating Montana citizens.

91.    On October 3, 2001, Merck launched a direct-to-consumer advertising campaign for Vioxx with television ads featuring Olympic skater Dorothy Hamill.  These ads ran repeatedly in Montana.  The ads omitted to warn consumers that Vioxx increased the risk of cardiovascular problems.

92.    Merck's Vioxx advertising and marketing campaign as a whole sought to create the false image, impression, and belief that Vioxx was safe for adults and had fewer side-effects and adverse reactions than other pain relief medications.  Merck had no reasonable grounds to believe that these representations were true.  Merck purposefully misrepresented, understated, and otherwise downplayed the serious health hazards and risks associated with Vioxx.

## COUNT ONE — UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT CLAIM

93.    Plaintiff repeats and realleges the paragraphs above as if set forth fully herein.

94.    In the course of business, Merck misrepresented and/or omitted material facts about the safety and effectiveness of Vioxx.  Merck misleadingly claimed that Vioxx was safe and was as, or more, effective than traditional NSAIDs in treating chronic pain, that it did not cause or contribute to any cardiovascular problem greater than any other NSAIDs, and that Vioxx use should not be limited to patients with gastrointestinal problems who could not use other NSAIDs.

95.    Merck systematically suppressed and concealed material information it developed or otherwise knew about the adverse cardiovascular effects of Vioxx and engaged in a mis-information and dis-information campaign to conceal the truth.

96.    Merck systematically sought to discredit or cast doubt upon scientific studies and reports and the work of scientists which concluded that Vioxx caused or contributed to adverse cardiovascular effects.

97.    Merck systematically engaged in a false and misleading marketing and advertising campaign to promote the use of Vioxx.

98.    Merck's conduct, as described above, was intended to and directed to health care providers and consumers and the public at large in Montana and constitutes unfair and deceptive practices in violation of Mont. Code Ann. § 30-14-103.

WHEREFORE, the State of Montana, by and through Attorney General Steve Bullock, prays as follows:

1.      That the Court adjudge and decree that Merck has engaged in the conduct alleged herein.

2.      That the Court adjudge and degree that such conduct is unlawful and in violation of Mont. Code Ann. § 30-14-103.

3.      That the Court enter its Order permanently enjoining Merck from further acts in violation of Mont. Code Ann. § 30-14-103.

4.      That the Court, pursuant to Mont. Code Ann. § 30-14-142, assess civil penalties of $5000.00 against Merck for each violation of Mont. Code Ann. § 30-14-103 complained of herein.

5.      That the Court award the State of Montana its attorneys fees and costs.

6.      That the Court order such other and further relief as the Court deems just, necessary, and appropriate.

Dated this __8th_ day of May, 2012.

                        STEVE BULLOCK
                        Attorney General
                        JIM MOLLOY
                        Assistant Attorney General
                        P.O. Box 201401
                        Helena, MT 59620-1401
                        Tel.: 406-444-2026


                        BY: /s/ William A. Rossbach
                             WILLIAM A. ROSSBACH

-33-

Special Assistant Attorney General
ROSSBACH HART, PC
P.O. Box 8988
Missoula, MT 59807-8988
Tel.:  406-543-5156

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all issues of fact in this case.

Dated this 8th  day of May, 2012.

> STEVE BULLOCK
> Attorney General
> JIM MOLLOY
> Assistant Attorney General
> P.O. Box 201401
> Helena, MT 59620-1401
> Tel.: 406-444-2026
>
>
> BY: /s/ William A. Rossbach
>     WILLIAM A. ROSSBACH
>     Special Assistant Attorney General
>     ROSSBACH HART, PC
>     P.O. Box 8988
>     Missoula, MT 59807
>     Tel.:  406-543-5156

LEXISNEXIS® FILE & SERVE
E-SERVICE
44138809
May 8 2012
5:24PM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | * | MDL No. 1657 |
| | * | |
| | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| This document relates to: | * | |
| *State of Montana ex rel Mike McGrath* | * | MAGISTRATE JUDGE KNOWLES |
| *v. Merck & Company*, Civil Action No. 06-4302 | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## NOTICE OF SUBMISSION

TO: John H. Beisner, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005

PLEASE TAKE NOTICE that, pursuant to ULLR 7.2E, Plaintiff's Motion for Leave

to Amend Complaint will be submitted for decision to the Honorable Eldon E. Fallon on May

23, 2012 at 9:00 a.m., or at some other date as may be set by the Court.

DATED this 8th day of May, 2012

/s/ William A. Rossbach
William A. Rossbach
ROSSBACH HART, P.C.
P.O. Box 8988
Missoula, MT 59807-8988
Telephone: (406) 543-5156
Telefax: (406) 728-8878
bill@rossbachlaw.com

1

**<u>CERTIFICATE OF SERVICE</u>**

**I** hereby certify that the above and foregoing Motion has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, upon Liaison Counsel Ann Oldfather by e-mail, and upon all parties by electronically uploading same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 8th day, 2012.

_/s/_ Bruce Kingsdorf _____