**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: VIOXX Products Liability Litigation | * * * | |
| This Document Relates to: | * * | MDL No. 1657 |
| *State of Alaska v. Merck & Co., Inc.* No. 2:06-cv-03132 | * * | SECTION L |
| | * * | JUDGE ELDON E. FALLON |
| | * * * | MAGISTRATE JUDGE KNOWLES |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S RENEWED MOTION TO REMAND**

Plaintiff argues that federal jurisdiction is lacking over Alaska's claim because there is not "a single issue in Alaska's Original Complaint related to Medicaid" that is necessary to resolve the case or sufficiently substantial to justify federal jurisdiction. But Alaska's Complaint could hardly be more clear: it expressly alleges that Merck misrepresented the risks of Vioxx "in requesting that [it] be placed on the Alaska Medicaid Program's list of drugs subject to reimbursement" and thereby "induced the State of Alaska to authorize expenditure of Medicaid funds for the purchase of Vioxx." (Orig. Compl. ¶¶ 7, 22.) As the Court is aware, the federal rules governing Medicaid coverage of prescription medications are highly complex and tremendously important to the proper functioning of the federal Medicaid system. Federal Medicaid rules govern whether and when ***any*** state – not just Alaska – may limit or bar coverage of FDA-approved drugs like Vioxx, and the formularies (if any) that are adopted under these rules must be approved by the Centers for Medicare and Medicaid Services ("CMS") before they can be put into effect. Thus, the requirements of federal Medicaid law play a very substantial role in the State's theories of causation and injury.

This conclusion is hardly novel; nor does it "herald an unprecedented expansion of federal jurisdiction over sovereign states' claims," as prophesied in Plaintiff's brief. (Mot. at 23.) To the contrary, the same conclusion was reached several years ago by Judge Jack Weinstein in several decisions in the *Zyprexa* litigation, denying remand of similar cases brought by other governmental entities. *See, e.g.*, *New Mexico v. Eli Lilly & Co.*, Nos. 04-MD-1596, 07-CV-01749 (JBW/RLM), 2009 U.S. Dist. LEXIS 20768, at *67-68 (E.D.N.Y. Mar. 11, 2009); *Montana ex rel. McGrath v. Eli Lilly & Co.*, Nos. 04-MD-1596, 07-CV-1933 (JBW), 2008 U.S. Dist. LEXIS 10355, at *8-10 (E.D.N.Y. Feb. 12, 2008); *West Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 234 (E.D.N.Y. 2007). It is also the conclusion suggested by this Court in a recent order involving the Pennsylvania AG suit, which noted that "[t]he presence of" claims seeking the recovery of "'costs allegedly incurred by [a] [state's] Medicaid program'" in a state's complaint "could be sufficient to confer subject matter jurisdiction." (Order & Reasons, *Commonwealth of Pennsylvania v. Merck & Co.*, MDL No. 1657, ECF No. 64364, at 9 n.3 (Apr. 30, 2013) (quoting *In re Vioxx Prods. Liab. Litig.*, 843 F. Supp. 2d 654, 669 (E.D. La. 2012)).)

The fact that Plaintiff has attempted to avoid federal jurisdiction by dismissing its claim for recovery of dollars spent by the State does not alter the result. Jurisdiction is determined based on the operative complaint at the time of removal, and federal law expressly provides for supplemental jurisdiction over state-law claims if federal jurisdiction exists over any claim in a suit – even if the claim giving rise to federal jurisdiction is later dismissed. *See* 28 U.S.C. § 1367(a). Although Plaintiff argues that the Court has discretion to remand the case, the factors set forth in the statute – most notably efficiency and uniformity – weigh heavily in favor of retaining jurisdiction where, as here, the cases at issue are part of an MDL proceeding and the

federal Court has developed expertise regarding the claims at issue. Indeed, Judge Weinstein exercised supplemental jurisdiction in virtually identical circumstances in the *Zyprexa* MDL proceeding on these very grounds.

For these reasons, discussed further below, Plaintiff's motion to remand should be denied.[1]

## BACKGROUND

### A. The Federal Medicaid Regime

In 1990, Congress overhauled the Medicaid prescription drug program, adopting two key features of the federal Medicaid statute that are relevant here.

First, the 1990 legislation required that states participating in the Medicaid prescription drug program generally cover all on-label prescriptions for drugs subject to a rebate agreement with the Secretary of the Department of Health & Human Services. *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 4401(a), 104 Stat. 1388 (1990). As the House Committee Report makes clear, the requirement that participating States cover on-label prescriptions was enacted out of a "concern[] that Medicaid beneficiaries have access to the same range of drugs that the private patients of their physicians enjoy." *See* H.R. Rep. No. 101-881, at 96-97 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2017, 2108-09. Congress did grant states "the option of imposing prior authorization requirements with respect to covered prescription drugs," but it barred them from using prior authorization as a back-door means to "prevent[] competent physicians from prescribing in accordance with their medical judgment." *Id.* at 98, 1990 U.S.C.C.A.N. at 2110; *see also Edmonds v. Levine*, 417 F. Supp. 2d 1323, 1329 (S.D. Fla. 2006)

---

1 While Merck also removed this case on the ground that Plaintiff's lawsuit raises substantial questions related to the federal Food, Drug & Cosmetic Act (*see* Notice of Removal ¶ 8), Merck does not address that ground for removal because the Court rejected a similar argument in the Kentucky AG case, *In re Vioxx*, 843 F. Supp. 2d at 669.

(noting that, under a prior-authorization regime, "the state may try to persuade a doctor to use an alternative drug, but ultimately the doctor retains the final word on use of the drug"). According to the House Committee Report, the prior-authorization regime gave states a role in the prescribing process, but denied them the power to "exclud[e] coverage of prescription drugs of manufacturers with agreements," because exclusion would undermine the goal of "assuring access." H.R. Rep. No. 101-881, at 98, 1990 U.S.C.C.A.N. at 2110.

Second, Congress also mandated that federal Medicaid funds would generally be unavailable to help cover drugs that were not subject to a rebate agreement. *See id.* The rebate requirement was intended to ensure that Medicaid would have "the benefit of the best price for which a manufacturer sells a prescription drug." *See id.* at 97, 1990 U.S.C.C.A.N. at 2109.

Congress continued to refine Medicaid to better implement its goals over the next several years. Most notably, in 1993, Congress amended the statute to give states some authority to exclude specific prescription drugs from Medicaid coverage, while placing tight restrictions on that authority. *See* Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 13602(d), 107 Stat. 312 (1993). As the House Committee Report explains, "[t]he purpose of this provision [was] to permit the States to reduce Medicaid spending on prescription drugs while not diminishing the medical care of Medicaid patients." H.R. Rep. No. 103-111, at 205 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378, 532.

This Court recognized the complexity of federal Medicaid law in the Louisiana AG proceeding involving Vioxx. In its ruling on Merck's motion for summary judgment in that case, the Court devoted seven pages to analyzing whether Louisiana had the authority to deny coverage of Vioxx under federal Medicaid law. *See In re Vioxx Prods. Liab. Litig.*, MDL No.

1657, No. 05-3700, 2010 U.S. Dist. LEXIS 142767, at *12-21 (E.D. La. Mar. 31, 2010). As the Court explained:

- Pursuant to Medicaid regulations, a state must "reimburse any use for a covered outpatient drug which is either (1) approved by the Federal Drug and Food administration ('FDA') or (2) supported by one or more citations in any congressionally-recognized compendia." *Id.* at *14 (internal quotation marks and citation omitted).

- Under 42 U.S.C. § 1396r-8(d)(1)(B), a state may deny coverage for outpatient drugs in only four limited circumstances: "1) if the prescribed use for the drug is not for a medically accepted indication (i.e. the FDA has not approved the drug for the use prescribed); 2) if the drug is listed in § 1396r-8(d)(2), or is subsequently determined by the Secretary of the U.S. Department of Health and Human Services (DHH) to be subject to clinical abuse or misuse; 3) if an agreement between the state and the drug manufacturer restricts use of the drug; or 4) if the drug has been excluded by a state-established restrictive (or exclusive) formulary." *Id.*

- Under the applicable facts, the only section of 42 U.S.C. § 1396r-8(d)(1)(B) that could potentially have applied to the Louisiana AG's claims was the provision that a state may deny Vioxx coverage through a restrictive formulary. *Id*. at *16.

- Under 42 U.S.C. § 1396r-8(d)(4), a Medicaid formulary "must include the covered outpatient drugs of any manufacturer which has entered into and complies with a rebate agreement," but even if "a rebate agreement exists," a drug may be excluded "with respect to the treatment of a specific disease or condition for an identified population" if "the excluded drug does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome of such treatment for such population over other drugs included in the formulary and there is a written explanation (available to the public) of the basis for the exclusion." *Id*. at *16-17 (internal quotation marks and citation omitted).

- Further, 42 U.S.C. § 1396r-8(d)(4)(D) provides that a state choosing to exclude a drug using this provision "must establish a prior authorization program which will provide an opportunity for physicians to obtain coverage for excluded drugs at the discretion of the state." *Id*. at *17.

- Thus, "whether Louisiana has discretion to deny coverage for Vioxx" under federal Medicaid regulations ***depends on whether the state Medicaid program complies with these federal provisions***. *Id*. at *18.

The Court's Findings of Fact & Conclusions of Law included a similarly detailed analysis of these same federal Medicaid requirements, as well as whether Louisiana had proven

at trial that it ***could*** and ***would*** have established an exclusive formulary that denied coverage to Vioxx if more information about the drug had been revealed. *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2010 U.S. Dist. LEXIS 64388, at *27-31, *58-61 (E.D. La. June 29, 2010). In that decision, the Court found that there are a number of federal requirements that must be met before a state can adopt an exclusive formulary. For example, federal law requires that an exclusive formulary be developed by a Pharmacy & Therapeutics committee appointed by the Governor, *id.* at *39-40 (citing 42 U.S.C. § 1396r-8(d)(4)(A)), and that states adopting exclusive formularies file amended state plans and seek approval from CMS, *id.* at *40 (citing 42 C.F.R. § 430.12(c)). The Court ultimately concluded that the Louisiana Attorney General could not prove that Louisiana would have adopted an exclusive formulary in compliance with these and other federal requirements. *Id.* at *58-61.

**B. <u>The Present Lawsuit</u>**

Plaintiff filed the present suit on December 23, 2005, seeking to recover economic losses allegedly incurred by the State's Medicaid and other health insurance programs in paying for Vioxx. (*See* Orig. Compl. ¶¶ 21-23.) According to Plaintiff, Merck "represented that Vioxx was at least as safe as other drugs of a similar class and/or type" "in requesting that Vioxx be placed on the Alaska Medicaid Program's lists of drugs subject to reimbursement." (*Id*. ¶ 7; *see id*. ¶ 18 (alleging that Merck "knowingly or intentionally made . . . false statements or misrepresentations . . . concerning the safety, or lack thereof, of Vioxx, which is information required to be provided by state law, rule, regulation, and/or provider agreement to the Alaska Medicaid Program"); *id*. ¶ 19 (asserting that Merck "knowingly and intentionally made claims under the Alaska Medicaid Program for a product that was substantially inadequate or inappropriate").) In so doing, Plaintiff asserts, Merck "knowingly or intentionally concealed or failed to disclose evidence that revealed the truth concerning the significant increased risk of

heart attack and other cardiovascular problems caused by Vioxx." (*Id.* ¶ 17.) Plaintiff complains that these "unlawful acts and practices induced the State of Alaska to authorize expenditure of Medicaid funds for the purchase of Vioxx." (*Id.* ¶ 22.) Based on these allegations, Plaintiff asserts a cause of action under the Alaska Unfair Trade Practices and Consumer Protection Act ("UTPA"). (*See id.* ¶¶ 12-20.) Among the relief sought in Plaintiff's original Complaint is "restitution damages for the value of all payments that the State of Alaska made for Vioxx prescriptions" and treble damages. (*Id.* Prayer for Relief.)

On January 18, 2006, Merck removed the case to federal court, citing the existence of federal question jurisdiction because, *inter alia*, Plaintiff's claims rested on the interpretation of federal Medicaid law. Merck explained that Plaintiff's claim for recovery of monies spent on Vioxx prescriptions raises important federal questions related to the federal Medicaid statute and its underlying regulations. (Notice of Removal ¶¶ 15-19.) Plaintiff filed a motion to remand on January 31, 2006, Merck filed an opposition brief on February 21, 2006, and the State filed its reply brief on March 1, 2006. The case was transferred to this Court in June 2006. Prior to transfer, the district court in Alaska granted Merck's motion to stay the case pending MDL transfer, noting that the jurisdictional issue raised by the State's remand motion was "difficult" and that the case did not "plainly warrant immediate remand." (*See* Order at 3 (attached as Ex. 1).)

Plaintiff filed an Amended Complaint on June 22, 2012, retaining its cause of action under the UTPA, removing all mentions of Medicaid, eliminating its request for restitution, and limiting its prayer for relief to civil penalties, an injunction, costs, attorneys' fees, and pre- and post-judgment interest. (*See generally* First Am. Compl.) Merck filed a motion for judgment on the pleadings with respect to these claims on May 3, 2013. (*See* MDL ECF No. 64,372.) Rather

than respond to Merck's dispositive motion, Plaintiff wrote a letter to the Court setting forth its position that briefing on Merck's motion should be stayed (*see* Letter from Scott A. Powell to Judge Fallon, May 29, 2013 (attached as Ex. 2)), and filed a motion to remand before this Court on September 3, 2013, and a supplement to that motion on September 9, 2013 (*see* MDL ECF Nos. 64,573, 64,582).

## ARGUMENT

### I. PLAINTIFF'S ORIGINAL COMPLAINT SATISFIES THE REQUIREMENTS FOR SUBSTANTIAL FEDERAL JURISDICTION UNDER *GRABLE*.

The Court has subject-matter jurisdiction over this case under the Supreme Court's decision in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), which recognizes the presence of substantial federal question jurisdiction in cases involving state-law claims that depend on the resolution of complex federal issues. This is so because Plaintiff's original bid to recover Medicaid dollars it spent covering Vioxx prescriptions depends in large part on the interpretation of federal Medicaid law, which determines both the drugs a state must cover under its Medicaid program and the limited circumstances under which it can decline to pay for such drugs.

In *Grable*, the Supreme Court unanimously reiterated its "longstanding" recognition that federal question jurisdiction is not limited to federal questions that arise on the face of a complaint, but also extends to "state-law claims that ***implicate*** significant federal issues." *Id.* at 312 (emphasis added).[2] As the Court explained, federal question jurisdiction exists if a state-law

---

[2] Throughout its brief, Plaintiff employs quotation marks around the word "implicates," in an apparent attempt to argue that "mere 'implications' of federal law" are insufficient to confer federal jurisdiction. (*E.g.*, Mot. at 2.) This suggestion is meritless. "[I]mplicate" is the Supreme Court's term, not Merck's. *Grable*, 545 U.S. at 312 (jurisdiction arises when "state-law claims implicate significant federal issues"). And in any event, the operative Complaint does not merely imply the presence of a federal issue; it expressly and repeatedly invokes Medicaid.

claim "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314. Thus, under *Grable*, substantial federal question jurisdiction exists over a state-law claim if four requirements are satisfied: (1) the claim "necessarily" raises a federal issue; (2) the federal issue is actually disputed; (3) the federal issue is "substantial"; and (4) the exercise of federal jurisdiction over that issue will not unsettle the federal-state balance of judicial power that Congress sought to create. *See id.* As set forth below, each of these requirements is satisfied here.

**A. This Case "Necessarily" Raises Issues Of Federal Medicaid Law.**

First, Plaintiff's allegations "necessarily" raise a federal issue. The State of Alaska's original Complaint alleges that, "in requesting that Vioxx be placed on the Alaska Medicaid Program's list of drugs subject to reimbursement, the Defendant represented that Vioxx was at least as safe as other drugs of a similar class and/or type used for the same purposes." (Orig. Compl. ¶ 7.) According to that Complaint, "Defendant engaged in knowing misrepresentations, including, but not limited to, direct representations to the Alaska Medicaid Program that Vioxx was safe and effective[.]" (*Id.* ¶ 8.) Alaska further alleges that "Defendant's unlawful acts and practices ***induced*** the State of Alaska ***to authorize expenditure of Medicaid funds*** for the purchase of Vioxx," thereby entitling the State to recover "the value of all payments that the State of Alaska made for Vioxx prescriptions." (*Id.* ¶ 22 (emphases added); *id.* Prayer for Relief.) In other words, the essence of Alaska's theory of recovery is that it would not have covered Vioxx prescriptions if Merck had adequately disclosed the drug's risks.

But the question of Alaska's authority to limit coverage of drugs under Medicaid is a complicated one of federal law, as this Court has already recognized. *See In re Vioxx*, 2010 U.S. Dist. LEXIS 142767, at *18 ("whether Louisiana has discretion to deny coverage for Vioxx"

under federal Medicaid regulations ***depends on whether the state Medicaid program complies with these federal provisions***). A federal question is therefore necessarily presented.

Judge Weinstein's ruling in *McGraw* is directly on point. There, West Virginia brought Medicaid-related claims in state court against Eli Lilly, the manufacturer of the prescription drug Zyprexa, alleging that Lilly had fraudulently promoted Zyprexa, causing damages to the state's Medicaid program. *See* 476 F. Supp. 2d at 233. Lilly removed the case on substantial federal question grounds, and the case was transferred to the *Zyprexa* MDL proceeding. West Virginia moved to remand, arguing that the *Grable* requirements were not met. Judge Weinstein denied the motion, however, holding that whether the state was obligated to cover Zyprexa "using funds largely provided by the federal government" was a federal question that was "essential" to the plaintiff's theory of recovery. *Id.* As Judge Weinstein explained, "[e]xcept in certain narrowly defined situations, states participating in the Medicaid program must cover drugs that are subject to an agreement between the manufacturer and the federal government." *Id.* Thus, the plaintiff's claims could not be evaluated without careful consideration of the federal statutory scheme.

So too here. In order for Plaintiff to prove that Merck's alleged conduct caused the State to cover Vioxx prescriptions on behalf of its Medicaid recipients, it must establish that Alaska Medicaid had discretion under some provision of federal law to exclude or restrict Vioxx from its reimbursement scheme. This is a "necessary" federal question.

Plaintiff attempts to distinguish Judge Weinstein's remand rulings in the *Zyprexa* litigation on the ground that they dealt with "off-label" promotion (Mot. at 19), but this effort fails. *McGraw* made clear that the jurisdictional issue in those cases did not turn on the off-label nature of the promotion alleged. Rather, just as in this case, "[r]esolution of the question of the state's obligation to reimburse its insureds for Zyprexa, using funds largely provided by the

federal government, [was] essential to the state's theory of damages and present[ed] a substantial and disputed federal issue under *Grable*." 476 F. Supp. 2d at 233. Plaintiff also contends that Judge Weinstein's rulings should be given little weight because the court "provided little explanation of how claims for damages related to Medicaid expenditures raised these issues." (Mot. at 19.) To the contrary, Judge Weinstein penned lengthy, thorough opinions outlining the parameters of the federal Medicaid framework and applying it to the state's claim for damages. *See, e.g.*, *McGraw*, 476 F. Supp. 2d at 233 (devoting four paragraphs to distilling the federal Medicaid framework implicated by the state's suit). This stands in stark contrast to Plaintiff's cited authority, which is utterly bereft of analysis. *See, e.g.*, *Alaska v. Eli Lilly*, No. 3:06-CV-88 TMB, 2006 WL 2168831, at *3 (D. Alaska July 28, 2006) (Mot. at 18); *McGraw*, 476 F. Supp. 2d at 234 (criticizing *Alaska* for failing to "discuss the federal Medicaid issues presented in sufficient detail for [a] court to be able to analyze them").

Plaintiff also argues that other cases have rejected substantial federal question jurisdiction in similar circumstances and that, at most, any Medicaid issue presented in this case is simply an alternative theory supporting recovery. (Mot. at 10-13.) Plaintiff is wrong. Plaintiff first cites *Mississippi ex rel. Hood v. AstraZeneca Pharm., LP*, 744 F. Supp. 2d 590 (N.D. Miss. 2010), for the proposition that a merely "gestalt" notion that Medicaid is implicated by a complaint does not suffice to create jurisdiction. (Mot. at 10-11.) In *Hood*, the court concluded with little analysis that Medicaid was merely background; it did not identify any specific argument by the defendant that the State's causation theory turned on the resolution of the federal question whether Medicaid would have allowed the State to deny coverage. *See* 744 F. Supp. 2d at 600-01. No such "gestalt" theory is advanced by Merck here. Rather, as elaborated above, the Complaint in this case expressly alleges that Merck caused Alaska to cover Vioxx, leading to the

authorization of payments for Vioxx that the State allegedly would not otherwise have made. Accordingly, *Hood* is inapposite.

Plaintiff next cites *Louisiana ex rel. Caldwell v. Bristol Myers-Squibb Sanofi Holding P'ship*, No. 2:12-cv-443, 2012 WL 3866493 (W.D. La. Sept. 4, 2012) (Mot. at 11), arguing that the court there rejected "nearly identical" arguments. But *Caldwell* is inapposite too. Unlike this case, the allegations and claims in *Caldwell* did not require Louisiana to prove that it would not have paid for the drug had the drug's full risks been disclosed. 2012 WL 3866493, at *3. Instead, the AG had alleged the causal theory that the defendant's conduct "caused physicians to write prescriptions they would not have written had they known all of the facts." *Id*. Indeed, the court specifically distinguished this Court's decision in the Louisiana AG proceeding involving Vioxx on that basis. *Id*. (holding that *Vioxx* was "not controlling on this case" because the AG in the instant case did not need to prove "that he would not have bought [the drug] had he known of the defect") (internal quotation marks and citation omitted). Here, by contrast, the Complaint expressly pleads that Merck caused damage to Alaska by inducing it to cover Vioxx in the first place – a theory that plainly depends on federal law.[3]

Nor does *Caldwell* support the suggestion that the Medicaid issue presented here is merely a "defense." Because the State's original complaint asserts a right to restitution, it undertook the burden of alleging and proving causation. *See* Alaska Stat. § 45.50.501(b) ("The court may make additional orders or judgments that are necessary to restore to any person in

---

[3] To the extent Plaintiff also alleges that Merck's alleged conduct caused damage by inducing doctors to write prescriptions for Vioxx, such an allegation would not change the analysis. There was no allegation in the *Caldwell* complaint that the state would have banned Plavix from its Medicaid formulary (*see generally* Pet., ECF No. 1-1, *Caldwell v. Bristol Myers Squibb Sanofi Holding P'ship*, No. 6:12-cv-443 (W.D. La. filed Feb. 15, 2012)); thus, the "necessity" issue was resolved in the AG's favor because it "presumably [could] prove [causation] by merely showing that the defendants' false or misleading advertising caused physicians to write prescriptions." 2012 WL 3866493, at *3. The court did not consider a complaint, like the one here, that expressly alleges a causal theory requiring the State to prove that it could have denied coverage of an FDA-approved drug.

interest any money or property, real or personal, which may have been ***acquired by means of*** an act or practice declared to be unlawful by AS 45.50.471") (emphasis added)). As this Court held in the Louisiana case, this entails an affirmative burden on the plaintiff to prove that it could have denied Vioxx coverage under Medicaid. *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2010 U.S. Dist. LEXIS 64388, at *38 (E.D. La. June 29, 2010) ("The State of Louisiana did not meet their burden of showing that they could and would have established an exclusive formulary and excluded Vioxx from it had the State known different information about the drug."); *id*. at *43-44 ("Apart from the question of whether LDHH *could* have instituted an exclusive formulary while Vioxx was on the market, Plaintiff did not carry its burden that, had the State possessed different clinical information about Vioxx, it *would* have sought to restrict Vioxx Medicaid reimbursements entirely.").

Plaintiff's next case, *New Mexico ex rel. King v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.*, No. CIV 08-0779 BB/WDS, 2009 U.S. Dist. LEXIS 116524 (D.N.M. Jan. 26, 2009) (Mot. at 11), supports removal here rather than undermining it. In *King*, "the State claim[ed] that [d]efendants fraudulently caused physicians to prescribe an expensive and unsafe medication, thereby triggering the State's obligation under Medicaid to pay for this expensive and unsafe medication." *King*, 2009 U.S. Dist. LEXIS 116524, at *7. Such an allegation is fundamentally different from the one Alaska asserts here. Alaska did not allege that its "obligation under Medicaid" led it to pay for Vioxx that was prescribed by doctors as a result of Merck's misconduct; rather, Alaska alleged that Merck's conduct "***induced*** the State of Alaska to ***authorize*** expenditure of Medicaid funds" for Vioxx. (Orig. Compl. ¶ 22 (emphases added).) As the *King* court suggested, "[c]laiming that [d]efendants wrongly triggered the State's obligation to pay for [a drug] is completely different" from claiming, as Alaska does here, that

the State did not have such an obligation as a matter of law, despite the requirements of the federal Medicaid statute. *King*, 2009 U.S. Dist. LEXIS 116524, at *7. In fact, the court stated that "[i]f Defendants' characterization of the State's complaint were accurate" – specifically, that "the State's complaint is an effort, at least in part, to obtain reimbursement from Defendants for payments it has made for Risperdal prescriptions, even though such payment is required by federal law" – "it is possible a substantial federal question might be present in this case." *Id*. at *5-6.

Plaintiff's related contention that the Medicaid issues are at most relevant to one "alternative" form of relief because they relate only to restitution and not to penalties or injunctive relief (Mot. at 10) is also wrong. Plaintiff's argument relies primarily on *Howery v. Allstate Insurance Co.*, 243 F.3d 912 (5th Cir. 2001) (Mot. at 10), but that case involved a situation where the federal issue was an afterthought, not a central aspect of the plaintiff's allegations. In *Howery*, the plaintiff homeowner filed a claim with the defendant insurance company after his townhome burned down. *Id*. at 914. When the defendant refused to pay because it determined that the plaintiff had committed arson, the plaintiff filed suit in Texas state court, asserting that the defendant engaged in various false, misleading, and deceptive acts in violation of the Texas Deceptive Trade Practices Act ("DTPA"). *Id*. at 915. Over the next two and a half years, the plaintiff filed ten amended complaints. *Id*. Only in the tenth edition was there any reference to federal law; specifically, the plaintiff asserted for the first time that the defendant "further violat[ed]" the DTPA by also violating Federal Trade Commission rules and regulations. *Id*. (internal quotation marks and citation omitted). The defendant removed the case to federal court on the basis of substantial federal question jurisdiction, and the plaintiff moved for remand. *Id*. The court determined that the plaintiff's allegation that the defendant "further

violat[ed] [ ] the Texas Deceptive Trade Practices Act" by also violating Federal Trade Commission rules was not enough to confer federal jurisdiction because that allegation was merely an "alternate ground[] for finding a violation of the DTPA" and was therefore "not a *necessary* element of the state claim." 243 F.3d at 918 (internal quotation marks and citation omitted). This case is nothing like *Howery*. After all, the allegation presenting a federal issue was not added as an afterthought to Alaska's Complaint. Rather, the only causal theory alleged to support restitution under the UTPA is the theory that Merck induced Alaska to cover Vioxx. Accordingly, *Howery* is inapposite.[4]

In short, Plaintiff's cases are either inapposite or unpersuasive. As Judge Weinstein held in a case just like this one, Plaintiff's Medicaid allegations necessarily present a federal issue because the State's theory of causation – that it would have denied coverage of an FDA-approved drug – depends on an interpretation of federal Medicaid law. For all of these reasons, Plaintiff's claims easily satisfy the first *Grable* requirement.

---

4 *Howery* also apparently gave no consideration to the possibility of supplemental jurisdiction and should be limited in light of that oversight. So long as one issue implicated a substantial federal question, that is enough; substantial federal question jurisdiction does not require that every claim for relief turn exclusively on federal law. *See McGrath*, 2008 U.S. Dist. LEXIS 10355, at *13 ("Federal jurisdiction, however, can rest on a federal question raised by only one of several claims that the plaintiff asserts."). Indeed, because Congress has expressly provided for supplemental federal jurisdiction over state-law claims, the notion that every claim in a suit must present a federal question is simply legal error. *See* 28 U.S.C. § 1367(a); *see also Davis v. GMAC Mortg. LLC*, No. 4:11-CV-95 (CDL), 2012 U.S. Dist. LEXIS 33351, at *8 n.3 (M.D. Ga. Mar. 13, 2012) ("[T]he Court finds a substantial federal question exists with respect to Plaintiffs' breach of contract claims, and the Court has supplemental jurisdiction over Plaintiffs' claims for breach of the implied duty of good faith and fair dealing to the extent that any such claims are separate from the breach of contract claims."). Two of Plaintiff's other cases, *Pennsylvania v. Eli Lilly & Co.*, 511 F. Supp. 2d 576, 581 (E.D. Pa. 2007) (Mot. at 18), and *Utah v. Eli Lilly & Co.*, 509 F. Supp. 2d 1016 (D. Utah 2007) (Mot. at 18), were premised on the same flawed reasoning and should not influence the Court's ruling here either. *See Pennsylvania*, 511 F. Supp. 2d at 581 (granting motion to remand because, *inter alia*, "'liability may proceed on entirely non-federal grounds'") (citation omitted); *Utah*, 509 F. Supp. 2d at 1024-25 (substantial federal question jurisdiction did not exist where two out of three theories did not raise federal issues); *see also* Jennifer E. Fairbairn, *Keeping Grable Slim: Federal Question Jurisdiction and the Centrality Test*, 58 Emory L.J. 977, 1006-08 (2009) (criticizing *Utah v. Eli Lilly* court's conclusion that "the federal issue must always be the only disputed issue" as "problematic" and unjustified by *Grable*).

**B. <u>The Federal Medicaid Issue Is "Disputed" Because Merck Disagrees That Alaska Could Deny Coverage Of Vioxx.</u>**

*Grable*'s second requirement – that the federal issues raised by the case be actually "disputed" – is also satisfied here, and Plaintiff does not appear to contend otherwise. In order to prove that Alaska Medicaid would have excluded or restricted Vioxx from Medicaid coverage, Plaintiff must show that the State had the authority to do so under federal law – a showing Merck maintains cannot be made. Thus, the second element of the *Grable* test is easily met.

**C. <u>The Federal Medicaid Issues Are "Substantial" Because They Implicate Medicaid's Congressionally Calibrated Prescription Drug Scheme, Which Applies Nationwide.</u>**

*Grable*'s third requirement is also satisfied because the federal questions necessarily raised in this case are not only disputed but "substantial." Plaintiff disagrees, arguing that "any Medicaid issue in this case would [not] be an 'important issue to the federal system as a whole,'" but rather a fact-bound, situation-specific inquiry. (Mot. at 16 (quoting *Gunn v. Minton*, 133 S. Ct. 1059, 1066 (2013)).) Plaintiff is mistaken.

As Judge Weinstein explained, a state that wishes to pursue a theory that it would have denied coverage of a drug in its Medicaid program must prove that it could do so within the context of complex federal Medicaid laws. Moreover, "[t]he federal questions presented by" such a "suit extend beyond the definition of a single federal statutory term to encompass a broad range of federal regulatory and funding provisions." *McGraw*, 476 F. Supp. 2d at 234. The interpretation of those provisions, in turn, has implications far beyond the parties in a civil suit; after all, they form essential components of Congress's overarching Medicaid policy of ensuring that Medicaid-eligible patients have access to beneficial medicines, while keeping the costs of that access under control. *See Edmonds*, 417 F. Supp. 2d at 1330-31 ("The statutory scheme is carefully constructed in such a way to precisely circumscribe the only methods by which a state

may remove a Medicaid-eligible drug from coverage and prevent it from either arbitrarily removing a drug or adopting its own *ad hoc* procedure for removing a drug from coverage."). In this case, for example, Alaska's original theory that it would have denied or restricted Medicaid coverage of an FDA-approved drug for an FDA-approved indication is in significant tension with Congress's goal that Medicaid participants have access to the same drugs as do the beneficiaries of private insurance plans. Thus, the broader federal interests are clear, and the requirement that the federal question raised be "substantial" is satisfied.

Plaintiff's contrary contention rests primarily on *Hood v. AstraZeneca Pharm., LP*, which concluded that Medicaid issues "would 'be fact-bound and situation-specific *under Mississippi law.*'" (Mot. at 16 (quoting 744 F. Supp. 2d at 601).) But *Hood* involved different proposed Medicaid questions – whether a state is allowed to seek reimbursement for drugs covered through Medicaid and whether Medicaid preempts the State's claims. 744 F. Supp. 2d at 599. Particularly because the defendants had couched the Medicaid issue in terms of preemption, the *Hood* court viewed the federal issues arising predominantly as a defense – which cannot give rise to federal jurisdiction. *See id.* at 602-05. Thus, the court concluded that the "central question" in the case before it was "whether the Defendants' advertising and promotion methods violate [Mississippi] tort law." *Id.* at 601 (internal quotation marks and citation omitted). Here, by contrast, the federal Medicaid issue would be central to resolving the causation element of the tort at issue because it governs the question whether Alaska could have denied coverage of Vioxx consistent with Medicaid's requirements.

Moreover, unlike the "fact-bound and situation-specific" issues central to the resolution of the state's claims in *Hood*, it is clear that resolution of the causation question in this case would turn largely on the construction of federal law. *See In re Vioxx*, 2010 U.S. Dist. LEXIS

142767, at *12-21 (engaging in extensive legal analysis to determine whether Louisiana could have restricted Vioxx coverage consistent with federal Medicaid laws). The resolution of this question also would likely have a significant impact on the development of federal law, since numerous similar suits have been filed in recent years by AGs seeking to recover Medicaid dollars on the theory that the state would not have paid for a drug but for the allegedly unlawful conduct of its manufacturer. As one legal commentator has noted, "[w]ithout doubt, tort suits by states against pharmaceutical manufacturers to recover states' Medicaid reimbursements to pharmacies, based upon manufacturers' marketing and sales of their products, are on the increase." Scott Smith, *The Escalation of Tort Claims by States Against Drug Companies for Medicaid Reimbursement*, Nuisance Law, Feb. 12, 2010, *available at* http://www.nuisancelaw.com/articles/thars-no-gold-them-thar-pills-contingent-fee-driven-lawsuits. Thus, in contrast to *Hood*, the federal issue raised by Plaintiff's Complaint has significance not only for the parties here, but for the federal Medicaid scheme at large.

Plaintiff also relies on *Gunn*, 133 S. Ct. 1059 (*see* Mot. at 16) – but that case involved a federal patent issue with no implications for the broader federal system and is thus not analogous to the instant case. In *Gunn*, the plaintiff brought a legal malpractice claim in state court against his former attorneys arising out of a failed patent infringement suit that had been litigated in state court. 133 S. Ct. at 1062-63. The plaintiff contended that the attorneys committed legal malpractice by failing to raise an experimental-use argument at the outset of the underlying patent case, which ultimately led to the invalidation of the plaintiff's patent for his computer program and telecommunications network. *Id.* at 1063. The trial court in the malpractice action found in favor of the attorneys, reasoning that the patent infringement claims would have failed even if the experimental-use argument had been timely raised. *Id.* Thereafter, the plaintiff

appealed to the Texas Court of Appeals, claiming, for the first time, that "[b]ecause his legal malpractice claim was based on an alleged error in a patent case, it 'aris[es] under' federal patent law for purposes of 28 U.S.C. § 1338(a)." *Id.* (citation omitted). The plaintiff further reasoned that because, under section 1338(a), "[n]o State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents," the Texas trial court in which the malpractice suit was brought lacked jurisdiction. *Id.* (internal quotation marks and citation omitted). As such, the plaintiff argued, the trial court's order should be invalidated, allowing him to bring suit in federal court. *Id.* The Texas Court of Appeals rejected the plaintiff's argument, finding that substantial federal question jurisdiction did not extend to the plaintiff's malpractice claim, but the Texas Supreme Court sided with the plaintiff. *Id.*[5]

The U.S. Supreme Court reversed, holding that no substantial federal question was presented. Although the Court agreed that the plaintiff's claims "may necessarily raise disputed questions of patent law, those cases are by their nature unlikely to have the sort of significance for the federal system necessary to establish jurisdiction." *Id.* at 1065. Rather, the issue was highly important only to the "plaintiff's case and to the parties [in the case]," *id.* at 1066; there was no such significance to the "federal system as a whole," *id.* This was so, the Court explained, because of "the backward-looking nature of a legal malpractice claim." *Id.* at 1066-67. "No matter how the state courts resolve that hypothetical 'case within a case,' it will not change the real-world result of the prior federal patent litigation," and the plaintiff's "patent will remain invalid." *Id.* at 1066-67.

[5] Although the plaintiff's argument was premised on the "arising under" language set forth in 28 U.S.C. § 1338, the Texas Supreme Court relied on the analogous *Grable* factors in finding federal jurisdiction. 133 S. Ct. at 1064.

The present case bears no resemblance to *Gunn*. Unlike "the backward-looking nature of a legal malpractice claim" that would not have even affected the patent at issue in that specific case, the issues disputed here directly implicate the ***federal*** Medicaid laws that delineate the requirements for restricting or excluding coverage of FDA-approved drugs. *Cf. Manning v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 12-4466 (JLL), 2013 WL 1164838, at *6 (D.N.J. Mar. 20, 2013) ("[T]he instant case[,which involves a type of short-selling practice deemed illegal by federal securities law,] [is] distinguishable from the backward looking malpractice 'case within a case' at issue in *Gunn*."). The scope of that authority is important to Medicaid beneficiaries throughout Alaska and potentially, the entire country.[6]

For all of these reasons, the federal issues presented are "substantial."

**D. Exercising Federal Jurisdiction Will Not Disturb The "Congressionally Approved Balance Of Federal And State Judicial Responsibilities."**

Finally, the fourth requirement of *Grable* is satisfied because exercising jurisdiction will not "disturb[] any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314; *see also id.* at 318-20 (suggesting that recognition of jurisdiction should "not materially affect, or threaten to affect, the normal currents of litigation").

As Judge Weinstein concluded in *McGraw*, exercising federal jurisdiction over a state-initiated suit to recover all Medicaid payments for a prescription drug "will not attract 'a horde of original filings and removal cases raising other state claims with embedded federal issues.'" *McGraw*, 476 F. Supp. 2d at 234 (citation omitted). After all, suits like this one do not involve the interpretation of broad federal standards that may apply in a range of cases, but rather "an

[6] For this reason, Plaintiff's other arguments to the effect that the federal issue presented here is "'fact-bound and situation-specific'" (Mot. at 16 (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 701 (2006))) are misplaced. Here, the federal issue is front and center, and its resolution would guide future cases, unlike the issue in the Supreme Court's *Empire* decision, which involved fact-bound claims about one deceased federal employee's health benefits. *See* 547 U.S. 700.

intricate federal regulatory scheme including detailed federal funding provisions" that are only implicated in a narrow group of state-law cases. *Id.*

Plaintiff appears to have overlooked this part of *McGraw* in arguing that Judge Weinstein failed to explain "how exercising federal jurisdiction in these cases would affect the balance between federal and state courts" (Mot. at 19) – a contention that is plainly erroneous. Plaintiff's alternative contention – that the Court again should look to *Hood v. AstraZeneca* (*id.* at 17) – is no more persuasive. Citing *Hood*, Plaintiff argues that "permitting federal jurisdiction" whenever the "Medicaid statutes are simply implicated would permit almost every case involving a pharmaceutical product to be removed to federal court based on federal-question jurisdiction." (Mot. at 17.) *Hood*'s analysis is deeply flawed. In *Hood*, the AG sued defendant pharmaceutical companies, seeking to recover Medicaid funds the State spent in covering prescriptions as a result of defendants' alleged fraudulent representations and omissions. *Hood*, 744 F. Supp. 2d at 594. The court remanded the suit to state court, in large part based on its speculative finding that sustaining federal jurisdiction over cases implicating federal Medicaid laws "could 'attract . . . a horde of original filings and removal cases raising other state claims with embedded federal issues.'" *Id.* at 601 (citation omitted). "Under these circumstances," the court determined, "the fact that Congress provided no private right of action in the Federal Medicaid Act presents compelling evidence that a finding of federal jurisdiction in the instant case would not be 'consistent with congressional judgment about the sound division of labor between state and federal courts.'" *Id.* (citation omitted).

But the court's prediction of a horde of federal litigation had no basis in fact and has not been borne out by experience. *McGraw* was decided over six years ago; yet there has been no "'horde of original filings'" or "'removal cases raising other state claims with embedded federal

issues.'" *Id.* at 601 (citation omitted). While Medicaid-based AG suits are growing, they remain a small sliver of the overall universe of prescription-drug litigation, and there is no evidence that *McGraw*'s holding has encouraged federal filings or removals in any other category of Medicaid-related suits. Moreover, the logic underlying *Hood*'s reasoning was fundamentally flawed. After all, *Hood* emphasized Congress's failure to provide a federal cause of action in the Medicaid statute, but the absence of an express federal cause of action is a necessary predicate for substantial federal question jurisdiction, which, by definition, covers cases in which there is no federal cause of action. Thus, as *Grable* expressly clarifies, Congress's decision not to create a federal cause of action cannot be dispositive. *See* 545 U.S. at 318-20.[7]

In short, Judge Weinstein's logic was unassailable; exercising jurisdiction over the State of Alaska's claim does not pose any threat that swarms of state-law Medicaid-related claims will overtake the federal court system. Accordingly, the *Hood* court's ruling should be rejected.

## II. THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S CLAIMS.

In an effort to boost its remand prospects, Plaintiff has now amended its Complaint to excise all Medicaid-related allegations. According to Plaintiff, even if the case was ever subject to federal jurisdiction, it should be remanded pursuant to 28 U.S.C. § 1367(c) because the "amended complaint makes no reference to Medicaid and does not seek relief for expenditures by Alaska for Vioxx." (Mot. at 20.) This last-ditch argument should be rejected too.

Federal law expressly provides for supplemental jurisdiction over state-law claims if federal jurisdiction exists over any claim in a suit. *See* 28 U.S.C. § 1367(a); *see also Davis*, 2012 U.S. Dist. LEXIS 33351, at *8 n.3 ("[T]he Court finds a substantial federal question exists with

---

[7] *South Carolina ex rel. McMaster v. Eli Lilly & Co.*, No. 7:07-1875-HMH, 2007 WL 2261693, at *3 (D.S.C. Aug. 3, 2007) (Mot. at 18), also cited in Plaintiff's brief, embraces the same flawed reasoning, rendering Plaintiff's *(cont'd)*

respect to Plaintiffs' breach of contract claims, and the Court has supplemental jurisdiction over Plaintiffs' claims for breach of the implied duty of good faith and fair dealing to the extent that any such claims are separate from the breach of contract claims."); Fairbairn, 58 Emory L.J. at 1006-08 (criticizing one court's conclusion that "the federal issue must always be the only disputed issue" as "problematic" and unjustified by *Grable*).[8] Such jurisdiction still exists if the claim giving rise to federal jurisdiction is dismissed. *Brown v. Sw. Bell Tel. Co.*, 901 F.2d 1250, 1254 (5th Cir. 1990) ("[W]hen there is a subsequent narrowing of the issues such that the federal claims are eliminated and only pendent state claims remain, federal jurisdiction is not extinguished."). While Plaintiff is correct that a court ***may*** decline to exercise supplemental jurisdiction where the claims giving rise to federal jurisdiction have been dismissed (*see* Mot. at 20-21), the factors set forth in 28 U.S.C. § 1367 weigh heavily in favor of exercising supplemental jurisdiction here.

In deciding whether to exercise supplemental jurisdiction, a court must consider whether: "(1) the claim raises a novel or complex issue of State law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). Further, courts have recognized that, even if one or more of these factors is present, a court should nonetheless exercise supplemental jurisdiction if "considerations of judicial economy, convenience, fairness, and comity" warrant doing so. *Mendoza v. Murphy*,

---

*(cont'd from previous page)*
reliance on it misplaced as well.

8 Another one of Plaintiff's cases, *Pennsylvania*, 511 F. Supp. 2d at 581 (First Supp'l Mot. at 18), was premised on the same flawed reasoning and should therefore not influence the Court's ruling here. *See*

*(cont'd)*

532 F.3d 342, 346 (5th Cir. 2008). In the MDL context, these factors generally justify the exercise of jurisdiction over non-dismissed claims because they "parallel the factors considered by the MDL panel in its decision to transfer the case to th[e] [MDL] court" in the first place. *In re New England Mut. Life Ins. Co. Sales Practices Litig.*, MDL-1105, 2003 U.S. Dist. LEXIS 25664, at *8-9 (D. Mass. May 20, 2003) (the factors that supported transfer of the action to the MDL court " also weigh in favor of this court's retaining supplemental jurisdiction over the . . . plaintiffs' remaining state-law claims."), *aff'd*, 358 F.3d 16 (1st Cir. 2004); *see also, e.g.*, *W. Va. ex rel. McGraw v. Eli Lilly & Co.*, No. 06-CV-5826, 2008 U.S. Dist. LEXIS 79625, at *7 (E.D.N.Y. Sept. 26, 2008) (retaining jurisdiction over non-dismissed claims in *Zyprexa* MDL litigation to ensure a "degree of national uniformity" with respect to claims against the pharmaceutical company in the MDL proceeding); *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, 580 F. Supp. 2d 630, 644 (S.D. Ohio 2008) ("declin[ing] to exercise supplemental jurisdiction over the remainder of the claims . . . would defeat the goal of judicial economy for which the action filed by [plaintiff] was consolidated into this multidistrict litigation."); *In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 311 (E.D.N.Y. 2005) ("the objectives underlying multi-district litigation[] make it appropriate to exercise supplemental jurisdiction in this case" where federal claim had been dismissed).

For this reason, Judge Weinstein exercised supplemental jurisdiction over state-law claims alleged by the West Virginia Attorney General in the *Zyprexa* MDL proceeding, even after the Medicaid claims in that case were dismissed. *See McGraw*, 2008 U.S. Dist. LEXIS 79625, at *9. According to Judge Weinstein, "values of judicial economy, convenience, fairness,

*(cont'd from previous page)*
*Pennsylvania*, 511 F. Supp. 2d at 581 (granting remand because, *inter alia*, "'liability may proceed on entirely non-federal grounds'") (citation omitted).

and comity" weighed in favor of trying the case in federal court because there were "[m]any states with claims against Lilly involving alleged unfair, deceptive, and fraudulent acts" in the *Zyprexa* MDL proceeding, and a "degree of national uniformity is desirable as these states' claims proceed." *Id.* at *7, *9. Judge Weinstein also noted that substantial discovery related to Zyprexa cases had already been conducted in the MDL proceeding, making the MDL court "well positioned to oversee the remaining discovery, ensuring that there is adequate consistency and fairness through the discovery process." *Id.* at *8. Finally, the court noted that the "exercise of federal jurisdiction over this action . . . does not pose any threat [of] a significant rise in the caseload of the federal courts." *Id.* at *8-9 (citation omitted).

The situation here is no different. As in *McGraw*, the Court is currently presiding over all of the litigating AGs' claims and therefore can ensure "national uniformity" in the treatment of these actions. *Id.* at *7. In addition, the MDL Court has overseen substantial discovery with regard to the Vioxx litigation and can best ensure that the remaining AG discovery is completed efficiently and fairly. (*See, e.g.*, Order, ECF No. 64,279 (Feb. 28, 2013).) Moreover, the fact that the Court has already tried the claims of one state AG and is familiar with the general facts and law that are at issue in these cases makes it all the more appropriate to exercise supplemental jurisdiction over this matter. Nor is there any risk that exercising supplemental jurisdiction in the Alaska case (along with the handful of other AG cases that remain) will significantly increase the federal caseload.

Finally, retaining supplemental jurisdiction over Plaintiff's case is all the more appropriate because "what has happened is not that the district court has dismissed the federal claim, but that the [P]laintiff[] ha[s] voluntarily deleted the federal predicate from [its] complaint." *In re New England*, 2003 U.S. Dist. LEXIS 25664, at *6. As one MDL court

explained, such "behavior [should be taken] into account in determining whether the balance of factors to be considered under the pendent jurisdiction doctrine support a remand in the case." *Id.* at *7 (internal quotation marks and citation omitted).

Plaintiff's contrary arguments do not undermine this conclusion. Plaintiff first contends that remand is appropriate here because "this case may present unique questions related to Alaska law." (Mot. at 21.) But "[i]t is within the very nature of coordinated or consolidated pretrial proceedings in multidistrict litigation for the transferee judge to be called upon to apply the law of more than one state." *In re Armored Car Antitrust Litig.*, 462 F. Supp. 394, 396 (J.P.M.L. 1978); *see also In re Glaceau VitaminWater Mktg. & Sales Practices Litig. (No. II)*, 764 F. Supp. 2d 1349, 1351 (J.P.M.L. 2011) (federal courts "routinely apply the laws of one or more jurisdictions" as part of their duties). The Court has already done just that, developing a wealth of experience regarding this case and AG claims generally that far surpasses that of any state court.

Analogizing to *Enochs v. Lampasas County*, 641 F.3d 155, 162 (5th Cir. 2011), Plaintiff also argues that remand would not create a heavy burden on the state court or inconvenience the parties. Unlike Plaintiff's case, however, in *Enochs*, the case "was still in its infancy" at the relevant time – "less than three months old" – and therefore "no discovery had occurred" and "no hearings or trial dates had been scheduled." 641 F.3d at 162. Thus, "hardly any federal judicial resources, let alone a significant amount of resources, had been devoted to the district court's consideration of the [ ] state law claims (or to any claims)." *Id*. at 159. Indeed, "the district court was not even moderately familiar with any of the [ ] state law issues." *Id*. at 162. Under these circumstances, the court held that "no financial or other inconvenience would have occurred, and no prejudice would have arisen" by remanding the case. *Id*. By contrast, this

Court has expended "immeasurable judicial resources" already, as Plaintiff admits. (Mot. at 21.) Given the maturity of the Vioxx MDL proceeding, and the Court's investment and extensive familiarity with this litigation, Plaintiff's reliance on *Enochs* is utterly unpersuasive.[9]

Finally, Plaintiff asserts that comity weighs heavily in favor of remand because "this case involves claims of a sovereign state." (*Id.* at 21-22.) But as Judge Weinstein stated in *McGrath*, the potential for inconsistent determinations makes it "difficult to accept the proposition that the federal judicial system cannot provide a single integrated practice in these cases by the Attorneys General." 2008 U.S. Dist. LEXIS 10355, at *18. Otherwise, "[p]otentially fifty states and the Commonwealth of Puerto Rico can independently sue in their respective jurisdictions," meaning that "local courts can potentially deliver at least fifty-one different results." *Id.*

## CONCLUSION

For the foregoing reasons, the Court should deny the renewed motion to remand.

Dated: September 19, 2013

Respectfully submitted,

*/s/ Dorothy H. Wimberly*

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005

[9] For the same reasons, Plaintiff's insistence that remand would occasion no burden or inconvenience on the state court (Mot. at 21) is absurd. Plaintiff would have the state court learn the legal and factual issues afresh and in doing so have it repeat much of the work this Court has already done in presiding over Vioxx litigation generally and Vioxx AG litigation specifically.

John H. Beisner
Jessica Davidson Miller
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005

ATTORNEYS FOR MERCK SHARP & DOHME CORP.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Opposition to Plaintiff's Renewed Motion to Remand has been served on Liaison Counsel, Russ Herman, Phillip Wittmann and Ann Oldfather, by U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8C, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 19th day of September, 2013.

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130
Phone: 504-581-3200
Fax: 504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel