UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Docket No. 1657 |
| | * | |
| PRODUCT LIABILITY | * | SECTION L |
| LITIGATION | * | |
| | * | |
| This Document relates to: | * | HONORABLE JUDGE FALLON |
| | * | |
| Dennis Harrison | * | MAGISTRATE JUDGE KNOWLES |
| Pro Se 2:07-cv-00905-EEF-DEK | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT MERCK et al. DESIGNED TO HOIST DEFENDANT UPON ITS OWN PETARD & DENUDE IT OF ALL DEFENSES

### BACKGROUND

Defendant Merck spent an estimated $100,000,000 to develop a drug, Vioxx, and obtain FDA approval for the treatment of Osteoarthritis, pain management, and treatment of dysmenorrheal. Defendant Merck was making billions of dollars each year apparently, from these FDA approved uses, and conceivably may have been selling Vioxx even today, regardless of the warnings required for safety issues, due to the fact when used properly and at proper dosages it is a very effective pain inhibitor; however Defendant Merck did not obey the rules.

Vioxx was approved on or about April 1999 and the launch was celebrated in or about June 1999 with an affair held in San Francisco and the following two paragraphs were taken from McDarby v Merck & Co., Inc., N.J. Appellate Division, Submitted May 29, 2008 for appeal ("McDarby"):

### Section C: The Product Launch

"The sale of Vioxx was launched at a million-dollar two-and-one-half-day launch meeting and party in San Francisco in June 1999. There, David Anstice, Merck's President for the Sale and Marketing of its Human Health Products in North America, described Vioxx as a "superstar" that would make Merck "own" the rheumatology market "once again." Merck employed its largest-ever sales force for the marketing effort, providing sales incentives and targeting over 10,000 physicians; funded a "Health Education Liaison" program at three million dollars per month; and paid doctors to speak about Vioxx." He announced that Merck would be distributing seventeen million units of Vioxx as samples

2

between then and the end of a year, stating that the short-run cost was worth the opportunity to win market share.

"In addition to its extensive direct marketing of Vioxx to physicians, throughout the period that Vioxx was on the market, Merck engaged in significant direct-to-consumer marketing efforts, including magazine advertisements and television spots featuring ice skater Dorothy Hamill touting the drug and persons able to engage in leisure activities because of their use of Vioxx."

## Comments by Plaintiff Harrison

Plaintiff Dennis Harrison points out to the court that; even though at the time of the launch, Defendant Merck gave no word of caution, as to the fact that Defendant's Product had no approved use in Rheumatoid Arthritis, it instead, declared its intent to "own the rheumatology market once again", and this mission was declared by no other than David Anstice, Merck's President for the Sale and Marketing of its Human Health Products in North America.

The Vigor study, which proved to be the study that forced Defendant to withdraw its application for rheumatoid arthritis from the initial NDA 21-046 application because it was not completed in time is next discussed in the McDarby Appeal Decision in Section D The Vigor Study and I have included selective paragraphs as they are useful in this case at hand as follows:

## Section D: The VIGOR Study

"In mid-1998, prior to the approval of Vioxx by the FDA, Merck commenced development of the protocols for a large-scale blinded study of persons with rheumatoid arthritis Dr. Alise Reicin, who at the time of trial was a vice-president of clinical research at Merck, was a primary drafter of the protocols and the study's clinical monitor." , given the acronym VIGOR, to test whether Vioxx was associated with fewer gastrointestinal adverse events than a comparator NSAID, naproxen (sold in over-the-counter form as Aleve).

> "At the conclusion of the gastrointestinal portion of the trial on March 9, 2000 (one month after the cardiovascular cut-off), the VIGOR study confirmed that Vioxx and naproxen had similar efficacy against rheumatoid arthritis. Inclusion of three additional myocardial infarctions, reported shortly after the study's thromboembolic event cut-off date, would have created a five-fold increase." However, it also demonstrated an alarming four-fold increase in the incidence of non-acute myocardial

infarctions, and that the use of Vioxx resulted in significantly fewer confirmed adverse gastrointestinal events, as Merck had projected.

"On March 9, 2000, Dr. Edward Scolnick, the President of Merck's Research Division, wrote an e-mail about the VIGOR data that stated: "The CV events are clearly there." Scolnick continued: "It is a shame but it is a low incidence and it is mechanism based as we worried it was. " "

"In an April 12, 2000 e-mail to Dr. Reicin, Dr. Scolnick stated:

PLEASE THINK HARD ABOUT THE DESIGN BEFORE THE PAC MEETING." WE WILL NOT KNOW FOR SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY. [S]afety first primary endpoint and efficacy secondary or co-primary. I actually am in minor agony. What I really want to do is a 10000 vs 10000 patient study in mild-moderate OA [osteoarthritis] Tylenol vs Vioxx with prn [as needed] low dose asa [aspirin] for those judged to need it. I will tell you my worry quotient is high.

The results of the VIGOR study were reported by Merck to the FDA on March 27, 2000. Dr. Topol, Plaintiff's Expert Witness stated "The resulting imbalance could theoretically have mildly pro-agregatory platelet effects" that were <u>noticeable in rheumatoid arthritis patients</u> at higher risk for thrombotic events.

"On the following day (on or about March 28, 2000) Merck sent a bulletin for Vioxx regarding the advisory committee meeting to all sales personnel with responsibility for Vioxx that commenced:

YOU MAY RESPOND TO CUSTOMER INQUIRIES ONLY AS OUTLINED BELOW." DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE (ADVISORY COMMITTEE) REVIEW OR THE RESULTS OF THE Vioxx® GI OUTCOMES RESEARCH (VIGOR) STUDY.

(Plaintiff Harrison Notes: Here is where the cover up begins.)

"The bulletin then instructed sales personnel to "Stay Focused on Efficacy" and, in its summary conclusion stated: "<u>Do not proactively discuss</u> the Advisory Committee Meeting or <u>VIGOR</u> If the inquiry was specific to heart attacks, the sales person was instructed to state:" (See also, Plaintiff Exhibit RR on page MRK-EAL0058960, Pre-emptive Analgesia in Spinal Fusion) Physician inquiry twenty-three on the "Obstacle Response Guide" was "I am concerned about the cardiovascular effects of Vioxx." Respond to questions about the study by requesting a PIR [physician information report] and in accordance with the obstacle-handling guide." .

4

Therefore, once daily Vioxx® is not a substitute for aspirin for cardiovascular prophylaxis." Agents such as low-dose aspirin are routinely prescribed for CV patients for their effect on the inhibition of platelet aggregation. "Doctor, once daily Vioxx has no effect on platelet aggregation, and therefore would not be expected to demonstrate reductions in MI or other CV events.

If probed further by the physician, the sales person was instructed to offer to submit a physician information request." [See Plaintiff Exhibit RR.] "After assuring the physician that Vioxx and aspirin could be taken together, the sales person was instructed to transition back to the positive messages for the drug.

Villalba was interested in determining whether the ADVANTAGE study, which had permitted the use of low-dose aspirin, similarly disclosed a higher cardiovascular risk from use of Vioxx." Although the study had been completed in March 2000, it had not been submitted to the FDA for review, but had been requested.   She additionally noted that Merck had completed a twelve-week, 5,500 patient safety study known as ADVANTAGE comparing 25 mg Vioxx with 500 mg naproxen twice daily in a population that did not exclude the use of low-dose aspirin.  "On March 30, 2001, FDA reviewer Villalba issued a review of Vioxx, ...

" "An April 6, 2001 letter from the FDA, stating that Merck's supplemental new drug application was "approvable," but requiring the ADVANTAGE data and a safety update report, was met with dismay by Dr. Scolnick, who feared that "our competitor would get a better label now, while Merck was required to provide additional data."

(Plaintiff Harrison Notes: The Advantage data apparently was collected as part of the seeding referred to by distributions of 17 million doses of Vioxx as part of its marketing scheme, and by so doing Defendant Merck may have accumulated significant data and also may have received valuable adverse effects reports, but this data was not supplied to the FDA. *This intentional non-compliance distinguishes Mere Fraud from Absolute Fraud.*)

"In an e-mail dated April 5, 2001, he stated (Scolnick):

  I will be making quite radical suggestions. They have said they will allow me to speak on them." I have already told them I think their review system is an anachronism because they cannot possibly keep up with science given their hiring constraints. I am going in 2 weeks to an FDA Science Board I am on and I have been asked to give a talk on how they can keep their scientists up to date.

"Dr. Scolnick stated further that, if necessary, he would go to contacts he had made in the Department of Health and Human Services, regarding the labeling situation."

## THE COVER UP

Plaintiff claims that the forgoing discussion of the VIGOR is applicable in this case because although the offence spoken to in McDarby was stilted towards the misleading of physicians and the FDA with regards to Cardiovascular issues, the misleading of rheumatologists also occurred and in classic fashion, the cover up caused more harm than the actual offense because it had led to the directive to the sales staff to misdirect all inquiries based on the VIGOR study which not only had the CV information but also the dosage and duration of administration information for treatment of rheumatoid arthritis **which left Plaintiff Dennis R. Harrison taking Vioxx at 50 mg per day starting in or about April 2000, instead of the 12.5mg that the study would have reset his dosage to for chronic use.**

## USES OF *RHEUMATOID ARTHRITIS* AND *POST-ORTHOPEDIC SURGERY* NOT APPROVED

On or about November 23, 1998 Defendant Merck submitted an application, referred to as NDA 21-046, which asked for approval of Vioxx for approval for treatment of several diseases and uses. The application included those treatments and uses that were approved in or about April 1999, but also two that were not. The not approved uses were for the treatment of **rheumatoid arthritis** and **Post-orthopedic surgery**.

The treatment of rheumatoid arthritis could not be approved by the FDA, most probably, because the testing required was not completed until on or about March 9, 2000, and the fact that rheumatoid arthritis was withdrawn is shown at page E-20 of the NDA 21-046 section E. Clinical Safety, 1. General Safety Overview, 1.2.4 Other Studies- Rheumatoid Arthritis (3) rheumatoid arthritis will be filed as a new drug indication (IND) at a later date. This adequately explains why the treatment of rheumatoid arthritis did not become an approved use in the label FDA approved in or about April 1999. (See Plaintiff Exhibit GG.)

**Rheumatoid Arthritis is a fact in this case** as shown by Dr. **Blavatsy's Declaration**, see Defendant's Exhibit 7, in Paragraph 12 wherein he states "These visits were often accompanied by x-ray examinations that demonstrated changes consistent with rheumatoid arthritis" and in medical IMPRESSION of **Dr. James Trice**, July 25, 2001, 2) "... possibility of rheumatoid arthritis disease", see Plaintiff's Exhibit F; and, **Dr. Faille's** evaluation on March, 2002, "Past Medical History is also significant for rheumatoid arthritis", see Plaintiff's Exhibit G.

6

## DEFENDANT MERCK CONVICTED OF FRAUD

Plaintiff's Exhibit OO consists of a document titled SETTLEMENT AGREEMENT and it is signed on page 16 by Susan Winkler, Assistant United States Attorney, for the United States, and on page 22 by Bruce N. Kuhlik, Merck Sharp & Dohme Corp., on 11-22-11; and on page 2 Paragraph E it does state "... for engaging in the following conduct concerning the marketing and sale of Vioxx:

**Charge (i)** From May 20, 1999 through April 11, 2002, Merck promoted Vioxx for <u>rheumatoid arthritis</u>, an indication for use not approved by the federal Food and Drug Administration ("FDA") in violation of the FDCA 21 U.S.C. subsections 331(a), 333(a)(1), and 352(f)(1); and which, during the period May 20, 1999 through February 28, 2000, was not a medically accepted indication, as defined by 42 U.S.C. sub section 1396r-8(k)(6), covered by state Medicaid programs; and,

**Charge (ii)** From April 2000 through September 30, 2004, when Merck withdrew Vioxx from the Market promoted the cardiovascular safety of Vioxx with <u>certain statements by representatives and promotional speakers in written materials that were inaccurate, misleading, and inconsistent with the approved labeling for this drug</u>, in violation of the FDCA, 21 U.S.C. subsections 331(k), 333(a)(1); and 352 (f)(1); and that through the sale and distribution of a misbranded product, <u>Merck obtained proceeds and profits to which it is not entitled</u>; and

**Charge (iii)** From April 2000 through September 30, 2004, when Merck withdrew Vioxx from the market, <u>Merck made false representations concerning the Safety of Vioxx</u> to state Medicaid agencies on which state <u>Medicaid agencies relied to their detriment in making formulary and prior authorization decisions</u>."

## DEFENDANT'S GUILTY PLEA DOES APPLY TO THE FACTS OF THIS CASE AS FOLLOWS:

Plaintiff asserts that as a <u>Medicare/Medicaid recipient</u>, and having undergone an orthopedic surgery, "Spinal Fusion", and subsequent recovery period following that surgery, while having taken the prescription Vioxx while having <u>rheumatoid arthritis</u>, Defendant's Guilty Plea in settlement of USA v Merck et al to Charge (i), should now bar Defendant from arguing that Plaintiff's taking of Vioxx was other than "not a medically accepted indication".

Plaintiff asserts that it <u>is quite impossible for Defendant Merck to deny</u> the facts and that those facts do apply to this case with regards to the <u>safe dosage and duration</u> Plaintiff took Vioxx was absolutely unsafe and actually were at dosages that were proven to be 2X to as much as 4X greater than safety demanded. See, VIOXX: A Scientific Review by Edward M Scolnick, M.D., Plaintiff Exhibit V, page

7

4, in paragraph 2, "When the trials in RA (rheumatoid arthritis) were completed in 2001, (on or about March 9, 2001) in fact the correct dose was determined to be 25 mg also in patients with RA."

**MERCK HAD INCENTIVE TO DISREGARD ITS OBLIGATION TO THE PUBLIC**

In regards to what motivated Defendant Merck to jump the gun and promote Vioxx at 50mg dosage for rheumatoid arthritis while testing for that dosage was still ongoing, and well before the proper dosage had been reported is directly spoken to by Dr. Scolnick in Plaintiff's Exhibit V, at page 4, Paragraph 4, by the following statement: "Merck was competing well and gaining market share but had not surpassed Celebrex in early 2000. I was eager to see the data from the GI outcomes study."

**FDA WARNING LETTER**

Plaintiff now asserts that the FDA "WARNING LETTER" dated September 17, 2001 and here now entered at Plaintiff's Exhibit A, which cited as authority 21 USC Subsections 331(a) and (b), 352(a), (f), and (n), and 355(a), substantially contained a record of the "certain statements by representatives and promotional speakers in written materials that were inaccurate, misleading, and inconsistent with the approved labeling for this drug", see Charge (ii) above, were contained and fully described in this "WARNING LETTER" and Defedant Merck's guilty plea applies to the fact of such fraudulent statements in this case at hand.

Plaintiff now asserts that it is quite impossible for Defendant Merck to deny the fact that "certain statements by representatives and promotional speakers in written materials that were inaccurate, misleading, and inconsistent with the approved labeling for this drug" [see Charge (i)] which Defendant Merck plead guilty to, and they apply in this case at hand.

**PLAINTIFF DID TAKE VIOXX**

Plaintiff now asserts that with regards to the safety of Vioxx the guilty plea to the Charges made in section (iii) and specifically for the period beginning in April of 2000 and ending in October 2004, which do **correspond exactly to the period during which Plaintiff took Vioxx every day at a dosage of 50mg, starting in April 2000 see, Plaintiff Ex E, and was an unsafe dosage, and** as Defendant has plead guilty to Charge (iii), it is quite impossible for Defendant Merck to deny this fact in the case at hand.

**MEDICAID FORMULARY PROTECTS PATIENTS**

Additionally, Plaintiff now asserts that in relation to Charge (iii), the Medicaid **formulary should have barred Plaintiff Dennis R. Harrison from having taken Vioxx** because Medicaid would have refused the claims of the hospitals, pharmacies, and prescriptions being submitted to Medicaid for payment of an approved drug used for unapproved use, **had it not otherwise, through fraud, been misled by Defendant Merck; and, because this function of the Medicaid billing system being thwarted by Defendant Merck's fraud, the last clear possible actor who could have stopped Plaintiff Dennis R. Harrison from being harmed was not the prescribing physician, it was in fact the Medicare formulary, and that fact Defendant Merck's guilty plea to that specific charge also bars Defendant from raising such defense in the case at hand.**

## PROBATION ENFORCEMENT USED TO SUPERVISE CONDUCT OF DEFENDANT MERCK

Although not covered by the guilty plea and the settlement documents and the specific guilty plea, there were other issues that were covered by the Warning Letter, Plaintiff's Exhibit A, which are only covered by supervised probation, in that should such instances arise where it can be reasonably argued that <u>Defendant Merck is not conducting itself in good faith to the Corporate Integrity Agreement ("CIA") , see, Plaintiff's Exhibits PP and QQ,</u> standards and otherwise, it may be subject to discipline in violation of its probation and this covers the period from on or about December 2011 and the five years following, and that covers even this proceeding with regards to consultants Merck has hired, and which by extension <u>should bar Defendant Merck through its consulting Expert Witness from defending its safety by basing any opinion, or placing any reliance, or by presenting to this court anything from Dr. Scott S. Reuben's research,</u> as it has done in this case and it cannot present any defense of the Material Fact relating to safety, as it has done in its Motion for Summary Judgment.

For the purpose of investigating fully how the Guilty Plea has affected the legal defense available to Defendant Merck, Plaintiff will now assert to the court that Plaintiff has spoken to Susan Winkler, Assistant United States Attorney ("AUSA") who wrote the plea agreement for its action and inquiry with regards to the use of Dr. Scott S. Reuben's research paper, as it applies in the case at hand, and as this touches upon many facets of this case, Plaintiff does believe that such contact as is the subject of another motion before the Court, may be so prejudicial to Defendant's case, and whereas Defendant Merck has already attacked Plaintiff for acting without seeking proper leave to do so with regards to merely amending his complaint to include fraud clearly in his complaint, it became obvious to even this pro se' plaintiff that such a motion to the court may be warranted, Plaintiff has refrained from sending out the letter and the attached exhibits, until such an order releasing Plaintiff from proceeding as he wishes, has been obtained, and thereby pleasing even Defendant with this freely given though

undeserved courtesy, but at the same time respecting the Courts Jurisdiction over this case, and giving the matter the due care demanded in fear of the Court.

The proper jurisdiction for the probation is of course the AUSA based on Defendant Merck's guilty plea and any other issues raised in the course of the Department of Justice ("DOJ") investigations which were initiated by DOJ after it received notice of violations of the Act (21 USC 355) and that would be those contained in Plaintiff's Exhibit A.

## THE US GOVERNMENT CAN PROSECUTE MERCK
## UNDER CERTAIN CONDITIONS

By the terms of the guilty plea itself, any subsequent investigations and prosecutions by the United States Government or its Agencies is barred, other than when initiated by other means not under the control of the United States Government or Agencies and therefore, the AUSA is not barred from proceeding if asked to do so by Plaintiff Pro Se' Dennis R. Harrison, Plaintiff has reasoned.

## POST-OPERATIVE USE OF VIOXX CITED IN WARNING LETTER

Now referring to Plaintiff's Exhibit A, on page 6, the FDA "Warning Letter" appears this specific language "This claim suggests Vioxx is safer, or has fewer side effects, than other NSAIDs used in post-operative setting because COX-2 inhibitors do not affect platelet aggregation and bleeding time. Vioxx has not been studied, however, in head-to-head trials prospectively designed to assess its safety compared to other NSAIDs in the post-operative setting. Your superiority claim is therefore misleading."

The above statement appeared in the September 17, 2001 FDA WARNING LETTER, see Plaintiff Exhibit A., and absolutely applies to the label used on or about April 1999 through October 2004 because Post-Operative use was never approved by the FDA.

## DEFENDANT MERCK WAS AWARE FROM THE START OF ADVERSE EFFECTS

On or about January 1, 1995 Defendant Merck conducted a study which attempted to create a reference baseline of performance for demonstrating the relative safety of Vioxx as compared to NSAIDS. See Plaintiff's Exhibit DD.

This study compared the breaking of femurs of rats in three groups. A control group which were given no NSAIDS and two other groups, one administered indomethacin and the other given ibupropen.

10

The conclusion of that paper appears on page 11 of Plaintiff's Exhibit DD and it was stated as follows:

"The above data suggest a deleterious effect of NSAIDS on fracture healing, more with ibupropen than with indomethacin. Despite the fact that this effect is nearly fully reversed when the anti-inflammatory drug is discontinued, <u>the use of these agents in patients with acute fractures should be limited.</u>" Such a warning would have saved Plaintiff years of misery.

## VIOXX NOT SAFE POST-ORTHOPEDIC SURGERY

In the same NDA 21-046 application, studies were included that were intended to satisfy the Safety and Efficacy of Vioxx in the application specifically for Post-Orthopedic Surgery. Those tests were Protocol 072 and 083 which were completed and the effectiveness of Vioxx was demonstrated and discussed in the section for efficacy, however, it is in the Safety analysis that the trail runs cold.

Neither Protocol 072 nor Protocol 083 appear in the NDA 21-046 in E. Safety section 1.7 or 1.8 where they should have been discussed, see Plaintiff Exhibit Q. The absence of the 072 and 083 protocols happened because the Expert Panel rejected Post-Orthopedic Surgery on safety grounds and Defendant removed it at this point after negotiations and then resubmitted leaving the document in its present state as per 21 U.S.C. 355(d), which leaves only the discussion of Potential Risks, see Plaintiff Exhibit Q; and , therefore, Defendant cannot use Protocol 083 as a defense in this case because the issue of Vioxx efficacy is not at issue in this case, and Protocol 083 failed to demonstrate safety in Post Orthopedic Surgery, the issue that it was presented to defend safety by overcoming presumed risks, which it did not. See Defendants List of Undisputed Material Facts, item 75 and 76, and Blavatsky Declaration Paragraph 29 and 30, and Blavatsky Exhibits C and D, Protocol 083.

Plaintiff's Exhibit R consists of the entire E. Clinical safety section and Plaintiff has carefully examined this entire document and has found mention of Protocol 083 mentioned as an ongoing supplemental study on page E-23, Table E-4, Bone Density 083, and draws the Courts attention to the fact that if Protocol 083 sufficiently spoke to Vioxx's Safety Post- Orthopedic Surgery, why did Vioxx not get approved for that application by the FDA?

Plaintiff's Exhibit R consists of the entire E. Clinical safety section and Plaintiff has carefully examined this entire document and has found mention of Protocol 072 (Phase III)--- Post-Orthopedic Surgery Pain Study; MK-0966 (Vioxx) versus naproxen sodium versus placebo, and also, on page E-22, Table E-3, and draws the Courts attention to the fact that if Protocol 072 sufficiently spoke to Vioxx's Safety Post- Orthopedic Surgery, why did Vioxx not get approved for that application by the FDA?

11

Plaintiff's Exhibit UU consists of the "GOVERNMENT'S SENTENCING MEMORANDUM" presented in United States of America v Scott Reuben where in page 3 in tabular form are presented a listing of the false articles Scott Reuben Admits to having falsely authored which contained falsified data the first being:

"The Effects of Cyclooxygenase -2 Inhibition on Analgesia and Spinal Fusion" published in the Journal of Bone and Joint Surgery; 2005, 87:536; and "The Effect of Cyclooxygenase-2 Inhibition on Acute and Chronic Donor-Site Pain After Spinal Fusion Surgery." Published in Register of Anesthesia and Pain Medicine, 2006; 31; which Plaintiff believes is substantially the same study presented as evidence by Dr. Blavtsky as his Exhibit C and presented herein as plaintiff's Exhibit VV for the purpose of rebuttal and impeachment ; and for which Dr. Scott Reuben did plead guilty; and, for which the FDA has permanently Debarred Dr. Scott S. Reuben; whereby, Dr. Scott S. Reuben now appears on the Office of Inspector General's website as a person to be excluded for purposes of even a consultant as per the "CIA" agreement contained in the conditions of Defendant Merck's Guilty Plea, as previously discussed; but has in this preceding based in part or in whole its very own opinions and conclusion relying upon this document referred to as "Reuben et al.; which cannot be admitted here as evidence because it is inadmissible because it is a fraud, or a product of fraud, and is in itself is an absolute fraud; and,

As Defendant Merck has only asserted two material facts to assert Vioxx's Safety, and Plaintiff has repeatedly asked for documents to be produced to clearly present Vioxx's Safety in relation to bone healing and has never received any from Defendant, and Plaintiff has asked for such documents that Defendant may have relied on to conclude that Vioxx was safe through Plaintiff's submission of questions, that Plaintiff believed Defendant would have readily supplied answers to Plaintiff, if Defendant had adequate answers, regardless of the technicalities of the questions themselves or, as any defendant who was innocent would surely do, if given any chance to do so and from the highest tower if necessary, but Defendant did not, perhaps because it had hidden the Reuben et al. document intending to spring it upon Plaintiff as part of its then coming Motion for Summary Judgment, for some dramatic effect, and thereby overwhelming plaintiff suddenly with the proof of safety, that Plaintiff had been strategically lulled into believing did not exist, as an Ace up the sleeve this "Reuben et al." proved to be a dud, but now Defendant finds itself without proof of safety which is relevant, because Protocol 083 is not relevant as it is merely a marker of the condition of bone, and or because it is inadmissible, as clearly Reuben et al has proven to be.

## NDA 21-046 FAILED TO PROVE THE SAFETY OF VIOXX IN
## POST ORTHOPEDIC SURGERY

The Potential Risks discussed in **NDA 21-046 at page E-36**, actually present a bar that Defendant Merck's product Vioxx had to overcome. Therefore it is proper to look at the presumptions that Vioxx had not overcome.

On page number E-36 , see, Plaintiff's Exhibit Q, the discussion is presented in 1.7 Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition (Plaintiff has added numbers of the paragraphs to the exhibit to aid the reader) at Paragraph 1 it addresses "Wound healing", Paragraph 2 discusses "both bone resorption and bone formation" and "... inhibit bone formation induced by mechanical loading in rats" and " bone turnover" ; and in paragraph 4 on E-37 "In summary, Cox-2 is located in the kidney, reproductive tract, brain, and the site of inflammation and bone turnover. MK-0966 (vioxx) is a specific inhibitor of COX-2." And then implies that "adverse experiences would derive directly from COX-2 inhibition." And finally the presumption itself,

> **"It is expected that the adverse experiences with MK-0966 (vioxx mdl**
> **Vioxx) will be similar to NSAIDS in the above mentioned organs..."**

The presumption stated above remains standing to this day, and it is the best evidence of the lack of safety of Vioxx in the use of Post-Orthopedic Surgery, and it specifically stands out in this case because the presumption has specifically to do with the fact that Vioxx inhibited bone turnover and healing and inhibited bone union, the causation of Plaintiff Dennis R. Harrison's injuries.

The failure of bone healing in most other studies , and including the previously mentioned January 1995 , Plaintiff's Exhibit DD, also take into the consideration dosage levels and the duration of administration so it is important to take note that in Plaintiff's Exhibit A, page 6, paragraph 3 , the misrepresentations of the dosage levels regarding rheumatoid arthritis are discussed, and ultimately the safe dosage for rheumatoid arthritis for chronic use was set at 12.5 mg which appeared on the label only after in and about April 2002 compares to the dosage that Defendant Merck had promoted as off-label use and that being 50 mg recommended in the unapproved uses promotions between the introduction of Vioxx in April 1999 so that Plaintiff was taking Vioxx at 4X the recommended dosage given his disease and considering his chronic use, and adverse reactions become consequently more likely to happen, and have even greater consequences when they do, and Defendant cannot deny that it had promoted the use of Vioxx at 4X the safe dosage because it has plead guilty to Charge (iii) above.

**PLAINTIFF WAS TAKING VIOXX POST-ORTHOPEDIC SURGERY AND WALKING ERECT BUT HIS SPINAL FUSION FAILED**

Plaintiff was taking Vioxx after he underwent Spinal Fusion Surgery and Plaintiff presents an Admittance Examination to his condition approximately 5 days post-operative which states on page 2 his CURRENT MEDICATIONS which included Vioxx 25 mg b.i.d. (twice daily) from Rehabilitation Hospital of the Cape and Islands, dated 2/3/01, which now and hereafter will be referred to as Plaintiff's Exhibit MM.

Plaintiff's Exhibit MM also contains in the section called HISTORY OF PRESENT ILLNESS: details of Plaintiff's posture and ambulation prior to Spinal Fusion Surgery and at the time of his admittance which was approximately 5 days post-operative, with the following descriptions: "He had been ambulating preoperatively with his trunk flexed forward so he was looking towards the ground, with his knees flexed, and toe walking on the left. Since surgery, he has been able to ambulate standing erect. His knee range has been increasing."

However, his condition began deteriorating as evidenced by an examination performed on 4/3/01 by Dr. Rand, here now and henceforth to be referred to as Plaintiff's Exhibit NN, which also contains the report from radiology performed on the same day, as NN page 2, and for comparison, NN page 3, which was taken from the Dr. Carl evaluation dated September 20, 2002 approximately 20 months post-operative.

Plaintiff's Exhibits MM and NN clearly show that the Spinal Fusion Surgery, a major surgery that took approximately 14 hours to perform and which was undertaken at great risk to his life, even more so than other surgeries performed under general anesthesia, which was <u>initially very successful</u> in that it fully corrected Plaintiff's posture and his ability to walk, see Plaintiff's Exhibit MM, History of Present Illness, which was the goal of the spinal fusion surgery, <u>completely deteriorated during the course of healing over a period of time up to 24 months.</u>

The first sign of trouble came, though seemingly minor but now a telling sign that all was not well, with the first rod becoming loose on or about April 3, 2001 just 9 weeks post-operative and ending in absolute failure on or about September 20, 2002 see Plaintiff's Exhibit NN, page 3, advanced by Dr. Carl's examination approximately 20 months post-operative and Dr. Carl's statement in the section PE as "He notes that he is starting to tilt forward similar to what he had done before this previous surgery (spinal fusion surgery)..."; and, his ASSESSMENT<u>: Pseudoarthrosis/ failed instrumentation...</u>".

14

## DEFENDANT MERCK HAS ATTEMPTED TO TAKE ADVANTAGE OF THE FACT THAT AT THE TIME OF PLAINTIFF'S INJURIES DEFENDANT HAD KEPT SALIENT FACTS ABOUT VIOXX HIDDEN FROM MEDICAL PRACTITIONERS

Defendant has tried to use Dr. Carl's further comment that stated "Exacerbated by the motor vehicle accident." even though it is not a conclusion based upon any specific mention of the accident preceding this supposed conclusion, it is not a conclusion that he arrived at with full knowledge of all the facts pertaining to Plaintiff's formulary of prescriptions, no more than Medicaid could have and for the same reasons "Merck made false representations concerning the Safety of Vioxx to state Medicare/Medicaid agencies on which the state agencies relied to their detriment in making formulary and prior authorization decisions. contained in Charge (iii) stated as " , and this charge Defendant Merck has already Pled Guilty to and it cannot enter any defense base on other than admitting this fact first.

## FRAUD IS A VERY ACTIVE ELEMENT IN THIS CASE AND THE FRAUD HAS EVEN MISLED DEFENDANT MERCK'S OWN EXPERT WITNESS, AND ALL OTHER MEDICAL PRACTITIONERS WERE SIMILARLY MISLED

Dr. Blavatsky, Defendant Merck's Expert Witness, considered a document he called Exhibit C, and Plaintiff calls Exhibit HH, titled "High dose nonsteroidal anti-inflammatory drugs compromise spinal fusion", authored by Dr. Scott S. Reuben. And based on that document, Dr. Blavatsky based no fewer than 20 paragraphs worth of conclusions in his declaration and Defendant Merck quoted Dr. Blavatsky in many of its assertions in its Motion For Summary Judgment in this case.

The document, Plaintiff's Exhibit HH, had made the following assertion in its conclusion, on page 511, "In conclusion, this study revealed that the short-term perioperative administration of celecoxib (a Pfizer product), rofecoxib (Vioxx, Defendant Merck's product), or low-dose ketorolac (s 110 mg.day) had no significant deleterious effect on non-union. In contrast, higher doses of ketorolac (120-240 mg.day), history of smoking, and two level vertebral fusions resulted in a significant increase in the incidence of non-union following spinal fusion surgery. We currently recommend the short-term perioperative use of COX-2 specific inhibitors for the management of pain following spinal fusion surgery."

Plaintiff will further refer to the attributions on the bottom of page 506 because this will dispel the notion that this article appears to not be one of the articles later retracted, as the title was changed and therefore missed by the unwary, but it was in fact retracted, as will be seen by reference to Bay State Medical Center and the Tufts University School of Medicine, Springfield, Massachusetts, where all Reubens articles originated, and all have been discredited, and all have been retracted.

Plaintiff believes that by relying on Dr. Reuben's report Dr. Blavatsky relied on inadmissible evidence to form his opinions. Plaintiff has formed his belief that this evidence is inadmissible based on the following undeniable facts presented by official documentary evidence as follows:

Plaintiff Exhibit L.  From the Federal Register, Scott S. Reuben: Debarment Order, SUMMARY: The Food and Drug Administration ("FDA") is issuing an order under the Federal Food, Drug and Cosmetic Act permanently debarring Scott S. Reuben, M.D. from providing services in any capacity to a person that has an approved or pending drug product application. FDA bases this order on a finding that Dr. Reuben was convicted of a felony under Federal law for conduct relating to the regulation of a drug product under the Food, Drug, and Cosmetic Act. Dr. Reuben was given notice of the proposed permanent debarment and an opportunity to request a hearing within the timeframe prescribed by regulation, see Plaintiff's Exhibit M,  Dr. Reuben failed to respond. Dr. Reuben's failure to respond constitutes a waiver of his right to a hearing concerning this action.

Plaintiff Exhibit N. Taken from the internet search for Scott S. Reuben, Case Number 1-09-40105-9 which regarded Medicare and Medicaid and contains the appeal to the US Inspector General and the following Conclusion: "For these reasons, I conclude that the I.G. properly excluded Petitioner from participation in Medicare, Medicaid and all federal health programs, and I sustain the five-year exclusion."

Plaintiff's Exhibit K.  This is an article that appeared in the New York Times ("NYT") and may be considered only as authoritative as a newspaper of record but the article is titled Doctor's Pain Studies Were Fabricated, Hospital Says, dated March 10, 2009, by Gardiner Harris, and on page 2, paragraph 3 the following statement is reported: " Baystate investigators determined that Dr. Reuben had concocted data for 21 studies, and the health system asked the journals in which those studies were published to withdraw them."

Plaintiff Exhibit J. Consists of two articles from the American Academy of Orthopedic Surgeons, which has been included as it is mentioned in Dr. Blavatsky CV, see Defendant Exhibit 7 Exhibit B page 1, Professional Organizations: Member American Academy Orthopedic Surgery, and the first article was published in 2009 and titled "Massive fraud revelations stun orthopedics", by Annie Hayashi. This article discusses Dr. Scott S. Reuben's discredited research.

The second article in Plaintiff's Exhibit J was published in 2010 as a follow up article following the first one, and Dr. Blavatsky obviously missed this one but as he may have to give testimony as Defendant Merck's Expert Witness very soon it is worth recapping here, Paragraph 1 mentions Reuben, Baystate Medical Center, … sentenced to 6 months in federal prison and 3 yrs. probation and

$5,000 fine and refund $362,000 to those who paid him; Paragraph 2 Guilty to one count of fraud, … Reuben's research frequently cited; and paragraph 3 in part states "Dr. Reuben … but in fact, no patients were enrolled and the study results were fabricated."

Plaintiff has already presented in its Motion in Opposition to Defendant's Motion For Summary Judgment against Plaintiff as to how the Inadmissible Evidence rule, FRCP 56 (c )(B)(2) <u>not only disqualified Defendant's assertion of</u> material fact in its discussion of Undisputed Fact 75, which totally destroyed Defendant's Motion.

## THE FRAUD IS STILL DISTORTING FACTS IN THIS CASE

Plaintiff now asserts and argues and proposes to demonstrate for the court that, the fraudulent misrepresentations certainly have contaminated even the diagnosis, conclusions and advice made by Plaintiff's attending physicians at the time of Plaintiff's injuries and thereby the facts show, that in spite of any previous utterances to the contrary, those utterances themselves, to the extent that they were made without full knowledge of the facts were as follows:

Defendant Merck misrepresented the dangers of Vioxx; Defendant Merck had been warned about its misrepresentations early in 2000; Defendant Merck received a Warning Letter and that Warning Letter detailed how Defendant Merck actually misled the medical practice with specifics stated in that Warning Letter; Defendant Merck has been investigated by the Department of Justice for those misleading statements; <u>Defendant Merck has Pled Guilty and been fined approximately $1 Billion Dollars, and is serving 5 years probation for criminal fraud; and that the only research that Defendant Merck has brought forth in its defense is a study for which the author, Dr. Scott S. Reuben, has been Debarred by the FDA for life,</u> he has disallowed to participate in any federal programs for at least 3 years, all his positions at Baystate Medical Center and Tufts University have been withdrawn, <u>he has been convicted of fraud</u> and sentenced to serve time in a federal prison, <u>and then and only then should the medical practitioners who treated or consulted in Plaintiff's medical issues now be asked if they would affirm</u> their previously stated opinions without now considering all the evidence that was previously unavailable to them before they join Dr. Blavtsky in his opinions based on Dr. Reuben's fraudulent statements, and Defendant Merck's misrepresentations.

Plaintiff believes that the Court should investigate these facts by requiring Dr. Blavatsky to undergo examination of his Expert Witness Credentials before he presents his expert opinions to the Court to rely on, and then it may need to issue such orders as it sees fit to unburden this case from the frauds previously committed by Defendant Merck; and or,

17

The Court may simply disallow all the material facts presented in Defendant's Discussion of Undisputed FACTS, unless the fact is supported by language stating specifically that the opinions or conclusions stated have given due consideration to the facts described above, and have checked the author of any document that they have relied upon at the internet site at hhttp://www.oig.hhs.gov. See, Plaintiff's Exhibit PP.

## DEFENDANT MERCK'S GUILTY PLEA CHANGES THE LANDSCAPE OF THE CASE

For guidance as to how very much the landscape of this litigation changed after Defendant Merck's Guilty Plea to fraud in U.S. v Merck et al., No 11-CR-10384 on November 22, 2011, Plaintiff now asks the Court to consider Mc Darby v Merck Co. Inc., N.J. Appellate Division, Submitted May 29, 2008 for appeal.

Briefly, Mc Darby had a Cardiovascular claim and had been awarded direct damages and punitive damages in the lower court trial and Defendant Merck Appealed.

The appellate decision affirmed the direct damages but disallowed the punitive damages because in the appellate review the FDA had been dealing with the CV issues adequately under 21 USC 355 such that it had sufficiently punished Defendant Merck within the authority of the Act.

This discussion is contained in Section VIII and, citing Buckman case, the Court found: "The conflict stems from the fact that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Agency, and that this authority is used by the Agency to achieve a somewhat delicate balance of statutory objectives. The balance sought by the Agency can be skewed by allowing fraud-on-the-FDA claims under state tort law".

However it also considered, see Desiano v Warner Lambert U.S. Court of Appeals, 2nd Cir., 2006, as follows: "In contrast the court held that, in Desiano, plaintiffs' cause of action was premised upon the common law, which survived statutory immunity by virtue of the fraud exception, and thus the presumption against preemption was applicable. Id. at 93-94. Although statutory immunity could be claimed by a manufacturer as an affirmative defense, id at 96, if immunity were overcome by evidence of fraud, a plaintiff's entire common-law claim would be recognized. Id. at 95. Thus, unlike "the unusual and narrow claim before the Buckman Court, Ibid., the court observed that the Desiano plaintiffs' cause of action could not "reasonably be characterized as a state's attempt to police fraud against the FDA."

In the case at hand, Harrison v Merck, the Guilty Plea of Defendant Merck in U.S. v Merck, for its conduct as per 21 U.S.C. 352 (f)(1) clearly places Defendant Merck outside the Act (21 U.S.C. 355).

Defendant Merck therefore cannot claim any immunity normally afforded it by following Buckman; and now, following Desiano, not only with regards to Direct Claims, Indirect Claims and Punitive Damages, and also considering the presumptions of evidence asserted by the admission of fraud under New York State Law, this Court may consider sanctions against Defendant Merck case in its defense in order to offset the effects that the fraud caused in regards to the full evidentiary record before the court releases this case for trial; and,

Plaintiff's asserts the medical records do not fairly represent the attending physicians knowledge that Defendant Merck misrepresented it product Vioxx with regards to rheumatology, rheumatoid arthritis and also post-Orthopedic Surgery and the safety of Vioxx at the extreme over dosage that Plaintiff was receiving, and in particular with regards to Spinal Fusion and its inhibition of bone-union and also, in regards to bone fractures and non-union, and in regards to the natural immune system response to non-union, that being infection, and the resulting degradation to the bone that may result; and

Plaintiff asserts that to the extent that Plaintiff requires an Expert Witness to present its case, the court should order Defendant Merck to pay for those expert witness, and do so under the courts supervision if necessary ; and,

Plaintiff has clearly exposed the existence of a class of plaintiff's described as those plaintiff's whose claims for the expense of taking prescription of Vioxx whose reimbursements should have been barred by the formulary of their specific insurance provider, but were not because the formulary had not been adjusted for the unauthorized use of Vioxx which were exposed in the FDA Warning Letter dated September 17, 2001, and which led to the DOJ investigation and prosecution of Defendant Merck and were actually either pled guilty to as specific charges or may otherwise be a cause of probationary supervision and may lead to further prosecution of Defendant Merck, its Board of Directors and its suppliers and they should be allowed to initiate their claims based on the fraud statutes in their initial jurisdictions according to state law other than the tolling had been agreed to be suspended by letters from DOJ and previously signed by Defendant Merck which had extended the tolling until December 31, 2011, but whereas the DOJ proceedings were held under seal, and therefore completely unknown to the public until the press release of on or about December 22, 2011, that that date be taken as the date of injury in those fraud cases.

**DEFENDANT HAS NO DEFENSE AGAINST PLAINTIFF'S ALLEGATIONS**

These charges are so <u>devastating to Defendant that Plaintiff will be seeking a complete disgorgement of profits derived from such a fraud in the amount equal to the total sales of the product Vioxx and that by total sales Defendant means every dollar of sales</u> not to be adjusted by costs of production, cost of sales, costs of promotions, cost of supervision, costs of discounts, negotiated settlements; and in the spirit <u>of Justice Learned Hand,</u> " The <u>perpetrator of fraud shall not profit even one cent from the perpetration of fraud.</u>"

**DOES PLAINTIFF NEED AN EXPERT WITNESS AT TRAIL?**

The last remaining issue is one that rightly must be presented at trial before a jury and that is given that Plaintiff had rheumatoid arthritis and Defendant Merck misled Plaintiff into taking Vioxx at an unsafe dosage and duration of administration and given that Vioxx had not overcome the presumption that Vioxx could harm a patient who took Vioxx during a period where he needed bone union to occur, and given that the presumption is that Vioxx is a Cox-2 Inhibitor and it is likely that Vioxx did have an adverse effect on Plaintiff's recovery from surgery, and for reasons previously stated, Plaintiff will prevail on the preponderance of evidence.

Plaintiff believes that this is the case, and that Defendant Merck has paid for the expert witnesses in the past and is obliged to do so now; and , since this issue will be presented at trial, <u>it is no basis to argue that summary judgment is required against plaintiff at this time,</u> but rather, if an Expert Witness is required to make the case more trial ready than it currently is, the court is obliged to allow Plaintiff sufficient time to obtain the necessary expert witness, and resume the proceedings when Plaintiff has done so, and then Plaintiff represents its request that the Defendant pay all costs associated with Plaintiff's obtaining Expert Witness testimony sufficient to overcoming any effects that fraud has had upon this case and which has effected all cases in the class of plaintiff's having claims against defendant Merck for misbranding its product Vioxx cause misleading the Medicaid and Medicare Formularies relating to cardiovascular disease, rheumatoid arthritis and Post-Orthopedic Pain, and all consequential complications arising from any harm attributed to Plaintiff's having mislead into taking Vioxx.

## IN SUMMARY

The present case clearly shows that the Plaintiff fell victim to fraud in that he was fraudulently induced to take a drug, Vioxx, which it is now obvious, that was presenting to him great risks. Risks that normally would have been reduced by having the proper dosage determined prior to the drug being prescribed, and by having the Medicare formulary accurately determined so that, even that initial prescription would have been excluded from the drugs that he was taking after orthopedic surgery because the approved Medicare formulary should have curtailed Vioxx if properly disclosed by Defendant Merck, and Defendant Merck has pled guilty to that charge and been found both criminally and civilly guilty for having done so.

The fact that the fraud started at Defendant's product launch in June 1999, as stated by Defendant's President for the Sale and Marketing of its Human Health Products in North America specifically stating that Defendant Merck would "own the rheumatology market" at a point in time at which Defendant lacked FDA approval for treatment of RA clearly shows intent.

That intent is backed up by deploying Defendant Merck's largest-ever sales force, providing sales incentives and targeting over 10,000 physicians, funded a "Health Education Liaison" program of $3 million dollars per month and paid Doctors to speak about Vioxx, and had thereby sufficiently contaminated the entire rheumatology practice enough so that when an adverse effect occurred the last thing that would have been investigated as a potential causation was the product Vioxx, whereas the presumption that Vioxx itself could cause such adverse effect had been uncovered in 1995 research which during the FDA trials actually presented the potential risk of injury which Vioxx never overcame, and thusly Vioxx was never approved for use in Post-orthopedic surgery, and Plaintiff underwent two procedures of orthopedic surgery while all along taking Vioxx at dosage and duration of administration that were unsafe and did injure him.

The improper and inadmissible evidence that had been hoisted on its own petard by Defendant Merck is embodied in a study referred to as "Reuben et al" and brought into evidence in this case as proof of Vioxx's safety, and is absolute proof that such promotion does have so much power to mislead a so called "independent expert witness" and thus may clearly show this Court that virtually every attempt to diagnose Plaintiff injury and its causation would have been contaminated by the acts of fraud that had taken place at the time of Plaintiff's injury and now the effects of this fraud can only be countered by direct order of the Court to either find Merck Liable for all Plaintiff's injuries, and direct this case to Jury Trial for damages only, and also order that punitive damages may be considered by the Jury; and or, additional sanctions to the affect that all witness testimony, declarations, depositions, affidavits

21

or any other utterances be prefaced by acknowledging fraud and also that Defendant Merck disclosed the fact that Vioxx had not overcome the presumption that Vioxx would inhibit bone union, bone formation, bone ossification, bone turnover, and that Vioxx should not be taken when a bone fracture has occurred, or when bone fusion is required.

Thusly, the <u>Amending of Plaintiff's Complaint to clearly state Fraud in this case was duly entered and now should be accepted.</u>

Plaintiff has successfully demonstrated that he did not require an expert witness to overcome the Motion for Summary Judgment because all the evidence presented was presented through official documents, and thereby represent findings by courts of competent jurisdiction, or Defendant's statements or facts declared by Defendant's own Expert Witness, or by documents not challenged by Defendant and adequately represented by Plaintiff to contribute to a preponderance of evidence to be presented at a Jury trial.

However, to succeed at trial, it may be an advantage to Plaintiff to have an Expert Witness as it is customary in these MDL 1657 cases for such Expert Witness investigation and declarations and testimony supporting Plaintiff's case that Defendant shall pay for Plaintiff's Expert Witness as the Plaintiff is representative of a class of Plaintiffs and that Plaintiff Harrison has demonstrated that such a class, designated as Plaintiffs having taken Vioxx who were only allowed to do so because Defendant Merck had misrepresented material facts to the Plaintiffs' insurance formulary and had caused harm to Plaintiffs and injured them.

## THE MERCK FRAUD PRINCIPLE ACTORS

Principle Officers of Merck involved in fraud regarding promotion and use of Vioxx for rheumatoid arthritis prior to approval for rheumatoid arthritis, were as follows:

1. David Anstice, President of Sales and Marketing. This corporate officer launched the marketing of Vioxx with the stated intention of owning the Rheumatology Market . See McDarby v Merck Appeal, section C. Product Launch.

2. Raymond V. Gilmartin, President and CEO, Merck & Co. Inc., P.O. Box 1000, UG3BC-10, North Wales, Pa. 19454. This corporate officer received the FDA Warning Letter and chose to litigate rather than warn the public. See address of FDA Warning Letter, Plaintiff Ex. A.

3. Edward M. Scolnick, M.D., Merck Research Laboratories , this actor monitored research and formed strategies and arguments to conceal scientific research which would have negatively impacted sales.  See, McDarby v Merck Appeal, section D VIGOR Study, numerous quotations.

EMPLOYEES OR CONTRACT EMPLOYEES EMPLOYED BY MERCK INVOLVED IN PROMOTING OF FRAUD, were as follows:

1.  Dr. Peter Holt was hired to specifically produce audio tapes used to instruct sales persons on how to present Vioxx to medical practitioners while misrepresenting  the risks and promoted Vioxx for unapproved uses. See, Plaintiff Ex. A. page 3 Promotional Audio Conferences, paragraphs 1 and 3.

2. Dr. Scott S. Reuben, a quasi independent researcher paid for publishing research paid for by Defendant merck. See, GOVERNMENT'S SENTENCING MEMORANDUM, Plaintiff's Ex. UU, page 4, table row 1, Merck paid Reuben $49,375.

3. Representative  1-9, see PAGE & ragraph and (Exhibit (c)

4. Physicians named as John and Mary Doe 1-10,000, McDarby v Merck & CO). Inc. NJ. Appellellate division, Submitted May 29, 2008 form appeal, section C; the product launch,

5. Dr. Blavatsky , Expert Witness, see Dr, Blavatsky Declaration paragraph 29.

6. Attorney's Unnamed. see Blavatsky Declaration paragraph 8, page 2 "documents handed to Blavatsky by Council".

## CONCLUSION

Liability for Plaintiffs injuries clearly lies with Defendant Merck. The effects of Defendant Merck's fraud were far reaching and can only be corrected by direct order of the court, and Plaintiff seeks orders to do just that, and for sanctions of $25,000 for costs of defending Plaintiff's case in these Summary Motion for Judgment against Plaintiff which did not present even one scintilla of a foundation that Vioxx was safe so that Defendant's Motion was brought forward in bad faith; and,

Plaintiff now asks the Court to release this case over to Federal Court sitting in Brooklyn, New York, where Plaintiff Pro Se Dennis Harrison may have access to the Hospital for Special Surgery, as his condition requires the services of that institution due to the constant threat of infection, which clearly came about in consequence of his injuries due to Defendant Merck's fraud and injuries stemming from his taking of Vioxx; and,

Up this point in time where Defendant Merck has been found guilty of criminal and civil fraud Cite, USA versus Merck, and has been publicly disgraced and fined one billion dollars they have still not lost their zeal to commit fraud therefore the sanctions called for in the following order not nearly justified but called for in the interest in justice.

24

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing:

## PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT MERCK et al. DESIGNED TO HOIST DEFENDANT UPON ITS OWN PETARD & DENUDE IT OF ALL DEFENSES

has been served on Defense Liaison Counsel (DLC) Dorothy H. Wimberley by electronic email as PDF attachment, Emily Pistille of Merck by electronic email as PDF attachment, and Doug Marvin of Merck by electronic email as PDF attachment also on this 8th day of October, 2013.

Further I hereby note utilizing the same electronic PDF method to Plaintiff Steering Committee PSC-I Russ Herman and Leonard Davis, and Plaintiff Steering Committee PSC-II Ann B. Oldfather and Megan Hastings also on this 8th day of October, 2013. .

I have also sent the above and the foregoing to the Clerk of Court of the United States District Court for the Eastern District of Louisiana via the same electronic email/PDF method and hard copy, also on this 8th day of October, 2013.

Respectfully submitted,

/s/ Dennis R. Harrison
Dennis R. Harrison
Plaintiff Pro Se
601 W. Brown Street
Iron Mountain, MI 49801
Phone: Cell 906-221-5906
badbonehealing@gmail.com

25

<div align="center">

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

</div>

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Docket No. 1657 |
| | * | |
| PRODUCT LIABILITY | * | SECTION L |
| LITIGATION | * | |
| | * | HONORABLE JUDGE FALLON |
| This Document relates to: | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| Dennis Harrison | * | |
| Pro Se 2:07-cv-00905-EEF-DEK | | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

<div align="center">

**PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT AGAINST
DEFENDANT MERCK et al. DESIGNED TO HOIST DEFENDANT UPON ITS OWN
PETARD & DENUDE IT OF ALL DEFENSES**

</div>

1. ORDER that the Defendant's Motion For Summary Judgment against Plaintiff be DENIED;

2. ORDER that Plaintiff's Motion to Amend Complaint be so ORDERED;

3. ORDER that Plaintiff has proved that Defendant is liable to him for damages and that this case now be tried in front of a Jury in New York State for determination of Dames and it may also consider punitive damage awards as it may deem fit;

4. ORDER that a statement be required and signed by all Expert Witnesses, Deponents, Declarants, Affiants and Witnesses stating that they do know that Defendant Merck has plead guilty to fraud regarding to material facts in this case for promoting the USE OF VIOXX AT DOSAGES AND DURATION OF ADMINISTRATION AT UNSAFE LEVELS OF 50MG WHEREAS NO MORE THAN 12.5MG WERE INDICATED TO BE SAFE. and Defendant Merck is currently restrained by the requirements of probation to not assert otherwise

5. ORDER that defendant Merck has previously employed Dr. Scott S. Reuben to produce studies related to the material facts of this case, and that Dr. Reuben has pled guilty to fraud in relation to fabricating the data that his research was based on with particular reference to Post-Operative Surgery with the administration of Vioxx after Spinal Fusion Surgery being safe and that Dr. Reuben has been disbarred permanently by the FDA for having done so, and that any conclusions based on , or relying on, in part or in whole are also inadmissible in the Court; and, That a statement be required and signed by all Expert Witnesses, Deponents, Declarants, Affiants and Witnesses stating that they do

know the above and they certify that they have not based their opinions, conclusions, impressions in reliance of Dr. Reuben's research;

6. ORDER that all medical conclusions must also take into account the following presumptions:

A. That Vioxx can inhibit bone union, bone formation, bone turnover in Spinal Fusion and in bone union following Femur Fracture.

B. That all conclusions or impressions, depositions, declarations, and statements given by all witnesses, whether by direct statement, or by consultation which were given as such prior to this order, must now also conform to this order, or they will be considered inadmissible;

C. This also applies to Defendant Merck's present and future expert witnesses.

7. Plaintiff has changed his demand for Defendant Merck to pay for an Expert Witness such that he represents a Class of injured persons the Court now orders Defendant Merck to pay for Plaintiff's Expert Witness under supervision of this Court; and now orders both defendant and Plaintiff to negotiate a motion to embody this order under the courts supervision;

8. ORDER that Defendant Merck did not put forth even one scililla's worth of proof as to Vioxx's safety regarding the FDA Unapproved off-label promotion of Vioxx in relation to Bone-Union, Bone Turnover, Bone Formation, in either Spinal Fusion or Femur Fractures which it is required to put forward in a FRCP 56 proceeding and therefore has shown Bad Faith in prosecuting the Motion For Summary Judgment against Plaintiff Dennis R. Harrison and this Court has determined that a sanction of $25,000 must be paid to Plaintiff Dennis R. Harrison immediately;

9. Order that the Jury trial for damages only and punitive damages be held in Brooklyn, New York so that Plaintiff may have access to the Hospital or special services which provides facility and services not

10. ORDERed that a hearing before the Court be held to examine the credentials of Dr. Blavatsky and the circumstances that led to his inclusion of any document he referred to as he referred to as "Reuben et

11. Final decision on this cross motion cannot be finalized at this time until further order of the Court.