EXHIBIT A:  Re: In Re Vioxx Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp.,* 2:07-cv-00905-EEF-DEK

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

3175ld

Food and Drug Administration
Rockville, MD  20857

**TRANSMITTED BY FACSIMILE**

Raymond V. Gilmartin
President and CEO
Merck & Co., Inc.                    SEP 1 7 2001
P.O. Box 1000, UG3BC-10
North Wales, PA  19454-1099

RE:   NDA 21-042
      Vioxx (rofecoxib) tablets
      MACMIS ID # 9456

# WARNING LETTER

Dear Mr. Gilmartin:

This Warning Letter concerns Merck & Co. Inc.'s (Merck) promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets. Specifically, we refer to promotional audio conferences given on behalf of Merck by Peter Holt, MD, a press release, and oral representations made by Merck sales representatives to promote Vioxx. As part of its routine monitoring and surveillance program, the Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed your promotional activities and materials and has concluded that they are false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations. See 21 U.S.C. §§ 331(a) and (b), 352(a), (f), and (n), and 355 (a).

You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

Although the exact reason for the increased rate of MIs observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.



EXHIBIT
A

Raymond V. Gilmartin                                                             Page 2
Merck & Co., Inc.
NDA 21-042

You have also engaged in promotional activities that minimize the Vioxx / Coumadin (warfarin) drug interaction, omit important risk information, make unsubstantiated superiority claims against other NSAIDs, and promote Vioxx for unapproved uses and an unapproved dosing regimen. In addition, in misrepresenting the Vioxx / warfarin drug interaction you also misrepresent Vioxx's safety profile by minimizing the potentially serious risk of significant bleeding that can result from using Vioxx and warfarin concomitantly.

Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile.

## Background

Vioxx is a NSAID with selective cyclooxygenase 2 (COX-2) inhibitory properties. It was approved on May 20, 1999, for the treatment of primary dysmenorrhea, for the management of acute pain in adults, and for relief of the signs and symptoms of osteoarthritis.

Prior to approval, endoscopy studies were submitted to the original NDA database demonstrating that treatment with Vioxx 25 mg or 50 mg daily was associated with a significantly lower percentage of endoscopically apparent gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. Because the correlation between findings of endoscopic studies and the relative incidence of clinically serious upper gastrointestinal (GI) events was unknown, after approval, Merck sponsored the VIGOR study to obtain information regarding clinically meaningful upper GI events and to develop a large controlled database for overall safety assessment.

The VIGOR study included approximately 4000 patients per treatment arm (Vioxx 50 mg a day or naproxen 1000 mg a day) treated for a median time of 9 months. The primary endpoint of the study was the relative risk of confirmed PUBs (perforations, symptomatic ulcers, and GI bleeds) in patients with rheumatoid arthritis taking Vioxx 50 mg daily (two to four times the approved dosing regimen for Vioxx in osteoarthritis), compared to patients taking naproxen, 1000 mg daily. The study also compared the safety and tolerability of the two treatments in patients with rheumatoid arthritis. The results of the study demonstrated that patients on Vioxx had a significantly lower cumulative incidence of PUB's compared to patients on naproxen (2.08% and 4.49% for Vioxx and naproxen, respectively).

Other important results from the VIGOR study included the unexpected findings that investigator reported serious cardiovascular events occurred in 101 patients (2.5%) in the Vioxx treatment group compared to 46 patients (1.1 %) in the naproxen treatment group, and MIs occurred in 20 patients among 4047 in the Vioxx treatment group (0.5%), compared to four patients among 4029 in the naproxen treatment group (0.1%). These unexpected findings were extensively discussed at the FDA Arthritis Advisory Committee Meeting on February 8, 2001. Although, the reason for these differences is not clear, possible explanations include both an ability of naproxen to function as a cardioprotective agent and a pro-thrombotic property of Vioxx.

Raymond V. Gilmartin                                                                    Page 3
Merck & Co., Inc.
NDA 21-042

## Promotional Audio Conferences

We are aware of six promotional audio conferences, presented on behalf of Merck by Peter Holt, MD that are in violation of the Act and its implementing regulations. These audio conferences were held on June 8, 2000, June 13, 2000, June 16, 2000, and three on June 21, 2000, and were moderated by Merck employees.

On December 12, 2000, we sent you a written inquiry about your involvement with and influence on the initiation, preparation, development, and publication of audio conferences given by Dr. Holt. We also asked you to describe the nature of the relationship between you and Dr. Holt. In your response dated January 5, 2001, you stated that, "Dr. Holt entered into a speaker contract with Merck on June 22, 1999." You also stated that, "Merck has determined that we arranged for Dr. Holt to speak at ten audio conferences in 2000. Merck Business Managers provided him with the topic for the audio conferences and, for two of the audio conferences, asked him to address the safety profiles of Vioxx and other NSAIDs."

The promotional audio conferences identified above, arranged by, and presented on behalf of, Merck were false or misleading in that they minimized the MI results of the VIGOR study, minimized the Vioxx / Coumadin drug interaction, omitted important risk information, made unsubstantiated superiority claims, and promoted Vioxx for unapproved uses and an unapproved dosing regimen. Our specific objections follow.

<u>Minimization of MI Results</u>

Statements made during the promotional audio conferences identified above minimize the potentially serious MI risk that may be associated with Vioxx therapy. For example, in your June 21, 2000, audio conference you begin your discussion of the MI rates observed in the VIGOR study by stating, "When you looked at the MI rate the rate was different for the two groups. The MI rate for Vioxx was 0.4 percent and if you looked at the Naprosyn arm it was 0.1 percent, so there was a reduction in MIs in the Naprosyn group." You then present your explanation as to why the Vioxx treatment arm had an increased rate of MIs compared to the naproxen treatment arm. Specifically, you state that,

> Vioxx is a wonderful, effective, selective COX-2 inhibitor that inhibits COX-2 but at the doses used does not inhibit COX-1. So therefore without the COX-1 inhibition you don't inhibit platelets, you don't prolong bleeding time and therefore it cannot be used as a cardiovascular protective drug. Naprosyn on the other hand is a wonderful platelet inhibitor, prolongs bleeding time and inhibits platelets identically to aspirin. Obviously the binding with Naprosyn is reversible and with aspirin is irreversible, but the effect on platelets and bleeding time is identical in terms of its effect and therefore functions as a wonderful drug for cardiovascular prophylaxis. So basically the MI rates are in sync with what we know about Vioxx and what we know about Naprosyn.

In fact, the situation is not at all clear. There are no adequate and well-controlled studies of naproxen that support your assertion that naproxen's transient inhibition of platelet aggregation is pharmacodynamically comparable to aspirin or clinically effective in decreasing the risk of MIs. Therefore, your representation that naproxen prolongs bleeding time and inhibits platelets identically to aspirin is misleading, and minimizes the potential seriousness of this finding. As you know, the

Raymond V. Gilmartin                                          Page 4
Merck & Co., Inc.
NDA 21-042

reason for the difference between Vioxx and naproxen has not been determined; it is also possible that Vioxx has pro-thrombotic properties.  Also, the MI rate that you report for Vioxx is inaccurate; the MI rate for Vioxx in the VIGOR study was 20 MIs among 4047 patients (0.5%), not 0.4%, as you stated.

Your minimization of the seriousness of the MI rates observed in the Vioxx treatment arm of the VIGOR trial is further reinforced in your audio conferences by your discussion of a retrospective analysis of this trial.  For example, in your June 21, 2000, audio conference, you state that,

> ...Merck went and pulled out those patients that again were enrolled in VIGOR and asked the question, who were those patients that really needed secondary cardiovascular prophylaxis from the get go, and that ended up being four percent of the study group in VIGOR based on whether there was a prior MI, stroke, TIA, angina, CABG or PTCA....Now if you look at the remaining part of VIGOR, which is 96 percent of the VIGOR population, and once again looked for the MI rate between Naprosyn and Vioxx, there's no statistically significant difference in the MI rate between Naprosyn and Vioxx.  In fact, Naprosyn is 0.2 percent and Vioxx is 0.1 percent.

Your claim that the MI rate for naproxen was 0.2 percent and for Vioxx was 0.1 percent is again inaccurate.  Contrary to your claim that there was a higher rate of MIs in the naproxen group compared to the Vioxx group, the MI rate for Vioxx in this subpopulation was 12 MIs among 3877 patients (0.3%) as compared to 4 MIs among 3878 patients (0.1%) for naproxen.

Moreover, you again minimize the Vioxx MI rate observed in the VIGOR study by your comparison of this rate to the rate of MIs observed for Celebrex (celecoxib) in the Celebrex Long-Term Arthritis Safety Study (CLASS).  For example, in your June 21, 2000, audio conference you state, "Now if you remember the crude MI rate of Vioxx in VIGOR that number was 0.4 percent which is basically the same or in fact a little bit less then the crude MI rate of Celebrex in CLASS which is 0.5 percent."  Your claim that the MI rates of Vioxx compared to Celebrex were basically the same, "or in fact a little bit less" is misleading.  You are comparing MI rates from two different trials with different patient populations.  For example, patients who had angina or congestive heart failure with symptoms that occurred at rest or minimal activity and patients taking aspirin, including low-dose (325 mg or less, daily or every other day) or other antiplatelet agents (e.g., ticlopidine) were excluded from the VIGOR trial.  The CLASS trial in contrast, did not exclude patients of this type.  The CLASS trial thus may have included patients at a higher risk for MIs.

<u>Minimization of Vioxx / Coumadin Interaction</u>

Statements made during your promotional audio conferences also minimize the risk of Vioxx therapy in patients who are taking warfarin.  For example, in your June 16, 2000, audio conference you stated that, "...if you look at the thromboembolic events it's very clear that these selective COX-2 inhibitors have the benefit of not having platelet aggregation and bleeding time, and therefore, can be used safely in terms of post-op and with Coumadin."  Your statement that Vioxx can be used safely with warfarin minimizes the precaution in the PI that states that "...in post-marketing experience, bleeding events have been reported, predominately in the elderly, in association with increases in prothrombin time in patients receiving Vioxx concurrently with warfarin."  Your promotion minimizing the risk of using Vioxx and warfarin concurrently is particularly troublesome because Merck was aware of this potentially dangerous drug interaction in 1999, well before these audio conferences occurred.  In fact,

Raymond V. Gilmartin                                                       Page 5
Merck & Co., Inc.
NDA 21-042

Merck began disseminating a revised PI in October 1999, which included new information about this risk.

The seriousness of this interaction is further minimized by your suggestion that COX-2 inhibitors, including Vioxx, can be used safely with warfarin because it "has the benefit of not having platelet aggregation and bleeding time." This claim implies that Vioxx is safer than other NSAIDS used in combination with warfarin. However, Vioxx has not been studied in head-to-head trials prospectively designed to assess this specific endpoint. Your superiority claim is therefore misleading.

We note that earlier in your June 16, 2000, promotional audio conference you state, "It can be used in people with Coumadin, although with Coumadin you've got to check their INR three and four days after you add the Cox inhibitor to the Coumadin because there may be a bump in the INR." This disclosure does not correct the overall misleading message, however, nor does it correct your suggestion that Vioxx is safer than other NSAIDs in patients taking warfarin.

Omission of Important Risk Information

Your promotional audio conferences fail to present serious and significant risks associated with Vioxx therapy. For example, your promotional audio conferences fail to state that Vioxx is contraindicated in patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. You also fail to present the gastrointestinal (GI) warning about the possibility of serious GI toxicity such as bleeding, ulceration, or perforation in patients taking Vioxx. Moreover, you fail to present Vioxx's precautions for use in patients who have liver and kidney disease, information about patient populations in which Vioxx's use is not recommended, such as women in late pregnancy, and information about Vioxx's most common adverse events.

Unsubstantiated Superiority Claims

You make several unsubstantiated superiority claims for Vioxx throughout your promotional audio conferences. For example, in your June 16, 2000, audio conference, you claim that, "The importance of [VIGOR and CLASS] is that the data is going to really help change I believe the package inserts for [Vioxx and Celebrex] down the road because it really shows once again that they are safer than non-steroidals." Your suggestion that COX-2 inhibitors, including Vioxx, have an overall safety profile that is superior to other NSAIDs is misleading because such an advantage has not been demonstrated. In fact, in the VIGOR study the incidence of serious adverse events was higher in the Vioxx treatment group than in the naproxen treatment group (9.3% and 7.8% for Vioxx and naproxen, respectively). The results of safety analyses that were pre-specified in the protocol for the VIGOR trial, such as CHF-.related adverse events and discontinuations due to edema-related adverse events, hepatic-related adverse events, hypertension-related adverse events, and renal-related adverse events were all numerically higher (in some cases statistically significantly higher) in the Vioxx treatment group than in the naproxen treatment group. Furthermore, your claim that the VIGOR and CLASS trials "show once again that they are safer than non-steroidals" is also misleading because it implies that the results of the VIGOR trial (i.e., patients on Vioxx had a significantly lower cumulative incidence of PUBs than patients on naproxen) can be applied to the entire class of NSAIDs.

In your June 16, 2000, audio conference you state, "...if you look at the thromboembolic events it's very clear that these selective COX-2 inhibitors have the benefit of not having platelet aggregation and

Raymond V. Gilmartin                                                          Page 6
Merck & Co., Inc.
NDA 21-042

bleeding time, and therefore, can be used safely in terms of post-op and with Coumadin." This claim
suggests that Vioxx is safer, or has fewer side effects, than other NSAIDs used in the post-operative
setting because COX-2 inhibitors do not affect platelet aggregation and bleeding time. Vioxx has not
been studied, however, in head-to-head trials prospectively designed to assess its safety compared to
other NSAIDS in the post-operative setting. Your superiority claim is therefore misleading.

Further examples of your unsubstantiated superiority claims include your claim that, "In terms of half
life Vioxx has a half life of 17 hours and is truly a once a day drug, whereas Celebrex has a half life of
11 hours and is a BID (twice a day) drug," stated in your June 16, 2000, audio conference. This claim
is misleading because it suggests that Celebrex must be dosed twice a day for all of its approved
indications. In fact, Celebrex is approved for use either twice a day, or once a day, for the treatment of
osteoarthritis. Therefore, your claim that Celebrex is a "BID drug" is misleading.

<u>Promotion of Unapproved Uses</u>

Your audio conferences are misleading because they promote Vioxx for unapproved uses. For
example, in your June 21, 2000, conference, you claim that in the VIGOR study, "...the Vioxx 50
milligrams a day and the Naprosyn, a gram a day, were absolutely equally effective in terms of treating
the patients with rheumatoid arthritis." Your claim is misleading because it suggests that Vioxx is
effective for the treatment of rheumatoid arthritis when this has not been demonstrated. The VIGOR
study was not designed to assess the efficacy of Vioxx for the treatment of rheumatoid arthritis. Your
claim that Vioxx is "absolutely equally effective" to naproxen in treating patients with rheumatoid
arthritis is also misleading because this has not been demonstrated by adequate and well-controlled
clinical studies, and because the VIGOR study was not capable of assessing their comparative
effectiveness.

Your promotional audio conferences are also misleading because they suggest that Vioxx is safe and
effective for other unapproved uses such as the prevention of cancer and invasive cancer, and for the
treatment of Alzheimer's disease and gout. Examples of claims that promote Vioxx for unapproved
uses, include, but are not limited to, your claims in your June 16, 2000 audio conference that,
"...COX-2 seems to be able to interfere with...programmed cell death. Therefore, you get this
increased cell growth which allows polps to form, cancer and then invasive cancer. And by blocking
COX-2 you can actually prevent the development of colon polyps, cancer and invasive cancer."
Additional examples include your claims that "So we tried it [Vioxx] after Vioxx was released and
really within one or two pills acute attacks of gout were being shut down," and "Specifically, if you
looked at potential uses of these drugs, the most exciting right now I guess in two areas, one is
Alzheimer's disease...."

**Press Release**

We have identified a Merck press release entitled, "Merck Confirms Favorable Cardiovascular Safety
Profile of Vioxx," dated May 22, 2001, that is also false or misleading for similar reasons stated above.
Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile,"
is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to
naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is
misleading; in fact, serious cardiovascular events were twice as frequent in the VIOXX treatment
group (101 events, 2.5%) as in the naproxen treatment group (46 events, 1.1%) in the VIGOR study.

Raymond V. Gilmartin                                                                      Page 7
Merck & Co., Inc.
NDA 21-042

### Oral Representations

Merck sales representatives have engaged in false or misleading promotional activities that also minimize the potentially serious MI results observed in the VIGOR trial. Specifically, Merck sales representatives made false or misleading statements to DDMAC reviewers at two different professional meetings. At your exhibit booth during the 119th Annual Meeting of the Maryland Pharmacists Association (MPhA), in Ocean City, Maryland, June 9 – June 12, 2001, your representative stated that the increased MI rate seen in patients on Vioxx in the VIGOR study is due to the fact that naproxen works just like aspirin (i.e., inhibits clotting and platelet aggregation). In addition, during the Annual Meeting of the American Society of Health-Systems Pharmacists (ASHP), in Los Angeles, California, June 3 – June 6, 2001, your representative stated that Vioxx had a greater MI rate in the VIGOR trial because naproxen is cardioprotective, having platelet effects similar to aspirin. These statements made by your sales representatives are misleading for the reasons stated above.

### Conclusions and Requested Actions

The promotional activities and materials described above minimize the potentially serious cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx / Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001. This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

1. Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.

2. Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

3. A written statement of your intent to comply with "1" and "2" above.

Your written response should be received no later than October 1, 2001. If you have any questions or comments, please contact Lesley Frank, Ph.D., JD, by facsimile at (301) 594-6771, or at the Food and Drug Administration, Division of Drug Marketing, Advertising and Communications, HFD-42, Rm. 17B-20, 5600 Fishers Lane, Rockville, MD 20857. We remind you that only written communications are considered official.

Raymond V. Gilmartin                                                    Page 8
Merck & Co., Inc.
NDA 21-042

In all future correspondence regarding this particular matter, please refer to MACMIS ID #9456 in addition to the NDA number.

The violations discussed in this letter do not necessarily constitute an exhaustive list. We are continuing to evaluate other aspects of your promotional campaign for Vioxx, and may determine that additional remedial messages will be necessary to fully correct the false or misleading messages resulting from your violative conduct.

Failure to respond to this letter may result in regulatory action, including seizure or injunction, without further notice.

Sincerely,

*{See appended electronic signature page}*

Thomas W. Abrams, R.Ph., MBA
Director
Division of Drug Marketing,
  Advertising, and Communications

B



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

Main Reception (617) 748-3100

John Joseph Moakley United States Courthouse
1 Courthouse Way
Suite 9200
Boston, Massachusetts 02210

February 24, 2006

R.J. Cinquegrana, Esq.                      Theodore V. Wells, Jr., Esq.
Choate, Hall & Stewart                      Paul, Weiss, Rifkind, Wharton & Garrison
Two International Place                      1285 Avenue of the Americas
Boston, MA 02110                            New York, NY  10019

Re: Merck & Co., Inc.; Tolling Agreement on Statute of Limitations

Dear Mr. Cinquegrana and Mr. Wells:

This letter confirms and sets forth an agreement between the Office of the United States Attorney for the District of Massachusetts and your client, Merck & Co., Inc. and its subsidiaries and affiliates (collectively, "Merck"). The terms of the agreement are as follows:

1.      As you are aware, this Office is presently conducting an investigation regarding Merck and its officers and employees. The conduct being investigated includes, without limitation, whether Merck and certain of its officers and employees, may have violated various federal criminal statutes, including but not limited to 18 U.S.C. §371, 18 U.S.C. §669, 18 U.S.C. §1001, 18 U.S.C. §1035, 18 U.S.C. §1341, 18 U.S.C. §1343, 18 U.S.C. §1347, 21 U.S.C. §331, 21 U.S.C. §333, 42 U.S.C. §1320a-7b; certain civil statutes including but not limited to 31 U.S.C. §3729; and certain administrative statutes such as 42 U.S.C. §1320a-7 and 42 U.S.C. §1320a-7a, in connection with the manner in which Merck developed, brought to market, marketed and sold VIOXX (hereafter, the "Conduct"). In signing this agreement, Merck does not acknowledge or concede that it has engaged in any wrongful conduct.

2.      In the course of our discussions, this Office has expressed its intention to afford you and your client the fullest opportunity to provide information to this Office which you deem relevant to matters relating to the investigation of the Conduct. Toward that end, you have advised this Office that your client, you and members of your firm will require a further time period to prepare any materials and gather information for presentation to this Office, and to consider and evaluate further information as may be provided by this Office. As a result, this Office and your client have agreed, as more fully set forth below, to toll the applicable statutes of limitations for the offenses and Conduct described in Paragraph 1 from the date this letter is executed through and including December 31, 2006.



EXHIBIT

B

Mr. Cinquegrana
Mr. Wells
February 24, 2006
Page 2

3.    This Office and your client, Merck, hereby agree that the time from the date of the execution of this letter through December 31, 2006 shall be excluded from any federal criminal, civil or administrative statute of limitations applicable to the Conduct described in paragraph 1. Merck also waives any and all constitutional or common law defenses pertaining to delay based on this exclusion of time. Nothing herein shall affect, or be construed as any waiver of any applicable statute of limitations defenses that Merck may have during the time frame prior to Merck's execution of this agreement, and Merck expressly reserves its right to raise any such defense, any provision of this agreement notwithstanding.

4.    Your client, Merck, enters into this agreement knowingly and voluntarily. Merck acknowledges that the statute of limitations confers benefits on it, and it is not required to waive those benefits, and that Merck is doing so after consulting with you because Merck believes it is in its best interest to do so.  Merck acknowledges that this agreement does not preclude this Office from taking any action or initiating any criminal or civil or administrative proceedings against Merck at any time during the relevant limitations period, including the time during which any statute of limitations is tolled, and that this agreement is not intended to apply to any other jurisdiction.

5.    This agreement relates only to the Conduct referred to in Paragraph 1 above. This writing contains the entire agreement between this Office and Merck and can be modified or supplemented only by means of a writing signed by this Office and Merck.

Mr. Cinquegrana
Mr. Wells
February 24, 2006
Page 3


If Merck is willing to enter into this agreement on the terms set forth above, it should indicate the same by signing on the spaces provided below and by initialing each page of this agreement. Please return an executed original to the undersigned by March 1, 2006.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By: _____
Jeremy M. Sternberg
Assistant U.S. Attorney


_____ Dated: 2/28/06
Merck & Co., Inc.
By Bruce Kuhlik
Its VP & Associate General Counsel

_____ Dated: 2/28/06
R.J. Cinquegrana
Choate, Hall & Stewart
Counsel to Merck & Co., Inc.

_____ Dated: 2/28/06
Theodore V. Wells, Jr.
Paul, Weiss, Rifkind, Wharton & Garrison
Counsel to Merck & Co., Inc.


cc: Jill Furman



EXHIBIT C:  Re: In Re Vioxx Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp., 2:07-cv-00905-EEF-DEK*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>MERCK SHARP & DOHME CORP. )<br><br>Defendant ) | CRIMINAL NO.<br><br>VIOLATION:<br><br>21 U.S.C. §§ 331(a), 333(a)(1), 352(f)(1)<br>(misbranding) |

## INFORMATION

The United States Attorney charges that:

### PRELIMINARY ALLEGATIONS

At all times material hereto, unless otherwise alleged:

#### The Defendant

1.     Between May 1999 and September 2004, Merck & Co., Inc. was a New Jersey corporation headquartered in Whitehouse Station, New Jersey, and was the operating company for Merck's pharmaceutical business in the United States. As a result of a reverse merger with another pharmaceutical company in 2009, Merck & Co., Inc. became a wholly-owned subsidiary of the acquiring company and was renamed **MERCK SHARP & DOHME CORP.** The acquiring company was renamed Merck & Co., Inc. The new Merck & Co., Inc. is a holding company for **MERCK SHARP & DOHME CORP.** and other corporate entities. Currently, **MERCK SHARP & DOHME CORP. ("MERCK")** is the operating company in the United States for the pharmaceutical business formerly conducted by Merck & Co. Inc. **MERCK** was publicly traded (NYSE ticker symbol MRK).

1



EXHIBIT
C

2.      MERCK was engaged in, among other things, the development, manufacture, promotion, sale and distribution of prescription drugs intended for human use nationwide and in the District of Massachusetts.  MERCK sold billions of dollars of pharmaceutical products each year.

3.      One prescription drug that was developed, manufactured, promoted, and sold by MERCK was Vioxx, a pain relief medication.  Vioxx was distributed by MERCK into interstate commerce in the United States, including specifically into Massachusetts, from in or about May 1999 through in or about September 2004, when MERCK withdrew Vioxx from the market.

### The FDA and the FDCA

4.      The United States Food & Drug Administration ("FDA") was the federal agency of the United States responsible for protecting the health and safety of the public by enforcing the Federal Food, Drug & Cosmetic Act ("FDCA") and ensuring, among other things, that drugs intended for use in humans were safe and effective for their intended uses and that the labeling of such drugs bore true and accurate information.

5.      The FDCA and its implementing regulations required that before a new drug was legally distributed in interstate commerce, the sponsor of a new drug was required to submit a New Drug Application ("NDA") to the FDA.

6.      The FDCA required that the NDA include proposed labeling for the proposed intended uses of the drug which included, among other things, the conditions for therapeutic use. The NDA was required to provide, to the satisfaction of FDA, data generated in adequate and well-controlled clinical investigations that demonstrated that the drug was safe and effective when used in accordance with the proposed labeling.

2

7.     An NDA sponsor was not permitted to promote or market the drug until the FDA had approved an NDA, including approval of the proposed labeling.  Moreover, if approved by the FDA, the sponsor of the NDA was permitted to promote and market the drug only for the medical conditions of use specified in the approved labeling.  Uses not approved by the FDA were known as "unapproved" or "off-label" uses.

8.     The FDCA, and its implementing regulations, required the sponsor to file a new NDA, or amend the existing NDA, in order to label or promote a drug for uses different from the conditions for use specified in the approved labeling.  The new or amended NDA was required to include a description of the newly proposed indications for use and evidence, in adequate and well-controlled clinical investigations, sufficient to demonstrate that the drug was safe and effective for the newly proposed therapeutic use or uses.  Only upon approval of the new NDA, or supplement, could the sponsor promote the drug for the new intended use.

9.     Under the FDCA, a drug was "misbranded" if its labeling did not contain "adequate directions for use." 21 U.S.C. § 352(f)(1).  "Adequate directions for use" meant directions under which a layperson could use a drug safely and effectively for the purposes for which it was intended. 21 C.F.R § 201.5.  A prescription drug, by definition, could not bear adequate directions for use by a layperson, but an FDA-approved prescription drug, bearing the FDA-approved labeling, could be exempt from the adequate directions for use requirement if it was sold for an FDA-approved use.  A prescription drug that was marketed for non-approved, off-label uses, did not qualify for this exemption and therefore was misbranded.  21 C.F.R. § 201.100.

3

10.     The FDCA prohibited, among other things, the distribution in interstate commerce of a misbranded drug.

### The Vioxx Approval Process

11.     On or about November 23, 1998, **MERCK** submitted an NDA for approval of a drug called Vioxx (chemical name: rofecoxib), which was a new drug within the meaning of 21 U.S.C. §321(p) and 21 C.F.R. §310.3(h)(4) and (5).  In that application, **MERCK** sought to demonstrate the drug's safety and efficacy for, and sought approval for, use for relief of the signs and symptoms of osteoarthritis, management of pain, and treatment of primary dysmenorrhea menstruation (the "Approved Uses").  On or about May 20, 1999, the FDA approved Vioxx for those uses and approved a label on that same date.  Vioxx was not then approved for any use or condition other than the Approved Uses.

12.     From at least May of 1999 through in or about April 2002, unapproved or off-label uses for Vioxx included the treatment of the signs and symptoms of rheumatoid arthritis.

13.     In 1999, **MERCK** initiated a clinical trial, known as Vioxx Gastrointestinal Outcomes Research ("VIGOR"), designed to determine whether Vioxx was safer for the gastrointestinal tract than traditional pain relievers.  The VIGOR trial was a prospective, randomized, double blind comparison of 50 mg of Vioxx and 1000 mg of naproxen in over 8,000 patients with rheumatoid arthritis.   The VIGOR results were made public by **MERCK** and provided to the FDA in March 2000.

14.     In February 2001, **MERCK** submitted a supplemental NDA seeking FDA approval of  rheumatoid arthritis as an indication for use for Vioxx.

4

15. On or about April 11, 2002, the FDA approved Vioxx for the treatment of rheumatoid arthritis.

16. Between May 1999 and April 11, 2002, MERCK promoted Vioxx to physicians for the treatment of rheumatoid arthritis, an unapproved use, before there was an FDA approved indication for rheumatoid arthritis.

17. On September 17, 2001, the FDA sent MERCK a Warning Letter regarding MERCK's improper promotional practices in connection with its marketing of Vioxx. In that Warning Letter, among other things, the FDA stated that MERCK was promoting Vioxx for unapproved uses, including rheumatoid arthritis. In particular, the FDA's Warning Letter stated:

> Your [MERCK's] audio conferences are misleading because they promote Vioxx for unapproved uses. For example, in your June 21, 2000, conference, you claim that in the VIGOR study ". . . the Vioxx 50 milligrams a day and the Naprosyn, a gram a day, were absolutely equally effective in terms of treating the patients with rheumatoid arthritis." Your claim is misleading because it suggests that Vioxx is effective for the treatment of rheumatoid arthritis when this has not been demonstrated.

18. Both before and after receipt of the Warning Letter, MERCK through its representatives promoted Vioxx for rheumatoid arthritis without any FDA approved indication for rheumatoid arthritis. For example, various MERCK sales representatives recorded in their call notes instances of promoting Vioxx for rheumatoid arthritis, including the following:

- March 20, 2000 – Representative A recorded as an "accomplishment" that he was able to "gain agreement on use of Vioxx for Ra [rheumatoid arthritis]" with Physician 1.

- March 24, 2000 – Representative B noted as a "strategy" with Physician 2 that he would "Continue to push Vioxx past Celebrex. Build on story of RA pat[ient]

5

given 12.5 mg Vioxx."

- September 5, 2000 - Representative C noted as a "next call strategy" that she urged that Physician 3 "use [Vioxx] first line in OA and RA pts."

- September 15, 2000 – Representative D noted as an accomplishment in his interaction with Physician 4 that he had an "in depth talk on RA and OA and how Vioxx helps during a lunch tutorial."

- October 16, 2000 – Representative E noted as a "strategy" with Physician 5 that he would "reinforce efficacy of Vioxx vs Celebrex for RA and pain."

- June 27, 2001 – Representative F noted as an "accomplishment" that "v[ioxx] is eff[ective] in ra" in conversation with Physician 6.

- June 28, 2001 – Representative G noted as an "accomplishment" that she had "discussed" with Physician 7 "additional uses/benefits of V[ioxx]" which included rheumatoid arthritis.

- September 25, 2001 – Representative H noted as an "accomplishment" in a conversation with Physician 8 that he had "discussed Vioxx excellent efficacy and off-label use in RA."

- November 15, 2001 – Representative I noted as a "strategy" for his interaction with Physician 9 that he would "gain agreement that Vioxx can be used for RA."

6

## COUNT ONE

**(Distribution of a Misbranded Drug: Inadequate Directions for Use
21 U.S.C. §§331(a), 333(a)(1) & 352(f)(1))**

19.     The allegations in paragraphs 1 through 18 are realleged and incorporated by reference herein.

20.     Beginning as early as May 1999, and continuing thereafter until on or about April 11, 2002, in the District of Massachusetts and elsewhere, the defendant,

### MERCK SHARP & DOHME CORP.

did introduce and cause the introduction, and did deliver for introduction and cause for delivery for introduction into interstate commerce, quantities of Vioxx, a drug within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §321(g), for an unapproved use, namely the treatment of rheumatoid arthritis, which drug was misbranded within the meaning of 21 U.S.C. §352(f)(1), in that Vioxx's labeling lacked adequate direction for such use.

All in violation of 21 U.S.C. §§331(a), 333(a)(1), and 352(f)(1).

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By:  *Susan Winkler*

JEREMY M. STERNBERG
SUSAN G. WINKLER
ZACHARY A. CUNHA
ASSISTANT U.S. ATTORNEYS

JILL P. FURMAN
ASSISTANT DIRECTOR
OFFICE OF CONSUMER LITIGATION

7





# &ANESTHESIA & ANALGESIA

100 Pine Street, Suite 230, San Francisco, CA 94111
Phone: (415) 777-2750, Fax: (415) 777-2803

Steven L. Shafer, MD
Editor-in-Chief

February 20, 2009

To our readers:

On January 22, 2009 Anesthesia & Analgesia received a summary of an investigation conducted by Baystate Medical Center into the research of Dr. Scott Reuben. To quote from the notice we received:

"Baystate Medical Center ("BMC") conducted and investigation pursuant to the Baystate Health Policy on Misconduct in Research and Scholarly Activities (the "Policy"). Dr. Reuben cooperated fully in this investigation. BMC's investigation determined that Dr. Reuben fabricated data reported in the referenced articles, and that all fabricated data were created under the sole control of Dr. Reuben."

The same day the Journal posted a list of the articles in Anesthesia & Analgesia found to be based on fabricated data. Since that time we have compiled a complete list of articles that Baystate Medical Center found were based on fabricated data:

1. Reuben SS, Connelly NR. Postarthroscopic meniscus repair analgesia with intraarticular ketorolac or morphine. Anesth. Analg. 1996;82:1036-9.
2. Reuben SS, Connelly NR, Maciolek H. Postoperative analgesia with controlled-release oxycodone for outpatient anterior cruciate ligament surgery. Anesth Analg. 1999;88:1286-91.
3. Reuben SS, Reuben JP. Brachial plexus anesthesia with verapamil and/or morphine. Anesth Analg. 2000;91:379-83.
4. Reuben SS, Connelly NR. Postoperative analgesic effects of celecoxib or rofecoxib after spinal fusion surgery. Anesth Analg. 2000;91:1221-5.
5. Reuben SS, Vieira P, Faruqui S, Verghis A, Kilaru P, Maciolek H. Local administration of morphine to bone following spinal fusion surgery. Anesthesiology 2001;95:390-4.
6. Reuben SS, Fingeroth R, Krushell R, Maciolek H: Evaluation of the safety and efficacy of the perioperative administration of rofecoxib for total knee arthroplasty. J Arthroplasty. 2002;17:26-31.
7. Reuben SS, Steinberg RB, Maciolek H, Manikantan P. An evaluation of the analgesic efficacy of intravenous regional anesthesia with lidocaine and ketorolac using a forearm versus upper arm tourniquet. Anesth Analg. 2002;95:457-60
8. Reuben SS, Gutta SB, Sklar J, Maciolek H: Effect of initiating a multimodal analgesic regimen upon patient outcomes after anterior cruciate ligament reconstruction for same-day surgery: a 1200-patient case series. Acute Pain 2004;6:87-93.



EXHIBIT

2

9. Reuben SS, Rosenthal EA, Steinberg RB, Faruqi S, Kilaru PR: Surgery on the affected upper extremity of patients with a history of complex regional pain syndrome: The use of intravenous regional anesthesia with clonidine. J. Clin Anesth 2004;16:517-522.

10. Reuben SS, Makari-Judson G, Lurie SD: Evaluation of efficacy of the perioperative administration of venlafaxine XR in the prevention of postmastectomy pain syndrome. J Pain Symptom Manage. 2004;27:133-9.

11. Reuben S. The effect of intraoperative valdecoxib administration on PGE2 levels in the CSF. J Pain 6, Supplement 1:S21 (Abstract 649)

12. Reuben SS, Ekman EF. The effect of cyclooxygenase-2 inhibition on analgesia and spinal fusion. J Bone Joint Surg Am. 2005;87:536-42

13. Scott S. Reuben, Srinivasa B. Gutta, Holly Maciolek, Joseph Sklar, James Redford. Effect of initiating a preventative multimodal analgesic regimen upon long-term patient outcomes after anterior cruciate ligament reconstruction for same-day surgery: A 1200-patient case series. Acute Pain 2005;7: 65-73.

14. Reuben SS, Pristas R, Dixon D, Faruqi S, Madabhushi L, Wenner S. The incidence of complex regional pain syndrome after fasciectomy for Dupuytren's contracture: a prospective observational study of four anesthetic techniques. Anesth Analg. 2006;102:499-503

15. Reuben SS, Buvanendran A, Kroin JS, Raghunathan K. The analgesic efficacy of celecoxib, pregabalin, and their combination for spinal fusion surgery. Anesth. Analg. 2006;103:1271-7

16. Reuben SS, Buvenandran A, Kroin JS, Raghunathan K. Analgesic efficacy of celecoxib,pregabalin, and their combination for spinal fusion surgery. Anesthesiology 2006;105:A1194.

17. Reuben SS, Buvanendran A, Kroin JS, Steinberg RB. Postoperative modulation of central nervous system prostaglandin E2 by cyclooxygenase inhibitors after vascular surgery. Anesthesiology 2006;104:411-6.

18. Reuben SS, Ekman EF, Raghunathan K, Steinberg RB, Blinder JL, Adesioye J. The effect of cyclooxygenase-2 inhibition on acute and chronic donor-site pain after spinal-fusion surgery. Reg Anesth Pain Med. 2006;31:6-13.

19. Reuben SS, Ekman EF, Charron D. Evaluating the analgesic efficacy of administering celecoxib as a component of multimodal analgesia for outpatient anterior cruciate ligament reconstruction surgery. Anesth Analg. 2007;105:222-7

20. Reuben SS, Ekman EF. The effect of initiating a preventive multimodal analgesic regimen on long-term patient outcomes for outpatient anterior cruciate ligament reconstruction surgery. Anesth Analg. 2007;105:228-32

21. Reuben SS, Buvenandran A, Katz B, Kroin JS. A prospective randomized trial on the role of perioperative celecoxib administration for total knee arthroplasty: improving clinical outcomes. Anesth Analg. 2008;106:1258-64

Most if not all of these manuscripts will be retracted by the journals in which they are published. However, our responsibility to our readership, and the patients we care for, requires immediate notification of the findings of the Baystate Medical Center to our readership. The formal retraction notice appears in the May issue of Anesthesia & Analgesia. The May issue includes two editorials addressing the implications of these retractions on our understanding of perioperative analgesia.

3

We appreciate the absolute dedication to academic integrity demonstrated by Baystate Medical Center in conducting this investigation, and sharing with the Journal their findings of data fabrication.

Sincerely,

Steven L. Shafer, MD
Editor-in-Chief
Anesthesia & Analgesia

CVS PHARMACY
PATIENT PRESCRIPTION RECORD
BETWEEN 04/01/2000 AND 12/03/2006
PHARMACY # 1021

PAGE: 1
RUN DATE: 12/03/2006 TIME 12:33:25
REQUEST NBR: 1824864

PHARMACY NAME: CVS PHARMACY #1021
ADDRESS: RTE 134, PATRIOT SQUARE S/C
CITY, ST, ZIP: SOUTH DENNIS MA 02660

PATIENT KEY: 1021511571
PATIENT NAME: HARRISON DENNIS
ADDRESS: 114 GAGES WAY
CITY, ST, ZIP: SOUTH DENNIS MA 02660

TELEPHONE: 508-394-3181
BIRTHDATE: 11/19/1952

ALLERGIES: None communicated by the patient.
CONDITIONS: None communicated by the patient.

| RX NUMBER | REL | NDC NUMBER | DRUG DESCRIPTION | PRESCRIBER NAME | DATE FILLED | RPH INT | COUNT DISP | TOTAL PRICE | PATIENT PD AMT | PAYER PD AMT | PAYER PD AMT | TP AUTHORIZATION # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 500026 | 2 | 00762724002 | IBUPROFEN 800MG TABLET GRE | HELLER, MATTHEW D | 06/12/2000 | JX | 120 | 26.39 | 8.00 | 4000 | 20.39 | |
| 500026 | 3 | 00762724002 | IBUPROFEN 800MG TABLET GRE | HELLER, MATTHEW D | 08/15/2000 | JX | 120 | 18.99 | 8.00 | 4000 | 13.59 | |
| 517251 | 1 | 53489044751 | SULFASALAZINE 500MG TABLET | RAE, HARRY | 04/06/2000 | JX | 160 | 17.30 | 5.00 | 4000 | 15.30 | |
| 570186 | 2 | 00093053061 | CLONAZEPAM 1MG TABLET TEV | RAE, HARRY G | 04/06/2000 | JX | 60 | 13.20 | 5.00 | 4000 | 8.20 | |
| 641532 | 2 | 00054486101 | PREDNISONE 10MG TABLET SRN | RAE, HARRY | 04/02/2000 | JX | 33 | 4.37 | 4.37 | 4000 | 0.00 | |
| 641566 | 1 | 00093310605 | AMOXICILLIN 500MG CAPSULE TEV | MCCARTHY, JOSEPH C | 08/21/2000 | JD | 4 | 3.82 | 3.82 | 4000 | 0.00 | |
| 641566 | 2 | 00093310605 | AMOXICILLIN 500MG CAPSULE TEV | MCCARTHY, JOSEPH C | 08/22/2000 | JD | 4 | 3.02 | 3.02 | 4000 | 0.00 | |
| 641566 | 3 | 00093310605 | AMOXICILLIN 500MG CAPSULE TEV | MCCARTHY, JOSEPH C | 08/16/2000 | RA | 4 | 3.03 | 3.03 | 4000 | 0.00 | |
| 641566 | 4 | 00093310605 | AMOXICILLIN 500MG CAPSULE TEV | MCCARTHY, JOSEPH C | 10/22/2005 | DB | 4 | 3.11 | 3.11 | 4000 | 0.00 | |
| 643461 | 1 | 00781228560 | RANITIDINE 150MG CAPSULE GEN | RAE, HARRY G | 04/09/2000 | JX | 60 | 38.96 | 5.00 | 4000 | 33.88 | |
| 643461 | 2 | 00781228560 | RANITIDINE 150MG CAPSULE GEN | RAE, HARRY G | 05/26/2000 | JC | 60 | 38.91 | 5.00 | 4000 | 33.91 | |
| 643458 | 1 | 00093010625 | PRINIVIL 10MG TABLET MSD | RAE, HARRY G | 05/08/2000 | JJ | 30 | 26.48 | 10.00 | 4000 | 16.48 | |
| 643458 | 2 | 00093010026 | PRINIVIL 10MG TABLET MSD | RAE, HARRY G | 06/12/2000 | JX | 30 | 26.49 | 10.00 | 4000 | 16.49 | |
| 643458 | 3 | 00093010026 | PRINIVIL 10MG TABLET MSD | RAE, HARRY G | 07/20/2000 | JX | 30 | 27.48 | 10.00 | 4000 | 17.48 | |
| 643458 | 4 | 00093010026 | PRINIVIL 10MG TABLET MSD | RAE, HARRY G | 08/12/2000 | JX | 30 | 27.48 | 10.00 | 4000 | 17.48 | |
| 643458 | 5 | 00093010028 | PRINIVIL 10MG TABLET MSD | RAE, HARRY G | 10/30/2000 | DB | 30 | 27.46 | 10.00 | 4000 | 17.46 | |
| 643458 | 6 | 00093010626 | PRINIVIL 10MG TABLET MSD | RAE, HARRY G | 11/21/2000 | DB | 30 | 27.46 | 10.00 | 4000 | 17.46 | |
| 646289 | 1 | 00185038301 | ACETAMINOPHEN/COD #4 TABLET | TEVRAE, HARRY G | 04/27/2000 | JL | 50 | 19.26 | 5.00 | 4000 | 14.26 | |
| 648714 | 1 | 00006014403 | VIOXX 50MG TABLET MSD | MCCARTHY, JOSEPH C | 04/27/2000 | JX | 34 | 112.33 | 10.00 | 4000 | 102.33 | |
| 648714 | 2 | 00006014403 | VIOXX 50MG TABLET MSD | MCCARTHY, JOSEPH C | 05/26/2000 | JX | 34 | 112.33 | 10.00 | 4000 | 102.33 | |
| 648714 | 3 | 00006014403 | VIOXX 50MG TABLET MSD | MCCARTHY, JOSEPH C | 06/23/2000 | JC | 34 | 112.33 | 10.00 | 4000 | 102.33 | |
| 648714 | 4 | 00006011403 | VIOXX 50MG TABLET MSD | MCCARTHY, JOSEPH C | 08/08/2000 | JX | 34 | 112.33 | 10.00 | 4000 | 102.33 | |
| 648714 | 5 | 00006011403 | VIOXX 50MG TABLET MSD | MCCARTHY, JOSEPH C | 09/05/2000 | RA | 34 | 112.35 | 10.00 | 4000 | 102.35 | |
| 648714 | 6 | 00006013408 | VIOXX 50MG TABLET MSD | MCCARTHY, JOSEPH C | 10/03/2000 | SA | 34 | 112.35 | 10.00 | 4000 | 102.35 | |
| 648714 | 7 | 00006011408 | VIOXX 50MG TABLET MSD | MCCARTHY, JOSEPH C | 14/08/2000 | JX | 34 | 113.32 | 10.00 | 4000 | 103.32 | |
| 652078 | 0 | 00181176201 | IMIPRAMINE HCL 10MG TABLET GEN | SERACCHI, FRANK | 04/19/2000 | MF | 90 | 12.73 | 5.00 | 4000 | 5.73 | |
| 656056 | 1 | 00006035631 | FOSAMAX 10MG TABLET MSD | RAE, HARRY | 04/25/2000 | JL | 30 | 53.56 | 10.00 | 4000 | 43.56 | |
| 656056 | 2 | 00006035631 | FOSAMAX 10MG TABLET MSD | RAE, HARRY | 06/12/2000 | JX | 30 | 53.58 | 10.00 | 4000 | 43.58 | |
| 656056 | 3 | 00006035831 | FOSAMAX 10MG TABLET MSD | RAE, HARRY | 08/15/2000 | RA | 30 | 57.68 | 10.00 | 4000 | 47.68 | |
| 656056 | 4 | 00006035631 | FOSAMAX 10MG TABLET MSD | RAE, HARRY | 10/30/2000 | DB | 30 | 60.21 | 10.00 | 4000 | 50.21 | |
| 656056 | 5 | 00006035631 | FOSAMAX 10MG TABLET MSD | RAE, HARRY | 11/21/2000 | DB | 30 | 60.21 | 10.00 | 4000 | 50.21 | |
| 656040 | 1 | 53470028218 | GINETIDINE 400MG TABLET SRS | RAE, HARRY | 04/25/2000 | JX | 60 | 17.15 | 5.00 | 4000 | 12.15 | |
| 656040 | 2 | 53470028218 | GINETIDINE 400MG TABLET SRS | RAE, HARRY | 04/25/2000 | JX | 60 | 17.15 | 5.00 | 4000 | 12.15 | |
| 656041 | 1 | 00093820401 | LOTRISONE CREAM SCH | RAE, HARRY | 04/25/2000 | JX | 15 | 23.44 | 10.00 | 4000 | 13.44 | |
| 656041 | 2 | 00093820401 | LOTRISONE CREAM SCH | RAE, HARRY | 07/22/2000 | JX | 15 | 23.44 | 10.00 | 4000 | 13.44 | |
| 656041 | 3 | 00093820401 | LOTRISONE CREAM SCH | RAE, HARRY | 09/15/2000 | RA | 15 | 23.44 | 10.00 | 4000 | 13.44 | |
| 656041 | 4 | 00093820401 | LOTRISONE CREAM SCH | RAE, HARRY | 11/21/2000 | DG | 15 | 24.49 | 10.00 | 4000 | 14.49 | |

00006
00006

HarrisonD—H&nMedInfo—
HarrisonD—H&nMedInfo—


EXHIBIT
E

CVS PHARMACY
PATIENT PRESCRIPTION RECORD
BETWEEN 04/05/2000 AND 12/03/2006
PHARMACY #  1021

PAGE:  2
RUN DATE: 12/03/2006  TIME: 12:53:29
REQUEST NBR:  1024884

PHARMACY NAME: CVS PHARMACY #1021
ADDRESS:       RTE 134, PATRIOT SQUARE S/C
CITY, ST, ZIP:  SOUTH DENNIS  MA 02660

PATIENT KEY:   1021031571
PATIENT NAME:  HARRISON DENNIS
ADDRESS:       516 GAGES WAY
CITY, ST, ZIP:  SOUTH DENNIS  MA 02660

TELEPHONE:  508-394-8191
BIRTHDATE:  11/19/1932

| RX NUMBER | REL | NDC NUMBER | DRUG DESCRIPTION | PRESCRIBER NAME | DATE FILLED | NEW INT | QUANT DISP. | TOTAL PRICE | PATIENT PD AMT | PAYER # | PAYER PD AMT | TP AUTHORIZATION # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 666041 | 4 | 00093829401 | LOTRISONE CREAM 3GM | RAE, HARRY | 01/24/2001 AC | | 15 | 24.46 | 16.00 | 4000 | 9.49 | |
| 653917 | 0 | 00781178201 | IMIPRAMINE HCL 10MG TABLET GEN | ERVIN, SHARON | 04/08/2003 JJ | | 90 | 27.79 | 27.39 | 1 | 0.00 | |
| 653751 | 1 | 00781178201 | IMIPRAMINE HCL 10MG TABLET GEN | ERVIN, SHARON | 05/12/2003 JX | | 90 | 13.64 | 5.00 | 4000 | 8.68 | |
| 653717 | 2 | 00781178201 | IMIPRAMINE HCL 10MG TABLET GEN | ERVIN, SHARON | 07/09/2003 JX | | 90 | 13.64 | 5.00 | 4000 | 8.68 | |
| 657512 | 0 | 00904046101 | PREDNISONE 10MG TABLET SHN | ERVIN, SHARON | 08/16/2003 JJ | | 33 | 7.89 | 7.89 | 1 | 0.00 | |
| 657520 | 0 | 00182063399 | CLONAZEPAM 1MG TABLET TEV | ERVIN, SHARON | 05/25/2003 JJ | | 60 | 13.15 | 5.00 | 4000 | 8.15 | |
| 651975 | 0 | 00364046101 | PREDNISONE 10MG TABLET SHN | RAE, HARRY | 05/25/2002 JC | | 30 | 4.27 | 4.27 | 4000 | 0.00 | |
| 651975 | 1 | 00364046101 | PREDNISONE 10MG TABLET SHN | RAE, HARRY | 06/02/2002 JC | | 30 | 4.27 | 4.27 | 4000 | 0.00 | |
| 651975 | 2 | 00364046101 | PREDNISONE 10MG TABLET SHN | RAE, HARRY | 07/30/2002 JJ | | 30 | 4.27 | 4.27 | 4000 | 0.00 | |
| 651976 | 3 | 00364046101 | PREDNISONE 10MG TABLET SHN | RAE, HARRY | 09/25/2002 DB | | 30 | 4.27 | 4.27 | 4000 | 0.00 | |
| 651976 | 0 | 00093025001 | ACETAMINOPHEN/COD #4 TABLET | EVRAE, HARRY | 09/25/2002 JC | | 60 | 19.79 | 5.00 | 4000 | 14.75 | |
| 651976 | 1 | 00093030001 | ACETAMINOPHEN/COD #4 TABLET | EVRAE, HARRY | 09/25/2002 JC | | 60 | 19.79 | 5.00 | 4000 | 14.75 | |
| 651976 | 2 | 00093030001 | ACETAMINOPHEN/COD #4 TABLET | EVRAE, HARRY | 07/02/2002 JX | | 90 | 15.94 | 5.00 | 4000 | 14.34 | |
| 656384 | 0 | 00182063301 | CLONAZEPAM 1MG TABLET TEV | RHODES, WILLIAM A | 07/21/2002 DB | | 30 | 7.83 | 5.05 | 4000 | 2.83 | |
| 677182 | 0 | 00002114400 | AMG 100MG PULVULE LIL | SMAYDA, RICHARD | 07/27/2000 AC | | 60 | 102.93 | 10.00 | 4000 | 92.93 | |
| 676001 | 0 | 00093082301 | CLONAZEPAM 1MG TABLET TEV | RAE, HARRY G | 05/04/2000 DB | | 90 | 13.85 | 3.69 | 4000 | 8.26 | |
| 673001 | 1 | 00093062301 | CLONAZEPAM 1MG TABLET TEV | RAE, HARRY G | 05/15/2000 RA | | 60 | 13.44 | 5.00 | 4000 | 8.44 | |
| 673001 | 3 | 00093067301 | CLONAZEPAM 1MG TABLET TEV | RAE, HARRY | 10/26/2000 DB | | 60 | 14.01 | 5.00 | 4000 | 9.01 | |
| 664217 | 0 | 00781178201 | IMIPRAMINE HCL 10MG TABLET GEN | SMAYDA, RICHARD | 06/22/2000 DB | | 90 | 13.15 | 5.00 | 4000 | 8.15 | |
| 664217 | 1 | 00781178201 | IMIPRAMINE HCL 10MG TABLET GEN | SMAYDA, RICHARD | 06/07/2000 JX | | 90 | 13.75 | 5.00 | 4000 | 8.75 | |
| 664218 | 1 | 00093030001 | ACETAMINOPHEN/COD #4 TABLET | EVSMAYDA, RICHARD | 03/22/2000 DB | | 90 | 19.94 | 5.00 | 4000 | 14.94 | |
| 664208 | 0 | 00093030001 | ACETAMINOPHEN/COD #4 TABLET | EVSMAYDA, RICHARD | 03/25/2000 DB | | 90 | 20.19 | 5.00 | 4000 | 15.19 | |
| 660924 | 0 | 00002314400 | AMG 100MG PULVULE LIL | SMAYDA, RICHARD | 05/29/2001 JX | | 60 | 100.83 | 19.25 | 4000 | 92.58 | |
| 660924 | 1 | 00002314400 | AMG 100MG PULVULE LIL | SMAYDA, RICHARD | 10/05/2000 JX | | 60 | 100.83 | 10.00 | 4000 | 92.83 | |
| 660924 | 2 | 00002314400 | AMG 100MG PULVULE LIL | SMAYDA, RICHARD | 11/03/2000 JX | | 60 | 110.89 | 15.00 | 4000 | 109.89 | |
| 660924 | 3 | 00002314400 | AMG 100MG PULVULE LIL | SMAYDA, RICHARD | 12/05/2000 JX | | 60 | 110.89 | 10.00 | 4000 | 99.89 | |
| 660924 | 4 | 00002314400 | AMG 100MG PULVULE LIL | SMAYDA, RICHARD | 02/25/2001 DB | | 60 | 110.89 | 15.00 | 4000 | 95.89 | |
| 660924 | 5 | 00002314400 | AMG 100MG PULVULE LIL | SMAYDA, RICHARD | 03/22/2001 DB | | 60 | 110.89 | 15.00 | 4000 | 95.89 | |
| 660924 | 6 | 00002314400 | AMG 100MG PULVULE LIL | SMAYDA, RICHARD | 02/23/2001 WB | | 60 | 110.89 | 15.00 | 4000 | 95.89 | |
| 660924 | 7 | 00002314400 | AMG 100MG PULVULE LIL | SMAYDA, RICHARD | 04/24/2001 BL | | 60 | 118.41 | 15.00 | 4000 | 103.41 | |
| 660924 | 8 | 00002314400 | AMG 100MG PULVULE LIL | SMAYDA, RICHARD | 05/18/2001 BL | | 60 | 118.41 | 15.00 | 4000 | 103.41 | |
| 691967 | 0 | 00904046101 | PREDNISONE 10MG TABLET SHN | RAE, HARRY G | 06/06/2000 DB | | 30 | 4.27 | 4.27 | 4000 | 0.00 | |
| 691967 | 1 | 00904046101 | PREDNISONE 10MG TABLET SHN | RAE, HARRY G | 10/25/2000 DB | | 30 | 3.35 | 3.39 | 4000 | 0.00 | |
| 691967 | 2 | 00904046901 | PREDNISONE 10MG TABLET SHN | RAE, HARRY G | 11/21/2000 DB | | 30 | 3.39 | 3.39 | 4000 | 0.00 | |
| 691967 | 3 | 00904046101 | PREDNISONE 10MG TABLET SHN | RAE, HARRY G | 12/18/2000 JC | | 30 | 4.36 | 4.36 | 4000 | 0.00 | |
| 691967 | 4 | 00904046101 | PREDNISONE 10MG TABLET SHN | RAE, HARRY G | 01/23/2001 DB | | 30 | 4.27 | 4.27 | 4000 | 0.00 | |
| 691967 | 5 | 00904046101 | PREDNISONE 10MG TABLET SHN | RAE, HARRY G | 02/22/2001 DB | | 30 | 4.27 | 4.27 | 4000 | 0.00 | |
| 692330 | 0 | 00781178201 | IMIPRAMINE HCL 10MG TABLET GEN | SMAYDA, RICHARD | 12/20/2000 DB | | 90 | 13.75 | 5.00 | 4000 | 8.75 | |
| 697330 | 1 | 00781178201 | IMIPRAMINE HCL 10MG TABLET GEN | SMAYDA, RICHARD | 11/21/2000 DB | | 90 | 13.75 | 5.00 | 4000 | 8.75 | |
| 698030 | 0 | 00093025001 | ACETAMINOPHEN/COD #4 TABLET | EVRAE, HARRY S | 10/24/2000 DB | | 90 | 20.87 | 5.00 | 4000 | 15.87 | |

HarrisonD-WindedInfo-
HarrisonD-WindedInfo-

CVS PHARMACY
PATIENT PRESCRIPTION RECORD
BETWEEN 04/01/2000 AND 12/03/2008
PHARMACY # K021

PAGE: 3
RUN DATE: 12/03/2008   TIME: 12:53:29
REQUEST NBR:   H24854

PHARMACY NAME: CVS PHARMACY #1021
ADDRESS: STE 154, PATRIOT SQUARE S/C
CITY, ST, ZIP: SOUTH DENNIS  MA 02660

PATIENT NAME: HARRISON DENNIS
ADDRESS: 194 GAGES WAY
CITY, ST, ZIP: SOUTH DENNIS  MA 02660

TELEPHONE: 508-394-5161
BIRTHDATE: 11/19/1952

| RX NUMBER | REL | NDC NUMBER | DRUG DESCRIPTION | PRESCRIBER NAME | DATE FILLED | RPH INT | QUANT DISP | TOTAL PRICE | PATIENT PD AMT | DAYS SUP | PAYER PD AMT | TP AUTHORIZATION # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

Harrison-WinMedInfo-
Harrison-WinMedInfo-

00008
00008

CVS PHARMACY
PATIENT PRESCRIPTION RECORD
BETWEEN 04/01/2000 AND 12/03/2003
PHARMACY # 1021

PAGE:    4
RUN DATE: 12/03/2003  TIME: 12:33:29
REQUEST NBR    1824864

PHARMACY NAME: CVS PHARMACY #1021
ADDRESS:        RTE 134, PATRIOT SQUARE S/C
CITY, ST, ZIP:   SOUTH DENNIS  MA 02660

PATIENT KEY:    1021511571
PATIENT NAME:   HARRISON DENNIS
ADDRESS         114 SAGES WAY
CITY, ST, ZIP:   SOUTH DENNIS MA 02660

TELEPHONE:  508-394-8161
BIRTHDATE:  11/19/1952

| RX NUMBER | REL | NDC NUMBER | DRUG DESCRIPTION | PRESCRIBER NAME | DATE FILLED | RPH INIT | QUANT DISP | TOTAL PRICE | PATIENT PD AMT | PAYER # | PAYER PD AMT | TP AUTHORIZATION # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 729259 | 0 | 00006010931 | PRINIVIL 10MG TABLET MSD | RAE, HARRY G | 03/23/2001 | WB | 30 | 27.46 | 15.00 | 4000 | 12.46 | |
| 729259 | 1 | 00006010931 | PRINIVIL 10MG TABLET MSD | RAE, HARRY G | 04/21/2001 | BL | 30 | 27.46 | 15.00 | 4000 | 12.46 | |
| 729259 | 2 | 00006010931 | PRINIVIL 10MG TABLET MSD | RAE, HARRY G | 08/19/2001 | AK | 30 | 28.71 | 15.00 | 4000 | 13.71 | |
| 729251 | 0 | 00364046101 | PREDNISONE 10MG TABLET SHN | RAE, HARRY G | 03/23/2001 | WB | 30 | 4.33 | 4.27 | 4000 | 0.06 | |
| 729251 | 1 | 00364046101 | PREDNISONE 10MG TABLET SHN | RAE, HARRY G | 04/21/2001 | BL | 30 | 4.27 | 4.27 | 4000 | 0.00 | |
| 729251 | 2 | 00364046101 | PREDNISONE 10MG TABLET SHN | RAE, HARRY G | 08/19/2001 | BL | 30 | 4.27 | 4.27 | 4000 | 0.00 | |
| 731672 | 0 | 59011010510 | OXYCONTIN 40MG TABLET SA PUR | RAE, HARRY G | 04/04/2001 | CO | 60 | 224.76 | 15.00 | 4000 | 209.75 | |
| 735238 | 0 | 59930150003 | CLOTRIMAZOLE 1% CREAM WAR | RAE, HARRY G | 04/25/2001 | LB | 45 | 12.74 | 6.00 | 4000 | 6.74 | |
| 735236 | 1 | 59930150003 | CLOTRIMAZOLE 1% CREAM WAR | RAE, HARRY G | 06/07/2001 | JG | 30 | 9.17 | 6.00 | 4000 | 3.17 | |
| 735237 | 0 | 00093294701 | CEPHALEXIN 500MG CAPSULE TEV | RAE, HARRY G | 04/25/2001 | LB | 46 | 14.84 | 6.00 | 4000 | 8.84 | |
| 738311 | 0 | 00006011066 | VIOXX 25MG TABLET MSD | RAE, HARRY G | 05/04/2001 | BL | 60 | 140.51 | 15.00 | 4000 | 125.51 | |
| 738311 | 1 | 00006011066 | VIOXX 25MG TABLET MSD | RAE, HARRY G | 06/07/2001 | JG | 60 | 140.81 | 15.00 | 4000 | 125.81 | |
| 738500 | 0 | 00083634301 | CLONAZEPAM 1MG TABLET TEV | RAE, HARRY G | 05/05/2001 | AC | 60 | 11.69 | 6.00 | 4000 | 5.69 | |
| 741813 | 0 | 00093039801 | ACETAMINOPHEN/COD #4 TABLET TEV | WOODS, JAMES M | 05/21/2001 | DS | 30 | 10.91 | 6.00 | 4000 | 4.91 | |
| 743648 | 0 | 59011010510 | OXYCONTIN 40MG TABLET SA PUR | RAE, HARRY G | 05/29/2001 | DS | 34 | 129.23 | 15.00 | 4000 | 113.23 | |
| 743648 | 0 | 00093039801 | ACETAMINOPHEN/COD #4 TABLET TEV | RAE, HARRY G | 05/29/2001 | BL | 60 | 19.32 | 6.00 | 4000 | 13.32 | |
| 745879 | 0 | 00083638301 | CLONAZEPAM 1MG TABLET TEV | RAE, HARRY G | 06/08/2001 | MR | 60 | 11.69 | 6.00 | 4000 | 5.69 | |
| 745690 | 0 | 00364046101 | PREDNISONE 10MG TABLET SHN | RAE, HARRY G | 06/08/2001 | LB | 30 | 9.93 | 9.93 | 1 | 0.00 | |
| 747377 | 0 | 59011010510 | OXYCONTIN 40MG TABLET SA PUR | RAE, HARRY G | 06/14/2001 | BL | 60 | 236.13 | 15.00 | 4000 | 221.13 | |
| 747378 | 0 | 00082214140 | AXID 150MG PULVULE LIL | RAE, HARRY G | 06/14/2001 | BL | 60 | 118.41 | 15.00 | 4000 | 103.41 | |
| 747395 | 0 | 00093039801 | ACETAMINOPHEN/COD #4 TABLET TEV | RAE, HARRY G | 06/16/2001 | WZ | 60 | 20.61 | 6.00 | 4000 | 14.61 | |

HarrisonD-WinMedInfo-
HarrisonD-WinMedInfo-
00009

CVS PHARMACY
PATIENT PRESCRIPTION RECORD
BETWEEN 04/01/2000 AND 12/03/2005
PHARMACY # 1021

PAGE:        5
RUN DATE: 12/03/2006 TIME: 12:03:29
REQUEST NBR:      1624464

PHARMACY NAME:   CVS PHARMACY #1021
ADDRESS:         RTE 134, PATRIOT SQUARE S/C
CITY, ST, ZIP:   SOUTH DENNIS   MA 02660

PATIENT KEY:     1021511571
PATIENT NAME:    HARRISON DENNIS
ADDRESS:         114 GAGES WAY
CITY, ST, ZIP:   SOUTH DENNIS   MA 02660

TELEPHONE:   508-394-8181
BIRTHDATE:   10/18/1952

SCRIPT COUNT:    139        TOTAL AMOUNT:   6362.12        TOTAL PATIENT PAID:  1178.13        TOTAL AGENCY PAID:    5205.99

HarrisonD-MinMedInfo-
HarrisonD-MinMedInfo-

00010
00010

CVS PHARMACY
PATIENT PRESCRIPTION RECORD
BETWEEN 04/07/2000 AND 12/03/2008
PHARMACY # 3102

PAGE:     1
RUN DATE 12/03/2008   TIME 12:33:33
REQUEST NBR:      1834884

PHARMACY NAME: CVS PHARMACY #3102
ADDRESS:          68 MILL HILL RD,
CITY, ST, ZIP:     WOODSTOCK   NY 12408

PATIENT KEY:      3102230001
PATIENT NAME:     HARRISON DENNIS
ADDRESS           313 STATION RD
CITY, ST, ZIP:     HURLEY NY 12443

TELEPHONE:   845-331-3072
BIRTHDATE:    11/15/1952

ALLERGIES:        None communicated by the patient.
CONDITIONS:       None communicated by the patient.

| RX NUMBER | REL | NDC NUMBER | DRUG DESCRIPTION | PRESCRIBER NAME | DATE FILLED | RPH INT | QUANT DISP | TOTAL PRICE | PATIENT PD AMT | PAYER # | PAYER PD AMT | TP AUTHORIZATION # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 172603 | 0 | 68774016301 | OXYCODONE HCL ER 42 MG TABL DAVDONOVAN, PAUL B | | 02/21/2007 | FL | 90 | 247.02 | 10.00 | 4000 | 232.02 | 0087JHK |
| 173030 | 0 | 00603354601 | ACETAMINOPHEN/COD #4 TABLETTEVDONOVAN, PAUL B | | 02/22/2007 | FL | 250 | 77.13 | 10.00 | 4000 | 67.13 | 00UKKA3 |
| 176122 | 0 | 00093053001 | ACETAMINOPHEN/COD #4 TABLETTEVDONOVAN, PAUL B | | 03/21/2007 | FL | 210 | 77.73 | 10.00 | 4000 | 67.73 | RTUCDOL |
| 176123 | 0 | 68774016301 | OXYCODONE HCL ER 40 MG TABL DAVDONOVAN, PAUL B | | 03/21/2007 | FL | 90 | 382.76 | 10.00 | 4000 | 372.76 | PAUK3EX |

HarrisonD-WinMedInfo-
HarrisonD-WinMedInfo-

00011
00011

CVS PHARMACY
PATIENT PRESCRIPTION RECORD
BETWEEN 04/01/2008 AND 12/03/2008
PHARMACY # : 3102

PAGE:     2
RUN DATE: 12/03/2008  TIME: 12:33:29
REQUEST NBR:     1624664

PHARMACY NAME:   CVS PHARMACY #3102
ADDRESS:         69 MILL HILL RD.
CITY, ST, ZIP:   WOODSTOCK   NY  12468

PATIENT KEY:     3102230601
PATIENT NAME:    HARRISON DENNIS
ADDRESS          313 STATION RD
CITY, ST, ZIP:   HURLEY NY  12443

TELEPHONE:   845-331-3272
BIRTHDATE:   11/09/1952

SCRIPT COUNT:    4        TOTAL AMOUNT:    778.84        TOTAL PATIENT PAID:    40.00        TOTAL AGENCY PAID:    738.84

HarrisonD-WLrMedInfo-    00012
HarrisonD-WinMedInfo-    00012

CVS PHARMACY
PATIENT PRESCRIPTION RECORD
BETWEEN 6/01/2008 AND 12/03/2008
PHARMACY # 328

PAGE:      1
RUN DATE: 12/03/2008  TIME: 12:33:25
REQUEST NBR:      1424984

PHARMACY NAME:   CVS/pharmacy #00023
ADDRESS:         1 GRAND UNION PLAZA
CITY, ST, ZIP:   SAUGERTIES   NY  12477

PATIENT KEY:     323395961
PATIENT NAME:    HARRISON DENNIS
ADDRESS:         64 SHORT STREET
CITY, ST, ZIP:   CATSKILL  NY  12414

TELEPHONE:    845-235-3072
BIRTHDATE:    11/18/1952

ALLERGIES:       None communicated by the patient.
CONDITIONS:      None communicated by the patient.

| RX NUMBER | REL | NDC NUMBER | DRUG DESCRIPTION | PRESCRIBER NAME | DATE FILLED | RPH INT | QUANT DISP | TOTAL PRICE | PATIENT PD AMT | PLAN'S $ | SAVED DOLLARS | TP AUTHORIZATION # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 504983 | 0 | 00093093001 | ACETAMNOPHEN-COD #4 TABLET | TREVDONOVAN, PAUL III | 03/14/2008 | DT | 250 | 77.13 | 10.00 | 4.00 | 57.13 | 7PPHWQ1 |

HarrisonD-WinMedInfo-
HarrisonD-WinMedInfo-

00013
00013

CVS PHARMACY
PATIENT PRESCRIPTION RECORD
BETWEEN 04/01/2000 AND 12/03/2005
PHARMACY # 323

PAGE:        1
RUN DATE:12/03/2005  TIME:12:33:29
REQUEST NBR:        1474694

PHARMACY NAME:   CVS/pharmacy #02353
ADDRESS:         1 GRAND UNION PLAZA
CITY, ST, ZIP:   SAUGERTIES    NY  12477

PATIENT KEY:     323296581
PATIENT NAME:    HARRISON DENNIE
ADDRESS:         6A SHORT STREET
CITY, ST, ZIP:   CATSKILL NY 12414

TELEPHONE:   845-251-3372
BIRTHDATE:   10/15/1962

SCRIPT COUNT:   1        TOTAL AMOUNT:   77.13        TOTAL PATIENT PAID:   10.00        TOTAL AGENCY PAID:   67.13

CVS PHARMACY
PATIENT PRESCRIPTION RECORD
BETWEEN 04/01/2000 AND 12/03/2008
PHARMACY # 428

PAGE:     1
RUN DATE: 12/03/2008  TIME: 12:32:29
REQUEST NBR:     1624904

PHARMACY NAME: CVS/pharmacy #00428
ADDRESS:        1391 ULSTER AVE.
CITY, ST, ZIP:   KINGSTON      NY  12401

PATIENT KEY:    42983893
PATIENT NAME:   HARRISON DENNIS
ADDRESS:        313 STATION ROAD
CITY, ST, ZIP:   HURLEY  NY  12443

TELEPHONE:  845-931-0272
BIRTHDATE:   11/18/1952

ALLERGIES:
99

CONDITIONS:        None confirmed/told by the patient.

Notified:  03/21/2007        Deactivated:

| RX NUMBER | REL. | NDC NUMBER | DRUG DESCRIPTION | PRESCRIBER NAME | DATE FILLED | RPH FILL | QUANT DISP | TOTAL PRICE | PATIENT PD AMT | PAYER # | PAYER PD AMT | TP AUTHORIZATION # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 217438 | 0 | 00093015001 | ACETAMINOPHEN-COD #4 TABLET | DONOVAN, PAUL B | 04/07/2003 | SR | 289 | 77.13 | 10.00 | 22650 | 67.13 | NOR/PHM |

HarrisonD-RxMedInfo-
HarrisonD-RxMedInfo-

00015
00015

CVS PHARMACY
PATIENT PRESCRIPTION RECORD
BETWEEN 04/01/2000 AND 12/03/2005
PHARMACY # 428

PAGE:        3
RUN DATE: 12/03/2005 TIME: 12:53:29
REQUEST NBR:        1634664

PHARMACY NAME:   CVS/pharmacy #00428
ADDRESS:         5301 ULSTER AVE.
CITY, ST, ZIP:   KINGSTON        NY 12401

PATIENT KEY:     426092881
PATIENT NAME:    HARRISON DENISE
ADDRESS:         313 STATION ROAD
CITY, ST, ZIP:   HURLEY  NY 12443

TELEPHONE:   845-331-3272
BIRTHDATE:   11/18/1952

SCRIPT COUNT:    1        TOTAL AMOUNT:   77.13        TOTAL PATIENT PAID:   10.00        TOTAL AGENCY PAID:   67.13

HarrisonD-MinMedInfo-
HarrisonD-MinMedInfo-

00016
00016

MAR-25-02 12:14 PM   JAMES.M.IRILE                 000 225 8525        P.05

**HARRISON, DENNIS**                                               July 25, 2001

49-year-old white male who comes in for evaluation of ankylosing spondylitis.

**HPI:**   This 49-year-old white male tells me that he was first diagnosed with ankylosing spondylitis in his early 20's and it has been a very aggressive disease since onset. He had severe spine disease and actually had problems with subluxation of the upper spine into the occiput to the point that he needed a cervical fusion done in 1999. He has also had bilateral hip replacements done in 1995. He has ongoing problems with pain and swelling in his shoulders, his knees, and in his hands and right wrist. He tells me he has lost about 15 lbs. in the last six months. He has also had problems with iritis in the past although he is not aware of any trouble with cardiac or lung difficulties. He has also had problems with osteoporosis, anemia, and sleep apnea. Because of his spinal problem the question has been raised as to whether he might actually have in addition to the ankylosing spondylitis RA.

**ROS** is otherwise unremarkable.

**PMH:**   Surgeries:  Status post the cervical fusion and hip procedures as mentioned above. Lumbar fusion was also done in January of this year. Allergies:  Indocin causes problems. His current medications include Axid, Vioxx, Fosamax, Prinivil, Amoxicillin, Imipramine, Tylenol 4, Clonazepam, Oxycontin, and Prednisone. His only other medical problem has been hypertension.

**SOCIAL HISTORY:**   He is a non-smoker, non-drinker.

**FAMILY HISTORY:**   His brother has spondylitis. He has retired from AT&T and

**EXAM:**   On PE he is a frail appearing white male who looks much older than his chronological age who is in no distress. His BP was 120/70 in the right arm seated. Pulse was 90 per minute and regular. Skin revealed no significant rash. HEENT exam unremarkable. Lungs were clear to auscultation. Heart:  Regular rate and rhythm. There is a II over VI systolic murmur at the left sternal border, no diastolic murmur was noted. Abdomen not examined. The neurovascular exam was normal. Joint Exam:  He had no swelling or pain in the DIP joints. There is 2+ swelling and tenderness in the IP joint of the right thumb. The rest of the IP joints reveal no swelling or pain. There is 2+ swelling and tenderness in the right first MCP joint. The rest of the MCP joints reveal no swelling or pain. There is 3+ synovial thickening and 2+ tenderness in the right wrist. The right wrist reveals 60 degrees of flexion and 40 degrees of extension. Left wrist revealed 80 degrees of flexion and extension without pain. Elbows revealed full ROM without pain. The shoulders were markedly abnormal with only 50 degrees of abduction, 30 degrees of external rotation, 20 degrees of internal rotation. Hips revealed full ROM without pain. The knees revealed 20 degree flexion contractures with further flexion to 100 degrees. There is quite a bit of proliferative synovitis and effusions in the knees. The ankles, midfoot and MTP joints are non-tender. There was some fusiform swelling of the left second toe. His cervical and lumbar spine revealed no significant motion.

**IMPRESSION:**   1)   Ankylosing spondylitis.
                 2)   Peripheral joint arthropathy. The degree of synovitis is surprising here and certainly raises the possibility of rheumatoid disease as does his cervical spine subluxation into the foramen magnum which required decompressive surgery.
                 3)   Hypertension.
                 4)   Weight loss. I suspect this is probably secondary to his active arthropathy.

**PLAN:**   Screening lab studies are pending including HIV, hepatitis B and C serologies and thyroid profile. Provided these were negative or normal, we will start him on Methotrexate 10 mg. a week, folic acid 2 mg. a day. I refilled his Oxycontin 40 mg. tabs one q.12.h., #60, and Klonopin 100 tabs, 1 mg., two at bedtime. That one had 5 refills. Follow up with me will be in eight weeks.

                                          JMT/ssw

8/23/01 Tlc pt. reqref Oxycontin 40 mgp. ← 12h. #60 orig
                                                                    Jmer

EXHIBIT
F

HarrisonD-NHNeuroSpineInt-          00025

EXHIBIT G: Re: In Re Vioxx Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp.*, 2:07-cv-00905-EEF-DEK

## Surgical Neurology Professional Association

Ronald J. Faille, M.D.
Theodore E. Jacobs, M.D.
N. Ross Jenkins, M.D.
Jennifer C. Karnan, M.D.

Brian E. Snow, PA-C
David C. Meland, PA-C
Joseph T. Kearns, PA-C

*Main Office*

8 Prospect Street
North Tree Specialty Suite
Nashua, NH 03060
(603) 882-1390
fax (603) 882-6925

4 Elliot Way, Suite 305
Manchester, NH 03103
(603) 669-3838
fax (603) 626-0103

246 Pleasant Street
Memorial Bldg., 8-197
Concord, NH 03301
(603) 225-6674
fax (603) 225-3148

March 28, 2002

RE: Harrison, Dennis R.
DOB: 11/19/52

**Chief Complaint:** Neck and back pain

**History of Present Illness:** This is a very pleasant right-hand-dominant 49-year-old male patient seen in consultation at the request of his rheumatologist Dr. Trice. Patient describes history of back pain and neck pain over many years secondary to his ankylosing spondylitis. On February 10, 2002 he was a restrained rear-seat passenger in a vehicle hit to the right front and since that time has had return of some of his neck pain and stiffness and low back pain and stiffness which was relieved to a great degree through surgery approximately 5-6 years ago when he underwent a "total cervical fusion". He has also undergone a lumbar and lower thoracic fusion both secondary to his ankylosing spondylitis.

**Past Medical History** is also significant for rheumatoid arthritis, osteoporosis, bilateral total hip arthroplasties, chronic microcytic anemia.

**Review of Systems:** He complains of neck pain and stiffness. He denies any weakness, paresthesias or radiation of pain to his upper or lower extremities. He denies any changes in bowel or bladder control. He denies any Valsalva effect. He denies any headaches but does describe occasional lancinating pain along his left scalp and just superior to his left ear.

**Medications:** Include Procrit injection weekly, prednisone 20 mg. q.o.d., Vioxx 25 mg. b.i.d., Axid 150 mg. b.i.d., Fosamax 10 mg. q.d., Prinivil 10 mg. q.d., imipramine 10 mg. tablets 3 p.o. q.h.s., OxyContin 40 mg. b.i.d., clonazepam 2 mg. q.h.s.

**Allergies:** To Indocin (anaphylaxis).

**Family History:** Very pleasant 49-year-old gentleman who is on retirement disability, lives at home with his wife and plans on

EXHIBIT
G

Re: Harrison, Dennis R.                    March 28, 2002      2
DOB: 11/19/52

moving to New York in the next few months where he is originally
from. His surgeries have taken place at hospitals in New York and
New Jersey and New England Baptist.

Physical Exam: Vital signs are as follows: BP 120/85, pulse
80, respirations 16. This gentleman has a somewhat cachectic
appearance with severe kyphosis of the C-spine and upper T-spine
and flattening of the lumbar lordosis, severely limited C-spine
ROM. both rotation and flexion/extension. Cranial nerves II-XII
are intact. HEENT: No abnormalities are noted. There is a well-
healed posterior cervical scar approximately 15 cm. in length.
Upper extremities: Strength is 5/5 over the left upper extremity,
4+ to 5/5 on the right upper extremity. He complains of right
elbow and right wrist pain which is long-standing and unchanged.
Sensation is intact throughout. DTRs are 2+ with spread
throughout. Negative Hoffmann's. Lower extremity strength is 5/5
throughout. DTRs are 2-3+/4 at the knees, 2+/4 at the ankles;
negative clonus. Toes are downgoing to Babinski. Patient is able
to rise, stand on his toes and his heels. Examination of the
lumbar area is remarkable for approximately 35-40 cm. long lower
thoracic lumbar wound which is well-healed and once again
flattening of the lumbar lordosis. No other abnormalities are
noted. No SI joint discomfort is noted. Romberg is negative.
Finger-to-nose is intact. Lungs are clear to auscultation. Heart:
Regular rate and rhythm.

Assessment: Ankylosing spondylitis, chronic degenerative
changes.

Plan: Patient was evaluated by Dr. Faille who recommended
that it would be more appropriate for the patient to continue to
seek his care in a major medical center given his multiple chronic
medical issues and lack of focal extremity complaints at this time,
and the fact that his symptoms have been actually improving since
his MVA back in February. He is to call with any questions or
problems.


                                        Joseph T. Kearns, PA-C


                                        Ronald J. Faille, M.D.

JTK/mer
wp46675.001
cc: James Trice, M.D.



# Massive fraud revelations stun orthopaedics

By Annie Hayashi

### Fabricated data discredit prominent pain management researcher

Revelations about a well-known pain management researcher have hit orthopaedics, anesthesia, and other medical fields, resulting in more than 20 scientific articles being identified as containing fabricated data.

Scott S. Reuben, MD, was one of the most prolific investigators in the field of anesthesia and analgesia, particularly for orthopaedic perioperative and postoperative pain management. His work on multimodal analgesia appeared in numerous peer reviewed medical journals, and he was frequently invited to speak on the subject.

So when an investigation begun last year by Baystate Medical Center in Springfield, Mass., recently found that Dr. Reuben had fabricated part or all of the data used in 21 of his studies since 1996, the news surprised and shocked both the anesthesia and the orthopaedic communities.

Both *The Journal of Bone and Joint Surgery (JBJS)* and *Anesthesia &Analgesia*, which were among the journals that have published Dr. Reuben's studies, have posted retractions on their Web sites. Anesthesiologists and orthopaedists who had used Dr. Reuben's treatment protocols were left with many unanswered questions.

"It is mind-boggling," said Santhanam Suresh, MD, professor of anesthesiology and pediatrics, Children's Memorial Hospital, Northwestern University's Feinberg School of Medicine, and section co-editor for the Academy's *Orthopaedic Knowledge Online* management of pain in orthopaedics Web site.

"Those of us in the anesthesia community who deal with acute postoperative pain management have adopted some of Dr. Reuben's techniques because of his solid, Level I evidence. It appeared to prove that the addition of a COX-2 inhibitor with pregabalin or gabapentin might actually reduce the amount of postoperative pain," he said.

EXHIBIT
J

"It definitely sets our understanding of perioperative analgesic management back," said Steven L. Shafer, MD, editor-in-chief of *Anesthesia & Analgesia*, which has retracted 10 of Dr. Reuben's previously published studies.

"Dr. Reuben advanced certain concepts in multimodal analgesia throughout his career and some of that work has not been reproduced by other laboratories. That work must be considered impeached since we don't know what is true," he stated.

**Two abstracts trigger investigation**
The deception was uncovered last year when two abstracts submitted by Dr. Reuben for Baystate Medical Center's annual "Research Week" were found to lack "necessary institutional review board oversight," according to Hal B. Jenson, MD, MBA, Baystate's chief academic officer.

"This prompted Baystate to conduct an investigation of Dr. Reuben's past research, which eventually uncovered an extensive history of fabrication dating back to 1996," said Baystate spokesperson, Jane Albert, director of public affairs.

According to Baystate Medical Center's *Policies and Procedures for Misconduct in Research and Scholarly Activities*, fabrication is defined as "making up data or results and recording or reporting them."

Dr. Reuben practiced at Baystate but was employed by Springfield Anesthesia Services, Inc. As a part of this group, he served as Baystate's director of acute pain and conducted research at the facility supported, in part, with grants from Pfizer. He has been on medical leave from his positions since May 2008.

According to a statement released by Baystate, Dr. Reuben is "barred from research and educational activities at Baystate for at least 10 years."

Dr. Reuben participated in the investigation and, according to Dr. Jenson, offered his full cooperation although his "recall of his earlier work was limited."

When it was determined that some or all of the data had been fabricated in 21 of Dr. Reuben's studies, the "stakeholders were all identified and contacted," said Dr. Jenson.

"Although these circumstances may be viewed as a failure that occurred, there is also a positive outcome—the review process did work to identify the fabrication. That is important to remember," Dr. Jenson said.

**Red flags?**
For years, no one in either the anesthesia or orthopaedic communities suspected that Dr. Reuben was fabricating data.

"I went back and looked at the reviews of Dr. Reuben's papers and not once did the question of data fabrication come up," said Dr. Shafer.

"I actually created one of the graphs in one of his retracted papers myself. I didn't like the graph that he had created and I had a publication deadline. So I asked him to send me the spreadsheet and did the graph the way it needed to be done. There was no indication in the data that I was working with a fabricated spreadsheet," he explained.

According to *JBJS* editor **James D. Heckman, MD**, "We rely upon the honest reporting of the authors. Fortunately, virtually everyone we deal with is honest in trying to do the right thing to advance science. Most people are scrupulous, meticulous in their disclosure of any problems or any potential problems."

The fact that Dr. Reuben conducted prospective, randomized, controlled studies may have increased the medical community's confidence in his work.

"Dr. Reuben was using the gold standard. You expect someone coming from a reputable university setting to go through the rigors of a proper scientific presentation," Dr. Suresh said.

- In retrospect, however, several editors cited the following possible "red flags" that could have called the data into question:
- The results of Dr. Reuben's studies on adding COX-2 inhibitors along with pregabalin or gabapentin were always positive.
- Although some of Dr. Reuben's findings were corroborated by other investigators, many were not.
- Any new investigational drug trials must be registered at clinicaltrials.gov, a Web site sponsored by the National Institutes of Health. None of Dr. Reuben's studies were registered.

According to Dr. Suresh, "When clincal trials are registered, data are generally under greater scrutiny. Important information is required, including the IRB approvals that initially led to Dr. Reuben's investigation."

Dr. Suresh also indicated Dr. Reuben's research came at a time when the anesthesia community was looking for adjuvants to opioids for effective analgesia.

"I thought multimodal analgesia, particularly for orthopaedic surgery, was a revolutionary step forward in managing pain. That certainly may be questionable at this point," he said.



*"No one study—no matter how good it is or how profound it seems—should change the course of clinical care. You must have the data corroborated and have the experiment repeated by someone else."*
**—James D. Heckman, MD**



## Cleaning up the contamination

The journal editors acknowledge that the 21 studies identified by Baystate Medical Center as including fabricated data are just the tip of the iceberg. (See "Fraudulent data") According to Pub Med, Dr. Reuben has published 72 studies since 1991. The ISI Science Citation Index indicates that Dr. Reuben's work has been cited in 763 other journal articles—adding yet another layer of complexity to an already very complicated situation.

"A question mark hangs over all of his work. I think we owe it to our readers and to the scientific and medical community to try and make some sort of determination about his other work," said Dr. Shafer. "I am having discussions with other editors-in-chief about what we can do."

Though Dr. Shafer concedes that journal editors do not have the resources or legal authority to con-duct a complete investigation into all of Dr. Reuben's work, he would like to make some effort "to identify those papers where other authors might come forward" with data and source documents and "allow those papers to stay as part of the unimpeached medical literature."

He is also making changes at *Anesthesia & Analgesia* to help prevent this from occurring again. "We will now be requiring more than one author to vouch for both the integrity of the raw data and the data analysis," he said.

At *JBJS*, Dr. Heckman notified subscribers that one article that was identified by Baystate Medical Center as fraudulent was being retracted, as was a *Current Concepts Review* from 2007. The decision to retract the review article was based on the fact that there are "several places where statements of fact regarding perioperative pain management are only supported by Dr. Reuben's work," said Dr. Heckman.

In addition to "cleansing" his own journal, Dr. Heckman would like to look at the orthopaedic literature as a whole. "Perhaps we need a work group of orthopaedic editors to look at how pervasive Dr. Reuben's work is and how much it may have compromised the orthopaedic literature."

Both Drs. Shafer and Heckman agreed, however, that no number of safeguards will prevent someone who is intent on fabricating data from doing so.

## Moving forward

The use of multimodal analgesia for orthopaedic surgery may be beneficial in certain cases, according to Dr. Suresh. "But specific use of some of the drugs used in Dr. Reuben's studies lack scientific merit at the present time," he said.

He believes further "scrutiny of the use of these drugs is necessary and further prospective, randomized, controlled trials are required to justify the use of these drugs."

Dr. Heckman has a caution for his readers: caveat lector—let the reader beware. "No one study—no matter how good it is or how profound it seems—should change the course of clinical care. You must have the data corroborated and have the experiment repeated by someone else.

"Only when you have equivalent data from different, independent sources should you ever really make a substantial change in your practice," he said.

*Annie Hayashi is the senior science writer for* AAOS Now. *She can be reached at* hayashi@aaos.org

**Additional References:**
Letter from James D. Heckman, editor-in-chief, *The Journal of Bone and Joint Surgery*
http://www.ejbjs.org/misc/retraction_apr09_ltr.pdf

Article from *Anesthesiology News*, "Fraud Case Rocks Anesthesiology Community"

AAOS *Now*
April 2009 Issue
http://www.aaos.org/news/aaosnow/apr09/cover1.asp

6300 North River Road Rosemont, Illinois 60018-4262 Phone 847.823.7186 Fax 847.823.8125

© 1995-2013 by the American Academy of Orthopaedic Surgeons. "All Rights Reserved." This website and its contents may not be reproduced in whole or in part without written permission. "American Academy of Orthopaedic Surgeons" and its associated seal and "American Association of Orthopaedic Surgeons" and its logo are all registered U.S. trademarks and may not be used without written permission.

# AAOS  AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS
AMERICAN ASSOCIATION OF ORTHOPAEDIC SURGEONS

## Reuben guilty of fraud

Scott S. Reuben, MD, former chief of the acute pain service at Baystate Medical Center in Springfield, Mass., has been sentenced to 6 months in federal prison and 3 years of probation. He was also ordered to pay a $5,000 fine and $362,000 in restitution to the companies that provided his research grants.

Dr. Reuben had previously pled guilty to one charge of fraud in connection with falsifying and fabricating research studies involving the painkiller celecoxib. As reported in AAOS Now (April 2009), Dr. Reuben's research was frequently cited and his techniques adopted by many orthopaedic surgeons. The fraudulent research seemed to prove that the addition of a Cox-2 inhibitor with pregabalin or gaba-pentin reduced postoperative pain.

According to information filed with the court, in September 2005, Dr. Reuben entered into a $73,512 clinical research grant agreement with Pfizer to compare its celecoxib product to placebo in patients undergoing multimodal analgesia therapy. In studies published in the journal Anesthesia & Analgesia, Dr. Reuben claimed positive results, but in fact, no patients were enrolled and the study results were fabricated. At least 13 of his published studies have been retracted.

**Additional Information:**

Studies

Letter

Article from Anesthesiology News, "Fraud Case Rocks Anesthesiology Community"

AAOS Now
August 2010 Issue
http://www.aaos.org/news/aaosnow/aug10/research3.asp

-**PRIVACY POLICY**- Disclaimers & Agreement  Advertising & Sponsorship  Contact AAOS  Technical Requirements  Careers

6300 North River Road  Rosemont, Illinois 60018-4262  Phone 847.823.7186  Fax 847.823.8125

© 1995-2013 by the American Academy of Orthopaedic Surgeons. "All Rights Reserved." This website and its contents may not be reproduced in whole or in part without written permission. "American Academy of Orthopaedic Surgeons" and its associated seal and "American Association of Orthopaedic Surgeons" and its logo are all registered U.S. trademarks and may not be used without written permission.

K



Search All NYTimes.com

# The New York Times

# Doctor's Pain Studies Were Fabricated, Hospital Says

By GARDINER HARRIS

Published: March 10, 2009

**Correction Appended**

In what may be among the longest-running and widest-ranging cases of academic fraud, one of the most prolific researchers in anesthesiology fabricated much of the data underlying his research, said a spokeswoman for the hospital where he works.

The researcher, Dr. Scott S. Reuben, an anesthesiologist in Springfield, Mass., who practiced at Baystate Medical Center, fabricated data in some or all of the 21 journal articles dating from at least 1996, said Jane Albert, a spokeswoman for Baystate Health.

The reliability of dozens more articles he wrote is uncertain, and the common practice — supported by his studies — of giving patients aspirinlike drugs and neuropathic pain medicines after surgery instead of narcotics is now being questioned.

Paul Cirel, a lawyer for Dr. Reuben, said that he could not discuss the case because Baystate had investigated it as part of a confidential peer-review process. Baystate officials "were aware of extenuating circumstances," Mr. Cirel said.

The drug giant Pfizer underwrote much of Dr. Reuben's research from 2002 to 2007. Many of his trials found that Celebrex and Lyrica, Pfizer drugs, were effective against postoperative pain.

"Independent clinical research advances disease treatments and improves the lives of patients," said Raymond F. Kerins Jr., a Pfizer spokesman. "As part of such research, we count on independent researchers to be truthful and motivated by a desire to advance care for patients. It is very disappointing to learn about Dr. Scott Reuben's alleged actions."

Drug companies routinely hire community physicians to conduct studies of already-approved medicines. In some cases, prosecutors have charged companies with underwriting studies of little scientific merit in hopes of persuading doctors to prescribe the medicines more often.



"When researchers are beholden to companies for much of their income, there is an incredible tendency to get results that are favorable to the company," said Dr. Jerome Kassirer, a former editor of The New England Journal of Medicine and the author of a book about conflicts of interest.

Dr. Reuben's activities were spotted by Baystate after questions were raised about two study abstracts that he filed last spring, Ms. Albert said. The health system determined that he had not received approval to conduct human research, Ms. Albert said.

Baystate investigators determined that Dr. Reuben had concocted data for 21 studies, and the health system asked the journals in which those studies were published to withdraw them.

Dr. Steve Shafer, the editor in chief of Anesthesia & Analgesia, which published many of the papers, said he was considering withdrawing any study in which Dr. Reuben served a pivotal role.

"He was one of the most prolific investigators in the area of postoperative pain management," Dr. Shafer said. His fraud "sets back our knowledge in the field tremendously."

### Correction: March 19, 2009

*An article on March 11 about an academic fraud case against Dr. Scott S. Reuben, an anesthesiologist in Springfield, Mass., paraphrased incorrectly from a comment by a spokeswoman for Baystate Medical Center, where he formerly practiced. The spokeswoman, Jane Albert, said in an interview that an investigating committee concluded that Dr. Reuben fabricated data underlying much of his research, and she added that he had cooperated with the investigation. She did not comment on whether he himself admitted fabricating data.*

*This article has been revised to reflect the following correction:*

### Correction: March 24, 2009

*An article on March 11 about an academic fraud case against Dr. Scott S. Reuben, an anesthesiologist in Springfield, Mass., paraphrased incorrectly from a comment by a spokeswoman for Baystate Medical Center, where he formerly practiced. And a correction*

*in this space on Thursday failed to correct the headline and another comment by the spokeswoman that was paraphrased incorrectly.*

*The spokeswoman, Jane Albert, said in an interview that an investigating committee concluded that Dr. Reuben fabricated data underlying much of his research, and she added that he had cooperated with the investigation. She did not say that he himself admitted fabricating data. (This error in the article was repeated in the headline.)*

*In addition, Ms. Albert said in the interview that the hospital found that Dr. Reuben fabricated data in some or all of 21 journal articles; she did not say that he did not conduct the clinical trials described in those articles.*

A version of this article appeared in print on March 11, 2009  on page A22 of the New York edition.

*L*   *File: FDA - Reuben Disbarment*
*taken from Federal Regist*

# The Federal Register

## The Daily Journal of the United States Government

**Notice**

## Scott S. Reuben: Debarment Order

A Notice by the Food and Drug Administration on 11/16/2011

- **EMAIL**
- **TWITTER**
- **FACEBOOK**

Previous ArticleNext Article

LEGAL DISCLAIMER

Font Controls

- Increase
- Decrease
- Sans
- Serif

PDF DEVPRINTPUBLIC INSPECTION

**Publication Date:**
Wednesday, November 16, 2011

**Agencies:**
Department of Health and Human Services
Food and Drug Administration

**Dates:**
This order is effective November 16, 2011.

**Effective Date:**
11/16/2011

**Entry Type:**
Notice



EXHIBIT

tabbies®

L

**Action:**

Notice.

**Document Citation:**

76 FR 71042

**Page:**

71042 -71043 (2 pages)

**Agency/Docket Number:**

Docket No. FDA-2011-N-0377

**Document Number:**

2011-29538

**Shorter URL:**

https://federalregister.gov/a/2011-29538 ❌

# ACTION

Notice.

# SUMMARY

The Food and Drug Administration (FDA) is issuing an order under the Federal Food, Drug, and Cosmetic Act permanently debarring Scott S. Reuben, M.D. from providing services in any capacity to a person that has an approved or pending drug product application. FDA bases this order on a finding that Dr. Reuben was convicted of a felony under Federal law for conduct relating to the regulation of a drug product under the Federal Food, Drug, and Cosmetic Act. Dr. Reuben was given notice of the proposed permanent debarment and an opportunity to request a hearing within the timeframe prescribed by regulation. Dr. Reuben failed to respond. Dr. Reuben's failure to respond constitutes a waiver of his right to a hearing concerning this action.

# TABLE OF CONTENTS Back to Top

- DATES:
- ADDRESSES:
- FOR FURTHER INFORMATION CONTACT:
- SUPPLEMENTARY INFORMATION:
  - I. Background
  - II. Findings and Order

# DATES: Back to Top

This order is effective November 16, 2011.

**ADDRESSES:** Back to Top

Submit applications for special termination of debarment to the Division of Dockets Management (HFA-305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852.

**FOR FURTHER INFORMATION CONTACT:** Back to Top

Kenny Shade, Division of Compliance Policy (HFC-230), Office of Enforcement, Office of Regulatory Affairs, Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, (301) 796-4640.

**SUPPLEMENTARY INFORMATION:** Back to Top

**I. Background** Back to Top

Section 306(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335a(a)(2)(B)) requires debarment of an individual if FDA finds that the individual has been convicted of a felony under Federal law for conduct relating to the regulation of any drug product under the Federal Food, Drug, and Cosmetic Act. On June 24, 2010, the U.S. District Court for the District of Massachusetts entered judgment against Dr. Reuben for health care fraud in violation of 18 U.S.C. 1347. The FDA's finding that debarment is appropriate is based on the felony conviction referenced herein for conduct relating to the regulation of a drug product. The factual basis for this conviction is as follows: Dr. Reuben was a physician licensed by the State of Massachusetts working as an anesthesiologist providing anesthesia services to patients in connection with surgeries, and also treating patients post-surgery in the District of Massachusetts. Dr. Reuben served as the chief of acute pain at a hospital in Western Massachusetts and maintained an office at the hospital for the purpose of conducting research. Dr. Reuben's interest, from a research perspective, was in post-operative multimodal analgesia therapy. Dr. Reuben made proposals for research funding to pharmaceutical companies that manufactured drugs that he used or proposed to use in multimodal analgesia therapy. Dr. Reuben represented to the companies that, as the principal investigator, he would be performing clinical studies with actual patients to whom he would administer the drug that was the subject of the research grant.

Dr. Reuben entered into contracts to perform research studies funded by the companies from at least as early as 1999. Dr. Reuben purported to perform the research called for by the contracts, and published articles in various medical journals based on the purported results of the research, when in fact those studies had not

been performed, and therefore the research results reported in the medical journals were false.

As a result of his convictions, on August 22, 2011, FDA sent Dr. Reuben a notice by certified mail proposing to permanently debar him from providing services in any capacity to a person that has an approved or pending drug product application. The proposal was based on a finding, under section 306(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335a(a)(2)(B)), that Dr. Reuben was convicted of a felony under Federal law for conduct relating to the regulation of a drug product under the Federal Food, Drug, and Cosmetic Act. This conclusion was based on the fact that FDA regulates clinical trials related to drug products such as those described previously as part of the Agency's regulation of drug products. The proposal also offered Dr. Reuben an opportunity to request a hearing, providing him 30 days from the date of receipt of the letter in which to file the request, and advised him that failure to request a hearing constituted a waiver of the opportunity for a hearing and of any contentions concerning this action. The proposal was received on August 26, 2011. Dr. Reuben failed to respond within the timeframe prescribed by regulation and has, therefore, waived his opportunity for a hearing and has waived any contentions concerning his debarment (21 CFR part 12).

## II. Findings and OrderBack to Top

Therefore, the Director, Office of Enforcement, Office of Regulatory Affairs, under section 306(a)(2)(B) of the (21 U.S.C. 335a(a)(2)(B)) of the Federal Food, Drug, and Cosmetic Act, under authority delegated to the Director (Staff Manual Guide 1410.35), finds that Scott S. Reuben has been convicted of a felony under Federal law for conduct relating to the regulation of a drug product under the Federal Food, Drug, and Cosmetic Act.

As a result of the foregoing finding, Dr. Reuben is permanently debarred from providing services in any capacity to a person with an approved or pending drug product application under sections 505, 512, or 802 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355, 360b, or 382), or under section 351 of the Public Health Service (42 U.S.C. 262), effective (see DATES) (see section 306(c)(1)(B), (c)(2)(A)(ii), and 201(dd) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335a(c)(1)(B), (c)(2)(A)(ii), and 321(dd))). Any person with an approved or pending drug product application who knowingly employs or retains as a consultant or contractor, or otherwise uses the services of Dr. Reuben, in any capacity during Dr. Reuben's debarment, will be subject to civil money penalties (section 307(a)(6) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335b(a)(6))). If Dr. Reuben provides services in any capacity to a person with an approved or pending drug product application during his period of debarment he will be subject to civil money penalties (section 307(a)(7) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335b(a)(7)). In

addition, FDA will not accept or review any abbreviated new drug applications submitted by or with the assistance of Dr. Reuben during his period of debarment (section 306(c)(1)(A) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335a(c)(1)(A))).

Any application by Dr. Reuben for special termination of debarment under section 306(d)(4) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335a(d)(4)) should be identified with Docket No. FDA-2011-N-0377 and sent to the Division of Dockets Management (seeADDRESSES). All such submissions are to be filed in four copies. The public availability of information in these submissions is governed by 21 CFR 10.20(j).

Publicly available submissions may be seen in the Division of Dockets Management between 9 a.m. and 4 p.m., Monday through Friday.

Dated: November 7, 2011.

**Armando Zamora,**
*Acting Director, Office of Enforcement, Office of Regulatory Affairs.*

[FR Doc. 2011-29508 Filed 11-14-11; 8:45 am]
BILLING CODE 4160-01-P

# HOME
- Home

# SECTIONS
- Money
- Environment
- World
- Science & Technology
- Business & Industry
- Health & Public Welfare

# BROWSE
- Agencies
- Topics
- Dates
- Public Inspection
- Executive Orders

# SEARCH
- Article Search
- Advanced Article Search
- Events Search
- Unified Agenda Search
- Public Inspection Search

# POLICY
- About Us
- Legal Status

- Contact Us
- Privacy
- Accessibility
- FOIA
- No Fear Act
- Continuity Information

# LEARN

- User Information
- About Public Inspection
- Document Drafting & Research
- Related Resources
- Tutorials, History, and Statistics
- Regulatory Journals
- Regulatory Improvement
- Developers

# BLOG

- Blog

# MY FR

- My Clipboard
- Sign In

Site Feedback

*M*       File: REUBEN - FDA - Notice

## Reuben, Scott S., M.D. NIDPOE 3/17/10



Department of Health and Human Services

Public Health Service
Food and Drug Administration
Silver Spring, MD 20993

### NOTICE OF INITIATION OF DISQUALIFICATION PROCEEDINGS
### AND OPPORTUNITY TO EXPLAIN (NIDPOE)

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Scott S. Reuben, M.D.
(b)(6)

Dear Dr. Reuben:

Between April 20 and May 21, 2009, Ms. Patty Murphy, representing the Food and Drug Administration (FDA), conducted an investigation to review your conduct of the following clinical investigations of the investigational drug Celecoxib (Celebrex), performed for Pfizer, Inc.:

• (b)(4), entitled "(b)(4)," and

• (b)(4), entitled "(b)(4)."

This inspection is a part of the FDA's Bioresearch Monitoring Program, which includes inspections designed to evaluate the conduct of research and to ensure that the rights, safety, and welfare of the human subjects of those studies have been protected.

At the conclusion of the inspection, Ms. Murphy prepared and sent to your legal representative Form FDA 483, Inspectional Observations. We have reviewed the inspection report and the documents submitted with that report. You did not respond to the matters under complaint, which are described below.

FDA's inspection raised numerous concerns about your conduct of studies, including potential fabrication of study subjects, fabrication of study data, and failure to follow the investigational plan. This matter was referred to FDA's Office of Criminal Investigations (OCI) for further investigation. Subsequently, the U.S. Attorney for the District of Massachusetts charged you with executing a scheme and artifice to defraud Pfizer, Inc. in connection with the delivery of and payment for health care benefits, items and services. On Jan. 8, 2010, you signed a plea agreement in which you plead guilty to one count of health care fraud in violation of 18 U.S.C. §1347. In doing so, you acknowledged that although you entered into an Independent Research Grant Agreement with Pfizer to conduct a study entitled "Perioperative Administration of Celecoxib (Celebrex) as a Component of Multimodal Analgesia for Outpatient Anterior Cruciate Ligament Reconstruction Surgery," you did not actually enroll any subjects in the study. You admitted that the results reported both to Pfizer and to Anesthesia and Analgesia Journal and in turn to the public were wholly made up and therefore false.

Based on our evaluation of information obtained by the Agency, we believe that you have repeatedly or deliberately violated regulations governing the proper conduct of clinical studies involving investigational products, as published under Title 21, Code of Federal Regulations (CFR), part 312.70 (copy enclosed).

This letter provides you with written notice of the matters under complaint and initiates an administrative proceeding, described below, to determine whether you should be disqualified from receiving investigational products, as set forth under 21 CFR 312.70.

A listing of the violations follows. The applicable provisions of the CFR are cited for each violation.

EXHIBIT

tabbies®

*M*

**1. You failed to conduct the studies or ensure they were conducted in accordance with the signed statement of investigator and the investigational plan [21 CFR 312.60].**

a. Protocol (b)(4), Section 6.2, "Exclusion Criteria," states that subjects will not be included in the study if they have a known allergy to sulfonamides. Section 7.3.1, "Screening Visit," states that laboratory test results will be used to determine if a subject is eligible for the study. You failed to ensure that the following study subjects met the protocol criteria for study subject selection:

i. Subject 1013 had a history of allergy to sulfonamides and was enrolled into the study.

ii. Subject 1015's and Subject 1016's screening laboratory results were not reviewed for exclusionary values until after their enrollment into the study.

b. Protocol (b)(4), Section 9.0, "Concomitant Therapy," states that Non Steroidal Anti-Inflammatory Drugs (NSAIDS) and oral or injectable corticosteroids are specifically excluded from use during the treatment period:.

i. Subjects 1003 and 1004 were administered dexamethasone preoperatively.

ii. Subjects 1013 and 1016 took NSAIDS postoperatively.

c. Protocol (b)(4), Section 7.2, "Study Schedule," states that the surgical procedure will be performed under general anesthesia, using fentanyl 1-3 mcg/kg, with an injection of marcaine 0.25% with epinephrine, 20 cc total dose at the index joint.

i. Subjects No. 1003, 1004, 1011, 1013, 1015, 1016, 1024, 1025, 1027 and 1029 did not receive the specified dose of marcaine with epinephrine per the study protocol.

ii. Subjects No. 1006 and 1008 did not receive the specified dose of fentanyl per the study protocol.

d. Protocol (b)(4), Section 7.7.5, "Study Drug Administration," states that Bottle B is dispensed to the subject after surgery, with instruction to take as needed upon the first occurrence of pain. If the subject requires additional pain medication after 30 minutes of taking the second dose of study medication from Bottle B, subject will be provided rescue analgesic medication (Bottle C). You failed to ensure that study medications were dispensed at the prescribed times.

i. Subject 1022 was administered rescue analgesic medication (Bottle C) twelve minutes after receiving the dose from Bottle B.

ii. Subject 1008 was administered rescue analgesic medication (Bottle C) ten minutes after receiving the dose from Bottle B.

e. Protocol (b)(4), Section 7.7.5, "Study Drug Administration," states that Bottle B is dispensed to the subject after surgery, with instruction to take as needed upon the first occurrence of pain. If the subject requires additional pain medication after 30 minutes of taking the second dose of study medication from Bottle B, [the] subject will be provided rescue analgesic medication (Bottle C).

You failed to ensure that study medications were dispensed at the prescribed times for Subject 1009, who was administered rescue analgesic medication (Bottle C) fifteen minutes after receiving the dose from Bottle B.

f. Protocol (b)(4) Section 7.2, "Study Schedule," states that the surgical procedure will be performed under general anesthesia, using fentanyl (up to 4 mcg/kg), with an injection of marcaine 0.25% with epinephrine (up to 20 cc total dose at the index joint). You failed to ensure that the marcaine was administered according to the investigational plan for Subjects 1008 and 1013, who were administered 30 cc of marcaine.

This letter is not intended to be an all-inclusive list of deficiencies with your clinical studies of investigational products. It is your responsibility to ensure adherence to each requirement of the law and relevant regulations.

On the basis of the above-listed violations, FDA asserts that you repeatedly or deliberately failed to comply with the cited regulations, which placed unnecessary risks to human subjects and jeopardized the integrity of data; and the FDA proposes that you be disqualified as a clinical investigator.

In the normal course of a disqualification proceeding, following receipt of this notice, you would have been entitled to/offered an opportunity to explain the matter either in writing or during an informal conference. You would have been entitled to, or offered the opportunity to reply to the above stated issues, including an explanation of why you should remain eligible to receive investigational products and not be disqualified as a clinical investigator, in a written response or at an informal conference in my office. This procedure is provided for by regulation 21 CFR 312.70. If your written or oral responses to our allegations were unsatisfactory, in the normal course of a disqualification proceeding, you would have been entitled to/offered a regulatory hearing before FDA, pursuant to 21 CFR 16 and 21 CFR 312.70. A presiding officer free from bias or prejudice and who has not participated in this matter would have conducted the hearing to determine whether or not you would remain entitled to receive investigational products.

However, pursuant to section 4 of your plea agreement, you agreed to enter into a disqualification agreement with FDA within 21 days of receiving FDA's NIDPOE. You further agreed not to contest the disqualification proceedings, to waive your opportunity to provide a written explanation, to waive your right to attend an informal conference, and to waive your right to any regulatory hearing pursuant to 21 CFR Parts 16 and 312.70. The following paragraphs include instructions for entering into the disqualification agreement with FDA.

You should be aware that neither entry into a consent agreement nor pursuit of a hearing precludes the possibility of a corollary judicial proceeding or administrative remedy concerning these violations.

To enter into the enclosed consent agreement with FDA, thereby terminating this disqualification process, you must:

    (1) Initial and date each page of this Agreement;
    (2) Sign and date the last page of this Agreement; and
    (3) Return this Agreement initialed, signed, and dated to the signature below.

A copy of the fully executed Agreement will be mailed to you.

Sincerely yours,
{See appended electronic signature page}
Leslie K. Ball, M.D.
Director
Division of Scientific Investigations
Office of Compliance
Center for Drug Evaluation and Research
Food and Drug Administration

This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic
signature.

/s/

LESLIE K BALL
03/17/2010

*N*

*TAKE FROM INTERNET SEAR*
*1-09-40105-9*

**Department of Health and Human Services**

**DEPARTMENTAL APPEALS BOARD**

**Civil Remedies Division**

Scott S. Reuben, M.D.,
(O.I. File No.: 1-09-40105-9),

Petitioner,

v.

The Inspector General.

Docket No. C-11-664

Decision No. CR2481

Date: January 6, 2012

**DECISION**

Petitioner, Scott S. Reuben, M.D., asks review of the Inspector General's (I.G.'s) determination to exclude him for five years from participation in the Medicare, Medicaid, and all federal health care programs under section 1128(a)(3) of the Social Security Act (Act). For the reasons discussed below, I find that the I.G. is authorized to exclude Petitioner and that the statute mandates a minimum five-year exclusion.

**Discussion**

The sole issue before me is whether the I.G. has a basis for excluding Petitioner from program participation. Because an exclusion under section 1128(a)(3) of the Act must be for a minimum period of five years, the reasonableness of the length of the exclusion is not an issue. Act § 1128(c)(3)(B); 42 C.F.R. § 1001.2007(a)(2).

The parties have submitted their written arguments (I.G. Br.; P. Br.), and the I.G. filed a reply. With his brief, the I.G. submitted four exhibits (I.G. Exs. 1-4). In the absence of any objections, I admit into evidence I.G. Exs. 1-4.



EXHIBIT

2

I directed the parties to indicate in their briefs whether an in-person hearing would be necessary and, if so, to describe the testimony it wishes to present, the names of the witnesses it would call, and a summary of each witnesses' proposed testimony. I specifically directed the parties to explain why the testimony would be relevant. Order and Schedule for Filing Briefs and Documentary Evidence, Attachment 1 (Informal Brief of Petitioner ¶ III) and Attachment 2 (Informal Brief of I.G. ¶ III) (Sept. 9, 2011). The I.G. indicates that an in-person hearing is not necessary. Although Petitioner does not directly respond to the question, he does not contend that an in-person hearing is necessary and lists no potential witnesses. I therefore conclude that an in-person hearing is not required.

> **Petitioner must be excluded for five years because he was convicted of felony fraud in connection with the delivery of a healthcare item or service.[1]**

Petitioner was a Massachusetts anesthesiologist who contracted with the drug manufacturer, Pfizer, Inc., to conduct clinical studies on patients to determine the efficacy of a certain drug in treating post-operative pain. Pfizer paid for the studies. Petitioner subsequently claimed to have conducted the studies, administering the tested drug to 100 post-surgical patients and a placebo to another 100 post-surgical patients. He published papers in a scientific journal claiming to have achieved success with the tested drug. In fact, he had not enrolled any patients in any study, and he fabricated the "results." I.G. Ex. 3 at 12-16.

On June 24, 2010, Petitioner pled guilty in federal district court for the District of Massachusetts to one count of felony health care fraud, 18 U.S.C. § 1347. Under that provision, a person commits health care fraud if, "in connection with the delivery of or payment for health care benefits, items, or services," he "knowingly and willfully executes, or attempts to execute" a scheme 1) to defraud a health benefit program or 2) to obtain, "by means of false or fraudulent pretenses, representations, or promises," money or property owned by a health benefit program.

The court accepted Petitioner's plea and entered judgment against him. I.G. Exs. 2, 4.

In a letter dated June 30, 2011, the I.G. advised Petitioner that, because he had been convicted of a felony offense related to fraud, theft, embezzlement, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service, the I.G. was excluding him from participation in Medicare, Medicaid, and all federal health care programs for a period of five years. I.G. Ex. 1.

---

[1] I make this one finding of fact/conclusion of law.

3

Section 1128(a)(3) provides that an individual or entity convicted of felony fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct in connection with the delivery of a health care item or service must be excluded from participation in federal health care programs for a minimum of five years. *See* 42 C.F.R. 1001.101(c). Because Petitioner was convicted of felony health care fraud, he is subject to exclusion.

Petitioner does not deny that he was convicted of felony fraud in connection with the delivery of a health care item or service. Instead, he attributes his misconduct to mental illness, points out that his practice as a clinician is unblemished, argues that he has paid his debt to society, and maintains that he is ready to resume his medical career. These are simply not bases for overturning a mandatory exclusion.

**Conclusion**

For these reasons, I conclude that the I.G. properly excluded Petitioner from participation in Medicare, Medicaid and all federal health care programs, and I sustain the five-year exclusion.

_____/s/_____
Carolyn Cozad Hughes
Administrative Law Judge



MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-36

**1.7   Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition (Cont.)**

1.   Wound healing and inflammation are related processes that both involve the activity of prostaglandins, cytokines, and inflammatory cell types.  Just as COX inhibition results in decreased inflammation, so it is theoretically possible that COX inhibition may impair wound healing.  One model of wound healing is the repair of experimentally induced GI mucosal lesions in laboratory animals.  COX-2 is expressed at the site of experimentally induced gastric erosions and ulcers in mice and rats [108; 222; 214; 223].  Both indomethacin (a nonspecific COX inhibitor) and the selective COX-2 inhibitor, NS-398, delay healing of these lesions [214; 222].  The impairment of ulcer healing by selective inhibition of COX-2 was not more severe than that produced by the nonspecific inhibitor [214].  Whether these preclinical model systems of experimentally induced erosions are relevant to human gastric erosion healing, or other clinical settings of wound repair, is unknown.

2.   Prostaglandins are likely to be important in bone metabolism.  There is evidence that prostaglandins, including prostaglandin E2 (PGE-2), are produced by osteoblasts and osteoblast-like cells [289; 290; 291], and that they can stimulate both bone resorption and bone formation [203].  The relative contribution to bone formation versus resorption in vivo by prostaglandins is unknown.  In addition, the roles of COX-1 versus COX-2 in the production of prostaglandins in bone has not been established.  One report demonstrated that both indomethacin and NS-398, a selective COX-2 inhibitor,

MRK-OS420124108



MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-37

### 1.7    Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition (Cont.)

inhibit bone formation induced by mechanical loading in rats [202].  COX-2 expression was induced in an in vitro model of mechanical loading [201], suggesting a role for COX-2 derived prostanoids in mechanically induced bone formation.    Data in humans on NSAID effects on biochemical markers of bone metabolism are limited [292] and there are no long-term, prospective data of the effects of either NSAIDs or COX-2-specific inhibitors on either biochemical markers of bone turnover or bone mineral density.

3.   A related area of concern is the effect of COX inhibitors on articular cartilage.   Preclinical studies and retrospective clinical studies have implicated NSAIDs in the acceleration of joint destruction in OA [256].  Results from well-designed and well-conducted randomized trials to address the question of whether NSAIDs affect the progression of OA in humans have yet to be reported.  If NSAIDs do affect the progression of OA, it is unknown whether this effect would be through COX-1 or COX-2.  It is expected that the effect of MK-0966 (a specific COX-2 inhibitor) on cartilage, if any, will be no different than with NSAIDs already in use since both classes of drugs inhibit prostaglandin production by COX-2 to a similar extent.

4.   In summary, COX-2 is located in the kidney, reproductive tract, brain, and at the site of inflammation and bone turnover.   MK-0966 is a specific inhibitor of COX-2.  Mechanism-based adverse experiences would derive directly from COX-2 inhibition. There is a wealth of

MRK-OS420124109

**1.7   Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition** (Cont.)

experience in humans with COX-2 inhibition during therapy with NSAIDs (nonspecific COX inhibitors). It is expected that the adverse experiences with MK-0966 will be similar to NSAIDs in the above-mentioned organs as both classes inhibit COX-2 to a similar degree. The lack of COX-1 inhibition by MK-0966 has the potential to eliminate the GI toxicity seen with NSAIDs. In addition, MK-0966 is expected to be free from platelet function inhibition that is COX-1 mediated.

**1.8   Potential Risks of Cyclooxygenase-1 Inhibition in Nonspecific Inhibitors of Cyclooxygenase**

1.   The specificity of MK-0966 for COX-2, and lack of inhibition of COX-1, extends to oral dosing in humans. NSAIDs inhibit both the COX-1 and COX-2 isoforms. Prostaglandin synthesis in the GI tract and platelets depends on COX-1 [103]. It is expected that MK-0966 will have a toxicity profile similar to placebo in these areas.

2.   Prostaglandins have an important role in mucosal protection in the GI tract. Several mechanisms are involved including reducing acid secretion, stimulating mucous secretion, maintaining blood flow, and increasing bicarbonate secretion [198; 199]. The production of these cytoprotective prostaglandins in the GI tract is dependent on COX-1. In the normal GI tract of humans, COX-1 is the only isoform expressed [100; 30].

3.   NSAID use in humans leads to the development of ulcers and their complications such as bleeding, perforation, and

MRK-OS420124110



**E. Clinical Safety**





MRK-OS420124072



**EXHIBIT**

R

# 1.   General Safety Overview

## 1.1   Introduction

This overview summarizes key aspects of the safety of MK-0966. First, the scope of the clinical development program and overall safety conclusions are introduced. The organization of the safety section is then summarized, including a description of how the numerous clinical studies conducted with osteoarthritis (OA) patients are grouped and then presented. Statistical methodology used in analyzing the safety data is presented, followed by a discussion of potential risks based upon preclinical data, the pattern of expression of cyclooxygenase-2 (COX-2), or clinical experience with nonsteroidal anti-inflammatory drugs (NSAIDs), which are nonspecific cyclooxygenase (COX) inhibitors.

All completed studies and ongoing studies with certified data by the visit cutoff date (31MAR98) are reported. Serious adverse experiences from sources other than case report forms are reported up to 31AUG98.

### 1.1.1   Scope and Overall Safety Conclusions of the MK-0966 Program

The MK-0966 clinical development program tested the hypothesis that MK-0966, a specific COX-2 inhibitor, would have efficacy equivalent to high doses of NSAIDs (nonspecific COX inhibitors) in the treatment of OA and pain with a superior clinical safety profile with respect to the gastrointestinal (GI) tract. The superior GI safety profile of MK-0966 is due to its lack of inhibition of gastroprotective COX-1 activity. The efficacy of MK-0966 in OA and analgesia is comparable to high doses of

MRK-OS420124073

MK-0966                                                                          E-2
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

**1.1.1    Scope and Overall Safety Conclusions of the MK-0966 Program (Cont.)**

NSAIDs. This safety section presents data demonstrating that at doses of MK-0966 (12.5 and 25 mg, OA; 50 mg, analgesia) providing efficacy comparable to high doses of NSAIDs, MK-0966 is safe and well tolerated. Importantly, MK-0966 has GI mucosal effects similar to placebo.

A total of 5435 subjects/patients were treated with MK-0966. Three thousand five hundred ninety-five patients with OA were treated with MK-0966. Of these, 1385 patients received MK-0966 for 6 months or longer and 818 patients were treated with MK-0966 for 1 year or longer. One thousand two patients with acute pain (Post-Dental Surgery Pain, Primary Dysmenorrhea, or Post-Orthopedic Surgery Pain) were treated with MK-0966. The maximum duration of treatment in the analgesia studies was 5 days.

Section 4. (GI Safety) of this document presents a comprehensive clinical program demonstrating that MK-0966 has a GI safety profile similar to placebo and superior to NSAIDs. Two 6-month endoscopy studies in patients with OA conducted with doses of 25 and 50 mg MK-0966 (the 50-mg dose is 2 times the maximum OA clinical dose) confirmed that MK-0966 has a GI safety profile similar to placebo. In addition, a prospectively defined integrated analysis of perforations, ulcers, and GI bleeding (PUBs) that occurred in the Phase IIb/III OA studies, adjudicated by a blinded outside panel of experts, confirmed that the GI safety profile of MK-0966 is markedly superior to NSAIDs. Additional studies conducted in healthy subjects included a 7-day endoscopy study conducted with a

MRK-OS420124074

MK-0966                                                                        E-3
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

**1.1.1   Scope and Overall Safety Conclusions of the MK-0966 Program (Cont.)**

dose of MK-0966 (250 mg) that is 10 to 20 times the clinical dose for OA, and 2 special studies ($^{51}$Cr Red Blood Cell Loss and $^{51}$Cr EDTA/L-Rhamnose study of intestinal permeability) conducted with doses of 25 and 50 mg (the 50-mg dose is 2 times the maximum clinical dose for OA). These special studies of GI safety further illustrated that MK-0966 at doses up to 50 mg has a GI safety profile comparable to placebo.

This document presents focused discussions of clinical data addressing potential toxicities of MK-0966 based upon preclinical data, the pattern of expression of COX-2, or clinical experience with NSAIDs (nonspecific COX inhibitors). Clinical data were therefore analyzed to specifically evaluate potential renal/vascular, wound healing, cartilage, and fertility/reproductive effects that might be attributable to MK-0966. It is important to note that MK-0966 is not a more effective inhibitor of COX-2 than NSAIDs. At the clinical dose for OA (12.5 and 25 mg), lipopolysaccharide-induced production of $PGE_2$, an ex vivo model of COX-2 activity, is inhibited to a similar degree by MK-0966 compared with therapeutic doses of NSAIDs [P061]. It is likely, therefore, that the effects of MK-0966 attributable to its ability to inhibit COX-2 will be quantitatively similar to those of NSAIDs. Indeed, this was the case for the renal/vascular and cartilage effects.

/MK-0966/WMA/RW1316.DOC  APPROVED                                   26OCT98

MRK-OS420124075

MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-4

### 1.1.1   Scope and Overall Safety Conclusions of the MK-0966 Program (Cont.)

The safety profile of MK-0966 in both the OA and analgesia studies was generally favorable.

- In placebo-controlled studies with MK-0966 at doses of 12.5 and 25 mg in OA and 50 mg in analgesia, the adverse experience profile of MK-0966 was generally similar to placebo, except for effects previously seen with NSAIDs related to COX-2 inhibition, for which MK-0966 was generally similar to NSAIDs.

- In OA studies, the adverse experience profile of MK-0966 seen in 6-week, placebo-controlled studies remained the same over longer periods of administration, up to 86 weeks.

- MK-0966 had a superior GI safety profile compared with NSAIDs. In 2 large long-term endoscopy studies, MK-0966 (25 and 50 mg) had an incidence of ulcers similar to placebo.  A combined analysis of all PUB events in the OA studies showed that MK-0966 had a significantly lower incidence of PUBs compared with NSAIDs.

- MK-0966 (12.5 and 25 mg) manifested mild effects on fluid balance (as represented by incidence of edema adverse experiences and weight gain) and blood pressure that were slightly greater than placebo but clinically comparable to NSAIDs. These events were of minor clinical importance (i.e., few patients discontinued due to these adverse experiences or required initiation or alterations of medical therapy). MK-0966 did not induce proteinuria, interstitial nephritis, or any other renal toxicities.

MRK-OS420124076

MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-5

### 1.1.1    Scope and Overall Safety Conclusions of the MK-0966 Program (Cont.)

- MK-0966 had an incidence of aminotransferase elevations (3 times or greater the upper limit of normal) similar to ibuprofen and significantly less than diclofenac with long-term administration.   Most elevations were clinically insignificant, many resolved with continued therapy.   The few patients who discontinued also had resolution of their elevations.

- The effects of MK-0966 treatment for 1 year on articular cartilage (as assessed by radiological change in joint space width [JSW] in the knee) were similar to diclofenac in patients with chronic OA.

- Gastroduodenal erosions observed endoscopically at baseline did not increase the risk of developing an ulcer (a measure of GI wound healing) in patients treated with MK-0966 compared with placebo.

### 1.1.2    Cyclooxygenase Cellular Biology and MK-0966 Specificity

It is currently understood that prostaglandin (PG) synthesis in humans is catalyzed by at least two forms of COX, cyclooxygenase-1 (COX-1) and COX-2 [107; 8; 122; 123]. COX-1 is constitutively expressed and enzymatically active in a variety of tissues, including the stomach, intestine, kidneys, and platelets [103]. COX-1 is considered to be the isoform responsible for the production of prostanoids required for gastric mucosal protection and normal platelet function [103].

In contrast to COX-1, COX-2 is not constitutively expressed in most tissues but rather is induced by mediators

MRK-OS420124077

TOP

### 1.1.2    Cyclooxygenase Cellular Biology and MK-0966 Specificity (Cont.)

such as serum growth factors, cytokines, and mitogens [125; 126; 127; 128; 102; 5; 104]. COX-2 expression has been detected in leukocytes [10], vascular smooth muscle cells [128; 161; 129], rheumatoid synoviocytes [107], the reproductive tract [204], kidney [1], pancreatic islet cells [294], and the brain [106].  COX-2 expression is not detected in normal gastric mucosa and platelets [31; 15; 45; 2; 3].  Given the localization and pattern of induction, it is hypothesized that COX-2 is primarily responsible for the synthesis of prostanoids that mediate inflammation, pain, and fever and is not involved in gastric mucosa protection and platelet function.

At, and significantly above, clinical doses, MK-0966 is a specific inhibitor of COX-2 having no significant effect on COX-1 as determined by assays of platelet function and assays of prostanoid production by human platelets and gastric mucosa (see Section C. Clinical Pharmacology). Using these same assays, NSAIDs have been characterized as nonspecific inhibitors of COX, inhibiting both COX-1 and COX-2 at clinical doses [P022; P061].

### 1.2    Organization of the Safety Section

This document is divided into three main sections: (1) safety in OA, (2) safety in analgesia, and (3) GI safety. The first two sections discuss safety in the treatment of OA and acute pain (analgesia), respectively.  Different types of patients and duration of exposure support this division.

MRK-OS420124078

MK-0966                                                                                          E-7
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

1.2   Organization of the Safety Section (Cont.)

The analgesia studies (except the Post-Orthopedic Surgery
Pain Study) primarily evaluated young (mean age
~24 years), otherwise healthy patients whereas the OA
studies evaluated more elderly patients (mean age
~63 years) with a chronic disease.

The OA studies included long-term administration of
MK-0966 for up to 86 weeks.  This section includes the
standard clinical and laboratory safety data from all studies.
Safety issues identified based on the adverse experience
profile of NSAIDs including prespecified "NSAID-type"
GI adverse experiences, renal/vascular, cartilage, and
reproduction/fertility effects are covered in the OA section.

The primary safety hypothesis of the development program
was that MK-0966 would have an improved GI safety
profile compared with NSAIDs.  Specific clinical studies
were conducted to investigate this hypothesis and the
results are reported separately from GI adverse experiences
reported in the OA section.  The GI safety section details
the results from 2 large 6-month endoscopy studies (ulcers
and erosions); pooled incidences of perforations, ulcers, GI
bleeds (PUBs) from  the clinical studies, and studies of
special interest ($^{51}$Cr Red Blood Cell Loss and $^{51}$Cr
EDTA/L-Rhamnose study of intestinal permeability).  The
effect of MK-0966 on wound healing is discussed with
reference to the healing/progression of gastric erosions in
the endoscopy studies.  The details of how the studies are
grouped for each of the three main sections are described
below.

MRK-OS420124079

### 1.2.1   Osteoarthritis Studies Section (Phase II/III Studies) and Clinical Pharmacology Studies (Phase I)

The safety profile of MK-0966 in OA is based on data from 9 Phase II/III studies in adults. All patients in these studies had a clinical diagnosis of OA, and had similar demographic characteristics. A broad range of preexisting conditions and concomitant medications was allowed in these studies, providing a good representation of the proposed patient population.  Patients at high risk for possible toxicities were included in these studies (i.e., elderly, history of PUBs, mild renal insufficiency, diabetes, hypertension, and cardiovascular disease).

In addition, safety data are provided from short-term Phase I/Clinical Pharmacology Studies.

Throughout the OA section, 4 groupings of OA studies are evaluated:  6-Week Studies, 6-Month Studies, 1-Year Studies,  and 6-Month-to-86-Week Studies.    These 4 groupings are based on the duration of treatment of the study phase of each individual study.  The demographics for each grouping was similar except for the Elderly OA Study (Protocol 058) where only patients ≥80 years old were enrolled.  A specific discussion of the effect of age on the safety profile of MK-0966 is reviewed in Section 10.

The clinical safety of a drug is defined by comparison with placebo.  Therefore, the primary safety evaluation for MK-0966 in this document is the comparison of the OA clinical dose range (12.5 and 25 mg) with placebo in the 6-Week Studies using individual between-group statistics (p-values).    The 6-Week Studies provide the best

MRK-OS420124080

MK-0966                                                                 E-9
Clinical Documentation
E. Clinical Safety
1. General Safety Overview

**1.2.1 Osteoarthritis Studies Section (Phase II/III Studies) and Clinical Pharmacology Studies (Phase I) (Cont.)**

opportunity for this comparison due to inclusion of placebo in all studies. Additionally, the safety profile of MK-0966 at the OA clinical dose range (12.5 and 25 mg) is compared with NSAIDs using summary statistics in the 6-Week and 6-Month Studies. Clinically meaningful differences are highlighted. Safety with long-term treatment is further confirmed in the 1-Year Studies, which presents the entire 1-year safety results from the Multinational and U.S. Diclofenac OA Studies (Protocols 034 and 035). Last, the safety profile beyond 6 months of treatment is compared with the other study groupings for new adverse experiences that appeared with continuous treatment with MK-0966 for up to 86 weeks (6-Month-to-86-Week Studies). Table E-1 presents the number of patients per treatment group for the study groupings.

MK-0966
Clinical Documentation
E. Clinical Safety
1. General Safety Overview

E-10

1.2.1 Osteoarthritis Studies Section (Phase II/III Studies) and Clinical Pharmacology Studies (Phase I) (Cont.)

Table E-1    Total Number of Patients Per Treatment Group for the Osteoarthritis Study Groupings

| Protocol | Placebo n | MK-0966 5 mg n | MK-0966 12.5 mg n | MK-0966 25 mg n | MK-0966 50 mg n | MK-0966 125 mg n | Ibuprofen n | Diclofenac n | Nabumetone n |
|---|---|---|---|---|---|---|---|---|---|
| **6-Week Studies** | | | | | | | | | |
| **Total** | 412 | 149 | 725 | 733 | 97 | 74 | 470 | NA | 115 |
| 010-Pilot OA | 72 | NA | NA | 73 | NA | 74 | NA | NA | NA |
| 029-Dose Ranging OA | 148 | 149 | 144 | 177 | 97 | NA | NA | NA | NA |
| 033-U.S. Ibuprofen OA | 69 | NA | 219 | 127 | NA | NA | 221 | NA | NA |
| 040-Multinational Ibuprofen OA | 74 | NA | 244 | 243 | NA | NA | 249 | NA | NA |
| 058-Elderly OA | 82 | NA | 118 | 96 | NA | NA | NA | NA | 115 |
| **6-Month Studies** | | | | | | | | | |
| **Total** | 571 | NA | 490 | 879 | 379 | NA | 377 | 498 | NA |
| 034-Multinational Diclofenac OA | NA | NA | 231 | 232 | 379 | NA | 377 | 230 | NA |
| 035-U.S. Diclofenac OA | NA | NA | 259 | 257 | NA | NA | NA | 268 | NA |
| 044-U.S. Endoscopy OA | 177 | NA | NA | 196 | 196 | NA | 196 | NA | NA |
| 045-Multinational Endoscopy OA | 196 | NA | NA | 195 | 195 | NA | 195 | NA | NA |
| **1-Year Studies** | | | | | | | | | |
| **Total** | NA | NA | 490 | 489 | NA | NA | NA | 498 | NA |
| 034-Multinational Diclofenac OA | NA | NA | 231 | 232 | NA | NA | NA | 230 | NA |
| 035-U.S. Diclofenac OA | NA | NA | 259 | 257 | NA | NA | NA | 268 | NA |

/MK-0966/WMA/RW/1316.DOC APPROVED--26OCT98

MRK-OSI2012002

MK-0966
Clinical Documentation
E. Clinical Safety
1. General Safety Overview

E-11

## 1.2.1   Osteoarthritis Studies Section (Phase II/III Studies) and Clinical Pharmacology Studies (Phase I) (Cont.)

Table E-1 (Cont)          Total Number of Patients Per Treatment Group for the Osteoarthritis Study Groupings

| Protocol | Placebo | 5 mg | MK-0966 | | | | Naproxen | Diclofenac | Nabumetone |
| | | | 12.5 mg | 25 mg | 50 mg | 125 mg | | | |
| | n | n | n | n | n | n | n | n | n |
| 6-Month-to-96-Week Studies | | | | | | | | | |
| Total | NA | NA | 415 | 435 | 73 | NA | NA | 409 | NA |
| 029-20/30—Dose Ranging OA | NA | NA | 63 | 86 | 73 | NA | NA | 62 | NA |
| 034/035—Multinational and U.S. Diclofenac OA (plus extensions)[§] | NA | NA | 352 | 349 | NA | NA | NA | 347 | NA |

NA=Not Applicable.  This treatment group was not part of the study design.
[†]  First 6 months of data of the 1-Year Studies.
[‡]  Entire 13 months of data of the 1-Year Studies, including the first 6 months of data reported in the 6-Month Studies group.
[§]  Includes the second 6 months of data of the 1-Year Studies reported as part of the 1-Year Studies group plus extensions to these studies.
[P018; P029; P029C; P033; P034; P034C; P035; P040; P044; P045; P058]

MRK-CS42012-4083

/MK-0966/WMA/RW1316.DOC  APPROVED—26OCT96

**1.2.1  Osteoarthritis Studies Section (Phase II/III Studies) and Clinical Pharmacology Studies (Phase I) (Cont.)**

### Six-Week Osteoarthritis Studies

The primary analysis of safety data in this document is the comparison of MK-0966 within the OA clinical dose range (12.5 and 25 mg) with placebo in the 6-Week Studies (using individual between-group statistics, p-values). Comparison between the MK-0966 and NSAID groups was performed with summary statistics.

Patient data from 5 studies are included in this section.  All of these studies were of similar design and patient demography (except the Elderly OA Study [Protocol 058] in which all patients were ≥80 years of age).  All studies included a placebo group.  Three of the studies also included an active-comparator NSAID.

- Protocol 010 (Phase IIa)—Pilot OA Study; MK-0966 versus placebo

- Protocol 029 (Phase IIb)—Dose-Ranging OA Study; MK-0966 versus placebo

- Protocol 033 (Phase III)—U.S. Placebo/Ibuprofen Study; MK-0966 versus ibuprofen versus placebo

- Protocol 040 (Phase III)—Multinational Placebo/Ibuprofen Study; MK-0966 versus ibuprofen versus placebo

- Protocol 058 (Phase III)—Elderly OA Study; MK-0966 versus nabumetone versus placebo

MRK-OS420124084

MK-0966                                                              E-13
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

### 1.2.1  Osteoarthritis Studies Section (Phase II/III Studies) and Clinical Pharmacology Studies (Phase I) (Cont.)

It should be noted that Protocols 029 and 058 both had long-term extensions, but only data from the initial 6 weeks of these studies are reported in this section.

#### Six-Month Osteoarthritis Studies

The primary objective of this section is the evaluation (using summary statistics) of the overall safety and tolerability of MK-0966 versus NSAID comparators during a 6-month treatment period.

Patient data from 4 studies are included in this section.

- Protocol 034 (Phase III)—Multinational Diclofenac OA Study; MK-0966 versus diclofenac; first 6 months of data of a 1-year study

- Protocol 035 (Phase III)—U.S. Diclofenac OA Study; MK-0966 versus diclofenac; first 6 months of data of a 1-year study

- Protocol 044 (Phase III)—U.S. Endoscopy Study; MK 0966 versus ibuprofen versus placebo

- Protocol 045 (Phase III)—Multinational Endoscopy Study; MK-0966 versus ibuprofen versus placebo

The baseline demographics of the OA patients in these studies were similar, allowing them to be combined.  Note that 2 studies (Protocols 034 and 035) were designed as 1-year double-blind, double-dummy, active-comparator (diclofenac) studies.  Only the first 6 months (Visits 1

MRK-OS420124085

### 1.2.1 Osteoarthritis Studies Section (Phase II/III Studies) and Clinical Pharmacology Studies (Phase I) (Cont.)

through 8) are included in this section. Two additional studies (Protocols 044 and 045) were designed as 6-month active-comparator (ibuprofen) and placebo-controlled (first 16 weeks only) studies with the primary objective of GI safety evaluated by upper endoscopy.

#### One-Year Osteoarthritis Studies

The primary objective of this section is to evaluate safety data for 1 year of continuous treatment with MK-0966 (12.5 and 25 mg) compared with diclofenac. Patient data from 2 identical studies are included in this section. The Multinational and U.S. Diclofenac OA Studies (Protocols 034 and 035, respectively) were designed as 1-Year Studies and conducted under double-blind conditions throughout the 1-year treatment period.

Note that safety data for the first 6 months of treatment from the Multinational and U.S. Diclofenac Studies are also reported in the 6-Month Studies section described above. The analysis in this section provides additional long-term, double-blind, active-comparator-controlled safety information over a 1-year treatment period in a large cohort of patients.

#### Six-Month-to-86-Week Osteoarthritis Studies

The primary objective of this section is to evaluate whether the safety profile of MK-0966 changes over time; i.e., are there new or more frequent adverse experiences in the time period after 6 months of treatment, as compared with the first 6 months of treatment.

MRK-OS420124086

MK-0966
Clinical Documentation
E. Clinical Safety
1. General Safety Overview

### 1.2.1 Osteoarthritis Studies Section (Phase II/III Studies) and Clinical Pharmacology Studies (Phase I) (Cont.)

Patient data from 3 studies are included in this section which presents a combined analysis of all OA patients who received treatment from 6 months to 86 weeks. These data complement the above 3 groupings as they provide information to compare the safety profile by duration of treatment. The primary comparison in this section is between MK-0966 (12.5 and 25 mg) and the active comparator used in these studies, diclofenac.

The studies that contribute to this section are:

- Protocol 029 (Phase IIb)—Dose-Ranging OA Study Extensions: data from the Second and Third Extensions (6 months to 86 weeks)

- Protocols 034/035 (Phase III)—The second 6 months of the initial 1-year Multinational and U.S. Diclofenac OA Studies plus Extension data up to 72 weeks of treatment

Note that the safety data for the second 6 months of treatment of the Multinational and U.S. diclofenac studies have also been included in the 1-Year Studies section described above. The Dose-Ranging OA Study (Protocol 029) had a First Extension from 6 weeks to 6 months of treatment (Protocol 029-10). Patients underwent a dose-escalation phase which included treatment group reassignments. This change in treatment group complicated the assessment of individual adverse experiences due to carryover effects. Data from clinical and laboratory adverse experiences during this extension are not included in this document and are in the clinical study report [P029X]. The

MRK-OS420124087

MK-0966                                                              E-16
Clinical Documentation
E.  Clinical Safety
I.  General Safety Overview

### 1.2.1  Osteoarthritis Studies Section (Phase II/III Studies) and Clinical Pharmacology Studies (Phase I) (Cont.)

safety conclusions from this extension are consistent with the overall findings of this document. Data from the first extension to the Elderly OA Study (Protocol 058-10) are not included for the same reasons stated above for Protocol 029-10. In addition there was very limited data by the visit cutoff date (31MAR98) [P058].

#### Clinical Pharmacology Studies—Phase I

Patient data from all Phase I clinical pharmacology studies are included in this section. This group is not combined with the OA populations because the clinical pharmacology studies were primarily conducted in healthy subjects, had short-term exposure to MK-0966, employed a variety of study designs and doses of MK-0966, and may have taken specified concomitant therapies in addition to MK-0966 to study potential drug interactions. MK-0966 data for the clinical pharmacology studies are reported as either MK-0966 alone or MK-0966 with concomitant medications if a second drug was given along with MK-0966 as part of a drug interaction study. For a complete listing of the studies in this group refer to the Summary of Studies in the OA Safety Section (Table E-2).

### 1.2.2  Analgesia Studies—Phase II/III

Three pain models were used to demonstrate safety and efficacy in analgesia with MK-0966. These models are post-dental surgery pain, primary dysmenorrhea, and post-orthopedic surgery pain. The exposure and safety data from the Post-Dental Surgery Pain and Primary Dysmenorrhea

/MK-0966/WMA/RW1316.DOC  APPROVED                                    26OCT98

MRK-OS420124088

MK-0966                                                              E-17
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

1.2.2    Analgesia Studies—Phase II/III (Cont.)

Studies are combined and reported using summary
statistics. The data from the Post-Orthopedic Surgery Pain
Study are reported separately because these patients were
older, had more comorbid conditions, underwent a major
surgical procedure, and had received MK-0966 therapy for
up to 5 consecutive days.

**Post-Dental Surgery Pain Studies**

- Protocol 004 (Phase IIa)—Pilot Post-Dental Surgery
  Pain Study; MK-0966 versus ibuprofen versus placebo

- Protocol 027 (Phase IIb)—Dose-Ranging in Post-Dental
  Surgery Pain Study; MK-0966 versus naproxen sodium
  versus placebo

- Protocol 051 (Phase IIb)—Dose-Ranging in Post-Dental
  Surgery Pain Study; MK-0966 versus naproxen sodium
  versus placebo

- Protocol 066 (Phase III)—Post-Dental Surgery Pain
  Study; MK-0966 versus ibuprofen versus placebo

- Protocol 071 (Phase III)—Post-Dental Surgery Pain
  Study; MK-0966 versus ibuprofen versus placebo

**Primary Dysmenorrhea Studies**

- Protocol 038 (Phase IIb)—Dose-Ranging in Primary
  Dysmenorrhea Study; MK-0966 versus ibuprofen
  versus placebo

/MK-0966/WMA/RW1316.DOC  APPROVED                        26OCT98

MRK-OS420124089

1.2.2    **Analgesia Studies—Phase II/III** (Cont.)

- Protocol 055 (Phase III)—Primary Dysmenorrhea Study; MK-0966 versus naproxen sodium versus placebo

- Protocol 056 (Phase III)—Primary Dysmenorrhea Study; MK-0966 versus naproxen sodium versus placebo

**Post-Orthopedic Surgery Pain Study**

- Protocol 072 (Phase III)—Post-Orthopedic Surgery Pain Study; MK-0966 versus naproxen sodium versus placebo

1.2.3    **GI Safety Studies**

The GI Safety Section reports the results of specific studies designed to assess GI safety. The GI Safety Section presents the primary end points of endoscopic ulcers and erosions from the U.S. and Multinational Endoscopy Studies (Protocols 044 and 045, respectively). The overall adverse experience data from Protocols 044 and 045 are presented in the 6-Month OA Studies, Section 2.3.1.2.

As specified in the GI safety Data Analysis Plan (DAP), Protocol 069 is a prespecified pooled analysis of the GI safety of the Phase IIb/III program in the OA population. All PUBs were analyzed in this report using a predefined set of diagnostic criteria. An independent adjudicating board decided if a reported event should be considered a confirmed or unconfirmed PUB.

MRK-OS420124090

MK-0966                                                                E-19
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

### 1.2.3   GI Safety Studies (Cont.)

#### Endoscopy Studies

- Protocol 009 (Phase I)—Pilot Endoscopy Study in Normal Volunteers; MK-0966 versus ibuprofen versus aspirin versus placebo

- Protocol 044 (Phase III)—U.S. OA Endoscopy Study; MK-0966 versus ibuprofen versus placebo

- Protocol 045 (Phase III)—Multinational OA Endoscopy Study; MK-0966 versus ibuprofen versus placebo

#### Studies of Special Interest

- Protocol 050 (Phase IIb)—RBC Loss Study; MK-0966 versus indomethacin versus placebo

- Protocol 041 (Phase IIb)—Intestinal Permeability Study; MK-0966 versus ibuprofen versus placebo

#### Pooled Analysis

Protocol 069—Pooled Analysis of the PUBs. Additionally, as part of Protocol 069, a pooled analysis of discontinuations due to GI adverse experiences and prespecified "NSAID type" GI adverse experiences are reported in Section 2.3.3.

### 1.2.4   Other Studies—Rheumatoid Arthritis

Three studies performed in patients with rheumatoid arthritis are reported in Section 5. These studies are reported in a separate section because: (1) they utilized doses of MK-0966 several fold higher than the dose

MRK-OS420124091

MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-20

### 1.2.4   Other Studies—Rheumatoid Arthritis (Cont.)

proposed for the treatment of OA and acute pain,
(2) rheumatoid arthritis patients have a distinct demographic
profile, and (3) rheumatoid arthritis will be filed as a new
indication at a later date.

### 1.3   Tables of All Clinical Studies

Table E-2, Table E-3, and Table E-4 present all the clinical
studies conducted with MK-0966.   Only serious adverse
experience information is provided in this document for the
ongoing supplemental studies (Section 7.).

MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-21

### 1.3   Tables of All Clinical Studies (Cont.)

Table E-2                          Summary of Studies in the Osteoarthritis Safety Section

| Study Type/Protocol Numbers | Total Duration | Total Daily MK-0966 Dose | Subjects/Patients Treated | | | Total Patients Randomized |
|---|---|---|---|---|---|---|
| | | | MK-0966 | Placebo | Active-Comparator/ Open-Label Control | |
| Phase I/Clinical Pharmacology Studies [P002; P003; P005; P009; P012 to P014; P018; P020 to P023; P028; P036; P037; P039; P041 to P043; P046 to P048; P050; P052 to P054; P057; P061 to P065; P070; P073; P075; P076] | | | | | | |
| 002; 003, 005, 009, 012, 013, 014, 018, 020, 021, 022, 023, 028, 056, 037, 059, 041, 042, 043, 046, 047, 048, 050, 092, 053, 054, 057, 061, 062, 063, 064, 065, 070, 073, 075, 076 | 1 to 50 days | 1 to 1000 mg | 777 | 318 | 394 | 1078[1] |
| Phase II/III Studies [P010; P029; P033; P040; P058; P034; P035; P044; P045; P029X; P029C; P034C] | | | | | | |
| 6-Week Studies 010, 029, 033, 040, 058 | 6 weeks | 5 to 125 mg | 1780 | 412 | 585 | 2777 |
| 6-Month Studies 034, 035, 044, 045 | 6 months | 12.5 to 50 mg | 1748 | 371 | 875 | 2994 |
| 1-Year Studies 034, 035 | 1 year | 12.5 to 25 mg | 979 | 0 | 498 | 1477[2] |
| 6-Month-to-86-Week Studies 029, 034, 035 | Up to 86 weeks | 12.5 to 50 mg | 925 | 0 | 409 | —[3] |

[1]  In the Phase I studies, patients received more than one treatment in crossover studies; therefore, the sum of the number of "Subjects/Patients Treated" (N=1489) is greater than the "Total Patients Randomized" (1078).
[2]  Patients in these studies are reported in the 6-Month and 6-Month-to-86-Week Studies as well.
[3]  Patients in the Extension Studies are already accounted for in the Phase II/III studies.

/MK-0966/WMA/RW1316.DOC  APPROVED--26OCT98

MRK-0S42012/4093

MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-22

1.3   Tables of All Clinical Studies (Cont.)

Table E-3                    Summary of the Studies in the Analgesia Safety Section

| Study Type Protocol Numbers | Total Duration | Total Daily MK-0966 Dose | Subjects/Patients Treated | | | Total Patients Randomized |
|---|---|---|---|---|---|---|
| | | | MK-0966 | Placebo | Active-Comparator/ Open-Label Control | |
| Post-Dental Surgery Pain Studies [P034; P022; P051; P066; P071] | | | | | | |
| 004, 027, 051,066, 071 | 24 hours/(single dose) | 7.5 to 500 mg | 631 | 219 | 211 | 1061 |
| Primary Dysmenorrhea Studies [P038; P055; P056] | | | | | | |
| 038, 055, 056 | 24 hours (single dose; 038) or up to 3 days (3 daily doses; 055, 056) for each of 3 to 4 menstrual cycles | 7.5 to 50 mg | 261 | 227 | 230 | 272† |
| Post-Orthopedic Surgery Pain Study [P072] | | | | | | |
| 072 | 5 days | 25 to 50 mg | 110 | 53 | 55 | 218 |
| † In these studies, patients received more than one treatment in crossover studies; therefore, the sum of the number of "subjects/patients treated" is greater than the "Total Patients Randomized." | | | | | | |

MK-0966/WMA/RW1316.DOC  APPROVED--26OCT98

MRK-0S42012409

MK-0966
Clinical Documentation
E. Clinical Safety
1. General Safety Overview

E-23

## 1.3   Tables of All Clinical Studies (Cont.)

Table E-4                Summary of All Supplemental Studies

| Study Type Protocol Numbers | Total Duration | Total Daily MK-0966 Dose | Subjects/Patients Treated | | | Total Patients Randomized |
|---|---|---|---|---|---|---|
| | | | MK-0966 | Placebo | Active Comparator/ Open-Label Control | |
| Completed Studies [P017; P017C; P011; P030; 267] | | | | | | |
| **Rheumatoid Arthritis Studies** | | | | | | |
| 017,011,030 Extension[1] | 6 weeks | 125 to 175 mg | 135 | 18[1] | 13 | 178[1] |
| 017 Banyu Corporation, Japan | Up to 48 weeks | 75 to 175 mg | 55 | 0 | 5 | —[1] |
| Phase I: 101, 102, 103 | Rising dose, 7 days | 50, 125, 200, 250, 375, 500 mg | 58 | 20 | 0 | 42[3] |
| Phase II: 503, 504, 201, 202 | Single dose, 6 weeks | 10, 12.5, 25, 50 mg | 71[3] | 0 | 0 | 72[3] |
| Ongoing Studies (not reported in this Worldwide Marketing Application) [280; 281; 309; 311; 308; 310; 307] | | | | | | |
| **Alzheimer's Disease** | | | | | | |
| 078 Bone Density | 2 years | 25 mg | Ongoing | Ongoing | Ongoing | Ongoing |
| 083 | 2 to 15 months | 25 mg | Ongoing | Ongoing | Ongoing | Ongoing |
| **Rheumatoid Arthritis** | | | | | | |
| 065 Bioequivalence | 52 weeks | 5, 25, or 50 mg | Ongoing | Ongoing | Ongoing | Ongoing |
| 087 | 1 day | 50 mg | Ongoing | Ongoing | Ongoing | Ongoing |

MK-0966/WMA/RW1516.DOC  APPROVED--26OCT98

MRK-OSFZ0124095

MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-24

### 1.3    Tables of All Clinical Studies (Cont.)

Table E-4 (Cont.)          Summary of All Supplemental Studies

| Study Type Protocol Numbers | Total Duration | Total Daily MK-0966 Dose | Subjects/Patients Treated | | | Total Patients Randomized |
|---|---|---|---|---|---|---|
| | | | MK-0966 | Placebo | Active Comparator/ Open-Label Control | |
| **Ongoing Studies (not reported in this Worldwide Marketing Application) (Cont.)** | | | | | | |
| Synovial Fluid (Rheumatoid Arthritis) 049, 081 | 3 to 4 weeks | 50 mg | Ongoing | Ongoing | Ongoing | Ongoing |
| Analgesia (Dental Pain) 084 | 1 day | 50, 100, or 200 mg | Ongoing | Ongoing | Ongoing | Ongoing |

[1] Patients received more than one treatment in crossover studies; therefore, the sum of the number of "Subjects/Patients Treated" is greater than the "Total Patients Randomized."
[2] Patients in the Extension Study are already accounted for in Rheumatoid Arthritis Studies.
[3] A follow-up of 1 patient failed.

/MK-0966/WMA/RW1316.DOC  APPROVED--26OCT98

MRK-OS42012A096

## 1.4  Statistical Methods for Evaluation of Clinical and Laboratory Adverse Experiences

Clinical and laboratory adverse experiences occurring postrandomization are summarized primarily by proportions of patients with at least one occurrence of the respective events.   Vital signs and laboratory safety measures were summarized by proportions of patients exceeding predefined limits of change.   Clinically meaningful criteria were prespecified and used to define the limits for the analysis of proportions exceeding predefined limits.

In general, statistical hypothesis testing for safety parameters must be interpreted cautiously.  The usual hypothesis testing paradigm and the resulting p-values are appropriate for a limited number of prespecified hypotheses for which there is reasonable power to detect clinically important effects. However, the analysis of safety data is in essence a screening process, with both the number of hypotheses and the specific hypotheses tested being a data-driven exercise.  These statistical tests function as indices to help identify outcomes that may require further clinical assessment.  Therefore, even if p-values indicate significant differences between treatments, assessment of the clinical relevance of the magnitude of the observed difference and relationship to other safety variables must be considered.  This includes preexisting conditions, duration and intensity of the adverse experience, outcome of the adverse experience, and related clinical and laboratory information.

MRK-OS420124097

MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-26

### 1.4 Statistical Methods for Evaluation of Clinical and Laboratory Adverse Experiences (Cont.)

In the OA studies the primary analysis was the comparison of MK-0966 12.5 mg to placebo and 25 mg to placebo in the 6-Week Studies. Summary statistics are presented for proportions of patients with adverse experiences. Pairwise treatment comparisons of adverse experience incidence and incidence of patients who exceeded predefined limits of change for laboratory and vital sign variables were carried out using Fisher's exact test for the 6-Week Studies. Individual treatment summary statistics and p-values for pairwise comparison of adverse experience rates between treatments, were computed for the MK-0966 groups in comparison with placebo using a step-down procedure for the 6-Week Studies. First, 25 mg versus placebo was tested; if statistically significant, then 12.5 mg versus placebo was tested. If 25 mg versus placebo was not significant, then 12.5 mg versus placebo was not tested because a finding of 12.5 mg different from placebo without 25 mg being different from placebo would not be consistent with dose-related effects and inconsistent with drug effect. All analyses and data summaries are based on the combined data from the five 6-Week Studies without accounting for study type. Certain adverse experiences of special interest were revealed by results of individual studies, the summary data within this report, or results of the individual testing in the 6-Week Studies. These received further detailed analysis and discussion, including individual testing for difference between treatment groups.

For the Phase II studies (Protocol 010 and 029), and for the 6-Month and 1-Year Studies, particular safety findings of

MRK-OS420124098

MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-27

## 1.4 Statistical Methods for Evaluation of Clinical and Laboratory Adverse Experiences (Cont.)

clinical interest from the 6-Week Studies and those from individual study reports were clinically evaluated for consistency with the respective combined studies results. For the 1-Year and 6-Month-to-86-Week Studies, particular safety findings of clinical interest from all previous analyses were clinically evaluated for consistency with those previous analyses. Thus, in the OA studies, statistical testing was confined to the 6-Week Studies to compare MK-0966 12.5 and 25 mg versus placebo for three reasons. First, the 12.5- and 25-mg MK-0966 doses are the clinical OA dose. Second, comparison to placebo defines the safety profile. Third, testing was limited to these doses versus placebo in the 6-Week Studies in order to minimize the number of statistical tests and the potential for multiplicity problems.

In the analgesia studies and clinical pharmacology studies, summary statistics are presented for proportions of patients with adverse experiences. Vital sign and laboratory measurements were occasionally not collected for purposes of assessing treatment effects; rather they were included for reasons related to "good clinical practices" and appropriate individual patient monitoring. Thus, these results were not subjected to any statistical analysis. Rather they were inspected for consistency with results from individual study analyses and assessed for clinical relevance.

An extensive preclinical investigation of MK-0966 toxicity was conducted in multiple species. Overall, the toxicity profile was consistent with what is expected based on the location of COX-2 expression.

MRK-OS420124099

MK-0966
Clinical Documentation
E.   Clinical Safety
1.   General Safety Overview

E-28

### 1.5   Potential Risks Based Upon Animal Data

Preclinical oral toxicity studies (in dogs, rats, and mice) demonstrated that the principal treatment-related changes were associated with renal and small intestinal toxicity (see Nonclinical Pharmacology and Toxicology Documentation). Gastric ulceration directly related to MK-0966 was not a feature of the GI toxicity in either dogs or rats—a finding that is in marked contrast to preclinical studies with NSAIDs (nonspecific COX inhibitors) [321]. The no-effect level for gastric ulceration was 30 mg/kg/day for 53 weeks in dogs (60 times the maximal OA clinical dose) and 300 mg/kg/day for 14 weeks in rats [271].

MK-0966 produced treatment-related effects in dogs and rats characterized primarily by ulcers in the jejunum/ileum, but not in the stomach. The no-effect level for intestinal ulcers in dogs administered MK-0966 was 30 mg/kg/day for 53 weeks [270] (60 times the maximal OA clinical dose). Intestinal ulcers in rats were dose and time dependent. No intestinal ulcers were observed in rats administered MK-0966 at 100 mg/kg/day for 14 weeks [271]. The no-effect level for the intestinal ulcerations in rats was 1 mg/kg/day following 53 weeks of treatment, 2 times the maximal OA clinical dose [319]. It is likely that the no-effect level in rats is lower than in dogs because rats undergo enterohepatic recirculation of MK-0966, which results in sustained exposure of the intestine to high concentrations of MK-0966. Enterohepatic recirculation is present at lower levels in dogs compared with rats and is not seen in humans.

MRK-OS420124100

1.5   Potential Risks Based Upon Animal Data (Cont.)

Prostaglandins derived from COX-2 have a role in fertility and reproduction [204]. The preclinical program evaluated the effects of COX-2 inhibition on fertility, implantation, and development (see Nonclinical Pharmacology and Toxicology Documentation). At 300 mg/kg/day, MK-0966 resulted in decreased fertility and fecundity indices in the rat [274]. At doses of 10 mg/kg/day and greater, there were treatment-related decreases in the number of corpora lutea, implants, and live fetuses, and increases in the number of resorbed and dead fetuses [274; 275]. These treatment-related changes resulted in increases in both preimplantation and postimplantation loss. The no-effect level for these findings in rats was 3 mg/kg/day [275] (6 times the maximal OA clinical dose). These findings are not surprising in light of the role prostaglandins play in both ovulation and implantation. Marketed NSAIDs have been shown to inhibit both ovulation and implantation in animal models to a similar degree. Finally, treatment of pregnant rats on the day of gestation with MK-0966 at doses of 3 mg/kg (6 times the maximal OA clinical dose) or greater, resulted in decreases in the diameter of the ductus arteriosus of the delivered fetuses; similar findings were observed with indomethacin treatment [276]. These results suggest that COX-2 may play a role in the perinatal patency of the ductus arteriosus.

Prostaglandins have an important role in renal physiology and COX-2 is constitutively expressed in the kidney [7]. The preclinical program evaluated the effects of COX-2 inhibition on renal function and sodium homeostasis. In

MRK-OS420124101

MK-0966                                                                                          E-30
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

**1.5   Potential Risks Based Upon Animal Data** (Cont.)

conscious male laboratory dogs, a 5-mg/kg dose of MK-0966 produced a transient inhibition of urinary $PGE_2$ excretion (41%) [91].  This was associated with some attenuation of sodium excretion in both dextrose- and sodium-infused animals.  Diclofenac infusions produced a >98% inhibition of urinary $PGE_2$ excretion with attenuation of sodium excretion in both dextrose- and sodium-infused animals [320].  In volume-depleted rats, a 10-mg/kg dose of MK-0966 caused a decrease in urine volume, sodium excretion, and glomerular filtration rate (GFR) compared with controls; these decreases were not statistically significant [91].  In the same experiment, indomethacin showed greater decreases than MK-0966 in urine volume, sodium excretion, and GFR; the changes in GFR and urine volume were significant compared with vehicle [91].  In addition, celecoxib has been shown to decrease urinary sodium excretion and urine volume [268].

Slight unilateral, focal necrosis of the renal papilla was seen in 2 of 8 dogs after 14 weeks of 50 mg/kg/day MK-0966 [269] (100 times the maximal OA clinical dose).  This finding was not seen in dogs administered MK-0966 at 30 mg/kg/day for 53 weeks [270] (60 times the maximal OA clinical dose).

MK-0966 was not carcinogenic when administered at maximum tolerated dosage levels to rats and mice for up to 106 and 104 weeks, respectively [277; 278; 279].  The maximum tolerated dosage level in rats was 8 mg/kg/day [277] and in mice was 60 mg/kg/day [279].

MRK-OS420124102

MK-0966                                                                    E-31
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

1.5     <u>Potential Risks Based Upon Animal Data</u> (Cont.)

MK-0966 did not produce any unexpected systemic toxicity. The observed systemic toxicities are all mechanism based and would be anticipated with all specific COX-2 inhibitors when given at clinical doses. The observed systemic toxicities of renal effects (including alteration in sodium homeostasis), reduced fertility and fecundity, and intestinal lesions were at systemic exposures in excess of those in Phase III clinical studies (2 to 100 times the maximal OA clinical dose). The dose response for small intestinal lesions was species specific, with the no-effect level in dogs representing 60 times the maximal OA dose. Of note, the no-effect level for gastric lesions in both dogs and rats demonstrated a significant improvement compared with NSAIDs [321].

It is also important to note certain toxicities that were not seen with MK-0966 in preclinical oral toxicity studies. In a 14-week oral toxicity study in dogs [269], no treatment-related changes in the articular surfaces were noted at a dosage of 50 mg/kg/day. The results from this toxicokinetic study demonstrate that MK-0966 achieves high levels in synovial fluid without any adverse effects on the articular structures including cartilage. In addition, no treatment-related changes were seen in bone at doses up to 300 mg/kg/day for 14 weeks in rats and 30 mg/kg for 53 weeks in dogs.

/MK-0966/WMA/RW1316.DOC  APPROVED                              26OCT98

MRK-OS420124103

### 1.6   Discussion of Safety Issues With Other Drugs of the Class

Published literature documenting the safety profile of other COX-2-specific inhibitors is scarce.   Preclinical data comparing the selectivity of various compounds in ex vivo human whole blood assays indicate that celecoxib is considerably less selective than MK-0966 [40; 239], but preliminary clinical data suggest it is COX-2 specific (i.e., no significant COX-1 inhibition) [238] at the suggested clinical dose range.   In preclinical studies, celecoxib has been shown to decrease urinary sodium excretion [268] and may therefore be anticipated to cause at least some degree of fluid retention.   No important clinical or laboratory adverse experiences were reported with celecoxib in both a 2-week OA study and a 4-week rheumatoid arthritis study [255].   Phase II/III clinical data on celecoxib are available in abstract form only so a full analysis of celecoxib-induced adverse experiences cannot be done at this time.

Flosulide (CGP-28238) has been characterized using human whole blood assays as a selective inhibitor of COX-2 [3]; results of assays to determine whether it is a specific inhibitor in man have not been reported.   An endoscopy study in patients with OA demonstrated that flosulide induced less stomach damage and was better tolerated than naproxen; a placebo control group was not included [197].

### 1.7   Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition

MK-0966 is a specific inhibitor of COX-2.   At the clinical dose of 12.5 and 25 mg and even with multiple doses up to

MRK-OS420124104

MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-33

### 1.7    Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition (Cont.)

375 mg daily (15 to 30 times the clinical dose range for OA) and single doses up to 1000 mg (40 to 80 times the clinical dose range for OA), there was no dose-dependent inhibition of COX-1 compared with placebo in assays of platelet function and assays of prostanoid production by human platelets and gastric mucosa.  This specificity of action is in distinction to NSAIDs that inhibit both COX-1 and COX-2 [104].   The potential risks based upon inhibition of COX-2 are therefore a subset of those already observed with marketed NSAIDs.  The known sites of constitutive COX-2 expression include the kidney [1], reproductive tract [204], pancreatic islet cells [294], and brain [106].  In addition, COX-2 expression is induced at sites of inflammation and repair [125; 126; 127; 128; 102; 5; 104].

Prostaglandins (e.g., $PGE_2$ and $PGI_2$) synthesized in the kidney play an important role in the regulation of renal blood flow, glomerular filtration, and the handling of salt and water [46; 1; 19; 18; 13; 27; 26; 20; 6; 21; 22; 25; 23]. Prostaglandin synthesis is believed to be most critical for maintaining renal blood flow and glomerular filtration in those pathophysiologic states associated with increased endogenous circulating vasoconstrictors such as congestive heart failure, cirrhosis with ascites, diuretic usage, and hypovolemia.  The use of NSAIDs in the presence of these pathophysiologic states where prostaglandins are important for maintaining renal blood flow can lead to reversible impairment of GFR and in severe cases, acute renal failure.

/MK-0966/WMA/RW1316.DOC  APPROVED                                         26OCT98

MRK-OS420124105

MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-34

### 1.7  Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition (Cont.)

NSAIDs, by inhibiting COX and thereby reducing prostaglandin levels, alter sodium and chloride absorption, which can result in edema and worsening of blood pressure control.  In addition, since prostaglandins have a role in renin release, NSAIDs can lead to hyporeninemic hypoaldosteronism causing hyperkalemia and hyponatremia.

Both COX-1 and COX-2 are constitutively expressed in the kidney of all species studied [12; 1; 19], but have distinct patterns of expression.  COX-1 is widely expressed throughout the kidney.  The expression of COX-2 is clearly more limited, but the precise cell types expressing COX-2 are a matter of some debate [19], with expression in the thick ascending limb of the loop of Henle being the most consistent finding.  This pattern of expression is consistent with COX-2 derived prostanoids being involved in salt and water handling by the kidney, but other functions for COX-2 derived prostanoids can not be ruled out. Conservatively, the renal adverse effects seen with the specific COX-2 inhibitor MK-0966 should be similar to those seen with NSAIDs.

Prostaglandins have several roles in reproduction, with COX-2 derived prostanoids being implicated in various female reproductive functions.  COX-2 is induced in ovarian follicles preceding ovulation [123; 205; 206; 207] and is only focally expressed in the uterus [296].  Analyses of genetically engineered COX-2 deficient mice reveal the importance of COX-2 in ovulation, fertilization,

MRK-OS420124106

1.7   **Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition** (Cont.)

implantation, and decidualization [204].   Results of preclinical studies support the hypothesis that COX-2 may play a role in the perinatal patency of the ductus arteriosus [293].  The clinical significance of COX-2 inhibition on fertility, pregnancy, and parturition is unknown.   It is expected that the specific COX-2 inhibitor, MK-0966, will have the same magnitude of effects as NSAIDs since both classes of drugs inhibit COX-2 to a similar extent.

Both COX-1 and COX-2 are present in the brain [106; 224].   In the bovine brain, COX immunoreactivity was located predominantly in the cerebral cortex, hippocampus and amygdala.   Glial cells are devoid of COX reactivity. Synaptic activity elevates the level of COX-2 expression in the rat [106; 224].   COX-2 expression is also elevated in the neuritic tangles and plaques of brains of patients with Alzheimer's disease [303].   The clinical significance of COX inhibition in the brain and the relative contribution of the two isoforms are unknown.

COX-2 expression, and the production of proinflammatory prostaglandins, is induced by proliferative or proinflammatory stimuli.   These include lipopolysaccharides, serum growth factors, hormones, and cytokines [125; 126; 127; 128; 102; 5; 104].   Induction of COX-2 occurs primarily at sites of inflammation in macrophages, polymorphonuclear leukocytes, endothelial cells, chondrocytes, and rheumatoid synoviocytes [128; 10; 129; 105; 107].   The anti-inflammatory activity of COX inhibitors, both specific and nonspecific, derives from inhibition of proinflammatory prostaglandins.

MRK-OS420124107

MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-36

1.7  Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition (Cont.)

1.  Wound healing and inflammation are related processes that both involve the activity of prostaglandins, cytokines, and inflammatory cell types.  Just as COX inhibition results in decreased inflammation, so it is theoretically possible that COX inhibition may impair wound healing.  One model of wound healing is the repair of experimentally induced GI mucosal lesions in laboratory animals.  COX-2 is expressed at the site of experimentally induced gastric erosions and ulcers in mice and rats [108; 222; 214; 223].  Both indomethacin (a nonspecific COX inhibitor) and the selective COX-2 inhibitor, NS-398, delay healing of these lesions [214; 222].  The impairment of ulcer healing by selective inhibition of COX-2 was not more severe than that produced by the nonspecific inhibitor [214].  Whether these preclinical model systems of experimentally induced erosions are relevant to human gastric erosion healing, or other clinical settings of wound repair, is unknown.

2.  Prostaglandins are likely to be important in bone metabolism.  There is evidence that prostaglandins, including prostaglandin E2 (PGE-2), are produced by osteoblasts and osteoblast-like cells [289; 290; 291], and that they can stimulate both bone resorption and bone formation [203].  The relative contribution to bone formation versus resorption in vivo by prostaglandins is unknown.  In addition, the roles of COX-1 versus COX-2 in the production of prostaglandins in bone has not been established.  One report demonstrated that both indomethacin and NS-398, a selective COX-2 inhibitor,

MRK-OS420124108

1.7    Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition (Cont.)

inhibit bone formation induced by mechanical loading in rats [202].   COX-2 expression was induced in an in vitro model of mechanical loading [201], suggesting a role for COX-2 derived prostanoids in mechanically induced bone formation.     Data in humans on NSAID effects on biochemical markers of bone metabolism are limited [292] and there are no long-term, prospective data of the effects of either NSAIDs or COX-2-specific inhibitors on either biochemical markers of bone turnover or bone mineral density.

3.    A related area of concern is the effect of COX inhibitors on articular cartilage.   Preclinical studies and retrospective clinical studies have implicated NSAIDs in the acceleration of joint destruction in OA [256].  Results from well-designed and well-conducted randomized trials to address the question of whether NSAIDs affect the progression of OA in humans have yet to be reported.  If NSAIDs do affect the progression of OA, it is unknown whether this effect would be through COX-1 or COX-2.  It is expected that the effect of MK-0966 (a specific COX-2 inhibitor) on cartilage, if any, will be no different than with NSAIDs already in use since both classes of drugs inhibit prostaglandin production by COX-2 to a similar extent.

4.    In summary, COX-2 is located in the kidney, reproductive tract, brain, and at the site of inflammation and bone turnover.   MK-0966 is a specific inhibitor of COX-2.  Mechanism-based adverse experiences would derive directly from COX-2 inhibition.  There is a wealth of

MRK-OS420124109

MK-0966                                                                    E-38
Clinical Documentation
E. Clinical Safety
1. General Safety Overview

**1.7   Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition** (Cont.)

experience in humans with COX-2 inhibition during therapy with NSAIDs (nonspecific COX inhibitors). It is expected that the adverse experiences with MK-0966 will be similar to NSAIDs in the above-mentioned organs as both classes inhibit COX-2 to a similar degree. The lack of COX-1 inhibition by MK-0966 has the potential to eliminate the GI toxicity seen with NSAIDs. In addition, MK-0966 is expected to be free from platelet function inhibition that is COX-1 mediated.

**1.8   Potential Risks of Cyclooxygenase-1 Inhibition in Nonspecific Inhibitors of Cyclooxygenase**

1.  The specificity of MK-0966 for COX-2, and lack of inhibition of COX-1, extends to oral dosing in humans. NSAIDs inhibit both the COX-1 and COX-2 isoforms. Prostaglandin synthesis in the GI tract and platelets depends on COX-1 [103]. It is expected that MK-0966 will have a toxicity profile similar to placebo in these areas.

2.  Prostaglandins have an important role in mucosal protection in the GI tract. Several mechanisms are involved including reducing acid secretion, stimulating mucous secretion, maintaining blood flow, and increasing bicarbonate secretion [198; 199]. The production of these cytoprotective prostaglandins in the GI tract is dependent on COX-1. In the normal GI tract of humans, COX-1 is the only isoform expressed [100; 30].

3.  NSAID use in humans leads to the development of ulcers and their complications such as bleeding, perforation, and

/MK-0966/WMA/RW1316.DOC  APPROVED                              26OCT98

MRK-OS420124110

MK-0966
Clinical Documentation
E.   Clinical Safety
1.   General Safety Overview

E-39

## 1.8   Potential Risks of Cyclooxygenase-1 Inhibition in Nonspecific Inhibitors of Cyclooxygenase (Cont.)

obstruction [198].   Among elderly individuals, patients using NSAIDs have approximately 4 times the relative risk of hospitalization for peptic ulcer disease as nonusers, with patients using the highest doses having approximately 8 times the relative risk [118].  Further evidence in support of the role of prostaglandins in maintaining mucosal integrity comes from clinical experience with administration of exogenous prostaglandin (misoprostol). Misoprostol administered concurrently with an NSAID greatly diminishes the ulcerogenic effects of NSAIDs [159; 185; 195; 196; 216; 45].

PUBs occur at an incidence of 2 to 4% per year in patients treated with NSAIDs.  In the United States alone, it is estimated that PUBs due to NSAIDs cause 76,000 hospitalizations and 7600 to 20,000 deaths per year [157]. Risk factors for the development of PUBs are: advanced age, high dose of NSAID, previous history of PUBs, and functional disability [157].   Because MK-0966, at and above the OA dose range, does not inhibit COX-1, it is probable that MK-0966 will not increase the risk of ulcers and their complications.  Studies with MK-0966 included patients with the risk factors of advanced age, prior history of PUBs, *Helicobacter pylori* infection, and concomitant diseases.

Platelets contain only COX-1 and are incapable of expressing COX-2 since they lack a nucleus [103]. Inhibition of the synthesis of the prostaglandin

/MK-0966/WMA/RW1316.DOC  APPROVED

26OCT98

MRK-OS420124111

MK-0966
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

E-40

### 1.8   Potential Risks of Cyclooxygenase-1 Inhibition in Nonspecific Inhibitors of Cyclooxygenase (Cont.)

thromboxane $A_2$ by NSAIDs impairs the ability of platelets to aggregate.  This results in a prolonged bleeding time and, in some cases, clinically significant spontaneous bleeding complications [29].  Some studies have suggested that both aspirin and NSAIDs may increase peri-operative blood loss [29].  This inhibition of platelet function may further potentiate the ability of NSAIDs to cause GI bleeding.  However, it must also be acknowledged that the inhibition of platelet function by aspirin has beneficial effects on cardiovascular morbidity and mortality [295; 297].  MK-0966 doses, up to and including 40 times the maximal dose, do not inhibit platelet function or bleeding time. It is theoretically possible that use of MK-0966 without concomitant aspirin in patients at risk for cardiovascular events may not provide the cardiovascular benefits of aspirin.

### 1.9   Rationale for Safety End Points Studied

The potential risks of MK-0966 are a subset of the known mechanism-based adverse experiences that occur with NSAIDs related to inhibition of COX-2.   Extensive preclinical studies revealed no unexpected toxicities with MK-0966.  No new safety concerns were discovered during Phase I testing at up to 40 times the highest dose studied in Phase III OA efficacy studies. Renal effects of MK-0966 were monitored at every visit with blood pressure and body weight measurements, laboratory tests for serum creatinine and qualitative tests for urine protein.  In addition, at most

MRK-OS420124112

MK-0966                                                          E-41
Clinical Documentation
E.  Clinical Safety
1.  General Safety Overview

1.9    Rationale for Safety End Points Studied (Cont.)

visits, serum electrolytes and a urinalysis were performed.
The effects of MK-0966 on fertility and pregnancy could
not be assessed in these studies. Women of childbearing
potential were required to use contraception and have
negative pregnancy tests. If a patient did become pregnant,
MK-0966 was discontinued. Also, the majority of the OA
patients were not of childbearing potential (average age,
63 years).

GI safety was specifically investigated in several ways
beyond the standard collection of spontaneous adverse
experiences. Two large endoscopy studies were performed
to compare the incidence of ulcer and erosion formation
with MK-0966 with placebo and ibuprofen. Although
endoscopic ulcers occur at a greater incidence than clinical
PUBs, they are a surrogate end point (indicator of mucosal
toxicity) for these events [210]. Mucosal damage, as
visualized endoscopically, must first occur before a clinical
PUB can develop. All PUB events that occurred as part of
Phase IIb/III were adjudicated by an independent board to
verify that they fulfilled PUB criteria. This analysis of
PUBs provides the clinical complement to the endoscopy
studies. Lastly, 2 specialty GI studies were performed to
assess mucosal integrity throughout the GI tract. RBC
blood loss (Protocol 050) is a more sensitive procedure
used to detect GI bleeding induced by NSAIDs. The
intestinal permeability study (Protocol 041) assessed
mucosal integrity of the entire GI tract.

MRK-OS420124113

## 2. Clinical Safety in Osteoarthritis Studies

### 2.1 Overall Extent and Duration of Exposure

Table E-5 presents the extent and duration of treatment with MK-0966 for all patients and subjects for all clinical studies (OA, analgesia, rheumatoid arthritis and Phase I/Clinical Pharmacology). Later in this section the duration and extent of exposure to MK-0966 in patients with OA is discussed. Data specific for analgesia studies are in the analgesia section.

These tables report actual doses of MK-0966 taken; missed doses or placebo washout days are not counted. An individual patient was counted only one time in the top row labeled "Any dose." Therefore, the total number of patients exposed to MK-0966 is recorded in the column "Total Number of Patients." A patient who received a variety of doses during a study, such as in a dose-escalation study, is reported in each specific dosage row for the duration that the dose was taken. Therefore, the summation of the number of patients in all specific dosage rows, for a specific duration of exposure, can be greater than the number reported in the "Any dose" row.

### 2.1.1 Total Exposure to MK-0966—All Phase I to III Studies

A total of 5435 subjects/patients were treated with MK-0966 in Phase I/Clinical Pharmacology, OA, analgesia, and rheumatoid arthritis studies (Table E-5). A total of 1396 patients received MK-0966 for 6 months or greater. This number is the summation of patients treated for 6 months and less than 1 year (574), plus patients treated

MRK-OS420124114

MK-0966
Clinical Documentation
E.  Clinical Safety
2.  Clinical Safety in Osteoarthritis Studies

2.1.1  <u>Total Exposure to MK-0966—All Phase I to III Studies</u> (Cont.)

for 1 year and less than 2 years (822). Individual subjects/patients are counted only once in the top row labeled "Any dose." A small number of subjects participated in multiple Phase I studies; 24 subjects were treated with MK-0966 in 2 studies and 2 in 3 studies, resulting in 5407 distinct individuals treated with at least 1 dose of MK-0966.

/MK-0966/WMA/RW1314.DOC  APPROVED

26OCT98

MRK-OS420124115

MK-0966                                                                                    E-44
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

2.1.1   **Total Exposure to MK-0966—All Phase I to III Studies (Cont.)**

Table E-5            Number of Patients on Study Drug by Dose and Actual Duration of Treatment
                     All Phase I to III Studies

| Range of Doses of MK-0966 | Treatment Intervals | | | | | | | Total Number of Patients |
|---|---|---|---|---|---|---|---|---|
| | <1 Week | ≥1 Week to <2 Weeks | ≥2 Weeks to <2 Months | ≥2 Months to <6 Months | ≥6 Months to <1 Year | ≥1 Year to <2 Years | ≥2 Years | |
| Any dose | 1428 | 244 | 1792 | 575 | 574 | 822 | 0 | 5435 |
| <12.5 mg | 173 | 24 | 135 | 2 | 0 | 0 | 0 | 334 |
| 12.5 mg to <25 mg | 214 | 47 | 646 | 136 | 75 | 371 | 0 | 1489 |
| 25 mg to <50 mg | 543 | 100 | 861 | 239 | 282 | 381 | 0 | 2406 |
| 50 mg to ≤100 mg | 760 | 119 | 128 | 156 | 209 | 63 | 0 | 1435 |
| >100 mg | 184 | 96 | 149 | 39 | 2 | 0 | 0 | 470 |

Although some patients may have taken 2 or more different dosages, they have been counted only one time each in the "Any dose" row.
[P002 to P005; P009 to P014; P017; P017C; P018; P020 to P023; P027 to P029; P029X; P029C; P030; P033; P034; P034C; P035 to P044; P044C; P047; P048; P050 to P058; P061 to P066; P069 to P073; P075; P076]

/MK-0966/WMA/RW1314.DOC  APPROVED--26OCT98

MRK-OS4201241l6

### 2.1.2   Osteoarthritis Safety Data

The OA safety experience is reported using 5 study groupings: 6-Week Studies, 6-Month Studies, 1-Year Studies, 6-Month-to-86-Week Studies, and Phase I/Clinical Pharmacology Studies. A standard format is used to aid in the review and understanding of the information. Table E-6 summarizes the contribution of individual studies to these groupings. Note that the Multinational and U.S. Diclofenac OA Studies (Protocol 034 and 035) contribute data in an overlapping fashion to 3 study groupings.

The duration and extent of exposure to MK-0966 for the various OA study groupings are reported first. This is followed by a description of the baseline characteristics of patients in the OA studies. The clinical adverse experience profile is presented in 2 sections.   The first section comprises overall adverse experiences, including most frequent, drug related (as determined by the investigator), and discontinuations due to clinical adverse experiences. The second section is a discussion of serious clinical adverse experiences.   The clinical adverse experience presentation concludes with a discussion of specific adverse experiences.

The laboratory adverse experience profile is presented in similar fashion.   In addition, this section includes a presentation of the predefined limits of change for laboratory tests and concludes with a discussion of specific laboratory adverse experiences.

MRK-OS420124117

MK-0966
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

**2.1.2   Osteoarthritis Safety Data** (Cont.)

Table E-6                           Contribution of Individual Studies to Overall OA Study Grouping

| Protocol: | 010 | 029 | 033 | 040 | 058 | 034/35 | 044/045 |
|---|---|---|---|---|---|---|---|
| **Study Group** | | | | | | | |
| 6-Week Studies | X | X | X | x | X | | |
| 6-Month Studies | | | | | | First 6 months of 1-year base studies | X |
| 1-Year Studies | | | | | | Entire year of 1-year base studies | |
| 6-Month-to-86-Week Studies | | 029-20 and 029-30 extension | | | | Second 6 months of 1-year base studies plus extension | |

Data from Protocols 034 and 035 (Multinational and U.S. Diclofenac OA Studies) appear in 3 study groupings:
   The first 6 months of the 1-Year Studies are combined with the 2 Endoscopy Studies to create the 6-Month Studies group.
   The entire year of the 1-year base studies constitute the 1-Year Studies group.
   The second 6 months of the 1-Year Studies plus extensions are combined with the extensions to Protocol 029 (second and third extensions) to create the 6-Month-to-86-Week Studies group.

[P010; P029; P029C; P033; P034; P034C; P035; P040; P044; P045; P058]

/MK-0966/WMA/RW1314.DOC  APPROVED -26OCT98

MRK-OS420124118

MK-0966                                                                    E-47
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

2.1.2   Osteoarthritis Safety Data (Cont.)

Specific analyses of clinical and laboratory evaluations related to potential mechanism-based toxicities or advantages of MK-0966 are summarized in the following sections: renal/vascular (Section 2.5), thromboembolic /cardiovascular (Section 2.3.3), and GI safety (Section 4.).

The primary safety evaluation for MK-0966 in this document is the comparison of the OA clinical dose range (12.5 and 25 mg) with placebo in the 6-Week Studies. The primary tables for this group report data as follows: placebo, 12.5 mg MK-0966, 25 mg MK-0966, 2400 mg ibuprofen, and 1500 mg nabumetone. A secondary set of tables summarizes the experience in the Pilot OA Study (Protocol 010) and the Dose-Ranging OA Study (Protocol 029). These tables report safety data with MK-0966 doses ranging from 5 times less (5 mg) and up to 5 times greater (125 mg) than the maximum recommended clinical OA dose (25 mg). The patients reported in the placebo, 12.5- and 25-mg treatment groups of the Dose-Ranging Study (Protocol 029) are also reported in the primary 6-Week Studies tables.

The 6-Month Studies provide comparisons between doses of 12.5, 25 (clinical OA dose range) and 50 mg (2 times the maximal clinical OA dose) MK-0966, 150 mg diclofenac, and 2400 mg ibuprofen with long-term administration. All patients reported in this study grouping are unique and are not reported in the 6-Week Studies. Due to prespecified study design, the placebo-treated patients in this group had approximately one-third less time on

/MK-0966/WMA/RW1314.DOC  APPROVED                          26OCT98

MRK-OS420124119

MK-0966
Clinical Documentation                                          E-48
E.  Clinical Safety
2.  Clinical Safety in Osteoarthritis Studies


2.1.2   Osteoarthritis Safety Data (Cont.)

treatment compared with all other groups. Therefore, direct
comparison of the MK-0966 or NSAID adverse experience
incidence with the placebo group is not appropriate.

The 1-Year Studies compare safety data from 1 year of
treatment with MK-0966 (12.5 and 25 mg) with diclofenac
(150 mg). Patient data from the Multinational and U.S.
Diclofenac OA Studies (Protocols 034 and 035) are
combined for the grouping. They were designed as 1-year
studies and conducted under double-blind conditions
throughout the treatment period. Safety data for the first
6 months of treatment are also reported in the 6-Month
Studies section described above. (The second 6 months of
treatment are also reported in the 6-Month-to-86-Week
Studies section).

The 6-Month-to-86-Week Studies evaluate whether the
safety profile of MK-0966 changes over time; i.e., are there
new or more frequent adverse experiences in the time
period after 6 months of treatment. Available data at the
time of the visit date cutoff (31MAR98) are reported using
the following groupings: 12.5, 25, 50 mg MK-0966, and
150 mg diclofenac. There is no overlap in the adverse
experiences with the 6-Week and 6-Month Studies groups,
as only adverse experiences that started during the
6-Month-to-86-Week period are reported. There is,
however, overlap with the 1-Year Studies as the adverse
experiences from the second 6 months of the 2 diclofenac
studies are reported in both groups.

/MK-0966/WMA/RW1314.DOC  APPROVED                          26OCT98

MRK-OS420124120

MK-0966                                                            E-49
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

### 2.1.2   Osteoarthritis Safety Data (Cont.)

Thirty-six studies comprise the Phase I/Clinical Pharmacology Studies. In general, these were studies of short duration and involved healthy subjects. Data are reported using the following groupings: placebo, MK-0966 (all doses combined), MK-0966 (all doses combined) plus other drugs, and placebo plus other drugs. "Other Drugs" in the latter 2 treatment groups refers to either a drug being tested for an interaction or as a comparator agent. Because of the use of crossover designs in several studies, individuals may be counted in more than 1 group. For example, in a MK-0966/placebo crossover study, a subject was counted as having been exposed to both MK-0966 and placebo in the tables. Individual subjects maintained the same allocation number throughout the study.

### 2.1.3   Exposure to MK-0966 in Osteoarthritis Studies

These tables report actual doses of MK-0966 taken; missed doses or placebo washout days are not counted. An individual patient was counted only one time in the top row labeled "Any dose." Therefore, the total number of patients exposed to MK-0966 is recorded in the column "Total Number of Patients." A patient who received a variety of doses during a study, such as in a dose-escalation study, is reported in a specific dosage row for the duration that the dose was taken. Therefore, the summation of the number of patients in all specific dosage rows for a specific duration of exposure can be greater than the number reported in the "Any dose" row.

MK-0966                                                          E-50
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

### 2.1.3   Exposure to MK-0966 in Osteoarthritis Studies (Cont.)

A total of 3595 patients with OA were treated with
MK-0966 (Table E-7).   A total of 1385 OA patients
received MK-0966 for 6 months or longer and 818 OA
patients received MK-0966 for 1 year or longer.

MRK-OS420124122

MK-0966                                                                          E-51
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

2.1.3   **Exposure to MK-0966 in Osteoarthritis Studies** (Cont.)

Table E-7                Number of Patients on Study Drug by Dose and Actual Duration of Treatment
                         All Osteoarthritis Studies

| Dose of MK-0966 | Treatment Intervals | | | | | | Total Number of Patients |
|---|---|---|---|---|---|---|---|
| | <1 Week | ≥1 Week to <2 Weeks | ≥2 Weeks to <2 Months | ≥2 Months to <6 Months | ≥6 Months to <1 Year | ≥1 Year to <2 Years | ≥2 Years | |
| Any dose | 66 | 90 | 1512 | 542 | 567 | 818 | 0 | 3595 |
| <12.5 mg | 15 | 9 | 135 | 2 | 0 | 0 | 0 | 161 |
| 12.5 mg | 22 | 32 | 646 | 136 | 75 | 371 | 0 | 1282 |
| 17.5 mg | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 25 mg | 36 | 34 | 760 | 239 | 282 | 381 | 0 | 1732 |
| 50 mg | 23 | 10 | 85 | 155 | 202 | 63 | 0 | 540 |
| >50 mg | 7 | 8 | 62 | 0 | 0 | 0 | 0 | 77 |

Although some patients may have taken 2 or more different dosages, they have been counted only one time each in the "Any dose" row.

[P010; P029; P029X; P029C; P033; P034; P034C; P035; P040; P044; P045; P058]

MRK-OS420124123

MK-0966                                                          E-52
Clinical Documentation
E.    Clinical Safety
2.    Clinical Safety in Osteoarthritis Studies


**2.1.3.1    Exposure to MK-0966 in the 6-Week Osteoarthritis Studies**

A total of 1780 patients with OA were treated with MK-0966 (Table E-8) in the 6-Week Studies. The mean duration of treatment was 40 days. There were 412 placebo patients in the 6-Week Studies.

MRK-OS420124124

MK-0966                                                                                                      E-53
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

2.1.3.1   Exposure to MK-0966 in the 6-Week Osteoarthritis Studies (Cont.)

Table E-8              Number of Patients on Study Drug by Dose and Actual Duration of Treatment
                       6-Week Osteoarthritis Studies

| Dose of MK-0966 | Treatment Intervals | | | | | Total Number of Patients |
|---|---|---|---|---|---|---|
| | <1 Week | ≥1 Week to <2 Weeks | ≥2 Weeks to <2 Months | ≥2 Months to <6 Months | ≥6 Months to <1 Year | |
| Any dose | 39 | 57 | 1683 | 1 | 0 | 1780 |
| <12.5 mg | 6 | 9 | 135 | 1 | 0 | 151 |
| 12.5 mg | 16 | 21 | 688 | 0 | 0 | 725 |
| 25 mg | 16 | 16 | 706 | 0 | 0 | 738 |
| 50 mg | 6 | 3 | 92 | 0 | 0 | 101 |
| >50 mg | 4 | 8 | 62 | 0 | 0 | 74 |

Although some patients may have taken 2 or more different dosages, they have been counted only one time each in the "Any dose" row.
[P010; P029; P033; P040; P058]

MRK-OS#20124125

MK-0966/WMA/RW1314.DOC  APPROVED--26OCT98

MK-0966                                                                                    E-54
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies


**2.1.3.2    Exposure to MK-0966 in the 6-Month Osteoarthritis Studies**

A total of 1748 patients with OA were treated with
MK-0966 (Table E-9) in the 6-Month Studies. The mean
duration of treatment was 142 days.

MRK-OS420124126

MK-0966                                                                                                    E-55
Clinical Documentation
E.  Clinical Safety
2.  Clinical Safety in Osteoarthritis Studies

**2.1.3.2    Exposure to MK-0966 in the 6-Month Osteoarthritis Studies (Cont.)**

Table E-9            Number of Patients on Study Drug by Dose and Actual Duration of Treatment
                     6-Month  Osteoarthritis Studies

| Dose of MK-0966 | Treatment Intervals | | | | | | Total Number of Patients |
|---|---|---|---|---|---|---|---|
| | <1 Week | ≥1 Week to <2 Weeks | ≥2 Weeks to <2 Months | ≥2 Months to <6 Months | ≥6 Months to <1 Year | ≥1 Year to <2 Years | |
| Any dose | 27 | 28 | 218 | 383 | 1092 | 0 | 1748 |
| 12.5 mg | 6 | 7 | 54 | 65 | 358 | 0 | 490 |
| 25 mg | 15 | 15 | 110 | 185 | 556 | 0 | 881 |
| 50 mg | 11 | 6 | 54 | 133 | 178 | 0 | 382 |
| >50 mg | 1 | 0 | 0 | 0 | 0 | 0 | 1 |

Although some patients may have taken 2 or more different dosages, they have been counted only one time each in the "Any dose" row.

[P034; P035; P044; P045]

MRK-OS420124127

MK-0966                                                                E-56
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

**2.1.3.3    Exposure to MK-0966 in the 1-Year Osteoarthritis Studies**

A total of 979 patients with OA were treated with
MK-0966 (Table E-10) in the 1-Year Studies. The mean
duration of treatment was 270 days.

MRK-OS420124128

MK-0966                                                                          E-57
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

2.1.3.3   Exposure to MK-0966 in the 1-Year Osteoarthritis Studies (Cont.)

Table E-10         Number of Patients on Study Drug by Dose and Actual Duration of Treatment
                   1-Year Osteoarthritis Studies

| Dose of MK-0966 | Treatment Intervals | | | | | | | Total Number of Patients |
|---|---|---|---|---|---|---|---|---|
| | <1 Week | ≥1 Week to <2 Weeks | ≥2 Weeks to <2 Months | ≥2 Months to <6 Months | ≥6 Months to <1 Year | ≥1 Year to <2 Years | ≥2 Years | |
| Any dose | 12 | 17 | 114 | 117 | 99 | 620 | 0 | 979 |
| 12.5 mg | 6 | 7 | 54 | 62 | 44 | 317 | 0 | 490 |
| 25 mg | 8 | 10 | 60 | 55 | 55 | 303 | 0 | 491 |
| 50 mg | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Although some patients may have taken 2 or more different dosages, they have been counted only one time each in the "Any dose" row. | | | | | | | | |

[P034C]

MRK-CJSA2012412

/MK-0966/WMA/RW1314.DOC  APPROVED~26OCT98

MK-0966
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

E-58

### 2.1.3.4    Exposure to MK-0966 in the 6-Month-to-86-Week Osteoarthritis Studies

A total of 923 patients with OA were treated with
MK-0966 (Table E-11) in the 6-Month-to-86-Week
Studies. For an individual patient, the days on treatment
reported in this table concern only those days from
6 months and beyond of a study, i.e., the primary study
treatment duration was not added to the duration of the
6-Month-to-86-Week Studies.

MRK-OS420124130

MK-0966                                                                                    E-59
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

2.1.3.4   Exposure to MK-0966 in the 6-Month-to-86-Week Osteoarthritis Studies (Cont.)

Table E-11                    Number of Patients on Study Drug by Dose and Actual Duration of Treatment
                              6-Month to 86-Week Osteoarthritis Studies

| Dose of MK-0966 | Treatment Intervals | | | | | | | Total Number of Patients |
|---|---|---|---|---|---|---|---|---|
| | <1 Week | ≥1 Week to <2 Weeks | ≥2 Weeks to <2 Months | ≥2 Months to <6 Months | ≥6 Months to <1 Year | ≥1 Year to <2 Years | ≥2 Years | |
| Any dose | 7 | 3 | 45 | 90 | 690 | 88 | 0 | 923 |
| <12.5 mg | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| 12.5 mg | 5 | 2 | 17 | 34 | 335 | 22 | 0 | 415 |
| 25 mg | 6 | 1 | 24 | 46 | 322 | 39 | 0 | 438 |
| 50 mg | 3 | 0 | 4 | 10 | 33 | 27 | 0 | 77 |

† Although some patients may have taken 2 or more different dosages, they have been counted only one time each in the "Any dose" row.

[P029C; P034C]

MK-0966/WMA/RW1314.DOC  APPROVED--26OCT98

MK-0966                                                                    E-60
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

### 2.1.3.5.   Exposure to MK-0966 in the Phase I/Clinical Pharmacology Studies

A total of 705 subjects and patients were treated with
MK-0966 in the Phase I Studies (Table E-12).

Table E-12                 Number of Patients on Study Drug by Dose and Actual
                           Duration of Treatment
                           Phase I/Clinical Pharmacology Studies

| Dose of MK-0966 | Treatment Intervals | | | | Total Number of Subjects |
| | <1 Week | ≥1 Week to <2 Weeks | ≥2 Weeks to <2 Months | ≥2 Months to <6 Months | |
|---|---|---|---|---|---|
| Any dose | 354 | 122 | 229 | 0 | 705 |
| <12.5 mg | 71 | 15 | 0 | 0 | 86 |
| 12.5 mg to <25 mg | 119 | 15 | 0 | 0 | 134 |
| 25 mg to <50 mg | 170 | 66 | 101 | 0 | 337 |
| 50 mg to ≤100 mg | 63 | 92 | 42 | 0 | 197 |
| >100 mg | 93 | 72 | 29 | 0 | 194 |
| Although some patients may have taken 2 or more different dosages, they have been counted only one time each in the "Any dose" row. | | | | | |

[P002; P003; P005; P009; P012 to P014; P018; P020 to P023; P028; P036; P037; P039; P041 to P043; P046 to P048; P050; P052 to P054; P057; P061 to P065; P070; P073; P075; P076]

## 2.2   Demographics and Other Characteristics of the Osteoarthritis Study Groups

Baseline characteristics, secondary diagnoses, and
concomitant therapies are presented for both the 6-Week
and 6-Month Studies. This information for the Phase II,
1-Year, 6-Month-to-86-Week, and Phase I/Clinical
Pharmacology Studies are in [257; 258; 259]. In general,
the mean age and racial composition was similar among
the various OA studies. The Phase I/Clinical Pharmacology
Studies consisted of young, healthy subjects.

MRK-OS420124132

MK-0966                                         E-61
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

### 2.2.1   Baseline Characteristics

### 2.2.1.1   Baseline Characteristics—6-Week Osteoarthritis Studies

Baseline characteristics for the 6-Week Studies are in Table E-13.

In the 6-Week Studies, the mean age was 65.2 years, with a range of 38 to 94 years. The mean age of the nabumetone age group was higher due to the protocol requirement of the Elderly OA Study (Protocol 058) that the patient's age be 80 years or older. The percent of males and females were 25.5 and 74.5%, respectively. Racial composition was White (83.3%), Hispanic (10.5%), Black (4.6%), or Other (1.6%). Overall, no clinically important differences between treatment groups were present.

/MK-0966/WMA/RW1314.DOC  APPROVED                        26OCT98

MRK-OS420124133

MK-0966                                                          E-62
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

#### 2.2.1.1   Baseline Characteristics—6-Week Osteoarthritis Studies (Cont.)

Table E-13               Baseline Patient Characteristics by Treatment Group
                         6-Week Osteoarthritis Studies

| | Placebo (N=412) | | MK-0966 12.5 mg (N=725) | | MK-0966 25 mg (N=735) | | Ibuprofen 2400 mg (N=470) | | Nabumetone 1500 mg (N=115) | | Total (N=2457) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) |
| **Gender** | | | | | | | | | | | | |
| Female | 305 | (74.0) | 545 | (75.2) | 548 | (74.6) | 358 | (76.2) | 74 | (64.3) | 1830 | (74.5) |
| Male | 107 | (26.0) | 180 | (24.8) | 187 | (25.4) | 112 | (23.8) | 41 | (35.7) | 627 | (25.5) |
| **Age[1]** | | | | | | | | | | | | |
| 20 and under | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) |
| 21 to 30 | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) |
| 31 to 40 | 6 | (1.5) | 6 | (0.8) | 7 | (1.0) | 0 | (0.0) | 0 | (0.0) | 19 | (0.8) |
| 41 to 50 | 54 | (13.1) | 75 | (10.3) | 85 | (11.6) | 50 | (10.6) | 0 | (0.0) | 264 | (10.7) |
| 51 to 60 | 91 | (22.1) | 191 | (26.3) | 174 | (23.7) | 147 | (31.3) | 0 | (0.0) | 603 | (24.5) |
| 61 to 70 | 121 | (29.4) | 212 | (29.2) | 262 | (35.6) | 173 | (36.8) | 0 | (0.0) | 768 | (31.3) |
| 71 to 80 | 94 | (22.8) | 140 | (19.3) | 153 | (20.8) | 89 | (18.9) | 40 | (34.8) | 516 | (21.0) |
| 81 to 90 | 44 | (10.7) | 97 | (13.4) | 53 | (7.2) | 11 | (2.3) | 74 | (64.3) | 279 | (11.4) |
| Over 90 | 2 | (0.5) | 4 | (0.6) | 1 | (0.1) | 0 | (0.0) | 1 | (0.9) | 8 | (0.3) |
| Mean | 64.6 | | 65.3 | | 64.2 | | 62.7 | | 82.5 | | 65.2 | |
| SD | 11.93 | | 11.94 | | 10.91 | | 9.19 | | 2.95 | | 11.56 | |
| Median | 65.0 | | 65.0 | | 65.0 | | 65.0 | | 82.0 | | 65.0 | |
| Range | 38 to 93 | | 38 to 94 | | 39 to 93 | | 41 to 90 | | 79 to 91 | | 38 to 94 | |
| **Race** | | | | | | | | | | | | |
| Asian | 2 | (0.5) | 3 | (0.4) | 4 | (0.5) | 0 | (0.0) | 1 | (0.9) | 10 | (0.4) |
| Black | 17 | (4.1) | 45 | (6.2) | 37 | (5.0) | 12 | (2.6) | 3 | (2.6) | 114 | (4.6) |
| Eurasian | 0 | (0.0) | 0 | (0.0) | 1 | (0.1) | 0 | (0.0) | 0 | (0.0) | 1 | (0.0) |
| European | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 1 | (0.2) | 0 | (0.0) | 1 | (0.0) |
| Hispanic American | 31 | (7.5) | 73 | (10.1) | 77 | (10.5) | 73 | (15.5) | 3 | (2.6) | 257 | (10.5) |
| Indian | 1 | (0.2) | 0 | (0.0) | 0 | (0.0) | 1 | (0.2) | 0 | (0.0) | 2 | (0.1) |
| Multiracial | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 1 | (0.2) | 0 | (0.0) | 1 | (0.0) |
| Native American | 5 | (1.2) | 10 | (1.4) | 6 | (0.8) | 1 | (0.2) | 2 | (1.7) | 24 | (1.0) |
| Polynesian | 0 | (0.0) | 1 | (0.1) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 1 | (0.0) |
| White | 356 | (86.4) | 593 | (81.8) | 610 | (83.0) | 381 | (81.1) | 106 | (92.2) | 2046 | (83.3) |

[1] Birth date masking to 12/31/XX in database, where XX is the true year of birth, may cause the patient's age to appear 1 year younger than the actual age, depending on the date of randomization.

[P010; P029; P033; P040; P058]

#### 2.2.1.2   Baseline Characteristics—6-Month Osteoarthritis Studies

Baseline characteristics for the 6-Month Studies are in Table E-14.

/MK-0966/WMA/RW1314.DOC   APPROVED                               26OCT98

MRK-OS420124134

MK-0966                                                        E-63
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

2.2.1.2   Baseline Characteristics — 6-Month Osteoarthritis Studies (Cont.)

In the 6-Month Studies, the mean age was 62.0 years, with a range of 38 to 91 years. The percents of males and females were 27.8 and 72.2%, respectively. Racial composition was White (78.2%), Hispanic (14.6%), Black (5.4%), or Other (1.8%). Overall, no clinically important differences between treatment groups were present.

/MK-0966/WMA/RW1314.DOC  APPROVED                    26OCT98

MRK-OS420124135

MK-0966
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

2.2.1.2   Baseline Characteristics—6-Month Osteoarthritis Studies (Cont.)

Table E-14          Baseline Patient Characteristics by Treatment Group
                    6-Month Osteoarthritis Studies

| | Placebo (N=371) | | MK-0966 12.5 mg (N=490) | | 25 mg (N=879) | | 50 mg (N=379) | | Diclofenac 150 mg (N=498) | | Ibuprofen 2400 mg (N=377) | | Total (N=2994) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) |
| **Gender** | | | | | | | | | | | | | | |
| Female | 262 | (70.6) | 356 | (72.7) | 640 | (72.8) | 267 | (70.4) | 373 | (74.9) | 264 | (70.0) | 2162 | (72.2) |
| Male | 109 | (29.4) | 134 | (27.3) | 239 | (27.2) | 112 | (29.6) | 125 | (25.1) | 113 | (30.0) | 832 | (27.8) |
| **Age†** | | | | | | | | | | | | | | |
| 20 and under | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) |
| 21 to 30 | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) |
| 31 to 40 | 0 | (0.0) | 5 | (1.0) | 4 | (0.5) | 0 | (0.0) | 6 | (1.2) | 0 | (0.0) | 15 | (0.5) |
| 41 to 50 | 20 | (5.4) | 55 | (11.2) | 73 | (8.3) | 19 | (5.0) | 48 | (9.6) | 31 | (8.2) | 246 | (8.2) |
| 51 to 60 | 156 | (42.0) | 146 | (29.8) | 315 | (35.8) | 164 | (43.3) | 154 | (30.9) | 152 | (40.3) | 1087 | (36.3) |
| 61 to 70 | 142 | (38.3) | 174 | (35.5) | 313 | (35.6) | 152 | (40.1) | 179 | (35.9) | 140 | (37.1) | 1100 | (36.7) |
| 71 to 80 | 49 | (13.2) | 98 | (20.0) | 156 | (17.7) | 39 | (10.3) | 100 | (20.1) | 48 | (12.7) | 490 | (16.4) |
| 81 to 90 | 4 | (1.1) | 12 | (2.4) | 18 | (2.0) | 5 | (1.3) | 10 | (2.0) | 6 | (1.6) | 55 | (1.8) |
| Over 90 | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 1 | (0.2) | 0 | (0.0) | 0 | (0.0) |
| Mean | 61.7 | | 62.5 | | 62.0 | | 61.5 | | 62.6 | | 61.6 | | 62.0 | |
| SD | 7.55 | | 9.85 | | 9.00 | | 7.49 | | 9.76 | | 8.29 | | 8.85 | |
| Median | 61.0 | | 63.0 | | 62.0 | | 61.0 | | 63.0 | | 61.0 | | 62.0 | |

/MK-0966/WMA/RW1314.DOC  APPROVED--26OCT98

MRK-COS42012413E

MK-0966
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

2.2.1.2   <u>Baseline Characteristics—6-Month Osteoarthritis Studies</u> (Cont.)

Table E-14 (Cont.)          Baseline Patient Characteristics by Treatment Group
                            6-Month Osteoarthritis Studies

| | Placebo (N=371) | | MK-0966 | | | | | | Diclofenac 150 mg (N=498) | | Ibuprofen 2400 mg (N=377) | | Total (N=2994) | |
| | | | 12.5 mg (N=490) | | 25 mg (N=879) | | 50 mg (N=379) | | | | | | | |
| | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Race** | | | | | | | | | | | | | | |
| Asian | 1 | (0.3) | 2 | (0.4) | 4 | (0.5) | 1 | (0.3) | 2 | (0.4) | 3 | (0.8) | 13 | (0.4) |
| Black | 25 | (6.7) | 23 | (4.7) | 45 | (5.1) | 20 | (5.3) | 25 | (5.0) | 24 | (6.4) | 162 | (5.4) |
| Eurasian | 0 | (0.0) | 0 | (0.0) | 1 | (0.1) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 1 | (0.0) |
| European | 0 | (0.0) | 0 | (0.0) | 2 | (0.2) | 1 | (0.3) | 0 | (0.0) | 0 | (0.0) | 3 | (0.1) |
| Hispanic American | 60 | (16.2) | 61 | (12.4) | 127 | (14.4) | 67 | (17.7) | 63 | (12.7) | 60 | (15.9) | 438 | (14.6) |
| Indian | 2 | (0.5) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 1 | (0.3) | 3 | (0.1) |
| Multi-Racial | 3 | (0.8) | 6 | (1.2) | 6 | (0.7) | 2 | (0.5) | 5 | (1.0) | 2 | (0.5) | 24 | (0.8) |
| Native American | 2 | (0.5) | 0 | (0.0) | 1 | (0.1) | 2 | (0.5) | 0 | (0.0) | 1 | (0.3) | 6 | (0.2) |
| Polynesian | 0 | (0.0) | 1 | (0.2) | 1 | (0.1) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 2 | (0.1) |
| White | 278 | (74.9) | 397 | (81.0) | 692 | (78.7) | 286 | (75.5) | 403 | (80.9) | 286 | (75.9) | 2342 | (78.2) |
| Range | 47 to 85 | | 39 to 86 | | 39 to 87 | | 49 to 86 | | 38 to 91 | | 49 to 88 | | 38 to 91 | |

† Birth date matching to 12/31/XX in database, where XX is the true year of birth, may cause the patient's age to appear 1 year younger than the actual age, depending on the date of randomization.

[P034; P035; P044; P045]

/MK-0966/WMA/RW1314.DOC APPROVED--26OCT98

MRK-COS20124137

MK-0966                                                    E-66
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

### 2.2.2    Secondary Diagnoses

A secondary diagnosis is defined as any medical condition that a patient had any time prior to randomization. This includes any diagnosis active at the time of randomization as well as any conditions the patient had in the past that were not active at the time of randomization.

### 2.2.2.1    Secondary Diagnoses—6-Week Osteoarthritis Studies

The number and percent of patients with a secondary diagnosis by body system (incidence ≥5%) in the 6-Week Studies are in Table E-15. The three most frequent secondary medical conditions in these studies were hypertension, drug allergy, and hypercholesterolemia. The nabumetone group derives solely from the Elderly OA Study (Protocol 058) and, therefore, had a greater number of secondary diagnoses consistent with the older age of patients in this treatment group. There were no other clinically important differences between treatment groups.

A complete listing of specific secondary diagnoses in the 6-Week Studies (incidence >0.0%) is in [258].

MRK-OS420124138

MK-0966
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

E-67

### 2.2.2.1   Secondary Diagnoses—6-Week Osteoarthritis Studies (Cont.)

Table E-15          Number (%) of Patients With Specific Secondary Diagnoses (Incidence ≥5.0% in One or More Treatment
                    Groups) by Body System
                    6-Week Osteoarthritis Studies

| | Placebo (N=412) | | MK-0966 12.5 mg (N=725) | | MK-0966 25 mg (N=735) | | Ibuprofen 2400 mg (N=470) | | Nabumetone 1500 mg (N=115) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) |
| Patients with one or more secondary diagnoses | 403 | (97.8) | 709 | (97.8) | 718 | (97.7) | 457 | (97.2) | 115 | (100.0) |
| Patients with no secondary diagnosis | 9 | (2.2) | 16 | (2.2) | 17 | (2.3) | 13 | (2.8) | 0 | (0.0) |
| Body as a Whole/Site Unspecified | 143 | (34.7) | 296 | (40.8) | 264 | (35.9) | 163 | (34.7) | 61 | (53.0) |
| Asthenia/fatigue | 7 | (1.7) | 25 | (3.4) | 14 | (1.9) | 9 | (1.9) | 6 | (5.2) |
| Diaphragmatic hiatus | 22 | (5.3) | 53 | (7.3) | 34 | (4.6) | 27 | (5.7) | 14 | (12.2) |
| Hernioplasty | 37 | (9.0) | 57 | (7.9) | 49 | (6.7) | 35 | (7.4) | 11 | (9.6) |
| Lower extremity edema | 15 | (3.6) | 44 | (6.1) | 36 | (4.9) | 32 | (6.8) | 14 | (12.2) |
| Malignant neoplasm surgery | 8 | (1.9) | 21 | (2.9) | 16 | (2.2) | 12 | (2.6) | 6 | (5.2) |
| Surgery | 14 | (3.4) | 35 | (4.8) | 39 | (5.3) | 12 | (2.6) | 5 | (4.3) |
| Cardiovascular System | 241 | (58.5) | 440 | (60.7) | 427 | (58.1) | 285 | (60.6) | 82 | (71.3) |
| Angina pectoris | 11 | (2.7) | 27 | (3.7) | 15 | (2.0) | 4 | (0.9) | 10 | (8.7) |
| Arrhythmia | 4 | (1.0) | 9 | (1.2) | 6 | (0.8) | 7 | (1.5) | 9 | (7.8) |

MRK-OS420124139

MK-0966
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

2.2.2.1   Secondary Diagnoses—6-Week Osteoarthritis Studies (Cont.)

Table E-15 (Cont.)            Number (%) of Patients With Specific Secondary Diagnoses (Incidence ≥5.0% in One or More Treatment
                              Groups) by Body System
                              6-Week Osteoarthritis Studies

| | Placebo (N=412) | | MK-0966 | | | | Ibuprofen 2400 mg (N=670) | | Nabumetone 1500 mg (N=115) | |
| | | | 12.5 mg (N=725) | | 25 mg (N=735) | | | | | |
| | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cardiovascular System (Cont.)** | 241 | (58.5) | 440 | (60.7) | 427 | (58.1) | 285 | (60.6) | 82 | (71.3) |
| Coronary artery disease | 9 | (2.2) | 17 | (2.3) | 9 | (1.2) | 6 | (1.3) | 9 | (7.8) |
| Coronary vascular surgery | 8 | (1.9) | 13 | (1.8) | 7 | (1.0) | 3 | (0.6) | 12 | (10.4) |
| Hypertension | 170 | (41.3) | 308 | (42.5) | 297 | (40.4) | 190 | (40.4) | 56 | (48.7) |
| Myocardial infarction | 12 | (2.9) | 12 | (1.7) | 12 | (1.6) | 8 | (1.7) | 8 | (7.0) |
| Systolic murmur | 10 | (2.4) | 24 | (3.3) | 19 | (2.6) | 13 | (2.8) | 12 | (10.4) |
| **Digestive System** | 205 | (49.8) | 386 | (53.2) | 357 | (48.6) | 242 | (51.5) | 76 | (66.1) |
| Appendectomy | 74 | (18.0) | 152 | (21.0) | 116 | (15.8) | 81 | (17.2) | 28 | (24.3) |
| Constipation | 25 | (6.1) | 39 | (5.4) | 45 | (6.1) | 23 | (4.9) | 18 | (15.7) |
| Dyspepsia | 19 | (4.6) | 50 | (6.9) | 58 | (8.9) | 38 | (8.1) | 13 | (11.3) |
| Heartburn | 16 | (3.9) | 36 | (5.0) | 24 | (3.3) | 27 | (5.7) | 7 | (6.1) |
| Hemorrhoidectomy | 13 | (3.2) | 34 | (4.7) | 18 | (2.4) | 11 | (2.3) | 6 | (5.2) |
| Hemorrhoids | 26 | (6.3) | 49 | (6.8) | 31 | (4.2) | 27 | (5.7) | 5 | (4.3) |

/MK-0966/WMA/RW1314.DOC  APPROVED--26OCT98

MRK-OSA2012414O

MK-0966
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

E-69

2.2.2.1   Secondary Diagnoses—6-Week Osteoarthritis Studies (Cont.)

Table E-15 (Cont.)   Number (%) of Patients With Specific Secondary Diagnoses (Incidence ≥5.0% in One or More Treatment Groups) by Body System
6-Week Osteoarthritis Studies

| | Placebo (N=412) | | MK-0966 12.5 mg (N=725) | | 25 mg (N=735) | | Ibuprofen 2400 mg (N=470) | | Nabumetone 1500 mg (N=115) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) |
| **Endocrine System** | 91 | (22.1) | 157 | (21.7) | 154 | (21.0) | 115 | (24.5) | 32 | (27.8) |
| Hypothyroidism | 49 | (11.9) | 77 | (10.6) | 82 | (11.2) | 55 | (11.7) | 23 | (20.0) |
| Noninsulin-dependent diabetes mellitus | 17 | (4.1) | 39 | (5.4) | 30 | (4.1) | 28 | (6.0) | 8 | (7.0) |
| **Eyes, Ears, Nose, and Throat** | 246 | (59.7) | 415 | (57.2) | 405 | (55.1) | 226 | (48.1) | 91 | (79.1) |
| Allergic rhinitis | 24 | (5.8) | 51 | (7.0) | 57 | (7.8) | 32 | (6.8) | 4 | (3.5) |
| Cataract | 43 | (10.4) | 76 | (10.5) | 89 | (12.1) | 27 | (5.7) | 35 | (30.4) |
| Glaucoma | 8 | (1.9) | 35 | (4.8) | 19 | (2.6) | 14 | (3.0) | 10 | (8.7) |
| Hearing loss | 38 | (9.2) | 65 | (9.0) | 47 | (6.4) | 35 | (7.4) | 25 | (21.7) |
| Lenticular surgery | 32 | (7.8) | 71 | (9.8) | 58 | (7.9) | 8 | (1.7) | 40 | (34.8) |
| Macular degeneration | 7 | (1.7) | 14 | (1.9) | 9 | (1.2) | 3 | (0.6) | 7 | (6.1) |
| Myopia | 19 | (4.6) | 32 | (4.4) | 26 | (3.5) | 17 | (3.6) | 7 | (6.1) |
| Sinusitis | 39 | (9.5) | 57 | (7.9) | 53 | (7.2) | 36 | (7.7) | 4 | (3.5) |
| Tonsillectomy | 76 | (18.4) | 132 | (18.2) | 121 | (16.5) | 66 | (14.0) | 28 | (24.3) |

MRK-CISA2017/24141

/MK-0966/WMA/RW1514.DOC  APPROVED--26OCT98

MK-0966
Clinical Documentation
E.   Clinical Safety
2.   Clinical Safety in Osteoarthritis Studies

E-70

2.2.2.1   Secondary Diagnoses — 6-Week Osteoarthritis Studies (Cont.)

Table E-15 (Cont.)          Number (%) of Patients With Specific Secondary Diagnoses (Incidence ≥5.0% in One or More Treatment
                            Groups) by Body System
                            6-Week Osteoarthritis Studies

| | Placebo (N=412) | | MK-0966 | | | | Ibuprofen 2400 mg (N=312) | | Nabumetone 1500 mg (N=115) | |
| | | | 12.5 mg (N=725) | | 25 mg (N=735) | | | | | |
| | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| Hemic and Lymphatic System | 29 | (7.0) | 50 | (6.9) | 69 | (9.4) | 27 | (5.7) | 13 | (11.3) |
| Anemia | 16 | (3.9) | 26 | (3.6) | 51 | (6.9) | 20 | (4.3) | 11 | (9.6) |
| Hepatobiliary System | 83 | (20.1) | 156 | (21.5) | 151 | (20.5) | 96 | (20.6) | 20 | (17.4) |
| Surgery | 66 | (16.0) | 115 | (15.9) | 122 | (16.6) | 72 | (15.3) | 15 | (13.0) |
| Immune System | 101 | (24.5) | 171 | (23.6) | 156 | (21.2) | 108 | (23.0) | 35 | (30.4) |
| Allergy | 19 | (4.6) | 26 | (3.6) | 29 | (3.9) | 19 | (4.0) | 7 | (6.1) |
| Drug allergy | 21 | (17.2) | 121 | (16.7) | 110 | (15.0) | 81 | (17.2) | 30 | (26.1) |
| Metabolism and Nutrition | 111 | (26.9) | 211 | (29.1) | 191 | (26.0) | 142 | (30.2) | 35 | (30.4) |
| Hypercholesterolemia | 62 | (15.0) | 98 | (13.5) | 82 | (11.2) | 59 | (12.6) | 14 | (12.2) |
| Hyperlipidemia | 22 | (5.3) | 36 | (5.0) | 32 | (4.4) | 19 | (4.0) | 13 | (11.3) |
| Obesity | 32 | (7.8) | 83 | (11.4) | 69 | (9.4) | 60 | (12.8) | 7 | (6.1) |

MK-0966/WMA/RW1314.DOC  APPROVED--26OCT98

MRK-OSF2012A142



# VIOXX:  A Scientific Review

Edward M. Scolnick, M.D.

Many media reports have appeared regarding Vioxx since Merck & Co., Inc. reported the results of the
APPROVe trial and withdrew Vioxx from clinical use.  Some reports cited e-mails from me to Merck
Research Laboratory scientists after the VIGOR trial data became available.  This document is
intended to chronicle the history of the discovery and development of Vioxx in a more complete way
than discussed in these media reports.

Nothing has been more important to the Merck Research Laboratories or to me than the safety of
patients who take our medicines.  Anyone who has worked with me during my time as President of
MRL knows that to be a fact.  Media reports have questioned the integrity of those physicians and
scientists who worked on the discovery and development of VIOXX.  I feel compelled to bring to light
the data we relied on in making our decisions and how our actions were consistent with the data
available at the time.  This paper will review the scientific thinking of MRL scientists and many
scientists in the academic community who published papers on the subject throughout the course of the
VIOXX project from its inception.  The paper reviews:  (1)  why a COX-2 selective inhibitor was
made; (2) how clinical studies addressed its development; (3) the thought process behind the VIGOR
trial; (4) MRL's immediate response to the data from VIGOR; (5) the rapid public dissemination of the
data; (6) the FDA approved label for VIOXX incorporating the data from the VIGOR trial; (7) the
scientific data and debate between the release of the VIGOR data and the APPROVE trial that led to
the withdrawal of VIOXX, a decision made nearly two years after I stepped down from being
President of MRL.

In 1993, after a scientific meeting in Keystone, Colorado, the Merck Research Laboratories
began a program to make a selective inhibitor of COX-2.  Scientific reports at that meeting had
revealed that there were two isoforms of cyclooxygenase.  COX-1 was present normally in the
gastrointestinal tract and COX-2 was induced in inflammatory cells at sites of inflammation.  Although
all the mechanisms by which traditional NSAIDs caused gastrointestinal ulcers were not known,
inhibition of COX-1 in the stomach and duodenum was the prevailing scientific thought on how
traditional NSAIDs caused gastrointestinal ulcers in humans.  The new information suggested that a



EXHIBIT

selective COX-2 inhibitor would have enhanced safety for the GI tract compared to traditional NSAIDs and retain the efficacy of traditional NSAIDS.  The project proceeded rapidly due to the dedication of scientists at the Merck Frosst Laboratories and in 18 months we had development candidates.  One of these turned out to be VIOXX.

In initial clinical studies, VIOXX was shown to alleviate dental pain, thus showing for the first time in humans that a COX-2 selective inhibitor had efficacy.  Initial gastrointestinal endoscopy studies demonstrated that as much as 250 mg of VIOXX once a day for 7 days in 51 subjects produced many fewer ulcers than 2400 mg of ibuprofen. 2400 mg/day is the highest dose of ibuprofen approved in its label.  At the time we thought the clinical dose of VIOXX might need to be as high as 100 mg.  When we learned later than the usual dose was 12.5 mg, we were clearly excited and looked forward to future endoscopy studies after longer exposure to VIOXX at lower clinical doses.

We performed clinical efficacy dose finding studies with great care.  Since we now had data in humans to suggest enhanced safety on the GI tract, we paid particular attention to VIOXX's effect on kidney function.  Traditional NSAIDs can adversely affect salt and water balance and elevate blood pressure in patients, and it was not known in humans what effect selective inhibition of COX-2 would have on renal physiology and blood pressure.  If VIOXX did, in fact, have enhanced GI safety vs. traditional NSAIDs, we did not want physicians to try higher doses than were also safe for kidney function and blood pressure in patients whose pain and inflammation were difficult to treat.  We determined the clinical dose for osteoarthritis would be 12.5 mg, with some patients gaining extra benefit from the maximum dose of 25 mg.  50 mg was found to be an optimal dose for relief of acute pain and primary dysmenorrhea.  Studies on salt and water balance indicated 12.5 mg and 25 mg were appropriate for chronic use.  When the drug was initially approved, the label for osteoarthritis stated clearly the "recommended starting dose of VIOXX is 12.5 mg once daily.  Some patients may receive additional benefit by increasing the dose to 25 mg once daily.  The maximum recommended daily dose is 25 mg."

During the Phase III development program, studies were performed to assess and prove in humans that the doses to be used chronically (12.5 mg and 25 mg) were actually safer with regards to gastrointestinal ulcers.  Special studies were also done to assess safety for the small intestine since it was known that NSAIDs historically could also cause small intestinal problems in humans.  The

2

studies on the small intestine were carefully done and were consistent with our hypothesis that this drug would not cause small intestinal ulcers.

The endoscopy studies were especially demanding and extensive. The data were obtained from two replicative studies with 689 patients in one study and 738 patients in another study. This data was included in the initial approved label for VIOXX. The results indicated a clear and large difference between the highest approved chronic dose of VIOXX (25 mg) and the highest allowed chronic dose of ibuprofen (2400 mg) over three time intervals (1) a 6-week period which included placebo; (2) a 3-month period which included placebo, and (3) a 6-month period. Because the study was conducted in patients with osteoarthritis, we could not maintain a placebo arm for the second 3 months since osteoarthritis is a painful condition. Not only did the study show the large difference from ibuprofen, but VIOXX was not detectably different in these studies from placebo for ulcers after 3 months of continuous use. Clearly one could not conclude that VIOXX had no risk of causing ulcers. Proving a negative result is always difficult in science. Nevertheless, the enhanced safety for the gastrointestinal tract was clear.

An interesting scientific discussion ensued among scientists and FDA regulatory personnel. It was often said there is no relationship between GI ulcers and the serious complications of NSAIDs such as perforations, obstructions, and bleeding. Thus for MRL to prove that this constellation of complications was reduced in patients taking VIOXX, an outcomes study measuring these events would be needed and required.

I have always thought that that issue should be more clearly articulated. A more accurate statement might have been that no simple quantitative relationship existed between ulcers detected by endoscopy and the triad of serious complications that arise in long clinical use. However, it was inconceivable to me that the pathophysiology process that leads to ulcers detected by endoscopy could not be integrally related to the processes that lead to the triad of more serious complications. To contend that the extensive 6 month endoscopy studies would not predict better long term gastrointestinal safety was simply not scientifically logical.

The next question was how to do such a study. Given the endoscopy data in patients with osteoarthritis, we asked ourselves, "was it ethical to do an outcomes study in such patients comparing

3

25 mg VIOXX to any NSAIDs?"  The FDA wanted the outcomes study done at 50 mg.  Was it ethical to do an outcomes study at 50 mg in patients with osteoarthritis vs. any other NSAID given that the  highest recommended dose for which Merck sought approval for osteoarthritis was 25 mg once a day? At the time, the studies for rheumatoid arthritis were not completed although data existed that VIOXX had efficacy in RA.  We believed the dose was going to be 50 mg although subsequent data showed that 25 mg was the correct dose.  Thus it was decided to test 50 mg dose at the insistence of the FDA and to do that in patients with RA where we thought at the time 50 mg would be the dose for this indication.  In planning the GI outcomes study, MRL scientists on the project team faced many unknowns and scientific conundrums.  Which NSAID to compare to VIOXX was the first question. Ibuprofen was considered but I recall that it was a drug taken 4x day and that compliance in a long term study would therefore be difficult.  Diclofenac was considered but I knew it had an incidence of liver function abnormalities and was concerned that such abnormalities might compromise the eventual number of patients in the trial.  Eventually, the decision was made to compare VIOXX to naproxen.

Given that the FDA wanted the outcomes study done with 50 mg of VIOXX, MRL scientists pondered what patient population the study could be performed in.  At the time available data suggested that 50 mg would be the dose for patients with rheumatoid arthritis, although the clinical trials in patients with RA were not yet complete.  It was decided that the only ethical way 50 mg could be studied was in patients with rheumatoid arthritis.  (When the trials in RA were completed in 2001, in fact the correct dose was determined to be 25 mg also in the patients with RA.)

The study was begun, and based on the completed large Phase III program, VIOXX was approved on May 20, 1999.  Celebrex had already been approved with data from endoscopic studies that showed it produced fewer GI ulcers than comparator NSAIDs but with data far less convincing than the data in the FDA approved VIOXX label.  VIOXX was well received in the market as Merck tried to gain market share from Celebrex which had been approved 6 months earlier.

Merck was competing well and gaining market share but had not surpassed Celebrex in early 2000.  I was eager to see the data from the GI outcomes study.  Not because I was worried about the result, but hoping it would be the data Merck needed to show how much better VIOXX was than Celebrex.  I asked the Merck statistician designated to oversee the trial to allow me to see the data the very minute the study was completed.  The scientist strongly reminded me that I was not allowed to be

4

the first and that there was a process and an order as to who would see the data based on prespecified rules. I retreated from my request and fully complied with the process with that reminder and awaited to be called. No one at Merck besides the statistician predesignated by the study protocol had any knowledge of any unblinded data in VIGOR before the study was fully completed.

On March 9, 2000, I was called and was told the results: both the GI outcomes data and the cardiovascular outcomes data. Although clearly pleased at the GI outcomes, I was stunned at the CV data and stated there was a clear effect. I, in fact, thought VIOXX had elevated the CV event rate. Despite my initial thought, I wanted to buoy the spirits of a team that had worked so diligently for so long on this program. My first comments were intended to encourage them to perform an in depth analysis of all the data in the trial since in many past trials first impressions of the interpretation of new data, I knew often were not accurate.

What was the scientific background for my first reaction?

In 1997, in a study sponsored by Merck, there was the surprising discovery that VIOXX, a COX-2 specific inhibitor, reduced the urinary excretion of a prostacyclin metabolite. A separate study had demonstrated similar effects with Celecoxib another COX-2 inhibitor. Prostacyclin is a major product of arachadonic acid metabolism and was considered to be an antiplatelet factor that inhibits platelet aggregation. These metabolite results were totally unexpected; previous studies of vascular tissue, isolated cells and immunohistochemistry suggested that COX-1 was responsible for prostacyclin production. The new finding was interpreted as indicating that COX-2 had a role in systemic prostacyclin synthesis. Both the nonselective NSAIDs and the COX-2 inhibitors may inhibit this pathway. Because selective COX-2 inhibitors do not affect platelet function whereas standard NSAIDs do, it was hypothesized that selective COX-2 inhibitors might alter the balance between the platelet derived thromboxane and the systemic prostacyclin and thereby increase the risk of cardiovascular events. These data were published in 1999. It is important to emphasize that the effect of prostacyclin was only a partial reduction as measured by a metabolite of prostacyclin in the urine. It is also important to realize that the in vivo importance of the reduction in the urinary metabolite was not known but a hypothesis. Studies conducted at Merck Frosst were not able to determine the source in animals of this prostacyclin metabolite. Around this time, data were also emerging that inflammation was a risk factor for athero-thrombosis (CRP levels) and it was postulated that anti-

5

inflammatory therapies might diminish the risk of cardiovascular events. Thus it was possible that partial reduction in systemic prostacyclin might be a risk factor for patients with cardiovascular disease and also possible that an anti-inflammatory drug might benefit such at risk patients. No data existed to resolve these two alternatives.

The prostaglandin metabolite results had became available to us as we neared completion of the initial development program which evaluated the safety and efficacy of VIOXX in the treatment of patients with osteoarthritis and acute pain (before the VIGOR trial was even started). The data prompted our team to conduct an immediate retrospective review of the cardiovascular thrombotic events in the Phase II and Phase III osteoarthritis studies. This was done first on a blinded basis and again when we had the unblinded data. These studies included 5435 osteoarthritis patients who participated in 8 double-blind, placebo-controlled and active comparator studies. In these studies, there were similar rates of thrombotic cardiovascular adverse events among patients taking VIOXX, placebo, and comparator NSAIDs (ibuprofen, diclofenac, or nabumetone). Thus, the first major studies conducted with VIOXX found no difference in cardiovascular thrombotic risks when comparing VIOXX with placebo or the NSAIDs ibuprofen, diclofenac, or nabumetone, even with a careful retrospective analysis. Nevertheless, we decided to prospectively collect and adjudicate all cardiovascular thrombotic events in all future trials of VIOXX to carefully monitor data on the question. This decision was made even before the VIGOR trial was designed. The Phase II and Phase III data were submitted to the United States Food & Drug Administration as part of the New Drug Application for VIOXX, specifically reviewed at a public meeting of the FDA Arthritis Advisory Committee, and later published in Konstam, et al., "Cardiovascular Thrombotic Events in Controlled Clinical Trials of Rofecoxib," *Circulation*.[i]

Thus, when I first saw the VIGOR data, my initial thought was the prostacyclin metabolite data and thus my reaction. The project team then subsequently explained to me that there was another plausible explanation, that naproxen had been cardioprotective. This was a theory based on naproxen's ability to inhibit COX-1. Despite the rationale for this theory, no one had ever before shown naproxen was cardioprotective. Why? Aspirin could be shown to be cardioprotective with relatively low doses because of two features (1) ASA irreversibly attaches itself to COX-1 in platelets, (2) to generate more platelets with active COX-1, new platelets need to populate the circulation from bone marrow precursor cells, a process which takes considerable time. Platelets existing in the circulation lack

6

nuclei and cannot simply make new templates for new COX-1 enzyme after residual ASA is cleared rapidly from the bloodstream. This is in contrast to stomach cells which can remake COX-1 rapidly from existing cells after short exposure times to low dose ASA. Thus, ASA can be relatively selective in its effect for platelet COX-1 vs. stomach COX-1. Naproxen taken at 500 mg b.i.d. could also block platelet COX-1 relatively completely because of its potency and long half life in the circulation. But because naproxen inhibits platelet COX-1 reversibly and not irreversibly like ASA, naproxen could not be expected to selectively inhibit platelet COX-1 for a 24 hr period without also inhibiting stomach COX-1 for a 24 hour period, and therefore produce many serious GI side effects. Thus, naproxen could not have been previously studied in a cardiovascular outcomes study like the ones in which ASA had been shown to be cardioprotective. One could speculate on whether Naproxen could be cardioprotective with good logic, but no clinical evidence existed at the time.

In telling me about the naproxen hypothesis, the team cited a paper in which flurbiprofen, a long acting NSAID, had been shown in fact to prevent rethrombosis after cardiac angioplasty and showed me the paper and the data.[ii] I did not readily accept that explanation. In the next few minutes I asked them to review up to date all other available data from ongoing trials of VIOXX, against all other NSAIDs and placebo. I was disturbed that so little comparison to placebo existed although copious data vs. other NSAIDs was available, none of which showed any CV events for VIOXX different from other non-naproxen NSAIDS. At my intense questioning of the relative paucity of placebo vs. VIOXX data, I was reminded we were studying VIOXX in osteoarthritis and that we could not keep such patients on placebo for long trials because osteoarthritis is a painful condition. Then during that discussion, a team member recalled an ongoing trial in patients with Alzheimer's Disease.

Another hypothesis was extant at the time: Alzheimer's disease had an inflammatory pathological component. If one could block that component, it was hypothesized that one might slow the progression of the disease. (This hypothesis has never been proven to this day in clinical trials.) Thus, we were in the midst of a study in elderly patients with Alzheimer's Disease, some of whom undoubtedly had underlying heart disease. The study design was 25 mg VIOXX, as an anti-inflammatory vs. placebo, an ethical study, since no drug had been shown to arrest or retard the Alzheimer's disease process. A relatively large patient database was available with only 2 arms to the trial, group A and group B. I was told we had blinded records of all adverse experiences which were always reported and promptly recorded during the course of any clinical trial. We could look at CV

7

events in group A vs. group B. If an imbalance were found, we would totally unblind the data and see if there was evidence vs. placebo that VIOXX was prothrombotic. The team worked incessantly in the next 24-48 hours and they were instructed to call me as soon as the data collection and tabulation was done. We all fully agreed if an imbalance were observed, we would determine if it were in the VIOXX arm or the placebo arm. On a Sunday night at 8:30 p.m., I received a call and was told all the data for total CV events and all available subcategories. There was no difference or pattern of differences between group A or group B. There was no evidence in any trial except VIOXX vs. naproxen in VIGOR that the CV event rate was different for VIOXX vs. placebo or other NSAIDs.

In the next few days, we queried an additional data source. In 1999, we were given a preprint of a case report of a patient with Lupus Erythematosis, an autoimmune disease where excess platelet activation was known to occur. This patient had been switched from a traditional NSAID to Celebrex and had a venous thromboembolism. The prostacyclin data on Celebrex in man was known at this time and the author speculated on a possible role for Celebrex in the patient's venous clot. Thus, we looked at available databases for the number of prescriptions written for VIOXX in patients with Lupus. I was told that despite the fact that there were 30,000 patients for whom VIOXX prescriptions had been written, we had no spontaneous reports of CV events in such patients. Being persistent, I then instructed the team to call a few leading rheumatologists to inquire if any of them had an experience with VIOXX like the case report above. No one had such an experience.

Given the available data, the team and I concluded that it was likely that naproxen had been cardioprotective. Alternative explanations could not be formally excluded, but the explanation appeared to explain all the available data. Flurbiprofen had set the precedent, the group that raised the speculation had, in fact, been prescient, even though to this point in time in March 2000, I had not recalled or was not familiar with their prior deliberations. No clinical data gathered in clinical trials with VIOXX except in the VIGOR trial came to my attention that caused me any concern about CV risk of VIOXX (Additionally, preclinical MRL scientists continued to study VIOXX and were instructed to look for a prothrombotic effect in an animal model that might reveal such. Such studies were later conducted in a subhuman primate complete with positive and negative controls and revealed no prothrombotic effect of either VIOXX or Celebrex.)

8

What did MRL do with the VIGOR results? We promptly told the FDA of our data and requested an expedited review. Despite the fact that VIGOR was a large trial involving 8,000 patients, we worked as rapidly as possible to submit fully validated data. We did that in just 3 months.

We also wanted to make physicians and patients aware of the results immediately. The naproxen cardioprotective effect appeared to us to be the explanation based on all available data as noted above, and we had excluded the use of ASA from all our trials up to this point in time.

If naproxen had been cardioprotective, then it was important to allow low dose ASA use in patients taking VIOXX in our trials and to make people aware of this in patients taking VIOXX since ASA had been excluded from all our ongoing trials as it had in VIGOR. Such trials including VIGOR, of course, had exclusions for enrolling patients with underlying heart disease. We decided that the fastest way to make all the available data known was to issue a press release and to send a letter to every investigator conducting any trial with VIOXX or Arcoxia. This would occur immediately and thus be broadly known while an FDA submission was prepared and eventually was reviewed. The press release was issued and the investigator letters sent March 27. The documents stated all data from all available trials, pointed out the VIGOR data, put forth the Naproxen cardioprotective hypothesis, stated clearly that such an effect of Naproxen had not been previously observed, changed the trial guidelines now to allow ASA use in patients doctors chose to use ASA in, and explained again the lack of effect of VIOXX on platelet COX-1. Thus, there was wide dissemination with all available data 18 days from the time I knew the data. The FDA had been notified earlier consistent with regulatory requirements.

During this time and continually thereafter, we evaluated the VIGOR data and continued to consider all possible options. In the meantime, the VIGOR results received extensive coverage and were widely debated in the scientific community, in the financial community, and in the press. Merck participated in these scientific discussions by making the data widely and quickly available and explaining the basis for our conclusions. Merck presented the data at Digestive Diseases Week in May and published the study in *The New England Journal of Medicine* in November (Bombardier 2000). An application to include the results in prescribing information was submitted to FDA in June 2000, followed by a public Advisory Committee meeting in February 2001. The prescribing information for

9

VIOXX was subsequently changed in the United States and around the world to reflect the cardiovascular results of VIGOR.

## PRECAUTIONS                                * * *

*Cardiovascular Effects*

The information below should be taken into consideration and caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease.

In VIGOR, a study in 8076 patients (mean age 58; VIOXX n=4047, naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with naproxen 500 mg twice daily (n=19). In VIGOR, mortality due to cardiovascular thrombotic events (7 vs 6, VIOXX vs naproxen, respectively) was similar between the treatment groups. (See CLINICAL STUDIES, *Special Studies, VIGOR, Other Safety Findings: Cardiovascular Safety*.) In a placebo-controlled database derived from 2 studies with a total of 2142 elderly patients (mean age 75; VIOXX n=1067, placebo n=1075) with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs 35 for patients treated with VIOXX 25 mg once daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for VIOXX versus placebo, respectively. The significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) in unknown. Prospective studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebo have not been performed.

**Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.** Therefore, in patients taking VIOXX, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis. (See CLINICAL STUDIES, *Special Studies, Platelets*; PRECAUTIONS, *Drug Interactions, Aspirin*.) Prospective, long-term studies on concomitant administration of VIOXX and aspirin evaluating cardiovascular outcomes have not been conducted.

*Fluid Retention, Edema, and Hypertension*

Fluid retention, edema, and hypertension have been reported in some patients taking VIOXX. In clinical trials of VIOXX at daily doses of 25 mg in patients with rheumatoid arthritis the incidence of hypertension was twice as high in patients treated with VIOXX as compared to patients treated with naproxen 1000 mg daily. Clinical trials with VIOXX at daily doses of 12.5 and 25 mg in patients with osteoarthritis have shown effects on hypertension and edema similar to those observed with comparator NSAIDs; these occurred with an increased frequency with chronic use of VIOXX at daily doses of 50 mg. (See ADVERSE REACTIONS.) VIOXX should be used with caution, and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension, or heart failure.

* * *

10

## DOSAGE AND ADMINISTRATION

### Osteoarthritis

The recommended starting dose of VIOXX is 12.5 mg once daily. Some patients receive additional benefit by increasing the dose to 25 mg once daily. The maximum recommended daily dose is 25 mg.

### Rheumatoid Arthritis

The recommended dose is 25 mg once daily. The maximum recommended daily dose is 25 mg.



### Management of Acute Pain and Treatment of Primary Dysmenorrhea

The recommended dose of VIOXX is 50 mg once daily. The maximum recommended daily dose is 50 mg. Use of Vioxx for more than 5 days is management of pain has not been studied. Chronic use of VIOXX 50 mg daily is not recommended. (See ADVERSE Reactions, Clinical Studies in OA and RA with VIOXX 50 mg).



### Patient Information about VIOXX

* * *

### What are the possible side effects of VIOXX?

Serious but rare side effect that have been reported in patients taking VIOXX or related medicines have included:

* * *

- Heart attacks and other serious events, such as blood clots in your body, have been reported in patients taking VIOXX.

***

On the advice of one of our consultants, to enhance the power and precision of our analyses, we also conducted a pooled analysis of the cardiovascular events from 23 studies involving more than 28,000 patients, representing more than 14,000 patient years. In this analysis, there was no evidence of an increased risk of cardiovascular thrombotic events for VIOXX compared to placebo or VIOXX compared to non-naproxen NSAIDs. There was, however, an increased risk of events on VIOXX compared with naproxen. Because of this difference in findings against the different comparators, we felt that it was inappropriate to combine all the comparator data into a single group even though doing so would have diminished the apparent difference from naproxen. We presented this analysis at major

11

medical meetings and published it in *Circulation* in October 2001. We provided up-dates to this analysis to regulatory authorities and published an up-dated analysis in the American Heart Journal.

Notwithstanding the extensive amount of clinical data detecting no difference in cardiovascular event rates between VIOXX at the maximum allowed chronic doses 12.5 mg and 25 mg and placebo and VIOXX and non-naproxen NSAIDs, MRL continued to study and monitor the cardiovascular safety of VIOXX. MRL also began evaluating different potential designs to gather CV outcomes data for VIOXX. In December 2001, I announced our intention to perform large outcome studies with VIOXX to further characterize CV risk. MRL was aware of recommendations that this study be performed in high-risk cardiovascular patients. However, this was felt to be problematic (1) because it was not clear what potential benefit to patients could be tested in such a study and (2) because all of the patients in such a study would have needed to take aspirin which could have potentially obscured a prothrombotic effect of VIOXX. After deliberations with numerous consultants, MRL finalized a protocol in 2002 which prespecified the analysis of adjudicated cardiovascular event data from placebo-controlled studies as a hypothesis-testing endpoint. These studies would enroll patients with a spectrum of CV risk, including patients taking and not-taking aspirin. Two of these studies, APPROVE and VICTOR, a 7000 patient study in patients with a history of colon cancer, had begun and the third, a 15,000 patient study in patients at risk for prostate cancer was initiated after consultation with regulatory agencies.

**Publications Appearing After Announcement of VIGOR Results in Chronological Order**

August 2001   A meta analysis was published in *JAMA* by Mukherjee et al.

The paper attempted a meta analysis of the VIGOR trial and the CLASS trial (for Celecoxib) to compare the relative risk for thrombotic cardiovascular events in these trials to an historical incidence of similar events in various secondary prevention trials testing ASA's effectiveness in reducing myocardial infarction. The comparison was between the historical control groups in the ASA trials to the treated groups in the coxib trials. The authors concluded that the annualized myocardial infarction rates in the coxib trials were significantly higher than in the historical placebo group.

It is noteworthy that the Mukherjee, et al. study used a historical control group to compare to patients using rofecoxib and Celebrex. In studies performed by drug

12

discovery companies submitted to FDA for approval for inclusion in drug labels, historical controls are simply not allowed.  Historical controls are not considered valid in studies claiming new findings about prescription medicines, and meta analyses which use such control groups are not considered statistically valid by the statistical community.

(Mukherjee, D., Hissen, S.E. and Topol, E.J.  Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors.  JAMA, 286, 954-959, 2001.

### Timeline of Epidemiological Studies Involving VIOXX or NSAIDs

Nov 2001    The *Medical Letter* reviewed the cardiovascular safety of COX-2 inhibitors.  That review concluded, "in one study, high doses of rofecoxib taken for months were associated with a 1.11% incidence of thrombotic cardiovascular events compared to 0.47% with naproxen.  Taking aspirin with a selective COX-2 inhibitor could protect against any possible prothrombotic effect, but would probably also diminish the apparent advantage in gastrointestinal safety with these drugs.  Until more prospective studies with and without low-dose aspirin are available, it would be premature to conclude that rofecoxib or celecoxib increase the risk of thrombotic cardiovascular disease."

Jan 2002    A retrospective cohort study by Ray et al is published in The Lancet.  Objective was to measure the effects of non-aspirin NSAIDs, including naproxen, on risk of serious coronary heart disease (CHD).  The adjusted RR (95% CI) for use of naproxen <1000 mg relative to non-use of any NSAID was 0.83 (0.64, 1.09), while that for ≥1000 mg was 1·00 (0·84–1·18).  When use of naproxen was compared with use of ibuprofen, the RR was 0·83 (0·69–0·98).  Study concludes that in a high-risk patient population of people 50 years and older, non-selective non-aspirin NSAIDs neither increased nor decreased risk of serious CHD compared with non-use.  Analysis evaluated 6,362 cases from the Tennessee Medicaid program during 181,441 periods of new NSAID use in 128,002 people and the same number of periods of non-use of NSAIDs among 134,642 people.

Ray WA, Stein CM, Hall K, Daugherty JR, Griffin MR.  Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease: an observational cohort study. Lancet 2002; 359: 118-23.

May 2002    Three separate case-control studies are published in *Archives of Internal Medicine*.  Each showed that use of naproxen reduced the risk of heart attacks.  These studies were

13

first presented at the American College of Rheumatology meeting in 2001.

**Solomon et al:** Objective was to determine whether NSAIDs have a similar effect or whether they differ in their effects on the risk of acute myocardial infarction (AMI). Study concludes that the findings do not support a relationship between the use of NSAIDs as a group and risk of heart attacks. However, use of naproxen was associated with a significant reduction in the risk of AMI (adjusted odds ratio, 0.84; 95% confidence interval, 0.72-0.98; P =.03).   Analysis evaluated 4,425 cases from the N.J. Medicare/ Medicaid Program against a control group of 17,700 subjects.

Solomon DH, Glynn RJ, Levin R, Avorn J. Nonsteroidal anti-inflammatory drug use and acute myocardial infarction. Arch Int Med 2002; 162: 1099-1104.

**Watson, et al:**  Objective of the study was to examine the risk of acute thromboembolic cardiovascular events (heart attack, sudden death and stroke) with naproxen use among patients with rheumatoid arthritis.  The study concludes that patients with rheumatoid arthritis and a current prescription for naproxen had a reduced risk of acute major thromboembolic CV events relative to those who did not take naproxen in the past year. Analysis evaluated 809 cases from British General Practice Research Database against a control group of 2,285 subjects. Study sponsored by Merck.

Watson DJ, Rhodes, T, Cai B, Guess HA.  Lower Risk of Thromboembolic Cardiovascular Events with Naproxen Among Patients with Rheumatoid Arthritis. Arch Int Med 2002; 162: 1105-10.

**Rahme, et al:**  Objective of the study was to compare the effect of naproxen to other NSAIDs in the prevention of acute myocardial infarction (AMI) in an elderly population.  The study concludes that compared to other NSAIDs, concurrent use of naproxen has a protective effect against AMI.  Analysis evaluated 4,163 cases from Canadian RAMQ and Med-Echo databases against a control group of 14,160 subjects. Study sponsored by Merck.

Rahme E, Pilote L, LeLorier J.  Association between Naproxen Use and Protection Against Acute Myocardial Infarction. Arch Int Med 2002; 162: 1111-5.

**Editorial associated with the article:**  The good news for the millions of users of COX-2 inhibitors (and their manufacturers) is that there is no evidence that use of COX-2 inhibitors increases (or decreases) the risk of myocardial infarction.  The findings in the VIGOR study and the findings in the report by Mukherjee et al are readily explicable by the beneficial effects of naproxen rather than a detrimental effect of COX-2 inhibitors.

Many users of NSAIDS and COX-2 inhibitors are in the age group that has or is at risk of having coronary artery disease.  Therefore, the concomitant use of low-dose aspirin (80 mg/d) should be strongly considered in patients with a history of coronary artery disease, stroke, transient ischemic attack, or peripheral vascular disease.  Aspirin should also be considered in patients older than 50 years who have 1 or more risk

14

factors for coronary artery disease. Although naproxen reduces the risk of myocardial infarction, it offers less protection than aspirin; therefore, aspirin should be considered in patients at risk of myocardial infarction who are taking naproxen.

Sep. 2002    **Schlienger et al.** published a case-control analysis using the United Kingdom-based General Practice Research Database (GPRD) in the *British Journal of Clinical Pharmacology*. The objective was to examine whether use of non-aspirin NSAIDs may be associated with a decreased risk of first-time acute MI. in patients treated between 1992 and 1997. There were 3319 cases and 13,139 controls. The overall adjusted RR for AMI in current NSAID users was 1.17 (95% CI 0.99, 1.37). The adjusted RRs for use of naproxen was 0.68 (0.42-1.13) based on 19 exposed cases and 105 exposed controls. The authors concluded that current NSAID exposure does not decrease the risk of AMI.

Schlienger RG, Jick H, Meier CR. Use of nonsteroidal anti-inflammatory drugs and the risk of first-time acute myocardial infarction. Br J Clin Pharmacol. 2002;54: 327–32

Oct 2002    A retrospective cohort study by **Ray et al** is published in *The Lancet*. Objective was to assess occurrence of serious coronary heart disease (CHD), specifically acute myocardial infarction (AMI) and cardiac death, in patients taking Vioxx, celecoxib or other NSAIDs. Study concludes use of Vioxx at doses greater than 25 mg could be associated with an increased risk of serious CHD (based on 12 exposed cases); in contrast, there was no evidence of increased risk among users of Vioxx at doses of 25 mg or less, celecoxib, naproxen or ibuprofen. Analysis evaluated 5,316 events from the Tennessee Medicaid program among 251,046 NSAID users and 202,916 non-users.

Ray WA, Stein CM, Daugherty JR, Hall K, Abrogast PG, Griffin MR. COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. Lancet 2002; 360: 1071-3.

Oct 2002    A database cohort analysis by **Levy et al** is presented at the American College of Rheumatology meeting. Objective was to assess the correlation between COX-2 use and heart attacks among persons prescribed a COX-2 inhibitor, ibuprofen, or naproxen for at least 50 consecutive days. Study concludes long-term use of either of the COX-2 inhibitors (Vioxx and celecoxib) separately is not associated with an increased risk of heart attack compared with naproxen or ibuprofen. When users of COX-2 inhibitors were combined, there was an increased risk compared with users of ibuprofen or naproxen combined. Analysis evaluated 645 events from the Kaiser Permanente database among 172,260 subjects.

**Conclusion:** "Long term use of COX-2s in a large staff model HMO is not associated with a significant increased risk of MI when compared to naproxen or ibuprofen. An analysis of the combination of both COX-2s compared to a cohort of NSAIDs showed an OR of 1.3 (95% CI 1.1-1.6). Further analysis is planned to examine the effect of length of exposure, dose effects, OTC NSAID use, smoking and concomitant ASA use on MI risk."

15

Levy GD, Cheetham C, Shoor S. Cohort Analysis of Myocardial risk and COX-2 in the Kaiser Large Observational Thrombosis Study (KLOTS). Arthritis Rheum 2002; 46 (9 suppl): S377.

Feb 2003    A population-based, retrospective cohort study by **Mamdani et al** is published in *Archives of Internal Medicine*. Objective was to compare the rates of acute myocardial infarction (AMI) among elderly patients taking COX-2 inhibitors, naproxen and non-aspirin NSAIDs. The rates of MI among the drugs studied were not different from each other nor were any of them different from controls not using NSAIDs. Study concludes no increased short-term risk of AMI among users of COX-2 inhibitors and no short-term reduced risk of AMI with naproxen. Analysis evaluated 701 events from administrative health care databases in Ontario among 66,964 users and 100,000 non-users.

Mamdani M, Rochon P, Juurlink, Anderson GM, Kopp A, Naglie G, Austin PC, Laupacis A. Effect of COX-2 selective cyclooxygenase inhibitors on short term risk of acute myocardial infarction in the elderly. Arch Int Med 2003; 163: 481-6.

Nov 2003    A case-control study by **Kimmel et al** is presented at the American Heart Association annual meeting. Objective was to determine the risk of nonfatal heart attacks in users of COX-2 inhibitors compared with users of non-aspirin NSAIDs. Study concludes there was no increased risk of heart attacks overall from COX-2 inhibitors. However, the effects of the two COX-2 inhibitors varied: celecoxib was associated with a reduced risk of MI while Vioxx was not associated with either reduced or increased risk. As a result the difference between them was significant. Nonselective, non-aspirin NSAIDs were also associated with a reduced risk of heart attack. Analysis evaluated 1,718 cases against 6,800 controls from the Delaware Valley Case-Control Network. Study sponsored by Merck and Pharmacia.

**Conclusion:** "There was no increased risk of MI overall from COX-2 inhibitors detected in this study. However, celecoxib and rofecoxib appear to have different effects, possibly due to a protective effect of celecoxib and a neutral effect of rofecoxib. These effects could explain the findings of randomized trials comparing COX-2s with nonselective NANSAIDs."

Kimmel SE, Berlin JA, Reilly M, Jaskowiak J, Kishel L, Strom BL. Risk of Myocardial infarction by type of cyclooxygenase-2 inhibitor. Circulation 2003; 108(17 Suppl IV):IV-752.

June 2004    Garcia-Rodriguez et al published a cohort study with a nested case-control analysis in Circulation. The objective was to determine whether use of NSAIDs affected risk of CHD, and whether use of ibuprofen interfered with protective affects of aspirin. 4975 cases of acute MI and death from CHD and 20 000 controls were identified between 1997 and 2000 in the UK.. The adjusted OR for any current NSAID use compared with nonuse was 1.07 (95% CI, 0.95 to 1.20). individual NSAIDs were all comparable, with

16



no major effect on the risk of acute MI. Naproxen was associated with an OR of 0.89 (95% CI, 0.64 to 1.24). The authors concluded there was no detectable risk reduction of NSAIDs on the occurrence of MI.

Garcia-Rodreguez LA, Varas-Lorenzo C, Maguire A, Gonzalez-Perez A. Nonsteroidal antiinflammatory drugs and the risk of myocardial infarction in the general population. Circulation 2004; 109:3000-3006.

Mar 2004    A population-based analysis by Whelton et al is presented at the American College of Cardiology meeting. Objective was to determine the risk of acute myocardial infarction (AMI) or stroke with Vioxx, celecoxib, and non-selective NSAIDs in hypertensive patients. Study concludes Vioxx significantly increases the risk of AMI or stroke compared with non-users of NSAIDS and there was no increased risk among users of celecoxib or non-selective NSAIDs. Analysis evaluated 3,723 users against 1,798 users from a private medical insurance healthcare claims database. Study sponsored by Pfizer.

Whelton A, Spalding WM, White WB, Reeves MJ, Suh SS, Fort JG. Rofecoxib increases cardiovascular events in arthritis patients but celecoxib and nonspecific nonsteroidal anti-inflammatory drugs do not: results from a large New England Health Care claims database. J Am College Cardiol 2004; 43 (5 Suppl 2): 415A

Mar 2004    A case-control study with cases of first, nonfatal MI identified prospectively and controls identified randomly from the community, by Kimmel et al is published in the Journal of the American College of Cardiology. Objective was to determine the risk of nonfatal heart attacks in users of non-selective, non-aspirin NSAIDs and the interaction between non-aspirin NSAIDs and aspirin. Study concludes that in the absence of aspirin use, non aspirin NSAIDs are associated with reduced odds of MI. In those using aspirin, non aspirin NSAIDs do not provide additional protection. Analysis evaluated 581 events from the Philadelphia community among 4,153 control subjects.

Kimmel SE, Berlin JA, Muredach R, Jaskowiak J, Kishel L, Chittams J, Strom BL. The effects of nonselective non-aspirin non-steroidal anti-inflammatory medications on the risk of nonfatal myocardial infarction and their interaction with aspirin. J Am Col Card 2004; 43(6):985-90.

Note: There are two different analyses using the same data set. This paper (JACC 2004) above is different focus from the abstract in 2003. A paper based on the earlier abstract had been rejected from Circulation, JAMA and Annals, and now resubmitted to Annals at the Journal's request.

Apr 2004    A case-control study by Solomon et al is published in *Circulation*. Objective was to assess the risk of acute myocardial infarction (AMI) among users of Vioxx, celecoxib, and NSAIDs in an elderly population. Study concludes Vioxx all doses combined was associated with a significant increased risk of AMI compared to celecoxib. Non-significant differences were found comparing Vioxx to ibuprofen, naproxen, other NSAIDs and to those not taking NSAIDs. The risk was higher in persons taking greater than 25 mg of Vioxx and during the first 90 days of use but not thereafter. Analysis

17

evaluated 10,895 cases from two state-sponsored pharmaceutical benefits program in the U.S. among 54,475 patients 65 years and older.  This study was first presented at the American College of Rheumatology meeting in 2003. Study sponsored by Merck.

"In all comparisons related to dose, use of rofecoxib >25 mg/d was associated with a higher adjusted relative risk of AMI than rofecoxib≤ 25 mg. The adjusted relative risk of rofecoxib >25 mg (OR, 1.70; 95% CI, 1.07 to 2.71) was higher than that seen for ≤ 25 mg (OR, 1.21; 95% CI, 1.01 to 1.44) compared with celecoxib > 200 mg or ≤ 200 mg.  The magnitude in elevation of relative risk was similar when rofecoxib was compared with no current NSAID, naproxen, ibuprofen, and other NSAIDs.  Neither celecoxib dosage was associated with an elevated risk of AMI in any comparison."

Solomon DH, Schneeweiss MD, Glynn RJ, Kiyota Y, Levin R, Mogun H. Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults.  Circulation 2004; 109:2068-2073.

May 2004    A population-based retrospective cohort study by **Mamdani et al** is published in *The Lancet*.  Objective was to compare the rates of admission for congestive heart failure (CHF) in elderly patients who were given COX-2 inhibitors or non-selective NSAIDs.  Study concludes there is a higher risk of admission for CHF in users of Vioxx and non-selective NSAIDs (diclofenac, naproxen and ibuprofen) but not celecoxib in comparison to non-users of NSAIDs.  Analysis evaluated 654 events from administrative healthcare databases in Ontario among 45,097 users of NSAIDs/COX-2 inhibitors and 100,000 non users.

Mamdani M, Juurlink DN, Lee DS, Rochon PA, Kopp A, Naglie G, Austin PC, Laupacis A, Stukel TA. Cyclo-oxygenase-2 inhibitors versus non-selective non-steroidal anti-inflammatory drugs and congestive heart outcomes in elderly patients: a population-based cohort study. Lancet 2004; 363:1751-56.

Aug 2004    A case-control study by **Graham et al** is presented at the International Conference on Pharmacoepidemiology and Therapeutic Risk Management.    Objective was to determine if NSAID use increases the risk of AMI or sudden cardiac death (SCD) and if the risk is similar among COX-2 selective agents.  Study concludes Vioxx use at doses greater than 25 mg increases the risk of AMI and SCD; Vioxx at 25 mg or less had an increased risk compared with celecoxib; and that several other NSAIDs increased the risk of AMI and SCD.  Analysis evaluated 8,199 cases from Kaiser Permanente against a control group of 32,796 subjects. Funding provided by FDA.    It is worth noting that Vioxx ≤ 25 mg was not statistically significantly different from remote NSAID use.

18

Table 3. Risk of AMI or SCD with current use of celecoxib,
ibuprofen, naproxen, rofecoxib, or other NSAID, or
recent use of a nonsteroidal agent.

| NSAID USE | Cases | Controls | Adjusted OR (95% CI) |
|---|---|---|---|
| Remote use | 4699 | 19876 | 1.00 |
| Recent use | 1728 | 6339 | 1.14 (1.06-1.22) |
| Current Use | | | |
| Celecoxib | 126 | 497 | 0.86 (0.69-1.07) |
| Ibuprofen | 674 | 2606 | 1.09 (0.99-1.21) |
| Naproxen | 369 | 1416 | 1.18 (1.04-1.35) |
| Rofecoxib $\leq$ 25 mg | 58 | 190 | 1.29 (0.93-1.79) |
| Rofecoxib > 25 mg | 10 | 8 | 3.15 (1.14-8.75) |
| Other NSAIDs | 1864 | 535 | 1.16 (1.04-1.30) |

Graham DJ, Campen D, Cheetham C, Hui R, Spence M, Ray WA. Risk of acute cardiac events among patients treated with cyclooxygenase-2 selective and non-selective nonsteroidal anti-inflammatory drugs. Pharmacoepidemiology Drug Safety 2004; 13:S287.

Aug 2004    A retrospective cohort study by **Rahme et al** is presented at the International Conference on Pharmacoepidemiology and Therapeutic Risk Management. Objective was to assess the rates of hospitalizations for acute myocardial infarction (AMI) in an elderly cohort. 52,029 patients were taking non-selective NSAIDs and 71,543 patients were taking rofecoxib, with 14,056.4 and 37,371.0 person-years of exposure, respectively. Based on the regression model, the adjusted hazard ratios of hospitalizations for MI was 1.03 (0.83-1.27) for rofecoxib vs. ibuprofen/diclofenac. Study concludes there was no difference in the rate of hospitalizations for AMI among

19

Vioxx and the non-selective NSAIDs ibuprofen and diclofenac.  Study sponsored by Merck.

Rahme E, Kong SX, Watson DJ, Toubouti Y, LeLorier J.  Association between rofecoxib, diclofenac/ibuprofen and hospitalization for acute myocardial infarction.  Pharmocoepidemiology Drug Safety 2004; 13:S235.

**Aug 2004**   A retrospective cohort study by **Shaya et al** is presented at the International Conference on Pharmacoepidemiology and Therapeutic Risk Management.  Objective was to examine the cardiovascular risk of COX-2 inhibitors compared to non-specific NSAIDS in a high risk Medicaid population.  Analysis evaluated medical and prescription claims for Maryland Medicaid enrollees, COX-2 users numbered 1208 and non-naproxen NSAID users numbered 5274.  Study concludes that COX-2 inhibitors did not increase cardiovascular risk over non-naproxen NSAIDs in a high risk population.

Shaya FT, Blume SW, Blanchette CM, Mullins CD, Weir MR.  Cardiovascular risk of selective cyclooxygenase-2 inhibitors compared to other nonsteroidal anti-inflammatory agents: an observational study of a Medicaid population.  Pharmocoepidemiology Drug Safety 2004; 13:S234.

**Oct 2004**   Campen presents at the American College of Rheumatology meeting the same data as was presented by Graham in Aug 2004 (see above).  The abstract (below) was submitted before the analysis was complete and thus contains no results.

"**Results:**  Within an NSAID study base of 1,394,764 patients that included 40,405 exposed to celecoxib, 991,261 to ibuprofen, 435,492 to naproxen and 26,748 to rofecoxib, there were 8,199 acute cardiac events (6,675 hospitalized AMI, 1,524 sudden death).  Mean age was 66.8 years and 61.8% were men.  After adjustment for multiple cardiovascular risk factors, the estimated relative risk (95% confidence interval) of acute cardiac events with current use of specific NSAIDS were: celecoxib: 0.77 (0.60-0.99) p=0.04; ibuprofen: 1.13 (1.00-1.30) p=0.05; naproxen: 1.11 (0.96-1.30) p=0.17; rofecoxib = 25 mg/d: 1.02 (0.71-1.46) p=0.96; rofecoxib > 25 mg/d: 5.04 (0.94-27.06), p= 0-.06.  Statistical power for this last comparison was limited by low levels of usage, with 5 exposed cases and 7 exposed controls.  A telephone survey of 830 randomly selected exposed controls showed no difference between COX-2 selective, non-selective (ibuprofen, naproxen) and remote users with respect to low dose aspirin or OTC NSAID use, smoking history or family history of AMI.

"**Conclusion:**  Rofecoxib use at doses above 25 mg/d was associated with a 5-fold increased risk of AMI and sudden cardiac death.  Naproxen use did not reduce risk while celecoxib use did reduce risk.  This latter finding was unanticipated and may be due to chance.  Additional study is needed."

Campen DH, Graham D, Cheetham C, Shoor S, Levy G, Hui R, Spence M, Ray WA.  Risk of Acute Cardiac Events Among Patients Treated with Cyclooygenase-2 Selective and Non-selective-Nonsteroidal Anti-Inflammatory Drugs. Arthritis & Rheumatism, 2004; 50(9 Suppl): S657

20

Re-make Figure 2 from Juni, et al., in order to label the comparator treatment group for each individual study and add the Alzheimer's trial data (protocols 078 and 091, combined).

### Data
Data are from the individual study protocols listed in Table 1. Counts of events were obtained by Maureen Kashuba from the rofecoxib CV pooled-analysis of 2003 by Saurabh Mukhopadhyay and from individual study Clinical Study Reports. Events were counted in this analysis if they were confirmed as a MI by adjudication or, for protocols not subject to adjudication, were investigator reported events that were considered MIs in the rofecoxib 2003 pooled analysis and contributed to the Antiplatet Trialists' Collaboration (APTC) combined endpoint. Based on these definitions, there are several discrepancies between the MRL event data and that summarized by Juni, et al:

- for P029 Ext.Erich(2001), MRL data have 1 more event than Juni, et al.
- for P068 Ext.Schnitzer(1999), MRL data have 1 less event than Juni, et al.
- for P096 Truitt(2001), MRL data have 1 more event than Juni, et al.
- for P097 Ext.Geusens(2002), MRL data have 2 less events than Juni, et al.

This results in a total event count of 63 for MRL and 64 for Juni, et al. Patient years at risk (denominator) data were obtained from the rofecoxib CV pooled-analysis of 2003 by Saurabh Mukhopadhyay and from individual study CSR's as indicated in Table 1. Placebo and non-naproxen NSAID groups were combined for studies that contained both. However, 1 study (096 Truitt 2001) had both placebo and naproxen treatment groups. Data from placebo and naproxen treatment groups were not combined because of naproxen's ability to profoundly inhibit platelet function across the dosing interval and thus its potential to provide a cardioprotective benefit.

### Methods
Relative risk was calculated as the rate per 100 person years for rofecoxib divided by the comparator rate per 100 person years, instead of crude rates which Juni used. This was done to account for differential discontinuation rates between treatments which we know exist in many of our studies. 0.5 was not added to numbers of events in studies with zero events in one of the treatments since the other treatment group in all such studies had only one or few events and use of 0.5 would materially alter the RR estimate. For example, assuming equal exposure in both treatment groups, if rofecoxib has 1 event and the control group has 0 events, the RR estimate is undefined or infinite. Adding 0.5 to numerator & denominator yields an RR estimate of 3.0. The 95% CI for each RR estimate was derived using the binomial distribution (with symmetric tail probabilities) of the between-treatment group split of the events, scaled for the imbalance in exposure time.

Homogeneity of hazard ratio (HR) across studies was tested using Zelen's exact test. HR and associated 95% CI was calculated for combined groups of studies according to the stratified exact conditional maximum likelihood computation of Martin and Austin (1996) using their program (http://www.sph.emory.edu/~haustin/exactma.html).

### Results
The RR's computed via the exact binomial method (Table 1, Figure 1) are qualitatively similar to those computed by Juni, et al., except for the following:
- in cases with zero events in one treatment group, as explained in the Methods section
- 097Ext.Truitt(2001), in which the MRL RR is close to 1.0, and that of Juni, et al. is materially greater than 1.0, and

22

- 097Ext.Geusens(2002), in which the event count data are off by 2.

For the 2nd bullet, the ratio of exposure time is similar to that of numbers of patients, so this difference in denominator is likely not the reason for this discrepancy. It remains unknown.

All non-naproxen-controlled studies have 95% CI's which largely overlap 1.0. Thus, examination of these non-naproxen controlled individual study data, whether via calculations by Juni, et al. or MRL are consistent with similarity of MI risk between rofecoxib and non-naproxen controls. The implication in the Juni publication that data from these studies that were not adjudicated by an external panel are somehow not accurate or have been inappropriately manipulated by MRL is totally false.

Juni et al. used an imprecise test for homogeneity among the individual studies. Implementation of Zelen's Exact test for homogeneity of HR across all the studies in Figure 1 and Table 1 reveal statistically significant heterogeneity (p=0.042); thus, their combining of all studies is inappropriate as described in detail in Merck's response to the Juni et al. publication [http://www.merck.com/statement_2004_1105/lancet.pdf]. Grouping all non-naproxen-controlled studies yielded no statistically significant heterogeneity of HR across studies (p=0.534). The combined HR estimated from the non-naproxen-controlled studies was 1.16 (0.63,2.13), close to 1.0, which is similar to that found in the MRL analyses. Importantly, because the confidence interval crosses 1, the result is not statistically significant.

For the naproxen-controlled studies, the test of homogeneity was still rejected (p=0.043). Visual inspection of the naproxen-controlled studies RR's revealed two distinct groups, one with RR's < 1, the other with RR's > 1:

  (1) VIGOR (prot.088) + ADVANTAGE(prot.102) + the Phase III RA 12-week controlled trial (prot.096 Part I) .For this set of trials the test of homogeneity of HR was not rejected (p>0.5), and the HR estimate was 5.22 (95% CI 2.08, 13.12), consistent with a decreased risk associated with naproxen and the result reported by Bombardier, et al.
  (2) The Phase IIb/III RA extension trials (068Ext, 096Ext, and 097Ext). For this second set of naproxen-controlled trials, the test of homogeneity was not rejected (p=0.484), and the HR estimate was 0.65 (95% CI 0.20,2.12), consistent with similarity of risk between rofecoxib and naproxen.

Thus, had Juni et al. done more powerful statistical analyses to detect heterogeneity across the trials, they would have come to the same conclusions as Konstam, et al. (2002) and Weir, et al. (2003). Figure 2 of this report displays the individual study results as displayed in Figure 1, but includes the 3 combined estimates of HR cited above.

Although this split of the naproxen studies removes the significant heterogeneity across studies, it does not explain why this heterogeneity occurs. One interpretation of the RA extension trials is that they could be representative of the same pattern of difference displayed in protocols 088, 102, and 096 Part I, but this pattern was not realized because of small numbers of events. Under this interpretation, the combined HR across all naproxen studies was 3.02 (95% CI 1.46, 6.24). Figure 3 displays this combined estimate and that of the non-naproxen-controlled studies, in addition to all the individual study results. Another interpretation is that since the extension-containing trials are a non-randomized subset of patients, i.e., those who elect to continue, they may not represent the same population which was randomized to the respective trials. Rather, the patients sensitive to the CV treatment difference observed in VIGOR may not have elected to enter these extensions. Thus, inclusion of the extension-containing studies could bias the naproxen estimate and only the 3 randomized studies should be

23

included to estimate the naproxen effect. Other hypotheses could also be entertained. In any event, the reason for the heterogeneity in the naproxen studies cannot be known from these analyses.

Table 2 displays the same information as Table 1, but instead it is broken by the 4 groups of studies for which combined HR estimates were provided.

**References**

Juni P, Nartey L, Richenbach S, Sterchi R, Dieppe PA, Egger M.  Risk of cardiovascular events and rofecoxib: cumulative meta-analysis.  Published online November 5, 2004 http://image.thelancet.com/extras/04art10237web.pdf.

Martin DO and Austin H. Exact estimates for a rate ratio. Epidemiology 1996;7:29-33.

Zelen M. The analysis of several 2 x 2 contingency tables.  Biometrika  1971;58:129-137.

**Table 1 – MI's, Exposure, and RR's for studies in Juni, et al. (2004)**

| study | rofe #events | rofe pat.yrs | control #events | control pat.yrs | relative risk | lower 95%CL | upper 95%CL | control |
|---|---|---|---|---|---|---|---|---|
| a:029Erich(2001) | 1 | 46 | 0 | 16 | .* | 0.01 | .* | placebo |
| b:029Ext.Ehrich(2001) | 1 | 196 a | 1 | 45 a | 0.23 | 0.04 | 18.90 | diclofenac |
| c:035Cannon(2000) | 2 | 645 | 1 | 315 | 0.98 | 0.20 | 60.56 | diclofenac |
| d:040Day(2000) | 1 | 72 | 0 | 48 | . | 0.02 | . | placebo+ibuprofen |
| e:043Hawkey(2000) | 0 | 157 | 2 | 125 | 0.00 | 0.00 | 4.24 | placebo+ibuprofen |
| f:058Truitt(2001) | 1 | 21 | 0 | 23 b | . | 0.03 | . | placebo+nabumetone |
| g:034Saag(2000) | 2 | 635 | 1 | 309 | 0.97 | 0.20 | 60.34 | diclofenac |
| h:085Kivitz(2004) | 1 | 61 | 0 | 28 | . | 0.01 | . | placebo |
| i:068Ext.Schnitzer(1999) | 1 | 788 | 1 | 132 | 0.17 | 0.03 | 13.79 | naproxen |
| j:088Bombardier(2000) | 20 | 2807 | 4 | 2809 | 5.00 | 2.09 | 20.29 | naproxen |
| k:090Gabba(2001) | 3 | 56 | 1 | 57 | 3.05 | 0.67 | 168.63 | nabumetone |
| l:096Truitt(2001) | 3 | 97 | 0 | 34 c | . | 0.14 | . | naproxen |
| m:096Truitt(2001) | 3 | 97 | 0 | 58 | . | 0.23 | . | placebo |
| n:102Lisse(2003) | 5 | 640 | 1 | 629 | 4.91 | 1.15 | 244.72 | naproxen |
| o:096Ext.Truitt(2001) | 4 | 864 d | 2 | 408 d | 0.94 | 0.26 | 10.51 | naproxen |
| p:097Ext.Geusens(2002 | 2 | 995 | 1 | 361 | 0.73 | 0.15 | 44.99 | naproxen |
| q:120+121Katz(2003) | 1 | 51 | 0 | 25 | . | 0.01 | . | placebo |
| r:078+091Alzheimers | 9 | 1661 | 12 | 1930 | 0.87 | 0.40 | 2.26 | placebo |
| s:non-naproxen combined | 25 | 2561 | 18 | 2979 | 1.16 | 0.63 | 2.13 | non-naproxen |
| t:naproxen combined | 35 | 6191 | 9 | 4373 | 3.02 | 1.46 | 6.24 | naproxen |
| u:088+102+096Truitt(2001) | 28 | 3544 | 5 | 3472 | 5.22 | 2.08 | 13.12 | naproxen |
| v:068+096+097 Ext. | 7 | 2647 | 4 | 901 | 0.65 | 0.20 | 2.12 | naproxen |

NOTES:
- Pat.yrs extracted from 2003 CV meta-analysis report, except as indicated by a, b, c, d:
  a- from the 029-10 CSR
  b- from the 058 base study CSR
  c- from the 096 base study CSR
  d- from the 096 Part II and Extension CSR's
- dots (`.') indicate that the value is undefined (infinite); for these cases the confidence limit is one-sided, 97.5% for consistency with each tail of the two-sided 95% CI's
- for 043Hawkey(2000) the Relative Risk estimate is 0 and the confidence limit is one-sided 97.5% for consistency with each tail of the two-sided 95% CI's

25

| | |
|---|---|
| **Submitted**<br>**Oct 2004** | Valentgas et al submitted a paper to JAMA describing retrospective cohort study of acute coronary events (MI or acute coronary syndrome) among 424,584 health plan enrollees ages 40-64 who used NANSAIDS by prescription from 1999-2001.  Objective to estimate rates of acute coronary syndrome (ACS) in relation to use of the COX-2 inhibitor medications, rofecoxib and celecoxib, and other NANSAID drugs, naproxen, diclofenac, and ibuprofen.  Compared with ibuprofen or diclofenac a combined referent group of use, the relative risk (RR) of confirmed ACS during periods of current rofecoxib use was 1.35 (95% CI 1.09-1.68).  For current use of celecoxib, the RR was 1.03 (95% CI 0.83 – 1.27).  There was no trend with time since onset of study, though risks in the first 30 days of rofecoxib and celecoxib were modestly elevated.   There was no increased risk with higher daily doses of rofecoxib or celecoxib compared with all doses of ibuprofen or diclofenac combined. The authors concluded that the incidence of confirmed MI/ACS was greater during rofecoxib use than use of ibuprofen or diclofenac. The increased risk with rofecoxib was not clearly related to timing or dose. |

The manuscript has been submitted for publication but not presented so the results are not in the public domain.  The study was funded by Merck and the manuscript has Merck authors.

Velentgas P, West W, Cannuscio CC, Watson DJ, Walker AM. Cardiovascular Risk of Selective Cyclooxygenase-2 Inhibitors and Other Non-aspirin Non-steroidal Anti-inflammatory Medications. Submitted to JAMA Oct. 2004.

| | |
|---|---|
| **Nov. 2004** | A paper by Juni, et al, was published in *Lancet* on November 5, 2004 after the announcement of the results of the APPROVe trial.  The paper cites many but not all of the clinical trials in which VIOXX was compared to some control for efficacy and safety.  From the studies cited in *Lancet,* the authors plot the relative risk of myocardial infarction vs. the cumulative patients studied and the year such data was available.  Figure 2.  It is noteworthy that this article compares relative risk for myocardial infarctions for VIOXX vs. a control agent.  The study omitted the published data on Alzheimer's patients in which VIOXX was compared to a placebo control. |

**Re-analysis of by-study MI's per Juni, et al. (2004)**

**Background**
Juni, et al. did a meta-analysis of MI relative risk (RR) for rofecoxib versus a combined comparator group including placebo, non-naproxen NSAIDs, and naproxen.  Their Figure 2 shows individual study RR estimates with associated 95% confidence intervals (CI's).  It is inferred from their text that (1) their individual study RR's are based on crude rates (i.e., counts of events (numerators) and numbers of patients (denominators)) rather than the typical RR's based on exposure time, (2) they added 0.5 to numerator counts for both treatments for studies in which one of the treatments had zero events to obtain finite variance for the individual study RR's, (3) they combined placebo and NSAID data for each study's RR estimate, and (4) they did not include any Alzheimer's trial data.  Their Figure 2 did not identify the comparator group for each study.

**Objective**

21

Figure 1 – Relative Risk and 95% Confidence Intervals for MI
from individual studies in Juni, et al. (2004)



Relative Risk (95% CI) or Myocardial Infarction

NOTES:
- x-axis is on log scale
- size of point estimates (triangles) is proportional to total treatment exposure. It is worth noting the size of the triangle in 090 which shows the lowest patient exposure of any trial. This study has been singled out in press reports as the study which should have indicated that Vioxx caused cardiovascular risk. Studies such as 035, 034, 029 or 045 have never been cited by MRL to claim cardioprotection by Vioxx.
- left-pointing arrow indicates 0 events on rofecoxib; thus, point estimate is 0, lower confidence limit is not defined, and upper confidence limit is one-sided 97.5% in order to be consistent with two-sided 95% CI's for studies with finite confidence limits
- right pointing arrows indicate 0 events on comparator; thus, point estimate is undefined (infinite), upper confidence limit is not defined, and lower confidence limit is one-sided 97.5% in order to be consistent with two-sided 95% CI's for studies with finite confidence limits

26



Figure 2 – RR and 95% CI's for MI from individual studies in Juni, et al. (2004) plus 3 combined-studies estimates

NOTES:
- x-axis is on log scale
- size of point estimates (triangles) is proportional to total treatment exposure
- left-pointing arrow indicates 0 events on rofecoxib; thus, point estimate is 0, lower confidence limit is not defined, and upper confidence limit is one-sided 97.5% in order to be consistent with two-sided 95% CI's for studies with finite confidence limits
- right pointing arrows indicate 0 events on comparator; thus, point estimate is undefined (infinite), upper confidence limit is not defined, and lower confidence limit is one-sided 97.5% in order to be consistent with two-sided 95% CI's for studies with finite confidence limits

27



Figure 3 – RR and 95% CI's for MI from individual studies in Juni, et al. (2004) plus 2 combined-studies estimates (all non-naproxen-controlled studies combined and all naproxen-controlled studies combined)

**NOTES:**
- x-axis is on log scale
- size of point estimates (triangles) is proportional to total treatment exposure
- left-pointing arrow indicates 0 events on rofecoxib; thus, point estimate is 0, lower confidence limit is not defined, and upper confidence limit is one-sided 97.5% in order to be consistent with two-sided 95% CI's for studies with finite confidence limits

right pointing arrows indicate 0 events on comparator; thus, point estimate is undefined (infinite), upper confidence limit is not defined, and lower confidence limit is one-sided 97.5% in order to be consistent with two-sided 95% CI's for studies with finite confidence limits

**Table 2 – MI's, Exposure, and RR's for studies in Juni, et al. (2004), split by comparator group**

| study control | rofe #events | rofe pat.yrs | control #events | control pat.yrs | relative risk | lower 95%CL | upper 95%CL |
|---|---|---|---|---|---|---|---|
| non-naproxen controlled studies | | | | | | | |
| a:029Erich(2001) placebo | 1 | 46 | 0 | 16 | .* | 0.01 | .* |
| b:029Ext.Ehrich(2001) diclofenac | 1 | 196 a | 1 | 45 a | 0.23 | 0.04 | 18.90 |
| c:035Cannon(2000) diclofenac | 2 | 645 | 1 | 315 | 0.98 | 0.20 | 60.56 |
| d:040Day(2000) placebo+ibuprofen | 1 | 72 | 0 | 48 | . | 0.02 | . |
| e:045Hawkey(2000) placebo+ibuprofen | 0 | 157 | 2 | 125 | 0.00 | 0.00 | 4.24 |
| f:058Truitt(2001) placebo+nabumetone | 1 | 21 | 0 | 23 b | . | 0.03 | . |
| g:034Saag(2000) diclofenac | 2 | 635 | 1 | 309 | 0.97 | 0.20 | 60.34 |
| h:083Kivitz(2004) placebo | 1 | 61 | 0 | 28 | . | 0.01 | . |
| k:090Geba(2001) nabumetone | 3 | 56 | 1 | 57 | 3.05 | 0.67 | 168.63 |
| m:096Truitt(2001) placebo | 3 | 97 | 0 | 58 | . | 0.25 | . |
| q:120+121Katz(2003) placebo | 1 | 51 | 0 | 25 | . | 0.01 | . |
| r:078+091Alzheimers placebo | 9 | 1661 | 12 | 1930 | 0.87 | 0.40 | 2.26 |
| s:non-naproxen combined non-naproxen | 25 | 2561 | 18 | 2979 | 1.16 | 0.63 | 2.13 |
| | | | | | | | |
| naproxen-controlled studies | | | | | | | |
| i:068Ext.Schnitzer(1999) naproxen | 1 | 788 | 1 | 132 | 0.17 | 0.03 | 13.79 |
| j:088Bombardier(2000) naproxen | 20 | 2807 | 4 | 2809 | 5.00 | 2.09 | 20.29 |
| l:096Truitt(2001) naproxen | 3 | 97 | 0 | 34 c | . | 0.14 | . |
| n:102Lisse(2003) naproxen | 5 | 640 | 1 | 629 | 4.91 | 1.15 | 244.72 |
| o:096Ext.Truitt(2001) naproxen | 4 | 864 d | 2 | 408 d | 0.94 | 0.26 | 10.51 |
| p:097Ext.Geusens(2002 naproxen | 2 | 995 | 1 | 361 | 0.73 | 0.15 | 44.99 |
| t:naproxen combined naproxen | 35 | 6191 | 9 | 4373 | 3.02 | 1.46 | 6.24 |

29

**Table 2 (cont.) – MI's, Exposure, and RR's for studies in Juni, et al. (2004), split by comparator group**

| study control | rofe #events | rofe pat.yrs | control #events | control pat.yrs | relative risk | lower 95%CL | upper 95%CL |
|---|---|---|---|---|---|---|---|
| **Group (1) of naproxen-controlled studies** | | | | | | | |
| j:088Bombardier(2000) naproxen | 20 | 2807 | 4 | 2809 | 5.00 | 2.09 | 20.29 |
| l:096Truitt(2001) naproxen | 3 | 97 | 0 | 34 c | . | 0.14 | . |
| n:102Lisse(2003) naproxen | 5 | 640 | 1 | 629 | 4.91 | 1.15 | 244.72 |
| u:088+102+096Truitt(2001) naproxen | 28 | 3544 | 5 | 3472 | 5.22 | 2.08 | 13.12 |
| | | | | | | | |
| **Group (2) of naproxen-controlled studies** | | | | | | | |
| i:068Ext.Schnitzer(1999) naproxen | 1 | 788 | 1 | 132 | 0.17 | 0.03 | 13.79 |
| o:096Ext.Truitt(2001) naproxen | 4 | 864 d | 2 | 408 d | 0.94 | 0.26 | 10.51 |
| p:097Ext.Geusens(2002 naproxen | 2 | 995 | 1 | 361 | 0.73 | 0.15 | 44.99 |
| v:068+096+097 Ext. naproxen | 7 | 2647 | 4 | 901 | 0.65 | 0.20 | 2.12 |

The statistical analyses that have been performed on this section of the document were performed by James Bolognese of MRL in consultation with Dr. Scott Zeger, Chairman of the Department of Biostatistics at Johns Hopkins University.

**Summary:**

Nine retrospective analyses of NSAID and VIOXX use performed after March 2000 until October 2004 in over 500,000 patients did not detect enhanced cardiovascular event rates in patients using Rofecoxib at dosages indicated for chronic use, 12.5 mg or 25 mg compared to other traditional NSAIDs. Some studies showed risk reduction for users of naproxen and some did not. It is difficult to determine the degree of rigorous compliance to daily twice a day dosing of naproxen at 500 mg doses in such studies. Since naproxen is not an irreversible inhibitor of platelet COX-1 (as noted above) vigorous full compliance would be necessary to expect a cardioprotective effect.

It is also noteworthy that the article in *Lancet*, November 2004, compares relative risk for myocardial infarctions of VIOXX vs. a control agent. The study omitted the published Alzheimer's patients where VIOXX was compared to a placebo control. As noted in Figure recalculated by MRL, the increased relative risk of MI for VIOXX vs. control is due to the

30

studies in which VIOXX was compared to naproxen as noted previously by MRL scientists. Although it is possible to deduce this from the article as originally published in *Lancet*, it is not easy to do so.  The new figure included above shows this conclusion more clearly.  A letter written by the Swedish Regulatory Agency draws the same conclusion: "[T]here was before the APPROVe trial no controlled data which indicated that rofecoxib would be different from placebo with regard to the risk for myocardial infarction and there was no basis to at an earlier time point withdraw VIOXX from the market."  MRL did not solicit the letter.

### Retrospective Studies of 50 mg dose and VIOXX label

     The Ray article, Lancet, 360, 1071-1073, 2002, the Solomon article, Circulation, May 4, 2002,  2068-2073, the Campen abstract in Arthritis and Rheumatism, Aug and Oct 2004, and the Graham analysis, August 2004, Table 3, all point out an elevated risk of cv events at dosages >25mg/day, above the maximum indicated dosage of 12.5-25 mg for chronic use.  Merck's label indicating proper dosage of VIOXX in 2000 and 2002 is noted below.  Also noted is the effect of 50 mg on blood pressure, salt and water retention in the label. 

**2000 Label**

**PRECAUTIONS**          *   *   *

*Renal Effects*
    Clinical trials with VIOXX at daily doses of 12.5 and 25 mg have shown renal effects(e.g., hypertension, edema) similar to those observed with comparator NSAIDs; these occurred with an increased frequency with chronic use of doses above the 12.5 to 25 mg range. (see ADVERSE REACTIONS)

                *   *   *

*Fluid Retention and Edema*
Fluid retention and edema have been observed in some patients taking VIOXX (see ADVERSE REACTIONS). VIOXX should be used with caution, and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension, or heart failure.

                *   *   *

**DOSAGE AND ADMINISTRATION**

**Osteoarthritis**

31

The recommended starting dose of VIOXX is 12.5 mg once daily.  Some patients receive additional benefit by increasing the dose to 25 mg once daily.  The maximum recommended daily dose is 25 mg.

**Management of Acute Pain and Treatment of Primary Dysmenorrhea**

The recommended dose of VIOXX is 50 mg once daily.  Subsequent doses should be 50 mg once daily as needed. Use of Vioxx for more than 5 days is management of pain has not been studied.

**April 2002 Label**

**PRECAUTIONS**                    * * *

*Fluid Retention, Edema, and Hypertension*
    Fluid retention, edema, and hypertension have been reported in some patients taking VIOXX.  In clinical trials of VIOXX at daily doses of 25 mg in patients with rheumatoid arthritis the incidence of hypertension was twice as high in patients treated with VIOXX as compared to patients treated with naproxen 1000 mg daily. Clinical trials with VIOXX at daily doses of 12.5 and 25 mg in patients with osteoarthritis have shown effects on hypertension and edema similar to those observed with comparator NSAIDs; these occurred with an increased frequency with chronic use of VIOXX at daily doses of 50 mg.  (See ADVERSE REACTIONS.)  VIOXX should be used with caution, and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension, or heart failure.

**DOSAGE AND ADMINISTRATION**

**Osteoarthritis**

The recommended starting dose of VIOXX is 12.5 mg once daily.  Some patients receive additional benefit by increasing the dose to 25 mg once daily.  The maximum recommended daily dose is 25 mg.

**Rheumatoid Arthritis**

The recommended dose is 25 mg once daily.  The maximum recommended daily dose is 25 mg.

**Management of Acute Pain and Treatment of Primary Dysmenorrhea**

The recommended dose of VIOXX is 50 mg once daily.  The maximum recommended daily dose is 50 mg. Use of Vioxx for more than 5 days is

32

management of pain has not been studied. Chronic use of VIOXX 50 mg daily is not recommended. (See ADVERSE Reactions, Clinical Studies in OA and RA with VIOXX 50 mg).

As noted above, two articles in 2002 and two articles in 2004 noted increased CV or congestive heart failure risk associated with chronic use of doses of VIOXX greater than 25 mg. Presumably this involved use of 50 mg or possibly even higher doses. The FDA approved label for VIOXX has clearly stated that the maximum indicated dose for chronic use was 25 mg and that the starting dose was 12.5 mg per day. The label has disclosed that use of 50 mg for times longer than five days (acute pain indication) in controlled clinical trials was associated with increased incidence of fluid retention, edema, and increased blood pressure as noted above.

**The APPROVe Trial**

APPROVe was a multi-center, randomized, placebo-controlled, double-blind study to determine the effect of 156 weeks (3 years) of treatment with rofecoxib on the recurrence of adenomatous polyps of the large bowel in patients with a history of colorectal adenomas. The study included approximately 2586 patients aged 40-96; approximately 62% male. Aspirin was allowed in the study.

No difference in results from the APPROVe trial was detectable for the first 18 months of continuous use of VIOXX 25 mg in the trial with regard to risk of cardiovascular thrombotic events. It was only after a much longer period of consecutive months of VIOXX 25 mg versus placebo that the risk for cardiovascular thrombotic events was elevated in the VIOXX arm, slightly less than twofold. The cardiovascular event rate began to diverge between the VIOXX and placebo arms after 18 months of continuous treatment, and the data finally became statistically significant after this much longer period of months. The event rate diverged similarly in patients taking low-dose ASA and in patients not taking ASA. It is important to emphasize that the ESMB (External Safety Monitoring Board) that followed the results had totally independent authority to halt the trial at any point. They chose to stop the trial when the results first became statistically significant. It is also important to emphasize that the fact that the CV event rate did not begin to diverge from the placebo arm until after 18 months is

33

consistent with the earlier Alzheimer's data and our conclusions from the VIGOR study (which lasted only approximately one year) that VIOXX was not prothrombotic. The meaning of the APPROVe data is also confounded by the fact that the CV event rate in the placebo arm turns relatively flat after 18 months, an unusual and unexplained course, which indicates very few CV events in the placebo arm after 18 months. Thus, it is not clear to me from the data available to me what the explanation is for the divergence in curves after 18 months.

34