*Confedential file
USRD TO SET Presumption
that merck "Vioxx" was unsafe
which Merck had to overcome*

BEG_BATES = MRK-NJ0152115
END_BATES * MRK-NJ0152123
BEG_ATTACH *
END_ATTACH *
DOCDATE * 01/01/1995
TITLE : Effect of nonsteroidal antiinflammatory drugs on / fracture healing a laboratory study in rats
AUTHORS : Keer, R.
Renfree, K
Banovac, K
Latta, L L
Aitman, R D
Hornicek, K

RECIPIENTS :
CC : [ILLEGIBLE]
Gertz, B J
DOC_TYPE * Journal Article/Literature/Abstract
CUSTODIAN : Gertz, Barry
MARGINALIA * YES
REDACTED * NO
OCR_FULL_TXT :

Journal of Orthopaedic Trauma
Vol. 9, No. 5, pp. 392-400
0 1995 Lippincott-Raven Publishers, Philadelphia
Effect of Nonsteroidal Antiinflammatory Drugs on
Fracture Healing: A Laboratory Study in Rats
R. D. Altman, *L. L. Latta, *R. Keer, *K. Renfree, *F. J. Hornicek, and *K. Banovac
Departments of Medicine and *Orthopaedics and Rehabilitation, University of Miami School of Medicine,
Veterans Administration Hospital, Miami, Florida, U.S.A.

Summary: We studied the effects of two nonsteroidal antiinflammatory drugs
(NSAIDs) on fracture healing in rats: ibuvrofen (30 mg/kg/day) -and indometh-
acin (I m day). Femoral fra cure were in uced via a three-point en ing
tec ni ue. SAIDs were administered orally for 4 or 12 weeks. Control ani-
ma s received no medication. In each group a minimu-mi-or Wslx animals were
killed at the following intervals: 2, 4, 6, 8, 10, and 12 weeks postfracture.
Fracture healing was determined by mechanical testing and histologic evalua-
tion. The bending strength of each fractured femur was expressed as a per-
~e'_ntage of the strength of the intact, contralateral femur. Histologic evaluation
was performed on serial longitudinal sections stained with hematoxylin and
eosin using a qualitative score of maturity of the callus. Ibuprofen and indo-
methacin both retarded fracture healing, with significant differences in "me-
weekS Of drug aurministration. tioin arugs also inaucea qualitative nisiologic
~hanges'_m_a_n_i_Tested -by delayed maturation of callus, which was noticeable
earlier than the differen-c-e-To-u-n-d -By T-e'-cFa_n_-ica-r-testing of bone. Our data
suggest that NSAIDs have an inhibitory effect on fracture repair that is re-
~-W. ~ft , nAt

Nonsteroidal antiinflammatory drugs (NSAIDs)
are frequently used in the management of inflam-
matory symptoms associated with trauma of differ-
ent origins, including fractures. Several groups of
investigators have evaluated the effect of these
drugs on fracture healing. However, the available
data are controversial. Some investigators have re-
ported that NSAIDs have an inhibitory effect on
fracture healing (1,8,19,21) and osteotomies (7,10,
12,16,22) in animals, whereas others more recently
have claimed that NSAIDs did not significantly
change the course of fracture repair (8,13,14).

Accepted April 18, 1995.
Address correspondence and reprint requests to K. Banovac,

7/4/2013 6:52 PM

EXHIBIT
DD

M.D., Ph.D., Department of Orthopaedics and Rehabilitation
(D27), 1 013 016960, University of Miami School of Medicine.
Miami, FL 33101, U.S.A.

9
C.2

These various studies used different experimental
protocols and various NSAIDs, which may have
contributed to the discrepancies in results. In the
present study, we evaluated the effect of two com-
monly used NSAIDs, ibuprofen and indomethacin,
on fracture healing in rats. The doses used were
equivalent to those recommended for humans. To
determine whether the effects of NSAIDs on frac-
ture healing were reversible, several groups of rats
also were followed after cessation of therapy.

METHODS

Animals

Female rats, retired breeders (375-450 g), were
anesthetized by intraperitoneal injection of 20 mg
sodium pentobarbital and a femur fracture was pro-

392

MRK-NJO152115

###1|||Page MRK-NJO152115^^^

1P
lr 1W
1
49 3~
lot

EFFECT OF NSAID ON FRACTURE HEALING

duced by a technique approved by the institutional
committee for the use of experimental animals (20).
Under aseptic conditions a small incision was made
over the area of the patellar tendon and a 22-gauge
hypodermic needle was manually pushed up the
medullary canal and the tip lodged into the proximal
femoral metaphysis. The needle was placed there in
order to prevent excessive displacement during
fracture and to provide the animal with a load-
sharing device. After insertion of the needle, the
right femur was fractured using a jig with a pneu-
matic device and a rounded wedge bar fixed to the
end of the piston. The wedge applied to the middle
of the femur had a total excursion of 4 mm. Care
was taken to produce simple, closed, transverse
midshaft fractures with not more than 5 mm dis-
placement. Pin placement before and after fracture
was evaluated by radiographic examination (Cabi-
net X-ray System Fixation Services, Hewlett-
Packard, McMinnille, OR). The base of the edle
was cut after radiographic examination ana . -e skin
incision closed with a single nylon suture. After
fracture, the animals were divided into five groups
and treated with NSAIDs as indicated in Table 1.
Individual doses of NSAIDs were mixed with pow-
dered food. These dosages of NSAIDs provided the

equivalent of 2,100 mg/day of ibuprofen (Motrin, Upjohn Company, Kalamazoo, MI) and 70 mg/day of indomethacin (Indocin, Merck & Co, West Point, PA) for a 70-kg person; these doses of NSAIDs are in the range of average recommended therapeutic doses. The administered dose of drug was monitored indirectly from the amount of daily food intake. In each group there was a minimum of six animals. Additional rats were added to each group to compensate for experimental losses, such as anesthesia overdose, respiratory infections, or escape from the cages. Before sacrifice, rats were anesthetized as described above and killed by air embolism at 2, 4, 6, 8, 10, and 12 weeks postfracture. Both legs were removed through disarticulation of the hip and the soft tissue dissected from the bone, except for a thin layer covering the callus. The intramed-

TABLE 1. Group number, medication, and duration of therapy

393

ullary device was then removed, and all specimens were tested wet at room temperature within 5 h of death.

Mechanical Testing

Callus strength was measured via a three-point bending technique, which has been described previously (20). The bone was positioned on two supports at the proximal and distal metaphyses and loaded from above directly on the fracture callus by using a curved, padded loading ram until refracture (or fracture). Load and displacement were measured, and the ultimate moment from the load-

deformation curve was determined for the healing right femur and for the intact, contralateral femur in the same animal. The results obtained on the intact femur were used as the control to calculate mechanical healing of the fractured right femur. The values were expressed as a percentage of mechanical healing, which is the healing femur strength as a percentage of the intact femur strength.

Histologic Studies

Each refractured bone was fixed in 10% saline-buffered formalin for I week. After fixation, the specimens were decalcified in equal volumes of 15% sodium formate and 50% formic acid for 2 weeks. Serial longitudinal sections (5-6 l.Lm) were prepared from the tissue previously embedded in paraffin. Sections were stained with hematoxylin and eosin or toluidine blue. The grade of healing was determined by two of us (K.R. and F J.H.) in a blind fashion using a scale for histological healing reported by Huo et al. (8), in which grade l = fibrous tissue in callus, grade 2 = predominant fibrous tissue and some cartilage, grade 3 = equal amount of fibrous tissue and cartilage, grade 4 = cartilage, grade 5 = predominant cartilage and some woven bone, grade 6 = equal amounts of cartilage and woven bone, grade 7 = predominantly woven bone with some cartilage, grade 8 = woven bone, grade 9 = woven bone and some mature bone, and grade 10 = lamellar (mature) bone. The mean of duplicate gradations were used for statistical analysis.

Group Dose (mg/kg/day) Therapy (weeks)

1   Placebo 12
2   Indomethacin I mg 4
3   Indomethacin I mg 12
4   Ibuprofen 30 mg 4
5   Ibuprofen 30 mg 12

Statistical Analysis

The statistical significance between the results were determined by analysis of variance and Student's I test.

MRK-NJO152116

###2|||Page MRK-NJO152116^^^

394
RESULTS
R. D. ALTMAN ET AL.
acin for 12 weeks, a significantly (p < 0.05)- lower

score of histologic healing was found after 8 and 10
weeks of drug administration. Some representative
histologic findings in the early stages (after 2 weeks)
of fracture healing are shown in Figs. 5 and 6 , and
in later stages (after 6 weeks) in Figs. 7 and 8 . The

[text obscured by redaction]

The comparison of data obtained by mechanical
and histologic evaluation between indomethacin- or
ibuprofen- treated animals, either after 4 or 12
weeks of treatment, showed statistically insignifi-
cant differences.

The results of mechanical testing in rats treated
with ibuprofen are shown in Fig. 1. Both groups of
rats treated with ibuprofen either for 4 weeks or 12
weeks postfracture had lower strengths of healed
fractures than the control (untreated) group. These
differences were statistically significant at 10 (p <
0.05) and 12 (p < 0.01) weeks postfracture. The
results of mechanical testing in rats treated with
indomethacin are shown in Fig. 2. A significantly
lower strength of callus was also found in the indo-
methacin-treated group of rats after 10 and 12
weeks (p < 0.05) of drug administration. In the
group of animals treated with indomethacin for 4
weeks, there was no significant difference in the
strength of the fractured femora when compared
with the control group.

[text obscured by redaction] The scores of histologic healing in the ibu-
profen-treated group were consistently lower than
those in the control rats throughout the entire pe-
riod of study, but a significant difference (p < 0.05)
was found in the group treated for 4 weeks at 4 and
8 weeks postfracture and in the group treated for 12
weeks at 4, 6, and 10 weeks postfracture (Fig. 3).
Figure 4 demonstrates the grade of histologic
healing in the indomethacin-treated rats. The score
of histologic healing in the group of rats treated with
indomethacin for a period of 4 weeks showed a sig-
nificant difference from controls only 8 weeks post-
fracture. In the other group treated with indometh-
0
z
z
T_

12
TIME POST-FRACTURE (WEEKS)
I J Orthop Trauma, Vol. 9, No. 5, 1995
1V
DISCUSSION
Our results demonstrate that ibuprofen and indo-
methacin inhibit fracture healing in rats. The
changes in the rate of healing were determined by
0 113UPROFEN 4 WEEKS
FIG. 1. Mechanical healing of femoral
fracture in rats treated with ibuprofen.
Binding strength of the fractured bone
was expressed as a percentage of the
contralateral intact femur (see Methods).
Bars indicate means ± SD; *p < 0.05, **p
< 0.01.
MRK-NJ0152117

###3|||Page MRK-NJ0152117^^^

lei
tip
EFFECT OF NSAID ON FRACTURE HEALING
395
0 INDOMEMACIN 4 WEEKS`
13 INDOMETRACIN 12 WEEKS
0 CONTROL
(D
FIG. 2. Mechanical healing of femoral Z
fracture in rats treated with inclometha-
cin. Bending strength of the fractured
bone was expressed as a percentage of <
the contralateral intact femur (see Meth- Z
ods). Bars indicate means t SD; *p <
0.05, **p < 0.01.
mechanical testing and histologic analysis of bone
specimens, which showed statistically significant
differences between a control group and animals
treated with NSAIDs. Comparing the effect of in-
domethacin on the process of mechanical healing
between the groups treated for 4 and 12 weeks (Fig.
3), it can be seen that the cessation of medication
after 4 weeks resulted in a consistently higher de-
gree of fracture healing than found in the group
treated for the entire period of 12 weeks. Although
the differences between these two groups were not
statistically significant, the comparison of these
data with the control group demonstrated signifi-
cant inhibitory effect of MAIDS on fracture healing
after an extended period of continuous administra-

tion. A different pattern of mechanical healing was

0

_3

0

0

TIME POST-FRACTURE (WEEKS)

found after discontinuation of ibuprofen and showed no improvement of fracture healing by mechanical criteria, indicating that different MAIDS may act differently on the processes involved in bone repair. The histologic evaluation of fracture calluses in rats treated with NSAIDs showed that the administration of indomethacin and ibuprofen induced qualitative changes in the healing process and that these changes in healing were noticeable earlier than were the changes in mechanical strength of callus tested by three-point bending, which predominantly reflects the strength of cortical bone.

In general, the mechanism of action of NSAIDs on the healing of traumatized tissue remains uncertain. In various tissues, MAIDS cause a delay of

0 IBUPROFEN 4 WEEKS

0 [BUPROFEN 12 WEEKS

M r-ni

TIME POST-FRACTURE (WEEKS)

FIG. 3. Histologic healing of femoral fracture in rats treated with ibuprofen. The score of maturity of callus was determined as described by Huo et al. (7). Bars indicate means ± SD; *p < 0.05.

J Orthop Trauma, Vol. 9, No. 5, 1995

i

MRK-NJO152118

2 4 6 8 10 12

###4|||Page MRK-NJ0152118^^^

396 R. D. ALTMAN ET AL.
0 INDOMETHACIN 4 WEEKS
EI INDOMETHACIN 12 WEEKS
0 CONTROL
LD III|
Z
0 6
.I
0
x 4
0
2
0

FIG. S. Histologic healing 2 weeks after femur fracture in ibu prof en-treated rat (a) and control untreated rat (b). a: Right side of photomicrograph predominantly illustrates fibrosis., Left side shows the initial stages of chondrogenesis. Histologic healing was scored as grade 2 (see Methods for gradation scale). b: Callus contains mainly large mature hypertrophic chondrocytes (arrows), scored as grade 4 of histologic healing. Original magnification x40. to)uidine blue staining.

J Orthop Trauma, Vol. 9, No. 5, 1995

FIG. 4. Histologic healing of femoral fracture in rats treated with indomethacin. The score of maturity of callus was determined as described by Huo et al. (7). Bars indicate mean t SID; *p < 0.05.

MRK-NJO152119

###5|||Page MRK-NJ0152119^^^

*A
EFFECT OF NSAID ON FRACTURE HEALING 397
It
49

49
4.21
490
40
4 Y
43
43~

FIG. 6. Histologic healing 2 weeks after femur fracture in indomethacin-treated rat (a) and control untreated rat (b). a: Photomicrograph illustrates similar amount of fibrous (left) and cartilaginous tissue (right) in the callus (histologic healing = grade 3). b: Callus from control rat demonstrates mature chondrocytes (upper part) and the initial appearance of woven bone (lower part), with the capillary invasion of cartilage (arrows). Histologic healing was scored as grade 5 (see Methods for gradation scale). Original magnification x40, toluidine blue staining.

wound healing after trauma, such as in skin 0 1, 15) and cartilage (16) and after tooth extraction (9).

The method of mechanical testing that we used to determine fracture healing might not have been sufficiently sensitive to detect a noticeable difference in the callus strength

The structural changes induced by indomethacin, in our study, became apparent after a longer period of drug administration and at the later stages of bone repair, usually 8-12 weeks postfracture. It is likely that the lack of expected effects of drugs in experiments with phenylbutazone and indomethacin, performed at 1-3 weeks postfracture by Mbugna et al. (13), and in those obtained with flunixin (prescribed in veterinary medicine) and piroxicam by More et al. (14), could be explained in part by this premature evaluation of the fracture callus.

Histologic

T77'
MRK-NJO152120

398
dK
NO
R. D. ALTMAN ET AL.

examination of tissue specimens of indomethacin-treated rats showed changes 8-10 weeks after fracture.

The second factor important in the evaluation of NSAIDs on fracture healing is the frequency of drug administration. Raisz et al. (17,18) reported that in cultured bone specimens three potent NSAIDs-indomethacin, flurbiprofen, and piroxicam--each had biphasic effects on the production of prostaglandins, the important local regulators of bone metabolism. These drugs paradoxically increased prostaglandin E-2 synthesis at low concentrations in culture medium, and when given at higher doses had an inhibitory effect on prostaglandin E-2 production. The above data suggest that the intermittent administration of NSAIDs could have a considerably different effect on prostaglandin syn-

J Orthop Trauma, Vol. 9, No. 5, 1995

FIG. 7. Histologic healing 6 weeks after fracture in indomethacin-treated rat (a) and control untreated rat (b). a: An area of callus presenting similar amount of cartilaginous tissue and woven bone (arrows). Histologic healing = grade 6. b: Callus tissue contains predominantly woven bone with some mature cartilage undergoing calcification (arrows). Histologic healing = grade 7. Original magnification x40, toluidine blue staining.

thesis in bone than does continuous therapy. Indeed, Huo et al. (8), using ibuprofen intermittently (only 5 days weekly throughout the entire 12-week study), showed consistently lower values of mechanical healing than were seen in a control group. However, these differences were not statistically significant at any point in time. Similarly, the histologic staging of callus maturity showed no significant differences between NSAID-treated and control groups (8). These data contrast ours only quantitatively, showing similar trends of changes in fracture healing, but not reaching statistical significance. We showed that indomethacin and ibuprofen given in a continuous fashion, instead of intermittently, throughout a 12-week period induced a significant delay in fracture healing determined both by mechanical and histologic criteria for healing.

MRK-NJO152121

###7|||Page MRK-NJO152121^^^

40
ly
EFFECT OF NSAID ON FRACTURE HEALING
FIG. 8. Histologic healing 12 weeks after frac-

ture in indomethacin-treated rat (a) and control untreated rat (b). a: At this stage mainly woven bone was found in the callus with the appearance of bone marrow elements. Histologic healing = grade 8. b: A representative area of callus in untreated rat shows more mature bone with some remaining woven bone and more prominent infiltration of bone marrow. Histologic healing = grade 9. Original magnification x40, toluidine blue staining.

Although both studies showed similar tissue responses, the changes were more pronounced in our study, which could be attributed to the higher bioavailability of drugs during continuous administration.

Most antiinflammatory drugs appear to act on mechanisms that are common to inflammation of many different causes. In addition to inhibition of prostaglandin synthesis, these mechanisms include neutrophil activation, migration, chemotaxis, and phagocytosis (2,3), and possibly many other unidentified tissue processes that are involved in inflammatory reactions. For example, a recent study has documented that NSAIDs may interfere with the local tissue production of growth factors. Edwall et al. (4) reported that indomethacin suppressed the expression of IGF-1 messenger RNA in

399

callus after femoral fracture in rats treated with the drug for 10 days. The above data suggest a deleterious effect of NSAIDs on fracture healing, more so with ibuprofen than with indomethacin. Despite the fact that this effect is nearly fully reversed when the antiinflammatory drug is discontinued, the use of these agents in patients with acute fractures should be limited. The improved fracture integrity encountered from a prostaglandin analog may suggest a role for this agent in fracture healing in humans, particularly with delayed union.

Acknowledgment: This work was supported in part by the Miami Department of Veterans Affairs, a Research Grant from Geriatric Research, Education and Clinical Center, and the Upjohn Company, Kalamazoo, MI. We thank Steve H. Hart for technical assistance and Dr. Theodore I. Malinin (Director, Tissue Bank, Department of
J Orthop Trauma, Vol. 9, No. 5, 1995
MRK-NJO152122

###8|||Page MRK-NJ0152122^^^

:.400
R. D. ALTMAN ET AL
Orthopaedics and Rehabilitation, University of Miami School of Medicine, Miami, FL) for providing us with laboratory facilities.
REFERENCES
1. Allen HL, Wase A, Bear WT: Indomethacin and aspirin:

effect of nonsteroidal antiinflammatory agents on the rate of fracture repair in the rat. Acta Orthop Scand 512:595-600, 1980.

2. Altman RD: Neutrophil activation: an alternative to prosta-glandin inhibition as the mechanism of action for NSAID. Semin Arthritis Rheum 19(Suppl 2):1-5,29-30, 1990.

3. Brooks PM, Day RO: Nonsteroidal antiinflammatory drugs--differences and similarities. N Engl J Med 324:1716-25, 1991.

4. Edwall D, Prosell FT, Levinovitz A, Jennische E, Norstedt G: Expression of insulin-like growth factor I messenger ri-bonucleic acid in regenerating bone after fracture: influence of indomethacin. J Bone Miner Res 7:207-13, 1992.

5. Elves MW, Bayley 1, Roylance PJ: The effect of indometh-acin upon experimental fractures in the rats. Acta Orihop Scand 53:35-41, 1982.

6. Engesaeter LB, Sudmann B, Sudmann E: Fracture healing in rats inhibited by locally administered indomethacin. Acta Orthop Scand 63:330-33, 1992.

7. Hogevold HE, Grogaard B, Reikeras O: Effect of short-term treatment with corticosteroids and indomethacin on bone healing. A mechanical study of osteotomies in rats. Acta Orthop Scand 63:607-611, 1992.

8. Huo MH, Troiano NW, Pelker RR, Gundberg CM, Friend-laender GE: The influence of ibuprofen on fracture repair: biomechanical, biochemical, histologic, and histomorpho-metric parameters in rats. J Orthop Res 9:383-390, 1991.

9. Husko PJ, Nieminen LHE, Nieman LS: The effect of indo-methacin on tooth extraction wound healing in rats. Exper-imentia 31:1056-1058, 1975.

10. Keller J, Bunger C, Andereassen TT, Bak B, Lucht U: Bone repair inhibited by indomethacin. Acia Orthop Scand 58. 379-383, 1987.

11. Lee KH, Tong TG: Mechanism of action of salicylates VIII. effect of topical application of retinoic acid on wound-healing retardation action of a few anti-inflammatory agents. J Pharmacol Sci 59:1036-1038, 1970.

J Orthop Trauma, Vol. 9, No. 5, 1995

12. Lindholm TS, Tomkvist H: Inhibitory effect on bone forma-tion and calcification exerted by the anti-inflammatory drug ibuprofen. Scand J Rheumatol 10:3842, 198).

13. Mbugua SW, Skoglund LA, Lokken P: Effects of phenylb-utazone and indomethacin on the post-operative course fol-lowing experimental orthopedic surgery in dogs. Acta Vet Scand 30:27-35, 1989.

14. More RC, Kody MH, Kabo JM, Dorey FJ, Meals RA: The effects of two nonsteroidal antiinflamunatory drugs on limb swelling, joint stiffness, and bone torsional strength follow-ing fracture in a rabbit model. Clin Orthop 247:306-12, 1989.

15. Morton JJP, Malone MH: Evaluation of vulnerary activity by an open wound procedure. Arch Int Pharmacodyn 1%: 117-126, 1972.

16. Obeid G, Zhang X, Wang X: Effect of ibuprofen on the healing and remodeling of bone and articular cartilage in the rabbit temporomandibular joint. J Oral Maxillofac Surg 50: 843-849, 1992.

17. Raisz LG, Pilbearn CC, Klein-Nulend J, Harrison JR: Pros-

taglandins and bone metabolism: possible role in osteoporosis. In: Osteoporosis 1990, Vol. 1, ed by C Christiansen, K Overgaard, Copenhagen, Denmark, Osteopress ApS, 1990, pp 253-258.
18. Raisz LG, Simmons HA, Fall PM: Biphasic effects of nonsteroidal anti-inflammatory drugs on prostaglandin production by cultured rat calvariae. Prostaglandins 37:559-565, 1989.
19. Ro J, Sudmann E. Marton PF: Effect of indomethacin on fracture healing in rats. Acta Orthop Scand 47:588-599, 1976.
20. Sarmiento A, Schaeffer JF, Beckman L, Latta LL, Enis JE: Fracture healing in rat femora as affected by functional weight-bearing. J Bone Joint Surg [Am] 59:369-375, 1977.
21. Sudmann E, Bang G: Indomethacin-induced inhibition of Haversian remodeling in rabbits. Acta Orthop Scand 50: 621-27, 1979.
22. Sudmann E, Dregelid E, Bessesen A, Morland J: Inhibition of fracture healing by indomethacin in rats. Eur J Clin Invest 9:333-339, 1979.
23. Tornkvist H, Lindholm TS: Effect of ibuprofen on mass composition of fracture callus and bone. Scand J Rheumatol 9:167-171, 1980.
MRK-NJO152123

###9|||Page MRK-NJO152123^^^

IMPORTANCE       =
ISSUES           = Yes
COMMENTS         :
ATT_COMMENTS     :
CONFIDENTIAL     =
MOD_DATE         = 20120320 0
CODED_DATE       = 00/00/0000

Study, MK-0966 versus Ibuprofen versus placebo
Pooled Analysis
Pi-otocol 069-Pooled Analysis of the PUBs. Additionally,
as part of Protocol 069, a pooled analysis of
discontinuations due to GI adverse experiences and
prespecified "NSAID type" GI adverse experiences are
reported in Section 2.3.3.
1.2.4 Other Studies-Rheumatoid Arthritis
Three studies perform-ied in patients with rheumatoid
arthritis are reported in Section 5. These studies are
reported in a separate section because: (1) they utilized
doses of MK-0966 several fold higher than the dose
/MK-0966/WMA/RWI316.DOC APPROVED
26OCT98
Do_nfi~tial - Subject To Protective Order MRK-NJO179938

###311|||Page MRK-NJ0179938^^^

MK-0966 E-20
Clinical Documentation
E. Clinical Safety
1. General Safety Overview
1.2.4 Other Studies-Rheumatoid Arthritis (Cont.)
proposed for Lhe treatment of OA and acute pain,
(2) rheumatoid arthritis patients have a distinct demographic
profile, and (3) rheumatoid arthritis will be filed as a new
indication at a later date.
1.3 Tables of All Clinical Studies
Table E-2, Table E-3, and Table E-4 present all the clinical
studies conducted with MK-0966. Only serious adverse
experience information is provided in this document for the
ongoing supplemental studies (Section 7.)
/MK-0966/WMA/RWI316.DOC APPROVED
26OCT98
ifonf4dential - Subject To Protective Order MRK-NJO179939

*rheumatoid arthritis withdrawn.*

###312|||Page MRK-NJ0179939^^^

MK-0966
Clinical Documentation
E. Clinical Safety
1. General Safety Overview
1.3 Tables of All Clinical Studies (Cont.)
Table E-2 Summary cf Studies in the Osteoarthritis Safety Section

| Study Type/Protocol Numbers | Total Duration | MK-0966 Dose | Subjects[Patients Ti-eated Total Daily Act ive-Com pa rator/ | -09 | Placebo | Total Patients Opeti-Label |
|---|---|---|---|---|---|---|



EXHIBIT
GG

# High dose nonsteroidal anti-inflammatory drugs compromise spinal fusion

*[De fortes doses d'anti-inflammatoires non stéroïdiens compromettent l'arthrodèse vertébrale]*

Scott S. Reuben MD,* David Ablett FRCP,† Rachel Kaye‡

**Purpose:** Although nonsteroidal anti-inflammatory drugs (NSAIDs) provide benefit to patients following spinal fusion surgery, their routine administration has remained controversial due to concerns about possible deleterious effects on bone healing. The goal of this retrospective study was to assess the incidence of non-union following the perioperative administration of ketorolac, celecoxib, or rofecoxib.

**Methods:** We retrospectively analyzed the data of 434 patients receiving perioperative ketorolac (20–240 mg·day$^{-1}$), celecoxib (200–600 mg·day$^{-1}$), rofecoxib (50 mg·day$^{-1}$), or no NSAIDs in the five days following spinal fusion surgery.

**Results:** There were no significant differences in the incidence of non-union among the groups that received no NSAIDs (11/130; 8.5%), celecoxib 5/60; 8.3%), or rofecoxib (9/124; 7.3%). In contrast, 23/120 of patients (19.2%) that received ketorolac had a higher incidence ($P < 0.001$) of non-union compared to non-NSAID users. However, only 3/50 patients (6%) receiving low-dose ketorolac ($\leq 110$ mg·day$^{-1}$) resulted in non-union which was not significantly different from non-NSAID users. Patients administered higher doses of ketorolac (120–240 mg·day$^{-1}$) resulted in a higher incidence ($P < 0.0001$) of non-union (20/70; 29%) compared to non-NSAID users. For those patients developing non-union, there was a higher incidence comparing smokers vs non-smokers ($P < 0.0001$) and one level fusion vs two level fusions ($P < 0.001$).

**Conclusions:** This study revealed that the short-term perioperative administration of celecoxib, rofecoxib, or low-dose ketorolac ($\leq 110$ mg·day$^{-1}$) had no significant deleterious effect on non-union. In contrast, higher doses of ketorolac (120–240 mg·day$^{-1}$), history of smoking, and two level vertebral fusions resulted in a significant increase in the incidence of non-union following spinal fusion surgery.

**Objectif :** Les anti-inflammatoires non stéroïdiens (AINS) sont bénéfiques après une arthrodèse vertébrale, mais leur administration régulière demeure controversée à cause des effets nuisibles possibles sur la cicatrisation de l'os. Notre étude rétrospective voulait évaluer l'incidence d'absence de fusion à la suite de l'administration périopératoire de kétorolac, célécoxib ou rofécoxib.

**Méthode :** Nous avons procédé à l'analyse rétrospective de données sur 434 patients qui ont reçu du kétorolac (20–240 mg·jour$^{-1}$), du célécoxib (200–600 mg·jour$^{-1}$), du rofécoxib (50 mg·jour$^{-1}$) ou aucun AINS dans les cinq jours suivant une arthrodèse vertébrale.

**Résultats :** L'incidence d'absence de fusion osseuse n'était pas significativement différente entre les patients sans AINS (11/130 ; 8,5 %) et ceux qui ont eu du célécoxib 5/60 ; 8,3 %) ou du rofécoxib (9/124 ; 7,3 %). Par ailleurs, 23/120 des patients (19,2 %) qui ont reçu le kétorolac ont présenté une incidence plus élevée ($P < 0,001$) d'absence de fusion en comparaison de ceux qui ont pris des AINS. Seulement 3/50 patients (6 %) recevant de faibles doses de kétorolac ($\leq 110$ mg·jour$^{-1}$) ont présenté une absence de fusion, ce qui n'est pas significativement différent des non-utilisateurs d'AINS. Des doses plus élevées de kétorolac (120–240 mg·jour$^{-1}$), comparées aux non-AINS, ont provoqué une plus haute incidence ($P < 0,0001$) d'absence de fusion (20/70 ; 29 %). L'incidence d'absence de fusion était plus élevée si on compare les fumeurs vs les non-fumeurs ($P < 0,0001$) et la fusion à un niveau vs à deux niveaux ($P < 0,001$).

**Conclusion :** L'étude a révélé que l'administration périopératoire à court terme de célécoxib, de rofécoxib ou de faibles doses de kétorolac ($\leq 110$ mg·jour$^{-1}$) n'a pas d'effet nuisible significatif sur l'absence de fusion. Par contre, des doses plus élevées de kétorolac (120–240 mg·jour$^{-1}$), le tabagisme et des fusions vertébrales à deux niveaux augmentent significativement l'incidence d'absence de fusion à la suite d'une arthrodèse vertébrale.

From the Acute Pain Service,* Baystate Medical Center and the Tufts University School of Medicine, Springfield, Massachusetts, USA; the Department of Anesthesiology,† Calgary Health Region, Calgary, Alberta, Canada; and the Brandeis University, Waltham, Massachusetts, USA.
  *Address correspondence to:* Dr. Scott S. Reuben, Baystate Medical Center, 759 Chestnut Street, Springfield, MA  01199, USA. Phone: 413-794-4325; Fax: 413-794-5349; E-mail: scott.reuben@bhs.org
Presented in part at the American Society of Regional Anesthesia and Pain Medicine Meeting, Vancouver, British Columbia, Canada, May 2002.
Support was provided solely from institutional and/or departmental source.
  *Accepted for publication November 3, 2004.*
  *Revision accepted February 14, 2005.*

EXHIBIT

H H

507

NONSTEROIDAL anti-inflammatory drugs (NSAIDs) inhibit the synthesis of prostaglandins both in the spinal cord and at the periphery, thus diminishing the hyperalgesic state after surgical trauma.[1] NSAIDs are useful as the sole analgesic after minor surgical procedures[2] and may have a significant opioid-sparing effect after major surgery.[3] It is currently recommended that NSAIDs be used in the multimodal analgesic approach for the management of perioperative pain.[4,5] The recent practice guidelines for acute pain management in the perioperative setting state "unless contraindicated, all patients should receive around-the-clock regimen of NSAIDs, coxibs, or acetaminophen".[5] Proposed and documented benefits of multimodal therapy include improved pain relief, reduction of the perioperative stress response, reduced opioid-related side effects, shorter hospital stays, decreased hospital costs, increased patient satisfaction, and a reduction in postoperative morbidity and mortality.[6,7] NSAID administration to patients undergoing spinal fusion surgery has demonstrated significant benefits including improved analgesia (decreased opioid use and pain scores), improvement in postoperative ambulation, shorter hospitalization, and a decreased incidence of nausea, vomiting, and sedation.[8–13] A cost-benefit analysis revealed a net savings to the institution of over $211,000 per year or over $350 per patient in those patients receiving NSAIDs for lumbar spine surgery.[12] In addition to these short-term analgesic benefits, a reduction in acute pain provided by perioperative NSAID administration may also reduce long-term morbidity following spinal fusion surgery. It is currently believed that there is a continuum of pain after surgery ranging from acute to chronic, and effective treatment of acute pain, may prevent the development of chronic pain syndromes.[14,15] Further, cyclooxygenase (COX)-2 is thought to play an integral role in the processes of peripheral and central sensitization, and the early intervention with COX-2 inhibitors may thwart the progression of acute pain to chronic pain.[16]

The routine use of COX-2 inhibitors for spinal fusion surgery has remained controversial due to concerns about possible deleterious effects on bone healing. Many investigators recommend that NSAIDs should not be utilized in the multimodal management of acute pain for patients undergoing spinal fusion surgery.[17–20] Although the data are conflicting, a large body of literature derived from laboratory animal studies suggests that NSAIDs either delay or inhibit bone healing.[17–19] It is difficult to extrapolate data from animal studies to humans due to the differences in pharmacokinetics between species. Further, in the majority of animal studies cited,[17–19] NSAID administration occurred over several weeks to months at doses greater than that approved for acute pain and NSAID blood levels were not measured. There are also significant flaws in study methodologies used in the human spinal fusion studies cited.[20] Numerous uncontrolled patient and surgical factors, marginal power, and retrospective design, all detract from the credibility of these negative findings.

We have been utilizing NSAIDs for almost a decade in the management of acute pain following spinal fusion surgery.[9–12] The goal of this retrospective study is to examine the effect of NSAIDs on the incidence of non-union at one-year following spinal fusion surgery.

## Methods

The Institutional Review Board approved the retrospective review of hospital charts and databases. The study population was a consecutive sample of 434 patients undergoing elective decompressive posterior lumbar laminectomy with instrumented spinal fusion by a single surgeon within an eight-year period (February 1994–January 2003). Spinal fusion was performed at one or two levels from L4 to sacrum using similar pedicle screw-rod constructs and autologous iliac crest bone graft. Exclusion criteria included more than two level vertebral fusions, patients with a prior history of spinal fusion, undergoing anterior lumbar fusion, or the use of other NSAIDs or glucocorticoids during the study period. Prior to surgery, all patients had standing anteroposterior (AP), lateral, and oblique radiographs of the lumbosacral spine.

Anesthesia was induced with either sodium pentothal or propofol and maintained with either isoflurane or sevoflurane with 70% $N_2O$ in $O_2$. All patients were administered fentanyl (5–10 $\mu g \cdot kg^{-1}$ *iv*) or morphine (0.3–0.5 $mg \cdot kg^{-1}$ *iv*) intraoperatively. Patients were connected to a patient controlled analgesia pump (Abbott PCA Plus, Abbott Park, Chicago, IL, USA) upon arrival to the postanesthesia care unit which was maintained for the first 24 hr after the completion of surgery. Bed rest was enforced for the first 24 hr postoperatively. Progressive ambulation was then begun through physical therapy. Perioperative NSAID administration included either ketorolac (20–240 $mg \cdot day^{-1}$), celecoxib (200–600 $mg \cdot day^{-1}$), or rofecoxib (50 $mg \cdot day^{-1}$) for five consecutive days according to the anesthesiologist's preference.

Fusion status was determined from the AP, oblique, and flexion-extension radiographs, and either tomography or a computed tomography scan when necessary obtained at one-year follow-up. For a fusion to be

termed solid, strict criteria were utilized according to previous published studies.[21-23] The AP radiograph had to show bridging bone bilaterally between transverse processes with trabeculation that was confluent across the fusion mass. Oblique radiographs had to confirm the presence of fusion bone in a confluent pattern between transverse processes. Flexion-extension films were considered to show solid fusion with < 2° motion on the lateral film. Criteria used to diagnose non-union included evidence of radiolucency around the hardware, collapse of graft height with a gap between the vertebral end plate and the bone graft, shift in position of the graft, and loss of fixation from hardware loosening or dislodgement. In addition, dynamic AP and lateral radiographs that revealed 4 mm horizontal motion and ≥ 10° angular motion on lateral films taken with the patient bending indicated non-union. The fusion status was determined solely by radiographic means by an independent radiologist who was blinded to the analgesic technique.

*Statistical analysis*
Demographic data (age, height, and weight) and procedure duration were analyzed with analysis of variance. The effect of ketorolac administration on non-union rate was further divided into two daily dose categories: 20 to 110 mg and 120 to 240 mg. The rationale for choosing these two dosing categories was based upon previously published guidelines for the perioperative administration of ketorolac.[10,24-26] We believe the drug manufacturers' current dosing guidelines for ketorolac (120 mg·day$^{-1}$)[24] are excessive and not consistent with the lower doses recommended in the current literature.[10,25,26] Difference in fusion rate was assessed with a Chi square test or Fisher's exact test. Multivariate logistic regression was used to explore the relationship between NSAID treatment, smoking status, age, gender, and levels of fusion on the odds of non-union. Two-factor interactions were investigated to identify factors that may have synergistic effects on the odds of non-union. Significance was determined at the $P < 0.05$ level. SAS® software, version 8.2; (SAS Institute Inc., Cary, NC, USA) was used to perform the statistical calculations.

**Results**
A total of 434 patients receiving either ketorolac ($n = 120$), rofecoxib ($n = 124$), celecoxib ($n = 60$), or no NSAID ($n = 130$) were included in this retrospective study. There were no significant differences among the groups with respect to age, height, weight, duration of surgery, smoking history, or number of vertebral levels fused (Table I). A total of 48 patients (11%)

developed non-union postoperatively. NSAID treatment, smoking status, and levels of fusion were all significant predictors of non-union when included in the multivariate logistic regression. There were no significant differences in the incidence of non-union among the groups that received no NSAIDs, celecoxib, or rofecoxib (Table II). Non-union was identified in 11 of the 130 patients (8.5%) who received no NSAIDs, nine of the 124 patients (7.3%) who received rofecoxib, and five of the 60 patients (8.3%) who received celecoxib (Table II). In contrast, 23 out of 120 patients (19.2%) that received ketorolac had a significantly ($P < 0.001$) higher incidence of non-union compared to non-NSAID users. This represents over a threefold greater likelihood of developing non-union with ketorolac administration (Table III). Only three of 50 patients (6%) receiving low-dose ketorolac (≤ 110 mg·day$^{-1}$) resulted in non-union which was not significantly different from non-NSAID users. Patients receiving higher doses of ketorolac (120–240 mg·day$^{-1}$) had a significantly ($P < 0.0001$) higher incidence of non-union (20 out of 70 patients; 29%) compared to non-NSAID users. This represents over an eightfold greater likelihood of developing non-union compared to non-NSAID users (Table III). For those patients developing non-union, there was a significantly higher incidence between smokers and non-smokers ($P < 0.0001$) and one level fusion *vs* two level fusions ($P < 0.001$); (Table III). Multivariate logistic regression indicated that the effects of smoking and levels of fusion were greater than additive (i.e., significant smoking status by level of fusion interaction). The effect of smoking on non-union was much greater in patients undergoing two-level fusions relative to those undergoing one-level fusion. Also, the increase in the odds of non-union in patients undergoing two-level fusions relative to those undergoing one-level fusion was larger in smokers.

**Discussion**
This study revealed that the short-term perioperative administration of celecoxib, rofecoxib, or low-dose ketorolac (≤ 110 mg·day$^{-1}$) had no significant deleterious effect on spinal fusion. In contrast, higher doses of ketorolac (120–240 mg·day$^{-1}$), history of smoking, and two level vertebral fusions resulted in a significant increase in the non-union rate following spinal fusion surgery.

Although NSAIDs have proven to be beneficial in the multimodal management of pain following spinal fusion surgery,[8-13] many physicians refrain from the use of these drugs because of a possible deleterious effect on osteogenesis and spinal fusion.[17-20] Spinal

CANADIAN JOURNAL OF ANESTHESIA

TABLE III  Multivariate odds ratio, 95% confidence intervals for non-union

| Group comparison | Odds ratio, 95% confidence interval | P Value |
|---|---|---|
| Rofecoxib *vs* no NSAID | 1.2 (0.4–3.9) | NS |
| Celecoxib *vs* no NSAID | 1.0 (0.2–3.7) | NS |
| Ketorolac *vs* no NSAID | 3.3 (1.0–10.3) | < 0.001 |
| Ketorolac ($\leq$ 110 mg·day$^{-1}$) *vs* no NSAID | 1.2 (0.2–6.1) | NS |
| Ketorolac (120–240 mg·day$^{-1}$) *vs* no NSAID | 8.8 (2.8–28.0) | < 0.0001 |
| Smokers *vs* no smokers | 14.7 (5.3–40.9) | < 0.0001 |
| 1 level fusion | 4.1 (1.1–14.7) | |
| 2 level fusion | 53.1 (11.1–254.5) | |
| 2 level fusion *vs* 1 level fusion | 5.6 (2.0–15.5) | < 0.001 |
| Nonsmokers | 1.5 (0.3–8.2) | |
| Smokers | 20.1 (6.4–63.1) | |

NS = not significant. NSAID = nonsteroidal anti-inflammatory drugs. Odds ratio were computed from a multivariate logistic regression model including NSAID treatment, smoking status, levels of fusion, and the interaction between smoking status and levels of fusion.

less than one week. In the retrospective study by Glassman *et al.*,[27] ketorolac was administered in doses greater than 2 mg·kg$^{-1}$·day$^{-1}$. The appropriate analgesic dose of ketorolac is controversial. Pre-marketing clinical investigations demonstrated that 30 to 90 mg of ketorolac provided postoperative analgesia similar to 6 to 12 mg of morphine and 50 to 100 mg of meperidine.[28–30] Since ketorolac has been marketed, there have been reports of death due to gastrointestinal and operative site bleeding.[31] In a response to these adverse events, the drug's manufacturer recommended reducing the dose of ketorolac from 150 to 120 mg·day$^{-1}$.[24] The European Committee for Proprietary Medicinal Products recommended a further maximal daily dose reduction to 60 mg for the elderly and to 90 mg for the non-elderly.[25] We have previously shown that ketorolac 7.5 mg administered every six hours (0.4 mg·kg$^{-1}$·day$^{-1}$) is the optimal analgesic dose for spinal fusion surgery.[10] Glassman *et al.*[27] utilized over five times these ketorolac doses in their clinical investigation of spinal fusion. The inhibitory effect of ketorolac on bone repair and fusion was found to be a dose-related phenomenon.[18,27,32] In a rabbit femoral defect model,[18] the administration of low-dose ketorolac (1.75 mg·kg$^{-1}$·day$^{-1}$) for one or five weeks postoperatively had no deleterious effect on bone healing. Ho *et al.*[32] demonstrated that ketorolac 2 mg·kg$^{-1}$·day$^{-1}$ for six weeks had minimal effect on bone repair in a rabbit ulnar defect model. In contrast, ketorolac 4 mg·kg$^{-1}$·day$^{-1}$ significantly decreased the torsional stiffness and energy absorption of the grafted ulnae and decreased the maximum torque in the intact and the grafted bones. In our present study, we also demonstrated a dose-dependent deleterious effect of ketorolac on bone healing. The incidence of non-union was significantly higher for those patients receiving ketorolac 120 to 240 mg·day$^{-1}$. In contrast, low-dose ketorolac ($\leq$ 110 mg·day$^{-1}$) resulted in no significant increase in non-union when compared to non-NSAID users.

In contrast to nonspecific NSAIDs, we believe that the use of COX-2 specific inhibitors represents a significant therapeutic advance in the perioperative management of pain for spinal fusion surgery. Although the perioperative administration of nonspecific NSAIDs may provide effective analgesia, their ability to decrease platelet aggregation and increase bleeding time may increase the incidence of perioperative bleeding due to inhibition of thromboxane A$_2$.[2,3,33] In fact, ketorolac is contraindicated as a prophylactic analgesic prior to any major surgery.[24] In contrast, because COX-2 specific NSAIDs have no inhibitory effect on platelet function, these drugs can be safely administered as preemptive analgesics for a variety of surgical procedures[34,35] without an increased risk of perioperative bleeding.

Several investigators have examined the effect of selective COX-2 inhibitors on spinal fusion in the animal model.[36–39] Long *et al.*[36] concluded that celecoxib does not significantly inhibit the rate of spinal fusion in the rabbit model and perhaps the inhibitory effects of NSAIDs on bone healing are likely mediated by inhibition of COX-1. However, Simon *et al.*[37] later demonstrated that both celecoxib and rofecoxib inhibited fracture healing to varying degrees in the rat model. Recently, it has been suggested that the deleterious effects of COX-2 inhibitors on fracture healing may be reversible with short-term treatment.[38,39] Gerstenfeld and Einhorn[39] examined the effects of ketorolac, valdecoxib, or vehicle over a seven- or 21-day time course. This study revealed that animals

treated for seven days had no statistically significant differences in the rate of non-unions after either 21 or 35 days of healing. In contrast, 21 days of treatment led to statistical differences in the rate of non-unions for valdecoxib after 21 days but the differences disappeared by 35 days. The data from this study suggested that both specific COX-2 inhibitors and nonselective NSAIDs delay fracture healing, but the magnitude of the effect was related to the duration of treatment. These authors[39] concluded that "extrapolation of these findings to a clinical setting suggests that management of fracture-associated pain with inhibitors of COX-2 should neither impair nor delay healing as long as the duration of treatment is consistent with current standards of care".

The results of our present study concur with these investigators' findings.[39] We observed no significant increase in the incidence of non-union when either celecoxib or rofecoxib was administered for five consecutive days in doses approved for acute pain management. Although low-dose ketorolac had no significant deleterious effect on spinal fusion, because it cannot be safely administered as a preemptive analgesic, we currently use only COX-2 specific inhibitors. We limit the administration of these analgesics for less than one week following spinal fusion surgery. We are in agreement with other investigators, that it is better to stigmatize smoking and not NSAID use in bone surgery.[40] Our results concur with other investigators[21,27] that the risk of smoking has a significant deleterious effect on spinal fusion. In the present study, smokers undergoing spinal fusion surgery were over 14 times more likely to develop non-union compared to non-smokers. Further, 74% of patients who were smokers and administered high-dose ketorolac developed non-union postoperatively.

In conclusion, this study revealed that the short-term perioperative administration of celecoxib, rofecoxib, or low-dose ketorolac ($\leq$ 110 mg·day$^{-1}$) had no significant deleterious effect on non-union. In contrast, higher doses of ketorolac (120–240 mg·day$^{-1}$), history of smoking, and two level vertebral fusions resulted in a significant increase in the incidence of non-union following spinal fusion surgery. We currently recommend the short-term perioperative use of COX-2 specific inhibitors for the management of pain following spinal fusion surgery.

## References

1 *McCormack K.* Non-steroidal anti-inflammatory drugs and spinal nociceptive processing. Pain 1994; 59: 9–43.
2 *Souter AJ, Fredman B, White PF.* Controversies in the perioperative use of nonsteroidal antiinflammatory drugs. Anesth Analg 1994; 79: 1178–90.
3 *Dahl JB, Kehlet H.* Non-steroidal anti-inflammatory drugs: rationale for use in severe postoperative pain. Br J Anaesth 1991; 66: 703–12.
4 *U.S. Department of Health and Human Services.* Acute Pain Management Guideline Panel. Acute pain management: operative or medical procedures and trauma. Clinical practice guideline. AHCPR Pub. No. 92-0032. Rockville, MD: Agency for Health Care Policy and Research, Public Health Service, 1992; Feb: 15–26.
5 *Ashburn MA, Caplan RA, Carr DB, et al.* Practice guidelines for acute pain management in the perioperative setting. An updated report by the American Society of Anesthesiologists Task Force on acute pain management. Anesthesiology 2004; 100: 1573–81.
6 *Kehlet H, Dahl JB.* The value of "multimodal" or "balanced analgesia" in postoperative pain treatment. Anesth Analg 1993; 77: 1048–6.
7 *Kehlet H, Wilmore DW.* Multimodal strategies to improve surgical outcome. Am J Surg 2002; 183: 630–41.
8 *Kinsella J, Moffat AC, Patrick JA, Prentice JW, McArdle CS, Kenny GN.* Ketorolac trometamol for postoperative analgesia after orthopaedic surgery. Br J Anaesth 1992; 69: 19–22.
9 *Reuben SS, Connelly NR, Steinberg R.* Ketorolac as an adjunct to patient-controlled morphine in postoperative spine surgery patients. Reg Anesth 1997; 22: 343–6.
10 *Reuben SS, Connelly NR, Lurie S, Klatt M, Gibson CS.* Dose-response of ketorolac as an adjunct to patient-controlled analgesia morphine in patients after spinal fusion surgery. Anesth Analg 1998; 87: 98–102.
11 *Reuben SS, Connelly NR.* Postoperative analgesic effects of celecoxib or rofecoxib after spinal fusion surgery. Anesth Analg 2000; 91: 1221–5.
12 *Reuben S, Ekman EF.* The effect of cycolo-oxygenase-2 inhibition on analgesia and spinal fusion. J Bone Joint Surg Am 2005; 87: 536–42.
13 *Turner DM, Warson JS, Wirt TC, Scalley RD, Cochran RS, Miller KJ.* The use of ketorolac in lumbar spine surgery: a cost-benefit analysis. J Spinal Disord 1995; 8: 206–12.
14 *Cousins MJ, Power I, Smith G.* 1996 Labat lecture: pain-a persistent problem. Reg Anesth Pain Med 2000; 25: 6–21.
15 *Perkins FM, Kehlet H.* Chronic pain as an outcome of surgery. A review of predictive factors. Anesthesiology 2000; 93: 1123–33.
16 *Samad TA, Sapirstein A, Woolf CJ.* Prostanoids and pain: unraveling mechanisms and revealing therapeutic targets. Trends Mol Med 2002; 8: 390–6.
17 *Gajraj NM.* The effect of cyclooxygenase-2 inhibitors

on bone healing. Reg Anesth Pain Med 2003; 28: 456–65.

18 *Dumont AS, Verma S, Dumont RJ, Hurlbert J.* Nonsteroidal anti-inflammatory drugs and bone metabolism in spinal fusion surgery: a pharmacological quandary. J Pharmacol Toxicol Methods 2000; 43: 31–9.

19 *Maxy RJ, Glassman SD.* The effect of nonsteroidal anti-inflammatory drugs on osteogenesis and spinal fusion. Reg Anesth Pain Med 2001; 26: 156–8.

20 *Wedel DJ, Berry D.* "He said, she said, NSAIDs". Reg Anesth Pain Med 2003; 28: 372–5.

21 *Deguchi M, Rapoff AJ, Zdeblick TA.* Posterolateral fusion for isthmic spondylolisthesis in adults: analysis of fusion rate and clinical results. J Spinal Disord 1998; 11: 459–64.

22 *Steinmann JC, Herkowitz HN.* Pseudarthrosis of the spine. Clin Orthop 1992; 284: 80–90.

23 *Lee C, Dorcil J, Radomisli TE.* Nonunion of the spine: a review. Clin Orthop 2004; 419: 71–5.

24 Toradol IV/IM (package insert). Nutley, NJ: Roche Laboratories; 1994.

25 *Choo V, Lewis S.* Ketorolac doses reduced. Lancet 1993; 342: 109.

26 *Sevarino FB, Sinatra RS, Paige D, Ning T, Brull SJ, Silverman DG.* The efficacy of intramuscular ketorolac in combination with intravenous PCA morphine for postoperative pain relief. J Clin Anesth 1992; 4: 285–8.

27 *Glassman SD, Rose SM, Dimar JR, Puno RM, Campbell MJ, Johnson JR.* The effect of postoperative nonsteroidal anti-inflammatory drug administration on spinal fusion. Spine 1998; 23: 834–8.

28 *O'Hara D, Fragen R, Kinzer M, Pemberton D.* Ketorolac tromethamine as compared with morphine sulfate for treatment of postoperative pain. Clin Pharmacol Ther 1987; 41: 556–61.

29 *Yee JP, Koshiver JE, Allbon C, Brown CR.* Comparison of intramuscular ketorolac tromethamine and morphine sulfate for analgesia of pain after major surgery. Pharmacotherapy 1986; 6: 253–61.

30 *Folsland B, Skulberg A, Halvorsen P, Helgesen KG.* Placebo-controlled comparison of single intramuscular doses of ketorolac tromethamine and pethidine for post-operative analgesia. J Int Med Res 1990; 18: 305–14.

31 *Strom BL, Berlin JA, Kinman JL, et al.* Parenteral ketorolac and risk of gastrointestinal and operative site bleeding. A postmarketing surveillance study. JAMA 1996; 275: 376–82.

32 *Ho ML, Chang JK, Wang GJ.* Antiinflammatory drug effects on bone repair and remodeling in rabbits. Clin Orthop 1995; 313: 270–8.

33 *Schafer AI.* Effects of nonsteroidal anti-inflammatory therapy on platelets. Am J Med 1999; 106: 25S–35S.

34 *Gilron I, Milne B, Hong M.* Cyclooxygenase-2 inhibitors in postoperative pain management: current evidence and future directions. Anesthesiology 2003; 99: 1198–208.

35 *Sinatra R.* Role of COX-2 inhibitors in the evolution of acute pain management. J Pain Symptom Manage 2002; 24 (1 Suppl.): S18–27.

36 *Long J, Lewis S, Kuklo T, Zhu Y, Riew KD.* The effect of cyclooxygenase-2 inhibitors on spinal fusion. J Bone Joint Surg Am 2002; 84: 1763–8.

37 *Simon AM, Manigrasso MB, O'Connor JP.* Cyclo-oxygenase 2 function is essential for bone fracture healing. J Bone Miner Res 2002; 17: 963–76.

38 *Gerstenfeld LC, Thiede M, Seibert K, et al.* Differential inhibition of fracture healing by non-selective and cyclooxygenase-2 selective non-steroidal anti-inflammatory drugs. J Orthop Res 2003; 21: 670–5.

39 *Gerstenfeld LC, Einhorn TA.* COX inhibitors and their effects on bone healing. Expert Opin Drug Saf 2004; 3: 131–6.

40 *Lagerkranser M.* Better to stigmatize smoking and not NSAID in connection with bone surgery! (Swedish). Lakartidningen 2002; 99: 3338–9.



**Rehabilitation Hospital**
of the Cape and Islands

*Expert Care, Exceptional Caring*

## HISTORY AND PHYSICAL

PATIENT:   HARRISON, Dennis              MR #011320

PHYSICIAN: Susan Ehrenthal, M.D.          Admitted: 2/3/01

HISTORY OF PRESENT ILLNESS:   The patient is a 48 year old man with ankylosing spondylitis who underwent a lumbar fusion at New England Baptist Hospital on 1/29/01. The surgery was performed by Dr. Rand. The patient has severe ankylosing spondylosis which required him to ambulate with his back flexed forward, causing him to lose 8 inches of height. He also had severe back pain which had been progressing over the past few months limiting his mobility. A year and a half ago he underwent a successful cervical fusion. Dr. Rand performed an osteotomy of L3-L4, laminectomy of L3-L4, spinal manipulation, and posterior spinal fusion from T8 to the sacrum. This surgery lasted over 12 hours. He has been doing quite well postoperatively. He developed a blister over his chest during the surgery, but this has been healing. His lumbar pain is much better. He had been ambulating preoperatively with his trunk flexed forward so he was looking towards the ground, with his knees flexed, and toe walking on the left. Since surgery, he has been able to ambulate standing erect. His knee range has been increasing. He has been instructed to avoid any flexion of the trunk. He is log rolling for transfers. A TLSO has been ordered but has not yet been received.

The patient was brought to RHCI by his wife from New England Baptist Hospital. He was requesting a private room as he likes privacy.

REVIEW OF SYSTEMS: The patient denies chest pain or shortness of breath. He denies difficulty urinating. He had a bowel movement yesterday. He denies significant pain in the back or the neck. He has essentially no rotation or flexion/extension of his neck.

PAST MEDICAL HISTORY:  His past medical history is significant for ankylosing spondylitis diagnosed when the patient was in his 30s. It began with sciatic pain. He also has a history of anemia, hypertension, depression, and sleep apnea. He had been using an old CPAP machine which has broken. His breathing has improved since the surgery. It is unclear if he will continue to require CPAP.  He has a history of  rheumatoid arthritis and osteoarthritis. His PCP is Dr. Harry Rae.

PAST SURGICAL HISTORY:  He is status post C1-C6 cervical fusion 1 ½ years ago, and bilateral total hip replacements.

ALLERGIES: No known drug allergies

311 Service Road, East Sandwich, Massachusetts 02537 • Tel. (508) 833-4000 • Fax (508) 833-4195
*A non-profit hospital providing comprehensive rehabilitation care. Managed by Spaulding Rehabilitation Hospital.*



EXHIBIT

M M

PATIENT:  HARRISON, Dennis        MR #011320        Admitted: 2/3/01

**CURRENT MEDICATIONS:**   Heparin 5000 units subcu b.i.d. until the patient is ambulating, Prednisone 20 mg PO q.o.d., Vioxx 25 mg b.i.d., Tylenol #4 one PO q4-6h, Fosamax 10 mg q.o.d., Axid 150 mg PO b.i.d., Prinivil 10 mg PO q.a.m., Imipramine 30 mg PO q.h.s., Klonopin 1.5 mg PO q.h.s., multivitamins one PO q.d., iron 325 mg PO t.i.d. with meals, Pericolace one PO b.i.d., Vitamin C 1000 mg PO b.i.d., Calcium 600 mg PO q.d.

**SOCIAL HISTORY:**  The patient lives with his wife in South Dennis. They moved to Cape Cod from New Jersey. They are planning on moving to New Hampshire in the near future. They have a five year old daughter. He had been a product manager for AT&T but has not worked in two years. He enjoys using a computer. He drives.

**PHYSICAL EXAMINATION:** He is alert. He is accompanied by his wife. Cognitively he appears intact. He likes privacy. HEENT – EOMI. Mouth is moist. Neck reveals that his cervical scar is well healed. He has essentially no flexion, extension, or rotation in either direction. Chest examination reveals two large oval shaped red rashes overlying each side of his chest. They are dry with no active weeping. Lungs are clear to auscultation. Heart has a regular rate and rhythm with no murmur appreciated. He has an oblique incision in his left upper quadrant with steristrips intact. There is no drainage.  His abdomen is soft and nontender with normal active bowel sounds. He has a long incision along his back which is covered with DSD. There is a minimal amount of yellow drainage on the bandage, but no active drainage.  He lacks approximately 5 degrees of full extension of his left knee. His hamstrings are very tight. He is able to wiggle his toes and perform bilateral ankle pumps. He is able to do a straight leg raise on the right but not on the left. His hips can be flexed to 90 degrees, but no further secondary to tightness. Bilateral calves are soft and nontender.

**IMPRESSION:**
1.  Ankylosing spondylitis, status post thoracolumbar fusion. The patient underwent a cervical fusion 1 ½ years ago.
2.  Hypertension
3.  Sleep apnea. Respiratory therapy will evaluate him to see if he will need another CPAP. He may not need this as a result of the improvement in his posture from the surgery.
4.  Anemia.

**PLAN:** The patient will be admitted to RHCI for orthopedic rehabilitation. He will follow the restrictions as per Dr. Rand. When he wants to be elevated, a reverse Trendelenberg should be used. His head can be flexed approximately 20 degrees. Once the TLSO is obtained, then he is to use it when out of bed. He will continue on his current medications. Heparin will be discontinued once the patient is ambulating on a regular basis. Respiratory therapy will evaluate him for CPAP and check O2 sats overnight. His program will consist of Physical Therapy and Occupational Therapy as well as supportive counseling.

SE/man
D: 2/3/01                                  Susan Ehrenthal, M.D.
T: 2/5/01
cc-Dr. Rand
cc-Dr. Rae

2

SEPTEMBER 20, 2002

HARRISON, DENNIS
CHART #:
DOB:

This is a 49 year old male who used to work as a product manager for AT & T who has a long history of musculoskeletal problems. He has been diagnosed as having ankylosing spondylitis. He underwent a cervical fusion for basilar invagination. He was having terrible headaches. That helped. That was back in 1999. In 2001 he underwent a massive surgical reconstruction for flat back secondary to the ankylosing spondylitis and it looks like they did his surgery from T8 down to the sacrum and did an osteotomy at the L3-4 level. He had been doing okay until a motor vehicle accident that arose February of this past year. Since that time he has had a down trend of his function. February and March he had mild dysfunction. April and May it became moderate. July to present it became quite severe. He notes that the pain sometimes is in his lower mid back when he lies down but a lot in his buttock region that creeps around to his lower abdomen and anterior thigh region, more so on the left than on the right. He has been told that his left total hip replacement is okay. He has had no bowel or bladder accidents. X-rays had shown a failed rod on one side in the past at about the 2-3 level and most recently it looks like both rods have now failed. He has some bladder urgency but no definitive bowel or bladder accidents. He went to see a surgeon in Concord, New Hampshire who didn't feel there was much to offer. He is now here because of the worsening of his symptomatology. He has been taking very high, more than normal doses of Ibuprofen to help diminish his pain. He is on Indocin. He takes Procrit, Vioxx, Tylenol #4, Oxycontin, Klonopin, Folic Acid, Imipramine, Methotrexate and Prednisone. He has anemia, nephrosis, osteoporosis and rheumatoid disease. In looking at the notes from the past, they did an anterior L3-4 osteotomy. They did that through a mini lateral incision on the left side but I think they did that to be able to get an adequate osteotomy done.

PE: He has a well healed posterior scar. He notes that he is starting to tilt forward similar to what he had done before this previous surgery but he lies down or when he pushes himself back, he is able to tilt back.

ASSESSMENT:   Pseudarthrosis/failed instrumentation most likely exacerbated by the motor vehicle accident.

HarrisonD-CapitalROGMR-    00001


EXHIBIT
NN

He comes back today on short notice. He called me the other day stating that he had some back pain and clicking that was new. When I saw him last time, there was evidence of a broken rod and at that time he seemed largely asymptomatic and fairly comfortable. He called the other day and was uncomfortable, without radiating pain, without bowel or bladder control issues and without any other signs. He has mild constitutional signs and has been just not feeling well.

Physical exam today shows nothing awry with his back that I can tell on gross exam. He moves pretty well. Interestingly, he states that he has been driving his daughter to school for the past three weeks and has therefore been really quite active; at about the six-week mark post-op he was fairly active already. This activity may feed into this situation.

In any case, he has been wearing his Jewett brace. He is concerned that there may have been a little loss of correction and whether he actually needs some more correction.

Review of x-rays taken today shows really no change. There is what looks like a broken rod on one side. The wire and the other rod are quite intact and the rod has not displaced any.

PLAN: At this point, I would follow him symptomatically. I think if he does not get better with some stabilization over time, he will be symptomatic and will then want to have a revision. If I did that, I would do it as a pedicle subtraction type osteotomy and try to get a little more correction, as well as reinstrument him. He understands that and will think it over.


Frank F. Rand, M.D.

FFR/bcg

HarrisonD-CapitalROGMR-    00073

PATIENT NAME: HARRISON, DENNIS                  11/19/52 M/R NUMBER:              269691
ORDERING DR : RAND, FRANK                                RADIOLOGY NUMBER:        269691
EXAM DATE:       4/03/01                                 TRANSCRIBE DATE:         4/05/01
OUTPATIENT: XR XRAY                                      ORDER NUMBER:            5580783
EXAM DESCRIPTION: SPINE ENTIRE AP & LAT                  ACCT. NUMBER:            1057489

PROCEDURE PERFORMED:  TOTAL SPINE

CLINICAL INDICATION:  STATUS POST FUSION

AP and lateral views of the entire spine show extensive postoperative
changes.  Specifically, there is posterior rod and laminar hook
fixation extending from the mid thoracic region to the sacrum
where screws extend to the iliac bones.  Lumbar levels are
transfixed with pedicle screws and there are laminar hooks in the
thoracic region.  A mildly prominent kyphosis is centered at the
lower thoracic region.

There are postoperative changes of cervical fusion with fusion not
only of cervical levels but fusion to the occiput.  While not
optimally visualized, the cervical spine appears straightened with
posterior element fusion suggested and the posterior hardware
extends from the occiput down to the lower cervical region.

There are bilateral hip arthroplasties.

prn:cel

JNEW

_____
        NEWMAN, JOEL S.
VERIFIED DATE:  4/05/01

HarrisonD-CapitalROGMR-    00051

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General ("OIG-HHS") of the Department of Health and Human Services ("HHS"), the TRICARE Management Activity ("TMA"), through its General Counsel; the Office of Personnel Management ("OPM"), which administers the Federal Employees Health Benefits Program; and the United States Department of Veteran Affairs ("VA") (collectively the "United States"), and Merck Sharp & Dohme Corp. ("Merck") (hereafter collectively referred to as "the Parties"), through their authorized representatives.

## RECITALS

A.     At all relevant times, Merck & Co., Inc. was a New Jersey corporation headquartered in Whitehouse Station, New Jersey, and was the operating company for Merck's pharmaceutical business in the United States. As a result of a reverse merger with another pharmaceutical company in 2009, Merck & Co., Inc. became a wholly-owned subsidiary of the acquiring company and was renamed Merck Sharp & Dohme Corp. The acquiring company was renamed Merck & Co., Inc. The new Merck & Co., Inc. is a holding company for Merck Sharp & Dohme Corp. and other corporate entities. Currently, Merck Sharp & Dohme Corp. is the operating company in the United States for the pharmaceutical business formerly conducted by Merck & Co., Inc.

B.     Merck developed, marketed, sold, and distributed pharmaceutical products throughout the United States, including the drug Rofecoxib, which was sold and marketed under the brand name Vioxx® from May 1999 until September 30, 2004, when Merck withdrew Vioxx from the market.



EXHIBIT

00

on such date as may be determined by the Court, Merck has agreed to plead guilty pursuant to Fed. R. Crim. P. 11(c)(1)(C) (the "Plea Agreement") to an Information to be filed in United States of America v. Merck Sharp & Dohme Corp., Criminal Action No. [to be assigned] (District of Massachusetts) (the "Criminal Action"), that will allege a violation of Title 21, United States Code Sections 331(a), 333 (a)(1), 352(f)(1), to wit, that Merck introduced and caused the delivery for introduction into interstate commerce of quantities of Vioxx® for an unapproved use, namely the treatment of rheumatoid arthritis, which drug was misbranded within the meaning of the Federal Food, Drug, and Cosmetic Act ("FDCA").

D.    Certain states have filed civil actions against Merck that are now consolidated in *In re VIOXX Products Liability Litigation*, MDL No. 1657, a federal multi-district litigation venued in the United States District Court for the Eastern District of Louisiana (the "MDL Action") that allege that Merck caused false claims for Vioxx to be submitted to the Medicaid program ("Medicaid"), Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-1 (the "State Alleged Medicaid Conduct"). The state civil actions allege other, non-Medicaid claims and such claims are not a subject of this Agreement.

E.    The United States contends that it has certain civil claims against Merck, as specified in Paragraph 2 below, for engaging in the following conduct concerning the marketing and sale of Vioxx®:

> (i)    from May 20, 1999 through April 11, 2002, Merck promoted Vioxx® for rheumatoid arthritis, an indication for use not approved by the federal Food and Drug Administration ("FDA") in violation of the FDCA, 21 U.S.C. §§ 331(a), 333(a)(1), and 352(f)(1); and which, during the period May 20, 1999 through February 28, 2000, was not a medically accepted indication, as defined by 42 U.S.C. § 1396r-8(k)(6), covered by state Medicaid programs;

2

(ii)    from April 2000 through September 30, 2004, when Merck withdrew Vioxx® from the market, Merck promoted the cardiovascular safety of Vioxx® with certain statements by representatives and promotional speakers in written materials that were inaccurate, misleading, and inconsistent with the approved labeling for the drug, in violation of the FDCA, 21 U.S.C. §§ 331(k), 333(a)(1); and 352(f)(1); and that through the sale and distribution of a misbranded product, Merck obtained proceeds and profits to which it was not entitled; and

(iii)    from April 2000 through September 30, 2004, when Merck withdrew Vioxx from the market, Merck made false representations concerning the safety of Vioxx to state Medicaid agencies on which state Medicaid agencies relied to their detriment in making formulary and prior authorization decisions.

Merck's conduct as described in this Preamble Paragraph will hereafter be referred to as the "Covered Conduct."

F.      The United States alleges that, as a result of the Covered Conduct, Merck knowingly caused false or fraudulent claims to be submitted for payment for Vioxx® to Medicaid; the TRICARE Program (formerly known as the Civilian Health and Medical Program of the Uniformed Services); the Federal Employees Health Benefits Program ("FEHBP"), 5 U.S.C. §§ 8901-8914; and caused purchases of Vioxx® by the Department of Veterans' Affairs ("DVA") (collectively, "the Federal Health Care Programs").  The United States contends that engaging in the Covered Conduct and causing the submission of false or fraudulent claims to the Federal Health Care Programs gives rise to civil liability under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq.; or common law.

G.      The United States also contends that it has certain administrative claims against Merck as specified in Paragraphs 3 through 5 below, for engaging in the Covered Conduct.

3

described in Paragraph 1(b) below (hereinafter referred to as the "Medicaid State Settlement Agreements") with certain states and/or the District of Columbia in settlement of the Covered Conduct and the State Alleged Medicaid Conduct. States with which Merck executes a Medicaid State Settlement Agreement in the form to which Merck and the National Association of Medicaid Fraud Control Units ("NAMFCU") have agreed, or in a form otherwise agreed to by Merck and an individual State, shall be defined as "Medicaid Participating States."

   I.  This Agreement is made in compromise of disputed claims. This Agreement is neither an admission of facts or liability by Merck nor a concession by the United States that its claims are not well-founded. Merck expressly denies the contentions and allegations of the United States as set forth herein and denies that it engaged in any wrongful conduct, except as to such admissions that Merck makes in connection with the Plea Agreement. Neither this Agreement or its execution, nor the performance of any obligation arising under it, including any payment, nor the fact of settlement is intended to be, or shall be understood as, an admission of liability or wrongdoing, or other expression reflecting on the merits of the dispute by any party to this Agreement.

   J.  To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, the Parties mutually desire to reach a final settlement as set forth below:

**TERMS AND CONDITIONS**

   NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations in this Agreement, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

4

of six hundred twenty eight million three hundred sixty four thousand dollars and 0/100 ($628,364,000.00) (the "Settlement Amount") and interest on the Settlement Amount at a rate of 2.125% from September 8, 2010, continuing until and including the day before payment is made. The Settlement Amount shall constitute a debt immediately due and owing to the United States and the Medicaid Participating States on the Effective Date of this Agreement. This debt shall be discharged by payments to the United States and the Medicaid Participating States, under the following terms and conditions:

        a.      Merck shall pay to the United States the sum of four hundred twenty six million three hundred eighty nine thousand dollars and 0/100 ($426,389,000), plus accrued interest on this amount at the rate of 2.125% per annum from September 8, 2010, continuing until and including the day before payment is made (the "Federal Settlement Amount"). The Federal Settlement Amount shall be paid by electronic funds transfer pursuant to written instructions from the United States no later than seven (7) business days after (i) this Agreement is fully executed by the Parties and delivered to Merck's attorneys; or (ii) the Court accepts a Fed. R. Crim. P. 11(c)(1)(C) guilty plea as described in Preamble Paragraph C in connection with the Criminal Action and imposes the agreed upon sentence, whichever occurs later.

        b.      Subject to the terms and procedures referenced below, including the implementation of the individual Medicaid State Settlement Agreements, Merck shall pay to each of the Medicaid Participating States its respective allocated share of the sum of two hundred one million nine hundred seventy five thousand dollars and 0/100 ($201,975,000) plus accrued interest on this amount at the rate of 2.125% per annum from September 8, 2010, continuing until and

including the day before such payment is made (the "Medicaid State Settlement Amount"). The Medicaid State Settlement Amount shall be deposited by electronic funds transfer pursuant to written instructions from the NAMFCU Negotiating Team into one or more interest-bearing money market or bank accounts held in the name of Merck but segregated from other Merck accounts (the "State Settlement Accounts") no later than seven (7) business days after (i) this Agreement is fully executed by the Parties and delivered to Merck's attorneys; or (ii) the Court accepts a Fed. Crim. P. 11(c)(1)(C) guilty plea as described in Preamble Paragraph C in connection with the Criminal Action and imposes the agreed upon sentence, whichever occurs later. Funds from the State Settlement Accounts shall be administered pursuant to terms and conditions to be agreed upon by Merck and the NAMFCU Negotiating Team as set forth in the individual Medicaid State Settlement Agreements that Merck will enter into with the Medicaid Participating States.

      c.    If Merck's agreed-upon guilty plea pursuant to Fed. R. Crim. P. 11(c)(1)(C) in the Criminal Action described in Preamble Paragraph C is not accepted by the Court or the Court does not impose the agreed-upon sentence for whatever reason, this Agreement shall be null and void at the option of either the United States or Merck. If either the United States or Merck exercises this option, which option shall be exercised by notifying all Parties, through counsel, in writing within five (5) business days of the Court's decision, the Parties will not object and this Agreement will be rescinded. If this Agreement is rescinded, Merck will not plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims, actions or proceedings arising from the Covered Conduct that are brought by the United States within 90 calendar days of rescission.

6

consideration of the obligations of Merck set forth in this Agreement, and conditioned upon Merck"s payment in full of the Settlement Amount, the United States (on behalf of itself, its officers, agencies, and departments) agrees to release Merck, together with its predecessors, current and former parents, direct and indirect affiliates, divisions, subsidiaries, successors, transferees, assigns, and their current and former directors, officers, employees or agents, individually and collectively, from any civil or administrative monetary claim the United States has or may have for the Covered Conduct and the State Alleged Medicaid Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812, the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et. seq., any statutory provision creating a cause of action for civil damages or civil penalties which the Civil Division of the Department of Justice has actual and present authority to assert and compromise pursuant to 28 C.F.R. Part O, Subpart I, 0.45(d), and common law claims for fraud, payment by mistake, breach of contract, disgorgement and unjust enrichment.

3.      In consideration of the obligations of Merck set forth in this Agreement and the Corporate Integrity Agreement ("CIA") entered into between OIG-HHS and Merck, and conditioned upon Merck's full payment of the Settlement Amount, OIG-HHS agrees to refrain from instituting, directing, or maintaining any administrative action seeking exclusion from Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) against Merck under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law) or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited activity) for the Covered Conduct and the State Alleged Medicaid Conduct, or under 42 U.S.C. § 1320a-7(b)(1)

7

based on Merck's agreement to plead guilty to the Criminal Action referenced in Paragraph C

above, except as reserved in Paragraph 6 (concerning excluded claims), below, and as reserved in

this Paragraph. The OIG-HHS expressly reserves all rights to comply with any statutory

obligations to exclude Merck from the Medicare, Medicaid, and other Federal health care

programs under 42 U.S.C. § 1320a-7(a) (mandatory exclusion) based upon the Covered Conduct

and the State Alleged Medicaid Conduct. Nothing in this Paragraph precludes the OIG-HHS

from taking action against entities or persons, or for conduct and practices, for which claims have

been reserved in Paragraph 6, below.

4.      In consideration of the obligations of Merck set forth in this Agreement,

conditioned upon Merck's full payment of the Settlement Amount, TMA agrees to release and

refrain from instituting, directing, or maintaining any administrative action seeking exclusion or

suspension from the TRICARE Program against Merck under 32 C.F.R. § 199.9 for the Covered

Conduct and the State Alleged Medicaid Conduct, except as reserved in Paragraph 6 (concerning

excluded claims), below, and as reserved in this Paragraph. TMA expressly reserves authority to

exclude Merck under 32 C.F.R. §§ 199.9 (f)(1)(i)(A), (f)(1)(i)(B), and (f)(1)(iii), based upon the

Covered Conduct. Nothing in this Paragraph precludes TMA or the TRICARE Program from

taking action against entities or persons, or for conduct and practices, for which claims have been

reserved in Paragraph 6, below.

5.      In consideration of the obligations of Merck in this Agreement, conditioned upon

Merck's full payment of the Settlement Amount, OPM agrees to release and refrain from

instituting, directing, or maintaining any administrative action seeking debarment from the

FEHBP against Merck under 5 U.S.C. § 8902a or 5 C.F.R. Part 970 for the Covered Conduct and

8

the State Alleged Medicaid Conduct, except as set forth in Paragraph 6 (concerning excluded claims), below, and except if excluded by the OIG-HHS pursuant to 42 U.S.C. § 1320a-7(a) or required by 5 U.S.C. § 8902a(b), or 5 C.F.R. Part 970. Nothing in this Paragraph precludes OPM from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 6, below.

6.    Notwithstanding any term of this Agreement, specifically reserved and excluded from the scope and terms of this Agreement as to any entity or person are the following claims of the United States:

a.    Any civil, criminal, or administrative liability arising under Title 26, U.S. Code (Internal Revenue Code);

b.    Any criminal liability;

c.    Except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs;

d.    Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct and the State Alleged Medicaid Conduct;

e.    Any liability based upon obligations created by this Agreement;

f.    Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct or the State Alleged Medicaid Conduct; or

g.    Any liability of individuals (including current or former directors, officers, employees, or agents of Merck) who receive written notification that they are the target of a criminal investigation, are criminally indicted or

9

arising from the Covered Conduct or the State Alleged Medicaid Conduct.

7.    Merck waives and shall not assert any defenses Merck may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code, and Merck acknowledges that no characterization or opinion with respect to characterization of the Settlement Amount for purposes of the Internal Revenue laws has been made by the United States in connection with the resolution of the matters covered by this Agreement.

8.    Merck fully and finally releases the United States, and its agencies, employees, servants, and agents from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Merck has asserted, could have asserted, or may assert in the future against the United States, and its agencies, employees, servants, and agents, related to the Covered Conduct and the United States' investigation and prosecution thereof.

9.    The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare carrier or intermediary, TRICARE, FEHBP,  or any state payer  related to the Covered Conduct; and Merck agrees not to resubmit to any Medicare carrier or intermediary, TRICARE, FEHBP, or any state payer any

10

previously denied claims related to the Covered Conduct, and agrees not to appeal any such denials of claims.

      10.    Merck agrees to the following:

          a.    <u>Unallowable Costs Defined</u>: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh and 1396-1396v; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Merck, its present or former officers, directors, employees, shareholders, and agents in connection with the following shall be "Unallowable Costs" on government contracts and under the Medicaid Program and Federal Health Care Programs:

        (1)    the matters covered by this Agreement and the related Plea Agreement;

        (2)    the United States' audit(s) and civil and criminal investigations of the matters covered by this Agreement;

        (3)    Merck's investigation, defense, and corrective actions undertaken in response to the United States' audits and civil and criminal investigation(s) in connection with the matters covered by this Agreement (including attorney's fees);

        (4)    the negotiation and performance of this Agreement and the related Plea Agreement;

        (5)    the payment Merck makes to the United States pursuant to this

11

(6)    the negotiation of, and obligations undertaken pursuant to the CIA to: (i) retain an independent organization to perform annual reviews as described in Section III of the CIA; and (ii) prepare and submit reports to OIG-HHS. However, nothing in this paragraph 10.a.(6) that may apply to the obligations undertaken pursuant to the CIA affects the status of costs that are not allowable based on any other authority applicable to Merck.

b.    <u>Future Treatment of Unallowable Costs</u>: Unallowable Costs shall be separately determined and accounted for by Merck, and Merck shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Merck or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

c.    <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>: Merck further agrees that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph 10) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Merck or any of its subsidiaries or affiliates,

12

and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs. Merck agrees that the United States, at a minimum, shall be entitled to recoup from Merck any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Merck or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph 10) on Merck or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

        d.      Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Merck's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

        11.      Merck expressly warrants that it has reviewed its financial situation and that it is currently solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and will remain solvent following payment of the Settlement Amount. Further, the Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants and obligations set forth herein constitute a contemporaneous exchange for new value given to Merck, within the meaning of 11 U.S.C. § 547(c)(1); and (b) conclude that these mutual

13

promises, covenants and obligations do in fact constitute such a Federal program exchange

Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which Merck was or became indebted to on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

12.     This Agreement is intended to be for the benefit of the Parties only.  The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 2 above or in Paragraph 13 (waiver for beneficiaries paragraph), below.

13.     Merck agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

14.     Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

15.     Each party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

16.     This Agreement is governed by the laws of the United States.  The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the District of Massachusetts, except that disputes arising under the CIA shall be resolved exclusively under the dispute resolution provisions in the CIA.

17.     For purposes of construing this Agreement, this Agreement shall be deemed to

14

have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

18.　　This Agreement constitutes the complete agreement between the Parties with respect to the issues covered by the Agreement. This Agreement may not be amended except by written consent of the Parties.

19.　　The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

20.　　This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

21.　　This Agreement is binding on Merck's successors, transferees, heirs, and assigns.

22.　　All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

23.　　This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).  Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

/

/

/

/

/

15

CARMEN M. ORTIZ
United States Attorney
District of Massachusetts

DATED:_____     BY: _____
                          Susan G. Winkler


DATED:_____     BY: _____
                          Jeremy M. Sternberg


DATED:_____     BY: _____
                          Zachary A. Cunha
                          Assistant United States Attorneys

16

CARMEN M. ORTIZ
United States Attorney
District of Massachusetts


DATED:_____          BY:   _____
                              Susan G. Winkler
                              Assistant United States Attorney


                        BY:   _____
                              Jeremy M. Sternberg
                              Assistant United States Attorney

                        BY:   _____
                              Zachary A. Cunha
                              Assistant United States Attorney

16

TONY WEST
Assistant Attorney General
Civil Division

DATED: _11·17·11_          BY: _Jami Yaue_

Joyce R. Branda, Director
Jamie Ann Yavelberg, Assistant Director
Tracy Hilmer, Assistant Director
Commercial Litigation Branch, Civil Division
U.S. Department of Justice


BY: _____

Jill P. Furman, Assistant Director
Lauren Bell, Trial Attorney
James Nelson, Trial Attorney
Consumer Protection Branch, Civil Division
U.S. Department of Justice

17

TONY WEST
Assistant Attorney General
Civil Division


DATED:_____        BY: _____

Joyce R. Branda, Director
Jamie Ann Yavelberg, Assistant Director
Tracy Hilmer, Assistant Director
Commercial Litigation Branch, Civil Division
U.S. Department of Justice




BY: _____

Jill P. Furman, Assistant Director
Lauren Bell, Trial Attorney
James Nelson, Trial Attorney
Consumer Protection Branch, Civil Division
U.S. Department of Justice




17

DATED: 11/21/11      BY: _____

GREGORY E. DEMSKE
Assistant Inspector General for Legal Affairs
Office of Counsel to the
 Inspector General
Office of Inspector General
United States Department of
 Health and Human Services

18

DATED: 11/17/11          BY: _____

PAUL J. HUTTER
General Counsel
TRICARE Management Activity
United States Department
 of Defense

19

DATED: 11/9/11          BY: _____
                             SHIRLEY R. PATTERSON
                             Assistant Director for Federal Employee Insurance
                             Operations
                             United States Office of
                                Personnel Management

20

DATED: 1/10/11                    BY:

                                 DAVID COPE
                                 Debarring Official
                                 Office of the Assistant Inspector General
                                    for Legal Affairs
                                 United States Office of
                                    Personnel Management

21

**MERCK SHARP & DOHME CORP.**

DATED: 11-22-11          BY: _Bruce Wh_____

Bruce N. Kuhlik
Executive Vice President & General Counsel
Merck & Co., Inc.


DATED:_____          BY: _____

Theodore V. Wells Jr., Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas, New York, NY 10019


DATED:_____          BY: _____

R.J. Cinquegrana, Esq.
Choate, Hall, & Stewart, LLP
Two International Place
Boston, MA 02210

22

**MERCK SHARP & DOHME CORP.**

DATED: _____    BY: _____
                        Bruce N. Kuhlik
                        Executive Vice President & General Counsel
                        Merck & Co., Inc.


DATED: 11.22.11    BY: *Theodore V. Wells, Jr.*
                        Theodore V. Wells Jr., Esq.
                        Paul, Weiss, Rifkind, Wharton & Garrison LLP
                        1285 Avenue of the Americas, New York, NY 10019


DATED: 11.22.11    BY: _____
                        R.J. Cinquegrana, Esq.
                        Choate, Hall, & Stewart, LLP
                        Two International Place
                        Boston, MA 02210

22



EXHIBIT **PP** : Re: In Re V**ioxx** Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp.*, 2:07-cv-00905-EEF-DEK

9/23/13                                                           OIG Search Results

P P

## Exclusions Search Results: Individuals

Results were found for

—Reuben, Scott

**If the name of the individual or entity appears below, click on the underlined last name or entity name to Verify the record. If the name does not appear in the search results below, print this Web page for your documentation.**

Print Search Results

| Last Name | First Name | Middle Name | General | Specialty | Exclusion | Waiver | SSN/EIN |
|---|---|---|---|---|---|---|---|
| REUBEN | SCOTT | | MEDICAL PRACTICE, MD | ANESTHESIOLOGY | 1128(a)(3) | | Verify |

Search conducted 9/24/2013 1:16:10 AM EST on OIG LEIE Exclusions database.
Source data updated on 9/18/2013 10:35:00 AM EST.

Return to Search

**EXHIBIT**

tabbies

P P

Case 2:05-md-01657-EEF-DEK   Document 64639-3   Filed 10/10/13   Page 52 of 154

9/23/13                     Exclusions Authorities | Exclusions | Office of Inspector General | U.S. Department of Health and Human Services

Skip Navigation Change Font Size

# Exclusion Authorities

Footnotes relate to effective dates.

## Scope

| Social Security Act | 42 USC § | Amendment |
|---|---|---|
| 1128[*] | 1320a-7 | Scope of exclusions imposed by the OIG expanded from Medicare and State health care programs to all Federal health care programs, as defined in section 1128B(f)(1). |

## Mandatory Exclusions

| Social Security Act | 42 USC § | Amendment |
|---|---|---|
| 1128(a)(1) | 1320a-7(a)(1) | Conviction of program-related crimes. Minimum Period: 5 years |
| 1128(a)(2) | 1320a-7(a)(2) | Conviction relating to patient abuse or neglect. Minimum Period: 5 years |
| 1128(a)(3)[‡] | 1320a-7(a)(3) | Felony conviction relating to health care fraud. Minimum Period: 5 years |
| 1128(a)(4)[‡] | 1320a-7(a)(4) | Felony conviction relating to controlled substance. Minimum Period: 5 years |
| 1128(c)(3)[‡](G)(i)[*] | 1320a-7(c)(3)(G)(i) | Conviction of two mandatory exclusion offenses. Minimum Period: 10 years |
| 1128(c)(3)[‡](G)(ii)[*] | 1320a-7(c)(3)(G)(ii) | Conviction on 3 or more occasions of mandatory exclusion offenses. Permanent Exclusion |

## Permissive Exclusions

| Social Security Act | 42 USC § | Amendment |
|---|---|---|
| 1128(b)(1)(A)[*] | 1320a-7(b)(1)(A) | Misdemeanor conviction relating to health care fraud. Minimum Period: 3 years |
| 1128(b)(1)(B)[‡] | 1320a-7(b)(1)(B) | Conviction relating to fraud in non- health care programs. Minimum Period: 3 |
| 1128(b)(2) | 1320a-7(b)(2) | Conviction relating to obstruction of an investigation. Minimum Period: 3 years |
| 1128(b) | 1320a- | |

| (3)[*] | 7(b)(3) | Misdemeanor conviction relating to controlled substance. Minimum Period: 3 years |
| 1128(b)(4) | 1320a-7(b)(4) | License revocation or suspension. Minimum Period: No less than the period imposed by the state licensing authority. |
| 1128(b)(5) | 1320a-7(b)(5) | Exclusion or suspension under federal or state health care program. Minimum Period: No less than the period imposed by federal or state health care program. |
| 1128(b)(6) | 1320a-7(b)(6) | Claims for. excessive charges, unnecessary services or services which fail to meet professionally recognized standards of health care, or failure of an HMO to furnish medically necessary services. Minimum Period: 1 year |
| 1128(b)(7) | 1320a-7(b)(7) | Fraud, kickbacks, and other prohibited activities. Minimum Period: None |
| 1128(b)(8) | 1320a-7(b)(8) | Entities controlled by a sanctioned individual. Minimum Period: Same as length of individual's exclusion. |
| 1128(b)(8)(A)[#] | 7(b)(8)(A) | Entities controlled by a family or household member of an excluded individual and where there has been a transfer of ownership/ control. Minimum Period: Same as length of individual's exclusion. |
| 1128(b)(9), (10), and (11) | 1320a-7(b)(9), (10), and (11) | Failure to disclose required information, supply requested information on subcontractors and suppliers; or supply payment information. Minimum Period: None |
| 1128(b)(12) | 1320a-7(b)(12) | Failure to grant immediate access. Minimum Period: None |
| 1128(b)(13) | 1320a-7(b)(13) | Failure to take corrective action. Minimum Period: None |
| 1128(b)(14) | 1320a-7(b)(14) | Default on health education loan or scholarship obligations. Minimum Period: Until default has been cured or obligations have been resolved to Public Health Service's (PHS) satisfaction. |
| 1128(b)(15)[*] | 1320a-7(b)(15) | Individuals controlling a sanctioned entity. Minimum Period: Same period as entity. |
| 1128(b)(16)[*] | 1320a-7(b)(16) | Making false statement or misrepresentations of material fact. Minimum period: None |
| 1156[*] | 1320c-5 | Failure to meet statutory obligations of practitioners and providers to provide' medically necessary services meeting professionally recognized standards of health care (Peer Review Organization (PRO) findings). Minimum Period: 1 year |

**Note:** except those imposed under section 1128(b)(7) [42 USC 1320a-7b(b)(7)], and those imposed on rural physicians under section 1156 [42 USC 1320C-5], all exclusions are effective prior to a hearing.

## Footnotes

**Health Insurance Portability and Accountability Act (HIPAA); Public Law 104-191**
Enacted August 21, 1996.

Case 2:05-md-01657-EEF-DEK   Document 64639-3   Filed 10/10/13   Page 54 of 154

9/23/13                                 Exclusions Authorities | Exclusions | Office of Inspector General | U.S. Department of Health and Human Services

†. The effective date of the new provisions sections 1128(a)(3) and 1128(a)(4), and the amended provisions section 1128(b)(1)(A), (B), and section 1128(b)(3) is August 22, 1996. These provisions apply to offenses occurring on or after that date.

‡. The effective date for the amendments to sections 1128(b)(15), 1128(c)(3), and 1156 is January 1, 1997.

**Balanced Budget Act (BBA); Public Law 105-33:**
Enacted August 5, 1997.

*. The effective date for the amendment to section 1128, and the new provisions section 1128(c)(3)(G)(i) and (ii) is August 5, 1997.

#. The effective date for the amendment to section 1128(b)(8)(A) is September 19, 1997 (45 days after BBA's enactment).

**Note:** check HIPAA and BBA for effective dates concerning other new amended sections affecting exclusions.

**Affordable Care Act (ACA); Public Law 111-148:**
Enacted March 23, 2010.

£. The effective date for the new provision section 1128(b)(16) is the date of enactment, March 23, 2010.

Top

Back to Exclusions



EXHIBIT **QQ**:  Re: In Re Vioxx Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp.*, 2:07-cv-00905-EEF-DEK

independence and objectivity with regard to the applicable IRO Review and that it has concluded that it is, in fact, independent and objective.

E.  Disclosure Program.

Prior to the Merck Effective Date, Merck established a multi-faceted Disclosure Program that enabled individuals to raise concerns related to any potential unethical or illegal behavior associated with Federal health care programs, FDA requirements or Merck's policies, procedures, or practices confidentially to the Office of Ethics. The Disclosure Program includes Merck's AdviceLine and Ombudsman Program, mechanisms that individuals can access and for which appropriate confidentiality is maintained.  Merck's AdviceLine is a toll-free telephone line staffed by a third-party that is available 24 hours a day, seven days a week.  Merck's Ombudsman Program is staffed by individuals in the Office of Ethics.  Merck shall continue this Disclosure Program during the term of this CIA.  Merck publicizes, and shall continue to publicize, the existence of the Disclosure Program in the Code of Conduct, the Ethical Operating Standards, through training sessions, and by posting information in prominent common areas of Merck's headquarter facilities, on Merck's intranet sites, and on Merck's external website.

During the term of this CIA, the Disclosure Program shall continue to emphasize confidentiality and a nonretribution, nonretaliation policy.  Merck makes and shall continue to make a preliminary, good faith inquiry into the allegations set forth in every disclosure to ensure that it obtains all necessary information to determine whether a further review should be conducted.  For any disclosure that is sufficiently specific so that it reasonably:  (1) permits a determination of the appropriateness of the alleged improper practice; and (2) provides an opportunity for taking corrective action, Merck conducts and shall continue to conduct an internal review of the allegations set forth in the disclosure.  Merck shall ensure that proper follow-up is conducted.  Disclosures made through the AdviceLine and the Ombudsman Program are investigated, as appropriate, by a designee from the Office of Ethics, who then determines the appropriate resolution in coordination with the appropriate parties, including the Compliance Officer or designee.

Merck maintains, and shall continue to maintain, a disclosure log, which includes a record and summary of each disclosure received (whether anonymous or not), the status of the respective internal reviews, and any corrective action taken in response to the internal reviews.  This disclosure log shall be made available to OIG upon request.

Merck & Co., Inc.
Corporate Integrity Agreement                    26



F. Ineligible Persons.

    1. *Definitions.* For purposes of this CIA:

        a. an "Ineligible Person" shall include an individual or entity who:

            i. is currently excluded, debarred, suspended, or otherwise ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs; or

            ii. has been convicted of a criminal offense that falls within the scope of 42 U.S.C. § 1320a-7(a), but has not yet been excluded, debarred, suspended, or otherwise declared ineligible.

        b. "Exclusion Lists" include:

            i. the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.oig.hhs.gov); and

            ii. the General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at http://www.epls.gov).

    2. *Screening Requirements.* Merck shall ensure that all prospective and current Covered Persons are not Ineligible Persons, by implementing the following screening requirements.

        a. as part of the hiring or contracting process, Merck shall require all prospective and current Covered Persons to disclose whether they are Ineligible Persons and shall screen potential Covered Persons against the Exclusion Lists prior to engaging their services.

        b. To the extent not already accomplished within 180 days prior to the Effective Date, Merck shall screen all Covered Persons against the Exclusion Lists within 90 days after the Effective Date and on an annual basis thereafter.

Merck & Co., Inc.
Corporate Integrity Agreement

      c. Merck shall maintain a policy requiring all Covered Persons to disclose immediately any debarment, exclusion, suspension, or other event that makes that person an Ineligible Person.

Nothing in this Section III.F affects Merck's responsibility to refrain from (and liability for) billing Federal health care programs for items or services furnished, ordered, or prescribed by excluded persons. Merck understands that items or services furnished by excluded persons are not payable by Federal health care programs and that Merck may be liable for overpayments and/or criminal, civil, and administrative sanctions for employing or contracting with an excluded person regardless of whether Merck meets the requirements of Section III.F.

      3. *Removal Requirement.* If Merck has actual notice that a Covered Person has become an Ineligible Person, Merck shall remove such Covered Person from responsibility for, or involvement with, Merck's business operations related to the Federal health care programs and shall remove such Covered Person from any position for which the Covered Person's compensation or the items or services furnished, ordered, or prescribed by the Covered Person are paid in whole or part, directly or indirectly, by Federal health care programs or otherwise with Federal funds at least until such time as the Covered Person is reinstated into participation in the Federal health care programs.

      4. *Pending Charges and Proposed Exclusions.* If Merck has actual notice that a Covered Person is charged with a criminal offense that falls within the scope of 42 U.S.C. §§ 1320a-7(a), 1320a-7(b)(1)-(3), or is proposed for exclusion during the Covered Person's employment or contract term, Merck shall take all appropriate actions to ensure that the responsibilities of that Covered Person have not and shall not adversely affect any claims submitted to any Federal health care program.

    G. Notification of Government Investigation or Legal Proceedings.

Within 30 days after discovery, Merck shall notify OIG, in writing, of any ongoing investigation or legal proceeding known to Merck conducted or brought by a U.S. governmental entity or its agents involving an allegation that Merck has committed a crime or has engaged in fraudulent activities in the U.S. This notification shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding. Merck shall also provide written

Merck & Co., Inc.
Corporate Integrity Agreement

notice to OIG within 30 days after the resolution of the matter, and shall provide OIG with a description of the findings and/or results of the investigation or proceedings, if any.

H. Reportable Events. The terms of this Section III.H shall become effective upon the date on which the last signatory to the CIA signs the document.

1. *Definition of Reportable Event.* For purposes of this CIA, a "Reportable Event" means anything that involves:

a. a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized;

b. a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any FDA requirements relating to the promotion of Government Reimbursed Products;

c. an FDA Warning Letter issued to Merck;

d. the employment of or contracting with a Covered Person who is an Ineligible Person as defined by Section III.F.1.a; or

e. the filing of a bankruptcy petition by Merck.

A Reportable Event may be the result of an isolated event or a series of occurrences.

2. *Reporting of Reportable Events.* If Merck determines (after a reasonable opportunity to conduct an appropriate review or investigation of the allegations) through any means that there is a Reportable Event, Merck shall notify OIG, in writing, within 30 days after making the determination that the Reportable Event exists.

3. *Reportable Events under Sections III.H.1.a-d.* For Reportable Events under Sections III.H.1.a-d, the report to OIG shall include:

Merck & Co., Inc.
Corporate Integrity Agreement                                29

a. a complete description of the Reportable Event, including the relevant facts, persons involved, and legal and Federal health care program or FDA authorities implicated;

b. a description of Merck's actions taken to correct the Reportable Event; and

c. any further steps Merck plans to take to address the Reportable Event and prevent it from recurring.

4. *Reportable Events under Section III.H.1.e.*  For Reportable Events under Section III.H.1.e, the report to the OIG shall include documentation of the bankruptcy filing and a description of any Federal health care program and/or FDA authorities implicated.

I.   Notification of Communications with FDA.  Within 30 days after the date of any written report, correspondence, or communication between Merck and the FDA that materially discusses Merck's or a Covered Person's actual or potential unlawful or improper promotion of Government Reimbursed Products (including any improper dissemination of information about off-label indications), Merck shall provide a copy of the report, correspondence, or communication to the OIG.  Merck shall also provide written notice to the OIG within 30 days after the resolution of any such disclosed off-label matter, and shall provide the OIG with a description of the findings and/or results of the matter, if any.

J.   Field Force Monitoring and Review Efforts.

To the extent not already accomplished, within 120 days after the Effective Date, Merck shall establish a comprehensive Field Force Monitoring Program (FFMP) to evaluate and monitor its sales representatives' interactions with HCPs and HCIs.  The FFMP shall be a formalized process designed to directly and indirectly observe the appropriateness of sales representatives' interactions with HCPs and HCIs and to identify potential off-label promotional activities or other improper conduct.  As described in more detail below, the FFMP shall include: 1) a Speaker Monitoring Program; 2) direct field observations (Observations) of sales representatives; and 3) the monitoring and review of other records relating to sales representatives' interactions with HCPs and HCIs (Records Reviews).

Merck & Co., Inc.
Corporate Integrity Agreement                                30

1.    *Speaker Program Activities.*  With regard to speaker programs, Merck shall maintain processes to require all speakers to complete training and enter written agreements that describe the scope of work to be performed, the speaker fees to be paid, and compliance obligations for the speakers (including requirements that the speaker may only use Merck approved materials and may not directly or indirectly promote the product for off-label uses.)  Merck shall maintain a centralized electronic system through which all speaker programs are administered.  This system shall establish controls regarding eligibility and qualifications of speakers and venues for the programs and require that speakers are paid according to a centrally managed system based on a fair-market value analysis conducted by Merck.  Merck shall maintain a comprehensive list of speaker program attendees through its centralized system.  In addition, Merck shall track and review the aggregate amount (including speaker fees, travel, and other expenses) paid to each speaker in connection with speaker programs conducted during each Reporting Period.  Merck shall require certified evaluations by sales representatives or other Merck personnel regarding whether a speaker program complied with Merck requirements, and in the event of non-compliance, Merck shall require the identification of the policy violation and ensure appropriate follow up activity to address the violation.

To the extent not already accomplished, Merck shall institute a Speaker Monitoring Program under which Merck compliance or other appropriately trained personnel who are independent from the functional area being monitored shall attend 150 speaker programs during each Reporting Period and conduct live audits of the programs (Speaker Program Audits).  The programs subject to Speaker Program Audits shall be selected both on a risk-based targeting approach and on a sampling approach.  For each program reviewed, personnel conducting the Speaker Program Audits shall review slide materials and other materials used as part of the speaker program, speaker statements made during the program, and Merck representative activities during the program to assess whether the program was conducted in a manner consistent with Merck's Policies and Guidance Documents.  Merck shall maintain the controls around speaker programs as described above, and shall conduct its Speaker Program Audits as described above throughout the term of the CIA.

2.    *Observations.*  As a component of the FFMP, Merck U.S. compliance personnel or other appropriately trained personnel shall conduct observations of sales representatives to assess whether the messages delivered and materials distributed to HCPs are consistent with applicable Federal healthcare or FDA requirements and with Merck's Policies and Guidance Documents.  These observations shall be full day ride-alongs with sales representatives (Observations), and each Observation shall consist of

directly observing all meetings between a sales representative and HCPs during the workday. The Observations shall be scheduled throughout the year, selected by Merck U.S. compliance personnel both on a risk-based targeting approach and on a sampling approach and the selection of the Observations shall include each therapeutic area and actively promoted Government Reimbursed Product, and be conducted across the United States. At the completion of each Observation, Merck U.S. compliance personnel or other appropriately trained personnel shall prepare a report which includes:

1) the identity of the sales representative;
2) the identity of the Merck compliance personnel or other appropriately trained personnel;
3) the date and duration of the Observation;
4) the product(s) promoted during the Observation;
5) an overall assessment of compliance with Merck policy; and
6) the identification of any potential off-label promotional activity or other improper conduct by the sales representative.

Merck U.S. compliance personnel or other appropriately trained personnel shall conduct at least 50 Observations during each Reporting Period.

3.    *Records Reviews.* As a component of the FFMP, Merck shall also review various types of records to assess sales representatives' interactions with HCPs and HCIs in order to identify potential or actual compliance violations. For each Reporting Period, Merck shall develop and implement a plan for conducting Records Reviews associated with at least three Government Reimbursed Products and a sampling of the representatives promoting those Government Reimbursed Products in every separate region. The OIG shall have the discretion to identify the three Government Reimbursed Products to be reviewed for each Reporting Period. The OIG will select the Government Reimbursed Products based on information about the Government Reimbursed Products provided by Merck, upon request by the OIG no later than 60 days prior to the beginning of the Reporting Period, and other information known to the OIG. If the OIG does not identify the Government Reimbursed Products to be reviewed within the first 30 days of the Reporting Period, Merck shall select the three Government Reimbursed Products to be reviewed.

These Records Reviews shall include the monitoring and review of: 1) records and systems relating to sales representatives' interactions with HCPs and HCIs (including records from any available electronic detailing system for the particular sales

Merck & Co., Inc.
Corporate Integrity Agreement                              32

ARCHIVE COPY  FX00184834

TEL: 800 672 6372
FAX: 800 637 2568

4-01-4503

August 1, 2001

Michael Dillon, R.Ph.
13 British American Blvd
Latham, NY 12110-1467

Dear Mr. Dillon:

Our National Account Executive, Victoria Stumpf, has referred your request for information regarding VIOXX
(rofecoxib tablets and oral suspension).   Your inquiry concerned the use of VIOXX for acute pain management.

**Design of the Acute Pain Studies for the Phase IIb/III Clinical Trials for VIOXX**

To obtain an indication for the management of acute pain in adults, our analgesia studies were designed by Merck Research
Laboratories (MRL) using short-term pain models as agreed in discussions with the FDA. The maximum duration for these acute pain
studies with VIOXX once daily was 5 days. This time interval was chosen by MRL because it was anticipated that few patients would
experience acute pain beyond 5 days, given the pain models selected.

Single-dose studies were conducted comparing rofecoxib 50 mg, ibuprofen 400 mg, and naproxen sodium 550 mg.  Single-dose
analgesic pain models are designed to assess the relative analgesic effect, onset of action, and peak effects of the drugs studied. The
single-dose analgesic pain models for rofecoxib also assessed total pain relief over 8 hours (TOTPAR8). Single-dose pain models are
not designed to compare the dosing regimens of the agents; in this case, rofecoxib once daily, ibuprofen three times daily, and
naproxen sodium twice daily.

In the analgesic studies, the doses of the comparator nonsteroidal anti-inflammatory drugs (NSAIDs) ibuprofen (400 mg) and
naproxen sodium (550 mg) were chosen by MRL based on the prescribing information for both products. As stated in the prescribing
information for Motrin, using doses greater than 400 mg was no more effective than the 400 mg dose. Additionally, the maximum
recommended dose of naproxen sodium for analgesia is 550 mg.

The following studies have been identified that discuss the use of rofecoxib in the treatment of acute pain.

I.      Acute Musculoskeletal Pain
II.     Pre-emptive Analgesia in Spinal Fusion
III.    Pre-emptive Analgesia in Radical Prostatectomy
IV.     Post-operative Analgesia in Post-orthopedic Surgery
V.      Post-operative Analgesia in Dental Surgery
VI.     Primary Dysmenorrhea
VII.    Headache
VIII.   Versus Narcotics



EXHIBIT
RR

**I. Acute Musculoskeletal Pain**

Summers et al. [1] performed an observational convenience study to compare the efficacy of rofecoxib 50 g (n =68) with ibuprofen
800 mg (n=56) in the treatment of mild to moderate musculoskeletal pain. The study was conducted in an urban emergency
department over a period of one month.  The patient's perception of pain was determined using a 100 mm visual analog scale (VAS)
prior to, and 30 minutes after oral drug treatment. Patients were excluded from the study if they had confounding injuries, distracting
medical conditions or major long bone fractures. The absolute VAS changes along with their clinical significance (>13 mm change)
were compared using a t test and a chi squared analysis (p<0.05).  Upon analysis, patient demographics were similar between the
groups.



MRK-EAL0058959

Study results showed a notable benefit to treatment with rofecoxib compared with ibuprofen in both the absolute changes in VAS (24 mm vs. 14 mm) and the number of clinically significant improvements in pain (62% vs. 35%). The authors concluded that COX-2 inhibitors may be useful in the treatment of acute musculoskeletal pain in the emergency room setting and may be superior to ibuprofen in relative pain relief.

## II. Pre-emptive Analgesia in Spinal Fusion

Reuben et al. [2] performed a randomized, placebo-controlled study in 60 patients undergoing decompression lumbar laminectomy with spinal fusion surgery to determine the analgesic efficacy and degree of intraoperative bleeding following the preoperative oral administration of rofecoxib 50 mg or celecoxib 200 mg. All patients, operated on by a single surgeon, received a standard general anesthetic with propofol (2 mg/kg), fentanyl (5 mcg/kg), and cisatracurium (0.2 mg/kg) and maintained in isoflurane in 70% $N_2O$ in $O_2$. After surgery, at the patient's first complaint of pain, a patient controlled analgesic (PCA) morphine pump (1 mg/mL) was connected to the IV infusion with initial settings: bolus 2 mg, lockout interval 8 minutes, 4 hour limit 40 mL. The bolus was increased to 2.5 mL and the 4 hour limit was increased to 50 mL if analgesia was inadequate after 1 hour. If analgesia remained inadequate after an additional 1 hour the bolus was increased to 3.0 mL. To measure efficacy, the Verbal Analog Pain Scale (VbAS) scores, and PCA requirements were assessed at 4, 8, 12, 16, 20, and 24 hours after surgery. Patients were asked to quantify their pain between 0 and 10 with 0 representing no pain and 10 the worst imaginable pain. Blood loss was determined by blood collected in the suction canister and in the surgical sponges. There were no differences between groups in demographic data, duration of surgery, or intraoperative blood loss.

As shown in the table below, the total morphine consumption was significantly higher in the placebo group compared with the groups treated with rofecoxib or celecoxib (p< 0.001).

### Total Morphine Consumption

|  | Placebo (n=20) | Rofecoxib 50 mg (n=20) | Celecoxib 200 mg (n=20) |
|---|---|---|---|
| Total Morphine Consumption (mg) | 117 ± 13 | 71± 7*** | 107 ± 17*** |

*** p<0.001 compared with placebo

The patients receiving placebo consumed a greater dose of morphine at two time intervals compared with the patients on celecoxib (4 hour and 8 hour, p<0.03) and at all time intervals compared with the patients receiving rofecoxib (p<0.0001). As shown in the figure below, for 5 of the 6 time intervals, the patients administered preoperative celecoxib consumed more morphine than those patients treated with rofecoxib preoperatively (p>0.01).

MRK-EAL0058960

**Morphine Use**



*p<0.03 compared to control
**p<0.01 compared with celecoxib

As shown in the table below, there was a significant difference with respect to pain (as measured by VbAS) at 8, 12, and 16 hours (p<0.03). Patients treated preoperatively with placebo reported more pain (higher VbAS scores) at 8 hours compared with those treated preoperatively with celecoxib but reported more pain at 8, 12, and 16 hours compared with patients treated preoperatively with rofecoxib. Patients administered preoperative celecoxib reported more pain (higher VbAS scores) at 12 and 16 hours compared with patients treated preoperatively with rofecoxib.

**Patient Assessed Post-surgical Pain Scores (mean ± SD)**

| Pain Scores | 4 hours | 8 hours | 12 hours | 16 hours | 20 hours | 24 hours |
|---|---|---|---|---|---|---|
| Placebo | 4.3 ± 1.0 | 4.0 ± 1.0 | 3.7 ± 0.9 | 3.4 ± 0.8 | 3.1 ± 0.8 | 2.9 ± 1.0 |
| Celecoxib | 3.4 ± 1.0 | 3.1 ± 1.1* | 3.9 ± 1.0 | 3.5 ± 1.1 | 3.2 ± 1.1 | 2.5 ± 0.9 |
| Rofecoxib | 3.5 ± 1.1 | 3.1 ± 1.0** | 2.9 ± 1.0**† | 2.7 ± 1.0**† | 2.8 ± 1.0 | 2.6 ± 1.1 |

* p<0.02, ** p<0.03 compared with placebo
† p<0.01 compared with celecoxib

The authors concluded that the addition of a single oral dose of rofecoxib or celecoxib to patients undergoing spinal fusion resulted in decreased morphine use and lower pain scores compared with placebo. Furthermore, preoperative treatment with rofecoxib for patients undergoing spinal fusion surgery provided a more sustained analgesic effect compared to preoperative treatment with celecoxib.

## III. Pre-emptive Analgesia in Radical Prostatectomy

Huang et al. (American Society of Anesthesiologists, October 14-18, 2000, San Francisco, CA) performed a prospective, randomized, double-blind, placebo-controlled study in 22 patients undergoing radical prostatectomy to compare the analgesic efficacy following the preoperative administration of rofecoxib 50 mg (n=11) with placebo (n=11). The demographics of the two treatment groups were similar. Patients, scheduled for surgery under one surgeon, were administered rofecoxib 50 mg or placebo one hour prior to the induction of standard anesthesia. The intraoperative fentanyl administration was comparable between the two groups. To measure efficacy, a 10 cm visual analog score (VAS, 0 = "no pain", 10 = "worst pain") was administered at 1, 2, 4, 6, 8, and 24 h after surgery. Morphine consumption was assessed by recording use from a patient-controlled analgesia (PCA) device. A patient-generated overall pain relief score (0 = "poor", 4 = "excellent") was assessed 24 hours after surgery. Data were analyzed using a Student's t-test with p<0.05 considered to be statistically significant. There were no significant differences in morphine consumption, or in the patient generated 10 cm VAS for pain at 1, 2, 4, 8 or 24 hours after surgery between the patients treated with rofecoxib 50 mg and the patients treated with placebo. Additionally, there was not a significant difference in the patient generated overall pain relief score assessed 24

MRK-EAL0058961

hours after surgery between the patients treated with rofecoxib 50 mg and the placebo treated group. The authors concluded that rofecoxib 50 mg does not provide significant analgesia for patients after radical prostatectomy.

## IV. Post-operative Analgesia in Post-orthopedic Surgery

Reicin et al. [3] conducted a double-blind, randomized, placebo-controlled study to compare the analgesic effects of rofecoxib 50 mg once daily followed by 50 mg once daily for 4 days (rofecoxib 50/50, n=54), rofecoxib 50 mg once daily followed by 25 mg once daily for 4 days (rofecoxib 50/25, n=56), naproxen sodium 550 mg followed by placebo for 4 days (n=55), or placebo (n=63) in the treatment of post-orthopedic surgical pain. Patients were eligible for enrollment in the study if they were age 18 or older and were scheduled for major orthopedic surgery (total hip replacement, total knee replacement, or femoral fracture repair with open reduction and internal fixation). Patients were excluded if they had an allergy or intolerance to any study medication or other NSAID, a history of asthma associated with nasal polyps, a recent history of chronic analgesic or tranquilizer use, dependency or alcohol abuse. Also excluded were morbidly obese patients and those with clinical malabsorption, bleeding disorders, uncontrolled hypertension, uncontrolled diabetes, renal insufficiency, recent transient ischemic attack or cerebrovascular accident, recent myocardial infarction or unstable angina, active hepatic or neoplastic disease or clinically significantly abnormalities on prestudy examination or on laboratory safety tests. The majority (57.8 %) of the patients enrolled in the study were female, 92.7% were Caucasian and the average age was 64.7 years. Forty-five percent of the patients had total hip replacement, 53.2 % total knee replacement and the remaining 1.8% had fracture repair surgery. At baseline, 81.7 % of the patients experienced moderate pain intensity while the remaining 18.3 % reported severe pain. The average time from the end of surgery until treatment medication randomization was 44.8 hours.

The patients underwent orthopedic surgery without prespecified restrictions on operative analgesia. Immediate postoperative analgesia was specified by investigator site and was administered orally, intramuscularly, epidurally and/or intravenously [by patient controlled analgesia (PCA) pump]. Randomization to the study drugs was begun after postoperative analgesia and the development of patient-reported moderate-to-severe pain (>4 hours for postoperative anesthesia administered orally and intramuscularly and 30 minutes for epidurally or intravenously administered analgesia).

The study was performed in two parts, a single dose study on day one and a multidose study on days 2-5. Rescue medication (hydrocodone bitartrate 7.5 mg plus acetaminophen 500 mg) was allowed p.r.n throughout the study. Patients were discouraged from taking supplemental medication for the first 60 minutes of the study. The primary endpoint was the total pain relief score over 8 hours (TOPAR8) on day 1. Other endpoints included the sum of the pain intensity differences over 8 hours (SPID8), patient's global evaluation, stopwatch time to confirmed perceptible pain relief, peak pain relief, peak pain intensity difference (PID), percent of patients who remedicated within 24 hours, and time to remedication.

On day 1, for TOPAR8, rofecoxib 50 mg was superior to placebo (p<0.001). For all other endpoints, except for the time to 50% of the patients with PID > 1, rofecoxib 50 mg was also superior to placebo on day 1. Rofecoxib 50 mg was not significantly different from the naproxen 550 mg-treated group at any endpoints.

MRK-EAL0058962

## Single-Dose Efficacy Results-Day 1

| | Placebo (n=63) | Rofecoxib 50 mg (n=110) | Naproxen 550 mg (n=55) |
|---|---|---|---|
| TOPAR8 (scale, 0 to 32) – LS Mean (95% CI) | 5.8 (2.9, 6.7) | 12.3* (10.2, 14.5) | 11.7* (8.8, 14.5) |
| Overall Analgesic Effect-SPID8 (scale, -8 to 24) – LS Mean (95% CI) | 1.8 (-0.1, 3.8) | 6.2* (4.8, 7.6) | 5.5* (3.6, 7.3) |
| Patients Global Evaluation at 8 hours (scale 0 to 4), LS Mean (95% CI) | 1.0 (0.6, 1.5) | 1.8 (1.5, 2.1) | 1.7 (1.3, 2.2) |
| Number of tablets of supplemental medication | 2.2 (1.8, 2.5) | 1.5* (1.3, 1.9) | 1.8 *1.4, 2.1) |
| Time (h) to 50% of patients with confirmed perceptible pain relief (95% CI) | NE | 0.9* (0.7, >4 h) | 1.2 (0.7, >4h) |
| Time (h) to 50% of patients with PID ≥ 1 (95% CI) | 1.5 (1.0, >4 h) | 1.0 (1.0, >4h) | 1.0 (0, >4 h) |
| Peak PID during 8h after first dose (scale −1 to 3) LS Mean (95% CI) | 0.8 (0.5, 1.0) | 1.3* (1.1, 1.5) | 1.2* (1.0, 1.5) |
| Peak pain relief during first 8h after dose (scale 0 to 4) LS Mean (95% CI) | 1.5 (1.1, 1.9) | 2.2* (1.9, 2.5) | 2.3* (1.9, 2.7) |

LS = Least Square, 95% CI = 95% Confidence Interval, NE = not estimable
*p<0.05 compared with placebo

Results from days 2-5 of the study showed a trend favoring rofecoxib in the amount of rescue medication used versus placebo.

## Average Rescue Medication Use vs. Placebo on Days 2-5

| | Average Supplemental Rescue Medication Tablets/Day LS Mean (95% CI) | Difference in Rescue Medication Use from Placebo LS Mean (95% CI) |
|---|---|---|
| Placebo | 2.6 (2.0, 3.1) | N/A |
| Rofecoxib 50/25 | 2.1 (1.6, 2.6) | -0.5 (-1.1, 0.1) |
| Rofecoxib 50/50 | 1.6 (1.2, 2.1) | -0.9* (-1.6, -0.3) |

*p = 0.005 compared with placebo.
N/A = Not applicable
LS = Least Squares

As shown in the table above, on days 2 to 5, rofecoxib 50/50 was statistically superior to placebo for number of tablets/day required of rescue medication (p=0.005). Rofecoxib 50/50 was also statistically significant compared with placebo in the patient's global evaluation (p=0.041). Rofecoxib 50/25 produced results at all end points between those of placebo and rofecoxib 50/50. All treatments were well tolerated.

## Number (%) of Patients who were Discontinued from Study

| | Placebo/ Placebo (n=53) | Rofecoxib 50/25 mg (n=56) | Rofecoxib 50/50 mg (n=54) | Naproxen 550 mg/ Placebo (n=55) |
|---|---|---|---|---|
| Discontinued due to any reason | 18 (34.0) | 11 (19.6) | 8 (14.8) | 6 (10.9) |
| Discontinued due to clinical AE | 8 (15.1) | 3 (5.4) | 4 (7.4) | 3 (5.5) |
| Discontinued due to lack of efficacy | 9 (17.0) | 2 (3.8) | 4 (7.4) | 1 (1.8) |
| Discontinued due to other reason* | 1 (1.9) | 6 (10.7) | 0 (0.0) | 2 (3.6) |

* Including patients who discontinued due to protocol violation and patients who withdrew consent.

The authors concluded that a single daily dose of rofecoxib 50 mg was efficacious in the treatment of post-orthopedic surgical pain and that rofecoxib can be used as a "narcotic sparing agent". Rofecoxib, a COX-2 selective agent that lacks platelet inhibition, may represent an alternative to nonspecific NSAIDs in the treatment of pain in the postoperative setting.

**V. Post-operative Analgesia in Dental Surgery**

A search of the published medical literature pertaining to VIOXX identified the following clinical studies comparing VIOXX and a narcotic agent or opioid in the management of patients with pain.

Chang et al (presented at American Pain Society, Atlanta GA, November 2-5, 2000) performed a double-blind, placebo-controlled, randomized study comparing the analgesic effects of rofecoxib 50 mg (n=182) with codeine 60 mg plus acetaminophen 600 mg (Cod/Acet 60/600 mg, n=180), and placebo (n=31) in the relief of moderate to severe pain associated with third molar extraction. Approximately 69% of the patients were female, with an approximate average age of 21. After the removal of at least 2 molars, study medication was administered and pain intensity (0=None, 1=Slight, 2=Moderate, 3=Severe) and pain relief (0=None, 1=A little, 2=Some, 3=A lot, 4=Complete) were determined at baseline and at 11 pre-specified time points (0, 0.5, 1, 2, 3, 4, 5, 6, 7, 8, 12, and 24 hours). Total pain relief over 6 hours (TOPAR6) was the primary endpoint. Patient global assessment of response to therapy (PGART), mean pain relief scores over 24 hours, and the median time to rescue medication (hydrocodone bitartrate 5 mg with acetaminophen 500 mg) were also assessed. The proportion of patients who rated the study medication as good, very good, or excellent at 6 hours was significantly greater for rofecoxib compared with codeine/acetaminophen or placebo as shown in the figure below.



Percent of patients with a Good, Very Good, or Excellent PGART at 6 hours

**p<0.01 compared with Cod/Acet 60/600. +p<0.01, ++p<0.001 compared with placebo

As shown below, rofecoxib 50 mg was superior to Cod/Acet 60/600 mg and placebo in the primary endpoint (TOPAR6, both p<0.001).



The results of the data from the mean pain relief score are shown below.



The median time to rescue medication was longer for rofecoxib 50 mg compared with Cod/Acet 60/600 mg and placebo as shown in the figure below.

## Cumulative % of Patients Taking Rescue Medication



\* p<0.001 vs. Cod/Acet     ‡ p<0.001 vs. Placebo     † p<0.001 vs. Placebo

### Time to Rescue Medication (hours)

|  | Rofecoxib 50 mg (n=182) | Cod/Acet 60/600 mg (n=180) | Placebo (n=31) |
|---|---|---|---|
| 25th Percentile | 2.87 | 2.03 | 1.53 |
| 50th Percentile | 9.58 | 2.32 | 1.57 |
| 75th Percentile | >24.00 | 4.15 | 2.10 |

More patients on the Cod/Acet 60/600 mg experienced adverse events than patients treated with rofecoxib or placebo (p<0.05) as shown in the table below.

### Clinical Adverse Experience Summary

|  | Rofecoxib 50 mg (n=182) N (%) | Cod/Acet 60/600 mg (n=180) N (%) | Placebo (n=31) N (%) |
|---|---|---|---|
| Patients with 1 or more Clinical Adverse Experience | 60 (33.0)* | 83 (46.1) | 10 (32.3) |
| Patients with a Drug Related Adverse Experience | 1 (0.5) | 3 (1.7) | 0 (0) |
| Patients with a serious Adverse Experience | 0 (0) | 0 (0) | 0 (0) |

*p<0.05 compared with Cod/Acet 60/600 mg

More patients on the Cod/Acet 60/600 mg experienced gastrointestinal adverse events than patients treated with rofecoxib (p<0.05), including nausea and vomiting as shown in the table below.

### Gastrointestinal Adverse Experiences

|  | Rofecoxib 50 mg (n=182) N (%) | Cod/Acet 60/600 mg (n=180) N (%) | Placebo (n=31) N (%) |
|---|---|---|---|
| Nausea | 11(6.0)* | 45 (25.0) | 3 (9.7) |
| Vomiting | 7 (3.8)* | 33 (18.3) | 2 (6.5) |

*p<0.05 compared with Cod/Acet 60/600 mg.

The authors concluded that the superior efficacy and gastrointestinal safety profile of rofecoxib 50 mg compared with Cod/Acet 60/600 mg provides support for an alternative option to opioid analgesic in the treatment of acute post-surgical pain.

Chang et al. (unpublished data, Merck & Co., Inc) performed a double-blind, placebo-controlled, randomized study comparing the analgesic effects of rofecoxib 50 mg (n=180) to codeine 60 mg with acetaminophen 600 mg (Cod/Acet 60/600 mg n=180), and placebo (n=30) in the relief of moderate to severe pain associated with third molar extraction. Approximately 53% of the patients were female, with an average age of 19.2. After the removal of at least 2 molars, study medication was administered and pain intensity (0=None, 1=Slight, 2=Moderate, 3=Severe) and pain relief (0=None, 1=A little, 2=Some; 3=A lot, 4=Complete) were determined at baseline and at 11 pre-specified time points (0, 0.5, 1, 2, 3, 4, 5, 6, 7, 8, 12, and 24 hours). Total pain relief over 6 hours (TOPAR6) was the primary endpoint. Patient global assessment of response to therapy (PGART), the mean pain relief scores over 24 hours, and the median time to rescue medication (hydrocodone bitartrate 5 mg with acetaminophen 500 mg) were also assessed. The proportion of patients who rated the study medication as good, very good, or excellent at 6 hours was significantly greater for rofecoxib compared with codeine/acetaminophen or placebo as shown in the figure below.



**Percent of Patients with Good, Very Good, or Excellent PGART after 6 hours**

**p<0.01 compared with Cod/Acet 60/600 mg.  +p<0.01, ++p<0.001 compared with placebo

MRK-EAL0058967

As shown below, rofecoxib 50 mg was superior to Cod/Acet 60/600 mg and placebo in the primary endpoint (TOPAR6, both p<0.001). Cod/Acet 60/600 mg was superior to placebo (p<0.01).



Mean Total Pain Relief (TOPAR) over 6 hours

** p<0.001 compared with Cod/Acet 60/600 mg.   + p<0.01, ++ p<0.001 compared with placebo

The results of the data from the mean pain relief score are shown below.  Rofecoxib was statistically superior to Cod/Acet 60/600 mg at 2, 3, 4, 5, 6, 7, 8, 12 and 24 hours (p<0.001) and to placebo at all time points (p<0.016 at 0.5 h, p<0.001 at all other time points). Cod/Acet 60/600 mg was statistically superior to rofecoxib 50 mg at the 0.5 hour time point (p<0.001). Cod/Acet 60/600 mg was statistically superior to placebo over the first 3 hours of treatment (p<0.001 at 0.5, 1 and 2 h, p<0.04 at 3 h).



Pain Relief (PR) over 24 hours

MRK-EAL0058968

The median time to rescue medication was longer for rofecoxib 50 mg compared with Cod/Acet 60/600 mg and placebo as shown in the figure below.



*p<0.001 compared with Cod/Acet 60/600 mg.  †p<0.01, ‡p<0.001 compared with placebo

The percentage of patients taking rescue medication during the 24-hour treatment period is shown below. For the patients treated with rofecoxib 50 mg, Cod/Acet 60/600 mg and placebo the percentage of patients who used rescue medication was 43.3%, 86.1% and 73.3%, respectively.



**p<0.001 compared with Cod/Acet 60/600 mg.  +p<0.01 compared with placebo

Significantly fewer patients treated with rofecoxib 50 mg used rescue medication compared Cod/Acet 60/600 mg (p<0.001) or placebo (p<0.01). There was no significant difference between the patients treated with Cod/Acet 60/600 mg and placebo with respect to the use of rescue medication.

MRK-EAL0058969

More patients on the Cod/Acet 60/600 mg experienced adverse events than patients treated with rofecoxib 50 mg or placebo (p<0.05) as shown in the table below.

### Clinical Adverse Experience Summary

|  | Rofecoxib 50 mg (n=180) N (%) | Cod/Acet 60/600 mg (n=180) N (%) | Placebo (n=30) N (%) |
|---|---|---|---|
| Patients with 1 or more Clinical Adverse Experience | 40 (22.2)** | 63 (35.0) | 14 (46.7) |
| Patients with a Drug Related Adverse Experience* | 15 (8.3) | 33 (18.3) | 8 (26.7) |
| Patients with a serious Adverse Experience | 0 (0) | 0 (0) | 0 (0) |

*Determined by the investigator to be possibly, probably or definitely drug related.
**p<0.05 compared with Cod/Acet 60/600mg

More patients on the Cod/Acet 60/600 mg experienced vomiting-related events than patients treated with rofecoxib (p<0.05). There was no significant difference between rofecoxib 50 mg and Cod/Acet 60/600 mg with regards to nausea (p=0.058).

### Gastrointestinal Adverse Experiences

|  | Rofecoxib 50 mg (n=180) N (%) | Cod/Acet 60/600 mg (n=180) N (%) | Placebo (n=30) N (%) |
|---|---|---|---|
| Nausea | 13 (7.2) | 25 (13.9) | 3 (10.0) |
| Vomiting | 10 (5.6)* | 25 (13.9) | 2 (6.7) |

*p<0.05 compared with Cod/Acet 60/600mg

The authors concluded that the superior efficacy and gastrointestinal safety profile of rofecoxib 50 mg compared with Cod/Acet 60/600 mg provides support for an alternative option to opioid analgesic in the treatment of acute post-surgical pain.

Morrison et al. [4] reported results of a double-blind, randomized, parallel group, placebo- and active comparator-controlled clinical trial to assess the analgesic efficacy and tolerability of rofecoxib in the treatment of postoperative dental pain. Following dental surgery, 151 patients experiencing moderate-to-severe pain were randomized to receive a single dose of rofecoxib 50 mg (n=50), ibuprofen 400 mg (n=51), or placebo (n=50). Patients were eligible for enrollment if they were ≥16 years of age and were scheduled to have two or more third molars removed (at least 1 of which was partially embedded in mandibular bone). Women were required to be either postmenopausal, surgically sterilized, or using an accepted form of birth control. Exclusion criteria included allergy or inability to tolerate naproxen sodium, aspirin, ibuprofen, indomethacin, or other NSAIDs, acetaminophen, or hydrocodone; history of asthma in association with nasal polyps; recent history of chronic analgesic or tranquilizer use or dependency; and alcohol abuse. Also excluded were patients who had the following: uncontrolled hypertension; diabetes mellitus; renal, cardiovascular, hepatic or neoplastic disease; stroke or neurological disorder; or clinically significant abnormalities on preclinical examination or laboratory tolerability tests (e.g., complete blood count, serum chemistries, and urinalysis).

Analgesic efficacy for up to 24 hours post-dose was determined using self-administered questionnaires. The primary endpoint was total pain relief over the eight-hour post-dose period (TOPAR8). Other endpoints observed included peak pain relief, PID, the sum of the pain intensity difference to 8 hours (SPID8), global evaluation at eight hours, time to confirmed perceptible pain relief, time to PID ≥1, maximum pain relief during the first eight hours postdose, percentage of patients taking rescue medication within 24 hours, time to taking rescue medication, and sum of pain relief plus PID (PRID) at the 24 hours. Tolerability was assessed using spontaneous reports of adverse experiences, physical findings, and laboratory measurements. Of the patients enrolled, 50.3% were women, the mean age was 18.3 years, 93.4% were white, and the average number of teeth removed was 3.8. There were no between-group differences observed in the type of surgical anesthetic used among the patients.

For the primary endpoint of TOPAR8, both rofecoxib 50 mg and ibuprofen 400 mg were significantly better than placebo (p<0.001). Rofecoxib was significantly better than placebo (p<0.01) but not significantly different from ibuprofen 400 mg on other measures of overall analgesic efficacy, including SPID8 and patient's global evaluation at 8 hours. The onset of analgesia, as assessed by both

MRK-EAL0058970

time to confirmed perceptible pain relief and time to PID $\geq 1$, was more rapid with rofecoxib 50 mg than placebo (p<0.012) but there was no significant difference in onset of analgesic effect between rofecoxib 50 mg and ibuprofen 400 mg. The peak analgesic effect of rofecoxib 50 mg, as assessed by both peak pain relief and peak PID scores, was better than placebo (p<0.001) but not significantly different from ibuprofen 400 mg. The mean pain relief score of the rofecoxib 50 mg group was significantly greater than that of the placebo group at 24-hour time point (p<0.001). The mean pain relief score for rofecoxib 50 mg became significantly greater than placebo at 1 hour postdose and remained significantly greater throughout the 24-hour observation period (p≤0.05). The mean pain relief score for ibuprofen 400 mg also differed significantly from placebo at 1 hour (p≤0.05) but was not significantly distinguishable from placebo beyond eight hours postdose. As shown in the table below, the number of patients who took rescue medication (acetaminophen plus hydrocodone bitartrate) within 24 hours was less with rofecoxib 50 mg than with placebo (p<0.001) or ibuprofen 400 mg (p<0.05) and the time to use of rescue medication was significantly longer with rofecoxib than with placebo (p<0.001) or ibuprofen 400 mg (p<0.05).

### Rescue Medication Usage

|  | Number of patients who took rescue medication within 24 hours N (%) | Time (h) to 50% of patients taking rescue medication LS mean (95% CI) |
|---|---|---|
| Placebo | 46 (92.0) | 2.4 (2.2 to 3.1) |
| Ibuprofen (400 mg) | 42 (82.4) | 6.1 (3.3 to 9.5)* |
| Rofecoxib (50 mg) | 28 (56.0)**† | 9.5 (3.9 to ∞)**† |

*p<0.05, **p<0.001 compared with placebo
†p<0.05 compared with ibuprofen 400 mg
LS= Least Squares

The duration of analgesic effect was longer with rofecoxib 50 mg than with ibuprofen 400 mg (p≤0.039). All treatments were well tolerated. The authors concluded that rofecoxib was efficacious in the treatment of postoperative dental pain with analgesic effects lasting up to 24 hours with a single dose and that COX-2-derived prostanoids play a role in treatment of pain associated with dental surgery.

Ehrich et al. [5] reported results of a pilot study of the analgesic efficacy of rofecoxib in 104 patients with moderate or severe pain following extraction of impacted third molars. In this double-blind, placebo-controlled, parallel-group trial, patients were randomized to receive single oral doses of rofecoxib 50 mg, rofecoxib 500 mg, ibuprofen 400 mg, or placebo. The patients rated their degree of pain at various time points over the 6 hours following administration of the study medication. They were permitted to request "rescue analgesia" (acetaminophen) if their pain relief was inadequate; however, if they did so, no further assessment of pain intensity was conducted. The overall analgesic effect was evaluated as TOTPAR (the time-weighted total pain relief score) at six hours SPID (the time-weighted sum of pain intensity difference) over six hours, and patient global evaluation scores at six hours. Additional endpoints included the time to analgesic effect (measured as the stopwatch time to meaningful pain relief) and the duration of analgesic effect (measured as the median time to rescue analgesia). In all three active treatment groups, the mean pain relief at all time points after 45 minutes was significantly better than that in the placebo group. The degree of mean pain relief was similar in the three groups. All three active treatments were significantly superior to placebo and similar to each other with regard to overall analgesic effect and time to onset of analgesia. Seventy-five percent of patients in the placebo group requested rescue medication within the first two hours after dosing. However, only 25% of patients in the rofecoxib and ibuprofen groups requested rescue medication over the entire six-hour study period; consequently, it was not possible to measure the median duration of effect of these drugs. The response to treatment was not significantly related to baseline pain intensity. The authors concluded that COX-2 inhibition is sufficient to produce analgesic efficacy and that COX-2 derived prostaglandins are important mediators of acute post-surgical pain.

Combined tolerability data were summarized from this study and a study of the *ex vivo* COX-2 selectivity of rofecoxib in which 16 healthy volunteers received rofecoxib in single doses ranging from 5 to 1000 mg.[5] In these studies, single doses of rofecoxib of up to 1000 mg were well tolerated. Clinical adverse events considered drug-related were transient and mild. The most common adverse events were nausea and headache. There was no apparent dose-relationship in the incidence of these adverse events.

Mehlisch et al. [6] conducted a randomized, placebo-controlled, double-blind dose-ranging study to compare the analgesic effects of rofecoxib with those of naproxen sodium in 229 patients with postoperative dental pain. Patients received single oral doses of rofecoxib (7.5 mg, 25 mg, 50 mg, or 100 mg), naproxen sodium (550 mg), or placebo. The primary study endpoint was total pain relief (TOTPAR) over the eight-hour post-dose period. Secondary endpoints included the sum of the PID, stopwatch time to meaningful relief, percent re-medicated, and time to re-medication. All doses of rofecoxib were significantly superior to placebo for TOTPAR at eight hours (p≤0.013). For all endpoints, the response was dose-related over the range of 7.5-50 mg. The 100 mg dose was similar in efficacy to the 50 mg dose, and both were similar in efficacy to naproxen sodium. The authors concluded that rofecoxib provided effective analgesia and that 50 mg was the minimal dose required to give maximal efficacy.

MRK-EAL0058971

Fricke et al. [7] conducted another randomized, placebo-controlled, double-blind dose-ranging study to compare the analgesic effects of rofecoxib with those of naproxen sodium in the treatment of postoperative dental pain in 331 patients who had undergone dental surgery. Subjects received single oral doses of rofecoxib (12.5 mg, 25 mg, or 50 mg), naproxen sodium (550 mg), or placebo. The primary endpoint was TOTPAR over the eight-hour post-dose period. Secondary endpoints included peak pain relief, PID, the SPID over the eight-hour post-dose period, stopwatch time to meaningful relief, time to re-medication, and patient's global evaluation. For all endpoints, rofecoxib was significantly superior to placebo (p≤0.009). The 25 and 50 mg doses of rofecoxib were significantly more effective than the 12.5 mg dose, and the 50 mg dose tended to be more effective than the 25 mg dose. For all endpoints, the efficacy of the 50 mg dose of rofecoxib was not significantly different from that of naproxen sodium. All treatments were well tolerated. The authors concluded that rofecoxib 50 mg provided similar analgesic efficacy to naproxen sodium for the treatment of postsurgical dental pain.

## VI. Primary Dysmenorrhea

Morrison et al. [8] reported a double-blind, randomized, placebo and active-comparator-controlled clinical trial to determine whether rofecoxib is effective in the treatment of primary dysmenorrhea. One hundred twenty-seven healthy patients with moderate to severe primary dysmenorrhea were randomly assigned to receive one of the following treatments for up to 3 days: rofecoxib 25 mg followed by 25 mg once daily; rofecoxib 50 mg followed by 25 mg once daily; naproxen sodium 550 mg every 12 hours; or placebo. Subjects took all four treatments in a balanced, complete-block, crossover design.

Eligibility criteria included age >18 years; negative serum β-hCG; and gynecologic examination within one year of entry that found no evidence of other causes of dysmenorrhea. Nursing mothers, subjects abusing drugs or alcohol, and subjects taking tricyclic antidepressants, analgesics, tranquilizers, hypnotics, sedatives, or corticosteroids were excluded. Of the 127 subjects studied, 79% were white; 12% were Hispanic, and the remaining were black or Asian. The mean age was 31.4 years (range 18-44 years).

Pain was evaluated at specified times using established rating scales. Pain intensity was recorded on a 0 to 3 scale (0=none to 3=severe) at baseline and at 0.5, 1, 1.5, 2, 3, 4, 5, 6, 7, 8, and 12 hours after the initial dose. Pain relief was recorded on a 0 to 4 scale (0=none to 4=complete). Subjects also were required to record any rescue medication used. At eight hours after the initial dose and at the end of the 72-hour treatment period, subjects rated the study drug on a scale of 0 to 4 (0=poor to 4=excellent).

The primary endpoint was total pain relief (TOTPAR) as the summed time-weighted pain relief scores to 8 hours. Additional assessments included the following: overall analgesic effect (summed time-weighted pain intensity difference to 8 hours, subjects' global evaluation); onset of analgesia (time to pain intensity difference from baseline ≥1); peak analgesia (pain intensity difference from baseline, peak pain relief); and duration of analgesia (% of subjects who took rescue medication, time to rescue medication). The results are summarized in Table 1.

MRK-EAL0058972

Results of the Primary Dysmenorrhea Trial of Rofecoxib

| Endpoint | Placebo (n=118) | Rofecoxib 25/25 mg (n=115) | Rofecoxib 50/25 mg (n=118) | Naproxen sodium 550 mg (n=122) |
|---|---|---|---|---|
| Total pain relief calculated as the summed time-weighted pain relief scores to 8 hours-LS mean (95% CI); 0-32 scale | 12.5 (10.9, 14.0) | 17.4* (15.8, 19.0) | 18.0* (16.4, 19.5) | 18.4* (16.9, 19.9) |
| Summed time-weighted pain intensity difference to 8 hours-LS mean (95% CI); -8-24 scale | 6.7 (5.7,7.7) | 9.8* (8.7,10.8) | 10.4* (9.4, 11.4) | 10.7* (9.7, 11.7) |
| Patients global evaluation-LS mean (95% CI); 0-4 scale | 1.2 (1.0, 1.5) | 1.8* (1.6, 2.0) | 2.0* (1.8, 2.2) | 1.9* (1.7, 2.2) |
| Time to pain intensity difference from baseline =1 – hours for 50th percentile (95% CI) | 1.5 (1.5, 2.0) | 1.5 (NE, NE) | 1.5 (1.0, 1.5) | 1.0* (1.0, 1.5) |
| Peak pain intensity difference from baseline-LS mean (95% CI), -1-3 scale | 1.4 (1.3, 1.5) | 1.8* (1.6, 1.9) | 1.7* (1.6, 1.9) | 1.8* (1.7, 2.0) |
| Peak pain relief-LS mean (95% CI), 0-4 scale | 2.3 (2.1,2.5) | 3.0* (2.8, 3.2) | 2.9* (2.7, 3.2) | 3.1* (2.9, 3.3) |
| Patients who took rescue medication with 12 hours (%) | 53 (44.9) | 31 (27.0)* | 32 (27.1)* | 36 (29.5)* |
| Patients who took additional doses of study medication 12 to 72 hours after initial dose (%) | 28 (23.7) | 31 (26.9) | 33 (27.9) | 35 (28.6) |

LS = least squares, CI=confidence interval, NE=no estimable.
*p≤0.006 v. placebo. No significant differences were found between the active treatment groups.

Throughout the 8-hour period, mean pain relief and mean pain intensity difference from baseline scores at each evaluation were higher for rofecoxib and naproxen sodium than placebo. There were statistically significant differences from placebo for naproxen sodium at 1 hour and for both rofecoxib groups at 2 hours, which persisted throughout the 12-hour study.

Both doses of rofecoxib were significantly superior to placebo for TOTPAR at eight hours and for all other endpoints (p≥0.006) except time to pain intensity difference from baseline =1. For all endpoints, the response to rofecoxib was not significantly different from the response to naproxen sodium. There were no statistically significant differences in adverse experiences between the treatments. The authors concluded that both rofecoxib regimens effectively treated primary dysmenorrhea.

### VII. Headache

Von Seggern et al. [9] conducted a randomized clinical trial to examine the effects of rofecoxib in the prevention of the peri-menstrual migraine. The frequency of peri-menstrual migraines was determined in patients by diary documentation of 5 days prior to and after menses. Patients (n=14) experiencing at least one monthly peri-menstrual migraine, were randomized to receive rofecoxib 25 mg or rofecoxib 50 mg daily administered 5 days prior to the start of menstrual flow and continuing for 10 days. The patients recorded all headaches that occurred during the treatment phases over two menstrual cycles with rofecoxib treatment. The mean peri-menstrual migraine frequency was reduced form 5.6 to 2.6 migraines per menstrual cycle (p=0.005). Eight of the 14 patients (57%) had a 50% reduction in headache frequency. There was no statistically significant difference in patient response to rofecoxib 25 mg versus rofecoxib 50 mg. Both doses of rofecoxib were well tolerated with no patients experiencing GI side effects. The duration, intensity and functional impairment of headaches was not significantly improved.

Wheeler [10] examined the effects of rofecoxib in patients with hemicrania continua (HC), a rare indomethacin-responsive chronic daily unilateral headache. Fourteen patients from a headache practice who met Goadsby and Lipton's HC criteria were prescribed rofecoxib. Thirteen women and one man were enrolled consisting of 7 Hispanics, 3 Caucasians, 3 African-Americans and 1 Indian. The age range was 28-67 years, mean 42.1. The HC onset was 13-54 years with a mean of 35 years. Five of the patients had indomethacin trials and responded completely, however 8 refused indomethacin. Of these 8 patients, one responded to diclofenac, one to naproxin, one failed celecoxib, and rofecoxib was tried first in the remaining patients. Rofecoxib was typically started at 50 mg daily for 5 days, then dosed between 12.5 to 50 mg daily, although some patients preferred to use the medication only for severe headache. Six patients responded to rofecoxib, experiencing fewer than four headaches per month with an additional patients responded with 4-6 headaches per month. One patient responded initially and failed due to analgesic rebound and another patient had complete control of severe headaches, but minimal daily headaches remained using 12.5 mg every other day. Three patients did not respond to rofecoxib and the results in patients are unknown.

MRK-EAL0058973

VIII. **Versus Narcotics**

Two double-blind, placebo-controlled, randomized studies were conducted comparing the analgesic effects of rofecoxib 50 mg, codeine 60 mg plus acetaminophen 600 mg and placebo. They are discussed above in the Postoperative Analgesia in Dental Surgery section (V).

The above information is supplied to you as a professional service in response to your specific request. Merck does not recommend the use of its products in any manner other than as described in the prescribing information. Enclosed for your convenience is prescribing information for VIOXX.

Sincerely,

Jeffrey M. Melin, MD, FACP
Associate Director
Medical Services

Enclosures: Circular, References

MRK-EAL0058974

AUGUST 1, 2001                     REFERENCES                          1

1.  Summers RL, Jones SM, Givertz AR. Comparison of the efficacy of rofecoxib and ibuprofen for the treatment of acute musculoskeletal pain in the emergency department. Acad Emerg Med. May 2000;7(5): 307-307.

2.  Reuben SS, Connelly NR. Postoperative analgesic effects of celecoxib or rofecoxib after spinal fusion surgery. Anesth Analg. 2000;91: 1221-1225.

3.  Reicin A, Brown J, Jove M, et al. Efficacy of single-dose and multidose rofecoxib in the treatment of post-orthopedic surgery pain. Am J Orthop. Jan, 2001;30(1): 40-48.

4.  Morrison BW, Christensen S, Yuan W, et al. Analgesic efficacy of the cyclooxygenase-2-specific inhibitor rofecoxib in post-dental surgery pain: A randomized, controlled trial. Clin Ther. 1999;21(6): 943-953.

5.  Ehrich E, Dallob A, DeLepeleire I, et al. Characterization of rofecoxib as a cyclooxygenase-2 isoform inhibitor and demonstration of analgesia in the dental pain model. Clin Pharmacol Ther. Mar 1999;65(3): 336-347.

6.  Mehlisch DR, Mills S, Sandler M, et al. Ex vivo assay of COX-2 inhibition predicts analgesic efficacy in post-surgical dental pain with MK-966. Clin Pharmacol Ther. Feb 1998;63(2): PI-8.

7.  Fricke J, Morrison B, Fite S, et al. MK-966 versus naproxen sodium 550 mg in post-surgical dental pain. Clin Pharmacol Ther. 1999;65(2): PI-7.

8.  Morrison BW, Daniels SE, Kotey P, et al. Rofecoxib, a specific cyclooxygenase-2 inhibitor, in primary dysmenorrhea: a randomized controlled trial. Obstet Gynecol. Oct 1999;94(4): 504-508.

9.  Von Seggern RL, Adelman JU, Mannix LK. An open-label trial of rofecoxib in the preventive treatment of peri-menstrual migraine. Headache. May 2000;40(5): 436.

10. Wheeler SD. Rofecoxib-responsive hemicrania continua. Headache. May 2000;40(5): 436-437.

11. Peres MFP, Zukerman E. Hemicrania continua responsive to rofecoxib. Cephalalgia. May, 2001;21(4): 130-131.

MRK-EAL0058975

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal No. 10-CR-30002-MAP |
| v. | ) |
| | ) |
| SCOTT REUBEN, | ) |
| | ) |
| Defendant. | ) |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States hereby submits its sentencing memorandum in connection with the June 24, 2010 sentencing of the defendant, Scott Reuben ("Defendant" or "Reuben"). Reuben, an anesthesiologist, has been convicted of health care fraud in violation of 18 U.S.C. §1347 for falsifying clinical research about pain management. As set forth in more detail below, the crime took place over a multi-year period, involved multiple victims, from the pharmaceutical companies from whom Reuben obtained the research grants, to the medical journals that published the false articles, to patients who received a treatment regimen that had not actually been studied by Reuben and had not actually achieved the safety and efficacy results reported by him in the false articles. The government's sentencing recommendation is as follows:

- imprisonment for a term of 14 months;

- fine of $5,000;

- forfeiture of $50,000;

- restitution of $361,932 ($296,557 payable to Pfizer Inc.; $49,375 payable to Merck & Co., Inc.; and $8,000 payable to Wyeth and $8,000 payable to Rays of Hope;

- supervised release of 2 years; and

- mandatory special assessment of $100.



months is below the applicable guideline range (18-24 months) and is consonant with the factors

of 18 U.S.C. §3553.

## I.     Introduction

### A.     The Information/Offense Conduct

The Information, which was filed on January 14, 2010, charged Reuben with one count

of health care fraud in violation of 18 U.S.C. §1347.

Reuben was an anesthesiologist who was the chief of acute pain at Bay State Hospital in

Springfield, Massachusetts.  At all relevant times, he treated patients both pre- and post-

operatively, and he conducted research in the area of pain management.  PSR ¶8.  Reuben's

particular research focus was multimodal analgesia therapy, meaning a combination of analgesia

therapy instead of the use of opioids.  Reuben's theory was that multimodal analgesia therapy

would be as effective for pain, promote long term healing and avoid some of the side effects

associated with opioid therapy.  PSR ¶9.

Reuben made a number of proposals for research funding to pharmaceutical companies

which manufactured drugs that he used or proposed to use in multimodal analgesia therapy.  Id.

Those drugs included Vioxx, manufactured by Merck, and Celebrex, manufactured by Pfizer.

Id.  In proposals to Merck and Pfizer and others, Reuben represented that he, as the principal

investigator, would be performing clinical studies with actual patients.  Id.  These research grant

proposals and the subsequent contracts also contemplated that Reuben would prepare an article

for publication in a medical journal based on the results of the research study.  Id.

Beginning in approximately 2000, Reuben entered into contracts to perform research as

2

contracts, and published articles in various medical journals based on the purported results of his

research, when in fact those studies had not been performed, and therefore the research results

were false and the published articles were false. PSR¶10. The following is a listing of the false

articles:

| Dr. Reuben False Articles | Grantor | Grant Amount |
|---|---|---|
| "The Effect of Cyclooxygenase-2 Inhibition on Analgesia and Spinal Fusion," Journal of Bone and Joint Surgery; 2005, 87:536; and "The Effect of Cyclooxygenase-2 Inhibition on Acute and Chronic Donor-Site Pain After Spinal Fusion Surgery," Register of Anesthesia and Pain Medicine, 2006; 31:6 | Pfizer | $63,425 |
| "Evaluating the Analgesic Efficacy of Administering Celecoxib as a Component of Multimodal Analgesia For Outpatient Anterior Cruciate Ligament Reconstruction Surgery," Anesthesia & Analgesia; 2007; 105:222; and "The Effect of Initiating a Preventive Multimodal Analgesic Regimen on Long-Term Patient Outcomes For Outpatient Anterior Cruciate Ligament Reconstruction Surgery," Anesthesia & Analgesia; 2007; 105:228. | Pfizer | $73,512 |
| "A Prospective Randomized Trial on the Role of Perioperative Celecoxib Administration for Total Knee Arthroplasty: Improving Clinical Outcomes," Anesthesia & Analgesia; 2008; 106:1258 | Pfizer | $118,200 |
| "The Effect of Intraoperative Valdecoxib Administration on PGE2 levels in the CSF," Journal of Pain, Supplement; 1:S21 (Abstract 649) | Pfizer | $41,420 |

3

| | | |
|---|---|---|
| "Perioperative Administration of Rofecoxib for Total Knee Arthroplasty," 2002; Journal of Arthroplasty, 17:26 | | |
| "Evaluation of Efficacy of the Perioperative Administration of Venlaxifine XR in the Prevention of Post-Mastectomy Pain Syndrome, Journal of Pain and Symptom Management, 2004; 27:133 | Wyeth/Rays of Hope | $16,000 |

The grant amounts associated with the articles referenced above total $361,932 and form the basis both for the restitution order that the Government seeks (and which the parties agree to in the plea agreement). This amount also forms the basis for the sentencing guideline loss calculation. See U.S.S.G. §2B1.1(b)(1)(G). The five journals and the four grantors fall one shy of the 10 victims needed to trigger the multiple victim enhancement in U.S.S.G. §2B1.1(b)(2)(A).

By way of specific example, in July 2005, Reuben proposed to Pfizer that he would perform research on the topic of "Perioperative Administration of Celecoxib [Celebrex] as a Component of Multimodal Analgesia for Outpatient Anterior Cruciate Ligament Reconstruction Surgery." In his proposal, Dr. Reuben informed Pfizer that the "goal of this study is to assess the analgesic efficacy of utilizing celecoxib in a preemptive multimodal analgesic technique for patients undergoing outpatient ACL surgery," and that he intended to include 100 patients in the study, with 50 of them randomized to receive Celebrex and 50 of them to receive a placebo. PSR ¶12.

On or about September 1, 2005, Dr. Reuben entered into an Independent Research Grant Agreement (the "Agreement") with Pfizer to conduct a clinical research study entitled "Perioperative Administration of Celecoxib [Celebrex] as a Component of Multimodal

4

Agreement, Pfizer agreed to provide (and indeed paid) a research grant in the amount of $73,512.00 and sufficient supplies of Celebrex and placebo to conduct the study. As such, for the purpose of the Agreement, Pfizer was a health care benefit program as defined by 18 U.S.C. §24(b). PSR ¶13

Dr. Reuben's protocol for the study was to treat 100 patients, with 50 receiving placebo and 50 receiving Celebrex as part of the multimodal analgesia therapy. In the articles by Dr. Reuben about this study ("Evaluating the Analgesic Efficacy of Administering Celecoxib as a Component of Multimodal Analgesia for Outpatient Anterior Cruciate Ligament Reconstruction Surgery," Vol. 105: 222-227, 2007 Anesthesia & Analgesia; and "The Effect of Initiating a Preventive Multimodal Analgesic Regimen on Long-Term Patient Outcomes for Outpatient Anterior Cruciate Ligament Reconstruction Surgery," Vol. 105: 228-232, 2007 Anesthesia & Analgesia), he claimed to have treated 200 patients, 100 with placebo and 100 with Celebrex. Dr. Reuben also claimed in these articles that patients had achieved success with multimodal analgesia therapy. PSR ¶14.

Dr. Reuben knew those claims were materially false because he knew he had not enrolled any patients into that study and the results reported both to Pfizer and to Anesthesia & Analgesia Journal and in turn to the public were wholly made up by him. PSR ¶15.

B.    The Plea Agreement

The plea agreement contains a sentencing guideline analysis, which is set forth below in Section II. The plea agreement also provides in paragraph 4 that the government agrees to recommend the following sentence to the Court:

5

- fine of $5,000;

- restitution of $361,932 ($296,557 payable to Pfizer Inc.; $49,375 payable to Merck & Co., Inc.; and $8,000 payable to Wyeth and $8,000 payable to Rays of Hope;

- forfeiture of $50,000;

- supervised release of 2 years; and

- mandatory special assessment of $100.

Defendant also agrees to recommend the same sentence, with the exception of the term of incarceration and period of supervisory release. Thus, the dispute about sentencing is between the government's recommendation of a below guideline incarcerative sentence of 14 months and Reuben's recommendation of home confinement.

II.     **Guidelines Analysis**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." Gall v. United States, 552 U.S. 38, 49 (2007). Here the parties appear to agree that the applicable Sentencing Guidelines calculation results in a Total Adjusted Offense Level of 15, which when combined with a Criminal History Category of I yields an advisory sentencing guideline range of 18-24 months of incarceration. See PSR ¶29. To be sure, the Guidelines are now advisory. However, the Supreme Court also "recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve §3553(a)'s objectives.'" Kimbrough v. United States, 552 U.S. 85, 109 (2007) (internal citation omitted).

6

Health Care Fraud in violation of 18 U.S.C. §1347

| | |
|---|---|
| base offense level (U.S.S.G. §2B1.1(a)(2)) | 6 |
| | + |
| loss enhancement (U.S.S.G.§2B1.1(b)(1)(G)) | 12 |
| | - |
| acceptance of responsibility (U.S.S.G. §3E1.1) | <u>3</u> |
| Total Offense Level   = | 15 |
| Range for CHC I       = | 18-24 months |

## III.    Sentencing Factors Under 18 U.S.C. §3553

The United States submits that its recommended sentence of 14 months incarceration is appropriate in light of the §3553 factors, particularly the nature and circumstances of the offense and the history and characteristics of the defendant, §3553(a)(1); and the need for the sentence to reflect the seriousness of the offense and afford adequate deterrence, §§3553(a)(2)(A) and (B).

### A.    Nature and Circumstances of the Offense/History and Characteristics of the Defendant.

In assessing these factors, it is important to set the context for this crime and this defendant. The criminal conduct here, and the related offense conduct, involved defrauding pharmaceutical companies, falsifying clinical research results, sending false articles based on false clinical research results to a number of scholarly medical journals, which in turn published these false articles, which in turn led members of the pain management medical community to read these false articles and in some instances base their treatment protocols for their patients on the false article they read.

7

The Journal of Bone & Joint Surgery, wrote in an a letter submitted hereto as Exhibit 1, that it published an article by Reuben that "purported to define a new method of paint management following spinal fusion, a procedure which is performed more than 250,000 times a year in the United States alone." The letter goes on to explain that once the "fraudulent nature of this publication was identified, The Journal had to create a novel, heretofore, unused, procedure to retract it." The letter concludes that the "reputation of the Journal of Bone and Joint Surgery as an absolutely reliable source of quality patient care information has been permanently damaged, and we will never fully recover. Most importantly, while it is impossible to measure, many patients have been adversely affected by his [Reuben's] actions."

In the same vein, as Dr. Jacques Chelly, Director of the Division of Regional Anesthesia and Acute Interventional Pain at the University of Pittsburgh Medical Center said in the wake of learning of Reuben's fraud, multimodal analgesia was "in shambles concerning many of the drugs we use. The big chunk of what people had based their protocol on is gone." Chelly noted that he stopped giving celecoxib and pregabalin to many patients upon finding out that Reuben's research on multimodal analgesia was fraudulent. Exhibit 2 (copy of March 2009 Anesethesiology News, quoting and citing to Dr. Chelly). Thus it is important to recognize that Reuben's false research did not just defraud pharmaceutical companies, it reached the trade press, the pain management professionals and had an impact on patient care.

Significantly, Reuben's criminal conduct took place over a wide span of time. The false articles identified herein span dates from 2002 to 2008. This was not a one time aberrant occurrence. Even the specific crime at issue, involved approximately 18 months between

8

much discussion in his sentencing brief, and certainly it merits careful and sensitive

consideration, but it is important to understand that during the entirety of the period of the

criminal conduct, Reuben was going to work day in and day out and anesthetizing patients,

treating patients post-operatively, teaching students, and by all outward accounts to colleagues,

patients and friends, functioning at a high level.  For example, one of his former colleagues at

Bay State Medical Center, Dr. Shameema Faruqui wrote to the Court:

> I have always found Scott to be a very cordial and helpful colleague.  He was well
> liked by the nursing and office staff.  His patients loved him as their pain
> physician.  Scott is an accomplished anesthesiologist and an excellent teacher.
> The pain fellows and anesthesiology residents always looked forward to working
> with him.

Another former colleague, Dr. Howard Krasner wrote to the Court:

> I have worked closely with Dr. Reuben clinically, and can speak to his excellent
> clinical skills. . . Dr. Reuben has always provided excellent anesthesia care for
> thousands of patients over the years. . . His contributions to resident education
> were substantial, such that he had been voted the best clinical instructor in the
> Anesthesiology Department by our residents several times over his teaching
> career.

All the while that Reuben was providing excellent patient care and outstanding teaching, he was

also engaging in criminal research fraud.  And yet, while he "does not contend that his bi-polar

illness prevented him from knowing right from wrong," Defendant's Sentencing Memo at p. 10,

nor could he given the extremely high functioning life he was otherwise leading, he seeks a

departure for "significantly reduced mental capacity" under U.S.S.G. §5K2.13.

9

Under this guideline a downward departure is warranted only if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Reuben is not able to meet either of these criteria. First, Application Note 1 of U.S.S.G. §5K2.13 defines significantly reduced mental capacity as meaning that the defendant "has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." Reuben concedes that he knew right from wrong, and thus cannot meet the first prong of this definition. To the extent he is arguing that he could not control behavior that he knew was wrongful, there is no evidence of that and that assertion defies credulity. This argument requires the Court to accept that in his day to day personal and professional life he was able to make dozens of cogent, coherent and controlled decisions regarding patient care, teaching, personal and familial relationships, yet he could not control his fraudulent research activities.

However, even assuming Reuben suffered from "significantly reduced mental capacity," he does not and cannot explain how his bipolar disorder "contributed substantially to the commission of the offense." He argues that "[w]ithout his mental disorder, he simply would not have had the stamina to maintain all of this activity. Stated crudely, his bipolar disorder acted like a drug, giving him an extraordinary amount of energy and drastically lowering his perceived need for sleep and down-time." Defendant's Memo at 13. However, the crime he committed stemmed from his failure to do the research, not by doing something illegal that required

10

does not make sense, particularly in light of all of the high functioning conduct that he otherwise engaged in during the exact same long period of time. There is no evidence to explain how Reuben could be divining right from wrong in all phases of his life other than his fraudulent research activities.

There are cases in which bipolar disorder (coupled with other diseases and traits) has been found by courts to constitute a "significantly reduced mental capacity" and then "contributed substantially to the commission of the offense," such that there has been a departure under U.S.S.G. §5K2.13. However, this is not such a case. Reuben cites United States v. Follette, 990 F.Supp. 1172 (D. Neb. 1998) in support of his argument that bipolar can form the basis for a departure to a non-incarcerative sentence. However, that case involved a young woman who had not finished high school, and who suffered from mental impairments beyond bipolar, who was an accessory after the fact to an armed robbery because her boyfriend (by whom she was pregnant at the time) prevailed on her to do so. That case also did not involve the profound general deterrence impact that an incarcerative sentence here would have.

    2.    Reuben's bipolar disorder does not exempt him from imprisonment.

Reuben argues that he has "an extraordinary physical impairment," U.S.S.G. §5H1.4, that renders him an appropriate candidate for home detention. In the main, bipolar is a somewhat common condition which psychiatrists are able to treat. Studies suggest that there is a meaningful percentage of the prison population that suffer from and are treated in prison for mental diseases like bipolar. A United States Department of Justice Special Report from September 2006 entitled "Mental Health Problems of Prison and Jail Inmates" reported that an

for a psychotic disorder." (Report attached hereto as Exhibit 3). The Bureau of Prisons

("BOP") is actually quite used to and adept at dealing with psychiatric disorders. There are a

number BOP facilities that specialize in providing care to mentally ill inmates. As BOP

explained in its letter attached hereto as Exhibit 4, Reuben will be able to continue on his

medication and therapeutic regimen. It would be unfortunate and unfair to consign only poor

defendants with bipolar disorder to incarceration, while privileged white collar defendants like

Reuben are thought to "have suffered enough" and merely get home detention.

      B.     An Incarcerative Sentence is Important to Promote Respect For Law and
            to Serve the Aim of General Deterrence.

Reuben argues, in the manner of most white collar criminals that he has suffered enough

(money, profession, reputation, divorce) and that a prison term is unwarranted. He argues that

his "crime and his illness have taken a respected researcher, anesthesiologist, and family man

and left him broke and broken with no profession, and under the constant careful watch of his

parents." Defendant's Memo at p. 19. Of course, these are the arguments made by virtually all

white collar defendants who seek to avoid any incarceration. Most white collar defendants, by

definition, have much to lose once convicted of a crime. Because of their education, status and

wealth, they are in position to lose good jobs, professional licenses, money and reputation.

And for white collar criminals, it is the prison term that offers the most profound general

deterrence. See 18 U.S.C. §3553(a)(2)(B)(sentencing goals include the need to afford adequate

deterrence to criminal conduct). "As the legislative history of the adoption of §3553

demonstrates, Congress viewed deterrence as particularly important in the area of white collar

crime." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006)(internal quotations and

central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail." United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006). See also United States v. Politano, 522 F.3d 69, 74 (1st Cir. 2008)(recognizing the importance of general deterrence in post-Booker sentencings).

Research fraud, the crime for which Reuben stands convicted, is a growing and pernicious problem. See "Scandalous science: Scientists cheating on data," by Daniel Peake, February 17, 2010, Medill Reports (attached hereto as Ex. 5) ("Despite increasing science journal retraction rates in recent years, scientific misconduct in research and publishing persists – particularly in pharmacological and medical research."). An incarcerative sentence would have profound general deterrence impact on the medical community, and the subset of that community that engages in research. A sentence of probation or home confinement would foster a notion in those communities that the punishment which the members of those communities fear the most, imprisonment, can be avoided by paying restitution. Further, the laudable goal of the Sentencing Commission, to reduce disparities in sentencing between white-collar criminals and blue-collar criminals would be undermined by a home confinement sentence here. Allowing white collar criminals to avoid jail because, as Reuben argues, he has suffered enough, would enforce, rather than reject, that there are two systems of justice extant, one for white-collar offenders, and one for blue-collar offenders.

13

The applicable §3553 factors and recent First Circuit case law in the area of <u>white</u> <u>collar</u> <u>crime</u> demonstrate that an incarcerative sentence, such as the one recommended by the government, as opposed to the home confinement sentence recommended by Defendant, is appropriate.[1]

---

[1] As noted, the government's recommendation is 4 months below the low end of the applicable guideline range, and thus is 4 months lower than the term the government agreed to recommend in the plea agreement. This recommendation reflects a number of factors, including Reuben's timely willingness to come forward about his crime, his effort to make full restitution in the face of personal financial uncertainty, and a recognition that such a sentence would be "sufficient, but not greater than necessary, to comply with the purposes" of 18 U.S.C. §3553(a)(2).

14

In sum, an incarcerative sentence of 14 months would recognize the seriousness of the offenses, promote respect for the law, and act as a meaningful general deterrent to other potential white collar offenders.  In contrast, the home confinement sentence sought by the Defendant would run counter to the well established goals of: (1) reducing disparity in sentencing between blue and white collar criminals; (2) preventing white collar criminals from buying their way out of jail; and (3) deterring white collar crime, particularly the burgeoning problem of medical research fraud.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:   /s/Jeremy M. Sternberg
Jeremy M. Sternberg
Assistant U.S. Attorney
United States Attorney's Office
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3142

## Certificate of Service

I hereby certify that the foregoing documents filed through the ECF system will be sent electronically to counsel for each defendant who is a registered participant as identified on the Notice of Electronic Filing (NEF).

/s/Jeremy M. Sternberg
Jeremy M. Sternberg
Assistant U.S. Attorney

Dated: June 22, 2010

15

EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX
PRODUCTS LIABILITY LITIGATION

MDL DOCKET NO. 1657
SECTION L

JUDGE FALLON
MAGISTRATE JUDGE KNOWLES

THIS DOCUMENT RELATES TO:

*Dennis R. Harrison v. Merck Sharp & Dohme Corp.*, 2:07-cv-00905-EEF-DEK

## DECLARATION OF NICHOLAS BLAVATSKY, M.D.

1.       I am an MD and Board Certified Orthopedist currently practicing in Butte, Montana, as a member of Montana Orthopedics.

2.       I pursued an undergraduate degree from the Air Force Academy in Colorado Springs but transferred after my second year to Carroll College in Helena, Montana, given a profound change in the curriculum at the Academy to strict engineering.

3.       I attended the University of Nevada Medical School in Reno between 1977 and 1981, graduated and began postgraduate internship training at the University Hospital in Las Vegas, Nevada. In 1982 I began orthopedic residency training in the program affiliated with the University of Arizona, Tucson. My training included rotations at the University Hospital in Tucson, Maricopa County Hospital in Phoenix, Good Samaritan Hospital, St. Joseph's Hospital, and the Veterans' Administration and Indian Hospitals, all in Phoenix. I also participated in private rotations with prominent orthopedists in various specialties such as hand, spine and joint reconstruction both in Phoenix and Tucson.


EXHIBIT
VV

approximately one year. The group I was with dissolved after several of the senior members retired. I continued my orthopedic practice in Winter Haven, Florida, some 45 minutes away from Orlando, with a group of several orthopedists. My scope of practice was general and broad and included a range of orthopedic procedures which included the care of upper and lower extremity injuries, joint replacement, and spine reconstruction. The practice allowed me to gain significant experience both in the clinical setting and in the operating room.

5.      In 1995 our practice was absorbed by a large multispecialty group and I practiced in that setting for five years between 1995 and 2000. In 2000 I elected to leave this model of practice for an opportunity in Montana. I had grown up in Montana, the majority of my family was located in Montana and I enjoyed traveling to the state on many different occasions for visits and for recreative opportunities.

6.      During the course of my practice in Florida, I held the position of Chief of Surgery and Chief of Orthopedics for many years and presided over various committees during that time. I also presented numerous educational topics of public interest to various citizens groups. I also developed, in concert with another orthopedist in Winter Haven, a program for joint reconstruction that became notable given its volume and outcomes.

7.      Since 2000 I have been a member of Montana Orthopedics, one of five orthopedists practicing in various areas of subspecialty including Trauma, Spine, Sports Medicine and Joint Reconstruction. Additional information regarding my background and experience is in my curriculum vitae, attached as Exhibit A hereto.

8.      I have reviewed the medical records and other information provided to me by counsel regarding Mr. Dennis Richard Harrison, DOB: 11/19/1952. The records include

2

Profile Form dated September 20, 2011, Mr. Harrison alleges that Vioxx, which he took from approximately April 2000 through September 2004 for pain relating to his ankylosing spondylitis and arthritis, was responsible for a femur fracture in 2003, failed spinal fusion in 2002, and wrist damage in 2002. Later in the same document he states that a different medicine, Fosamax, was actually responsible for the femur fracture in 2003, and that Vioxx was responsible for the "lack of healing" of that femur fracture. Based on my review of these materials, as well as my extensive training and experience in orthopedic surgery and review of relevant literature, I offer the following opinions:

9.      Mr. Dennis Harrison, now approximately 60 years old, has multiple comorbidities that pre-date his use of Vioxx. He has been managed for early onset, severe ankylosing spondylitis, osteoarthritis, osteoporosis/osteopenia (originally described in 1995/98 time frame), and other related conditions for the past 30+ years. Ankylosing spondylitis is a type of connective tissue disorder which manifests itself with primary involvement of the spine and major weight-bearing joints. It has a variable presentation among those affected. It is often associated with severe inflammatory episodes that can be disabling in nature. In most cases, inflammation caused by ankylosing spondylitis causes abnormal bone formation, leading to curvature and fusion of the spine. It can also cause severe inflammation in the hips, shoulders, jaw, and chest, as well as inflammation of the eyes. Some records suggest that Mr. Harrison had back and leg pain dating back to his teenage years. Mr. Harrison has been through multiple medical and surgical treatments for his various conditions.

10.      Significantly, at the relatively early age of 42, Mr. Harrison underwent bilateral total hip replacements in a staged fashion due to ankylosing spondylitis and advanced

3

1995. After progressive symptoms in his right hip, he then consulted Dr. Joseph Pizzurro in mid-1995 and elected to go forward with definitive hybrid total hip arthroplasty on the right side on August 9, 1995.  Hybrid hip arthroplasty means that the femoral component (that is the stem that fits into the marrow cavity of the proximal third of the femur) is immediately (within a matter of seconds) stabilized by methylmethacrylate cement.  It is an unusual circumstance for Mr. Harrison to request a specific method of total hip reconstruction, but given the experience he had on the left side, understandable.  This hybrid hip technique allowed immediate weightbearing and early participation in rehabilitative exercises.

11.      Significantly, Mr. Harrison required postoperative (left) and preoperative (right) radiation in connection with his hip arthroplasties, as ankylosing spondylitis is notorious for producing heterotopic (unwanted) bone formation. This condition may create tremendous stiffness in the immediate postoperative interval and potentially impede if not retard appropriate rehabilitative efforts.  Mr. Harrison apparently recovered largely uneventfully and required further visits with related specialties including rheumatology and spine surgery.  Notably, hip involvement with ankylosing spondylitis at young age often signals a more severe progression of the disease process.  Moreover, the severity of his disease is noted in radiological examinations of his neck in May 1995 that showed ankylosis (bony fusion of joints) of all of his cervical joints below C2. Stated differently, within the spectrum of severity, Mr. Harrison's disease was on the severe end of that spectrum.

12.      Mr. Harrison suffered also from severe inflammatory arthritis. This was apparent through his various office visits with complaints pertaining to numerous joints, including his back, neck, knees, shoulders, and wrists. These visits were often accompanied by

4

arthritis.

     13.    In addition, he was managed with the typical interventions for these types of disorders with non-steroidal anti-inflammatories (NSAIDs), steroid preparations such as prednisone (generally at a high dose on a consistent basis – sometimes self-adjusting his dose), and antimetabolites such as methotrexate, biologics such as Enbrel alone or in combination.

     14.    Mr. Harrison often required support with pain preparations such as Vicodin, Tylenol 4, and oxycontin. The severity of Mr. Harrison's various conditions were extensively detailed by him in his November 1998 "Disability Report" (for example, Mr. Harrison stated that "my neck is in constant, severe pain; my neck is immobile…stiff and sore 24 hours a day…constant pain, stiffness, & soreness – all day and night…"). (HarrisonD-SSD-00089-90)[1] Unfortunately, this is the nature of such severe disease process.

     15.    In March of 1999, Mr. Harrison continued to report severe right-sided neck pain that had been increasing over the preceding several months and was associated with daily headaches. At that time it was noted that in the mornings it took him "many hours to be able to move around." Further, at that time, Mr. Harrison was taking a steroid (prednisone), two prescription strength NSAIDs (etodolac and ibuprofen), and Tylenol #4. Shortly thereafter, in April 1999, Mr. Harrison consulted with Dr. Frank Rand, a spine surgeon, for progressive complaints regarding his neck. Dr. Rand noted that, over the preceding three years, Mr. Harrison demonstrated progressive and painful head/chest cervical spine deformities. He also suffered from headaches and numbness. Further, he was noted to have taken disability benefits fairly recently due to his ankylosing spondylitis. At the time, Mr. Harrison was on numerous

---

[1]    Specifically referenced medical records are compiled and attached at Exhibit B.

Vicodin, imipramine and Azulfidine. Mr. Harrison had not yet begun taking Vioxx at that time.

16.     Because of his spinal deformity and progressive cervical symptomatology, Mr. Harrison underwent an extensive cervical fusion from occiput to C6 on October 4, 1999. This was an extensive surgery with a large metal plate being placed at the back of the skull and extending down to the C6 vertebra. In other words, his skull has been mechanically fused to his cervical spine and results in extremely limited range of motion of the neck and head. Thereafter, Mr. Harrison was asymptomatic until the Fall of 2000 when he reported recurring numbness after an accident at a hardware store.

17.     In January of 2001, in an attempt to treat Mr. Harrison's progressive kyphosis (curvature of the upper spine resulting in a "hump-back deformity" often caused by ankylosing spondylitis) and to increase lordosis (inward or "swayback" curvature) of his lumbar spine, Mr. Harrison underwent an extensive surgery to his thoracic and lumbar spine (T8 to sacrum). In what was reported to be a 14-hour surgery, rods were inserted on both sides of the spinal column with accompanying screws and wires at almost each level of the spine. (HarrisonD-CapitalROGMR-00028-32) In a spinal fusion surgery such as this, the rods are intended to correct and maintain the deformity, and support the spine until the fusion matures. They are not, however, intended to function as an indefinite load sharing device. Remarkably, after the fusion surgeries, and in keeping with the severity of his disease, Mr. Harrison had only 7 of 24 vertebral segments (from C7 to T8) that were un-instrumented. Of note, a spinal surgery intending to instrument and fuse 9 vertebral segments is an uncommon, quite involved, and often accompanied by complications (again, due to the severity of the disease and the magnitude of the surgery).

6

of one or more of the 9 segments), but the other rod was intact and until recently he was reported to be "largely asymptomatic and fairly comfortable." (HarrisonD-CapitalROGMR-00073) Further, it was noted that he had been fairly active and able to drive his daughter to school, and thus the single broken rod did not appear to have greatly impacted his activities.

19.     For the remainder of 2001, Mr. Harrison noted his typical joint complaints consistent with his aggressive disease. In July 2001, Mr. Harrison noted some ongoing problems with his right wrist and on December 4, 2001, he received a steroid injection in his right wrist for ongoing pain and inflammation.

20.     Unfortunately, on February 10, 2002, Mr. Harrison was a back-seat passenger in a multiple car pileup on an icy road. In the Emergency Department, Mr. Harrison noted that he had chronic pain "everywhere," but that no areas were hurting more than usual. (HarrisonD-ConcordHMR-00004-05) On February 25, 2002, it was noted that Mr. Harrison had an increase in spine and wrist pain following his traffic accident. Later that year, in September 2002, Mr. Harrison visited Dr. Allan Carl where it was noted that Mr. Harrison had been doing okay until a motor vehicle accident in February of 2002. (HarrisonD-NHNeuroSpineInt-00027) Since that time, Mr. Harrison had a downward trend in his function that became quite severe by July of 2002. Dr. Carl noted that it appeared that both rods from his January 2001 surgery had failed and that Mr. Harrison was taking "very high, more than normal" doses of ibuprofen to help with his pain. Dr. Carl noted that Mr. Harrison was taking ibuprofen, indomethacin, Tylenol #4, oxycontin, prednisone and Vioxx *at the same time*. (HarrisonD-CapitalROGMR-00001-03)

21.     While contemplating a revision surgery for his lumbar spine, Mr. Harrison had another misfortune. On January 9, 2003, Mr. Harrison slipped on ice, fell directly on his hip, and

7

00006-07, 16)  He required definitive management for a periprosthetic (involving the femur bone supporting the prosthesis), markedly displaced, spiral, comminuted fracture (many fragments of bone separated from each other) of his right femur.[2]  The patient was also noted to have mild hyperglycemia (which can be indicative of his use of prednisone and has also been associated with ineffective bone healing).

22.     On January 10, 2003, he was treated medically and surgically with an appropriate internal fixation device (consisting generally of orthopedic plates, orthopedic screws, and cerclage wires) designed to reassemble and realign the fracture fragments surrounding the total hip arthroplasty.  (HarrisonD-BenedictineHMR-00017-18, 29-30)  This fixation mechanism is not designed or intended to be a load-sharing repair.  In other words, Mr. Harrison needed to adhere strictly to a non-weightbearing status, specifically including the use of crutches for mobilization, for a minimum of 8-10 weeks to allow the femur bone to heal.  Further, it appears that the surgeon who performed this procedure, Dr. Null, advised Mr. Harrison of the importance of these requirements in facilitating the repair of his femur.  In this respect, Mr. Harrison was made aware that this procedure required very different post-operative compliance than his 1995 hip athroplasties, which, by contrast, did permit almost immediate weightbearing.  It is worth noting that over my many years of experience I have encountered patients who have not

---

[2]     Although at one time Mr. Harrison attributed his January 2003 femur fracture to Vioxx, he apparently has recently claimed that Fosamax (and not Vioxx) caused the fracture. Regardless, it is my opinion that neither Vioxx, nor any other medication that Mr. Harrison was taking, contributed in any way to his femur fracture.  Although there have been instances where certain medications have been linked with the occurrence of so-called "atypical" femur fractures (see, e.g., Shane, et al., Atypical subtrochanteric and diaphyseal fractures, J Bone Miner Res. 2010; 25:2267-2294), Mr. Harrison's femur fracture was not "atypical" in nature – it was a periprosthetic, spiral, comminuted fracture of the femur due to falling on ice.  Such fractures are specifically excluded from the definition of "atypical" femur fractures (Shane 2010).

8

failure of the fixation device.

23.        On January 23, 2003, Mr. Harrison followed-up with Dr. Null (the surgeon who repaired his femur on January 10) and Dr. Null reported that, against his advice, Mr. Harrison was weight-bearing with his right leg even though he should have been non-weight-bearing. (HarrisonD-SSD-00038)  Although Dr. Null reported a "healing fracture" at that time, Dr. Null cautioned Mr. Harrison that continued weight-bearing may cause his surgery to fail due to increased stress on the repair site.  On February 20, 2003, Mr. Harrison again visited Dr. Null and physical examination showed that Mr. Harrison's right leg was swollen and deformed proximally.  (HarrisonD-SSD-00039)  Not only had Mr. Harrison not been using his crutches as explained by Dr. Null, Mr. Harrison reported to Dr. Null that approximately two and one-half weeks prior to the visit, Mr. Harrison "slipped and fell down the stairs" and had noticed swelling since that time.

24.        Radiographs taken on February 20 showed broken cerclage wires, an angulated proximal screw, and failure of the fixation with displacement of the fracture fragments. (HarrisonD-SSD-00039) In other words, because of his fall and weight-bearing activity, Mr. Harrison's femur status was essentially back to where it was shortly after his fall on the ice in January.  Dr. Null's impression at the time was: "1: Refracture of the right femur. 2. Failure of fixation, secondary to trauma."  I agree with Dr. Null that failure of the fixation was due to weight-bearing activities, trauma, and non-compliance.  There is nothing to suggest that this failure of fixation was due to inadequate bone healing.  Dr. Null further stated that Mr. Harrison might ultimately require a long-stem prosthesis.

9

repair. (HarrisonD-AlbanyMCMR-00001-02) Thus, unfortunately, Mr. Harrison's postoperative course was also marked by almost immediate failure of the repair complicated with an enterococcal infection, which did not relate in any way to adequacy of bone healing.

26.     As a result, Mr. Harrison then required reconstructive efforts including a two-stage hip reconstruction. First, on February 28, 2003, he underwent removal of the existing hip replacement and femur hardware with implantation of an intercurrent antibiotic-laden spacer. (HarrisonD-AlbanyMCMR-00001-02) After long-term IV antibiotic (vancomycin) treatment, his infection finally cleared and, after a preoperative course of radiation therapy, on June 27, 2003, Joseph Pizzurro M.D. performed a definitive total hip arthroplasty with a modular device often used in tumor surgery to replace the top-third of his femur. Not surprisingly, during that procedure, Dr. Pizzurro remarked about the poor quality of Mr. Harrison's femur bone due to his overall disease (ankylosing spondylitis), and the chronic use of prednisone which over time can severely and negatively impact the overall quality of bone. (HarrisonD-RidgewoodOrtMR-00031-33) Thereafter, in 2003, Mr. Harrison suffered additional bouts of systemic infection (sepsis) unrelated to his bone healing, but thankfully none of those infections further compromised his replacement hardware. This new device has apparently served him well since that time.

27.     In the years following, Mr. Harrison continued to be treated for his various conditions, including inflammatory arthritis of his joints, anemia, abdominal pain and anxiety. Mr. Harrison had experienced symptoms in his knees for many years, and in January of 2008, these knee problems increased. As a result, he received steroid injections in his knees in 2008 and 2009. By August of 2009, Mr. Harrison decided that he would pursue total knee

10

Harrison underwent bilateral total knee arthroplasties and, like after his 2003 fracture, was readmitted shortly thereafter with infection (MSSA), which appeared to be persistent into 2011, and for which he has been recommended lifetime antibiotic treatment. (HarrisonD-OrthpdcSprtsMdMR-00244-47) Thus, Mr. Harrison was at significant risk of infection after almost any procedure due to his chronic use of prednisone to treat his ankylosing spondylitis.

28.     As referenced above, the question has arisen as to whether the use of Vioxx, a specific Cox-2 inhibitor, may have interfered with the healing of Mr. Harrison's femur fracture in 2003. First, it is important to note that the use of NSAIDs (including Cox-2 selective inhibitors) before and after surgery is standard practice.  NSAIDs provide numerous benefits to patients receiving them, such as pain relief, diminished swelling, diminished reliance on narcotics, early participation in therapy, shortened hospital stays, and increased patient satisfaction, among others.  With respect to bone healing specifically, having researched the medical literature, it is apparent that few human studies have been conducted with NSAIDs (and selective Cox-2 inhibitors).  While there are anecdotal reports that these preparations (again, including all NSAIDs, traditional and Cox-2 selective alike) may interfere with either human bone growth or healing, controlled studies conducted in the rodent and rabbit models have reported mixed results with respect to their effects.  While animal models can help identify potential biologic mechanisms, human studies are necessary to provide reliable evidence of a clinically relevant effect.

29.     With respect to Vioxx specifically, there has been one controlled human study investigating its effects on spinal fusion.  In 2005, Reuben et al. (attached as Exhibit C hereto) reported a retrospective review of 434 patients taking Vioxx, Celebrex or ketorolac on the

11

following surgery), there was no difference in the incidence of non-union for Vioxx compared to no NSAID use (Reuben, et al., 2005, Table III). Of note, the authors found a significantly higher incidence of non-union in multiple level fusion versus single level fusion. As referenced above, this is not surprising given that it is well recognized that additional levels of spinal fusion increase the possibility of non-union of bone.

30.     Although a different marker than bone healing per se, Vioxx has been investigated regarding its affect on bone mineral density (BMD). In 2003, Murphy et al. reported in an abstract presented at EULAR on a prospective clinical study with Vioxx, ibuprofen and placebo on biomarkers of bone turnover. The authors reported that neither Vioxx or ibuprofen had a clinically significant effect on biochemical markers of bone turnover or BMD and no clinically significant effects on bone between treatments was observed (Murphy et al., 2003, Abstract, attached as Exhibit D hereto). Thus, while animal studies may suggest that all NSAIDs (not just Vioxx or selective Cox-2 inhibitors) may negatively affect bone healing, there is no reliable, controlled human data to suggest that Vioxx impairs bone healing or leads to decreases in bone mineral density levels.

31.     As a result, and considering the clinical circumstances and the relevant medical literature, it is my opinion that Vioxx played no role in either Mr. Harrison's 2003 femur fracture or the healing of that fracture. First, there is no evidence that Vioxx caused his femur fracture. His femur fracture was clearly the result of his unfortunate fall on the ice, landing directly on his right hip. Particularly in a patient with osteopenia/osteoporosis like Mr. Harrison, this is an extremely common clinical scenario.

12

fracture, it was effectively rendered moot due to the re-fracture, removal of fixation and prosthetic hardware, and two-staged reconstruction, which was ultimately successful. Given Mr. Harrison's non-compliance with weight-bearing restrictions, Mr. Harrison's fall down the stairs in February as reported by Dr. Null, and his complicating infection, Mr. Harrison was left with poor bone stock of his right femur and thus it is my opinion that the time frame of his healing and ultimate reconstruction was not unduly prolonged. A several-month process for ultimate healing is not unduly prolonged considering the above-referenced factors, particularly where the original fracture site was essentially re-fractured due to trauma. Moreover, a review of Mr. Harrison's contemporaneous medical records does not show that any of his treating physicians viewed his healing process as inexplicably prolonged.

33.     At the time of his fall in January 2003, Mr. Harrison presented in a very compromised fashion. Not only did he suffer from severe ankylosing spondylitis and chronic anemia reflective of his long-standing illness, but he also demonstrated compromised, poor bone quality with a combination of brittleness and osteopenia/osteoporosis. Moreover, preoperative and perioperative management with long-term steroid preparations and perioperative radiation likely also contributed to his compromised bone quality. Further, with respect to mechanical factors surrounding his fracture, the patient suffered a fracture very near the tip of his prosthesis suggesting that the transition zone between reinforced, *i.e.*, cemented prosthesis, versus uncemented, un-reinforced bone just distal to the prosthesis served as an important stressor that resulted in such a fracture. In essence, the transition between a cemented femur and brittle native femur serves a critical stress point and is a common location for a periprosthetic fracture. The amount of initial displacement in the femur was dramatic and well documented. Marked

13

blood supply.

34.     Moreover, during the immediate weeks following his surgery, it was noted that Mr. Harrison was weight-bearing (against express medical advice) and that he had a traumatic incident of falling down the stairs. Finally, Mr. Harrison suffered a persistent infection postoperatively that also affected his ability to heal and ultimately required the use of reconstructive efforts. Mr. Harrison's taking of prednisone and methotrexate, along with his anemia, increased his susceptibility to infection – a susceptibility that has ultimately plagued Mr. Harrison over a number of years.

35.     Thus, it is my opinion that Mr. Harrison's overall healing from his femur fracture was not unduly prolonged and the combination of medical and mechanical orthopedic issues outlined above provide ample reason for the several-month healing process. In my professional opinion, I see nothing in Mr. Harrison's records that indicates that Vioxx played a negative role in his course of healing.

36.     With respect to Mr. Harrison's claim that Vioxx caused his spinal surgery in January 2001 to fail, it is my opinion that Vioxx did not cause or contribute to the breaking of the rods inserted along his spinal column. There are many reasons why rods may fail after a surgery of this type: surgical technique, type of hardware used, longer spans (which Mr. Harrison had) are subject to more complications, poor bone quality, chronic disease states, use of certain chronic medications (such as steroids), trauma, etc. Indeed, in October 2002 when Mr. Harrison was contemplating a revision surgery, his consulting surgeon, Dr. Carl, mentioned that one of the risks to such operations is that the bone simply may not heal and the rods break as a result –

14

well-known risk and Mr. Harrison's clinical situation increased that risk.

37.     As a result, and because of the multitude of variables in a complex procedure such as the January 2001 surgery, it is my opinion that Mr. Harrison's chronic ankylosing spondylitis, chronic osteoporosis/osteopenia, and chronic prednisone use are the most likely contributing factors as to why his rod system ultimately failed. Further, it is notable that the second rod failed coincident to his motor vehicle accident in February 2002, but that he was doing "okay" until that accident. Even minor trauma with an underlying severe disease process may contribute to failure. Finally, with respect to symptomatology, in 2005 it is noted that subsequent to the motor vehicle accident in 2002, Mr. Harrison suffered from persistent pain in the right leg and lower back.

38.     With respect to Mr. Harrison's claim that he suffered a wrist injury ("fracturing and/or severely disfiguring") due to Vioxx, it is my opinion that his use of Vioxx had no effect on his progressive wrist symptomatology. First, his medical records do not document the occurrence of any acute fracture of Mr. Harrison's wrist. Rather, the records show that in July 2001, Mr. Harrison began to complain of swelling and limited motion in his right wrist, and his symptoms appeared chronic and progressive. Further, as referenced above, in December 2001, he received a steroid injection to try to improve his range of motion and decrease his symptomatology. Next, in 2005, well after stopping Vioxx, Mr. Harrison continued to note progressive symptoms in his right wrist such that his loss of motion was judged to be 70%. Finally, in August 2012, Mr. Harrison underwent surgery on his right hand for ruptured tendons. In short, Mr. Harrison's chronic symptoms and loss of range of motion with his right hand and wrist are consistent with his progressive, severe inflammatory arthritis. Unfortunately, this

15

Harrison's right wrist symptomatology. As a result, it is my opinion that Vioxx played no role in his chronic problems with his right wrist. In fact, based on human experience, Vioxx should have been beneficial to him in terms of its proven analgesic and anti-inflammatory properties.

39.     As an aside, I noted that Mr. Harrison seemed to believe that his medical problems must be due to some outside agent (such as Vioxx or Fosamax) because his brother suffers from the same disease (ankylosing spondylitis) and his brother's complications of the disease have not been as severe as his. However, it is well recognized that spondylitis does not follow the same course in everyone; even among family members. Thus, Mr. Harrison's brother's disease progression is actually not relevant to Mr. Harrison's disease severity or progression.

40.     Based on all of the items discussed above, it is again my opinion that: 1) Vioxx did not cause Mr. Harrison's femur fracture; 2) Mr. Harrison did not experience a delay in healing for his right femur fracture due to the use of Vioxx.

41.     The opinions above are provided to a reasonable degree of medical probability. Should further information become available to me, I reserve the right to supplement my opinions. I am compensated at an hourly rate of $450.00 per hour.

16

# NICHOLAS BLAVATSKY, M.D.

**DATE OF BIRTH:** March 3, 1955

**BUSINESS ADDRESS:** Montana Orthopedics
435 S. Crystal, Suite 400, Butte, Montana  59701

**BUSINESS TELEPHONE:** (406) 496-3400

**PRESENT POSITION:** Partner, Montana Orthopedics

**EDUCATION:** Orthopedic Surgical Residency, Maricopa Medical Center, Phoenix, Arizona
July 1982 – June 1986

General Surgical Internship, Southern Nevada Memorial Hospital, Las Vegas,
Nevada  July 1981 – June 1982

University of Nevada School of Medical Sciences, Reno Nevada - M.D. -
May 1981

Carroll College, Helena, Montana - B.A. Biology -  May 1977

United States Air Force Academy, Colorado Springs, Colorado - Major:  Biology,
Life Science - July 1973  - August 1975

**BOARDS:** Board Certified - July 8, 1988 -  American Academy of Orthopedic Surgeons
Board Recertified - January 1999
Board Recertified – January of 2009

**STATES LICENSURE:**
Florida    June   1986    No:  48414
Montana            2000    No:  8799

**PROFESSIONAL ORGANIZATIONS:** Member:  American Academy Orthopedic Surgery, American College of
Surgery, American Medical Association, Arizona State Medical Society,
Maricopa County Medical Society, Orange County Medical Society, Florida
Orthopedic Society, Montana Orthopedic Society, Montana Medical
Association.

**HONORS AND AWARDS:** Graduation from Undergraduate Program "With Honors"  Commandant's and
Superintendent's List at U.S. Air Force Academy.

**RESEARCH EXPERIENCE:** Extraction of photosensitive peptides from bean sprout preparations.

**CLINICAL RESEARCH AND PRESENTATIONS:** "Use of High Resolution C.T. Scanner in Delineating Acetabular Fractures"
(presented Western Orthopedic Association Annual meeting, May 1982).

Retrospective Study of Supracondylar Fractures in 100 Children Less Than 15
years of Age (presented to city wide Orthopedic Conference, September 1982).

Review of "Y" and "T" Intercondylar Fractures in Adults t Maricopa Medical
Center 1978 – 1983 (presented at Annual Autumn Symposium, 1983).

"The Twenty Year Experience With the Operative Management of Congenital Vertical Talus at Arizona Crippled Children's Hospital (presented at city-wide Grand Rounds, May 1984).

"The Normal and Variant Anatomy of the Spinal Circulation" (presented at the Annual Spring Symposium, May 1986).

"Rotator Cuff Injury and Repair" (presented at the Annual Spring Symposium, May 1986)

"Common Foot Problems in the Elderly" (presented for the Good Samaritan Society, Kissimmee, Florida October 1986).

"Arthritis, Natural History and Surgical Management" (presented at an open civic forum, Kissimmee, Florida October 1986).

Numerous community based talks on adult reconstructive topics, hip, knee, shoulder reconstruction, city wide presentations, 2000, 2003, 2005, 2006. Butte, MT.

**SPECIAL INTERESTS:**

Prevention and management of sports injuries. Foot and ankle problems. Trauma and joint reconstruction. Adult reconstruction upper and lower extremity joint replacement. Hand and ankle reconstruction. Sport reconstruction.

**MEETINGS ATTENDED:**

Disorders of the Spine, University of South Florida, College of Medicine, 1989, 1990, 1991, 1992, 1993.

Techniques in Spinal Fixation, Georgia Baptist Medical Center, September 12, 1992.

Reconstructive Surgery of the Hip and Knee, January 27-30, 1993, University of Colorado School of Medicine.

American Academy of Orthopedic Surgeons, Advance Concepts, Trauma of the Pelvis and Lower Extremities, November 23-26, 1991.

Florida Orthopedic Institute, Fractures of the Femur, May 12, 1990.

University of Utah, Arthroscopic Surgery, January 12-14, 1989.

University of Colorado, Sports Medicine Conference, March 17-24, 1990.

Cemented vs. Uncemented Revision Joint Replacement, St. Luke's Medical Center, November 24-27, 1985.

California Orthopedic and Sports Medicine Group, Meniscal Allograft Transplantation, September 15, 1993.

Masters Joint Revision course, Rosemont, IL, 2001

Stryker Advanced Product and Procedural Training – MIS Didactic and Clinical Workshop for the Navigated Hip Procedure (posterolateral Technique and Stryker Navigation Technology), Science Care Bioskills Facility – Phoenix, Arizona, April 7, 2005

2

Case 2:05-md-01657-EEF-DEK   Document 64859-5   Filed 10/10/13   Page 112 of 154

Upper Extremity Reconstructive course through Florida Orthopedic Institute, 1995, 1998, 2000.

San Diego Shoulder course, 2002.

Basic and Advanced Shoulder Arthroscopy, Learning Center Rosemount, IL, on four different occasions.

Annual Sports Medicine Conference, state wide attendance by primary care physicians, therapists and athletic trainers. Presentations pertaining to upper and lower extremity reconstructive topics, yearly 2000-2006.

Stryker Triathlon TS Product Skills Training, Science Care Bioskills – Denver, Colorado, July 17, 2008

Stryker Triathlon PKR Product Skills Training, Science Care Bioskills – Denver, Colorado, July 17, 2008

Stryker Hip Resurfacing Skills Training, Science Care Bioskills – Denver, Colorado, July 18, 2008

Have attended meetings each year in hand, foot and ankle joint reconstruction and trauma subjects representing 45-70 hours of CME.

3

**ADULT**

Number Holder
139045

NOV 10 1995
S S A DISTRICT OFFICE

## SECTION 1 — INFORMATION ABOUT THE DISABLED PERSON

**A. NAME** *(First, Middle Initial, Last)*

Dennis R. Harrison

**B. SOCIAL SECURITY NUMBER**

136 48 6634

**C. DAYTIME TELEPHONE NUMBER** *(If you have no number where you can be reached, give us a daytime number where we can leave a message for you.)*

978 741-1869    Your Number ☐    Message Number ☒    None ☐

Area Code    Number

**D.** Give the name of a friend or relative that we can contact (other than your doctors) **who knows about your illnesses, injuries or conditions** and can help you with your claim.

NAME  Robert B. Harrison    RELATIONSHIP  Father

ADDRESS  17 5th Street
*(Number, Street, Apt. No.( if any), P.O. Box, or Rural Route)*

Wayne , N.J. 07470    DAYTIME PHONE  973 696-0252
City    State    ZIP    Area Code    Phone Number

**E.** What is your height without shoes?   5' 3" ~~×~~    **F.** What is your weight without shoes?   155 pounds
feet    inches

✱ Height was 5'10¾", I have lost 7¾" of height!

**G.** Do you have a medical assistance card? (For example, Medicaid or Medi-Cal)  YES ☐  NO ☒
If "YES," show the number here:

**H.** Can you speak English?  YES ☒  NO ☐  If "NO," what languages can you speak? _____

If you **cannot speak English,** is there someone we may contact who speaks English and will give you messages? *(If this is the same person as in "D" above, show "SAME" here.)*

NAME _____    RELATIONSHIP _____

ADDRESS _____
*(Number, Street, Apt. No.( if any), P.O. Box, or Rural Route)*

City _____ State _____ ZIP _____    DAYTIME PHONE _____ Area Code _____ Phone Number _____

**I.** Can you read English?  YES ☒  NO ☐    **J.** Can you write more than your name in English?  YES ☒  NO ☐

FORM **SSA-3368-BK** (7/88)  DESTROY ALL PRIOR EDITIONS    PAGE 1

Disability Report - Adult - Form SSA-3368-BK

(A Form of Arthritis), osteoarthritis, osteoporosis — my body has very extensive Arthritis. I had 2 hips replaced, my neck is in constant, severe pain, my neck is immobile, my shoulders/arms do not lift up, I am very anemic & sleep & lose 24 hours a day. my knees often needed aspiration (lift is often hard to breathe

**B. How do your illnesses, injuries or conditions limit your ability to work?** Constant pain & stiffness & soreness — all day & nite but difficulty sleeping. I am tired almost all of the time, I have difficulty concentrating because of constant pain & drowsiness. I have almost fallen asleep driving to/from work at least 30-40 times & many times almost have gotten into a car accident. I am not competitive in my work. Anymore what once was a minor work item had gotten to be major & difficult chores taking much much longer & with poor quality. I can't get to work on time & have missed many many days & had sickness;

**C. Do your illnesses, injuries or conditions cause you pain?**   YES ☒   NO ☐
All of the day & night

**D. When did your illnesses, injuries or conditions first bother you?** Early 90's & has continually worsened & progressed.

| Month | Day | Year |
|-------|-----|------|
|       |     | early 1990's |

**E. When did you become unable to work because of your illnesses, injuries or conditions?**

| Month | Day | Year |
|-------|-----|------|
| 5     | 5   | 28   |

**F. Have you ever worked?**   YES ☒   NO ☐   *(If "NO," go to Section 4.)*

**G. Did you work at any time after the date your illnesses, injuries or conditions first bothered you?**   YES ☒   NO ☐

**H. If "YES," did your illnesses, injuries or conditions cause you to:** *(Check all that apply.)*

☒ work fewer hours? *(Explain below.)*
☒ change your job duties? *(Explain below.)*
☒ make any job-related changes such as your attendance, help needed, or employers? *(Explain below.)*

1. Fewer hours — I progressively got to work later & later As the pain & stiffness is at it's worse in the morning, & I often needed to leave work early & either at time went to

2. As I became increasingly ineffective, my job duties became less & less meaningful

3. During the last 6-9 months of work, I often needed to take sick day(s) & also vacation & personal days because of the diseases.

**I. Are you working now?**   YES ☐   NO ☒

If "NO," when did you stop working?

| Month | Day | Year |
|-------|-----|------|
| 5     | 5   | 28   |

**J. Why did you stop working?** Several key reasons including almost falling asleep driving to/from work at least 30 times; falling asleep at meetings with my eyes in my hands, very severe pain causing me to get to work very late & very often; A growing awareness of my increasing ineffectiveness & less & less ability to "cover it up", assignments

became late & of poor quality. & my ability to interact effectively at work degraded substantially, my supervisor's comments indicated their increasing concern about my work. PAGE 2

## OPERATIVE REPORT

**PREOPERATIVE DIAGNOSIS:**
Ankylosing spondylitis with lumbar flat back syndrome.

**POSTOPERATIVE DIAGNOSIS:**
Ankylosing spondylitis with lumbar flat back syndrome.

**PROCEDURE PERFORMED:**
Anterior spinal release and fusion at L3-4.

**SURGEON:**
Frank Rand, MD

**ASSISTANT:**
Sandro Larocca, MD

**ANESTHESIA:**
General endotracheal.

**INDICATIONS FOR PROCEDURE:**
The patient is a 48-year-old gentleman with ankylosing spondylitis status post previous occipital cervical fusion with decompression as well as bilateral hip replacement who presents now with relative lumbar flat back syndrome for an extension lumbar osteotomy.  He understands the risks and benefits and agrees to go ahead giving his permission.

**PROCEDURE:**
He is properly identified, brought to the operating room, placed in a comfortable supine position.  This done carefully given that he has an occiput to pelvis fusion already.  He was carefully propped up and his abdomen was prepped and draped in a sterile fashion.  He was given antibiotic prophylaxis.

A slightly oblique incision was made between the costal margin and the rectus over what was felt to be the L3-4 disc space. This incision was carried down through the skin into the subcutaneous tissue.  Dissection was carried down directly to the external oblique muscle which was divided in the direction of its fibers.  This was done carefully to expose the internal oblique with its fibers running in a 90 degree direction to the external oblique.  These likewise were split in the direction of their passage by dissecting a plane between the two muscles and then dividing the internal oblique muscle in the direction of its fibers, actually in 90 degrees to the direction of the wound.

This then revealed the transverse abdominis muscle.  Again, a plane developed between the muscles and they were split also.  A little bit of release of the insertion of the lateral rectus fascia had to be done and then with that there was an opening

HarrisonD-CapitalROGMR-    00028

OPERATIVE REPORT

placed there. Unfortunately, a left iliac crest bone graft had
been done before which left a fairly large gap and it was
difficult but I was able to sound from the posterosuperior iliac
spine pass this gap in the posterior table and then back into the
inner table area to place an interpelvic post on the left. It was
somewhat easier to do this on the right as there had been no
previous donor site there. These were actually to the length of
around 75 to 80 mm.  It seemed like given his small size and the
length required that the actual transverse linker rod would be
the best fit in the pelvis with a bend to have its tulip top
accept the axial rod.  So these were custom bent to fit within
the pelvis and be long enough and actually the bend made it so
that it was really not prominent at all at the posterosuperior
iliac spine.

With the spine dissected out and this fixation obtained, then
attention was directed at the L3-L4 level and a laminectomy was
done there. This was done actually by Dr. Norregaard of
neurosurgery (who was available for this portion of the procedure
and he will dictate a separate operative note).  Basically, a
pedicle-to-pedicle decompression was performed so that within an
extension maneuver, the L3 root would be out of harms' way.

As the laminectomy was completed, an interspinal spreader was
placed so that the lordosis would not increase gradually, it was
actually maintained in its pre-laminectomy state so that the
decompression could be done quite thoroughly and undercut
actually so that there would be no pinching of the nerve roots.
With this done and actually prior to the laminectomy,
transpedicular fixation was placed at L5, S1, L4 bilaterally
(L3 was initially probed but felt that fixation would be too
close proximity to the L4 fixation so this was abandoned); L2 and
L2 transpedicular screws were placed and hooks were placed on the
right side at T8, T9, T10, and T11, and on the left side at
T8 and T9 (these were over the transverse processes).  With
these fixation points done then, a laminectomy was done and a
corrective spinal maneuver was carried out to increase the lumbar
lordosis.  This really was fairly easy to do given the
laminectomy and to hold it in position an interspinal wire was
placed in the sense that the base of the spinous process, a right
angle clamp was used to go through the interspinous ligament and
a 16-gauge Luque wire was looped around the spinous process of L2
and the trailing edge of L4 as the laminectomy of L3-L4 removed a
good portion of it. A jet wire tightner was used to spin this
down and tighten it and actually held the osteotomy closed. This
allowed the contouring of the spinal rod to be much easier as the
corrective position and maneuver was done. Satisfactory
monitoring was obtained during this time and the rod could be
bent essentially to the in situ position, this was the correct
position. The left sided rod was contoured, bent, and put into
place incorporating the correction. Then the right sided rod was

## OPERATIVE REPORT

**PREOPERATIVE DIAGNOSIS:**
Ankylosing spondylitis and flat back syndrome.

**POSTOPERATIVE DIAGNOSIS:**
Ankylosing spondylitis and flat back syndrome.

**PROCEDURE PERFORMED:**
1.  Laminectomy at L3-L4 with bilateral foraminotomy.
2.  Posterior spinal instrumentation and fusion, T8 to the sacrum
with transpedicular screws and hooks with interpelvic fixation
length to the axial rod system.

**SURGEON:**
FRANK RAND, MD

**ASSISTANTS:**
THORKILD VAD NORREGAARD, MD
SANDRO LAROCCA, MD

**ANESTHESIA:**
General endotracheal.

**INDICATIONS FOR PROCEDURE:**
The patient is a 48-year-old gentleman who is status post an
anterior L3-L4 disk release and fusion who presents now for his
corrective procedure to realign his spine and increase lumbar
lordosis.

**PROCEDURE:**
The patient was actually transferred off of the Jackson table.
The chest support built up with blankets to support his
cervicothoracic kyphosis. He was then carefully rolled prone and
positioned on the Jackson table off the stretcher so that care
could be taken not to exert any undue pressure on his head-neck-
chest alignment. With the proper buildup on the chest support, it
seemed like he was comfortably resting then on his chest support
and his hips were comfortably in extension with supports there.
His other pressure points were carefully padded and it was
checked repeatedly through the surgery that he had about a head-
weight worth of pressure on his forehead on a foam pad on the
head support.

His back was scrubbed, prepped and draped in the sterile fashion.
He was maintained on antibiotic prophylaxis.

A midline incision was made from essentially the mid to upper
thoracic spine right down to the sacrum. This was dissected out
carefully. The bone was fairly soft and dissection was carried
out over both iliac crests so that interpelvic fixation could be

OPERATIVE REPORT

completion of the procedure, there were hooks placed at T8 bilaterally, T9 bilaterally; on the right side, T10-11 caudally directed. These were tighten against the screws placed at L1-2 so that there was no loosening there.  The screws were tighten up in the caudal fragment (essentially the lower lumbar spine at L4, L5, S1, and then the tulip grip of the lateral connector used to go down in between the pelvic tables) was bent and contoured to accept the axial rod at the end of the construct.  This completed then the instrumentation from T8 to the sacrum including interpelvic fixation. The left sided rod was first, the right sided rod was second.

The wound was irrigated with a pulsatile lavager and transverse linkers placed last. Quite a bit of bone graft was obtained from the laminectomy was placed in the posterolateral gutters at the level of the laminectomy , L3-L4 and the remainder of the posterior elements were roughen up some as there was a little bit of movement in the upper lumbar spine to create the rest of the arthrodesis through this area.

The patient had drains placed prior to closure both in the deep subfascial zone as well as in the superficial subcutaneous layer given that the interpelvic fixation came up through the fascia to get into the posterosuperior iliac spines and we will allow the deep hematoma to come up to the surface. The drains were sewn in.

The wound was again irrigated and then closed in layers with O Vicryl to the deep fascia, 2-O to the subcutaneous tissue, and a Monocryl closure in the skin.  Steri-Strips and dressings applied.

The patient tolerated the procedure well. The entirety of the procedure, anterior and posterior somewhere in the 14 hour range. The patient was awoken, remained intubated overnight, carefully transferred to the supine position and all pressure points carefully supported (his head and neck region particularly), and taken to the intensive care unit in satisfactory condition.

_____

FRANK RAND, MD

CC: THORKILD VAD NORREGAARD, MD
SANDRO LAROCCA, MD
DOCTOR'S BILLING INC
P.O. BOX 86, HINGHAM, MA 02043

OPERATIVE REPORT

into the retroperitoneal space underneath the transverse abdominis.   Direct blunt dissection was then carried over towards the spine and what was felt to be the L3-4 disc space was identified.

An x-ray actually confirmed this to be the L4-5 disc space so dissection was carried up bluntly more proximally and the L3-4 disc space was identified.  Bookwalter retractor was used to hold retraction as well as a Wylie retractor placed directly on the L3 4 disc space.  With this done, the disc was excised and the end plates were scraped free of end plate cartilage and allograft bone was placed in the disc space after the area was irrigated. Care was taken to nearly circumferentially release the annulus sharply at L3-4 so that this area would extend and open during the posterior portion of the procedure.

With this done, the wound was irrigated and closed reapproximating the muscle fibers, reattaching the lateral rectus fascia, and closing the fascia over the external oblique, 2-0 to the subcutaneous tissue and a subcuticular stitch of monocryl completed the procedure.  Patient tolerated the procedure well. Sponge and needle count was correct.

_____

FRANK RAND, MD

FR:EDiX13193     C: 02/06/01 12:32
D: 02/03/01 11:24 T: 010206 12:32 DOCUMENT: 200102030103622900

HarrisonD-CapitalROGMR-   00032

He comes back today on short notice. He called me the other day stating that he had some back pain and clicking that was new. When I saw him last time, there was evidence of a broken rod and at that time he seemed largely asymptomatic and fairly comfortable. He called the other day and was uncomfortable, without radiating pain, without bowel or bladder control issues and without any other signs. He has mild constitutional signs and has been just not feeling well.

Physical exam today shows nothing awry with his back that I can tell on gross exam. He moves pretty well. Interestingly, he states that he has been driving his daughter to school for the past three weeks and has therefore been really quite active; at about the six-week mark post-op he was fairly active already. This activity may feed into this situation.

In any case, he has been wearing his Jewett brace. He is concerned that there may have been a little loss of correction and whether he actually needs some more correction.

Review of x-rays taken today shows really no change. There is what looks like a broken rod on one side. The wire and the other rod are quite intact and the rod has not displaced any.

PLAN: At this point, I would follow him symptomatically. I think if he does not get better with some stabilization over time, he will be symptomatic and will then want to have a revision. If I did that, I would do it as a pedicle subtraction type osteotomy and try to get a little more correction, as well as reinstrument him. He understands that and will think it over.

Frank F. Rand, M.D.

FFR/bcg

HarrisonD-CapitalROGMR-    00073

**EMERGENCY ROOM VISIT**                                    Page 1

Harrison, Dennis                    Rm#:                      Hosp#: 53-04-89
DOB: 11/19/1952                     Pat. Type: E/R
Att. Phy: Russell S Kay, MD         Date: 02/10/2002          Act#:0204100183

**ATTENDING PHYSICIAN:** Roger Belson, M.D.

**CHIEF COMPLAINT:** Motor vehicle crash, back pain.

**HISTORY OF PRESENT ILLNESS:** The patient is a 49-year-old male who was involved in a motor vehicle crash. He was the back-seat passenger. It was a multiple car pileup on icy roads. He was restrained. He complains of pain in his right upper back.

**PAST MEDICAL HISTORY:** This is a gentleman whose past medical history is very significant in that he has enclosing spondylosis and spondylitis. He has had a lumbar fusion. He has rheumatoid arthritis. He has osteoporosis.

**DAILY MEDICATIONS:** Klonopin, Epogen, Oxycontin, Fosamax, methotrexate, imipramine and Tylenol #4.

He arrives fully immobilized in a mass casualty incident. His complaints only have to do with the right upper back. This is upper to mid thorax, just to the right of midline in the region of the scapula. He did not hit his head. He says he has chronic pain everywhere, but no other areas are hurting anymore than usual.

**PHYSICAL EXAMINATION:** Blood pressure is 152/78, pulse 90, respiratory rate 16. He is afebrile. Pulse oximetry is 98%. His pupils are equal. Face is symmetric. Tongue is midline. He has a significant kyphosis. There is no tenderness to the neck. The area of discomfort that he has is the region of the right scapula or just to the midline from that, but palpation in this area does not seem uncomfortable. His lung sounds are clear. His anterior chest is nontender. His abdomen is soft. The gentleman was able to ambulate up and down the halls without significant discomfort. He has strong peripheral pulses in both arms and ankles.

An x-ray of the chest is obtained. It shows a normal mediastinum, no pneumothorax and no incidental rib fracture. He has hardware in the lumbar area. There is no pneumothorax. It is my impression that this is a soft tissue injury. He was given two Tylenol #4 here. I am going to ask that he continue with his usual medications at home. He should expect several days of soreness, but after that, there should be some decrease in the area of discomfort. If this is not the case, he needs to return here or contact Dr. Belson.

**DIAGNOSIS:** Strained right upper back.

Document #658706
**ORIGINAL**

Harrison, Dennis                    Rm#:                        Hosp#: 53-04-89
DOB: 11/19/1952                     Pat. Type: E/R
Att. Phy: Russell S Kay, MD         Date: 02/10/2002             Act#:0204100183

Dictated and Authenticated by:
Russell S Kay, MD
D: 02/10/2002 9:44 P
T: 02/11/2002  5:26 P
omn
593420

cc:     Russell S Kay, MD

Document #: 658706
**ORIGINAL**

HarrisonD-ConcordHMR-    00005

Case 2:16-cv-03857-E-DLH Document 64659-3 Filed 10/10/13 Page 123 of 154

developed depression. In sum, he has been very comfortable with respect to his
arthritis although he does have some ongoing heel pain.

**EXAM:** On exam he has no significant swelling or tenderness in the DIP, PIP or MCP joints.
There is 1-2+ swelling but no pain with palpation or passive flexion and extension in
the right wrist. The left wrist reveals full ROM without pain. The elbows, shoulders,
hips, knees and ankles reveal no pain with passive motion. Effusions are present in both
knees. Midfoot and MTP joints are non-tender.

**IMPRESSION:**   1)  Inflammatory polyarthritis which has I think certainly from a clinical
standpoint improved substantially.
                  2)  Intercurrent depression.
                  3)  Chronic anemia secondary to #1.
                  4)  Osteoporosis.

**PLAN:** Continue Methotrexate 20 mg. a week, folic acid 2 mg. a day, Prednisone 20 mg. every
other day and his other meds as previously. Recheck in two months.
cc: Dr. Belson                                                      JMT/esw

2-25-02 R pt - c/o ↑ spine pain, wrist pain & recurrent pain in hand post
accident & 2wks ago - Ref to PCA. ? when surgeon had suggested for
spine surgery - cannot remember. L Lwy on L tenderness point. (or

SEPTEMBER 20, 2002

HARRISON, DENNIS
CHART #:
DOB:

This is a 49 year old male who used to work as a product manager
for AT & T who has a long history of musculoskeletal problems. He
has been diagnosed as having ankylosing spondylitis. He underwent
a cervical fusion for basilar invagination. He was having terrible
headaches. That helped. That was back in 1999. In 2001 he underwent
a massive surgical reconstruction for flat back secondary to the
ankylosing spondylitis and it looks like they did his surgery from
T8 down to the sacrum and did an osteotomy at the L3-4 level. He
had been doing okay until a motor vehicle accident that arose
February of this past year. Since that time he has had a down trend
of his function. February and March he had mild dysfunction. April
and May it became moderate. July to present it became quite severe.
He notes that the pain sometimes is in his lower mid back when he
lies down but a lot in his buttock region that creeps around to his
lower abdomen and anterior thigh region, more so on the left than
on the right. He has been told that his left total hip replacement
is okay. He has had no bowel or bladder accidents. X-rays had shown
a failed rod on one side in the past at about the 2-3 level and
most recently it looks like both rods have now failed. He has some
bladder urgency but no definitive bowel or bladder accidents. He
went to see a surgeon in Concord, New Hampshire who didn't feel
there was much to offer. He is now here because of the worsening of
his symptomatology. He has been taking very high, more than normal
doses of Ibuprofen to help diminish his pain. He is on Indocin. He
takes Procrit, Vioxx, Tylenol #4, Oxycontin, Klonopin, Folic Acid,
Imipramine, Methotrexate and Prednisone. He has anemia, nephrosis,
osteoporosis and rheumatoid disease. In looking at the notes from
the past, they did an anterior L3-4 osteotomy. They did that
through a mini lateral incision on the left side but I think they
did that to be able to get an adequate osteotomy done.

PE: He has a well healed posterior scar. He notes that he is
starting to tilt forward similar to what he had done before this
previous surgery but he lies down or when he pushes himself back,
he is able to tilt back.

ASSESSMENT:   Pseudarthrosis/failed instrumentation most likely
exacerbated by the motor vehicle accident.

HarrisonD-CapitalROGMR-     00001

HARRISON, DENNIS
PAGE TWO
SEPTEMBER 20, 2002

SUGGESTION & DISCUSSION: I explained to him that in the past somebody took a big wedge out of the back of his spine, put it in the front so that they could crank him back so he could look up. That had held okay but when the bone underneath doesn't want to heal, the metal eventually takes all the stresses. The metal is like a big super duper coat hanger. Eventually you could break it if you put enough stresses on it. One of the rods had already been broken which means that underneath that rod, there is an area that hasn't healed solidly with bone but it has fiber tissue. There is a reason why that happens. When you take bone and use bone graft, you take it from one place and put it somewhere else. The body destroys it; makes it into fiber tissue and then it is supposed to calcify and ossify it. At any point in time, it can stop what it is supposed to do and just sort of end up with sort of like a fibrous tissue. That might have been what was holding him all along and that rod until he got whacked. The rod shearing then made things unstable which is why he is tilting back and probably suffered some sort of a fracture there. Not only did he fracture through the rod but fractured through the bone as well. Interestingly enough, folks with ankylosing spondylitis are the ones who end up with catastrophic problems from accidents. What that means is that the bones of their spine don't have a whole lot of flexibility between them so an accident makes it more like a bamboo stick and they can break. So in reality, he is a real lucky camper that he had those rods in because they acted like a bit of an added support that held him.

On his examination today, I find a couple of unusual findings. It looks like his reflexes are more brisk than usual to both his upper and lower extremities. When I stroke the bottom of his left foot, his toes come out and fan while on the right side they don't which is also indicative of an abnormal reflex that means that there may have been or still could be some pressure on the spinal cord, not necessarily at that L2-3 region but more so somewhere else. So I think we have our work cut out for us. I do think we probably need to consider repairing where that crack arose. That would mean that we would need to take out some of the metal, span across it, open up the front and put something in that space like the guy had done at the level just below. We may even need to put some metal screws in there. What is not in our favor is that the guy has got thin bone, he has got osteoporosis, he has also got a problem with

HARRISON, DENNIS
PAGE THREE
SEPTEMBER 20, 2002

Prednisone usage because that makes the bones even weaker. I think we have got to deal with what we have to deal with. I do think we need somebody to help us direct his medical care. He is going to need surgery here more than likely to try to fix that area. I am a little concerned though to try to understand where all the rest of the findings are. I think I want to go ahead by doing MRI's of his neck, mid and low back and see if there is any obvious outside pressure that is poking on the spinal cord. They may not be. All this business could actually be from the original foramen magnum problem which is all the way up in the top of the brain and that might have been the precipitating event of all these abnormal reflexes to begin with. So I think we need to do a couple of things. We are going to need to MRI his brain, C-spine, T-spine and L-spine in anticipation for surgery. I want to do a bone scan. Even though his injury arose in February which was about seven months ago, we may be lucky enough to see some abnormal uptake at that L2-3 level. I would like somebody to see him from Rheumatology here. We may want him to be seen by a neurologist dependent upon what the MRI shows. I would like him to get in some sort of turtleshell. We will see about getting a new brace fabricated. I just want him to be protected because I do think that that is a weak link so if, indeed, he falls over the fence, gets tripped up, that may be an area that may cause damage. He also needs to understand though that at the upper most area where the surgery ends is also at risk as well. I am sure that they had told him that in the past. I am also going to send him over for some x-rays, standing AP and lateral scoli C-spine AP and lateral, supine lateral scoli in flexion and extension. I will see him back in just a moment with those x-rays.

Allen Carl, M.D., F.A.C.S.

AC/lg
cc:  Dr. Paul Donovan
     Dr. Cristello

# BENEDICTINE
## H O S P I T A L

### EMERGENCY DEPARTMENT REPORT

PATIENT NAME:
MEDICAL RECORD NUMBER:
ACCOUNT NUMBER:
DATE OF ADMISSION:
DATE OF DISCHARGE:
EMERGENCY PHYSICIAN:
FAMILY PHYSICIAN:
ROOM NUMBER:

HARRISON, DENNIS
33-69-63
000341944
01/09/03
/ /
RUSSELL FIRMAN, M.D.

HMR

**CHIEF COMPLAINT:**          Right hip pain.

**HISTORY OF PRESENT ILLNESS:**  The patient is a 50-year-old white male who presents to the emergency department with hip pain.  He fell on ice.  He landed directly onto his right hip.  He felt a snap.  He received 5 mg of morphine in the pre-hospital setting.  The patient said that he had bilateral hip replacements with one in the early 1990's, and the right hip was replaced in 1995 in New Jersey.  The patient has pain of a 9 out of 10 upon arrival.  There is no back pain or belly pain associated with this.  There is no chest pain or shortness of breath.  He did not have a syncopal episode.  No lightheadedness or dizziness.  He said he was just walking and slipped on ice when this occurred.  He is normally on OxyContin for pain in his neck as he has a cervical spine tumor.  He denies any neck pain currently.  No modifying factors.  It feels better when he is laying still.

**REVIEW OF SYSTEMS:**          At least eight other systems are reviewed and found to be negative in addition to those reviewed above.

**PAST MEDICAL HISTORY:**          Cervical spine tumor for which he is being cared for in Albany.  Hip replacements bilaterally.  Rods in the back.  Prostate disease.

**PAST FAMILY/SOCIAL HISTORY:**  No alcohol or tobacco use.

**CURRENT MEDICATIONS:**          Vioxx, Tylenol with codeine, Imipramine, Klonopin, prednisone, Fosamax, OxyContin, Procrit.

**ALLERGIES:**          Indocin.

15 MARY'S AVENUE   KINGSTON, NEW YORK   12401   914 338 . 2500   FAX  914 334 . 4737

ACCOUNT NUMBER:                00031341861
DATE OF ADMISSION:             01/09/03

PAGE 2

PHYSICAL EXAMINATION:          Vital signs as per the emergency
department record.  PERRLA.  EOMI.  No head trauma.  Spine nontender.
The back is nontender.  Lungs are clear and equal bilaterally.  Heart
has a regular rate and rhythm.  Abdomen is soft, benign, and
nontender.  The right proximal thigh is swollen with an obvious
hematoma present, and there is pain on any palpation of the right
greater trochanter and over the proximal femur.  The knee is
nontender.  Skin is warm and dry with no DVT.  Pulses are intact.
Capillary refill is less than two seconds.  The patient is well
hydrated and nontoxic appearing.  No depression.  No cellulitis.  No
lymphadenopathy.  Cranial nerves are intact.  Cerebellar exam is
negative.  There are good pulses to the right lower extremity which
are slightly shortened.  No compartment syndrome.

DIAGNOSTIC TESTING:            Electrolytes are normal except for a
glucose of 117, BUN of 26, $CO_2$ of 30, calcium of 8.3.  The hemoglobin
is 9.1.  White blood cell count is 12.8.  Platelet count 572,000.  X-
ray of the pelvis, right hip, and right femur showed there to be a
fracture starting at the mid shaft of the right stem replacement
running obliquely down below the stem through the femur.

DIAGNOSIS:                     1.    Acute right femur fracture.
                               2.    Mild hyperglycemia.

PLAN OF CARE:                  The patient was given 10 mg of morphine
IV, and I have consulted Dr. Null at 0950 and asked him to evaluate
the patient.  The patient requested treatment and services here at the
hospital and his definitive care here.  The patient's pain will be
reassessed.  He was re-examined several times to make sure that a
compartment syndrome does not develop or any expanding hematoma.
Condition at the time of consultation with Dr. Null is stable.


RF/ddi/eb
D:01/09/03
T:01/09/03
BY:0792                        _____
7A/14YFL/J:5687                RUSSELL FIRMAN, M.D.
XZ:#7805687.193

U:000792

HarrisonD-BenedictineHMR-    00007

# BENEDICTINE
## H O S P I T A L

### DISCHARGE SUMMARY

PATIENT NAME:                HARRISON, DENNIS
MEDICAL RECORD NUMBER:       33-69-63
ACCOUNT NUMBER:              000341944
DATE OF ADMISSION:           01/09/03
DATE OF DISCHARGE:           01/13/03
ATTENDING PHYSICIAN:         WILLIAM NULL, M.D.


ADMITTING DIAGNOSIS:         Fracture of right femur.

HISTORY OF PRESENT ILLNESS:   A 50-year-old white male with a history
of ankylosing spondylitis and bilateral total hip replacements, who
fell on the ice, on the day of admission, suffering a fracture to his
right femur below the hip prosthesis.  The patient was admitted for
definitive treatment.

PHYSICAL EXAMINATION:         On admission, the right leg was
significantly shortened and swollen, externally rotated.
Neurovascular status intact.

X-rays showing a spiral comminuted fracture at the base of the right
femur, right femoral prosthesis.

HOSPITAL COURSE:              On the day of admission, the patient
was seen by medicine and cleared medically for surgery.  He was taken
to the operating room on the following day where he had an open
reduction and internal fixation of the right femur with a plate,
screws and cerclage wires.  Postoperative course was essentially
unremarkable.  Maintained for 48 hours on prophylactic IV Ancef.  He
was started on physical therapy for transfers and ambulation on weight
bearing of the extremity.  He was discharged to home.  Follow up in
the office in 10 days for removal of his stitches.


WN/ddi/ci/zh
D:02/18/03
T:02/18/03
BY:0470
7D/15ZMK/J:1048             WILLIAM NULL, M.D.
XZ:#7931048.2I3

U:000470


MARY'S AVENUE   KINGSTON, NEW YORK   12401   914 338.2500   FAX: 914 354.4757

HarrisonD-BenedictineHMR-   00016

# BENEDICTINE
## H O S P I T A L

**HOSPITAL REGULATION: All positive & important findings shall be recorded.**

### PRE-OP HISTORY & PHYSICAL

PATIENT NAME:                    HARRISON, DENNIS
MEDICAL RECORD NUMBER:           33-69-63
ACCOUNT NUMBER:                  000341944
DATE OF ADMISSION:               01/09/03
ATTENDING PHYSICIAN:             WILLIAM NULL, M.D.

**ADMITTING DIAGNOSIS:**          Fractured right femur.

**CHIEF COMPLAINT:**              Pain, right leg.

**HISTORY OF PRESENT ILLNESS:**  This is a 50-year-old white male with a history of ankylosing spondylitis and bilateral hip replacements who slipped and fell on the ice on the day of admission suffering an injury to his right leg. He was seen in the Benedictine Hospital emergency room where x-rays revealed a displaced fracture of the right femur just below the right total hip prosthesis. The patient is now being admitted for definitive operative intervention.

**PAST MEDICAL HISTORY:**         Significant for ankylosing spondylitis and anemia.

**PAST SURGICAL HISTORY:**        Bilateral total hip replacements and spinal fusion both cervical and lumbar.

**MEDICATIONS:**                  Prednisone 20 mg q.o.d., Fosamax 70 mg q. week, Klonopin 2 mg p.o. h.s., Vioxx 25 mg p.o. b.i.d., imipramine 30 mg q.h.s., Celexa 20 mg q.d., OxyContin 40 mg t.i.d., Prinivil 10 mg q.d.

**ALLERGIES:**

**SOCIAL HISTORY:**               He lives with his wife. He does not drink or smoke.

**FAMILY HISTORY:**               Ankylosing spondylitis.

**REVIEW OF SYSTEMS:**            Confined primarily to right hip pain today.



**MARY'S AVENUE  KINGSTON, NEW YORK  12401  914 338.2500  FAX: 914 334.4737**

HarrisonD-BenedictineHMR-    00017

Case 2:05-md-01657-EEF-DEK   Doc 64639-3   Filed 10/10/13   Page 131 of 154

**PHYSICAL EXAMINATION:**         A well developed, well nourished white male in obvious distress. Head is normocephalic, atraumatic. Pupils equal, round, reactive to light and accommodation. Extraocular movements are intact. Throat is clear. Tongue is midline. Neck is rigid with minimal motion. HEART: S1 and S2 normal without murmurs. Lungs are clear bilaterally. Abdomen is soft and nontender. Bowel sounds are normoactive. Examination of the right leg shows significant swelling with shortening of the right leg in external rotation. There is crepitus and pain with range of motion. Neurovascular status intact right lower extremity.

X-rays, AP and lateral, of the right femur show a comminuted transverse fracture just below the tip of the prosthesis of the right femur.

**PLAN:**         Patient admitted for an ORIF of his right femur. He will require a plate with wires above and screws below. The procedure, complications, risks, and benefits were explained to the patient. Dr. Donahue will see the patient in medical consultation. May consider preoperative transfusion for the anemia.

WN/ddi/ei
D:01/10/03
T:01/10/03
BY:0470
JE/14XLS/J:5841
AZ:#7995841.1A3                    WILLIAM NULL, M.D.

U:000470

HarrisonD-BenedictineHMR-    00018

# BENEDICTINE
## H O S P I T A L

**OPERATIVE NOTE**

PATIENT NAME:
MEDICAL RECORD NUMBER:
ACCOUNT NUMBER:
DATE OF OPERATION:
SURGEON:
ASSISTANT:

HARRISON, DENNIS
33-69-63
000341944
01/10/03
WILLIAM NULL, M.D.

PREOPERATIVE DIAGNOSIS:          Fracture of right femur.

POSTOPERATIVE DIAGNOSIS:         Fracture of right femur.

OPERATION PERFORMED:             Internal fixation, right femur.

DESCRIPTION:                     The patient was taken to the operating
room and after adequate spinal anesthesia, the patient was positioned
in the lateral decubitus position with the right hip up.  The patient
was secured with the hip hugger, and the right hip and thigh were then
prepped and draped in a sterile fashion using alcohol and Betadine.  A
skin incision was made beginning at the distal aspect of the total hip
incision that was previously present from the greater trochanter
three-quarters of the way down the thigh.  The incision was carried
down through subcutaneous tissue.  Hemostasis was achieved with
electrocautery.  The fascia of the iliotibial band was exposed.  This
was then incised the length of the incision, exposing the fascia of
the vastus lateralis.  The vastus lateralis and its muscle fibers were
then lifted off the posterior interosseous membrane.  Perforating
vessels were identified and either coagulated by electrocautery or
ligated and tied with 0 Vicryl ties.  The dissection was continued
along the posterior interosseous membrane until the femur was
encountered. The fracture was exposed.  There was a butterfly fragment
laterally and posteriorly, and there was complete displacement of the
fracture as previously noted.  Using blunt and sharp dissection, the
muscle fibers were split off the femoral shaft at the left of the
fracture to expose the entire fracture and using irrigation and
debridement and using a curet, the hip was then reduced.  Traction was
applied using bone-holding clamps to reduce the fracture.  The
fracture was at the very tip of the total hip prosthesis, and the
cement was still intact, including the bone cement plug in the distal
fragment.  Traction was applied on the thigh until the tip of the
prosthesis could absolutely be fitting into the distal fragment,
locking with the fracture in place and then held with a bone-holding

S MARY'S AVENUE   KINGSTON, NEW YORK   12401   914 338 . 2500   FAX   914 334 . 4737

HarrisonD-BenedictineHMR-       00029

clamp. The butterfly fragment was then reduced and held with a bone-holding clamp. The C arm was brought into position, which confirmed anatomic reduction of the fracture. A nine-hole plate was then bent to conform to the lateral aspect of the femur, bringing it up along the lateral border of the greater trochanter. The plate was secured to the fracture. The distal three holes were drilled with the 3.2-mm drill tapped with a 4.5 tap and 4.5 cortical screws placed. The remaining holes, because they were over the prosthesis and the fracture, were secured using cerclage wires. The wires were passed with a wire passer. A 2-mm wire was passed through it. It was passed and tightened with the tightener, and then the excess wire was removed with the clamp. This was performed at the remaining seven slots. At the most proximal slot, one wire was passed beneath the lesser trochanter. A second wire was attempted to be passed proximal to this and was unable to be passed; the space was too tight and there was nowhere to pass that wire without risking injury to the neurovascular structures. Therefore, that wire was left off, and one cortical screw was placed proximally by drilling with a 3.2 drill, tapping with a 3.5 tap, and a 3.5 cortical screw placed. AP views with the C arm confirmed anatomic reduction of the fracture and correct position of the screws, wires, and plate. A bone graft was then placed around the fracture site both medially and laterally. The wound was copiously irrigated with triple antibiotic solution, and the vastus lateralis fascia was now tapped posterior to the interosseous space. The iliotibial band was then closed with figure-of-eight sutures of 0 Vicryl suture. The subcutaneous tissue was closed with simple sutures of 0 Vicryl suture. The skin was closed with staples. Xeroform gauze, Kerlix, sponge, and ABD was used as dressing. The patient went to the recovery room in satisfactory condition. There were no complications. Blood loss was approximately 1000 cc.


WN/ddi/ci/rq
D:01/10/03
T:01/11/03                    WILLIAM NULL, M.D.
BY:0470
70/150FT/J:5885
XZ:#7925885.1A3

U:000470

HARRISON, DENNIS
DOB:   11/19/1952

WLN.
01/23/2003
SUBJECTIVE:  The patient returns for re-evaluation.  He is a
50-year-old white male who I saw at the Benedictine Hospital
emergency room on January 9, 2003, with a fractured right femur
below a right total hip replacement.  He was admitted and treated
with open reduction and internal fixation with screws and wires.
He comes for removal of the stitches, as well as evaluation of a
popping sound that he has been having.  Upon discussion, he has
been weightbearing on this leg, when is supposed to be
nonweightbearing.

OBJECTIVE:  Examination shows that, as he walks, he does put about
30-40% of the weight on that leg.  The wound is healing nicely.
The stitches are removed and Steri-Strips are applied.  He has good
range of motion; no abnormalities are noted.  His neurovascular
status is intact in the right lower extremity.

RADIOGRAPHS:  Taken today, AP and lateral of the right femur, show
the fracture has anatomic alignment, with excellent position and
alignment of the cerclage wires, thigh plate, and screws.

IMPRESSION:  Healing fracture, right femur.

PLAN:  My biggest concern is the weightbearing.  I told him that he
really needs to be off the leg more; otherwise, this is going to
fail.  He will be rechecked in 4 weeks with new x-rays.  He will
call me if there are any problems.


WILLIAM L. NULL, M. D. [002510]

DICTATED BY:  NULL, WILLIAM L., M. D. [002510]
2516/019911/10056/10015
DD: 01/24/2003    DT: 01/26/2003 22:18

cc:  Dr. Paul Donovan, Grand Street Medical Associates, 27 Grand
      Street, Kingston, NY 12401, FAX: 845-334-9894

Harrison, Dennis
DOB:

WLN
DOS: 2/20/03

**PROBLEM:** Right leg.

**HISTORY OF PRESENT ILLNESS:** The patient returns. He is now 5 weeks since his internal fixation of the right femur. Upon discussion with the patient, 2 or 3 things have occurred since I saw him last.
1. He has not been using crutches, as I told him. He has been putting the crutch on the right side and trying to not weightbear that way.
2. He also told me that 2-1/2 weeks ago he ran quickly to the door, because he thought his wife was having some trouble outside, and slipped and fell down the stairs. Since that time, he has noted swelling on the lateral aspect of his leg. He failed to call and notify us and he comes here for evaluation.

**PHYSICAL EXAMINATION:** Today, the right leg is obviously swollen and deformed, proximally. Amazingly, he does not have a lot of discomfort. Neurovascular status is intact in the right lower extremity.

**RADIOGRAPHS:** Were repeated today. AP and lateral views of the femur show that the patient has torn 2 of the 3 cerclage wires, and the 1 proximal screw is angulated about 20 degrees.

**IMPRESSION:**
1. Refracture of the right femur.
2. Failure of fixation, secondary to trauma.

**PLAN:** At this time, I had a long discussion with the patient. My concerns are that this may continue to fail without proper fixation and the patient is unable to remain nonweightbearing. His best choice may be to have a long stem prosthesis placed, but that would certainly require extensive surgery, since the cement mantle below the tip of the prosthesis is about 6-7 inches long. I discussed this case with Dr. Mark Fuchs. He will see the patient in Albany next week. The patient will remain on bed rest at home with minimal ambulation, strict nonweightbearing, until he sees Dr. Fuchs and we make a decision on what the best treatment options would be from this point forward.

William L. Null, M.D.

WLN/ti/Harrison.Darris.2510.098870
DD: 02/22/2003  DT: 2/23/03

cc  Paul Donovan, M.D.
     Grand Street Medical Associates

HarrisonD-SSD-      00039

## TRANSFER DISCHARGE SUMMARY

**NAME:** HARRISON, DENNIS

**MED. REC#:** 1879639

**ATTENDING MD:** PAUL HOSPODAR, M.D.
**DATE OF BIRTH:** 11/19/1952

**ADMISSION DATE:** 02/25/2003
**DISCHARGE DATE:** 03/05/2003

**ADMISSION DIAGNOSIS:** Right periprosthetic femur fracture.

**DISCHARGE DIAGNOSIS:** Status post removal of hardware, antibiotic spacer placement, as well as cerclage vying _____ of right prosthetic femur fracture.

**HISTORY OF PRESENT ILLNESS:** The patient is a 50-year-old gentleman with a long history of ankylosing spondylitis with multiple orthopedic surgeries. The patient previously had three procedures in his right hip region. He has also had bilateral total hip arthroplasties as well. He had some spine surgery.

**PAST MEDICAL HISTORY:** Significant for ankylosing spondylitis as well as osteoporosis and osteoarthritis and anemia.

**PAST SURGICAL HISTORY:** Bilateral total hip arthroplasties in 1995, cervical fusion in 1999, lumbar fusion in 2000, open reduction internal fixation of the right femur two months ago.

**MEDICATIONS:** Include:
1. Vioxx.
2. Oxycontin.
3. Klonopin.
4. Imipramine.
5. Celexa.

**ALLERGIES:** Indocin.

**PHYSICAL EXAMINATION:** At time of admission is documented in his chart. HEENT: Left eye with some slight ptosis. HEART: Regular rate and rhythm. S1, S2. CHEST: Clear to auscultation bilaterally. ABDOMEN: Positive bowel sounds. Soft, nontender, nondistended. EXTREMITIES: Pain with range of motion of his right fib deformity and the right hip as well. Sensation was intact throughout upper as well as lower extremities and there is no pain with any range of motion of any other joints other than his right hip.

**HOSPITAL COURSE:** The patient was admitted to the Orthopedic Surgery Service. He was seen by the Nutrition Service in order to optimize his nutrition. He was taken to the Operating Room on 2/28/03 and underwent removal of hardware and open reduction internal fixation and placement of antibiotic spacer. The patient tolerated the procedure well without any complications at all. At the time of surgery there was noticed to be some grossly purulent fluid near the site of his fracture and there was some loose femoral components as well noted. The patient therefore underwent removal of hardware as well as I&D and the patient had the placement of an antibiotic spacer. He was seen by Dr. Ellis Tobin's Infectious Diseases Service and was started on Ancef awaiting full culture data. The culture showed good enterococcus as

well as enterococcus fecalis and so the patient was started on some vancomycin. He also had a chest CT done to rule out any sort of metastatic lesions at all. That was normal as well as a bone scan that was done which showed simply some lesions which were probably old healing rib fractures. The patient had a PICC line placed and he was started on vancomycin with his trough level to be checked weekly. The level will be maintained between 10 and 15 and the patient will receive 6 weeks of IV vancomycin.

**DISCHARGE MEDICATIONS:** The patient will be continuing on these medications at the time of discharge:
1. Oxycontin 40 mg p.o. t.i.d.
2. Vancomycin 1 gm IV q.12h. with trough levels to be checked two times a week as well as previously noted.
3. Protonix 40 mg p.o. q.d.
4. PICC line flushes as per protocol with statin levels taken.
5. Lortab 1-2 tablets p.o. q.4-6h. p.r.n. with a maximum daily dose of Tylenol 4,000 mg from all sources.
6. Ortho bowel regime.
7. Coumadin to maintain an INR between 1.5 and 2.0 for deep vein thrombosis prophylaxis.
8. Celexa 20 mg p.o. q.d.
9. Imipramine 30 mg p.o. q.h.s.
10. Klonopin 2 mg p.o. b.i.d.
11. Vioxx 50 mg p.o. q.d.

**DISCHARGE INSTRUCTIONS:** The patient was doing well at the time of discharge. He had no complaints. His wound has remained clean, dry and intact and he will continue with some rehabilitation as well. The patient will continue to be nonweightbearing with posterior precautions to his right lower extremity.

**FOLLOW UP:** The patient will be followed by Dr. Hospodar of Capital Region Orthopedic Group at 489-2666 as well as Dr. Ellis Tobin's Infectious Disease Service as well.


PAUL HOSPODAR, M.D.                          Date:


SHENBAGAMURTHI/ds
D: 03/05/2003
T: 03/05/2003
Job #: 276734
Doc. #: 64208

cc:

SURGEON ASSISTANT: JAMES PEDICANO, M.D.
DATE OF SURGERY: JUNE 27, 2003
PATIENT: DENIS HARRISON
MR# M 493383
ROOM#6
COPIES TO: CHART AND DR. PIZZURRO

**TYPE OF OPERATION:** Removal of an antibiotic impregnated methyl methacrylate prosthetic spacer with revision right total hip arthroplasty with a 64 mm Trident two-piece cup With a Constrained liner, a Proximal Modula Replacement Stem with a HNR proximal body, 80 mm mid body, and a 13 mm X 127th millimeter stem with antibiotic impregnated methylmethacrylate, Standard [22 mm] head, Dall Miles cables.
**ANESTHETIST:** HENRY ZHOU, M.D.
**ANESTHESIA:** GENERAL ENDOTRACHEAL
**PRE- OPERATIVE DIAGNOSIS:** Status post removal of total hip prosthesis, fixation plate, screws, and methyl methacrylate for an infected periprosthetic fracture right femur.
**POST- OPOERATIVE DIAGNOSIS:** Status post removal of total hip prosthesis, fixation plate, screws, and methyl methacrylate for an infected periprosthetic fracture right femur.

**GROSS FINDINGS:**
This patient had a hybrid total hip arthroplasty in 1995 and sustained a periprosthetic fracture in February, 2003.  He underwent an open reduction and plate, screw, and cable fixation which became infected and was subsequently removed, debrided, with insertion of an antibiotic impregnated methylmethacrylate prosthetic spacer.  There was marked scarring of all tissues about the hip joint with a nonunited fracture of the shaft of the femur with poor quality bone.  The acetabular bone was reasonably good.  Cultures were taken prior to the administration of antibiotics and a gram stain was negative for organisms.  Due to the deformity of the fracture, but comminution of the fracture, and the quality of bone, it was decided to use a Proximal Modula Femoral Replacement stem.  Due to the patient's overall disease in the type of prosthesis used for the femur it was decided to use a Constrained liner.  Aside from scarring the many soft tissues were not remarkable.

**PROCEDURE:**
The patient was brought operating room number 6, which is a clean air room where laminar flow filters have been functioning for several hours. The operative team wore General endotracheal anesthesia was administered. When adequate level of anesthesia was obtained, a today catheter was inserted.  The patient was placed in the lateral position and was held in position by inserting the appropriate pegs in the appropriate holes.

The patient was draped in the usual manner, with sterile paper drapes.  After all appropriate draping had been completed, utilizing a previous long curvilinear scar a curvilinear incision was mapped out and made over the greater trochanter, extended down the femoral shaft approximately 10 cm and proximally 30 cm. The procedure was carried down by sharp dissection through the subcutaneous tissues to the fascia lata. The fascia lata was developed and divided along the femur and the posteriorly into the muscle fibers of the gluteus maximis.  The two layers were developed and a large self-retaining Charnley C retractor was inserted.

HarrisonD-RidgewoodOrtMR-    00031

anaerobic cultures were taken. Whatever capsule was left was removed with cutting cautery. The hip joint was dislocated. The soft tissues were cleared out of the proximal femur and the antibiotic prosthetic cement spacer was removed.

A capsulotomy incision was made on the superior and anterior capsule. A large anterior retractor was inserted. A capsulotomy was performed also inferiorly and posteriorly. A large inferior retractor was inserted with a pad behind it. The soft tissue around the acetabulum were cleared. With the use of an acetabular gourge and curettes the granulation tissue in the acetabulum was removed. The acetabulum was reamed to a 63 mm with concentric reamers at every 2mm.

A 63 mm and 64 mm acetabular expanders were then used. The 64 mm was left in place. The acetabular was irrigated. At this time, the femoral head was reamed into a cancellous paste.
The exspander was removed and the acetabulum was irrigated and impacted with cancellous paste from the acetabular moral reamings. The outer shell, of a 64 mm Trident 2 piece cup was the aligned and impacted. When this was completed the holder was removed. A central screw was inserted and a Constrained polyethylene Attention was placed to the femoral shaft. The surgical incision was extended distally. With the use of cautery the vastus lateralis was peeled off the lateral cortex of the femur and the distal end of the fracture was visualized. All soft tissues were removed about the entire femur in this area and retractors were inserted. With the use of an oscillating saw are an osteotomy was carried out at the distal ends of the femoral shaft fracture. The remaining proximal femur was osteotomized along its length from posteriorly to anteriorly and opened. All soft tissues were removed with the use of a Midas Rex.

Attention was then placed on the distal femur. The belly retractor was inserted. The The above-mentioned stem was configured and assembled on the back table. Two packages of methylmethacrylate containing Tobramycin was then fixed in a Stryker cement mixer end of The aqueous epinephrine soaked tail pads were removed from the canal. The canal was then filled with methyl methacylate using a Stryker cement gun and pressurizer and a Proximal Modula Femoral Replacement stem was inserted. Excess cement was curetted away. Various sized head and neck units were tried. It was decided to go with a Standard [22 mm] head. This head size gave us an excellent range of stable motion and the length as desired.

A Standard [22 mm] head was impacted on the Proximal Modular Femoral Replacement stem. It was tested and brought through an excellent range of motion. The patient's proximal femoral fragments with then wrapped around this femoral prosthesis and held in place with 3 2.0 mm Dali Miles cables. These were inserted in the usual fashion, tightened, crimped, and cut. The wound was then irrigated with copious amounts of saline.

After considering irrigation, the fascia lata was approximated with #1 Vicaryl interrupted sutures and then a running #1 Vicaryl. The deep subcutaneous tissues were closed in layers with running sutures of 0 PDS and interrupted sutures of 2-0 Monacryl. The skin edges were approximated with skin staples. The wound was dressed with Xeroform gauze, 4x8s, ABDs, sterile ace bandage.

This was a clean case. The patient had sequential compression devices to both lower

patient received Vancomycin 1.0 g at the intraoperative cultures.

**Condition of patient: see anesthesia recovery room notes.**

Joseph P. Pizzurro, M.D., F.A.C.S.
Date dictated-June 27, 2003
Date transcribed-June 27, 2003

BELLIN MEMORIAL CENTER
744 S. Webster Ave., PO Box 23400, Green Bay, WI  54305-3400

## HISTORY AND PHYSICAL EXAMINATION

NAME: HARRISON, DENNIS R
ADMITTING DOCTOR: STEVEN SCHECHINGER
DATE OF BIRTH: 11/19/1952
AGE: 58Y

ACCOUNT: V0011739664
RECORD: M000667836
ADMISSION DATE: 03/26/2011
ROOM NUMBER: 803 ORTHNEU

PRIMARY CARE PROVIDER: JAMES A BATTI MD

CHIEF COMPLAINT: Left knee.

HISTORY OF PRESENT ILLNESS: Mr. Harrison is a 58-year-old male who was transferred to Bellin Hospital from Dickinson with increased left knee pain and concern for infection. The patient has a past history significant for bilateral total knee arthroplasties performed by Dr. Grace in January 2010. Approximately 10 days following his surgery he presented with a deep infection to the knee requiring irrigation and debridement with polyethylene exchange. The patient was placed on a six-week course of IV antibiotics for Gram-positive *Staph aureus* which was sensitive. He was then placed on lifetime suppression per Dr. Davis with dicloxacillin. The patient does have an autoimmune disease with ankylosing spondylitis and takes both prednisone and Remicade for this and is at a high infection risk which was the reasoning for the lifetime suppression.

The patient reports over the last several weeks he has had gradually increasing pain in the left knee as well as increasing warmth and swelling. He has also noted over the last several days, fevers. This prompted him to present to the emergency room at Dickinson Hospital where he was admitted for sepsis. The patient did have blood cultures as well as a knee aspiration that was performed this morning with Gram-positive cocci noted on the gram stain. He was then placed on IV vancomycin and IV Zosyn. The patient states his knee pain has improved substantially after the aspiration as well as with the initiation of the IV antibiotics. He is currently denying any feelings of chills and states the knee pain has regressed substantially.

PAST MEDICAL HISTORY:
1. Ankylosing spondylitis.
2. Anemia secondary to autoimmune disease.
3. Hypertension.
4. Proteinopathy.

PAST SURGICAL HISTORY:
1. Bilateral total knee arthroplasty in January 2010 performed by Dr. Grace.
2. Bilateral total hip arthroplasty.
3. Lumbar spine fusion.

*THIS DOCUMENT NEEDS TO BE ELECTRONICALLY SIGNED*
HARRISON, DENNIS R                                                        Page 1 of 4
RECORD NUMBER M000667836                     HISTORY & PHYSICAL EXAMINATION
                                             ACCOUNT NUMBER V0011739664
                                             Dictating Provider Copy



HarrisonD-OrthpdcSprtsMdMR-        00244

4.  Cervical spine fusion.
5.  Tonsillectomy.
6.  The patient has a very significant anesthesia risk given his extremely difficult airway, and per his previous operative reports, was quite difficult to obtain an airway in even with endoscopic intubation techniques.

MEDICATIONS:
1.  Klonopin.
2.  Lisinopril.
3.  Prilosec.
4.  Tylenol.
5.  Prednisone 10 mg daily.
6.  Aspirin.
7.  Acidophilus.
8.  Vitamin C.
9.  Omega 3.
10. Calcium.
11. Vitamin D.
12. Dicloxacillin 500 mg p.o. t.i.d.
13. Zoloft.
14. Remicade.

ALLERGIES: Indocin, Naprosyn, and sulfa.

SOCIAL HISTORY: The patient denies tobacco or alcohol use. He is on disability. He lives in Iron Mountain.

FAMILY HISTORY: Reviewed and negative.

REVIEW OF SYSTEMS: A 10-system review was performed and negative aside from that of the history and past medical history.

IMAGING: AP of the chest as well as AP and lateral views of the left knee are currently pending per report from the outside hospital. Knee films are unremarkable.

EKG: Also pending.

LABORATORY STUDIES: UA is reviewed and unremarkable. CBC, CMP, CRP, ESR, PT/INR, type and screen are all currently pending from Bellin. Labs from the outside hospital are reviewed and demonstrate an ESR of 96 which has been chronically elevated for the past year as well as a CRP of 73 which has also been chronically elevated at approximately that same level for the past year. Other labs from the outside hospital demonstrate white count 11.5, hemoglobin 10.3, hematocrit 33.7, platelets 537, BUN 25, creatinine 0.8, total protein 8.2, albumin 4, sodium 138, potassium 4.4, chloride 100, calcium 9.3, ALT less than 6, AST 26, alkaline phosphatase 71. Knee aspirate results

*THIS DOCUMENT NEEDS TO BE ELECTRONICALLY SIGNED*

HARRISON, DENNIS R                                          Page 2 of 4

HISTORY & PHYSICAL EXAMINATION

RECORD M0006478J6                                    ACCOUNT V0011738664
                                                    Dictating Provider Copy



from outside hospital, Gram stain demonstrates many polys with a few Gram-positive cocci. Cell count of the fluid from the outside hospital demonstrates 270,000 white blood cells, 25,000 red blood cells, no crystals, with opaque purulent appearance.

PHYSICAL EXAM:

VITALS: The patient is currently afebrile with a temperature of 97.8.

MENTAL STATUS: He is alert and oriented x3. He is conversational, pleasant, no acute distress.

HEENT: His pupils are equal, round, and reactive. He has no evidence of cervical lymphadenopathy. Oronasal mucosa is within normal limits.

HEART: Regular rate, normal rhythm.

CHEST: Clear to auscultation bilaterally.

ABDOMEN: Soft, nontender, and nondistended.

NECK: He is unable to turn his neck from side-to-side, flex or extend it which has been long-standing for him given his ankylosing spondylitis and previous cervical spine fusion. He has no tenderness over the cervical, thoracic, or lumbar spine. His pelvis is stable.

NEUROLOGIC: He is fully intact in bilateral lower extremities without deficits noted.

ORTHOPEDIC: Focused orthopedic evaluation of the left lower extremity demonstrates a previous left total knee incision, well healed. There is no erythema, no redness over the knee. There is warmth to the touch which is increased compared to the contralateral knee. Palpation over the knee demonstrates some slight tenderness much improved from what the patient reports it was yesterday. Range of motion is from 0 to 90 degrees without pain which he states is his baseline motion. He has a +1 effusion about the knee. It is stable with varus and valgus stress and does not provide significant discomfort when examination is performed. He has CNS fully intact distally to the left foot and full motion of the left ankle and hip. I am able to fully range the right hip and knee without pain. There is no warmth or concern for infection involving the right knee or hip. The patient has full range of motion of bilateral upper extremities without pain or discomfort noted.

IMPRESSION: Mr. Harrison is a 58-year-old male with acute exacerbation of his left chronically infected total knee arthroplasty who has been on long-term suppressive dicloxacillin therapy.

PLAN: A lengthy discussion was held today with the patient regarding treatment options for his knee. Given his significant immunosuppression as well as the fact that he has been taking Remicade and chronic prednisone, he likely has an acute exacerbation of his chronic knee infection despite the oral dicloxacillin suppression therapy. Treatment option for him would be to attempt to resuppress the infection with a course of IV antibiotic therapy followed by resumption of an oral agent for long-term lifetime antibiotic suppression. The patient would like to proceed with this route. The alternative would be to present to the operating room for a two-stage

*THIS DOCUMENT NEEDS TO BE ELECTRONICALLY SIGNED*



HARRISON, DENNIS R                                                      Page 3 of 4

RECORD M009667836          HISTORY & PHYSICAL EXAMINATION

                                              ACCOUNT V0011739664
                                              Dictating Provider Copy

HarrisonD-OrthpdcSprtsMdMR~        00246

revision. However, given his immunosuppressed state as well as the long-term chronicity of this infection, his risk of failure of a two-stage revision is quite high which would likely leave him worse off than his current state.

The patient understands the risks of both treatment options, those risks including need for potential knee arthrodesis in the future or even potential of an above-knee amputation. He is agreeable to continuing with the suppressive IV antibiotic therapy. We will plan to keep him on vancomycin and Zosyn at this time. I did perform a repeat aspiration of the patient's left knee to remove any additional fluid which was present using a sterile technique. Approximately 30 cc of purulent-appearing fluid was aspirated from the left knee. This fluid was then sent for aerobic and anaerobic cultures as well as cell count and Gram stain.

The patient will be allowed to resume a regular diet. The hospitalist admitting physician Dr. Lee will manage his other medical comorbidities as well as make a decision whether to discontinue or taper his prednisone therapy to help fight the infection. We will also discontinue his Remicade infusions which he has been receiving previously and he will followup with his rheumatologist for alternative treatment options.

Dr. Davis, the infectious disease specialist, will be available on Monday March 28, and at that point will discuss with him placement of a PICC line, duration of IV antibiotic therapy, and recommendations for an oral agent. We will obtain the final culture results from Dickinson Hospital as well as await our own culture results from the aspiration performed today. In addition to this we will also obtain a blood culture, CRP, ESR, CBC, CMP, and PT/INR, as well as a type and screen, UA, chest x-ray, and EKG. This plan was discussed at length with Dr. Grace who agrees with this plan and will assume management of the patient on Monday.

STEVEN J SCHECHINGER, MD

SJS:dkb
Doc# 1378553   VoiceID# 1418843
D. 03/26/2011 15:03:40   T. 03/26/2011 19:53:23
cc: STEVEN J SCHECHINGER, MD, <Dictator>
JAMES A BATTI MD, Primary Care Physician



THIS DOCUMENT NEEDS TO BE ELECTRONICALLY SIGNED
HARRISON, DENNIS R                                           Page 4 of 4
HISTORY & PHYSICAL EXAMINATION
RECORD M000667836                                       ACCOUNT V0011738564
                                                        Dictating Provider Copy

HarrisonD-OrthpdcSprtsMdMR-         00247

# High dose nonsteroidal anti-inflammatory drugs compromise spinal fusion

## [De fortes doses d'anti-inflammatoires non stéroïdiens compromettent l'arthrodèse vertébrale]

Scott S. Reuben MD,* David Ablett FRCP,† Rachel Kaye‡

**Purpose:** Although nonsteroidal anti-inflammatory drugs (NSAIDs) provide benefit to patients following spinal fusion surgery, their routine administration has remained controversial due to concerns about possible deleterious effects on bone healing. The goal of this retrospective study was to assess the incidence of non-union following the perioperative administration of ketorolac, celecoxib, or rofecoxib.

**Methods:** We retrospectively analyzed the data of 434 patients receiving perioperative ketorolac (20–240 mg·day$^{-1}$), celecoxib (200–600 mg·day$^{-1}$), rofecoxib (50 mg·day$^{-1}$), or no NSAIDs in the five days following spinal fusion surgery.

**Results:** There were no significant differences in the incidence of non-union among the groups that received no NSAIDs (11/130; 8.5%), celecoxib 5/60; 8.3%), or rofecoxib (9/124; 7.3%). In contrast, 23/120 of patients (19.2%) that received ketorolac had a higher incidence ($P < 0.001$) of non-union compared to non-NSAID users. However, only 3/50 patients (6%) receiving low-dose ketorolac ($\leq 110$ mg·day$^{-1}$) resulted in non-union which was not significantly different from non-NSAID users. Patients administered higher doses of ketorolac (120–240 mg·day$^{-1}$) resulted in a higher incidence ($P < 0.0001$) of non-union (20/70; 29%) compared to non-NSAID users. For those patients developing non-union, there was a higher incidence comparing smokers vs non-smokers ($P < 0.0001$) and one level fusion vs two level fusions ($P < 0.001$).

**Conclusions:** This study revealed that the short-term perioperative administration of celecoxib, rofecoxib, or low-dose ketorolac ($\leq 110$ mg·day$^{-1}$) had no significant deleterious effect on non-union. In contrast, higher doses of ketorolac (120–240 mg·day$^{-1}$), history of smoking, and two level vertebral fusions resulted in a significant increase in the incidence of non-union following spinal fusion surgery.

*Objectif :* Les anti-inflammatoires non stéroïdiens (AINS) sont bénéfiques après une arthrodèse vertébrale, mais leur administration régulière demeure controversée à cause des effets nuisibles possibles sur la cicatrisation de l'os. Notre étude rétrospective voulait évaluer l'incidence d'absence de fusion à la suite de l'administration périopératoire de kétorolac, célécoxib ou rofécoxib.

*Méthode :* Nous avons procédé à l'analyse rétrospective de données sur 434 patients qui ont reçu du kétorolac (20–240 mg·jour$^{-1}$), du célécoxib (200–600 mg·jour$^{-1}$), du rofécoxib (50 mg·jour$^{-1}$) ou aucun AINS dans les cinq jours suivant une arthrodèse vertébrale.

*Résultats :* L'incidence d'absence de fusion osseuse n'était pas significativement différente entre les patients sans AINS (11/130 ; 8,5 %) et ceux qui ont eu du célécoxib 5/60 ; 8,3 %) ou du rofécoxib (9/124 ; 7,3 %). Par ailleurs, 23/120 des patients (19,2 %) qui ont reçu le kétorolac ont présenté une incidence plus élevée ($P < 0,001$) d'absence de fusion en comparaison de ceux qui ont pris des AINS. Seulement 3/50 patients (6 %) recevant de faibles doses de kétorolac ($\leq 110$ mg·jour$^{-1}$) ont présenté une absence de fusion, ce qui n'est pas significativement différent des non-utilisateurs d'AINS. Des doses plus élevées de kétorolac (120–240 mg·jour$^{-1}$), comparées aux non-AINS, ont provoqué une plus haute incidence ($P < 0,0001$) d'absence de fusion (20/70 ; 29 %). L'incidence d'absence de fusion était plus élevée si on compare les fumeurs vs les non-fumeurs ($P < 0,0001$) et la fusion à un niveau vs à deux niveaux ($P < 0,001$).

*Conclusion :* L'étude a révélé que l'administration périopératoire à court terme de célécoxib, de rofécoxib ou de faibles doses de kétorolac ($\leq 110$ mg·jour$^{-1}$) n'a pas d'effet nuisible significatif sur l'absence de fusion. Par contre, des doses plus élevées de kétorolac (120–240 mg·jour$^{-1}$), le tabagisme et les fusions vertébrales à deux niveaux augmentent significativement l'incidence d'absence de fusion à la suite d'une arthrodèse vertébrale.

From the Acute Pain Service,* Baystate Medical Center and the Tufts University School of Medicine, Springfield, Massachusetts, USA; the Department of Anesthesiology,† Calgary Health Region, Calgary, Alberta, Canada; and the Brandeis University,‡ Waltham, Massachusetts, USA.

*Address correspondence to:* Dr. Scott S. Reuben, Baystate Medical Center, 759 Chestnut Street, Springfield, MA 01199, USA. Phone: 413-794-4325; Fax: 413-794-5349; E-mail: scott.reuben@bhs.org

Presented in part at the American Society of Regional Anesthesia and Pain Medicine Meeting, Vancouver, British Columbia, Canada, May 2002.

Support was provided solely from institutional and/or departmental source.

*Accepted for publication November 3, 2004.*

*Revision accepted February 14, 2005.*

drugs (NSAIDs) inhibit the synthesis of prostaglandins both in the spinal cord and at the periphery, thus diminishing the hyperalgesic state after surgical trauma.[1] NSAIDs are useful as the sole analgesic after minor surgical procedures[2] and may have a significant opioid-sparing effect after major surgery.[3] It is currently recommended that NSAIDs be used in the multimodal analgesic approach for the management of perioperative pain.[4,5] The recent practice guidelines for acute pain management in the perioperative setting state "unless contraindicated, all patients should receive around-the-clock regimen of NSAIDs, coxibs, or acetaminophen".[5] Proposed and documented benefits of multimodal therapy include improved pain relief, reduction of the perioperative stress response, reduced opioid-related side effects, shorter hospital stays, decreased hospital costs, increased patient satisfaction, and a reduction in postoperative morbidity and mortality.[6,7] NSAID administration to patients undergoing spinal fusion surgery has demonstrated significant benefits including improved analgesia (decreased opioid use and pain scores), improvement in postoperative ambulation, shorter hospitalization, and a decreased incidence of nausea, vomiting, and sedation.[8-13] A cost-benefit analysis revealed a net savings to the institution of over $211,000 per year or over $350 per patient in those patients receiving NSAIDs for lumbar spine surgery.[12] In addition to these short-term analgesic benefits, a reduction in acute pain provided by perioperative NSAID administration may also reduce long-term morbidity following spinal fusion surgery. It is currently believed that there is a continuum of pain after surgery ranging from acute to chronic, and effective treatment of acute pain, may prevent the development of chronic pain syndromes.[14,15] Further, cyclooxygenase (COX)-2 is thought to play an integral role in the processes of peripheral and central sensitization, and the early intervention with COX-2 inhibitors may thwart the progression of acute pain to chronic pain.[16]

The routine use of COX-2 inhibitors for spinal fusion surgery has remained controversial due to concerns about possible deleterious effects on bone healing. Many investigators recommend that NSAIDs should not be utilized in the multimodal management of acute pain for patients undergoing spinal fusion surgery.[17-20] Although the data are conflicting, a large body of literature derived from laboratory animal studies suggests that NSAIDs either delay or inhibit bone healing.[17-19] It is difficult to extrapolate data from animal studies to humans due to the differences in pharmacokinetics between species. Further, in the

tration occurred over several weeks to months at doses greater than that approved for acute pain and NSAID blood levels were not measured. There are also significant flaws in study methodologies used in the human spinal fusion studies cited.[20] Numerous uncontrolled patient and surgical factors, marginal power, and retrospective design, all detract from the credibility of these negative findings.

We have been utilizing NSAIDs for almost a decade in the management of acute pain following spinal fusion surgery.[9-12] The goal of this retrospective study is to examine the effect of NSAIDs on the incidence of non-union at one-year following spinal fusion surgery.

## Methods

The Institutional Review Board approved the retrospective review of hospital charts and databases. The study population was a consecutive sample of 434 patients undergoing elective decompressive posterior lumbar laminectomy with instrumented spinal fusion by a single surgeon within an eight-year period (February 1996–January 2003). Spinal fusion was performed at one or two levels from L4 to sacrum using similar pedicle screw-rod constructs and autologous iliac crest bone graft. Exclusion criteria included more than two level vertebral fusions, patients with a prior history of spinal fusion, undergoing anterior lumbar fusion, or the use of other NSAIDs or glucocorticoids during the study period. Prior to surgery, all patients had standing anteroposterior (AP), lateral, and oblique radiographs of the lumbosacral spine.

Anesthesia was induced with either sodium pentothal or propofol and maintained with either isoflurane or sevoflurane with 70% $N_2O$ in $O_2$. All patients were administered fentanyl (5–10 µg·kg$^{-1}$ $iv$) or morphine (0.3–0.5 mg·kg$^{-1}$ $iv$) intraoperatively. Patients were connected to a patient controlled analgesia pump (Abbott PCA Plus, Abbott Park, Chicago, IL, USA) upon arrival to the postanesthesia care unit which was maintained for the first 24 hr after the completion of surgery. Bed rest was enforced for the first 24 hr postoperatively. Progressive ambulation was then begun through physical therapy. Perioperative NSAID administration included either ketorolac (20–240 mg·day$^{-1}$), celecoxib (200–600 mg·day$^{-1}$), or rofecoxib (50 mg·day$^{-1}$) for five consecutive days according to the anesthesiologist's preference.

Fusion status was determined from the AP, oblique, and flexion-extension radiographs, and either tomography or a computed tomography scan when necessary obtained at one-year follow-up. For a fusion to be

Case 2:05-md-01657-EEF-DEK Document 6436-2 Filed 10/19/16 Page 147 of 154

previous) published studies[21,23] The radiograph had to show bridging bone bilaterally between transverse processes with trabeculation that was confluent across the fusion mass. Oblique radiographs had to confirm the presence of fusion bone in a confluent pattern between transverse processes. Flexion-extension films were considered to show solid fusion with < 2° motion on the lateral film. Criteria used to diagnose non-union included evidence of radiolucency around the hardware, collapse of graft height with a gap between the vertebral end plate and the bone graft, shift in position of the graft, and loss of fixation from hardware loosening or dislodgement. In addition, dynamic AP and lateral radiographs that revealed 4 mm horizontal motion and ≥ 10° angular motion on lateral films taken with the patient bending indicated non-union. The fusion status was determined solely by radiographic means by an independent radiologist who was blinded to the analgesic technique.

*Statistical analysis*

Demographic data (age, height, and weight) and procedure duration were analyzed with analysis of variance. The effect of ketorolac administration on non-union rate was further divided into two daily dose categories: 20 to 110 mg and 120 to 240 mg. The rationale for choosing these two dosing categories was based upon previously published guidelines for the perioperative administration of ketorolac.[10,24–26] We believe the drug manufacturers' current dosing guidelines for ketorolac (120 mg·day$^{-1}$)[24] are excessive and not consistent with the lower doses recommended in the current literature.[10,25,26] Difference in fusion rate was assessed with a Chi square test or Fisher's exact test. Multivariate logistic regression was used to explore the relationship between NSAID treatment, smoking status, age, gender, and levels of fusion on the odds of non-union. Two-factor interactions were investigated to identify factors that may have synergistic effects on the odds of non-union. Significance was determined at the $P < 0.05$ level. SAS® software, version 8.2; (SAS Institute Inc., Cary, NC, USA) was used to perform the statistical calculations.

**Results**

A total of 434 patients receiving either ketorolac ($n = 120$), rofecoxib ($n = 124$), celecoxib ($n = 60$), or no NSAID ($n = 130$) were included in this retrospective study. There were no significant differences among the groups with respect to age, height, weight, duration of surgery, smoking history, or number of vertebral levels fused (Table I). A total of 48 patients (11%)

nificant predictors of non-union when included in the multivariate logistic regression. There were no significant differences in the incidence of non-union among the groups that received no NSAIDs, celecoxib, or rofecoxib (Table II). Non-union was identified in 11 of the 130 patients (8.5%) who received no NSAIDs, nine of the 124 patients (7.3%) who received rofecoxib, and five of the 60 patients (8.3%) who received celecoxib (Table II). In contrast, 23 out of 120 patients (19.2%) that received ketorolac had a significantly ($P < 0.001$) higher incidence of non-union compared to non-NSAID users. This represents over a threefold greater likelihood of developing non-union with ketorolac administration (Table III). Only three of 50 patients (6%) receiving low-dose ketorolac (≤ 110 mg·day$^{-1}$) resulted in non-union which was not significantly different from non-NSAID users. Patients receiving higher doses of ketorolac (120–240 mg·day$^{-1}$) had a significantly ($P < 0.0001$) higher incidence of non-union (20 out of 70 patients; 29%) compared to non-NSAID users. This represents over an eightfold greater likelihood of developing non-union compared to non-NSAID users (Table III). For those patients developing non-union, there was a significantly higher incidence between smokers and non-smokers ($P < 0.0001$) and one level fusion *vs* two level fusions ($P < 0.001$); (Table III). Multivariate logistic regression indicated that the effects of smoking and levels of fusion were greater than additive (i.e., significant smoking status by level of fusion interaction). The effect of smoking on non-union was much greater in patients undergoing two-level fusions relative to those undergoing one-level fusion. Also, the increase in the odds of non-union in patients undergoing two-level fusions relative to those undergoing one-level fusion was larger in smokers.

**Discussion**

This study revealed that the short-term perioperative administration of celecoxib, rofecoxib, or low-dose ketorolac (≤ 110 mg·day$^{-1}$) had no significant deleterious effect on spinal fusion. In contrast, higher doses of ketorolac (120–240 mg·day$^{-1}$), history of smoking, and two level vertebral fusions resulted in a significant increase in the non-union rate following spinal fusion surgery.

Although NSAIDs have proven to be beneficial in the multimodal management of pain following spinal fusion surgery,[8–13] many physicians refrain from the use of these drugs because of a possible deleterious effect on osteogenesis and spinal fusion.[17–20] Spinal

| | No NSAID | Rofecoxib | Celecoxib | Ketorolac |
|---|---|---|---|---|
| Number | 130 | 124 | 60 | 120 |
| Gender [M/F (% M)] | 77/53 (59%) | 72/52 (58%) | 36/24 (60%) | 69/51 (58%) |
| Age (yr) | 44 ± 13 | 47 ± 16 | 49 ± 15 | 46 ± 19 |
| Weight (kg) | 79 ± 15 | 81 ± 16 | 83 ± 19 | 80 ± 12 |
| Height (cm) | 168 ± 12 | 171 ± 14 | 169 ± 11 | 170 ± 10 |
| Duration of surgery (min) | 179 ± 28 | 184 ± 32 | 171 ± 29 | 176 ± 37 |
| *Spinal levels fused* | | | | |
| 1 level | 91 (70%) | 85 (69%) | 45 (75%) | 84 (70%) |
| 2 levels | 39 (30%) | 39 (31%) | 15 (25%) | 36 (30%) |
| Smokers | 39 (30%) | 35 (29%) | 17 (28%) | 33 (28%) |
| Non-smokers | 91 (70%) | 89 (71%) | 43 (72%) | 87 (72%) |

Data are presented as mean ± SD or number (%). NSAID = nonsteroidal anti-inflammatory drugs. There were no statistical differences between the two groups.

TABLE II  Non-union by subgroups

| | No NSAID | Rofecoxib | Celecoxib | Ketorolac | Ketorolac (20–110 mg·day⁻¹) | Ketorolac (120–240 mg·day⁻¹) | Total |
|---|---|---|---|---|---|---|---|
| Number | 130 | 124 | 60 | 120 | 50 | 70 | 434 |
| Non-union | 11 | 9 | 5 | 23 | 3 | 20 | 48 |
| *Spinal levels fused* | | | | | | | |
| 1 level | 3/91 | 3/85 | 1/45 | 4/84 | 1/35 | 3/49 | 11/305 |
| 2 levels | 8/39 | 6/39 | 4/15 | 19/36 | 2/15 | 17/21 | 37/129 |
| Smokers | 9/39 | 7/35 | 4/17 | 20/33 | 3/10 | 17/23 | 40/124 |
| Non-smokers | 2/91 | 2/89 | 1/43 | 3/87 | 0/40 | 3/47 | 8/310 |
| Male | 7/77 | 6/72 | 3/36 | 13/69 | 2/28 | 11/41 | 29/254 |
| Female | 4/53 | 3/52 | 2/24 | 10/51 | 1/22 | 9/29 | 19/180 |

NSAID = nonsteroidal anti-inflammatory drugs.

fusion is a complex process that is influenced by multiple physiologic and mechanical factors. These include patient age, cigarette smoking, surgical technique, number of vertebral levels fused, spinal instrumentation, bone graft composition, use of recombinant bone morphogenetic protein, and electrical stimulation.[17–19] In particular, the use of NSAIDs has received considerable attention with regard to its effect on spinal fusion. Unfortunately, there are currently only two studies in humans which have examined the effect of NSAIDs on spinal fusion.[21,27] In a retrospective study of 83 patients undergoing posterolateral fusion for isthmic spondylolisthesis, single-level fusions showed an overall union rate of 82%, and two-level fusions, a 74% rate.[21] However, patients who continued to take NSAIDs for more than three months postoperatively showed significantly lower union and success rates (44% and 37%). In a retrospective study of 288 patients undergoing spinal fusion surgery, Glassman *et al.*[27] demonstrated that non-union was five times more likely to occur if ketorolac, a parenteral NSAID, was administered postoperatively compared with no NSAID use. A total of 121 patients received no NSAID after surgery, whereas 167 patients received ketorolac. There were five (4%) non-unions in the group receiving no NSAIDs and 29 (17%) non-unions in the ketorolac group ($P < 0.001$). There was a dose-dependent relationship between non-union rate and ketorolac use up to the range of nine to 12 doses per patient. The results of this study led Glassman *et al.*[27] to recommend that NSAIDs be avoided in the early postoperative period following spinal fusion surgery.

However, we believe the NSAID administration in these two studies[21,27] does not correlate with acceptable clinical practice for acute pain management. NSAIDs were administered either for a prolonged period of time (≥ three months)[21] or using excessive doses (> 2 mg·kg⁻¹·day⁻¹) of ketorolac.[27] We believe that prolonged and/or high dose NSAID administration may be deleterious to spinal fusion and thus limit the use of these drugs to the lowest effective dose for

| Group comparison | Odds ratio, 95% confidence interval | P Value |
|---|---|---|
| Rofecoxib *vs* no NSAID | 1.2 (0.4–3.9) | NS |
| Celecoxib *vs* no NSAID | 1.0 (0.2–3.7) | NS |
| Ketorolac *vs* no NSAID | 3.3 (1.0–10.3) | < 0.001 |
| Ketorolac ($\leq$ 110 mg·day$^{-1}$) *vs* no NSAID | 1.2 (0.2–6.1) | NS |
| Ketorolac (120–240 mg·day$^{-1}$) *vs* no NSAID | 8.8 (2.8–28.0) | < 0.0001 |
| Smokers *vs* no smokers | 14.7 (5.3–40.9) | < 0.0001 |
| 1 level fusion | 4.1 (1.1–14.7) | |
| 2 level fusion | 53.1 (11.1–254.5) | |
| 2 level fusion *vs* 1 level fusion | 5.6 (2.0–15.5) | < 0.001 |
| Nonsmokers | 1.5 (0.3–8.2) | |
| Smokers | 20.1 (6.4–63.1) | |

NS = not significant. NSAID = nonsteroidal anti-inflammatory drugs. Odds ratio were computed from a multivariate logistic regression model including NSAID treatment, smoking status, levels of fusion, and the interaction between smoking status and levels of fusion.

less than one week. In the retrospective study by Glassman *et al.*,[27] ketorolac was administered in doses greater than 2 mg·kg$^{-1}$·day$^{-1}$. The appropriate analgesic dose of ketorolac is controversial. Pre-marketing clinical investigations demonstrated that 30 to 90 mg of ketorolac provided postoperative analgesia similar to 6 to 12 mg of morphine and 50 to 100 mg of meperidine.[28–30] Since ketorolac has been marketed, there have been reports of death due to gastrointestinal and operative site bleeding.[31] In a response to these adverse events, the drug's manufacturer recommended reducing the dose of ketorolac from 150 to 120 mg·day$^{-1}$.[24] The European Committee for Proprietary Medicinal Products recommended a further maximal daily dose reduction to 60 mg for the elderly and to 90 mg for the non-elderly.[25] We have previously shown that ketorolac 7.5 mg administered every six hours (0.4 mg·kg$^{-1}$·day$^{-1}$) is the optimal analgesic dose for spinal fusion surgery.[10] Glassman *et al.*[27] utilized over five times these ketorolac doses in their clinical investigation of spinal fusion surgery. The inhibitory effect of ketorolac on bone repair and fusion was found to be a dose-related phenomenon.[18,27,32] In a rabbit femoral defect model,[18] the administration of low-dose ketorolac (1.75 mg·kg$^{-1}$·day$^{-1}$) for one or five weeks postoperatively had no deleterious effect on bone healing. Ho *et al.*[32] demonstrated that ketorolac 2 mg·kg$^{-1}$·day$^{-1}$ for six weeks had minimal effect on bone repair in a rabbit ulnar defect model. In contrast, ketorolac 4 mg·kg$^{-1}$·day$^{-1}$ significantly decreased the torsional stiffness and energy absorption of the grafted ulnae and decreased the maximum torque in the intact and the grafted bones. In our present study, we also demonstrated a dose-dependent deleterious effect of ketorolac on bone healing. The incidence of non-

union was significantly higher for those patients receiving ketorolac 120 to 240 mg·day$^{-1}$. In contrast, low-dose ketorolac ($\leq$ 110 mg·day$^{-1}$) resulted in no significant increase in non-union when compared to non-NSAID users.

In contrast to nonspecific NSAIDs, we believe that the use of COX-2 specific inhibitors represents a significant therapeutic advance in the perioperative management of pain for spinal fusion surgery. Although the perioperative administration of nonspecific NSAIDs may provide effective analgesia, their ability to decrease platelet aggregation and increase bleeding time may increase the incidence of perioperative bleeding due to inhibition of thromboxane $A_2$.[2,3,33] In fact, ketorolac is contraindicated as a prophylactic analgesic prior to any major surgery.[24] In contrast, because COX-2 specific NSAIDs have no inhibitory effect on platelet function, these drugs can be safely administered as preemptive analgesics for a variety of surgical procedures[34,35] without an increased risk of perioperative bleeding.

Several investigators have examined the effect of selective COX-2 inhibitors on spinal fusion in the animal model.[36–39] Long *et al.*[36] concluded that celecoxib does not significantly inhibit the rate of spinal fusion in the rabbit model and perhaps the inhibitory effects of NSAIDs on bone healing are likely mediated by inhibition of COX-1. However, Simon *et al.*[37] later demonstrated that both celecoxib and rofecoxib inhibited fracture healing to varying degrees in the rat model. Recently, it has been suggested that the deleterious effects of COX-2 inhibitors on fracture healing may be reversible with short-term treatment.[38,39] Gerstenfeld and Einhorn[39] examined the effects of ketorolac, valdecoxib, or vehicle over a seven- or 21-day time course. This study revealed that animals

differences in the rate of non-unions after either 21 or 35 days of healing. In contrast, 21 days of treatment led to statistical differences in the rate of non-unions for valdecoxib after 21 days but the differences disappeared by 35 days. The data from this study suggested that both specific COX-2 inhibitors and nonselective NSAIDs delay fracture healing, but the magnitude of the effect was related to the duration of treatment. These authors[39] concluded that "extrapolation of these findings to a clinical setting suggests that management of fracture-associated pain with inhibitors of COX-2 should neither impair nor delay healing as long as the duration of treatment is consistent with current standards of care".

The results of our present study concur with these investigators' findings.[39] We observed no significant increase in the incidence of non-union when either celecoxib or rofecoxib was administered for five consecutive days in doses approved for acute pain management. Although low-dose ketorolac had no significant deleterious effect on spinal fusion, because it cannot be safely administered as a preemptive analgesic, we currently use only COX-2 specific inhibitors. We limit the administration of these analgesics for less than one week following spinal fusion surgery. We are in agreement with other investigators, that it is better to stigmatize smoking and not NSAID use in bone surgery.[40] Our results concur with other investigators[21,27] that the risk of smoking has a significant deleterious effect on spinal fusion. In the present study, smokers undergoing spinal fusion surgery were over 14 times more likely to develop non-union compared to non-smokers. Further, 74% of patients who were smokers and administered high-dose ketorolac developed non-union postoperatively.

In conclusion, this study revealed that the short-term perioperative administration of celecoxib, rofecoxib, or low-dose ketorolac ($\leq 110$ mg·day$^{-1}$) had no significant deleterious effect on non-union. In contrast, higher doses of ketorolac (120–240 mg·day$^{-1}$), history of smoking, and two level vertebral fusions resulted in a significant increase in the incidence of non-union following spinal fusion surgery. We currently recommend the short-term perioperative use of COX-2 specific inhibitors for the management of pain following spinal fusion surgery.

## References

1 *McCormack K.* Non-steroidal anti-inflammatory drugs and spinal nociceptive processing. Pain 1994; 59: 9–43.

2 *Souter AJ, Fredman B, White PF.* Controversies in the perioperative use of nonsteroidal antiinflammatory drugs: rationale for use in severe postoperative pain. Br J Anaesth 1991; 66: 703–12.

3 *U.S. Department of Health and Human Services.* Acute Pain Management Guideline Panel. Acute pain management: operative or medical procedures and trauma. Clinical practice guideline. AHCPR Pub. No. 92-0032. Rockville, MD: Agency for Health Care Policy and Research, Public Health Service, 1992; Feb: 15–26.

5 *Ashburn MA, Caplan RA, Carr DB, et al.* Practice guidelines for acute pain management in the perioperative setting. An updated report by the American Society of Anesthesiologists Task Force on acute pain management. Anesthesiology 2004; 100: 1573–81.

6 *Kehlet H, Dahl JB.* The value of "multimodal" or "balanced analgesia" in postoperative pain treatment. Anesth Analg 1993; 77: 1048–6.

7 *Kehlet H, Wilmore DW.* Multimodal strategies to improve surgical outcome. Am J Surg 2002; 183: 630–41.

8 *Kinsella J, Moffat AC, Patrick JA, Prentice JW, McArdle CS, Kenny GN.* Ketorolac trometamol for postoperative analgesia after orthopaedic surgery. Br J Anaesth 1992; 69: 19–22.

9 *Reuben SS, Connelly NR, Steinberg R.* Ketorolac as an adjunct to patient-controlled morphine in postoperative spine surgery patients. Reg Anesth 1997; 22: 343–6.

10 *Reuben SS, Connelly NR, Lurie S, Klatt M, Gibson CS.* Dose-response of ketorolac as an adjunct to patient-controlled analgesia morphine in patients after spinal fusion surgery. Anesth Analg 1998; 87: 98–102.

11 *Reuben SS, Connelly NR.* Postoperative analgesic effects of celecoxib or rofecoxib after spinal fusion surgery. Anesth Analg 2000; 91: 1221–5.

12 *Reuben S, Ekman EF.* The effect of cycolo-oxygenase-2 inhibition on analgesia and spinal fusion. J Bone Joint Surg Am 2005; 87: 536–42.

13 *Turner DM, Warson JS, Wirt TC, Scalley RD, Cochran RS, Miller KJ.* The use of ketorolac in lumbar spine surgery: a cost-benefit analysis. J Spinal Disord 1995; 8: 206–12.

14 *Cousins MJ, Power I, Smith G.* 1996 Labat lecture: pain-a persistent problem. Reg Anesth Pain Med 2000; 25: 6–21.

15 *Perkins FM, Kehlet H.* Chronic pain as an outcome of surgery. A review of predictive factors. Anesthesiology 2000; 93: 1123–33.

16 *Samad TA, Sapirstein A, Woolf CJ.* Prostanoids and pain: unraveling mechanisms and revealing therapeutic targets. Trends Mol Med 2002; 8: 390–6.

17 *Gajraj NM.* The effect of cyclooxygenase-2 inhibitors

456–465

18 *Dumont AS, Verma S, Dumont RJ, Hurlbert J.* Nonsteroidal anti-inflammatory drugs and bone metabolism in spinal fusion surgery: a pharmacological quandary. J Pharmacol Toxicol Methods 2000; 43: 31–9.

19 *Maxy RJ, Glassman SD.* The effect of nonsteroidal anti-inflammatory drugs on osteogenesis and spinal fusion. Reg Anesth Pain Med 2001; 26: 156–8.

20 *Wedel DJ, Berry D.* "He said, she said, NSAIDs". Reg Anesth Pain Med 2003; 28: 372–5.

21 *Deguchi M, Rapoff AJ, Zdeblick TA.* Posterolateral fusion for isthmic spondylolisthesis in adults: analysis of fusion rate and clinical results. J Spinal Disord 1998; 11: 459–64.

22 *Steinmann JC, Herkowitz HN.* Pseudarthrosis of the spine. Clin Orthop 1992; 284: 80–90.

23 *Lee C, Dorcil J, Radomisli TE.* Nonunion of the spine: a review. Clin Orthop 2004; 419: 71–5.

24 Toradol IV/IM (package insert). Nutley, NJ: Roche Laboratories; 1994.

25 *Choo V, Lewis S.* Ketorolac doses reduced. Lancet 1993; 342: 109.

26 *Severino FB, Sinatra RS, Paige D, Ning T, Brull SJ, Silverman DG.* The efficacy of intramuscular ketorolac in combination with intravenous PCA morphine for postoperative pain relief. J Clin Anesth 1992; 4: 285–8.

27 *Glassman SD, Rose SM, Dimar JR, Puno RM, Campbell MJ, Johnson JR.* The effect of postoperative nonsteroidal anti-inflammatory drug administration on spinal fusion. Spine 1998; 23: 834–8.

28 *O'Hara D, Fragen R, Kinzer M, Pemberton D.* Ketorolac tromethamine as compared with morphine sulfate for treatment of postoperative pain. Clin Pharmacol Ther 1987; 41: 556–61.

29 *Yee JP, Koshiver JE, Allbon C, Brown CR.* Comparison of intramuscular ketorolac tromethamine and morphine sulfate for analgesia of pain after major surgery. Pharmacotherapy 1986; 6: 253–61.

30 *Foldand B, Skulberg A, Halvorsen P, Helgesen KG.* Placebo-controlled comparison of single intramuscular doses of ketorolac tromethamine and pethidine for post-operative analgesia. J Int Med Res 1990; 18: 305–14.

31 *Strom BL, Berlin JA, Kinman JL, et al.* Parenteral ketorolac and risk of gastrointestinal and operative site bleeding. A postmarketing surveillance study. JAMA 1996; 275: 376–82.

32 *Ho ML, Chang JK, Wang GJ.* Antiinflammatory drug effects on bone repair and remodeling in rabbits. Clin Orthop 1995; 313: 270–8.

33 *Simon AM. Effects of nonsteroidal anti-inflammatory therapy on placebo.* Am J Med 1999; 106: 3S–13S.

34 *Gilron I, Milne B, Hong M.* Cyclooxygenase-2 inhibitors in postoperative pain management: current evidence and future directions. Anesthesiology 2003; 99: 1198–208.

35 *Sinatra R.* Role of COX-2 inhibitors in the evolution of acute pain management. J Pain Symptom Manage 2002; 24 (1 Suppl.): S18–27.

36 *Long J, Lewis S, Kuklo T, Zhu Y, Riew KD.* The effect of cyclooxygenase-2 inhibitors on spinal fusion. J Bone Joint Surg Am 2002; 84: 1763–8.

37 *Simon AM, Manigrasso MB, O'Connor JP.* Cyclo-oxygenase 2 function is essential for bone fracture healing. J Bone Miner Res 2002; 17: 963–76.

38 *Gerstenfeld LC, Thiede M, Seibert K, et al.* Differential inhibition of fracture healing by non-selective and cyclooxygenase-2 selective non-steroidal anti-inflammatory drugs. J Orthop Res 2003; 21: 670–5.

39 *Gerstenfeld LC, Einhorn TA.* COX inhibitors and their effects on bone healing. Expert Opin Drug Saf 2004; 3: 131–6.

40 *Lagerkranser M.* Better to stigmatize smoking and not NSAID in connection with bone surgery! (Swedish). Lakartidningen 2002; 99: 3338–9.

# Annals of the Rheumatic Diseases

Lisbon

eular 2003

## Annual European Congress of
# RHEUMATOLOGY

www.annrheumdis.com

BMJ

eular

The EULAR Journal

## FRI0224 LONG-TERM EFFICACY AND TOLERABILITY OF LUMIRACOXIB IN OSTEOARTHRITIS OF THE KNEE

E. Schell[1], L. Bucher[2], L. Tanasi[3], J. Ouellet[4], A. Moore[5], A. Lee[5]. [1] Nürnberg, Germany; [2] Mura Erigne, France, [3] Stent Ferenc Korhaz, Reumatologai Osztaly, Miskolc, Hungary, [4] Sherbrooke, Canada, [5] CR and D, Novartis Pharma AG, Basel, Switzerland

**Background:** Lumiracoxib (Prexige®) is a cyclooxygenase-2 (COX-2) inhibitor developed for the treatment of osteoarthritis (OA), rheumatoid arthritis and acute pain.
**Objectives:** To assess the long-term efficacy and safety of lumiracoxib in patients with knee OA, a 39-week, multicentre, randomized, double-blind, active-controlled (celecoxib) extension of a 13-week multicentre, randomized, double-blind, placebo-controlled, active-comparator study (reported at the ACR Annual congress, 2002) was conducted.
**Methods:** In the 13-week core study, 1702 patients aged ≥18 years with primary knee OA requiring NSAID therapy were randomized to lumiracoxib 200 mg od, lumiracoxib 400 mg od, celecoxib 200 mg od or placebo. Approx. 87% of eligible patients who had completed the core study participated in the extension. Patients receiving an active treatment in the core study remained on this for the extension (subgroup A, n=1064). Patients receiving placebo in the core study were randomized (1:1:1) to lumiracoxib 200 mg or 400 mg od, or celecoxib 200 mg od (subgroup B, n=171). In total, 1235 patients entered the extension: lumiracoxib 200 mg (n=411); lumiracoxib 400 mg (n=419); celecoxib (n=405). Primary efficacy variables assessed at the extension start and 3, 6 and 9 months were: OA pain intensity in the target joint (using a 100 mm visual analogue scale (VAS)), patient's global assessment of disease activity (VAS) and functional status assessed by WOMAC® Total and Pain subscale scores. Safety and tolerability were assessed.
**Results:** In the 3 month core study, subgroup A experienced significant improvement in OA pain and patient's global assessment of disease activity after treatment with either lumiracoxib or celecoxib compared with placebo. After 9 months of treatment in the extension phase lumiracoxib and celecoxib were similar in maintaining efficacy.
After 3 months of placebo treatment in the core study, subgroup B patients were switched to either lumiracoxib or celecoxib in the extension phase. At 6 months in subgroup B, lumiracoxib 200 mg was superior to celecoxib 200 mg od (difference of 9.67 mm; p=0.044) for OA pain reduction, and both doses of lumiracoxib were superior to celecoxib for patients' global assessment of disease activity (differences of 10.25 mm and 10.49 mm for lumiracoxib 200 and 400 mg, respectively; both p<0.05). After 9 months of active treatment, lumiracoxib and celecoxib provided similar efficacy in these patients. No statistically significant differences were observed between any treatment groups in WOMAC® Total or Pain subscale scores in either subgroup. More patients in the celecoxib group (n=31; 7.7%) discontinued due to unsatisfactory therapeutic effect than in the lumiracoxib 200 mg (n=26; 6.1%) and 400 mg (n=13; 3.1%) groups.
The safety and tolerability of lumiracoxib and celecoxib were comparable, with similar adverse event profiles for all treatment groups.
**Conclusion:** Lumiracoxib 200 mg od and 400 mg od provided sustained long-term pain relief and improved functional status in patients with knee OA. Treatment with lumiracoxib was well tolerated.

## FRI0225 CO-ADMINISTRATION OF LUMIRACOXIB AND WARFARIN DOES NOT ALTER THE PHARMACOKINETIC PROFILE OF R- OR S-WARFARIN

J. Bonner[1], J. Branson[2], S. Milosavljev[3], C. Rordorf[3], G. Scott[1]. [1] CR and D, Novartis Pharmaceuticals, Horsham, United Kingdom, [2] CR and D, Novartis Pharma AG, Basel, Switzerland, [3] CR and D, Novartis Pharmaceutical Corporation, East Hanover, United States

**Background:** Lumiracoxib (Prexige®) is a novel cyclooxygenase-2 (COX-2) selective inhibitor, which has been developed for the management of osteoarthritis, rheumatoid arthritis and acute pain. Lumiracoxib is cleared principally by cytochrome P 450 (CYP) 2C9 catalyzed metabolism.
**Objectives:** The aim of this study was to evaluate the effect of concomitant administration of lumiracoxib and placebo on the pharmacokinetic (PK) and pharmacodynamic (PD) properties of warfarin, a 'sensitive' substrate for CYP2C9.
**Methods:** This was an open-label, randomized, placebo-controlled, parallel-group study. Subjects (n=24, mean age 33.5 years, 20 male) genotyped as CYP2C9 extensive metabolizers received loading doses of 5–10 mg od racemic warfarin for two days. Doses of between 2–6 mg/day, titrated individually to achieve a stable prothrombin time (PT), were administered on Days 3–8. On Day 9, subjects with stable PT were randomized to receive either lumiracoxib 400 mg od or placebo, for 5 days together with their steady-state dose of warfarin. Blood samples were withdrawn serially (11 times), on Days 8 and 13, and plasma R- and S-warfarin concentrations determined by HPLC. Urine was collected up to 24 hours post dose on Days 8 and 13 and excretion of the warfarin metabolite 8-7-hydroxy warfarin (S7OHW) determined by LC/MS. PT was measured every 12 hours to assess potential PD interaction. Analysis of variance was used to compare the effects of concomitant treatment on warfarin PK and PD variables.

**Results:** Lumiracoxib treatment had no significant effects on steady-state plasma R- orS-warfarin pharmacokinetics compared with placebo. Area under the plasma concentration-time curve (AUC) values for R- and S-warfarin, respectively, were 2907.1 and 1867.6 ng/h•L for placebo and 2877.8 and 2003.9 ng/h•L for lumiracoxib. Cmax values for R- and S-warfarin, respectively, were 162.9 and 119.6 ng/mL for placebo and 173.3 and 128.7 ng/mL for lumiracoxib. AUC and Cmax ratios (Day 8 vs 13) were near to unity in lumiracoxib and placebo groups for both R- and S-warfarin. S7OHW recovery in urine was variable, and slightly lower following lumiracoxib treatment compared with placebo on Day 13. Lumiracoxib treatment induced a small increase in PT from Day 8 to 13 (17.5 vs 19.0 seconds, respectively); comparative placebo values were 17.6 and 17.5 seconds, respectively. Study treatments were equally well tolerated with no discontinuations occurring due to adverse events.
**Conclusion:** Co-administration of lumiracoxib had no significant effects on steady state warfarin plasma pharmacokinetics. The lack of interaction observed between lumiracoxib and the 'sensitive' CYP2C9 substrate, warfarin, suggests that lumiracoxib has a low potential for drug-drug interactions with other CYP2C9 substrates. Nonetheless, in accordance with common practice, routine monitoring of coagulation is recommended when warfarin is co-administered with lumiracoxib.

## FRI0226 EFFECTS OF ROFECOXIB AND IBUPROFEN ON BONE MINERAL DENSITY (BMD) AND BIOCHEMICAL INDICES OF BONE TURNOVER IN PATIENTS WITH OSTEOARTHRITIS

G. Murphy[1], L. DeTora[2], M. Leo[3], B. Gertz[4]. [1] Clinical Pharmacology, [2] Worldwide Regulatory Operation, [3] Clinical Biostatistics, [4] Clinical Research, Merck and Co., Inc., Rahway, United States

**Background:** Prospective clinical data on the effects of NSAIDs or selective COX-2 inhibitors on bone resorption are scant.
**Methods:** We conducted a prospective trial in 305 patients with OA (164 men and 141 postmenopausal women; at least 50 years old) to evaluate the effects of rofecoxib 25 mg once daily and ibuprofen 800 mg three times daily on BMD and biochemical markers (serum osteocalcin, urine N-telopeptide/creatinine ratio, and serum bone specific alkaline phosphatase) of bone turnover. Patients were randomized to placebo, rofecoxib, or ibuprofen for 12 weeks. Placebo-treated patients switched to an active treatment (1:1 ratio; predefined at randomization) and other patients received the same therapy, for an additional 52 weeks. Biochemical markers were evaluated at 12 and 52 weeks. Spine, hip, and total body BMD were evaluated at 26, 52, and 65 weeks; the group of patients receiving continuous active treatment at week 52 was prespecified as of primary interest; equivalence bounds for BMD were (-2% to 2%). The subgroup of women was also evaluated.
**Results:** Similar differences from baseline in BMD were seen in patients receiving rofecoxib (n=55) or ibuprofen (n=59) for 52 weeks, with mean changes from baseline ranging from -0.39% (SD=1.45) to 1.21% (SD=1.18). Data were similar at 26 and 65 weeks. Biochemical markers of bone metabolism showed similar, small effects among patients receiving rofecoxib (n=98), ibuprofen (n=107), or placebo (n=100) for 12 weeks; the geometric mean ratio (GMR) of 12-week mean to baseline mean ranged from 0.89 to 1.06 for individual groups. Data were similar at 52 and 65 weeks. An analysis of women over age 50 showed similar results for both BMD and biochemical markers of bone turnover.
**Conclusion:** In this study, neither rofecoxib nor ibuprofen had a clinically significant effect on biochemical markers of bone turnover or BMD. No clinically significant differences in effects on bone between treatments were observed.

## FRI0227 RELATIONSHIP BETWEEN MILD ACETABULAR DYSPLASIA AND RADIOGRAPHIC HIP OSTEOARTHRITIS: A STUDY FROM A POPULATION WITH LOW PREVALENCE OF HIP OSTEOARTHRITIS

S. Haznedaroglu[1], B. Gokar[1], A. Sancak[1]. [1] Rheumatology, Gazi University, Ankara, Turkey

**Background:** Prevalence of hip osteoarthritis (OA) varies across different geographies and the reasons for this remain unclear. Mild acetabular dysplasia has been considered as a risk factor but recent studies have been controversial.
**Objectives:** In Turkey, prevalence of significant radiographic hip osteoarthritis (OA), i.e. Kellgren and Lawrence (K&L) grade 3 and 4, is 2.9% among those aged 55 and over, which is lower than Western populations. We aimed to investigate the potential effects of radiomorphometric variables on this discrepancy.
**Methods:** 92 Turkish patients (65M, 27F) aged 55 and over were studied. Plain supine abdominal radiographies and intravenous pyelographies were evaluated. Center-edge (CE) angle and acetabular depth of each hip were measured and K&L grading was done. Acetabular dysplasia was defined as either CE angle < 25 degrees or acetabular depth <9 mm. Patients with deformed hips that did not permit reliable measurements were excluded (2 patients).
**Results:** Mean ± SD CE angle of the right and left hips were 34 ± 7 and 35 ± 7 degrees (range 14-52 and 16-50), respectively. Mean ± SD acetabular

I hereby certify that the above and foregoing Declaration of Nicholas Blavatsky,

M.D. has been served on this 17th day of May, 2013 on Plaintiff Dennis Harrison by email and

by Federal Express at:

> 601 W. Brown Street
> Iron Mountain, MA 49801

> _/s/ Emily Renshaw Pistilli_
> Emily Renshaw Pistilli
> WILLIAMS & CONNOLLY LLP
> 725 12th Street NW
> Washington, DC 20005
> Phone:  202-434-5000
> Fax:      202-434-5029
> epistilli@wc.com
>
> Attorney for Defendant Merck, Sharp and
> Dohme Corp.