# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Docket No. 1657 |
| | * | |
| PRODUCT LIABILITY | * | SECTION L |
| LITIGATION | * | |
| | * | |
| This Document relates to: | * | HONORABLE JUDGE FALLON |
| | * | |
| Dennis Harrison | * | MAGISTRATE JUDGE KNOWLES |
| Pro Se 2:07-cv-00905-EEF-DEK | * | |

*********************************************************************

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S SUMMARY MOTION PART 1

1. In or about December 2011, Merck Sharp Dohme Corp. Plead guilty to an Information filed in Federal District Court of Mass. For having introduced misbranded drugs into interstate commerce with intent to defraud and mislead, 21 USC 331(a), 333(a), and 352 (f)(1) and (2); the product that they had misbranded was Vioxx which had been approved by the FDA for use in the treatment of osteoarthritis, management of pain, and treatment of dysmenorrheal; and no other. The drug was withdrawn from the market in or about October 2004. Vioxx had been defended by the manufacturer against notices from the FDA and an official Warning Letter from the FDA not on the basis of concern for public safety as they are obliged to do, but by shrewd legal maneuvering with little or no regard to its statutory obligations which requires safety first, but motivated only by the huge profits it was making and continued to make even after it became known or should have became known to Defendant and its Board of Directors and even its Partners in advertising, that for all its efficacy, Vioxx was unsafe for human consumption, and therein lies its guilt. Findings of facts are upheld

TENDERED FOR FILING

OCT -3 2013

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

2

unless clearly erroneous. See, Media Services Group v Bay Cities Communications, Inc., 237 F.3d 1326, 1329 (11th Cir. 2001).

2. Defendant Merck had applied for the approval of Vioxx in an application called a New Drug Application (NDA), on or about November of 1998, and in its application it applied for treatment of osteoarthritis, management of pain, and treatment of dysmenorrheal, the three uses that Vioxx ultimately was approved for, in and about April 1999, and also, treatment of rheumatoid arthritis, and post-orthopedic surgery pain for which Vioxx was not approved for thus making them unapproved uses.

3. 21 USC § 352 - Misbranded drugs and devices

**(a) False or misleading label**

If it's labeling is false or misleading in any particular. Health care economic information provided to a formulary committee, or other similar entity, in the course of the committee or the entity carrying out its responsibilities for the selection of drugs for managed care or other similar organizations, shall not be considered to be false or misleading under this paragraph if the health care economic information directly relates to an indication approved under section 355 of this title or under section 262 (a) of title 42 for such drug and is based on competent and reliable scientific evidence.

**(f) Directions for use and warnings on label**

Unless it's labeling bears

(1) adequate directions for use; and

(2) such adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users, except that where any requirement of clause (1) of this paragraph, as applied to any drug or device, is not necessary for the protection of the public health, the Secretary shall promulgate regulations exempting such drug or device from such requirement. Required labeling for prescription devices intended for use in health care facilities or by a health care professional and required labeling for in vitro diagnostic

3

devices intended for use by health care professionals or in blood establishments may be made available solely by electronic means, provided that the labeling complies with all applicable requirements of law, and that the manufacturer affords such users the opportunity to request the labeling in paper form, and after such request, promptly provides the requested information without additional cost.

The FDA definition of "Substantial Evidence" only applies to drugs presenting FDA approvals for approved uses. When the drug manufacturer goes out side the act, see 21 U.S.C. 352 (f), the definition of "Substantial Evidence" changes to "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v Perales, 402 U.S. 389, 401 (1971)

1.  The Defendant Merck's memorandum of law ignores essential and statutory provisions and engages in other fallacious reasoning. Defendant Merck ignores its obligation under Federal Laws to maintain adequate warnings. Section 502(f)(2) of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §352(f)(2) expressly provides that a drug "shall be deemed to be misbranded" unless its label bears "adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or duration of administration or application, in such manner and form, as are necessary for the protection of users... ." This statutory provision, which by its terms applies to all drugs, establishes a federal requirement that Vioxx must have adequate label warnings. Yet the Defendant Merck's memorandum of law contains not even a single citation to this statutory obligation.

2.  The FDA further clarified and operationalized Defendant Merck's responsibility to maintain adequate label warnings in regulations 21 C.F.R. §201.57(2005) sets forth "specific requirements on content and format of labeling for human prescription drugs." Subsection §201.57 governs "Warnings" and provides: "Under this section heading, the

labeling shall describe serious adverse reactions and potential safety hazards.... The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug: a causal relationship need not have been proved." Thus, this regulation adds a timeliness component to the federal labeling requirement: label warnings must be revised "as soon as there is reasonable evidence of an association." See FDA WARNING LETTER, Plaintiff's Exhibit A.

3. The Defendant Merck did not offer any satisfactory explanation of how their failure to strengthen warnings on their label for Vioxx regarding the risk of over dosing rheumatoid arthritis patients or post-orthopedic surgery patients can be squared with 21 C.F.R. §201.57. See, Kellogg, 2008 WL 5272715, *4 (" The obligation to revise a label to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug applies to both generic and listed drug manufacturers.")

4. Applying the facts of the case at hand: Defendant Merck received a WARNING LETTER from the FDA on or about September 17, 2000 (Plaintiff's Exhibit A) which in part called attention to the fact that recent results of testing had shown that dosage for rheumatoid arthritis patients were not the same as for osteoarthritis patients and that because of that rheumatoid arthritis (RA) patients were receiving dosages at 2 to 4 times the indicated safe dosage and that those patients were being treated for their RA by virtue of off-label promotions of Vioxx , and that the use of Vioxx for the treatment of RA was an unapproved use of Vioxx. See also, UNITED STATES OF AMERICA v. MERCK SHARP DOHME, INC, Plaintiff's Exhibit C.

5.  Because federal food and drug law obligates manufacturers to maintain adequate warnings, the negligence laws of the State of New York do not conflict with federal law, but rather they compliment it. As the United States Supreme Court said in rejecting preemption claimed by drug manufacturers, "state-law remedies further consumer protection by motivating manufacturers to produce safe and effective drugs and to give adequate warnings." Levine, 129 S. CT at 1200. Furthermore, "State tort suits uncover drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may motivate injured persons…. (Thusly), lending force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times." Id. at 1202.

6.  The record in this case shows that Defendant Merck received the notice of their inadequate safety warnings when they received the WARNING LETTER on, or about September 17, 2000, Plaintiff Ex. A, and then negotiated with the FDA and then applied for IND 897, See IND application dated April 20, 2001, see plaintiff Exhibit O, and then applied for a new label that did go into effect on or about April 20, 2002, See Press announcement from Defendant Merck, Plaintiff's Ex. EE, which was then, approximately 500 days after it had received notice, but was even longer than that as the results of tests that were implicitly referred to in the warning letter had preceded the publication of the warning letter, and those test results are what Defendant Merck was obligated to react to because they had effectively shown that issues of public safety had arisen, and their failure to react is what gives rise to negligence and even gross negligence under New York State Law and is thereby applicable in the present case because Plaintiff originally

filed in New York State, and those laws remains the jurisdiction basis for this case or more directly stated, New York State Laws apply.

7. Should Defendant Merck argue that they could not have issued stronger warnings or issued a changed dosage, or modified the duration of specified dosages without following the IND process to the letter of the law; such an argument is a complete red herring, because such safety requirements are not required to issue a safety warning. All that a drug company needs to do is pay attention to the published medical literature regarding their drugs as well as adverse reports received from users, and of course, WARNING LETTERS from the FDA, and then they must react as the foundation of all the FDA Act starting from 21 USC 355(a) is based on the dual public obligation of Safety and Efficacy and by implication safety comes first.

8. In the vernacular the drug application process we follow is often referred to as a Drug Trial, and well it may be. The FDA act beginning at 21 U.S.C. §355(a) Necessity of effective approval of application takes jurisdiction of any drug for introduction into interstate commerce, and Merck did submit by applying for NDA 21-042. §355(b) specifies the content and procedure for filing the application NDA 21-042. §355(d) Grounds for refusing application; a/or approval of application; and definition of the special term "substantial" evidence, fully describes the conducting of a trial as first presentation, then rebuttal, followed by re-presentation of amended application, followed by the ultimate finding of approval or disapproval and the acceptance of the label which that the FDA has given limited approval to, based on those findings. §355(e) Withdrawal

7

of approval; grounds for withdrawal; or, immediate suspension upon finding of imminent hazard to public health.

It is in accordance with the powers described in the Act and in accordance specifically with section (e ) that the FDA issued the Warning Letter on September 17, 2001; and it is for the purpose of enforcement of the determinations of the FDA that on or before February 24, 2006 the Department opened investigations and did notify Defendant Merck that it was being investigated for violation: For having introduced misbranded drugs into interstate commerce with intent to defraud and mislead, 21 USC 331(a), 333(a), and 352 (f)(1) and (2); the product that they had misbranded was Vioxx which had been approved by the FDA for use in the treatment of osteoarthritis, management of pain, and treatment of dysmenorrheal; and no other. The investigations proceeded and involved Grand Jury Panels and resulted in prosecutions of Dr. Scott S. Reuben, Pfizer and Defendant Merck & Co. In the case against Merck & Co. the information specifically describes Merck's promotion for uses unapproved by the FDA and herein lays Plaintiff's case for personal injury and harm for having committed Fraud, Negligence and even Gross negligence under the laws of the United States of America, and under the laws of New York State.

### Mc Darby v Merck Leads to Desiano

Briefly, Mc Darby had a cardiovascular claim and had been awarded direct damages and punitive damages.

The decision affirmed the direct damages but disallowed the punitive damages because in the appellate review the FDA had been dealing with the CV issues adequately under 21

USC 355 such that it had sufficiently punished Defendant Merck within the authority of the Act.

This discussion is contained in Section VIII and, citing Buckman case, the Court found: "The conflict stems from the fact that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Agency, and that this authority is used by the Agency to achieve a somewhat delicate balance of statutory objectives.  The balance sought by the Agency can be skewed by allowing fraud-on-the-FDA claims under state tort law".

However it also considered Desiano v Warner Lambert U.S. Court of Appeals, 2nd Cir., 2006, as follows: "In contrast the court held that, in Desiano, plaintiffs' cause of action was premised upon the common law, which survived statutory immunity by virtue of the fraud exception, and thus the presumption against preemption was applicable. Id. at 93-94. Although statutory immunity could be claimed by a manufacturer as an affirmative defense, id at 96, if immunity were overcome by evidence of fraud, a plaintiff's entire common-law claim would be recognized. Id. at 95. Thus, unlike "the unusual and narrow claim before the Buckman Court, Ibid., the court observed that the Desiano plaintiffs' cause of action could not "reasonably be characterized as a state's attempt to police fraud against the FDA."

In the case at hand, Harrison v Merck, the Guilty Plea of Defendant Merck in U.S. v Merck, for its conduct as per 21 U.S.C. 352 (f)(1) clearly places Defendant Merck outside the Act (21 U.S.C. 355). Defendant Merck cannot claim any immunity normally afforded it following Buckman, and now following Desiano, not only with regards to Direct

Claims, Indirect Claims and Punitive Damages, and also considering the presumptions of evidence asserted by the admission of fraud.

## OTHER APPLICABLE CITATIONS

The FDA definition of "Substantial Evidence" only applies to drugs presenting FDA approvals for approved uses. When the drug manufacturer goes out side the act, see 21 U.S.C. 352 (f), the definition of "Substantial Evidence" changes to "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v Prales, 402 U.S. 389, 401 (1971)'

Findings of facts are upheld unless clearly erroneous. Media Services Group v Bay Cities Communications, Inc., 237 F.3d 1326, 1329 (11th Cir. 2001).

Motion to dismiss complaint for failure to state a claim. Review is de nova. The court accepts all allegations of the complaint as true and construes the facts in the light most favorable to the plaintiff. Harry v Marchant, 237 F.3d 1315, 1317 (11th Cir. 2001).

Determination that a case is not ripe. Reviewed de novo. Vu Jang v United tech. corp., 206 F.3d 1147, 1147, 1149 (11th Cir. 2000).

Motion for leave to amend complaint. Reviewed for abuse of discretion. Johnson v. Booker T. Washington Broad. Serv., 134 F.3d 1458, 1464 (11th cir. 2000)..

Not every Material Fact in dispute is genuine, however, "… if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury reasonably could find for the plaintiff." Id at 252.

When an expert opinion is not supported by sufficient evidence to validate it in the eyes of the law, or when indisputable record facts render the opinion unreasonable, it cannot support a jury verdict." Brook Group Ltd. V. Brown & Williamson Tobacco Corp. 2578, 2598 (1993)

"Evidence manifestly at variance with the laws of nature and the physical facts is of no probative value and may not support a jury verdict." Ralston Purina Co. v Hobson. 554 F.2d 725, 7229 (5th Cir. 1977).

Rule 56 (f) motion for continuance to obtain affidavits or discovery. Reviewed for abuse of discretion. Carmichael v. Bell Helicopter Textron. Inc., 117 F.3d 491, 493 (11th Cir. 1997); Burks v. American Cast Iron Pipe Co., 212 F. 3d 1333, 1336 (11th Cir. 2000).

Admissibility of expert testimony. Reviewed for abuse of discretion. Toole v Baxter Healthcare Corp.., 235 F. 34\d 1307, 1312 (11th Cir. 2000); Allison v. McGhan Med Corp., 184 F.d 1300, 1306 (11th Cir. 2000)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANT'S SUMMARY MOTION PART 1**

# EXHIBITS

**Exhibit A:**  *WARNING LETTER from the FDA;* inadequate safety warnings; WARNING LETTER on, or about September 17, 2000; dosage for rheumatoid arthritis patients were not the same as for osteoarthritis;   receiving dosages at 2 to 4 times the indicated safe dosage... by virtue of off-label promotions of Vioxx.

**Exhibit C:**  *UNITED STATES OF AMERICA v. MERCK SHARP DOHME, INC.;* use of Vioxx for the treatment of RA was an unapproved use of Vioxx.

**Exhibit O:**  *IND 897;* and then negotiated with the FDA and then applied for IND 897, See IND application dated April 20, 2001, see plaintiff Exhibit O, ...

**Exhibit EE:** *new label;* on or about April 20, 2002,; approximately 500 days after it had received notice; issues of public safety had arisen; obligated to react; failure to react; rise to negligence and even gross negligence under New York State Law; New York State Laws apply.

1

EXHIBIT A: Re: In Re Vioxx Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp.*, 2:07-cv-00905-EEF-DEK

 **DEPARTMENT OF HEALTH & HUMAN
SERVICES**

Public Health Service

51751d

Food and Drug Administration
Rockville, MD 20857

**TRANSMITTED BY FACSIMILE**

Raymond V. Gilmartin
President and CEO
Merck & Co., Inc.
P.O. Box 1000, UG3BC-10
North Wales, PA 19454-1099

SEP 17 2001

RE: NDA 21-042
Vioxx (rofecoxib) tablets
MACMIS ID # 9456

# WARNING LETTER

Dear Mr. Gilmartin:

This Warning Letter concerns Merck & Co. Inc.'s (Merck) promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets. Specifically, we refer to promotional audio conferences given on behalf of Merck by Peter Holt, MD, a press release, and oral representations made by Merck sales representatives to promote Vioxx. As part of its routine monitoring and surveillance program, the Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed your promotional activities and materials and has concluded that they are false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations. See 21 U.S.C. §§ 331(a) and (b), 352(a), (f), and (n), and 355 (a).

You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

Although the exact reason for the increased rate of MIs observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.

Raymond V. Gilmartin                                                                    Page 2
Merck & Co., Inc.
NDA 21-042

You have also engaged in promotional activities that minimize the Vioxx / Coumadin (warfarin) drug interaction, omit important risk information, make unsubstantiated superiority claims against other NSAIDs, and promote Vioxx for unapproved uses and an unapproved dosing regimen. In addition, in misrepresenting the Vioxx / warfarin drug interaction you also misrepresent Vioxx's safety profile by minimizing the potentially serious risk of significant bleeding that can result from using Vioxx and warfarin concomitantly.

Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile.

## Background

Vioxx is a NSAID with selective cyclooxygenase 2 (COX-2) inhibitory properties. It was approved on May 20, 1999, for the treatment of primary dysmenorrhea, for the management of acute pain in adults, and for relief of the signs and symptoms of osteoarthritis.

Prior to approval, endoscopy studies were submitted to the original NDA database demonstrating that treatment with Vioxx 25 mg or 50 mg daily was associated with a significantly lower percentage of endoscopically apparent gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. Because the correlation between findings of endoscopic studies and the relative incidence of clinically serious upper gastrointestinal (GI) events was unknown, after approval, Merck sponsored the VIGOR study to obtain information regarding clinically meaningful upper GI events and to develop a large controlled database for overall safety assessment.

The VIGOR study included approximately 4000 patients per treatment arm (Vioxx 50 mg a day or naproxen 1000 mg a day) treated for a median time of 9 months. The primary endpoint of the study was the relative risk of confirmed PUBs (perforations, symptomatic ulcers, and GI bleeds) in patients with rheumatoid arthritis taking Vioxx 50 mg daily (two to four times the approved dosing regimen for Vioxx in osteoarthritis), compared to patients taking naproxen, 1000 mg daily. The study also compared the safety and tolerability of the two treatments in patients with rheumatoid arthritis. The results of the study demonstrated that patients on Vioxx had a significantly lower cumulative incidence of PUB's compared to patients on naproxen (2.08% and 4.49% for Vioxx and naproxen, respectively).

Other important results from the VIGOR study included the unexpected findings that investigator reported serious cardiovascular events occurred in 101 patients (2.5%) in the Vioxx treatment group compared to 46 patients (1.1 %) in the naproxen treatment group, and MIs occurred in 20 patients among 4047 in the Vioxx treatment group (0.5%), compared to four patients among 4029 in the naproxen treatment group (0.1%). These unexpected findings were extensively discussed at the FDA Arthritis Advisory Committee Meeting on February 8, 2001. Although, the reason for these differences is not clear, possible explanations include both an ability of naproxen to function as a cardioprotective agent and a pro-thrombotic property of Vioxx.

Raymond V. Gilmartin                                                     Page 3
Merck & Co., Inc.
NDA 21-042

## Promotional Audio Conferences

We are aware of six promotional audio conferences, presented on behalf of Merck by Peter Holt, MD that are in violation of the Act and its implementing regulations. These audio conferences were held on June 8, 2000, June 13, 2000, June 16, 2000, and three on June 21, 2000, and were moderated by Merck employees.

On December 12, 2000, we sent you a written inquiry about your involvement with and influence on the initiation, preparation, development, and publication of audio conferences given by Dr. Holt. We also asked you to describe the nature of the relationship between you and Dr. Holt. In your response dated January 5, 2001, you stated that, "Dr. Holt entered into a speaker contract with Merck on June 22, 1999." You also stated that, "Merck has determined that we arranged for Dr. Holt to speak at ten audio conferences in 2000. Merck Business Managers provided him with the topic for the audio conferences and, for two of the audio conferences, asked him to address the safety profiles of Vioxx and other NSAIDs."

The promotional audio conferences identified above, arranged by, and presented on behalf of, Merck were false or misleading in that they minimized the MI results of the VIGOR study, minimized the Vioxx / Coumadin drug interaction, omitted important risk information, made unsubstantiated superiority claims, and promoted Vioxx for unapproved uses and an unapproved dosing regimen. Our specific objections follow.

### Minimization of MI Results

Statements made during the promotional audio conferences identified above minimize the potentially serious MI risk that may be associated with Vioxx therapy. For example, in your June 21, 2000, audio conference you begin your discussion of the MI rates observed in the VIGOR study by stating, "When you looked at the MI rate the rate was different for the two groups. The MI rate for Vioxx was 0.4 percent and if you looked at the Naprosyn arm it was 0.1 percent, so there was a reduction in MIs in the Naprosyn group." You then present your explanation as to why the Vioxx treatment arm had an increased rate of MIs compared to the naproxen treatment arm. Specifically, you state that,

> Vioxx is a wonderful, effective, selective COX-2 inhibitor that inhibits COX-2 but at the doses used does not inhibit COX-1. So therefore without the COX-1 inhibition you don't inhibit platelets, you don't prolong bleeding time and therefore it cannot be used as a cardiovascular protective drug. Naprosyn on the other hand is a wonderful platelet inhibitor, prolongs bleeding time and inhibits platelets identically to aspirin. Obviously the binding with Naprosyn is reversible and with aspirin is irreversible, but the effect on platelets and bleeding time is identical in terms of its effect and therefore functions as a wonderful drug for cardiovascular prophylaxis. So basically the MI rates are in sync with what we know about Vioxx and what we know about Naprosyn.

In fact, the situation is not at all clear. There are no adequate and well-controlled studies of naproxen that support your assertion that naproxen's transient inhibition of platelet aggregation is pharmocodynamically comparable to aspirin or clinically effective in decreasing the risk of MIs. Therefore, your representation that naproxen prolongs bleeding time and inhibits platelets identically to aspirin is misleading, and minimizes the potential seriousness of this finding. As you know, the

Raymond V. Gilmartin                                                                    Page 4
Merck & Co., Inc.
NDA 21-042

reason for the difference between Vioxx and naproxen has not been determined; it is also possible that
Vioxx has pro-thrombotic properties. Also, the MI rate that you report for Vioxx is inaccurate; the MI
rate for Vioxx in the VIGOR study was 20 MIs among 4047 patients (0.5%), not 0.4%, as you stated.

Your minimization of the seriousness of the MI rates observed in the Vioxx treatment arm of the
VIGOR trial is further reinforced in your audio conferences by your discussion of a retrospective
analysis of this trial. For example, in your June 21, 2000, audio conference, you state that,

> ...Merck went and pulled out those patients that again were enrolled in VIGOR and asked the
> question, who were those patients that really needed secondary cardiovascular prophylaxis
> from the get go, and that ended up being four percent of the study group in VIGOR based on
> whether there was a prior MI, stroke, TIA, angina, CABG or PTCA....Now if you look at the
> remaining part of VIGOR, which is 96 percent of the VIGOR population, and once again
> looked for the MI rate between Naprosyn and Vioxx, there's no statistically significant
> difference in the MI rate between Naprosyn and Vioxx. In fact, Naprosyn is 0.2 percent and
> Vioxx is 0.1 percent.

Your claim that the MI rate for naproxen was 0.2 percent and for Vioxx was 0.1 percent is again
inaccurate. Contrary to your claim that there was a higher rate of MIs in the naproxen group compared
to the Vioxx group, the MI rate for Vioxx in this subpopulation was 12 MIs among 3877 patients
(0.3%) as compared to 4 MIs among 3878 patients (0.1%) for naproxen.

Moreover, you again minimize the Vioxx MI observed in the VIGOR study by your comparison of
this rate to the rate of MIs observed for Celebrex (celecoxib) in the Celebrex Long-Term Arthritis
Safety Study (CLASS). For example, in your June 21, 2000, audio conference you state, "Now if you
remember the crude MI rate of Vioxx in VIGOR that number was 0.4 percent which is basically the
same or in fact a little bit less then the crude MI rate of Celebrex in CLASS which is 0.5 percent."
Your claim that the MI rates of Vioxx compared to Celebrex were basically the same, "or in fact a little
bit less" is misleading. You are comparing MI rates from two different trials with different patient
populations. For example, patients who had angina or congestive heart failure with symptoms that
occurred at rest or minimal activity and patients taking aspirin, including low-dose (325 mg or less,
daily or every other day) or other antiplatelet agents (e.g., ticlopidine) were excluded from the VIGOR
trial. The CLASS trial in contrast, did not exclude patients of this type. The CLASS trial thus may
have included patients at a higher risk for MIs.

Minimization of Vioxx / Coumadin Interaction

Statements made during your promotional audio conferences also minimize the risk of Vioxx therapy
in patients who are taking warfarin. For example, in your June 16, 2000, audio conference you stated
that, "...if you look at the thromboembolic events it's very clear that these selective COX-2 inhibitors
have the benefit of not having platelet aggregation and bleeding time, and therefore, can be used safely
in terms of post-op and with Coumadin." Your statement that Vioxx can be used safely with warfarin
minimizes the precaution in the PI that states that "...in post-marketing experience, bleeding events
have been reported, predominately in the elderly, in association with increases in prothrombin time in
patients receiving Vioxx concurrently with warfarin." Your promotion minimizing the risk of using
Vioxx and warfarin concurrently is particularly troublesome because Merck was aware of this
potentially dangerous drug interaction in 1999, well before these audio conferences occurred. In fact,

Raymond V. Gilmartin                                                          Page 5
Merck & Co., Inc.
NDA 21-042

Merck began disseminating a revised PI in October 1999, which included new information about this risk.

The seriousness of this interaction is further minimized by your suggestion that COX-2 inhibitors, including Vioxx, can be used safely with warfarin because it "has the benefit of not having platelet aggregation and bleeding time." This claim implies that Vioxx is safer than other NSAIDS used in combination with warfarin. However, Vioxx has not been studied in head-to-head trials prospectively designed to assess this specific endpoint. Your superiority claim is therefore misleading.

We note that earlier in your June 16, 2000, promotional audio conference you state, "It can be used in people with Coumadin, although with Coumadin you've got to check their INR three and four days after you add the Cox inhibitor to the Coumadin because there may be a bump in the INR." This disclosure does not correct the overall misleading message, however, nor does it correct your suggestion that Vioxx is safer than other NSAIDs in patients taking warfarin.

<u>Omission of Important Risk Information</u>

Your promotional audio conferences fail to present serious and significant risks associated with Vioxx therapy. For example, your promotional audio conferences fail to state that Vioxx is contraindicated in patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. You also fail to present the gastrointestinal (GI) warning about the possibility of serious GI toxicity such as bleeding, ulceration, or perforation in patients taking Vioxx. Moreover, you fail to present Vioxx's precautions for use in patients who have liver and kidney disease, information about patient populations in which Vioxx's use is not recommended, such as women in late pregnancy, and information about Vioxx's most common adverse events.

<u>Unsubstantiated Superiority Claims</u>

You make several unsubstantiated superiority claims for Vioxx throughout your promotional audio conferences. For example, in your June 16, 2000, audio conference, you claim that, "The importance of [VIGOR and CLASS] is that the data is going to really help change I believe the package inserts for [Vioxx and Celebrex] down the road because it really shows once again that they are safer than non-steroidals." Your suggestion that COX-2 inhibitors, including Vioxx, have an overall safety profile that is superior to other NSAIDs is misleading because such an advantage has not been demonstrated. In fact, in the VIGOR study the incidence of serious adverse events was higher in the Vioxx treatment group than in the naproxen treatment group (9.3% and 7.8% for Vioxx and naproxen, respectively). The results of safety analyses that were pre-specified in the protocol for the VIGOR trial, such as CHF-, related adverse events and discontinuations due to edema-related adverse events, hepatic-related adverse events, hypertension-related adverse events, and renal-related adverse events were all numerically higher (in some cases statistically significantly higher) in the Vioxx treatment group than in the naproxen treatment group. Furthermore, your claim that the VIGOR and CLASS trials "show once again that they are safer than non-steroidals" is also misleading because it implies that the results of the VIGOR trial (i.e., patients on Vioxx had a significantly lower cumulative incidence of PUBs than patients on naproxen) can be applied to the entire class of NSAIDs.

In your June 16, 2000, audio conference you state, "…if you look at the thromboembolic events it's very clear that these selective COX-2 inhibitors have the benefit of not having platelet aggregation and

Raymond V. Gilmartin                                                    Page 6
Merck & Co., Inc.
NDA 21-042

bleeding time, and therefore, can be used safely in terms of post-op and with Coumadin." This claim
suggests that Vioxx is safer, or has fewer side effects, than other NSAIDs used in the post-operative
setting because COX-2 inhibitors do not affect platelet aggregation and bleeding time. Vioxx has not
been studied, however, in head-to-head trials prospectively designed to assess its safety compared to
other NSAIDS in the post-operative setting. Your superiority claim is therefore misleading.

Further examples of your unsubstantiated superiority claims include your claim that, "In terms of half
life Vioxx has a half life of 17 hours and is truly a once a day drug, whereas Celebrex has a half life of
11 hours and is a BID (twice a day) drug," stated in your June 16, 2000, audio conference. This claim
is misleading because it suggests that Celebrex must be dosed twice a day for all of its approved
indications. In fact, Celebrex is approved for use either twice a day, or once a day, for the treatment of
osteoarthritis. Therefore, your claim that Celebrex is a "BID drug" is misleading.

Promotion of Unapproved Uses

Your audio conferences are misleading because they promote Vioxx for unapproved uses. For
example, in your June 21, 2000, conference, you claim that in the VIGOR study, "...the Vioxx 50
milligrams a day and the Naprosyn, a gram a day, were absolutely equally effective in terms of treating
the patients with rheumatoid arthritis." Your claim is misleading because it suggests that Vioxx is
effective for the treatment of rheumatoid arthritis when this has not been demonstrated. The VIGOR
study was not designed to assess the efficacy of Vioxx for the treatment of rheumatoid arthritis. Your
claim that Vioxx is "absolutely equally effective" to naproxen in treating patients with rheumatoid
arthritis is also misleading because this has not been demonstrated by adequate and well-controlled
clinical studies, and because the VIGOR study was not capable of assessing their comparative
effectiveness.

Your promotional audio conferences are also misleading because they suggest that Vioxx is safe and
effective for other unapproved uses such as the prevention of cancer and invasive cancer, and for the
treatment of Alzheimer's disease and gout. Examples of claims that promote Vioxx for unapproved
uses, include, but are not limited to, your claims in your June 16, 2000 audio conference that,
"...COX-2 seems to be able to interfere with...programmed cell death. Therefore, you get this
increased cell growth which allows polps to form, cancer and then invasive cancer. And by blocking
COX-2 you can actually prevent the development of colon polyps, cancer and invasive cancer."
Additional examples include your claims that "So we tried it [Vioxx] after Vioxx was released and
really within one or two pills acute attacks of gout were being shut down," and "Specifically, if you
looked at potential uses of these drugs, the most exciting right now I guess in two areas, one is
Alzheimer's disease...."

**Press Release**

We have identified a Merck press release entitled, "Merck Confirms Favorable Cardiovascular Safety
Profile of Vioxx," dated May 22, 2001, that is also false or misleading for similar reasons stated above.
Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile,"
is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to
naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is
misleading; in fact, serious cardiovascular events were twice as frequent in the VIOXX treatment
group (101 events, 2.5%) as in the naproxen treatment group (46 events, 1.1%) in the VIGOR study.

Raymond V. Gilmartin                                          Page 7
Merck & Co., Inc.
NDA 21-042

## Oral Representations

Merck sales representatives have engaged in false or misleading promotional activities that also minimize the potentially serious MI results observed in the VIGOR trial.  Specifically, Merck sales representatives made false or misleading statements to DDMAC reviewers at two different professional meetings.  At your exhibit booth during the 119th Annual Meeting of the Maryland Pharmacists Association (MPhA), in Ocean City, Maryland, June 9 - June 12, 2001, your representative stated that the increased MI rate seen in patients on Vioxx in the VIGOR study is due to the fact that naproxen works just like aspirin (i.e., inhibits clotting and platelet aggregation).  In addition, during the Annual Meeting of the American Society of Health-Systems Pharmacists (ASHP), in Los Angeles, California, June 3 – June 6, 2001, your representative stated that Vioxx had a greater MI rate in the VIGOR trial because naproxen is cardioprotective, having platelet effects similar to aspirin.  These statements made by your sales representatives are misleading for the reasons stated above.

## Conclusions and Requested Actions

The promotional activities and materials described above minimize the potentially serious cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx / Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses.  On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.  This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages.  This corrective action plan should also include:

1.  Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.

2.  Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information.  This proposed letter should be submitted to us for review prior to its release.  After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

3.  A written statement of your intent to comply with "1" and "2" above.

Your written response should be received no later than October 1, 2001.  If you have any questions or comments, please contact Lesley Frank, Ph.D., JD, by facsimile at (301) 594-6771, or at the Food and Drug Administration, Division of Drug Marketing, Advertising and Communications, HFD-42, Rm. 17B-20, 5600 Fishers Lane, Rockville, MD 20857.  We remind you that only written communications are considered official.

Raymond V. Gilmartin                                                    Page 8
Merck & Co., Inc.
NDA 21-042

In all future correspondence regarding this particular matter, please refer to MACMIS ID #9456 in addition to the NDA number.

The violations discussed in this letter do not necessarily constitute an exhaustive list. We are continuing to evaluate other aspects of your promotional campaign for Vioxx, and may determine that additional remedial messages will be necessary to fully correct the false or misleading messages resulting from your violative conduct.

Failure to respond to this letter may result in regulatory action, including seizure or injunction, without further notice.

Sincerely,

*(See appended electronic signature page)*

Thomas W. Abrams, R.Ph., MBA
Director
Division of Drug Marketing,
  Advertising, and Communications

EXHIBIT C: Re: In Re Vioxx Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp.,* 2:07-cv-00905-EEF-DEK

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. |
| v. | |
| MERCK SHARP & DOHME CORP. | VIOLATION: |
| Defendant | 21 U.S.C. §§ 331(a), 333(a)(1), 352(f)(1) (misbranding) |

## INFORMATION

The United States Attorney charges that:

## PRELIMINARY ALLEGATIONS

At all times material hereto, unless otherwise alleged:

## The Defendant

1.      Between May 1999 and September 2004, Merck & Co., Inc. was a New Jersey

corporation headquartered in Whitehouse Station, New Jersey, and was the operating company

for Merck's pharmaceutical business in the United States.  As a result of a reverse merger with

another pharmaceutical company in 2009, Merck & Co., Inc. became a wholly-owned subsidiary

of the acquiring company and was renamed **MERCK SHARP & DOHME CORP.**  The

acquiring company was renamed Merck & Co., Inc.  The new Merck & Co., Inc. is a holding

company for **MERCK SHARP & DOHME CORP.** and other corporate entities.  Currently,

**MERCK SHARP & DOHME CORP.** ("MERCK") is the operating company in the United

States for the pharmaceutical business formerly conducted by Merck & Co. Inc.  **MERCK** was

publicly traded (NYSE ticker symbol MRK).

1

2.      MERCK was engaged in, among other things, the development, manufacture, promotion, sale and distribution of prescription drugs intended for human use nationwide and in the District of Massachusetts.  MERCK sold billions of dollars of pharmaceutical products each year.

3.      One prescription drug that was developed, manufactured, promoted, and sold by MERCK was Vioxx, a pain relief medication.  Vioxx was distributed by MERCK into interstate commerce in the United States, including specifically into Massachusetts, from in or about May 1999 through in or about September 2004, when MERCK withdrew Vioxx from the market.

### The FDA and the FDCA

4.      The United States Food & Drug Administration ("FDA") was the federal agency of the United States responsible for protecting the health and safety of the public by enforcing the Federal Food, Drug & Cosmetic Act ("FDCA") and ensuring, among other things, that drugs intended for use in humans were safe and effective for their intended uses and that the labeling of such drugs bore true and accurate information.

5.      The FDCA and its implementing regulations required that before a new drug was legally distributed in interstate commerce, the sponsor of a new drug was required to submit a New Drug Application ("NDA") to the FDA.

6.      The FDCA required that the NDA include proposed labeling for the proposed intended uses of the drug which included, among other things, the conditions for therapeutic use. The NDA was required to provide, to the satisfaction of FDA, data generated in adequate and well-controlled clinical investigations that demonstrated that the drug was safe and effective when used in accordance with the proposed labeling.

2

7.     An NDA sponsor was not permitted to promote or market the drug until the FDA had approved an NDA, including approval of the proposed labeling.  Moreover, if approved by the FDA, the sponsor of the NDA was permitted to promote and market the drug only for the medical conditions of use specified in the approved labeling.  Uses not approved by the FDA were known as "unapproved"or "off-label" uses.

8.     The FDCA, and its implementing regulations, required the sponsor to file a new NDA, or amend the existing NDA, in order to label or promote a drug for uses different from the conditions for use specified in the approved labeling.  The new or amended NDA was required to include a description of the newly proposed indications for use and evidence, in adequate and well-controlled clinical investigations, sufficient to demonstrate that the drug was safe and effective for the newly proposed therapeutic use or uses.  Only upon approval of the new NDA, or supplement, could the sponsor promote the drug for the new intended use.

9.     Under the FDCA, a drug was "misbranded" if its labeling did not contain "adequate directions for use."  21 U.S.C. § 352(f)(1).  "Adequate directions for use" meant directions under which a layperson could use a drug safely and effectively for the purposes for which it was intended. 21 C.F.R § 201.5.  A prescription drug, by definition, could not bear adequate directions for use by a layperson, but an FDA-approved prescription drug, bearing the FDA-approved labeling, could be exempt from the adequate directions for use requirement if it was sold for an FDA-approved use.  A prescription drug that was marketed for non-approved, off-label uses, did not qualify for this exemption and therefore was misbranded.  21 C.F.R. § 201.100.

3

10.     The FDCA prohibited, among other things, the distribution in interstate commerce of a misbranded drug.

**The Vioxx Approval Process**

11.     On or about November 23, 1998, MERCK submitted an NDA for approval of a drug called Vioxx (chemical name: rofecoxib), which was a new drug within the meaning of 21 U.S.C. §321(p) and 21 C.F.R. §310.3(h)(4) and (5).  In that application, MERCK sought to demonstrate the drug's safety and efficacy for, and sought approval for, use for relief of the signs and symptoms o̲ ̲ ̲ ̲management of pa̲ ̲ ̲and̲treatment of primary d̲ smenorrh̲ (the "Approved Uses").  On or about May 20, 1999, the FDA approved Vioxx for those uses and approved a label on that same date.  Vioxx was not then approved for any use or condition other than the Approved Uses.

12.     From at least May of 1999 through in or about April 2002, unapproved or off-label uses for Vioxx included the treatment of the signs and symptoms of rheumatoid arthritis.

13.     In 1999, MERCK initiated a clinical trial, known as Vioxx Gastrointestinal Outcomes Research ("VIGOR"), designed to determine whether Vioxx was safer for the gastrointestinal tract than traditional pain relievers.  The VIGOR trial was a prospective, randomized, double blind comparison of 50 mg of Vioxx and 1000 mg of naproxen in over 8,000 patients with rheumatoid arthritis.   The VIGOR results were made public by MERCK and provided to the FDA in March 2000.

14.     In February 2001, MERCK submitted a supplemental NDA seeking FDA approval of  rheumatoid arthritis as an indication for use for Vioxx.

4

15.   On or about April 11, 2002, the FDA approved Vioxx for the treatment of rheumatoid arthritis.

16.   Between May 1999 and April 11, 2002, MERCK promoted Vioxx to physicians for the treatment of rheumatoid arthritis, an unapproved use, before there was an FDA approved indication for rheumatoid arthritis.

17.   On September 17, 2001, the FDA sent MERCK a Warning Letter regarding MERCK's improper promotional practices in connection with its marketing of Vioxx.  In that Warning Letter, among other things, the FDA stated that MERCK was promoting Vioxx for unapproved uses, including rheumatoid arthritis.  In particular, the FDA's Warning Letter stated:

> Your [MERCK's] audio conferences are misleading because they promote
> Vioxx for unapproved uses.  For example, in your June 21, 2000,
> conference, you claim that in the VIGOR study ". . . the Vioxx 50
> milligrams a day and the Naprosyn, a gram a day, were absolutely equally
> effective in terms of treating the patients with rheumatoid arthritis."  Your
> claim is misleading because it suggests that Vioxx is effective for the
> treatment of rheumatoid arthritis when this has not been demonstrated.

18.   Both before and after receipt of the Warning Letter, MERCK through its representatives promoted Vioxx for rheumatoid arthritis without any FDA approved indication for rheumatoid arthritis.  For example, various MERCK sales representatives recorded in their call notes instances of promoting Vioxx for rheumatoid arthritis, including the following:

- March 20, 2000 – Representative A recorded as an "accomplishment" that he was able to "gain agreement on use of Vioxx for Ra [rheumatoid arthritis]" with Physician 1.

- March 24, 2000 – Representative B noted as a "strategy" with Physician 2 that he would "Continue to push Vioxx past Celebrex.  Build on story of RA pat[ient]

5

given 12.5 mg Vioxx."

- September 5, 2000 - Representative C noted as a "next call strategy" that she urged that Physician 3 "use [Vioxx] first line in OA and RA pts."

- September 15, 2000 - Representative D noted as an accomplishment in his interaction with Physician 4 that he had an "in depth talk on RA and OA and how Vioxx helps during a lunch tutorial."

- October 16, 2000 – Representative E noted as a "strategy" with Physician 5 that he would "reinforce efficacy of Vioxx vs Celebrex for RA and pain."

- June 27, 2001 – Representative F noted as an "accomplishment" that "v[ioxx] is eff[ective] in ra" in conversation with Physician 6.

- June 28, 2001 -- Representative G noted as an "accomplishment" that she had "discussed" with Physician 7 "additional uses/benefits of V[ioxx]" which included rheumatoid arthritis.

- September 25, 2001 – Representative H noted as an "accomplishment" in a conversation with Physician 8 that he had "discussed Vioxx excellent efficacy and off-label use in RA."

- November 15, 2001 – Representative I noted as a "strategy" for his interaction with Physician 9 that he would "gain agreement that Vioxx can be used for RA."

## COUNT ONE

### (Distribution of a Misbranded Drug: Inadequate Directions for Use
### 21 U.S.C. §§331(a), 333(a)(1) & 352(f)(1))

19.    The allegations in paragraphs 1 through 18 are realleged and incorporated by reference herein.

20.    Beginning as early as May 1999, and continuing thereafter until on or about April 11, 2002, in the District of Massachusetts and elsewhere, the defendant,

### MERCK SHARP & DOHME CORP.

did introduce and cause the introduction, and did deliver for introduction and cause for delivery for introduction into interstate commerce, quantities of Vioxx, a drug within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §321(g), for an unapproved use, namely the treatment of rheumatoid arthritis, which drug was misbranded within the meaning of 21 U.S.C. §352(f)(1), in that Vioxx's labeling lacked adequate direction for such use.

All in violation of 21 U.S.C. §§331(a), 333(a)(1), and 352(f)(1).


CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By:    *Susan Winkler*
JEREMY M. STERNBERG
SUSAN G. WINKLER
ZACHARY A. CUNHA
ASSISTANT U.S. ATTORNEYS

JILL P. FURMAN
ASSISTANT DIRECTOR
OFFICE OF CONSUMER LITIGATION

7

EXHIBIT O:  Re: In Re Vioxx Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp., 2:07-cv-00905-EEF-DEK*



Ik, MD 20850

IND 46,894: VIOXX™ (Rofecoxib)

Background Information
(Peri-Operative Analgesia)

pain"

there publically

VIOXX™.                                "c,      pain"

Jonca Bull, M.D., Acting Director
IND 46,894: VIOXX™ (Rofecoxib)
Page 2

We consider the information included in this submission to be a confidential matter, and request
that the Food and Drug Administration not make its content, nor any future communications in
regard to it, public without first obtaining the written permission of Merck & Co., Inc.

If you have any questions or need additional information please contact Robert E. Silverman,
M.D. Ph.D. (610) 397-2944 or, in my absence, Bonnie J. Goldmann, M.D. (610) 397-2383.

Sincerely,

Robert E. Silverman, M.D., Ph.D.
Senior Director
Regulatory Affairs

Federal Express #1

Attachment
Desk Copies (15):        Ms. Sandra Folkendt, HFD-550, Room N322

q:/acld/vioxx/background/perio/covltr

Confidential - Subject To Protective Order  MRK-NJ0169023

MRK-NJ0169022
MRK-NJ0169226
MRK-NJ0169021
MRK-NJ0169226
04/20/2001
IND 46,894 Vioxx (Rofecoxib) / background information / (peri operative analgesia) [12/00/1993 - 04/20/2001]
Silverman, Robert E
Bull, Jonca
Folkendt, Sandra
Letter
Gertz, Barry
NO
YES

Robert E Silverman, M.D., Ph.D.
Senior Director
Regulatory Affairs
April 20, 2001
Jonca Bull, M.D., Acting Director
Division of Anti-Inflammatory, Analgesic and
Ophthalmologic Drug Products
HFD-550, Room N314
Office of Drug Evaluation V (CDER)
Food and Drug Administration
9201 Corporate Blvd.
Rockville, MD 20850
Dear Dr. Bull:
Merck & Co., Inc.
P.O. Box 4
West Point PA 19486
Tel 610 397 2944

215652 5000
Fax 610 397 2516
MERCK
Research Laboratories
Serial No. 897
IND 46,894: VIOXXTm (Rofecoxib)
Background Information
(Peri-Operative Analgesia)
Reference is made to the above Investigational New Drug Application (IND). ZD
Merck Research Laboratories (MRL), a Division of Merck & Co., Inc., is planning to initiate a
clinical development program to support a new indication for VIOXXI'm for the "peri-operative
management of post-operative pain". MRL believes that this potential use of VIOXXI'11
represents an important therapeutic advance that is not included in the current product circular.
This specific indication, we believe, has not previously been registered by any analgesic nor is
there publically available guidance from the Agency on the development of drugs for this
indication. MRL would like to discuss our development program to solicit the Agency's
concurrence with the plan prior to the initiation of pivotal trials.

By this letter, therefore, MRL is requesting a meeting with the FDA to discuss our peri-operative
analgesia program. Enclosed is a Background Package that contains; a proposed agenda for the
meeting; a list of MRL participants; a set of questions or issues for discussion; a brief report on
the background, rationale and outline of the proposed clinical program; and a draft clinical
protocol for one of the pivotal trials.

MRL will also be submitting within the next few weeks, a Background Package and a meeting
request to discuss our proposed clinical program to support a "chronic pain" indication for
VJOY,XTIM. MRL is amenable to merging the discussions of peri-operative analgesia and chronic
pain into a single meeting with the Agency at the Agency's discretion.
To facilitate the scheduling of the meeting(s), Dr. Silverman will contact Ms. Folkendt within the
next two weeks. MRL looks forward to the discussion with the FDA.
Confidential   Subject To Protective Order MRK-NJO169022

###1|||Page MRK-NJO189022^^^

Jonca Bull, M.D., Acting Director
I'ND 46,894: VIOXXTM (Rofecoxib)
Page 2

We consider the information included in this submission to be a confidential matter, and request that the Food and Drug Administration not make its content, nor any future comi-nunications in regard to it, public without first obtaining the written permission of Merck & Co., Inc.

If you have any questions or need additional information please contact Robert E. Silverman, M.D., Ph.D. (610) 397-2844 or, in my absence, Bonnie J. Goldmann, M.D. (610) 397-2383.

Sincerely,

Robert E. Silverman, M.D., Pli-D.
Senior Director
Regulatory Affairs
Federal Express #1

Attachment

Desk Copies (15): Ms. Sandra Folkendt, HFD-550, Room N322
q: i'acid/vioxxY.background/perio/covltr
Confidential - Subject To Protective Order
MRK-NJO169023

###2|||Page MRK-NJO169023^^^

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PUBLIC HEALTH SERVICE**
**FOOD AND DRUG ADMINISTRATION**
**INVESTIGATIONAL NEW DRUG APPLICATION (IND)**
*(TITLE 21, CODE OF FEDERAL REGULATIONS (CFR) PART 312)*

Form Approved: OMB No. 0910-0014
Expiration Date: September 30, 2002
See OMB Statement on Reverse

NOTE: No drug may be shipped or clinical investigation begun until an IND for that investigation is in effect (21 CFR 312.40)

1. OF SPONSOR
...ck & Co., Inc.

2. DATE OF SUBMISSION
April 20, 2001

3. ADDRESS (Number, Street, City, State and Zip Code)
Sumneytown Pike
P.O. Box 4, BLA-28
West Point, PA 19486

4. TELEPHONE NUMBER (Include Area Code)
(610) 397-2944

5. NAME(S) OF DRUG (Include all available names: Trade, Generic, Chemical, Code)
VIOXX™ (Rofecoxib), L-748751, MK-0966

6. IND NUMBER (if previously assigned)
46,894

7. INDICATION(S) (Covered by this submission)
Treatment of osteoarthritis, rheumatoid arthritis, acute pain, primary dysmenorrhea

8. PHASE(S) OF CLINICAL INVESTIGATION TO BE CONDUCTED    ☐ PHASE 1   ☐ PHASE 2   ☐ PHASE 3   ☐ OTHER (Specify)

9. LIST NUMBERS OF ALL INVESTIGATIONAL NEW DRUG APPLICATIONS (21 CFR Part 312), NEW DRUG OR ANTIBIOTIC APPLICATIONS (21 CFR Part 314), DRUG MASTER FILES (21 CFR Part 314.420), AND PRODUCT LICENSE APPLICATIONS (21 CFR Part 601) REFERRED TO IN THIS APPLICATION.

10. IND submission should be consecutively numbered. The initial IND should be numbered "Serial Number: 000." The next submission (e.g. amendment, report, or correspondence) should be numbered "Serial Number: 001." Subsequent submissions should be numbered consecutively in the order in which they are submitted.

SERIAL NUMBER
B97

11. THIS SUBMISSION CONTAINS THE FOLLOWING: (Check all that apply)
☐ INITIAL INVESTIGATIONAL NEW DRUG APPLICATION (IND)          ☐ RESPONSE TO CLINICAL HOLD

PROTOCOL AMENDMENT(S):
☐ NEW PROTOCOL
☐ CHANGE IN PROTOCOL
☐ NEW INVESTIGATOR

INFORMATION AMENDMENT(S):
☐ CHEMISTRY/MICROBIOLOGY
☐ PHARMACOLOGY/TOXICOLOGY
☐ CLINICAL

IND SAFETY REPORT(S):
☐ INITIAL WRITTEN REPORT
☐ FOLLOW-UP TO A WRITTEN REPORT

☐ RESPONSE TO FDA REQUEST FOR INFORMATION          ☐ ANNUAL REPORT          ☐ GENERAL CORRESPONDENCE

☐ REQUEST FOR REINSTATEMENT OF IND THAT IS WITHDRAWN, INACTIVATED, TERMINATED OR DISCONTINUED
☒ OTHER Background Package - Peri-Operative Analgesia

CONTENTS OF APPLICATION

This application contains the following items: (Check all that apply)

- [ ] 1. Form FDA 1571 [21 CFR 312.23(a)(1)]
- [ ] 2. Table of Contents [21 CFR 312.23(a)(2)]
- [ ] 3. Introductory statement [21 CFR 312.23(a)(3)]
- [ ] 4. General Investigational plan [21 CFR 312.23(a)(3)(iv)]
- [ ] 5. Investigator's brochure [21 CFR 312.23(a)(5)]
- [ ] 6. Protocol(s) [21 CFR 312.23(a)(6)]
  - [ ] a. Study protocol(s) [21 CFR 312.23(a)(6)]
  - [ ] b. Investigator data [21 CFR 312.23(a)(6)(iii)(b)] or completed Form(s) FDA 1572
  - [ ] c. Facilities data [21 CFR 312.23(a)(6)(iii)(b)] or completed Form(s) FDA 1572
  - [ ] d. Institutional Review Board data [21 CFR 312.23(a)(6)(iii)(b)] or completed Form(s) FDA 1572
- [ ] 7. Chemistry, manufacturing, and control data [21 CFR 312.23(a)(7)]
  - [ ] Environmental assessment or claim for exclusion [21 CFR 312.23(a)(7)(iv)(e)]
- [ ] 8. Pharmacology and toxicology data [21 CFR 312.23(a)(8)]
- [ ] 9. Previous human experience [21 CFR 312.23(a)(9)]
- [ ] 10. Additional information [21 CFR 312.23(a)(10)]

IS ANY PART OF THE CLINICAL STUDY TO BE CONDUCTED BY A CONTRACT RESEARCH ORGANIZATION?  ☐ YES  ☐ NO

IF YES, WILL ANY SPONSOR OBLIGATIONS BE TRANSFERRED TO THE CONTRACT RESEARCH ORGANIZATION?  ☐ YES  ☐ NO

IF YES, ATTACH A STATEMENT CONTAINING THE NAME AND ADDRESS OF THE CONTRACT RESEARCH ORGANIZATION, IDENTIFICATION OF THE CLINICAL STUDY, AND A LISTING OF THE OBLIGATIONS TRANSFERRED.

NAME AND TITLE OF THE PERSON RESPONSIBLE FOR MONITORING THE CONDUCT AND PROGRESS OF THE CLINICAL INVESTIGATIONS

NAME(S) AND TITLE(S) OF THE PERSON(S) RESPONSIBLE FOR REVIEW AND EVALUATION OF INFORMATION RELEVANT TO THE SAFETY OF THE DRUG

I agree not to begin clinical investigations until 30 days after FDA's receipt of the IND unless I receive earlier notification by FDA that the studies may begin. I also agree not to begin or continue clinical investigations covered by the IND if those studies are placed on clinical hold. I agree that an Institutional Review Board (IRB) that complies with the requirements set forth in 21 CFR Part 56 will be responsible for initial and continuing review and approval of each of the studies in the proposed clinical investigation. I agree to conduct the investigation in accordance with all other applicable regulatory requirements.

NAME OF SPONSOR OR SPONSOR'S AUTHORIZED REPRESENTATIVE

Robert E. Silverman, M.D., Ph.D.
Senior Director, Regulatory Affairs

SIGNATURE OF SPONSOR OR SPONSOR'S AUTHORIZED REPRESENTATIVE

ADDRESS (Number, Street, City, State and ZIP Code)

P.O. Box 4, BL A-26
West Point, PA 19486

TELEPHONE NUMBER (Include Area Code)
(484) 344-

DATE
April 20, 2001

(WARNING: A willfully false statement is a criminal offense. U.S.C. Title 18, Sec. 1001.)

Food and Drug Administration
CDER Central Document Room
5901 Ammendale Road
Beltsville, MD 20705

Please DO NOT RETURN this application to the above address.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

FORM FDA 1571 (10/99)

PAGE 2 OF 2

Confidential - Subject to Protective Order

| **EXHIBIT EE**: Re: In Re Vioxx Products Liability Litigation, MDL No. 1657<br>*Dennis R. Harrison v. Merck Sharp & Dohme Corp.*, 2:07-cv-00905-EEF-DEK | Merck Announcement<br>Press Notes |
|---|---|

## VIOXX® Label Change
### Questions & Answers
### *For internal use only in response to media inquiries*

### FINAL: 4/11/02

### LABEL CHANGES

**Q1.** **Tell me about this label change for Vioxx approved by the FDA.**

**A1.** The label changes approved by the FDA include the addition of the findings from VIGOR, including GI and cardiovascular results, along with cardiovascular results from a placebo-controlled database; and the addition of an expanded indication for a new use of Vioxx 25 mg in adult rheumatoid arthritis.

**Q2.** **Why did it take so long to receive this approval?  Why didn't you include the cardiovascular findings from VIGOR in your label sooner?**

**A2.** Merck first announced the preliminary results of the VIGOR study in March 2000.  Since that time, the results have been presented at major medical meetings, published in the *New England Journal of Medicine*, discussed at a public meeting of the FDA advisory committee, and debated in both the medical and lay press.  We believe the results have been broadly disseminated and widely known.

Since we filed the sNDA for VIGOR in June 2000, we have worked diligently with the FDA to include the results of VIGOR in the labeling for Vioxx.  We are pleased to bring that process to closure and to have the results of the study included in the labeling.

**Q3.** **What is Merck's take on why the label for Vioxx still carries the traditional NSAID warning?**

**A3.** The GI warning has been modified in the label for Vioxx to say: "Although the risk of GI toxicity is not completely eliminated with Vioxx, the results of the Vioxx GI Outcomes Research (VIGOR) study demonstrate that in patients treated with Vioxx, the risk of GI toxicity with Vioxx 50 mg once daily is significantly less than with naproxen 500 mg twice daily."

Merck worked with the FDA to update the label for Vioxx to reflect the findings of VIGOR, a study designed to evaluate whether Vioxx at twice its highest chronic dose would significantly reduce the risk of serious GI side effects compared to the NSAID naproxen.

With this important modification, Vioxx is the first and only medicine that selectively inhibits the COX-2 enzyme proven to reduce the risk of developing clinically important GI side effects compared to the commonly used NSAID naproxen, and to have such risk reductions cited in the label.

SCIENCE Q&A —   1

MRK-ADS0000216


NO. 693

**Q4.** What is Merck's reaction to having the cardiovascular data added to the Precautions section?

**A4.** Merck first announced the preliminary results of the VIGOR study in March 2000. Since that time, the results have been presented at major medical meetings, published in the *New England Journal of Medicine*, discussed at a public meeting of the FDA advisory committee, and debated in both the medical and lay press. We believe the results have been broadly disseminated and widely known.

Since we filed the sNDA for VIGOR in June 2000, we have worked diligently with the FDA to include the results of VIGOR in the labeling for Vioxx. We are pleased to bring that process to closure and to have the results of the study included in the labeling.

MRK-ADS0000217

**GI-specific language**

**Q5.**   **What were the key changes to the label as they relate to GI findings from VIGOR?**

**A5.**   The label now cites the results from VIGOR which showed that Vioxx 50 mg -- at twice the highest chronic dose -- significantly reduced the risk of serious GI side effects by 54 percent compared to naproxen and that the reduction in risk seen with Vioxx was maintained in patients with or without risk factors for developing symptomatic ulcers, perforations, obstructions and bleeds.  Risk factors included prior history of a PUB, age of 65 or older, *Helicobacter pylori* infection or concomitant use of corticosteroids.

The GI advantage of Vioxx vs. naproxen proven in VIGOR has resulted in a modification to the GI Warning section.

While the warning remains in the label for Vioxx, it has been modified to say: "Although the risk of GI toxicity is not completely eliminated with Vioxx, the results of the Vioxx GI Outcomes (VIGOR) study demonstrate that in patients treated with Vioxx, the risk of GI toxicity with Vioxx 50 mg once daily is significantly less than with naproxen 500 mg twice daily."

With this important modification, Vioxx is the first and only medicine that selectively inhibits the COX-2 enzyme proven to reduce the risk of developing clinically important GI side effects compared to naproxen, a commonly used NSAID, and to have such risk reductions cited in the label.

**Q6.**   **Does having the language on fewer GI events offset the NSAID warning language?**

**A6.**   While the GI warning still remains in the label for Vioxx, it has now been modified to reflect the GI results from VIGOR.  Vioxx is the first and only medicine that selectively inhibits the COX-2 enzyme proven to reduce the risk of developing clinically important GI side effects compared to naproxen.  We believe the modification of the NSAID Warning to reflect the GI safety advantage of Vioxx vs. naproxen will be viewed by physicians as an important differentiator for Vioxx and will be well received in the marketplace.

**Q7.**   **Is Merck conducting additional studies with Vioxx to further assess GI benefits?**

**A7.**   As with all our products, Merck continues to study Vioxx in order to advance the scientific knowledge of the product.  Specific information on our research and development program is proprietary.

**Q8.**   **Will Merck be conducting studies to assess the actual risk of GI events with Vioxx in order to remove the GI NSAID warning?**

**A8.**   As with all our products, Merck continues to study Vioxx in order to advance the scientific knowledge of the product.  Specific information on our research and development program is proprietary.

We are pleased that the label for Vioxx now contains a modification to the GI NSAID warning based on the results of VIGOR, which showed that Vioxx significantly reduced the risk of serious GI events by 54 percent compared to naproxen.

SCIENCE Q&A — 3

MRK-ADS0000218

**Q9.**   Is Merck conducting studies to demonstrate the effect on the GI tract of combining Vioxx plus low dose aspirin?

**A9.**   Yes.  We have a study under way to look at concomitant use of Vioxx and low-dose aspirin.  Results will be presented in a scientific forum once they become available.  Specific information on the study is proprietary.

MRK-ADS0000219

**VIGOR AEs/Discontinuations**

Q10.  What were the incidences of serious adverse events and discontinuations from the VIGOR study and how do they compare to your current label?

A10.  Rates of serious adverse events and discontinuations due to clinical adverse experiences were higher in studies with Vioxx 50 mg compared to studies with either 12.5 or 25 mg.  Chronic use of 50 mg is not recommended.

MRK-ADS0000220

<u>Cardiovascular</u>

**Q11.  Don't you have a new cardiovascular warning in the label?**

**A11.**  No.  The new cardiovascular language in our label is not a "warning;" it is a precaution.
A warning is intended to describe serious adverse reactions and potential safety
hazards.  A precaution describes "any special care to be exercised by the practitioner for
the safe and effective use of the product"[1].  The only warning that has been modified in
the label is the GI warning, which now reflects the GI advantage seen with Vioxx vs.
naproxen in VIGOR.

*(If pressed, refer to news release.)*

**Q12.  Do you believe there is a tradeoff between a reduction in GI risk with Vioxx versus
a cardiovascular risk?**

**A12.**  When physicians decide which medicine – if any – to prescribe for their patients, they
need to consider the benefits and risks of the medicine, as well as their patients' medical
condition and history and then make a decision about which medicine to prescribe.  We
believe that when physicians do that, they will continue to believe that Vioxx is an
appropriate choice for many of their patients with osteoarthritis, acute pain, and now
adult rheumatoid arthritis.

**Q13.  What is the exact mechanism for why there was a higher incidence of heart
attacks with Vioxx?**

**A13.**  The labeling for Vioxx includes the cardiovascular results of VIGOR and the
cardiovascular results from two placebo-controlled studies.  It does not take a position
on the cause of the difference in cardiovascular events in VIGOR.  It does make a point
of emphasizing that Vioxx is not a substitute for aspirin for cardiovascular prophylaxis
and that all of this information – the results of VIGOR, the placebo studies, and that
Vioxx is not a substitute for aspirin – should be considered by prescribers and that Vioxx
should be used with caution in patients with a history of ischemic heart disease.  Merck
will promote Vioxx in accordance with this labeling.  Scientifically, we recognize that
there are two possible alternate explanations for the results in VIGOR – one that Vioxx
caused the difference and one that naproxen caused the difference.  Merck scientists
continue to believe that the weight of the evidence indicates that the difference is a result
of an effect of naproxen.

**Q14.  Do the rates of cardiovascular events change over time?**

**A14.**  The labeling does not take a position on this question.  I can tell you that we did a
number of statistical tests to evaluate this question.  In these statistical tests, we saw no
evidence that the rates changed over time.

---

[1] FDA CDER handbook from FDA website.

MRK-ADS0000221

**Q15.** Is there a relationship between the incidence of hypertension/edema and the incidence of heart attacks?

**A15.** There was no correlation between hypertension/edema and cardiovascular events in VIGOR or any of our studies with Vioxx.

**Q16.** It appears some of the data/event rates in the new label specific to VIGOR are different from data previously published in NEJM. Can you explain?

**A16.** Merck first announced the preliminary results of the VIGOR study in March 2000. At that time, we released the "crude" rates of cardiovascular events, which represented the absolute incidence of patients who had events. Since that time, these results have been presented in many peer-reviewed, public forums in that way and also in terms of rates per 100 patient-years. These results have been presented at major medical meetings, published in *The New England Journal of Medicine*, discussed at a public meeting of the FDA advisory committee, and debated in both the medical and lay press. The labeling presents these same data by providing the number of events [Table 3]; and for overall thrombotic adverse events, it provides the cumulative rate at certain time points [Table 2].

Although there are different ways in which the data have been presented, the publications, presentations and labeling all make the same point – that the rate of cardiovascular events in the VIGOR study was higher in patients taking Vioxx than in patients taking naproxen and that this difference was largely due to a difference in the incidence of myocardial infarction.

**Q17.** What happened to your naproxen theory? It's not addressed in your news release. Do you still believe the findings were because of a cardiovascular benefit of naproxen?

**A17.** The labeling for Vioxx includes the cardiovascular results of VIGOR and the cardiovascular results from two placebo-controlled studies. It does not take a position on the cause of the difference in cardiovascular events in VIGOR. It does make a point of emphasizing that Vioxx is not a substitute for aspirin for cardiovascular prophylaxis and that all of this information – the results of VIGOR, the placebo studies, and that Vioxx is not a substitute for aspirin – should be considered by prescribers and that Vioxx should be used with caution in patients with a history of ischemic heart disease. Merck will promote Vioxx in accordance with this labeling. Scientifically, we recognize that there are two possible alternate explanations for the results in VIGOR – one that Vioxx caused the difference and one that naproxen caused the difference. Merck scientists continue to believe that the weight of the evidence indicates that the difference is a result of an effect of naproxen.

**Q18.** What is the status of the CV outcomes study with Vioxx? With Arcoxia?

**A18.** We are planning to conduct appropriate large-scale studies to further assess the cardiovascular profile of our COX-2 medicines. Specific details of those studies are proprietary.

MRK-ADS0000222

Q19. When will the placebo-controlled studies mentioned under the cardiovascular effects section be completed?  What did they intend to show?

A19. The placebo-controlled studies are studies evaluating Vioxx in elderly patients with Alzheimer's disease and mild cognitive impairment.  One of the studies, which has been completed, evaluated the effect of Vioxx 25 mg in slowing the progression of Alzheimer's disease.  This study did not show evidence of efficacy.  The finding is not unexpected given new data which suggests that if NSAIDs were to be effective, they need to be given several years prior to the treatment of Alzheimer's disease. [Note: a replicate study of the completed study mentioned above was subsequently stopped early with no analysis of efficacy undertaken.]  Another study, which is currently ongoing, is evaluating the effects of Vioxx 25 mg in preventing the progression of Alzheimer's disease in patients with mild cognitive impairment.  Preliminary results were obtained and included in the database for evaluation of cardiovascular thrombotic events and deaths related to those events as noted in the label.

Q20. Have the Alzheimer's data been made public prior to it being added to your label?

A20. Yes.  These data were discussed during the FDA Advisory Committee meeting that reviewed the results of VIGOR and were included in the cardiovascular pooled-analysis presented at the European League Against Rheumatism (EULAR) and American College of Rheumatology (ACR) annual meetings last year, and subsequently published in *Circulation*, October 2001.

Q21. Tell me about the difference in the death rates with Vioxx and placebo that your label cites from the placebo-controlled studies.

A21. First, the number of events was small:  8 vs 3.  Second, this difference was not statistically significant and third, the number of events in VIGOR was similar: 7 vs 6.

Q22. What were the cardiovascular findings in the Phase III RA studies with Vioxx?

A22. In the Phase IIb/III rheumatoid arthritis studies that evaluated Vioxx 25 mg once daily with naproxen 500 mg twice daily, the difference between the two groups was generally similar to what was observed in VIGOR.  These data were included in the cardiovascular pooled-analysis presented at the EULAR and ACR annual meetings last year, and subsequently published in *Circulation*, October 2001.

MRK-ADS0000223

**Renal-Specific**

**Q23.**   **What were the rates of hypertension and edema with Vioxx in VIGOR and how did they relate to your overall safety findings in VIGOR?**

**A23.**   The incidences of hypertension and edema reported in VIGOR were consistent with those reported in the Phase III studies [*NOTE*: these were mostly from the OA endoscopy studies] that evaluated the chronic use of Vioxx 50 mg in osteoarthritis patients.  In VIGOR, hypertension was reported in 8.5 percent of patients and lower extremity edema was reported in 4.0 percent of patients taking Vioxx 50 mg – a dose two times the highest approved chronic dose for osteoarthritis and rheumatoid arthritis. In VIGOR, there was no correlation between these renal vascular effects and cardiovascular events.  As stated in the label, chronic use of Vioxx 50 mg is not recommended.

   [*If directly asked*:  The incidence of hypertension reported with naproxen 500 mg twice daily in VIGOR was 5.0 percent and the incidence of edema was 2.6 percent.]

**Q24.**   **How do the rates of hypertension and edema seen in VIGOR with Vioxx 50 mg compare to the current Vioxx label?  To those seen in CLASS with Celebrex?**

**A24.**   First, it's important to remember that all NSAIDs work by inhibiting COX-2 and all have effects on the kidney, as is reflected in the prescribing information for these medicines, including Vioxx and Celebrex as well as ibuprofen, diclofenac and naproxen.

   In VIGOR, the incidences of edema and hypertension with were consistent with those seen in the Phase III studies of osteoarthritis patients with Vioxx 50 mg, a dose two times the highest approved dose for chronic use.
   → With chronic dosing of 50 mg in the Phase III osteoarthritis studies, the incidence of hypertension was 8.2 percent, and the incidence of lower extremity edema was 6.3 percent.
   → In VIGOR, incidences for 50 mg were similar: hypertension was reported in 8.5 percent of patients and lower extremity edema in 4.0 percent.
   Per the label, chronic use of Vioxx 50 mg is not recommended.

   As for the hypertension and edema rates seen in the CLASS study, we cannot make direct comparisons across studies.  This is particularly true here because of differences in the length of the studies, methodologies, adverse event definitions and investigators.

   [*For Background*:  In the osteoarthritis studies that were conducted over a six-week to six-month duration, the combined incidence of hypertension was 3.0 percent for ibuprofen 2400 mg and 1.6 percent for diclofenac 150 mg; and the combined incidence of lower extremity edema was 3.8 percent for ibuprofen and 3.4 percent for diclofenac.]

MRK-ADS0000224

Q25.  **Why was there a two-fold higher incidence of hypertension seen with Vioxx 25 mg in the RA studies?  Why does this differ from the results seen in your osteoarthritis studies?**

A25.  It's important to remember that all NSAIDs work by inhibiting COX-2 and all have effects on the kidney, as is reflected in the prescribing information for these medicines, including Vioxx and Celebrex as well as ibuprofen, diclofenac and naproxen.  Therefore, increases in the incidence of hypertension are not unexpected.

As our label states, clinical trials with Vioxx at daily doses of 12.5 mg and 25 mg in patients with osteoarthritis have shown effects on hypertension and edema similar to those observed with comparator NSAIDs; these occurred with an increased frequency with chronic use of Vioxx at daily doses of 50 mg.  Chronic use of 50 mg is not recommended.  These Phase III clinical trials involved more than 4,000 patients.

It is not known why there were differing incidences of hypertension in the osteoarthritis and rheumatoid arthritis studies.  It is difficult to make comparisons across trials as the rheumatoid arthritis and osteoarthritis studies involved various NSAID comparators to Vioxx, and they examined different types of patients, with different investigators, and at different time periods.

[*For Background*:  In the osteoarthritis studies that were conducted over a six-week to six-month duration, the combined incidence of hypertension was 3.5 percent for Vioxx 12.5 mg or 25 mg compared to 3.0 percent for ibuprofen 2400 mg and 1.6 percent for diclofenac 150 mg.]

MRK-ADS0000225

RA-efficacy

Q26.   Is your RA indication coming later than expected?

A26.   No.  Merck announced the filing for the rheumatoid arthritis indication in April 2001.  The actual filing date was March 1, 2001.  In December 2001, Merck received an approvable letter from the FDA for our rheumatoid arthritis application.

Q27.   Was the patient population in the Phase III RA studies different/same as the RA population in VIGOR?

A27.   The patient populations for the Phase III studies and the VIGOR study were similar in that all patients had rheumatoid arthritis.  However, specific inclusion and exclusion criteria varied, reflective of the different study endpoints that were specified (VIGOR – GI safety and RA – efficacy).

       [For Background: In the Phase III studies designed to evaluate the efficacy of Vioxx in treating the signs and symptoms of rheumatoid arthritis, patients had to be at least 18 years of age or older (mean age 54) and diagnosed with rheumatoid arthritis for at least 6 months.  Only patients previously on chronic therapy with NSAIDs were enrolled, and only those who, following a washout of prestudy NSAIDs and demonstration of flare, were then randomized to Vioxx, naproxen or placebo.  Patients were allowed to take methotrexate or low-dose corticosteroids; and in one of the pivotal studies, patients were allowed to take aspirin (less than 5 percent did).

       In VIGOR, which was designed to be a rigorous evaluation of the GI profile of Vioxx at twice its highest chronic dose, patients included those with rheumatoid arthritis who were at least 50 years of age (or 40 years of age and receiving long-term glucocorticoid therapy) and who were expected to require NSAIDs for at least one year.  Patients were allowed to take disease-modifying drugs (e.g. methotrexate, corticosteroids) to control their rheumatoid arthritis.  The study was designed to exclude patients requiring aspirin for cardiovascular protection.]

Q28.   When will the results of your two Phase III studies for RA be published?

A28.   We consider our publication plans proprietary.

Q29.   Will you seek an indication for juvenile rheumatoid arthritis?  If so, when?

A29.   Our sNDA for Vioxx was for adult rheumatoid arthritis only.  Details on our regulatory filings are considered proprietary.

Q30.   Do you have studies under way for juvenile RA?

A30.   Pharmacokinetic studies (e.g. studies examining the effects on absorption, metabolism and excretion) with Vioxx in children with juvenile rheumatoid arthritis have been conducted.  Results of these studies were presented last year at the European League Against Rheumatism (EULAR) and American College of Rheumatology (ACR) annual meetings.  Larger studies are needed to confirm these findings.  Additional information on our research program is proprietary.

SCIENCE Q&A — 11

MRK-ADS0000226

Drug Interactions

**Q31.** How has the methotrexate and other drug interaction language in the label changed? What was the basis for these changes?

**A31.** Three changes were made to the section on Drug Interactions:
1) Additional language for aspirin: in patients taking Vioxx, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis. Prospective, long-term studies on concomitant administration of Vioxx and naproxen have not been conducted.
2) Updated language for methotrexate: the approved doses of Vioxx – 12.5 mg, 25 mg and 50 mg – each administered once daily for seven days, had no effect on the plasma concentration of methotrexate.
3) The addition of an interaction with theophylline: Vioxx 12.5 mg, 25 mg and 50 mg administered once daily for seven days increased plasma concentration levels of theophylline. As a result, adequate monitoring is recommended when Vioxx is initiated or changed in patients receiving theophylline.

**Q32.** What is theophylline? Is the interaction with the drug serious?

**A32.** Theophylline is a bronchodilator indicated for the treatment of chronic asthma and chronic lung diseases. As stated in the prescribing information for Vioxx, adequate monitoring of theophylline plasma concentrations should be considered when therapy with Vioxx is initiated or changed in patients receiving theophylline.

**Q33.** What is the market impact of this new interaction? Are there other similar drugs that Vioxx could have an interaction with?

**A33.** We do not expect this interaction to have an impact on the market for Vioxx.

MRK-ADS0000227

**Aspirin**

**Q34.**   Were there changes to the label specific to concomitant use of Vioxx with aspirin?

**A34.**   Yes, new language was added to the *Drug Interactions, Aspirin* section, which included:
  - language informing physicians that in patients taking Vioxx, antiplatelet therapies (such as aspirin) should not be discontinued and should be considered for those with an indication for cardiovascular prophylaxis; and
  - a statement that prospective, long-term studies on concomitant administration of Vioxx and aspirin have not been conducted.

Other information on the concomitant use of aspirin and Vioxx that was already in the labeling included:
  - the statement that use of low-dose aspirin with Vioxx may result in an increased rate of GI ulceration or other complications, compared to Vioxx alone; and
  - the statement that Vioxx is not a substitute for aspirin for cardiovascular prophylaxis because it lacks an effect on platelets.

**Q35.**   To what percentage of Vioxx users does the new precaution apply?  What proportion of patients who take Vioxx for arthritis have ischemic heart disease?

**A35.**   We estimate that 10 percent of the total arthritis patient population in the U.S. has existing ischemic heart disease.[2]

**Q36.**   Does your new labeling recommend that patients prescribed Vioxx take aspirin?

**A36.**   The labeling for Vioxx does not direct that patients taking Vioxx must be put on aspirin. It states – as it always has since the original FDA approval of the medicine in May 1999 – that Vioxx is not a substitute for aspirin for cardiovascular prophylaxis because of its lack of effect on platelets.  The labeling reminds physicians that, because of this lack of effect on platelets, in patients taking Vioxx, antiplatelet therapies should not be discontinued and should be considered for those with an indication for cardiovascular prophylaxis.

**Q37.**   Would patients benefit more from taking naproxen than Vioxx because heart disease is so common?

**A37.**   Aspirin continues to be the gold standard for cardiovascular prophylaxis.  There are not sufficient data to warrant a change in that practice.

---

[2] ORM analysis of NHANES and Medstat databases looking at patients within the OA database age 40+ and present with ICD-9 codes for CHD or CVD.

MRK-ADS0000228

**Q38.** **Will Merck conduct a trial to evaluate the effects of Vioxx on the antiplatelet effects of aspirin?**

**A38.** We know Vioxx does not interfere with the antiplatelet effects of low-dose aspirin. In fact, that statement is in our labeling, and has recently been confirmed by others. (Catella-Lawson F., Reilly MP, Kapoor SC, Cucchiara AJ, De Marco S., Glisson J., Tournier B., Vyas SN, FitzGerald G.A. *Ibuprofen, but not rofecoxib or acetaminophen, antagonizes the irreversible antiplatelet effect of aspirin. Arthr Rheum* 2000; 43: S296). However, prospective long-term studies on concomitant administration of Vioxx and aspirin have not been conducted. Our plans in that respect are proprietary.

**Q39.** **The JAMA paper by Mukherjee and Topol raised the question that use of aspirin with COX-2 inhibitors may diminish their proven GI benefit. Is that true?**

**A39.** As our labeling for Vioxx has always indicated, concomitant use of low-dose aspirin with Vioxx may increase the risk of GI side effects compared to the use of Vioxx alone. A study is currently underway to look at concomitant use of Vioxx and low-dose aspirin. Results will be presented in a scientific forum once they become available. Specific information on the study is proprietary.

MRK-ADS0000229

## OTHER

**Q40.** What parts of this label do you expect will be "class" labeling for COX-2s?

**A40.** We can't speculate on FDA actions. We can say that Vioxx is the only COX-2 to have met its primary and secondary endpoints in a large GI outcomes study.

**Q41.** Can you comment on the FDA's recent report from its AE Surveillance report noting that the number of AEs reported for Vioxx were much higher than those reported for Celebrex even though the total number of prescriptions for Celebrex were higher than for Vioxx?

**A41.** The FDA provides the following caveat within its quarterly reports of the Adverse Event Reporting System (AERS) database:

With respect to the summaries of post-marketing adverse experience reports, which have been prepared by FDA's Division of Drug Risk Evaluation I (Office of Post-Marketing Drug Risk Assessment), please note that these summaries provide qualitative and descriptive information about reports that have been received for individual drugs. These summaries should not be interpreted as supporting conclusions about the comparative safety of the different drugs. Variations in adverse event reporting practices make quantitative safety comparisons of different drugs problematic. Sources of variation may include manufacturer reporting practices, time on market, calendar year, and publicity. These and other factors may result in substantial variations in the types and numbers of reports for individual drugs in the spontaneous Adverse Event Reporting System.

**Q42.** How many adverse events – CV, renal GI – have you seen in post-marketed use of Vioxx?

**A42.** Based on our most recent public presentation of these data – at the FDA Advisory Committee meeting in February 2001 – there were 118 thrombotic events, including 40 myocardial infarctions; 482 serious GI events; and 212 serious renal events had been reported between May 1999 through October 2000.

**Q43.** How do post-marketing reports for Vioxx compare with NSAIDs such as naproxen?

**A43.** Direct comparisons cannot be made. The medicines have been on the market for different lengths of time, have been used by different patients in different settings with different concomitant medications, and the two companies may have different tracking and reporting mechanisms.

As caveated by the FDA within its quarterly reports of the Adverse Event Reporting System (AERS) database:

With respect to the summaries of post-marketing adverse experience reports, which have been prepared by FDA's Division of Drug Risk Evaluation I (Office of Post-Marketing Drug Risk Assessment), please note that these summaries provide qualitative and descriptive information about reports that have been received for individual drugs.

SCIENCE Q&A — 15

These summaries should not be interpreted as supporting conclusions about the comparative safety of the different drugs. Variations in adverse event reporting practices make quantitative safety comparisons of different drugs problematic. Sources of variation may include manufacturer reporting practices, time on market, calendar year, and publicity. These and other factors may result in substantial variations in the types and numbers of reports for individual drugs in the spontaneous Adverse Event Reporting System.

**Q44.   How reliable are post-marketing event reports in judging the safety profile of a medicine?**

**A44.**   Post-marketing reporting certainly plays an important role in on-going monitoring of the safety of a prescription medicine. However, it's important to keep in mind that just because someone was taking a medicine when they had an event does not mean that the medicine was the cause. As caveated by the FDA within its quarterly reports of the Adverse Event Reporting System (AERS) database:

With respect to the summaries of post-marketing adverse experience reports, which have been prepared by FDA's Division of Drug Risk Evaluation I (Office of Post-Marketing Drug Risk Assessment), please note that these summaries provide qualitative and descriptive information about reports that have been received for individual drugs. These summaries should not be interpreted as supporting conclusions about the comparative safety of the different drugs. Variations in adverse event reporting practices make quantitative safety comparisons of different drugs problematic. Sources of variation may include manufacturer reporting practices, time on market, calendar year, and publicity. These and other factors may result in substantial variations in the types and numbers of reports for individual drugs in the spontaneous Adverse Event Reporting System.

MRK-ADS0000231

**FOR BACKGROUND ONLY:**

Specific changes to the label around VIGOR included:

- Addition of GI safety and cardiovascular findings detailed under the *Clinical Studies* section of the label;
- Modification of the *Gastrointestinal Warning* section carried by all NSAIDs to reflect the GI safety advantage of Vioxx 50 mg (approximately 50 percent reduction in risk of serious GI events) compared to naproxen;
- Deletion of language that stated "the correlation between findings of endoscopic studies, and the relative incidence of clinically serious upper GI events that may be observed with different products, has not been fully established," which was replaced with language that includes "...the results of outcomes studies, such as VIGOR, are more clinically relevant than the results of endoscopy studies";
- Addition of bolded statement under *Clinical Studies, Platelets*: "Because of its lack of platelet effects, Vioxx is not a substitute for aspirin for cardiovascular prophylaxis." (This statement is not new; was in the prior label for Vioxx.)
- Update to *Precautions* section to include new subsection titled *Cardiovascular Effects* that includes CV thrombotic results and related CV deaths from VIGOR and CV thrombotic results and related CV deaths from two placebo-controlled studies with a reference that the clinical significance of these three studies is unknown and that prospective studies comparing the incidence of serious CV events have not been performed. The paragraph also includes a bolded reference to "Because of its lack of effect on platelets, Vioxx is not a substitute for aspirin" and that "in patients taking Vioxx, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for CV prophylaxis." The paragraph begins with the statement "the information below should be taken into consideration and caution should be exercised when Vioxx is used in patients with a medical history of ischemic heart disease."
- Update to *Precautions* section *Information for Patients* to add references to the location with the label for additional information on GI safety and for additional information for CV safety information. The statement "Vioxx is not a substitute for aspirin for CV prophylaxis because of its lack of effect on platelets" was also added here;
- Additional language to *Drug Interaction, Aspirin* [located under *Precautions* section] that states "antiplatelet therapies should not be discontinued in patients taking Vioxx and should be considered in patients with an indication for CV prophylaxis";
- Revised paragraph under *Adverse Events* now titled "*Clinical Studies in OA and RA with Vioxx 50 mg*" that provides side effects of the 50 mg dose; and
- Clarification under *Dosage and Administration* for management of *Acute Pain* that states "Chronic use of Vioxx 50 mg once daily is not recommended."

Specific changes to the label for Rheumatoid Arthritis included:

- Addition of efficacy data from the Phase III rheumatoid arthritis studies to the *Clinical Studies* section;
- Addition of safety data from the Phase III studies to the *Adverse Events* section;
- Brief mention of results from a comparative endoscopy study in rheumatoid arthritis patients in the *Clinical Studies* section (results consistent with findings from osteoarthritis endoscopy studies);
- An update to the *Precautions* section under *Fluid retention, edema and hypertension* to include hypertension results from the RA studies; and
- Addition of data under *Drug Interactions, Methotrexate* that showed there was no effect on plasma concentrations of methotrexate with recommended doses of Vioxx.

MRK-ADS0000232

Other changes included:

- Deletion of two data tables from the osteoarthritis endoscopy trials for editorial reasons; the overall data from these trials remain in the label;
- Removal of references to "no safety data is available" under *Warning* for *Advanced Renal Disease* based on availability of post-marketing data. (Recommendations remain the same.)
- Addition of new *Drug Interaction* with *Theophylline*, a medicine used to treat asthma. Adequate monitoring of therapy is now recommended when Vioxx is used with theophylline;
- Addition of the statement "As with other NSAIDs, including those that selectively inhibit COX-2, there have been more spontaneous post-marketing reports of fatal GI events and acute renal failure in the elderly than in younger patients" to the section *Geriatric Use* under *Precautions*;
- Addition of *Hepatic Insufficiency* to the *Dosage and Administration* section that recommends patients with moderate hepatic impairment should be treated with the lowest possible dose. This is based on pharmacokinetic data that have been added to the *Clinical Pharmacology, Special Populations, Hepatic Insufficiency* section of the label; and
- Update to *Precautions* section *Information for Patients* that includes a statement encouraging physicians to have their patients read the patient package insert for Vioxx before starting therapy and to reread it each time the prescription is renewed.

# # #

MRK-ADS0000233

# CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing:

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S SUMMARY MOTION PART 1

has been served on Defense Liaison Counsel (DLC) Dorothy H. Wimberley by electronic email as PDF attachment, Emily Pistille of Merck by electronic email as PDF attachment, and Doug Marvin of Merck by electronic email as PDF attachment on this 24th day of September, 2013.

Further I hereby note utilizing the same electronic PDF method to Plaintiff Steering Committee PSC-I Russ Herman and Leonard Davis, and Plaintiff Steering Committee PSC-II Ann B. Oldfather and Megan Hastings.

I have also sent the above and the foregoing to the Clerk of Court of the United States District Court for the Eastern District of Louisiana via the same electronic email/PDF method and hard copy, on this 24th day of September, 2013.

/s/Dennis R. Harrison
Dennis R. Harrison
Plaintiff
601 W. Brown Street
Iron Mountain, MI 49801
Phone: Cell 906-221-5906
badbonehealing@gmail.com

14

Dennis R. Harrison
601 W. Brown Street
Iron Mountain, MI   49801
906-221-5906

September 28, 2013

<u>Via Electronic mail/PDF</u>

*DOROTHY H. WIMBERLEY*
A PROFESSIONAL CORPORATION
DIRECT DIAL:  (504) 593-0849
DIRECT FAX:   (504) 596-0849
E-MAIL: DWIMBERLY@STONEPIGMAN.COM

STONE PIGMAN WALTHER WITTMANN 11C.
COUNSELORS AT LAW
546 CARONDELET STREET NEW ORLEANS
LOUISIANA   70130-358S

Re:  In Re Vioxx Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp.*, **2:07-cv-00905-EEF-DEK**

Dear Dorothy:

I enclose a copy of the:

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**OPPOSITION TO DEFENDANTS SUMMARY MOTION PART 2**

Sincerely,

*Dennis R. Harrison*

**Dennis Richard Harrison**
**MBA/BGS**

DHW/cr Enclosures

TENDERED FOR **FILING**

OCT -3 2013

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

cc:   all via email/PDF
D. Marvin, E. Pistilli, A. Oldfather, M. Hastings, J. Duggan , R. Herman, L. Davis, A. Kingsley

Via email/PDF and hard copy
Clerk of Court of the United States District Court for the Eastern District of Louisiana

1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|                          |     |                              |
|--------------------------|-----|------------------------------|
| In re: Vioxx             | *   | MDL Docket No. 1657          |
|                          | *   |                              |
| PRODUCT LIABILITY        | *   | SECTION L                    |
| LITIGATION               | *   |                              |
|                          | *   |                              |
| This Document relates to:| *   |                              |
|                          | *   | HONORABLE JUDGE FALLON       |
| Dennis Harrison          | *   |                              |
| Pro Se 2:07-cv-00905-EEF-DEK | * | MAGISTRATE JUDGE KNOWLES   |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS SUMMARY MOTION PART 2

1. Defendant Merck is claiming an exemption from New York Laws based on the presumed preemption created by Federal Laws and Regulations regarding specifically the determination of safety and efficacy of FDA Approved Drugs. Such a presumption may make legal sense as only an FDA Approved Drug is allowed to enter interstate commerce, See 21 U.S.C. 355(a),  and the FDA has or can appoint special panels to review scientific documents, hear scientific arguments, and perform a trial to determine facts and their admissibility so that it can form an opinion and give that drug approval for whatever uses it deems warranted and to issue a finding in the form of an approved label, and there is no other Court authorized to do so that can do all that. See, 21 U.S.C. 355 (d). However, The definition of "Substantial Evidence" only applies to drugs presenting FDA approvals for approved uses. When the drug manufacturer goes outside the act, see 21 U.S.C 352 (f), the definition of "Substantial Evidence" changes to "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v Perales, 402 U,S. 389, 401 (1971).

TENDERED FOR FILING

OCT -3 2013

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

2

2. Many of the MDL 1657 Plaintiff's came to this Court after receiving prescriptions from Physicians that they received for treatment of approved uses, but erroneously may have chosen to argue that the FDA approved label did not provide adequate warning for an approved use, and then attempted to overturn the safety of Vioxx based on evidence that the FDA had already considered and rejected, or new evidence which it had never seen, thus moving forward with their cases became difficult because such arguments had to be made against the "Substantial Evidence" rule of the Act, and would amount to relabeling an FDA approved drug and the Federal District Court cannot hear that because it lacks authority because the authority for labeling lies only with the FDA. See the Act, 21 U.S.C. 355(a)

3. Plaintiff is not challenging the FDA-Approved uses because Defendant marketed, promoted and otherwise falsely induced Plaintiff Dennis R. Harrison to take Vioxx for Unapproved Use and thereby acted Outside the purview of any protections it may have derived if it had had FDA approval.

Reviewing the Act starting with 21 U.S.C. § 355(a).

§355 New Drugs

a. Necessity of effective approval of application: No person shall introduce or deliver for introduction into interstate commerce any new drug, unless approval of an application pursuant to subsection (b) or (j) of this section is effective with respect to such drug.

b. Secretary an application with respect to any drug subject to provisions of subsection (a) of this section. Such person shall submit to the Secretary as a part of the application

3

(7) based on a fair evaluation of all material facts, such labeling is false or misleading in any particular; he shall issue an order refusing to approve the application. If, after such notice and opportunity for hearing, the Secretary finds that clauses (1) through (6) do not apply, he shall issue an order approving the application.

Definition of "Substantial Evidence":

As used in this subsection and subsection of this section, the term "substantial evidence" means evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof. If the Secretary, based on relevant science, that data from one adequate and well-controlled clinical investigation and confirmatory evidence (obtained prior to or after such investigation) are sufficient to establish effectiveness, the Secretary may consider such data and evidence to constitute substantial evidence for the purpose of the preceding sentence.

This definition of "Substantial Evidence" only applies to drugs presenting FDA approval for approved uses. When the drug manufacturer goes outside the act it is treated as an outlaw, see 21 U.S.C 352 (f), the definition of "Substantial Evidence" changes to the common law definition of "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v Perales, 402 U,S. 389, 401 (1971).

## I.  <u>VIOXX UNAPPROVED USE NOT SAFE</u>

1.   By marketing for other than the FDA approved uses, Defendant Merck has left the protections of the Act and forged its path following 21 U.S.C. 352 (f) (1) and (2) which put Merck under risk of Civil and Criminal prosecution in all jurisdictions whether they being state controversies or federal, and that is certainly what happened here, because the fundamental question as to safety and efficacy became an open question subject to state laws.

2.   As applied in the case at hand, it is the Defendant Merck who has the burden to prove that its promotion of Vioxx for rheumatoid arthritis and or Ankylosing Spondylitis, and Post-Operative Orthopedic surgery are approved uses of Vioxx, because if it does have such proof under the Act it can be assumed that Vioxx was safe and effective in these applications. However, this case, and UNITED STATES v. MERCK & Co., clearly shows that Defendant Merck is clearly without such proof, so that the presumption changes to the presumption that Vioxx is either not Effective or not Safe or both not Effective and not Safe based on its lack of FDA approval for the uses for which it had promoted Vioxx.

3.   With regards to the treatment of rheumatoid arthritis (RA), Defendant Merck started to promote its product Vioxx for use after the initial label was approved and treatment for RA was not approved at that time. The FDA issued a Warning Letter, see §355(e), see Plaintiff's Exhibit A, and eventually Defendant Merck was prosecuted for that specific offense and the other violations were simply resolved as included offenses because the $1 Billion Dollar settlement had reached the

maximum attainable level and as Defendant Merck was cooperating it was allowed to plead just to the one count.

4. Although Merck applied for the approval for the treatment of RA in its IND 897 application of April 20 2001, see Plaintiff's Exhibit O, which was later approved in April 2002, see Press Announcement Plaintiff's Exhibit EE, and the new 2002 Label Plaintiff's Exhibit FF, the issue of safety of Vioxx with regards to this case, still remains because the promotions prior to the approval were 50 mg with no limit of duration and the approved use after April 2002 had been lowered to just 12.5mg for chronic use, and Plaintiff was thusly taking 4x (four Times) the approved dosage, and he received no warning from Vioxx to change his formulary, and thereby he continued to be greatly injured by Defendant Merck & Co. regards to overdosing on a drug that inhibits bone growth.

5. With Ankylosing Spondylitis (AS), Defendant Merck had never specifically applied for that to be an approved use, however AS is normally treated in the practice of Rheumatology and Plaintiff had rheumatoid arthritis in addition to AS, see Plaintiff's Exhibit F & G, Blavatsky Declaration paragraph 11 & 12, and thereby became exposed to the false promotion of Vioxx, continuously between on or about April 1999 and April 2002 and even until October 2004, and was prescribed Vioxx at dosage and duration that became to be known to be four times (4X) greater than recommended by the labeling change issued in April 2002 at a point in time where the Spinal Fusion he had undergone had already failed.

6. The Plaintiff now moves that with regards to the safety of Vioxx for the unapproved use of treating rheumatoid arthritis, that the safety of the dosage of

more than 12.5mg for chronic use was not proved to be safe during the period beginning in or about April 1999 to at least in or about October 2004, as it was not an FDA approved use under any circumstances for rheumatoid arthritis until after in or about April 2002 and never became an FDA approved use at the dosages other than 12.5mg to 25mg at any time following the FDA approved uses and dosages approve on or about April 2002; and further moves that with regards to the case at hand, the burden to prove that Vioxx was safe to use at other than the approved dosages and duration has shifted to Defendant Merck and that for the period starting April 1999 to April 2002 in order to prove that the use of Vioxx for the treatment of rheumatoid arthritis at dosages of more than 12mg for chronic use was safe it needs to present to this Court with regards to this case a letter endorsing Vioxx's safety at a dosage of 50mg for chronic use, and in the absence of such a letter, the Plaintiff shall be not required to prove the non safety of Vioxx regarding the specific use of treatment of rheumatoid arthritis in this case.

## II.  VIOXX UNAPPROVED USE IN POST-ORTHOPEDIC SURGERY NOT SAFE

1.  The fact that post-operative orthopedic pain was not an approved use of Vioxx came up several times in the FDA Warning Letter, and it can be presumed that it too was investigated as the promotion of Vioxx for that unapproved use was advocated by Dr. Scott S. Reuben and he had cooperated with the Department of Justice as witnessed by his plea bargain reducing a five year prison sentence to just 6 months, which preceded Defendant Merck's Guilty Plea by approximately a year.

2.  Defendant Merck had applied for the FDA approval for the use of Vioxx for Post-Orthopedic pain in its November 1998 application and also in its April 2001 application for FDA approval, see Plaintiff's Exhibit O. These Post-Orthopedic use applications in November 23, 1998, and April 20, 2001, did not fail on the issue of efficacy, both applications failed on the issue of Safety based on its inability to overcome evidence arising from pre-clinical trials which it never overcame in either application for approval; and therefore Vioxx Failed on the issue of Safety not once but twice and, in the absence of any other showing, it may be presumed to be Not Safe for use in the use of Post-Operative Orthopedic Surgery, and at this juncture that presumption is clearly a material fact, and to overcome that material fact, Defendant Merck would now have to come forward with letters from the FDA to prove otherwise else wise as the Federal District Court lacks jurisdiction to even hear a case for relabeling of an approved drug for unapproved use, as that is squarely the jurisdiction of only the FDA.

3.  Plaintiff now moves that the burden to prove Safety is now clearly upon Defendant as it must now prove it in the FRCP 56 proceeding at 56(a), as the very first issue, and it will fail;

4.  and at this juncture the PTO58 requirement of a scientific expert witness on Plaintiff Dennis R. Harrison should be lifted and his case can go forward and Defendant Merck may choose to defend itself only by presenting letters from the FDA regarding this specific issue for this Court or to consider Defendant's argument pertaining to the Safety of Vioxx in Post-Surgical Orthopedic use, if it chooses to do so.

## OTHER APPLICABLE CITATIONS

The FDA definition of "Substantial Evidence" only applies to drugs presenting FDA approvals for approved uses. When the drug manufacturer goes out side the act, see 21 U.S.C 352 (f), the definition of "Substantial Evidence" changes to "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v Perales, 402 U,S. 389, 401 (1971)

Findings of facts are upheld unless clearly erroneous. Media Services Group v Bay Cities Communications, Inc., 237 F.3d 1326, 1329 (11th Cir. 2001).

Motion to dismiss complaint for failure to state a claim. Review is de nova. The court accepts all allegations of the complaint as true and construes the facts in the light most favorable to the plaintiff. Harry v Marchant, 237 F.3d 1315, 1317 (11th Cir. 2001).

Determination that a case is not ripe. Reviewed de novo. Vu Jang v United tech. corp., 206 F.3d 1147, 1147, 1149 (11th Cir. 2000).

Motion for leave to amend complaint. Reviewed for abuse of discretion. Johnson v. Booker T. Washington Broad. Serv., 134 F.3d 1458, 1464 (11th cir. 2000)..

Not every Material Fact in dispute is genuine, however, "... if the evidence is such that a reasonable jury could return a verdicy for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury reasonably could find for the plaintiff."n Id at 252.

When an expert opinion is not supported by sufficient evidence to validate it in the eyes of the law, or when indisputable record facts render the opinion unreasonable, it cannot support a jury verdict." Brook Group Ltd. V. Brown & Williamson Tobacco Corp. 2578, 2598 (1993)

"Evidence manifestly at variance with the laws of nature and the physical facts is of no probative value and may not support a jury verdict." Ralston Purina Co. v Hobson. 554 F.2d 725, 7229 (5th Cir. 1977).

Rule 56 (f) motion for continuance to obtain affadavits or discovery. Reviewed for abuse of discretion. Carmichael v. Bell Helicopter Textron. Inc., 117 F.3d 491, 493 (11th Cir. 1997); Burks v. American Cast Iron Pipe Co., 212 F. 3d 1333, 1336 (11th Cir. 2000).

Admissibility of expert testimony. Reviewed for abuse of discretion. Toole v Baxter Healthcare Corp.., 235 F. 34\d 1307, 1312 (11th Cir. 2000); Allison v. McGhan Med Corp. , 184 F.d 1300,1306 (11th Cir. 2000)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing,

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## OPPOSITION TO DEFENDANTS SUMMARY MOTION PART 2

has been served on Defense Liaison Counsel (DLC) Dorothy H. Wimberley by electronic email as PDF attachment, Emily Pistille of Merck by electronic email as PDF attachment, and Doug Marvin of Merck by electronic email as PDF attachment on this 28th day of September, 2013.

Further I hereby note utilizing the same electronic PDF method to Plaintiff Steering Committee PSC-I Russ Herman and Leonard Davis, and Plaintiff Steering Committee PSC-II Ann B. Oldfather and Megan Hastings on this 28th day of September, 2013.

I have also sent the above and the foregoing to the Clerk of Court of the United States District Court for the Eastern District of Louisiana via the same electronic email/PDF method and hard copy, on this 28th day of September, 2013.

/s/Dennis R. Harrison
Dennis R. Harrison
Plaintiff
601 W. Brown Street
Iron Mountain, MI 49801
Phone: Cell 906-221-5906
badbonehealing@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing,

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS SUMMARY MOTION PART 2

has been served on Defense Liaison Counsel (DLC) Dorothy H. Wimberley by electronic email as PDF attachment, Emily Pistille of Merck by electronic email as PDF attachment, and Doug Marvin of Merck by electronic email as PDF attachment on this 28th day of September, 2013.

Further I hereby note utilizing the same electronic PDF method to Plaintiff Steering Committee PSC-I Russ Herman and Leonard Davis, and Plaintiff Steering Committee PSC-II Ann B. Oldfather and Megan Hastings on this 28th day of September, 2013.

I have also sent the above and the foregoing to the Clerk of Court of the United States District Court for the Eastern District of Louisiana via the same electronic email/PDF method and hard copy, on this 28th day of September, 2013.

/s/ Dennis R. Harrison
Dennis R. Harrison
Plaintiff
601 W. Brown Street
Iron Mountain, MI 49801
Phone: Cell 906-221-5906
badbonehealing@gmail.com

11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| In re: Vioxx | * | MDL Docket No. 1657 |
|  | * |  |
| PRODUCT LIABILITY | * | SECTION L |
| LITIGATION | * |  |
|  | * |  |
| This Document relates to: | * | HONORABLE JUDGE FALLON |
|  | * |  |
| Dennis Harrison | * | MAGISTRATE JUDGE KNOWLES |
| Pro Se 2:07-cv-00905-EEF-DEK | * |  |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## OPPOSITION TO DEFENDANTS SUMMARY MOTION PART 2

**Pursuant to the laws of the United States reviewed by this memorandum**, Plaintiff has shown that Defendant must prove Vioxx was FDA approved for use for the treatment of rheumatoid arthritis before it may raise any other defense against Plaintiff, and the safety of Vioxx in regard to Post Orthopedic Surgery and rheumatoid arthritis must also be proven by Merck by a showing that it had obtained FDA approval for the uses of rheumatoid arthritis and Post-Operative Surgery between April 1999 and April 2002 before requiring Plaintiff to meet any other milestones of proof than is required by the so called "Lone Pine" opinion. Furthermore Defendant must show that it was not violating the law during the period of Vioxx entering the market and at least April 1999 and April 2002 date, the date that the FDA finally approved Vioxx and that is not possible in view of the fact that it stands convicted of having done so in circumstances exactly the same as the case at hand and is under probation restrictions and supervision and should be required by this Court to bring letters from its probation supervisor showing that is free to defend on these two issues.

_____

**ELDON E. FALLON**
**UNITED STATES DISTRICT JUDGE**

12