EXHIBIT A: Re: In Re Vioxx Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp.*, 2:07-cv-00905-EEF-DEK

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
Rockville, MD 20857

**TRANSMITTED BY FACSIMILE**

Raymond V. Gilmartin
President and CEO
Merck & Co., Inc.
P.O. Box 1000, UG3BC-10
North Wales, PA 19454-1099

SEP 17 2001

**RE: NDA 21-042**
Vioxx (rofecoxib) tablets
MACMIS ID # 9456

# WARNING LETTER

Dear Mr. Gilmartin:

This Warning Letter concerns Merck & Co. Inc.'s (Merck) promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets. Specifically, we refer to promotional audio conferences given on behalf of Merck by Peter Holt, MD, a press release, and oral representations made by Merck sales representatives to promote Vioxx. As part of its routine monitoring and surveillance program, the Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed your promotional activities and materials and has concluded that they are false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations. See 21 U.S.C. §§ 331(a) and (b), 352(a), (f), and (n), and 355 (a).

You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

Although the exact reason for the increased rate of MIs observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.

EXHIBIT
A

You have also engaged in promotional activities that minimize the Vioxx / Coumadin (warfarin) drug interaction, omit important risk information, make unsubstantiated superiority claims against other NSAIDs, and promote Vioxx for unapproved uses and an unapproved dosing regimen. In addition, in misrepresenting the Vioxx / warfarin drug interaction you also misrepresent Vioxx's safety profile by minimizing the potentially serious risk of significant bleeding that can result from using Vioxx and warfarin concomitantly.

Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile.

## Background

Vioxx is a NSAID with selective cyclooxygenase 2 (COX-2) inhibitory properties. It was approved on May 20, 1999, for the treatment of primary dysmenorrhea, for the management of acute pain in adults, and for relief of the signs and symptoms of osteoarthritis.

Prior to approval, endoscopy studies were submitted to the original NDA database demonstrating that treatment with Vioxx 25 mg or 50 mg daily was associated with a significantly lower percentage of endoscopically apparent gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. Because the correlation between findings of endoscopic studies and the relative incidence of clinically serious upper gastrointestinal (GI) events was unknown, after approval, Merck sponsored the VIGOR study to obtain information regarding clinically meaningful upper GI events and to develop a large controlled database for overall safety assessment.

The VIGOR study included approximately 4000 patients per treatment arm (Vioxx 50 mg a day or naproxen 1000 mg a day) treated for a median time of 9 months. The primary endpoint of the study was the relative risk of confirmed PUBs (perforations, symptomatic ulcers, and GI bleeds) in patients with rheumatoid arthritis taking Vioxx 50 mg daily (two to four times the approved dosing regimen for Vioxx in osteoarthritis), compared to patients taking naproxen, 1000 mg daily. The study also compared the safety and tolerability of the two treatments in patients with rheumatoid arthritis. The results of the study demonstrated that patients on Vioxx had a significantly lower cumulative incidence of PUB's compared to patients on naproxen (2.08% and 4.49% for Vioxx and naproxen, respectively).

Other important results from the VIGOR study included the unexpected findings that investigator reported serious cardiovascular events occurred in 101 patients (2.5%) in the Vioxx treatment group compared to 46 patients (1.1 %) in the naproxen treatment group, and MIs occurred in 20 patients among 4047 in the Vioxx treatment group (0.5%), compared to four patients among 4029 in the naproxen treatment group (0.1%). These unexpected findings were extensively discussed at the FDA Arthritis Advisory Committee Meeting on February 8, 2001. Although, the reason for these differences is not clear, possible explanations include both an ability of naproxen to function as a cardioprotective agent and a pro-thrombotic property of Vioxx.

**Promotional Audio Conferences**

We are aware of six promotional audio conferences, presented on behalf of Merck by Peter Holt, MD that are in violation of the Act and its implementing regulations. These audio conferences were held on June 8, 2000, June 13, 2000, June 16, 2000, and three on June 21, 2000, and were moderated by Merck employees.

On December 12, 2000, we sent you a written inquiry about your involvement with and influence on the initiation, preparation, development, and publication of audio conferences given by Dr. Holt. We also asked you to describe the nature of the relationship between you and Dr. Holt. In your response dated January 5, 2001, you stated that, "Dr. Holt entered into a speaker contract with Merck on June 22, 1999." You also stated that, "Merck has determined that we arranged for Dr. Holt to speak at ten audio conferences in 2000. Merck Business Managers provided him with the topic for the audio conferences and, for two of the audio conferences, asked him to address the safety profiles of Vioxx and other NSAIDs."

The promotional audio conferences identified above, arranged by, and presented on behalf of, Merck were false or misleading in that they minimized the MI results of the VIGOR study, minimized the Vioxx / Coumadin drug interaction, omitted important risk information, made unsubstantiated superiority claims, and promoted Vioxx for unapproved uses and an unapproved dosing regimen. Our specific objections follow.

Minimization of MI Results

Statements made during the promotional audio conferences identified above minimize the potentially serious MI risk that may be associated with Vioxx therapy. For example, in your June 21, 2000, audio conference you begin your discussion of the MI rates observed in the VIGOR study by stating, "When you looked at the MI rate the rate was different for the two groups. The MI rate for Vioxx was 0.4 percent and if you looked at the Naprosyn arm it was 0.1 percent, so there was a reduction in MIs in the Naprosyn group." You then present your explanation as to why the Vioxx treatment arm had an increased rate of MIs compared to the naproxen treatment arm. Specifically, you state that,

> Vioxx is a wonderful, effective, selective COX-2 inhibitor that inhibits COX-2 but at the doses used does not inhibit COX-1. So therefore without the COX-1 inhibition you don't inhibit platelets, you don't prolong bleeding time and therefore it cannot be used as a cardiovascular protective drug. Naprosyn on the other hand is a wonderful platelet inhibitor, prolongs bleeding time and inhibits platelets identically to aspirin. Obviously the binding with Naprosyn is reversible and with aspirin is irreversible, but the effect on platelets and bleeding time is identical in terms of its effect and therefore functions as a wonderful drug for cardiovascular prophylaxis. So basically the MI rates are in sync with what we know about Vioxx and what we know about Naprosyn.

In fact, the situation is not at all clear. There are no adequate and well-controlled studies of naproxen that support your assertion that naproxen's transient inhibition of platelet aggregation is pharmacodynamically comparable to aspirin or clinically effective in decreasing the risk of MIs. Therefore, your representation that naproxen prolongs bleeding time and inhibits platelets identically to aspirin is misleading, and minimizes the potential seriousness of this finding. As you know, the

reason for the difference between Vioxx and naproxen has not been determined; it is also possible that Vioxx has pro-thrombotic properties. Also, the MI rate that you report for Vioxx is inaccurate; the MI rate for Vioxx in the VIGOR study was 20 MIs among 4047 patients (0.5%), not 0.4%, as you stated.

Your minimization of the seriousness of the MI rates observed in the Vioxx treatment arm of the VIGOR trial is further reinforced in your audio conferences by your discussion of a retrospective analysis of this trial. For example, in your June 21, 2000, audio conference, you state that,

> ...Merck went and pulled out those patients that again were enrolled in VIGOR and asked the question, who were those patients that really needed secondary cardiovascular prophylaxis from the get go, and that ended up being four percent of the study group in VIGOR based on whether there was a prior MI, stroke, TIA, angina, CABG or PTCA....Now if you look at the remaining part of VIGOR, which is 96 percent of the VIGOR population, and once again looked for the MI rate between Naprosyn and Vioxx, there's no statistically significant difference in the MI rate between Naprosyn and Vioxx. In fact, Naprosyn is 0.2 percent and Vioxx is 0.1 percent.

Your claim that the MI rate for naproxen was 0.2 percent and for Vioxx was 0.1 percent is again inaccurate. Contrary to your claim that there was a higher rate of MIs in the naproxen group compared to the Vioxx group, the MI rate for Vioxx in this subpopulation was 12 MIs among 3877 patients (0.3%) as compared to 4 MIs among 3878 patients (0.1%) for naproxen.

Moreover, you again minimize the Vioxx MI rate observed in the VIGOR study by your comparison of this rate to the rate of MIs observed for Celebrex (celecoxib) in the Celebrex Long-Term Arthritis Safety Study (CLASS). For example, in your June 21, 2000, audio conference you state, "Now if you remember the crude MI rate of Vioxx in VIGOR that number was 0.4 percent which is basically the same or in fact a little bit less then the crude MI rate of Celebrex in CLASS which is 0.5 percent." Your claim that the MI rates of Vioxx compared to Celebrex were basically the same, "or in fact a little bit less" is misleading. You are comparing MI rates from two different trials with different patient populations. For example, patients who had angina or congestive heart failure with symptoms that occurred at rest or minimal activity and patients taking aspirin, including low-dose (325 mg or less, daily or every other day) or other antiplatelet agents (e.g., ticlopidine) were excluded from the VIGOR trial. The CLASS trial in contrast, did not exclude patients of this type. The CLASS trial thus may have included patients at a higher risk for MIs.

Minimization of Vioxx / Coumadin Interaction

Statements made during your promotional audio conferences also minimize the risk of Vioxx therapy in patients who are taking warfarin. For example, in your June 16, 2000, audio conference you stated that, "...if you look at the thromboembolic events it's very clear that these selective COX-2 inhibitors have the benefit of not having platelet aggregation and bleeding time, and therefore, can be used safely in terms of post-op and with Coumadin." Your statement that Vioxx can be used safely with warfarin minimizes the precaution in the PI that states that "...in post-marketing experience, bleeding events have been reported, predominately in the elderly, in association with increases in prothrombin time in patients receiving Vioxx concurrently with warfarin." Your promotion minimizing the risk of using Vioxx and warfarin concurrently is particularly troublesome because Merck was aware of this potentially dangerous drug interaction in 1999, well before these audio conferences occurred. In fact,

Merck began disseminating a revised PI in October 1999, which included new information about this risk.

The seriousness of this interaction is further minimized by your suggestion that COX-2 inhibitors, including Vioxx, can be used safely with warfarin because it "has the benefit of not having platelet aggregation and bleeding time." This claim implies that Vioxx is safer than other NSAIDS used in combination with warfarin. However, Vioxx has not been studied in head-to-head trials prospectively designed to assess this specific endpoint. Your superiority claim is therefore misleading.

We note that earlier in your June 16, 2000, promotional audio conference you state, "It can be used in people with Coumadin, although with Coumadin you've got to check their INR three and four days after you add the Cox inhibitor to the Coumadin because there may be a bump in the INR." This disclosure does not correct the overall misleading message, however, nor does it correct your suggestion that Vioxx is safer than other NSAIDs in patients taking warfarin.

Omission of Important Risk Information

Your promotional audio conferences fail to present serious and significant risks associated with Vioxx therapy. For example, your promotional audio conferences fail to state that Vioxx is contraindicated in patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. You also fail to present the gastrointestinal (GI) warning about the possibility of serious GI toxicity such as bleeding, ulceration, or perforation in patients taking Vioxx. Moreover, you fail to present Vioxx's precautions for use in patients who have liver and kidney disease, information about patient populations in which Vioxx's use is not recommended, such as women in late pregnancy, and information about Vioxx's most common adverse events.

Unsubstantiated Superiority Claims

You make several unsubstantiated superiority claims for Vioxx throughout your promotional audio conferences. For example, in your June 16, 2000, audio conference, you claim that, "The importance of [VIGOR and CLASS] is that the data is going to really help change I believe the package inserts for [Vioxx and Celebrex] down the road because it really shows once again that they are safer than non-steroidals." Your suggestion that COX-2 inhibitors, including Vioxx, have an overall safety profile that is superior to other NSAIDs is misleading because such an advantage has not been demonstrated. In fact, in the VIGOR study the incidence of serious adverse events was higher in the Vioxx treatment group than in the naproxen treatment group (9.3% and 7.8% for Vioxx and naproxen, respectively). The results of safety analyses that were pre-specified in the protocol for the VIGOR trial, such as CHF-related adverse events and discontinuations due to edema-related adverse events, hepatic-related adverse events, hypertension-related adverse events, and renal-related adverse events were all numerically higher (in some cases statistically significantly higher) in the Vioxx treatment group than in the naproxen treatment group. Furthermore, your claim that the VIGOR and CLASS trials "show once again that they are safer than non-steroidals" is also misleading because it implies that the results of the VIGOR trial (i.e., patients on Vioxx had a significantly lower cumulative incidence of PUBs than patients on naproxen) can be applied to the entire class of NSAIDs.

In your June 16, 2000, audio conference you state, "...if you look at the thromboembolic events it's very clear that these selective COX-2 inhibitors have the benefit of not having platelet aggregation and

bleeding time, and therefore, can be used safely in terms of post-op and with Coumadin." This claim suggests that Vioxx is safer, or has fewer side effects, than other NSAIDs used in the post-operative setting because COX-2 inhibitors do not affect platelet aggregation and bleeding time. Vioxx has not been studied, however, in head-to-head trials prospectively designed to assess its safety compared to other NSAIDS in the post-operative setting. Your superiority claim is therefore misleading.

Further examples of your unsubstantiated superiority claims include your claim that, "In terms of half life Vioxx has a half life of 17 hours and is truly a once a day drug, whereas Celebrex has a half life of 11 hours and is a BID (twice a day) drug," stated in your June 16, 2000, audio conference. This claim is misleading because it suggests that Celebrex must be dosed twice a day for all of its approved indications. In fact, Celebrex is approved for use either twice a day, or once a day, for the treatment of osteoarthritis. Therefore, your claim that Celebrex is a "BID drug" is misleading.

Promotion of Unapproved Uses

Your audio conferences are misleading because they promote Vioxx for unapproved uses. For example, in your June 21, 2000, conference, you claim that in the VIGOR study, "...the Vioxx 50 milligrams a day and the Naprosyn, a gram a day, were absolutely equally effective in terms of treating the patients with rheumatoid arthritis." Your claim is misleading because it suggests that Vioxx is effective for the treatment of rheumatoid arthritis when this has not been demonstrated. The VIGOR study was not designed to assess the efficacy of Vioxx for the treatment of rheumatoid arthritis. Your claim that Vioxx is "absolutely equally effective" to naproxen in treating patients with rheumatoid arthritis is also misleading because this has not been demonstrated by adequate and well-controlled clinical studies, and because the VIGOR study was not capable of assessing their comparative effectiveness.

Your promotional audio conferences are also misleading because they suggest that Vioxx is safe and effective for other unapproved uses such as the prevention of cancer and invasive cancer, and for the treatment of Alzheimer's disease and gout. Examples of claims that promote Vioxx for unapproved uses, include, but are not limited to, your claims in your June 16, 2000 audio conference that, "...COX-2 seems to be able to interfere with...programmed cell death. Therefore, you get this increased cell growth which allows polps to form, cancer and then invasive cancer. And by blocking COX-2 you can actually prevent the development of colon polyps, cancer and invasive cancer." Additional examples include your claims that "So we tried it [Vioxx] after Vioxx was released and really within one or two pills acute attacks of gout were being shut down," and "Specifically, if you looked at potential uses of these drugs, the most exciting right now I guess in two areas, one is Alzheimer's disease...."

## Press Release

We have identified a Merck press release entitled, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx," dated May 22, 2001, that is also false or misleading for similar reasons stated above. Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile," is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading; in fact, serious cardiovascular events were twice as frequent in the VIOXX treatment group (101 events, 2.5%) as in the naproxen treatment group (46 events, 1.1%) in the VIGOR study.

## Oral Representations

Merck sales representatives have engaged in false or misleading promotional activities that also minimize the potentially serious MI results observed in the VIGOR trial. Specifically, Merck sales representatives made false or misleading statements to DDMAC reviewers at two different professional meetings. At your exhibit booth during the 119th Annual Meeting of the Maryland Pharmacists Association (MPhA), in Ocean City, Maryland, June 9 – June 12, 2001, your representative stated that the increased MI rate seen in patients on Vioxx in the VIGOR study is due to the fact that naproxen works just like aspirin (i.e., inhibits clotting and platelet aggregation). In addition, during the Annual Meeting of the American Society of Health-Systems Pharmacists (ASHP), in Los Angeles, California, June 3 – June 6, 2001, your representative stated that Vioxx had a greater MI rate in the VIGOR trial because naproxen is cardioprotective, having platelet effects similar to aspirin. These statements made by your sales representatives are misleading for the reasons stated above.

## Conclusions and Requested Actions

The promotional activities and materials described above minimize the potentially serious cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx / Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001. This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

1. Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.
2. Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.
3. A written statement of your intent to comply with "1" and "2" above.

Your written response should be received no later than October 1, 2001. If you have any questions or comments, please contact Lesley Frank, Ph.D., JD, by facsimile at (301) 594-6771, or at the Food and Drug Administration, Division of Drug Marketing, Advertising and Communications, HFD-42, Rm. 17B-20, 5600 Fishers Lane, Rockville, MD 20857. We remind you that only written communications are considered official.

In all future correspondence regarding this particular matter, please refer to MACMIS ID #9456 in addition to the NDA number.

The violations discussed in this letter do not necessarily constitute an exhaustive list. We are continuing to evaluate other aspects of your promotional campaign for Vioxx, and may determine that additional remedial messages will be necessary to fully correct the false or misleading messages resulting from your violative conduct.

Failure to respond to this letter may result in regulatory action, including seizure or injunction, without further notice.

Sincerely,

*{See appended electronic signature page}*

Thomas W. Abrams, R.Ph., MBA
Director
Division of Drug Marketing,
Advertising, and Communications



B

U.S. Department of Justice

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

February 24, 2006

R.J. Cinquegrana, Esq.
Choate, Hall & Stewart
Two International Place
Boston, MA 02110

Theodore V. Wells, Jr., Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019

Re: Merck & Co., Inc.; Tolling Agreement on Statute of Limitations

Dear Mr. Cinquegrana and Mr. Wells:

This letter confirms and sets forth an agreement between the Office of the United States Attorney for the District of Massachusetts and your client, Merck & Co., Inc. and its subsidiaries and affiliates (collectively, "Merck"). The terms of the agreement are as follows:

1. As you are aware, this Office is presently conducting an investigation regarding Merck and its officers and employees. The conduct being investigated includes, without limitation, whether Merck and certain of its officers and employees, may have violated various federal criminal statutes, including but not limited to 18 U.S.C. §371, 18 U.S.C. §669, 18 U.S.C. §1001, 18 U.S.C. §1035, 18 U.S.C. §1341, 18 U.S.C. §1343, 18 U.S.C. §1347, 21 U.S.C. §331, 21 U.S.C. §333, 42 U.S.C. §1320a-7b; certain civil statutes including but not limited to 31 U.S.C. §3729; and certain administrative statutes such as 42 U.S.C. §1320a-7 and 42 U.S.C. §1320a-7a, in connection with the manner in which Merck developed, brought to market, marketed and sold VIOXX (hereafter, the "Conduct"). In signing this agreement, Merck does not acknowledge or concede that it has engaged in any wrongful conduct.

2. In the course of our discussions, this Office has expressed its intention to afford you and your client the fullest opportunity to provide information to this Office which you deem relevant to matters relating to the investigation of the Conduct. Toward that end, you have advised this Office that your client, you and members of your firm will require a further time period to prepare any materials and gather information for presentation to this Office, and to consider and evaluate further information as may be provided by this Office. As a result, this Office and your client have agreed, as more fully set forth below, to toll the applicable statutes of limitations for the offenses and Conduct described in Paragraph 1 from the date this letter is executed through and including December 31, 2006.

EXHIBIT
tabbies
B

EXHIBIT C: Re: In Re Vioxx Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp.*, 2:07-cv-00905-EEF-DEK

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. |
| v. | ) | |
| MERCK SHARP & DOHME CORP. | ) | VIOLATION: |
| | ) | 21 U.S.C. §§ 331(a), 333(a)(1), 352(f)(1) (misbranding) |
| Defendant | ) | |

**INFORMATION**

The United States Attorney charges that:

**PRELIMINARY ALLEGATIONS**

At all times material hereto, unless otherwise alleged:

**The Defendant**

1. Between May 1999 and September 2004, Merck & Co., Inc. was a New Jersey corporation headquartered in Whitehouse Station, New Jersey, and was the operating company for Merck's pharmaceutical business in the United States. As a result of a reverse merger with another pharmaceutical company in 2009, Merck & Co., Inc. became a wholly-owned subsidiary of the acquiring company and was renamed **MERCK SHARP & DOHME CORP.** The acquiring company was renamed Merck & Co., Inc. The new Merck & Co., Inc. is a holding company for **MERCK SHARP & DOHME CORP.** and other corporate entities. Currently, **MERCK SHARP & DOHME CORP. ("MERCK")** is the operating company in the United States for the pharmaceutical business formerly conducted by Merck & Co. Inc. **MERCK** was publicly traded (NYSE ticker symbol MRK).

EXHIBIT
C

D

100 Pine Street, Suite 230, San Francisco, CA 94111
Phone: (415) 777-2750, Fax: (415) 777-2803

Steven L. Shafer, MD
Editor-in-Chief

February 20, 2009

To our readers:

On January 22, 2009 Anesthesia & Analgesia received a summary of an investigation conducted by Baystate Medical Center into the research of Dr. Scott Reuben. To quote from the notice we received:

"Baystate Medical Center ("BMC") conducted and investigation pursuant to the Baystate Health Policy on Misconduct in Research and Scholarly Activities (the "Policy"). Dr. Reuben cooperated fully in this investigation. BMC's investigation determined that Dr. Reuben fabricated data reported in the referenced articles, and that all fabricated data were created under the sole control of Dr. Reuben."

The same day the Journal posted a list of the articles in Anesthesia & Analgesia found to be based on fabricated data. Since that time we have compiled a complete list of articles that Baystate Medical Center found were based on fabricated data:

1. Reuben SS, Connelly NR. Postarthroscopic meniscus repair analgesia with intraarticular ketorolac or morphine. Anesth. Analg. 1996;82:1036-9.
2. Reuben SS, Connelly NR, Maciolek H. Postoperative analgesia with controlled-release oxycodone for outpatient anterior cruciate ligament surgery. Anesth Analg. 1999;88:1286-91.
3. Reuben SS, Reuben JP. Brachial plexus anesthesia with verapamil and/or morphine. Anesth Analg. 2000;91:379-83.
4. Reuben SS, Connelly NR. Postoperative analgesic effects of celecoxib or rofecoxib after spinal fusion surgery. Anesth Analg. 2000;91:1221-5.
5. Reuben SS, Vieira P, Faruqui S, Verghis A, Kilaru P, Maciolek H. Local administration of morphine to bone following spinal fusion surgery. Anesthesiology 2001;95:390-4.
6. Reuben SS, Fingeroth R, Krushell R, Maciolek H. Evaluation of the safety and efficacy of the perioperative administration of rofecoxib for total knee arthroplasty. J Arthroplasty. 2002;17:26-31.
7. Reuben SS, Steinberg RB, Maciolek H, Manikantan P. An evaluation of the analgesic efficacy of intravenous regional anesthesia with lidocaine and ketorolac using a forearm versus upper arm tourniquet. Anesth Analg. 2002;95:457-60
8. Reuben SS, Gutta SB, Sklar J, Maciolek H: Effect of initiating a multimodal analgesic regimen upon patient outcomes after anterior cruciate ligament reconstruction for same-day surgery: a 1200-patient case series. Acute Pain 2004;6:87-93.

9. Reuben SS, Rosenthal EA, Steinberg RB, Faruqi S, Kilaru PR: Surgery on the affected upper extremity of patients with a history of complex regional pain syndrome: The use of intravenous regional anesthesia with clonidine. J. Clin Anesth 2004;16:517-522.
10. Reuben SS, Makari-Judson G, Lurie SD: Evaluation of efficacy of the perioperative administration of venlafaxine XR in the prevention of postmastectomy pain syndrome. J Pain Symptom Manage. 2004;27:133-9.
11. Reuben S. The effect of intraoperative valdecoxib administration on PGE2 levels in the CSF. J Pain 6, Supplement 1:S21 (Abstract 649)
12. Reuben SS, Ekman EF. The effect of cyclooxygenase-2 inhibition on analgesia and spinal fusion. J Bone Joint Surg Am. 2005:87:536-42
13. Scott S. Reuben, Srinivasa B. Gutta, Holly Maciolek, Joseph Sklar, James Redford. Effect of initiating a preventative multimodal analgesic regimen upon long-term patient outcomes after anterior cruciate ligament reconstruction for same-day surgery: A 1200-patient case series. Acute Pain 2005;7: 65-73.
14. Reuben SS, Pristas R, Dixon D, Faruqi S, Madabhushi L, Wenner S. The incidence of complex regional pain syndrome after fasciectomy for Dupuytren's contracture: a prospective observational study of four anesthetic techniques. Anesth Analg. 2006;102:499-503
15. Reuben SS, Buvanendran A, Kroin JS, Raghunathan K. The analgesic efficacy of celecoxib, pregabalin, and their combination for spinal fusion surgery. Anesth Analg. 2006;103:1271-7
16. Reuben SS, Buvenandran A, Kroin JS, Raghunathan K. Analgesic efficacy of celecoxib,pregabalin, and their combination for spinal fusion surgery. Anesthesiology 2006;105:A1194.
17. Reuben SS, Buvanendran A, Kroin JS, Steinberg RB. Postoperative modulation of central nervous system prostaglandin E2 by cyclooxygenase inhibitors after vascular surgery. Anesthesiology 2006;104:411-6.
18. Reuben SS, Ekman EF, Raghunathan K, Steinberg RB, Blinder JL, Adesioye J. The effect of cyclooxygenase-2 inhibition on acute and chronic donor-site pain after spinal-fusion surgery. Reg Anesth Pain Med. 2006;31:6-13.
19. Reuben SS, Ekman EF, Charron D. Evaluating the analgesic efficacy of administering celecoxib as a component of multimodal analgesia for outpatient anterior cruciate ligament reconstruction surgery. Anesth Analg. 2007;105:222-7
20. Reuben SS, Ekman EF. The effect of initiating a preventive multimodal analgesic regimen on long-term patient outcomes for outpatient anterior cruciate ligament reconstruction surgery. Anesth Analg. 2007;105:228-32
21. Reuben SS, Buvenandran A, Katz B, Kroin JS. A prospective randomized trial on the role of perioperative celecoxib administration for total knee arthroplasty: improving clinical outcomes. Anesth Analg. 2008;106:1258-64

Most if not all of these manuscripts will be retracted by the journals in which they are published. However, our responsibility to our readership, and the patients we care for, requires immediate notification of the findings of the Baystate Medical Center to our readership. The formal retraction notice appears in the May issue of Anesthesia & Analgesia. The May issue includes two editorials addressing the implications of these retractions on our understanding of perioperative analgesia.

We appreciate the absolute dedication to academic integrity demonstrated by Baystate Medical Center in conducting this investigation, and sharing with the Journal their findings of data fabrication.

Sincerely,

Steven L. Shafer, MD
Editor-in-Chief
Anesthesia & Analgesia

HARRISON, DENNIS July 25, 2001

49-year-old white male who comes in for evaluation of ankylosing spondylitis.

HPI: This 49-year-old white male tells me that he was first diagnosed with ankylosing spondylitis in his early 20's and it has been a very aggressive disease since onset. He had severe spine disease and actually had problems with subluxation of the upper spine into the occiput to the point that he needed a cervical fusion done in 1999. He has also had bilateral hip replacements done in 1995. He has ongoing problems with pain and swelling in his shoulders, his knees, and in his hands and right wrist. He tells me he has lost about 15 lbs. in the last six months. He has also had problems with iritis in the past although he is not aware of any trouble with cardiac or lung difficulties. He has also had problems with osteoporosis, anemia, and sleep apnea. Because of his spinal problem the question has been raised as to whether he might actually have in addition to the ankylosing spondylitis RA.

ROS is otherwise unremarkable.

PMH: Surgeries: Status post the cervical fusion and hip procedures as mentioned above. Lumbar fusion was also done in January of this year. Allergies: Indocin causes problems. His current medications include Axid, Vioxx, Fosamax, Prinivil, Amoxicillin, Imipramine, Tylenol 4, Clonazepam, Oxycontin, and Prednisone. His only other medical problem has been hypertension.

SOCIAL HISTORY: He is a non-smoker, non-drinker.

FAMILY HISTORY: His brother has spondylitis. He has retired from AT&T and

EXAM: On PE he is a frail appearing white male who looks much other than his chronological age who is in no distress. His BP was 120/70 in the right arm seated. Pulse was 90 per minute and regular. Skin revealed no significant rash. HEENT exam unremarkable. Lungs were clear to auscultation. Heart: Regular rate and rhythm. There is a II over VI systolic murmur at the left sternal border, no diastolic murmur was noted. Abdomen not examined. The neurovascular exam was normal. Joint Exam: He had no swelling or pain in the DIP joints. There is 2+ swelling and tenderness in the IP joint of the right thumb. The rest of the IP joints reveal no swelling or pain. There is 2+ swelling and tenderness in the right first MCP joint. The rest of the MCP joints reveal no swelling or pain. There is 3+ synovial thickening and 2+ tenderness in the right wrist. The right wrist reveals 60 degrees of flexion and 40 degrees of extension. Left wrist revealed 80 degrees of flexion and extension without pain. Elbows revealed full ROM without pain. The shoulders were markedly abnormal with only 50 degrees of abduction, 30 degrees of external rotation, 20 degrees of internal rotation. Hips revealed full ROM without pain. The knees revealed 20 degree flexion contractures with further flexion to 100 degrees. There is quite a bit of proliferative synovitis and effusions in the knees. The ankles, midfoot and MTP joints are non-tender. There was some fusiform swelling of the left second toe. His cervical and lumbar spine revealed no significant motion.

IMPRESSION:
1) Ankylosing spondylitis.
2) Peripheral joint arthropathy. The degree of synovitis is surprising here and certainly raises the possibility of rheumatoid disease as does his cervical spine subluxation into the foramen magnum which required decompressive surgery.
3) Hypertension.
4) Weight loss. I suspect this is probably secondary to his active arthropathy.

PLAN: Screening lab studies are pending including HIV, hepatitis B and C serologies and thyroid profile. Provided these were negative or normal, we will start him on Methotrexate 10 mg. a week, folic acid 2 mg. a day. I refilled his Oxycontin 40 mg. tabs one q.12.h., #60, and Klonopin 100 tabs, 1 mg., two at bedtime. That one had 5 refills. Follow up with me will be in eight weeks.

JMT/asw

8/22/01 TC pt. req. Oxycontin 40 mg. ÷ 12h. #60 [illegible] Ames

EXHIBIT F

EXHIBIT G: Re: In Re Vioxx Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp.*, 2:07-cv-00905-EEF-DEK

G

**Surgical Neurology Professional Association**

Ronald J. Fallk, M.D.
Theodore R. Jacobs, M.D.
N. Ross Jenkins, M.D.
Jennifer C. Kernan, M.D.

Brian E. Snow, PA-C
David C. Molind, PA-C
Joseph T. Kearns, PA-C

8 Prospect Street
North Two Specialty Suite
Nashua, NH 03060
(603) 882-1300
fax (603) 882-6025

*Main Office*
4 Elliot Way, Suite 303
Manchester, NH 03103
(603) 669-3838
fax (603) 626-0103

246 Pleasant Street
Memorial Bldg., S-107
Concord, NH 03301
(603) 225-6674
fax (603) 225-2140

March 28, 2002

RE: Harrison, Dennis R.
DOB: 11/19/52

Chief Complaint: Neck and back pain

History of Present Illness: This is a very pleasant right-hand-dominant 49-year-old male patient seen in consultation at the request of his rheumatologist Dr. Trice. Patient describes history of back pain and neck pain over many years secondary to his ankylosing spondylitis. On February 10, 2002 he was a restrained rear-seat passenger in a vehicle hit to the right front and since that time has had return of some of his neck pain and stiffness and low back pain and stiffness which was relieved to a great degree through surgery approximately 5-6 years ago when he underwent a "total cervical fusion". He has also undergone a lumbar and lower thoracic fusion both secondary to his ankylosing spondylitis.

Past Medical History is also significant for rheumatoid arthritis, osteoporosis, bilateral total hip arthroplasties, chronic microcytic anemia.

Review of Systems: He complains of neck pain and stiffness. He denies any weakness, paresthesias or radiation of pain to his upper or lower extremities. He denies any changes in bowel or bladder control. He denies any Valsalva effect. He denies any headaches but does describe occasional lancinating pain along his left scalp and just superior to his left ear.

Medications: Include Procrit injection weekly, prednisone 20 mg. q.o.d., Vioxx 25 mg. b.i.d., Axid 150 mg. b.i.d., Fosamax 10 mg. q.d., Prinivil 10 mg. q.d., imipramine 10 mg. tablets 3 p.o. q.h.s., OxyContin 40 mg. b.i.d., clonazepam 2 mg. q.h.s.

Allergies: To Indocin (anaphylaxis).

Family History: Very pleasant 49-year-old gentleman who is on retirement disability, lives at home with his wife and plans on

EXHIBIT
G

moving to New York in the next few months where he is originally from. His surgeries have taken place at hospitals in New York and New Jersey and New England Baptist.

Physical Exam: Vital signs are as follows: BP 120/85, pulse 80, respirations 16. This gentleman has a somewhat cachectic appearance with severe kyphosis of the C-spine and upper T-spine and flattening of the lumbar lordosis, severely limited C-spine ROM. both rotation and flexion/extension. Cranial nerves II-XII are intact. HEENT: No abnormalities are noted. There is a well-healed posterior cervical scar approximately 15 cm. in length. Upper extremities: Strength is 5/5 over the left upper extremity, 4+ to 5/5 on the right upper extremity. He complains of right elbow and right wrist pain which is long-standing and unchanged. Sensation is intact throughout. DTRs are 2+ with spread throughout. Negative Hoffmann's. Lower extremity strength is 5/5 throughout. DTRs are 2-3+/4 at the knees, 2+/4 at the ankles; negative clonus. Toes are downgoing to Babinski. Patient is able to rise, stand on his toes and his heels. Examination of the lumbar area is remarkable for approximately 35-40 cm. long lower thoracic lumbar wound which is well-healed and once again flattening of the lumbar lordosis. No other abnormalities are noted. No SI joint discomfort is noted. Romberg is negative. Finger-to-nose is intact. Lungs are clear to auscultation. Heart: Regular rate and rhythm.

Assessment: Ankylosing spondylitis, chronic degenerative changes.

Plan: Patient was evaluated by Dr. Faille who recommended that it would be more appropriate for the patient to continue to seek his care in a major medical center given his multiple chronic medical issues and lack of focal extremity complaints at this time, and the fact that his symptoms have been actually improving since his MVA back in February. He is to call with any questions or problems.

Joseph T. Kearns, PA-C

Ronald J. Faille, M.D.

JTK/mer
wp46675.001
cc: James Trice, M.D.

XH NEWA
70130
LA-US
MSY
U.S. MARSHALS
FedEx Express NEW Package US Airbill
8023 0430 2249
1 From
Date 10/2/2013
Sender's Name Dennis R. Harrison
Phone 906 221-5906
Company Retired (AT&T)
Address 601 W Brown Street
City Iron Mountain
State MI ZIP 49801
2 Your Internal Billing Reference MEMORANDUM 1/2; OPPOSITION
3 To
Recipient's Name Clerk of The Court
Phone 504 589-7545
Company United States District Court
Address 500 Poydras Street, Room C-151
City New Orleans, LA
State LA ZIP 70130
4 Express Package Service
Next Business Day
FedEx First Overnight
FedEx Priority Overnight
FedEx Standard Overnight
2 or 3 Business Days
FedEx 2Day A.M.
FedEx 2Day
FedEx Express Saver
5 Packaging
FedEx Envelope
FedEx Pak
FedEx Box
FedEx Tube
Other
6 Special Handling and Delivery Signature Options
SATURDAY Delivery
No Signature Required
Direct Signature
Indirect Signature
HOLD Weekday
HOLD Saturday
Does this shipment contain dangerous goods?
No
Yes
Dry Ice
Cargo Aircraft Only
7 Payment Bill to:
Sender
Recipient
Third Party
Credit Card
Cash/Check
Total Packages
Total Weight
644
8023 0430 2249
© 2011 FedEx 158396 REV 1/11
fedex.com 1.800.GoFedEx 1.800.463.3339
For FedEx Express® Shipments
Align bottom of Peel and Stick Airbill or Pou
117
1
B
2249
10.03

J J

2009

# Massive fraud revelations stun orthopaedics

By Annie Hayashi

**Fabricated data discredit prominent pain management researcher**

Revelations about a well-known pain management researcher have hit orthopaedics, anesthesia, and other medical fields, resulting in more than 20 scientific articles being identified as containing fabricated data.

Scott S. Reuben, MD, was one of the most prolific investigators in the field of anesthesia and analgesia, particularly for orthopaedic perioperative and postoperative pain management. His work on multimodal analgesia appeared in numerous peer reviewed medical journals, and he was frequently invited to speak on the subject.

So when an investigation begun last year by Baystate Medical Center in Springfield, Mass., recently found that Dr. Reuben had fabricated part or all of the data used in 21 of his studies since 1996, the news surprised and shocked both the anesthesia and the orthopaedic communities.

Both *The Journal of Bone and Joint Surgery (JBJS)* and *Anesthesia &Analgesia*, which were among the journals that have published Dr. Reuben's studies, have posted retractions on their Web sites. Anesthesiologists and orthopaedists who had used Dr. Reuben's treatment protocols were left with many unanswered questions.

"It is mind-boggling," said Santhanam Suresh, MD, professor of anesthesiology and pediatrics, Children's Memorial Hospital, Northwestern University's Feinberg School of Medicine, and section co-editor for the Academy's *Orthopaedic Knowledge Online* management of pain in orthopaedics Web site.

"Those of us in the anesthesia community who deal with acute postoperative pain management have adopted some of Dr. Reuben's techniques because of his solid, Level I evidence. It appeared to prove that the addition of a COX-2 inhibitor with pregabalin or gabapentin might actually reduce the amount of postoperative pain," he said.

"It definitely sets our understanding of perioperative analgesic management back," said Steven L. Shafer, MD, editor-in-chief of *Anesthesia & Analgesia*, which has retracted 10 of Dr. Reuben's previously published studies.

"Dr. Reuben advanced certain concepts in multimodal analgesia throughout his career and some of that work has not been reproduced by other laboratories. That work must be considered impeached since we don't know what is true," he stated.

**Two abstracts trigger investigation**

The deception was uncovered last year when two abstracts submitted by Dr. Reuben for Baystate Medical Center's annual "Research Week" were found to lack "necessary institutional review board oversight," according to Hal B. Jenson, MD, MBA, Baystate's chief academic officer.

"This prompted Baystate to conduct an investigation of Dr. Reuben's past research, which eventually uncovered an extensive history of fabrication dating back to 1996," said Baystate spokesperson, Jane Albert, director of public affairs.

According to Baystate Medical Center's *Policies and Procedures for Misconduct in Research and Scholarly Activities*, fabrication is defined as "making up data or results and recording or reporting them."

Dr. Reuben practiced at Baystate but was employed by Springfield Anesthesia Services, Inc. As a part of this group, he served as Baystate's director of acute pain and conducted research at the facility supported, in part, with grants from Pfizer. He has been on medical leave from his positions since May 2008.

According to a statement released by Baystate, Dr. Reuben is "barred from research and educational activities at Baystate for at least 10 years."

Dr. Reuben participated in the investigation and, according to Dr. Jenson, offered his full cooperation although his "recall of his earlier work was limited."

When it was determined that some or all of the data had been fabricated in 21 of Dr. Reuben's studies, the "stakeholders were all identified and contacted," said Dr. Jenson.

"Although these circumstances may be viewed as a failure that occurred, there is also a positive outcome—the review process did work to identify the fabrication. That is important to remember," Dr. Jenson said.

**Red flags?**

For years, no one in either the anesthesia or orthopaedic communities suspected that Dr. Reuben was fabricating data.

"I went back and looked at the reviews of Dr. Reuben's papers and not once did the question of data fabrication come up," said Dr. Shafer.

"I actually created one of the graphs in one of his retracted papers myself. I didn't like the graph that he had created and I had a publication deadline. So I asked him to send me the spreadsheet and did the graph the way it needed to be done. There was no indication in the data that I was working with a fabricated spreadsheet," he explained.

According to *JBJS* editor **James D. Heckman, MD**, "We rely upon the honest reporting of the authors. Fortunately, virtually everyone we deal with is honest in trying to do the right thing to advance science. Most people are scrupulous, meticulous in their disclosure of any problems or any potential problems."

The fact that Dr. Reuben conducted prospective, randomized, controlled studies may have increased the medical community's confidence in his work.

"Dr. Reuben was using the gold standard. You expect someone coming from a reputable university setting to go through the rigors of a proper scientific presentation," Dr. Suresh said.

- In retrospect, however, several editors cited the following possible "red flags" that could have called the data into question:
- The results of Dr. Reuben's studies on adding COX-2 inhibitors along with pregabalin or gabapentin were always positive.
- Although some of Dr. Reuben's findings were corroborated by other investigators, many were not.
- Any new investigational drug trials must be registered at clinicaltrials.gov, a Web site sponsored by the National Institutes of Health. None of Dr. Reuben's studies were registered.

According to Dr. Suresh, "When clinical trials are registered, data are generally under greater scrutiny. Important information is required, including the IRB approvals that initially led to Dr. Reuben's investigation."

Dr. Suresh also indicated Dr. Reuben's research came at a time when the anesthesia community was looking for adjuvants to opioids for effective analgesia.

"I thought multimodal analgesia, particularly for orthopaedic surgery, was a revolutionary step forward in managing pain. That certainly may be questionable at this point," he said.

*"No one study—no matter how good it is or how profound it seems—should change the course of clinical care. You must have the data corroborated and have the experiment repeated by someone else."*
***—James D. Heckman, MD***



**Cleaning up the contamination**
The journal editors acknowledge that the 21 studies identified by Baystate Medical Center as including fabricated data are just the tip of the iceberg. (See "Fraudulent data") According to Pub Med, Dr. Reuben has published 72 studies since 1991. The ISI Science Citation Index indicates that Dr. Reuben's work has been cited in 763 other journal articles—adding yet another layer of complexity to an already very complicated situation.

"A question mark hangs over all of his work. I think we owe it to our readers and to the scientific and medical community to try and make some sort of determination about his other work," said Dr. Shafer. "I am having discussions with other editors-in-chief about what we can do."

Though Dr. Shafer concedes that journal editors do not have the resources or legal authority to con-duct a complete investigation into all of Dr. Reuben's work, he would like to make some effort "to identify those papers where other authors might come forward" with data and source documents and "allow those papers to stay as part of the unimpeached medical literature."

He is also making changes at *Anesthesia & Analgesia* to help prevent this from occurring again. "We will now be requiring more than one author to vouch for both the integrity of the raw data and the data analysis," he said.

At *JBJS*, Dr. Heckman notified subscribers that one article that was identified by Baystate Medical Center as fraudulent was being retracted, as was a *Current Concepts Review* from 2007. The decision to retract the review article was based on the fact that there are "several places where statements of fact regarding perioperative pain management are only supported by Dr. Reuben's work," said Dr. Heckman.

In addition to "cleansing" his own journal, Dr. Heckman would like to look at the orthopaedic literature as a whole. "Perhaps we need a work group of orthopaedic editors to look at how pervasive Dr. Reuben's work is and how much it may have compromised the orthopaedic literature."

Both Drs. Shafer and Heckman agreed, however, that no number of safeguards will prevent someone who is intent on fabricating data from doing so.

**Moving forward**
The use of multimodal analgesia for orthopaedic surgery may be beneficial in certain cases, according to Dr. Suresh. "But specific use of some of the drugs used in Dr. Reuben's studies lack scientific merit at the present time," he said.

He believes further "scrutiny of the use of these drugs is necessary and further prospective, randomized, controlled trials are required to justify the use of these drugs."

Dr. Heckman has a caution for his readers: caveat lector—let the reader beware. "No one study—no matter how good it is or how profound it seems—should change the course of clinical care. You must have the data corroborated and have the experiment repeated by someone else.

"Only when you have equivalent data from different, independent sources should you ever really make a substantial change in your practice," he said.

*Annie Hayashi is the senior science writer for* AAOS Now. *She can be reached at hayashi@aaos.org*

**Additional References:**
Letter from James D. Heckman, editor-in-chief, *The Journal of Bone and Joint Surgery*
http://www.ejbjs.org/misc/retraction_apr09_ltr.pdf

Article from *Anesthesiology News*, "Fraud Case Rocks Anesthesiology Community"

AAOS *Now*
April 2009 Issue
http://www.aaos.org/news/aaosnow/apr09/cover1.asp

6300 North River Road Rosemont, Illinois 60018-4262 Phone 847.823.7186 Fax 847.823.8125

© 1995-2013 by the American Academy of Orthopaedic Surgeons. "All Rights Reserved." This website and its contents may not be reproduced in whole or in part without written permission. "American Academy of Orthopaedic Surgeons" and its associated seal and "American Association of Orthopaedic Surgeons" and its logo are all registered U.S. trademarks and may not be used without written permission.

AAOS AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS
AMERICAN ASSOCIATION OF ORTHOPAEDIC SURGEONS

# Reuben guilty of fraud

Scott S. Reuben, MD, former chief of the acute pain service at Baystate Medical Center in Springfield, Mass., has been sentenced to 6 months in federal prison and 3 years of probation. He was also ordered to pay a $5,000 fine and $362,000 in restitution to the companies that provided his research grants.

Dr. Reuben had previously pled guilty to one charge of fraud in connection with falsifying and fabricating research studies involving the painkiller celecoxib. As reported in *AAOS Now* (April 2009), Dr. Reuben's research was frequently cited and his techniques adopted by many orthopaedic surgeons. The fraudulent research seemed to prove that the addition of a Cox-2 inhibitor with pregabalin or gaba-pentin reduced postoperative pain.

According to information filed with the court, in September 2005, Dr. Reuben entered into a $73,512 clinical research grant agreement with Pfizer to compare its celecoxib product to placebo in patients undergoing multimodal analgesia therapy. In studies published in the journal *Anesthesia & Analgesia*, Dr. Reuben claimed positive results, but in fact, no patients were enrolled and the study results were fabricated. At least 13 of his published studies have been retracted.

**Additional Information:**

Studies

Letter

Article from *Anesthesiology News*, "Fraud Case Rocks Anesthesiology Community"

AAOS *Now*
August 2010 Issue
http://www.aaos.org/news/aaosnow/aug10/research3.asp

-PRIVACY POLICY- Disclaimers & Agreement Advertising & Sponsorship Contact AAOS Technical Requirements Careers
6300 North River Road Rosemont, Illinois 60018-4262 Phone 847.823.7186 Fax 847.823.8125
© 1995-2013 by the American Academy of Orthopaedic Surgeons. "All Rights Reserved." This website and its contents may not be reproduced in whole or in part without written permission. "American Academy of Orthopaedic Surgeons" and its associated seal and "American Association of Orthopaedic Surgeons" and its logo are all registered U.S. trademarks and may not be used without written permission.





K

Search All NYTimes.com
The New York Times

# Doctor's Pain Studies Were Fabricated, Hospital Says

By GARDINER HARRIS
Published: March 10, 2009

**Correction Appended**

In what may be among the longest-running and widest-ranging cases of academic fraud, one of the most prolific researchers in anesthesiology fabricated much of the data underlying his research, said a spokeswoman for the hospital where he works.

The researcher, Dr. Scott S. Reuben, an anesthesiologist in Springfield, Mass., who practiced at Baystate Medical Center, fabricated data in some or all of the 21 journal articles dating from at least 1996, said Jane Albert, a spokeswoman for Baystate Health.

The reliability of dozens more articles he wrote is uncertain, and the common practice — supported by his studies — of giving patients aspirinlike drugs and neuropathic pain medicines after surgery instead of narcotics is now being questioned.

Paul Cirel, a lawyer for Dr. Reuben, said that he could not discuss the case because Baystate had investigated it as part of a confidential peer-review process. Baystate officials "were aware of extenuating circumstances," Mr. Cirel said.

The drug giant Pfizer underwrote much of Dr. Reuben's research from 2002 to 2007. Many of his trials found that Celebrex and Lyrica, Pfizer drugs, were effective against postoperative pain.

"Independent clinical research advances disease treatments and improves the lives of patients," said Raymond F. Kerins Jr., a Pfizer spokesman. "As part of such research, we count on independent researchers to be truthful and motivated by a desire to advance care for patients. It is very disappointing to learn about Dr. Scott Reuben's alleged actions."

Drug companies routinely hire community physicians to conduct studies of already-approved medicines. In some cases, prosecutors have charged companies with underwriting studies of little scientific merit in hopes of persuading doctors to prescribe the medicines more often.

EXHIBIT
K

"When researchers are beholden to companies for much of their income, there is an incredible tendency to get results that are favorable to the company," said Dr. Jerome Kassirer, a former editor of The New England Journal of Medicine and the author of a book about conflicts of interest.

Dr. Reuben's activities were spotted by Baystate after questions were raised about two study abstracts that he filed last spring, Ms. Albert said. The health system determined that he had not received approval to conduct human research, Ms. Albert said.

Baystate investigators determined that Dr. Reuben had concocted data for 21 studies, and the health system asked the journals in which those studies were published to withdraw them.

Dr. Steve Shafer, the editor in chief of Anesthesia & Analgesia, which published many of the papers, said he was considering withdrawing any study in which Dr. Reuben served a pivotal role.

"He was one of the most prolific investigators in the area of postoperative pain management," Dr. Shafer said. His fraud "sets back our knowledge in the field tremendously."

***Correction: March 19, 2009***

*An article on March 11 about an academic fraud case against Dr. Scott S. Reuben, an anesthesiologist in Springfield, Mass., paraphrased incorrectly from a comment by a spokeswoman for Baystate Medical Center, where he formerly practiced. The spokeswoman, Jane Albert, said in an interview that an investigating committee concluded that Dr. Reuben fabricated data underlying much of his research, and she added that he had cooperated with the investigation. She did not comment on whether he himself admitted fabricating data.*

*This article has been revised to reflect the following correction:*

***Correction: March 24, 2009***

*An article on March 11 about an academic fraud case against Dr. Scott S. Reuben, an anesthesiologist in Springfield, Mass., paraphrased incorrectly from a comment by a spokeswoman for Baystate Medical Center, where he formerly practiced. And a correction*

*in this space on Thursday failed to correct the headline and another comment by the spokeswoman that was paraphrased incorrectly.*

*The spokeswoman, Jane Albert, said in an interview that an investigating committee concluded that Dr. Reuben fabricated data underlying much of his research, and she added that he had cooperated with the investigation. She did not say that he himself admitted fabricating data. (This error in the article was repeated in the headline.)*

*In addition, Ms. Albert said in the interview that the hospital found that Dr. Reuben fabricated data in some or all of 21 journal articles; she did not say that he did not conduct the clinical trials described in those articles.*

A version of this article appeared in print on March 11, 2009, on page A22 of the New York edition.

L

File: FDA - Reuben Disbarment taken from Federal Regist

L

# The Federal Register

## The Daily Journal of the United States Government

Notice

## Scott S. Reuben: Debarment Order

A Notice by the Food and Drug Administration on 11/16/2011

-
- EMAIL
- TWITTER
- FACEBOOK

Previous ArticleNext Article

LEGAL DISCLAIMER

Font Controls

- Increase
- Decrease
- Sans
- Serif

PDF DEVPRINTPUBLIC INSPECTION

**Publication Date:**

Wednesday, November 16, 2011

**Agencies:**

Department of Health and Human Services

Food and Drug Administration

**Dates:**

This order is effective November 16, 2011.

**Effective Date:**

11/16/2011

**Entry Type:**

Notice

**Action:**

Notice.

**Document Citation:**

76 FR 71042

**Page:**

71042 -71043 (2 pages)

**Agency/Docket Number:**

Docket No. FDA-2011-N-0377

**Document Number:**

2011-29538

**Shorter URL:**

https://federalregister.gov/a/2011-29538

## ACTION

Notice.

## SUMMARY

The Food and Drug Administration (FDA) is issuing an order under the Federal Food, Drug, and Cosmetic Act permanently debarring Scott S. Reuben, M.D. from providing services in any capacity to a person that has an approved or pending drug product application. FDA bases this order on a finding that Dr. Reuben was convicted of a felony under Federal law for conduct relating to the regulation of a drug product under the Federal Food, Drug, and Cosmetic Act. Dr. Reuben was given notice of the proposed permanent debarment and an opportunity to request a hearing within the timeframe prescribed by regulation. Dr. Reuben failed to respond. Dr. Reuben's failure to respond constitutes a waiver of his right to a hearing concerning this action.

## TABLE OF CONTENTSBack to Top

- DATES:
- ADDRESSES:
- FOR FURTHER INFORMATION CONTACT:
- SUPPLEMENTARY INFORMATION:
  - I. Background
  - II. Findings and Order

## DATES:Back to Top

This order is effective November 16, 2011.

## ADDRESSES: Back to Top

Submit applications for special termination of debarment to the Division of Dockets Management (HFA-305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852.

## FOR FURTHER INFORMATION CONTACT: Back to Top

Kenny Shade, Division of Compliance Policy (HFC-230), Office of Enforcement, Office of Regulatory Affairs, Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, (301) 796-4640.

## SUPPLEMENTARY INFORMATION: Back to Top

### I. Background Back to Top

Section 306(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335a(a)(2)(B)) requires debarment of an individual if FDA finds that the individual has been convicted of a felony under Federal law for conduct relating to the regulation of any drug product under the Federal Food, Drug, and Cosmetic Act.

On June 24, 2010, the U.S. District Court for the District of Massachusetts entered judgment against Dr. Reuben for health care fraud in violation of 18 U.S.C. 1347.

The FDA's finding that debarment is appropriate is based on the felony conviction referenced herein for conduct relating to the regulation of a drug product. The factual basis for this conviction is as follows: Dr. Reuben was a physician licensed by the State of Massachusetts working as an anesthesiologist providing anesthesia services to patients in connection with surgeries, and also treating patients post-surgery in the District of Massachusetts. Dr. Reuben served as the chief of acute pain at a hospital in Western Massachusetts and maintained an office at the hospital for the purpose of conducting research. Dr. Reuben's interest, from a research perspective, was in post-operative multimodal analgesia therapy. Dr. Reuben made proposals for research funding to pharmaceutical companies that manufactured drugs that he used or proposed to use in multimodal analgesia therapy. Dr. Reuben represented to the companies that, as the principal investigator, he would be performing clinical studies with actual patients to whom he would administer the drug that was the subject of the research grant.

Dr. Reuben entered into contracts to perform research studies funded by the companies from at least as early as 1999. Dr. Reuben purported to perform the research called for by the contracts, and published articles in various medical journals based on the purported results of the research, when in fact those studies had not

been performed, and therefore the research results reported in the medical journals were false.

As a result of his convictions, on August 22, 2011, FDA sent Dr. Reuben a notice by certified mail proposing to permanently debar him from providing services in any capacity to a person that has an approved or pending drug product application. The proposal was based on a finding, under section 306(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335a(a)(2)(B)), that Dr. Reuben was convicted of a felony under Federal law for conduct relating to the regulation of a drug product under the Federal Food, Drug, and Cosmetic Act. This conclusion was based on the fact that FDA regulates clinical trials related to drug products such as those described previously as part of the Agency's regulation of drug products. The proposal also offered Dr. Reuben an opportunity to request a hearing, providing him 30 days from the date of receipt of the letter in which to file the request, and advised him that failure to request a hearing constituted a waiver of the opportunity for a hearing and of any contentions concerning this action. The proposal was received on August 26, 2011. Dr. Reuben failed to respond within the timeframe prescribed by regulation and has, therefore, waived his opportunity for a hearing and has waived any contentions concerning his debarment (21 CFR part 12).

## II. Findings and OrderBack to Top

Therefore, the Director, Office of Enforcement, Office of Regulatory Affairs, under section 306(a)(2)(B) of the (21 U.S.C. 335a(a)(2)(B)) of the Federal Food, Drug, and Cosmetic Act, under authority delegated to the Director (Staff Manual Guide 1410.35), finds that Scott S. Reuben has been convicted of a felony under Federal law for conduct relating to the regulation of a drug product under the Federal Food, Drug, and Cosmetic Act.

As a result of the foregoing finding, Dr. Reuben is permanently debarred from providing services in any capacity to a person with an approved or pending drug product application under sections 505, 512, or 802 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355, 360b, or 382), or under section 351 of the Public Health Service (42 U.S.C. 262), effective (see DATES) (see section 306(c)(1)(B), (c)(2)(A)(ii), and 201(dd) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335a(c)(1)(B), (c)(2)(A)(ii), and 321(dd))). Any person with an approved or pending drug product application who knowingly employs or retains as a consultant or contractor, or otherwise uses the services of Dr. Reuben, in any capacity during Dr. Reuben's debarment, will be subject to civil money penalties (section 307(a)(6) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335b(a)(6))). If Dr. Reuben provides services in any capacity to a person with an approved or pending drug product application during his period of debarment he will be subject to civil money penalties (section 307(a)(7) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335b(a)(7)). In

addition, FDA will not accept or review any abbreviated new drug applications submitted by or with the assistance of Dr. Reuben during his period of debarment (section 306(c)(1)(A) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335a(c)(1)(A))).

Any application by Dr. Reuben for special termination of debarment under section 306(d)(4) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 335a(d)(4)) should be identified with Docket No. FDA-2011-N-0377 and sent to the Division of Dockets Management (seeADDRESSES). All such submissions are to be filed in four copies. The public availability of information in these submissions is governed by 21 CFR 10.20(j).

Publicly available submissions may be seen in the Division of Dockets Management between 9 a.m. and 4 p.m., Monday through Friday.

Dated: November 7, 2011.

**Armando Zamora,**

*Acting Director, Office of Enforcement, Office of Regulatory Affairs.*

## HOME

- Home

## SECTIONS

- Money
- Environment
- World
- Science & Technology
- Business & Industry
- Health & Public Welfare

## BROWSE

- Agencies
- Topics
- Dates
- Public Inspection
- Executive Orders

## SEARCH

- Article Search
- Advanced Article Search
- Events Search
- Unified Agenda Search
- Public Inspection Search

## POLICY

- About Us
- Legal Status

M [M] File: Reuben - FDA - Notice

# Reuben, Scott S., M.D. NIDPOE 3/17/10

Department of Health and Human Services

Public Health Service
Food and Drug Administration
Silver Spring, MD 20993

**NOTICE OF INITIATION OF DISQUALIFICATION PROCEEDINGS AND OPPORTUNITY TO EXPLAIN (NIDPOE)**

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Scott S. Reuben, M.D.
**(b)(6)**

Dear Dr. Reuben:

Between April 20 and May 21, 2009, Ms. Patty Murphy, representing the Food and Drug Administration (FDA), conducted an investigation to review your conduct of the following clinical investigations of the investigational drug Celecoxib (Celebrex), performed for Pfizer, Inc.:

- **(b)(4)**, entitled "**(b)(4)**," and
- **(b)(4)**, entitled "**(b)(4)**."

This inspection is a part of the FDA's Bioresearch Monitoring Program, which includes inspections designed to evaluate the conduct of research and to ensure that the rights, safety, and welfare of the human subjects of those studies have been protected.

At the conclusion of the inspection, Ms. Murphy prepared and sent to your legal representative Form FDA 483, Inspectional Observations. We have reviewed the inspection report and the documents submitted with that report. You did not respond to the matters under complaint, which are described below.

FDA's inspection raised numerous concerns about your conduct of studies, including potential fabrication of study subjects, fabrication of study data, and failure to follow the investigational plan. This matter was referred to FDA's Office of Criminal Investigations (OCI) for further investigation. Subsequently, the U.S. Attorney for the District of Massachusetts charged you with executing a scheme and artifice to defraud Pfizer, Inc. in connection with the delivery of and payment for health care benefits, items and services. On Jan. 8, 2010, you signed a plea agreement in which you plead guilty to one count of health care fraud in violation of 18 U.S.C. §1347. In doing so, you acknowledged that although you entered into an Independent Research Grant Agreement with Pfizer to conduct a study entitled "Perioperative Administration of Celecoxib [Celebrex] as a Component of Multimodal Analgesia for Outpatient Anterior Cruciate Ligament Reconstruction Surgery," you did not actually enroll any subjects in the study. You admitted that the results reported both to Pfizer and to Anesthesia and Analgesia Journal and in turn to the public were wholly made up and therefore false.

Based on our evaluation of information obtained by the Agency, we believe that you have repeatedly or deliberately violated regulations governing the proper conduct of clinical studies involving investigational products, as published under Title 21, Code of Federal Regulations (CFR), part 312.70 (copy enclosed).

This letter provides you with written notice of the matters under complaint and initiates an administrative proceeding, described below, to determine whether you should be disqualified from receiving investigational products, as set forth under 21 CFR 312.70.

A listing of the violations follows. The applicable provisions of the CFR are cited for each violation.

EXHIBIT
M

**1. You failed to conduct the studies or ensure they were conducted in accordance with the signed statement of investigator and the investigational plan [21 CFR 312.60].**

a. Protocol (b)(4), Section 6.2, "Exclusion Criteria," states that subjects will not be included in the study if they have a known allergy to sulfonamides. Section 7.3.1, "Screening Visit," states that laboratory test results will be used to determine if a subject is eligible for the study. You failed to ensure that the following study subjects met the protocol criteria for study subject selection:

  i. Subject 1013 had a history of allergy to sulfonamides and was enrolled into the study.

  ii. Subject 1015's and Subject 1016's screening laboratory results were not reviewed for exclusionary values until after their enrollment into the study.

b. Protocol (b)(4), Section 9.0, "Concomitant Therapy," states that Non Steroidal Anti-Inflammatory Drugs (NSAIDS) and oral or injectable corticosteroids are specifically excluded from use during the treatment period:.

  i. Subjects 1003 and 1004 were administered dexamethasone preoperatively.

  ii. Subjects 1013 and 1016 took NSAIDS postoperatively.

c. Protocol (b)(4), Section 7.2, "Study Schedule," states that the surgical procedure will be performed under general anesthesia, using fentanyl 1-3 mcg/kg, with an injection of marcaine 0.25% with epinephrine, 20 cc total dose at the index joint.

  i. Subjects No. 1003, 1004, 1011, 1013, 1015, 1016, 1024, 1025, 1027 and 1029 did not receive the specified dose of marcaine with epinephrine per the study protocol.

  ii. Subjects No. 1006 and 1008 did not receive the specified dose of fentanyl per the study protocol.

d. Protocol (b)(4), Section 7.7.5, "Study Drug Administration," states that Bottle B is dispensed to the subject after surgery, with instruction to take as needed upon the first occurrence of pain. If the subject requires additional pain medication after 30 minutes of taking the second dose of study medication from Bottle B, subject will be provided rescue analgesic medication (Bottle C). You failed to ensure that study medications were dispensed at the prescribed times.

  i. Subject 1022 was administered rescue analgesic medication (Bottle C) twelve minutes after receiving the dose from Bottle B.

  ii. Subject 1008 was administered rescue analgesic medication (Bottle C) ten minutes after receiving the dose from Bottle B.

e. Protocol (b)(4), Section 7.7.5, "Study Drug Administration," states that Bottle B is dispensed to the subject after surgery, with instruction to take as needed upon the first occurrence of pain. If the subject requires additional pain medication after 30 minutes of taking the second dose of study medication from Bottle B, [the] subject will be provided rescue analgesic medication (Bottle C).

You failed to ensure that study medications were dispensed at the prescribed times for Subject 1009, who was administered rescue analgesic medication (Bottle C) fifteen minutes after receiving the dose from Bottle B.

f. Protocol (b)(4) Section 7.2, "Study Schedule," states that the surgical procedure will be performed under general anesthesia, using fentanyl (up to 4 mcg/kg), with an injection of marcaine 0.25% with epinephrine (up to 20 cc total dose at the index joint). You failed to ensure that the marcaine was administered according to the investigational plan for Subjects 1008 and 1013, who were administered 30 cc of marcaine.

This letter is not intended to be an all-inclusive list of deficiencies with your clinical studies of investigational products. It is your responsibility to ensure adherence to each requirement of the law and relevant regulations.

On the basis of the above-listed violations, FDA asserts that you repeatedly or deliberately failed to comply with the cited regulations, which placed unnecessary risks to human subjects and jeopardized the integrity of data; and the FDA proposes that you be disqualified as a clinical investigator.

In the normal course of a disqualification proceeding, following receipt of this notice, you would have been entitled to/offered an opportunity to explain the matter either in writing or during an informal conference. You would have been entitled to, or offered the opportunity to reply to the above stated issues, including an explanation of why you should remain eligible to receive investigational products and not be disqualified as a clinical investigator, in a written response or at an informal conference in my office. This procedure is provided for by regulation 21 CFR 312.70. If your written or oral responses to our allegations were unsatisfactory, in the normal course of a disqualification proceeding, you would have been entitled to/offered a regulatory hearing before FDA, pursuant to 21 CFR 16 and 21 CFR 312.70. A presiding officer free from bias or prejudice and who has not participated in this matter would have conducted the hearing to determine whether or not you would remain entitled to receive investigational products.

However, pursuant to section 4 of your plea agreement, you agreed to enter into a disqualification agreement with FDA within 21 days of receiving FDA's NIDPOE. You further agreed not to contest the disqualification proceedings, to waive your opportunity to provide a written explanation, to waive your right to attend an informal conference, and to waive your right to any regulatory hearing pursuant to 21 CFR Parts 16 and 312.70. The following paragraphs include instructions for entering into the disqualification agreement with FDA.

You should be aware that neither entry into a consent agreement nor pursuit of a hearing precludes the possibility of a corollary judicial proceeding or administrative remedy concerning these violations.

To enter into the enclosed consent agreement with FDA, thereby terminating this disqualification process, you must:

(1) Initial and date each page of this Agreement;
(2) Sign and date the last page of this Agreement; and
(3) Return this Agreement initialed, signed, and dated to the signature below.

A copy of the fully executed Agreement will be mailed to you.

Sincerely yours,
{See appended electronic signature page}
Leslie K. Ball, M.D.
Director
Division of Scientific Investigations
Office of Compliance
Center for Drug Evaluation and Research
Food and Drug Administration

---

This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic
signature.

---

/s/

---

LESLIE K BALL
03/17/2010

N

N

TAKE FROM INTERNET SEARC
1-09-40105-9

**Department of Health and Human Services**

**DEPARTMENTAL APPEALS BOARD**

**Civil Remedies Division**

Scott S. Reuben, M.D.,
(O.I. File No.: 1-09-40105-9),

Petitioner,

v.

The Inspector General.

Docket No. C-11-664

Decision No. CR2481

Date: January 6, 2012

**DECISION**

Petitioner, Scott S. Reuben, M.D., asks review of the Inspector General's (I.G.'s) determination to exclude him for five years from participation in the Medicare, Medicaid, and all federal health care programs under section 1128(a)(3) of the Social Security Act (Act). For the reasons discussed below, I find that the I.G. is authorized to exclude Petitioner and that the statute mandates a minimum five-year exclusion.

**Discussion**

The sole issue before me is whether the I.G. has a basis for excluding Petitioner from program participation. Because an exclusion under section 1128(a)(3) of the Act must be for a minimum period of five years, the reasonableness of the length of the exclusion is not an issue. Act § 1128(c)(3)(B); 42 C.F.R. § 1001.2007(a)(2).

The parties have submitted their written arguments (I.G. Br.; P. Br.), and the I.G. filed a reply. With his brief, the I.G. submitted four exhibits (I.G. Exs. 1-4). In the absence of any objections, I admit into evidence I.G. Exs. 1-4.

EXHIBIT
N

I directed the parties to indicate in their briefs whether an in-person hearing would be necessary and, if so, to describe the testimony it wishes to present, the names of the witnesses it would call, and a summary of each witnesses' proposed testimony. I specifically directed the parties to explain why the testimony would be relevant. Order and Schedule for Filing Briefs and Documentary Evidence, Attachment 1 (Informal Brief of Petitioner ¶ III) and Attachment 2 (Informal Brief of I.G. ¶ III) (Sept. 9, 2011). The I.G. indicates that an in-person hearing is not necessary. Although Petitioner does not directly respond to the question, he does not contend that an in-person hearing is necessary and lists no potential witnesses. I therefore conclude that an in-person hearing is not required.

***Petitioner must be excluded for five years because he was convicted of felony fraud in connection with the delivery of a healthcare item or service.*** [1]

Petitioner was a Massachusetts anesthesiologist who contracted with the drug manufacturer, Pfizer, Inc., to conduct clinical studies on patients to determine the efficacy of a certain drug in treating post-operative pain. Pfizer paid for the studies. Petitioner subsequently claimed to have conducted the studies, administering the tested drug to 100 post-surgical patients and a placebo to another 100 post-surgical patients. He published papers in a scientific journal claiming to have achieved success with the tested drug. In fact, he had not enrolled any patients in any study, and he fabricated the "results." I.G. Ex. 3 at 12-16.

On June 24, 2010, Petitioner pled guilty in federal district court for the District of Massachusetts to one count of felony health care fraud, 18 U.S.C. § 1347. Under that provision, a person commits health care fraud if, "in connection with the delivery of or payment for health care benefits, items, or services," he "knowingly and willfully executes, or attempts to execute" a scheme 1) to defraud a health benefit program or 2) to obtain, "by means of false or fraudulent pretenses, representations, or promises," money or property owned by a health benefit program.

The court accepted Petitioner's plea and entered judgment against him. I.G. Exs. 2, 4.

In a letter dated June 30, 2011, the I.G. advised Petitioner that, because he had been convicted of a felony offense related to fraud, theft, embezzlement, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service, the I.G. was excluding him from participation in Medicare, Medicaid, and all federal health care programs for a period of five years. I.G. Ex. 1.

---

[1] I make this one finding of fact/conclusion of law.

Section 1128(a)(3) provides that an individual or entity convicted of felony fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct in connection with the delivery of a health care item or service must be excluded from participation in federal health care programs for a minimum of five years. *See* 42 C.F.R. 1001.101(c). Because Petitioner was convicted of felony health care fraud, he is subject to exclusion.

Petitioner does not deny that he was convicted of felony fraud in connection with the delivery of a health care item or service. Instead, he attributes his misconduct to mental illness, points out that his practice as a clinician is unblemished, argues that he has paid his debt to society, and maintains that he is ready to resume his medical career. These are simply not bases for overturning a mandatory exclusion.

**Conclusion**

For these reasons, I conclude that the I.G. properly excluded Petitioner from participation in Medicare, Medicaid and all federal health care programs, and I sustain the five-year exclusion.

/s/
Carolyn Cozad Hughes
Administrative Law Judge

EXHIBIT O: Re: In Re Vioxx Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp.*, 2:07-cv-00905-EEF-DEK

April 20, 2001

Jonca Bull, M.D., Acting Director
Division of Anti-Inflammatory, Analgesic and
Ophthalmologic Drug Products
HFD-550, Room N314
Office of Drug Evaluation V (CDER)
Food and Drug Administration
9201 Corporate Blvd.
Rockvi

Serial No. 897

MERCK

Dear Dr. Bull:

Reference is made to the above Investigational New Drug Application (IND).

Merck Research Laboratories (MRL), a Division of Merck & Co., Inc., is planning to initiate a clinical development program to support a new indication for VIOXX™ for the "peri-operative management of post-operative MRL believes that this potential use of VIOXX™ represents an important advance that is not included in the current product circular. This specific indication, we believe, has not previously been registered by any analgesic nor is available guidance from the Agency on the development of drugs for this indication. MRL would like to discuss our development program to solicit the Agency's concurrence with the plan prior to the initiation of pivotal trials.

By this letter, therefore, MRL is requesting a meeting with the FDA to discuss our peri-operative analgesia program. Enclosed is a Background Package that contains; a proposed agenda for the meeting; a list of MRL participants; a set of questions or issues for discussion; a brief report on the background, rationale and outline of the proposed clinical program; and a draft clinical protocol for one of the pivotal trials.

MRL will also be submitting within the next few weeks, a Background Package and a meeting request to discuss our proposed clinical program to support a hronic indication for MRL is amenable to merging the discussions of peri-operative analgesia and chronic pain into a single meeting with the Agency at the Agency's discretion.

To facilitate the scheduling of the meeting(s), Dr. Silverman will contact Ms. Folkendt within the next two weeks. MRL looks forward to the discussion with the FDA.

Jonca Bull, M.D., Acting Director
IND 46,894: VIOXX™ (Rofecoxib)
Page 2

We consider the information included in this submission to be a confidential matter, and request that the Food and Drug Administration not make its content, nor any future communications in regard to it, public without first obtaining the written permission of Merck & Co., Inc.

If you have any questions or need additional information please contact Robert E. Silverman, M.D. Ph.D. (610) 397-2944 or, in my absence, Bonnie J. Goldmann, M.D. (610) 397-2383.

Sincerely,

Robert E. Silverman, M.D., Ph.D.
Senior Director
Regulatory Affairs

Federal Express #1

Desk Copies (15): Ms. Sandra Folkendt, HFD-550, Room N322

q:/ac1d/vioxx/background/perio/coviter

EXHIBIT
O

Attachment

MRK-NJ0169022
MRK-NJ0169226
MRK-NJ0169021
MRK-NJ0169226
04/20/2001
IND 46.894 Vioxx (Rofecoxib) / background information / (peri operative analgesia) [12/00/1993 - 04/20/2001]
Silverman, Robert E
Bull, Jonca
Folkendt, Sandra
Letter
Gertz, Barry
NO
YES

Robert E Silverman, M.D., Ph.D.
Senior Director
Hogilatory Affairs
April 20, 2001
Jonca Bull, M.D., Acting Director
Division of Anti -Inflammatory, Analgesic and
Oplithalmologic Drug Products
HFD-550, Room N314
Office of Drug Evaluation V (CDER)
Food and Drug Administration
9201 Corporate Blvd.
Rockville, MD 20850
Dear Dr. Bull:
Merck & Co., Inc.
FO. Box 4
West Point PA 19486
Tel 610 397 2944

Confidential - Subject To Protective Order MRK-NJ0169023

215652 5000
Fax 610 397 2516
MERCK
Research Laboratories
Serial No. 897
IND 46,894: VIOXXTm (Rofecoxib)
Background Information
(Peri-Operative Analgesia)
Reference is made to the above Investigational New Drug Application (IND). ZD
Merck Research Laboratories (MRL), a Division of Merck & Co., Inc., is planning to initiate a clinical development program to support a new indication for VIOXXI'm for the "pen-operative management of post-operative pain". MRL believes that this potential use of VIOXXI'11 represents an important therapeutic advance that is not included in the current product circular. This specific indication, we believe, has not previously been registered by any analgesic nor is there publically available guidance from the Agency on the development of drugs for this indication. MRL would like to discuss our development program to solicit the Agency's concurrence with the plan prior to the initiation of pivotal trials.

By this letter, therefore, MRL is requesting a meeting with the FDA to discuss our peri-operative analgesia program. Enclosed is a Background Package that contains; a proposed agenda for the meeting; a list of MRL participants; a set of questions or issues for discussion; a brief report on the background, rationale and outline of the proposed clinical program; and a draft clinical protocol for one of the pivotal trials.

MRL will also be submitting within the next few weeks, a Background Package and a meeting request to discuss our proposed clinical program to support a "chronic pain" indication for VJOY,XTIM. MRL is amenable to merging the discussions of peri-operative analgesia and chronic pain into a single meeting with the Agency at the Agency's discretion.
To facilitate the scheduling of the meeting(s), Dr. Silverman will contact Ms. Folkendt within the next two weeks. MRL looks forward to the discussion with the FDA.
Confidential Subject To Protective Order MRK-NJO169022

Jonca Bull, M.D., Acting Director
I'ND 46,894: VIOXXTM (Rofecoxib)
Page 2

We consider the infornation included in this submission to be a confidential matter, and request that the Food and Drug Administration not make its content, nor any future comi-nunications in regard to it, public without first obtaining the written permission of Merck & Co., Inc.

If you have any questions or need additional information please contact Robert E. Silverman, M.D., Ph.D. (610) 397-2944 or, in my absence, Bonnie J. Goldmann, M.D. (610) 397-2383.

Sincerely,

Robert E. Silverman, M.D., Pli-D.
Senior Director
Regulatory Affairs
Federal Express #1

Attachment
Desk Copies (15): Ms. Sandra Folkendt, HFD-550, Room N322
q: facld/vioxxY.background/perio/covltr
Confidential - Subject To Protective Order
MRK-NJO169023

###2|||Page MRK-NJ0169023^^^

Form Approved: OMB No. [illegible]
[illegible]
See OMB Statement on Reverse

DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION

**INVESTIGATIONAL NEW DRUG APPLICATION (IND)**

(TITLE 21, CODE OF FEDERAL REGULATIONS (CFR) PART 312)

NOTE: No drug may be shipped or clinical investigation begun until an IND for that investigation is in effect (21 CFR 312.40)

[illegible] OF SPONSOR

2. DATE OF SUBMISSION
April 20 2001

3. ADDRESS (Number, Street, City, State and Zip Code)
Sumneytown Pike
P.O. Box 4, BLA-28
West Point, PA 19486

4. TELEPHONE NUMBER (Include Area Code)
(610) 397-2944

5. NAME(S) OF DRUG (Include all available names: Trade, Generic, Chemical, Code)
VIOXX™ (Rofecoxib), L-748731, MK-0966

6. IND NUMBER (If previously assigned)
46,894

7. INDICATION(S) (Covered by this submission)
Treatment of osteoarthritis, rheumatoid arthritis, acute pain, primary dysmenorrhea

8. PHASE(S) OF CLINICAL INVESTIGATION TO BE CONDUCTED: ☐ PHASE 1 ☐ PHASE 2 ☐ PHASE 3 ☐ OTHER ____ (Specify)

9. LIST NUMBERS OF ALL INVESTIGATIONAL NEW DRUG APPLICATIONS (21 CFR Part 312), NEW DRUG OR ANTIBIOTIC APPLICATIONS (21 CFR Part 314), DRUG MASTER FILES (21 CFR Part 314.420), AND PRODUCT LICENSE APPLICATIONS (21 CFR Part 601) REFERRED TO IN THIS APPLICATION

10. IND submission should be consecutively numbered. The initial IND should be numbered "Serial number: 000." The next submission (e.g., amendment, report, or correspondence) should be numbered "Serial Number 001." Subsequent submissions should be numbered consecutively in the order in which they are submitted.

SERIAL NUMBER
897

11. THIS SUBMISSION CONTAINS THE FOLLOWING: (Check all that apply)

☐ INITIAL INVESTIGATIONAL NEW DRUG APPLICATION (IND)
☐ RESPONSE TO CLINICAL HOLD

PROTOCOL AMENDMENT(S):
☐ NEW PROTOCOL
☐ CHANGE IN PROTOCOL
☐ NEW INVESTIGATOR

INFORMATION AMENDMENT(S):
☐ CHEMISTRY/MICROBIOLOGY
☐ PHARMACOLOGY/TOXICOLOGY
☐ CLINICAL

IND SAFETY REPORT(S):
☐ INITIAL WRITTEN REPORT
☐ FOLLOW-UP TO A WRITTEN REPORT

☐ RESPONSE TO FDA REQUEST FOR INFORMATION
☐ ANNUAL REPORT
☐ GENERAL CORRESPONDENCE

☐ REQUEST FOR REINSTATEMENT OF IND THAT IS WITHDRAWN, INACTIVATED, TERMINATED OR DISCONTINUED

☒ OTHER: round Package - ri Operative Analgesia



P

Alan S. Nies, M.D.

Clinical Sciences
Merck Research Laboratories

21

- Review development program as background

## Rofecoxib Clinical Development

- Selectivity for COX-2
- Efficacy equivalent to NSAIDs
  - 12.5 mg and 25 mg for osteoarthritis
- Safety related to COX-2 inhibition
  - Gastrointestinal
  - Renal
  - Cardiovascular

22

- Approved chronic doses 12.5 and 25 mg
- Completed Phase III – 25 mg is the maximally effective dose in RA as well

## Long Term Efficacy in Osteoarthritis Rofecoxib 12.5 mg & 25 mg Once Daily

23

- 25 and 50 mg vs Diclofenac over 1 year – reviewed by committee 1999.
- More pain is up.
- Screening and Randomization (Flare)

## Rofecoxib COX Selectivity

- Defined clinically in subjects receiving rofecoxib
  - Assays of COX-1 and COX-2 activity in blood
    - no effect on COX-1 at any dose studied
    - dose-dependent inhibition of COX-2
      - similar to NSAIDs
  - Effects on bleeding time / platelet function
  - Assays of COX activity in gastric biopsies

24

- Committee knows well.
- 25 highest approved dose.
- Dose responsive Cox-2
- NSAIDs not shown but inhibit both.

## Rofecoxib Pharmacokinetics Are Linear

25

- Area Under Curve Single dose

## Rofecoxib COX Selectivity

- Defined clinically in subjects receiving rofecoxib
  - Assays of COX-1 and COX-2 activity in blood
  - Effects on bleeding time / platelet function
  - Assays of COX activity in gastric biopsies

26

- Selectivity

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



### Rofecoxib Does Not Affect Bleeding Time or Platelet Aggregation

27

- 15 X Chronic dose
- 2X chronic dose
- Low dose ASA inhibits 90%

### Rofecoxib COX Selectivity

- Defined clinically in subjects receiving rofecoxib
  - Assays of COX-1 and COX-2 activity in blood
  - Effects on bleeding time / platelet function
  - Assays of COX activity in gastric biopsies

28

- Target organ for major serious toxicity
- Normal mucosa only COX-1
- Previously presented 25 mg data (Cryer and Feldman)

### Effect of Rofecoxib 50 mg and Naproxen on *Ex vivo* $PGE_2$ Synthesis in Gastric Biopsy Samples

29

- Subjects received for 5 days.
- Measured by $PGE_2$ synthesis of biopsy specimens
- 50 mg is Twice our approved dose

### Safety of Rofecoxib

- Gastrointestinal Special Studies
- Renal
- Cardiovascular

30

- Safety

### Gastrointestinal Special Studies

- Endoscopic gastroduodenal erosion (normal subjects)
  - 250 mg superior to NSAID (aspirin and ibuprofen)
- Endoscopic gastroduodenal ulceration (OA patients)
  - 25 mg and 50 mg superior to ibuprofen 800 mg three times daily
- Special GI safety (normal subjects)
  - 25 mg and 50 mg superior to NSAID and similar to placebo
    - fecal red blood cell loss
    - intestinal permeability

31

- Two sets of Endoscopy trials/ normals & OA
- 250 mg order of magnitude higher
- Placebo for 4 months others for 6
- Endoscopy at 0, 6, 12, and 24 weeks

### Endoscopic Comparisons to Ibuprofen

32

- Data presented to committee 1999 & Label
- Cumulative incidence of ulcers.
- Placebo only up to 12 weeks
- Ibuprofen one of safer—confidence in Vigor that rofecoxib superior to another NSAID

2

### Gastrointestinal Special Studies

- Endoscopic gastroduodenal erosion (normal subjects)
  - 250 mg superior to NSAID
- Endoscopic gastroduodenal ulceration (OA patients)
  - 25 mg and 50 mg superior to ibuprofen 800 mg three times daily
- Special GI safety (normal subjects)
  - 25 mg and 50 mg superior to NSAID and similar to placebo
    - fecal red blood cell loss
    - intestinal permeability

33

- Entire GI tract
- Predictive value of these surrogates has been confirmed by VIGOR

### Safety of Rofecoxib

- Gastrointestinal Special Studies
- Renal
- Cardiovascular

34

- Mechanism based renal safety

### Prostaglandins and the Kidney

- Both COX-1 & COX-2 are present in the normal kidney
- Prostaglandins involved in renal physiology
  - Glomerular filtration rate
  - Renin secretion
  - Sodium, potassium and water homeostasis
- NSAIDs produce a small incidence of edema and hypertension

35

- Small incidence of edema and hypertension with NSAIDs

### COX-2 Inhibitors and the Kidney

- COX-2 selective inhibitors are equivalent to non-selective NSAIDs in reducing urinary sodium excretion - Dose Related

36

- COX-2 are like NSAIDs
- Dose - related

### Comparative Effects on Sodium

Change from Baseline Daily Urinary Sodium Excretion

Healthy Subjects 60-80 yr in 200 mEq Na+ Balance
Day
Protocol 906

37

- Recent study ; Highest approved doses of celexoxib and rofecoxib
- 200 mEq Na+ balance, metabolic ward
- Change in daily Na+ excretion vs time
- Cox-2 inhibitors like non-selective NSAIDs

### Safety of Rofecoxib

- Gastrointestinal Special Studies
- Renal
- Cardiovascular
  - Platelet - Endothelium Interactions

38

- Cardiovascular safety—platelet endothelial interactions

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Effects of NSAIDs on Thromboxane

39

- ASA, NSAIDs if produce sufficient inhibition
- Interferes with hemostasis—minor bleeding
- Must inhibit 90%

## Comparison of the Effect of Rofecoxib and NSAIDs on Platelet Aggregation

Platelet Aggregation
(Average % Inhibition Over Dosing Interval)

40

- Various NSAIDs used in program
- Aspirin is gold standard—irreversible inhibition
- NSAIDs reversible & differ in ability to produce sustained inhibition of aggregation

## Effect of NSAIDs on Platelet Aggregation

41

- Ibuprofen vs Naproxen over dose interval
- Ibuprofen's short half life

## Comparison of Inhibitory Effect of Aspirin and Naproxen on Platelet Aggregation

| | Aspirin 81 mg N=12 | Naproxen 1000 mg N=8 |
|---|---|---|
| Mean % inhibition* from baseline | 92.1 | 93.0 |
| Median | 92.9 | 93.2 |
| Minimum, maximum | 84.1, 95.0 | 89.7, 96.4 |

42

- Of the NSAIDs studied, only naproxen mimics aspirin in mean, median, variability

## COX-2 Cardiovascular Issues

- Can some NSAIDs, such as naproxen, have aspirin-like cardioprotective properties by potently inhibiting platelet aggregation?

43

- Question whether some NSAIDs can be cardioprotective like aspirin?

## Effects of NSAIDs on Thromboxane and Prostacyclin

44

- Other side of issue is the endothelium
- Data less solid-complex cells, hard to study
- COX-1 classically thought to be responsible
- But COX-2 inhibits systemic $PGI_2$ synthesis

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### Effect of Celecoxib & Rofecoxib on PGIM

45

- Data from same lab in two studies
- Urinary excretion of PGIM (define)
- Systemic synthesis reduced about 60%
- Cell types contributing to PGIM not known

### Effects of NSAIDs on Thromboxane and Prostacyclin

46

- Thus may alter balance, but the clinical importance of 60% reduction systemic synthesis is unknown
- Also redundancy in the system—nitric oxide—independent of cyclooxygenase

### COX-2 Cardiovascular Issues

- By inhibiting platelet aggregation can some NSAIDs, such as naproxen, have aspirin-like cardioprotective properties?
- What is the clinical importance of inhibiting systemic prostacyclin synthesis without inhibiting platelet aggregation?

47

- Question the clinical importance of inhibiting systemic $PGI_2$ synthesis without inhibiting platelet aggregation

### COX-2 Cardiovascular Issues

- We postulated that COX-2 inhibitors might alter the balance between the platelet and the endothelium
- We therefore examined our Phase IIb/III database. No evidence of excess cardiovascular events
  - Comparators: Ibuprofen 800 mg TID; diclofenac 50 mg TID; placebo
- In 1998 we established a Standard Operating Procedure to capture and adjudicate cardiovascular events in all future COX-2 inhibitor studies - prior to VIGOR

48

- Phase IIb/III data presented in 1999; comparators Diclofenac, ibuprofen
- Results do not suggest a prothrombotic effect of rofecoxib but cardioprotective effect of naproxen

### Conclusions

- Rofecoxib is a COX-2 inhibitor without effects on COX-1 at and above the clinical doses.
- Rofecoxib 12.5 mg and 25 mg once daily is equally effective to NSAIDs in osteoarthritis
- Rofecoxib effects on the gastrointestinal mucosa are significantly less than NSAIDs
- The renal effects of COX-2 inhibitors are similar to NSAIDs

49

- 

### Conclusions

- Platelet thromboxane production is variably reduced by NSAIDs but not by COX-2 inhibitors
- Systemic prostacyclin synthesis is reduced by both

The clinical effects of rofecoxib are a consequence of its selective inhibition of COX-2 and its lack of effect on COX-1. This supports the COX-2 hypothesis.

50

- Clinical effects of rofecoxib are a consequence of COX-2 inhibition and support the COX-2 hypothesis

Created on 05/07/99 12:49 PM draft label

# DRAFT 1999

**VIOXX™**
**(rofecoxib tablets and suspension)**

## DESCRIPTION

VIOXX* (rofecoxib) is described chemically as 4-[4-(methylsulfonyl)phenyl]-3-phenyl-2(5*H*)-furanone. It has the following chemical structure:

Rofecoxib is a white to off-white to light yellow powder. It is sparingly soluble in acetone, slightly soluble in methanol and isopropyl acetate, very slightly soluble in ethanol, practically insoluble in octanol, and insoluble in water. The empirical formula for rofecoxib is $C_{17}H_{14}O_4S$, and the molecular weight is 314.36.

Each tablet of VIOXX for oral administration contains either 12.5 or 25 mg of rofecoxib and the following inactive ingredients: lactose, microcrystalline cellulose, hydroxypropyl cellulose, croscarmellose sodium, magnesium stearate, and yellow ferric oxide.

Each 5 mL of the oral suspension contains either 12.5 or 25 mg of rofecoxib and the following inactive ingredients: xanthan gum, sorbitol solution, sodium citrate (dihydrate), citric acid (monohydrate), strawberry flavor, and purified water. Added as preservatives are sodium methylparaben 0.13% and sodium propylparaben 0.02%.

## CLINICAL PHARMACOLOGY

### Mechanism of Action

VIOXX is a nonsteroidal anti-inflammatory drug that exhibits anti-inflammatory, analgesic, and antipyretic activities in animal models. The mechanism of action of VIOXX is believed to be due to inhibition of prostaglandin synthesis, primarily via

---

*Trademark of MERCK & CO., Inc., Whitehouse Station, New Jersey, USA
COPYRIGHT © MERCK & CO., Inc., 1998
All rights reserved.

EXHIBIT T

inhibition of cyclooxygenase-2 (COX-2). At therapeutic concentrations in humans, VIOXX does not inhibit the cyclooxygenase-1 (COX-1) isoenzyme.

**Pharmacokinetics**

***Absorption***

The mean oral bioavailability of VIOXX at therapeutically recommended doses of 12.5, 25 and 50 mg is approximately 93%. The area under the curve (AUC) and peak plasma level ($C_{max}$) were 3286(±843) ng*hr/mL and 207 (±111) ng/mL, respectively. Both $C_{max}$ and AUC are roughly dose proportional across the clinical dose range. At higher doses, under fasting conditions, there is a less than proportional increase in $C_{max}$ and AUC, which is thought to be due to the low solubility of the drug in aqueous media. At lower doses, there is a more than dose proportional decrease in $C_{max}$ and AUC, which is thought to be due to the nonlinear pharmacokinetics of rofecoxib. The plasma concentration-time profile exhibited multiple peaks. The time to maximal concentration ($T_{max}$) ranged from 2 to 9 hours and may not reflect rate of absorption as $T_{max}$ may occur as a secondary peak. With multiple dosing, steady state conditions are reached by Day 4. The $AUC_{(0-24hr)}$ and Cmax at steady-state after multiple doses of 25 mg rofecoxib was 4018 (±1140) ng•hr/mL and 321 (±104) ng/mL, respectively. The accumulation factor based on geometric means was 1.67.

VIOXX Tablets and VIOXX Oral Suspension are bioequivalent.

***Food and Antacid Effects***

Food had no significant effect on either the peak plasma concentration ($C_{max}$) or extent of absorption (AUC) of rofecoxib when VIOXX tablets were taken with a high fat meal. The time to peak plasma concentration ($T_{max}$), however, was delayed by 1 to 2 hours. The food effect on the suspension formulation has not been studied. In clinical trials, VIOXX was administered without regard to food.

There was 13% and 8% decrease in AUC when VIOXX was administered with calcium carbonate antacid and magnesium/aluminum antacid to elderly subjects, respectively. There was an approximate 20% decrease in $C_{max}$ of rofecoxib with either antacid.

***Distribution***

Rofecoxib is approximately 87% bound to human plasma protein over the range of concentrations of 0.05 to 25 μg/mL. The apparent volume of distribution at steady state ($V_{ss}$) is approximately 91 L following a 12.5 mg dose and 86 L following a 25 mg dose.

Rofecoxib crosses the placenta in rats and rabbits, and the blood-brain barrier in rats.

***Metabolism***

Metabolism of rofecoxib is primarily mediated through reduction by cytosolic enzymes. The principal metabolic products are the *cis*-dihydro and *trans*-dihydro derivatives of

rofecoxib, which account for nearly 56% of recovered radioactivity in the urine. An additional 8.8% of the dose was recovered as the glucuronide of the hydroxy derivative, L-755,190, a product of oxidative metabolism. The biotransformation of rofecoxib and L-755,190 is reversible in humans. There are also three additional unidentified metabolites.

Cytochrome P450 plays a minor role in metabolism of rofecoxib. Inhibition of CYP3A activity by administration of ketoconazole 400 mg daily does not affect rofecoxib disposition. However, induction of general hepatic metabolic activity by administration of the non-specific inducer rifampin 600 mg daily produces a 50% decrease in rofecoxib plasma concentrations. (Also see **Drug Interactions**).

***Excretion***

Rofecoxib is eliminated predominantly by hepatic metabolism with little (<1%) unchanged drug recovered in the urine. Following a single radiolabeled dose of 125 mg, approximately 72% of the dose was excreted into the urine and 14% in the feces as metabolites.

Rofecoxib exhibits nonlinear pharmacokinetics. Higher plasma clearance was observed at lower dose levels. The plasma clearance after 12.5 and 25 mg doses was approximately 141 and 120 mL/min, respectively. The terminal half-life was approximately 10 hours. The effective half-life (based on steady state levels) was approximately 16.9 hours.

**Special Populations**

***Gender***

The pharmacokinetics of rofecoxib are comparable in men and women.

***Geriatric***

After a single dose of 25 mg VIOXX in elderly subjects (over 65 years old) a 34% increase in AUC was observed as compared to the young subjects. While the clinical significance of this increase is unknown, therapy with VIOXX should be initiated at the lowest recommended dose.

***Pediatric***

VIOXX has not been investigated in patients below 18 years of age.

***Race***

Meta-analysis of pharmacokinetic studies has suggested a slightly (10-15%) higher AUC of rofecoxib in Blacks and Hispanics as compared to Caucasians. No dosage adjustment is necessary on the basis of race.

***Hepatic Insufficiency***

A pharmacokinetic study in mild (Child-Pugh score ≤6) hepatic insufficiency patients

indicated that rofecoxib AUC was similar between these patients and healthy subjects. Limited data in patients with moderate (Child-Pugh score ≥7 and ≤9) hepatic insufficiency suggest a trend towards higher AUC of rofecoxib in these patients, but more data are needed to evaluate pharmacokinetics in these patients. Patients with severe hepatic insufficiency have not been studied. Therefore, the use of VIOXX in patients with moderate to severe hepatic insufficiency is not recommended.

***Renal Insufficiency***

No information is available on the pharmacokinetics of rofecoxib in patients with advanced renal disease not requiring dialysis. (see WARNINGS-Advanced Renal Disease). In a small study of patients with end stage renal disease undergoing dialysis, peak rofecoxib plasma levels and AUC declined 18% and 9%, respectively, when dialysis occurred four hours after dosing. When dialysis occurred 48 hours after dosing, the elimination profile of rofecoxib was unchanged.

**Drug Interactions**

*Also see* **PRECAUTIONS – Drug Interactions.**

***General:*** *In vitro* studies indicated that rofecoxib might be a mild inducer for CYP 3A4. In human studies the potential for rofecoxib to inhibit or induce CYP activity was investigated in studies using the intravenous erythromycin breath test and the oral midazolam test. No significant difference in erythromycin demethylation was observed with rofecoxib (75 mg daily) compared to placebo. An approximate 30% reduction of the AUC of midazolam was observed with rofecoxib (25 mg daily). This reduction is most likely due to increased first pass metabolism through induction of intestinal CYP 3A by rofecoxib.

Clinical studies with rofecoxib have identified potentially significant interactions with ACE inhibitors, antacids, cimetidine, methotrexate, rifampin, and warfarin. The effects of rofecoxib on the pharmacokinetics and/or pharmacodynamics of ketoconazole, prednisone/prednisolone, oral contraceptives, and digoxin have been studied *in vivo* and clinically important interactions have not been found.

**CLINICAL STUDIES**

**Osteoarthritis (OA):** VIOXX was evaluated in double-blind controlled trials of 6 to 86 weeks duration that enrolled approximately 3600 patients with osteoarthritis of the knee or hip. In six-week trials, treatment with VIOXX 12.5 mg and 25 mg daily demonstrated significant reduction in signs and symptoms of osteoarthritis compared to placebo. At daily doses of 12.5 mg and 25 mg the effectiveness of VIOXX was shown to be comparable to that of ibuprofen 800 mg TID (in 6 week studies) and diclofenac 50 mg TID (in 6 month studies) for the treatment of the signs and symptoms of OA.

**Analgesia, including Dysmenorrhea**

In clinical studies, VIOXX relieved pain in acute analgesic models of post-operative dental pain, post-orthopedic surgical pain, and primary dysmenorrhea. The analgesic effect (including onset of action) of a single 50-mg dose of VIOXX was generally similar to 550 mg of naproxen sodium or 400 mg of ibuprofen. In a multiple-dose clinical study of post-orthopedic surgical pain, after an initial 50-mg dose, 50 mg daily of VIOXX for up to 5 days was effective in reducing pain. However, it is to be noted that most of the patients receiving VIOXX *required additional* analgesic medication during days 2 – 5, although they consumed a smaller amount of additional analgesic than the patients who were treated with placebo.

**Gastrointestinal Safety**

Upper Endoscopy in Patients with Osteoarthritis

Two identical (U.S. and Multinational) endoscopy studies in a total of 1516 patients were conducted to compare the percentage of patients who developed endoscopically detectable gastroduodenal ulcers with VIOXX 25 mg daily or 50 mg daily, ibuprofen 2400 mg daily, or placebo. Patients who were 50 years of age and older with osteoarthritis and who had no ulcers at baseline were evaluated by endoscopy after weeks 6 12, and 24 of treatment. The placebo-treatment group was discontinued at week 16 by design. Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentages of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. See Figures 1 and 2 for the results of these studies.

(Include placebo rates as numerical values in footnotes to figures, remove placebo bars from these figures )

MAY-07-1999 10:50 BARBARA FANELLI 610 397 2526 P.07
NO.900 P007/020

Created on 05/07/99 12:49 PM draft label

Figure 1

[MERCK – Please reformat Figure 1 with placebo data as a footnote]

Figure 2

***Assessment of Fecal Occult Blood Loss in Healthy Subjects:***

Occult fecal blood loss associated with VIOXX 25 mg daily, VIOXX 50 mg daily,

6

MRK-AAF0002016

ibuprofen 2400 mg per day, and placebo was evaluated in a study utilizing 51Cr-tagged red blood cells in 67 healthy males. After 4 weeks of treatment with VIOXX 25 mg daily or VIOXX 50 mg daily, the increase in the amount of fecal blood loss was not statistically significant compared with placebo-treated subjects. In contrast, ibuprofen 2400 mg per day produced a statistically significant increase in fecal blood loss as compared with placebo-treated subjects and VIOXX-treated subjects. The clinical relevance of this finding is unknown.

***Platelets:***
Multiple doses of VIOXX 12.5, 25, and up to 375 mg administered daily up to 12 days had no effect on bleeding time relative to placebo. Similarly, bleeding time was not altered in a single dose study with 500 or 1000 mg of VIOXX. There was no inhibition of *ex vivo* arachidonic acid- or collagen-induced platelet aggregation with 12.5, 25, and 50 mg of VIOXX.

## INDICATIONS AND USAGE

VIOXX is indicated:

For relief of the signs and symptoms of osteoarthritis.

For the short-term management of acute pain in adults.

For the management of primary dysmenorrhea.

## CONTRAINDICATIONS

VIOXX is contraindicated in patients with known hypersensitivity to rofecoxib or any other component of VIOXX.

VIOXX should not be given to patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. Severe, rarely fatal, anaphylactic-like reactions to NSAIDs have been reported in such patients (see WARNINGS - Anaphylactoid Reactions, and PRECAUTIONS - Preexisting Asthma).

VIOXX should not be given to patients with active peptic ulceration or gastrointestinal bleeding.

## WARNINGS

**Gastrointestinal (GI) Effects- Risk of GI Ulceration, Bleeding, and Perforation:**
Serious gastrointestinal toxicity such as bleeding, ulceration, and perforation of the stomach, small intestine or large intestine, can occur at any time, with or without warning symptoms, in patients treated with nonsteroidal anti-inflammatory drugs (NSAIDs). Minor upper gastrointestinal problems, such as dyspepsia, are common and may also

occur at any time during NSAID therapy. Therefore, physicians and patients should remain alert for ulceration and bleeding, even in the absence of previous GI tract symptoms. Patients should be informed about the signs and/or symptoms of serious GI toxicity and the steps to take if they occur. The utility of periodic laboratory monitoring has not been demonstrated, nor has it been adequately assessed. Only one in five patients who develop a serious upper GI adverse event on NSAID therapy is symptomatic. It has been demonstrated that upper GI ulcers, gross bleeding or perforation, caused by NSAIDs, appear to occur in approximately 1% of patients treated for 3-6 months, and in about 2-4% of patients treated for one year. These trends continue thus, increasing the likelihood of developing a serious GI event at some time during the course of therapy. However, even short-term therapy is not without risk.

NSAIDs should be prescribed with extreme caution in patients with a prior history of ulcer disease or gastrointestinal bleeding. Most spontaneous reports of fatal GI events are in elderly or debilitated patients and therefore special care should be taken in treating this population. **To minimize the potential risk for an adverse GI event, the lowest effective dose should be used for the shortest possible duration.** For high risk patients, alternate therapies that do not involve NSAIDs should be considered.

Studies have shown that patients with a ***prior history of peptic ulcer disease and/or gastrointestinal bleeding*** and who use NSAIDs, have a greater than 10-fold higher risk for developing a GI bleed than patients with neither of these risk factors. In addition to a past history of ulcer disease, pharmacoepidemiological studies have identified several other co-therapies or co-morbid conditions that may increase the risk for GI bleeding such as: treatment with oral corticosteroids, treatment with anticoagulants, longer duration of NSAID therapy, smoking, alcoholism, older age, and poor general health status.

**Anaphylactoid Reactions**

Anaphylactoid reactions were not reported in patients receiving VIOXX in clinical trials. However, as with NSAIDs in general, anaphylactoid reactions may occur in patients without known prior exposure to VIOXX. VIOXX should not be given to patients with the aspirin triad. This symptom complex typically occurs in asthmatic patients who experience rhinitis with or without nasal polyps, or who exhibit severe, potentially fatal bronchospasm after taking aspirin or other NSAIDs (see CONTRAINDICATIONS and PRECAUTIONS - *Preexisting Asthma*). Emergency help should be sought in cases where an anaphylactoid reaction occurs.

**Advanced Renal Disease**

No safety information is available regarding the use of VIOXX in patients with advanced kidney disease. Therefore, treatment with VIOXX is not recommended in these patients. If VIOXX therapy must be initiated, close monitoring of the patient's kidney function is advisable (see PRECAUTIONS - Renal Effects).

**Pregnancy**

In late pregnancy VIOXX should be avoided because it may cause premature closure of the ductus arteriosus.

**PRECAUTIONS**

**General**

VIOXX cannot be expected to substitute for corticosteroids or to treat corticosteroid insufficiency. Abrupt discontinuation of corticosteroids may lead to exacerbation of corticosteroid-responsive illness. Patients on prolonged corticosteroid therapy should have their therapy tapered slowly if a decision is made to discontinue corticosteroids.

The pharmacological activity of VIOXX in reducing inflammation, and possibly fever, may diminish the utility of these diagnostic signs in detecting infectious complications of presumed noninfectious, painful conditions.

***Hepatic Effects:***

Borderline elevations of one or more liver tests may occur in up to 15% of patients taking NSAIDs, and notable elevations of ALT or AST (approximately three or more times the upper limit of normal) have been reported in approximately 1% of patients in clinical trials with NSAIDs. These laboratory abnormalities may progress, may remain unchanged, or may be transient with continuing therapy. Rare cases of severe hepatic reactions, including jaundice and fatal fulminant hepatitis, liver necrosis and hepatic failure (some with fatal outcome) have been reported with NSAIDs. In controlled clinical trials of VIOXX, the incidence of borderline elevations of liver tests at doses of 12.5 and 25 mg daily was comparable to the incidence observed with ibuprofen and lower than that observed with diclofenac. Approximately 1% of patients taking VIOXX 12.5 and 25 mg daily, and 1.9% of patients taking VIOXX 50 mg daily, had notable elevations of ALT and AST.

A patient with symptoms and/or signs suggesting liver dysfunction, or in whom an abnormal liver test has occurred, should be monitored carefully for evidence of the development of a more severe hepatic reaction while on therapy with VIOXX. Use of VIOXX is not recommended in patients with moderate to severe hepatic insufficiency (see Pharmacokinetics – Special Populations). If clinical signs and symptoms consistent with liver disease develop, or if systemic manifestations occur (e.g., eosinophilia, rash, etc.), VIOXX should be discontinued.

***Renal Effects:***

Long-term administration of NSAIDs has resulted in renal papillary necrosis and other renal injury. Renal toxicity has also been seen in patients in whom renal prostaglandins have a compensatory role in the maintenance of renal perfusion. In these patients, administration of a nonsteroidal anti-inflammatory drug may cause a dose-dependent reduction in prostaglandin formation and, secondarily, in renal blood flow, which may precipitate overt renal decompensation. Patients at greatest risk of this reaction are those with impaired renal function, heart failure, liver dysfunction, those taking diuretics and ACE inhibitors, and the elderly. Discontinuation of NSAID therapy is usually followed

by recovery to the pretreatment state. Clinical trials with VIOXX at daily doses of 12.5 and 25 mg have shown renal effects similar to those observed with comparator NSAIDs. Increased risk for renal-related adverse events (fluid retention, edema, hypertension, increased BUN and creatinine and hyperkalemia) have been observed with chronic use of daily doses of VIOXX of 50 mg or more.

Caution should be used when initiating treatment with VIOXX in patients with considerable dehydration. It is advisable to rehydrate patients first and then start therapy with VIOXX. Caution is also recommended in patients with pre-existing kidney disease (see WARNINGS-Advanced Renal Disease).

***Hematological Effects:***

Anemia is sometimes seen in patients receiving VIOXX. Patients on long-term treatment with VIOXX should have their hemoglobin or hematocrit checked if they exhibit any signs or symptoms of anemia or blood loss. VIOXX does not generally affect platelet counts, prothrombin time (PT), or partial thromboplastin time (PTT), and does not appear to inhibit platelet aggregation at indicated dosages (See CLINICAL STUDIES-Special Studies-Platelets).

***Fluid Retention and Edema:***

Fluid retention and edema have been observed in some patients taking VIOXX (see ADVERSE REACTIONS). These effects were more marked in patients taking daily doses of 50 mg or more. Therefore, VIOXX should be used with caution in patients with fluid retention, hypertension, or heart failure. VIOXX 50 mg daily should not be used for more than 5 days.

***Preexisting Asthma:***

Patients with asthma may have aspirin-sensitive asthma. The use of aspirin in patients with aspirin-sensitive asthma has been associated with severe bronchospasm which can be fatal. Since cross reactivity, including bronchospasm, between aspirin and other nonsteroidal anti-inflammatory drugs has been reported in such aspirin-sensitive patients, VIOXX should not be administered to patients with this form of aspirin sensitivity and should be used with caution in patients with preexisting asthma.

***Infections***

VIOXX may mask fever, which is a sign of infection. The physician should be aware of this when using VIOXX in patients being treated for infection.

**Information for Patients**

VIOXX can cause discomfort and, rarely, more serious side effects, such as gastrointestinal bleeding, which may result in hospitalization and even fatal outcomes. Although serious GI tract ulcerations and bleeding can occur without warning symptoms, patients should be alert for the signs and symptoms of ulcerations and bleeding, and should ask for medical advice when observing any indicative signs or symptoms.

Patients should be apprised of the importance of this follow-up (see WARNINGS, Risk of Gastrointestinal Ulceration, Bleeding and Perforation).

Patients should promptly report signs or symptoms of gastrointestinal ulceration or bleeding, skin rash, unexplained weight gain, or edema to their physicians.

Patients should be informed of the warning signs and symptoms of hepatotoxicity (e.g., nausea, fatigue, lethargy, pruritus, jaundice, right upper quadrant tenderness, and "flu-like" symptoms). If these occur, patients should be instructed to stop therapy and seek immediate medical therapy.

Patients should also be instructed to seek immediate emergency help in the case of an anaphylactoid reaction (see WARNINGS).

In late pregnancy VIOXX should be avoided because it may cause premature closure of the ductus arteriosus.

**Laboratory Tests**

Because serious GI tract ulcerations and bleeding can occur without warning symptoms, physicians should monitor for signs or symptoms of GI bleeding.

During the controlled clinical trials, there was an increased incidence of elevated BUN, creatinine, potassium and uric acid in patients receiving VIOXX compared with patients on placebo. Other laboratory abnormalities that occurred more frequently in the patients receiving VIOXX included increased AST, ALT and GGT. These laboratory abnormalities were also seen in patients who received comparator NSAIDs in these studies. There are limited data on the effects of VIOXX administration on acid-base balance.

**Drug Interactions**

***ACE-inhibitors:*** Reports suggest that NSAIDs may diminish the antihypertensive effect of Angiotensin Converting Enzyme (ACE) inhibitors. In patients with mild to moderate hypertension, administration of 25 mg daily of VIOXX with the ACE inhibitor benazepril, 10 to 40 mg for 4 weeks, was associated with an average increase in mean arterial pressure of about 3 mm Hg compared to ACE inhibitor alone. This interaction should be given consideration in patients taking VIOXX concomitantly with ACE-inhibitors.

***Antacids:*** There was 13% and 8% decrease in rofecoxib AUC when VIOXX was administered with calcium carbonate antacid and magnesium/aluminum antacid to elderly subjects, respectively. There was an approximate 20% decrease in $C_{max}$ of rofecoxib with either antacid.

***Aspirin:*** Concomitant administration of aspirin with VIOXX may result in an increased

rate of GI ulceration or other complications, compared to use of VIOXX alone. At steady state, VIOXX 50 mg once daily had no effect on the anti-platelet activity of low-dose (81 mg once daily) aspirin, as assessed by ex vivo platelet aggregation and serum $TXB_2$ generation in clotting blood. VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.

*Cimetidine:* Co-administration with cimetidine 800 mg twice daily increased the $C_{max}$ of rofecoxib by 21%, the $AUC_{0-120h}$ by 23% and the $t_{1/2}$ by 15%.

*Digoxin:* Rofocoxib 75 mg once daily for 11 days does not alter the plasma concentration profile of digoxin after single 0.5 mg oral dose. The relevance of this study with daily dosing of digoxin is unknown.

*Furosemide:* Clinical studies, as well as post marketing observations, have shown that NSAIDs can reduce the natriuretic effect of furosemide and thiazides in some patients. This response has been attributed to inhibition of renal prostaglandin synthesis.

*Ketoconazole:* Ketoconazole 400 mg daily did not have any clinically important effect on the pharmacokinetics of rofecoxib.

*Lithium:* NSAIDs have produced an elevation of plasma lithium levels and a reduction in renal lithium clearance. Thus, when VIOXX and lithium are administered concurrently, subjects should be observed carefully for signs of lithium toxicity.

*Methotrexate:* VIOXX 75 mg and 250 mg administered once daily for 10 days increased plasma concentrations by 23% and 40% respectively, as measured by $AUC_{0-24 hr}$ in patients receiving methotrexate 7.5 to 15 mg/week for rheumatoid arthritis. An equivalent magnitude of reduction in methotrexate renal clearance was observed. The effects of the recommended doses for osteoarthritis (12.5 and 25 mg) of VIOXX on plasma methotrexate levels are unknown. Adequate monitoring of methotrexate-related toxicity should be considered when VIOXX and methotrexate are administered concomitantly.

*Oral Contraceptives:* Rofecoxib did not have any clinically important effect on the pharmacokinetics of ethinyl estradiol and norethindone.

*Prednisone/prednisolone:* Rofecoxib did not have any clinically important effect on the pharmacokinetics of prednisolone or prednisone.

*Rifampin:* Co-administration of VIOXX with rifampin 600mg daily, a potent inducer of hepatic metabolism, produced an approximate 50% decrease in rofecoxib plasma concentrations. Therefore, a starting daily dose of 25 mg of VIOXX should be considered for the treatment of osteoarthritis when VIOXX is co-administered with potent inducers of hepatic metabolism.

*Warfarin:* A potential for interaction between VIOXX and warfarin was demonstrated by a small increase in the pharmacodynamic effect of warfarin. An average increase in prothrombin time International Normalized Ratio (INR) of approximately 11% and 8% was observed after a single dose of 30 mg warfarin with healthy subjects on 50 mg rofecoxib and after multiple doses of warfarin for 3 weeks with healthy subjects on 25 mg of rofecoxib, respectively. A few individuals showed a greater response. Anti-coagulant activity should be monitored closely, particularly in the first few days, after initiating or changing VIOXX therapy in patients receiving warfarin or similar agents.

**Carcinogenesis, Mutagenesis, Impairment of Fertility**

Rofecoxib was not carcinogenic in mice given oral doses up to 30 mg/kg in male and female mice given oral doses up to 30 mg/kg/day (approximately 5 and 2 fold [male] and 2 and <1 fold [female] the human exposure as measured by the $AUC_{0-24}$ at 25 and 50 mg daily based on $AUC_{0-24}$) and in male rats given oral doses up to 8 mg/kg (approximately 5 and 2 fold the human exposure at 25 and 50 mg daily based on $AUC_{0-24}$) for two years. There was a statistically non-significant increase in the incidence of brain glioma in female rats at doses of 2- 8 mg/kg (approximately 2 and <1 to 7 and 2 fold the human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). This is viewed as an equivocal finding with unknown human relevance.

Rofecoxib was not mutagenic in an Ames test or in a V-79 mammalian cell mutagensis assay, nor clastogenic in a chromosome aberration assay in Chinese hamster ovary (CHO) cells, in an *in vitro* and an *in vivo* alkaline elution assay, or in an *in vivo* micronucleus test in mouse bone marrow.

Rofecoxib did not impair male fertility in rats at oral doses up to 100 mg/kg (approximately 20 and 7 fold human exposure at 25 and 50 mg daily based on the $AUC_{0-24}$). In general, rofecoxib had no effect on fertility index [number of pregnant females/number of cohabitated males] in female rats at doses up to 30 mg/kg (approximately 20 and 7 fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). However, in one out of five studies, there was a dose dependent decrease in fertility. There was partial inhibition of ovulation at ≥10 mg/kg (approximately 8 and 3 fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$).

**Pregnancy:**

*Teratogenic effects:* Pregnancy Category C. Rofecoxib was not teratogenic in rats at doses up to 50 mg/kg/day (approximately 28 and 10 fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). There was a statistically non-significant dose dependent increase in the overall incidence of vertebral malformations in the rabbit at a dose of 50 mg/kg/day (approximately 2 or <1 fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). There are no studies in pregnant women. VIOXX should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

*Nonteratogenic effects:* In rabbits, there was an increase in the incidence of incomplete

ossification at ≥25 mg/kg/day [approximately <1 fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$]. Rofecoxib produced peri-implantation and post-implantation losses and reduced embryo/fetal survival in rats and rabbits at oral doses ≥10 and ≥75 mg/kg/day, respectively (approximately 9 and 3 fold [rats] and 2 and <1 fold (rabbits] human exposure based on the $AUC_{0-24}$ at 25 and 50 mg daily). These changes are expected with inhibition of prostaglandin synthesis and are not the result of permanent alteration of female reproductive function. There was an increase in the incidence of postnatal mortality in rats at ≥10 mg/kg/day (approximately 9 and 3 fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$.) Rofecoxib was found to decrease the diameter of the ductus arteriosus at all doses tested (3–300 mg/kg, single dose, 3 mg/kg is approximately 2 and <1 fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). Therefore, use of VIOXX during the third trimester of pregnancy should be avoided.

*Labor and delivery:* There was no evidence of a significant adverse effect on gestation duration or parturition in females at doses up to ≤15 mg/kg in rats (approximately ≥10 and ≥3X fold human exposure as measured by the $AUC_{0-24}$ at 25[50] mg). The effects of VIOXX on labor and delivery in pregnant women are unknown.

*Nursing mothers:* Rofecoxib is excreted in the milk of lactating rats at concentrations similar to those in plasma. There was an increase in pup mortality and a decrease in pup body weight on postnatal days 8-21 following exposure of pups to milk from dams administered VIOXX during lactation at a dose of 25 mg/kg/day [this was the only dose tested and represents approximately <20 and <7 fold fold human exposure based on $AUC_{0-24}$ ]. It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk and because of the potential for serious adverse reactions in nursing infants from VIOXX, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

**Pediatric Use**

Safety and effectiveness in pediatric patients below the age of 18 years have not been evaluated.

**Geriatric Use**

Of the patients who received VIOXX in osteoarthritis clinical trials, approximately [Merck to supply number] were 65 years of age or older. While the incidence of adverse experiences tended to be higher in elderly patients, no substantial differences in safety and effectiveness were observed between these subjects and younger subjects. Greater sensitivity of some older individuals cannot be ruled out.

## ADVERSE REACTIONS

*Osteoarthritis*

Created on 05/07/99 12:49 PM draft label

Approximately 3600 patients with osteoarthritis were treated with VIOXX; approximately 1400 patients received VIOXX for 6 months or longer and approximately 800 patients for one year or longer. The following table of adverse experiences is based on five clinical studies in osteoarthritic patients for ~~6 weeks~~ 6 months at the therapeutically recommended doses of 12.5 and 25 mg. The table includes all adverse experiences, whether or not attributed to treatment with VIOXX, that were observed in at least 2% of patients treated with VIOXX. Rates reported represent composite data from 5 studies, but may not accurately predict results in all patient populations and treatment settings.

[TABLE FROM MERCK]

~~TABLE 1~~
~~Percentage of Patients With Specific Clinical Adverse Experiences~~
~~(Incidence ≥2.0% in patients treated with VIOXX) by Body System~~
~~6-Week Osteoarthritis Population~~

| | ~~Placebo (N=412)~~ | ~~VIOXX 12.5 mg (N=735)~~ | ~~VIOXX 25 mg (N=736)~~ | ~~Ibuprofen 2400 mg (N=476)~~ |
|---|---|---|---|---|
| | ~~%~~ | ~~%~~ | ~~%~~ | ~~%~~ |
| ~~Body as a Whole/Site Unspecified~~ | | | | |
| ~~Abdominal pain~~ | ~~4.7~~ | ~~2.1~~ | ~~3.0~~ | ~~3.8~~ |
| ~~Asthenia/fatigue~~ | ~~1.0~~ | ~~2.3~~ | ~~4.4~~ | ~~4.7~~ |
| ~~Dizziness~~ | ~~2.2~~ | ~~2.1~~ | ~~2.4~~ | ~~1.8~~ |
| ~~Lower extremity edema~~ | ~~1.0~~ | ~~3.3~~ | ~~3.4~~ | ~~4.0~~ |
| ~~Upper respiratory infection~~ | ~~6.8~~ | ~~6.0~~ | ~~6.8~~ | ~~2.8~~ |
| ~~Cardiovascular System~~ | | | | |
| ~~Hypertension~~ | ~~0.6~~ | ~~1.7~~ | ~~2.2~~ | ~~1.8~~ |
| ~~Digestive System~~ | | | | |
| ~~Diarrhea~~ | ~~5.8~~ | ~~4.8~~ | ~~6.7~~ | ~~4.0~~ |
| ~~Dyspepsia~~ | ~~4.5~~ | ~~4.8~~ | ~~2.8~~ | ~~3.8~~ |
| ~~Epigastric discomfort~~ | ~~0.6~~ | ~~2.2~~ | ~~2.0~~ | ~~5.3~~ |
| ~~Heartburn~~ | ~~1.5~~ | ~~2.3~~ | ~~2.4~~ | ~~2.3~~ |
| ~~Nausea~~ | ~~4.0~~ | ~~3.7~~ | ~~6.0~~ | ~~4.8~~ |
| ~~Eyes, Ears, Nose, and Throat~~ | | | | |
| ~~Sinusitis~~ | ~~1.5~~ | ~~2.2~~ | ~~4.6~~ | ~~1.5~~ |
| ~~Nervous System~~ | | | | |
| ~~Headache~~ | ~~6.2~~ | ~~2.2~~ | ~~4.6~~ | ~~4.3~~ |
| ~~Urogenital System~~ | | | | |
| ~~Urinary tract infection~~ | ~~1.5~~ | ~~2.6~~ | ~~4.8~~ | ~~2.1~~ |

~~In clinical studies for up to 6 months (approximately 1400 patients treated with VIOXX 12.5 or 25 mg), the overall clinical adverse experience profile was similar to that found in the 6 week studies. The following adverse experiences, whether or not attributed to treatment with VIOXX, were observed at incidences of ≥ 5% of patients treated with VIOXX, and are not included in the above list for the 6 week studies:~~

~~*Body as a Whole/Site Unspecified:* chest pain, influenza-like disease~~

MRK-AAF0002025

~~Digestive System: constipation, vomiting, flatulence~~
~~Eyes, Ears, Nose, and Throat: pharyngitis~~
~~Musculoskeletal System: back pain, muscular cramp~~
~~Nervous System: insomnia~~
~~Respiratory System: bronchitis, cough~~
~~Skin and Skin Appendages: pruritus, rash~~

~~Rarely, oral ulcers have occurred.~~

In 1-year controlled clinical trials and in extension studies for up to 86 weeks (approximately 800 patients treated with VIOXX for one year or longer), the adverse experience profile was qualitatively similar to that observed in studies of shorter duration.

Additional adverse experiences reported occasionally include:

| | |
|---|---|
| Body as a whole - | fever, infection, sepsis |
| Cardiovascular system - | congestive heart failure, hypertension, tachycardia, syncope |
| Digestive system - | dry mouth, esophagitis, gastric/peptic ulcers, gastritis, gastrointestinal bleeding, glossitis, hematemesis, hepatitis, jaundice |
| Hemic and lymphatic system - | ecchymosis, eosinophilia, leukopenia, melena, purpura, rectal bleeding, stomatitis, thrombocytopenia |
| Metabolic and nutritional - | weight changes |
| Nervous system - | anxiety, asthenia, confusion, depression, dream abnormalities, drowsiness, insomnia, malaise, nervousness, paresthesia, somnolence, tremors, vertigo |
| Respiratory system - | asthma, dyspnea |
| Skin and appendages - | alopecia, photosensitivity, pruritus, sweat |
| Special senses - | blurred vision |
| Urogenital system - | cystitis, dysuria, hematuria, interstitial nephritis, oliguria/polyuria, proteinuria, renal failure |

Other adverse reactions, which occur rarely are:

| | |
|---|---|
| Body as a whole - | anaphylactic reactions, appetite changes, death |
| Cardiovascular system - | arrhythmia, hypotension, myocardial infarction, palpitations, vasculitis |
| Digestive system - | eructation, liver failure, pancreatitis |
| Hemic and lymphatic system - | agranulocytosis, hemolytic anemia, aplastic anemia, lymphadenopathy, pancytopenia, |
| Metabolic and nutritional - | hyperglycemia |
| Nervous system - | convulsions, coma, hallucinations, meningitis |
| Respiratory- | respiratory depression, pneumonia |
| Skin and appendages - | angioedema, toxic epidermal necrosis, erythema multiforma, exfoliative dermatitis, Stevens Johnson syndrome, urticaria |
| Special senses - | conjunctivitis, hearing impairment |

*Analgesia, including primary dysmenorrhea*

Approximately one thousand patients were treated with VIOXX in analgesia studies. All patients in post-dental surgery pain studies received only a single dose of study medication. Patients in primary dysmenorrhea studies may have taken up to 3 daily doses of VIOXX, and those in the post-orthopedic surgery pain study were prescribed 5 daily doses of VIOXX.

The adverse experience profile in the analgesia studies was generally similar to those reported in the osteoarthritis studies. The following additional adverse experience, which occurred at an incidence of at least 2% of patients treated with VIOXX, was observed in the post-dental pain surgery studies: post-dental extraction alveolitis (dry socket).

In 110 patients treated with VIOXX (average age approximately 65 years) in the post-orthopedic surgery pain study, the most commonly reported adverse experiences were constipation, fever, and nausea.

## OVERDOSAGE

No overdoses of VIOXX were reported during clinical trials. Administration of single doses of VIOXX 1000 mg to 6 healthy volunteers and multiple doses of 250 mg/day for 14 days to 75 healthy volunteers did not result in serious toxicity.

In the event of overdose, it is reasonable to employ the usual supportive measures, e.g., remove unabsorbed material from the gastrointestinal tract, employ clinical monitoring, and institute supportive therapy, if required.

Rofecoxib is not removed by hemodialysis; it is not known whether rofecoxib is removed by peritoneal dialysis.

## DOSAGE AND ADMINISTRATION

VIOXX is administered orally. The lowest dose of VIOXX should be sought for each patient.

*Osteoarthritis*
The recommended starting dose of VIOXX is 12.5 mg once daily. Some patients may receive additional benefit by increasing the dose to 25 mg once daily. The maximum recommended daily dose is 25 mg.

*Short-term Management of Acute Pain and Management of Primary Dysmenorrhea*
The recommended initial dose of VIOXX is 50 mg once daily. Subsequent doses should be 50 mg once daily as needed. The maximum recommended daily dose of 50 mg should not exceed 5 days. Use of VIOXX for more than 5 days in management of acute pain has not been studied and there is a significant increase in dose-related adverse events with chronic use of 50 mg (See CLINICAL STUDIES, *Analgesia, including primary dysmenorrhea.*)

No dosage adjustment is necessary for elderly patients, for patients with mild to moderate renal insufficiency (creatinine clearance 30 to 80 mL/min) or for patients with mild hepatic insufficiency (Child-Pugh score ≤6). There are not sufficient clinical data in patients with moderate to severe hepatic insufficiency (Child-Pugh score ≥7), and the use of VIOXX is not recommended in these patients. (See **Pharmacokinetics**, *Special Populations*.)

VIOXX tablets may be taken with or without food.

*Oral Suspension*
VIOXX Oral Suspension 12.5 mg/5 mL or 25 mg/5 mL may be substituted for VIOXX Tablets 12.5 or 25 mg, respectively, in any of the above indications. Shake before using.

**HOW SUPPLIED**

No. 3810 – Tablets VIOXX, 12.5 mg, are cream/off-white, round, shallow cup tablets engraved MRK 74 on one side and VIOXX on the other. They are supplied as follows:

NDC 0006-0074-31 unit of use bottles of 30
NDC 0006-0074-54 unit of use bottles of 90
NDC 0006-0074-28 unit dose packages of 100
NDC 0006-0074-68 bottles of 100
NDC 0006-0074-82 bottles of 1000
NDC 0006-0074-80 bottles of 8000.

No. 3811 – Tablets VIOXX, 25 mg, are yellow, round, tablets engraved MRK 110 on one side and VIOXX on the other. They are supplied as follows:

NDC 0006-0110-31 unit of use bottles of 30
NDC 0006-0110-54 unit of use bottles of 90
NDC 0006-0110-28 unit dose packages of 100
NDC 0006-0110-68 bottles of 100
NDC 0006-0110-82 bottles of 1000
NDC 0006-0110-80 bottles of 8000.

No. 3784 – Oral Suspension VIOXX, 12.5 mg/5 mL is an opaque, white to faint yellow suspension with a strawberry flavor that is easily resuspended upon shaking.

NDC 0006-3784-64 unit of use bottles containing 150 mL (12.5 mg/5 mL).

No. 3785 – Oral Suspension VIOXX, 25 mg/5 mL, is an opaque, white to faint yellow suspension with a strawberry flavor that is easily resuspended upon shaking.

NDC 0006-3785-64 unit of use bottles containing 150 mL (25 mg/5 mL).

*Storage*

*VIOXX Tablets*:

Store at 25°C (77°F), excursions permitted to 15-30°C (59-86°F).

*VIOXX Oral Suspension:*

Store at 25°C (77°F), excursions permitted to 15-30°C (59-86°F).

---

Dist. by
MERCK & CO., INC., West Point, PA 19486, USA

Issued Month Year
Printed in USA



**VIOXX: A Scientific Review**

Edward M. Scolnick, M.D.

Many media reports have appeared regarding Vioxx since Merck & Co., Inc. reported the results of the APPROVe trial and withdrew Vioxx from clinical use. Some reports cited e-mails from me to Merck Research Laboratory scientists after the VIGOR trial data became available. This document is intended to chronicle the history of the discovery and development of Vioxx in a more complete way than discussed in these media reports.

Nothing has been more important to the Merck Research Laboratories or to me than the safety of patients who take our medicines. Anyone who has worked with me during my time as President of MRL knows that to be a fact. Media reports have questioned the integrity of those physicians and scientists who worked on the discovery and development of VIOXX. I feel compelled to bring to light the data we relied on in making our decisions and how our actions were consistent with the data available at the time. This paper will review the scientific thinking of MRL scientists and many scientists in the academic community who published papers on the subject throughout the course of the VIOXX project from its inception. The paper reviews: (1) why a COX-2 selective inhibitor was made; (2) how clinical studies addressed its development; (3) the thought process behind the VIGOR trial; (4) MRL's immediate response to the data from VIGOR; (5) the rapid public dissemination of the data; (6) the FDA approved label for VIOXX incorporating the data from the VIGOR trial; (7) the scientific data and debate between the release of the VIGOR data and the APPROVE trial that led to the withdrawal of VIOXX, a decision made nearly two years after I stepped down from being President of MRL.

In 1993, after a scientific meeting in Keystone, Colorado, the Merck Research Laboratories began a program to make a selective inhibitor of COX-2. Scientific reports at that meeting had revealed that there were two isoforms of cyclooxygenase. COX-1 was present normally in the gastrointestinal tract and COX-2 was induced in inflammatory cells at sites of inflammation. Although all the mechanisms by which traditional NSAIDs caused gastrointestinal ulcers were not known, inhibition of COX-1 in the stomach and duodenum was the prevailing scientific thought on how traditional NSAIDs caused gastrointestinal ulcers in humans. The new information suggested that a

EXHIBIT

tabbles

V

selective COX-2 inhibitor would have enhanced safety for the GI tract compared to traditional NSAIDs and retain the efficacy of traditional NSAIDS. The project proceeded rapidly due to the dedication of scientists at the Merck Frosst Laboratories and in 18 months we had development candidates. One of these turned out to be VIOXX.

In initial clinical studies, VIOXX was shown to alleviate dental pain, thus showing for the first time in humans that a COX-2 selective inhibitor had efficacy. Initial gastrointestinal endoscopy studies demonstrated that as much as 250 mg of VIOXX once a day for 7 days in 51 subjects produced many fewer ulcers than 2400 mg of ibuprofen. 2400 mg/day is the highest dose of ibuprofen approved in its label. At the time we thought the clinical dose of VIOXX might need to be as high as 100 mg. When we learned later than the usual dose was 12.5 mg, we were clearly excited and looked forward to future endoscopy studies after longer exposure to VIOXX at lower clinical doses.

We performed clinical efficacy dose finding studies with great care. Since we now had data in humans to suggest enhanced safety on the GI tract, we paid particular attention to VIOXX's effect on kidney function. Traditional NSAIDs can adversely affect salt and water balance and elevate blood pressure in patients, and it was not known in humans what effect selective inhibition of COX-2 would have on renal physiology and blood pressure. If VIOXX did, in fact, have enhanced GI safety vs. traditional NSAIDs, we did not want physicians to try higher doses than were also safe for kidney function and blood pressure in patients whose pain and inflammation were difficult to treat. We determined the clinical dose for osteoarthritis would be 12.5 mg, with some patients gaining extra benefit from the maximum dose of 25 mg. 50 mg was found to be an optimal dose for relief of acute pain and primary dysmenorrhea. Studies on salt and water balance indicated 12.5 mg and 25 mg were appropriate for chronic use. When the drug was initially approved, the label for osteoarthritis stated clearly the "recommended starting dose of VIOXX is 12.5 mg once daily. Some patients may receive additional benefit by increasing the dose to 25 mg once daily. The maximum recommended daily dose is 25 mg."

During the Phase III development program, studies were performed to assess and prove in humans that the doses to be used chronically (12.5 mg and 25 mg) were actually safer with regards to gastrointestional ulcers. Special studies were also done to assess safety for the small intestine since it was known that NSAIDs historically could also cause small intestinal problems in humans. The

studies on the small intestine were carefully done and were consistent with our hypothesis that this drug would not cause small intestinal ulcers.

The endoscopy studies were especially demanding and extensive. The data were obtained from two replicative studies with 689 patients in one study and 738 patients in another study. This data was included in the initial approved label for VIOXX. The results indicated a clear and large difference between the highest approved chronic dose of VIOXX (25 mg) and the highest allowed chronic dose of ibuprofen (2400 mg) over three time intervals (1) a 6-week period which included placebo; (2) a 3-month period which included placebo, and (3) a 6-month period. Because the study was conducted in patients with osteoarthritis, we could not maintain a placebo arm for the second 3 months since osteoarthritis is a painful condition. Not only did the study show the large difference from ibuprofen, but VIOXX was not detectably different in these studies from placebo for ulcers after 3 months of continuous use. Clearly one could not conclude that VIOXX had no risk of causing ulcers. Proving a negative result is always difficult in science. Nevertheless, the enhanced safety for the gastrointestinal tract was clear.

An interesting scientific discussion ensued among scientists and FDA regulatory personnel. It was often said there is no relationship between GI ulcers and the serious complications of NSAIDs such as perforations, obstructions, and bleeding. Thus for MRL to prove that this constellation of complications was reduced in patients taking VIOXX, an outcomes study measuring these events would be needed and required.

I have always thought that that issue should be more clearly articulated. A more accurate statement might have been that no simple quantitative relationship existed between ulcers detected by endoscopy and the triad of serious complications that arise in long clinical use. However, it was inconceivable to me that the pathophysiology process that leads to ulcers detected by endoscopy could not be integrally related to the processes that lead to the triad of more serious complications. To contend that the extensive 6 month endoscopy studies would not predict better long term gastrointestinal safety was simply not scientifically logical.

The next question was how to do such a study. Given the endoscopy data in patients with osteoarthritis, we asked ourselves, "was it ethical to do an outcomes study in such patients comparing

25 mg VIOXX to any NSAIDs?" The FDA wanted the outcomes study done at 50 mg. Was it ethical to do an outcomes study at 50 mg in patients with osteoarthritis vs. any other NSAID given that the highest recommended dose for which Merck sought approval for osteoarthritis was 25 mg once a day? At the time, the studies for rheumatoid arthritis were not completed although data existed that VIOXX had efficacy in RA. We believed the dose was going to be 50 mg although subsequent data showed that 25 mg was the correct dose. Thus it was decided to test 50 mg dose at the insistence of the FDA and to do that in patients with RA where we thought at the time 50 mg would be the dose for this indication. In planning the GI outcomes study, MRL scientists on the project team faced many unknowns and scientific conundrums. Which NSAID to compare to VIOXX was the first question. Ibuprofen was considered but I recall that it was a drug taken 4x day and that compliance in a long term study would therefore be difficult. Diclofenac was considered but I knew it had an incidence of liver function abnormalities and was concerned that such abnormalities might compromise the eventual number of patients in the trial. Eventually, the decision was made to compare VIOXX to naproxen.

Given that the FDA wanted the outcomes study done with 50 mg of VIOXX, MRL scientists pondered what patient population the study could be performed in. At the time available data suggested that 50 mg would be the dose for patients with rheumatoid arthritis, although the clinical trials in patients with RA were not yet complete. It was decided that the only ethical way 50 mg could be studied was in patients with rheumatoid arthritis. (When the trials in RA were completed in 2001, in fact the correct dose was determined to be 25 mg also in the patients with RA.)

The study was begun, and based on the completed large Phase III program, VIOXX was approved on May 20, 1999. Celebrex had already been approved with data from endoscopic studies that showed it produced fewer GI ulcers than comparator NSAIDs but with data far less convincing than the data in the FDA approved VIOXX label. VIOXX was well received in the market as Merck tried to gain market share from Celebrex which had been approved 6 months earlier.

Merck was competing well and gaining market share but had not surpassed Celebrex in early 2000. I was eager to see the data from the GI outcomes study. Not because I was worried about the result, but hoping it would be the data Merck needed to show how much better VIOXX was than Celebrex. I asked the Merck statistician designated to oversee the trial to allow me to see the data the very minute the study was completed. The scientist strongly reminded me that I was not allowed to be

the first and that there was a process and an order as to who would see the data based on prespecified rules. I retreated from my request and fully complied with the process with that reminder and awaited to be called. No one at Merck besides the statistician predesignated by the study protocol had any knowledge of any unblinded data in VIGOR before the study was fully completed.

On March 9, 2000, I was called and was told the results: both the GI outcomes data and the cardiovascular outcomes data. Although clearly pleased at the GI outcomes, I was stunned at the CV data and stated there was a clear effect. I, in fact, thought VIOXX had elevated the CV event rate. Despite my initial thought, I wanted to buoy the spirits of a team that had worked so diligently for so long on this program. My first comments were intended to encourage them to perform an in depth analysis of all the data in the trial since in many past trials first impressions of the interpretation of new data, I knew often were not accurate.

What was the scientific background for my first reaction?

In 1997, in a study sponsored by Merck, there was the surprising discovery that VIOXX, a COX-2 specific inhibitor, reduced the urinary excretion of a prostacyclin metabolite. A separate study had demonstrated similar effects with Celecoxib another COX-2 inhibitor. Prostacyclin is a major product of arachadonic acid metabolism and was considered to be an antiplatelet factor that inhibits platelet aggregation. These metabolite results were totally unexpected; previous studies of vascular tissue, isolated cells and immunohistochemistry suggested that COX-1 was responsible for prostacyclin production. The new finding was interpreted as indicating that COX-2 had a role in systemic prostacyclin synthesis. Both the nonselective NSAIDs and the COX-2 inhibitors may inhibit this pathway. Because selective COX-2 inhibitors do not affect platelet function whereas standard NSAIDs do, it was hypothesized that selective COX-2 inhibitors might alter the balance between the platelet derived thromboxane and the systemic prostacyclin and thereby increase the risk of cardiovascular events. These data were published in 1999. It is important to emphasize that the effect of prostacyclin was only a partial reduction as measured by a metabolite of prostacyclin in the urine. It is also important to realize that the in vivo importance of the reduction in the urinary metabolite was not known but a hypothesis. Studies conducted at Merck Frosst were not able to determine the source in animals of this prostacyclin metabolite. Around this time, data were also emerging that inflammation was a risk factor for athero-thrombosis (CRP levels) and it was postulated that anti-

inflammatory therapies might diminish the risk of cardiovascular events. Thus it was possible that partial reduction in systemic prostacyclin might be a risk factor for patients with cardiovascular disease and also possible that an anti-inflammatory drug might benefit such at risk patients. No data existed to resolve these two alternatives.

The prostaglandin metabolite results had became available to us as we neared completion of the initial development program which evaluated the safety and efficacy of VIOXX in the treatment of patients with osteoarthritis and acute pain (before the VIGOR trial was even started). The data prompted our team to conduct an immediate retrospective review of the cardiovascular thrombotic events in the Phase II and Phase III osteoarthritis studies. This was done first on a blinded basis and again when we had the unblinded data. These studies included 5435 osteoarthritis patients who participated in 8 double-blind, placebo-controlled and active comparator studies. In these studies, there were similar rates of thrombotic cardiovascular adverse events among patients taking VIOXX, placebo, and comparator NSAIDs (ibuprofen, diclofenac, or nabumetone). Thus, the first major studies conducted with VIOXX found **no** difference in cardiovascular thrombotic risks when comparing VIOXX with placebo or the NSAIDs ibuprofen, diclofenac, or nabumetone, even with a careful retrospective analysis. Nevertheless, we decided to prospectively collect and adjudicate all cardiovascular thrombotic events in all future trials of VIOXX to carefully monitor data on the question. This decision was made even before the VIGOR trial was designed. The Phase II and Phase III data were submitted to the United States Food & Drug Administration as part of the New Drug Application for VIOXX, specifically reviewed at a public meeting of the FDA Arthritis Advisory Committee, and later published in Konstam, et al., "Cardiovascular Thrombotic Events in Controlled Clinical Trials of Rofecoxib," *Circulation.*[i]

Thus, when I first saw the VIGOR data, my initial thought was the prostacyclin metabolite data and thus my reaction. The project team then subsequently explained to me that there was another plausible explanation, that naproxen had been cardioprotective. This was a theory based on naproxen's ability to inhibit COX-1. Despite the rationale for this theory, no one had ever before shown naproxen was cardioprotective. Why? Aspirin could be shown to be cardioprotective with relatively low doses because of two features (1) ASA irreversibly attaches itself to COX-1 in platelets, (2) to generate more platelets with active COX-1, new platelets need to populate the circulation from bone marrow precursor cells, a process which takes considerable time. Platelets existing in the circulation lack

nuclei and cannot simply make new templates for new COX-1 enzyme after residual ASA is cleared rapidly from the bloodstream. This is in contrast to stomach cells which can remake COX-1 rapidly from existing cells after short exposure times to low dose ASA. Thus, ASA can be relatively selective in its effect for platelet COX-1 vs. stomach COX-1. Naproxen taken at 500 mg b.i.d. could also block platelet COX-1 relatively completely because of its potency and long half life in the circulation. But because naproxen inhibits platelet COX-1 reversibly and not irreversibly like ASA, naproxen could not be expected to selectively inhibit platelet COX-1 for a 24 hr period without also inhibiting stomach COX-1 for a 24 hour period, and therefore produce many serious GI side effects. Thus, naproxen could not have been previously studied in a cardiovascular outcomes study like the ones in which ASA had been shown to be cardioprotective. One could speculate on whether Naproxen could be cardioprotective with good logic, but no clinical evidence existed at the time.

In telling me about the naproxen hypothesis, the team cited a paper in which flurbiprofen, a long acting NSAID, had been shown in fact to prevent rethrombosis after cardiac angioplasty and showed me the paper and the data.[ii] I did not readily accept that explanation. In the next few minutes I asked them to review up to date all other available data from ongoing trials of VIOXX, against all other NSAIDs and placebo. I was disturbed that so little comparison to placebo existed although copious data vs. other NSAIDs was available, none of which showed any CV events for VIOXX different from other non-naproxen NSAIDS. At my intense questioning of the relative paucity of placebo vs. VIOXX data, I was reminded we were studying VIOXX in osteoarthritis and that we could not keep such patients on placebo for long trials because osteoarthritis is a painful condition. Then during that discussion, a team member recalled an ongoing trial in patients with Alzheimer's Disease.

Another hypothesis was extant at the time: Alzheimer's disease had an inflammatory pathological component. If one could block that component, it was hypothesized that one might slow the progression of the disease. (This hypothesis has never been proven to this day in clinical trials.) Thus, we were in the midst of a study in elderly patients with Alzheimer's Disease, some of whom undoubtedly had underlying heart disease. The study design was 25 mg VIOXX, as an anti-inflammatory vs. placebo, an ethical study, since no drug had been shown to arrest or retard the Alzheimer's disease process. A relatively large patient database was available with only 2 arms to the trial, group A and group B. I was told we had blinded records of all adverse experiences which were always reported and promptly recorded during the course of any clinical trial. We could look at CV

events in group A vs. group B. If an imbalance were found, we would totally unblind the data and see if there was evidence vs. placebo that VIOXX was prothrombotic. The team worked incessantly in the next 24-48 hours and they were instructed to call me as soon as the data collection and tabulation was done. We all fully agreed if an imbalance were observed, we would determine if it were in the VIOXX arm or the placebo arm. On a Sunday night at 8:30 p.m., I received a call and was told all the data for total CV events and all available subcategories. There was no difference or pattern of differences between group A or group B. There was no evidence in any trial except VIOXX vs. naproxen in VIGOR that the CV event rate was different for VIOXX vs. placebo or other NSAIDs.

In the next few days, we queried an additional data source. In 1999, we were given a preprint of a case report of a patient with Lupus Erythematosis, an autoimmune disease where excess platelet activation was known to occur. This patient had been switched from a traditional NSAID to Celebrex and had a venous thromboembolism. The prostacyclin data on Celebrex in man was known at this time and the author speculated on a possible role for Celebrex in the patient's venous clot. Thus, we looked at available databases for the number of prescriptions written for VIOXX in patients with Lupus. I was told that despite the fact that there were 30,000 patients for whom VIOXX prescriptions had been written, we had no spontaneous reports of CV events in such patients. Being persistent, I then instructed the team to call a few leading rheumatologists to inquire if any of them had an experience with VIOXX like the case report above. No one had such an experience.

Given the available data, the team and I concluded that it was likely that naproxen had been cardioprotective. Alternative explanations could not be formally excluded, but the explanation appeared to explain all the available data. Flurbiprofen had set the precedent, the group that raised the speculation had, in fact, been prescient, even though to this point in time in March 2000, I had not recalled or was not familiar with their prior deliberations. No clinical data gathered in clinical trials with VIOXX except in the VIGOR trial came to my attention that caused me any concern about CV risk of VIOXX (Additionally, preclinical MRL scientists continued to study VIOXX and were instructed to look for a prothrombotic effect in an animal model that might reveal such. Such studies were later conducted in a subhuman primate complete with positive and negative controls and revealed no prothrombotic effect of either VIOXX or Celebrex.)

What did MRL do with the VIGOR results? We promptly told the FDA of our data and requested an expedited review. Despite the fact that VIGOR was a large trial involving 8,000 patients, we worked as rapidly as possible to submit fully validated data. We did that in just 3 months.

We also wanted to make physicians and patients aware of the results immediately. The naproxen cardioprotective effect appeared to us to be the explanation based on all available data as noted above, and we had excluded the use of ASA from all our trials up to this point in time.

If naproxen had been cardioprotective, then it was important to allow low dose ASA use in patients taking VIOXX in our trials and to make people aware of this in patients taking VIOXX since ASA had been excluded from all our ongoing trials as it had in VIGOR. Such trials including VIGOR, of course, had exclusions for enrolling patients with underlying heart disease. We decided that the fastest way to make all the available data known was to issue a press release and to send a letter to every investigator conducting any trial with VIOXX or Arcoxia. This would occur immediately and thus be broadly known while an FDA submission was prepared and eventually was reviewed. The press release was issued and the investigator letters sent March 27. The documents stated all data from all available trials, pointed out the VIGOR data, put forth the Naproxen cardioprotective hypothesis, stated clearly that such an effect of Naproxen had not been previously observed, changed the trial guidelines now to allow ASA use in patients doctors chose to use ASA in, and explained again the lack of effect of VIOXX on platelet COX-1. Thus, there was wide dissemination with all available data 18 days from the time I knew the data. The FDA had been notified earlier consistent with regulatory requirements.

During this time and continually thereafter, we evaluated the VIGOR data and continued to consider all possible options. In the meantime, the VIGOR results received extensive coverage and were widely debated in the scientific community, in the financial community, and in the press. Merck participated in these scientific discussions by making the data widely and quickly available and explaining the basis for our conclusions. Merck presented the data at Digestive Diseases Week in May and published the study in *The New England Journal of Medicine* in November (Bombardier 2000). An application to include the results in prescribing information was submitted to FDA in June 2000, followed by a public Advisory Committee meeting in February 2001. The prescribing information for

VIOXX was subsequently changed in the United States and around the world to reflect the cardiovascular results of VIGOR.

**PRECAUTIONS**

* * *

*Cardiovascular Effects*

The information below should be taken into consideration and caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease.

In VIGOR, a study in 8076 patients (mean age 58; VIOXX n=4047, naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with naproxen 500 mg twice daily (n=19). In VIGOR, mortality due to cardiovascular thrombotic events (7 vs 6, VIOXX vs naproxen, respectively) was similar between the treatment groups. (See CLINICAL STUDIES, *Special Studies, VIGOR, Other Safety Findings: Cardiovascular Safety.)* In a placebo-controlled database derived from 2 studies with a total of 2142 elderly patients (mean age 75; VIOXX n=1067, placebo n=1075) with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs 35 for patients treated with VIOXX 25 mg once daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for VIOXX versus placebo, respectively. The significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) in unknown. Prospective studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebo have not been performed.

**Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.** Therefore, in patients taking VIOXX, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis. (See CLINCIAL STUDIES, *Special Studies, Platelets*; PRECAUTIONS, *Drug Interactions, Aspirin.*) Prospective, long-term studies on concomitant administration of VIOXX and aspirin evaluating cardiovascular outcomes have not been conducted.

*Fluid Retention, Edema, and Hypertension*

Fluid retention, edema, and hypertension have been reported in some patients taking VIOXX. In clinical trials of VIOXX at daily doses of 25 mg in patients with rheumatoid arthritis the incidence of hypertension was twice as high in patients treated with VIOXX as compared to patients treated with naproxen 1000 mg daily. Clinical trials with VIOXX at daily doses of 12.5 and 25 mg in patients with osteoarthritis have shown effects on hypertension and edema similar to those observed with comparator NSAIDs; these occurred with an increased frequency with chronic use of VIOXX at daily doses of 50 mg. (See ADVERSE REACTIONS.) VIOXX should be used with caution, and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension, or heart failure.

* * *

**DOSAGE AND ADMINISTRATION**

**Osteoarthritis**

The recommended starting dose of VIOXX is 12.5 mg once daily. Some patients receive additional benefit by increasing the dose to 25 mg once daily. The maximum recommended daily dose is 25 mg.

**Rheumatoid Arthritis**

The recommended dose is 25 mg once daily. The maximum recommended daily dose is 25 mg.

**Management of Acute Pain and Treatment of Primary Dysmenorrhea**

The recommended dose of VIOXX is 50 mg once daily. The maximum recommended daily dose is 50 mg. Use of Vioxx for more than 5 days is management of pain has not been studied. Chronic use of VIOXX 50 mg daily is not recommended. (See ADVERSE Reactions, Clinical Studies in OA and RA with VIOXX 50 mg).

**Patient Information about VIOXX**

* * *

**What are the possible side effects of VIOXX?**

Serious but rare side effect that have been reported in patients taking VIOXX or related medicines have included:

* * *

- Heart attacks and other serious events, such as blood clots in your body, have been reported in patients taking VIOXX.

***

On the advice of one of our consultants, to enhance the power and precision of our analyses, we also conducted a pooled analysis of the cardiovascular events from 23 studies involving more than 28,000 patients, representing more than 14,000 patient years. In this analysis, there was no evidence of an increased risk of cardiovascular thrombotic events for VIOXX compared to placebo or VIOXX compared to non-naproxen NSAIDs. There was, however, an increased risk of events on VIOXX compared with naproxen. Because of this difference in findings against the different comparators, we felt that it was inappropriate to combine all the comparator data into a single group even though doing so would have diminished the apparent difference from naproxen. We presented this analysis at major

medical meetings and published it in *Circulation* in October 2001. We provided up-dates to this analysis to regulatory authorities and published an up-dated analysis in the American Heart Journal.

Notwithstanding the extensive amount of clinical data detecting no difference in cardiovascular event rates between VIOXX at the maximum allowed chronic doses 12.5 mg and 25 mg and placebo and VIOXX and non-naproxen NSAIDs, MRL continued to study and monitor the cardiovascular safety of VIOXX. MRL also began evaluating different potential designs to gather CV outcomes data for VIOXX. In December 2001, I announced our intention to perform large outcome studies with VIOXX to further characterize CV risk. MRL was aware of recommendations that this study be performed in high-risk cardiovascular patients. However, this was felt to be problematic (1) because it was not clear what potential benefit to patients could be tested in such a study and (2) because all of the patients in such a study would have needed to take aspirin which could have potentially obscured a prothrombotic effect of VIOXX. After deliberations with numerous consultants, MRL finalized a protocol in 2002 which prespecified the analysis of adjudicated cardiovascular event data from placebo-controlled studies as a hypothesis-testing endpoint. These studies would enroll patients with a spectrum of CV risk, including patients taking and not-taking aspirin. Two of these studies, APPROVE and VICTOR, a 7000 patient study in patients with a history of colon cancer, had begun and the third, a 15,000 patient study in patients at risk for prostate cancer was initiated after consultation with regulatory agencies.

**Publications Appearing After Announcement of VIGOR Results in Chronological Order**

August 2001 A meta analysis was published in *JAMA* by Mukherjee et al.

The paper attempted a meta analysis of the VIGOR trial and the CLASS trial (for Celecoxib) to compare the relative risk for thrombotic cardiovascular events in these trials to an historical incidence of similar events in various secondary prevention trials testing ASA's effectiveness in reducing myocardial infarction. The comparison was between the historical control groups in the ASA trials to the treated groups in the coxib trials. The authors concluded that the annualized myocardial infarction rates in the coxib trials were significantly higher than in the historical placebo group.

It is noteworthy that the Mukherjee, et al. study used a historical control group to compare to patients using rofecoxib and Celebrex. In studies performed by drug

discovery companies submitted to FDA for approval for inclusion in drug labels, historical controls are simply not allowed. Historical controls are not considered valid in studies claiming new findings about prescription medicines, and meta analyses which use such control groups are not considered statistically valid by the statistical communuity.

(Mukherjee, D., Hissen, S.E. and Topol, E.J. Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors. JAMA, 286, 954-959, 2001.

Timeline of Epidemiological Studies Involving VIOXX or NSAIDs

Nov 2001 The *Medical Letter* reviewed the cardiovascular safety of COX-2 inhibitors. That review concluded, "in one study, high doses of rofecoxib taken for months were associated with a 1.11% incidence of thrombotic cardiovascular events compared to 0.47% with naproxen. Taking aspirin with a selective COX-2 inhibitor could protect against any possible prothrombotic effect, but would probably also diminish the apparent advantage in gastrointestinal safety with these drugs. Until more prospective studies with and without low-dose aspirin are available, it would be premature to conclude that rofecoxib or celecoxib increase the risk of thrombotic cardiovascular disease."

Jan 2002 A retrospective cohort study by Ray et al is published in The Lancet. Objective was to measure the effects of non-aspirin NSAIDs, including naproxen, on risk of serious coronary heart disease (CHD). The adjusted RR (95% CI) for use of naproxen <1000 mg relative to non-use of any NSAID was 0.83 (0.64, 1.09), while that for ≥1000 mg was 1·00 (0·84–1·18). When use of naproxen was compared with use of ibuprofen, the RR was 0·83 (0·69–0·98). Study concludes that in a high-risk patient population of people 50 years and older, non-selective non-aspirin NSAIDs neither increased nor decreased risk of serious CHD compared with non-use. Analysis evaluated 6,362 cases from the Tennessee Medicaid program during 181,441 periods of new NSAID use in 128,002 people and the same number of periods of non-use of NSAIDs among 134,642 people.

Ray WA, Stein CM, Hall K, Daugherty JR, Griffin MR. Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease: an observational cohort study. Lancet 2002; 359: 118-23.

May 2002 Three separate case-control studies are published in *Archives of Internal Medicine*. Each showed that use of naproxen reduced the risk of heart attacks. These studies were

first presented at the American College of Rheumatology meeting in 2001.

**Solomon et al**: Objective was to determine whether NSAIDs have a similar effect or whether they differ in their effects on the risk of acute myocardial infarction (AMI). Study concludes that the findings do not support a relationship between the use of NSAIDs as a group and risk of heart attacks. However, use of naproxen was associated with a significant reduction in the risk of AMI (adjusted odds ratio, 0.84; 95% confidence interval, 0.72-0.98; P =.03). Analysis evaluated 4,425 cases from the N.J. Medicare/ Medicaid Program against a control group of 17,700 subjects.

Solomon DH, Glynn RJ, Levin R, Avorn J. Nonsteroidal anti-inflammatory drug use and acute myocardial infarction. Arch Int Med 2002; 162: 1099-1104.

**Watson, et al**: Objective of the study was to examine the risk of acute thromboembolic cardiovascular events (heart attack, sudden death and stroke) with naproxen use among patients with rheumatoid arthritis. The study concludes that patients with rheumatoid arthritis and a current prescription for naproxen had a reduced risk of acute major thromboembolic CV events relative to those who did not take naproxen in the past year. Analysis evaluated 809 cases from British General Practice Research Database against a control group of 2,285 subjects. Study sponsored by Merck.

Watson DJ, Rhodes, T, Cai B, Guess HA. Lower Risk of Thromboembolic Cardiovascular Events with Naproxen Among Patients with Rheumatoid Arthritis. Arch Int Med 2002; 162: 1105-10.

**Rahme, et al**: Objective of the study was to compare the effect of naproxen to other NSAIDs in the prevention of acute myocardial infarction (AMI) in an elderly population. The study concludes that compared to other NSAIDs, concurrent use of naproxen has a protective effect against AMI. Analysis evaluated 4,163 cases from Canadian RAMQ and Med-Echo databases against a control group of 14,160 subjects. Study sponsored by Merck.

Rahme E, Pilote L, LeLorier J. Association between Naproxen Use and Protection Against Acute Myocardial Infarction. Arch Int Med 2002; 162: 1111-5.

**Editorial associated with the article:** The good news for the millions of users of COX-2 inhibitors (and their manufacturers) is that there is no evidence that use of COX-2 inhibitors increases (or decreases) the risk of myocardial infarction. The findings in the VIGOR study and the findings in the report by Mukherjee et al are readily explicable by the beneficial effects of naproxen rather than a detrimental effect of COX-2 inhibitors.

Many users of NSAIDS and COX-2 inhibitors are in the age group that has or is at risk of having coronary artery disease. Therefore, the concomitant use of low-dose aspirin (80 mg/d) should be strongly considered in patients with a history of coronary artery disease, stroke, transient ischemic attack, or peripheral vascular disease. Aspirin should also be considered in patients older than 50 years who have 1 or more risk

factors for coronary artery disease. Although naproxen reduces the risk of myocardial infarction, it offers less protection than aspirin; therefore, aspirin should be considered in patients at risk of myocardial infarction who are taking naproxen.

Sep. 2002 **Schlienger et al.** published a case-control analysis using the United Kingdom-based General Practice Research Database (GPRD) in the *British Journal of Clinical Pharmacology*. The objective was to examined whether use of non-aspirin NSAIDs may be associated with a decreased risk of first-time acute MI. in patients treated between 1992 and 1997. There were 3319 cases and 13,139 controls. The overall adjusted RR for AMI in current NSAID users was 1.17 (95% CI 0.99, 1.37). The adjusted RRs for use of naproxen was 0.68 (0.42-1.13) based on 19 exposed cases and 105 exposed controls. The authors concluded that current NSAID exposure does not decrease the risk of AMI.

Schlienger RG, Jick H, Meier CR. Use of nonsteroidal anti-inflammatory drugs and the risk of first-time acute myocardial infarction. Br J Clin Pharmacol. 2002;54: 327–32

Oct 2002 A retrospective cohort study by **Ray et al** is published in *The Lancet*. Objective was to assess occurrence of serious coronary heart disease (CHD), specifically acute myocardial infarction (AMI) and cardiac death, in patients taking Vioxx, celecoxib or other NSAIDs. Study concludes use of Vioxx at doses greater than 25 mg could be associated with an increased risk of serious CHD (based on 12 exposed cases); in contrast, there was no evidence of increased risk among users of Vioxx at doses of 25 mg or less, celecoxib, naproxen or ibuprofen. Analysis evaluated 5,316 events from the Tennessee Medicaid program among 251,046 NSAID users and 202,916 non-users.

Ray WA, Stein CM, Daugherty JR, Hall K, Abrogast PG, Griffin MR. COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. Lancet 2002; 360: 1071-3.

Oct 2002 A database cohort analysis by **Levy et al** is presented at the American College of Rheumatology meeting. Objective was to assess the correlation between COX-2 use and heart attacks among persons prescribed a COX-2 inhibitor, ibuprofen, or naproxen for at least 50 consecutive days. Study concludes long-term use of either of the COX-2 inhibitors (Vioxx and celecoxib) separately is not associated with an increased risk of heart attack compared with naproxen or ibuprofen. When users of COX-2 inhibitors were combined, there was an increased risk compared with users of ibuprofen or naproxen combined. Analysis evaluated 645 events from the Kaiser Permanente database among 172,260 subjects.

**Conclusion:** "Long term use of COX-2s in a large staff model HMO is not associated with a significant increased risk of MI when compared to naproxen or ibuprofen. An analysis of the combination of both COX-2s compared to a cohort of NSAIDs showed an OR of 1.3 (95% CI 1.1-1.6). Further analysis is planned to examine the effect of length of exposure, dose effects, OTC NSAID use, smoking and concomitant ASA use on MI risk."

Levy GD, Cheetham C, Shoor S. Cohort Analysis of Myocardial risk and COX-2 in the Kaiser Large Observational Thrombosis Study (KLOTS). Arthritis Rheum 2002; 46 (9 suppl): 5377.

Feb 2003 A population-based, retrospective cohort study by **Mamdani et al** is published in *Archives of Internal Medicine*. Objective was to compare the rates of acute myocardial infarction (AMI) among elderly patients taking COX-2 inhibitors, naproxen and non-aspirin NSAIDs. The rates of MI among the drugs studied were not different from each other nor were any of them different from controls not using NSAIDs. Study concludes no increased short-term risk of AMI among users of COX-2 inhibitors and no short-term reduced risk of AMI with naproxen. Analysis evaluated 701 events from administrative health care databases in Ontario among 66,964 users and 100,000 non-users.

Mamdani M, Rochon P, Juurlink, Anderson GM, Kopp A, Naglie G, Austin PC, Laupacis A. Effect of COX-2 selective cyclooxygenase inhibitors on short term risk of acute myocardial infarction in the elderly. Arch Int Med 2003; 163: 481-6.

Nov 2003 A case-control study by **Kimmel et al** is presented at the American Heart Association annual meeting. Objective was to determine the risk of nonfatal heart attacks in users of COX-2 inhibitors compared with users of non-aspirin NSAIDs. Study concludes there was no increased risk of heart attacks overall from COX-2 inhibitors. However, the effects of the two COX-2 inhibitors varied: celecoxib was associated with a reduced risk of MI while Vioxx was not associated with either reduced or increased risk. As a result the difference between them was significant. Nonselective, non-aspirin NSAIDs were also associated with a reduced risk of heart attack. Analysis evaluated 1,718 cases against 6,800 controls from the Delaware Valley Case-Control Network. Study sponsored by Merck and Pharmacia.

**Conclusion:** "There was no increased risk of MI overall from COX-2 inhibitors detected in this study. However, celecoxib and rofecoxib appear to have different effects, possibly due to a protective effect of celecoxib and a neutral effect of rofecoxib. These effects could explain the findings of randomized trials comparing COX-2s with nonselective NANSAIDs."

Kimmel SE, Berlin JA, Reilly M, Jaskowiak J, Kishel L, Strom BL. Risk of Myocardial infarction by type of cyclooxygenase-2 inhibitor. Circulation 2003; 108(17 Suppl IV):IV-752.

June 2004 Garcia-Rodriguez et al published a cohort study with a nested case-control analysis in Circulation. The objective was to determine whether use of NSAIDs affected risk of CHD, and whether use of ibuprofen interfered with protective affects of aspirin. 4975 cases of acute MI and death from CHD and 20 000 controls were identified between 1997 and 2000 in the UK.. The adjusted OR for any current NSAID use compared with nonuse was 1.07 (95% CI, 0.95 to 1.20). individual NSAIDs were all comparable, with



no major effect on the risk of acute MI. Naproxen was associated with an OR of 0.89 (95% CI, 0.64 to 1.24). The authors concluded there was no detectable risk reduction of NSAIDs on the occurrence of MI.

Garcia-Rodreguez LA, Varas-Lorenzo C, Maguire A, Gonzalez-Perez A. Nonsteroidal antiinflammatory drugs and the risk of myocardial infarction in the general population. Circulation 2004; 109:3000-3006.

Mar 2004 A population-based analysis by **Whelton et al** is presented at the American College of Cardiology meeting. Objective was to determine the risk of acute myocardial infarction (AMI) or stroke with Vioxx, celecoxib, and non-selective NSAIDs in hypertensive patients. Study concludes Vioxx significantly increases the risk of AMI or stroke compared with non-users of NSAIDS and there was no increased risk among users of celecoxib or non-selective NSAIDs. Analysis evaluated 3,723 users against 1,798 users from a private medical insurance healthcare claims database. Study sponsored by Pfizer.

Whelton A, Spalding WM, White WB, Reeves MJ, Sub SS, Fort JG. Rofecoxib increases cardiovascular events in arthritis patients but celecoxib and nonspecific nonsteroidal anti-inflammatory drugs do not: results from a large New England Health Care claims database. J Am College Cardiol 2004; 43 (5 Suppl 2): 415A

Mar 2004 A case-control study with cases of first, nonfatal MI identified prospectively and controls identified randomly from the community, by Kimmel et al is published in the Journal of the American College of Cardiology. Objective was to determine the risk of nonfatal heart attacks in users of non-selective, non-aspirin NSAIDs and the interaction between non-aspirin NSAIDs and aspirin. Study concludes that in the absence of aspirin use, non aspirin NSAIDs are associated with reduced odds of MI. In those using aspirin, non aspirin NSAIDs do not provide additional protection. Analysis evaluated 581 events from the Philadelphia community among 4,153 control subjects.

Kimmel SE, Berlin JA, Muredach R, Jaskowiak J, Kishel L, Chittams J, Strom BL. The effects of nonselective non-aspirin non-steroidal anti-inflammatory medications on the risk of nonfatal myocardial infarction and their interaction with aspirin. J Am Col Card 2004; 43(6):985-90.

Note: There are two different analyses using the same data set. This paper (JACC 2004) above is different focus from the abstract in 2003. A paper based on the earlier abstract had been rejected from Circulation, JAMA and Annals, and now resubmitted to Annals at the Journal's request.

Apr 2004 A case-control study by **Solomon et al** is published in *Circulation*. Objective was to assess the risk of acute myocardial infarction (AMI) among users of Vioxx, celecoxib, and NSAIDs in an elderly population. Study concludes Vioxx all doses combined was associated with a significant increased risk of AMI compared to celecoxib. Non-significant differences were found comparing Vioxx to ibuprofen, naproxen, other NSAIDs and to those not taking NSAIDs. The risk was higher in persons taking greater than 25 mg of Vioxx and during the first 90 days of use but not thereafter. Analysis

evaluated 10,895 cases from two state-sponsored pharmaceutical benefits program in the U.S. among 54,475 patients 65 years and older. This study was first presented at the American College of Rheumatology meeting in 2003. Study sponsored by Merck.

"In all comparisons related to dose, use of rofecoxib >25 mg/d was associated with a higher adjusted relative risk of AMI than rofecoxib≤ 25 mg. The adjusted relative risk of rofecoxib >25 mg (OR, 1.70; 95% CI, 1.07 to 2.71) was higher than that seen for ≤ 25 mg (OR, 1.21; 95% CI, 1.01 to 1.44) compared with celecoxib > 200 mg or ≤ 200 mg. The magnitude in elevation of relative risk was similar when rofecoxib was compared with no current NSAID, naproxen, ibuprofen, and other NSAIDs. Neither celecoxib dosage was associated with an elevated risk of AMI in any comparison."

Solomon DH, Schneeweiss MD, Glynn RJ, Kiyota Y, Levin R, Mogun H. Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults. Circulation 2004; 109:2068-2073.

May 2004 — A population-based retrospective cohort study by **Mamdani et al** is published in *The Lancet*. Objective was to compare the rates of admission for congestive heart failure (CHF) in elderly patients who were given COX-2 inhibitors or non-selective NSAIDs. Study concludes there is a higher risk of admission for CHF in users of Vioxx and non-selective NSAIDs (diclofenac, naproxen and ibuprofen) but not celecoxib in comparison to non-users of NSAIDs. Analysis evaluated 654 events from administrative healthcare databases in Ontario among 45,097 users of NSAIDs/COX-2 inhibitors and 100,000 non users.

Mamdani M, Juurlink DN, Lee DS, Rochon PA, Kopp A, Naglie G, Austin PC, Laupacis A, Stukel TA. Cyclo-oxygenase-2 inhibitors versus non-selective non-steroidal anti-inflammatory drugs and congestive heart outcomes in elderly patients: a population-based cohort study. Lancet 2004; 363:1751-56.

Aug 2004 — A case-control study by **Graham et al** is presented at the International Conference on Pharmacoepidemiology and Therapeutic Risk Management. Objective was to determine if NSAID use increases the risk of AMI or sudden cardiac death (SCD) and if the risk is similar among COX-2 selective agents. Study concludes Vioxx use at doses greater than 25 mg increases the risk of AMI and SCD; Vioxx at 25 mg or less had an increased risk compared with celecoxib; and that several other NSAIDs increased the risk of AMI and SCD. Analysis evaluated 8,199 cases from Kaiser Permanente against a control group of 32,796 subjects. Funding provided by FDA. It is worth noting that Vioxx ≤ 25 mg was not statistically significantly different from remote NSAID use.

Table 3. Risk of AMI or SCD with current use of celecoxib, ibuprofen, naproxen, rofecoxib, or other NSAID, or recent use of a nonsteroidal agent.

| NSAID USE | Cases | Controls | Adjusted OR (95% CI) |
|---|---|---|---|
| **Remote use** | **4699** | 19876 | **1.00** |
| **Recent use** | 1728 | 6339 | **1.14** (1.06-1.22) |
| **Current Use** | | | |
| **Celecoxib** | **126** | **497** | **0.86** **(0.69-1.07)** |
| Ibuprofen | 674 | 2606 | **1.09** **(0.99-1.21)** |
| Naproxen | 369 | 1416 | 1.18 **(1.04-1.35)** |
| Rofecoxib ≤ 25 mg | 58 | 190 | **1.29** **(0.93-1.79)** |
| **Rofecoxib > 25 mg** | 10 | 8 | 3.15 (1.14-8.75) |
| Other NSAIDs | 1864 | 535 | 1.16 (1.04-1.30) |

Graham DJ, Campen D, Cheetham C, Hui R, Spence M, Ray WA. Risk of acute cardiac events among patients treated with cyclooxygenase-2 selective and non-selective nonsteroidal anti-inflammatory drugs. Pharmocoepidemiology Drug Safety 2004; 13:S287.

Aug 2004 A retrospective cohort study by **Rahme et al** is presented at the International Conference on Pharmacoepidemiology and Therapeutic Risk Management. Objective was to assess the rates of hospitalizations for acute myocardial infarction (AMI) in an elderly cohort. 52,029 patients were taking non-selective NSAIDs and 71,543 patients were taking rofecoxib, with 14,056.4 and 37,371.0 person-years of exposure, respectively. Based on the regression model, the adjusted hazard ratios of hospitalizations for MI was 1.03 (0.83-1.27) for rofecoxib vs. ibuprofen/diclofenac. Study concludes there was no difference in the rate of hospitalizations for AMI among

Vioxx and the non-selective NSAIDs ibuprofen and diclofenac. Study sponsored by Merck.

Rahme E, Kong SX, Watson DJ, Toubouti Y, LeLorier J. Association between rofecoxib, diclofenac/ibuprofen and hospitalization for acute myocardial infarction. Pharmocoepidemiology Drug Safety 2004; 13:S235.

Aug 2004 A retrospective cohort study by **Shaya et al** is presented at the International Conference on Pharmacoepidemiology and Therapeutic Risk Management. Objective was to examine the cardiovascular risk of COX-2 inhibitors compared to non-specific NSAIDS in a high risk Medicaid population. Analysis evaluated medical and prescription claims for Maryland Medicaid enrollees, COX-2 users numbered 1208 and non-naproxen NSAID users numbered 5274. Study concludes that COX-2 inhibitors did not increase cardiovascular risk over non-naproxen NSAIDs in a high risk population.

Shaya FT, Blume SW, Blanchette CM, Mullins CD, Weir MR. Cardiovascular risk of selective cyclooxygenase-2 inhibitors compared to other nonsteroidal anti-inflammatory agents: an observational study of a Medicaid population. Pharmocoepidemiology Drug Safety 2004; 13:S234.

Oct 2004 Campen presents at the American College of Rheumatology meeting the same data as was presented by Graham in Aug 2004 (see above). The abstract (below) was submitted before the analysis was complete and thus contains no results.

"**Results:** Within an NSAID study base of 1,394,764 patients that included 40,405 exposed to celecoxib, 991,261 to ibuprofen, 435,492 to naproxen and 26,748 to rofecoxib, there were 8,199 acute cardiac events (6,675 hospitalized AMI, 1,524 sudden death). Mean age was 66.8 years and 61.8% were men. After adjustment for multiple cardiovascular risk factors, the estimated relative risk (95% confidence interval) of acute cardiac events with current use of specific NSAIDS were: celecoxib: 0.77 (0.60-0.99) p=0.04; ibuprofen: 1.13 (1.00-1.30) p=0.05; naproxen: 1.11 (0.96-1.30) p=0.17; rofecoxib = 25 mg/d: 1.02 (0.71-1.46) p=0.96; rofecoxib > 25 mg/d: 5.04 (0.94-27.06), p= 0-.06. Statistical power for this last comparison was limited by low levels of usage, with 5 exposed cases and 7 exposed controls. A telephone survey of 830 randomly selected exposed controls showed no difference between COX-2 selective, non-selective (ibuprofen, naproxen) and remote users with respect to low dose aspirin or OTC NSAID use, smoking history or family history of AMI.

"**Conclusion:** Rofecoxib use at doses above 25 mg/d was associated with a 5-fold increased risk of AMI and sudden cardiac death. Naproxen use did not reduce risk while celecoxib use did reduce risk. This latter finding was unanticipated and may be due to chance. Additional study is needed."

Campen DH, Graham D, Cheetham C, Shoor S, Levy G, Hui R, Spence M, Ray WA. Risk of Acute Cardiac Events Among Patients Treated with Cyclooygenase-2 Selective and Non-selective-Nonsteroidal Anti-Inflammatory Drugs. Arthritis & Rheumatism, 2004; 50(9 Suppl): S657

Re-make Figure 2 from Juni, et al., in order to label the comparator treatment group for each individual study and add the Alzheimer's trial data (protocols 078 and 091, combined).

**Data**

Data are from the individual study protocols listed in Table 1. Counts of events were obtained by Maureen Kashuba from the rofecoxib CV pooled-analysis of 2003 by Saurabh Mukhopadhyay and from individual study Clinical Study Reports. Events were counted in this analysis if they were confirmed as a MI by adjudication or, for protocols not subject to adjudication, were investigator reported events that were considered MIs in the rofecoxib 2003 pooled analysis and contributed to the Antiplatet Trialists' Collaboration (APTC) combined endpoint. Based on these definitions, there are several discrepancies between the MRL event data and that summarized by Juni, et al:

- for P029 Ext.Erich(2001), MRL data have 1 more event than Juni, et al.
- for P068 Ext.Schnitzer(1999), MRL data have 1 less event than Juni, et al.
- for P096 Truitt(2001), MRL data have 1 more event than Juni, et al.
- for P097 Ext.Geusens(2002), MRL data have 2 less events than Juni, et al.

This results in a total event count of 63 for MRL and 64 for Juni, et al. Patient years at risk (denominator) data were obtained from the rofecoxib CV pooled-analysis of 2003 by Saurabh Mukhopadhyay and from individual study CSR's as indicated in Table 1. Placebo and non-naproxen NSAID groups were combined for studies that contained both. However, 1 study (096 Truitt 2001) had both placebo and naproxen treatment groups. Data from placebo and naproxen treatment groups were not combined because of naproxen's ability to profoundly inhibit platelet function across the dosing interval and thus its potential to provide a cardioprotective benefit.

**Methods**

Relative risk was calculated as the rate per 100 person years for rofecoxib divided by the comparator rate per 100 person years, instead of crude rates which Juni used. This was done to account for differential discontinuation rates between treatments which we know exist in many of our studies. 0.5 was not added to numbers of events in studies with zero events in one of the treatments since the other treatment group in all such studies had only one or few events and use of 0.5 would materially alter the RR estimate. For example, assuming equal exposure in both treatment groups, if rofecoxib has 1 event and the control group has 0 events, the RR estimate is undefined or infinite. Adding 0.5 to numerator & denominator yields an RR estimate of 3.0. The 95% CI for each RR estimate was derived using the binomial distribution (with symmetric tail probabilities) of the between-treatment group split of the events, scaled for the imbalance in exposure time.

Homogeneity of hazard ratio (HR) across studies was tested using Zelen's exact test. HR and associated 95% CI was calculated for combined groups of studies according to the stratified exact conditional maximum likelihood computation of Martin and Austin (1996) using their program (http://www.sph.emory.edu/~haustin/exactma.html).

**Results**

The RR's computed via the exact binomial method (Table 1, Figure 1) are qualitatively similar to those computed by Juni, et al., except for the following:

- in cases with zero events in one treatment group, as explained in the Methods section
- 097Ext.Truitt(2001), in which the MRL RR is close to 1.0, and that of Juni, et al. is materially greater than 1.0, and

- 097Ext.Geusens(2002), in which the event count data are off by 2.

For the 2nd bullet, the ratio of exposure time is similar to that of numbers of patients, so this difference in denominator is likely not the reason for this discrepancy. It remains unknown.

All non-naproxen-controlled studies have 95% CI's which largely overlap 1.0. Thus, examination of these non-naproxen controlled individual study data, whether via calculations by Juni, et al. or MRL are consistent with similarity of MI risk between rofecoxib and non-naproxen controls. The implication in the Juni publication that data from these studies that were not adjudicated by an external panel are somehow not accurate or have been inappropriately manipulated by MRL is totally false.

Juni et al. used an imprecise test for homogeneity among the individual studies. Implementation of Zelen's Exact test for homogeneity of HR across all the studies in Figure 1 and Table 1 reveal statistically significant heterogeneity (p=0.042); thus, their combining of all studies is inappropriate as described in detail in Merck's response to the Juni et al. publication [http://www.merck.com/statement_2004_1105/lancet.pdf]. Grouping all non-naproxen-controlled studies yielded no statistically significant heterogeneity of HR across studies (p=0.534). The combined HR estimated from the non-naproxen-controlled studies was 1.16 (0.63,2.13), close to 1.0, which is similar to that found in the MRL analyses. Importantly, because the confidence interval crosses 1, the result is not statistically significant.

For the naproxen-controlled studies, the test of homogeneity was still rejected (p=0.043). Visual inspection of the naproxen-controlled studies RR's revealed two distinct groups, one with RR's < 1, the other with RR's > 1:

(1) VIGOR (prot.088) + ADVANTAGE(prot.102) + the Phase III RA 12-week controlled trial (prot.096 Part I) .For this set of trials the test of homogeneity of HR was not rejected (p>0.5), and the HR estimate was 5.22 (95% CI 2.08, 13.12), consistent with a decreased risk associated with naproxen and the result reported by Bombardier, et al.

(2) The Phase IIb/III RA extension trials (068Ext, 096Ext, and 097Ext). For this second set of naproxen-controlled trials, the test of homogeneity was not rejected (p=0.484), and the HR estimate was 0.65 (95% CI 0.20,2.12), consistent with similarity of risk between rofecoxib and naproxen.

Thus, had Juni et al. done more powerful statistical analyses to detect heterogeneity across the trials, they would have come to the same conclusions as Konstam, et al. (2002) and Weir, et al. (2003). Figure 2 of this report displays the individual study results as displayed in Figure 1, but includes the 3 combined estimates of HR cited above.

Although this split of the naproxen studies removes the significant heterogeneity across studies, it does not explain why this heterogeneity occurs. One interpretation of the RA extension trials is that they could be representative of the same pattern of difference displayed in protocols 088, 102, and 096 Part I, but this pattern was not realized because of small numbers of events. Under this interpretation, the combined HR across all naproxen studies was 3.02 (95% CI 1.46, 6.24). Figure 3 displays this combined estimate and that of the non-naproxen-controlled studies, in addition to all the individual study results. Another interpretation is that since the extension-containing trials are a non-randomized subset of patients, i.e., those who elect to continue, they may not represent the same population which was randomized to the respective trials. Rather, the patients sensitive to the CV treatment difference observed in VIGOR may not have elected to enter these extensions. Thus, inclusion of the extension-containing studies could bias the naproxen estimate and only the 3 randomized studies should be

included to estimate the naproxen effect. Other hypotheses could also be entertained. In any event, the reason for the heterogeneity in the naproxen studies cannot be known from these analyses.

Table 2 displays the same information as Table 1, but instead it is broken by the 4 groups of studies for which combined HR estimates were provided.

**References**

Juni P, Nartey L, Richenbach S, Sterchi R, Dieppe PA, Egger M. Risk of cardiovascular events and rofecoxib: cumulative meta-analysis. Published online November 5, 2004 http://image.thelancet.com/extras/04art10237web.pdf.

Martin DO and Austin H. Exact estimates for a rate ratio. Epidemiology 1996;7:29-33.

Zelen M. The analysis of several 2 x 2 contingency tables. Biometrika 1971;58:129-137.

**Table 1 – MI's, Exposure, and RR's for studies in Juni, et al. (2004)**

| study | rofe #events | rofe pat.yrs | | control #events | control pat.yrs | | relative risk | lower 95%CL | upper 95%CL | control |
|---|---|---|---|---|---|---|---|---|---|---|
| a:029Erich(2001) | 1 | 46 | | 0 | 16 | | .* | 0.01 | .* | placebo |
| b:029Ext.Ehrich(2001) | 1 | 196 | a | 1 | 45 | a | 0.23 | 0.04 | 18.90 | diclofenac |
| c:035Cannon(2000) | 2 | 645 | | 1 | 315 | | 0.98 | 0.20 | 60.56 | diclofenac |
| d:040Day(2000) | 1 | 72 | | 0 | 48 | | . | 0.02 | . | placebo+ibuprofen |
| e:045Hawkey(2000) | 0 | 157 | | 2 | 125 | | 0.00 | 0.00 | 4.24 | placebo+ibuprofen |
| f:058Truitt(2001) | 1 | 21 | | 0 | 23 | b | . | 0.03 | . | placebo+nabumetone |
| g:034Saag(2000) | 2 | 635 | | 1 | 309 | | 0.97 | 0.20 | 60.34 | diclofenac |
| h:085Kivitz(2004) | 1 | 61 | | 0 | 28 | | . | 0.01 | . | placebo |
| i:068Ext.Schnitzer(1999) | 1 | 788 | | 1 | 132 | | 0.17 | 0.03 | 13.79 | naproxen |
| j:088Bombardier(2000) | 20 | 2807 | | 4 | 2809 | | 5.00 | 2.09 | 20.29 | naproxen |
| k:090Geba(2001) | 3 | 56 | | 1 | 57 | | 3.05 | 0.67 | 168.63 | nabumetone |
| l:096Truitt(2001) | 3 | 97 | | 0 | 34 | c | . | 0.14 | . | naproxen |
| m:096Truitt(2001) | 3 | 97 | | 0 | 58 | | . | 0.25 | . | placebo |
| n:102Lisse(2003) | 5 | 640 | | 1 | 629 | | 4.91 | 1.15 | 244.72 | naproxen |
| o:096Ext.Truitt(2001) | 4 | 864 | d | 2 | 408 | d | 0.94 | 0.26 | 10.51 | naproxen |
| p:097Ext.Geusens(2002 | 2 | 995 | | 1 | 361 | | 0.73 | 0.15 | 44.99 | naproxen |
| q:120+121Katz(2003) | 1 | 51 | | 0 | 25 | | . | 0.01 | . | placebo |
| r:078+091Alzheimers | 9 | 1661 | | 12 | 1930 | | 0.87 | 0.40 | 2.26 | placebo |
| s:non-naproxen combined | 25 | 2561 | | 18 | 2979 | | 1.16 | 0.63 | 2.13 | non-naproxen |
| t:naproxen combined | 35 | 6191 | | 9 | 4373 | | 3.02 | 1.46 | 6.24 | naproxen |
| u:088+102+096Truitt(2001) | 28 | 3544 | | 5 | 3472 | | 5.22 | 2.08 | 13.12 | naproxen |
| v:068+096+097 Ext. | 7 | 2647 | | 4 | 901 | | 0.65 | 0.20 | 2.12 | naproxen |

**NOTES:**

- Pat.yrs extracted from 2003 CV meta-analysis report, except as indicated by a, b, c, d:
  a- from the 029-10 CSR
  b- from the 058 base study CSR
  c- from the 096 base study CSR
  d- from the 096 Part II and Extension CSR's
- dots ('.') indicate that the value is undefined (infinite); for these cases the confidence limit is one-sided, 97.5% for consistency with each tail of the two-sided 95% CI's
- for 045Hawkey(2000) the Relative Risk estimate is 0 and the confidence limit is one-sided 97.5% for consistency with each tail of the two-sided 95% CI's

Submitted Oct 2004

Valentgas et al submitted a paper to JAMA describing retrospective cohort study of acute coronary events (MI or acute coronary syndrome) among 424,584 health plan enrollees ages 40-64 who used NANSAIDS by prescription from 1999-2001. Objective to estimate rates of acute coronary syndrome (ACS) in relation to use of the COX-2 inhibitor medications, rofecoxib and celecoxib, and other NANSAID drugs, naproxen, diclofenac, and ibuprofen. Compared with ibuprofen or diclofenac a combined referent group of use, the relative risk (RR) of confirmed ACS during periods of current rofecoxib use was 1.35 (95% CI 1.09-1.68). For current use of celecoxib, the RR was 1.03 (95% CI 0.83 – 1.27). There was no trend with time since onset of use, though risks in the first 30 days of rofecoxib and celecoxib were modestly elevated. There was no increased risk with higher daily doses of rofecoxib or celecoxib compared with all doses of ibuprofen or diclofenac combined. The authors concluded that the incidence of confirmed MI/ACS was greater during rofecoxib use than use of ibuprofen or diclofenac. The increased risk with rofecoxib was not clearly related to timing or dose.

The manuscript has been submitted for publication but not presented so the results are not in the public domain. The study was funded by Merck and the manuscript has Merck authors.

Velentgas P, West W, Cannuscio CC, Watson DJ, Walker AM. Cardiovascular Risk of Selective Cyclooxygenase-2 Inhibitors and Other Non-aspirin Non-steroidal Anti-inflammatory Medications. Submitted to JAMA Oct. 2004.

Nov. 2004

A paper by Juni, et al, was published in *Lancet* on November 5, 2004 after the announcement of the results of the APPROVe trial. The paper cites many but not all of the clinical trials in which VIOXX was compared to some control for efficacy and safety. From the studies cited in *Lancet*, the authors plot the relative risk of myocardial infarction vs. the cumulative patients studied and the year such data was available. Figure 2. It is noteworthy that this article compares relative risk for myocardial infarctions for VIOXX vs. a <u>control agent</u>. The study omitted the published data on Alzheimer's patients in which VIOXX was compared to a placebo control.

**Re-analysis of by-study MI's per Juni, et al. (2004)**

**<u>Background</u>**

Juni, et al. did a meta-analysis of MI relative risk (RR) for rofecoxib versus a combined comparator group including placebo, non-naproxen NSAIDs, and naproxen. Their Figure 2 shows individual study RR estimates with associated 95% confidence intervals (CI's). It is inferred from their text that (1) their individual study RR's are based on crude rates (i.e., counts of events (numerators) and numbers of patients (denominators)) rather than the typical RR's based on exposure time, (2) they added 0.5 to numerator counts for both treatments for studies in which one of the treatments had zero events to obtain finite variance for the individual study RR's, (3) they combined placebo and NSAID data for each study's RR estimate, and (4) they did not include any Alzheimer's trial data. Their Figure 2 did not identify the comparator group for each study.

**<u>Objective</u>**

Figure I – Relative Risk and 95% Confidence Intervals for MI from individual studies in Juni, et al. (2004)

NOTES:

- x-axis is on log scale
- size of point estimates (triangles) is proportional to total treatment exposure. It is worth noting the size of the triangle in 090 which shows the lowest patient exposure of any trial. This study has been singled out in press reports as the study which should have indicated that Vioxx caused cardiovascular risk. Studies such as 035, 034, 029 or 045 have never been cited by MRL to claim cardioprotection by Vioxx.
- left-pointing arrow indicates 0 events on rofecoxib; thus, point estimate is 0, lower confidence limit is not defined, and upper confidence limit is one-sided 97.5% in order to be consistent with two-sided 95% CI's for studies with finite confidence limits
- right pointing arrows indicate 0 events on comparator; thus, point estimate is undefined (infinite), upper confidence limit is not defined, and lower confidence limit is one-sided 97.5% in order to be consistent with two-sided 95% CI's for studies with finite confidence limits

Figure 2 – RR and 95% CI's for MI from individual studies in Juni, et al. (2004) plus 3 combined-studies estimates

NOTES:

- x-axis is on log scale
- size of point estimates (triangles) is proportional to total treatment exposure
- left-pointing arrow indicates 0 events on rofecoxib; thus, point estimate is 0, lower confidence limit is not defined, and upper confidence limit is one-sided 97.5% in order to be consistent with two-sided 95% CI's for studies with finite confidence limits
- right pointing arrows indicate 0 events on comparator; thus, point estimate is undefined (infinite), upper confidence limit is not defined, and lower confidence limit is one-sided 97.5% in order to be consistent with two-sided 95% CI's for studies with finite confidence limits

Figure 3 – RR and 95% CI's for MI from individual studies in Juni, et al. (2004) plus 2 combined-studies estimates (all non-naproxen-controlled studies combined and all naproxen-controlled studies combined)

NOTES:

- x-axis is on log scale
- size of point estimates (triangles) is proportional to total treatment exposure
- left-pointing arrow indicates 0 events on rofecoxib; thus, point estimate is 0, lower confidence limit is not defined, and upper confidence limit is one-sided 97.5% in order to be consistent with two-sided 95% CI's for studies with finite confidence limits

right pointing arrows indicate 0 events on comparator; thus, point estimate is undefined (infinite), upper confidence limit is not defined, and lower confidence limit is one-sided 97.5% in order to be consistent with two-sided 95% CI's for studies with finite confidence limits

**Table 2 – MI's, Exposure, and RR's for studies in Juni, et al. (2004), split by comparator group**

| study<br>control | rofe #events | rofe pat.yrs | control #events | control pat.yrs | relative risk | lower 95%CL | upper 95%CL |
|---|---|---|---|---|---|---|---|
| non-naproxen controlled studies | | | | | | | |
| a:029Erich(2001)<br>placebo | 1 | 46 | 0 | 16 | .* | 0.01 | .* |
| b:029Ext.Ehrich(2001)<br>diclofenac | 1 | 196 a | 1 | 45 a | 0.23 | 0.04 | 18.90 |
| c:035Cannon(2000)<br>diclofenac | 2 | 645 | 1 | 315 | 0.98 | 0.20 | 60.56 |
| d:040Day(2000)<br>placebo+ibuprofen | 1 | 72 | 0 | 48 | . | 0.02 | . |
| e:045Hawkey(2000)<br>placebo+ibuprofen | 0 | 157 | 2 | 125 | 0.00 | 0.00 | 4.24 |
| f:058Truitt(2001)<br>placebo+nabumetone | 1 | 21 | 0 | 23 b | . | 0.03 | . |
| g:034Saag(2000)<br>diclofenac | 2 | 635 | 1 | 309 | 0.97 | 0.20 | 60.34 |
| h:085Kivitz(2004)<br>placebo | 1 | 61 | 0 | 28 | . | 0.01 | . |
| k:090Geba(2001)<br>nabumetone | 3 | 56 | 1 | 57 | 3.05 | 0.67 | 168.63 |
| m:096Truitt(2001)<br>placebo | 3 | 97 | 0 | 58 | . | 0.25 | . |
| q:120+121Katz(2003)<br>placebo | 1 | 51 | 0 | 25 | . | 0.01 | . |
| r:078+091Alzheimers<br>placebo | 9 | 1661 | 12 | 1930 | 0.87 | 0.40 | 2.26 |
| s:non-naproxen combined<br>non-naproxen | 25 | 2561 | 18 | 2979 | 1.16 | 0.63 | 2.13 |
| naproxen-controlled studies | | | | | | | |
| i:068Ext.Schnitzer(1999)<br>naproxen | 1 | 788 | 1 | 132 | 0.17 | 0.03 | 13.79 |
| j:088Bombardier(2000)<br>naproxen | 20 | 2807 | 4 | 2809 | 5.00 | 2.09 | 20.29 |
| l:096Truitt(2001)<br>naproxen | 3 | 97 | 0 | 34 c | . | 0.14 | . |
| n:102Lisse(2003)<br>naproxen | 5 | 640 | 1 | 629 | 4.91 | 1.15 | 244.72 |
| o:096Ext.Truitt(2001)<br>naproxen | 4 | 864 d | 2 | 408 d | 0.94 | 0.26 | 10.51 |
| p:097Ext.Geusens(2002<br>naproxen | 2 | 995 | 1 | 361 | 0.73 | 0.15 | 44.99 |
| t:naproxen combined<br>naproxen | 35 | 6191 | 9 | 4373 | 3.02 | 1.46 | 6.24 |

**Table 2 (cont.) – MI's, Exposure, and RR's for studies in Juni, et al. (2004), split by comparator group**

| study control | rofe #events | rofe pat.yrs | control #events | control pat.yrs | relative risk | lower 95%CL | upper 95%CL |
|---|---|---|---|---|---|---|---|
| Group (1) of naproxen-controlled studies | | | | | | | |
| j:088Bombardier(2000) naproxen | 20 | 2807 | 4 | 2809 | 5.00 | 2.09 | 20.29 |
| l:096Truitt(2001) naproxen | 3 | 97 | 0 | 34 c | . | 0.14 | . |
| n:102Lisse(2003) naproxen | 5 | 640 | 1 | 629 | 4.91 | 1.15 | 244.72 |
| u:088+102+096Truitt(2001) naproxen | 28 | 3544 | 5 | 3472 | 5.22 | 2.08 | 13.12 |
| Group (2) of naproxen-controlled studies | | | | | | | |
| i:068Ext.Schnitzer(1999) naproxen | 1 | 788 | 1 | 132 | 0.17 | 0.03 | 13.79 |
| o:096Ext.Truitt(2001) naproxen | 4 | 864 d | 2 | 408 d | 0.94 | 0.26 | 10.51 |
| p:097Ext.Geusens(2002 naproxen | 2 | 995 | 1 | 361 | 0.73 | 0.15 | 44.99 |
| v:068+096+097 Ext. naproxen | 7 | 2647 | 4 | 901 | 0.65 | 0.20 | 2.12 |

The statistical analyses that have been performed on this section of the document were performed by James Bolognese of MRL in consultation with Dr. Scott Zeger, Chairman of the Department of Biostatistics at Johns Hopkins University.

**Summary:**

Nine retrospective analyses of NSAID and VIOXX use performed after March 2000 until October 2004 in over 500,000 patients did not detect enhanced cardiovascular event rates in patients using Rofecoxib at dosages indicated for chronic use, 12.5 mg or 25 mg compared to other traditional NSAIDs. Some studies showed risk reduction for users of naproxen and some did not. It is difficult to determine the degree of rigorous compliance to daily twice a day dosing of naproxen at 500 mg doses in such studies. Since naproxen is not an irreversible inhibitor of platelet COX-1 (as noted above) vigorous full compliance would be necessary to expect a cardioprotective effect.

It is also noteworthy that the article in *Lancet*, November 2004, compares relative risk for myocardial infarctions of VIOXX vs. a control agent. The study omitted the published Alzheimer's patients where VIOXX was compared to a placebo control. As noted in Figure recalculated by MRL, the increased relative risk of MI for VIOXX vs. control is due to the

studies in which VIOXX was compared to naproxen as noted previously by MRL scientists. Although it is possible to deduce this from the article as originally published in *Lancet*, it is not easy to do so. The new figure included above shows this conclusion more clearly. A letter written by the Swedish Regulatory Agency draws the same conclusion: "[T]here was before the APPROVe trial no controlled data which indicated that rofecoxib would be different from placebo with regard to the risk for myocardial infarction and there was no basis to at an earlier time point withdraw VIOXX from the market." MRL did not solicit the letter.

**Retrospective Studies of 50 mg dose and VIOXX label**

The Ray article, Lancet, 360, 1071-1073, 2002, the Solomon article, Circulation, May 4, 2002, 2068-2073, the Campen abstract in Arthritis and Rheumatism, Aug and Oct 2004, and the Graham analysis, August 2004, Table 3, all point out an elevated risk of cv events at dosages >25mg/day, above the maximum indicated dosage of 12.5-25 mg for chronic use. Merck's label indicating proper dosage of VIOXX in 2000 and 2002 is noted below. Also noted is the effect of 50 mg on blood pressure, salt and water retention in the label.

**2000 Label**

**PRECAUTIONS**

* * *

*Renal Effects*

Clinical trials with VIOXX at daily doses of 12.5 and 25 mg have shown renal effects(e.g., hypertension, edema) similar to those observed with comparator NSAIDs; these occurred with an increased frequency with chronic use of doses above the 12.5 to 25 mg range. (see ADVERSE REACTIONS)

* * *

*Fluid Retention and Edema*

Fluid retention and edema have been observed in some patients taking VIOXX (see ADVERSE REACTIONS). VIOXX should be used with caution, and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension, or heart failure.

* * *

**DOSAGE AND ADMINISTRATION**

**Osteoarthritis**

The recommended starting dose of VIOXX is 12.5 mg once daily. Some patients receive additional benefit by increasing the dose to 25 mg once daily. The maximum recommended daily dose is 25 mg.

**Management of Acute Pain and Treatment of Primary Dysmenorrhea**

The recommended dose of VIOXX is 50 mg once daily. Subsequent doses should be 50 mg once daily as needed. Use of Vioxx for more than 5 days is management of pain has not been studied.

**April 2002 Label**

**PRECAUTIONS**

* * *

*Fluid Retention, Edema, and Hypertension*

Fluid retention, edema, and hypertension have been reported in some patients taking VIOXX. In clinical trials of VIOXX at daily doses of 25 mg in patients with rheumatoid arthritis the incidence of hypertension was twice as high in patients treated with VIOXX as compared to patients treated with naproxen 1000 mg daily. Clinical trials with VIOXX at daily doses of 12.5 and 25 mg in patients with osteoarthritis have shown effects on hypertension and edema similar to those observed with comparator NSAIDs; these occurred with an increased frequency with chronic use of VIOXX at daily doses of 50 mg. (See ADVERSE REACTIONS.) VIOXX should be used with caution, and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension, or heart failure.

DOSAGE AND ADMINISTRATION

**Osteoarthritis**

The recommended starting dose of VIOXX is 12.5 mg once daily. Some patients receive additional benefit by increasing the dose to 25 mg once daily. The maximum recommended daily dose is 25 mg.

**Rheumatoid Arthritis**

The recommended dose is 25 mg once daily. The maximum recommended daily dose is 25 mg.

**Management of Acute Pain and Treatment of Primary Dysmenorrhea**

The recommended dose of VIOXX is 50 mg once daily. The maximum recommended daily dose is 50 mg. Use of Vioxx for more than 5 days is

management of pain has not been studied. Chronic use of VIOXX 50 mg daily is not recommended. (See ADVERSE Reactions, Clinical Studies in OA and RA with VIOXX 50 mg).

As noted above, two articles in 2002 and two articles in 2004 noted increased CV or congestive heart failure risk associated with chronic use of doses of VIOXX greater than 25 mg. Presumably this involved use of 50 mg or possibly even higher doses. The FDA approved label for VIOXX has clearly stated that the maximum indicated dose for chronic use was 25 mg and that the starting dose was 12.5 mg per day. The label has disclosed that use of 50 mg for times longer than five days (acute pain indication) in controlled clinical trials was associated with increased incidence of fluid retention, edema, and increased blood pressure as noted above.

**The APPROVe Trial**

APPROVe was a multi-center, randomized, placebo-controlled, double-blind study to determine the effect of 156 weeks (3 years) of treatment with rofecoxib on the recurrence of adenomatous polyps of the large bowel in patients with a history of colorectal adenomas. The study included approximately 2586 patients aged 40-96; approximately 62% male. Aspirin was allowed in the study.

No difference in results from the APPROVe trial was detectable for the first 18 months of continuous use of VIOXX 25 mg in the trial with regard to risk of cardiovascular thrombotic events. It was only after a much longer period of consecutive months of VIOXX 25 mg versus placebo that the risk for cardiovascular thrombotic events was elevated in the VIOXX arm, slightly less than twofold. The cardiovascular event rate began to diverge between the VIOXX and placebo arms after 18 months of continuous treatment, and the data finally became statistically significant after this much longer period of months. The event rate diverged similarly in patients taking low-dose ASA and in patients not taking ASA. It is important to emphasize that the ESMB (External Safety Monitoring Board) that followed the results had totally independent authority to halt the trial at any point. They chose to stop the trial when the results first became statistically significant. It is also important to emphasize that the fact that the CV event rate did not begin to diverge from the placebo arm until after 18 months is

consistent with the earlier Alzheimer's data and our conclusions from the VIGOR study (which lasted only approximately one year) that VIOXX was not prothrombotic. The meaning of the APPROVe data is also confounded by the fact that the CV event rate in the placebo arm turns relatively flat after 18 months, an unusual and unexplained course, which indicates very few CV events in the placebo arm after 18 months. Thus, it is not clear to me from the data available to me what the explanation is for the divergence in curves after 18 months.

W

# CAPITAL REGION ORTHOPAEDIC GROUP

1367 Washington Ave. • Suite 200 • Albany, New York 12206
(518) 489-2666 • Fax (518) 489-5933/2080

Richard H. Alfred, M.D.
R. Maxwell Alley, M.D.
Allen Carl, M.D.
Robert A. Cheney, M.D.
John Czajka, M.D.
Shankar P. Das, M.D.
Bruce Dick, M.D.
John DiPreta, M.D.
Marc D. Fuchs, M.D.
Robert J. Hedderman, M.D.
Paul P. Hospodar, M.D.
Jeffrey Lozman, M.D.
Brian O'M. Quinn, M.D.
David E. Quinn, M.D.
James M. Schneider, M.D.
James E. Striker, M.D.
Richard L. Uhl, M.D.
Richard R. Whipple, M.D.

*General Orthopaedic Surgery*
*Arthroscopy*
*Foot and Ankle Surgery*
*Hand Surgery/ Microsurgery*
*Pediatric Orthopaedics*
*Reconstructive Surgery*
*Scoliosis*
*Spine Surgery*
*Sportsmedicine*
*Total Joint Replacement*
*Trauma and Fracture Care*

October 18, 2002

Dept. of Rheumatology

RE: HARRISON, DENNIS

To Whom It May Concern:

I would like you to see Dennis Harrison. He is a fellow with a history of ankylosing spondylitis. While he is here in the area and planning for undergoing surgical management, I would appreciate it if you could look at him to make sure that there aren't any other issues that we need to address around the time for his surgical management.

Thank you in advance for your help.

Sincerely yours,

Allen Carl, M.D., F.A.C.S.
AC/lg

*Catskill Center:*
*Greene Medical Arts Building*
*159 Jefferson Heights*
*Catskill, NY 12414*
*(518) 943-0667*

*Clifton Park Center:*
*Shenendehowa Medical Park*
*989 Route 146, Building 200*
*Clifton Park, NY 12065*
*(518) 383-0617*



AA

J Spinal Disord. 1998 Dec;11(6):459-64.

# Posterolateral fusion for isthmic spondylolisthesis in adults: analysis of fusion rate and clinical results.

Deguchi M, Rapoff AJ, Zdeblick TA.

**Source**

Division of Orthopedic Surgery, University of Wisconsin, Madison, USA.

## Abstract

This is a retrospective study of 83 consecutive adult patients with isthmic spondylolisthesis who underwent identical decompressive surgery combined with posterolateral spine fusion. We sought to determine factors that affect the fusion rate and clinical outcomes for adult patients with isthmic spondylolisthesis. The outcome of operative treatment for isthmic spondylolisthesis in adults has been poorly documented, as opposed to the treatment of children and adolescents. From 1989 to 1994, 83 consecutive adult patients (age 19-66 years; average, 38 years) underwent surgical treatment consisting of the Gill procedure and posterolateral fusion for isthmic lumbosacral spondylolisthesis. Seventy-three patients (46 men and 27 women) were available for an average of 3.8 years' follow-up (1.0-7.4 years). Thirty-eight underwent one-level fusion, and 35 underwent two-level fusions. Pedicle screw instrumentation was performed in 69 patients. A postoperative questionnaire including the Roland index, clinical charts, and radiographs were reviewed by an independent observer to assess the postoperative course, clinical results, and fusion status. Twenty-five variables were evaluated to determine which affected the fusion and success rates. Primary radiologic fusion and clinical success rates were 78 and 71%, respectively. There was a strong positive correlation between radiologic fusion and clinical success. Overall, single-level fusions showed an 82% fusion rate, and two-level fusions, a 74% rate. For two-level fusions, a significantly higher fusion rate was achieved with a rigid pedicle screw-fixation system than a semirigid system


EXHIBIT
AA

(79 vs. 57%). For smokers, cessation from smoking postoperatively did not increase the fusion rate, and patients who continued to smoke after surgery showed a significantly higher rate of pseudarthrosis. Worker's compensation status did not affect clinical results significantly. Patients who continued to take nonsteroidal antiinflammatory drugs (NSAIDs) >3 months postoperatively showed significantly lower fusion and success rates (44 and 37%). Single-level lumbar fusion for isthmic spondylolisthesis was equally effective with either rigid or semirigid pedicle screw instrumentation. For multilevel spine fusion in isthmic spondylolisthesis, rigid pedicle screw-fixation systems resulted in a high fusion rate. A smoking history or NSAIDs use postoperatively had strong negative influences on the fusion and clinical success rates.

PMID:

9884288

[PubMed - indexed for MEDLINE]

## Related citations in PubMed

- Transpedicular fixation for the treatment of isthmic spondylolisthesis in adults.[Spine (Phila Pa 1976). 1995]
- Comparison of allograft to autograft in multilevel anterior cervical discectomy and fusion with rigid plate fixation.[Spine J. 2003]
- Instrumented slip reduction and fusion for painful unstable isthmic spondylolisthesis in adults.[J Spinal Disord Tech. 2008]
- [redacted] Adult spondylolisthesis treated with posterolateral lumbar fusion and pedicular instrumentation with AO DC plates.[J Spinal Disord. 1997]
- [redacted] [Surgical treatment of spondylolisthesis with mild displacement by pedicular fixation and posterolateral fusion in adults].[Rev Chir Orthop Reparatrice Appar Mot. 1992...]

See reviews... See all...

## Cited by 7 PubMed Central articles

- Soft tissue injections in the athlete.[Sports Health. 2009]
- Minimum 10-Year Follow-up Study of Anterior Lumbar Interbody Fusion for Degenerative Spondylolisthesis: Progressive Pattern of the Adjacent Disc Degeneration.[Asian Spine J. 2012]

- [redacted] Do nonsteroidal anti-inflammatory drugs affect bone healing? A critical analysis.[ScientificWorldJournal. 2012]

See all...

## Related information

- Related Citations
- MedGen
- Cited in PMC
- Cited in Books

## Recent Activity

ClearTurn Off

- Posterolateral fusion for isthmic spondylolisthesis in adults: analysis of fusio...

  PubMed

- Results after anterior–posterior lumbar spinal fusion: 2–5 years follow-up

  PMC

- The usefulness of serum amyloid A as a postoperative inflammatory marker after p...

  PubMed

See more...

You are here: NCBI > Literature > PubMed

USA.gov

Copyright | Disclaimer | Privacy | Browsers | Accessibility | Contact
National Center for Biotechnology Information, U.S. National Library of Medicine8600 Rockville Pike, Bethesda MD, 20894 USA

BB

Orthopedics. 2005 Mar;28(3):299-303; quiz 304-5.

# The effect of nonsteroidal anti-inflammatory agents on spinal fusion.

Thaller J, Walker M, Kline AJ, Anderson DG.

**Source**

University of Virginia School of Medicine, Charlottesville, Va. 22908, USA.

**Abstract**

A large body of information suggests NSAIDS have a negative impact on the healing of bone. Although each clinical healing scenario presents a slightly different level of challenge, the healing of a posterolateral spinal fusion is one of the most difficult challenges in bony healing. Clinically, this results in a relatively high rate of nonunions using traditional fusion techniques. Spinal fusion models have confirmed NSAIDS have a definite inhibitory effect on healing of the fusion. Although data are limited, it appears this effect is most severe when NSAIDS are administered in the early postoperative period. Moreover, the effect may be worse with certain types initial inflammatory, subsequent reparative, and final remodeling phases. Because of the anti-inflammatory activity of NSAIDS, one might assume their effects would be worse when administered in the inflammatory phase. Indeed, the study by Riew et al suggests the inhibitory effects are more significant when NSAIDS are administered earlier following fusion. Other studies conducted with non-spinal models also suggest early administration of NSAIDS results in greater inhibition of bone formation (Goodman et al). Unfortunately, the length of the inflammatory phase in humans is not well known. This leaves the clinician unsure about the safe time to allow resumption of NSAID usage clinically. It appears likely NSAID use following a spinal fusion procedure will increase the rate of pseudarthrosis. The literature suggests that avoidance of NSAIDS in the postoperative period may avoid nonunion. Additionally, we propose that chronic NSAID usage should be addressed in a similar manner to cigarette smoking. While neither are absolute contraindications to elective spinal fusion, patients should be counseled to discontinue the use of NSAIDS in the peri- and postoperative period to maximize their chance for a successful fusion.

EXHIBIT

BB

Essentials in Total Hip Arthroplasty

Orthopedics

ORTHOPEDICS

REVIEW ARTICLE

# The Effect of Nonsteroidal Anti-Inflammatory Agents on Spinal Fusion

Matthew Walker, BS; John Thaller, MD; Alex J. Kline, BS; D. Greg Anderson, MD

**Orthopedics**
**March 2005 · Volume 28 · Issue 3**

Article Get Citation

Spinal arthrodesis has become an increasingly common procedure in the United States, with more than 185,000 such cases performed each year.[1] Despite the generally beneficial results of spinal arthrodesis, a significant number of cases fail to achieve the desired outcome. Often this is the result of poor patient selection or the presence of a surgical complication.

Among the various surgical complications, nonunion or pseudarthrosis is one of the most difficult to overcome. Pseudarthrosis occurs in 5% to 35% of single-level fusions and may be the source of continued spinal symptoms requiring revision surgery.[2-6] The nonunion rates for multilevel procedures are even higher.[7,8] Although the use of internal fixation has decreased the rate of pseudarthrosis for some procedures, this complication has not been eradicated.

Many factors are believed to contribute to pseudarthrosis, including host factors such as advanced age, chronic disease, and tobacco usage, and technical factors such as the type, quality, and quantity of bone graft used to perform the fusion. Other factors such as the mechanical stability of the fusion site and the use of postoperative medications, including corticosteroids and nonsteroidal anti-inflammatory drugs (NSAIDS), can play a role in this vexing process. While some aspects are uncontrollable, any factors contributing to pseudarthrosis can be altered to diminish the risk of fusion failure.

Continuing the use of some medications such as corticosteroids for severe asthma is necessary in the postoperative period following spinal fusion despite a potential detrimental effect on the healing of the fusion. Likewise, NSAIDS may be useful for patients with debilitating symptoms of osteoarthritis, which can limit postoperative rehabilitation and diminish the quality of life.

Nonsteroidal anti-inflammatory drugs are an effective non-narcotic analgesic and can be useful in controlling postoperative pain. In some cases, patients may experience an "arthritic flair" postoperatively when chronic NSAID therapy is withdrawn. Therefore, it is reasonable to consider the risk:benefit ratio with regard to NSAID therapy in selected patients following spinal fusion.

This article reviews the literature relating to the effects of NSAIDS on spinal fusion. With a better understanding of the physiologic effects of NSAIDS, surgeons will be better armed to make decisions about when NSAIDS are appropriate in the postoperative period following spinal arthrodesis.

## Basic Science

The primary effect of NSAIDS is to inhibit the enzyme cyclo-oxygenase (COX), which is active in the process of forming prostaglandins, leukotrienes, and thromboxanes from their precursor, arachidonic acid (Figure). There are two distinct isoforms of the COX enzyme: COX-1 is ubiquitous and found in nearly every tissue in the body, notably in the stomach, small intestine, and platelets,

while COX-2 is restricted to certain tissues including bones and joints.

**Figure:** Diagram shows the process of forming prostaglandins, leukotrienes, and thromboxanes from their precursor, arachidonic acid.

Cyclo-oxygenase-1 is a regulatory "housekeeping" enzyme involved in homeostasis, while COX-2 is inducible, increasing more than 20-fold in macrophages, monocytes, synoviocytes, chondrocytes, and osteoblasts when stimulated by an inflammatory stimuli such as interleukin-1, tumor necrosis factor, or platelet-derived growth factor.[9-13] Both COX isoenzymes are inhibited by traditional NSAIDS. However, because the musculoskeletal inflammatory effects are mostly attributable to the action of COX-2, selective inhibitors of this enzyme have been developed in an effort to avoid the negative side effects (such as gastric breakdown) linked to COX-1 inhibition.

Due in large part to the potential decrease in unwanted side effects from COX-1 inhibition, COX-2 selective inhibitors have rapidly become popular for musculoskeletal conditions. It is, however, important to note that none of the commercially available COX-2 inhibitors are purely selective for the COX-2 isoenzyme. In addition, the biologic activity of the COX system is more complicated than simply interpreting the effects of COX-2 inhibition as favorable and COX-1 inhibition as unfavorable.

The role of COX enzymes in bone metabolism is interesting as prostaglandins play an essential role in the processes of both bone formation and resorption. A number of factors can act on osteoblasts and osteoclasts including hormones, cytokines, prostaglandins, and mechanical factors.[14] The major prostaglandins involved in bone metabolism are prostaglandin $E_1$ and prostaglandin $E_2$.[15-19] Because these molecules are involved in both the formation and resorption of bone, the net bone gain or loss depends on the environment and the type of bone on which the prostaglandins act.

The effects of prostaglandins in bone were recognized in an early review by Norrdin et al[19] who noted prostaglandins were potent mediators of bone resorption at sites of inflammation. Others have shown bone resorption at sites of inflammation can be inhibited by the administration of an NSAID.[20-22] In cell cultures, prostaglandins lead to the inhibition of osteoclastic activity.[15,20] Nonsteroidal anti-inflammatory drugs inhibit bone formation clinically and are used by hip surgeons to diminish heterotopic ossification.[23]

Infants exposed to infusions of prostaglandin $E_1$ to maintain patency of the ductus arteriosus are known to undergo accelerated periosteal long bone formation for approximately 4 weeks following treatment.[24-26] Prostaglandins also have been implicated in bone formation during myositis ossificans and osteoid osteoma.[27-29] Prostaglandin $E_2$ appears to play a key role in the adaptive response of bone to stress.[30-33]

In a study of weanling rats, the administration of NSAIDS resulted in increased metaphyseal bone and decreased numbers of osteoclasts.[34] Nonsteroidal anti-inflammatory drugs also have been used to block the resorption of bone by osteoclast and prevent disuse osteopenia.[35,36] However, when combined with estradiol, NSAIDS may lead to reduced cancellous bone volume.[37] Work in animal models confirms NSAIDS have a significant detrimental effect on the healing of fractures and osteotomies.[38-48]

These studies serve to underscore the complex effects of NSAIDS and prostaglandins in bone metabolism. In addition, it appears likely NSAIDS act via mechanisms in addition to cyclo-oxygenase inhibition. For instance, Ho et al[15] found both prostaglandins and NSAIDS had similar inhibitory effects on osteoblasts in culture, suggesting the NSAIDS were acting via a prostaglandin-independent

mechanism. Others have suggested NSAIDS can affect the cell cycle, thus inhibiting cell proliferation via a pathway independent of prostaglandins.[17]

**Table**

Traditional Nonselective COX and Selective COX-2 Inhibitors

| **Traditional Nonselective COX Inhibitors** | **Selective COX-2 Inhibitors** |
|---|---|
| Salicylic acid derivatives | Diaryl-substituted furanones |
| Aspirin | Rofecoxib |
| Sodium salicylate | Diaryl-substituted pyrazoles |
| Salsalate | Celecoxib |
| Diflunisal | Indoleacetic acids |
| Sulfasalazine | Etodolac |
| Olsalazine | Sulfonanilides |
| Indoleacetic and indene acetic acids | Nimesulide |
| Indomethacin | |
| Sulindac | |
| Heteroaryl acetic acids | |
| Tolmetin | |
| Diclofenac | |
| Ketorolac | |
| Arylpropionic acids | |
| Ibuprofen | |
| Naproxen | |
| Flurbiprofen | |
| Ketoprofen | |
| Fenoprofen | |
| Oxaprozin | |
| Anthranilic acids (fenamates) | |
| Mefenamic acid | |
| Meclofenamic acid | |
| Enolic acids | |
| Oxicams (piroxicam, meloxicam) | |
| Alkanones | |
| vNabumetone | |

*Abbreviation: COX=cyclo-oxygenase*

## Spinal Fusion in the Animal Model

The model used to study spinal fusion is important to consider when evaluating the results of animal studies. In general, the more challenging healing environments involve the posterolateral spine (intertransverse fusion) as opposed to the interbody space. The stability of the construct is also important to consider with uninstrumented fusions presenting a more difficult healing challenge. Finally, there are significant species differences in the healing of spinal fusions, with higher animals, particularly primates, representing the greatest healing challenge. To be a valid model for the challenging biologic environment in humans, an appropriate animal model should demonstrate a significant rate of pseudarthrosis when subjected to an uninstrumented intertransverse fusions.[49-52]

Lebwohl et al[53] presented an early study using orally-administered ibuprofen in a rabbit fusion model. While their data failed to reach statistical significance, a trend toward increased nonunion was observed.

Dimar et al[54] used a rat model to investigate the effects of orally administered indomethacin on spinal fusion. The animals received indomethacin 1 week preoperatively and 12 weeks postoperatively. Using manual palpation, the rate of nonunion was 90% in the NSAID group compared to 55% for the control group (P<.001), qualitative="" histology="" demonstrated="" significant="" resorption="" of="" bone="" graft="" in="" the="" indomethacin="" group="" in="" contrast="" to="" the="" control="">

Boden et al[51] used a rabbit intertransverse model to study fusion. This is an attractive model with a nonunion rate for autograft fusion similar to humans. Using this model, Martin et al[52] found the postoperative administration of ketorolac (infused via a subcutaneous pump) increased the nonunion rate from 25% to 65% (P=.037). They also reported the use of bone morphogenetic protein-2 for spinal fusion overcame the inhibitory effects of ketorolac and yielded a fusion rate of 100%.

Long et al[55] were the first to compare a COX-2 inhibitor to a nonselective NSAID in a spinal fusion model. Using the same rabbit fusion model as Boden et al,[51] the authors compared the effects of 8 weeks of orally administered indomethacin and celecoxib (a COX-2 selective drug). This study confirmed the deleterious effects of the nonselective NSAID, which reduced the fusion rate from 64% in the control animals to 18% in the indomethacin-treated animals (P=.002). The COX-2 treated animals demonstrated a 45% fusion rate, which was not statistically different from the control group (P=.224), but may show a trend toward poorer healing that could have been seen with larger numbers of animals.

Riew et al[56] reported on a study designed to evaluate the time course following fusion when NSAIDS exerted their detrimental effects. With a hypothesis that NSAIDS must act during the initial inflammatory phase to prevent early osteogenesis, the authors examined the effects of indomethacin when initiated at 2 and 4 weeks post fusion surgery.

In rabbits given indomethacin 2 weeks postoperatively, the rate of successful fusion was 21%. When the indomethacin was delayed until 4 weeks, the rate of successful fusion increased to 48%. The control group received saline starting at the 2-week time point and achieved a fusion rate of 65%. Statistically significant differences were noted when comparing the 2-week indomethacin group with the control group (P<.002) and="" when="" comparing="" the="" 2-="" and="" 4-week="" indomethacin="" groups="">P=.05).[56] These data seem to confirm an initial inhibitory effect that may diminish with time.

## Spinal Fusion in Humans

Glassman et al[57] studied the effects of NSAIDS in humans. They reported on a retrospective series of 288 patients undergoing posterolateral intertransverse fusions with a minimum of 2 years of follow-up. One hundred twenty-one patients received no NSAIDS postoperatively, while 167 received ketorolac in the early postoperative period for pain control. Nonunions were defined as failure of fusion noted on the basis of surgical exploration, broken hardware, or tomograms.

The nonunion rate was 4% in the group without NSAIDS and 17% in the ketorolac group. This difference was statistically significant (P<.001) and="" suggests="" an="" approximately="" five="" times="" greater="" likelihood="" of="" developing="" pseudarthrosis="" following="" the="" administration="" of="" ketorolac.="" an="" additive="" effect="" was="" noted="" for="" smokers="" who="" received="" ketorolac,="" with="" a="" 25%="" rate="" of="" nonunion.="" more="" doses="" of="" ketorolac="" appeared="" to="" increase="" the="" risk="" of="" nonunion,="" up="" to="" the="" range="" of="" 9="" to="" 12="" doses="" per="">

## Summary

A large body of information suggests NSAIDS have a negative impact on the healing of bone. Although each clinical healing scenario presents a slightly different level of challenge, the healing of a posterolateral spinal fusion is one of the most difficult challenges in bony healing. Clinically, this results in a relatively high rate of nonunions using traditional fusion techniques.

Spinal fusion models have confirmed NSAIDS have a definite inhibitory effect on healing of the fusion. Although data are limited, it appears this effect is most severe when NSAIDS are administered in the early postoperative period. Moreover, the effect may be worse with certain types of NSAIDS.

Bone healing classically has been divided into three phases consisting of initial inflammatory, subsequent reparative, and final remodeling phases.[58] Because of the anti-inflammatory activity of NSAIDS, one might assume their effects would be worse when administered in the inflammatory phase. Indeed, the study by Riew et al[56] suggests the inhibitory effects are more significant when NSAIDS are administered earlier following fusion.

Other studies conducted with nonspinal models also suggest early administration of NSAIDS results in greater inhibition of bone formation (Goodman et al). Unfortunately, the length of the inflammatory phase in humans is not well known. This leaves the clinician unsure about the safe time to allow resumption of NSAID usage clinically.

It appears likely NSAID use following a spinal fusion procedure will increase the rate of pseudarthrosis. The literature suggests that avoidance of NSAIDS in the postoperative period may avoid nonunion.[57] Additionally, we propose that chronic NSAID usage should be addressed in a similar manner to cigarette smoking. While neither are absolute contraindications to elective spinal fusion, patients should be counseled to discontinue the use of NSAIDS in the peri- and postoperative period to maximize their chance for a successful fusion.

## References

Boden S. Overview of the biology of lumbar spine fusion and principles for selecting a bone graft substitute. *Spine*. 2002; 27(16 suppl 1):S26-S31.

Brantigan JW. Pseudoarthrosis rate after allograft posterior lumbar interbody fusion with pedicle screw and plate fixation. *Spine*. 1994; 19:1271-1279.

DePalma AF, Rothman RH. The nature of pseudoarthrosis. *Clin Orthop*. 1968; 59:113-118.

Hutter CG. Posterior intervertebral body fusion: a 25 year study. *Clin Orthop*. 1983; 179:86-96.

Prothero SR, Parks JC, Stinchfield FE. Complications after low back fusion in 1000 patients: a comparison of two series one decade apart. *Clin Orthop*. 1994; 306:5-11.

Steinman JC, Herkowitz HN. Pseudoarthrosis of the spine. *Clin Orthop*. 1992; 284:80-90.

Cleveland M, Bosworth DM, Thompson FR. Pseudoarthrosis in the lumbosacral spine. *J Bone Joint Surg*. 1948; 30:301-312.

Jackson RK, Boston DA, Edge AJ. Lateral mass fusion: a prospective study of a consecutive series with long term follow-up. *Spine*. 1985; 10:828-832.

Fiorucci S, Antonelli E, Burgaud JL, Morelli A. Nitric oxide-releasing NSAIDS: a review of their current status. *Drug Saf*. 2001; 24:801-811.

van't Hof RJ, Del Soldato P, Ralston SH. NO-NSAIDS: a novel class of osteoclast inhibitors. *Mediators of Inflamm*. 1999; 8(suppl 1):S128.

Ralston SH, Torbergsen A, van't Hof RJ, et al. New NO-NSAIDS and bone. Presented at: 11th International Conference on Advances in Prostaglandin and Leukotriene Research: Basic Science and New Clinical Applications; June 20-22, 2000; Florence, Italy.

Yoshida K, Oida H, Kobayashi T, et al. Stimulation of bone formation and prevention of bone loss by prostaglandin E EP4 receptor activation. *Proc Nat Acad Sci USA*. 2002; 99:4580-4585.

Narumiya S, Sugimoto Y, Ushikubi F. Prostanoid receptors: structures, properties, and functions. *Physiol Rev*. 1999; 79:1193-1226.

Ganong WF. Hormonal control of calcium metabolism and the physiology of bone. In: Ganong WF, ed. *Review of Medical Physiology*. 18th ed. Stamford, Conn: Appleton and Lange; 1997:359-371.

Raisz LG. Potential impact of selective cyclooxygenase-2 inhibitors on bone metabolism in health and disease. *Am J Med*. 2001; 110(supple 3A):43S-45S.

Raisz LG, Martin TJ. Prostaglandins in bone and mineral metabolism. In: Peck WA, ed. *Bone and Mineral Research, Annual 2*. New York, NY: Elsevier Science Publishers; 1984:286.

Harvey W, Bennett A. *Prostaglandins in Bone Resorption*. Boca Raton, Fla: CRC Press; 1988.

Dietrich JW. Goodson JM, Raisz LG. Stimulation of bone resorption by various prostaglandins in organ culture. *Prostaglandins*. 1975; 10:231-240.

Norrdin RW, Jee WSS, High WB. The role of prostaglandins in bone in vivo. *Prostaglandins Leukot Essent Fatty Acids*. 1990; 41:139-149.

Chambers TJ, McSheehy PM, Thomson BM, Fuller K. The effect of calcium-regulating hormones and prostaglandins on bone resorption by osteoclasts desegregated from neonatal rabbit bones. *Endocrinology*. 1985; 116:234-239.

Corbett M, Dekel S, Puddle B, Dickson RA, Francis MJO. The production of prostaglandins in response to experimentally-induced osteomyelitis in rabbits. *Prostaglandins Med*. 1979; 2:403-412.

Dekel S, Francis MJ. The treatment of osteomyelitis of the tibia with sodium salicylate, an experimental study in rabbits. *J Bone Joint Surg Br*. 1981; 63:178-184.

Almasbakk KH, Roysland P. Does indomethacin prevent postoperative ectopic ossification in total hip replacement? *Acta Orthop Scand*. 1977; 48:566.

Ueda K, Saito A, Nakano H, et al. Brief clinical and laboratory observations. Cortical hyperostosis following long-term administration of prostaglandin E1 in infants with cyanotic congenital heart disease. *J Pediatr.* 1980; 97:834-836.

Sone K, Tashiro M, Fujinaga T, Tomomasa T, Tokuyama K, Kuroume T. Long-term low-dose prostaglandin E1 administration. *J Pediatr.* 1980; 97:866-867.

Ringel RE, Brenner JI, Haney PJ, Burns JE, Moulton AL, Berman MA. Prostaglandin-induced periostitis: a complication of long-term $PGE_1$ infusion in an infant with congenital heart disease. *Radiology.* 1982; 142:657-658.

Maxwell WA, Halushka PV, Miller RL, Spicer SS, Westphal MC, Penny LD. Elevated prostaglandin production in cultured cells from a patient with fibrodysplasia ossificans progressive. *Prostaglandins.* 1978; 15:123-129.

Healey JH, Ghelman B. Osteoid osteoma and osteoblastoma: current concepts and recent advances. *Clin Orthop.* 1986; 204:76-85.

Wold LE, Pritchard DJ, Bergert J, Wilson DM. Prostaglandin synthesis by osteoid osteoma and osteoblastoma. *Mod Pathol.* 1989; 1:129-131.

Rodan GA, Bournet LA, Harvey A, Mensi T. Cyclic AMP and cyclic GMP: mediators of the mechanical effects on bone remodeling. *Science.* 1975; 189:467-469.

Davidovitch Z, Shanfeld JL. Cyclic AMP levels in alveolar bone of orthodontically-treated cats. *Arch Oral Biol.* 1975; 20:567-574.

Davidovitch Z, Montgomery PC, Gustafson GT, Eckerdal O. Cellular localization of cyclic AMP in periodontal tissue during experimental tooth movement in cats. *Calcif Tissue Res.* 1976; 18:317-329.

Somjen D, Binderman I, Berger E, Harell A. Bone remodelling induced by physical stress is prostaglandin E2 mediated. *Biochim Biophys Acta.* 1980; 627:91-100.

Jee WSS, Li XJ, Li YL. Flurbiprofen-induced stimulation of periosteal bone formation and inhibition of bone resorption in older rats. *Bone.* 1988; 9:381-389.

Thompson DD, Rodan GA. Indomethacin inhibition of tenotomy-induced bone resorption in rats. *J Bone Miner Res.* 1988; 3:409-414.

Waters DJ, Caywood DD, Trachte GJ, Turner RT, Hodgson SF. Effect of aspirin treatment on bone mass and bone prostaglandin E in canine immobilization osteoporosis. *J Bone Miner Res.* 1989; 4:S187.

Samuels A, Perry MJ, Tobias JH. High-dose estrogen-induced osteogenesis in the mouse is partially suppressed by indomethacin. *Bone.* 1999; 25:675-680.

Allen HL, Wase A, Bear WT. Indomethacin and aspirin: effect of nonsteroidal anti-inflammatory agents on the rate of fracture repair in the rat. *Acta Orthop Scand.* 1980; 51:595-600.

Bo J, Sudmann E, Marton PF. Effect of indomethacin on fracture healing in rats. *Acta Orthop Scand.* 1976; 47:588-599.

Elves MW, Bayley I, Roylance PJ. The effect of indomethacin upon experimental fractures in the rat. *Acta Orthop Scand.* 1982; 53:35-41.

Tornkvist H, Lindholm TS. Effect of ibuprofen on mass and composition of fracture callus and bone. An experimental study on adult rat. *Scand J Rheumatol.* 1980; 9:167-171.

Akman S, Gogus A, Sener N, Bilgic B, Aksoy B, Seckin F. Effect of diclofenac sodium on union of tibial fractures in rats. *Adv Ther.* 2002; 19:119-125.

Altman RD, Latta LL, Keer R, et al. Effect of nonsteroidal anti-inflammatory drugs on fracture healing: a laboratory study in rats. *J Orthop Trauma.* 1995; 9:392-400.

Endo K, Sairyo K, Komatsubara S, et al. Cyclooxygenase-2 inhibitor inhibits the fracture healing. *J Physiol Anthropol Appl Human Sci.* 2002; 21:235-238.

Ho ML, Chang JK, Wang GJ. Antiinflammatory drug effects on bone repair and remodeling in rabbits. *Clin Orthop.* 1995; 313:270-278.

Hogevold HE, Grogaard B, Reikeras O. Effects of short-term treatment with corticosteroids and indomethacin on bone healing: a mechanical study of osteotomies in rats. *Acta Orthop Scand.* 1992; 62:607-611.

Bo J, Sudmann E, Marton PF. Effect of indomethacin on fracture healing in rats. *Acta Orthop Scand.* 1976; 47:588-589.

Tornkvist H, Lindholm TS, Netz P, Stromberg L, Lindholm TC. Effect of ibuprofen and indomethacin on bone metabolism reflected in bone strength. *Clin Orthop.* 1984; 187:255-259.

Boden S. Evaluation of carriers of bone morphogenetic protein for spinal fusion. *Spine.* 2001; 26:850.

Martin GJ Jr, Boden SD, Marone MA, Marone MA, Moskovitz PA. Posterolateral intertransverse process spinal arthrodesis with rhBMP-2 in a nonhuman primate: important lessons learned regarding dose, carrier, and safety. *J Spinal Disord.* 1999; 12:179-186.

Boden SD, Schimandle JH, Hutton WC. An experimental lumbar intertransverse process spinal fusion model. Radiographic, histologic, and biomechanical healing characteristics. *Spine.* 1995; 20:412-420.

Martin GJ Jr, Boden SD, Titus L. Recombinant human bone morphogenetic protein-2 overcomes the inhibitory effect of ketorolac, a nonsteroidal anti-inflammatory drug (NSAID), on posterolateral lumbar intertransverse process spine fusion. *Spine*. 1999; 24:2188-2193.

Lebwohl NH, Starr JK, Milne EL, Latta LL, Malinin TI. *Inhibitory Effect of Ibuprofen on Spinal Fusion in Rabbits*. Rosemont, Ill: American Academy of Orthopaedic Surgeons. Abstract.

Dimar JR, Ante WA, Zhang YP, Glassman SD. The effects on nonsteroidal anti-inflammatory drugs on posterior spinal fusions in the rat. *Spine*. 1996; 21:1870-1876.

Long J, Lewis S, Kuklo T, et al. The effect of cyclooxygenase-2 inhibitors on spinal fusion. *J Bone Joint Surg Am*. 2002; 84:1763-1768.

Riew KD, Long J, Rhee J, et al. Time-dependent inhibitory effects of indomethacin on spinal fusion. *J Bone Joint Surg Am*. 2003; 85:632-634.

Glassman SD, Rose SM, Dimar JR, et al. The effect of postoperative nonsteroidal anti-inflammatory drug administration on spinal fusion. *Spine*. 1998; 23:834-838.

Einhorn TA. The cell and molecular biology of fracture healing. *Clin Orthop*. 1998; 335(suppl):S7-S21.

## Authors

From the University of Virginia School of Medicine, Charlottesville, Va.

The authors have no industry relationships to declare.

Reprint requests: D. Greg Anderson, MD, University of Virginia, Dept of Orthopedic Surgery, 400 Ray C Hunt Dr, Charlottesville, VA 22908.

Recommend Be the first of your friends to recommend this.

Tweet Share Share Email Print

Comments (5) Login

Sort by: Date Rating Last Activity

**Jennifer** · 70 weeks ago 0

This is an interesting study. I recently had a partial menisectomy (medial left knee) and my recovery has gone so much slower than the surgeon said it would. I also developed a blood clot in my calf that was discovered 9 days post operation and am currently being treated with coumadin and lovonox injections. Was just curious if any patients in this study developed blood clots. It certainly slows recovery. I have not been able to start my physical therapy because of it. My surgery was on April 16th, so I am 13 days out.

Reply 1 reply · active 69 weeks ago

**lhcung** · 69 weeks ago 0

Dear Jennifer
There were 8.6% (62/724) DVT developed in the study. You may do more ankle pumping and gentle massage over your calf. Regular follow-up in OPD is important. Wish you an early recovery.

Reply

**Jolenie** · 69 weeks ago 0

When will the Biolox Delta be FDA approved for both the femoral head and liner? It would certainly make sense to use the same ceramic material as they do elsewhere in the world.

Reply 1 reply · active 69 weeks ago

**wyanoke** 6p · 68 weeks ago +1

**Publish?**

Reply

**Dr. A. Talukdar** 68 weeks ago 0



Sir,
The article was useful and interesting. I would like to share our experience with this flap. We have three such flaps. Two flaps have taken on well, but in the third flap for posterior heel defect post melanoma excision we had tip necrosis. I wanted feedback: a. how broad do you keep skin bridge? b. If you have necrosis do you wait and watch or actively intervene?

Reply

Enter text right here!

Comment as a Guest, or login:

Name
Displayed next to your comments.

Email
Not displayed publicly.

Website (optional)
If you have a website, link to it here.

Subscribe to: None

Submit Comment

Healio is intended for health care provider use and all comments will be posted at the discretion of the editors. We reserve the right not to post any comments with unsolicited information about medical devices or other products. At no time will Healio be used for medical advice to patients.

# Response

CC

1. Scott S. Reuben, MD
+Author Affiliations
1. Baystate Medical Center and the, Tufts University School of Medicine, Springfield, MA

In Response:

I agree with Dr. Matsumura that the influence of nonsteroidal antiinflammatory drugs (NSAIDs) on bone osteogenesis has important clinical implications for patients undergoing spinal fusion surgery. The two studies (1,2) that Dr. Matsumura cites involve the administration of NSAIDs for more than 3 months after posterior spinal fusion in either the rat model (1) or humans (2). Both studies raised serious questions about the inhibitory effects of long-term NSAID administration on spinal fusion. Glassman et al. (3) further revealed that even the short-term administration of NSAIDs can significantly affect spinal fusion. This retrospective study reviewed the cases of 288 patients who had undergone posterior spinal fusion procedures receiving either ketorolac ($n = 167$) or no NSAIDs ($n = 121$) in the immediate postoperative period. The authors report that nonunion was approximately five times more likely to occur if ketorolac was administered postoperatively. The authors recommended that NSAIDs be avoided in the early postoperative period.

We have previously administered ketorolac in the immediate postoperative period for spinal fusion surgery (4,5) but have been reluctant to continue this practice because of concerns regarding the detrimental effects of this ketorolac on spinal fusion. However, the new class of COX-2 inhibitors, celecoxib and rofecoxib, may offer an alternative to conventional NSAIDs in the management of pain after spinal fusion surgery (6). Recently it has been demonstrated that the COX-2 inhibitors do not have significant deleterious effects on the healing of intertransverse process fusions in the rabbit model (7). In this study, rabbits randomly received celecoxib (≥10 mg/kg), indomethacin (≥10 mg/kg), or placebo daily for 8 wk after single-level intertransverse posterolateral fusions using autogenous iliac crest bone. There was no statistical difference between the celecoxib and control groups for fusion rate or remodeling of the fusion mass. In contrast, rabbits treated with indomethacin demonstrated a significantly ($P < 0.05$) higher incidence of nonunion (50%).

We have demonstrated a significant reduction in pain and opioid use with the perioperative administration of celecoxib or rofecoxib for patients undergoing spinal fusion surgery (6). In addition, because COX-2 inhibitors do not inhibit platelet function (8), these NSAIDs do not have to be discontinued before surgery. We demonstrated that the administration of either celecoxib or rofecoxib before surgery resulted in no significant increase in the incidence of intraoperative bleeding (6).

We retrospectively analyzed the data on the first 106 patients receiving perioperative rofecoxib who underwent instrumented posterior spinal fusion using autologous crest bone graft. All patients were administered rofecoxib 50 mg daily for five consecutive days starting on the morning of surgery. All patients received patient-controlled analgesia with morphine for the first 48 h after surgery. No other NSAIDs or glucocorticoids were administered during the postoperative period. At 1-yr follow-up, office records were reviewed to evaluate the status of the fusion. Nonunion was defined using similar criteria described by Glassman et al. (3), which included surgical exploration, hardware failure, or tomograms. After 1 yr, nonunion was identified in 5 of 106 (4.7%) of the patients receiving perioperative rofecoxib. This incidence of nonunion is similar to that reported in the literature for patients not receiving the perioperative administration of NSAIDs (4%) (3).

EXHIBIT
tabbies
CC

We believe the administration of COX-2 inhibitors is a safer alternative to conventional NSAIDs, including ketorolac, in the management of pain after spinal fusion surgery. The administration of rofecoxib in the early postoperative period demonstrated no significant deleterious effect on spinal fusion. We are in the process of performing a prospective, randomized, double-blinded controlled clinical trial to verify the safety and efficacy of administering rofecoxib for patients undergoing spinal fusion surgery.

Previous Section

## References

1. Dimar JR, Ante WA, Zhang YP, Glassman SD. The effects of nonsteroidal anti-inflammatory drugs on posterior spinal fusions in the rat. *Spine* 1996;21: 1870–6.
2. Deguchi M, Rapoff AJ, Zdeblick TA. Posterolateral fusion for isthmic spondylolisthesis in adults: analysis of fusion rate and clinical results. *J Spinal Disord* 1998; 11: 495–64.
3. Glassman SD, Rose SM, Dimar JR, et al. The effect of postoperative nonsteroidal anti-inflammatory drug administration on spinal fusion. *Spine* 1998; 23: 834–8.

   CrossRefMedline
4. Reuben SS, Connelly NR, Steinberg RB. Ketorolac as an adjunct to patient-controlled morphine in postoperative spine surgery patients. *Reg Anesth* 1997; 22: 343–6.

   Medline
5. Reuben SS, Connelly NR, Lurie S, et al. Dose-response of ketorolac as an adjunct to patient-controlled analgesia morphine in patients after spinal fusion surgery. *Anesth Analg* 1998; 87: 98–102.
6. Reuben SS, Connelly NR. Postoperative analgesic effects of celecoxib or rofecoxib after spinal fusion surgery. *Anesth Analg* 2000; 91: 1221–5.
7. Lewis SJ, Long J, Kuklo TR, Riew KD. The effect of COX-2 inhibitors on spinal fusion. Proceedings from the North American Spine Society 15th Annual Meeting, Oct 26, 2000:64–5.
8. Hawkey CJ. COX-2 inhibitors. *Lancet* 1999; 353: 307–14.

# VIOXX® Label Change
## Questions & Answers
*For internal use only in response to media inquiries*

**FINAL: 4/11/02**

**LABEL CHANGES**

**Q1. Tell me about this label change for Vioxx approved by the FDA.**

A1. The label changes approved by the FDA include the addition of the findings from VIGOR, including GI and cardiovascular results, along with cardiovascular results from a placebo-controlled database; and the addition of an expanded indication for a new use of Vioxx 25 mg in adult rheumatoid arthritis.

**Q2. Why did it take so long to receive this approval? Why didn't you include the cardiovascular findings from VIGOR in your label sooner?**

A2. Merck first announced the preliminary results of the VIGOR study in March 2000. Since that time, the results have been presented at major medical meetings, published in the *New England Journal of Medicine*, discussed at a public meeting of the FDA advisory committee, and debated in both the medical and lay press. We believe the results have been broadly disseminated and widely known.

Since we filed the sNDA for VIGOR in June 2000, we have worked diligently with the FDA to include the results of VIGOR in the labeling for Vioxx. We are pleased to bring that process to closure and to have the results of the study included in the labeling.

**Q3. What is Merck's take on why the label for Vioxx still carries the traditional NSAID warning?**

A3. The GI warning has been modified in the label for Vioxx to say: "Although the risk of GI toxicity is not completely eliminated with Vioxx, the results of the Vioxx GI Outcomes Research (VIGOR) study demonstrate that in patients treated with Vioxx, the risk of GI toxicity with Vioxx 50 mg once daily is significantly less than with naproxen 500 mg twice daily."

Merck worked with the FDA to update the label for Vioxx to reflect the findings of VIGOR, a study designed to evaluate whether Vioxx at twice its highest chronic dose would significantly reduce the risk of serious GI side effects compared to the NSAID naproxen.

With this important modification, Vioxx is the first and only medicine that selectively inhibits the COX-2 enzyme proven to reduce the risk of developing clinically important GI side effects compared to the commonly used NSAID naproxen, and to have such risk reductions cited in the label.

MRK-ADS0000216





**Q4. What is Merck's reaction to having the cardiovascular data added to the Precautions section?**

A4. Merck first announced the preliminary results of the VIGOR study in March 2000. Since that time, the results have been presented at major medical meetings, published in the *New England Journal of Medicine*, discussed at a public meeting of the FDA advisory committee, and debated in both the medical and lay press. We believe the results have been broadly disseminated and widely known.

Since we filed the sNDA for VIGOR in June 2000, we have worked diligently with the FDA to include the results of VIGOR in the labeling for Vioxx. We are pleased to bring that process to closure and to have the results of the study included in the labeling.

__GI-specific language__

**Q5. What were the key changes to the label as they relate to GI findings from VIGOR?**

A5. The label now cites the results from VIGOR which showed that Vioxx 50 mg – at twice the highest chronic dose – significantly reduced the risk of serious GI side effects by 54 percent compared to naproxen and that the reduction in risk seen with Vioxx was maintained in patients with or without risk factors for developing symptomatic ulcers, perforations, obstructions and bleeds. Risk factors included prior history of a PUB, age of 65 or older, *Helicobacter pylori* infection or concomitant use of corticosteroids.

The GI advantage of Vioxx vs. naproxen proven in VIGOR has resulted in a modification to the GI Warning section.

While the warning remains in the label for Vioxx, it has been modified to say: "Although the risk of GI toxicity is not completely eliminated with Vioxx, the results of the Vioxx GI Outcomes (VIGOR) study demonstrate that in patients treated with Vioxx, the risk of GI toxicity with Vioxx 50 mg once daily is significantly less than with naproxen 500 mg twice daily."

With this important modification, Vioxx is the first and only medicine that selectively inhibits the COX-2 enzyme proven to reduce the risk of developing clinically important GI side effects compared to naproxen, a commonly used NSAID, and to have such risk reductions cited in the label.

**Q6. Does having the language on fewer GI events offset the NSAID warning language?**

A6. While the GI warning still remains in the label for Vioxx, it has now been modified to reflect the GI results from VIGOR. Vioxx is the first and only medicine that selectively inhibits the COX-2 enzyme proven to reduce the risk of developing clinically important GI side effects compared to naproxen. We believe the modification of the NSAID Warning to reflect the GI safety advantage of Vioxx vs. naproxen will be viewed by physicians as an important differentiator for Vioxx and will be well received in the marketplace.

**Q7. Is Merck conducting additional studies with Vioxx to further assess GI benefits?**

A7. As with all our products, Merck continues to study Vioxx in order to advance the scientific knowledge of the product. Specific information on our research and development program is proprietary.

**Q8. Will Merck be conducting studies to assess the actual risk of GI events with Vioxx in order to remove the GI NSAID warning?**

A8. As with all our products, Merck continues to study Vioxx in order to advance the scientific knowledge of the product. Specific information on our research and development program is proprietary.

We are pleased that the label for Vioxx now contains a modification to the GI NSAID warning based on the results of VIGOR, which showed that Vioxx significantly reduced the risk of serious GI events by 54 percent compared to naproxen.

**Q9. Is Merck conducting studies to demonstrate the effect on the GI tract of combining Vioxx plus low dose aspirin?**

A9. Yes. We have a study under way to look at concomitant use of Vioxx and low-dose aspirin. Results will be presented in a scientific forum once they become available. Specific information on the study is proprietary.

VIGOR AEs/Discontinuations

**Q10. What were the incidences of serious adverse events and discontinuations from the VIGOR study and how do they compare to your current label?**

A10. Rates of serious adverse events and discontinuations due to clinical adverse experiences were higher in studies with Vioxx 50 mg compared to studies with either 12.5 or 25 mg. Chronic use of 50 mg is not recommended.

**Cardiovascular**

**Q11. Don't you have a new cardiovascular warning in the label?**

A11. No. The new cardiovascular language in our label is not a "warning;" it is a precaution. A warning is intended to describe serious adverse reactions and potential safety hazards. A precaution describes "any special care to be exercised by the practitioner for the safe and effective use of the product"[1]. The only warning that has been modified in the label is the GI warning, which now reflects the GI advantage seen with Vioxx vs. naproxen in VIGOR.

*(If pressed, refer to news release.)*

**Q12. Do you believe there is a tradeoff between a reduction in GI risk with Vioxx versus a cardiovascular risk?**

A12. When physicians decide which medicine – if any – to prescribe for their patients, they need to consider the benefits and risks of the medicine, as well as their patients' medical condition and history and then make a decision about which medicine to prescribe. We believe that when physicians do that, they will continue to believe that Vioxx is an appropriate choice for many of their patients with osteoarthritis, acute pain, and now adult rheumatoid arthritis.

**Q13. What is the exact mechanism for why there was a higher incidence of heart attacks with Vioxx?**

A13. The labeling for Vioxx includes the cardiovascular results of VIGOR and the cardiovascular results from two placebo-controlled studies. It does not take a position on the cause of the difference in cardiovascular events in VIGOR. It does make a point of emphasizing that Vioxx is not a substitute for aspirin for cardiovascular prophylaxis and that all of this information – the results of VIGOR, the placebo studies, and that Vioxx is not a substitute for aspirin – should be considered by prescribers and that Vioxx should be used with caution in patients with a history of ischemic heart disease. Merck will promote Vioxx in accordance with this labeling. Scientifically, we recognize that there are two possible alternate explanations for the results in VIGOR – one that Vioxx caused the difference and one that naproxen caused the difference. Merck scientists continue to believe that the weight of the evidence indicates that the difference is a result of an effect of naproxen.

**Q14. Do the rates of cardiovascular events change over time?**

A14. The labeling does not take a position on this question. I can tell you that we did a number of statistical tests to evaluate this question. In these statistical tests, we saw no evidence that the rates changed over time.

[1] FDA CDER handbook from FDA website.

**Q15. Is there a relationship between the incidence of hypertension/edema and the incidence of heart attacks?**

A15. There was no correlation between hypertension/edema and cardiovascular events in VIGOR or any of our studies with Vioxx.

**Q16. It appears some of the data/event rates in the new label specific to VIGOR are different from data previously published in NEJM. Can you explain?**

A16. Merck first announced the preliminary results of the VIGOR study in March 2000. At that time, we released the "crude" rates of cardiovascular events, which represented the absolute incidence of patients who had events. Since that time, these results have been presented in many peer-reviewed, public forums in that way and also in terms of rates per 100 patient-years. These results have been presented at major medical meetings, published in *The New England Journal of Medicine*, discussed at a public meeting of the FDA advisory committee, and debated in both the medical and lay press. The labeling presents these same data by providing the number of events [Table 3]; and for overall thrombotic adverse events, it provides the cumulative rate at certain time points [Table 2].

Although there are different ways in which the data have been presented, the publications, presentations and labeling all make the same point – that the rate of cardiovascular events in the VIGOR study was higher in patients taking Vioxx than in patients taking naproxen and that this difference was largely due to a difference in the incidence of myocardial infarction.

**Q17. What happened to your naproxen theory? It's not addressed in your news release. Do you still believe the findings were because of a cardiovascular benefit of naproxen?**

A17. The labeling for Vioxx includes the cardiovascular results of VIGOR and the cardiovascular results from two placebo-controlled studies. It does not take a position on the cause of the difference in cardiovascular events in VIGOR. It does make a point of emphasizing that Vioxx is not a substitute for aspirin for cardiovascular prophylaxis and that all of this information – the results of VIGOR, the placebo studies, and that Vioxx is not a substitute for aspirin – should be considered by prescribers and that Vioxx should be used with caution in patients with a history of ischemic heart disease. Merck will promote Vioxx in accordance with this labeling. Scientifically, we recognize that there are two possible alternate explanations for the results in VIGOR -- one that Vioxx caused the difference and one that naproxen caused the difference. Merck scientists continue to believe that the weight of the evidence indicates that the difference is a result of an effect of naproxen.

**Q18. What is the status of the CV outcomes study with Vioxx? With Arcoxia?**

A18. We are planning to conduct appropriate large-scale studies to further assess the cardiovascular profile of our COX-2 medicines. Specific details of those studies are proprietary.

**Q19. When will the placebo-controlled studies mentioned under the cardiovascular effects section be completed? What did they intend to show?**

A19. The placebo-controlled studies are studies evaluating Vioxx in elderly patients with Alzheimer's disease and mild cognitive impairment. One of the studies, which has been completed, evaluated the effect of Vioxx 25 mg in slowing the progression of Alzheimer's disease. This study did not show evidence of efficacy. The finding is not unexpected given new data which suggests that if NSAIDs were to be effective, they need to be given several years prior to the treatment of Alzheimer's disease. [*Note*: a replicate study of the completed study mentioned above was subsequently stopped early with no analysis of efficacy undertaken.] Another study, which is currently ongoing, is evaluating the effects of Vioxx 25 mg in preventing the progression of Alzheimer's disease in patients with mild cognitive impairment. Preliminary results were obtained and included in the database for evaluation of cardiovascular thrombotic events and deaths related to those events as noted in the label.

**Q20. Have the Alzheimer's data been made public prior to it being added to your label?**

A20. Yes. These data were discussed during the FDA Advisory Committee meeting that reviewed the results of VIGOR and were included in the cardiovascular pooled-analysis presented at the European League Against Rheumatism (EULAR) and American College of Rheumatology (ACR) annual meetings last year, and subsequently published in *Circulation*, October 2001.

**Q21. Tell me about the difference in the death rates with Vioxx and placebo that your label cites from the placebo-controlled studies.**

A21. First, the number of events was small: 8 vs 3. Second, this difference was not statistically significant and third, the number of events in VIGOR was similar: 7 vs 6.

**Q22. What were the cardiovascular findings in the Phase III RA studies with Vioxx?**

A22. In the Phase IIb/III rheumatoid arthritis studies that evaluated Vioxx 25 mg once daily with naproxen 500 mg twice daily, the difference between the two groups was generally similar to what was observed in VIGOR. These data were included in the cardiovascular pooled-analysis presented at the EULAR and ACR annual meetings last year, and subsequently published in *Circulation*, October 2001.

**Renal-Specific**

**Q23. What were the rates of hypertension and edema with Vioxx in VIGOR and how did they relate to your overall safety findings in VIGOR?**

A23. The incidences of hypertension and edema reported in VIGOR were consistent with those reported in the Phase III studies [*NOTE*: these were mostly from the OA endoscopy studies] that evaluated the chronic use of Vioxx 50 mg in osteoarthritis patients. In VIGOR, hypertension was reported in 8.5 percent of patients and lower extremity edema was reported in 4.0 percent of patients taking Vioxx 50 mg – a dose two times the highest approved chronic dose for osteoarthritis and rheumatoid arthritis. In VIGOR, there was no correlation between these renal vascular effects and cardiovascular events. As stated in the label, chronic use of Vioxx 50 mg is not recommended.

[*If directly asked:* The incidence of hypertension reported with naproxen 500 mg twice daily in VIGOR was 5.0 percent and the incidence of edema was 2.6 percent.]

**Q24. How do the rates of hypertension and edema seen in VIGOR with Vioxx 50 mg compare to the current Vioxx label? To those seen in CLASS with Celebrex?**

A24. First, it's important to remember that all NSAIDs work by inhibiting COX-2 and all have effects on the kidney, as is reflected in the prescribing information for these medicines, including Vioxx and Celebrex as well as ibuprofen, diclofenac and naproxen.

In VIGOR, the incidences of edema and hypertension with were consistent with those seen in the Phase III studies of osteoarthritis patients with Vioxx 50 mg, a dose two times the highest approved dose for chronic use.

→ With chronic dosing of 50 mg in the Phase III osteoarthritis studies, the incidence of hypertension was 8.2 percent, and the incidence of lower extremity edema was 6.3 percent.

→ In VIGOR, incidences for 50 mg were similar: hypertension was reported in 8.5 percent of patients and lower extremity edema in 4.0 percent.

Per the label, chronic use of Vioxx 50 mg is not recommended.

As for the hypertension and edema rates seen in the CLASS study, we cannot make direct comparisons across studies. This is particularly true here because of differences in the length of the studies, methodologies, adverse event definitions and investigators.

[*For Background*: In the osteoarthritis studies that were conducted over a six-week to six-month duration, the combined incidence of hypertension was 3.0 percent for ibuprofen 2400 mg and 1.6 percent for diclofenac 150 mg; and the combined incidence of lower extremity edema was 3.8 percent for ibuprofen and 3.4 percent for diclofenac.]

**Q25. Why was there a two-fold higher incidence of hypertension seen with Vioxx 25 mg in the RA studies? Why does this differ from the results seen in your osteoarthritis studies?**

A25. It's important to remember that all NSAIDs work by inhibiting COX-2 and all have effects on the kidney, as is reflected in the prescribing information for these medicines, including Vioxx and Celebrex as well as ibuprofen, diclofenac and naproxen. Therefore, increases in the incidence of hypertension are not unexpected.

As our label states, clinical trials with Vioxx at daily doses of 12.5 mg and 25 mg in patients with osteoarthritis have shown effects on hypertension and edema similar to those observed with comparator NSAIDs; these occurred with an increased frequency with chronic use of Vioxx at daily doses of 50 mg. Chronic use of 50 mg is not recommended. These Phase III clinical trials involved more than 4,000 patients.

It is not known why there were differing incidences of hypertension in the osteoarthritis and rheumatoid arthritis studies. It is difficult to make comparisons across trials as the rheumatoid arthritis and osteoarthritis studies involved various NSAID comparators to Vioxx, and they examined different types of patients, with different investigators, and at different time periods.

[*For Background*: In the osteoarthritis studies that were conducted over a six-week to six-month duration, the combined incidence of hypertension was 3.5 percent for Vioxx 12.5 mg or 25 mg compared to 3.0 percent for ibuprofen 2400 mg and 1.6 percent for diclofenac 150 mg.]

RA-efficacy

**Q26. Is your RA indication coming later than expected?**

A26. No. Merck announced the filing for the rheumatoid arthritis indication in April 2001. The actual filing date was March 1, 2001. In December 2001, Merck received an approvable letter from the FDA for our rheumatoid arthritis application.

**Q27. Was the patient population in the Phase III RA studies different/same as the RA population in VIGOR?**

A27. The patient populations for the Phase III studies and the VIGOR study were similar in that all patients had rheumatoid arthritis. However, specific inclusion and exclusion criteria varied, reflective of the different study endpoints that were specified (VIGOR – GI safety and RA – efficacy).

[*For Background*: In the Phase III studies designed to evaluate the efficacy of Vioxx in treating the signs and symptoms of rheumatoid arthritis, patients had to be at least 18 years of age or older (mean age 54) and diagnosed with rheumatoid arthritis for at least 6 months. Only patients previously on chronic therapy with NSAIDs were enrolled, and only those who, following a washout of prestudy NSAIDs and demonstration of flare, were then randomized to Vioxx, naproxen or placebo. Patients were allowed to take methotrexate or low-dose corticosteroids; and in one of the pivotal studies, patients were allowed to take aspirin (less than 5 percent did).

In VIGOR, which was designed to be a rigorous evaluation of the GI profile of Vioxx at twice its highest chronic dose, patients included those with rheumatoid arthritis who were at least 50 years of age (or 40 years of age and receiving long-term glucocorticoid therapy) and who were expected to require NSAIDs for at least one year. Patients were allowed to take disease-modifying drugs (e.g. methotrexate, corticosteroids) to control their rheumatoid arthritis. The study was designed to exclude patients requiring aspirin for cardiovascular protection.]

**Q28. When will the results of your two Phase III studies for RA be published?**

A28. We consider our publication plans proprietary.

**Q29. Will you seek an indication for juvenile rheumatoid arthritis? If so, when?**

A29. Our sNDA for Vioxx was for adult rheumatoid arthritis only. Details on our regulatory filings are considered proprietary.

**Q30. Do you have studies under way for juvenile RA?**

A30. Pharmacokinetic studies (e.g. studies examining the effects on absorption, metabolism and excretion) with Vioxx in children with juvenile rheumatoid arthritis have been conducted. Results of these studies were presented last year at the European League Against Rheumatism (EULAR) and American College of Rheumatology (ACR) annual meetings. Larger studies are needed to confirm these findings. Additional information on our research program is proprietary.

<u>Drug Interactions</u>

**Q31. How has the methotrexate and other drug interaction language in the label changed? What was the basis for these changes?**

A31. Three changes were made to the section on Drug Interactions:

1) Additional language for <u>aspirin</u>: in patients taking Vioxx, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis. Prospective, long-term studies on concomitant administration of Vioxx and naproxen have not been conducted.
2) Updated language for <u>methotrexate</u>: the approved doses of Vioxx – 12.5 mg, 25 mg and 50 mg – each administered once daily for seven days, had no effect on the plasma concentration of methotrexate.
3) The addition of an interaction with <u>theophylline</u>: Vioxx 12.5 mg, 25 mg and 50 mg administered once daily for seven days increased plasma concentration levels of theophylline. As a result, adequate monitoring is recommended when Vioxx is initiated or changed in patients receiving theophylline.

**Q32. What is theophylline? Is the interaction with the drug serious?**

A32. Theophylline is a bronchodilator indicated for the treatment of chronic asthma and chronic lung diseases. As stated in the prescribing information for Vioxx, adequate monitoring of theophylline plasma concentrations should be considered when therapy with Vioxx is initiated or changed in patients receiving theophylline.

**Q33. What is the market impact of this new interaction? Are there other similar drugs that Vioxx could have an interaction with?**

A33. We do not expect this interaction to have an impact on the market for Vioxx.

**Aspirin**

**Q34. Were there changes to the label specific to concomitant use of Vioxx with aspirin?**

A34. Yes, new language was added to the *Drug Interactions, Aspirin* section, which included:

- language informing physicians that in patients taking Vioxx, antiplatelet therapies (such as aspirin) should not be discontinued and should be considered for those with an indication for cardiovascular prophylaxis; and
- a statement that prospective, long-term studies on concomitant administration of Vioxx and aspirin have not been conducted.

Other information on the concomitant use of aspirin and Vioxx that was already in the labeling included:

- the statement that use of low-dose aspirin with Vioxx may result in an increased rate of GI ulceration or other complications, compared to Vioxx alone; and
- the statement that Vioxx is not a substitute for aspirin for cardiovascular prophylaxis because it lacks an effect on platelets.

**Q35. To what percentage of Vioxx users does the new precaution apply? What proportion of patients who take Vioxx for arthritis have ischemic heart disease?**

A35. We estimate that 10 percent of the total arthritis patient population in the U.S. has existing ischemic heart disease.[2]

**Q36. Does your new labeling recommend that patients prescribed Vioxx take aspirin?**

A36. The labeling for Vioxx does not direct that patients taking Vioxx must be put on aspirin. It states – as it always has since the original FDA approval of the medicine in May 1999 – that Vioxx is not a substitute for aspirin for cardiovascular prophylaxis because of its lack of effect on platelets. The labeling reminds physicians that, because of this lack of effect on platelets, in patients taking Vioxx, antiplatelet therapies should not be discontinued and should be considered for those with an indication for cardiovascular prophylaxis.

**Q37. Would patients benefit more from taking naproxen than Vioxx because heart disease is so common?**

A37. Aspirin continues to be the gold standard for cardiovascular prophylaxis. There are not sufficient data to warrant a change in that practice.

[2] ORM analysis of NHANES and Medstat databases looking at patients within the OA database age 40+ and present with ICD-9 codes for CHD or CVD.

**Q38. Will Merck conduct a trial to evaluate the effects of Vioxx on the antiplatelet effects of aspirin?**

A38. We know Vioxx does not interfere with the antiplatelet effects of low-dose aspirin. In fact, that statement is in our labeling, and has recently been confirmed by others. (*Catella-Lawson F., Reilly MP, Kapoor SC, Cucchiara AJ, De Marco S., Glisson J., Tournier B., Vyas SN, FitzGerald G.A. Ibuprofen, but not rofecoxib or acetaminophen, antagonizes the irreversible antiplatelet effect of aspirin. Arthr Rheum 2000; 43: S298*). However, prospective long-term studies on concomitant administration of Vioxx and aspirin have not been conducted. Our plans in that respect are proprietary.

**Q39. The JAMA paper by Mukherjee and Topol raised the question that use of aspirin with COX-2 inhibitors may diminish their proven GI benefit. Is that true?**

A39. As our labeling for Vioxx has always indicated, concomitant use of low-dose aspirin with Vioxx may increase the risk of GI side effects compared to the use of Vioxx alone. A study is currently underway to look at concomitant use of Vioxx and low-dose aspirin. Results will be presented in a scientific forum once they become available. Specific information on the study is proprietary.

**OTHER**

**Q40. What parts of this label do you expect will be "class" labeling for COX-2s?**

A40. We can't speculate on FDA actions. We can say that Vioxx is the only COX-2 to have met its primary and secondary endpoints in a large GI outcomes study.

**Q41. Can you comment on the FDA's recent report from its AE Surveillance report noting that the number of AEs reported for Vioxx were much higher than those reported for Celebrex even though the total number of prescriptions for Celebrex were higher than for Vioxx?**

A41. The FDA provides the following caveat within its quarterly reports of the Adverse Event Reporting System (AERS) database:

With respect to the summaries of post-marketing adverse experience reports, which have been prepared by FDA's Division of Drug Risk Evaluation I (Office of Post-Marketing Drug Risk Assessment), please note that these summaries provide qualitative and descriptive information about reports that have been received for individual drugs. These summaries should not be interpreted as supporting conclusions about the comparative safety of the different drugs. Variations in adverse event reporting practices make quantitative safety comparisons of different drugs problematic. Sources of variation may include manufacturer reporting practices, time on market, calendar year, and publicity. These and other factors may result in substantial variations in the types and numbers of reports for individual drugs in the spontaneous Adverse Event Reporting System.

**Q42. How many adverse events – CV, renal GI – have you seen in post-marketed use of Vioxx?**

A42. Based on our most recent public presentation of these data – at the FDA Advisory Committee meeting in February 2001 – there were 118 thrombotic events, including 40 myocardial infarctions; 482 serious GI events; and 212 serious renal events had been reported between May 1999 through October 2000.

**Q43. How do post-marketing reports for Vioxx compare with NSAIDs such as naproxen?**

A43. Direct comparisons cannot be made. The medicines have been on the market for different lengths of time, have been used by different patients in different settings with different concomitant medications, and the two companies may have different tracking and reporting mechanisms.

As caveated by the FDA within its quarterly reports of the Adverse Event Reporting System (AERS) database:

With respect to the summaries of post-marketing adverse experience reports, which have been prepared by FDA's Division of Drug Risk Evaluation I (Office of Post-Marketing Drug Risk Assessment), please note that these summaries provide qualitative and descriptive information about reports that have been received for individual drugs.

These summaries should not be interpreted as supporting conclusions about the comparative safety of the different drugs. Variations in adverse event reporting practices make quantitative safety comparisons of different drugs problematic. Sources of variation may include manufacturer reporting practices, time on market, calendar year, and publicity. These and other factors may result in substantial variations in the types and numbers of reports for individual drugs in the spontaneous Adverse Event Reporting System.

**Q44. How reliable are post-marketing event reports in judging the safety profile of a medicine?**

A44. Post-marketing reporting certainly plays an important role in on-going monitoring of the safety of a prescription medicine. However, it's important to keep in mind that just because someone was taking a medicine when they had an event does not mean that the medicine was the cause. As caveated by the FDA within its quarterly reports of the Adverse Event Reporting System (AERS) database:

With respect to the summaries of post-marketing adverse experience reports, which have been prepared by FDA's Division of Drug Risk Evaluation I (Office of Post-Marketing Drug Risk Assessment), please note that these summaries provide qualitative and descriptive information about reports that have been received for individual drugs. These summaries should not be interpreted as supporting conclusions about the comparative safety of the different drugs. Variations in adverse event reporting practices make quantitative safety comparisons of different drugs problematic. Sources of variation may include manufacturer reporting practices, time on market, calendar year, and publicity. These and other factors may result in substantial variations in the types and numbers of reports for individual drugs in the spontaneous Adverse Event Reporting System.

**FOR BACKGROUND ONLY:**

Specific changes to the label around VIGOR included:

- Addition of GI safety and cardiovascular findings detailed under the *Clinical Studies* section of the label;
- Modification of the *Gastrointestinal Warning* section carried by all NSAIDs to reflect the GI safety advantage of Vioxx 50 mg (approximately 50 percent reduction in risk of serious GI events) compared to naproxen;
- Deletion of language that stated "the correlation between findings of endoscopic studies, and the relative incidence of clinically serious upper GI events that may be observed with different products, has not been fully established," which was replaced with language that includes "...the results of outcomes studies, such as VIGOR, are more clinically relevant than the results of endoscopy studies";
- Addition of bolded statement under *Clinical Studies, Platelets*: "Because of its lack of platelet effects, Vioxx is not a substitute for aspirin for cardiovascular prophylaxis." (This statement is not new; was in the prior label for Vioxx.)
- Update to *Precautions* section to include new subsection titled *Cardiovascular Effects* that includes CV thrombotic results and related CV deaths from VIGOR and CV thrombotic results and related CV deaths from two placebo-controlled studies with a reference that the clinical significance of these three studies is unknown and that prospective studies comparing the incidence of serious CV events have not been performed. The paragraph also includes a bolded reference to "Because of its lack of effect on platelets, Vioxx is not a substitute for aspirin" and that "in patients taking Vioxx, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for CV prophylaxis." The paragraph begins with the statement "the information below should be taken into consideration and caution should be exercised when Vioxx is used in patients with a medical history of ischemic heart disease."
- Update to *Precautions* section *Information for Patients* to add references to the location with the label for additional information on GI safety and for additional information for CV safety information. The statement "Vioxx is not a substitute for aspirin for CV prophylaxis because of its lack of effect on platelets" was also added here;
- Additional language to *Drug Interaction, Aspirin* [located under *Precautions* section] that states "antiplatelet therapies should not be discontinued in patients taking Vioxx and should be considered in patients with an indication for CV prophylaxis";
- Revised paragraph under *Adverse Events* now titled "*Clinical Studies in OA and RA with Vioxx 50 mg*" that provides side effects of the 50 mg dose; and
- Clarification under *Dosage and Administration* for management of *Acute Pain* that states "Chronic use of Vioxx 50 mg once daily is not recommended."

Specific changes to the label for Rheumatoid Arthritis included:

- Addition of efficacy data from the Phase III rheumatoid arthritis studies to the *Clinical Studies* section;
- Addition of safety data from the Phase III studies to the *Adverse Events* section;
- Brief mention of results from a comparative endoscopy study in rheumatoid arthritis patients in the *Clinical Studies* section (results consistent with findings from osteoarthritis endoscopy studies);
- An update to the *Precautions* section under *Fluid retention, edema and hypertension* to include hypertension results from the RA studies; and
- Addition of data under *Drug Interactions, Methotrexate* that showed there was no effect on plasma concentrations of methotrexate with recommended doses of Vioxx.

Other changes included:

- Deletion of two data tables from the osteoarthritis endoscopy trials for editorial reasons; the overall data from these trials remain in the label;
- Removal of references to "no safety data is available" under *Warning* for *Advanced Renal Disease* based on availability of post-marketing data. (Recommendations remain the same.)
- Addition of new *Drug Interaction* with *Theophylline*, a medicine used to treat asthma. Adequate monitoring of therapy is now recommended when Vioxx is used with theophylline;
- Addition of the statement "As with other NSAIDs, including those that selectively inhibit COX-2, there have been more spontaneous post-marketing reports of fatal GI events and acute renal failure in the elderly than in younger patients" to the section *Geriatric Use* under *Precautions*;
- Addition of *Hepatic Insufficiency* to the *Dosage and Administration* section that recommends patients with moderate hepatic impairment should be treated with the lowest possible dose. This is based on pharmacokinetic data that have been added to the *Clinical Pharmacology, Special Populations, Hepatic Insufficiency* section of the label; and
- Update to *Precautions* section *Information for Patients* that includes a statement encouraging physicians to have their patients read the patient package insert for Vioxx before starting therapy and to reread it each time the prescription is renewed.

###

EXHIBIT FF: Re: In Re Vioxx Products Liability Litigation, MDL No. 1657
*Dennis R. Harrison v. Merck Sharp & Dohme Corp.*, 2:07-cv-00905-EEF-DEK

# VIOXX R
## (rofecoxib tablets and oral suspension)

### DESCRIPTION

VIOXX* (rofecoxib) is described chemically as 4-[4-(methylsulfonyl)phenyl]-3-phenyl-2(5*H*)-furanone. It has the following chemical structure:

Rofecoxib is a white to off-white to light yellow powder. It is sparingly soluble in acetone, slightly soluble in methanol and isopropyl acetate, very slightly soluble in ethanol, practically insoluble in octanol, and insoluble in water. The empirical formula for rofecoxib is $C_{17}H_{14}O_4S$, and the molecular weight is 314.36.

Each tablet of VIOXX for oral administration contains either 12.5 mg, 25 mg, or 50 mg of rofecoxib and the following inactive ingredients: croscarmellose sodium, hydroxypropyl cellulose, lactose, magnesium stearate, microcrystalline cellulose, and yellow ferric oxide. The 50 mg tablets also contain red ferric oxide.

Each 5 mL of the oral suspension contains either 12.5 or 25 mg of rofecoxib and the following inactive ingredients: citric acid (monohydrate), sodium citrate (dihydrate), sorbitol solution, strawberry flavor, xanthan gum, and purified water. Added as preservatives are sodium methylparaben 0.13% and sodium propylparaben 0.02%.

### CLINICAL PHARMACOLOGY

*Mechanism of Action*

VIOXX is a nonsteroidal anti-inflammatory drug (NSAID) that exhibits anti-inflammatory, analgesic, and antipyretic activities in animal models. The mechanism of action of VIOXX is believed to be due to inhibition of prostaglandin synthesis, via inhibition of cyclooxygenase-2 (COX-2). At therapeutic concentrations in humans, VIOXX does not inhibit the cyclooxygenase-1 (COX-1) isoenzyme. Studies to elucidate the mechanism of action of VIOXX in the acute treatment of migraine have not been conducted.

*Pharmacokinetics*

*Absorption*

The mean oral bioavailability of VIOXX at therapeutically recommended doses of 12.5, 25, and 50 mg is approximately 93%. The area under the curve (AUC) and peak plasma level ($C_{max}$) following a single 25-mg dose were 3286 (±843) ng•hr/mL and 207 (±111) ng/mL, respectively. Both $C_{max}$ and AUC are roughly dose proportional across the clinical dose range. At doses greater than 50 mg, there is a less than proportional increase in $C_{max}$ and AUC, which is thought to be due to the low solubility of the drug in aqueous media. The plasma concentration-time profile exhibited multiple peaks. The median time to maximal concentration ($T_{max}$), as assessed in nine pharmacokinetic studies, is 2 to 3 hours. Individual $T_{max}$ values in these studies ranged between 2 to 9 hours. This may not reflect rate of absorption as $T_{max}$ may occur as a secondary peak in some individuals. With multiple dosing, steady-state conditions are reached by Day 4. The $AUC_{0-24hr}$ and $C_{max}$ at steady state after multiple doses of 25 mg rofecoxib was 4018 (±1140) ng•hr/mL and 321 (±104) ng/mL, respectively, in healthy adults. The accumulation factor

*Registered trademark of MERCK & CO., Inc., Whitehouse Station, New Jersey, USA
COPYRIGHT © MERCK & CO., Inc., 1998, 2002
All rights reserved

2002

EXHIBIT FF

based on geometric means was 1.67. The $AUC_{0-24hr}$ and $C_{max}$ at steady state after multiple doses of 25 mg rofecoxib was 6934 (±2158) ng•hr/mL and 519 (±163) ng/mL, respectively, in adult RA patients (N=12, mean body weight 62 kg).

VIOXX Tablets 12.5 mg and 25 mg are bioequivalent to VIOXX Oral Suspension 12.5 mg/5 mL and 25 mg/5 mL, respectively.

*Food and Antacid Effects*

Food had no significant effect on either the peak plasma concentration ($C_{max}$) or extent of absorption (AUC) of rofecoxib when VIOXX Tablets were taken with a high fat meal. The time to peak plasma concentration ($T_{max}$), however, was delayed by 1 to 2 hours. The food effect on the suspension formulation has not been studied. VIOXX tablets can be administered without regard to timing of meals.

There was a 13% and 8% decrease in AUC when VIOXX was administered with calcium carbonate antacid and magnesium/aluminum antacid to elderly subjects, respectively. There was an approximate 20% decrease in $C_{max}$ of rofecoxib with either antacid.

*Distribution*

Rofecoxib is approximately 87% bound to human plasma protein over the range of concentrations of 0.05 to 25 mcg/mL. The apparent volume of distribution at steady state ($V_{dss}$) is approximately 91 L following a 12.5-mg dose and 86 L following a 25-mg dose.

Rofecoxib has been shown to cross the placenta in rats and rabbits, and the blood-brain barrier in rats.

*Metabolism*

Metabolism of rofecoxib is primarily mediated through reduction by cytosolic enzymes. The principal metabolic products are the cis-dihydro and trans-dihydro derivatives of rofecoxib, which account for nearly 56% of recovered radioactivity in the urine. An additional 8.8% of the dose was recovered as the glucuronide of the hydroxy derivative, a product of oxidative metabolism. The biotransformation of rofecoxib and this metabolite is reversible in humans to a limited extent (<5%). These metabolites are inactive as COX-1 or COX-2 inhibitors.

Cytochrome P450 plays a minor role in metabolism of rofecoxib. Inhibition of CYP 3A activity by administration of ketoconazole 400 mg daily does not affect rofecoxib disposition. However, induction of general hepatic metabolic activity by administration of the non-specific inducer rifampin 600 mg daily produces a 50% decrease in rofecoxib plasma concentrations. (Also see *Drug Interactions*.)

*Excretion*

Rofecoxib is eliminated predominantly by hepatic metabolism with little (<1%) unchanged drug recovered in the urine. Following a single radiolabeled dose of 125 mg, approximately 72% of the dose was excreted into the urine as metabolites and 14% in the feces as unchanged drug.

The plasma clearance after 12.5- and 25-mg doses was approximately 141 and 120 mL/min, respectively. Higher plasma clearance was observed at doses below the therapeutic range, suggesting the presence of a saturable route of metabolism (i.e., non-linear elimination). The effective half-life (based on steady-state levels) was approximately 17 hours.

*Special Populations*

*Gender*

The pharmacokinetics of rofecoxib are comparable in men and women.

*Geriatric*

After a single dose of 25 mg VIOXX in elderly subjects (over 65 years old) a 34% increase in AUC was observed as compared to the young subjects. Dosage adjustment in the elderly is not necessary; however, therapy with VIOXX should be initiated at the lowest recommended dose.

*Pediatric*

The steady state pharmacokinetics of rofecoxib was evaluated in patients ≥ 2 years to ≤ 17 years of age who weigh more than 10 kg with pauciarticular and polyarticular course Juvenile Rheumatoid Arthritis (JRA). The apparent clearance after oral administration of rofecoxib in patients ≥ 12 years to ≤ 17 years of age was similar to that of healthy adults and higher than that of adult RA patients. The apparent clearance after oral administration of rofecoxib in patients ≥ 2 years to ≤ 11 years of age was less than that of adults and increased with age. The apparent oral clearance of rofecoxib increases with body weight (and body surface area). (See Table 1.)

**Table 1**
**Rofecoxib Apparent Oral Clearance (CL/F, mean ± SD) in JRA Patients* and Adults.**

| | JRA patients | | | Adults | |
|---|---|---|---|---|---|
| Group | 2- to 5-year-old (N=21) | 6- to 11-year-old (N=13) | 12- to 17-year-old (N=11) | Healthy Age range: 20-48 (N=26) | RA Patients Age range: 31-64 (N=12) |
| Body Weight (kg)(mean ± SD) | 17 ± 2 | 29 ± 6 | 57 ± 13 | 77 ± 13 | 62 ± 11 |
| CL/F (mL/min) | 37 ± 15 | 52 ± 13 | 87 ± 21 | 96 ± 30 | 65 ± 20 |

* Pauciarticular and Polyarticular Course JRA

A dose of 0.6 mg/kg to a maximum of 25 mg once daily in patients ≥ 2 years to ≤ 11 years of age and body weight 10 kg or above and a dose of 25 mg once daily in patients ≥ 12 years to ≤ 17 years of age would yield an AUC slightly higher than that of the 25-mg tablet once daily in healthy adults (AUC Geometric Mean Ratio, 1.12) and slightly lower than that in adult RA patients (AUC GMR, 0.77).

*Race*

Meta-analysis of pharmacokinetic studies has suggested a slightly (10-15%) higher AUC of rofecoxib in Blacks and Hispanics as compared to Caucasians. No dosage adjustment is necessary on the basis of race.

*Hepatic Insufficiency*

A single-dose pharmacokinetic study in mild (Child-Pugh score ≤6) hepatic insufficiency patients indicated that rofecoxib AUC was similar between these patients and healthy subjects. A pharmacokinetic study in patients with moderate (Child-Pugh score 7-9) hepatic insufficiency indicated that mean rofecoxib plasma concentrations were higher (mean AUC: 55%; mean $C_{max}$: 53%) relative to healthy subjects. Since patients with hepatic insufficiency are prone to fluid retention and hemodynamic compromise, the maximum recommended chronic dose of VIOXX for patients with moderate hepatic insufficiency is 12.5 mg daily. (See PRECAUTIONS, *Hepatic Effects* and DOSAGE AND ADMINISTRATION, *Hepatic Insufficiency.*) Patients with severe hepatic insufficiency have not been studied.

*Renal Insufficiency*

In a study (N=6) of patients with end stage renal disease undergoing dialysis, peak rofecoxib plasma levels and AUC declined 18% and 9%, respectively, when dialysis occurred four hours after dosing. When dialysis occurred 48 hours after dosing, the elimination profile of rofecoxib was unchanged. While renal insufficiency does not influence the pharmacokinetics of rofecoxib, use of VIOXX in advanced renal disease is not recommended. (See WARNINGS, *Advanced Renal Disease.*)

*Drug Interactions* (Also see PRECAUTIONS, *Drug Interactions.*)

*General*

In human studies the potential for rofecoxib to inhibit or induce CYP 3A4 activity was investigated in studies using the intravenous erythromycin breath test and the oral midazolam test. No significant difference in erythromycin demethylation was observed with rofecoxib (75 mg daily) compared to placebo, indicating no induction of hepatic CYP 3A4. A 30% reduction of the AUC of midazolam was observed with rofecoxib (25 mg daily). This reduction is most likely due to increased first pass metabolism through induction of intestinal CYP 3A4 by rofecoxib. *In vitro* studies in rat hepatocytes also suggest that rofecoxib might be a mild inducer for CYP 3A4.

Drug interaction studies with the recommended doses of rofecoxib have identified potentially significant interactions with rifampin, theophylline, and warfarin. Patients receiving these agents with VIOXX should be appropriately monitored. Drug interaction studies do not support the potential for clinically important interactions between antacids or cimetidine with rofecoxib. Similar to experience with other nonsteroidal anti-inflammatory drugs (NSAIDs), studies with rofecoxib suggest the potential for interaction with ACE inhibitors. The effects of rofecoxib on the pharmacokinetics and/or pharmacodynamics of ketoconazole, prednisone/prednisolone, oral contraceptives, and digoxin have been studied *in vivo* and clinically important interactions have not been found.

**CLINICAL STUDIES**

***Adults***

*Osteoarthritis (OA)*

VIOXX has demonstrated significant reduction in joint pain compared to placebo. VIOXX was evaluated for the treatment of the signs and symptoms of OA of the knee and hip in placebo- and active-controlled clinical trials of 6 to 86 weeks duration that enrolled approximately 3900 patients. In patients with OA, treatment with VIOXX 12.5 mg and 25 mg once daily resulted in improvement in patient and physician global assessments and in the WOMAC (Western Ontario and McMaster Universities) osteoarthritis questionnaire, including pain, stiffness, and functional measures of OA. In six studies of pain accompanying OA flare, VIOXX provided a significant reduction in pain at the first determination (after one week in one study, after two weeks in the remaining five studies); this continued for the duration of the studies. In all OA clinical studies, once daily treatment in the morning with VIOXX 12.5 and 25 mg was associated with a significant reduction in joint stiffness upon first awakening in the morning. At doses of 12.5 and 25 mg, the effectiveness of VIOXX was shown to be comparable to ibuprofen 800 mg TID and diclofenac 50 mg TID for treatment of the signs and symptoms of OA. The ibuprofen studies were 6-week studies; the diclofenac studies were 12-month studies in which patients could receive additional arthritis medication during the last 6 months.

*Rheumatoid Arthritis (RA)*

VIOXX has demonstrated significant reduction of joint tenderness/pain and joint swelling compared to placebo. VIOXX was evaluated for the treatment of the signs and symptoms of RA in two 12-week placebo- and active-controlled clinical trials that enrolled a total of approximately 2,000 patients. VIOXX was shown to be superior to placebo on all primary endpoints (number of tender joints, number of swollen joints, patient and physician global assessments of disease activity). In addition, VIOXX was shown to be superior to placebo using the American College of Rheumatology 20% (ACR20) Responder Index, a composite of clinical, laboratory, and functional measures of RA. VIOXX 25 mg once daily and naproxen 500 mg twice daily showed generally similar effects in the treatment of RA. A 50-mg dose once daily of VIOXX was also studied; however, no additional efficacy was seen compared to the 25-mg dose.

*Analgesia, including Dysmenorrhea*

In acute analgesic models of post-operative dental pain, post-orthopedic surgical pain, and primary dysmenorrhea, VIOXX relieved pain that was rated by patients as moderate to severe. The analgesic effect (including onset of action) of a single 50-mg dose of VIOXX was generally similar to 550 mg of naproxen sodium or 400 mg of ibuprofen. In single-dose post-operative dental pain studies, the onset of analgesia with a single 50-mg dose of VIOXX occurred within 45 minutes. In a multiple-dose study of post-orthopedic surgical pain in which patients received VIOXX or placebo for up to 5 days, 50 mg of VIOXX once daily was effective in reducing pain. In this study, patients on VIOXX consumed a significantly smaller amount of additional analgesic medication than patients treated with placebo (1.5 versus 2.5 doses per day of additional analgesic medication for VIOXX and placebo, respectively).

*Migraine with or without aura*

The efficacy of VIOXX in the acute treatment of migraine headaches was demonstrated in two double-blind, placebo-controlled, outpatient trials. Doses of 25 and 50 mg were compared to placebo in the treatment of one migraine attack. A second dose of VIOXX was not allowed in either trial. In these controlled short-term studies, patients were predominantly female (88%) and Caucasian (84%), with a mean age of 40 years (range 18 to 78). Patients were instructed to treat a moderate to severe headache. Headache relief, defined as a reduction in headache severity from moderate or severe pain to mild or no pain, was assessed up to 2 hours after dosing. Associated symptoms such as nausea, photophobia, and phonophobia were also assessed. Maintenance of relief was assessed for up to 24 hours postdose. Other medication, with the exception of NSAIDs (including COX-2 inhibitors) or combination medications that contained NSAIDs, was permitted from 2 hours after the dose of study medication. The frequency and time to use of additional medications were also recorded.

In both placebo-controlled trials, the percentage of patients achieving headache relief 2 hours after treatment was significantly greater among patients receiving VIOXX at all doses compared to those who received placebo (Table 2). There were no statistically significant differences between the 25- and the 50-mg dose groups in either trial.

**Table 2**
**Percentage of Patients with Headache Relief (Mild or No Headache)**
**2 hours Following Treatment**

| Trial | VIOXX 25 mg | VIOXX 50 mg | Placebo |
|---|---|---|---|
| 1 | 54%* (n=176) | 57%* (n=187) | 34% (n=175) |
| 2 | 60%* (n=187) | 62%* (n=188) | 30% (n=187) |

*p<0.0001 vs. placebo

Note that, in general, comparisons of results obtained in different clinical studies conducted under different conditions by different investigators with different samples of patients are ordinarily unreliable for purposes of quantitative comparison.

The estimated probability of achieving initial headache relief within 2 hours following treatment is depicted in Figure 1.

Figure 1
Estimated Probability of Achieving Initial Headache Relief within 2 Hours

Figure 1 shows the Kaplan-Meier plot of the probability over time of obtaining headache relief (no or mild pain) following treatment with VIOXX or placebo. The plot is based on pooled data from the 2 placebo-controlled, outpatient trials in adults providing evidence of efficacy. Patients taking additional medication or not achieving headache relief prior to 2 hours were censored at 2 hours.

There was a decreased incidence of migraine-associated nausea, photophobia and phonophobia in VIOXX treated patients compared to placebo. The estimated probability of taking other medication for migraine over the 24 hours following initial dose of study treatment is summarized in Figure 2.

Figure 2
Estimated Probability of Patients Taking Additional Medication for Migraines over the 24 Hours Following the Initial Dose of Study Treatment

This Kaplan-Meier plot is based on pooled data obtained in 2 placebo-controlled outpatient trials. Patients not using additional medications were censored at 24 hours. The plot includes both patients who had headache relief at 2 hours and those who had no response to the initial dose. Additional medication was not allowed within 2 hours postdose.

VIOXX was effective regardless of presence of aura, gender, race, age, presence of menses or dysmenorrhea. Similarly, the concomitant use of common migraine prophylactic drugs (e.g., beta-blockers, calcium channel blockers, tricyclic antidepressants) or oral contraceptives did not affect efficacy. VIOXX was also effective whether or not there was a history of prior response to NSAIDs.

*Special Studies*

The following special studies were conducted to evaluate the comparative safety of VIOXX.

*VIOXX GI Clinical Outcomes Research (VIGOR Study)*

*Study Design*

The VIGOR study was designed to evaluate the comparative GI safety of VIOXX 50 mg once daily (twice the highest dose recommended for chronic use in OA and RA) versus naproxen 500 mg twice daily (common therapeutic dose). The general safety and tolerability of VIOXX 50 mg once daily versus naproxen 500 mg twice daily was also studied. VIGOR was a randomized, double-blind study (median duration of 9 months) in 8076 patients with rheumatoid arthritis (RA) requiring chronic NSAID therapy (mean age 58 years). Patients were not permitted to use concomitant aspirin or other antiplatelet drugs. Patients with a recent history of myocardial infarction or stroke and patients deemed to require low-dose aspirin for cardiovascular prophylaxis were to be excluded from the study. Fifty-six percent of patients used concomitant oral corticosteroids. The GI safety endpoints (confirmed by a blinded adjudication committee) included:

PUBs-symptomatic ulcers, upper GI perforation, obstruction, major or minor upper GI bleeding.

Complicated PUBs (a subset of PUBs)-upper GI perforation, obstruction or major upper GI bleeding.

*Study Results*

*Gastrointestinal Safety in VIGOR*

The VIGOR study showed a significant reduction in the risk of development of PUBs, including complicated PUBs in patients taking VIOXX compared to naproxen (see Table 3).

**Table 3**
**VIGOR-Summary of Patients with Gastrointestinal Safety Events[1]**
**COMPARISON TO NAPROXEN**

| GI Safety Endpoints | VIOXX 50 mg daily (N=4047)[2] n[3] (Cumulative Rate[4]) | Naproxen 1000 mg daily (N=4029)[2] n[3] (Cumulative Rate[4]) | Relative Risk of VIOXX compared to naproxen[5] | 95% CI[5] |
|---|---|---|---|---|
| PUBs | 56 (1.80) | 121 (3.87) | 0.46* | (0.33, 0.64) |
| Complicated PUBs | 16 (0.52) | 37 (1.22) | 0.43* | (0.24, 0.78) |

[1]As confirmed by an independent committee blinded to treatment, [2]N=Patients randomized, [3]n=Patients with events, [4]Kaplan-Meier cumulative rate at end of study when at least 500 patients remained (approx. 10 1/2 months), [5]Based on Cox proportional hazard model

*p-value ≤0.005 for relative risk compared to naproxen

The risk reduction for PUBs and complicated PUBs for VIOXX compared to naproxen (approximately 50%) was maintained in patients with or without the following risk factors for developing a PUB (Kaplan-Meier cumulative rate of PUBs at approximately 10 1/2 months, VIOXX versus naproxen, respectively): with a prior PUB (5.12, 11.47); without a prior PUB (1.54, 3.27); age 65 or older (2.83, 6.49); or younger than 65 years of age (1.48, 3.01). A similar risk reduction for PUBs and complicated PUBs (approximately 50%) was also maintained in patients with or without *Helicobacter pylori* infection or concomitant corticosteroid use.

*Other Safety Findings: Cardiovascular Safety*

The VIGOR study showed a higher incidence of adjudicated serious cardiovascular thrombotic events in patients treated with VIOXX 50 mg once daily as compared to patients treated with naproxen 500 mg twice daily (see Table 4). This finding was largely due to a difference in the incidence of myocardial infarction between the groups. (See Table 5.) (See PRECAUTIONS, *Cardiovascular Effects*.) Adjudicated serious cardiovascular events (confirmed by a blinded adjudication committee) included: sudden death, myocardial infarction, unstable angina, ischemic stroke, transient ischemic attack and peripheral venous and arterial thromboses.

**Table 4**
**VIGOR-Summary of Patients with Serious Cardiovascular Thrombotic Adverse Events[1] Over Time**
**COMPARISON TO NAPROXEN**

| Treatment Group | Patients Randomized | | 4 Months[2] | 8 Months[3] | 10 ½ months[4] |
|---|---|---|---|---|---|
| VIOXX 50 mg | 4047 | Total number of events | 17 | 29 | 45 |
| | | Cumulative Rate† | 0.46% | 0.82% | 1.81%* |
| Naproxen 1000 mg | 4029 | Total number of events | 9 | 15 | 19 |
| | | Cumulative Rate† | 0.23% | 0.43% | 0.60% |

[1]Confirmed by blinded adjudication committee, [2]Number of patients remaining after 4 months were 3405 and 3395 for VIOXX and naproxen respectively, [3]Number of patients remaining after 8 months were 2806 and 2798 for VIOXX and naproxen respectively, [4]Number of patients remaining were 531 and 514 for VIOXX and naproxen respectively.

†Kaplan-Meier cumulative rate.

* p-value <0.002 for the overall relative risk compared to naproxen by Cox proportional hazard model

**Table 5**
**VIGOR- Serious Cardiovascular Thrombotic Adverse Events[1]**

| | VIOXX 50 mg N[2]=4047 n[3] | Naproxen 1000 mg N[2]=4029 n[3] |
|---|---|---|
| Any CV thrombotic event | 45 * | 19 |
| Cardiac events | 28** | 10 |
| Fatal MI/Sudden death | 5 | 4 |
| Non-fatal MI | 18** | 4 |
| Unstable angina | 5 | 2 |
| Cerebrovascular | 11 | 8 |
| Ischemic stroke | 9 | 8 |
| TIA | 2 | 0 |
| Peripheral | 6 | 1 |

[1]Confirmed by blinded adjudication committee, [2]N=Patients randomized. [3]n=Patients with events

* p-value <0.002 and ** p-value ≤0.006 for relative risk compared to naproxen by Cox proportional hazard model

For cardiovascular data from 2 long-term placebo-controlled studies, see PRECAUTIONS, *Cardiovascular Effects.*

*Upper Endoscopy in Patients with Osteoarthritis and Rheumatoid Arthritis*

The VIGOR study described above compared clinically relevant outcomes. Several studies summarized below have utilized scheduled endoscopic evaluations to assess the occurrence of asymptomatic ulcers in individual patients taking VIOXX or a comparative agent. The results of outcomes studies, such as VIGOR, are more clinically relevant than the results of endoscopy studies (see CLINICAL STUDIES, *Special Studies, VIGOR*).

Two identical (U.S. and Multinational) endoscopy studies in a total of 1516 patients were conducted to compare the percentage of patients who developed endoscopically detectable gastroduodenal ulcers with VIOXX 25 mg daily or 50 mg daily, ibuprofen 2400 mg daily, or placebo. Entry criteria for these studies permitted enrollment of patients with active *Helicobacter pylori* infection, baseline gastroduodenal erosions, prior history of an upper gastrointestinal perforation, ulcer, or bleed (PUB), and/or age ≥65 years. However, patients receiving aspirin (including low-dose aspirin for cardiovascular prophylaxis) were not enrolled in these studies. Patients who were 50 years of age and older with osteoarthritis and who had no ulcers at baseline were evaluated by endoscopy after weeks 6, 12, and 24 of treatment. The placebo-treatment group was discontinued at week 16 by design.

Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. See Figures 3 and 4 for the results of these studies.

NDA 21-042/S-026
NDA 21-052/S-019
Page 9

**Figure 3**

**COMPARISON TO IBUPROFEN**

**Life-Table Cumulative Incidence Rate of Gastroduodenal Ulcers ≥ 3 mm** (Intention-to-Treat)**

U.S. Study
Cumulative Incidence Rate (%)
50
40
30
20
10
0
8-Week
12-Week***
24-Week
Time by Treatment

Placebo (N=158)
Rofecoxib 25mg (N=186)
Rofecoxib 50mg (N=178)
Ibuprofen 2400 mg (N=167)

† $p < 0.001$ versus ibuprofen 2400 mg
** Results of analyses using a ≥ 5mm gastroduodenal ulcer endpoint were consistent
*** The primary endpoint was the cumulative incidence of gastroduodenal ulcer at 12 weeks

**Figure 4**

COMPARISON TO IBUPROFEN

**Life-Table Cumulative Incidence Rate of Gastroduodenal Ulcers ≥ 3 mm** (Intention-to-Treat)**

† $p < 0.001$ versus ibuprofen 2400 mg
** Results of analyses using a ≥ 5mm gastroduodenal ulcer endpoint were consistent.
*** The primary endpoint was the cumulative incidence of gastroduodenal ulcer at 12 weeks

In a similarly designed 12-week endoscopy study in RA patients treated with VIOXX 50 mg once daily (twice the highest dose recommended for chronic use in OA and RA) or naproxen 1000 mg daily (common therapeutic dose), treatment with VIOXX was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with naproxen.

A similarly designed 12-week endoscopy study was conducted in OA patients treated with low-dose enteric coated aspirin 81 mg daily, low-dose enteric coated aspirin 81 mg plus VIOXX 25 mg daily, ibuprofen 2400 mg daily, or placebo. There was no difference in the cumulative incidence of endoscopic gastroduodenal ulcers in patients taking low-dose aspirin plus VIOXX 25 mg as compared to those taking ibuprofen 2400 mg daily alone. Patients taking low-dose aspirin plus ibuprofen were not studied. (See PRECAUTIONS, *Drug Interactions, Aspirin.*)

Serious clinically significant upper GI bleeding has been observed in patients receiving VIOXX in controlled trials, albeit infrequently (see WARNINGS, *Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding, and Perforation*).

*Assessment of Fecal Occult Blood Loss in Healthy Subjects*

Occult fecal blood loss associated with VIOXX 25 mg daily, VIOXX 50 mg daily, ibuprofen 2400 mg per day, and placebo was evaluated in a study utilizing $^{51}Cr$-tagged red blood cells in 67 healthy males. After 4 weeks of treatment with VIOXX 25 mg daily or VIOXX 50 mg daily, the increase in the amount of fecal blood loss was not statistically significant compared with placebo-treated subjects. In contrast, ibuprofen 2400 mg per day produced a statistically significant increase in fecal blood loss as compared with placebo-treated subjects and VIOXX-treated subjects. The clinical relevance of this finding is unknown.

*Platelets*

Multiple doses of VIOXX 12.5, 25, and up to 375 mg administered daily up to 12 days had no effect on bleeding time relative to placebo. There was no inhibition of *ex vivo* arachidonic acid- or collagen-induced platelet aggregation with 12.5, 25, and 50 mg of VIOXX.

**Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.** (See PRECAUTIONS, *Cardiovascular Effects*.)

***Pediatric Patients***

***Pauciarticular and Polyarticular Course Juvenile Rheumatoid Arthritis (JRA)***

In a 12-week, double-blind active-controlled, non-inferiority study, 310 patients, 2 years to 17 years of age with pauciarticular or polyarticular course JRA, received the following treatments: lower-dose VIOXX 0.3 mg/kg (to a maximum of 12.5 mg) once daily in patients ≥ 2 years to ≤ 11 years of age or VIOXX 12.5 mg once daily in patients ≥ 12 years to ≤ 17 years of age; higher-dose VIOXX 0.6 mg/kg (to a maximum of 25 mg) once daily in patients ≥ 2 years to ≤ 11 years of age or VIOXX 25 mg once daily in patients ≥ 12 years to ≤ 17 years of age; NSAID comparator targeted to an effective dose in patients ≥ 2 years to ≤ 17 years of age. The response rates were based upon the JRA Definition of Improvement ≥ 30% (JRA DOI 30) criterion, which is a composite of clinical, laboratory, and functional measures of JRA. The JRA DOI 30 response rates were 55% in both the VIOXX 0.6 mg/kg (to a maximum of 25 mg) and NSAID comparator treatment groups achieving the non-inferiority criterion. A single non-inferiority trial is not sufficient to support a conclusion of equivalence.

In a 52-week open-label extension to the 12-week study, 160 patients received VIOXX 0.6 mg/kg to a maximum of 25 mg once daily (patients ≥ 2 years to ≤ 11 years of age) or 25 mg once daily (patients ≥ 12 years to ≤ 17 years of age) and 67 patients ≥ 2 years to ≤ 17 years of age received NSAID comparator targeted to an effective dose. There were no unexpected safety findings.

**INDICATIONS AND USAGE**

VIOXX is indicated:

For relief of the signs and symptoms of osteoarthritis.

For relief of the signs and symptoms of rheumatoid arthritis in adults.

For relief of the signs and symptoms of pauciarticular or polyarticular course Juvenile Rheumatoid Arthritis (JRA) in patients 2 years and older and who weigh 10 kg (22 lbs) or more.

For the management of acute pain in adults.

For the treatment of primary dysmenorrhea.

For the acute treatment of migraine attacks with or without aura in adults.

The safety and effectiveness of VIOXX have not been established for cluster headache, which is present in an older, predominantly male, population.

**CONTRAINDICATIONS**

VIOXX is contraindicated in patients with known hypersensitivity to rofecoxib or any other component of VIOXX.

VIOXX should not be given to patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. Severe, rarely fatal, anaphylactic-like reactions to NSAIDs have been reported in such patients (see WARNINGS, *Anaphylactoid Reactions* and PRECAUTIONS, *Preexisting Asthma*).

**WARNINGS**

*Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding, and Perforation*

Serious gastrointestinal toxicity such as bleeding, ulceration, and perforation of the stomach, small intestine or large intestine, can occur at any time, with or without warning symptoms, in patients treated with nonsteroidal anti-inflammatory drugs (NSAIDs). Minor upper gastrointestinal problems, such as dyspepsia, are common and may also occur at any time during NSAID therapy. Therefore, physicians and patients should remain alert for ulceration and bleeding, even in the absence of previous GI tract symptoms. Patients should be informed about the signs and/or symptoms of serious GI toxicity and the steps to take if they occur. The utility of periodic laboratory monitoring has not been demonstrated, nor

has it been adequately assessed. Only one in five patients who develop a serious upper GI adverse event on NSAID therapy is symptomatic. It has been demonstrated that upper GI ulcers, gross bleeding or perforation, caused by NSAIDs, appear to occur in approximately 1% of patients treated for 3-6 months, and in about 2-4% of patients treated for one year. These trends continue thus, increasing the likelihood of developing a serious GI event at some time during the course of therapy. However, even short-term therapy is not without risk.

Although the risk of GI toxicity is not completely eliminated with VIOXX, the results of the VIOXX GI outcomes research (VIGOR) study demonstrate that in patients treated with VIOXX, the risk of GI toxicity with VIOXX 50 mg once daily is significantly less than with naproxen 500 mg twice daily. (See CLINICAL STUDIES, *Special Studies, VIGOR*.)

NSAIDs should be prescribed with extreme caution in patients with a prior history of ulcer disease or gastrointestinal bleeding. Most spontaneous reports of fatal GI events are in elderly or debilitated patients and therefore special care should be taken in treating this population. **To minimize the potential risk for an adverse GI event, the lowest effective dose should be used for the shortest possible duration.** For high risk patients, alternate therapies that do not involve NSAIDs should be considered.

Previous studies have shown that patients with a *prior history of peptic ulcer disease and/or gastrointestinal bleeding* and who use NSAIDs, have a greater than 10-fold higher risk for developing a GI bleed than patients with neither of these risk factors. In addition to a past history of ulcer disease, pharmacoepidemiological studies have identified several other co-therapies or co-morbid conditions that may increase the risk for GI bleeding such as: treatment with oral corticosteroids, treatment with anticoagulants, longer duration of NSAID therapy, smoking, alcoholism, older age, and poor general health status.

*Anaphylactoid Reactions*

As with NSAIDs in general, anaphylactoid reactions have occurred in patients without known prior exposure to VIOXX. In post-marketing experience, rare cases of anaphylactic/anaphylactoid reactions and angioedema have been reported in patients receiving VIOXX. VIOXX should not be given to patients with the aspirin triad. This symptom complex typically occurs in asthmatic patients who experience rhinitis with or without nasal polyps, or who exhibit severe, potentially fatal bronchospasm after taking aspirin or other NSAIDs (see CONTRAINDICATIONS and PRECAUTIONS, *Preexisting Asthma*). Emergency help should be sought in cases where an anaphylactoid reaction occurs.

*Advanced Renal Disease*

Treatment with VIOXX is not recommended in patients with advanced renal disease. If VIOXX therapy must be initiated, close monitoring of the patient's kidney function is advisable (see PRECAUTIONS, *Renal Effects*).

*Pregnancy*

In late pregnancy VIOXX should be avoided because it may cause premature closure of the ductus arteriosus.

**PRECAUTIONS**

*General*

VIOXX cannot be expected to substitute for corticosteroids or to treat corticosteroid insufficiency. Abrupt discontinuation of corticosteroids may lead to exacerbation of corticosteroid-responsive illness. Patients on prolonged corticosteroid therapy should have their therapy tapered slowly if a decision is made to discontinue corticosteroids.

The pharmacological activity of VIOXX in reducing inflammation, and possibly fever, may diminish the utility of these diagnostic signs in detecting infectious complications of presumed noninfectious, painful conditions.

*Cardiovascular Effects*

The information below should be taken into consideration and caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease.

In VIGOR, a study in 8076 patients (mean age 58; VIOXX n=4047, naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with naproxen 500 mg twice daily (n=19). In VIGOR, mortality due to cardiovascular thrombotic events (7 vs 6, VIOXX vs naproxen, respectively) was similar between the treatment groups. (See CLINICAL STUDIES, *Special Studies, VIGOR, Other Safety Findings: Cardiovascular Safety.*) In a

placebo-controlled database derived from 2 studies with a total of 2142 elderly patients (mean age 75; VIOXX n=1067, placebo n=1075) with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs 35 for patients treated with VIOXX 25 mg once daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for VIOXX versus placebo, respectively. The significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown. Prospective studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebo have not been performed.

**Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.** Therefore, in patients taking VIOXX, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis. (See CLINICAL STUDIES, *Special Studies, Platelets*; PRECAUTIONS, *Drug Interactions, Aspirin*.) Prospective, long-term studies on concomitant administration of VIOXX and aspirin evaluating cardiovascular outcomes have not been conducted.

*Fluid Retention, Edema, and Hypertension*

Fluid retention, edema, and hypertension have been reported in some patients taking VIOXX. In clinical trials of VIOXX at daily doses of 25 mg in patients with rheumatoid arthritis the incidence of hypertension was twice as high in patients treated with VIOXX as compared to patients treated with naproxen 1000 mg daily. Clinical trials with VIOXX at daily doses of 12.5 and 25 mg in patients with osteoarthritis have shown effects on hypertension and edema similar to those observed with comparator NSAIDs; these occurred with an increased frequency with chronic use of VIOXX at daily doses of 50 mg. (See ADVERSE REACTIONS.) VIOXX should be used with caution, and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension, or heart failure.

*Renal Effects*

Long-term administration of NSAIDs has resulted in renal papillary necrosis and other renal injury. Renal toxicity has also been seen in patients in whom renal prostaglandins have a compensatory rôle in the maintenance of renal perfusion. In these patients, administration of a nonsteroidal anti-inflammatory drug may cause a dose-dependent reduction in prostaglandin formation and, secondarily, in renal blood flow, which may precipitate overt renal decompensation. Patients at greatest risk of this reaction are those with impaired renal function, heart failure, liver dysfunction, those taking diuretics and ACE inhibitors, and the elderly. Discontinuation of NSAID therapy is usually followed by recovery to the pretreatment state.

Caution should be used when initiating treatment with VIOXX in patients with considerable dehydration. It is advisable to rehydrate patients first and then start therapy with VIOXX. Caution is also recommended in patients with pre-existing kidney disease (see WARNINGS, *Advanced Renal Disease*).

*Hepatic Effects*

Borderline elevations of one or more liver tests may occur in up to 15% of patients taking NSAIDs, and notable elevations of ALT or AST (approximately three or more times the upper limit of normal) have been reported in approximately 1% of patients in clinical trials with NSAIDs. These laboratory abnormalities may progress, may remain unchanged, or may be transient with continuing therapy. Rare cases of severe hepatic reactions, including jaundice and fatal fulminant hepatitis, liver necrosis and hepatic failure (some with fatal outcome) have been reported with NSAIDs, including VIOXX. In controlled clinical trials of VIOXX, the incidence of borderline elevations of liver tests at doses of 12.5 and 25 mg daily was comparable to the incidence observed with ibuprofen and lower than that observed with diclofenac. In placebo-controlled trials, approximately 0.5% of patients taking rofecoxib (12.5 or 25 mg QD) and 0.1% of patients taking placebo had notable elevations of ALT or AST.

A patient with symptoms and/or signs suggesting liver dysfunction, or in whom an abnormal liver test has occurred, should be monitored carefully for evidence of the development of a more severe hepatic reaction while on therapy with VIOXX. The maximum recommended chronic daily dose in patients with moderate hepatic insufficiency is 12.5 mg daily. Use of VIOXX is not recommended in patients with severe hepatic insufficiency (see CLINICAL PHARMACOLOGY, *Special Populations* and DOSAGE AND ADMINISTRATION, *Hepatic Insufficiency*). If clinical signs and symptoms consistent with liver disease develop, or if systemic manifestations occur (e.g., eosinophilia, rash, etc.), VIOXX should be discontinued.

*Hematological Effects*

Anemia is sometimes seen in patients receiving VIOXX. In placebo-controlled trials, there were no significant differences observed between VIOXX and placebo in clinical reports of anemia. Patients on long-term treatment with VIOXX should have their hemoglobin or hematocrit checked if they exhibit any signs or symptoms of anemia or blood loss. VIOXX does not generally affect platelet counts, prothrombin time (PT), or partial thromboplastin time (PTT), and does not inhibit platelet aggregation at indicated dosages (see CLINICAL STUDIES, *Special Studies, Platelets*).

*Preexisting Asthma*

Patients with asthma may have aspirin-sensitive asthma. The use of aspirin in patients with aspirin-sensitive asthma has been associated with severe bronchospasm which can be fatal. Since cross reactivity, including bronchospasm, between aspirin and other nonsteroidal anti-inflammatory drugs has been reported in such aspirin-sensitive patients, VIOXX should not be administered to patients with this form of aspirin sensitivity and should be used with caution in patients with preexisting asthma.

***Information for Patients***

Physicians should instruct their patients to read the patient package insert before starting therapy with VIOXX and to reread it each time the prescription is renewed in case any information has changed.

VIOXX can cause discomfort and, rarely, more serious side effects, such as gastrointestinal bleeding, which may result in hospitalization and even fatal outcomes. Although serious GI tract ulcerations and bleeding can occur without warning symptoms, patients should be alert for the signs and symptoms of ulcerations and bleeding, and should ask for medical advice when observing any indicative signs or symptoms. Patients should be apprised of the importance of this follow-up. For additional gastrointestinal safety information see CLINICAL STUDIES, *Special Studies, VIGOR* and WARNINGS, *Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding and Perforation*. Patients should be informed that VIOXX is not a substitute for aspirin for cardiovascular prophylaxis because of its lack of effect on platelets. For additional cardiovascular safety information see CLINICAL STUDIES, *Special Studies, VIGOR* and PRECAUTIONS, *Cardiovascular Effects*.

Patients should promptly report signs or symptoms of gastrointestinal ulceration or bleeding, skin rash, unexplained weight gain, edema or chest pain to their physicians.

Patients should be informed of the warning signs and symptoms of hepatotoxicity (e.g., nausea, fatigue, lethargy, pruritus, jaundice, right upper quadrant tenderness, and "flu-like" symptoms). If these occur, patients should be instructed to stop therapy and seek immediate medical therapy.

Patients should also be instructed to seek immediate emergency help in the case of an anaphylactoid reaction (see WARNINGS).

In late pregnancy VIOXX should be avoided because it may cause premature closure of the ductus arteriosus.

*Laboratory Tests*

Because serious GI tract ulcerations and bleeding can occur without warning symptoms, physicians should monitor for signs or symptoms of GI bleeding.

*Drug Interactions*

*ACE inhibitors:* Reports suggest that NSAIDs may diminish the antihypertensive effect of Angiotensin Converting Enzyme (ACE) inhibitors. In patients with mild to moderate hypertension, administration of 25 mg daily of VIOXX with the ACE inhibitor benazepril, 10 to 40 mg for 4 weeks, was associated with an average increase in mean arterial pressure of about 3 mm Hg compared to ACE inhibitor alone. This interaction should be given consideration in patients taking VIOXX concomitantly with ACE inhibitors.

*Aspirin:* Concomitant administration of low-dose aspirin with VIOXX may result in an increased rate of GI ulceration or other complications, compared to use of VIOXX alone. In a 12-week endoscopy study conducted in OA patients there was no difference in the cumulative incidence of endoscopic gastroduodenal ulcers in patients taking low-dose (81 mg) enteric coated aspirin plus VIOXX 25 mg daily, as compared to those taking ibuprofen 2400 mg daily alone. Patients taking low-dose aspirin plus ibuprofen were not studied. (See CLINICAL STUDIES, *Special Studies, Upper Endoscopy in Patients with Osteoarthritis and Rheumatoid Arthritis*.)

At steady state, VIOXX 50 mg once daily had no effect on the anti-platelet activity of low-dose (81 mg once daily) aspirin, as assessed by *ex vivo* platelet aggregation and serum TXB2 generation in clotting blood. Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis. Therefore, in patients taking VIOXX, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis. (See CLINICAL

STUDIES, *Special Studies, Platelets* and PRECAUTIONS, *Cardiovascular Effects.*) Prospective, long-term studies on concomitant administration of VIOXX and aspirin have not been conducted.

*Cimetidine:* Co-administration with high doses of cimetidine [800 mg twice daily] increased the $C_{max}$ of rofecoxib by 21%, the $AUC_{0-120hr}$ by 23% and the $t_{1/2}$ by 15%. These small changes are not clinically significant and no dose adjustment is necessary.

*Digoxin:* Rofecoxib 75 mg once daily for 11 days does not alter the plasma concentration profile or renal elimination of digoxin after a single 0.5 mg oral dose.

*Furosemide:* Clinical studies, as well as post-marketing observations, have shown that NSAIDs can reduce the natriuretic effect of furosemide and thiazides in some patients. This response has been attributed to inhibition of renal prostaglandin synthesis.

*Ketoconazole:* Ketoconazole 400 mg daily did not have any clinically important effect on the pharmacokinetics of rofecoxib.

*Lithium:* NSAIDs have produced an elevation of plasma lithium levels and a reduction in renal lithium clearance. In post-marketing experience there have been reports of increases in plasma lithium levels. Thus, when VIOXX and lithium are administered concurrently, subjects should be observed carefully for signs of lithium toxicity.

*Methotrexate:* VIOXX 12.5, 25, and 50 mg, each dose administered once daily for 7 days, had no effect on the plasma concentration of methotrexate as measured by $AUC_{0-24hr}$ in patients receiving single weekly methotrexate doses of 7.5 to 20 mg for rheumatoid arthritis. At higher than recommended doses, VIOXX 75 mg administered once daily for 10 days increased plasma concentrations by 23% as measured by $AUC_{0-24hr}$ in patients receiving methotrexate 7.5 to 15 mg/week for rheumatoid arthritis. At 24 hours postdose, a similar proportion of patients treated with methotrexate alone (94%) and subsequently treated with methotrexate co-administered with 75 mg of rofecoxib (88%) had methotrexate plasma concentrations below the measurable limit (5 ng/mL). Standard monitoring of methotrexate-related toxicity should be continued if VIOXX and methotrexate are administered concomitantly.

*Oral Contraceptives:* Rofecoxib did not have any clinically important effect on the pharmacokinetics of ethinyl estradiol and norethindrone.

*Prednisone/prednisolone:* Rofecoxib did not have any clinically important effect on the pharmacokinetics of prednisolone or prednisone.

*Rifampin:* Co-administration of VIOXX with rifampin 600 mg daily, a potent inducer of hepatic metabolism, produced an approximate 50% decrease in rofecoxib plasma concentrations. Therefore, a starting daily dose of 25 mg of VIOXX should be considered for the treatment of osteoarthritis when VIOXX is co-administered with potent inducers of hepatic metabolism.

*Theophylline:* VIOXX 12.5, 25, and 50 mg administered once daily for 7 days increased plasma theophylline concentrations ($AUC_{(0-\infty)}$) by 38 to 60% in healthy subjects administered a single 300-mg dose of theophylline. Adequate monitoring of theophylline plasma concentrations should be considered when therapy with VIOXX is initiated or changed in patients receiving theophylline.

These data suggest that rofecoxib may produce a modest inhibition of cytochrome P450 (CYP) 1A2. Therefore, there is a potential for an interaction with other drugs that are metabolized by CYP 1A2 (e.g., amitriptyline, tacrine, and zileuton).

*Warfarin:* Anticoagulant activity should be monitored, particularly in the first few days after initiating or changing VIOXX therapy in patients receiving warfarin or similar agents, since these patients are at an increased risk of bleeding complications. In single and multiple dose studies in healthy subjects receiving both warfarin and rofecoxib, prothrombin time (measured as INR) was increased by approximately 8% to 11%. In post-marketing experience, bleeding events have been reported, predominantly in the elderly, in association with increases in prothrombin time in patients receiving VIOXX concurrently with warfarin.

*Carcinogenesis, Mutagenesis, Impairment of Fertility*

Rofecoxib was not carcinogenic in mice given oral doses up to 30 mg/kg (male) and 60 mg/kg (female) (approximately 5- and 2-fold the human exposure at 25 and 50 mg daily based on $AUC_{0-24}$) and in male and female rats given oral doses up to 8 mg/kg (approximately 6- and 2-fold the human exposure at 25 and 50 mg daily based on $AUC_{0-24}$) for two years.

Rofecoxib was not mutagenic in an Ames test or in a V-79 mammalian cell mutagenesis assay, nor clastogenic in a chromosome aberration assay in Chinese hamster ovary (CHO) cells, in an *in vitro* and an *in vivo* alkaline elution assay, or in an *in vivo* chromosomal aberration test in mouse bone marrow.

Rofecoxib did not impair male fertility in rats at oral doses up to 100 mg/kg (approximately 20- and 7-fold human exposure at 25 and 50 mg daily based on the $AUC_{0-24}$) and rofecoxib had no effect on fertility in female rats at doses up to 30 mg/kg (approximately 19- and 7-fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$).

*Pregnancy*

*Teratogenic effects: Pregnancy Category C.*

Rofecoxib was not teratogenic in rats at doses up to 50 mg/kg/day (approximately 28- and 10-fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). There was a slight, non-statistically significant increase in the overall incidence of vertebral malformations only in the rabbit at doses of 50 mg/kg/day (approximately 1- or <1-fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). There are no studies in pregnant women. VIOXX should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

*Nonteratogenic effects*

Rofecoxib produced peri-implantation and post-implantation losses and reduced embryo/fetal survival in rats and rabbits at oral doses ≥10 and ≥75 mg/kg/day, respectively (approximately 9- and 3-fold [rats] and 2- and <1-fold [rabbits] human exposure based on the $AUC_{0-24}$ at 25 and 50 mg daily). These changes are expected with inhibition of prostaglandin synthesis and are not the result of permanent alteration of female reproductive function. There was an increase in the incidence of postnatal pup mortality in rats at ≥5 mg/kg/day (approximately 5- and 2-fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). In studies in pregnant rats administered single doses of rofecoxib, there was a treatment-related decrease in the diameter of the ductus arteriosus at all doses used (3-300 mg/kg; 3 mg/kg is approximately 2- and <1-fold human exposure at 25 or 50 mg daily based on $AUC_{0-24}$). As with other drugs known to inhibit prostaglandin synthesis, use of VIOXX during the third trimester of pregnancy should be avoided.

*Labor and delivery*

Rofecoxib produced no evidence of significantly delayed labor or parturition in females at doses 15 mg/kg in rats (approximately 10- and 3-fold human exposure as measured by the $AUC_{0-24}$ at 25 and 50 mg). The effects of VIOXX on labor and delivery in pregnant women are unknown.

Merck & Co., Inc. maintains a registry to monitor the pregnancy outcomes of women exposed to VIOXX while pregnant. Healthcare providers are encouraged to report any prenatal exposure to VIOXX by calling the **Pregnancy Registry at (800) 986-8999**.

*Nursing mothers*

Rofecoxib is excreted in the milk of lactating rats at concentrations similar to those in plasma. There was an increase in pup mortality and a decrease in pup body weight following exposure of pups to milk from dams administered VIOXX during lactation. The dose tested represents an approximate 18- and 6-fold human exposure at 25 and 50 mg based on $AUC_{0-24}$. It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk and because of the potential for serious adverse reactions in nursing infants from VIOXX, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

*Pediatric Use*

The use of VIOXX in patients with pauciarticular or polyarticular course JRA ≥ 2 years to ≤ 17 years of age was studied in pharmacokinetic studies and a 12-week, double-blind active-controlled study with a 52-week open-label extension. (See CLINICAL PHARMACOLOGY, *Pediatric;* CLINICAL STUDIES, *Pediatric Patients, Pauciarticular and Polyarticular Course Juvenile Rheumatoid Arthritis (JRA);* ADVERSE REACTIONS, *Pauciarticular and Polyarticular Course JRA.*)

Rofecoxib has not been studied in patients under the age of 2 years, with body weight less than 10 kg (22 lbs.), or in children with systemic type JRA.

*Geriatric Use*

Of the patients who received VIOXX in osteoarthritis clinical trials, 1455 were 65 years of age or older. This included 460 patients who were 75 years or older, and in one of these studies, 174 patients who were 80 years or older. No substantial differences in safety and effectiveness were observed between these subjects and younger subjects. Greater sensitivity of some older individuals cannot be ruled out. As with other NSAIDs, including those that selectively inhibit COX-2, there have been more spontaneous post-marketing reports of fatal GI events and acute renal failure in the elderly than in younger patients.

Dosage adjustment in the elderly is not necessary; however, therapy with VIOXX should be initiated at the lowest recommended dose.

## ADVERSE REACTIONS

### *Osteoarthritis*

Approximately 3600 patients with osteoarthritis were treated with VIOXX; approximately 1400 patients received VIOXX for 6 months or longer and approximately 800 patients for one year or longer. The following table of adverse experiences lists all adverse events, regardless of causality, occurring in at least 2% of patients receiving VIOXX in nine controlled studies of 6-week to 6-month duration conducted in patients with OA at the therapeutically recommended doses (12.5 and 25 mg), which included a placebo and/or positive control group.

Clinical Adverse Experiences occurring in ≥ 2.0% of Patients Treated with VIOXX in OA Clinical Trials

| | Placebo | VIOXX 12.5 or 25 mg daily | Ibuprofen 2400 mg daily | Diclofenac 150 mg daily |
|---|---|---|---|---|
| | (N = 783) | (N = 2829) | (N = 847) | (N = 498) |
| *Body As A Whole Site Unspecified* | | | | |
| Abdominal Pain | 4.1 | 3.4 | 4.6 | 5.8 |
| Asthenia/Fatigue | 1.0 | 2.2 | 2.0 | 2.6 |
| Dizziness | 2.2 | 3.0 | 2.7 | 3.4 |
| Influenza-Like Disease | 3.1 | 2.9 | 1.5 | 3.2 |
| Lower Extremity Edema | 1.1 | 3.7 | 3.8 | 3.4 |
| Upper Respiratory Infection | 7.8 | 8.5 | 5.8 | 8.2 |
| *Cardiovascular System* | | | | |
| Hypertension | 1.3 | 3.5 | 3.0 | 1.6 |
| *Digestive System* | | | | |
| Diarrhea | 6.8 | 6.5 | 7.1 | 10.6 |
| Dyspepsia | 2.7 | 3.5 | 4.7 | 4.0 |
| Epigastric Discomfort | 2.8 | 3.8 | 9.2 | 5.4 |
| Heartburn | 3.6 | 4.2 | 5.2 | 4.6 |
| Nausea | 2.9 | 5.2 | 7.1 | 7.4 |
| *Eyes, Ears, Nose, And Throat* | | | | |
| Sinusitis | 2.0 | 2.7 | 1.8 | 2.4 |
| *Musculoskeletal System* | | | | |
| Back Pain | 1.9 | 2.5 | 1.4 | 2.8 |
| *Nervous System* | | | | |
| Headache | 7.5 | 4.7 | 6.1 | 8.0 |
| *Respiratory System* | | | | |
| Bronchitis | 0.8 | 2.0 | 1.4 | 3.2 |
| *Urogenital System* | | | | |
| Urinary Tract Infection | 2.3 | 2.8 | 3.5 | 3.6 |

In the OA studies, the following spontaneous adverse events occurred in >0.1% to 1.9% of patients treated with VIOXX regardless of causality:

*Body as a Whole:* abdominal distension, abdominal tenderness, abscess, chest pain, chills, contusion, cyst, diaphragmatic hernia, fever, fluid retention, flushing, fungal infection, infection, laceration, pain, pelvic pain, peripheral edema, postoperative pain, syncope, trauma, upper extremity edema, viral syndrome.

*Cardiovascular System:* angina pectoris, atrial fibrillation, bradycardia, hematoma, irregular heartbeat, palpitation, premature ventricular contraction, tachycardia, venous insufficiency.

*Digestive System:* acid reflux, aphthous stomatitis, constipation, dental caries, dental pain, digestive gas symptoms, dry mouth, duodenal disorder, dysgeusia, esophagitis, flatulence, gastric disorder,

gastritis, gastroenteritis, hematochezia, hemorrhoids, infectious gastroenteritis, oral infection, oral lesion, oral ulcer, vomiting.

*Eyes, Ears, Nose, and Throat:* allergic rhinitis, blurred vision, cerumen impaction, conjunctivitis, dry throat, epistaxis, laryngitis, nasal congestion, nasal secretion, ophthalmic injection, otic pain, otitis, otitis media, pharyngitis, tinnitus, tonsillitis.

*Immune System:* allergy, hypersensitivity, insect bite reaction.

*Metabolism and Nutrition:* appetite change, hypercholesterolemia, weight gain.

*Musculoskeletal System:* ankle sprain, arm pain, arthralgia, back strain, bursitis, cartilage trauma, joint swelling, muscular cramp, muscular disorder, muscular weakness, musculoskeletal pain, musculoskeletal stiffness, myalgia, osteoarthritis, tendinitis, traumatic arthropathy, wrist fracture.

*Nervous System:* hypesthesia, insomnia, median nerve neuropathy, migraine, muscular spasm, paresthesia, sciatica, somnolence, vertigo.

*Psychiatric:* anxiety, depression, mental acuity decreased.

*Respiratory System:* asthma, cough, dyspnea, pneumonia, pulmonary congestion, respiratory infection.

*Skin and Skin Appendages:* abrasion, alopecia, atopic dermatitis, basal cell carcinoma, blister, cellulitis, contact dermatitis, herpes simplex, herpes zoster, nail unit disorder, perspiration, pruritus, rash, skin erythema, urticaria, xerosis.

*Urogenital System:* breast mass, cystitis, dysuria, menopausal symptoms, menstrual disorder, nocturia, urinary retention, vaginitis.

The following serious adverse events have been reported rarely (estimated <0.1%) in patients taking VIOXX, regardless of causality. Cases reported only in the post-marketing experience are indicated in italics.

*Cardiovascular:* cerebrovascular accident, congestive heart failure, deep venous thrombosis, *hypertensive crisis*, myocardial infarction, *pulmonary edema*, pulmonary embolism, transient ischemic attack, unstable angina.

*Gastrointestinal:* cholecystitis, colitis, colonic malignant neoplasm, *duodenal perforation*, duodenal ulcer, *esophageal ulcer*, *gastric perforation*, *gastric ulcer*, gastrointestinal bleeding, *hepatic failure*, *hepatitis*, intestinal obstruction, *jaundice*, pancreatitis.

*Hemic and lymphatic: agranulocytosis, aplastic anemia, leukopenia*, lymphoma, *pancytopenia, thrombocytopenia.*

*Immune System: anaphylactic/anaphylactoid reaction, angioedema, bronchospasm, hypersensitivity vasculitis.*

*Metabolism and nutrition: hyponatremia.*

*Nervous System: aseptic meningitis, epilepsy aggravated.*

*Psychiatric: confusion, hallucinations.*

*Skin and Skin Appendages: photosensitivity reactions, severe skin reactions, including Stevens-Johnson syndrome and toxic epidermal necrolysis.*

*Urogenital System: acute renal failure*, breast malignant neoplasm, *hyperkalemia, interstitial nephritis*, prostatic malignant neoplasm, urolithiasis, *worsening chronic renal failure.*

In 1-year controlled clinical trials and in extension studies for up to 86 weeks (approximately 800 patients treated with VIOXX for one year or longer), the adverse experience profile was qualitatively similar to that observed in studies of shorter duration.

***Rheumatoid Arthritis***

Approximately 1,100 patients were treated with VIOXX in the Phase III rheumatoid arthritis efficacy studies. These studies included extensions of up to 1 year. The adverse experience profile was generally similar to that reported in the osteoarthritis studies. In studies of at least three months, the incidence of hypertension in RA patients receiving the 25 mg once daily dose of VIOXX was 10.0% and the incidence of hypertension in patients receiving naproxen 500 mg twice daily was 4.7%.

***Analgesia, including primary dysmenorrhea***

Approximately one thousand patients were treated with VIOXX in analgesia studies. All patients in post-dental surgery pain studies received only a single dose of study medication. Patients in primary dysmenorrhea studies may have taken up to 3 daily doses of VIOXX, and those in the post-orthopedic surgery pain study were prescribed 5 daily doses of VIOXX.

The adverse experience profile in the analgesia studies was generally similar to those reported in the osteoarthritis studies. The following additional adverse experience, which occurred at an incidence of at least 2% of patients treated with VIOXX, was observed in the post-dental pain surgery studies: post-dental extraction alveolitis (dry socket).

***Migraine with or without aura***

Approximately 750 patients were treated with a single dose of VIOXX 25 mg or 50 mg in two single-attack migraine studies. Approximately 460 patients in the 3-month extension phase of one study treated up to 8 (average 3) migraine attacks per month. In single attack studies, the following adverse events were more frequent in the VIOXX treatment groups (25 mg and 50 mg) compared to the placebo group. and occurred at an incidence of at least 2% of patients treated: dizziness, nausea, somnolence and dyspepsia. In the 3-month extension phase of one study, the following adverse events occurred at an incidence of at least 2% of patients treated in the VIOXX treatment groups (25 mg and 50 mg): dizziness, dry mouth, nausea, and vomiting.

***Clinical Studies in OA and RA with VIOXX 50 mg (Twice the highest dose recommended for chronic use)***

In OA and RA clinical trials which contained VIOXX 12.5 or 25 mg as well as VIOXX 50 mg, VIOXX 50 mg QD was associated with a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn, nausea and vomiting), lower extremity edema, hypertension, serious[*] adverse experiences and discontinuation due to clinical adverse experiences compared to the recommended chronic doses of 12.5 and 25 mg (see DOSAGE AND ADMINISTRATION).

***Pauciarticular and Polyarticular Course Juvenile Rheumatoid Arthritis***

In a 12-week study, 209 JRA patients, ≥ 2 years to ≤ 17 years of age, were treated with rofecoxib; 109 and 100 patients were treated with lower-dose rofecoxib and higher-dose rofecoxib, respectively. In a 52-week open-label extension, 160 JRA patients, ≥ 2 years to ≤ 17 years of age, were treated with higher-dose rofecoxib for up to 15 months. No new adverse experiences were identified other than a single case of pseudoporphyria (a photo-induced blistering reaction), an adverse event that has been seen in patients with JRA treated with non-selective NSAIDs. In this 12-week study, the most common adverse experiences (at 0.6 mg/kg dose) were upper abdominal pain, nasopharyngitis, diarrhea, upper respiratory tract infection, abdominal pain, headache and rhinitis. Rash was also reported.

## OVERDOSAGE

No overdoses of VIOXX were reported during clinical trials. Administration of single doses of VIOXX 1000 mg to 6 healthy volunteers and multiple doses of 250 mg/day for 14 days to 75 healthy volunteers did not result in serious toxicity.

In the event of overdose, it is reasonable to employ the usual supportive measures, e.g., remove unabsorbed material from the gastrointestinal tract, employ clinical monitoring, and institute supportive therapy, if required.

Rofecoxib is not removed by hemodialysis; it is not known whether rofecoxib is removed by peritoneal dialysis.

## DOSAGE AND ADMINISTRATION

VIOXX is administered orally. The lowest dose of VIOXX should be sought for each patient.

*Osteoarthritis*

The recommended starting dose of VIOXX is 12.5 mg once daily. Some patients may receive additional benefit by increasing the dose to 25 mg once daily. The maximum recommended daily dose is 25 mg.

---

[*]adverse experience that resulted in death, permanent or substantial disability, hospitalization, congenital anomaly, or cancer, was immediately life threatening, was due to an overdose, or was thought by the investigator to require intervention to prevent one of the above outcomes

*Rheumatoid Arthritis*

The recommended dose is 25 mg once daily. The maximum recommended daily dose is 25 mg.

*Pauciarticular and Polyarticular Course Juvenile Rheumatoid Arthritis*

| Pediatric Patients | Daily Dose |
|---|---|
| ≥ 2 years to ≤ 11 years of age and ≥ 10 to < 42 kg | 0.6 mg/kg to a maximum of 25 mg* |
| ≥ 2 years to ≤ 11 years of age and ≥ 42 kg | 25 mg |
| ≥ 12 years to ≤ 17 years of age | 25 mg |

*Oral suspension dosage form is recommended. To improve dosing accuracy in smaller weight children, the use of 12.5 mg/5 mL oral suspension (2.5 mg/mL) is recommended.

*Management of Acute Pain and Treatment of Primary Dysmenorrhea*

The recommended dose of VIOXX is 50 mg once daily. The maximum recommended daily dose is 50 mg. Use of VIOXX for more than 5 days in management of pain has not been studied. Chronic use of VIOXX 50 mg daily is not recommended. (See ADVERSE REACTIONS, *Clinical Studies in OA and RA with VIOXX 50 mg*).

*Acute Treatment of Migraine Attacks with or without aura*

The recommended starting dose of VIOXX is 25 mg once daily. Some patients may receive additional benefit with 50 mg as compared to 25 mg. The maximum recommended daily dose is 50 mg. The safety of treating more than 5 migraine attacks in any given month has not been established. Chronic daily use of VIOXX for the acute treatment of migraine is not recommended.

*Hepatic Insufficiency*

Because of significant increases in both AUC and $C_{max}$ in patients with moderate hepatic impairment (Child-Pugh score: 7-9), the maximum recommended chronic daily dose is 12.5 mg. (See CLINICAL PHARMACOLOGY, *Special Populations*). The efficacy of 12.5 mg in rheumatoid arthritis patients with moderate hepatic insufficiency has not been studied.

VIOXX Tablets may be taken with or without food.

*Oral Suspension*

VIOXX Oral Suspension 12.5 mg/5 mL or 25 mg/5 mL may be substituted for VIOXX Tablets 12.5 or 25 mg, respectively, in any of the above indications. Shake before using.

**HOW SUPPLIED**

No. 3810 — Tablets VIOXX, 12.5 mg, are cream/off-white, round, shallow cup tablets engraved MRK 74 on one side and VIOXX on the other. They are supplied as follows:

**NDC** 0006-0074-31 unit of use bottles of 30
**NDC** 0006-0074-28 unit dose packages of 100
**NDC** 0006-0074-68 bottles of 100
**NDC** 0006-0074-82 bottles of 1000
**NDC** 0006-0074-80 bottles of 8000.

No. 3834 — Tablets VIOXX, 25 mg, are yellow, round tablets engraved MRK 110 on one side and VIOXX on the other. They are supplied as follows:

**NDC** 0006-0110-31 unit of use bottles of 30
**NDC** 0006-0110-28 unit dose packages of 100
**NDC** 0006-0110-68 bottles of 100
**NDC** 0006-0110-82 bottles of 1000
**NDC** 0006-0110-80 bottles of 8000.

No. 3835 — Tablets VIOXX, 50 mg, are orange, round tablets engraved MRK 114 on one side and VIOXX on the other. They are supplied as follows:

**NDC** 0006-0114-31 unit of use bottles of 30
**NDC** 0006-0114-28 unit dose packages of 100
**NDC** 0006-0114-68 bottles of 100
**NDC** 0006-0114-74 bottles of 500
**NDC** 0006-0114-81 bottles of 4000.

No. 3784 — Oral Suspension VIOXX, 12.5 mg/5 mL, is an opaque, white to faint yellow suspension with a strawberry flavor that is easily resuspended upon shaking.

**NDC** 0006-3784-64 unit of use bottles containing 150 mL (12.5 mg/5 mL).

No. 3785 — Oral Suspension VIOXX, 25 mg/5 mL, is an opaque, white to faint yellow suspension with a strawberry flavor that is easily resuspended upon shaking.

NDC 0006-3785-64 unit of use bottles containing 150 mL (25 mg/5 mL).

*Storage*

*VIOXX Tablets:*

Store at 25°C (77°F), excursions permitted to 15-30°C (59-86°F). [See USP Controlled Room Temperature.]

*VIOXX Oral Suspension:*

Store at 25°C (77°F), excursions permitted to 15-30°C (59-86°F). [See USP Controlled Room Temperature.]

Rx only

---

MERCK & CO., INC., Whitehouse Station, NJ 08889, USA

Issued
Printed in USA

**Patient Information about**
**VIOXX® (rofecoxib tablets and oral suspension)**
**VIOXX® (pronounced "VI-ox")**
**for Osteoarthritis, Rheumatoid Arthritis, Juvenile Rheumatoid Arthritis, Pain and Migraine Attacks**
**Generic name: rofecoxib ("ro-fa-COX-ib")**

You should read this information before you or your child start taking VIOXX*. Also, read the leaflet each time you refill a prescription, in case any information has changed. This leaflet provides only a summary of certain information about VIOXX. The doctor or pharmacist can give you an additional leaflet that is written for health professionals that contains more complete information. This leaflet does not take the place of talking with your doctor about your condition or treatment. If you have questions about VIOXX ask your doctor or pharmacist.

**What is VIOXX?**

VIOXX is a prescription medicine called a COX-2 selective, nonsteroidal anti-inflammatory drug (NSAID). (See section "What is VIOXX used for?")

**Who should not take VIOXX?**

Do not take VIOXX if you or your child:

- have had an allergic reaction such as asthma attacks (wheezing), hives, or swelling of the throat and face to aspirin or other medicines called non-steroidal anti-inflammatory drugs (NSAIDs). There are many NSAID medicines. Ask the doctor or pharmacist for a list of medicines that contain NSAIDs if you are not sure.
- are allergic to rofecoxib, the active ingredient of VIOXX, or to any other ingredients in VIOXX. See the end of this leaflet for a complete list of ingredients in VIOXX.

**What are the possible side effects of VIOXX?**

Serious but rare and potentially life-threatening side effects that have been reported in patients taking VIOXX include:

- Serious stomach problems, such as stomach and intestinal bleeding, can happen with or without warning symptoms. These problems, if serious, could lead to hospitalization or death. Although this does not happen often, you should watch for the signs and symptoms (for instance, stomach burning, vomiting blood, or if there is blood in the bowel movement or it is black and sticky like tar). Call your doctor right away if you or your child have any of these serious side effects.

- Serious allergic reactions include the symptoms and signs of swelling of the face, lips, tongue; trouble breathing such as chest tightness or shortness of breath; trouble swallowing; hives; wheezing; or shock (loss of blood pressure and consciousness). Get emergency help right away if you get any of these symptoms or signs. Serious skin reactions have also been reported.

*Registered trademark of MERCK & CO., Inc.
COPYRIGHT © MERCK & CO., Inc., 1998, 2002
All rights reserved

- Heart attacks and other serious cardiovascular events, such as blood clots in your body have been reported in patients taking VIOXX.

- Serious kidney problems can happen, including acute (sudden) kidney failure and worsening of chronic kidney failure.

- Severe liver problems, including hepatitis, jaundice and liver failure, can occur. Call your doctor if you or your child gets any of these symptoms of liver problems. These include: nausea; itching; pain in the right upper abdomen; yellow skin or eyes; or flu-like symptoms.

Your doctor may do blood tests and check you or your child for problems that may happen during treatment with VIOXX.

More common, but less serious side effects reported with VIOXX have included the following:

- Respiratory infections
- Headache
- Dizziness
- Diarrhea
- Nausea, vomiting and upset stomach
- Heartburn
- Stomach pain
- Swelling of the legs and/or feet
- High blood pressure
- Back pain
- Tiredness
- Urinary tract infection.

In addition, the following side effects have been reported: anxiety, blurred vision, colitis, confusion, constipation, decreased levels of sodium in the blood, depression, fluid in the lungs, hair loss, hallucinations, increased levels of potassium in the blood, insomnia, low blood cell counts, menstrual disorder, palpitations, pancreatitis, ringing in the ears, severe increase in blood pressure, skin reactions caused by sunlight, tingling sensation, unusual headache with stiff neck (aseptic meningitis), vertigo, worsening of epilepsy.

These are not all the side effects reported with VIOXX. Do not use this leaflet alone for information about side effects. Your doctor or pharmacist can talk to you about other side effects. Any time you or your child have a medical problem you think may be related to VIOXX, talk to your doctor.

**What is VIOXX used for?**

VIOXX is used in adults for:

- relief of the pain and inflammation (swelling and soreness) of osteoarthritis (arthritis from wear and tear on your bones and your joints)

- relief of the pain and inflammation of rheumatoid arthritis in adults (arthritis caused by a condition where your immune system attacks your joints)
- management of short-term pain
- treatment of menstrual pain (pain during women's monthly periods)
- treatment of migraine headache attacks with or without aura.

VIOXX is used in children and adolescents, of at least 2 years of age and who weigh at least 10 kg (22 lbs.) to help relieve:

- the signs and symptoms of pauciarticular or polyarticular Juvenile Rheumatoid Arthritis (JRA). VIOXX has not been studied in children with systemic type JRA.

VIOXX has not been studied in children less than 2 years old or with body weight less than 10 kg (22 lbs.).

**What should I tell the doctor before and during treatment with VIOXX?**

Tell your doctor about all your or your child's medical conditions including if you or your child have or have had:

- an allergic reaction to aspirin or other NSAIDs
- asthma (a small number of patients with asthma have reactions to aspirin or other NSAIDs)
- stomach problems such as ulcers or bleeding
- kidney disease
- liver disease
- angina (for instance, chest, arm, or jaw pain), a heart attack, or a blocked artery in the heart
- heart failure
- high blood pressure

Tell your doctor if you or your child are:

- pregnant or plan to become pregnant. VIOXX may harm your unborn baby if you take it in late pregnancy. If you take VIOXX while you are pregnant, ask your doctor how you can be on the VIOXX Pregnancy Registry.
- breast-feeding or plan to breast-feed. It is not known if VIOXX passes into your milk and if it can harm your baby. You should discuss with your doctor whether or not to take VIOXX if you are breast-feeding.

Tell your doctor about:

- any other medical problems or allergies you or your child have now or have had.
- all the medicines you or your child take including prescription and non-prescription medicines, vitamins, and herbal supplements.

Tell your doctor right away if you or your child develop:

- serious stomach problems such as ulcer or bleeding symptoms (for instance, stomach burning, vomiting blood, or if there is blood in the bowel movement or it is black and sticky like tar.
- unexplained weight gain or swelling of the legs, feet, and/or hands.

- skin rash or allergic reactions. If you or your child have a severe allergic reaction, get medical help right away.

**Can VIOXX be taken with other medicines?**

Tell your doctor about all of the other medicines you or your child are taking or plan to take while you or your child are on VIOXX, even other medicines that you can get without a prescription, including vitamins and herbal supplements. VIOXX and certain other medicines can affect each other causing serious side effects. Keep a list of the medicines you or your child take. Show the list to your doctors and pharmacists each time you get a new medicine. They will tell you if it is safe to take VIOXX with other medicines. Especially tell your doctor if you or your child are taking:

- or have taken warfarin (Coumadin®) or any other similar blood thinner within the past 10 days
- theophylline (a medicine used to treat asthma)
- rifampin (an antibiotic)
- ACE inhibitors (medicines used for high blood pressure and heart failure)
- lithium (a medicine used to treat a certain type of depression).

VIOXX cannot take the place of aspirin for prevention of heart attack or stroke. If you or your child take both aspirin and VIOXX, there may be a higher chance of serious stomach problems than if VIOXX is taken alone. If you or your child are taking aspirin for prevention of heart attack or stroke, you or your child should not stop taking aspirin without talking to your doctor.

**How should VIOXX be taken?**

- Take VIOXX exactly as prescribed by the doctor. The dose will depend on the condition being treated and other medical problems you or your child may have. Do not change the dose of VIOXX or take extra doses unless the doctor has told you to.
- VIOXX may be taken with or without food.
- If you or your child miss a dose of VIOXX by a few hours, take it as soon as you remember. If it is close to the next dose, do NOT take the missed dose.
- If you or your child take too much VIOXX, call the doctor, pharmacist, or poison control center right away.

**How should I store VIOXX?**

- Store VIOXX at room temperature, 59° to 86°F (15° to 30°C).
- Safely throw away VIOXX that is out of date or no longer needed.
- Keep VIOXX and all medicines out of the reach of children.

**What else should I know about VIOXX?**

This leaflet provides a summary of certain information about VIOXX. If you have any questions or concerns about VIOXX talk to your health professional. Your doctor or pharmacist can give you an additional leaflet that is written for health professionals. This leaflet is also available at www.vioxx.com.

Medicines are sometimes prescribed for conditions other than those described in patient information leaflets. Do not use VIOXX for a condition for which it was not prescribed. Do not give VIOXX to other people even if they have the same symptoms you have. It may harm them.

**What are the ingredients in VIOXX?**

Active Ingredient: rofecoxib

Inactive Ingredients:

Oral suspension: citric acid (monohydrate), sodium citrate (dihydrate), sorbitol solution, strawberry flavor, xanthan gum, sodium methylparaben, sodium propylparaben.

Tablets: croscarmellose sodium, hydroxypropyl cellulose, lactose, magnesium stearate, microcrystalline cellulose, and yellow ferric oxide.

**Rx Only**

Issued

MERCK & CO., Inc.
Whitehouse Station, NJ 08889, USA



Study-, MK-0966 versus Ibuprofen versus placebo
Pooled Analysis
Pi-otocol 069-Pooled Analysis of the PUBs. Additionally, as part of Protocol 069, a pooled analysis of discontinuations due to GI adverse experiences and prespecified "NSAID type" GI adverse experiences are reported in Section 2.3.3.
1.2.4 Other Studies-Rheumatoid Arthritis
Three studies perfom-ied in patients with rheumatoid arthritis are reported in Section 5. These studies are reported in a separate section because: (1) they utilized doses of MK-0966 several fold higher than the dose
/MK-0966/WMA/RWI316.DOC APPROVED
260CT98
Do_nfil~tial - Subject To Protective Order MRK-NJO179938

###311|||Page MRK-NJ0179938^^^

MK-0966 E-20
Clinical Documentation
E. Clinical Safety
1. General Safety Overview
1.2.4 Other Studies-Rheumatoid Arthritis (Cont.)
proposed for Lhe treatment of OA and acute pain, (2) rheumatoid arthn'tis patients have a distinct demographic profile, and (3) rheumatoid arthfitis will be filed as a new indication at a later date.

rheumatoid arthritis withdrawn.

1.3 Tables of All Clinical Studies
Table E-2, Table E-3, and Table E-4 present all the clinical studies conducted with MK-0966. Only serious adverse experience information is provided in this document for the ongoing supplemental studies (Section 7.).
/MK-0966fWMA/RWI316.DOC APPROVED
260CT98
ifonf-idential - Subject To Protective Order MRK-NJO179939

###312[|]Page MRK-NJ0179939^^^

MK-0966
Clinical Documentation
E. Clinical Safety
1. General Safety Overview
1.3 Tables of All Clinical Studies (Cont.)
Table E-2 Summary of Studies in the Osteoarthritis Safety Section

| Study Type/Protocol Numbers | Total Duration | Total Daily MK-0966 Dose | Subjects[Patients Ti-eated -09 | Placebo | Act ive-Com pa rator/ Opeti-Label | Total Patients |
|---|---|---|---|---|---|---|

Case 2:05-md-01657-EEF-DEK Document 64640-3 Filed 10/16/13 Page 160 of 182

# High dose nonsteroidal anti-inflammatory drugs compromise spinal fusion

## *[De fortes doses d'anti-inflammatoires non stéroïdiens compromettent l'arthrodèse vertébrale]*

Scott S. Reuben MD,* David Ablett FRCP,† Rachel Kaye‡

**Purpose:** Although nonsteroidal anti-inflammatory drugs (NSAIDs) provide benefit to patients following spinal fusion surgery, their routine administration has remained controversial due to concerns about possible deleterious effects on bone healing. The goal of this retrospective study was to assess the incidence of non-union following the perioperative administration of ketorolac, celecoxib, or rofecoxib.

**Methods:** We retrospectively analyzed the data of 434 patients receiving perioperative ketorolac (20–240 mg·day$^{-1}$), celecoxib (200–600 mg·day$^{-1}$), rofecoxib (50 mg·day$^{-1}$), or no NSAIDs in the five days following spinal fusion surgery.

**Results:** There were no significant differences in the incidence of non-union among the groups that received no NSAIDs (11/130; 8.5%), celecoxib 5/60; 8.3%), or rofecoxib (9/124; 7.3%). In contrast, 23/120 of patients (19.2%) that received ketorolac had a higher incidence ($P < 0.001$) of non-union compared to non-NSAID users. However, only 3/50 patients (6%) receiving low-dose ketorolac (≤ 110 mg·day$^{-1}$) resulted in non-union which was not significantly different from non-NSAID users. Patients administered higher doses of ketorolac (120–240 mg·day$^{-1}$) resulted in a higher incidence ($P < 0.0001$) of non-union (20/70; 29%) compared to non-NSAID users. For those patients developing non-union, there was a higher incidence comparing smokers *vs* non-smokers ($P < 0.0001$) and one level fusion *vs* two level fusions ($P < 0.001$).

**Conclusions:** This study revealed that the short-term perioperative administration of celecoxib, rofecoxib, or low-dose ketorolac (≤ 110 mg·day$^{-1}$) had no significant deleterious effect on non-union. In contrast, higher doses of ketorolac (120–240 mg·day$^{-1}$), history of smoking, and two level vertebral fusions resulted in a significant increase in the incidence of non-union following spinal fusion surgery.

***Objectif :*** *Les anti-inflammatoires non stéroïdiens (AINS) sont bénéfiques après une arthrodèse vertébrale, mais leur administration régulière demeure controversée à cause des effets nuisibles possibles sur la cicatrisation de l'os. Notre étude rétrospective voulait évaluer l'incidence d'absence de fusion à la suite de l'administration péri-opératoire de kétorolac, célécoxib ou rofécoxib.*

***Méthode :*** *Nous avons procédé à l'analyse rétrospective de données sur 434 patients qui ont reçu du kétorolac (20–240 mg·jour$^{-1}$), du célécoxib (200–600 mg·jour$^{-1}$), du rofécoxib (50 mg·jour$^{-1}$) ou aucun AINS dans les cinq jours suivant une arthrodèse vertébrale.*

***Résultats :*** *L'incidence d'absence de fusion osseuse n'était pas significativement différente entre les patients sans AINS (11/130 ; 8,5 %) et ceux qui ont eu du célécoxib 5/60 ; 8,3 %) ou du rofécoxib (9/124 ; 7,3 %). Par ailleurs, 23/120 des patients (19,2 %) qui ont reçu le kétorolac ont présenté une incidence plus élevée ($P < 0,001$) d'absence de fusion en comparaison de ceux qui ont pris des AINS. Seulement 3/50 patients (6 %) recevant de faibles doses de kétorolac (≤ 110 mg·jour$^{-1}$) ont présenté une absence de fusion, ce qui n'est pas significativement différent des non-utilisateurs d'AINS. Des doses plus élevées de kétorolac (120–240 mg·jour$^{-1}$), comparées aux non-AINS, ont provoqué une plus haute incidence ($P < 0,0001$) d'absence de fusion (20/70 ; 29 %). L'incidence d'absence de fusion était plus élevée si on compare les fumeurs vs les non-fumeurs ($P < 0,0001$) et la fusion à un niveau vs à deux niveaux ($P < 0,001$).*

***Conclusion :*** *L'étude a révélé que l'administration périopératoire à court terme de célécoxib, de rofécoxib ou de faibles doses de kétorolac (≤ 110 mg·jour$^{-1}$) n'a pas d'effet nuisible significatif sur l'absence de fusion. Par contre, des doses plus élevées de kétorolac (120–240 mg·jour$^{-1}$), le tabagisme et des fusions vertébrales à deux niveaux augmentent significativement l'incidence d'absence de fusion à la suite d'une arthrodèse vertébrale.*

From the Acute Pain Service,* Baystate Medical Center and the Tufts University School of Medicine, Springfield, Massachusetts, USA; the Department of Anesthesiology,† Calgary Health Region, Calgary, Alberta, Canada; and the Brandeis University, Waltham, Massachusetts, USA.

*Address correspondence to:* Dr. Scott S. Reuben, Baystate Medical Center, 759 Chestnut Street, Springfield, MA 01199, USA. Phone: 413-794-4325; Fax: 413-794-5349; E-mail: scott.reuben@bhs.org

Presented in part at the American Society of Regional Anesthesia and Pain Medicine Meeting, Vancouver, British Columbia, Canada, May 2002.

Support was provided solely from institutional and/or departmental source.

*Accepted for publication November 3, 2004.*

*Revision accepted February 14, 2005.*



NONSTEROIDAL anti-inflammatory drugs (NSAIDs) inhibit the synthesis of prostaglandins both in the spinal cord and at the periphery, thus diminishing the hyperalgesic state after surgical trauma.[1] NSAIDs are useful as the sole analgesic after minor surgical procedures[2] and may have a significant opioid-sparing effect after major surgery.[3] It is currently recommended that NSAIDs be used in the multimodal analgesic approach for the management of perioperative pain.[4,5] The recent practice guidelines for acute pain management in the perioperative setting state "unless contraindicated, all patients should receive around-the-clock regimen of NSAIDs, coxibs, or acetaminophen".[5] Proposed and documented benefits of multimodal therapy include improved pain relief, reduction of the perioperative stress response, reduced opioid-related side effects, shorter hospital stays, decreased hospital costs, increased patient satisfaction, and a reduction in postoperative morbidity and mortality.[6,7] NSAID administration to patients undergoing spinal fusion surgery has demonstrated significant benefits including improved analgesia (decreased opioid use and pain scores), improvement in postoperative ambulation, shorter hospitalization, and a decreased incidence of nausea, vomiting, and sedation.[8–13] A cost-benefit analysis revealed a net savings to the institution of over $211,000 per year or over $350 per patient in those patients receiving NSAIDs for lumbar spine surgery.[12] In addition to these short-term analgesic benefits, a reduction in acute pain provided by perioperative NSAID administration may also reduce long-term morbidity following spinal fusion surgery. It is currently believed that there is a continuum of pain after surgery ranging from acute to chronic, and effective treatment of acute pain, may prevent the development of chronic pain syndromes.[14,15] Further, cyclooxygenase (COX)-2 is thought to play an integral role in the processes of peripheral and central sensitization, and the early intervention with COX-2 inhibitors may thwart the progression of acute pain to chronic pain.[16]

The routine use of COX-2 inhibitors for spinal fusion surgery has remained controversial due to concerns about possible deleterious effects on bone healing. Many investigators recommend that NSAIDs should not be utilized in the multimodal management of acute pain for patients undergoing spinal fusion surgery.[17–20] Although the data are conflicting, a large body of literature derived from laboratory animal studies suggests that NSAIDs either delay or inhibit bone healing.[17–19] It is difficult to extrapolate data from animal studies to humans due to the differences in pharmacokinetics between species. Further, in the majority of animal studies cited,[17–19] NSAID administration occurred over several weeks to months at doses greater than that approved for acute pain and NSAID blood levels were not measured. There are also significant flaws in study methodologies used in the human spinal fusion studies cited.[20] Numerous uncontrolled patient and surgical factors, marginal power, and retrospective design, all detract from the credibility of these negative findings.

We have been utilizing NSAIDs for almost a decade in the management of acute pain following spinal fusion surgery.[9–12] The goal of this retrospective study is to examine the effect of NSAIDs on the incidence of non-union at one-year following spinal fusion surgery.

## Methods

The Institutional Review Board approved the retrospective review of hospital charts and databases. The study population was a consecutive sample of 434 patients undergoing elective decompressive posterior lumbar laminectomy with instrumented spinal fusion by a single surgeon within an eight-year period (February 1996–January 2003). Spinal fusion was performed at one or two levels from L4 to sacrum using similar pedicle screw-rod constructs and autologous iliac crest bone graft. Exclusion criteria included more than two level vertebral fusions, patients with a prior history of spinal fusion, undergoing anterior lumbar fusion, or the use of other NSAIDs or glucocorticoids during the study period. Prior to surgery, all patients had standing anteroposterior (AP), lateral, and oblique radiographs of the lumbosacral spine.

Anesthesia was induced with either sodium pentothal or propofol and maintained with either isoflurane or sevoflurane with 70% $N_2O$ in $O_2$. All patients were administered fentanyl (5–10 $\mu g \cdot kg^{-1}$ *iv*) or morphine (0.3–0.5 $mg \cdot kg^{-1}$ *iv*) intraoperatively. Patients were connected to a patient controlled analgesia pump (Abbott PCA Plus, Abbott Park, Chicago, IL, USA) upon arrival to the postanesthesia care unit which was maintained for the first 24 hr after the completion of surgery. Bed rest was enforced for the first 24 hr postoperatively. Progressive ambulation was then begun through physical therapy. Perioperative NSAID administration included either ketorolac (20–240 $mg \cdot day^{-1}$), celecoxib (200–600 $mg \cdot day^{-1}$), or rofecoxib (50 $mg \cdot day^{-1}$) for five consecutive days according to the anesthesiologist's preference.

Fusion status was determined from the AP, oblique, and flexion-extension radiographs, and either tomography or a computed tomography scan when necessary obtained at one-year follow-up. For a fusion to be

termed solid, strict criteria were utilized according to previous published studies.[21–23] The AP radiograph had to show bridging bone bilaterally between transverse processes with trabeculation that was confluent across the fusion mass. Oblique radiographs had to confirm the presence of fusion bone in a confluent pattern between transverse processes. Flexion-extension films were considered to show solid fusion with < 2° motion on the lateral film. Criteria used to diagnose non-union included evidence of radiolucency around the hardware, collapse of graft height with a gap between the vertebral end plate and the bone graft, shift in position of the graft, and loss of fixation from hardware loosening or dislodgement. In addition, dynamic AP and lateral radiographs that revealed 4 mm horizontal motion and ≥ 10° angular motion on lateral films taken with the patient bending indicated non-union. The fusion status was determined solely by radiographic means by an independent radiologist who was blinded to the analgesic technique.

*Statistical analysis*

Demographic data (age, height, and weight) and procedure duration were analyzed with analysis of variance. The effect of ketorolac administration on non-union rate was further divided into two daily dose categories: 20 to 110 mg and 120 to 240 mg. The rationale for choosing these two dosing categories was based upon previously published guidelines for the perioperative administration of ketorolac.[10,24–26] We believe the drug manufacturers' current dosing guidelines for ketorolac (120 mg·day$^{-1}$)[24] are excessive and not consistent with the lower doses recommended in the current literature.[10,25,26] Difference in fusion rate was assessed with a Chi square test or Fisher's exact test. Multivariate logistic regression was used to explore the relationship between NSAID treatment, smoking status, age, gender, and levels of fusion on the odds of non-union. Two-factor interactions were investigated to identify factors that may have synergistic effects on the odds of non-union. Significance was determined at the $P < 0.05$ level. SAS® software, version 8.2; (SAS Institute Inc., Cary, NC, USA) was used to perform the statistical calculations.

## Results

A total of 434 patients receiving either ketorolac ($n$ = 120), rofecoxib ($n$ = 124), celecoxib ($n$ = 60), or no NSAID ($n$ = 130) were included in this retrospective study. There were no significant differences among the groups with respect to age, height, weight, duration of surgery, smoking history, or number of vertebral levels fused (Table I). A total of 48 patients (11%) developed non-union postoperatively. NSAID treatment, smoking status, and levels of fusion were all significant predictors of non-union when included in the multivariate logistic regression. There were no significant differences in the incidence of non-union among the groups that received no NSAIDs, celecoxib, or rofecoxib (Table II). Non-union was identified in 11 of the 130 patients (8.5%) who received no NSAIDs, nine of the 124 patients (7.3%) who received rofecoxib, and five of the 60 patients (8.3%) who received celecoxib (Table II). In contrast, 23 out of 120 patients (19.2%) that received ketorolac had a significantly ($P < 0.001$) higher incidence of non-union compared to non-NSAID users. This represents over a threefold greater likelihood of developing non-union with ketorolac administration (Table III). Only three of 50 patients (6%) receiving low-dose ketorolac (≤ 110 mg·day$^{-1}$) resulted in non-union which was not significantly different from non-NSAID users. Patients receiving higher doses of ketorolac (120–240 mg·day$^{-1}$) had a significantly ($P < 0.0001$) higher incidence of non-union (20 out of 70 patients; 29%) compared to non-NSAID users. This represents over an eightfold greater likelihood of developing non-union compared to non-NSAID users (Table III). For those patients developing non-union, there was a significantly higher incidence between smokers and non-smokers ($P < 0.0001$) and one level fusion *vs* two level fusions ($P < 0.001$); (Table III). Multivariate logistic regression indicated that the effects of smoking and levels of fusion were greater than additive (i.e., significant smoking status by level of fusion interaction). The effect of smoking on non-union was much greater in patients undergoing two-level fusions relative to those undergoing one-level fusion. Also, the increase in the odds of non-union in patients undergoing two-level fusions relative to those undergoing one-level fusion was larger in smokers.

## Discussion

This study revealed that the short-term perioperative administration of celecoxib, rofecoxib, or low-dose ketorolac (≤ 110 mg·day$^{-1}$) had no significant deleterious effect on spinal fusion. In contrast, higher doses of ketorolac (120–240 mg·day$^{-1}$), history of smoking, and two level vertebral fusions resulted in a significant increase in the non-union rate following spinal fusion surgery.

Although NSAIDs have proven to be beneficial in the multimodal management of pain following spinal fusion surgery,[8–13] many physicians refrain from the use of these drugs because of a possible deleterious effect on osteogenesis and spinal fusion.[17–20] Spinal

TABLE I Patient demographics and surgical data

| | *No NSAID* | *Rofecoxib* | *Celecoxib* | *Ketorolac* |
|---|---|---|---|---|
| Number | 130 | 124 | 60 | 120 |
| Gender [M/F (% M)] | 77/53 (59%) | 72/52 (58%) | 36/24 (60%) | 69/51 (58%) |
| Age (yr) | 44 ± 13 | 47 ± 16 | 49 ± 15 | 46 ± 19 |
| Weight (kg) | 79 ± 15 | 81 ± 16 | 83 ± 19 | 80 ± 12 |
| Height (cm) | 168 ± 12 | 171 ± 14 | 169 ± 11 | 170 ± 10 |
| Duration of surgery (min) | 179 ± 28 | 184 ± 32 | 171 ± 29 | 176 ± 37 |
| *Spinal levels fused* | | | | |
| 1 level | 91 (70%) | 85 (69%) | 45 (75%) | 84 (70%) |
| 2 levels | 39 (30%) | 39 (31%) | 15 (25%) | 36 (30%) |
| Smokers | 39 (30%) | 35 (29%) | 17 (28%) | 33 (28%) |
| Non-smokers | 91 (70%) | 89 (71%) | 43 (72%) | 87 (72%) |

Data are presented as mean ± SD or number (%). NSAID = nonsteroidal anti-inflammatory drugs. There were no statistical differences between the two groups.

TABLE II Non-union by subgroups

| | *No NSAID* | *Rofecoxib* | *Celecoxib* | *Ketorolac* | *Ketorolac (20–110 mg·day⁻¹)* | *Ketorolac (120–240 mg·day⁻¹)* | *Total* |
|---|---|---|---|---|---|---|---|
| Number | 130 | 124 | 60 | 120 | 50 | 70 | 434 |
| Non-union | 11 | 9 | 5 | 23 | 3 | 20 | 48 |
| *Spinal levels fused* | | | | | | | |
| 1 level | 3/91 | 3/85 | 1/45 | 4/84 | 1/35 | 3/49 | 11/305 |
| 2 levels | 8/39 | 6/39 | 4/15 | 19/36 | 2/15 | 17/21 | 37/129 |
| Smokers | 9/39 | 7/35 | 4/17 | 20/33 | 3/10 | 17/23 | 40/124 |
| Non-smokers | 2/91 | 2/89 | 1/43 | 3/87 | 0/40 | 3/47 | 8/310 |
| Male | 7/77 | 6/72 | 3/36 | 13/69 | 2/28 | 11/41 | 29/254 |
| Female | 4/53 | 3/52 | 2/24 | 10/51 | 1/22 | 9/29 | 19/180 |

NSAID = nonsteroidal anti-inflammatory drugs.

fusion is a complex process that is influenced by multiple physiologic and mechanical factors. These include patient age, cigarette smoking, surgical technique, number of vertebral levels fused, spinal instrumentation, bone graft composition, use of recombinant bone morphogenetic protein, and electrical stimulation.[17–19] In particular, the use of NSAIDs has received considerable attention with regard to its effect on spinal fusion. Unfortunately, there are currently only two studies in humans which have examined the effect of NSAIDs on spinal fusion.[21,27] In a retrospective study of 83 patients undergoing posterolateral fusion for isthmic spondylolisthesis, single-level fusions showed an overall union rate of 82%, and two-level fusions, a 74% rate.[21]. However, patients who continued to take NSAIDs for more than three months postoperatively showed significantly lower union and success rates (44% and 37%). In a retrospective study of 288 patients undergoing spinal fusion surgery, Glassman *et al.*[27] demonstrated that non-union was five times more likely to occur if ketorolac, a parenteral NSAID, was administered postoperatively compared with no NSAID use. A total of 121 patients received no NSAID after surgery, whereas 167 patients received ketorolac. There were five (4%) non-unions in the group receiving no NSAIDs and 29 (17%) non-unions in the ketorolac group ($P < 0.001$). There was a dose-dependent relationship between non-union rate and ketorolac use up to the range of nine to 12 doses per patient. The results of this study led Glassman *et al.*[27] to recommend that NSAIDs be avoided in the early postoperative period following spinal fusion surgery.

However, we believe the NSAID administration in these two studies[21,27] does not correlate with acceptable clinical practice for acute pain management. NSAIDs were administered either for a prolonged period of time (≥ three months)[21] or using excessive doses (> 2 $mg \cdot kg^{-1} \cdot day^{-1}$) of ketorolac.[27] We believe that prolonged and/or high dose NSAID administration may be deleterious to spinal fusion and thus limit the use of these drugs to the lowest effective dose for

TABLE III Multivariate odds ratio, 95% confidence intervals for non-union

| *Group comparison* | *Odds ratio, 95% confidence interval* | *P Value* |
|---|---|---|
| Rofecoxib *vs* no NSAID | 1.2 (0.4–3.9) | NS |
| Celecoxib *vs* no NSAID | 1.0 (0.2–3.7) | NS |
| Ketorolac *vs* no NSAID | 3.3 (1.0–10.3) | < 0.001 |
| Ketorolac (≤ 110 mg·day$^{-1}$) *vs* no NSAID | 1.2 (0.2–6.1) | NS |
| Ketorolac (120–240 mg·day$^{-1}$) *vs* no NSAID | 8.8 (2.8–28.0) | < 0.0001 |
| Smokers *vs* no smokers | 14.7 (5.3–40.9) | < 0.0001 |
| 1 level fusion | 4.1 (1.1–14.7) | |
| 2 level fusion | 53.1 (11.1–254.5) | |
| 2 level fusion *vs* 1 level fusion | 5.6 (2.0–15.5) | < 0.001 |
| Nonsmokers | 1.5 (0.3–8.2) | |
| Smokers | 20.1 (6.4–63.1) | |

NS = not significant. NSAID = nonsteroidal anti-inflammatory drugs. Odds ratio were computed from a multivariate logistic regression model including NSAID treatment, smoking status, levels of fusion, and the interaction between smoking status and levels of fusion.

less than one week. In the retrospective study by Glassman *et al.*,[27] ketorolac was administered in doses greater than 2 mg·kg$^{-1}$·day$^{-1}$. The appropriate analgesic dose of ketorolac is controversial. Pre-marketing clinical investigations demonstrated that 30 to 90 mg of ketorolac provided postoperative analgesia similar to 6 to 12 mg of morphine and 50 to 100 mg of meperidine.[28–30] Since ketorolac has been marketed, there have been reports of death due to gastrointestinal and operative site bleeding.[31] In a response to these adverse events, the drug's manufacturer recommended reducing the dose of ketorolac from 150 to 120 mg·day$^{-1}$.[24] The European Committee for Proprietary Medicinal Products recommended a further maximal daily dose reduction to 60 mg for the elderly and to 90 mg for the non-elderly.[25] We have previously shown that ketorolac 7.5 mg administered every six hours (0.4 mg·kg$^{-1}$·day$^{-1}$) is the optimal analgesic dose for spinal fusion surgery.[10] Glassman *et al.*[27] utilized over five times these ketorolac doses in their clinical investigation of spinal fusion surgery. The inhibitory effect of ketorolac on bone repair and fusion was found to be a dose-related phenomenon.[18,27,32] In a rabbit femoral defect model,[18] the administration of low-dose ketorolac (1.75 mg·kg$^{-1}$·day$^{-1}$) for one or five weeks postoperatively had no deleterious effect on bone healing. Ho *et al.*[32] demonstrated that ketorolac 2 mg·kg$^{-1}$·day$^{-1}$ for six weeks had minimal effect on bone repair in a rabbit ulnar defect model. In contrast, ketorolac 4 mg·kg$^{-1}$·day$^{-1}$ significantly decreased the torsional stiffness and energy absorption of the grafted ulnae and decreased the maximum torque in the intact and the grafted bones. In our present study, we also demonstrated a dose-dependent deleterious effect of ketorolac on bone healing. The incidence of non-union was significantly higher for those patients receiving ketorolac 120 to 240 mg·day$^{-1}$. In contrast, low-dose ketorolac (≤ 110 mg·day$^{-1}$) resulted in no significant increase in non-union when compared to non-NSAID users.

In contrast to nonspecific NSAIDs, we believe that the use of COX-2 specific inhibitors represents a significant therapeutic advance in the perioperative management of pain for spinal fusion surgery. Although the perioperative administration of nonspecific NSAIDs may provide effective analgesia, their ability to decrease platelet aggregation and increase bleeding time may increase the incidence of perioperative bleeding due to inhibition of thromboxane $A_2$.[2,3,33] In fact, ketorolac is contraindicated as a prophylactic analgesic prior to any major surgery.[24] In contrast, because COX-2 specific NSAIDs have no inhibitory effect on platelet function, these drugs can be safely administered as preemptive analgesics for a variety of surgical procedures[34,35] without an increased risk of perioperative bleeding.

Several investigators have examined the effect of selective COX-2 inhibitors on spinal fusion in the animal model.[36–39] Long *et al.*[36] concluded that celecoxib does not significantly inhibit the rate of spinal fusion in the rabbit model and perhaps the inhibitory effects of NSAIDs on bone healing are likely mediated by inhibition of COX-1. However, Simon *et al.*[37] later demonstrated that both celecoxib and rofecoxib inhibited fracture healing to varying degrees in the rat model. Recently, it has been suggested that the deleterious effects of COX-2 inhibitors on fracture healing may be reversible with short-term treatment.[38,39] Gerstenfeld and Einhorn[39] examined the effects of ketorolac, valdecoxib, or vehicle over a seven- or 21-day time course. This study revealed that animals

treated for seven days had no statistically significant differences in the rate of non-unions after either 21 or 35 days of healing. In contrast, 21 days of treatment led to statistical differences in the rate of non-unions for valdecoxib after 21 days but the differences disappeared by 35 days. The data from this study suggested that both specific COX-2 inhibitors and nonselective NSAIDs delay fracture healing, but the magnitude of the effect was related to the duration of treatment. These authors[39] concluded that "extrapolation of these findings to a clinical setting suggests that management of fracture-associated pain with inhibitors of COX-2 should neither impair nor delay healing as long as the duration of treatment is consistent with current standards of care".

The results of our present study concur with these investigators' findings.[39] We observed no significant increase in the incidence of non-union when either celecoxib or rofecoxib was administered for five consecutive days in doses approved for acute pain management. Although low-dose ketorolac had no significant deleterious effect on spinal fusion, because it cannot be safely administered as a preemptive analgesic, we currently use only COX-2 specific inhibitors. We limit the administration of these analgesics for less than one week following spinal fusion surgery. We are in agreement with other investigators, that it is better to stigmatize smoking and not NSAID use in bone surgery.[40] Our results concur with other investigators[21,27] that the risk of smoking has a significant deleterious effect on spinal fusion. In the present study, smokers undergoing spinal fusion surgery were over 14 times more likely to develop non-union compared to non-smokers. Further, 74% of patients who were smokers and administered high-dose ketorolac developed non-union postoperatively.

In conclusion, this study revealed that the short-term perioperative administration of celecoxib, rofecoxib, or low-dose ketorolac ($\leq$ 110 mg·day$^{-1}$) had no significant deleterious effect on non-union. In contrast, higher doses of ketorolac (120–240 mg·day$^{-1}$), history of smoking, and two level vertebral fusions resulted in a significant increase in the incidence of non-union following spinal fusion surgery. We currently recommend the short-term perioperative use of COX-2 specific inhibitors for the management of pain following spinal fusion surgery.

## References

1 *McCormack K.* Non-steroidal anti-inflammatory drugs and spinal nociceptive processing. Pain 1994; 59: 9–43.

2 *Souter AJ, Fredman B, White PF.* Controversies in the perioperative use of nonsteroidal antiinflammatory drugs. Anesth Analg 1994; 79: 1178–90.

3 *Dahl JB, Kehlet H.* Non-steroidal anti-inflammatory drugs: rationale for use in severe postoperative pain. Br J Anaesth 1991; 66: 703–12.

4 *U.S. Department of Health and Human Services.* Acute Pain Management Guideline Panel. Acute pain management: operative or medical procedures and trauma. Clinical practice guideline. AHCPR Pub. No. 92-0032. Rockville, MD: Agency for Health Care Policy and Research, Public Health Service, 1992; Feb: 15–26.

5 *Ashburn MA, Caplan RA, Carr DB, et al.* Practice guidelines for acute pain management in the perioperative setting. An updated report by the American Society of Anesthesiologists Task Force on acute pain management. Anesthesiology 2004; 100: 1573–81.

6 *Kehlet H, Dahl JB.* The value of "multimodal" or "balanced analgesia" in postoperative pain treatment. Anesth Analg 1993; 77: 1048–6.

7 *Kehlet H, Wilmore DW.* Multimodal strategies to improve surgical outcome. Am J Surg 2002; 183: 630–41.

8 *Kinsella J, Moffat AC, Patrick JA, Prentice JW, McArdle CS, Kenny GN.* Ketorolac trometamol for postoperative analgesia after orthopaedic surgery. Br J Anaesth 1992; 69: 19–22.

9 *Reuben SS, Connelly NR, Steinberg R.* Ketorolac as an adjunct to patient-controlled morphine in postoperative spine surgery patients. Reg Anesth 1997; 22: 343–6.

10 *Reuben SS, Connelly NR, Lurie S, Klatt M, Gibson CS.* Dose-response of ketorolac as an adjunct to patient-controlled analgesia morphine in patients after spinal fusion surgery. Anesth Analg 1998; 87: 98–102.

11 *Reuben SS, Connelly NR.* Postoperative analgesic effects of celecoxib or rofecoxib after spinal fusion surgery. Anesth Analg 2000; 91: 1221–5.

12 *Reuben S, Ekman EF.* The effect of cycolo-oxygenase-2 inhibition on analgesia and spinal fusion. J Bone Joint Surg Am 2005; 87: 536–42.

13 *Turner DM, Warson JS, Wirt TC, Scalley RD, Cochran RS, Miller KJ.* The use of ketorolac in lumbar spine surgery: a cost-benefit analysis. J Spinal Disord 1995; 8: 206–12.

14 *Cousins MJ, Power I, Smith G.* 1996 Labat lecture: pain-a persistent problem. Reg Anesth Pain Med 2000; 25: 6–21.

15 *Perkins FM, Kehlet H.* Chronic pain as an outcome of surgery. A review of predictive factors. Anesthesiology 2000; 93: 1123–33.

16 *Samad TA, Sapirstein A, Woolf CJ.* Prostanoids and pain: unraveling mechanisms and revealing therapeutic targets. Trends Mol Med 2002; 8: 390–6.

17 *Gajraj NM.* The effect of cyclooxygenase-2 inhibitors

Case 2:05-md-01657-EEF-DEK Document 64640-3 Filed 10/16/13 Page 166 of 182

on bone healing. Reg Anesth Pain Med 2003; 28: 456–65.

18 *Dumont AS, Verma S, Dumont RJ, Hurlbert J.* Nonsteroidal anti-inflammatory drugs and bone metabolism in spinal fusion surgery: a pharmacological quandary. J Pharmacol Toxicol Methods 2000; 43: 31–9.

19 *Maxy RJ, Glassman SD.* The effect of nonsteroidal anti-inflammatory drugs on osteogenesis and spinal fusion. Reg Anesth Pain Med 2001; 26: 156–8.

20 *Wedel DJ, Berry D.* "He said, she said, NSAIDs". Reg Anesth Pain Med 2003; 28: 372–5.

21 *Deguchi M, Rapoff AJ, Zdeblick TA.* Posterolateral fusion for isthmic spondylolisthesis in adults: analysis of fusion rate and clinical results. J Spinal Disord 1998; 11: 459–64.

22 *Steinmann JC, Herkowitz HN.* Pseudarthrosis of the spine. Clin Orthop 1992; 284: 80–90.

23 *Lee C, Dorcil J, Radomisli TE.* Nonunion of the spine: a review. Clin Orthop 2004; 419: 71–5.

24 Toradol IV/IM (package insert). Nutley, NJ: Roche Laboratories; 1994.

25 *Choo V, Lewis S.* Ketorolac doses reduced. Lancet 1993; 342: 109.

26 *Sevarino FB, Sinatra RS, Paige D, Ning T, Brull SJ, Silverman DG.* The efficacy of intramuscular ketorolac in combination with intravenous PCA morphine for postoperative pain relief. J Clin Anesth 1992; 4: 285–8.

27 *Glassman SD, Rose SM, Dimar JR, Puno RM, Campbell MJ, Johnson JR.* The effect of postoperative nonsteroidal anti-inflammatory drug administration on spinal fusion. Spine 1998; 23: 834–8.

28 *O'Hara D, Fragen R, Kinzer M, Pemberton D.* Ketorolac tromethamine as compared with morphine sulfate for treatment of postoperative pain. Clin Pharmacol Ther 1987; 41: 556–61.

29 *Yee JP, Koshiver JE, Allbon C, Brown CR.* Comparison of intramuscular ketorolac tromethamine and morphine sulfate for analgesia of pain after major surgery. Pharmacotherapy 1986; 6: 253–61.

30 *Folsland B, Skulberg A, Halvorsen P, Helgesen KG.* Placebo-controlled comparison of single intramuscular doses of ketorolac tromethamine and pethidine for post-operative analgesia. J Int Med Res 1990; 18: 305–14.

31 *Strom BL, Berlin JA, Kinman JL, et al.* Parenteral ketorolac and risk of gastrointestinal and operative site bleeding. A postmarketing surveillance study. JAMA 1996; 275: 376–82.

32 *Ho ML, Chang JK, Wang GJ.* Antiinflammatory drug effects on bone repair and remodeling in rabbits. Clin Orthop 1995; 313: 270–8.

33 *Schafer AI.* Effects of nonsteroidal anti-inflammatory therapy on platelets. Am J Med 1999; 106: 25S–35S.

34 *Gilron I, Milne B, Hong M.* Cyclooxygenase-2 inhibitors in postoperative pain management: current evidence and future directions. Anesthesiology 2003; 99: 1198–208.

35 *Sinatra R.* Role of COX-2 inhibitors in the evolution of acute pain management. J Pain Symptom Manage 2002; 24 (1 Suppl.): S18–27.

36 *Long J, Lewis S, Kuklo T, Zhu Y, Riew KD.* The effect of cyclooxygenase-2 inhibitors on spinal fusion. J Bone Joint Surg Am 2002; 84: 1763–8.

37 *Simon AM, Manigrasso MB, O'Connor JP.* Cyclo-oxygenase 2 function is essential for bone fracture healing. J Bone Miner Res 2002; 17: 963–76.

38 *Gerstenfeld LC, Thiede M, Seibert K, et al.* Differential inhibition of fracture healing by non-selective and cyclooxygenase-2 selective non-steroidal anti-inflammatory drugs. J Orthop Res 2003; 21: 670–5.

39 *Gerstenfeld LC, Einhorn TA.* COX inhibitors and their effects on bone healing. Expert Opin Drug Saf 2004; 3: 131–6.

40 *Lagerkranser M.* Better to stigmatize smoking and not NSAID in connection with bone surgery! (Swedish). Lakartidningen 2002; 99: 3338–9.

# WW

**Plaintiff Dennis Harrison Exhibit WW – Subset of Merck Exhibit 1 Statements**

1. **Plaintiff Ex. WW.** *Consists of two items, 75 &76, taken from Defendant's statement of Material Facts Not In Dispute*, paragraphs 75 & 76, which defendant used to demonstrate the safety of Vioxx, both of which were proposed as proving the safety of Vioxx by Dr. Blavatsky in the Declaration, see Plaintiff Exhibit UU, paragraphs 29 and 30, both of which relied in part or in whole of the safety of Vioxx as presented in "Reuben et al." a research paper that has been totally discredited and that was used to present material facts in this case based on inadmissible evidence and that fact is believed by Plaintiff to no longer in dispute.

**DEFENDANT MERCK SHARP & DOHME CORP.'S LR56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO DISPUTE**

Pursuant to LR56.1, Defendant Merck Sharp & Dohme Corp. ("Merck"), by undersigned counsel, hereby submits the following statement of material facts as to which there is no genuine issue to accompany its Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56:

...

***PLAINTIFF NOTE; QUESTIONS BEFORE 75 & 76 ARE NOT SHOWN IN THIS EXHIBIT***

***ALL STATEMENTS ARE ADDRESSED SEPARATELY BY PLAINTIFF***

...

Clinical Studies Relating to Vioxx and Bone Healing

75. In 2005, Reuben et al. reported a retrospective review of 434 patients taking Vioxx, Celebrex (another Cox-2 selective NSAID) or ketorolac (a traditional, nonselective NSAID) on the incidence of non-union of bone following spinal surgery. *See* Blavatsky Decl. (Ex. 7) ¶ 29 and Ex. C thereto. After short tem' use (five days following surgery), there was no difference in the incidence of non-union for Vioxx compared to no NSAID use. *Id.* The authors therefore concluded that the short-term perioperative administration of Vioxx, Celebrex, or low-dose ketorolac "had no significant deleterious effect on nonunion." *Id.*

76. In its clinical trial program for Vioxx, Merck conducted what was known as Protocol 083, a randomized, prospective clinical study conducted in 305 patients with osteoarthritis to evaluate the effects of Vioxx and ibuprofen versus placebo on biomarkers of BMD and bone turnover. *See* Blavatsky Decl. (Ex. 7) ¶ 30 and Ex. D thereto. In 2003, Murphy *et al.* reported the results of this study in an abstract presented at EULAR (the conference of the European League Against Rheumatism). *Id.* These authors reported that they observed no clinically significant effects on bone between treatments. *Id.*

Dated: July 22, 2013

EXHIBIT WW

1132873v1

Addendum to "WW" AS IT IS Referred to in 'WW'AS "UU" D.W.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 10-CR-30002-MAP |
| v. | ) | |
| | ) | |
| SCOTT REUBEN, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States hereby submits its sentencing memorandum in connection with the June 24, 2010 sentencing of the defendant, Scott Reuben ("Defendant" or "Reuben"). Reuben, an anesthesiologist, has been convicted of health care fraud in violation of 18 U.S.C. §1347 for falsifying clinical research about pain management. As set forth in more detail below, the crime took place over a multi-year period, involved multiple victims, from the pharmaceutical companies from whom Reuben obtained the research grants, to the medical journals that published the false articles, to patients who received a treatment regimen that had not actually been studied by Reuben and had not actually achieved the safety and efficacy results reported by him in the false articles. The government's sentencing recommendation is as follows:

- imprisonment for a term of 14 months;
- fine of $5,000;
- forfeiture of $50,000;
- restitution of $361,932 ($296,557 payable to Pfizer Inc.; $49,375 payable to Merck & Co., Inc.; and $8,000 payable to Wyeth and $8,000 payable to Rays of Hope;
- supervised release of 2 years; and
- mandatory special assessment of $100.

As set forth below, the government's recommendation for a sentence of incarceration of 14 months is below the applicable guideline range (18-24 months) and is consonant with the factors of 18 U.S.C. §3553.

## I. Introduction

### A. The Information/Offense Conduct

The Information, which was filed on January 14, 2010, charged Reuben with one count of health care fraud in violation of 18 U.S.C.§1347.

Reuben was an anesthesiologist who was the chief of acute pain at Bay State Hospital in Springfield, Massachusetts. At all relevant times, he treated patients both pre- and post-operatively, and he conducted research in the area of pain management. PSR ¶8. Reuben's particular research focus was multimodal analgesia therapy, meaning a combination of analgesia therapy instead of the use of opioids. Reuben's theory was that multimodal analgesia therapy would be as effective for pain, promote long term healing and avoid some of the side effects associated with opioid therapy. PSR ¶9.

Reuben made a number of proposals for research funding to pharmaceutical companies which manufactured drugs that he used or proposed to use in multimodal analgesia therapy. Id. Those drugs included Vioxx, manufactured by Merck, and Celebrex, manufactured by Pfizer. Id. In proposals to Merck and Pfizer and others, Reuben represented that he, as the principal investigator, would be performing clinical studies with actual patients. Id. These research grant proposals and the subsequent contracts also contemplated that Reuben would prepare an article for publication in a medical journal based on the results of the research study. Id.

Beginning in approximately 2000, Reuben entered into contracts to perform research as

funded by pharmaceutical companies, purported to perform the research called for by the contracts, and published articles in various medical journals based on the purported results of his research, when in fact those studies had not been performed, and therefore the research results were false and the published articles were false. PSR¶10. The following is a listing of the false articles:

| **Dr. Reuben False Articles** | **Grantor** | **Grant Amount** |
|---|---|---|
| "The Effect of Cyclooxygenase-2 Inhibition on Analgesia and Spinal Fusion," Journal of Bone and Joint Surgery; 2005, 87:536; and "The Effect of Cyclooxygenase-2 Inhibition on Acute and Chronic Donor-Site Pain After Spinal Fusion Surgery," Register of Anesthesia and Pain Medicine, 2006; 31:6 | Pfizer | $63,425 |
| "Evaluating the Analgesic Efficacy of Administering Celecoxib as a Component of Multimodal Analgesia For Outpatient Anterior Cruciate Ligament Reconstruction Surgery," Anesthesia & Analgesia; 2007; 105:222; and "The Effect of Initiating a Preventive Multimodal Analgesic Regimen on Long-Term Patient Outcomes For Outpatient Anterior Cruciate Ligament Reconstruction Surgery," Anesthesia & Analgesia; 2007; 105:228. | Pfizer | $73,512 |
| "A Prospective Randomized Trial on the Role of Perioperative Celecoxib Administration for Total Knee Arthroplasty: Improving Clinical Outcomes," Anesthesia & Analgesia; 2008; 106:1258 | Pfizer | $118,200 |
| "The Effect of Intraoperative Valdecoxib Administration on PGE2 levels in the CSF," Journal of Pain, Supplement; 1:S21 (Abstract 649) | Pfizer | $41,420 |

| | | |
|---|---|---|
| "Evaluation of the Safety and Efficacy of the Perioperative Administration of Rofecoxib for Total Knee Arthroplasty," 2002; Journal of Arthroplasty, 17:26 | Merck | $49,375 |
| "Evaluation of Efficacy of the Perioperative Administration of Venlaxifine XR in the Prevention of Post-Mastectomy Pain Syndrome, Journal of Pain and Symptom Management, 2004; 27:133 | Wyeth/Rays of Hope | $16,000 |

The grant amounts associated with the articles referenced above total $361,932 and form the basis both for the restitution order that the Government seeks (and which the parties agree to in the plea agreement). This amount also forms the basis for the sentencing guideline loss calculation. See U.S.S.G. §2B1.1(b)(1)(G). The five journals and the four grantors fall one shy of the 10 victims needed to trigger the multiple victim enhancement in U.S.S.G. §2B1.1(b)(2)(A).

By way of specific example, in July 2005, Reuben proposed to Pfizer that he would perform research on the topic of "Perioperative Administration of Celecoxib [Celebrex] as a Component of Multimodal Analgesia for Outpatient Anterior Cruciate Ligament Reconstruction Surgery." In his proposal, Dr. Reuben informed Pfizer that the "goal of this study is to assess the analgesic efficacy of utilizing celecoxib in a preemptive multimodal analgesic technique for patients undergoing outpatient ACL surgery," and that he intended to include 100 patients in the study, with 50 of them randomized to receive Celebrex and 50 of them to receive a placebo. PSR ¶12.

On or about September 1, 2005, Dr. Reuben entered into an Independent Research Grant Agreement (the "Agreement") with Pfizer to conduct a clinical research study entitled "Perioperative Administration of Celecoxib [Celebrex] as a Component of Multimodal

Analgesia for Outpatient Anterior Cruciate Ligament Reconstruction Surgery." As part of that Agreement, Pfizer agreed to provide (and indeed paid) a research grant in the amount of $73,512.00 and sufficient supplies of Celebrex and placebo to conduct the study. As such, for the purpose of the Agreement, Pfizer was a health care benefit program as defined by 18 U.S.C. §24(b). PSR ¶13

Dr. Reuben's protocol for the study was to treat 100 patients, with 50 receiving placebo and 50 receiving Celebrex as part of the multimodal analgesia therapy. In the articles by Dr. Reuben about this study ("Evaluating the Analgesic Efficacy of Administering Celecoxib as a Component of Multimodal Analgesia for Outpatient Anterior Cruciate Ligament Reconstruction Surgery," Vol. 105: 222-227, 2007 Anesthesia & Analgesia; and "The Effect of Initiating a Preventive Multimodal Analgesic Regimen on Long-Term Patient Outcomes for Outpatient Anterior Cruciate Ligament Reconstruction Surgery," Vol. 105: 228-232, 2007 Anesthesia & Analgesia), he claimed to have treated 200 patients, 100 with placebo and 100 with Celebrex. Dr. Reuben also claimed in these articles that patients had achieved success with multimodal analgesia therapy. PSR ¶14.

Dr. Reuben knew those claims were materially false because he knew he had not enrolled any patients into that study and the results reported both to Pfizer and to Anesthesia & Analgesia Journal and in turn to the public were wholly made up by him. PSR ¶15.

B. The Plea Agreement

The plea agreement contains a sentencing guideline analysis, which is set forth below in Section II. The plea agreement also provides in paragraph 4 that the government agrees to recommend the following sentence to the Court:

- incarceration at the low end of the Guideline range of (which appears to be 18-24 months);

- fine of $5,000;

- restitution of $361,932 ($296,557 payable to Pfizer Inc.; $49,375 payable to Merck & Co., Inc.; and $8,000 payable to Wyeth and $8,000 payable to Rays of Hope;

- forfeiture of $50,000;

- supervised release of 2 years; and

- mandatory special assessment of $100.

Defendant also agrees to recommend the same sentence, with the exception of the term of incarceration and period of supervisory release. Thus, the dispute about sentencing is between the government's recommendation of a below guideline incarcerative sentence of 14 months and Reuben's recommendation of home confinement.

II.  **Guidelines Analysis**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." Gall v. United States, 552 U.S. 38, 49 (2007). Here the parties appear to agree that the applicable Sentencing Guidelines calculation results in a Total Adjusted Offense Level of 15, which when combined with a Criminal History Category of I yields an advisory sentencing guideline range of 18-24 months of incarceration. See PSR ¶29. To be sure, the Guidelines are now advisory. However, the Supreme Court also "recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve §3553(a)'s objectives.'" Kimbrough v. United States, 552 U.S. 85, 109 (2007) (internal citation omitted).

The calculations are set forth below:

Health Care Fraud in violation of 18 U.S.C. §1347

| | |
|---|---|
| base offense level (U.S.S.G. §2B1.1(a)(2)) | 6 |
| | + |
| loss enhancement (U.S.S.G.§2B1.1(b)(1)(G)) | 12 |
| | - |
| acceptance of responsibility (U.S.S.G. §3E1.1) | 3 |
| Total Offense Level = | 15 |
| Range for CHC I = | 18-24 months |

III. **Sentencing Factors Under 18 U.S.C. §3553**

The United States submits that its recommended sentence of 14 months incarceration is appropriate in light of the §3553 factors, particularly the nature and circumstances of the offense and the history and characteristics of the defendant, §3553(a)(1); and the need for the sentence to reflect the seriousness of the offense and afford adequate deterrence, §§3553(a)(2)(A) and (B).

A. Nature and Circumstances of the Offense/History and Characteristics of the Defendant.

In assessing these factors, it is important to set the context for this crime and this defendant. The criminal conduct here, and the related offense conduct, involved defrauding pharmaceutical companies, falsifying clinical research results, sending false articles based on false clinical research results to a number of scholarly medical journals, which in turn published these false articles, which in turn led members of the pain management medical community to read these false articles and in some instances base their treatment protocols for their patients on the false article they read.

For example, the editors of one of the journals that published a false article by Reuben, The Journal of Bone & Joint Surgery, wrote in an a letter submitted hereto as Exhibit 1, that it published an article by Reuben that "purported to define a new method of paint management following spinal fusion, a procedure which is performed more than 250,000 times a year in the United States alone." The letter goes on to explain that once the "fraudulent nature of this publication was identified, The Journal had to create a novel, heretofore, unused, procedure to retract it." The letter concludes that the "reputation of the Journal of Bone and Joint Surgery as an absolutely reliable source of quality patient care information has been permanently damaged, and we will never fully recover. Most importantly, while it is impossible to measure, many patients have been adversely affected by his [Reuben's] actions."

In the same vein, as Dr. Jacques Chelly, Director of the Division of Regional Anesthesia and Acute Interventional Pain at the University of Pittsburgh Medical Center said in the wake of learning of Reuben's fraud, multimodal analgesia was "in shambles concerning many of the drugs we use. The big chunk of what people had based their protocol on is gone." Chelly noted that he stopped giving celecoxib and pregabalin to many patients upon finding out that Reuben's research on multimodal analgesia was fraudulent. Exhibit 2 (copy of March 2009 Anesethesiology News, quoting and citing to Dr. Chelly). Thus it is important to recognize that Reuben's false research did not just defraud pharmaceutical companies, it reached the trade press, the pain management professionals and had an impact on patient care.

Significantly, Reuben's criminal conduct took place over a wide span of time. The false articles identified herein span dates from 2002 to 2008. This was not a one time aberrant occurrence. Even the specific crime at issue, involved approximately 18 months between

research proposal in 2005 to publication in 2007. Reuben's mental condition is the subject of much discussion in his sentencing brief, and certainly it merits careful and sensitive consideration, but it is important to understand that during the entirety of the period of the criminal conduct, Reuben was going to work day in and day out and anesthetizing patients, treating patients post-operatively, teaching students, and by all outward accounts to colleagues, patients and friends, functioning at a high level. For example, one of his former colleagues at Bay State Medical Center, Dr. Shameema Faruqui wrote to the Court:

> I have always found Scott to be a very cordial and helpful colleague. He was well liked by the nursing and office staff. His patients loved him as their pain physician. Scott is an accomplished anesthesiologist and an excellent teacher. The pain fellows and anesthesiology residents always looked forward to working with him.

Another former colleague, Dr. Howard Krasner wrote to the Court:

> I have worked closely with Dr. Reuben clinically, and can speak to his excellent clinical skills. . . Dr. Reuben has always provided excellent anesthesia care for thousands of patients over the years. . . His contributions to resident education were substantial, such that he had been voted the best clinical instructor in the Anesthesiology Department by our residents several times over his teaching career.

All the while that Reuben was providing excellent patient care and outstanding teaching, he was also engaging in criminal research fraud. And yet, while he "does not contend that his bi-polar illness prevented him from knowing right from wrong," Defendant's Sentencing Memo at p. 10, nor could he given the extremely high functioning life he was otherwise leading, he seeks a departure for "significantly reduced mental capacity" under U.S.S.G. §5K2.13.

1. <u>No departure/deviation is warranted under U.S.S.G. §5K2.13.</u>

Under this guideline a downward departure is warranted only if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Reuben is not able to meet either of these criteria. First, Application Note 1 of U.S.S.G. §5K2.13 defines significantly reduced mental capacity as meaning that the defendant "has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." Reuben concedes that he knew right from wrong, and thus cannot meet the first prong of this definition. To the extent he is arguing that he could not control behavior that he knew was wrongful, there is no evidence of that and that assertion defies credulity. This argument requires the Court to accept that in his day to day personal and professional life he was able to make dozens of cogent, coherent and controlled decisions regarding patient care, teaching, personal and familial relationships, yet he could not control his fraudulent research activities.

However, even assuming Reuben suffered from "significantly reduced mental capacity," he does not and cannot explain how his bipolar disorder "contributed substantially to the commission of the offense." He argues that "[w]ithout his mental disorder, he simply would not have had the stamina to maintain all of this activity. Stated crudely, his bipolar disorder acted like a drug, giving him an extraordinary amount of energy and drastically lowering his perceived need for sleep and down-time." Defendant's Memo at 13. However, the crime he committed stemmed from his failure to do the research, not by doing something illegal that required

"stamina" or "an extraordinary amount of energy." The link between his disease and his conduct does not make sense, particularly in light of all of the high functioning conduct that he otherwise engaged in during the exact same long period of time. There is no evidence to explain how Reuben could be divining right from wrong in all phases of his life other than his fraudulent research activities.

There are cases in which bipolar disorder (coupled with other diseases and traits) has been found by courts to constitute a "significantly reduced mental capacity" and then "contributed substantially to the commission of the offense," such that there has been a departure under U.S.S.G. §5K2.13. However, this is not such a case. Reuben cites United States v. Follette, 990 F.Supp. 1172 (D. Neb. 1998) in support of his argument that bipolar can form the basis for a departure to a non-incarcerative sentence. However, that case involved a young woman who had not finished high school, and who suffered from mental impairments beyond bipolar, who was an accessory after the fact to an armed robbery because her boyfriend (by whom she was pregnant at the time) prevailed on her to do so. That case also did not involve the profound general deterrence impact that an incarcerative sentence here would have.

2. Reuben's bipolar disorder does not exempt him from imprisonment.

Reuben argues that he has "an extraordinary physical impairment," U.S.S.G. §5H1.4, that renders him an appropriate candidate for home detention. In the main, bipolar is a somewhat common condition which psychiatrists are able to treat. Studies suggest that there is a meaningful percentage of the prison population that suffer from and are treated in prison for mental diseases like bipolar. A United States Department of Justice Special Report from September 2006 entitled "Mental Health Problems of Prison and Jail Inmates" reported that an

"estimated 15% of state prisoners and 24% of jail inmates reported symptoms that met criteria for a psychotic disorder." (Report attached hereto as Exhibit 3). The Bureau of Prisons ("BOP") is actually quite used to and adept at dealing with psychiatric disorders. There are a number BOP facilities that specialize in providing care to mentally ill inmates. As BOP explained in its letter attached hereto as Exhibit 4, Reuben will be able to continue on his medication and therapeutic regimen. It would be unfortunate and unfair to consign only poor defendants with bipolar disorder to incarceration, while privileged white collar defendants like Reuben are thought to "have suffered enough" and merely get home detention.

B. An Incarcerative Sentence is Important to Promote Respect For Law and to Serve the Aim of General Deterrence.

Reuben argues, in the manner of most white collar criminals that he has suffered enough (money, profession, reputation, divorce) and that a prison term is unwarranted. He argues that his "crime and his illness have taken a respected researcher, anesthesiologist, and family man and left him broke and broken with no profession, and under the constant careful watch of his parents." Defendant's Memo at p. 19. Of course, these are the arguments made by virtually all white collar defendants who seek to avoid any incarceration. Most white collar defendants, by definition, have much to lose once convicted of a crime. Because of their education, status and wealth, they are in position to lose good jobs, professional licenses, money and reputation.

And for white collar criminals, it is the prison term that offers the most profound general deterrence. See 18 U.S.C. §3553(a)(2)(B)(sentencing goals include the need to afford adequate deterrence to criminal conduct). "As the legislative history of the adoption of §3553 demonstrates, Congress viewed deterrence as particularly important in the area of white collar crime." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006)(internal quotations and

citations omitted). "Restitution is desirable but so is the deterrence of white collar crime (of central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail." United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006). See also United States v. Politano, 522 F.3d 69, 74 (1st Cir. 2008)(recognizing the importance of general deterrence in post-Booker sentencings).

Research fraud, the crime for which Reuben stands convicted, is a growing and pernicious problem. See "Scandalous science: Scientists cheating on data," by Daniel Peake, February 17, 2010, Medill Reports (attached hereto as Ex. 5) ("Despite increasing science journal retraction rates in recent years, scientific misconduct in research and publishing persists – particularly in pharmacological and medical research."). An incarcerative sentence would have profound general deterrence impact on the medical community, and the subset of that community that engages in research. A sentence of probation or home confinement would foster a notion in those communities that the punishment which the members of those communities fear the most, imprisonment, can be avoided by paying restitution. Further, the laudable goal of the Sentencing Commission, to reduce disparities in sentencing between white-collar criminals and blue-collar criminals would be undermined by a home confinement sentence here. Allowing white collar criminals to avoid jail because, as Reuben argues, he has suffered enough, would enforce, rather than reject, that there are two systems of justice extant, one for white-collar offenders, and one for blue-collar offenders.

The applicable §3553 factors and recent First Circuit case law in the area of white collar crime demonstrate that an incarcerative sentence, such as the one recommended by the government, as opposed to the home confinement sentence recommended by Defendant, is appropriate.[1]

---

[1] As noted, the government's recommendation is 4 months below the low end of the applicable guideline range, and thus is 4 months lower than the term the government agreed to recommend in the plea agreement. This recommendation reflects a number of factors, including Reuben's timely willingness to come forward about his crime, his effort to make full restitution in the face of personal financial uncertainty, and a recognition that such a sentence would be "sufficient, but not greater than necessary, to comply with the purposes" of 18 U.S.C. §3553(a)(2).

## IV. Conclusion

In sum, an incarcerative sentence of 14 months would recognize the seriousness of the offenses, promote respect for the law, and act as a meaningful general deterrent to other potential white collar offenders. In contrast, the home confinement sentence sought by the Defendant would run counter to the well established goals of: (1) reducing disparity in sentencing between blue and white collar criminals; (2) preventing white collar criminals from buying their way out of jail; and (3) deterring white collar crime, particularly the burgeoning problem of medical research fraud.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: /s/Jeremy M. Sternberg
Jeremy M. Sternberg
Assistant U.S. Attorney
United States Attorney's Office
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3142

Certificate of Service

I hereby certify that the foregoing documents filed through the ECF system will be sent electronically to counsel for each defendant who is a registered participant as identified on the Notice of Electronic Filing (NEF).

/s/Jeremy M. Sternberg
Jeremy M. Sternberg
Assistant U.S. Attorney

Dated: June 22, 2010