# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Case No. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | SECTION L |
| LITIGATION | * | |
| | * | JUDGE FALLON |
| *This document relates to* | * | |
| | * | MAGISTRATE JUDGE |
| *Dennis R. Harrison v Merck Sharp & Dohme Corp.,* | * | KNOWLES |
| *2:07-cv-00905-EEF-DEK* | * | |
| | * | |

*******************************************************************************

## PLAINTIFF'S REPLY TO DEFENDANT MERK'S REPLY

**(1) There is evidence that Plaintiff actually suffered the injury that he alleged in his Complaint--- insufficient healing of his femur--- and that is a claim he has continued to assert for the past seven years.**

On February 28, 2003, approximately six weeks after the emergency operation performed by Dr. Null aligned the fractured femur so that union could occur, that on February 25, 2003 Plaintiff went to the hospital. The Preoperative diagnosis, see page 00028 Plaintiff Ex. 1, was: Infected nonunion of right hip periprothetic fracture, right femur. And on the same page in the section titled PROCEDURE in paragraph 2 " It should be noted that a large pocket of pus and fluid was then encountered." And in paragraph three the details that "Two cerclage titanium wires , Zimmer, were tightened around the bone to give an open reduction internal fixation of the bone. This was found to give excellent support and alignment to the bone."

Hospodar , in his post-operative report ,see page 00001 of Plaintiff Ex. A, gave his discharge diagnosis as : Status post removal of hardware, antibiotic spacer placement, as well as cerclage vying of right prosthetic femur fracture. And under Hospital Course: " At the time of the surgery there was noticed to be some grossly purulent fluid near the site of his fracture and there was some loose femoral components as well noted. The patient

TENDERED FOR FILING

NOV 1 2 2013

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

1

therefore underwent removal of hardware as well as l&d and the placement of an antibiotic spacer." At this point in time, on or about March 5, 2003 Plaintiff was discharged and placed in Albany County Nursing Home, see, Plaintiff Ex. A page 00013.

On or about April 17, 2003 Hospodar saw Plaintiff and in his report, see Plaintiff Ex. A, page 00015,

"He is now almost six weeks out from removal of his total hip with pathologic fracture. He has on x-ray what appears to be signs of healing of the fracture, although minimal. We just aspirated his hip. We are waiting culture results. I will see him back in two weeks.  At that point we will make a determination on when we are going to reimplant him."

On or about May 16, 2003 Hospadar's records show , see Plaintiff Exhibit A., page 00016, that pending another aspiration Hospodar was anticipating doing the reimplant the following month.

On or about June 5, 2003 Plaintiff and Dr. Hospodar parted ways, although Hospodar offered to continue seeing Plaintiff for as much as 30 more days. On or about June 27, 2003, in view of the fact that at that late date,  almost 4 months after the, February 28, 2003 open reduction internal fixation of the bone of Plaintiff's right femur, the bone still had not healed adequately, Plaintiff underwent an operation by Dr. Joseph Pizzurro, on June 27, 2003, which ultimately was successful because this procedure relied on cementing the implant rather than depending on bone formation to secure the implant. On that date, if Pizzurro had observed sufficient signs of healing, he would have not continued with the cemented implant, but he acted upon whatever he saw in there and went forward with the cemented implant, and that puts a specific date on which to base that failure to heal injury could have been known.

**There is scientific evidence that Vioxx interferes with an individual's bone healing.**

Plaintiff counters this argument by simply stating that the presumption that Merck had to overcome to attain approval for Post-Orthopedic Surgery was contained in the 1995 rat study documented in their NDA 21-042 application wherein it stated the risks on

2

inhibiting the Cox-2 Enzyme, see, Plaintiff's Exhibit B, (MRK-OS420124108, MRK-OS420124109, MRK-OS420124110).

By failing to get approval for Post-Orthopedic Surgery Use, in the legal sense, Vioxx was deemed to be unsafe for that use in that FDA drug approval application, and therefore, it is reasonable to now conclude that the presumptions of the risks of taking Vioxx included non-union of bones and also negatively affecting bone turnover, both still legally standing.

One category of the risks that Vioxx had to overcome was that by inhibiting the Cox-2 enzyme the risk of inhibiting bone formation, bone union after a fracture, and normal bone turnover, which is a process that heals mundane trauma incurred daily.  The risks needed to be addressed with regards to Mercks application for Post-Orthopedic Surgery.

Protocol 072 was designed to demonstrate the safety of Vioxx in post-orthopedic surgery uses. The application for that use was withdrawn, after negotiation, and we know that because there is no mention of Protocol 072 in the appropriate section of the NDA, E. Clinical Safety, 1.7 of the NDA 21-042 application; however, the "Potential Risks  of Inhibition of the Cox-2 Enzyme", see, Plaintiff's Exhibit B, (MRK-OS420124108, MRK-OS420124109, MRK-OS420124110), were not redacted, and presumably then are still standing, even now.

Mercks reply does not refute this logic which was stated in previous motions, and therein it can now be ruled that the presumed risks are accepted as fact by not only the FDA, which Plaintiff repeatedly advised Merck to consult with and to bring forward an opinion of the FDA to refute the obvious and it has not, but are now also admitted to by Merck itself. This Court is now free to rule on this issue.

**THERE ARE HUMAN STUDIES:** Simply stated, the VIGOR Study showed a 41% increase in fractures when patients took Vioxx as compared to Ibupropen. This was a double blind study of two groups of patients who suffered from Rheumatoid Arthritis, a

malady that Plaintiff also suffers from, and Plaintiff asserts that he as well as other patients who suffer rheumatoid arthritis are HUMANS, unless they are lawyers, and this VIGOR study tested HUMANS and this Court can now rule on that, and the humanity of lawyers, if it deems to.

In this VIGOR study, each group had over 4000 participants and it was discovered that just during the conduct of the study, there were many incidences of fractures, all of which occurred between 3 to 6 months after taking Vioxx or Ibupropen respectively.

This is, of course, is proof that Vioxx does interfere with bone healing. The facts are discussed by the FDA Committee reviewing Mercks application for Post-Surgical use of Vioxx in the application first submitted in April of 2001 and in which again, the Post Surgery application was again not approved, and we now can see why.

Once again Plaintiff fails to see how Merck expects to prevail at trial when its very own science shows these adverse effects, and this adverse effect was not even disclosed in the label they designed, even knowing that Vioxx was more than capable of stopping bone union and also bone turnover, two processes that adversely affected Plaintiff, and which now can be presented to the jury supported by documents and not requiring more than competent medical testimony to do so.

**Plaintiff's claims are not time-barred by New York's Three Year Statute of Limitations; and Plaintiff did not base its inclusion of the Lumbar injury merely on scienter, or expert knowledge that Plaintiff supposedly concealed prior to his injury took place.**

Plaintiff Dennis R. Harrison filed on June 26, 2006, one day before the three year anniversary of June 27, 2003 operation that cemented his femur after unsuccessful healing over the course of 6 months, and finally he knew that the femur was not healing by union of the bone.  By at last ending the process and accepting that non-union had occured it can now be stated that he was in fact injured by-nonunion and he had the surgery to correct his injury without further delay. He filed in New York because he was a resident of New York.

4

He could have also filed in MA because he had the spinal fusion surgery there and he correctly understood that the date of discovery of the injury would have been appropriate in MA too.

The actual complaint did state fraud, the injury for the non-healing of the femur, as well as the Lumbar injury, and thereby he protected his rights completely when he filed and that he has amended his complaint to clarify certain issues regarding fraud, does not in anyway infer that he has invented an issue to back his way into a claim of fraud.

New York has a special Statute of Limitations for fraud which is generally 6 years but for absolute fraud, designed for the most heinous of fraud who have a finding of fraud against them, the statue runs as much as 8 years.

No dismissal can be attained on this issue because the fraud did take place, it resulted in the collapse of Plaintiff's Lumbar Spine and that did cause plaintiff to be unable to walk properly and in consequence he fell and broke his femur, and all of the subsequent injuries stay in, even if the Lumbar Injury does not.

Plaintiff asserts that if not for the fraud Plaintiff's attending physicians would have known that the Vioxx Plaintiff was being prescribed and would inhibit not only pain but also inhibit bone healing, and would have discontinued any prescriptions for the Vioxx he was taking, had they been informed.

It is hard to imagine that the New York State Appeals court would apply a standard other than the one specified for cases of fraud where absolute fraud has been plead guilty to already and for substantially the same facts, and that New York State Statute of Limitations is 6 to 8 years after the injury. With regards to the Spinal fusion, that would mean that Plaintiff filed on June 26, 2006 and the earliest fraud limitation would have been April 3, 2007. With regard to the non-union of the femur that injury occurred when the

non-union was determined on June 27, 2003, and fraud had occurred with this injury as

well, but filing on June 26, 2006 has him covered in both NY and MA.

Plaintiff also believes that under New York State Law, he may amend his complaint,

for the purpose of restating facts that have become known through Plaintiff's right to

investigate his case, right up to the moment the case is submitted for a ruling by trial, and

therefore, if in this summary proceeding the court were to rule on the summary motion on

the basis of the statute of limitations, it would have to reverse itself when the complaint

was amended.

**Plaintiff has not failed to designate an expert witness to support his claims, and he is be able to meet his burden of establishing medical causation at trial, and Defendant's summary judgment is not warranted .**

Plaintiff counters that Merck's argument is flawed in fact. New York State Court of

Appeals has consistently held that after Plaintiff has established the reasonableness of

claims with a statement from a medical practitioner the case qualifies to go to trial.  What

has been referred to as the Lone Pine Report meets the NY qualification.

New York State has no other qualification that an expert with any higher expert

credential is required; the exception to that would be when the drug in question was being

used for an FDA approved use. New York State acknowledges that the FDA is the sole

authority to determine safety and efficacy as per 21 USC 355, also called the FDA Act

("ACT") .

However, in this case, Merck has violated the FDA Act and now finds itself

accountable under 21 USC 352 and under that statute it has no right to demand scientific

proof to merely advance to trial and the Plaintiff should not be coerced into designating any

expert at this time,  other than the Lone Pine witness he had previously brought into the

case in 2008.

With regards to whether or not Dr. Wyse's opinion that Vioxx inhibited bone healing with regards to his femur fracture, Plaintiff sees no reason why it would not equally well apply to the lumbar injury as it also was a bone in need of healing, and Defendant is free to argue otherwise to a jury if it would like.

**Plaintiff by no means attempted to rewrites history, by putting forth his theories regarding the nature of his injuries and medical causation... and did not ignore the claims and factual assertions in his own Complaint.**

Plaintiff did not rewrite history at all.  Plaintiff merely amended his complaint for clarity by arguing as follows:

If we assume that the acts of fraud, which injured Plaintiff's lumbar spine, are not allowed, but knowing that Plaintiff is not admitting that this assumption should or will be found to be an actual fact but merely for the purpose of argument, to attach to this case because in the original complaint the spinal injury was not specified, for purposes of argument, and cannot now be claimed for damages, as Defendant Merck now claims, due to scienter, this does not mean that those very same acts of fraud did not injure Plaintiff, it just means that Plaintiff cannot derive compensation for the lumbar injury with regards to the existing complaint.

Therefore, as to the Statutory Limitations of New York State for Fraud the tolling still starts as of the date of injury which still is in or about April 2001, when it was reported that the implanted supports sprung loose. Plaintiff filed on June 26, 2006 and therefore this case stands with the issue of non-healing of Plaintiff's femur because that injury attaches to the fraud due to the fact the fracture was a consequence of the lumbar injury in that the Plaintiff could no longer walk correctly and he fell and his femur fractured.  This in no way lessons the argument that the decrease in bone health due to inhibition of bone turnover, as previously stated, is not independently a cause of injury.

And for the purpose of argument only with no admission implied, Plaintiff still would claim that the acts of fraud that Defendant has plead guilty to, had left him taking Vioxx at a

dosage and duration far in excess of safe dosage levels and thusly was in a status wherein the

natural healing process had been inhibited by the 50mg Dosage of Vioxx that he was taking

when he broke his femur, just as it had interfered with his recovery from the Spinal Fusion

Surgery performed to his Lumbar region, and that overdose was also due to the false and

premature promotion of Vioxx for patients with rheumatoid arthritis.

However, the scienter problem with Plaintiff's Lumbar injury hinges on whether or not

the lumbar injury itself caused the broken femur or instead, the lumbar injury actually was

integral to the femur injury and as that was claimed in the original complaint, in a reasonable

manner, the lumbar injury is still part of the case and may in fact be a claim for injury and

damages even now.

Here we must look at the original complaint without regards to the amendment and we

see that in paragraphs 24, 25, 46, 77, and 80 the lumbar injury did play a prominent part in

Plaintiff's injury, as a precipitating fact. The following paragraphs taken from the original

complaint verbatim and are identified by the paragraph numbers used in the original complaint

are as follows:

24. Before the above (i.e. broken leg and ensuing complications) occurred, Plaintiff was
well on his way to recovery from past operations, except one (Lumbar), which also failed
because of inadequate bone repair. The correcting operation (15 dangerous hours) was
being scheduled and pre-testing started BEFORE the broken leg occurred.  Initially the
broken leg was considered just a nuisance that would delay this important (and critical for
a decent way of life) operation.  But as a simple routine operation (i.e. the leg) grew into a
long, brutal nightmare it was indefinitely delayed.  Plaintiff is now too weak to receive the
type of operation that he was being scheduled to get, and because of his recent nightmare
with the leg, is now psychologically and emotionally too nervous about getting through it
alive and not paralyzed.

The underlined language of paragraph 24 of the original complaint has clearly stated the

fact of and cause of his lumbar injury and this occurred during the period Plaintiff was

taking Vioxx at 50 mg per day.

8

25. <u>Defendant, in choosing to hide, deceive, and fraudulently sell Vioxx caused the very</u> <u>inadequate bone repair that cascaded into multiple events</u>, and has severely and irrepably damaged Plaintiff's life. As will be explained more below, Plaintiff had been doing so well before the operations started to fail, he had expected to return to his (about) $120,000 annual salary and bonus (present day average compensation of the position is about $150,000) executive career.  Plaintiff's life was damaged in many other ways, which will be explained.

The under lined language of paragraph 25, clearly states the issue of fraud and that the

fraud attaches directly to the inadequate bone repair.

46. <u>At Least one other operation (lumbar – prior to the leg operation) was done in MA.</u>  It also, per surgeon's notes, failed because of inadequate bone repair).  This litigation does not allege Vioxx as the cause for the inadequate bone repair in the lumbar operation, but is stated for reasons of chronological history.  This litigation concerns his broken right leg "femur" which did not heal correctly because of inadequate bone repair (from the use of VIOXX), the eight months of brutal "recovery" (actually a waiting time for "sufficient bone healing" to allow for the "final" operation),  the several operations in which he eventually needed, and the personal, financial and family damages he suffered greatly.

The underlined language in paragraph 46 clearly establishes that the paragraph should be

understood in the context of addressing jurisdictional issues, not changing the facts, as

Merck wishes it had.

77.  Quite unfortunately, and though not a subject of this litigation, nor the subject of these allegations, the lumbar operation failed because of the inadequate bone repair, and BOTH of the supporting rods broke.  Without going into more detail here, <u>the failed lumbar</u> <u>operation caused severe complications</u> which still exist today, and the Plaintiff has had some cervical symptoms re-appear over the last the last 1-2 years (increasingly).  Plaintiff, motivated mostly by his desire to go back to work, did make the extremely difficult decision to undergo another long and dangerous operation in order to correct the Lumbar failure (due to inadequate bone repair).  With a successful lumbar operation to correct the failed rods, Plaintiff expected that he would be able to go back to work.  Again, at the time, his health otherwise was very good.

The underlined language of paragraph 77 clearly states the lumbar had failed and that

there were complications that stemmed from that failure.

80.  The above notes on the cervical and lumbar operations are not the reasons for this litigation.  However, they are important to establish Plaintiff's past and how that related to what was to happen (with the broken leg).  By stating the timing of the use of Vioxx and both the need and/or impact of spinal surgery (cervical and lumbar, Plaintiff is merely stating the facts of the past in chronological order.  Litigation is only about the issues

surrounding Vioxx and the broken leg and both the events it caused, ( negative ones)  or prevented (such as Lumbar correction). <u>Plaintiff, by stating facts, is only attempting to help understand and establish a pattern that may not be perceived as relevant.  If felt appropriate, any potential litigation, for any reason whatsoever, not specifically excluding or including Vioxx issues, would be held in the state of MA where those operations took place and where the statute of limitations begins on discovery.</u>

The underlined language in paragraph 80 is asserting Plaintiffs allegation conclusively in that it may have to transfer the case to Massachusetts at some later date because of statute of limitations advantages when the fraud is eventually proven, assuming that the case had not been settled before the fraud could definitely be established.

In paragraph 24 Plaintiff clearly states his grounds for damages due to the failure of the Lumbar operation.  In paragraph 46 Plaintiff is addressing issues of jurisdiction and further develops them in paragraphs 77, and 80.

This case, although originally filed in New York, where Plaintiff resided at the time of his filing the original complain, may also be filed, when the case is returned to states for trial in MA.  He may elect to be transferred to Mass., because the lumbar surgery took place in Boston, see, Plaintiff's original complaint in paragraph 46, and therefore the tolling for fraud may start tolling when the fraud is discovered, see, Plaintiff's original complain, paragraph 80, so that everything then would come in and scienter would not be a factor.

This issue is not one that has to be decided in a summary motion, nor is it appropriate to be, because Plaintiff has not been asked to select where he would like to have his case tried up until now.

**Plaintiff has not contradicted his sworn deposition testimony, nor did he ignore the claims and factual assertions he alleged in his Complaint.**

The patients understanding of his diagnosed disease is neither proof that he either has a disease or that he does not have a disease, when there is available the true medical records which clearly support that Plaintiff has both "AS" and "RA", see, Plaintiff's Exhibits F from the records of Dr. James Trice dated July 25, 2001, wherein in the subsection IMPRESSION: 1) Ankylosing spondylitis. 2) ... rheumatoid arthritis.  And In Plaintiff Ex. G , in paragraph 2 of page

1, appears : Past Medical History is also significant for rheumatoid arthritis,... in the notes of Dr. Ronald J. Faille, M.D. and dated March 28, 2002.

At the times at which those clarifying diagnosis for "RA" were made, plaintiff was a patient and he was not made aware of them. In the deposition he was asked questions as the injured party, not as a medical practitioner, and as such he could only answer the questions to the best of his knowledge and recollections.

Merck cannot defend itself on the lack of disclosure or demonstrate that Plaintiff had mislead it on the facts because even before its motion for summary judgment was file it already had its expert witness report in hand, and plaintiff can prove that because the now famous paragraph 12 of his declaration was handed to Plaintiff as Ex. 7 at the time he first received the motion.  It is impossible to have both included the facts in its motion  and then deny  Merck knew the facts it contained, after quoting those facts in the motion.  Had Merck merely stated its question as: Dr.Trice states that you have RA in his record, do you still assert that you do not?" The deponent would then have realized to context and realized his error, but Merck was simply entrapping Plaintiff asking questions without first establishing the context of the question.

There are two injuries directly attributed to Plaintiff's taking of Vioxx., they being the use of Vioxx Post Orthopedic Surgery, which applies to both procedures , and the use of Vioxx Post Orthopedic Surgery after the February 28, 2003 open reduction fixation.

There are two causations as well. The non-union of bone caused the failure of the spinal fusion and separately caused the failure of the open reduction fixation of the femur.

The continual taking of Vioxx from in or about April 2000 until on or about September 30, 2004 connects the spinal fusion failure to the femur fracture in that Vioxx is known to inhibit the cox-2 enzyme which is needed for the body to allow bone formation and bone union.

The taking of Vioxx also inhibits bone turnover and thereby left Plaintiff's bones in an unhealthy and weakened condition leading up to his fall on or about January 9, 2003.

The failure of Plaintiff's spinal fusion surgery left in a status that he was no longer able to walk correctly and thusly he fell due to a condition caused by taking Vioxx.

After the fall, Plaintiff immediately had an open reduction and fixation of his right femur in a hospital, and after waiting approximately 40 days for healing to take place, the issue of non-union and its accompanying pus is sign that the immune system was responding, so that the wound was cleaned and a new approach begun. One in which the surgery would no longer using the original appliance but instead replacing it with a spacer until the fracture could heal before putting another implant in. By February 28, 2003, nonunion had been diagnosed and a second surgery was performed.

This second surgery lead also to inadequate healing and a third surgery was performed, one that was successful but one after which Plaintiff continued to experience continuing bouts of post surgical infections. This phenominum of surgical infections stems from the femur fracture and the three surgeries that it lead to and are still attributable to Plaintiff's taking of Vioxx.

As to Defendant's claim there is no evidence of inadequate bone healing in the medical record, Plaintiff asserts that there certainly is. See, Plaintiff Ex. A, The Preoperative diagnosis, see page 00028 Plaintiff Ex. 1, was: Infected nonunion of right hip periprothetic fracture, right femur.

Hospodar, in his post-operative report, noticed, during surgery, "some grossly purulent fluid near the site of this fracture and there was some loose femoral components as well noted. The patient therefore underwent removal of hardware as well as I&d and the placement of an antibiotic spacer."

This is typical procedure if non-union has occurred.  Defendant's claim to that simple fact being otherwise is merely a tactic to get this court involved in a debate of which came first, the loosening of the appliances due to non-union or the straw man of the appliances became loosened when they first became loose. The legal cure for this debate is to put it before a jury.

Defendant is being less than forthright when it asserts that Plaintiff's claim is invalid because the contemporary diagnosis did not call attention to Vioxx as having been the bad actor in the non-union of Plaintiff's femur in that Defendant had done everything imaginable to conceal the facts which it itself had found in the 1995 rat study and even its own VIGOR study in 2000 and that is that without any doubt Vioxx inhibits bone reformation and bone turn over and bone union. And, if Plaintiff had not previously mentioned it, Rheumatoid Arthritis Patients are human beings, and it would be unethical to re-run the VIGOR study with Vioxx because it contributed to a 41% increase of fracture as compared to Ibupropen because Vioxx is unhealthy for bones and therefore not safe to take after any orthopedic surgery that require bone healing, as in spinal fusion, or after having fractured bones set to mend.

The non-movant, Plaintiff Dennis Harrison, asserts in opposition to Defendants assertion that Vioxx could not have caused his femur fracture, the following statement, contained on the FDA web site which was found at (www.access data.fda.gov/drugsatfda/2002/21-042s007_Vioxx.cfm), in a document found in section Medical Reviews(s), Part 1 (PDF) on page 10 , and which is now part of Plaintiff's Ex. XX. , which states :

"A second area of concern is that there were more fractures in the rofecoxib 50 mg group as compared to naproxen in this data set, and this is consistent with the VIGOR study (also in a population of patients with RA) in which there were 41 (1%) and 29 (0.7%) fractures (all sites) in the rofecoxib and naproxen groups, respectively." ; and also states,

" Since COX-2 is involved in regulation of bone metabolism, concerns have been raised regarding the long term bone effects of COX-2 inhibitors".

The first statement calls attention to an increase of 12 Fractures more in the Vioxx group when compared to the ibupropen group fractures of 29. That means a 41% increase (calculated as 12 divided by 29) was experienced by Vioxx users.

This also stands in stark opposition to Dr. Blavatsky's opinion that Vioxx played no part in Plaintiff's femur fracture,  and as the statement comes from the official FDA site, and therefore it is admissible.

The second statement reflects that the presumption contained in the 21-042 E. Clinical Safety section with regards to the risks of COX-2 INHIBITORS, is still very much a presumption of the FDA that had not been overcome when the review took place in or about December 2001, which supports Plaintiff's argument that this indeed was and still is the presumption of the FDA.

On or about May 13, 2013  Merck filed its responses to Dennis Harrison's Interrogatories, and that document is now presented here as Plaintiff Ex. YY.  Starting on page 11 the first in a series of questions with regards to the 2002 Label  where in there appeared the following statement contained in the approved label "ADVERSE REACTIONS": "Musculoskeletal System: ankle sprain, arm pain, arthralgia, back strain, bursitis, cartilage trauma, joint swelling, muscular  cramp, muscular disorder, muscular weakness, musculoskeletal pain, musculoskeletal stiffness, my algia, osteoarthritis, tendinitis, traumatic arthropathy, wrist fracture." , the question was 4(a)  "What does Merck mean by the simple phrase "wrist fracture" and what does Merck believes causes "wrist fracture" ?

Merck first states that it is answering based on the 1999 Label, see, Plaintiff's Ex. F, which does not have the quoted statement in it.

Then Merck , without hesitation boldly states, the quoted language speaks for itself... and "wrist fracture" can be assumed to mean a fracture of the wrist.

Never-the-less, Plaintiff must conclude that in spite of the fact that the reviewer of the Vigor study noted a 41% increase in the number fractures reported in the rheumatoid arthritis (VIGOR) study of Vioxx users as compared to ibupropen users in the same study, the only fracture that was mentioned directly in the April 2002 label that was even significance at all to report was a mere incidence of unknown causation was the wrist fracture.

The answers Merck gave pre-supposed that Merck would never have to answer questions with any more detail than they had just done because their answers had passed muster with the FDA Act 21 U.S.C. 355 ('the ACT") and are entirely sufficient under the ACT.

However, the question is not being asked under the ACT, it is being asked under 21 U.S.C. 352 (f) because Merck has already plead guilty to fraud under 21 U.S.C. 352(f) and it must now prove the safety of Vioxx, to a standard of a preponderance of evidence and it has merely stated that the issues raised by the reviewer were not answered by any means or reference, no matter how obscure, by any expansive interpretation of wrist fracture meaning, all fractures, or covering femur fractures, or being representative of all fractures. Therefore, Plaintiff has conclusively shown that Merck had not covered itself in any way to the charge that Vioxx may have contributed to Plaintiff's femur fracture, with the VIGOR Study, with the Protocol 083, and certainly with the Reuben et al fraud, so there is no defense having been offered by Defendant Merck against the charge that Defendant Merck's fraudulent miss representations mislead Plaintiff Dennis R. Harrison to his detriment of not being able to avoid suffering the femur fracture by not taking Defendant's drug that increased the risk of having a fracture by 41% simply by the taking Vioxx.

The fraud that Defendant Merck plead guilty to started with misrepresentations regarding the approved uses of Vioxx from within a few months of its initial approval in or about June of 1999. The study that Merck needed to gain approval for marketing Vioxx to

rheumatoid arthritis patients had begun in or about May of 1999 and so had the fraudulent promotions and this fact is discussed in the Warning Letter sent by the FDA to Merck in or about September 17, 2001.

The VIGOR study was intended to prove Vioxx's safety for rheumatoid arthritis sufferers and Merck did gain the FDA Approval in or about May of 2002. But here now we can see from the facts spoken about in the Darby vs Merck appeal decision showing the false statements, intentional misrepresentations, concealment of factual issues that were then going on, although not admitted to until Defendant Merck's Guilty Plea on or about November 11, 2012, but at the time of their approval in May of 2002, while the fraud was still on going, and otherwise not discovered, Merck was already seeking legal advice concerning an ongoing fraud with regards to this VIGOR study and chooses to keen them concealed under privilege . See page 48 of Plaintiff's Ex. YY, at "As to No. 26- This document is privileged and privilege will not be waived. This answer is, of course, unresponsive to

INTERROGATORY NO: 26

Is the following internal email topic related to the various studies implicating Vioxx in bone/healing or bone/healing general health?*

If so, please describe this email in a manner that <u>can be utilized to lead to lead to the discovery of admissible evidence.</u>

---

**"May 22, 2002 Request for legal advice and opinions regarding Risk Factors for Fracture"**

Document 581 of 1,947

13ATES_RANGE    MRK-AADG225g09-MRK-AAD0225909

ATTACI-LINFO        Attached to IARK-AAD0225908-MR1<-AA00225908

PRN_CLAIM Attorney-Client Privilege

---

*Plaintiff notes that this internal email was Granted Attorney-Client privilege within the Vioxx cardiovascular litigation. Plaintiff understands that this document may not be available as evidence. HOWEVER the title implies  that it would be reasonable to lead to the discovery of admissible evidence. Per the FRCP: For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.

**Rheumatoid arthritis is a medical condition with which Plaintiff has been diagnosed.**
The fact is that their own expert has stated that rheumatoid arthritis is a malady of the Plaintiff as well as at least two of his physicians .

**Rheumatoid arthritis is the condition for which Plaintiff was prescribed Vioxx for by his physicians.**
Plaintiff counters that Defendant has not offered any evidence to support such an argument, and Plaintiff herein will list those Rheumatologists who attended to Plaintiff who did prescribe Vioxx to Plaintiff, Dr. James M. Trice. See, Exhibit C.

**There is evidence of inadequate healing of Plaintiff's femur--- the injury alleged in his complaint and Lone Pine report and proof that he suffered that injury.  There Is Evidence Of  Inadequate Femur Healing in the Medical Records.**
The non-union is evidence of inadequate healing and puss and other evidence of non-union were present to support that after six weeks-post operative the wound would not heal and the previous operation was dissembled. There absolutely is  mountains of documentary evidence to prove all of this. The Preoperative diagnosis, see page 00028 Plaintiff Ex. 1, was: Infected nonunion of right hip periprothetic fracture, right femur.

The Lone Pine Report need only support that it was reasonable to conclude that Vioxx had inhibited bone union, bone formation, or bone healing by whatever means the declarant chose, as long as he was a medical practitioner, anything beyond that sworn statement submitted by Dr. Wyse is something only required on Merck's Wish List. It has no part of New York State Law. At trial Plaintiff and Defendant can present any expert witness they choose.  Neither Plaintiff nor Defendant is locked into using any witness at trial that it may designate now for any purpose, so how can Merck conclude that an expert

who signed a statement in 2008, at a time when most if not all of Merck's nefarious acts

were still unknown, need to give a witness regarding matters that have been exposed as

frauds only as of 2012 and after?.

**The perceived flaws in plaintiff's expert's analysis are relevant to the weight a jury should give to the expert's report and testimony; they do not present sufficient grounds for ruling that analysis inadmissible.  Analysis and conclusions should be challenged through cross-examination; the jury must decide whether or not his methodology was appropriate. As the United States Supreme Court said in Daubert vs. Merrell Dow Pharms., Inc. (509 US 579, 596 [1993]), "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attaching shaky but admissible evidence."**

The last scrap of evidence actually included in Defendant Merck's application for Post-

Operative Orthopedic surgery applications, see NDA 21-042, that Defendant Merck presented in

their material facts, and which it presented as a material fact supporting the use of Vioxx in the

issue of bone-union claimed to be supporting the safety of Vioxx in its application for Post-

Orthopedic Surgery failed on the issue of the safe use of Vioxx Post-Orthopedic Surgery because

the Protocol 083 did not involve surgical patients, it only tested healthy patients not undergoing

orthopedic surgery, protocol 083 did support safe and effective use in healthy persons but not

persons undergoing Orthopedic Surgery and to whatever degree it may have demonstrated

safety, it demonstrated safety insufficiently so as the application for the use of Vioxx failed to

overcome the presumptions established in the pre-clinical trials that Vioxx inhibited the union of

bone, and it is precisely those presumptions that still stand as the opinion of the FDA and are the

best evidence to be used to guide the Court, and that this material is in dispute and that dispute

may be resolved before a jury only.

Therefore neither Dr. Blavatsky's Declaration nor the presentation of protocol 083

obstructs, in any significant way, the advancement of Plaintiff's case and therefore Defendant's

motion does fail

Plaintiff asserts that if not for the fraud Plaintiff's attending physicians would have known that the Vioxx Plaintiff was being prescribed would inhibit not only pain but also inhibit bone healing, and would have discontinued any prescriptions for Vioxx he was taking.

Plaintiff asserts that if not for the fraud Plaintiff's insurance provider (Medicare) would have not allowed claims involving Vioxx to be paid, and by turning back those claims to the provider, the Plaintiff's intake of Vioxx would have ceased and been replaced by more suitable pain medications during his post-operative recovery periods simply because Merck had been pandering an unapproved use, which was unapproved on safety issues, and also because it was not approved for patients who had rheumatoid arthritis and also because Vioxx was being administered to Plaintiff in dosage of 50mg per day which was unsafe for chronic use.

Merck cited Fisher which involved an approved drug which had been approved for the use it was being used for.  The knowledge of the defect was disclosed to the FDA and its label and use had the FDA approval. No absolute fraud was involved. Therefore the case is not similar to the present case.

Fathi dealt with Pfizer  and came in 2009 prior to Pfizer's guilty Plea for fraud the following year. Pfizer was also an employer of Dr. Scott S. Reuben, who plead guilty to fraud in 2009, whereas  Pfizer's guilty Plea and fine of $2.3 Billion came in 2010, and Merck's guilty plea is already in and part of the record.

Plaintiff did not merely tack on fraud or bring the lumbar injury into the case as a last minute maneuver to avert a summary judgment, as Merck is attempting to characterize Plaintiff assertions, the lumbar injury and its connection to Vioxx was clearly stated in the original complaint is paragraphs 24, 25, 46, and 77, and 80 in support of his claim for the femur fracture.  Now, with knowledge of the absolute fraud the lumbar injury, which was

already stated in the original complaint, can come into the case as not only as a

precipitating injury, but also as a claim for damages as well. Plaintiff's injuries are not time

barred.

Belarge v. Kardas, 69 A.D.3d 779, 892 N.Y.S.2d 529 (2d Dept. 2010) (reversing
summary judgment to defendant in motor vehicle accident; issue of scar resulting from
motor vehicle accident as serious injury under New York State Insurance Law 5102;
Complaint reinstated).

 Misicki v. Caradonna, 12 N.Y.3d 511, 909 N.E.2d 1213, 882 N.Y.S.2d 375
(2009).(Amicus Curiae Brief drafted by Joshua Annenberg on behalf of New York State
Trial Lawyers' Association and submitted to the New York Court of Appeals in favor of
plaintiff-appellant Misicki. Amicus Curiae Brief argued the Court of Appeals should
interpret New York State Industrial Code 23-9.2(a), concerning the inspection,
maintenance and repair of power equipment, as a specific positive safety command
supportive of a Labor Law 241(6) action. The Court of Appeals so held and thus
reversed the Appellate Division, Second Department, and reinstated Misicki's action).
 Laduca v. Levidow, 29 A.D.3d 533, 813 N.Y.S. 2d 671 (2d Dept 2006), rearg, denied
(affirming motion court's restoration of malpractice action and denying motion to reargue
by appellants-defendants).


**There is  Scientific Evidence That Vioxx Causes a Person's Bones to heal improperly.**
          The standard for summary judgment is well-established. Summary judgment is

appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.

CIV. P. 56(c). A material fact is genuinely disputed only if, based on that fact, a reasonable

jury could find in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986). On a motion for summary judgment, all evidence must be viewed and

all inferences must be drawn in a light most favorable to the nonmoving party. See City of

Yonkers v. Otis Elevator Co., 844 F.2d 42, 45 (2d Cir. 1988).

          The party seeking summary judgment bears the initial burden of "informing the

district court of the basis for its motion" and identifying the matter "it believes

demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477

20

U.S. 317, 323 (1986). Upon the movant's satisfying that burden, the onus then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), Case 1:09-cv-00032-LEK-RFT Document 63 Filed 12/14/10 Page 13 of 26 set forth specific facts showing that there is a genuine issue of fact for trial." First Nat'l Bank of Az. v. Cities Serv. Co., 391 U.S. 253, 288 (1968). In particular, when there are conflicting statements as to how an accident occurred there is a triable issue of fact as to whether a particular defendant's conduct caused or contributed to the accident.

Omrami v. Socrates, 227 A.D.2d 459, 642 N.Y.S.2d 932, 933 (2d Dep't 1996); Burchette v. Aklah,2002 WL 31663225 (N.Y. Sup. App. Term Nov. 14, 2002)("parties' conflicting accounts raise material factual issues involving, inter alia, the time interval(s) between . . . the chain reaction collisions and the sequence of impacts between the three vehicles").

The issue of even links of causation that Merck relies on so much is put in question by virtue of its guilty plea, because the methodology of establishing the links themselves have been tampered with in the conduct of those fraudulent acts. In a similar conundrum courts have cut through the confusion as follows:

On January 3, 2012, Justice Eileen Bransten of the Supreme Court of the State of New York granted partial summary judgment to two insurers suing Countrywide Financial Corporation concerning the insurance of securitizations of mortgages underwritten by Countrywide. In the two cases, the insurers, MBIA and Syncora Guarantee, have brought claims for fraud and breach of the insurance agreements at issue. The Court found that to establish a claim of fraud the insurers must show that representations by Countrywide induced the insurers to issue insurance policies on terms to which they otherwise would not have agreed and that they are not required to establish a direct causal link between Countrywide's misrepresentations and the insurers' claims payments made pursuant to the insurers' policies at issue. The Court further held that the insurers may seek rescissory damages upon proving all elements of its claims for fraud and breach of representation and/or warranty. MBIA Decision. Syncora Decision.

The present case in which we are now locked in motions and countermotions is one that is very simple to rule on in that the Defendant has plead guilty to the acts it performed in the conduct of promoting its product with the intention of misleading physicians to prescribe this drug Vioxxc and its statements and actions were intended to inhibit the proper investigation that any physician would undertake when he was treating or prescribing a drug to patients who had rheumatoid arthritis. Plaintiff has more than adequately demonstrated these factors and has shown proof that he took Vioxx, that he suffered from rheumatoid arthritis, that his insurance (Medicare) was falsely billed for this drug, that all the events were contemporary in time to the events that were the subject of Merck's guilty plea, that during that time period he did undergo two surgical procedure that did fail and left him in the pathetic condition he is now in, and that is that he cannot stand erect, he cannot walk without risk of serious injury, he cannot breathe because the hunchback is now so severe that it virtually chokes him, he is now taking no less than 8 Tylenol-4 per day, which contains narcotics, every day and even now is in great pain and taking pain killers and is forced to type out this reply using two fingers on his right hand, which he only now has the ability to use after recent surgery, while his left hand and arm are in a sling due to a fractured shoulder and humorous fracture (no pun intended).

## Merck argues Plaintiff Cannot Avoid Summary Judgment By Rewriting History.

Plaintiff counters that it is not Plaintiff who needs to rewrite history, it is the Defendant Merck who is attempting to rewrite its history of obfuscation and misleading statements which it had previously plead guilty to by basically representing to the court that it should disregard its fraud and allow defendant to continue marketing Vioxx by accepting that this poisonous drug is safe and could not possibly have harmed the Plaintiff.

Plaintiff has asked the leave of the Court for the purpose of cutting off this tactic from further distorting Plaintiff's right to redress and obtain testimony without the issue of Merck's Fraud being concealed by the following sanctions being issued, and are simply restated here so that Defendant may understand the logic of having these sanctions and so that it may go forward without the risk of violating their Corporate Integrity Agreement (CIA) by joining with Plaintiff by supporting the motion Plaintiff has asked the Court's leave to follow.

Although Plaintiff believes it has previously filed an acceptable motion to amend his original complaint, Plaintiff now recognizes the need to ask for leave of the court under certain complication situations and does want to comply with the spirit of that requirement and now formally asks leave of the court to make a motion to amend Plaintiff's original complaint.

Plaintiff prays for relief because justice can never achieved in this case, only damages for the injuries can be awarded. This case must go on. The sanctions and restraints that Plaintiff has called for are absolutely warranted as he has previously requested in his Motion in Opposition and his cross complaint.

**There is scientific evidence that Vioxx caused injury, and this claim is not time-barred.**

Plaintiff has shown that scientifically in the rat studies Vioxx inhibits bone formation, bone replacement and bone turnover . Three illustrations of the same inhibition of the COX-2 enzymes roll in healing.  The Science shows that it is inhibited so effectively that 90% of the rats did not heal when their femurs were fractured and then resets.  This is not a risk that sometimes an adverse effect can occur, this is a statement that 90% of the time bone union does not occur, The Preoperative diagnosis,

see page 00028 Plaintiff Ex. 1, was: Infected nonunion of right hip periprosthetic fracture, right

femur.

## IV. Plaintiff has no misunderstanding of "off-label" usage regarding and prescription medications promoted by their manufacture for unapproved uses.

Once Merck stepped outside the FDA Act and entered its drug into interstate

commerce promoting Vioxx for uses unapproved by the FDA and specifically promoted

such unapproved use directly to physicians, a sales tactic which proved to be in

violation of interstate commerce laws, by promoting use to treat rheumatoid arthritis, a

malady that Plaintiff does suffer from, and promoting the post-orthopedic use of Vioxx a

use that has been unapproved by the FDA and by promoting the chronic use of Vioxx at

50mg dosage without stating the administration period of that dosage , it took upon itself

exposure to litigation and responsibility for any and all damages that this caused or

contributed to. To prove otherwise Merck should obtain a letter to the effect that it is

innocent from the FDA.

## It is unfortunate for Merck that Merck is perplexed by Plaintiff's new focus on rheumatoid arthritis. However,

Merck should not have been perplexed as its own Expert advised Merck and this

court that indeed Plaintiff did have rheumatoid arthritis. Plaintiff also has pointed out that

at least two attending physicians investigated that diagnosis and their inquiries were

what Blavatsky based his opinion upon because they were in Plaintiff's Medical

Records. Plaintiff believes Merck was not so perplexed as merely caught flat footed.

## Plaintiff erred in his sworn testimony, but there was no non-disclosure intended, nor was there any intent to mislead.

Dennis R. Harrison was obliged to state what he knows based upon his

understanding.  To put more weight on this error than just a simple error Defendant

needs to show a bit more than just that statement, and it could have done that by simply

confronting the witness with documents that it had in its possession at that time, and

then having clarified what it was asking about, the examination could proceed. But

Merck has made no such showing.

## V.  Plaintiff's Cross Motion for Summary Judgment Should Be Granted

The proof of injury due to Plaintiff's taking of Vioxx are the facts that his spine collapsed while taking Vioxx after the spinal fusion surgery and that Vioxx inhibits bone formation, and that after his femur broke, whether precipitated by the effects stemming from his spinal collapse or due to the inhibition of naturally occurring bone turn over while taking Vioxx at dosages notoriously recommended to 10,000 physicians by Merck's largest sales force on record, all of which need be supported by just more than a scintilla's worth of evidence, have already been proven with a great deal more than a scintilla's worth of proof, and that Merck cannot profess its innocence nor declare its immunity because it has been accused of fraud in these matters and plead guilty to those charges. Therefore, Plaintiff's cross motion should be granted. The reply is very complete and it answers the nagging questions of this case as follows:

The femur fracture had been diagnosed as non-union on February 25, 2003, however, it was determined that a second attempt would be undertaken and Hospadar performed that operation on 2/28.03. When that operation was completed, it was allowed to heal until June 27, 2003, at which time the union should have occured but did not.

On June 27, 2003, a third operation using cement was performed and that proved to be successful.

Harrison filed in New York on June 26, 2003 and qualifies for the Femur injury.

His complaint filed on June 26, 2006 specified the Lumbar injury in Paragraph 24, and claimed fraud in paragraph 25.

Paragraphs 46, 77, 80 should be read as stating the fact of the Lumbar injury regardless of it being time-barred in NEW YORK FOR DAMAGES, BUT IT STILL REMAINED A PRECIPITATING FACT IN THE FEMUR INJURY.

Paragraph 80 went into Juristdiction of Boston, not because of the femur but because the Lumbar injury came about from the surgery performed in Boston.

The effect of Merck's guilty plea is that fraud regarding the lumbar injury allows for the longer fraud statute and thus cover back to the lumbar injury, and now everything is in.

/s/ Dennis R. Harrison

25