# EXHIBIT YY

**MERCK SHARP & DOHME CORP.'S RESPONSES AND OBJECTIONSTO PLAINTIFF DENNIS HARRISON'S FIRST SET OF INTERROGATORIES**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Case No. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | SECTION L |
| LITIGATION | * | |
| | * | JUDGE FALLON |
| *This document relates to* | * | |
| | * | MAGISTRATE JUDGE |
| *Dennis R. Harrison v. Merck Sharp & Dohme Corp.,* | * | KNOWLES |
| **2:07-cv-00905-EEF-DEK** | * | |

## MERCK SHARP & DOHME CORP.'S RESPONSES AND OBJECTIONS TO PLAINTIFF DENNIS HARRISON'S FIRST SET OF INTERROGATORIES

Merck Sharp & Dohme Corp. ("Merck,,), by and through its attorneys, hereby responds and objects to Plaintiff Dennis Harrison's First Set of Interrogatories (the "Interrogatories,,):

## GENERAL OBJECTIONS

The following general objections are incorporated in, and serve as additions to, Merck's responses to each of Plaintiff Harrison's Interrogatories.

1.      Merck objects to the Requests to the extent they are vague, ambiguous, argumentative, duplicative, overly broad, unduly burdensome or oppressive, or seek information or documents that are not relevant to the claims or defenses of any party or to the subject matter involved in this action. Merck further objects to the Requests to the extent they seek information or documents, or otherwise purport to impose obligations upon Merck, beyond those permitted by the Federal Rules of Civil Procedure and/or court orders entered in this case.

2.      Merck objects to the Interrogatories to the extent that the discrete questions contained in the Interrogatories, whether or not denoted by Plaintiff as "subparts,,, exceed the number of interrogatories permitted by Federal Rules of Civil Procedure Rule 33(a)(1).

3.      Merck objects to the Interrogatories to the extent they seek information or documents that are protected from discovery by the attorney-client privilege, the work product doctrine, or that are otherwise immune or protected from disclosure. Merck does not intend to waive any applicable protections or privileges through the supplying of information or production of documents in response to the Interrogatories. On the contrary, Merck specifically intends to preserve any and all applicable protections or privileges.

4.      Inadvertent production of any document shall not constitute a waiver of any privilege or any other ground for objecting to discovery with respect to such document or any other document, or with respect to the subject matter thereof or the information contained therein; nor shall such inadvertent production waive Merck's right to demand that such

documents be returned or to object to the use of the document or the information contained therein during this or any other proceeding.

5.     Merck objects to the Interrogatories to the extent they seek information or documents generated in the course of the defense of this action or any other action regarding Vioxx. Merck will not produce such information or documents.

6.     Merck objects to the Interrogatories as overly broad and unduly burdensome to the extent they call for the identification of "all" documents or "any and all" documents when all relevant facts can be obtained from fewer than "all" documents or "any and all" documents. Merck objects to the Interrogatories to the extent they seek documents other than those that can be located upon a search of files where such documents reasonably can be expected to be found.

7.     Merck objects to the Interrogatories to the extent they seek confidential or proprietary information or trade secrets. Merck will only produce such other confidential or proprietary information or trade secrets, if relevant, subject to and in reliance on the protective order in this case (i.e., Pre-Trial Order No. 13), and in some cases, only with additional confidentiality protections.

8.     Merck objects to the Interrogatories as overly broad and unduly burdensome to the extent they purport to seek information or documents without regard to a specific timeframe or date cut-off. The production of such information or documents shall be subject to and without waiver of any of the objections stated herein, and shall not be deemed to be an admission on the part of Merck that such information or documents are either relevant or admissible. Indeed, Merck specifically notes that information or documents generated after plaintiffs last ingested Vioxx are unlikely to be relevant or admissible at the trial of this matter.

9.     Merck objects to the Interrogatories to the extent they purport to require Merck to provide a compilation, abstract, audit, and/or other document summary that does not currently exist.

10.     Merck objects to the Interrogatories to the extent they call for information or documents that are unreasonably cumulative or duplicative; outside of Merck's possession, custody or control; or obtainable from some other source that is more convenient, less burdensome or less expensive.

11.     Merck objects to the Interrogatories to the extent that they assert a request for production of all documents relating to the Interrogatory topics, on the grounds that such a blanket demand does not constitute a proper request for documents as permitted by Federal Rules of Civil Procedure Rule 34. In addition, in many cases, the requested categories of documents have already been produced to the Plaintiffs' Steering Committee and have been made available to Plaintiff.

12.     Merck objects to the Interrogatories to the extent they call for answers relating to Merck's "belief," Merck's "understanding," or similar. A corporate entity such as Merck is not the equivalent of a single personified individual, but rather is comprised of numerous individuals acting in various capacities at various times. Therefore, under the present circumstances,

2

questions inquiring as to what Merck "believed,„ "understood,„ etc., cannot be meaningfully answered.

13.     Merck objects to the Interrogatories that make reference to the phrases "first generation of NSAID's„ and "NSAID-1's„, which are not defined or otherwise explained, as overly broad, not reasonably calculated to lead to the discovery of admissible evidence, vague and ambiguous.  For purposes of responding to these Interrogatories, Merck interprets the phrase "first generation of NSAID's„ and/or "NSAID-1's„, to mean non-selective non-steroidal anti-inflammatory medications that existed in 1999.

14.     Merck is responding to the Interrogatories without waiving or intending to waive, but on the contrary, preserving and intending to preserve: (a) the right to object, on the grounds of competency, privilege, relevance, or materiality, or any other proper grounds, to the use of such documents or information for any purpose, in whole or in part, in any subsequent proceedings, in this action or in any other action; (b) the right to object on all grounds, at any time, to document requests, interrogatories, or other discovery procedures involving or relating to the subject of the Interrogatory to which Merck has responded herein; and (c) the right at any time to revise, correct, add to or clarify any of the answers made herein.

15.     Merck reserves the right to supplement or correct these responses and to raise any additional objections deemed necessary and appropriate in light of the results of any further review.

16.     Merck objects to the extent that typographical errors in the Interrogatories render such Interrogatories vague or confusing.  The Interrogatories are reproduced below as propounded, including aspects that may be typographical errors.  Merck has not used "sic„ or any other indicator in the responses to designate where precise reproduction may result in a typographical error.

## PRELIMINARY STATEMENT

As noted above, Plaintiff's Interrogatories contain far more discrete questions than the 25 permitted by Rule 33 of the Federal Rules of Civil Procedure.  "Subparts„ may be counted as part of a "primary„ interrogatory for purposes of Rule 33 only where the "purported subparts are 'logically or factually subsumed within and necessarily related to the primary [interrogatory in] question.'„  *Nottingham v. Murphy Oil USA, Inc.*, Civil Action No. 07-4211, 2010 WL 1049582, at *2 (E.D.La. Mar. 19, 2010) ("[T]he Court should decide whether the first question is primary and subsequent questions are secondary to the primary question; or whether the subsequent question could stand alone and is independent of the first question . . . . If the first question can be answered fully and completely without answering the second question, then the second question is totally independent of the first and not 'factually subsumed within and necessarily related to the primary question.„ (quoting *Kendall v. GES Exposition Servs., Inc.*, 174 F.R.D. 684, 685 (D. Nev. 1997) and *Krawczyk v. City of Dallas*, No. Civ. A. 3:03-CV0584D, 2004 WL 614842, at *2 (N.D. Tex. Feb.27, 2004))); *see also Kendall*, 174 F.R.D. at 686-87 ("[D]iscrete or separate questions should be counted as separate interrogatories, notwithstanding they are joined by a conjunctive word and may be related.„).  Plaintiff's Interrogatories contain upwards of 100 discrete questions, not including general requests purporting to ask for identification of

3

documents relating to each question. In addition, many of the questions that Plaintiff has explicitly demarcated as subparts themselves contain multiple discrete questions. Plaintiff disagrees with Merck's position regarding the number of interrogatories he has served, and he believes that all of the questions that he has propounded in what he has titled Interrogatories 1 through 25 are non-discrete subparts that fall within the 25 interrogatory limit set forth in Rule 33.

Notwithstanding this dispute, and in the interest of moving this litigation forward, subject to and without waiving any general or specific objections set forth herein, Merck is hereby providing responses that address Plaintiff's first 25 discrete questions (contained within the Interrogatories titled 1 through 7), as well as providing additional responsive information aimed at addressing the topics and issues raised by the numerous queries contained within what Plaintiff has titled Interrogatories 1 through 25.

## SPECIFIC RESPONSES & OBJECTIONS TO INDIVIDUAL INTERROGATORIES

The foregoing general objections are incorporated into each of the specific objections and responses that follow. The stating of a specific objection or response shall not be construed as a waiver of Merck's general objections.

## INTERROGATORY NO. 1(a):

(a) Was Vioxx marketed as a superior replacement to the first generation of NSAID's (NSAID-1's)? If so, what is the basis upon which Merck marketed this belief or opinion?

## RESPONSE TO INTERROGATORY NO. 1(a):

Merck objects to this Interrogatory on the grounds that it is overly broad, not reasonably calculated to lead to the discovery of admissible evidence, vague and ambiguous, particularly with respect to the phrases "first generation of NSAID's,, and "NSAID-1's,,, and "superior replacement,,, which are not defined or otherwise explained. For purposes of responding to this Interrogatory, Merck interprets the phrase "first generation of NSAID's,, to mean non-selective non-steroidal anti-inflammatory medications that existed in 1999. Merck further objects to this Interrogatory because it is overly broad and ambiguous as to time period. Merck further objects to this Interrogatory at vague and ambiguous with respect to its request for a statement of Merck's "belief,, or "opinion.,,

Subject to and without waiving its objections, Merck responds as follows: Vioxx was

4

marketed consistent with its FDA-approved product labeling as a selective Cox-2 inhibitor that had a more favorable gastrointestinal safety profile than certain NSAIDS that inhibit both the Cox-2 and Cox-2 enzymes.  For additional information, Merck refers Plaintiff to the FDA's April 6, 2005 Memorandum entitled Analysis and recommendations for Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk, *available at* http://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsa ndProviders/ucm106201.pdf.

Further responding, Merck states that documents containing information responsive to this Interrogatory have already been produced, including but not limited to the IND submissions to the FDA for Vioxx, at Bates ranges MRK-I894 0000001-0105099, MRK-I269 0000001-0009610, MRK-I222 0000001-0005988, MRK-I419 0000001-0004491, MRK-I768 0000001-0005232, and MRK-I687 0000001-0005389; NDA submissions to the FDA for Vioxx, at Bates ranges MRK-OS42 0000001-0166451, MRK-9942 0000001-0024842, MRK-0042 0000001-0033165, MRK-0142 0000001-0169499, MRK-0242 0000001-0002844, MRK-N052 0000001-0008567, MRK-S042 0000001-0142684, MRK-N052 0000001-0019454, and MRK-N647 0000001-0007344; the Vioxx labeling production at MRK-LBL 0000001-0000313; and the SPiDER Clinical Study Report productions at Bates ranges MRK-AHP 0000001-0131143. Pursuant to Federal Rule of Civil Procedure 33(d), Merck directs Plaintiff to those documents for such information.

**INTERROGATORY NO. 1(b):**

(b) If so, did Merck also believe that Vioxx was superior (to NSAID-1's) in regard to less or no deleterious effect on bone or spine healing in either delaying healing, stopping the healing process, or contributing to a sub-optimal healing result – "healing" is often referred to as "remodeling".  If so, what is the basis upon which Merck marketed this belief or opinion?

5

## RESPONSE TO INTERROGATORY NO. 1(b):

Merck specifically incorporates the foregoing general objections as to the phrase "NSAID-1's,,, and as to Merck's "belief,, or "opinion.,,

Subject to and without waiving its objections, Merck responds as follows: Merck did not make superiority claims regarding Vioxx versus other NSAIDS relating to bone or spine healing. Merck refers the Plaintiff to Protocol 083, the results of which indicated that neither Vioxx nor ibuprofen had a clinically significant effect on biochemical markers of bone turnover or bone mineral density. Further responding, Merck states that documents containing information responsive to this Interrogatory have been produced, including but not limited to the IND submissions to the FDA for Vioxx, at Bates ranges MRK-I894 0000001-0105099, MRK-I269 0000001-0009610, MRK-I222 0000001-0005988, MRK-I419 0000001-0004491, MRK-I768 0000001-0005232, and MRK-I687 0000001-0005389; NDA submissions to the FDA for Vioxx, at Bates ranges MRK-OS42 0000001-0166451, MRK-9942 0000001-0024842, MRK-0042 0000001-0033165, MRK-0142 0000001-0169499, MRK-0242 0000001-0002844, MRK-N052 0000001-0008567, MRK-S042 0000001-0142684, MRK-N052 0000001-0019454, and MRK-N647 0000001-0007344; and the SPiDER Clinical Study Report productions at Bates ranges MRK-AHP 0000001-0131143, including MRK-01420166374-0167054 (the CSR for Protocol 083). Pursuant to Federal Rule of Civil Procedure 33(d), Merck directs Plaintiff to those documents for such information.

## INTERROGATORY NO. 2(a):

(a) Was it Merck's belief that NSAID-1's had various degrees (mixtures) of both Cox-1 and Cox-2 inhibitors?

## RESPONSE TO INTERROGATORY NO. 2(a):

Merck specifically incorporates the foregoing objections regarding the terms "NSAID-1,,

6

and Merck's "beliefs.,, Merck further objects to this Interrogatory on the grounds that it is vague

and ambiguous, particularly with respect to its reference to "mixtures,, of "Cox-1 and Cox-2

inhibitors.,,

Subject to and without waiving its objections, Merck responds as follows:  The

distinguishing feature between non-selective NSAIDS and the class of Cox-2 inhibitors is that

non-selective NSAIDS, to varying degrees, inhibit both the Cox-1 and Cox-2 enzyme, while

Cox-2 inhibitors target only the Cox-2 enzyme.  For additional information, Merck refers

Plaintiff to the FDA's April 6, 2005 Memorandum entitled Analysis and recommendations for

Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk,

*available at*

http://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsa

ndProviders/ucm106201.pdf.

## INTERROGATORY NO. 2(b):

(b) **If the answer is YES did Merck believe that it was the Cox-1 inhibition which
primarily reduced inflammation, the Cox-2 inhibition, equal, or no opinion?**

## RESPONSE TO INTERROGATORY NO. 2(b):

Merck objects to this Interrogatory on the grounds that it is confusing, vague, and

ambiguous, particularly with respect to its request for a statement of Merck's "belief,,, and also

as to the relationship between Cox-1 inhibition and Cox-2 inhibition.

Subject to and without waiving its objections, Merck responds as follows:  Merck

interprets this Interrogatory as inquiring as to the roles that the Cox-1 and Cox-2 enzymes play in

relation to inflammation in the human body.  Opinions in the scientific community differ

regarding the extent and effect of Cox-1 and Cox-2 inhibition among the various members of

NSAID class.  Vioxx targeted the inhibition of Cox-2 and it was effective in reducing

7

inflammation.  Vioxx did not inhibit Cox-1.  For additional information, Merck refers Plaintiff to

the FDA's April 6, 2005 Memorandum entitled Analysis and recommendations for Agency

action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk, *available at*

http://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsa

ndProviders/ucm106201.pdf.

<u>INTERROGATORY NO. 3(a):</u>

       **Within the "ADVERSE REACTIONS" SECTION of the Celebrex Label there is
reference to "bone disorder" and "fracture accidental":**

       **Musculoskeletal: Arthralgia, arthrosis, "bone disorder, fracture accidental",
myalgia, neck stiffness, synovitis, tendinitis.**

       **(a) Was Merck aware of the Celebrex label?**

<u>RESPONSE TO INTERROGATORY NO. 3(a):</u>

       Merck objects to this Interrogatory on the grounds that it is overly broad, unduly

burdensome, and seeks information that is neither relevant to the claims or defenses of any party,

nor reasonably calculated to lead to the discovery of admissible evidence.  Merck further objects

to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to

its request for a statement of Merck's "aware[ness].,, Merck further objects to this Interrogatory

on the grounds that it is ambiguous as to time period, and because it does not specify which

Celebrex label it is referencing, and the current Celebrex label does not contain the quoted

language.

       Subject to and without waiving its objections, Merck responds as follows:  Certain

employees of Merck would have known of the competitor products to Vioxx, including

Celebrex, and would also have known that all pharmaceuticals marketed in the United States—

including Celebrex—must be approved by the FDA and carry an FDA-approved label. At any

given point in time, there would have been some Merck personnel who had read the Celebrex

8

label.

**INTERROGATORY NO. 3(b):**

(b) If so, what was Merck's belief of the meaning of "bone disorder" and "fracture accidental"?

**RESPONSE TO INTERROGATORY NO. 3(b):**

Merck objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to its request for a statement of Merck's "belief." Merck further objects to this Interrogatory on the grounds that it is ambiguous as to time period, because it does not specify which Celebrex label it is referencing, and the current Celebrex label does not contain the quoted language. Merck further objects to this Interrogatory on the grounds that the quoted language speaks for itself.

Subject to and without waiving its objections, Merck responds as follows: Generally, the "Adverse Reaction" section within pharmaceutical labeling identifies adverse experiences that were reported in specified clinical trials and/or as spontaneous post-marketing adverse events, regardless of causality, and therefore the listing any individual adverse experience in the Adverse Reaction section of a label does not imply the existence of any causal link. Merck did not manufacture or market Celebrex, and Merck personnel did not participate in drafting Celebrex labeling. Thus, Merck cannot speculate on what was meant or referenced by the quoted language, assuming it appeared in some version of the Celebrex label.

**INTERROGATORY NO. 3(c):**

(c) If so, did Merck have a belief as to what caused this by Celebrex?

9

**RESPONSE TO INTERROGATORY NO. 3(c):**

Merck incorporates by reference the specific objections stated to Interrogatory No. 3(b).

Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous,

particularly with respect to the phrase "what caused this by Celebrex."

Subject to and without waiving its objections, Merck incorporates by reference its

response to Interrogatory No. 3(b).

**INTERROGATORY NO. 3(d):**

**(d) Did Merck have any opinion or position in\how this may relate (i.e. similarities) to Vioxx, and**

**RESPONSE TO INTERROGATORY NO. 3(d):**

Merck incorporates by reference the specific objections stated to Interrogatory No. 3(b).

Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous,

particularly with respect to its request for a statement of Merck's "opinion," or "position," and

with respect to the phrase "how this may relate (i.e. similarities)."

Subject to and without waiving its objections, Merck incorporates by reference its

response to Interrogatory No. 3(b).

**INTERROGATORY NO. 3(e):**

**(e) did it cause Merck to evaluate Vioxx for a similar issue?**

**RESPONSE TO INTERROGATORY NO. 3(e):**

Merck incorporates by reference the specific objection s stated to Interrogatory No. 3(b).

Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous,

particularly with respect to the phrases "evaluate," and "similar issue."

Subject to and without waiving its objections, Merck incorporates by reference its

response to Interrogatory No. 3(b).  Merck further states that, as with all its pharmaceutical

products, it collected data regarding all adverse experiences as reported by clinical investigators

in Vioxx clinical trials, as well as post-marketing spontaneous adverse events reported for Vioxx.

### INTERROGATORY NO. 3(f):

(f) What is the basis upon which Merck formed this belief or opinion and what did Merck rely on for this belief?

### RESPONSE TO INTERROGATORY NO. 3(f):

Merck incorporates by reference the specific objections stated to Interrogatory No. 3(b).

Merck further objects to this Interrogatory on the grounds that it is so overly broad, vague and

ambiguous as to be largely unintelligible. Merck further objects to this Interrogatory on the

grounds that it is vague and ambiguous particularly with respect to its request for a statement of

Merck's "opinion,, or "belief.,,

Subject to and without waiving its objections, Merck incorporates by reference its

response to Interrogatory No. 3(b).

### INTERROGATORY NO. 4(a):

Within the "ADVERSE REACTIONS" SECTION of the Vioxx Label there is reference to "wrist fracture":

"Musculoskeletal System: ankle sprain, arm pain, arthralgia, back strain, bursitis, cartilage trauma, joint swelling, muscular cramp, muscular disorder, muscular weakness, musculoskeletal pain, musculoskeletal stiffness, myalgia, osteoarthritis, tendinitis, traumatic arthropathy, wrist fracture..

(a) What does Merck mean by the simple phrase "wrist fracture" and what does Merck believe causes "wrist fracture"?

### RESPONSE TO INTERROGATORY NO. 4(a):

Merck objects to this Interrogatory on the grounds that it is overly broad, vague and

ambiguous, particularly with respect to its request for a statement of Merck's "opinion.,, Merck

further objects to this Interrogatory on the grounds that it is ambiguous as to time period, and

11

because it does not specify which Vioxx label it is referencing. For purposes of its response,
Merck will refer to the initial version of the Vioxx label from the time of its 1999 FDA approval.
Merck further objects to this Interrogatory on the grounds that the quoted language speaks for
itself. Merck further objects to this Interrogatory because it contains two individual discrete
questions not enumerated as separate interrogatories.

Subject to and without waiving its objections, Merck responds as follows: The quoted
language speaks for itself, and the term "wrist fracture„ can be assumed to mean a fracture of the
wrist. Generally, the "Adverse Reaction„ section within pharmaceutical labeling identifies
adverse experiences that were reported in specified clinical trials and/or as spontaneous post-
marketing adverse events, regardless of causality, and therefore the listing any individual adverse
experience in the Adverse Reaction section of a label does not imply the existence of any causal
link. The introductory paragraph to the specific subsection of the 1999 Vioxx label where the
quoted language appears states: "In the OA studies, the following spontaneous adverse events
occurred in >0.1% to 1.9% of patients treated with VIOXX regardless of causality.„ For instance,
a wrist fracture can be caused by tripping and falling onto an outstretched hand, and such
fracture, if it occurred to a study subject during the course of one of the studies referenced in the
Vioxx label, would be reflected in the Adverse Reactions section of that label. *See, e.g.*, MRK-
APC0007080 (adverse event report of left wrist fracture secondary to fall reported in Protocol
078).

Wrist fractures are very common. Commonly available sources of medical information
indicate that they are the most frequent broken bone injury in the arm, and the most common
broken bone injury in general in patients under 65, and that in the United States, approximately 1
out of every 10 broken bones is a broken wrist, and 1 out of every 6 fractures treated in an
emergency room is a wrist fracture. *See, e.g.*, http://www.webmd.com/a-to-z-guides/colles-

fracture; http://orthopedics.about.com/cs/upperfx/a/wristfracture.htm.  The fact that less than

2.0% of participants in the VIOXX OA clinical trials reported experiencing a wrist fracture

during the time period in which they were taking Vioxx does not lead to any other implications,

inferences or conclusions.

**INTERROGATORY NO. 4(b):**

    **(b) Does "wrist fracture" imply fractured bone and does that imply any other bones either are more susceptible to fracture, or don't heal as well as normal if fractured?**

**RESPONSE TO INTERROGATORY NO. 4(b):**

    Merck incorporates by reference the specific objections identified in response to

Interrogatory No. 4(a).

    Subject to and without waiving its objections, Merck incorporates by reference its

response to Interrogatory No. 4(a).

**INTERROGATORY NO. 4(c):**

    **(c) Did the FDA have any comments on "wrist fracture", and does Merck believe that "wrist fracture" is a useful description for whatever issue it is?**

**RESPONSE TO INTERROGATORY NO. 4(c):**

    Merck incorporates by reference the specific objections identified in response to

Interrogatory No. 4(a).

    Subject to and without waiving its objections, Merck incorporates by reference its

response to Interrogatory No. 4(a).  Merck further states that "wrist fracture,, is an accurate

description of the adverse experiences reported.  Further responding, Merck states that

documents containing information responsive to this Interrogatory, including documents relating

to the FDA's review of the initial Vioxx labeling, have been produced at, including but not

limited to the IND submissions to the FDA for Vioxx, at Bates ranges MRK-I894 0000001-

0105099, MRK-I269 0000001-0009610, MRK-I222 0000001-0005988, MRK-J419 0000001-

13

0004491, MRK-I768 0000001-0005232, and MRK-I687 0000001-0005389; NDA submissions to the FDA for Vioxx, at Bates ranges MRK-OS42 0000001-0166451, MRK-9942 0000001-0024842, MRK-0042 0000001-0033165, MRK-0142 0000001-0169499, MRK-0242 0000001-0002844, MRK-N052 0000001-0008567, MRK-S042 0000001-0142684, MRK-N052 0000001-0019454, and MRK-N647 0000001-0007344; the SPiDER Clinical Study Report productions at Bates ranges MRK-AHP 0000001-0131143; the FDA Correspondence at Bates ranges MRK-AAF 0000001- MRK-AAF0017703, and specifically the Villalba Medical Officer Review at MRK-ADJ0010137-176; and the custodial file productions of Dennis Erb at Bates range MRK-AID 0000001-0119995; Robert Silverman at Bates range MRK-ACD 0000001-0154202; Ned Braunstein at Bates range MRK-AFV 0000001-0519740; Philip Huang at Bates range MRK-AIU 0000001-0278591; and Bonnie Goldmann at Bates range MRK-AFT 0000001-001564. Pursuant to Federal Rule of Civil Procedure 33(d), Merck directs Plaintiff to those documents for such information.

## INTERROGATORY NO. 4(d):

(d) What is the basis upon which Merck formed their beliefs, or opinions on the foregoing questions and what did Merck rely on to form those beliefs or opinions?

## RESPONSE TO INTERROGATORY NO. 4(d):

Merck incorporates by reference the specific objections stated to Interrogatory No. 4(a).

Subject to and without waiving its objections, Merck incorporates by reference its responses to Interrogatory Nos. 4(a) and 4(c). Merck further states that events listed in the quoted language from the Adverse Event section of the 1999 Vioxx label were based on reports received from clinical trial investigators. "Wrist fracture,, is commonly understood terminology for a break that occurs in the wrist bones, and is common in the general population.

## INTERROGATORY NO. 5(a):

14

**(a) At any time prior to or after FDA approval, was it Merck's belief that Vioxx MIGHT or DID HAVE a deleterious effect on bone/spine healing?  what plans**

**RESPONSE TO INTERROGATORY NO. 5(a):**

Merck objects to this Interrogatory on the grounds that it is overly broad, vague and ambiguous, particularly with respect to its request for a statement of what "might,, have been Merck's "belief,,, with respect to the term "deleterious effect,,, which is not defined or otherwise explained.  Merck further objects to this Interrogatory because it is overly broad and ambiguous as to time period.

Subject to and without waiving its objections, Merck responds as follows:  Merck refers the Plaintiff to Protocol 083, the results of which indicated that neither Vioxx nor ibuprofen had a clinically significant effect on biochemical markers of bone turnover or bone mineral density. Further responding, Merck states that documents containing information responsive to this Interrogatory have been produced in the custodial file productions of Alise Reicin at Bates range MRK-AAD 0000001- 0551169; E.B. Brakewood at Bates range MRK-ADF 0000001-0061338; Thomas Cannell at Bates range MRK-ADG 0000001-0080859; Riad El-Dada at Bates range MRK-ADM 0000001-0184231; Barry Gertz at Bates range MRK-AAC 0000001-0190162; Adam Schechter at Bates range MRK-ABX 0000001-0097350; Douglas Watson at Bates range MRK-ABY 0000001-0249846 and the documents from the departmental file production of Public Affairs at Bates range MRK-ADX 0000001- 0038649; the Vioxx Project Team at Bates range MRK-ABF 0000001-0005702; and the Physician Information Request ("PIR,,) productions at Bates range MRK-AKT 0000001-4391560.  Pursuant to Federal Rule of Civil Procedure 33(d), Merck directs Plaintiff to those documents for such information.

**INTERROGATORY NO. 5(b):**

**(b) If so when, did Merck communicate their belief to the FDA, and did Merck have to address the issue?**

**RESPONSE TO INTERROGATORY NO. 5(b):**

Merck objects to this Interrogatory on the grounds that it is overly broad, vague and

ambiguous, particularly with respect to its request for a statement of Merck's "belief." Merck

further objects to this Interrogatory because it is overly broad and ambiguous as to time period.

Merck further objects to this Interrogatory because it contains multiple discrete questions not

enumerated as separate interrogatories.

Subject to and without waiving its objections, Merck incorporates by reference its

responses to Interrogatory No. 5(a).

**INTERROGATORY NO. 5(c):**

(c) **What is the basis upon which Merck formed their beliefs, or opinions on whether
or not Vioxx might have, did, or did not have in regard to a potential deleterious effect on
bone/spine healing and what did Merck rely on to form its belief or opinion?**

**RESPONSE TO INTERROGATORY NO. 5(c):**

Merck objects to this Interrogatory on the grounds that it is overly broad, vague and

ambiguous, particularly with respect to its request for a statement of "might," be Merck's

"beliefs," or "opinions," and with respect to the term "potential deleterious effect," which is not

defined or otherwise explained. Merck further objects to this Interrogatory because it is overly

broad and ambiguous as to time period.

Subject to and without waiving its objections, Merck incorporates by reference its

responses to Interrogatory No. 5(a). Merck also directs Plaintiff's attention to written responses

it provided to physicians who made information requests (PIRs), —some of which relate to bone

healing. *See generally* MRK-AKT0000001 to MRK-AKT4391560; *see, e.g.*, MRK-

AKT1493866, MRK-AKT0628680; MRK-AKT0063091.

**INTERROGATORY NO. 6(a):**

(a) **At any time prior to or after FDA approval, were there any tests, studies, or**

research conducted by Merck with the PRIMARY GOAL regarding an understanding if Vioxx had a deleterious effect on bone/spine healing?

## RESPONSE TO INTERROGATORY NO. 6(a):

Merck objects to this Interrogatory on the grounds that it is overly broad, vague and ambiguous, particularly with respect to the terms "PRIMARY GOAL,, and "deleterious effect,,, which are not defined or otherwise explained. Merck further objects to this Interrogatory because it is overly broad and ambiguous as to time period – the phrase "any time prior to or after FDA approval,, does not actually impose any time limitation.

Subject to and without waiving its objections, Merck responds as follows: Merck refers the Plaintiff to Protocol 083, the results of which indicated that neither Vioxx nor ibuprofen had a clinically significant effect on biochemical markers of bone turnover or bone mineral density. Responding further, Merck states that documents containing information responsive to this Interrogatory have been produced from the custodial files of Alise Reicin at Bates range MRK-AAD 0000001-0551169; Barry Gertz at Bates range MRK-AAC 0000001-0190162; and Douglas Watson at Bates range MRK-ABY 0000001-0249846; as well as including but not limited to the IND submissions to the FDA for Vioxx, at Bates ranges MRK-I894 0000001-0105099, MRK-I269 0000001-0009610, MRK-I222 0000001-0005988, MRK-I419 0000001-0004491, MRK-I768 0000001-0005232, and MRK-I687 0000001-0005389; NDA submissions to the FDA for Vioxx, at Bates ranges MRK-OS42 0000001-0166451, MRK-9942 0000001-0024842, MRK-0042 0000001-0033165, MRK-0142 0000001-0169499, MRK-0242 0000001-0002844, MRK-N052 0000001-0008567, MRK-S042 0000001-0142684, MRK-N052 0000001-0019454, and MRK-N647 0000001-0007344; and the SPiDER Clinical Study Report productions at Bates range MRK-AHP 0000001-0131143. Pursuant to Federal Rule of Civil Procedure 33(d), Merck directs Plaintiff to those documents for such information.

17

**INTERROGATORY NO. 6(b):**

      **(b) If so when and what were the result(s)?**

**RESPONSE TO INTERROGATORY NO. 6(b):**

      Merck incorporates by reference the specific objections stated to Interrogatory No. 6(a).

      Subject to and without waiving its objections, Merck incorporates by reference its

responses to Interrogatory No. 6(a).

**INTERROGATORY NO. 6(c):**

      **(c) If so, did Merck communicate those results to the FDA?  If there were NO tests
with the PRIMARY GOAL regarding an understanding if Vioxx had a deleterious effect on
bone/spine healing, on what did Merck rely upon to justify not testing, studying or
researching?**

**RESPONSE TO INTERROGATORY NO. 6(c):**

      Merck objects to this Interrogatory on the grounds that it is overly broad, vague and

ambiguous, particularly with respect to the terms "PRIMARY GOAL,, and "deleterious effect,,

which are not defined or otherwise explained.  Merck further objects to this Interrogatory

because it is overly broad and ambiguous as to time period.  Merck further objects to this

Interrogatory because it contains multiple discrete questions not enumerated as separate

interrogatories.  Merck further objects to this Interrogatory on the grounds that it is unduly

argumentative with respect to the word "justify.,,

      Subject to and without waiving its objections, Merck incorporates by reference its

responses to Interrogatory No. 6(a).  Responding further, Merck states that Clinical Study

Reports from the Vioxx clinical trials were provided to the FDA, and that Protocol 083 provided

clinical trial data regarding the effect of Vioxx on biochemical markers of bone turnover and

bone mineral density.

**INTERROGATORY NO. 7(a):**

      **(a) At any time prior to or after FDA approval, did any entity (FDA, research facility,**

university, organization, other drug manufacturer), person employed by Merck (related to Vioxx development), or person not employed by Merck (e.g. R&D, scientist, surgeon, physician, etc.) express concern(s) TO MERCK in re to Vioxx or the "class" of Cox-2 inhibitors, about their potential deleterious effects on bone/spine healing?

## RESPONSE TO INTERROGATORY NO. 7(a):

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to the terms "potential deleterious effects," and "express concern(s) TO MERCK," which are not defined or otherwise explained. Merck further objects to this Interrogatory because it is overly broad and ambiguous as to time period. Merck further objects to this Interrogatory to the extent that it requests information regarding medications other than Vioxx.

Subject to and without waiving its objections, Merck responds as follows: Prior to FDA approval, no one working on clinical development at Merck or in the FDA review division identified any signal suggesting that Vioxx had any elevated risk for impaired bone or spine healing. While Vioxx was on the market, no post-approval human studies suggested that Vioxx had any elevated risk for impaired bone or spine healing. Further responding, Responding further, Merck states that documents containing information responsive to this Interrogatory have been produced from including but not limited to the Clinical Development Oversight Committee production, at Bates ranges MRK-ABP 0000001-0021578; the Vioxx Project Team production at Bates ranges MRK-ABF 0000001-0005702; as well as from the custodial files of Alise Reicin at Bates range MRK-AAD 0000001-0551169; Barry Gertz at Bates range MRK-AAC 0000001-0190162; and Gail Murphy at Bates range MRK-APD 0000001-0027846. Pursuant to Federal Rule of Civil Procedure 33(d), Merck directs Plaintiff to those documents for such information.

19

THE PAGE

**INTERROGATORY NO. 7(b):**

**(b) If so, when (date) did they occur and describe those concern(s).**

**RESPONSE TO INTERROGATORY NO. 7(b):**

Merck incorporates by reference the specific objections stated to Interrogatory No. 7(a). Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to the term "concerns,,, which is not defined or otherwise explained, and because it is unclear to what this question refers.

Subject to and without waiving its objections, Merck incorporates by reference its response to Interrogatory No. 7(a).

**INTERROGATORY NO. 7(c):**

**(c) If so, please describe the view Merck had on the concerns(s).**

**RESPONSE TO INTERROGATORY NO. 7(c):**

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to the terms "concern(s),,, which is not defined or otherwise explained, and because of its request for a statement of the "view,, of "Merck.,, Merck further objects to this interrogatory because it is overly broad and ambiguous as to time period. Merck further objects to this Interrogatory to the extent that it requests information regarding medications other than Vioxx.

Subject to and without waiving its objections, Merck incorporates by reference its response to Interrogatory No. 7(a).

**INTERROGATORY NO. 7(d):**

**(d) If so, if the entity or individual was not the FDA, did Merck notify the FDA and what was the FDA's response?**

20

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is vague, ambiguous, and confusing, in that it is not clear to what "entity or individual" this question refers. Merck further objects to this Interrogatory because it is overly broad and ambiguous as to time period. Merck further objects to this Interrogatory to the extent that it requests information regarding medications other than Vioxx.

Subject to and without waiving its objections, Merck incorporates by reference its response to Interrogatory No. 7(a).

## INTERROGATORY NO. 7(e):

(e) Did Merck feel that it needed to take any action in order to address the concerns expressed, and if so what were those actions?

## RESPONSE TO INTERROGATORY NO. 7(e):

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to the terms "concerns," which is not defined or otherwise explained, and because of its request for a statement of Merck's "feel[ing]." Merck further objects to this Interrogatory because it is overly broad and ambiguous as to time period. Merck further objects to this Interrogatory to the extent that it requests information regarding medications other than Vioxx.

Subject to and without waiving its objections, Merck incorporates by reference its response to Interrogatory No. 7(a).

21

**RESPONSE TO INTERROGATORY NO. 7(d):**

**INTERROGATORY NO. 7(f):**

(f) If Merck took action did Merck believe that their actions would prevent more deleterious bone/spine healing problems than if it did not take action?

**RESPONSE TO INTERROGATORY NO. 7(f):**

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to the term "deleterious bone/spine healing problems,,, which is not defined or otherwise explained, and because of its request for a statement of Merck's "belief.,, Merck further objects to this Interrogatory because it is overly broad and ambiguous as to time period.  Merck further objects to this Interrogatory to the extent that it requests information regarding medications other than Vioxx.

Subject to and without waiving its objections, Merck incorporates by reference its response to Interrogatory No. 7(a).

**INTERROGATORY NO. 7(g):**

(g) What is the basis upon which Merck formed their beliefs, or opinions  on the foregoing questions  and what did Merck rely on to form those beliefs or opinions?

**RESPONSE TO INTERROGATORY NO. 7(g):**

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to its request for a statement of Merck's "beliefs or opinions.,, Merck further objects to this Interrogatory because it is overly broad and ambiguous as to time period. Merck further objects

22

to this Interrogatory to the extent that it requests information regarding medications other than

Vioxx.

Subject to and without waiving its objections, Merck incorporates by reference its

response to Interrogatory No. 7(a).

**All interrogatories after this point exceed the permissible number of 25, including

discrete subparts. Nevertheless, subject to and without waving this objection, Merck will

provide information that is responsive to the general topic of each numbered entry below

and/or attempt to direct Plaintiff to where such information is likely to be found.**

## INTERROGATORY NO. 8:

(a) In April, 1999 approximately one month before Vioxx was approved by the FDA
did Merck attend a meeting with the FDA to discuss "the general safety and tolerability
profile for rofecoxib"?

(b) In that meeting is Merck aware that a Dr. Wilson stated:

"And as is also known, during episodes of inflammation, ulcerations,
infections, there's an up- regulation of the level of COX-2. And it's suggested
that the function of COX-2 in this situation is to promote healing and to
promote elimination of any infectious agent....And in rabbits there was an
increase in the incidence of incomplete ossification".

(c) If Merck was aware of Dr. Wilson's statement, did that cause Merck any concern
in re to bone/spine healing?

(d) If Dr. Wilson's statement did not cause any concern within Merck, upon what
basis was Merck justified not to have concern, and on what did Merck rely on to justify not
having any concern.

## RESPONSE TO INTERROGATORY NO. 8:

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks

information that is neither relevant to the claims or defenses of any party, nor reasonably

calculated to lead to the discovery of admissible evidence. Merck further objects to this

Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to the phrase "concern in re to bone/spine healing,,, and with respect to its request for a statement of Merck's "awareness,, and/or "concern(s).,, Merck further objects to this Interrogatory on the grounds that the quoted language speaks for itself. Merck further objects to this Interrogatory on the grounds that it is unduly argumentative with respect to the word "justify.,,

Subject to and without waiving its objections, Merck responds as follows: Based on a review of relevant records, it does not appear that a meeting between Merck personnel and FDA personnel took place in April, 1999. Counsel believes that Plaintiff must be referring to an FDA Advisory Committee meeting that took place on April 20, 1999.

On April 20, 1999 there was a meeting of the FDA's Arthritis Advisory Committee regarding the Vioxx New Drug Application ("NDA,,). FDA Advisory Committees are comprised of outside experts who are not FDA employees, but who provide advice to the FDA. At the April 20, 1999 meeting, the Arthritis Advisory Committee voted to recommend the approval of the Vioxx NDA. Employees of Merck were present at that meeting. The transcript and minutes of that meeting, which are publically available at http://www.fda.gov/ohrms/dockets/ac/cder99t.htm, speak for themselves. Responding further, Merck states that documents containing information responsive to this Interrogatory have been produced in the productions of FDA Advisory Committee Background Materials at Bates range MRK-AAP 0000001-0000788; as well as the custodial files of Deborah Shapiro at Bates range MRK-AAB 0000001-0123207; Barry Gertz at Bates range MRK-AAC 0000001-0164855; Alise Reicin at Bates range MRK-AAD 0000001-0427983; and Ned Braunstein at Bates range MRK-AFV 0000001-0388206. Pursuant to Federal Rule of Civil Procedure 33(d), Merck directs Plaintiff to those documents for such information.

24

<u>INTERROGATORY NO. 9:</u>

(a) Did the FDA express concern at a **RESEARCH MANAGEMENT COMMITTEE MEETING** in January of 1998 about the effects on COX-2 inhibitors on bone?

(b) If so, what was Merck's response to the FDA, what was the basis of Merck's view that their response was appropriate, and on what did Merck rely on to justify its response?

(c) If so, did the response include "discussion" of a bone mineralization test and would that test have been sufficient for gaining knowledge on the potential issue of bone/spine healing?

(d) If Merck believed that a "bone mineralization" test (study) would have been sufficient to evaluate Vioxx and potential deleterious effect on bone/spine healing, upon what basis did Merck form this belief and what did Merck rely on to form this basis? The excerpt below is sourced from EW; Attorney Eric Weinberg.[1]

<u>RESPONSE TO INTERROGATORY NO. 9:</u>

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks

information that is neither relevant to the claims or defenses of any party, nor reasonably

calculated to lead to the discovery of admissible evidence. Merck further objects to this

Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to its

request for a statement of Merck's "view,, and/or "belief.,, Merck further objects to this

Interrogatory on the grounds that the embedded document speaks for itself. Merck further

objects to this Interrogatory to the extent that it requests information regarding medications other

than Vioxx.

Subject to and without waiving its objections, Merck responds as follows: The Research

Management Committee was an internal Merck committee where MRL management reviewed

the major administrative and broad scientific issues of the research division, including the review

and approval of new compounds for development, with a focus on early development, preclinical

and Phase I-IIa studies. FDA personnel did not participate in the meetings of this committee, nor

---

[1]    Plaintiff has included images of various documents in his Interrogatories. Those images
       are not reproduced here.

25

did FDA personnel attend the specific meeting referenced in the Interrogatory.  The referenced

minutes note that the FDA, based on previously published data for other NSAIDS, wanted

information regarding the potential effects of Cox-2 inhibitors on bone.  (This is an information

request that would have been communicated to Merck prior to the referenced meeting.) Merck

performed a bone mineral density study with Vioxx, and the results of that study were provided

to FDA.  It does not appear that FDA communicated any additional questions or concerns to

Merck regarding that study.   Responding further, Merck states that documents containing

information responsive to this Interrogatory have been produced from the custodial files of

Deborah Shapiro at Bates range MRK-AAB 0000001- 0123210; Ken Truitt at Bates range MRK-

AHR 0000001-0135162; Douglas Greene at Bates range MRK-ACR 0000001-0048810; Alan

Nies at Bates range MRK-ABC 0000001-0052689; and Doug Watson at Bates range MRK-ABY

0000001-0199812; as well as the production of EDRC at Bates range MRK-AHK 0000001-

0004700; and the Clinical Development Oversight Committee/Clinical Research Review

Committee meeting minutes, identified at Bates range MRK-ABP 0000001-0029952.  Pursuant

to Federal Rule of Civil Procedure 33(d), Merck directs Plaintiff to those documents for such

information.

### INTERROGATORY NO. 10:

(a) At a Scientific Advisors' meeting in May of 1998 was there any concern or discussion in relation to Osteoporosis and Fracture healing expressed?

(b) In re to fracture healing, was Merck's position: at the meeting in (a):

"It seems unlikely that Vioxx will significantly interfere with fracture healing, but should that issue arise, demonstration of intact fracture repair in animals may provide some reassurance regarding safety of high doses?"

(c) If so, specifically what does Merck mean by "should that issue arise" and what constitutes a threshold of "should that issue arise?"

(d) Does the statement "intact fracture repair in animals may provide some

26

reassurance regarding safety of high doses" imply that Merck did accept "animal testing for bone/spine healing (remodeling) problems.

(e) What does "some reassurance" mean, and specifically what is the high dosage or equivalent implied in regarding safety of high doses?

## RESPONSE TO INTERROGATORY NO. 10:

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to the term "concern," and with respect to its request for a statement of Merck's "position." Merck further objects to this Interrogatory on the grounds that the quoted language speaks for itself

Subject to and without waiving its objections, Merck responds as follows: These questions appear to be based on the document summarizing the May 1998 meeting of Merck's Board of Scientific Advisors. The questions posed by this Interrogatory appear to be based on erroneous assumptions about the nature, structure and/or purpose of this meeting.

The Board of Scientific Advisors is comprised of independent outside scientific consultants. It is not an internal Merck committee made up of Merck personnel. There is a summary of the May 1998 meeting which spanned three days. That document summarized the discussion and/or recommendations from the Board on various aspects of the clinical development program for Vioxx. As this is a summary of the views of outside scientists, the attempts to parse through the language of the summary and attribute certain conclusions to Merck and/or define "Merck's position," are misplaced.

Responding further, Merck states that documents containing information responsive to this Interrogatory have been produced from the custodial files of David Percival at Bates range MRK-AEI 0000001-0006421; Thomas Simon at the Bates range MRK-ABS 0000001-0475977;

27

James Bolognese at Bates range MRK-AFO 0000001-0287432; Ned Braunstein at Bates range

MRK-AFV 0000001-0388206; Barry Gertz at Bates range MRK-AAC 0000001-0164855; Kevin

Horgan at Bates range MRK-AHC 0000001-0035811; and Christopher Lines, identified at Bates

range MRK-AHD 0000001-0092138; and from the production of the Board of Scientific

Advisors at Bates range MRK-AGG 0000001-0003131.

## INTERROGATORY NO. 11:

(a) On February 4, 1997 in meeting minutes to Mk-966 Project Team Members by Stephanie P.  Gibbons, RPh, what was the purpose of any discussion in re to potentially conducting a "sub study" bone mineral density "examination"

(b) What is a "sub study"?

(c) Was a "sub study" to determine if Vioxx could contribute to Osteoporosis and did it include assessing if Vioxx was deleterious to bone/spine healing? Please provide a description of what the potential "sub-study"'s objectives were.

(d) Did the discussion result in any test design or implementation before the topic was brought up again nearly one year later in January of 1998 at the RESEARCH MANAGEMENT COMMITTEE meeting?

(e) The email refers to "Based on recent journal items" – please identify the "recent journal items" in which this email refers to. The excerpt below is sourced from EW; Attorney Eric Weinberg.

## RESPONSE TO INTERROGATORY NO. 11:

Merck objects to this Interrogatory on the grounds that it is overly broad, unduly

burdensome, and seeks information that is neither relevant to the claims or defenses of any party,

nor reasonably calculated to lead to the discovery of admissible evidence.  Merck further objects

to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to

the term "deleterious to bone/spine healing,,, which is not defined or otherwise explained.  Merck

further objects to this Interrogatory to the extent that it appears to mischaracterize the referenced

document.  Merck further objects to this Interrogatory on the grounds that the quoted language

speaks for itself.

28

Subject to and without waiving its objections, Merck responds as follows:  The minutes of the January 7, 1997 Project Team meeting and its attachments provide a fulsome summary of the discussion, and the reasons such discussion took place.  At this point, any attempt to elaborate on the contemporaneous meeting minutes of a meeting that took place more than thirteen (13) years ago would be speculative.  A complete set of these minutes and the referenced attachment can be found at MRK-ABF0000803-0823.

Responding further, Merck refers the Plaintiff to Protocol 083, the results of which indicated that Vioxx did not have a clinically significant effect on biochemical markers of bone turnover or bone mineral density.  Further responding, Merck states that documents containing information responsive to this Interrogatory have been produced from the custodial file of Deborah Shapiro MRK-AAB 0000001- 0123210; Ken Truitt at Bates range MRK-AHR 0000001-0135162; Douglas Greene at Bates range MRK-ACR 0000001-0048810; Alan Nies at Bates range MRK-ABC 0000001-0052689; Doug Watson at Bates range MRK-ABY 0000001-0199812; as well as the production of EDRC at Bates range MRK-AHK 0000001-0004700; the Clinical Development Oversight Committee/Clinical Research Review Committee meeting minutes at Bates range MRK-ABP 0000001-0029952; the Vioxx Project Team at Bates ranges MRK-ABF 0000001-0005702.

### INTERROGATORY NO. 12:

(a) Even earlier, in December of 1996 was the question of testing Vioxx for potential deleterious bone/healing discussed or suggested? The item below is to help understand and frame the question.

(b) If so, were the individuals discussing the issue Reynold Spector, Joe Burek, and B.J. Gertz?

(c) Who else, within Merck or not (i.e. external to Merck), was working with these individuals to discuss the possibility (of bone mineralization) testing?

(d) Is this discussion related to any of the other discussions in 1997, and one in 1998

29

noted above?

(e) The date was nearly 2 ½ years before FDA approval – would that timeframe (i.e. 2 ½ years before FDA approval) be considered a sufficient enough time, before FDA approval, to address the concerns about bone/spine healing and bone mineralization before approval? The excerpt below is sourced from EW; Attorney Eric Weinberg.

## RESPONSE TO INTERROGATORY NO. 12:

Merck objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to the terms "concerns,, and "potential deleterious bone/healing,, which are not defined or otherwise explained, appear to be based on false or misleading assumptions, and because the small section provided of the document provides insufficient context to understand the questions. Merck further objects to this Interrogatory on the grounds that the excerpted document is incomplete and not sufficiently identified. Merck further objects to this Interrogatory on the grounds that, if the complete document were available and reviewed, it would more likely than not speak for itself. Merck further objects to this Interrogatory because it calls for speculation. Merck further objects to this Interrogatory to the extent it requests information about the activities of individuals not associated with Merck.

Subject to and without waiving its objections, Merck responds as follows: The questions contained in Interrogatory No. 12 appear to be directed at certain handwritten notes on a specific document. Plaintiff has not provided sufficient information to ascertain who authored the notes, and Merck cannot speculate on what the handwritten notes may mean. Responding further, Merck incorporates by reference its response to Interrogatory No. 11.

30

## INTERROGATORY NO. 13:

(a) Did any of these several "discussions" (above – several Interrogatories in re to bone mineralization) of the possibility of designing a bone mineralization test include evaluation for the potential deleterious impacts upon bone healing?

(b) Would "bone mineralization" tests and research be significantly reasonable to address the potential issues of bone/spine healing?

(c) If so, Please provide a description of how Merck would utilize results of a bone mineralization test to properly understand the issue of "bone healing"?

(d) Were these "bone mineralization" tests designed to understand the potential contribution of Vioxx towards Osteoporosis only, or did Merck believe that they were also capable of providing credulous information in re to potential deleterious effects upon bone healing? Please provide the basis of Merck's beliefs and what did Merck rely on to form this basis.

## RESPONSE TO INTERROGATORY NO. 13:

Merck objects to this Interrogatory on the grounds that it is overly broad, unduly

burdensome, and seeks information that is neither relevant to the claims or defenses of any party,

nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects

to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to

the phrases "significantly reasonable,,, "potential deleterious impacts upon bone healing,,, and

"credulous information in re to potential deleterious effects upon bone healing,,, and because of

its request for a statement of Merck's "beliefs,,, Merck further objects to this Interrogatory

because it calls for speculation. Merck further objects to this Interrogatory to the extent it

requests information about the activities of individuals not associated with Merck. Merck further

objects to this Interrogatory on the grounds that it calls for expert opinion or testimony.

Subject to and without waiving its objections, Merck incorporates by reference its

response to Interrogatory Nos. 1(b), 5(a), 6(a), and 11.

## INTERROGATORY NO. 14:

(a) Was Merck aware that there was an FDA ARTHRITIS ADVISORY

31

COMMITTEE Public Hearing on NSAID Cox-2 Safety issues on March 24, 1998?

(b) Was Merck aware that there were several concerns about COX-2 inhibitors and bone/healing in addition to bone/spine general health at the meeting?

(c) If so, please describe what Merck's response was, the basis upon which Merck believed to be the appropriate response, and what Merck relied upon to justify the basis of their response.

## RESPONSE TO INTERROGATORY NO. 14:

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to the terms "concerns about COX-2 inhibitors and bone/healing,,, and with respect to its request for a statement of Merck's "awareness,, or "belief.,,

Subject to and without waiving its objections, Merck responds as follows: On March 24, 1998, there was a meeting of the FDA's Arthritis Advisory Committee. The transcript and minutes of the meeting, which are publically available at http://www.fda.gov/ohrms/dockets/ac/cder98t.htm, speak for themselves. According to the FDA's summary minutes, the committee met to "discuss the safety issues; gastro-intestinal tolerability, renal, bone and reproductive toxicity related to NSAID COX-2 and other agents.,, Merck personnel attended this meeting, including Dr. Tom Simon and Dr. Robert Silverman. During and after this time, Merck continued to research and evaluate the overall safety profile of Vioxx, respond to all FDA concerns or queries as expressed, and ultimately Merck provided the FDA with sufficient evidence for them to conclude that Vioxx was safe and effective when used as instructed in the product labeling, as evidenced by the FDA's initial May 1999 approval of Vioxx for three indications. Following this approval, the Vioxx clinical

32

development program continued, and Merck continued to address FDA questions or concerns as they arose. The FDA had several additional opportunities to conduct full review of the risk/benefit profile of Vioxx, and continued to find it safe and effective, as evidenced by its approvals of Vioxx in additional indications. The FDA's approval letters and labeling for these new indications are available on the FDA website, as well as within the documents already produced by Merck in this litigation.

Responding further, Merck states that documents containing information responsive to this Interrogatory have been produced in the productions of FDA Advisory Committee Background Materials at Bates range MRK-AAP 0000001-0000788 and the Vioxx Project Team at Bates range MRK-ABF 0000001-0005702 ; as well as the custodial files of Deborah Shapiro at Bates range MRK-AAB 0000001-0123207; Barry Gertz at Bates range MRK-AAC 0000001-0164855; Alise Reicin at Bates range MRK-AAD 0000001-0427983; Robert Silverman at Bates range MRK-ACD0157542; and Ned Braunstein at Bates range MRK-AFV 0000001-0388206. Responding further, Merck incorporates by reference its responses to Interrogatories Nos. 6(a), 8, and 11.

### INTERROGATORY NO. 15:

(a) Is Merck aware that, in 2006, a significant risk of developing osteoporosis was found in men from Vioxx usage from analysis of a large healthcare database by scientists unrelated to Merck?

(b) If so, did Merck communicate to the FDA this finding and did Merck remind the FDA of the 078 findings of statistically significant risk of osteoporosis?

### RESPONSE TO INTERROGATORY NO. 15:

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this

33

Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to its reference to a 2006 "analysis of a large healthcare database,,, and with respect to its request for a statement of Merck's "awareness,,, and with respect to the phrase "remind the FDA.,,

Subject to and without waiving its objections, Merck responds as follows:  It is unclear what this Interrogatory is referencing.  But regardless, Merck voluntarily pulled Vioxx from the market in September 2004, and the medication was no longer being manufactured or marketed by 2006.  Merck further states that it complied with applicable regulations and requirements regarding reporting study results and journal publications to FDA.  The safety data from Merck studies involving Vioxx were provided to the FDA.  Responding further, Merck states that documents containing information responsive to this Interrogatory have been produced at, including but not limited to, the IND submissions to the FDA for Vioxx, at Bates ranges MRK-I894 0000001-0105099, MRK-I269 0000001-0009610, MRK-I222 0000001-0005988, MRK-I419 0000001-0004491, MRK-I768 0000001-0005232, and MRK-I687 0000001-0005389; NDA submissions to the FDA for Vioxx, at Bates ranges MRK-OS42 0000001-0166451, MRK-9942 0000001-0024842, MRK-0042 0000001-0033165, MRK-0142 0000001-0169499, MRK-0242 0000001-0002844, MRK-N052 0000001-0008567, MRK-S042 0000001-0142684, MRK-N052 0000001-0019454, and MRK-N647 0000001-0007344; the SPiDER Clinical Study Report productions at Bates ranges MRK-AHP 0000001-0131143; as well as from the custodial files of Ned Braunstein at Bates range MRK-AFV 0000001-0388206; Robert Silverman at Bates range MRK-ACD 0000001-0146725 ; Eve Slater at Bates range MRK-ABD 0000001-0004824; Peter Honig at Bates range MRK-ACM 0000001-0010244; Bonnie Goldmann at Bates range MRK-AFT 0000001-0015640; Douglas Greene at Bates range MRK-ACR 0000001-0048810; and Phil Huang at Bates range MRK-AIU 0000001-0185714.

**INTERROGATORY NO. 16:**

These questions relate to Protocol 83.

(a) Did Merck believe that the results from 25 mg would be adequate to address 50 mg usage?

(b) Did Merck believe that a study on bone mineralization is adequate to address the potential of deleterious effect upon bone/spine healing that is alleged?

(c) Does Merck believe that 15 months is adequate for a "long term" study?

(d) On all of the foregoing questions within this interrogatory which were an answer of yes or no, upon what basis does Merck rely upon for their belief or opinion?

**RESPONSE TO INTERROGATORY NO. 16:**

Merck objects to this Interrogatory on the grounds that it is overly broad, vague and ambiguous, particularly with respect to the phrases "adequate to address," and "potential of deleterious effect upon bone/spine healing," which are not defined or otherwise explained, and with respect to its request for a statement of Merck's "belief," and/or "opinion," Merck further objects to this Interrogatory because it exceeds the maximum number of discrete interrogatories permitted by Rule 33 of the Federal Rules of Civil Procedure.

Subject to and without waiving its objections, Merck responds as follows:  The objectives and results of Protocol 083 are fully set out in the clinical study report.  The results of that study do not provide a signal of any harmful effects of Vioxx on the bones, generally.  Responding further, Merck incorporates by reference its responses to Interrogatories Nos. 1(b), 5(a), 6(a), and 11.

**INTERROGATORY NO. 17:**

(a) Did Merck utilize Animal Studies to support the benefits of Vioxx?

(b) Did Alise Reicin, Merck's vice president of clinical research state (to USA Today) that Merck did not have any human test data confirming  that naproxen helped to prevent clotting, so the company relied on animal studies?

35

(c) Does Merck know that, per Dr. John Pippin, a cardiologist and consultant to PCRM (Physicians Committee for Responsible Medicine), stated that:

"Despite having test results "from over 8,000 humans that the drug was killing people Merck continued to use animal studies to justify continuing to sell Vioxx "Although a previous clinical test showed that Vioxx increased the likelihood of heart ailments, the company relied on animal studies, including those performed on African green monkeys, as the basis for claims that the drug was safe".

(d) At any time, prior or after FDA approval, was Merck aware that there were numerous studies by Independent Research on various animals indicating that there was a potential problem with bone/spine healing and the use of Vioxx?

(e) Did Merck indicate, at any time before or after FDA approval, that studies on animals which indicated that there was a reasonable potential bone/healing issue, were not valid because it was performed on animals?

(f) Was Merck approached, by independent researchers who performed animal studies, that there was a potential problem with Vioxx and bone/spine healing or bone/spine general health? If so, please identify these researchers.

(g) Did Merck refute animal studies by independent or external sources at any time in regard to potential bone healing problems from Vioxx, because they were animal studies and Merck's position was animal studies were not relevant? On what basis did Merck rely on?

(h) Did Merck do any of its own studies on animals specifically in regard to bone/spine healing? If so, what were the results of the tests? If not, on what basis did Merck rely upon to conclude that animal studies were not of reasonable benefit?

(i) Did Merck at any time, before or after FDA approval, plan or consider animal studies for bone/spine healing or bone/spine/general health – this includes "should an issue arise?" If so please describe the plan or consideration of a plan, and was the plan or consideration implemented?

(j) Did Merck express a view in any of the Merck MK-966 project meetings that they would test on animals, "if the need arises". If so, what does "if the need arises" mean? and in Merck's view – did the need arise?

## RESPONSE TO INTERROGATORY NO. 17:

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks

information that is neither relevant to the claims or defenses of any party, nor reasonably

36

calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is highly argumentative. Merck further objects to this Interrogatory as vague and ambiguous, particularly with respect to its request for a statement of Merck's "view,, and/or "position,,, and with respect to the phrases "using Animal Studies to support the benefits of Vioxx,,, "potential problem with bone/spine healing,,, and "reasonable benefit.,, Merck further objects to this Interrogatory on the grounds that it is overly broad and ambiguous as to time period. Merck further objects to this Interrogatory on the grounds that the quoted language speaks for itself.

Subject to and without waiving its objections, Merck responds as follows: The numerous questions posed by this Interrogatory appear to be based on erroneous or misleading assumptions regarding the drug development process. Animal testing has important role in drug development. Typically, experimental medications are tested on animals before humans in what are known as preclinical studies, and the FDA publishes guidance regarding what types of preclinical testing should be including in investigational new drug applications. General information about the role of animal studies in the FDA's drug approval process is available on the FDA's website (http://www.fda.gov/drugs/resourcesforyou/consumers/ucm143534.htm). Although animal studies can yield scientifically relevant information, such data cannot necessarily be extrapolated to humans; nor can such data yield definitive conclusions regarding humans. One benefit of such studies, however, is that potentially relevant data and information can be generated more quickly than in human trials.

With respect to the African Green Monkey study, after FDA reviewed the preliminary VIGOR results, it specifically asked Merck in April 2000 to conduct an animal study to evaluate the relationship between cardiovascular thrombotic events and Vioxx. Merck conducted a pilot study and determined that the appropriate animal model to use was the African Green Monkey.

37

With FDA's concurrence, Merck began the African Green Monkey study in September 2000. The preliminary study results were submitted to FDA in January 2001 and discussed at the February 7-8, 2001 FDA Arthritis Advisory Committee meeting.

Further responding, Merck states that documents containing information responsive to this Interrogatory have been produced, including but not limited to the IND submissions to the FDA for Vioxx, at Bates ranges MRK-I894 0000001-0105099, MRK-I269 0000001-0009610, MRK-I222 0000001-0005988, MRK-I419 0000001-0004491, MRK-I768 0000001-0005232, and MRK-I687 0000001-0005389; NDA submissions to the FDA for Vioxx, at Bates ranges MRK-OS42 0000001-0166451, MRK-9942 0000001-0024842, MRK-0042 0000001-0033165, MRK-0142 0000001-0169499, MRK-0242 0000001-0002844, MRK-N052 0000001-0008567, MRK-S042 0000001-0142684, MRK-N052 0000001-0019454, and MRK-N647 0000001-0007344; and the SPiDER Clinical Study Report productions at Bates ranges MRK-AHP 0000001-0131143; as well as the custodial files of Ned Braunstein at Bates range MRK-AFV 0000001-0388206; Robert Silverman at Bates range MRK-ACD 0000001-0146725 ; Eve Slater at Bates range MRK-ABD 0000001-0004824; Peter Honig at Bates range MRK-ACM 0000001-0010244; Bonnie Goldmann at Bates range MRK-AFT 0000001-0015640; Douglas Greene at Bates range MRK-ACR 0000001-0048810; and Phil Huang at Bates range MRK-AIU 0000001-0185714.  Pursuant to Federal Rule of Civil Procedure 33(d), Merck directs Plaintiff to those documents for such information.

**INTERROGATORY NO. 18:**

(a) On or about March 17, 2003 was an email sent from Riad H. El-Dada in which the topic was how to provide rationale for the lack of interest in an animal model for bone healing testing?

(b) In the same email, was there an indication that if a Human Study was undertaken that studies to support Arcoxia would not be possible and that the blood pressure issue was more important ("a bigger deal") than bone healing?

38

The email below is to help understand and frame the question and is sourced from EW; Attorney Eric Weinberg.

## RESPONSE TO INTERROGATORY NO. 18:

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is vague, ambiguous, and confusing. Merck further objects to this Interrogatory on the grounds that the excerpted document is incomplete and not sufficiently identified. Merck further objects to this Interrogatory on the grounds that, if the complete document were available and reviewed, it would more likely than not speak for itself.

Subject to and without waiving its objections, Merck responds as follows: Although incomplete, the excerpted document appears to relate to Arcoxia. Information regarding the research program for Arcoxia is not relevant to this case. That medication has never been marketed or sold in the United States, nor is there any allegation that Plaintiff took that medication.

## INTERROGATORY NO. 19:

(a) Did Merck retain and pay, at any time, Dr. Thomas A. Einhorn as a paid consultant? If so, please indicate when and how much. Dr. Einhorn was Chairman of the Department of Orthopaedic Surgery and Professor of Orthopaedic Research Laboratory, Department of Orthopaedic Surgery, Boston University Medical Center, 715 Albany Street, R-205, Boston, MA 02118, USA

(b) Was Merck aware that Dr. Thomas Einhorn, (Professor and Chairman, Department of Orthopedic Surgery, Boston University Medical Center stated to USA today …"It's time to tell the public"… The role of COX-2 in bone repair … has been shown to (adversely affect bone repair)… this is due to the inhibition of Cox-2 and not COX-1! Vioxx is a Cox-2 inhibitor?"

(c) In regard to the article above did Merck respond by denying any links between Vioxx and bone healing? If Merck did respond by denying "any links", upon what basis did Merck have to deny any link between Vioxx and "adversely affecting bone repair) and on

39

what did Merck rely upon for such basis?

       (d) Did Merck know that one of Dr/ Einhorn's views was "I would be less inclined to consider using these drugs (i.e. Cox-2 inhibitors) if a patient has any co morbid condition that might itself prevent or delay healing".

       (e) If Merck believed that it did not need to take action as a result of Dr. Einhorn's conclusions, upon what basis did Merck establish that belief, and upon what did Merck rely upon for their belief or opinion? After Dr. Einhorn's views were published, did Merck attempt in any manner to gain his agreement to "soften" his position immediately, or over time?

## RESPONSE TO INTERROGATORY NO. 19:

Merck objects to this Interrogatory on the grounds that it is overly broad, unduly

burdensome, and seeks information that is neither relevant to the claims or defenses of any party,

nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects

to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to

its request for a statement of Merck's "opinion,, or "belief.,,

Subject to and without waiving its objections, Merck responds as follows: This group of

questions appears to be quoting from a May 27, 2002 AP wire story (picked up by numerous

media outlets including USA Today) that reported on an animal study that appeared in the

Journal of Bone and Mineral Research. Personnel at Merck were aware of the AP wire story and

its contents, as well as the actual study that appeared in the Journal of Bone and Mineral

Research. Although Dr. Einhorn is quoted in the article, he did not conduct the study. The

language of that article speaks for itself.

Dr. Einhorn is an orthopedic surgeon whose publically available curriculum vitae

indicates that he has consulted for multiple pharmaceutical companies, including Searle and Eli

Lilly. Based on a review of Merck records, Dr. Einhorn participated in one of Merck's advisory

committees on acute pain in 2000. Merck engaged a third-party vendor to handle the details

40

regarding identifying relevant scientists, procuring their participation, and coordinating any

compensation or expense reimbursement for that meeting.  In this instance, the vendor that

provided the outside expert advisory support to Merck for this meeting was Scientific

Therapeutics Information, Inc.,.

Further responding, Merck states that documents containing information responsive to

this Interrogatory have been produced in the custodial files of E.B. Brakewood at Bates range

MRK-ADF 0000001-0061338; Thomas Cannell at Bates range MRK-ADG 0000001-0080859;

Riad El-Dada at Bates range MRK-ADM 0000001-0184231, as well as in the third-party

document production made by Scientific Therapeutics Information, Inc.  Responding further,

Merck incorporates by reference its response to Interrogatory No. 20.

## INTERROGATORY NO. 20:

(a) Did Dr. Patrick O'Connor advise Merck in July of 2000 that Vioxx caused
DELAYED fracture healing?

(b) If so, did Dr. O'Connor request to discuss his concerns with Merck and did he
provide any information upon initially contacting Merck? Did Merck agree to meet to
discuss his concerns?

(c) Were Dr. Ken Truitt and Dr. Silverman among the individuals who were notified?
If so, was Lisa Fischer the individual who notified Dr. Ken Truitt and Dr. Silverman?

(d) Was a Dr. Dennis Gross involved in the contact from Dr. O'Connor in any way?

The excerpt below is sourced from EW; Attorney Eric Weinberg.

(e) Was Merck aware that Dr. O'Connor published his findings in the Journal of
Bone and Mineral Research in 2002?

(f) Did Merck Scientists write a letter to the JMBR challenging the findings of Dr.
O'Connor because they were based upon animal data?

(g) If so, were the scientists (and/or) Dr. Hochberg, Dr. Reicin and Dr. Melin?

41

**RESPONSE TO INTERROGATORY NO. 20:**

Merck objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague and ambiguous, particularly with respect to its request for a statement of Merck's "awareness,, and with respect to the term "concerns.,, Merck further objects to this Interrogatory on the grounds that the excerpted document is incomplete and not sufficiently identified. Merck further objects to this Interrogatory on the grounds that, if the complete document were available and reviewed, it would more likely than not speak for itself.

Subject to and without waiving its objections, Merck responds as follows: J. Patrick O'Connor is listed as a co-author of an article entitled *Cyclo-Oxygenase 2 Function Is Essential for Bone Fracture Healing*, published in Volume 17, Number 6, of the Journal of Bone and Mineral Research. Volume 18, Number 3 of that journal includes a Letter to the Editor entitled *Cox-2 Inhibitors and Fracture Healing: An Argument Against Such an Effect*, authored by Marc C. Hochberg, Jeffrey M. Melin, and Alise Reicin. These publications speak for themselves, and are publically available at http://onlinelibrary.wiley.com/journal/10.1002/(ISSN)1523-4681.

Further responding, Merck states that documents containing information responsive to this Interrogatory have been produced in the custodial files of E.B. Brakewood at Bates range MRK-ADF 0000001-0061338; Thomas Cannell at Bates range MRK-ADG 0000001-0080859; Riad El-Dada at Bates range MRK-ADM 0000001-0184231; Barry Gertz at Bates range MRK-AAC 0000001-0190162; and Alise Reicin at Bates range MRK-AAD 0000001- 0551169. Pursuant to Federal Rule of Civil Procedure 33(d), Merck directs Plaintiff to those documents for such information.

**INTERROGATORY NO. 21:**

(a) Did Merck ever send any advice, or directives to Orthopedic Organizations, doctors or surgeons in regard to potential bone/spine issues?

42

(b) If so, please provide what the advice or directives was and how it was worded?

(c) Did Merck ever utilize US Mail, Internet, and/or email in corresponding with Orthopedic Doctors or Surgeons about any inquiries related to Vioxx and potential bone/spine issues by US Mail, Internet, and email ?

## RESPONSE TO INTERROGATORY NO. 21:

Merck objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly with respect to the terms "advice," "directives," "Orthopedic Organizations," and "potential bone/spine issues," which are not defined or otherwise explained.

Subject to and without waiving its objections, Merck responds as follows: Merck has previously produced in this litigation the Dear Healthcare Professional letters sent by Merck relating to Vioxx, which can be found in the production of Professional Promotional Materials MRK-P 0000001-0011470. Merck has also produced exemplars of the letters that its Scientific Affairs department sent to physicians in response to inquiries (PIRs). Some of these PIR responses addressed questions or issues concerning bone healing. This production can be found at MRK-AKT0000001 to MRK-AKT4391560. *See, e.g.*, MRK-AKT1493866, MRK-AKT0628680; MRK-AKT0063091.

## INTERROGATORY NO. 22:

(a) There is a Merck sponsored study which started on 2/2011 in Sweden (see below) utilizing another cox-2 inhibitor, Etoricoxib).

(b) The target is "anklyosing Spondylitis" - what is the purpose of this study in relation to anklyosing spondalitis patients?

(c) Is one of the purposes to gain some insight into the ability of Etoricoxib to inhibit the fusing process or additional bone growth in anklyosing spondalitis.

43

(d) If so, on what basis does Merck believe that a study is warranted, and what did Merck rely on in order to design and begin the test process?

This excerpt is to help define and frame the question.

## RESPONSE TO INTERROGATORY NO. 22:

Merck objects to this Interrogatory on the grounds that it is overly broad and seeks information that is neither relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence. Merck further objects to this Interrogatory on the grounds that it is vague and ambiguous. Merck further objects to this Interrogatory on the grounds that the excerpted document is incomplete and not sufficiently identified.   Merck further objects to the extent that the Interrogatory purports to question events that may have occurred in 2011 – seven years after Merck withdrew Vioxx from the market.

Subject to and without waiving its objections, Merck responds as follows:  The excerpted document and questions relate to Arcoxia (etoricoxib).  Information regarding the research program for Arcoxia is not relevant to this case.  That medication has never been  marketed or sold in the United States, nor is there any allegation that Plaintiff took that medication.

## INTERROGATORY NO. 23:

(a) Did Merck understand that there were many tests, and even patents, on the possibility of using Vioxx as a method to prevent bone growth in some situations where it was medically necessary?

(b) Was Merck aware of a study which concluded that Celecoxib was more effective than Ibuprofen in preventing heterotypic bone formation after total hip replacement – the study is Celecoxib versus ibuprofen in the prevention of heterotypic ossification following total hip replacement? (A PROSPECTIVE RANDOMIZED TRIAL M. Saudan, MD;Orthopaedic; P. Saudan, MD ; T. Perneger, PhD, Professor; N. Riand, MD, Orthopaedic Surgeon; A. Keller, MD, Physician; and P. Hoffmeyer, MD, Professor).

(c) Is Merck aware of any other studies which compare Ibuprofen to a COX-2 inhibitor in regard to bone healing? If Merck was aware of any of the above, did Merck believe that it was not relevant to any of their testing(s), other entity or individual testing and research? If so, and if Merck did not find relevancy, upon what basis did Merck establish its

44

belief, and what did Merck rely on for its belief?

The following article titles which are available on the Internet. They are referenced here only to help understand the issue and frame the question. Merck is not requested to acknowledge or answer to each of the specific article(s) referenced.

## RESPONSE TO INTERROGATORY NO. 23:

Merck objects to this Interrogatory on the grounds that it is overly broad, unduly

burdensome, and seeks information that is neither relevant to the claims or defenses of any party,

nor reasonably calculated to lead to the discovery of admissible evidence.  The cited publication

with the lead author M. Saudan appears to have been published in 2007, over two years after the

withdrawal of Vioxx from the market.  Merck further objects to this Interrogatory on the grounds

that it is vague and ambiguous, particularly with respect to its request for a statement of Merck's

"awareness,, and/or "understanding,, of particular studies not involving Vioxx.

Subject to and without waiving its objections, Merck responds as follows:  Merck

incorporates by reference its responses to Interrogatories Nos. 1(b), 5(a), 6(a), 7(a) and 16.

## INTERROGATORY NO. 24:

(a) Did Merck know (July, 2002) that studies were being done to understand if Vioxx could become a useful treatment in Fibro dysplasia Ossificans disease (b) If so, did Merck know that one of these studies was announced as below in PA in the year 2002.

"...they will be starting a study within the next 6 months where they will test Vioxx in FOP patients in the United States from the age of two and older. We are looking ... Dr. Frederick Kaplan gave a speech about finding a cure for FOP. After his speech, Dr. Eileen Shore spoke about the work being done at the University of Pennsylvania's laboratory. Dr. Kaplan made it clear that they are making progress in their efforts at the lab and that they will be starting a study within the next 6 months where they will test Vioxx in FOP patients in the United States from the age of two and older"

## RESPONSE TO INTERROGATORY NO. 24:

Merck objects to this Interrogatory on the grounds that it is overly broad, unduly

burdensome, and seeks information that is neither relevant to the claims or defenses of any party,

45

nor reasonably calculated to lead to the discovery of admissible evidence.  Merck further objects

to this Interrogatory on the grounds that it misrepresents the document that it purports to rely on:

The quoted publication, which is available on the internet at http://www.ifopa.org/news-and-

events/fop-connection-newsletters.html, appears to have been published in November 2004, and

refers to an announcement allegedly made, not on behalf of Merck, at a July 2004 meeting in

Sweden of the Scandinavian FOP association.  Vioxx was withdrawn from the market in

September, 2004, and no further Vioxx clinical studies were conducted after that time.  Merck

further objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly

with respect to its request for a statement of Merck's knowledge of particular studies not

conducted by Merck.  Merck further objects to this Interrogatory on the grounds that the quoted

document speaks for itself.

## INTERROGATORY NO. 25:

(a) Is Merck aware of research being conducted of Vioxx and Cox-2 inhibitors in general for HUMAN tests to attempt to slow down or stop HUMAN bone ossification?

(b) Did Merck sponsor or provide any resources, in whole or in part, for tests that were designed for conditions in which bone growth was excessive to test the slowing or stopping of ossification by a COX-2 inhibitor?

(c) If so, what was the basis for Merck's belief that Vioxx may offer the benefits (slowing or stopping bone growth) and what did Merck rely upon for such basis?

## RESPONSE TO INTERROGATORY NO. 25:

Merck objects to this Interrogatory on the grounds that it is overly broad, not reasonably

calculated to lead to the discovery of admissible evidence, vague, ambiguous, and confusing,

particularly with respect to the phrase "tests that were designed for conditions in which bone

growth was excessive to test the slowing or stopping of ossification by a COX-2 inhibitor.,,

Merck further objects to this Interrogatory because it is overly broad and ambiguous as to time

period.  Merck further objects to this Interrogatory at vague and ambiguous with respect to its

46

request for a statement of Merck's "belief,,, and to the extent it requests a statement of Merck's
knowledge of particular studies not conducted by Merck.

Subject to and without waiving its objections, Merck responds as follows:  Vioxx was
withdrawn from the market in September 2004.  To the extent that research studies not
conducted by Merck resulted in published articles, those publications were included in Merck's
Periodic Safety Update Reports provided to the FDA, previously produced in including but not
limited to the IND submissions to the FDA for Vioxx, at Bates ranges MRK-I894 0000001-
0105099, MRK-I269 0000001-0009610, MRK-I222 0000001-0005988, MRK-I419 0000001-
0004491, MRK-I768 0000001-0005232, and MRK-I687 0000001-0005389; NDA submissions
to the FDA for Vioxx, at Bates ranges MRK-OS42 0000001-0166451, MRK-9942 0000001-
0024842, MRK-0042 0000001-0033165, MRK-0142 0000001-0169499, MRK-0242 0000001-
0002844, MRK-N052 0000001-0008567, MRK-S042 0000001-0142684, MRK-N052 0000001-
0019454, and MRK-N647 0000001-0007344; as well as the custodial files of Thomas Bold at
Bates range MRK-ACO 0000001-0143948; Linda Hostelley at Bates range MRK-ACV
0000001-0060742; Phillip Huang at Bates range MRK-AIU 0000001-0185714; Janet Van
Adelsberg MRK-AFK 0000001-0219049 and Bettina Oxenius at Bates range MRK-AFN
0000001-0106743; as well as the departmental file of Clinical Risk & AEC Safety Surveillance
at Bates range MRK-AEC 0000001-0126565.  Pursuant to Federal Rule of Civil Procedure
33(d), Merck directs Plaintiff to those documents for such information.

The First Set of Interrogatories served by Plaintiff also included additional questions
labeled Interrogatory No. 26 through Interrogatory No. 33.  Plaintiff acknowledges that, even
under his own counting method (which does not properly account for numerous discrete

47

subparts), these additional questions exceed the limits of the Federal Rules, and further concedes that Merck has no obligation to respond to them.  Nevertheless, in the hopes of eliminating or limiting the amount of additional correspondence or motions practice, Merck offers the following commentary and information regarding those Interrogatories.

- As to No. 26 – This document is privileged and the privilege will not be waived.

- As to No. 27 – There were personnel at Merck who were generally aware of scientific articles that appeared about its products.  The FDA's guidances regarding periodic safety reporting call for certain information about these types of articles to be reported in the Periodic Safety Update Reports submitted to FDA for individual drugs.  Merck complied with these obligations as they relate to Vioxx.  These reports have been produced and can be found at the Bates ranges identified in response to Interrogatory No. 25.

- As to No. 28 – There do not appear to have been any clinical trials conducted that would address the question posed.  A complete listing of Merck's clinical trials involving Vioxx (some of which included Celebrex as a comparator) can be found in Merck's responses to the Plaintiff Steering Committee' First Set of Interrogatories propounded in the MDL, as well as in the IND and NDA productions identified in response to Interrogatory No. 1(a).

- As to No. 29 – Pfizer is a competitor of Merck.  Merck did not provide support to Pfizer in conducting clinical trials of Pfizer drugs.  More specifically as to the referenced ADAAPT Trial, additional information about the results of that trial and how it compared to similar trials conducted by Merck can be found in the FDA's April 6, 2005 Memorandum.

48

- As to No. 30 – Merck's prior productions include internal e-mail and internal memoranda. These documents were compiled into a database by the PSC which is believed to be searchable. A search of the terms listed in the Interrogatory would yield "hits.,,

- As to No. 31 – Issues regarding the Merck Manual and its revisions have been the topic of previous discovery – particularly as it related to the issue of prostaglandins.

- As to No. 32 – The CSR for 078 has been produced. *See* MRK-AFK0203863. As to the other argumentative matters and assumptions contained in this interrogatory, Plaintiff is directed to the responses to Interrogatory Nos. 6 and 7 (and subparts thereto).

- As to No. 33 – Please see note re Interrogatory No. 27.

Dated: May 13, 2013          Respectfully submitted,

By:    */s/ Emily Renshaw Pistilli*
       Douglas R. Marvin
       M. Elaine Horn
       Emily Renshaw Pistilli
       WILLIAMS & CONNOLLY LLP
       725 Twelfth Street, N.W.
       Washington, D.C. 20005
       Phone:  202-434-5000
       Fax:    202-434-5029

       Attorneys for Merck Sharp & Dohme Corp.

       —and—

       Phillip A. Wittman, 13625
       Dorothy H. Wimberly, 18509

49

STONE PIGMAN WALTHER WITTMAN, L.L.C.
546 Carondelet Street
New Orleans, LA 70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

50

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Merck Sharp & Dohme Corp.'s Responses and Objections to Plaintiff Dennis Harrison's First Set of Interrogatories have been served on Plaintiff Dennis Harrison by e-mail and Federal Express at 601 W. Brown Street, Iron Mountain, MI 49801.  I further certify that the above and foregoing has been served on Liaison Counsel, Russ Herman, Phillip Wittmann and Ann Oldfather, by e-mail or by hand delivery and e-mail on this 13th day of May, 2013.

/s/ Emily Renshaw Pistilli
Emily Renshaw Pistilli
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax:    202-434-5029