UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | SECTION  L |
| LITIGATION | * | |
| | * | JUDGE FALLON |
| THIS DOCUMENT RELATES TO: | * | |
| THIRD PARTY PAYOR COMMON | * | SPECIAL MASTER JUNEAU |
| BENEFIT FEES | * | |
| | * | |
| FILER: Robert E. Arceneaux/Margaret Woodward/ | * | November 27, 2013 |
| Pascal F. Calogero, Jr. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**ERIC H. WEINBERG'S MEMORANDUM IN SUPPORT OF
OBJECTION TO THE SPECIAL MASTER'S
REPORT AND RECOMMENDATION REGARDING
THIRD PARTY PAYOR  COMMON BENEFIT AWARDS (REC. DOC #64682)**

MAY IT PLEASE THE COURT:

This memorandum is respectfully submitted on behalf of the Law Offices of Eric H.
Weinberg ("Weinberg") in objection to the Report and Recommendation of Special Master
Regarding Third Party Payor ("TPP") Common Benefit Awards, and in ongoing opposition to the
recommendation of the TPP fee allocation committee ("FAC") .

**I. Introduction**

This objection follows more than a year of litigation concerning the allocation of common
benefit fees.   On June 13, 2012, the TPP FAC published its initial recommendations for an initial
pool of 34 applicants for common benefit funds.   That recommendation proposed that seven
applicants receive no award at all, and further proposed deep cuts to all but the members of the FAC
and a favored few others.   It offered little rationale for its proposal; and on the face of the record,
the FAC's recommendations could not withstand serious scrutiny.   Nonetheless, only ten applicants
objected.   The FAC made a "final" recommendation on December 11, 2012, adjusting its proposed
allocation to half the objectors (all but the four Central States objectors), without explanation of its
shift.  Four more applicants abandoned their objections.

The six remaining hold-outs– Weinberg and the five Central States objectors had too much at stake to accept an unjust recommendation, and thus proceeded with their objections; as anticipated, they encountered undue resistence and unsubstantiated denigration from the FAC at every turn.  After preliminary discovery and skirmishes failed to achieve any resolution, this Court, by order dated March 15, 2013, appointed Patrick Juneau as Special Master and charged him "to review the two remaining [groups of] objections," and to "submit a written recommendation of the amount the remaining objectors should receive."

By agreement of the parties, supported by the Special Master's protocol, the matter was submitted in May, 2013 on the parties' briefs.  The FAC disputed the value of the objectors' contributions, but had not by that late date offered a scintilla of evidence in support of their dispute.  *See,* R. Doc. 64422, p. 5.  In particular, it had failed to show that the objectors' carefully documented and sworn applications for fees were not fully compliant with established requirements, accurate and credible, and probative of their entitlement to full compensation of fees and remuneration of costs as sought in their applications.  By contrast,  Weinberg had shown, by a close reading of the submissions by the FAC and its favored few, that those applications were shot through with far-reaching and profound defects and deficiencies, rendering them utterly undeserving of the FAC-recommended allocations.

The Special Master revised his protocol on June 10, 2013, and called for a "hearing" on June 20, 2013 for the sole purpose of responding to his questions of designated witnesses.  *See*, Revised Scheduling Protocol, June 10, 2013.  According to the Special Master's protocol, Mr. Weinberg spoke for his claims, Mr. Dassow spoke for the Central States Objectors, and Mr. Seeger spoke for the FAC.  The parties' counsel were not permitted to produce other witnesses, ask any questions of any witness, conduct any cross-examination, interpose any objections, or offer any rebuttal testimony.  The hearing, the Master  explained, was not intended to be a true evidentiary hearing, but instead was to respond to his specific questions.  Tr., 6/20/13 hearing, p. 2.

Although the Special Master heard from the objectors, his recommendation indicates that he heeded only the uncorroborated testimony of Mr. Seeger, "who according to all accounts was the primary involved counsel in the third-party payor litigation." Report, p. 2.  Master Juneau dismissed almost entirely the contradictory and corroborated testimony of Weinberg and relied heavily on Mr. Seeger's testimony that "all of this work by Mr. Weinberg was not done at the request of liaison counsel or counsel directing the litigation," and "that none of this work by Mr. Weinberg was of any benefit in the prosecution and ultimate resolution of the third-party payor litigation." *Id.*

Based on these conclusions of fact and a review of Weinberg's time records, Special Master Juneau proposed a fee award to Weinberg of $135,292.00, about a tenth of Weinberg's $1,138,500 lodestar.  He made no observations about and no recommendations for Weinberg's costs of $27,392.61.

The Special Master's report is due to be given no weight whatsoever.

First, as shown below, Mr. Seeger's uncorroborated testimony was contrary to the facts as documented in the evidence adduced..  Because it represented the only evidentiary record of the FAC's claims, and because it came last and was not subject to rebuttal, objection, or cross-examination, the Special Master's report, which relies heavily on Mr. Seeger's testimony, is itself fundamentally unreliable.

The Special Master's report suffers from a second, equally fatal flaw.  This Court's order of March 15, 2013 instructed Master Juneau to consider only appropriate allocations for the several objectors. This Master Juneau attempted to do by confining his attention to the objectors' submissions and the FAC's attacks against them.  However, in making his recommendations, Master Juneau came up hard against an inescapable reality of fee allocations made from a limited fund. As the Fifth Circuit aptly put it, "'[a]llocation means proportion.'"  *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 234 (5th Cir. 2008), quoting *In re Vitamins Antitrust Litig.*, 398 F.Supp.2d at 234.

Weinberg showed that the FAC's recommendations were based on inaccurate, inflated, and in some instances outright inventive time records.  Further, he showed that when the invalid entries were backed out of the totals, the fund was more than adequate to compensate the objectors *fully*. In accordance with his charge, however, the Special Master did not consider any of this evidence. Instead, he observed that because of the limited nature of the fund,  any "just" award to Weinberg would deplete the fund available to other applicants; he then concluded that the mere fact of a limited fund warranted a reduction of Weinberg's award.  Report, p. 2.  According to the design of his inquiry, he reached this conclusion without reference to the other applications.   Therefore his implicit conclusion that the limited fund was inadequate and that Weinberg's allocation had to be reduced rather than any of the other awards, was inherently unreliable.  In overturning a similarly flawed analysis, the court in *High Sulfur* observed: "One cannot . . . compare apples to oranges without knowing what the oranges are." 517 F.3d at 234.  Master Juneau could not fairly conclude that Weinberg's work was of deeply-discounted benefit to the common weal without considering the benefit conferred by other applicants, whom the FAC would reward  in some instances for doing no work at all.

In brief, the objectors pleaded with Special Master Juneau to confer with Judge Higbee in order to gain some independent perspective on their contributions to the New Jersey litigation.  The Report makes no mention of his having done so, perhaps leaving consultation to this Court, which has expressed an intention to confer with its New Jersey colleague.

This Court's order of March 15, 2013 states that "[t]he Court shall, as Rule 53(f)(3) requires, review *de novo* all objections to such reports, rulings, recommendations, or findings  [by the master]."   *De novo* review and consultation with Judge Higbee, we submit, will establish Weinberg's entitlement to a minimum award of $1,138,500 in fees and  $27,392.61 in costs.

## II.     Facts and Procedural History

On September 20, 2004, Merck withdrew Vioxx from the market after data from a clinical

trial indicated that use of the drug increased the risk of cardiovascular thrombotic events.  Thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims.   New Jersey instituted a consolidated state court proceeding in 2003.   Nearly two years  later, this MDL was formed, and all federal suits were transferred into the MDL.  But numerous actions continued in state courts, including the consolidated proceeding in New Jersey, in which Weinberg was actively engaged.  *See* Order and Reasons, 10/19/10, R. Doc. 54040, at 2-3.

On November 7, 2007, Merck and the MDL negotiating panel entered into a global settlement that resolved the majority of Vioxx personal injury claims.   Claimants proceeding in state courts were given the option of joining the settlement.  A common benefit fund was established and special provision was made for state court counsel to participate in the allocation on the same footing as MDL counsel.  *Id.,* at 6-10.

In the prior allocation litigation, this Court bore witness to the tension between MDL and non-MDL counsel, as the MDL FAC valued its own and its colleagues' contributions at a considerable premium over those of their state-court counterparts.  In Weinberg's case, for example, the FAC recommended an initial allocation of $221,000; it  dropped that recommendation to zero after Weinberg lodged an objection.  Following a hearing in which Weinberg demonstrated the breadth and value of his work, the FAC settled on a final recommendation of $3.5 million, which the Court approved and awarded.  *See* Order and Reasons, 8/9/11, R. Doc. 63195.

As the personal injury cases neared settlement in 2007, work geared up in the Third Party Payor ("TPP") litigation.   These actions, filed on behalf of third parties who had paid for the drug and for Vioxx-related injuries and damages, also proceeded both within the MDL and in state courts.  The FAC asserts that the "lead TPP case" proceeded in New Jersey.   *See* R. Doc. 63928, at 2.[1]

---

[1]Within the MDL, little happened on the TPP front.  The FAC properly notes that MDL counsel drafted a master complaint  and fended off a motion to dismiss by Merck, then experienced "several years lull on the TPP front while the Court addressed the personal injury matters."  *See* R. Doc. 63928, at 2.  As the TPP litigation approached settlement,
(continued...)

However, that class action, *"Local 68,"* principally prosecuted by the Seeger firm, did not get very far before the state Supreme Court of New Jersey decertified the class in September of 2007. *Id.* Another class action in California, principally prosecuted by Tom Sobol, likewise failed at the certification level. *Id.,* at 2-3. After *Local 68* died, Seeger partnered with Weinberg and others in New Jersey to ready a new set of cases for trial. At the heart of the instant litigation is Seeger's contention that several years worth of work, all conducted by the objectors in New Jersey, made no substantial contribution to the TPP common benefit.

Seeger and Sobol commenced TPP settlement negotiations with Merck in early 2009. The settlement for private third party payors, largely finalized over the summer, was announced in September of 2009. The $80 million dollar agreement included $65,000,000 for claimants and their private counsel, and a $15 million dollar common benefit fund which is now to be allocated among common benefit counsel. *Id.,* at 3-4.

In all of the TPP litigation, there were no trials and only a handful of depositions, two of which Weinberg second-chaired. Apart from the two failed certification efforts and the TPP settlement, then, there were few concrete milestones in the private TPP litigation.

Proceeding alongside and beyond the private TPP litigation are governmental claims, principally lodged by states' attorneys general, who like the private third party payors, seek to recover Vioxx damages occasioned to and overpayments made by the states. The Louisiana AG case was tried to a loss in the MDL in 2010. Most of the other AG cases are proceeding in the MDL but with their own teams of counsel. In some of the state cases, the AGs have agreed to share common benefit fees with the MDL leadership. In others, the MDL leadership is seeking to recover common benefit contributions from resistant counsel. Because the Louisiana AG action yielded no recovery – and therefore no attorneys' fees – and the recovery of fees from other AG actions is

---

[1](...continued)
the court established a schedule for bellwether trials; but settlement was on the horizon, and MDL counsel had barely commenced work on readying those cases for trial when the final settlement was announced. *Id.*

uncertain, it appears that certain MDL leadership included the time spent on the unsuccessful Louisiana AG case in their claims against the TPP common benefit fund, which was meant to be entirely separate.  Weinberg is involved in the Utah and Pennsylvania AG cases, but has not included time spent on those actions in his TPP submissions.

The TPP Common Benefit Fund was created by the 2009 TPP Settlement Agreement, which allotted to this Court the task of allocating the fund.  The Agreement specifically provided for "due consideration by him in accordance with established procedures for notice, objection and hearing in conformance with Fifth Circuit precedent."  R. Doc. 63928, Exh. C, ¶5.2.1.  The Agreement expressly contemplated the appointment of a FAC including Messrs. Seeger and Herman, and indicated that their recommended plan of allocation "shall be guided by objective measures of Common Benefit Attorneys' contributions, in addition to their subjective understanding of the relative contributions of counsel. . . ."  *Id.,* at ¶5.2.2.

In accordance with the Agreement and this precedent, on August 17, 2011, the Court entered PTO 57 to implement the process for allocation and disbursement.  It appointed Russ Herman, Chris Seeger, Andy Birchfield, Elizabeth Cabraser, Tom Sobol, and James Dugan to the FAC. It directed that they collect from applicants: a description of the common benefit work performed; lodestar information, which was to include an identification of the extent to which any fees or costs had been previously submitted and compensated either by clients or by a court-ordered award; and a description of each applicant's contributions to the common benefit, including any leadership roles or committee appointments.   The FAC was to gather and evaluate these submissions, make a preliminary recommendation, allow for comment, and circulate its final recommendations "no later than November 7, 2011."  *Id.*

In accordance with the procedures put into place by the Court and the FAC, Weinberg timely submitted his original application with supporting documentation on September 16, 2011, and a Supplemental Application on October 17, 2011.  *See* R. Doc. 64044, Exhs. A & B. The FAC,

however, did not make a preliminary allocation recommendation until June 13, 2012. *See* R. Doc. 63928. The Court called for objections to be filed by August 10, 2012, and Weinberg timely complied. *See* R. Doc. 64044. Thereafter, he fought for and secured access to the other applicants' submissions, then rendered further comment on the FAC's recommendations, to which the FAC responded. On March 15, 2013, the Court appointed Special Master Juneau to review relevant documents, conduct such further proceedings as he considered necessary, and render a recommendation concerning "the amount the remaining objectors should receive." *See* R. Doc. 64304. Master Juneau directed the parties to submit pertinent documents, file briefs, and participate in a hearing scheduled to commence on May 23, 2013. *See* R. Doc. 64361. The protocol was subsequently amended to provide for submission on briefs. A final amendment called for sworn responses to the Special Master's questions in a hearing conducted on June 20, 2013.

On November 8, 2013, the Master issued his report, recommending that Weinberg receive $135,292.00 in fees, about 1/10 of the time Weinberg submitted; he made no finding or recommendation concerning costs. This objection followed.

## II.  Weinberg Is Entitled to No less than His Lodestar and Costs of $1,165,892.61

Attorneys fees are set in the Fifth Circuit through the lodestar approach, with adjustment according to a list of factors that could result in a multiplier or a downward adjustment. *See Forbush v. J.C. Penney Co.*, 98 F.3d 817 (5th Cir. 1996). Lodestar, then, is the relevant starting point of this Court's inquiry, as the Court recognized in discussing the seminal Fifth Circuit case on allocation of common benefit fees:

> The takeaway from *High Sulfur* is that in allocating a fund of attorneys' fees, the Court must conform to "traditional judicial standards of transparency, impartiality, procedural fairness, and ultimate judicial oversight." 517 F.3d at 234. That requires creating a sufficient record, making sufficient factual findings, **considering the time worked and the *Johnson* factors**, providing an opportunity to be heard to all the applicants, and exercising independent judgment in allocating those fees rather than simply rubber-stamping a committee recommendation.

*Id.*, at 26, discussing *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220,

227 (5th Cir. 2008). While adjustments to the lodestar are certainly appropriate (based upon the *Johnson* factors), it is respectfully submitted that any fee allocation committee bears a heavy burden to justify tossing out lodestar, particularly when it does so for everyone but its own members. Something objective must be relied upon, not merely the committee's subjective and clearly unreliable view that one attorney's work was not as useful as another's.[2]

The TPP FAC implicitly acknowledged the importance of lodestar in its July, 2012 recommendation, which closely tracked lodestar for favored firms: the Dugan Firm, Hagans Berman, Sobol and Shapiro, Herman Herman Katz and Kotlar, Levin Fishbein, and Lief Cabraser.  *See* R. Doc. 63928-1. Seeger Weiss uniquely received a recommendation of more than its lodestar.  *Id.*

While lodestar is the starting point of the analysis, it is not the end point.  This Court has made clear that "there is a hierarchy of value for work that tends to have a greater impact on the litigation and generates more 'common benefit.' Such work deserves greater compensation."  R. Doc. 63195, at 27.  As demonstrated herein, and as a simple perusal of Weinberg's reported time entries reveal, his hours were spent on actual litigation work – intensive efforts to develop viable theories and evidence to support the TPP claims. Short of TPP trial hours, which no one amassed, Weinberg's litigation hours are at the highest echelon of the hierarchy of compensable hours, and not sub-lodestar "soft" hours as contemplated by this Court.

Weinberg's timely Original Submission to the TPP FAC appended daily records of 1518 hours of time, all of them entered by Weinberg himself, at a rate of $750/hr., yielding a lodestar of $1,138,500; he further detailed $27,392.61 in expenses, with each entry supported by an invoice. *See* R. Doc. 64044, Exh. A.

Several details of Weinberg's submissions are particularly noteworthy.  The first, evident

---

[2]In the PI fee allocation, this Court expressly instructed the FAC to "consider devising objective categories for types of work done for common benefit, based on the relative significance of that work in bringing about the ultimate successful resolution of this litigation."  R. Doc. 63195, at 16.  As noted above, the TPP Settlement Agreement also requires the use of objective criteria.¶5.2.2.  Nothing of the sort appears to have been done by the TPP FAC given that it has turned over no documents which demonstrated an objective approach to its recommended allocation, despite an order from Special Master Juneau to turn over all documents upon which it relied.

on the face of Weinberg's time records, is that he logged his 1518 hours of common benefit time between November 12, 2007 and September 13, 2009; therefore, as he certified, none of this time related to the by-then concluded personal injury litigation and, more importantly, that time was not submitted in connection with the personal injury common benefit allocation. *See* R. Doc. 64044, Exhs. A-7 and B. The same is true of Weinberg's expenses. *See id.,* Exhs. A-8, and B. Additionally, as the FAC acknowledges, Weinberg received no payment for his work from TPP clients. *See* R. Doc. 63928-1, at 4. Third, as Weinberg testified and as the below-discussed emails establish, Weinberg occupied a leadership role by invitation of Mr. Seeger. Tr., pp. 10-13, 19-21, 36, 39. Also significant to the Court's comparative analysis is the fact that Weinberg's time was entered by him at the rate approved by this Court in the PI litigation. By contrast, many other applicants submitted substantial amounts of paralegal time and charged indefensible rates. *Infra.*

In the PI allocation, this Court saw extensive evidence of Weinberg's command of scientific issues, and the importance of his expertise to the overall litigation. He carried that expertise forward into the TPP litigation. He developed common benefit evidence, principally expert scientific evidence, which included proof of a panoply of risks of Vioxx that were not disclosed to Third Party Payors, and evidence of safer and cheaper alternatives to Vioxx which the payors would have purchased had they known of the Vioxx risks. Tr., pp. 20-22, 30-33, 40. *See* also, R. Doc. 64044, Exh. A-1 through 4.

As a result of Weinberg's early command of the scientific issues, Mr. Seeger created a working partnership in the New Jersey TPP litigation among Seeger Weiss, Weinberg, and Cohen Placitella & Roth. Tr., pp. 10-13, 20-22, 36. *See also*, R. Doc. 64044 , Exh. E-1. Weinberg continued to develop the broader risk/benefit evidence case against Merck throughout 2008 and 2009. Tr., pp. 29-31, 37, 43. For example, he provided Lead MDL and New Jersey counsel with a road map to this strategy in July of 2008, *see id.,* Exhs. E-2 and E-3; met with Lead and Liaison Counsel at their offices in New York in September of 2008 to "discuss trial themes and vet liability

theories, " *see id.,* Exh. E-4 ;[3] prepared and circulated guidelines for document review in October of 2008, *see id.,* Exh. E-5;  provided expert analysis of risk data in the Alzheimer's studies to Liaison Counsel in November of 2008,  *see id.,* Exh. E-6; and in late 2008 and early 2009 provided MDL Lead Counsel with his work on a significant risk issue that had not previously been pursued in the MDL, *see id.*, Exh. E-7, E-8,  E-9.

In January of 2009, Liaison Counsel endorsed Weinberg's litigation strategy of broadening the evidence of the risks associated with Vioxx that were relevant to the plaintiffs' purchasing decisions. *See id.,* Exh. E-10.  In February of 2009 Weinberg organized a working meeting of Vioxx TPP counsel in New Jersey, at the request of Liaison Counsel.  *See id.* Exh. E-11.  It took place in March of 2009 and was attended by several plaintiffs' counsel representing private TPPs, including Liaison Counsel.  Weinberg arranged and chaired the meeting, created the work guidelines and agenda, and drafted and circulated the minutes of the meeting.   He testified that Mr. Seeger approved these coordinating efforts.  Tr., pp. 10-13, 35-36.

 Of the three firms in the New Jersey "working group," the FAC initially recommended a $4.7 million fee to Seeger Weiss and zero fees to Weinberg and to Cohen Placitella & Roth. In its final post-objection recommendation, the FAC increased its recommendation for Weinberg to $450,000 and for CPR to $122,000[4]; it "reduced" Seeger's recommended award to $3,965,000.  *See* R. Doc. 64193.  The disproportionate favoring of Seeger is especially disturbing because of the enormous contribution it attributes to the common benefit from a single decertified class action, which constitutes the overwhelming majority of its TPP hours.

In May of 2009, Weinberg accompanied a biostatistics expert to Melbourne, Australia.,

---

[3] Lead Counsel Christopher Seeger and Liason Counsel David Buchanan attended this meeting, along with their then-partner, Jeffrey Grand.  The agenda was  common benefit work.

[4] In the June 20th hearing, Mr. Seeger suggested that Weinberg sought a disproportionate award compared to CPR, which accepted $122,000 for doing more work.  Tr., p. 84.  As shown below, Mr. Seeger's apportionment of the workload between the two firms was both ill-informed and wrong: Mr. Seeger attributed exclusively to CPR work done by Weinberg.  He also fails to note that CPR received substantial compensation from TPP clients, offsetting its common benefit application.

where he testified in the Australian Class Action trial.  Weinberg's first-hand view of Merck's assault against this evidence proved invaluable in the further development of the expert and theories of liability to be utilized in the Vioxx private TPP cases.  Tr., pp. 24-25, 27.

By June and July of 2009, it was apparent that few MDL lawyers were working on the TPP cases.  Tr., p. 26.  Only a handful of depositions were taken in all of the TPP litigation; these were taken outside the MDL in New Jersey.  Weinberg second-chaired two of these depositions. He made substantial efforts to coordinate with PSC firms, sharing  theories of liability and expert work product with MDL lawyers and suggesting the integration into the MDL of valuable work product that would serve the common benefit of all TPP plaintiffs.  *See*  R. Doc. 64044,  Exh. E-12, E-13, E-14.

Significantly, the acknowledged "lull" in TPP work within the MDL meant that few MDL lawyers, and therefore most of the TPP FAC, although aware of the fact of Weinberg's ongoing efforts, were unaware of the details or the importance of his work.  Weinberg therefore offered the FAC multiple means of bridging the gap.  First, he provided extremely detailed time records in his submissions.  *See id.,*  Exh. A.  Second, he provided a substantial sampling of work product.  *Id.* Third, he provided certifications from two among the many attorneys in the TPP litigation who looked to Weinberg for leadership.  Joseph Grinstein, Esq. and Mark Schultz, Esq., prominent attorneys who represented some of the largest plaintiffs in the TPP litigation, each attested to the value of Weinberg's work.  Neither submitted common benefit claims personally nor had any interest in Weinberg's entitlement to Common Benefit Fees.  *See id.,* Exh. D.

While the FAC may not know as much as it should of Weinberg's contributions, Merck had enough notice in the depositions and in the expert testimony Weinberg shepherded through the TPP action in Australia to perceive its risk in litigating the TPP claims, and correspondingly, its advantage in entering into a global settlement.

Weinberg's workup of a viable theory of liability for TPP  plaintiffs merits, at the very least,

full compensation.  He became involved in the TPP cases early, and worked them hard.  The TPP FAC recognizes that New Jersey substantially preceded the MDL in TPP litigation.  *See* R. Doc. 63928, at 2.  The "several years lull on the TPP front," which the FAC acknowledges,  was largely restricted to the  MDL.  Thus, the TPP work in New Jersey served as the template for most of the TPP litigation.

Weinberg, who occupied a central role in the New Jersey efforts, ranks among the most significant contributors  to the overall TPP litigation.   He developed much of the scientific theory, which greatly exceeds in novelty and difficulty the administrative and review work undertaken by those for whom the FAC recommends substantially higher compensation.  Additionally, Weinberg contributed substantial funds to the development of such evidence, which the FAC has not only disregarded as a multiplier, but proposes not to reimburse.    Weinberg's experience and reputation, and the high quality of his work have already been documented in the PI litigation. Unlike most other claimants, he received no fee for his work from any TPP clients.  He devoted himself entirely to the common benefit, and therefore is entirely dependent on a just allocation for the compensation of his work.  As a sole practitioner, Weinberg took substantial risks in devoting such extensive efforts to the TPP cases.

At this Court's urging, the TPP FAC specifically inquired into the prior submission of hours in the PI litigation. However, it notably omitted from its "threshold observations" any reference to the appropriate treatment of such hours.  *See* R. Doc. 63928, at 7.  With respect to Weinberg, the Recommendation expressly and accurately notes that his time was not previously submitted.  On the other hand, as noted below, the FAC recommended full compensation for some of its members' time which was previously submitted *and compensated*.

Because Weinberg suspected, even before the FAC's Recommendation issued,  that other claimants were duplicating previously-submitted time in their TPP claims, he tendered an Addendum to the FAC.  It noted that if duplication were allowable, he should be credited with an

-13-

additional 1680 hours of *his* time, previously submitted in the PI action but benefitting the TPP action, bringing his common benefit lodestar to $2,398,500.  *See* R. Doc. 64044, Exh. C.  He described in detail how his overlapping hours were directly relevant to the issues in litigation of the TPP claims.  In its recommended allocation, the TPP FAC did not list nor in any way acknowledge this submission.  Nor did it explain how Weinberg's overlapping hours are distinguishable from those of FAC members for which it recommended duplicative payment.

If the duplicated hours are disallowed for one claimant, they should be disallowed for all.  Conversely, if they are allowed for any claimants, they must be allowed for all.  As the following section shows, neither the FAC nor the Special Master gave any credible explanation for slashing Weinberg's time.

## III.   THE FAC'S DEVALUATION OF WEINBERG'S WORK AND THE SPECIAL MASTER'S ACCEPTANCE OF THAT DEVALUATION SHOULD BE GIVEN NO WEIGHT

Until the June 20, 2013 hearing, the FAC offered no factual or theoretical justification for either awarding or withholding any award to Weinberg.  On June 20, 2013, Mr. Seeger testified that he did not, as lead counsel in the New Jersey litigation, authorize work by Weinberg, that Weinberg had proceeded on his own to "chase[] everything that glitters," and that Weinberg's work had been of no value to the TPP common benefit.  Tr., pp. 67-69, 76-79.  Apparently accepting this uncorroborated testimony and ignoring the documentary evidence to the contrary, the Special Master reviewed Weinberg's time records, and deleted all but 166 of Weinberg's reported 1518 hours, then applied "an appropriate lodestar factor" and arrived at an award of $135,292.  Report, p. 2.

### A.   The TPP FAC has offered no credible justification for awarding Weinberg less than lodestar.

#### 1.   The FAC's first recommendation

In its first recommended allocation, filed on June 13, 2012, the TPP FAC recommended that Weinberg receive no payment for his time, and no reimbursement for his expenses.  It did not

dispute his hours, his expenses, nor his recitation of significant contributions, and it assigned no reasons whatsoever for this recommendation.   *See* R. Doc. 63928.

Several of the FAC's general observations in that initial filing squarely supported full compensation of Weinberg.   The Recommendation noted with approval the "aggressive" litigation of TPP cases in New Jersey, *see* R. Doc. 63928, at 2.   It stated that client-specific work was discounted; and it noted, with respect to Weinberg, that none of his work fit within that category. *See id.*, at 7, 26.  It also noted that none of Weinberg's time was previously submitted in the personal injury action.  *See id.*, at 25.

The FAC placed the claimants into three "buckets": those who should be well-compensated for "significant substantive TPP common benefit work;" those who received no compensation in the personal injury litigation and should be "reasonably compensated for their TPP common benefit contributions;" and those who "did not contribute meaningfully to the common benefit of TPP." *Id.,* at 8.   Because Weinberg clearly belonged in the first bucket, and, equally clearly, could not be dumped into the last, it appeared that the TPP FAC may have placed him into the mysterious second. Then, it somehow disqualified him on account of his having received compensation in the personal injury litigation.   It noted that he received $3.5 million in the prior allocation; but it made no showing of how this fact is relevant to the TPP allocation.  Given the certification that Weinberg's TPP hours were not previously submitted, it made no sense to penalize him for his prior contribution to and compensation in the personal injury litigation.  Almost every member of the TPP FAC was likewise compensated in the prior allocation, and this did not seem to have adversely impacted any of their recommended allocations.  Indeed, Seeger, for which the TPP FAC has recommended the largest fee of all, received $36,600,000 in the PI action.

Without sharing any details about the claims against the $15 million dollar fund, the TPP FAC observed that those claims totaled $23 million.  *See id.,* at 8.  An $8,000,000 shortfall did not

justify the complete elimination of Weinberg's claim.  Moreover, the alleged inadequacy of the fund was a myth created by the FAC's own exaggerated demands against it; *removal of the FAC's duplicative time would allow for full lodestar compensation of every applicant*.  At any rate, the initial demand-vs.-available funds ratio has substantially diminished, because many of the claimants either abandoned their claims altogether or accepted the FAC's recommended reductions rather than engage in the costly and arduous process of objection.  Nothing in the FAC's initial recommendation explained the complete dismissal of the claim of one of the most prolific workers developing science and strategy, and therefore a leader in the TPP litigation.

### 2.     The FAC's resistence to meaningful comparative analysis.

After the FAC submitted its initial recommendation, this Court invited objection by any claimant disputing the propriety of the recommendation.  *See* R. Doc. 64011.  Weinberg timely filed his objection on August 10, 2012.  *See* R. Doc. 64044.  In it, Weinberg observed that he could not make the appropriate comparison of his recommended award to others, because the FAC had neither explained its rationale for allocation nor made available the submissions of other claimants; the underlying material on which the FAC had purportedly based its recommendation was contained in its Exh. D, which it had filed under seal.  *See* R. Doc. 64044, at 3.

On Weinberg's repeated requests and motions, *see* R. Doc. 64165-1, the Court directed the FAC to provide access to Exh. D, and it ultimately did so.  However, Weinberg's review of Exhibit D revealed a double-blind: several key claimants *had not submitted their time records to the FAC* in connection with their claims, as required by Court order and FAC-directed process, but had instead simply referred the FAC to time records submitted directly to Phil Garrett.   Weinberg sought review of Mr. Garrett's records so that Weinberg could conduct the necessary analysis.  But he also questioned the compliance with Court-ordered process of those claimants who had neglected to include their time records as required; he further questioned whether the FAC had even reviewed

the time records submitted to Mr. Garrett. *See* R. Doc. 64165.

The FAC suggested that Weinberg had no need to review Mr. Garrett's records, because, astonishingly, the FAC admitted that *it had not examined the time records submitted to Mr. Garrett.* *See* R. Doc. 64171. Thus, the FAC's argument went, any materials which *it* had not considered were "irrelevant" to the allocation, *see id.,* at 2-3, notwithstanding Fifth Circuit precedent, which makes them the unquestioned starting point of any fee allocation. If Weinberg wished to review the "irrelevant" materials, however, the FAC declared that it had "no objection" provided Weinberg's counsel pursued a method of review likely to cost more than the value of Weinberg's entire claim. *See id.* Weinberg demurred. *See* R. Doc. 64176.

On December 4, 2012, the Court directed Mr. Garrett to give Weinberg direct access to his records. *See* R. Doc. 64183. In the December 11, 2012 status conference, the FAC instructed Mr. Garrett to provide Weinberg's counsel with a password to his web database. As will be shown below, the Garrett records disclosed multiple and profound irregularities in several favored claimants' requests for common benefit fees. As will also be shown below, the FAC made no adjustments to its recommendation after the irregularities were disclosed. Likewise, Master Juneau, who considered only the objectors' submissions, gave no consideration to the shocking flaws in the FAC's submissions.

### 3.   The FAC's second allocation recommendation.

On December 11, 2012, exactly one week after the Court opened Mr. Garrett's records to Weinberg, but before Weinberg had had any opportunity to analyze them, the TPP FAC filed a "[Proposed] Decision Distributing Third Party Payor Common Benefit Fund." *See* R. Doc. 64193. Attached was a "Final Proposed Allocation." *See* R. Doc. 64193-2.

Although Weinberg had just been given access to significant new material, the FAC had received *no new material* between the first and second recommendation– that is to say, it had

-17-

received no new materials pertinent to a fee allocation as governed by Fifth Circuit precedent.  The only new factors at work were the filing of certain objections, and equally important, the non-filing of others, reducing the overall claims against the $15 million fund.   Ten firms objected.  *See*  R. Doc. 64193-1, at 6.  The FAC recommended an increase for half the objectors, including Weinberg; but it made no changes with respect to the Central States Objectors.  *See* R. Doc. 64193-2.

The "Proposed Decision" gave no indication how the FAC had arrived at the recommended increases.  Weinberg's recommended allocation went from 0 to $450,000, and the FAC did not offer any explanation whatsoever how his contribution went from worthless to considerable, nor why it still remained a disproportionate fraction of Weinberg's lodestar.  Purporting to speak for the Court, the FAC-authored "Proposed Decision" declared, "[t]he underlying basis for the Court's conclusion is set forth in the Fee Allocation Committee's Recommendations."  R. Doc. 64193-1, at 6.  This made no sense whatsoever, since the FAC's earlier recommendations were for *different* allocations. It particularly made no sense in regard to Weinberg, for whom an allocation of zero had been recommended.

### 4.     The FAC's retraction of its allocation recommendation for Weinberg

While the Proposed Decision said nothing for or against Weinberg's work, it specifically declared that if Weinberg refused to abandon his assertion of a right to appeal, the FAC would "re-distribute. . .the allocation" to him ratably back to its members.  *See* R. Doc. 64193-1, at 11.  This "poison pill" paragraph in the Proposed Decision suffers from numerous fatal flaws, which Weinberg has in part addressed to the Court.  R. Doc. 64206, at 8-9.  Weinberg's right of appeal, however, is irrelevant to the issue currently before the Court – the appropriate allocation of common benefit fees.

The only true significance of the FAC's poison pill lies in its utter disregard for the appropriate functioning of this or any other fee allocation committee.   PTO 57 appointed the TPP

FAC and charged it with the responsibility of recommending an allocation to the Court. In the order, the Court specifically directed the FAC to gather lodestar information, and descriptions of the applicants' "significant contributions to the common benefit of private TPP efforts in this MDL and/or in related state proceedings." *Id.,* at 3. Implicit in these directives was the Court's expectation that the FAC would *base its recommendations* on such pertinent considerations. In suggesting that Weinberg was entitled to a $450,000 allocation, which the FAC *recommended* to the Court in its fiduciary capacity, it certified to the Court that Weinberg had made at least a $450,000 contribution to the common benefit.

Unbound by this representation to the Court, Mr. Herman later advised Weinberg in writing that the FAC's "offer" had been withdrawn. *See*, R. Doc. 64423, Exh. A. The implication was that it would readjust its recommendation for him to zero, a fact that was confirmed in the June 20th hearing. *See*, Tr., p. 85.

### 5.     The FAC's charge of "double-dipping"

Before the June 20th hearing, the only explanation the FAC had offered for reducing Weinberg's recommended allocation came in the form of Mr. Herman's allegation, during an April, 2013 telephone conference with the Special Master, that Weinberg was guilty of "double-dipping." This charge, it should be noted, came only after Weinberg offered substantial, detailed, and *documented* evidence of double-dipping by members of the FAC, as summarized below. The FAC, by contrast, has never offered any evidence of double-dipping by Weinberg. Directed by the Special Master to produce to Weinberg no later than May 6, 2013 any evidence which bore on its recommendations to the Court, the FAC produced nothing.

Evidently, the FAC intended to prove its charge through the time records it subpoenaed from Weinberg. It expected to find that, contrary to Mr. Weinberg's sworn statements, he had charged to the TPP matter time in fact spent on the AG cases. Indeed, as Weinberg showed and as will be

detailed below, FAC members had done precisely that, and the FAC has shown not the least regard for its own misconduct nor has it adjusted any of its self-recommendations based upon it.   But as Weinberg explained, he had cut off his TPP submissions at the point when the TPP settlement was announced and before the AG work ramped up.  Given the similarities between the cases, there was inevitably some slight overlap, but Mr. Weinberg attested that he could not distinguish the few hours at issue and considered all pre-settlement time properly attributed to TPP.  Tr., p. 19.  To avoid any double-dipping, he assured the Court that none of the time charged to TPP would be repeated in future AG submissions.  R. Doc. 64422, p. 10.  The FAC members, whose doubled entries ran into the many hundreds of hours, made no like assurances.

The FAC also charged that Weinberg was double-dipping for work done in the PI case.  It based that argument on the fact that he worked with the same experts and much of the same data that was used in the personal injury case.  For example, the Alzheimer's paper appended to his TPP submission is a work which has been in progress for many years, and to which he referred in the PI allocation hearing; but this does not mean that Weinberg is billing again for the *same* work.  R. Doc. 64044, Exh. A-4.  Twenty-four pages long when the PI case settled, the submitted document is now 100 pages with over 130 citations to Merck documents, medical literature, deposition testimony, and other relevant materials.

Updating his work for the TPP cases has been a particular challenge, which he has doggedly pursued.  Tr., pp. 30-32.  The FAC's failure to meet that challenge has produced a string of losses.  Weinberg's work in mining the data to discover new material and to develop new theories that would carry the litigation forward produced discernable results.  For example, in the PI cases, the fact that more patients developed Alzheimer's was considered irrelevant; in the TPP cases, the concealed fact that Vioxx put elderly patients at risk bears significantly on the decisions of payors to purchase the drug.  Weinberg's hours from November 2007 through September 2009 reflected

work that deepened the understanding of and expanded the ability to use the evidence in the private TPP cases– and it went far beyond his or any other work undertaken in the PI cases. *Id.*

Significantly, Weinberg shared that evidence with MDL counsel, who billed time for studying it. For example, reference to the time of a *single* attorney within the Lieff Cabraser firm shows that he logged more than $11,000 dollars in time for reviewing Weinberg's work. *See* R. Doc. 63569, Exh. D, Lieff, Cabraser, at 57, 59, 61, 63-68. The FAC recommended *full payment* of that and many other such entries repeated throughout favored submissions. It simply cannot justify paying 100 cents on the dollar to those who *reviewed* Weinberg's work, while recommending that Weinberg receive nothing for *authoring* the work.

This was where matters stood when the FAC attempted to bolster the strength of its arguments by a motion for contempt. This Court will recall those proceedings, the FAC's misrepresentation of the importance of the documents to the hearing at which the Special Master had said they could not be used, and Mr. Herman's ultimate oral concession that the documents, produced at enormous inconvenience to Weinberg, did not establish double-dipping. *See,* Minute Entry, 7/1/13, denying Motion for Contempt, R. Doc. 64474.

There has been no double-dipping by Weinberg, as his submissions attest under oath. But his charge of double-dipping by the FAC is real, as shown below.

### 6. Mr. Seeger's testimony in the June 20th hearing was not credible

The Master cannot be faulted for establishing a protocol that would offer the objectors no opportunity to cross-examine or to rebut testimony. However, hindsight, confirmed by ample evidence of record, establishes that this protocol represented a grave mistake. Following Mr. Seeger's uncorroborated and easily impeachable testimony, the shocked Weinberg team pointed to the documents attached to Weinberg's submission, which proved on their face that Mr. Seeger's testimony was less than candid. As noted above, they could make no further objection to the

process, because Master Juneau had prohibited objections.   Tr., pp. 2-3, 13. To right the balance of due process, Weinberg attaches hereto additional evidence contradicting Mr. Seeger's testimony. Exhs. A through E.

The illogic of many of Mr. Seeger's statements is addressed in the following section.   We here address two of the most notable inaccuracies, which were cited by the Special Master, that Weinberg's work was mostly unauthorized and mostly useless.   *See,* Report, p. 2.  Both claims are untrue.

Mr. Seeger testified accurately that the early thrust of the New Jersey TPP litigation centered in *Local 68*, an action litigated almost exclusively by his firm.   Judge Higbee certified the *Local 68* class and named Seeger Weiss class counsel.   That role naturally led to his appointment as Liaison Counsel with this MDL, and to the appointment of the firm as Liaison Counsel in New Jersey.  Tr., p. 62-65.    However, Mr. Seeger understandably deemphasized  the events that followed upon the New Jersey Supreme Court's decertification of the *Local 68* class in September of 2007. See R. Doc. 63928, at 2. After the class certification failed, *Local 68* did not even proceed with its own TPP action as a stand-alone claim.  In all likelihood, this is because in January of 2009, its president was indicted  for  misuse  of  union  funds–  and  later  convicted.    *See*,  http://www.examiner. com/article/lawmaker-s-nephew-indicted-on-corruption-charges.

Seeger Weiss allegedly had over 9 million dollars invested in a case that had cratered.  As shown below, the firm was compensated for approximately half of that work in the PI common benefit award, and seeks the other half from this TPP allocation.

Mr. Weinberg testified that in October of 2007, one month after *Local 68* collapsed and one month before the Vioxx PI case settled, Mr. Seeger went to Weinberg and Cohen, Placitella and Roth (CPR) to arrange a partnership for the TPP litigation going forward.  Tr., pp. 10-13.  Mr. Seeger testified that he went to the initial meeting only to see Mr. Placitella, that Mr. Weinberg was

not invited, that the latter sat in at Mr. Placitella's pleasure, and that he, Mr. Seeger, "had no idea that Eric Weinberg did anything in the third-party payor case." Tr., p. 67.

This testimony is completely belied by voluminous emails among the parties. Most notably, on October 24, 2007, Mr. Buchanan acknowledged receipt of Dr. Madigan's report from Mr. Weinberg, and commended it as "very strong. . .You guys did a great job." In the same email he asked whether Mr. Weinberg would attend a case management conference the following day. Two weeks later in a November 9, email directed to Messrs. Seeger and Weinberg, and merely copied to Mr. Placitella, Mr. Buchanan wrote that the newly-announced PI settlement would not interrupt the work on TPP: "full steam ahead on tpp." Attachment to Exh. A,[5] pp. 2, 3.

The record shows that Weinberg attended numerous case management conferences in Atlantic City, and additionally organized, led, or attended major coordinating and strategic sessions, meetings and conference calls: 2/12/08 with Bill Marvin at CPR to draft private TPP complaint for the three firm "working group" of Seeger Weiss, CPR, and Weinberg; conference calls about drafting and expert issues 2/20/08; 3/27/08; 7/23/08; TPP strategic planning session at Seeger Weiss 9/5/08 with EHW, Schultz, Roth, Marvin, Buchanan, Grand (Chris Seeger did not attend); Atlantic City 3/25/09 at Fox Rothschild, attended by several TPP counsel including Grinstein, Lipofsky, Paolicelli, Gross, Sigelman (by phone), Schultz, Weinberg and Buchanan (Chris Seeger did not attend); 4/20/09 dinner meeting in NYC with private TPP damages experts Rubinstein and Rubino, EHW and Schultz (David Buchanan and Chris Seeger did not attend); 4/21/09 strategic session at Lanier Law Firm with experts Rubinstein and Rubino, EHW, Schultz and Janush (David Buchanan and Chris Seeger did not attend; Weinberg reported to them on the substance); 6/11/09 meeting with

---

[5] Exhibit A hereto is Eric Weinberg's declaration, which offers no substantive testimony except to verify the authenticity of the emails attached thereto. The attached emails have been Bates-numbered for ready reference. Further reference will be solely to Exh. A, p. *. Included among the Exhibit A emails are several previously introduced as Exhibit E to record document 64044. Mr. Seeger's testimony, however, touched on a number of previously undocumented points, enlarging the parties' dispute; Exhibit A responds to the new allegations made by Mr. Seeger, but places the new emails in the broader context of the record previously made by Weinberg.

Schultz, Placitella, Roth, Cohen and Jeff Pollock at Fox Rothschild to discuss damages theories for "working group" cases (David Buchanan and Chris Seeger did not attend); 6/23/09 conference call with Schultz and Dassow and others regarding experts; 6/30/09 meeting with TPP experts Madigan and O'Connor (David Buchanan and Chris Seeger did not attend.)   *See,* Exh. A, pp. 4,5,7,8,9,10,13,16,17,41,43,51, and 52, and Report, Exh. 4 (Weinberg time records).

The record also shows that Seeger attended none of these meetings or sessions, contrary to his assertion that he led meetings where maybe Weinberg sat quietly in the room.   *See,* Exh. B, ¶7, and Seeger time entries; Tr., p.84.

Mark Schultz, a member of CPR during the TPP litigation, notes that "Mr. Seeger was not himself an active participant in the matters CPR and Mr. Weinberg pursued in the TPP litigation." "While Mr. Seeger was copied on numerous emails," Mr. Schultz averred, "he seldom attended meetings and conferences or participated in telephone conferences."   The more active involvement, he added, came from other members of the firm, notably, Dave Buchanan and Jeff Grand.  Exh. B, ¶5.   Mr. Seeger's lack of involvement may partially explain why he attributed exclusively to Mr. Schultz the work on the TPP damage model claimed by Mr. Weinberg:

> I do have specific recollection of meetings with Chris Placitella's firm and a gentleman in that firm by the name of Mark Schultz, who I and Dave [Buchanan] interacted with on working on a damages model for the third-party payer litigation. And I don't have any recollection of Mr. Weinberg in that. Doesn't mean he didn't sit in the room quietly.

Tr., p. 84.  Mr. Schultz disputes Mr. Seeger's recollection, saying that Weinberg's involvement (by contrast to Mr. Seeger's) was "active," and that Weinberg worked collaboratively with him on the damages model for the TPP cases.

Mr. Seeger's testimony that Weinberg had no role in the TPP litigation is difficult to explain. Not only was he copied on numerous emails to and from Mr. Weinberg, he personally acknowledged Weinberg's position in their working group.  By email dated March 20, 2008, Mr. Weinberg wrote

-24-

to Mr. Seeger, attaching a copy of the Alzheimer's paper, and suggesting that they bring in attorneys from Lieff Cabraser, with whom Mr. Weinberg had recently interacted on the topic.  Mr Seeger responded an hour later: "Eric, *we already have a working group of which you're a part. . .us, Placitella's firm, and you.*  In my view, we don't need others but I don't rule out working and cooperating with others."  Exh. A, p. 6, R. Doc. 64044,  Exh. E-1, also introduced at 6/20/13 hearing, tr., pp. 88-89.  (Emphasis supplied.)  Mr. Seeger's testimony that he did not invite or know of Weinberg's involvement in the New Jersey working group cannot be squared with this email.

Likewise, Mr. Seeger's testimony that Mr. Weinberg's work was unauthorized cannot be reconciled with legion emails between and among Mr. Weinberg and members of Seeger Weiss, including Mr. Seeger.  In brief, the FAC asserted: "Counsel in New Jersey were unsupervised.  No Steering Committee existed.  Counsel acted independently."  It concluded that without the oversight that existed in the MDL, Mr. Weinberg was free to pursue frivolous activities for which he now sought a common benefit award.  R. Doc., 64424, p. 2.  At the hearing, Mr. Seeger suggested contradictorily that there was a supervisory structure, that he was the supervisor, and that Weinberg's work was largely unauthorized.  *See, e.g.*, Tr. P. 79.  The Special Master accepted this revised version of the facts.  Report, p. 2.

In fact, the FAC's brief was closer to the truth, in that there was no formalized approval mechanism for specific tasks.  Tr., p. 35.  This did not mean, however, that Weinberg simply wandered off on his own pursuits without consulting  or reporting to the working group.  To the contrary, as Mr. Weinberg testified, tr., pp. 20-22, and as Mr. Schultz stated in affidavit, "[t]here were regular communications by email among members of CPR, Mr. Weinberg, and Seeger, Weiss, advising of our thoughts, theories and actions concerning the litigation."  Exh. B, ¶6.  These, Mr. Schultz added, "were supplemented by telephone calls, conferences, and court appearances."  *Id.*

The voluminous email record confirms their statements and effectively undercuts Mr.

Seeger's contradictory suggestion.  In this substantial record, we call particular attention to the following emails: 10/24/07, Weinberg to Buchanan, attaching Madigan report, Exh. A, p. 2; 2/16/08, Weinberg to Buchanan and Buchanan to Weinberg, setting up time to talk about TPP cases; 2/19/08, Weinberg to Buchanan ("I think it's important that we be on the same page, in terms of how to proceed, potential clients, the proofs to be offered, etc."), *Id*. 4,5; 3/20/08, Weinberg to Seeger, proposing specific recovery theories and discovery, *Id*. 6; 3/21/08, Weinberg to Grand, proposing a particular expert on causation and reporting inroads to locating a pharmacy benefit expert, *Id*. 8; 3/27/08, Weinberg to Grand, and Grand back to Weinberg, Buchanan, setting up telephone conference concerning Weinberg's drafting of a TPP complaint, *Id*. 7; 7/9/08, Weinberg to Grand, Buchanan, cc. Seeger attaching roadmap to prosecute the TPP reimbursement case, *Id*. 9; 7/23/08 among Weinberg, CPR and Seeger Weiss scheduling telephone conference on "procedures/protocols/work responsibilities" in TPP,  *Id*. 10,11; 7/23/08, Weinberg to Buchanan attaching updated working memo and summary of "broader risk-benefit argument applicable to TPP cases, *Id*. 13; 8/3/08, Weinberg to Buchanan suggesting analysis of analyses of Vioxx v. comparators, *Id*. 14; 9/4/08, among Grand, Weinberg, and CPR re "Vioxx confab", *Id*. 16-17; 10/20/08, Weinberg to Buchanan, cc Seeger, Grand, CPR, re TPP Document Review ("Chris S. suggested we get a call together among just us to talk about these cases"), *Id*. 18; 12/12/08, Weinberg to Russ Herman ("I am pleased to share all of our work product on this issue"), *Id*. 24; 1/20/09, Weinberg to Buchanan, referencing study on bone density as a risk issue ("I would like to co-chair a science committee with someone in your firm and broaden our approach to risk benefit"), *Id*. 27; 1/20/09, Buchanan to Weinberg ("This is great"), *Id*.; 1/29/09, Weinberg following up on discovery of relevant Merck documents, *Id*. 30-31; 3/27-3/29/09, Weinberg to Buchanan and back re Weinberg's upcoming involvement in Vioxx litigation in Australia, *Id*. 42; 3/20/09, Weinberg to Grand, attaching documents and protocol concerning Vioxx alternatives, *Id*. 40; 4/1/09, Weinberg

to participants of meeting of counsel, including Buchanan, re summary of meeting and coordination of depositions and discovery, *Id*. 43-44; 5/5/09, Grinstein to Buchanan re Vioxx TPP depos ("I think they are science depos mainly, but I defer to Eric[Weinberg]/Mark [Schultz], *Id*. 46; 6/3/09, Schultz to Buchanan et al. Re TPP meeting, NJ cases ("Eric [Weinberg] and I would like to have a meeting in Philadelphia with as many of you as possible to review where [our] cases stand, what our theories are, and what experts we have to review each theory"), *Id*. 51; 6/23/09, Weinberg to Buchanan attaching transcripts from Australia Vioxx trial and arranging meeting for discussion, *Id*. 52; 3/5/10, Buchanan to Weinberg, congratulating him on the verdict in Australia, *Id*. 77.

No one reviewing these emails, which represent only a fraction of the email record and which do not reflect the numerous discussions by telephone, in conference, and in case management conferences, could believe that Weinberg was a rogue actor, whose work in the New Jersey TPP litigation was unknown to liaison counsel. With respect to Dr. Madigan and the Australia trip in particular, Weinberg sought Seeger Weiss's assistance in his trial preparation. *Id*. 45.

Mr. Seeger attempted to place a final nail in the coffin of Weinberg's submission by declaring that Weinberg's work, to the extent it was known, had no value to the TPP litigation. This testimony was no more credible than his claim that liaison counsel were unaware of Weinberg's activities. Part of the fallacy of Mr. Seeger's denigration lies in his illogical and erroneous definition of value; the following section will deal with that issue. But Mr. Seeger's testimony also reflects an unreasonable refusal to accord any credit to any of Weinberg's undertakings. The invalidity of this opinion can be demonstrated in the first instance by the fact that as noted above, *Mr. Seeger sought Mr. Weinberg out to be in his select cadre of New Jersey TPP litigators.*

Mr. Seeger attempted to buttress his own doubtful opinion by offering alleged hearsay that others shared his view. The Special Master's prohibition of objections allowed this objectionable testimony into the record, but it is patently false. To begin, Mark Schultz, a key member of the

-27-

Seeger-assembled team, says:

> Mr. Seeger testified that Mr. Weinberg "chases everything that glitters," and "had a tendency to prepare lots of things." (Tr., pp. 77, 78). These statements are true, and correctly describe Mr. Weinberg's doggedness, persistence, and intense work ethic. Mr. Seeger's statements, however, do not credit the knowledge, experience, creativity, and intelligence with which Mr. Weinberg approaches his work. In combination, these attributes made him a leader in the development of the science underpinning the private TPP litigation.

Exh._B, ¶10.

Members of Mr. Seeger's firm echoed these sentiments. As noted above, Mr. Buchanan repeatedly commended Weinberg and encouraged his ongoing efforts: "I really like this [Madigan] report," 10/24/07; "You guys did a great job," 10/24/07; "Full steam ahead," 11/9/07; "This is great," 1/20/09; "Congratulations on the [Australia] verdict," 3/5/10. Exh. A, pp. 2,3, 27,77.

Mr. Seeger testified that he had members of the Lieff Cabraser firm look at Dr. Madigan's report, and "they said it was useless." Tr., p. 68. In point of fact, it was Weinberg who transmitted Dr. Madigan's report to Donald Arbitblit, and Mr. Seeger *who rejected Mr. Weinberg's suggestion that Lieff Cabraser be added to the New Jersey team. See,* email 3/20/08 (emphasis supplied). Exh. A, p.6. Far from considering Weinberg's work "useless," Mr. Arbitblit wrote in a June 23, 2009 email: "Eric, I agree with your analysis, and we are on the same page with this." *Id.* 53. With respect to Dr. Madigan's report in particular, Mr. Arbitblit said on July 24, 2009: "Eric, Thanks for sending this. I have reviewed it and found a couple of minor errors in an otherwise excellent report." *Id.* 73. As noted above, Lieff Cabraser billed heavily for this work, and the FAC approved its billings for review while disapproving all of Weinberg's time in the development of the report. And after the work had been vetted by MDL counsel, Mr. Weinberg was appointed Co-Chair of the Expert/Science Committee of the AG cases in the MDL.

We could go on a great additional length, but Mr. Weinberg made his case at the hearing when he testified: "I was never told to stop. I was never told: Don't do that, it's worthless. I was never told: You're frolicking. I was never told: You're wasting time." Tr., p. 22. After bringing

Weinberg into the case, if Liaison Counsel had ever truly been dissatisfied with Weinberg's efforts, they owed it to him to terminate his role. After taking eighteen months of his time, virtually full-time, Mr. Seeger cannot in good conscience wait until the tail end of fee allocation phase to declare his work frolicksome, frivolous, and wasteful.

The worst of it is that Mr. Seeger was responsible, as liaison counsel and a member of the TPP FAC, to stand up for his New Jersey team, report truthfully on their efforts, and ensure that the people he had drafted were fairly compensated for their efforts. In the June 20th hearing, Master Juneau specifically asked Mr. Seeger to explain the FAC's recommendation that Weinberg receive no award for TPP common benefit work. Mr. Seeger responded:

> he got a zero because I couldn't recall, and nobody on the committee could really point to anything that Mr. Weinberg did that was truly third-party payer related.

Tr., p. 83.

No one on the FAC but Mr. Seeger had first-hand knowledge of Mr. Weinberg's efforts. They looked to him for the information, although Weinberg's submission and vigorous objections certainly put them on notice that Mr. Seeger was not a reliable source. Mr. Seeger couldn't recall Mr. Weinberg's work in large part because he left that work to Weinberg and others. This is demonstrated by the fact that Seeger Weiss billed only *30 minutes of expert time after the decertification of Local 68. See,* Exh. C, Seeger Weiss time records.

### B.    The Proper Assessment of a Common Benefit.

The determination of whether a firm's work has provided a common benefit is properly based on established criteria. While the decision is inherently subjective in part, it is not inherently irrational. *See,* PTO 6(D). Mr. Seeger's testimony, which constituted the only evidence in support of the FAC's contention that Weinberg made no contribution to the common benefit in the TPP litigation, crossed the line from the subjective to the irrational. His testimony against Weinberg variously contradicted the written record, the FAC's own

statements, common sense, and well-recognized principles of common benefit work.   It should have been rejected out of hand as the biased, self-interested, and incredible rant that it was.

Instead, Master Juneau made Mr. Seeger's untrustworthy opinions the centerpiece of his report, reciting the statements by liaison counsel that "a significant portion of his [Mr. Weinberg's] time" was not "of any benefit in the prosecution and ultimate resolution of the third-party payor litigation."  Report, p. 2.   In accepting Mr. Seeger's views at face value, Master Juneau abdicated his responsibility to make the independent determination requested by this Court.

An independent evaluation of Weinberg's contributions would have considered the following factors.  First, work is not "useless" simply because it is unused.  Mr. Seeger's testimony repeatedly blurred this distinction.  "  (Tr., p. 67, 68, 77, 78, 83).   As Mr. Schultz appropriately responded in affidavit:

> It is true that the work was not introduced in a court of law; but this is so because no TPP cases were tried.  In that sense no one's work was "used."  Mr. Weinberg and I believed that we had developed a workable theory of the case; but Mr. Buchanan advised that he felt compelled to settle the case by an opinion authored by Judge Higbee which suggested that the consumer claims could not be aggregated.

Exh. B, ¶9.

This Court has endorsed the Schultz view of utility and rejected the Seeger definition.  In the PI litigation, it awarded substantial fees for the preparation of cases for trial despite the fact that they were not tried.  In *Turner v. Murphy Oil,* it approved a substantial award to Darleen Jacobs for preparation of a case on damages that was never presented because the case settled. And in the instant case, Mr. Seeger's definition would defeat his own firm's claim in its entirety, for *Local 68*, once decertified, went nowhere.  Mr. Seeger attempted to distinguish *Local 68* by asserting that it was "the hammer over Merck's head," claiming ongoing benefits that are not supported by the decertification decision, nor by common sense.  Tr., p. 70 .

To the contrary, reason suggests that the decertification of both *Local 68* and Mr. Sobol's attempted TPP class action, as well as Judge Higbee's ruling that consumer claims could not be aggregated, constituted the real hammer over the plaintiffs' heads.  Mr. Schultz states:  I did not participate in the settlement discussions, but I find [Mr. Seeger's hammer] claim surprising, because *Local 68* appeared to die a complete death when certification was denied; I do not recall the case being mentioned further by anyone." Exh.B, ¶4.

Also patently unreasonable is Mr. Seeger's contention that Weinberg's participation in a winning Vioxx consumer case in Australia delivered no benefit to the TPP.  As noted above, Weinberg had worked with Dr. Madigan for several years to develop new and better theories of liability against Merck, based on thought, study, and documents newly-mined by Weinberg from millions of pages of documents produced in the PI litigation by Merck or secured in Weinberg's FOIA action.  The Australia case offered an invaluable practical opportunity to test their new theories in the courtroom.  Dr. Madigan was paid for his work, but Weinberg was not; he went mainly to protect the witness he had developed over a period of years and to observe how he performed under fire from Merck.  Tr., pp. 24-28.

Weinberg had another reason to travel to Australia, however.  As his time entries reflect, he also participated in the trial while Merck presented its case.  Just as Weinberg knew that the plaintiffs had to develop their case in order to survive in the well-informed world of Vioxx litigation, he also knew that Merck needed to develop its experts and theories on an ongoing basis.  In the Australia trial, Merck used a US biostatistician, one who could  be used again in TPP litigation.  By attending the trial, Weinberg gained valuable insights into Merck's changing scientific theories, against which he and Dr. Madigan set to work *after the trial*, as his time entries and emails also show.  *See,* Exh. A, pp. 52, 57, 61-64. This work was undertaken for the purpose of producing a benefit to the private TPP actions, which at the time, were the Vioxx

cases that were moving forward most aggressively.  And as the FAC allows, this movement was occurring in NJ, not in the MDL.  At the time of this Court's March 5, 2009 Vioxx status conference, all private MDL TPP cases remained stayed- "settlement related."

Finally, this Court cannot overlook, as the FAC does, the fact that before the Australian verdict was partially overturned, the plaintiff achieved one of the few Vioxx wins anywhere. The effective testimony by a US expert Merck knew would be used in US TPP cases against a US expert Merck intended to use in US TPP cases cannot be written off as insignificant. Mr. Seeger attempted to undercut its obvious significance by testifying that there was no mention of the Australia litigation in the TPP settlement negotiations with Merck.  Tr., p. 76.  If that is true, shame on the plaintiffs' negotiating committee for not making use of it.  But, Merck's silence on the Australia case does not establish that it was not influenced by it, for parties seldom play up their weaknesses in negotiations.   Logic defeats Mr. Seeger's contention that his crushing loss in *Local 68* had a greater impact than the win in which Weinberg participated.

As further evidence that Madigan's and Weinberg's common benefit effort was successful and led to greater under understandings of Merck's potential liability, this Court can take notice that Drs. Madigan and Egilman have since been enrolled as an expert in several AG and class action cases, some of which have also proceeded to substantial settlements.

Weinberg's submissions detail extensive work on one of the most difficult aspects of the TPP litigation, the scientific proof of liability and damages.  That work was requested, monitored, and lauded by Liaison counsel, who cannot now say that the work did not contribute to the common benefit.

### C. The Reductions of Weinberg's Compensable Hours by the FAC and the Special Master Are Unreasonable and Unwarranted.

Having adopted Mr. Seeger's view that "a significant portion" of Weinberg's time was not compensable, Master Juneau set about determining how much was compensable.

In this regard, the FAC offered patently unreasonable formulations.  In its pre-hearing brief, the FAC dismissed 85% of Weinberg's work out of hand because, allegedly "as he concedes," "the vast majority" of his time "was spent working with two experts, Dr. John Kostis and Dr. David Madigan on matters related to Mr. Weinberg's ongoing analysis of Merck's Alzheimer's Studies and Dr. Madigan's testimony in the personal injury action in Australia."  R. Doc. 64398, p. 4.

Weinberg conceded no such thing, and his time records, had the FAC studied them, prove otherwise.  The approximated 85% of Weinberg's time spent working with experts included the following, not just the two the FAC selected:  Curt Furberg; David Madigan; Patrick O'Connor; David Egilman; Jerry Avorn; Howard Brod (d); John Kostis; Karl Herrup; Bruce Psaty; Harlan Krumholz;Teresa Kauf (d); Mike Schwartz (d); John Colaizzi (d); Mark Rubino (d); Elan Rubinstein (d); David Nash (d); Mark Woodward; Julie Donahue (d); Brennan Spiegel; James Wright; J. Scott Armstrong (d); Kip Piper (d); Dennis Tolley (d); and Joseph Couto (d).  *See* R. Doc. 64044, Exh. A.  The letter "(d)" designates an expert on the issue of damages.  Some of these experts were merely explored as possibilities, while others, the time records show, worked at length on TPP issues.  In any case, Weinberg's detailed time records show he  devoted significant time and effort to expert issues in TPP, far beyond his work with Madigan and Kostis.

As to Drs. Madigan and Kostis, the FAC argued that Weinberg, having worked with these experts before on certain subjects [the Alzheimer's studies, as analyzed by Drs. Madigan and Kostis]," R. Doc. 64398, p. 4, could not be compensated for additional work on these subjects ever again, even though new and progressive work was done long after the PI settlement, and those subjects were as relevant to the TPP litigation as they were to the PI litigation.

To begin with, the argument is completely disingenuous, for the Vioxx Plaintiffs' Steering Committee ("PSC"), which includes several members of the TPP FAC, has actively sought common benefit reimbursement not only for work on the same topics, but for *exactly the same work.* For example, as the Court is well aware, in the Pennsylvania AG action, the PSC has sought a common benefit assessment on the ground that "[t]he Commonwealth and its attorneys were provided a detailed road map and evidence collected and assimilated by the PSC that formed the basis of all claims against Merck." R. Doc. 64205-1, p. 2. In other words, the PSC is advancing the *exact same* work for which it was fully compensated in the PI allocation as a basis for the allocation of common benefit fees to it in the Government TPP actions. *See, id.* at 2-3, 9.

Aside from this bit of hypocrisy, the FAC's argument that Weinberg should not be paid for new work just because it involved a subject previously worked on is simply wrong. First, the TPP litigation is not entirely different and distinct from the PI litigation; some issues are notably different, but many of the underlying issues are similar. If the Court cannot take judicial notice of this fact, the PSC's own argument that Pennsylvania settled its TPP action on the strength of the PSC's work in the PI litigation should put it to rest. Second, the suggestion that work on the same subject cannot be new enough to warrant common benefit allocation overlooks the significance of the precise contributions which Weinberg– and Weinberg *acting virtually alone* – made to the private TPP litigation. A review of the time records submitted in the TPP allocation shows that no one else did the sort of scientific analysis that Weinberg did– the precise work which he was in fact brought in to do.

In the June 20th hearing, Mr. Seeger dropped the FAC's 15% formulation, which would have awarded Weinberg about $170,000, to zero. As noted above, Mr. Seeger said zero was the right number because no one knew of anything Weinberg did "that was truly third-party payer

related." Tr., p. 83.  Then, he conceded that having listened to Mr. Weinberg's testimony and looked at the documents, "it appears . . . that he has attended meetings. . .and there may be some work there."  *Id* at 84.

Special Master Juneau split the baby between the FAC's appalling $170,000 offer and Mr. Seeger's ludicrous zero-plus-meetings.  He arrived at a sum of $135,000 by highlighting those time entries which he deemed compensable.  Report, Exh. 4.  He did not explain how he chose the highlighted entries and the highlighting reveals no inherent rationality.   It includes entries for Weinberg's supposedly worthless work, such as the entry of 2/7/08, relating to Weinberg's working paper, which the FAC and Mr. Seeger blasted as useless, *see,* Tr., p. 77. And it excludes entries which are obviously compensable, such as Weinberg's 3/18/09 entry, "Review Court decision denying class certification in Kleinman/Martin v. Merck."  This was a critical decision by Judge Higbee for which Seeger and multiple other CBF applicants logged unchallenged time.  *See, e.g.,* Exh. C, Seeger Weiss, 3/18/09 (DPK).  Other oversights include case management conferences with Judge Higbee, some of which were allowed, (3/25/09), and others disallowed (4/15/09), for no discernable reason, and contrary to Mr. Seeger's concession that Mr. Weinberg "attended some meetings."

Indeed, the only coherent factor among the Special Master's highlighted entries is that each contains the letters TPP; further supporting this bizarre selection methodology is the fact that none of the unhighlighted entries contain the letters TPP, except those reflecting legal research or document review, all of which have been excluded.  For example, the 2/7/08 entry related to Weinberg's working paper contains the letters TPP; he had multiple additional entries for this ongoing effort, none of which contained the letters TPP and none of which were highlighted, *see,* entries for 12/11-12/18/08.

Is it possible that the Special Master thought he could help Mr. Seeger identify the hours

that were "truly third-party payer related" by isolating those referring explicitly to TPP?  It goes without saying that if this was really the Master's approach to determining allowable hours, it contributed nothing to the allocation analysis, for Weinberg has sworn that *all* of his time entries related to the TPP litigation, so that the use or omission of those identifying letters in any given entry was essentially meaningless.

The irrationality of the highlighting is visible on the first page of the Master's Exhibit 4. An 11/20/07 entry relating to FOIA work, in which the letters TPP are used, is highlighted; but four subsequent entries related to the FOIA litigation, for 11/21, 11/26, 11/28, and  11/29, in which the letter TPP are not used, have been excluded.   All of this work related to the same effort, to secure new documentary evidence from the FDA in aid of Weinberg's scientific analysis.  Including the discussion with a US Attorney on the matter (11/20), while excluding mediation with the court (11/29), is completely unreasonable.  Moreover, it is *unreasoned*, as the Master offered no explanation for his choices.  The FOIA action, Weinberg's submission shows, was ultimately successful, yielding documents which Weinberg then incorporated into his analyses.  Neither Mr. Seeger nor the FAC in brief challenged the usefulness of Weinberg's FOIA time, of his legal research, nor of his document work, all of which were clearly supportive of his development of legal and scientific theories of causation and damages.  Therefore, nothing in the record supports the unexplained conclusion by the Special Master that such time did not contribute to the common benefit.

To be sure, the Special Master's highlighting demonstrates no reference to the *Johnson* factors which this Court has considered essential to a proper evaluation.  *See,* PTO 6(D), p. 2. For example, Weinberg billed time preparing for and second-chairing corporate representative depositions, difficult work which has warranted multipliers in prior allocations.  *See,* Exhs. D-1 and D-2.  Here Mr. Seeger did not address such efforts, and the Special Master disallowed the

entries without comment.   As noted above, Fifth Circuit precedent requires consideration of "the time worked and the *Johnson* factors."  According to this standard, 9/10 of the time worked cannot be simply deleted without explanation.

Neither the FAC nor the Special Master have conducted an appropriate evaluation of Weinberg's work.  At this point, the only right and fair allocation would accept Weinberg's sworn and credible submissions, which demonstrate a legitimate and comparatively worthwhile contributions to the common benefit.

**IV.    The FAC's Recommendations to Others, Which Double-, Triple-, and in Some Cases Quadruple-Compensate for Time Spent by Attorneys and Paralegals Alike, Demonstrate That Weinberg Is Entitled to at Least the Single Compensation of His Lodestar.**

Although the Court directed the Special Master to recommend only "the amount that the remaining objectors should receive," rather than a full allocation for all applicants, R. Doc. 64304, at 4, the comparative review required in allocation cases nonetheless demands review of both the FAC's excesses and its deficiencies.  Since the Court is required to allocate a fixed sum, the amount one claimant receives can only be evaluated in relation to what other competing claimants are receiving.  For example, it might be fair for one claimant to "take a haircut" on his allocation, if all other claimants likewise were undergoing a similar shave. But, if other claimants are receiving top dollar, and in some cases more than top dollar, then a buzz cut to one is difficult to justify.  The Fifth Circuit has expressly held that in these matters, the Court cannot allocate fees to a given claimant in a vacuum, and without relativity or comparison to the amount competing claimants are due to receive.   *See In re High Sulfur Content Gasoline Products Liability Litigation, supra.*  Accordingly, it is both appropriate and necessary to look at the FAC's other recommendations to determine whether Weinberg is being treated equitably. Such a review reveals that this is not the case, as some claimants are getting lodestar and mammoth lagniappe, while Weinberg has been given a buzz-cut, ostensibly because there are insufficient

funds available to compensate him.

For example, the Levin firm submitted a ledger which included the entire kitchen sink of its non-personal injury time entries, including work on Stratton, mandamus, Snapka, Turner Branch, Becnel, and other matters. Recognizing the clear impropriety of including such entries in its TPP submission, Levin highlighted its TPP time, and noted, "[o]nly highlighted time is included in the current fee petition for third party payor common benefit fees." R. Doc. 64206, Attachment B. The highlighted time sums to a mere 33 hours, a small fraction of the overall ledger. But the FAC took no notice of this essential footnote, having never looked at the ledger. Additionally, Levin, too, forgot about its footnote and claimed *all the time on the ledger.* Accordingly, the FAC based the recommended award on the *full ledger lodestar of $658,850, all but 33 hours of which were completely unrelated to the TPP litigation.* Noting that Levin had also *previously submitted and been compensated for this time in the personal injury action*, the TPP FAC recommended a "reduction" in the TPP award to $650,000. *See* R. Doc. 63928, at 19. For the 33 hours devoted to the TPP matter, then, the FAC recommended that Levin be compensated at a rate of $19,709/hr., notwithstanding that the firm has previously been fully compensated for the time.

After Weinberg pointed out this extraordinary defect in the Levin submission, Levin sought to add 2130 hours of work previously submitted – and compensated – in the personal injury action. *See* R. Doc. 64235-5, at 2. According to Levin, the FAC recognized that this work contributed to the TPP settlement and so made its "appropriate" recommendation of compensation almost entirely duplicating the award in the prior case. *Id.,* at 2-3. The FAC submitted this declaration by Levin without comment in its February 1, 2013 Response, *see* R. Doc. 64235-2, as if this Court had not expressly directed inquiry into such duplication, as if Levin had not concealed such duplication in its submission contrary to the requirements of PTO

57, and as if the FAC had not also concealed the duplication from the Court in its recommendation. When Weinberg noted his dissatisfaction with this explanation, the FAC excoriated him for refusing to accept the "stubborn. . . fact" of its judgment that double-compensation was appropriate. R. Doc. 64424, p. 6. As Weinberg has noted, he can identify another 1680 hours of his time, previously compensated in the personal injury distribution, which likely contributed far more to the TPP settlement. If Levin's hours are duplicated, so must Weinberg's be.

In the case of Seeger Weiss, statements in its submissions are conflicting with regard to whether it was previously compensated for the time submitted for TPP common benefit allocation.[6] Seeger contends that it was not previously compensated for some 8800 hours devoted to the TPP. *See* R. Doc. 64235-4, The FAC supports Seeger's contention that the *Local 68* time was "not considered" in making the personal injury award. *See* R. Doc. 64235-2, at 2. But unlike Seeger, the FAC suggests that some of the TPP time *was submitted in the PI case, but "only" halfway compensated:* Seeger "incurred a total of $9 million in TPP time and submitted less than half of this time in conjunction with the Court's previous common benefit proceedings." R. Doc. 63582, at 3. Whether Seeger previously submitted some of its time or not, that is, whether the "true" lodestar is $4.5 million or $9 million, this is a staggering award for a case which did not develop beyond class certification. More significant to the present inquiry is the question how much of that time conceivably served the common benefit.

---

[6] In accordance with this Court's guidelines, the submission form inquired of all claimants, "Has the Vioxx MDL Court, or any other Court, already awarded you or your firm common benefit fees for Vioxx TPP-related work?" Seeger answered this question, "No." *See* R. Doc. 64206, Attachment A. However, the form also instructed, "Provide the number of hours and amount of lodestar included in your claimed total TPP common benefit hours and lodestar that you previously submitted for consideration by the Court in conjunction with its prior award of common benefit fees." To this question, Seeger responded that 8,828 hours were previously submitted for a lodestar of $4,202,858.75. *Id.* This represents *all* of the hours submitted in connection with the TPP. The suggestion, then, is that although the hours were previously submitted, they were not previously compensated. In its original recommendation, the TPP FAC states "Seeger Weiss LLP now asks the Court to consider that it had incurred a total of $9 million in TPP time and submitted less than half of this time in conjunction with the Court's previous common benefit proceedings. R. Doc. 63582, at 3.

Mr. Seeger testified that *Local 68* was "incredibly significant" and "the hammer over Merck's" head.  Tr., p. 70.  As noted above, Mr. Schultz disputed that claim, as do the facts this *Local 68* was ultimately untriable, leaving Weinberg and the rest the New Jersey team scrambling to ready other cases for trial, with new experts, new theories, and new evidence.  But, even accepting Mr. Seeger's assessment, it is impossible to value the common benefit of one decertified class action at *nine million dollars.*   The total amount billed by *all the rest of the New Jersey applicants*, for readying multiple new TPP cases for trial, is under three million altogether.  And the FAC has disallowed or deeply discounted those new claims, to accommodate its recommendation that Seeger Weiss, which has *already* received $4.5 million for *Local 68*, receive *another $4 million.*

The enormous overvaluation of the *Local 68* contribution is exacerbated by the fact that Seeger was not the only firm for which the FAC recommended substantial awards in connection with the failed *Local 68* class action.  Lieff Cabraser also logged a considerable number of hours in the failed action.   Even more disturbingly, years after the case had been lost and *months after the TPP case had been settled*, Dugan claimed to have devoted more than 100 hours to "reviewing the [*Local 68*] record"– for what purpose it is impossible to guess.  But the FAC recommended that some $50,000 of such time by Dugan be fully compensated, in addition to the millions for Seeger and a substantial award to Lieff Cabaraser.  *See* R. Doc. 63569, Exh. D, Dugan, at 2,4,5, 67-69.   Everyone piled into the *Local 68* bandwagon because it was one of the very few TPP cases litigated anywhere.  But by September of 2007, when the TPP cases were just gearing up, *Local 68* was already dead in the water.

Herman logged time for *Local 68*, too, twice or more.  Indeed, the Herman firm doubled up on numerous entries.  That firm calculated its TPP time in two separate exhibits. It formulated "Exhibit 2" by running five separate reports based on its submissions to Garrett. The first report

searched for the term "TPP," *see* R. Doc. 64206, Att. C-1, at 1-18; the second for the terms "third party" or "3rd party," *see id*., Att. C-2, at 1-19; the third for "NJ" or "New Jersey," *see id*., Att. C-3, at 1-16; the fourth for "local 68," *see id*., Att. C-4, at 1-1; and the fifth for "AG" or "Attorney General," *see id*., Att. C-5, at 1-32.  Herman then added the time for each of these reports: 163.25, 140.5, 116.5, 5, and 352.5, and submitted 601.75 of the total 777.75 hours[7] for a TPP lodestar compensation of $425,613. It formulated "Exhibit 3" by running the same searches. *See id*., Att. D. The purpose of this second set of reports is not clear. Theoretically, perhaps, Exhibit 3 drew from a different period of time; but in actuality, there is tremendous overlap between the exhibits, both in timekeepers and their time entries for identical dates.  Exhibit 3 produced another 719 hours of time for  compensation of $555,487.50.  *Herman then combined the overlapping Exhibits 2 and 3 for a total submission of $981,100.* The TPP FAC "reduced" this claim to $950,000 in its recommendation.

Compounding the error in submitting AG time and expenses for TPP fund reimburse-ment, Herman submitted many of its AG hours *two, three, or even four times*. As noted above, Herman calculated its hours by running multiple reports, searching for words such as "AG" or "TPP."  However, a cursory review of Attachment C(1), which is supposedly the TPP report, shows that the term "AG" or "Attorney General" appears in more than forty entries. When Herman ran its "AG" report, it *repeated* each of those entries. *Compare* R. Doc. 64206, Attachment C-5. The same duplication occurred with virtually *every term* for which Herman searched. Then, when Herman generated its Exhibit 2 from the *same word searches*, for every overlapping date between Exhibits 2 & 3– and there are many– it at least *doubled* its time; *but where the time entries are already duplicated by overlapping searches, Exhibit 3 **quadrupled***

---

[7]The discrepancy in hours is explained by the fact that Herman "only" charged half of the hours appearing on C-5, its AG run. As discussed *infra,* Herman more than made up for this "deduction" by charging many of those hours four times. Moreover, reducing the AG hours by half (even apart from the complication of then multiplying them by four) does not bring the AG time to the zero contemplating by this Court for claims against the TPP fund.

*those entries.* R. Doc. 64206, Attachment E, *en globo,* provided an example of time (1.5 hrs. billed *four* times by Russ Herman for AG and TPP work on 12/29/08). Because such "AG" time should not have been charged even *once* against the TPP fund, its *quadrupling* is completely unconscionable.

Many other entries are obviously not related to the TPP. While it impossible due to page constraints to list them all, two examples document the point. There is a 5/2/2011 entry for RLV, "Draft/revise and finalize FAC opposition to Objectors' motion re: 3rd Party Payors." Since there were no Third Party Payor Objectors at that time, this entry plainly relates to the personal injury litigation, in which the FAC filed such an opposition. Additionally, in searching for "New Jersey" time, the firm drew up *several years'* worth of time related to the New Jersey PI actions. *See* R. Doc. 64206, , Exh. C-3, at 1-9.

The Herman firm selectively responded to Weinberg's criticism. It contended that it compensated for quadruple-billing some of its time – for example, the combined AG/TPP time– by halving those entries. *See* R. Doc. 64235-3, at 3. Weinberg had acknowledged as much in his criticism. *See* R. Doc. 64206, n. 4. But Herman's math still left much to be desired: the application of a multiplier of 4 to a great deal of time cannot be corrected by dividing some of that time by 2, especially, when some of the time was AG time which should not have been included at all.

More accommodatingly, the firm also "adjusted" its lodestar downward by $275,000. *Id.,* at 10. *But the FAC did not adjust its recommended allocation to the firm by a whit*, making the $275,000 adjustment to Herman's time strictly gratuitous, as it had no apparent bearing on a $950,000 recommendation.

Herman was not the only firm to charge its AG time. Such time appears to be heavily represented in the Dugan entries as well. The TPP settlement was finalized on September 14,

-42-

2009, *see* R. Doc. 63928, at 2, although firms like Dugan, which were actively involved in the negotiations, surely knew that the deal was done by mid-summer.  As noted above, in late September, October, and November, 2009, firm members entered more than 100 hours of time for items like "discovery," and review of documents from Seeger's failed *Local 68* case, which been concluded for two years.   $27,300 of that time was entered by associates and paralegals after the TPP settlement.   *See* R. Doc. 64206, Attachment E. Considering that the TPP had been settled, such entries clearly relate to the AG litigation, in which the firm was deeply involved.

Mr. Dugan disputed this charge, and the FAC accepted his bald statement that AG time had not been included in his TPP submissions.  R. Doc. 64424, p. 10.  Mr. Dugan's unsworn statements are not credible.  He claimed to have hired Dr. David Kessler, former commissioner of the FDA, as his expert in the private TPP litigation, and he billed tens of thousands of dollars to private TPP for trips in 2009 to visit Dr. Kessler in San Francisco and New York.  However, Dr. Kessler testified in his January 2010 AG deposition that the only Vioxx case he had been retained in was that one.  He also said that he did not get any Vioxx documents to review until he came to New Orleans in June, 2009 (by which time Mr. Dugan likely knew that TPP was nearing settlement). Exh. E, pp.5-11.   Dr. Kessler also said that he had been paid about $90,000 the AG case.  *Id.* at 18.  It appears he was paid approximately $97,790 from the MDL Government Action Litigation Fund by three separate checks in October and November of 2009.  But as noted in n. 8, *infra*, the FAC reneged on its promise to provide discovery about the use of the fund.   The point is that Kessler testified, honestly, that he was only retained to be an expert in one case - for the State of Louisiana.  He only met with counsel one time - in NOLA.  The record appears to show that Dr. Kessler's bills for services rendered through November 2009 were paid by the MDL Government Action Fund. Yet Dugan's TPP  records show that he billed for numerous meetings with Kessler.

Nothing in this Court's orders suggests that any AG time is compensable out of the TPP common benefit fund, nor should it be.  Weinberg, who has also been heavily involved in the governmental actions, adhered to this Court's instructions and did not submit AG hours for reimbursement out of the TPP fund. And, as noted above, to the extent that there is any overlap of TPP and AG hours in what he has submitted (some few hours of his work benefitted both private and public TPP claims), he will not seek reimbursement for those hours from any AG common benefit funds.

In addition to inclusion of hours expended on matters other than TPP work, as with Herman's (and most FAC members' submissions), there are also multiple individual entries that are suspicious, such as Mr. Dugan's reported time for the single day of 5/28/09, which totaled *27.5 hours.* S*ee id.*   Again, Mr. Dugan sought to rectify the error by declaring "as to the assertion that 27.5 hours was billed in a single day Mr. Dugan would agree that there was a typo and that it should have been 7.5 hours."  R. Doc. 64424, p. 10.  The FAC added, "even with this minor adjustment, he should be given his full reward [sic]." *Id.*

The point here is not the twenty hours, although we disagree with the FAC that an acknowledged 20-hour mistake warrants no adjustment.  The point is that Dugan's entries are wildly suspicious on their face, bringing into question whether the FAC conducted any review of any submissions save the objectors'.  And, the 27.5 hour issue only serves to exacerbate that concern.  For the day in question, Mr. Dugan logged the following time in ten separate entries: 7, 7, 2.5, .5, 4, 2, .25, 2, 2, and .25.   These ten entries total 27.5, *but there is not a single entry for more than 7 hours and thus none that can be singly adjusted to 7.5 to correct the "mistake."* What this shows is that neither Mr. Dugan nor the FAC were concerned enough by the error *even to look at the records attached to Weinberg's pleading*.   Thus, the "typo" excuse was obviously fashioned from wholecloth, as probably was Dugan's entire TPP submission.  Using limited

space to list the individual errors would be myopic, as there is a much larger issue with regard to the Dugan allocation.

Looking at Dugan's single time entries is hardly warranted when it appears that *most of his firm's time is duplicated.* Up until the settlement of the private TPP litigation, Dugan was a member of the Murray firm. Consequently, Murray claims that Mr. Dugan's time belongs to it. *See* R. Doc. 63569, Exh. D, Murray, at 100. In its submission, Murray noted that Dugan refused to coordinate his submissions for common benefit fees. Therefore, *it expressly warned the FAC to be on the lookout for duplications in the two firms' submissions*. *Id.,* at pp. 1-2.

The FAC paid no apparent heed to this warning. If it had, it would have noted that Dugan submitted 255 hours of time for Plymale, another former employee of Murray, whose time was *also submitted by Murray*. Worse, Dugan charges Plymale's time at *$545/hr.*, while Murray charges the time for *its employee* at *$400.* This raises a question about Dugan's charge of his own time at $595/hr. during the period when, as an employee of the Murray firm, he would doubtless have been billed at a considerably lower rate– as Plymale was. After Murray's heads up, such review ought to have been performed by the TPP FAC, but in spite of Dugan's gross duplication of time and inflation of rates, the FAC recommended an award close to the firm's full lodestar. Likewise, the FAC proposes to pay both Murray and Dugan for the *same* costs, which may have *already* been reimbursed out of funds Dugan received in the AG litigation.[8]

Mr. Seeger acknowledged in the June 20th hearing a "possibility" that the objectors would "have some gotcha moments where somebody made a mistake." Tr., p. 83. He allowed that these should be corrected, and invited the Special Master to do so. *Id.* But correcting the FAC's

---

[8] The single item of discovery Weinberg sought in this phase was a report of the use of the $600,000 paid by Merck in the Louisiana AG action (in which Dugan had a prime role, and for which he used the experts claimed as TPP costs). No information was provided, and it may be presumed that information within its control and withheld by Dugan is adverse to its claim.

mistakes was outside the Special Master's charge.  The gross mistakes in multiple submissions remain uncorrected and the FAC's recommended allocation remains unrevised.

## V.   CONCLUSION

The body of the memorandum addresses the FAC's bewildering lack of justification for denying Weinberg compensation for his significant contributions to the private TPP common benefit.  But bewilderment is strictly of matter of record.  Off the record, Weinberg is neither confused nor surprised.  The FAC has treated Weinberg here just like it did before, making "recommendations" for his allocation that are in reality negotiating numbers, not intended to be a proper evaluation of the value of his work: zero, then $450,000, then zero again, the last expressly characterized as an "offer," not a recommendation to the Court.

The Special Master accepted the FAC's incredible assertion that "most" of Weinberg's time was worthless; but in excising 9/10 of the submitted time, the Master made no discernable judgments about what time was compensable and what was not.  The unexplained exclusion of entries relating to case management conferences and participating in taking corporate depositions is utterly inconsistent with an application of the *Johnson* factors.  And indeed, the Master made no reference to those or any other factors beyond Mr. Seeger's uncorroborated and noncredible testimony.

Because there were no US trials and little formal discovery, Weinberg's work developing a viable theory of the case was among the most valuable work that was done in the TPP litigation. Certainly the failed class actions in New Jersey and California contributed nothing more to the common benefit. Yet the FAC has recommended top dollar for that work and for the work of firms that billed, double billed, and in some cases quadruple-billed largely administrative time. If it be true that some hours are worth more than others, Weinberg, who spearheaded the effort to develop evidence to support a viable theory for the TPP litigation,

evidence whose utility was proved by a jury verdict in Australia and by its ongoing development and use in the AG cases, deserves to be compensated at the top of the scale.

This Court is not new to allocation disputes. In *Turner v. Murphy Oil*, 592 F. Sup 2d. at n. 8, the Court cogently observed, "when a fee committee is appointed, the Court must maintain close supervision of the committee and 'closely scrutinize' any recommendation from the committee," citing *In re High Sulfur Content Gasoline Products Liab. Litig.*, 517 F.3d 220, 235 (5th Cir.2008). "This is so," the Court went on to say, "because there are conflicts of interest inherent in appointing a fee committee: the members of the committee suggest to the court a division of a limited fund among themselves and other firms. For every dollar counsel A would receive, that was one less dollar available for counsel B, C, D and so on. As a result, in order to substantiate and improve the amount allocated, counsel would necessarily have to denigrate and undermine the efforts of other counsel seeking part of the Common Benefit Fund. Further, sometimes once the "common enemy," in this case Murphy, is removed, plaintiffs' counsel have a difficult time coming to any kind of agreement and they begin to turn on each other." Id., n. 9.

In this case, we submit, things have progressed well beyond scrapping over a limited fund. The FAC's recommendations betray an almost complete lack of scrutiny of the submissions and of most objective factors that might have informed their recommendations. Rather, they apparently decided, based on submitted lodestar alone, who would get what. The real work began only when the objections came in. Then the FAC turned on the objectors. And rather than settle this dispute, the FAC has decided to make an example of the objectors, apparently because of the question of whether there can be any appeal.

Weinberg has made a solid, corroborated record of his substantial contribution to the TPP effort, work that he undertook at the express invitation of Mr. Seeger, who asked him to be part of his working group, and then denied under oath that Weinberg has any role in the TPP

litigation.  The Special Master accepted Seeger's testimony, because there was no ability to cross

examine, impeach, or introduce contradictory evidence. This Court has the benefit of all the

evidence, and Weinberg prays that it correct the gross injustice and inequity he is suffering

because he is not one of the "favored few" and has dared to challenge the FAC's insufficient

"offer" to him.

Respectfully submitted:


/s/ Robert E. Arceneaux                                            /s/ Margaret E. Woodward
_____          _____
Robert E. Arceneaux, La Bar No. 01199          MARGARET E. WOODWARD, La. Bar
ROBERT E. ARCENEAUX LLC                            No.13677
47 Beverly Garden Drive                                      3701 Canal Street, Suite C
Metairie, LA 70001                                              New Orleans, Louisiana  70119
(504) 833-7533 office                                          (504) 301-4333 office
(504) 833-7612 fax                                              (504) 301-4365 fax
rea7001@cox.net                                                mewno@aol.com


Pascal F. Calogero, Jr., La. Bar No. 03802
AJUBITA, LEFTWICH & SALZER, L.L.C.
1100 Poydras Street
New Orleans LA 70163-1950
(504) 582-2300 office
(504) 582-2310 fax
pcalogero@alsfirm.com

Attorneys for Law Offices of Eric Weinberg


## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum has been served on Russ

Herman by  e-mail, and by upon all parties by electronically uploading the same to Lexis Nexis

File & Serve in accordance with Pre Trial Order No.8, on this date, November 27, 2013.


/s/Robert E. Arceneaux
_____