Confidential - Subject to Protective Order

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
---oOo---

In re: VIOXX PRODUCTS       )
LIABILITY LITIGATION        ) MDL No. 1657
                            )
This Document Relates To:   ) SECTION L
                            )
   STATE OF LOUISIANA, ex rel.)
   JAMES D. CALDWELL, JR.   )
   Attorney General,        ) JUDGE ELDON E. FALLON
                            )
           Plaintiffs,      ) MAGISTRATE JUDGE
                            ) KNOWLES
   vs.                      )
                            )
   MERCK SHARP & DOHME CORP.,) Case No. 05-3700
                            )
           Defendants.      )
_____)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
THURSDAY, JANUARY 21, 2010

   Deposition of DAVID A. KESSLER, M.D., held at Lieff, Cabraser, Heimann & Bernstein, LLP, 275 Battery Street, 29th Floor, San Francisco, California, commencing at approximately 7:03 a.m., before KIMBERLEE SCHROEDER, CCRR, CSR No. 11414.

Golkow Technologies, Inc. - 1.877.370.DEPS

Exh. E

Confidential - Subject to Protective Order

Page 2

```
 1                  A P P E A R A N C E S
 2                        ---oOo---
 3   ON BEHALF OF THE PLAINTIFF'S STEERING COMMITTEE ON
     BEHALF OF THE STATE OF LOUISIANA:
 4
          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
 5        BY: DONALD C. ARBITBLIT, ESQUIRE
          275 Battery Street, 29th Floor
 6        San Francisco, California 94111
          (415) 956-1000
 7        E-mail: darbitblit@lchb.com
 8
     FOR THE DEFENDANTS MERCK SHARP & DOHME CORP.:
 9
          GOLDMAN, ISMAIL, TOMASELLI, BRENNAN & BAUM, LLP
10        BY: TAREK ISMAIL, ESQUIRE
          1 North Franklin Street, Suite 625
11        Chicago, Illinois 60606
          (312) 541-3000
12        E-mail: tismail@goldmanismail.com
13
     ALSO PRESENT:
14
          ALLEN HARBERG, ESQ.
15        MERCK & CO., INC.
          351 N. Sumneytown Pike
16        North Wales, Pennsylvannia 19454
          (267) 305-2449
17        E-mail:  allen_harberg@merck.com
18                        ---oOo---
19
20
21
22
23
24
25
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Exh. E

Confidential - Subject to Protective Order

Page 5

1  Louisiana.
2           I was asked to look at Merck's duty of care
3  and how it acted. That's my general understanding.
4      Q.  Do you have an understanding of what the
5  claims are that have been alleged by the State?
6      A.  I was told that when I first was contacted. I
7  have some general understanding of that.
8      Q.  Can you tell me what your understanding is?
9      A.  My understanding is that there are individuals
10 on behalf of the State of Louisiana who purchased the
11 drug, and purchased it under conditions that it believed
12 that had it had other information about the drug and
13 other understanding, it would not have purchased the
14 drug.
15     Q.  What individuals from the State of Louisiana
16 are you referring to in your prior answer?
17     A.  I believe that it involved individuals who
18 used State funds to purchase the drug.
19     Q.  When was the first time you were contacted in
20 any Vioxx-related litigation to serve as an expert?
21     A.  It was in this case. There was no prior
22 contact, prior to this case, this matter.
23          I do not have a specific recollection
24 about the date that I was contacted.
25          It was -- my guess is it was last year. It

Golkow Technologies, Inc. - 1.877.370.DEPS

Exh. E

Page 6

1  probably was before June of last year, but I don't have
2  the specific date when I was contacted.
3      Q.  Do you have any documentation that would help
4  you identify better when you were first contacted?
5      A.  No.
6      Q.  But just so I'm clear, your first contact from
7  any individual with regard to you serving as a witness
8  in Vioxx litigation occurred in 2009?
9      A.  2009.  It's possible that call came in late
10  2008.  I have no recollection of when that call came in.
11          My first recollection besides a phone call
12  contact was I was asked to come meet with the lawyers,
13  and those lawyers both for the State and for the
14  Plaintiffs, representing the Plaintiffs in this case in
15  Louisiana.
16      Q.  I want to talk about those conversations in a
17  minute.  But just to tie up your initiation of the Vioxx
18  litigation, were you aware that you had been designated
19  as an expert witness on behalf of Plaintiffs in 2006?
20      A.  I was not aware of that.  Let me correct this.
21  I do not believe I was aware of that.  I have no
22  recollection of that.
23      Q.  All right.  Besides, as you sit here today,
24  you don't recall doing any work related to Vioxx prior
25  to your involvement in the case brought by the State of

Confidential - Subject to Protective Order

Page 7

1  Louisiana?
2      A.   You used the word "work."  Can you define
3  "work," sir?
4      Q.   Do you recall doing any activities on behalf
5  of any lawyers involved in the Vioxx litigation prior to
6  your retention to serve as an expert --
7      A.   I have no recollection of that.  I don't
8  believe that's the case.
9      Q.   Just to finish my question, retention as an
10 expert for the State of Louisiana?
11     A.   No.  No prior work.
12     Q.   Who first contacted you to be a witness in
13 this case?
14     A.   It could have been either James Dugan or his
15 colleague, Doug Plymale, one of the two.
16     Q.   You had worked with Mr. Dugan previously?
17     A.   In a previous -- yes.
18     Q.   Is that the Neurontin litigation?
19     A.   Yes, it is
20     Q.   Any other work you've done previous with
21 Mr. Dugan, other than the Neurontin case?
22     A.   No.
23     Q.   Was Mr. Plymale also involved in that
24 litigation?
25     A.   Yes.  I believe so.

Golkow Technologies, Inc. - 1.877.370.DEPS

Exh. E

Confidential - Subject to Protective Order

Page 8

1    Q.   What was -- as best you can recall, what did
2  Mr. Dugan tell you, and what did you tell him?  Or if it
3  was Mr. Plymale, what he told you and what you told him
4  in that first phone call?
5    A.   I don't really have a memory of that first
6  phone call.
7    Q.   Did you agree to serve as an expert at that
8  time?
9    A.   Don't have a memory of that phone call.
10   Q.   What's your -- you mentioned that you went and
11 met with the lawyers for the State?
12   A.   I believe -- yes.  There were lawyers for the
13 State in the room.
14        There were several lawyers there for the
15 State.  I believe they were representing the Attorney
16 General's Office of Louisiana.
17   Q.   Where was that meeting?
18   A.   My recollection, it was in Mr. Dugan's office.
19 And I believe we went to lunch shortly thereafter.
20   Q.   What is -- when did that meeting take place?
21   A.   Again, I believe I said it was June.
22   Q.   Okay.  Had -- prior to that meeting, had you
23 agreed to serve as an expert?
24   A.   I said I do not -- I do not have a
25 recollection of when I specifically agreed to serve as

Confidential - Subject to Protective Order

Page 9

1  an expert.
2       Q.   What was discussed during the meeting you had
3  in New Orleans?
4       A.   My recollection was that the complaint, and
5  started to see some documents in New Orleans.
6       Q.   Did you walk through the allegations of the
7  complaint during that meeting?
8       A.   Walk through?  I saw the complaint.  I don't
9  think I -- there was some discussion of the complaint.
10 I'm not sure I walked through the entire complaint.
11      Q.   Prior to your meeting in New Orleans, had you
12 reviewed any documents relating to your opinions in this
13 matter?
14      A.   Sir, let me -- I'm not -- let me answer that
15 and see if I understand your question.
16           I reviewed -- I certainly -- I've written --
17 cited documents with colleagues jointly that involved
18 Vioxx.  Okay.  Those, I was -- so I was aware of certain
19 public understanding, certain documents cited then in
20 certain legal writings.
21           But when I began to review documents to the
22 extent that it's in this particular matter, I certainly
23 had that background of years ago, and it certainly, as
24 any human, it would influence me to some extent, that
25 prior background.

Golkow Technologies, Inc. - 1.877.370.DEPS

Exh. E

Confidential - Subject to Protective Order

Page 10

1           But I base my report and my opinion on the
2  documents that I subsequently reviewed, but obviously
3  had a background in some of the more general issues.
4  The issues that were -- those things were publicly
5  available prior.
6        Q.   Is the prior article you're talking about your
7  law journal article on preemption issues?
8        A.   Yes.  Coauthored with David Vladeck.  I
9  believe there were also citations to Vioxx in the amicus
10 brief.
11       Q.   Prior to -- so prior to your meeting in
12 New Orleans, you had not received documents from the
13 Plaintiff nor done a literature review specific for your
14 opinions in this case; would that be fair?
15       A.   That would be fair.
16       Q.   So the first documents -- withdrawn.
17            Have you signed a protective order agreeing to
18 an undertaking and maintain confidentiality?
19       A.   I assume I have.  I have to review the actual
20 file, sir.  I don't have a specific recollection.  I can
21 visualize that document, but I believe I must have.
22       Q.   So the first company documents you saw that
23 weren't otherwise in the public domain relating to Vioxx
24 occurred no earlier than your June meeting in
25 New Orleans; would that be fair?

Golkow Technologies, Inc. - 1.877.370.DEPS

Exh. E

Confidential - Subject to Protective Order

Page 11

1    A.    That would be a fair statement.
2    Q.    Who do you recall in attendance at that
3    meeting?
4    A.    I believe it was Mr. Dugan, Mr. Plymale.
5    I don't have a recollection of the names of the
6    attorneys for the State of Louisiana, the A.G.'s
7    office.  I believe Mr. Arbitblit was there.
8    Q.    Was that your only meeting you had in
9    New Orleans?
10   A.    Yes, sir.
11   Q.    Do you recall what documents they showed you
12   in that meeting?
13   A.    No.  I don't have a specific recollection of
14   which documents at that meeting.
15   Q.    Do you recall any other -- the names of any
16   other attorneys you have spoken to with respect to this
17   matter, other than Mr. Arbitblit, Mr. Plymale,
18   Mr. Dugan, and the currently unnamed individuals from
19   the Attorney General's Office?
20   A.    I believe those are the individuals that I've
21   spoken to in this matter.
22   Q.    Have you been contacted by any other lawyer
23   involved in Vioxx litigation, other than those involved
24   with the Louisiana matter?
25   A.    It is possible that I have been contacted by a

Golkow Technologies, Inc. - 1.877.370.DEPS

Exh. E

Confidential - Subject to Protective Order

Page 17

1  A.  That would be helpful.
2      One was for a major United States
3  pharmaceutical company in developing its risk
4  management.  It's called RiskMAPs under the FDA.
5      Another one was to advise a major U.S.
6  pharmaceutical company on conduct and ethics with regard
7  to marketing practices.
8  Q.  Do you believe the identity of the
9  pharmaceutical companies that have retained you is a
10 matter of confidentiality?
11 A.  You know, I just don't have my recollection --
12 I don't know specifically here.  You know, I have to
13 check the file.
14 Q.  Is either of those engagements still ongoing?
15 A.  No.
16 Q.  Do you have any system by which you keep track
17 of the time you spend on an expert retention for
18 litigation?
19 A.  What I normally do is usually a piece of paper
20 or a scrap piece of paper, and I keep track, I list the
21 hours that I spend after -- I would just write it down.
22 Q.  How many hours have you spent on the Louisiana
23 matter?
24 A.  I wouldn't want to -- I would not want to
25 hesitate.  It should be on my bill to the firm.

Golkow Technologies, Inc. - 1.877.370.DEPS

Exh. E

Confidential - Subject to Protective Order

Page 18

1   Q.   Do you have your bill?
2   A.   No, I do not.  I hope -- Mr. Dugan was
3   supposed to be here.  I do not have the bill.  I'm sure
4   he would be happy to --
5   Q.   Sorry.  Were you done?  I didn't mean to cut
6   you off.
7   A.   No.
8   Q.   What's your best estimate of the amount of
9   money you have invoiced Mr. Dugan for in this matter?
10  A.   It was my recollection -- again, I've not
11  looked at this -- it was in 90 range of hours.
12  Q.   So around $90,000?
13  A.   In that range.
14  Q.   And that would be through what date?
15  A.   That was through -- that was -- again, I don't
16  have the specific date.  But probably through the
17  preparation of the report.
18  Q.   Have you spent additional time on this matter
19  since you submitted your expert report in November?
20  A.   Certainly, in preparing for today.
21  Q.   What did you do to prepare for today's
22  deposition?
23  A.   I read my report, I reviewed documents, and I
24  met with Counsel.
25  Q.   When did you do those activities that you just

Confidential - Subject to Protective Order

Page 47

1   about that you did not include in Exhibit 3?
2       A.   No.
3       Q.   When did you prepare your expert report?
4       A.   I don't have specific dates.  It would be
5   between the period of that June meeting and
6   November 5th.
7       Q.   When you record your time for -- withdrawn.
8            When you did record your time that you spent
9   working on this matter, did you note the activities that
10  you engaged in?
11      A.   No.
12      Q.   Did anyone review a draft of Exhibit 3 before
13  you signed it?
14      A.   For the purposes only of typographical errors
15  and for the accuracy of my citation numbers.
16      Q.   Who reviewed your -- a draft of your expert
17  report for typographical errors and citation accuracy?
18      A.   I believe I gave it to -- actually, I gave the
19  document -- transferred the document to a word processor
20  at Don's firm.  And I assume that I heard from Don
21  regarding those typographicals.
22      Q.   When you say you transferred the document to a
23  computer at Mr. Arbitblit's firm, did you e-mail it to
24  him?  Did you --
25      A.   No.  My recollection is I handed a thumb drive

Golkow Technologies, Inc. - 1.877.370.DEPS

Exh. E