# EXHIBIT

# A

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

RITA B. BARKER, SANDY L. BARTON,
LILLIE BEAVERS, LUCY BOATNER,
MARGIE COLBERT, SHERRY L.
COLLINS, MICHAEL P. COPAS,
JONATHAN DAVIS, CANDY
DIRICKSON, MABEL C. DUMBELL,
HUBERT ELLIS, CHERYL GILBERT,
PHYLLIS HAYDEN, ETTA R. JAMES,
FREDDIE L. JONES, JOAN
KASSABAUM, FRED KIRK, HARRY
LINLEY, ELIZABETH LOGWOOD,
SANDRA K. LONG, JOSEPH MICKELS,
NORMAN NELSON, JOHN PICKETT,
DONALD RAPPOLD, ANITA D.
RISNER, PETER A. RULO, JOHN
SMITH, RAYMOND JAMES SPARR,
JAMES LEE UNDERHILL, MARVA L.
VANHOOSER, SUSAN A. WALKER,
WANDA F. WEAVER, JODIE E.
WINKFIELD, ROBIN ROBINSON,
BRYAN UMSTEAD, VANETTA
WILLIAMS, WALTER COOPER, EARL
FOSTER, CARL SHINKLE, VIRGINIA
TACKITT, EDITH A. NEILL, TOBY
BELL, CURTIS JOHNSON, VELMA
PORTER, DIANN ARBOGAST, JOE
DAMRON, LURA RICHARDS, ROBERT
J. WHITE, JACK SCHAFFER, JAMES
COOLEY, BOBBY L. MOXTER, EDITH
H. PAULEY, WILLIE G. HELM

                    Plaintiffs,

        v.

MERCK & CO. INC.,

Serve:  Registered Agent
            The Corporation Company
            120 South Central Ave.
            Clayton, MO 63105

Cause No.: 052-99291
Division:

JURY TRIAL DEMANDED

**AMY SEPKO,**
Serve: Residence
           6622 Nottingham
           St. Louis, MO 63109

**SHERRY ALBERTS,**
Serve: Residence
           5855 Nina
           St. Louis, MO 63112

**JOHN AND/OR JANE DOES 1-100,**

Serve: Hold Service

                    Defendants.

## PETITION

COME NOW plaintiffs, by and through their undersigned attorneys, and for their petition against defendants state the following:

1.      This is a proceeding brought by plaintiffs seeking damages for personal injuries and economic damages suffered as a result of defective and dangerous pharmaceutical product Vioxx, which was manufactured, marketed, distributed and/or sold by Merck to the general public.

## THE PARTIES

2.      Plaintiffs are as follows:

3.      Plaintiff, Rita B. Barker is a 58 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a stroke in 2002 as a result of her use of Vioxx.

4.      Sandy L. Barton is a 36 year old female resident of the State of Missouri who obtained Vioxx from a Missouri physician. Plaintiff suffered a heart attack in 2003 as a result of her use of Vioxx.

5.     Plaintiff Lillie Beavers is 74 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2003 as a result of her use of Vioxx.

6.     Plaintiff Lucy Boatner is a 71 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack and stroke in 2003 as a result of her use of Vioxx.

7.     Margie Colbert is a 69 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2002 as a result of her use of Vioxx.

8.     Sherry L. Collins is a 54 year old female resident of the State of Missouri who obtained Vioxx from a Missouri physician. Plaintiff suffered a stroke in 1999 as a result of her use of Vioxx.

9.     Michael P. Copas is a 49 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2002 as a result of his use of Vioxx.

10.     Plaintiff Jonathan Davis is a male resident of the State of Missouri who obtained Vioxx from Sinks Pharmacy in Rolla, Missouri. Plaintiff suffered a heart attack in 2003 at the age of 32 as a result of his use of Vioxx.

11.     Plaintiff Candy Dirickson was the lawful wife of decedent Ricky Dirickson, Jr., who died as a result of his use of Vioxx, until the time of Mr. Dirickson's death. Plaintiff, as a member of the class of persons entitled to recover, has standing to institute and prosecute this cause of action under and by Section 537.080 at *et.seq.* of Missouri Revised Statutes, commonly known as the Missouri "Wrongful Death Statute". Decedent, Ricky Dirickson, Jr., was a resident of the State of Missouri at the time of his death. Decedent obtained his Vioxx

prescriptions from a Missouri pharmacy and suffered a heart attack and ultimately death on March 28, 2002 as a result of his Vioxx use.

12.     Plaintiff Mabel Christine Dumbell is a 58 year old female resident of the State of Missouri who obtained Vioxx prescriptions from a Missouri pharmacy.   Plaintiff suffered pulmonary embolism in 2003 as a result of her use of Vioxx.

13.     Hubert Ellis is a 68 year old male resident of the State of Missouri who obtained Vioxx prescriptions from a Missouri pharmacy.  Plaintiff suffered a stroke in 2001 as a result of his use of Vioxx.

14.     Cheryl Gilbert is a 55 year old female resident of the State of Missouri who obtained Vioxx prescriptions from a Missouri physician.   Plaintiff suffered cardiovascular injuries and strokes in 2001 as a result of her use of Vioxx.

15.     Plaintiff Phyllis Hayden is a 58 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy.  Plaintiff suffered a heart attack in 2002 as a result of her use of Vioxx.

16.     Plaintiff Etta R. James is a 73 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy.  Plaintiff suffered a stroke in 2003 as a result of her use of Vioxx.

17.     Plaintiff Freddie Lynn Jones is a 54 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy.  Plaintiff had a stent installed in 2001 as a result of his use of Vioxx.

18.     Plaintiff Joan Kassabaum is a 69 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy.  Plaintiff suffered a stroke in 2003 as a result of her use of Vioxx.

19.     Plaintiff Fred Kirk is a 65 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered heart arrhythmias and deep venous thrombosis as a result of his use of Vioxx.

20.     Plaintiff Harry Linley is a 53 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a stroke in 2003 as a result of his use of Vioxx.

21.     Plaintiff Elizabeth Logwood is a 69 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2004 as a result of her use of Vioxx.

22.     Sandra K. Long is a 49 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2004 as a result of her use of Vioxx.

23.     Plaintiff Joseph Mickels is a 61 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2004 as a result of his use of Vioxx.

24.     Plaintiff Norman Nelson is a 54 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2003 as a result of his use of Vioxx.

25.     Plaintiff John Pickett is a 57 year old male resident of the State of Missouri who obtained Vioxx from a pharmacy duly licensed in the State of Missouri. Plaintiff suffered a heart attack in June of 2003 as a result of his use of Vioxx.

26.     Plaintiff Donald Rappold is a 61 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2002 as a result of his use of Vioxx.

27.     Plaintiff Anita D. Risner is a 42 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2004 as a result of her use of Vioxx.

28.     Plaintiff Peter A. Rulo is a 46 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a stroke in 2000 as a result of his use of Vioxx.

29.     Plaintiff John Smith is a 57 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2004 as a result of his use of Vioxx.

30.     Plaintiff Raymond James Sparr is a 55 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a pulmonary embolism as a result of his use of Vioxx.

31.     Plaintiff James Lee Underhill is a 45 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack as a result of his use of Vioxx.

32.     Plaintiff Marva L. Vanhooser is a 62 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2004 as result of her use of Vioxx.

33.     Plaintiff Susan A. Walker is a 50 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a stroke in 2001 as result of her use of Vioxx.

34.     Plaintiff Wanda F. Weaver is a 58 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2000 as result of her use of Vioxx.

35.    Plaintiff Jodie E. Winkfield is a 40 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy.  Plaintiff suffered a stroke in 2003 as result of her use of Vioxx.

36.    Plaintiff Robin Robinson is a 43 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy.  Plaintiff suffered a heart attack in 2004 as result of her use of Vioxx.

37.    Plaintiff Bryan Umstead was the son of decedent Virgil L. Umstead, Jr., who died as a result of his use of Vioxx.  Plaintiff, as a member of the class of persons entitled to recover, has standing to institute and prosecute this cause of action under and by Section 537.080 at *et.seq.* of Missouri Revised Statutes, commonly known as the Missouri "Wrongful Death Statute".  Decedent, Virgil L. Umstead, Jr., was a resident of the State of Missouri at the time of his death.  Decedent obtained his Vioxx prescriptions from a Missouri pharmacy and/or physician and suffered a heart attack and ultimately death on November 1, 1999 as a result of his Vioxx use.

38.    Plaintiff Vanetta Williams is a 46 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy.  Plaintiff suffered a heart attack in 2002 as result of her use of Vioxx.

39.    Plaintiff Walter Cooper is a 52 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy.  Plaintiff suffered a stroke in 2004 as result of his use of Vioxx.

40.    Earl Foster is a 70 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy.  Plaintiff suffered a heart attack in 2004 as result of his use of Vioxx.

41.    Carl Shinkle is a 57 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy.  Plaintiff suffered a stroke in 2002 as result of his use of Vioxx.

42.    Virginia Tackitt is a 74 year old female resident of the State of Missouri who obtained Vioxx from a Missouri physician.  Plaintiff suffered a heart attack in 2003 as result of her use of Vioxx.

43.    Edith A. Neill is a 41 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy.  Plaintiff suffered a heart attack in 2001 as result of her use of Vioxx.

44.    Plaintiff Toby Bell was the grandson of decedent Annie Bell, who died as a result of her use of Vioxx.  Plaintiff, as a member of the class of persons entitled to recover, has standing to institute and prosecute this cause of action under and by Section 537.080 at *et.seq.* of Missouri Revised Statutes, commonly known as the Missouri "Wrongful Death Statute". Decedent, Annie Bell, was a resident of the State of Missouri at the time of her death.  Decedent obtained her Vioxx prescriptions from a Missouri pharmacy and/or physician and suffered a stroke and ultimately death on June 15, 2003 as a result of her Vioxx use.

45.    Curtis Johnson is a 35 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy and/or physician.  Plaintiff suffered a heart attack as a result of his Vioxx use.

46.    Velma Porter is a 67 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy and/or physician.  Plaintiff suffered a heart attack in 2004 as a result of her Vioxx use.

47.    Plaintiff Diann Arbogast was the daughter of decedent Theodore L. Arbogast, who died as a result of her use of Vioxx.  Plaintiff, as a member of the class of persons entitled to

recover, has standing to institute and prosecute this cause of action under and by Section 537.080 at *et.seq.* of Missouri Revised Statutes, commonly known as the Missouri "Wrongful Death Statute". Decedent, Theodore L. Arbogast, was a resident of the State of Missouri at the time of his death. Decedent obtained his Vioxx prescriptions from a Missouri pharmacy and/or physician and suffered a stroke and ultimately death on August 4, 2003 as a result of his Vioxx use.

48.     Plaintiff Joe Damron is a 71 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy and/or physician. Plaintiff suffered a heart attack in 2001 as a result of his Vioxx use.

49.     Lura Richards is a 70 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a stroke in 2000 as a result of her Vioxx use.

50.     Robert J. White is a 63 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2004 as a result of his Vioxx use.

51.     Plaintiff Jack Shaffer was the brother of decedent Sharon D. Cooley, who died as a result of her use of Vioxx. Plaintiff, as a member of the class of persons entitled to recover, has standing to institute and prosecute this cause of action under and by Section 537.080 at *et.seq.* of Missouri Revised Statutes, commonly known as the Missouri "Wrongful Death Statute". Decedent, Sharon D. Cooley, was a resident of the State of Missouri at the time of her death. Decedent obtained her Vioxx prescriptions from a Missouri pharmacy. Plaintiff suffered a cardiovascular injury which led to her ultimately death on November 17, 2003 as a result of her Vioxx use.

52.     Plaintiff James Cooley was the lawful husband of decedent Sharon D. Cooley, who died as a result of her use of Vioxx, until the time of Sharon Cooley's death. Plaintiff, as a member of the class of persons entitled to recover, has standing to institute and prosecute this cause of action under and by Section 537.080 at *et.seq*. of Missouri Revised Statutes, commonly known as the Missouri "Wrongful Death Statute". Decedent, Sharon D. Cooley, was a resident of the State of Missouri at the time of her death. Decedent obtained her Vioxx prescriptions from a Missouri pharmacy. Plaintiff suffered a cardiovascular injury which led to her ultimately death on November 17, 2003 as a result of her Vioxx use.

53.     Bobby Moxter is a 75 year old male resident of the State of Missouri who obtained Vioxx from a Missouri Pharmacy. Plaintiff suffered a stroke as a result of his Vioxx use.

54.     Edith H. Pauley is a 69 year old female resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a heart attack in 2004 as a result of her Vioxx use.

55.     Willie G. Helm is a 58 year old male resident of the State of Missouri who obtained Vioxx from a Missouri pharmacy. Plaintiff suffered a stroke as a result of his Vioxx use.

56.     Plaintiffs maintain that Vioxx is defective, dangerous to human health, and lacked proper warnings as to the dangers associated with its use.

57.     Defendant, Merck & Co., Inc. (hereinafter, "Merck"), is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at One Merck Drive, White House Station, New Jersey 08889.

58.     At all times relevant hereto, Defendant Merck engaged in the business of testing, developing, manufacturing, distributing, licensing, labeling and marketing, either directly or

indirectly through third parties or related entities, the pharmaceutical drug, Vioxx, in Missouri, Illinois, Kansas and throughout the United States.

59.      Defendant Amy Sepko (hereinafter, "Sepko") is a co-conspirator and employee sales representative of Merck in charge of selling, marketing and distributing Vioxx to the general public, as well as doctors and hospitals in the Missouri, Illinois and Kansas region for Merck. She is a citizen of the State of Missouri and resident of St. Louis City. Defendant Sepko was involved in a co-conspiracy and acted in concert of action in the tortious distributing, marketing, and selling of Vioxx used to treat arthritis and as a pain reliever throughout the Missouri, Illinois and Kansas region.

60.      Defendant Sherry Alberts (hereinafter, "Alberts") is a co-conspirator and employee sales representative of Merck in charge of selling, marketing and distributing Vioxx to the general public, as well as doctors and hospitals in the Missouri, Illinois and Kansas region for Merck. She is a citizen of the State of Missouri and resident of St. Louis City. Defendant Alberts was involved in a co-conspiracy and acted in concert of action in the tortious distributing, marketing, and selling of Vioxx used to treat arthritis and as a pain reliever throughout the Missouri, Illinois and Kansas region.

61.      Defendants John/Jane Does 1-100 are co-conspirators and Merck sales representatives in the Missouri, Illinois and Kansas region, in charge of selling, marketing and distributing Vioxx to the general public, as well as doctors and hospitals in the Missouri, Illinois and Kansas region. Defendants John/Jane Does 1-100 were involved in a co-conspiracy and acted in concert of action in the tortious distributing, marketing, and selling of Vioxx used to treat arthritis and as a pain reliever throughout the Missouri, Illinois and Kansas region.

62.      Defendants Sepko, Alberts, and John/Jane Does 1-100, were hired by Merck, acted in concert of action with Merck and/or conspired with Merck to promote the use of Vioxx

to individual doctors and hospitals in the Missouri, Illinois and Kansas region, as well as to the general public in those states, knowingly misrepresenting Vioxx as safe.

63.    In doing so, they engaged in tortious conduct by failing to disclose and/or affirmatively misrepresenting the safety of Vioxx with regard to heart attacks, strokes, and other cardiovascular events to promote the sale and distribution of Vioxx to individuals including the plaintiffs herein acting in concert of action and/or in conspiracy with Merck.  These actions included providing samples to doctors and hospitals throughout the Missouri, Illinois and Kansas region entering into formulary agreements, etc., as well as providing misleading and false material representations and omitting to disclose material facts as alleged below.  Furthermore, the tortious conduct in furtherance of the concert of action and/or conspiracy occurred in the City of St. Louis, State of Missouri.

64.    Plaintiffs purchased and/or obtained their prescriptions for Vioxx from duly licensed pharmacies, registered to do business in the State of Missouri, and/or duly licensed medical providers throughout the State of Missouri and specifically within the City of St. Louis.

## FACTS COMMON TO ALL COUNTS

65.    Vioxx is the brand name of rofecoxib, one of a class of drugs called "prostaglandins," which work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain. Prostaglandins are COX (cyclooxygenase) inhibitors; COX enzymes metabolize arachidonic acid to produce prostaglandins.

66.    Vioxx is a COX-2 inhibitor, which is designed to produce prostaglandins at inflammatory sites, and to produce prostacyclin, a vasodilator and an inhibitor of platelet aggregation.

67.     Defendant Merck submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-042 by the FDA.

68.     Defendant Merck also submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for oral suspension, at doses of 12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-052 by the FDA.

69.     On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

70.     At the time the drug was approved by the FDA the labeling for rofecoxib stated, in the section entitled "Special Studies -- Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

71.     The "Warnings" section of the labeling for rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) Effects -- Risk of GI Ulceration, Bleeding, and Perforation."

72.     Defendant Merck submitted NDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for rofecoxib. In conjunction with the NDA, Defendant

Merck performed the Vioxx GI Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was performed from January 6, 1999 through March 17, 2000.

73.     The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

74.     In March, 2000, the VIGOR study found Vioxx patients had double the rate of serious cardiovascular problems than those on Naproxen, an older nonsteroidal anti-inflammatory drug (NSAID).  The VIGOR data revealed that: (a) patients on Vioxx were five times more likely to suffer a heart attack as compared to patients on Naproxen; and (b) patients on Vioxx were 2.3 times more likely to suffer serious cardiovascular disease (including heart attacks, ischemic stroke, unstable angina and sudden unexplained death) as compared to patients on Naproxen.

75.     On March 27, 2000, Merck issued a press release leading off with the find that Vioxx caused fewer digestive tract problems than Naproxen.  Merck continued to assert that it was not that Vioxx caused cardiovascular problems, but that Naproxen protected against them.

76.     In June of 2000, in industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, it was shown that Vioxx use resulted in a statistically significant increase in hypertension, myocardial infarction and stroke.  Not only did Merck do nothing to further accurately publish these studies, or warn consumers, but in August 2000, it denied the results

with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today.

77.    From March 2000 - September 2004, Merck, Sepko Alberts and John/Jane Does 1-100 continued to deny the ill health effects associated with Vioxx while at the same time reaping profits obtained through its non-disclosure and concealment. Merck engaged in a massive advertising and sampling program  and gained continued increases in the market share, which enhanced Merck's financial stability to the detriment of its consumers. As a result of Merck's scheme, it reaped more than $2 billion in profit in the year 2000 alone, and appropriated approximately 23 percent share of the market.

78.    Merck, Sepko, Alberts and John/Jane Does 1-100 continued to profit from their scheme, concert of action and/or conspiracy by withholding information from Plaintiffs, the consuming public, and the health care industry.

79.    In November of 2000, The New England Journal of Medicine published the VIGOR study (VIGOR = Vioxx Gastrointestinal Outcomes Research) and Merck responded by knowingly downplaying and/or withholding the severity of cardiovascular risks associated with Vioxx consumption over Naproxen consumption.

80.    Further, in its January 23, 2001 8-K filing with the Securities and Exchange Commission, Defendant fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

> "Our results reflect the strength of our growth strategy," Mr. Gilmartin said. "Our five key products, VIOXX, ZOCOR, COZAAR/HYZAAR*, FOSAMAX and SINGULAIR, drove Merck's performance for the year and created a powerful platform for growth." These products accounted for 57% of Merck's worldwide human health sales for 2000 and 61% for the fourth quarter.

81.    "Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said. VIOXX, a once-a-day medicine, is the only COX-2 indicated in the United States both for

osteoarthritis and acute pain. Since its extraordinarily successful 1999 launch, VIOXX has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest-selling medicine. In the United States, VIOXX now accounts for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to market in this class in the United States. VIOXX achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.

82.     A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR Study. This 8,000-patient gastrointestinal outcomes research study, in which VIOXX reduced the risk of serious gastrointestinal complications by half compared to the NSAID naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that VIOXX significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

83.     In February 2001, an FDA Advisory Panel recommended the FDA require a label warning on Vioxx for its possible link to cardiovascular problems.  In documents dated February 8, 2001, according to the FDA Advisory Committee Briefing Document, in the VIGOR study the potential advantage of decreasing the risk of complicated gastrointestinal side effects was paralleled by the increased risk of developing cardiovascular thrombotic events.

84.     On May 22, 2001 Merck issued a press release through the PR Newswire that stated, "In response to news and analyst reports of data the Company first released a year ago, Merck & Co., Inc. today reconfirmed the favorable cardiovascular safety profile of Vioxx".

85.     On August 22, 2001 Drs. Eric Topol and Steven Nessen's article "Risk of Cardiovascular Evens Associated with Selective Cox-2 Inhibitors" was published in the Journal

of the American Medical Association (JAMA) and reported findings of the Cleveland Clinic's study that "current data would suggest that use of these so called Cox-2 Inhibitors might lead to increased cardiovascular events".

86.     On August 21, 2001, the day before the JAMA article was published, Merck commented in a published report in Bloomberg News that "We have additional data beyond what they (Topol and Nessen) cite, and the findings are very, very reassuring, Vioxx does not result in any increase in cardiovascular events compared to placebo".

87.     On August 23, 2001 Merck stated in a press release that "the Company stands behind the overall and cardiovascular safety profile...of Vioxx".

88.     On September 17, 2001, Thomas W. Abrams, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of Defendant Merck, relating to "promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets."

89.     The Warning Letter stated that Defendant Merck had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

90.     The eight (8) page Warning Letter outlines, in detail, the conduct of Defendant Merck that supports the FDA's issuance of the Warning Letter, and makes the following "Conclusions and Requested Actions:"

> The promotional activities and materials described above minimize the potentially serious Cardiovascular findings that were observed

in the VIGOR study, minimize the Vioxx / Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.

This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

1.   Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.

2.   Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

3.   A written statement of your intent to comply with "1" and "2" above.

91.   Merck was also aware at this time of the increased risks of thrombotic (blood clotting) adverse effects such as strokes and blood clots in the legs, hypertension, and altered kidney function. However, Vioxx was by then a blockbuster moneymaker and Merck decided to protect its "cash cow" at all costs though the continued false and misleading claims to the general public and treating physicians of the general public, including plaintiffs, through direct to

consumer advertising and through its agents, servants and employees, including Sepko, Alberts and John/Jane Does 1-100.

92.     On January 12, 2002, Dr. Wayne A. Ray, a Professor of Preventive Medicine at Vanderbilt University, and others, reported in an article published in The Lancet that Naproxen did not have significant protective cardiovascular effect and that Vioxx, when taken at higher doses that had become common, of which Merck had become aware and anticipated, posed an increased risk of heart-related problems.

93.     On April 11, 2002, the FDA approved a supplemental application for the use of Vioxx (rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain. The FDA also approved new labeling, a "Dear Doctor" letter, and a new patient package insert. The labeling and the "Dear Doctor" letter contained information concerning the results of the VIGOR study.

94.     The revised labeling further states that the administration of Vioxx 50 mg, was associated with a higher incidence of gastrointestinal symptoms.

95.     Further, the "Dear Doctor" letter, approved in conjunction with the revisions to the Vioxx labeling, outlines the changes to the Vioxx labeling.

96.     The revised "Patient Information" sheet does not add any information about the results of the VIGOR study."

97.     The "Patient Information" sheet is the only written document that is provided to a patient for whom Vioxx is prescribed.

98.     Both the initial labeling and the revised labeling are ineffective because they do not properly advise physicians and patients of the potential cardiovascular side effects and hazards of Vioxx.

99.     In 2002, Merck was spending more than $100 million a year in direct-to-consumer advertising. Such advertising was used as direct representations by Merck that Vioxx was safe, which clearly underestimated the risks of cardiovascular events. In addition, Merck continued to aggressively promote Vioxx to the medical community by encouraging its sales representatives, including Sepko, Alberts and John/Jane Does 1-100 to deliver large amounts of free samples to the medical community, including the treating doctors of plaintiffs, and encourage them to give away free samples to their patients.

100.    In 2002 and 2003 Merck refused requests from the American Heart Association, the National Stroke Association and the Arthritis Foundation that it conduct additional safety studies, claiming that Vioxx was safe and that it did not plan to conduct any such study.

101.    On October 30, 2003, an article in The Wallstreet Journal reported that another study sponsored by Merck and presented at the annual meeting of the American College of Rheumatology confirmed an increased risk of heart attacks in patients taking Vioxx. According to The Wallstreet Journal, within the first 30 days of taking Vioxx the risk of a heart attack was increased by 30% as compared to Celebrex. This study looked at the records of 54,475 Medicare patients, all of whom were over 65, and was described by Dr. Eric Topol as "the best study to date".

102.    In 2003, Dr. Jerry Avorn, a Divisional Director at Brigham and Women's Hospital in Boston, and colleague Dr. Daniel H. Solomon reported on a Merck financed study based on a survey of patient records that found Vioxx, even at some moderate dosages, increased cardiovascular risk.

103.    Merck disputed the findings of the Avorn-Solomon study, and the name of the Company epidemiologist who had worked on it was removed from the report before it was published in a medical journal.

104.   In 2003 worldwide sales of Vioxx totaled $2.5 billion.

105.   To further increase the appeal of Vioxx to the general public through Merck's direct to consumer advertising, from 1999 through 2004, it used Olympic gold medalists Dorothy Hamill and Bruce Jenner to promote it.

106.   From January through June, 2004, Merck spent an estimated $45 million in advertising Vioxx.

107.   In May 2004, the results of a study funded by the Canadian government were published in The Lancet.  The study reviewed data from 1.3 million elderly patients (66 and older) taking Vioxx vs. Celebrex vs. a common arthritis pain pill (NSAID) vs. no medication. The records from approximately 130,000 persons randomly reviewed from the population base found that persons taking Vioxx had an 80% increase in hospital admissions for congestive heart failure within one yaer of taking Vioxx when compared to persons taking NSAIDS.

108.   On August 25, 2004, Dr. David Graham, Associate Director for Science in the FDA's Office of Drug Safety, presented results of a database analysis of 1.4 million patients that showed Vioxx users are more likely to suffer a heart attack or sudden cardiac death than those taking Celebrex or an older NSAID.

109.   Despite the foregoing, on August 26, 2004, Merck continued to represent to consumers that Vioxx is safe, and that any cardiovascular and/or cardiothrombotic side effects are not associated with the drug.  Merck stated in a press release that "Merck stands behind the efficacy, overall safety and cardiovascular safety of Vioxx".

110.   On September 30, 2004, Merck finally withdrew Vioxx from the United States and more than 80 other countries, after obtaining additional information from its own studies, which had been instigated by Merck to determine if it could claim Vioxx protects against the recurrence of colon polyps, which can become cancerous, that the group in the study taking

Vioxx after 18 months had twice as high a risk of developing cardiovascular disease as the placebo group.

111.   Up to and including September 30, 2004, defendants Merck, Sepko, Alberts and John/Jane Does 1-100, each of them, continued to represent to consumers of Vioxx that it was safe, and that any cardiovascular and/or cardiothrombotic side effects are not associated with the drug. The defendants, and each of them, acting in concert of action and/or in furtherance of their conspiracy, downplayed any potential gastrointestinal side effects of Vioxx, promoting it as safer and more efficacious than other medications approved for treatment of similar conditions.

112.   Pursuant to direct to consumer advertising and prescriptions received from their treating physicians, plaintiffs regularly purchased and ingested Vioxx for various periods of time. Plaintiffs now suffer from heart attacks, strokes, TIAs, coronary artery disease, althersclerosis, blood clots, and other diseases caused by the use of Vioxx.

113.   Vioxx is primarily prescribed to reduce pain from inflammation. However, the defendant Merck failed to conduct sufficient research in manufacturing and marketing Vioxx to determine the severity of the drugs' potential side effects. Defendants, and each of them, withheld adverse reports, or gave incorrect information about such reports, they had received about side effects such as heart attacks and strokes. As a result of each of the defendants' failure and the undisclosed defects of Vioxx, plaintiffs have sustained heart attacks, strokes, TIAs, coronary artery disease, althersclerosis, blood clots and/or other ill-effects.

114.   Defendant Merck conducts business in the State of Missouri, and at all times relevant hereto, developed, manufactured, advertised and sold the pharmaceutical drug Vioxx in the State of Missouri, including the City of St. Louis, as well as through co-defendants Sepko, Alberts and John/Jane Does 1-100, who acted in concert of action and/or acted in furtherance of their conspiracy, which occurred in the City of St. Louis, State of Missouri.

115.    In addition, Merck and co-defendants Sepko, Alberts and John/Jane Does 1-100 instigated and pursued formulary agreements with health care networks, including, but not limited to BJC, for it to use Vioxx for its patients at BJC hospitals throughout the state of Missouri, including in the City or St. Louis, to the exclusion of other Cox 2 inhibitors, all in concert of action and/or in furtherance of their conspiracy which occurred in the City of St. Louis, State of Missouri.

## JURISDICTION AND VENUE

116.    Defendants are subject to the in personam jurisdiction of this Court, and venue is proper herein, by virtue of the fact that defendants did and/or does business within the state of Missouri and committed torts in whole or in part in the City of St. Louis, State of Missouri, against plaintiffs, as more fully set forth herein.  Defendants advertised in Missouri and the City of St. Louis, made material omissions and representations in the City of St. Louis, breached warranties in the City of St. Louis and acted in concert of action and/or in furtherance of their conspiracy in the City of St. Louis, State of Missouri.

117.    Venue is proper in this Court pursuant to R.S.Mo. §508.010.2 in that defendants Sepko and Albert reside in the City of St. Louis and in the alternative pursuant to R.S.Mo. §508.010.1 because plaintiffs reside in St. Louis City and defendants Merck, Sepko and Albert may be found in St. Louis City, and in the alternative pursuant to 508.010.6 because certain of the causes of action accrued in the City of St. Louis, since  Vioxx was marketed, advertised, distributed, promoted, sold and/or ingested in the City of St. Louis and defendants, each of them, acted in concert of action and/or in furtherance of their conspiracy in the City of St. Louis, State of Missouri, which constitutes the commission of a tort in the City of St. Louis, State of Missouri.

118.    Defendants Sepko and Alberts are and were at all times pertinent hereto citizens and residents of the City of St. Louis, State of Missouri, constituting "local defendants" within the meaning of the Federal Removal and Diversity Statutes, precluding removal of this action to Federal Court.

119.    In addition, these individual defendants constitute tortfeasors against whom plaintiffs, each of them, have a justiciable claim for negligence, fraudulent misrepresentations and omissions, acting in concert of action and/or acting in furtherance of their conspiracy with Merck, and other third parties.

## COUNT I

### STRICT PRODUCTS LIABILITY - DEFECIVE DESIGN AGAINST MERCK

Come now plaintiffs and for Count I of their petition against defendant Merck state the following:

120.    Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

121.    Defendant Merck designed, produced, manufactured and injected into the stream of commerce, in the regular course of its business, the pharmaceutical drug Vioxx which it knew would be used by plaintiffs and others.

122.    At the time the Vioxx was manufactured and sold to plaintiffs by Merck, it was in a defective condition and unreasonably dangerous when put to its reasonably anticipated use, and subjected its users to increased risks of heart attacks, strokes, and other illnesses which exceeded its benefits, and for which other safer products were available.

123.    Alternatively, when Vioxx was manufactured and sold to plaintiffs by defendant, it was defective in design and formulation, making use of it more dangerous than other drugs for pain relief.

124.    The Vioxx sold to plaintiffs reached plaintiffs without substantial change. Plaintiffs were unaware of the dangerousness of the products until after their use and the development of heart attacks, strokes, and other related illnesses.  Plaintiffs ingested the Vioxx without making any changes or alterations and used it in a manner reasonably anticipated by Merck.

125.    As a direct and proximate result of the defective and dangerous design of Vioxx, plaintiffs have been damaged.

126.    Merck's conduct, as described herein, knowing the defective condition and danger of Vioxx, yet continuing to advertise, market, distribute and sell it to plaintiffs and the general public showed complete indifference to or conscious disregard for the safety of users of Vioxx, including plaintiffs.

WHEREFORE, plaintiffs demand judgment in their favor and against Merck for:

A.  A fair and just amount of actual damages in an amount to be proved at trial;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter Merck and others from engaging in the wrongful conduct; and

E.  Such other and further relief as the Court deems just and proper under the circumstances.

## COUNT II

## STRICT PRODUCTS LIABILITY - FAILURE TO WARN AGAINST MERCK

Come now plaintiffs and for Count II of their petition against defendant Merck state the following:

127.   Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

128.   At the time the Vioxx was manufactured and sold to plaintiffs by Merck in the course of its business, it was in a defective condition and unreasonably dangerous when put to its reasonably anticipated use, and subjected its users to increased risks of heart attacks, strokes, and other illnesses which exceeded its benefits, and for which other safer products were available.

129.   The users of Vioxx, including plaintiffs, did not have knowledge of its defective and unreasonably dangerous condition, which subjected them to increased risks of heart attacks, strokes, and other illnesses which exceeded its benefits, and for which other safer products were available.

130.   The Vioxx manufactured and supplied by Merck was unaccompanied by proper and adequate warnings regarding all possible adverse side effects associated with the use of Vioxx, and the comparative severity and duration of the adverse effects.  The warnings given by Merck did not accurately reflect the symptoms, type, scope or severity of the side effects.

131.   In addition, Merck failed to warn plaintiffs, based on its VIGOR study.  Such adequate warnings of the VIGOR study results would have shown that Vioxx possessed serious potential side effects, and full and proper warnings, including types of symptoms, scope and severity of illness, should have been given to plaintiffs with respect to their use of Vioxx.

132.   Merck also failed to adequately warn plaintiffs of the adverse reports it received about Vioxx from third parties.

133.    Furthermore, Merck failed to effectively warn users and physicians that numerous other methods of pain relievers, including Ibuprofen, Naproxen, Mobic, and/or potentially Celebrex were a safer alternative.

134.    Finally, Merck failed to give adequate post-marketing warnings or instructions for the use of Vioxx because after it knew or should have known of the risk of injury from Vioxx use, it still failed to provide adequate warnings to users or consumers of Vioxx, including plaintiffs, and continued to aggressively promote the product to doctors, hospitals, and directly to consumers, including plaintiffs.

135.    Plaintiffs used Vioxx in a manner reasonably anticipated by Merck.

136.    As a direct and proximate result of Merck's failure to warn of the potentially severe side effects of the Vioxx products, plaintiffs have been damaged.

137.    Merck's conduct, as described herein, knowing of the defective condition and danger of Vioxx, yet continuing to advertise, market, distribute and sell it to the general public, including plaintiffs, without issuing proper warnings, showed complete indifference to or conscious disregard for the safety of users of Vioxx, including plaintiffs.

WHEREFORE, plaintiffs demand judgment in their favor and against Merck for:

A.    A fair and just amount of actual damages in an amount to be proved at trial;

B.    Costs of suit;

C.    Pre-judgment and post-judgment interest;

D.    Punitive damages in a fair and reasonable amount to punish and deter Merck and others from engaging in the wrongful conduct; and

E.    Such other and further relief as the Court deems just and proper under the circumstances.

**COUNT III**

## NEGLIGENT DESIGN AGAINST MERCK

Come now plaintiffs and for Count III of their petition against defendant Merck state the following:

138.    Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

139.    Defendant Merck designed, produced, manufactured and injected Vioxx into the stream of commerce, in the regular course of its business, which it knew would be used by plaintiffs and others.

140.    At the time the Vioxx was manufactured and sold to plaintiffs by Merck, it was defective in design in that it subjected users to increased risks of heart attacks, strokes, and other illnesses which exceeded its benefits, and for which other safer products were available.

141.    Alternatively, when Vioxx was manufactured and sold to plaintiffs by Merck, it was defective in design and formulation in that it subjected users to increased risks of heart attacks, strokes and other illnesses, which made use of the Vioxx more dangerous than other drugs for pain relief.

142.    Merck failed to use ordinary care to manufacture and/or design Vioxx to be reasonably safe in that it increased the users risks of heart attacks, strokes and other illnesses which exceeded its benefits and for which other safer products were available.

143.    In addition, Merck failed to use ordinary care by performing adequate testing and study or properly analyzing the findings of the VIGOR study.  Such adequate testing, study or analysis of the VIGOR would have shown that Vioxx possessed serious potential side effects of Vioxx and its dangerous and defective design and condition, which would have allowed Merck to remove Vioxx from the market, months, if not years before its recall on September 30, 2004,

which delay caused increased risk of injuries and damages to Vioxx users, including the plaintiffs.

144.    Finally, Merck failed to use ordinary care by acting properly on adverse reports it received about Vioxx, and failed to properly study Vioxx pre-market and analyze and follow up on its studies as well as other studies regarding the dangerous and defects of Vioxx.

145.    As a direct and proximate result of the defective and dangerous design of the Vioxx, plaintiffs have been damaged.

146.    Merck's conduct, as described herein, knowing of the defective condition and danger of Vioxx, yet continuing to advertise, market, distribute and sell it to the general public, including plaintiffs, showed complete indifference to or conscious disregard for the safety of users of Vioxx, including plaintiffs.

WHEREFORE, plaintiffs demand judgment in their favor and against Merck for:

A.  A fair and just amount of actual damages in an amount to be proved at trial;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  Such other and further relief as the Court deems just and proper under the circumstances.

## COUNT IV

### NEGLIGENT FAILURE TO WARN AGAINST DEFENDANTS MERCK, SEPKO, ALBERTS AND JOHN/JANE DOES 1-100

Come now plaintiffs and for Count IV of their petition against defendants Merck, Sepko, Alberts, and John/Jane Does 1-100, state the following

147.   Plaintiffs incorporate all allegations in the preceding paragraphs as is fully set forth in this Count.

148.   Defendants owed a duty to users of Vioxx, including plaintiffs, to warn of any dangerous defects or side effects, including unreasonable and dangerous risks, reactions, and illnesses, as well as a duty to provide adequate post market warnings as it learned of Vioxx's substantial defects and dangers, including a users increased risks of heart attacks, strokes and other serious illnesses.

149.   Defendants breached their duty of reasonable care owed to plaintiffs in that defendants failed to:

a.   Conduct sufficient testing which, if properly performed, would have shown that Vioxx had serious side effects, including heart attacks, strokes, hypertension, althersclerosis, blood clots, and other serious illnesses, and warn users of those risks; and/or

b.   Include adequate warnings with the marketing, distribution, and sale of Vioxx that would alert users to the potential risks and serious side effects of the drugs; and/or

c.   Warn plaintiffs that use of Vioxx carried increased risks of death or permanent disability from heart attacks, strokes, blood clots, and other cardiovascular disorders and other serious side effects; and/or

d.   Advise the FDA, the health care industry, and the public about the adverse reports it had received regarding Vioxx from third parties as well as its own studies; and/or

e.   Warn physicians and hospitals treating plaintiffs that prescribing Vioxx to plaintiffs carried increased risks of death or permanent disability from heart attacks,

strokes, blood clots, and other cardiovascular disorders and other serious side effects; and/or

     f.  Issue other appropriate warnings to plaintiffs and the health care industry in general.

150.    Defendants knew or by using ordinary care should have known that Vioxx caused unreasonably dangerous risks and serious side effects of which the general public would not be aware.  Defendants nevertheless advertised, marketed and promoted their products to the general public, the health care industry and plaintiffs, knowing there were safer methods and products for pain control without warning the general public, health care industry and plaintiffs, of the dangerous condition of Vioxx.

151.    As a direct and proximate result of defendants' negligence and breaches of their duty of reasonable care, plaintiffs have been damaged.

152.    Defendants' conduct, as described herein, knowing of the defective condition and danger of Vioxx, yet continuing to advertise, market, distribute and sell it to the general public, including plaintiffs, without issuing proper warnings, showed complete indifference to or conscious disregard for the safety of users of Vioxx, including plaintiffs.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants Merck, Sepko, Alberts, and John/Jane Does 1-100 for:

A.  A fair and just amount of actual damages in an amount to be proved at trial;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter defendants and others from engaging in the wrongful conduct; and

E.   Such other and further relief as the Court deems just and proper under the circumstances.

COUNT V

DECEPTIVE TRADE PRACTICES ACT-AGAINST DEFENDANTS MERCK, SEPKO, ALBERTS AND JOHN/JANE DOES 1-100

Come now plaintiffs and for Count V of their petition against defendants Merck, Sepko, Alberts and John/Jane Does 1-100 state the following:

153.   Plaintiffs bring this action pursuant to R.S.Mo. §407.010 et seq. (The Missouri Merchandising Practices Act) (hereinafter, "Act")in that they purchased and used Vioxx for their personal use and thereby suffered ascertainable loss as a result of defendants' actions in violation of the Missouri consumer protection statutes, the tort of which occurred in part in the City of St. Louis, State of Missouri.

154.   The unfair or deceptive acts or practices as defined in the Act include, "the use of any deception, fraud, false pretense, false promise, misrepresentation or concealment, suppression or omission of any material fact... in the conduct of any trade or commerce."

155.   Defendants, each of them, violated the Act by their use of false and misleading misrepresentations or omissions of material fact in connection with the sale of Vioxx. Defendants communicated the purported benefits of Vioxx, while failing to disclose the serious and dangerous side effects related to the use of defendants' products, and in fact actually attempting to dodge or conceal issues of cardiovascular concern raised by health care providers regarding the adverse cardiovascular effects of Vioxx.

156.   Defendants, including Sepko and Alberts, as well as John/Jane Does 1-100 actively participated in a scheme with defendant Merck, titled "Dodge Ball Vioxx" in which they were trained to intentionally omit material information of known cardiovascular side effects of Vioxx from treating physicians and health care providers when meeting with them in an attempt

to market, promote and sell Vioxx to the general public, including plaintiffs' treating physicians and health care providers.

157.   As a direct and proximate result of violating the Act, defendants are liable to plaintiffs for actual damages, including the cost of the Vioxx, medical bills and costs associated with their consumption of the Vioxx, costs and reasonable attorneys' fees, and for such additional relief as the Court may deem appropriate.

158.   Defendants' conduct, as described herein, knowing of the defective condition and danger of Vioxx, yet continuing to advertise, market, distribute and sell it to the general public, including plaintiffs, in an intentional and willful violation of the Act was outrageous and showed complete indifference to or conscious disregard for the safety of users of Vioxx, including plaintiffs.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants Merck, Sepko, Alberts and John/Jane Does 1-100 for:

A.  A fair and just amount of actual damages in an amount to be proved at trial;

B.  Costs of suit and attorneys fees;

C.  Pre-judgment and post-judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter defendants and others from engaging in the wrongful conduct; and

E.   Such other and further relief as the Court deems just and proper under the circumstances.

## COUNT VI

## FRAUDULENT MISREPRESENTATION AGAINST DEFENDANTS MERCK, SEPKO, ALBERTS, AND JOHN/JANE DOES 1-100

Come now plaintiffs and for Count VI of their petition against defendants Merck, Sepko, Alberts and John/Jane Does 1-100, state the following:

159.   Plaintiffs reallege the allegations in the preceding paragraphs as if fully set out herein.

160.   Defendants misrepresented a number of facts to the general public through direct to consumer advertising, including plaintiffs and/or treating physicians of plaintiffs, including: the potential serious cardiovascular findings that were observed in the VIGOR study;   the Vioxx/Coumadin drug interaction; crucial risk information associated with Vioxx; the Vioxx safety profile; studies from third parties regarding the risks and dangers of Vioxx; and the safety of Vioxx, including that any cardiovascular and/or cardio thrombotic side effects were not associated with the drug.

161.   These representations were false and made by defendants, and each of them, both jointly and severely, with knowledge of their falsity or ignorance of their truth or falsity.

162.   These representations were material to plaintiffs and/or their treating physicians to prescribe, request, ingest and /or maintain plaintiffs' prescriptions of Vioxx.

163.   The defendants, and each of them, jointly and severely,   intended for plaintiffs and/or their treating physicians, to rely upon the material misrepresentations to induce plaintiffs to request Vioxx from their treating physicians and/or for plaintiffs' treating physicians to initially prescribe Vioxx and continue to have plaintiffs take it.

164.   Defendants, each of them, further intended that the health care industry, including plaintiffs' treating physicians would prescribe Vioxx to plaintiffs and furthermore that they would discuss defendants' representations with other heath care providers in the industry, who would in turn prescribe Vioxx to their patients in reliance on the false and material representations of defendants.

165.   Plaintiffs, their treating physicians and other health care providers, who prescribed Vioxx to the general public, including plaintiffs, were ignorant of the falsity of

defendants' representations as described above and plaintiffs relied upon them in requesting prescriptions of Vioxx from their treating physicians, and/or plaintiffs' treating physicians prescribing Vioxx to plaintiffs, and/or plaintiffs' treating physicians discussing the benefits of Vioxx with other health care providers, who in turn prescribed Vioxx for their patients, including plaintiffs.

166.   Plaintiffs, their treating physicians, and other health care providers who prescribed Vioxx to the general public, including plaintiffs, had a right to rely on the truthfulness of defendants' representations regarding Vioxx, as described above, as they were made by the manufacturer of the drug, and its sales representatives, including Sepko, Alberts, John/Jane Does 1-100, who have the most knowledge of the benefits and risks of taking and prescribing Vioxx, as they are directly employed by defendant Merck and are allegedly privy to all studies and information about it.

167.   As a direct result of defendants' fraudulent misrepresentations, plaintiffs have sustained personal injuries and actual damages in an amount to be proved at trial.

168.   Defendants' conduct, as described herein, knowing of the defective condition and danger of Vioxx, yet making fraudulent misrepresentations to plaintiffs and/or plaintiffs' treating physicians was outrageous because of defendants' evil motive or a reckless indifference to the safety of users of Vioxx, including plaintiffs.

WHEREFORE, plaintiffs pray for a judgment against defendants Merck, Sepko, Alberts, and John/Jane Does 1-100 jointly and severally for:

A. Actual and compensatory damages in an amount to be proved at trial;

B. Costs of suit;

C. Pre and post judgment interest;

D. Punitive damages in a fair and reasonable amount to punish and deter defendants and others from engaging in such wrongful conduct; and

E. Such other and further relief as the Court deems just and proper under the circumstances.

COUNT VII

FRAUDULENT OMISSION/CONCEALMENT AGAINST DEFENDANTS MERCK, SEPKO, ALBERTS, AND JOHN/JANE DOES 1-100

Come now plaintiffs and for Count VII of their petition against defendants Merck, Sepko, Alberts, and John/Jane Does 1-100 state the following:

169.    Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

170.    Defendants, and each of them, were in an unequal position with plaintiffs and/or the treating physicians of plaintiffs, health care providers and the general public, in that they had superior knowledge of the risks and dangers of Vioxx as described herein that was not within the fair and reasonable reach of plaintiffs and/or plaintiffs' treating physicians, health care providers and the general public.

171.    Defendants, and each of them, had actual knowledge of the cardiothrombotic effects of Vioxx. Despite having knowledge of the cardiothrombotic effects of Vioxx, defendants jointly engaged in a pattern and conduct of actively concealing and omitting to disclose those effects when marketing and promoting Vioxx to plaintiffs, plaintiffs' treating doctors, health care providers, and to the general public in direct to consumer advertisements.

172.    At the time these omissions were made, defendants, and each of them, had knowledge of the substantial and significant cardiothrombotic effects of Vioxx.

173.    Defendants, and each of them, omitted to inform plaintiffs, plaintiffs' treating physicians, health care providers and the general public, of the true cardiothrombotic and other

adverse health effects of Vioxx. They further downplayed the results of various studies showing the cardiothrombotic effects and explaining the cardiothrombotic effects of Vioxx as set forth in the VIGOR study, they withheld adverse reports or gave incorrect information about the reports they received about the side effects of Vioxx such as heart attacks and strokes. They further instructed and had a training manual for their sales force to dodge and mislead doctors when they asked questions about the cardiothrombotic effects of Vioxx.

174.    Defendants' failure to disclose material facts constituted fraudulent concealment. Each of the defendants sanctioned, approved and/or participated in the failure to disclose these material facts to plaintiffs, plaintiffs' treating physicians, the health care industry and to the general public.

175.    Each of the Defendants knew the concealed/omitted material facts were unavailable to plaintiff and plaintiffs' treating physicians and health care providers, yet Merck approved in instructing its agents, servants and employees, including defendants Sepko, Alberts and John/Jane Does 1-100, who actively participated herein, to not disclose this material information in order to promote the sales of Vioxx over and above other Cox 2 inhibitors, as well as any non-steroidal anti-inflammatory such as Ibuprofen, Naproxyn, and combined Cox 1 and Cox 2 inhibitors such as Mobic.

176.    Plaintiffs exercised reasonable diligence in attempting to seek additional information regarding Vioxx after hearing/receiving Merck's numerous direct to consumer commercials and advertisements directed to plaintiffs and the general public, by consulting with their treating physicians.

177.    The information not disclosed by defendants, and each of them, as described above, was not within the reasonable reach of plaintiffs and/or their treating physicians and was not discoverable by plaintiffs and/or their treating physicians.

178.    The non-disclosed information as described above, was material, defendants knew they were not disclosing complete information and intended that plaintiffs and/or their treating physicians act upon the non-disclosed information in a manner reasonably contemplated.

179.    Plaintiffs and/or their treating physicians were ignorant as to the undisclosed information as described above and had a right to rely that defendants had in fact given full disclosure of the risks and benefits of Vioxx and were therefore reasonable to believe no other material facts were undisclosed by defendants, and each of them.

180.    If plaintiffs and/or their treating physicians had known the complete information on Vioxx, including all of the risks and dangers associated with taking it, they would not have prescribed and/or plaintiffs would not have taken Vioxx as evidenced by Merck withdrawing it from the market on September 30, 2004.

181.    As a direct result of defendants' fraudulent concealment and/or omissions of material facts, including the dangers and risks of Vioxx as described above, plaintiffs have sustained personal injuries and actual damages in an amount to be proved at trial.

182.    Defendants' conduct, as described herein, knowing of the dangers and risks of Vioxx, yet fraudulently concealing and/or omitting to tell plaintiffs and/or plaintiffs' treating physicians of these material facts,   was outrageous because of defendants' evil motive or a reckless indifference to the safety of users of Vioxx, including plaintiffs.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants Merck, Sepko, Alberts, and John/Jane Does 1-100 for:

A.  A fair and just amount of actual damages in an amount to be proved at trial;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter defendants and others from engaging in such wrongful conduct; and

E.  Such other and further relief as the Court deems just and proper under the circumstances.

## COUNT VIII

### CONCERT OF ACTION AGAINST DEFENDANTS MERCK, SEPKO, ALBERTS AND JOHN/JANE DOES 1-100

Comes now plaintiffs and for Count VIII of their petition against defendants Merck, Sepko, Alberts and John/Jane Does 1-100 state the following:

183.  Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

184.  Defendants, and each of them, actively pursued a common plan or scheme to design, promote, advertise, distribute and sell Vioxx for their individual financial gain and benefit by willfully and fraudulently misrepresenting and/or concealing and/or intentionally failing to disclose material facts to plaintiffs, plaintiffs' treating physicians, health care providers and to the general public about the risks and dangers of Vioxx.

185.  Defendants, and each of them, advanced this common intent, plan, scheme and purpose by: (1) failing to inform plaintiffs, plaintiffs' treating physicians, health care providers and the general public, of the true cardiothrombotic and other adverse health effects of Vioxx; (2) intentionally downplaying, misinterpreting, and engaging in the intentional omissions of information regarding the results of various studies showing the cardiothrombotic effects and explaining the cardiothrombotic effects of Vioxx as set forth in the VIGOR study; (3) withholding adverse reports and/or giving incorrect information about the reports they received about the side effects of Vioxx such as heart attacks, strokes and blood clots to plaintiffs and plaintiffs' treating physicians, health care providers and the general public; (4) creating and

drafting a training manual for the sales force to dodge and mislead doctors when they were asked questions about the cardiothrombotic effects of Vioxx. This program, each acting in concert of action with the other, under a common scheme entitled by Defendants, "Dodgeball Vioxx" to be used as a guide for the consistent and willful presentation of false and misleading information by Merck and its drug representatives, each of them, including co-defendants herein; (5) engaging in a pattern and conduct of actively concealing and omitting to disclose these effects when marketing and promoting Vioxx through direct to consumer advertising and marketing to plaintiffs, plaintiffs' treating physicians and health care providers, as well as the general public, including:

> the potential serious cardiovascular findings that were observed in the VIGOR study; the Vioxx/Coumadin drug interaction; crucial risk information associated with Vioxx; the Vioxx safety profile; studies from third parties regarding the risks and dangers of Vioxx; and the safety of Vioxx in that any cardiovascular and/or cardio thrombotic side effects were not associated with the drug.

186.   Defendants' misrepresentations of material fact as described herein, constituted fraudulent misrepresentations and defendants failure to disclose material facts, as further described herein, constituted fraudulent concealment in furtherance of the concert of action.

187.   Each of the defendants sanctioned, approved and/or participated in misrepresenting material facts to plaintiffs and/or to plaintiffs' treating physicians and health care providers and/or failed to disclose/omitted material facts to plaintiffs, plaintiffs' treating physicians and heath care providers and to the general public in connection with the common purpose or scheme to promote, advertise, distribute and profit, each of them, from the sale of Vioxx to plaintiffs and the general public.

188.   Each of the defendants knew their conduct, as described above, as well as the conduct of all of the defendants, jointly and severely, constituted a breach of duty owed plaintiffs, yet gave substantial assistance and/or encouragement to the others to carry out

defendants' common plan or scheme, "Dodgeball Vioxx", to promote, advertise, distribute and profit from the sale of Vioxx to plaintiffs and the general public, which in turn was a substantial factor in causing or contributing to cause plaintiffs' personal injuries and actual damages in an amount to be proved at trial.

189.    Defendants' conduct, as described herein, knowing of the dangers and risks of Vioxx, yet fraudulently concealing and/or omitting to tell plaintiffs and/or plaintiffs' treating physicians of these material facts, in furtherance of their concert of action was outrageous because of defendants' evil motive or a reckless indifference to the safety of users of Vioxx, including plaintiffs.

WHEREFORE, plaintiffs pray for a judgment against defendants Merck, Sepko, Alberts, and John/Jane Does 1-100 jointly and severally for:

A.  Actual and compensatory damages in an amount to be proved at trial;

B.  Costs of suit;

C.  Pre and post judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter defendants and others from engaging in such wrongful conduct; and

E.    Such other and further relief as the Court deems just and proper under the circumstances.

## COUNT IX

## CONSPIRACY AGAINST DEFENDANTS MERCK, SEPKO AND ALBERTS

Comes now plaintiffs, pleading alternatively, and for Count IX of their petition against defendants Merck, Sepko and Alberts state the following:

190.    Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

191.    Defendants, each of them, actively pursued a common plan or scheme, including a conspiracy with Missouri pharmacies to sell more profitable prescription Vioxx to the exclusion of less profitable non-prescription medications, to design, promote, advertise, distribute and sell Vioxx for their individual financial gains and benefit by willfully and fraudulently misrepresenting and/or concealing and/or intentionally failing to disclose material facts to plaintiffs, plaintiffs' treating physicians, health care providers and to the general public about the risks and dangers of Vioxx.

192.    Defendants,  and each of them, in one or more of the following ways, advanced this common intent, plan, scheme and purpose by: (1) failing to inform plaintiffs, plaintiffs' treating physicians, health care providers and the general public, of the true cardiothrombotic and other adverse health effects of Vioxx; (2) intentionally downplaying, misinterpreting and engaging in the intentional omissions of information regarding the results of various studies showing the cardiothrombotic effects and explaining the cardiothrombotic effects of Vioxx as set forth in the VIGOR study; (3) withholding adverse reports and/or giving incorrect information about the reports they received about the side effects of Vioxx such as heart attacks, strokes and blood clots to plaintiffs and plaintiffs' treating physicians, health care providers and the general public; (4) creating and drafting a training manual for the sales force to dodge and mislead doctors when they were asked questions about the cardiothrombotic effects of Vioxx.  This common plan, scheme and conspiracy entitled "Dodgeball Vioxx" used as a guide or handbook for the willful presentation of false and misleading information by Merck; (5) engaging in a pattern and conduct of actively concealing and omitting to disclose these effects when marketing and promoting Vioxx through direct to consumer advertising and marketing to plaintiffs, plaintiffs' treating physicians and health care providers, as well as the general public, including:

the potential serious cardiovascular findings that were observed in the VIGOR study;  the Vioxx/Coumadin drug interaction; crucial risk information associated with Vioxx; the

Vioxx safety profile; studies from third parties regarding the risks and dangers of Vioxx; and the safety of Vioxx in that any cardiovascular and/or cardio thrombotic side effects were not associated with the drug.

193.    Defendants' misrepresentations of material fact as described herein, constituted fraudulent misrepresentations and defendants failure to disclose material facts, as further described herein, constituted fraudulent concealment in furtherance of the conspiracy which occurred in part, in the City of St. Louis, State of Missouri.

194.    Each of the defendants participated in misrepresenting material facts to plaintiffs and/or to plaintiffs' treating physicians and health care providers and/or failed to disclose/omitted material facts to plaintiffs, plaintiffs' treating physicians and heath care providers and to the general public in connection with the common purpose or scheme to promote, advertise, distribute, and each of them profit from the sale of Vioxx to plaintiffs to the general public.

195.    Sales representatives of Merck, including Sepko and Alberts, are paid bonuses and incentives for the increased distribution and sale of Vioxx, to their individual profit, independent of their guaranteed earnings and salary and/or Merck's profit.

196.    In attempting to reach additional bonuses and incentives above and beyond their ordinary compensation and payment structure with defendant Merck, defendants Sepko and Alberts acted for their own personal benefit or self interest to their individual profit, independent of Merck's profit, which went beyond their agency relationship with Merck, including exceeding the instructions and/or restrictions placed on them by Merck as contained in Merck's manual of deception, "Dodgeball Vioxx", to act in furtherance of the conspiracy for their own personal gain, profits and benefits, independent of the motives of Merck and separate and distinct from Merck's interest in achieving their goals, by making fraudulent misrepresentations and

concealing or omitting material facts to plaintiff's physicians and healthcare providers for their personal and individual profit and gain.

197.   As a result of the conspiracy of the defendants, as described above, plaintiffs sustained personal injuries and actual monetary damages in an amount to be proved at trial.

198.   Defendants' conduct, as described herein, knowing of the dangers and risks of Vioxx, yet fraudulently misrepresenting and/or concealing and/or omitting to tell plaintiffs and/or plaintiffs' treating physicians of these material facts,   was outrageous because of defendants' evil motive or a reckless indifference to the safety of users of Vioxx, including plaintiffs.

WHEREFORE, plaintiffs pray for a judgment against defendants Merck, Sepko and Alberts, jointly and severally for:

A.  Actual and compensatory pecuniary damages in an amount to be proved at trial;

B.  Costs of suit;

C.  Pre and post judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter defendants and others from engaging in such wrongful conduct; and

E.   Such other and further relief as the Court deems just and proper under the circumstances.

SIMON•PASSANANTE, P.C

By:  _Todd S. Hageman_

Todd S. Hageman #6226790
701 Market Street, Ste. 1150
St. Louis, Missouri 63101
(314) 241-2929
Facsimile: (314) 588-1999

ATTORNEYS FOR PLAINTIFF