SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interests of brevity, portions of any opinion may not have been summarized.)

**International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.**
**(A-22-2006)**

**Argued March 19, 2007 – Decided September 6, 2007**

**PER CURIAM**

In this appeal, the Court considers the propriety of an order certifying a nationwide class of third-party payors that paid for the purchase of the prescription drug, Vioxx.

The International Union of Operating Engineers Local No. 68 Welfare Fund (Welfare Fund) is a joint union-employer Taft-Hartley trust fund which is organized and operates pursuant to the laws of New Jersey.  As a part of its services, the Trust Fund acts as a sponsor of health benefit plans that provide prescription drug coverage for its members and their beneficiaries.  It is therefore a third-party payor, meaning it makes payments to pharmaceutical companies for prescription medications for those members.

The Trust Fund asserts that as a third-party payor it made payments and incurred costs for Vioxx, the prescription drug manufactured and marketed by defendant, Merck.  The Trust Fund further asserts that it was induced by Merck's fraudulent marketing scheme to pay a higher price than that charged for similar medications.  In addition, the Trust Fund claims that Merck was aware that its product was neither more effective nor safer than other available products, and that Merck engaged in extensive efforts to conceal or minimize information that there were significant health and safety risks associated with the continued use of Vioxx.

The Trust Fund also asserts that Merck's marketing intentionally targeted third-party payors that oversee and make payments for the vast majority of prescription medications.   Third-party payors rely on Prescription Benefit Managers (PBMs) that select drugs to be included on the payor's approved purchase listing, known as a formulary.  The Trust Fund's expert contends that there is an agreed-upon set of principles and guidelines governing the practices of third-party payors and PBMs in establishing the terms under which the third-party payor agrees to be responsible for the costs of members' prescriptions.  As a result, the Fund claims it can fairly represent the interests of a variety of third-party payors, including funds like itself, as well as such diverse entities as corporate health insurers, health maintenance organizations and self-insured employers.  Merck's expert asserts that the way in which PBMs operate in evaluating drugs for formulary purposes varies greatly.  The expert's research showed that different managed care plans accorded Vioxx widely different formulary treatment.  Merck's expert asserts that there are such divergences among class members and in how they analyzed Merck's information on Vioxx that class certification is inappropriate.

Central to the Trust Fund's assertions is its argument that if Merck had disclosed the adverse information about which it was aware, the Trust Fund and other class members would have taken action to discourage consumers from purchasing Vioxx, thereby reducing the amounts paid to reimburse members for the drug's cost.  Merck contends that this argument amounts to nothing more than a "fraud on the market" theory that cannot be sustained in accordance with this State's law.

**HELD**: Certification of a nationwide class is not appropriate because common questions of fact or law do not predominate and a class action is not superior to other available mechanisms for redress.

1. Class action certification is governed by Rule 4:32-1.  The provision that is at issue here is Rule 4:32-1(b)(3), which this Court recently addressed in Iliadis v. Wal Mart Stores, Inc., 191 N.J. 88 (2007).  This provision requires that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that the class action is superior to other available methods for the fair and efficient adjudication of the controversy.  In Iliadis, the Court explained the meaning of predominance, referring to the

importance of an analysis of the number and, more importantly, the significance of common questions.  At a minimum, predominance requires a common nucleus of operative facts.  The superiority requirement involves a comparison with alternative procedures and a determination of the fairness and efficiency of each.  The Court also expressed concern in Iliadis that, absent a class, where members lack financial resources and have only nominal claims, individual members would not pursue their claims.  The Court there found a class action superior, in part, because it served as an equalizing mechanism between adversaries of vastly different resources. (pp. 12-16)

2.The Law Division concluded that the Trust Fund's proposed class met the prerequisites for predominance and superiority.  In a published opinion, the Appellate Division affirmed.  384 N.J. Super. 275 (App. Div. 2006).  The Appellate Division based its decision, in large part, on its conclusion that the New Jersey Consumer Fraud Act (CFA) could be applied to all members of the class, and that therefore common questions of law would predominate.  The Appellate Division reasoned that the CFA's ascertainable loss requirement need not be proven by each class member individually, but could be proven on a class-wide basis through expert testimony. (pp. 16-20)

3. The first question the Court addresses is whether, even if it agrees that the CFA can be given nationwide application to all class members, common questions of fact or law predominate.  The record demonstrates that each third-party payor, relying on different PBMs, made individualized decisions concerning the benefits that would be available to its members for whom Vioxx was prescribed.  The existence of separately created formularies, different tier systems, and individualized requirements for approval for reimbursement imposed on various plans' members and their prescribing physicians are significant.  Standing alone, that evidence suggests that common fact questions surrounding what Merck knew and what it did would not predominate. (pp. 20-25)

4. Nationwide application of the CFA creates a further consideration important to the predominance analysis.  In place of the traditional reliance element of fraud and misrepresentation, the CFA requires a consumer to demonstrate it has sustained an ascertainable loss.  The Trust Fund asserts that the common facts surrounding Merck's marketing scheme created an effect on the price of Vioxx such that the ascertainable loss element of the CFA may be proven on a class-wide basis by use of expert analysis alone.  Merck urges that such an approach cannot demonstrate ascertainable loss because it amounts to a "fraud on the market" theory.  That theory is a creature of federal securities litigation, and it allows plaintiffs that purchase securities to demonstrate they were damaged simply because a defendant engaged in prohibited behavior and there was a change in price.  This Court has rejected the fraud on the market theory as inappropriate in any context other than federal securities fraud litigation.  The Trust Fund's proof theory – that it can demonstrate class-wide damages through use of a single expert who could opine about the effect on pricing due to Merck's marketing campaign - would indeed be the equivalent of fraud on the market.  To the extent that the Trust Fund proposed, and the Appellate Division authorized, the use of a single expert to establish this critical CFA proof element so as to create a common question of fact or law that would bear on the predominance analysis, the Court's rejection of the theoretical basis for that proof mechanism removes it as a potential common question entirely. (pp. 25-27)

5. The Court addresses a further, fundamental question relating to the proposed class.  Merck focuses on the relatively large sum of damages that the Trust Fund contends it individually sustained, and argues a class action is not appropriate.  The argument has merit.  The Court reaches this conclusion based on its recent analysis of class actions as expressed in Iliadis.  It is the differences between the proposed class members here and those in Iliadis that requires the Court to reach a different result in this matter than the one reached there.  Iliadis involved claims raised by a proposed class of thousands of individual hourly wage earners, and the amount any worker might individually recover was small.  The class members would have been greatly disadvantaged pursuing their claims individually against a large corporate defendant.  Unlike those hourly wage earners, members of this proposed class allege they have been damaged in large sums, and are well-organized, institutional entities with considerable resources.  Unlike in Iliadis, here there is no disparity in bargaining power and no likelihood that the claims are individually so small that they will not be pursued.  In short, the Court finds no ground on which to conclude that the proposed nationwide class meets the test for superiority that the Court has traditionally required. (pp. 27-30)

The judgment of the Appellate Division is **REVERSED**, and the matter is **REMANDED** to the Law Division for further proceedings consistent with this opinion.

**JUSTICES LONG, LaVECCHIA, WALLACE, RIVERA-SOTO, and  HOENS join in this opinion. JUSTICE ALBIN did not participate.**

2

SUPREME COURT OF NEW JERSEY
A-22 September Term 2006

INTERNATIONAL UNION OF
OPERATING ENGINEERS LOCAL NO.
68 WELFARE FUND, individually
and on behalf of all others
similarly situated,

     Plaintiff-Respondent,

        v.

MERCK & CO., INC.,

     Defendant-Appellant.

Argued March 19, 2007 – Decided September 6, 2007

On appeal from the Superior Court, Appellate Division, whose opinion is reported at 384 N.J. Super. 275 (2006).

John H. Beisner, a member of the District of Columbia bar, argued the cause for appellant (Dechert, attorneys; Mr. Beisner, Diane P. Sullivan and Richard Jasaitis, III, on the briefs).

Christopher A. Seeger argued the cause for respondent (Seeger Weiss and Lynch Keefe Bartels, attorneys; Mr. Seeger, John E. Keefe, Jr., David R. Buchanan, Frederick S. Longer and Donald E. Haviland, Jr., on the briefs).

Michael Dore argued the cause for amicus curiae Pharmaceutical Research and Manufacturers of America (Lowenstein Sandler, attorneys; Mr. Dore and Rosemary E. Ramsay, of counsel and on the brief).

Theodore M. Lieverman argued the cause for amici curiae AARP; American Federation of

State, County and Municipal Employees;
Center for Medical Consumers; Central New
York Citizens in Action; Citizen Action of
New York; Commonwealth Care Alliance, Inc.;
Florida Chain; Gray Panthers of Sacramento;
Health Care for All; Lynn Health Task Force;
Medicare Rights Center; New Jersey Citizen
Action; New Jersey PIRG Law & Policy Center;
Pennsylvania Employees Benefit Trust Fund;
Prescription Access Litigation Project;
United Senior Action of Indiana; Elaine
Kleinman and Ronald Martin (Spector Roseman
& Kodroff, attorneys; Mr. Lieverman and
David J. Cohen, on the brief).

Anita R. Hotchkiss submitted a brief on
behalf of amicus curiae Product Liability
Advisory Council, Inc. (Porzio, Bromberg &
Newman, attorneys; Ms. Hotchkiss and Michael
E. Rowan, on the brief).

John F. Brenner submitted a joint brief on
behalf of amici curiae The Commerce and
Industry Association of New Jersey; The
Somerset County Business Partnership and The
Chemistry Council of New Jersey (McCarter &
English, attorneys for The Commerce and
Industry Association of New Jersey; Norris
McLaughlin & Marcus, attorneys for The
Somerset County Business Partnership and
Reed Smith, attorneys for The Chemistry
Council of New Jersey; Mr. Brenner, Steven
A. Karg and Steven J. Picco, of counsel).

Edward J. Fanning, Jr. and David R. Kott
submitted a brief on behalf of amicus curiae
Healthcare Institute of New Jersey (McCarter
& English, attorneys; Mr. Fanning, Mr. Kott
and Marielena Piriz, on the brief).


PER CURIAM

In July 2005, a Law Division judge granted the motion of

plaintiff International Union of Operating Engineers Local #68

Welfare Fund "to certify a nationwide class of third-party[,] non-government payors who . . . paid any person or entity for the purchase of a prescription anti-inflammatory arthritis and acute pain medication marketed by defendant Merck & Company, Inc. . . . under the brand name Vioxx."  The Appellate Division affirmed that decision and defendant moved for leave to appeal to this Court.

We granted that motion for leave to appeal, agreeing to consider the propriety of the order certifying a nationwide class.  Because we conclude that the court erred in finding that common questions of fact or law predominate and that a class action would be superior to other mechanisms for adjudicating the claims, we reverse.

I.

We accept as true all of the allegations in the complaint in light of the fact that we are considering the issues in the context of a challenge to class certification.  See Riley v. New Rapids Carpet Ctr., 61 N.J. 218, 223 (1972); see also Delgozzo v. Kenny, 266 N.J. Super. 169, 180-81 (App. Div. 1993) (citing Blackie v. Barrack, 524 F.2d 891, 901 n.17 (9th Cir. 1975), cert. denied, 429 U.S. 816, 97 S. Ct. 57, 50 L. Ed. 2d 75 (1976)).  For purposes of our analysis, we derive the essential facts from plaintiff's complaint and the record developed in connection with the motion for class certification.

A.

According to the complaint, plaintiff "is a joint union-employer Taft-Hartley trust fund,"[1] which is organized and operates pursuant to the laws of New Jersey.  As a part of its services, plaintiff acts as a party to benefit contracts, a policy issuer, and a sponsor of health benefit plans that provide prescription drug coverage for its members and beneficiaries.  It is therefore a third-party payor, meaning that it makes payments to pharmaceutical companies for prescription medications for those for whom its benefit plans afford coverage.

Plaintiff asserts that as a third-party payor it made payments, and therefore incurred costs, for Vioxx, a prescription drug manufactured and marketed by defendant.  More specifically, plaintiff asserts that it was induced to make

---

[1] The complaint does not specify whether plaintiff is organized as a New Jersey corporation, referring instead to the fact that it "is organized and operating in the State of New Jersey."  We presume, for purposes of this analysis, that it qualifies as a consumer as that term is intended in our consumer fraud statute. We do so in recognition of the fact that the Consumer Fraud Act, although not defining the term "consumer," has been repeatedly recognized to be remedial legislation which should be construed liberally. See Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139 (1999); Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604 (1997); Joe D'Egidio Landscaping v. Apicella, 337 N.J. Super. 252, 258 (App. Div. 2001).  Although one might argue that the relationship between plaintiff and defendant is more attenuated than the traditional consumer role as contemplated by the Consumer Fraud Act, we leave for another day the question of the Act's scope in light of our analysis of the other issues before us.

those payments and incur those costs in response to defendant's wide-ranging fraudulent marketing scheme.  In essence, the complaint alleges that defendant marketed its product as a safer and more effective alternative to other traditional pain medications, thus driving the price of its product substantially higher than the price charged for similar medications.

More to the point, however, plaintiff asserts that defendant did so through an aggressive marketing campaign undertaken at a time when defendant was aware that its product was neither more effective nor safer than other available products.  Pointing in particular to three separate warning letters issued to defendant by the Food and Drug Administration (FDA), plaintiff asserts that defendant engaged in extensive efforts to conceal or otherwise minimize information coming to its attention to the effect that its product was not as safe as available alternatives.

At the same time, plaintiff contends that defendant was aware, through its ongoing clinical studies, that there were significant health and safety risks associated with continued use of its product and that defendant also either minimized or actively concealed those studies from the FDA, the public, and third-party payors.  In particular, plaintiff asserts that beginning in 1998, defendant's clinical studies and internal analyses of the use of Vioxx demonstrated a link between the

7

medication and adverse cardiovascular side effects.  In spite of
that discovery, however, defendant continued its marketing and
promotional campaign and concealed those adverse findings until
the product was withdrawn from the market in September 2004.

B.

Plaintiff also asserts that the defendant intentionally
targeted third-party payors that oversee, and make payments for,
the vast majority of purchases of prescription medications.
Although the specific allegations about defendant's marketing
campaign are not important to our analysis, plaintiff asserts,
as part of its class action allegations, that defendant engaged
in a uniform series of fraudulent activities in its dealings
with all members of the proposed nationwide class.  As such,
plaintiff asserts that it can fairly represent the interests of
a variety of third-party payors, including other Taft-Hartley
funds like itself, as well as such diverse entities as corporate
health insurers, health maintenance organizations, private
employers, self-insured employers, and multi-employer union
benefit organizations.

The parties do not dispute the manner in which this
plaintiff or other third-party payors operate in making
decisions about payments for particular medications.  Whenever a
plan member receives a prescription and takes it to be filled,
the plan member must first demonstrate that he or she is covered

by a third-party payor plan.  In general, the plan member
submits membership information, such as a prescription insurance
card, to the dispensing pharmacy for verification and approval
by the third-party payor.  Once the plan member has done so, the
dispensing pharmacy verifies that the prescribed medication is
one that the third-party payor has authorized for purchase.  The
drugs that each third-party payor has authorized are included
within that third-party payor's approved purchase listing, known
as a formulary.

Third-party payors do not independently select medications
for inclusion in their formularies.  Instead, each third-party
payor relies on Prescription Benefit Managers (PBMs) whose
functions include placing prescription drugs on the individual
third-party payors' formularies.  PBMs, in turn, utilize
specialized committees of pharmacists, physicians, and
healthcare professionals, which are known as Pharmacy and
Therapeutics Committees (P&T Committees), to develop and
maintain the formularies.  The P&T Committees do so by
conducting their own evaluation of the effectiveness, safety,
and cost of each available medication.

In performing their function, P&T Committees evaluate a
wide variety of available material bearing on the question of
each drug's efficacy and safety.  In general, according to
plaintiff's expert, P&T Committees focus on materials referred

to as "primary information."  That includes published materials
reporting on the results of randomized clinical trials;
observational or epidemiological data; meta-analysis, which is a
method of combining results of several studies in order to
synthesize and evaluate data; and case reports.  At least some
of the published material rests on work done by or for the
manufacturers of the particular products.

P&T Committees also consider information and data that is
submitted to them by each product's manufacturer.  In many
cases, the manufacturer of a product being considered for
inclusion in formularies compiles this information and data and
submits it in a format known as a "formulary compendium."
Defendant created such compendia in this case.

The P&T Committees' evaluations may result in the inclusion
of a product on a particular third-party payor's formulary.  The
decision to include a medication, however, does not necessarily
result in uniform treatment of that drug in every formulary, as
each operates differently.  Formularies are frequently comprised
of tiers, with different treatment, for prescription
authorization and payment purposes, accorded to the drugs
assigned to different tiers.  In a tiered formulary, some
therapeutic drugs are "preferred," which may result in a lower
co-payment obligation for the plan member and may result in
greater overall sales of the drug.  At the other end of the

spectrum, for purposes of a tiered formulary, the work performed by the P&T Committee might result in a decision that some prescription drugs are not authorized for purchase at all.

During the relevant time period, some PBMs relied on "open" formularies which essentially included all prescription medications that were approved by the FDA.  Even open formularies, however, involve decisions by P&T Committees that determine how any specific medication will be treated for purposes of placement.  Those decisions may result in conditions relating to how a third-party payor will cover the cost of a medication.

As a practical matter, each PBM, through the work performed by the P&T Committee and its creation of the formulary, sets the terms under which the third-party payor agreed to be responsible for the costs of its members' prescriptions.  Plaintiff's expert contends that there is an agreed-upon set of principles and guidelines governing the practices of third-party payors and PBMs in making these decisions.  He points out that "in October 2000, the Academy of Managed Care Pharmacy ('AMCP') published a Format for Formulary Submission, which is a standardized format for [manufacturers to submit] product, clinical, and economic data on a new drug."

Defendant's expert asserts that in spite of that effort to create a standardized format, the way in which PBMs operate in

evaluating drugs for formulary purposes varies greatly. He
certified that when he conducted his research, he discovered
that, rather than operating in a uniform manner as plaintiff's
expert opined, different managed care plans evaluated Vioxx and
accorded it widely different formulary treatment. He found that
because open formularies were common, Vioxx was included in most
third-party payors' plans. Some, however, by giving it
"preferred" status, assigned it to a "low co-payment tier."
Others placed it in a "non-preferred" tier where a high co-
payment was required. In other plans, Vioxx prescriptions were
essentially discouraged either because pre-approval was required
before a physician could prescribe it or because it could only
be prescribed after other, cheaper drugs had been tried without
success. Defendant's expert also certified that different P&T
Committees responded to ongoing releases of information about
Vioxx in different ways, with some altering its placement in
their formularies. He asserted that, as a factual matter, there
are such divergences among class members and in how they
analyzed the information received from defendant that class
certification is inappropriate.

C.

Central to plaintiff's class action assertions is its
argument that defendant engaged in a fraudulent marketing
campaign that induced, or was intended to induce, all third-

12

party payors to accord Vioxx preferred status in their formularies.  Plaintiff argues that if defendant had disclosed the adverse information about which it was aware concerning the safety and efficacy of the drug, plaintiff and the other class members either would not have authorized its inclusion in their formularies or would have placed it in a tier that would have discouraged consumers from purchasing it, and, therefore, would have reduced the amounts that third-party payors authorized for reimbursement of the drug's cost to plan members.  Defendant argues that this argument amounts to nothing more than a "fraud on the market" theory that cannot be sustained in accordance with our law.

II.

In seeking class certification,[2] plaintiff relied on the following definition of the proposed class, as set forth in its complaint:

> All third-party payors in the United States of America, who have paid any person or entity for the purchase of the prescription drug Vioxx (rofecoxib) since May 1, 1999.  Third-party payors include any non-governmental entity that is (i) a party to a contract, issuer of a policy, or sponsor of a plan, which contract, policy, or plan provides prescription drug coverage to natural persons, and is also (ii) at risk, pursuant to such contract, policy, or

---

[2] Because the complaint was filed in 2003, the federal Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4, codified as amended at 28 U.S.C.A. §§ 1453, 1711-1715 (2006), does not apply to any aspect of our analysis.

plan, to purchase or pay for all or part of the cost of prescription drugs dispensed to natural persons covered by such contract, policy, or plan. Excluded from the Class are (1) employees of defendant, including its officers or directors; (2) plaintiff's counsel; and (3) the Judge of the Court to which this case is assigned.

It is against this definition of the proposed class that we must consider the analysis of the Law Division and of the Appellate Division supporting the certification of a nationwide class of plaintiffs.

A.

We begin with a brief review of the standards that govern class action certification. We have recently addressed, in a different context, this Court's historical class action jurisprudence. See Iliadis v. Wal Mart Stores, Inc., 191 N.J. 88 (2007). As we pointed out in Iliadis, class action certification is governed by Rule 4:32-1. That Rule includes both general, see R. 4:32-1(a), and specific, see R. 4:32-1(b), requirements. Iliadis, supra, 191 N.J. at 106. The central question before us, as in Iliadis, is whether the putative class raises "questions of law or fact common to the members of the class [that] predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." R. 4:32-1(b)(3). As we have previously held, the

analysis of these aspects of the Rule must be "'rigorous.'" See
Iliadis, supra, 191 N.J. 106-07 (quoting Carroll v. Cellco
P'ship, 313 N.J. Super. 488, 495 (App. Div. 1998) (quoting Gen.
Tele. Co. of the Sw. v. Falcon, 457 U.S. 147, 161, 102 S. Ct.
2364, 2372, 72 L. Ed. 2d 740, 752 (1982))).  Moreover, our
review includes searching 'beyond the pleadings [to gain an ] .
. . understand[ing of] the claims, defenses, relevant facts, and
applicable substantive law.'"  Id. at 107 (quoting Carroll,
supra, 313 N.J. Super. at 495).

     In Iliadis, supra, we explained the meaning of
predominance, referring to the importance of an analysis of "the
number, and more important the significance of common
questions." 191 N.J. 108 (citing Carroll, supra, 313 N.J. Super.
at 499).  We noted as well that "a court must decide whether the
'benefit from the determination in a class action [of common
questions] outweighs the problems of individual actions.'"
Ibid. (alteration in original) (quoting In re Cadillac V8-6-4
Class Action, 93 N.J. 412, 430 (1983)).  Finally, we noted that
"predominance requires, at [a] minimum, a 'common nucleus of
operative facts.'"  Ibid. (quoting In re Cadillac, supra, 93
N.J. at 431).

     We recognized, as well, that there is no requirement that
individual issues be absent, ibid. (citing Varacallo v. Mass.
Mut. Life Ins. Co., 332 N.J. Super. 31, 45 (App. Div. 2000), or

"that the common issues dispose of the entire dispute," ibid. (citing Strawn v. Canuso, 140 N.J. 43, 67 (1995), superseded on other grounds by, L. 1995, c. 253, § 10 (codified at N.J.S.A. 46:3C-10), as recognized in Nobrega v. Edison Glen Assocs., 167 N.J. 520 (2001)).  Nor does predominance require that all issues be identical among class members or that each class member be affected in precisely the same manner.  See Fiore v. Hudson County Employees Pension Comm'n, 151 N.J. Super. 524, 528 (App. Div. 1977).

We also explained in Iliadis the meaning of the Rule's requirement that a class be "superior" to other methods of adjudication.  Iliadis, supra, 191 N.J. at 114.  The superiority requirement involves "'a comparison with alternative procedures,'" ibid. (quoting In re Cadillac, supra, 93 N.J. at 436), to evaluate both fairness and efficiency of the class action proceeding.

We there reiterated the basic principles that govern the decision concerning whether a particular proposed class meets the criteria for superiority.  In part, we noted that "our analysis demands '(1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of the fairness to all whose interests may be involved between such alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each

method.'"   Id. at 114-15 (quoting In re Cadillac, supra, 93 N.J. at 436 (quotation omitted in original)).   More specifically, in Iliadis, we identified as important to the superiority analysis a consideration of the "class members' 'lack of financial wherewithal.'"  Id. at 115 (quoting Saldana v. City of Camden, 252 N.J. Super. 188, 200 (App. Div. 1991)).   In such circumstances, we have expressed a concern that, absent a class, the individual class members would not pursue their claims at all, thus demonstrating superiority of the class action mechanism.   See ibid.; Muhammad v. County Bank of Rehoboth Beach, 189 N.J. 1, 17 (2006), cert. denied, 127 S. Ct. 2032, 167 L. Ed. 2d 763 (2007).

In Iliadis, supra, we also referred, in part, to the significance of plaintiffs having "nominal" claims, 191 N.J. at 115 (citing Varacallo, supra, 332 N.J. Super. at 52), and to the role of class actions as an "equalizing mechanism" between adversaries of vastly different resources, id. at 115, as a part of the considerations that bear on the superiority analysis.   To be sure, we also evaluated the available alternative dispute resolution forum, the importance of uniformity of outcome and the impact of differing statutes of limitations, see id. at 116, in concluding that, in Iliadis, a class action was indeed the superior adjudicatory mechanism, see id. at 117.

Finally, in _Iliadis_, we addressed the question of whether a class action would be unmanageable.  Recognizing that rejection of a proposed class for reasons relating to its manageability is "disfavored," _ibid._, we nevertheless acknowledged that some proposed class actions may present management issues of such magnitude that certification should be withheld, see _id._ at 118. It is in light of this recent reiteration of the fundamental principles that guide certification of class actions generally that we must consider the issues presented in this matter.

B.

In granting the motion for class certification, the Law Division concluded that the proposed class met the prerequisites for predominance and superiority.  The court's conclusion about predominance rested on two related considerations.

First, the motion court concluded that the facts relating to defendant's marketing campaign, its suppression of adverse information, and its behavior in working to have Vioxx included in formularies were common to all members of the proposed class of third-party payors.  Even though the court recognized that the decision of any particular P&T Committee, PBM, or third-party payor about adding this product to the formulary or about its placement in the formulary was an individual one, the court concluded that facts relating to the marketing campaign itself and the information distributed by defendant to those decision-

18

makers was common to all class members.  Second, the court found
that common questions of law predominate because its choice of
law analysis led it to conclude that New Jersey's Consumer Fraud
Act (CFA), N.J.S.A. 56:8-1 to -166, should apply to all members
of this nationwide class.

The motion court also found that a class action would be
superior to other methods of affording relief to all potential
plaintiffs, including being superior to pending federal multi-
district litigation raising some, if not all, of the same
claims.  That conclusion was, in essence, a logical extension of
the court's decision about the predominance of common questions
of fact and law.

In a published opinion, the Appellate Division affirmed.
See Int'l Union of Operating Eng'rs Local # 68 Welfare Fund v.
Merck & Co., 384 N.J. Super. 275 (App. Div. 2006).  Applying an
abuse of discretion standard to the motion court's factual
determinations, see id. at 283 (citing In re Cadillac, supra, 93
N.J. at 436-39), and utilizing a de novo standard of review in
evaluating the court's analysis of the questions of law, see id.
at 284 (citing Manalapan Realty, L.P. v. Twp. Comm. of
Manalapan, 140 N.J. 366, 378 (1995)), the appellate panel
concluded that certification of a nationwide class was
appropriate, see id. at 281.

19

The panel noted that defendant concedes that there are some common issues and that the proposed class meets the basic prerequisites for class certification set forth in Rule 4:32-1(a).  See id. at 285.  In the panel's analysis, then, the only questions were, in accordance with Rule 4:32-1(b)(3), whether "common questions predominate [and whether] a class action would be superior to other methods of adjudicating this controversy." Ibid.  In addressing whether these criteria for class certification have been met, the appellate panel based its decision, in large part, on its conclusion that our CFA could be applied to all members of the class, see id. at 305, and that therefore common questions of law would predominate.

In addition, although recognizing and cataloging the individual decision-making processes engaged in by the PBMs and, therefore, by the many potential class members, see id. at 282-83, the appellate panel decided that there were also common questions of fact, see id. at 292.  As a part of that analysis, the panel reasoned that the CFA's ascertainable loss requirement need not be proven by each class member individually, but could be proven on a class-wide basis through expert testimony.  See id. at 291.  Recognizing that a nationwide class action that applies a single state's law to all claims is "rare," id. at 303, and that this class will "undoubtedly present management problems," id. at 304, the appellate panel nevertheless

concluded that neither of those concerns militated against
certification of this class, see id. at 305-06.

C.

Defendant moved for leave to appeal, raising three
essential arguments.  First, defendant contends that the
Appellate Division erred in concluding that, in accordance with
choice of law principles, the CFA can apply to a nationwide
class.  Second, defendant asserts that plaintiff's theory that
it can meet the CFA's ascertainable loss on a class-wide basis
amounts to a fraud on the market theory which this Court has
previously held cannot apply outside the strict parameters of
securities fraud litigation.  Finally, defendant suggests that
the appellate panel erred in concluding that a class action is
superior to other mechanisms readily available to members of the
class.

Plaintiff urges us to conclude that the Appellate
Division's analysis is entirely correct.  First, plaintiff
argues that its evaluation of our choice of law principles was
sound, with the result that the nationwide application of our
CFA to all class members is appropriate.  Second, plaintiff
asserts that the CFA's ascertainable loss component may be met
on a class-wide basis through expert proofs that need only
establish some causal relationship between the defendant's acts
and the injuries suffered by the members of the class.  Further,

21

plaintiff rejects defendant's contention that this method of proof equates with a fraud on the market theory.  Finally, plaintiff suggests that a class action is indeed a superior mechanism for achieving a remedy.

We granted defendant's motion for leave to appeal and we also granted leave to submit amicus curiae briefs to a large and diverse number of entities.

                                 IV.

Although the parties have suggested that the choice of law analysis, and the corollary decision to apply our CFA to all members of the nationwide class, was the lynchpin for class certification and should therefore be the essential focus of this appeal, we do not adopt that approach.  Rather, we address this class action certification, as we have others, by analyzing more generally the assertions about predominance and superiority.

In doing so, we note that defendant concedes that there are some common questions.  To be sure, there is no disagreement about the fact that, whatever its specifics, defendant's marketing plan and withholding of adverse information did not vary as among potential consumers.  Nor is there any difference in the facts as they relate to the FDA warning letters or the drug's eventual withdrawal from the market.  We confront in this appeal, however, two essential questions.  First, we consider

whether those facts, even were we to agree that our CFA could be given nationwide application to all class members,[3] constitute common questions of fact or law that predominate. Second, we consider whether a class action is superior to other available mechanisms for redress of the claims raised by plaintiff.

A.

Our analysis of the fact questions, however, is intertwined with our consideration of the questions of law asserted to be common. If we were to agree with the appellate panel that our CFA could appropriately be applied to all members of this nationwide class, the proofs that our CFA would require, in and of themselves, demonstrate an overall lack of predominant common questions. We reach this conclusion for reasons that arise from the CFA itself.

The CFA imposes liability on any person who uses: "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or

---

[3] As the appellate panel noted, certification of a nationwide class is "rare," Int'l Union, supra, 384 N.J. Super. at 303, and application of the law of a single state to all members of such a class is even more rare. Although defendant advances strong arguments in support of its appeal from the Appellate Division's choice of law analysis, in light of our decision on predominance and superiority, we express no view on the Appellate Division's choice of law reasoning or the result it reached as to the applicability of our law to all members of a nationwide class.

omission." N.J.S.A. 56:8-2.  Consumer fraud violations are divided broadly "into three . . . categories: affirmative acts, knowing omissions, and regulatory violations." Cox v. Sears Roebuck & Co., 138 N.J. 2, 17 (1994).  Thus, to state a CFA claim, a plaintiff must allege "three elements: (1) unlawful conduct . . . ; (2) an ascertainable loss . . . ; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." N.J. Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8, 12-13 (App. Div.), certif. denied, 178 N.J. 249 (2003).

Our statute essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss.  See Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 246 (2005); Sheila B. Scheuerman, The Consumer Fraud Class Action, Reining in Abuse by Requiring Plaintiffs to Allege Reliance as an Essential Element, 43 Harv. J. on Legis. 1, 25-30 (2006) (surveying different requirements for proof of traditional fraud element of reliance in consumer fraud statutes nationwide).

Our analysis requires us to consider, in light of the requirements of our CFA,[4] what questions of fact or law are

_____

[4] In framing the issues for this Court in the motion for leave to appeal, the parties sought to focus on the choice of law decision that led to the application of our CFA to all class members.  Although they theorized that it was the application of

24

common and whether those questions predominate in the sense
required for certification of a class.  In addressing this
aspect of the appeal, the parties rely on different parts of the
record.  We begin with a brief recitation of the particular
facts that each party asserts are relevant to the question of
predominance.

Plaintiff argues that we should focus on the facts relating
to the conduct engaged in by defendant in marketing its product
and in withholding important information about the product's
risks from the FDA and the public.  In doing so, plaintiff
asserts that all of the facts relating to defendant's behavior
and its marketing campaign are common to all class members.
Moreover, plaintiff argues that each member of the proposed
class received the same information and was a target of the same
deceptive campaign.

Defendant argues that we should instead consider the facts
that relate to the members of the class more generally.  As
such, defendant points out that the essence of the claims must
be that each class member was injured individually when it
decided, based on defendant's allegedly fraudulent conduct, to
include Vioxx in its formulary and, more to the point, when it
paid for the drug purchased by plan members in its home state.

our CFA itself that created a common question of law, we do not
agree with the premise that reliance on the CFA necessarily
created a common question that meets the test for predominance.

Defendant further suggests that because each class member made that evaluation at different times and based on different criteria and because each reacted differently with regard to formulary placement even after the facts that allegedly prove the fraud became known, there are overwhelmingly individual, rather than common, questions of law and fact.  This fundamental dispute about focus forms the heart of the debate on appeal.

Although the record does not identify the members of the proposed class, other than the named plaintiff, with any precision, the available information makes it plain that they are a diverse group of entities.  More important to our analysis, however, plaintiff does not suggest that each of these proposed class members, receiving the same information from defendant, reacted in a uniform or even similar manner.  Rather, the record speaks loudly in its demonstration that each third-party payor, relying on PBMs and P&T Committees, made individualized decisions concerning the benefits that would be available to its members for whom Vioxx was prescribed.  The evidence about separately created formularies, different types of tier systems, and individualized requirements for approval or reimbursement imposed on various plans' members and, to some extent, their prescribing physicians, are significant.  That evidence convinces us that the commonality of defendant's behavior is but a small piece of the required proofs.  Standing

alone, that evidence suggests that the common fact questions surrounding what defendant knew and what it did would not predominate.

B.

Nationwide application of our CFA would create a further consideration important to our analysis of predominance.  As a part of its argument, plaintiff asserts that the common facts surrounding defendant's marketing scheme created an effect on the price of Vioxx such that the ascertainable loss element of our CFA may be proven, on a class-wide basis, by reliance on expert analysis alone.  Defendant urges us to conclude that plaintiff's approach cannot demonstrate ascertainable loss as required by our CFA because it amounts to a "fraud on the market" theory.

We need only briefly address this aspect of the dispute. Our CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover.  In place of the traditional reliance element of fraud and misrepresentation, we have required that plaintiffs demonstrate that they have sustained an ascertainable loss.  Most recently, in Theidemann, supra, we discussed at length the meaning of this concept and its importance to CFA litigation.

Fraud on the market is essentially a creature of federal securities litigation.  See Kaufman v. i-Stat Corp., 165 N.J.

27

94, 97 (2000).  In that context, plaintiffs who purchased securities are permitted to demonstrate that they were damaged simply because defendant engaged in behavior otherwise prohibited and there was a change in price.  See ibid.  The theory therefore presumes reliance.  See Basic Inc. v. Levinson, 485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194, (1988); Blackie, supra, 524 F.2d at 906 (explaining rationale for permitting fraud on market theory in securities fraud litigation); see also Finkel v. Docutel/Olivetti Corp., 817 F.2d 356, 359-62 (5th Cir. 1987) (limiting fraud on market theory to specified varieties of securities fraud claims), cert. denied, 485 U.S. 959, 108 S. Ct. 1220, 99 L. Ed. 2d 421 (1988).

We have rejected the fraud on the market theory as being inappropriate in any context other than federal securities fraud litigation.  See Kaufman, supra, 165 N.J. at 97-98.  Therefore, to the extent that plaintiff seeks to prove only that the price charged for Vioxx was higher than it should have been as a result of defendant's fraudulent marketing campaign, and seeks thereby to be relieved of the usual requirements that plaintiff prove an ascertainable loss, the theory must fail.  See N.J. Citizen Action, supra, 367 N.J. Super. at 15-16 ("[P]laintiffs must nonetheless plead and prove a causal nexus between the alleged act of consumer fraud and the damages sustained.").

Plaintiff argues that it should be permitted to demonstrate class-wide damages through use of a single expert who would opine about the effect on pricing of the marketing campaign in which defendant engaged.  To the extent that that plaintiff intends to rely on a single expert to establish a price effect in place of a demonstration of an ascertainable loss or in place of proof of a causal nexus between defendant's acts and the claimed damages, however, plaintiff's proofs would fail.  That proof theory would indeed be the equivalent of fraud on the market, a theory we have not extended to CFA claims.

The significance of plaintiff's planned approach to proof of ascertainable loss is clear.  To the extent that plaintiff proposed, and the Appellate Division authorized, the use of a single expert to establish this critical CFA proof element so as to create a common question of fact or law that would bear on the predominance analysis, our rejection of the theoretical basis for that proof mechanism removes it as a potential common question entirely.

C.

Finally, we address a further, fundamental, question relating to the proposed class.  In short, defendant argues that, under any circumstances, certification of a class as defined by plaintiff cannot be appropriate.  Focusing on the relatively large sum of damages that this plaintiff contends it

has individually sustained as a result of defendant's marketing
of Vioxx, defendant argues that a class action is not
appropriate.  Whether we regard this as an attack on the
superiority prong of the test or as a general question about the
propriety of certification for this proposed class in general,
it has independent merit.

We reach this conclusion based on our recent analysis of
class actions as expressed in our Iliadis decision.  Although we
need not repeat any of the more general matters to which we
there adverted, it is the differences between the proposed class
members here and those in Iliadis that requires us to reach a
different result in this matter than the one we reached there.

In Iliadis, supra, we considered claims raised by a
proposed class of individual hourly wage earners, numbering in
the thousands. See 191 N.J. at 95.  The essential theory of
recovery asserted on behalf of that putative class rested on
allegations of corporate-wide policies designed to deny the
individuals compensation for relatively small units of time that
they worked under circumstances when they were, by company-wide
contract terms, entitled to be paid.  See id. at 95-96, 115-17.
The amount that any individual worker might ultimately or
potentially recover in damages was small.  See id. at 115.  The
class numbered in the thousands.  See id. at 95.  Individually,
they would be greatly disadvantaged in any effort to pursue

their claims against a large corporate defendant.  See id. at 104-05.  We concluded that, in accordance with well-established principles governing class actions, the Iliadis class should be certified.  See id. at 120-21.

It was, perhaps, the quintessential example of facts and circumstances that would support class-wide relief.  In particular, we noted that the specifics of the manner in which the defendant was alleged to have accomplished its goal of diminishing the compensation otherwise due the class members, the small amount that any one class member would be due, and the large number of class members for whom relief would otherwise not be practically available, all militated in favor of a conclusion that the common issues predominated and the class action mechanism was superior to any other forum for relief.  We did not depart, in that analysis, from our traditional class action jurisprudence, but stayed squarely within its ordinary parameters.

It is in light of that background that we cannot escape the vast differences between that appropriate use of the class action device and the present inappropriate one.  Unlike the individual wage earners there, plaintiff and, by extension, all of the members of the class, allege that they have been damaged in large sums.  Unlike those hourly wage earners, plaintiff and the other third-party payors are well-organized institutional

entities with considerable resources.  Unlike in <u>Iliadis</u>, here
we see no disparity in bargaining power and no likelihood that
the claims are individually so small that they will not be
pursued.  In short, we find no ground on which to conclude that
this proposed nationwide class meets the test for superiority
that we have traditionally required.

VIII.

The judgment of the Appellate Division is reversed and this
matter is remanded to the Law Division for further proceedings
consistent with this opinion.

JUSTICES LONG, LaVECCHIA, WALLACE, RIVERA-SOTO, and HOENS
join in this opinion.  JUSTICE ALBIN did not participate.

SUPREME COURT OF NEW JERSEY

NO.   A-22___                          SEPTEMBER TERM 2006

ON APPEAL FROM   _____Appellate Division, Superior Court_____


INTERNATIONAL UNION OF
OPERATING ENGINEERS LOCAL NO.
68 WELFARE FUND, individually
and on behalf of all others
similarly situated,

       Plaintiff-Respondent,

             v.

MERCK & CO., INC.,

       Defendant-Appellant.



DECIDED                September 6, 2007
_____Justice Long_____   PRESIDING

OPINION BY        Per Curiam_____

CONCURRING OPINION BY _____

DISSENTING OPINION BY _____

| CHECKLIST | REVERSE AND REMAND | |
|---|---|---|
| JUSTICE LONG | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE WALLACE | X | |
| JUSTICE RIVERA-SOTO | X | |
| JUSTICE HOENS | X | |
| TOTALS | 6 | |