Christopher A. Seeger
David R. Buchanan
SEEGER WEISS LLP
550 Broad Street, Suite 920
Newark, New Jersey 07102
(973) 639-9100

Attorneys for Plaintiff

```
----------------------------------------------------------  x
                                                            :   SUPERIOR COURT OF NEW JERSEY
                                                            :   LAW DIVISION: ATLANTIC COUNTY
                                                            :
In Re: VIOXX LITIGATION                                     :   CASE CODE 619
                                                            :
                                                            :   CIVIL ACTION
                                                            :
----------------------------------------------------------  x
INTERNATIONAL UNION OF OPERATING                            :
ENGINEERS LOCAL NO. 68 WELFARE                              :
FUND, individually and on behalf of all others             :   DOCKET NO.: ATL-L-3015-03 MT
similarly situated,                                         :
                                                            :
                                    Plaintiff,              :   FILED UNDER SEAL
                                                            :
               -against-                                    :
                                                            :
MERCK & CO., INC.,                                          :
                                                            :
                                    Defendant.              :
----------------------------------------------------------  x
```

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

   A.     The Importance of Third-Party Payors to Merck ........................................... 3

   B.     The Development of VIOXX ........................................................................ 4

         1.     Merck's "COX-2 Hypothesis" ........................................................ 4

         2.     Merck's Dire Need for VIOXX's Approval &
              "Blockbuster" Sales ....................................................................... 5

         3.     Merck Was Unable to Demonstrate Clinically
              Significant Safety Advantages for VIOXX Pre-Approval ................ 6

   C.     Merck Engaged in Unconscionable and Deceptive Marketing
       Practices in Connection With the Marketing and Sales of VIOXX ............. 9

         1.     Merck's Unprecedented Marketing Campaign Positioned
              VIOXX as a "Safer," More Cost-Effective Alternative to
              Traditional NSAIDs ...................................................................... 10

         2.     Despite Its Public Claims of VIOXX's Superior Safety, Merck
               Knew—as Early as 1996—That VIOXX Was Actually Less Safe
               Than Traditional NSAIDs That Would Have Cost Third-Party
              Payors Only Pennies Per Day .......................................................... 13

         3.     Even After Post-Marketing Studies Confirmed
              VIOXX's Cardiovascular Risk, Merck Continued
              to Mislead Consumers, Physicians, and Third-Party
              Payors About the Drug's Safety Profile ......................................... 14

               a.     The VIGOR Trial Confirms Cardiovascular Risks
                    for VIOXX ........................................................................ 15

                b.     To Ensure That VIOXX Was Retained on Formularies,
                    Merck Continued to Tout the Drugs's Safety Advantages
                      White Denying the Existence of Cardiovascular Risks ......... 16

i

|   |   | 4. | Merck's Campaign to Silence and Intimidate Critics of VIOXX | 20 |
|---|---|---|---|---|
|   | D. | | VIOXX Is Withdrawn From the Market | 21 |
|   | E. | | The Present Action | 22 |

ARGUMENT ....................................................................................................... 23

A. Applicable Standards ..................................................................................... 23

B. The Class Satisfies the Criteria of Rule 4:32-1(a) ....................................... 25

|   | 1. | The Class is Too Numerous to Permit Joinder of All Class Members | 25 |
|---|---|---|---|
|   | 2. | There Are Questions of Law or Fact Common to the Members of the Class, and Those Questions Predominate Over Questions Affecting Only Individual Members | 26 |
|   | 3. | Plaintiff's Claims are Typical of Those of the Class | 30 |
|   | 4. | Plaintiff Will Adequately Represent the Interests of Absent Class Members | 31 |

C. Besides the predominance of Common Questions, a Class Action Would Be Superior to Alternative Methods of Adjudication ....................... 33

|   | 1. | Certification of the Class Will Promote the Interest of Judicial Efficiency and Economy | 33 |
|---|---|---|---|
|   | 2. | A Class Trial Will Be Manageable Because Only New Jersey Law Will Govern All Class Members' Claims | 34 |

CONCLUSION .................................................................................................... 44

## TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ..................................................... 32

*Allstate Ins. Co. v Hague*, 449 U.S. 302 (1981)................................................................ 42

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994).................................................................. 26

*Barabin v. Aramark Corp.*, 210 F.R.D. 152 (E.D. Pa. 2002), *aff'd*, No. 02-8057,
2003 WL 355417 (3d Cir. Jan. 24, 2003) .......................................................................... 30

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975)............................................................. 30

*Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543 (D.N.J. 1998)................. 37, 38

*Brancheau v. Residential Mortg. Group, Inc.*,
177 F.R.D. 655 (D. Minn. 1997)........................................................................................ 27

*Buford v. H & R Block, Inc.*, 168 F.R.D. 340 (S.D. Ga. 1996), *aff'd*,
*Jones v. H & R Block*,117 F.3d 1433 (11th Cir. 1997) ...................................................... 27

*In re Cadillac V8-6-4 Class Action*,
93 <u>N.J.</u> 412, 461 A.2d 736 (1983)...................................................... 23, 24, 27, 30, 31, 33

*Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540 (D.N.J. 1999)................................. 31

*Carroll v. Cellco P'ship*, 313 <u>N.J. Super.</u> 488, 713 A.2d 509
(App. Div. 1998) ............................................................................................. 23, 27, 29, 35

*Cartigilia v. Johnson & Johnson Co.*,
No. MID-L-2754-01, 2002 WL 1009473 (<u>N.J. Super.</u> Apr. 24, 2002)............................. 35

*Century 21 Real Estate Corp. v. Hometown Real Estate Co.*,
890 S.W.2d 118 (Tex. App. 1994) ..................................................................................... 42

*Cox v. Sears Roebuck & Co.*, 138 <u>N.J.</u> 2, 647 A.2d 454 (1994) ....................................... 37

*DeLoach v. Philip Morris Cos.*, 206 F.R.D. 551 (M.D.N.C. 2002)............................ 30, 34

<u>*Delgozzo v. Kenny*</u>, 266 <u>N.J. Super.</u> 169, 628 A.2d 1080
(App. Div. 1993) ............................................................... 24, 25 27, 28 29, 30, 32, 34, 35

*In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524
(M.D. Fla. 1996)..................................................................................................... 26

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)....................................................24-25

*Erny v. Estate of Merola*, 171 N.J. 86, 792 A.2d 1208 (2002) .......................................... 36

*Esplin v. Hirschi*, 402 F.2d 94 (10th Cir. 1968).................................................................. 34

*Fink v. Ricoh Corp.*, 365 N.J. Super. 520, 839 A.2d 942
(Law Div. 2003) .............................................................................. 25, 26, 29, 35

*Fu v. Fu*, 160 N.J. 108, 733 A.2d 1133 (1999) .......................................................... 36, 37

*Gantes v. Kason Corp.*, 145 N.J. 478, 679 A.2d 106 (1996) ....................................... 36, 37

*General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147 (1982)........................................ 30

*Goasdone v. American Cyanamid Corp.*, 354 N.J. Super. 519, 808 A.2d 159
(Law Div. 2002) ...................................................................................... 24, 31, 34

*Goshen v. Mutual Life Ins. Co. of New York*,
98 N.Y.2d, 746 N.E.2d 858 (2002) .................................................................... 42

*Gross v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
303 N.J. Super. 336, 696 A.2d 793 (Law Div. 1997) ........................................... 27, 31, 32

*Hallaba v. Worldcom Network Servs. Inc.*, 196 F.R.D. 630
(N.D. Okla. 2000)..................................................................................................... 26

*Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324,
614 A.2d 124 (1992) .............................................................................................. 42

*Int'l Union of Operating Engr's Local No. 68 Welfare Fund v. Merck & Co.*,
No. ATL-L3015-03 MT (Law Div. July 8, 2004 ....................................... 25, 34

*Kronisch v. Howard Savs. Inst.*, 133 N.J. Super. 124, 335 A.2d 587
(Ch. Div. 1975)........................................................................................................ 25

*Kropinski v. Johnson & Johnson*, No. A-3979-97T1, 1999 WL. 33603132
(App. Div. Jan. 7, 1999)....................................................................................... 35

*Kugler v. Romain*, 58 N.J. 522, 279 A.2d 640 (1980).................................................. 37, 38

*Leon v. Rite Aid Corp.*,
340 N.J. Super. 462, 774 A.2d 674 (App. Div. 2001).......................................................... 29

*Lettenmaier v. Lube Connection, Inc.*, 162 N.J. 134, 741 A.2d 591 (1999) ............... 37, 41

*In re LifeUSA Holding, Inc.*, 242 F.3d 136, 144 (3d Cir. 2001)…………………………...26

*Lockwood Motors, Inc. v. General Motors Corp.*, 162 F.R.D. 569
(D. Minn. 1995)..................................................................................................................... 34

*Lonza v. The Hartford Accident and Indem. Co.*, 359 N.J. Super. 333,
820 A.2d 53 (App. Div. 2003) ............................................................................................. 36

*Lusky v. Capasso Bros.*, 118 N.J. Super. 369, 287 A.2d 736
(App. Div. 1972) ................................................................................................................... 24

*Ly v. Nystrom*, 615 N.W.2d 302 (Minn. 2000).................................................................... 42

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222
(Iowa 1998) ........................................................................................................................... 36

*Muise v. GPU, Inc.*, 371 N.J. Super. 13, 851 A.2d 799
(App. Div. 2004) ...................................................................................................... 23, 26, 33

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493
(S.D.N.Y. 1996) .................................................................................................................... 34

*New Mea Constr. Corp. v. Harper*, 203 N.J. Super. 486, 497 A.2d 534
(App. Div. 1985) ................................................................................................................... 37

*In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158
(E.D. Pa. 1997)...................................................................................................................... 31

*Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21 (D. Mass. 2003) ......................... 27

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)...................................................... 42

*Pirozzi v. Penske Olds-Cadillac-GMC, Inc.*, 605 A.2d 373
(Pa. Super. 1992)................................................................................................................... 42

*In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603
(N.D. Ga. 1997)..................................................................................................................... 26

*In re Prudential Ins. Co. of Am. Sales Practices Litig.,*
148 F.3d 283 (3d 1998 Cir.1998)...........................................…..............29

*Riley v. New Rapids Carpet Ctr.,* 61 N.J. 218, 294 A.2d 7 (1972) .................................... 24

*Saldana v. City of Camden,* 252 N.J. Super. 188, 599 A.2d 582
(App. Div. 1991) ..................................................................................................... 26

*Salmeron v. Highlands Ford Sales, Inc.,* 271 F. Supp. 2d 1314
(D.N.M. 2003)......................................................................................................... 42

*Schwartz v. Dana Corp./Parish Division,* 196 F.R.D. 275
(E.D. Pa. 2000)....................................................................................................... 26

*Seafare Corp. v. Trenor Corp.,* 363 S.E.2d 643 (N.C. App. 1988)................................... 42

*State ex rel. Corbin v. Hovatter,* 698 P.2d 225 (Ariz. App. 1985)................................... 42

*Stoller v. Baldwin-United Corp.,* No. 82-1438, 1985 WL 5809
(S.D. Ohio June 4, 1985)....................................................................................... 30

*Strawn v. Canuso,* 140 N.J. 43, 657 A.2d 420 (1995) ......................................... 23, 27, 30

*Stringer v. Merck & Co.,* No. 03-CV-411 ....................................................................... 39

*Talalai v. Cooper Tire & Rubber Co.,* No. L-008830.00, slip op. at 33-36
(N.J. Super. Law Div. Sept. 13, 2002) ................................................................. 35

*Union Ink Co., v. AT&T Corp.,* 352 N.J. Super. 617, 801 A.2d 361
(App. Div.), *cert. denied,* 174 N.J. 547, 810 A.2d 66 (2002) ............................................ 29

*Varacallo v. Mass. Mut. Life Ins. Co.,* 332 N.J. Super. 31,
752 A.2d 807 (App. Div. 2000) ..................................................................... 24, 25, 27, 29

*Veazey v. Doremus,* 103 N.J. 244, 510 A.2d 1187 (1986) ................................................. 36

*In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124 (2d Cir. 2000),
*cert. denied, Visa U.S.A. Inc. v. Wal-Mart Stores, Inc.,*
536 U.S. 917 (2002) ............................................................................................30-31

*In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 247 (D. Del. 2002)..............26

*Weiss v. York Hospital,* 745 F.2d 786 (3d Cir. 1984) ......................................................... 25

*Zeller v. Northrup King Co.,* 370 N.W.2d 809 (Wis. App. 1985)...................................... 42

*Zinberg v. Washington Bancorp, Inc.,* 138 F.R.D. 397 (D.N.J. 1990).............................. 26

*Zorba Contractors, Inc. v. Housing Auth., City of Newark,*
362 <u>N.J. Super.</u> 124, 827 A.2d 313 (App. Div. 2003)........................................................ 29

## STATUTES:

Alaska Stat. 45.50.471.................................................................................................... 41

Alaska Stat. § 45.50.531................................................................................................. 41

Ark. Code Ann. 4-88-107............................................................................................... 41

Ariz. Rev. Stat. § 44-1522(A) ....................................................................................... 41

CFA, N.J. Stat. Ann. § 56:8-1 ....................................................................................... 21

Colo. Rev. Stat. § 6-1-105.............................................................................................. 41

Colo. Rev. Stat. § 6-1-113.............................................................................................. 41

Conn. Gen. Stat. § 42-110b(a)........................................................................................ 41

Conn. Gen. Stat. § 42-110g ............................................................................................ 41

Del. Code Ann. tit. 6, § 2512 ......................................................................................... 42

Del. Code Ann. tit. 6, § 2513 ......................................................................................... 41

Del. Code Ann. tit. 6, § 2525 ......................................................................................... 41

Fla. Stat. Ann. § 501.202(2)........................................................................................... 42

Fla. Stat. Ann. § 501.204................................................................................................ 41

Ga. Code Ann. § 10-1-391(a)......................................................................................... 42

Ga. Code Ann. § 10-1-392(a)......................................................................................... 41

Ga. Code Ann. § 10-1-399 ............................................................................................. 41

Haw. Rev. Stat. § 487-1 ................................................................................................. 41

815 Ill. Comp. Stat. 505/10a ......................................................................................... 41

815 Ill. Comp. Stat. 505/2 ............................................................................................. 41

Kan. Stat. Ann. § 626(a) ............................................................................................ 41

Kan. Stat. Ann. § 50.623(b) ....................................................................................... 42

Kan. Stat. Ann. § 50.634 ............................................................................................ 41

Ky. Rev. Stat. Ann. § 367.170 .................................................................................... 41

Ky. Rev. Stat. Ann. § 367.220(1) ............................................................................... 41

La. Rev. Stat. § 51:1409 ............................................................................................. 41

Md. Code Ann., Com. Law § 13-102 .......................................................................... 42

Md. Code Ann., Com. Law § 13-301 .......................................................................... 41

Me. Rev. Stat. Ann. tit. 5, § 207 ................................................................................. 41

Me. Rev. Stat. Ann. tit. 5, § 213(1) ............................................................................ 41

Minn. Stat. Ann. § 325F.69(1) .................................................................................... 41

Miss. Code Ann. § 75-24-15(1) ................................................................................... 41

Miss. Code Ann. § 75-24-5 ......................................................................................... 41

Mo. Ann. Stat. § 407.025 ............................................................................................ 41

Mo. Rev. Stat. § 407.020 ............................................................................................ 41

Mont. Code Ann. § 30-14-103 .................................................................................... 41

N.C. Gen. Stat. § 75-1.1(a) ......................................................................................... 41

N.C. Gen. Stat. § 75-16 .............................................................................................. 41

N.D. Cent. Code § 51-15-02 ....................................................................................... 41

N.H. Rev. Stat. Ann. § 358-A:10 ................................................................................ 41

N.H. Rev. Stat. Ann. § 358-A:2 .................................................................................. 41

N.J. Stat. Ann. § 56:8-19 ............................................................................................ 41

N.J. Stat. Ann. § 56:8-2 .............................................................................................. 41

N.M. Stat. Ann. § 57-12-10 ............................................................................................. 41

N.M. Stat. Ann. § 57-12-3 ............................................................................................... 41

N.Y. Gen. Bus. Law § 349 ............................................................................................... 41

Neb. Rev. Stat. § 87-302 ................................................................................................. 41

Nev. Rev. Stat. 598.015, 598.0923 ................................................................................. 41

Ohio Rev. Code Ann. § 1345.02 ..................................................................................... 41

73 Pa. Cons. Stat. Ann. § 201-3 ...................................................................................... 41

73 Pa. Cons. Stat. Ann. § 201-9.2 ................................................................................... 41

Ohio Rev. Code Ann. § 1345.09 ..................................................................................... 41

Okla. Stat. Ann. tit. 15, § 753 ......................................................................................... 41

Okla. Stat. Ann. tit. 15, § 761.1 ...................................................................................... 41

Or. Rev. Stat. § 646.608 .................................................................................................. 41

Or. Rev. Stat. § 646.638 .................................................................................................. 41

S.C. Code Ann. § 39-5-140 ............................................................................................. 41

S.C. Code Ann. § 39-5-20 ............................................................................................... 41

Tenn. Code Ann. § 13-11-109 ......................................................................................... 41

Tenn. Code Ann. § 47-18-102 ......................................................................................... 42

Tenn. Code Ann. § 47-18-104 ......................................................................................... 41

Tex. Bus. & Com. Code Ann. § 17.46 ............................................................................ 41

Tex. Bus. & Com. Code Ann. § 17.50 ............................................................................ 41

Utah Code Ann. § 13-11-19 ............................................................................................ 41

Utah Code Ann. § 13-11-4 .............................................................................................. 41

Va. Code Ann. § 59.1-200 ............................................................................................... 41

ix

Va. Code Ann. § 59.1-204..................................................................................................41

Vt. Stat. Ann. tit. 9, § 2451 ..............................................................................................42

Vt. Stat. Ann. tit. 9, § 2453 ..............................................................................................41

Vt. Stat. Ann. tit. 9, § 2461(b)..........................................................................................41

W. Va. Code § 46A-6-101 ................................................................................................42

W. Va. Code § 46A-6-104 ................................................................................................41

W. Va. Code § 46A-6-106(1)............................................................................................41

Wash. Rev. Code § 19.86.020...........................................................................................41

Wash. Rev. Code § 19.86.090...........................................................................................41

Wash. Rev. Code § 19.86.920...........................................................................................42

Wis. Stat. Ann § 100.18 ...................................................................................................41

Wyo. Stat. Ann. § 40-12-105 ...........................................................................................41

## RULES AND OTHER AUTHORITIES:

Ala. Code § 8-19-10..........................................................................................................41

Ala. Code § 8-19-2............................................................................................................42

Ala. Code § 8-19-5............................................................................................................41

Cal. Bus. & Prof. Code § 17200........................................................................................41

Idaho Code § 48-601 .........................................................................................................42

Idaho Code § 48-603 .........................................................................................................41

Idaho Code § 48-608(1) ....................................................................................................41

Ind. Code § 24-5-0.5-3(a)..................................................................................................41

Indiana Code § 24-5-0.5-1(a)(2) .......................................................................................41

Indiana Code § 24-5-0.5-1(a)(2) .......................................................................................42

Iowa Code § 714.16(2) .................................................................................. 41

Iowa Code § 714.16 ...................................................................................... 36

Mass. Gen. Laws ch. 93A, § 2 ...................................................................... 41

Mass. Gen. Laws ch. 93A, § 9 ...................................................................... 41

Mass. Gen. Laws ch. 93A, § 2 ...................................................................... 41

Mass. Gen. Laws ch. 93A, § 9 ...................................................................... 41

Mich. Comp. Laws § 445.903 ....................................................................... 41

Mich. Comp. Laws § 445.911 ....................................................................... 41

N.J. Ct. R. 4:32-1 ......................................................................................... 25

N.J. Ct. R. 4:32(b)(3) .................................................................................... 23

N.J. Ct. R. 4:32-1(a) ..................................................................................... 23

N.J. Ct. R. 4:32-1(b) ..................................................................................... 23

N.J. Ct. R. 4:32-1(b)(3) ................................................................................. 33

N.J. Ct. R. 4:32-2(b) ..................................................................................... 43

S.D. Codified Laws § 37-24-6 ...................................................................... 41

S.D. Codified Laws § 37-24-31 .................................................................... 41

## PRELIMINARY STATEMENT

Plaintiff International Union of Operating Engineers Local No. 68 Welfare Fund, individually and on behalf of all others similarly situated ("Local 68" or "Plaintiff"), respectfully submits this memorandum in support of its motion for class certification, pursuant to New Jersey Court Rule 4:32-1. Local 68 seeks certification of a nationwide class of third-party payors who have paid any person or entity for the purchase of the prescription anti-inflammatory arthritis and acute pain medication rofecoxib that was manufactured and marketed by Defendant Merck & Co., Inc. ("Merck" or "Defendant") under the brand-name VIOXX.

Local 68 and the other members of the class provide prescription drug benefits for their plan participants. When their plan participants filled prescriptions for VIOXX, the purchase was authorized and the drug was paid for by Local 68 and other class members, in whole or in part. Merck caused Local 68 and class members to add VIOXX to their formularies of approved anti-inflammatories—despite the eight-fold higher price of the drug—by deceiving them (as it deceived prescribing physicians and consumers) into believing that the premium price charged for VIOXX was justified on the grounds that the drug was just as effective but safer than other drugs of its class. Merck asserted that because VIOXX was safer, the increased cost for VIOXX would be offset by the savings realized in avoidance of treatment for gastrointestinal complications attendant to other pain relievers.

In fact, VIOXX was not safe, as Merck was forced to admit when it voluntarily withdrew the drug from the worldwide market on September 30, 2004. Moreover, Merck was well aware of significant cardiovascular risks long before it released the drug to the market in May 1999. Despite this knowledge, Merck touted VIOXX as a miracle drug for arthritis patients that would save third-party payors millions of dollars in medical expenses for gastrointestinal perforations,

ulcers, and bleeds. At the same time, however, Merck consistently hid the markedly heightened risk of heart attacks or strokes. Merck concealed these health risks by manipulating scientific data, promulgating implausible theories, and intimidating those that dared to question VIOXX's safety. In the process, Merck reaped billions of dollars in sales of VIOXX.

In the meantime, Plaintiff and class members paid billions of dollars for the cost of VIOXX prescriptions as a result of Merck's misleading and deceptive promotion of VIOXX as being safe and effective. Plaintiff brought this action, alleging a violation of the New Jersey Consumer Fraud Act ("CFA") and a claim for common law fraudulent misrepresentation or suppression, on its own behalf and on behalf of the numerous third-party payors throughout the country who have been victimized by Merck's scheme.[1] Local 68 seeks to recoup the excessive prescription costs that it and other class members incurred as a result of Merck's unconscionable and deceptive practices.

As set forth below, the proposed class amply satisfies the threshold "numerosity," "commonality," "typicality," and "adequacy of representation" requirements of New Jersey Court Rule 4:32-1(a), as well as the "predominance" and "superiority" requirements of New Jersey Court Rule 4:32-1(b)(3). In particular, the focus of this litigation centers on the existence of Merck's deceptive marketing scheme. Those issues will center on Merck's conduct rather than the conduct of class members and hence will be predominant common questions. Accordingly, the Court should certify the class.

---

[1]   Plaintiff does not seek certification of its common law fraud claim.

2

## STATEMENT OF FACTS

### A.    The Importance of Third-Party Payors to Merck

Local 68 is a joint union-employer Taft-Hartley trust fund, organized and operating in the

State of New Jersey. *See* November 4, 2004 Certification of Matthew Maiorana ("Maiorana

Cert."), Ex. 1 at ¶ 1 (Complaint). Like other class members, Local 68 is a "third-party payor,"

that provides prescription drug coverage for its members. When plan members are prescribed a

drug by their physician, the cost of that prescription is paid for, in whole or in part, by third-party

payors. *See id.* at ¶¶ 24-27.

The extent to which the cost of a drug is paid for by third-party payors is determined by

that drug's status on the third-party payor's "formulary"—a list of drugs its plan participants are

authorized to purchase for payment under the benefit plan. *See id.* at ¶¶ 24-27. In some cases, a

third-party payor may employ a medical care organization ("MCO") or prescription benefit

manager ("PBM") to design or administer its benefit plan, but it is the third-party payor that

ultimately pays the costs of prescription drugs, in whole or in part, for its plan participants. *See

id.* at ¶¶ 24-27.

Placement of a drug on the formularies of third-party payors, MCOs, and PBMs is critical

to the commercial success of that drug. *See id.*, Ex. 2 (June 18, 1999 Memorandum from

P. Counihan) (indicating how preferred placement in formularies will lead to commercial success

for VIOXX). When releasing a new drug, pharmaceutical companies such as Merck, market and

promote the drug directly to consumers and medical professionals (including physicians and

leading medical scholars) in order to leverage pressure on third-party payors, MCOs, and large

institutional buyers (*e.g.*, hospitals) to include the drug in their formularies. *See id.*, Ex. 3 at 9

(Oct. 1999 Board of Directors Report) (describing how direct-to-consumer campaign leverages

3

consumers' "influential role in the buying process"); Ex. 4 (July 15, 1999 Merck Presentation, *Leveraging the Consumer and DTC Campaign in the Physician's office*) (describing strategies to leverage consumers and physicians to increase prescription demand). Faced with an increased demand for a drug by consumers and health care professionals, third-party payors are compelled to add that drug to their formularies. *See id.*, Ex. 2 ("The ground swell of physician demand that will be created by our representatives will be the most important factor to ensure that every [MCO] provides access for VIOXX.").

Recognizing that third-party payors are "powerful buyers," *id.*, Ex. 5 at 22-23 (Merck 1999 Annual Report, *The Value of Pharmaceuticals*), pharmaceutical companies, such as Merck, specifically target them in their marketing efforts. In order to secure placement on formularies, payors must be convinced of both the therapeutic and economic value of a drug. Thus, Merck specifically incorporates the purported economic benefit of its products into its marketing plan for third-party payors. *See, e.g.*, *id.*, Ex. 6 (Merck Report, *HMO/PBM Contracting Strategy*) (describing "Pharmacoeconomic Model" used to demonstrate overall cost efficiency of having VIOXX on formulary as compared to traditional NSAIDs). As described below, Merck's promotional campaign for VIOXX fit this paradigm perfectly.

**B.    The Development of VIOXX**

### 1.    Merck's "COX-2 Hypothesis"

In May 1999, Merck released VIOXX, the brand name for rofecoxib. VIOXX is among a class of pain relievers called non-steroidal anti-inflammatory drugs ("NSAIDs"). Other pain relievers in this class include aspirin, naproxen (such as Alleve®), ibuprofen (such as Advil® or Motrin®), and diclofenac (such as Voltaren®). NSAIDs act to relieve pain and inflammation by inhibiting production of an enzyme called prostaglandin G/H synthase. This enzyme consists of

4

two similar forms, cyclooxygenase-1 ("COX-1") and cyclooxygenase-2 ("COX-2"). While

COX-2 is generally associated with effects on pain and inflammation, COX-1 is associated,

among other things, with effects on platelet aggregation and the integrity of the gastrointestinal

("GI") tract. *See* Maiorana Cert., Ex. 7 (*VIOXX*, available at http://www.merckfrosst.com/

e/research/r_d/major_accomplishm/vioxx.html (downloaded Oct. 12, 2004)) (describing

mechanism of the drug)); Ex. 8 (Garrett FitzGerald and Carlo Patrono, *The Coxibs, Selective*

*Inhibitors of Cyclooxygenase-2*, 345 New England J. of Med. 433 (2001)) (same). Traditional

NSAIDs inhibit both COX-1 and COX-2. Thus, while traditional NSAIDs may provide effective

pain relief, they have been associated with negative GI side effects. *See id.*

Merck distinguished VIOXX from other NSAIDs as a selective COX-2 inhibitor.

Because VIOXX targeted COX-2, but not COX-1, Merck asserted that VIOXX possessed the

anti-inflammatory and analgesic properties of other NSAIDs without the potentially harmful

gastroinstestinal risks associated with them. Merck referred to this as the "COX-2 hypothesis."

*See id.*, Ex. 9 at 10-14 (Feb. 8, 2001 FDA Arthritis Advisory Committee Meeting Minutes). In

short, Merck claimed that VIOXX was as efficacious as other NSAIDs, but safer. *See id.* at 31,

48.

## 2. Merck's Dire Need for VIOXX's Approval & "Blockbuster" Sales

Merck first announced that it was developing a COX-2 specific inhibitor in May 1996,

touting it as a miracle drug for arthritis sufferers. *See* Maiorana Cert., Ex. 10 (May 21, 1996

Press Release). At the time it began advance promotion of the drug, Merck faced patent

expirations on some its most successful drugs—including Mevacor, Pepcid, and Prolosec—that

had represented more than $4 billion in U.S. drug sales. *See id.*, Ex. 11 (Joseph Brown, *Vioxx*

*the Victor*, Med Ad News (Feb. 2000)). Moreover, financial analysts asserted that Merck could

resolve its financial problems only by merging with another pharmaceutical company. *See id.*,

Ex. 12 (Robert Langreth, *Merck's Health Hinges on Sales of Arthritis Pill*, Wall St. J. at B1

(April 14, 1999)). In sum, Merck was in dire need of a "blockbuster" drug to offset the loss of

revenue streams due to imminent patent expirations and to ward off speculation about the

company's stability. *See id.*; Ex. 13 (Gloria Lau, *Merck Promises to Remain Healthy Even As*

*Blockbuster Patents Expire*, Investor's Bus. Daily at 1 (Nov. 16, 2000)).

Similarly, Merck faced a significant competitive threat from Monsanto and Pfizer, two

other pharmaceutical companies that together were developing another COX-2 inhibitor,

Celebrex. *See id.*, Ex. 14 (Gardiner Harris, *The Cure: With Big Drugs Dying, Merck Didn't*

*Merge—It Found New Ones*, Wall St. J. (Jan. 10, 2001)). Celebrex was slated to go to market

months ahead of VIOXX. *See id.* Merck well understood the precarious position it faced. If it

could not bring VIOXX to market—and do so quickly—Merck's future would have taken a

different course: "If those first two [VIOXX] compounds had failed . . . we would be a very

different company." *Id.* (quoting Dr. Edward Scolnick, then president of Merck Research

Laboratories).

### 3. Merck Was Unable to Demonstrate Clinically Significant Safety Advantages for VIOXX Pre-Approval

Understanding the fiercely competitive environment for NSAIDs, and knowing that a

competitor was developing a COX-2 inhibitor for release ahead of VIOXX, Merck knew that to

succeed in stealing market share from competitors, it had to demonstrate a GI safety profile

superior to that of competing NSAIDs—including, Celebrex. *See* Maiorana Cert., Ex. 12 ("To

be able to displace Celebrex, [VIOXX] needs to have some significant superiority in its product

label, such as a clearly enhanced safety profile."); Ex. 15 (Feb. 18, 1999 Memorandum from W.

6

Dixon to D. Anstice) (describing need to differentiate VIOXX from other NSAIDs and Celebrex, in part, through labeling).

Thus, years before approval of the drug, Merck met with U.S. Food and Drug Administration ("FDA") officials to determine what types of studies would be necessary to demonstrate that VIOXX really possessed the safety benefits that Merck claimed the drug promised. *See id.*, Ex. 16 at Part 1, pp. 4-5 (Minutes of End-of-Phase II Conferences with the FDA (May 22, 1996)). Senior FDA representatives advised Merck that in order to get the label it wanted, Merck would have to demonstrate the safety of the drug compared to a placebo, or sugar pill, in a large-scale outcomes trial. *See id.*; Ex. 17 at 3 (VIOXX Project Team Minutes (Sept. 4, 1996)).

Yet, when the Company sat down to plan the large outcomes trial the FDA requested, it realized that it was quite possible that such a study would reveal problems with VIOXX that could "kill [the] drug." First, when leading experts consulted by Merck concerning the study suggested that the Company compare the safety of VIOXX to Tylenol (acetaminophen)—owing to Tylenol's placebo-like safety perception—Company representatives objected. In particular, two Merck executives "questioned the advisability of an acetaminophen arm, because the findings could highlight the favorable properties of acetaminophen." *Id.*, Ex. 18 at 5-6 (Cox-2 Inhibitor Consultants' Meeting Minutes (Sept. 28, 1996)). In fact, the Company quickly scrapped the consultant's recommendation to compare VIOXX to Tylenol in such a trial. *See id.*, Ex. 19 at 1 (MK-0966 Consultants' Meeting Minutes (Nov. 4, 1996)).

Second, Merck knew that, due to the mechanism by which the drug inhibited COX-2 but not COX-1, use of VIOXX could result in increased platelet aggregation (blood clotting) and thus increased rates of heart attacks and strokes. *See id.*, Ex. 20 (Feb. 25-26, 1997 emails among

7

A. Reicin, B. Daniels, and B. Morrison). As one Merck researcher warned: "without COX-1 inhibition you will get more thrombotic events and kill drug [sic]." *Id.* Moreover, it was clear to researchers that the desired superior GI safety profile would be impossible to demonstrate in Merck's target patient group for VIOXX—arthritis sufferers. *See id.* Because of their age and accepted medical practice, many potential VIOXX users would also be taking aspirin to reduce the risk of suffering cardiac events. Aspirin, however, is known to have GI side-effects. Thus, although permitting low-dose aspirin ("ASA") use for arthritis sufferers participating in the trial would help to reduce the cardiovascular events caused by VIOXX, it would destroy the alleged GI-superiority of the drug because any purported GI benefit of VIOXX would be offset by aspirin use. As Merck researcher Alise Reicin (who went on to supervise the VIGOR trial) bemoaned:

> This is a no win situation! The relative risk of [adverse GI events with] even low dose aspirin may be as high as 2-4 fold. Yet, the possibility of increased CV [cardiovascular] events is of great concern (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients – ie those that have already had an MI, CABG, PTCA? This may decrease the CV event rate so that a difference between the two groups would not be evident. The only problem would be – Would we be able to recruit any patients?

*Id.* Unwilling to jeopardize the drug's approval, Merck determined that the safest course was to avoid conducting the outcomes trial altogether. *See id.*, Ex. 21 at 1 (Proposal to Generate G.I. Outcomes Data on VIOXX (June 12, 1998) (indicating that the G.I. Outcomes study had been cancelled in 1997).

Because Merck had failed to conduct any study prior to approval demonstrating that VIOXX reduced the incidence of clinically meaningful side effects of NSAID therapy, at the time of approval, the FDA required that VIOXX carry the traditional warning concerning GI safety risks that accompanied all NSAIDs. *See id.*, Ex. 22 at 2 (May 24, 1999 email from J.

8

Weiner to W. Dixon) (transmitting FDA press release discussing approval and labeling for

VIOXX). Key to Merck's marketing plan for VIOXX, however, was the ability to claim that

VIOXX was just as effective—but safer—than traditional NSAIDs and Celebrex. *See id.*, Ex. 23

(Apr. 20, 2000 Marketing Update to Human Health Product Approval Comm. ("HHPAC")).

Only this superior labeling would allow Merck to steal NSAID market-share from Searle/Pfizer,

which had beaten Merck to market with their own COX-2 inhibiting drug, Celebrex. *See id.*; Ex.

24 (June 1, 1998 Email from E. McKinney to B. Seidenberg) ("If [Celebrex] gets a superior label

and outcomes data before us, it will be <u>extremely difficult</u> for Merck to win.") (emphasis in

original).[2]

As described below, *see infra* at 14, even without a label that allowed Merck to

legitimately claim superior safety, the Company and its representatives did just that with the

medical community, healthcare providers, and third-party payors. *See id.*, Ex. 25 (Dec. 16, 1999

Warning Letter from FDA to Merck) (concerning misrepresentation of safety information for

VIOXX).

**C.    Merck Engaged in Unconscionable and Deceptive Marketing
       Practices in Connection With the Marketing and Sales of VIOXX**

In the instant action, Plaintiff claims that as a result of Merck's unconscionable and

deceptive marketing campaign for VIOXX, third-party payors placed VIOXX on their

formularies and thereafter approved and paid for their members' VIOXX prescriptions—thereby

---

[2] After learning that Pfizer was initiating a large outcome study to support a post-launch label change indicating the GI superiority of Celebrex, Merck was forced to reconsider its own study. *See id.*, Ex. 21 at 1-2. Ultimately, Merck proposed a large scale clinical trial similar to that conducted by Pfizer. This VIOXX G.I. Outcomes Research ("VIGOR") trial—the results of which would not be received until almost a year after VIOXX was approved—was designed specifically to demonstrate a superior GI safety profile of VIOXX as compared to one of its competitors, a traditional NSAID called naproxen. *See id.*, Ex. 27 (Merck Fact Sheet on the VIGOR Study). As discussed below, *see infra* pp. 14-15, the VIGOR trial revealed a two to five times increased risk of cardiovascular events compared to users of naproxen.

insuring the commercial success of VIOXX. *See id.*, Ex. 1 at ¶¶ 4-8. Such misconduct, if

proven, states a claim under the CFA. *See id.*, Ex. 26 at 8 (*In re VIOXX Litig.*, No. 619,

Memorandum of Decision (Law Div. July 8, 2004) (Higbee, J.)).

As detailed below, Merck targeted the decision-makers for formularies on two fronts. On

one side, Merck made misrepresentations regarding the drugs safety and efficacy directly to

third-party payors in an effort to persuade them that the drug was more cost-effective than

competing NSAIDs. On the other side, Merck launched an unprecedented marketing and

promotion campaign to consumers and physicians to increase demand for the drug, thereby

increasing pressure on third-party payors to place VIOXX on their formularies. In both

instances, Merck touted safety advantages of the drug that simply did not exist.

### 1.    Merck's Unprecedented Marketing Campaign Positioned VIOXX as a "Safer," More Cost-Effective Alternative to Traditional NSAIDs

***Merck Targeted Third-Party Payors.*** Given that the bulk of prescription drug sales are

purchased through, and paid for, by third-party payors like Plaintiff, Merck had to"[a]chieve

formulary status/access for VIOXX equal or better than Celebrex and branded NSAIDs." *Id.*,

Ex. 28 (Merck Internal Report, *VIOXX Managed Care Objectives*). In an interview with

*Investor's Business Daily*, Merck CEO Raymond Gilmartin confirmed that the placement of

drugs on formularies was critical to "mov[ing] market share." *Id.*, Ex. 12.

The price of VIOXX, however, was 800% more than competing non-selective NSAIDs

that were equally as effective in alleviating pain and inflammation associated with arthritis.

VIOXX had a wholesale cost of $72.00 for a 30-day supply, in contrast to other NSAIDs which

wholesaled for $9.00 or less for a 30-day supply. *See id.*, Ex. 1 at ¶ 12; *see also* Ex. 26 (Merck

Presentation Slide) (listing generic ibuprofen at cost of 50 cents per day, compared to proposed

cost of 25 mg of VIOXX at $2.42 per day). Merck recognized that the higher price of VIOXX

would cause third-party payor costs to "skyrocket." *Id.*, Ex. 6 (Merck Internal Report *HMO/PBM VIOXX* ). Thus, to get and keep VIOXX on payors' formularies, promotional efforts were aimed to "[p]ublicize/highlight the economic value of VIOXX to convince payors of the benefits of using VIOXX over NSAIDs." *Id.*, Ex. 29 at T.1 (Mar. 20, 2001 Presentation to HHPAC); *see also* Ex. 30 (Merck Report, *HMO/PBM VIOXX 2S01*). "The premise at the outset was that the economic value of VIOXX would be determined primarily, if not exclusively, in relation to its improved gastrointestinal (GI) safety and tolerability compared with conventional anti-inflammatory drugs (NSAIDs)." *Id.*, Ex. 31 (Apr. 12, 2001 Memo from VIOXX Outcomes Research Team to HHPAC).

To further this goal, Merck authored studies designed to demonstrate that VIOXX was more cost-effective than other NSAIDs due to the latter's GI toxicity. *See id.*, Ex. 32 (Merck Report, *Economic Evaluation of Refecoxib Versus Non-Selective Non-Steroidal Anti-Inflammatory Drugs for Osteoarthritis* (2000)). Moreover, Merck provided decision-makers for formularies with summaries of clinical studies that were designed to demonstrate VIOXX's safety and efficacy. *See id.*, Ex. 33 (Formulary Data for VIOXX (May 24, 1999)). In sum, Merck aggressively and directly marketed to third-party payors, asserting that the increased cost of VIOXX would be more than offset by the *decreased expenses* in treating negative GI side-effects associated with traditional NSAIDs. *See id.*, Ex. 32 at 15. ("Drug cost differences between rofecoxib and NSAIDs [are] markedly offset by expected cost savings in GI problems and co-medications averted with [VIOXX].").

Notably, but perhaps unsurprisingly, none of the materials provided to third-party payors, MCOs, or PBMs discussed the drug's potentially devastating cardiovascular effects. *See id.*; Ex. 31.

11

***Merck's Unprecedented DTC Campaign and Promotions to Physicians.*** In order to put pressure on third-party payors and medical care organizations to add VIOXX to their formularies, Merck had to increase public demand for the drug by convincing physicians and consumers of the purported superior safety profile of VIOXX. Thus, within days of receiving approval to market the drug, Merck began to aggressively promote VIOXX to health professionals and consumers. *See* Maiorana Cert., Ex. 11 (noting that "within days of receiving marketing approval, Merck was able to mobilize more than 4,500 sales representatives to detail VIOXX to physicians" and "has a huge advertising budget for the brand, targeting physicians and consumers"). For example, in 2000, Merck spent nearly $161 million on direct-to-consumer advertising for VIOXX—more than PepsiCo spent on Pepsi Cola. *See id.*, Ex. 34 (Rita Rubin, *Spotlight Falls on Drug Ads*, USA Today (Dec. 12, 2001)). Merck's message was clear: VIOXX was safer than—and just as effective as—traditional NSAIDs. *See id.*, Ex. 35 at 16-17 (Oct. 27, 1999 Report, *Update on DTC Advertising for VIOXX* ).

Specifically, Merck disseminated materials to consumers and physicians:

- Claiming that VIOXX is safe and effective, and allows patients to lead more fulfilling lives, while making no mention of cardiovascular risk. *See, e.g.*, *id.*, Ex. 36 (Report, *VIOXX "Real Life" Campaign – Print*) (including copy of print ad and discussion of campaign objectives).

- Touting the strength and safety of VIOXX while failing to either warn or caution physicians regarding cardiovascular risks incidental to the mechanism of the drug. *See, e.g.*, *id.*, Ex. 37 (Advertisement and Prescribing Information appearing in *The Journal of Pain* (Winter 2000)); Ex. 38 (*Representative Resource Guide*) (containing copies of and discussion of physician materials).

The success of Merck's marketing efforts was immediately evident. Within months of VIOXX's release, industry analysts predicted that VIOXX sales would exceed $1 billion in its first year on the market. *See id.*, Ex.10.

2.      **Despite Its Public Claims of VIOXX's Superior Safety, Merck Knew—as Early as 1996—That VIOXX Was Actually <u>Less Safe</u> Than Traditional NSAIDs That Would Have Cost Third-Party Payors Only Pennies Per Day**

Within seven months of VIOXX's release on the market, the FDA found that Merck

engaged in "false or misleading" promotional activities.  Maiorana Cert., Ex. 25 (Dec. 16, 1999

Letter from FDA to E. Westrick).   Moreover, the FDA found that Merck was (i) misrepresenting

the "safety profile of VIOXX" through its claim that it was "safer than a placebo" and (ii)

misrepresenting the efficacy of the drug though "unsubstantiated" comparisons to Celebrex and

other NSAIDs.  *Id.*  Additionally, Merck's representations were found to minimize "the GI

warning associated with VIOXX and [to be] inconsistent with the data in the [product labeling]."

*Id.*

Amazingly, Merck made such claims despite its knowledge, as early as 1996, that due to

the mechanism by which the drug inhibited COX-2 but not COX-1, use of VIOXX could result

in increased platelet aggregation (blood clotting) and thus increased rates of heart attacks and

strokes.  *See* Section B-3, *supra.*  Further, in smaller, pre-VIGOR trials conducted between July

1995 and February 1998, VIOXX had demonstrated its potential to cause cardiovascular events.

*See, e.g.*,  Maiorana Cert., Ex. 39 (Protocol 10, Table 39; Protocol 34, Table 42; Protocol 45,

Table 43) (demonstrating that patients taking VIOXX experienced more than twice as many

adverse cardiovascular events than those taking comparator NSAIDs).

Moreover, only five months before Merck filed its New Drug Application ("NDA") for

VIOXX with the FDA in late 1998, Merck's Scientific Advisory Board for VIOXX mandated

that researchers "systematically collect data on cardiovascular (CV) events in all clinical trials

for VIOXX."  *Id.*, Ex. 40 at 1, 6 (June 9, 1998 Memo from S. Pemrick to VIOXX Project Team).

The Board was specifically interested in instances of myocardial infarction and stroke and was

concerned that "[b]ased on data on PGI [prostaglandin] metabolism obtained for VIOXX, it is conceivable that VIOXX could disturb the [endothelium-platelet] interaction *to favor platelet aggregation*." *Id.* at 6 (emphasis added).

Nevertheless, when presenting information to the FDA and its advisory committee on cardiovascular risks less than one year later (in connection with Merck's attempts to get the drug approved), Merck asserted that "there is no evidence, *preclinically or clinically*, to suggest that rofecoxib carries any increased risk for cardiovascular events." *Id.*, Ex. 41 (FDA Advisory Committee Background Information (Apr. 20, 1999) (emphasis added)).[3]

### 3.   Even After Post-Marketing Studies Confirmed VIOXX's Cardiovascular Risk, Merck Continued to Mislead Consumers, Physicians, and Third-Party Payors About the Drug's Safety Profile

As noted *supra*, attempting to demonstrate the GI superiority of VIOXX to the FDA and obtain a favorable safety GI safety profile for the drug's label, Merck conducted the VIOXX GI Outcomes Research (VIGOR) study, an 8,000 person clinical trial that concluded in March 2000. *See* Maiorana Cert., Ex. 42 (Claire Bombardier *et al.*, *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, 343(21) N. Eng. J. Med. 1520, 1521 (Nov. 23, 2000)).  In designing VIGOR, Merck researchers faced the same dilemma they faced when trying to design a pre-approval long-term trial for arthritis users: owing to VIOXX's specific mechanism of action, trial participants would likely require aspirin to reduce CV events caused by VIOXX.  However, allowing aspirin use during the trial would dilute any purported GI benefits of VIOXX as compared to other NSAIDs. *See supra* at pp. 7-8;

---

[3]   Regrettably, when procuring the "Informed Consent" of the participants in its clinical trials, the Company similarly failed to warn those patients of the risks of thrombotic cardiovascular events that Merck and its Scientific Advisory Board had identified. *See, e.g.*, *id.*, Ex. 43 (1998 Informed Consent for VIGOR trial).

Ex. 20. Thus, to minimize the potential for the VIGOR study finding reduced GI events but higher CV events from VIOXX, Merck heeded the suggestion made by its researchers years before and excluded "high risk" patients from the trial. Merck hoped that in so doing, it would decrease the CV event rate and thereby mask any differences in safety risk between the two groups (naproxen and VIOXX). *See id.*, Ex. 20 ("What about the idea of excluding high risk CV patients . . . This may decrease the CV event rate so that a difference between the two groups would not be evident.").

<blockquote> <strong>a.      The VIGOR Trial Confirms Cardiovascular Risks for VIOXX</strong> </blockquote>

Despite Merck's efforts to design VIGOR so as to obscure the true risk of CV events in the patients who would ultimately receive the drug, the study revealed that patients taking VIOXX suffered more than *twice* as many more serious cardiovascular events than patients taking the generic drug naproxen. *Id.*, Ex. 44 (Debabrata Mukherjee *et al., Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors*, 286(8) J. Am. Med. Ass'n 954, 956 (Aug. 22/29, 2001)). Even more striking was the finding that VIOXX users suffered *five times* more heart attacks than patients taking naproxen. *See id.* Merck had a problem on its hands. Just as Merck scientists and clinical trial results had predicted years earlier, and long before the drug was approved (*see* Ex. 20 (Morrison to Reicin emails)), its blockbuster drug's unique mechanism of action caused life-threatening cardiovascular side-effects.

Moreover, in measures of overall safety compared to naproxen, VIOXX flunked. The VIGOR data revealed that patients taking VIOXX in the VIGOR study suffered *more* deaths, hospitalizations, and serious adverse events than those patients on naproxen. *See id.* Ex. 45 at 9-12 (Feb. 8, 2000 Arthritis Advisory Committee Briefing Document). While users of VIOXX in VIGOR did experience a reduction in GI events as compared to naproxen, that reduction did not

15

translate into the improved safety (and related long-term cost savings) the Company had been touting. As the FDA concluded:

> The risk reduction in relevant GI events did not translate into an overall safety benefit of rofecoxib over naproxen. GI benefit must be assessed within the overall safety profile of the drug. *Evaluation of safety by routine parameters showed no advantage of rofecoxib over naproxen.*

*Id.* at 21 (emphasis added).

The FDA further concluded that even in the one area where VIOXX appeared to offer a safety advantage—GI safety—that advantage was illusory:

> [T]he risk of serious GI complications with rofecoxib is still a concern. From May 1999 to October 2000, the FDA post-marketing AER system received 37 unduplicated reports of death due to gastrointestinal complications associated with the use of rofecoxib.

*Id.* at 22. Indeed, FDA representatives questioned whether the decrease in GI complications demonstrated in the VIOXX arm of the study would be abolished if VIGOR had been conducted in a real world situation—*e.g.,* patients were permitted to take VIOXX and low-dose aspirin concomitantly. *See id.*

In the end, considering the startling excess of cardiovascular side-effects of VIOXX and uncertain GI benefits, FDA representatives concluded that as between VIOXX and naproxen, "*one can argue that naproxen would be the preferred drug.*" *Id.*, Ex. 46 at 35 (Dec. 8, 2000 Memorandum of Dr. Shari Targum) (emphasis added).

### b.   To Ensure That VIOXX Was Retained on Formularies, Merck Continued to Tout the Drugs's Safety Advantages While Denying the Existence of Cardiovascular Risks

The implications of the VIGOR cardiovascular findings on the future success of VIOXX were striking. Of paramount concern was the retention of the drug on the formularies of third-

party payors. *See, e.g.*, Maiorana Cert., Ex. 47 at 2-3 (May 8, 2000 Memorandum from W.

Dixon to E. Scolnick) (describing plans to rally "thought leaders" to allay concerns regarding

cardiovascular risk and to influence "prescribing physicians and formulary decisions"); Ex. 48

(Feb. 12, 2002 email from T. Cannell to D. Anstice) (explaining that the most common reason

that institutions are reluctant to place VIOXX on their formularies are "concerns about CV

issues"). To accomplish this task, Merck had to sell the public, medical community, and third-

party payors on the supposedly superior safety profile of VIOXX. To do so, Merck had to

persuade these constituencies that naproxen had properties never before conceived or discovered

in its 18 preceding years of marketed use.

    ***Merck's Unfounded Naproxen Hypothesis***. To explain the significant disparity in

cardiovascular events between VIOXX and naproxen in the VIGOR trial, Merck put forth an

incredible theory. It argued that VIOXX did not increase the risk of cardiovascular risk. Rather,

Merck claimed that naproxen had cardioprotective properties and that it consequently prevented

cardiovascular events that—but for naproxen—would have happened anyway. *See id.*, Ex. 42.

Merck propounded this theory in Merck-authored or sponsored articles in medical journals, press

releases and news reports, and lectures by thought leaders (paid by Merck). *See, e.g.*, *id.*; Ex. 49

(Mar. 27, 2001 Memorandum from T. Mills to W. Dixon) (detailing plans for internal and

external speakers to promote the "naproxen theory"); Ex. 50 (May 22, 2001 Press Release)

(attributing VIGOR results to cardioprotective effect of naproxen).

    ***Consultants and Employees Reject Naproxen Theory***. At the same time that Merck

publicly floated its "naproxen theory" to the medical community and third-party payors, it

internally acknowledged there was no evidence to support it. For example, in a memorandum

prepared for the current head of Merck Research Laboratories in January 2002, Merck concluded

that (a) the magnitude of the effect for naproxen was larger than the effect that would be expected had VIOXX been compared with aspirin, and (b) there was no prospectively defined cardiovascular outcomes study showing that naproxen could provide cardioprotective benefit. *See id.*, Ex. 51 (Jan. 21, 2002 Report, *VIOXX CV Document*).

Moreover, Merck's own consultant, Carlo Patrono, who Merck described as "the world's most respected and knowledgeable" scientist in the field, warned the Company that its theory was implausible. *See id.*, Ex. 52 (Patrono Correspondence).

**Merck Continued to Promote and Market VIOXX as a Safer Alternative to NSAIDs.**
Undaunted, Merck continued to promote and market VIOXX as having a superior safety profile as compared to traditional NSAIDs—particularly to third party payors. *See id.*, Ex. 53 (Attachments to Merck Report, *HMO/PBM VIOXX 2S01*) (describing objective to address formularies' concerns about the drug's CV safety profile and including customer presentation that minimizes CV risks). Merck engaged in this conduct, despite its prior acknowledgment that "[t]he economic advantage of VIOXX over NSAIDs *is only borderline* and payors cannot be convinced of the economic benefits of using VIOXX." *Id.*, Ex. 30 (emphasis added).

**FDA Rebukes Merck for Misrepresenting VIOXX's Safety.** Merck's campaign of deception did not go unnoticed by the FDA. In September 2001, the FDA issued a formal warning to Merck regarding its "promotional campaign for VIOXX that minimizes the potentially serious cardiovascular findings" that were observed in the VIGOR trial. *Id.*, Ex. 54 (Sept. 17, 2001 FDA Warning Letter to R. Gilmartin). The FDA specifically objected to Merck's dissemination of the naproxen theory, noting that it was "hypothetical, ha[d] not been demonstrated by substantial evidence, and that there [was] another reasonable explanation, that VIOXX may have pro-thrombotic properties." *Id.* Identifying statements made in Merck audio

18

conferences and by sales representatives directed toward physicians, the FDA found the misrepresentations so extreme as to constitute "significant public health and safety concerns." *Id.* at 2. With respect to public statements made by Merck in a May 2001 Press Release, the FDA warned Merck that "your claim . . . that Vioxx has a 'favorable cardiovascular profile,' *is simply incomprehensible*, given the rate of MI and serious cardiovascular events compared to naproxen." *Id.* (emphasis added); *see also* Ex. 45 at 35; Ex. 46 at 11 (FDA commentary noting that there was no clinical trial or epidemiological data that supported Merck's hypothesis).[4]

In April 2002, the FDA required Merck to revise the VIOXX label to reveal certain cardiovascular findings from the VIGOR trial. *See id.*, Ex. 56 (Apr. 11, 2002 FDA Press Release); Ex. 57 (Apr. 11, 2002 VIOXX label text). Consistent with its self-created hypothesis that naproxen was cardioprotective, Merck incredibly represented that "[t]he significance of the cardiovascular findings . . . is unknown." *Id.* Merck continued to float its implausible theory despite the fact that later studies only confirmed the cardiovascular risks of VIOXX and discredited Merck's naproxen theory. *See, e.g.*, Ex. 58 (Daniel H. Solomon, et al., *Relationship Between Selective Cyclooxgenase-2 Inhibitors and Acute Myocardial Infarction in Older Adults*, 109 Circulation 2068 (2004); Ex. 59 ( Wayne A. Ray, et al., *Non-Steroidal Anti-Inflammatory Drugs and Risks of Serious Coronary Heart Disease: An Observational Cohort Study*, 359 The Lancet 118 (2002).

---

[4] Additionally, Merck further tried to persuade FDA that VIOXX presented no cardiovascular risks by pooling the VIGOR results with the results of smaller, shorter-term trials that utilized different dosages of the drug and different patient populations. The FDA questioned the validity of this post-hoc analysis. *See id.*, Ex. 46 at 19. Indeed, before being forced to rely on its "pooled" analysis to defend VIOXX's safety, the Company too had questioned the value of "pooled" analysis in assessing the drug's safety. *See id.*, Ex. 55 at 2 (FDA Request from Medical Officer (Mar. 1, 1999) (cautioning FDA about relying on results pooling data from trials with different protocols and patient populations).

### 4.     Merck's Campaign to Silence and Intimidate Critics of VIOXX

While Merck continued to tout the safety of VIOXX, it employed threats and intimidation to silence critics of the drug. *See* Maiorana Cert., Ex. 60 (Jan. 9, 2001 Letter to Raymond Gilmartin) (describing threats and retaliatory acts by Merck employees against those who questioned the safety of VIOXX). One scientist went so far as to write to Merck's Chief Executive Officer, Raymond Gilmartin, complaining that he and several of his colleagues had been threatened by Merck employees. *See id.* Moreover, other academics felt intimidated by Merck's lodging of complaints against them with their employers and other institutions. *See id.*

Notably, two of the academics who complained about Merck's tactics, held positions of influence with key formularies that Merck had targeted as "must win" accounts. *See id.*, Ex. 61 (Feb. 15, 2002 email from J. Myers) (stating that Dr. Stillman, "an adversary of Merck and VIOXX will not permit the hospital to make VIOXX the exclusive COX-2 on its formulary, because of "perceived CV issues of VIOXX"); Ex. 62 (June 9, 2000 correspondence between Dr. Stillman and L. Sherwood); Ex. 63 (Oct. 4, 2000 Memo from S. Baumgartner to L. Sherwood) (detailing Dr. Singh's activities and complaining of his efforts to dissuade formularies from choosing VIOXX).

Merck likewise went to unprecedented lengths to control scientific debate concerning VIOXX in medical and scientific journals. For example, when Merck learned in August 2001 that the Journal of the American Medical Association ("JAMA") intended to run an article by prominent researchers from the Cleveland Clinic, it instituted a full-court press to persuade the authors of the study and JAMA itself from publishing the article in its current form. *See id.*, Ex. 64 at A1 (Thomas Burton and Gardiner Harris, *Study Raises Spector of Cardiovascular Risk for Hot Arthritis Pills*, Wall St. J. (Aug. 22, 2001)). The article raised concern about the serious

20

cardiovascular risks of COX-2 drugs like VIOXX. *See id.* After it failed to persuade JAMA and the study's authors to withdraw or change their article (following face-to-face meetings with all concerned), Merck went on the offensive—issuing preemptive press announcements and sending "Dear Doctor" letters to physicians around the country, *via Federal Express,* attempting to discredit the study's findings. *See id.*, Ex. 65 (Aug. 2001 Dear Healthcare Provider Letter); Ex. 66 (Aug. 28, 2001 Sperber Letter to JAMA). In each circumstance, Merck's VIOXX offensive continued to reaffirm the overall safety benefit to VIOXX that was essential to Merck's efforts to maintain VIOXX on the formularies of third-party payors.

## D.    VIOXX Is Withdrawn From the Market

It was not until September 30, 2004 that Merck stopped denying that VIOXX could cause serious cardiovascular and cerebrovascular injuries. *See id.*, Ex. 67 (Sept. 30, 2004 Merck Press Release Announcing Worldwide Withdrawal of VIOXX). On that date, Merck withdrew VIOXX from the worldwide market, after another clinical trial, named the APPROVe study, demonstrated increased risk of heart attack and stroke in the VIOXX arm of the study, compared to the placebo arm of the study. *See id.* Merck asserted that pulling the drug was "in the best interests of the patients." *Id.*[5] The discovery record demonstrates quite the reverse; until it could no longer avert the truth, Merck put profits before patient safety. In the process, Merck extracted billions from third-party payors who authorized and paid for VIOXX over safer NSAIDs already available on the market at a fraction of the cost.

---

[5] The public health implications of VIOXX's CV risk and widespread use are startling. The FDA estimates that more than 27,000 people may have suffered heart attacks *as a result of ingesting VIOXX. See id.*, Ex. 68 (Marc Kaufman and Brooke A. Masters, *Researchers Expand on Dangers of Vioxx*, Wash. Post, Oct. 7, 2004 at AO3. Other researchers suggest that the public health impact was far greater. See id. (explaining that Cleveland Clinic researcher Eric J. Topol estimates that number of people who may have had heart problems and strokes is between 30,000 to 100,000) Ex. 69 at 1708 (Eric J. Topol, *Failing the Public Health—Rofecoxib, Merck, and the FDA*, 17 New England J. Med. 1707 (Oct. 2004).

21

**E.   The Present Action**

Local 68 commenced this action on October 30, 2003, alleging two counts against

Defendant: (i) common law fraudulent misrepresentation or suppression, and (ii) violation of the

CFA, N.J. Stat. Ann. § 56:8-1, *et seq*. Plaintiff here seeks certification of its claim under the

CFA.

The action arises from Merck's marketing, advertising, promotion, and sale of VIOXX

and, in particular, its misrepresentation and concealment of material safety information from

end-users, physicians, and third-party payors concerning the cardiovascular and GI risks

associated with VIOXX, which resulted in third-party payors paying vastly more than they

should and otherwise would have for VIOXX. *See id.*, Ex. 1 at ¶ 25.

Plaintiff now seeks certification of the following class:

> All third-party payors in the United States of America, who have
> paid any person or entity for the purchase of the prescription drug
> VIOXX (rofecoxib) since May 1, 1999. Third-party payors
> include any non-governmental entity that is (i) a party to a
> contract, insurer of a policy, or sponsor of a plan, which contract,
> policy, or plan provides prescription drug coverage to natural
> persons, and is also (ii) at risk, pursuant to such contract, policy or
> plan, to purchase or pay for all or part of the cost of prescription
> drugs dispensed to natural persons covered by such contract,
> policy, or plan. Excluded from the Class are (1) employees of
> defendant, including its officers or directors; (2) Plaintiff's
> counsel; and (3) the Judge of the Court to which this case is
> assigned.

*Id.* at ¶ 26. As set forth below, the proposed class satisfies the requirements of Rules 4:32-1(a)

and 4:32-1(b)(3). Accordingly, the Court should certify the class.

22

## ARGUMENT

## THE COURT SHOULD CERTIFY THE CLASS

### A. Applicable Standards

New Jersey Court Rule 4:32-1(a) "imposes four requirements for certification:

numerosity, commonality, typicality, and adequacy of representation." *In re the Cadillac V8-6-4*

*Class Action*, 93 N.J. 412, 425, 461 A.2d 736, 742 (1983); *accord Strawn v. Canuso*, 140 N.J.

43, 66, 657 A.2d 420, 432 (1995). The Rule states:

> One or more members of a class may sue or be sued as
> representative parties on behalf of all only if (1) the class is so
> numerous that joinder of all members is impracticable, (2) there
> are questions of law or fact common to the class, (3) the claims or
> defenses of the representative parties are typical of the claims or
> defenses of the class, and (4) the representative parties will fairly
> and adequately protect the interests of the class.

R. 4:32-1(a).

A party seeking certification of a class must also satisfy one of thee subsections under

Rule 4:32-1(b). Here, Plaintiff seeks certification under Rule 4:32-1(b)(3). In relevant part,

4:32-1(b) provides that "[a]n action may be maintained as a class action if the prerequisites of

paragraph (a) are satisfied" and

> the court finds that the questions of law or fact common to the
> members of the class predominate over any questions affecting
> only individual members, and that a class action is superior to
> other available methods for the fair and efficient adjudication of
> the controversy.

R. 4:32(b)(3). These two additional requirements in subsection (b)(3) are commonly referred to

as the "predominance" and "superiority" elements. *See, e.g., Muise v. GPU, Inc.*, 371 N.J.

Super. 13, 30, 851 A.2d 799, 809 (App. Div. 2004); *Carroll v. Cellco P'ship*, 313 N.J. Super.

488, 495, 713 A.2d 509, 512 (App. Div. 1998).

New Jersey courts strongly favor the use of class actions in consumer fraud litigation

such as this. *In re Cadillac V8-6-4 Class Action*, 93 N.J. at 435, 461 A.2d at 747 ("the class

action rule should be liberally construed in a case involving allegations of consumer fraud");

*Varacallo v. Mass. Mut. Life Ins. Co.*, 332 N.J. Super. 31, 44, 752 A.2d 807 (App. Div. 2000)

("[O]ur highest court has instructed trial courts to liberally allow class actions involving

allegations of consumer fraud. That principle has been reiterated and reinforced over the years

even where the claim involved theories of common law fraud as well as consumer fraud.");

*Delgozzo v. Kenny*, 266 N.J. Super. 169, 180, 628 A.2d 1080, 1086 (App. Div. 1993) ("New

Jersey case law supports the conclusion that the class action vehicle is particularly appropriate in

cases, such as this one, alleging consumer fraud, regardless of the particular legal theory

advanced.") (internal citations omitted). Private class actions further the goals of the CFA.

*Riley v. New Rapids Carpet Center*, 61 N.J. 218, 225-26, 294 A.2d 7, 11 (1972). Thus, the New

Jersey Supreme Court has admonished that "a court should be slow to hold that a suit [involving

a consumer fraud claim] may not proceed as a class action." *Id.* at 228, 294 A.2d at 12.

 Although the burden of establishing class status is on the plaintiff, *Goasdone v. American

Cyanamid Corp.*, 354 N.J. Super. 519, 527, 808 A.2d 159, 164 (Law Div. 2002), "a class action

'should be permitted unless there is a *clear* showing that it is inappropriate or improper.'"

*Delgozzo*, 266 N.J. Super. at 180, 628 A.2d at 1086 (quoting *Lusky v. Capasso Bros.*, 118 N.J.

Super. 369, 373, 287 A.2d 736, 738 (App. Div. 1972)) (emphasis added); *accord Carroll*, 313

N.J. Super. at 498, 713 A.2d at 514. A defendant opposing certification of a class must "rebut

the presumption that the proposed plaintiff class meets the requirements of commonality,

typicality, and adequacy of representation." *Delgozzo*, 266 N.J. Super. at 189, 628 A.2d at 1091

(citation and internal quotation marks omitted).

 In addition, a court may not "conduct a preliminary inquiry into the merits of a suit in

order to determine whether it may be maintained as a class action." *Eisen v. Carlisle &
Jacquelin*, 417 U.S. 156, 177 (1974)[6]; *accord Delgozzo*, 266 N.J. Super. at 180-81, 628 A.2d at
1086 (citing cases). "The court is bound to take the substantive allegations of the complaint as
true, thus necessarily making the class order speculative in the sense that the plaintiff may be
altogether unable to prove his allegations." *Delgozzo*, 266 N.J. Super. at 181, 628 A.2d at 1086
(citation and internal quotation marks omitted); *Varacallo*, 332 N.J. Super. at 42, 752 A.2d at
813 (court "required to give plaintiffs every favorable view of plaintiffs' complaint and the
record") (citing cases; internal quotation marks omitted).

## B.  The Class Satisfies the Criteria of Rule 4:32-1(a)

### 1.  The Class is Too Numerous to Permit Joinder of All Class Members

The proposed class here—all third-party payors in the United States who paid for the
VIOXX prescriptions of their plan participants since May 1, 1999—is surely too numerous to
make joinder of all members practicable. As the Court recently observed, "'third party payor'
funds [like Local 68] are common today as most prescription drugs are purchased through
prescription plans." Maiorana Cert., Ex. 26 at 1. While the exact number of class members is
not presently known, precise enumeration or identification is not required, *Fink v. Ricoh Corp.*,
365 N.J. Super. 520, 557, 839 A.2d 942, 966 (Law Div. 2003); *Kronisch v. Howard Savings
Inst.*, 133 N.J. Super. 124, 132, 335 A.2d 587, 591 (Ch. Div. 1975), and courts generally have set
a low threshold for finding that the numerosity requirement has been satisfied, *see, e.g., Weiss v.
York Hosp.*, 745 F.2d 786, 808 n.35 (3d Cir. 1984) ("numbers in excess of forty, particularly

---

[6] New Jersey courts have recognized that Rule 4:32-1 is modeled after its federal counterpart, Rule 23 of the Federal
Rules of Civil Procedure. *See Varacallo*, 332 N.J. Super. at 41, 752 A.2d at 812. Therefore, although not bound by
federal courts' interpretations of the cognate federal rule, New Jersey courts consistently look to those decisions for
guidance. *See Delgozzo*, 266 N.J. Super. at 188, 628 at 1090 (citing cases).

those exceeding one hundred or one thousand have sustained the requirement"); *Saldana v. City of Camden*, 252 N.J. Super. 188, 193, 599 A.2d 582, 584 (App. Div. 1991) (class of 81 members satisfied numerosity requirement). Further, the size of the class can reasonably be ascertained after discovery. *See Zinberg v. Washington Bancorp, Inc.*, 138 F.R.D. 397, 405 (D.N.J. 1990). There can be little doubt that the number of third-party payors in the United States and their geographical dispersion across the country make their joinder in one action impracticable.

### 2. There Are Questions of Law or Fact Common to the Members of the Class, and Those Questions Predominate Over Questions Affecting Only Individual Members[7]

"Commonality exists when proposed class members challenge the same conduct of the defendants." *Schwartz v. Dana Corp./Parish Div.*, 196 F.R.D. 275, 279 (E.D. Pa. 2000). "Because the [commonality] requirement may be satisfied by a single common issue, it is easily met." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994); *accord Fink*, 365 N.J. Super. at 558, 839 A.2d at 967 ("a single common question is sufficient") (citations and internal quotation marks omitted).

Rule 4:32-1(b)(3), on the other hand, requires that common questions predominate. Although "[t]he predominance requirement is more demanding than the commonality requirement," *Muise*, 371 N.J. Super. at 37, 851 A.2d at 813, the courts of this State have

---

[7] A plaintiff who satisfies the more stringent predominance-of-common questions test *a fortiori* satisfies the commonality requirement. Thus, because of the overlap between the commonality requirement of subsection (a) and the predominance requirement of subsection (b)(3), courts often deal with the two issues simultaneously. *See In re LifeUSA Holding, Inc.*, 242 F.3d 136, 144 (3d Cir. 2001) ("[B]ecause the Rule 23(b)(3) predominance requirement incorporates the commonality requirement of Rule 23(a) we must treat them together."); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 247 (D. Del. 2002) (noting that "[t]he Third Circuit requires that the commonality and predominance requirements be analyzed together, because the predominance requirement, which is far more demanding, incorporates the commonality requirement") (citation and internal quotation marks omitted); *Hallaba v. Worldcom Network Servs. Inc.*, 196 F.R.D. 630, 635 (N.D. Okla. 2000); *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 613 n.8 (N.D. Ga. 1997); *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 529 (M.D. Fla. 1996). Because Plaintiff seeks class certification pursuant to Rule 4:32-1(b)(3), it addresses the predominance test in this section of its memorandum.

consistently stated that the predominance test is met "[i]f a common nucleus of operative facts is present," and "the potential class, including absent members, seeks to remedy *a common legal grievance*." *In re the Cadillac V8-6-4 Class Action*, 93 N.J. at 431, 461 A.2d at 745 (citing treatise; internal quotation marks omitted; emphasis added); *accord Strawn*, 140 N.J. at 52, 657 A.2d 425; *Varacallo*, 332 N.J. Super. at 45, 752 A.2d at 814; *Gross v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 303 N.J. Super. 336, 343, 696 A.2d 793, 796 (Law Div. 1997); *Delgozzo*, 266 N.J. Super. at 189, 628 A.2d at 1091.

The predominance inquiry is not the quantitative test. Indeed, "[a] single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions." *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 356 (S.D. Ga. 1996) (citation and internal quotation marks omitted; emphasis added), *aff'd mem.*, 117 F.3d 1433 (11th Cir. 1997); *accord Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 27 (D. Mass. 2003) ("A single, central issue as to the defendant's conduct vis a vis class members can satisfy the predominance requirement even when other elements of the claim require individualized proof."); *Brancheau v. Residential Mortg. Group, Inc.*, 177 F.R.D. 655, 660 (D. Minn. 1997) (single question may be predominant).

In the predominance inquiry, "the focus is on whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Carroll*, 313 N.J. Super. at 499, 713 A.2d at 514 (citation and internal quotation marks omitted); *see also In re the Cadillac V8-6-4 Class Action*, 93 N.J. at 434-35, 461 A.2d at 747 ("Here, the trial court found that the core of the case concerns common issues of fact and law and that, notwithstanding the individual proofs required on their respective claims, plaintiffs seek to redress a 'common legal grievance.'").

New Jersey courts have found the predominance element satisfied in cases, such as this,

27

involving a pattern of deception. For example, in *Delgozzo*, an action involving purchasers in

New Jersey, New York, and Connecticut of the defendant's faulty boiler, the Appellate Division

reversed the lower court's denial of class certification. 266 N.J. Super. at 179, 628 A.2d at 1085.

The court found that common questions predominated over individual issues because the

plaintiffs alleged "common problems" with their boilers; that they were "generally . . . misled by

defendants' misrepresentations, which, although spanning a period of years, represented a

common course of conduct"; "that defendants failed to warn of the hazards associated with their

product and failed to adequately test" the boiler before marketing it; and that the alleged defect

causing the problems "persisted throughout the entire class period, and was inherent in the

technology itself." *Id.* at 185, 628 A.2d at 1089. The use of "similar misrepresentations" to

perpetrate a "fraud" on numerous persons favored a class action. *Id.* at 181-82, 628 A.2d at

1087.

In the case at bar, the predominance element is amply satisfied. There are numerous

common questions of law or fact given that Local 68 and the other class members are all third-

party payors who sustained the same type of damages as a result of Merck's uniform wrongful

conduct. Because the class consists of entities that paid the prescription costs of VIOXX

consumed by their plan participants, these core questions override all others in this litigation,

including:

- whether Merck concealed or suppressed material information regarding the safety and efficacy of VIOXX;

- whether Merck misrepresented the safety and efficacy of VIOXX;

- whether Merck engaged in deceptive or misleading promotional campaigns designed to induce class members to add VIOXX to their formularies, or to authorize the purchase of VIOXX by their plan participants;

- whether Merck violated the CFA; and

- whether, as a result of Merck's misrepresentations and failure to disclose material information regarding the safety and efficacy of VIOXX, class members were damaged.

These common issues will be the object of most of the efforts of the Court and litigants.

Merck's conduct in misrepresenting and concealing the true safety and efficacy profiles of VIOXX, of which it was aware, and deceiving class members about VIOXX's safety and efficacy is at the core of this action. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 314-15 (3d Cir. 1998) (common scheme to defraud satisfies predominance requirement); *Buford*, 168 F.R.D. at 349 ("An alleged scheme to defraud which affects a class of people is a common question of law and/or fact, *regardless* of the characteristic of the scheme's intended victims.") (citing cases; emphasis added).

Merck's course of conduct resulted in the same economic injuries to all of the class members: as a result of Merck's wrongful conduct, class members were induced to pay $72.00 for a 30-day supply of VIOXX rather than $9.00 or less for a 30-day supply of other NSAIDs. Merck wrongfully extracted its 800% premium for VIOXX using a common, concerted promotional campaign. As in *Delgozzo*, common misrepresentations and concealment concerning VIOXX caused class members' harm. Common questions, therefore, predominate over any individual questions.

Notably, a plaintiff asserting a claim under the CFA need not prove reliance. *See Varacallo*, 332 N.J. Super. at 43, 752 A.2d at 814; *Fink*, 365 N.J. Super. at 545, 839 A.2d at 958. The plaintiff must demonstrate only that the defendant knowingly concealed, suppressed or omitted a material fact, with the intent that others rely on the omission. *Zorba Contractors, Inc. v. Hous. Auth., City of Newark*, 362 N.J. Super. 124, 139, 827 A.2d 313, 322 (App. Div. 2003);

29

*accord Union Ink Co., v. AT&T Corp.*, 352 <u>N.J. Super.</u> 617, 646, 801 A.2d 361, 379 (App. Div.)

("There is no reliance requirement for Consumer Fraud Act liability"), *certif. denied*, 174 <u>N.J.</u>

547, 810 A.2d 66 (2002); *Leon v. Rite Aid Corp.*, 340 <u>N.J. Super.</u> 462, 468, 774 A.2d 674, 677

(App. Div. 2001) (plaintiff need not prove reliance as long as ascertainable loss resulting from

defendant's conduct is demonstrated). Thus, the Court will not have to grapple with questions of

individual class members' reliance on Defendant's deceptions.[8]

While there may be differences among class members regarding the measure of damages,

New Jersey courts, like their federal counterparts, will certify a class despite the possible

presence of individual questions concerning causation, reliance, or damages. *Strawn*, 140 <u>N.J.</u> at

67, 657 A.2d at 432 ("Despite potential issues of causation, reliance, and damages particular to

the individual actions, the core of this case concerns common issues of fact and law."); *Delgozzo*,

266 <u>N.J. Super.</u> at 185, 628 A.2d at 1089 ("[t]he existence of questions concerning individual

representations made to a plaintiff, or relating to proof of damages, should not be a bar to

upholding a class action where there are significant common questions as to liability").[9]

---

[8] Even assuming *arguendo* that it did, New Jersey courts have held that classes may be certified even though individual questions of reliance by individual members on alleged misrepresentations persist after resolution of common questions. *See Carroll*, 313 <u>N.J. Super.</u> at 499, 713 A.2d at 514; *Delgozzo*, 266 <u>N.J. Super.</u> at 185, 628 A.2d at 1089.

[9] Indeed, "[i]ndividual questions of damages are *typical* in class actions." *DeLoach v. Philip Morris Cos.*, 206 F.R.D. 551, 566 (M.D.N.C. 2002) (emphasis added); *accord Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment."); *Barabin v. Aramark Corp.*, 210 F.R.D. 152, 160 (E.D. Pa. 2002) ("awarding damages normally entails examination of individual claims"), *aff'd*, No. 02-8057, 2003 WL 355417 (3d Cir. Jan. 24, 2003); *Stoller v. Baldwin-United Corp.*, No. 82-1438, 1985 WL 5809, at *12 (S.D. Ohio June 4, 1985) ("The amount of damage is nearly always an individual question and can usually be determined by the application of a mechanical formula") (citing cases; internal quotation marks omitted).

Individual damages determinations can be handled by a claims administrator or special master appointed by the Court. *See, e.g., In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2000) (noting that among "management tools available . . . to address any individualized damages issues that might arise in a class action" are appointment of "special master to preside over individual damages proceedings"), *cert. denied*, 536 U.S.

Continued...

30

### 3. Plaintiff's Claims are Typical of Those of the Class

The "typicality" component of Rule 4:32-1(a) simply requires that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982) (citing cases; internal quotation marks omitted); *accord In re the Cadillac V8-6-4 Class Action*, 93 N.J. at 425, 461 A.2d at 742 ("The claims of the representatives must have the essential characteristic common to the claim of the class.") (citing treatise; internal quotation marks omitted).  Put another way, to satisfy the typicality element, "the claims of the class members and class representatives must arise from the same event or practice or course of conduct and must be based on the same legal theory." *Goasdone*, 354 N.J. Super. at 530, 808 A.2d at 165.

The typicality test, however, does not require that the class representative's claims be identical to the claims of absent class members. *See id.* at 529, 808 A.2d at 165.  "When the same unlawful conduct was directed at or affected both the named plaintiffs and the members of the putative class, the typicality requirement is usually met, irrespective of varying fact patterns that may underlie individual claims." *Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 544 (D.N.J. 1999) (citing cases).

Local 68's claims are typical of the class generally.  Like other class members, Local 68 paid for the prescription costs of VIOXX consumed by its plan participants.  Plaintiffs' theories of liability and damages are the same as those of all class members.  As such, Plaintiff's claims "have the essential characteristics common to the claims of the class[;]" thus, "the claims of the representative[] are typical and . . . the representative[] will adequately protect the interests of the

---

917 (2002); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 175 (E.D. Pa. 1997) (employing claims administrator).

31

class." *In re the Cadillac V8-6-4 Class Action*, 93 N.J. at 425, 461 A.2d at 742 (internal quotation omitted).

### 4. Plaintiff Will Adequately Represent the Interests of Absent Class Members

The Rule 4:32-1(a) requirement of typicality of claims overlaps with the test for adequacy of representation. *Gross*, 303 N.J. Super. at 342, 696 A.2d at 796. "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997) (citations and internal quotation marks omitted).

The elements of the adequacy of representation requirement "include the interests of the named representatives being co-extensive with the interests of the other members of the class and assurance that the representatives will vigorously prosecute the interests, which requires the assistance of responsible and able counsel." *Gross*, 303 N.J. Super. at 342-43, 696 A.2d at 796. Consequently, the adequacy of representation component is satisfied if the plaintiff's interests are not antagonistic to those of the class, and the plaintiff's attorney is qualified, experienced and generally able to conduct the proposed litigation. *Delgozzo*, 266 N.J. Super. at 188, 628 A.2d at 1090.

As to this element of Rule 4:32-1(a), New Jersey courts presume that the plaintiff will fairly and adequately represent the interests of the class, and the burden is on the opposing party to demonstrate that the proposed representation will be inadequate. *Gross*, 303 N.J. Super. at 342, 696 A.2d at 796; *accord Delgozzo*, 266 N.J. Super. at 188, 628 A.2d at 1090 ("The defendant bears the burden of demonstrating that the proposed representation will be inadequate.").

Here, Local 68 can and will fairly and adequately protect the interests of the class. As discussed in Section B(3), *supra*, Plaintiff's injuries are illustrative of those of absent class members, having suffered identical economic injuries as a result of Merck's deceptive marketing of VIOXX. Moreover, Local 68 seeks the same form of relief on behalf of itself and absent class members, including compensatory, treble, and punitive damages.

Plaintiff's vigorous prosecution of class members' interests is also ensured because it has retained counsel with expertise in the conduct of complex class litigation. Local 68's attorneys are Seeger Weiss LLP, which has extensive nationwide expertise in the areas of class action, consumer fraud, securities fraud, and other complex litigation. *See* Maiorana Cert., Ex. 70 (copy of firm resume of Seeger Weiss LLP); *see also* http://www.seegerweiss.com/practice.htm.

## C. Besides the Predominance of Common Questions, a Class Action Would Be Superior to Alternative Methods of Adjudication

In addition to the requirement that common questions predominate over questions affecting individual class members, Rule 4:32-1(b)(3) requires a showing that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." R. 4:32-1(b)(3). In assessing the so-called "superiority" prong, a court "should be mindful that the class action rule should be construed liberally in a case involving allegations of consumer fraud." *In re Cadillac V8-6-4 Class Action*, 93 N.J. at 435, 461 A.2d at 747; *accord Muise*, 371 N.J. Super. at 35, 851 A.2d at 812 ("there is an enhanced preference for class actions in consumer fraud cases"). A class action is "a means of providing a procedure that is fair to all parties and promotes judicial efficiency. The relevant considerations include . . . not only the interests of class members and other parties but also the effect of class certification on efficient judicial management." *In re Cadillac V8-6-4 Class Action*, 93 N.J. at 436-37, 461 A.2d at 748.

1.  **Certification of the Class Will Promote the Interests of
    Judicial Efficiency and Economy**

In the case at bar, absent certification of the class, class members would be forced to

spend large sums of money developing and proving the same complex medical and scientific

issues over and over again.  For example, the claims at issue will entail expert evidence in the

areas of epidemiology, pharmacology, cardiology, neurology, and clinical trial design.  The

consumer fraud claims will also require a great deal of discovery.  As this Court recently noted,

"[o]ver a million pages of documents, including advertising and marketing materials and drug

studies have been provided by defendant to plaintiff."  Maiorana Cert., Ex. 26 at 4; *see also*

*DeLoach*, 206 F.R.D. at 566 (class action superior where "[d]iscovery expenses alone would

make individual pursuit of the claims prohibitive, as demonstrated by the substantial volume of

exhibits generated to this point").  Litigating each action individually would be grossly

expensive, inefficient, and wasteful.

Just as importantly, a multiplicity of suits would congest the dockets of this and other

courts with unnecessary, duplicative litigation, which would frustrate the goals of judicial

efficiency and economy.  *See, e.g., Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968)

(certification warranted where it was "virtually certain that a class action will achieve economies

of time, effort, and expense, and promote uniformity of decision as to persons similarly

situated") (citation and internal quotation marks omitted); *In re NASDAQ Market-Makers*

*Antitrust Litig.*, 169 F.R.D. 493, 527 (S.D.N.Y. 1996) (rejecting defendants' argument that class

action would not be manageable where "[s]eparate proceedings would produce duplicate efforts,

unnecessarily increase the costs of litigation, [and] impose an unwarranted burden on this

Court").  Consequently, the greatest efficiency can be achieved through class treatment of

Plaintiff's claims.  *See, e.g., Delgozzo*, 266 N.J. Super. at 194, 628 A.2d at 1093-94.  A class

action will also better ensure a uniform, consistent interpretation of the law.  Certainly,

individual litigation would not be preferable given that there are predominant common questions.

*See Lockwood Motors, Inc. v. General Motors Corp.*, 162 F.R.D. 569, 582 (D. Minn. 1995); *cf.*

*Goasdone*, 354 <u>N.J. Super.</u> at 542, 808 A.2d at 172 (class action not superior "[d]ue to the

multiplicity of individual issues").

### 2.  A Class Trial Will Be Manageable Because Only New Jersey Law Will Govern All Class Members' Claims

Besides the efficiencies to be gained through class treatment of Plaintiff's claims, a class

action would be superior because it will be eminently manageable.  Certification of this

nationwide class will not pose insurmountable choice of law problems.  *Cf. Fink*, 365 <u>N.J. Super.</u>

at 599, 839 A.2d at 992 ("Because of the complexity and management problems which would be

confronted by the need to apply the law of conceivably up to 50 states and the need to resolve the

numerous factual issues generated for individual members of the class depending upon their state

of residence, plaintiffs have been unable to satisfy the superiority condition for class action

certification.").

As a general matter, the courts of this State have certified nationwide classes raising

consumer fraud claims.  *See Kropinski v. Johnson & Johnson*, No. A-3979-97T1, 1999 WL

33603132, at **1-2 (App. Div. Jan. 7, 1999) (affirming trial court's decision certifying

nationwide class involving consumer fraud challenge to marketing of disposable contact lenses);

*Talalai v. Cooper Tire & Rubber Co.*, No. L-008830.00, slip op. at 33-36 (<u>N.J. Super.</u> Law Div.

Sept. 13, 2002) (certifying nationwide class action for settlement purposes); *see also Carroll*,

713 A.2d at 520, 313 A.2d at 511 (remanding for consideration of nationwide certification under

CFA); *cf. Cartigilia v. Johnson & Johnson Co.*, No. MID-L-2754-01, 2002 WL 1009473, at

**13-16 (<u>N.J. Super.</u> Apr. 24, 2002) (recognizing that New Jersey courts permit nationwide class

actions but declining to certify consumer fraud claim only because plaintiffs failed to demonstrate "ascertainable loss" under CFA after discovery and filing of class certification motion).[10]

As the forum state, New Jersey's choice-of-law rules determine which law applies to the claims of the class. *Gantes v. Kason Corp.*, 145 N.J. 478, 484, 679 A.2d 106, 109 (1996) ("Because the action was brought in New Jersey, the issue must be determined in accordance with this State's choice-of-law rule.); *Lonza v. The Hartford Accident and Indem. Co.*, 359 N.J. Super. 333, 342, 820 A.2d 53, 58 (App. Div. 2003) ("As the forum state, New Jersey's choice-of-law principles determine which law to apply.").

New Jersey applies "a flexible 'governmental-interest' standard, which requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation." *Gantes*, 145 N.J. at 484, 679 A.2d at 109 (citing cases). This involves two steps:

> The first step in the analysis is to determine whether a conflict exists between the law of the interested states. Any such conflict is to be determined on an issue-by-issue basis. If an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties.

*Veazey v. Doremus*, 103 N.J. 244, 248, 510 A.2d 1187, 1189 (1986) (internal citations omitted).

---

[10] *See also Carroll*, 313 N.J. Super. at 497, 713 A.2d at 513 ("This court has determined that conflict of law issues do not *per se* foreclose certification of a multistate class.") (citation omitted); *Delgrosso*, 266 N.J. Super. at 190, 628 A.2d at 1092 ("The fact that there may be conflict of laws issues does not foreclose the certification of a multistate class.").

In the case at bar, because there are genuine conflicts between the CFA and other consumer fraud statutes,[11] the Court must assess which state has the greatest governmental interest in having its law applied here. *See Fu v. Fu*, 160 N.J. 108, 119, 733 A.2d 1133, 1139 (1999) ("[t]he second prong of the governmental-interest analysis requires the court to determine which state has the most significant relationship to the occurrence and the parties"). The analysis looks to "the contacts which are considered most germane to the governmental-interest test." *Erny v. Estate of Merola*, 171 N.J. 86, 102-03, 792 A.2d 1208, 1218 (2002); *see Fu*, 160 N.J. at 125, 733 A.2d at 1142 (examining place where injury occurred; place where conduct causing injury occurred; domicile, residence, nationality, place of incorporation and place of business of parties; and place where relationship, if any, between parties is centered). In the instant case, analysis of the pertinent facts leads inescapably to the conclusion that that state is New Jersey.

One of the "main purposes" of the CFA is "to punish the wrongdoer[.]" *Lettenmaier v. Lube Connection, Inc.*, 162 N.J. 134, 139, 741 A.2d 591, 593 (1999); *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 21, 647 A.2d 454, 463 (1994). "The interest in deterrence has been recognized as a relevant factor to be considered in choice-of-law decisions." *Gantes*, 145 N.J. at 489, 679 A.2d at 111.

There can be no genuine doubt that New Jersey has a significant interest in ensuring that New Jersey manufacturers and distributors of products do not produce and market defective products—an interest that applies not only to the manufacturers but also to consumers everywhere. *See Kugler v. Romain*, 58 N.J. 522, 538, 417 A.2d 640, 648 (1980) (noting state's public policy of providing broad protection for "the greatest possible good for the greatest

---

[11] For example, Iowa's Consumer Fraud Act, Iowa Code § 714.16, does not confer a private right of action. *See Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 228 (Iowa 1998).

possible number of consumers who have common problems and complaints"); *see also Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998) ("this state has a powerful incentive to insure that local merchants deal fairly with citizens of other states and countries"). Indeed, "[t]he available legislative history demonstrates that the [CFA] was intended to be one of the strongest consumer protection laws in the nation." *New Mea Constr. Corp. v. Harper*, 203 N.J. Super. 486, 501-02, 497 A.2d 534, 544 (App. Div. 1985).

As the Court recently found in denying Merck's motion to dismiss products liability lawsuits on the ground of *forum non conveniens*, "New Jersey has a substantial interest in policing the conduct and protecting the interests of its citizen corporations, such as Merck." Maiorana Cert., Ex. 71 at 6 (*In re VIOXX Litig,* No. 619, Memorandum of Decision (Law Div. Sept. 13, 2004) (Higbee, J.)). The Court further noted:

> Plaintiffs allege, *inter alia*, that Merck intentionally failed to provide the required warnings on the VIOXX packaging and that it intentionally used misleading advertisements and promotional materials to induce consumers to purchase and use VIOXX. The Plaintiffs further allege that the decisions to do so were made in NJ, where Merck, a New Jersey corporation, is headquartered. *There is clearly a significant connection to NJ.*

*Id.* (emphasis added). The Court also found that "while the several states in which these Plaintiffs ingested VIOXX have an interest in these cases, [New Jersey] has a *greater* interest in allegedly fraudulent action that may have been committed by one of its citizens. . . . [New Jersey] has an interest in deterring wrongful conduct by its residents." *Id.* at 7 (emphasis added).

As in *In re VIOXX Litig.*, the Complaint here alleges that the wrongful conduct occurred in, was directed from, and emanated from Merck's facilities in New Jersey. *See* Maiorana Cert., Ex. 1 at ¶ 57 (Merck's "unlawful conduct arose, was directed, and emanated from New Jersey to the detriment and injury of class members in New Jersey and the United States.").

Moreover, application of the CFA to non-resident class members' claims is consistent

with the intention of the New Jersey Legislature. *See Boyes*, 27 F. Supp. 2d at 547 ("there is

little doubt that the New Jersey Legislature intended its Consumer Fraud statute to apply to sales

made by New Jersey sellers *even if the buyer is an out-of-state resident and some aspect of the*

*transaction took place outside New Jersey*.") (emphasis added); *see also Kugler*, 120 <u>N.J. Super.</u>

at 269, 293 A.2d at 711 (CFA "is not confined by its terms of spirit to activities involving

residents of this State"; CFA "prohibits unlawful practices in New Jersey without limitation as to

the place of residence of the persons imposed upon").

As this Court has previously commented, Merck cannot genuinely dispute its

overwhelming connections to New Jersey. *See* Maiorana Cert., Ex. 71 at 6. It was incorporated

in New Jersey at least as early as 1927. Its principal place of business and worldwide

headquarters are located in Whitehouse Station, New Jersey, where it employs over 2,200

workers. *See* Maiorana Cert., Ex. 72 (New Jersey Business Entity Report (May 7, 2004)).

Merck's Manufacturing Division ("MMD") is also housed in Whitehouse Station, New Jersey.

*Id.* In Rahway, New Jersey, Merck maintains Merck Research Laboratories ("MRL"), which

includes 150 buildings and nearly 4,700 employees. *Id.*, Ex. 73 (Merck Profile, at

http://www.njfuture.org/articles/merck.html (downloaded May 6, 2004)). Merck moved to

Rahway in 1902, which remains a vital center of its manufacturing and research. In addition to

Rahway and Whitehouse Station, Merck's other main sites in New Jersey include Cokesbury,

Somerville, Fairlawn, and Mountain Lakes. *See id.*, Ex. 74 (Merck Profile, Health Care Instit. of

New Jersey, at http://66.241.196.22/merck.asp (May 7, 2004)).

Merck-Medco, a New Jersey-based subsidiary of Merck prior to August 2003, when it

was spun off as a publicly-traded company, is a nationwide pharmacy benefits manager with

facilities in Fair Lawn, Parsippany, and Franklin Lakes, New Jersey. Merck-Medco employs

3,500 people in New Jersey. *See id.*, Ex. 75 (Merck-Medco 2002 Press Release, at

http://www.state.nj.us/commerce/newsarch/releases_2002/p91117a.htm). An April 2001 article

describes Merck-Medco as handling 65 million individuals and operating the world's largest

dispensing pharmacy. *See id.*, Ex. 76 (April 18, 2002 Merck Press Release, available at

http://www.merck.com/newsroom/press_releases/financial/2002_0418_print.html).

Merck cannot seriously dispute these overwhelming ties to New Jersey. *See id.*, Ex. 71.

(noting that Merck filed brief in U.S. District Court for the Southern District of Texas, in

*Stringer v. Merck & Co.*, No. 03-CV-411, in which it argued that it "reside[s] in NJ and the

claims of over 155 Texan plaintiffs should be transferred to [New Jersey] where they would be

more properly heard").

With respect to the product that is at the center of this litigation, Merck developed

VIOXX at MRL in Rahway, New Jersey. *See id.*, Ex. 13. From its New Jersey locations, Merck

assembled teams of research, manufacturing, and marketing personnel to assist in the launch of

VIOXX. Merck also readied thousands of bottles and packages in advance, so the company

could gear up immediately once FDA approval arrived. It launched VIOXX from its New Jersey

facilities, four days after the FDA approved it on May 20, 1999. *See id.*, Ex. 11. Within eleven

days after the FDA approval, MMD in New Jersey had coordinated the nationwide stocking of

more than 40,000 pharmacies with VIOXX. *See id.* Moreover, in connection with its motion to

dismiss centralized personal injury claims on *forum non conveniens* grounds, Merck admitted

that it maintains facilities in New Jersey that "were and are involved in the development and sale

of VIOXX." *Id.*, Ex. 77 at ¶ 2 (Apr. 8, 2004 Certification of Robert E. Silverman). Notably, as

specifically relates to this litigation, the aggressive plan to have third-party payors add VIOXX

to their formularies was designed and implemented from New Jersey. *See, e.g.*, *id.* at Ex. 47.

Thus, the relevant conduct took place here, including Merck's decisions to manufacture, distribute, market, promote, advertise, and sell VIOXX; the decisions regarding research protocols; the interpretation and dissemination of the results in VIGOR and other VIOXX-related research; communications with the FDA, the medical community and the public at large regarding cardiovascular risks associated with VIOXX; and decisions to reject or ignore evidence that VIOXX can increase the risk of cardiovascular events. In sum, it was out of its New Jersey offices and facilities that Merck made decisions that concealed the dangers of VIOXX from the public, the FDA, and physicians, and issued false and misleading advertising and warning labels.

Therefore, as in *In re VIOXX Litigation*, New Jersey has a substantial interest in regulating the conduct at issue here. New Jersey has an overriding interest in applying its laws because the wrongful conduct occurred in, was directed from, and emanated from New Jersey. Punishing and deterring fraudulent or deceptive conduct are among the "main purposes" of the CFA. *Lettenmaier*, 162 N.J. at 139, 741 A.2d at 593; *Cox*, 138 N.J. at 21, 647 A.2d at 463. Consequently, New Jersey's interest in applying its law to Merck's conduct here is paramount. New Jersey law, therefore, will apply to all class members' claims.

Nor will application of New Jersey law frustrate the interests of any other jurisdiction. Including New Jersey, 48 states—all but Hawaii[12] and Rhode Island—declare fraudulent or

---

[12] Hawaii finds that "[t]he public health, welfare and interest require a strong and effective consumer protection program to protect the interests of both the consumer public and the legitimate businessperson. Toward this end, a permanent office of consumer protection is created to coordinate the services offered to the consumer by various state and county agencies, together with private organizations, and to aid in the development of preventive and remedial programs affecting the interest of the consumer public." Haw. Rev. Stat. § 487-1.

deceptive consumer or trade practices to be unlawful.[13]  Thirty-four states, including New Jersey,

explicitly provide for a private right of action for violation of their consumer protection laws.[14]

Despite differences in the particulars of the statutes, the claims they permit and the elements of

those claims, and their availability to commercial plaintiffs, all of them have as their purpose the

prevention of fraudulent or deceptive practices and the protection of consumers.[15]  Application of

the CFA to the claims of all class members is therefore consonant with the purposes of various

consumer protection statutes.

---

[13] Ala. Code § 8-19-5; Alaska Stat. 45.50.471; Ariz. Rev. Stat. § 44-1522(A); Ark. Code Ann. 4-88-107 and 108; Cal. Bus. & Prof. Code § 17200; Colo. Rev. Stat. § 6-1-105; Conn. Gen. Stat. § 42-110b(a); Del. Code Ann. tit. 6, § 2513; Fla. Stat. Ann. § 501.204; Ga. Code Ann. § 10-1-392(a); Idaho Code § 48-603; 815 Ill. Comp. Stat. 505/2; Ind. Code § 24 5-0.5-3(a); Iowa Code § 714.16(2)(a); Kan. Stat. Ann. § 626(a); Ky. Rev. Stat. Ann. § 367.170; La. Rev. Stat. § 51:1409; Me. Rev. Stat. Ann. tit. 5, § 207; Md. Code Ann., Com. Law § 13-301; Mass. Gen. Laws ch. 93A, § 2; Mich. Comp. Laws § 445.903; Minn. Stat. Ann. § 325F.69(1); Miss. Code Ann. § 75-24-5; Mo. Rev. Stat. § 407.020; Mont. Code Ann. § 30-14-103; Neb. Rev. Stat. § 87-302; Nev. Rev. Stat. 598.015, 598.0923 and 598.0925; N.H. Rev. Stat. Ann. § 358-A:2; N.J. Stat. Ann. § 56:8-2; N.M. Stat. Ann. § 57-12-3; N.Y. Gen. Bus. Law § 349; N.C. Gen. Stat. § 75-1.1(a); N.D. Cent. Code § 51-15-02; Ohio Rev. Code Ann. § 1345.02; Okla. Stat. Ann. tit. 15, § 753; Or. Rev. Stat. § 646.608; 73 Pa. Cons. Stat. Ann. § 201-3; S.C. Code Ann. § 39-5-20; S.D. Codified Laws § 37-24-6; Tenn. Code Ann. § 47-18-104; Tex. Bus. & Com. Code Ann. § 17.46; Utah Code Ann. § 13-11-4; Vt. Stat. Ann. tit. 9, § 2453; Va. Code Ann. § 59.1-200; Wash. Rev. Code § 19.86.020; W. Va. Code § 46A-6-104; Wis. Stat. Ann § 100.18; Wyo. Stat. Ann. § 40-12-105.

[14] Ala. Code § 8-19-10; Alaska Stat. § 45.50.531; Colo. Rev. Stat. § 6-1-113; Conn. Gen. Stat. § 42-110g; Del. Code Ann. tit. 6, § 2525; Ga. Code Ann. § 10-1-399; Idaho Code § 48-608(1); 815 Ill Comp. Stat. 505/10a; Indiana Code § 24-5-0.5-1(a)(2); Kan. Stat. Ann. § 50.634; Ky. Rev. Stat. Ann. § 367.220(1); Me. Rev. Stat. Ann. tit. 5, § 213(1); Mass. Gen. Laws ch. 93A, § 9; Mich. Comp. Laws § 445.911; Miss. Code Ann. § 75-24-15(1); Mo. Ann. Stat. § 407.025; N.M. Stat. Ann. § 57-12-10; N.H. Rev. Stat. Ann. § 358-A:10; N.J. Stat. Ann. § 56:8-19; N.Y. Gen. Bus. Law § 349; N.C. Gen. Stat. § 75-16; Ohio Rev. Code Ann. § 1345.09; Okla. Stat. Ann. tit. 15, § 761.1; Or. Rev. Stat. § 646.638; 73 Pa. Cons. Stat. Ann. § 201-9.2; S.C. Code Ann. § 39-5-140; S.D. Codified Laws § 37-24-31; Tenn. Code Ann. § 13-11-109; Tex. Bus. & Com. Code Ann. § 17.50; Utah Code Ann. § 13-11-19; Vt. Stat. Ann. tit. 9, § 2461(b); Va. Code Ann. § 59.1-204; Wash. Rev. Code § 19.86.090; W. Va. Code § 46A-6-106(1).

[15] *E.g.*, Ala. Code § 8-19-2; Del. Code Ann. tit. 6, § 2512; Fla. Stat. Ann. § 501.202(2); Ga. Code Ann. § 10-1-391(a); Idaho Code § 48-601; Ind. Code § 24-5-0.5-1(a)(2); Kan. Stat. Ann. § 50.623(b); Md. Code Ann., Com. Law § 13-102; Tenn. Code Ann. § 47-18-102; Vt. Stat. Ann. tit. 9, § 2451; Wash. Rev. Code § 19.86.920; W. Va. Code § 46A-6-101; *Salmeron v. Highlands Ford Sales, Inc.*, 271 F. Supp. 2d 1314, 1318 (D.N.M. 2003); *Goshen v. Mutual Life Ins. Co. of New York*, 746 N.E.2d 858, 863 (N.Y. 2002); *Ly v. Nystrom*, 615 N.W.2d 302, 308 (Minn. 2000); *Century 21 Real Estate Corp. v. Hometown Real Estate Co.*, 890 S.W.2d 118, 130 (Tex. App. 1994); *Pirozzi v. Penske Olds-Cadillac-GMC, Inc.*, 605 A.2d 373, 375 (Pa. Super. 1992); *Seafare Corp. v. Trenor Corp.*, 363 S.E.2d 643, 653 (N.C. App. 1988); *State ex rel. Corbin v. Hovatter*, 698 P.2d 225, 227 (Ariz. App. 1985); *Zeller v. Northrup King Co.*, 370 N.W.2d 809, 813-14 (Wis. App. 1985).

Finally, application of New Jersey law to the entire class comports with the constitutional guarantee of due process. The New Jersey Supreme Court has noted that "[t]he leading case dealing with due-process limitations on state choice of law is *Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981)." *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 369, 614 A.2d 124, 147 (1992). Under *Allstate*, due process in the choice of law requires contacts with the forum, interests arising out of those contacts, and fairness to the defendant. *Id.; see Allstate*, 449 U.S. at 312-13 ("for a state's substantive law to be selected in a constitutionally permissible manner, that state must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair"). In addition, if the forum state wishes to bind an absent class member concerning a claim for money damages, the class member must receive notice plus an opportunity to be heard and participate in the litigation, as well as the right to opt out. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).

In the instant case, the aforementioned aggregation of contacts with New Jersey—including Merck's substantial presence in this State; its activities here concerning the product that is at the center of this litigation; and this State's interest in regulating the conduct at issue here—amply satisfy any due process concerns. Indeed, Merck cannot genuinely claim a lack of fundamental fairness if it is required to defend against the claims of a nationwide class where the law that will be applied will be that of the jurisdiction where it is resident and the claims will be adjudicated by a court in its own backyard.

Additionally, assuming the Court certifies the class, under Rule 4:32-2(b), notice and an opportunity to opt out of the litigation must be provided to members of any class certified under subsection (b)(3). Although the Rule requires only "the best notice practicable under the

43

circumstances, consistent with due process of law," R. 4:32-2(b), because the membership of the class can likely be ascertained through discovery—Merck's own records should reveal the identity of all third-party payors—it is probable that individual notice can be furnished to class members in this case.  Consequently, the other due process consideration identified by the Supreme Court—notice and an opportunity for opting out —can easily be met here.

* * * *

In sum, this action satisfies the requirements of Rule 4:32-1(a) and (b)(3).  The class is too numerous to permit reasonable joinder and the claims present overriding common issues.  All of the numerous class members suffered the same type of economic damage as the result of a common scheme by Merck to misrepresent VIOXX's safety and efficacy and to conceal its unacceptable cardiovascular and cerebrovascular risks.  Local 68's claims are typical of the class claims and Local 68 will adequately represent the class.  Lastly, the efficiency of litigating this complex action as a class action make a class action a superior method of adjudication, and the application of one state's law, New Jersey's, is warranted because this State has a paramount interest in applying its consumer protection statute to a resident defendant such as Merck, and the conduct underlying this litigation emanated from this State.  Application of New Jersey law to the claims of class members will make a class action eminently manageable.

<strong>CONCLUSION</strong>

For the foregoing reasons, the Court should certify the class.

Dated: New York, New York
       November 4, 2004

44