

Jun 17 2005
8:01PM

**SEEGER WEISS LLP**
550 Broad Street, Suite 920
Newark, NJ 07102
(973) 639-9100

**Attorneys for Plaintiff**

-------------------------------------------------------- x
                       :    SUPERIOR COURT OF NEW JERSEY
                       :    LAW DIVISION: ATLANTIC COUNTY
                       :
In Re: VIOXX LITIGATION        :    VIOXX LITIGATION
                       :
                       :    CASE CODE 619
                       :
                       :
INTERNATIONAL UNION OF OPERATING  :    Honorable Carol E. Higbee
ENGINEERS LOCAL #68 WELFARE FUND,  :
individually and on behalf of all others similarly  :    Docket No. ATL-3015-03-MT
situated,                            :
                       :
                Plaintiff,      :
                       :
         vs.                  :
                       :
MERCK & CO., INC.,           :
                       :
               Defendant.    :
-------------------------------------------------------- x

**PLAINTIFFS MEMORANDUM OF LAW IN REPLY TO DEFENDANT
MERCK & CO., INC.'S OPPOSITION TO PLAINTIFFS
<u>MOTION FOR CLASS CERTIFICATION</u>**

## Table of Contents

**Page**

Table of Authorities...................................................................................iii

Preliminary Statement ...............................................................................1

Argument – The Court Should Certify The Class .................................... 3

   A. Certification of a Nationwide Class of Third-Party Payors Is Appropriate..............3

      1. A Choice of Law Analysis Supports the Application of the
         NJCFA to Each Class Member's Claims ..........................................3

         a.  The Relevant Contacts to Be Considered .......................................8

         b.  The Relevant Contacts Are in New Jersey .......................................9

         c.  New Jersey's Policy Interests Are Furthered More
            Significantly Than Those of the Other Jurisdiction ..........................21

         d.  Defendant Relies on Inapposite Federal Cases ...................................28

   B. Defendant's Reading of the NJCFA Is Unduly Restrictive ...............................34

   C. Common Questions Predominate over Questions Affecting Individual
      Class Members ...............................................................................36

      1. Plaintiff's NJCFA Claim Does Not Require an Individualized
         Inquiry into How Merck Interacted with Each Class Member .................36

      2. Defendant Misstates Caselaw Concerning Motions for Class
         Certification of Claims Arising under the NJCFA ...............................42

         a.  The Court Will Not Have to Wrestle with Individual
            Issues of Reliance ...............................................................42

         b.  Defendant's Cases Are Inapposite ...................................................45

      3. Merck's Marketing and Promotion of VIOXX Were Materially Uniform ..........49

      4. Individual Formulary Determinations Are Not at Issue ...............................51

i

5.  The Issue of Ascertainable Loss Also Does Not Defeat Plaintiff's
     Showing of Predominant Common Questions ....................................54

D.  Plaintiff Will Adequately Represent the Interests of Absent Class Members............56

1.  Plaintiff's Claims Are Typical of Those of Other Class Members ................... 56

     a.  Plaintiff's Lack of Direct Dealings with Merck Is Irrelevant .....................57

     b.  Plaintiff's Claims are Typical Where Defendant Has Engaged
          in a Common Course of Fraudulent Conduct ...................................59

     c.  Differences in Damages Do Not Defeat Typicality ...............................60

2.  Plaintiff Is an Adequate Class Representative ...........................................61

Conclusion ........................................................................................63

## TABLE OF AUTHORITIES

### FEDERAL

**CASES**                                                                                    **Page(s)**

Appleyard v. Wallace, 754 F.2d 955 (11th Cir. 1985) .................................................................57

Bacon v. Honda of America Manufacturing, Inc., 205 F.R.D. 466 (S.D. Ohio 2001) .................52

Balentine v. Union Mortg. Co., No. 91 C 8213, 1994 WL 34256 (N.D. Ill. Feb. 2, 1994)..........31

Barnes v. American Tobacco Co., 161 F.3d 127 (3d Cir. 1998) ...................................................29

Begley v. Academy Life Insurance Co., 200 F.R.D. 489 (N.D. Ga. 2001) ...................................58

Bentley v. Honeywell International, Inc., 223 F.R.D. 471 (S.D. Ohio 2004) ...............................57

Boyes v. Greenwich Boat Works, Inc., 27 F. Supp. 2d 543 (D.N.J. 1998) .......................23, 24, 25

In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002).................................................28

Bynum v. District of Columbia, 214 F.R.D. 27 (D.D.C. 2003).....................................................57

CIBC World Markets, Inc. v. Deutsche Bank Securities, Inc., 309 F. Supp. 2d 637
    (D.N.J. 2004)...........................................................................................................................30

In re Caremark International Inc. Securities Litigation, No. 94 C. 4751, 1996 WL 351182
    (N.D. Ill. June 25, 1996) .........................................................................................................63

Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir. 1996) ..................................................29

Chin v. Chrysler Corp., 182 F.R.D. 448 (D.N.J. 1998) ................................................................30

Clawans v. United States, 75 F. Supp. 2d 368 (D.N.J. 1999)........................................................25

In re Consolidated Parlodel Litigation, 22 F. Supp. 2d 320 (D.N.J. 1998) ..................................30

Davis v. Southern Bell Telegraph & Telegraph Co., 158 F.R.D. 173 (S.D. Fla. 1994) ................51

Demitropoulos v. Bank One Milwaukee, N.A., 915 F. Supp. 1399 (N.D. Ill. 1996) ....................58

Deutschman v. Beneficial Corp., 132 F.R.D. 359 (D. Del. 1990)................................................58

Dukes v. Wal-Mart Stores, Inc., 222 F.R.D. 137 (N.D. Cal. 2004)..............................................62

Eggleston v. Chicago Journeymen Plumbers' Local Union, 657 F.2d 890 (7th Cir. 1981)...........61

*In re Energy System Equipment Leasing Securities Litigation*, 642 F. Supp. 718 (E.D.N.Y. 1986)..................................................................................................33

*Fields v. Biomatrix, Inc.*, 198 F.R.D. 451 (D.N.J. 2000)..............................................57

*In re Ford Motor Co. Ignition Switch Products Liability Litigation*, 174 F.R.D. 332 (D.N.J. 1997)..............................................................................................30, 31

*In re Ford Motor Co. Ignition Switch Products Liability Litigation*, 194 F.R.D. 484 (D.N.J. 2000)..................................................................................................31

*Fry v. UAL Corp.*, 136 F.R.D. 626 (N.D. Ill. 1991)......................................................63

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176 (2d Cir. 1990)..............................................................................................61

*Harding v. Tambrands Inc.*, 165 F.R.D. 623 (D. Kan. 1996) ......................................31

*James v. City of Dallas*, 254 F.3d 551 (5th Cir. 2001) .................................................56

*Kalodner v. Michaels Stores, Inc.*, 172 F.R.D. 200 (N.D. Tex. 1997) ........................63

*Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir. 1987)............................51

*Kohn v. American Housing Foundation, Inc.*, 178 F.R.D. 536 (D. Colo. 1998)...........29

*In re Linerboard Antitrust Litigation*, 203 F.R.D. 197 (E.D. Pa. 2001), aff'd, 305 F.3d 145 (3d Cir. 2002), cert. denied, 538 U.S. 977 (2003) ....................................................52

*In re Mercedes-Benz Antitrust Litigation*, 213 F.R.D. 180 (D.N.J. 2003) ...................50

*NN & R, Inc. v. One Beacon Insurance Group*, 362 F. Supp. 2d 514 (D.N.J. 2005)....44

*In re Neopharm, Inc. Securities Litigation*, 225 F.R.D. 563 (N.D. Ill. 2004)..........63, 57

*Retsky Family Ltd. Partnership v. Price Waterhouse LLP*, No. 97 C 7694, 1999 WL 543209 (N.D. Ill. July 23, 1999)...................................................................................61

*In re Rezulin Products Liability Litigation*, 210 F.R.D. 61 (S.D.N.Y. 2002)................28

*Robertson v. NBA*, 389 F. Supp. 867 (S.D.N.Y. 1975).................................................62

*In re School Asbestos Litigation*, 789 F.2d 996 (3d Cir. 1986)....................................33

*Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46 (E.D.N.Y. 2000) .................................7

*Sley v. Jamaica Water & Utility, Inc.*, 77 F.R.D. 391 (E.D. Pa. 1977) ........................61

*Steiner v. Equimark Corp.*, 96 F.R.D. 603 (W.D. Pa. 1983) ...................................56, 60

Stephenson v. Bell Atlantic Corp., 177 F.R.D. 279 (D.N.J. 1997) ................................49

Varacallo v. Mass. Mutual Life Insurance Co., 226 F.R.D. 207 (D.N.J. 2005) ......................51, 56

Zapata v. IBP, Inc., 167 F.R.D. 147 (D. Kan. 1996) .......................................62

Zeffiro v. First Pa. Banking & Trust Co., 96 F.R.D. 567 (E.D. Pa. 1983) ..............................56, 61

## STATE CASES

Almog v. Israel Travel Advisory Serv., Inc., 298 N.J. Super. 145 (App. Div. 1997) ..................26

Arons v. Rite Aid Corp., No BEL-L- 4641-03, 2005 WL 975462 (Law Div. Mar. 23, 2005)......31

Benjamin v. Corcoran, 268 N.J. Super. 517 (App. Div. 1993)......................................59

Butkera v. Hudson River Sloop "Clearwater," Inc., 300 N.J. Super. 550 (App. Div. 1997).........26

In re Cadillac V8-6-4 Class Action, 93 N.J. 412 (1983)........................................23, 33, 34, 35, 56,

Carpenter v. BMW of North America, Inc., No. 99-CV-214, 1999 WL 415390
    (E.D. Pa. June 21, 1999) .........................................................................31

Carroll v. Cellco Partnership, 313 N.J. Super. 488 (App. Div. 1998) ..........................3, 34, 48, 49

Cartiglia v. Johnson & Johnson Co., No. MID-L-2754-01, CODE247, 2002 WL 32155348
    (Law Div. Apr. 24, 2002)………………………………………………………………..3

Coleman v. Fiore Brothers, Inc., 113 N.J. 594 (1989)......................................22

Cox v. Sears Roebuck & Co., 138 N.J. 2........................................................22, 25, 42

D'Agostino v. Johnson & Johnson, Inc., 133 N.J. 516 (1993)..........................4, 5, 24, 26

Daaleman v. ElizabethTown Gas Co., 142 N.J. Super. 531 (Law. Div. 1976) ..........................25

Dabush v. Mercedes-Benz, USA, LLC, No. A-0970-03T5, 2005 WL 1334872
    (App. Div. May 26, 2005)........................................................................42

Delgozzo v. Kenny, 266 N.J. Super. 169 (App. Div. 1993) ....................................3, 33, 34, 52, 61

Erny v. Estate of Merola, 171 N.J. 86 (2002) ....................................................4, 5, 6, 7,

Ex parte Exxon Corp., 725 So. 2d 930 (Ala. 1998) ..............................................32

Fenwick v. Kay America Jeep, Inc., 72 N.J. 372 (1977)..............................................44

v

Fink v. Ricoh Corp., 365 N.J. Super. 520 (Law Div. 2003) ....................................4, 5,  33, 43, 47

Fu v. Fu, 160 N.J. 108 (1999) ...................................................................................4, 5, 8, 9, 24,

Furst v. Einstein Moomjy, Inc., 182 N.J. 1 (2004) ...............................................22, 23, 25

Gantes v. Kason Corp., 145 N.J. 478 (1996) ........................................................3, 4, 26

Gennari v. Weichert Co. Realtors, 148 N.J. 582 (1997) ......................................23, 43

Goasdone v. American Cyanamid Corp., 354 N.J. Super. 519 (Law Div. 2002) ........................56

Gross v. Johnson & Johnson-Merck Consumer Pharms. Co., 303 N.J. Super. 336
     (Law Div. 1997) ...............................................................................................46, 47, 61

Grubbs v. Chapman, 376 N.J. Super. 420 (App. Div. 2005) ............................................25

Hamilton Partners, Ltd. v. Sunbeam Corp., No. 99-CV-8275, 2001 WL 34556527
     (S.D. Fla. July 3, 2001) ...................................................................................51

Heake v. Atlantic Casualty Insurance Co., 15 N.J. 475 (1954) .....................................59

Heindel v. Pfizer, Inc., No. 02-3348  2004 WL 1398024 (D.N.J. June 7, 2004) .........................29

Hemming v. Alfin Fragrances, Inc., No. 86 Civ. 2563 (JFK), 1990 WL 106997
     (S.D.N.Y. July 25, 1990) ..................................................................................60, 61

Huffmaster v. Robinson, 221 N.J. Super. 315 (Law Div. 1986) .............................................25, 29

Instructional System, Inc. v. Computer Curriculum Corp., 130 N.J. 324 (1992) ..........................26

Island Mortg. of New Jersey and Perennial Lawn Care, Inc. v. 3M, 373 N.J. Super. 172
     (Law Div. 2004) ................................................................................................44

James v. Arms Tech., Inc., 359 N.J. Super. 291 (App. Div. 2003) ...................................39

Kramer v. Ciba-Geigy Corp., 371 N.J. Super. 580 (App. Div. 2004) ...............................................3

Kropinski v. Johnson & Johnson, No. A-3979-97T1, 1999 WL 33603132
     (App. Div. Jan. 7, 1999).....................................................................................3

Kugler v. Haitian Tours, Inc., 120 N.J. Super. 260 (Chan. Div. 1972) .........................................23

Kugler v. Romain, 58 N.J. 522 (1980)...................................................................22, 23, 32, 58

Lemelledo v. Beneficial Management Corp. of America, 150 N.J. 255 (1997).......................22, 23

Leon v. Rite Aid Corp., 340 N.J. Super. 462 (App. Div. 2001) ......................................................46

Lettenmaier v. Lube Connection, Inc., 162 N.J. 134 (1999) ...................................................22, 25

Marinelli v. K-Mart Corp., 318 N.J. Super. 554 (App. Div. 1999) .........................................24, 27

Muise v. GPU, Inc., 371 N.J. Super. 13 (App. Div. 2004) ..............................................................54

New Jersey Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8 (App. Div.)42, 43, 44, 46

New Mea Construction Corp. v. Harper, 203 N.J. Super. 486 (App. Div. 1985).........................22

Nicholas v. Poughkeepsie Savings Bank/FSB, No. 90 Civ. 1607 (RWS), 1990 WL 213093
   (S.D.N.Y. Dec. 20, 1990)...........................................................................................................59

In re Pennsylvania Baycol Third-Party Payor Litigation, No. 1874 Sept. Term 2001, 2005
   852135 (Pa. Com. Pl. Apr. 5, 2005)..........................................................................................33

Perez v. Wyeth Laboratories Inc., 161 N.J. 1  (1999)...............................................................38, 39

Perth Amboy Iron Works, Inc. v.  American Home Assur. Co., 226 N.J. Super. 200
   (App. Div. 1988)..........................................................................................................................57

Riley v. New Rapids Carpet Ctr., 61 N.J. 218 (1972) ...................................................................34

Scott v. Mayflower Home Importation Corp., 363 N.J. Super. 145 (Law Div. 2001) ..................43

Silva v. Automobiles of Amboy, Inc., 267 N.J. Super. 546 (App. Div. 1993).............................22

Skeer v. EMK Motors, Inc., 187 N.J. Super. 465 (App. Div. 1982)......................................22, 26

State Farm Mutual Automobile Insurance Co. v. Simmons' Estate, 84 N.J. 28 (1980) .................4

State v. Fortin, 178 N.J. 540 (2004)..............................................................................................38

State v. Harvey, 121 N.J. 407 (1990)..............................................................................................38

Strawn v. Canuso, 140 N.J. 43 (1995) .....................................................................................34, 51

Talalai v. Cooper Tire & Rubber Co., 360 N.J. Super. 547 (Law Div. 2001)...............................42

Talalai v. Cooper Tire & Rubber Co., No. 00CV5694AJL, 2001 WL 1877265
   D.N.J. Jan. 8, 2001)....................................................................................................................23

In Re Terayon Communications System, Inc., No. C 00-1967 MHP, 2003 WL 21383824
   (D. Cal. Feb. 24, 2003) ..............................................................................................................63

Union Ink Co., v. AT&T Corp., 352 N.J. Super. 617 (App. Div.) ................................................46

Varacallo v. Massachusetts Mutual Life Insurance Co., 332 N.J. Super. 31
    (App. Div. 2000) ........................................................................................33, 34, 35, 43, 46, 57

Veazey v. Doremus, 103 N.J. 244 (1986)...........................................................................4, 6

Ware v. Ciba-Geigy Corp., No. ATL-L-243-04, slip op.
    (Law Div. May 20, 2005) ..............................................................................................21

Weinberg v. Sprint Corp. 173 N.J. 250 (2002).................................................................43

Willis v. Thorn Americas, Inc., No. 95-5878, 1996 WL 117436 (E.D. Pa. Mar. 11, 1996) .........31

Zorba Contractors, Inc. v. Housing Authority, 362 N.J. Super. 124 (App. Div. 2003)................46

## STATUTES & RULES

28 U.S.C. § 1404(a) ........................................................................................................30

New Jersey Statute Annotated (N.J.S.A.) § 56:8-19…………………………..…………..……22

New Jersey Rules of Court, R.1:6-6…………………………….………………………………..39

## OTHER AUTHORITIES

Restatement (Second) of Conflict of Laws § 145, cmt. b.......................................................5, 8, 9

E.M. Kolassa, "The Economic Contribution of Pharmaceutical Marketing," 14 Journal of
Pharm. Mkt'g & Mgmt. 101, 101 (2002)   ........................................................................50

S.B. Banahan, & M. Kolassa, "Marketing Smart: What Makes Your MCO Tick?" Pharmaceutical
Executive 54, 54 (Mar. 1997) .........................................................................................53

## PRELIMINARY STATEMENT

Plaintiff respectfully submits this reply to Defendant's memorandum in opposition ("D.Mem.") to its motion for class certification. Defendant does not dispute that joinder of all members of the class is impracticable. Nor does Defendant contest the existence of at least one issue common to all class members so as to satisfy the "commonality" element. Rather, Defendant argues only that (i) a class action would not be manageable; (ii) questions concerning individual class members outweigh the common questions; and (iii) Plaintiff's claims are not typical of those of other class members and it will not adequately protect their interests.

Merck's purported manageability concern is founded on a fatally infirm choice of law analysis. As set forth below, in Plaintiff's opening memorandum, and in the accompanying comprehensive Appendix, New Jersey has the strongest interest *vis à vis* other states in seeing its law applied to the instant matter. That is not surprising: the discovery developed to date reveals that the critical marketing, scientific, and labeling decisions relating to VIOXX—which underlie Plaintiff's unconscionable practices and concealment claims—were made in New Jersey. Similarly, focusing on the NJCFA, in contrast to the consumer protection schemes of other jurisdictions, reveals that New Jersey law should apply to this dispute. Application of the NJCFA to all class members' claims, however, dooms Defendant's manageability challenge.

Claiming that its liability turns on the individualized decision-making processes of prescribing physicians around the country, Merck contends that individual questions will predominate over common ones. Quite the reverse. The relevant inquiry here—and the one that overwhelms all others—is the unconscionable corporate conduct by Merck

directed at third-party payors.  It is the decision by third-party payors to put and maintain VIOXX on formulary, and on what terms, that was influenced by Merck's improper conduct and concealment.  The losses pursued herein result from that fateful decision. Regardless of why a particular physician prescribed VIOXX, absent an agreement by third-party payors to purchase the drug when presented with those prescriptions, no loss would have been suffered.

Similarly, in focusing on the decision by third-party payors to put VIOXX on formulary, Merck contends that individualized causation analyses will be required as to each specific decision.  In so doing, Merck runs afoul of controlling precedent.  Where defendant "withheld material information with the intent that consumers would rely on it in purchasing [its product], the purchase of the [product] by a person who was shown the literature would be sufficient to establish *prima facie* proof of causation."  Varacallo v. Massachusetts Mut. Life Ins. Co., 332 N.J. Super. 31, 49 (App. Div. 2000).  Defendant does not dispute that the third-party payor committees charged with making formulary decisions were exposed to the improper conduct and marketing literature challenged herein.  It is that exposure—established by common proof—that establishes causation.

Finally, Merck contends that Plaintiff here is an inadequate class representative, unable to adequately prosecute this case and protect the interests of the class.  That Defendant's concern over Plaintiff's ability to protect the class is born out of Merck's desire to prevent one betrays the vacuousness of that contention.

Defendant's challenges, factually bereft and legally unavailing, should be rejected.  Plaintiff has met its burden on this motion and the Court should certify the class.

**ARGUMENT**

**THE COURT SHOULD CERTIFY THE CLASS**

**A.  Certification of a Nationwide Class of Third-Party Payors Is Appropriate**

Defendant first argues that a nationwide class cannot be certified because the NJCFA does not apply to non-resident class members' claims.  D.Mem. at 23-30.  That argument is meritless because the NJCFA applies to the claims of all class members.[1]

**1.  A Choice of Law Analysis Supports the Application of the NJCFA to Each Class Member's Claims**

Although Defendant argues that the NJCFA does not apply here, the pertinent choice-of-law analysis employed by New Jersey courts strongly supports its application.

A court considering a motion for certification of a multistate class must conduct an extensive analysis of how differences in states' laws may affect the predominance and superiority elements.  Carroll, 313 N.J. Super. at 496-97.   As the forum state, New Jersey's choice-of-law rules determine which law applies to the claims of the class. Gantes v. Kason Corp., 145 N.J. 478, 484 (1996); Kramer v. Ciba-Geigy Corp., 371 N.J. Super. 580, 597 (App. Div. 2004) (citing cases).

_____

[1]  Contrary to Defendant's assertions, New Jersey courts have certified nationwide litigation classes raising consumer fraud claims.  See Kropinski v. Johnson & Johnson, No. A-3979-97T1, 1999 WL 33603132, at **1-2 (App. Div. Jan. 7, 1999) (per curiam) (affirming certification of nationwide class involving NJCFA challenge to marketing of disposable contact lenses); see also Carroll v. Cellco P'ship, 313 N.J. Super. 488, 498 (App. Div. 1998) (directing lower court to consider whether to certify multi-state NJCFA action).  Merck states that it "has found no published New Jersey decision certifying a nationwide litigation class based on the application of the NJCFA to all fifty states," D.Mem. at 24 n.11, suggesting that no such authority exists.  Kropinski is reported in WESTLAW.  Moreover, New Jersey courts have rejected the argument that a nationwide NJCFA class cannot be certified.  See Carroll, 313 N.J. Super. at 497 ("[C]onflict of law issues do not _per se_ foreclose certification of a multistate class.") (citation omitted); Delgozzo v. Kenny, 266 N.J. Super. 169, 190 (App. Div. 1993) (same); Cartiglia v. Johnson & Johnson Co., No. MID-L-2754-01, CODE247, 2002 WL 32155348, at *16 (Law Div. Apr. 24, 2002) (characterizing such argument as "perplexing").

New Jersey applies "a flexible 'governmental-interest' standard, which requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation." Gantes, 145 N.J. at 484 (citing cases). The "governmental interests analysis" looks to the "connection of the parties to the respective states, the nature of the pertinent events that have transpired within each state, and the character of each state's policy preferences relevant to the particular litigation." State Farm Mut. Auto. Ins. Co. v. Simmons' Estate, 84 N.J. 28, 36 (1980). "[T]he 'qualitative, not quantitative, nature of the states' contacts ultimately determines whether its law should apply.'" D'Agostino v. Johnson & Johnson, Inc., 133 N.J. 516, 526 (1993) (quoting Veazey v. Doremus, 103 N.J. 244, 248 (1986)).

This analysis involves two steps, the first of which is to determine whether an actual conflict exists between the laws of the interested states. Veazey, 103 N.J. at 248 (citing authorities). Here, conflicts exist between the NJCFA and the cognate laws of other jurisdictions. See Appendix, passim. Thus, the first step is satisfied.

The second step of the governmental interests test requires an assessment of which state has the most significant relationship to the occurrence and the parties with respect to the issue at stake. Erny v. Estate of Merola, 171 N.J. 86, 101, 103 (2002); Fu v. Fu, 160 N.J. 108, 119 (1999). The court must "identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." Veazey, 103 N.J. at 248.

Because the consumer protection claims here concern the field of tort law, see Fink v. Ricoh Corp., 365 N.J. Super. 520, 570, 586 (Law Div. 2003), a court applies, under the governmental interests test, the following five factors from section 145 of the

Restatement (Second) of Conflict of Laws ("Restatement"):   "'(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states.'" Fu, 160 N.J. at 122 (Restatement § 145, cmt. b).  "The most important of those [factors] is the competing interests of the states.  As discussed in Fu, the initial focus should be on what [policies] the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether these concerns will be furthered by applying that law to the multi-state situation." Erny, 171 N.J. at 101-02 (internal citations and quotation marks omitted).

The next most important factor is the "interests underlying tort law," Erny, 171 N.J. at 104, under which a court "consider[s] 'the degree to which deterrence and compensation, the fundamental goals of tort law, would be furthered by the application of a state's local law.'" Id. at 102 (citation omitted).  The next factor, "the interests of interstate comity," requires the court to "determine whether application of a competing state's laws would frustrate the policies of other interested states." Fu, 160 N.J. at 122.[2]

---

[2] The "interests of judicial administration" factor is "less significant for the purpose of making choice-of-law determinations in tort actions," because to the extent this factor "conflicts with a strong state policy, the factor yields." Erny, 171 N.J. at 102.  Similarly, the "interests of the parties" factor—"of extreme importance in the field of contracts"— "ordinarily plays little or no part in a choice-of-law question in the field of torts." Fu, 160 N.J. at 123.  Given these factors' negligible importance in the realm of torts, of which consumer fraud actions are a species, see Fink, 365 N.J. Super. at 570, 586, Plaintiff does not address them in its Appendix.  Even assuming those factors were considered, however, where "the tort directly implicates a New Jersey company," applying New Jersey law "provides for fairness and certainty for the parties involved." D'Agostino, 133 N.J. at 539.  Therefore, applying the policies behind the NJCFA "does not undermine any valid expectation of [Merck]." Id.  Nor does it upset any expectations of consumers in other jurisdictions, because, here, "New Jersey law does not regulate conduct outside the state.  Rather, New Jersey law regulates conduct in New Jersey." Id.

Defendant purports to conduct a governmental interests analysis and even criticizes Plaintiff's analysis for focusing on Merck's New Jersey presence and its activities in this State with respect to VIOXX.  See D.Mem. at 25-30.  Merck claims that Plaintiff's analysis "would strip all other states of their ability to regulate the sale and marketing of products to their resident consumers."  Id. at 27.  It is *Defendant*, however, that pursues a single-minded approach, completely ignoring competing interests and haphazardly dealing with the second stage of the governmental interests analysis.

The deficiencies in Defendant's analysis are manifest from its focus on "each state's paramount interest in regulating prescription drug sales within its borders."  Id. at 26; see also id. at 30 (arguing "every other state's overwhelming interest in regulating the advertising, prescription, and sale of prescription drugs to its own residents").  Merck's overriding focus on the place where class members authorized the VIOXX purchases unmasks its analysis for what it really is:  a *lex loci delicti* standard—long ago abandoned by New Jersey, see Veazey, 103 N.J. at 247 (collecting cases)—cloaked as a governmental interests analysis.

Merck's analysis is flawed.  "Traditional choice-of-law analysis in [the] tort context does *not* permit the examination to end upon review only of the law of the site of the conduct and injury. . . . [T]he governmental-interest analysis requires that the sister state's policies be reviewed before determining which state has the dominant interest in having its . . . law apply."  Erny, 171 N.J. at 99 (emphasis added).  In addition, "[t]he inquiry also must determine whether any policy of the situs state would be frustrated by application of another state's law."  Id.  "Thus, when the sister state has an interest in having its law applied to a specific issue," and the policies of the state where the injury

occurred "will not be frustrated by the application of the other state's law," id. at 99-100, the sister state's law may be applied.[3]

Equally unconvincing is Merck's assertion that some states' consumer protection laws are more favorable to their respective resident class members than the NJCFA with regard to certain aspects of their claims.   See D.Mem. at 26 n.12.   Rather than comprehensively analyze the states' laws and underlying policies *on balance,* Defendant parses them and adduces isolated nuggets to suggest that those states' interests outweigh application of the NJCFA.   Defendant then erects a facade of a comprehensive analysis through its Appendix.   See id., App. A at 1 (summarizing "[s]*ome* [v]ariations [a]mong [s]tate [c]onsumer [p]rotection [l]aws") (emphasis added).

The governmental interests analysis, however, is not a smorgasbord by which parties are free to pick and choose which aspects of particular states' laws are more or less beneficial to class members.   Rather, the analysis must examine the *totality* of each state's laws.   Here, as discussed in Sections A(1)(a)-(d), infra, and the Appendix, (i) New Jersey has, on balance, the strongest statutory consumer fraud scheme in the country, and the NJCFA is more protective than cognate schemes of other states, including those cited by Defendant, see, e.g., App. at 10-12, 17-19, 21-23, 70-72, and 90-92; (ii) New Jersey has the most significant relationship to this litigation; and (iii) the policies and purposes behind the NJCFA would be more substantially furthered by it being applied here.

---

[3] In assuming that class member's respective states would favor the application of their own law no matter what the outcome to their residents' rights, Merck fails to recognize that "[s]tates can have a broader concern with the protection of the welfare of their own citizens than in the strict application of their own law." Simon v. Philip Morris Inc., 124 F. Supp. 2d 46, 75 (E.D.N.Y. 2000). "[A] state's policy interest in allowing application of similar rules of law and redress for its citizens in another forum may outweigh an interest in strict application of its own law—particularly if the result [would be] a lack of an effective remedy for its residents" if its own law were to apply. Id. (citing authorities).

a.     **The Relevant Contacts to Be Considered**

"[T]he contacts that are most significant to [the governmental-interests] analysis"

are:  (1) the place where the injury occurred; (2) the place where the conduct causing the

injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place

of business of the parties; and (4) the place where the relationship, if any, between the

parties is centered.  Fu, 160 N.J. at 125 (citing Restatement § 145(2)).

In this case, as to the first factor, to the extent the injury occurred at the place of

injury (*i.e.*, the place of authorized purchase of VIOXX), Plaintiff and class members

were injured in multiple jurisdictions.  Thus, there is no single "place of injury" and the

relative interest of each state is more or less equal.  See generally Restatement § 145(2),

cmt. e ("Situations do arise . . . where the place of injury will not play an important role

in the selection of the state of the applicable law. . . .  This will . . . be so when . . . *injury*

*has occurred in two or more states*.") (emphasis added).

The cumulative analysis of the remaining relevant prongs shows that the germane

contacts are in New Jersey.  In this respect, the contact consisting of the place where the

conduct *causing* the injury occurred—by and large New Jersey, see Section A(1)(b),

infra—is accorded "particular weight" in this case because the injury occurred in multiple

states.  See Restatement § 145(2), cmt. e ("When the injury occurred in two or more

states . . . the place where the defendant's conduct occurred will usually be given

particular weight in determining the state of the applicable law.").  This contact also

merits considerable weight because one of the primary purposes behind the NJCFA is to

deter and punish violations of the consumer fraud laws.  See id. § 145(2), cmt. e ("when

the primary purpose of the tort rule involves is to deter or punish misconduct, the place

where the conduct occurred has peculiar significance"); see also Section A(1)(d), infra.

The third prong (the domicile or residence of the parties or place of business) also favors New Jersey because Merck's principal place of business is here and its culpable conduct occurred here.  See Fu, 160 N.J. at 133 ("The domicile, residence, place of incorporation, and place of business of a defendant corporation are relevant, although not dispositive, considerations in a choice-of-law determination.") (citations omitted); see also Restatement § 145(2), cmt. e ("At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation").

New Jersey's compelling interest in deterring and punishing deceptive and unconscionable business practices in New Jersey is implicated by this contact.[4]  Also, as with the second prong, the principal place of business contact is to be accorded significant weight because the injury occurred in multiple states.   See generally Restatement § 145(2), cmt. e ("These contacts are of importance in situations where injury occurs in two or more states.").

**b.      The Relevant Contacts Are in New Jersey**

The factual record here overwhelmingly supports the conclusion that New Jersey is the center of gravity of this litigation.  As noted in Plaintiff's opening papers, Merck's headquarters and the offices of its senior executives are located in Whitehouse Station,

---

[4] In denying Merck's motion to dismiss non-residents' personal injury suits, this Court rejected the argument that non-residents' home states have a greater interest than does New Jersey.  Noting that the claims "involve[d] an international advertising campaign and potentially a failure to disclose information," the Court held that New Jersey "has a greater interest in allegedly fraudulent action that may have been committed by one of its citizens," and that "the focus should not be mechanically on where the harm was suffered because [New Jersey] has an interest in deterring wrongful conduct by its residents." In re: VIOXX® Litig., Case Code No. 619, memo. at 6-7 (Law Div. Sept. 13, 2004).

New Jersey. Merck's research, marketing, and regulatory personnel are located primarily in New Jersey and Pennsylvania, as well as other locations. Additionally, Merck maintains manufacturing facilities in New Jersey and other locations throughout the world. See June 17, 2005 Certif. of Jeffrey S. Grand ("Grand Cert."), Ex. 2 at 23 (Dep. Tr. of Merck Research Labs. Pres., Peter Kim); see also Pl.'s Mem. at 39-40.

Although Merck has research facilities all over the world, VIOXX was primarily developed—and its clinical trials were designed—in New Jersey. See id., Ex. 3 at 8 (Merck 2000 Annual Report) (noting that Merck Research Laboratories ("MRL") facility in Rahway, New Jersey is one of MRL's "core" locations, and development of VIOXX was "largely completed at Rahway, NJ"). Indeed, Merck's first research facility was founded in New Jersey and throughout the last 70 years, it has continued to build research and manufacturing facilities in New Jersey. Its own internal documents emphasize Merck's longstanding ties to the State. See, e.g., id., Ex. 4 (Oct. 12, 1999 Press Release).

Significantly, all plans and activities related to a drug—including marketing activities, discussed below—were reviewed and "signed off" on by Merck's Human Health Product Approval Committee ("HHPAC"). See id., Ex. 5 at 25 (Mar. 16, 2005 Dep. Tr. of David Anstice). HHPAC met monthly at Merck's headquarters in Whitehouse Station. See id.; Ex. 6 (sample cover of HHPAC Report, MRK-BL0001217, indicating location of meeting was Whitehouse Station ("WHS")).[5] Senior Merck executives, including former Merck CEO, Raymond Gilmartin, participated in those meetings. See id., Ex. 7 (sample HHPAC Distribution List). Merck has characterized

---

[5]Locations of meetings and events are typically indicated by abbreviations. For example, an HHPAC meeting on March 20, 2001 was held in conference room 3A-32 at Whitehouse Station (abbreviated as WHS3A-32). Similarly, conference rooms at Merck Research Laboratories' Rahway facility are abbreviated as "RY." See id., Ex. 28.

this committee as a "senior-level, interdisciplinary management committee" responsible for critical decisions and strategies related to the development and marketing of a drug.[6] As demonstrated below, these critical decisions—which were largely made in New Jersey—had a significant impact on the ability of formulary decision-makers to make informed determinations about whether Vioxx was safe and appropriate for inclusion in their formularies and to what extent prescriptions for Vioxx should be reimbursed.

Merck executives and scientific staff typically met at Merck facilities in New Jersey to discuss their concerns regarding the risks of VIOXX and to make responsive decisions. Merck's senior management and MRL scientists routinely met with its Board of Scientific Advisors in both Whitehouse Station—its corporate headquarters—and Branchburg, New Jersey. See, e.g., Grand Cert., Ex. 8 at MRK-AGG0002841-42 (Agenda for May 3-6, 1998 Board of Scientific Advisors' Meeting). This purportedly independent Board advised Merck on the development and testing of its products.

For example, in May 1998, Merck's Board of Scientific Advisors met and ultimately concluded that VIOXX's mechanism of action could potentially cause cardiovascular events. See id., Ex. 9 at 11-17 (May 1998 Programmatic Review). This conclusion was derived in part from learning that one of Merck's studies had demonstrated that patients taking VIOXX had a marked decrease of a prostacyclin metabolite in their urine. See id., Ex. 10 (Oct. 20, 1997 memo. discussing Protocol 023 data). One of the Board's concerns was that VIOXX inhibited production of prostacyclin

---

[6] See Def.'s Opp. to Pl.'s Mot. to Compel, at 14-15 ("HHPAC also makes crucial decisions about whether Merck should go forward with particular plans" and "periodically reviews the most highly sensitive marketing, regulatory, scientific, and manufacturing plans for each of Merck's products") (internal citations omitted).

in the vasculature and might cause VIOXX users to become pro-thrombotic. Indeed, an internal email suggests that MRL scientists were concerned that Vioxx would be associated with systemic prostacylin production in a published article. See id., Ex. 11 (Feb. 18, 1998 memo. from Briggs Morrison to other MRL scientists). Also, the Board was concerned that VIOXX use might accelerate the atherosclerotic process, lead to a thinning of blood vessel walls, and cause plaque lining the walls of blood vessels to become unstable. See id., Ex. 9 at 11-13. It recommended specific studies to resolve this issue. See id. at 16-17.[7]

Rather than delay the submission of its new drug application ("NDA") for VIOXX to the FDA, however, MRL decided not to conduct the recommended studies that would have resolved the cardiovascular risk issue at that time. See id., Ex. 14 (Sept. 29, 1998 note from Dr. Alan Nies, indicating that Merck had decided not to conduct recommended tests). If Merck had disclosed all of these concerns to the FDA, medical community, and formulary decision-makers prior to the drug's approval, such knowledge might have delayed or prevented Vioxx's approval for sale and its subsequent placement on formularies.

Even after the drug was approved and marketed, MRL refused to run clinical trials that might highlight negative properties of VIOXX, particularly its cardiovascular risks. For example, after the VIGOR results had raised public concerns that VIOXX use might increase the risk of heart attacks, Merck scientists internally questioned whether

---

[7] These recommendations were consistent with those of several other Merck consultants, who, both before and after the Scientific Advisors' meeting described above, wrote to senior MRL personnel in New Jersey to propose studies to resolve the cardiovascular issue. See, e.g., id., Ex. 12 (Oct. 27, 1997 letter from Dr. John Oates to Dr. Alan Nies, head of VIOXX Project Team at MRL); Ex. 13 (Sept. 9, 1998 letter from Dr. Carlo Patrono to Dr. Martino Laurenzi).

Merck should conduct a large-scale, cardiovascular outcomes trial to determine the significance of that risk. See id., Ex. 15 (Apr. 12, 2000 email from Edward Scolnick to Alise Reicin); Ex. 16 (Nov. 21, 2001 email from Edward Scolnick to Douglas Greene *et al.*). HHPAC, however, was ultimately asked to approve a recommendation *not* to initiate a CV Outcomes Study that would have resolved the cardiovascular safety issues. See id., Ex. 17 at MRK-ABL0000936-937 (May 17, 2000 HHPAC Presentation, Key Marketing Messages). The purported reasons for not conducting a cardiovascular safety study included Merck's conclusion that "there is no compelling marketing need for such a study" and that "the implied message" would not be "favorable." Id. HHPAC approved this proposal. See id., Ex. 18 at 2 (Minutes of May 17, 2000 HHPAC meeting).

More than a year later, Merck viewed quelling concern among the medical community about VIOXX's cardiovascular risk as "essential." See id., Ex. 19 at MRK-ABW0005624 (Sept. 13, 2001 email from Edward Scolnick to David Anstice describing a CV Outcomes study as "essential" to VIOXX franchise). At an annual meeting held for Wall Street analysts at Merck's New Jersey headquarters, Merck announced that it would conduct cardiovascular outcome trials on VIOXX. See id., Ex. 20 at 68 (excerpts from Dec. 11, 2001 presentation, Annual Business Briefing 2001). Indeed, on February 27, 2002, Merck's HHPAC approved the design of a large-scale cardiovascular outcomes trial that would compare VIOXX plus aspirin to placebo plus aspirin (the "VALOR" trial). See id., Ex. 21 at MRK-ABA0058133-34, 152 (Feb. 27, 2002 VALOR presentation to HHPAC); Ex. 22 (Feb. 27, 2002 email from Peter DiBattiste to Anna Esposito, confirming that HHPAC had approved study).

Shortly thereafter, however, Merck reached agreement with the FDA on a revised

label for VIGOR that would include a cardiovascular precaution, rather than the cardiovascular warning originally proposed by the FDA.   See id., Ex. 23 (Mar. 21, 2002 letter to FDA); Ex. 24 at 1, 3 (Draft Mar. 22, 2002 Press Release to be issued from Whitehouse Station, N.J.)   As one financial trade paper later remarked, the label announcement "remove[d] a significant overhang from [Merck's] stock" and that the stock "had limited downside risk, . . . especially with Vioxx's label concerns *out of the way*." See id., Ex. 25 at 1, 3 (Apr. 12, 2002 report from Morgan Stanley).  Since Merck had eliminated the "marketing need" to conduct the CV Outcomes trial on March 21, 2002, when it   reached agreement with the FDA on a revised label for Vioxx, it "deferred" the VALOR trial the following day.   See id., Ex. 26  (Mar. 22, 2002 Memo to MRL Research Associates). [8]

Again, had Merck chosen to conduct cardiovascular outcome studies at or prior to this time, Vioxx would likely have been withdrawn from market prior to September 30, 2004 and countless injuries or deaths would have been prevented.  With respect to the drug's placement on formularies, it is beyond dispute that had Merck resolved issues concerning Vioxx's cardiovascular safety prior to September 30, 2004, physicians and formulary decision-makers would have been able to make informed decisions regarding whether to prescribe or pay for the drug.

In addition, many of Merck's deceptive communications that misled formulary decision-makers—including but not limited to publications, promotional materials, and

---

[8] Compare Ex. 24 at 3 ("As previously announced, the Company plans to conduct large cardiovascular clinical outcomes trials"); with Ex. 27 at 1, 3 (Final version of press release, issued  Apr. 11, 2002 from Whitehouse Station, N.J.) (omitting the affirmation that Merck would be conducting a large cardiovascular clinical trial in favor of "[p]rospective studies with Vioxx to compare the incidence of serious cardiovascular events to NSAID comparators or placebo have not been performed").

product labeling and inserts—were the disseminated from New Jersey, and were approved by Merck senior management in New Jersey (HHPAC), or involved significant participation by New Jersey-based employees.  Such materials were similar to those provided to physicians and the general public by design.  A key component of Merck's marketing plan was to use physician prescribing practices and a public demand for Vioxx to pressure and/or influence formulary decision-makers into paying for the drug.  This marketing plan was also approved by Merck senior management in New Jersey.

For example, Merck's "key marketing messages" were subject to HHPAC approval.  After the VIGOR trial demonstrated a five-fold risk in cardiovascular events in patients taking VIOXX when compared to those taking naproxen, Merck's marketing personnel sought approval of "key messages" to be communicated through sales representatives, responses to professional information requests ("PIRs"), and national and regional advocates and opinion leaders.  See, e.g., Ex. 17 (May 17, 2000 HHPAC Presentation, Key Marketing Messages).  Part of Merck's marketing plan to third-party payors, including MCOs and formulary decision-makers, was to use direct-to-consumer advertising and physician marketing to "leverage" increased prescription demand and therefore, placement on formularies. See Nov. 4, 2004 Cert. of Matthew J. Maiorana, Ex. 4 (July 15, 1999 Merck Presentation, Leveraging the Consumer and DTC Campaign in the Physician's Office).  Indeed, Merck sought to influence prominent physicians located across the country, including New Jersey, because of their high volume of prescriptions and its belief that such physicians might have the ability to influence formulary decision-makers.  See id., Ex. 28 at MRK-AFI0201437-42 (July 23, 1999 Merck Report, Physicians to Neutralize) (identifying physicians across the country—including in New

Jersey—who wrote a high volume of NSAID prescriptions); see also Ex. 29 at 3 (Managed Care Advocate Developmental Tactical Plan).[9]

Merck also developed uniform marketing messages that were targeted for formulary-decision makers. On March 20, 2001, Merck's VIOXX Commercialization Team ("CST") gave a research, marketing, and regulatory presentation to HHPAC at Whitehouse Station. See id., Ex. 32 at MRK-ABL0001217-236 (excerpt from Mar. 20, 2001 VIOXX HHPAC Stage IV Review Meeting materials). At that time, the VIOXX CST was led by Dr. Alise Reicin, an MRL scientist stationed in Merck's Rahway facility. See id., Ex. 33 at 108-09 (Mar. 2, 2005 Dep. Tr. of Alise Reicin), Ex. 34 (Alise Reicin letterhead from 2001, indicating Merck address in Rahway). During this presentation, the VIOXX CST recommended conducting and publishing pharmaeconomic studies that would "convince payors of the benefits of using Vioxx over NSAIDs." See id., Ex. 32 at MRK-ABL0001224. Of chief concern to the VIOXX CST was its own admission that "[t]he economic advantage of Vioxx over NSAIDs is only borderline and payors cannot be convinced of the economic benefits of using Vioxx." Id. These actions were initiated by Merck's CST and approved by Merck's HHPAC in New Jersey.

In the following month, HHPAC reviewed a plan by Merck Outcomes Research, which noted that Merck's "key challenge is to get Vioxx into MCO [Managed Care Organization] formularies and treatment guidelines." See, Ex. 35 at 4 (excerpt from Apr.

---

[9] Merck knew that once VIOXX was placed on a formulary, its share of the NSAID market would increase dramatically. See id., Ex. 30, MRK-P0010914-15 (Compendium of formulary information cards for various states, used to detail physicians, including New Jersey doctors), Ex. 31 (Mar. 2003 Report, Aetna Vioxx Ramp Up!, indicating that placement on Aetna's New Jersey formulary led to Merck's increased market share). The above materials illustrate that marketing plans approved by HHPAC in New Jersey were not only directed at formularies across the country, but also directed at physicians and formulary decision-makers located in New Jersey.

20, 2001 HHPAC Presentation, Vioxx-Outcomes Research). This plan included exposing decision-makers to article publications and presentations. See id. at 5.

Although Merck developed a marketing plan specifically for formularies and third-party payors, as noted supra, many of the marketing and promotional materials given to formulary decision-makers were nearly identical to the information disseminated to the public and medical community generally.[10] All of these materials withheld or attempted to minimize data concerning cardiovascular and other safety risks related to VIOXX.

For example, in response to concerns that VIOXX might cause patients to become prothrombotic, MRL's Epidemiology Department performed a meta-analysis of the drug's pre-approval, osteoarthritis clinical trials. See Grand Cert., Ex. 38 at 1-2 (MRL Epidemiology Dep't Technical Report No. EP07006.005.98). Even though VIOXX had demonstrated a statistically-significant increased risk of a serious cardiovascular event in several categories, an MRL employee concluded that "no change in conduct of the VIOXX trials appears warranted." See id. at 13-14. This analysis was never provided to the FDA or shared with the medical community or formulary decision-makers. Compare id. with id., Exs. 39 (Abstract of 1999 article by MRL New Jersey scientists, Beth Seidenberg and Brian Daniels), 40 (Merck's "Cardiovascular Card," detailing device for physicians in use by Merck's sales representatives until April 2002), and 36 (Formulary Compendium for VIOXX).

---

[10] See generally id., Ex. 36 (1999 Formulary Compendium for VIOXX, containing materials distributed to formulary decision makers, including product label, clinical trial summaries, and published articles); see also id., Ex. 37 at MRK-AAX0003364 (June 22, 2001 HHPAC Presentation, demonstrating that marketing plan design for payors was very similar to that of prescribing physicians and opinion leaders).

MRL's New Jersey-based scientists routinely participated in Merck's VIOXX marketing efforts. Indeed, in an email to MRL employee Alise Reicin, a senior Merck marketing executive thanked her for her "major role" in "defus[ing] the CV risk issue for Vioxx" and for "the tremendous support [she] provided to the marketing organization." Id., Ex. 41 (May 25, 2000 email from Margie McGlynn to Alise Reicin).

Following the VIGOR trial, there was concern within Merck and members of the medical community that VIOXX might increase the risk for serious cardiovascular events, particularly myocardial infarctions or "MIs" (heart attacks). This was because the VIGOR trial had demonstrated a five-fold increase in heart attacks among VIOXX users when compared to a traditional NSAID, naproxen. In October 2000, Merck conducted a meta-analysis of all of its clinical trials, both completed and ongoing. This analysis, which was conducted by MRL New Jersey employee Deborah Shapiro, showed that *program-wide* there was a statistically significant increase in heart attacks for VIOXX compared to other NSAIDs. See id., Ex. 42 at NJ0070395 (Oct. 18, 2000 Shapiro Meta-Analysis).

This analysis, which was particularly important in light of the VIGOR results, was never given to the FDA. See, Ex. 43 at 7-10 (Merck Meta Analysis Provided to FDA, omitting MI-only meta analysis). Similarly, it was omitted from updates to the Formulary Compendium and the CV Card information used in marketing VIOXX to physicians. See, e.g., Ex. 44 (2002 VIOXX Formulary Compendium). The analysis *was* shared, however, with a group of external cardiovascular consultants at a meeting between the consultants and MRL New Jersey employees. Of the four non-Merck consultants that attended the meeting, one thought the data reflected a potential problem,

one couldn't draw a conclusion without further data, and two others stated that VIOXX should be *contraindicated* in high-risk patients, particularly those suffering from rheumatoid arthritis. See id., Ex. 45 at 3 (Notes from Cardiology Consultants Meeting) (found in custodial file of MRL New Jersey-based employee, Barry Gertz). Further, Mr. Gertz's notes from the meeting include a note to Alise Reicin to "*reduce* the emphasis on MI" in the data presentation. Id. (emphasis in original). Again, Merck never shared the views of its paid consultants with the FDA, formulary decision-makers, or the medical community. Instead, it continued to tout the safety of the drug and went on to publish a version of its meta-analysis that *excluded* the MI-only analysis. See id., Ex. 46 (Konstam article). Several of Merck's New Jersey-based employees are listed as the publication's authors. See id. (including Alise Reicin, Deborah Shapiro, and Barry Gertz).

Moreover, Merck excluded negative data from its marketing materials and publications—which were often authored by or with the participation of MRL scientists. For example, in April 2001, an MRL statistician prepared a memorandum detailing the alarming mortality rates in *two* of Merck's placebo-controlled Alzheimer's clinical trials, protocol 078 and protocol 091. See id., Ex. 47 (Apr. 8, 2001 MK-0966 Combined Mortality Analysis). This data demonstrated that patients on VIOXX were nearly three times as likely to die than patients taking a placebo. See id. at 7. Days later, Alise Reicin circulated a summary of this data—albeit with slightly different results—to several MRL New Jersey-based employees. See id., Ex. 48 at 3  (Apr. 17, 2001 document, VIOXX DEATHS). Following an emergency teleconference of MRL scientists (many of them New Jersey-based) to discuss the alarming difference in mortality rates and whether there was a need to set up a data safety monitoring board ("DSMB") to protect patients in the

still ongoing trials, the MRL employees decided to do nothing. See id., Ex. 49 (handwritten note on email concerning teleconference). Notably, the mortality data on Merck's CV card was never updated to include the Alzheimer's mortality data; nor was it accurately reflected in the Formulary Compendium.

Also, as noted by former Merck CEO, Raymond Gilmartin, the drug label is a key method by which a manufacturer communicates safety and efficacy data to the medical community. See id., Ex. 50 at 170 (Mar. 24, 2005 Deposition Transcript of Raymond Gilmartin). Merck's Worldwide Product Labeling, which negotiated the label with the FDA, had employees both in New Jersey and Pennsylvania. See id., Ex. 51 (Organizational Charts for Merck Worldwide Product Labeling). Additionally, executives from MRL's Rahway facility played a key role in those negotiations.[11]

Following the VIGOR study, the FDA proposed the inclusion of a cardiovascular warning in the VIOXX label, id., Ex. 53 (Oct. 15, 2001 Proposed Draft Label), and it recommended the inclusion of test results that had demonstrated a cardiovascular risk and undermined Merck's public claims that VIOXX could be used concomitantly with aspirin. See id. (section entitled, Warnings). Merck refused to accept this label. See id. Ex. 52.

Ultimately, the label negotiated between Merck and the FDA did not include a cardiovascular warning or additional data that would have increased public concern about the risk. Some of the data the FDA proposed for inclusion in the label was omitted from Merck's Formulary Compendium and CV Card. Compare id., Ex. 53 at MRK-

---

[11] See, e.g., Ex 52 (Nov. 1, 2001 email from Karen Grosser to Edward Scolnick, indicating that Ms. Grosser and Ms. Benezra-Kurshan were participating in VIOXX labeling negotiations); id. (including Scolnick email to Grosser, indicating that he would not "sign[] off on the VIOXX circular" with FDA's proposed cardiovascular language).

NJ0335162 (proposed language concerning cardiovascular risk increase in ADVANTAGE trial) with id., Exs. 40, 44 (CV Card and 2002 Formulary Compendium). Merck's refusal to include a complete and accurate account of critical cardiovascular safety data in its label resulted in physicians making uninformed prescribing decisions, and in formularies' making payments for a drug that they might otherwise not have paid for. As demonstrated by the draft "black box" warning prepared by Merck prior to withdrawal of the Vioxx, the elevation of the drug's cardiovascular precaution to a cardiovascular warning necessarily results in limitations on the appropriate dosing duration and patient population. See id. Ex. 54 at 2-4 (Draft Labeling Scenario).

In sum, not only was Vioxx developed in New Jersey, but critical decisions regarding the continued testing and marketing of the drug were also made within the state. As demonstrated above, these decisions resulted in physicians and formulary-decision makers having misleading and incomplete information to evaluate the safety of Vioxx, and therefore, the propriety of prescribing the drug or placing it on formularies.

### c.    New Jersey's Policy Interests Are Furthered More Significantly Than Those of the Other Jurisdictions

Besides New Jersey's substantial ties to this litigation, the relevant policy interests also tip the balance in favor of the NJCFA's application. As this Court has explained:

> To evaluate the competing interests of the States, the courts must consider what policies the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether the concerns will be furthered by applying that law to the multi-state situation. This means that a state only has an interest in applying its law if the state's contacts with the litigation are related to the policies for the applicable law.

Ware v. Ciba-Geigy Corp., No. ATL-L-243-04, slip op. at 12 (Law Div. May 20, 2005) (Grand Cert., Ex. 1) (citations and internal quotation marks omitted).

In the case at bar, New Jersey has a significantly greater interest in having its law applied in this case than the other states. New Jersey courts have articulated at least four policies underlying the NJCFA: (1) to compensate victims for their loss; (2) to punish the wrongdoer by imposing treble damages; (3) to attract competent pro-consumer counsel by imposing attorney's fees on the offending defendant; and (4) to deter the use of deceptive practices. Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 11 (2004); Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139 (1999); Cox v. Sears Roebuck & Co., 138 N.J. 2, 21. These policies are reflected in the NJCFA's provision making awards of treble damages, attorney's fees, filing fees, and costs *mandatory*. See generally Skeer v. EMK Motors, Inc., 187 N.J. Super. 465, 469-73 (App. Div. 1982).[12]

Indeed, of critical significance to the present analysis is the fact that "the [NJCFA] was intended to be one of the *strongest consumer protection laws in the nation*." New Mea Constr. Corp. v. Harper, 203 N.J. Super. 486, 501-02 (App. Div. 1985) (emphasis added).[13] In fact, the desirability of making the NJCFA widely available as an enforcement tool is what has led New Jersey courts to endorse the liberal

---

[12] Other policies underlying the NJCFA are to "assure that the financial cost to the private plaintiff [is] minimized and compensation maximized," Skeer, 187 N.J. Super. at 471; ensure "public interests of substantial consumer groups [are] . . . protected," Kugler v. Romain, 58 N.J. 522, 538 (1980); "ensur[e] justice for all citizens," Silva v. Autos of Amboy, Inc., 267 N.J. Super. 546, 555 (App. Div. 1993); and "achieve uniformity" in the NJCFA's application, Coleman v. Fiore Bros., Inc., 113 N.J. 594, 598 (1989).

[13] Accord Lemelledo, 150 N.J. at 265 ("[T]he CFA could not possibly enumerate all, or even most, of the areas and practices that it covers without severely retarding its broad remedial power to root out fraud in its myriad, nefarious manifestations.'); Cox, 138 N.J. at 15 ("the Legislature amended the [NJCFA in 1971 to confer a private right of action] to give New Jersey one of the strongest consumer protection laws in the nation") (citation and internal quotation marks omitted).

interpretation of the class action rule as *particularly appropriate* in NJCFA cases.[14]

Notably, the NJCFA was intended to apply not just to consumers in New Jersey

but to consumers *outside* of the State. See Kugler v. Haitian Tours, Inc., 120 N.J. Super.

260, 269 (Chan. Div. 1972) (NJCFA "is not confined by its terms of spirit to activities

involving residents of this State. . . . [I]t prohibits unlawful practices in New Jersey

without limitation as to the place of residence of the persons imposed upon.").[15]   As the

court in Boyes v. Greenwich Boat Works, Inc., 27 F. Supp. 2d 543 (D.N.J. 1998), noted,

the New Jersey Legislature intended the NJCFA "to apply to sales made by New Jersey

sellers even if the buyer is an out-of-state resident and some aspect of the transaction took

place outside New Jersey."   Id. at 547.   The court added that "[w]hile there can be no

doubt that the New Jersey legislature desired to protect its own residents, it is equally

clear that this state has a powerful incentive to insure that local merchants deal fairly with

---

[14] See In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 435 (1983) (absent certification of consumer cases, "manufacturer[s] may continue with impunity to place defective products on the market"); Kugler, 58 N.J. at 540 ("A class action by consumers produces several salutary by-products, including a therapeutic effect upon those sellers who indulge in fraudulent practices, aid to legitimate business enterprises by curtailing illegitimate competition and avoidance to the judicial process of the burden of multiple litigation involving identical claims.") (citation and internal quotation marks omitted).

[15] Accord Talalai v. Cooper Tire & Rubber Co., No. 00CV5694AJL, 2001 WL 1877265, at *5 (D.N.J. Jan. 8, 2001) ("The protections of the New Jersey Consumer Fraud Act are not limited to New Jersey residents."); see N.J.S.A. § 56:8-19 (conferring standing on "[a]ny person who suffers any ascertainable loss" by reason of practices declared unlawful under the statute) (emphasis added); id. § 56:8-1 (defining "person" as, inter alia, "any . . . corporation" and not limited to New Jersey residents); see also Furst, 182 N.J. at 12 (NJCFA is "remedial legislation that [is] construe[d] liberally to accomplish its broad purpose of safeguarding the public"); Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 264 (1997) (NJCFA's language "evinces a clear legislative intent that its provisions be applied broadly in order to . . . root out consumer fraud") (citing cases); Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604 (1997) ("The history of the Act is one of constant expansion for consumer protection.").

citizens of other states and countries." Id.

Indeed, the New Jersey Supreme Court has held that where "the tort directly implicates a New Jersey company," "[a]llowing New Jersey law to apply provides for fairness and certainty for the parties involved." D'Agostino, 133 N.J. at 539.  Applying the policies behind the NJCFA thus "does not undermine any valid expectation of [Merck]." Id.   Nor does it upset any expectations of consumers in other jurisdictions, because "New Jersey law does not regulate conduct outside the state.  Rather, New Jersey law regulates conduct in New Jersey," id., such as Merck's conduct respecting VIOXX.

Furthermore, as Plaintiff discusses in its analysis of the consumer protection laws of the other fifty jurisdictions, under the second prong of the governmental interests test, New Jersey, on balance, has the strongest consumer protection law and strongest interest in having its law applied here.  See Appendix, passim.  Hence, the policies and purposes behind the NJCFA would be more substantially furthered by its application in this case.

Similarly, an analysis of how the consumer protection laws of New Jersey and the other jurisdictions promote the goals that underlie tort law, i.e., compensation and deterrence, demonstrates that New Jersey has the most significant relationship to the occurrence and the parties in this action.[16]  Specifically, the other jurisdictions have a lesser interest here in deterrence because most of their consumer protection laws (i) do not provide for treble damages or, if they do, they provide only for discretionary, rather

---

[16] See Fu, 160 N.J. at 119, 123 (interests underlying tort law require court to consider degree to which deterrence and compensation would be furthered by application of local law); see also Marinelli v. K-Mart Corp., 318 N.J. Super. 554, 566 (App. Div. 1999) ("state's interests . . . [are] in assuring full and fair compensation for its injured domiciliaries and the deterrence of tortious misconduct on the part of its domiciliaries").

than mandatory, awards of treble damages, see Appendix, passim[17]; and (ii) make attorney's fees available, if at all, only at a court's discretion, see id., passim.[18] Thus, the other jurisdictions have less compelling deterrence interest here because it is those types of monetary awards that put teeth in a consumer fraud statute.[19]

Also, the other jurisdictions' compensation interest here is less compelling because they do not afford protection to consumers outside of their respective jurisdictions who are victimized by a New Jersey corporation. By contrast, New Jersey's strong interest in creating deterrence and affording compensation will be significantly furthered in this case. See Furst, 182 N.J. at 11; Lettenmaier, 162 N.J. at 139; Cox, 138 N.J. at 21.[20] Indeed, New Jersey has a strong interest in deterring misconduct on the part

---

[17] This Court has noted that "[c]onsumers are better protected by a mandatory treble damage rule than a discretionary one." Huffmaster v. Robinson, 221 N.J. Super. 315, 320 (Law Div. 1986) ("scales . . . tipped in favor of [application of the NJCFA over Pennsylvania law] . . . because only [the NJCFA's] application permits application of the mandatory New Jersey policy"); see also Boyes, 27 F. Supp. 2d at 546 ("New Jersey's law offers more protection than Pennsylvania's in that treble damages and attorney fees are mandatory in New Jersey and discretionary in Pennsylvania").

[18] Just recently, the Appellate Division reaffirmed the importance of the NJCFA's fee-shifting provision. See Grubbs v. Chapman, 376 N.J. Super. 420, 449 (App. Div. 2005) (noting that "the provision for attorney's fees in the [NJ]CFA is one of the deterrent aspects of the legislation") (citation and internal quotation marks omitted).

[19] See Cox, 138 N.J. at 21 (NJCFA provides deterrence "by awarding a victim treble damages, attorneys' fees, filing fees, and costs"); Daaleman v. ElizabethTown Gas Co., 142 N.J. Super. 531, 536 (Law. Div. 1976) (treble damages, attorney's fees, costs and equitable relief under NJCFA "are clearly intended not only to compensate a plaintiff for his actual losses, but to punish a defendant who has violated the Consumer Fraud Act as well as to deter him from further violations"), aff'd in relevant part, 150 N.J. Super. 78, (App. Div. 1977), rev'd on other grounds, 77 N.J. 267 (1978).

[20] See also Clawans v. United States, 75 F. Supp. 2d 368, 373 (D.N.J. 1999) ("New Jersey has a strong interest in preventing tortious misconduct by its domiciliaries"); In re: VIOXX® Litig., memo. at 6 ("New Jersey has a substantial interest in policing the conduct and protecting the interests of its citizen corporations, such as Merck").

of its corporate citizens, even where the harm occurs outside its borders.[21]

Moreover, these policies are reflected by the NJCFA's provision making mandatory treble damages, attorney's fees, filing fees, and costs, see Skeer, 187 N.J. Super. at 469-73, as well as by New Jersey's liberal application of its class action statute in consumer fraud cases. These remedies further reflect New Jersey's equally strong policy interest in compensating victimized consumers.[22]

In this case, as discussed above in Section A(1)(b), New Jersey's contacts with the litigation are weighty and relevant to the policies underlying New Jersey's deterrence and compensation interests. In light of these extensive contacts, "[t]his is . . . not a case in which New Jersey seeks to regulate access to its courts by nondomiciliary plaintiffs; here it seeks to affect what is done in New Jersey by a domiciliary corporation." D'Agostino, 133 N.J. at 538. New Jersey's interest in deterring the unlawful conduct of a resident corporation is plainly greater than that of the other jurisdictions.

---

[21]  See D'Agostino, 133 N.J. at 525-40 (New Jersey's interest in deterring future misconduct by corporations in New Jersey required application of New Jersey law even though such misconduct caused harm outside New Jersey); Butkera v. Hudson River Sloop "Clearwater," Inc., 300 N.J. Super. 550, 554 (App. Div. 1997) ("[T]he defendant's home state has not only a cognizable interest but also the paramount interest in its law being enforced"); Almog v. Israel Travel Advisory Serv., Inc., 298 N.J. Super. 145, 158 (App. Div. 1997) (New Jersey law applied to wrongful conduct of New Jersey citizens in Israel); see also Instructional Sys., Inc. v. Computer Curriculum Corp., 130 N.J. 324, 370 (1992) ("The proposition is 'fairly well established that a state may regulate its residents, even when they are acting outside of the state.'") (citation omitted).

[22]  In the analogous context of products liability suits, the Appellate Division has held that the "combined facts of plaintiff's domicile and situs of the accident may . . . have to yield to the policy interests of defendant's home state. This is particularly so if the home state's policy is to ensure the accountability in tort of its domiciliaries for the consequences of their negligent conduct." Butkera, 300 N.J. Super. at 554 (discussing Gantes v. Kason Corp., 145 N.J. 478, 482-89 (1996)); cf. Gantes, 145 N.J. at 497 ("New Jersey's policy in deterring tortious conduct of manufacturers is implicated by the defendant's material contacts with this State, and thus represents a substantial interest").

Moreover, New Jersey's compensation interest is greater than that of the other jurisdictions because in class actions the NJCFA affords *mandatory* treble damages to New Jersey consumers as well as to consumers *outside* of New Jersey, whereas most other jurisdictions do not afford mandatory treble damages in class actions and have no interest in compensating non-domiciliaries who are injured by a New Jersey corporation.

Even were it the case that New Jersey and other jurisdictions share "an interest in promoting deterrence, the interests of the state with an interest in 'both a compensation *and* deterrence interest outweigh[] the interest of the state having only a deterrence objective.'" Marinelli, 318 N.J. Super. at 565 (emphasis added). Therefore, based on the relevant contacts in this case, New Jersey's strong interests in providing both deterrence and compensation will be substantially furthered, and these interests outweigh the interests of other jurisdictions. Based on these differences between the NJCFA and the consumer protection laws of the other jurisdictions, and considered in light of the relevant contacts in this case, New Jersey has the most significant relationship to this litigation.

Finally, with respect to the interests of interstate comity, because the NJCFA provides much greater overall consumer protection than the laws of the jurisdictions, the application of those states' laws here would frustrate New Jersey's broader consumer protection policies, while the application of the NJCFA would *not* frustrate the more limited policies of the other jurisdictions. See Appendix, passim.[23]

---

[23] The foregoing analysis distinguishes this case from Ware, where this Court held that Alabama law governed the plaintiffs' medical monitoring (*i.e.*, personal injury) claim because even though the defendants were based in New Jersey or conducted operations there, there was minimal evidence of New Jersey-based conduct relating to the liability issues. The defendants were not New Jersey corporations; all of the waste dumping had occurred in Alabama and the plaintiffs' exposure to the hazardous chemicals had occurred there; the chemical facilities in question had been open in Alabama since 1952;

d.    **Defendant Relies on Inapposite Federal Cases**

The cases that Defendant cites in arguing that the NJCFA cannot apply to NJCFA to all class members' claims are off point. Most of them involved either sprawling, disparate classes or the court's incomplete governmental interests analysis. Some of the cases did not even entail class certification motions.

In In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002) (D.Mem. at 27), the court reversed the certification of nationwide classes of tire and vehicle purchasers, holding that they would not be manageable given the variability of products at issue. Six trade names of defective tires *alone* involved 67 different tire specifications, and "it would not be possible to make a once-and-for-all decision about whether all *60 million tires* were defective, *even if the law were uniform.*" Id. at 1018-19 (emphasis added).[24] The conclusion that each state's law applied to the claims of class members who bought their products within their respective borders flowed from a simple fact that Defendant omits. The forum state was Indiana, a *lex loci delicti* state. Id. at 1016.

In In re Rezulin Products Liability Litigation, 210 F.R.D. 61 (S.D.N.Y. 2002) (D.Mem. at 26, 28), involved centralized products liability cases involving *personal* injuries—liver and heart toxicity stemming from use of the drug at issue, id. at 63-64— which, by their nature, present highly individualized questions of causation and are not

---

and there was uncertain, little, or no evidence connecting waste shipments from New Jersey to the injuries suffered in Alabama. Ware, slip op. at 13-14.

[24] See also id. (20% of vehicles at issue had not even been equipped with the defective tires at issue, some vehicles had been or would be resold, and that several factors affected failure rate of products at issue); id. at 1016 (many class members faced no future threat of product failure because 30 million tires had already been recalled and replaced).

amenable to class treatment.[25]   See also id. at 67 (noting "plaintiffs' attempt to recharacterize what at root is a products liability suit as one of consumer fraud").  Also, the defendants included not only the drug's manufacturer, but also prescribing physicians and pharmacists.  The court found that competing against New Jersey's interests was "that of every other state in ensuring . . . that the rules it establishes to govern *physician and pharmacist* conduct are upheld."  Id. at 70-71 (emphasis added).

In Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir. 1996) (D.Mem. at 24, 30 n.15), the court reversed the certification of a nationwide class of smokers.  By its nature, tobacco litigation involves personal injury claims that present highly-individualized causation and related issues, such as addiction.  See Barnes v. American Tobacco Co., 161 F.3d 127, 143 n.19 (3d Cir. 1998) ("[I]ndividual issues raised by cigarette litigation often preclude class certification.") (citing cases).

In Heindel v. Pfizer, Inc., No. 02-3348 (SRC), 2004 WL 1398024 (D.N.J. June 7, 2004) (D.Mem. at 28-29), the court considered summary judgment motions, not a class certification motion.  The Pennsylvania citizen plaintiffs had purchased and consumed both VIOXX *and* Celebrex, and sued both drugs' manufacturers.  Id., 2004 WL 1398024, at **1-2.  Thus, the court faced the question of whether to apply New Jersey law to claims concerning manufacturers of two separate products.  It declined to apply the NJCFA, noting, in particular, that defendant Pfizer's activities in New Jersey with respect to the marketing and promotion of Celebrex were attenuated.  See id. at **10-11.

---

[25] See, e.g., Kohn v. American Hous. Found., Inc., 178 F.R.D. 536, 543 (D. Colo. 1998) ("Class certification is simply not appropriate where causation in a personal injury case predicated on exposure . . . will necessarily be different for every person in the proposed class, based on each person's length of exposure . . ., notice, pre-existing medical conditions and other factors.") (citation and internal quotation marks omitted).

Notably, the Heindel court ruled on a much less-developed factual record than the one now before this Court concerning Merck's activities in New Jersey relating to VIOXX.[26]

In re Consolidated Parlodel Litigation, 22 F. Supp. 2d 320 (D.N.J. 1998) (D.Mem. at 28), involved only *a motion to transfer venue*, which focuses on considerations of efficiency and convenience.[27]  The court performed no governmental interests analysis and considered only where the plaintiffs' claims most likely arose.  See Id. at 326.

In Chin v. Chrysler Corp., 182 F.R.D. 448 (D.N.J. 1998) (D.Mem. at 24, 26), the court failed to properly apply the governmental interests test.  The court concluded its analysis prematurely after finding only that each class member's "home state ha[d] *an* interest"—not the *greater* interest—and the mere existence of conflicts.  Id. (emphasis added); see id. ("Since the laws of each of the 50 states vary on important issues . . . the Court cannot conclude that there would be no conflict in applying the law of a single jurisdiction.  Thus, the Court will need to apply the law of each of the states from which Plaintiffs hail.").  Additionally, the Chin court denied class certification after finding that proving a product defect on a class-wide basis would difficult where a majority of class members had not even experienced any problems with the product.  Id. at 455.

In re Ford Motor Co. Ignition Switch Products Liability Litigation, 174 F.R.D. 332 (D.N.J. 1997)  ("Ford Motor I") (D.Mem. at 23, 26), is unpersuasive for many of the

---

[26]  While claiming that Plaintiffs have not adduced "published" authority to support the certification of a nationwide class, D.Mem. at 24 n.11, Defendant does not hesitate to rely on Heindel and numerous other unpublished rulings in opposition to such certification.

[27]  See 28 U.S.C. § 1404(a) (court may transfer venue "[f]or the convenience of parties and witnesses"); CIBC World Mkts., Inc. v. Deutsche Bank Secs., Inc., 309 F. Supp. 2d 637, 643 (D.N.J. 2004) (Section 1404(a)'s purpose "is to avoid the waste of time, energy and money and, in addition, to safeguard litigants, witnesses and the public against avoidable inconvenience and expense") (citation and internal quotation marks omitted).

same reasons as Chin. The Ford Motor I court failed to apply both prongs of the governmental interests test, making the conclusory statement that all of the 50 states had an interest because each was where their respective residents purchased their vehicles. See id. at 348 (each class member's "home state has *an* interest in protecting its consumers from in-state injuries caused by foreign corporations") (emphasis added).[28]

Defendant's reliance on the trial court's subsequent ruling in In re Ford Motor Co. Ignition Switch Products Liability Litigation, 194 F.R.D. 484 (D.N.J. 2000) ("Ford Motor II") (D.Mem. at 30 n.15), fares no better. The Ford Motor II court merely adhered to its earlier ruling and did not apply a governmental interests test. See id. at 488-49. In addition, the court cited unique reasons why the causation inquiry would be individualized. The original lead plaintiff had been dropped from the case after it came to light that he himself had set fire to his vehicle and another plaintiff had voluntarily dismissed her claims after an investigation revealed that the fire in her vehicle was unrelated to the ignition switch. Id. at 491.[29]

---

[28] In addition, because the claims stemmed from a defective ignition switch in some *23 million* vehicles built and sold from 1984 to 1993, the court found that the question of product defect was likely to turn on facts particular to each class member or, at a minimum, for each of the *158* model years at issue. Id. at 336, 342. The record showed that the defect was not subject to class-wide proof. Id. at 342-44 (out of 158 vehicle models, 157 had incident rates statistically significantly different from at least one other model; some models were 75 times more likely to experience switch failure than others).

[29] The other federal decisions that Merck cites (D.Mem. at 30 n.15) are similarly wide of the mark. See Harding v. Tambrands Inc., 165 F.R.D. 623, 631-32 (D. Kan. 1996) (no governmental interests analysis); Carpenter v. BMW of North Am., Inc., No. 99-CV-214, 1999 WL 415390, at **5-6 (E.D. Pa. June 21, 1999) (no governmental interests analysis; plaintiff merely "suggest[ed] having 51 subclasses, i.e., a subclass for each jurisdiction"); Willis v. Thorn Americas, Inc., No. 95-5878, 1996 WL 117436, at **1-2 (E.D. Pa. Mar. 11, 1996) (no governmental interests analysis; plaintiffs merely "suggest[ed] that, in lieu of a single nationwide class, this court should certify 43 subclasses, one for each state in which the defendants operate"); Balentine v. Union Mortg. Co., No. 91 C 8213, 1994 WL 34256, at *5 (N.D. Ill. Feb. 2, 1994) (court followed choice of law rules of Illinois, which

The state decisions that Merck cites also do not support its arguments. In Kugler v. Romain, 58 N.J. 522 (1980) (D.Mem. at 27-29), the New Jersey Supreme Court performed no choice of law analysis. 58 N.J. at 525. At any rate, Defendant omits salient facts that supported the application of the NJCFA to the non-resident defendant in that case. Contrary to Merck's statement that the defendant's conduct "emanated" from New York, the Kugler court described the defendant as "engaged in the installment sale of so-called educational books and related materials in New York *and* New Jersey." Id. at 527 (emphasis added). Notably, the defendant's "[s]ales solicitations were made *exclusively* through *house-to-house canvass* by defendant's employees. No advance appointments were made. The solicitors simply descended upon a selected section of a municipality and undertook by house-to-house calls to sell a package of books. . . ." Id. (emphasis added). Thus, the defendant injected himself into New Jersey, giving New Jersey an obvious interest in the application of its law. Defendant's suggestion that Kugler supports the conclusion that other states would mechanically apply their respective consumer fraud statutes on behalf of their citizens even if their claims stem from activities that Merck orchestrated or carried out from New Jersey is meritless.

Finally, in Ex parte Exxon Corp., 725 So.2d 930 (Ala. 1998) (D.Mem. at 27 & n.13), the Alabama Supreme Court reversed the certification of a nationwide class because the trial court failed to perform a governmental interests analysis. Id. at 932-33. Instead, the trial court's class certification order "state[d] simply that one state's law *might* apply to the entire class," and it "failed to consider whether that one state would have a significant contact or significant aggregation of contacts to the claims asserted by

apply presumption of *lex loci delicti* in tort cases).

each plaintiff to ensure that the choice of law was not arbitrary or unfair to [the defendant]." Id. at 932 (citation and internal quotation marks omitted; emphasis added).

In sum, application of the NJCFA to the claims of all class members in this action is appropriate, obviating any need for the Court to grapple with other states' laws. Therefore, a nationwide class is eminently manageable and common questions predominate over individual questions.[30]   In fact, one court recently certified a nationwide class in an analogous third-party payor action. See In re Pennsylvania Baycol Third-Party Payor Litig., No. 1874 Sept. Term 2001, 2005 WL 852135, at *6 (Pa. Com. Pl. Apr. 5, 2005) (certifying nationwide class and holding that Pennsylvania law would govern).[31]

---

[30]   Manageability is the only aspect of the "superiority" component of R. 4:32-1(b)(3) that Merck addresses, apparently conceding that other relevant considerations, such as the efficiency to be gained by class adjudication, are satisfied. See R. 4:32-1(b)(3) (enumerating "factors pertinent" to superiority); see also In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 436 (1983) (superiority "implies a comparison with alternative procedures"). Moreover, although Merck treats manageability and superiority as distinct elements, see D.Mem. at 1 (claiming action "fails the requirements of both manageability and superiority"), the former is actually a subcategory of the latter, see, e.g., In re Energy Sys. Equip. Leasing Secs. Litig., 642 F. Supp. 718, 752 (E.D.N.Y. 1986) ("the only element of superiority questioned by defendants is that of manageability").

[31] Defendant argues that the application of the consumer fraud statutes of all fifty states would render a nationwide class unmanageable. D.Mem. at 30-31. To be sure, were the Court to conclude that the NJCFA does not apply to all class members, the application of fifty-one jurisdictions' laws would likely prove unworkable. Cf. Fink, 365 N.J. Super. at 599 (noting "complexity and management problems which would be confronted by the need to apply the law of conceivably up to 50 states"). A concern about certifying a nationwide class, however, would not limit the Court to certifying *only* a New Jersey statewide class. The Court has broad power to define a different class. See In re Cadillac, 93 N.J. at 437 ("R. 4:32 vests in the trial court substantial control over management of a class action. A trial court can mold the class[.]"); Delgozzo, 266 N.J. Super. at 194 (manageability problems stemming from application of multiple states' laws "seem[] amenable to resolution by more narrowly defining the class"); In re School Asbestos Litig., 789 F.2d 996, 1010 n.11 (3d Cir. 1986) ("sheer magnitude of the task of construing the various laws" may "compel a court . . . *to* reduce [class] to a more

**B.    Defendant's Reading of the NJCFA Is Unduly Restrictive**

Defendant alternatively claims that even if the NJCFA applied to every class member's claim, "individualized issues of proof preclude adjudication" of their claims on a class-wide basis. D.Mem. at 31.  That argument is also without merit.

As a general matter, Merck ignores the guiding principles that apply to cases such as this.  The New Jersey Supreme Court has instructed that trial courts must be "mindful that the class action rule should be construed liberally in a case involving allegations of consumer fraud."  In re Cadillac, 93 N.J. at 435.[32]  As the court explained, "a court should be slow to hold that a suit may not proceed as a class action" because "[t]he nature of a consumer fraud case is such that a plaintiff may not be able to demonstrate at once that all the requisites are met and that no fatal problem of manageability will be encountered."  Riley v. New Rapids Carpet Ctr., 61 N.J. 218, 228 (1972).

---

manageable number of states") (citation and internal quotation marks omitted).  For example, if the Court were troubled by manageability considerations, it could certify a multistate class composed of all third-party payors in Merck's northeastern marketing region.    Such  a  more  compact,  contiguous  class  would  lessen  any  purported manageability concerns.

[32] Accord Strawn v. Canuso, 140 N.J. 43, 68 (1995) ("the class action rule should be construed liberally in a case involving allegations of consumer fraud") (citing cases; internal quotation marks omitted); Varacallo v. Massachusetts Mut. Life Ins. Co., 332 N.J. Super. 31, 44 (App. Div. 2000) ("For nearly thirty years, our highest court has instructed trial courts to liberally allow class actions involving allegations of consumer fraud"); Carroll, 313 N.J. Super. at 498 ("[t]h[e] preference for class certification applies especially for adjudication of multiple consumer-fraud claims") (citing cases); Delgozzo, 266 N.J. Super. at 180 ("[T]he class action vehicle is particularly appropriate in cases . . . alleging consumer fraud, regardless of the particular legal theory advanced.") (citations omitted); Arons, 2005 WL 975462, at *14 ("[L]ike most remedial legislation, the Act should be construed liberally in favor of consumers. . .  It is well to remember that the Consumer Fraud Act is aimed at more than the stereotypic con man. The statutory and regulatory scheme is also designed to promote the disclosure of relevant information to enable the consumer to make intelligent decisions in the selection of products and services.") (citations and internal quotation marks omitted).

Indeed, in <u>Varacallo</u>, the Appellate Division noted that "[i]rrespective of whether the trial court may be required to deal with individual claims of reliance, causation, and/or damages, the predominance factor has been met and class actions have been approved in this State where the court has found a common core of operative facts and the plaintiffs are seeking to redress a common legal grievance." 332 <u>N.J. Super.</u> at 45, (citation and internal quotation marks omitted); <u>see also id.</u> ("The principle is that class actions should be liberally allowed where consumers are attempting to redress a common grievance under circumstances that would make individual actions uneconomical to pursue."). In the case at bar, the claims arise from a common nucleus of operative facts— Defendant's systematic marketing and promotion scheme—and Plaintiff seeks to redress a common legal grievance on behalf of all third-party payors.

Instructive is <u>In re Cadillac</u>. There, the New Jersey Supreme Court affirmed the certification of a class of automobile engine purchasers. It found that class adjudication of the consumer fraud claims against the engine's manufacturer was preferable to individual litigation of even a bellwether case. 93 <u>N.J.</u> at 436. Noting that "[m]any of the crucial issues [we]re factual and raise[d] substantial problems of proof"—including "the existence of a design defect," the manufacturer's "knowledge of the defect," and "its intent toward its customers"—the court found that '[t]hose proofs doubtless w[ould] require substantial discovery, expert testimony, and trial time, all of which would render uneconomical an individual suit by a single disgruntled customer." <u>Id.</u> at 437.[33] So, too,

---

[33] <u>Accord Kugler</u>, 58 <u>N.J.</u> at 537-38 ("[G]iving the consumer rights and remedies which he must assert individually in the courts would provide little therapy for the overall public aspect of the problem. . . . [I]f the only available route had been pursuit of a private remedy by individual victims of the unfair practices . . . , [it] would require an unrealistic

it would make sense to resolve Plaintiff's claims on a class basis than require each third-party payor across the country to conduct duplicative discovery regarding Merck's conduct or independently establish Merck's liability.  As this Court has noted, "It is much easier to produce millions of documents in one forum than in 100 different forums."  In re: VIOXX® Litig., memo. at 5.

### C. Common Questions Predominate over Questions Affecting Individual Class Members

#### 1. Plaintiff's NJCFA Claim Does Not Require an Individualized Inquiry into How Merck Interacted with Each Class Member

Defendant argues that even if the NJCFA governs all class members' claims, individual issues predominate over common questions because each class member must show that Merck's fraud "actually caused individual treating physicians to prescribe VIOXX® to individual patients/plan participants and (2) actually caused individual P&T [Pharmacy and Therapeutics] Committees to include VIOXX® on individual plan formularies."  D.Mem. at 31-32 (emphasis omitted).

In particular, Defendant's reliance on the decisions of treating physicians is a red herring.  The relevant decision here was *not* the decision of physicians whether to prescribe VIOXX .  Rather, it was the decision of third-party payors whether to add VIOXX to their formularies.  It was *that* decision that was influenced by Merck's knowing omissions or unconscionable marketing practices.  Given Merck's broad, uniform campaign to promote VIOXX, *everyone* exposed to Merck's messages was

---

expenditure of judicial energy and would be inconsistent with current trends and consumer protective legislation.").

affected by its deception.[34]

Notwithstanding the focus of this litigation on the effect of Merck's conduct on third-party payors, Defendant asserts that the Court will have to consider whether Merck's omissions caused *each* P&T Committee to add VIOXX to the third-party payor's formulary. In support of this argument, Merck submitted the certification of E.M. Kolassa, Ph.D. D.Mem. at 33 (citing Kolassa Cert. ¶ 16).

Putting to one side that formularies employ a remarkably uniform process in selecting drugs for their formularies, see Section C(4), infra; see generally Certification of William N. Kelly, Pharm.D., dated June 17, 2005 ("Kelly Cert.") (Grand Cert., Ex. 60) ¶¶ 16-25, Dr. Kolassa's certification cannot survive minimal scrutiny. Whereas he stated in his certification that he was asked to describe the marketing of VIOXX, at his deposition he stated he had not been asked to deal with the drug's marketing. Compare Kolassa Cert. ¶ 9 with Kolassa Tr. 6:4-19.

Putting to one side that discrepancy, Dr. Kolassa's conclusions are double-hearsay. Although stating in his certification that he "supervised" interviews of medical and pharmacy directors for purposes of preparing it, Kolassa Cert. ¶ 10, he did not personally speak with any personnel of managed care organizations and the interviews conducted at his behest were merely to confirm pre-held beliefs as to how those organizations handled VIOXX. Kolassa Tr. 38:13-39:17, 41:22-42:4, 52:5-11. Dr. Kolassa did not even know the identities of the interviewees. Id. 40:7-14, 41:18-21. Contrary to the assertion in his certification, the five interviewees were not randomly

---

[34] See generally Varacallo, 332 N.J. Super. at 49 (where defendant "withheld material information with the intent that consumers would rely on it in purchasing [its product], the purchase of the [product] by a person who was shown the literature would be sufficient to establish *prima facie* proof of causation"); see also Section C(3), infra.

selected.   Indeed, they did not even represent a statistically-valid sample.   Compare
Kolassa Cert. ¶ 10 with Kolassa Tr. 41:1-8, 42:5-13, 52:18-53:11, 53:21-54:3.

Notably, although he claimed that P&T Committees' decision-making was highly
individualized, Dr. Kolassa *never served on such a committee and never even attended a
P&T Committee meeting*, and he was unaware if any of the individuals interviewed for
purposes of preparing his certification had, either.  Kolassa Tr. 56:18-24, 57:7-11.  Thus,
Dr. Kolassa's opinion fails the fundamental test that an expert opinion must be to a
reasonable degree of certainty or probability.    See State v. Fortin, 178 N.J. 540, 597
(2004); State v. Harvey, 121 N.J. 407, 431 (1990).   Indeed, it was not even based on
personal knowledge.  See R. 1:6-6 (where facts are previously outside record, court may
hear motion "on affidavits made on personal knowledge").[35]

Putting to one side that the focus will be on third-party payors' exposure to
Merck's knowing omissions and unconscionable marketing practices, Merck's argument
that the Court will have to probe into the mindset of prescribing physicians and wrestle
with what led them to prescribe VIOXX to their patients fails for another reason.  New
Jersey has rejected the "learned intermediary" doctrine as a defense where, as here, drugs
are marketed directly to consumers.[36]  In Perez v. Wyeth Laboratories Inc., 161 N.J. 1

---

[35] In at least one respect, Dr. Kolassa undermined Merck's suggestion that physicians
considered a multiplicity of factors in deciding whether to prescribe VIOXX.  The drug's
premium price had little to do with physicians' decision to prescribe it.  According to Dr.
Kolassa—who played a prominent role in the company's pricing of the drug—"for the
most part, physicians are unaware of and unaffected by the prices of individual drugs."
Id. 20:3-5; see id. 9:7-24, 11:8-13:3.

[36] This suit involves direct marketing.  The complaint specifically alleges that in order to
jump-start sales, Merck engaged in a massive direct-to-consumer advertising blitz to the
public to induce them to use or request VIOXX.  Compl. ¶ 23.  It was Merck's intensive
promotion of VIOXX to the public that fueled consumer demand that, in turn, led to

(1999), the New Jersey Supreme Court, concluding that "the patient's interest in reliable information predominates over a policy interest that would insulate manufacturers," held that "the learned intermediary doctrine does not apply to the direct marketing of drugs to consumers" and that "[p]rescription drug manufacturers that market their products directly to consumers should be subject to claims by consumers if their advertising fails to provide an adequate warning of the product's dangerous propensities." Id. at 21, 29; accord James v. Arms Tech., Inc., 359 N.J. Super. 291, 319 (App. Div. 2003) (noting New Jersey Supreme Court's holding in Perez that learned intermediary doctrine does not apply to direct marketing of drugs to consumers).

In support of its argument, Defendant relied on the certification of Dr. Merlin Wilson.[37]   See D.Mem. at 39 (relying on Wislon Cert. and arguing that causation issues here "are especially difficult and complex").   Like Dr. Kolassa's certification, however, Dr. Wilson's certification does not withstand scrutiny.   At his deposition, Dr. Wilson, who has been retained by Merck in at least a dozen cases and could not even estimate how much Merck has paid him for his services, admitted that he did not purport to speak for all physicians who prescribed VIOXX.   Dep. Tr. of Merlin R. Wilson, M.D. ("Wilson

---

physicians prescribing the drug to their patients and third-party payors adding VIOXX to their formularies.   One of Defendant's own experts so confirmed.   Dep. Tr. of E.M. Kolassa, Ph.D. ("Kolassa Tr.") (Grand Cert., Ex. 58) 7:14-15 ("In the case of VIOXX, . . . [Merck] use[d] direct consumer advertising to encourage consumers to ask their physicians about it").

[37] Dr. Wilson opined that physicians' "final decision" to prescribe VIOXX "depend[ed] on many factors" and was "highly tailored on a case-by-case basis"; physicians had to assess their patients "unique medical needs" in determining whether to prescribe VIOXX and, if so, what dosage to prescribe; and "the medical community ha[d] been aware of questions concerning potential cardiovascular risks from VIOXX® for many years," including the VIGOR study, which, according to Dr. Wilson, had been "widely disseminated" upon its March 2000 release.   See, e.g., Wilson Certif. ¶¶ 9-11, 16.

Tr.") (Grand Cert., Ex. 59) 12:25-13:11, 14:21-15:2; see id. 132:13:133:12. Therefore, his certification also fails the fundamental test that an expert opinion must be to a reasonable degree of certainty or probability.

That infirmity aside, Dr. Wilson's testimony undermined the assertions in his certification that the medical community and P&T Committees were operating with the benefit of full and accurate disclosure from Merck. As noted in Section A(1)(b) above, however, the factual record is otherwise.

Further, Dr. Wilson could not recall whether he read about the VIGOR study's results in March 2000. He only "thought" he had read something about them at that time in a Merck press release.[38] He acknowledged that a November 2000 Merck video press release *never* mentioned that VIOXX may have caused heart attacks among patients participating in the VIGOR study or that VIOXX posed a potential heart attack risk, and did not know if pharmacy benefits managers ("PBMs") would have had any information beyond what was contained in Merck's press release. Id. 74:13-75:8, 76:4-13; see id. 70:7-73:4.[39]

In addition, Dr. Wilson testified that after the FDA admonished Merck for making

---

[38] Id. 18:11-18, 20:2-7; see also id. 11:19-23:15, 25:13-19 (asked whether Merck took position that possible explanation of VIGOR results was that VIOXX was causing increased numbers of myocardial infarctions, testified he "d[idn]'t remember" Merck's position at time of VIGOR results' release).

[39] Although Merck asserts that it was not until it received the preliminary results of the APPROVe study in September 2004 that there was "statistically significant" evidence of increased cardiovascular risks posed by VIOXX use and that it withdrew VIOXX from the market only after that study "raised questions," D.Mem. at 14, Merck's own expert began advising most of his *own* patients of the drug's increased heart attack risks after the November 2000 publication of an article discussing the VIGOR study—*nearly four years earlier.* Wilson Tr. 57:15-60:15.

false claims about the cardiovascular safety of VIOXX, he did not remember receiving from Merck any clarification of its statements.  Id. 82:5-85:8; see also id. 86:16-87:4 (did not receive letter from Merck in November 2001 advising that VIOXX had not been proven to be safer or to produce fewer side-effects than other NSAIDs or letter advising that one possible explanation in VIGOR study for higher incidence of myocardial infarctions among VIOXX patients was that VIOXX was the cause).  Thus, Dr. Wilson's testimony confirms that Merck *widely* concealed material facts about VIOXX from physicians.[40]

In short, even if admissible, Dr. Wilson's certification provides flimsy support for Merck's implausible argument that every physician in the country who ever prescribed VIOXX will have to be consulted in order for this Court to determine Merck's liability.  In any event, the lack of support for Merck's argument aside, as discussed above, the Court's focus in this case will be on the exposure of P&T Committees to Merck's deceptions—not the decision-making of prescribing physicians.

---

[40] Although Dr. Wilson claimed in his certification that he had persuaded his patients' insurers to pay for prescribed COX-2 inhibitors not on their formularies—suggesting that formulary approval is not a major consideration that physicians take into account in choosing drugs to prescribe or that formulary placement was not Merck's critical objective as the means of ensuring the commercial success of VIOXX—he admitted having called insurers only once or twice.  Compare Wilson Tr. 141:23-143:22 with Wilson Cert. ¶ 12.  Moreover, while suggesting in his certification that VIOXX was the only practicable choice of NSAID for many patients given the number of alleged deaths annually from gastrointestinal complications caused by NSAIDs, Dr. Wilson acknowledged that his estimate of annual deaths (taken from an article and relating to an unknown time-period) possibly included deaths stemming from other forms of complications caused by NSAID usage.  Compare Wilson Tr. 122:16-124:16 with Wilson Cert. ¶¶ 6, 18-20.  He further acknowledged that one of the sources of his opinion that VIOXX caused fewer gastrointestinal complications was a clinical study lasting all of three months.  Id. 104:16-105:3; see Wilson Cert. ¶ 20 & Ex. 1.

### 2. Defendant Misstates Caselaw Concerning Motions for Class Certification of Claims Arising under the NJCFA

#### a. The Court Will Not Have to Wrestle with Individual Issues of Reliance

Defendant further asserts that "New Jersey courts have routinely held that individualized causation issues preclude class certification, even where the defendant has advertised directly to consumers." D.Mem. at 32. That argument is unavailing.

Causation will not be an individualized inquiry in this case. Notably, under the NJCFA, liability attaches "*whether or not* any person has in fact been misled, deceived or damaged" on account of the unlawful conduct at issue. N.J.S.A. 56:8-2 (emphasis added).[41] Therefore, Plaintiff need not prove that each class member was, in fact, actually deceived by Merck. Plaintiff need only demonstrate (1) Merck's unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between Merck's unlawful conduct and the ascertainable loss of Plaintiff and class members. See New Jersey Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8, 12 (App. Div.), certif. denied, 178 N.J. 249 (2003); Dabush v. Mercedes-Benz, USA, LLC, No. A-0970-03T5, 2005 WL 1334872, at *5 (App. Div. May 26, 2005).

In particular, while a common law fraud claim requires proof of reliance, it is axiomatic that a consumer fraud claim under the NJCFA "requires only proof of a causal nexus" between the alleged omission and the ascertainable loss. Varacallo, 332 N.J.

---

[41] See Cox, 138 N.J. at 17 ("A practice can be unlawful even if no person was in fact misled or deceived thereby.") (citing cases); Talalai v. Cooper Tire & Rubber Co., 360 N.J. Super. 547, 554 (Law Div. 2001) ("'A practice can violate the CFA even though no one was misled or deceived as a result.'") (quoting Byrne v. Weichert Realtors, 290 N.J. Super. 126, 136 (App. Div.), certif. denied, 147 N.J. 259 (1996)).

Super. at 43.[42]   Therefore, the Court will not be faced with questions concerning

individual class members' specific reliance on Merck's knowing omissions or

unconscionable marketing practices.[43]

Specifically, the complaint alleges a series of material omissions. The complaint

alleges that Defendant concealed truthful and complete efficacy and safety information

regarding VIOXX—in particular, comparative information about VIOXX and traditional

NSAIDs. Compl. ¶ 52(a); see also id. ¶ 5.   The complaint further alleges that Merck

omitted adequate warnings and suppressed material medical information regarding the

use of VIOXX. Id. ¶ 52(b); see also id. ¶ 31 (to ensure that VIOXX would be included in

---

[42] See Gennari, 148 N.J. at 607 ("Weichert's liability . . . arises from the Act, which does
not require proof of reliance"); New Jersey Citizen Action, 367 N.J. Super. at 15 ("the
element of traditional reliance required to be pleaded and proven in a common law fraud
or misrepresentation case need not be proven in order to recover for damages pursuant
to the CFA") (citation omitted), Fink, 365 N.J. Super. at 545 ("reliance need not be proven
under the NJCFA"); id. at 540-41 ("Unlike other states that require [a] plaintiff to prove
reliance under their consumer protection statutes, the proof requirements that the New
Jersey statute places on its claimants is less burdensome.") (footnote omitted); Scott v.
Mayflower Home Imp. Corp., 363 N.J. Super. 145, 157 (Law Div. 2001) ("Reliance by
the consumer is . . . is not required in a CFA case.").

Defendant's assertion that the NJCFA imposes a higher standard of proof on
private litigants is unavailing. See D.Mem. at 34. True, unlike private parties, the
Attorney General may sue to obtain equitable relief in order to halt deceptive practices
even if no one has been harmed. See Weinberg, 173 N.J. at 250 ("In effect, the Act
permits only the Attorney General to bring actions for purely injunctive relief."). 
Plaintiff, however, does not seek an injunction to prevent *potential* harm from
Defendant's conduct; it seeks damages on account of the *actual* and ascertainable loss
that it and other class members suffered, having paid vastly more for VIOXX by reasons
of Defendant's deceptions than they would have paid for competitor NSAIDs, and seeks
reimbursement for the difference in the price of VIOXX. See Compl. ¶¶ 7-9, 33 &
Wherefore Clause ¶ (b).

[43] Even in the case of a common law fraud claim, individual issues of reliance are no
obstacle to class certification in cases where a defendant has, like Merck, concealed or
suppressed material facts. See Varacallo, 332 N.J. Super. at 50 (presumption of reliance
and causation arise where claims of proposed common law consumer fraud class involve
"omissions of material fact") (citing cases); see also id. at 51 ("Where [an] omission of
fact is common to the entire class, class certification is *favored*.") (emphasis added).

formularies, Merck not only provided false and misleading information to prescription benefit managers and third-party payors, but also omitted material information concerning safety and benefits of VIOXX as compared to other drugs of same therapeutic class). The complaint details specific critical omissions. See id. ¶¶ 15, 19-20, 22.

Nor does Plaintiff's NJCFA claim rest on Merck's knowing omissions alone. The complaint alternatively pleads a violation of the NJCFA based on unconscionable commercial practices. See N.J.S.A. 56:8-2 (declaring, inter alia, "any unconscionable commercial practice . . . to be an unlawful practice"). Specifically, the complaint alleges that Merck engaged in unconscionable marketing practices by promoting VIOXX as a drug "with a greater safety and efficacy profile as compared to its NSAID competitors when the purported safety and efficacy benefits were unfounded." Compl. ¶ 52(d).

Where an unconscionable commercial practice is alleged, liability attaches based on the mere *capacity* of the conduct to mislead others. See Fenwick v. Kay Am. Jeep, Inc., 72 N.J. 372, 378 (1977) ("The capacity to mislead is the prime ingredient of deception or an unconscionable commercial practice. Intent is not an essential element."); Island Mortg. of New Jersey and Perennial Lawn Care, Inc. v. 3M, 373 N.J. Super. 172, 177 (Law Div. 2004) ("New Jersey courts have consistently held that the heart of an unconscionable commercial practice is the 'capacity to mislead.'") (citing cases).[44]   Indeed, the more lenient "capacity to mislead" standard for "unconscionable

---

[44] See also New Jersey Citizen Action, 367 N.J. Super. at 13 (complaint states claim under NJCFA if challenged business practice is "misleading and stand[s] outside the norm of reasonable business practice in that it will victimize the average consumer") (citation and internal quotation marks omitted); NN & R, Inc. v. One Beacon Ins. Group, 362 F. Supp. 2d 514, 523 (D.N.J. 2005) ("unconscionable commercial practice necessarily entails a lack of good faith, fair dealing, and honesty"; "capacity to mislead is the prime ingredient").

commercial practices" does not even require that there have been a false statement of fact. See Leon v. Rite Aid Corp., 340 N.J. Super. 462, 470 (App. Div. 2001). Thus, the elements of Plaintiff's NJCFA claim demonstrate that liability will not entail an individualized inquiry and that the claim is amenable to common or generalized proof.

Defendant's related attempt to distinguish cases supporting class certification of NJCFA claims on the grounds that they "involved end-user consumers who . . . did not purchase products through learned intermediaries," D.Mem. at 38, is unavailing. Aside from the unavailability of the learned intermediary rule in an NJCFA case such as this, given Merck's broad, uniform campaign to promote VIOXX, *everyone* exposed to Merck's messages was affected by its deception. See generally Varacallo, 332 N.J. Super. at 49; see also Section C(3), infra. Having saturated the market with its materially uniform statements about VIOXX, Merck cannot now claim that the mindset of individual prescribing physicians will be the focus of the causation inquiry.

### b. Defendant's Cases Are Inapposite

In support of its argument that causation will be an individualized inquiry in this action, Merck ignores a number of Plaintiff's authorities[45] while principally relying on

---

[45] Merck does not even address two of the cases cited in Plaintiff's opening memorandum which held that reliance is not an element of an NJCFA claim. See Pl.'s Mem. at 30 (citing Union Ink Co., v. AT&T Corp., 352 N.J. Super. 617, 646 (App. Div.) ("There is no reliance requirement for Consumer Fraud Act liability"), certif. denied, 174 N.J. 547 (2002); Leon, 340 N.J. Super. at 468 (plaintiff need not prove reliance as long as ascertainable loss resulting from defendant's conduct is demonstrated)).

Defendant vainly tries to distinguish a third case, Zorba Contractors, Inc. v. Housing Authority, 362 N.J. Super. 124 (App. Div. 2003) (Pl.'s Mem. at 29), by arguing that "even" it recognized that the NJCFA requires "proof of a causal nexus between the concealment of the material fact and the loss." D.Mem. at 34-35 (citation and internal quotation marks omitted). That is unremarkable. Contrary to Merck's suggestion, the

two Law Division cases.  See D.Mem. at 35-37.  The first, New Jersey Citizen Action, did not even address a class certification motion.  The court there held that the defendant's statements about its anti-allergy medication were non-actionable puffery, 367 N.J. Super. at 13-14, and that the generalized "fraud on the market" theory employed in securities fraud cases could not be used to establish causation under the NJCFA, id. at 15-16.  Here, Plaintiff's claims are *not* based on a "fraud on the market" theory.

The second case that Defendant cites in support of its argument that New Jersey caselaw disfavors certification of NJCFA claims such as these, Gross v. Johnson & Johnson-Merck Consumer Pharms. Co., 303 N.J. Super. 336 (Law Div. 1997), is far afield because it was a mass media *false advertising* case brought by individual purchasers of an over-the-counter drug, and the court specifically noted the obstacles to class treatment of those false advertising claims.  The court reasoned that because the class comprised only individuals who saw and relied on the challenged advertisements in purchasing the drug, individual questions predominated over common questions.  Id. at 349-50 ("[E]very single member of the class would have to answer individualized questions as to whether each member . . . relied on at least one of three particular advertisements from a plethora of media coverage when deciding to purchase Pepcid and,

---

NJCFA's "causal nexus" requirement imposes only a minimal burden and is *not* a proxy for the reliance component of common law fraud claims.  See Varacallo, 332 N.J. Super. at 49 ("The Supreme Court has taken pains to point out that this element is a *significant distinction* from the requirement of reliance in a common law fraud claim.") (emphasis added).  For this reason, the distinction that Merck asserts in the context of its choice-of-law discussion—arguing that other states have a stronger interest in having their own laws apply to class members within their borders because their "significantly less stringent" consumer fraud statutes lack a reliance requirement—is illusory.  See D.Mem. at 26 n.12.

whether they would not have purchased Pepcid but for the particular advertisements.").[46]
Simply put, this is *not* a mass media false advertising case.

Merck's reliance on <u>Fink</u> (D.Mem. at 36-37) is similarly misplaced. <u>Fink</u> was also a false advertising-based NJCFA case. Because the claims stemmed from product promotion through false advertising, the court held that the plaintiffs had to demonstrate that each class member read one or more of the advertisements. <u>See</u> 365 <u>N.J. Super.</u> at 545. While Defendant selectively quotes that portion of <u>Fink</u> discussing the difficulties in adducing common proof of a false advertising-based NJCFA claim, <u>see</u> D.Mem. at 36, it fails to mention that the <u>Fink</u> court held that NJCFA plaintiffs are *not* required to offer direct proof that the entire class relied on a representation of a defendant that *omitted* material facts, where the plaintiffs establish that the defendant withheld those material facts for the purpose of inducing the very action the plaintiffs pursued. The court held that, under such circumstances, if NJCFA plaintiffs establish the core issue of liability, they are entitled to a presumption of reliance or causation. <u>Id.</u> at 548.[47] As detailed above, the complaint alleges numerous material omissions. <u>See</u> Section C(2)(a), <u>supra</u>.

These distinctions aside, the Appellate Division's decision in <u>Varacallo</u>—which made clear that there is no reliance element in the NJCFA—is controlling authority and,

---

[46] <u>See also</u> <u>id.</u> at 346, 349 (question of whether each consumer purchased drug in reliance on advertisements "during a massive media 'blitz' would necessarily be highly individualized and complex"; noting that "New Jersey has never certified a class action in a mass media false advertising case").

[47] Defendant remarkably asserts that Plaintiffs have "[i]mplicitly acknowledg[ed]" that case law under the NJCFA "requires individualized proof of causation." D.Mem. at 38. Plaintiffs have acknowledged no such thing. To the contrary, as discussed above, causation need not proven for each class member where reliance can be presumed based on the defendant's material omissions or where the NJCFA claim is based on an unconscionable commercial practice.

to the extent that there is any tension between Varacallo on the one hand and Gross and Fink on the other, this Court is bound by the former, not the latter.

Equally unpersuasive is Carroll (D.Mem. at 38).  Carroll predates Varacallo, which made plain that the NJCFA does not require a showing of reliance.  Moreover, Carroll is easily distinguishable on its facts alone.   There, the plaintiff cellphone subscribers raised a hodgepodge of claims pertaining to both billing practices *and* service quality, including charges for "landline" fees; the "rounding-up" of calls to the next full minute; how the duration of calls was measured; and "dropped" calls. 313 N.J. Super. at 491.   The plaintiffs claimed different degrees of reliance on the defendant's representations.  One testified that he had relied on the promise of free minutes, another on her familiarity with the defendant's name, and a third on his partners' recommendation and the fact that his partners were already subscribers.   Also, the plaintiffs gave substantially different explanations as to what information was conveyed to them before they signed up for the defendant's service.   Id. at 503-04.  The court found a "diversity of facts" underlying each plaintiff's claims, noting that "[e]ach plaintiff had a different interaction with defendant's representatives, and the ability to prove reliance depend[ed] on circumstances peculiar to each plaintiff." Given these wide variations, the court concluded that "individual questions . . . could well overwhelm the common issues."  Id. at 505.

This case, by contrast, does not involve a mishmash of challenged practices, services, or products.  Rather, the evidence discussed in Section A(1)(b), supra, bears out Defendant's materially uniform messages to third-party payors and the health care industry about VIOXX.  It amply satisfies the requirement that class plaintiffs must

demonstrate that "the same *or similar* representations . . . were made to the entire class." Carroll, 313 N.J. Super. at 502 (emphasis added).

Also unavailing is Defendant's reliance on Stephenson v. Bell Atlantic Corp., 177 F.R.D. 279 (D.N.J. 1997) (D.Mem. at 37-38). There, the court denied certification because the record did not demonstrate that the defendant had made "the same core of written misrepresentations or omissions" to all, or most, of members of the proposed class. Id. at 292. Similarly, the plaintiffs' inability to establish that all of the defendant's oral representations were scripted failed to establish a predominance of common questions. Id. at 293. Here, by contrast, the record demonstrates material uniformity in Merck's promotion and marketing of VIOXX.

### 3. **Merck's Marketing and Promotion of VIOXX Were Materially Uniform**

As discussed in Section A(1)(b), supra, the record in the instant case shows that the information that Merck disseminated about VIOXX was materially uniform. Even Merck's own expert acknowledged that Merck's sales force met with physicians using materials that were consistent with the package insert of the drug and its official labeling. Kolassa Tr. 8:20-9:4. In fact, Merck's marketing materials promoting the safety and efficacy of VIOXX figured decisively and uniformly in fueling consumer demand and causing third-party payors to put VIOXX on their formularies and to thereafter authorize their participants' purchase of the drug. Indeed, Dr. Kolassa has noted that physicians rely on pharmaceutical companies' marketing materials in order to educate themselves about the availability and uses of particular products. Id. 112:19-113:2, 113:14-24,

119:18-120:2.[48]   Furthermore, despite the advent of direct-to-consumer marketing, the

flow of information from pharmaceutical companies to physicians continues unabated.

Id. 120:9-17.  Pharmaceutical companies such as Merck arm their representatives with

information to be passed on to physicians, and that information is both consistent with the

drug's label and insert and as to the substance of what is passed on to physicians.  Id.

115:23-118:12.  Significantly, Merck developed trials with the aim of disseminating the

data for the purpose of fueling both demand and convincing third-party payors to add

VIOXX to their formularies.[49]   Where, as here, the focus will be on Merck's conduct

(i.e., what it told consumers, physicians, and P&T Committees), the predominance test is

easily met.  See In re Mercedes-Benz Antitrust Litig., 213 F.R.D. 180, 187 (D.N.J. 2003)

("common issues predominate when the focus is on the defendants' conduct and not on

---

[48] See E.M. Kolassa, "The Economic Contribution of Pharmaceutical Marketing," 14
Journal of Pharm. Mkt'g & Mgmt. 101, 101 (2002) (Grand Cert., Ex. 61) ("[T]he
promotional programs of pharmaceutical companies . . . inform and educate physicians
on the availability and uses of pharmaceutical products.  There are no other commonly
employed or widely used mechanisms whereby clinicians may learn about drugs and their
uses."); id. at 103 ("The vast majority of pharmaceutical marketing activities center on
the provision of information to physicians and other health care professionals. . . . [T]he
marketing activities of firms are the only mechanism whereby the diffusion of
information concerning new therapies can be assured."); E.M. Kolassa, "Maximizing
Patient Choice" (2001) (Grand Cert., Ex. 55) ("Most pharmaceutical marketing activities
focus on providing information to physicians and other healthcare professionals.  Without
these activities, many physicians would not know about new medicines, or new uses for
existing medicines. . . . Pharmaceutical marketing provides the most current information
about new medicines, . . .").

[49] See Grand Cert., Ex. 32 (HHPAC Stage IV Review Meeting, Mar. 20, 2001, noting
that "plans are in place to use not only the VIGOR data, but epidemiological and
outcomes research data, to convince payors . . . that Coxib use is cost effective" and that
"[a] broad mix of programs have been designed worldwide to describe the burden of
illness of GI-induced gastropathy and to build a case that the use of Coxibs instead of
traditional NSAIDs is cost-effective despite the higher out of pocket costs").

the conduct of the individual class members").[50]

### 4. Individual Formulary Determinations Are Not at Issue

Defendant's argument that common questions do not predominate because each P&T Committee considered different information in selecting VIOXX for its formulary is also without merit. See D.Mem. at 42. As discussed in Section A(1)(b), supra, the information that P&T Committees received about VIOXX was materially uniform. In any event, where the nucleus of the case concerns "common issues of fact and law," the existence of individual issues does not defeat class certification.[51]

As noted above, Defendant's omissions and unconscionable marketing practices directed at both P&T Committees and to physicians were remarkably similar. Therefore, there is very little variation regarding the knowledge that each P&T Committee or physician had before selecting VIOXX. Minor differences in Defendant's disclosures are no cause to deny class certification. Even though Defendant's disclosures may have

---

[50] Even if Merck's disseminated materials were not identical, certification is still appropriate as long as the "presentations of the misrepresentations did not vary materially from one another." Davis v. Southern Bell Tel. & Tel. Co., 158 F.R.D. 173, 175 (S.D. Fla. 1994); accord Varacallo v. Mass. Mut. Life Ins. Co., 226 F.R.D. 207, 231 (D.N.J. 2005) ("[I]n cases where it is alleged that the defendant made similar misrepresentations, non-disclosures, or engaged in a common course of conduct, courts have found that conduct to satisfy the commonality and predominance requirements."); Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 724 (11th Cir. 1987) (oral representations to plaintiffs did not vary materially from misleading information alleged to have been disseminated generally); Hamilton Partners, Ltd. v. Sunbeam Corp., No. 99-CV-8275, 2001 WL 34556527, at *12 (S.D. Fla. July 3, 2001) ("courts have certified classes alleging a common fraudulent scheme, despite the existence of different modes or methods of misrepresentations, so long as the misrepresentations did not vary materially").

[51] See Strawn, 140 N.J. at 67 (class certification was required "despite potential issues of causation, reliance, and damages particular to the individual actions"); see also Delgozzo, 266 N.J. Super. at 190 (predominance inquiry focuses on whether the "potential class, including absent class members, seeks to remedy a common legal grievance") (internal quotations omitted).

changed slightly over time, its omissions and unconscionable marketing practices were consistently similar and served the same purpose. See Delgozzo, 266 N.J. Super. at 182 ("a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action") (citation and internal quotation marks omitted).

Next, Defendant argues that the highly-individualized decision-making of P&T Committees predominates over common questions. See D.Mem. at 44-45. That, too, is meritless. Contrary to Defendant's suggestion, P&T Committees employ a remarkably uniform process in selecting drugs for their formularies. See Kelly Cert. (Grand Cert., Ex. 60) ¶¶ 16-25.[52]   Moreover, because a handful of PBMs manage 70% of all prescriptions dispensed for ambulatory care patients and 95% of the prescriptions of those having prescription drug benefit coverage, id. ¶ 12, the likelihood is that only a few P&T Committees' decisions affected most class members.[53]

---

[52] To the extent that there is any difference of opinion between Dr. Kelly's opinions and those of Dr. Kolassa as to the issue of whether P&T Committees' formulary determination processes are substantially similar, the Court may not "determine which expert is more credible." In re Linerboard Antitrust Litig., 203 F.R.D. 197, 217 n.13 (E.D. Pa. 2001), aff'd, 305 F.3d 145 (3d Cir. 2002), cert. denied, 538 U.S. 977 (2003). Absent evidence that they are so fatally flawed as to be inadmissible as a matter of law, the Court should defer to Dr. Kelly's opinions. See, e.g., Bacon v. Honda of Am. Mfg., Inc., 205 F.R.D. 466, 470 (S.D. Ohio 2001) ("This court is unable to say at this stage of the proceedings that the expert evidence offered by the plaintiffs is so flawed as to be inadmissible as a matter of law.").

[53] Defendant argues that some health plans have "open" formularies, under which any FDA-approved drug is automatically included and that, therefore, class members with open formularies cannot establish that they were injured by Merck's fraud. D.Mem. at 44. That is unavailing. Those third-party payors with open formularies must still make a determination as to which tier of the formulary to place a drug. Tier placement then determines the extent to which health plans will cover the cost of the drug, including the amount, if any, of required co-payments of plans' participants. See Kelly Cert. ¶¶ 21, 25. Consequently, those class members with open formularies still suffered an ascertainable

In an article that he co-authored, Defendant's own expert noted the similarities with respect to formulary decision-making, stating that "HMO decision makers fit into four broad segments," and that "[a]ll four HMO decision-maker segments ascribe generally high importance to product performance: safety and efficacy." Shaun Poovala, Benjamin Banahan, and Mick Kolassa, "Marketing Smart: What Makes Your MCO Tick?," Pharmaceutical Executive 54, 54 (Mar. 1997) (Grand Cert., Ex. 56); see also Kolassa Tr. 86:20-87:1. Dr. Kolassa's co-authored article—whose conclusions he did not repudiate at his deposition, see Kolassa Tr. 87:22-24—noted numerous similarities among the HMO industry in the handling of drug formulary approval. Poovala et al., "Marketing Smart," at 55.[54] At his deposition, he noted that, typically, a clinical and a staff pharmacist will conduct the initial evaluation of a drug and make a presentation to a P&T Committee as to whether a particular drug would represent "an important addition" to a formulary, whether it might be "redundant," or whether the P&T Committee should impose certain restrictions. Kolassa Tr. 126:10-127:2.

Further contradicting Defendant's suggestion that formulary determinations are a highly individualized process is the fact that the Academy of Managed Care Pharmacy

loss on account of Merck's deceptions because they were affected by those deceptions in making tier determinations regarding VIOXX.

[54] Consistent with Merck's approach to the marketing of VIOXX—in which it justified its eight-fold, premium price for VIOXX by touting the costs to be saved as a result of patients suffering fewer gastrointestinal complications—the article, published in the pharmaceutical industry's leading trade magazine, offered guidance on drug marketing strategies. It noted that HMO decision-makers "value innovative drug features and long-term cost issues as extremely important," and have "express[ed] that paying an expensive price for a drug is less of an issue if it reduces overall treatment costs." Poovala et al., "Marketing Smart," at 54. Dr. Kolassa's article was based on a study of pharmacy and medical directors far more representative than the five interviewees selected in connection with the preparation of his certification. Kolassa Tr. 85:9-86:19.

("ACMP") has created a *standardized manual* for formulary submissions.  See ACMP,

Format for Formulary Submissions, Version 2.0 (Oct. 2002) ("Format") (Grand Cert., Ex.

62); Kolassa Tr. 108:5-109:1.  Dr. Kolassa conceded that most pharmaceutical companies

construct and submit "dossiers" in accordance with the ACMP's Format.  Id. 109:2-8.

Similarly, Dr. Kolassa acknowledged that the ACMP has authored a report specifically

addressing formularies' common practices.  Id. 110:3-7; see ACMP, Common Practices

in Formulary Management Systems:  a Report Prepared by the American Academy of

Managed Care Pharmacy (June 2000) (Grand Cert., Ex. 57).

Besides these similarities, because third-party payors were obligated to pay

prescription costs for drugs on their respective formularies, they sustained the *same type*

of damage with each prescription filled, *irrespective* of particular formulary restrictions.[55]

Similarly, whether an individual physician prescribed VIOXX for a patient as a result of

Defendant's disclosures or non-disclosures, see D.Mem. at 40-41, is equally immaterial.

Third-party payors are obligated to pay for drugs on their formulary *irrespective* of the

reasoning of individual physicians for prescribing the drug for a particular patient.  Thus,

the number of prescriptions paid by each third-party payor is merely a damages question,

which does not defeat class certification.[56]

---

[55] The tier level at which prescriptions were *paid* would only be germane to the question
of damages, which is no bar to class certification.  See infra.

[56] Muise v. GPU, Inc., 371 N.J. Super. 13, 46 (App. Div. 2004) ("Once the court finds
that common questions of liability, and the fact of damage, predominate, individual
variations in the calculation of damages does not preclude class certification.");
Delgozzo, 266 N.J. Super. at 190 ("[T]he overwhelming weight of authority holds that
the need for individual damages calculations does not diminish the appropriateness of
class action certification where common questions as to liability predominate") (citation
and internal quotation marks omitted).

### 5. The Issue of Ascertainable Loss Also Does Not Defeat Plaintiff's Showing of Predominant Common Questions

Equally unpersuasive is Defendant's argument that Plaintiff cannot prove on a class-wide basis that the benefits that third-party payors' plan participants received from VIOXX did not, in fact, exceed the associated costs, including the cost of treating cardiovascular side-effects. D.Mem. at 46. Merck's straw man argument sidesteps the salient fact that Defendant voluntarily *pulled VIOXX from the market due to the dangers associated with the drug.* To the extent, then, that class members paid *any* prescription costs after VIOXX was placed on their formulary, they suffered an ascertainable loss.

At any rate, Defendant's ascertainable loss analysis clouds the issues. The ascertainable loss in this case is *not*, as Defendant asserts, the difference between what class members saved by not having to pay for treatments for gastrointestinal complications that their plan participants *possibly* avoided by taking VIOXX and the treatment their participants, instead, required for cardiovascular events that VIOXX produced. See id. at 46. That is an attenuated and speculative theory of damages that is nowhere alleged in the complaint. This is not a personal injury case brought by end-users of VIOXX. Plaintiff makes no claim stemming from its participants' VIOXX use.[57]

Rather, the ascertainable loss here is the difference in price that third-party payors shouldered for footing the bills for the premium price of VIOXX as a consequence of Merck's material omissions and unconscionable marketing practices about the safety and efficacy of VIOXX. Plaintiff seeks recovery only of the premium prices that it and other class members paid for their participants' VIOXX prescriptions. See, e.g., Compl. ¶¶ 7-

---

[57] Defendant oddly relies on In re Rezulin (D.Mem. at 47), which involved a proposed class of all persons who ingested Rezulin and their spouses. See 210 F.R.D. at 62. Plaintiff and class members are not end-users.

9, 33. It does not seek damages for any other form of loss. Thus, contrary to Defendant's assertion, the issue of ascertainable loss for the entire class is straightforward and susceptible to experts proofs.

**D.   Plaintiff Will Adequately Represent the Interests of Absent Class Members**

Defendant also makes numerous arguments challenging Plaintiff's fitness to prosecute this consumer fraud action. Each one is spurious.

**1.     Plaintiff's Claims Are Typical of Those of Other Class Members**

The typicality test requires only "that the claims of the class representatives must 'have the essential characteristics common to the claims of the class.'" Goasdone v. American Cyanamid Corp., 354 N.J. Super. 519, 529 (Law Div. 2002) (quoting In re Cadillac, 93 N.J. at 425) (internal citation and quotation marks omitted). "[T]he claims of the class members and class representatives must arise from the same event or practice or course of conduct and must be based on the same legal theory." Id. at 530. Therefore, so long as there is "a strong similarity of legal theories" shared by Plaintiff and class members and  their claims "arise from the same alleged course of conduct" by Merck the typicality test is met.  Varacallo, 226 F.R.D. at 232 (citation and internal quotation marks omitted).[58]

Thus, "the test for typicality is not demanding." James v. City of Dallas, 254 F.3d 551, 571 (5th Cir. 2001). "Even *pronounced* factual differences will generally not

---

[58] Accord Steiner v. Equimark Corp., 96 F.R.D. 603, 609 (W.D. Penn. 1983) (focus is "whether the overall scenario is sufficiently similar or typical to ensure that the plaintiff will represent the claims of the class during the course of the litigation") (citaton and internal quotation marks omitted); Zeffiro v. First Pa. Banking & Trust Co., 96 F.R.D. 567, 569-70 (E.D. Pa. 1983) ("heart" of typicality test "is that plaintiff and each member of the represented group have an interest in prevailing on similar legal claims.").

preclude a finding of typicality where there is a strong similarity of legal theories."
Fields v. Biomatrix, Inc., 198 F.R.D. 451, 456 (D.N.J. 2000) (citation and internal
quotation marks omitted; emphasis added); accord Appleyard v. Wallace, 754 F.2d 955,
958 (11th Cir. 1985) ("[A] strong similarity of legal theories will satisfy the typicality
requirement despite *substantial* factual differences.") (collecting cases; emphasis added).
Furthermore, "the typicality requirement is liberally construed." In re Neopharm, Inc.
Secs. Litig., 225 F.R.D. at 566 (citation and internal quotation marks omitted).[59]

Here, Plaintiff's theories of liability and damages are the same as those of all class
members.  Nonetheless, Defendant argues that Plaintiff's claims are not typical because
(1) it did not rely on Merck's materials; (2) Merck made numerous disclosures that
changed over time; and (3) Plaintiff continued to pay for VIOXX after it knew of
Merck's fraud. D.Mem. at 48-50. Each argument is of no moment. Defendant simply
draws distinctions without a difference.

### a.  Plaintiff's Lack of Direct Dealings with Merck Is Irrelevant

Defendant's assertion that Plaintiff "never communicated with Merck about
VIOXX" is another red herring. See D.Mem. at 49. Under the NJCFA, a plaintiff need
not prove reliance, see, e.g., Varacallo, 332 N.J. Super. at 43, and the statute does not
require privity between the plaintiff and defendant, Perth Amboy Iron Works, Inc. v.

---

[59] Accord Bentley v. Honeywell Int'l, Inc., 223 F.R.D. 471, 482 (S.D. Ohio 2004) ("The
issue of typicality . . . should be liberally construed.") (citation and internal quotation
marks omitted); Bynum v. District of Columbia, 214 F.R.D. 27, 34 (D.D.C.  2003)
(typicality element "has been liberally construed by courts").

American Home Assur. Co., 226 N.J. Super. 200, 211 (App. Div. 1988), aff'd on opinion below, 118 N.J. 249 (1990).  Hence Merck's assertion fails.[60]

Putting that aside, Plaintiff's selection of Horizon Blue Cross-Blue Shield of New Jersey ("Horizon") to design and administer its benefit plan and to make formulary determinations is something *common* among third-party payors.  Given their staffing and resource limitations, third-party payors often rely on outside administrators' formulary determinations because the size and expertise of large entities such as Horizon makes them best equipped to handle formulary and claims determinations.  See Kelly Cert. ¶ 10 (Grand Cert., Ex. 60); Dep. Tr. of Thomas P. Giblin ("Giblin Tr.") 13:12-25, 43:10-45:9, 66:4-19, 73:11-17, 84:1-24, 135:2-136:2, 146:23-147:4, 151:14-17, 156:11-23, 165:5-22. Indeed, Defendant's own expert conceded that health insurers frequently employ a PBM to make formulary determinations.  Kolassa Tr. 27:18-23, 58:8-60:9, 60:17-61:20.

In any event, it is immaterial *who* made the formulary determination.  Irrespective of whether Plaintiff or its designee made it, that determination was affected by Merck's deception and Plaintiff suffered financial loss as a result because Plaintiff had the ultimate obligation to pay for VIOXX prescriptions presented by its participants. Consequently, what *is* material—and hence renders Plaintiff typical—is whether Merck concealed material facts or engaged in unconscionable commercial practices to the detriment of class members.  See Deutschman v. Beneficial Corp., 132 F.R.D. 359, 373 (D. Del. 1990) ("the focus of the typicality inquiry is not plaintiff's behavior, but

---

[60] See Demitropoulos v. Bank One Milwaukee, N.A., 915 F. Supp. 1399, 1418 (N.D. Ill. 1996) (rejecting challenge to typicality; while plaintiff never read lease upon which claim was based, statute did not require reliance); Begley v. Academy Life Ins. Co., 200 F.R.D. 489, 495 (N.D. Ga. 2001) (rejecting defendants' argument that representatives of proposed consumer fraud class were atypical because they had not actually read their insurance policy and could not recall all details of presentations they received).

*defendants'*") (emphasis added).

Thus, the fact that Plaintiff delegated decisions regarding the placement of drugs on its formulary to Horizon in no way shows a lack of typicality because even if Merck did not communicate *directly* with Plaintiff, it communicated with Plaintiff's agent or designee. See, e.g., Nicholas v. Poughkeepsie Savings Bank/FSB, No. 90 Civ. 1607 (RWS), 1990 WL 213093, at **3-4 (S.D.N.Y. Dec. 20, 1990) (rejecting challenge to plaintiff's typicality even though plaintiff had never personally read allegedly misleading statements and had, instead, relied on advice of stockbroker in making purchase).  In this respect, Defendant admits that Horizon presumably saw its marketing and analyzed scientific studies about VIOXX during the course of making formulary decisions.  See D.Mem. at 50.  Because Plaintiff cloaked Horizon with authority to make decisions on its behalf, Horizon's knowledge is necessarily imputed to its principal.[61]

### b.  Plaintiff's Claims are Typical Where Defendant Has Engaged in a Common Course of Fraudulent Conduct

Defendant next argues that there is "no typical representative who can advance the claims of the entire class" because its disclosures changed over time.  D.Mem. at 50. As discussed above, although Defendant's disclosures may have changed over time, its omissions and practices were materially consistent.  See Section C(3), supra.  Courts have recognized that "allegation[s] of repeated misrepresentations over a period of time, each

---

[61] See Heake v. Atlantic Cas. Ins. Co., 15 N.J. 475, 482 (1954) ("Knowledge of the agent is chargeable upon his principal, whenever the principal, if acting for himself, would have received notice of the matters known to the agent.") (citation and internal quotation marks omitted); Benjamin v. Corcoran, 268 N.J. Super. 517, 529 (App. Div. 1993) ("[K]nowledge of, or notice to, an agent is imputed to the principal when it is received by the agent while acting within the course and scope of his employment, and when it is in reference to matters over which the agent's authority extends").

of which is tied to a singular fraudulent purpose, weigh[] heavily in favor of class certification." Hemming v. Alfin Fragrances, Inc., No. 86 Civ. 2563 (JFK), 1990 WL 106997, at *3 (S.D.N.Y. July 25, 1990) (citing cases).[62]

### c. Differences in Damages Do Not Defeat Typicality

Also unavailing is Defendant's argument that Plaintiff did not have the authority to choose the drugs it would purchase. D.Mem. at 51. As noted in Section D(1)(a), supra, Plaintiff, like other class members, designated another entity to administer its formulary, and it is bound by the actions of its agent. Like all other class members, Plaintiff ultimately suffered the loss because it paid for its participants' prescriptions.

Similarly specious is Merck's argument that Plaintiff is not typical of the class because it continued to pay for VIOXX prescriptions after filing this suit. D.Mem. at 52. That is immaterial. Defendant wholly ignores Plaintiffs' testimony that Merck's fueling of heavy consumer demand for VIOXX undermined Plaintiff's ability to abruptly halt payment for VIOXX prescriptions. Giblin Tr. 136:7-137:7. In this respect, Plaintiff is similarly situated to all other third-party payors.

In any event, there is no evidence that such minor issue will overwhelm Plaintiff's ability to vigorously pursue the case.[63] At bottom, the issue of how many prescriptions

---

[62] See id. (typicality element met where plaintiff alleged common course of conduct, even though statements made by defendant constantly changed throughout class period); Steiner, 96 F.R.D. at 608 (certifying class where the "alleged wrong [occurred] over a lengthy period of time and through a variety of different documents"; class certification is not defeated "by fluctuations in the underlying facts over the class period").

[63] See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990) (typicality is destroyed only if defenses unique to class representative "threaten to become the focus of the litigation"); Retsky Family Ltd. P'ship v. Price Waterhouse LLP, No. 97 C 7694, 1999 WL 543209, at *3 (N.D. Ill. July 23, 1999) ("Typicality will only be destroyed where the defenses against the named

Plaintiff paid for—whether before or after the filing of this action—goes to the question of what *damages* it suffered, and differences in damages do not defeat typicality.[64]

### 2. Plaintiff Is an Adequate Class Representative

A class representative is adequate if its interests are co-extensive with the interests of the other members of the class. Gross, 303 N.J. Super. at 342-43 (adequacy element looks to whether "the interests of the named representatives [are] co-extensive with the interests of the other members of the class" and whether "the representatives will vigorously prosecute the interests, which requires the assistance of responsible and able counsel"). As to this element, the burden is on *Merck* to demonstrate Plaintiff's inadequacy. Gross, 303 N.J. Super. at 342; Delgozzo, 266 N.J. Super. at 188.[65]

Here, Plaintiff is a third-party payor that paid for VIOXX prescriptions after VIOXX was added to its formulary as a result of Merck's aggressive campaign. Its interests in recouping its losses, therefore, are co-extensive with the interests of absent class members. Merck nevertheless claims that Plaintiff is inadequate because Horizon,

_____

representatives are likely to usurp a significant portion of the litigant's time and energy, and there is a danger that the absent class members will suffer if their representative is preoccupied with defenses unique to it.") (citation and internal quotation marks omitted).

[64] See Zeffiro, 96 F.R.D. at 570 ("differences in the amount of damages claimed" do not render claims atypical); Hemming, 1990 WL 106997, at *3 ("A difference in the amount of damage, date, size, or manner of purchase, . . . does not render the claim atypical.").

[65] As a general matter, the Court should view Merck's attack on Plaintiff's adequacy skeptically. According weight to a defendant's concerns over the adequacy of representation of a plaintiff class whose certification it is laboring assiduously to defeat "is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house." Eggleston v. Chicago Journeymen Plumbers' Local Union, 657 F.2d 890, 895 (7th Cir. 1981); accord Sley v. Jamaica Water & Utility, Inc., 77 F.R.D. 391, 394 (E.D. Pa. 1977) (defendants advancing arguments "ostensibly grounded on a concern for the adequacy of the plaintiffs' representation are realistically not concerned with the 'best' representation for the plaintiff class but rather their goal is to ensure 'no' representation") (citation and internal quotation marks omitted; emphasis added).

to whom Plaintiff contracted formulary determinations, kept VIOXX on its formulary and continued to pay for VIOXX prescriptions after Plaintiff commenced this action and that Plaintiff therefore has a potential claim against Horizon.  D.Mem. at 52-53.

Whether Plaintiff *might* have a claim against Horizon is not only legally inadequate speculation,[66] but also no bar to Plaintiff's adequacy.  Even assuming that such a claim could be brought, its viability would depend on the success of this suit.  If Merck committed no fraud, then Horizon could not be liable for having kept VIOXX on its formulary.  Thus, if anything, Plaintiff would have an *even stronger* incentive to pursue its claims diligently because it would have to prove Merck's culpability in order to recover against Horizon.

Next, Defendant argues that because Plaintiff vested authority in a third-party administrator (Horizon) to handle its benefits plan, it cannot adequately represent the class for that reason alone.  D.Mem. at 53-54.  As noted above, this practice is common in the industry, see Kelly Cert. ¶¶ 10-12 (Grand Cert., Ex. 60), and therefore does not disqualify Plaintiff from representing the class.[67]

---

[66] See Robertson v. NBA, 389 F. Supp. 867, 899 (S.D.N.Y. 1975) (defendant must show that "the alleged potential conflicts are real probabilities and not mere imaginative speculation"); Dukes v. Wal-Mart Stores, Inc., 222 F.R.D. 137, 169 (N.D. Cal. 2004) ("Defendant's speculation . . . does not warrant a finding that the named plaintiffs can not adequately represent the class."); Zapata v. IBP, Inc., 167 F.R.D. 147, 161 (D. Kan. 1996) ("[S]peculation concerning conflict that might develop between the representative plaintiffs and the class members does not sustain a finding that the representative is unable to prosecute a claim vigorously.") (citation and internal quotation marks omitted).

[67] See Section D(1)(a), supra; In Re Terayon Communications Sys., Inc., No. C 00-1967 MHP, 2003 WL 21383824, at *4 (N.D. Cal. Feb. 24, 2003) (plaintiff's reliance on third parties to make stock purchase decision did not render him inadequate class representative; "*in fact, he is probably representative of a large number of class members*") (emphasis added).

Moreover, the cases that Defendant cites (D.Mem. at 53) are inapposite. In one of them, reliance was an element of the claim, see In re Caremark Int'l Inc. Secs. Litig., No. 94 C 4751, 1996 WL 351182, at *6 (N.D. Ill. June 24, 1996) (securities case; no adequacy because plaintiffs could not have relied on alleged misrepresentations and omissions), which is not the case with the NJCFA. In the other, the unsuccessful representative had never even followed the affairs of the corporation he was suing, Fry v. UAL Corp., 136 F.R.D. 626, 636 (N.D. Ill. 1991). Here, to the extent that Plaintiff may not have *directly* relied on Merck's omissions or unconscionable marketing practices, that was only due to Plaintiff's contractual delegation of authority, not because of indifference or disinterest on Plaintiff's part. Indeed, far from being indifferent, Plaintiff has exhibited sufficient knowledge of the relevant issues.[68] It negotiated with Horizon each year regarding rates, reviewed analyses of payments and approved charges, and even discussed payment for VIOXX. Giblin Tr. 42:17-21, 45:23-47:16, 56:2-57:8, 59:16-60:11, 128:16-129:14. Thus, Plaintiff has exhibited the requisite awareness to adequately represent the class.

## CONCLUSION

For the foregoing reasons and for the reasons set forth in Plaintiff's opening memorandum dated November 4, 2004, the Court should certify the proposed class.

---

[68] See In re Neopharm, Inc. Secs. Litig., 225 F.R.D. 563, 567 (N.D. Ill. 2004) (adequacy met where plaintiff showed "involvement in and awareness of the financial affairs at stake"); Kalodner v. Michaels Stores, Inc., 172 F.R.D. 200, 209 (N.D. Tex. 1997) (test looks to whether class representatives have "a general understanding of their position as plaintiffs with respect to the cause of action and the alleged wrongdoing perpetrated against them by the defendants") (citation and internal quotation marks omitted).

Dated:   June 17, 2005

                                        Respectfully submitted,

                                          SEEGER WEISS LLP

By:                                    
                                        Christopher A. Seeger
                                        David R. Buchanan
                                        Diogenes P. Kekatos
                                        James A. O'Brien III
                                        Jeffrey S. Grand
                                        550 Broad Street, Suite 920
                                        Newark, NJ   07102
                                        Telephone:  (973) 639-9100
                                        Facsimile:   (973) 639-9393
                                        *Attorneys for Plaintiff*

*Of Counsel:*

John E. Keefe, Jr.
LYNCH MARTIN
830 Broad Street
Shrewsbury, NJ  07702
Telephone:  (732) 224-9400
Facsimile:   (732) 224-9494

Carlene Rhodes Lewis
Shelley Sanford
GOFORTH LEWIS SANFORD LLP
1111 Bagby, Suite 2200
Houston, TX  77071
Telephone:  (713) 650-0022
Facsimile:  (713) 650-1669

Dennis Reich
REICH & BINSTOCK
4265 San Felipe, Suite 1000
Houston, TX   77027
Telephone:  (713) 622-7271
Facsimile:   (713) 439-0727

**SEEGER WEISS LLP**
550 Broad Street, Suite 920
Newark, NJ 07102
(973) 639-9100

**Attorneys for Plaintiff**

```
---------------------------------------------------------  x
                                                           :   SUPERIOR COURT OF NEW JERSEY
                                                           :   LAW DIVISION: ATLANTIC COUNTY
                                                           :
In Re: VIOXX LITIGATION                                    :   VIOXX LITIGATION
                                                           :
                                                           :   CASE CODE 619
                                                           :
                                                           :
INTERNATIONAL UNION OF OPERATING                           :   Honorable Carol E. Higbee
ENGINEERS LOCAL #68 WELFARE FUND,                          :
individually and on behalf of all others similarly         :   Docket No. ATL-3015-03-MT
situated,                                                  :
                                                           :
                                       Plaintiff,          :   CERTIFICATE OF SERVICE
                                                           :
                                                           :
                   vs.                                     :
                                                           :
MERCK & CO., INC.,                                         :
                                                           :
                                       Defendant.          :
---------------------------------------------------------  x
```

JEFFREY S. GRAND, ESQ., by way of certification and in lieu of affidavit, says:

  1.     I am an attorney at law of the state of New York and associate counsel
         with the law firm of Seeger Weiss LLP, attorneys for Plaintiff(s), and as
         such, I am fully familiar with the facts set forth herein.

  2.     On June 17, 2005 I caused one copy of:

         a.     Plaintiffs' Memorandum of Law in Reply to Defendant Merck &

                Co., Inc.'s Opposition to Plaintiffs' Motion for Class Certification;

         b.     Certification of Jeffrey S. Grand, Esq., with attached exhibits;

         c.     Appendix of Law; and

    d.  Certificate of Service.

to be delivered to,

     Hon. Carol E. Higbee, J.S.C.
     Atlantic County Superior Court
     Civil Courthouse, Chambers 339E
     1201 Bacharach Boulevard
     Atlantic City, NJ  08401

via Federal Express and File and Serve; and further forwarded one copy of the
aforementioned documents to all Counsel of Record and,

     Theodore V.H. Mayer
     Hughes, Hubbard & Reed LLP
     One Battery Park Plaza
     New York, New York 10004

     Diane P. Sullivan, Esq.
     Dechert LLP
     PO Box 5218
     Princeton, New Jersey 08543

     Attorneys for Defendant Merck & Co., Inc.

via electronic service through upload to the File and Serve website, which is to be posted
by Lexis Nexis within an hour of its receipt.

   I hereby certify that the foregoing statements made by me are true.  I am aware
that if any of the foregoing statements are willfully false, I am subject to punishment.

            Jeffrey S. Grand

Dated: June 17, 2005