# Superior Court of New Jersey
# Appellate Division

Dkt. No. AM-880-04T1

---

------------------------------------------------------- x
                        :

INTERNATIONAL UNION OF OPERATING     :   Civil Action
ENGINEERS LOCAL #68 WELFARE FUND,    :
individually and on behalf of all others similarly  :   ON APPEAL FROM AN
situated,                           :   INTERLOCUTORY ORDER OF THE
                                    :   SUPERIOR COURT OF NEW JERSEY,
           Plaintiff-Respondent,      :   LAW DIVISION, ATLANTIC COUNTY,
                                    :   DOCKET NO. ATL-L-3015-03-MT
                                    :
                    v.                    :
                                    :
MERCK & CO., INC.,                :   Sat Below: Hon. Carol E. Higbee, P.J.Cv.
                                    :
           Defendant-Appellant.       :
                                    :
                                    :
                                    :
------------------------------------------------------- x

---

## BRIEF FOR PLAINTIFF-RESPONDENT

Christopher A. Seeger
David R. Buchanan
SEEGER WEISS LLP
550 Broad Street, Suite 920
Newark, NJ 07102-4573
Telephone: (973) 639-9100

John E. Keefe, Jr.
LYNCH KEEFE BARTELS LLC
830 Broad Street
Shrewsbury, NJ 07702
Telephone: (732) 224-9400

(Additional counsel listed on signature page)

*Attorneys for Plaintiff-Respondent International Union of
Operating Engineers Local #68 Welfare Fund*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.......................................1

PROCEDURAL HISTORY.........................................4

STATEMENT OF FACTS........................................4

ARGUMENT.................................................11

   THE COURT SHOULD AFFIRM THE TRIAL COURT'S ORDER ........11

      I.    The Limited Scope of Review of the Ruling
           Below .........................................11

      II.   The Trial Court Correctly Determined That
           the CFA Applies to the Class .................13

          A. Defendant Misapplies the Governmental
            Interest Test...............................14

             1.   Defendant Fails to Demonstrate That
                 Other States Have Greater Interests
                 Than Does New Jersey ...................15

             2.   Defendant Never Addressed New Jersey's
                 Substantial Qualitative Contacts or
                 Other States' Contacts .................22

             3.   Defendant Fails to Address New Jersey's
                 Strong Interests under the CFA ..........28

             4.   Defendant Fails to Address the Interests
                 Underlying Tort Law (Deterrence and
                 Compensation) ...........................35

          B. The Trial Court's Decision Comports
            with Applicable Precedent.................41

         C. Defendant's Constitutional Arguments Are
            Not Properly Before the Court and Are,
            in Any Event, Meritless....................43

        III. Plaintiff's CFA Claim Focuses on Merck's
           Uniform Conduct, Not on Individual
           "Causation" Questions .........................45

A. Defendant Improperly Seeks to Impose
   a Reliance Element Where None Exists .......45

B. The Causal Nexus between Defendant's
   Deceptive Conduct and Class Members'
   Injury Is Capable of Common Proof..........48

C. The Liability Inquiry Will Focus on
   Defendant's Conduct, Not on What P&T
   Committees Did.............................49

D. Defendant's Cases Are Inapposite ..........58

E. Ascertainable Loss Is a Common Question ....62

CONCLUSION...............................................65

## TABLE OF AUTHORITIES

**CASES**                                                                          **PAGES**

Almog v. Israel Travel Advisory Service, Inc.,
    298 N.J. Super. 145 (App. Div. 1997)....................... 37

Avery v. State Farm Mutual Automobile Insurance Co., 835
    N.E.2d 801 (Ill. 2004).................................... 35

Brown v. Market Development, Inc., 322 N.E.2d 367 (Ohio Ct.
    Cmm'n Pleas 1974)......................................... 33

Boyes v. Greenwich Boat Works, Inc.,
    27 F. Supp. 2d 543 (D.N.J. 1998)...................... 31, 36

Butkera v. Hudson River Sloop "Clearwater," Inc.,
    300 N. J. Super. 550 (App. Div. 1997)................. 37, 38

In re Bridgestone/Firestone, Inc. Tires Products Liability
    Litigation, 288 F.3d 1012 (7th Cir. 2002)................. 17

In re Byram Township Board of Ed.,
    152 N. J. Super. 12 (App. Div. 1997)...................... 45

In re Cadillac V8-6-4 Class Action,
    93 N.J. 412 (1983)............................... 11, 12, 58

Cartiglia v. Johnson & Johnson Co., No. MID-L-2754-01, 2002
    WL 1009473 (Law Div. Apr. 24. 2002)...................... 58

Carroll v. Cellco Partnership, 313 N.J. Super. 488
    (App. Div. 1998)............................... 41, 42, 57-60

Cavuoti v. New Jersey Transit Corp.,
    161 N.J. 107 (1999)...................................... 31

Clawans v. United States,
    75 F. Supp. 2d 368 (D.N.J. 1999).......................... 37

Cornblatt, P.A. v. Barow, 153 N.J. 218 (1998) ................ 23

Cohen v. Uniroyal, Inc., 77 F.R.D. 685 (E.D. Pa 1977) ........ 58

Cox v. Sears Roebuck & Co.,
    138 N.J. 2 (1994)...................... 29, 33, 36, 37, 38

Cutler v. Borough of Westwood, 295
    N.J. Super. 344 (App. Div. 1996).......................... 32

D'Agostino v. Johnson & Johnson, Inc.,
    133 N.J. 516 (1993) ..................................... Passim

Daaleman v. ElizabethTown Gas Co.,
    142 N.J. Super. 531 (Law Div. 1976) ................. 33, 36, 38

Delgozzo v. Kenny, 266 N.J. Super. 269
    (App. Div. 1993) ................................... 11-12, 54

Erny v. Estate of Merola,
    171 N.J. 86 (2002) ........................... 15, 18, 22, 26

Fenwick v. Kay America Jeep, Inc., 72 N.J. 372 (1977) ......... 48

Fink v. Ricoh Corp., 365 N.J. Super. 520
    (Law Div. 2003) ............................... 26, 42, 59, 60

Folbaum v. Rexall Sundown Inc., No. A-244-02T1, slip op.
    (N.J. Super. Ct. App. Div. June 3, 2004) .................... 61

In re Ford Motor Co. Ignition Switch Products Liability
    Litigation, 174 F.R.D. 332 (D.N.J. 1997) .................... 42

Franchise Tax Bd. v. Hyatt, 538 U.S. 488 (2003) .............. 43

Freeman v. Eastman Chemicals, Co., 172 S.W.3d 512
    (Tenn. 2005) .............................................. 32

Fresh Start Industrial, Inc. v. ATX Telecomms. Services,
    295 F. Supp. 2d 521 (E.D. Pa. 2003) .................... 24, 40

Fu v. Fu, 160 N.J. 108 (1999) ........................... Passim

Furst v. Einstein Moomjy, Inc.,
    182 N.J. 1 (2004) ...................................... 29, 38

Gantes v. Kason Corp.,
    145 N.J. 478 (1996) ................... 16, 24, 30, 37, 38, 39

Gennari v. Weichert Co. Realtors,
    148 N.J. 582 (1997) ................................... 29, 46

Goshen v. Mutual Life Insurance Co., 774 N.E.2d 1190 ......... 35

Gross v. Johnson & Johnson-Merck Consumer Pharms. Co., 303
    N.J. Super. 336 (N.Y. 2002) ................................ 60

Grubbs v. Chapman, 376 N.J. Super. 420
    (App. Div. 2005) .......................................... 36

_Heindel v. Pfizer, Inc.,_
   381 F. Supp. 2d 364 (D.N.J. 2004).........................24

_Huffmaster v. Robinson, J.A.,_ 221 N.J. Super. 315
(Law Div. 1986) .....................................24, 36

_Instructional System, Inc. v. Computer Curriculum Corp.,_
   130 N.J. 324 (1992).....................................35

_Island Mortg. of N.J. and Perennial Lawn Care, Inc. v. 3M,_
   373 N.J. Super. 172 (Law Div. 2004).....................48

_Kohn v. American Housing Foundation, Inc.,_
   178 F.R.D. 536 (D. Colo. 1998)..........................61

_Kropinski v. Johnson & Johnson,_ No. A-3979-97T1, 1999 WL
   33603132 (App. Div. Jan. 7, 1999).......................42

_Kugler v. Haitian Tours, Inc.,_
   120 N.J. Super. 260 (Chan. Div. 1972)...................31

_Laufer v. The United States Life Insurance Co.,_ No. BER-L-
   9082-04, 2005 WL 1869211
   (Law Div. Aug. 8, 2005)......................34, 43, 58

_Lemelledo v. Beneficial Mgmt. Corp. of America,_
   150 N.J. 255 (1997)..................................31, 33

_Leon v. Rite Aid Corp.,_
   340 N.J. Super. 462 (App. Div. 2001)....................33

_Lettenmaier v. Lube Connection, Inc.,_
   162 N.J. 134 (1999)..................................29, 38

_Margulies v. Chase Manhattan Mortgage Corp.,_
   2005 WL 2923580 (App. Div. Nov. 7, 2005)................30

_Martin v. Dahlberg, Inc.,_
   156 F.R.D. 207 (N.D. Cal. 1994).........................58

_In re McDonnell Douglas Corp. Securities Litigation,_
   98 F.R.D. 613 (E.D. Mo. 1982)...........................54

_In re Mercedes-Benz Antitrust Litigation,_
   213 F.R.D. 180 (D.N.J. 2003)............................49

_Meshinsky v. Nichols Yacht Sales, Inc.,_
   110 N.J. 464 (1988).....................................48

*Mobley v. Volkswagon of America, Inc.*, No. BER-L-2104-02,
  2005 WL 1911223 (Law. Div. July 15, 2005)....................26

*Muise v. GPU, Inc.*,
  371 N.J. Super. 13 (App. Div. 22004)....................11, 54

*New Jersey Citizen Action v. Schering-Plough Corp.*,
  367 N.J. Super. 8 (App. Div 2003)....................46

*New Mea Construction Corp. v. Harper*,
  203 N.J. Super. 465 (App. Div. 1982)....................29

*Northwest Mortgage, Inc. v. Superior Court*,
  85 Cal. Rptr. 2d 18 (Cal. App. 4th Dist. 1999)....................33

*O'Connor v. Boeing North America, Inc.*,
  184 F.R.D. 311 (C.D. Cal. 1998)....................58

*Pfau v. Trent Aluminum Co.*, 55 N.J. 511 (1970)....................21

*Pfizer, Inc. v. Employers Insurance of Wausau*,
  154 N.J. 187 (1998)....................21

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)....................43

*Poulos v. Caesars World, Inc.*, 379 F.3d 654
  (9th Cir. 2004)....................12

*In re Prudential Insurance Co. of America Sales Practices
  Litigation*, 962 F. Supp. 450, aff'd, 148 F.3d 283
  (D.N.J. 1997)....................64

*In re Rezulin Products Liability Litigation*,
  210 F.R.D. 61 (S.D.N.Y 2002)....................58, 61, 65

*Riley v. New Rapids Carpet Ctr.*, 61 N.J. 218 (1972)....................11

*Rodriguez v. McKinney*, 156 F.R.D. 112 (E.D. Pa 1994)....................58

*Rozema v. Marshfield Clinic*,
  174 F.R.D. 425 (W.D. Wis. 1997)....................49

*Sikes v. Teleline, Inc.*,
  281 F.3d 1350 (11th Cir. 2002)....................58

*Skeer v. EMK Motors, Inc.*,
  187 N.J. Super. 465 (App. Div. 1982)....................29, 38, 48

*Sprint Spectrum, L.P. v. Zoning Board of Adjustment*,
  360 N.J. Super. 373 (App. Div. 2003)....................26

State v. Nasir, 355 N.J. Super. 96
    (App. Div. 2002)..................................20, 23, 43

Steiner v. Equimark Corp.,
    96 F.R.D. 603 (W.D. Pa. 1983)..............................58

Stephenson v. Bell Atlantic Corp.,
    177 F.R.D. 279 (D.N.J. 1997)...............................62

Talalai v. Cooper Tire & Rubber Co.,
    360 N.J. Super. 547 (Law. Div. 2001)......................64

Talalai v. Cooper Tire & Rubber Co., No. 00CV5694AJL,
    2001 WL 1877265 (D.N.J. 20001)............................31

Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives &
    Composites, Inc., 209 F.R.D. 159 (C.D. Cal. 2002)..........49

Thiedemann v. Mercedes-Benz USA, LLC,
    183 N.J. 234 (2005)...................................62, 64

Tracker Marine v. Ogle, 108 S.W.3d 349, 358
    (Tex. Ct. App. 2003) .....................................19

Turner v. Aldens, Inc., 179 N.J. Super. 596
    (App. Div. 1981)..........................................31

Union Ink Co., v. AT&T Corp., 352 N.J. Super. 617
    (App. Div.) certif. denied, 174 N.J. 547 (2002).........46, 62

Vanderbilt Mortgage & Finance, Inc. v. Posey,
    146 S.W.3d 302 (Tex. Ct. App. 2004)...................19, 26

Varacallo v. Mass. Mutual Life Insurance Co.,
    332 N.J. Super. 31 (App. Div. 2000)...................Passim

Veazey v. Doremus, 103 N.J. 244 (1986) ......................17

Walsh v. Mattera,
    379 N.J. Super. 548 (App. Div. 2005)...............21, 23, 40

Zorba Contractors, Inc. v. Housing Authority,
    362 N.J. Super. 124 App. Div. 2003).......................46

## STATUTES and RULES

Class Action Fairness Act,
    Pub.# L. No. 109-2, 119 Stat. 4( Feb 15, 2005) ............45

New Jersey Statute Annotated ("N.J.S.A.") 56:8-2 ....... 33, 47, 51

   N.J.S.A. 56:8-19 ................................. 31, 32, 33

## OTHER AUTHORITIES

Restatement (Second) of Conflicts of Laws (1971)  ......... Passim

Format for Formulary Submissions, Version 2.0, Academy of
   Managed Care Pharmacy (Oct. 2002) ......................... 51

## PRELIMINARY STATEMENT

Defendant Merck & Co., Inc. ("Defendant" or "Merck") appeals from the July 29, 2005 Order of the Honorable Carol E. Higbee, certifying a nationwide class of third-party payors ("payors") who paid for the purchase of the prescription drug Vioxx.

In marketing and promoting Vioxx, Merck concealed material information about its safety and efficacy, including serious risks of adverse cardiovascular events—risks that forced it to pull the drug off the market. Plaintiff and class members, who were among those targeted by Merck in its aggressive promotion of Vioxx, added it to their formularies (lists of drugs paid under their drug benefit plans) without having this information. Merck's material omissions and unconscionable marketing practices caused them to suffer substantial economic losses because they paid for Vioxx rather than less expensive alternative medications for their participants.

On appeal, Defendant attacks the scope of Judge Higbee's certification order, and also argues that "causation" and "ascertainable loss" questions affecting individual class members predominate over questions common to the class. These arguments fail to establish an abuse in Judge Higbee's exercise of her discretion. First, the

trial court's application of the New Jersey Consumer Fraud Act ("CFA") to all class members was thoroughly sound under the facts and law. Contrary to Defendant's claim that it "circumvented" obstacles, Judge Higbee conducted a rigorous and thorough analysis of *each* state's interest in the litigation and found that New Jersey has the paramount interest. That conclusion is unassailable given the confluence of (i) Merck's extensive New Jersey ties and its Vioxx-related activities here, as documented in the record and noted by the trial court; and (ii) the fact that, on balance, the CFA is a more protective statute than other states' cognate consumer fraud schemes. To date, Defendant has never conducted a thorough, state-by-state analysis—as did Plaintiff and the trial court—to attempt to prove its spurious contention that some state other than New Jersey somehow has an overriding interest in the application of its own law to this dispute. Rather, by arguing that controlling weight should be given to individual states' interests in regulating drug sales within their borders, it has merely sought to slip in a *lex loci delicti* standard under the guise of a governmental interest test.

Moreover, by complaining that Judge Higbee should have accorded greater weight to individual states' interests in regulating drug sales within their borders, Defendant is

-2-

improperly asking this Court reweigh the facts in the record and substitute its discretion for that of Judge Higbee—an exercise foreclosed by the limited scope of review of class certification determinations.

Defendant's other arguments fare no better. Although the CFA contains no reliance element and the core liability question will focus on *its* conduct, Merck claims that there are "causation" questions relating to the decision-making of individual pharmacy and therapeutics ("P&T") committees, which made the formulary determination on behalf of many payors. That is irrelevant given the materially uniform omissions in the information that P&T Committees received from Merck (i.e., a common core of operative facts), and, as a factual matter, the record demonstrates the uniformity with which P&T Committees make formulary decisions.

Finally, Defendant's argument that individual questions concerning class members' ascertainable loss precludes class treatment also fails. Because the record shows wide-ranging, materially uniform omissions by Merck, class members' subsequent addition of Vioxx to formulary establishes a *prima facie* showing of ascertainable loss flowing from those deceptions. The *measure* of that loss is purely a damages question susceptible to formulaic proof through expert testimony at trial.

-3-

### PROCEDURAL HISTORY

Plaintiff commenced this action in October 2003, Da110, and moved for class certification in November 2004. After extensive discovery and briefing, the trial court heard argument and, on July 29, 2005, issued a seventy-page opinion and an Order granting the motion. Da1-71. By Order filed on October 3, 2005, this Court granted Merck's motion for leave to appeal the trial court's Order.

### STATEMENT OF FACTS

Plaintiff is a joint union-employer Taft-Hartley trust fund, organized and operating in New Jersey. See Da110, 727. As a payor, Plaintiff provides prescription drug coverage for its members. Da404-05. When plan members are prescribed a drug by their physician, the cost of that prescription is picked up, in whole or in part, by the payor. Da116-17, 727.

The extent to which the cost of a drug is paid by payors is determined by that drug's status on the payor's "formulary"—a list of drugs that its plan participants are authorized to purchase because the drugs will be paid for under the benefit plan. Da116, 727. Payors commonly employ a managed care organization ("MCO") or pharmacy benefits manager ("PBM") to administer their benefit plans, but it is the payor that ultimately pays prescription drug

costs, in whole or in part, for its plan participants.[1]
Pa483-84 (Kelly Cert. ¶¶ 11-12); Da376 (Kolassa Cert. ¶
12), 117 (Compl. ¶ 29). The formulary determination is
typically made by a P&T Committee, comprised of healthcare
professionals. Pa484-85 (Kelly Cert. ¶ 15).

In May 1999, Merck released Vioxx, the brand name for
rofecoxib. Vioxx is among a class of pain relievers known
as non-steroidal anti-inflammatory drugs ("NSAIDs").
Specifically, Vioxx is a Cox-2 specific inhibitor.[2] Merck's
marketing strategy was to push Vioxx, and justify the
substantial disparity (as much as seven-fold) in its price
over competitor NSAIDs (see Pa93; Da112 (Comp. ¶ 12)), by
claiming that Vioxx possessed the anti-inflammatory and
analgesic properties of other NSAIDs without their GI
risks, thus making it more cost-effective over the long
term. Pa3, 18-22, 41, 71-79; Da113 (Compl. ¶ 13).

Facing the expiration of patents on some of its most
successful drugs and competition from other Cox-2 inhibitor

---

[1] Given their limited resources, payors typically rely on
outside administrators' formulary determinations because
their size and expertise makes them best equipped to handle
such determinations. Pa483 (Kelly Cert. ¶ 10).

[2] The Cox-2 enzyme is believed to directly work at sites of
inflammation in the body. Traditional NSAIDs inhibit both
Cox-1 and Cox-2 enzymes. Because the Cox-1 enzyme is
believed to have a gastrointestinal ("GI") protective
effect, by attacking the Cox-1 enzyme, traditional NSAIDs
often cause ulcers and other GI problems. Pa188-92.

drugs, Pa27, 30-35, 43, 48, Merck needed a major success. To jump-start sales, it mounted a direct-to-consumer advertising blitz to induce members of the public to ask their doctors for Vioxx and mobilized 4,500 sales representatives to target physicians. Merck's goal was to fuel demand that would force "powerful buyers" to add Vioxx to their formularies. Pa3, 7, 11, 13, 25, 98-117, 296-98 ("Create Need for VIOXX"); Da113-16 (Compl. ¶¶ 13-17, 23).

Understanding that most prescription drug sales are purchased through and paid for by payors, Merck had to "[a]chieve formulary status/access for Vioxx equal or better than Celebrex and branded NSAIDs." Pa48; see Pa3, 193 (MCOs "are huge buyers who can move market share"), 294 ("key challenge was to get VIOXX placed into MCO formularies"); Da117 (Compl. ¶ 30).[3]   A year after its release of Vioxx, Merck achieved more than $2 billion annually in Vioxx sales and enjoyed a roughly 23% share of the NSAID market. Da118 (Compl. ¶ 34). Merck attained its objective of making Vioxx a "blockbuster" drug.

---

[3] Faced with strong demand for a drug by consumers and health care providers, payors are compelled to add it to their formularies. Pa3, 7. Formularies are commonly tiered, with certain drugs in a given class treated as "preferred" (i.e., requiring little or no co-payment from plan participants, Da116 (Compl. ¶ 26), 378 (Kolassa Cert. ¶ 17)); see Pa488 (Kelly Cert. ¶ 25). Thus, achieving preferred status on a payor's formulary is optimal.

To convince payors to include Vioxx on their formulary lists, Merck asserted that the higher cost of its drug would be offset by the savings to payors realized by not having to treat the adverse GI side effects associated with traditional, non-selective NSAIDs.[4]  Defendant made such claims, despite the knowledge that the claimed economic benefit of Vioxx was "borderline" at best.[5]

More importantly, both before and throughout the time that it marketed Vioxx, Defendant possessed and concealed material information about the risks of cardiovascular complications stemming from the use of Vioxx—specifically, that Vioxx inhibits the production of prostacyclin, a hormone-like substance that dilates blood vessels and

---

[4] Pa53 ("Publicize/highlight the economic value of VIOXX to convince payors of the benefits of using VIOXX over NSAIDs."), Pa55 ("plans are in place" to use data "to convince payors . . . that Coxib use is cost effective" and that "[a] broad mix of programs have been designed worldwide to . . . build a case that the use of Coxibs instead of traditional NSAIDs is cost-effective despite the higher out of pocket costs"), 96, 282-85, 287, 289-91, 296.

[5] Significantly, Merck's "economic analysis" failed to take into account that the majority of Vioxx users would be of an advanced age and would be taking low-dose aspirin for cardioprotection.   Indeed, long before it marketed Vioxx, Defendant anticipated that concomitant use of Vioxx and low-dose aspirin ("ASA") eviscerated the purported GI benefit of Vioxx.  Pa37 ("real world is everyone is on it [low-dose aspirin]"); Pa36 ("Low-Dose Aspirin—I HEAR YOU! This is a no win situation!  The relative risk of even low dose aspirin may be as high as 2-4 fold.").

-7-

reduces blood clotting—and it overstated Vioxx's GI safety benefits. Pa0245 (Oct. 20, 1997 Memorandum), Pa247 (Feb. 18, 1998 Memorandum). Further, Defendant failed to disclose the potential for Cox-2 specific inhibition to cause plaque rupture and to accelerate atherosclerosis.[6]

Disturbingly, even after the drug was on the market, Defendant delayed disclosure of critical safety information learned in its Vioxx clinical trials—that use of the drug had been associated with a nearly three-fold increase in death. Pa411-16.[7]

Defendant employed a broad and encompassing scheme of deceptions to conceal information about the risks posed by Vioxx. Steadfastly denying to the medical community and formulary decision-makers that Vioxx posed any cardiovascular risks, it disparaged professionals and academic articles that discussed such risks; designed

---

[6]   E.g., Pa235 (May 1998 Scientific Board of Advisors, Programmatic Review); Pa301-03 (1998 internal analysis demonstrating statistically significant increase in cardiovascular events in pre-approval Vioxx clinical trials); Pa309-13 (2000 internal analysis demonstrating increased risk of myocardial infarction ("MI" or heart attack) across entire Vioxx clinical program).

[7] Had it been disclosed to formulary decision-makers, such information would have undermined Merck's claim that Vioxx was more cost-effective than traditional NSAIDs. Indeed, knowledge of an increased risk of heart attack or death associated with Vioxx would undoubtedly have led payors to exclude Vioxx from their formularies or, at the very least, to place limits on reimbursements for the drug.

-8-

clinical studies to mask the association between Vioxx use and cardiovascular risks (such as by excluding "high risk" patients); avoided conducting cardiovascular safety studies altogether, lest they confirm such a link; and issued or sanctioned articles and publications by its employees and their consultants that advanced the "company line." Defendant even sought to silence or "neutralize" members of the medical and scientific community who questioned the drug's safety.[8]

In particular, after a large clinical study, called the Vioxx GI Outcomes Research ("VIGOR") study, showed more than a five-fold increase in heart attacks for Vioxx users as compared to patients taking a traditional NSAID, naproxen, Merck floated an unsupported theory—that the difference in cardiovascular events was the result of a *cardioprotective effect of naproxen*, rather than an increased risk for Vioxx users. It widely disseminated this explanation—through press releases, sales representatives, and Merck sponsored lectures—despite the

---

[8] Pa36-37, 39, 64-95, 120, 122, 124, 126, 128, 132, 143-48, 151-54, 156-57, 160-61, 164-65, 167-70, 172-73, 197-98, 200-07, 237-43, 245, 247, 249, 252, 255, 258, 272-74, 303, 306, 307, 310, 312-13, 400 (need to "reduce the emphasis" on heart attacks) (emphasis in original), 402-10, 413, 416, 418, 739-64; see also Pa729-34 (surveying evidence relating to Merck's material omissions).

fact that it had no clinical or epidemiological support, and against the advice of its own expert consultants.[9]

Merck's misleading campaign ultimately resulted in the FDA issuing it a formal warning in September 2001.[10] Notably, *none* of the materials provided to payors discussed Vioxx's cardiovascular risks.[11]

It was not until September 2004 that Merck ceased denying the linkage between Vioxx and serious cardiovascular events. After yet another clinical trial (the "APPROVe" study) showed increased risk of heart attack and stroke to patients taking Vioxx, Merck withdrew Vioxx from the worldwide market. Pa208-09.

Plaintiff brought this suit on its behalf and on behalf of all payors in the United States to recover damages stemming from Merck's fraud——namely, the inclusion

---

[9] See, e.g., Pa180-87 (FDA Warning Letter to Merck concerning promulgation of its naproxen theory); Pa134 (Merck-sponsored article attributing VIGOR results to cardioprotective effect of naproxen).

[10] Pa180-87; see also Pa45-47 (Dec. 1999 FDA warning letter, addressing Merck's "false and misleading misrepresentations of Vioxx's safety profile").

[11] See, e.g., Pa96 (first page of 44-page "Formulary Data" packet), 299 (cover of 1999 Vioxx Formulary Compendium), 322-97 (2002 Vioxx Formulary Compendium, containing materials distributed to formulary decision-makers, including product label, clinical trial summaries, and published articles).

of Vioxx on their formularies and the resulting payment of
Vioxx prescriptions for their participants in place of
alternative, less expensive medications.   Da110-24.

**ARGUMENT**

**THE COURT SHOULD AFFIRM THE TRIAL COURT'S ORDER**

**I.   The Limited Scope of Review of the Ruling Below**

A high level of deference is accorded a trial court's
decision to certify a class:  it may be overturned only for
an abuse of discretion.   Muise v. GPU, Inc., 371 N.J.
Super. 13, 29, 31 (App. Div. 2004); see In re Cadillac V8-
6-4 Class Action, 93 N.J. 412, 436 (1983).   The New Jersey
Supreme Court has also instructed that courts must be
"mindful that the class action rule should be construed
liberally in a case involving allegations of consumer
fraud," In re Cadillac, 93 N.J. at 435,[12] and has admonished
that "a court should be slow to hold that a [consumer
fraud] suit may not proceed as a class action," Riley v.
New Rapids Carpet Ctr., 61 N.J. 218, 228 (1972).   Thus, "a
class action 'should be permitted unless there is a clear
showing that it is inappropriate or improper.'"   Delgozzo

---

[12] Accord Varacallo v. Mass. Mut. Life Ins. Co., 332 N.J.
Super. 31, 44 (App. Div. 2000) ("For nearly thirty years,
our highest court has instructed trial courts to liberally
allow class actions involving allegations of consumer
fraud.").

v. Kenny, 266 N.J. Super. 169, 180 (App. Div. 1993)(citation omitted; emphasis added).[13]

Defendant erroneously argues that a *de novo* standard of review applies to the entirety of its appeal, claiming that only questions of law are at issue. Db10-11. New Jersey State courts, however, have uniformly held that class certification decisions are reviewed for an abuse of discretion. In any event, Merck has failed to show that the trial court applied any improper legal standards.

On the contrary, as discussed below, Defendant seeks to apply a choice-of-law analysis that has no foundation in New Jersey jurisprudence, while at the same time ignoring controlling choice-of-law precedent. The remaining issues that Merck characterizes as purely legal, *i.e.*, causation and ascertainable loss, Db10-11, are also reviewed under the abuse of discretion standard.[14]

---

[13] In addition, "[t]he court is bound to take the substantive allegations of the complaint as true," Delgozzo, 266 N.J. Super. at 181 (citation and internal quotation marks omitted), and is "required to give plaintiffs *every* favorable view of plaintiffs' complaint and the record," Varacallo, 332 N.J. Super. at 42 (citing cases; internal quotation marks omitted; emphasis added).

[14] See In re Cadillac, 93 N.J. at 439 (trial court's predominance and superiority determinations deemed not abuse of discretion); see also Poulos v. Caesars World, Inc., 379 F.3d 654, 664 (9th Cir. 2004) ("We review these determinations [concerning predominance and superiority] under an abuse of discretion standard").

## II.   The Trial Court Correctly Determined That the CFA Applies to the Class

Defendant's challenge to Judge Higbee's determination that the CFA applies to the claims of all class members boils down to the anomalous proposition that the law of other jurisdictions should apply to Plaintiff's CFA claims even though (i) Defendant is being sued in its home state, where it maintains a huge presence; and (ii) those claims stem from conduct that principally occurred in this State. None of the cases that Defendant cites in attacking Judge Higbee's certification Order involved an analogous situation, and in none of them did the court perform the rigorous analysis that Judge Higbee conducted here.

Defendant's underlying assumption is that 50 separate statewide classes (or a multitude of individual actions) on the same issue would be a superior method of adjudicating the various payors' claims. On this record, that conclusion makes no sense. As discussed below, given the extensive qualitative New Jersey contacts here and the fact that, on balance, the CFA is perhaps the strongest statutory consumer fraud scheme in the country, Defendant's arguments fail.

## A.    Defendant Misapplies the Governmental Interest Test

Defendant correctly recognizes that New Jersey applies the governmental interest analysis to choice of law questions on tort cases.  Db15.  As Merck observes, this standard entails a determination of (1) whether a conflict exists between the laws of the interested states, and (2) if so, which jurisdiction has the greatest interest in the issues at stake.  Db15-16.  Defendant, however, proceeds to ignore the second part of that test and seeks to apply instead a standard not recognized by this State's courts.

Moreover, Defendant fails to apply the pertinent choice-of-law rules that New Jersey courts have adopted as part of the second prong of the governmental interest analysis.  Specifically, nowhere does Merck address the crucial components which include, besides the determination of the state with the greatest interest, the relevant factors drawn from the Restatement (Second) of Conflicts of Laws (1971) ("Restatement"), including the interests of interstate comity, the interests underlying the field of tort law (deterrence and compensation), and (most importantly) the competing interests of the states.  Fu v. Fu, 160 N.J. 108, 118-19, 122-25 (1999) (discussing Restatement §§ 6, 145).  In contrast, as discussed below, Judge Higbee faithfully adhered to New Jersey precedent in

-14-

applying these factors and in properly performing the appropriate governmental interest analysis.  See Da29-65.

### 1. Defendant Fails to Demonstrate That Other States Have Greater Interests Than Does New Jersey

Defendant asserts that even though other states have "less restrictive," Db18, or "less stringent statutes," Db21, than the CFA, they do not have "weaker interests" than New Jersey but merely have "*different* interests, which are entitled to at least equal respect." Db21 (emphasis added and deleted).  That argument is fatally flawed. Defendant fails to perform an essential step in the governmental interest analysis, which requires the determination of which "state [has] the *greatest* interest in governing the specific issue in the underlying litigation." Fu, 160 N.J. at 118 (emphasis added).[15]

Merck's argument that the CFA cannot apply to all class members' claims simply because each state has a "different," Db21, or even a "strong," Db19, interest, is squarely at odds with New Jersey precedent.  "Traditional choice-of-law analysis in [the] tort context does not permit the examination to end upon review only of the law

---

[15] Accord Erny v. Estate of Merola 171 N.J. 86, 95, 103 (2002) (test is which "state has the *most significant* relationship to the occurrence and the parties") (emphasis added).

of the site of the conduct and injury . . . . [T]he governmental-interest analysis requires that the sister state's policies be reviewed before determining which state has the *dominant* interest in having its . . . law apply." *Erny*, 171 *N.J.* at 99 (emphasis added).[16] Defendant's failure to deal with this necessary prong of the governmental interest analysis by demonstrating that other states have *greater*—not merely "different"—interests than New Jersey, and its concession that the laws of other states are "*less restrictive*," Db18 (emphasis added), than the CFA, dooms its attack on the trial court's decision.

Merck's overriding focus on the purported interests of the jurisdictions other than New Jersey (see Db18, 19, 21) reveals its analysis for what it really is: an effort to avoid addressing New Jersey's strong consumer protection policies and to apply the inflexible *lex loci delecti* standard, which automatically selects the law of the place

---

[16] Accord Gantes v. Kason Corp., 145 *N.J.* 478, 493 (1996) ("determination that [a state] . . . has a cognizable and substantial interest does not end the inquiry into whether the choice of its statute . . . is appropriate to resolve the conflict . . . . [That state's] interest . . . must be compared and weighed against any governmental interest that [the other state] has in applying its statute."); D'Agostino v. Johnson & Johnson, Inc., 133 *N.J.* 516, 526 (1993) ("determinative law is 'that of the state with the *greatest interest* in governing the *particular issue*'") (emphasis added and in original; citation omitted).

of the wrong.[17]  New Jersey, however, long ago abandoned the *lex loci delecti* standard in favor of the more flexible governmental interest standard, see Veazey v. Doremus, 103 N.J. 244, 247 (1986), which analyzes the relevant governmental interests of the states at issue.

Thus, Merck's argument that the consumer laws of all other states should mechanically apply because of "each state's paramount interest in . . . the application of its own law to resident class members' claims" (Pa554; see Db19), is inconsistent with New Jersey precedent. See Fu, 160 N.J. at 136 (rejecting "adopt[ion] [of] a mechanical rule that [a State] has the paramount interest in applying its law to any controversy involving parties who are all residents of th[at] State. . . . [I]n a choice of law determination involving the field of tort . . . the more critical concerns . . . focus on the governmental policies of the [interested] states").[18]

---

[17] As Defendant argued below in clear *lex loci delecti* terms, "when a plaintiff suffers an injury in his or her home state, New Jersey's choice-of-law rules compel the application of that home state's law to his or her claim." Pa551.

[18] That Defendant has consistently tried to cloak the *lex loci delecti* rule as a governmental interest analysis is demonstrated not only by its relentless focus on the law of the place where class members reside, see Db18-21, 24-25, but also by its heavy emphasis on decisions such as In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig., 288

Defendant also misconstrues the governmental interest test in arguing that Judge Higbee failed to accord sufficient weight to the interests of other states, Db18-25, in "*regulating* pharmaceutical transactions within their borders." Db25 (emphasis added). The second prong of the governmental interest test "requires analysis of the *purposes* underlying each law [at issue]." Erny, 171 N.J. at 97 (emphasis added).[19]   In contrast to Defendant, the trial court and Plaintiff exhaustively detailed the central underlying purpose of the consumer protection laws of the fifty states:  the protection of consumers from deceptive commercial practices. See Pa617-724 (Plaintiff's detailed choice-of-law analysis of consumer laws of 49 states and District of Columbia vis-à-vis the CFA); Da38-64 (Judge

---

F.3d 1012 (7th Cir. 2002), see Db12-13, 21, which it characterizes as one of "[t]he most prominent recent cases." Db12. Although Bridgestone reversed the certification of a nationwide class, the court's decision flowed from a determinative legal fact that Merck omits: the forum state in that case (Indiana) applies the doctrine of *lex loci delecti*, see 288 F.3d at 1016, thus requiring the application of all 50 states laws, see id.

[19] See Fu, 160 N.J. at 119 (test requires "identif[ication] [of] the governmental *policies underlying the law of each state*") (emphasis added); D'Agostino, 133 N.J. at 526 ("The determinative law is 'that of the state with the greatest interest in governing the *particular issue*'") (citation omitted; emphasis in original).

-18-

Higbee's state-by-state analysis).[20]  Nowhere does Merck genuinely address these specific purposes underlying the consumer fraud laws.  Rather, it seeks to shift the focus to the generalized subject of the states' interest in the "*regulation*" of pharmaceutical or consumer transactions, Db25 (emphasis added); see Db18-19, 22-23, 28.

Defendant's misguided reliance on these purported "policy choices," however, is unrelated to the consumer protection "'[policies] [that] the legislature[s] or court[s] intended to protect.'"  Fu, 160 N.J. at 125 (citation omitted).  Merck asserts, for example, that "states must balance compensation and deterrence objectives with . . . concerns that increasing damages liability may . . . increase the cost of new drugs or decrease their availability to state residents."  Db22.  Yet Merck fails

---

[20] Defendant quotes *dictum* in Tracker Marine v. Ogle, 108 S.W.3d 349, 358 (Tex. Ct. App. 2003), which opined that states balance competing concerns and that courts should allow each state to apply its own law.  See Db21.  Merck's reliance on this case is misplaced.  As a later Texas Court of Appeals decision recognized, Tracker Marine and other Texas cases involved the situation where "the class proponents are contending that the laws of the various states do not conflict and thus a single state's law can be applied."  Vanderbilt Mortgage & Fin., Inc. v. Posey, 146 S.W.3d 302, 317-18 & n.6 (Ct. App. Tex. 2004).  That is different from a "second method by which a nationwide class can be certified—when the law of one state applies to all of the transactions.  If a single state has the 'most significant' contacts to all of the transactions involving deceptive trade practices, a nationwide class can be certified."  Id. at 318.  The latter situation exists here.

to demonstrate that these purported drug policy choices are in any way related to the underlying purposes or policies of *the consumer protection laws* that are at issue here. See Db22 (first paragraph).[21]   As the New Jersey Supreme

---

[21]   In a separate paragraph and footnote, Defendant purports to examine states' consumer protection policies in support of its argument that other states' consumer laws should apply here to the exclusion of the CFA. See Db22-23 & n.4. With respect to its policy arguments concerning Arkansas, Massachusetts, Michigan, and North Carolina, see Db23 n.4, it is critical to note that Defendant never presented this to the trial court, see Pa529-91, and thus it is not properly before this Court, see State v. Nasir, 355 N.J. Super. 96, 103 (App. Div. 2002).   Moreover, this analysis briefly and selectively covers only portions of some states' consumer laws, see Db22-3 & n.4, and even then Defendant's analysis does not (1) specifically identify the underlying policies of the laws at issue, (2) compare those policies to those underlying the CFA, and (3) determine which state has the *greatest* interest.   See id. (discussing isolated portions of consumer fraud-related laws in 15 states).   Thus, rather than comprehensively analyze the states' laws and the actual underlying policies, Merck parses them and adduces isolated nuggets to suggest that those states have purportedly "balance[d] the benefits of compensation and deterrence with the potential harms of over-deterrence," and that these purported policy choices are entitled to equal respect.   See Db22-23 & n.4.   The governmental interest analysis, however, is not a smorgasbord at which parties are free to pick and choose which aspects of particular states' laws are more or less beneficial or favorable to their position.   Rather, the analysis must examine, as the trial court did here, the *whole* law and determine the underlying policies and which state has the greatest interest.   Indeed, although Defendant claims that these laws "balance . . . the potential harms of over-deterrence," Db22, the articulated purposes of the consumer laws of the 15 states to which it refers are to protect consumers from deceptive practices. Pa617-19, 625-26, 637-42, 647-50, 654-55, 657-59, 664-67, 669-78, 682-85, 687-91, 696-97, 703-06, 709-11, 723-24.

Court has stated, "[i]t is not appropriate for [a court] to impute inarticulated purposes to the legislature of another state." Pfau v. Trent Aluminum Co., 55 N.J. 511, 522 (1970). Tellingly, the authorities that Defendant cites for this proposition are *products liability* cases against drug manufacturers; a *products liability* law, see Db22 (first paragraph); and various laws concerning the regulation of *pharmaceutical drugs*, Db23-24 & n.5.[22] Thus, Defendant fails to "identify the governmental *policies underlying the* [consumer protection] *law of each state.*" Fu, 160 N.J. at 119 (emphasis added).[23]

Indeed, other states' policy choices made in regulating products liability lawsuits have nothing to do with furthering the central purpose of the *consumer*

---

[22] In making its erroneous products liability and pharmaceutical drug policy argument, Defendant relies on laws from a mere *six states*. See Db22-24 & n.5. It even argues that these laws demonstrate the "importance of individual states' *drug sale policies.*" Db22 (emphasis added). Defendant, however, never raised these laws or policies below. At any rate, because these products liability and pharmaceutical laws do not involve the underlying purposes or policies of the consumer protection laws at issue, they are irrelevant.

[23] See also Pfizer, Inc. v. Employers Ins. of Wausau, 154 N.J. 187, 198 (1998) (state's law applies only if it "will advance the policies that the law was intended to promote") (emphasis added); Walsh v. Mattera, 379 N.J. Super. 548, 555 (App. Div. 2005) (test requires identification of "policy interest that each state has in applying its law to the particular circumstances and parties.").

*protection* laws, which is the protection of consumers from deceptive practices. In particular, Merck argues that applying the CFA to a nationwide class would adversely impact on policy choices that other states have made to protect the costs and availability of drugs, Db22, 24, or to "limit the exposure of [drug] manufacturers to product liability actions," Db24. However, because this is not a products liability case and those drug policies are not implicated here, they would not "'be furthered by applying th[e] [consumer fraud] law[s] [of the other states] to the multi-state situation.'" *Erny*, 171 N.J. at 102.[24]

### 2. Defendant Never Addressed New Jersey's Substantial Qualitative Contacts or Other States' Contacts

Defendant also fails to demonstrate how the policies underlying the states' consumer protection laws "are

---

[24] To the extent that Defendant argues that some states limit damages liability in their consumer protection laws by factoring in "the potential harms of over-deterrence," Db22, it fails to recognize that these purported policy concerns are not the articulated "[policies] the legislature[s] or court[s] [of those states] intended to protect," *Erny*, 171 N.J. at 101-02 (citation omitted), in their respective consumer protection laws. *See supra* at 20 n.21 (stated purposes of 15 states' consumer laws cited by Merck are to protect consumers). Even if these were the policies the other states intended to protect, Defendant cannot demonstrate that such policies carry much, if any, weight with respect to the "the interests underlying the field of tort law" (deterrence and compensation), *Fu*, 160 N.J. at 123; *see* Section II-A(4), *infra*, particularly in the context of a suit *in* New Jersey against a *New Jersey* company whose conduct at issue occurred *in* New Jersey.

-22-

affected by each state's contacts to the litigation and the parties." Fu, 160 N.J. at 119; see also Walsh, 379 N.J. Super. at 555 (party must show "how strongly the contacts involved relate to each state's policy").

Before the trial court, Defendant presented no evidence or arguments concerning the presence of qualitative contacts in any of the states, let alone how the consumer protection policies are affected or furthered by them. See Pa529-91. Merck now attacks Judge Higbee's analysis by arguing that she ignored a number of contacts in other states, such as "where the Vioxx purchases were made" and "where the formulary decisions about Vioxx were made." Db31. Because Defendant also never raised this argument before the trial court, however, it is not properly before this Court. Nasir, 355 N.J. Super. at 103.[25] As Judge Higbee noted, "[u]nlike the numerous and substantial fact-based contacts New Jersey has with this litigation, there has been little evidence presented to establish contacts between this litigation and the home

---

[25]   Nor did Defendant present any evidentiary support for this argument, thereby foreclosing consideration of it for that reason alone. See Cornblatt, P.A. v. Barow, 153 N.J. 218, 407 (1998) (even if argument first raised on appeal is "one 'of sufficient public concern,'" court "will not consider the issue if the record before the court is not complete as to the newly-presented issue") (citing cases).

state of a putative class member." Da36-37.  Applying the
Restatement factors, Judge Higbee properly found that "no
individual state has a stronger factual connection to this
litigation than New Jersey." Da35.  Given the inadequacies
of its governmental interest analysis below and its failure
to proffer evidence on the contacts question, Defendant's
attack on Judge Higbee's evaluation of the relevant
contacts is completely without merit.[26]

Indeed, the record reflects that Merck has extensive
qualitative contacts in New Jersey that implicate the
policies underlying the CFA.  As Judge Higbee recognized,
Plaintiff's evidentiary submissions show that Merck

---

[26]  The case that Defendant cites for its newly-raised
"contacts" argument, Heindel v. Pfizer, Inc., 381 F. Supp.
2d 364 (D.N.J. 2004), see Db31 n.9, was decided on an
entirely different factual record than the more substantial
record before Judge Higbee, which showed Merck's extensive
qualitative New Jersey contacts, compare 381 F. Supp. 2d at
375-77 with infra at 25-28.  Moreover, Heindel is
inapposite because Pennsylvania would have no interest
here.  Its consumer protection law does not protect
business entities such as Plaintiff and would thus
frustrate New Jersey's interest under the CFA.  See Fresh
Start Indus., Inc. v. ATX Telecomms. Servs., 295 F. Supp.
2d 521, 527 (E.D. Pa. 2003); see also Pa697-700 (comparing
Pennsylvania's weaker consumer policies to New Jersey's
stronger policies in CFA); Huffmaster v. Robinson, J.A.,
221 N.J. Super. 315, 320 (Law Div. 1986) (applying CFA
instead of Pennsylvania's consumer protection law because
CFA offers greater protection).  Also, Heindel quotes out
of context language in Gantes, see 295 F. Supp. 2d at 527,
that actually contradicts Heindel's reasoning, see Gantes,
145 N.J. at 496-97.

-24-

conducted substantial activities in New Jersey concerning its development, labeling, and marketing of Vioxx.

Specifically, Defendant's significant qualitative contacts with New Jersey and this litigation, Da34—contacts that Defendant fails to acknowledge here— including the following: Merck is a New Jersey corporation with its headquarters in Whitehouse Station, New Jersey; its Human Health Product Approval Committee ("HHPAC"), which reviews and "signs off" on all plans and activities relating to drugs, is located in New Jersey, as is Merck Research Laboratories ("MRL"); Merck developed Vioxx in New Jersey; all of the critical decisions concerning testing, promotion, and marketing of the drug (including the messages conveyed to physicians and formulary decision-makers), as well as communications concerning the labeling of the drug, took place in New Jersey; and New Jersey-based Merck scientists otherwise prominently participated in meetings, analyses, and authorship of articles and publications relating to Vioxx. See Da34-35, Pa214, 220, 222-25, 228, 230, 232-33, 235, 237-43, 245, 247, 249, 250-52, 253, 255, 257, 292, 301, 306-07, 310, 398-400, 402, 411, 418, 420, 518-19. Those contacts—none of which Merck addressed below or here—are directly implicated by the policies underlying the CFA, i.e., the protection of consumers, deterrence of

-25-

consumer fraud, and punishment of wrongdoers.[27]   See infra

at 29 & n.34.

Section 145 of the Restatement sets forth the contacts

to be evaluated in tort cases.[28]   See Fu, 160 N.J. at 125.[29]

Those are:   (1) the place of injury;   (2) the place where

the conduct causing the injury occurred;   (3) the domicile,

residence, nationality, place of incorporation, and place

---

[27] Also, the trial court's contacts analysis involves fact-finding that must be construed in Plaintiff's favor, see Varacallo, 332 N.J. Super. at 42, and is accorded deference, see Vanderbilt Mortg. & Fin., 146 S.W.3d at 313 ("the determination of the state contacts to be considered involves a factual inquiry which requires deference to the trial court's determination") (citing cases).

[28] CFA actions are a species of tort.   See Fink v. Ricoh Corp., 365 N.J. Super. 520, 586 (Law Div. 2003).

[29] Although the trial court also applied Restatement § 148, see Da31-35, in tort cases New Jersey appellate courts have applied only § 145.   See, e.g., Erny, 171 N.J. at 101-02; Fu, 160 N.J. at 133.   Section 148 applies to "false representations," Restatement § 148 cmt. a, whereas Plaintiff's claims center on material omissions and unconscionable commercial practices.   Also, § 145 has been applied in CFA cases.   See Mobley v. Volkswagen of Am., Inc., No. BER-L-2104-02, 2005 WL 1911223, at *2 (Law. Div. July 15, 2005).   Because New Jersey's appellate courts apply § 145 in cases such as this, and because this Court can affirm the decision below for any reason supported by the record, see Sprint Spectrum, L.P. v. Zoning Bd. of Adjustment, 360 N.J. Super. 373, 376 n.1 (App. Div. 2003), Plaintiff addresses § 145.   Even if § 148 applied, however, Judge Higbee's decision was eminently correct.   See Vanderbilt Mortg. & Fin., 146 S.W.3d at 315-16 (§ 148 "must be analyzed in conjunction with Section 145 and Section 6"); Restatement § 148 cmt. b (rule applies "unless . . . some other state" has a greater interest) (emphasis added).

-26-

of business of the parties; and (4) the place where the relationship, if any, between the parties is centered.  Id.

As to the first factor, there is no single "place of injury" because Plaintiff and class members were injured in multiple jurisdictions, and thus the relative interest of each state is more or less equal.[30]  The second factor (the place of conduct) merits considerable weight because one of the primary purposes behind the CFA is to deter and punish violations of the CFA, and Merck's violations of the CFA principally occurred at its New Jersey headquarters, see supra at 25.[31]  The third factor (domicile or place of business of parties) also favors New Jersey because Merck's headquarters is here,[32] and its conduct here implicates New

---

[30] See Restatement § 145(2) cmt. e ("Situations do arise . . . where the place of injury will not play an important role in the selection of the state of the applicable law. . . . This will . . . be so when . . . *injury has occurred in two or more states*.") (emphasis added).

[31] See Restatement § 145(2), cmt. e ("when the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance"); id. ("When the injury occurred in two or more states . . . the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law.").

[32] See Fu, 160 N.J. at 133 ("The domicile, residence, place of incorporation, and place of business of a defendant corporation are relevant, although not dispositive, considerations in a choice-of-law determination.") (citations omitted); see also Restatement § 145(2), cmt. e ("At least with respect to most issues, a corporation's

Jersey's compelling interest in deterrence and punishment under the CFA.

In sum, the qualitative contacts in New Jersey overwhelmingly favor application of the CFA. Vioxx was developed here, and critical decisions regarding its development, labeling, promotion, and marketing were made within this State. These decisions resulted in formularly-decision makers having misleading and incomplete information to evaluate the safety and efficacy of Vioxx before placing it on their formularies. Merck has consistently failed to address these relevant considerations and to apply the <u>Restatement</u>.[33]

### 3. Defendant Fails to Address New Jersey's Strong Interests under the CFA

Equally unavailing is Defendant's argument that the trial court "overvalued New Jersey's interest." Db25.

---

principal place of business is a more important contact than the place of incorporation").

[33] While Merck argues that, under section 148 of the <u>Restatement</u>, the place of pecuniary loss is entitled to substantial significance, Db26 (quoting <u>Restatement</u> § 148 cmt. I), that argument was also never raised below (<u>see</u> Pa529-91) and thus is not properly before the Court. Even if § 148 applied, however, Merck ignores § 148 cmt. c, which, the trial court noted, provides that "[w]hen the loss is pecuniary," the "place of loss" is "difficult to locate." Da32." This is particularly true here because Merck failed to present any evidence or arguments below on the place of loss or on where its misleading information was received or acted upon by class members.

Initially, Defendant's disagreement over how much weight should be assigned to certain interests falls far short of demonstrating an abuse of discretion. Furthermore, New Jersey's policy interests underlying the CFA are substantial. They include protection of consumers, deterrence of consumer fraud, compensation of victims, punishment of wrongdoers, and attracting competent counsel.[34] These policies are reflected by the CFA's *mandatory* awards of treble damages, attorney's fees, filing fees, and costs. See generally Skeer v. EMK Motors, Inc., 187 N.J. Super. 465, 469-73 (App. Div. 1982). "The history of the Act is one of constant expansion for consumer protection," Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604 (1997), and "[t]he available legislative history demonstrates that [it] was intended to be one of the *strongest* consumer protection laws in the nation," New Mea Constr. Corp. v. Harper, 203 N.J. Super. 465, 469-73 (App. Div. 1982) (emphasis added).

In light of these powerful and repeatedly articulated policies, Judge Higbee properly concluded that the CFA represents one of the strongest consumer fraud schemes in

---

[34] See Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 11 (2004); Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139 (1999); Cox v. Sears Roebuck & Co., 138 N.J. 2, 21.

the country. Da65.[35]  By contrast, Defendant has failed, as it failed below, to identify or acknowledge *any* of the purposes or policies underlying the CFA, let alone to "compare[] and weigh[]" them, Gantes, 145 N.J. at 493, against other states' consumer protection policies.

Defendant's argument that the trial court erred in "overvalu[ing] New Jersey's interest in regulating out-of-state sales of products" also betrays a fundamental misinterpretation of the statutory language of the CFA.  As Judge Higbee properly recognized, the CFA was intended to apply to consumers both in New Jersey and *outside* of the State.  Da36-37.[36]  The plain language of the CFA (ignored

---

[35] Defendant's reliance on Margulies v. Chase Manhattan Mortgage Corp., 2005 WL 2923580 (App. Div. Nov. 7, 2005), see Merck's Nov. 17, 2005 letter to the Court, is misplaced.  In Margulies, this Court opined that Maryland had a greater interest than New Jersey in applying its consumer protection act.  See 2005 WL 2923580, at **7-9. Margulies, though, was decided on a summary judgment motion without discovery, not on a class certification motion. Also, both its purely conclusory statement as to the CFA's reach and its choice-of-law analysis were *dicta* because it first addressed a separate basis for its decision, i.e., whether a contractual provision that dictated the application of Maryland law was controlling.  Id. at *7. Further, Margulies is limited to its unique facts, which involved a Maryland mortgage loan transaction for Maryland real estate of a Maryland property owner, see id. at **8-9, whereas, here, Merck has substantial qualitative New Jersey contacts that implicate the CFA's policies.  See Pa661-63 (comparison of CFA and Maryland law).

[36] See Kugler v. Haitian Tours, Inc., 120 N.J. Super. 260, 269 (Chan. Div. 1972) (CFA "is not confined by its terms of

by Merck) compels this conclusion, providing that "[a]ny person who suffers any ascertainable loss" by reason of practices declared unlawful under the statute "may bring an action." N.J.S.A. 56:8-19 (emphasis added).[37] This

---

spirit to activities involving residents of this State. . . . [I]t prohibits unlawful practices in New Jersey without limitation as to the place of residence of the persons imposed upon."). As Judge Higbee noted (Da33), in Boyes v. Greenwich Boat Works, Inc., 27 F. Supp. 2d 543 (D.N.J. 1998), the court stated there is "little doubt that the New Jersey Legislature intended its Consumer Fraud statute to apply to sales made by New Jersey sellers even if the buyer is an out-of-state resident and some aspect of the transaction took place outside New Jersey." Id. at 547. The court added that "[w]hile there can be no doubt that the New Jersey legislature desired to protect its own residents, it is equally clear that this state has a powerful incentive to insure that local merchants deal fairly with citizens of other states and countries." Id.; accord Talalai v. Cooper Tire & Rubber Co., No. 00CV5694AJL, 2001 WL 1877265, at *5 (D.N.J. Jan. 8, 2001) ("The protections of the New Jersey Consumer Fraud Act are not limited to New Jersey residents."). The silence of the Legislature in the face of these decisions is a clear indication that the legislative policy and intent is to apply the CFA to consumers inside and outside New Jersey. See Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 133 (1999). Also, the failure of the New Jersey legislature to restrict the CFA to New Jersey consumers further demonstrates an intention that it apply to out-of-state consumers as well. See Turner v. Aldens, Inc., 179 N.J. Super. 596, 602 (App. Div. 1981) ("[T]he failure to restrict the definition of retail charge accounts at least to contracts 'entered into in this State' manifests an intention that the laws respecting those contracts be given extraterritorial effect."). To the extent that Defendant argues that such an intention cannot be read into the CFA, this Court has rejected such an argument. See id. at 602-04.

[37] See Freeman v. Eastman Chem. Co., 172 S.W.3d 512, 517 (Tenn. 2005) (consumer law with "any person" language applies to non-residents); cf. D'Agostino, 133 N.J. at 537

interpretation is consistent with the "clear legislative intent that [the CFA's] provisions be applied broadly in order to . . . root out consumer fraud." Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 264 (1997). New Jersey thus has a strong policy interest in extending the CFA' protections to any consumer in the United States who is injured by consumer fraud committed in New Jersey by a New Jersey business.[38]

Furthermore, N.J.S.A. 56:8-19 confers standing on consumers who suffer damages "as a result of *the use or employment by another person of any method, act or practice* declared unlawful under this act," to bring an action. N.J.S.A. 56:8-19 (emphasis added).[39] The plain language of

---

(use of "any" in statutory language represented "an explicit forum policy to affect the foreign situs, not just to deter domestic actions").

[38]   Defendant effectively seeks to have this Court read into the CFA words that would limit the statute by rendering it applicable only to New Jersey consumers, i.e., "Any [*New Jersey resident*] who suffers an ascertainable loss . . . ." That contravenes rules of statutory construction. See Cutler v. Borough of Westwood, 295 N.J. Super. 344, 348-49 (App. Div. 1996) ("'It is fundamental that 'the meaning of a statute must . . . be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms'").

[39]   In addition, the CFA provides that "*the use . . . of any unconscionable commercial practice or the knowing[] concealment . . . or omission of any material fact. . . in* connection with the sale or advertisement of any

the statute—which Defendant ignores—shows that the
activities that the CFA targets are in-state unlawful
practices or conduct, not necessarily the ultimate sales
transactions that may occur outside New Jersey. See Cox,
138 N.J. at 17 (to violate CFA, "person must commit an
'unlawful practice' as defined in the legislation").[40]
Hence, so long as the conduct at issue was carried out
within New Jersey, the CFA can apply outside New Jersey.[41]

   Thus, the application of the CFA to this case would

---

merchandise" is declared unlawful. N.J.S.A. 56:8-2
(emphasis added).

[40] See, e.g., Lemelledo, 150 N.J. at 263 ("The CFA is
intended to protect consumers 'by eliminating sharp
practices and dealings in the marketing of merchandise and
real estate.") (citation omitted; Daaleman v. ElizabethTown
Gas Co., 77 N.J. 267, 270 (1978) ("The Consumer Fraud Act .
. . is aimed basically at unlawful sales and advertising
practices designed to induce consumers to purchase
merchandise or real estate.") (emphasis added); Leon v.
Rite Aid Corp., 340 N.J. Super. 462, 467 (App. Div. 2001)
("'The goal of the Act is to 'protect the consumer against
imposition and loss as a result of fraud and fraudulent
practices by persons engaged in the sale of goods and
services.'") (citation omitted).

[41] Cf. Northwest Mortgage, Inc. v. Superior Court, 85 Cal.
Rptr. 2d 18, 23-25 & n.13 (Cal Ct. App. 1999) (California
unfair competition law potentially covers nonresidents
where defendant's offending conduct occurred in
California); Brown v. Market Dev., Inc., 322 N.E.2d 367,
369-71 (Ohio Ct. Cmm'n Pleas 1974) (language of Consumer
Sales Practices Act indicated that "what is sought to be
regulated are the practices used [by Ohio merchants] in
making or seeking to make sales to consumers, and not the
terms of completed sales with consumers"; act applies
regardless of consumer's location).

not, as Defendant argues, result in the regulation of consumer sales transactions in other jurisdictions. As the New Jersey Supreme Court has stated, "New Jersey law does not regulate conduct *outside* the state. Rather, New Jersey law regulates conduct in New Jersey, such as [a corporation's] alleged orchestration of [its violations of New Jersey law]." D'Agostino, 133 N.J. at 539-40 (emphasis added).[42] By applying the CFA, Judge Higbee is not "exporting New Jersey . . . law so much as applying New Jersey domestic policy . . . to a domestic company." Id.[43]

---

[42] Laufer v. The United States Life Ins. Co., No. BER-L-9082-04, 2005 WL 1869211 (Law Div. Aug. 8, 2005) (Da201-13), upon which Merck relies (Db13, 20, 25), is distinguishable. The plaintiff there failed to "provide[] an in-depth choice of law analysis," and "the source of the allegedly deceptive correspondence . . . operate[d] out of Illinois." Id. at *5. In sharp contrast, Plaintiff here presented to the trial court an exhaustive 108-page choice-of-law analysis of the consumer protection laws of 49 other states and the District of Columbia (see Pa596-724), and an extensive evidentiary showing that demonstrated Merck's substantial qualitative contacts in New Jersey concerning its Vioxx development and marketing activities. Indeed, Laufer recognizes that "New Jersey trial judges have, in appropriate circumstances, the authority to certify a national class action." 2005 WL 1869211, at *6.

[43] Defendant characterizes Goshen v. Mutual Life Ins. Co., 774 N.E.2d 1190, 1196 (N.Y. 2002), as rejecting the nationwide certification of a New York consumer protection claim. Db12, 25. Goshen, though, had nothing to do with a class certification motion, and Merck fails to mention that the court's holding was based on the legislative history and the language of New York's statute, which demonstrated a legislative intent not to apply the statute to out-of-

"The proposition is 'fairly well established that a state may regulate its residents, even when they are acting outside of the state.'" Instructional Sys., Inc. v. Computer Curriculum Corp., 130 N.J. 324, 370 (1992) (citation omitted). Here, the CFA's application to the claims of non-resident class members furthers the numerous salutary policies underlying the CFA, while at the same time targeting only Merck's conduct within New Jersey.[44]

### 4. Defendant Fails to Address the Interests Underlying Tort Law (Deterrence and Compensation)

An analysis of how the consumer protection laws of New Jersey and the other jurisdictions promote the goals that underlie tort law—another key consideration[45] that Defendant ignores—further demonstrates that New Jersey has the most significant relationship to this litigation.

Specifically, other jurisdictions have a lesser

---

state transactions. See 744 N.E.2d at 1195-96 (quoting statute).

[44] Avery v. State Farm Mut. Auto. Ins. Co., 835 N.E.2d 801, 853-54 (Ill. 2005) (Db12, 26, 30), is also inapposite. The statute at issue there expressly applies only to transactions that affect Illinois residents, id. at 850 (quoting statute), and its legislative history also indicates that it was not intended to apply extraterritorially, id. at 852.

[45] See Fu, 160 N.J. at 119, 123 (interests underlying tort law require court to consider degree to which deterrence and compensation would be furthered by application of local law).

deterrence interest here because most of their consumer protection laws (i) do not provide for treble damages or, provide only for discretionary, rather than mandatory, treble damages awards, see Pa617-724, passim[46]; and (ii) make attorney's fees available, if at all, only at a court's discretion, see id., passim.[47]  It is, however, precisely those types of monetary awards that put teeth in a consumer fraud statute.[48]

---

[46] These distinctions are important. "Consumers are better protected by a mandatory treble damage rule than a discretionary one." Huffmaster v. Robinson, 221 N.J. Super. 315, 320 (Law Div. 1986) ("scales . . . tipped in favor of [the CFA's application over Pennsylvania law] . . . because only [the CFA's] application permits application of the mandatory New Jersey policy"); see also Boyes, 27 F. Supp. 2d at 546 ("New Jersey's law offers more protection than Pennsylvania's in that treble damages and attorney fees are mandatory in New Jersey and discretionary in Pennsylvania").

[47] This Court recently reaffirmed the importance of the CFA's fee-shifting provision. See Grubbs v. Chapman, 376 N.J. Super. 420, 449 (App. Div. 2005) ("[T]he provision for attorney's fees in the CFA is one of the deterrent aspects of the legislation") (citation  and internal quotation marks omitted).

[48] See Cox, 138 N.J. at 21 (CFA provides deterrence "by awarding a victim treble damages, attorneys' fees, filing fees, and costs"); Daaleman v. ElizabethTown Gas Co., 142 N.J. Super. 531, 536 (Law. Div. 1976) (treble damages, attorney's fees, and costs under CFA "are clearly intended not only to compensate a plaintiff for his actual losses, but to punish a defendant who has violated the Consumer Fraud Act as well as to deter him from further violations"), aff'd in relevant part, 150 N.J. Super. 78, (App. Div. 1977), rev'd on other grounds, 77 N.J. 267 (1978).

Moreover, New Jersey courts have repeatedly applied New Jersey law where New Jersey has a substantial interest in policing and deterring misconduct on the part of its corporate citizens, even where the harm occurs outside its borders and involves nondomiciliaries of New Jersey.[49] Here, as in Gantes and D'Agostino, the statute, its background, the facts, and the applicable caselaw demonstrate that New Jersey has the greatest interest in deterring the type of misconduct by a New Jersey corporation that the law was designed to eradicate.[50]

---

[49] See Gantes, 145 N.J. at 497 ("New Jersey's policy in deterring tortious conduct of manufacturers is implicated by the defendant's material contacts with this State, and thus represents a substantial interest"; New Jersey deterrence policy deemed superior to Georgia's interest in compensation of its residents); D'Agostino, 133 N.J. at 525-40 (New Jersey's interest in deterring misconduct by corporations in New Jersey required application of New Jersey law even though misconduct caused harm to nondomiciliary of New Jersey outside New Jersey); Butkera v. Hudson River Sloop "Clearwater," Inc., 300 N.J. Super. 550, 554 (App. Div. 1997) ("[T]he [corporate] defendant's home state has not only a cognizable interest but also the paramount interest in its law being enforced"); Almog v. Israel Travel Advisory Serv., Inc., 298 N.J. Super. 145, 158-69 (App. Div. 1997) (New Jersey law applied to wrongful conduct of New Jersey citizens in Israel where "[k]ey events occurred in New Jersey" and New Jersey law more broadly benefited plaintiff); see also Clawans v. United States, 75 F. Supp. 2d 368, 373 (D.N.J. 1999) ("New Jersey has a strong interest in preventing tortious misconduct by its domiciliaries").

[50] See Butkera, 300 N.J. Super. at 554 ("combined facts of plaintiff's domicile and situs of the accident may . . .

This strong deterrence policy is reflected by the CFA's provision making mandatory treble damages, attorney's fees, filing fees, and costs, see Skeer, 187 N.J. Super. at 469-73; supra at 36 nn.46-48, as well as by New Jersey's liberal application of its class action statute in consumer fraud cases, see Section I, supra. New Jersey's interest in deterring the unlawful conduct of a resident corporation is plainly greater than any deterrence interests of other jurisdictions. See Pa617-724, passim.

The CFA's remedies likewise reflect New Jersey's equally strong policy interest in compensating victimized consumers. Furst, 182 N.J. at 11; Lettenmaier, 162 N.J. at 139; Daaleman, 142 N.J. Super. at 536; Cox, 138 N.J. at 21; see also Pa617-724. Thus, New Jersey's compensation interest is plainly greater than that of other jurisdictions because the CFA affords mandatory treble damages to consumers inside *and* outside New Jersey, whereas most other jurisdictions do not afford mandatory treble damages in class actions and have no interest in compensating non-domiciliaries who are injured by a New

---

have to yield to the policy interests of defendant's home state. This is particularly so if the home state's policy is to ensure the accountability in tort of its domiciliaries for the consequences of their negligent conduct") (discussing Gantes, 145 N.J. at 482-89).

-38-

Jersey corporation.   See Pa617-724, passim.

Further, as discussed above, New Jersey's extensive qualitative contacts with the litigation are weightier and relevant to the policies underlying New Jersey's deterrence and compensation interests.   In light of these contacts, "[t]his is . . . not a case in which New Jersey seeks to regulate access to its courts by nondomiciliary plaintiffs; here it seeks to affect what is done in New Jersey by a domiciliary corporation."   D'Agostino, 133 N.J. at 538.

Therefore, other states' "interest[s] ought not be given precedence over domestic policies of a higher quality."   D'Agostino, 133 N.J. at 543.   New Jersey's strong interest in creating deterrence and maximizing compensation to victimized consumers, both inside and outside New Jersey, will be more significantly furthered in this case.[51]

In addition, with respect to the interests of interstate comity, because the CFA provides much greater overall consumer protection than other jurisdictions' laws,

---

[51] Furthermore, "[a]pplication of New Jersey law will not undermine [other states'] interest[s] in compensating [their] injured residents because that interest is not actually implicated or compromised by allowing a [consumer fraud] action brought by [non-residents of New Jersey] to proceed against [a non-resident] manufacturer [of those states]."   Gantes, 145 N.J. at 498.

application of the CFA would *not* frustrate those less protective schemes, Da65; <u>see</u> Pa617-724, <u>passim</u>, while application of the laws of other jurisdictions *would* frustrate New Jersey's substantial interests under the CFA. <u>See, e.g.</u>, <u>Fresh Start Indus., Inc.</u>, 295 F. Supp. 2d at 527-28; <u>see also</u> Pa617-724, <u>passim</u>. Notably, Merck failed both below and here to address "whether application of one law will further or frustrate the policies of the other state[s]." <u>Walsh</u>, 379 <u>N.J. Super.</u> at 555.

In sum, in light of New Jersey's substantial policies underlying the CFA and the significant qualitative contacts in New Jersey that are implicated by these policies, New Jersey has the most significant relationship to the occurrence and the parties in this litigation. For these reasons, Judge Higbee's choice-of-law determination should not be disturbed.[52]

---

[52] The "interests of the parties" factor—"of extreme importance in the field of contracts"—"ordinarily plays little or no part in a choice-of-law question in the field of torts." <u>Fu</u>, 160 <u>N.J.</u> at 123. Even assuming this factor were considered, however, where "the tort directly implicates a New Jersey company," allowing New Jersey law to apply "provides for fairness and certainty for the parties involved." <u>D'Agostino</u>, 133 <u>N.J.</u> at 539. Therefore, applying the policies behind the CFA "does not undermine any valid expectation of [Defendant]." <u>Id.</u>

## B. The Trial Court's Decision Comports with Applicable Precedent

Defendant also argues that the trial court's decision conflicts with a number of other decisions rejecting nationwide certification of class actions raising consumer protection claims. Db12-14. Merck, however, relies on a number of inapposite and non-controlling decisions, see id., while simultaneously ignoring relevant New Jersey case law that forecloses its argument, see Section II-A, supra. Indeed, contrary to Defendant's claim that New Jersey law prohibits the certification of a multistate class, see Db11, one of the few New Jersey decisions that it cites, Carroll v. Cellco Partnership, 313 N.J. Super. 488 (App. Div. 1998), explicitly recognizes that "conflict of law issues *do not* per se foreclose certification of a multistate class," id. at 497 (emphasis added), so long as "an analysis of the different state laws and the effect on the predominance of common legal issues" supports such a certification. Id. This is an analysis *that Judge Higbee painstakingly and thoroughly conducted*. Da38-64.[53]   In

---

[53] Although Defendant interprets Carroll as rejecting certification of a nationwide class action because of choice of law issues, see Db11, Carroll in fact rejected certification because the plaintiff and the trial court there *failed to perform the analysis required by the second prong of the governmental interest test*, see 313 N.J.

fact, this Court in <u>Carroll</u> expressly directed the trial court on remand to consider whether to certify a multi-state CFA claim, <u>see</u> 313 <u>N.J. Super.</u> at 511, a fact that Defendant ignores.[54]

The cases that Merck characterizes as conflicting with Judge Higbee's decision are inapposite or fail to actually apply the second prong of the governmental interest analysis.[55]

---

<u>Super.</u> at 497-98.  In contrast, Plaintiff and Judge Higbee performed such an analysis here.  <u>See</u> Pa617-724; Da38-64.

[54] Moreover, seven months after it decided <u>Carroll</u>, this Court affirmed the certification of a nationwide CFA class. <u>See</u> <u>Kropinski v. Johnson & Johnson</u>, No. A-3979-97T1, 1999 WL 33603132, at **1-2 (App. Div. Jan. 7, 1999).  Pa784-85.

[55] The cases that Defendant cites (Db12-14) are all non-binding and materially distinguishable, and most did not apply the second prong of the governmental interest test. For example, in <u>Fink</u>, the court and the parties failed to apply the second prong of that test, <u>see</u> 365 <u>N.J. Super.</u> at 593-95, and the court essentially applied the doctrine of <i>lex loci delicti</i>, <u>see</u> <u>id.</u> at 593-94.  Also, <u>Fink</u> found that the plaintiffs had shown only that New Jersey was the location of the defendants' principal place of business, without more.  <u>Id.</u> at 534, 594.  Indeed, <u>Fink</u> noted that the case was different than those where, as here, the conduct at issue emanated from New Jersey.  <u>See</u> <u>id.</u> at 594-95.  Other cases that Defendant cites are similarly inapposite.  <u>See, e.g.</u>, <u>In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.</u>, 174 <u>F.R.D.</u> 332, 348 (D.N.J. 1997) (Db14) (court failed to apply both prongs of governmental interest test, making only conclusory statement that all 50 states had "an" interest because their respective residents purchased their vehicles there).

## C. Defendant's Constitutional Arguments Are Not Properly Before the Court and Are, in Any Event, Meritless

Merck further argues that several provisions of the federal Constitution "severely restrict New Jersey's legitimate interest in regulating the conduct of New Jersey companies beyond New Jersey's borders." Db27; see also Db28-30. These constitutional arguments, however, were *never* raised below. See Pa551-82, 589. Defendant thus waived them. Nasir, 355 N.J. Super. at 103.

In any case, Defendant ignores settled law (including a landmark U.S. Supreme Court decision) that the Due Process Clause does not preclude nationwide certification where, as here, there are significant contacts with the forum state. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 818 (1985); see also Laufer, 2005 WL 1869211, at *6 ("New Jersey trial judges have . . . the authority to certify a national class action under Phillips Petroleum").[56]

---

[56] The Supreme Court has reaffirmed the vitality of the Shutts choice-of-law standard as the hallmark of constitutional due process. See Franchise Tax Bd. v. Hyatt, 538 U.S. 488, 495 (2003). Indeed, at the constitutional level, the Supreme Court has expressly abandoned its efforts to second-guess trial courts' choice-of-law decisions, so long as their analyses proceed, as the trial court's did here, in fulfillment of the Shutts contacts and interests criteria, because "it is frequently the case under the Full Faith and Credit Clause that a court can lawfully apply either the law of one State or the

-43-

Because New Jersey's contacts and resulting interests are "manifest" in this case, and it is indisputable that "at least some of the conduct alleged to be [wrongful] occurred in" New Jersey, Judge Higbee's selection of New Jersey law to govern the claims of the entire class should be affirmed here—just as the court's choice of Nevada law to govern a plaintiff's claims was affirmed in Franchise Tax Board, a much closer case. See 538 U.S. at 495.[57]

Finally, Merck raises the straw man argument that the trial court's decision "could well spur the courts of other states to rule similarly, leaving New Jersey's residents without recourse to their own consumer fraud statute" when suing out-of-state companies. Db32. Putting aside that this argument is sheer speculation, Defendant fails to acknowledge the recent enactment of the Class Action

---

contrary law of another." Id. at 496; see id. ("[W]e abandoned the balancing-of-interests approach to conflicts of law. . . . [A] State need not substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate.") (citations and internal quotation marks omitted).

[57] Defendant disputes Plaintiff's and class members' standing to bring a claim under the CFA (i.e., whether they are "consumers"). See Db20 n.3. Merck, however, previously litigated this issue through a motion to dismiss that Judge Higbee denied and with respect to which this Court denied leave to appeal on August 23, 2004. The law of the case doctrine precludes Defendant's effort to relitigate this issue, especially in the context of an interlocutory class certification appeal.

Fairness Act ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (Feb. 15, 2005), which gives federal courts expanded jurisdiction over a number of class actions. Under CAFA, a suit such as this filed after February 18, 2005 would in all likelihood be adjudicated by a federal court. Judge Higbee recognized and accounted for this fact in her analysis. See Da13-14. Therefore, her decision will not "spur" similar rulings from other states' courts.[58]

### III. Plaintiff's CFA Claim Focuses on Merck's Uniform Conduct, Not on Individual "Causation" Questions

#### A. Defendant Improperly Seeks to Impose a Reliance Element Where None Exists

Defendant contends that Judge Higbee "circumvented . . . factual variations" that preclude a finding that common questions of law or fact predominate in this action. Db34. If anyone has "circumvented" anything, however, it is

---

[58] Most of the arguments presented on the choice-of-law issue by the amici curiae who filed briefs in support of Defendant's motion for leave to appeal were not raised below or concern issues not before the Court. See Brief of Amicus Curiae Pharmaceutical Research and Manufacturers of America, at 7 n.5 (Plaintiff's standing), 8-9, 20 (economic studies); 9-11 (separation of powers); 13-15 (constitutional issues); 17-18, 22-23 (public policy); Brief of Amicus Curiae Product Liability Advisory Council ("PLAC"), at 1 (public policy), 2, 14 & n.2 (standing), 8-10, 11 (Restatement § 148 and contacts), 12 (choice of law), 15 (consumer fraud laws), 17-18 (the CFA). These arguments are not properly before the Court. See In re Byram Township Bd. of Ed., 152 N.J. Super. 12, 18 (App. Div. 1977) (amicus curiae may not raise claims that parties themselves have not raised).

-45-

Defendant, which has sought to import a reliance element into the CFA under the guise of "causation."

While a common law fraud claim requires proof of reliance, a CFA claim "requires only proof of a causal nexus" between the alleged omission and the ascertainable loss, Varacallo, 332 N.J. Super. at 43; accord Zorba Contractors, Inc. v. Housing Auth., 362 N.J. Super. 124, 139 (App. Div. 2003) (same), and does not require a showing of reliance, Gennari, 148 N.J. at 607 (CFA "does not require proof of reliance").[59]   Therefore, proving causation under the CFA does not require evidence that each class member specifically relied upon Defendant's omissions or misrepresentations.   Moreover, the CFA's "causal nexus" element is *not* the same as proximate cause or "but-for" causation in a negligence action.   See Varacallo, 332 N.J. Super. at 49 ("causal nexus" element "is a *significant distinction* from the requirement of reliance in a common law fraud claim") (emphasis added).

---

[59]   Accord New Jersey Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8, 15 (App. Div.) ("the element of traditional reliance required to be pleaded and proven in a common law fraud or misrepresentation case need not be proven in order to recover for damages pursuant to the CFA") (citation omitted), certif. denied, 178 N.J. 249 (2003); Union Ink Co., v. AT&T Corp., 352 N.J. Super. 617, 646 (App. Div.) ("There is no reliance requirement for Consumer Fraud Act liability"), certif. denied, 174 N.J. 547 (2002).

Thus, contrary to Merck's claim, Judge Higbee did not "adopt a special, less demanding formulation of CFA causation." Db44. She simply followed precedent in holding that, because Plaintiff alleges that "elements of fraud pervaded every aspect of Merck's actions in developing and marketing Vioxx"—i.e., "a common core of operative facts"—it could show on a classwide basis that Merck's conduct was a "causal factor" in payors' inclusion of Vioxx on their formularies "without a detailed analysis of each decision made by each member of the class." Da67.

Defendant's argument that liability has to be determined individually for each class member also fails because the CFA alternatively imposes liability for the commission of unconscionable commercial practices, see N.J.S.A. 56:8-2, and the complaint expressly pleads unconscionable commercial practices on Defendant's part. See Da123 (Compl. ¶ 52(d)). Notably, "unconscionable commercial practices" include "'incomplete disclosures.'" Skeer, 187 N.J. Super. at 472 (quoting Gov.'s Press Release for Assembly Bill 2402, at 2 (June 29, 1971)). Where an unconscionable commercial practice is alleged, liability attaches based on the mere *capacity* of the conduct to

mislead others.[60]   There need not have been a false statement of fact.[61]

### B. The Causal Nexus between Defendant's Deceptive Conduct and Class Members' Injury Is Capable of Common Proof

The causal nexus between Merck's omissions or unconscionable commercial practices and class members' ascertainable loss will be amenable to generalized proof. Judge Higbee did not rest her class certification determination on Plaintiff's "*ipse dixit* assertions of 'pervasive fraud.'" Db45. As noted above, the record is replete with evidence of Defendant's broad, systematic campaign to aggressively promote Vioxx and squelch any evidence calling into question its safety and efficacy. Defendant ignores that common questions predominate where, as here, the case will focus on what *the defendant* did because, in such cases, the resolution of the liability question will *necessarily* be classwide. In re Mercedes-Benz Antitrust Litig., 213 F.R.D. 180, 187 (D.N.J. 2003)

---

[60] See Fenwick v. Kay Am. Jeep, Inc., 72 N.J. 372, 378 (1977) ("The capacity to mislead is the prime ingredient of deception or an unconscionable commercial practice."); Island Mortg. of N.J. and Perennial Lawn Care, Inc. v. 3M, 373 N.J. Super. 172, 177 (Law Div. 2004) ("New Jersey courts have consistently held that the heart of an unconscionable commercial practice is the 'capacity to mislead.'") (citing cases).

[61] See Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 472 (1988); Leon, 340 N.J. Super. at 470.

("common issues predominate when the focus is on the defendants' conduct and not on the conduct of the individual class members").[62]

Moreover, as noted above, the record shows that Merck's development, promotion, and marketing of Vioxx (while withholding material information known to it) did not vary materially with respect to individual class members. Given Defendant's broad, uniform campaign to promote Vioxx, the inclusion of Vioxx on formulary by payors, who were one of the principal audiences targeted by Merck, constitutes *prima facie* proof of causation.[63]

## C.  The Liability Inquiry Will Focus on Defendant's Conduct, Not on What P&T Committees Did

Merck's contention that Judge Higbee should have focused on P&T Committees' decision-making (Db38-43; see

---

[62]  Accord Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc., 209 F.R.D. 159, 167 (C.D. Cal. 2002) ("[I]n order to determine predominance, the Court looks to whether the focus of the proposed class action will be on the words and conduct of the defendants rather than on the behavior of the individual class members.") (citing cases); Rozema v. Marshfield Clinic, 174 F.R.D. 425, 439 (W.D. Wis. 1997) ("because proof of liability will focus on defendants' conduct and not defendants' relationship with individual plaintiffs, it is a question common to the entire proposed class").

[63]  See Varacallo, 332 N.J. Super. at 49 (where defendant "withheld material information with the intent that consumers would rely on it in purchasing [its product], the purchase of the [product] by a person who was shown the literature would be sufficient to establish *prima facie* proof of causation").

Db8-9) is a red herring, designed to shift the focus of the liability inquiry away from its conduct.

Under the CFA, Plaintiff is "required to prove only that defendant's conduct was *a* cause of damages. [It] need not prove that [Merck's] conduct was *the sole* cause of loss." Varacallo, 332 N.J. Super at 48 (emphasis added). Thus, Plaintiff does not have to demonstrate that, were it not for Merck's fraud, payors would not have added Vioxx to formulary. That being the case, examination of the deliberations of individual P&T Committees is unnecessary.

Moreover, under Defendant's reasoning, *no* consumer fraud class can ever be certified unless it is shown that all members think and decide alike. That proposition is not only fallacious but also indefensible on this record, which shows that Defendant put the same information before all class members and the public. In addition, Defendant's novel, highly-restrictive view both ignores settled law favoring liberal construction of the CFA and class treatment of CFA cases, see Section I, supra, and turns the appropriate liability analysis on its head because it runs contrary to the language of the CFA itself, which focuses the liability question on the *defendant's* conduct, not on the internal thought processes or decision-making of

-50-

aggrieved consumers.[64]

Setting that aside, Defendant's argument fails because P&T Committees employ a remarkably uniform process in selecting drugs for their formularies.  See Pa485-88 (Kelly Cert. ¶¶ 16-25); see also Pa456 (Kolassa Tr. 126:10-126:24 (in P&T Committees, clinical and staff pharmacists typically conduct initial evaluation of drug and make presentation to committee as to whether it will represent "an important addition" to formulary or be "redundant")). In fact, there is a *common format* for formulary submissions.  See Pa511 (Academy of Managed Care Pharmacy ("ACMP"), Format for Formulary Submissions, Version 2.0 (Oct. 2002)), Pa452 (Kolassa Tr. 108:5-109:1). Defendant's own expert acknowledged that most pharmaceutical companies construct and submit "dossiers" in accordance with that manual, and that the ACMP has authored a report specifically addressing formularies' common practices. Pa452 (Kolassa Tr. 109:2-8, 110:3-7); see Pa432.[65]

---

[64] The statute looks to whether a CFA defendant has employed, *inter alia*, "any unconscionable commercial practice," "deception," "fraud," or "omission of any material fact," and liability attaches "whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A. 56:8-2.

[65] Further, because a handful of PBMs manage 70% of all prescriptions dispensed for ambulatory care patients and 95% of the prescriptions of those having prescription drug

More importantly, P&T Committees *receive and consider the same information*, as was done in the case of Vioxx. See Pa486 (Kelly Cert. ¶¶ 18-19); Da380 (Kolassa Cert. ¶ 21) (P&T Committees commonly consider information supplied by drug-makers).[66]

The evidence that Defendant introduced below does not support, and in several respects actually undermines, its argument. Although one of Defendant's experts, Dr. E.M. Kolassa, claimed that P&T Committees' decision-making was highly individualized, Da378, 380-84 (Kolassa Cert. ¶¶ 16, 22-28), he himself had co-authored an article noting the *similarities* relating to formulary approval, Pa429, Pa449

---

benefit coverage, Pa483-84 (Kelly Cert. ¶ 12); see also Da376 (Kolassa Cert. ¶ 5 ("Most prescription drug sales in the United States are made through PBMs."), most class members' formulary determinations were in all likelihood made by a limited number of P&T Committees.

[66] Indeed, another of Defendant's experts, Dr. Merlin Wilson, acknowledged that a November 2000 Merck video press release *never* mentioned that Vioxx may have caused heart attacks among patients in the VIGOR study or that Vioxx posed a potential heart attack risk, and did not know if PBMs would have had any information beyond that contained in a Merck press release. Pa469 (Wilson Tr. 74:13-75:8, 76:4-13); see Pa468-69 (Wilson Tr. 70:7-73:4). In addition, Dr. Wilson testified that after the FDA admonished Merck for making false claims about the cardiovascular safety of Vioxx, see Pa180-87, he did not remember receiving from Merck any clarification of its statements. Pa471-72 (Wilson Tr. 82:5-85:8). Thus, testimony from Merck's own expert underscored Merck's widel concealment of material facts about Vioxx.

(Kolassa Tr. 86:20-87:1).   In any event, the aforementioned evidence (including Dr. Kolassa's own deposition testimony) and the uniformity of information put before P&T Committees completely refute the assertion that class certification is precluded   because   of   P&T   Committees'   individualized decision-making.

Defendant   also   points   to   differences   in   payors' treatment of Vioxx on their respective formularies, with some placing the drug on a "preferred" tier, while others did not.   It argues that because some health plans have "open" formularies, under which any FDA-approved drug is automatically included or maintained on a formulary, those class members cannot establish that they were injured by Merck's fraud. Db40-41, 47.   That, too, is unavailing.

Even payors with open formularies must still make a determination as to *which tier* of the formulary to place or maintain a drug.   Tier placement then determines the extent to which health plans will cover the cost of the drug, including the amount, if any, of required co-payments of plans' participants.   See Pa 486-88 (Kelly Cert. ¶¶ 21, 25).[67]   Consequently,   even those class members with open

---

[67]   Asserting   that   "different   P&T   Committees   reacted differently   to   information   about   the   potential cardiovascular risks of Vioxx," Db39-40, Defendant cites August 2001 minutes of the P&T Committee of Horizon Blue

formularies suffered ascertainable loss on account of Merck's conduct because they were affected by its deceptions in making tier determinations regarding Vioxx.[68]

Moreover, although Defendant asserts that P&T Committees have a "broad range of tools at their disposal," and that they "have different objectives and different people on their committees," Db8, 47, Judge Higbee took

---

Cross-Blue Shield of New Jersey ("Horizon"), which administered Plaintiff's pharmacy benefits plan, Da409, Db47-48 (citing Da534). This meeting, though, was held long *after* Horizon had added Vioxx to its formulary. At most, these minutes reflect some awareness of cardiovascular complications associated with atypically heavier use of Vioxx. Cf. Da508 (96% of Vioxx prescriptions were for tablets of less than 50 mg and 84% for once daily dosage). Prior to August 2001, Horizon's P&T Committee was aware of increased risk of edema and hypertension from Vioxx use—a well-known risk for *all* NSAIDs—but not of increased risk of heart attacks. See Da479-80, 514. At any rate, Merck sidesteps the fact that, in August 2001, it was *denying* any cardiovascular risks from Vioxx use. It is inconceivable that, given available alternatives, payors having information that Vioxx posed a heart attack risk would have continued to pay for Vioxx or, at a minimum, pay for the drug at a preferred tier level.

[68] Defendant's assertion that class members with open formularies "would have continued to cover Vioxx" even after revelations about its safety risks, Db47; see also Db48 n.11, is implausible. See supra at 54 n.67. Even if true, that goes to the measure of *damages*, not liability. Variations in the measure of damages are no bar to class certification. Muise, 371 N.J. Super. at 46; Delgozzo, 266 N.J. Super. at 190. Indeed, as courts have recognized, individual damages questions are *typical* in class actions. E.g., In re McDonnell Douglas Corp. Secs. Litig., 98 F.R.D. 613, 617 (E.D. Mo. 1982) ("The amount of damage is nearly always an individual question and can usually be determined by the application of a mechanical formula").

this into account but found it immaterial because the complaint alleges a "long-term, widespread, and uniform pattern of deception" that "was accomplished by various methods." Given the breadth of such deceptive conduct, Judge Higbee found that notwithstanding any differences in P&T Committees' make-up, operations, or objectives, a classwide causal link can be shown here because "elements of fraud *pervaded every aspect* of Merck's actions in developing and marketing Vioxx." Da66-67 (emphasis added). Thus, the predominance factor is satisfied here because, as Judge Higbee found, "Merck's actions regarding Vioxx from the time the drug was first conceived until the time it was withdrawn from the market constitute[] 'a common core of operative facts.'" Da67 (quoting Varacallo, 332 N.J. Super. at 45). Defendant has not shown that these findings are clearly erroneous.[69]

Next, Defendant argues, disingenuously, that "the mix of information" concerning the risks posed by Vioxx "varied widely," thereby allegedly precluding a finding that common questions predominate. Db42. Merck, however, cites no evidence that *it* provided payors, P&T Committees, health

---

[69] Nor can it. As discussed above, the evidence adduced during class discovery resoundingly confirms the complaint's allegations concerning the scope and uniformity of Defendant's actions. See supra at 6-10.

care providers, or end-users a "mix of information." That is not surprising because the record shows Merck's consistent suppression of information concerning the safety and efficacy of Vioxx.

Unable to point to its own statements to support its "mix of information" theory, Defendant is forced to rely on "articles in the popular press." Db42. Yet even there, it cites only one article pre-dating the launch of Vioxx—when class members would not have already added it to formulary. Essentially, Merck's argument can be distilled down to the indefensible proposition that anytime some of the consumers injured by a defendant's deceptive conduct may have had access to some kernel of truth from alternative sources, their claims cannot be resolved on a classwide basis.

As a general matter, the irony of Defendant's current reliance on articles questioning the safety of Vioxx—in light of its strenuous assertions prior to September 30, 2004 that there were no cardiovascular risks associated with Vioxx and its concerted (and often heavy-handed) efforts to "neutralize" critics within the medical community—simply cannot be overstated.[70]

---

[70] Thus, while citing a 1999 article to suggest that formulary decision-makers were aware of Vioxx's cardiovascular risks (Db42; Da357-58), Defendant ignores the fact that, *after* this article was published, it

Furthermore, whether some class members *may* have had *some* access to information from third parties about the risks posed by Vioxx[71] does not alter the classwide nature of the liability question here——which is whether *Defendant* concealed material facts about the product's safety and efficacy from class members, health care providers, and end-users. Thus, so long as the message to which class members were exposed *from Merck* was materially uniform, the class possesses the requisite cohesion.

Defendant's assertion that the information available to payors "changed over time," Db43, also fails because its statements remained materially consistent,[72] and because

continued to deny that Vioxx carried any such risks and made repeated public representations affirming its safety.

[71] Defendant exaggerates the value of the alternative information that class members allegedly could have balanced against its deceptions. For example, with respect to the late 2000 New England Journal of Medicine article concerning the VIGOR study, Db42, Defendant ignores the fact that the article's main focus was on Vioxx's GI safety, see Da359-67. The article dismissed the imbalance in heart attacks between Vioxx and naproxen as a consequence of the latter's alleged cardioprotective qualities, Da362, an unfounded theory that Merck itself had floated. Also, the article failed to include a discussion of other cardiovascular adverse events and misstated the incidence of heart attacks in the VIGOR trial.

[72] The cases that Defendant cites for its "fluctuation of facts" theory (Db43) are inapposite. In Carroll, the "varying degrees of disclosure" stemmed from the "considerable variation in marketing strategies for each region." 313 N.J. Super. at 505. Here, Merck did not

class certification is not defeated "by fluctuations in the underlying facts over the class period." Steiner v. Equimark Corp., 96 F.R.D. 603, 608 (W.D. Penn. 1983).[73]

### D. Defendant's Cases Are Inapposite

Defendant reaches far afield for caselaw to support its argument that individualized "causation" questions preclude class certification.[74]   Its reliance on Carroll,

---

tailor its message about Vioxx.   The differences in labeling in Rezulin were in the context of personal injury claims based on a failure to warn, not consumer fraud. See 210 F.R.D. at 66. Sikes v. Teleline, Inc., 281 F.3d 1350 (11th Cir. 2002), Martin v. Dahlberg, Inc., 156 F.R.D. 207 (N.D. Cal. 1994), and Rodriquez v. McKinney, 156 F.R.D. 112 (E.D. Pa. 1994), were civil RICO cases.   Those courts held that reliance was an element of the predicate acts of mail, wire, or bank fraud and that, given variations in the misrepresentations, questions concerning individual class members' reliance predominated, see 281 F.3d at 1360-64; 156 F.R.D. at 215; 156 F.R.D. at 116.   In contrast, the CFA has no reliance component.

[73] Accord Laufer, 2005 WL 1869211, at *12 ("Common questions arise from a common nucleus of operative facts' regardless of whether the underlying facts fluctuate over the class period and vary as to individual claimants.") (citing cases; internal quotation marks omitted); Cartiglia v. Johnson & Johnson Co., No. MID-L-2754-01, 2002 WL 1009473, at *10 (Law Div. Apr. 24, 2002) (Da214-29) (same); O'Connor v. Boeing North Am., Inc., 184 F.R.D. 311, 331 (C.D. Cal. 1998) (citing cases); Cohen v. Uniroyal, Inc., 77 F.R.D. 685, 691 (E.D. Pa. 1977).

[74] While citing inapposite cases, Defendant vainly tries to distinguish In re Cadillac and Varacallo by claiming that those cases involved the same or similar misrepresentation to the entire class. Db 45-46.   Yet, here, too, the record shows that Merck conveyed materially uniform information about the safety and efficacy of Vioxx to payors, health care providers, and end-users.   Thus, like Varacallo, this

313 N.J. Super. 488, is misplaced.  See Db36.  Carroll
predates Varacallo, which made plain that the CFA does not
require a showing of reliance.  In any event, Carroll was a
mass media *false advertising* case, which this case is not.
There, the plaintiff cellphone subscribers raised a
hodgepodge of claims pertaining to *both* billing practices
*and* service quality, and they gave different reasons for
having signed for defendant's service and substantially
different explanations as to what information was conveyed
to them before they signed up.  313 N.J. Super. at 491,
503-04.  Based on such a record, "[e]ach plaintiff had a
different interaction with defendant's representatives, and
the ability to prove reliance depend[ed] on circumstances
peculiar to each plaintiff." Id. at 505.

     This case, by contrast, does not involve a mishmash of
challenged practices or products.  Rather, the record bears
out Defendant's materially uniform messages about Vioxx to
payors and health care providers.  It satisfies the
requirement that class plaintiffs must demonstrate that
"the same or similar representations . . . were made to the
entire class." Id. at 502.

     Merck's reliance on Fink is similarly misplaced.  See

---

case involves omissions of material fact common to the
class.  See 332 N.J. Super. at 50.

Db37. Because the claims in Fink, like those in Carroll, were based on false advertising, the trial court held that the plaintiffs had to demonstrate that each class member read one or more of the advertisements. See 365 N.J. Super. at 545. Yet even Fink held that CFA plaintiffs are *not* required to offer direct proof that the entire class relied on a defendant's *omission* of material facts, where the plaintiff establishes that the defendant withheld those material facts for the purpose of inducing the very action the plaintiff pursued. Under such circumstances, a CFA plaintiff is entitled to a presumption of reliance or causation. Id. at 548. Here, the complaint details numerous material omissions, such as Merck's concealment or suppression of information concerning the safety and efficacy of Vioxx, Da111, 113, 115, 117, 122 (Compl. ¶¶ 5, 15, 19-20, 22, 31, 52(a)-(b)), and class discovery confirmed the widespread nature of these material omissions, see supra at 7-10.[75]

---

[75] Similarly, Gross v. Johnson & Johnson-Merck Consumer Pharms. Co., 303 N.J. Super. 336 (Law Div. 1997)(see Db35; PLACb23), was a mass media false advertising case brought by over-the-counter drug purchasers, and the court specifically noted the obstacles to class treatment of those claims. The court reasoned that because the class comprised only individuals who saw and relied on the challenged advertisements, individual questions predominated. Id. at 346, 349-50. At any rate, the trial court in Gross, like that in Fink, wrongly imported a

Oddly, Defendant characterizes In re Rezulin Products Liability Litigation, 210 F.R.D. 61 (S.D.N.Y. 2002), as "most analogous" to this case. Db37. Rezulin, however, was not a decision of a New Jersey court interpreting the CFA, and it involved claims for *personal* injuries (liver and heart toxicity) stemming from use of the drug at issue. Id. at 63-64. Personal injury claims, by their nature, present highly individualized questions of causation and are ordinarily not amenable to class treatment. See, e.g., Kohn v. American Hous. Found., Inc., 178 F.R.D. 536, 543 (D. Colo. 1998). Although the plaintiffs asserted CFA claims, the Rezulin court noted that they were really trying to repackage "a products liability suit as one of consumer fraud." 210 F.R.D. at 67.

Equally inapposite is Folbaum v. Rexall Sundown Inc., No. A-244-02T1 (App. Div. June 3, 2004). Db28; see Da314-25. There, many members of the proposed class could not show ascertainable loss because they, in fact, understood the product's calcium content, as stated in the package's rear label, which, by the plaintiff's admission, was not deceptive. Da316, 320. Thus, the fraud did not occur in every transaction. Da320. Here, Merck's omissions and unconscionable practices were systemic, not isolated.

---

reliance element into the CFA.

Further off point is <u>New Jersey Citizen Action</u>, <u>see</u> PLACb24, which did not even involve a class certification motion.   The court there held that the defendant's statements about its product were non-actionable puffery, 367 <u>N.J. Super.</u> at 13-14, and that the generalized "fraud on the market" theory employed in securities fraud cases could not be used to establish causation under the CFA, <u>id.</u> at 15-16.   This case does not rest on a "fraud on the market" theory.   Plaintiff does not assert that Merck's deceptions inflated the market price of Vioxx.[76]

## E.   Ascertainable Loss Is a Common Question

Finally, Defendant argues that individual questions of class members' "ascertainable loss" preclude a showing of predominance.   Db49-52.   That, too, is meritless.

Courts have defined the CFA's "ascertainable loss" component broadly.[77]   Here, Plaintiff can demonstrate a

---

[76] Also misplaced is Defendant's reliance on <u>Stephenson v. Bell Atlantic Corp.</u>, 177 <u>F.R.D.</u> 279 (D.N.J. 1997) (Db35, 37), where the record did not demonstrate that the defendant had made "the same core of written misrepresentations or omissions" to all, or most, of members of the proposed class.   <u>Id.</u> at 292.   Here, by contrast, the record demonstrates material uniformity in Merck's promotion and marketing of Vioxx.

[77] <u>See</u> <u>Thiedemann v. Mercedes-Benz USA, LLC</u>, 183 <u>N.J.</u> 234, 248 (2005) ("either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle"); <u>Union Ink Co.</u>, 352 <u>N.J. Super.</u> at 646 (ascertainable loss "has been broadly defined as embracing

class-wide "out of pocket" loss by class members or that
class members received "less than what was promised."
Defendant sidesteps the salient fact that it voluntarily
*pulled Vioxx from the market due to the dangers associated
with the drug.* To the extent, then, that class members
paid *any* prescription costs after Vioxx was placed on their
formulary, they suffered an ascertainable loss because they
authorized the purchase of Vioxx without having full
knowledge of its risks and benefits, especially in
comparison to alternative, less expensive NSAIDs. See
Da123 (Compl. ¶¶ 55-56); see also Pa93, Da112 (Compl. ¶
112) (noting disparity between price of Vioxx and other
NSAIDs). Had Merck not suppressed the truth about Vioxx,
payors would not have placed it on formulary in the first
place, would have accorded it less favorable tier
placement, or otherwise would have authorized the purchase
of Vioxx on more favorable terms. Da112, 118, 121 (Compl.
¶¶ 7-9, 33, 43, 45). Variations in class members'
ascertainable losses based on, for example, differences in
formulary tier placement of Vioxx, are merely damages

---

more than a monetary loss"; "'ascertainable loss' occurs
when a consumer receives less than what was promised").

questions that can be addressed through expert proof.[78]

Defendant asserts that each class member must prove "how much it 'otherwise spent'" due to its fraud. Db50.[79] That theory of ascertainable loss is without any sound factual or legal basis. Plaintiff's CFA claim is not based on physical harm suffered by its plan participants. Rather, class members—not their participants—paid all or most of the cost of Vioxx prescriptions. Consequently, payors suffered ascertainable loss by placing Vioxx on formulary after Merck systematically concealed information about the drug's safety and efficacy, resulting in their paying for Vioxx rather than cheaper and safer alternative medications or combinations of medications.[80]

---

[78] See Thiedemann, 183 N.J. at 249 (expert may speak to ascertainable loss); In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 517 (D.N.J. 1997) (at class action trial, court may allow expert witness' testimony regarding aggregation of damages or to show appropriate formula for calculating individual damages), aff'd, 148 F.3d 283 (3d Cir. 1998).

[79] Similarly, the PLAC recycles the argument that Defendant made below—that individual prescription transactions will have to be analyzed to determine which class members' participants received "the benefit of the bargain" for the Vioxx they obtained and which did not. PLACb22; see Pa574.

[80] See Talalai v. Cooper Tire & Rubber Co., 360 N.J. Super. 547, 563 (Law Div. 2001) (where defendant "failed to tell" plaintiffs "the true nature of the product they were buying," plaintiffs "established a legally cognizable injury" under CFA).

Thus, Plaintiff does not have to show that payors' participants failed to benefit from Vioxx or that they suffered cardiovascular injury from taking it.[81]   It need only demonstrate (i) Merck's material omissions or unconscionable marketing practices, (ii) payors' ensuing inclusion of Vioxx on their respective formularies, and (iii) payors' payment of Vioxx prescriptions.

### CONCLUSION

The Court should affirm the trial court's Order.

Dated:     December 1, 2005

Respectfully submitted,

SEEGER WEISS LLP

By: _____
Christopher A. Seeger
David R. Buchanan
550 Broad Street, Suite 920
Newark, NJ    07102
Telephone:   (973) 639-9100
*Attorneys for Plaintiff-Respondent*

---

[81] For this reason, In re Rezulin (PLACb 21), which involved a proposed class of individuals who took Rezulin and their spouses, see 210 F.R.D. at 62, is inapposite.   Plaintiff and class members are not Vioxx end-users.

-65-

*Of Counsel:*

Diogenes P. Kekatos
James A. O'Brien III
Jeffrey S. Grand
SEEGER WEISS LLP
One William Street, 10th Floor
New York, NY 10004-2502
Telephone: (212) 584-0700

John E. Keefe, Jr.
LYNCH KEEFE BARTELS LLC
830 Broad Street
Shrewsbury, NJ 07702
Telephone: (732) 224-9400

Carlene Rhodes Lewis
Shelley Sanford
GOFORTH LEWIS SANFORD LLP
1111 Bagby, Suite 2200
Houston, TX 77071
Telephone: (713) 650-0022