# Supreme Court of New Jersey

### Dkt. No. 59588

---------------------------------------------------------  x
                                               :

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL #68 WELFARE FUND, individually and on behalf of all others similarly situated, | Civil Action |
| | ON APPEAL FROM AN INTERLOCUTORY DECISION OF THE SUPERIOR COURT OF NEW JERSEY, APPELLATE DIVISION, DOCKET NO. A-0450-05T1 |
| Plaintiff-Respondent, | |
| v. | |
| | Sat Below: |
| MERCK & CO., INC., | |
| | HON. STEVEN L. LEFELT |
| Defendant-Appellant. | HON. RUDY B. COLEMAN |
| | HON. GEORGE L. SELTZER |

---------------------------------------------------------  x

---

## PLAINTIFF-RESPONDENT'S SUPPLEMENTAL BRIEF

---

Christopher A. Seeger
David R. Buchanan
SEEGER WEISS LLP
550 Broad Street, Suite 920
Newark, NJ 07102-4573
Telephone: (973) 639-9100

John E. Keefe, Jr.
KEEFE BARTELS
830 Broad Street
Shrewsbury, NJ 07702
Telephone: (732) 224-9400

*(Additional counsel on signature page of brief)*

*Attorneys for Plaintiff-Respondent International Union of Operating Engineers Local #68 Welfare Fund*

**TABLE OF CONTENTS**

                                                                    **Page**

Preliminary Statement......................................1

Issue Presented...........................................4

Procedural History........................................4

Statement of Facts........................................4

ARGUMENT ——- THE COURT SHOULD AFFIRM THE DECISION BELOW...11

I.    Standard of Review ................................11

II.   The CFA Properly Governs All Class
      Members' Claims ...................................14

      A.    Merck Misconstrues New Jersey
            Choice-of-Law Precedent ....................19

            1.    The Interests of Interstate Comity Favor
                  Application of the CFA .................20

            2.    The Interests Underlying Tort Law,
                  Deterrence and Compensation, Favor the
                  CFA's Application ......................24

                  a. Deterrence .........................24

                  b. Compensation .......................30

            3.    The Competing Interests of the States
                  Favor the CFA's Application ............36

            4.    New Jersey's Extensive Qualitative
                  Contacts Compel Application of the CFA ..37

      B.    Defendant's Constitutional Arguments Are
            Hollow .....................................39

      C.    Merck Misconstrues Relevant Precedent ........40

      D.    Merck's Policy Arguments Are Meritless .......42

III. Questions Common to All Class Members
     Predominate .................................... 42

     A.   Merck Distorts the CFA's Elements ........... 42

     B.   The Liability Inquiry Will Focus on Merck's
          Conduct, Not That of Individual Class
          Members ..................................... 49

     C.   Merck Relies on Inapposite False Advertising
          Cases ....................................... 53

     D.   This Case Involves No Fraud-on-the-Market
          Theory ...................................... 57

     E.   Merck Misconstrues the Ascertainable Loss
          Element ..................................... 59

Conclusion............................................. 64

## TABLE OF AUTHORITIES

### FEDERAL CASES

**Page(s)**

Allstate Insurance Co. v. Hague, 449 U.S. 302, 101 S. Ct. 633, 66 L. Ed. 2d 521 (1981)................................. 40

Basic Inc. v. Levinson, 485 U.S. 224 (1988) .................. 57

Bober v. GlaxoWellcome PLC, 246 F.3d 934 (7th Cir. 2001) ...... 28

Boughton v. Cotter Corp., 65 F.3d 823 (10th Cir. 1995) ....... 11

Boyes v. Greenwich Boat Works, Inc., 27 F. Supp. 2d 543 (D.N.J. 1998)..................................... 18, 26, 30

Cohen v. Uniroyal, Inc., 77 F.R.D. 685 (E.D. Pa. 1977) ....... 48

Cook v. Rockwell International Corp., 273 F. Supp. 2d 1175 (D. Colo. 2003).......................................... 63

Desiano v. Warner-Lambert Co., 326 F.3d 339 (2d Cir. 2003) .... 60

Fresh Start Industrial, Inc. v. ATX Telecommunications Services, 295 F. Supp. 2d 521 (E.D. Pa. 2003)........... 24, 41

Garcia v. Wyeth-Ayerst Laboratories, 385 F.3d 961 (6th Cir. 2004)......................................... 29

Gunter v. Ridgewood Energy Corp., 164 F.R.D. 391 (D.N.J. 1996)......................................... 12

Haley v. Medtronic, Inc., 169 F.R.D. 643 (C.D. Cal. 1996) ..... 53

Heindel v. Pfizer, Inc., 381 F. Supp. 2d 364 (D.N.J. 2004)..................................... 20, 21, 41

Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996) ....... 63

In re Air Disaster Near Honolulu, 792 F. Supp. 1541 (N.D. Cal. 1990)......................................... 56

In re Apple Computer Securities Litigation, 886 F.2d 1109 (9th Cir. 1989)......................................... 47

In re Badger Mountain Irrigation District Securities
    Litigation, 143 F.R.D. 693 (W.D. Wash. 1992)............... 17

In re Bridgestone/Firestone, Inc., 288 F.3d 1012
    (7th Cir. 2002).......................................... 15

In re Consolidated Parlodel Litigation, 22 F. Supp. 2d 320
    (D.N.J. 1998)............................................ 16

In re Ford Motor Co. Ignition Switch Products Liability
    Litigation, 174 F.R.D. 332 (D.N.J. 1997).................. 16

In re Linerboard Antitrust Litigation, 305 F.3d 145
    (3d Cir. 2002)........................................... 53

In re McDonnell Douglas Corp. Securities Litigation, 98
    F.R.D. 613 (E.D. Mo. 1982)............................... 52

In re Mercedes-Benz Antitrust Litigation, 213 F.R.D. 180
    (D.N.J. 2003)............................................ 53

In re Orfa Securities Litigation, 654 F. Supp. 1449
    (D.N.J. 1987)............................................ 17

In re Prudential Insurance Co. of America Sales Practices
    Litigation, 962 F. Supp. 450 (D.N.J. 1997), aff'd, 148
    F.3d 283 (3d Cir. 1998).................................. 63

In re Rezulin Products Liability Litigation,
    210 F.R.D. 61 (S.D.N.Y. 2002)......................... 16, 48

In re School Asbestos Litigation, 789 F.2d 996
    (3d Cir. 1986)........................................... 17

In re Select Comfort Corp. Securities Litigation,
    202 F.R.D. 598 (D. Minn. 2001)........................... 53

In re Telectronics Pacing System, Inc., 164 F. Supp. 2d 222
    (S.D. Ohio 1995)......................................... 17

In re Warfarin Sodium Antitrust Litigation, 391 F.3d 516
    (3d Cir. 2004)........................................... 60

Kohn v. American Housing Foundation, Inc., 178 F.R.D. 536
    (D. Colo. 1998).......................................... 56

Martin v. Dahlberg, Inc., 156 F.R.D. 207 (N.D. Cal. 1994) ..... 48

O'Connor v. Boeing North America, Inc., 184 F.R.D. 311
     (C.D. Cal. 1998) .......................................... 48

Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 109 S. Ct.
     2965, 86 L. Ed. 2d 628 (1985) .............................. 39

Rodriguez v. McKinney, 156 F.R.D. 112 (E.D. Pa. 1994) ........ 48

Sikes v. Teleline, Inc., 281 F.3d 1350 (11th Cir. 2002) ....... 48

Steiner v. Equimark Corp., 96 F.R.D. 603 (W.D. Pa. 1983) ...... 48

Talalai v. Cooper Tire & Rubber Co., No. 00CV5694AJL,
     2001 WL 1877265 (D.N.J. Jan. 8, 2001) .................... 18

Weil v. Long Island Savings Bank, FSB, 200 F.R.D. 164
     (E.D.N.Y. 2001) ........................................... 53

## STATE CASES

Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218 (1998) ........ 19

Almog v. Israel Travel Advisory Service, Inc.,
     298 N.J. Super. 145 (App. Div. 1997) ........... 24, 35, 36, 41

Avery v. State Farm Mutual Automobile Insurance Co.,
     835 N.E.2d 801 (Ill. 2005) ................................ 16

Barbara's Sales, Inc. v. Intel Corp., ___ N.E.2d ___,
     2006 WL 2105656 (Ill. App. Ct. July 25, 2006) ....... 17, passim

Bayside Chrysler Plymouth Jeep Eagle, Inc. v. Ma, No. A-
     3575-04T3, 2006 WL 1449783 (N.J. App. Div. May 26, 2006).... 43

Bell v. Farmers Insurance Exchange, 9 Cal. Rptr. 3d 544
     (Ct. App. 2004) .......................................... 63

Butkera v. Hudson River Sloop "Clearwater," Inc.,
     300 N.J. Super. 550 (App. Div. 1997) ............... 24, 35, 41

Carroll v. Cellco Partnership, 313 N.J. Super. 488
     (App. Div. 1998) .................................... 48, 53-55

Cheminova America Corp. v. Corker, 779 So. 2d 1175
     (Ala. 2000) .............................................. 17

Clothesrigger, Inc. v. GTE Corp., 236 Cal. Rptr. 2d 605
  (Ct. App. 1987) .......................................... 17

Cox v. Sears Roebuck & Co., 138 N.J. 2 (1994) . 23, 26, 27, 31, 44

D'Agostino v. Johnson & Johnson, Inc., 133 N.J. 516
  (1993) ................................................ 24, 36

Daaleman v. ElizabethTown Gas Co., 142 N.J. Super. 531
  (Law Div. 1976), aff'd as modified, 150 N.J. Super. 78
  (App. Div. 1977), rev'd, 77 N.J. 267 (1978) ............. 26, 31

Dal Ponte v. American Mortgage Express Corp., No. 04-2152
  (JEI), 2006 WL 2403982 (D.N.J. Aug. 17, 2006) ....... 23, 27, 35

Deemer v. Silk City Textile Machine Co., 193 N.J. Super.
  643 (App. Div. 1984) ................................... 40, 41

Delgozzo v. Kenny, 266 N.J. Super. 169 (App. Div. 1993) ... 13, 52

Erny v. Estate of Merola, 171 N.J. 86 (2002) ......... 20, passim

Fink v. Ricoh Corp., 365 N.J. Super. 520 (Law Div. 2003) .. 16, 55

Freeman v. Eastman Chemical Co., 172 S.W.3d 512
  (Tenn. 2005) .............................................. 30

Fu v. Fu, 160 N.J. 108 (1999) ........................ 21, passim

Furst v. Einstein Moomjy, Inc., 182 N.J. 1 (2004) . 23, 25, 26, 31

Gantes v. Kason Corp., 145 N.J. 478
  (1996) ............................... 24, 25, 29, 31, 34, 36

Gennari v. Weichert Co. Realtors, 148 N.J. 582 (1997) ..... 23, 43

Goshen v. Mutual Life Insurance Co., 774 N.E.2d 1190
  (N.Y. 2002) .............................................. 16

Gross v. Johnson & Johnson-Merck Consumer Pharmaceuticals
  Co., 303 N.J. Super. 336 (Law Div. 1997) ................... 56

Grubbs v. Chapman, 376 N.J. Super. 420 (App. Div. 2005) ....... 27

Haggerty v. Cedeno, 279 N.J. Super. 607 (App. Div. 1995) ...... 35

Huffmaster v. Robinson, J.A., 221 N.J. Super. 315
    (Law Div. 1986)....................................... 24, 26

Hundred East Credit Corp. v. Eric Schuster,
    212 N.J. Super. 350 (App. Div. 1986)................... 12, 28

Iliadis v. Wal-Mart Stores, Inc., 387 N.J. Super. 405
    (App. Div. 2006)........................................... 13

In re Activision Securities Litigation, No. C-83-4639,
    1985 WL 5827 (N.D. Cal. Dec. 2, 1985)...................... 40

In re Cadillac V8-6-4 Class Action, 93 N.J. 412 (1983) .... 11, 51

In re Pennsylvania Baycol Third-Party Payor Litigation,
    No. 1874 Sept. Term 2001, 2005 WL 852135
    (Pa. Ct. Comm. Pl. Apr. 4, 2005) ......................... 53

In re St. Jude Medical, Inc., No. MDL No. 01-1396,
    2006 WL 2943154 (D. Minn. Oct. 13, 2006)........... 17, 28, 36

Instructional System, Inc. v. Computer Curriculum Corp.,
    130 N.J. 324 (1992)....................................... 40

Kaufman v. i-Stat Corp., 165 N.J. 94 (2000) .................. 58

Kleczek v. Jorgenson, 767 N.E.2d 913 (Ill. App. Ct. 2002) ..... 28

Kropinski v. Johnson & Johnson, No. A-3979-97-T1, 1999 WL
    33603132 (N.J. App. Div. Jan. 7, 1999)..................... 17

Kugler v. Haitian Tours, Inc., 120 N.J. Super. 260
    (Chan. Div. 1972)..................................... 18, 30

L'Esperance v. Benware, 830 A.2d 675 (Vt. 2003) .............. 28

Laufer v. U.S. Life Insurance Co., No. BER-L-9082-04,
    2005 WL 1869211 (N.J. Law Div. Aug. 8, 2005),
    aff'd, 385 N.J. Super. 172 (App. Div. 2006)............ 16, 62

Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383 (1999) ..... 11

Lemelledo v. Beneficial Management Corp. of America,
    150 N.J. 255 (1997)................................... 11, 32

Lettenmaier v. Lube Connection, Inc., 162 N.J. 134
    (1999) ............................................. 23, 26, 31

Lobo Exploration Co. v. Amoco Prod. Co., 991 P.2d 1048
    (Okla. Ct. Civ. App. 1999) ................................. 17

Margulies v. Chase Manhattan Mortgage Corp., No. A-4087-03-
    T3, 2005 WL 2923580 (N.J. App. Div. Nov. 7, 2005) ........... 20

Marinelli v. K-Mart Corp., 318 N.J. Super. 554
    (App. Div. 1999), aff'd o.b., 162 N.J. 516 (2000) ........... 31

Muise v. GPU, Inc., 371 N.J. Super. 13
    (App. Div. 2004) ................................... 11, 52, 63

Muhammad v. County Bank of Rehoboth Beach, Delaware,
    ___ N.J. ___, 2006 WL 2273448 (N.J. Aug. 9, 2006) .......... 12

New Jersey Citizen Action v. Schering-Plough Corp.,
    367 N.J. Super. 8 (App. Div. 2003) ..................... 43, 58

New Mea Construction Corp. v. Harper, 203 N.J. Super. 465
    (App. Div. 1982) ........................................... 23

Nieder v. Royal Indemnity Insurance Co., 62 N.J. 229 (1973) ... 19

Northwest Mortgage, Inc. v. Superior Court, 85 Cal. Rptr.
    2d 18 (Ct. App. 1999) ...................................... 17

Olive v. Graceland, 61 N.J. 182 (1972) ........................ 13

Perez v. Wyeth Laboratories, Inc., 161 N.J. 1 (1999) .......... 29

Peterson v. BASF Corp., 618 N.W.2d 821
    (Minn. Ct. App. 2000) .............................. 17, 18, 60

Pfau v. Trent Aluminum Co., 55 N.J. 511 (1970) .... 16, 21, 22, 28

Pfizer, Inc. v. Employers Insurance of Wausau, 154 N.J. 187
    (1998) ..................................................... 21

Pratt v. Panasonic Consumer Electrics Co., No. L-48-05,
    2006 WL 1933660 (N.J. Law Div. July 12, 2006) .............. 34

Rowe v. Hoffman La-Roche, 383 N.J. Super. 442
    (App. Div. 2006) ............................... 24, 35, 36, 41

Skeer v. EMK Motors, 187 N.J. Super. 465 (App. Div. 1982) ..... 26

State Farm Mutual Automobile Insurance Co. v. Simmons'
    Estate, 84 N.J. 28 (1980) .................................... 21

Talalai v. Cooper Tire & Rubber Co., 360 N.J. Super. 547
    (Law Div. 2001) ........................................ 18, 60

Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234 (2005) . 42, 61

Tracker Marine v. Ogle, 108 S.W.3d 349 (Tex. Ct. App. 2003) ... 20

Union Ink Co., v. AT&T Corp., 352 N.J. Super. 617
    (App. Div. 2002) .......................................... 43

Vanderbilt Mortgage & Finance, Inc. v. Posey,
    146 S.W.3d 302 (Tex. Ct. App. 2004) ................. 11, 20, 33

Varacallo v. Mass. Mutual Life Insurance Co.,
    332 N.J. Super. 31 (App. Div. 2000) ................. 18, passim

Washkoviak v. Student Loan Marketing Association,
    900 A.2d 168 (D.C. Ct. App. 2006) .......................... 33

West Morris Pediatrics, P.A. v. Henry Schein, Inc.,
    385 N.J. Super. 581 (Law Div. 2004) ....................... 16

Zorba Contractors, Inc. v. Housing Authority,
    362 N.J. Super. 124 (App. Div. 2003) ...................... 43

## STATUTES AND RULES

New Jersey Rules of Court, R. 1:36-3 ......................... 20

New Jersey Rules of Court, R. 2:6-2(a)(1) .................... 19

New Jersey Statutes Annotated, N.J.S.A. 56:8-2 ............... 57

New Jersey Statutes Annotated, N.J.S.A. 56:8-19 .......... 30, 42

## TREATISES

3 Alba Conte and Herbert B. Newberg, Newberg on Class
    Actions (4th ed. 2002) ..................................... 63

Restatement (Second) of Conflict of Laws (1971) ....... 22, passim

**MISCELANEOUS**

Bruce Japsen, Merck's Vioxx lawyer looks for another win,
   Chi. Trib., Aug. 4, 2006, available at 2006 WLNR 13670683.. 13

## PRELIMINARY STATEMENT

Plaintiff respectfully submits this brief in response to that of Defendant Merck & Co., Inc. ("Defendant" or "Merck"). Merck challenges the decision of the Appellate Division (Lefelt, Coleman, and Seltzer, JJ.A.D.), which unanimously affirmed the Order of the Honorable Carol E. Higbee, certifying this suit on behalf of third-party payor Vioxx purchasers ("payors") as a class action.

Merck's attacks on the decisions below are without merit. As a threshold matter, Merck improperly raises a slew of arguments for the first time, foremost among them a revamped choice-of-law argument that misconstrues New Jersey's governmental interest test. Among other things, by claiming that, in a choice-of-law selection, the place where misrepresentations were received mechanically controls and that the New Jersey Consumer Fraud Act ("CFA") is categorically unavailable to non-domiciliaries injured by a New Jersey corporation whose relevant conduct emanated from this State, Merck continues to advocate an obsolete lex loci delicti rule disguised as a governmental interest analysis.

Merck simply ignores settled New Jersey choice-of-law precedent that the state with the "greatest interest" is the state with (i) the superior deterrence and compensation

interests and (ii) the superior qualitative contacts with the litigation.   Merck presents a myopic analysis of the deterrence and compensation interests that underlie consumer fraud laws.   It misreads or ignores controlling cases, relies on inapposite product liability laws, and disregards New Jersey's qualitative contacts.   In contrast, the courts below properly addressed the governmental interest factors and noted New Jersey's overriding qualitative contacts with this litigation, including the activities relating to the marketing and promotion of Vioxx that were centered in this State. Merck never refuted any of this evidence showing that New Jersey is the undeniable center of gravity of this dispute.

Merck's argument that the liability inquiry will focus on how individual payors "reacted" to its concealment of information about Vioxx represents its latest effort to graft onto the CFA a reliance element, which would preclude the statute from ever applying to groups of consumers injured by the same misconduct.   Here, the Appellate Division properly found that the causal nexus between Merck's conduct and payors' injuries is provable classwide because no payor would have been isolated from Merck's extensive efforts to market Vioxx.   Payors routinely consider information supplied by drug-makers in making formulary determinations and Merck's

promotion of Vioxx was far-reaching and materially uniform.

As for its claim that the Appellate Division embraced a fraud-on-the-market theory, Merck misconstrues the theory of Plaintiff's case. Plaintiff has never alleged that Merck's suppression of material information about the safety and efficacy of Vioxx resulted in a higher market price for the drug. Prescription drugs do not trade like stocks. Rather, Merck's deceptions facilitated the placement of Vioxx on payors' formularies, resulting in their paying for Vioxx in place of cheaper, equally efficacious, and safer alternatives. This fact of injury—which Merck confuses with the extent of injury, a purely damages question amenable to formulaic proof, as the Appellate Division noted—is provable classwide because the systemic, widespread fraud in the marketing and promotion of Vioxx affected all payors' formulary determinations.

In sum, Merck's hyperbolic description of the decisions below as unprecedented cannot mask either the common nucleus of operative fact surrounding its promotion and marketing of Vioxx to all payors or New Jersey's paramount interest in the application of its law to this dispute. Because the confluence of these two salient considerations makes class adjudication of this action eminently manageable, the Court should affirm the decision below.

## ISSUE PRESENTED

Whether the Appellate Division erred in its thoroughly-reasoned opinion in holding that Judge Higbee did not abuse her considerable discretion in certifying the class.

## PROCEDURAL HISTORY

Plaintiff commenced this action in October 2003, Da1, and in November 2004, moved to certify it as a class action. Following extensive discovery, briefing, and a hearing, Judge Higbee issued a 70-page opinion on July 29, 2005, granting Plaintiff's motion. Da18-88. The Appellate Division granted Defendant's motion for leave to appeal Judge Higbee's ruling and, on March 31, 2006, unanimously affirmed it. Da89-130.

After the Appellate Division denied, on April 26, 2006, Defendant's motion for reconsideration of its decision, Defendant moved this Court for leave to appeal, which it granted on July 19, 2006. On September 19, 2006, the Court granted Defendant's motion for supplemental briefing.

## STATEMENT OF FACTS

When drug benefits plan members are prescribed a drug by their physician, payors pay all or part of the cost. Da116-17. The share of a drug's cost that the payor pays is determined by the drug's status on the payor's "formulary," a list of drugs that the plan will pay for. Da7. Plaintiff is

-4-

a payor organized and operating in New Jersey that provides drug coverage to its members. Da1, 133-34.

Given their limited resources, payors commonly employ outside administrators, such as a pharmacy benefits manager ("PBM") or a Managed Care Organization ("MCO") to administer their benefit plans. The payor, however, ultimately pays the drug costs, in whole or in part, for its plan participants. Pa483-84 (Kelly Cert. ¶¶ 10-12); Da142 (Kolassa Cert. ¶ 12), 8 (Compl. ¶ 29). The formulary determination is typically made by a Pharmacy and Therapeutics ("P&T") Committee, composed of healthcare professionals. Pa484-85 (Kelly Cert. ¶ 15).

In May 1999, Merck released Vioxx, which is among a class of pain relievers known as non-steroidal anti-inflammatory drugs ("NSAIDs").[1] Facing the expiration of patents on some of its most successful drugs and competition from other Cox-2 inhibitor drugs, Pa27-35, 43; see Pa48, Defendant pushed Vioxx—and justified the up to seven-fold disparity in its price over other NSAIDs—by claiming that it possessed the anti-inflammatory and analgesic properties of other NSAIDs

---

[1] Specifically, Vioxx is a Cox-2 specific inhibitor. The Cox-2 enzyme is believed to directly work at sites of inflammation in the body. Traditional NSAIDs inhibit both Cox-1 and Cox-2 enzymes. Because the Cox-1 enzyme is believed to have a gastrointestinal ("GI") protective effect, by attacking the Cox-1 enzyme, traditional NSAIDs may cause ulcers and other GI problems. Pa188-92.

without their GI risks, and was thus more cost-effective, despite its significantly higher price.[2]  Pa93, 103-06, 112-13; Da3-4 (Compl. ¶¶ 10-13).[3]  Defendant made such claims, despite knowledge that the asserted economic benefit of Vioxx was lacking in real world use.[4]

Because payors pay for most prescription drugs, Merck

---

[2]  Thus, Merck's sales pitch for Vioxx assumed that patients taking the drug would be spared the expense of treating GI disorders that sometimes occur in patients who regularly take NSAIDs.   Consequently, the higher cost of Vioxx would be offset by reduced medical expenses in treating GI side effects.   Even if true, that "GI benefit" claim ignored the medical costs incurred to treat cardiovascular side effects (e.g., heart attack, stroke, hypertension, and edema) posed by Vioxx use.  See infra at 8-10 & nn.9-12.

[3]  Pa3, 18-22, 41, 71-79; Da113 (Compl. ¶ 13); see also Pa53 ("Publicize/highlight the economic value of VIOXX to convince payors of the benefits of using VIOXX over NSAIDs."), 55 ("plans are in place" to use data "to convince payors . . . that Coxib use is cost effective"; "[a] broad mix of programs have been designed worldwide to . . . build a case that the use of Coxibs instead of traditional NSAIDs is cost-effective despite the higher out of pocket costs"), 297-98.

[4]  Significantly, Merck's claims about the "GI benefit" of Vioxx failed to take into account that the majority of Vioxx users would be of an advanced age and be taking low-dose aspirin to protect against heart attacks and strokes.   Indeed, long before it marketed Vioxx, Merck anticipated that concomitant use of Vioxx and low-dose aspirin ("ASA") would eviscerate the purported GI benefit of Vioxx, but knew that the alternative (use of Vioxx without aspirin) was a greater risk of cardiovascular events.   Pa36 ("Low-Dose Aspirin—I HEAR YOU! This is a no win situation!   The relative risk of even low dose aspirin may be as high as 2-4 fold.   Yet, the possibility of increased CV [cardiovascular] events is of great concern"), 37 ("real world is everyone is on it [low-dose aspirin]").

knew that achieving formulary status[5] was crucial to Vioxx's success.[6]   So it used both direct-to-consumer advertising and targeting of physicians—including a massive direct-to-consumer advertising blitz to induce members of the public to request Vioxx and the addition of at least 700 new sales representatives to its team to launch a massive sampling program to physicians—to fuel demand and force "powerful buyers" to add Vioxx to their formularies.[7]   Merck knew that, faced with strong demand for a drug by consumers and health care providers, payors would be compelled to add it to their formularies.[8]

---

[5] Formularies are commonly tiered, with certain drugs in a given class treated as "preferred" (i.e., requiring little or no co-payment from plan participants, Da7 (Compl. ¶ 26), 144-45 (Kolassa Cert. ¶ 17)); see Pa488 (Kelly Cert. ¶ 25).   Thus, achieving preferred status on a payor's formulary is optimal.

[6] Pa3, 48 ("Vioxx Managed Care Objectives")("[a]chieve formulary status/access for Vioxx equal or better than Celebrex and [other] branded NSAIDs"), 193 (MCOs "are huge buyers who can move market share"), 294 ("key challenge was to get VIOXX placed into MCO formularies"); Da8-9 (Compl. ¶¶ 30-32).

[7] Pa3, 7, 11, 13, 25, 98-117, 296-98 ("Create Need for VIOXX"), 436-37 (Kolassa Tr. 5:20-7:2), Da6 (Compl. ¶ 23).

[8] Pa3 ("The ground swell of physician demand that will be created by our representatives will be the most important factor to ensure that every managed care organization provides access for Vioxx."), 7 (report listing "Behavioral Objective" to have consumers "[a]sk for Vioxx by name," and noting market research that "Vioxx advertising more likely to motivate consumers to request Vioxx by name"), 9, 11 (presentation on

The strategy worked. Merck turned Vioxx into a blockbuster drug, achieving more than $2 billion annually in Vioxx sales and capturing nearly a quarter of the NSAID market. Da9 (Compl. ¶ 34).

Both before and during the time that it marketed Vioxx, however, Merck knew about risks of cardiovascular complications stemming from the drug's use—specifically, that Vioxx inhibits the production of prostacyclin, a hormone-like substance that dilates blood vessels and reduces blood clotting—and it overstated Vioxx's GI safety benefits. Further, Defendant failed to disclose the potential for Cox-2 specific inhibition to cause or accelerate heart disease, i.e., causing plaque rupture or accelerating atherosclerosis.[9] Disturbingly, even after the drug was on the market, Defendant delayed disclosure of critical safety information learned in its Vioxx clinical trials—namely, that use of the drug had

---

"[l]everaging the consumer" through direct-to-consumer marketing campaign; stating need to "develop[] . . . tactical plan which [would] bring[] together the physician and consumer to ensure Rx for Vioxx").

[9] E.g., Pa235 (May 1998 Merck Scientific Bd. of Advisors, Programmatic Review), 245 ("most of prostacyclin production comes from COX-2"), 247, 301-03 (1998 internal analysis demonstrating statistically-significant increase in cardiovascular events in pre-approval Vioxx clinical trials), 309-13 (2000 internal analysis demonstrating increased risk of myocardial infarction across entire Vioxx clinical program).

been associated with a nearly three-fold increase in death.[10]

Merck employed a broad and encompassing scheme to conceal information about those risks. It designed clinical studies to mask the association between Vioxx use and cardiovascular risks (such as by excluding "high risk" patients); avoided conducting cardiovascular safety studies altogether, lest they confirm that link; issued or sanctioned articles and publications by employees and consultants that both omitted or misstated material safety information and advanced the "company line"; delayed release of information from clinical trials showing that use of Vioxx had been associated with a nearly three-fold increase in death; floated a theory—after one large clinical study showed a more than five-fold increase in heart attacks for Vioxx users as compared to patients taking a traditional NSAID, naproxen—that the heart attack disparity was due to the "cardioprotective" effect of naproxen—despite a lack of support for that theory and against its own expert consultants' advice; and sought to intimidate, discredit, silence, or otherwise "neutralize" those scientists, academics, and professionals who questioned

---

[10] Pa411, 413 (mortality frequency), 414, 416.

the safety of Vioxx.[11]

Defendant's campaign of deception led to a formal warning from the Food and Drug Administration ("FDA") in September 2001, wherein the FDA concluded that Merck's promotional campaign for Vioxx raised "significant public health and safety concerns."[12]

Notably, none of the materials provided to payors warned of Vioxx's cardiovascular risks.[13] Not until the end of September 2004 did Merck cease denying the linkage between Vioxx and serious cardiovascular events, withdrawing Vioxx from the worldwide market after yet another clinical trial showed increased risk of heart attack and stroke to those taking the drug. Pa208-09.

---

[11] Pa36 ("excluding [from study] high risk CV patients," such as those who have already had a heart attack, coronary artery bypass, or angioplasty, "may decrease the CV event rate so that a difference between the two groups would not be evident"), 37, 39, 64-95, 120, 122, 124, 126, 128, 132, 134 (sponsored article promoting naproxen cardioprotective effect theory), 143-48, 151-54, 156-57, 160-61, 164-65, 167-70, 172-73, 197-98, 200-07, 237-43, 245, 247, 249, 252, 255, 258, 272-74, 303, 306, 307, 310, 312-13, 400 (need to "reduce the emphasis" on heart attacks), 402-10, 411-16, 418, 738-65 (Merck report, "Physicians to Neutralize").

[12] Pa181; see Pa180-87; see also Pa45-47 (Dec. 1999 FDA warning letter, addressing Merck's "false and misleading . . . misrepresentations of Vioxx's safety profile").

[13] E.g., Pa322-97 (2002 Vioxx Formulary Compendium, distributed to formulary decision-makers, including product label, clinical trial summaries, and published articles).

Plaintiff brought this suit on its behalf and on behalf of all payors in the United States to recover damages stemming from Defendant's fraud—namely, the inclusion of Vioxx on their formularies and the resulting payment of Vioxx prescriptions for their participants in place of alternative, less expensive medications.  Da1-15.

## ARGUMENT

## THE COURT SHOULD AFFIRM THE DECISION BELOW

### I.  Standard of Review

A trial court's decision to certify a class is reviewed for an abuse of discretion.  In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 436 (1983); Muise v. GPU, Inc., 371 N.J. Super. 13, 29, 31 (App. Div. 2004).  As the Appellate Division noted, "Judge Higbee's decisions certifying the nationwide class of plaintiffs and finding that common issues of law and fact predominate are reviewed on this basis."  Da96 (citing In re Cadillac, 93 N.J. at 436-39).[14]

---

[14] Merck asserts that this appeal concerns only "two key legal rulings" to which only a de novo standard of review applies. Defendant's Supplemental Brief ("Dsb") 7.  Judge Higbee, however, made numerous fact-intensive determinations, such as those relating to the relevant contacts and her consideration of payors' decision-making in assessing whether liability can be resolved classwide.  Those determinations are therefore entitled to deference.  See Boughton v. Cotter Corp., 65 F.3d 823, 827-28 (10th Cir. 1995) (abuse of discretion standard governs review of predominance determination because it is "primarily a factual one with which a district court generally

"[T]his Court has instructed that '"the class action rule should be construed liberally in a case involving allegations of consumer fraud.'" Muhammad v. County Bank of Rehoboth Beach, Del., ___ N.J. ___, 2006 WL 2273448, at *7 (N.J. Aug. 9, 2006) (quoting Strawn v. Canuso, 140 N.J. 43, 68 (1995) (in turn quoting In re Cadillac, 93 N.J. at 435)); accord Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 264 (1997) ("The language of the CFA evinces a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud.").[15]

---

has a greater familiarity and expertise than does a court of appeals") (citing cases; internal quotation marks omitted); Vanderbilt Mortg. & Fin., Inc. v. Posey, 146 S.W.3d 302, 313 (Tex. Ct. App. 2004) ("[T]he determination of the state contacts to be considered involves a factual inquiry which requires deference to the trial court's determination.") (citing cases); see generally Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 398 (1999) ("A trial court's findings are entitled to great deference and will be overturned only if the trial court abuses that discretion."). Review is de novo only as to Judge Higbee's conclusions that are purely of law. Id.

[15] Merck's claim that liberal construction of the CFA is inappropriate here because this is not a "small damages" case, Dsb2, 37 n.10, was never raised below. Hence that argument is waived. See infra at 19 & n.21. In any event, courts have rejected the suggestion that the CFA is meant to protect only "small" individual consumers, e.g., Hundred East Credit Corp. v. Eric Schuster, 212 N.J. Super. 350, 355-57 (App. Div. 1986), and no case has ever held that the CFA, a remedial statute, is to be applied parsimoniously where the injured party is not an individual. That aside, not only is Plaintiff not a "major corporate entit[y]," Dsb37 n.10, but the reality is that few payors have the wherewithal to bring costly, protracted suits against a well-financed corporate defendant

Moreover, a class certification motion should not be denied based on the complaint's merits.  See Olive v. Graceland, 61 N.J. 182, 189 (1972).  Rather, "[t]he court is bound to take the substantive allegations of the complaint as true," Delgozzo v. Kenny, 266 N.J. Super. 169, 181 (App. Div. 1993) (citation and internal quotation marks omitted), and to afford a plaintiff "'every favorable view' of [the] complaint and the record." Iliadis v. Wal-Mart Stores, Inc., 387 N.J. Super. 405, 416 (App. Div. 2006) (citing cases).  Therefore, "a class action 'should be permitted unless there is a clear showing that it is inappropriate or improper.'" Delgozzo, 266 N.J. Super. at 180 (citation omitted; emphasis added).

---

such as Merck, which has amassed overwhelming resources to fight a war of attrition in its Vioxx-related litigation. E.g., Bruce Japsen, Merck's Vioxx lawyer looks for another win, Chi. Trib., Aug. 4, 2006, available at 2006 WLNR 13670683 ("The Merck litigation is different in that the company has vowed to challenge plaintiff allegations on a case-by-case basis.  Merck has set aside almost $1 billion to fight the cases.").  Even if certain payors were undeterred by such a lopsided playing field, Judge Higbee found that a multitude of separate payor suits congesting courts' dockets nationwide would not be a superior method of adjudicating this dispute given the common core of operative facts, Da85, and Merck has not shown that finding to be clearly erroneous.  See Gunter v. Ridgewood Energy Corp., 164 F.R.D. 391, 400 (D.N.J. 1996) (even though plaintiffs had incentive to sue individually, class treatment superior given size of class and "common nucleus of questions concerning the alleged fraud of the defendants [that was] shared by all members of the class").

## II.   The CFA Properly Governs All Class Members' Claims

No matter how cleverly it has repackaged them, Merck's choice-of-law arguments continue to boil down to the anomalous proposition that other jurisdictions' laws should apply here, notwithstanding that Merck is being sued in its home state and the claims stem from conduct that principally occurred in New Jersey.    None of the cases that Merck cites involved an analogous situation, and in none of them did the court perform the exhaustive and rigorous analysis that Judge Higbee, Da46-82, and Plaintiff, Pa617-724, conducted here, and which the Appellate Division thoroughly scrutinized in affirming her decision, Da109-29.

Merck's underlying assumption is that a multitude of individual suits (or 50 separate statewide classes) on the same issue would be a superior method of adjudicating the various payors' claims.    On this record, that conclusion is untenable.    As discussed below, given the extensive qualitative New Jersey contacts here that implicate the policies underlying the CFA—which is, on balance, perhaps the strongest statutory consumer fraud scheme in the country— Merck's vacuous arguments fail.    At bottom, Merck improperly asks this Court to reweigh both choice-of-law factors and facts and substitute its judgment for that of Judge Higbee.

Specifically, Merck below failed to apply the two-pronged governmental interest analysis.    It argued that the CFA should not apply based on a choice-of-law rule that resembled a

-14-

hybrid of the long-abandoned _lex loci delicti_ rule and solely the first prong of the governmental interest analysis, _i.e._, halting the inquiry based only on the existence of conflicts among the laws of states where class members were injured, and avoiding the second prong's required determination as to which state has the "greatest interest."  See Pa551-59.

Merck now cloaks these same arguments in "governmental interest analysis" garb, but it does not genuinely perform such an analysis.  It adds to its presentation several points never raised below.  See _infra_ at 19 & n.21; Section II-A, _passim_.  Chiefly, Merck makes the circular argument that a single state's law cannot be applied solely because there are _conflicts_ among the nation's consumer protection laws, which "'courts must respect,'" Dsb8 (citation omitted).  That argument, however, is the same one that it made below, _i.e._, that courts should refuse to apply a single state's law if there is a mere conflict of laws, without regard to the second prong of the analysis, _i.e._, determining, in light of that conflict, which state has the "greatest interest"—in other words, once again, a de facto _lex loci delicti_ approach.

Tellingly, as it did below, see Pa555, Merck emphasizes In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002), see Dsb8-9, 29, which rejected certification of a nationwide consumer class because the forum state, Indiana, follows a _lex loci delicti_ choice-of-law rule.  See 288 F.3d

at 1016.[16]   Merck fails to acknowledge that New Jersey discarded that doctrine long ago, in favor of the flexible governmental interest standard.  See Pfau v. Trent Aluminum Co., 55 N.J. 511, 515 (1970).

Defendant further argues that there is a "body of precedent" that counsels against the multistate certification of a CFA class.  Dsb9-10.  None of the decisions comprising this "body," however, involve precedent of this Court or of the Appellate Division.  See id.  In any event, the decisions hailed by Merck are materially distinguishable,[17] as the

---

[16] Defendant also emphasizes that decisions such as Avery v. State Farm Mut. Auto. Ins. Co., 835 N.E.2d 801 (Ill. 2005), and Goshen v. Mutual Life Ins. Co., 774 N.E.2d 1190 (N.Y. 2002), adhered to the "rule" of Bridgestone/Firestone in rejecting nationwide classes.  Dsb9.  Neither Goshen nor Avery involved a choice-of-law analysis, and the former did not even involve a class certification motion.  Both cases held that the language or legislative history of the New York and Illinois consumer protection laws, respectively, restricted their application to in-state consumers.  See Avery, 835 N.E.2d at 849-53 (Illinois statute limited to transactions occurring in Illinois based on statutory language, legislative history, and rule against giving statute extraterritorial effect absent clear intent); Goshen, 774 N.E.2d at 1195-96 (New York statute applied to commercial transaction occurring within New York based on statute's language).  Merck has pointed to no such legislative intent in the CFA limiting its application to New Jersey consumers or in-state transactions.

[17] See West Morris Pediatrics, P.A. v. Henry Schein, Inc., 385 N.J. Super. 581, 606-09 (Law. Div. 2004) (declining to reach second prong of governmental interest analysis due to individualized issues arising from varying oral representations, which precluded showing of predominant common questions); Laufer v. U.S. Life Ins. Co., No. BER-L-9082-04, 2005 WL 1869211, at *5 (N.J. Law Div. Aug. 8, 2005) (unpublished) (certifying only statewide class where plaintiff failed to "provide[] an in-depth choice of law analysis," and

Appellate Division found.   Da124-26.   Moreover, Merck ignores
an   equally   "vast   body"   of   cases   that   have   upheld   the
certification   of   nationwide   classes   involving   consumer
protection   laws[18]   or   other   consumer-oriented   claims[19]—cases

---

source of deceptive correspondence operated out of Illinois),
aff'd on other grounds, 385 N.J. Super. 172 (App. Div. 2006);
Fink v. Ricoh Corp., 365 N.J. Super. 520, 593-95 (Law Div.
2003) (court and parties failed to apply second prong of
governmental interest test, and court noted that case differed
from those where conduct at issue emanates from New Jersey);
In re Consol. Parlodel Litig., 22 F. Supp. 2d 320, 326-27
(D.N.J. 1998) (consolidated product liability cases involving
venue   transfer   motion;   critical   issues   "rest[ed]   upon
testimony and other evidence from each Plaintiff's treating
physicians" located in each plaintiff's home state); In re
Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D.
332, 348 (D.N.J. 1997) (court failed to apply both prongs of
governmental interest test, making only conclusory statement
that all 50 states had "an" interest because their respective
residents had purchased their vehicles there); In re Rezulin
Prods. Liab. Litig., 210 F.R.D. 61, 63-64, 67 (S.D.N.Y. 2002)
(products liability action raising personal injury claims that
involve inherently individualized issues).

[18] E.g., Barbara's Sales, Inc. v. Intel Corp., ___ N.E.2d ___,
2006 WL 2105656, at **5-7 (Ill. App. Ct. July 25, 2006)
(California consumer protection law); Peterson v. BASF Corp.,
618 N.W.2d 821, 825-26 (Minn. Ct. App. 2000) (New Jersey CFA);
Lobo Exploration Co. v. Amoco Prod. Co., 991 P.2d 1048, 1050-
54 (Okla. Ct. Civ. App. 1999) (Oklahoma consumer protection
act); Clothesrigger, Inc. v. GTE Corp., 236 Cal. Rptr. 2d 605,
607-11 (Ct. App. 1987) (California unfair business practices
law); Kropinski v. Johnson & Johnson, No. A-3979-97-T1, 1999
WL   33603132,   at   **1-2   (N.J.   App.   Div.   Jan.   7,   1999)
(unpublished) (CFA); In re St. Jude Med., Inc., No. MDL No.
01-1396, 2006 WL 2943154, at **3-7 (D. Minn. Oct. 13, 2006)
(certifying   class   raising   claims   under   Minnesota   consumer
protection law); see also Northwest Mortg., Inc. v. Superior
Court, 85 Cal. Rptr. 2d 18, 23-25 & n.13 (Ct. App. 1999)
(California   unfair   competition   law   potentially   covers
nonresidents where defendant's offending conduct occurred in
California; remanding for further fact-finding).

that involve facts similar or analogous to this case.
Defendant also misconstrues or ignores decisions applying the
CFA to claims of non-New Jersey consumers that arise from the
conduct of New Jersey defendants.  See Dsb16 n.3.[20]

At any rate, "[r]ather than counting [the] cases for or
against class certification . . . it is more appropriate to
identify and apply principles established in this State on
this issue." Varacallo v. Mass. Mut. Life Ins. Co., 332 N.J.
Super. 31, 45 (App. Div. 2000).  Indeed, while Merck cites
some nonbinding cases declining to certify nationwide classes,
see Dsb8-10 & n.2, it fails to address New Jersey precedent
that supports the decisions below:  cases holding that the

---

[19]  See, e.g., In re Sch. Asbestos Litig., 789 F.2d 996, 1009-11
(3d Cir. 1986); In re Telectronics Pacing Sys., Inc., 164 F.
Supp. 2d 222 (S.D. Ohio 1995); In re Badger Mountain
Irrigation Dist. Secs. Litig., 143 F.R.D. 693, 699-700 (W.D.
Wash. 1992) (applying Washington law); In re Orfa Secs.
Litig., 654 F. Supp. 1449, 1455-64 (D.N.J. 1987) (class
raising, inter alia, New Jersey common law fraud claims);
Cheminova Am. Corp. v. Corker, 779 So.2d 1175, 1180, 1181-82
(Ala. 2000) (class raising UCC breach of warranty claim).

[20]  See Kugler v. Haitian Tours, Inc., 120 N.J. Super. 260, 269
(Chan. Div. 1972) (CFA "is not confined by its terms o[r]
spirit to activities involving residents of this State. . . .
[I]t prohibits unlawful practices in New Jersey without
limitation as to the place of residence of the persons imposed
upon."); Boyes v. Greenwich Boat Works, Inc., 27 F. Supp. 2d
543, 547 (D.N.J. 1998) (New Jersey Legislature intended CFA
"to apply to sales made by New Jersey sellers even if the
buyer is an out-of-state resident and some aspect of the
transaction took place outside New Jersey"); Peterson, 618
N.W.2d at 825-26 (applying CFA to nationwide class); Talalai
v. Cooper Tire & Rubber Co., No. 00CV5694AJL, 2001 WL 1877265,
at *5 (D.N.J. Jan. 8, 2001) ("The protections of the [CFA] are
not limited to New Jersey residents.").

state with the "greatest" interest in the application of its law is usually the state having weightier deterrence interests and qualitative contacts, even where the harm occurs to a non-domiciliary outside of the forum.  See infra at 24-25 & n.28.

### A. Merck Misconstrues New Jersey Choice-of-Law Precedent

Defendant argues that the lower courts erred in applying the governmental interest factors, namely, the interests of interstate comity and tort law (deterrence and compensation), and the states' competing interests.  Dsb10-22.  Merck's arguments below, however, ignored these factors.  See Pa551-59.  As noted above, it erroneously argued for the application of a rule that resembled the first prong of the governmental interest analysis and the lex loci delicti doctrine.  See Db16-17 (App. Div. Br.); Pa551-55, 558-59 (arguing that law of states other than New Jersey should control simply because states had different, not greater, interests).  Because its arguments here were not presented below and are not supported by any evidence in the record, they should be rejected.  See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973).[21]

---

[21] "An appellate court will consider matters not properly raised below only if the issue is one 'of sufficient public concern.'"  Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 230 (1998).  "Even if the matter satisfies that test, the court will not consider the issue if the record before the court is not complete as to the newly-presented issue."  Id. (citing cases).  Here, the choice-of-law analysis that Merck presented to Judge Higbee did not address all of the 50 states' laws, let alone the crucial second prong of the governmental interest test.  See Pa529-91; see also Pa583 (Merck's addendum, entitled "Summary of Some Variations Among State Consumer Protection Laws," pointing out only conflicts

### 1. The Interests of Interstate Comity Favor Application of the CFA

Merck fails to properly analyze the "interests of interstate comity" factor, see Dsb13-15, which requires consideration of "whether application of one law will further or frustrate the policies of the other state[s]." Erny v. Estate of Merola 171 N.J. 86, 95, 107 (2002) (emphasis added).

Defendant ignores this analysis, and relies on inapposite authorities: dicta from a Texas case (interpreting Texas law),[22] and citations to products liability and negligence cases. See Dsb13.[23] Merck also again relies on the first

---

among some laws) (emphasis added). Nor did Merck submit any evidence of relevant contacts outside of New Jersey. See Section II-A-3, infra. Consequently, its belated arguments are not supported by any evidence in the record. As a related matter, the point headings in Merck's brief for sections I(A), I(A)(1), I(A)(2), I(A)(3), I(A)(4), and I(C), all concern arguments not raised below and, thus, violate the rule requiring that arguments not raised in the trial court be so noted. See R. 2:6-2(a)(1).

[22] Merck's reliance on Tracker Marine v. Ogle, 108 S.W.3d 349, 358 (Tex. Ct. App. 2003), Dsb13, is misplaced. As a later decision of that court noted, Tracker Marine involved the case where "the class proponents are contending that the laws of the various states do not conflict and thus a single state's law can be applied." Vanderbilt Mortg. & Fin., Inc. v. Posey, 146 S.W.3d 302, 317-18 & n.6 (Tex. Ct. App. 2004). That differs from a "second method by which a nationwide class can be certified—when the law of one state applies to all of the transactions. If a single state has the 'most significant' contacts to all of the transactions involving deceptive trade practices, a nationwide class can be certified." Id. at 318 (citing cases). Such is the case here.

[23] Merck also relies on five other decisions in support of this argument, three of which involved products liability claims (Sanders and In re Rezulin), see Dsb14-15; a fourth

---

prong of the governmental interest test, arguing that the mere conflicts between states' consumer fraud laws shows that applying the CFA will frustrate other states' "interests." Dsb14.   Defendant contends that simply based on "this principle . . . other states' choices about how to regulate consumer transactions within their borders are entitled to controlling weight." Dsb14 (emphasis added); see Dsb13-15.

That argument ignores the second prong of the governmental interest test by failing to properly address whether application of "one law will further or frustrate the policies of the other states." Erny, 171 N.J. at 107.   The "policies" analyzed under that second prong are "'the policies that the law was intended to promote.'"   Pfizer, Inc. v. Employers Ins. of Wausau, 154 N.J. 187, 198 (1998).[24]   As

---

(Heindel v. Pfizer, Inc., 381 F. Supp. 2d 364 (D.N.J. 2004)) that is inapposite, see infra at 41-42 n.50; and a fifth, (Margulies v. Chase Manhattan Mortg. Corp., No. A-4087-03-T3, 2005 WL 2923580 (N.J. App. Div. Nov. 7, 2005)), that is an unpublished decision having no precedential value, see R. 1:36-3, and which is also inapposite because, among other things, the consumer protection law of Maryland at issue there does not afford any protection to business entities such as Plaintiff and class members, see Pa662—a material distinction that Merck ignores.   Hence, the application of Maryland's consumer protection law (and 21 others like it, Pa617-724) would frustrate New Jersey's policy under the CFA in affording such protection to Plaintiff and other payors, see Pa663—rendering Margulies unpersuasive for that reason alone.

[24]   See Erny, 171 N.J. at 97 ("[A]pplication of the governmental-interest test requires analysis of the purposes underlying each law") (emphasis added); Fu v. Fu, 160 N.J. 108, 119 (1999) (court "must identify the governmental policies underlying the law of each state") (emphasis added);

Plaintiff's and Judge Higbee's extensive choice-of-law analyses below revealed, the primary stated policies or purposes of the nations' consumer protection laws is the protection against consumer fraud and unfair or deceptive trade practices. See Pa617-724; Da55-81. Merck ignores that articulated policy, and fails to analyze whether application of the CFA would frustrate or further it.[25]

Defendant's reliance on product liability policies, Dsb13, 14-15, 21, and a vague notion of "states' choices about how to regulate consumer transactions," Dsb14, are thus misplaced. The states have "never expressed such . . . purpose[s] behind [their consumer fraud laws], and it is not appropriate for [the Court] to impute [u]narticulated purposes to the legislature of another state." Pfau, 55 N.J. at 522.

---

Pfau, 55 N.J. at 516 (court "must first examine [statute's] purposes as articulated") (emphasis added); see also State Farm Mut. Auto. Ins. Co. v. Simmons' Estate, 84 N.J. 28, 40 (1980) (state's policy is discerned first through legislation, and then through any decisional law); Heindel, 381 F. Supp. 2d at 371 (if conflict exists between two state's laws, court turns to "evaluation of the [statute's] underlying policies") (emphasis added); Restatement (Second) Conflict of Laws (1971) ("Restatement") § 6(2) cmt. e (in resolving conflict of laws, courts consider purpose of each state's law).

[25] Without mentioning a single state's stated policy underlying a consumer fraud law, see Dsb14-15, 21, Merck claims that the states have "adopt[ed]" their laws "to increase the availability and lower the price of products sold in their markets." Dsb21. None of the states, however, have "expressed such a purpose behind," Pfau, 55 N.J. at 522, their consumer protection laws, and Merck cites only product liability cases for this assertion.

Consequently, Merck fails to demonstrate that the CFA's application to non-domiciliary class members' claims would frustrate the articulated purpose of the nations' consumer protection laws to protect against consumer fraud.  On the contrary, the CFA's application would significantly further that purpose.  See Pa617-724, passim; Da81-82; Dal Ponte v. Am. Mortg. Express Corp., No. 04-2152 (JEI), 2006 WL 2403982, at **6-7 (D.N.J. Aug. 17, 2006) (unpublished).

By contrast, other states' laws are weaker than the CFA, see Pa617-724, passim, as Merck and its amici concede, Db18, 21 (App. Div. Br.); Db16-18 (Mot. for Leave Br.); CIANJb7, 8, 12, 18.  New Jersey's stated policies underlying the CFA (none of which Merck addresses) are substantial:  the protection of consumers, deterrence of consumer fraud, compensation of victims, punishment of wrongdoers, and attraction of competent counsel.[26]  "The available legislative history demonstrates that the [CFA] was intended to be 'one of the strongest consumer protection laws in the nation,'" New Mea Constr. Corp. v. Harper, 203 N.J. Super. 486, 501-02 (App. Div. 1985) (citation omitted; emphasis added), and "[t]he history of the [CFA] is one of constant expansion for consumer protection." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604 (1997). Consequently, applying other states' weaker laws to this case

---

[26] See Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 11 (2004); Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139 (1999); Cox v. Sears Roebuck & Co., 138 N.J. 2, 21 (1994).

would frustrate New Jersey's broad consumer protection policies that underlie the CFA.[27]  See Pa617-724, passim.  The interests of interstate comity thus strongly favor the CFA's application here.

### 2. The Interests Underlying Tort Law, Deterrence and Compensation, Favor the CFA's Application

#### a. Deterrence

Defendant's argument that the interests underlying tort law, deterrence and compensation, favor application of the consumer protection laws of all states other than New Jersey also was not raised below.  See Pa529-91.

In any event, Merck's argument is meritless.  Defendant's two-paragraph discussion of the deterrence factor fails to address New Jersey precedent recognizing New Jersey's substantial interest in policing and deterring misconduct on the part of its corporate citizens, even where the harm occurs outside its borders to non-domiciliaries of New Jersey.[28]  This

---

[27] See also Fresh Start Indus., Inc. v. ATX Telecomms. Servs., 295 F. Supp. 2d 521, 526-28 (E.D. Pa. 2003) (application of weaker Pennsylvania unfair trade practices law would frustrate New Jersey's broad policies under CFA, whereas CFA's application would not impair Pennsylvania's policy to protect consumers from unfair or deceptive business practices); Huffmaster v. Robinson, J.A., 221 N.J. Super. 315, 320 (Law Div. 1986) (applying CFA instead of Pennsylvania's statute because CFA offered greater protection).

[28] See Gantes v. Kason Corp., 145 N.J. 478, 497 (1996) ("New Jersey's policy in deterring tortious conduct of manufacturers is implicated by the defendant's material contacts with this State, and thus represents a substantial interest"; New Jersey's deterrence policy held superior to Georgia's interest in compensation of its residents); D'Agostino v. Johnson &

bedrock policy applies in this case because of Merck's overwhelming qualitative contacts in New Jersey, and because the CFA "is remedial legislation that [this Court] construe[s] liberally to accomplish its broad purpose of safeguarding the public." Furst, 182 N.J. at 11-12 (citing cases). "[T]his State's judiciary . . . `has led the country in its ideological commitment to the protection of consumers and concomitant consequence of inducing those who place products into the stream of commerce to act with social responsibility.'" Gantes, 145 N.J. at 490 (citation omitted).

New Jersey's strong policy of deterring corporate

_____

Johnson, Inc., 133 N.J. 516, 525-40 (1993) (New Jersey's interest in deterring misconduct by corporations in New Jersey required application of New Jersey law even though misconduct caused harm to non-domiciliary outside New Jersey); Rowe v. Hoffman La-Roche, 383 N.J. Super. 442, 457-66 (App. Div. 2006) (New Jersey's "strong governmental interest" in deterring manufacture of unsafe products within its borders substantially outweighed countervailing Michigan contacts and governmental interests) (discussing Gantes); Almog v. Israel Travel Advisory Serv., Inc., 298 N.J. Super. 145, 158-69 (App. Div. 1997) (New Jersey law applied to wrongful conduct of New Jersey business in Israel where it had "significant interest in deterring wrongful conduct by its residents," and where "[k]ey events occurred in New Jersey," and New Jersey law more broadly benefited plaintiff) (citing Gantes); cf. Erny, 171 N.J. at 106-08 (applying law of state with greater deterrence and compensation interest, even though plaintiff was non-domiciliary injured outside of that state); Fu, 160 N.J. at 136 (applying law of state with greater deterrent and compensation interest to claim of non-domiciliary of state); Butkera v. Hudson River Sloop "Clearwater," Inc., 300 N.J. Super. 550, 554 (App. Div. 1997) ("[corporate] defendant's home state has not only a cognizable interest but also the paramount interest in its law being enforced").

misconduct is not only enshrined in its jurisprudence, but also is reflected by the CFA's provisions for treble damages, attorney's fees, filing fees, and costs, all of which are mandatory. Skeer v. EMK Motors, 187 N.J. Super. 465, 469-73 (App. Div. 1982); see Da124 (noting that treble damages further interest of deterrence, rather than compensation).[29] By contrast, other jurisdictions have a lesser deterrence interest here, if any. Their consumer statutes (i) do not provide for treble damages or provide only for discretionary, rather than mandatory, treble or punitive damages awards, Pa617-724, passim,[30] or provide for treble or punitive damages

---

[29] See also Furst, 182 N.J. at 11 ("The Legislature passed the Consumer Fraud Act in 1960 to give consumers relief from fraudulent practices in the marketplace and to deter merchants from employing those practices"); Lettenmaier, 162 N.J. at 139 (CFA "construed liberally in favor of the consumer to accomplish its deterrent and protective purposes"); Cox, 138 N.J. at 21 (CFA provides deterrence "by awarding a victim treble damages, attorneys' fees, filing fees, and costs"); Daaleman v. ElizabethTown Gas Co., 142 N.J. Super. 531, 536 (Law. Div. 1976) (treble damages, attorney's fees, and costs under CFA "are clearly intended not only to compensate a plaintiff for his actual losses, but to punish a defendant who has violated the [CFA] as well as to deter him from further violations"), aff'd in relevant part, 150 N.J. Super. 78, (App. Div. 1977), rev'd on other grounds, 77 N.J. 267 (1978).

[30] These distinctions are important. "Consumers are better protected by a mandatory treble damage rule than a discretionary one." Huffmaster, 221 N.J. Super. at 320 ("scales . . . tipped in favor of [the CFA's application over Pennsylvania law] . . . because only [the CFA's] application permits application of the mandatory New Jersey policy"); see also Boyes, 27 F. Supp. 2d at 546 ("New Jersey's law offers more protection than Pennsylvania's in that treble damages and attorney fees are mandatory in New Jersey and discretionary in Pennsylvania").

only under a high threshold, such as for willful and knowing violations, id., passim; and (ii) allow only discretionary awards of attorney's fees, id., passim.[31]  Mandatory, as opposed to discretionary, awards, however, are what put real teeth in a consumer fraud statute.  Thus, New Jersey's interest in deterring and punishing the unlawful conduct of one of its residents is a weightier policy interest than other jurisdictions' deterrence interests.

Merck completely ignores New Jersey's strong interest in deterrence under the CFA, and argues that other jurisdictions' deterrence interests favor application of their laws because "the actual harmful conduct at issue" took place "primarily in the individual states where the [class members] do business." Dsb20 (emphasis omitted).  That argument also fails.

The qualitative contacts concerning Merck's conduct at its New Jersey headquarters, where it conceived and effected the alleged unlawful practices at issue, are extensive and, because they squarely implicate New Jersey's policies of deterrence and punishment, are weighty.  See Da116-17; see, e.g., Dal Ponte, 2006 WL 2403982, at *7; cf. Barbara's Sales, 2006 WL 2105656, *5; St. Jude Med., 2006 WL 2943154, at **3-4,

---

[31] "[T]he provision for attorney's fees in the CFA is one of the deterrent aspects of the legislation." Grubbs v. Chapman, 376 N.J. Super. 420, 449 (App. Div. 2005) (citation and internal quotation marks omitted); accord Cox, 138 N.J. at 24 ("the provision for attorneys' fees was intended to impose on the defendant in a private action a greater financial penalty [than in an action brought by the Attorney General]") (citation and internal quotation marks omitted).

6-7. Also, as noted above, New Jersey courts have consistently applied New Jersey law where, as here, corporate misconduct within this State injures non-domiciliaries outside of New Jersey. See supra at 24 & n.28.

Merck nonetheless argues that New Jersey's interest does not outweigh a generalized "interest of . . . other states in regulating the conduct of New Jersey corporations within their borders." Dsb20-21. Defendant fails, however, to point to any "[]articulated purposes," Pfau, 55 N.J. at 522, of other states, let alone any that express a deterrent interest (or one that is greater than New Jersey's). Its argument that "some states have chosen policies (punitive damages, for example) that would have an even greater deterrent effect on misconduct in their markets," Dsb21, not only fails to point to any articulated purposes, but is insupportable. The six states to which it selectively refers all have weaker deterrent interests than does New Jersey, and at least half have no interest at all.[32]

---

[32] Merck contends that "many states' laws would authorize greater (or easier) recovery than the NJCFA through uncapped punitive damages, less strict mens rea elements, and the like." Dsb19 & n.4 (citing laws of Massachusetts, Vermont, the District of Columbia, Illinois, Oregon, and Missouri). Putting to one side that Merck never raised this argument or these provisions below, see Pa529-91, the consumer fraud laws to which it refers all provide less deterrence than the CFA. See Pa635-37, 647-50, 664-65, 672-73, 695-97, 713-15. Unlike the CFA, the consumer statutes of the District of Columbia, Missouri, and Oregon, along with those of at least 19 other states, Pa617-724, passim, do not protect entities such as Plaintiff, see Pa636, 672, 696; Hundred East Credit Corp., 212

Defendant's paradoxical argument that other states with weaker deterrent interests than New Jersey's nonetheless have a "greater" interest than New Jersey, Dsb21, was rejected in Gantes, 145 N.J. at 489-91, and turns the "interests of tort" factor on its head. That factor examines "how strongly," not how weakly, "the statutes in issue promote the goals that generally underlie tort law—compensation and deterrence." Erny, 171 N.J. at 106 (emphasis added).[33]

In any event, Merck fails to identify any articulated policies underlying consumer fraud laws showing that "other states have . . . adopt[ed] policies" with "less deterrent consequences . . . to increase the availability and lower the price of products sold in their markets." Dsb21. Tellingly, Merck relies only on irrelevant product liability cases. See id. (citing Garcia v. Wyeth-Ayerst Labs., 385 F.3d 961 (6th Cir. 2004); Perez v. Wyeth Labs, Inc., 161 N.J. 1, 25 (1999)). But even if other states have articulated a lesser deterrence

---

N.J. Super. at 248-49.  Vermont allows treble damages only where malice or ill will is shown.  L'Esperance v. Benware, 830 A.2d 675, 681-82 (Vt. 2003).  Massachusetts requires a willful and knowing violation for such damages.  Pa664.  In Illinois, actual and punitive damages, attorney's fees, and court costs are discretionary; punitive damages require a showing of outrageous conduct; treble damages are unavailable; and FDA-regulated conduct may be exempt.  Pa648-49; Kleczek v. Jorgenson, 767 N.E.2d 913, 922 (Ill. App. Ct. 2002); Bober v. GlaxoWellcome PLC, 246 F.3d 934, 940-42 (7th Cir. 2001).

[33] See also Fu, 160 N.J. at 136 (considering, as part of analysis of tort interest, "the extent to which each state's laws further the goals of deterrence and compensation").

interest, that would not give them a superior interest in having their law apply because to do so would frustrate <u>New Jersey</u>'s strong interest in deterring CFA-proscribed conduct.[34]

### b. Compensation

Defendant's argument that the compensation interests of other states favors application of their laws, Dsb15-20—another argument not raised below, <u>see</u> Pa529-91—is also unavailing.

Merck points to no articulated compensation policies underlying other states' laws. Moreover, its claim that New Jersey has no interest in compensating non-domiciliaries, Dsb15, ignores the intent of New Jersey's legislature. As the courts below recognized, the CFA protects "any person," <u>N.J.S.A.</u> 56:8-19, and was intended to apply to victimized consumers both inside and outside of New Jersey. Da36-37, 102.[35]  Also, the CFA's mandatory remedies reflect New Jersey's strong interest in maximizing compensation of consumers.

---

[34] <u>Cf.</u> <u>Restatement</u> § 6 cmt. f ("application of a state's statute or common law rule which would absolve the defendant from liability could hardly be justified on the basis of this state's interest in the welfare of the injured plaintiff"); <u>id.</u> § 146 cmt. e ("If . . . the defendant would enjoy a special immunity for his conduct under the local law of the state of injury, it is not clear that the interests of this state would be furthered by application of its rule").

[35] <u>See</u> <u>Kugler</u>, 120 <u>N.J. Super.</u> at 269; <u>Boyes</u>, 27 <u>F. Supp.</u> 2d at 547; <u>see also</u> <u>Freeman Indus., LLC v. Eastman Chem. Co.</u>, 172 <u>S.W.</u>3d 512, 517 (Tenn. 2005) (consumer law with "any person" language applies to non-residents).

Furst, 182 N.J. at 12; Lettenmaier, 162 N.J. at 139; Daaleman, 142 N.J. Super. at 536; Cox, 138 N.J. at 21, 24.

Furthermore, this Court has rejected the argument that Merck posits: "[a]pplication of New Jersey law will not undermine [other states'] interest[s] in compensating [their] injured residents because that interest is not actually implicated or compromised by allowing a [consumer fraud] action brought by [non-residents of New Jersey] to proceed against [a non-resident] manufacturer [of those states]." Gantes, 145 N.J. at 497-98.[36]

Merck selectively relies on cases stating that consumer protection laws protect only consumers within each state, Dsb16, and ignores both the CFA's broad language and cases applying it to consumers outside New Jersey, see supra at 18 n.20, an interpretation that is consistent with the CFA's liberal construction in class actions and the "clear legislative intent that [the CFA's] provisions be construed

---

[36] Rather than address New Jersey's compensation interests underlying the CFA, Merck relies on Marinelli v. K-Mart Corp., 318 N.J. Super. 554 (App. Div. 1999), aff'd o.b., 162 N.J. 516 (2000). Dsb15-16. Marinelli, however, involved the comparative negligence laws of New Jersey and Pennsylvania. The language from Marinelli that Merck quotes—that a state has no interest in compensating non-domiciliaries—relied on the Appellate Division's decision in Fu, see 318 N.J. Super. at 566 (quoting Fu v. Fu, 309 N.J. Super. 435, 441 (App. Div. 1998)), which this Court reversed after Marinelli was decided, holding that New York had a greater interest than New Jersey in deterrence and in compensating a non-domiciliary. Fu, 160 N.J. at 137; see also Erny, 171 N.J. at 104-08 (New York's stronger deterrence and compensation interests compelled application of New York law to New York non-domiciliary).

broadly in order to . . . root out consumer fraud."
Lemelledo, 150 N.J. at 264.  Merck also ignores New Jersey
precedent applying a state's law to a non-domiciliary injured
outside the forum, and decisions applying consumer protection
laws to nationwide classes.  See supra at 17 n.18, 24-25 n.28.

Defendant briefly discusses class members' relevant
contacts, Dsb17, something it did not raise below, let alone
support with any evidence.  Merck's argument is specious.
Defendant, for example, quotes dicta in Fu stating that "'the
state where the injury occurred, which is often where the
plaintiff resides, may have the greatest interest."  Dsb17
(quoting Fu, 160 N.J. at 123).  Merck, however, selectively
quotes language that advocates the discarded lex loci deliciti
approach, while omitting language limiting its application to
where "the tort rule is designed primarily to compensate a
victim for his or her injuries."  Fu, 160 N.J. at 123.  Merck
has not demonstrated that any of the consumer protection
statutes are designed "primarily" to compensate victims and,
in any event, it ignores rules advocating the application of
the law of the place of the defendant's conduct.[37]

Similarly unconvincing is Merck's contention that "the

---

[37] See Restatement § 145 cmt. e ("when the primary purpose of
the tort rule involved is to deter or punish misconduct, the
place where the conduct occurred has peculiar significance");
id. § 145 cmt. c ("the state where the conduct took place may
be the state of dominant interest and thus that of most
significant relationship").

plaintiff's principal place of business is of particular
significance 'when the loss is pecuniary in its nature,' . . .
because the state of the victim's residence will bear the
economic consequences of the loss." Dsb17 (citation omitted).
As the courts below recognized, "'the place of loss does not
play so important a role in the determination of the law
governing actions for fraud and misrepresentation as does the
place of injury in the case of injuries to persons or to
tangible things.'" Da115 (quoting Restatement, § 148 cmt. c);
accord Da52; see also Fu, 160 N.J. at 133 (place of business
of defendant corporation is relevant consideration).

Merck's argument that section 148 of the Restatement
precludes application of the CFA here, Dsb17—an argument it
never raised before Judge Higbee, see Pa529-91—is also wrong.
Section 148, viewed in conjunction with Sections 6 and 145
(which Merck ignores), confirms that the CFA applies here.[38]

---

[38] See Restatement § 148 cmt. b ("this Section calls for the
application of the local law of the state selected on the
basis of the stated contacts, unless, with respect to the
particular issue, some other state has a more significant
relationship to the occurrence and the parties") (emphasis
added); id. § 148 cmt. e ("relative importance [of these
contacts] in a given case should be determined in the light of
the choice-of-law principles stated in [Restatement] § 6 with
emphasis upon the purpose sought to be achieved by the
relevant tort rules of the potentially interested states, the
particular issue and the tort involved.") (emphasis added);
see also Vanderbilt Mortg. & Fin., 146 S.W.3d at 316 (§ 148
"must be analyzed in conjunction with Section 145 and Section
6") (emphasis added); Washkoviak v. Student Loan Mktg. Ass'n,
900 A.2d 168, 182 n.18 (D.C. Ct. App. 2006) (noting that court
"employed § 148 only as a 'useful framework," and "did not
adopt it as a test to be mechanically applied";

See, e.g., Barbara's Sales, 2006 WL 2105656, at **3-5
(applying California consumer fraud law to nationwide class
where conduct of defendant occurred in California; applying
Restatement §§ 6 and 148); cf. Erny, 171 N.J. at 96-97, 101-04
(applying Restatement §§ 6 & 145 to tort claim); Fu, 160 N.J.
at 119-26, 133 (same).[39]

Nor can Merck persuasively claim that other states'
compensation interests are superior to New Jersey's, Dsb18-19,
given that New Jersey affords greater compensation to non-
domiciliaries and domiciliaries alike.  Pa617-724, passim.[40]

Likewise, the argument that other states with weaker laws
have an "interest . . . which must be respected," Dsb19-20,
fails to demonstrate a greater interest, and this Court has
rejected it in analogous circumstances.  See Gantes, 145 N.J.
at 489-91 (rejecting, in light of New Jersey's strong interest
in deterring misconduct by resident corporations, argument

---

"jurisdiction's contacts are to be measured qualitatively
rather than quantitatively").

[39] Merck's reliance on Pratt v. Panasonic Consumer Elecs. Co.,
No. L-48-05, 2006 WL 1933660 (N.J. Law Div. July 12, 2006),
Dsb17-18, is misplaced.  In Pratt, New Jersey's contacts with
the litigation were "not that significant," and neither the
trial court nor the parties conducted a rigorous analysis of
the competing states' laws and policies.  Id. at *13.  Here,
in contrast, Judge Higbee conducted such a rigorous analysis,
which should not be upset absent an abuse of discretion.

[40] Merck tries to have it both ways.  In seeking leave to
appeal, it argued that New Jersey law should not apply where
other states have chosen to provide less compensation.  Db9,
18 (Mot. for Leave Br.).

-34-

that state with weaker or no interest in imposing liability had greater interest in applying its law).[41]

Here, given (i) that the chief aim of states' consumer fraud laws is the protection against consumer fraud and deceptive trade practices, Pa617-724, passim; and (ii) that New Jersey has strong policies of compensation and of deterring and punishing wrongdoers, Merck cannot rationally claim that other states have a superior interest in barring their consumers from obtaining the greater relief that the CFA affords, where the wrongful conduct at issue was committed by a New Jersey corporation in New Jersey.[42]   See Dal Ponte, 2006

---

[41]  Merck's contention that states providing lesser or no recovery have superior interests also misconstrues the precedent that it cites.   Dsb19-20.   Fu, upon whose dicta Merck relies, ultimately applied the law of the state that offered greater deterrence and compensation to a non-domiciliary of that state.   160 N.J. at 137; accord Erny, 171 N.J. at 104-08.   The language in Haggerty v. Cedeno, 279 N.J. Super. 607, 612 (App. Div. 1995), that Merck quotes was relied upon by the Appellate Division in Fu v. Fu, 309 N.J. Super. 435, 441 (App. Div. 1998), which this Court reversed.   160 N.J. at 132-36.   In any case, Merck's argument founders on the reasoning of Gantes and its progeny.

[42] Da118 ("No state has an interest in denying its own citizens recovery while protecting a foreign New Jersey corporation when the conduct at issue took place, to a significant degree, in New Jersey."); cf. Rowe, 383 N.J. Super. at 465 ("we perceive no Michigan interest in depriving its resident of recovery"); Almog, 298 N.J. Super. at 159 ("we do not see how Israeli law can reasonably be regarded as offended by one of its citizens being fully vindicated in the courts of another jurisdiction" (citing Gantes); Butkera, 300 N.J. Super. at 555 ("We are persuaded that by granting [corporation] immunity based simply on the situs of the accident and the domicile of the injured person [in New Jersey], we would be undermining the strongly stated and firmly held policy of its home state,

WL 2403982, at *7; cf. Barbara's Sales, 2006 WL 2105656, *5; St. Jude Med., 2006 WL 2943154, at *6.[43]

### 3. The Competing Interests of the States Favor the CFA's Application

Although this Court has described the "competing interests of the states" factor as "the most important" of the five Restatement factors analyzed under the governmental interest analysis, Erny, 171 N.J. at 101, 103-04, Defendant did not address this crucial factor below, see Pa529-91, and even here devotes only one paragraph to it, Dsb21-22.[44]

---

New York, without concomitantly advancing or promoting the countervailing policy of this state.") (citing Gantes).

[43] Irrespective of other states' compensation interests, New Jersey courts have held that New Jersey law should apply where, as here, New Jersey has a strong interest in deterring misconduct of resident corporations, even where the injured party is a non-domiciliary harmed outside the State. See Gantes, 145 N.J. at 497-498; D'Agostino, 133 N.J. at 525-40; Rowe, 383 N.J. at 458-66; Almog, 298 N.J. at 158-59.

[44] Even now, however, Merck avoids addressing the competing interests factor. Instead, selectively quoting isolated parts of the opinions below, Merck accuses the lower courts of a biased preference for New Jersey law. Dsb21-22 ("'[I]t is the forum state's duty to disregard its own substantive preference regarding the competing rules of law.'") (citation omitted). That charge is baseless. The language that Merck quotes from Fu for this contention simply recognizes the unremarkable proposition that a forum should not apply its own law in a choice-of-law context merely because it may prefer it for its own domestic affairs. 160 N.J. at 131. Here, the courts below did not blindly "prefer" New Jersey law. Rather, they fully analyzed the facts under New Jersey's governmental interest test and followed New Jersey precedent, see Da55-81,

The "competing interests" factor supports the CFA's application here. "'[T]he initial focus should be on what [policies] the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether these concerns will be furthered by applying that law to the multi-state situation.'" Erny, 171 N.J. at 101-02 (citations omitted).

As discussed above in connection with the interests of interstate comity factor, the central articulated purpose of all consumer protection laws is to safeguard against consumer fraud and unfair or deceptive trade practices. The CFA's articulated policies are to protect consumers, deter and punish perpetrators of consumer fraud, compensate victimized consumers, and attract competent counsel. Those policies would significantly further the articulated policies of other states' consumers laws. By contrast, because those states' laws are weaker than the CFA, their application here would not further the CFA's broad policies. See Pa617-724, passim.

### 4. New Jersey's Extensive Qualitative Contacts Compel Application of the CFA

Merck also fails to address how the policies underlying the states' consumer protection laws "are affected by each

---

109-29—which Merck failed to do.  Merck never analyzed which state has the greater interest.

state's contacts to the litigation and the parties." Fu, 160 N.J. at 119.[45]

Here, the record shows New Jersey's extensive—and undisputed—qualitative contacts with this litigation. Vioxx was developed here; critical decisions concerning its development, labeling, promotion, and marketing (including the messages conveyed to physicians and formulary decision-makers) were made in this State; and New Jersey-based Merck scientists otherwise prominently participated in meetings, analyses, and authorship of articles and publications relating to Vioxx.[46] As the Appellate Division recognized, "the claimed misrepresentations and omissions in the marketing and advertising of the drug all emanated largely from New Jersey." Da117. Those contacts are directly implicated by the CFA's policies, including protection of consumers, deterrence of consumer fraud, and punishment of wrongdoers.

By contrast, the only contacts that other states have, if

---

[45] Merck presented no evidence or arguments concerning any state's qualitative contacts, let alone how the consumer protection policies are affected or furthered by them. See Pa529-91. As Judge Higbee found, "[u]nlike the numerous and substantial fact-based contacts New Jersey has with this litigation, there has been little evidence presented to establish contacts between this litigation and the home state of a putative class member." Da36-37.

[46] E.g., Pa214, 220, 222-25, 228, 230, 232-33, 235, 237-43, 245, 247, 249, 250-52, 253, 255, 257, 292, 301, 306-07, 310, 398-400, 402, 411, 418, 420, 518-19.

any, relate to class members' receipt of Merck's deceptive communications and their resulting economic loss. Da117. As Judge Higbee noted, however, those communications emanated from New Jersey. Da52 ("The marketing of Vioxx was a national effort that was planned or executed through New Jersey offices."); accord Da116-17. Thus, in light of its extensive qualitative contacts, New Jersey's interests far outweigh those of any other state, as both Judge Higbee and the Appellate Division found. Da52 ("[N]o individual state has stronger factual connection to this litigation than New Jersey."), 117 ("New Jersey's interests in this litigation . . . far outweigh the interests of all other states."). New Jersey's contacts are weightier because they implicate the CFA's broad underlying policies and New Jersey's strong policy of deterring its resident businesses' misconduct.

## B. Defendant's Constitutional Arguments Are Hollow

Merck tries to augment its anemic choice-of-law arguments with a constitutional attack. See Dsb23-25. The Court should reject that argument—which differs markedly from the narrower three-sentence throwaway argument in the addendum to Merck's trial court brief that applying the CFA's treble-damages provisions would run afoul of the Fourteenth Amendment, Pa589——because Merck ignores precedent holding that Due Process is satisfied where, as here, a state has a "significant contact

or significant aggregation of contacts" to class members' claims. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 818-22, 109 S. Ct. 2965, 2977-80, 86 L. Ed. 2d 628 (1985); see Allstate Ins. Co. v. Hague, 449 U.S. 302, 308-13, 101 S. Ct. 633, 637-40, 66 L. Ed. 2d 521 (1981); Barbara's Sales, 2006 WL 2105656, at *6; cf. Instructional Sys., Inc. v. Computer Curriculum Corp., 130 N.J. 324, 370 (1992) ("The proposition is 'fairly well established that a state may regulate its residents, even when they are acting outside of the state.'") (citation omitted).[47]

### C. Merck Misconstrues Relevant Precedent

Merck's argument that the Appellate Division misconstrued Gantes is equally flawed. See Dsb25-27. Merck's claim that Gantes involved a choice of procedural, rather than substantive, law, Dsb25-26, is a distinction without a difference. As the Appellate Division has recognized, Gantes did not limit its holding to cases involving procedural issues, such as the application of a statute of limitations.[48]

---

[47] Merck wrongly claims that Shutts mandates that "'an individualized choice-of-law analysis must be applied to each plaintiff's claim.'" Dsb10. "Shutts does not require the court to conduct an individualized inquiry into the relative interests of each state vis-a-vis each individual plaintiff. Shutts requires an 'individualized inquiry' only as to whether the forum state has a sufficient contact with and interest in the plaintiffs' claims." In re Activision Secs. Litig., No. C-83-4639, 1985 WL 5827, at *4 (N.D. Cal. Dec. 2, 1985) (unpublished) (footnote omitted).

[48] Deemer v. Silk City Textile Mach. Co., 193 N.J. Super. 643 (App. Div. 1984), which found New Jersey's deterrent interests

See Rowe, 383 N.J. Super. at 466 (rejecting suggestion that Gantes "applies solely to issues of so-called procedural law, like statutes of limitations, and not to choice-of-law issues concerning which state's substantive law should apply").[49]

Merck's attack on some decisions cited by the Appellate Division also fails. Dsb27-28. That two Illinois decisions cited by the court below relied on cases overruled by Avery is immaterial. As noted above, Avery is inapposite, see supra at 16 n.16, and a recent post-Avery Illinois decision affirmed the certification of a national consumer fraud class on facts similar to those here. See Barbara's Sales, 2006 WL 2105656, at **5-6.[50]

_____

outweighed by another state's compensation interests, is unpersuasive authority. Dsb26-27. The continued vitality of Deemer is open to serious question in light of Gantes. See Rowe, 383 N.J. Super. at 464; Da122. At any rate, Deemer would not apply here, given that Merck has not identified any other state's articulated compensation interests, or shown that the CFA's application would frustrate the purposes of other states' laws. Cf. Deemer, 193 N.J. Super. at 649-52 (identifying competing states' contacts and analyzing their respective interests).

[49] Other courts have similarly not construed Gantes as turning on the application of a statute of limitations rather than a law governing liability. E.g., Almog, 298 N.J. Super. at 158-59; Butkera, 300 N.J. Super. at 554-56.

[50] Merck's reliance on Heindel, Dsb28-29, is also misplaced. The Pennsylvania consumer protection law at issue in Heindel does not afford any protection to business entities such as Plaintiff and class members. See Pa697-98; Fresh Start Indus., Inc., 295 F. Supp. 2d at 527. Besides, Heindel was decided on an entirely different factual record than the more substantial record before Judge Higbee, which showed Merck's

### D. Merck's Policy Arguments Are Meritless

Finally, the Court should reject Merck's eleventh-hour policy arguments, Dsb30-32, because (i) it did not present them to Judge Higbee, see Pa529-91, and (ii) in any case, they lack merit for the reasons set forth at pages 37-40 of Plaintiff's August 9, 2006 brief in response to the briefs of Merck's supporting amici.

### III. Questions Common to All Class Members Predominate

#### A. Merck Distorts the CFA's Elements

In addition to its redesigned challenge to the choice-of-law determinations below, Defendant accuses the courts below of "altering the substantive requirements for each claimant's proof of causation and 'ascertainable loss' under the NJCFA." Dsb32. That is completely without merit. If anyone is trying to "alter[]" the CFA's elements, it is Merck.

Defendant's express disclaimer of a reliance element, see Dsb36 n.9, cannot mask the substance of its attempt to import such a component into the CFA by claiming that each class member must individually demonstrate its "response" or "reaction to[] Merck's statements about Vioxx." Dsb32-33. It bases its argument on a strained reading of the CFA's "as a result of" language, N.J.S.A. 56:8-19, and this Court's statement in Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234 (2005), that a loss must be "attributable to" conduct made unlawful by the CFA, id. at 246.

---

compelling qualitative New Jersey contacts. Compare 381 F. Supp. 2d at 375-77 with supra at 38 & nn.45-46.

A CFA claim, however, "requires only proof of a causal nexus" between the alleged omission and the ascertainable loss, Varacallo, 332 N.J. Super. at 43; accord Zorba Contractors, Inc. v. Housing Auth., 362 N.J. Super. 124, 139 (App. Div. 2003) (same), and, unlike a common law fraud claim, does not require a showing of reliance. Gennari, 148 N.J. at 607 (CFA "does not require proof of reliance").[51]

Notably, the CFA's "as a result of" or "causal nexus" element is not the same as "proximate" or "but for" causation. See Varacallo, 332 N.J. Super. at 49 ("causal nexus" element "is a significant distinction from the requirement of reliance in a common law fraud claim") (emphasis added); Bayside Chrysler Plymouth Jeep Eagle, Inc. v. Ma, No. A-3575-04T3, 2006 WL 1449783, at *13 (N.J. App. Div. May 26, 2006) ("Unlike other states that require plaintiff to prove reliance under their consumer protection statutes, the proof requirements that the [CFA] places on its claimants [are] less burdensome.") (citation and internal quotation marks omitted).

Also, as the Appellate Division noted, "the prime ingredient" of a CFA violation is the mere "capacity to

---

[51] Accord New Jersey Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8, 15 (App. Div. 2003) ("the element of traditional reliance required to be pleaded and proven in a common law fraud or misrepresentation case need not be proven in order to recover for damages pursuant to the CFA") (citation omitted); Union Ink Co., v. AT&T Corp., 352 N.J. Super. 617, 646 (App. Div. 2002) ("There is no reliance requirement for [CFA] liability").

mislead," Da100-01 (quoting Cox, 138 N.J. at 17) (internal citation omitted), and the statute requires Plaintiff "to prove only that defendant's conduct was a cause of damages. [It] need not prove that [Merck's] conduct was the sole cause of loss." Varacallo, 332 N.J. Super. at 48 (emphasis added); accord Da104.

Because (i) the CFA requires no showing of reliance; (ii) a defendant's conduct need only have had the capacity to mislead; and (iii) conduct in violation of the CFA need only have contributed to class members' ascertainable losses and need not have been the sole cause, the liability inquiry here will not require an examination of how each payor specifically "reacted" or "responded" to information about Vioxx.[52]

Indeed, an examination of individual payors' "reaction" is especially not warranted on this record, which shows that Merck uniformly saturated payors with information about Vioxx that reflected material omissions about the drug's safety and efficacy. E.g., Pa322-97 (2002 Vioxx formulary compendium). Furthermore, it is undisputed that Merck directly targeted payors as part of its strategy to gain formulary placement for Vioxx in order to ensure the drug's commercial success. E.g., Pa280, 282-85, 287, 289-91. Indeed, because Merck was the

---

[52] Because its fraud need only have been a factor and no "but for" causation standard applies, Defendant's reference to "the wide diversity of sources and information" that were available to each payor, Dsb37 (emphasis omitted), is beside the point.

font of all information about Vioxx, payors' formulary decisions concerning Vioxx were necessarily founded on the omissions that form the basis of Plaintiff's CFA claims.

Where, as here, a defendant has "withheld material information with the intent that consumers would rely on it . . . the purchase of the [product] by a person who was shown the literature"—in this case, payors—"would be sufficient to establish prima facie proof of causation." Varacallo, 332 N.J. Super. at 49.[53]   Prima facie proof of causation makes particular sense in this case. It is inconceivable that, given available alternative pain medications, payors having access to the information about Vioxx that Merck suppressed— in particular about its cardiovascular risks, see supra at 8-10—would have placed Vioxx on their formulary or accorded it a preferred formulary tier level.

Defendant vainly tries to distinguish Varacallo and In re Cadillac. See Dsb42-45. Merck's assertion that those cases involved the dissemination of "'essentially the same information'" whereas this case does not, Dsb43 (citation omitted), is patently inaccurate. The record here shows that

---

[53] Defendant contends that a classwide presumption of causation is impossible because of the defenses that it would be entitled to assert. Dsb44. Besides putting the proverbial cart before the horse, that unsupported argument proves nothing. Neither the Appellate Division, nor Judge Higbee, nor Plaintiff ever suggested that Plaintiff's classwide proof (including the uniformity of Merck's material omissions) would give rise to an irrebuttable presumption.

Merck's promotion and marketing of Vioxx were uniform and its material omissions consistent.[54]

The key distinction that Defendant tries to make between this case and In re Cadillac and Varacallo is disingenuous. Merck asserts that, unlike those cases, class members here "received and acted upon a widely varying mix of information during the class period." Dsb43-45. Merck, however, cites no evidence that it ever provided payors, P&T Committees, health care providers, or anyone else a "widely varying mix of information." That is not surprising because the record shows Merck's consistent, methodical, and uniform suppression of information concerning the safety and efficacy of Vioxx.

Unable to point to its own statements to support its "mix of information" theory, Defendant relies on "articles . . . in the popular press." Dsb40. Yet even there, it cites only one article that pre-dates the launch of Vioxx (see Dsa1-2)——when class members would not yet have added it to their formulary.[55]

---

[54] Merck also inaccurately claims that Varacallo adopted a fraud-on-the-market standard. See Section III-D, infra (addressing Merck's fraud-on-the-market argument). Varacallo accepted an indirect reliance standard, not fraud-on-the-market. See 332 N.J. Super. at 48-49. It merely noted that fraud-on-the-market is a form of indirect reliance employed in securities fraud cases. Id. at 47-48.

[55] Merck exaggerates the value of the alternative information that payors allegedly could have balanced against its deceptions. For example, with respect to the late 2000 article concerning the so-called VIGOR study, Dsb40, Merck ignores the article's main focus on Vioxx's GI safety. See Dsa3-11. The article dismissed the heart attack disparity between patients taking Vioxx and those taking naproxen as a

Essentially, Merck's argument can be distilled down to the indefensible proposition that if purchasers injured by a defendant's deceptive conduct had access to a small kernel of truth from alternative sources, their CFA claims cannot be resolved on a classwide basis.[56]

At any rate, whether some class members had access to any information from third parties about the risks posed by Vioxx is totally beside the point and does not alter the fundamental classwide liability question here—which is whether Defendant concealed material facts about the safety and efficacy of Vioxx. Thus, so long as the message to which class members were exposed _from Merck_ was materially uniform, the class possesses the requisite cohesion.[57]

---

consequence of the latter's alleged cardioprotective qualities, Dsa9-10, an unfounded theory that Merck itself had floated. Also, the article did not discuss other cardiovascular adverse events and misstated the incidence of heart attacks in the VIGOR trial.

[56] Although it also points to an April 2002 labeling change, Dsb41, Merck fails to mention that this change occurred three years after the release of Vioxx—long after payors had already made their formulary determinations concerning the drug. Furthermore, this FDA-mandated change did not reveal any of the abundant material information regarding the safety and efficacy of Vioxx that Merck had suppressed. See supra at 8-10. In fact, even after this change, Merck continued to deny for nearly 30 months that Vioxx posed any cardiovascular risks, making repeated public statements affirming its safety.

[57] As a general matter, the irony of Merck's "mix of information" defense cannot be overstated for two reasons. First, although it now cites sources of information about Vioxx's risks, prior to September 30, 2004, Merck strenuously denied that any such risks existed, and resorted to often

-47-

Related to its argument that the availability of information about Vioxx from other sources precludes class treatment, Defendant asserts that the information available to payors "changed over time." Dsb41. Defendant's statements, however, remained materially consistent,[58] and class certification is not defeated "by fluctuations in the underlying facts over the class period." Steiner v. Equimark Corp., 96 F.R.D. 603, 608 (W.D. Pa. 1983).[59]

---

heavy-handed efforts to "neutralize" critics. See supra at 8-10. Second, Merck's "mix of information" defense is identical to a "truth-on-the-market" defense, which is unique to cases employing a fraud-on-the-market presumption, e.g., In re Apple Computer Secs. Litig., 886 F.2d 1109, 1115 (9th Cir. 1989)—the very theory that Merck wrongly criticizes the Appellate Division for allegedly invoking, see Section III-D, infra.

[58] The cases that Merck cites are inapposite. See Dsb41 & n.12. Whereas the "varying degrees of disclosure" in Carroll stemmed from the "considerable variation in marketing strategies for each region," 313 N.J. Super. at 505, Merck did not materially tailor its messages about Vioxx by geographic region. The labeling differences in Rezulin related to personal injury claims based on a failure to warn, 210 F.R.D. at 66, not consumer fraud. Sikes v. Teleline, Inc., 281 F.3d 1350 (11th Cir. 2002), Martin v. Dahlberg, Inc., 156 F.R.D. 207 (N.D. Cal. 1994), and Rodriguez v. McKinney, 156 F.R.D. 112 (E.D. Pa. 1994), were civil RICO cases. Because reliance was an element of the predicate acts of mail, wire, or bank fraud, questions concerning individual class members' reliance predominated due to variations in the misrepresentations, see 281 F.3d at 1360-64; 156 F.R.D. at 215; 156 F.R.D. at 116. In stark contrast, the CFA has no reliance component.

[59] Accord O'Connor v. Boeing North Am., Inc., 184 F.R.D. 311, 331 (C.D. Cal. 1998) (citing cases); Cohen v. Uniroyal, Inc., 77 F.R.D. 685, 691 (E.D. Pa. 1977); Laufer, 2005 WL 1869211, at *12 ("Common questions arise from a common nucleus of operative facts' regardless of whether the underlying facts

**B.  The Liability Inquiry Will Focus on Merck's
    Conduct, Not That of Individual Class Members**

Next, Merck claims that Judge Higbee's "own findings"
preclude a classwide liability determination.  Dsb36; see also
Dsb5-6.  Merck, however, takes her factual findings out of
context and disregards the overwhelming evidence of record.

Defendant cherry-picks statements in Judge Higbee's
decision concerning P&T Committee differences, and sidesteps
her ultimate factual finding that any such differences were
immaterial given the alleged "long-term, widespread, and
uniform pattern of deception" that "was accomplished by
various methods."  Da83-84.  Because "elements of fraud" are
alleged to have "pervaded every aspect of Merck's actions in
developing and marketing Vioxx," Judge Higbee found that
Plaintiff could establish that Merck's omissions or
misrepresentations "were a causal factor" in class members'
determination to add Vioxx to their formulary "without a
detailed analysis of each decision made by each member of the
class."  Da84.  She concluded that "Merck's actions regarding
Vioxx from the time the drug was first conceived until the
time it was withdrawn from the market constitute[] a common
core of operative facts."  Id. (citation and internal
quotation marks omitted).  Merck cannot have it both ways:
embracing Judge Higbee's statement about certain individual
aspects of P&T Committees, yet glossing over her finding that

fluctuate over the class period and vary as to individual
claimants.") (citing cases; internal quotation marks omitted).

Merck's pervasive deceptions render those individual characteristics meaningless.

Setting aside this key factual finding—which is fatal to its theory that questions concerning individual payors will predominate—Merck exceedingly overstates P&T Committee differences. P&T Committees employ a remarkably uniform process in selecting drugs for their formularies. See Pa485-88 (Kelly Cert. ¶¶ 16-25). In fact, there is a common format for formulary submissions. See Pa511 (Academy of Managed Care Pharmacy ("ACMP"), Format for Formulary Submissions, Version 2.0 (Oct. 2002)). Merck's own expert acknowledged that most pharmaceutical companies construct and submit "dossiers" in accordance with that manual, and that the ACMP has addressed common formulary practices. Pa452 (Kolassa Tr. 108:5-109:2-8, 110:3-7); see Pa432.[60]

More importantly, as even Defendant itself concedes, Dsb37, P&T Committees commonly receive and consider the same information—as, in fact, occurred in the case of Vioxx. Pa486 (Kelly Cert. ¶¶ 18-19); see Da146 (Kolassa Cert. ¶ 21) (P&T Committees consider information supplied by drug-

---

[60] Indeed, because a handful of PBMs (such as Medco, which Merck owned during most of the time that Vioxx was on the market) manage 95% of the prescriptions of those having prescription drug benefit coverage, Pa483-84 (Kelly Cert. ¶ 12); see also Da142 (Kolassa Cert. ¶ 14 ("Most prescription drug sales in the United States are made through PBMs.")), most payors' formulary determinations were likely made by a limited number of P&T Committees.

makers).[61]   That being so, the Appellate Division correctly noted that "no P&T Committee could have been completely isolated from Merck's extensive development and marketing efforts," and that, contrary to Defendant's suggestion, Dsb44, it is highly improbable that P&T Committees would have decided to add Vioxx to their plans' respective formularies absent Merck's wrongful conduct. Da105 (emphasis added).

The record here confirms both the uniformity and consistency of Defendant's messages about Vioxx, see supra at 5-10, and thus shows a "'common nucleus of operative facts'" that towers over questions affecting only individual class members.   Varacallo, 332 N.J. Super. at 42 (quoting In re Cadillac, 93 N.J. at 431).[62]

Connected to Merck's emphasis on individual P&T Committee deliberations is its assertion that its misconduct could not have affected payors with "open" formularies (i.e., those that

---

[61]   To the extent that P&T Committees differ in their formulary determinations, including tier placement decisions that determine the level of reimbursement for a drug, those differences stem from the varying needs of their respective plan's sponsors, not from differences in the processes that they employ.   Pa485 (Kelly Cert. ¶ 16).

[62]   Merck's effort to shift the focus from its conduct to how P&T Committees "reacted" to information about Vioxx is not only, as shown above, factually bereft, but also imposes an impossible burden.  Its reasoning precludes any consumer fraud class from ever being certified—even though all of its members purchased a product after being exposed to the seller's materially uniform information—unless it is shown that all of its members think, decide, and react identically to the same set of information or concealment of information.

include any FDA-approved drug). Dsb6, 38-39. Not only does Merck cite no record evidence for its claim respecting the percentage of open formularies, but its point is specious.

As the Appellate Division noted, even payors with open formularies still had to make a determination as to which tier of the formulary to place Vioxx on. Da105; see Pa 486, 488 (Kelly Cert. ¶¶ 20, 25) (tier placement determines extent to which health plans will cover drug's cost, including amount, if any, of required co-payments). Therefore, contrary to Merck's ipse dixit that the existence of open formularies makes classwide proof impossible here, Dsb39 n.11, the all-encompassing deceptions about the safety and efficacy of Vioxx affected all payors—whether they affirmatively added Vioxx to their formulary or had "open" formularies on which they gave Vioxx favorable tier placement.[63]

---

[63] Defendant claims that class members' different "reaction[s]" to revelations about Vioxx's safety risks—in particular, some payors' continued payment for Vioxx prescriptions—are "conclusive proof" that this case cannot be tried on a classwide basis. Dsb38, 51. Such facts, however, relate only to the question of class members' mitigation of their damages, not Merck's liability, inasmuch as these different "reactions" would have occurred after payors had first added Vioxx to their formulary. Variations in the measure of damages are no bar to class certification. Muise, 371 N.J. Super. at 46; Delgozzo, 266 N.J. Super. at 190. Indeed, individual damages questions are typical in class actions. E.g., In re McDonnell Douglas Corp. Secs. Litig., 98 F.R.D. 613, 617 (E.D. Mo. 1982) ("The amount of damage is nearly always an individual question and can usually be determined by the application of a mechanical formula"). In fact, far from such facts precluding classwide adjudication, Judge Higbee noted that payors' continued payment for Vioxx prescriptions is an issue likely to be common to most or all class members. Da41.

In short, contrary to Merck's unfounded assertion that a classwide presumption of causation is "impossible" to justify on this record, Dsb44, this is a paradigmatic case in which the liability inquiry will focus on what messages came (or failed to come) from Merck—that is, on what <u>Defendant</u> did. That being so, the resolution of the core question of liability will necessarily be classwide.[64]

## C. <u>Merck Relies on Inapposite False Advertising Cases</u>

Defendant's principal legal support for its effort to transform the CFA's causal nexus test into one that is

---

[64] See <u>In re Linerboard Antitrust Litig.</u>, 305 <u>F.</u>3d 145, 163 (3d Cir. 2002) ("[C]ommon issues of concealment predominate here because the inquiry necessarily focuses on defendants' conduct, that is, what defendants did rather than what plaintiffs did.") (citation and internal quotation marks omitted); <u>In re Mercedes-Benz Antitrust Litig.</u>, 213 <u>F.R.D.</u> 180, 187 (D.N.J. 2003) ("common issues predominate when the focus is on the defendants' conduct and not on the conduct of the individual class members"); <u>In re Select Comfort Corp. Secs. Litig.</u>, 202 <u>F.R.D.</u> 598, 610 (D. Minn. 2001) ("[C]ommon questions predominate when the alleged fraudulent representations constitute a common course of conduct.") (citation and internal quotation marks omitted); <u>Weil v. Long Island Sav. Bank, FSB</u>, 200 <u>F.R.D.</u> 164, 175 (E.D.N.Y. 2001) (inquiry that "necessarily focuses on defendants' conduct, that is, what defendants did, rather than what plaintiffs did" predominates over individual questions) (citation and internal quotation marks omitted); <u>Haley v. Medtronic, Inc.</u>, 169 <u>F.R.D.</u> 643, 650 (C.D. Cal. 1996) (common questions predominated where plaintiffs' claim focused on defendant's conduct, not defective product's effect on plaintiffs); <u>cf.</u> <u>In re Penn. Baycol Third-Party Payor Litig.</u>, No. 1874 Sept. Term 2001, 2005 WL 852135, at *5 (Pa. Ct. Com. Pl. Apr. 4, 2005) (unpublished) (liability to payors for costs of unsafe medication sold to consumers was common question).

indistinguishable from the reliance requirement in common law fraud cases is Carroll v. Cellco Partnership, 313 N.J. Super. 488 (App. Div. 1998). See Dsb33-34. Carroll, however, predates Varacallo, which reaffirmed Gennari's rejection of a reliance test in CFA cases. See 332 N.J. Super. at 43.

That distinction aside, Carroll was a mass media false advertising case. There, the plaintiff cellphone subscribers raised a hodgepodge of claims pertaining to both billing practices and service quality. 313 N.J. Super. at 491. They claimed reliance on different representations by the defendant, different explanations as to what information was conveyed to them before they signed up for the service, and different reasons for their having signed up. Id. at 503-04. Given such a record, Carroll found a "diversity of facts" and noted that "[e]ach plaintiff had a different interaction with defendant's representatives, and the ability to prove reliance depend[ed] on circumstances peculiar to each plaintiff," and thus concluded that "individual questions . . . could well overwhelm the common issues." Id. at 505.

This case, by contrast, does not involve false advertising or a mishmash of challenged practices, services, or products. Nor does it involve sundry representations. Rather, the evidence in the record bears out Defendant's

materially uniform messages to payors and healthcare providers
about Vioxx.   See supra at 5-10.   It amply satisfies the
requirement that class plaintiffs must demonstrate that "the
same or similar representations . . . were made to the entire
class." 313 N.J. Super. at 502 (emphasis added).

Merck's reliance on Fink, Dsb34-35, is also misplaced.
Because the claims in Fink, like those in Carroll, were based
on false advertising, the trial court held that the plaintiffs
had to demonstrate that each class member read one or more of
the challenged advertisements.  See 365 N.J. Super. at 545.

Yet even Fink held that CFA plaintiffs are not required
to offer direct proof that the entire class relied on a
defendant's omission of material facts, where the defendant
withheld those material facts for the purpose of inducing the
very action the plaintiff pursued.   In omissions-based CFA
cases, the plaintiff is entitled to a presumption of reliance
or causation.  Id. at 548.  Here, Plaintiff relies principally
on Merck's concealment of information concerning the safety
and efficacy of Vioxx, e.g., Da2, 4, 6, 8, 13 (Compl. ¶¶ 5,
15, 19-20, 22, 31, 52(a)-(b)); class discovery confirmed the
widespread nature of those material omissions, see supra at 8-
10; and the complaint alleges that the purpose behind these
omissions was to facilitate formulary placement of Vioxx, Da2-

3, 6, 8-9, 15 (Compl. ¶¶ 6-7, 21, 31-34, 53-56).

Similarly, Gross v. Johnson & Johnson-Merck Consumer Pharms. Co., 303 N.J. Super. 336 (Law Div. 1997), see Dsb33, was a mass media false advertising case brought by over-the-counter drug purchasers, and the court specifically noted the obstacles to class treatment of false advertising claims. The court reasoned that because the proposed class was composed of individuals who relied on the challenged advertisements, individual questions predominated. Id. at 346, 349-50.

In short, to the extent that Carroll, Gross, or Fink required a showing of reliance, they did so improperly but, at any rate, their departure from CFA precedent was only in the limited realm of false advertising-based CFA claims.

Oddly, Merck touts In re Rezulin as "most analogous" to this case. Dsb35. Putting to one side that the Rezulin court was not a New Jersey court, that case involved claims for personal injuries (liver and heart toxicity) stemming from use of the drug at issue. 210 F.R.D. at 63-64. Personal injury claims are ordinarily not amenable to class treatment because they present highly individualized causation questions.[65] Although the Rezulin plaintiffs asserted CFA claims, they were

---

[65] E.g., In re Air Disaster Near Honolulu, 792 F. Supp. 1541, 1551 (N.D. Cal. 1990); Kohn v. American Hous. Found., Inc., 178 F.R.D. 536, 543 (D. Colo. 1998).

trying "to recharacterize what at root [wa]s a products liability suit as one of consumer fraud." Id. at 67. Such is not the case here.[66]

### D. This Case Involves No Fraud-on-the-Market Theory

Merck baldly accuses the Appellate Division of "altering substantive law through judicial rules of procedure." Dsb45. Specifically, Defendant equates the Appellate Division's holding that liability could be resolved on a classwide basis through generalized proof that Merck's "overarching scheme of omissions and representations about Vioxx allowed the company to achieve more favorable placement on the formularies than it otherwise might have," Da106, with a fraud-on-the-market approach. Dsb45-47. This argument is also flimsy.

While the rationale behind the fraud-on-the-market theory in securities fraud cases is that buyers of publicly-traded securities rely on the integrity of an efficient market to process material information and set prices, see generally Basic Inc. v. Levinson, 485 U.S. 224, 241-47, 108 S. Ct. 978, 988-92, 99 L. Ed. 2d 194 (1988), this is not a price inflation

---

[66] Besides its tenuous grounding in off-point cases, Merck's construction of the CFA runs contrary to the language of the statute itself, which focuses the liability question on the defendant's conduct. The CFA looks to whether a defendant has employed, inter alia, "any unconscionable commercial practice," "deception," "fraud," or "omission of any material fact," N.J.S.A. 56:8-2, not to how consumers "react" to the proscribed conduct. Merck turns this inquiry on its head.

case.  Rather, it involves Merck's strategy of ensuring that
payors would authorize the purchase of Vioxx by <u>affirmatively</u>
<u>adding it to their formulary or by according it favorable tier</u>
<u>placement</u>.  Da7-9 (Compl. ¶¶ 24-34).  Plaintiff does <u>not</u> claim
that Merck's concealment of information about Vioxx distorted
the drug's market price.  <u>Merck</u>—not an amorphous "market"—
set the drug's price.  Indeed, Merck's own expert was involved
in pricing decisions about Vioxx.  <u>E.g.</u>, Pa437 (Kolassa Tr.
10:5-11:24).  What Merck's suppression of information
accomplished is that it <u>facilitated the placement of Vioxx on</u>
<u>payors' formularies</u>.  Da8-9 (Compl. ¶¶ 31-33).[67]

Besides, payors did not passively rely on the integrity
of the prescription drug "market" to process information about

---

[67] For this reason, Merck's reliance on <u>New Jersey Citizen</u>
<u>Action</u> is misplaced.  <u>See</u> Dsb46.  <u>Citizen Action</u> did not
involve a class certification motion, and the plaintiffs there
alleged that the prices of the defendant's over-the-counter
allergy medicines had been driven up to artificially high
levels through demand fueled by the defendant's direct-to-
consumer marketing strategy that promoted the drugs'
effectiveness.  367 <u>N.J. Super.</u> at 11-12.  As noted above,
Plaintiff does not allege a distorted market price for Vioxx
stemming from Merck's fraud.  <u>Kaufman v. i-Stat Corp.</u>, 165
<u>N.J.</u> 94 (2000), <u>see</u> Dsb46, is also inapposite.  In <u>Kaufman</u>,
this Court held that a fraud-on-the-market theory cannot
substitute for a showing of individual reliance in suits
alleging common law fraud.  165 <u>N.J.</u> at 108-11.  That is an
unremarkable proposition given that common law fraud has
always required a showing of individual reliance, and courts
have refused to import the fraud-on-the--market theory adopted
in federal securities fraud cases, <u>see</u> <u>supra</u> at 57, into the
field of common law fraud, <u>see</u> 165 <u>N.J.</u> at 104-06.

Vioxx.   Rather, they were active, sophisticated buyers, whom Merck <u>directly targeted</u> in order to gain favorable treatment of Vioxx.  <u>See, e.g.</u>, Pa48, 280, 282-85, 287, 294.

### E.   Merck Misconstrues the Ascertainable Loss Element

Merck's attack on the ascertainable loss analysis of the courts below fares no better.  It infers from Judge Higbee's statement that Plaintiff "seeks to recover funds that it would not have otherwise spent," Da83, that each class member must show that Merck's fraud caused it to spend more on treatment costs for its participants for cardiovascular events triggered by Vioxx than what it saved in treatment costs for GI complications they (possibly) avoided by taking Vioxx.  Dsb49.

Neither Plaintiff nor Judge Higbee, however, put forward such a highly remote ascertainable loss theory.  Rather, that extremely elongated concept is what <u>Merck</u> framed in its trial court brief as the only possible theory, Pa574-75, despite the fact that neither is this a personal injury case brought by Vioxx end-users nor is Plaintiff's CFA claim based on physical harm suffered by payors' plan participants.  Rather, the complaint alleges that payors suffered ascertainable losses by placing Vioxx on their formulary after Merck systematically concealed information about the drug's safety and efficacy, resulting in their paying for Vioxx rather than cheaper and

safer alternative medications or combinations of medications. See Da3, 9 (Compl. ¶¶ 7-9, 33). As the Appellate Division explained, Defendant promoted Vioxx as

> not only safe, but superior to other available pain-killers because of its improved gastrointestinal protection. In reality, Vioxx was not appreciably better than other, less expensive, competitors and actually posed significant additional cardiovascular risks. Plaintiff thus suffered a "loss in value" when, on behalf of its participants, <u>it paid for a drug with serious health risks that Merck did not disclose, rather than choosing, based on full and truthful information, to select competitors' products instead. In short, when third-party payors paid for Vioxx, they got something less valuable than what was paid for and what had been promised</u>.

Da107 (emphasis added).

Nor can there be any genuine dispute that payors' "lost opportunity" to authorize the purchase of cheaper NSAIDs of similar efficacy and without the cardiovascular risks of Vioxx is an ascertainable loss.[68]

---

[68] See <u>Peterson</u>, 618 <u>N.W.</u>2d at 824 ("lost opportunity" sufficient to show CFA injury); <u>Talalai v. Cooper Tire & Rubber Co.</u>, 360 <u>N.J. Super.</u> 547, 563 (Law Div. 2001) (where defendant "failed to tell" plaintiffs "the true nature of the product they were buying," plaintiffs "established a legally cognizable injury" under CFA); <u>see also In re Warfarin Sodium Antitrust Litig.</u>, 391 <u>F.</u>3d 516, 531 (3d Cir. 2004) (payors "suffered direct economic harm when, as a result of DuPont's alleged misrepresentations, they paid supracompetitive prices for Coumadin instead of purchasing lower-priced generic warfarin sodium"); <u>Desiano v. Warner-Lambert Co.</u>, 326 <u>F.</u>3d 339, 350 (2d Cir. 2003) (health benefits providers may recover from drug manufacturer amounts overpaid to purchase higher-priced drug due to "illegal or deceptive marketing practices"

Furthermore, contrary to Merck's claim, Judge Higbee's analysis, read in proper context, was congruent with the Appellate Division's, inasmuch as she noted that "[o]nce the decision to include Vioxx in its prescription plan was made, and the level of payment was set, the third-party payor would be contractually obligated to pay for it if a plan participant received a prescription for it." Da83.   In other words, like the Appellate Division, Judge Higbee recognized that the ascertainable losses flowed immediately and directly from payors' favorable formulary treatment of Vioxx.

Moreover, in claiming that it is "implausib[le]" to determine ascertainable loss on a classwide basis, Dsb48, Merck blurs important distinctions.   The existence of class members' ascertainable loss—i.e., whether there is an "actual loss"—relates to the fact of injury. Thiedemann, 183 N.J. at 248 (loss is ascertainable if it is "quantifiable or measurable," although "it need not yet have been experienced as an out-of-pocket loss to the plaintiff"). As the Appellate Division noted, that can be shown classwide in this case because payors suffered a loss in value either by placing Vioxx on their formulary or by according it favorable tier

---

that misrepresented drug's safety).

placement. Da107.[69] The extent of an ascertainable loss, on the other hand, is simply the measure of damages, and, as noted above, individual class members' damages variations do not preclude class certification. See supra at 52 n.63.

For this reason, Defendant's assertion that the Appellate Division's sanctioning of an aggregate damages approach reflects a fraud-on-the-market theory, Dsb50, is unfounded. The Appellate Division proposed an aggregate approach for calculating payors' damages, not for determining whether, in fact, they experienced an ascertainable loss. See Da107-08.

Besides, the Appellate Division proposed an aggregate damages approach only in response to the argument of Merck's amicus, Pharmaceutical Research and Manufacturers of America, that Judge Higbee's ascertainable loss analysis reflected "a fundamental misunderstanding of the complexities inherent in the distribution of pharmaceutical products." PhRMAb30-34 (App. Div. Br.); see Da108. Aside from the fact that this argument was not properly before the Appellate Division because those alleged "complexities" had never been argued to Judge Higbee, Merck cites no authority to support its claim

---

[69] In any event, at the class certification stage, Plaintiff need only demonstrate that it suffered an ascertainable loss; it need not make such a showing on behalf of absent class members. See Laufer v. U.S. Life Ins. Co., 385 N.J. Super. 172, 186 (App. Div. 2006) (ascertainable loss element relates solely to CFA plaintiff's standing).

that aggregate damages approaches are exclusive to fraud-on-the-market cases. See Dsb50. On the contrary, courts have endorsed aggregate damages methods in a variety of contexts.[70]

Finally, Defendant contends that Plaintiff has "reformulate[d]" its ascertainable loss theory. Dsb51. That is not so. Plaintiff did not argue "overpayments" for Vioxx as the ascertainable loss. The statement in Plaintiff's brief below that Merck seizes upon out of context, Dsb51 n.17, merely employed different phrasing to state what the Appellate Division itself found—namely, that an ascertainable loss can be proven classwide because Merck's extensive promotion and marketing efforts and its all-encompassing deceptions influenced all payors, Da105, whether they be payors that

---

[70] E.g., Hilao v. Estate of Marcos, 103 F.3d 767, 782-84 (9th Cir. 1996) (victims of human rights abuses); Cook v. Rockwell Int'l Corp., 273 F. Supp. 2d 1175, 1212 (D. Colo. 2003) (property damage from radioactive emissions at nuclear weapons plant); In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 517 (D.N.J. 1997) (deceptive sales practices in marketing of insurance), aff'd, 148 F.3d 283 (3d Cir. 1998); Bell v. Farmers Ins. Exch., 9 Cal. Rptr. 3d 544, 571-79 (Cal. Ct. App. 2004) (unpaid overtime); see generally Muise, 371 N.J. Super. at 47-48 (court may accept proof of aggregate damages "where a reliable mathematical formula is available and the court can presume that all class members suffered damage"); 3 Alba Conte and Herbert B. Newberg, Newberg on Class Actions § 10:2, at 477 (4th ed. 2002) ("Proof of aggregate monetary relief for the class is feasible and reasonable under various circumstances. In fact, the ultimate goal in class actions is to determine the aggregate sum, which fairly represents the collective value of claims of individual class members.") (footnote omitted).

affirmatively added Vioxx to their formulary or payors with open formularies that gave it favorable tier placement.[71]

**CONCLUSION**

The Court should affirm the decision below.

Dated:    October 20, 2006

Respectfully submitted,

SEEGER WEISS LLP

By: _Christopher A. Seeger_  (BB)
Christopher A. Seeger
David R. Buchanan
550 Broad Street, Suite 920
Newark, NJ    07102
Telephone:  (973) 639-9100
*Attorneys for Plaintiff-Respondent*

*Of Counsel:*

Diogenes P. Kekatos
James A. O'Brien III
Jeffrey S. Grand
SEEGER WEISS LLP
One William Street, 10th Floor
New York, NY  10004
Telephone:  (212) 584-0700

John E. Keefe, Jr.
KEEFE BARTELS
830 Broad Street
Shrewsbury, NJ  07702
Telephone:  (732) 224-9400

---

[71]  Far from being "irreconcilable" with Judge Higbee's decision, Dsb51, Plaintiff's ascertainable loss claim is consistent with her findings that (i) payors' losses stemmed from the formulary status accorded to Vioxx, Da83, and (ii) given the allegations of pervasive, systemic fraud in the drug's promotion and marketing, all formulary decisions respecting Vioxx were invariably affected, Da84.

Arnold Levin
Fredrick S. Longer
**LEVIN, FISHBEIN, SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA  19106-3697
Telephone:  (215) 592-1500

Thomas R. Kline
**KLINE & SPECTER, P.C.**
The Nineteenth Floor
1525 Locust Street
Philadelphia, PA 19102
Telephone: (215) 772-1000

Elizabeth J. Cabraser
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, CA   94111-3339
Telephone: (415) 956-1000

Jonathan Shub
**SHELLER, LUDWIG & BADEY, P.C.**
One Greentree Centre, Suite 201
Route 73 & Greentree Road
Marlton, NJ   08053
Telephone: (856) 988-5590

Shelly Sanford
**GOFORTH LEWIS SANFORD LLP**
1111 Bagby, Suite 2200
Houston, TX   77071
Telephone:  (713) 650-0022

Dennis Reich
**REICH & BINSTOCK**
4265 San Felipe, Suite 1000
Houston, TX   77027
Telephone:  (713) 622-7271