UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: VIOXX                      : | |
|                             : | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION : | |
|                             : | SECTION L |

**In Re: VIOXX** :

   :       MDL Docket No. 1657

**PRODUCTS LIABILITY LITIGATION** :

   :       SECTION L

   :

   :       JUDGE FALLON

   :       MAG. JUDGE KNOWLES

   :

**THIS DOCUMENT RELATES TO:** :

   :

**THIRD PARTY PAYOR COMMON** :

**BENEFIT FEES** :

   :

**THE TPP FEE ALLOCATION COMMITTEE'S RESPONSE TO THE OBJECTIONS TO THE REPORT AND RECOMMENDATION OF SPECIAL MASTER REGARDING THIRD PARTY PAYOR COMMON BENEFIT AWARDS AND FEE ALLOCATION COMMITTEE'S REVISED PROPOSED ALLOCATION AWARDS**

I.    <u>INTRODUCTION</u>

The Court-appointed Third Party Payor Fee Allocation Committee ("FAC") respectfully submits this Response to the two Objections filed to the November 8, 2013 Report and Recommendation of Special Master Regarding Third Party Payor Common Benefit Awards. Specifically, the FAC responds to the Objections of the Law Offices of Eric H. Weinberg and those of counsel for the Central States Central States Southeast and Southwest Area Health and Welfare Fund ("Central States"), *i.e.*, Hovde Dassow & Deets, the Lanier Law Firm, PLLC, Ewing McMillin & Willis PLLC, and Gary L. Franke & Co.[1]

---

[1]   Though these firms in fact represented two Third Party Payor clients – Central States and Central Pennsylvania Teamsters Health Welfare and Pension Fund – the firms received a modest fee for their work from Central Pennsylvania Teamsters.   Thus, the Central States counsel's application

## II.   **FACTUAL BACKGROUND**

The September 14, 2009 Third Party Payor and Common Benefit Settlement Agreements created a $65 million fund to compensate certain identified plaintiffs and separately created a $15 million fund to pay common benefit attorneys fees and expenses related to Third Party Payor ("TPP") litigation. Following the presentation of the Common Benefit Settlement Agreement, the Court established procedures and deadlines for private TPP common benefit fees.   The Court initiated a process through which a reasonable allocation of these funds could be dispersed, for payment of fees and costs from the Common Benefit Fees and Expense Fund created by the Common Benefit Settlement Agreement, by issuing PTO No. 6(D) and PTO No. 57.[2]   PTO No. 6(D), issued by the Court on September 15, 2008, as well as directives articulated orally at a monthly status conference on January 6, 2011, set forth procedures governing the allocation of TPP common benefit attorneys fees.   *See In re Vioxx Prods. Liab. Litig.*, 2011 WL 572394, at *1 (E.D. La. Jan. 11, 2011).   One of the rules set forth in those procedures was that claimants "were required . . . to work under the direction of the PSC."   *Id.*; *see also* PTO No. 6(D), at 7 ("Participating attorneys will not be compensated for work performed without authorization by a member of the PEC, PSC, or NPC, or similarly situated leaders in state consolidated litigation.").

PTO No. 57 was entered on August 17, 2011.   Pursuant to the order, the FAC was established and is comprised of Russ M. Herman, Elizabeth J. Cabraser, Christopher Seeger, Thomas M. Sobol, Andy D. Birchfield, Jr., and James R. Dugan II.   As relevant here, PTO No.

---

for fee and expense from the fund for work performed for both clients has been cast as work for Central States.   Audet & Partners, another participating Central States counsel, separately resolved its fee award with the FAC.

[2]   *In re Vioxx Prods. Liab. Litig.,* MDL No. 1657, PTO No. 57 (E.D. La. Sept. 17, 2011).

57 provided that it covered "counsel . . . who have . . . performed common benefit work at the request of plaintiffs' leadership in this MDL or related state proceedings."   PTO No. 57 also set forth certain guidelines for assessing the relative contribution of each fee applicant for their work claimed to be expended for the common benefit of private TPP plaintiffs and for ensuring that work efforts already *specifically* compensated for benefitting personal injury clients not be reiterated.   Applications for TPP common benefit fees were due by September 16, 2011.   The FAC received 26 timely initial submissions on behalf of 30 firms from any firm seeking to recover common benefit fees or costs under the TPP CBF Agreement. Amongst these submissions were those of the present objectors:   Eric H. Weinberg (on behalf of the Law Offices of Eric H. Weinberg) and certain remaining "Central States" Objectors (*i.e.*, Hovde Dassow & Deets, Lanier Law Firm, Gary L. Franke & Co., and Ewing McMillin & Willis PLLC).

The Fee Allocation Committee substantively reviewed all submissions and discussed these submissions during multiple phone calls. The Committee decided that it needed additional information from applicants and advised the Court that it would require more time to make a recommendation. The Committee asked all applicants to complete a supplemental form that asked applicants to (i) segregate and report TPP-only time and to exclude any client-specific work from their claimed TPP common benefit lodestar, (ii) categorize and describe their common benefit activities, (iii) identify their unreimbursed costs, and (iv) indicate what portion of the claimed TPP common benefit time, if any, was previously submitted in conjunction with the Court's early common benefit proceedings. The Committee informed all applicants via email that the supplemental information had to be completed by Monday, October 17, 2011.

Pursuant to that directive, Eric H. Weinberg, on behalf of the Law Offices of Eric H. Weinberg, submitted his Supplemental Vioxx Third Party Payor Common Benefit Application

3

[Rec.Doc. 63569, Exh. D, Tab 24].   That Supplemental Application stated that Mr. Weinberg purported to have a total TPP common benefit lodestar of $1,138,500.00, and expenses of $27,392.61.   All told, Mr. Weinberg sought $1,165,892.61 purportedly for TPP related work. The Weinberg Supplemental Application broke down the time submissions of his solo-practitioner firm as being, in his own words, only 15% "spent in coordinating TPP plaintiffs' common efforts and activities," and the remaining approximately 85% spent on expert work (70%) or   preparing for depositions (15%).   *Id.*   The Weinberg Supplemental Application was certified by Mr. Weinberg as being true, accurate and complete.   *Id.*

After reviewing the submissions and supplemental material, the FAC, consistent with the directives of PTO No. 57, filed its initial Recommendation on November 17, 2011 [Rec.Doc. 63569].[3]   Therein, the FAC recognized that the "applicants fell into three buckets:   some applicant should be well compensated for significant substantive TPP common benefit work; some applicants were not previously compensated for TPP common benefit work during the Court's earlier common benefit proceedings and should be reasonably compensated for their TPP common benefit contributions; and some applicants did not contribute meaningfully to the common benefit of TPPs."   Nov. 17, 2011 Recommendation at 11.

Consistent with Mr. Weinberg's certification that 85% of his time was devoted to experts and preparing for depositions, the FAC observed from Mr. Weinberg's submissions that he purported to have "conducted extensive research into Merck Documents, and medication and scientific information related to Vioxx."   *Id.* at 26.   In its initial recommendation, the FAC

---

[3]   On November 8, 2011, the FAC filed a motion to file Exhibit D to its recommendation under seal [Rec.Doc. 63555].   That motion was granted by Order dated November 10, 2011 [Rec.Doc. 63564].   After receiving this Order, on November 11, 2011, the FAC re-filed its Recommendation, with Exhibit D being filed under seal.

further quoted Mr. Weinberg's submissions, which addressed his developing a unique risk/benefit theory of Merck's liability, studied adverse bone density efforts of Vioxx, and analyzed Merck's Alzheimer's Studies, and the FAC also noted his role was co-counsel in a personal injury action in Australia.   *Id.*

Mr. Weinberg's time records submitted for TPP purposes bear out the fact that the vast majority of his time between the announcement of the personal injury settlement in November 2007 and the announcement of the TPP settlement in September 2009 (as he concedes approximates 85% of his time) was spent working with two experts, Dr. John Kostis and Dr. David Madigan, on matters related to Mr. Weinberg's ongoing analysis of Merck's Alzheimer Studies and Dr. Madigan's testimony in the personal injury action in Australia.   Notably, Mr. Weinberg's efforts on these exact same subjects were previously recognized by the earlier FAC and the Court as being related to personal injury matters and for which Mr. Weinberg was allocated compensation from the earlier settlement.[4]   *See In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740, 823 (E.D. La. Aug. 9, 2011) (noting, in awarding Mr. Weinberg's firm $3,500,000 in common benefit fees, that Mr. Weinberg worked with experts including Dr. John Kostis and Dr. David Madigan.   Mr. Weinberg assisted in exposing the fact that the Alzheimer Studies showed a statistically significant risk of cardiovascular events and death by the years 2000 and 2001 . . .").

In connection with the earlier allocation of the award from the personal injury settlement, that FAC made no consideration for TPP work.   Although by court order, all such hours were

---

[4]   It should not be forgotten that in that earlier setting Mr. Weinberg was engaged in a spurious attempt to use his liability theories to obtain an INVENTORY settlement solely for his client base, contrary to established jurisprudence and antithetical to the intentions of the Court.

reported to the Court-appointed certified public accountant, as evidenced by PTO No. 57, TPP-related time was *not* considered in making the prior allocation.   *See Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d at 767.   Instead, the qualitative criteria employed to make allocative recommendations rested upon specific considerations related to other classifications.   *Id.* Instead, the qualitative criteria employed to make allocative recommendations rested upon specific considerations related to other classifications.   Id. ("To arrive at this recommendation, the FAC developed its own objective criteria by breaking down each common benefit fee applicant's contribution to the work categories of Key Leadership Roles, Trials, Settlement, Law & Briefing, Settlement Implementation/Post-Settlement Matters, Discovery/Science, Committee Leadership and Participation, Funding, and Case Management.").   TPP work was simply not one of the criteria used to compensate counsel from the personal injury award.   It is plainly evident then that Mr. Weinberg's compensation for work with Drs. Madigan and Kostis, then, as now, was related to personal injury claims.

Accordingly, as part of its November 17, 2011 initial recommendation regarding TPP common benefit compensation, the FAC found Mr. Weinberg's time falling into the third bucket – no meaningful contribution to TPP claims – and offered him nothing.

After taking in additional evidence, comments and objections, the FAC finalized its Recommendation, which report was filed with the Court on June 13, 2012 [Rec.Doc. 63928]. Again, the FAC recommended that Mr. Weinberg not receive any allocation.   The Court published this Final Recommendation in its Order of July 25, 2012, and invited anyone objecting to the Final Recommendation to "file with the Court an objection setting forth the reasons for their objection, describing the amount they feel they should be entitled to, and attaching all

available supporting documentation.[5]

Thereafter, objections were filed by several objectors, including Mr. Weinberg [Rec.Doc. 64044] and the Central States Objectors [Rec.Doc. 64046].   With the Court's oversight, the FAC was able to resolve all but these two objections.[6]   Upon this impasse, on December 11, 2012, the FAC filed its Notice of Filing of [Proposed] Decision Distributing Third Party Payor Common Benefit Fund [Rec.Doc. 64193].   Following that, certain disputes involving production of time records or the records of Mr. Garrett were resolved, and additional briefing was submitted by the interested parties.

On March 15, 2013, the Court determined that additional review of the TPP common benefit fee allocation was needed by a Special Master.    By Order of the Court, Mr. Juneau was appointed Special Master to review the two remaining objections.[7]   Whereupon, the Special Master issued a Scheduling Protocol for Third Party Payor Common Benefit Fees of April 26, 2013 [Rec. Doc. 64361], which requested that memoranda be presented by the FAC and the objectors by May 15, 2013, and set a hearing on the matter for May 23, 2013.[8]   By agreement of the parties, the hearing set for May 23, 2013 was cancelled with the understanding that the matter would be submitted on the papers submitted.   After reviewing the papers, however, the Special

---

[5]  *See In re Vioxx Products Liab. Litig.,* MDL No. 1657, Order (E.D. La. July 25, 2012)[Rec.Doc. 64011].

[6]  The FAC at one point offered Mr. Weinberg $450,000 to resolve his objection.   That offer was rejected, and the FAC reverted to its original position.

[7]  *In re Vioxx Prods. Liab. Litig.,* MDL No. 1657, Order at 3 (E.D. La. March 15, 2013)[Rec.Doc. 64304].

[8]  At the Special Master's request, a List of Documents Regarding TPP Fee Allocation Provided in Response to the Special Master Protocol was also filed on May 6, 2013 [Rec.Doc. 64378].

Master determined that he would need to question witnesses and issued a Revised Scheduling Protocol for Third Party Payor Common Benefit Fees on June 10, 2013 [Rec.Doc. 64439]. Therein, Mr. Juneau set an evidentiary hearing for June 20, 2013.

In anticipation of the June 20, 2013 Hearing, the FAC issued a subpoena upon Mr. Weinberg requesting that he produce all of his time records for any Vioxx-related matter from February 2005 to the present.    The FAC requested these records to better understand Mr. Weinberg's time submissions, some of which were duplicative or otherwise questionable.   By Order dated June 7, 2013 [Rec.Doc. 64437], the Court ordered Mr. Weinberg to produce these time records. When Mr. Weinberg informed the FAC that he had no intention of complying with the subpoena until *well after* the June, 20, 2013 evidentiary hearing, the FAC filed a motion for contempt, or alternatively, to strike.   The motion was granted in part, and Mr. Weinberg was obliged to provide his requested time records at the Hearing.  *See* Order of June 19, 2013 [Rec.Doc. 64451].   Although Mr. Weinberg only partially complied with the Court's June 19, 2013 Order in a timely fashion, on July 1, 2013, the Court declined to find Mr. Weinberg in Contempt [Rec.Doc. 64474].

The Evidentiary Hearing took place on June 20, 2013.   The Special Master heard testimony from Mr. Weinberg, from Mr. Dassow on behalf of the Central States Objectors, and from Mssrs. Seeger and Buchanan on behalf of the FAC.

Thereafter, on November 8, 2013, Mr. Juneau issued his Report and Recommendation [Rec.Doc. 64682].   From the record established, Mr. Juneau reported:

> With regard to the objection of Eric Weinberg, the testimony and submissions revealed that a significant portion of his time was expended in working with experts, participating at his election in litigation that was pending in Australia, preparation of an article on Alzheimer's disease and work related to bone density. Chris Seeger,

who according to all accounts was the primary involved counsel in the third-party payor litigation, testified that all of this work by Mr. Weinberg was not done at the request of liaison counsel or counsel directing the litigation. (Transcript of Proceedings before Special Master, pp. 77-79). Additionally, Mr. Seeger testified that none of this work by Mr. Weinberg was of any benefit in the prosecution and ultimate resolution of the third-party payor litigation. (Transcript of Proceedings before Special Master, pp. 67-68, 76-78 and 85-87).

Report & Recommendation at 2. The Special Master carefully considered the totality of Mr. Weinberg's time records and determined that only 166 hours of the time reported (giving him the benefit of doubt even for grouped time entries) were compensable as being related to TPP efforts. Although Mr. Weinberg's claimed hourly rate is $750/hour [Supplemental Vioxx Third Party Payor Common Benefit Application of the Law Offices of Eric H. Weinberg (Oct. 17, 2011)], which would translate into a lodestar of $124,500.00, the Special Master recommended that Mr. Weinberg recover $135,292.00. *Id.* This amount reflects a multiplier of approximately 1.1 for the time deemed compensable, a generous award for the modest (if not dubious) relative contribution Mr. Weinberg made to TPP-related efforts, considering that no other counsel recovered anywhere near their full lodestar amounts.

Submissions by the Central States objectors were primarily addressed to the law firms of Hovne, Dassow & Deets, and the Lanier Law Firm. The Special Master's Report and Recommendation afforded these two firms awards of $425,152.00 and $75,000.00, respectively. *Id.* at 3.

The matter is now ripe for this Court's determination of attorneys fees and costs.[9]

---

[9] Pursuant to Section 4.1 of the Common Benefit Settlement Agreement between Merck & Co., Inc. and Certain TPP Plaintiffs' Attorneys Identified Herein (Sept. 14, 2009) , the private settlement agreement provides that this Court is to be the final arbiter of attorneys fees and costs. The Court's decision is to be "final and Non-Appealable and binding" on the parties. *Id.* at § 4.1.4.

### III.  **ARGUMENT**

#### A.  **STANDARDS OF REVIEW**

The standard of review of the Report and Recommendation by the Special Master is *de novo*.  *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 813 (E.D. La. 2007); Fed.R.Civ.P. 53(g)(3-4).   This Court is obliged to review the objections to the findings of fact and conclusions of law the Special Master anew.

"The claimant has the burden of demonstrating that the hours claimed were reasonably expended on the prevailing claim," *Von Clark v. Butler*, 916 F.2d 255, 259 (5th Cir. 1990), and that they exercised billing judgment, *Walker v. City of Mesquite,* 313 F.3d 246, 251 (5th Cir. 2002); *see also League of United Latin American Citizens # 4552 (LULAC) v. Roscoe Independent School District,* 119 F.3d 1233 (5th Cir. 1997) ("the calculation requires a determination of whether the total number of hours claimed were reasonable and whether specific hours claimed were reasonably expended . . .. [and] the district court must eliminate excessive or duplicative time.") (citations omitted). Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant.   *Green v. Adm'rs of Tulane Educ. Fund,* 284 F.3d 642, 662 (5th Cir. 2002).

Furthermore, "[t]here is a strong presumption that the lodestar is the reasonable fee, and the fee applicant [Weinberg] bears the burden of showing that such an adjustment is *necessary* to the determination of a reasonable fee."   *Walker v. U.S. Dep't of Housing and Urban Development*, 99 F.3d 761, 771 (5th Cir. 1996) (emphasis in original) (citation and internal quotation marks omitted).[10]   "[U]pward adjustments of the lodestar figure . . . . are proper only in

---

[10]   Weinberg argues that the FAC "bears a heavy burden to justify tossing out [his] lodestar." Weinberg Objection, at 9.   But Weinberg improperly allocates the burden on the FAC here.   As an

certain rare and exceptional cases supported by both specific evidence on the record and detailed findings by the lower courts." *Shipes v. Trinity Indus.,* 987 F.2d 311, 320 (5th Cir. 1993)

In addition, the review by the Court should address only the record before Special Master at the time of his ruling.   Here, Mr. Weinberg improperly and unfairly attempts to augment the record, *after* the Special Master has already ruled, *afte*r Mr. Weinberg had ample opportunity to present all available and relevant evidence to the Special Master, and all of this *after* Mr. Weinberg had originally agreed to rest on his papers instead of appearing at the May 23, 2013 Hearing.   *See* Weinberg Objection, Exhibits A - E (Declaration of Eric H. Weinberg, attaching various documents, including 77 pages of email records).   Because the new material produced by Mr. Weinberg was not presented to the Special Master, the Court should decline to consider it. *See Commissariat Á L'Energie Atomique v. Samsung Electronics Co*., 245 F.R.D. 177, 179-80 (D. Del. 2007) (noting that *"[d]e novo* review . . . does not necessarily mean a review that includes the submission of new evidence, particularly when evidentiary proceedings previously occurred before the Special Master," and declining to consider newly raised evidence where party had ample opportunity to develop the record before special master); 9 Moore's Federal Practice §

---

initial matter, prior to addressing any adjustments to a lodestar, Weinberg bears the initial burden of providing adequate documentation for his claimed hours and demonstrating that those hours were reasonably expended, including a showing that he has met the standards set forth in PTO No. 6D and PTO No. 57.   He has not met that burden.   Moreover, he bears the burden of demonstrating that he exercised billing judgment, which he also has not done.   Weinberg failed to document any hours written off as unproductive, excessive, or redundant.   Even as to lodestar adjustment, Weinberg's allocating of the burden on that issue on the FAC is also wrong.   The Special Master determined that Weinberg's lodestar hourly amount tallied to 166 hours of compensable work. Under Fifth Circuit law, Weinberg has the burden of demonstrating that that lodestar figure should be adjusted upward (a circumstance that would be "rare" and "exceptional" and which he has failed to show).

53.40 (2008) (same).[11]

## B. THE SPECIAL MASTER'S REPORT AND RECOMMENDATION SHOULD BE AFFIRMED

By his own admission, only 15% of Mr. Weinberg's post-personal injury settlement time was specific to TPP matters. The remaining 85% of Mr. Weinberg's work hours no relation to TPP matters. Nor did he "perform[] common benefit work at the request of plaintiffs' leadership in this MDL or related state proceedings." PTO 57. What the evidence proved to the Special Master was that Mr. Weinberg consistently engaged in a self-interested frolic pursuing obscure and peripheral issues from the onset of Vioxx litigation, and that even after the Personal Injury settlement, he continued to pursue his self-indulgences as far away as Australia. And even though he was unsuccessful in obtaining compensation for his time "Down Under," he now attempts to recycle that effort to secure a source of attorneys fees despite its inapposite placement—a venture having never been intended for such purposes in the first instance. The FAC recognized Mr. Weinberg's gambit for what it was: an attempt to parlay Mr. Weinberg's ongoing uncompensated personal injury dalliances into compensable TPP time. The Special

---

[11]   Mr. Weinberg asserts that this new evidence is necessary to rebut Mr. Seeger's testimony before the Special Master. Weinberg Objection at 22-28, 30, 31 & n.5. But that characterization is simply a subterfuge for submitting new and previously available evidence that improperly attempts to bolster Mr. Weinberg's alleged contributions to the case as a general matter (i.e., evidence that could and should have been submitted prior to Mr. Seeger's testimony because it related, if at all, to issues already existing in the proceedings and because Mr. Seeger's testimony corroborated evidence and argument that was already in the record). Indeed, before the Special Master, Mr. Weinberg had the *initial* burden of supplying adequate documentation and time records of hours reasonably expended, and of demonstrating with "specific evidence" that an upward adjustment of his lodestar hours was warranted. TPP common benefit fee applications were due by September 16, 2011. The FAC accepted additional evidence prior to its June 13, 2012 final recommendation. Also, the FAC was only responsible for recommending an appropriate allocation; the burden of establishing entitlement to the fee is and always ways the responsibility of the applicant, namely Mr. Weinberg. Further, Weinberg had the opportunity to submit any additional evidence before the Special Master by a May 17, 2013 deadline. As such, the Court should decline to accept the untimely evidence that Weinberg now presents.

Master was more accommodating and liberally provided Mr. Weinberg an enhanced award only for that time specifically devoted to TPP matters (as alleged by Mr. Weinberg)—*i.e.*, based on the time entries provided by Mr. Weinberg himself, only 166 hours were devoted to TPP work (not the 1518 hours of time claimed by Mr. Weinberg).

The Special Master also accommodated Mr. Weinberg's improperly formatted time submissions, noting that "[s]ince Mr. Weinberg often grouped many of his time entries, it was almost impossible to parse out the time he devoted to any particular task."   Report and Recommendation, at 2.   Mr. Weinberg's time submissions were in violation of PTO No. 6(D), which required that "time . . . be recorded in quarter-of-an-hour increments and shall indicate with specificity the hours, location and particular activity."   PTO6(D).

In his Objections, Mr. Weinberg insists on repeating the same canards he presented to the Special Master.   His efforts to denegrate the work of other counsel in no way enhances the limited work he performed that was addressed to TPP matters.   The FAC made clear to Mr. Juneau that Mr. Weinberg's work in New Jersey was not directed towards TPP matters, nor did it significantly (if at all) contribute to the overall TPP litigation when compared to the work of others.

Counsel in New Jersey were unsupervised.   No Steering Committee existed.   Counsel acted independently.    They had no reporting obligations.[12]   And without the oversight like that

---

[12]  For purposes of developing the record for allocating attorneys fees for the Vioxx Personal Injury Settlement, the prior Fee Allocation Committee received the testimony of Mr. Weinberg. Mr. Weinberg's testimony regarding his contributions towards personal injury work largely duplicates the work he submits today. *See Vioxx Fee Committee Presentation*, Transcript of the Law Offices of Eric Weinberg at 21 (Dec. 1, 2008) (hereafter "Weinberg Transcript")[Rec.Doc. 64424-1 (filed under seal)]:

Mr. Levin:   [B]ut was the leadership in Jersey aware of everything

present in the MDL, Mr. Weinberg took the liberty to embellish, and seek duplicative compensation for, the same activities *he previously had been compensated for in connection with Vioxx personal injury litigation after the personal injury settlement*.   So, as before, Mr. Weinberg worked with Dr. Madigan.[13]   He completed the Alzeheimerg worked with Dr. Madigan.th Vioxx personal injury litigatio[14]   He prepared for trial in Australia.[15]   But none of this work (the same work he now attributes to TPP common benefit efforts) was shared with the MDL to be placed into the MDL trial package.[16]

Mr. Weinberg also betrays his ignorance of the significant work undertaken for his clients' benefit by Seeger Weiss and other *Local 68* counsel, such as Levin, Fishbein, Sedran & Berman, years before (and even after) his involvement.   Incredibly, Weinberg contends work began on Vioxx TPP matters when he first decided to take notice in late 2007, *e.g.,* "work geared up" in the

---

you were doing and all the engagements of experts you did and
whether any of it was duplicative of what they were doing?
Mr. Weinberg:   I assume so.   ***
Mr. Levin:   Did you report them, and did they approve or
disapprove, or were you basically out there on your own doing a
good job?

[13]   Weinberg Transcript at 22-23 ("[Madigan] was my expert who I cultivated myself." . . . "Kronmal did terrific work, but I saw some things, some directions that I wanted to go that were a little bit different.   I wanted to have my own guy.").

[14]   Weinberg Transcript at 9 ("The work that I did to develop the Alzheimer's story is captured in a paper I wrote, which ultimately I will try and get published.").

[15]   Weinberg Transcript at 15 ("I've been asked by our colleagues in Australia, Slatery Warden, if they can work with Madigan, I will be working with them and introduce evidence in their cases I think in March in Australia.").

[16]   Weinberg Transcript at 30 ("Russ, in terms of what should be in the trial package, I'm willing to share all of it.   I do think you should have Madigan in the trial package.").   However until asked the question, at the PI FAC hearing Weinberg never even submitted the report. The case was over and only then did he graciously and belatedly submit the same.

14

TPP litigation in late 2007, after settlement of the personal injury litigation (Weinberg Objection at 5); the lead TPP case, *Local 68*, "did not get very far" (*id.* at 6); and "there were few concrete milestones in the private TPP litigation" (*id.*).

Mr. Weinberg's false impressions, which consequently gave rise to false statements to the Special Master, are, however, understandable.   For nearly six years of Vioxx TPP litigation, Mr. Weinberg was completely absent from it and in no way involved.   After that, he essentially rode along in a sidecar while he self-pursued, at his own direction, other Vioxx curiosities and litigation in Australia and for various state attorneys general, some of which he continues to pursue to this day.   That his myopic perspective is explainable does not, however, convert the reality of his "attendance" in Vioxx TPP litigation to a claim of benefits conferred to others. Moreover, Mr. Weinberg suggestion that his alleged TPP-related work was done at the direction of the PSC is belied by the fact that the thrust of his belated evidence (that he improperly submits now, *see supra* at 11-12 & n.11) reflects the theme that none of his work was PSC-directed:   (1) email exchanges with PSC attorneys denoting his proposals and ideas, all instigated by Mr. Weinberg; and (2) emails commending Mr. Weinberg for his efforts or confirming dates and time of availability for phone calls, all in response to communications sent by Mr. Weinberg.   *See* Weinberg Objection, at 23-28.   None of this indicates, with the requisite "specific evidence," that any of his alleged TPP-related work was done at the direction of the PSC.   Equally as telling is the fact that one of his main points before the Special Master was:   "I was never told to stop." *Id.* at 28.   Not being told "to stop" is not the same as performing TPP-related work at the direction of the PSC.

A recurrent criticism by Mr. Weinberg is the FAC's recognition of the contributions of

several counsel in connection with the *Local 68* proceeding[17], which was certified as a nationwide class action by the trial and intermediate appellate courts in New Jersey, before class certification was ultimately vacated by the New Jersey Supreme Court.   As evidenced by the record, there was much effort expended in those proceedings.   Though Mr. Weinberg highlights the certification denial (which no doubt served as the impetus for him being retained in the one case in which he was retained), he ignores the foundation built from that case for his and all other TPP claims.[18]

In particular, though much has been said about *Local 68,* little has been said about the first-filed Vioxx third party payor case—*Plumbers & Pipefitters Local 572 v. Merck & Co., Inc.,* Civ. No. L-857-02, Class Action Complaint (January 11, 2002) [Rec.Doc. 64424-2].   This case was actively litigated through the dismissal phase in 2003.   In its ruling, the court affirmed the viability of Plaintiff's common law fraud claim, but dismissed Plaintiff's New Jersey Consumer Fraud Act ("NCFA") Claim.   The loss of the NJCFA claim—which if successful would have permitted treble damages and attorneys' fees (both of which are designed to encourage the prosecution of more modest claims)—would have been a severe setback for Vioxx TPP litigation.

---

[17]   In addition to the activities of Seeger Weiss and Levin, Fishbein in *Local 68*, HHK was asked to review all of the pleadings in connection with its participation in the trial team of that action.

[18]   Mr. Weinberg's seeming ignorance of these facts is perhaps best explained by the complete absence of his involvement with any briefing or legal issue of general applicability in the Vioxx TPP litigation.   A review of the docket reflects not a brief that bears his name or otherwise reflects his involvement. Mr. Weinberg's submitted time records do nothing to correct that impression.

Accordingly, after the New Jersey Supreme Court declared Vioxx litigation a "mass tort" and centralized all cases in Atlantic County, Seeger Weiss commenced another third party payor case—*Local 68*—that, like *Plumbers & Pipefitters*, pressed claims for common law fraud and NJCFA. Merck once again sought to dismiss Plaintiffs' common law and NJCFA claims. Seeger Weiss briefed and defended the motion, and in so doing, secured a denial of Merck's dismissal challenge, and specifically sustained the viability of Plaintiffs' NJCFA claims. *See Int'l Union of Operating Engr's Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 2004 WL 3767338 (N.J. Law Div. July 8, 2004). Merck sought an immediate appeal in an effort to shut down Vioxx third party payor claims, which Seeger Weiss opposed. *See Int'l Union of Operating Engr's Local No. 68 Welfare Fund v. Merck & Co., Inc.*, Plaintiff-Respondent's Memorandum of Law in Opposition to Defendant-Appellant's Motion for Leave to Appeal (N.J. App. Div. August 16, 2004)[Rec.Doc. 64424-3]. Merck's request for appellate review was declined by the New Jersey Appellate Division, resulting in a huge blow for Merck. The *Local 68* dismissal decision was the first decision in New Jersey to recognize the standing of a third party payor to pursue recovery under the NJCFA for prescriptions purchased by its members/insured. It was a watershed ruling, and one that made feasible the litigation of TPP claims for relatively modest recoveries.

Thereafter, the *Local 68* Plaintiffs sought class certification such that TPPs from anywhere in the country could pursue their claims in a consolidated and representative manner with *Local 68,* to the extent they wished to. Central to that effort was establishing the nationwide applicability of New Jersey law to the claims of non-New Jersey resident TPPs (such that common claims would be litigated in any class case)—a point that Merck vigorously opposed. The many hundreds of pages of briefing and analysis by Seeger Weiss and Merck on the 50-state

17

choice of law/conflicts of law issue ultimately yielded to trial and appellate opinions affirming the application of the NJCFA to the claims brought by TPPs from outside of New Jersey.   *See generally Int'l Union of Operating Engr's Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 2005 WL 2205341, *23 (N.J. Law Div. July 29, 2005), *aff'd*, 894 A.2d 1136 (N.J. App. Div. 2006) ("Accordingly, we agree with Judge Higbee that, based upon the evidence she had before her, New Jersey law may properly be applied to the entire plaintiff class [on a nationwide-basis], as this state has the most significant relationship to the alleged fraud and the parties."), *rev'd on other grounds*, 929 A.2d 1076 (N.J. 2007).   In its subsequent ruling, the New Jersey Supreme Court did not disturb the 50-state choice-of-law holdings of the trial and appellate courts as to the NJCFA (precedent that stands to this day).

Thus, as a result of the efforts of Seeger Weiss and its co-counsel in *Local 68,* the road was paved for New Jersey and non-New Jersey VIOXX TPPs alike to pursue claims (a) under New Jersey law, (b) in New Jersey court, (c) with treble damages, and (d) that resulted in mandatory attorneys fees upon success.[19]   No doubt, Mr. Weinberg was aware of these significant and watershed rulings, and sought their advantage when he first appeared on the Vioxx TPP litigation scene nearly six years *after* the first TPP case was commenced.   It should be noted that it is Mr. Weinberg—among dozens of Vioxx TPP counsel—that takes exception to recognizing the conferral of such benefits.

As part of his assault on the Special Master's Report, Mr. Weinberg improperly attempts to substitute his own standards for those imposed by this Court, as informed by Fifth Circuit law.

---

[19]   These accomplishments are not to minimize the substantial discovery, case management, and expert/trial development that happened in concert with the motion practice in *Local 68.*  Examples of the Seeger Weiss contribution are reflected in the numerous filings and rulings, all of which are a matter of public record, attached hereto as Exhibit "A".

*See* Weinberg Objection, at 29-32.   He complains (inaccurately) that Mr. Seeger's testimony alone supports the FAC's finding that he made no contribution to the common benefit in the TPP litigation and it is implausible.   *Id.* at 29-30.   This line of attack, however, ignores that the FAC's "subjective understanding of the relevant contributions of counsel," PTO No. 6(D), at 2, is a relevant consideration.   Mr. Weinberg also asserts that, regardless of whether his alleged TPP-related work was "used" in the litigation, it nonetheless had "utility," Weinberg Objection, at 30, for various self-serving reasons spun by Mr. Weinberg himself, *id.* at 30-32.   That conclusory contention ignores this Court's standards in PTO No. 6(D) and PTO No. 57, for evaluation of compensable TPP-related work.   Among other factors, one is "the extent to which each common benefit firm made a substantial contribution to the outcome of the litigation." PTO No. 6(D), at 4.   The evidence in the record shows that none of the work performed by Mr. Weinberg fell within that category.   His work certainly was not "the 'catalyst or a proximate cause' for the benefits the [plaintiffs] received as a result of the settlement."   *In re Maniaci-Canni*, No. CV 10–0958(AKT), 2013 WL 5314348, at *9 (E.D.N.Y. Sept. 10, 2013) (citations omitted); *see generally In re Sulzer Hip Prosthesis and Knee Prosthesis Prods. Liab. Litig.,* 268 F. Supp. 2d 907, 924 (N.D. Ohio 2003) ("[A] given attorney fee was reimbursable only if it actually advanced the interests of the *entire* Plaintiff Class.   Fees that were charged for counsel's efforts taken primarily for the benefit of a given individual plaintiff, or even a smaller group of plaintiffs, and not the entire class of plaintiffs as a whole, did not qualify for reimbursement, as they did not provide a true 'Common Benefit.'") (emphasis in original), *affirmed,* 398 F.3d 778 (6th Cir. 2005); *In re Diet Drugs Prods. Liab. Litig.*, No. Civ.A. 99–20593, MDL 1203, 2003 WL 21641958, at *6 (E.D. Pa. May 15, 2003) ("fees are to be allocated in a manner that reflects the relative contribution of the individual firms and attorneys to the overall

outcome of the litigation") (citing cases).

Although Mr. Weinberg recognizes that the total combined lodestar of all TPP counsel far exceeds the $15 million fund available to pay these counsel, he demands 100% compensation for *all* the time he submitted.   The overarching theme of Mr. Weinberg's argument is patent.   *HE* and THE WORK HE performed, according to his own whim, were important and all that matters.   Mr. Weinberg's inflated sense of self, however, was not overlooked by the FAC.   The committee reviewed Mr. Weinberg's submission, found little work performed that was exclusively directed to benefit TPP litigation, and objectively determined that the little work performed towards TPP litigation offered no significant contribution to the resolution of TPP claims.   This recommendation remains eminently justified, and Mr. Weinberg has failed to meet his heavy burden of demonstrating that his claimed hours were reasonably expended on compensable TPP-related work, that he exercised billing judgment, and that exceptional and rare circumstances, supported by specific evidence, justified an upward adjustment of the lodestar amount determined by the Special Master.

And, as to Mr. Weinberg's efforts to diminish the contributions of other claimants, his arguments are unjustified, misplaced, or just plain wrong.   As the party seeking the adjustment to the lodestars of the other claimants, Mr. Weinberg likewise bears the burden of establishing that exceptional and rare circumstances warrant a reduction based on specific evidence.   *La. Power & Light v. Kellstrom,* 50 F.3d 319, 329 (5th Cir. 1995) (citing *U.S. Football League v. Nat'l Football League,* 887 F.2d 408, 413 (2d Cir.1989)); *Shipes,* 987 F.2d at 320; *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565 (1986).

Mr. Weinberg assails the efforts of Levin Fishbein Sedran & Berman; and Seeger Weiss to name but two, but fails to meet his heavy burden here as well.   Each of these offices shall be

addressed in order:

As to Levin, Fishbein, Sedran and Berman, Mr. Weinberg repeats almost verbatim from the same specious verbiage he used in his December 20, 2012 Memorandum in Response to TPP FAC's Production and Recommendation [Rec.Doc. 64206].   Every error therein was exposed, refuted, and disposed of on February 1, 2013, when the TPP FAC responded to Mr. Weinberg's unfounded December 20, 2012 Response [Rec.Doc. 64235].   Levin, Fishbein, Sedran and Berman provided a firm-specific response that explicated in precise detail the basis for its submissions.   [Rec.Doc. 64235-5].   Refusing to let the facts get in the way of his argument, Mr. Weinberg steadfastly hews to his original misunderstanding.   But no matter how many times he misstates the record, the facts (being stubborn things) fail to support his confection.   To comply with this Court's mandate applicable to all applicants that they identify any time previously submitted, Mr. Levin stated in his Declaration of September 15, 2011, "All of LFSB's time engaged in the representation of Local 68 [2,130.75 hours] was previously submitted in the firm's common benefit fee submission [into the MDL court pursuant to PTO 6] (Rec.Doc. 17642) … In total, LFSB devoted 2,130.75 hours of professional time with a total lodestar value of $631,437.50 based on then-current hourly rates.   Mr. Levin did nothing different than all other applicants.   Indeed, to do so would be violative of the reporting procedures.   This Court already considered this time in its Order and Reasons of October 19, 2010 and August 9, 2011."[20]   Levin

---

[20]  Of course, when it came time for the PI Fee Allocation Committee to allocate this time, TPP matters were not properly among the factors considered.   *See In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740, 767 (E.D. La. Aug. 9, 2011) ("To arrive at this recommendation, the FAC developed its own objective criteria by breaking down each common benefit fee applicant's contribution to the work categories of Key Leadership Roles, Trials, Settlement, Law & Briefing, Settlement Implementation/Post-Settlement Matters, Discovery/Science, Committee Leadership and Participation, Funding, and Case Management.").   No credit was given to TPP time for any of the applicants who chose to comply with PTOs 57 and 60 .

Declaration ¶7.   Mr. Levin identified an additional 34 hours of professional time overseeing the activities of Third Party claims with a lodestar value of $27,412.50.   *Id.* ¶8.   Only this combined time (2,164.75 hours) accounted for the firm's $658,850 fee submission.   Mr. Weinberg's attribution of this time to matters involving Stratton, mandamus, Snapka is merely rattling off time entries for unrelated matters that were specifically identified as being **NOT** part of the submission.   His subversion is a doomed effort.

As to Seeger Weiss, Mr. Weinberg lodges a series of vague criticisms about the relevance of *Local 68*, addressed above, and the specific value of the work of Seeger Weiss (Weinberg Objection at 39-41).   Mr. Weinberg challenges to Mr. Seeger's testimony and the FAC's recommendation are not only belied by the record, but he ignores that PTO No. 6(D) specifically provided that the FAC's "subjective understanding of the relevant contributions of counsel toward generating the Settlement Fund" were a relevant factor in the equation.

Mr. Weinberg argues that the evidence is conflicting as to whether Seeger Weiss was previously compensated for TPP common benefit time.   For the reasons previously set forth by Seeger Weiss, that argument is unavailing.   *See* Rec.Doc. 64235-4, at 1-5 (Response of Seeger Weiss to Objections, dated February 1, 2013).   Mr. Weinberg also criticizes Mr. Seeger for questioning Mr. Weinberg's personal decision to preview to Merck the testimony of his expert, Dr. Madigan, in a personal injury case tried in Australia.   Weinberg Objection at 31-32.   Apart from confirming the fact that Dr. Madigan's testimony was really only pertinent to personal injury claims, the hubris of exposing Dr. exposing Dr. Madigan to cross-examination in a foreign jurisdiction where the expert could be compromised for purposes in the United States is patent. No benefit was derived from using Dr. Madigan in that litigation.

Finally, contrary to his challenge to the significant benefits conferred by Seeger Weiss'

work in *Local 68*, Weinberg Objection at 39-40, as set forth above, but for the instance of *Local 68* and the relentless prosecution of it by Seeger Weiss and other *Local 68* counsel, Weinberg largely would have been out of luck or without a feasible vehicle to pursue his client's claims. His own inaction for years would have barred damage claims under common law and NJCFA theories under applicable statutes of limitation.   Similarly, absent Seeger Weiss' efforts in *Local 68*, his client's damages would have been capped at actual ascertainable losses (no trebling), and he would have had no entitlement to attorneys' fees.   Weinberg's broader question as to Seeger Weiss' relevance to TPP litigation is disproved by the simple fact that, at the outset, it alone was prosecuting Vioxx TPP claims.   It then served as court-appointed class counsel (and appellate counsel) to *all* Vioxx TPPs during the more than two years the litigation was prosecuted as a certified class action.   Thereafter, the firm served as court-appointed Liaison Counsel for Vioxx TPP claimants.   There is little doubt by objective evidence that Seeger Weiss led the Vioxx TPP charge.[21]

### C.   THE CENTRAL STATES' OBJECTION IS MISPLACED

Five law firms submitted fee applications for pre-settlement work performed on behalf of Central States Southeast and Southwest Area Health and Welfare Fund ("Central States").   The representation of Central States was principally handled by Audet & Partners and Hovde Dassow

---

[21]   The trial court that oversaw the extensive TPP litigation in New Jersey saw and expressed that fact quite clearly:   "[T]here is probably no other law firm as knowledgeable about VIOXX. Christopher Seeger is both liaison counsel in New Jersey where the largest number of VIOXX cases are filed, and is also on the Plaintiff's Steering Committee in the MDL.   He and his firm have led the discovery process in VIOXX litigation.   They are well respected among the mass tort bar.   The seven million documents already produced in the VIOXX litigation are maintained in a depository at Seeger Weiss's offices."   *Int'l Union of Operating Engr's Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 2005 WL 2205341 at *15.

& Deets, with support provided by the Lanier Law Firm, PLLC, Ewing McMillin & Willis PLLC, and Gary L. Franke & Co.   The submissions of the Central States counsel (in particular, the Supplemental Vioxx Third Party Payor Common Benefit Application [Docket No. 64046-1 at 147]) did not attempt to clarify efforts undertaken by the Central States counsel for expert work versus deposition work versus bellwether work versus court-appointed managerial work versus settlement work versus bellwether work.   Members of the FAC, however, were generally familiar with the role, work performed, and contributions of certain of the Central States counsel. For others, review of the submissions and back-up time entries confirmed the FAC's general understanding that Central States counsel's claimed common benefit conferred was derivative of their case specific efforts undertaken at their own instance for Central States' benefit (rather than for the common benefit).

Audet & Partners submitted $403,762 in lodestar and $49,264 in expenses in support of its common benefit application for compensation from the Vioxx TPP fee and expense fund.   For its part, Hovede, Dassow & Deets submitted a lodestar of $696,600 and $105,573 in expenses. Review of the applications and time entries for Audet and Hovede Dassow reflects their focus on discovery and pre-trial matters in the specific context of the Central States case.   At some point after the commencement of the Central States case, Audet and Hovede Dassow appear to have reached an agreement with the Lanier Firm to be available in the event that the Central States case would be tried.   The Lanier Law Firm, PLLC submitted $157,615 in lodestar and $0 in expenses for its claimed common benefit contributions.

Beyond the submissions of these three firms, the FAC received submissions from two additional firms – Gary L. Franke & Co. and Ewing McMillin & Willis PLLC – who also performed work for Central States.   By review of the time submissions for these firms, it appears

24

that Franke and Ewing predominantly worked under the direction of the Audet and Hovede Dassow firms (behind the scenes) on client-specific issues and discovery particular to the Central States case.   For their efforts, Ewing sought $185,000 in fees and $1,539 in expenses; Franke, in turn, sought $128,297 in fees and $9,522.

All told, the legal team assembled by Audet/Dassow to litigate the Central States claim submitted an aggregate lodestar of $1,571,274 and expenses of $165,898.   The involvement of so many counsel for one client led to a predictable accrual of excess lodestar and costs and duplicative hours.[22]   Courts have not hesitated to impose fee reductions where counsel overstaffed a case.   *Orchano v. Advanced Recovery, Inc.,* 107 F.3d 94, 98 (2d Cir. 1997).   But that did not deter the FAC from recognizing and allocating appropriate value to the team's efforts (Central States was one among several Vioxx TPP plaintiffs that proceeded through active discovery in New Jersey).   However, in the limited fund setting in which the FAC was operating, the Audet/Dassow team's request for nearly 12% of the Vioxx TPP attorney fee and expense fund on account of primarily case-specific efforts for one client could not be supported.

Accordingly, the FAC, mindful of the roles and relative involvement of each of the

---

[22]   The FAC noted in its review of underlying time entries the frequent appearance of several senior attorneys from separate Central States firms covering or monitoring routine case events for the same TPP client-case management conferences, conference calls, meetings with the client, etc. *E.g.*, Docket No. 64046-1 at 13-16, 43, 46, 117-21 (three, and sometimes four, partners from the Central States law firms attending routine monthly management conferences before Judge Higbee between 2006 and 2007).   Though that arrangement may have been acceptable to Central States—or its counsel under the terms of the co-counsel arrangement that was struck among counsel—the client was not asked to bear that cost; rather, in this limited fund setting, all Vioxx TPP counsel have been asked to assume the cost of those decisions by Central States' counsel. Relatedly, review of those same entries reflects the inclusion of hundreds of attorney hours by Central States counsel for attendance at case management conferences during times when the attending firms were separately representing and prosecuting Vioxx personal injury claims for individual clients

respective member firms of the Central States' counsel (and of the relevance of the case and the work performed by Central States counsel to the broader TPP litigation), recommended a gross allocation of $640,000 to these firms, divided as follows: $120,000 to Audet & Partners; $375,000 to Hovede Dassow & Deets; $50,000 to the Lanier Law Firm; $60,000 to Ewing, McMillin & Willis PLLC; and $35,000 to Gary L. Franke & Co.

The Audet/Dassow team did not accept the FAC's initial proposed allocation, and formally objected, citing specific issues and concerns that it believed should be considered. [Docket No. 64046].    Upon further consideration of each firm's submission, as well as their underlying time entries, the FAC provided a revised allocation to Audet & Partners of $240,000. In so doing, the FAC raised Audet's proposed allocation to slightly more than half of its submitted lodestar and expenses, and brought its allocation roughly in line with that originally proposed to Hovede Dassow.   Audet & Partners accepted the revised proposed allocation and has withdrawn any objection it had to the FAC's allocations.   Attempts by the FAC to reconcile concerns of the remaining Central States counsel, however, were unsuccessful.

The Special Master agreed that the Central States objectors overstaffed their efforts, and attempted to compensate them fairly.   He found Mr. Dassow's firm "should receive an award on the same percentage of fees and expense requested as was awarded the Audit firm in the revised award.   Accordingly, the award to the HDD firm is a generous $425,152.00."   Report and Recommendation at 3.   He also handsomely awarded Mr. Lanier $75,000.00.   *Id.*   These awards were appropriately directed to those Central States counsel that actively participated in the process.   As such, as recognized by the Special Master, the other counsel should not be considered.

The Central States objectors bear the initial burden of demonstrating that their hours were

reasonably expended on TPP common benefit work, that they exercised billing judgment, and that exceptional and rare circumstances justify an upward adjustment in the lodestar determination. They have failed to meet these burdens here. The Central Objectors take issue with the conclusions and judgment calls of the FAC and the Special Master, but they merely put their own self-serving spin on the issues, and point to no "specific evidence." *See id.* at 2-6. As discussed above, the Central States objectors overstaffed their cases (seven lawyers for one trial), their work was case specific and not for the common benefit (even if performed at the direction of Judge Higbee), and they accrued excess lodestar and costs. The Central States objectors have not overcome their heavy burdens, the conclusions of the FAC are reasonable and fair, and Special Master's ruling as to them should be affirmed.

## IV. <u>REVISED RECOMMENDATIONS</u>

In light of the Special Master's Report and Recommendation, the FAC has reevaluated its earlier recommendations and submits a Revised Proposed Allocation to each law firm claiming common benefit TPP fees. The FAC has adjusted all of the law firms' allocations by making a pro-rata reduction to accommodate the three (3) law firms who had specific awards recommended by Special Master Juneau. The TPP FAC's Revised Proposed Allocation is attached hereto as Exhibit "B".

## V.  <u>CONCLUSION</u>

For the reasons set forth above, Mr. Weinberg has failed to meet his burden of demonstrating that his hours were reasonably expended for the claimed work, that he exercised billing judgment, and that exceptional and rare circumstances warrant an upward increase to his lodestar and a decrease to the lodestars of other common benefit fee claimants. He also failed to show that the FAC's recommendation was not fair and reasonable. Mr. Weinberg did not

27

significantly contribute to the resolution of the TPP claims.   He submitted an inflated lodestar, replete with billings from foreign matters that are unrelated to TPP claims and/or which reflect time on other matters in which he failed to obtain compensation and which were not at the direction of the PSC.   Mr. Weinberg should not be permitted to simply push his unrelated and unauthorized time into the TPP mix and expect to recover full compensation for that time.   The Special Master agreed and awarded Mr. Weinberg a fraction of the amount he sought—an award that was strictly limited to the time claimed by Mr. Weinberg as being TPP-related.

Similarly, the remaining Central States counsel's demand for additional compensation exceeds the amount reasonably due to them given their relative contribution.   The FAC attempted to compensate the Central States counsel's work effort fairly and reasonably but within the scope of the work performed by the whole.   The Special Master basically agreed with and affirmed the recommendation of the FAC.

Because all of the Special Master's findings and conclusions of law are fair and reasonable, factually supportable, and consistent with governing law and the Orders of this Court, his Report and Recommendation should be affirmed.   In addition, the FAC's revised recommendations (which take into account the Special Master's Report and Recommendation) are fair and reasonable and should be approved.

Respectfully submitted,

/s/ Russ M. Herman
Russ M. Herman
**Herman, Herman & Katz, L.L.C.**
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax: (504) 561-6024
rherman@hhklawfirm.com

28

/s/ Elizabeth Cabraser
Elizabeth Cabraser
**Lieff Cabraser Heimann & Bernstein, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Fax: (415) 956-1008
ecabraser@lchb.com

/s/ Christopher A. Seeger
Christopher A. Seeger
**Seeger Weiss LLP**
77 Water Street
New York, NY 10005
Telephone: (212) 584-0700
cseeger@seegerweiss.com

/s/ Thomas M. Sobol
Thomas M. Sobol
**Hagens Berman Sobol Shapiro LLP**
55 Cambridge Parkway, Suite 301
Cambridge, MA   02142
Telephone: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com

/s/ Andy D. Birchfield, Jr.
Andy D. Birchfield, Jr.
**Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.**
218 Commerce Street
Montgomery, AL 36104
Telephone: (800) 898-2034
Fax: (334) 954-7555
andy_birchfield@beasleyallen.com

/s/ James Dugan
James Dugan
**Dugan Law Firm**
One Canal Place
Suite 1000
365 Canal Street
New Orleans, LA 70130
Telephone: (504) 648-0180
Fax: (504) 648-0181

*The TPP Fee Allocation Committee*

W:\! 27115 VIOXX\000\TPP RECOMMENDATION\TPP FAC'S RESPONSE TO OBJECTIONS TO THE SM REPORT AND RECOMMENDATION\TPP RESPONSE TO OBJECTIONS
TO SPECIAL MASTER REPORT 12 24 PM 12 16 13.DOCX

30

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Russ Herman, Ann B. Oldfather, and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 17th day of December, 2013.

/s/ Leonard A. Davis
Leonard A. Davis, Esq. (#14190)
Herman, Herman & Katz, L.L.C.
820 O'Keefe Avenue
New Orleans, LA   70113
Ph:   (504) 581-4892
Fax:   (504) 561-6024
ldavis@hhklawfirm.com

W:\! 27115 VIOXX\000\TPP RECOMMENDATION\TPP FAC'S RESPONSE TO OBJECTIONS TO THE SM REPORT AND RECOMMENDATION\TPP RESPONSE TO OBJECTIONS TO SPECIAL MASTER REPORT 12 24 PM 12 16 13.DOCX

31