Christopher A. Seeger, Esq.
David R. Buchanan, Esq.
SEEGER WEISS LLP
550 Broad Street, Suite 920
Newark, NJ 07102
Telephone: (973) 639-9100

**RECEIVED and FILED**

OCT 3 0 2003

**ATLANTIC COUNTY LAW DIVISION**

Attorneys for Plaintiff

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL NO. 68 WELFARE FUND, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MERCK & CO., INC.,<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY<br>ATLANTIC COUNTY<br>LAW DIVISION<br><br>DOCKET NO. _____ MT<br><br>VIOXX LITIGATION<br><br>**CLASS ACTION COMPLAINT<br>AND JURY DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiff, International Union of Operating Engineers, Local No. 68, Welfare Fund, individually and on behalf of all other third-party payors similarly situated, by its attorneys, and for its causes of action against defendant, referenced herein, alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff International Union of Operating Engineers, Local No. 68, Welfare Fund ("Local 68") is a joint union-employer Taft-Hartley trust fund, organized and operating in the State of New Jersey. At all times relevant hereto, said plaintiff has been a party to a contract, issuer of a policy, or sponsor of a plan, which contract, policy, or plan provides prescription drug coverage to natural persons. Plaintiff has incurred, pursuant to such contract, policy, or plan, full or partial purchase costs for Vioxx® prescriptions dispensed to natural persons covered by such contract, policy, or plan.

2. Defendant Merck & Co., Inc. is incorporated, and maintains its principal

place of business, in the State of New Jersey. At all relevant times hereto, defendant was in the business of manufacturing, marketing, distributing, advertising, sampling, and/or selling the prescription drug rofecoxib under the brand name Vioxx® in New Jersey and throughout the United States. Defendant Merck does business in Atlantic County, New Jersey, and venue is therefore appropriate in this court.

3. Upon information and belief, the research, design, manufacture marketing, and advertisement for Vioxx® were centralized in defendant's New Jersey offices, and accordingly the acts and omissions complained of herein emanated from New Jersey.

## SUBSTANTIVE ALLEGATIONS

4. This Class Action Complaint arises from defendant's marketing, advertising, promotion, and sale of the prescription drug Vioxx®, an anti-inflammatory drug and pain reliever containing rofecoxib. Plaintiff alleges violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq. ("New Jersey CFA"), and fraudulent misrepresentation and suppression of material information in connection with the marketing and sale of Vioxx®.

5. Defendant misrepresented and concealed material safety information from end-users, physicians, and third-party payors concerning the cardiovascular and gastrointestinal risks associated with Vioxx®. Additionally, defendant made false and intentionally misleading representations, and omitted material facts, regarding the comparative safety and efficacy of Vioxx® as compared to traditional non-steroidal anti-inflammatory drugs (NSAIDs).

6. The purpose of defendant's misrepresentations and omissions, in combination with defendant's aggressive marketing and promotion schemes, was to (i) create, and thereafter increase, end-user and physician demand for Vioxx® in an already crowded NSAID market, (ii) induce insurance plans, self-insured plans, and other third-party payors, such as Local 68 (collectively, "Third-Party Payors"), to purchase and/or authorize the purchase of Vioxx® by their plan participants, and (iii) justify the enormous

price disparity between Vioxx® and traditional NSAIDs.

7. As a result of defendant's fraudulent and unconscionable commercial practices in connection with the marketing and sale of Vioxx®, Merck induced Third-Party Payors to endorse and thereafter purchase Vioxx®. Defendant intended that end-users and Third-Party Payors would rely on Merck's marketing, advertisements, promotional efforts, and misrepresentations to the detriment of Third-Party Payors. They did.

8. As a consequence, Third-Party Payors paid vastly more than they should and otherwise would have for Vioxx® (approximately 800% more than equally efficacious and safer NSAIDs, such as naproxen).

9. Plaintiff seeks actual damages, treble damages, punitive damages, attorneys' fees, costs, and all other relief available to a class of Third-Party Payors, including any non-governmental entity that (a) is a party to a contract, issuer of a policy, or sponsor of a plan, which contract, policy, or plan provides prescription drug coverage to natural persons, and (b) has incurred, pursuant to such contract, policy, or plan, full or partial purchase costs for Vioxx® prescriptions dispensed to natural persons covered by such contract, policy, or plan.

## Drug Approval and Defendant's Mis-Marketing Scheme

10. Defendant obtained Food and Drug Administration (FDA) approval for Vioxx® on a fast-track basis in or about May 1999, and began the distribution and sale of Vioxx® throughout the United States immediately thereafter.

11. Vioxx® is a cox-2 specific inhibitor used in the treatment of inflammation and pain, and is among the class of drugs known as NSAIDs.

12. Defendant introduced Vioxx® at a wholesale cost of approximately $72.00 for a 30-day supply. In contrast, traditional NSAIDs wholesaled for $9.00 or less for the same 30-day supply.

13. To justify this enormous disparity, defendant Merck marketed Vioxx® as a safer alternative to traditional NSAIDs because of its inhibition of the cox-2 enzyme only, which is believed to directly work at sites of inflammation in the human body. Traditional NSAIDs inhibit both cox-1 and cox-2 enzymes. Because the cox-1 enzyme is believed to have a gastrointestinal protective effect, traditional NSAIDs pose a risk of ulcer and other gastrointestinal problems. Vioxx®, however, also poses a risk of ulcer and gastrointestinal problems, and the FDA has therefore required defendant to include such warnings on the Vioxx® label and inserts.

14. Nevertheless, defendant has repeatedly promoted Vioxx® as safer than traditional NSAIDS, representing that Vioxx® posed a significantly reduced risk of gastrointestinal problems than other NSAIDS, with equally efficacious results as an anti-inflammatory and pain reliever. As set forth below, these representations were not true.

15. For example, the FDA issued a Warning Letter to defendant on July 16, 1999, just two months after receiving FDA approval, warning defendant that its advertisements for Vioxx® failed to provide adequate information regarding Vioxx®'s approved indication and usage, failed to include risk information, and failed to present a brief summary of necessary information related to side affects, contraindications, and effectiveness, or to provide adequate provision for the dissemination of full product labeling in connection with its advertisements.

16. On December 16, 1999, the FDA again issued a letter to defendant advising that its promotional pieces were "false and misleading because they contain misrepresentations of Vioxx®'s safety profile, unsubstantiated comparative claims, and are lacking in fair balance." Defendant's promotional materials misrepresented the gastrointestinal risks associated with Vioxx®, in contradiction to the warnings contained in its package insert, and made broad superiority claims not only over "the class of NSAIDs, of which it is a member, but to all analgesic and anti-inflammatory therapies available for the management of pain." According to the FDA, "this global superiority

4

claim has not been demonstrated by substantial evidence, and therefore, is false and misleading." Not only were the materials false and misleading, but also defendant failed to submit the materials to the FDA as required by federal regulation.

Another FDA warning letter was issued to defendant on September 17, 2001, stating that defendant's "promotional activities and materials . . . are false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations." The FDA stated that defendant's campaign minimized "potentially serious cardiovascular findings" from a Vioxx® study and misrepresented Vioxx®'s "safety profile." Defendant made "unsubstantiated superiority claims against other NSAIDs" and failed "to present the gastrointestinal (GI) warning about the possibility of serious GI toxicity such as bleeding, ulceration, or perforation in patients taking Vioxx."

17. In fact, defendant's promotional materials affirmatively misrepresented the efficacy and safety information for Vioxx® and its competitors. The FDA stated that by "minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentations of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile." The FDA concluded that defendant's claim that "Vioxx has a 'favorable safety profile' is simply incomprehensible, given the rate of MI [myocardial infarction] and serious cardiovascular events compared to naproxen" (emphasis added). Among other things, the FDA ordered defendant to issue a "Dear Healthcare Provider" letter "to correct false or misleading impressions and information."

18. Defendant knew or should have known that any purported gastrointestinal benefits of Vioxx®, if any, were limited to patients diagnosed with osteoarthritis, who had one or more gastrointestinal risk factors, such as ulcers or hemorrhage, and who concurrently used an anticoagulant.

19. Furthermore, defendant concealed material information that its cox-2 specific inhibitor, Vioxx®, was less safe than traditional NSAIDs against which it was studied in general, and in particular when used in conjunction with aspirin to protect against known or potential cerebrovascular or cardiovascular events.

20. Defendant suppressed and/or failed to act upon medical and scientific information showing Vioxx® is associated with significant and dangerous adverse cardiovascular effects, independently and compared to traditional NSAIDs, and was no more efficacious than traditional NSAIDs, including, without limitation, the drug naproxen.

21. Defendant knew, or was reckless in not knowing, of the increased risk of stroke and myocardial infarctions in Vioxx® users over naproxen users, but affirmatively acted to suppress or withhold such information with the intent to mislead end-users, physicians, and Third-Party Payors.

22. In November of 2000, defendant caused the publication of a study in the New England Journal of Medicine and knowingly withheld from this publication the severity of cardiovascular risks associated with Vioxx® consumption over naproxen consumption. This very same data, when finally presented to the FDA in 2001, resulted in a determination by the FDA medical reviewer that "[t]here is an increased rate of [myocardial infarction] and stroke in the rofecoxib group compared with naproxen . . . this analysis could lead one to conclude that naproxen, with a 51% risk reduction compared to rofecoxib, would be the preferred drug." (emphasis in original).

## Unprecedented Direct-to-Consumer Marketing Efforts

23. To jump-start sales, Merck engaged in a massive direct-to-consumer (DTC) advertising blitz to the public to induce them to use or request Vioxx®. Defendant further added at least 700 new sales representatives to its team and engaged in a massive sampling program to physicians. Defendant manipulated and controlled

information and knowledge regarding the indications, directions, usage, efficacy, safety, and warnings of Vioxx® through its DTC advertising, aggressive sampling to physicians, and the uniform suppression of the gastrointestinal and cardiovascular risks associated with Vioxx®. Defendant's DTC marketing strategies, in conjunction with its extreme sampling program to physicians, intended to and did induce end-users to use Vioxx® over traditional NSAIDs that defendant knew, or should have known, were equally efficacious and safer than Vioxx®. Merck spent more than twice its entire research and development budget for Vioxx® on this marketing and advertising campaign.

### Defendant's Activities Targeted to Third-Party Payors

24. Third-Party Payor funds such as plaintiff oversee the authorization and processing of medical claims and prescription purchases sought by their members. The vast majority of all prescription purchases made in this country are authorized and made by Third-Party Payor funds on behalf of the members of their plans.

25. Before any prescription can be dispensed pursuant to a Third-Party Payor plan, the plan member must submit his membership information (generally reflected on a membership card) to the dispensing pharmacy for verification that the medication prescribed by the member's physician is approved for purchase by the Third-Party Payor fund and, if so, on what terms — e.g., the maximum number of dispensed doses and at what co-payment charge by the member.

26. The list of drugs for which a given Third-Party Payor authorizes purchases by its members is referred to as a "formulary." Third-Party Payor formularies are frequently tiered such that certain drugs in a given therapeutic class are "preferred." A preferred drug may have a lower co-payment obligation than another drug of the same therapeutic class, while yet another drug of the same class may not be approved for purchase through the fund. Each Third-Party Payor formulary sets forth the terms under which that Third-Party Payor is responsible for the cost of purchasing its members' prescriptions.

27. If a prescription drug is not on a given Third-Party Payor's formulary when a pharmacist attempts to authorize a member's prescription, the prescription is not approved and the purchase will not be authorized or paid by the Third-Party Payor. When the prescription is declined by the Third-Party Payor (and assuming that the plan member chooses not to cover the purchase price of the prescription on her own), a substitution for another drug in the same therapeutic class (which is on the formulary) may be sought by the pharmacy or prescribing physician. This fact is well known to pharmaceutical manufacturers like defendant Merck.

28. Indeed, in addition to researching, manufacturing, and marketing prescription pharmaceutical products, Merck was (until August, 2003) the sole shareholder of the world's largest prescription benefit manager, Medco Health Solutions, Inc. ("Medco"). (Merck "spun off", or sold, Medco to the public in a multi-billion dollar initial public offering this past summer.)

29. Prescription benefit managers (such as Medco) assist in the management of prescription plans for Third-Party Payors, a process that includes assisting in the development of Third-Party Payor formularies and prescription purchase protocols.

30. Given that the bulk of prescription sales are purchased through and paid by Third-Party Payors, the failure of a pharmaceutical manufacturer to have its drug on the formulary, let alone the "preferred" list of such formulary, for Third-Party Payors will have severe negative consequences on sales of that product.

31. As a result, shortly after the FDA approved Vioxx®, in an attempt to ensure that Vioxx® would be included in Third-Party Payor formularies, Merck provided false and misleading information (and likewise omitted material information) concerning the safety and benefits of the drug as compared to other drugs of the same therapeutic class, as described above, to prescription benefit managers and Third-Party Payors.

32. In so doing, Merck was aware that once Vioxx® was listed on Third-Party Payor formularies (including its listing as a preferred therapeutic agent), Third-Party

Payors would, as a matter of course and practice, authorize and purchase the Vioxx® prescriptions of their members. Thus, the key to Vioxx®'s success — regardless of consumer demand (which was independently created through the same false and misleading statements and omissions of defendant) — was Third-Party Payor willingness to authorize the purchase of, and purchase, the drug.

33.  Merck's conduct in connection with the marketing, promotion, and pricing of Vioxx® caused plaintiff and other Third-Party Payors to purchase or authorize the purchase of Vioxx® for their members. Had the significant negative undisclosed information concerning the safety, efficacy, and benefits of Vioxx® been disclosed in connection with defendant's marketing efforts, plaintiff and other Third-Party Payors would not have purchased the drug, or would not have done so on the terms they did.

## The Ends Achieved by Defendant's Misconduct

34.  As a result of defendant's DTC and Third-Party Payor mis-marketing scheme, defendant gained a significant share of the NSAID market that it would not have gained if it had not suppressed information about Vioxx® and/or made false representations about its superiority, safety, and efficacy. After Vioxx®'s introduction, domestic sales of anti-inflammatory pain relievers, including cox-2 drugs, rose 65% in one year, to $4.5 billion. Before the cox-2 marketing frenzy, sales for anti-inflammatory drugs had been in decline. In the year 2000 alone, Merck realized more than $2 billion in sales of Vioxx® and acquired approximately 23% of the NSAID market share.

## Class Action Allegations

35. Pursuant to Rule 4:32-1, *et seq.*, of the New Jersey Court Rules, plaintiff seeks class certification, in that (a) the class is so numerous that joinder of all members is impracticable; (b) there are questions of law or fact common to the class; (c) the claims or defenses of the representative party are typical of the claims or defenses of the class; and

9

(d) the representative party will fairly and adequately protect the interests of the class.

The common questions of law or fact, among others, include:

a. Whether defendant concealed material information from end-users, physicians, and Third-Party Payors, to the financial detriment of Third-Party Payors, regarding the safety and efficacy of Vioxx®;

b. Whether defendant targeted specific end-users and physicians through DTC advertising and an extreme sampling campaign to induce individuals to purchase and consume Vioxx® over other NSAIDs and to induce Third-Party Payors to purchase, or authorize the purchase, of Vioxx®;

c. Whether defendant misrepresented the safety and efficacy of Vioxx® to the public and Third-Party Payors to the financial detriment of Third-Party Payors;

d. Whether, as a result of defendant's misrepresentations and failure to disclose material information regarding the safety and efficacy of Vioxx®, plaintiff and other Third Party Payors were damaged and/or suffered ascertainable loss;

e. Whether, as a result of defendant's misrepresentations and failure to disclose material information regarding the safety and efficacy of Vioxx®, defendant committed fraud;

f. The appropriate scope, extent, and measure of damages and equitable relief that should be awarded;

g. Whether defendant's actions were sufficiently wrongful to entitle plaintiff and the putative class to punitive damages; and/or

h. Whether defendant's actions were sufficiently wrongful to entitle plaintiff and the putative class to attorneys' fees, prejudgment interest, and costs of suit.

36. Plaintiff will fairly and adequately represent the interests of the members of the class. Plaintiff's interests are the same as, and not in conflict with, the other members of the proposed class. Plaintiff's counsel is experienced in class action and

complex litigation.

37. Plaintiff requests that this Court certify the following Class pursuant to Rule 4:32-1(b)(1), (2) and/or (3) of the New Jersey Court Rules as appropriate:

All third-party payors in the United States of America, who have paid any person or entity for the purchase of the prescription drug Vioxx® (rofecoxib) since May 1, 1999. Third-party payors include any non-governmental entity that is (i) a party to a contract, issuer of a policy, or sponsor of a plan, which contract, policy, or plan provides prescription drug coverage to natural persons, and is also (ii) at risk, pursuant to such contract, policy, or plan, to purchase or pay for all or part of the cost of prescription drugs dispensed to natural persons covered by such contract, policy, or plan. Excluded from the Class are (1) employees of defendant, including its officers or directors; (2) plaintiff's counsel; and (3) the Judge of the Court to which this case is assigned.

## COUNT I

## Fraudulent Misrepresentation and/or Suppression

38. Plaintiff repeats and realleges the allegations set forth above as if fully contained herein.

39. Defendant concealed from plaintiff, the putative class, physicians, and end-users, truthful and complete efficacy and safety information regarding Vioxx®, particularly comparative information between Vioxx® and traditional NSAIDs.

40. Defendant provided, disseminated, marketed, and otherwise distributed advertising and other information to end-users, physicians, and Third-Party Payors that omitted adequate warnings and suppressed material medical information regarding the use of Vioxx®.

41. Defendant affirmatively misrepresented the safety and efficacy of Vioxx®

11

in its advertising, promotional, and safety materials and information disseminated to end-users, physicians and Third-Party Payors.

42. Defendant promoted Vioxx® as a drug with a greater safety and efficacy profile as compared to its NSAID competitors when the purported safety and efficacy benefits were unfounded.

43. The foregoing omissions, misrepresentations, and practices proximately caused plaintiff and the putative class to suffer damages in that they authorized the purchase of, and purchased, Vioxx® without knowing the true and complete risks and benefits of Vioxx®, in general, and specifically in comparison to alternative, and significantly less expensive, NSAIDs.

44. Defendant intended, or consciously disregarded, that plaintiff and the putative class would rely on its omissions, misrepresentations, and practices so that they would authorize the purchase of, and purchase, Vioxx®.

45. Plaintiff and the putative class would not have authorized the purchase of Vioxx®, or purchased it on the terms they did, had they known the true and complete risks and benefits of Vioxx®, in general, and specifically in comparison to alternative, and significantly less expensive, NSAIDs.

46. The defendant had superior knowledge and information regarding the truth about Vioxx® and plaintiff and the putative class did not have access to this information.

47. Defendant's unlawful conduct arose, was directed, and emanated from New Jersey to the detriment and injury of class members throughout the United States.

## COUNT II

### Violations of New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-1, *et seq.*)

48. Plaintiff repeats and realleges the allegations set forth above as if fully contained herein.

49. At all relevant times material hereto, defendant conducted trade and commerce within the meaning of the New Jersey CFA.

50. Plaintiff, the putative class members, and defendant are "persons" within the meaning of N.J.S.A. 56:8-1.

51. Section 56:8-2 of the New Jersey CFA provides that unconscionable and deceptive conduct in connection with the sale or marketing of a product is unlawful, e.g.:

> "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice..."

52. Defendant's practices in connection with the marketing and sale of Vioxx® violate the New Jersey CFA for, *inter alia*, one or more of the following reasons:

   a. Defendant knowingly suppressed and concealed from plaintiff, the putative class, the medical community, and end-users truthful and complete efficacy and safety information regarding Vioxx®, particularly comparative information between Vioxx® and traditional NSAIDs;

   b. Defendant provided, disseminated, marketed, and otherwise distributed DTC advertising and other information to end-users, physicians, and Third-Party Payors that omitted adequate warnings and suppressed material medical information regarding the use of Vioxx®;

   c. Defendant misrepresented the safety and efficacy of Vioxx® in its advertising, promotional, and safety materials and information disseminated to end-users, physicians, and Third-Party Payors; and/or

    d.    Defendant engaged in unconscionable commercial practices in promoting Vioxx® as a drug with a greater safety and efficacy profile as compared to its NSAID competitors when the purported safety and efficacy benefits were unfounded.

53. Defendant's omissions, misrepresentations, and practices had the tendency, capacity, and likelihood to deceive plaintiff and the putative class.

54. Defendant intended, or consciously disregarded, that plaintiff and the putative class would rely on its omissions, misrepresentations, and practices so that they would authorize the purchase of, and purchase, Vioxx®.

55. The foregoing omissions, misrepresentations, and practices caused plaintiff and the putative class to suffer ascertainable losses in that they authorized the purchase of, and purchased, Vioxx® without knowing the true and complete risks and benefits of Vioxx®, in general, and specifically in comparison to alternative, and significantly less expensive, NSAIDs.

56. Plaintiff and the putative class would not have authorized the purchase of Vioxx®, or purchased it on the terms they did, had they known the true and complete risks and benefits of Vioxx®, in general, and specifically in comparison to alternative, and significantly less expensive, NSAIDs.

57. Defendant's unlawful conduct arose, was directed, and emanated from New Jersey to the detriment and injury of class members in New Jersey and the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

a. That this matter be certified as a class action with the Class defined as set forth above, that plaintiff be appointed Class Representative, and its attorneys be appointed Class counsel;

b. That judgment be entered against defendant in an undetermined amount for violation of the New Jersey CFA, including actual damages, treble damages, and costs of suit, including attorney's fees;

c. That judgment be entered against defendant in an undetermined amount upon the claim for fraudulent misrepresentation and suppression, including actual damages, exemplary and/or punitive damages, and costs of suit, including attorney's fees;

d. That judgment be entered against defendant for appropriate equitable relief and costs of suit, including attorney's fees; and

e. For such other damages, equitable relief, or other relief that the Court may deem just and proper, including pre- and post-judgment interest.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues.

Christopher A. Seeger, Esq.

DATED: October 30, 2003

## NOTICE TO ATTORNEY GENERAL

Plaintiff will serve a copy of this complaint upon the Office of the Attorney General for the State of New Jersey, as required by statute, within ten (10) days of the filing of this complaint.

Respectfully Submitted,

Christopher A. Seeger, Esq.
David R. Buchanan, Esq.
Seeger Weiss LLP
550 Broad Street
Newark, NJ 07102
Telephone: (973) 639-9100
Facsimile: (973) 639-9393

DATED: October 30, 2003

**OF COUNSEL:**

John E. Keefe, Jr.
Lynch Martin
830 Broad Street
Shrewsbury, NJ 07702
Telephone: (732) 224-9400
Facsimile: (732) 224-9494

Joe R. Whatley, Jr., Esq.
Whatley Drake, L.L.C.
2323 2nd Avenue North
Birmingham, AL 35203
Telephone: (205) 328-9576
Facsimile: (205) 328-9669

Dennis Reich, Esq.
Reich & Binstock
4265 San Felipe
Suite 1000
Houston, TX 77027
Telephone: (713) 622-7271
Facsimile: (713) 439-0727

## DESIGNATION OF TRIAL COUNSEL

Christopher A. Seeger, Esq. is designated as trial counsel in this matter.

DATED: October 30, 2003

_____
Christopher A. Seeger, Esq.

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matters in controversy in this action are the subject of another action. That action, encaptioned *Plumbers & Pipefitters Local 572 Health and Welfare Fund, et al., v. Merck & Co., Inc.*, Superior Court of the State of New Jersey, Law Division, Docket No. ATL-L-001705-03, is also pending in this Court. Except as represented herein, I certify that the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

DATED: October 30, 2003

_____
Christopher A. Seeger, Esq.