# Supreme Court of New Jersey

---

### Dkt. No. 59588

```
----------------------------------------------------  x
                                                       :
INTERNATIONAL UNION OF OPERATING                       :   Civil  Action
ENGINEERS LOCAL #68 WELFARE FUND,                      :
individually and on behalf of all others similarly     :   ON APPEAL FROM AN
situated,                                              :   INTERLOCUTORY DECISION OF THE
                                                       :   SUPERIOR COURT OF NEW JERSEY,
                    Plaintiff-Respondent,              :   APPELLATE DIVISION, DOCKET NO.
                                                       :   A-0450-05T1
                                                       :
               v.                                      :
                                                       :   Sat Below:
MERCK & CO., INC.,                                     :
                                                       :   HON. STEVEN L.LEFELT
                    Defendant-Appellant.               :   HON. RUDY B. COLEMAN
                                                       :   HON. GEORGE L. SELTZER
                                                       :
                                                       :
                                                       :
----------------------------------------------------  x
```

---

### PLAINTIFF-RESPONDENT'S BRIEF IN OPPOSITION TO MOTION FOR LEAVE TO APPEAL INTERLOCUTORY DECISION UNANIMOUSLY AFFIRMING DISCRETIONARY CLASS CERTIFICATION ORDER OF THE HON. CAROL E. HIGBEE

---

Christopher A. Seeger
David R. Buchanan
SEEGER WEISS LLP
550 Broad Street, Suite 920
Newark, New Jersey 07102-4573
Telephone:  (973) 639-9100

John E. Keefe, Jr.
LYNCH KEEFE BARTELS LLC
830 Broad Street
Shrewsbury, NJ  07702
Telephone:  (732) 224-9400

*(Additional counsel on signature page of brief)*

*Attorneys for Plaintiff-Respondent International Union of Operating Engineers Local #68 Welfare Fund*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Preliminary Statement . . . . . . . . . . . . . . . . .   1

Issue Presented . . . . . . . . . . . . . . . . . . .   2

Procedural History . . . . . . . . . . . . . . . . . .   2

Statement of Facts . . . . . . . . . . . . . . . . . .   3

ARGUMENT:   THE COURT SHOULD DENY LEAVE TO APPEAL . . . . .   6

     I.   DEFENDANT DEMONSTRATES NO GROUNDS
           FOR FURTHER REVIEW . . . . . . . . . . . . .   6

    II.   THE DECISIONS BELOW ARE NOT
           "MANIFESTLY ERRONEOUS" . . . . . . . . . . . .   14

Conclusion . . . . . . . . . . . . . . . . . . . . .   25

## TABLE OF AUTHORITIES

<u>CASES:</u>                                                           <u>PAGE(S)</u>

Almog v. Israel Travel Advisory Serv., Inc.,
298 <u>N.J. Super.</u> 145 (App. Div. 1997).............12, 13, 17

Bellarmine Coll. v. Hornung, 662 <u>S.W.</u>2d 847 (Ct. App. Ky.
1984)....................................................7

Borough of Glassboro v. Gloucester Co. Bd. of Chosen
Freeholders, 98 <u>N.J.</u> 186 (1984)...........................8

Butkera v. Hudson River Sloop "Clearwater," Inc.,
300 <u>N.J. Super.</u> 550 (App. Div. 1997).............12, 13, 16

Carr v. Houma Redi-Mix Concrete Co., 710 So.2d 260
(La. Ct. App. 1997).....................................7

Carroll v. Cellco Partnership, 313 <u>N.J. Super.</u> 488
(App. Div. 1998)....................................13, 14

Chamberlan v. Ford Motor Co., 402 <u>F.</u>3d 952
(9th Cir. 2005).............................6, 7, 10, 15

Clothesrigger, Inc. v. GTE Corp., 236 <u>Cal. Rptr.</u> 2d 605
(Cal. Ct. App. 1987)....................................9

Colton v. Ross Stores, Inc., No. E036548, 2005 WL
1427820 (Cal. Ct. App. June 17, 2005)................... 7

Cornblatt, P.A. v. Barow, 153 <u>N.J.</u> 218 (1998)............17

Cox v. Sears Roebuck & Co., 138 <u>N.J.</u> 2 (1994)............11

D'Agostino v. Johnson & Johnson, 133 <u>N.J.</u> 516
(1993).............................................11, 12, 16

Delgozzo v. Kenny, 266 <u>N.J. Super.</u> 169 (App. Div. 1993)...24

Desiano v. Warner-Lambert Co., 326 <u>F.</u>3d 339
(2d Cir. 2003).........................................24

Eaton v. Unified Sch. Dist. No. 1 of PIMA County,
595 <u>P.</u>2d 183 (Ariz. Ct. App. 1979)......................7

EEOC v. State of N.J., 620 <u>F. Supp.</u> 977 (D.N.J. 1985)....8-9

<u>Erny v. Estate of Merola</u>, 171 <u>N.J.</u> 86
(2002).....................................11, 12, 13, 14, 16

<u>First Alabama Bank of Montgomery, N.A. v. Martin</u>,
381 <u>So.</u>2d 32 (Ala. 1980).................................7

<u>Fu v. Fu</u>, 160 <u>N.J.</u> 108 (1999)...................11, 12, 14

<u>Fu v. Fu</u>, 309 <u>N.J. Super.</u> 435 (App. Div. 1998)...........13

<u>Furst v. Einstein Moomjy, Inc.</u>, 182 <u>N.J.</u> 1 (2004)........11

<u>Gantes v. Kason Corp.</u>, 145 <u>N.J.</u> 478 (1996)....11, 12, 13, 16

<u>Garrow v. Elizabeth Gen. Hosp. and Dispensary</u>,
79 <u>N.J.</u> 549 (1979).........................................6

<u>Gennari v. Weichert Realtors</u>, 148 <u>N.J.</u> 584 (1997).........22

<u>In re  Telectronics Pacing Sys., Inc.</u>, 172 <u>F.R.D.</u> 271
(S.D. Ohio 1997) ...........................................9

<u>In re Badger Mountain Irrigation Dist. Secs. Litig.</u>,
143 <u>F.R.D.</u> 693 (W.D. Wash. 1992)..........................9

<u>In re Cadillac V8-6-4 Class Action</u>, 93 <u>N.J.</u> 412
(1983)...............................................7, 11, 15

<u>In re Certain Sections of the Uniform Admin. Procedural
Rules</u>, 90 <u>N.J.</u> 85 (1982).................................6

<u>In re Copley Pharm., Inc.</u>, 161 <u>F.R.D.</u> 456 (D. Wyo. 1995)...9

<u>In re Delta Airlines</u>, 310 <u>F.</u>3d 953 (6th Cir. 2002).....7, 10

<u>In re Lorazepam & Clorazepate Antitrust Litig.</u>,
289 <u>F.</u>3d 98 (D.C. Cir. 2002)............................10

<u>In re McDonnell Douglas Corp. Secs. Litig.</u>, 98 <u>F.R.D.</u> 613
(E.D. Mo. 1982).........................................24

<u>In re Pennsylvania R.R.</u>, 20 <u>N.J.</u> 398 (1956)...............7

*In re Prudential Ins. Co. of Am. Sales Practices Litig.,*
962 F. Supp. 450 (D.N.J. 1997), aff'd, 148 F.3d 283
(3d Cir. 1998).................................................25

*In re Rhone-Poulenc Rorer, Inc.,* 51 F.3d 1293
(7th Cir. 1995)..............................................9

*In re School Asbestos Litig.,* 789 F.2d 996
(3d Cir. 1986)..............................................9

*In re Telectronics Pacing Sys., Inc.,* 172 F.R.D. 271
(S.D. Ohio 1997) ...........................................9

*In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516
(3d Cir. 2004)..............................................23

*Instructional Sys., Inc. v. Computer Curriculum Corp.,*
130 N.J. 324 (1992).........................................11

*Klay v. Humana, Inc.,* 382 F.3d 1241 (11th Cir. 2004),
cert. denied, 543 U.S. 1081 (2005)..........................10

*Kropinski v. Johnson & Johnson,* No. A-3979-97T1, 1999 WL
33603132 (App. Div. Jan. 7, 1999)..........................14

*Laufer v. U.S. Life Ins. Co.,* 385 N.J. Super. 172
(App. Div. May 1, 2006)....................................25

*Lemelledo v. Beneficial Mgmt. Corp.,* 150 N.J. 255
(1997).................................................11, 20

*Lettenmaier v. Lube Connection, Inc.,* 162 N.J. 134
(1999)......................................................11

*Link v. Mercedes-Benz of N. Am.,* 550 F.2d 860
(3d Cir. 1977)..............................................7

*Lusardi v. Xerox Corp.,* 747 F.2d 175 (3d Cir. 1984).....7, 8

*Margulies v. Chase Manhattan Mortgage Co.,* 2005 WL 2923580
(App. Div. Nov. 7, 2005)...................................12

*Marinelli v. K-Mart Corp.,* 318 N.J. Super. 554 (App. Div.
1999), aff'd, 162 N.J. 516 (2000)......................12, 13

*Moon v. Warren Haven Nursing Home,* 182 N.J. 507 (2005).....6

Muise v. GPU, Inc., 371 N.J. Super. 13,
(App. Div. 2004)........................................24

New Jersey Citizen Action v. Schering-Plough Corp.,
367 N.J. Super. 8 (App. Div.)..........................23

Peterson v. BASF Corp., 618 N.W.2d 821
(Minn. Ct. App. 2000).................................24

Renegotiation Bd. v. Bannercraft Clothing Co.,
415 U.S. 1 (1974).......................................8

Riley v. New Rapids Carpet Ctr., 61 N.J. 218 (1972).......11

Rossbach v. Evening News Pub. Co., 3 N.J. Super. 143
(App. Div. 1949).........................................7

Rowe v. Hoffman-La Roche, Inc., 383 N.J. Super 442
(App. Div. 2006).................................12, 13, 16

Smith v. Hercules, Inc., No. 01C-08-291WCC,
2003 WL 1605771 (Del. Super. Mar. 3, 2003)...............7

State v. Kennedy, 247 N.J. Super. 21
(App. Div 1991)......................................9, 20

State v. Nasir, 355 N.J. Super. 96
(App. Div. 2002)......................................19

State v. Reldan, 100 N.J. 187 (1985)......................6

Strawn v. Canuso, 140 N.J. 43 (1995)..................7, 11

Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.,
262 F.3d 134 (2d Cir. 2001)..............................7

Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234
(2005)......................................... 23, 24, 25

United States v. Sturm, Ruger & Co., 84 F.3d 16
(1st Cir. 1996).....................................10, 20

Vanderbilt Mortg. & Fin. v. Posey, 146 S.W.3d 302
(Ct. App. Tex. 2004)................................18, 20

Varacallo v. Mass. Mut. Life Ins. Co.,
332 N.J. Super. 31 (App. Div. 2000)............18, 22, 24

Veazey v. Doremus, 103 N.J. 244 (1986) ...................16

Wershba v. Apple Computer, Inc., 110 Cal. Rptr. 2d 145
(Cal. Ct. App. 2001).......................................9


**STATUTE & RULES:**

N.J. Statutes Annotated 56:8-19...........................12

N.J. Rules of Court R. 1:36-3............................12

N.J. Rules of Court R. 2:2-2(b)........................7, 10

N.J. Rules of Court R. 2:5-6(a)..........................8

N.J. Rules of Court R. 2:12-3...........................10

N.J. Rules of Court R. 2:12-4...........................10

N.J. Rules of Court R. 4:32-1............................1


**OTHER AUTHORITIES:**

Restatement (Second) of Conflicts of Laws (1971)......19, 20

Linda A. Johnson, Merck Says It's in Vioxx Fight
for Long Haul, Sept. 12, 2005, http:
//www.law.com/jsp/article.jsp?id=1126256714188.............8

## PRELIMINARY STATEMENT

Plaintiff International Union of Operating Engineers Local No. 68 Welfare Fund ("Plaintiff") respectfully submits this brief in opposition to the motion of Defendant Merck & Co., Inc. ("Defendant") for leave to appeal the March 31, 2006 decision of the Appellate Division (Lefelt, Coleman, and Seltzer, JJ.A.D.), which affirmed the July 29, 2005 Order of the Honorable Carol E. Higbee, certifying this as a class action under R. 4:32-1.

Defendant fails to show the requisite irreparable harm and exceptional or extraordinary circumstances to warrant interlocutory review. Its bald claim that a class trial will be "costly" and speculation that the decision below might affect other New Jersey companies, Db7, do not show irreparable harm.

Nor has Defendant demonstrated that the decision below is "manifestly erroneous." By arguing that the New Jersey Consumer Fraud Act ("CFA") is unavailable to non-domiciliaries injured by a New Jersey corporation whose relevant conduct occurred in New Jersey, Defendant resurrects a lex loci delicti rule. Defendant ignores settled New Jersey choice-of-law precedent holding that the state with the "greatest interest" is the state with the greater deterrence and compensation interests and qualitative contacts. Having failed to properly apply the governmental interest standard, Defendant now makes an unfounded "floodgates" argument that New Jersey companies will face baseless suits, Db7, even though the Appellate Division's thoroughly-reasoned analysis is limited to the unique confluence of facts

establishing New Jersey's overriding contacts with this litigation and this State's paramount interest in applying its law to this dispute.

No more convincing is Defendant's professed need for "guidance" on the choice-of-law issue. Db1-2. Defendant asked for, and received, that guidance from the Appellate Division. Defendant's dissatisfaction is not over a lack of appellate guidance but, rather, the substance of the guidance given it.

Also without merit is the Hobson's choice that Defendant posits between a "fraud-on-the-market" approach that it wrongly claims the Appellate Division adopted, and the requirement that each class member prove its reliance on Defendant's concealment of material information about Vioxx. Db19-24. Defendant's individual reliance approach grafts a new and stricter standard onto the CFA, and prohibits it from applying to classes of consumers injured by the same misconduct. Here, the Appellate Division properly found that a "causal nexus" between Defendant's deceptive conduct and class members' injuries can be shown through class-wide proof. Its decision strictly adheres to settled precedent, which Defendant ignores or misreads.

## ISSUE PRESENTED

Whether Defendant has met the criteria, including a showing of irreparable harm, to warrant further interlocutory review of Judge Higbee's discretionary class certification determination.

## PROCEDURAL HISTORY

Plaintiff commenced this action in October 2003. Da1.

Following extensive discovery and briefing, on July 29, 2005, Judge Higbee issued a 70-page opinion granting Plaintiff's class certification motion. Da18-88. The Appellate Division granted Defendant's motion for leave to appeal her ruling and, on March 31, 2006, unanimously affirmed it. Da89-130.

### STATEMENT OF FACTS

When drug benefits plan members are prescribed a drug by their physician, third-party payors ("payors") pay all or part of the cost. Da116-17. The share of a drug's cost that the payor pays is determined by the drug's status on the payor's "formulary"—a list of drugs that the plan will pay for. Da7.[1] Plaintiff is a payor organized and operating in New Jersey that provides drug coverage to its members. Da1, 133-34.

In May 1999, Defendant released Vioxx, which is among a class of pain relievers known as non-steroidal anti-inflammatory drugs ("NSAIDs"). Defendant pushed Vioxx, and justified the up to seven-fold disparity in its price over other NSAIDs, by claiming that it possessed the anti-inflammatory and analgesic properties of other NSAIDs without their gastrointestinal risks, and was thus more cost-effective, despite its significantly

---

[1] Given their limited resources, payors commonly employ outside administrators, such as a pharmacy benefits manager ("PBM") or Managed Care Organization ("MCO") to administer their benefit plans. The payor, however, ultimately pays the drug costs, in whole or in part, for its plan participants. Pa483-84 (Kelly Cert. ¶¶ 10-12); Da142 (Kolassa Cert. ¶ 12), 8 (Compl. ¶ 29). The formulary determination is typically made by a Pharmacy and Therapeutics ("P&T") Committee, comprised of healthcare professionals. Pa484-85 (Kelly Cert. ¶ 15).

higher price.  Pa93, Da3-4 (Compl. ¶¶ 10-13).[2]

Because payors pay for most prescription drugs, Defendant knew that achieving formulary status was crucial to Vioxx's success.[3]  So it used both direct-to-consumer advertising and targeting of physicians to fuel demand and force "powerful buyers" to add Vioxx to their formularies.  Pa3, 7, 11, 13, 25, 98-117, 296-98 ("Create Need for VIOXX"), 436-37 (Kolassa Tr. 5:20-7:2).  The strategy worked.  Defendant achieved more than $2 billion annually in Vioxx sales and captured nearly a quarter of the NSAID market.  Da9 (Compl. ¶ 34).

Both before and during the time it marketed Vioxx, however, Defendant knew about risks of cardiovascular complications stemming from the drug's use,[4] and employed a broad and encompassing scheme to conceal information about those risks.

_____

[2]  Pa3, 18-22, 41, 71-79; Da113 (Compl. ¶ 13); see also Pa53 ("Publicize/highlight the economic value of VIOXX to convince payors of the benefits of using VIOXX over NSAIDs."), 55 ("plans are in place" to use data "to convince payors . . . that Coxib use is cost effective"; "[a] broad mix of programs have been designed worldwide to . . . build a case that the use of Coxibs instead of traditional NSAIDs is cost-effective despite the higher out of pocket costs"), 96, 282-85, 287, 289-91, 296.

[3]  Pa3, 48 ("[a]chieve formulary status/access for Vioxx equal or better than" other NSAIDs), 193 (MCOs "are huge buyers who can move market share"), 294 ("key challenge was to get VIOXX placed into MCO formularies"); Da8-9 (Compl. ¶¶ 30-32).

[4]  E.g., Pa235 (May 1998 Scientific Bd. of Advisors, Programmatic Review), 245, 247, 301-03 (1998 internal analysis demonstrating statistically-significant increase in cardiovascular events in pre-approval Vioxx clinical trials), 309-13 (2000 internal analysis demonstrating increased risk of myocardial infarction across entire Vioxx clinical program).

It designed clinical studies to mask the association between Vioxx use and cardiovascular risks (such as by excluding "high risk" patients); avoided conducting cardiovascular safety studies altogether, lest they confirm that link; issued or sanctioned articles and publications by employees and consultants that advanced the "company line"; delayed release of information from clinical trials that use of Vioxx had been associated with a nearly three-fold increase in death; floated a theory, after one large clinical study showed a more than five-fold increase in heart attacks for Vioxx users as compared to patients taking a traditional NSAID, naproxen, that the heart attack disparity was due to the cardioprotective effect of naproxen—despite lack of support for that theory and against its own expert consultants' advice; and sought to discredit, silence, or "neutralize" those scientists, academics, and professionals who questioned the safety of Vioxx.[5]   Defendant's campaign of deception led to a formal warning from the Food and Drug Administration ("FDA") in September 2001.[6]

Notably, none of the materials provided to payors discussed

---

[5]   Pa36-37, 39, 64-95, 120, 122, 124, 126, 128, 132, 134 (sponsored article promoting naproxen cardioprotective effect theory), 143-48, 151-54, 156-57, 160-61, 164-65, 167-70, 172-73, 197-98, 200-07, 237-43, 245, 247, 249, 252, 255, 258, 272-74, 303, 306, 307, 310, 312-13, 400 (need to "reduce the emphasis" on heart attacks), 402-10, 411-16, 418, 738-65 (Report, "Physicians to Neutralize").

[6]   Pa180-87; see also Pa45-47 (Dec. 1999 FDA warning letter, addressing Defendant's "false and misleading . . . misrepresentations of Vioxx's safety profile").

Vioxx's cardiovascular risks.[7]   Not until September 2004 did Defendant cease denying the linkage between Vioxx and serious cardiovascular events—withdrawing Vioxx from the worldwide market, after yet another clinical trial showed increased risk of heart attack and stroke to those taking the drug.  Pa208-09.

## ARGUMENT

## THE COURT SHOULD DENY LEAVE TO APPEAL

I. **Defendant Demonstrates No Grounds for Further Review**

As a threshold matter, Defendant's motion for leave to appeal fails to satisfy the strict standard for interlocutory review, which is sparingly granted[8] and appropriate only in "extraordinary" or "exceptional" cases—of which this is not one.  See Garrow v. Elizabeth Gen. Hosp. and Dispensary, 79 N.J. 549, 560 (1979) (citation and internal quotation marks omitted;

---

[7] E.g., Pa322-97 (2002 Vioxx Formulary Compendium, distributed to formulary decision-makers, including product label, clinical trial summaries, and published articles).

[8] "[I]nterlocutory review by courts is rarely granted because of the strong policy against piecemeal adjudications." In re Certain Sections of the Uniform Admin. Procedural Rules, 90 N.J. 85, 100 (1982). New Jersey "has long favored uninterrupted proceedings at the trial level, with a single and complete review, so as to avoid the possible inconvenience, expense and delay of a fragmented adjudication." Id.; accord State v. Reldan, 100 N.J. 187, 205 (1985) ("Interlocutory appellate review runs counter to a judicial policy that favors an 'uninterrupted proceeding at the trial level with a single and complete review.'") (citation omitted).  This Court recently reaffirmed this policy, Moon v. Warren Haven Nursing Home, 182 N.J. 507, 510-11, 513 (2005), and it applies to interlocutory appeals of class certification orders, Chamberlan v. Ford Motor Co., 402 F.3d 952, 959 (9th Cir. 2005) (interlocutory appeals are "the exception rather than the rule") (citation omitted).

emphasis added); In re Pennsylvania R.R., 20 N.J. 398, 408-09 (1956) (emphasis added).

Both Defendant and its supporting amicus fail to cite any New Jersey decision holding that interlocutory review of a class certification order is necessary to prevent irreparable injury.[9] See R. 2:2-2(b).[10] Because the order can be reviewed on appeal from a final judgment, an interlocutory appeal is not necessary to prevent irreparable injury. Rossbach v. Evening News Pub. Co., 3 N.J. Super. 143, 145 (App. Div. 1949). A vast body of cases—which Defendant fails to acknowledge—have denied interlocutory review of class certification orders.[11]

---

[9] Although this Court has previously granted interlocutory review of class certification orders, see Strawn v. Canuso, 140 N.J. 43, 53 (1995); In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 420 (1983), the issue of whether the standards for interlocutory review were met did not appear to be in dispute in those cases since it was not discussed.

[10] Indeed, if the mere certification of a class constituted per se irreparable harm, this Court would be obliged to review every interlocutory class certification order.

[11] E.g., Chamberlan, 402 F.3d at 957-62; In re Delta Airlines, 310 F.3d 953, 957-62 (6th Cir. 2002); Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd., 262 F.3d 134, 140-43 (2d Cir. 2001); Lusardi v. Xerox Corp., 747 F.2d 175, 176-78 (3d Cir. 1984); Link v. Mercedes-Benz of North Am., 550 F.2d 860, 862-64 (3d Cir. 1977); Carr v. Houma Redi-Mix Concrete Co., 710 So.2d 260, 260-61 (La. Ct. App. 1997); Bellarmine Coll. v. Hornung, 662 S.W.2d 847, 848-49 (Ct. App. Ky. 1984); First Ala. Bank of Montgomery, 381 So.2d 32, 34-35 (Ala. 1980); Eaton v. Unified Sch. Dist. No. 1, 595 P.2d 183, 184-86 (Ariz. Ct. App. 1979); Colton v. Ross Stores, Inc., No. E036548, 2005 WL 1427820, at *3 (Cal. Ct. App. June 17, 2005); Smith v. Hercules, Inc., No. 01C-08-291WCC, 2003 WL 1605771, at **1-3 (Del. Super. Mar. 3, 2003).

Defendant instead argues that irreparable harm will result because a class trial would be "exceedingly costly," and because <u>other</u> New Jersey companies might be subjected to future class actions under the decision below. Db6-7. These arguments are unavailing.

First, litigation burdens and expenses do not constitute irreparable harm. <u>Renegotiation Board v. Bannercraft Clothing Co.</u>, 415 <u>U.S.</u> 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury"); <u>Lusardi</u>, 747 <u>F.</u>2d at 178. Tellingly, Defendant never sought a stay of the proceedings below from Judge Higbee pending appeal. <u>See</u> <u>R.</u> 2:5-6(a); <u>see, e.g.</u>, <u>Borough of Glassboro v. Gloucester County Bd. of Chosen Freeholders</u>, 98 <u>N.J.</u> 186, 195 (1984).[12]

Second, the argument that "other New Jersey companies" might be subjected to future nationwide class actions under the choice-of-law ruling below is sheer conjecture, which is insufficient to demonstrate irreparable harm. <u>E.g.</u>, <u>EEOC v.</u>

---

[12] Defendant's claim of irreparable harm due to the costs of the proceedings below is also belied by the fact that, as a large corporation with earnings in the billions, it has vast resources. It has set aside at least $685 million for Vioxx-related litigation, and has publicly announced a fight-every-case strategy. <u>See</u> Linda A. Johnson, Merck Says It's in Vioxx Fight for Long Haul, Sept. 12, 2005, http://www.law.com/jsp/article.jsp?id=1126256714188 (comments by Defendant's general counsel that its Vioxx-related liability posed no threat to the company, and that it "is in this for the long haul. We have both the resources and the resolve to address these cases one by one over many years.").

State of N.J., 620 F.Supp. 977, 997 (D.N.J. 1985).[13]  Indeed, the
choice-of-law determination here constituted only one aspect of
the decision below and, in any event, adhered to precedent.

Defendant's supporting amicus, Pharmaceutical Research and
Manufacturers of America ("PRMA"), argues that Defendant will
suffer irreparable harm because class certification can pressure
a defendant into settling, thereby effectively preventing
review.  PRMAb4.  The weakness of this argument aside,[14]
Defendant itself has not argued that point here or below and
thus it is not properly before the Court.[15]  At any rate, neither

[13]  Defendant's sweeping contention that New Jersey companies
will become "targets of nationwide class actions" on the basis
that "no other state construes" its choice-of-law rules to
permit nationwide class actions, Db7, is belied by the fact that
numerous other jurisdictions have permitted such actions under
similar circumstances, including under the CFA.  E.g., Peterson
v. BASF Corp., 618 N.W.2d 821, 825-26 (Minn. Ct. App. 2000)
(upholding certification of nationwide CFA class); Wershba v.
Apple Computer, Inc., 110 Cal. Rptr. 2d 145, 159-61 (Cal. Ct.
App. 2001); Clothesrigger, Inc. v. GTE Corp., 236 Cal. Rptr. 2d
605, 607-11 (Cal. Ct. App. 1987); In re School Asbestos Litig.,
789 F.2d 996, 1009-11 (3d Cir. 1986); In re Telectronics Pacing
Sys., Inc., 164 F. Supp. 2d 222 (S.D. Ohio 1995); In re Copley
Pharm., Inc., 161 F. Supp. 2d 456 (D. Wyo. 1995); In re Badger
Mountain Irrigation Dist. Secs. Litig., 143 F.R.D. 693, 699-700
(W.D. Wash. 1992) (applying Washington law).

[14]  A number of courts have rejected this speculative "pressure-
to-settle-equals-irreparable-harm" argument.  E.g., In re
Telectronics Pacing Sys., Inc., 172 F.R.D. 271, 275-76 (S.D.
Ohio 1997); In re Copley Pharm., 161 F.R.D. at 459-61; see also
In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1304-08 (7th Cir.
1995)(Rovner, J., dissenting).

[15]  See State v. Kennedy, 247 N.J. Super. 21, 36 (App. Div. 1991)
("none of the arguments belatedly advanced by the ACLU was
presented to the Law Division.  We adhere to the general rule
that an amicus curiae must accept the case before the court as

the PRMA nor Defendant has ever substantiated this conclusory argument, which runs counter to sound public policy.[16]

Defendant also argues that interlocutory review is warranted under standards that apply to appeals brought before this Court "as of right" from a final judgment. See Db7-10 (discussing R. 2:12-3 and R. 2:12-4). These standards, however, do not apply to Defendant's motion. See R. 2:2-2(b). Even were they relevant, Defendant does not satisfy them.

As to its contention that there are questions of general public importance that should be settled by this Court, Defendant fails to identify a single unsettled question of such importance. See Db7-8 & n.2. On the contrary, the decision below strictly adheres to settled principles enunciated by this

---

presented by the parties and cannot raise additional issues"); United States v. Sturm, Ruger & Co., 84 F.3d 1, 6 (1st Cir. 1996) ("an amicus cannot introduce a new argument into a case").

[16] E.g., Chamberlan, 402 F.3d at 960 (rejecting argument that Ford Motor Company faced risk of "ruinous liability" if pressured to settle, where its "claims [we]re conclusory and [we]re not backed up by declarations, documents, or other evidence"); id. ("the potential recovery here may be 'unpleasant to a behemoth' company, . . . but it is hardly terminal.") (citation omitted); In re Delta Airlines, 310 F.3d at 960-61 (same); In re Lorazepam & Clorazepate Antitrust Litig., 289 F.3d 98, 108 (D.C. Cir. 2002) (same) (citing cases); see also Klay v. Humana, Inc., 382 F.3d 1241, 1274-75 (11th Cir. 2004) ("It would be unjust to allow corporations to engage in rampant and systematic wrongdoing, and then allow them to avoid a class action because the consequences of being held accountable for their misdeeds would be financially ruinous. . . . Mere pressure to settle is not a sufficient reason for a court to avoid certifying an otherwise meritorious class action suit.").

Court on (1) choice of law[17]; (2) class actions involving consumer fraud claims[18]; (3) the CFA's construction[19]; (4) the applicability of New Jersey law to in-state conduct of a corporate resident that causes out-of-state harm to non-domiciliaries[20]; and (5) issues of causation and ascertainable loss under the CFA, see infra at 21-25.[21]

---

[17] See Erny v. Estate of Merola, 171 N.J. 86, 104-08 (2002); Fu v. Fu, 160 N.J. 108, 130-38 (1999); Gantes v. Kason Corp., 145 N.J. 478, 493, 497 (1996) D'Agostino v. Johnson & Johnson, 133 N.J. 516, 539-40 (1993). These cases hold that the state with the greater deterrent and compensation interests and qualitative contacts usually has the greatest interest in its law being applied—principles that the courts below applied here.

[18] See Strawn v. Canuso, 140 N.J. 43, 67-68 (1995); In re Cadillac V8-6-4 Class Action, 93 N.J. at 431, 435-39; Riley v. New Rapids Carpet Ctr., 61 N.J. 218, 223, 226-28 (1972).

[19] See Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 11-12 (2004); Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139 (1999); Lemelledo v. Beneficial Mgmt. Corp., 150 N.J. 255, 264, 268 (1997); Cox v. Sears Roebuck & Co., 138 N.J. 2, 21 (1994).

[20] See Gantes, 145 N.J. at 487-98; D'Agostino, 133 N.J. at 536, 538, 539-40; see also Instructional Sys., Inc. v. Computer Curriculum Corp., 130 N.J. 324, 370 (1992) ("The proposition is 'fairly well established that a state may regulate the conduct of its residents, even when they are acting outside of the state'") (citation omitted).

[21] Defendant claims to seek "much-needed guidance" from this Court, oddly citing Judge Higbee's statement about the absence of a "controlling Supreme Court or Appellate Division level decision as to whether [the CFA] can be applied to a class action involving out of state plaintiffs and a New Jersey defendant.'" Db1-2 (emphasis added). Setting aside that Defendant has now received such "guidance" from a definitive, unanimous Appellate Division, the application of the CFA to non-domiciliaries is not an unsettled issue but, rather, is controlled here to a large extent by well-defined New Jersey choice-of-law precedent. See supra at 11-13 & nn.17, 20, 22.

Defendant's argument that this case should be heard in tandem with <u>Rowe v. Hoffman-La Roche, Inc.</u>, 383 <u>N.J. Super</u> 442 (App. Div. 2006), because both involve a "'similar . . . question,'" Db8 (citation omitted), is disingenuous. Below, Defendant insisted that <u>Rowe</u> is <u>inapposite</u>. <u>See</u> Pa769-70.

Moreover, contrary to Defendant's assertion, Db9, the Appellate Division's decision is not at odds with <u>Marinelli v. K-Mart Corp.</u>, 318 <u>N.J. Super.</u> 554 (App. Div. 1999), <u>aff'd o.b.</u>, 162 <u>N.J.</u> 516 (2000). <u>Marinelli</u> did not involve the CFA or a class action but, instead, a choice-of-law determination between application of the comparative negligence laws of New Jersey and Pennsylvania. Also, Defendant's argument that <u>Marinelli</u> broadly dictates that New Jersey law should never apply to residents of other states that may choose to provide lesser "compensation or protection" is foreclosed not only by the CFA's language applying its provisions to "any person," <u>N.J.S.A.</u> 56:8-19, but also by New Jersey precedent holding that the law of the state with the <u>stronger</u> deterrence and compensation interests and qualitative contacts should normally apply, <u>even if the harm occurs to a non-domiciliary of that state.</u>[22]   Indeed, the

---

[22] <u>See</u> <u>Erny</u>, 171 <u>N.J.</u> at 104-08; <u>Fu</u>, 160 <u>N.J.</u> at 130-38; <u>Gantes</u>, 145 <u>N.J.</u> at 493, 497; <u>D'Agostino</u>, 133 <u>N.J.</u> at 538-40, 545; <u>Rowe</u>, 383 <u>N.J. Super.</u> at 456-66; <u>Butkera v. Hudson River Sloop "Clearwater," Inc.</u>, 300 <u>N.J. Super.</u> 550, 554-56 (App. Div. 1997); <u>Almog v. Israel Travel Advisory Serv., Inc.</u>, 298 <u>N.J. Super.</u> 145, 158-59 (App. Div. 1997), <u>appeal dismissed</u>, 152 <u>N.J.</u> 361 (1998). Not surprisingly, Defendant declines to genuinely address any of this precedent and, instead, improperly relies on an unpublished decision, <u>Margulies v. Chase Manhattan Mortgage Co.</u>, 2005 WL 2923580 (App. Div. Nov. 7, 2005). <u>See</u> <u>R.</u> 1:36-3.

-12-

language quoted by Defendant from Marinelli—that a state has no
interest in compensating non-domiciliaries, see 318 N.J. Super.
at 566—relies on Fu v. Fu, 309 N.J. Super. 435, 441 (App. Div.
1998), see 318 N.J. Super. at 566 (quoting Fu), which this
Court, subsequent to Marinelli, overturned on appeal, Fu, 160
N.J. at 132-39, finding that New York had a greater interest
than New Jersey in deterrence and in compensating a non-
domiciliary of New York, id. at 137.[23]

Defendant erroneously suggests that Carroll v. Cellco
Partnership, 313 N.J. Super. 488 (App. Div. 1998), erects a per
se bar to certification of a multi-state class. See Db10 & n.4.
Carroll explicitly recognizes that "conflict of law issues do

---

Defendant also claims that Gantes is inapposite because (i)
it involved a determination of which states' statute of
limitations should be applied, and (ii) the underlying
substantive tort law of Georgia, rather than New Jersey, was
deemed applicable (an issue not at stake in Gantes). Db10.
That is an irrelevant distinction. The issue of whether New
Jersey's or Georgia's substantive tort law applied was not
before this Court in Gantes. See 145 N.J. at 484, 495. Indeed,
in language that Defendant ignores, the Appellate Division has
recognized that Gantes did not limit its holding to cases
involving only the application of a statute of limitation. See
Rowe, 383 N.J. Super. at 466 (rejecting suggestion that Gantes
"applies solely to issues of so-called procedural law, like
statutes of limitations, and not to choice-of-law issues
concerning which state's substantive law should apply"). Other
courts have similarly not construed Gantes as turning on the
application of a statute of limitations rather than a law
governing liability. E.g., Almog, 298 N.J. Super. at 158-59;
Butkera, 300 N.J. Super. at 554-56.

[23] See Erny, 171 N.J. at 104-08 (New York's stronger deterrent
and compensation interests compelled application of New York
(rather than New Jersey) law to non-domiciliary of New York).

-13-

not per se foreclose certification of a multistate class," id.
at 497 (emphasis added), so long as "an analysis of the
different state laws and the effect on the predominance of
common legal issues" supports such a certification.   Id.   In
fact, Carroll expressly directed the trial court on remand to
consider whether to certify a multi-state CFA claim.   Id. at
511.[24]   Plaintiff (in a detailed, 108-page analysis, Pa617-724)
and Judge Higbee, Da46-82, conducted such a thorough analysis
below—which Defendant did not rebut.[25]

## II. The Decisions Below Are Not "Manifestly Erroneous"

Defendant devotes the remainder of its brief to arguing

---

[24] Moreover, seven months after it decided Carroll, the Appellate
Division affirmed the certification of a nationwide CFA class.
See Kropinski v. Johnson & Johnson, No. A-3979-97T1, 1999 WL
33603132, at **1-2 (App. Div. Jan. 7, 1999). Pa784-85.

[25]   Carroll in fact rejected certification because the plaintiff
and the trial court there failed to perform the analysis
required by the second prong of the governmental interest test,
see Carroll, 313 N.J. Super. at 496-98.   Here, by contrast,
Defendant presented Judge Higbee an analysis of only selected
states' laws ("Summary of Some Variations Among States' Consumer
Protection Laws," Pa583-91 (emphasis added)) that failed to
address the second prong of the governmental interest analysis
by determining which state had the greatest interest.   See Erny,
171 N.J. at 95-103; Fu, 160 N.J. at 118; see also Carroll, 313
N.J. Super. at 497 ("thorough analysis of the state laws is
particularly important").

While Defendant suggests that New Jersey has a per se rule
against one state's law applying to multi-state classes, this
Court found such an argument "to diminish the individualized
assessment that controls in the governmental-interests test that
[it] appl[ies] to each choice-of-law determination.   Each
choice-of-law case presents its own unique combination of facts
. . . that influence the resolution of the choice-of-law issue
presented." Erny, 171 N.J. at 108.

that the decision below is "demonstrably erroneous." Db12-24. Even assuming _arguendo_ that this standard can substitute for a showing of irreparable harm and "extraordinary" or "exceptional" circumstances, Defendant fails to show—particularly in light of Judge Higbee's broad discretion, _see In re Cadillac_, 93 N.J. at 436—that the decision below is "manifestly erroneous and virtually certain to be reversed on appeal from the final judgment." _Chamberlan_, 402 F.3d at 962.

Defendant argues that the choice-of-law analysis below errs in determining, under the governmental interest standard, that New Jersey has the "greatest interest" in the issues at stake. Db12-19. Defendant's choice-of-law analysis, however, is presented as though it were proceeding before this Court on a clean slate. Unlike Plaintiff, who presented below a detailed, 108-page choice-of-law analysis that, like Judge Higbee's analysis, Da38-64, carefully considered and weighed the states' relevant policies, Pa617-724, Defendant presented no competing analysis below to address the crucial second prong of the governmental interest test by comparing the relevant policies of the states and determining which state has the "greatest" interest, _see_ Pa529-91; _supra_ at 14 & n.25. Instead, Defendant baldly maintained that the law of the states where class members resided should control simply because the states had "different" (not _greater_) interests than New Jersey, thus essentially advocating a poorly-disguised _lex loci delicti_ standard, Pa551, 554—which New Jersey long ago rejected in favor of the

governmental interest standard, see Veazey v. Doremus, 103 N.J. 244, 247 (1986).[26]

Defendant now purports to apply the "greatest" interest standard, see Db13, 15-18, but a close inspection reveals that, as it did before, Defendant actually ignores that standard and maintains that the law of all the states other than New Jersey should apply (i.e., a lex loci delecti standard) simply because those states have "different" (not greater) interests than New Jersey, Db16, 17 (emphasis added)—even though the other states may impose lesser liability and provide lesser compensation and protection to injured consumers than the CFA does, see Db16-18.

The fatal flaw in Defendant's argument, which relies on no actual analysis of the purposes underlying the states' consumer protection laws—chiefly, the protection of consumers, not the profit margins of large corporations, see Pa617-724; Da55-81—is that it contravenes settled New Jersey choice-of-law precedent. That precedent holds that the law of the state with the greatest (not merely a "different") interest should apply, which will usually be the state having the weightier deterrence and compensation interests and qualitative contacts.[27] Because those

---

[26] That Defendant and its supporting amicus cloak a lex loci delecti standard in governmental interest garb is revealed by their insistence that the CFA cannot apply to residents of other jurisdictions who are injured by the misconduct of a New Jersey company whose conduct principally occurred in this state.

[27] See Erny, 171 N.J. at 104-08; Fu, 160 N.J. at 130-38; Gantes, 145 N.J. at 493, 497; D'Agostino, 133 N.J. at 538-40, 545; Rowe, 383 N.J. Super. at 456-66; Butkera, 300 N.J. Super. at 554-56;

factors, as applied here, demonstrate that applying the CFA
would further its broad purposes of deterring consumer fraud and
of protecting and compensating consumers more significantly than
other states' laws would, see Pa617-724, and because its
application would further, not frustrate, the purposes of the
other states' consumer protection laws, see id., the Appellate
Division properly held that New Jersey has the greatest interest
and that the CFA should apply. Da109-29. Defendant's abject
failure to demonstrate otherwise and its reliance on what is
essentially a lex loci delecti standard fall far short of
demonstrating a "manifestly erroneous" decision below.

Further, Defendant failed to present before Judge Higbee
any argument or evidence concerning other states' relevant
contacts to this dispute, see Pa529-91,[28] whereas Plaintiff
adduced overwhelming evidence of Defendant's extensive
qualitative contacts in New Jersey that implicate the policies
underlying the CFA—contacts that Judge Higbee properly
considered.[29] Her findings of fact on these contacts are

---

Almog, 298 N.J. Super. at 158-59. Defendant fails to
distinguish any of this precedent.

[28] Defendant's failure to present any evidentiary support below
for its belated contacts argument forecloses consideration of it
here. See Cornblatt, P.A. v. Barow, 153 N.J. 218, 407 (1998)
(even if argument first raised on appeal is "one 'of sufficient
public concern,'" court "will not consider the issue if the
record before the court is not complete as to the newly-
presented issue") (citing cases).

[29] As Judge Higbee recognized (Da51-52), Defendant conducted
substantial activities in New Jersey concerning its development,

entitled to deference.[30]

Moreover, after reviewing the compelling record evidence regarding New Jersey's qualitative contacts with this litigation, the Appellate Division concurred with Judge Higbee that "New Jersey's contacts with this dispute are both extensive and weighty." Da116. As the Appellate Division observed, "Vioxx was primarily developed in New Jersey"; "[s]cientific research, studies, and presentations relating to the safety of Vioxx and its clinical studies were conducted in this State"; and "[t]he ultimate decision-making power regarding Vioxx's marketing and development was exercised in New Jersey." Id. Faced with this evidence, the Appellate Division held that "New Jersey's interests in this litigation . . . far outweigh the interests of all other states." Da117 (emphasis added).

Nevertheless, Defendant argues, conclusorily, that other jurisdictions have stronger contacts than New Jersey, and that a

---

labeling, promotion, and marketing of Vioxx. Pa214, 220, 222-25, 228, 230, 232-33, 235, 237-43, 245, 247, 249, 250-52, 253, 255, 257, 292, 301, 306-07, 310, 398-400, 402, 411, 418, 420, 518-19. Those contacts are directly implicated by the policies underlying the CFA, i.e., the protection and compensation of consumers, deterrence of consumer fraud, and punishment of wrongdoers. See supra at 11 n.19 (cases detailing policies underlying CFA).

[30] See Varacallo v. Mass. Mut. Life Ins. Co., 332 N.J. Super. 31, 42 (App. Div. 2000); Vanderbilt Mortg. & Fin. v. Posey, 146 S.W.3d 302, 313 (Ct. App. Tex. 2004) ("the determination of the state contacts to be considered involves a factual inquiry which requires deference to the trial court's determination") (citing cases).

contacts analysis under sections 145 and 148 of the <u>Restatement</u>
<u>(Second) of Conflicts of Laws (1971)</u> ("<u>Restatement</u>"), compels
the application of the consumer protection laws of all the
states other than New Jersey.  <u>See</u> Db13-14.  Because Defendant
never made these arguments to Judge Higbee, however, <u>see</u> Pa529-
91, they are not properly before the Court.  <u>See</u> <u>State v. Nasir</u>,
355 <u>N.J. Super.</u> 96, 103 (App. Div. 2002).  At any rate, the
Appellate Division conducted a thorough contacts analysis under
sections 145[31] and 148[32] of the <u>Restatement</u> and properly concluded

---

[31] As to the first § 145 factor, there is no single "place of
injury" because Plaintiff and class members were injured in
multiple jurisdictions (where they received Defendant's
communications), and thus the relative interest of each state is
more or less equal.  The second factor (the place of Defendant's
conduct) merits considerable weight because one of the CFA's
primary purposes is to deter and punish violations of the
statute, and Defendant's CFA violations principally occurred in
New Jersey (whereas class members' injuries occurred in multiple
locations).  <u>See</u> <u>Restatement</u> § 145(2) cmt. e.  The third factor
(domicile or place of business of parties) also favors New
Jersey because Defendant's headquarters is here, and its
culpable conduct here implicates New Jersey's compelling
interests in deterrence and punishment under the CFA.  <u>See</u> <u>Fu</u>,
160 <u>N.J.</u> at 133.  The fourth factor (place where relationship of
parties is centered) also favors New Jersey, because the
relationship between Defendant and class members is "centered"
in New Jersey, since that is the only state where the conduct
relevant and common to all class members occurred.

[32] Comment b to § 148 "calls for the application of the local law
of the state selected on the basis of the stated contacts,
<u>unless, with respect to the particular issue, some other state</u>
<u>has a more significant relationship to the occurrence and the</u>
<u>parties</u>."  (Emphasis added).  Here, as discussed above, New
Jersey clearly has the more significant relationship.  Second,
comment c to § 148 states that, where, as here, the loss is
pecuniary in nature, the place of loss is very difficult to
determine, in contrast to the place where the defendant made the

that "New Jersey's interests in this litigation . . . <u>far</u> outweigh the interests of all other states." Da117 (emphasis added); <u>see</u> Da112-17; <u>see also</u> Da48-82 (Judge Higbee's <u>Restatement</u> analysis).

The PRMA presents numerous policy arguments, asserting that New Jersey's pharmaceutical industry will be adversely impacted, PRMAb2-25, and that the courts below erred in applying the CFA because the FDA regulates the pharmaceutical industry, PRMAb1-2, 8-10. Because these arguments also were never raised before Judge Higbee or by Defendant, <u>see</u> Pa529-91, they are not properly before the Court. <u>See Kennedy</u>, 247 <u>N.J. Super.</u> at 36; <u>Sturm, Ruger & Co.</u>, 84 <u>F.</u>3d at 6.[33]

The other "errors" on which Defendant relies are its

———————————————————————

misrepresentation (here, New Jersey), which is deemed an "important" contact. <u>See</u> § 148 cmt. h. Third, comment e to § 148 states that the "relative importance [of these contacts] in a given case should be determined in the light of the choice-of-law principles stated in [Restatement] § 6 with emphasis upon the purpose sought to be achieved by the relevant tort rules of the potentially interested states, the particular issue and the tort involved." <u>See also Vanderbilt Mortg. & Fin.</u>, 146 <u>S.W.</u>3d at 316 (§ 148 "must be analyzed in conjunction with Section 145 and Section 6"). This favors New Jersey law because the §§ 6 and 145 factors favor application of the CFA, and New Jersey has the strongest interest under its consumer fraud law in deterring and policing tortious conduct of resident companies.

[33] Moreover, PRMA's newly-raised FDA-preemption argument relates to the merits and thus is not a proper subject of this motion for interlocutory review of the procedural, class certification order. At any rate, PRMA fails to overcome, let alone address, the presumption that the CFA applies to Defendant's conduct. <u>See Lemelledo</u>, 150 <u>N.J.</u> at 268-75. Further, the CFA contains no exception for products regulated by other government agencies.

argument that causation and ascertainable loss cannot be resolved on a class-wide basis because of P&T Committee and formulary variations. Db5-6, 19-21. That is without merit.

What Defendant fails to mention is that P&T Committees employ a remarkably uniform process in selecting drugs for their formularies. See Pa485-88 (Kelly Cert. ¶¶ 16-25). In fact, there is a common format for formulary submissions. See Pa511 (Academy of Managed Care Pharmacy ("ACMP"), Format for Formulary Submissions, Version 2.0 (Oct. 2002)). Defendant's own expert acknowledged that most pharmaceutical companies construct and submit "dossiers" in accordance with that manual, and that the ACMP has addressed common formulary practices. Pa452 (Kolassa Tr. 108:5-109:2-8, 110:3-7); see Pa432.[34]

Notably, common processes aside, P&T Committees receive and consider the same information——as was, in fact, done in the case of Vioxx. See Pa486 (Kelly Cert. ¶¶ 18-19); Da146 (Kolassa Cert. ¶ 21) (P&T Committees consider information supplied by drug-makers). That being the case, the Appellate Division noted that "no P&T Committee could have been completely isolated from Merck's extensive development and marketing efforts." Da105 (emphasis added).[35] The record confirms both the uniformity and

---

[34] Indeed, because a handful of PBMs manage 95% of the prescriptions of those having prescription drug benefit coverage, Pa483-84 (Kelly Cert. ¶ 12); see also Da142 (Kolassa Cert. ¶ 14 ("Most prescription drug sales in the United States are made through PBMs.")), most payors' formulary determinations were likely made by a limited number of P&T Committees.

[35] Judge Higbee also found P&T Committee differences immaterial

consistency of Defendant's messages about Vioxx.  See supra at 3-6.  Thus, any P&T Committee variations are immaterial.[36]

Furthermore, as the Appellate Division noted, Da104, the CFA requires Plaintiff "to prove only that defendant's conduct was a cause of damages.  [It] need not prove that [Defendant's] conduct was the sole cause of loss."  Varacallo, 332 N.J. Super. at 48 (emphasis added).  Thus, the test is not whether, but for Defendant's fraud, payors would not have added Vioxx to their formulary.[37]  Because conduct in violation of the CFA need only

---

given the alleged "long-term, widespread, and uniform pattern of deception" that "was accomplished by various methods." Da83-84. Because "elements of fraud" are alleged to have "pervaded every aspect of Merck's actions in developing and marketing Vioxx," she found that a classwide causal link can be shown, irrespective of any P&T Committee differences. Da84 ("Merck's actions regarding Vioxx from the time the drug was first conceived until the time it was withdrawn from the market constitute[] a common core of operative facts.") (citation and internal quotation marks omitted).

[36] Defendant again argues that payors with "open" formularies— those that include any FDA-approved drug—could not have sustained an ascertainable loss due to Defendant's misconduct. Db5-6.  As the Appellate Division correctly concluded, however, even payors with open formularies must still make a decision as to which tier of the formulary to place or maintain a drug. Da105; see Pa 486-88 (Kelly Cert. ¶¶ 21, 25) (tier placement determines extent too which health plans will cover drug's cost, including amount, if any, of required co-payments).  Therefore, given the systematic and pervasive concealment of material information about Vioxx, all payors were affected, whether they affirmatively added Vioxx to their formulary or had "open" formularies and gave Vioxx favorable tier placement.

[37] See id. at 49 ("causal nexus" element "is a significant distinction from the requirement of reliance in a common law fraud claim") (emphasis added); see also Gennari v. Weichert Realtors, 148 N.J. 584, 607 (1997) (CFA "does not require proof of reliance").

-22-

have <u>contributed</u> to class members' ascertainable losses, Da104, P&T Committees need not have treated information about Vioxx in an identical manner for class treatment to be appropriate.[38]

Next, Defendant and the PRMA argue that the decision below endorses a fraud-on-the-market theory.  Db22-24, PRMAb23.[39]  Not true.  Defendant confuses a "loss in value"—which this Court has endorsed as an ascertainable loss theory in CFA cases[40] and which the Appellate Division applied here, Da107[41]—with fraud on

---

[38] Defendant's claim that the Appellate Division "eliminated the substantive requirement" that each class member prove a direct link between its "personal loss" and Defendant's deceptions, Db21, merely recycles its efforts below to graft a reliance element onto the CFA—this time in constitutional garb.

[39] Defendant's claim that the decision below is at odds with <u>New Jersey Citizen Action v. Schering-Plough Corp.</u>, 367 <u>N.J. Super.</u> 8 (App. Div.), <u>certif. denied</u>, 178 N.J. 249 (2003), Db22, is specious.  The <u>Citizen Action</u> plaintiffs alleged that the defendant used direct-to-consumer marketing to promote the effectiveness of its over-the-counter products, thereby fueling demand and driving up prices. 367 <u>N.J. Super.</u> at 11-12.  This is not a price inflation case; rather, it involves Defendant's strategy of ensuring that payors would authorize the purchase of Vioxx by affirmatively adding it to their formulary or by according it favorable tier placement.  Da7-9 (Compl. ¶¶ 24-34).

[40] <u>See</u> <u>Thiedemann v. Mercedes-Benz USA, LLC</u>, 183 <u>N.J.</u> 234, 248 (2005) ("either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages").

[41] Defendant fails to recognize that payors' "lost opportunity" to authorize the purchase of cheaper NSAIDs of similar efficacy and without the cardiovascular risks of Vioxx suffices as an ascertainable loss.  <u>See</u> <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 <u>F.</u>3d 516, 531 (3d Cir. 2004) (payors "suffered direct economic harm when, as a result of DuPont's alleged misrepresentations, they paid supracompetitive prices for Coumadin instead of purchasing lower-priced generic warfarin

the market.  Plaintiff, however, does not claim that Defendant's concealment of information about Vioxx <u>distorted the drug's market price</u>.  Rather, Defendant's suppression of information <u>facilitated the placement of Vioxx on payors' formularies</u>, Da8-9 (Compl. ¶¶ 31-33).[42]  <u>Defendant</u>—not a "market"—set the price of Vioxx.  <u>E.g.</u>, Pa437 (Kolassa Tr. 10:5-11:24).

Defendant assumes that, unless each class member proves its reliance, a fraud-on-the-market approach is the only conceivable way to establish liability on a class-wide basis.  Not so.  Where a defendant has "withheld material information with the intent that consumers would rely on it . . . the purchase of the [product] by a person who was shown the literature"—in this case, payors—"would be sufficient to establish <u>prima facie</u> proof of causation."  <u>Varacallo</u>, 332 <u>N.J. Super.</u> at 49.

---

sodium"); <u>Desiano v. Warner-Lambert Co.</u>, 326 <u>F.</u>3d 339, 350 (2d Cir. 2003) (health benefits providers may recover from drug companies amounts overpaid to purchase higher-priced product "due to illegal or deceptive marketing practices"); <u>Peterson</u>, 618 <u>N.W.</u>2d at 824 ("lost opportunity" sufficient to show CFA injury).

[42] In claiming that individualized proof is needed to show the "existence and extent" of payors' ascertainable losses, Defendant blurs important distinctions.  Db21.  The "existence" of an ascertainable loss—whether there is an "actual loss," <u>Thiedemann</u>, 183 <u>N.J.</u> at 248—relates to the fact of injury, whereas the "extent" of that loss is the <u>measure of damages</u>, and variations in class members' damages do not preclude class certification.  <u>Muise v. GPU, Inc.</u>, 371 <u>N.J. Super.</u> 13, 46 (App. Div. 2004); <u>Delgozzo v. Kenny</u>, 266 <u>N.J. Super.</u> 169, 190 (App. Div. 1993).  Indeed, damages questions are <u>typically</u> individual and usually dealt with formulaically.  <u>In re McDonnell Douglas Corp. Secs. Litig.</u>, 98 <u>F.R.D.</u> 613, 617 (E.D. Mo. 1982) (citing cases); <u>see infra</u> n.43.

-24-

Finally, the PRMA's argument that the "complexities" of pharmaceutical distribution preclude the use of generalized proof of causation and ascertainable loss, PRMAb19-25, is yet another argument that was never raised to Judge Higbee.  See supra at 9-10 n.15, 17 n.28, 20.[43]

### CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion for leave to appeal.

Dated:   June 2, 2006

Respectfully submitted,

SEEGER WEISS LLP

By: _____
Christopher A. Seeger
David R. Buchanan
550 Broad Street, Suite 920
Newark, NJ   07102
Telephone:  (973) 639-9100
**Attorneys for Plaintiff-
Respondent**

---

[43]   Defendant asserts that the Appellate Division is "circumventing" the CFA's ascertainable loss element in class actions.  Db24.  That is meritless.  The ascertainable loss element relates solely to a CFA plaintiff's standing.  See Laufer v. U.S. Life Ins. Co., 385 N.J. Super. 172, 2006 WL 1133226, at **7-8 (App. Div. May 1, 2006) (discussing Thiedemann and other cases).  There is no requirement that a proposed methodology for resolving every absent class member's ascertainable loss be adduced before a CFA class can be certified.  Here, variations in class members' ascertainable losses based on different formulary tier placement of Vioxx can be addressed through expert proof.  E.g., In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 517 (D.N.J. 1997) (at class action trial, court may allow expert witness testimony as to appropriate formula for calculating individual damages), aff'd, 148 F.3d 283 (3d Cir. 1998).

*Of Counsel:*

Diogenes P. Kekatos
James A. O'Brien III
Jeffrey S. Grand
SEEGER WEISS LLP
One William Street, 10th Floor
New York, NY  10004
Telephone:  (212) 584-0700

John E. Keefe, Jr.
LYNCH KEEFE BARTELS LLC
830 Broad Street
Shrewsbury, NJ  07702
Telephone:  (732) 224-9400

Carlene Rhodes Lewis
Shelley Sanford
GOFORTH LEWIS SANFORD LLP
1111 Bagby, Suite 2200
Houston, TX  77071
Telephone:  (713) 650-0022