**EXHIBIT**

**XX**

# CENTER FOR DRUG EVALUATION AND RESEARCH

**APPLICATION NUMBER:  21-042/S-007, S-008, S-010, S-012, S-013, S-014  and  21-052/S-004, S-005, S-006, S-007, S-008, S-009**

## MEDICAL REVIEW(S)

4

MRK-AFV0443614

# MEDICAL OFFICER REVIEW

## DIVISION OF ANTI-INFLAMMATORY, ANALGESIC AND OPTHALMIC DRUG PRODUCTS—HFD-550

sNDA #21042/s012

| | |
|---|---|
| Submission date: | 2/28/2001 |
| Submission type: | NDA supplement |
| | |
| Review date: | 12/15/2001 |
| Drug name: | rofecoxib (Vioxx) |
| Applicant: | Merck |
| Pharmacologic category: | anti-inflammatory |
| Proposed indications: | signs and symptoms of RA |
| Dosage form and route: | oral tablets, 25mg, daily |

_____

Joel Schiffenbauer, M.D.        Date
Medical Officer


_____

Lourdes Villalba, M.D.        Date
Medical Officer


**APPEARS THIS WAY
ON ORIGINAL**

_____

Lawrence Goldkind, M.D.        Date
Deputy Division Director, DAAODP


_____

Jonca Bull, M.D.        Date
Office Director, ODE V

5

MRK-AFV0443615

# (C. Safety)

The safety evaluations for rofecoxib in the trials in this submission, as well as the safety data from the VIGOR trial of 8,00 patients (reviewed elsewhere), provide information on safety including absolute rates of serious adverse events (SAE), adverse events (AE), withdrawals due to AEs, as well as comparative safety in relation to naproxen. There is still concern for the question of cardiovascular (CV) thrombotic risks associated with the use of rofecoxib compared to naproxen or placebo, which cannot be definitively addressed by the studies to date.

The RA safety database contains approximately 2000 patients exposed to rofecoxib (12.5, 25 and 50 mg); 550 patients exposed to naproxen and 1000 patients exposed to placebo. The bulk of the exposure was to 3 and 6 months of treatment. Approximately 1500 patients were exposed to rofecoxib 25 mg (n= 797) and 50 mg (n= 677) in 3-month placebo controlled studies. Approximately 180, 140 and 80 patients were exposed to rofecoxib 25mg, rofecoxib 50mg and naproxen 1000 mg respectively, for one year or more. *The most relevant of the three datasets appears to be the one-year comparative data including naproxen.* However, since not all randomized patients actually completed the studies, for events of particular interest, it appears more appropriate to compare event rates based on true exposure.

There were a total of eight deaths: five on rofecoxib, two on naproxen and one on placebo. There were two, one and one cardiovascular deaths in the rofecoxib 50 mg, rofecoxib 25 mg and naproxen groups, respectively. The pattern of adverse events, discontinuations due to adverse events, laboratory AE's and vital signs was consistent with data submitted in the original NDA submission. .

There were 6 MI 's (one fatal) in the rofecoxib 25 mg group, 5 MI's (one fatal) and 1 sudden death in the rofecoxib 50 mg group and one fatal MI in the naproxen group. Although the number of events is small, the higher incidence of MI's on rofecoxib as compared to naproxen is consistent with findings in VIGOR and ADVANTAGE. Consistent with VIGOR but different from ADVANTAGE, there was no excess of strokes in the naproxen group in the RA database.

Hypertension related events were observed two to three times more often in each of the rofecoxib arms, as compared to the naproxen arm or placebo. A higher percentage of patients presented important increase of blood pressure and required concomitant antihypertensive medication and/or discontinued from each of the rofecoxib arms compared to the naproxen arm. The numbers of patients with edema-related events were higher in the rofecoxib 25 and 50 mg groups as compared to naproxen. These findings were consistent in the placebo-controlled treatment phase and in the long-term exposure databases.

Three CHF related events occurred during one year studies - all in the rofecoxib 50 mg group -. Two additional cases occurred in the extension period, one in

7

MRK-AFV0443621

rofecoxib 25 mg and one in rofecoxib 50 mg. The number of CHF events is small to draw definitive conclusions but is consistent with VIGOR in which rofecoxib 50 mg was associated with higher risk of developing CHF related events than naproxen.

**By Plaintiff** ➡

More fractures occurred in the rofecoxib arms (9 and 3 for rofecoxib 50mg and 25 mg respectively) as compared to the naproxen arm (no fractures). This trend was consistent with the VIGOR study. However, in a larger safety database of approximately 3000 patients exposed to either rofecoxib 25 mg or placebo for one year there was no differences in the numbers of fractures. A study evaluating _____ with rofecoxib has recently been completed and is under review.

The number of patients who discontinued due to one or more AEs was slightly higher for rofecoxib 50 mg and naproxen groups (9 % and 8 %, respectively), compared to the placebo and rofecoxib 25 mg groups (4 % and 5 %, respectively).  Of note, the body system with most discontinuations was the digestive, for all treatment groups, including placebo.  The vast majority of the events leading to discontinuation were not considered serious by the investigator.

In the one year dataset, the number of patients discontinued due to AEs was 9.4%, 13.5%, and 12.5% in the rofecoxib 25 mg, rofecoxib 50 mg and naproxen, respectively. The most frequent events were in the body as a whole, cardiovascular and digestive systems.

In the extension studies dataset, the number of patients who discontinued due to AEs was 9.4%, 13.5 and 12.5% in the rofecoxib 25 mg group, rofecoxib 50 and naproxen groups respectively. The most frequent events leading to discontinuation were in the cardiovascular and digestive systems.

In the placebo controlled phase of the RA studies, 60 to 66% of patients had at least one adverse experience. In the one-year dataset, 81 to 85% of patients had at least one AE. In the extension studies, approximately 76 % of patients had at least one AE. The most frequent events were in the body as a whole system (22-26% of patients in the placebo controlled phase; 42-44% in the one year database and 31 to 37% in the extension studies) and in the digestive system (20.8%, 23.3 %, 30.6% and 39.5% in the placebo, rofecoxib 25 mg, rofecoxib 50 mg and naproxen groups, respectively in the placebo-controlled phase; 36% to 48 % in the one-year dataset and 24% to 30 % in the extension studies).

In summary, there were no substantial differences in the total number of serious adverse events, discontinuations due to adverse events and common adverse events between treatment groups in each of the three datasets, particularly the long term datasets. There appears to be a dose trend in the AEs described above.

8

7

MRK-AFV0443622

The pattern of laboratory adverse events is consistent with those observed in prior databases with rofecoxib: the 50 mg dose is associated with higher number of renal-related laboratory AEs than naproxen 500 mg bid. Decrease in hematocrit with rofecoxib 50 mg is similar to naproxen and higher than with rofecoxib 25 mg. The incidence of liver-related laboratory AEs with rofecoxib appears to be similar to naproxen.

- Drug-drug interaction potential

There is no new information concerning drug-drug interactions provided in this sNDA. The interested reader is referred to the currently approved label for further discussion of this issue.

- Exposure in trials versus probable marketing exposure

The trials submitted enrolled RA patients that appear to be representative of the general population of RA patients that will be taking rofecoxib with the exception of the trial exclusions discussed below. The duration of exposure in these trials was at least one year and in some cases longer. The VIGOR study administered twice the recommended dose of rofecoxib for greater than 6 months. Furthermore, rofecoxib is already approved for the use in OA and acute pain and has been marketed for these indications for more than one year. Taken together there does not appear to be any new safety issues that have not been identified either in this submission or in post-marketing analyses. The reader is referred to the reviews of VIGOR and ADVANTAGE studies by Dr. Villalba.

- Effect of trial exclusions on safety profile versus expected marketed population

Patients at cardiovascular risk such as those with a recent history of myocardial infarction and stroke and those using prophylactic low dose aspirin were not included in these trials. This raises significant concern in view of the findings in VIGOR and ADVANTAGE, and the theoretical concern that rofecoxib may pro-thrombotic based on its COX-2 specificity. The existing published studies and databases reviewed are not conclusive. It is anticipated that individuals in the general population with CV risks will be placed on this drug, with or without aspirin prophylaxis. It is suggested that                                    ]
[                                    The sponsors submitted a meta-analysis to address this issue. Their conclusion is that this meta-analysis is supportive of the concept that naproxen is protective and reduces the risk of CV thrombotic events, and that rofecoxib is similar to placebo in terms of this risk. However, this analysis does not provide adequately robust data that a prospective randomized trial would provide to address this question. The size and

9

duration of submitted studies as well as the absence of meaningful comparisons to non-naproxen NSAIDs limits the conclusions from this meta-analysis.

- Relationship of safety to other drugs available for indication

The only active NSAID comparator used in the studies was naproxen. In these and other studies the overall incidence of adverse events with rofecoxib compared to naproxen is similar. However, the rate of PUBs is higher in naproxen treated individuals while the rate of CV thrombotic events is lower in naproxen users. The large GI outcome study VIGOR (reviewed elsewhere) has demonstrated that rofecoxib has a lower rate of PUBs than naproxen. Endoscopy studies do not provide additional relevant clinical outcomes data beyond that provided in the VIGOR trial.

- Unresolved safety issues

Analysis of the data from the RA application safety database demonstrates a trend consistent with the VIGOR (and ADVANTAGE) study: rofecoxib 50 mg/day has higher incidence of serious cardiovascular thrombotic events, edema-related, hypertension related and CHF related events than naproxen 1000 mg/day. Rofecoxib 25 mg dose behaves similarly to the 50 mg dose in this safety database. Therefore, the cardiovascular findings are consistent with those in the VIGOR and ADVANTAGE studies for rofecoxib as compared to naproxen, but do not provide information for the safety profile of rofecoxib in patients using low dose aspirin and in comparison to other NSAIDs. A major unresolved issue is whether the rate of CV thrombotic events is similar to placebo and naproxen is protective because of anti-platelet effects, or if rofecoxib is in fact pro-thrombotic.



By Plaintiff

A second area of concern is that there were more fractures in the rofecoxib 50 mg group as compared to naproxen in this data set, and this is consistent with the VIGOR study (also in a population of patients with RA) in which there were 41 (1%) and 29 (0.7%) fractures (all sites) in the rofecoxib and naproxen groups, respectively. The RA population is at high risk of osteoporosis because of the chronic use of steroids. The background fracture rate for this population is unknown. A recent study from Finland suggests that the risk of hip fracture is increased by three fold in patients with RA, as compared with that of non-RA patients. Since COX-2 is involved in regulation of bone metabolism, concerns have been raised regarding the long term bone effects of COX-2 inhibitors.



By Plaintiff

10

MRK-AFV0443624

# EXHIBIT

# A

9A

NAME:   HARRISON, DENNIS                          MED. REC.#   1679635
DATE OF BIRTH:                                    CHART LOCATION: G5/G506/C
SURGEON:     PAUL HOSPODAR, M.D.                  OPERATION DATE:   02/28/03


(Created by Plaintiff because of poor quality of copy and scan)

ASSISTANT: SRIDHAR DURBHAKULA, M.D.
          J.MARTIN LELAND, M.D.

(nonunion)

**PREOPERATIVE DIAGNOSIS:** Infected nonunion of right hip periprosthetic fracture, right femur.

(nonunion)

**POSTOPERATIVE DIAGNOSIS:** Infected nonunion of right hip periprosthetic fracture, right femur.

**OPERATION:** 1. Removal of infected total hip replacement. 2. Takedown of nonunion, right femur. 3. Removal of hardware, right femur. 4. Open reduction internal fixation, right femur. 5. Insertion of antibiotic cemented spacer, right femur.

**ANESTHESIA:**

**PROCEDURE:** The patient was taken to the operating room and placed in supine position. General anesthesia was then induced. The patient was then carefully positioned in the left lateral decubitus position, care was taken to pad the neck in its position since the patient has ankylosing spondylitis and is fused from the cervical spine to his lumbar spine. After he was placed in the left lateral decubitus position, right hip was prepped and draped in usual sterile fashion. Foley was placed prior to the start of the case.

At this point the incision was opened up directly over the previous incision, carried down through the subcutaneous tissues. The fascia was split in the direction of its fibers. It should be noted that a large pocket of pus and fluid was then encountered. This was sent for culture. Tissue samples were also sent for pathology and for culture.

At this point the wound was thoroughly irrigated and debrided. Once this was performed the fracture was encountered. All loose hardware was removed from the femur proximally and distally with the plate, wires and screws being removed. At this point the cement in intramedullary was removed using the Oscar device as well as backcutting backbiters, curets and splitting curets. At this point the femoral hip component was removed and the cement was removed from the proximal part of the femur as well. The cup which was found to be well fixed was removed using the circumferential bone cutting device. Once the cup was circumferentially cut, it was the easily removed with minimal bone loss. At this point the entire wound was thoroughly irrigated. Once this was performed, all the devitalized bone was removed. At this point, in a custom made mold, an antibiotic spacer was made with a Rush rod and three packs of cement. The fracture was then held reduced and the Rush rod and cement spacer were impacted into place. This gave good fixation of the fracture. Two cerclage titanium wires, Zimmer, were tightened around the bone to give an open reduction internal fixation to the bone. This was found to give excellent support and alignment of the bone. At this point the wound was thoroughly irrigated again and drains were placed deep, carried out proximally and laterally. The wound was then closed in layers. The vastus lateralis was tacked down back over its posterior attachment.



03/04/2003 10:39 AM  chart copy                                    1 of 2

10

**TRANSFER/DISCHARGE SUMMARY**

| | |
|---|---|
| **NAME:  HARRISON, DENNIS** | **MED. REC#:** 1879639 |

**ATTENDING MD:**  PAUL HOSPODAR, M.D.  **ADMISSION DATE:** 02/25/2003
**DATE OF BIRTH:** 11/19/1952  **DISCHARGE DATE:** 03/05/2003

**ADMISSION DIAGNOSIS:** Right periprosthetic femur fracture.

**DISCHARGE DIAGNOSIS:** Status post removal of hardware, antibiotic spacer placement, as well as cerclage vying _____ of right prosthetic femur fracture.

**HISTORY OF PRESENT ILLNESS:** The patient is a 50-year-old gentleman with a long history of ankylosing spondylitis with multiple orthopedic surgeries. The patient previously had three procedures in his right hip region. He has also had bilateral total hip arthroplasties as well. He had some spine surgery.

**PAST MEDICAL HISTORY:** Significant for ankylosing spondylitis as well as osteoporosis and osteoarthritis and anemia.

**PAST SURGICAL HISTORY:** Bilateral total hip arthroplasties in 1995, cervical fusion in 1999, lumbar fusion in 2000, open reduction internal fixation of the right femur two months ago.

**MEDICATIONS:** include:
1. Vioxx.
2. Oxycontin.
3. Klonopin.
4. Imipramine.
5. Celexa.

**ALLERGIES:** Indocin.

**PHYSICAL EXAMINATION:** At time of admission is documented in his chart. HEENT: Left eye with some slight ptosis. HEART: Regular rate and rhythm. S1, S2. CHEST: Clear to auscultation bilaterally. ABDOMEN: Positive bowel sounds. Soft, nontender, nondistended. EXTREMITIES: Pain with range of motion of his right fib deformity and the right hip as well. Sensation was intact throughout upper as well as lower extremities and there is no pain with any range of motion of any other joints other than his right hip.

**HOSPITAL COURSE:** The patient was admitted to the Orthopedic Surgery Service. He was seen by the Nutrition Service in order to optimize his nutrition. He was taken to the Operating Room on 2/28/03 and underwent removal of hardware and open reduction internal fixation and placement of antibiotic spacer. The patient tolerated the procedure well without any complications at all. At the time of surgery there was noticed to be some grossly purulent fluid near the site of his fracture and there was some loose femoral components as well noted. The patient therefore underwent removal of hardware as well as I&D and the patient had the placement of an antibiotic spacer. He was seen by Dr. Ellis Tobin's Infectious Diseases Service and was started on Ancef awaiting full culture data. The culture showed good enterococcus as 



11

March 12, 2003

**HARRISON, DENNIS**
**DOB: 11/19/52**
**SS# 136486634**
**CHART # 37939**

He was brought back from Albany County Nursing Home for us to review. His white count came back 13,800.  He is in a fair amount of pain. He has erythema and redness up and down the right thigh into the leg.

Dr. Hospodar is out of town and I have not seen this wound before, but with the elevated white count and erythema the safest thing is to admit the patient back into the hospital for appropriate IV antibiotics and probably aspiration under fluoroscopic control for cultures. We will discuss this with the residents and let them know he is coming.

Jeffrey Lozman, M.D.

JL:cjb

12

April 17, 2003

**HARRISON, DENNIS**
**DOB: 11/19/52**
**SS# 136486634**
**CHART # 220951**

He is now almost six weeks out from removal of his total hip with pathologic fracture.

He has on x-ray what appear to be some signs of healing of the fracture although minimal.

We just aspirated his hip.  We are waiting culture results. I will see him back in two weeks. At that point we will make a determination on when we are going to reimplant him.

Paul P. Hospodar, M.D.

PPH:cjb

cc:     Paul Donovan, M.D.

HarrisonD-CapitalROGMR-      00015

13

**HARRISON, DENNIS**
**DOB: 11/19/52**
**CHART#: 220951**
**SS#: 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**

<u>May 16, 2003</u>

At this point, it looks like he has cleared his infection.

We are going to send him for a sed rate and one more aspiration. If this is negative, we will set him up for revision surgery including a 10 inch solution and a bipolar acetabular component and most likely cables. We will set him up for surgery sometime next month.

Paul P. Hospodar, M.D.

PPH: wcs

cc:     Paul Donovan, M.D.

HarrisonD-CapitalROGMR-    00016

*14*

**HARRISON, DENNIS**
**DOB: 11/19/52**
**CHART#: 220951**
**SS#: 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**

<u>June 5, 2003</u>

He apparently came into the office very upset about his Medicare situation. Apparently he states that it has run out. My medical assistant explained to him that we had nothing to do with this situation. He needs to be set up for an aspiration, which was given to the nursing home and the patient to be set up at a local hospital. This was never done. The patient comes in now claiming we do the aspiration here which we do not. This needs to be done at a hospital. It needs to be arranged.

He has been quite belligerent to our staff and we are going to see him back on a p.r.n. basis. He is seeking a second opinion this week. We will send him notes and also a letter to Mr. Harrison giving him the names of two other orthopaedic surgeons in the area that he can seek help from for his difficult problem. I will see him back on a p.r.n. basis. We will continue to treat him for at least the next 30 days or until he transfers his care to someone else.

Paul P. Hospodar, M.D.

PPH: wcs

cc:    Paul Donovan, M.D.

HarrisonD-CapitalROGMR-    00017

15

DATE OF SURGERY: JUNE 27, 2003
PATIENT: DENIS HARRISON
MR# M 493383
ROOM#8
COPIES TO: CHART AND DR. PIZZURRO

**TYPE OF OPERATION:** Removal of an antibiotic impregnated methyl methacrylate prosthetic spacer with revision right total hip arthroplasty with a 64 mm Trident two-piece cup With a Constrained liner, a Proximal Modula Replacement Stem with a HNR proximal body, 80 mm mid body, and a 13 mm X 127th millimeter stem with antibiotic impregnated methylmethacrylate, Standard [22 mm] head, Dall Miles cables.
**ANESTHETIST: HENRY ZHOU, M.D.**
**ANESTHESIA: GENERAL ENDOTRACHEAL**
**PRE- OPERATIVE DIAGNOSIS:** Status post removal of total hip prosthesis, fixation plate, screws, and methyl methacrylate for an infected periprosthetic fracture right femur.
**POST- OOPERATIVE DIAGNOSIS:** Status post removal of total hip prosthesis, fixation plate, screws, and methyl methacrylate for an infected periprosthetic fracture right femur.

**GROSS FINDINGS:**
This patient had a hybrid total hip arthroplasty in 1995 and sustained a periprosthetic fracture in February, 2003. He underwent an open reduction and plate, screw, and cable fixation which became infected and was subsequently removed, debrided, with insertion of an antibiotic impregnated methylmethacrylate prosthetic spacer. There was marked scarring of all tissues about the hip joint with a comminuted nonunited fracture of the shaft of the femur with poor quality bone. The acetabular bone was reasonably good. Cultures were taken prior to the administration of antibiotics and a gram stain was negative for organisms. Due to the deformity of the fracture, but comminution of the fracture, and the quality of bone, it was decided to use a Proximal Modula Femoral Replacement stem. Due to the patient's overall disease in the type of prosthesis used for the femur it was decided to use a Constrained liner. Aside from scarring the many soft tissues were not remarkable.

**PROCEDURE:**
The patient was brought operating room number 6, which is a clean air room where laminar flow filters have been functioning for several hours. The operative team wore General endotracheal anesthesia was administered. When adequate level of anesthesia was obtained, a today catheter was inserted. The patient was placed in the lateral position and was held in position by inserting the appropriate pegs in the appropriate holes.

The patient was draped in the usual manner, with sterile paper drapes. After all appropriate draping had been completed, utilizing a previous long curvilinear scar a curvilinear incision was mapped out and made over the greater trochanter, extended down the femoral shaft approximately 10 cm and proximally 30 cm. The procedure was carried down by sharp dissection through the subcutaneous tissues to the fascia lata. The fascia lata was developed and divided along the femur and the posteriorly into the muscle fibers of the gluteus maximis. The two layers were developed and a large self-retaining Charnley C retractor was inserted.

16

cautery. The hip joint was dislocated. The soft tissues were cleared out of the proximal femur and the antibiotic prosthetic cement spacer was removed.

A capsulotomy incision was made on the superior and anterior capsule. A large anterior retractor was inserted. A capsulotomy was performed also inferiorly and posteriorly. A large inferior retractor was inserted with a pad behind it. The soft tissue around the acetabulum were cleared. With the use of an acetabular gourge and curettes the granulation tissue in the acetabulum was removed. The acetabulum was reamed to a 63 mm with concentric reamers at every 2mm.

A 63 mm and 64 mm acetabular expanders were then used. The 64 mm was left in place. The acetabular was irrigated. At this time, the femoral head was reamed into a cancellous paste.
The exspander was removed and the acetabulum was irrigated and impacted with cancellous paste from the acetabular moral reamings. The outer shell, of a 64 mm Trident 2 piece cup was the aligned and impacted. When this was completed the holder was removed. A central screw was inserted and a Constrained polyethylene Attention was placed to the femoral shaft. The surgical incision was extended distally. With the use of cautery the vastus lateralis was peeled off the lateral cortex of the femur and the distal end of the fracture was visualized. All soft tissues were removed about the entire femur in this area and retractors were inserted. With the use of an oscillating saw are an osteotomy was carried out at the distal ends of the femoral shaft fracture. The remaining proximal femur was osteotomized along its length from posteriorly to anteriorly and opened. All soft tissues were removed with the use of a Midas Rex.

Attention was then placed on the distal femur. The belly retractor was inserted. The The above-mentioned stem was configured and assembled on the back table. Two packages of methylmethacrylate containing Tobramycin was then fixed in a Stryker cement mixer end of The aqueous epinephrine soaked tail pads were removed from the canal. The canal was then filled with methyl methacylate using a Stryker cement gun and pressurizer and a Proximal Modula Femoral Replacement stem was inserted. Excess cement was curetted away. Various sized head and neck units were tried. It was decided to go with a Standard [22 mm] head. This head size gave us an excellent range of stable motion and the length as desired.

A Standard [22 mm] head was impacted on the Proximal Modular Femoral Replacement stem. It was tested and brought through an excellent range of motion. The patient's proximal femoral fragments with then wrapped around this femoral prosthesis and held in place with 3 2.0 mm Dall Miles cables. These were inserted in the usual fashion, tightened, crimped, and cut. The wound was then irrigated with copious amounts of saline.

After considering irrigation, the fascia lata was approximated with #1 Vicaryl interrupted sutures and then a running #1 Vicaryl. The deep subcutaneous tissues were closed in layers with running sutures of 0 PDS and interrupted sutures of 2-0 Monacryl. The skin edges were approximated with skin staples. The wound was dressed with Xeroform gauze, 4x8s, ABDs, sterile ace bandage.

This was a clean case. The patient had sequential compression devices to both lower

*17*

Condition of patient: see anesthesia recovery room notes.

Joseph P. Pizzurro, M.D., F.A.C.S.
Date dictated-June 27, 2003
Date transcribed-June 27, 2003

HarrisonD-RidgewoodOrtMR-   00033

18

# EXHIBIT

# B

**1.7    Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition (Cont.)**

1.  Wound healing and inflammation are related processes that both involve the activity of prostaglandins, cytokines, and inflammatory cell types. Just as COX inhibition results in decreased inflammation, so it is theoretically possible that COX inhibition may impair wound healing. One model of wound healing is the repair of experimentally induced GI mucosal lesions in laboratory animals. COX-2 is expressed at the site of experimentally induced gastric erosions and ulcers in mice and rats [108; 222; 214; 223]. Both indomethacin (a nonspecific COX inhibitor) and the selective COX-2 inhibitor, NS-398, delay healing of these lesions [214; 222]. The impairment of ulcer healing by selective inhibition of COX-2 was not more severe than that produced by the nonspecific inhibitor [214]. Whether these preclinical model systems of experimentally induced erosions are relevant to human gastric erosion healing, or other clinical settings of wound repair, is unknown.

2.  Prostaglandins are likely to be important in bone metabolism. There is evidence that prostaglandins, including prostaglandin E2 (PGE-2), are produced by osteoblasts and osteoblast-like cells [289; 290; 291], and that they can stimulate both bone resorption and bone formation [203]. The relative contribution to bone formation versus resorption in vivo by prostaglandins is unknown. In addition, the roles of COX-1 versus COX-2 in the production of prostaglandins in bone has not been established. One report demonstrated that both indomethacin and NS-398, a selective COX-2 inhibitor,

/MK-0966/WMA/RW1316.DOC  APPROVED                                    26OCT98

MRK-OS420124108

20

1.7    Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition (Cont.)

inhibit bone formation induced by mechanical loading in rats [202]. COX-2 expression was induced in an in vitro model of mechanical loading [201], suggesting a role for COX-2 derived prostanoids in mechanically induced bone formation. Data in humans on NSAID effects on biochemical markers of bone metabolism are limited [292] and there are no long-term, prospective data of the effects of either NSAIDs or COX-2-specific inhibitors on either biochemical markers of bone turnover or bone mineral density.

3. A related area of concern is the effect of COX inhibitors on articular cartilage. Preclinical studies and retrospective clinical studies have implicated NSAIDs in the acceleration of joint destruction in OA [256]. Results from well-designed and well-conducted randomized trials to address the question of whether NSAIDs affect the progression of OA in humans have yet to be reported. If NSAIDs do affect the progression of OA, it is unknown whether this effect would be through COX-1 or COX-2. It is expected that the effect of MK-0966 (a specific COX-2 inhibitor) on cartilage, if any, will be no different than with NSAIDs already in use since both classes of drugs inhibit prostaglandin production by COX-2 to a similar extent.

4. In summary, COX-2 is located in the kidney, reproductive tract, brain, and at the site of inflammation and bone turnover. MK-0966 is a specific inhibitor of COX-2. Mechanism-based adverse experiences would derive directly from COX-2 inhibition. There is a wealth of

MRK-OS420124109

21

**1.7    Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition (Cont.)**

experience in humans with COX-2 inhibition during therapy with NSAIDs (nonspecific COX inhibitors). It is expected that the adverse experiences with MK-0966 will be similar to NSAIDs in the above-mentioned organs as both classes inhibit COX-2 to a similar degree. The lack of COX-1 inhibition by MK-0966 has the potential to eliminate the GI toxicity seen with NSAIDs. In addition, MK-0966 is expected to be free from platelet function inhibition that is COX-1 mediated.

**1.8    Potential Risks of Cyclooxygenase-1 Inhibition in Nonspecific Inhibitors of Cyclooxygenase**

1.   The specificity of MK-0966 for COX-2, and lack of inhibition of COX-1, extends to oral dosing in humans. NSAIDs inhibit both the COX-1 and COX-2 isoforms. Prostaglandin synthesis in the GI tract and platelets depends on COX-1 [103]. It is expected that MK-0966 will have a toxicity profile similar to placebo in these areas.

2.   Prostaglandins have an important role in mucosal protection in the GI tract. Several mechanisms are involved including reducing acid secretion, stimulating mucous secretion, maintaining blood flow, and increasing bicarbonate secretion [198; 199]. The production of these cytoprotective prostaglandins in the GI tract is dependent on COX-1. In the normal GI tract of humans, COX-1 is the only isoform expressed [100; 30].

3.   NSAID use in humans leads to the development of ulcers and their complications such as bleeding, perforation, and

MRK-OS420124110

# EXHIBIT

# C

# Rheumatologist

280 Pleasant St
Concord, NH 03301

Specialty & Clinical Interests
**Rheumatologist: General Rheumatology**
**Education & Medical Training**
**George Washington University**
Residency, Internal Medicine, 1977 - 1980
**George Washington University School of Medicine and Health Sciences**

American Board of Internal Medicine
Certified 2014 years in Internal Medicine

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| '29/01 | 375343 | 50 VIOXX 25 MG | 00006 0110 68 | 1 TRICE | SM | $.00 | 09/27/ |
| 26/01 | 375343 | 60 VIOXX 25 MG | 00006 0110 68 | 2 TRICE | JC | $.00 | 09/27/01 |
| 26/01 | 375343 | 60 VIOXX 25 MG | 00006 0110 68 | 3 TRICE | SM | $.00 | 09/27/01 |
| 26/02 | 375343 | 60 VIOXX 25 MG | 00006 0110 68 | 4 TRICE | JC | $15.00 | 09/27/0 |
| '23/02 | 375343 | 60 VIOXX 25 MG | 00006 0110 68 | 5 TRICE | SM | $15.00 | 09/27/ |
| 26/01 | 375343 | 60 VIOXX 25 MG | 00006 0110 68 | 3 TRICE | SM | $.00 | 09/27/0 |
| /26/02 | 375343 | 60 VIOXX 25 MG | 00006 0110 68 | 4 TRICE | JC | $15.00 | 09/27/ |
| /23/02 | 375343 | 60 VIOXX 25 MG | 00006 0110 68 | 5 TRICE | SM | $15.00 | 09/27/ |

Dr. Trice was in contact with Dr. Belson (below) and in discussions in re to the arthritic conditions Plaintiff Harrison had. Dr. Trice, a rheumatalogist, had evaluated D. Harrison several times and diagnosed Rheumatoid Arthritis, as well as several rheumatalogists, and even the Merck Expert Witness himself – Dr. Blaventsky.

Dr. Trice and Dr. Belson shared responsibility in the management of both the anklyosing spondalitis and rheumatoid arthritis as is also represented in prescriptions for Vioxx being prescribed by both physicians.

f the 15 Rheumatologists in Burlington shown on this page:

- 14 Board certified
- 4 Award winners
- 30 Reviews
- Average rating is 3.2 stars
- Average wait time is 18.8 minutes

# Top Rheumatologists in Burlington, VT

## Dr. James Trice, MD
(0) (0)

24

- Rheumatology
- Pediatric Rheumatology
- **32 years experience**
- 4 star hospital

# Dr. Roger E. Belson, MD

## Internal Medicine

## <u>Board Certified</u>

http://www.healthgrades.com/physician/dr-roger-belson-38jmq

14 Bridge St
Henniker,
NH
03242

'14/02   383285   (1) VIOXX 25 MG            00006 0110 68   5 BELSON            SN        $14.21   0:

Dr. Belson was in contact with Dr. James Matthew Trice MD Rheumatologist as they jointly managed the Plaintiff ptient, especially for rheumatoid arthritis (diagnosed by Dr. James Trice – rheumatalogist) and anklyosing spondalitis.

# CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing:

**PLAINTIFF DENNIS R. HARRISON, PRO SE', NOW ASKS LEAVE OF THE COURT TO SUBSTITUTE EXHIBIT XX OF PLAINTIFF'S REPLY TO DEFENDANT MERCK'S REPLY AND RE-INPUT EXHIBITS A, B, and C.**

has been served on Defense Liaison Counsel (DCO) Dorothy H. Wimberley by electronic email as PDF attachment, Emily Pistille of Merck by electronic email as PDF attachment, and Doug Marvin of Merck by electronic email as PDF attachment on this 5th day of December, 2013.

Further I hereby note utilizing the same electronic PDF method to Plaintiff Steering Committee PSC-I Russ Herman and Leonard Davis, and Plaintiff Steering Committee PSC-II Ann B. Oldfather and Megan Hastings also on this 5th day of December, 2013.

I have also sent the above and the foregoing to the Clerk of Court of the United States District Court for the Eastern District of Louisiana via the same electronic email/PDF method and hard copy, also on this 5th day of December, 2013.

/s/Dennis R. Harrison
Dennis R. Harrison
Plaintiff Pro Se
601 W. Brown Street
Iron Mountain, MI 49801
Phone: Cell 906-221-5906
badbonehealing@gmail.com

3

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCT LIABILITY** | * | **SECTION L** |
| **LITIGATION** | * | |
| | * | |
| **This Document relates to:** | * | **HONORABLE JUDGE FALLON** |
| | * | |
| **Dennis Harrison** | * | **MAGISTRATE JUDGE KNOWLES** |
| **Pro Se 2:07-cv-00905-EEF-DEK** | * | |

**********************************************************************

### PLAINTIFF DENNIS R. HARRISON, PRO SE', NOW ASKS LEAVE OF THE COURT TO SUBSTITUTE EXHIBIT XX OF PLAINTIFF'S REPLY TO DEFENDANT MERCK'S REPLY AND RE-INPUT EXHIBITS A, B, and C.

### IT IS HEREBY ORDERED

(1) The Exhibit XX as included in this Motion be substituted and re-input via LAED CM/ECF to replace prior Exhibit XX submitted to the Clerk of the Court and previously input to LAED CM/ECF.

(2) The Exhibits A, B, C also included in this Motion having unacceptable quality in ECF have been reprinted by the Plaintiff. The Clerk of the Court shall re-input these exhibits also via LAED CM/ECF.

So ordered.

**NEW ORLEANS, LOUISIANA,** this _____ day of December, 2013.


_____
**ELDON E. FALLON**
**UNITED STATES DISTRICT JUDGE**

37

TO:   Clerk of Court
      United States District Court
      500 Poydras Street, Room C-151
      New Orleans, LA 70130


RE:   Dennis Harrison
      Pro Se 2:07-cv-00905-EEF-DEK


### In case of Problem:

Andrew Kingsley
Law Clerk to the Hon. Eldon E. Fallon
United States District Court, Eastern District of Louisiana
500 Poydras St.,
New Orleans, LA 70130

(504) 589-7545 (telephone)
(504) 589-6966 (fax)

Dennis R. Harrison
601 W. Brown Street
Iron Mountain, MI   49801
906-221-5906

December 5, 2013

**Via Electronic mail/PDF**

*DOROTHY H. WIMBERLEY*
A PROFESSIONAL CORPORATION
DIRECT DIAL:  (504) 593-0849
DIRECT FAX:   (504) 596-0849
E-MAIL: DWIMBERLY@STONEPIGMAN.COM

STONE PIGMAN WALTHER WITTMANN 11C.
COUNSELORS AT LAW
546 CARONDELET STREET NEW ORLEANS
LOUISIANA   70130-358S

Re:  In Re Vioxx Products Liability Litigation, MDL No. 1657
***Harrison, Dennis R. v. Merck & Co., Inc., 2:07-cv-00905-EEF-DEK***

Dear Dorothy:

I enclose a copy of the:

### PLAINTIFF DENNIS R. HARRISON, PRO SE', NOW ASKS LEAVE OF THE COURT TO SUBSTITUTE EXHIBIT XX OF PLAINTIFF'S REPLY TO DEFENDANT MERCK'S REPLY AND RE-INPUT EXHIBITS A, B, and C.

Sincerely,

*Dennis R. Harrison*

Dennis Richard Harrison
MBA/BGS

DHW/cr Enclosures

cc:     all via email/PDF

        D. Marvin, E. Pistilli, A. Oldfather, M. Hastings, R. Herman, L. Davis, J. Duggan
        J. Beisner, E. Cabraser, D. Barrios, A. Kingsley

via email/PDF and hard copy
Clerk of Court of the United States District Court for the Eastern District of Louisiana

1

