Dennis R. Harrison
601 W. Brown Street
Iron Mountain, MI   49801
906-221-5906

December 9, 2013

**Via Electronic mail/PDF**

*DOROTHY H. WIMBERLEY*
A PROFESSIONAL CORPORATION
DIRECT DIAL:  (504) 593-0849
DIRECT FAX:   (504) 596-0849
E-MAIL: DWIMBERLY@STONEPIGMAN.COM

STONE PIGMAN WALTHER WITTMANN 11C.
COUNSELORS AT LAW
546 CARONDELET STREET NEW ORLEANS
LOUISIANA   70130-3585

Re: In Re Vioxx Products Liability Litigation, MDL No. 1657
*Harrison, Dennis R. v. Merck & Co., Inc., 2:07-cv-00905-EEF-DEK*

TENDERED FOR FILING

DEC 16 2013

Dear Dorothy:

I enclose a copy of the:

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

**Plaintiff's statement that he is now able to gain an expert witness;
Defendant duly responded and its response raised issues that Plaintiff now
asks leave of the court to respond to.**

Sincerely,

Dennis Richard Harrison
MBA/BGS

DHW/cr Enclosures

cc:   all via email/PDF

    D. Marvin, E. Pistilli, A. Oldfather, M. Hastings, R. Herman, L. Davis, J. Duggan
    J. Beisner, E. Cabraser, D. Barrios, A. Kingsley

via email/PDF and hard copy
Clerk of Court of the United States District Court for the Eastern District of Louisiana

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Docket No. 1657 |
| PRODUCT LIABILITY LITIGATION | * | SECTION L |
| This Document relates to: | * | HONORABLE JUDGE FALLON |
| *Dennis Harrison* *Pro Se 2:07-cv-00905-EEF-DEK* | * | MAGISTRATE JUDGE KNOWLES |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Plaintiff's statement that he is now able to gain an expert witness; Defendant duly responded and its response raised issues that Plaintiff now asks leave of the court to respond to.**

The Plaintiff's reply to the reply (previously submitted) is very complete and it answered the nagging questions of this case as follows:

The femur fracture had been diagnosed as non-union on February 25, 2003, however, it was determined that a second attempt would be undertaken and Dr. Hospadar performed that operation on 2/28/03. When that operation was completed, it was allowed to heal until June 27, 2003, at which time the union should have occurred, but did not. Dr. Pizzurro concluded, in the section Gross Findings, non-united fracture of the femur had occurred, and proceeded with the third operation. (See, Plaintiff's Exhibit A, pages 00028, 00001, 00031)

On June 27, 2003, the third operation using cement was performed, and that proved to be successful. Therefore, the femur injury occurred on June 27, 2003 with regards to the issue of non-union because that is the specific date that non-union (non-united fracture) was officially determined to have occurred.

Harrison filed in New York on June 26, 2006 and qualifies for the Femur Injury.

His complaint filed on June 26, 2006 additionally specified the Lumbar injury in Paragraph 24, of the original complaint, and claimed fraud in paragraph 25 of the original complaint.

Paragraphs 46, 77, 80, of the original complaint, should be read as stating the fact of the Lumbar Injury regardless of whether or not it being time-barred for the purpose of damages in NEW YORK, as it is still the precipitating fact to the Femur Injury.

TENDERED FOR FILING

DEC 16 2013

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

2

Paragraph 80, of the original complaint, went into Jurisdiction of Boston, not because of the femur but because the Lumbar injury came about from the surgery performed in Boston.

The effect of Merck's guilty plea is that fraud regarding the lumbar injury allows for the longer fraud statute in New York and thus attaches back to the lumbar injury, and so then everything, both Lumbar and Femur, is in.

The services of an expert witness will strengthen these arguments for a jury trial, and as the issues have narrowed greatly, so that we now know what needs to be addressed through the summary proceedings, and so, the resources of the Plaintiff can now be directed economically.

The questions that he can and will address are:

1. Is the medical term nonunion, non-union, non-united fracture are all the same as insufficient bone healing which appears to be puzzling to Defendant.

2. Is a continuous period of 4 months in a rest home sufficient to conclude union had not and would not happen?

Plaintiff intends that the written expert report will be made available 90 days before the trial date, which still has to be set. I have previously attached Dr. Rosenbaum's CV and now will list the cases he has been involved with during the last year. And, Dr. Rosenbaum will charge approximately $350 per hour thus fulfilling the requirements of rule 26.

The expert witness is not necessary to fulfill the requirements in this case at this time. The Plaintiff need only to prove his case by a preponderance of evidence and should not now be required to provide an expert witness, other than assure that he will have one available in order to be trial ready, to successfully upset a summary motion; because the standard of proof is simply more than a scintilla, and thus can be reasonably deduced from documents, and the issues have been dealt with using Defendant's own Expert Witness, Defendant's own Plea Agreements, the Defendants own FDA applications, the FDA's official Warning Letter, the Defendant's own utterances by its own corporate officers at corporate celebrations which were documented in appeals court decisions, and medical records obtained by defendant through its own requests to Plaintiff's physicians, which defendant's Expert Witness had access to.

The actual guilty Plea and payment of a fine of $1 Billion for promoting Vioxx to Rheumatologists also amounts to more than a scintilla's worth of evidence that Defendant Merck committed fraud in the promotion of its Drug Vioxx to patients with

3

Rheumatoid Arthritis and although not specifically plead guilty to by Merck, Merck did attempt to support that Vioxx was safe in post-operative procedures by using a document authored by S.S. Reuben, another convicted fraudster, who promoted Vioxx after Spinal Fusion Surgery, in spite of the fact that Reuben is a prohibited person under terms of its Plea agreement.

The only issues that should be properly before the court now are the determination of damages that Merck will have to pay.

Does the court itself require that the Plaintiff requires an expert witness to explain that the failure to heal bone is stated by using the term nonunion of bone, or non-united fracture?

Plaintiff thinks not.

Does the court itself require that an expert explain to it that in order to determine nonunion or non-united that sufficient healing time is required to pass before making the fateful decision to declare the nonunion a fact and medically put an end to that healing and move on to other methods?

Plaintiff thinks not.

Otherwise, the Expert Witness written report is only required 90 days prior to the trial, which date has not been set at this time, for the purpose of proper notice and access for examination prior to trial, and well before that date it is likely that still other expert witnesses will make that list too, but Plaintiff will add to that list at its own leisure, leading up to 90 days prior to trial and then adding even to that as circumstances arise. Such is the conduct of litigation.

In addition to Dr. Rosenbaum's CV, the following information has been obtained from Dr. Rosenbaum:

Beverly Ezra v. DCC litigation

Pamela Sutherland v. DCC litigation

Barbara Howe v. DCC litigation

Helen Miller v. DCC litigation

Kathy Gatza v. DCC litigation

DCC is the facility for Dow Corning Breast Implant litigation.

Rosenbaum was retained by defense counsel for Dow Corning.

/s/ Dennis R. Harrison

4

# EXHIBIT

# A



## ALBANY MEDICAL CENTER HOSPITAL
### NEW SCOTLAND AVENUE
### ALBANY, NY 12208

### REPORT OF OPERATION

**NAME:** HARRISON, DENNIS  **MED. REC#:** 1879639
**DATE OF BIRTH:**  **CHART LOCATION:** C5/C506
**SURGEON:** PAUL HOSPODAR, M.D.  **OPERATION DATE:** 02/28/03

**ASSISTANT:** SRIDHAR DURBHAKULA, M.D.
J. MARTIN LELAND, M.D.

(Created by Plaintiff because of poor quality of copy and scan)

**PREOPERATIVE DIAGNOSIS:** Infected nonunion (nonunion) of right hip periprosthetic fracture, right femur.

**POSTOPERATIVE DIAGNOSIS:** Infected nonunion (nonunion) of right hip periprosthetic fracture, right femur. *By Plaintiff*

**OPERATION:** 1. Removal of infected total hip replacement. 2. Takedown of nonunion, right femur. 3. Removal of hardware, right femur. 4. Open reduction internal fixation, right femur. 5. Insertion of antibiotic cemented spacer, right femur.

**ANESTHESIA:**

**PROCEDURE:** The patient was taken to the operating room and placed in supine position. General anesthesia was then induced. The patient was then carefully positioned in the left lateral decubitus position, care was taken to pad the neck in its position since the patient has ankylosing spondylitis and is fused from the cervical spine to his lumbar spine. After he was placed in the left lateral decubitus position, right hip was prepped and draped in usual sterile fashion. Foley was placed prior to the start of the case.

At this point the incision was opened up directly over the previous incision, carried down through the subcutaneous tissues. The fascia was split in the direction of its fibers. It should be noted that a large pocket of pus and fluid was then encountered. This was sent for culture. Tissue samples were also sent for pathology and for culture.

At this point the wound was thoroughly irrigated and debrided. Once this was performed the fracture was encountered. All loose hardware was removed from the femur proximally and distally with the plate, wires and screws being removed. At this point the cement in intramedullary was removed using the Oscar device as well as backcutting backbiters, curets and splitting curets. At this point the femoral hip component was removed and the cement was removed from the proximal part of the femur as well. The cup which was found to be well fixed was removed using the circumferential bone cutting device. Once the cup was circumferentially cut, it was the easily removed with minimal bone loss. At this point the entire wound was thoroughly irrigated. Once this was performed, all the devitalized bone was removed. At this point, in a custom made mold, an antibiotic spacer was made with a Rush rod and three packs of cement. The fracture was then held reduced and the Rush rod and cement spacer were impacted into place. This gave good fixation of the fracture. Two cerclage titanium wires, Zimmer, were tightened around the bone to give an open reduction internal fixation to the bone. This was found to give excellent support and alignment of the bone. At this point the wound was thoroughly irrigated again and drains were placed deep, carried out proximally and laterally. The wound was then closed in layers. The vastus lateralis was tacked down back over its posterior attachment.



03/04/2003 10:39 AM  chart copy

1 of 2

**NAME:** HARRISON, DENNIS  **MED. REC#:** 1879639

**ATTENDING MD:** PAUL HOSPODAR, M.D.  **ADMISSION DATE:** 02/25/2003
**DATE OF BIRTH:** 11/19/1952  **DISCHARGE DATE:** 03/05/2003

**ADMISSION DIAGNOSIS:** Right periprosthetic femur fracture.

**DISCHARGE DIAGNOSIS:** Status post removal of hardware, antibiotic spacer placement, as well as cerclage vying _____ of right prosthetic femur fracture.

**HISTORY OF PRESENT ILLNESS:** The patient is a 50-year-old gentleman with a long history of ankylosing spondylitis with multiple orthopedic surgeries. The patient previously had three procedures in his right hip region. He has also had bilateral total hip arthroplasties as well. He had some spine surgery.

**PAST MEDICAL HISTORY:** Significant for ankylosing spondylitis as well as osteoporosis and osteoarthritis and anemia.

**PAST SURGICAL HISTORY:** Bilateral total hip arthroplasties in 1995, cervical fusion in 1999, lumbar fusion in 2000, open reduction internal fixation of the right femur two months ago.

**MEDICATIONS:** Include:
1. Vioxx.
2. Oxycontin.
3. Klonopin.
4. Imipramine.
5. Celexa.

**ALLERGIES:** Indocin.

**PHYSICAL EXAMINATION:** At time of admission is documented in his chart. HEENT: Left eye with some slight ptosis. HEART: Regular rate and rhythm. S1, S2. CHEST: Clear to auscultation bilaterally. ABDOMEN: Positive bowel sounds. Soft, nontender, nondistended. EXTREMITIES: Pain with range of motion of his right fib deformity and the right hip as well. Sensation was intact throughout upper as well as lower extremities and there is no pain with any range of motion of any other joints other than his right hip.

**HOSPITAL COURSE:** The patient was admitted to the Orthopedic Surgery Service. He was seen by the Nutrition Service in order to optimize his nutrition. He was taken to the Operating Room on 2/28/03 and underwent removal of hardware and open reduction internal fixation and placement of antibiotic spacer. The patient tolerated the procedure well without any complications at all. At the time of surgery there was noticed to be some grossly purulent fluid near the site of his fracture and there was some loose femoral components as well noted. The patient therefore underwent removal of hardware as well as I&D and the patient had the placement of an antibiotic spacer. He was seen by Dr. Ellis Tobin's Infectious Diseases Service and was started on Ancef awaiting full culture data. The culture showed good enterococcus as 

March 12, 2003

**HARRISON, DENNIS**
**DOB: 11/19/52**
**SS# 136486634**
**CHART # 37939**

He was brought back from Albany County Nursing Home for us to review. His white count came back 13,800. He is in a fair amount of pain. He has erythema and redness up and down the right thigh into the leg.

Dr. Hospodar is out of town and I have not seen this wound before, but with the elevated white count and erythema the safest thing is to admit the patient back into the hospital for appropriate IV antibiotics and probably aspiration under fluoroscopic control for cultures. We will discuss this with the residents and let them know he is coming.

Jeffrey Lozman, M.D.

JL:cjb

April 17, 2003

**HARRISON, DENNIS**
**DOB: 11/19/52**
**SS# 136486634**
**CHART # 220951**

He is now almost six weeks out from removal of his total hip with pathologic fracture.

He has on x-ray what appear to be some signs of healing of the fracture although minimal.

We just aspirated his hip. We are waiting culture results. I will see him back in two weeks. At that point we will make a determination on when we are going to reimplant him.

Paul P. Hospodar, M.D.

PPH:cjb

cc:   Paul Donovan, M.D.

**HARRISON, DENNIS**
**DOB: 11/19/52**
**CHART#: 220951**
**SS#: 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**

May 16, 2003

At this point, it looks like he has cleared his infection.

We are going to send him for a sed rate and one more aspiration. If this is negative, we will set him up for revision surgery including a 10 inch solution and a bipolar acetabular component and most likely cables. We will set him up for surgery sometime next month.

Paul P. Hospodar, M.D.

PPH: wcs

cc:   Paul Donovan, M.D.

**HARRISON, DENNIS**
DOB: 11/19/52
CHART#: 220951
SS#: 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

June 5, 2003

He apparently came into the office very upset about his Medicare situation. Apparently he states that it has run out. My medical assistant explained to him that we had nothing to do with this situation. He needs to be set up for an aspiration, which was given to the nursing home and the patient to be set up at a local hospital. This was never done. The patient comes in now claiming we do the aspiration here which we do not. This needs to be done at a hospital. It needs to be arranged.

He has been quite belligerent to our staff and we are going to see him back on a p.r.n. basis. He is seeking a second opinion this week. We will send him notes and also a letter to Mr. Harrison giving him the names of two other orthopaedic surgeons in the area that he can seek help from for his difficult problem. I will see him back on a p.r.n. basis. We will continue to treat him for at least the next 30 days or until he transfers his care to someone else.

Paul P. Hospodar, M.D.

PPH: wcs

cc:   Paul Donovan, M.D.

THE VALLEY HOSPITAL
OPERATIVE RECORD
SURGEON: JOSEPH PIZZURRO, M.D.
SURGEON ASSISTANT: JAMES PEDICANO, M.D.
DATE OF SURGERY: JUNE 27, 2003
PATIENT: DENIS HARRISON
MR# M 493383
ROOM#6
COPIES TO: CHART AND DR. PIZZURRO

TYPE OF OPERATION: Removal of an antibiotic impregnated methyl methacrylate prosthetic spacer with revision right total hip arthroplasty with a 64 mm Trident two-piece cup With a Constrained liner, a Proximal Modula Replacement Stem with a HNR proximal body, 80 mm mid body, and a 13 mm X 127th millimeter stem with antibiotic impregnated methylmethacrylate, Standard [22 mm] head, Dall Miles cables.
ANESTHETIST: HENRY ZHOU, M.D.
ANESTHESIA: GENERAL ENDOTRACHEAL
PRE- OPERATIVE DIAGNOSIS: Status post removal of total hip prosthesis, fixation plate, screws, and methyl methacrylate for an infected periprosthetic fracture right femur.
POST- OPOERATIVE DIAGNOSIS: Status post removal of total hip prosthesis, fixation plate, screws, and methyl methacrylate for an infected periprosthetic fracture right femur.

GROSS FINDINGS:
This patient had a hybrid total hip arthroplasty in 1995 and sustained a periprosthetic fracture in February, 2003. He underwent an open reduction and plate, screw, and cable fixation which became infected and was subsequently removed, debrided, with insertion of an antibiotic impregnated methylmethacrylate prosthetic spacer. There was marked scarring of all tissues about the hip joint with a comminuted nonunited fracture of the shaft of the femur with poor quality bone. The acetabular bone was reasonably good. Cultures were taken prior to the administration of antibiotics and a gram stain was negative for organisms. Due to the deformity of the fracture, but comminution of the fracture, and the quality of bone, it was decided to use a Proximal Modula Femoral Replacement stem. Due to the patient's overall disease in the type of prosthesis used for the femur it was decided to use a Constrained liner. Aside from scarring the many soft tissues were not remarkable.

PROCEDURE:
The patient was brought operating room number 6, which is a clean air room where laminar flow filters have been functioning for several hours. The operative team wore General endotracheal anesthesia was administered. When adequate level of anesthesia was obtained, a today catheter was inserted. The patient was placed in the lateral position and was held in position by inserting the appropriate pegs in the appropriate holes.

The patient was draped in the usual manner, with sterile paper drapes. After all appropriate draping had been completed, utilizing a previous long curvilinear scar a curvilinear incision was mapped out and made over the greater trochanter, extended down the femoral shaft approximately 10 cm and proximally 30 cm. The procedure was carried down by sharp dissection through the subcutaneous tissues to the fascia lata. The fascia lata was developed and divided along the femur and the posteriorly into the muscle fibers of the gluteus maximis. The two layers were developed and a large self-retaining Charnley C retractor was inserted.

cautery. The hip joint was dislocated. The soft tissues were cleared out of the proximal femur and the antibiotic prosthetic cement spacer was removed.

A capsulotomy incision was made on the superior and anterior capsule. A large anterior retractor was inserted. A capsulotomy was performed also inferiorly and posteriorly. A large inferior retractor was inserted with a pad behind it. The soft tissue around the acetabulum were cleared. With the use of an acetabular gourge and curettes the granulation tissue in the acetabulum was removed. The acetabulum was reamed to a 63 mm with concentric reamers at every 2mm.

A 63 mm and 64 mm acetqbular expanders were then used. The 64 mm was left in place. The acetabular was irrigated. At this time, the femoral head was reamed into a cancellous paste.
The exspander was removed and the acetabulum was irrigated and impacted with cancellous paste from the acetabular moral reamings. The outer shell, of a 64 mm Trident 2 piece cup was the aligned and impacted. When this was completed the holder was removed. A central screw was inserted and a Constrained polyethylene Attention was placed to the femoral shaft. The surgical incision was extended distally. With the use of cautery the vastus lateralis was peeled off the lateral cortex of the femur and the distal end of the fracture was visualized. All soft tissues were removed about the entire femur in this area and retractors were inserted. With the use of an oscillating saw are an osteotomy was carried out at the distal ends of the femoral shaft fracture. The remaining proximal femur was osteotomized along its length from posteriorly to anteriorly and opened. All soft tissues were removed with the use of a Midas Rex.

Attention was then placed on the distal femur. The belly retractor was inserted. The The above-mentioned stem was configured and assembled on the back table. Two packages of methylmethacrylate containing Tobramycin was then fixed in a Stryker cement mixer end of The aqueous epinephrine soaked tail pads were removed from the canal. The canal was then filled with methyl methacylate using a Stryker cement gun and pressurizer and a Proximal Modula Femoral Replacement stem was inserted. Excess cement was curetted away. Various sized head and neck units were tried. It was decided to go with a Standard [22 mm] head. This head size gave us an excellent range of stable motion and the length as desired.

A Standard [22 mm] head was impacted on the Proximal Modular Femoral Replacement stem. It was tested and brought through an excellent range of motion. The patient's proximal femoral fragments with then wrapped around this femoral prosthesis and held in place with 3 2.0 mm Dall Miles cables. These were inserted in the usual fashion, tightened, crimped, and cut. The wound was then irrigated with copious amounts of saline.

After considering irrigation, the fascia lata was approximated with #1 Vicaryl interrupted sutures and then a running #1 Vicaryl. The deep subcutaneous tissues were closed in layers with running sutures of 0 PDS and Interrupted sutures of 2-0 Monacryl. The skin edges were approximated with skin staples. The wound was dressed with Xeroform gauze, 4x8s, ABDs, sterile ace bandage.

This was a clean case. The patient had sequential compression devices to both lower

Condition of patient: see anesthesia recovery room notes.

*[signature]*

Joseph P. Pizzurro, M.D., F.A.C.S.
Date dictated-June 27, 2003
Date transcribed-June 27, 2003

# **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing:

**Plaintiff's statement that he is now able to gain an expert witness; Defendant duly responded and its response raised issues that Plaintiff now asks leave of the court to respond to.**

has been served on Defense Liaison Counsel (DLC) Dorothy H. Wimberley by electronic email as PDF attachment, Emily Pistille of Merck by electronic email as PDF attachment, and Doug Marvin of Merck by electronic email as PDF attachment on this 9th day of December, 2013.

Further I hereby note utilizing the same electronic PDF method to Plaintiff Steering Committee PSC-I Russ Herman and Leonard Davis, and Plaintiff Steering Committee PSC-II Ann B. Oldfather and Megan Hastings also on this 9th day of December, 2013.

I have also sent the above and the foregoing to the Clerk of Court of the United States District Court for the Eastern District of Louisiana via the same electronic email/PDF method and hard copy, also on this 9th day of December, 2013.

/s/*Dennis R. Harrison*
Dennis R. Harrison
Plaintiff Pro Se
601 W. Brown Street
Iron Mountain, MI 49801
Phone: Cell 906-221-5906
badbonehealing@gmail.com

5

TO: Clerk of Court
United States District Court
500 Poydras Street, Room C-151
New Orleans, LA 70130

RE: **Dennis Harrison**
**Pro Se 2:07-cv-00905-EEF-DEK**

Please notify of receipt:

Andrew Kingsley
Law Clerk to the Hon. Eldon E. Fallon
United States District Court, Eastern District of Louisiana
500 Poydras St.,
New Orleans, LA 70130
(504) 589-7545 (telephone)
(504) 589-6966 (fax)

PRIORITY MAIL
POSTAGE REQUIRED

PRESS FIRMLY TO SEAL

**PRIORITY MAIL**

DATE OF DELIVERY SPECIFIED*
USPS TRACKING™ INCLUDED*
INSURANCE INCLUDED*
PICKUP AVAILABLE
* Domestic only

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

PS00001000014

EP14F July 2013
OD: 12.5 x 9.5

USPS TRACKING #
9114 9011 8986 6078 5629 08

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM:
Dennis Hanson
601 W. Brown St.
Iron Mtn, MI
49801

TO:
Clerk of Court
United States District Court
500 Poydras Street, Room C-151
New Orleans, LA
70130

U.S. POSTAGE
IRON MOUNTAIN, MI
49801
DEC 10, 13
AMOUNT
$5.60
00075354-07

This envelope is made from post-consumer waste. Please recycle - again.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013; All rights reserved.