## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX PRODUCTS LIABILITY LITIGATION | * | MDL Case No. 1657 |
| | * | |
| | * | SECTION L |
| This document relates to: | * | |
| | * | JUDGE FALLON |
| *Linda Isner, Executrix of the Estate of* | * | |
| *Jeffrey Isner, M.D., v. Seeger Weiss, LLP, et al.,* | * | MAGISTRATE JUDGE |
| | * | KNOWLES |
| **2:12-cv-02406-EEF-DEK** | * | |

*****************************************************************************

### DEFENDANTS BROWNGREER PLC AND ORRAN L. BROWN'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Of the tens of thousands of claimants who enrolled in the Vioxx Resolution Program,[1]

Linda Isner received the highest award of anyone across the country: $6.9 million. Even though

that multi-million dollar payout exceeds any award of compensatory damages that she could

have lawfully received if she had proceeded to trial in her own state of Massachusetts, plaintiff

asserts that she is entitled to more money. She seeks to recover her perceived deficiency from

various participants in the settlement process, including the Claims Administrator for the

settlement, BrownGreer PLC and Orran L. Brown (a member of BrownGreer PLC) (collectively,

"BrownGreer Defendants").[2]

The claims that Ms. Isner attempts to assert against the BrownGreer Defendants,

however, fail as a matter of law for numerous reasons: <u>First</u>, Ms. Isner executed a Release that

bars any claims whatsoever against the BrownGreer Defendants, including suits "to enforce, or

otherwise" with respect to the settlement. *See* Part I.A, *infra.*

---

[1]     Also referred to herein as the "Resolution Program" or the "Program."

[2]     Ms. Isner has also brought claims against Merck's counsel, Hughes Hubbard & Reed LLP ("HHR"), and Theodore ("Ted") Mayer, a partner of that firm, as well as Plaintiffs' Steering Committee member Chris Seeger and his law firm Seeger Weiss LLP.

<u>Second</u>, Ms. Isner's Release contains express disclaimers stating: (1) that she was enrolling in the Program "without relying on any representation or other statement made by or on behalf of, Merck or any other person"; and (2) that she acknowledged that "there is no guarantee that I will receive any settlement payment or, if any settlement payment is made, the amount there of."  Such disclaimers belie Ms. Isner's current contentions that she enrolled in the Resolution Program based on alleged misrepresentations.  *See* Part I.B, *infra.*

<u>Third</u>, Ms. Isner's claims for negligent and fraudulent misrepresentation fail because no actionable misrepresentation of any kind occurred.  Although Ms. Isner now contends that she was promised a "dollar for dollar" recovery of her husband's lost earning capacity, the documents that she relies on to support that claim show that no such blanket assurances were given.  Instead, the documents show that any award for "future" earnings (*i.e.*, earnings for the time period that post-dates the settlement agreement) would be discounted in some respect that was yet to be determined.  Moreover, even if representations that were made regarding future plans for the Extraordinary Injury Program did not actually come to pass, statements of a promissory nature and predictions regarding future events that are not false when made are not actionable.  *See* Part II, *infra.*

<u>Fourth</u>, by her conduct, Ms. Isner has waived any right to challenge the award yielded by the procedures of the Resolution Program when she decided to accept and retain the $6.9 million award.  Notably, Ms. Isner does not seek to be placed in a position equivalent to what she would have been in had she never enrolled in the Program.  Absent enrolling in the Program, Ms. Isner would have had the right to proceed to trial like the 18 plaintiffs who tried cases prior to the settlement:  of that group, 15 received nothing through the trial and appeals process and 2 were awarded less than $5 million through the judicial system.  Instead, of facing the risks and costs of

2

trial that those other 18 plaintiffs faced, Ms. Isner has retained the full benefits that she received under that Program—a relatively efficient recovery of $6.9 million—while she attempts to make an entirely speculative (and, as explained below, legally untenable) case for more money.  *See* Part III, *infra.*

Fifth, the alleged "dollar for dollar" recovery that Ms. Isner seeks actually exceeds (by a substantial measure) the compensatory damages recoverable under Massachusetts law. Moreover, Ms. Isner received more money in the Resolution Program than she could have ever received for her husband's lost earning capacity if she had gone to trial.  Unlike the Vioxx Resolution Program, Massachusetts law requires that any projected future income be assessed at a ***net*** value—*i.e.*, post-taxes—and must also be reduced to present value.  Once Ms. Isner's claim is adjusted to account for taxes, it amounts to net wages totaling $4,968,000, and when further adjusted to account for present value, that sum is reduced to $3,687,000—an amount substantially less than Ms. Isner's actual Extraordinary Injury award of $5,359,000.  *See* Part IV, *infra.*

Finally, Ms. Isner has no statutory claim under Chapter 93A of the Massachusetts General Laws because the transaction at issue here is not commercial in nature, and no underlying tort occurred.  *See* Part V, *infra.*

## BACKGROUND

### A.     The Vioxx Litigation.[3]

Merck voluntarily withdrew Vioxx from the market on September 30, 2004, based on

---

[3]     This Court has summarized the extensive history of the Vioxx litigation many time.  *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 869 F. Supp. 2d 719, 720–23 (E.D. La. 2012) (parallel state court proceedings that infringed on consummated settlements enjoined); *In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740, 758–62 (E.D. La. 2011) (allocation of common benefit funds).

1150439v1

questions raised by preliminary data from one of its ongoing clinical trials—the APPROVe study.  In APPROVe, there was an increased occurrence of heart attacks after 18 months of use in the Vioxx arm of the trial.  The market withdrawal of Vioxx sparked widespread litigation in federal and state court.

For the next three years, various courts across the country held numerous Vioxx trials.  This Court conducted six bellwether trials.  Of those six trials, one resulted in a hung jury, one resulted in a plaintiff's verdict, and four resulted in defense verdicts for Merck.[4]  In the New Jersey coordinated proceeding, the court overseeing coordinated litigation in that state conducted four trials involving five plaintiffs.  Of those trials, juries issued verdicts in favor of two plaintiffs (one of which occurred in a re-trial) and verdicts in favor of Merck as to the claims of four plaintiffs (one of which was vacated by the trial court and re-tried to the aforementioned plaintiff's verdict).  In the California coordinated proceeding, the presiding court conducted two trials involving three plaintiffs.  Of those claims, one resulted in a defense verdict and two resulted in hung juries.  As for non-coordinated proceedings, courts also held one single-plaintiff trial each in Alabama, Illinois, and Florida, and two such trials were held in Texas.  Three of those trials resulted in defense verdicts for Merck and two resulted in plaintiffs' verdicts.  Both of those plaintiffs' verdicts were subsequently overturned on appeal.

**B.     The Vioxx Resolution Program.**

In early 2007, the judges presiding over the various coordinated proceedings urged the parties to engage in meaningful settlement discussions.  This Court appointed a group of leading plaintiffs' attorneys to engage in settlement discussions with Merck.  This group became known

---

[4]     The mistrial resulted from a hung jury in the *Irvin* case.  That case was tried a second time and resulted in a defense verdict.  Several months later, the Court vacated that verdict and ordered a third trial based on subsequently discovered problems with a defense expert.  Once the settlement was announced, a third trial did not take place.

1150439v1

as the NPC (Negotiating Plaintiffs' Counsel).  Over the next year, counsel for Merck and the

NPC representatives had extensive communications on the relevant issues.  More than 50

meetings and hundreds of telephone conferences took place.  *See, e.g.*, *In re Vioxx Prods. Liab.*

*Litig.,* 869 F. Supp. 2d 719, 721 (E.D. La. 2012).

On November 9, 2007, Merck and the NPC announced that they had reached a settlement

agreement.  The settlement established a Resolution Program based on a fixed amount of funds

intended to resolve all pending or tolled state and federal Vioxx claims as of the date of the

settlement that involved allegations of myocardial infarction ("MI"), stroke, or sudden cardiac

death.  The Master Settlement Agreement ("Agreement" or "MSA") set out the Program

requirements.  *See* Ex. A (MSA) §§ 1.2.1, 17.1.22.[5]

As part of the Resolution Program, Merck provided $4.85 billion to be distributed to

qualifying claimants.  The MSA set out the process for evaluating claims to be conducted and

refined by a Claims Administrator.  Merck and the NPC jointly selected BrownGreer to be the

Claims Administrator.  Ultimately, more than 50,000 claims were processed through the

Program, and all of the settlement funds were fully allocated.  *See* Ex. B (July 27, 2010 Final

Report of Claims Administrator) at 26.

By submitting an Enrollment Form, claimants and their enrolling counsel agreed to be

bound by all of the terms and conditions of the Agreement.  *See* MSA § 1.2.4 (Ex. A).  Under the

terms of the MSA, each counsel who enrolled clients in the Program agreed that he or she would

"exercise his or her independent judgment in the best interest of each client individually before

---

[5]     All exhibits referenced herein are attached to the BrownGreer Defendants' LR56.1
        Statement of Material Facts As To Which There Is No Dispute, filed contemporaneously
        with this Motion.

1150439v1

determining whether to recommend enrollment in the Program." *See* § 1.2.2 of Jan. 17, 2008 Amendment to Settlement Agreement (amending MSA § 1.2.8.1) (included in Ex. A at 74).

### 1.    Eligibility Criteria and Claim Valuation.

To be eligible for payment under the Program, the MSA required that claimants present adequate documentation to pass threshold "gates" related to proof of injury, product use, and proximity of use to alleged injury. *See* MSA §§ 2.1, 2.2, 2.3 (Ex. A). If the Claims Administrator determined a claimant to be qualified to enter the Program and his claims package was complete, the Claims Administrator processed the claim through the claims valuation process set forth in the MSA. *See id.* § 3.

If the Claims Administrator determined that a claimant did not meet the requisite gate requirements, the Gate Committee conducted a further review.[6] *See id.* § 2.5. If the Gate Committee also determined that a claimant was not eligible, the claimant could appeal the Gate Committee's determination to the Special Master as set forth in the MSA. *See id.* § 2.6. The Special Master's decision on whether the claimant was eligible was binding, final, and non-appealable. *See id.* § 2.6.3.

The MSA established a claim valuation system that assigned points based on such factors as severity of the injury, length of use of Vioxx, and risk factors evident from the medical records. The valuation system was published on the Court's and the Claims Administrator's websites, making it available for consideration by all those deciding whether to enroll in the Program. Each claimant could apply the valuation methodology to the facts on which the claim was based to calculate the number of points that would be allocated to the claim. The actual monetary value of a point was not known prior to enrollment because the value turned on how

---

[6]     Representatives from the NPC as well as counsel for Merck comprised the Gate Committee.

many claimants actually enrolled in the Program, how many qualified for payments, and how many points their claims received. Accordingly, a range for the eventual award to which a claim would be entitled could be estimated, but the precise amount of any award could not be determined until the Claims Administrator had assessed all claims. Claimants who chose to enroll in the Program executed an individual release that expressly noted the variability and uncertainty as to the future calculations. Each claimant acknowledged "THAT THERE IS NO GUARANTEE THAT I WILL RECEIVE ANY SETTLEMENT PAYMENT OR, IF ANY SETTLEMENT PAYMENT IS MADE, THE AMOUNT THEREOF." *See* MSA Ex. 1.2.2.3 at 6–7 (original emphasis) (included in Ex. A at 78–90).

After the valuation process was completed for a particular claimant, the Claims Administrator notified the claimant of his or her points award. *See* MSA § 3.2.3 (Ex. A). Each claimant then had the opportunity to appeal his or her points award to a Special Master for a *de novo* review. *Id.* § 3.2.4. The monetary value of the points awarded to each claimant was determined after all qualified claimants had completed the valuation process. *Id.* § 3.1.

## 2. Compensation for Extraordinary Injuries.

Certain categories of claimants were also eligible to apply for additional compensation. Under the terms of the MSA, a portion of the settlement funds provided by Merck were reserved to make additional payments to claimants who had substantiated extraordinary injuries ("EI"). These were claimants who had either experienced atypical issues with their medical injuries and/or experienced unusually large economic damages (*e.g.*, medical expenses or lost wages exceeding $250,000). The MSA charged the Claims Administrator with establishing the process and criteria for evaluating EI claims. *Id.* § 4.2.7 (Ex. A).

Initially, the MSA capped the maximum amount allowable for a single EI claim at $600,000. A subsequent amendment to the MSA eliminated this cap. *See* § 1.2.5 of Jan. 17, 2008 Amendment to Settlement Agreement (amending MSA § 4.2.6) (included in Ex. A at 75). As with the base awards, claimants would not know the ultimate value of any individual EI award at the time claimants agreed to enter the Program. Moreover, at the time of the enrollment period, the Claims Administrator had not yet created any criteria or protocols to govern the EI process.

After the initial processes for determining eligibility and evaluating claims were up and running, the Claims Administrator published a detailed instruction manual setting out the criteria for receiving an EI award and the process for assigning a valuation to those EI claims. *See* Ex. C (Claims Administrator's Review Criteria Manual). The Review Criteria Manual specified certain required documents necessary to substantiate EI claims (*e.g.*, medical bills, cancelled checks). The Claims Administrator reviewed each EI claim and supporting documentation, and issued a Notice of EI Assessment setting forth an assessed amount for the EI claim, and explaining how the assessment was determined and how any missing documentation affected the assessment. *Id.* § VII.A. A claimant then had the opportunity to submit additional documentation and request a second review by the Claims Administrator. *Id.* § VII.A.2(b). After a second review, the Claims Administrator issued a Notice of Second Review of EI Assessment to explain the determinations made in the second review. *Id.* § VII.B.2. If desired, the claimants could then appeal the Second Review EI Assessment to a Special Master. *Id.* § VII.C. The decision of the Special Master was returned to the Claims Administrator for any adjustments to the EI Assessment as determined by the Special Master. At that point, the EI Assessment became final, and "not . . . subject to any further appeal." *Id.* § VII.C.6(b).

8

### C.    The Isner Claim and Ms. Isner's Consideration of Enrollment.

Dr. Jeffrey Isner was a practicing cardiologist and medical researcher who lived in Massachusetts.  In 1996, Dr. Isner experienced symptoms while on vacation that prompted him to undergo a cardiac catheterization.  Although the results of that procedure were normal, Dr. Isner had a family history of cardiovascular disease, including his father's fatal heart attack.  *See generally* Ex. D (Isner Claims Package).

At around 4:00 a.m. on October 31, 2001, Dr. Isner, then 53-years-old, complained to his wife that he was having chest pains.  Shortly thereafter, he went into cardiac arrest, lost consciousness, and became unresponsive.  He was taken to the hospital by ambulance, but the hospital physicians were unable to revive him.  The causes of death listed on his death certificate were "cardiopulmonary arrest" and "coronary artery vasospasm."  *Id.* at 5.

About three years later, shortly after Merck withdrew Vioxx from the market, Dr. Isner's widow, Linda Isner, filed suit against Merck in state court in Massachusetts on October 29, 2004, as Executrix of Dr. Isner's estate, asserting a wrongful death claim.  Merck removed the case to federal court and it was transferred it to the Vioxx MDL.  Ms. Isner's suit remained pending at the time the settlement was announced in November, 2007.

As the Court is aware, as the deadline for enrollment in the Program approached, several information sessions were held around the country during which this Court addressed those in attendance (in person or by video-conference), and representatives from Merck, the NPC and BrownGreer were available to discuss the Program and answer questions.  Ms. Isner and her attorney, Joseph Doherty, attended one such conference on October 20, 2008, in New York City.  Ex. G (Isner EI Appeal Statement) at 1.  At that conference, and in the remaining two weeks leading up to the enrollment deadline, Ms. Isner's counsel had several communications with

various participants in the settlement process seeking clarification about certain issues in the Program.  *See generally* Ex. E (Plaintiff's Collection of Counsel E-Mails).

As evidenced by the e-mails that plaintiff has relied up on in support of her claims, the original primary issue of concern for plaintiff's counsel was whether the time period for any recovery for lost wages was cut-off as of the November 2007 date of the MSA, or whether claimants could collect awards for lost future earnings beyond that date as well.  *See id.*[7]

On October 21, 2008, for example, plaintiff's counsel noted in an e-mail to Ted Mayer that, in reviewing the MSA, he had "not been able to locate the specific provision that you confirmed yesterday, which addresses the fact that EI payments are ***not*** limited to the time period from Dr. Isner's death to the date of the settlement on 11/09/07."  E-mail from J. Doherty to T. Mayer, Oct. 21, 2008 (included in Ex. E).  Plaintiff's counsel asked to see "the specific language that establishes the right to EI payments for both past and future lost earnings through to the end of Dr. Isner's work-life expectancy," explaining that he needed "specific confirmation" of this fact before he could "advise [his client] further."  *Id.*  Mr. Doherty sent a similar e-mail to Chris Seeger the following day.  *See* E-mail from J. Doherty to C. Seeger, Oct. 22, 2008 (included in Ex. E) (again noting that he could not find the provision stating that EI payments would cover work-life expectancies that extended beyond the date of the settlement).

Plaintiff alleges that Ted Mayer replied to Mr. Doherty's e-mail the next day and promised that she "would be entitled to EI damages for *all* of her husband's lost earnings, 'dollar for dollar,'" and plaintiff reproduced a portion of that e-mail in her Complaint.  Compl. (Case No. 2:12-cv-02406-EEF-DEK, Rec. Doc. 1-2) ¶¶ 25–27.  In broader context, however, it is clear

---

[7]  Plaintiff's counsel compiled this particular collection of e-mails and included them with plaintiff's appeal to the Special Master in the EI Program.  The dates for these emails referenced herein refer to the dates identified by plaintiff's counsel in Exhibit E.  Portions of these e-mails are also referenced in plaintiff's Complaint.  *See, e.g.*, Compl. ¶¶ 24, 25.

10

that the e-mail contained significant qualifications of this statement that are omitted from plaintiff's selective quotation in her Complaint:

> As you know, BrownGreer has not yet established all the criteria for EI awards.  What can be said with certainty is that for an otherwise qualifying claim, *future earnings* will be awarded without a cap, up to an age cutoff (which they have told me will be no lower than 65).  The awards will be dollar for dollar *subject to* 1) disability benefits, which would not apply in a death case such as this, 2) I believe, *discount to present value as of the payment date* (i.e., the assumed date for final payments under the Program) for that portion of the award that is attributable to the period after that assumed payment date, and 3) any proration that may prove necessary under Section 4.2.8.

E-mail from T. Mayer to J. Doherty, Oct. 22, 2008 (included in Ex. E) (emphases added).

Indeed, Mr. Doherty's own response to this e-mail on October 22 confirms that the only "conclusively established" fact at that point was that EI payments would take into account work-life expectancy that extended beyond the date of the settlement—and that other considerations governing the calculation of such payments were "unknowable" at that time:

> I had a long telephone conference with Orran Brown this afternoon.  We resolved several issues, *but we acknowledged that there were also many issues that involved "un-knowable" factors*, at this time, which will not be resolved prior to October 30th. . . . Orran confirmed, (as you similarly confirmed in your e-mail today), that . . . EI damages will include **all** lost earnings/lost earning capacity throughout Dr. Isner's full work-life expectancy, (rather than from the date of his death up to the date of the settlement agreement).  Orran stated that although *the complete criteria for allocating EI damages has not as yet been finalized* or reduced to writing, *this specific criteria, governing past as well as future lost earning capacity, has been conclusively established*, in view of the fact that Merck, the Plaintiffs' committee and BrownGreer all agree that the language of Section 4.2.6 mandates such an interpretation.  As Orran stated succinctly today:  "You have Merck saying 'that is the way it is to be read'.  You have the Plaintiffs' team saying 'that is the way it is to be read'.  And you have BrownGreer saying 'that is the way it is to be read.'  That's all you need." . . .  I apologize if you felt I was being critical in my last e-mail, concerning the fact that we had a misunderstanding as

1150439v1

> to whether EI damages were or were not capped as of the date of
> the settlement.

E-mail from J. Doherty to T. Mayer, Oct. 22, 2008 (included in Ex. E) (some emphases added).

Notably absent from this follow-up e-mail is any suggestion of an understanding that EI payments would be "dollar for dollar." Nor was this idea communicated by Mr. Doherty in the subsequent e-mail that he sent to NPC member Chris Seeger several days later. That October 27, 2008 e-mail confirms that plaintiff's concern—and the related communications—centered on whether a cap existed on individual EI awards: "Ted Mayer and Orran Brown have confirmed the fact that EI damages are not capped as of the date of the settlement and that Linda Isner's claim for EI damages can include lost earning capacity through the end of her husband's work-life expectancy." E-mail from J. Doherty to C. Seeger, Oct. 27, 2008 (included in Ex. E).

### D.    Enrollment and Valuation of the Isner Claim.

Ms. Isner ultimately elected to enroll in the Program. As part of her enrollment package, she provided a Release that she executed on October 30, 2008. The Release contained the following language:

> **I AM ENTERING INTO THIS RELEASE FREELY AND
> VOLUNTARILY, WITHOUT BEING INDUCED,
> PRESSURED OR INFLUENCED BY, AND WITHOUT
> RELYING ON ANY REPRESENTATION OR OTHER
> STATEMENT MADE BY OR ON BEHALF OF, MERCK OR
> ANY OTHER PERSON.**

Ex. F (Oct. 30, 2008 Release of Claimant Linda Isner) at 7 (original emphasis).

The Release that she executed also stated:

> **I FURTHER ACKNOWLEDGE THAT I UNDERSTAND
> THIS RELEASE AND THE AGREEMENT AND THAT
> THERE IS NO GUARANTEE THAT I WILL RECEIVE
> ANY SETTLEMENT PAYMENT OR, IF ANY
> SETTLEMENT PAYMENT IS MADE, THE AMOUNT
> THEREOF.**

1150439v1

And likewise stated:

> By signing this Release, both I and any such Derivative Claimant
> understand and acknowledge that there is no assurance as to the
> amount, if any, of payment to be made to any claimant under the
> Program, and this fact shall in no way affect the validity or effect
> of this Release.

*Id.* at 2, 7 (original emphasis).

The Claims Administrator completed a full review of Ms. Isner's base claim and issued a
points award valued at $1,573,602.19, the fourth-highest base award assigned to any claimant.
After reviewing plaintiff's Extraordinary Injury claim, the Claims Administrator issued an
additional award assessment of $5,359,316.74.  This was the highest EI amount awarded to any
claimant in the Program.  Ms. Isner received a total award of $6,932,918.93.  *See* Ex. H (Special
Master Decision).  This was the single highest award of all of the 32,000 claimants who enrolled
in the Program and received monetary payments.[8]  *See* Defs.' Opp'n to Pl.'s Mot. to Vacate
Conditional Transfer Order, J.P.M.L. Case No. 1657, July 10, 2012 (Rec. Doc. 1549) at 4.
Notwithstanding the substantial value assigned to her claim in the Program, plaintiff contended
that she was being shortchanged, and filed an appeal to the Special Master.  In plaintiff's view,
valuation principles that the Claims Administrator developed and applied uniformly to ***all*** EI
claims should not have been applied to her claims.  Rather, plaintiff contended that she was
promised a "dollar for dollar" recovery on all aspects of her EI award.  Plaintiff pursued an
appeal of her EI award through the Program, contesting the Claims Administrator's (1) use of the
base points her claim was awarded to adjust potential EI damages so as to maintain the relative

---

[8]    Notably, because the total amount of settlement monies available to claimants was a fixed
fund, every dollar assigned to Ms. Isner's claim meant one fewer dollar was available to
all other claimants.

1150439v1

standing of any individual claim as to other claimants in the Program;[9] and (2) reduction of all future lost wages claims by 50% to account for the inherent element of uncertainty in such claims and discount them to present value.[10]  *See* Isner EI Appeal Statement (Ex. G).  The appeal was denied.  *See* Special Master Decision (Ex. H).

> ### E.  Ms. Isner's Post-Program Challenge to Her Settlement Payment

After the Special Master denied Ms. Isner's appeal of the Claims Administrator's award, she **collected, accepted and retained the proceeds of the Resolution Program payment.**

Nearly two years after collecting her $6.9 million award, Ms. Isner initiated this action in Massachusetts Superior Court.  Defendants removed the action to federal court, and the JPML transferred it to the Vioxx MDL proceeding (MDL 1657) over plaintiff's opposition.  *See* October 1, 2012 JPML Transfer Order, Case No. 2:12-cv-02406-EEF-DEK (Rec. Doc. 1).

In her Complaint, plaintiff contends that the identified defendants misled her as to the potential award for lost income that she could obtain in the Program.  *See* Compl. ¶ 10.  Plaintiff further alleges that "the defendants' representations, assurances and agreements were the basis for the plaintiff's decision to enter into the proposed settlement."  *See id.* ¶ 29.  Plaintiff seeks to recover based on claims of negligent and fraudulent misrepresentation and violation of the Massachusetts consumer protection laws.

---

[9]    For example, if two MI claimants each had qualifying EI expenses of $1 million, but Claimant A's claim was a stronger claim with a base award of 800 points (calculated based on age, duration of use, and various risk factors) as compared with Claimant B who had a base award of 50 points, they would not each receive $1 million.  Rather, Claimant A would be assigned a starting number of .800 of $1 million (or $800,000) and Claimant B would be assigned a starting number of .050 of $1 million ($50,000).

[10]   The Claims Administrator determined that 50% was a reasonable discount adjustment that could fairly be applied across the program.  So, continuing with the examples in the footnote above, Claimant A would be issued an award of $400,000 and Claimant B would be issued an award of $25,000.

14

## **ARGUMENT**

Under the well-settled principles governing motions for summary judgment, the

BrownGreer Defendants are entitled to judgment as a matter of law because "there is no genuine

dispute as to any material fact."  Fed. R. Civ. P. 56(a).  Because "only those disputes over facts

that might affect the outcome of the lawsuit under the governing substantive law will preclude

summary judgment," *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir. 1987), any

possible dispute about other issues can have no impact on resolution of this motion, *see*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Because this case was originally filed in Massachusetts, this Court applies the choice-of-

law principles from that state.  *See In re Vioxx Prods. Liab. Litig.*, 522 F. Supp. 2d 799, 813

(E.D. La. 2007).  The MSA has a choice-of-law provision that references New York law, MSA §

16.3 (Governing Law) (Ex. A), and Massachusetts law will credit that choice as it applies to

interpretation of the contract itself, *Kitner v. CTW Transp., Inc.*, 762 N.E.2d 867, 871–72 (Mass.

App. Ct. 2002).  Thus, under Massachusetts choice-of-law principles, New York law governs the

interpretation and enforcement of plaintiff's Release and agreement to settle.  By contrast, with

respect to tort claims related to the contract, Massachusetts law applies.  *Stagecoach Transp., Inc*

*v. Shuttle, Inc.*, 741 N.E.2d 862, 867 (Mass. App. Ct. 2001) (contract that provided it would be

"governed and interpreted in accordance with the laws of the State of New York" does not

encompass tortious conduct (internal quotation marks and citation omitted)).

Applying the applicable state law legal principles as noted above, all of Ms. Isner's

claims fail as a matter of law for many reasons including, *inter alia*, that she executed a release

that bars this suit, and which expressly disclaims reliance on any misrepresentations regarding

the amount of potential recovery; that the documents upon which she relies to assert her claim

1150439v1

belie her claims that any misrepresentations were made about a "dollar for dollar" recovery, and even if they were, such representations are not actionable under Massachusetts law; and that she cannot prove any injury resulting from a misstatement even if one had occurred because the lost wage damages she seeks are recoverable under Massachusetts law, but the amount that she has already received far exceeds the amount recoverable for lost wages under Massachusetts law. For these and other reasons discussed more fully below, Ms. Isner's claims against the BrownGreer Defendants should be dismissed in their entirety.

I.      **The Terms of Ms. Isner's Release Compel Summary Judgment.**

A.      **The Release Expressly Incorporates the Terms of the MSA and Bars Any Suit Against the BrownGreer Defendants.**

The Release executed by Ms. Isner expressly incorporates the terms of the MSA. Specifically, the Release states: "I have enrolled to participate in the program (the 'Program') set forth in the Settlement Agreement (the 'Agreement') dated as of November 9, 2007," and that "the terms of the Agreement govern the resolution of my claim." Isner Release (Ex. F). And, Section 16.9.2 of the Agreement expressly bars suits against the Claims Administrator. That provisions states, in pertinent part:

> [N]o Program Claimant (including any Enrolled Program Claimant or Qualifying Program Claimant) shall have any right to institute any proceeding, judicial or otherwise, against Merck, the NPC or any Administrator to enforce, or otherwise with respect to, this Agreement.

MSA § 16.9.2 (Ex. A).

Exculpatory provisions, such as MSA Section 16.9.2, that shield persons from liability are fully enforceable under New York law. *See, e.g.*, *David Gutter Furs v. Jewelers Prot. Servs.*, 594 N.E.2d 924, 924–25 (N.Y. 1992) (absent reckless indifference or gross negligence, contractual exculpatory and limitation of liability clauses are fully enforceable); *accord Abacus*

16

*Fed. Savs. Bank v. ADT Sec. Servs., Inc.,* 967 N.E.2d 666, 670 (N.Y. 2012) (exculpatory provisions enforceable unless there is "conduct that smacks of intentional wrongdoing and evinces a reckless indifference to the rights of others"); *see also Am. Auto. Ins. Co. v. Rest Assured Alarm Sys.*, 786 F. Supp. 2d 798, 804 (S.D.N.Y. 2011) (New York courts "have repeatedly and consistently enforced exculpatory clauses") (collecting cases involving failed alarm systems); *Soja v. Keystone Trozze, LLC*, 964 N.Y.S.2d 731, 732–33 (App. Div. 2013) (summary judgment proper where architect did not engage in conduct so grossly negligent as to preclude enforcement of exculpatory clause); *Klapper v. Graziano*, 970 N.Y.S.2d 355, 362–63 (Sup. Ct., King's Cnty. 2013) (where physician signed appearance release as a condition of appearing on reality television show, subsequent alleged defamatory and tortuous conduct not actionable)*.*

Under the terms of the MSA, "Administrator" includes the Claims Administrator, BrownGreer.  *See* MSA § 17.1.6 (Ex. A).  And, the MSA vests the Claims Administrator with the responsibility for determining the criteria for assessing and valuing EI claims.  *See id.* §§ 4.2.6, 4.2.7.  Plaintiff's suit violates the prohibition on lawsuits against the Claims Administrator because it premises liability on the criteria for the EI program that were ultimately developed by the Claims Administrator, exercising authority expressly delegated by the MSA and applied to plaintiff's  EI claim, as well as the claims of all other EI claimants.  Thus, the claims asserted by Ms. Isner against the BrownGreer Defendants falls squarely within the scope of the Release that she signed and its incorporated terms which bar such claims, and warrant a grant of the requested summary judgment.

1150439v1

**B.     The Specific Disclaimer Clauses Contained in Ms. Isner's Release Bar Any Claim that She Relied upon Alleged Representations Like the Ones that Are the Basis for This Suit.**

Ms. Isner's Release also bar her claims for the independent reason that the Release expressly disclaimed reliance on any representation made outside of the Agreement.  Moreover, the Release specifically provided that "**THERE IS NO GUARANTEE THAT I WILL RECEIVE ANY SETTLEMENT PAYMENT OR, IF ANY SETTLEMENT PAYMENT IS MADE, THE AMOUNT THEREOF.**"  Isner Release (Ex. F) at 7 (original emphasis).  Under New York law, such disclaimers preclude lawsuits, like this one, that are based on allegations that contradict the disclaimers.  *E.g.*, *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 599 (N.Y. 1959) ("The presence of such a disclaimer clause is inconsistent with the contention that plaintiff relied upon the misrepresentation, and was led thereby to make the contract." (internal quotation marks and citations omitted)).

The gravamen of plaintiff's suit is that the defendants represented to her counsel that she would receive a specific amount of compensation for her husband's lost wages—specifically a "dollar for dollar" compensation for his work-life expectancy.  Compl. ¶ 22.  Plaintiff claims that this representation was tantamount to an assurance that she would specifically be entitled to "$8,490,935.93."  *Id.* ¶ 36.  But reliance on these representations—all of which are alleged to have been made before plaintiff executed her Release—is specifically barred by an express disclaimer in the Release.  In a section entitled "Acknowledgement of Comprehension; No Guarantee of Payment," the Release provided, "**I AM ENTERING INTO THIS RELEASE . . . WITHOUT RELYING ON ANY REPRESENTATION OR OTHER STATEMENT MADE BY OR ON BEHALF OF, MERCK OR ANY OTHER PERSON**" and specifically that "**I UNDERSTAND THIS RELEASE AND THE AGREEMENT AND THAT THERE IS NO GUARANTEE THAT I WILL RECEIVE ANY SETTLEMENT PAYMENT OR, IF**

18

**ANY SETTLEMENT PAYMENT IS MADE, THE AMOUNT THEREOF.**"  Isner Release

(Ex. F) at 7 (original emphasis).

Notwithstanding these clear disclaimers, Ms. Isner asserts contrary allegations to craft her

claim.  *See e.g.*, Compl. ¶ 29 ("The defendants' representations, assurances and agreements were

the basis for the plaintiff's decision to enter into the proposed settlement."), ¶ 28 ("Brown

confirmed that Mrs. Isner would be entitled to 'dollar for dollar' recovery.").  But, New York

law does not permit such a change in position.  "The presence of such a disclaimer clause is

inconsistent with the contention that plaintiff relied upon the misrepresentation, and was led

thereby to make the contract."  *Danann Realty*, 157 N.E.2d at 599 (internal quotation marks

omitted) (plaintiff could not assert reliance on defendants' misrepresentations regarding

operating expenses and profits of building where sales contract stated that no such

representations regarding operating expenses were being made).

As the New York Court of Appeals explained in *Danann Realty Corp. v. Harris*:

> [P]laintiff has in the plainest language announced and stipulated
> that it is not relying on any representations as to the very matter as
> to which it now claims it was defrauded.  Such a specific
> disclaimer destroys the allegations in plaintiff's complaint that the
> agreement was executed in reliance upon these contrary oral
> representations.

157 N.E.2d at 599.  In short, Ms. Isner acknowledged in her executed Release that she was not

relying on any guarantees concerning payments or amounts of payments when she enrolled in the

Program.  Thus, she cannot now claim that she was relying on an alleged promise of "dollar for

dollar" recovery because, under the applicable law, the specificity of her disclaimer "destroys the

allegation[s] that plaintiff entered into the agreement in reliance on defendants' contrary

representations."  *JMC Ne. Corp. v. Porcelli*, 954 N.Y.S.2d 521, 522 (App. Div. 2012) (internal

quotation marks omitted) (dismissing claim premised on alleged misrepresentation of net profits

and expenses where purchase agreement expressly stated no reliance "as to the past, present or prospective income or profits of the business"); *see also Capstone Enters. v. Cnty. of Westchester*, 691 N.Y.S.2d 574, 575  (App. Div. 1999) (Where an agreement "contains a clear disclaimer of reliance on oral representations a party is precluded from making subsequent assertions of fraudulent inducement based on oral representations.").  For this reason, too, the express language of Ms. Isner's Release bars her claims and warrants summary judgment.

## II.    Ms. Isner's Misrepresentation Claims Fail Because No Factual Misrepresentations Were Made.

### A.    No Misrepresentations Were Made: Ms. Isner Was Never Promised "Dollar for Dollar" Recovery.

Ms. Isner bases this lawsuit on her belief that she was allegedly promised a "dollar for dollar" recovery, but did not receive one.  But none of the communications that plaintiff identifies in her Complaint make any such promises.  Read in its proper context, the "dollar for dollar" statement attributed to Defendant Ted Mayer was not false.

Plaintiff's claims about an alleged "dollar for dollar" recovery arise from an October 22, 2008 e-mail from Mr. Mayer.  Prior to enrolling in the settlement Program, plaintiff sought confirmation that EI payments could include "***both past and future*** lost earnings through to the end of Dr. Isner's work-life expectancy,"  *See* Oct. 2008 e-mails between J. Doherty and T. Mayer (included in Ex. E) (emphasis in original).

Although plaintiff's counsel repeatedly quotes from Mr. Mayer's response to Mr. Doherty, he always stops the quote at "dollar for dollar."  *See, e.g.*, Compl. ¶ 27.  But, as a factual matter, Mr. Mayer included several caveats to his projection, and specifically noted that any awards would be subject to multiple discounts that were yet to be determined.  The full relevant language reads as follows:

20

> As you know, BrownGreer has not yet established all the criteria
> for EI awards. What can be said with certainty is that for an
> otherwise qualifying claim, **future earnings** will be awarded
> without a cap, up to an age cutoff (which they have told me will be
> no lower than 65). The awards will be dollar for dollar **subject to**
> 1) disability benefits, which would not apply in a death case such
> as this, 2) I believe, **discount to present value as of the payment
> date** (i.e., the assumed date for final payments under the Program)
> for that portion of the award that is attributable to the period after
> that assumed payment date, and 3) any proration that may prove
> necessary under Section 4.2.8.

E-mail from T. Mayer to J. Doherty, Oct. 22, 2008 (included in Ex. E) (emphases added).

This prediction of how Mr. Mayer thought future earnings would be calculated for EI

purposes in the future turned out to be largely correct. The Claims Administrator's Review

Criteria Manual states:

> **3. <u>Standard Discount for Future Uncertainty and to Present Value</u>.**
> The total AED LWI Amount calculated in the manner described
> above, will be discounted to account for: (i) the uncertainty that the
> Claimant would have worked until the end of the AED LWI
> Measurement Period; (ii) the uncertainty that the Claimant would
> have earned the same wages until the end of the AED LWI
> Measurement Period; and (iii) the present day value of the AED
> LWI. The Standard Discount will be a percentage applied to all
> awards of AED LWI. ***The Standard Discount will be 50% applied
> to the AED LWI Amount. The resulting amount is the
> Discounted AED LWI Amount.***

Review Criteria Manual (Ex. C) at IV.G.3 (emphasis added).

Mr. Mayer's October 22, 2008 e-mail clearly states that the future earnings award would

be subject to some kind of discounting—the specific amount not stated. There was indeed a

discount rate applied that accounted for future versus present value, as well as uncertainties

about future earnings. This rate was a flat 50% applied to all claims. Also, even though plaintiff

likes to harp on the "dollar for dollar" language, Mr. Mayer's e-mail clearly places qualifications

on that language and also notes his uncertainty as to the specifics of those qualifications ("I

1150439v1

believe").  In short, the statements attributed to Mr. Mayer in Paragraphs 27 and 28 of the

Complaint are not false.

> **B.     The Alleged Misrepresentations Are Predictions About the Future that Cannot Be Actionable as a Matter Of Law.**

Even if plaintiff's characterization of the "dollar for dollar" statement were accurate,

Ms. Isner's misrepresentation claims would still fail.  Under the applicable Massachusetts law,

only statements of a factual nature that are false when made give rise to a cause of action.

*Robert E. Ricciardelli Carpet Serv. v. Home Depot U.S.A.*, 679 F. Supp. 2d 192, 208 (D. Mass.

2010).  Statements of a promissory nature and predictions regarding future events are not false

when made, as required to show deliberate or negligent misrepresentation.  *Id.; see also*

*Hallmark Inst. of Photography, Inc. v. CollegeBound Network*, 518 F. Supp. 2d 328, 332 (D.

Mass. 2007) ("Defendant may not be held liable if the representation concerned a matter of

opinion, estimate or judgment, which was not susceptible of actual knowledge at the time of its

utterance." (internal quotation marks omitted)); *McCartin v. Westlake*, 630 N.E.2d 283, 289

(Mass. App. Ct. 1994) (alleged misrepresentations about future business plans were goals for the

future not statements of fact and not actionable).

Plaintiff alleges that the BrownGreer Defendants made a representation that she "would

be entitled to 'dollar for dollar' recovery" for the lost earnings she alleged.  Compl. ¶ 28.  Even if

there were evidence to support this allegation (and there is not), it is clear that the representation

alleged could only be understood as a prediction.  At the time that Ms. Isner enrolled in the

resolution Program, the details regarding how EI payments would be calculated and distributed

had not yet been established.  Indeed, in an e-mail sent by plaintiff's counsel after the alleged

representations that are the basis of this suit, counsel expressly "***acknowledged that there were***

***also many issues***" with respect to the calculation of EI payments "***that involved 'un-knowable'***

***factors . . . which will not be resolved prior to October 30th***," and specifically that "***the***

***complete criteria for allocating EI damages has not as yet been finalized***."  E-mail from J.

Doherty to T. Mayer, Oct. 22, 2008 (included in Ex. E) (emphases added).  The only matter he

thought was determined at the time he made these statements was the fact that the EI payment

would be based on "past as well as future lost earning capacity."  *Id.*  These acknowledgements

confirm that the alleged representations were predictive in nature.  Thus, her claims fail.  *See*

*Hallmark*, 518 F. Supp. 2d at 332 (Statements that are of a "fundamentally predictive nature" are

not statements of present fact upon which someone could reasonably rely on. (internal quotation

marks omitted)).  And here there is ***no evidence—or even an allegation***—that any BrownGreer

Defendant made any predictions known to be false or that there was an intention not to carry out

a promise.  Thus, plaintiff cannot prove "[a]n essential element—the intention not to carry out

the promise, existing when the promise was made," and her claims must fail as a matter of law.

*McCartin,* 630 N.E.2d at 289 n.11.

> ### C.     The BrownGreer Defendants Did Not Make Any Representations Regarding "Dollar for Dollar" Recovery.

Finally, even if Massachusetts law would permit a misrepresentation claim based on

predictive statements, Ms. Isner's claim would still fail because she cannot attribute the "dollar

for dollar" statement in Mr. Mayer's e-mail to the Claims Administrator, Orran Brown.  The only

specific statement that plaintiff attributes to Mr. Brown appears in Paragraph 28 of the

Complaint:

> You have Merck saying "that is the way it is to be read".  You
> have the plaintiffs' team saying "that is the way it is to be read".
> And you have BrownGreer saying "that is the way it is to be read".
> That's all you need.

As with the truncated "dollar for dollar" snippet, plaintiff's selective quotation of this e-

mail omits key language.  When placed in context, the quote attributed to Mr. Brown in

23

Paragraph 28 of the Complaint references the interpretation of Section 4.2.6 of the MSA and whether claims for lost wages terminate as of the date of the settlement agreement.  In an October 22, 2008 e-mail, Mr. Doherty purported to summarize his conversation with Mr. Brown:

> Orran confirmed, (as you similarly confirmed in your e-mail today), that . . . EI damages will include **_all_** lost earnings/lost earning capacity throughout Dr. Isner's full work-life expectancy, (rather than from the date of his death up to the date of the settlement agreement).  Orran stated that although the complete criteria for allocating EI damages has not as yet been finalized or reduced to writing, this specific criteria, governing past as well as future lost earning capacity, has been conclusively established, in view of the fact that Merck, the Plaintiffs' committee and BrownGreer all agree that the language of Section 4.2.6 mandates such an interpretation.  As Orran stated succinctly today:  "You have Merck saying 'that this is the way it is to be read'.  You have the Plaintiffs' team saying 'that is the way it is to be read'.  And you have BrownGreer saying 'that is the way it is to be read.'  That's all you need."

E-mail from J. Doherty to T. Mayer, Oct. 22, 2008 (included in Ex. E).

Based on the more complete summary, the BrownGreer statement clearly references the time period for calculating potential lost earning capacity awards, not the amount—that is, that the potential eligible earnings would cover "Dr. Isner's full work-life expectancy, (rather than from the date of his death up to the date of the settlement agreement.)"  *Id.*  This was in fact what happened.  The EI award was calculated based on estimates of Dr. Isner's earnings up through a presumptive retirement age (in 2013) rather through the date of the settlement (2007).  In short, plaintiff can point to no statement by Mr. Brown that is false or misleading in any way.

## III.	By Accepting and Retaining the $6.9 Million Award Issued by the Settlement Program, Ms. Isner Has Waived Any Right To Press the Claims She Now Asserts.

The crux of Ms. Isner's claims is that she relied on alleged misrepresentations when she enrolled in the settlement Program regarding how EI awards would be calculated.  However, once the alleged inaccuracy of the representations was revealed to her, Ms. Isner made no effort

1150439v1

to rescind or repudiate the settlement.  Rather she continued to pursue her claims within the confines of that Program, and accepted all of the benefits that could be derived from it.  Once a party has knowledge of facts that constitute grounds for rescission, she must either repudiate the contract promptly, or acquiesce to its terms.  *See, e.g.*, *Rivera v. Sovereign Bank*, No. 11–CV–1618, -- F. Supp. 2d --, 2013 WL 5502865, at *16 (E.D.N.Y.  Sept. 30, 2013) ("Upon learning that a contract is voidable, the releasing party must promptly repudiate the contract or release or she will be deemed to have ratified it." (alterations and internal quotation marks omitted)); *Cabot Corp. v. AVX Corp.*, 863 N.E.2d 503, 515 (Mass. 2007) (When a party fails promptly to "disclaim the contract or release about which he is complaining" it will be deemed "to have forfeited his right to do so." (internal quotation marks omitted)).  But, with full knowledge of how the EI awards were actually calculated, Ms. Isner accepted payment of the $6.9 million settlement award, and has never made any effort to reject or return it.  By her conduct, she waived any right to assert tort claims essentially challenging the amount of that award.

Ms. Isner enrolled in the Program in October 2008.  She received notice of the formula that BrownGreer planned to use in valuing EI claims in December 2009 when the Claims Administrator posted the EI Review Criteria Manual.  Using those criteria, on January 28, 2010, the Claims Administrator issued an initial EI award on Ms. Isner's claim.  Ms. Isner, through her counsel, asserted at various levels within the Program and outside the Program that her EI claim should be valued differently than the formula applied to the claims of all other claimants.  The Claims Administrator did not agree with her position.  Ultimately, the Claims Administrator's final award was affirmed by the Special Master on June 2, 2010.  The EI award was issued to Ms. Isner's counsel on June 30, 2010.  *See* July 27, 2010 Final Report of Claims Administrator

25

(Ex. B) at 59.  At no point has Ms. Isner attempted to reject or return the proceeds of the EI award.

Well-settled defenses to claims of fraud or misrepresentation include ratification and waiver.  In the context of contractual relationships, a party can waive his right to take action based on alleged fraud or other wrongful acts, however, if his own conduct evidences a ratification of the underlying agreement.  *Cabot*, 863 N.E.2d at 514–15.  A party ratifies an otherwise voidable agreement "by intentionally accepting benefits under the contract" or "by . . . acquiescing in the contract for a period of time after he has the opportunity to avoid it."  *Id.* at 515 (internal quotation marks omitted); *see also Deren v. Digital Equip. Corp.*, 61 F.3d 1, 2–3 (1st Cir. 1995) (collecting cases finding that retaining benefits for a substantial period of time constitutes ratification).  More specifically, to avoid having her claims barred by a ratification or waiver defense, plaintiff could not retain the monies that were given to her pursuant to the terms of the agreement that she claims she was fraudulently induced to enter.  *See Seward v. B.O.C. Div. of G.M.C.*, 805 F. Supp. 623, 633 (N.D. Ill. 1992) (where plaintiff retained money received in exchange for release and continued to receive additional benefits while simultaneously pursuing lawsuit, he attempted "to have his cake and eat it too," and could not avoid a ratification defense); *Nat'l Am. Corp. v Fed. Rep. of Nigeria*, 448 F. Supp. 622, 645 (S.D.N.Y. 1978) ("Instead of objecting and possibly seeking rescission, plaintiff retained the money . . . conduct unequivocally ratifying the Agreements."), *aff'd*, 597 F.2d 314 (2d Cir. 1979).

By asserting the present claims, Ms. Isner essentially attempts to have her cake and eat it too.  At the time that she enrolled in the settlement, Ms. Isner had no guarantee of recovering any money at all, nor any guarantee of when she would receive any money if she should prevail at trial, nor any guarantee that the amount she might be awarded would exceed what she could

26

receive in the Program.  Thus, plaintiff has no basis to assert, as she does in her Complaint, that she relied on alleged misrepresentations when enrolling the Program, or that she suffered a pecuniary loss in doing so.  *See* Compl. ¶¶ 49-50.  Instead, Ms. Isner received a relatively speedy and substantial recovery by going through the Program—unquestionable benefits that she has never repudiated.

In sum, through her conduct, Ms. Isner ratified the process for calculating EI awards under the MSA and the award issued to her under the MSA.  Thus, she has waived the right to bring any claims on alleged misrepresentations that purportedly induced her to enter into that Agreement.

## IV. Plaintiff's Settlement Payment Exceeded the Amount Permitted Under Massachusetts Law, Precluding Any Cognizable Tort Claim.

Damages constitute an essential element of any tort claim.  *See, e.g., Van Brode Grp., Inc. v. Bowditch & Dewey*, 633 N.E.2d 424, 429 (Mass. App. Ct. 1994) (it is "fundamental that a tort action cannot be sustained without proof of damages").[11]  In cases involving alleged misrepresentations, a plaintiff alleging misrepresentation must show that her alleged reliance on the misrepresentation made her "worse off."  *Thompson*, 1999 Mass. App. Div. at 263.  Thus, even where a plaintiff can show that she relied on an allegedly false representation by the defendant, she must still show that she would have done something differently, and been better off, if she had not relied on the statement.  *See, e.g., McCarthy v. Brockton Nat'l Bank*, 50 N.E.2d 196, 202 (Mass. 1943) (no injury for six years after misrepresentation because plaintiff

---

[11]     *See also Bernal v. Weitz*, 765 N.E.2d 798, 800 (Mass. App. Ct. 2002) ("Actual damages or loss are an essential element of the tort of negligence."); *Cardullo v. Landau*, 105 N.E.2d 843, 845 (Mass. 1952) ("[H]ere the plaintiff failed to show that he sustained any damage, proof of which was essential to recovery for deceit."); *Thompson v. Main St. Auto Sales & Servs., Inc.*, 1999 Mass. App. Div. 260, 263 (1999) ("Damages are an essential element of the tort of deceit; a mere misrepresentation does not create a cause of action.").

27

did not prove she would have done anything different and more advantageous with securities she trusted with a bank had she kept them and managed her investments herself); *Connelly v. Bartlett*, 190 N.E. 799, 801 (Mass. 1934) ("Deceit is not an absolute wrong, for which the injured person may recover at least nominal damages, like one who sues for breach of contract or the invasion of an absolute right." (internal quotation marks omitted)); *Boston Prop. Exch. Transfer Co. v. Iantosca*, 720 F.3d 1, 10–12 & n.8 (1st Cir. 2013) (plaintiff's 93A and other tort claims against its lawyers for mishandling a prior case failed because the plaintiff could not show that the "allegedly tortious conduct put the plaintiff in a worse position than [it] would have been in but for the misdeed").

In this case, the question of whether Ms. Isner was damaged must be evaluated from the standpoint of what position she would have been in had she not entered the Program. Yet, rather than seeking to be placed in a position equivalent to what she would have been in had she never enrolled in the Program, she has retained the full benefits that she received under that Program while she attempts to make a case for more money.

As an initial matter, Ms. Isner cannot establish that she would have received any award, let alone one that exceeded her actual settlement award. This is not a case where under any view of the facts, Ms. Isner was entitled to receive at least $6.9 million on her underlying claim. If Ms. Isner had never enrolled in the Program, rather than receiving $6.9 million, she would have had the right to proceed to trial, and she would have stood in a position similar to those 18 plaintiffs who had their cases tried prior to the settlement—most of whom did not prevail on their claims. Any contrary assertions are purely speculative.

Moreover, the measure of damages that plaintiff seeks to employ in this suit is not permitted under Massachusetts law. Ms. Isner asserts that she is entitled to "dollar for dollar"

recovery of projected gross future income of decedent.  But even in the best case scenario, she would never have recovered that amount for lost wages outside of the Program.  At a minimum, Massachusetts law requires that any projected future income be assessed at a **net** value—*i.e.*, post-taxes.  This is expressly spelled out in the Massachusetts wrongful death statute.[12]  Mass. Gen. Laws ch. 229, § 2 (2014); *see also Leibovich v. Antonellis*, 574 N.E.2d 978, 983 (Mass. 1991) ("[I]n arriving at a figure representing the present value of the son's lost earning capacity, he had calculated the son's estimated gross income over his work life and reduced that amount by twenty percent for taxes, in order to reflect actual net pay.").  Moreover, Massachusetts law requires that any award for future lost income must be reduced to present value.  *See, e.g.*, *Welch v. Keene Corp.*, 575 N.E. 2d 766, 772 (Mass. App. Ct. 1991) ("It has long been the rule that an award for loss of future earning capacity must be reduced to 'present value' in order to allow for the earning power of that money." (citation omitted)).  The date by which to assess "present value" is the date of the commencement of the action.  *Id.* n.11 (citation omitted).

A proper application of these reductions at trial (assuming she had prevailed) would have left plaintiff with an award for lost income that would be **substantially less than** the $5,359,000 she received in the Program for lost wages.  Specifically, plaintiff asserted a gross lost income figure of $8,490,935.93, Compl. ¶ 36, which she calculated by taking a gross annual salary of approximately $700,000 and multiplying it by 12 years, 1 month and 17 days.  *See* EI Appeal Statement (Ex. G).  But this figure neither subtracts taxes nor adjusts for present value as required under Massachusetts law.

---

[12]     Indeed, plaintiff's original 2004 personal injury complaint specifically references "reasonably expected net income."  *See* Ex. I (Compl. & Jury Claim, *Isner v. Merck & Co.*, No. 04-4304 (Commw. of Mass. Middlesex SS, filed Oct. 29, 2004)) ¶ 23.

1150439v1

Taxes alone would have reduced the figure proffered by plaintiff by at least $286,000:  In 2001, a household with a gross income of $700,000 fell into the tax bracket of 39.1% (married filing jointly), and this resulted in an effective tax rate of 35.11%.  In other words, this results in federal tax of $245,743 on the $700,000 gross income (not including Social Security or Medicare).  The applicable Massachusetts tax rate for 2001 was 5.85%.  This results in a state tax of $40,950 on the $700,000 gross income.[13]  Subtracting these numbers results in a **_net_** income of $414,000.  Calculating 12 years of the net wages thus yields a total amount of $4,968,000, without any adjustment for present value.  The EI award that plaintiff actually received in the Program was $5,359,000.

The additional present-value adjustment needed to reach a net income figure would reduce the number further.  Under the applicable Massachusetts law principles, the damages assessed from 2001 (the date of the underlying event) and 2004 (the date Ms. Isner filed suit) would not be reduced; but the amounts awarded from 2005 to 2013 would be so reduced.  _Welch_, 575 N.E.2d at 772 n.11.  The "past lost wages" amount for the period between the event and the initiation of the lawsuit is approximately $1,242,000 (3 years of $414,000).  The net present value to 2004 of the resulting $4,117,000 is approximately $2,450,000.[14]  Thus, the combined past and future awards equals $3,687,000.

---

[13]     Notably this is consistent with actual federal tax returns filed by the Isners (which includes adjustments for dependents, etc.) in prior years.  In 1999, the Isners' tax returns reflect an Adjusted Gross Income of approximately $716,000, and an assessment of federal taxes in the amount of approximately $232,000.  _See_ Ex. J (Isner 1999 Federal Tax Return).  Massachusetts employs a flat tax rate of 5.85% which would yield a state tax assessment of approximately $42,000.  Applying these figures results in a net income of approximately $442,000.

[14]     If discounted to 2004 (the year plaintiff filed suit), the net present value ranges from $2,240,000 to $2,650,000 using a discount factor of 5% to 7%.  _See Present Value Calculator_, CalculatorPro, http://www.calculatorpro.com/calculator/present-value-calculator/ (last visited Feb. 5, 2014).

In short, Ms. Isner cannot prove that she is "worse off" today than she would have been had she gone to trial and prevailed.  Under the latter course of action, the most she could have recovered in lost wages is $3,687,000—a sum far less than the $5,359,000 award for lost wages that she received by settling.[15]

## V.   The Allegations as to the BrownGreer Defendants Fail To State a Valid Claim Under Massachusetts Consumer Protection Law.

Ms. Isner has asserted a claim under the Massachusetts consumer protection statute— specifically, Massachusetts General Laws Chapter 93A, Section 9.  *See* Compl. Count III.  She bases her claim on the same allegations of misrepresentations alleged in her other claims. Compl. ¶ 52.  Her Chapter 93A claims fail for two reasons:

First, where, as here, the alleged basis for a violation of Massachusetts's consumer-protection law under Chapter 93A is a fraudulent or negligent misrepresentation, the 93A claim fails if the plaintiff is unable to prove a false representation of material fact.  *See, e.g.*, *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 25 (1st Cir. 2001).  As discussed above, Ms. Isner cannot state a claim for fraudulent or negligent misrepresentation.[16]  *Hallmark*, 518 F. Supp. 2d at 332 (holding Chapter 93A claim must be dismissed "since it has failed to establish any breach of contract, misrepresentation, or other actionable conduct").

Second, the allegations that Ms. Isner makes fall outside the scope of Chapter 93A, a statute that by its terms only applies to transactions that occur in trade or commerce. Chapter 93A defines the scope of "trade" and "commerce" as transactions that involve the sale (or

---

[15]   Nor, as previously discuss, can it be assumed that plaintiff would have prevailed at trial. It is worth noting that Dr. Mark Furman, the causation expert apparently retained by Ms. Isner, had previously testified at two Vioxx trials—the *Dedrick* MDL trial and the *Schwaller* trial in Illinois state court.  Ex. K (Notice of Submission of Expert Report Mark Furman, M.D.)  Both of those trials resulted in defense verdicts.

[16]   *See* Part II, *supra*.

leasing) of goods and services.[17]  No such transaction occurred here.  As Massachusetts courts have determined, transactions that are essentially private in nature fall outside the scope of Chapter 93A.  *See, e.g.*, *Gannett v. Lowell,* 450 N.E.2d 1121, 1123 (Mass. App. Ct. 1983) (Executor engaging in transactions with third party to induce execution of a settlement agreement as part of administering an estate not covered by Chapter 93A even where alleged misrepresentations involved).  This is particularly true where the parties' "only contact occur[s] in the context of . . . litigation." *Arthur D. Little, Inc. v. E. Cambridge Sav. Bank*, 625 N.E.2d 1383, 1386–89 (Mass. App. Ct. 1994) (when defendant's bank did not cooperate with plaintiff in dispute over defendant's funds held by bank, court rejected contention that "the bank's stonewalling tactics amounted to a violation of [Chapter 93A]," because there was no commercial relationship between bank and plaintiff).  No commercial relationship ever existed between BrownGreer and Ms. Isner.  Thus, Chapter 93A does not apply.

---

[17]     "Trade" and "commerce" shall include the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security as defined in subparagraph (k) of section four hundred and one of chapter one hundred and ten A and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth."  Mass. Gen. Laws ch. 93A, § 1(b) (2014).

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of the BrownGreer Defendants on all of plaintiff's claims.

Dated:  February 10, 2014                    Respectfully submitted,

_/s/ Dorothy H. Wimberly_____
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130
Phone: 504-581-3200
Fax:     504-581-3361

_Defendants' Liaison Counsel_

Douglas R. Marvin
Eva Petko Esber
M. Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, DC  20005
Phone: 202-434-5000

John H. Beisner
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Phone: 202-371-7000

_Counsel for Defendants BrownGreer PLC,_
_Orran L. Brown, Hughes Hubbard & Reed_
_LLP, and Theodore Mayer_

1150439v1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Motion for Summary Judgment and Incorporated Memorandum of Law has been served on Liaison Counsel, Russ Herman, Ann B. Oldfather, and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 10th day of February, 2014.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel