UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX PRODUCTS LIABILITY LITIGATION | * | MDL Case No. 1657 |
| | * | |
| | * | SECTION L |
| This document relates to: | * | |
| | * | JUDGE FALLON |
| *Linda Isner, Executrix of the Estate of Jeffrey Isner, M.D., v. Seeger Weiss, LLP, et al.*, | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| 2:12-cv-02406-EEF-DEK | * | |

*************************************************************************

**DEFENDANTS BROWNGREER PLC AND ORRAN L. BROWN'S LR56.1
STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO DISPUTE**

Pursuant to Local Rule 56.1, Defendants BrownGreer PLC and Orran L. Brown (collectively "BrownGreer Defendants"), by undersigned counsel, hereby submit the following statement of material facts as to which there is no genuine issue, to accompany their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56:

**The Vioxx Resolution Program**

1.      On November 9, 2007, Merck and a court-appointed group of Negotiating Plaintiffs' Counsel (the "NPC") announced that they had reached a settlement agreement with respect to the Vioxx Litigation. The settlement established the Vioxx Resolution Program ("Resolution Program" or the "Program") based on a fixed amount of funds intended to resolve all pending or tolled state and federal Vioxx claims as of the date of the settlement that involved allegations of myocardial infarction ("MI"), stroke, or sudden cardiac death. The Master Settlement Agreement ("Agreement" or "MSA") set out the Program requirements. *See* Ex. A (MSA) §§ 1.2.1, 17.1.22.

2.      As part of the Resolution Program, Merck provided $4.85 billion to be distributed to qualifying claimants. The MSA set out the process for evaluating claims to be conducted and

refined by a Claims Administrator. Merck and the NPC jointly selected BrownGreer to be the Claims Administrator. Ultimately, more than 50,000 claims were processed through the Program, and all of the settlement funds were fully allocated. *See* Ex. B (July 27, 2010 Final Report of Claims Administrator) at 26.

3. By submitting an Enrollment Form, claimants and their enrolling counsel agreed to be bound by all of the terms and conditions of the Agreement. *See* MSA § 1.2.4 (Ex. A). Under the terms of the MSA, each counsel who enrolled clients in the Program agreed that he or she would "exercise his or her independent judgment in the best interest of each client individually before determining whether to recommend enrollment in the Program." *See* § 1.2.2 of Jan. 17, 2008 Amendment to Settlement Agreement (amending MSA § 1.2.8.1) (included in Ex. A at 74).

4. To be eligible for payment under the Program, the MSA required that claimants present adequate documentation to pass threshold "gates" related to proof of injury, product use, and proximity of use to alleged injury. *See* MSA §§ 2.1, 2.2, 2.3 (Ex. A). If the Claims Administrator determined a claimant to be qualified to enter the Program and his claims package was complete, the Claims Administrator processed the claim through the claims valuation process set forth in the MSA. *See id.* § 3.

5. If the Claims Administrator determined that a claimant did not meet the requisite gate requirements, the Gate Committee conducted a further review. *See id.* § 2.5. If the Gate Committee also determined that a claimant was not eligible, the claimant could appeal the Gate Committee's determination to the Special Master as set forth in the MSA. *See id.* § 2.6. The Special Master's decision on whether the claimant was eligible was binding, final, and non-appealable. *See id.* § 2.6.3.

6. The MSA established a claim valuation system that assigned points based on such factors as severity of the injury, length of use of Vioxx, and risk factors evident from the medical records. The valuation system was published on the Court's and the Claims Administrator's websites, making it available for consideration by all those deciding whether to enroll in the Program. The actual monetary value of a point was not known prior to enrollment because the value turned on how many claimants actually enrolled in the Program, how many qualified for payments, and how many points their claims received. Claimants who chose to enroll in the Program executed an individual release that expressly noted the variability and uncertainty as to the future calculations. Each claimant acknowledged "**THAT THERE IS NO GUARANTEE THAT I WILL RECEIVE ANY SETTLEMENT PAYMENT OR, IF ANY SETTLEMENT PAYMENT IS MADE, THE AMOUNT THEREOF.**" *See* MSA Ex. 1.2.2.3 at 5–6 (original emphasis) (included in Ex. A at 78-90).

7. After the valuation process was completed for a particular claimant, the Claims Administrator notified the claimant of his or her points award. *See* MSA § 3.2.3 (Ex. A). Each claimant then had the opportunity to appeal his or her points award to a Special Master for a *de novo* review. *Id.* § 3.2.4. The monetary value of the points awarded to each claimant was determined after all qualified claimants had completed the valuation process. *Id.* § 3.1.

8. Certain categories of claimants were also eligible to apply for additional compensation for extraordinary injuries ("EI"). These were claimants who had either experienced atypical issues with their medical injuries and/or experienced unusually large economic damages (*e.g.*, medical expenses or lost wages exceeding $250,000). The MSA charged the Claims Administrator with establishing the process and criteria for evaluating EI claims. *Id.* § 4.2.7 (Ex. A).

9.	Initially, the MSA capped the maximum amount allowable for a single EI claim at $600,000. A subsequent amendment to the MSA eliminated this cap. *See* § 1.2.5 of Jan. 17, 2008 Amendment to Settlement Agreement (amending MSA § 4.2.6) (included in Ex. A at 75).

10.	As with the base awards, claimants would not know the ultimate value of any individual EI award at the time claimants agreed to enter the Program. Moreover, at the time of the enrollment period, the Claims Administrator had not yet created any criteria or protocols to govern the EI process. After the initial processes for determining eligibility and evaluating claims were up and running, the Claims Administrator published a detailed instruction manual setting out the criteria for receiving an EI award and the process for assigning a valuation to those EI claims. *See* Ex. C (Claims Administrator's Review Criteria Manual).

11.	The Claims Administrator reviewed each EI claim and supporting documentation, and issued a Notice of EI Assessment setting forth an assessed amount for the EI claim, and explaining how the assessment was determined and how any missing documentation affected the assessment. *Id.* § VII.A. A claimant then had the opportunity to submit additional documentation and request a second review by the Claims Administrator. *Id.* § VII.A.2(b). After a second review, the Claims Administrator issued a Notice of Second Review of EI Assessment to explain the determinations made in the second review. *Id.* § VII.B.2. If desired, the claimants could then appeal the Second Review EI Assessment to a Special Master. *Id.* § VII.C. The decision of the Special Master was returned to the Claims Administrator for any adjustments to the EI Assessment as determined by the Special Master. At that point, the EI Assessment became final, and "not . . . subject to any further appeal." *Id.* § VII.C.6(b).

12.	The Claims Administrator's Review Criteria Manual states:

> **3. Standard Discount for Future Uncertainty and to Present Value.**
> The total AED LWI Amount calculated in the manner described

> above, will be discounted to account for: (i) the uncertainty that the Claimant would have worked until the end of the AED LWI Measurement Period; (ii) the uncertainty that the Claimant would have earned the same wages until the end of the AED LWI Measurement Period; and (iii) the present day value of the AED LWI. The Standard Discount will be a percentage applied to all awards of AED LWI. ***The Standard Discount will be 50% applied to the AED LWI Amount. The resulting amount is the Discounted AED LWI Amount.***

Review Criteria Manual (Ex. C) at IV.G.3 (emphasis added).

## The Isner Claim and Ms. Isner's Consideration of Enrollment

13. Dr. Jeffrey Isner was a practicing cardiologist and medical researcher who lived in Massachusetts. In 1996, Dr. Isner experienced symptoms while on vacation that prompted him to undergo a cardiac catheterization. Although the results of that procedure were normal, Dr. Isner had a family history of cardiovascular disease, including his father's fatal heart attack. *See generally* Ex. D (Isner Claims Package).

14. On October 31, 2001, Dr. Isner, then 53-years-old, complained to his wife that he was having chest pains. Shortly thereafter, he went into cardiac arrest at home, lost consciousness, and became unresponsive. He was taken to the hospital by ambulance, but the hospital physicians were unable to revive him. The causes of death listed on his death certificate were "cardiopulmonary arrest" and "coronary artery vasospasm." *Id* at 5.

15. About three years later, shortly after Merck withdrew Vioxx from the market, Dr. Isner's widow, Linda Isner, filed suit against Merck in state court in Massachusetts on October 29, 2004, as Executrix of Dr. Isner's estate, asserting a wrongful death claim. *See* Ex. I (Compl. & Jury Claim, *Isner v. Merck & Co.*, No. 04-4304 (Commw. of Mass. Middlesex SS, filed Oct. 29, 2004)) ¶ 23. Ms. Isner's suit remained pending at the time the settlement was announced in November, 2007.

1150442v1

16. In connection with her personal injury claim, Plaintiff Isner retained Mark Furman, M.D. as an expert witness and submitted a case specific expert report from Dr. Furman pursuant to Pretrial Order No. 28 in that litigation. *See* Ex. K (Notice of Submission of Expert Report Mark Furman, M.D.).

17. As the deadline for enrollment in the Resolution Program approached, several information sessions were held around the country. Ms. Isner and her attorney, Joseph Doherty, attended one such conference on October 20, 2008, in New York City. Ex. G (Isner EI Appeal Statement) at 1. At that conference, and in the remaining two weeks leading up to the enrollment deadline, Ms. Isner's counsel had several communications with various participants in the settlement process seeking clarification about certain issues in the Program. *See generally* Ex. E (Plaintiff's Collection of Counsel E-Mails).

18. On October 21, 2008, plaintiff's counsel noted in an e-mail to Ted Mayer that, in reviewing the MSA, he had "not been able to locate the specific provision that you confirmed yesterday, which addresses the fact that EI payments are **_not_** limited to the time period from Dr. Isner's death to the date of the settlement on 11/09/07." E-mail from J. Doherty to T. Mayer, Oct. 21, 2008 (included in Ex. E). Plaintiff's counsel asked to see "the specific language that establishes the right to EI payments for both past and future lost earnings through to the end of Dr. Isner's work-life expectancy," explaining that he needed "specific confirmation" of this fact before he could "advise [his client] further." *Id.* Mr. Doherty sent a similar e-mail to Chris Seeger the following day. *See* E-mail from J. Doherty to C. Seeger, Oct. 22, 2008 (included in Ex. E) (again noting that he could not find the provision stating that EI payments would cover work-life expectancies that extended beyond the date of the settlement).

19. An October 22, 2008 e-mail from Mr. Mayer to Mr. Doherty stated:

> As you know, BrownGreer has not yet established all the criteria for EI awards. What can be said with certainty is that for an otherwise qualifying claim, *future earnings* will be awarded without a cap, up to an age cutoff (which they have told me will be no lower than 65). The awards will be dollar for dollar *subject to* 1) disability benefits, which would not apply in a death case such as this, 2) I believe, *discount to present value as of the payment date* (i.e., the assumed date for final payments under the Program) for that portion of the award that is attributable to the period after that assumed payment date, and 3) any proration that may prove necessary under Section 4.2.8.

E-mail from T. Mayer to J. Doherty, Oct. 22, 2008 (included in Ex. E) (emphases added).

    20.    An October 22, 2008 e-mail from Mr. Doherty to Mr. Mayer stated:

> I had a long telephone conference with Orran Brown this afternoon. We resolved several issues, *but we acknowledged that there were also many issues that involved "un-knowable" factors*, at this time, which will not be resolved prior to October 30th. . . . Orran confirmed, (as you similarly confirmed in your e-mail today), that . . . EI damages will include *all* lost earnings/lost earning capacity throughout Dr. Isner's full work-life expectancy, (rather than from the date of his death up to the date of the settlement agreement). Orran stated that although *the complete criteria for allocating EI damages has not as yet been finalized* or reduced to writing, *this specific criteria, governing past as well as future lost earning capacity, has been conclusively established*, in view of the fact that Merck, the Plaintiffs' committee and BrownGreer all agree that the language of Section 4.2.6 mandates such an interpretation. As Orran stated succinctly today: "You have Merck saying 'that is the way it is to be read'. You have the Plaintiffs' team saying 'that is the way it is to be read'. And you have BrownGreer saying 'that is the way it is to be read.' That's all you need." . . . I apologize if you felt I was being critical in my last e-mail, concerning the fact that we had a misunderstanding as to whether EI damages were or were not capped as of the date of the settlement.

E-mail from J. Doherty to T. Mayer, Oct. 22, 2008 (included in Ex. E) (some emphases added).

    21.    An October 27, 2008 e-mail from Mr. Doherty to NPC member Chris Seeger stated: "Ted Mayer and Orran Brown have confirmed the fact that EI damages are not capped as of the date of the settlement and that Linda Isner's claim for EI damages can include lost earning

7

capacity through the end of her husband's work-life expectancy." E-mail from J. Doherty to C. Seeger, Oct. 27, 2008 (included in Ex. E).

### Enrollment and Valuation of the Isner Claim

22.     Ms. Isner elected to enroll in the Program. As part of her enrollment package, she provided a Release that she executed on October 30, 2008. The Release contained the following language:

> **I AM ENTERING INTO THIS RELEASE FREELY AND VOLUNTARILY, WITHOUT BEING INDUCED, PRESSURED OR INFLUENCED BY, AND WITHOUT RELYING ON ANY REPRESENTATION OR OTHER STATEMENT MADE BY OR ON BEHALF OF, MERCK OR ANY OTHER PERSON.**

Ex. F (October 30, 2008 Release of Claimant Linda Isner) at 7 (original emphasis).

23.     In a section entitled "Acknowledgement of Comprehension; No Guarantee of Payment," Ms. Isner's Release further that

> **I FURTHER ACKNOWLEDGE THAT I UNDERSTAND THIS RELEASE AND THE AGREEMENT AND THAT THERE IS NO GUARANTEE THAT I WILL RECEIVE ANY SETTLEMENT PAYMENT OR, IF ANY SETTLEMENT PAYMENT IS MADE, THE AMOUNT THEREOF.**

*Id.* (original emphasis).

24.     Ms. Isner's Release also stated:

> By signing this Release, both I and any such Derivative Claimant understand and acknowledge that there is no assurance as to the amount, if any, of payment to be made to any claimant under the Program, and this fact shall in no way affect the validity or effect of this Release.

*Id.* at 2.

25.     The Claims Administrator completed a full review of Ms. Isner's base claim and issued a points award valued at $1,573,602.19. After reviewing plaintiff's Extraordinary Injury

claim, the Claims Administrator issued an additional award assessment of $5,359,316.74.  Ms. Isner received a total award of $6,932,918.93.  *See* Ex. H (Special Master Decision).

26. Plaintiff filed an appeal of her award to the Special Master.  In her appeal, she contested the Claims Administrator's (1) use of the base points her claim was awarded to adjust potential EI damages so as to maintain the relative standing of any individual claim as to other claimants in the Program; and (2) reduction of all future lost wages claims by 50% to account for the inherent element of uncertainty in such claims and discount them to present value.  *See* Isner EI Appeal Statement (Ex. G).  The appeal was denied.  *See* Special Master Decision (Ex. H).

27. Section 16.9.2 of the MSA expressly bars suits against the Claims Administrator. That provisions states, in pertinent part:

> [N]o Program Claimant (including any Enrolled Program Claimant or Qualifying Program Claimant) shall have any right to institute any proceeding, judicial or otherwise, against Merck, the NPC or any Administrator to enforce, or otherwise with respect to, this Agreement.

MSA § 16.9.2 (Ex. A).  Under the terms of the MSA, "Administrator" includes the Claims Administrator, BrownGreer.  *See id.* § 17.1.6.  And, the MSA vests the Claims Administrator with the responsibility for determining the criteria for assessing and valuing EI claims.  *See id.* §§ 4.2.6, 4.2.7.

28. In 1999, Plaintiff Isner and Dr. Isner filed joint tax returns reflecting an Adjusted Gross Income of approximately $716,000, and an assessment of federal taxes in the amount of approximately $232,000.  *See* Ex. J (Isner 1999 Federal Tax Return).

### Ms. Isner's Post-Program Challenge to Her Settlement Payment

29. After the Special Master denied Ms. Isner's appeal of the Claims Administrator's award, she collected, accepted and retained the proceeds of the Resolution Program payment. Nearly two years after collecting her $6.9 million award, Plaintiff Isner initiated this action in

Massachusetts Superior Court.  Defendants removed the action to federal court, and the JPML transferred it to the Vioxx MDL proceeding (MDL 1657) over plaintiff's opposition.  *See* October 1, 2012 JPML Transfer Order, Case No. 2:12-cv-02406-EEF-DEK (Rec. Doc. 1).

Dated:  February 10, 2014

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130
Phone: 504-581-3200
Fax:    504-581-3361

*Defendants' Liaison Counsel*

Douglas R. Marvin
Eva Petko Esber
M. Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, DC  20005
Phone: 202-434-5000

John H. Beisner
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Phone: 202-371-7000

*Counsel for Defendants BrownGreer PLC, Orran L. Brown, Hughes Hubbard & Reed LLP, and Theodore Mayer*

1150442v1

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Statement of Material Facts has been served on Liaison Counsel, Russ Herman, Ann B. Oldfather, and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 10th day of February, 2014.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

1150442v1