UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX Products Liability Litigation | * | MDL No. 1657 |
| This Document Relates to: | * | SECTION L |
| State of Utah v. Merck, et al. | * | JUDGE ELDON E. FALLON |
| | * | MAGISTRATE JUDGE KNOWLES |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## STATE OF UTAH'S RESPONSE TO MOTOIN TO COMPEL AND MOTION FOR PROTECTIVE ORDER

### Introduction

This motion is a waste of time. Merck seeks to compel a witness that Merck and its lawyers know perfectly well does not exist. Merck's motion seeks a witness with knowledge of the reasons for the creation of two documents. The documents in question[1] were created by Duane Parke. Mr. Parke was a Medicaid pharmacist with no responsibilities in detecting fraud.

Mr. Parke has been deposed and has no memory of why or how he created the Documents. Merck claims to believe those documents show that the State had knowledge of their fraud in December 2004 when the first and main document was created. Upon discovery and disclosure of metadata[2] showing Duane Parke to be the creator of these documents, a

---

[1] There are two documents in question. The first was created in December 2004. The second was created in April 2005. Hereinafter, the State refers to both as "The Documents."

[2] Metadata is "Secondary data that organize, manage and facilitate the use and understanding of primary data. Metadata are evaluated when conducting and responding to electronic discovery." Black's Law Dictionary. In this particular case, the data were contained in Microsoft Excel Spreadsheets. Microsoft data includes the name of the creator and the names of anyone who might have revised the data. It also includes the date of creation, the date of last revision and most importantly, if the document has been printed.

1

reasonable litigant would have stopped. Because Merck and its lawyers did not stop, this opposition to Merck's motion to compel and motion for protective order is needed.

## Factual Background

The Court needs to understand the sequence of events which demonstrate the lack of substance in Merck's motion. After Duane Parke created the Documents in December 2004 and April 2005, he forgot all about them. Merck first used the Documents in the depositions of Tim Morley, taken on October 25, 2012, Duane Parke, taken on November 9, 2012, and Randy Baker, taken on November 29, 2012. Randy Baker was the person most knowledgeable about the contents of the Utah Medicaid data warehouse. If data reports were needed in Utah Medicaid, Mr. Baker was the likely source. Mr. Parke and Mr. Morley were Medicaid pharmacists. None of the three had any duties involving fraud detection. At these depositions, counsel for the State of Utah ("the State") knew the Documents came from the hard drive of the pharmacy department. However, the State did not know of the existence of the metadata.

If the State had known about the metadata, it would not have undertaken the search for individuals who knew anything about who created the Documents. The State's lawyers talked with a great number of individuals and not surprisingly none of them knew anything about the Documents. The depositions of Parke and Morley exhausted the institutional memory of the Utah Medicaid pharmacy department. There was no one else in that department that could respond. The deposition of Mr. Baker demonstrated that the Documents were created by someone other than himself.

There were but three individuals known to have the ability to obtain pharmaceutical data from the data warehouse. Mr. Baker was the obvious first choice. Mr. Parke knew how to do data queries and often did them for his own purposes. *See* Affidavit of Baker [hereinafter,

"Baker Aff."], attached hereto as Exhibit A, at ¶ 3. The other individual known to have the ability to pull pharmaceutical data was Brenda Strain. Ms. Strain worked in the program integrity unit but had received training from Mr. Baker and could pull pharmaceutical data if needed. *See* Baker Aff. At ¶4. She was a more advanced user than Mr. Parke. *Id.* at ¶ 4. Unfortunately, Ms. Strain died unexpectedly in 2012. There were other individuals who worked in Utah Medicaid who could pull data unrelated to pharmaceuticals. Thus, by elimination, the creator of the document would be Mr. Baker, Mr. Parke or Ms. Strain.

Mr. Baker was deposed. He denied being the creator of the document and gave good reasons why that was so. Mr. Parke (who actually created the Documents) was also deposed. He testified that he had no memory of the Documents or why they were created. Merck and its lawyers were not satisfied with these answers. They continued to demand a witness with knowledge of the creation of the Documents.

When Merck persisted in demanding a witness, the State produced Alex Yei. Mr. Yei did not work with the pharmacists but worked in the program integrity section. Mr. Yei was the boss of the deceased Brenda Strain. As stated, Ms. Strain was known to have the abilities to pull pharmaceutical data from the Utah Medicaid Database. Mr. Yei was prepared to testify as to the contents of the Documents. He was also prepared to testify as to Ms. Strain's work and the manner in which she produced data based documents. This testimony was not satisfactory to Merck. They continued to demand a witness with knowledge of the creation of the Documents.

Along with the production of Mr. Yei for deposition, the State interviewed everyone identified with the Program Integrity Section and not surprisingly, found no one who had seen or discussed the Documents. For that matter, the State found no one in the program integrity unit who had discussed Vioxx prior to 2006.

The State interviewed David Stallard, a lawyer in the 2004 Medicaid Fraud Control Unit and he knew nothing of the Documents in question. *See* Affidavit of Stallard [hereinafter, "Stallard Aff."], attached hereto as Exhibit E, at ¶ 5. He continues to maintain that the first he knew of possible false claims was when Texas filed its lawsuit on June 30, 2005.

At that point, the metadata was discovered. The State then knew that the sole creator of the Documents was Duane Parke. The State then knew that the Documents had never been printed and that there was no evidence that they had ever been transmitted. It became obvious that the reason no one knew about the Documents was that Mr. Parke created them, forgot about them, never discussed them with anyone and never printed them. With this evidence, any search for a person with knowledge of why Mr. Parke created the Documents would be futile. It was obvious as to why no one, interviewed by the State, knew about the Documents. They had not seen them because Mr. Parke created them and never printed them.

The State cannot produce a witness that knows more than Mr. Parke. Mr. Parke is the only person who saw the Documents. Mr. Parke has been deposed and he does not remember creating the Documents or discussing why he thought he should study the Cox-2 inhibitors. Merck knows all of this. Yet, its lawyers continue to hound the State to produce a witness that Merck and its lawyers know does not exist. Merck's continued request for a witness, other than Mr. Parke who knows anything about why Mr. Parke created the Documents is simply harassment. Because Mr. Parke created the Documents, it is not surprising that no one else at Utah Medicaid knows anything about them.

In order to help the Court understand this matter, we insert the metadata itself. Metadata from Document 1 shows that it was created in December 2004 by Duane Parke and that it was

4

never printed. *See* Page 5. Metadata from Document 2 showing that it was created by Duane Parke, never modified and never printed. *See* Page 6.



5

COX-II.STUDY.4.5.05.xls [Compatibility Mode] - Microsoft Excel

File | Home | Insert | Page Layout | Formulas | Data | Review | View

- Save
- Save As
- Open
- Close
- Info
- Recent
- New
- Print
- Save & Send
- Help
- Options
- Exit

## Information about COX-II.STUDY.4.5.05

G:\VIOXX Burn 7-27-09\COX-II.STUDY.4.5.05.xls

**Convert**

### Compatibility Mode
Some new features are disabled to prevent problems when working with previous versions of Office. Converting this file will enable these features, but may result in layout changes.

**Protect Workbook**

### Permissions
Anyone can open, copy, and change any part of this workbook.

**Check for Issues**

### Prepare for Sharing
Before sharing this file, be aware that it contains:
- Document properties, printer path and author's name
- Content that cannot be checked for accessibility issues because of the current file type

**Manage Versions**

### Versions
There are no previous versions of this file.

**Properties**

| | |
|---|---|
| Size | 15.0KB |
| Title | |
| Tags | |
| Comments | |
| Template | |
| Status | |
| Categories | |
| Subject | |
| Hyperlink Base | |
| Company | Utah Department of Health |

**Related Dates**

| | |
|---|---|
| Last Modified | 4/7/2005 7:14 AM |
| Created | 4/5/2005 7:02 AM |
| Last Printed | |

**Related People**

| | |
|---|---|
| Manager | |
| Author | DParke |
| Last Modified By | DParke |

**Related Documents**

Open File Location

Show Fewer Properties

6

It is now helpful to understand the testimony of Duane Parke. We attach a lengthy portion of the transcript because it is necessary to understand that Mr. Parke had no memory of the Documents which according to the metadata, he created.

    Q.    Prior to your meeting with the State's lawyers, had you seen Exhibit 20 before?
    A.    I don't recall it. And it looks like something I would have done. But, you know, it was clearly done on the data warehouse.
    Q.    Why do you say it looks like something you would have done?
    A.    Well, it's the layout that I would typically put, put into a document.
    Q.    What's the data source for Exhibit 20?
    A.    It would have been the Medicaid data warehouse.
    Q.    Be the historical claims data for Utah Medicaid?
    A.    For that time period that's noted.
    Q.    So the time period here is July 2003 through December 2004, correct?
    A.    Yes.
    Q.    And would this cover – well, do you have firsthand knowledge or personal knowledge of what's contained in Exhibit 20?
    A.    I have just simply no recollection whatsoever even though I might have done it. But I, I thought I was gone by December of '04. But I don't have a recollection of when I retired the first time either. Just walked out the door and never came back until they hired me back.
    Q.    I take it you can't tell me the purpose for which Exhibit 20 was prepared?
    A.    No.
    Q.    Who requested it or commissioned this analysis?
    A.    Well, let's look on the last page and see if there's anything there that – I have no, no clue where this is going.
    Q.    Do you have any knowledge as to how Exhibit 20 was put together?
    A.    Well, any time you did a query on, on the data warehouse, it was – at least any time I did a query on the data warehouse, it was always on an Excel spreadsheet. You'd, you'd – you just could list across the top and what – down the side what you wanted. And clearly this is patient specific.
    And then they've gone out – after that is the primary sort. They've gone in and, and – well, let me say they, they qualified it by looking at Cox-2s.
    Q.    Can you tell what the search criteria is that got this data run from this document?
    A.    I don't understand the question.
    Q.    Well, this is obviously some printout from the larger data warehouse, correct? Can you determine what query was made to the data warehouse to get this downloaded data?
    A.    You know, anybody who's proficient in the data warehouse can sit down and put – ask this query and have it in five minutes.
    Q.    But what –
    A.    Whether this is part of a bigger query or not, I don't know.

      Q.     And that's what I'm asking. What is the query that's reflected? Can you tell what the query is?
      A.     It just looks to me like it's just a plain and simple enumeration of client, diagnosis, category of service, and they're – whether they had a claim or not.
      Q.     By looking at this document, can you tell what was specifically keyed into the system to get this printout?
      A.     Well, first off, they would have had to start off by identifying the, the drugs that were under consideration. And they would have used, I think the HICL, which would give you the – one HICL gives you all, all of Vioxx. Another HICL, six-digit code, gives you all the Celebrex. You can – you go down, you can step down another and get strengths if you want, but that's a different number entirely.
      But you – it looks to me like you would have used three HICLs to identify the drugs under consideration. And then you would just gone and say, list all patients that had a hit for this time period for these HICLs and their diagnosis and their cat – provider ID or category of service.
      And then the final claim indicator, yes or not, whether it's paid or not. I'm not really proficient on going in and getting provider category of service because I was told not to go there. So I don't think this is my document.
      Q.     All right. So from what you can glean from Exhibit 20, you don't think you participated in the preparation of this –
      A.     Huh-uh.
      Q.     -- correct?
      A.     Yeah. Although like I said, until you get down to there, the top part looks like something I'd lay out. Just – that's just the way of it. That's just almost the way everybody would lay it out.
      Q.     Okay. But particular columns that are reflected here, those aren't columns that you typically access?
      A.     I would always typically access the patient ID number on – if that's what I'm looking for.
      Q.     Specifically Column C, provider categories?
      A.     Column A.
      Q.     Right. But provider – Column C is something you typically wouldn't do, right?
      A.     Yeah. I'm very uncomfortable with that one, because I've tried to get drugs approved, some of these high tech drugs, by category. For instance, cancer drugs, you know, should be covered only by oncologists. I got stomped all over by the UMA on that one. So –
      Q.     All right.
      A.     So that was – that's not a column that I'm really good at.
      Q.     Okay. So even having looked at Exhibit 20 today and having visited with counsel for the State about Exhibit 20 earlier this week, it doesn't trigger any recollection from you as to how this report was generated, whether you were involved, what the data mean, et cetera?
      A.     No. And then the – you know, the line No. 1 includes all the Coxes, and line 6 specifies just Celebrex. So, you now, the – there's a conflict right there before you get to any data.

Q. Well, even given your experience with the data warehouse in your time at Department of Health, you would need more information before you could unpack what's in part of Exhibit 20, correct?

A. Yeah. I told – I don't know what – to what end this is, is, other, other than a basically numerical listing of clients.

(Deposition Exhibit 21 was marked.)

Q. (By Mr. Ismail) Do you recognize Exhibit 21, sir?

A. I ought to. It's the layout that I use, but I don't recognize it.

Q. It says Cox-2 Study, April 5, 2005. Do you see that at the top?

A. Yeah.

Q. Were you still employed by the Department of Health?

A. I don't think so.

Q. Did you review this document in preparation for today?

A. No.

Q. Do you recall ever seeing it before today?

A. No.

Q. Do you have any idea what is reflected on Exhibit 21?

A. Well, it looks like two different quarters a year apart.

Q. Let me ask a different question. Withdrawn. Do you know how Exhibit 21 was put together?

A. Off the data warehouse.

Q. That's surmising based on the columns here?

A. Yes.

Q. Do you have any knowledge about what analysis or study was done to create Exhibit 21?

A. Well, it correlates pretty well with this study here in that this, this does happen to look at Bextra and Vioxx as well as Celebrex, giving you the final claim indicator and the total charge for those quarters.

Q. All right? My question is a little different, not sitting here today and reading it, can you surmise what various columns mean. My question is whether you recall or have any personal knowledge as to how Exhibit 21 was put together.

A. No. No, I can't. I'm sorry.

Q. Do you know – and I take it you can't help us figure out who put Exhibit 21 together or for what purpose?

A. I have no clue right at the moment.

Q. Did anyone ever ask you to run any analyses about claims relating to Vioxx for the purpose of the State's lawsuit against Merck?

A. No.

Q. Remember any conversations about someone else doing that data run?

A. No.

Deposition of Duane Parke, Page 221;17-228:19.

## The Designation of Alex Yei was Reasonable Under the Circumstances

Not knowing of the existence of the metadata, the State continued its futile search for anyone who might know anything about the Documents. As stated, there were three individuals with the known ability to pull pharmaceutical data. Mr. Baker denied that the spreadsheets were his work; Mr. Parke forgot that he created the Documents. This left the deceased Brenda Strain. *See*, Baker Aff. at ¶ 6. After reasonable investigation, the State chose Brenda's boss, Alex Yei, as the person who it reasonably thought would have the *most* knowledge about the Documents, if created by her. *Id.*, at 7. As the boss of the individual presumed to have created the Documents, the State believed that Alex Yei could testify about Brenda's work and how she created documents generally. *Id.*

Merck complains to this Court about Alex Yei's alleged lack of preparation, but he could have spent hours contemplating the Documents and he would not have divined any additional knowledge. In fact, no one could have done so because no one knows anything about them. That being said, Alex Yei was prepared to speak in general terms about how documents such as this are created. Moreover, Alex Yei would not have divined new information by showing the Documents to numerous Utah employees (as the State's attorneys had already done) only to be told by each person that he or she knows nothing about it. Alex Yei was well prepared to speak about the Documents generally, as this is the only area about which he could know anything concerning the Documents:

> Q. Tell me what you did to prepare yourself to be able to speak on these four topics (i.e., the topics listed in the Rule 30(b)(6) notice including, *inter alia*, the two Documents at issue).
>
> A. Um, basically I went through the reports, looked at the information that was provided in each of the reports. I had worked extensively with data elements that are similar to these and was familiar with the headings on the reports. Deposition of Alex Yei [hereinafter, "Yei Depo."], at 9. *See* Exhibit B attached hereto.

Mr. Yei reviewed the Documents and was familiar with similar data elements. He later volunteered that he could "tell you the reason for creating documents that may have been similar that I have personally asked for." *Id.*, at 38. However, Merck did not want to know about this; Merck only wanted to know why the Documents were created. The problem is that no one knows that.

After Mr. Yei's deposition, the State complied with Merck's continued requests to uncover information about the Documents. *See, e.g.*, true and accurate copy of October 3, 2013 letter from State's Counsel to Merck's Counsel, attached hereto as Exhibit C.

Subsequently, the State uncovered the metadata for both Documents and learned the following from it: Duane Parke created the Documents, the Documents were never printed, and there was no evidence the Documents were ever forwarded to anyone. Merck and its lawyers knew all of this. See, October 9, 2013 letter from State's Counsel to Merck's counsel, attached as Exhibit K to Motion to Compel; Baker Aff., at ¶¶ 9 - 12. Then, in response to an October 14, 2013 letter, the State's Counsel sent another letter on October 18, 2013 to Merck's counsel with photographs of the screenshots showing the newly discovered metadata. *See*, true and accurate copy of letter, attached hereto as Exhibit D.

However, as discussed above, Merck had already deposed Duane Parke and he did not recall the Documents, much less anything about his creation of them almost 10 years prior. The State has fulfilled its obligations to determine the person with most knowledge of these Documents through its thorough investigation. Since no one has seen or remembers anything about the Documents, it would appear the person with the most knowledge is their creator, Duane Parke. However, Duane Parke has already answered questions about these Documents, and does not remember anything about them. There is no one else with *any* knowledge, much

less the *most* knowledge. The State is not trying to "avoid having to provide basic testimony about the charts," as claimed by Merck. Motion, at p. 7. There is no basic testimony or information to be had except as follows: Duane Parke created the Documents, they were neither printed nor forwarded, and no one knows anything about them.

### The Deposition of David Stallard Would be Futile

Merck has requested the deposition of David Stallard, an attorney with the Utah Medicaid Fraud Control Unit. *See*, Motion to Compel, at 4 – 5. However, Mr. Stallard also knows nothing about the Documents. *See*, Stallard Aff. ¶6. As stated in undersigned counsel's letter to Merck's counsel, and attached as Exhibit N to the Motion to Compel, Merck knew about Mr. Stallard before the close of fact witness discovery and chose not to depose him. There is no reason, therefore, that Mr. Stallard should be subject to deposition: fact discovery is closed and Mr. Stallard does not know anything about the Documents. *Id.*, at ¶¶ 6-7.

### The State Continued to Tell Merck Mr. Parke was the Creator of the Documents

In short, if no one but the creator of the Documents saw them and that person remembers nothing about them, then no investigation by the State could uncover information concerning the circumstances that led to their creation. *See, e.g.*, Baker Aff., at ¶ 14

Merck has known since at least October 9, 2013 that Duane Parke created the Documents. Next, on December 12, 2013, the State again informed Merck that no one has any knowledge about the Documents. *See*, letter attached as Exhibit N to the Motion to Compel. Merck thus waited almost two months since this correspondence to file a Motion to Compel. The State has filed to remand this case to Utah. The final deposition in this matter was taken at the end of January, so the remand issue is ripe. Merck should not be permitted to delay remand through its Motion to compel the impossible.

## Legal Argument

The Utah Rules of Civil Procedure are rules of reason. Rule 1 provides that the rules "should be construed and administered to secure the just, speedy and inexpensive determination of every action and proceeding." Hounding the State to produce a witness that Merck and its lawyers know perfectly well does not exist is contrary to Rule 1.

Merck and its lawyers are abusing the discovery process. Rule 26(c) protects against such abuse. Continuing to hound the State for a witness that everyone knows does not exist is annoyance, embarrassment, oppression and an undue burden or expense.

There is no legitimate reason for Merck and its lawyers to continue to harass the State to produce a witness knowledgeable about the Documents when they know perfectly well that Duane Parke created the Documents and never shared them with anyone. The motion is irresponsible, a waste of counsel's time and a waste of the court's time.

Merck pretends to postulate an imagined conspiracy of silence concerning the documents. None of the depositions taken have disclosed any information other than responsible individuals have no knowledge of Duane Parke's private musings. The State's lawyers have undertaken a diligent effort to find anyone with knowledge not knowing that such a search was futile. When the State believed that Brenda Strain (who died in 2012) might have had the most knowledge about the creation of the Documents the State disclosed that fact. (*see*, May 16, 2013 e-mail from State's counsel to Merck's counsel, attached as Exhibit H to Motion to Compel) since Duane Parke had already testified on November 9, 2012 that he did not remember them. *Id.*; *see, also*, Deposition of Duane Parke, generally; January 27, 2014 e-mail from State's Counsel to Merck's Counsel, attached as Exhibit P to Motion to Compel (which document states, verbatim, the testimony of Duane Parke concerning the Documents).

For these reasons the State asks this Court to deny the Motion to Compel and further moves this Court for a protective order pursuant to Rule 26(c), of the Federal Rules of Civil Procedure, to prohibit any further discovery or deposition testimony concerning the documents.

**The Documents are not relevant to these proceedings**

Merck's lawyers claim that the Parke documents have some relevance to the Utah False Claims Act statute of limitations. Even if someone other than a pharmacist had seen the Documents, the Documents do not support Merck's claims. Thus, the court should give little heed to this argument.

Merck refers to these charts as "preliminary damage analyses." Motion, at p. 5. Notably, though, the Documents do not have any summaries, dollar damage reviews, or any 'analyses' at all. For instance, the first Document is a list of persons on any Cox-2 who also had any kind of heart treatment. Most notably, the start date for this list of Medicaid claimants is July 1, 2003, which is the date the State placed Vioxx on pre-approval[3]. All this document shows is what is already known and undisputed: that Utah Medicaid placed Vioxx on pre-approval because it had concerns that its effectiveness did not warrant its higher cost in relation to generic substitutes. Nothing on the face of these Documents indicates they were created for the analysis of anything. *See*, Baker Aff., at ¶ 13.

Evaluation of a Utah statute of limitations claim is complicated. The UFCA is a Utah statute; the statute of limitations under the former act was determined in *State of Utah v. Apotex*. The Utah discovery rules are found in *Grigsby* and *Russell Packard*. If the case is to be reviewed on Appeal, the Utah Supreme Court is the proper entity to determine Utah law.

---

[3] Pre-approval means that the State had to approve Vioxx before it could be prescribed. Utah placed Vioxx on pre-approval because there was concern that its use was not justified given its much greater cost in relation to similar pain relievers. Generally speaking, Vioxx was perceived to benefit only Medicaid recipients with gastrointestinal distress.

Pending before the court is a motion for summary judgment brought by the State as to the Statute of Limitations. Mr. Stallard says that the first knowledge that Merck had falsified evidence of cardiovascular risk by the attorney general's office was when he heard of the Texas lawsuit through the media in early July 2005. *See*, Stallard Aff., at ¶ 3. Merck, itself, in the Washington DC false claims case opposed recovery by a qui tam relator. Merck argued that evidence of its false representations were in the public record when Texas filed its complaint. The Attorney General told Mr. Stallard to follow up. Mr. Stallard received a copy of the Texas complaint, which in fact, alleged falsity. The State investigated until it received knowledge that Dr. Alice Reicin among others intentionally misrepresented the number of heart attacks in an article Merck commissioned for the New England Journal of Medicine. The State sued Merck shortly thereafter. At the very least Mr. Stallard's Affidavits demonstrate a question of fact as to the statute of limitations. In Utah, questions of fact are submitted to the jury. Further, under Utah procedures, Merck has the burden of proof on a statute of limitations defense, as any other affirmative defense. *See* Rule 12(b) of the Utah Rules of Civil Procedure.

There is no good reason for this court to entangle itself if a Utah statutory limitations case. There will be ample time for Merck to make whatever motions it choses after remand to Utah. The question is state and fact specific. It has nothing to do with this court's obligation to allow common discovery. It is a device to delay remand and nothing more.

**The State Moves this Court for a Protective Order as to Merck's request for further deposition testimony or as to any additional discovery concerning the Documents**

For the reasons stated above, the State moves this Court for a protective order pursuant to Federal Rule of Civil Procedure 26(c) to prohibit any further deposition testimony or discovery concerning the Documents. It is further supported by the attached certification of counsel, as required under Rule 26(c), of undersigned counsel's good faith effort to confer as evidenced by

the extensive correspondence attached as exhibits to the Motion to Compel and to this pleading. Plaintiff further notes that discovery is closed and the issue of remand is ripe.

In connection with this motion Merck and its lawyers should certify as to when they became aware of the metadata.

### Conclusion

For the foregoing reasons, the State asks this Court to deny the Motion to Compel and to grant the State's Motion for Protective Order to prohibit any further deposition testimony or discovery concerning the Documents.

DATED this 18th day of February, 2014.

/s/
_____
Joseph W. Steele
Kenneth D. Lougee
SIEGFRIED & JENSEN
5664 South Green Street
Salt Lake City, UT 84123

/s/
_____
Eric H. Weinberg

THE LAW OFFICES OF ERIC H. WEINBERG
149 Livingston Avenue
New Brunswick, NJ 08901

/s/
_____
Richard W. Schulte
812 E. National Road, Suite A
Vandalia, OH 45377

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing **STATE OF UTAH'S RESPONSE TO MOTOIN TO COMPEL AND MOTION FOR PROTECTIVE ORDER** has been served on Liaison Counsel, Russ Herman, Phillip Wittmann and Ann Oldfather, by U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 18th day of February, 2014.

/S/_____