UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Case No. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | SECTION L |
| LITIGATION | * | |
| | * | JUDGE FALLON |
| *This document relates to* | * | |
| | * | MAGISTRATE JUDGE |
| *Jo Levitt v. Merck Sharp & Dohme Corp.*, | * | KNOWLES |
| 2:06-cv-09757-EEF-DEK | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DEFENDANT MERCK SHARP & DOHME CORP.'S MOTION FOR SUMMARY
JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Plaintiff Jo Levitt alleges that Vioxx caused her to suffer two heart attacks (or "MIs"): one on March 9, 2000, a few months after she started taking Vioxx, and a second on May 26, 2000. To prevail, Ms. Levitt must offer expert testimony that Vioxx caused her to have those heart attacks. To meet this burden, on December 13, 2013, Ms. Levitt designated Dr. Jay Schapira, a cardiologist in Los Angeles. After Dr. Schapira's deposition had twice been canceled, Ms. Levitt withdrew Dr. Schapira as an expert on March 20, 2014, without explanation. None of the other experts for whom Ms. Levitt has provided a report have opined that Vioxx caused Ms. Levitt to experience her alleged heart attacks. As a result, Ms. Levitt cannot meet her burden on specific causation, and the Court should enter summary judgment on all claims.

**BACKGROUND**

**A.     Ms. Levitt's Medical History and Vioxx Usage**

Prior to taking Vioxx, Ms. Levitt had a long history of pain-related and fatigue-related ailments dating back to at least 1994. *See* Excerpts of Records of Dr. Ronald B. Hartman at 1

(Oct. 19, 1994 and Nov. 4, 1994 progress notes) (attached as Ex. A). Her specific complaints included hip pains, *id.*; polyarthritis, malaise, and fatigue, *id.* at 2 (June 9, 1995 progress note); left sciatica and hip dysfunction, depression, and continued fatigue, *id.* at 3 (September 10, 1996 and September 17, 1996 progress notes); myalgia "with tiredness" dating to the mid-1990s, *see* Excerpts of Records from Dr. Arnold Katz ("Katz Records") at 1 (Letter from Dr. E. Go to Dr. A. Katz) (attached as Ex. B). Eventually her primary care physician referred her to a rheumatologist—Dr. Arnold Katz.

Dr. Katz diagnosed her with fibromyalgia, with related chronic fatigue and sleep disorder in October 1999. He prescribed several medications, including Vioxx. *See* Katz Records (Ex. B) at 2 (Oct. 11, 1999 letter from A. Katz to R. Hartman). Dr. Katz, prescribed Vioxx to Ms. Levitt specifically to treat pain related to fibromyalgia.[1] Katz Dep. 29:1–5 (excerpts attached as Ex. C). Fibromyalgia is a chronic condition associated with pain, insomnia, and chronic fatigue. Katz Dep. 29: 7–9, 20–21, 32:10–20. Severe cases of fibromyalgia can be disabling if left untreated. Katz Dep. 31:16–22. Dr. Katz characterized Ms. Levitt's case of fibromyalgia as "moderate to severe." Katz Dep. 34:5–10. Both Dr. Katz and Ms. Levitt agree that Vioxx helped to ease Ms. Levitt's fibromyalgia pain. Levitt Dep. 72:19–24 (excerpts attached as Ex. D); Katz Dep. 76:23–77:4; Katz Records (Ex. B) at 3 ("Vioxx has helped . . . . If she misses med, she has increased pain."). After a couple of months of taking Vioxx, Ms. Levitt's pain improved, but her chronic fatigue persisted. Katz Records (Ex. B) at 3. Ms. Levitt continued to take Vioxx until April 29, 2002, when her insurance stopped covering the medication. Katz Dep. 77:5–14; Katz Records (Ex. B) at 4 (Apr. 29, 2002 call note). She then switched to Bextra. Dr. Katz continued,

---

[1]   Ms. Levitt had briefly taken Vioxx before when she requested it from Dr. Hartman, but she had stopped taking it by the time she saw Dr. Katz. Katz Dep. 28:14–18.

2

however, to prescribe Vioxx to other fibromyalgia patients like Ms. Levitt until Merck voluntarily withdrew Vioxx from the market on September 30, 2004. Katz Dep. 77:12–18.

### B. Ms. Levitt's Cardiovascular Health

In this lawsuit, Ms. Levitt alleges that she experienced two "heart attacks" a few months after she started taking Vioxx –in March, 2000 and May/June 2000. *See, e.g.*, Plaintiff Profile Form, ¶ I.C.1.a, at 2 (alleged injuries are "heart attacks") (attached as Ex. E); *see also* Compl. ¶ 35.

Prior to taking Vioxx, Ms. Levitt had several substantial risk factors for cardiovascular disease. She had an extensive family history of cardiac issues. As a cardiologist noted in 2000, Ms. Levitt had a "family history of heart disease in both her mother and father, and coronary artery disease was widespread in her mother's family." Excerpts of Mid-America Cardiology Associates Records ("Mid-America Records") at 2 (Mar. 10, 2000 Hospital History & Physical) (attached as Ex. F). As other medical records noted, this family history included a father with cardiac arrhythmia and a maternal grandmother who had a stroke, Excerpts of Records of Dr. James Neiburger ("Neiburger Records") at 1 (May 17, 1993 progress notes) (attached as Ex. G); and a mother with diabetes, Katz Records (Ex. B) at 1 (Letter from Dr. E. Go to Dr. A. Katz). She also had an extensive smoking history. Although in 2000 she was noted as having stopped smoking several years prior, she had previously smoked 2 packs per day for almost 25 years.[2]

---

[2] Although the substantial cardiovascular risks associated with smoking decrease upon smoking cessation, there is scientific evidence that former smokers remain at an increased risk level – possibly as high as 22% increased risk. *See* Koon K. Teo et al., *Tobacco Use and Risk of Myocardial Infarction in 52 Countries in the INTERHEART Study: A Case-Control Study*, 368 Lancet 647, 651 (Aug. 19, 2006) ("[I]n people who had quit [smoking] 20 or more years ago, there was a residual excess risk of about 22%.") (attached as Ex. H).

Neiburger Records at 1. She also had high cholesterol and hypertension. Mid-America Records (Ex. F) at 4 (Mar. 11, 2000 DC Face Sheet).[3]

Ms. Levitt first reported chest pain while on Vioxx in March 2000, less than six months after she started taking it upon the instructions of Dr. Katz. *See* Mid-America Records (Ex. F) at 1. After experiencing chest pain intermittently for approximately one week, Ms. Levitt was admitted to St. Luke's Hospital in Kansas City. Once admitted, Ms. Levitt was "ruled out for myocardial infarction"—that is, the doctors at the hospital determined that she did not have an MI. *Id.* When examined at the hospital, her cardiac enzymes were normal. *See* Excerpts of St. Luke's Hospital Records at 1–3 (Pathology Report) (attached as Ex. J). Instead, Ms. Levitt was diagnosed with unstable angina and coronary artery disease. Mid-America Records (Ex. F) at 4 (Mar. 11, 2000 DC Face Sheet). While in the hospital, she received angioplasty and a stent. *Id.*

Notably none of Ms. Levitt's contemporaneous medical records document an MI or heart attack diagnosis for this event. According to her hospital discharge summary, she received an angioplasty with minor residual stenosis. Her diagnosis was unstable angina, coronary artery disease, hypertension, and hyperlipidemia. Mid-America Records (Ex. F) at 4 (Mar. 11, 2000 DC Face Sheet). At a follow-up cardiology visit on March 23, 2000, there was "no evidence for previous infarction" and her exercise echocardiogram "showed no ischemic ST segment changes." *Id.* at 5–6. This test showed a "normal ejection fraction at rest" and a "normal response" to stress. *Id.* at 6.

Ms. Levitt again visited St. Luke's South on May 26, 2000, complaining of chest pain. According to her cardiologist, Dr. Thomas Rosamond, it was unclear whether the cause of the

---

[3] Notably, before being withdrawn, Dr. Schapira opined in his expert report that Ms. Levitt had risk factors that placed her at an increased risk of three or four times baseline without any consideration of Vioxx. *See* Report of Dr. Jay Schapira at 7 (attached as Ex. I)).

4

chest pain was cardiovascular or her fibromyalgia.  Ms. Levitt received a diagnostic catheterization showing re-stenosis.  Ms. Levitt underwent double bypass surgery.  Again, Ms. Levitt "did not rule in for myocardial infarction"—that is, she was not diagnosed with an MI. Mid-America Records (Ex. F) at 7–8.

Ms. Levitt went to the hospital for two more bouts of chest pain in 2000, neither of which, according to her doctors, appeared related to her heart.  On July 26, 2000, Ms. Levitt reported experiencing "palpitations, shortness of breath, tachycardia, diaphoresis, nausea, diarrhea as well as tingling and numbness of her extrem[i]ties."  According to Dr. James L. Vacek's summary, "myocardial infarction was ruled out."  Dr. Vacek further concluded that Ms. Levitt's symptoms were "unlikely . . . cardiac in etiology," observing that she likely "had an anxiety or panic attack" and that her symptoms were "associated with significant emotional distress occurring at the time of a re-zoning hearing."[4]  Mid-America Records (Ex. F) at 9–10. Ms. Levitt again sought treatment on November 27, 2000 with symptoms "very similar to" her July symptoms.  Ms. Levitt again underwent a stress test, which was "normal."  Like Dr. Vacek, Dr. Rosamond concluded that Ms. Levitt's symptoms were "more likely to be nonspecific musculoskeletal complaints or perhaps panic anxiety episodes."  Dr. Rosamond suggested that if the symptoms persisted, it would be appropriate for Dr. Hartman to assess "other noncardiac diagnoses for her symptoms."  *Id.* at 11–12.

Ms. Levitt did not go to the emergency room again for chest pain until September 13, 2002, almost two years later, and more than four months after she stopped taking Vioxx.  Once she arrived at St. Luke's Hospital, she was, as on her previous visits, "ruled out for myocardial

---

[4]  Throughout most of 2000, Ms. Levitt was involved in very stressful litigation involving a large scale renovation project being challenged by her neighbor who wanted work to cease and be demolished.  *See* Levitt Dep. 109:5–113:15.

5

infarction with a nonischemic EKG and negative cardiac enzymes." Excerpts of Cardiovascular Consultants, P.C. Records at 1 (Sept. 13, 2002 Discharge Summary) (attached as Ex. K). A stress test on September 16, 2002 again showed "no significant ECG changes" and "no significant arrhythmias." *Id.* at 2. Ms. Levitt's medical records show no subsequent visits to the emergency room for chest pain or any cardiovascular issue.

Although Ms. Levitt's lawsuit is based on her allegation that Vioxx caused her to experience two heart attacks, a review of her medical records shows that she never experienced an MI during the entire time she was on Vioxx, or during the years after she had stopped taking Vioxx (2002) through the filing of her lawsuit in 2006. Every documented test shows no evidence of ischemia of any kind. *See, e.g.*, Excerpts of Kramer & Crouse Cardiology Records at 1 (Nov. 27, 2007 progress note noting that stress test "did not show any evidence of ischemia or infarct" and "[c]ompared to age and gender matched controls, the patient had good activity tolerance.") (attached as Ex. L).[5]

### C.    The Withdrawn Specific Causation Expert

On September 30, 2004, Merck withdrew Vioxx from the market based on results from the APPROVe study suggesting that participants in the drug arm of the trial experienced an increased rate of MI after 18 months of usage as compared to participants in the placebo arm of the trial. *See In re Vioxx Prod. Liab. Litig.*, MDL No. 1657, 2010 WL 2649513, at *8 (E.D. La. June 29, 2010). Ms. Levitt was one of thousands of former Vioxx users who subsequently filed suit. She alleged that she had experienced heart attacks in 2000 that were caused by Vioxx.

---

[5]   As explained by the American Heart Association: "When the heart muscle is starved for oxygen and nutrients, it is called ischemia. When damage or death of part of the heart muscle occurs as a result of ischemia, it is called a heart attack or myocardial infarction (MI)." Am. Heart Ass'n, *About Heart Attacks*, https://www.heart.org/HEARTORG/ Conditions/HeartAttack/AboutHeartAttacks/About-Heart-Attacks_UCM_002038 _Article.jsp (attached as Ex. M)

When the Resolution Program was announced to settle pending claims alleging MI, stroke or sudden cardiac death (SCD), Ms. Levitt opted *not* to participate.

Under this Court's Order of November 14, 2013, Ms. Levitt was required to designate experts and provide reports pursuant to Fed. R. Civ. P. 26(a)(2) no later than December 13, 2013. (Rec. Doc. 64688.) Ms. Levitt designated five experts, only one of whom suggested that Vioxx could have caused her to have an MI, cardiologist Jay N. Schapira.[6] On page 7 of his report, Dr. Schapira states, "Vioxx is therefore a significant risk factor for her to develop cardiovascular disease as demonstrated by her acute myocardial infarction on March 10, 2000 that required angioplasty." Schapira Report (Ex. I) at 7. After canceling Dr. Schapira's deposition twice, Ms. Levitt's counsel informed Merck's counsel on March 20, 2014, without any explanation, "We have decided to withdraw Dr. Schapira as an expert witness in the Levitt case." *See* Collected Deposition Scheduling Documents at 1 (Mar. 20, 2014 e-mail from S. Hall to J. Williams) (attached as Ex. N).[7] Ms. Levitt's withdrawal of Dr. Schapira leaves Ms. Levitt without any expert opinion that Vioxx caused her to experience an MI.[8]

---

[6] Two experts address damages issues (an economist and a vocational rehabilitation specialist). Two experts address general causation—David Madigan, Ph.D., a statistician, and Dr. David Egilman, an internist with training in preventive occupational medicine and epidemiology. Dr. Egilman's 50-page report (plus additional appendices) largely tracks the prior opinions he previously proffered in Vioxx matters, including opinions on Merck's studies, company conduct, and the label. It also contains approximately seven pages related specifically to Ms. Levitt—six pages that summarize her assumed medical history and one with two opinions, both asserting that Vioxx contributed to her preexisting heart disease. There are no opinions regarding her alleged heart attacks.

[7] Nevertheless, Ms. Levitt has continued to insist that discovery should move forward, repeatedly ignoring Merck's request to clarify how she intends to meet her burden of showing specific causation. By a motion also filed today, Merck seeks a stay of discovery pending the resolution of this motion.

[8] Dr. Schapira was originally scheduled to be deposed on Tuesday, March 4, 2014. On Saturday, March 1, plaintiff's counsel sent an email stating: "*I just got off the phone with Dr Schapira. His clinic practice has been extensive these last few weeks and there are no*

**ARGUMENT**

Ms. Levitt brought this lawsuit alleging that Vioxx caused her to experience two "heart attacks" (or MIs). Compl. ¶ 35; Plaintiff Profile Form, ¶ I.C.1.a, at 2. Her claim fails, however, because she has not provided expert evidence that Vioxx caused her to experience an MI, as she is required to do under Missouri law.[9] In cases involving complex medical injuries, plaintiffs like Ms. Levitt must provide expert evidence on causation to avoid summary judgment. *See In re Trasylol Prod. Liab. Litig.*, No. 08-MD-01928, 2011 WL 7109295, at *10 (S.D. Fla. Feb. 4, 2011) (applying Missouri law to grant summary judgment when no competent expert testimony that the medication caused plaintiff's alleged cardiovascular injury); *In re Baycol Prods. Litig.*, No. 05–2578 (MJD/SRN), 2009 WL 8154265, at *5 (D. Minn. Apr. 8, 2009) (applying Missouri law to grant summary judgment where no competent expert testimony supported claim that Baycol caused injury); *Eppler v. Ciba-Geigy Corp.*, 860 F. Supp. 2d 1391, 1394–95 & n. 3

---

*signs of slowing. He is indicating that he needs to postpone his deposition."* See Collected Deposition Scheduling Documents (Ex. N) at 4 (Mar. 1, 2014 e-mail from D. Thomas to J. Williams) (emphasis added). Subsequently, defense counsel received copies of Dr. Schapira's billing records. Those records showed that the March 1 cancellation was apparently preceded that same day by a 4-hour three-way conference call between Dr. Schapira, plaintiff's counsel, and Dr. Egilman, another plaintiff expert. *Id.* at 9 (Schapira 3/1/2014 invoice entry). The deposition was re-scheduled to occur the afternoon of Tuesday, March 18. On Monday, March 19, defense counsel contacted plaintiff's counsel to inquire as to the latest possible start time for the deposition the next day due to potential travel delays associated with an ongoing snow storm. Defense counsel was informed that Dr. Schapira had actually scheduled patients for the day. *See id.* at 9–11 (Mar. 19, 2014 e-mail chain between S. Hall and E. Horn). Over the next several days, defense counsel repeatedly requested new dates to depose Dr. Schapira. On Thursday, March 22nd, plaintiff's counsel stated that he was scheduled to talk with Dr. Schapira that day and would provide dates by the end of the day. At the end of the day, plaintiff's counsel issued an email withdrawing Dr. Schapira as an expert.

[9]   Ms. Levitt filed this suit in the Western District of Missouri. Thus, Missouri choice-of-law principles apply, and those follow the law of the place of the injury. *In re Trasylol Prod. Liab. Litig.*, 2011 WL 7109295, at *10 (applying Missouri law to St. Louis resident's claimed injuries that occurred in Missouri).

(W.D. Mo. 1994) (requiring expert medical causation testimony in pharmaceuticials product liability case); *see also Brickey v. Concerned Care of Midwest, Inc.*, 988 S.W.2d 592, 596 (Mo. App. Ct. 1999) (requiring expert causation evidence for "sophisticated injury, requiring surgical intervention or other highly scientific technique for diagnosis, [because] proof of causation is not within a lay person's understanding"); *Kipp v. Nordyne, Inc.*, 969 S.W.2d 236, 241 (Mo. App. Ct. 1998) ("If medical causation is not within common knowledge or experience, however, . . . an injury may be of such a nature that expert opinion is essential to show that it was caused by the accident to which it is ascribed.").[10]  Because Ms. Levitt has withdrawn the only expert who was designated to opine on whether Vioxx caused her to experience an MI, summary judgment should be entered on all claims.

**CONCLUSION**

For the foregoing reasons, Merck respectfully requests that this Court grant summary judgment on all claims.

---

[10]  This fundamental principle is not unique to Missouri. *See,e.g.*, *Autery v. GlaxoSmithKline, L.L.C.*, 496 F. App'x 388, 389 (5th Cir. 2012) (per curiam) (granting summary judgment in pharmaceuticals product liability case under Louisiana law when plaintiff failed to produce expert causation evidence); *Rhodes v. Bayer Healthcare Pharm. Inc.*, Civ. A. No. 10-1695, 2013 WL 1282450, at *2 (W.D. La. Mar. 28, 2013) (The medical causation issues presented in this case . . . [are] a matter beyond the common knowledge of a lay person; thus, expert evidence is required in order for Plaintiffs' case to survive."); *Kimble v. Danek Med., Inc.*, No. Civ. A. H-96-3855, 2000 WL 1468675, at *3 (S.D. Tex. Sept. 10, 2000) ("In this case, because the effect of the implantation of a TSRH device during spinal fusion surgery is not "a matter of common knowledge or within the experience of a layperson, expert testimony is required on the issues of medical causation." (internal citations and alterations omitted)).

Dated:  March 28, 2014

Respectfully submitted,

By: */s/ Dorothy H. Wimberly*
    Phillip A. Wittmann, 13625
    Dorothy H. Wimberly, 18509
    STONE PIGMAN WALTHER
    WITTMANN L.L.C.
    546 Carondelet Street
    New Orleans, Louisiana 70130
    Phone: 504-581-3200
    Fax:    504-581-3361

Defendants' Liaison Counsel

—and—

    Douglas R. Marvin
    M. Elaine Horn
    Jonathan L. Williams
    WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, N.W.
    Washington, D.C. 20005
    Phone: 202-434-5000
    Fax:    202-434-5029

Attorneys for Merck Sharp & Dohme Corp.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Motion for Summary Judgment and Incorporated Memorandum of Law has been served on Liaison Counsel, Russ Herman, Ann B. Oldfather, and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 28th day of March, 2014.

                                                 */s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

1154928v1