From: "Joseph L. Doherty, Jr." <jdoherty@jdohertylaw.com>
Subject: Vioxx Conference Yesterday
Date: Tue, Oct 21, 2008 10:48:09 PM
To: <mayer@hugheshubbard.com>

Ted,

I enjoyed meeting you in person yesterday. I was astounded to learn that Jean Mayer was your Dad. I remember citing portions of an article by him in a paper I wrote during my junior or senior year at Colby, (either relating to the Civil War, to economics, or to world hunger - I forget which paper it was). If I ever find the paper in one of the many boxes in my cellar, I will send you a copy. Growing up in Medford, MA, I remember him as an extraordinary person and an extremely well respected President at Tufts.

I have reviewed the two amendments to the Master Settlement Agreement (January, 2008, and February, 2008). However, I have not been able to locate the specific provision that you confirmed yesterday, which addresses the fact that EI payments are **not** limited to the time period from Dr. Isner's death to the date of the settlement on 11/09/07.

Would you please let me know where I can find the specific language that establishes the right to EI payments for **both past and future** lost earnings through to the end of Dr. Isner's work-life expectancy? Was there a more recent amendment, (which I could not locate), after February, 2008, or was the issue addresed in the original settlement agreement?

If the issue was resolved in the original agreement, why did you not mention this fact to me during our earlier discussions in August, or during our intial discussions yesterday, when it was clear that I was operating under the incorrect assumption that EI damages would be capped as of the date of the proposed settlement agreement in November, 2007.

Obviously, if Linda Isner will actually be entitled to recover dollar-for-dollar EI damages for all lost wages through the end of her husband's work-like expectancy, that would change our evaluation of the potential settlement amount substantially, and it might bring her "into the fold", so to speak.

Before I can advise her further, I need specific confirmation of the fact that she will, in fact, be entitled to recover lost earings by Dr. Isner throughout his entire work-life expectancy, from the date of his death, October 31, 2001, through the end of his work-life expectancy at age 70. (Or age 67? Or age 65? - whichever end-point Brown Greer intends to utilize).

Please get back to me as soon as possible. Time is obviously running short.


Thanks,
Joe


Joseph L. Doherty, Jr.
Doherty & Quill

225 Franklin Street - 26th Floor
Boston, Massachusetts 02110
(617) 217-2837
(617) 217-2001 (fax)



From: "Mayer, Ted" <mayer@hugheshubbard.com>
Subject: Vioxx Conference --Confidential Settlement communication
Date: Wed, Oct 22, 2008 05:28:47 PM
To: "Joseph L. Doherty, Jr."<jdoherty@jdohertylaw.com>

Joe :

I enjoyed meeting you as well, and special thanks to Mrs. Isner for making the trip. Thanks also for the kind words about my Dad.

The provision to which Chris Seeger and I were referring is Section 4.2.6, as amended, which reads "Each Qualifying Program Claimant that is eligible for, and properly and timely applies for an EI payment shall (Subject to 4.2.8 and to all other terms and conditions of this Agreement) receive an EI payment according to criteria to be determined by the Claims Administrator. EI Payments are in addition to the Final Settlement Payments pursuant to Section 4.3." Under this provision, there is no individual cap on awards, nor are awards for qualifying claims limited to past lost earnings. The only cap on awards is the aggregate cap referred to in Section 4.2.8, which provides for proration in the event the aggregation of individual MI EI awards exceeds the MI EI Payment Cap Amount of $195 million. I have confirmed with Brown Greer that it agrees with this interpretation.

I did walk you through this provision in one of our prior calls, and I had left that prior call believing that your principal continuing concern was the uncertainty regarding the likely extent of proration under the Agreement. If I didn't make the intended meaning of the provision clear in that call, I have myself to blame. On Monday, I did not realize that you continued to interpret the Agreement as prohibiting recovery for future lost wages until you spoke during our meeting with Judge Corodemus; before I had the opportunity to address that point, Judge Corodemus asked Sean and me to step out. In any case, I am glad we are discussing the issue now.

As you know, Brown Greer has not yet established all the criteria for EI awards. What can be said with certainty is that for an otherwise qualifying claim, future earnings will be awarded without a cap, up to an age cutoff (which they have told me will be no lower than 65). The awards will be dollar for dollar subject to 1 ) disability benefits, which would not apply in a death case such as this, 2) I believe, discount to present value as of the payment date (i.e., the assumed date for final payments under the Program) for that portion of the award that is attributable to the period after that assumed payment date, and 3) any proration that may prove necessary under Section 4.2.8.

I hope that this is helpful to you and provides comfort that Mrs. Isner will be fairly treated in the Program. The process does not allow prediction of the recovery amount with precision, but certainly provides vastly more certainty, more speed, and less stress than a return to the tort system with all elements of the claim at issue.

Joe, please feel free to call or email if you have further questions.

With best regards,

Ted Mayer

---

**From:** Joseph L. Doherty, Jr. [mailto:jdoherty@jdohertylaw.com]
**Sent:** Tuesday, October 21, 2008 10:48 PM
**To:** Mayer, Ted
**Subject:** Vioxx Conference Yesterday

Ted,

    I enjoyed meeting you in person yesterday. I was astounded to learn that Jean Mayer

was your Dad. I remember citing portions of an article by him in a paper I wrote during my junior or senior year at Colby, (either relating to the Civil War, to economics, or to world hunger - I forget which paper it was). If I ever find the paper in one of the many boxes in my cellar, I will send you a copy. Growing up in Medford, MA, I remember him as an extraordinary person and an extremely well respected President at Tufts.

I have reviewed the two amendments to the Master Settlement Agreement (January, 2008, and February, 2008). However, I have not been able to locate the specific provision that you confirmed yesterday, which addresses the fact that EI payments are **not** limited to the time period from Dr. Isner's death to the date of the settlement on 11/09/07.

Would you please let me know where I can find the specific language that establishes the right to EI payments for **both past and future** lost earnings through to the end of Dr. Isner's work-life expectancy? Was there a more recent amendment, (which I could not locate), after February, 2008, or was the issue addresed in the original settlement agreement?

If the issue was resolved in the original agreement, why did you not mention this fact to me during our earlier discussions in August, or during our intial discussions yesterday, when it was clear that I was operating under the incorrect assumption that EI damages would be capped as of the date of the proposed settlement agreement in November, 2007.

Obviously, if Linda Isner will actually be entitled to recover dollar-for-dollar EI damages for all lost wages through the end of her husband's work-like expectancy, that would change our evaluation of the potential settlement amount substantially, and it might bring her "into the fold", so to speak.

Before I can advise her further, I need specific confirmation of the fact that she will, in fact, be entitled to recover lost earings by Dr. Isner throughout his entire work-life expectancy, from the date of his death, October 31, 2001, through the end of his work-life expectancy at age 70. (Or age 67? Or age 65? - whichever end-point Brown Greer intends to utilize).

Please get back to me as soon as possible. Time is obviously running short.


Thanks,
Joe


Joseph L. Doherty, Jr.
Doherty & Quill
225 Franklin Street - 26th Floor
Boston, Massachusetts 02110
(617) 217-2837
(617) 217-2001 (fax)


*********************************************************************
This email and any files transmitted with it may contain privileged or confidential information.

Use, disclosure, copying or distribution of this message by anyone other than the intended recipient is strictly prohibited. If you have received this email in error please notify the sender by reply email and destroy all copies of this message in your possession, custody or control. ***********************************************************************

**From:** "Mayer, Ted" <mayer@hugheshubbard.com>
**Subject:** Isner--Confidential Settlement Communication
**Date:** Thu, Oct 23, 2008 09:12:22 AM
**To:** "Joseph L. Doherty, Jr."<jdoherty@jdohertylaw.com>

Joe:

Let me address these on a confidential basis, to the extent we have information. The information that follows is not official in any way, but I will give you my best shot at the questions for what it may be worth to you in your deliberations with your client.

1, 3, 4. The number of claims that are eligible because they alleged either MI or SCD is a moving target because we continue to receive dismissals from claimants who have concluded they cannot make out a case. I would estimate that the number as of the October 30 final enrollment deadline will be somewhere in the range of 30, 750. The number of opt-ins is also a moving target, as we have a number of claims that are still in the process of completing enrollment. Well over 30,000 have initiated or completed enrollment, and we expect that at the deadline we will be well in excess of 99 percent.

I do not have separately broken-out information on MI death enrollments, but perhaps we can get to some relevant data points another way:

First, keep in mind that the claims receiving point awards are a subset of total enrolled claims, since many claims fail one or more gates.. The agreement allows Merck to push through the gates, following Gate Committee review, sufficient claims (MI and stroke combined) such that total gate passages would equal 70% + 2500. This would work out to roughly 75% gate passages if all pushes were used, which is not mandatory.

Second, of the point awards issued to date--which are all MI or SCD claims-- a little over 7 % are Injury Level 1 or death; i.e.. a little over 7% of claims that have passed the gates and have been evaluated for points have death as an injury. That number may move around because this is still early days, but I know of no reason to assume that the first claims in the queue were of lower average injury severity than the general run of plaintiff firm inventories.

2, 5. I do not have aggregate information on claimant ages. I don't think there is in place any system that tracks this on an aggregate basis, but in case I am wrong will look into whether BG has any information of this kind that can be shared.

6, 7. I have not seen any report on this. Again, I will look into whether BG can compile information of this kind that could be useful..

---

**From:** Joseph L. Doherty, Jr. [mailto:jdoherty@jdohertylaw.com]
**Sent:** Thursday, October 23, 2008 12:29 AM
**To:** Mayer, Ted
**Subject:** Re: Vioxx Conference --Confidential Settlement communication

Ted,

Thank you for getting back to me. I had a long telephone conference with Orran Brown this afternoon. We resolved several issues, but we acknowledged that there were also many issues that involved "un-knowable" factors, at this time, which will not be resolved prior to October 30th.

For example, Orran confirmed, (as you similarly confirmed in your e-mail today), that the issue of whether EI damages will include **all** lost earnings/lost earing capacity throughout Dr.

Isner's full work-life expectancy, (rather than from the date of his death up to the date of the settlement agreement). Orran stated that although the complete criteria for allocating EI damages has not as yet been finalized or reduced to writing, this specific criteria, governing past as well as future lost earing capacity, has been conclusively established, in view of the fact that Merck, the Plainitiffs' committee and Brown Greer all agree that the language of Section 4.2.6 mandates such an interpretation. As Orran stated succinctly today: "You have Merck saying 'that is the way it is to be read'. You have the Plaintiffs' team saying 'that is the way it is to be read'. And you have BrownGreer saying 'that is the way it is to be read'. That's all you need".

In order for me to conduct a more complete analysis of the various "un-known" factors, I would truly appreciate receiving as much information, (as soon as possible), concerning the following questions:

1. How many overall eligible claims were presented on behalf of decedents who died from MI's or Sudden Cardiac Death and how many of them have, as of this time, opted into the settlement?

2. What were the ages of those decedents at the times of their deaths?

3. How many total MI (non-death) plaintiffs were eligible for the settlement?

4. How many of them have opted in, opted out or are still undecided?

5, What were the ages of those plaintiffs at the time of their MI's?

6. How many MI death claimants have claimed and/or are eligible for for EI damages?

7. How many MI non-death claimants have claimed and/or are eligible for for EI damages?

My guess is that you have spread sheets anyalyzing all of the information requested above. I will agree to absolute confidentiality concerning any information you provide in relation to these questions. If I can obtain this information, I will be able to prepare some reasonable extrapolations as to the likelihood of exceeding the $195 million global cap on EI damage awards and I can provide better estimates as to the range of potential amounts Mrs. Isner would be likely to receive if she were to agree to the settlement.

Thanks,

Joe

P.S I apologize if you felt I was being critical in my last e-mail, concerning the fact that we had a misunderstading as to whether EI damages were or were not capped as of the date of the settlement. It was as much my over-sight as it was yours that we did not address and clarify the issue sooner than ten days prior to the deadline. That being said, we now have only 7-8 days left. I promise to be a pain in the neck to you, sending daily e-mails and asking all sorts of complicated questions, in the hope that I can obtain enough information before October 30th to provide my client with all of the specific established facts as well as a best case/worst case analysis of theunknown/unknowable facts. If I can make

the "un-knowable" at least somewhat more predictable, I will be in a better position to make informed recommendations to Mrs. Isner and she will be in a better position to make an informed decision as to whether she will opt in or opt out of the proposed settlement,

2001 (fax)
**********************************************************************

This email and any files transmitted with it may contain privileged or confidential information. Use, disclosure, copying or distribution of this message by anyone other than the intended recipient is strictly prohibited. If you have received this email in error please notify the sender by reply email and destroy all copies of this message in your possession, custody or control. **********************************************************************