IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX<br>PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO<br>ALL CASES | MDL NO. 1657<br><br>SECTION: L<br><br>JUDGE FALLON |

**MEMORANDUM IN SUPPORT OF MERCK'S
MOTION FOR SANCTIONS AGAINST DR. DAVID EGILMAN**

Defendant Merck Sharp & Dohme Corp. ("Merck") respectfully moves the Court to impose sanctions against Dr. David Egilman for violating Pretrial Order No. 13 ("PTO 13" or the "Protective Order"). Dr. Egilman, an expert witness retained by the states with actions pending against Merck in this multidistrict litigation ("MDL") proceeding, recently made several statements to a reporter from the *Wall Street Journal*, purporting to summarize the content of documents covered by this Court's Protective Order. These statements were made public in a blog on the *Wall Street Journal*'s website, resulting in a clear breach of the terms of this Court's Order, which binds Dr. Egilman and the other retained experts who have received confidential information by virtue of their participation in the Vioxx MDL proceeding. Dr. Egilman's brazen conduct undermines the purpose of protective orders, which "serve essential functions in civil adjudications, including the protection of the parties' privacy and property rights." *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 414 (E.D.N.Y. 2007), *aff'd sub nom.*, *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 192 (2d Cir. 2010).

Dr. Egilman should be sanctioned for his improper disclosure. His conduct has made it clear that he does not respect this Court's authority to make the conclusive determination as to what can and cannot be made public under the terms of its Protective Order. And his latest disclosure continues a pattern of similar conduct for which he has previously been sanctioned by

1155772v1

two different courts. In order to stop this pattern of behavior and protect Merck's confidential documents, the Court should order Dr. Egilman to return all confidential information that he has received under this Court's Protective Order and enter monetary sanctions against him.

## FACTUAL BACKGROUND

Over the course of this MDL proceeding, which has now been pending for nine years, Merck has produced millions of pages of documents to plaintiffs. *See generally, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 869 F. Supp. 2d 719, 721 (E.D. La. 2012). Many of these documents have contained sensitive information that Merck has sought to keep confidential. On May 24, 2005, the Court issued a protective order (the "Protective Order") to "facilitate a timely and efficient discovery process" in the Vioxx MDL proceeding while addressing the confidentiality concerns of all parties. (PTO 13 (attached as Ex. 1).) PTO 13 "govern[s] all documents, the information contained therein, and all other information produced or disclosed during th[e] [MDL] Action whether revealed in a document, deposition, other testimony, discovery response or otherwise, by any party in this Action[.]" (*Id.* ¶ 1.) Under PTO 13, "[a] party . . . may designate as Confidential Information any document or information produced by or testimony given by any other person or entity that the party reasonably believes qualifies as such party's Confidential Information pursuant to th[e] Protective Order." (*Id.* ¶ 9.) The order further provides that a party to the Vioxx litigation who receives confidential information "may show and deliver Confidential Information" to "any outside consultant or expert whether formally retained or not" – as long as the expert reads and agrees to be bound by the Protective Order's terms. (*Id.* ¶¶ 10, 12.) Under the order, confidential information must be used "only in connection with this Action or an action in which the Receiving Party is permitted by this Order to use Confidential Information," and any Receiving Party who "learns of any unauthorized disclosure" must "immediately . . . inform the Supplying Party of all pertinent facts relating to such disclosure and

[ ] make all reasonable efforts to prevent disclosure by each unauthorized person who received such information." (*Id.* ¶¶ 14, 19.)

For most of the litigation, the parties have been able to resolve confidentiality disputes without enlisting the Court's aid.  Recently, however, Dr. Egilman has sought to challenge the confidential status of vast swaths of documents.  Dr. Egilman first took his crusade to the state court in Franklin County, Kentucky, even though the only Vioxx matter pending in that court had already settled.  Over the last few months, Dr. Egilman has sought de-designation of an ever-shifting range of documents in that proceeding, many of which Dr. Egilman has refused to identify with specificity.  Merck requested and was granted more time to respond to Dr. Egilman's challenges after it advised the Kentucky court that it could not ascertain the documents Dr. Egilman has targeted in light of his refusal to clarify the scope of his requests.  (*See* Order, *Commonwealth of Ky. v. Merck & Co.*, No. 09-CI-1671, Mar. 20, 2014 (attached as Ex. 2).)

Because many of the documents for which Dr. Egilman seeks de-designation are covered not only by the protective order in Kentucky but also by this Court's PTO 13, Merck previously brought Dr. Egilman's efforts to the Court's attention, leading to the hearing before the Court on February 28, 2014.  At that hearing, the Court made clear that, while it would not interfere with Dr. Egilman's efforts in Kentucky, any information designated as confidential in this MDL proceeding cannot be disclosed unless and until this Court determines that such information is not confidential.  (MDL Hr'g Tr. 18:3-20:10 (attached as Ex. 3).)  The Kentucky court has similarly recognized that both courts need to make their own determinations, and that one court's determination would not be binding on the other.  (Ky. Mar. 5, 2014 Hr'g Tr. 37:2-38:6 (attached as Ex. 4).)

1155772v1

In the past month, Dr. Egilman has become increasingly aggressive in his position with respect to confidential information. As Merck recently detailed in a letter to the Court, Dr. Egilman recently threatened to unilaterally disclose confidential depositions without waiting for a court order, arguing in an e-mail to Merck's counsel, Andrew Goldman, that his deposition in the AG cases is not confidential because "I think thirty days have passed since my deposition was provided to you," and "you have not followed up with a letter designating portions of the deposition or attached exhibits confidential." (E-mail from David Egilman to Andrew Goldman, Mar. 14, 2014 (attached as Ex. 5).) Dr. Egilman concluded that he "consider[s] the material to be public." (*Id.*) After further exchanges between Dr. Egilman and Mr. Goldman, Dr. Egilman flatly asserted that "none of my deposition testimony is confidential and no exhibits are confidential," and "[i]f you think otherwise, I suggest that you seek guidance from the Court." (E-mail from David Egilman to Andrew Goldman, Mar. 20, 2014 (attached as Ex. 6); *see also* Letter from John Beisner to Hon. Eldon Fallon, Mar. 25, 2014 (attached as Ex. 7).)

Merck also recently learned of an article posted on the *Wall Street Journal* website featuring direct quotes from Dr. Egilman purporting to describe confidential Vioxx documents, including the following:

- "In general, there's information on the toxicity of [Vioxx] that's not been previously published by Merck and there is information that Merck published that misrepresents the health effects of the drug."

- The Vioxx documents "provide new information on the health hazards of the drug and evidence of fraud in the conduct of the studies."

- "I've been able to see documents few others have."

See Ed Silverman, *More Disclosure Coming in Merck's Decade-Long Vioxx Nightmare*, Mar. 26, 2014, http://blogs.wsj.com/corporate-intelligence/2014/03/26/more-disclosure-coming-in-mercks-decade-long-vioxx-nightmare (attached as Ex. 8).

1155772v1

Notably, this is not Dr. Egilman's first foray into unauthorized disclosure of confidential information. As the recent *Wall Street Journal* article highlights, Dr. Egilman agreed to pay Eli Lilly $100,000 after leaking to the press confidential documents regarding Zyprexa back in 2007. *See* Silverman, *supra*. In that case, Judge Weinstein, who was presiding over the *Zyprexa* MDL proceeding, ordered Dr. Egilman to return all confidential documents to Eli Lilly after finding that Dr. Egilman had "deliberately thwarted a federal court's power to effectively conduct civil litigation." *Zyprexa*, 474 F. Supp. 2d at 395; *Eli Lilly*, 617 F.3d at 192 ("[T]he record is unequivocal that Gottstein schemed with Egilman to bypass the protective order and, in fact, aided and abetted the latter's violation of the same."); *see also Kuiper v. Givaudan, Inc.*, No. C06-4009-MWB, 2009 U.S. Dist. LEXIS 9157, at *26 (N.D. Iowa Feb. 6, 2009) (noting that Dr. Egilman had been sanctioned in a state court proceeding, where "the trial court found Dr. Egilman 'knowingly, deliberately, intentionally and willfully' violated a previous order of that court prohibiting certain extrajudicial statements") (quoting *Ballinger v. Brush Wellman*, No. 96-CV-2532 (Colo. Dist. Ct. Jefferson Cnty., June 21, 2001)).[1]

## ARGUMENT

The Court should impose sanctions on Dr. Egilman because Dr. Egilman's remarks to the *Wall Street Journal* constitute a clear breach of PTO 13 and because Dr. Egilman's prior statements and conduct in this and other proceedings make clear that nothing short of sanctions will deter his conduct. Such sanctions should include the return of all confidential documents to

---

[1] On appeal, the Colorado Court of Appeals vacated the ruling. *See Egilman v. District Court*, First Judicial District, No. 01CA1982 (Colo. App. Sept. 5, 2002) (attached as Ex. 9). However, it did so *only* because the trial court issued the sanctions order without providing Dr. Egilman with sufficient notice prior to entering the sanction. *Id.* at 3-5. The appellate court did not question the trial court's conclusion that Dr. Egilman had violated its order; nor did it vacate the portion of the trial court's order striking Dr. Egilman's testimony on the same grounds. *See id.* at 5; *see also generally* Findings, Conclusions, & Orders Concerning Sanctions, *Ballinger v. Brush Wellman Inc.*, No. 96-CV-2532 (Colo. Dist. Ct. Jefferson Cnty., June 22, 2001) (attached as Ex. 10). Counsel for Merck obtained the *Ballinger* rulings from the Northern District of Iowa's docket in *Kuiper v. Givaudan*, cited above.

Merck and the payment of reasonable costs necessary to compensate Merck for the preparation of its motion.

## I. DR. EGILMAN VIOLATED THE PROTECTIVE ORDER IN THIS CASE.

There can be no doubt that Dr. Egilman's recent behavior violated the Court's PTO 13. A disclosure violates a protective order even if it is indirect – i.e., where it purports to summarize or be based on a confidential document rather than revealing the document itself. *See, e.g.*, *Nevil v. Ford Motor Co.*, No. CV 294-015, 1999 U.S. Dist. LEXIS 23222, at *10-11 (S.D. Ga. Dec. 23, 1999) (finding that general references to confidential documents in a deposition violated protective order); *Pyramid Real Estate Servs., LLC v. United States*, 95 Fed. Cl. 613, 621-22 (Fed. Cl. 2010) ("The court . . . takes . . . [c]ounsel at his word" that "'[he] did not disclose specific source selection information with [his] client.'" "However, the use by . . . [c]ounsel of the protected information to advise his client to bring a separate civil action outside of this litigation was improper, regardless of whether Counsel revealed the protected information he used to arrive at his conclusion.") (citation omitted). Indeed, even the act of disclosing that one's opinions are based on protected documents suffices to establish a violation. *See Nevil*, 1999 U.S. Dist. LEXIS 23222, at *10 ("Assertions that this evidence came from specific General Tire documents violate[d] the terms of the Protective Order.").

In *Nevil*, for example, the court sanctioned a plaintiff's expert in a product-liability suit against General Tire, a tire manufacturer, for improperly disclosing confidential information after the case settled. *Id.* at *2. Prior to settlement, the *Nevil* court had approved a protective order that "restricted the use and dissemination of confidential and proprietary information." *Id.* The expert signed an acknowledgment of that order. *Id.* After settlement, however, General Tire learned that the expert disclosed confidential information obtained in the *Nevil* suit in depositions in two other lawsuits. *Id.* at *4-5. Although the expert had not actually revealed the documents

containing the confidential information or quoted them verbatim, he did make clear that his opinions in the two other lawsuits had been informed by that information.  In the first suit, he acknowledged that he had relied on "manufacturing and design documents" that had been "deemed confidential or protected" in other cases, including in the *Nevil* case, as "background information."  *Id.*  The expert explained that the protected materials were helpful in that they "show[ed] some of the design processes" that companies like General Tire "have gone through," noting that General Tire designed a "series of tires" featuring a "zero-degree belt" that were used to "control separation problems" in its plants.  *Id.* at *5-6.  He also stated that the confidential information "support[ed]" his opinions that "there was a contamination issue" and "design issue" plaguing zero-degree belt tires generally.  *Id.* at *7.  In the second deposition identified by General Tire, the expert was asked to describe studies comparing certain types of tires.  *Id.* at *9.  The expert answered by stating that he had "seen the results of that in some of the papers that [he] had] seen under protective order," including the General Tire documents.  *Id.*

     Based on this testimony, General Tire moved for sanctions, arguing that the expert had violated the protective order.  The expert disagreed that he had violated the order, arguing that he "merely disclosed the existence of General Tire documents without disclosing their substance," and that, in any event, much of the information was already within the public domain.  *Id.* at *10.  The court rejected the expert's arguments, explaining that in both of the depositions, the expert "disclose[d] specific information contained in General Tire studies."  *Id.*  According to the court, the fact that some of the information was part of the public record did not matter because the expert testified that he learned the information from confidential General Tire documents.  *Id.*  "Assertions that this evidence came from specific General Tire documents violate[d] the terms of the Protective Order."  *Id.*

1155772v1

The same logic applies here. As set forth above, Dr. Egilman offered his characterization of confidential Vioxx information to the *Wall Street Journal*, resulting in an article titled *More Disclosure Coming in Merck's Decade-Long Vioxx Nightmare*. The article quotes Dr. Egilman as stating that "[i]n general, there's information on the toxicity of the drug that's not been previously published by Merck and there is information that Merck published that misrepresents the health effects of the drug." Silverman, *supra*. According to Dr. Egilman, confidential Vioxx documents "provide new information on the health hazards of the drug and evidence of fraud in the conduct of the studies." *Id.* The article also features a boast by Dr. Egilman that he has "been able to see documents few others have." *Id.*

Dr. Egilman's conduct here is far more egregious than the expert's behavior in *Nevil*. After all, in *Nevil*, the expert divulged confidential information in response to direct deposition questions, whereas here, Dr. Egilman sought out media coverage to bring attention to his access to confidential Merck documents. In so doing, Dr. Egilman "disclose[d] **specific** information contained in" Merck documents that are protected by PTO 13. *Nevil*, 1999 U.S. Dist. LEXIS 23222, at *10 (emphasis added). Moreover, Dr. Egilman claimed that the Vioxx documents that "few others have" seen "provide **new** information on the health hazards of the drug and evidence of fraud in the conduct of the studies." Silverman, *supra* (emphasis added). These statements are particularly prejudicial to Merck because the Company lacks any effective means of rebutting Dr. Egilman's statements in the public forum without discussing the very documents it seeks to keep confidential. *See Zyprexa*, 474 F. Supp. 2d at 425 ("The harm faced by Lilly is amplified by the fact that the protected documents which respondents seek to disseminate are segments of a large body of information, whose selective and out-of-context disclosure may lead

8

to . . . undeserved reputational harm . . . ."). In short, Dr. Egilman's disclosure of confidential Vioxx documents plainly violated the Protective Order in this case.

## II. THE COURT SHOULD IMPOSE SANCTIONS ON DR. EGILMAN.

Sanctions are necessary and appropriate in this case because Dr. Egilman's conduct in disseminating confidential Vioxx information was particularly egregious and because he is a repeat violator of court orders, making it all the more likely that future violations will occur absent robust sanctions. Specifically, the Court should: (1) require Dr. Egilman to return all confidential documents to which he has been given access in this litigation; and (2) compensate Merck for the expense of filing this motion.

The Supreme Court has recognized that "'[t]he power of a court to make an order carries with it the equal power to punish for a disobedience of that order.'" *United States v. Barnett*, 376 U.S. 681, 697 (1964) (quoting *In re Debs*, 158 U.S. 564, 594 (1895)); *see also In re Lafayette Radio Elecs. Corp.*, 761 F.2d 84, 93 (2d Cir. 1985) ("ancillary jurisdiction is recognized as part of a court's inherent power to prevent its judgments and orders from being ignored or avoided with impunity"); Fed. R. Civ. P. 37(b) (authorizing entry of any "just" order, including an order of contempt, for failure to obey the Court's discovery orders). The power to sanction "is a necessary prerequisite to the administration of justice; without it, courts would be ill-equipped to ensure the rule of law in a democratic society." *Zyprexa*, 474 F. Supp. 2d at 417-18. Notably, "[a] person who is not a party to a proceeding may be held in contempt if he or she has actual knowledge of a court's order and either abets the [party] or is legally identified with him." *Quinter v. Volkswagen of Am.*, 676 F.2d 969, 972 (3d Cir. 1982). Thus, courts routinely enforce protective orders that are violated by experts and other non-parties through the imposition of sanctions. *Zyprexa*, 474 F. Supp. 2d at 414.

1155772v1

The circumstances here strongly support sanctioning Dr. Egilman by requiring him to return all confidential information to which he has obtained access in this litigation.  Dr. Egilman's conduct was not an innocent, inadvertent disclosure of confidential information.  To the contrary, he purposely leaked his views of information that he acknowledged was confidential to a journalist in order to garner publicity for his views regarding Merck.  Lest there be any doubt that this was an isolated incident, Dr. Egilman's prior skirmishes in other cases regarding court orders make clear that it was not.  As noted above, Dr. Egilman has previously leaked confidential information to the press, resulting in sanctions by Judge Weinstein.  *See Zyprexa*, 474 F. Supp. 2d at 395-97.  Dr. Egilman's status as a repeat violator of protective orders only underscores the need for substantial sanctions in this case.  *See Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488-90 (5th Cir. 2012) (affirming award of sanctions where attorney had willfully violated a protective order in another case involving the same defendant).  And Dr. Egilman's relentless effort to obtain de-designation of Merck's documents in multiple courts simply highlights his overarching goal:  to attack Merck in the media using confidential documents to which he obtained access for the limited purpose of providing expert opinions.  The simplest way to prevent him from doing so is to require the return of all confidential documents in this litigation.  *See Zyprexa*, 474 F. Supp. 2d at 422-27 (ordering Dr. Egilman and others to return confidential documents and enjoining further dissemination of documents after finding that Dr. Egilman violated protective order); *Nevil*, 1999 U.S. Dist. LEXIS 23222, at *11 (imposing a series of "minimal" sanctions, including an order requiring the expert to return all confidential materials subject to the protective order and barring him from "showing, discussing, or divulging" any confidential materials obtained from General Tire that would violate the protective order).

1155772v1

In addition, the Court should impose monetary sanctions on Dr. Egilman for the trouble he has caused Merck by virtue of his conduct, as other courts have done in similar circumstances. *See, e.g.*, *Quinter*, 676 F.2d at 974-75 (remanding to determine appropriate fine to impose for civil contempt as sanction for expert's violation of protective order); *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 223-24 (7th Cir. 1992) (affirming dismissal of case and award of legal fees and costs to defendant as sanctions where "conduct of [plaintiff's] experts and attorneys clearly transgressed the court's protective order" when expert engaged in *ex parte* inspection of evidence and plaintiff actively concealed this fact from the court).  Monetary sanctions are appropriate because they will help to "deter future violations of protective orders" by Dr. Egilman "and to reflect the seriousness of such orders." *Smith & Fuller*, 685 F.3d at 487-90 (affirming imposition of monetary sanctions against plaintiff's counsel for inadvertent disclosure of confidential documents in violation of protective order).  As set forth above, Dr. Egilman has violated confidentiality orders in other litigation and did so here with full knowledge that the information he was describing was confidential.  He has also forced Merck to defend its confidential documents in multiple courts at the same time, while barraging the Company with multiple, inconsistent and ambiguous requests that have made it virtually impossible to respond to or address his purported concerns.  At the very least, Dr. Egilman should be forced to pay for Merck's efforts in protecting its confidential information in this proceeding.

## CONCLUSION

For the foregoing reasons, the Court should find that Dr. Egilman violated PTO 13, order Dr. Egilman to return any and all materials governed by the Protective Order and impose monetary sanctions to compensate Merck for its efforts in bringing this motion.

Dated: April 4, 2014							Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005

John H. Beisner
Jessica Davidson Miller
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005

ATTORNEYS FOR MERCK SHARP & DOHME CORP.

## **CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing Brief in Support of Motion for Sanctions has been served on Liaison Counsel, Russ Herman, Ann B. Oldfather, and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, on Dr. Egilman via e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(C), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 4th day of April, 2014.

          */s/ Dorothy H. Wimberly*
          Dorothy H. Wimberly, 18509
          STONE PIGMAN WALTHER
          WITTMANN L.L.C.
          546 Carondelet Street
          New Orleans, Louisiana  70130
          Phone:  504-581-3200
          Fax:     504-581-3361
          dwimberly@stonepigman.com

          Defendants' Liaison Counsel

1155772v1