UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX Products Liability Litigation | * | MDL No. 1657 |
| This Document Relates to: | * | SECTION L |
| State of Utah v. Merck, et al. | * | JUDGE ELDON E. FALLON |
| | * | MAGISTRATE JUDGE KNOWLES |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF, STATE OF UTAH'S MOTION IN OPPOSITION TO CONTEMPT CITATION**

In this case, Dr. Egilman has been designated as an expert witness for Utah Medicaid as well as for other states. Any sanction or loss of access to the documentary record entered against Dr. Egilman would have serious consequences for the States. At the very least, Merck would use it in cross-examination. Nevertheless, Utah was not served with the motion. Merck has not copied Utah counsel on its letters to the Court.

Utah takes this opportunity to respond and protect its rights to a fair trial. It seems axiomatic but when Utah obtains documents from sources other than discovery, those separately obtained documents are not subject to the Court's Confidentiality Order. This axiom seems even more compelling when it was Merck that put documents into the public domain by filing on the internet. As discussed below, Merck filed a 1400 page discussion of the relevant documents on its internet site. The report, prepared for Merck by Judge John Martin in 2006 ("Martin Report")

1

was an intensive review of Merck documents with Merck's preferred analysis.

This motion is directed solely at Merck's disclosure of documents Merck now claims to be confidential. It therefore is not a repeat of the argument made by the PSC which resulted in *In re Vioxx Products Liability Litigation,* 2007 WL 854251 (E.D. La March 6, 2007). *See* Exhibit A, attached hereto. Utah does not seek discovery of anything related to the creation of the Martin Report, including witness statements, prior drafts, or communications with counsel. Utah accepts the Court's determination that the Martin Report was created in anticipation of litigation. We do not seek the deposition of Mr. Martin. However, we claim the right to open discussion of the documents included by Mr. Martin despite Merck's claims of confidentiality. Those claims have been waived through publication of the documents. The issue of waiver of claimed confidentiality of Merck documents was never before the Court.

In creating the Report, Mr. Martin and his associates photocopied, quoted, paraphrased and otherwise published the contents of the documents that Merck now claim confidential. The sum and substance of this opposition is that once Merck publicized the contents of bates numbered documents, those documents no longer are confidential. They are in the public discourse. Waiver of confidentiality is not a novel concept. The privilege for any communication is waived by public disclosure of the contents of the specified documents. Some of the hundreds of examples of the disclosure of confidential documents are set out.

**Example A**

Looking at the Martin Report, Appendix D, page 47 we find the following.

"On January 20, 2000, Dr. Beth Seidenberg convened a meeting to discuss:

- The Data Safety and Monitoring Board's request regarding the adjudicated cardiovascular even analysis.

- Whether the adjudicated cardiovascular event analysis (as opposed to unadjudicated data such as would be submitted for all the non-gastrointestinal adverse events) needed to be in the clinical study report ("CSR") that need summarized the study's results for the FDA, and

- Whether cardiovascular events could be adjudicated after the frozen file date.

The footnote source for this material is "1/20/99 VIGOR Cardiovascular Event Adjudications meeting agenda, MRK-NDJ0120258; <u>see also</u> 1/18/00 email from A. Reicin to D. Shapiro, MRK-NJ0120258. Merck claims confidentiality for these documents.

**Example B**

On page 44 of the Martin Report, Appendix D, we find a copied letter from Michael Weinblatt, M.D.

> Michael E. Weinblatt, M.D.
> Director of Clinical Rheumatology
> Brigham and Women's Hospital
> 75 Francis Street
> Boston, MA 02115
>
> December 20, 1999
>
> Alise Reicin, M.D.
> Director, Clinical Research
> Merck Research Laboratories
> P.O. Box 2000, RY33-656
> Rahway, NJ 07065
>
> Dear Dr. Reicin:
>
> We are aware that the VIGOR adjudication committee review VIOXX® program. Due to the interest about COX 2 inhibitors and their potential role in vascular events, we recommend that an analysis plan be developed to analyze adjudicated serious vascular events in the VIGOR trial separately from any other planned analyses of these data. It will important that these events be adjudicated blinded.
>
> Sincerely yours,
>
> Michael Weinblatt (signed by Deborah Shapiro)
> Michael Weinblatt, M.D.
>
> cc: Deborah Shapiro, Thomas Capizzi

The footnote to the letter is 12/20/99 letter from M. Weinblatt to A. Reicin (cc: D. Shipero an T. Capizzi), MRK-NJ0071311. Merck claims this document is confidential.

3

**Example C**

In the Martin Report, Appendix D, page 40 we find Table 2 setting out Cumulative Cardiovascular Serious Events and Deaths in the Vigor Trial:

Table 2
Cumulative Cardiovascular Serious Adverse
Events and Deaths in the VIGOR Trial

| | Cardiovascular Serious Adverse Events | | | Deaths* | |
|---|---|---|---|---|---|
| Treatment Group | A (Vioxx) (N=4050) | B (naproxen) (N=4030) | % Difference in Proportions | A (Vioxx) (N=4050) | B (naproxen) (N=4030) |
| 9/2/99 Data | 36 (0.9%) | 16 (0.4%) | 0.5 (95% CI 0.1, 0.9) | 11 | 6 |
| 11/1/99 Data | 52 (1.3%) | 29 (0.7%) | 0.6 (95% CI 0.1, 1.0) | 16 | 6 |
| 12/1/99 Data | 61 (1.5%) | 30 (0.7%) | 0.8 (95% CI 0.3, 1.2) | 17 | 9 |

*Differences in proportions were not calculated for deaths in pre-meeting reports to the VIGOR Trial Data and Safety Monitoring Board.

The footnote to the table reads as follows: 12/1/99 VIGOR Interim Non-Endpoint Safety Report, MRK-NJ0101706 at 20; 10/7/99 VIGOR Interim Non-Endpoint Safety Report. Merck claims both documents are confidential.

**Example D.**

In the Martin Report, Appendix D, pages 29-33, Martin paraphrases the 3/2/99 Interim Monitoring Guidelines for VIGOR, MRK-NJ0092968. *See* Exhibit B attached hereto. Merck claims that document is confidential.

As can be seen, across the report, including the Appendixes, Merck discloses the content

if not the actual document. Merck has never specified which document, Dr. Egilman was presumed to have communicated through paraphrase. Merck is disingenuous in this regard as it would be difficult to find a confidential document not referred to, cited or set out in its entirety in the Martin report. We attach as Exhibit C spreadsheets covering approximately half of the Martin Report. Each entry contains the discussion of Merck as to the contents. We indicate in separate columns, Merck's claims of confidentiality and whether the document was produced in the MDL. In creating this spreadsheet we searched for the documents by Bates Numbers in the 15 databases available to us. If a document by Bates Number is not found in any of the 15, it is so notated.

The facts disclose that at the times Merck was negotiating Confidentiality Orders; it disclosed the very documents it wished to seal from public criticism. We wish not to be accusatory but the effect of the Confidentiality Orders signed by the court was to gag plaintiffs, their counsel and experts. At the same time, Merck freely disclosed the documents with their accompanying commentary.

Utah believes that as the Court observes the manner in which Merck disseminated information as to the documents, it will find no basis for continued confidentiality orders. Therefore, Utah objects to any finding of contempt against Dr. Egilman. As the Court noted in its prior decision, "[T]he report was published on Merck's and Debevoise's websites and a number of press conferences were held to announce its release." *See* Exhibit D attached hereto.

Merck complains that Dr. Egilman paraphrased unknown but confidential documents. Merck put their confidential documents on the internet. It then held numerous press conferences and gave press releases concerning its evaluation and commentary on confidential documents.

5

## Further Factual Background

Utah submits the following timeline with respect to its involvement in this case:

1. Utah filed its action in Utah State Court on April 28, 2006.

2. Merck removed the case to Federal Court on May 18, 2006.

3. Utah filed a motion to remand which was not heard in the Utah Federal District Court.

4. The case was sent to the MDL Panel on June 23, 2006.

5. The MDL panel joined this case to the consolidated litigation.

6. PTO 13(c) was signed on March 13, 2012. *See* Exhibit E attached hereto. A prior pretrial order No. 13 was approved by the court prior to Utah's arrival in New Orleans (May 24, 2005). PTO 13A was entered January 30, 2009. All of these pre-trial orders contained confidentiality provisions. PTO13(c) granted "highly confidential" status to documents "which relate to the parties' confidential and proprietary information that may be subject to protection under Fed. R. Civ. P. 26(c); and WHEREAS, the parties have provided and will provide a significant amount of discovery materials in this Action and the parties agree that a protective order will facilitate a timely and efficient discovery process…"

7. While the litigation proceeded and while entering and signing these confidentiality orders, Merck did the following:

    a) "In December 2004, a Special Committee of the Board of Directors of Merck & Co., Inc., retained The Honorable John S. Martin, Jr. of Debevoise & Plimpton to undertake a thorough review of the conduct of senior management in connection with the development and marketing of Vioxx." *See* Exhibit D.

b) "Judge Martin and a team of lawyers from Debevoise have recently concluded an intensive and comprehensive 20-month investigation, during the course of which they …reviewed millions of pages of documents…." *Id.*

c) "We commend Judge Martin and his colleagues on the comprehensiveness and clarity of the Report, and we encourage interested parties to review in detail not only the Report itself but also the 20 Appendices that set out the facts supporting the conclusions that Judge Martin reached."  Judge Martin and his team of investigators conducted 'an intensive and comprehensive 20-month investigation.  They … reviewed "millions of pages" of documents.  The full report comprises over 1400 pages. *Id.*  Mr. Martin and his law firm spent over 53,000 hours conducting the investigation. *See* the Martin Report, page 1, attached hereto as Exhibit F.

d) The Special Committee of Merck's Board voted that the Martin Report be made public. *See* Exhibit D.

e) The Martin Report was made available on both the Debevoise & Plimpton and Merck websites on September 6, 2006. *See* Exhibit F.

f) The Martin Report cites, contains, discusses and evaluates "millions of documents." Almost all of those documents are designated as "confidential" under the provisions of prior Rule 13 and Rule 13(c).  The disclosure and discussion of the documents are comprehensive.  Merck discloses the existence and summary of all relevant documents, most of which they later designated as confidential.

    g) The remainder of the documents were never placed in the MDL document depository. As discussed below, some of the omitted documents are highly relevant to Utah's case. Martin had them but Merck chose not to place them in the depository.

    h) A Statement made by Merck states "After exhaustive review, the final report confirms what we at Merck have always believed—that there is no basis for the claim that Merck knowingly put patients at risk of cardiovascular events" *See* Exhibit G, attached hereto. In other words, Merck gave its lawyer's opinion that none of Merck's management, intentionally deceived. Merck made that opinion based upon documents in order to influence the public's view of these controversies. Almost all of those documents are designated as "confidential" in the MDL document depository. However, the document, a quote or a paraphrase of the documents stating Merck's arguments were available on the internet.

8. A check of the Internet discloses that the Martin Report (but not the Appendices) may be found on the Wall Street Journal website today.

9. The Martin Report with the Appendices remained on the Merck webpage until the fall or winter of 2012-2013. All of these documents were on the internet for approximately 6 years. Any computer user could have accessed the Martin report over the internet during that time.

10. Pre-trial order 13(c) provides that "Nothing in this Supplemental Protective Order shall preclude any party from using its own Highly Confidential Information in any manner it sees fit, without prior consent of any party or the Court." *See* Exhibit E.

11. Paragraph 18, of Pre-trial 13(c), however, does not indicate that if Merck disclosed the documents over the internet, those documents would retain the same confidential status. This

was not a one-time limited disclosure. Judge Martin claimed to have reviewed "millions of documents" and gave his opinions on what the documents meant. There is nothing in the Court's order indicating that the Court would maintain confidentiality in the face of mass disclosure of virtually the entire database. Further, there is nothing in the pretrial order which prevents Merck from waiver of the protective confidentiality provisions through public disclosure.

12. Pretrial Order 13(c) required action by Merck if Merck intended to rely on confidential designations. For example paragraph 9(a) required Merck to designate on the record during the taking of a deposition that the deposition or some part of it constitutes Highly Confidential Information. Merck generally complied with this provision. However, paragraph 9(b) required Merck to send a letter within thirty (30) calendar days of the receipt of the transcript of a deposition. "The letter shall direct the court reporter to indicate the portions designated as Highly Confidential Information and segregate them as appropriate…If the Supplying Party does not serve a designation letter within the thirty day period, then the entire transcript will be deemed to not contain Highly Confidential Information."

13. In the recent course of expert depositions, Merck generally did not follow that procedure. As has been pled by Dr. Egilman, that procedure was not followed in his deposition. In the deposition of Dr. Richard B. Gremillion, Merck designated the entire deposition as confidential even though only two of the exhibits bore a confidential marking. *See* Exhibit F page 150-151, attached hereto as Exhibit H. Nevertheless, Merck's counsel never followed up with a letter designating portions of the deposition as confidential. To the best of

9

counsel's knowledge, Merck did not send letters with respect to any expert deposition taken within the last year.

14. Paragraph 23, of Pre-trial 13(c), protects against "inadvertent production of any document." However, publishing the Martin report was not inadvertent. It was intentional.

15. Merck was also order to produce a privilege log, telling why each item came within the protection of Rule 26. Merck has not done so for months, if not years.

16. Merck has therefore put before the public, not only its views of its innocence but also cites documents that they claim establish their positions. Merck hides behind its claim of confidentiality only if a party or a witness challenges their views. If one takes Merck's view, citation to or discussion of the Martin Report is also precluded under this Court's PTO 13(c) because a discussion of the Martin Report would be entangled with a discussion of the documents in the depository. Merck has turned this Court's confidentiality order into a sword to attack anyone who questions their version of events instead of a shield protecting documents properly as set out in FRCP 26.

## ARGUMENT

### A. This Court Never Intended to Seal Merck Documents from the Public.

The Court confidentiality orders were never intended to shield Merck's action from public gaze in perpetuity. "On May 24, 2005, the Court entered Pretrial Order No. 13, the Confidentiality Order agreed to by the PSC and DSC. The Court explained that it is cognizant of the need to balance the First Amendment right of the public to be informed with the Sixth Amendment guarantee of a fair trial to the litigants. Rather than deny the public the right to know, the Court has resolved this tension by delaying public knowledge in certain instances.

The Court entered the Confidentiality Order to allow Defendants the comfort to produce certain information without fear that their proprietary information would be compromised." *In re Vioxx Products Liability Litigation*, 2005 WL 1662043 (E.D. La.).

At that time, Merck did not inform the Court that it had hired a former Judge to produce a comprehensive evaluation of the relevant documents to bolster Merck's defense. Indeed, the Martin Report was issued within ten weeks of the Court entering the above order. The widespread publication of the Martin Report would indicate that Merck views the confidentiality order as a "gag" order where they can say whatever they want about the documents but should anyone else venture a contrary opinion, that opinion is worthy of contempt. That could not have been the Court's intent in issuing the confidentiality order in the first instance.

We note that at the time of the initial confidentiality order, there was an on-going criminal investigation of Merck which accounts for the Court's Sixth Amendment concern. That concern has been resolved with Merck's guilty plea.

The Court's other concern was that Merck have freedom to produce documents without fear of compromising its proprietary information. The Court should resolve that concern. The drug was removed from the market ten years ago and defendant has made no attempt to obtain an appropriate label in order to sell the drug. Any scientific secrets have long been known by Merck's competitors such that no generic Vioxx has been approved or produced. We note that the FDA has precluded human studies. *See* Exhibit I, attached hereto. Thus, there is little chance of Merck having scientific proprietary information at this juncture.

Protecting proprietary information might meet a legitimate purpose of FRCP 26 (b) and 26 (c). However, Merck, in 2005, 2009 and 2011 had no intention of protecting their proprietary

11

information as Merck fully disclosed its documents and argued their meanings. Merck's only intent in seeking the order was to allow them to tell their story but make it impossible to contradict their statements.

### Confidentiality Covers Only Information Gained in Litigation Discovery

In *Seattle Times Co. v. Reinhart*, 467 U.S. 20, 104 S.Ct. 2199 (1984), while upholding a protective order as within the power of the District Court to control litigation, the Supreme Court said:

> As in this case, such a protective order prevents a party from disseminating only that information obtained through use of the discovery process. Thus, the party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes.

Thus, Dr. Egilman is free to discuss and write about documents disclosed or discussed in the Martin Report. Since Martin included virtually every relevant document, Dr. Egilman has the right to discuss the broad implications of Martin's citations and quotations from the Merck documents. If there is a source for his opinions, such as Martin, gained other than through discovery, he is free to give them.

### Confidentiality May be Waived

Merck's problem is that it publically disseminated the Martin Report which cites and paraphrases all or nearly all of the documents in question. All privileges may be waived through intentional or inadvertent disclosure. We need not consider inadvertent disclosure as Merck put the document on the internet and kept it there for about six years. Board approval demonstrates that the Merck Board felt disclosure important.

We consider the designation of confidentiality to be the functional equivalent of the Attorney-Client privilege. The Attorney-Client privilege is considered to be the most inviolate

12

of the privileges. "The oldest of the privileges for confidential communications, the attorney client privilege protects communications made in confidence by a client to his lawyer for the purposes of obtaining legal advice." *Hodges, Grant & Kauffman,* 768 F.2d 719, 720 (5th Cir. 1985). Yet the Fifth Circuit makes plain that the privilege may be waived by public disclosure. "Because the privilege protects only confidential communications, the presence of a third person while such communications are made or the disclosure of an otherwise privileged communication to a third party *eliminates* the intent for confidentiality upon which the privilege rests." Id. at 721.(emphasis added.) "A party's decision to produce protected written work product, including notes of conversations made in the course of a criminal investigation and information learned during a criminal investigation, unquestionably waives protection of such materials." *Wright v. State,* 374 S.W.3d 564 (Tex-App 2012).

The purpose of the Confidentiality Record was to allow Merck to produce documents without fear of losing proprietary information. When Merck decided to publish the Martin report, there no longer was any rational reason for continuing confidentiality. Merck decided that the documents should be part of the public debate. Having made that decision, it is too late for Merck to attempt to silence those who disagree.

A more recent district court case concerning the waiver of the attorney client privilege is *Alpert v. Riley,* 267 F.R.D. 202 (S.D. Texas 2010). There, the disclosure was inadvertent. However, the three factors relied upon by the court are relevant to this discussion. First, is the reasonableness of the steps taken to avoid disclosure. Merck took no steps to avoid disclosure of the documents or their contents but instead put them on the internet. The second factor is whether reasonably prompt action was taken to remedy the inadvertent disclosure. Here Merck

13

and its lawyers put the documents on their separate websites and left them up for more than six years. The documents were only removed when it became obvious that Utah was using the Martin report and the cited documents in discovery. Thus, no effort was made to retrieve the documents from the public domain. The final factor is overriding fairness. Merck has had the ability to shape the discussion about the safety of its drug for the past 14 years. It did so publically through the disclosure of the contents of its documents. It put the disclosure on the internet for anyone with interest and a computer. Fairness does not help Merck. It is not fair for Merck to disseminate its views of the documents but hold anyone else who enters the controversy in contempt.

### Utah and Egilman have Standing to Oppose Confidentiality

The law in the Fifth Circuit is quite clear that standing depends upon its federal rights of an impartial tribunal are threatened. Dr. Egilman has standing because Merck has chosen this forum to seek punishment for alleged violations of the confidentiality order. A summary of the law of this circuit is found in *American Civil Liberties Union of Mississippi, Inc. v. Mabus*, 719 F.Supp. 1345 (S.D.Miss., 1989).

> A plaintiff has standing to sue in federal courts when he demonstrates that his federal rights are jeopardized by an action of the state. *KVUE–TV, Inc. v. Austin Broadcasting Corporation*, 709 F.2d 922 (5th Cir.1983), aff'd, *Texas v. KVUE–TV, Inc.*, 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984). Such jeopardy is shown when his rights are deprived, or threatened with deprivation, as a result of the putatively unconstitutional conduct of the defendant, the injury can be traced back to the challenged conduct, and the injury is likely to be redressed by a favorable decision. *Valley Forge College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). An injury must be real, not abstract or hypothetical, but this requirement does not preclude injury which is threatened. *Valley Forge College*, 454 U.S. at 482, 102 S.Ct. at 763. *KVUE*, 709 F.2d at 928. Past wrongs alone are insufficient to grant standing

14

without a continuing adverse effect. <u>O'Shea v. Littleton,</u> 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

Because of the threat of harm to its case, Utah has standing to challenge confidentiality. Because Dr. Egilman may be sanctioned, he has standing to challenge confidentiality.

### Merck's Omitted Documents are Substantial and Substantive

Some of the documents cited by Mr. Martin but not found in the document depository are of great relevance to this plaintiff's case. An ongoing controversy will be Merck's knowledge of the relative risks of cardiovascular events incurred through the use of Vioxx. Merck did not produce the following document, MRK-S0420112195, at 217, 219, 228, Figure B5 at 230. This document is discussed by Martin at pages 161-163 of the main report. ) The description is as follows.

> In the Intention-to-Treat Analysis in the follow-up study, the relative risk for confirmed thrombotic events on Vioxx versus placebo was 1.74% (95% confidence interval, 1.19 to 2.55), and the relative risk for APTC composite cardiovascular endpoint events on Vioxx versus placebo was 1.86 (95% confidence interval, 1.19 to 2.90), 5/26/06 APPROVe Extension Statistical Package

We briefly explain the significance of this omission. In the VIGOR trial, Merck's analysis was limited to events which occurred while the participant was on the drug or within 14 days of discontinuation. Plaintiff's experts will testify that accurate analysis requires following the subject to see if untoward events occur after the discontinuation of the drug. That in rough terms is what is meant by "intention to treat" analysis.

Courts have handled relative risk and confidence ratios inconsistently but a relative risk of 1.74 means that Merck knew that it was increasing the rate of thrombotic events by 74%. It is also relevant that the confidence ratios do not touch 1, thus meaning that in all cases; the risk will

never be the same as placebo. The APTC composite cardiovascular endpoint events show even greater risk. (Relative risk 1.86). Thus, the withheld document greatly aids the plaintiff and does not help the defendant.

As the document was not produced pursuant to the Confidentiality Order, and Merck discussed it, confidentiality never attached to that document. Utah and Dr. Egilman learned of the document through other means and not through discovery.

### Utah Law Would Reach the Same Results

Utah has Evidentiary Rule 507(a) which provides in pertinent portion, "A person upon whom these rules confer a privilege against disclosure of the confidential matter or communication waives the privilege if the person…voluntarily discloses or consents to the disclosure of any significant part of the matter or communication, or fails to take reasonable precautions against inadvertent disclosure."

Merck has disclosed almost every document and has discussed their relevance in a public forum. The privilege in Utah has been waived by voluntary disclosure.

Speaking of waiver in attorney-client privilege, Judge Dee Benson of the District Court of Utah said:

> (i)    *Partial Waivers and Exceptions: Selected Documents*
>
>> When considering disclosing selective privileged documents on a certain subject, counsel should keep in mind that the courts are likely (under a rule of completeness rationale) to require the disclosure of other privileged documents covering the same subject. For example, the United States District Court for the District of Delaware in *Hercules, Inc. v. Exxon Corp* explained:
>>
>> [i]n general the voluntary waiver by a client, without limitation, of one or more privileged documents passing between a certain attorney and the client discussing a certain subject waives the privilege as to all communications between the same

attorney and the same client on the subject.

This principle operating against partial disclosures is grounded on the unfairness "for a client to disclose those instances which please him and withhold all other occations."

## Conclusion

The Court imposed a confidentiality order to expedite discovery. The purpose was to allow Merck to freely disclose documents that might have Rule 26 protection. The Confidentiality Order was never intended to be a vehicle by which Merck could widely publish its version of what the documents mean and preclude the plaintiff, or its witnesses from publically discussing documents in the public domain. Accordingly, we would urge the court to refrain from sanctioning Dr. Egilman for comments upon documents disclosed in the Martin report or for comments upon documents Merck chose not to submit.

DATED this 19th day of May, 2014.

/S/
Joseph W. Steele
Kenneth D. Lougee
SIEGFRIED & JENSEN
5664 South Green Street
Salt Lake City, UT 84123

/S/
Richard W. Schulte
812 E. National Road, Suite A
Vandalia, OH 45377

/S/
Eric H. Weinberg
THE LAW OFFICES OF ERIC H. WEINBERG
149 Livingston Avenue
New Brunswick, NJ 08901

*Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing **PLAINTIFF, STATE OF UTAH'S MOTION IN OPPOSITION TO COMTEMPT CITATION** has been served on Liaison Counsel, Russ Herman, Phillip Wittmann and Ann Oldfather, by U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 19th day of May, 2014.

/S/