**EXHIBIT B**

Report of John S. Martin, Jr. to the Special Committee  
of the Board of Directors of Merck & Co., Inc.  
Concerning the Conduct of Senior Management  
in the Development and Marketing of Vioxx

September 5, 2006  
Debevoise & Plimpton LLP

Dr. Deborah Shapiro, the unblinded statistician, collected data and performed analyses at the request of the Data Safety and Monitoring Board members. As unblinded statistician, Dr. Shapiro was aware of the treatment group assignments and reported solely to the Data Safety and Monitoring Board with regard to the trial while the trial was ongoing. Dr. Shapiro also participated in Data Safety and Monitoring Board meetings.[109] A blinded statistician, Dr. Thomas Capizzi, also was assigned to the VIGOR Trial to make any amendments to the data analysis plan that occurred after Dr. Shapiro became aware of treatment group assignments.

This section describes the composition of the VIGOR Trial Data Safety and Monitoring Board, the meetings it held to monitor gastrointestinal and overall safety, amendments to the VIGOR Trial Protocol and Data Analysis Plan requested by the Data Safety and Monitoring Board, and Merck's responses to these requests.

1. Board Composition.

The five-person VIGOR Data Safety and Monitoring Board was headed by Dr. Michael Weinblatt[*], a professor at Harvard Medical School and practicing rheumatologist affiliated with Brigham and Women's Hospital in Boston, Massachusetts. The other members were Dr. James Neaton[*], Professor of Biostatistics at the University of Minnesota School of Public Health; Dr. David Bjorkman[*], Professor of Medicine specializing in gastroenterology at the University of Utah School of Medicine; Dr. Roger Sturrock[*], Professor of Rheumatology at the Center for Rheumatic Diseases at Glasgow

---

[109] 1/25/05 deposition of D. Shapiro at 62 (In re Vioxx Litig., No. 619, N.J. Super. Ct. Law Div.); 9/3/99 VIGOR Trial Protocol 088-04, MRK-I8940054839, at 902.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Royal Infirmary at the University of Glasgow in Scotland; and Dr. Alan Silman*, Professor of Rheumatic Diseases Epidemiology with the Arthritis Research Campaign's Epidemiology Unit at the University of Manchester Medical School in England.[110]

The VIGOR Trial Steering Committee, the clinical monitor, Dr. Reicin, and a Merck statistician, jointly selected Dr. Weinblatt* as Chair of the VIGOR Trial Data Safety and Monitoring Board, and his appointment was approved by Dr. Spector, Senior Vice President of Clinical Sciences at MRL.[111] No member of the Data Safety and Monitoring Board was an investigator in the study or affiliated with MRL, although some had previously been consultants to MRL.[112] According to Drs. Weinblatt* and Bjorkman*, the Data Safety and Monitoring Board was not composed of people who knew each other well.

2. Meetings.

During the VIGOR Trial, the Data Safety and Monitoring Board met a total of four times, and members were paid $2,000 per meeting or teleconference.[113] After the

---

[110] 3/2/99 Interim Monitoring Guidelines for VIGOR, MRK-NJ0092968, at 68.

[111] See Guidelines for Data & Safety Monitoring Boards, MRK-NJ0067528, at 32 ("The Steering Committee and the Merck medical monitor and statistician jointly agree upon a candidate for DSMB chairman. This candidate must then be approved by the Senior Vice-President of MRL."); 4/15/99 letter from B. Seidenberg to M. Weinblatt*, MRK-GAR0001749, at 50 (contract for DSMB services, signed by Dr. Spector); 4/29/04 deposition of D. Shapiro at 172 (Garza v. Heart Clinic, P.A., No. DC-03-84, Tex. Dist. Ct.).

[112] Undated slide presentation, "VIGOR Committees," MRK-NJ0350519, at 29; 9/3/99 VIGOR Trial Protocol 088-04, MRK-I8940054839, at 902.

[113] See, e.g., 4/15/99 letter from B. Seidenberg to M. Weinblatt*, MRK-GAR0001749, at 50 (contract for DSMB services); 4/15/99 letter from B. Seidenberg to D. Bjorkman*, MRK-GAR0001747, at 48 (contract for DSMB services); 4/15/99 letter from B. Seidenberg to A. Silman*, MRK-GAR0001751, at 52 (contract for DSMB services).

Report of John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Trial began, Dr. Shapiro conducted statistical analyses and sent pre-meeting reports to Data Safety and Monitoring Board members, which they returned to Dr. Shapiro after review. These reports were printed on blue paper to prevent photocopying and maintain the confidentiality of the data.[114] During each meeting, the Data Safety and Monitoring Board members reviewed the efficacy and safety analyses in the pre-meeting reports provided by Dr. Shapiro. At the conclusion of each meeting, the Data Safety and Monitoring Board members voted whether to allow the VIGOR Trial to continue.[115]

    a.    March 2, 1999 meeting.

The Data Safety and Monitoring Board's first meeting was conducted by teleconference on March 2, 1999, during the enrollment phase of the VIGOR Trial. The purpose of that meeting was for the Data Safety and Monitoring Board members to meet one another and review the Protocol and Data Analysis Plan.[116] Dr. Reicin participated in the initial meeting and presented Vioxx Phase III safety and efficacy data.[117] The last three slides of Dr. Reicin's presentation, distributed to Data Safety and Monitoring Board members prior to the teleconference,[118] provided background information on

---

[114] 3/2/99 Interim Monitoring Guidelines for VIGOR, MRK-NJ0092968, at 69-70, 75.

[115] 3/2/99 Interim Monitoring Guidelines for VIGOR, MRK-NJ0092968, at 70; see Minutes of 10/3/99 DSMB meeting, MRK-AFL0000889, at 90; Minutes of 11/17/99 DSMB meeting, MRK-AFL0000891, at 92; Minutes of 12/20/99 DSMB meeting, MRK-AFL0000899, at 99.

[116] Minutes of 3/2/99 DSMB meeting, MRK-GAR0001744, at 44-45; 3/2/99 DSMB meeting agenda, MRK-NJ0092980.

[117] 3/2/99 DSMB meeting agenda, MRK-NJ0092980; Minutes of 3/2/99 DSMB meeting, MRK-GAR0001744, at 44.

[118] 2/26/99 letter from A. Reicin to D. Bjorkman* attaching slide presentation, DJB04135.

Report of John S. Martin, Jr. to the Special Committee  
of the Board of Directors of Merck & Co., Inc.  
Concerning the Conduct of Senior Management  
in the Development and Marketing of Vioxx

September 5, 2006  
Debevoise & Plimpton LLP

cardiovascular events in the Vioxx program and reviewed the Company's plans to adjudicate all serious thrombotic adverse events from the VIGOR Trial for inclusion in a "prespecified combined analysis with other VIOXX studies."[119] The slides stated that while the "[i]ncidence of cardiovascular SAEs in [Vioxx] Phase III trials [was] low and not quantitatively different from NSAID comparators or placebo,"[120] there existed a "[t]heoretical risk of increased thromboembolic events on VIOXX c/w [compared with] standard NSAIDs" because (i) "NSAIDs inhibit platelet function (via COX-1 inhibition)," (ii) there was a "lack of platelet inhibition with VIOXX," and (iii) "VIOXX may inhibit prostacyclin generation."[121] The minutes of this meeting do not reflect any further discussion about cardiovascular events,[122] and neither Dr. Weinblatt*, nor Dr. Bjorkman*, Dr. Reicin, or Dr. Shapiro recalled such a discussion taking place.

At this meeting, the Data Safety and Monitoring Board approved the "Interim Monitoring Guidelines for VIGOR," which were adapted from other large-scale MRL outcomes trials and detailed the role and responsibilities of the Data Safety and

---

[119] Undated slide presentation by A. Reicin to DSMB, "Cox-2 Specific Inhibition in Arthritis Therapy: Clinical Trial Results of VIOXX," DJB04136, at 203-05 (attached to 2/26/99 letter from A. Reicin to D. Bjorkman*, DJB04135).

[120] Undated slide presentation by A. Reicin to DSMB, "Cox-2 Specific Inhibition in Arthritis Therapy: Clinical Trial Results of VIOXX," DJB04136, at 205 (attached to 2/26/99 letter from A. Reicin to D. Bjorkman*, DJB04135).

[121] Undated slide presentation by A. Reicin to DSMB, "Cox-2 Specific Inhibition in Arthritis Therapy: Clinical Trial Results of VIOXX," DJB04136, at 204 (attached to 2/26/99 letter from A. Reicin to D. Bjorkman*, DJB04135).

[122] Minutes of 3/2/99 DSMB meeting, MRK-GAR0001744-45.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Monitoring Board during its monitoring of the VIGOR Trial.[123] The Guidelines stated, among other things, that in evaluating whether the trial should be terminated prematurely, the Data Safety and Monitoring Board should consider the "desire on the part of the sponsor and the FDA to have a substantial number of patients with at least one year [sic] experience on the test drug."[124]

Both Drs. Weinblatt* and Bjorkman* stated that the provision was not unusual or inappropriate and reflected a valid concern with terminating a study before the primary endpoint was reached. They agreed that the inclusion of that guideline would not stop the Data Safety and Monitoring Board from terminating the trial if, in its view, a clear-cut safety reason existed.[125]

      b.    <u>October 3, 1999 meeting</u>.

On October 3, 1999, the Data Safety and Monitoring Board members met by teleconference to discuss data from the first interim analysis of the VIGOR Trial. Although the Data Safety and Monitoring Board members had the option of being told which group was receiving Vioxx and which group was receiving naproxen, they declined to be fully unblinded and instead reviewed results broken down into Treatment Group A and Treatment Group B.[126] According to Dr. Bjorkman*, the Data Safety and

---

[123] Minutes of 3/2/99 DSMB meeting, MRK-GAR0001744, at 45.

[124] Interim Monitoring Guidelines for VIGOR, MRK-NJ0092968, at 73.

[125] Indeed, as discussed in Appendix Q, the External Safety Monitoring Board for the APPROVe Trial made such a recommendation based on cardiovascular safety data when that trial was only weeks away from completion.

[126] Minutes of 10/3/99 DSMB meeting, MRK-AFL0000889, at 89.