# EXHIBIT J

**FILED**
Jun 13 2013 03:48PM
Franklin Circuit Court
Sally Jump, Clerk
Transaction ID: 52826417

## Commonwealth of Kentucky v. Merck & Co., Inc.

## SUMMARY OF OPINIONS

### Lisa Rarick, M.D.

### June 13, 2013

This is a general summary of my areas of expertise and intended testimony in the matter of *Commonwealth of Kentucky v. Merck & Co., Inc.* This is not intended as an exhaustive statement of my opinions but as an identification of the areas in which I have expertise and intend to offer opinions. I have been asked and reserve the right generally to respond to the opinions of plaintiff's experts within my areas of expertise. All of my opinions applying my expertise as a medical doctor are stated to a reasonable degree of medical certainty.

## BACKGROUND AND QUALIFICATIONS

I am a medical doctor with specialty training in the field of Obstetrics and Gynecology. I received my undergraduate and medical degrees from Loma Linda University School of Medicine in Loma Linda, California. I completed my internship and residency in Obstetrics and Gynecology at Georgetown University in Washington, D.C. Following my residency, I was a clinical instructor at Georgetown University.

### *FDA Experience*

In December 1988, I started working at the United States Food and Drug Administration ("FDA"). I worked at FDA for the next 15 years. I served in many capacities in FDA's Center for Drug Evaluation and Research ("CDER"), including as a reviewing Medical Officer, as the

**EXHIBIT 20**

Director of the Division for Reproductive and Urologic Drug Products, as Deputy Director in the Office of Drug Evaluation 2, and as the Associate Director for Quality Assurance in the Office of the Center Director.  I served my last year in the Public Health Service in FDA's Office of the Commissioner in the Office of Women's Health before leaving FDA in 2003.

While at FDA I served as both a primary and a supervisory reviewer of many types of submissions — Investigational New Drug Applications ("IND"s), clinical protocols, clinical study reports, New Drug Applications ("NDA"s), supplemental New Drug Applications ("sNDA"s), product labeling, post-marking data, citizens' petitions, and Advisory Committee meeting materials.  In my service at FDA, I also contributed to the development and implementation of many guidance documents as well as educational programs (both within and outside of FDA).  My curriculum vitae is attached as Exhibit A.

### Materials Reviewed

In preparing my opinions, I reviewed numerous documents relating to Vioxx, including submissions to FDA from Merck, correspondence between Merck and FDA, and FDA documentation regarding Vioxx (including information from the Merck INDs, NDAs, and supplemental NDAs, both pre- and post-approval).  I also reviewed "Dear Healthcare Professional" letters, press releases, internal Merck communications, post marketing study protocols and results, and medical and scientific articles related to Vioxx.  I have reviewed FDA memoranda, regulations, and guidances.  I have reviewed expert reports, depositions, and exhibits regarding Vioxx, as well as Congressional testimony and Advisory Committee materials. I have reviewed materials relating to publication of the VIGOR results in the New England Journal of Medicine.  I have reviewed the FDA's new regulation regarding prescription

drug labeling and comments in the Federal Register regarding the FDA's review and approval process generally and FDA's review and approval of labeling specifically. I have also searched and reviewed the FDACDER website regarding Vioxx.  I have also reviewed the plaintiff's complaint, as well as sections of the Consumer Protection Act Kentucky Revised Statutes (367.170) relating to the basis of a claim thereunder, and plaintiff's experts' designations.  I have also reviewed many of the depositions that have been taken in this matter.

### *FDA Regulations and Role in Development, Approval and Labeling of Prescription Drugs*

FDA regulates food, cosmetics, drugs, medical devices, biologics, and veterinary products.  FDA focuses extensive effort on ensuring that it approves prescription drugs that are safe and effective when used in accordance with approved labeling.  FDA employs rigorous drug review, approval, and post-marketing oversight processes, and it extensively regulates pharmaceutical companies and the manufacture and sale of prescription medications.

In reviewing drug applications for innovative medicines, FDA involves experts from a variety of fields, including, but not limited to, chemistry, toxicology, pharmacology, medicine, clinical trial design, statistics, and epidemiology.  FDA provides an extensive regulatory framework and actively communicates with the official sponsor during the development, review, action, and post-marketing oversight of such drugs.  During the time that Vioxx was on the market, FDA considered its regulations to serve as both a floor and a ceiling for a sponsor, not merely as a minimal standard.  FDA also employs outside experts to provide further evaluation and recommendations through its Advisory Committee process.  The sponsor must perform the necessary testing pursuant to strict regulatory requirements to proceed through the various phases

of drug development leading to review and possible approval.  Once a drug is marketed, strict regulations govern the continued collection, review and submission of safety data to FDA.

Prescription drug products go through a series of tests before they can be approved and marketed.  A drug sponsor must submit an IND to FDA prior to the administration of any new drug to any human being in the United States.  This IND application contains extensive information on the manufacturing of the drug as well as the data on all animal studies performed on the new product, and any available clinical information.  Based on this information, FDA reviews the proposed protocols for studies in humans and may either allow these studies to proceed, halt development, or require changes in the proposed development plan as a condition of allowing it to proceed.  Based on initial safety information from the first studies in humans, the drug sponsor conducts more extensive clinical trials to establish the effectiveness, as well as the safety or risks, of the product in the intended population.  The drug sponsor continues to submit protocols for subsequent clinical trials to FDA, and FDA may allow, halt, or request modification of these studies as appropriate.  FDA continues to monitor the clinical trial program, and reviews and analyzes the results of the clinical trials as they become available.

When a sponsor believes that it has sufficient data to demonstrate that the drug is safe and effective if used as intended, the sponsor submits to FDA an NDA containing these data and proposed prescribing information.  The NDA contains voluminous information regarding the drug product, including, along with actual data, a summary of all available efficacy and safety information, integrated assessments of benefit and risk and proposed labeling.  The vast majority of drugs studied in humans fail to make it to the NDA stage.

FDA critically analyzes and evaluates all of the information provided in the NDA, including the proposed prescribing information.  FDA, which often has additional data that is not

available to the sponsor, is in the best position to evaluate the safety and efficacy of a drug.  FDA makes the final determination on the content, placement, and language of the information in the prescribing information in the interests of public health and in accordance with the regulations.

The drug sponsor and FDA continue to monitor and investigate the risks and benefits associated with a drug after FDA approves the drug for marketing.  One key element of post-marketing safety monitoring is the collection and review of adverse experiences.  There are two main sources of adverse experience reports:  clinical trials and post-marketing experience.  FDA regulations dictate when and how a drug sponsor must report adverse experiences to FDA.

Since I began working at the FDA, the FDA had, and continues to have, extensive authority to take action concerning a drug and its labeling after it has been approved.  If FDA determines that new information demonstrates that a drug is no longer safe or effective, FDA can order the drug removed from the market by withdrawing its approval.   If FDA determines that the prescribing information is no longer current and must be revised to incorporate new safety or effectiveness information, it instructs the sponsor to revise its prescribing information.  If a sponsor does not comply with FDA's instruction, FDA can withdraw its approval of the drug and/or take actions to declare the drug misbranded.  In practice, the situation rarely escalates to the level of formal enforcement action because the sponsor voluntarily complies with FDA's requested action or otherwise addresses the FDA's concerns in a manner acceptable to FDA.  Although the labeling process is sometimes referred to as a "negotiation," the FDA is the regulatory authority and makes the final determination.

Apart from, but in consultation with the Division reviewing the INDs, NDA, and sNDAs, the Division of Drug Marketing, Advertising and Communications ("DDMAC"), is the division of CDER that reviewed and regulated promotional materials and activities for prescription drug

products during the period that Vioxx was on the market (this Division is now called the Office of Prescription Drug Promotion, "OPDP").  DDMAC/OPDP does not have responsibility for the review of safety, effectiveness, or labeling of drugs, but instead has responsibility for overseeing promotional materials and activities.  DDMAC/OPDP reviewers engage in a variety of tasks to meet their responsibilities.  This includes providing written comments to pharmaceutical sponsors; reviewing complaints about alleged promotional violations; initiating enforcement actions on promotional materials that are false or misleading; comparing the product labeling and promotional materials of various closely related products to ensure that the regulatory requirements are consistently and equitably applied; and acting as liaison between DDMAC/OPDP and other divisions within FDA/CDER on promotional issues.

**OPINIONS**

What follows is a general summary of opinions I intend to offer in this matter.  As noted above, it is not intended to be exhaustive and I reserve the right to respond to opinions of Plaintiff's experts or arguments of Plaintiff's that fall within my area of expertise as well as to amend or supplement my opinions as required in response to questions from counsel or additional information.

### *Merck Adequately and Responsibly Investigated the Safety Profile of Vioxx*

Merck adequately and responsibly investigated the safety profile of Vioxx and conducted extensive pre-clinical and clinical studies both before and after FDA approved Vioxx. Moreover, Merck worked with FDA in designing the clinical trials program for Vioxx.

The original NDA for Vioxx demonstrates that Merck performed extensive investigation and analyses in an appropriate patient population prior to seeking FDA approval.  The initial NDA submission for Vioxx contained information from 58 clinical trials involving approximately 8,500 patients, including information from approximately 1,400 patients who had taken Vioxx for over six months and approximately 820 patients who had taken Vioxx for one year or longer.  A safety update report for the initial NDA provided to FDA contained further information and follow-up safety information from on-going clinical trials.  Based on my experience, the NDA for Vioxx included substantially more information than typically is provided with NDAs for other new drugs, both in terms of the breadth of the total database and in terms of the numbers of long-term users.  In fact, Merck went well beyond the standards set out by the International Conference for Harmonization, which FDA adopted in 1995 (and reconfirmed in 2005).  Those standards recommend that NDAs for new drugs include data from a minimum of 1,500 patients exposed to the drug, and recommend that 100 of those patients should have taken the drug for one year or more.

Merck took specific and reasonable steps to investigate the cardiovascular safety profile of Vioxx.  For example, Merck collected and analyzed cardiovascular adverse experience reports from every clinical trial involving Vioxx and submitted those reports to FDA as required.  In early 1998, a Merck scientist, Dr. Doug Watson, did a comparison of selected thrombotic CV SAEs from ongoing, blinded Vioxx Phase IIb and III OA trials and their extensions with placebo-group data from studies of two other Merck drug products.  In my experience, FDA does not consider this type of comparison relevant to the review of drug products.  Notably, the data from the Vioxx trials and other product information evaluated in the Watson analysis were fully and appropriately disclosed to the FDA.

In 1998, Merck sought the advice of its Board of Scientific Advisors, a group of outside experts. Merck presented the relevant data available on Vioxx to the Board, along with potential safety issues. The issues considered included the "FitzGerald hypothesis" that arose from the results of Protocol 023. None of the available data reflected a "known" risk of increased cardiovascular thrombotic events with Vioxx, but rather reflected certain hypothetical risks as well as certain hypothetical cardiovascular benefits of selective Cox-2 inhibition. The Board considered the information and recommended that Merck systematically collect and adjudicate data on relevant cardiovascular events in clinical trials for Vioxx. In response, Merck instituted a cardiovascular adjudication standard operating procedure requiring that an independent adjudication committee review and adjudicate all relevant cardiovascular events in a blinded fashion. Prior to approval of Vioxx, Merck notified FDA that it was independently adjudicating cardiovascular events and submitted to FDA the cardiovascular adjudication standard operating procedure with the protocol for VIGOR. Of note, the scientific advisory board, after considering both hypothetical adverse effects and potential unexpected therapeutic benefits concluded that there was a "strong mandate for introduction of Vioxx into medical practice as soon as is feasible."

FDA and the medical community understand that all drugs have risks, and that not all risks are known at the time a drug is approved. FDA and the medical community expect that additional safety information will be identified and investigated in post-marketing studies and through post-marketing experience. Had FDA concluded at the time Merck filed its NDA for Vioxx that additional clinical studies were warranted or needed before it could approve Vioxx, it would have required such studies. Prior to approval, FDA recognized the theoretical concern of potential thrombotic events in Vioxx users and did not require additional clinical studies prior to

approving Vioxx, nor did FDA, unlike with many new drugs, require or request that Merck commit to any post-marketing clinical studies to further investigate the safety of Vioxx. This indicates that FDA concluded from the information included in the NDA for Vioxx that there were no specific safety concerns that required additional investigation beyond that already proposed by Merck. Had FDA concluded that the available information was not adequate to support approval, it was within FDA's power to deny approval of the Vioxx NDA and to require additional studies prior to approval, such as a specific CV-endpoints study. The fact that FDA did not take such action is a reflection of FDA's conclusion that the extensive clinical data provided, including cardiovascular event information, as well as the theoretical concern disclosed by Merck, did not warrant such additional study pre-approval and that Merck's proposed monitoring of CV events in ongoing trials was an appropriate approach to further evaluate the theoretical risk.

Nevertheless, Merck continued to investigate the safety profile of Vioxx. Following FDA approval, Merck conducted additional clinical studies of Vioxx, which added to the available safety and efficacy data, and reasonably and timely reported the results of those trials to FDA. Merck also monitored and reported the spontaneous adverse experiences in accordance with FDA regulations. In my opinion, Merck's post-marketing investigation of the safety profile of Vioxx was responsible and reasonable.

### Merck Responsibly and Timely Disclosed Potential Risks of Vioxx

Merck timely and responsibly disclosed the potential risks of Vioxx to FDA and to the medical community. Throughout the drug development process, Merck responsibly communicated information regarding the safety and efficacy of Vioxx to FDA as required in

compliance with FDA regulations and guidances.  Merck's discussion of the safety of Vioxx in the NDA was reasonable and proper.  Further, FDA was specifically aware of the results of Protocol 023, a study conducted by Garrett Fitzgerald and others, at the time of FDA's review of the Vioxx NDA.  Following FDA's approval of the NDA for Vioxx, Merck continued to responsibly and timely communicate information regarding the safety and efficacy of Vioxx to FDA as required.  The FDA approved Vioxx as safe and effective as labeled with the express understanding of the FitzGerald hypothesis and that a larger database would be needed to address with certainty the question of potential CV risks.  The FDA has explicitly recognized that drugs are routinely approved with identified theoretical risks.

In addition to fulfilling its federal regulatory reporting requirements, Merck employed other avenues to disclose and disseminate information regarding the safety profile of Vioxx to the medical community.

The initial package insert for Vioxx reasonably included the available safety and efficacy information for Vioxx.  It disclosed the known risks and benefits for the indications and doses for which Vioxx was approved, including cardiovascular events that had been observed in clinical trials such as myocardial infarction.  The initial label also described the clinical pharmacology of Vioxx and stated that Vioxx is not a substitute for aspirin for cardiovascular prophylaxis. All subsequent Vioxx approved labels provided appropriate and adequate safety information.

It is my opinion that Merck reasonably and responsibly disclosed data regarding the safety and efficacy of Vioxx.  Based on my review of the materials in this case, I found no evidence of inappropriate or improper representation of data to FDA or to FDA Advisory Committees.

***Merck Disclosed VIGOR to FDA and to the Medical Community in a Timely and
Reasonable Manner***

Merck promptly and reasonably reported the results of VIGOR to FDA and to the

medical community.  The preliminary VIGOR data were unblinded to a small group of Merck

scientists on March 9, 2000, and the last patient completed drug therapy on March 17, 2000.

Merck quickly compiled the necessary information, and called FDA on March 22, 2000 to

inform them of the results of VIGOR.  The next day, March 23, 2000, Merck sent FDA a

summary report of the VIGOR data by facsimile.  On March 27, 2000, Merck officially

submitted its summary report and issued a press release announcing the results of VIGOR.  In

my experience, Merck's compilation and disclosure of the VIGOR results to FDA was

reasonable and remarkably quick.

After receiving Merck's summary report in March 2000, FDA did not request or require

Merck to submit proposed labeling immediately.  Indeed, on May 1, 2000, Dr. Robert DeLap,

then director of CDER's Office of Drug Evaluation V, stated he was "convinced [Vioxx] is

labeled appropriately."

On June 29, 2000, Merck submitted an sNDA to FDA, which included, along with the

data from VIGOR, proposed labeling incorporating the results from VIGOR.  It is my opinion

that Merck's June 29, 2000 submission was reasonable and comprehensive.

After receiving the sNDA, including proposed labeling incorporating the VIGOR results;

FDA assigned it a standard review, notwithstanding Merck's request for a priority review.

FDA's actions in response to the summary report and the sNDA for VIGOR indicate that FDA

did not believe that the labeling for Vioxx should be changed immediately to incorporate the

VIGOR data.

Following Merck's transmission of the results from VIGOR to FDA in March 2000, Merck took steps to disseminate the information to the wider medical community.  For example, after Merck issued the press release announcing the results of VIGOR in March 2000, Merck submitted a manuscript presenting the results of VIGOR to a peer-reviewed scientific journal in May 2000, the *New England Journal of Medicine* (the results were published in the November 23, 2000 edition).  Also in May 2000, Merck presented the VIGOR results at Digestive Disease Week.  In June 2000, Merck presented the results of VIGOR at the European League Against Rheumatism.  Merck also disclosed the results in response to unsolicited inquiries from healthcare providers through a process involving Physician Information Requests ("PIRs").

Based on my experience, training, and understanding, promotional statements must be consistent with FDA-approved labeling.  Contrary to plaintiff's experts' suggestions, information relating to the VIGOR trial was appropriately not included in Merck promotional materials prior to the approval of labeling that incorporated the VIGOR results.

I have reviewed an editorial in the *New England Journal of Medicine* in which the editors call into question "the integrity of the data" on adverse cardiovascular events in the original article concerning the VIGOR study published in November 2000.  My review of materials makes clear that the editorial's claims are not accurate.

The original *New England Journal of Medicine* article included cardiovascular event data reported as of a pre-specified cut-off date of February 10, 2000.  Merck scientists chose the pre-specified date for cardiovascular events to allow sufficient time for supporting documentation to be collected and sent to the outside committee for adjudication.  Having a pre-specified cut-off date for data analyses is expected and is standard practice in clinical trials.  Along with allowing for appropriate analyses, this practice also serves to avoid manipulation of results.  Absent such a

pre-specified cut-off date, investigators can choose a date retrospectively to support a certain desired result or outcome.

Adverse events reported after the cut-off dates were not included in the published article, which was consistent with sound scientific practice.  However, all cardiovascular events for the VIGOR trial were adjudicated and reported by Merck to FDA.  The FDA's review focuses on the clinical data submitted through both the IND and NDA processes and not on the published version of clinical trials.  In the VIGOR sNDA submitted to FDA on June 29, 2000, Merck provided all investigator-reported events as well as an analysis of the events reported within the pre-specified timeframe.  Merck included all reported events in the standard four-month safety update submitted to FDA in October 2000.  All reported cardiovascular events were also disclosed publicly at the February 2001 FDA Advisory Committee meeting.  Merck also included updated information regarding the total number of heart attacks seen in VIGOR in subsequent press releases, in journal articles, and in subsequent proposed and FDA-approved labeling.  From a regulatory standpoint, having a pre-specified cut-off date for data analysis was proper and Merck's reporting of events to FDA, including thrombotic events that occurred after the cut-off date, complied with FDA regulations.

Merck appropriately submitted to FDA the data analysis plan for VIGOR which included a discussion of the prespecified subgroup analyses.  As part of the VIGOR study report, Merck presented the prespecified subgroup analyses as well as additional relevant analyses.  FDA reviews reflect its understanding and active consideration of the VIGOR subgroup data.

Using a model pre-approved by the FDA, the VIGOR trial demonstrated that Vioxx was effective in the treatment of rheumatoid arthritis and that it significantly decreased the risk of GI perforations, ulcers, and bleeds compared to naproxen.  The FDA reviewed the VIGOR results

and concluded that they supported an indication for rheumatoid arthritis as well as a modification of the GI risk information to reflect the reduction in risk of GI events.  Thus, it was accurate to state that Vioxx was effective for treatment of RA and demonstrated reduced risk of GI events.

### *Merck Responsibly and Properly Worked with FDA to Incorporate the VIGOR Results into the Prescribing Information for Vioxx and to Evaluate Further the Safety and Efficacy of Vioxx*

Merck proactively sought to revise the prescribing information for Vioxx to incorporate the results of VIGOR in cooperation with FDA.  After the preliminary VIGOR results were unblinded to a small group of scientists at Merck, Merck quickly disclosed the information to FDA and promptly submitted an sNDA in June 2000 -- approximately four months after preliminary data from the trial first became available.  In my experience, this was an extremely short time period to compile, process, analyze, and present such a large and complex data set and to complete such a substantial regulatory submission.

The sNDA included proposed labeling, which incorporated the VIGOR results as of the pre-specified cut-off date, for FDA's review and approval.  It would have been inappropriate for Merck to change the prescribing information for Vioxx to incorporate the results of the VIGOR trial without the prior approval of FDA.  With limited exception, a drug manufacturer must obtain prior FDA approval before making changes to the prescribing information for its drug.  A drug manufacturer may change its prescribing information without FDA's prior approval only in certain limited circumstances under a procedure called Changes-Being-Effected ("CBE").  FDA practice and policy, and FDA guidances applicable during the time Vioxx was on the market, however, made clear that major labeling changes — such as the incorporation of the results of a study like VIGOR, which produced a complex data set and which was conducted in a population for which the drug was not yet indicated taking an unapproved chronic dose — must be approved

by FDA prior to being effected.  The industry practice and FDA's preferred procedure, certainly at the time Vioxx was on the market, was for sponsors to consult with FDA before any significant labeling change, including issues related to safety information.  Based on my experience, had Merck submitted prescribing information for Vioxx incorporating the results of VIGOR pursuant to the CBE procedure, FDA would have rejected it and Merck would have risked an FDA finding that Vioxx was "misbranded" as well as resulting enforcement actions (including possible product seizure).  Thus, Merck acted reasonably and responsibly in submitting proposed labeling incorporating the results of VIGOR to FDA for approval; use of the CBE procedure to incorporate the VIGOR results into the labeling for Vioxx would have been inappropriate.

       Had FDA concluded at any time that the prescribing information for Vioxx was insufficient and that additional or different information needed to be communicated to healthcare professionals or to the public, FDA could have taken action to disseminate that information, including through its own communications channels such as talk papers, dear healthcare professional letters or press releases.  Instead, FDA refused Merck's request for a priority review for the sNDA for VIGOR.  This refusal and FDA's subsequent actions underscore that, from March 2000 through April 2002, Vioxx was appropriately labeled for its approved indications and doses and that it would have been inappropriate for Merck to incorporate the results of VIGOR into the prescribing information for Vioxx through the CBE procedure.

       The time it took for FDA to approve prescribing information for Vioxx incorporating the results of VIGOR was reasonable.  The record reflects that Merck acted reasonably and responsibly in working with FDA to incorporate the VIGOR results under the circumstances. VIGOR presented a highly complex data set: it involved thousands of patients from multiple

clinical sites, who had a condition for which Vioxx did not yet have an approved indication, it involved double the anticipated chronic dose of Vioxx for that indication (and double the approved chronic dose), and it involved an active comparator.  Moreover, because VIGOR was conducted in a rheumatoid arthritis population that required treatment for pain and inflammation, it had no placebo arm.

FDA needed to place the data in context with all of the other data available for Vioxx and for other drugs in the COX-2-selective class.  Merck was conducting additional large studies in populations other than the rheumatoid arthritis population studied in VIGOR.  FDA requested that Merck provide this new data as it became available so that FDA could better understand the results from VIGOR and their potential applicability to the approved prescribing information for Vioxx.  FDA also asked for additional analyses of existing data and for an additional animal study to further investigate cardiovascular issues.  Merck responded reasonably and promptly to these requests, including conducting an appropriate animal study.

Indeed, the record clearly reflects that between March 2000 and April 2002, Merck and FDA engaged in extensive information exchanges and discussions to arrive at optimal labeling for Vioxx.  FDA also convened an Advisory Committee in February 2001 in order to better understand the VIGOR results in the context of the totality of the evidence.  The Advisory Committee reviewed the results from VIGOR and the other available clinical data for Vioxx and made recommendations.

Based on the recommendations from the Advisory Committee, Merck submitted revised proposed labeling in March 2001 incorporating the VIGOR results for FDA's review and approval.  This proposed labeling was a reasonable response to the comments and conclusions of the Advisory Committee members.

On October 15, 2001, FDA sent to Merck for discussion their first draft of labeling incorporating the results of VIGOR.  Merck and FDA continued to review all relevant information and considered various presentations of the data to most appropriately communicate the risks and benefits of Vioxx.  On April 11, 2002, FDA approved new labeling incorporating the VIGOR results, as well as the results from additional placebo-controlled studies, and a new indication for rheumatoid arthritis.  Throughout this process, Merck was responsive to all FDA requests and was proactive in providing data to FDA, in requesting meetings with FDA, and in responding to FDA actions.

Following an extensive review of the VIGOR data and other available information, the FDA determined that the significance of the CV findings in the VIGOR trial were unknown. FDA concluded that the cardiovascular results from VIGOR were properly included in the Precautions section of the prescribing information for Vioxx rather than in the Warnings section. As the applicable regulations at the time state "The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug…"  It is thus notable that the FDA determined that such "evidence of an association" was not clear and reasonable when it approved the precautionary language in the April 2002 Vioxx label. Moreover, in January 2006, FDA recognized that the distinction between warnings and precautions was not meaningful to healthcare providers for whom drug labeling is intended and therefore issued new labeling regulations combining into a single section the previously separate Warnings and Precautions sections.

*Merck Acted Responsibly in Conducting and Disclosing other Post-marketing Clinical Studies*

After FDA approved Vioxx for marketing, Merck continued to study the safety and efficacy of Vioxx, including investigating the potential use of Vioxx for important medical needs.  FDA continually assessed the clinical study program for Vioxx and permitted Merck's investigation of potential new indications.  Notably, subsequent to the approval of the label incorporating the results of VIGOR, Merck filed sNDAs for two new indications:  the treatment of migraine headaches and the treatment of juvenile rheumatoid arthritis.  FDA carefully evaluated each of these supplements and all of the then-available data related to Vioxx and concluded that the total risk/benefit profile of the drug not only warranted continued marketing for the existing indications, but also expanded usage for these additional indications.  In addition, each of these approvals reflects an FDA determination that Vioxx provided a clear clinical benefit when used as labeled.

I have reviewed allegations that the results of VIGOR and three of Merck's other clinical trials, the ADVANTAGE trial (Protocol 102) and Protocols 085 and 090, constituted a safety signal of cardiovascular risk associated with Vioxx and demonstrated that the cardiovascular results of VIGOR were due to the pro-thrombotic effect of Vioxx.  The evidence does not support these allegations.  Likewise, the suggestion that Merck delayed or failed to submit to FDA information concerning the ADVANTAGE study is unfounded.

The Protocol 090 clinical trial was six weeks in duration, involved a 12.5 mg daily dose of Vioxx and had two comparator arms:  nabumetone and placebo.  While there were more thrombotic events in the group taking Vioxx than in the comparator arms, there was no statistically significant difference.  In Merck clinical study Protocol 085, a study with virtually identical design, size and duration as Protocol 090, there was only one thrombotic event — a

myocardial infarction reported in the group taking Vioxx.  The relevance of the findings from Protocols 090 and 085 must be viewed in context.  The duration of the studies was short and the number of events relatively small, which make it difficult to draw any safety conclusions based on these studies alone.

Moreover, Merck timely and properly reported the results of Protocols 085 and 090 to FDA in accordance with FDA regulations and guidance.  Merck submitted the data from Protocols 085 and 090 on June 29, 2000, with the sNDA for VIGOR.  FDA reviewed those results, as well as all of the other clinical trial evidence, and did not conclude that Vioxx caused thrombotic events or that Merck needed to conduct additional safety testing for Vioxx to remain on the market.  Nor did FDA conclude that the results of Protocols 085 and 090 raised a safety signal.

ADVANTAGE was a 12-week study involving approximately 5,500 patients designed to compare the tolerability of Vioxx 25 mg to naproxen 1000 mg daily.  Merck submitted preliminary data from ADVANTAGE to FDA in March 2000 and timely and properly submitted additional and updated data to FDA on an ongoing basis in compliance with FDA regulations and guidance.  There were too few events to draw definitive safety conclusions from the ADVANTAGE study.  In ADVANTAGE, five patients in the group receiving Vioxx suffered heart attacks compared to one in the naproxen group and no patients in the Vioxx group suffered strokes compared to six patients taking naproxen.

In December 2001, after reviewing the Vioxx safety database once again, FDA reviewers were uncertain whether the cardiovascular data from VIGOR and ADVANTAGE could be due to the cardioprotective effect of naproxen or some possible pro-thrombotic effect of Vioxx.  In March 2002, FDA reviewers recognized that the data from the Alzheimer's clinical trials, which

compared Vioxx with placebo and showed no difference in heart attack rates, supported the

hypothesis that the cardiovascular results from the VIGOR and ADVANTAGE studies may in

part be explained by the anti-platelet effect of naproxen.

It is my opinion that data from Merck clinical trials Protocols 091, 078 and 126 ("the

Alzheimer's studies") were properly and timely disclosed to FDA and that these studies did not

provide a safety signal that Vioxx was causing deaths in study patients.  Merck's submissions to

FDA and FDA's reviews of these submissions confirm that Merck timely and reasonably

disclosed to FDA adverse event data, including mortality data, from these studies.  Specifically,

Merck properly provided FDA with "all cause" mortality data from the Alzheimer's studies,

which showed a higher rate of all cause mortality in the group taking Vioxx compared to the

group taking placebo.

Furthermore, the mortality data from the Alzheimer's studies does not indicate that Vioxx

caused the deaths in those trials.  Nor did the mortality data warrant the inclusion of a warning in

the Vioxx label for mortality risk.  FDA reviewers analyzed the overall Vioxx mortality data and

accurately noted that while there were more deaths in the Vioxx group of the Alzheimer's

studies, the deaths did not appear to be drug related.  Moreover, a difference in mortality rates

was not seen in other Vioxx clinical trials.  FDA, therefore, did not conclude that Vioxx was

causing these fatalities.

A conclusion that Vioxx was the cause of these deaths would have been scientifically

unsupported based on my review and FDA's review of the mortality data.  These deaths resulted

from a wide variety of causes, including such things as cancer, trauma, electrocution, and

bromide ingestion.  Also, many of the deaths reported occurred long after treatment with Vioxx

had ceased.  In addition, as FDA noted, a statistical increase in mortality rates was not seen in

other Vioxx clinical trials.  Indeed, in the clinical trials included in the original NDA to support the approval of Vioxx for use in the treatment of osteoarthritis, the mortality incidence was significantly lower in Vioxx patients than in comparator non-steroidal anti-inflammatory drugs ("NSAIDs").  Further, Merck disclosed to FDA interim data in which it presented the difference in all cause mortality seen in the Alzheimer's studies.  The interim cardiovascular thrombotic mortality data from studies 078 and 091 were included in Merck's labeling in 2002, which reported a difference of eight deaths in the group taking Vioxx versus three in the group taking placebo, a finding that is not statistically significant.

The Alzheimer's data did not show an increased risk of thrombotic cardiovascular events for Vioxx compared to placebo.  In her Medical Officer Review of the Alzheimer's data, Dr. Villalba concluded that there was no excess of myocardial infarctions in the Vioxx group and no suggestion of an excess in cardiovascular events for Vioxx compared to placebo.  Further, I find no reason to believe that Merck should have terminated Protocol 078.

In addition, I do not agree with the opinion of plaintiff's experts that Protocol 078 established that Vioxx caused the progression of Alzheimer's Disease.  It is not appropriate to reach such a conclusion from a single endpoint of a single clinical trial and I note that the FDA also never reached such a conclusion.

I have also reviewed criticisms from plaintiff's experts of Merck's pooled analyses of clinical trials with Vioxx, which were published in peer-reviewed journals. I understand that Merck is criticized, among other things, for its use of the Antiplatelet Trialists' Collaboration ("APTC") endpoint in its pooled analyses.  It is my opinion that these criticisms are unfounded and that Merck's use of the APTC endpoint was responsible and reasonable.  Merck provided FDA with reports of all serious cardiovascular events from its clinical trials.

Moreover, as FDA has recognized, the APTC endpoint is widely accepted and commonly used in quantifying the overall cardiovascular impact of anti-thrombotic compounds in clinical trials.  A group of outside consultants recommended the APTC endpoint to Merck for its planned pooled analysis after reviewing the initial results from VIGOR, which showed a greater number of heart attacks in patients taking Vioxx than in patients taking naproxen.  In response to this recommendation, Merck pre-specified the APTC combined endpoint for its pooled analyses and informed FDA of its decision.  FDA did not object to Merck's use of the APTC endpoint, and, in fact, requested that Merck provide additional pooled analyses using the APTC endpoint.  Based on my experience, from a practical standpoint, a placebo-controlled cardiovascular outcomes trial would be virtually impossible to conduct in keeping with good clinical trial practice.  Merck's decision to use ongoing placebo-controlled trials, with FDA's knowledge and agreement, to continue to assess the cardiovascular safety profile of Vioxx was responsible and reasonable.

Based on my review of the materials in this case, I believe that Merck at all times reasonably and timely disclosed data regarding the safety and efficacy of Vioxx in compliance with FDA regulations and guidances.  Further, I found no evidence of inappropriate or improper representation of data to FDA.  I have seen no evidence that FDA at any time has found or suggested that Merck withheld or misrepresented data regarding Vioxx to the FDA.  In fact, Dr. Sandra Kweder, the Deputy Director for the Office of New Drugs in CDER, testified before Congress in November 2004 that Merck had acted properly and pursuant to the scientific data regarding Vioxx, and she acknowledged that Merck had acted responsibly with respect to Vioxx throughout the "whole process."

### *Merck Acted Responsibly in its Vioxx Promotional Activities*

I have reviewed advertisements, press releases, training materials, and approved pieces provided to Merck sales representatives.  I believe those materials are accurate and appropriate. After considering all the information provided, the FDA did not find that any promotional activity of Merck regarding Vioxx in the state of Kentucky was inappropriate other than one isolated incident involving a home-made sales detail piece, for which Merck took appropriate corrective action and the FDA found satisfactorily resolved.  Moreover, other than the isolated incident described, I have seen no evidence of inappropriate promotional conduct related to Vioxx in the state of Kentucky.

As described above, the FDA's Division of Drug Marketing, Advertising and Communications is the division of CDER that reviewed and regulated promotional materials and activities for prescription drug products during the period that Vioxx was on the market. DDMAC/OPDP does not review the safety and efficacy of drugs like Vioxx.  Rather, DDMAC/OPDP oversees promotional activities.  As part of its routine monitoring activities, DDMAC communicated with Merck regarding specific promotional materials including "Untitled Letters."   With appropriate response from Merck, the issues raised in each of these letters were appropriately addressed, resolved and the matters closed.  None of the activities related to DDMAC's "Untitled Letters," other than the isolated incident described above, appear to be matters related to activities in the state of Kentucky.

In September 2001, Merck received a Warning Letter from FDA's Division of Drug Marketing, Advertising, and Communications ("DDMAC").  Neither "Untitled Letters" nor "Warning Letters" constitute a regulatory enforcement action.  In the September 2001 Warning Letter, DDMAC raised a concern about statements made by a promotional speaker during audio conferences.  The Warning Letter also questioned a press release Merck had issued regarding the

VIGOR results and certain statements allegedly made by sales representatives at two pharmacist conferences.  Merck reasonably and timely responded to this letter.  Merck explained its actions with respect to the press release (that this was not considered a promotional activity but rather a scientific response) and described its planned corrective actions with respect to the other issues. FDA took no disciplinary action against Merck, concluded that the matter had been satisfactorily resolved and closed the matter.

In my experience, the fact that FDA closed this matter without requiring or taking further action indicates that FDA was satisfied with Merck's explanations and planned corrective actions.

FDA regulations call for manufacturers like Merck to submit advertising and promotional materials to DDMAC/OPDP accompanied by a specific form (Form 2253) at the time of first use.  Based on my review, Merck complied with these requirements, submitting proposed direct-to-consumer advertisements for Vioxx and, in fact, awaiting FDA review prior to first use. Advertising and promotional materials are regularly monitored by DDMAC/OPDP for compliance with marketing regulations, including that the materials appropriately provide a balanced portrayal of risks and benefits.   DDMAC's letters to Merck reflect this regular monitoring by opening with language such as, "[a]s part of our routine surveillance."

New drugs like Vioxx — which constituted a new molecular entity as defined by the FDA and which was part of a new drug class of selective COX-2 inhibitors — generally receive heightened scrutiny of advertising and promotional materials from DDMAC/OPDP.  Moreover, Vioxx received even more attention because of market competition and the recognized practice of competitor-reporting to DDMAC/OPDP of alleged marketing and promotional violations. Despite DDMAC's close scrutiny of advertising and promotional activities of Merck related to

Vioxx, DDMAC never found any of Merck's direct-to-consumer advertising for Vioxx to be false or misleading.

After its September 2001 Warning Letter,  DDMAC did not send any additional warning or untitled letters to Merck related to marketing or promotional activities for Vioxx, nor did DDMAC ever conclude that Merck failed to comply with the Action Plan included in Merck's response to the September 2001 Warning Letter.  The direct-to-consumer advertisements identified by several of plaintiff's experts and that may have run in Kentucky were subject to express pre-approval by FDA.

To the extent there is any suggestion that marketing surveys performed by third-parties retained by Merck should have been provided to FDA, I disagree.   For many reasons, the FDA does not require, nor desire, such materials to be provided.


### *Merck Responded Reasonably and Responsibly to the Interim APPROVe Data*

Merck acted responsibly in voluntarily withdrawing Vioxx from the market in response to interim data from APPROVe.  The APPROVe study was monitored by an external safety monitoring board ("ESMB").  The ESMB recommended on September 23, 2004 that the APPROVe study be stopped because the preliminary results showed a small increased risk of confirmed cardiovascular events in the population being studied beginning after 18 months of continuous treatment with Vioxx.  Merck reviewed and analyzed the data then available, accepted the recommendation of the ESMB, and terminated the study.  Merck also made the decision to voluntarily withdraw Vioxx from the market, and did so on September 30, 2004, after informing FDA of its decision.

The results from the first 18 months of APPROVe show no increased risk of cardiovascular events.  These results are consistent with prior randomized placebo-controlled clinical trial data for Vioxx, including the results of the Alzheimer's studies that were previously included in the prescribing information.  Merck's withdrawal of Vioxx was entirely voluntary.  I saw no evidence that FDA would have requested or required Merck to withdraw Vioxx from the market based on the APPROVe data.  In my opinion, Merck could have continued to market Vioxx with appropriate labeling.

With Merck's voluntary marketing withdrawal of Vioxx, the FDA was required to put on "hold" any ongoing IND clinical studies.  The clinical hold letter of October 2004 describes the statutory grounds for imposition of clinical hold that is applied in these circumstances.  As the regulations dictates, such a "hold" allows for resumption of IND clinical trials only after the FDA has notified the sponsor that the investigations may proceed.  Such a standard administrative action is not meant to negate the FDA's continued conclusions that the benefits of Vioxx outweigh the risks.  As is clear from (1) subsequent FDA reviews; (2) the February 2005 Advisory Committee presentations and discussion; and (3) the April 2005 FDA memorandum, even after withdrawal of Vioxx from the market and the administrative imposition of a clinical hold, the FDA continued to conclude that the benefits of Vioxx outweigh the risks.

### FDA Performed Subsequent NSAID Reviews and Published Findings and Took Regulatory Action in 2005

In April 2005, following an Advisory Committee meeting from February 16 through 18, 2005 to examine the overall benefit and risk considerations for COX-2-selective NSAIDs, CDER issued a decision memorandum of analyses and recommendations for FDA action regarding NSAIDs and cardiovascular risk.  Notably, the FDA concluded that any cardiovascular risks

associated with Vioxx are comparable to the risks associated with all other non-aspirin NSAIDs (selective and non-selective), with the possible exception of Naproxen.  FDA, based on the conclusions in the decision memorandum, required cardiovascular warnings on all NSAIDs absent submission of clinical data from a sponsor demonstrating that its medicines did not present such risk.

Notably, this comprehensive review of the NSAID data regarding serious adverse cardiovascular effects specifically questions the validity of the "Fitzgerald hypothesis" as the explanation of possible increased CV risk for COX-2 selective agents when it concludes that "it remains unclear, however, that it is the presence of, or the degree of, COX-2 selectivity that accounts for these observations, as some have hypothesized" and "…these observations raise serious questions about the so called "COX-2 hypothesis," which suggests that COX-2 selectivity contributes to increased CV risk."

Importantly, this FDA review also concludes that short-term use of NSAIDS to relieve acute pain does not appear to confer an increased risk of serious adverse CV events and that only Vioxx has been shown to reduce the risk of serious GI bleeding compared to a non-selective NSAID (naproxen) following chronic use.

This memorandum reflects FDA's conclusions regarding cardiovascular risks associated with NSAIDs.  This remains the current position of the FDA regarding the cardiovascular risk of NSAIDs.  Furthermore, manufacturers of NSAIDs are complying with FDA's mandate to include additional cardiovascular warnings.

*Opinions of Plaintiff's Experts*

I intend to respond to opinions offered or that may be offered by plaintiff's experts that are within my area of expertise regardless of whether they are directly addressed in this summary.

**CONCLUSION**

It is my opinion, based on my years of experience in the regulation of pharmaceuticals, that Merck adequately investigated the safety profile of Vioxx, timely and responsibly disclosed potential risks of Vioxx, reasonably disclosed the results of VIGOR to FDA and to the medical community, and properly worked with FDA to incorporate the VIGOR results into the prescribing information for Vioxx. Merck acted responsibly and properly throughout the development and marketing of Vioxx. It is also my opinion that Merck responded responsibly to the September 2001 Warning Letter and that Merck acted appropriately in response to the APPROVe interim data. In short, I believe that Merck at all times reasonably and timely disclosed data regarding the safety and efficacy of Vioxx in compliance with FDA regulations and guidances. Further, I found no evidence of inappropriate or improper withholding or representation of data to the FDA.

I reserve my right to supplement this report.

# <u>Lisa Rarick, M.D.</u>

## <u>Materials Reviewed</u>

1.   Commonwealth of Kentucky v. Merck, Complaint (September 28, 2009)

2.   Plaintiffs' Expert Disclosures (April 14, 2013)

3.   Plaintiffs' Rule 26.02 Expert Disclosures (April 15, 2013)

4.   Plaintiff's Supplemental Expert Disclosures (May 21, 2013)

5.   Plaintiff's Supplemental Responses to Defendant's First Set of Interrogatories and Appendices A & B to same (August 6, 2012)

6.   Plaintiff's Second Supplemental Response to Defendant's First Set of Interrogatories (June 3, 2013)

7.   Depositions of Bruce T. Eckerle, Allan Goldberg, M.D., Carla Holmes, Jonathan Ravid Jaffe, M.D., Linda Mitchell, Harvey Schuck, M.D., Thomas Cannell, David Madigan, Ph.D., David S. Egilman, M.D., MPH, Peter Rost, M.D., David A. Kessler, M.D., J.D., Beth Barnes, Ph.D.

8.   Deposition of Douglas Watson, M.D. (May 17, 2011; June 8, 2011; July 27, 2011), and Errata sheet

9.    VIOXX Package Inserts and Approval Letters

10.   Current and former labels of various NSAIDs and Naproxen

11.   Depositions in various Vioxx Proceedings

12.   FDA Medical Officer Reviews for Vioxx

13.   Transcripts of Congressional Hearings related to Vioxx

14.   FDA's Sequence of Events with Vioxx, since opening of IND

15.   Documents produced by FDA

16.   FDA Regulations

17.   FDA website

18.   Transcripts and Briefing Materials for Arthritis Advisory Committee Meetings on Vioxx

19.   Summary 2005 COXIB ACM Minutes

20. Transcripts and Briefing Materials for Arthritis Advisory Committee Meeting on Arcoxia

21. Correspondence with the FDA regarding Vioxx. (MRK-AAF0000001-17703)

22. Regulatory Filings with the FDA regarding NDA 21-042 (1999 Submission). (MRK-9940000001-2482)

23. Regulatory Filings with the FDA regarding CORE NDA 21-042 (2000 Submission). (MRK-00420000001-33165)

24. Regulatory Filings with the FDA regarding NDA 21-042 (2001 Submission). (MRK-01420019409-169499)

25. Regulatory Filings with the FDA regarding NDA 21-042 (2002 Submission). (MRK-02420000001-2844)

26. Regulatory Filings with the FDA regarding IND 55,269. (MRK-I2690000001-9610)

27. Regulatory Filings with the FDA regarding IND 46,894. (MRK-I8940000001-95877) and (MRK-I8940095960-105099)

28. Regulatory Filings with the FDA regarding NDA 21-052. (MRK-N0520000001-19454)

29. Regulatory Filings with the FDA regarding NDA 21-647. (MRK-N6470000001-7344)

30. Regulatory Filings with the FDA regarding NDA 21-042. (MRK-OS420000001-166451) and (MRK-S0420000001-142684)

31. Regulatory Filings with the FDA regarding IND MK-0996 (L-748731). (MRK-I4190000001-4491)

32. Regulatory Filings with the FDA regarding IND MK-0996 (L-748731). (MRK-I7680000001-5232)

33. Regulatory Filings with the FDA regarding Original IND (L-748731). (MRK-I2220000001-5988)

34. PMRD and ImpactRX Documents. (MRK-PLAH0000001-33101) and (MRK-PLABAI0000001-17277)

35. Kentucky Consumer Protection Act KRS 367.110 *et seq.*

36. Deposition of Leonard Tacconi (April 28, 2004) in Garza v. Merck & Co., Inc.

37. Trial Testimony of David Anstice (January 29, 2007) in Hermans/Humeston v. Merck & Co., Inc.

38.     ICH-E1: "The Extent of Population Exposure to Assess Clinical Safety for Drugs Intended for Long-Term Treatment of Non-Life-Threatening Conditions," dated June 1995.

39.     Merck Press Releases 1996-2005. (MRK-PRL0000001-257, 259-464, 468-469)

40.     Merck Research Laboratories Memorandum from T. Musliner to B. Friedman et al., dated November 21, 1996, Subject: Anticipated Consequences Of NSAID Antiplatelet Effects on Cardiovascular Events and Effects Of Excluding Low-Dose Aspirin Use in The Cox-2 GI Outcomes Megatrial. (MRK-ACS0007163-70)

41.     Merck, Email from Brian F. Daniels to Thomas Simon et al. dated February 26, 1997, Subject: Re: GI Outcomes Trial Protocol. (MRK-AAD0089672-674)

42.     Merck, Watson, D., Final Results of an Analysis of the Incidence of Cardiovascular SAEs in the Phase IIb/III VIOXX Osteoarthritis Clinical Trials, February 2, 1998. (MRK-AAD0046029-052)

43.     CDER Handbook, dated March 16, 1998.

44.     Merck, Reference P023, MRL Clinical Study Report, Multicenter Study:  A Double-Blind, Placebo-Controlled, Parallel-Group Study to Evaluate and Compare the Effects of L-748,731 (MK-0966), Indomethacin, and Placebo on Urinary Sodium Excretion and Other Parameters of Renal Function in Subjects Consuming a 200-mEq Sodium Diet (Protocol 023), dated April 17, 1998.  (MRK-OS420055426-530)

45.     Merck, Memo from Suzanne M. Pemrick to MK-0966 Project Team Members, dated June 8, 1998; Subject: MK-0966 Project Team Minutes for May 12, 1998. (MRK-AAD0032419-467)

46.     Merck Research Laboratories Memorandum from Suzanne M. Pemrick, Ph.D. to MK-0966 (VIOXX) Project Team Members, dated July 13, 1998, Subject: MK-0966 (VIOXX) Project Team Minutes for June 9, 1998. (MRK-ABF0001631-98)

47.     Merck presentation, "Selling Clinics Basic Training Leader's Guide", 1999. (MRK-AAR0028794-813)

48.     Merck, Letter from Louis M. Sherwood to Dear Doctor regarding Vioxx contraindications, dated 1999 (MRK-AAR0007515)

49.     FDA, Arthritis Advisory Committee Transcript, April 20, 1999. (MRK-AAP0000137-406).

50.     FDA April 30, 1999 Pelayo Renal Safety Review.

51.     Merck, Email from Edward M. Scolnick to David W. Blois and Bonnie J. Goldman, dated May 14, 1999; Subject: Vioxx US circular. (MRK-ABH0015578)

52.     FDA May 20, 1999 Villalba Medical Officer Review (Rofecoxib). (MRK-PUBLIC0000156-283)

53.     FDA May 20, 1999 Initial Approval Letter. (MRK-ACD0076268-76291)

54.     Letter from John A. Oates, M.D., Professor of Pharmacology, Vanderbilt University School of Medicine, to Edward Scolnick, MD, President, Merck, dated August 13, 1999, regarding episodes of thrombotic complications occurring in patients with the antiphospholipid syndrome soon after initiating therapy with celecoxib. (MRK-AAC0013060-64)

55.     FDA, Center for Drug Evaluation and Research, "Guidance for Industry, Changes to an Approved NDA or ANDA," dated November 1999.

56.     Merck, Interim Analysis of VIGOR, Unblinded Minutes; dated October 4, November 19 and December 22, 1999. (MRK-AAB0000510-15)

57.     Merck, January 26, 2000 Memo from Deborah Shapiro regarding Merck Management Requests to VIGOR Data Safety and Monitoring Board. (MRK-AAB0000517-18)

58.     Merck, Email from Edward M. Scolnick to Deborah R. Shapiro, dated February 11, 2000; Subject: RE: Talk. (MRK-AAB0069330-34)

59.     Merck, Email from Edward M. Scolnick to Deborah R. Shapiro et al., dated March 3, 2000; Subject: Vigor (MRK-ABH0016219)

60.     Merck, Bulletin for Vioxx, VIOXX Gastrointestinal Outcomes Research Study, dated March 27, 2000 and Letter from Mark J. Greco, MD, regarding results of the VIGOR trial. (MRK-AAR0007265-88)

61.     Email from Carlo Patrono to Martino Laurenzi, dated April 3, 2000; Subject: CV Issue (MRK-ADL0011977).

62.     Email from James A. Bolognese to Alise S. Reicin, dated April 13, 2000; Subject: RE: RA and CV mortality. (MRK-AAB0061158-59)

63.     "FDA: Too Early to Tell if Merck's Vioxx Needs Stronger Labeling", Dickinsons FDA Webview, May 1, 2000. (MRK-ADO0000738)

64.     Merck, Letters from Jeffrey M. Melin to Dear Doctor, dated May 8, 2000 regarding the VIOXX Gastrointestinal Outcomes Research trial and COX-2 inhibitors. (MRK-ABO0001809-10)

65.     Merck, VIOXX presentation, "Key Marketing Messages", HHPAC, May 17, 2000. (MRK-ABI0001899-915)

66.     FDA, Medical Officer's Advisory Committee GI Briefing Document, Division of Anti-Inflammatory, Analgesic and Ophthalmologic Drug Products: HFD-550, Review of

Vioxx Gastrointestinal Outcomes, Submission Date: June 29, 2000, Reviewer: Lawrence Goldkind, M.D. (MRK-AAD0067401-456)

67.     FDA, Memo from Renan Bonnel et al. (through Julie Beitz) to Jonca Bull, Subject: OPDRA Post Marketing Safety Review, Drugs: Rofecoxib, Celecoxib and Etodolac; Reaction: Thrombotic Vascular Events.  October 12, 2000. (MRK-AAD0022897-920)

68.     Merck, Shapiro Presentation: "VIOXX Preliminary Cardiovascular Meta-Analysis", October 18, 2000. (MRK-AAB0009616-668)

69.     Merck, Email from Durban M. Clement to Jay Galeota et al., dated November 2, 2000; Subject: VIOXX PT. SBD Teleconference 11/7, with attachments HTN & Edema Obstacle, November 24 Pt SBD Teleconference. (MRK-ADW0066820-26)

70.     Merck, Letter from Louis M. Sherwood, Merck to Dear Doctor, dated 2001, regarding the Safety Profile of VIOXX. (MRK-ADW0004462-63)

71.     Merck, Letters from Louis M. Sherwood and G. Paul Payton to Dear Doctor regarding CV data from OA studies, dated 2001 (MRK-P0002475-481)

72.     Merck, Letter from Denise Juliano to Dear Consultant Pharmacist regarding CV data from OA studies, dated 2001 (MRK-P0002733-39)

73.     Letter from James F. Fries, MD, Stanford University School of Medicine, to Raymond Gilmartin, Merck, dated January 9, 2001. (MRK-ABO0000250-53)

74.     Letter from Raymond Gilmartin, Merck to James F. Fries, MD, Stanford University School of Medicine, dated January 23, 2001. (MRK-ABG0000024-25).

75.     Merck, Email from Edward M. Scolnick to Raymond Gilmartin and David W. Anstice, dated January 31, 2001; Subject: Monday MC. (MRK-ACR0008985).

76.     FDA memorandum from SR Ahmad et al. (through Julie Beitz) to Jonca Bull, Subject: OPDRA Post Marketing Safety Review, Drugs: Etodolac, Celecoxib and Rofecoxib; Reaction: Renal Failure. February 1, 2001. (MRK-AAD0022879-896)

77.     FDA Memo from Targum to Cook, Consultation NDA 21-042, S-007, Review of Cardiovascular Safety Database; February 1, 2001.  (MRK-ABX002367-2404)

78.     Merck, Email from Harry A. Guess to Thomas Rhodes et al., dated February 5, 2001; Subject: FW: A word of Praise. (MRK-ACT0009918).

79.     FDA, Arthritis Advisory Committee Transcripts, February 8, 2001. (MRK-AAC0031952-2196).

80.     Email from Harry A. Guess to Douglas J. Watson et al., dated February 13, 2001; Subject: Passing Along A Note Of Thanks From Last Week. (MRK-ACT0018064)

81.     Merck, Presentation: "Dodge Ball VIOXX", listing 12 "Obstacles" associated with VIOXX, March 1, 2001. (MRK-AAR0019773-86).

82.     Letter from Raymond Gilmartin, Merck to James F. Fries, MD, Stanford University School of Medicine, dated March 22, 2001. (MRK-ABI0007187).

83.     Merck, Memo from Josh Chen to Ray Bain et al., dated April 4, 2001; Subject: MK-0996 Protocol 091 First AD Treatment Trial Summary of the Mortality Analysis. (MRK-AFT0009649-75).

84.     Merck, Memo from Joshua Chen to Raymond P. Bain, dated April 8, 2001; Subject: MK-0966 Combined Mortality Analysis Protocol 091 + Protocol 078 (MRK-AFT0009599-638)

85.     Merck, Email from Edward M. Scolnick to Dr. Douglas Greene, dated April 9, 2001; Subject: RE: VIGOR Approvable letter (MRK-ACR0009151-52).

86.     Merck, Letter from Louis M. Sherwood to Dear Healthcare Provider regarding Mukherjee article, dated August 2001 (MRK-P0002740-44)

87.     FDA, Warning Letter, dated September 17, 2001. (MRK-ABX0007685-93)

88.     Merck, Response Letter to Thomas Abrams (FDA) regarding DDMAC's Warning Letter, dated October 1, 2001. (MRK-ABI0003148-55)

89.     Merck, Email from Edward M. Scolnick to David W. Anstice, dated October 16, 2001; Subject: RE: vioxx label. (MRK-ABW0004799)

90.     Merck, Email from Edward Scolnick to Alise Reicin, dated November 7, 2001, Subject: comfort. (MRK-AAD0111414)

91.     Email from Alise S. Reicin to Edward M. Scolnick, dated November 7, 2001; Subject: Slides from Today. (MRK-ABH0020163-216)

92.     Merck, Email from Edward M. Scolnick to Douglas Alan Greene, dated November 8, 2001; Subject: RE: History Lesson. (MRK-ACR0009287)

93.     Merck, Letter from Louis M. Sherwood, Merck to Healthcare Provider re correction of Drug Information re Vioxx, dated November 2001. (MRK-AAD0076244-45)

94.     Merck, Letter to Thomas Abrams (FDA) regarding response to DDMAC's Warning Letter, dated November 19, 2001. (MRK-ACI0013233-13246)

95.     FDA, Letter from Laura Governale to Thomas M. Casola concluding DDMAC matter, dated January 2, 2002. (MRK-AAF0007894-95)

96.     Merck, Email from Edward M. Scolnick to Bonnie J. Goldman et al., dated February 25, 2002; Subject: Vioxx label. (MRK-ACR0009297)

97.     Merck, Letter from John Yates to Dear Healthcare Professional with highlighted label, dated April 2002 (MRK-P0011429-439)

98.     FDA April 11, 2002 Approval Letter. (MRK-AFV0266655-266673)

99.     "FDA Approves New Indication and Label Changes for the Arthritis Drug, Vioxx", FDA Talk Paper, T02-18, April 11, 2002. (MRK-AAX0006209-10)

100.    Merck, Important Prescribing Information - Dear Healthcare Professional Letter, April 2002.

101.    Merck, Letter regarding 12.5 mg versus naproxen, March 17 2004 (MRK-APW0000041-42)

102.    Merck, Letter regarding dental pain, March 17 2004 (MRK-APW0000052-53)

103.    Merck, "IND 46,894: VIOXX (rofecoxib): Information Amendment – Clinical (Updated Cardiovascular Pooled Analysis)," dated March 22, 2004. (MRK-I8940080062-0133)

104.    FDA March 26, 2004 Approval Letter.

105.    Merck, Presentation: "VIOXX CV Update, Interim Data from APPROVe Study thru 8/16/04. (MRK-AFF0000001-20).

106.    FDA August 19, 2004 Approval Letter. (MRK-N0520018851-8879)

107.    Merck, Letter regarding postbunionectomy, August 24, 2004 (MRK-APW0000062-63)

108.    Bulletin for Vioxx: Action Required: Observational Analysis by Graham et al., No. COX 04-463, August 26, 2004. (MRK-AAR0069485-87)

109.    Merck, Letter from William Keane to Dear Healthcare Professional regarding withdrawal, September 30, 2004 (MRK-P0011253-59)

110.    Merck, Letter from Ned S. Braunstein to Brian E. Harvey, FDA, dated September 30, 2004, regarding NDA 21-042 VIOXX (Rofecoxib Tablets), General Correspondence, Voluntary Withdrawal of Product from the Market. (MRK-AFF0000021-22).

111.    Merck News Release, Merck Announces Voluntary Worldwide Withdrawal of VIOXX (September 30, 2004). (MRK-AFF0000053-55)

112.    FDA News "FDA Issues Public Health Advisory on Vioxx as its Manufacturer Voluntarily Recalls the Product", dated September 30, 2004.

113.    FDA October 11, 2004 Letter to Dennis M. Erb, Ph.D at Merck.  (MRK-AID0007283-7284)

114.    Final Transcript, Thomson Street Events, MRK-Merck & Co., Inc. Conference Call, October 13, 2004. (MRK-AFF0000218-32).

115.    Kweder, SL, FDA Presentation, "Drug Regulation in Controversy: Vioxx", November 10, 2004. (MRK-AHD0007632-51).

116.    Statement of Sandra Kweder, MD, before the Committee on Finance, United States Senate, November 18, 2004. (MRK-AHD0007600-607)

117.    Testimony of Sandra Kweder before the Senate Finance Committee, dated November 18, 2004.

118.    FDA December 18, 2004 Villalba Interim Review, NDA # 21-042/s030 (Update of Cardiovascular Thrombotic Events in Alzheimer's Studies 078 and 091).

119.    FDA Statement on Naproxen, December 20, 2004.

120.    VIOXX Timeline, Key Dates for VIGOR (1998-2011) and Long-term, Placebo-controlled Studies Implemented to Provide Cardiovascular Safety Data. (MRK-AFF0000212-15).

121.    Merck, January 21, 2005 - Rofecoxib FDA Advisory Committee Background Information + Sequence of Events with VIOXX, since opening of IND. (MRK-S0420050745-920)

122.    FDA February 16, 2005, Joint Meeting of the Arthritis Advisory Committee and The Drug Safety and Risk Management Advisory Committee Transcript.

123.    FDA, John Jenkins & Paul Seligman, "Analysis and Recommendations for Agency Action Regarding Non-Steroidal Anti-Inflammatory Drugs and Cardiovascular Risk" (Memo dated April 6, 2005).

124.    "An Open Letter from Merck" from Peter S. Kim dated 12/15/05.

125.    Merck, Letter from Philip L. Huang, M.D. to the FDA, dated May 10, 2006. (MRK-S0420112017-2132)

126.    Merck Statement on the APPROVe Extension Statistical Package, May 11, 2006. (MRK-AFN0116525)

127.    Merck, Letter from Philip L. Huang, M.D. to the FDA, dated May 30, 2006. (MRK-S0420112190-2331)

128.    June 26, 2006 Open Letter from Merck. (MRK-ABY0200925-929)

129.    June 26, 2006 Press Release entitled "Merck Stands Behind Original APPROVe Study Results." (MRK-AFK0338614-616)

130.    Merck, August 18, 2008 Open Letter from Jonathan M. Edelman to the Editors of The Annals of Internal Medicine.

131.    Merck, November 23, 2009 Press Release entitled "Merck Statement on Article in The Archives of Internal Medicine Involving VIOXX®."

132.    Merck, Acute Pain letter (MRK-APW0000027-030)

133.    Merck, Acute Pain letter (MRK-APW0000031-34)

<u>Publicly available information and scientific literature including, but not limited to, the following</u>

1.    Antithrombotic Trialists' Collaboration, "Collaborative Meta-Analysis of Randomised Trials of Antiplatelet Therapy for Prevention of Death, Myocardial Infarction, and Stroke in High Risk Patients," *BMJ* 2002;324:71-86.

2.    *AP Online* "New Worries Tarnishing Arthritis Drugs," November 11, 2004.

3.    Baigent C. and Patrono C., "Selective Cyclooxygenase 2 Inhibitors, Aspirin, and Cardiovascular Disease: A Reappraisal," *Arthritis Rheum* 2003 Jan; 48(1):12-20.

4.    Baron J.A., et al., "A Randomized Trial of Rofecoxib for the Chemoprevention of Colorectal Adenomas, " *Gastroenterology* 2006; 131:1674-1682.

5.    Baron J.A., et al., "Cardiovascular Events Associated with Rofecoxib:  Final Analysis of the APPROVe Trial," *Lancet* 2008; 372:1756-64.

6.    Bhana and McClellen, "Indobufen: An Updated Review of Its Use in the Management of Atherothrombosis" *Drugs and Aging,* 2001 Jan. 1 18(5): 369-388.

7.    Bombardier C, et al. "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis." *NEJM* 2000; 343:1520-1528.

8.    Bombardier C., Reicin A., et al., "Response to Expression of Concern regarding VIGOR Study," *NEJM* 2006; 354:1196-1199.

9.    Bombardier C., et. al., Letter to Editor, "Rofecoxib and Clinically Significant Gastrointestinal Events," *Am J of Med Sciences* 2011; 342(5):438-439.

10.    Bresalier RS, et al., "Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial," *NEJM* 2005 Feb 15; 352:1092-102 and Correction, *NEJM* 2006; 355:221.

11.    Brzozowski, T et al., "Classic NSAID and Selective Cyclooxygenase (COX)-1 and COX-2 inhibitors in Healing of Chronic Gastric Ulcers", *Microscopy Research and Technique* 2001; 53:343-353.

12.    Brideau, C. et al., "A Human Whole Blood Assay For Clinical Evaluation of Biochemical Efficacy of Cyclooxygenase Inhibitors," *Inflamm Res*. 1996; 45:68-74.

9

13. Brochier "Evaluation of Fluribiprofen for Prevention of Reinfarction and Reocclusion after Successful Thrombolysis or Angioplasty in Acute Myocardial Infarction," *Eur Heart J*. 1993 Jul; 14(7):951-7.

14. Capone ML, et al., "Clinical Pharmacology of Platelet, Monocyte and Vascular Cyclooxygenase Inhibition by Naproxen and Low-Dose Aspirin in Healthy Subjects," *Circulation* 2004 Mar 30; 109(12):1468-71.

15. Cataldo et. al., "Indobufen Compared With Aspirin and Dipyridamole on Graft Patency After Coronary Artery Bypass Surgery: Results of a Combined Analysis." *Coronary Artery Disease* 1998; 9(4):217-22.

16. Catella-Lawson F, et al., "Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics and Vasoactive Eicosanoids," *J Pharmacol. Exp. Ther*. 1999 May; 289(2): 735-41.

17. Catella-Lawson F et al., "Cyclooxygenase Inhibitors and the Antiplatelet Effects of Aspirin," *NEJM* 2001; 345(25):1809-1817.

18. Coxib and traditional NSAID Trialists' (CNT) Collaboration, "Vascular and upper gastrointestinal effects of non-steroidal anti-inflammatory drugs: meta-analyses of individual participant data from randomised trials," Lancet. 2013 May 29. pii: S0140-6736(13)60900-9. doi: 10.1016/S0140-6736(13)60900-9. [Epub ahead of print]

19. Curfman G.D., et al., Editorial, Expression of Concern: Bombardier et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," *NEJM* 2005; 353(26):2813-2814.

20. Curfman G.D., et al., Editorial "Expression of Concern Reaffirmed," *NEJM* 2006, Feb. 22.

21. Fornaro G, et al., "Indobufen in the Prevention of Thromboembolic Complications in Patients With Heart Disease. A Randomized, Placebo-Controlled, Double-Blind Study," *Circulation* 1993 Jan; 87(1):162-4.

22. Graham D.Y., et. al., "Rofecoxib and Clinically Significant Upper and Lower Gastrointestinal Events Revisited Based on Documents from Recent Litigation," *Am J Med Sci* 2011; 342(5):357-365.

23. Graham D.J., et al., "Risk Of Acute Myocardial Infarction And Sudden Cardiac Death In Patients Treated With Cyclo-Oxygenase 2 Selective And Non-Selective Non-Steroidal Anti-Inflammatory Drugs: Nested Case-Control Study," *Lancet* 2005 Feb 5;365(9458):475-81.

24. Harris, G. "Drug Safety Review Says F.D.A. Delayed Vioxx Study," *New York Times*, November 4, 2004. (MRK-AFV0343156-58).

25. Herper, October 5, 2004; "Fuzzy Drug Company Math" (Forbes.com)

26.     Herper, October 14, 2004; "Merck's Missing Vioxx Study" (Forbes.com)

27.     Horton, R "Vioxx, The Implosion Of Merck, And Aftershocks At The FDA",
        www.thelancet.com, November 5, 2004.

28.     Juni P., et al., "Risk of Cardiovascular Events and Rofecoxib: Cumulative Meta-
        analysis," *Lancet* 2004; 364(9450):2021-2029.

29.     Kearney PM et al., "Do Selective Cyclo-oxygenase-2 Inhibitors and Traditional Non-
        Steroidal Anti-inflammatory Drugs Increase the Risk of Atherothrombosis? Meta-
        Analysis of Randomised Trials," *BMJ* 2006;332:1302-1308.

30.     Kerr D.J., et al., "Rofecoxib and Cardiovascular Adverse Events in Adjuvant Treatment
        of Colorectal Cancer [the VICTOR Trial], " *NEJM* 2007; 357(4):360-369, and
        Supplementary Appendix.

31.     Kim P.S., et al., Response to Article by Juni et al. Published in *The Lancet* on Nov. 5,
        Merck internet posting 11/5/04. (MRK-AAD0412032-35)

32.     Kimmel S.E., et al., "The Effects of Nonselective Non-Aspirin Nonsteroidal Anti-
        Inflammatory Medications on the Risk of Nonfatal Myocardial Infarction and Their
        Interaction with Aspirin," *J Am Coll Cardiol* 2004 Mar 17;43(6):985-90.

33.     Klultstein, MW et al., "Rofecoxib, a Cox 2 Inhibitor NSAID Lowers C-Reactive Protein
        And IL-6 Level In Patients With Unstable Angina Pectoris," *European Heart Journal*,
        September 2001 22, Abstr. Supp: 241.

34.     Ko, D et al., "Nonsteroidal Antiinflammatory Drugs After Acute Myocardial Infarction,"
        *American Heart Journal* 2002, 143(3):475-81.

35.     Konstam MA, et al., "Cardiovascular Thrombotic Events in Controlled, Clinical Trials Of
        Rofecoxib," *Circulation* 2001 Nov; 104(19):2280-2288.

36.     Laine L., et al., "Ulcer Formation with Low-Dose Enteric-Coated Aspirin and the Effect
        of COX-2 Selective Inhibition:  A Double-Blind Trial," *Gastroenterol* 2004; 127:395-
        402.

37.     Leese P.T., et al., "Effects of Celecoxib, A Novel Cyclooxygenase-2 Inhibitor, on Platelet
        Function Ii Healthy Adults: A Randomized, Controlled Trial," *J Clin Pharmacol*. 2000
        Feb; 40(2):124-32.

38.     Lipani, J, "Cox-2 Inhibitors and Cardiovascular Risk, the Data Are Inconclusive and
        These Drugs Are Needed," *Cleveland Clinic Journal of Medicine*, November 2001;
        68(11):961-62.

39.     McAdam B.F., et al., "Systemic Biosynthesis of Prostacyclin by Cyclooxygenase (COX)-
        2: The Human Pharmacology of a Selective Inhibitor of COX-2," *Proc Natl Acad Sci
        USA* 1999; 96:272-277.

40.    Mamdani M, et al., "Effect of Selective Cyclooxygenase 2 Inhibitors and Naproxen on Short-Term Risk of Acute Myocardial Infarction in the Elderly," *Arch Intern Med* 2003 Feb 24; 163(4):481-6.

41.    Mukherjee D, et al., "Risk of Cardiovascular Events Associated with Selective COX-2 inhibitors," *JAMA* 2001 Aug; 286(8):954-959.

42.    Murata T et al., "Altered Pain Perception and Inflammatory Response in Mice Lacking Prostacyclin Receptor," *Nature* 1997 Aug 14; 388:678-682.

43.    NDCHealth, October 20, 2004; "NDCHealth Measures Potential Long-Term Users of Vioxx."

44.    *NYT* "A Medical Journal Calls for a New Watchdog on Drugs" (November 23, 2004).

45.    Ouellet, M et al., "A High Level of Cyclooxygenase-2 Inhibitor Selectivity is Associated With a Reduced Interference of Platelet Cyclooxygenase-1 Inactivation By Aspirin," *PNAS*, December 4, 2001, 98(25):14583-14588.

46.    Patrono C., et al., "Platelet-Active Drugs: The Relationships Among Dose, Effectiveness, And Side Effects: The Seventh ACCP Conference on Antithrombotic and Thrombolytic Therapy," *Ches*t 2004 Sep; 126(3 Suppl.):234S-264S.

47.    Practico D., et al., "Acceleration of Atherogenesis by COX-1 Dependent Prostanoid Formation in Low Density Lipoprotein Receptor Knockout Mice," *PNAS* 2001 Mar 13; 98(6):3358-3363.

48.    Rahme E, et al., "Association Between Naproxen Use and Protection Against Acute Myocardial Infarction," *Arch Intern Med* 2002 May; 162:1111-1115; Correction 2002;169:1858.

49.    Ray W.A., et al., "Non-steroidal Anti-inflammatory Drugs and Risk of Serious Coronary Heart Disease: An Observational Cohort Study," *Lancet* 2002 Jan 12; 359(9301):118-23.

50.    Ray W.A., et al., "COX-2 Selective Non-Steroidal Anti-Inflammatory Drugs and Risk Of Serious Coronary Heart Disease," *Lancet* 2002 Oct 5;360(9339):1071-73.

51.    Reicin AS, et al., "Comparison of Cardiovascular Thrombotic Events in Patients With Osteoarthritis Treated With Rofecoxib Versus Nonselective Nonsteroidal Anti-Inflammatory Drugs (Ibuprofen, Diclofenac, And Nabumetone)," *Am J Cardiol*. 2002 Jan 15; 89(2):204-209.

52.    Reicin, A et al.,  "Incidence of Cardiovascular Events in the Rofecoxib Development Program" (Poster).

53.    Richwine and Heavey "UPDATE 2-Reuters Summit-US FDA: won't change system post-Vioxx,"  November 15, 2004.

54.     Ridker PM, et al., "Inflammation, Aspirin, and the Risk of Cardiovascular Disease in Apparently Healthy Men," *NEJM* 1997 Apr; 336:973-979.

55.     Ross, J.S., et al., "Pooled Analysis of Rofecoxib Placebo-Controlled Clinical Trial Data, Lessons for Postmarket Pharmaceutical Safety Surveillance," *Arch Intern Med.* 2009; 169(21):1976-1985.

56.     Ross J.S., et al., Editor's Correspondence, Research Letters:  "Persistence of Cardiovascular Risk After Rofecoxib Discontinuation," *Arch Intern Med.* 2010; 170(22):2035-2036, with Correction in *Arch Intern Med.* 2011; 171(4):305.

57.     Sajadieh A., et al., "Nonsteroidal Anti-Inflammatory Drugs After Acute Myocardial Infarction", *Am J Cardiology*, 1999 83:1263-65.

58.     Schnitzer, TJ et al., "Comparison of Lumiracoxib With Naproxen and Ibuprofen in the Therapeutic Arthritis Research and Gastrointestinal Event Trial (TARGET), Reduction in Ulcer Complications: Randomised Controlled Trial," *The Lancet* 2004, 364:665-74.

59.     Schwartz et al. "Inhibition of Platelet Aggregation by Naproxen, Rofecoxib, Diclofenac, Ibuprofen and Meloxicam." [Abstract EULAR presentation]

60.     Shah, AA et al.,  "Selective Inhibition Of Cox-2 in Humans is Associated With Less Gastrointestinal Injury: A Comparison Of Nimesulide And Naproxen," *Gut* 2001 48:339-46.

61.     Simons and Stipp, November 1, 2004; "Will Merck Survive Vioxx?" (*CNN Money*).

62.     Singer, II et al., "COX-1 is the Major Isoform of Cyclooxygenase Co-Localizing With Prostacyclin Synthase in Normal Dog Aortic Endothelium," Cox PGIS Inflammation Poster, Rev 2, May 28, 2003.

63.     Singh, G. et al., "Consequences of Increased Systolic Blood Pressure in Patients with Osteoarthritis and Rheumatoid Arthritis," *The Journal of Rheumatology* 2003, 30 (4):714-19.

64.     Smith E.F., et al., "Stabilization of Cardiac Lysosomal and Cellular Membranes in Protection of Ischemic Myocardium due to Coronary Occlusion:  Efficacy of the Nonsteroidal Anti-inflammatory Agent, Naproxen," *Am Heart J* 101:394, 1981.

65.     Solomon  D.H., et al., "Nonsteroidal Antiinflammatory Drug Use and Acute Myocardial Infarction," *Arch Intern Med.* 2002 May; 162:1099-1104.

66.     Solomon DH, et al., "Relationship Between Selective Cyclooxygenase 2 Inhibitors and Acute Myocardial Infarction in Older Adults," *Circulation* 2004 May 4; 109(17):2068-73.

67.     Summary of Meetings American Heart Association & American College of Rheumatology, November 10-15, 2010. (MRK-ABK0167641-MRK-ABK0167648).

68.     Topol EJ, "Failing the Public Health — Rofecoxib, Merck, and the FDA," *NEJM* 2004;351(17):1707-1709.

69.     Topol "Good Riddance to a Bad Drug, " *NYT* (October 2, 2004).

70.     Tuleja E., et al., "Effects of Cyclooxygenases Inhibitors on Vasoactive Prostanoids and Thrombin Generation at the Site of Microvascular Injury in Healthy Men," *Arteriosclerosis Thromb Vasc Biol* 2003 Jun 1; 23(6):1111-15.

71.     van Adelsburg J., "The VIOXX in Prostate Cancer Prevention Study:  Cardiovascular Events Observed in the Rofecoxib 25 mg and Placebo Treatment Groups, " *Current Medical Research and Opinion* 2007; 23(9):2063-2070.

72.     van Hecken A., "Comparative Inhibitory Activity of Rofecoxib, Meloxicam, Diclofenac, Ibuprofen, and Naproxen on COX-2 versus COX-1 in Healthy Volunteers," *J of Clin Pharm* 2000; 40:1109-1120.

73.     "VIGOR:  Landmark Study Confirms Superior GI Safety Profile With Rofecoxib," A Report from Digestive Week Congress, May 24, 2000. (MRK-AAC0023877 – MRK-AAC0023878)

74.     Warner, TD, et al., "Nonsteroid Drug Selectivities For Cyclo-Oxygenase-1 Rather Than Cyclo-Oxygenase-2 Are Associated With Human Gastrointestinal Toxicity: A Full *In* Vitro Analysis," *Pharmacology* 1999; 7563-7568.

75.     Watson DJ, et al., "Lower Risk of Thromboembolic Cardiovascular Events With Naproxen Among Patients With Rheumatoid Arthritis," *Arch Intern Med*. 2002 May; 162:1105-1110.

76.     Weir MR, et al., "Selective COX-2 Inhibition and Cardiovascular effects: A Review of the rofecoxib development program," *Am Heart J* 2003 Oct; 146(4):591-604.

77.     Whelton A, "Renal and Related Cardiovascular Effects of Conventional and COX-2 Specific NSAIDs and non NSAID Analgesics", *Am J Therapeutics* 2000; 7(2): 63-74

78.     Wong, E., et al., "Effects of Cox-2 Inhibitors on Aortic Prostacyclin Production in Cholesterol-Fed Rabbits," *Atherosclerosis* 2001; 393-402.

79.     Woodcock, J, "Current System Works; Opposing View: Even After Approval, FDA Strives To Get Answers About Drugs' Dangers," *USA Today*, October 14, 2004.

80.     *WSJ* "Shares of Merck Sink on Worries Over Vioxx, " May 1, 2000.

81.     *WSJ* "Merck Fought Vioxx Safety Concerns", November 1, 2004; Mathews, AW and Martinez, B, "E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage", November 1, 2004.

82.     *WSJ* "Did FDA Staff Minimize Vioxx's Red Flags?" (November 10, 2004).

83.  *WSJ* "Despite Warnings, Drug Giant Took Long Path to Vioxx Recall." (November 14, 2004).

84.  *WSJ* "Path to Withdrawal, and Aftermath." (November 17, 2004).

85.  *WSJ* "Merck Documents Shed Light on Vioxx Legal Battles." (February 7, 2005).

86.  *WSJ* "Merck & Co. Offers Rationale, Context for Vioxx Memos." (November 15, 2004).

87.  2006 Federal Register, 21 CFR Parts 201, 314, and 601, Requirements on Labeling

88.  VIOXX Patient Information, Packaging, Carton Labels and Package Inserts. (MRK-LBL0000001-313)

In addition to the materials listed above, during my education, training, and the practice of medicine, I regularly reviewed materials relevant to my practice including, but not limited to books, treatises, medical literature, scientific test data, and the like.  I reviewed materials of this kind related to topics of interest for my medical practice including such documents about NSAIDs.

# EXHIBIT K

Summary of Prepared Testimony

Raymond V. Gilmartin,
President, Chairman and Chief Executive Officer,
Merck and Co., Inc.

before the
United States Senate Committee on Finance

November 18, 2004

- The Food and Drug Administration approved Vioxx only after Merck had extensively studied the medicine.

- Merck continued to extensively study Vioxx after it was approved for marketing to gain more clinical information about the medicine.

- Merck has promptly disclosed the results of numerous Merck-sponsored studies to the FDA, physicians, the scientific community and the media and participated in a balanced, scientific discussion of its risks and benefits.

- Until data from the APPROVe clinical trial became available in September, the combined data from randomized controlled clinical trials showed no difference in confirmed cardiovascular event rates between Vioxx and placebo and Vioxx and NSAIDs other than naproxen.

- While epidemiological studies have an important role to play, given their inherent limitations, when both epidemiological studies and randomized controlled clinical studies are available, the randomized controlled clinical trials are the most persuasive evidence.

- As soon as the data from the APPROVe study became available, Merck acted quickly to withdraw the medicine from the market.

Prepared Testimony

Raymond V. Gilmartin,
President, Chairman and Chief Executive Officer,
Merck and Co., Inc.

before the
United States Senate Committee on Finance

November 18, 2004

Mr. Chairman, Senator Baucus, members of the Committee, my name is Ray Gilmartin and I am chairman, president and chief executive officer of Merck & Co. On behalf of the 60,000 men and women of Merck, I am pleased to have the chance to come before you to tell you more about who we are and what we stand for.

On the afternoon of September 24th, Dr. Peter Kim, President of Merck Research Laboratories, called to alert me to information he had received just that morning. The information was from an independent, external board of physicians and scientists monitoring the safety of patients in a major trial on Vioxx. He told me that in the trial we sponsored – known as APPROVe –there was an increased risk of confirmed cardiovascular events beginning after 18 months of continuous daily treatment in patients taking Vioxx compared to those taking placebo.

That call triggered a series of events that led, within four days of that call, to Merck contacting the FDA to tell them that we were going to withdraw Vioxx from the market.

The decision that we made to voluntarily withdraw Vioxx was difficult in several ways. Vioxx was the only nonsteroidal anti-inflammatory medicine or NSAID that was demonstrated to provide pain relief similar to high-dose NSAIDs and proven to reduce the risk of developing debilitating gastrointestinal side effects compared to those on NSAIDs. This was an important benefit for many who suffered from the pain of arthritis and other conditions. An estimated 15,000 Americans die each year from gastrointestinal bleeding associated with NSAID use.

Many patients counted on Vioxx to help them when no other medicine would. We believed that it would have been possible for Merck to continue to market Vioxx with labeling that would incorporate the new data.

On another level, however, the decision we made to withdraw Vioxx was easy. Given the availability of alternative therapies and the questions raised by the data, withdrawing Vioxx was consistent with an ethic that has driven Merck actions and decisions for more than one hundred years. Merck puts patients first.

I am pleased today to assist the Committee in better understanding this decision and the events that led to it.  I would like to make three points clear at the outset.

First, the Food and Drug Administration approved Vioxx only after Merck had extensively studied the medicine and found it to be safe and effective. Merck continued to extensively study Vioxx after it was approved for marketing to gain more clinical information about the medicine.

Second, over the past six years, since the time Merck submitted a New Drug Application for Vioxx to the FDA, we have promptly disclosed the results of numerous Merck-sponsored studies to the FDA, physicians, the scientific community and the media and participated in a balanced, scientific discussion of its risks and benefits.

Third, until APPROVe, the combined data from randomized controlled clinical trials showed no difference in confirmed cardiovascular event rates between Vioxx and placebo and Vioxx and NSAIDs other than naproxen.  When data from the APPROVe study became available, Merck acted quickly to withdraw the medicine from the market.

In my few minutes, I welcome the chance to review each of these points and welcome your questions.

<u>Merck's Actions in Response to Questions on Vioxx Safety</u>

Mr. Chairman, as you know, no medicine is absolutely safe; all medicines have side effects.  To determine both its risks and benefits, Merck extensively studied Vioxx before seeking regulatory approval to market it and we continued to conduct studies after the FDA approved Vioxx.

I have provided, with this statement, a timeline of our Vioxx research and development process to aid in the Committee's understanding of the events.

Our original New Drug Application to the FDA for Vioxx included data on more than 5,000 patients with osteoarthritis. The clinical trials compared the effects of Vioxx to other non-naproxen NSAIDs and to placebo, and included data on patients who had been on Vioxx for longer than one year.  In these studies, there was no difference in the rate of cardiovascular events between Vioxx and placebo, or between Vioxx and non-naproxen NSAIDs.

Prior to the FDA's approval of Vioxx, we had initiated a study known as VIGOR.  That study was designed to compare the gastrointestinal safety profile of Vioxx at twice its maximum recommended chronic dose with naproxen.

We chose naproxen for this study instead of placebo because we intended to test Vioxx in patients with rheumatoid arthritis.  These are among the patients who we hoped would benefit from taking Vioxx.  It would not have been ethical or practical to subject people suffering from arthritis pain to a placebo for a long time.

The preliminary results from the VIGOR trial became available to Merck in March, 2000. In the trial, there was a higher cardiovascular event rate in patients taking Vioxx than naproxen.  These data were of concern to us.

It is important to note that, because the VIGOR study compared two drugs – Vioxx and naproxen – and not Vioxx and placebo, it was not possible to make a determination, based on the VIGOR study alone, whether naproxen was having a beneficial cardiovascular effect, or whether Vioxx was having a detrimental cardiovascular effect.

To help us evaluate the meaning of the VIGOR study, Merck took the step of looking into data from two trials we had already initiated in which patients with memory impairment or Alzheimer's were given Vioxx or placebo.  We found that there was no difference in cardiovascular event rates in these two trials.

These data, our earlier clinical data, and a pharmacological study that showed that naproxen had strong anti-platelet effects similar to aspirin, when it is taken regularly twice a day, as it was in VIGOR, led us to conclude that the best explanation for the difference in VIGOR was an effect of naproxen.

As Merck continued to monitor the safety of Vioxx, we recognized the value and interest in obtaining additional cardiovascular safety data on Vioxx and discussed how to obtain placebo-controlled data in the population of patients with pain in whom Vioxx was indicated. Among the issues we had to consider was the ethical difficulty in giving placebo, rather than a pain-relief medicine, to patients in pain over a longer period of time.

After deliberations with numerous outside advisers, Merck developed and discussed with the FDA a plan to prospectively analyze the cardiovascular event rates from three, large, placebo-controlled studies, two of which were already underway.

It was preliminary information from one of those long-term trials – the APPROVe study – that led to Merck's decision to withdraw Vioxx.

Merck's Disclosure of Safety-related Information on Vioxx

Merck has promptly disclosed the results of Merck-sponsored studies of Vioxx to the FDA, physicians, the scientific community and the media.  By doing so, we fostered – both internally and externally – a robust scientific discussion of the risks and benefits of Vioxx.

In March 2000, when we received the results of the VIGOR study, we promptly issued a news release providing its conclusions and we submitted its results to the FDA.  The cardiovascular results of VIGOR were widely reported and discussed at the time.  Just two months later, we submitted the initial VIGOR results to the New England Journal of Medicine for publication and presented the data at a major scientific meeting.

We also worked diligently with the FDA to review the data and develop revised prescribing information. This revised prescribing information included the cardiovascular data from VIGOR and a cardiovascular precaution.

Since the time of our release of the VIGOR study data, there has been a healthy scientific discussion of the safety of Vioxx and other COX-2 inhibitors. This discussion has occurred within Merck's laboratories and at external scientific forums.

Merck supported that discussion. However, when researchers published articles or gave speeches that presented misleading or inaccurate information about Vioxx, Merck sought to set the record straight about a medicine that provided significant benefits to patients.

We are confident that a careful and complete examination of Merck's conduct shows that, at all times, we acted responsibly and in a manner consistent with Merck's commitment to patient safety and our rigorous adherence to scientific investigation, openness and integrity.

Merck Acted Based on Data from a Placebo-Controlled Clinical Study

In light of the history of our detailed examination of the cardiovascular safety of Vioxx, Dr. Kim's September 24th call to me was unexpected. Our clinical data – from our original application to the FDA seeking approval of Vioxx to that day – had shown no difference between Vioxx and placebo.

Mr. Chairman, Merck believed wholeheartedly in Vioxx. I believed wholeheartedly in Vioxx. In fact, my wife was a user of Vioxx until the day we withdrew it from the marketplace.

Much has been made of epidemiological studies conducted over the past few years about Vioxx.

Two points are worth noting about these studies.

First, because of the design limitations inherent in epidemiological studies, their results must be interpreted with caution. For example, years of epidemiological studies on hormone replacement therapy (HRT) appeared to indicate that HRT was heart and cancer protective. In fact, recent well-controlled clinical studies have proven the opposite.

Second, the epidemiological data were inconsistent. I have included with this statement a timeline of epidemiological studies involving Vioxx or other NSAIDs that illustrate this point.

While epidemiological studies have an important role to play, given their inherent limitations, when both epidemiological studies and randomized controlled clinical studies are available, the randomized controlled clinical trials are the most persuasive evidence.

Prior to APPROVe, there was no demonstrated increased risk of cardiovascular events for patients taking Vioxx compared to patients taking placebo or NSAIDs other than naproxen in randomized controlled clinical trials. And, we only found an increased risk of cardiovascular events because Merck continued to study Vioxx for such a long time period. In fact, Vioxx and aspirin are the only two NSAIDS for which there is significant, publicly available long-term safety data.

When Dr. Kim contacted me to describe the risk, Merck acted.

Conclusion

In conclusion, Mr. Chairman, throughout Merck's history, it has been our rigorous adherence to scientific investigation, openness and integrity that has enabled us to bring new medicines to people who need them.

I am proud that we followed that same rigorous scientific process at every step of the way with Vioxx. Mr. Chairman, I would be pleased to answer the questions that you or the Committee might have.



**VIOXX TIMELINE**
**Key Dates for VIGOR and Long-term, Placebo-controlled**
**Studies Implemented to Provide Cardiovascular Safety Data**

**1993**          Studies published in which indobufen (Circulation, 1993, 87:162-164) and the non-selective NSAID flurbiprofen (European Heart Journal, 1993, 13, 951-957) are shown to reduce cardiovascular (cv) events.

**1998**
April          Results of FitzGerald study first presented.  Among the results of the study was the surprising discovery that COX-2 specific inhibitors reduced the urinary excretion of prostacyclin metabolite. Based on these results, it was, for the first time, hypothesized that COX-2 specific inhibitors may alter the balance between prostacyclin and thromboxane and thereby increase the risk of cv events.

          Trial of VIOXX versus placebo in the prevention of Alzheimer's in patients with Mild Cognitive Impairment (MCI) begins.

Nov          Vioxx New Drug Application (NDA) submitted to the U.S. Food & Drug Administration (FDA). The application included data on approximately 5,400 osteoarthritis patients who participated in 8 double-blind, placebo-controlled and active-comparator studies.  In these studies, similar rates of investigator-reported thrombotic cardiovascular adverse events were seen with VIOXX, placebo, and comparator NSAIDs (ibuprofen, diclofenac, or nabumetone).

**1999**
Jan          VIOXX Gastrointestinal Outcomes Research[1] (VIGOR) trial initiated.
Feb          First trial of VIOXX versus placebo for the treatment of Alzheimer's disease begins.
April          Public meeting of FDA Advisory Committee on VIOXX NDA.
May          VIOXX approved by the FDA.
Oct          Adenomatous Polyp Prevention On VIOXX[2] (APPROVe) trial protocol finalized.

**2000**

| | |
|---|---|
| Feb | APPROVe trial enrollment begins. |
| March | Preliminary results from VIGOR become available to Merck. |
| March | News release on preliminary results of VIGOR issued by Merck. |
| March | Preliminary VIGOR results submitted to the FDA. |
| March | Merck unblinded to safety data from two ongoing Alzheimer's studies – one for prevention and one for treatment – that compare VIOXX to placebo. These data show no difference in cardiovascular event rates between VIOXX and placebo. |
| April | Second trial of VIOXX versus placebo for the treatment of Alzheimer's begins. |
| May | Preliminary VIGOR data submitted to the *New England Journal of Medicine* for publication. |
| May | VIGOR presented at Digestive Disease Week. |
| June | Final VIGOR data submitted to FDA in a Supplemental New Drug Application, which included draft prescribing information. |
| Nov | The GI and cardiovascular safety findings from VIGOR published in *The New England Journal of Medicine*. First VIOXX versus placebo trial in the treatment of Alzheimer's disease ends. In preparation for VIGOR Advisory Committee, second interim analysis of safety data from Alzheimer's prevention and treatment trials conducted, again showing no difference in cardiovascular event rates between VIOXX and placebo. |

**2001**

| | |
|---|---|
| Feb | Public meeting of FDA Advisory Committee on VIGOR. |
| May | Second trial of VIOXX versus placebo for treatment Alzheimer's disease stopped. |
| Oct | Pooled analysis of cardiovascular data from Phase II/III studies published in Circulation. Analysis demonstrated that VIOXX was not associated with excess cardiovascular thrombotic events compared with either placebo or non-naproxen NSAIDs. |
| Sept | Merck and Oxford University sign letter of intent to conduct the VIOXX in Colorectal Cancer Therapy: definition of Optimal Therapy[3] (VICTOR) trial. |
| Nov | APPROVe enrollment completed. |

**2002**

| | |
|---|---|
| April | U.S. Prescribing Information for VIOXX updated with VIGOR information and data from two placebo-controlled studies |
| April | First patient is enrolled in VICTOR trial. |
| June | Pooled analysis of placebo-controlled studies in patients with Alzheimer's and MCI presented at EULAR. The incidence of |

serious cardiovascular adverse events in this population was
similar on VIOXX and placebo.

## 2003

| | |
|---|---|
| March | VIOXX in Prostate cancer (ViP) trial protocol finalized. |
| April | Trial of VIOXX versus placebo in MCI ends. |
| June | ViP trial enrollment begins. |
| | Updated pooled analysis of Alzheimer's treatment and MCI data presented at EULAR. The cardiovascular event rate in patients taking VIOXX 25 mg continued to be similar to the rate in patients taking placebo; mean duration of treatment was 1.2 years in VIOXX group and 1.3 years in placebo group. |
| Oct | Updated pooled analysis published in the American Heart Journal. Analysis demonstrated that VIOXX was not associated with excess cv thrombotic events compared with either placebo or non-naproxen NSAIDs. |

## 2004

| | |
|---|---|
| Sept | APPROVe External Data Safety Monitoring Board notifies Merck of its recommendation to end APPROVe trial. |
| Sept | APPROVe, ViP and VICTOR trials terminated early. |
| Sept | Merck voluntarily withdraws VIOXX from the market. |
| Nov | APPROVe trial scheduled to end. |

## 2005

| | |
|---|---|
| Aug | ViP trial enrollment scheduled to be completed. |

## 2011

| | |
|---|---|
| Aug | ViP trial scheduled to end. |

---

[1.] In VIGOR, Vioxx 50 mg once daily (n=4,047) – a dose twice the highest recommended chronic dose – was compared to a common therapeutic dose of naproxen 500 mg twice daily (n=4,029) in patients with rheumatoid arthritis (median length of participation was nine months). The study assessed the incidence of serious GI events and the most serious, or "complicated," GI events, which included perforations, obstructions or major bleeding (PUB) in the upper GI tract. The study was designed to exclude patients requiring aspirin for cardioprotection.

In VIGOR, Vioxx 50 mg once daily significantly reduced the risk of serious GI events by 54 percent and the risk of complicated GI events by 57 percent compared to naproxen 500 mg twice daily. A total of 56 patients treated with Vioxx experienced a serious GI event compared to 121 patients taking naproxen, and a total of 16 patients receiving Vioxx had a complicated GI event versus 37 patients taking naproxen. In the study, the reduction in risk for serious and complicated GI events with Vioxx was maintained in patients both at high risk for developing a PUB and in patients without risk factors. Such

risk factors include: prior history of a PUB, age of 65 or older, *Helicobacter pylori* infectionor concomitant use of corticosteroids.

In VIGOR, a statistically significant higher incidence of serious cardiovascular thrombotic events was seen in patients receiving Vioxx 50 mg once daily compared to patients treated with naproxen 500 mg twice daily. A total of 45 serious cardiovascular thrombotic events occurred among 4,047 patients taking Vioxx compared to 19 among 4,029 taking naproxen. This was largely due to a difference in the incidence of non-fatal heart attacks: 18 for Vioxx and 4 for naproxen. The number of cardiovascular thrombotic deaths was similar in patients treated with Vioxx (n=7) compared to naproxen (n=6).

2. APPROVe was a multi-center, randomized, placebo-controlled, double-blind study to determine the effect of 156 weeks (3 years) of treatment with rofecoxib on the recurrence of adenomatous polyps of the large bowel in patients with a history of colorectal adenomas. The study included approximately 2600 patients aged 40-96; approximately 62% male. Aspirin was allowed in the study.

In APPROVe there was an increased relative risk for confirmed cardiovascular events, such as heart attack and stroke, beginning after 18 months of treatment for patients taking VIOXX as compared to placebo. Results for the first 18 months of the study did not show an increased risk of confirmed CV events on VIOXX and in this respect, the results are similar to the results of two prior placebo controlled studies described in the current U.S. labeling for VIOXX.

Merck followed the recommendation of the study's External Safety Monitoring Board and terminated this trial on September 30, 2004.

3. VICTOR was a randomized, double-blind, placebo-controlled, international, multicenter study of VIOXX in 7,000 colorectal cancer patients following potentially curative therapy. The primary hypothesis tested in the study was that VIOXX administered for two years will result in greater overall survival compared with placebo. CV events were monitored by the VICTOR trial investigators and Merck as part of the adverse events monitoring conducted as part of the study. The study was stopped on September 30, 2004.

4. ViP was a randomized, double-blind, placebo-controlled, multicenter study to evaluate the effects of VIOXX in decreasing the risk of prostate cancer. The study protocol called for 15,000 male patients, aged = 50 and = 75 years, with a life expectancy of greater than 6 years, with PSA = 2.5 ng/mL and = 10 ng/mL to be enrolled. The primary hypothesis to be tested in the study was that the risk of developing prostate cancer over six years of treatment will be lower in patients treated with VIOXX 25 mg/day than in patients treated with placebo; and that treatment with VIOXX would be generally safe and well tolerated. Cardiovascular adverse events were monitored by an external safety monitoring board as a part of the study. The trial was halted on September 30, 2004.

# # #

4

**Forward-Looking Statement**

This document contains "forward-looking statements" as that term is defined in the Private Securities Litigation Reform Act of 1995. These statements involve risks and uncertainties, which may cause results to differ materially from those set forth in the statements. The forward-looking statements may include statements regarding product development, product potential or financial performance. No forward-looking statement can be guaranteed, and actual results may differ materially from those projected. Merck undertakes no obligation to publicly update any forward-looking statement, whether as a result of new information, future events, or otherwise. Forward-looking statements in this press release should be evaluated together with the many uncertainties that affect Merck's business, particularly those mentioned in the cautionary statements in Item 1 of Merck's Form 10-K for the year ended Dec. 31, 2003, and in its periodic reports on Form 10-Q and Form 8-K (if any) which the company incorporates by reference.



## Timeline of Epidemiological Studies Involving VIOXX or NSAIDs[1]

Jan 2002    A retrospective cohort study by **Ray et al** is published in *The Lancet*. Objective
was to measure the effects of non-aspirin NSAIDs, including naproxen, on risk of
serious coronary heart disease (CHD). Study concludes that in a high-risk
patient population of people 50 years and older, non-selective non-aspirin
NSAIDs neither increased nor decreased risk of serious CHD. Analysis
evaluated 6,362 cases from the Tennessee Medicaid program during 181,441
periods of new NSAID use in 128,002 people and the same number of periods of
non-use of NSAIDs among 134,642 people.

May 2002    Three separate case-control studies are published in *Archives of Internal
Medicine*. Each showed that use of naproxen reduced the risk of heart attacks.
These studies were first presented at the American College of Rheumatology
meeting in 2001.

**Solomon et al**: Objective was to determine whether NSAIDs have a similar
effect or whether they differ in their effects on the risk of acute myocardial
infarction (AMI). Study concludes that the findings do not support a relationship
between the use of NSAIDs as a group and risk of heart attacks. However, use of
naproxen was associated with a significant reduction in the risk of AMI (adjusted
odds ratio, 0.84; 95% confidence interval, 0.72-0.98; P =.03). Analysis
evaluated 4,425 cases from the N.J. Medicare/ Medicaid Program against a
control group of 17,700 subjects.

**Watson, et al**: Objective of the study was to examine the risk of acute
thromboembolic cardiovascular events (heart attack, sudden death and stroke)
with naproxen use among patients with rheumatoid arthritis. The study
concludes that patients with rheumatoid arthritis and a current prescription for
naproxen had a reduced risk of acute major thromboembolic CV events relative
to those who did not take naproxen in the past year. Analysis evaluated 809
cases from British General Practice Research Database against a control group
of 2,285 subjects. Study sponsored by Merck.

**Rahme, et al**: Objective of the study was to compare the effect of naproxen to
other NSAIDs in the prevention of acute myocardial infarction (AMI) in an elderly
population. The study concludes that compared to other NSAIDs, concurrent use
of naproxen has a protective effect against AMI. Analysis evaluated 4,163 cases
from Canadian RAMQ and Med-Echo databases against a control group of
14,160 subjects. Study sponsored by Merck.

---

[1] **Editor's Note:** Timeline is not an exhaustive list of every study ever conducted to evaluate the safety of NSAIDs and COX-2
inhibitors; selected studies have been identified to illustrate the wide divergence of results from observational studies.

1

Oct 2002   A retrospective cohort study by **Ray et al** is published in *The Lancet*. Objective was to assess occurrence of serious coronary heart disease (CHD), specifically acute myocardial infarction (AMI) and cardiac death, in patients taking Vioxx, celecoxib or other NSAIDs. Study concludes use of Vioxx at doses greater than 25 mg could be associated with an increased risk of serious CHD; in contrast, there was no evidence of increased risk among users of Vioxx at doses of 25 mg or less, celecoxib, naproxen or ibuprofen. Analysis evaluated 5,316 events from the Tennessee Medicaid program among 251,046 NSAID users and 202,916 non-users.

Oct 2002   A database cohort analysis by **Levy et al** is presented at the American College of Rheumatology meeting. Objective was to assess the correlation between COX-2 use and heart attacks among persons prescribed a COX-2 inhibitor, ibuprofen, or naproxen for at least 50 consecutive days. Study concludes long-term use of either of the COX-2 inhibitors (Vioxx and celecoxib) separately is not associated with an increase risk of heart attack compared with naproxen or ibuprofen. When users of COX-2 inhibitors were combined, there was an increased risk compared with users of ibuprofen or naproxen combined. Analysis evaluated 645 events from the Kaiser Permanente database among 172,260 subjects.

Feb 2003   A population-based, retrospective cohort study by **Mamdani et al** is published in *Archives of Internal Medicine*. Objective was to compare the rates of acute myocardial infarction (AMI) among elderly patients taking COX-2 inhibitors, naproxen and non-aspirin NSAIDs. Study concludes no increased short-term risk of AMI among users of COX-2 inhibitors and no short-term reduced risk of AMI with naproxen. Analysis evaluated 701 events from administrative health care databases in Ontario among 66,964 users and 100,000 non-users.

Nov 2003   A case-control study by **Kimmel et al** is presented at the American Heart Association annual meeting. Objective was to determine the risk of nonfatal heart attacks in users of COX-2 inhibitors compared with users of non-aspirin NSAIDs. Study concludes there was no increased risk of heart attacks overall from COX-2 inhibitors, or from VIOXX separately and that nonselective, non-aspirin NSAIDs were associated with a reduced risk of heart attack. Analysis evaluated 1,718 cases against 6,800 controls from the Delaware Valley Case-Control Network. Study sponsored by Merck and Pharmacia.

Mar 2004   A population-based analysis by **Whelton et al** is presented at the American College of Cardiology meeting. Objective was to determine the risk of acute myocardial infarction (AMI) or stroke with Vioxx, celecoxib, and non-selective NSAIDs in hypertensive patients. Study concludes Vioxx significantly increases the risk of AMI or stroke compared with non-users of NSAIDS and there was no increased risk among users of celecoxib or non-selective NSAIDs. Analysis evaluated 3,723 users against 1,798 users from a private medical insurance healthcare claims database. Study sponsored by Pfizer.

Mar 2004   A case-control study by **Kimmel et al** is published in the *Journal of the American College of Cardiology*. Objective was to determine the risk of nonfatal heart attacks in users of non-selective, non-aspirin NSAIDs and the interaction between non-aspirin NSAIDs and aspirin. Study concludes non-selective, non-aspirin NSAIDs are associated with a reduced risk of heart attack. Analysis

2

evaluated 581 events from the Philadelphia community among 4,153 control subjects.

Apr 2004    A case-control study by **Solomon et al** is published in *Circulation*. Objective was to assess the risk of acute myocardial infarction (AMI) among users of Vioxx, celecoxib, and NSAIDs in an elderly population. Study concludes Vioxx all doses combined was associated with a significant increased risk of AMI compared to celecoxib. Non-significant differences were found comparing Vioxx to ibuprofen, naproxen, other NSAIDs and to those not taking NSAIDs. The risk was higher in persons taking greater than 25 mg of Vioxx and during the first 90 days of use but not thereafter. Analysis evaluated 10,895 cases from two state-sponsored pharmaceutical benefits program in the U.S. among 54,475 patients 65 years and older. This study was first presented at the American College of Rheumatology meeting in 2003. Study sponsored by Merck.

May 2004    A population-based retrospective cohort study by **Mamdani et al** is published in *The Lancet*. Objective was to compare the rates of admission for congestive heart failure (CHF) in elderly patients who were given COX-2 inhibitors or non-selective NSAIDs. Study concludes there is a higher risk of admission for CHF in users of Vioxx and non-selective NSAIDs (diclofenac, naproxen and ibuprofen) but not celecoxib in comparison to non-users of NSAIDs. Analysis evaluated 654 events from administrative healthcare databases in Ontario among 45,097 users of NSAIDs/COX-2 inhibitors and 100,000 non users.

June 2004   A cohort study by **Garcia Rodriguez et al** is published in *Circulation*. Objective was to estimate the effect of non-aspirin NSAIDs on the occurrence of AMI and death from CHD. Study concludes there was no risk reduction of NSAIDs on the occurrence of MI. Analysis evaluated 4,975 cases from the General Practice Research Database in the U.K. against a control of 20,000 subjects.

Aug 2004    A case-control study by **Graham et al** is presented at the International Conference on Pharmacoepidemiology and Therapeutic Risk Management. Objective was to determine if NSAID use increases the risk of AMI or sudden cardiac death (SCD) and if the risk is similar among COX-2 selective agents. Study concludes Vioxx use at doses greater than 25 mg increases the risk of AMI and SCD; Vioxx at 25 mg or less had an increased risk compared with celecoxib; and that several other NSAIDs increased the risk of AMI and SCD. Analysis evaluated 8,199 cases from Kaiser Permanente against a control group of 32,796 subjects. Funding provided by FDA.

Aug 2004    A retrospective cohort study by **Rahme et al** is presented at the International Conference on Pharmacoepidemiology and Therapeutic Risk Management. Objective was to assess the rates of hospitalizations for acute myocardial infarction (AMI) in an elderly cohort. 52,029 patients were taking non-selective NSAIDs and 71,543 patients were taking rofecoxib, with 14,056.4 and 37,371.0 person-years of exposure, respectively. Based on the regression model, the adjusted hazard ratios of hospitalizations for MI was 1.03 (0.83-1.27) for rofecoxib vs. ibuprofen/diclofenac. Study concludes there was no difference in the rate of hospitalizations for AMI among Vioxx and the non-selective NSAIDs ibuprofen and diclofenac. Study sponsored by Merck.

3

Aug 2004        A retrospective cohort study by **Shaya et al** is presented at the International
                Conference on Pharmacoepidemiology and Therapeutic Risk Management.
                Objective was to examine the cardiovascular risk of COX-2 inhibitors compared
                to non-specific NSAIDS in a high risk Medicaid population.  Analysis evaluated
                medical and prescription claims for Maryland Medicaid enrollees, COX-2 users
                numbered 1208 and non-naproxen NSAID users numbered 5274.  Study
                concludes that COX-2 inhibitors did not increase cardiovascular risk over non-
                naproxen NSAIDs in a high risk population.

                                        # # #


**Forward-Looking Statement**

This document contains "forward-looking statements" as that term is defined in the Private Securities
Litigation Reform Act of 1995. These statements involve risks and uncertainties, which may cause results
to differ materially from those set forth in the statements. The forward-looking statements may include
statements regarding product development, product potential or financial performance. No forward-
looking statement can be guaranteed, and actual results may differ materially from those projected. Merck
undertakes no obligation to publicly update any forward-looking statement, whether as a result of new
information, future events, or otherwise. Forward-looking statements in this press release should be
evaluated together with the many uncertainties that affect Merck's business, particularly those mentioned
in the cautionary statements in Item 1 of Merck's Form 10-K for the year ended Dec. 31, 2003, and in its
periodic reports on Form 10-Q and Form 8-K (if any) which the company incorporates by reference.

# EXHIBIT L

CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY
  & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Tel.: (973) 994-1700
Fax: (973) 994-1744

DeCOTTIIS, FITZPATRICK & COLE, LLP
Glenpointe Centre West
500 Frank W. Burr Boulevard
Teaneck, NJ 07666
Tel.: (201) 928-1100
Fax: (201) 928-0588

*Co-Liaison Counsel for Lead Plaintiffs*

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
Tel.: (212) 554-1400
Fax: (212) 554-1444

MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119-0165
Tel.: (212) 594-5300
Fax: (212) 868-1229

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

*[Additional Counsel on Signature Page]*

BRICKFIELD & DONAHUE
70 Grand Avenue
River Edge, NJ 07661
Tel.: (201) 258-3984
Fax: (201) 488-9559

BROWER PIVEN
  A PROFESSIONAL CORPORATION
475 Park Avenue South, 33rd Floor
New York, NY 10016
Tel.: (212) 501-9000
Fax: (212) 501-0300

STULL, STULL & BRODY
6 East 45th Street, 5th Floor
New York, NY 10017
Tel.: (212) 687-7230
Fax: (212) 490-2022

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE MERCK & CO., INC., SECURITIES, DERIVATIVE & "ERISA" LITIGATION | MDL No. 1658 (SRC)<br>Case No. 2:05-CV-01151-SRC-CLW |
| THIS DOCUMENT RELATES TO: THE CONSOLIDATED SECURITIES ACTION | Case No. 2:05-CV-02367-SRC-CLW |

## CORRECTED CONSOLIDATED SIXTH AMENDED
## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ........................................................................ 1

II.  THE CLAIMS ASSERTED IN THIS COMPLAINT ..................................... 11

III. JURISDICTION AND VENUE .................................................................... 12

IV.  PARTIES .................................................................................................. 12

    A.   The Plaintiffs ...................................................................................... 12

    B.   The Defendants ................................................................................... 13

        1.   Merck ......................................................................................... 13

        2.   The Officer Defendants .............................................................. 13

V.   CLASS ACTION ALLEGATIONS .............................................................. 15

VI.  THE DEFENDANTS' FRAUD ..................................................................... 17

    A.   Merck Develops VIOXX in an Attempt to Create a Blockbuster
        "Selective" NSAID with Reduced Gastrointestinal Side Effects ......... 17

        1.   The Problems Associated With Traditional, Non-Selective
            NSAIDs ...................................................................................... 17

        2.   Discovery of the COX-2 Enzyme Raises Hopes that a Selective
            NSAID Could be Developed Which Would Not Cause the
            Gastrointestinal Problems Associated with Traditional NSAIDs ............ 18

        3.   Merck Races to Develop and Stay Ahead of Its Competitors in
            Developing a COX-2 Inhibitor ................................................... 19

        4.   Merck's Huge Financial Stake in the Success of VIOXX ......................... 23

        5.   Merck's Successful VIOXX Product Launch in 1999 .............................. 24

        6.   Merck's "Blockbuster" VIOXX Sales Grow From 2000 Through
            Mid-2004 .................................................................................... 25

        7.   Merck Shocks Investors By Pulling VIOXX From The Market .............. 26

B.    Unbeknownst to Investors, Merck Had Grave Concerns About VIOXX's
      Potential to Cause Heart Attacks and Strokes, Which Were Reinforced By
      Undisclosed Merck Data, Even Before It Launched VIOXX In May 1999 ......... 26

      1.    Merck Learns That VIOXX Upsets the Homeostatic Balance
            Between Prostacyclin and Thromboxane, and the Concerns Raised
            by Protocol 023 .................................................................................... 26

      2.    Merck Cancels a Large VIOXX Clinical Trial in August 1997
            Over Undisclosed Concerns It Would Show That VIOXX Caused
            Serious Adverse Cardiovascular Problems ............................................. 29

      3.    November 1997: Preeminent Medical Researcher and Merck
            Consultant Dr. John Oates Rejects Internal Merck Efforts to
            Rationalize the Adverse Implications of Protocol 023 ........................... 32

      4.    Merck's Undisclosed Internal Analysis of Osteoarthritis Clinical
            Data Shows That Women Taking VIOXX Have A Statistically
            Significant 216% Increased Risk of Serious Adverse
            Cardiovascular Events Compared To Women Taking A Placebo ............ 34

      5.    Merck Attempts to "Manage" Concerns About VIOXX's
            Cardiovascular Safety as It Nears Completion of Its New Drug
            Application for VIOXX in 1998 ............................................................. 36

C.    May 21, 1999 (The First Day of the Class Period): Merck Heralds the
      FDA's Approval of VIOXX While Continuing to Conceal Its "Great
      Concern" And Related Adverse Information About VIOXX's Safety ................. 39

D.    March 2000: Merck Is Finally Forced to Undertake a Large
      Gastrointestinal Outcomes Trial (VIGOR), Which Confirms the
      Company's Belief That VIOXX Is Prothrombotic ............................................... 39

E.    The "Naproxen Hypothesis": Merck Falsely Represents That It Believes
      That the Higher Incidence of Adverse CV Events Among VIOXX Users
      in the VIGOR Trial Is Attributable To Purported Cardioprotective
      Properties of Naproxen Rather Than Prothrombotic Properties of VIOXX ......... 45

F.    Merck Wrongfully Changes Causes of Death in Its ADVANTAGE Trial
      to Minimize the Risk of "Rais[ing] Concerns" About the "Naproxen
      Hypothesis" ......................................................................................................... 56

G.    2001: The Undisclosed Results of Merck's Studies of VIOXX In Alzheimer's Disease Patients Show that VIOXX Raises the Risk of Cardiac Mortality ................................................................... 59

H.    Defendants Successfully Keep Merck's Internal Conclusions About the True Significance of the VIGOR Results off VIOXX's Label ........................... 67

I.    2003-2004: Merck Continues To Vigorously Defend VIOXX's Safety ............. 69

    1.    October 2003: Merck Disparages the Brigham Study Findings, and Again Reassures the Public That VIOXX Is Safe ................................... 69

    2.    August 2004: Merck Disparages the Kaiser Study Findings, and Again Reassures the Public That VIOXX Is Safe ................................... 73

VII.    THE FULL TRUTH EMERGES ............................................................................ 74

    A.    The September 2004 Withdrawal of VIOXX ...................................................... 74

VIII.    POST-CLASS PERIOD EVENTS ....................................................................... 76

IX.    MATERIALLY FALSE AND MISLEADING STATEMENTS ................................... 79

    A.    Materially False and Misleading Statements Made In Connection With VIOXX's Introduction to the Market ................................................... 79

    B.    Materially False and Misleading Statements Made During the Second Half of 1999 ............................................................................... 80

    C.    Materially False and Misleading Statements Made in Connection with Defendants' Discussions of Merck's Fourth Quarter and Year-End 1999 Results ....................................................................................... 81

    D.    Merck and the Officer Defendants' Spring 2000 Statements Announcing the VIGOR Trial Results and Proffering their Purported Belief in the Naproxen Hypothesis ...................................................................... 83

    E.    Materially False and Misleading Statements Made During the Second Half of 2000 .............................................................................. 95

    F.    Materially False and Misleading Statements Made During the Second Half of 2001 ............................................................................. 102

    H.    Materially False and Misleading Statements Made During the First Half of 2002 ............................................................................... 109

I.   Materially False and Misleading Statements Made During the Second Half of 2002 ........................................................................................... 115

K.   Materially False and Misleading Statements Made During the Second Half of 2003 ........................................................................................... 115

L.   Materially False and Misleading Statements Made During the First Half of 2004 ....................................................................................................... 117

M.   Materially False and Misleading Statements Made During the Second Half of 2004 ........................................................................................... 119

X.   ADDITIONAL SCIENTER ALLEGATIONS ............................................ 120

XI.   LOSS CAUSATION ..................................................................................... 133

XII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................. 135

XIII.   PRESUMPTION OF RELIANCE ............................................................... 136

XIV.   CLAIMS FOR RELIEF ................................................................................ 138

COUNT ONE ................................................................................................ 138

COUNT TWO ............................................................................................... 142

COUNT THREE ............................................................................................ 143

XV.   PRAYER FOR RELIEF ............................................................................... 144

XVI.   JURY TRIAL DEMANDED ........................................................................ 146

Lead Plaintiffs and Court-appointed Class Representatives, the Public Employees'
Retirement System of Mississippi, Steven LeVan, Jerome Haber and Richard Reynolds
(collectively, "Lead Plaintiffs" or "Plaintiffs") bring this consolidated class action complaint for
violation of the federal securities laws ("Complaint") against Merck & Co., Inc. from at least
1999 through 2004 ("Merck" or the "Company"), Dr. Alise Reicin (Merck Vice President,
Project and Pipeline Leadership) and Dr. Edward Scolnick (Merck's former Executive Vice
President for Science and Technology and President of Merck Research Laboratories) (the
"Officer Defendants").  Merck and the Officer Defendants are referred to collectively herein as
"Defendants."[1]  The allegations against the Defendants are based on personal knowledge as to
Plaintiffs' own acts and on information and belief as to all other matters, such information and
belief having been informed by the investigation conducted by and under the supervision of their
counsel ("Lead Counsel"), the materials referenced in this Complaint, and Lead Counsel's
extensive consultations with pertinent experts.  Plaintiffs believe that formal discovery, including
document discovery and depositions of relevant witnesses, has provided and will continue to
provide additional evidentiary support for their allegations.   By and through their counsel,
Plaintiffs, on behalf of themselves and the Class they represent, allege as follows:

I.      **PRELIMINARY STATEMENT**

1.      Plaintiffs bring this federal securities class action on behalf of themselves and a
proposed class of persons and entities (the "Class") who purchased or acquired Merck securities
between May 21, 1999 and September 29, 2004, inclusive (the "Class Period").  By Opinion and

---

[1] In accordance with the Court's prior Orders and decisions, Lead Plaintiffs do not assert claims:
(i) against the dismissed Defendants; (ii) for the previously dismissed allegedly false and
misleading statements during the Class Period; or (iii) for loss causation allegations concerning
the November 1, 2004 *Wall Street Journal* article.  However, Lead Plaintiffs reserve all rights
with respect to these claims and Defendants.

Order dated January 30, 2013, the Court certified this action as a class action on behalf of all persons and entities who, from May 21, 1999 to September 29, 2004, inclusive, purchased or otherwise acquired Merck common stock or call options, or sold Merck put options.

2.    Throughout the Class Period, Merck and the Officer Defendants made materially false and misleading statements of fact and belief concerning the safety profile and commercial viability of Merck's purported "blockbuster" drug VIOXX (a/k/a MK 966 or "rofecoxib").  As a result of Defendants' materially false and misleading statements, during the Class Period the value of Merck securities was significantly inflated.  When the truth concerning VIOXX's safety and commercial viability finally began to emerge, the value of Merck securities fell sharply, causing Plaintiffs and Class members to suffer massive damages.  In contrast, during the same period, Defendant Scolnick sold hundreds of thousands of shares of his own personal holdings of Merck stock, reaping lucrative insider selling profits in excess of *$24.8 million*.

3.    VIOXX is a non-steroidal anti-inflammatory drug ("NSAID") intended for use in the treatment of arthritis and other acute pain.  Traditional NSAIDs, such as aspirin, ibuprofen and naproxen, function by inhibiting two enzymes:  cyclooxygenase-1 ("COX-1"), which is associated with the maintenance of protective gastrointestinal ("GI") mucus, and cyclooxygenase-2 ("COX-2"), which is associated with the response to pain and inflammation. Unfortunately, the inhibition of COX-1 (and resulting inhibition of protective gastrointestinal mucus) by traditional NSAIDs can cause serious GI side effects.  In developing VIOXX, Merck sought to develop a drug that would selectively suppress only COX-2 (thereby suppressing pain and inflammation) *without* suppressing COX-1 (thereby *avoiding* the adverse GI side effects associated with traditional NSAIDs).

4.      There is an enormous worldwide market (estimated to be worth multiple billions of dollars *per year*) for a painkilling drug that lacks the adverse GI side effects of traditional NSAIDs, because patients suffering from diseases that cause chronic pain, such as arthritis, would be inclined to take such a drug on a daily basis.  Consequently, Defendants and the market viewed VIOXX as a potential "blockbuster" drug.

5.      The importance of VIOXX's commercial success to Merck could hardly be overstated, because at all relevant times Merck desperately needed to be able to market a major new drug whose revenue would be sufficient to off-set the more than $5 billion in annual revenue that Merck would be losing as *five* of Merck's existing drugs (Vasotec, Pepcid, Mevacor, Prilosec and Prinivil) were all scheduled to go "off patent" (*i.e.*, lose their patent protection) between August 2000 and the end of 2001.  According to published reports, Merck's ability to survive as a separate company might even have been at risk if VIOXX failed to achieve and maintain blockbuster status.

6.      Beginning with its press release of May 21, 1999 (the first day of the Class Period), in which Merck trumpeted the news that the FDA had approved VIOXX for the treatment of osteoarthritis, throughout the Class Period Defendants repeatedly touted VIOXX's safety profile, sales and commercial prospects in press releases, public statements, Merck-prepared medical journal articles, and filings with the SEC.  Defendants repeatedly claimed, *inter alia*, that VIOXX was a "key growth driver" for Merck, that it had "robust" growth prospects for the treatment of arthritis and numerous other ailments, and that VIOXX sales would generate billions of dollars annually well into the future.  By 2003, VIOXX was Merck's second best-selling drug (with annual sales of $2.5 billion), and Merck readily acknowledged that without VIOXX Merck "would be a very different company."

3

7.     As set forth in detail below, however, Defendants' Class Period public statements concerning VIOXX were materially false or misleading, omitted to disclose numerous material facts necessary to make their statements not materially misleading, and/or misrepresented Merck's and its senior officers' and scientists' actual beliefs concerning VIOXX's safety and, consequently, its commercial prospects.  Indeed, from the very start of the Class Period in May 1999, when Merck first announced the news of the FDA's approval of VIOXX, unbeknownst to the public, Merck internally had grave concerns that VIOXX caused serious cardiovascular ("CV") side effects, including myocardial infarction ("MI") (*i.e.,* heart attacks) and strokes. These serious concerns about VIOXX's CV risks were based on the research of one of Merck's own consultants (Dr. Garret FitzGerald) -- and the corroborating views privately provided to Merck by one of the Company's other prominent consultants (Dr. John Oates) -- which showed, based on urine analyses, that VIOXX upset one of the body's internal mechanisms by (a) suppressing prostacyclin (a chemical that occurs naturally in the body which *widens* blood vessels and *inhibits* blood clotting) while *simultaneously* (b) having *no* impact on the body's production of thromboxane (a chemical that *narrows* blood vessels and potently *promotes* blood clots).

8.     Accordingly, as confirmed in internal Merck emails from the late 1990's that were only disclosed after the Class Period, as a result of Merck's "great concern" that VIOXX increases the risk of adverse CV events -- and that any clinical findings to that effect would "kill [the] drug" -- Merck scientists discussed how to design Merck's major clinical trials of VIOXX to minimize the risk that they would call attention to the extent of VIOXX's adverse CV (or "prothrombotic") side effects.  Nonetheless, by no later than February 1998 Merck was in possession of a non-public internal analysis indicating that patients in its VIOXX clinical trials

had significantly higher rates of serious adverse CV events compared to patients taking placebo, including a statistically significant *216%* increased risk for adverse CV events among women taking VIOXX.

9.      Although the FDA approved VIOXX in May 1999, Merck and the Officer Defendants knew that (a) the FDA would not allow it to market VIOXX with a label stating that VIOXX posed a significantly lower risk of adverse GI side effects than traditional NSAIDs unless and until Merck conducted a large scale gastrointestinal trial demonstrating that this was true, and (b) VIOXX's commercial prospects would be sharply curtailed if Merck failed to obtain an FDA-approved label affirming VIOXX's favorable GI safety.   Accordingly, even though Merck had put off conducting a large-scale GI trial in 1997 (primarily due to its fears that such a trial would highlight VIOXX's prothrombotic side effects), in January 1999 -- by which time Merck was reasonably confident that it would obtain initial FDA approval of VIOXX -- Merck commenced a large scale VIOXX Gastrointestinal Outcomes Research ("VIGOR") trial. The VIGOR trial compared the results of a large patient group taking VIOXX to a similarly large patient group taking naproxen (a traditional NSAID marketed in the U.S. under the brand names Aleve and Naprosyn).

10.     Merck designed the VIGOR study to minimize the likelihood that the results would show that VIOXX was prothrombotic, but the results of the VIGOR study nonetheless showed that patients taking VIOXX had a statistically significant higher incidence of adverse CV events (particularly heart attacks) than patients taking naproxen.  Reviewing these results, Merck and the Officer Defendants concluded that VIOXX was prothrombotic, as they had feared.  As defendant Edward Scolnick, Merck's Executive Vice President for Science and Technology and Merck's chief research scientist, acknowledged in a March 9, 2000 internal email to three other

5

senior Merck scientists (including Merck's Executive Director of Clinical Research, defendant

Alise Reicin):

> I just received and went through the [VIGOR] data…. ***The
> [adverse] CV [cardiovascular] events are clearly there…. It is a
> shame*** but it is a low incidence ***and it is mechanism based as we
> worried it was***. [Dr. John] Oates and [senior Merck scientists]
> Alan [Nies] and Barry [Gertz] were right about the metabolite
> meanings ie urine Pg [prostaglandin] data….[1]

Defendant Scolnick's reference to the cause of the cardiovascular events being "mechanism

based as we worried it was," and his statement that Drs. Oates, Nies and Gertz "were right"

about the meaning of the "urine Pg [prostaglandin] data," was an admission that he understood

that it was VIOXX's inhibition of prostacyclin (which was anti-thrombotic), combined with

VIOXX's lack of any effect on thromboxane (which was *pro*-thrombotic), that caused patients

taking VIOXX to experience a significantly increased risk of serious adverse CV events.

11.     On March 27, 2000, Merck issued a press release discussing VIGOR's results.

The release emphasized that VIGOR's results showed that VIOXX had a superior GI safety

profile to naproxen, while also noting the significantly higher incidence of adverse CV events

among VIOXX users compared to naproxen users.  However, rather than acknowledge their

conclusion that the statistically significant difference in the number of heart attacks and other

adverse CV events in the VIGOR trial was "mechanism based" (*i.e.*, attributable to the manner in

which VIOXX upset the body's homeostatic balance of prostacyclin and thromboxane) -- an

admission that the Officer Defendants knew would likely "kill the drug" and precipitate a

financial crisis for Merck -- the Officer Defendants tried to explain away the difference in

VIGOR's adverse CV data by manufacturing a hypothesis that attributed VIGOR's CV results to

---

[1]  Unless otherwise stated, all emphases herein are added.

the alleged "cardioprotective" properties of naproxen (the "naproxen hypothesis").  For example, as Merck's March 27, 2000 press release represented:

> **[S]ignificantly fewer thromboembolic events were observed in patients taking naproxen in this GI outcomes study, which is consistent with naproxen's ability to block platelet aggregation.** This effect on these events had not been observed previously in any clinical studies for naproxen.  **VIOXX, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects.**

To further support their "naproxen hypothesis," the press release further falsely represented that "[a]n extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with VIOXX, showed no indication of a difference in the incidence of thromboembolic events between VIOXX, placebo and comparator NSAIDs."

12.    The VIGOR results were widely reported.  Market analysts understood that the higher rate of adverse CV events among VIOXX users in VIGOR could be due to either (a) purported cardioprotective properties of naproxen or (b) the prothrombotic effect of VIOXX.  However, in the wake of Merck's repeatedly stated belief that the difference in the rate of adverse CV events between VIOXX and naproxen was likely due to and "consistent with" a cardioprotective effect of naproxen rather than a prothrombotic effect of VIOXX -- and in the wake of Merck's further assurances that there was no indication of a difference in the incidence of thromboembolic events between VIOXX, placebo and comparator NSAIDS in Merck's other clinical trial data -- virtually all members of the scientific, medical and Wall Street analyst communities either accepted or treated as plausible Merck's publicly stated view that the "naproxen hypothesis" was the "likeliest interpretation" of the VIGOR study results.

13.    However, as defendant Scolnick's internal March 9, 2000 email confirms, unbeknownst to investors Merck actually believed that the increased CV events in VIGOR ***were***

*caused by VIOXX,* and as detailed below Merck concocted and advanced the "naproxen hypothesis" to protect VIOXX's commercial viability.

14.     Over the weeks, months and years following the release of the VIGOR study results, Merck and the Officer Defendants continued to promote the "naproxen hypothesis" and to tout VIOXX's purported safety and blockbuster commercial viability, even as additional evidence continued to mount internally at Merck that VIOXX caused heart attacks and other serious adverse CV events.

15.     For example, by no later than early April 2000 -- just a week after Merck first announced the results of the VIGOR study -- the preliminary results of another Merck study (the ADVANTAGE study, which also compared VIOXX to naproxen) became available internally at Merck.  In an email to defendant Scolnick, defendant Reicin noted that there were *seven* heart attacks in one treatment group compared to only *one* in the other group.  Although the two groups were still "blinded" at that time, there was little doubt that the former group was the VIOXX group and the latter group was the naproxen group.  Moreover, as shown by internal Merck emails produced after the Class Period, in November 2000 defendant Reicin pressured another Merck scientist to change the reported cause of death of at least one of the patients in the ADVANTAGE trial who was taking VIOXX from "heart attack" to "unknown cause of death" so as not to "raise concerns" about VIOXX's CV safety and the validity of Merck's "naproxen hypothesis."  Merck's manipulation of the ADVANTAGE data in this fashion was not publicly disclosed until April 2005, after the Class Period.

16.     By April 2001, Merck and the Officer Defendants were also in possession of non-public information concerning the results of two clinical trials (known as Protocol 078 and Protocol 091) that they had conducted to assess the effects of VIOXX on Alzheimer's disease.

On both a standard "intention to treat" basis as well as a standard "on treatment" basis, these studies showed statistically significant increases in deaths (including a statistically significant increase in heart disease deaths) in patients being treated with VIOXX compared to those being treated with placebo -- results that obviously would have been material to investors and medical professionals alike.

17.     However, Merck chose not to disclose to the public that its internally prepared analyses showed a statistically significant increase in mortality (including a statistically significant increase in heart disease deaths) for VIOXX patients whether using standard "intention-to-treat" or "on treatment" analysis.  Instead, Merck attempted to conceal these studies' statistically significant results by creating and then employing a non-standard "On Drug" methodology pursuant to which it reported substantially reduced -- and ***not*** statistically significant -- increased mortality risks for patients who used VIOXX in these two trials.  Merck's concealment of the true nature and extent of the safety risks of VIOXX from the institutional review boards ("IRB's") that were responsible for patient enrollment at the clinical test sites for these trials was sufficiently improper and outrageous that, when the relevant facts were finally disclosed in 2008, the authors of an article published in the *Journal of the American Medical Association ("JAMA")* characterized Merck's extraordinary misconduct as "violating the trust of [the] human participants who volunteered to participate" in the trials.

18.     Notwithstanding this growing body of additional, material non-public information in Merck's possession concerning VIOXX's association with increased CV risks and deaths, Merck continued to falsely downplay any concerns about VIOXX's safety or profit potential, and to falsely reaffirm its purported belief in the "naproxen hypothesis."  For example, on August 21, 2001 -- the day before *JAMA* published an article that expressed concerns about VIOXX's

possible prothrombotic effects -- a Merck spokesman assured *Bloomberg News* that Merck had "additional data beyond what [the authors of the *JAMA* article] cite, and the findings are very, very reassuring. VIOXX does not result in any increase in cardiovascular events compared to placebo." Approximately six weeks later, on October 9, 2001, *The New York Times* quoted defendant Scolnick reiterating (a) that Merck's belief that the "naproxen hypothesis" remained the "likeliest interpretation" of the VIGOR data, and (b) that Merck had found no evidence in other studies that VIOXX increased the risk of heart attacks. Scolnick added that without the "theoretical question" raised by Dr. FitzGerald's early research concerning VIOXX's impact on prostacyclin "no one would have a question remaining in their mind that there might be an additional interpretation" (*i.e.*, that VIOXX caused increased CV risks). Similarly, in an April 2002 conference call, a Merck spokesman reiterated the Company's "belief that the effects seen in VIGOR were [due to] the anti-platelet effect of naproxen" and that that was "a position that Merck has always had."

19. In the fall of 2003, the results of a Merck-funded study at Brigham and Women's Hospital in Boston (the "Brigham Study") became public. The Brigham Study, which looked at the records of almost 55,000 Medicare patients over the age of 65, found an increased risk of heart attack in patients taking VIOXX, compared with patients taking Celebrex (a rival COX-2 inhibitor that was VIOXX's main competitor) and with patients not taking any painkiller. The results of the Brigham Study raised doubts about Merck's "naproxen hypothesis," but Merck aggressively countered the results of the study by arguing that epidemiological studies (such as the Brigham study) were not as significant as the results of clinical trials, and by vigorously reiterating its purported belief in the "naproxen hypothesis." As a result of Merck's renewed public defense of its "naproxen hypothesis," investor concerns about VIOXX were substantially

assuaged, and the market continued to be materially misled as to Merck's actual beliefs and the true extent to which VIOXX's commercial viability was in jeopardy.

20.     On September 30, 2004, Merck announced that it was withdrawing VIOXX from the market based on a new study showing an "increased risk of confirmed cardiovascular events beginning after 18 months of continuous therapy."  In response to this news, the price of Merck common stock plummeted more than $12 in heavy trading to close at $33.00, down approximately 27% from its closing price the previous day.  Securities analysts expressed shock and surprise at the sudden withdrawal of VIOXX.

21.     Since the end of the Class Period in September 2004, and as noted above and as further described below, significant information that was previously unknown to and/or concealed from Plaintiffs and investors has been obtained by Lead Counsel which details Merck's and the Officer Defendants' knowing concealment and manipulation of VIOXX trial data, their lack of good faith belief in the Company's "naproxen hypothesis," their efforts to intimidate and discredit anyone who attempted to seriously challenge VIOXX's safety, and their knowingly (or at least recklessly) materially false and misleading public assurances throughout the Class Period that there was "no indication" that VIOXX caused adverse CV events, and that VIOXX would continue to generate billions of dollars in annual sales for Merck for years to come.  By this Complaint, Plaintiffs, on behalf of themselves and the other members of the Class, seek a recovery for the massive financial losses that they and their fellow Class members have suffered as a result of Defendants' violations of the federal securities laws, as further set forth herein.

## II.     THE CLAIMS ASSERTED IN THIS COMPLAINT

22.     This Complaint sets forth claims under Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1,

and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §
240.10b-5 ("Rule 10b-5"), against the Defendants, who were knowing or reckless participants in
defrauding investors in connection with their material misrepresentations and omissions
concerning VIOXX.

## III.    **JURISDICTION AND VENUE**

23.    This Court has jurisdiction over the subject matter of this action pursuant to
Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action
arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§
1331 and 1337.

24.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15
U.S.C. § 78aa.  Defendant Merck at all relevant times was, and still is, headquartered in this
District and many of the acts and transactions that constitute the violations of law complained of
herein, including the dissemination to the public of materially false and misleading statements,
occurred in and/or issued from this District.  In addition, venue is proper in this District pursuant
to the Order of the Judicial Panel on Multidistrict Litigation, dated February 23, 2005.

25.    In connection with the acts alleged in this Complaint, Defendants, directly or
indirectly, used the means and instrumentalities of interstate commerce, including, but not
limited to, the U.S. mails, interstate telephone communications and the facilities of national
securities exchanges.

## IV.    **PARTIES**

### A.    **The Plaintiffs**

26.    Court-appointed and certified Co-Lead Plaintiff, the Public Employees'
Retirement System of Mississippi ("Mississippi PERS") is a pension fund established for the
benefit of the current and retired public employees of the State of Mississippi.  Mississippi PERS

is responsible for the retirement income of employees of the State, including current and retired employees of the state's public school districts, municipalities, counties, community colleges, state universities, libraries and water districts. Mississippi PERS provides benefits to over 60,000 retirees, and is responsible for providing retirement benefits to more than 250,000 current public employees. Mississippi PERS purchased shares of common stock of Merck during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

27. Court-appointed and certified Co-Lead Plaintiffs Steven LeVan, Jerome Haber and Richard Reynolds purchased shares of common stock of Merck during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. Co-Lead Plaintiffs Mississippi PERS, LeVan, Haber and Reynolds previously submitted certifications reflecting their transactions in Merck common stock during the Class Period, which are incorporated by reference herein.

**B.      The Defendants**

**1.      Merck**

28.      Defendant Merck is a global pharmaceutical company that develops, manufactures, and markets a broad range of human and animal health products. As of September 29, 2004, the Company had in excess of 2.2 billion shares of common stock outstanding, which were actively and efficiently traded on the New York Stock Exchange (the "NYSE"). Merck is a New Jersey corporation with its principal place of business located at One Merck Drive, Whitehouse Station, New Jersey.

**2.      The Officer Defendants**

29.      (a)      Defendant Edward Scolnick ("Scolnick") was Merck's Executive Vice President for Science and Technology and President of Merck Research Laboratories from the

beginning of the Class Period through and including December 31, 2002, when he stepped down. From January 1, 2003 through the end of the Class Period, Scolnick served as President *Emeritus*, Merck Research Laboratories.  During 1999, 2000, and 2001, Scolnick was also a member of the Company's Management Committee.  As the senior Merck officer in charge of Merck's research and development, Scolnick was intimately involved in and fully conversant with the development, research, and testing of VIOXX, and was well aware of the risks and problems associated with the drug.

(b)     As detailed herein, during the Class Period, defendant Scolnick was one of Merck's chief spokespersons in connection with information provided to the public about VIOXX, and he made public statements concerning VIOXX and Merck's financial condition, performance, and prospects that were materially false and misleading and omitted to state material facts, including materially false and misleading statements in documents filed with the SEC during the Class Period.

(c)     As detailed herein, defendant Scolnick was a direct, substantial, and primary participant in the wrongdoing alleged herein.  While in possession of materially adverse non-public information regarding Merck, Scolnick personally profited from the sale of his personal holdings of Merck securities at artificially inflated prices during the Class Period. During the Class Period, Scolnick sold at least 381,200 shares of his personal holdings of Merck stock, recognizing more than $24.8 million in insider selling profits.  In addition, from the beginning of the Class Period through his retirement, Scolnick received substantial performance-based bonuses and other compensation based on, among other things, growth in Merck's earnings per share, Merck's sales compared to certain of Merck's competitors and the change in the Company's return on operating assets versus the prior year.  From January 1, 2003 through

the end of the Class Period, Scolnick was no longer subject to public reporting requirements concerning the sale of Merck stock. Without the benefit of further discovery, Plaintiffs are unable to ascertain whether Scolnick sold any additional shares of his personal holdings of Merck common stock during the Class Period.

30.     (a)     Defendant Alise S. Reicin ("Reicin") was, at all relevant times, the Executive Director of Clinical Research at Merck Research Laboratories. Reicin was responsible for overseeing research with regard to the safety and efficacy of Merck products, including VIOXX, and supervised the VIGOR Study.

(b)     As detailed herein, defendant Reicin was a direct, substantial, and primary participant in the wrongdoing. As detailed herein, during the Class Period, Reicin made public statements concerning VIOXX that were materially false and misleading and omitted to state material facts.

(c)     As defendant Reicin was not required to file information with the SEC concerning her transactions in Merck securities during the Class Period, without the benefit of further discovery Plaintiffs are unable to determine whether Reicin, while in possession of material adverse information regarding Merck, profited from the sale of Merck securities at artificially inflated prices.

## V.     CLASS ACTION ALLEGATIONS

31.     Plaintiffs bring this action as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities who purchased or acquired the securities of Merck during the period from May 21, 1999 through September 29, 2004, inclusive. Excluded from the Class are Defendants; Merck's affiliates and subsidiaries; the officers and directors of Merck and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; the legal representatives, heirs,

successors, and assigns of any excluded person or entity; and any entity in which any excluded person or entity has or had a controlling interest.

32.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Merck had billions of shares of common stock outstanding, which were actively traded on the NYSE.  The average daily trading volume during the Class Period was more than 6.5 million shares.  Although the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are at least thousands of members of the proposed Class.  Members of the Class can be identified from records maintained by Merck or its transfer agent, and can be notified of the pendency of this action by mail and publication using forms of notice similar to those customarily used in securities class actions.

33.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

34.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that conflict with the interests of the Class.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

> (a)     whether Defendants' statements and omissions during the Class Period materially misrepresented the safety and commercial viability of VIOXX;
>
> (b)     whether Defendants' acts and omissions as alleged herein violated the federal securities laws;
>
> (c)     whether the Officer Defendants are personally liable for the alleged misrepresentations and omissions described herein;

      (d)        whether Defendants' misrepresentations and omissions caused the Class members to suffer a compensable loss; and

      (e)        whether the members of the Class have sustained damages, and the proper measure of damages.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by many individual Class members will be small relative to the expense and burden of individual litigation, it is practically impossible for most members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.    THE DEFENDANTS' FRAUD

37.     As discussed below, each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Merck securities by disseminating materially false and misleading statements (including statements of opinion or belief) and/or concealing material adverse facts regarding VIOXX.  The scheme:  (i) deceived the investing public regarding the commercial viability of VIOXX and the intrinsic value of Merck securities; (ii) enabled Merck and the Officer Defendants to artificially inflate the price of Merck securities; (iii) enabled defendant Scolnick to sell over *$32.4 million* of his personal holdings of Merck shares; and (iv) caused Plaintiffs and other members of the Class to suffer damages as a result of the Defendants' misconduct.

### A.    Merck Develops VIOXX in an Attempt to Create a Blockbuster "Selective" NSAID with Reduced Gastrointestinal Side Effects

#### 1.    The Problems Associated With Traditional, Non-Selective NSAIDs

38.     Traditional NSAIDs reduce inflammation and pain, and are widely used to treat persons suffering from arthritis and muscle pain, and other inflammatory conditions.  NSAIDs work by inhibiting the cyclooxygenase ("COX") enzyme, which catalyzes the formation of two

prostaglandins in the body -- prostacyclin and thromboxane -- which play a central role in inflammation.  Prostacyclin is a chemical that occurs naturally in the body that *widens* blood vessels and *inhibits* blood clotting.  Thromboxane is a chemical that *narrows* blood vessels and potently *promotes* blood clotting.  These two chemicals, which have opposite effects, exist in the body in a natural balance referred to as "homeostasis."

39.     Long-term use of traditional NSAIDs -- such as aspirin, ibuprofen and naproxen -- can cause gastrointestinal ("GI") and renal (kidney) problems.  Adverse GI effects caused by traditional NSAIDs include nausea, indigestion, and, in more severe cases, gastric perforation, ulceration and bleeding.  Adverse renal effects include salt and fluid retention, and high blood pressure.  The risk of developing such problems increases with dosage and the duration of treatment.

> **2.     Discovery of the COX-2 Enzyme Raises Hopes that a Selective NSAID Could be Developed Which Would Not Cause the Gastrointestinal Problems Associated with Traditional NSAIDs**

40.     For many years, scientists only recognized one form of the COX enzyme.  This form, now known as COX-1, is naturally present in the stomach lining, where it helps play a protective role in preventing erosion of the stomach lining by the stomach's own acid.

41.     In the early 1990s, scientists discovered a second form of the COX enzyme, referred to as COX-2.  COX-2 is not normally present in the stomach and only appears in the stomach when there is inflammation, and at the site of the inflammation.  Following the discovery of COX-2, scientists concluded that COX-2, but not COX-1, was primarily involved with inflammation.

42.     Traditional NSAIDs inhibit both COX-1 and COX-2.  In the wake of the discovery of COX-2, scientists realized that traditional NSAIDs relieved pain and inflammation by inhibiting COX-2, but caused GI problems by inhibiting COX-1.  This new-found knowledge

raised hopes that a drug could be developed that would inhibit COX-2 but not COX-1, and thereby provide the relief from pain and inflammation provided by traditional NSAIDs while simultaneously avoiding the GI problems associated with traditional NSAIDs.

### 3. Merck Races to Develop and Stay Ahead of Its Competitors in Developing a COX-2 Inhibitor

43.     Shortly after the discovery of COX-2, Merck began work on trying to develop a novel NSAID that would inhibit COX-2 without inhibiting COX-1.

44.     Merck, like other pharmaceutical companies and Wall Street analysts, recognized that such a pill would have the potential for enormous commercial success because patients suffering from diseases that cause chronic pain and inflammation, such as arthritis, would be inclined to take a painkiller that lacked the adverse GI side effects of traditional NSAIDs on a daily basis.  Merck also recognized that the first company to bring such a pill to market would have a tremendous competitive advantage.  For example, in a 1996 internal Product Development Plan for VIOXX, Merck projected that ***"the base case valuation for MK-966 [VIOXX] is expected to be $889MM assuming the product is first to market.  In a second to market scenario, the valuation falls to $278MM, implying a significant value ($611MM) to being first to market."***

45.     Merck scientists and executives, however, "feared they were in a race -- and running second" from the get-go, as reported in a January 10, 2001 *Wall Street Journal* article entitled "The Cure: With Big Drugs Dying, Merck Didn't Merge -- It Found New Ones" (the "January 2001 *Wall Street Journal* article").  As the article reported, in 1994 defendant Scolnick, the President of Merck Research Laboratories, "ordered researchers in [Merck's lab in] Montreal to pursue [this] work as fast as they could."  Underscoring this urgency, the article quoted Scolnick as stating that he would call the Montreal lab "every other day and say, 'Hey, is

everybody working on this project?'"  Scolnick added that "they got the message that it was important."

46.     Defendant Scolnick and others at Merck recognized that G.D. Searle, a division of Monsanto Company, was their primary competition.  According to the January 2001 *Wall Street Journal* article, Scolnick and Merck were aware of rumors that Dr. Philip Needleman, a renowned pharmacologist at Washington University in St. Louis who had written articles on the creation of a COX-2 inhibitor, had "subsequently crossed town to join Monsanto Co. [and] was working on a similar drug for that company."

47.     By October 1994, Merck had developed two compounds that performed well in test-tube testing.  According to the January 2001 *Wall Street Journal* article, "Normally, Dr. Scolnick would have chosen one of these to put through the expensive and risky process of testing in humans. ***But the project was so important – and Merck appeared to be in such a high-stakes competition with Monsanto – that he decided to put both compounds in clinical trials***."

48.     Only one of Merck's two compounds was found to inhibit COX-2 effectively.  In 1995, Merck gave the successful compound the code name MK-966 (also known as "rofecoxib" and later marketed under the trade name "VIOXX") and began running it through further clinical trials.  At about the same time, Monsanto/Searle selected a different compound, SC-58635 (also known as "celecoxib" and later marketed under the trade name "Celebrex"), as its lead compound in its efforts to develop a COX-2 inhibitor, and began running Celebrex through similar clinical trials.

49.     In Merck's 1996 internal Product Development Plan, Merck recognized that:

> ***Searle is seen as major competition in the area of highly selective COX-2 inhibitors.***  They have reported their targeted filing date for

OA [osteoarthritis] as 4Q98. *If they were to be the first entry in the market with the new class of compounds it would have a significant negative impact on our financial projections.* To reduce the risk of MK-966 [VIOXX] as the second entry, an accelerated development strategy is proposed and the additional resources needed to achieve the stated objectives are being requested. Phase III will be initiated almost in parallel with Phase IIB and a GI outcomes study will be initiated prior to completion of Phase III. This strategy with its own attendant risks (see below)[2] is necessitated by the commercial implications of not being the first entry.

50. In order to achieve its marketing objectives, Merck needed to show not only that VIOXX was effective as a treatment for pain from arthritis and other ailments, but also that VIOXX was less likely to cause GI problems than traditional NSAIDs. Before the FDA would allow Merck to make that claim, Merck needed to conduct a large-scale gastrointestinal outcomes trial. Absent such a trial, the FDA would require the label for VIOXX (or any other COX-2 inhibitor) to carry the same GI warning that it required for all traditional NSAIDs. (As discussed below, however, Merck found it expedient to defer performing such a GI outcomes trial until *after* it was reasonably assured that VIOXX would receive initial FDA approval.)

51. In February 1998, Pfizer Inc., one of the world's largest pharmaceutical companies and a major competitor of Merck, reached an agreement with Monsanto/Searle to co-promote and develop Celebrex as well as a "next generation" COX-2 inhibitor. On February 23,

---

[2] The risks identified "below" included (1) whether Merck's proposed clinical trials would be sufficient to obtain FDA approval for a drug label which would state that VIOXX had a lower incidence of significant GI complications than chosen comparator NSAIDs; (2) whether Merck would choose the right dosage of VIOXX for Phase III testing, recognizing that Phase III would "be initiated prior to completion of the Phase IIB dose finding study"; (3) whether Merck could secure an adequate supply of naproxen for its large scale gastrointestinal outcomes trial; (4) whether certain endoscopy studies Merck was planning to perform would be acceptable to the FDA; (5) whether the FDA would approve a proposed study comparing VIOXX with nabumetone; (6) whether the timeline for the large scale GI outcomes trial scheduled to begin in the third quarter of 1997 could be maintained; and (7) whether the FDA would accept one year patient exposure data from the large-scale GI outcomes trial with two year data to follow in a Safety Update Report.

1998, David Anstice, Merck's President of Human Health -- The Americas, sent a memo to his

staff with the subject header "VIOXX," stating:

> **Battle is now joined with Pfizer in another major therapeutic area and one which is CRITICAL to Merck from 2000 onwards.** We should assume Pfizer will promote [Celebrex] everywhere. **We simply CANNOT LOSE in any single market in The Americas.** We need to have superior marketing positioning and plans, and better execution. We need to have opinion leaders with us, and we need to identify the correct resource needs. Every Sales VP, every Sales BD, BM and Rep must <u>personally</u> accept the challenge of winning versus Searle/Pfizer, that is greater than 50% share of the COX-II Inhibitor market. Let's start thinking this way from today.[3]

52.     To Merck's dismay, Monsanto/Searle completed its clinical trials first. On June

29, 1998, Monsanto/Searle and Pfizer submitted a New Drug Application ("NDA") to the FDA

for Celebrex. Merck would not submit its NDA for VIOXX to the FDA until November 23,

1998 -- almost five months later.

53.     On December 31, 1998, Merck received further bad news when the FDA gave

Pfizer and Monsanto/Searle approval to begin marketing Celebrex (albeit with the standard GI

warning). Pfizer and Monsanto/Searle launched Celebrex in February 1999 with massive

marketing campaigns directed at both physicians and consumers. Celebrex "quickly became the

most successful drug launch in U.S. history" according to the January 2001 *Wall Street Journal*

article.

54.     Several industry analysts predicted that Celebrex's successful launch would make

it difficult for VIOXX to succeed. As reported in an April 14, 1999 *Wall Street Journal* article

entitled "Merck's Health Hinges on Sales Of Arthritis Pill" (the "April 1999 *Wall Street Journal*

article"), certain analysts held the view that "Celebrex ha[d] taken off so fast with arthritis

---

[3] Upper case letters and underlining contained in original.

sufferers that there are comparatively few dissatisfied patients left for VIOXX to tap and thus it could be difficult for Merck to persuade recent Celebrex converts to switch to VIOXX."

### 4.      Merck's Huge Financial Stake in the Success of VIOXX

55.      The April 1999 *Wall Street Journal* article bluntly described Merck's dependence on the success of VIOXX:  "***Merck needs VIOXX to be a winner.  After years of rapid sales and profit growth, patents on some of its biggest sellers will soon expire, opening the door to less-expensive generic versions.  The company is also grappling with a slowdown in sales growth of its big cholesterol-drug franchise and was recently hit with a delay in developing a new antidepressant.***"

56.      The January 2001 *Wall Street Journal* article further detailed Merck's patent expiration problem, stating: "Merck's problem, which at times has infected almost every big pharmaceuticals company, was that patents on several of its best-selling drugs would be expiring.  Generic knock-offs would then eat deeply into market share and profits on drugs like Vasotec and Prinivil for hypertension, Mevacor for high cholesterol and Pepcid and Prilosec for ulcers."

57.      More specifically, patents for these five drugs, which together accounted for a staggering ***$5.875 billion*** (or approximately 18%) of Merck's world-wide sales in 1999, were set to expire in 2000 and 2001:

| Drug | 1999 Worldwide Sales | Patent Expiration |
|---|---|---|
| Vasotec | $2.3 Billion | August 2000 |
| Pepcid | $910 Million | October 2000 |
| Mevacor | $600 Million | June 2001 |
| Prilosec | $1.25 Billion | October 2001 |

| Prinivil | $815 Million | December 2001 |
| --- | --- | --- |

58.     The January 2001 *Wall Street Journal* article also noted that "[e]ver since investors caught on to [Merck's impending patent expiration problem], Wall Street ha[d] been insisting that Merck join the merger rush sweeping the pharmaceuticals industry."  According to the article, ***defendant Scolnick had recognized this coming "crisis" for fifteen years and "secretly feared that Merck might not survive it as an independent company."***

### 5.     Merck's Successful VIOXX Product Launch in 1999

59.     On May 20, 1999, the FDA gave Merck approval to market VIOXX.  Desperate to catch up with Pfizer/Searle, Merck immediately set in motion an elaborate plan to get VIOXX onto the market and into the medicine cabinets of millions of Americans.  Within eleven days of approval, VIOXX was stocked in 40,000 pharmacies, a feat that the January 2001 *Wall Street Journal* article called "remarkable."

60.     Merck had also "girded for a marketing battle," having "hired 700 new sales representatives to push VIOXX and other new drugs," according to the April 1999 *Wall Street Journal* article.

61.     On May 21, 1999, a *Dow Jones Newswire* report elaborated on the importance of VIOXX to Merck, and the anticipated competition between VIOXX and Celebrex:  "The battle for this summer's blockbuster may not occur in movie theaters, but instead in the corner drugstore."  The report quoted David Saks, a pharmaceutical analyst at Gruntal & Co.:  ***"VIOXX to Merck is like the hot movie 'Star Wars' to the movie industry. . . . It's the biggest product for Merck."***  That day, Merck common stock closed at $69.20 -- up $2.47 from the previous day's closing price -- on heavy trading volume of 7,578,900, which was 53% greater than the previous day's trading volume.

62.     Despite Merck's all-out efforts, an early report on CNBC-TV suggested VIOXX's sales were disappointing.  A week after Merck launched VIOXX, CNBC reported that "Merck's Vioxx is not off to nearly as fast a start over its first seven days officially on the market as its main competitor in the same class, Celebrex."  Upon receipt of this report, defendant Scolnick urgently emailed Jan Weiner, Merck's executive director of public affairs, at 1:43 a.m. on June 4, 1999, stating "Before I have a heart attack, please tell me what is really happening."  After receiving reassurances from Weiner that the CNBC report was based on erroneous data, Scolnick thanked her, stating "***I spent the last 2 months of my life doing everything I humanly could to get Vioxx through with a good label***."

63.     Weiner was correct in her assessment that CNBC's data was wrong.  As *The Wall Street Journal* later reported, "[w]ithin three months of its launch, the Merck drug gained nearly a third of the brand-new market for 'Cox-2 inhibitors' … and within a year it had nearly half."  In addition, VIOXX was "dominant" in Europe, where it had "beaten Celebrex to market in most countries despite filing later."

**6.     Merck's "Blockbuster" VIOXX Sales Grow From 2000 Through Mid-2004**

64.     By 2000, Merck was reaping more than $175 million in sales from VIOXX every month, a number that continued to grow during the Class Period.  In total, Merck generated more than $2.1 billion from sales of VIOXX in 2000, which represented more than 10% of Merck's pharmaceutical sales.

65.     In 2001, Merck generated more than $2.3 billion from sales of VIOXX, more than 11% of Merck's pharmaceutical sales.

66.     In 2002, Merck generated more than $2.5 billion from sales of VIOXX, almost 12% of Merck's pharmaceutical sales.

67.     In 2003, Merck generated more than $2.5 billion from sales of VIOXX,
approximately 12.5% of Merck's pharmaceutical sales.

68.     During the first six months of 2004, Merck generated more than $1.3 billion from
sales of VIOXX.

### 7.     Merck Shocks Investors By Pulling VIOXX From The Market

69.     On September 30, 2004, Merck suddenly withdrew VIOXX from the market, after
an external Data and Safety Monitoring Board overseeing a long-term Merck study to evaluate
whether VIOXX could prevent colon cancer (the "APPROVe" trial) recommended that the trial
be halted because patients taking VIOXX were significantly more likely than patients taking
placebo to suffer heart attacks and strokes.

**B.     Unbeknownst to Investors, Merck Had Grave Concerns About VIOXX's
Potential to Cause Heart Attacks and Strokes, Which Were Reinforced By
Undisclosed Merck Data, Even Before It Launched VIOXX In May 1999**

**1.     Merck Learns That VIOXX Upsets the Homeostatic Balance Between
Prostacyclin and Thromboxane, and the Concerns Raised by Protocol
023**

70.     In 1996, Merck consultants Dr. Garrett FitzGerald and Dr. Francesca Catella-
Lawson conducted a two-week clinical trial ("Protocol 023") for Merck that compared the
effects of VIOXX, indomethacin (a traditional non-selective NSAID) and a placebo on the
kidneys.  They did this by measuring the urinary excretion of prostacyclin and thromboxane
metabolites in thirty-six patients.  The quantity of such metabolites in the urine is a proxy for the
levels of prostacyclin and thromboxane in the bloodstream.

71.     As discussed in ¶ 38 above, prostacyclin *widens* the blood vessels so that blood
can flow more freely and potently *inhibits* blood clotting, whereas thromboxane *narrows* the
blood vessels and potently *promotes* blood clots.  These chemicals, which have opposite effects,
exist in the human body in a natural balance referred to as homeostasis.  An excess of

prostacyclin inhibits the body's ability to form blood clots in the case of a wound. An excess of thromboxane increases the risk of "thrombotic events" such as heart attacks and strokes, which occur as a result of blood clots forming in the body and obstructing blood vessels.

72. As set forth in the article reporting on the results of Protocol 023,[4] Dr. FitzGerald, Professor of Cardiovascular Medicine and Chairman of the Department of Pharmacology at the University of Pennsylvania, and Dr. Catella-Lawson, Assistant Professor in the Department of Medicine at the University of Pennsylvania, were aware that traditional NSAIDs had been found to inhibit both COX-1 and COX-2 and to reduce significantly the synthesis of both prostacyclin and thromboxane. Because they thought the synthesis of prostacyclin and thromboxane was related only to COX-1, however, they hypothesized that VIOXX -- which inhibited only COX-2 -- would have *no effect* on the urinary excretion of either prostacyclin or thromboxane metabolites.

73. Drs. FitzGerald and Catella-Lawson found that the results of Protocol 023 were inconsistent with this hypothesis. As they expected, VIOXX had no effect on urinary excretion of thromboxane metabolites but, contrary to their expectations, it *did* inhibit the urinary excretion of prostacyclin metabolites. Their findings suggested that COX-2 played a role in prostacyclin formation, and that VIOXX (as a COX-2 inhibitor) upset the homeostatic balance by inhibiting synthesis of the chemical that reduces clotting, widens blood vessels and promotes the flow of blood in the body (prostacyclin), without having any corollary impact on the chemical that narrows blood vessels and promotes clotting (thromboxane).

---

[4] The article, entitled "Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids," was published in the May 1999 issue of the *Journal of Pharmacology and Therapeutics*.

74.     Senior Merck scientists were very concerned by these findings.  As noted above, an excess of thromboxane in the body could elevate the risk of thrombotic events such as heart attacks and strokes by causing blood clots to form and blood vessels to constrict, which together would increase the risk that the vital flow of blood to the brain or heart would be obstructed. Protocol 023 thus raised concerns that VIOXX might be "prothrombotic" -- *i.e.*, that it would cause thrombotic events such as heart attacks and strokes (and therefore have a safety profile that was worse than, or no better than, traditional NSAIDs, which were known to result in heightened incidence of a variety of gastrointestinal problems).

75.     The results of Protocol 023 were published in the May 1999 issue of the *Journal of Pharmacology and Therapeutics* ("*JPAT*").   The authors of the article included Merck scientists Drs. Briggs Morrison, Barry J. Gertz, and Hui Quan.  However, at Merck's insistence, the article downplayed the cardiovascular significance of Protocol 023's findings.  Drafts of the article submitted by Drs. FitzGerald and Catella-Lawson to Merck in January and February 1998 (which were not disclosed to the public until after the Class Period) unequivocally stated that the results of Protocol 023 showed that "*[s]ystemic* biosynthesis of prostacyclin … *was* decreased," and that "[i]nhibition of [prostacyclin metabolites] by MK 966 [VIOXX] implies a *major role* for Cox-2 in *systemic* biosynthesis of prostacyclin in humans."   An internal Merck memo dated February 18, 1998 from Dr. Morrison to his colleagues Drs. Nies, Gertz, Seidenberg, Quan and Bolognese (which also was not disclosed until after the Class Period) indicated Merck's "discomfort" with these conclusions, and proposed having a teleconference with Drs. FitzGerald and Catella-Lawson to change them.  The final version of the article published in the May 1999 *JPAT* shows that the statements that Merck wanted to change were in fact greatly softened or eliminated.   The final article stated only that "COX-2 *may* play a role in the systemic

28

biosynthesis of prostacyclin in healthy humans," and that "the implications of prostacyclin suppression *in vivo* are unclear." Consequently, publication of the May 1999 *JPAT* article did not cause analysts or investors to materially discount Merck's glowing statements about VIOXX's financial prospects.

> **2.    Merck Cancels a Large VIOXX Clinical Trial in August 1997 Over Undisclosed Concerns It Would Show That VIOXX Caused Serious Adverse Cardiovascular Problems**

76.    Though Merck was able to successfully downplay the significance of Protocol 023 in the May 1999 *JPAT* article, internal Merck emails from 1997 (which were not disclosed to the public until after the Class Period) confirm that Merck scientists were greatly concerned that VIOXX caused heart attacks and strokes. As noted in ¶¶ 49 and 50, Merck had planned to initiate a large gastrointestinal outcomes trial before it obtained FDA approval for VIOXX. Such a trial had the potential to provide Merck with a very significant marketing advantage: if the results demonstrated that VIOXX was significantly less likely to cause serious GI problems than traditional NSAIDs, Merck would be able to sell VIOXX without the GI warning that the FDA required for both traditional NSAIDs and other COX-2 inhibitors (*i.e.*, Celebrex) until Celebrex demonstrated that it was GI-protective when compared to traditional NSAIDs. In the wake of Protocol 023, however, Merck also realized that such a trial had the potential to confirm that VIOXX had prothrombotic qualities -- which had the potential to be a disaster for Merck.

77.    On February 23, 1997, defendant Reicin circulated a draft of the protocol for the proposed large scale VIOXX GI outcomes trial to her colleagues Drs. Briggs Morrison, Brian Daniels, Thomas Simon and Elliot Ehrlich. The proposed study protocol would have disallowed use of low dose aspirin (a traditional NSAID that inhibits both COX-1 and COX-2 enzymes and that was known to be cardio-protective). On February 25, 1997 at 8:23 a.m., Dr. Morrison, a

senior research and development executive at Merck who also was a co-author of the article that

reported the results of Protocol 023, replied to all recipients of defendant Reicin's email, stating:

> [I] [w]ould allow low dose aspirin - I know this has been discussed
> to death but real world is everyone is on it so why exclude **AND
> without COX-1 inhibition [provided by aspirin] you will get more
> thrombotic events and <u>kill [the] drug.</u>**

78.    Data from a large scale GI outcomes trial showing that VIOXX users suffered

"more thrombotic events" than naproxen users would indeed have likely "kill[ed] the drug"

because VIOXX's commercial prospects rested entirely on the claim that it was safer to use than

traditional NSAIDs, *i.e.*, on showing both that VIOXX was less likely to cause the GI problems

associated with long-term use of traditional NSAIDs and that it did not cause other adverse side

effects that outweighed its GI-protective qualities.  If Merck generated data showing a reduction

in adverse GI events but an increase in adverse CV events -- data which it would have to share

with the FDA -- **before** the FDA had decided to approve VIOXX for marketing, the FDA almost

certainly would have required Merck to undertake additional lengthy trials to establish VIOXX's

cardiovascular safety (perhaps by a large scale trial against placebo) before the agency would

allow VIOXX to be marketed.

79.    On February 25, 1997, approximately two hours after Dr. Morrison sent his email,

defendant Reicin replied to all recipients of Dr. Morrison's email stating:

> Low Dose Aspirin – I HEAR YOU! This is a no win situation! The
> relative risk of [more adverse GI events if we allow] even low dose
> aspirin may be as high as 2-4 fold.  ***Yet, the possibility of
> increased CV [cardiovascular] events is of <u>great concern</u>- (I just
> can't wait to be the one to present those results to senior
> management!)***

In other words, although defendant Reicin was worried that allowing patients in the proposed

large-scale GI outcomes trial to take aspirin would lead to more GI problems (because aspirin

inhibits COX-1), she was "great[ly] concern[ed]" that excluding aspirin would lead to more

30

adverse cardiovascular events (because without COX-1 inhibition, there would be an excess of thromboxane in the bloodstream) which, in the words of her colleague Dr. Morrison, would "kill the drug."[5]

80.     Accordingly, in the same email, defendant Reicin proposed that Merck design the gastrointestinal outcomes trial in a manner which would minimize the risk that it would generate significantly more adverse CV events among patients taking VIOXX in the study, and thereby hide the increased risk of heart attacks and strokes that VIOXX posed if it was prothrombotic by excluding from the trial patients who would be more vulnerable to its prothrombotic effects. Specifically, she stated:

> **What about the idea of excluding high risk CV patients-** ie those that have already had an MI [heart attack], CABG [coronary artery bypass grafting] or PTCA [angioplasty]? **This may decrease the CV event rate so that a difference between the two groups would not be evident.** The only problem would be –Would we be able to recruit any patients?

81.     The reply sent the next day, February 26, 1997, by Dr. Brian Daniels, another senior Merck executive, to all recipients of defendant Reicin's email reflected his appreciation of the dilemma Merck faced. He stated: "***It is clear to me that the program will be <u>severely hurt</u> if the megatrial shows a win in PUBs [i.e., serious GI problems] and a loss in MI/CVA [i.e., heart attacks/other adverse cardiovascular events].*** That is what we are setting up by not allowing ASA [aspirin]."

82.     As a result of these concerns, by no later than August 1997 Merck decided to *cancel* (or at least defer until FDA approval was already reasonably assured) its planned large-scale gastrointestinal outcomes trial. On August 13, 1997, Kyra Lindemann, a Merck

---

[5] Defendant Reicin's email also confirms that Merck's "senior management" was closely following developments relating to the testing of VIOXX and bringing it to market.

spokeswoman, circulated internally a draft press release and draft questions and answers concerning Merck's decision not to move forward with the gastrointestinal outcomes trial. ***Her email noted that these materials were "a bit awkward to write … because of the actual reasons for not proceeding with the study,"*** and that she had tried to "put a positive spin" on the decision not to move forward with the study by "emphasiz[ing] the fact that [Merck is] conducting [other] outcome studies" and by "convinc[ing]ly express[ing] confidence that our Phase III program is large enough to support these studies."

### 3. November 1997: Preeminent Medical Researcher and Merck Consultant Dr. John Oates Rejects Internal Merck Efforts to Rationalize the Adverse Implications of Protocol 023

83.     While continuing to press forward with the development of VIOXX, Merck scientists were sufficiently concerned by the implications of Drs. FitzGerald and Catella-Lawson's Protocol 023 research, which suggested that VIOXX might be prothrombotic, that they searched high and low for an "alternative" explanation of Protocol 023's results.

84.     For example, in the fall of 1997, Merck scientists Dr. Alan Nies (who was in charge of VIOXX's development) and Dr. Barry Gertz (who reported to Nies and was an author of the article reporting the results of Protocol 023) contacted Dr. John Oates, one of the world's foremost experts on prostacyclin and thromboxane, in the hopes of explaining away Protocol 023's results. Drs. Nies and Gertz asked Dr. Oates (who was then Senior Professor of Medicine and Professor of Pharmacology at Vanderbilt University School of Medicine) whether Protocol 023's finding that VIOXX inhibited the amount of prostacyclin metabolites in the urine could be attributed to an effect VIOXX was having on the kidney, rather than an effect VIOXX was having on the overall level of prostacyclin in the bloodstream. If VIOXX's effects were so limited, it would mean that VIOXX did not throw off the overall homeostatic balance between

prostacyclin and thromboxane in the bloodstream, and Merck's concerns that VIOXX was prothrombotic would be substantially alleviated.

85.     Merck scientists had previously posed this question privately to Drs. FitzGerald and Catella-Lawson, who had responded that they did *not* believe that Protocol 023's results could be attributed to an effect VIOXX was having solely on the kidneys.  By letter dated November 17, 1997, Dr. Oates gave a similar answer.  Specifically, Dr. Oates privately advised Drs. Nies and Gertz that it was "quite unlikely" that the decreased prostacyclin metabolites could be attributed to an effect of VIOXX on the kidneys, because the "major sources of prostacyclin are exterior to the kidney, and that even in the kidney a predominant source would be expected to arise from a renal vasculature."  Thus, Dr. Oates' opinion, rather than alleviating Merck's concerns about VIOXX's potential prothrombotic properties, only further supported Drs. FitzGerald and Catella-Lawson's conclusion that VIOXX disturbed the body's natural homeostasis between prostacyclin and thromboxane.

86.     Internal Merck emails from this period also reflect Merck's continuing concerns about VIOXX's potential prothrombotic properties.  For example, on January 13, 1998, defendant Scolnick emailed Tony Ford-Hutchinson, the head of Merck's team in Montreal that had developed the VIOXX molecule, and Bennett M. Shapiro, Merck's Executive Vice President of Basic Research, stating "***we all know what the issues are about MK 966 [VIOXX] and prostacyclin and thromboxane based on the urinary metabolite data***.  I assume we are working VERY hard to clarify this in montreal [sic]….The data on prostacyclin in man seems clear.  Can we try in animals?  If it is true we MUST find out how it works."

   **4.    Merck's Undisclosed Internal Analysis of Osteoarthritis Clinical Data Shows That Women Taking VIOXX Have A Statistically Significant 216% Increased Risk of Serious Adverse Cardiovascular Events Compared To Women Taking A Placebo**

87.    In February 1998, Merck prepared an internal analysis comparing the incidence of serious cardiovascular problems in patients taking VIOXX in Merck's Phase IIb/III VIOXX osteoarthritis trials (conducted as of December 15, 1997) to the incidence of serious cardiovascular problems among patients taking a placebo in certain other large clinical trials that Merck had undertaken in connection with its PROSCAR and FOSAMAX drugs.[6]   In the Introduction and Background section of the analysis, Merck scientist Dr. Doug Watson (the lead author of the analysis) noted that the impetus for the analysis was Drs. FitzGerald and Catella-Lawson's findings in Protocol 023, which had "raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular events," as well as the results of a small Merck clinical study (Protocol 010) in which patients taking VIOXX "had more clinical 'Cardiovascular' AEs [adverse events] than the placebo group."   The purpose of the internal February 1998 Merck analysis was to determine whether Merck needed to change the design of its clinical trials for VIOXX to provide for "more formal monitoring of the risk of thrombotic CV serious adverse events (SAEs) with VIOXX."

88.    Because Merck did not know at the time of analysis which patients in the Phase IIb/III VIOXX osteoarthritis trials were using VIOXX as opposed to a comparator NSAID or placebo, it included *all* patients in the VIOXX osteoarthritis trials in the VIOXX arm of the analysis.   The internal 1998 Merck analysis thus compared all patients in the Phase IIb/III VIOXX osteoarthritis trials (including those who were taking comparator NSAIDs or placebos

---

[6]    PROSCAR is used to treat enlarged prostate; FOSAMAX is used to treat or prevent osteoporosis.

rather than VIOXX) to all patients who were known to have taken only placebo in the PROSCAR and FOSAMAX trials. Consequently, if VIOXX users had higher rates of thrombotic events, such an increase would be reduced or perhaps even masked entirely by the inclusion of patients taking other NSAIDs or placebo in the "VIOXX arm" of the comparative analysis.

89. Nonetheless, as Dr. Gurkipal Singh, then-Adjunct Clinical Professor of Medicine at Stanford University School of Medicine, stated in public testimony before the United States Senate Committee on Finance on November 18, 2004 -- after Merck had withdrawn VIOXX from the market -- Merck's internal February 1998 analysis "concluded that men taking VIOXX had a 28% greater risk [of serious cardiovascular adverse events] (not statistically significant), *but in women, the risk was more than double (216%, statistically significant) compared to people not taking any drug in other Merck studies.*"[7] Dr. Singh added that "[t]o the best of my knowledge, these data were never made public" and that *"[t]his is when a public scientific discussion of the pros and cons of the medication should have started."*

90. The internal February 1998 Merck analysis did not become a starting point for a scientific debate about VIOXX's safety, however, because instead of making public these results that could have "kill[ed] the drug," Merck (which was under tremendous pressure to get VIOXX to market ahead of Celebrex) went out of its way -- and outside the bounds of accepted medical research practices -- to avoid disclosing the fact that Merck's own data indicated that VIOXX caused at least a 216% statistically significant increase in serious cardiovascular events among women compared to placebo. Merck attempted to rationalize the data by speculating that the rate

---

[7] For the reasons set forth in ¶ 88 above, it seems likely that it would have been more accurate for Dr. Singh to state that Merck had found that men had *at least* a 28% greater risk of serious cardiovascular adverse events, and that women had *at least* a statistically significant 216% greater risk of serious cardiovascular adverse events, compared to people taking a placebo.

of serious cardiovascular events among the large population of women taking placebo (over 4,400 women) was "atypically low," and that it was this "atypically low" rate of serious adverse cardiovascular events in women in the placebo group -- rather than a statistically significant increased cardiovascular risk from VIOXX -- that was responsible for the statistically significant difference in cardiovascular results obtained. Relying on this clearly unscientific, "heads I win, tails you lose" line of reasoning, the February 1998 internal Merck analysis purported to reach the astounding conclusion that the incidence rates of serious cardiovascular events in the VIOXX trials "appear roughly consistent with what would be expected in the general population," and that Merck therefore did not need to change its study protocols to provide for better monitoring of cardiovascular risks with VIOXX. This conclusion was so obviously flawed that no reasonable scientist could have relied upon it other than by recklessly disregarding the self-serving and non-scientific assumptions on which it was based. The results of Merck's internal February 1998 analysis did not become public until after the Class Period.

> **5. Merck Attempts to "Manage" Concerns About VIOXX's Cardiovascular Safety as It Nears Completion of Its New Drug Application for VIOXX in 1998**

91. In April 1998, Dr. Alan Nies (the senior Merck scientist who had been corresponding with Dr. Oates about Protocol 023's problematic findings) prepared a report on VIOXX for Merck's Board of Scientific Advisors, a board comprised of external scientists that is supposed to act as an independent check on the biases of Merck scientists, and which was scheduled to hold its annual meeting in May 1998. Recognizing that its Board of Scientific Advisors might put the brakes on Merck's rush to have VIOXX beat Celebrex to market, the internal and non-public report prepared by Dr. Nies did not disclose the serious concerns that Merck scientists and executives had about VIOXX's potential to cause thrombotic events such as heart attacks and strokes. Indeed, the Merck report prepared by Dr. Nies made no mention of

any issues concerning cardiovascular safety until page 10 of the 11 page report, in a section entitled "Prostacyclin Metabolism." That section discussed Protocol 023's findings that VIOXX inhibited prostacyclin but not thromboxane, but represented that Merck's internal February 1998 analysis of VIOXX osteoarthritis data did not suggest any cause for concern. However, Dr. Nies' report did **_not_** disclose to the Board of Scientific Advisors the data from Merck's February 1998 internal analysis showing a **_statistically significant 216%_** greater chance of suffering a serious cardiovascular event among female patients in osteoarthritis trials involving VIOXX and a 28% greater chance of suffering such an event among male patients, nor did it disclose the clearly unscientific assumption on which Dr. Watson had concluded that this data was not significant, even though members of the Board of Scientific Advisors would have certainly found such information highly relevant in assessing VIOXX's alleged safety.

92.     Nonetheless, Merck's external Board of Scientific Advisors was still troubled by VIOXX's potential cardiovascular effects given its impact on prostacyclin. Indeed, more than half of the Board's internal and non-public Programmatic Review of the VIOXX program (7 out of 13 pages) was addressed to Protocol 023's findings that VIOXX inhibited prostacyclin but not thromboxane, and the potential implications of those findings. Noting that "[p]rostacyclin is the most potent endogenous inhibitor of platelet aggregation [clotting]" and that "it also potently inhibits the development of ischemic ventricular fibrillation [cardiac arrest]," the Board emphasized that Protocol 023's finding that VIOXX reduces the urinary excretion of the prostacyclin metabolite raised the possibility that **_"[b]y removing this potent inhibitor of platelet aggregation, the probability that a coronary plaque rupture would lead to myocardial infarction [heart attack] or ischemic ventricular fibrillation [cardiac arrest] is enhanced._**" Accordingly, contrary to the recommendation contained in Merck's internal February 1998

37

analysis (which was never shown to the Board), Merck's external advisory Board "proposed that coronary events be predetermined endpoints [*i.e.*, a primary focus of the data being collected] in all future controlled trials with Vioxx" and "that these endpoints be assessed by a uniform set of criteria so that meta-analysis of coronary and cerebrovascular events from all of these trials can be performed."

93.     Actively exploring whether VIOXX in fact caused thrombotic events, with the attendant risk that it might "kill the drug," was not something that Merck wanted to do.  Instead, Merck continued to rush forward with its efforts to get VIOXX on the market in an effort to keep pace with Celebrex, and Merck effectively shrugged off the serious concerns raised by Dr. Oates and Merck's Board of Scientific Advisors.  Thus, in a September 29, 1998 handwritten memo, Dr. Nies informed his Merck colleagues Drs. Barry Gertz and Reynold Spector (head of clinical sciences at Merck) that he had spoken to Dr. Oates -- who had proposed studying VIOXX in patients with atherosclerosis and elevated thromboxane metabolite excretion -- and had told him that Merck "would not be doing any [such] clinical studies at this time."

94.     As noted in ¶ 76 above, Merck submitted its New Drug Application for VIOXX to the FDA on November 23, 1998.  In the months before its approval, Merck officials publicly spoke of VIOXX only in glowing terms.  For example, on December 9, 1998, at Merck's annual analyst meeting, defendant Scolnick boasted:  "Short-term high dose, long-term low dose, it's a wonderful drug . . . VIOXX has lived up to our highest expectations."  Merck and the Officer Defendants thus conditioned the market to believe that VIOXX would be a blockbuster hit, never disclosing the Company's "great concern" about VIOXX's potential to cause thrombotic events such as heart attacks and strokes, or the growing body of internal clinical data that fueled those concerns.

**C.    May 21, 1999 (The First Day of the Class Period): Merck Heralds the FDA's Approval of VIOXX While Continuing to Conceal Its "Great Concern" And Related Adverse Information About VIOXX's Safety**

95.    On May 21, 1999, the first day of the Class Period, Merck issued a press release announcing that VIOXX "has received marketing approval from the U.S. Food and Drug Administration.  VIOXX has been approved for the relief of osteoarthritis (OA), management of acute pain in adults, and treatment of menstrual pain (primary dysmenorrheal)."  With respect to the drug's side effects, the press release stated:  "The most common side effects reported in clinical trials with VIOXX were upper-respiratory infection, diarrhea and nausea."

96.    Merck and the Officer Defendants did not disclose to investors their "great concern" that VIOXX caused serious side effects, such as heart attacks and strokes.  Although this concern had led Merck to cancel its large-scale GI outcomes study in 1997, Merck and the Officer Defendants decided not to disclose this concern or that it was based on their knowledge that (a) VIOXX upset the homeostatic balance between prostacyclin and thromboxane by inhibiting prostacyclin but not thromboxane; and (b) Merck's internal February 1998 analysis, which was not disclosed to the public until after the Class Period, showed that patients in VIOXX clinical trials had higher rates of serious adverse cardiovascular events compared to patients taking placebo, including a ***statistically significant  increase of at least 216% among women.***

**D.    March 2000: Merck Is Finally Forced to Undertake a Large Gastrointestinal Outcomes Trial (VIGOR), Which Confirms the Company's Belief That VIOXX Is Prothrombotic**

97.    In January 1999, with FDA approval of VIOXX within sight, Merck had finally begun its long-delayed large gastrointestinal outcomes trial, entitled VIOXX Gastrointestinal Outcomes Research ("VIGOR") -- the trial that Merck knew was necessary to obtain a label stating that VIOXX had a lower incidence of significant GI complications than comparator

NSAIDs, but which Merck had previously cancelled in August 1997 out of concern that it would confirm that VIOXX was prothrombotic. By early 1999, Merck had been effectively forced to undertake such a study by news that Pfizer and Monsanto/Searle had already begun a similar study with respect to Celebrex, entitled Celebrex Long-Term Arthritis Safety Study ("CLASS"). If CLASS could establish that Celebrex caused significantly fewer serious GI problems than traditional NSAIDs and Merck could not produce similar study results in a comparable large-scale trial, VIOXX's competitive position vis-à-vis Celebrex would be severely jeopardized.

98. Moreover, because the results of the large scale GI outcomes trial would not be reported to the FDA until *after* VIOXX was approved for marketing, a post-FDA approval finding that VIOXX users incurred a significantly higher rate of heart attacks would not pose nearly as big a danger to Merck. More particularly, as long as Merck could proffer some plausible alternative explanation for such results -- such as an alleged cardioprotective effect of the comparator drug naproxen -- the FDA would have to go through a burdensome regulatory process before it could *remove* VIOXX from the market. In other words, by delaying the start of its large GI outcomes trial so that its results would not become available until after initial FDA approval was secured, Merck was able to reduce substantially the risk that the results, even if they suggested that VIOXX might be prothrombotic, would "kill the drug."

99. Moreover, Merck also intentionally designed VIGOR to minimize the likelihood that the results would show that VIOXX was prothrombotic. Consistent with defendant Reicin's 1997 proposal that Merck exclude patients at high risk of suffering a serious cardiovascular event so as to minimize the odds of producing adverse study results, Merck excluded from VIGOR all patients who were taking low-dose aspirin to prevent cardiovascular problems -- the very class of predominantly older patients who suffer from osteoarthritis and were most likely to experience

40

adverse cardiovascular events if VIOXX were prothrombotic. Merck also initially chose not to gather data about adverse cardiovascular events as a designated endpoint (primary focus) of this trial -- contrary to the recommendation of Merck's Board of Scientific Advisors that "coronary events be predetermined endpoints in all future controlled trials with Vioxx." Merck also chose not to name a cardiologist to VIGOR's Data and Safety Monitoring Board ("DSMB"), which was the panel established to monitor the unblinded results of VIGOR in order to protect the safety of trial participants.

100. Merck enrolled more than 8,000 patients in VIGOR, with 4,047 being given VIOXX and 4,029 being given naproxen (a traditional NSAID). It appointed to the DSMB Drs. Michael Weinblatt, David Bjorkman, James Neaton, Alan Silman, Roger Sturrock, and Deborah Shapiro.

101. Contrary to the customary practice of naming to a DSMB only unbiased outside scientists, at least half of the members of VIGOR's DSMB had substantial Merck-related conflicts of interest. As later revealed on National Public Radio's June 8, 2006 *All Things Considered* program, Dr. Weinblatt, the head of the DSMB, and his wife owned Merck stock worth $73,000. Dr. Bjorkman served as a Merck consultant during the period that VIGOR was ongoing. And Dr. Shapiro, who filled the critically important role of VIGOR's *unblinded* statistician, was the most conflicted of all, as she was a full-time Merck scientist who reported to defendant Scolnick.

102. By the beginning of September 1999, patients in the VIGOR study who were taking VIOXX had, compared to patients taking naproxen, suffered substantially more serious cardiovascular events in general (36 in VIOXX users, 16 in naproxen users), substantially more cardiovascular events leading to discontinuation of treatment (*i.e.*, patients quitting the study) (32

in VIOXX users, 17 in naproxen users), and almost twice as many deaths (11 in VIOXX users, 6 in naproxen users).

103.    By the beginning of November 1999, these trends had continued and, in the case of serious adverse cardiovascular events leading to discontinuation or death, gotten significantly worse for VIOXX.  For example, by November 1999, patients taking VIOXX had substantially more serious cardiovascular events (52 in VIOXX users, 29 in naproxen users), more than twice as many cardiovascular events leading to discontinuation (40 in VIOXX users, 17 in naproxen users) and almost three times as many deaths (16 in VIOXX users, 6 in naproxen users).  The minutes of the DSMB's November 17, 1999 meeting reflect that these "differences between the treatment groups were … significant beyond the level of chance."  Nonetheless, the supposedly independent VIGOR DSMB, in consultation with Merck scientist Shapiro, decided not to stop the VIGOR study -- a result which would have been devastating to Merck.  Rather, the DSMB noted its concern about this data and scheduled a special interim meeting for December 20, 1999 at which it would "focus on deaths and cardiovascular AEs [adverse events]."

104.    The minutes of the DSMB's December 20, 1999 meeting state that "[t]he members noted that the trends previously observed [concerning deaths and cardiovascular adverse experiences] continued."  Nonetheless, the VIGOR DSMB once again decided not to stop the VIGOR study.

105.    The minutes of the DSMB's December 20, 1999 meeting further reflect that members of the DSMB were surprised to learn that Merck had not yet prepared a data analysis plan for adverse cardiovascular events despite the fact that "the VIGOR Data Analysis Plan states that a data analysis plan would be developed for these events."  The DSMB resolved to write a letter to defendant Reicin requesting "that an analysis plan be developed to analyze

serious cardiovascular events in the VIGOR trial separately from any other planned analyses of these data," and that "these events be adjudicated blinded" to avoid any bias in interpretation. The DSMB noted that it was "not recommending a change to the trial conduct, simply that a prespecified plan be accomplished."

106. Merck's failure to develop a data analysis plan for adverse cardiovascular events was not an innocent oversight but the product of *a conscious decision by senior management*. In a January 14, 2000 email, Dr. Watson, the Merck scientist who had prepared Merck's internal February 1998 analysis of serious adverse cardiovascular events among osteoarthritis patients who had used VIOXX, wrote:

> [T]he plan approved by [Merck's] CDOC [Clinical Development Oversight Committee] was to include VIGOR with other blocks of studies for an analysis later. [Dr.] Jim [Bolognese] had the assignment to develop a DAP [Data Analysis Plan] for the analysis. *Since then we (Jim and I) have been instructed by CDOC and senior management to not do so, and that comparisons with other treatments are not to be made.*

107. On January 21, 2000, Merck scientist and VIGOR DSMB member Dr. Shapiro informed her fellow DSMB members that Merck had declined their request to perform a separate analysis of VIGOR's cardiovascular data. Dr. Weinblatt, on behalf of the DSMB, pushed back against Merck's refusal to perform such an analysis. By letter dated January 24, 2000 to defendant Reicin, Dr. Weinblatt wrote that "An analysis of these cardiovascular data must be provided separately for VIGOR as part of the study report."

108. On February 7, 2000, Merck reluctantly agreed to analyze VIGOR's cardiovascular data, but to include only events reported through February 10, 2000 -- a cut-off date that was one month earlier than the cut-off date for GI data -- in its initial analyses. Dr. Weinblatt, on behalf of the DSMB, accepted Merck's proposal to use different cut-off dates for cardiovascular and GI data even though use of different cut-off dates was inconsistent with

customary scientific practice.  Shortly thereafter, Dr. Weinblatt accepted Merck's offer to pay him $5,000 a day to sit on a Merck Advisory Board.  Over the next two years, Merck paid him $60,000 pursuant to that agreement.

109.    Reports of the DSMB's insistence on an analysis of VIGOR's cardiovascular data had filtered through Merck, increasing concerns that the data would show precisely what Merck most feared: that VIOXX caused thrombotic events.  Indeed, on February 11, 2000, one day after Merck's cut-off date for inclusion of cardiovascular adverse event data (and just a month before the cut-off date for the inclusion of GI adverse event data), defendant Scolnick sent his subordinate Dr. Shapiro -- the unblinded statistician for the VIGOR trial -- an email which attached a copy of a Wall Street analyst report suggesting that momentum was swinging toward Celebrex in its battle with VIOXX.  The email, which clearly suggests that Scolnick intended to try to influence Dr. Shapiro's analysis of VIGOR's cardiovascular data, reads as follows:

> Deborah  Please read this story.  It is my understanding that you are the unblinded statistician in our Vigor study.  In the last few days we are being pounded by stories like this.  As with the key issue with aggrastat when Snappin and I had to make a decision *as soon as you know what the answer is I would like a confidential meeting with you.  This situation cannot simply follow the 'book' ways of my knowing.*  Please let me know when I can talk to you confidentially.  You can reach me when this time comes at work at home [redacted] by voicemail (private) or anywhere by email- I am the only one who listens to my voice mail or email. Thanks I hope your lucky rabbit's foot is as good as it was with mevacor afcaps/ Ed Scolnick

110.    On March 9, 2000, defendant Scolnick was informed of the preliminary results of the VIGOR trial.  The data showed that patients taking VIOXX suffered *significantly* more heart attacks and deaths than the patients taking naproxen.  In response, on March 9, 2000, Scolnick emailed Shapiro, Nies, and defendant Reicin as follows:

> To all: I just received and went through the data. … *The CV [cardiovascular] events are clearly there*. … It is a shame but it is

> a low incidence and ***it is mechanism based as we worried it was.
> [Dr. John] Oates and Alan [Nies] and Barry [Gertz] were right
> about the metabolite meanings ie urine Pg [prostaglandin] data.***

Defendant Scolnick's reference to the cause of the cardiovascular events being "mechanism-based as we worried it was," and his statement that Drs. Oates, Nies and Gertz "were right" about the meaning of the urine prostaglandin data, was an admission that he believed that VIOXX was prothrombotic, and that the reason it was prothrombotic was because it inhibited prostacyclin without inhibiting thromboxane.

### E. The "Naproxen Hypothesis": Merck Falsely Represents That It Believes That the Higher Incidence of Adverse CV Events Among VIOXX Users in the VIGOR Trial Is Attributable To Purported Cardioprotective Properties of Naproxen Rather Than Prothrombotic Properties of VIOXX

111. Although the VIGOR results confirmed Merck's and its senior scientists' belief that VIOXX was prothrombotic, Merck and the Officer Defendants also knew that publicly admitting this fact would precipitate a financial disaster for Merck, resulting in the loss of its investment in VIOXX and billions of dollars in potential revenue from VIOXX.

112. Thus, rather than acknowledge their belief that the statistically significant difference in the number of heart attacks in the VIGOR trial was "mechanism based" and attributable to VIOXX's prothrombotic properties, Merck and the Officer Defendants decided to attempt to lead both the medical and Wall Street investor communities to believe that the VIGOR CV results were most likely attributable to some cardioprotective effect of naproxen (*i.e.*, the "naproxen hypothesis").

113. In the days that followed the internal distribution of VIGOR's results within Merck, senior Merck scientists and consultants worked around the clock to try to find meaningful support for the theory that naproxen was cardioprotective. They failed. On March 13, 2000 at 1:20 a.m., defendant Reicin emailed defendant Scolnick and Dr. Nies:

> Alan and Ed:
>
> Below is attached the abstract for the **only study** I could find which assessed the potential cardioprotective effects of an NSAID.
>
> Alise

The abstract was for a seven year old article from the July 1993 issue of *European Heart Journal* entitled "Evaluation of Flurbiprofen for Prevention of Reinfarction and Reocclusion After Successful Thrombolysis or Angioplasty in Acute Myocardial Infarction."

114.     The 1993 *European Heart Journal* article reported that a small-scale study (464 patients in total) in France among patients who had been successfully treated for a heart attack within six hours of its onset showed that patients who had taken flurbiprofen, a traditional NSAID, had lower risks of suffering a second heart attack or needing a coronary angioplasty or bypass graft than patients who took a placebo.  The article speculated that flurbiprofen might offer advantages over aspirin, but cautioned that comparable efficacy needed to be established. *The article had nothing to say about naproxen, as naproxen was not used in that study.*

115.     Over the next two weeks, Merck continued to search for any support for its naproxen hypothesis.  In a March 24, 2000 email, Dr. FitzGerald (the Merck consultant who had conducted Protocol 023) sent Dr. Alan Nies (the Merck scientist who was in charge of developing VIOXX) "the best comparative clin[ical] data on MI [heart attack] and NSAIDs" of which he was aware.   That same day, Dr. Nies forwarded Dr. FitzGerald's email to defendant Reicin and fellow senior Merck scientist Dr. Gertz.

116.     Dr. FitzGerald's March 24, 2000 email provided data from an unpublished non-Merck study, involving an analysis of more than 164,000 patients, which sought to estimate and compare the effects of aspirin and non-aspirin NSAIDs in preventing heart attacks.  FitzGerald's email contained specific data for aspirin, naproxen, ibuprofen, and diclofenac individually, as

well as data for naproxen, ibuprofen and diclofenac combined. As Dr. FitzGerald's email went on to point out, although the data confirmed that aspirin significantly reduced the risk that patients might suffer a first, nonfatal heart attack, *the other NSAIDs, including naproxen, "had no significant effect," either individually or combined, on the risk of suffering a heart attack.* Dr. FitzGerald noted that "amongst these INSIGNIFICANT effects [capital letters in original], naproxen looked best," but reiterated that "there were no sig[nificant] diff[erence]s between the nsaids."

117.    Dr. FitzGerald's non-public March 24, 2000 email therefore failed to provide any reasonable basis for Merck to claim that naproxen was cardioprotective, and in fact *undercut* that claim. Indeed, Merck knew, based on Dr. FitzGerald's email, that the best scientific evidence available showed that naproxen "had no significant effect" in preventing a heart attack.

118.    The data on naproxen contained in Dr. FitzGerald's March 24, 2000 email were not disclosed to the market. The results of the study referenced in this email were later published in the July 2000 issue of *Epidemiology* in an article entitled "Differential Effects of Aspirin and Non-Aspirin Nonsteroidal Antiinflammatory Drugs in the Primary Prevention of Myocardial Infarction in Postmenopausal women." However, unlike Dr. FitzGerald's email, which contained the specific data for naproxen, ibuprofen, and diclofenac individually, the *Epidemiology* article reported only the *aggregate* data for a group of *unspecified* non-aspirin traditional NSAIDs. The article did not even mention that naproxen was one of the traditional NSAIDs considered in the study. Thus, Merck had data on naproxen (which Dr. FitzGerald's March 24, 2000 email indicates he privately received from the study's author) that was not available in the published version of the study.

119. Notwithstanding its failure to find any meaningful scientific support for its "naproxen hypothesis" (and notwithstanding the non-public information in its possession that contradicted that hypothesis), on March 27, 2000 Merck issued a press release designed to lead the public to believe that the "naproxen hypothesis" was the most likely explanation for VIGOR's CV results, and that VIOXX did not cause heart attacks or strokes. After lauding VIGOR's GI results, Merck's press release stated:

> In addition, significantly fewer thromboembolic events were observed in patients taking naproxen in this GI outcomes study, **which is consistent with naproxen's ability to block platelet aggregation**. This effect on these events had not been observed previously in any clinical studies for naproxen. **VIOXX, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects.**

The press release further stated:

> An extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with VIOXX, showed no indication of a difference in the incidence of thromboembolic events between VIOXX, placebo and comparator NSAIDs. Further analyses are ongoing, and final results of the GI outcomes study with VIOXX will be presented at peer-reviewed medical meetings this year.

120. Merck's March 27, 2000 press release was intentionally designed to mislead investors, patients and doctors into believing that it clearly was more likely than not (a) that VIOXX had no impact on a user's risk of suffering a heart attack, stroke or other adverse CV event and (b) that the results of VIGOR did not impair VIOXX's commercial prospects and viability. However, as set forth above, in fact Merck and the Officer Defendants (a) had concluded that VIOXX was prothrombotic, and (b) in searching for information that might support the "naproxen hypothesis" had found only additional, non-public information that undercut their hypothesis.

48

121.    Merck's March 27, 2000 press release was widely reported and analyzed in the press and by securities analysts.  In the wake of this press release, market analysts and members of the press understood that, in the absence of more definitive studies, it was still possible that VIOXX was prothrombotic, but most repeated and adopted Merck's "naproxen hypothesis," which was propped up by Merck's false representation that there was "no indication" from Merck's other clinical data that VIOXX might be prothrombotic.

122.    Although it was widely reported that Merck's "naproxen hypothesis" was the most likely explanation for the CV events in VIGOR, some financial analysts and journalists suggested that the alternative explanation -- that VIOXX was prothrombotic -- might be equally plausible.  In response to "speculative news reports," on April 28, 2000 Merck issued a press release entitled "Merck Confirms Favorable Cardiovascular Safety Profile of VIOXX" that stated:

> Extensive review of data from the completed osteoarthritis trials and on-going clinical trials with VIOXX, as well as post-marketing experience with VIOXX, have shown no difference in the incidence of cardiovascular events, such as heart attack, among patients taking VIOXX, other NSAIDs and placebo.

Merck also reaffirmed its professed belief in its "naproxen hypothesis," stating that the difference in the rate of heart attacks found in VIGOR was "consistent with naproxen's ability to block platelet aggregation."  As was the case with Merck's March 27, 2000 press release, however, the April 28, 2000 press release was materially false and misleading because it failed to disclose Merck's lack of good faith belief in its naproxen hypothesis, and the totality of the information upon which its actual belief was based, including, *inter alia*, the results of Merck's internal February 1998 analysis (which showed at least a statistically significant 216% greater risk of serious adverse cardiovascular events among women taking VIOXX as compared to women taking placebos in other Merck studies) and the results of Protocol 023.

123.    Defendants also looked for ways to purportedly bolster their claim that naproxen had reduced cardiovascular risk (and VIOXX had not increased it).  To that end, Defendants publicly claimed in Merck's May 24, 2000 press release and the November 23, 2000 article in the *New England Journal of Medicine* formally reporting the VIGOR results (and listing defendant Reicin as an author) that 4% of the patients were improperly enrolled in VIGOR as they were at especially high risk for adverse cardiovascular events, and that the presence of this subpopulation in the VIGOR study was driving the extraordinary discrepancy observed between the number of heart attacks suffered by patients that took VIOXX compared to patients that took naproxen in VIGOR.

124.    In accordance with the VIGOR protocol, all of the patients enrolled in VIGOR had been screened for cardiovascular risk by independent investigators at the outset of the study, and any patients who were indicated for low-dose aspirin prophylaxis had been excluded.  After learning the VIGOR results, however, Merck contradicted the judgment of the independent study clinicians, and concluded that 4% of the VIGOR patients were purportedly indicated for low-dose aspirin prophylaxis and had been admitted to the VIGOR study in violation of the protocol (and were so-called "protocol violators").  On May 24, 2000, Merck issued a press release concerning the VIGOR results that reiterated the naproxen hypothesis and claimed that this 4% subgroup of patients experienced a higher rate of heart attacks than the remaining 96% of the VIGOR population, and that "[a]mong the 96 percent of patients in VIGOR who were not candidates for low-dose aspirin for such cardioprotection, there was no significant difference in heart attack rates – 0.1 percent among patients taking naproxen and 0.2 percent among patients taking Vioxx."

125. Merck's May 24, 2000 statement was materially misleading because it communicated to the public that this supposedly higher-risk "aspirin-indicated" subgroup faced a qualitatively different cardiovascular risk than the rest of the VIGOR population, and that the incidence of adverse cardiovascular events within that subgroup was quantitatively different in a meaningful and demonstrable way. Thus, Merck claimed that the result observed in VIGOR was entirely consistent with the naproxen hypothesis. According to Merck, administration of potent antiplatelet agents to rheumatoid arthritis patients would normally reduce the incidence of CV events by a certain amount and, when such an agent is administered to a group of patients at extraordinary risk for such events, differences in event rates would be expected to increase dramatically.

126. Before and after Merck issued its May 24, 2000 statement, Merck internally recognized that the "4% claim" was incorrect and unreliable. Merck employees that reviewed a May 11, 2000 draft paper to report on the VIGOR results, which advanced Merck's claim concerning the effect of the 4% of the VIGOR population on the magnitude of the observed difference in between-arm cardiovascular events, commented concerning that claim, "*give me a break*[. O]ne barely has enough power (with just 21 events) to detect an overall difference with so few events." In other words, VIGOR barely had enough statistical power to detect the overall difference in heart attacks across the entire study, and it would have thus lacked statistical power to compare the number of events within the 4% and 96% subgroups against each other. The reviewer also commented that "*this is a stretch for a post hoc analysis* – there is considerable overlap in the CI's [confidence intervals]," which undermined the notion that the 4% and 96% subgroups were meaningfully different. Despite these criticisms of the 4% analysis, Merck proceeded to publish its May 24, 2000 press release containing the analysis and reiterated it in

the November 23, 2000 *New England Journal of Medicine* paper formally publishing the VIGOR results, which listed Reicin as an author.

127.    In addition, in an internal presentation of the "VIGOR Final Results" in June of 2000, Merck statisticians acknowledged, "clinical has made much of the fact that if the ***protocol violators*** [i.e., the 4% of the VIGOR population who purportedly should have been aspirin-indicated] had been excluded, we would not have had any issues with the cardiovascular data. However, ***statistically these relative risks [for cardiovascular events on VIOXX versus naproxen in the 4% subgroup and in the 96% subgroup] are not different***.  That may be because the aspirin indicated group is so small but we cannot tell that here."

128.    Likewise, according to notes that Deborah Shapiro, a Director of Statistics at Merck who served as the unblinded statistician on the VIGOR trial, took at a non-public meeting with Merck's outside consultants on October 18, 2000, the consultants told defendant Reicin and other Merck employees that it was "***misleading to emphasize aspirin indication*** since no significant heterogeneity" – *i.e.*, there was not a sufficient finding that the characteristics of the 4% subgroup were sufficiently different from the 96% subgroup.  Shapiro in fact testified in this case on March 6, 2013 that she understood this to mean that "***you can't just pull out that four percent***" as Merck did in its May 24, 2000 press release and the November 23, 2000 *NEJM* article, because "there was no significant difference in treatment effect [and] the relative risk was not significantly different in the two subgroups."  Merck's May 24, 2000 press release was thus materially false and misleading.[2]  Yet, Merck published that analysis in the May 24, 2000 press

---

[2] Indeed, numerous members of the Merck Research Laboratories Communications Department, including its head, Dr. Laurence Hirsch, were made aware, at least as early as January 2001, that "MRL [Merck Research Laboratories] was advised by their consultants not to use [the rates in the 96% non-aspirin-indicated patients in VIGOR] – ***too shaky***."

release and in the November 23, 2000 *New England Journal of Medicine* article publishing the VIGOR results without mention of the adverse internal information.

129.    On May 24, 2000, Merck gave a formal presentation of the VIGOR study data at a major digestive disease medical conference.  At that conference, Merck again reiterated its naproxen hypothesis and touted VIOXX's purported safety.  Market analysts again reacted favorably to these further reassurances, while still acknowledging that the naproxen hypothesis was not proven.

130.    Throughout the Class Period, Merck continued to offer the naproxen hypothesis as the most likely explanation for VIGOR's cardiovascular results.  For example, in a February 2001 presentation before the FDA's Arthritis Advisory Committee concerning Merck's request to amend the label for VIOXX to reflect the positive GI results from the VIGOR study, defendant Reicin reiterated that it was Merck's belief that "the decreased cardiovascular events with naproxen in VIGOR is consistent with [naproxen's] potent anti-platelet effects."

131.    On August 22, 2001, the *Journal of the American Medical Association (*"*JAMA*"*)* published an article, authored by cardiologists Eric J. Topol, Steven E. Nissen, and Debabrata Mukherjee of the Cleveland Clinic, entitled "Risk of Cardiovascular Events Associated With Selective COX-2 Inhibitors," which reported the results of a study of VIOXX and Celebrex (the "Cleveland Clinic Study").  The *JAMA* article stated that "[c]urrent data would suggest that use of selective COX-2 inhibitors might lead to increased cardiovascular events," and further noted: "The available data raise a cautionary flag about the risk of cardiovascular events with COX-2 inhibitors."

132.    On August 21, 2001, the day before the *JAMA* article was published, *Bloomberg News* reported that, in anticipation of the publication of the Cleveland Clinic Study findings,

Merck, through its Senior Director of Cardiovascular Clinical Research, Laura Demopoulos, had commented: "We already have additional data beyond what they cite, and the findings are very, very reassuring. VIOXX does not result in any increase in cardiovascular events compared to placebo." Merck's August 21, 2001 statement was intended to, and did, reassure the market concerning VIOXX's purported lack of cardiovascular risks.

133.    On August 23, 2001, the day after the release of the *JAMA* article, Merck issued a Company press release stating that "the Company stands behind the overall and cardiovascular safety profile . . . of VIOXX." Immediately after the publication of the *JAMA* article, Merck also sent, by Federal Express, "Dear Doctor" letters to physicians throughout the country disparaging the article as "not based on any new clinical study" and assuring the physicians that Merck "stands behind the overall and cardiovascular safety profile" of VIOXX.

134.    News and analyst reports following the release of the *JAMA* article reinforced the "naproxen hypothesis" as the most likely interpretation of the VIGOR CV data and disparaged the *JAMA* article. For example, on August 22, 2001, Credit Suisse First Boston reported that:

> The JAMA researchers themselves point out several significant limitations in their study . . . .We note that the VIGOR trial did not include low-dose aspirin, and that the control drug (naproxen) is known to possess a cardio-protective, anti-platelet effect. This makes it extremely difficult to determine whether the difference in cardiac events seen in VIGOR results from a naproxen "benefit" or a Vioxx "liability."

135.    On September 21, 2001, the FDA posted on its website a warning letter that its Division of Drug Marketing, Advertising, and Communications ("DDMAC") had sent to Merck four days earlier regarding its marketing and promotion of VIOXX. The DDMAC Letter stated:

> You have engaged in a promotional campaign for VIOXX that minimizes the potentially serious cardiovascular findings that were observed in the [VIGOR] study, and thus, misrepresents the safety profile for VIOXX. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on VIOXX

were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

Although the exact reason for the increased rate of MIs observed in the VIOXX treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that VIOXX does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. *That is a possible explanation*, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that VIOXX may have pro-thrombotic properties.

The DDMAC Letter targeted only an imbalance in some of Merck's promotional efforts; it did not contend that the "naproxen hypothesis" was wrong or that Defendants did not believe it to be true. All of the information in the DDMAC Letter concerning the CV safety of VIOXX was based on the VIGOR results themselves or on information publicly discussed following the release of the VIGOR results and at the February 8, 2001 AAC meeting.

136.    The DDMAC Letter received widespread coverage by the media and securities analysts.  Nevertheless, securities analysts continued to project that VIOXX would generate blockbuster revenues for Merck.  For example, on September 25, 2001, Credit Suisse First Boston issued an analyst report that concluded: "[w]e retain our Buy rating on Merck. . . ."  That same day, Lehman Brothers issued a report that maintained its "Strong Buy" recommendation and a $90 price target for Merck.  The Lehman report noted that "[w]arning letters of this nature are certainly not unusual and in fact [are] almost a staple of the pharmaceutical industry today. As pointed out in the [DDMAC Letter], DDMAC does not dispute Merck's claims."

137.    In an October 9, 2001 *New York Times* article entitled "For Pain Reliever, Questions of Risk Remain Unresolved," defendant Scolnick again falsely reiterated his and Merck's purported belief in the "naproxen hypothesis."  Scolnick stated that Merck's position

throughout was that "the likeliest interpretation of the data is that naproxen lowered the
thromboembolic event rate," and that Merck had "found no evidence that VIOXX increased the
risk of heart attacks." Scolnick added that without the theoretical questions raised by Dr.
FitzGerald (based on the results of Protocol 023), "no one would have a question remaining in
their mind that there might be an additional interpretation."

### F. Merck Wrongfully Changes Causes of Death in Its ADVANTAGE Trial to Minimize the Risk of "Rais[ing] Concerns" About the "Naproxen Hypothesis"

138. Merck's and the Officer Defendants' claims concerning the "naproxen
hypothesis" were further undermined when Merck and the Officer Defendants learned the results
of another trial, known as ADVANTAGE, which concluded just days after Merck had issued its
first materially false and misleading press release concerning the VIGOR CV results.[8]

139. ADVANTAGE was a so-called "seeding" trial undertaken at the behest of
Merck's marketing division (rather than Merck's medical research division). The term "seeding
trial" refers to a pharmaceutical study whose purpose is not to further medical knowledge of the
drug but rather to introduce it to a large number of doctors and to compensate them for their
participation in the trial in the hope that they will continue to prescribe that drug in the future.

140. The purported goal of the ADVANTAGE seeding trial was to demonstrate that
VIOXX was less likely to pose GI problems than naproxen -- which had also been the goal of the
VIGOR study. Compared to VIGOR, ADVANTAGE was shorter in duration (three months),
involved a lower dosage of VIOXX (only 25 mg compared to 50 mg in VIGOR), and had fewer
patients (5,557 as compared to VIGOR's 8,076).

---

[8] ADVANTAGE is an acronym for "Assessment of Differences Between VIOXX and Naproxen
to Ascertain Gastrointestinal Tolerability and Effectiveness."

141.    ADVANTAGE had one key difference from VIGOR, however.  Although the
Merck scientists who had designed VIGOR had intentionally tried to exclude from the trial all
patients who took low dose aspirin to prevent cardiovascular problems in order to eliminate the
patients who were most likely to be vulnerable to VIOXX's prothrombotic properties (and
thereby to minimize the number of heart attacks and strokes reported in that trial), the marketing
executives who designed ADVANTAGE did *not* require the physicians who administered the
trial to exclude patients taking low dose aspirin.  Accordingly, in contrast to the VIGOR study
population, approximately 13% of the patients in each treatment group in ADVANTAGE were
taking low dose aspirin.  Because a larger percentage of higher-risk patients participated in
ADVANTAGE, it was more likely that adverse CV events would be observed in ADVANTAGE
and that ADVANTAGE's CV results would be even worse, from Merck's point of view, than
those in VIGOR.

142.    By no later than early April 2000, just one week after Merck released its initial
press release concerning VIGOR's results, all ADVANTAGE patients had completed their
treatment and the preliminary results of the trial had become available internally at Merck.

143.    In an April 3, 2000 email exchange, defendants Reicin and Scolnick, and Merck
scientist Dr. Shapiro, discussed the preliminary results of the ADVANTAGE trial.  Defendant
Reicin noted that there were *seven* heart attacks in one treatment group, compared to only *one* in
the other group.  Although the two treatment groups were still "blinded" at that time, there could
have been little doubt among Reicin, Scolnick and Shapiro that the first group was the VIOXX
group and the second group was the naproxen group.

144.    These results triggered an angry internal response from defendant Scolnick.  As
reported after the Class Period in an April 24, 2005 *New York Times* article entitled "Evidence in

VIOXX Suits Shows Intervention by Merck Officials," Scolnick asserted in an internal email that ADVANTAGE served "no scientific purpose" (because VIOXX had already been tested against naproxen in VIGOR) and that "*Small marketing studies which are intellectually redundant are extremely dangerous*."

145.    Senior Merck scientists did more than simply complain about ADVANTAGE, however.  Unbeknownst to the public, to make the ADVANTAGE results appear less damaging for VIOXX, Merck scientists *improperly changed the initially reported causes of patient deaths in the study to "improve" the study's results*.  For example, on November 8, 2000, Merck scientist Eliav Barr emailed defendant Reicin concerning the death of a 73 year old woman who had been taking VIOXX in the ADVANTAGE trial.  Dr. Barr wrote:

> *Common things being common, the clinical scenario is likely to be MI [heart attack].*  Certainly it is not definitive.  I just used my clinical judgment.  *If it is easier to call this an unknown cause of death, I could be persuaded to say that as well.*

In response, defendant Reicin wrote to Barr: "*I would prefer unknown cause of death so that we don't raise concerns*."  In this fashion, Merck "adjudicated" two of the seven heart attacks reported in the preliminary ADVANTAGE results into "sudden/unknown" cardiac events and transformed the study's statistically significant 700% difference in the rate of heart attacks (seven heart attacks in patients taking VIOXX compared to only one taking naproxen) into a 500% difference which -- because of the size of the sample -- was *not* statistically significant.

146.    Approximately three years later, Merck finally published the purported "results" of ADVANTAGE in the *Annals of Internal Medicine* ("*Annals*") on October 7, 2003.  The *Annals* article was principally drafted by Merck scientists.  The article published the manipulated cause of death numbers.

147.     Merck's improper tampering with the ADVANTAGE results was not revealed until April 24, 2005 in a *New York Times* article, entitled "Evidence in VIOXX Suits Shows Intervention by Merck Officials," which reported:

> In 2000, amid rising concerns that its painkiller VIOXX posed heart risks, Merck overruled one of its own scientists after he suggested that a patient in a clinical trial had probably died of a heart attack. In an email exchange about VIOXX, the company's most important new drug at the time, a senior Merck scientist repeatedly urged the researcher to change his views about the death "so that we don't raise concerns." In reports to the Food and Drug Administration and in a paper published in 2003, Merck listed the cause death as "unknown" for the patient, a 73-year-old woman.

**G.     2001: The Undisclosed Results of Merck's Studies of VIOXX In Alzheimer's Disease Patients Show that VIOXX Raises the Risk of Cardiac Mortality**

148.     Merck also continued to propagate its "naproxen hypothesis" and to tout VIOXX's commercial prospects in the face of the adverse results of two other major VIOXX clinical trials.

149.     Specifically, from April 2001 through the end of the Class Period, Merck and the Officer Defendants were privy to the unfavorable results of two clinical trials conducted by Merck to assess the effects of VIOXX on the occurrence and progression of Alzheimer's disease (known as Protocol 078 and Protocol 091). These two studies showed significantly higher mortality rates among patients who took VIOXX, including a sharply higher rate of deaths from heart disease.[9]

150.     At the time Merck began Protocols 078 and 091 in 1998, some studies suggested that inflammatory mechanisms were associated with Alzheimer's disease and that the COX-2

---

[9] Protocols 078 and 091 showed that VIOXX did not have any beneficial impact on the occurrence and progression of Alzheimer's disease. Merck began a third Alzheimer's trial known as Protocol 126, but according to published reports, discontinued it in March 2001 after Protocol 091 showed no benefit.

enzyme might aggravate such inflammation. This led Merck to hypothesize that treatment with a selective COX-2 inhibitor such as VIOXX might retard the development or progression of Alzheimer's disease.

151.    Merck designed Protocol 078 to study whether treatment with VIOXX could delay the onset of Alzheimer's disease (the "Prevention Trial"). A total of 1,457 patients over the age of 65 with mild cognitive impairment took part in the Prevention Trial, with 725 receiving VIOXX (only 25 mg, once daily) and 732 patients receiving a placebo. The trial was initially scheduled to last two years.

152.    Merck designed Protocol 091 to assess the effect of VIOXX in slowing the progression of dementia in patients with established Alzheimer's disease (the "Treatment Trial"). A total of 692 patients over the age of 50 who met standard research criteria for possible or probable Alzheimer's disease and had mild or moderate dementia participated in the Treatment Trial, with 346 receiving VIOXX (25 mg once daily) and 346 receiving placebo.[10]

153.    According to Merck, both the Prevention Trial and the Treatment Trial were conducted on an "intention-to-treat" (also known as an "intent-to-treat") basis. In an intention-to-treat study, data is collected and reported based on the initial treatment intent, and not on the duration of the treatment that is actually administered. Thus, participants in the Prevention and Treatment Trials who discontinued treatment were asked to return to the clinic for all remaining visits and assessments during the full time period that researchers had intended for them to receive treatment (even though they might have already stopped taking the medication).

---

[10]    Of the patients initially assigned to the VIOXX group, thirty-five patients received 25 mg of VIOXX for 15 months, and 311 patients received VIOXX 25 mg only for 12 months and then received a placebo for three months.

Intention-to-treat analysis is considered the "gold standard" in clinical trials because it helps to avoid bias and other errors that can arise due to treatment discontinuation.

154.    Merck also planned to perform an "on-treatment" analysis of the Alzheimer's Prevention and Treatment Trials. In an on-treatment analysis, data is reported only through the time period during which patients are actually taking the treatment (or through a short time thereafter). Merck's data analysis plan for the Prevention and Treatment Trials called for data to be reported through fourteen days after patients discontinued the treatment.

155.    In April 2001, consistent with its proposed data analysis protocols, Merck conducted internal "intention-to-treat" and "on-treatment" analyses of the results of the Prevention and Treatment Trials. An April 8, 2001 internal Merck memorandum, authored by Joshua Chen, Ph.D., a Merck statistician, entitled "MK-0966 [VIOXX] Combined Mortality Analysis Protocol 091 + Protocol 078," summarized the overall mortality data from the Prevention and Treatment Trials that Merck had collected up to that time.[11] This April 2001 memorandum, which did not become public until after the Class Period, included separate intention-to-treat and on-treatment analyses of the Prevention and Treatment Trials and analyses of the two trials combined.[12]

156.    ***All three of the intention-to-treat analyses prepared in April 2001 found a statistically significant increased risk of mortality in patients taking VIOXX compared to patients taking placebo.*** The intention-to-treat analysis for the Prevention Trial data available up to that point showed that there were twenty-one deaths in patients treated with VIOXX compared

---

[11]    As of April 2001, the Treatment Trial had been completed and the Prevention Trial was still in progress. The cut-off date used for the Prevention Trial data was March 23, 2001.

[12]    For the intention-to-treat analysis, the memorandum included events occurring during the study period of Protocol 091 plus 14 days and the last follow-up for patients in Protocol 078 plus 14 days. For the on-treatment analysis, the memorandum included events which occurred during treatment with the drug or within 14 days after discontinuation of the study drug.

to only nine deaths in patients treated with placebo -- *a statistically significant 257% increase in the risk of death among VIOXX patients in the Prevention Trial*. The intention-to-treat analysis for the Treatment Trial showed that there were thirteen deaths in patients treated with VIOXX compared to only three deaths in patients treated with placebo -- *a statistically significant 467% percent increase in the risk of death among VIOXX patients in the Treatment Trial*. Merck's internal aggregated intention-to-treat analysis, which combined both the Prevention and Treatment Trials, further showed that VIOXX was associated with a *statistically significant 287% increase in total mortality in VIOXX patients in the aggregated Prevention and Treatment Trials* (thirty-four deaths in patients treated with VIOXX compared to only twelve deaths in patients treated with placebo.) These statistically significant differences in mortality would plainly have been considered material by analysts and investors had they been disclosed to the market.

157. *The on-treatment analyses of the Treatment Trial, and of the combined Prevention and Treatment Trial data, also found statistically significant increased risks of mortality in patients taking VIOXX*. On an "on treatment" basis, in the Prevention Trial there were thirteen deaths in patients treated with VIOXX compared to only seven deaths in patients treated with placebo, resulting in a highly elevated 217% increase in the risk of death among VIOXX patients that fell slightly short of being statistically significant. However, notwithstanding the relatively small sample size, the on-treatment analysis for the Treatment Trial showed that there were nine deaths in patients treated with VIOXX compared to only two deaths in patients treated with placebo -- *a statistically significant 500% increase in the risk of death among patients who took VIOXX*. Merck's internal aggregated on-treatment analysis, combining both the Prevention and Treatment Trials, showed that VIOXX was associated with *a*

***statistically significant 283% increase in total mortality in VIOXX patients in the combined
Prevention and Treatment Trials*** (twenty-two deaths in patients treated with VIOXX compared
to only nine deaths in patients treated with placebo.)

158.  Also unbeknownst to the public, these statistically significant increased risks of
mortality in patients taking VIOXX were fueled in large part by statistically significant increased
risks of heart disease deaths among patients taking VIOXX.  In April 2008, Dr. Bruce Psaty, a
Professor of Medicine and Epidemiology and a member of the Cardiovascular Health Research
Unit at the University of Washington School of Medicine, and Richard A. Kronmal, Ph.D., a
Professor of Statistics and Biostatistics at the University of Washington School of Public Health
and Community Medicine who served as an expert for plaintiffs in VIOXX product liability
litigation and thus had access to previously-undisclosed materials, published their own
independently prepared mortality analysis of Merck's internal Prevention and Treatment Trial
data files in an article in *JAMA* entitled "Reporting Mortality Findings in Trials of Rofecoxib for
Alzheimer Disease or Cognitive Impairment."  In that article, Dr. Kronmal revealed that there
were approximately ***3.5 times*** more heart disease-related deaths in the Prevention and Treatment
Trials among patients taking VIOXX than among those taking placebo, and that the difference
was statistically significant.[13]

159.  Although this adverse information was plainly in Merck's and the Officer
Defendants' possession throughout the Class Period, these Defendants continued to tout the
"naproxen hypothesis" and VIOXX's commercial prospects without disclosing any of this
statistically significant adverse Alzheimer's trial data to the public.  Indeed, it appears that these

---

[13]  Dr. Kronmal classified the causes of death in those studies based on data presented in the July
2001 SUR that Merck had submitted to the FDA for the Treatment Trial, and in the Clinical
Study Report that Merck filed with the FDA in July 2003 for the Prevention Trial.

Defendants also failed to disclose accurate and complete data for the Alzheimer's studies to the FDA. For example, in July 2001, Merck filed a Safety Update Report ("SUR") with the FDA that misrepresented its April 2001 mortality findings from the Prevention and Treatment Trials by failing to provide the FDA with either its intention-to-treat data (which would have shown statistically significant increased mortality rates in the Prevention and Treatment Trials separately, as well as on a combined basis) or its on-treatment data (which would have shown statistically significant increased mortality rates in the Treatment Trial and the aggregated Prevention and Treatment Trial data). Instead, Merck improperly (and retrospectively) concocted a new definition for "mortality events" for the data it presented to the FDA in its SUR. Utilizing this specially crafted definition for mortality events -- dubbed by Merck "On Drug – SUR" -- Merck reported to the FDA substantially reduced, and non-statistically significant, increased risks of mortality in the Prevention and Treatment Trials.

160.    As described in an October 31, 2001 internal Merck memorandum from Raymond Bain, Merck's Vice-President for Biostatistics and Research Decision Sciences, to Drs. Nies and Gertz, Merck's post hoc "On Drug – SUR" definition included not only deaths that occurred during the period that the patient was taking treatment (either VIOXX or placebo) or through fourteen days after discontinuation, but also deaths that happened after that period so long as Merck determined that the death was "linked" to an event that happened while the patient was taking the drug or in the fourteen days after the patient discontinued treatment. This October 2001 internal Merck memorandum shows that Merck did not begin to employ this mortality event definition until the time approached when Merck had to provide data on the Alzheimer's Prevention and Treatment Trials to the FDA.

161. Utilizing this new "mortality event" definition, Merck told the FDA in July 2001 that fifteen patients taking VIOXX had died in the Prevention Trial as compared to nine patients taking a placebo -- a **non**-statistically significant 187% increase in the risks of death among VIOXX users. Merck also told the FDA that fourteen patients taking VIOXX had died in the Treatment Trial as compared to eight patients taking placebo -- a **non**-statistically significant 209% increase in the risk of death among VIOXX users. On the basis of these numbers, Merck made the materially false and misleading representation to the FDA that "review of the deaths does not identify a specific increased risk with rofecoxib," and that "the profile of serious clinical adverse experiences with rofecoxib is generally similar to that of placebo in a large cohort of patients, most of whom were older than 65 years of age." Merck's misrepresentations misled the FDA regarding the magnitude and significance of the VIOXX mortality risk, and were part of Merck's and the Officer Defendants' fraudulent effort to keep the truth about VIOXX's safety concealed from investors.

162. Although Merck had materially misrepresented the rates of deaths among patients using VIOXX in the Alzheimer's disease trials in its submissions to the FDA, the FDA still privately expressed concern about the number of deaths observed in the Treatment Trial. On December 5, 2001, the FDA sent a non-public letter to Merck asking whether the Prevention Trial, which was still ongoing, should continue based on the reported excess mortality (which Merck had understated) observed in the Treatment Trial: "Please clarify whether the safety monitoring board and the IRB [institutional review board] overseeing these studies are aware of the excess in total cause mortality in the Vioxx 25 mg group as compared to placebo (p=0.026) and the trend against Vioxx 25 mg on CV mortality compared to placebo. . . . *Have these oversight groups commented on the ethics of continuing study 078 in light of the mortality*

*data?*" The FDA's letter to Merck assumed that Merck had DSMBs in place for the Prevention and Treatment Trials, but in fact those trials did ***not*** have DSMBs in place. Merck had avoided the independent oversight and monitoring that a DSMB provides by simply not creating DSMBs for its Alzheimer's disease trials. Instead, the only human-subject protections available to the study participants were those provided by (i) the investigators, who were blinded both to the treatment allocation (*i.e.*, blinded as to whether a patient was in the VIOXX arm or the placebo arm) and to the findings for study-wide adverse events, and (ii) the Merck reviewers, who were obviously conflicted and ultimately chose to ignore and misrepresent serious safety issues.

163. The planned duration of the Prevention Trial was two years, but in 2002, instead of discontinuing the Prevention Trial, Merck extended it beyond its original cut-off date even though the data indicated that Alzheimer's disease was progressing more rapidly in the patients taking VIOXX than in those taking placebo and that there was a statistically-significant increased risk of death in Alzheimer's study participants who took VIOXX. However, Merck failed to disclose those facts to the public, to the Institutional Review Boards ("IRBs") overseeing the trials, or to study participants themselves -- even as Merck was asking those cognitively impaired study participants to give their consent to continue to participate in the Prevention Trial for an additional two years.

164. In the words of the two authors of the post-class period April 2008 *JAMA* article discussing Merck's conduct with respect to the Alzheimer's disease studies, the mortality findings and the Alzheimer's disease findings known to Merck in 2002 "would, in [our] judgment, have prompted a DSMB, if it had existed, to stop the trial early." But a decision to stop an ongoing Merck study due to VIOXX's increased mortality risk would have been a

devastating blow to Merck at a time when it was committed, for compelling financial reasons, to continue to falsely reassure the market that VIOXX was safe.  So Merck continued the study.

165.    Merck's and the Officer Defendants' decisions to conceal the truth and extend the Prevention Trial unfortunately took a predictable human toll on participants in the study.  Indeed, during the additional duration of the Prevention Trial, there were approximately eight excess deaths among those randomly assigned to receive VIOXX (twenty additional deaths among those assigned to VIOXX compared to only twelve among those assigned to placebo).  In the words of the authors of the April 2008 *JAMA* article:  "[The] failure of [Merck] to inform IRBs of a safety issue violate[d] the trust of those human participants who volunteered to advance science, medicine, and public health."

166.    Merck never publicly revealed the adverse facts concerning the Alzheimer's studies during the Class Period.  Their disclosure would have severely jeopardized VIOXX's commercial viability and the financial health of Merck as a whole.

### H.    Defendants Successfully Keep Merck's Internal Conclusions About the True Significance of the VIGOR Results off VIOXX's Label

167.    According to a May 5, 2005 memorandum (the "Congressional Memorandum") issued after the Class Period by the minority members of the United States House of Representatives Government Reform Committee (the "House Government Reform Committee"), there was a two-year delay between the time that Merck filed a request (on June 29, 2000) to change the initial VIOXX label to reflect the purported beneficial GI findings in the VIGOR Study and the time that the initial VIOXX label was changed to "include cardiovascular data from VIGOR."  According to the Congressional Memorandum, which was based on non-public documents obtained or subpoenaed by Congress after the Class Period:

> The extended delay resulted, in part, from FDA's need to convene an advisory committee meeting and conduct extra analyses.  It also

67

was due to a series of disputes between the agency and the company. Under the Food, Drug and Cosmetic Act, FDA and manufacturers must agree on label changes. For approximately six months, Merck resisted a variety of FDA's proposals, leading to an extended series of conference calls to negotiate differences.

168. The Congressional Memorandum further reported that the "FDA initially requested [in a non-public communication] that the label warn physicians that VIOXX could cause heart attacks and other cardiovascular problems." To that end, the FDA proposed that the VIOXX label include the following information in the "Warning" section:[14]

> ***Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events such as those with a history of myocardial infarction and angina and in patients with pre-existent hypertension and congestive heart failure.***
>
> ***The risk of developing myocardial infarction in the VIGOR study was five fold higher in patients treated with Vioxx 50 mg (0.5%) as compared to patients treated with naproxen (0.1%)***….This finding was consistent with a smaller and shorter study using Vioxx 25 mg that allowed the use of low dose ASA [aspirin.] Prospective, well powered, long-term studies required to compare the incidence of serious CV events in patients taking Vioxx versus NSAID comparators other than naproxen have not been performed.

169. According to the Congressional Memorandum, the FDA's proposed warning "***was unacceptable to Merck.***" In fact, although Merck believed that VIOXX was prothrombotic, the Officer Defendants recognized that such a warning would have a material adverse impact on

---

[14] FDA regulations require that information concerning risks associated with a drug be set forth on the label according to the seriousness of the risk. For example, the "Contraindications" heading (the most serious of the "headings") would indicate "situations in which the drug should not be used because the risk of use clearly outweighs any possible benefit." 21 C.F.R. § 201.57(d) (v)(d)(j)). The "Warning" section would indicate that there is reasonable evidence of an association of a serious hazard [or risk] with a drug; a causal relationship need not have been proved. 21 C.F.R. § 201.57(3) (v)(e). The "Precautions" section merely reflects "information regarding any special care to be exercised by the practitioner for safe and effective use of the drug." 21 C.F.R. § 201.57(3)(v)(f).

VIOXX sales and thus refused to agree to the FDA's proposed language, in form or substance, in the "Warnings" section of any of VIOXX's drug labels during the Class Period.

170. Indeed, as discussed below, even when the VIOXX label was changed in April 2002 to reflect the VIGOR results (including the favorable GI findings), Merck only agreed to inclusion of the adverse CV results from VIGOR in the "Precautions" section of the label. In addition, the April 2002 VIOXX label included watered-down language to the effect that "the significance of the cardiovascular findings of these three studies (VIGOR and 2 placebo-controlled studies) is unknown."

171. In an April 2002 conference call with analysts and investors addressing the labeling changes for VIOXX, Merck spokesperson Mark Stejbach falsely reiterated that it was Merck's "belief that the [CV] effect seen in VIGOR were the results of the anti-platelet effect of naproxen," and added that "I think that's a position Merck has always had and now its quite clearly laid out in the labeling."

## I. 2003-2004: Merck Continues To Vigorously Defend VIOXX's Safety

### 1. October 2003: Merck Disparages the Brigham Study Findings, and Again Reassures the Public That VIOXX Is Safe

172. In September 2003, abstracts of papers to be presented at an upcoming meeting of the American College of Rheumatology began to circulate. An abstract for one of these papers, entitled "The Relationship Between COX-2 Inhibitors and Acute Myocardial Infarction," reported that in a "matched case-control study of 54,475 patients ≥ 65 years of age," "current rofecoxib [VIOXX] use was associated with an increased adjusted relative risk of acute myocardial infarction [heart attack] compared with celecoxib [Celebrex] use and with no NSAID use [placebo]." In other words, the abstract reported that a large epidemiological study

(supported by Brigham and Women's Hospital in Boston (the "Brigham Study")) had found that VIOXX was associated with a greater risk of heart attack than either Celebrex or placebo.

173.    As early as September 17, 2003, an internal Merck document shows that Merck was briefing its sales force concerning ways to mitigate the effect of this study on VIOXX sales. Nonetheless, as later reported by *Reuters News Service* on October 22, 2003, word of the Brigham Study led to a decline in sales of VIOXX in the third quarter of 2003.  As the article, entitled "Merck to Cut 4,400 Jobs, Posts Flat Earnings," stated:

> Merck & Co. Inc. said on Wednesday it would cut 4,400 jobs and reported disappointing earnings, hurt by falling sales of arthritis medicine VIOXX and a paucity of profitable new drugs. . . .Sales of VIOXX fell 32 percent in the period to $510 million.  ***The arthritis drug is suffering from clinical trial data suggesting it might slightly raise the risk of heart attacks***, and the growing perception that its pain-fighting capabilities are no better than traditional painkillers.

174.    On October 28, 2003, the results of the Brigham Study were formally presented at the annual meeting of the American College of Rheumatology.  Two days later, on October 30, 2003, *The Wall Street Journal* published an article, entitled "VIOXX Study Sees Heart-Attack Risk," which revealed the results of the Brigham Study to the broader public.  The article stated:

> Brigham & Women's Hospital rheumatologist and epidemiologist Daniel H. Solomon headed the study, which looked at records of 54,475 Medicare patients, all of them over 65.
>
> Researchers found that the apparent cardiac risk was greatest in the first 90 days in which a patient is taking VIOXX, which generically is known as rofecoxib.  ***In the first 30 days, the researchers found, VIOXX was linked to a 39% increased heart-attack risk compared with Celebrex.  Between 30 and 90 days, that increased relative risk was 37%.***
>
> * * *
>
> Eric J. Topol, chairman of cardiovascular medicine at the Cleveland Clinic and one of the authors who first raised the issue two years ago, called the research "the best study to date."

* * *

> The new study, Dr. Topol said, "greatly substantiates our concerns about the cardiac side effects." He observed that the possible cardiac effects of VIOXX appear "worse with the higher doses."

175. Merck immediately moved to counter the data generated by the Brigham Study and to discount the study's conclusions. For example, in the October 30 *Wall Street Journal* article and again in an article published in *American Health Line* on October 31, 2003, defendant Reicin publicly disparaged the study, stating that: "Randomized clinical trials are the gold standard and this isn't such a trial...In our placebo-controlled randomized trials, we have found no significant difference between Vioxx and placebo." Defendant Reicin's falsely reassuring statements helped prevent Merck's stock from experiencing any significant decline in response to the public release of the Brigham Study findings.

176. On May 4, 2004, the Brigham Study was published in the American Heart Association journal *Circulation*, reiterating the results that were first made public in October 2003.

177. However, not only did Merck publicly disparage and attempt to discredit the results of the Brigham Study, but according to a May 18, 2004 *Wall Street Journal* article, entitled "Merck Takes Author's Name Off VIOXX Study," Merck had ordered the name of one of its epidemiologists removed from the list of authors of the Brigham Study in an effort to distance itself from the Study's adverse findings concerning VIOXX's safety profile:

> Stepping into thorny ethical territory, drug titan Merck & Co. ordered the name of one of its epidemiologists purged from the list of authors on a research paper -- after the study produced an unflattering portrait of a blockbuster drug Merck happens to make.

> * * *

> "It's an enormous disservice to the reader," says Drummond Rennie, deputy editor of the Journal of the American Medical

Association. "If the people up there in the list of authors aren't responsible for everything in the article, something's wrong. *It's completely unethical.*"

* * *

"Merck disagreed with the conclusions and didn't think it was appropriate to have a Merck author," company spokeswoman Mary Elizabeth Blake said.

* * *

The eighth [author] was Carolyn C. Cannuscio, a Merck epidemiologist.

When the article appeared, its conclusion -- that Vioxx "was associated with an elevated relative risk of acute myocardial infarction [heart attack]" -- was the same as before. So was the methodology. But this time, Dr. Cannuscio's name was missing.

* * *

*For Merck, maintaining Vioxx sales is essential*. With $2.55 billion in 2003 sales, it is among Merck's top drugs. The company is under considerable pressure these days, with some promising experimental drugs having failed and the cholesterol drug Zocor facing patent expiration in 2006.

* * *

JAMA editor Catherine DeAngelis is disappointed that Merck didn't see this as a chance to show that sponsors of research can willingly publish findings that run contrary to their own interests. *"They missed a wonderful opportunity to get some good publicity for the pharmaceutical industry," she says. "Aren't they seeking truth?"*

178. Merck and the Officer Defendants were not, in fact, seeking the truth. As alleged herein, Merck and the Officer Defendants consistently misrepresented and concealed their actual beliefs concerning the safety of VIOXX and the totality of the information that caused them to have that belief, and as a result investors continued to be misled as to the enormous risk that disclosure by Merck of VIOXX's true safety profile would jeopardize VIOXX's commercial viability and its ability to generate substantial revenues for the Company. To ensure sales of

VIOXX remained strong, however, the Officer Defendants continued to suppress, obscure, and distort the truth about VIOXX.  In an article titled "Coxibs, Science, and the Public Trust," that appeared in the January 24, 2005 edition of *Archives of Internal Medicine*, Daniel Solomon and Jerry Avorn, two of the authors of the Brigham Study, commented on Merck's scheme to conceal the truth about VIOXX: ***"[E]ven after funding and agreeing with the design of the Study, Merck publicly discredited our findings***."

> **2.     August 2004: Merck Disparages the Kaiser Study Findings, and Again Reassures the Public That VIOXX Is Safe**

179.     On August 25, 2004, *Bloomberg News* reported that a study funded by the FDA, involving almost 1.4 million Kaiser Permanente health care members (the "Kaiser Study"), found that "[t]he difference in heart risk was statistically significant between a recommended dose of VIOXX, 25 mg a day or less, and Celebrex."  Specifically, the Kaiser Study, which was led by Dr. David Graham of the FDA, found that patients taking VIOXX had a 50% greater chance of heart attack and sudden cardiac death than patients taking Celebrex.  The Kaiser Study also found that VIOXX, at a dose of 25 mg a day, more than tripled the risk of heart attack compared with patients who had not taken any painkiller within the past two months.

180.     On August 26, 2004, Merck, through the *Business Wire*, moved immediately to refute and discredit the Kaiser Study so as to allay any investor concerns by announcing:

> ***Merck strongly disagrees with the conclusions of an observational analysis by Graham et al, presented at an international medical meeting this week, which evaluated the rate of cardiovascular events in patients taking COX-2 specific inhibitors VIOXX (rofecoxib) and Celebrex (celecoxib) and in patients taking non-selective NSAIDs.***  This analysis is a retrospective database analysis -- not a clinical trial. Observational analyses have limitations, often conflict with each other, and must be interpreted within the context of data from large, randomized, controlled clinical trials.

181. The August 26, 2004 press release also quoted Merck's then-head of Merck
Research Laboratories, Peter Kim, as stating:

> This retrospective analysis is based only on a database review.
> Observational analyses do not have the rigor of randomized,
> controlled clinical trials. The robust clinical trial data available
> support the safety of VIOXX. ***Based on all of the data that are
> available from our clinical trials, Merck stands behind the
> efficacy and safety, including cardiovascular safety, of VIOXX . .
> . . Nothing is more important to Merck than the safety of our
> medicines***.

## VII.   THE FULL TRUTH EMERGES

### A.   The September 2004 Withdrawal of VIOXX

182. On September 30, 2004, just over a month after publicly reaffirming the "safety,
including cardiovascular safety" of VIOXX, Merck shocked the market by announcing that,
"effective immediately," it was withdrawing VIOXX worldwide. Merck stated that its decision
was based on the recommendation of an independent External Safety Monitoring Board (the
"ESMB"), which was overseeing the APPROVe trial. According to Merck, the ESMB
recommended that the APPROVe trial be halted because of "an increased risk of confirmed
cardiovascular events beginning after 18 months of continuous therapy."

183. That same day, Merck also held a conference call for analysts to further discuss
the withdrawal. Merck's then-CEO Raymond Gilmartin stated:

> We are taking this action because we believe it serves the interests
> of patients . . . We believe it would have been possible to continue
> to market VIOXX with labeling that would incorporate these new
> data. However, given the availability of alternative therapies and
> the questions raised by the data, we concluded that a voluntary
> withdrawal is the responsible course to take.

184. Securities analysts and market professionals were plainly stunned by the news of
VIOXX's withdrawal. For example, the next day, on October 1:

(a)   Cummins Catherwood, who helps manage $900 million at Walnut Assets Management in Philadelphia, commented in a *Bloomberg News* article entitled "Merck To Withdraw VIOXX Because of Heart Risks": "***This is just like an avalanche coming out of nowhere***."

(b)   A Morgan Stanley report stated: "Yesterday, MRK announced the ***surprise withdrawal*** of Vioxx."

(c)   A Cathy Financial report stated: "In a surprising move, Merck announced that it is voluntarily withdrawing its COX-II inhibitor VIOXX from worldwide markets. . . . ***This announcement came as a shock and is a major blow to Merck's already weak business fundamentals*** reflected by Zocor's expected patent expire in mid-2006 and its limited pipeline."

(d)   A Bear Stearns report stated: "***Stunningly, Merck withdraws VIOXX from worldwide markets*** due to new colorectal study which unexpectedly showed Vioxx has twice the cardiovascular risk versus placebo after 18 months of continuous use."

185.   In response to the September 30 disclosures, the price of Merck securities plummeted, as Merck's shares fell almost 27%, or more than $12 per share, to close at $33 per share. The decline was the greatest one-day percentage price decline of Merck stock since January 1990. The reported trading volume was 145,048,600 shares, more than 426% greater than the next highest reported trading volume since January 1990. The $0.50 to $0.60 decrease in earnings per share that Merck announced on September 30, 2004, represented the loss of at least $1.1 billion in annual earnings. The one day decline wiped out a staggering ***$27 billion*** of the total market capitalization of the Company. Merck was by far the worst performing stock on September 30 in the three stock indexes of which it is a member, the Dow Jones 30 Industrial Average, the S&P 500 Index, and the S&P Pharmaceuticals Index.

## VIII. POST-CLASS PERIOD EVENTS

186. In the wake of Merck's September 30, 2004 withdrawal of VIOXX from the market, additional details of Merck's wrongdoing and fraudulent scheme have become public, including but not limited to:

a. The October 6, 2004 *Wall Street Journal* article, which reported that a study led by a Food and Drug Administration safety official found that people taking a high dose of Vioxx were 3.69 times as likely to have a serious cardiac event as people taking Celebrex, while the ratio for people taking a low dose of Vioxx was 1.5. The study projected that the widespread use of Vioxx may have led to more than 27,000 heart attacks and sudden cardiac deaths before the drug's withdrawal;

b. The November 1, 2004 *Wall Street Journal* article, entitled "Warning Signs: E-mails Suggest Merck Knew Vioxx's Dangers at Early Stage," which: (1) revealed internal Company e-mails and other documents that confirmed Merck and the Officer Defendants' awareness of the seriousness of the safety issues affecting VIOXX from prior to the beginning of the Class Period, including Merck scientist Dr. Morrison's February 1997 email expressing concern that the large scale GI outcomes trial would "kill the drug," Defendant Reicin's response proposing to design the large scale GI outcomes trial to preclude patients with a high risk of cardiovascular problems so that the difference in the rate of heart attacks between VIOXX patients and others "would not be evident," and defendant Scolnick's March 9, 2000 email stating the incidence of CV events seen in the VIGOR study was "mechanism-based as we worried it was"; (2) revealed the tactics that Merck had instructed its salespersons to use to "dodge" questions from physicians about VIOXX's cardiovascular safety; and (3) highlighted how Merck and the Officer

76

Defendants "also went on the offensive against academic researchers who began to question VIOXX's safety";

c.   The November 1, 2004 Fortune magazine cover story on VIOXX, entitled "Will Merck Survive VIOXX?; Looming Lawsuits, Angry Investors, Declining Profits: The Vioxx Debacle Is Just The Latest Setback For The Proud Pharmaceutical Giant," which revealed that Merck spent more than $500 million on commercials for Vioxx, but generated roughly $2.5 billion in annual sales at the time of the withdrawal;

d.   Dr. Gurkipal Singh's November 18, 2004 revelation in testimony before the Senate Finance Committee that Merck had performed an internal analysis in February 1998 that showed that women in the VIOXX trials had a statistically significant 216% increased risk of suffering an adverse cardiovascular event than patients in other Merck trials taking a placebo (as discussed in ¶ 89);

e.   The *New York Times'* April 24, 2005 revelations that defendant Reicin had improperly caused a Merck scientist to change the cause of death of a patient who had been taking VIOXX in the ADVANTAGE trial so as not to "raise concerns," and that the "lead author" of the published ADVANTAGE study had actually not written the ADVANTAGE report and had been unaware of defendant Reicin's misconduct (as discussed in ¶¶ 145-147, 274);

f.   National Public Radio's *All Things Considered* June 8, 2006 program, which revealed that half the members of VIGOR's DSMB had substantial conflicts of interest (as discussed in ¶ 101);

g.      The November 9, 2007 announcement that Merck had agreed to pay **$4.85 billion**

to settle state and federal myocardial infarction (heart attack) and ischemic stroke

claims filed against the Company in the United States.  Notably, unlike Merck's

Class Period SEC filings, which characterized the smattering of VIOXX product

cases filed during the Class Period as being "normal to its business" and

"completely without merit," such language was conspicuously absent from

Merck's post-Class Period SEC filings that described the tens-of-thousands of

actions commenced after the Company withdrew VIOXX and after information

concerning Defendants' wrongdoing was revealed to the market;

h.      Dr. Psaty's and Dr. Kronmal's April 2008 article in the *Journal of the American*

*Medical Association* ("*JAMA*"), which revealed Merck's misconduct in

concealing statistically significant mortality data in the Alzheimer's Trials from

the FDA and publishing false and misleading statements to the public indicating

that its data showed that VIOXX was "generally well tolerated" (as discussed in ¶

158);[15] and

i.      On November 22, 2011, it was announced that Merck would pay $950 million

and a unit of the company would plead guilty to a criminal misdemeanor charge

(for one count of misbranding VIOXX) to resolve a U.S. probe of its illegal

marketing of VIOXX.  In connection with the settlement, the company paid a

$321.6 million criminal fine and $628.3 million to resolve civil claims that it sold

VIOXX for unapproved uses and made false statements about its cardiovascular

safety.

---

[15] The internal Merck documents and emails referenced herein have become publicly available, largely as a result of governmental investigations of Merck's conduct and private litigation.

## IX.    MATERIALLY FALSE AND MISLEADING STATEMENTS

187.    As described in detail above and summarized below, Merck's and the Officer Defendants' statements of belief in VIOXX's purported safety and the "naproxen hypothesis" were materially false and misleading because, unbeknownst to investors, such statements were made in bad faith, and misrepresented and/or concealed that Merck and its senior scientists actually believed that VIOXX was prothrombotic (and that it was VIOXX's prothrombotic "mechanism based" characteristics, and not the "naproxen hypothesis," that was the likeliest explanation for VIGOR's CV results).   The paragraphs set forth below: (i) identify each of Merck's and the Officer Defendants' Class Period statements alleged to be materially false and misleading under Section 10(b) of the Exchange Act; (ii) set forth when, where, and by whom they were made, and (iii) summarize how and why they were materially false and misleading.

### A.    Materially False and Misleading Statements Made In Connection With VIOXX's Introduction to the Market

188.    On May 21, 1999, the first day of the Class Period, Merck issued a press release which announced that VIOXX "has received marketing approval from the U.S. Food and Drug Administration," and that "VIOXX has been approved for the relief of osteoarthritis (OA), management of acute pain in adults, and treatment of menstrual pain (primary dysmenorrheal)." With respect to VIOXX's side effects, the press release represented that:  "The most common side effects reported in clinical trials with VIOXX were upper respiratory infection, diarrhea and nausea."

189.    By having chosen to speak about VIOXX's "side effects," Merck had a duty to speak fully and truthfully on that subject.  However, in violation of that duty, the above-referenced statements from the May 21, 1999 Merck press release were materially false and misleading because they failed to disclose the "great concern" on the part of Merck and the

Officer Defendants that VIOXX was prothrombotic, and the totality of the facts on which that "great concern" was based, including, *inter alia*, (a) their awareness of the initial manuscripts of the results of Protocol 023, in which Drs. FitzGerald and Catella-Lawson had expressed their view that the results "implie[d] a *major role* for Cox-2 in *systemic* biosynthesis of prostacyclin in humans" and thus upset the natural balance between prostacyclin and thromboxane in the body; (b) their private conversations with preeminent medical researcher Dr. Oates, who supported Drs. FitzGerald and Catella-Lawson's views of the Protocol 023 data; and (c) Merck's internal February 1998 analysis, which showed that female patients in the VIOXX trials had at least a statistically significant 216% increase in the risk of suffering an adverse cardiovascular event compared to patients taking a placebo and that male patients taking had a 28% increase in the risk of such an event. As a result, investors were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

## B. Materially False and Misleading Statements Made During the Second Half of 1999

190. On October 25, 1999, Merck issued a press release announcing the results of a new study that showed that osteoarthritis patients taking VIOXX "developed significantly fewer endoscopic ulcers than patients taking ibuprofen, a commonly used arthritis medicine." The press release also stated that "[i]n other studies, the most common side effects reported in clinical trials with VIOXX were upper respiratory infection, diarrhea, nausea and high blood pressure."

191. By having chosen to speak about VIOXX's "side effects," Merck had a duty to speak fully and truthfully on that subject. However, in violation of that duty, the above-referenced statements from the October 25, 1999 Merck press release were materially false and misleading because they failed to disclose the "great concern" on the part of Merck and the

Officer Defendants that VIOXX was prothrombotic, and the totality of the facts on which that "great concern" was based, including, *inter alia*, the information referenced in ¶ 189 above. As a result, investors were materially misled as to the enormous risk that VIOXX's safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

192. On November 23, 1999, Merck issued a press release announcing the results of a study published in *JAMA*, which found that VIOXX "significantly reduced the risk of gastrointestinal (GI) side effects" compared to other commonly prescribed NSAIDs. The press release further stated that "[c]ommon side effects reported in clinical trials with VIOXX were upper-respiratory infection, diarrhea, nausea and high blood pressure."

193. The above-referenced statements from the November 23, 1999 Merck press release concerning VIOXX's side effects were materially false and misleading because they failed to disclose the "great concern" on the part of Merck and the Officer Defendants that VIOXX was prothrombotic, and the totality of the facts on which that "great concern" was based, including, *inter alia*, the information referenced in ¶ 189. As a result, investors were materially misled as to the enormous risk that VIOXX's safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

### C. Materially False and Misleading Statements Made in Connection with Defendants' Discussions of Merck's Fourth Quarter and Year-End 1999 Results

194. On March 9, 2000, the VIGOR study results were forwarded to Merck's chief scientist, defendant Scolnick. Later that same day, defendant Scolnick wrote his email to defendant Reicin and other senior Merck scientists who were overseeing Merck's VIOXX's

research programs, in which he acknowledged that the "[adverse] CV events are clearly there" in

the VIGOR study results, and that

> It is a shame but it is a low incidence and it is mechanism based as
> we worried it was. [Dr.] Oates and [senior Merck scientists] Alan
> [Nies] and Barry [Gertz] were right about the metabolite meanings
> ie urine Pg [prostacyclin] data…"

(*See* ¶ 110 above).

195. On March 22, 2000 -- just thirteen days after defendant Scolnick's March 9, 2000

email, Merck filed the Company's 1999 Form 10-K with the SEC. Defendant Scolnick signed

the 1999 Form 10-K, which stated as follows:

> **With its product profile for** strength, **safety** and once daily
> simplicity, **VIOXX remains the country's fastest growing
> prescription arthritis medicine**. In the product's first seven
> months, U.S. physicians wrote more than five million
> prescriptions. VIOXX is also enjoying success in the 47 other
> countries in which it has been launched.

196. By having chosen to speak about VIOXX's "profile for …safety" and worldwide

commercial success, Merck and Scolnick had a duty to speak fully and truthfully on those

subjects. However, in violation of that duty, the above-referenced statements from Merck's 1999

Form 10-K were materially false and misleading because they failed to disclose that Merck and

the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events,

and the totality of the facts on which their belief was based, including, *inter alia*, (a) their

awareness of the initial manuscripts of the results of Protocol 023, in which Drs. FitzGerald and

Catella-Lawson had expressed their view that the results "implie[d] a *major role* for Cox-2 in

*systemic* biosynthesis of prostacyclin in humans" and thus upset the natural balance between

prostacyclin and thromboxane in the body; (b) their private conversations with preeminent

medical researcher Dr. Oates, who supported Drs. FitzGerald and Catella-Lawson's views of the

Protocol 023 data; (c) Merck's internal February 1998 analysis, which showed that female

patients in the VIOXX trials had at least a statistically significant 216% increase in the risk of

suffering an adverse cardiovascular event compared to patients taking a placebo and that male

patients taking had a 28% increase in the risk of such an event; and (d) their awareness of non-

public data from a study involving more than 164,000 patients -- which Dr. FitzGerald

considered to be the "the best comparative clin[incal] data on MI and NSAIDs" -- and which

showed that naproxen (like ibuprofen and diclofenac, but unlike aspirin) "had no significant

effect" on reducing the risk of suffering a heart attack. As a result, investors remained unaware

of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic

effects, and were materially misled as to the enormous risk that VIOXX's true safety profile

would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to

generate substantial revenue for the Company.

###### D. Merck and the Officer Defendants' Spring 2000 Statements Announcing the VIGOR Trial Results and Proffering their Purported Belief in the Naproxen Hypothesis

197.    On March 27, 2000, Merck issued a press release that purported to summarize the

findings of the VIGOR study. The press release emphasized that those who took VIOXX had

significantly fewer adverse gastrointestinal events than those who took naproxen in the VIGOR

study. Although the press release also acknowledged that those who took VIOXX experienced

significantly more thromboembolic events than those who took naproxen in the study, the press

release was designed to lead investors and the public to believe that it was the purported

cardioprotective effect of naproxen that was the most likely explanation for VIGOR's CV results

(the "naproxen hypothesis"), and that VIOXX was not prothrombotic. As the press release

stated:

> [S]ignificantly fewer thromboembolic events were observed in
> patients taking naproxen in this GI outcomes study, which is
> **consistent** with naproxen's ability to block platelet aggregation.

This effect on these events had not been observed previously in any clinical studies for naproxen. VIOXX, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects.

The press release also stated:

> ***An extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with VIOXX, showed no indication of a difference in the incidence of thromboembolic events between VIOXX, placebo and comparator NSAIDs.*** Further analyses are ongoing, and final results of the GI outcomes study with VIOXX will be presented at peer-reviewed medical meetings this year.

198.    However, the statements in Merck's March 27, 2000 press release, which sought to attribute the difference in thromboembolic events in VIGOR to naproxen's purported cardioprotective characteristics (the "naproxen hypothesis"), were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (rather than VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and that it was the "mechanism based" effect of VIOXX in suppressing prostacyclin (without suppressing thromboxane) -- rather than the "naproxen hypothesis" -- that explained VIGOR's results, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 196. As a result, investors were affirmatively misled as to, and remained unaware of, Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

199.    In addition, Merck's further statements in the March 27, 2000 press release to the effect that "[a]n extensive review of safety data from all other completed and ongoing clinical trials**,** as well as the post-marketing experience with VIOXX, showed no indication of a difference in the incidence of thromboembolic events between VIOXX, placebo and comparator NSAIDs" were also materially false and misleading because, at the time the statement was made, Merck and the Officer Defendants were in possession of the results of Merck's non-public internal February 1998 analysis, which showed, *inter alia,* that women taking VIOXX had *at least* a 216% (statistically significant) greater risk of experiencing serious adverse cardiovascular events compared to women not taking any drug in other Merck studies.  As a result of these further materially false and misleading statements in the March 27 press release, investors were further materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

200.    In the wake of Merck's March 27, 2000 press release, market analysts and members of the press understood that thromboembolic events could be a side effect of VIOXX, but repeated Merck's representations concerning the naproxen hypothesis and statements that there was no evidence from Merck's other clinical data that VIOXX was prothrombotic.  For example:

(a)    On April 12, 2000, an article in *Biotech Week* entitled "Merck & Co., Inc.: Preliminary Results of Gastrointestinal Outcomes Study Presented" reported that:

> Vioxx, like all COX-2 selective medicines, does not block platelet aggregation and would not be expected to have similar effects. Medicines like aspirin and naproxen that significantly inhibit

85

> COX-1 block platelet aggregation and therefore have the potential to provide cardioprotection.

and

> (b)    On April 17, 2000, an analyst report issued by JP Morgan reported that:

> Celebrex showed no statistical difference for NSAIDs on any of a variety of [CV] risk factors. This contrasts to Merck's VIOXX in the VIGOR study, which did show that VIOXX patients experienced more thromboembolic events (*i.e.*, strokes, heart attacks) than NSAID patients. ***This may have been due to the anti-clotting benefits of NSAIDS and the fact that VIGOR did not allow background aspirin therapy***….

> While Celebrex showed no disadvantage on thromboembolic events, it narrowly failed to show statistical significance on the primary GI endpoint, while it did demonstrate statistical advantage on a variety of other GI endpoints…. ***For VIOXX, although medical intuition implies that the thromboembolic event issue is an "NSAID-issue," the theoretical [CV] protective benefits of naproxen (the VIGOR comparator NSAID) has not been clinically proven, and the non-aspirin using cut of CLASS did not show the same problem for Celebrex. [However,] In our view, the GI superiority of both Celebrex and VIOXX is the primary issue and should be evident to the FDA.*** We expect meaningful modifications of the standard NSAID GI warning for both products after these data are reviewed.

201.    On April 27, 2000 CNBC and *Reuters* reported that some analysts were increasingly concerned that VIGOR's CV data would attract heightened FDA scrutiny. However, in response to what Merck characterized as "speculative news reports," Merck responded with a renewed public relations campaign to emphasize Defendants' purported belief in the "naproxen hypothesis" as the likeliest explanation for the VIGOR results, and to reassure the public that VIOXX was safe. For example, on April 27, 2000, *Reuters* reported that Merck spokesperson Jan Weiner had told *Reuters* "that there was no evidence that VIOXX actually put patients at higher risk of adverse [cardiovascular] events" and that "it was likely that naproxen had conferred protection to patients taking that drug."

202.     Similarly, on April 28, 2000, Merck issued a Company press release entitled "Merck Confirms Favorable Cardiovascular Safety Profile of VIOXX," which reaffirmed Merck's purported belief in the "naproxen hypothesis" and reiterated the purported safety profile of VIOXX.  As the April 28 press release stated:

> In response to speculative news reports, Merck & Co. today confirmed the **favorable cardiovascular safety profile of Vioxx**.
>
> In preliminary findings from Merck's large gastrointestinal (GI) study that compared Vioxx in patients with rheumatoid arthritis, significantly fewer heart attacks were observed in patients taking naproxen (0.1 percent) compared to patients taking Vioxx (0.5 percent).  ***This result is consistent with naproxen's ability to block platelet aggregation.***  This is the first time this effect of naproxen to reduce these events has been demonstrated in a clinical study.  ***Vioxx, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have these effects in reducing these events***.
>
> Extensive review of data from the completed osteoarthritis trials and on-going clinical trials with Vioxx, as well as post-marketing experience with Vioxx have shown ***NO DIFFERENCE*** [emphasis in original] in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx, other NSAIDs and placebo.

203.     The statements in the April 27, 2000 *Reuters* article and Merck's April 28, 2000 press release, which sought to attribute the difference in heart attacks in VIGOR to naproxen's purported cardioprotective characteristics (the "naproxen hypothesis"), were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the "naproxen hypothesis" (rather than VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and that it was the "mechanism based" effect of VIOXX in suppressing prostacyclin (without suppressing thromboxane) -- rather than the "naproxen hypothesis" -- that explained VIGOR's results, and the totality of the facts on which

87

their belief was based, including, *inter alia*, the information referenced in ¶ 196. As a result, investors were affirmatively misled as to, and remained unaware of, Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were further materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

204. In addition, the statements in the April 28, 2000 press release that an "[e]xtensive review of data from the completed osteoarthritis trials and on-going clinical trials with Vioxx, as well as post-marketing experience with Vioxx had shown "no difference" in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx, other NSAIDs and placebo" were also materially false and misleading because, at the time the statement was made, Merck and the Officer Defendants were in possession of the results of Merck's non-public internal February 1998 analysis, which showed, *inter alia,* that women taking VIOXX had *at least* a 216% (statistically significant) greater risk of experiencing serious adverse cardiovascular events compared to women not taking any drug in other Merck studies. As a result of these further materially false and misleading statements in the March 27 press release, investors were further materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

205. That the market continued to be misled by Merck's false assurances in April 2000 concerning the safety of VIOXX and the continuing strong commercial prospects and viability of the drug is evidenced by the comments of securities analysts who followed Merck. For example:

(a)     On April 28, *Dow Jones*' news wire service reported that perhaps Wall Street's most influential Merck analyst, PaineWebber's Jeff Chaffkin, credited Merck's renewed assurances of VIOXX's "favorable" safety profile.  As Dow Jones reported:

> [A]t least one analyst – and the company – said there's **little to worry about.  "This whole thing has been overblown and taken out of context,"** says Wall Street Journal All-Star analyst Jeff Chaffkin of PaineWebber.  "We had this data over four weeks ago. This is nothing new."

(b)     On April 28, 2000, Lehman Brothers issued an analyst report which stated:

> Concerns have been **circulated** in the press that Merck's Cox-2 inhibitor drug, VIOXX, may be associated with increased risk of stroke or heart attack.  These concerns are not supported by the clinical data publicly known. In our March 27 note, we wrote that Merck's preview of the VIGOR study results included a statistically significant differential in thromboembolic events between VIOXX and Naproxen users.  Merck attributes the difference to Naproxen's platelet blocking characteristics.

(c)     On April 28, 2000, Merrill Lynch issued an analyst report, which stated:

> Detailed data from the [VIGOR] study has not been released. [However,] *[w]e have no reason to believe Vioxx would cause a greater rate of [CV] events than would be seen without treatment. It may be that Naprosyn [a/k/a naproxen] (which is known to inhibit platelet aggregation and thus blood clot formation) reduces the rate of [CV] events."*
>
> Our estimates and rating [accumulate] are unchanged.

(d)     On April 28, 2000, Ryan, Beck, & Co. issued an analyst report that commented, with regard to Merck's reassurances that VIOXX was safe, that "[t]here is no credibility problem for Merck."

(e)     On May 1, 2000, Bernstein Research Call issued an analyst report that stated:  "We'd be shocked if [the] FDA gave this a second glance, much less re-labeled

VIOXX to suggest greater risks of vascular events.  *It's not VIOXX increasing events, it's Naproxen reducing them."*

      (f)      On May 2, 2000 Goldman Sachs issued an analyst report that stated:

VIGOR study of rheumatoid arthritis shows a lower rate of heart attacks among patients receiving naproxen compared to Vioxx users (0.1% for naproxen vs. 0.5% for Vioxx). *Merck assures that its review of all completed and ongoing studies of Vioxx fails to find any difference in the incidence of [CV] events between Vioxx and other anti-inflammatory drugs (such as naproxen) and placebo.* We maintain our 2000 sales estimate of $1.7 billion

                              *   *   *

This data will be submitted to FDA to support removal of the NSAID class labeling that warns of the potential for [GI] toxicity.

What has attracted more attention is the finding that there were significantly fewer thromboembolic events in the Naproxen group. *While naproxen is known to inhibit platelet aggregation (or "clumping" that can lead to the formation of clots in arteries), it has never been shown clinically that naproxen prevents heart attacks the way that aspirin, another platelet inhibitor, does.  We do not find this lack of data surprising as outcomes studies were never conducted on these older off-patient NSAIDs. It is well known, however, that Cox-2 inhibitors do not inhibit platelet aggregation to any significant degree and would not be expected to prevent heart attacks.*

                              *   *   *

If a label change were to be considered by the [FDA], we would not expect either drug, Vioxx or Celebrex, to be given preferential labeling over the other with respect to [CV] safety…*However, we believe the more conclusive GI safety achieved in Merck's VIGOR study could plausibly result in a preferential safety label for Vioxx relative to Celebrex*

206.      On May 24, 2000, Merck issued a press release which stated that:

As previously reported, significantly fewer heart attacks were seen in patients taking naproxen (0.1 percent) compared to the group taking Vioxx (0.4 percent) in this study [VIGOR].  *The reduction in heart attacks is consistent with naproxen's ability to block platelet aggregation by inhibiting COX-1*.  This effect on platelet aggregation is similar to low-dose aspirin, which is used to prevent

> second cardiac events in patients with a history of heart attack,
> stroke or other cardiac events. Patients taking low-dose aspirin did
> not participate in VIGOR although 4 percent of patients enrolled in
> the study did meet the criteria for use of aspirin to prevent second
> cardiac events. Among the 96 percent of patients in VIGOR who
> were not candidates for low-dose aspirin for such cardioprotection,
> there was no significant difference in heart-attack rates – 0.1
> percent among patients taking naproxen and 0.2 percent among
> patients taking Vioxx.

This portion of the press release reiterated the "naproxen hypothesis" and communicated Merck's purported understanding that it was the high-risk, aspirin-indicated 4% of the VIGOR population that was driving the disparity between the VIOXX and naproxen arms of the VIGOR trial. In other words, since the difference in heart attack rates between patients taking VIOXX and naproxen in the remaining 96% of the population was not statistically significant, Merck claimed that the difference in CV events in VIGOR overall was explained by the number of patients that suffered adverse CV events in the 4% subgroup who purportedly should have been taking low-dose aspirin for cardioprotection but did not.

207.  Merck's above-quoted statements in the May 24, 2000 press release – which sought to attribute the difference in heart attacks in VIGOR to naproxen's purported cardioprotective characteristics (the "naproxen hypothesis") and stressed a purported difference between the 4% subgroup and the remainder of the VIGOR population – were materially false and misleading because (a) they constituted an affirmatively false representation that Merck believed in good faith that it was the "naproxen hypothesis" (rather than VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and that it was the "mechanism based" effect of VIOXX in suppressing prostacyclin (without suppressing thromboxane) -- rather than the "naproxen hypothesis" -- that explained VIGOR's results, and the totality of the facts on which their belief

91

was based, including, *inter alia*, the information referenced in ¶ 196; and (c) as explained above, in ¶¶ 123-128, Merck already internally understood that the claim of a difference between the 4% subgroup and the remainder of the VIGOR population was non-existent from a statistical perspective.  As a result, investors were affirmatively misled as to, and remained unaware of, Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were further materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

208.    On May 24, 2000, Merck gave a formal presentation of the VIGOR study data at a major digestive disease medical conference.  At that conference, Merck again reiterated its "naproxen hypothesis" and touted VIOXX's purported safety.  Market analysts again reacted favorably to these further reassurances, while still acknowledging that the "naproxen hypothesis" was not proven.  For example:

>       (a)    On May 24, 2000 J.P. Morgan issued an analyst report stating:
>
>       We believe that for both VIOXX and Celebrex, most physicians already believe that the drugs are safer and that the next level of marketing is to take that message directly to consumers….   We continue to be enthusiastic about the COX-2 inhibitors (total class forecast of $13 billion in 2004) ….
>
>       …. For both drugs, the safety trials, while ***very impressive***, also present challenges.  For VIOXX, there is the increased risk of heart attacks for patients on VIOXX versus naproxen (***probably*** but not conclusively ***due to the anti-platelet effect of naproxen***)….
>
>       (b)    On May 25, Morgan Stanley Dean Witter issued an analyst report,

entitled "Positive Clinical Outcomes Studies Presented at DDW," that stated:

>       This week, we attended a number of presentations on the [GI] safety of COX-2 inhibitors at the annual Digestive Disease Week conference.  The full data from these clinical outcomes trials have been anticipated since Celebrex and VIOXX were introduced last

year, because of the potential that the data could lead to a revision of the labels or even removal of the standard NSAID GI warning. Additionally, the partial release of data last month led to some confusion and speculation about the relative safety of the products in the GI and cardiovascular systems.

***In our opinion, both of these major studies successfully achieved their goals of differentiating the long-term safety profile of the COX-2 inhibitors from those of comparator NSAIDS.*** Though there were some differences in study designs and the results of the CLASS and VIGOR trials, one product does not emerge as clearly superior to the other, in our opinion.

(c)     On June 13, 2000, Bernstein Research Call issued a research report, entitled "COX-2 GI Safety Data Will Positively Effect COX-2 Demand; VIOXX Benefits More Than Celebrex, Improving MRK's Near Term Outlook," which stated:

Our proprietary survey of the arthritis market shows that the pending addition of GI safety data into COX-2 marketing messages will expand demand for the class, contrary to our expectation.  We see a near term (6-12 month) gain for the COX-2 class of an additional 5-8% of arthritis category scripts; COX-2's at present have a 38% share.

Merck's VIOXX is the primary beneficiary of this potential inflection point in demand; the 220 physicians surveyed were 20 percent more likely to prefer VIOXX than Celebrex….    Our market simulation changes our mind on VIOXX; we now see the potential for continued growth, and have raised our '00 number by $300M, and our '04 number by $1.1B.  VIOXX accounts for one-sixth of our '00 Merck EPS, and almost a fourth of our '04 EPS.

….  Active physicians that saw the VIGOR data including the mention of higher incidence of MI in VIOXX patients not only wrote more COX-2 [prescriptions] than controls for MI-risk only patients, they wrote more VIOXX for these patients than did their control counterparts.  GI risk matters more than MI risk in this market, and physicians have apparently taken the view that more VIGOR/VIOXX patients VIGOR/traditional NSAID patients had MI's because no VIGOR patients were allowed aspirin, and traditional NSAIDS block platelet aggregation where COX-2's don't….

… With VIOXX's outlook improved, our view of the stock improves as well….

209. Merck's statements at the May 24, 2000 digestive disease medical conference, which sought to attribute the difference in heart attacks in VIGOR to naproxen's purported cardioprotective characteristics (the "naproxen hypothesis"), were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the "naproxen hypothesis" (rather than VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and that it was the "mechanism based" effect of VIOXX in suppressing prostacyclin (without suppressing thromboxane) -- rather than the "naproxen hypothesis" -- that explained VIGOR's results, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 196. As a result, investors were affirmatively misled as to, and remained unaware of, Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were further materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

210. Indeed, by vociferously touting VIOXX's purported safety profile during the Class Period, Merck and the Officer Defendants were able to win further acceptance for the "naproxen hypothesis" as the most likely explanation for the VIGOR CV results. For example, on May 25, 2000, Merck marketing executive Margie McGlynn emailed defendants Reicin and Scolnick. The email forwarded two analyst reports "which most clearly demonstrate the success of our efforts to defuse the CV risk issue for VIOXX," and "personally thank[ed them] for all of

[their] efforts and the tremendous support you provided [to] the marketing organization." The analyst reports supported Merck's hypothesis that the difference in rates of heart attacks in VIGOR was consistent with naproxen's ability to block platelet aggregation.

211. On June 29, 2000, Merck issued a press release announcing that Merck "today had submitted a Supplemental New Drug Application for VIOXX" to the FDA seeking to "request labeling changes based on the recently completed 8,000-patient gastrointestinal outcome study called VIGOR." The following day, Merck common stock increased more than $2.50 to close at $76.63 on June 28, compared to its closing price of $74.11 the previous day.

### E.    Materially False and Misleading Statements Made During the Second Half of 2000

212. On November 23, 2000, the *New England Journal of Medicine* ("*NEJM*") published an article written by several Merck employees, including defendant Reicin and Deborah Shapiro entitled "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis." The article formally reported the results of the VIGOR trial, and specifically with respect to myocardial infarctions, reported a relative risk of 0.2. Under General Safety, the article reported that, "[t]he mortality rate was 0.5 percent in the rofecoxib group and 0.4 percent in the naproxen group. ***The rate of death from cardiovascular causes was 0.2 percent in both groups. Ischemic cerebrovascular events occurred in 0.2 percent of the patients in each group***." The article also stated "[t]he rate of myocardial infarction was significantly lower in the naproxen group than in the rofecoxib group (0.1 percent vs. 0.4 percent). ***This difference was primarily accounted for by the high rate of myocardial infarction among the 4 percent of the study population with the highest risk of a myocardial infarction, for whom low dose aspirin is indicated.*** The difference in the rates of myocardial infarction between the rofecoxib and naproxen groups was not significant among the patients

without indications for aspirin therapy as secondary prophylaxis." Finally, the article stated that "[n]aproxen inhibits the production of thromboxane by 95 percent and inhibits platelet aggregation by 88 percent, and this effect is maintained throughout the dosage interval; therefore, the effects of regular use of naproxen may be similar to those of aspirin. . . . Thus, ***our results are consistent with the theory that naproxen has a coronary protective effect and highlight the fact that rofecoxib does not provide this type of protection*** owing to its selective inhibition of cyclooxygenase-2 at its therapeutic dose and higher doses."

213.    Merck's presentation of the results of the VIGOR trial relating to the relative risk of VIOXX was entirely geared toward presentation of the "naproxen hypothesis" rather than presenting the alternative explanation for the VIGOR results, that VIOXX was prothrombotic. For example, when reporting data from a clinical trial comparing an active treatment with a comparator treatment, results are typically presented with relative risk representing the risk on the active treatment divided by the risk on the comparator. In VIGOR, this would have resulted in a relative risk of 5 for VIOXX versus naproxen. Instead, Merck presented the risk of the comparator divided by the active treatment, resulting in a relative risk of 0.2 for naproxen versus VIOXX.

214.    The remaining portions of the article, which reaffirmed Merck professed belief in the "naproxen hypothesis" and stressed a purported difference between the 4% subgroup and the remainder of the VIGOR population – were also materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the "naproxen hypothesis" (rather than VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse

CV events, and that it was the "mechanism based" effect of VIOXX in suppressing prostacyclin (without suppressing thromboxane) -- rather than the "naproxen hypothesis" -- that explained VIGOR's results, and the totality of the facts on which their belief was based, including, inter alia, the information referenced in ¶ 196; and (c) as explained above, in ¶¶ 123-128, Merck scientists already internally understood that the claim of a difference between the 4% subgroup and the remainder of the VIGOR population was non-existent from a statistical perspective. As a result, investors were affirmatively misled as to, and remained unaware of, Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were further materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

215.    On February 8, 2001, Merck issued a Company press release announcing, among other things, that the FDA Arthritis Advisory Committee had met that day to review Merck's application to modify the prescribing information for VIOXX to reflect results of the VIGOR Study. Commenting on the data that Merck had submitted to the FDA Advisory Committee, Eve Slater, M.D., Merck's Senior Vice President for Clinical and Regulatory Development, stated: "Merck is confident that the data presented today support the excellent safety profile of VIOXX."

216.    During the February 8, 2001 public hearing before the FDA Arthritis Advisory Committee ("AAC"), defendant Reicin made the following public statements to the panel: "when you review the results of VIGOR in isolation you don't know whether the imbalance of cardiovascular events [in VIGOR] was caused by a decrease in events on a platelet-inhibiting NSAID, naproxen, or an increase in events on a COX-2 selective inhibitor," *i.e.*, VIOXX.

However, Reicin reiterated that it was Merck's belief that "the decreased cardiovascular events with naproxen in VIGOR is consistent with [naproxen's] potent antiplatelet effects." Defendant Reicin's remarks reassured the members of the AAC; for example, a February 8, 2001 report by *Bloomberg News* quoted Dr. Nigel Harris, the chair of the AAC, as stating "Differences in cardiac risk between VIOXX and naproxen appeared to result from a beneficial effect of naproxen, not a danger from VIOXX." Similarly, defendant Reicin's remarks reinforced what a contemporaneous J.P. Morgan analyst report of February 2, 2001 characterized as "the commonly accepted view that [VIGOR's CV findings are] likely due to the anti-platelet (*i.e.*, anti-clotting) benefits of naproxen (an NSAID) rather than any risk of VIOXX."

217. The statements contained in Merck's February 8, 2001 press release, as well as defendant Reicin's statements reiterating the "naproxen hypothesis" before the FDA Arthritis Advisory Committee, were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 196. As a result, investors remained unaware of Merck's actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

218. On April 10, 2001, Merck issued a press release which reported that Merck had received an "approvable letter" from the FDA relating to the Company's application for changes

to the prescribing information for VIOXX, *i.e.*, to include the so-called positive GI findings observed in VIGOR.[16] Merck again expressed its confidence ***"in the comprehensive data that support the excellent gastrointestinal and overall safety profile of VIOXX."***

219.    However, the statements in the April 10, 2001 press release concerning Merck's receipt of the approvable letter and VIOXX's safety profile were materially false and misleading because (i) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and ii) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, (a) their awareness of the initial manuscripts of the results of Protocol 023, in which Drs. FitzGerald and Catella-Lawson had expressed their view that the results "implie[d] a *major role* for Cox-2 in *systemic* biosynthesis of prostacyclin in humans" and thus upset the natural balance between prostacyclin and thromboxane in the body; (b) their private conversations with preeminent medical researcher Dr. Oates, who supported Drs. FitzGerald and Catella-Lawson's views of the Protocol 023 data; (c) Merck's internal February 1998 analysis, which showed that female patients in the VIOXX trials had at least a statistically significant 216% increase in the risk of suffering an adverse cardiovascular event compared to patients taking a placebo and that male patients taking had a 28% increase in the risk of such an event; (d) their awareness of  non-public data from a study involving more than 164,000 patients -- which Dr. FitzGerald considered to be the "the best comparative clin[incal] data on MI and

---

[16] An "approvable letter" is defined by the FDA as a written statement that the FDA will approve the application if specific additional information or material is submitted or specific conditions are met.  An approvable letter is a first necessary step in the process for obtaining approval of a label change application.

NSAIDs"-- and which showed that naproxen (like ibuprofen and diclofenac, but unlike aspirin)

"had no significant effect" on reducing the risk of suffering a heart attack; (e) the non-public

final results from Merck's Alzheimer's Treatment Trial (Protocol 091), which showed that

VIOXX patients had a statistically significant higher rate of deaths than patients treated by

placebo on an ITT basis, on treatment basis, and combined ITT/on treatment basis; (f) the non-

public interim results of Merck's Alzheimer's Prevention Trial (Protocol 078), which showed

that VIOXX patients had a statistically significant higher rate of deaths than patients being

treated by placebo on an "intention to treat" basis and combined ITT/on treatment basis; and (g)

the non-public aggregated results of Merck's Alzheimer's trials, which showed that patients

taking VIOXX had a statistically significant higher rate of heart disease death.  As a result,

investors remained unaware of Merck's actual beliefs concerning VIOXX's prothrombotic

effects, and were materially misled as to the enormous risk that VIOXX's true safety profile

would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to

generate substantial revenue for the Company.

220.  On April 11, in response to Merck's April 10, 2001 Company press release,

Lehman Brothers issued an analyst report commenting on the approvable letter.

> [I]t is our interpretation from the FDA Advisory committee
> meeting that we attended this past February and yesterday's receipt
> of the approvable letter, that Vioxx will achieve an expanded label
> inclusive of its GI safety over naproxen....***While some language
> may also go into the precaution section of the label regarding the
> fact that Vioxx (or perhaps COX-2's in general) is not
> cardioprotective, we expect that the expanded [GI] safety labeling
> for Vioxx will be the key***. *** Additionally, another major topic of
> discussion with the panel concerned [CV] risks associated with
> Vioxx use....While the panel agreed it was unclear what the source
> of this increased risk associated with Vioxx use was due to, the
> separation between naproxen and Vioxx was deemed significant
> enough to be highlighted in some context.****We want to reiterate
> our belief that this is a strong positive for Vioxx and MRK.*

221.    On May 22, 2001, Merck issued a Company press release, which stated, among other things:  "In response to news and analyst reports of data the Company first released a year ago, Merck & Co., Inc. today reconfirmed the favorable cardiovascular safety profile of VIOXX."

222.    On May 29, 2001, Merck issued another Company press release, which again "reconfirmed the favorable cardiovascular safety profile of VIOXX."

223.    However, Merck's statements in the May 22 and 28, 2001 press releases concerning the "favorable cardiovascular safety profile of VIOXX" were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 219.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

224.    On June 13, 2001, Merck issued a press release announcing, among other things: "In a new meta-analysis combining data from 19 clinical studies with VIOXX (rofecoxib) involving more than 28,000 patients, the relative risks of serious cardiovascular events were similar with VIOXX and placebo, and with VIOXX and the widely prescribed non-steroidal anti-

inflammatory drugs (NSAIDs) ibuprofen, diclofenac and nabumetone."  The press release quoted defendant Reicin as stating:

> Results seen in the meta-analysis with VIOXX vs. naproxen are consistent with the ability of naproxen to block platelet aggregation, and, therefore, to act as an anti-platelet agent.

225.    However, the statements in the June 13, 2001 press release concerning the "naproxen hypothesis" were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 219.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

**F.      Materially False and Misleading Statements Made During the Second Half of 2001**

226.    On July 20, 2001, Merck issued a press release announcing the Company's results for the second quarter 2001 (the period ending June 30, 2001).  The July 20, 2001 press release stated:

> Since its 1999 launch, Vioxx has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest medicine.  In 2001, Vioxx achieved new-prescription leadership within the coxib market in the United States, ***demonstrating that physicians continue to recognize the medicine's benefits to the patients***.

*New scientific data supporting the efficacy and overall safety profile of VIOXX were presented at medical meetings during the quarter. These data included the results of the ADVANTAGE trial, presented at the Digestive Diseases Week conference in May*.

227.   The above-referenced statements from the July 20, 2001 Merck press release concerning VIOXX were materially false and misleading because they failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 219.   As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

228.   On August 22, 2001, *JAMA* published the findings of the Cleveland Clinic Study, which concluded that VIGOR's CV results could be explained by either a prothrombotic effect of VIOXX or an antithrombotic effect of naproxen, but which stated no conclusion as to which theory was most likely.   *See also* ¶ 131 above.

229.   On August 21, 2001, *Bloomberg News* quoted Merck's Senior Director of Cardiovascular Clinical Research, Laura Demopoulos, as stating, in anticipation of the publication of the *JAMA* article, that:   *"We [Merck] already have additional data beyond what they cite, __and the findings are very, very reassuring__.  VIOXX does not result in any increase in cardiovascular events compared to placebo."*

230.   Similarly, on August 23, 2001, the day after the release of the *JAMA* article, the Merck issued a press release reaffirming that *"the Company stands behind the overall and cardiovascular safety profile . . . of VIOXX."*   Immediately after the publication of the *JAMA*

article, Merck also sent, by Federal Express, "Dear Doctor" letters to physicians throughout the country that disparaged the *JAMA* article as "not based on any new clinical study," and that assured the physicians that Merck ***"stands behind the overall and cardiovascular safety profile"*** of VIOXX.

231.    However, the reassuring statements by Merck concerning VIOXX's cardiovascular safety contained in the August 21, 2001 *Bloomberg News* article and its August 23, 2001 press release were materially false and misleading because (a) they constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 219.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

232.    Subsequent news and analyst reports following the release of the *JAMA* article reflected Merck's efforts to downplay and disparage the *JAMA* article and to reinforce the "naproxen hypothesis" as the correct interpretation of the VIGOR data.  For example, on August 22, 2001, Credit Suisse First Boston reported that:

>    ***The JAMA researchers themselves point out several significant limitations in their study . . . .We note that the VIGOR trial did not include low-dose aspirin, and that the control drug (naproxen) is known to possess a cardio-protective, anti-platelet***

*effect*. This makes it extremely difficult to determine whether the difference in cardiac events seen in VIGOR results from a naproxen 'benefit' or a Vioxx 'liability.'"

233. On September 24, 2001, a *Bloomberg News* report about the September 17, 2001 letter from the FDA's Division of Drug Marketing, Advertising and Communications (the "DDMAC Letter") (*see* ¶¶ 135-136) quoted Merck's spokeswoman Christine Fanelle as stating: "**We continue to stand behind the overall safety and the cardiovascular safety of the product**, but our immediate priority is to discuss our response" with the FDA.

234. However, the statement set forth above in the September 24, 2001 *Bloomberg News* article, which was intended to, and did, reassure the market concerning VIOXX's cardiovascular safety, was materially false and misleading because (a) it constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results and/or failed to correct a prior false representation; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 219. As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

235. On October 9, 2001, *The New York Times* published an article about COX-2 inhibitors, entitled "The Doctor's World, For Pain Reliever, Questions of Risk Remain Unresolved." The article reported on the continued popularity of VIOXX and Celebrex, but also

noted that questions had been raised as to whether "VIOXX may have an unexpected side effect -- a very slight increase in the risk of heart attack. The risk is hypothesized, not proved." The article, among other things, also quoted defendant Scolnick as stating: "[T]here are two possible interpretations [for the CV results from VIGOR]. . . [n]aproxen lowers heart attack rate, or VIOXX raises it. . . Either COX-2 inhibitors shift the clotting balance, or naproxen, which can impede blood clotting has a positive effect. According to the article, defendant Scolnick added that: "while the Company announced the heart attack findings to doctors and the public, it looked back at its data from studies using different drugs or dummy pills [placebos] in comparison to VIOXX. It found no evidence that VIOXX increased the risk of heart attacks." In addition, the article quoted defendant Scolnick as stating that, ***the company decided that "the likeliest interpretation of that data is that naproxen lowered the thrombotic event rate,*** and that without the theoretical question raised by Dr. FitzGerald, "no one would have a question remaining in their mind that there might be an additional interpretation."

236. However, defendant Scolnick's statement to *The New York Times*, which sought to attribute the difference in thromboembolic events in VIGOR to naproxen's purported cardioprotective characteristics (*e.g.*, "the likeliest interpretation of that [VIGOR] data is that naproxen lowered. . . the thrombotic event rate") were materially false and misleading because (a) it constituted an affirmatively false representation that defendant Scolnick believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results; and (b) it failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 219. As a result, investors remained unaware of Merck and the

106

Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

237. In addition, defendant Scolnick's statement in the October 9 *New York Times* article to the effect that Merck had "found no evidence that Vioxx increased the risk of heart attacks" was also materially false and misleading because, at the time the statement was made, Merck and the Officer Defendants were in possession of the results of (a) Merck's non-public internal February 1998 analysis, which showed, *inter alia,* that women taking VIOXX had *at least* a 216% (statistically significant) greater risk of experiencing serious adverse cardiovascular events compared to women not taking any drug in other Merck studies; (b) the non-public final results from Merck's Alzheimer's Treatment Trial (Protocol 091), which showed that VIOXX patients had a statistically significant higher rate of deaths than patients treated by placebo on an intention-to-treat basis, on treatment basis, and combined intention-to-treat/on treatment basis; (c) the non-public interim results of Merck's Alzheimer's Prevention Trial (Protocol 078), which showed that VIOXX patients had a statistically significant higher rate of deaths than patients being treated by placebo on an "intention to treat" basis and combined intention-to-treat/on treatment basis; and (d) the non-public aggregated results of Merck's Alzheimer's trials, which showed that patients taking VIOXX had a statistically significant higher rate of heart disease death. As a result, investors were further materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

238.　On December 11, 2001, Merck issued a news release reporting that, during its Annual Business Briefing to update approximately 300 securities analysts on the status of the Company, Merck "announced plans to conduct a large cardiovascular clinical outcomes study with Vioxx."　According to a *Bloomberg News* article of that day, at the Annual Business Briefing defendant Scolnick explained that Merck will conduct such research on VIOXX so it can be "100 percent sure" of VIOXX's safety.　Defendant Scolnick additionally falsely reassured the market:　"Whatever the answer is in these studies, we will report it to the world."

239.　By having chosen to speak about VIOXX's cardiovascular safety, Merck and the Officer Defendants had a duty to speak fully and truthfully on that subject.　However, in violation of that duty, the above-referenced statements from December 11, 2001 were materially misleading because (a) they failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 219; and (b) as discussed further below, at ¶¶ 241-243, in mid-March 2002, Merck decided to cancel its large-scale VIOXX clinical outcomes study due to VIOXX's prothrombotic effects, but Merck did not update or correct its December 11, 2001 statements (or any future statements Merck made about VIOXX) in order to inform the market of the cancellation of the large-scale VIOXX cardiovascular outcomes study.　As a result, investors remained unaware of Merck and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects and the true status of the large-scale VIOXX clinical outcomes trial, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

**H.     Materially False and Misleading Statements Made During the First Half of 2002**

240.    On March 15, 2002, Merck and the Officer Defendants were forced to withdraw the original NDA for ARCOXIA, thereby putting further pressure on Defendants to conceal their beliefs about the adverse cardiovascular profile of its blockbuster drug VIOXX.  As a result, Merck's dependence on VIOXX for its future revenues significantly increased.

241.    In March 2002, Merck and the Officer Defendants secretly halted the cardiovascular clinical study it previously announced to blunt criticism of VIOXX's health risks, which defendant Scolnick stated would have provided "100 percent" assurance of VIOXX's safety.  *The New York Times,* in an article entitled "Merck Canceled an Early Study of VIOXX," which was published after the Class Period (on February 8, 2005), reported that "previously undisclosed company documents show that the drug maker was poised to begin a major cardiovascular study of [VIOXX] in 2002, and abruptly dropped the project before it was set to start."

242.    The *New York Times* reported:

> [M]erck has never disclosed how extensively it planned that study, which was known inside the company as the Valor trial, or how close it came to starting it.  **By early 2002, the drug maker had already contacted outside researchers to oversee the test, had approached a competing drug maker to obtain anti-ulcer drugs to ease the possibility of side effects, and had prepared a 70-page protocol that spelled out how the test was to be conducted**, **according to documents reviewed by The New York Times**.

> One planning document, for example, shows that the first patients were supposed to enter the study in June 2002 and the last patient was to leave it in January 2004.  But in mid-March 2002, just days before company researchers had planned to submit the study's protocol to the F.D.A., top executives of the drug maker ordered work on the project halted.  It was never revived.

> "I have the unpleasant task of having to inform you that the VIOXX CV Outcomes Study has been placed on hold," a memo

dated March 13, 2002, and sent to dozens of Merck employees worldwide, stated. "*At this time we do not have any of the details that led to this decision, however, we have been informed that upper management is in the process of reviewing the various study options*."

* * *

Asked to provide a copy of a document from March 2002 which summarized the decisions given at the time for not going forward with the study, [a Merck spokeswoman] said that no such document existed.

243.    The timing of Merck and the Officer Defendants' decision to call off the Valor

Study is also significant.  *The New York Times* reported:

Work on the Valor trial was halted at the same time that officials from Merck and the F.D.A. were concluding lengthy and heated negotiations over how Vioxx's label would reflect data from an earlier trial, known as the Vigor study, which indicated that the widely used painkiller posed potential cardiovascular risks.

244.    On April 11, 2002, Merck issued a press release announcing that the FDA had

"approved changes to the prescribing information [*i.e.*, the label leaflet] for VIOXX . . . to

include results from the landmark 8,000 patient [VIGOR] Study."  Merck also stated that "[t]he

prescribing information also has been revised to include cardiovascular data from VIGOR."  The

press release, however, also went on to falsely assure investors once again that VIOXX was safe,

quoting defendant Scolnick as stating that:  "*Merck is confident in the . . . safety profile of

VIOXX.*"

245.    However, the statement in the April 11, 2002 Merck press release, which

reassured investors concerning VIOXX's purported lack of cardiovascular risks, was materially

false and misleading because (a) it constituted an affirmatively false representation that Merck

and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as

opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's

adverse CV results and/or failed to correct a prior false representation; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 219.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

246.    Merck's numerous materially false and misleading statements of opinion or belief concerning VIOXX's adverse safety profile, which jeopardized the commercial viability of the drug and put the franchise at risk, were not limited to the SEC filings, press releases, and conference calls with securities analysts detailed herein.  Instead, Merck also included materially false or misleading statements in VIOXX's labeling leaflet (which is the multi-page, small print pamphlet inserted in the box in which a pharmaceutical product is sold, as opposed to the "sticker" that is attached to the container of the product itself).

247.    Labeling leaflet information with respect to a major product is regularly considered by analysts and other financial market participants in assessing a company's business, products, and prospects.  Securities analysts who specialize in pharmaceutical companies study product label leaflets as part of their analysis of a drug's commercial viability, long-term growth and revenue prospects, and potential for product liability exposure.  Thus, truthful labeling is an essential component of the market's valuation of the performance and prospects of a pharmaceutical company, including but not limited to discounted cash flow, as well as the company's securities.

248. The label leaflets for VIOXX did not include any reference whatsoever to any possible cardiovascular side effects attributable to VIOXX in the "Precautions" section (let alone in the more serious "Contraindications" or "Warnings" sections) prior to the release of a new label on or about April 12, 2002. Those pre-April 2002 label leaflets were materially false and misleading because they failed to disclose that Merck's senior scientists actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which that belief was based.

249. Moreover, even after the VIOXX label was changed on April 12, 2002 "to include cardiovascular data from VIGOR" (as well as VIGOR's purported beneficial GI findings), that label (the "April 12, 2002 Label") contained materially false and misleading statements concerning VIOXX's safety profile. Among other things, the April 12, 2002 Label stated the following:

> The information below should be taken into consideration and caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease:
>
> In VIGOR, a study in 8076 patients (mean age 58; VIOXX n=4047, naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with naproxen 500 mg twice daily (n=19). In VIGOR, mortality due to cardiovascular thrombotic events (7 vs 6, VIOXX vs naproxen, respectively) was similar between the treatment groups. (See CLINICAL STUDIES, Special Studies, VIGOR, Other Safety Findings: Cardiovascular Safety.) In a placebo-controlled database derived form 2 studies with a total of 2142 elderly patients (mean age 75; VIOXX n-1067, placebo n=1075) with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs 35 for patients treated with VIOXX 25 mg once daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for VIOXX versus placebo, respectively. The significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown. Prospective studies specifically designed to compare the incidence of serious CV events in

patients taking VIOXX versus NSAID comparators or placebo have not been performed (emphasis added).

250.     The April 12, 2002 Label was materially false and misleading.  Merck's mortality data from "2 placebo-controlled studies" showing 8 events on VIOXX compared to 3 on placebo referenced the mortality rates in Protocols 078 plus 091 using on-drug confirmed cardiovascular deaths as of March 16, 2001, the cutoff date for the April 12, 2002 labeling approval.  However, as of March 16, 2001, confirmed cardiovascular deaths using ITT were 10 vs. 3 for VIOXX vs. placebo, and as of the actual date of the labeling approval, confirmed cardiovascular deaths using ITT were 17 vs. 5 for VIOXX versus placebo.  Both results were statistically significant.  The label failed to disclose that Merck and the Officer Defendants had in their possession as of the labeling approval cutoff date data that showed that use of VIOXX caused a statistically significant increase in cardiovascular deaths.  The April 12, 2002 Label was also materially false and misleading because it failed to disclose that Merck actually believed that use of VIOXX caused serious CV events, and the totality of facts on which its belief was based, including, inter alia, the information referenced in ¶ 225.  As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

251.     On April 18, 2002, subsequent to the release of the results for the first quarter of 2002, Merck held a conference call for analysts, money and portfolio managers, institutional investors, and large Merck shareholders.  During the call, Merck spokesman Mark Stejbach commented on the "new labeling changes" to VIOXX, which purportedly included the results from VIGOR:

> *[I]mportantly there was a change to the precautions, again not the warnings, but the precautions regarding cardiovascular language and two effects there, there were the results of the VIGOR study that had been disclosed for some time that you all know about.* And that showed a lower cardiovascular event rate for naproxen vs. VIOXX in the VIGOR Study. And importantly, also in the label now are the results of the safety results of two large placebo control studies in a large elderly population. And in that study we saw essentially no difference between VIOXX and placebo on the rate of cardiovascular. *In fact, numerically VIOXX is even a little lower. But this is very reassuring and we think its part of the body of evidence that supports our belief that the effect seen in VIGOR were the results of the anti-platelet effect of naproxen*. Of course, VIOXX does not have an effect on platelets consistent with its selective inhibition and that's reflected in the label. And so appropriate patients should be given anti-platelet therapy. *So, I think that's a position Merck has always had and now its quite clearly laid out in the labeling*.

252. However, the statements made during Merck's April 18, 2002 conference call, which sought to attribute the difference in thromboembolic events in VIGOR to naproxen's purported cardioprotective characteristics (the "naproxen hypothesis"), were materially false and misleading because (a) it constituted an affirmatively false representation that Merck and the Officer Defendants believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results and/or failed to correct a prior false representation; and (b) failed to disclose that Merck and the Officer Defendants actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 219. As a result, investors remained unaware of Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

### I. Materially False and Misleading Statements Made During the Second Half of 2002

253. On October 18, 2002, subsequent to the release of its results for the third quarter of 2002, Merck held a conference call for analysts, money and portfolio managers, institutional investors, and large Merck shareholders. During the call, a participant asked the Merck spokesperson the following question: "Ed Scolnick last December had basically told us there would be a VIOXX cardiovascular safety study performed, what's the status of beginning that trial or have those plans been abandoned?" In response, the Merck spokesperson stated:

> In terms of the cardiovascular outcome studies, you're right that we discussed doing those studies and *we have not abandoned them*, in fact, we're continuing to make progress on those, it's a very complex area as you all know and we're researching this area . . . . [S]o we'll continue with some of these ongoing things, continue to update the scientific community, but I know… we are still planning cardiovascular outcome studies for Vioxx and look forward to, hopefully soon, be able to discuss that in more detail and in a comprehensive manner across the products. Okay, so with that I apologize, we've run over. . . .

254. Merck and the Officer Defendants' statements during the third quarter 2002 conference call that Merck was "continuing to make progress" on the cardiovascular outcome studies was materially false and misleading because, unbeknownst to investors, Merck had already cancelled its cardiovascular outcomes study, as set forth in ¶¶ 241-243 above.

### J. Materially False and Misleading Statements Made During the Second Half of 2003

255. On or about August 15, 2003, Merck issued a new VIOXX label that included a brief description of an aspirin endoscopy study. The new label, however, was otherwise substantively unchanged, and was therefore materially false and misleading for the same reasons as set forth above in ¶ 250 above.

256.     As previously discussed in ¶¶ 172-174 above, during the fall of 2003 there were published reports of new data suggesting that VIOXX "might slightly raise the risk of heart attacks" and might "not have any greater efficacy than traditional NSAIDS," followed by an October 30, 2003 *Wall Street Journal* article which reported that the Brigham Study had found an increased risk of heart attack in patients taking VIOXX compared to patients taking Celebrex or placebo.

257.     On November 2, 2003, in response to the October 30, 2003 *Wall Street Journal* article, defendant Reicin publicly stated that "In [Merck's] placebo-controlled randomized trials, we have found no significant difference between VIOXX and placebo." Defendant Reicin also sought to disparage the Brigham Study results by stating: "Randomized clinical trials are the 'gold standard,' and this isn't such a trial."

258.     Similarly, in a letter to the editor of *The Wall Street Journal* entitled "Merck Stands Behind The Safety of VIOXX" which was published on November 5, 2003, Peter Kim, then-President of Merck Research Laboratories, also sought to disparage the Brigham Study results while reaffirming Merck's purported belief that VIOXX was safe and was not prothrombotic. As Kim stated in his letter to the editor:

> ***Nothing is more important to Merck than the safety of its medicines. Your Oct. 30 story about an observational analysis of Vioxx was incomplete***. The article discussed only the findings from this analysis where Vioxx appeared to have an unfavorable risk profile, but failed to report other findings from the same analysis that showed no statistically significant difference in the risk of heart attack for Vioxx compared with other commonly used anti-inflammatory drugs.
>
> The story also failed to report that another observational analysis presented at the same scientific meeting also showed no statistically significant difference in heart attacks between Vioxx and two widely used anti-inflammatory drugs, ibuprofen and diclofenac. ***A complete reporting of the data presented might have remedied the mistaken impression left by the story***.

Observational methods lack the rigor of randomized, controlled clinical trials, and have led the scientific community astray before. For example, decades of observational analyses suggested that hormone replacement therapy reduced heart disease risk in post-menopausal women, but the landmark Women's Health Initiative, a randomized, controlled trial, found the opposite with an estrogen progestin combination. That is why observational studies must be interpreted with caution. *Merck stands behind the safety of Vioxx based on the results of numerous randomized, controlled clinical trials.*

Finally, it should be noted that Merck has previously announced it is conducting large prospective, randomized placebo-controlled clinical trials that, when added to the extensive data from clinical trials already available, will provide an even more comprehensive picture of the cardiovascular safety profile of Vioxx.

259. However, defendant Reicin's November 2, 2003 statements and Merck's November 5, 2003 statements were materially false and misleading because (a) they constituted affirmatively false representations that Merck and Reicin believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results and/or failed to correct a prior false representation; and (b) failed to disclose that Merck and Reicin actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 219. As a result, investors remained unaware of Merck's and Reicin's actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

### K. Materially False and Misleading Statements Made During the First Half of 2004

260. On March 10, 2004, *Bloomberg News* reported that a study funded by Pfizer, which examined possible risks posed by various painkillers, found that VIOXX was linked to a

higher risk of heart attack for patients with high blood pressure.  Continuing Merck's effort to negate, minimize, and discredit any link between VIOXX and increased cardiovascular risk, according to the *Bloomberg News* report, Merck spokeswoman Mary-Elizabeth Blake stated that "***the company disagrees with the findings***" and that "the study wasn't designed well."

261.    However, the statements in Merck's March 10, 2004 press release, which reassured the market concerning VIOXX's purported lack of cardiovascular risks, were materially false and misleading because (a) they constituted an affirmatively false representation that Merck believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results and/or failed to correct a prior false representation; and (b) failed to disclose that Merck actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which their belief was based, including, *inter alia*, the information referenced in ¶ 219 above.  As a result, investors remained unaware of Merck's actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

262.    On or about April 6, 2004, Merck issued a new VIOXX label that stated VIOXX had been approved for the acute treatment of migraines for adults.  The new label, however, was otherwise substantively unchanged, and was therefore materially false and misleading for the same reasons as set forth above in ¶ 250 above.

**L.** **Materially False and Misleading Statements Made During the Second Half of 2004**

263. On August 26, 2004, Merck moved immediately to refute and discredit the Kaiser Study and to reassure investors as to VIOXX's safety by issuing a statement on the *Business Wire*. The August 26 statement averred as follows:

> *Merck strongly disagrees with the conclusions of an observational analysis by Graham et al, presented at an international medical meeting this week, which evaluated the rate of cardiovascular events in patients taking COX-2 specific inhibitors VIOXX (rofecoxib) and Celebrex (celecoxib) and in patients taking non-selective NSAIDs.* This analysis is a retrospective database analysis -- not a clinical trial. Observational analyses have limitations, often conflict with each other, and must be interpreted within the context of data from large, randomized, controlled clinical trials.

The August 26, 2004 statement also quoted Merck's Peter Kim as stating:

> This retrospective analysis is based only on a database review. Observational analyses do not have the rigor of randomized, controlled clinical trials. The robust clinical trial data available support the safety of VIOXX. *Based on all of the data that are available from our clinical trials, Merck stands behind the efficacy and safety, including cardiovascular safety, of VIOXX . . . . Nothing is more important to Merck than the safety of our medicines*.

264. The August 26, 2004 statements reported by *Business Wire*, including Merck's statement that "Merck stands behind the efficacy and safety, including cardiovascular safety, of VIOXX," were materially false and misleading because they (a) constituted an affirmatively false representation that Merck believed in good faith that it was the naproxen hypothesis (as opposed to VIOXX's prothrombotic effects) that was the most likely explanation of VIGOR's adverse CV results and/or failed to correct a prior false representation; and (b) failed to disclose that Merck actually believed that use of VIOXX caused serious adverse CV events, and the totality of the facts on which its belief was based, including, *inter alia*, the information

referenced in ¶ 219 above.  As a result, investors remained unaware of Merck's actual beliefs concerning VIOXX's prothrombotic effects, and were materially misled as to the enormous risk that VIOXX's true safety profile would jeopardize (or at least significantly limit) VIOXX's commercial viability and ability to generate substantial revenue for the Company.

265.   On August 27, 2004, the *San Jose Mercury News* quoted Merck spokesperson Mary Elizabeth Blake responding to the Kaiser Permanente study by stating:  "***We are certainly confident in the efficacy and safety of VIOXX.***"  This statement was also materially false and misleading for the same reasons as stated in the immediately preceding paragraph.

266.   On September 30, 2004, Merck issued a press release announcing that, "effective immediately," the Company was withdrawing VIOXX worldwide in light of the recommendation of the External Safety Monitoring Board for the APPROVe study that the study be stopped based on the increased risk of confirmed cardiovascular events they found in patients taking VIOXX.

267.   That same day, Merck also held a conference call for analysts to further discuss the withdrawal.  During the call, then-CEO Gilmartin stated:

> We are taking this action because we believe it serves the interests of patients . . . We believe it would have been possible to continue to market VIOXX with labeling that would incorporate these new data.  However, given the availability of alternative therapies and the questions raised by the data, *we concluded that a voluntary withdrawal is the responsible course to take*.

## X.   ADDITIONAL SCIENTER ALLEGATIONS

268.   As alleged herein, Merck and the Officer Defendants acted with scienter in that they knew, or recklessly disregarded with deliberate recklessness, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued

or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

269.    For example, the following allegations strongly support a finding that Merck and the Officer Defendants acted with scienter:

(A)     Merck and the Officer Defendants reviewed and/or had access to the unpublished original version of Drs. Garrett FitzGerald and Francesca Catella-Lawson's article reporting on the results of Protocol 023, and thereafter pressured Drs. FitzGerald and Catella-Lawson to "tone down" their conclusions in the published 023 version. *See* ¶¶ 73-75.

(B)     In a February 1997 email, Merck scientist Dr. Briggs Morrison, an author of the article reporting the results of Protocol 023 and one of the Merck scientists who pressured Drs. FitzGerald and Catella-Lawson to "tone down" their conclusions, wrote defendant Reicin and other senior Merck scientists warning them that their proposed design for the planned GI outcomes trial was faulty because "without COX-1 inhibition, you will get more thrombotic events and kill [the] drug." *See* ¶ 77.

(C)     Defendant Reicin, in a February 1997 email, admitted that "the possibility of increased CV events is of great concern" and remarked on her reluctance to "be the one to present those results to senior management." *See* ¶ 79.

(D)     Defendant Reicin, in the same February 1997 email, proposed that Merck design the GI trial to "exclude[e] high risk CV patients" in the hopes of "decreas[ing] the

CV event rate so that a difference between the two groups would not be evident." *See* ¶ 80.

(E)   The Officer Defendants were senior officers of Merck and, as evidenced by defendant Reicin's February 1997 email that she couldn't "wait to be the one to tell management" about the serious concerns of those in Merck Research Laboratories about VIOXX's prothrombotic characteristics (which would "kill the drug"), Merck's senior management was closely involved in the production and development of the Company's blockbuster drug. *See* ¶ 79.

(F)   Merck and the Officer Defendants cancelled two GI outcome studies for fear that they would show VIOXX to be prothrombotic and "kill the drug." *See* ¶ 82.

(G)   The Officer Defendants reviewed and/or had access to the Company's internal February 1998 analysis showing that women in the VIOXX osteoarthritis trials had a statistically significant 216% increase in serious adverse cardiovascular events. *See* ¶¶ 87-90.

(H)   The Officer Defendants chose not to share the Company's internal February 1998 analysis with either Merck's Board of Scientific Advisors or the public. *See* ¶¶ 91-92.

(I)   The Officer Defendants intentionally designed the VIGOR trial to exclude patients at high risk of a heart attack in order to minimize the risk that the results would show that VIOXX was prothrombotic. *See* ¶ 99.

(J)   The Officer Defendants ordered that Merck scientists stop working on creating a data analysis plan for cardiovascular events in VIGOR, and not make comparisons between VIOXX and other comparator drugs, despite the fact that

Merck's Board of Scientific Advisors had recommended that this be done for all VIOXX trials and that the protocol for VIGOR called for such a data analysis plan. *See* ¶ 106.

(K)     The Officer Defendants deliberately staffed at least half of the VIGOR DSMB with a combination of physicians who had financial conflicts of interest with Merck and a full-time Company employee who reported to defendant Scolnick. *See* ¶ 101.

(L)     The Officer Defendants deliberately chose not to assign a cardiologist to VIGOR's DSMB. *See* ¶ 99.

(M)     The Officer Defendants took efforts to avoid complying with the DSMB's request that Merck analyze the cardiovascular events in VIGOR as provided for in the trial protocol. *See* ¶ 107.

(N)     Defendant Scolnick, Merck's then-President of Merck Research Laboratories, requested a confidential meeting with the purportedly "blinded" statistician for VIGOR (Merck Scientist Deborah Shapiro) *the day after* the premature cardiovascular (as opposed to GI) cut-off for VIGOR because, as he emphasized in his March 2001 email to her that attached a securities analyst report, "this situation cannot simply follow the 'book' ways of my knowing." *See* ¶ 109.

(O)     Defendant Scolnick acknowledged, *albeit* solely within the confines of the Company's walls, that VIOXX was the cause of the increased rate of adverse cardiovascular events in VIGOR -- *i.e.*, that it was "mechanism-based as we worried it was." *See* ¶ 110.

(P)     Defendants Scolnick and Reicin, and other senior Merck scientists, conceded to one another that their frantic efforts to find support for the naproxen hypothesis following their receipt of the VIGOR cardiovascular results were unsuccessful. *See* ¶ 113.

(Q)     The Officer Defendants, unlike the market, were in possession of and had access to "the best comparative clin[ical] data on MI [heart attack] and NSAIDs," which confirmed that aspirin significantly reduced the risk that patients might suffer a first, nonfatal heart attack, but that naproxen, ibuprofen, and diclofenac (*i.e.*, other traditional NSAIDs) "had no significant effect," either individually or combined, on the risk of suffering a heart attack.  *See* ¶¶ 115-117.

(R)     Defendant Reicin pressured Merck scientists to reclassify the "cause of death" for at least one patient in the ADVANTAGE study so it would not "raise concerns." *See* ¶ 145.

(S)     Merck changed the pre-announced (and customary) "intention-to-treat" and "on treatment" methodologies for analyzing data from the Alzheimer's trials after they determined that the (non-public) statistically significant results highlighted the fact that VIOXX was unsafe. *See* ¶¶ 148-166.

(T)     Merck and the Officer Defendants failed to disclose the statistically significant mortality data from Merck's Alzheimer's trials to investors. *See* ¶¶ 148-166.

(U)     Merck and the Officer Defendants attempted to have the name of a Merck scientist secretly removed from the publication of the Brigham Study, in order to try to distance Merck from the study's adverse cardiovascular finding.  *See* ¶¶ 177-178.

(V)     The Officer Defendants framed Merck's public statements regarding the safety of
VIOXX to falsely promote the naproxen hypothesis and otherwise mislead
investors as to the true facts about VIOXX.

270.    In addition, the fact that Merck and the Officer Defendants pressured and/or
attempted to intimidate academics and others who were critical of VIOXX (as first made public
by the media in November 2004) further supports a strong inference of scienter.  From the outset
of the Class Period, Merck sought to either co-opt (through offers of research grants, paid
memberships on advisory boards, etc.) or silence critics of VIOXX.  For example, an internal
Merck email dated April 29, 1999 from Merck marketing manager Susan Baumgartner to
colleagues in Merck's marketing department, which was not disclosed to the public until after
the Class Period, provides a "list of 'problem' physicians that we must, at a minimum,
neutralize."

271.    Similarly, a July 23, 1999 internal Merck email from Ms. Baumgartner to
Merck's Regional Managing Directors references Merck's efforts to sway the "most challenging
(and also some of the most vocal and influential) national and regional physicians for VIOXX."
As the email notes, these physicians "have [been] identified as being 1) Important from a
business perspective in terms of influence and/or prescribing, and 2) Not as supportive of Merck
and/or VIOXX as we would like."  Baumgartner proceeded to note that "some of these
physicians have already been 'neutralized.'"  While Baumgartner's email focused on ways to co-
opt physicians who were "not as supportive of Merck and/or VIOXX as [Merck] would like,"
through means such as giving them grants, employing them to do research, and other funding
mechanisms, Merck also engaged in far more nefarious tactics with academics and physicians for
whom Merck's efforts were unsuccessful.  As first revealed in the November 1, 2004 *Wall Street*

*Journal* article, Merck repeatedly attempted to intimidate, pressure and/or outright threaten academic researchers who began to question VIOXX's safety.

272.    In addition, as revealed in an April 16, 2008 *JAMA* article entitled "Guest Authorship and Ghostwriting in Publications Related to Rofecoxib," Merck routinely and repeatedly authored drafts of manuscripts of scientific articles or contracted with vendors to draft review articles, and then sought out external academics (*i.e.,* ghost writers) who were willing to be identified as lead authors for these articles, for the purpose of misleading the medical community and investors into believing that these external academics had done research that supported Merck's "naproxen hypothesis."  For example, the April 2008 *JAMA* article noted that the article presenting the results of the Prevention Trial (in Alzheimer's patients) -- which had been designed and conducted principally by Merck scientists -- was largely written by Merck scientists and not the attributed first author.  Indeed, in an internal Merck email dated January 27, 2004, Merck scientist Eric Yuen told fellow Merck scientist Christopher Lines that "I think you should be the first author since you have done virtually all of the writing."  In response, Lines stated "I'm just wondering whether, given the nature of the results and target journal, it's more appropriate to have someone who's a neurologist as first author?"  The authors of the April 2008 *JAMA* article noted that a neurologist from the University of California San Diego was recruited to be the "lead author" of the final article -- and the final article "authored" by this neurologist contained only "minor differences in language and organization between the draft and final versions of the manuscript (particularly in the abstract as opposed to the text)" and that "the trial itself and the analyses were complete before the academically affiliated investigators were involved in the manuscript."

273. As the "lead author" of the October 2003 *Annals* article, which published the results of ADVANTAGE, told *The New York Times* in 2005:

> Merck designed the trial, paid for the trial, ran the trial … Merck came to me after the study was completed and said, 'We want your help to work on the paper.' The initial paper was written at Merck, and then was sent to me for editing.

When this "first author" was later confronted about Merck's improper adjudication of causes of patient deaths in ADVANTAGE, he responded that he was unaware of any such conduct and that "*Basically, I went with the cardiovascular data that was presented to me*."

274. In addition to all of the foregoing, Merck and the Officer Defendants each had powerful motives and the opportunity to perpetrate the fraudulent scheme and course of business described herein. For example:

(A) The central importance of VIOXX to the overall performance and prospects of the Company gave the Officer Defendants a powerful motive to suppress the truth to avoid any adverse impact on VIOXX's commercial viability and prospects.

(B) That the patents on a number of Merck's best selling products were set to expire made the success of VIOXX all the more critical to Merck and the Officer Defendants. Specifically, Merck was set to lose $5 billion in annual revenue as *five* of Merck's best-selling drugs (Vasotec, Pepcid, Mevacor, Prilosec and Prinivil) were all scheduled to lose patent protection between August 2000 and the end of 2001. Disclosure of adverse facts concerning VIOXX would have further threatened VIOXX's drug pipeline.

(C) VIOXX was Merck's second best selling pharmaceutical product in 2000, 2001, 2002, and 2003, generating billions of dollars in worldwide sales for the Company. Merck described VIOXX as a "driving force" behind the Company's

performance. VIOXX accounted for between 10% and 12.5% of Merck's pharmaceutical sales during the Class Period. Accordingly, the Officer Defendants had an obvious motive to delay as long as possible their true beliefs about VIOXX's safety and commercial prospects to avoid jeopardizing its sales, which were so critical to the Company's performance.

(D)     The Officer Defendants were also motivated to conceal their true beliefs concerning VIOXX's prothrombotic characteristics from the market because of problems that the Company was experiencing with ARCOXIA, the Company's planned successor to VIOXX. On March 15, 2002, the Officer Defendants were forced to withdraw the NDA for ARCOXIA. Thus, again, Merck and the Officer Defendants had a clear motive to keep the market in the dark for as long as possible with respect to their true beliefs concerning VIOXX's safety profile so that Merck could continue to reap profits from VIOXX.

(E)     Because naproxen and other traditional NSAIDs sell for a fraction of the price of VIOXX, and because VIOXX is no more effective than traditional NSAIDs at treating inflammation and pain, the disclosures of the serious safety risks associated with VIOXX would have significantly jeopardized its commercial prospects.

(F)     Similarly, any disclosure of the Officer Defendants' true beliefs about VIOXX's safety profile would have put it at a strong disadvantage with respect to Celebrex, which was being actively promoted by Pfizer and Monsanto and had the advantage of being approved by the FDA approximately six months before VIOXX was approved.

(G)     As detailed below, defendant Scolnick profited personally from the wrongdoing alleged herein by selling hundreds of thousands of shares of Merck stock at artificially inflated prices, as detailed below, for total proceeds of more than $32.4 million.

(H)     The Officer Defendants clearly had the opportunity to commit the fraudulent conduct alleged herein.  The Officer Defendants were all members of Merck's senior management who controlled the Company's public statements during the Class Period.

275.     As mentioned above, during the Class Period, defendant Scolnick sold substantial amounts of Merck common stock from his personal holdings while in possession of adverse non-public information about VIOXX's safety profile and its commercial prospects.  Defendant Scolnick's insider sales often immediately followed the exercise of options to purchase Merck common stock.  Stock options provide the grantee with the right to purchase the company's stock at the exercise price and then sell those shares in the open market at the then-prevailing market price.  Thus, option holders benefit most from exercising options and selling their shares when they believe the market value of the stock (*i.e.*, the price they will receive when selling the stock in the open market) is at a high point, or when they believe that subsequent events or disclosures will lower the value of their shares.  As discussed below, defendant Scolnick's insider sales occurred at relative high points during the Class Period at prices of $85.00 per share (near the Class Period high closing price of $94.88), which exceeded the closing price of Merck stock on the day the Company disclosed the worldwide withdrawal of VIOXX (*i.e.*, $33.00 on September 30, 2004).  Defendant Scolnick's insider sales resulted in instantaneous net profits of ***$24.8 million***.

276.     Defendant Scolnick's stock sales were unusual because of the:  (i) numbers of shares sold; (ii) dollar amounts of the transactions, and (iii) percentages of his holdings sold, which were very large and far exceeded prior trading patterns.  Moreover, defendant Scolnick made *zero* open market purchases of Merck stock during the Class Period.[25]

277.     Merck's Compensation and Benefits Committee maintained important guidelines regarding the number of Merck shares the Company's Chief Executive Officer and other key executives were expected to hold.  Those guidelines significantly narrowed the percentages of stock the executives could sell at any given moment.  As the Company's Proxy Statements filed in 1999, 2000 and 2001 all stated, in sum and substance:

> The [Compensation and Benefits] Committee expects the CEO to *hold 70%* and the other executive officers named in the Summary Compensation Table to *hold 60% of the shares which may be purchased from the gain on stock option exercise after deducting option price, taxes and transaction costs*.

In the Company's Proxy Statements filed in 2002 and 2003, the wording was changed to read, in sum and substance:

> The [Compensation and Benefits] Committee expects the CEO and other executive officers named in the Summary Compensation Table to *hold Merck Common Stock in an amount representing a multiple of base salary.  For the CEO, the multiple is ten; for the other executive officers, the multiple is five*.  The Committee further expects that, until such multiples are reached, the CEO and the other executive officers *hold a proportion of shares that may be purchased from the net gain on stock option exercise, after deducting exercise price, taxes and transaction costs*.  For the

---

[25]  Certain Merck executives' holdings in Merck stock options increased during the Class Period through option grants by the Compensation and Benefits Committee of the Merck Board of Directors.  These option grants increased such executives' motive to increase Merck's stock price.  However, since defendant Scolnick was not a member of Merck's Compensation and Benefits Committee during the Class Period, he did not control the option grants, and any acquisition of options by defendant Scolnick cannot support an inference that Scolnick believed Merck had a positive outlook for the future.

CEO, the proportion is **70%**; for the other executive officers, the proportion is **60%**.

278.    In the Company's Proxy Statement filed in 2004, the wording was further

changed to read:

> The [Compensation and Benefits] Committee expects senior management globally (about 200 employees), including the Chief Executive Officer and other executive officers named in the Summary Compensation Table, to **hold Merck Common Stock in an amount representing a multiple of base salary. For the Chief Executive Officer, the multiple is ten; for the other executive officers, the multiple is five.** The Committee further expects that, until such multiples are reached, employees covered by the guidelines **hold a proportion of shares that may be purchased with the net gain from the exercise of stock options, after deducting the exercise price, taxes and transaction costs**.  For the Chief Executive Officer, the proportion is **70 percent**; for the other executive officers, the proportion is **60 percent**.

279.    The Compensation and Benefits Committee, which controlled senior Merck

executives' compensation, thus stated publicly to Merck investors that it "expected" the CEO

(Gilmartin) and other members of senior management (including defendant Scolnick) to **hold**

large percentages of their Merck stock.  This restricted these individuals' ability to sell large

portions of their shares at any given time.  This "expectation" essentially prevented these

defendants from selling all of their Merck shares at any one time while they served in senior

management positions at the Company, as such a sale would contravene the stated policies of the

Committee.[26]

280.    While in possession of material adverse non-public information regarding Merck,

defendant Scolnick personally profited from the sale of Merck stock at artificially-inflated prices

---

[26] As defendant Reicin was not required to file information with the SEC concerning her transactions in Merck securities during the Class Period, without the benefit of further discovery, Plaintiffs are unable to determine whether defendant Reicin, while in possession of material adverse information regarding Merck, profited from the sale of Merck securities at artificially inflated prices.

during the Class Period. On October 25, 2000, defendant Scolnick exercised options to purchase 381,200 shares of Merck common stock. The exercise prices of the options were between $16.25 and $21.2805, and Scolnick's cost to exercise all 381,200 options was $7,601,225.10. Scolnick then sold in the open market all 381,200 of the shares resulting from the exercises of those options at the market price of $85.00, for proceeds of $32,402,000.00 and profits of ***$24,800,774.90:***

| Date | No. Shares Sold | Price per Share | Sale Proceeds | Exercise Price | Cost of Option Exercise | Profit | % Total Shares, Options |
|---|---|---|---|---|---|---|---|
| 10/25/00 | 600 | $85.00 | $51,000 | $21.2085 | $12,725.10 | $38,274.90 | 58.13% |
| 10/25/00 | 600 | $85.00 | $51,000 | $16.25 | $9,750.00 | $41,250.00 | |
| 10/25/00 | 180,000 | $85.00 | $15,300,000 | $18.5625 | $3,341,250.00 | $11,958,750.00 | |
| 10/25/00 | 200,000 | $85.00 | $17,000,000 | $21.1875 | $4,237,500.00 | $12,762,500.00 | |
| Total | 381,200 | | $32,402,000 | | $7,601,225.10 | $24,800,774.90 | |

281.    When defendant Scolnick stepped-down from the Company on January 1, 2003 (three years and 226 days into the Class Period), he was no longer subject to public reporting requirements concerning the sale of Merck stock. Without the benefit of further discovery, Plaintiffs are unable to ascertain whether defendant Scolnick sold any additional shares of Merck common stock during the Class Period.

282.    Defendant Scolnick's October 25, 2000 insider sale of 381,200 shares of Merck common stock was unusual in scope because: (i) the approximately $24.8 million in profits he made on this transaction is staggering and represented approximately ***31.4 times*** Scolnick's base salary for 2000 (*i.e.*, $790,000); and (ii) the large number of shares sold by Scolnick represented 58.13% of his combined personal holdings in Merck common stock and exercisable, "in the money" Merck stock options at the time, and represented 100% of his holdings in exercisable "in the money" Merck stock options at the time.

283.     Defendant Scolnick's October 25, 2000 sale of 381,200 shares of Merck common stock was also unusual in scope and timing because:  (i) during the Class Period, Scolnick acquired *zero* shares of Merck common stock through acquisitions that were not related to stock option exercises; (ii) in the three years and 226 days preceding the Class Period, Scolnick exercised Merck options and sold Merck common stock on two occasions, in the amounts of 108,000 shares (on June 13, 1997) and 220,000 shares (on February 17 and 19, 1999), meaning that his October 25, 2000 sale of Merck stock was approximately *3.5 times* and *1.73 times* greater, respectively, than each of these prior dispositions of Merck stock; and (iii) Scolnick's approximately $24.8 million in profit he made on his October 25, 2000 transaction was *1.6 times* greater than the profits he earned on these prior June 1997 and February 1999 stock sales *combined*.  With such totals in the millions of dollars, this magnitude of difference is significant.

## XI.    LOSS CAUSATION

284.     During the Class Period, as detailed herein, Merck and the Officer Defendants engaged in a course of conduct that artificially inflated the price of Merck securities throughout the Class Period.  Merck and the Officer Defendants' unlawful conduct directly caused the losses incurred by Plaintiffs and the other members of the Class.  The materially false and misleading statements set forth above were widely disseminated to the securities markets, investment analysts and the investing public.  As a result, Plaintiffs and the other members of the Class purchased Merck securities at artificially-inflated prices and were damaged when the artificial inflation gradually dissipated as a result of partial-corrective disclosures entering the market that revealed Merck's and the Officer Defendants' actual beliefs concerning VIOXX's prothrombotic characteristics, and the market's understanding of the impact of the true facts on VIOXX-related sales and VIOXX-related liabilities.

285.  By making contemporaneous misstatements in connection with certain partial disclosures of October 2003 and September 30, 2004 as alleged herein, Merck and the Officer Defendants mitigated the impact of those corrective disclosures and prevented the full truth about VIOXX's safety profile and commercial prospects and liability risk, including Merck's and the Officer Defendants' true beliefs concerning the same from being revealed at once.  When the true facts became known and/or the materialization of the risks that had been fraudulently concealed by Merck and the Officer Defendants occurred as alleged herein, the price of Merck securities declined significantly as artificial inflation was removed from the market price of these securities, causing substantial damage to Plaintiffs and members of the Class.  Discovery and expert analysis may reveal further partial disclosures of corrective information.

286.  Between October 22 and October 30, 2003, there was an accumulation of information that partially disclosed the truth concerning the risks that had been misrepresented or fraudulently concealed by Merck and the Officer Defendants concerning VIOXX's actual safety profile and commercial prospects.  As set forth above (¶ 173), on October 22, 2003 *Reuters* reported that VIOXX's sales had declined in the third quarter of 2003 due to data "suggesting [VIOXX] might slightly raise the risk of heart attacks, and the growing perception that VIOXX did not have any greater efficacy than traditional NSAIDS."  In addition, Credit Suisse First Boston issued an analyst report on October 22, 2003 informing investors that "Upcoming ACR [American College of Rheumatology] Data could Put Incremental Pressure on Franchise," *i.e.*, that the formal presentation of the aforementioned data from the Merck sponsored Brigham Study, which showed an increased risk of heart attack in patients taking VIOXX compared to patients taking Celebrex or placebo, could result in lowered VIOXX sales.  In response to news of the declines in VIOXX sales as a result of the Brigham Study, Merck shares fell almost 7%, or

more than $3 per share, to close at $45.72 per share on October 22, 2003. Shortly thereafter, on October 30, 2003, *The Wall Street Journal* published an article concerning the adverse findings observed in the Brigham Study, causing Merck stock to fall to $43.94, reflecting a further 2.2% decline in the price of Merck stock. Nevertheless, due to Merck's and the Officer Defendants' vigorous efforts to discredit the Brigham Study, and their subsequent public statements reassuring investors of VIOXX's purported safety and blockbuster commercial viability, the price of Merck stock remained artificially high, and the fraud continued.

287.    Then, on September 30, 2004, Merck shocked investors by announcing the immediate worldwide withdrawal of VIOXX because of "an increased risk of confirmed cardiovascular events" connected to VIOXX. As discussed in ¶¶ 180-181, only weeks earlier, Merck had reiterated its purported good faith belief in the naproxen hypothesis (and VIOXX's commercial prospects) by reaffirming the cardiovascular safety of VIOXX. In response to this second partial disclosure, the Company's stock price dropped from a closing price of $45.07 on September 29, 2004 to close at $33 per share on September 30, 2004, a decline of 27% on exceptionally heavy volume of 145,048,600 shares (which was more than 426% greater than the next highest reported trading volume since January 1990 -- 34,024,200 shares on November 21, 2003 -- and 27 times its normal volume). As discussed in ¶ 184, following the September 30 announcement, securities analysts also expressed their shock and concern at VIOXX's sudden withdrawal.

## XII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

288.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this Complaint. None of the misstatements and omissions complained of herein was a forward-looking statement, nor were any of the statements identified as forward-looking when made.

Rather, the false or misleading statements and omissions complained of in this Complaint concerned misstatements and/or omissions of historical and/or current facts and conditions existing at the time the statements were made.

289. Alternatively, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. Furthermore, to the extent the statutory safe harbor would otherwise apply to any statement found by the Court to be forward-looking pleaded herein, the Officer Defendants are liable for those false or misleading statements because at the time those statements were made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Merck who knew that the statement was materially false or misleading when made.

## XIII. PRESUMPTION OF RELIANCE

290. Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

291. In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Merck securities was open, efficient, and well-developed for the following reasons, among others:

> i. The market for Merck securities was, at all relevant times, an efficient market that promptly digested current information with respect to the Company from all reliable, publicly-available sources and reflected such information in the price of Merck securities;

ii.     Merck common and preferred stock met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient market for securities;

iii.    The Company was consistently followed, before and throughout the Class Period, by the media, which issued over 7,000 news stories regarding Merck during the Class Period.  Merck was followed by numerous securities analysts employed by firms including Goldman, Sachs & Co., JP Morgan Securities Inc., Merrill Lynch, and Morgan Stanley, among others, who wrote reports about the Company and the value of its securities that were publicly available and entered the public marketplace.  Indeed, there was extensive securities analyst coverage of Merck, with over 1,500 analyst reports published during the Class Period;

iv.     The price of Merck securities reacted promptly to the dissemination of new information regarding the Company, as set forth above.  Merck securities were actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional investor participation.  The average daily trading volume for Merck common stock during the Class Period was 5.5 million shares and the average weekly turnover was 1.2%;

v.      Merck regularly communicated with public investors through established market communication mechanisms, including through regular press releases, which were carried by national and international news wires, and through other wide ranging public disclosures, such as communications and conferences with investors, the financial press and other similar reporting services;

vi.     As a public company, Merck filed period public reports with the SEC;

vii.    Merck met the SEC's requirements to register debt and equity securities filed on Form S-3; and

viii.   Merck's securities were rated by rating agencies such as Moody's, Standard & Poor's, and Fitch Ratings.

292.    As a result of the foregoing, the market for Merck securities promptly digested current information regarding Merck from all reliable, publicly available sources and reflected

such information in the price of Merck's securities. Under these circumstances, purchasers of Merck securities during the Class Period suffered injury through their purchase of Merck securities at artificially-inflated prices and a presumption of reliance applies.

293. Accordingly, Lead Plaintiffs and the other members of the Class did rely and are entitled to have relied upon the integrity of the market price for Merck securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XIV.  CLAIMS FOR RELIEF

**COUNT ONE**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against Merck and the Officer Defendants**

294. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

295. During the Class Period, Defendants Merck and the Officer Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public regarding Merck's business, operations, management and the intrinsic value of Merck securities; (ii) enable Merck and the Officer Defendants to artificially inflate the price of Merck securities; (iii) enable Defendant Scolnick to sell over $32.4 million of his privately-held Merck shares during the Class Period and while in possession of material adverse non-public information about the Company; and (iv) cause Lead Plaintiffs and other members of the Class to purchase Merck securities at artificially-inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Merck and the Officer Defendants jointly and individually (and each of them) took the actions set forth herein.

296. Merck and the Officer Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts

necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Merck's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Merck and the Officer Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

297.    Merck and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Merck as specified herein.

298.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Merck's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Merck and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Merck securities during the Class Period.

299.    Defendant Merck is liable for all materially false and misleading statements made during the Class Period, as alleged above.

300.    Merck is further liable for the materially false and misleading statements made by Merck officers in press releases and during conference calls and at conferences with investors

and analysts, as alleged above, as the makers of such statements and under the principle of respondeat superior.

301.    The Officer Defendants, as top executive officers of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of these Defendants was able to and did control the content of the public statements disseminated by Merck.  These Defendants had direct involvement in the daily business of the Company and participated in the preparation and dissemination of Merck's materially false and misleading statements as set forth above.

302.    In addition, Defendants Scolnick and Reicin are liable for, among other material omissions and false and misleading statements, the false and misleading statements they made and/or signed.

303.    The allegations above establish a strong inference that Merck and the Officer Defendants acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts.  Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness for the purpose and effect of concealing Merck's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Merck and the Officer Defendants' material misstatements and omissions throughout the Class Period, if they did not have actual knowledge of the misrepresentations and omissions alleged, Merck and the Officer Defendants were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

304.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Merck securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Merck's publicly-traded securities were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by Merck and the Officer Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Merck and the Officer Defendants but not disclosed in public statements by them during the Class Period, Lead Plaintiffs and the other members of the Class purchased or acquired Merck securities during the Class Period at artificially high prices and were damaged thereby.

305.     At the time of said material misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and Merck and the Officer Defendants' material omissions.  Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth, they would not have purchased or otherwise acquired their Merck securities, or, if they had purchased or acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

306.     By virtue of the foregoing, Merck and the Officer Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

307.     As a direct and proximate result of their wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases or acquisitions and sales of the Company's securities during the Class Period.

## COUNT TWO
### Violation of Section 20(a) of the Exchange Act Against
### The Officer Defendants

308.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

309.    The Officer Defendants acted as controlling persons of Merck within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are materially false and misleading.  The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

310.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

311.    As set forth above, each of the Officer Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, each of the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Officer Defendants' wrongful conduct,

Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT THREE
### Violations of Section 10(b) and 20A of the Exchange Act
### And Rule 10b-5 Promulgated Thereunder by Defendant Scolnick for Insider Trading

312.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

313.    This claim is asserted pursuant to Section 20A of the Exchange Act against defendant Scolnick by Mississippi PERS (the "20A Plaintiff"), on behalf of itself and other Class members who purchased shares of Merck common stock contemporaneously with the sale of Merck common stock by defendant Scolnick while he was in possession of material, non-public information concerning VIOXX as alleged herein.

314.    Defendant Scolnick violated Exchange Act Section 10(b), Rule 10b-5 and Section 20(a) for the reasons stated in Counts One and Two above.  Additionally, defendant Scolnick further violated Exchange Act Section 10(b) and Rule 10b-5 by selling shares of Merck common stock while in possession of material, nonpublic adverse information concerning VIOXX's cardiovascular risks, which information he had a duty to disclose, and which he failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

315.    Contemporaneously with defendant Scolnick's insider sales of Merck common stock on October 25, 2000, the 20A Plaintiff purchased shares of Merck common stock on a national securities exchange while defendant Scolnick was in possession of material, nonpublic information concerning VIOXX's cardiovascular risks.

316.    Other Class members also purchased shares of Merck common stock contemporaneously with defendant Scolnick's insider sales of Merck common stock, including on October 25, 2000.

317.    The 20A Plaintiff and other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

318.    By reason of his violation of the Exchange Act alleged herein, defendant Scolnick is liable to the 20A Plaintiff and other members of the Class who purchased shares of Merck common stock contemporaneously with defendant Scolnick's sales of Merck common stock during the Class Period.

319.    The 20A Plaintiff and the other members of the Class who purchased contemporaneously with defendant Scolnick's Merck securities sales seek disgorgement by the defendant Scolnick of profits gained (or losses avoided) from defendant Scolnick's transactions in Merck common stock contemporaneous with the 20A Plaintiff and other members of the Class.

320.    This action was brought within five years after the date of the last transaction that is the subject of defendant Scolnick's violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count One above, was brought within five years after the date of the last transaction that violated section 20A of the Exchange Act by defendant Scolnick.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Further determining that this action is a proper class action and further certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure with the Class Period as defined herein;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Ordering the disgorgement by defendant Scolnick of all profits gained and losses avoided to those Class members who purchased Merck common stock contemporaneously with the sales by defendant Scolnick of Merck common stock;

D.      Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Such other and further relief as the Court may deem just and proper.

## XVI.  JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  June 14, 2013

                                /s/ James E. Cecchi
                                James E. Cecchi
                                CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY
                                   & AGNELLO, P.C.
                                5 Becker Farm Road
                                Roseland, NJ  07068
                                Tel.:  (973) 994-1700
                                Fax:  (973) 994-1744

                                Al DeCotitis
                                DECOTTIIS, FITZPATRICK & COLE, LLP
                                Glenpointe Centre West
                                500 Frank W. Burr Boulevard
                                Teaneck, NJ 07666
                                Tel:  (201) 928-1100
                                Fax: (201) 928-0588

                                Paul B. Brickfield
                                BRICKFIELD & DONAHUE
                                70 Grand Avenue
                                River Edge, NJ  07661
                                Tel.:  (201) 258-3984
                                Fax:  (201) 488-9559

                                *Co-Liaison Counsel for Lead Plaintiffs*

                                BERNSTEIN LITOWITZ BERGER
                                  & GROSSMANN LLP
                                Salvatore J. Graziano
                                David Wales
                                Adam H. Wierzbowski
                                Kristin A. Meister
                                1285 Avenue of the Americas
                                New York, NY 10019
                                Tel.:  (212) 554-1400
                                Fax:  (212) 554-1444

BROWER PIVEN
  A PROFESSIONAL CORPORATION
David A.P. Brower
Richard Weiss
475 Park Avenue South, 33rd Floor
New York, NY 10016
Tel.:  (212) 501-9000
Fax:  (212) 501-0300

MILBERG LLP
Matthew Gluck
Matthew Kupillas
Roland Riggs
One Pennsylvania Plaza
New York, NY  10119-0165
Tel.:  (212) 594-5300
Fax:  (212) 868-1229

STULL, STULL & BRODY
Jules Brody
Mark Levine
Patrick Slyne
6 East 45th Street, 5th Floor
New York, NY 10017
Tel.:  (212) 687-7230
Fax:  (212) 490-2022

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

# EXHIBIT M

**CRAVATH, SWAINE & MOORE LLP**
Evan R. Chesler
Robert H. Baron
Karin A. DeMasi
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000

**HUGHES HUBBARD & REED LLP**
William R. Stein
Eric S. Parnes
1775 I Street, NW
Washington, DC 20006-2401
Telephone: (202) 721-4600

*Counsel for Defendants Merck & Co., Inc. and Alise S. Reicin*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE MERCK & CO., INC., SECURITIES, DERIVATIVE & "ERISA" LITIGATION | MDL No. 1658 (SRC) |
| THIS DOCUMENT RELATES TO: THE CONSOLIDATED SECURITIES ACTION | Case No. 2:05-CV-01151-SRC-CLW Case No. 2:05-CV-02367-SRC-CLW |

## DEFENDANTS' ANSWER TO THE CORRECTED CONSOLIDATED SIXTH AMENDED CLASS ACTION COMPLAINT

Defendants Merck & Co., Inc. ("Merck" or the "Company") and Alise S. Reicin (collectively, "Defendants"), upon personal knowledge and/or upon information and belief, answer the Corrected Consolidated Sixth Amended Class Action Complaint (the "Complaint") as follows.[1] For ease of reference, Defendants have included in this Answer the captions and headings used in the Complaint, but do not thereby admit the truth of any allegations contained in the captions and headings or any inference that could be drawn from those captions and headings.

I.  **PRELIMINARY STATEMENT**

1.  Defendants deny the averments set forth in paragraph 1 of the Complaint, except admit that Plaintiffs purport to assert the claims described in paragraph 1 and admit that this Court issued an Order regarding class certification on January 30, 2013 and refer to that Order for its contents.

2.  Defendants deny the averments set forth in paragraph 2 of the Complaint.

3.  Defendants deny the averments set forth in paragraph 3 of the Complaint, except admit that Vioxx is a selective nonsteroidal anti-inflammatory drug ("NSAID") and refer to the FDA-approved prescribing information for Vioxx for its indicated uses and full context, and admit that the inhibition of cyclooxygenase-1 (COX-1) in patients taking traditional non-selective NSAIDs such as naproxen is believed to be associated with gastric damage and increased bleeding among patients taking such traditional non-selective NSAIDs.

---

[1] Count III is not alleged against answering Defendants and, therefore, no response is required. To the extent footnote 1 of Plaintiffs' Corrected Consolidated Sixth Amended Class Action Complaint makes averments, those averments are denied.

2

4.      Defendants deny the averments set forth in paragraph 4 of the Complaint, except admit that Merck believed there would be a patient population for an anti-inflammatory medication that could offer the same pain relief and anti-inflammatory benefit as traditional NSAIDs but with greatly reduced risk of fatal or debilitating GI side effects.

5.      Defendants deny the averments set forth in paragraph 5 of the Complaint, except admit that U.S. patents expired in 2000 for Vasotec and Pepcid and in 2001 for Prilosec, Prinivil, and Mevacor.

6.      Defendants deny the averments set forth in paragraph 6 of the Complaint, except admit that Merck issued a press release dated May 21, 1999, and refer to the press release for its contents, and admit that worldwide Vioxx sales figures exceeded $2.5 billion in the year 2003.

7.      Defendants deny the averments set forth in paragraph 7 of the Complaint.

8.      Defendants deny the averments set forth in paragraph 8 of the Complaint.

9.      Defendants deny the averments set forth in paragraph 9 of the Complaint, except admit that Merck received FDA approval, on May 20, 1999, to manufacture and market the prescription medicine Vioxx, and admit that the VIGOR study involving Vioxx exists and refer to the referenced study for its actual language and full text.

10.      Defendants deny the averments set forth in paragraph 10 of the Complaint, except admit that the VIGOR study involving Vioxx exists and refer to the referenced study for its actual language and full text, and admit that the March 9, 2000 email referenced in the third sentence of paragraph 10 exists and refer to the document for its contents.

3

11.    Defendants deny the averments set forth in paragraph 11 of the Complaint, except admit that Merck issued a press release dated March 27, 2000, and refer to the press release for its contents.

12.    Defendants deny the averments set forth in paragraph 12 of the Complaint, except state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the characterizations of unspecified statements and opinions of analysts referenced in paragraph 12 of the Complaint.

13.    Defendants deny the averments set forth in paragraph 13 of the Complaint.

14.    Defendants deny the averments set forth in paragraph 14 of the Complaint.

15.    Defendants deny the averments set forth in paragraph 15 of the Complaint, except admit that the VIGOR and ADVANTAGE studies involving Vioxx exist and refer to the referenced studies for their actual conclusions and full text, admit that an email string beginning on March 30, 2000 referenced in the second sentence of paragraph 15 exists and refer to the document for its contents, and admit that an email string beginning on November 8, 2000 referenced in the fourth sentence of paragraph 15 exists and refer to the document for its contents.

16.    Defendants deny the averments set forth in paragraph 16 of the Complaint, except admit that the referenced studies Protocol 078 and Protocol 091 exist and refer to the referenced studies for their actual language and full text.

17.    Defendants deny the averments set forth in paragraph 17 of the Complaint, except admit that the *Journal of American Medical Association* published an article dated April 16, 2008, authored by Drs. Bruce M. Psaty and Richard A. Kronmal and refer to the article for its contents.

4

18.     Defendants deny the averments set forth in paragraph 18 of the Complaint, except admit that *Bloomberg News* published an article entitled "Merck, Pharmacia Pain Drugs Tied to Heart Attacks, Study Finds" dated August 21, 2001, and refer to the article for its contents, admit that the *Journal of American Medical Association* published an article dated August 22/29, 2001, authored by Drs. Debabrata Mukherjee, Steven E. Nissen, and Eric J. Topol and refer to the article for its contents, admit that the *New York Times* published an article entitled "For Pain Reliever, Questions of Risk Remain Unresolved" dated October 9, 2001, and refer to the article for its contents, and admit that Merck conducted a conference call on April 18, 2002, and refer to the transcript for its contents.

19.     Defendants deny the averments set forth in paragraph 19 of the Complaint, except admit that the study conducted by the Harvard-affiliated Brigham and Women's Hospital referenced in the first sentence of paragraph 19 exists and refer to the study for its actual language and full context, and state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of "investor concerns" referenced in the fourth sentence of paragraph 19.

20.     Defendants deny the averments set forth in paragraph 20 of the Complaint, except admit and aver that on September 30, 2004, Merck announced that in the APPROVe study, a prospective, randomized, placebo-controlled clinical trial, there was an increased relative risk for confirmed cardiovascular events beginning after 18 months of treatment in patients taking Vioxx compared with those taking a placebo, and that, given the availability of alternative therapies and questions raised by the data from that trial, Merck concluded that a voluntary worldwide withdrawal of Vioxx best served the interests of patients, state that the second sentence of paragraph 20 purports to describe prices of Merck stock, which

5

are matters of public record, and refer to such public records, and state that they are without knowledge or information sufficient to form a belief as to the truth of the averments concerning analysts in the third sentence of paragraph 20.

21. Defendants deny the averments set forth in paragraph 21 of the Complaint.

## II. **THE CLAIMS ASSERTED IN THIS COMPLAINT**

22. Defendants deny the averments set forth in paragraph 22 of the Complaint, except admit that Plaintiffs purport to assert the claims described in paragraph 22.

## III. **JURISDICTION AND VENUE**

23. Defendants deny the averments set forth in paragraph 23 of the Complaint, except admit that the Court has subject matter jurisdiction to hear the claims in this action but deny that Plaintiffs have valid claims under the Securities Exchange Act.

24. Defendants deny the averments set forth in paragraph 24 of the Complaint, except admit that Merck is headquartered in this District, and admit that venue in this District is proper.

25. Defendants deny the averments set forth in paragraph 25 of the Complaint, except admit that Defendants have used the means and instrumentalities of interstate commerce in the regular course of their business activities.

## IV. **PARTIES**

### A. **The Plaintiffs**

26. Defendants deny the averments set forth in paragraph 26 of the Complaint, except state that they are without knowledge or information sufficient to form a belief as to the truth of the averments in the first, second, and third sentences of paragraph 26 of the Complaint, and admit that the Court appointed Public Employees' Retirement System of Mississippi as a Lead Plaintiff in this matter.

6

27. Defendants deny the averments set forth in paragraph 27 of the Complaint, except admit that the Court appointed Steven LeVan, Jerome Haber, and Richard Reynolds as Lead Plaintiffs in this matter.

**B.** **The Defendants**

1. **Merck**

28. Defendants deny the averments set forth in paragraph 28 of the Complaint, except admit that Merck's common stock was traded on the New York Stock Exchange and refer to the public record for the number of outstanding shares of Merck Common Stock, and admit that Merck is a New Jersey corporation with its principal place of business located at One Merck Drive, Whitehouse Station, New Jersey.

2. **The Officer Defendants**

29. (a) Defendants deny the averments set forth in paragraph 29(a) of the Complaint, except admit the averments in the first and third sentences of paragraph 29(a).

(b) Defendants deny the averments set forth in paragraph 29(b) of the Complaint.

(c) Defendants deny the averments set forth in paragraph 29(c) of the Complaint, except admit that Defendant Scolnick sold Merck stock on one or more occasions during the period of May 21, 1999 to September 29, 2004, and admit and aver that Defendant Scolnick's compensation included short-term and longer-term components, with short-term components including base salary and annual bonus awards under the stockholder-approved Executive Incentive Plan ("EIP") and longer-term components including stock option grants under the stockholder-approved Incentive Stock Plan ("ISP").

30.     (a)  Defendants deny the averments set forth in paragraph 30(a) of the

Complaint, and aver that Defendant Reicin served as Director, then Senior Director, of

Pulmonary/Immunology from 1998-2001, Executive Director and Therapeutic Area Head of

Clinical Immunology & Analgesia from 2002-2004, and Vice President and Therapeutic

Area Head of Clinical Immunology & Analgesia beginning in 2004.

         (b)     Defendants deny the averments set forth in paragraph 30(b) of the

Complaint.

         (c)     Defendants deny the averments set forth in paragraph 30(c) of the

Complaint.

## V.     CLASS ACTION ALLEGATIONS

31.     Defendants deny the averments set forth in paragraph 31 of the Complaint,

except admit that Plaintiffs purport to bring this action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of persons and entities who purchased or acquired the

securities of Merck during the Class Period (the "Class"), and admit that Plaintiffs purport to

exclude from the Class those individuals and entities listed in the second sentence of

paragraph 31 of the Complaint.

32.     Defendants deny the averments set forth in paragraph 32 of the Complaint,

except admit that Merck's common stock was traded on the New York Stock Exchange and

refer to the public record for the number of outstanding shares of Merck common stock.

33.     Defendants deny the averments set forth in paragraph 33 of the Complaint.

34.     Defendants deny the averments set forth in paragraph 34 of the Complaint,

except state that they are without knowledge or information sufficient to form a belief as to

the truth of the averments concerning Plaintiffs' counsel, and state that they are without

8

knowledge or information sufficient to form a belief as to whether Plaintiffs have interests that conflict with the interests of the Class.

35.     Defendants deny the averments set forth in paragraph 35 of the Complaint.

(a)     Defendants deny the averments set forth in paragraph 35(a) of the Complaint.

(b)     Defendants deny the averments set forth in paragraph 35(b) of the Complaint.

(c)     Defendants deny the averments set forth in paragraph 35(c) of the Complaint.

(d)     Defendants deny the averments set forth in paragraph 35(d) of the Complaint.

(e)     Defendants deny the averments set forth in paragraph 35(e) of the Complaint.

36.     Defendants deny the averments set forth in paragraph 36 of the Complaint.

## VI.     **THE DEFENDANTS' FRAUD**

37.     Defendants deny the averments set forth in paragraph 37 of the Complaint.

A.     **Merck Develops VIOXX in an Attempt to Create a Blockbuster "Selective" NSAID with Reduced Gastrointestinal Side Effects**

1.     **The Problems Associated With Traditional, Non-Selective NSAIDs**

38.     Defendants deny the averments set forth in paragraph 38 of the Complaint, except admit that the class of NSAIDs are used to treat pain and inflammation of arthritis; traditional NSAIDs work by inhibiting cyclooxygenase ("COX"), an enzyme that stimulates synthesis of numerous prostaglandins including prostacyclin and thromboxane; prostacyclin is a chemical produced in many tissues in the body; scientists believe that prostacyclin plays

a role in inhibiting platelet aggregation and therefore blood clots; and another chemical, called thromboxane, promotes platelet aggregation and clotting.

39.    Defendants admit the averments set forth in paragraph 39 of the Complaint and aver that the referenced adverse effects are also believed to be associated with short-term use of such traditional NSAIDs.

> 2.    **Discovery of the COX-2 Enzyme Raises Hopes that a Selective NSAID Could be Developed Which Would Not Cause the Gastrointestinal Problems Associated with Traditional NSAIDs**

40.    Defendants deny the averments set forth in paragraph 40 of the Complaint, except admit and aver that in the early 1990s, scientists discovered that the COX enzyme had two forms, COX-1 and COX-2, which appeared to have several distinct functions; and there was an established body of scientific evidence that, among other functions, COX-1 stimulated the synthesis of prostaglandins responsible for protection of the stomach lining, while COX-2 stimulated the synthesis of prostaglandins responsible for pain and inflammation.

41.    Defendants deny the averments set forth in paragraph 41 of the Complaint, except admit and aver that in the early 1990s, scientists discovered that the COX enzyme had two forms, COX-1 and COX-2, which appeared to have several distinct functions; and there was an established body of scientific evidence that, among other functions, COX-1 stimulated the synthesis of prostaglandins responsible for protection of the stomach lining, while COX-2 stimulated the synthesis of prostaglandins responsible for pain and inflammation.

42.    Defendants deny the averments set forth in paragraph 42 of the Complaint, except admit and aver that traditional NSAIDs inhibit both COX-1 and COX-2; there was an

10

established body of scientific evidence that, among other functions, COX-1 stimulated the synthesis of prostaglandins responsible for protection of the stomach lining, while COX-2 stimulated the synthesis of prostaglandins responsible for pain and inflammation; and this led to a hypothesis that NSAIDs designed to inhibit only COX-2 could offer the same pain relief and anti-inflammatory benefit as traditional NSAIDs, but with greatly reduced risk of fatal or debilitating perforations, ulcers, and bleeding.

### 3. Merck Races to Develop and Stay Ahead of Its Competitors in Developing a COX-2 Inhibitor

43. Defendants deny the averments set forth in paragraph 43 of the Complaint, except admit that Merck scientists began research on COX-2 inhibitors in the early 1990s.

44. Defendants deny the averments set forth in paragraph 44 of the Complaint, except admit that Merck believed there would be a patient population for an anti-inflammatory medication that could offer the same pain relief and anti-inflammatory benefit as traditional NSAIDs but with greatly reduced risk of fatal or debilitating GI side effects, admit that the MK-966 Product Development Plan exists and refer to the document for its contents, and state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the characterizations of unspecified opinions of other pharmaceutical companies and analysts referenced in the first sentence of paragraph 44 of the Complaint.

45. Defendants deny the averments set forth in paragraph 45 of the Complaint, except admit that the *Wall Street Journal* published an article entitled "When Its Patents Expired, Merck Didn't Merge -- It Found New Drugs" dated January 10, 2001, and refer to the article for its contents.

11

46.     Defendants deny the averments set forth in paragraph 46 of the Complaint, except admit that the *Wall Street Journal* published an article entitled "When Its Patents Expired, Merck Didn't Merge -- It Found New Drugs" dated January 10, 2001, and refer to the article for its contents.

47.     Defendants deny the averments set forth in paragraph 47 of the Complaint, except admit that the *Wall Street Journal* published an article entitled "When Its Patents Expired, Merck Didn't Merge -- It Found New Drugs" dated January 10, 2001, and refer to the article for its contents.

48.     Defendants deny the averments set forth in paragraph 48 of the Complaint, except admit that Vioxx is a selective COX-2 inhibitor and was referred to internally as MK-966 and admit that Vioxx is the trade name for rofecoxib, and state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding Monsanto/Searle in the third sentence of paragraph 48 of the Complaint.

49.     Defendants deny the averments set forth in paragraph 49 of the Complaint, except admit that the MK-966 Product Development Plan exists and refer to the document for its contents.

50.     Defendants deny the averments set forth in paragraph 50 of the Complaint.

51.     Defendants deny the averments set forth in paragraph 51 of the Complaint, except admit that a memorandum dated February 23, 1998 exists and refer to the document for its contents, and state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding Pfizer Inc. in the first sentence of paragraph 51 of the Complaint.

52. Defendants deny the averments set forth in paragraph 52 of the Complaint, except admit that on November 23, 1998, Merck submitted a New Drug Application ("NDA") for Vioxx (rofecoxib) Tablets, and that simultaneously, Merck submitted an NDA for Vioxx (rofecoxib) Oral Suspension, and refer to the NDAs for their actual language and full text, and admit that Searle submitted a NDA to the FDA for Celebra (celecoxib).

53. Defendants deny the averments set forth in paragraph 53 of the Complaint, except admit that the *Wall Street Journal* published an article entitled "When Its Patents Expired, Merck Didn't Merge -- It Found New Drugs" dated January 10, 2001, and refer to the article for its contents.

54. Defendants deny the averments set forth in paragraph 54 of the Complaint, except admit that the *Wall Street Journal* published an article entitled "Merck's Health Hinges on Sales Of Arthritis Pill" dated April 14, 1999, and refer to the article for its contents, and state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the characterizations of unspecified statements and opinions of analysts referenced in paragraph 54 of the Complaint.

4. **Merck's Huge Financial Stake in the Success of VIOXX**

55. Defendants deny the averments set forth in paragraph 55 of the Complaint, except admit that the *Wall Street Journal* published an article entitled "Merck's Health Hinges on Sales Of Arthritis Pill" dated April 14, 1999, and refer to the article for its contents.

56. Defendants deny the averments set forth in paragraph 56 of the Complaint, except admit that the *Wall Street Journal* published an article entitled "When Its Patents

13

Expired, Merck Didn't Merge -- It Found New Drugs" dated January 10, 2001, and refer to the article for its contents.

57.     Defendants deny the averments set forth in paragraph 57 of the Complaint, except admit that U.S. patents expired in 2000 for Vasotec and Pepcid and in 2001 for Prilosec, Prinivil, and Mevacor.

58.     Defendants deny the averments set forth in paragraph 58 of the Complaint, except admit that the *Wall Street Journal* published an article entitled "When Its Patents Expired, Merck Didn't Merge -- It Found New Drugs" dated January 10, 2001, and refer to the article for its contents.

5.     **Merck's Successful VIOXX Product Launch in 1999**

59.     Defendants deny the averments set forth in paragraph 59 of the Complaint, except admit that Merck received FDA approval, on May 20, 1999, to manufacture and market the prescription medicine Vioxx, and admit that the *Wall Street Journal* published an article entitled "When Its Patents Expired, Merck Didn't Merge -- It Found New Drugs" dated January 10, 2001, and refer to the article for its contents.

60.     Defendants deny the averments set forth in paragraph 60 of the Complaint, except admit that the *Wall Street Journal* published an article entitled "Merck's Health Hinges on Sales Of Arthritis Pill" dated April 14, 1999, and refer to the article for its contents.

61.     Defendants deny the averments set forth in paragraph 61 of the Complaint, except admit that Dow Jones Newswire published an article entitled "Merck To Market Vioxx To Doctors First, Then Consumers" dated May 21, 1999, and refer to the article for its contents, and state that the third sentence of paragraph 61 of the Complaint purports to

describe prices of Merck stock, which are matters of public record, and refer to such public records.

62.     Defendants deny the averments set forth in paragraph 62 of the Complaint, except admit that *CNBC* published a broadcast entitled "Vioxx's Slow Start" dated June 3, 1999, and refer to the broadcast for its contents, and admit that an email string dated June 4, 1999 exists and refer to the document for its contents.

63.     Defendants deny the averments set forth in paragraph 63 of the Complaint, except admit that the *Wall Street Journal* published an article entitled "When Its Patents Expired, Merck Didn't Merge -- It Found New Drugs" dated January 10, 2001, and refer to the article for its contents.

### 6.     Merck's "Blockbuster" VIOXX Sales Grow From 2000 Through Mid-2004

64.     Defendants deny the averments set forth in paragraph 64 of the Complaint, except admit that worldwide Vioxx sales figures exceeded $2 billion in the year 2000.

65.     Defendants deny the averments set forth in paragraph 65 of the Complaint, except admit that worldwide Vioxx sales figures exceeded $2.3 billion in the year 2001.

66.     Defendants deny the averments set forth in paragraph 66 of the Complaint, except admit that worldwide Vioxx sales figures exceeded $2.5 billion in the year 2002.

67.     Defendants deny the averments set forth in paragraph 67 of the Complaint, except admit that worldwide Vioxx sales figures exceeded $2.5 billion in the year 2003.

68.     Defendants deny the averments set forth in paragraph 68 of the Complaint, except admit that worldwide Vioxx sales figures exceeded $1.3 billion in the year 2004.

15

        **7.**     **Merck Shocks Investors By Pulling VIOXX From The Market**

    69.     Defendants deny the averments set forth in paragraph 69 of the Complaint,

except admit and aver that on September 30, 2004, Merck announced that in the APPROVe

study, a prospective, randomized, placebo-controlled clinical trial, there was an increased

relative risk for confirmed cardiovascular events beginning after 18 months of treatment in

patients taking Vioxx compared with those taking a placebo, and that, given the availability

of alternative therapies and questions raised by the data from that trial, Merck concluded

that a voluntary worldwide withdrawal of Vioxx best served the interests of patients.

    **B.**     **Unbeknownst to Investors, Merck Had Grave Concerns About VIOXX's Potential to Cause Heart Attacks and Strokes, Which Were Reinforced By Undisclosed Merck Data, Even Before It Launched VIOXX In May 1999**

        **1.**     **Merck Learns That VIOXX Upsets the Homeostatic Balance Between Prostacyclin and Thromboxane, and the Concerns Raised by Protocol 023**

    70.     Defendants deny the averments set forth in paragraph 70 of the Complaint,

except admit that the referenced study Protocol 023 by Drs. FitzGerald and Catella-Lawson

exists and refer to the referenced study for its actual language and full text.

    71.     Defendants deny the averments set forth in paragraph 71 of the Complaint,

except admit and aver that prostacyclin is a chemical produced in many tissues in the body;

scientists believe that prostacyclin plays a role in inhibiting platelet aggregation and

therefore blood clots; and another chemical, called thromboxane, promotes platelet

aggregation and clotting.

    72.     Defendants deny the averments set forth in paragraph 72 of the Complaint,

except admit that Protocol 023 exists and refer to the referenced study for its actual language

and full text.

73. Defendants deny the averments set forth in paragraph 73 of the Complaint, except admit that Protocol 023 exists and refer to the referenced study for its actual language and full text.

74. Defendants deny the averments set forth in paragraph 74 of the Complaint.

75. Defendants deny the averments set forth in paragraph 75 of the Complaint, except admit that in May 1999, the Journal of *Pharmacology and Experimental Therapeutics* published the results of Protocol 023, authored by Francesca Catella-Lawson, Brendan McAdam, Briggs W. Morrison, Shiv Kapoor, Dean Kujubu, Lisa Antes, Kenneth C. Lasseter, Hui Quan, Barry J. Gertz, and Garret A. FitzGerald, admit that drafts of such publication referenced in the fourth sentence of paragraph 75 exist, and admit that the memorandum dated February 18, 1998 referenced in the fifth sentence of paragraph 75 exists and refer to the referenced documents for their actual language and full context.

2. **Merck Cancels a Large VIOXX Clinical Trial in August 1997 Over Undisclosed Concerns It Would Show That VIOXX Caused Serious Adverse Cardiovascular Problems**

76. Defendants deny the averments set forth in paragraph 76 of the Complaint, and state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning Celebrex referenced in the third sentence of paragraph 76 of the Complaint.

77. Defendants deny the averments set forth in paragraph 77 of the Complaint, except admit that the draft protocol referenced in the first sentence of paragraph 77 exists, admit that an email string beginning on February 23, 1997 referenced in the first and third sentences of paragraph 77 exists, and refer to the referenced documents for their contents.

78. Defendants deny the averments set forth in paragraph 78 of the Complaint.

17

79.     Defendants deny the averments set forth in paragraph 79 of the Complaint, except admit that an email string beginning on February 23, 1997 referenced in the first sentence of paragraph 79 exists and refer to the referenced document for its contents.

80.     Defendants deny the averments set forth in paragraph 80 of the Complaint, except admit that an email string beginning on February 23, 1997 referenced in the first sentence of paragraph 80 exists and refer to the referenced document for its contents.

81.     Defendants deny the averments set forth in paragraph 81 of the Complaint, except admit that an email string beginning on February 23, 1997 referenced in paragraph 81 exists and refer to the referenced document for its contents.

82.     Defendants deny the averments set forth in paragraph 82 of the Complaint, except admit that the August 13, 1997 email and accompanying draft press release and draft questions and answers referenced in the second sentence of paragraph 82 exist and refer to the referenced documents for their contents.

3.     **November 1997: Preeminent Medical Researcher and Merck Consultant Dr. John Oates Rejects Internal Merck Efforts to Rationalize the Adverse Implications of Protocol 023**

83.     Defendants deny the averments set forth in paragraph 83 of the Complaint.

84.     Defendants deny the averments set forth in paragraph 84 of the Complaint, except admit that an October 23, 1997 memorandum from Dr. John Oates to Drs. Alan Nies and Barry Gertz referenced in the first sentence of paragraph 84 exists and refer to the referenced document for its actual language and full text.

85.     Defendants deny the averments set forth in paragraph 85 of the Complaint, except admit that the November 17, 1997 letter referenced in the second sentence of paragraph 85 exists and refer to the document for its contents.

86.    Defendants deny the averments set forth in paragraph 86 of the Complaint, except admit that the January 13, 1998 email referenced in the second sentence of paragraph 86 exists and refer to the document for its contents.

4.    **Merck's Undisclosed Internal Analysis of Osteoarthritis Clinical Data Shows That Women Taking VIOXX Have A Statistically Significant 216% Increased Risk of Serious Adverse Cardiovascular Events Compared To Women Taking A Placebo**

87.    Defendants deny the averments set forth in paragraph 87 of the Complaint, except admit that Dr. Watson's analysis referenced in paragraph 87 exists and refer to the referenced document for its contents.

88.    Defendants deny the averments set forth in paragraph 88 of the Complaint, except admit that Dr. Watson's analysis referenced in paragraph 88 exists and refer to the referenced document for its contents.

89.    Defendants deny the averments set forth in paragraph 89 of the Complaint, except admit that the November 18, 2004 testimony referenced in paragraph 89 exists and refer to the referenced testimony for its contents.

90.    Defendants deny the averments set forth in paragraph 90 of the Complaint, except admit that Dr. Watson's analysis referenced in paragraph 90 exists and refer to the referenced document for its contents.

5.    **Merck Attempts to "Manage" Concerns About VIOXX's Cardiovascular Safety as It Nears Completion of Its New Drug Application for VIOXX in 1998**

91.    Defendants deny the averments set forth in paragraph 91 of the Complaint, except admit that Dr. Nies's April 1998 report referenced in paragraph 91 exists and refer to the referenced document for its contents.

19

92.     Defendants deny the averments set forth in paragraph 92 of the Complaint, except admit that the Programmatic Review of the Vioxx program referenced in the second sentence of paragraph 92 exists and refer to the referenced document for its contents.

93.     Defendants deny the averments set forth in paragraph 93 of the Complaint, except admit that Dr. Nies's September 29, 1998 memorandum referenced in the third sentence of paragraph 93 exists and refer to the referenced document for its contents.

94.     Defendants deny the averments set forth in paragraph 94 of the Complaint, except admit that on November 23, 1998, Merck submitted a New Drug Application ("NDA") for Vioxx (rofecoxib) Tablets, and that simultaneously, Merck submitted an NDA for Vioxx (rofecoxib) Oral Suspension, and refer to the NDAs for their actual language and full text.

C.     **May 21, 1999 (The First Day of the Class Period): Merck Heralds the FDA's Approval of VIOXX While Continuing to Conceal Its "Great Concern" And Related Adverse Information About VIOXX's Safety**

95.     Defendants deny the averments set forth in paragraph 95 of the Complaint, except admit that Merck issued a press release dated May 21, 1999, and refer to the press release for its contents.

96.     Defendants deny the averments set forth in paragraph 96 of the Complaint.

D.     **March 2000: Merck Is Finally Forced to Undertake a Large Gastrointestinal Outcomes Trial (VIGOR), Which Confirms the Company's Belief That VIOXX Is Prothrombotic**

97.     Defendants deny the averments set forth in paragraph 97 of the Complaint, except admit that the VIGOR study involving Vioxx exists and refer to the referenced study for its actual conclusions and full text, and admit and aver that Pharmacia funded a study called CLASS and refer to the study for its actual conclusions and full text.

98.     Defendants deny the averments set forth in paragraph 98 of the Complaint.

99.     Defendants deny the averments set forth in paragraph 99 of the Complaint, except admit that the VIGOR study involving Vioxx exists and refer to the referenced study for its actual conclusions and full text.

100.    Defendants deny the averments set forth in paragraph 100 of the Complaint, except admit that the VIGOR study involving Vioxx exists, and admit that 8,076 patients enrolled in the study with 4,047 in the Vioxx group and 4,029 in the naproxen group, and refer to the referenced study for its actual conclusions and full text, and admit that Drs. Michael Weinblatt, David Bjorkman, James Neaton, Alan Silman, Roger Sturrock, and Deborah Shapiro were members of the DSMB.

101.    Defendants deny the averments set forth in paragraph 101 of the Complaint, except admit that National Public Radio published a broadcast entitled "Conflicted Safety Panel Let Vioxx Study Continue" dated June 8, 2006, and refer to the broadcast for its contents.

102.    Defendants deny the averments set forth in paragraph 102 of the Complaint, except admit that the VIGOR study involving Vioxx exists, and refer to the referenced study for its actual conclusions and full text.

103.    Defendants deny the averments set forth in paragraph 103 of the Complaint, except admit that the VIGOR study involving Vioxx exists and refer to the referenced study for its actual conclusions and full text, and admit that the minutes of the November 17, 1999 meeting of the DSMB referenced in the third sentence of paragraph 103 exists and refer to the document for its contents.

21

104. Defendants deny the averments set forth in paragraph 104 of the Complaint, except admit that the minutes of the December 20, 1999 meeting of the DSMB referenced in paragraph 104 exist and refer to the document for its contents.

105. Defendants deny the averments set forth in paragraph 105 of the Complaint, except admit that the minutes of the December 20, 1999 meeting of the DSMB referenced in paragraph 105 exist and refer to the document for its contents.

106. Defendants deny the averments set forth in paragraph 106 of the Complaint, except admit that an email string beginning on January 13, 2000 referenced in the second sentence of paragraph 106 exists and refer to the document for its contents.

107. Defendants deny the averments set forth in paragraph 107 of the Complaint, except admit and state that the letter referenced in the first sentence of paragraph 107 exists and is dated January 24, 2000, and refer to the letter for its contents, and admit that Dr. Weinblatt's January 24, 2000 letter referenced in the third sentence of paragraph 107 exists and refer to the document for its contents.

108. Defendants deny the averments set forth in paragraph 108 of the Complaint, except admit that Merck outlined its plan for analyzing the thrombotic cardiovascular events from VIGOR in a letter dated February 7, 2000 to Dr. Weinblatt of the VIGOR DSMB and refer to that document for its contents, and further admit that Dr. Weinblatt agreed to serve as a member of the U.S. Multidisciplinary Advisory Board for COX-2 inhibitors.

109. Defendants deny the averments set forth in paragraph 109 of the Complaint, except admit that the February 11, 2000 email referenced in the second sentence of paragraph 109 exists and refer to the document for its contents.

22

110.     Defendants deny the averments set forth in paragraph 110 of the Complaint, except admit that the VIGOR study involving Vioxx exists and refer to the referenced study for its actual conclusions and full text, and admit that the March 9, 2000 email referenced in the third sentence of paragraph 110 exists and refer to the document for its contents.

E.     **The "Naproxen Hypothesis": Merck Falsely Represents That It Believes That the Higher Incidence of Adverse CV Events Among VIOXX Users in the VIGOR Trial Is Attributable To Purported Cardioprotective Properties of Naproxen Rather Than Prothrombotic Properties of VIOXX**

111.     Defendants deny the averments set forth in paragraph 111 of the Complaint, except admit that the VIGOR study involving Vioxx exists and refer to the referenced study for its actual conclusions and full text.

112.     Defendants deny the averments set forth in paragraph 112 of the Complaint.

113.     Defendants deny the averments set forth in paragraph 113 of the Complaint, except admit that the March 13, 2000 email referenced in the third sentence of paragraph 113 exists and refer to that document for its contents, and admit that in 1993 the *European Heart Journal* published an article authored by M.L. Brochier referenced in the fourth sentence of paragraph 113 and refer to the article for its contents.

114.     Defendants deny the averments set forth in paragraph 114 of the Complaint, except admit that in 1993 the *European Heart Journal* published an article authored by M.L. Brochier referenced in paragraph 114 and refer to the article for its contents.

115.     Defendants deny the averments set forth in paragraph 115 of the Complaint, except admit that an email string beginning on March 24, 2000, referenced in the second and third sentences of paragraph 115 exists and refer to the document for its contents.

116. Defendants deny the averments set forth in paragraph 116 of the Complaint, except admit that an email string beginning on March 24, 2000, referenced in paragraph 116 exists and refer to the document for its contents.

117. Defendants deny the averments set forth in paragraph 117 of the Complaint.

118. Defendants deny the averments set forth in paragraph 118 of the Complaint, except admit that an email string beginning on March 24, 2000 exists and refer to the document for its contents, and admit that *Epidemiology* published an article in July 2000 and refer to the article for its actual conclusions and full text.

119. Defendants deny the averments set forth in paragraph 119 of the Complaint, except admit that Merck issued a press release dated March 27, 2000, and refer to the press release for its contents.

120. Defendants deny the averments set forth in paragraph 120 of the Complaint.

121. Defendants deny the averments set forth in paragraph 121 of the Complaint, except state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the characterizations of unspecified statements and opinions of analysts and members of the press referenced in paragraph 121 of the Complaint.

122. Defendants deny the averments set forth in paragraph 122 of the Complaint, except state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the characterizations of unspecified statements and opinions of analysts and journalists referenced in the first sentence of paragraph 122 of the Complaint, and admit that Merck issued a press release dated April 28, 2000, and refer to the press release for its contents.

24

123.     Defendants deny the averments set forth in paragraph 123 of the Complaint, except admit that Merck issued a press release dated May 24, 2000 and refer to the press release for its contents and admit that the *New England Journal of Medicine* published an article on November 23, 2000 and refer to the article for its actual conclusions and full text.

124.     Defendants deny the averments set forth in paragraph 124 of the Complaint, except admit that Merck issued a press release dated May 24, 2000 and refer to the press release for its contents.

125.     Defendants deny the averments set forth in paragraph 125 of the Complaint.

126.     Defendants deny the averments set forth in paragraph 126 of the Complaint, except admit that the May 11, 2000 draft paper referenced in second and fourth sentences of paragraph 126 exists and refer to the document for its contents, admit that Merck issued a press release dated May 24, 2000 and refer to the press release for its contents and admit that the *New England Journal of Medicine* published an article on November 23, 2000 and refer to the article for its actual conclusions and full text.

127.     Defendants deny the averments set forth in paragraph 127 of the Complaint, except admit that the document entitled "VIGOR Final Results" referenced in paragraph 127 exists and refer to the document for its contents.

128.     Defendants deny the averments set forth in paragraph 128 of the Complaint, except admit that a document reflecting Deborah Shapiro's notes from an October 18, 2000 meeting exists and refer to the document for its contents, admit that Deborah Shapiro was deposed in this action on March 6, 2013 and refer to her testimony for its contents, admit that an email string beginning on January 29, 2001 referenced in paragraph 128 exists and refer to the document for its contents, admit that Merck issued a press release dated May 24,

25

2000 and refer to the press release for its contents and admit that the *New England Journal of Medicine* published an article on November 23, 2000 and refer to the article for its actual conclusions and full text.

129.    Defendants deny the averments set forth in paragraph 129 of the Complaint, except admit that the Digestive Disease Week presentation referenced in the first sentence of paragraph 129 of the Complaint exists and refer to that document for its contents, and state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the characterizations of unspecified statements and opinions of analysts referenced in the third sentence of paragraph 129 of the Complaint.

130.    Defendants deny the averments set forth in paragraph 130 of the Complaint, except admit that Merck stated that the VIGOR results were consistent with naproxen's ability to prevent platelet aggregation, and admit that the February 2001 presentation before the FDA's Arthritis Advisory Committee exists and refer to the presentation for its contents.

131.    Defendants deny the averments set forth in paragraph 131 of the Complaint, except admit that the *Journal of American Medical Association* published an article dated August 22/29, 2001, authored by Drs. Debabrata Mukherjee, Steven E. Nissen, and Eric J. Topol and refer to the article for its contents.

132.    Defendants deny the averments set forth in paragraph 132 of the Complaint, except admit that *Bloomberg News* published an article entitled "Merck, Pharmacia Pain Drugs Tied to Heart Attacks, Study Finds" dated August 21, 2001, and refer to the article for its contents, and state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the characterizations of

26

unspecified statements and opinions of the market referenced in the third sentence of paragraph 132 of the Complaint.

133. Defendants deny the averments set forth in paragraph 133 of the Complaint, except admit that Merck issued a press release dated August 23, 2001, and refer to the press release for its contents, and admit that Merck sent a letter regarding Vioxx to physicians in August 2001 and refer to the referenced letter for its contents.

134. Defendants deny the averments set forth in paragraph 134 of the Complaint, except state that they are without knowledge or information sufficient to form as belief as to the truth of the averments in the first sentence of paragraph 134 concerning unspecified news and analyst reports, and admit that Credit Suisse First Boston issued a report on August 22, 2001, concerning Merck and refer to the report for its contents.

135. Defendants deny the averments set forth in paragraph 135 of the Complaint, except admit that in September 2001 Merck received a letter from Thomas W. Abrams of DDMAC and refer to the letter for its actual language and full context.

136. Defendants deny the averments set forth in paragraph 136 of the Complaint, except state that they are without knowledge or information sufficient to form as belief as to the truth of the averments concerning analysts' opinions, admit that Credit Suisse First Boston issued a report on September 25, 2001, concerning Merck and refer to the report for its contents, and admit that Lehman Brothers issued a report on September 25, 2001, concerning Merck and refer to the report for its contents.

137. Defendants deny the averments set forth in paragraph 137 of the Complaint, except admit that the *New York Times* published an article entitled "For Pain Reliever,

27

Questions of Risk Remain Unresolved" dated October 9, 2001, and refer to the article for its contents.

> **F.  Merck Wrongfully Changes Causes of Death in Its ADVANTAGE Trial to Minimize the Risk of "Rais[ing] Concerns" About the "Naproxen Hypothesis"**

138.    Defendants deny the averments set forth in paragraph 138 of the Complaint, except admit that the VIGOR and ADVANTAGE studies involving Vioxx exist and refer to the referenced studies for their actual conclusions and full text.

139.    Defendants deny the averments set forth in paragraph 139 of the Complaint, except admit that the ADVANTAGE study involving Vioxx exists and refer to the study for its actual conclusions and full text.

140.    Defendants deny the averments set forth in paragraph 140 of the Complaint, except admit that the VIGOR and ADVANTAGE studies involving Vioxx exist and refer to the referenced studies for their actual conclusions and full text.

141.    Defendants deny the averments set forth in paragraph 141 of the Complaint, except admit that the VIGOR and ADVANTAGE studies involving Vioxx exist and refer to the referenced studies for their actual conclusions and full text.

142.    Defendants deny the averments set forth in paragraph 142 of the Complaint, except admit that the VIGOR and ADVANTAGE studies involving Vioxx exist and refer to the referenced studies for their actual conclusions and full text.

143.    Defendants deny the averments set forth in paragraph 143 of the Complaint, except admit that an email string beginning on March 30, 2000, exists and refer to the document for its contents.

28

144.     Defendants deny the averments set forth in paragraph 144 of the Complaint, except admit that the *New York Times* published an article entitled "Evidence in Vioxx Suits Shows Intervention by Merck Officials" dated April 24, 2005, and refer to the article for its contents.

145.     Defendants deny the averments set forth in paragraph 145 of the Complaint, except admit that the November 8, 2000 email referenced in the third sentence of paragraph 145 exists and refer to the document for its contents.

146.     Defendants deny the averments set forth in paragraph 146 of the Complaint, except admit that *Annals of Internal Medicine* published an article on October 7, 2003, and refer to the article for its contents.

147.     Defendants deny the averments set forth in paragraph 147 of the Complaint, except admit that the *New York Times* published an article entitled "Evidence in Vioxx Suits Shows Intervention by Merck Officials" dated April 24, 2005, and refer to the article for its contents.

G.     **2001: The Undisclosed Results of Merck's Studies of VIOXX In Alzheimer's Disease Patients Show that VIOXX Raises the Risk of Cardiac Mortality**

148.     Defendants deny the averments set forth in paragraph 148 of the Complaint.

149.     Defendants deny the averments set forth in paragraph 149 of the Complaint, except admit that Protocol 078 and Protocol 091 exist and refer to the referenced studies for their actual language and full text.

150.     Defendants deny the averments set forth in paragraph 150 of the Complaint, except admit that Protocol 078 was designed to evaluate the safety and efficacy of Vioxx for the prevention of Alzheimer's disease in patients with mild cognitive impairment and

29

Protocol 091 was designed to evaluate the safety and efficacy of Vioxx in slowing the progression of symptoms of Alzheimer's disease and refer to the referenced studies for their actual language and full text.

151. Defendants deny the averments set forth in paragraph 151 of the Complaint, except admit that Protocol 078 was designed to evaluate the safety and efficacy of Vioxx for the prevention of Alzheimer's disease in patients with mild cognitive impairment, and admit that 1,457 patients aged 65 years or older with mild cognitive impairment were randomized, with 732 patients receiving placebo and 725 receiving Vioxx 25 mg once daily, and refer to the referenced study for its actual language and full text.

152. Defendants deny the averments set forth in paragraph 152 of the Complaint, except admit that Protocol 091 was designed to evaluate the safety and efficacy of Vioxx in slowing the progression of symptoms of Alzheimer's disease, and admit that 692 patients aged 50 years or older with mild or moderate Alzheimer's disease were randomized, with 346 patients receiving Vioxx and 346 patients receiving placebo, and refer to the referenced study for its actual language and full text.

153. Defendants deny the averments set forth in paragraph 153 of the Complaint.

154. Defendants deny the averments set forth in paragraph 154 of the Complaint.

155. Defendants deny the averments set forth in paragraph 155 of the Complaint, except admit that the April 8, 2001 memorandum referenced in the second sentence of paragraph 155 exists and refer to the document for its contents.

156. Defendants deny the averments set forth in paragraph 156 of the Complaint, except admit that the April 8, 2001 memorandum referenced in paragraph 156 exists and refer to the document for its contents.

157.     Defendants deny the averments set forth in paragraph 157 of the Complaint, except admit that the April 8, 2001 memorandum referenced in paragraph 157 exists and refer to the document for its contents.

158.     Defendants deny the averments set forth in paragraph 158 of the Complaint, except admit that the *Journal of American Medical Association* published an article dated April 16, 2008, authored by Drs. Bruce M. Psaty and Richard A. Kronmal and refer to the article for its contents.

159.     Defendants deny the averments set forth in paragraph 159 of the Complaint, except admit that the July 2001 Safety Update Report referenced in the third sentence of paragraph 159 exists and refer to the document for its contents.

160.     Defendants deny the averments set forth in paragraph 160 of the Complaint, except admit that the October 31, 2001 memorandum referenced in paragraph 160 exists and refer to the document for its contents.

161.     Defendants deny the averments set forth in paragraph 161 of the Complaint, except admit that the July 2001 Safety Update Report referenced in paragraph 161 exists and refer to the document for its contents.

162.     Defendants deny the averments set forth in paragraph 162 of the Complaint, except admit that the December 5, 2001 letter referenced in the second sentence of paragraph 162 exists and refer to the document for its contents.

163.     Defendants deny the averments set forth in paragraph 163 of the Complaint.

164.     Defendants deny the averments set forth in paragraph 164 of the Complaint, except admit that the *Journal of American Medical Association* published an article dated

April 16, 2008, authored by Drs. Bruce M. Psaty and Richard A. Kronmal and refer to the article for its contents.

165.    Defendants deny the averments set forth in paragraph 165 of the Complaint, except admit that the *Journal of American Medical Association* published an article dated April 16, 2008, authored by Drs. Bruce M. Psaty and Richard A. Kronmal and refer to the article for its contents.

166.    Defendants deny the averments set forth in paragraph 166 of the Complaint.

H.    **Defendants Successfully Keep Merck's Internal Conclusions About the True Significance of the VIGOR Results off VIOXX's Label**

167.    Defendants deny the averments set forth in paragraph 167 of the Complaint, except admit that the May 5, 2005 memorandum exists and refer to the document for its contents.

168.    Defendants deny the averments set forth in paragraph 168 of the Complaint, except admit that the May 5, 2005 memorandum exists and refer to the document for its contents.

169.    Defendants deny the averments set forth in paragraph 169 of the Complaint, except admit that the May 5, 2005 memorandum referenced in the first sentence of paragraph 169 exists and refer to the document for its contents.

170.    Defendants deny the averments set forth in paragraph 170 of the Complaint, except admit that the Vioxx label referenced in paragraph 170 exists and refer to the label for its contents.

171.    Defendants deny the averments set forth in paragraph 171 of the Complaint, except admit that the April 18, 2002 conference call transcript referenced in paragraph 171 exists and refer to the statement for its contents.

I.      **2003-2004: Merck Continues To Vigorously Defend VIOXX's Safety**

      1.      **October 2003: Merck Disparages the Brigham Study Findings, and Again Reassures the Public That VIOXX Is Safe**

172.    Defendants deny the averments set forth in paragraph 172 of the Complaint, except admit that the study abstract referenced in the second sentence of paragraph 172 exists and refer to the study for its actual language and full context.

173.    Defendants deny the averments set forth in paragraph 173 of the Complaint, except admit that *Reuters* published an article entitled "Merck to Cut 4,400 Jobs, Posts Flat Earnings" dated October 22, 2003, and refer to the article for its contents.

174.    Defendants deny the averments set forth in paragraph 174 of the Complaint, except admit that the study conducted by the Harvard-affiliated Brigham and Women's Hospital referenced in the first sentence of paragraph 174 exists and refer to the study for its actual language and full context, and admit that the *Wall Street Journal* published an article entitled "Vioxx Study Sees Heart-Attack Risk --- Merck Funded Research After Concerns Were Raised About Its Painkilling Drug" dated October 30, 2003, and refer to the article for its contents.

175.    Defendants deny the averments set forth in paragraph 175 of the Complaint, except admit that the *Wall Street Journal* published an article entitled "Vioxx Study Sees Heart-Attack Risk --- Merck Funded Research After Concerns Were Raised About Its Painkilling Drug" dated October 30, 2003, and admit that *American Health Line* re-reported the October 30, 2003 *Wall Street Journal* article on October 31, 2003, and refer to the articles for their contents.

176.    Defendants deny the averments set forth in paragraph 176 of the Complaint, except admit that the referenced publication of the study conducted by the Harvard-affiliated

Brigham and Women's Hospital exists and refer to the study for its actual language and full context.

177. Defendants deny the averments set forth in paragraph 177 of the Complaint, except admit that the *Wall Street Journal* published an article entitled "Merck Takes Author's Name Off Vioxx Study" dated May 18, 2004, and refer to the article for its contents.

178. Defendants deny the averments set forth in paragraph 178 of the Complaint, except admit that *Archives of Internal Medicine* published an article on January 24, 2005, and refer to the article for its contents.

2. **August 2004: Merck Disparages the Kaiser Study Findings, and Again Reassures the Public That VIOXX Is Safe**

179. Defendants deny the averments set forth in paragraph 179 of the Complaint, except admit that *Bloomberg News* published an article entitled "Merck's Vioxx Raises Heart Risk More Than Celebrex" dated August 25, 2004, and refer to the article for its contents, and admit that the Kaiser study referenced in paragraph 179 exists and refer to the study for its actual language and full context.

180. Defendants deny the averments set forth in paragraph 180 of the Complaint, except admit that Merck issued a press release dated August 26, 2004, and refer to the press release for its actual language and full context.

181. Defendants deny the averments set forth in paragraph 181 of the Complaint, except admit that Merck issued a press release dated August 26, 2004, and refer to the press release for its actual language and full context.

VII.    **THE FULL TRUTH EMERGES**

A.    **The September 2004 Withdrawal of VIOXX**

182.    Defendants deny the averments set forth in paragraph 182 of the Complaint, except state that the first sentence of paragraph 182 purports to quote a statement by Defendant Merck and refer to Merck's press release of August 26, 2004 for its contents, admit that on September 23, 2004, Merck was informed that the External Safety Monitoring Board (ESMB) had recommended that the APPROVe study be stopped, and admit and aver that on September 30, 2004, Merck announced that in the APPROVe study, a prospective, randomized, placebo-controlled clinical trial, there was an increased relative risk for confirmed cardiovascular events beginning after 18 months of treatment in patients taking Vioxx compared with those taking a placebo, and that, given the availability of alternative therapies and questions raised by the data from that trial, Merck concluded that a voluntary worldwide withdrawal of Vioxx best served the interests of patients.

183.    Defendants deny the averments set forth in paragraph 183 of the Complaint, except admit that the September 30, 2004 conference call statement referenced in paragraph 183 exists and refer to the statement for its contents.

184.    Defendants deny the averments set forth in paragraph 184 of the Complaint, except state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the characterizations of unspecified statements and opinions of analysts referenced in paragraph 184 of the Complaint.

(a)    Defendants deny the averments set forth in paragraph 184(a) of the Complaint, except aver that *Bloomberg News* published an article entitled "Merck to

Withdraw Vioxx Because of Heart Risks" dated September 30, 2004, and refer to the article for its contents.

(b)     Defendants deny the averments set forth in paragraph 184(b) of the Complaint, except admit that Morgan Stanley published a report on October 1, 2004, concerning Merck and refer to the report for its contents.

(c)     Defendants deny the averments set forth in paragraph 184(c) of the Complaint, except admit that Cathay Financial published a report on October 1, 2004, concerning Merck and refer to the report for its contents.

(d)     Defendants deny the averments set forth in paragraph 184(d) of the Complaint, except admit that Bear Stearns published a report on October 1, 2004, concerning Merck and refer to the report for its contents.

185.     Defendants deny the averments set forth in paragraph 185 of the Complaint, except state that these averments purport to describe prices of Merck stock, which are matters of public record, and refer to such public records.

## VIII.  **POST-CLASS PERIOD EVENTS**

186.     Defendants deny the averments set forth in paragraph 186 of the Complaint.

(a)     Defendants deny the averments set forth in paragraph 186(a) of the Complaint, except admit that the *Wall Street Journal* published an article entitled "New Vioxx Study Projects Cases Of Heart Attacks" dated October 6, 2004, and refer to the article for its contents.

(b)     Defendants deny the averments set forth in paragraph 186(b) of the Complaint, except admit that the *Wall Street Journal* published an article entitled "Warning

36

Signs: Emails Suggest Merck Knew Vioxx's Dangers at Early Stage" dated November 1, 2004, and refer to the article for its contents.

(c)     Defendants deny the averments set forth in paragraph 186(c) of the Complaint, except admit that *Fortune* magazine published an article entitled "Will Merck Survive Vioxx" dated November 1, 2004, and refer to the article for its contents.

(d)     Defendants deny the averments set forth in paragraph 186(d) of the Complaint, except admit that the November 18, 2004 testimony of Dr. Singh referenced in paragraph 186(d) exists and refer to the referenced testimony for its contents.

(e)     Defendants deny the averments set forth in paragraph 186(e) of the Complaint, except admit that the *New York Times* published an article entitled "Evidence in Vioxx Suits Shows Intervention by Merck Officials" dated April 24, 2005, and refer to the article for its contents.

(f)     Defendants deny the averments set forth in paragraph 186(f) of the Complaint, except admit that National Public Radio published a broadcast entitled "Conflicted Safety Panel Let Vioxx Study Continue" dated June 8, 2006, and refer to the broadcast for its contents.

(g)     Defendants deny the averments set forth in paragraph 186(g) of the Complaint, except admit that Merck issued a press release dated November 9, 2007, and refer to the press release for its contents.

(h)     Defendants deny the averments set forth in paragraph 186(h) of the Complaint, except admit that the *Journal of American Medical Association* published an article dated April 16, 2008, authored by Drs. Bruce M. Psaty and Richard A. Kronmal and refer to the article for its contents.

37

(i)     Defendants deny the averments set forth in paragraph 186(i) of the Complaint, except admit that Merck issued a press release dated November 22, 2011, and refer to the press release for its contents.

IX.    **MATERIALLY FALSE AND MISLEADING STATEMENTS**

187.    Defendants deny the averments set forth in paragraph 187 of the Complaint.

A.    **Materially False and Misleading Statements Made In Connection With VIOXX's Introduction to the Market**

188.    Defendants deny the averments set forth in paragraph 188 of the Complaint, except admit that Merck issued a press release dated May 21, 1999, and refer to the press release for its contents.

189.    Defendants deny the averments set forth in paragraph 189 of the Complaint.

B.    **Materially False and Misleading Statements Made During the Second Half of 1999**

190.    Defendants deny the averments set forth in paragraph 190 of the Complaint, except admit that Merck issued a press release dated October 25, 1999, and refer to the press release for its contents.

191.    Defendants deny the averments set forth in paragraph 191 of the Complaint.

192.    Defendants deny the averments set forth in paragraph 192 of the Complaint, except admit that Merck issued a press release dated November 23, 1999, and refer to the press release for its contents.

193.    Defendants deny the averments set forth in paragraph 193 of the Complaint.

C.    **Materially False and Misleading Statements Made in Connection with Defendants' Discussions of Merck's Fourth Quarter and Year-End 1999 Results**

194.    Defendants deny the averments set forth in paragraph 194 of the Complaint, except admit that the VIGOR study involving Vioxx exists and refer to the referenced study

for its actual conclusions and full text, and admit that the March 9, 2000 email referenced in the second sentence of paragraph 194 exists and refer to the document for its contents.

195.    Defendants deny the averments set forth in paragraph 195 of the Complaint, except admit that the March 9, 2000 email referenced in the first sentence of paragraph 195 exists and refer to the document for its contents, and admit that Merck filed the 1999 Form 10-K and admit that the referenced individual signed the 1999 Form 10-K and refer to the document for its contents.

196.    Defendants deny the averments set forth in paragraph 196 of the Complaint.

D.    **Merck and the Officer Defendants' Spring 2000 Statements Announcing the VIGOR Trial Results and Proffering their Purported Belief in the Naproxen Hypothesis**

197.    Defendants deny the averments set forth in paragraph 197 of the Complaint, except admit that Merck issued a press release dated March 27, 2000, and refer to the press release for its contents.

198.    Defendants deny the averments set forth in paragraph 198 of the Complaint.

199.    Defendants deny the averments set forth in paragraph 199 of the Complaint.

200.    Defendants deny the averments set forth in paragraph 200 of the Complaint, except state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the characterizations of unspecified statements and opinions of analysts and members of the press referenced in paragraph 200 of the Complaint.

(a)    Defendants deny the averments set forth in paragraph 200(a) of the Complaint, except admit that *Biotech Week* published an article entitled "Preliminary Results

of Gastrointestinal Outcomes Study Presented" dated April 12, 2000, and refer to the article for its contents.

      (b)     Defendants deny the averments set forth in paragraph 200(b) of the Complaint, except admit that J.P. Morgan issued a report on April 17, 2000, concerning Merck and refer to the report for its contents.

     201.    Defendants deny the averments set forth in paragraph 201 of the Complaint, except admit that *CNBC* and *Reuters* published reports on April 27, 2000, and refer to the reports for their contents.

     202.    Defendants deny the averments set forth in paragraph 202 of the Complaint, except admit that Merck issued a press release dated April 28, 2000, and refer to the press release for its contents.

     203.    Defendants deny the averments set forth in paragraph 203 of the Complaint.

     204.    Defendants deny the averments set forth in paragraph 204 of the Complaint.

     205.    Defendants deny the averments set forth in paragraph 205 of the Complaint, except state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the characterizations of unspecified statements and opinions of analysts referenced in paragraph 205 of the Complaint.

      (a)     Defendants deny the averments set forth in paragraph 205(a) of the Complaint, except admit that *Dow Jones* published a report on April 28, 2000, and refer to the report for its contents.

      (b)     Defendants deny the averments set forth in paragraph 205(b) of the Complaint, except admit that Lehman Brothers issued a report on April 28, 2000, concerning Merck and refer to the report for its contents.

       (c)     Defendants deny the averments set forth in paragraph 205(c) of the Complaint, except admit that Merrill Lynch issued a report on April 28, 2000, concerning Merck and refer to the report for its contents.

       (d)     Defendants deny the averments set forth in paragraph 205(d) of the Complaint.

       (e)     Defendants deny the averments set forth in paragraph 205(e) of the Complaint, except admit that Bernstein issued a report on May 1, 2000, concerning Merck and refer to the report for its contents.

       (f)     Defendants deny the averments set forth in paragraph 205(f) of the Complaint, except admit that Goldman Sachs issued a report on May 2, 2000, concerning Merck and refer to the report for its contents.

    206.    Defendants deny the averments set forth in paragraph 206 of the Complaint, except admit that Merck issued a press release dated May 24, 2000 and refer to the press release for its contents.

    207.    Defendants deny the averments set forth in paragraph 207 of the Complaint.

    208.    Defendants deny the averments set forth in paragraph 208 of the Complaint, except admit that the Digestive Disease Week presentation referenced in the first sentence of paragraph 208 of the Complaint exists and refer to the presentation for its contents, and state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the characterizations of unspecified statements and opinions of analysts referenced in the third sentence of paragraph 208 of the Complaint.

(a)     Defendants deny the averments set forth in paragraph 208(a) of the Complaint, except admit that J.P. Morgan published a report on May 24, 2000, concerning Merck and refer to the report for its contents.

(b)     Defendants deny the averments set forth in paragraph 208(b) of the Complaint, except admit that Morgan Stanley Dean Witter published a report on May 25, 2000, concerning Merck and refer to the report for its contents.

(c)     Defendants deny the averments set forth in paragraph 208(c) of the Complaint, except admit that Bernstein published a report on June 13, 2000, concerning Merck and refer to the report for its contents.

209.     Defendants deny the averments set forth in paragraph 209 of the Complaint.

210.     Defendants deny the averments set forth in paragraph 210 of the Complaint, except admit that the May 25, 2000 email referenced in the second sentence of paragraph 210 exists and refer to the document for its contents.

211.     Defendants deny the averments set forth in paragraph 211 of the Complaint, except admit that Merck issued a press release dated June 29, 2000, and refer to the press release for its contents, and state that these averments purport to describe prices of Merck stock, which are matters of public record, and refer to such public records.

**E.     Materially False and Misleading Statements Made During the Second Half of 2000**

212.     Defendants deny the averments set forth in paragraph 212 of the Complaint, except admit that the *New England Journal of Medicine* published an article on November 23, 2000 and refer to the article for its actual conclusions and full text.

213.     Defendants deny the averments set forth in paragraph 213 of the Complaint.

214.     Defendants deny the averments set forth in paragraph 214 of the Complaint.

215.     Defendants deny the averments set forth in paragraph 215 of the Complaint, except admit that Merck issued a press release dated February 8, 2001, and refer to the press release for its contents.

216.     Defendants deny the averments set forth in paragraph 216 of the Complaint, except admit that the referenced February 8, 2001 presentation before the FDA exists and refer to the presentation for its contents, admit that *Bloomberg News* published an article entitled "Merck Drug Should Note Heart Risk, Stomach Benefit, Panel Says" dated February 8, 2001, and refer to the article for its contents, and admit that J.P. Morgan issued a report on February 2, 2001, concerning Merck and refer to the report for its contents.

217.     Defendants deny the averments set forth in paragraph 217 of the Complaint.

218.     Defendants deny the averments set forth in paragraph 218 of the Complaint, except admit that Merck issued a press release dated April 10, 2001, and refer to the press release for its contents.

219.     Defendants deny the averments set forth in paragraph 219 of the Complaint.

220.     Defendants deny the averments set forth in paragraph 220 of the Complaint, except admit that Lehman Brothers issued a report on April 11, 2001, concerning Merck and refer to the report for its contents.

221.     Defendants deny the averments set forth in paragraph 221 of the Complaint, except admit that Merck issued a press release dated May 22, 2001, and refer to the press release for its contents.

222.     Defendants deny the averments set forth in paragraph 222 of the Complaint, except admit that Merck issued a press release dated May 29, 2001, and refer to the press release for its contents.

43

223.    Defendants deny the averments set forth in paragraph 223 of the Complaint.

224.    Defendants deny the averments set forth in paragraph 224 of the Complaint, except admit that Merck issued a press release dated June 13, 2001, and refer to the press release for its contents.

225.    Defendants deny the averments set forth in paragraph 225 of the Complaint.

F.    **Materially False and Misleading Statements Made During the Second Half of 2001**

226.    Defendants deny the averments set forth in paragraph 226 of the Complaint, except admit that Merck issued a press release dated July 20, 2001, and refer to the press release for its contents.

227.    Defendants deny the averments set forth in paragraph 227 of the Complaint.

228.    Defendants deny the averments set forth in paragraph 228 of the Complaint, except admit that the *Journal of American Medical Association* published an article dated August 22/29, 2001, authored by Drs. Debabrata Mukherjee, Steven E. Nissen, and Eric J. Topol and refer to the article for its contents.

229.    Defendants deny the averments set forth in paragraph 229 of the Complaint, except admit that *Bloomberg News* published an article entitled "Merck, Pharmacia Pain Drugs Tied to Heart Attacks, Study Finds" dated August 21, 2001, and refer to the article for its contents.

230.    Defendants deny the averments set forth in paragraph 230 of the Complaint, except admit that Merck issued a press release dated August 23, 2001, and refer to the press release for its contents, and admit that Merck sent a letter regarding Vioxx to physicians in August 2001 and refer to the referenced letter for its actual language and full context.

231.    Defendants deny the averments set forth in paragraph 231 of the Complaint.

232.    Defendants deny the averments set forth in paragraph 232 of the Complaint, except state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in the first sentence of paragraph 232 of the Complaint, and admit that Credit Suisse First Boston published a report on August 22, 2001, concerning Merck and refer to the report for its contents.

233.    Defendants deny the averments set forth in paragraph 233 of the Complaint, except admit that *Bloomberg News* published an article entitled "Merck Misrepresents Safety of Vioxx, FDA Says in Warning Letter" dated September 24, 2001, and refer to the article for its contents.

234.    Defendants deny the averments set forth in paragraph 234 of the Complaint.

235.    Defendants deny the averments set forth in paragraph 235 of the Complaint, except admit that the *New York Times* published an article entitled "For Pain Reliever, Questions of Risk Remain Unresolved" dated October 9, 2001, and refer to the article for its contents.

236.    Defendants deny the averments set forth in paragraph 236 of the Complaint.

237.    Defendants deny the averments set forth in paragraph 237 of the Complaint.

238.    Defendants deny the averments set forth in paragraph 238 of the Complaint, except admit that Merck issued a press release dated December 11, 2001, and refer to the press release for its contents and admit that *Bloomberg News* published an article entitled "Merck to Study Cardiovascular Risk in Vioxx and Successor Drug" dated December 11, 2001, and refer to the article for its contents.

239.    Defendants deny the averments set forth in paragraph 239 of the Complaint.

**H.  Materially False and Misleading Statements Made During the First Half of 2002**

240.   Defendants deny the averments set forth in paragraph 240 of the Complaint.

241.   Defendants deny the averments set forth in paragraph 241 of the Complaint, except admit that the *New York Times* published an article entitled "Merck Canceled an Early Study of Vioxx" dated February 8, 2005, and refer to the article for its contents.

242.   Defendants deny the averments set forth in paragraph 242 of the Complaint, except admit that the *New York Times* published an article entitled "Merck Canceled an Early Study of Vioxx" dated February 8, 2005, and refer to the article for its contents.

243.   Defendants deny the averments set forth in paragraph 243 of the Complaint, except admit that the *New York Times* published an article entitled "Merck Canceled an Early Study of Vioxx" dated February 8, 2005, and refer to the article for its contents

244.   Defendants deny the averments set forth in paragraph 244 of the Complaint, except admit that Merck issued a press release dated April 11, 2002, and refer to the press release for its contents.

245.   Defendants deny the averments set forth in paragraph 245 of the Complaint.

246.   Defendants deny the averments set forth in paragraph 246 of the Complaint.

247.   Defendants deny the averments set forth in paragraph 247 of the Complaint, except state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning unspecified statements and opinions of analysts and other financial market participants referenced in paragraph 247 of the Complaint.

248.    Defendants deny the averments set forth in paragraph 248 of the Complaint, except admit that the Vioxx label referenced in paragraph 248 exists and refer to the label for its contents.

249.    Defendants deny the averments set forth in paragraph 249 of the Complaint, except admit that on April 11, 2002, the FDA approved label revisions based upon the VIGOR results and refer to the label for its contents.

250.    Defendants deny the averments set forth in paragraph 250 of the Complaint.

251.    Defendants deny the averments set forth in paragraph 251 of the Complaint, except admit that the April 18, 2002 conference call statement referenced in paragraph 251 exists and refer to the statement for its contents.

252.    Defendants deny the averments set forth in paragraph 252 of the Complaint.

I.      **Materially False and Misleading Statements Made During the Second Half of 2002**

253.    Defendants deny the averments set forth in paragraph 253 of the Complaint, except admit that the October 18, 2002 conference call statement referenced in paragraph 253 exists and refer to the statement for its contents.

254.    Defendants deny the averments set forth in paragraph 254 of the Complaint.

J.      **Materially False and Misleading Statements Made During the Second Half of 2003**

255.    Defendants deny the averments set forth in paragraph 255 of the Complaint, except admit that the Vioxx label referenced in paragraph 255 exists and refer to the label for its contents.

256.    Defendants deny the averments set forth in paragraph 256 of the Complaint, except admit that the *Wall Street Journal* published an article entitled "Vioxx Study Sees

Heart-Attack Risk --- Merck Funded Research After Concerns Were Raised About Its
Painkilling Drug" dated October 30, 2003, and refer to the article for its contents.

257.     Defendants deny the averments set forth in paragraph 257 of the Complaint.

258.     Defendants deny the averments set forth in paragraph 258 of the Complaint,
except admit that the *Wall Street Journal* published an article entitled "Merck Stands Behind
the Safety of Vioxx" dated November 5, 2003, and refer to the article for its contents.

259.     Defendants deny the averments set forth in paragraph 259 of the Complaint.

K.     **Materially False and Misleading Statements Made During the First Half
of 2004**

260.     Defendants deny the averments set forth in paragraph 260 of the Complaint,
except admit that *Bloomberg News* published an article entitled "Merck's Vioxx May Carry
Risk of Heart Attack, Researchers Say" dated March 10, 2004, and refer to the article for its
contents.

261.     Defendants deny the averments set forth in paragraph 261 of the Complaint.

262.     Defendants deny the averments set forth in paragraph 262 of the Complaint,
except admit that the Vioxx label referenced in paragraph 262 exists and refer to the label
for its contents.

L.     **Materially False and Misleading Statements Made During the Second
Half of 2004**

263.     Defendants deny the averments set forth in paragraph 263 of the Complaint,
except admit that Merck issued a press release dated August 26, 2004, and refer to the press
release for its contents.

264.     Defendants deny the averments set forth in paragraph 264 of the Complaint.

265.     Defendants deny the averments set forth in paragraph 265 of the Complaint, except admit that the *San Jose Mercury News* published an article entitled "Arthritis Drug Linked to Higher Heart Risks; Kaiser, Other Insurers to Reconsider Its Use" dated August 27, 2004, and refer to the article for its contents.

266.     Defendants deny the averments set forth in paragraph 266 of the Complaint, except admit and aver that on September 30, 2004, Merck announced that in the APPROVe study, a prospective, randomized, placebo-controlled clinical trial, there was an increased relative risk for confirmed cardiovascular events beginning after 18 months of treatment in patients taking Vioxx compared with those taking a placebo, and that, given the availability of alternative therapies and questions raised by the data from that trial, Merck concluded that a voluntary worldwide withdrawal of Vioxx best served the interests of patients, and admit that Merck issued a press release dated September 30, 2004, and refer to the press release for its contents.

267.     Defendants deny the averments set forth in paragraph 267 of the Complaint, except admit that the September 30, 2004 conference call statement referenced in paragraph 267 exists and refer to the statement for its contents.

X.     **ADDITIONAL SCIENTER ALLEGATIONS**

268.     Defendants deny the averments set forth in paragraph 268 of the Complaint.

269.     Defendants deny the averments set forth in paragraph 269 of the Complaint.

(A)     Defendants deny the averments set forth in paragraph 269(A) of the Complaint.

(B)     Defendants deny the averments set forth in paragraph 269(B) of the Complaint, except admit that an email string beginning on

February 23, 1997 referenced in paragraph 269(B) exists and refer to the document for its contents.

(C)     Defendants deny the averments set forth in paragraph 269(C) of the Complaint, except admit that an email string beginning on February 23, 1997 referenced in paragraph 269(C) exists and refer to the document for its contents.

(D)     Defendants deny the averments set forth in paragraph 269(D) of the Complaint, except admit that an email string beginning on February 23, 1997 referenced in paragraph 269(D) exists and refer to the document for its contents.

(E)     Defendants deny the averments set forth in paragraph 269(E) of the Complaint.

(F)     Defendants deny the averments set forth in paragraph 269(F) of the Complaint.

(G)     Defendants deny the averments set forth in paragraph 269(G) of the Complaint.

(H)     Defendants deny the averments set forth in paragraph 269(H) of the Complaint.

(I)     Defendants deny the averments set forth in paragraph 269(I) of the Complaint.

(J)     Defendants deny the averments set forth in paragraph 269(J) of the Complaint.

50

(K)     Defendants deny the averments set forth in paragraph 269(K) of the
        Complaint.

(L)     Defendants deny the averments set forth in paragraph 269(L) of the
        Complaint.

(M)     Defendants deny the averments set forth in paragraph 269(M) of the
        Complaint.

(N)     Defendants deny the averments set forth in paragraph 269(N) of the
        Complaint, except admit and aver that the February 11, 2000 email
        referenced in paragraph 269(N) exists and refer to the document for its
        contents.

(O)     Defendants deny the averments set forth in paragraph 269(O) of the
        Complaint.

(P)     Defendants deny the averments set forth in paragraph 269(P) of the
        Complaint.

(Q)     Defendants deny the averments set forth in paragraph 269(Q) of the
        Complaint.

(R)     Defendants deny the averments set forth in paragraph 269(R) of the
        Complaint.

(S)     Defendants deny the averments set forth in paragraph 269(S) of the
        Complaint.

(T)     Defendants deny the averments set forth in paragraph 269(T) of the
        Complaint.

(U)    Defendants deny the averments set forth in paragraph 269(U) of the Complaint.

(V)    Defendants deny the averments set forth in paragraph 269(V) of the Complaint.

270.    Defendants deny the averments set forth in paragraph 270 of the Complaint, except admit that the April 29, 1999 email referenced in the third sentence of paragraph 270 exists and refer to the document for its contents.

271.    Defendants deny the averments set forth in paragraph 271 of the Complaint, except admit that the July 23, 1999 email referenced in the first sentence of paragraph 271 exists and refer to the document for its contents.

272.    Defendants deny the averments set forth in paragraph 272 of the Complaint, except admit that the *Journal of American Medical Association* published an article dated April 16, 2008, authored by Drs. Bruce M. Psaty and Richard A. Kronmal and refer to the article for its contents, and admit that the January 27, 2004 email referenced in the third sentence of paragraph 272 exists and refer to the document for its contents.

273.    Defendants deny the averments set forth in paragraph 273 of the Complaint, except admit that the *New York Times* published an article entitled "Evidence in Vioxx Suits Shows Intervention by Merck Officials" dated April 24, 2005, and refer to the article for its contents.

274.    Defendants deny the averments set forth in paragraph 274 of the Complaint.

(A)    Defendants deny the averments set forth in paragraph 274(A) of the Complaint.

    (B)    Defendants deny the averments set forth in paragraph 274(B) of the Complaint.

    (C)    Defendants deny the averments set forth in paragraph 274(C) of the Complaint.

    (D)    Defendants deny the averments set forth in paragraph 274(D) of the Complaint.

    (E)    Defendants deny the averments set forth in paragraph 274(E) of the Complaint.

    (F)    Defendants deny the averments set forth in paragraph 274(F) of the Complaint.

    (G)    Defendants deny the averments set forth in paragraph 274(G) of the Complaint.

    (H)    Defendants deny the averments set forth in paragraph 274(H) of the Complaint.

275.    Defendants deny the averments set forth in paragraph 275 of the Complaint.

276.    Defendants deny the averments set forth in paragraph 276 of the Complaint.

277.    Defendants deny the averments set forth in paragraph 277 of the Complaint, except admit that the 1999-2003 proxy statements referenced in the third and fourth sentences of paragraph 277 exist and refer to the documents for their content.

278.    Defendants deny the averments set forth in paragraph 278 of the Complaint, except admit that the 2004 proxy statement exists and refer to the document for its contents.

279.    Defendants deny the averments set forth in paragraph 279 of the Complaint.

280.   Defendants deny the averments set forth in paragraph 280 of the Complaint, except admit that Defendant Scolnick sold Merck stock on one or more occasions during the period of May 21, 1999 to September 29, 2004.

281.   Defendants deny the averments set forth in paragraph 281 of the Complaint.

282.   Defendants deny the averments set forth in paragraph 282 of the Complaint.

283.   Defendants deny the averments set forth in paragraph 283 of the Complaint.

XI.   **LOSS CAUSATION**

284.   Defendants deny the averments set forth in paragraph 284 of the Complaint.

285.   Defendants deny the averments set forth in paragraph 285 of the Complaint.

286.   Defendants deny the averments set forth in paragraph 286 of the Complaint, except admit that *Reuters* published an article entitled "Merck to Cut 4,400 Jobs, Posts Flat Earnings" dated October 22, 2003, and refer to the article for its contents, admit that the *Wall Street Journal* published an article entitled "Vioxx Study Sees Heart-Attack Risk --- Merck Funded Research After Concerns Were Raised About Its Painkilling Drug" dated October 30, 2003, and refer to the article for its contents, admit that Credit Suisse First Boston issued a report on October 22, 2003, concerning Merck and refer to the report for its contents, and state that these averments purport to describe prices of Merck stock, which are matters of public record, and refer to such public records.

287.   Defendants deny the averments set forth in paragraph 287 of the Complaint, except state that these averments purport to describe prices of Merck stock, which are matters of public record, and refer to such public records, and state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations

concerning the characterizations of unspecified statements and opinions of analysts and investors referenced in paragraph 287 of the Complaint.

XII.   **INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

288.   Defendants deny the averments set forth in paragraph 288 of the Complaint.

289.   Defendants deny the averments set forth in paragraph 289 of the Complaint.

XIII.   **PRESUMPTION OF RELIANCE**

290.   Defendants deny the averments set forth in paragraph 290 of the Complaint, except refer to *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) for its contents.

291.   Defendants deny the averments set forth in paragraph 291 of the Complaint.

   i.   Defendants deny the averments set forth in paragraph 291(i) of the Complaint.

   ii.   Defendants deny the averments set forth in paragraph 291(ii) of the Complaint, except admit that Merck stock was traded on the New York Stock Exchange.

   iii.   Defendants deny the averments set forth in paragraph 291(iii) of the Complaint, except admit that certain outside analysts covered Merck.

   iv.   Defendants deny the averments set forth in paragraph 291(iv) of the Complaint, except state that these averments purport to describe prices of Merck stock, which are matters of public record, and refer to such public records.

   v.   Defendants deny the averments set forth in paragraph 291(v) of the Complaint, except admit that Merck made various disclosures to the public.

vi.  Defendants deny the averments set forth in paragraph 291(vi) of the Complaint, except admit that Merck filed periodic public reports with the SEC.

vii.  Defendants admit that Merck met the SEC's requirements for filing a Form S-3 registration statement during the period of May 21, 1999 to September 29, 2004.

viii.  Defendants admit that Moody's, Standard & Poor's and Fitch Ratings rated Merck securities during the period of May 21, 1999 to September 29, 2004.

292.  Defendants deny the averments set forth in paragraph 292 of the Complaint, except state that they are without knowledge or information sufficient to form a belief as to the truth of the averments concerning the market's "digest[ion]" of information.

293.  Defendants deny the averments set forth in paragraph 293 of the Complaint.

XIV.  **CLAIMS FOR RELIEF**

**COUNT ONE**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Merck and the Officer Defendants**

294.  Defendants repeat and incorporate by reference their answers to paragraphs 1 through 293 of the Complaint as if fully set forth herein.

295.  Defendants deny the averments set forth in paragraph 295 of the Complaint.

296.  Defendants deny the averments set forth in paragraph 296 of the Complaint.

297.  Defendants deny the averments set forth in paragraph 297 of the Complaint.

298.  Defendants deny the averments set forth in paragraph 298 of the Complaint.

299.  Defendants deny the averments set forth in paragraph 299 of the Complaint.

300.     Defendants deny the averments set forth in paragraph 300 of the Complaint.

301.     Defendants deny the averments set forth in paragraph 301 of the Complaint.

302.     Defendants deny the averments set forth in paragraph 302 of the Complaint.

303.     Defendants deny the averments set forth in paragraph 303 of the Complaint.

304.     Defendants deny the averments set forth in paragraph 304 of the Complaint.

305.     Defendants deny the averments set forth in paragraph 305 of the Complaint.

306.     Defendants deny the averments set forth in paragraph 306 of the Complaint.

307.     Defendants deny the averments set forth in paragraph 307 of the Complaint.

## COUNT TWO

### Violation of Section 20(a) of the Exchange Act Against The Officer Defendants

308.     Defendant Reicin (the "Count II Defendant") repeats and incorporates by reference her answers to paragraphs 1 through 307 of the Complaint as if fully set forth herein.

309.     Count II Defendant denies the averments set forth in paragraph 309 of the Complaint.

310.     Count II Defendant denies the averments set forth in paragraph 310 of the Complaint.

311.     Count II Defendant denies the averments set forth in paragraph 311 of the Complaint.

## COUNT THREE

### Violations of Section 10(b) and 20A of the Exchange Act And Rule 10b-5 Promulgated Thereunder by Defendant Scolnick For Insider Trading

312.     Count III is not alleged against answering Defendants; therefore, no response is required.

313.    Count III is not alleged against answering Defendants; therefore, no response is required.

314.    Count III is not alleged against answering Defendants; therefore, no response is required.

315.    Count III is not alleged against answering Defendants; therefore, no response is required.

316.    Count III is not alleged against answering Defendants; therefore, no response is required.

317.    Count III is not alleged against answering Defendants; therefore, no response is required.

318.    Count III is not alleged against answering Defendants; therefore, no response is required.

319.    Count III is not alleged against answering Defendants; therefore, no response is required.

320.    Count III is not alleged against answering Defendants; therefore, no response is required.

XV.    **PRAYER FOR RELIEF**

Defendants state that the unnumbered wherefore clause and the paragraphs following paragraph 320 of the Complaint are a prayer for relief to which no response is required. Defendants aver, however, that Plaintiffs are entitled to no relief, and that judgment should be entered in all Defendants' favor on all Counts of the Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

Defendants assert the following affirmative and other defenses.  In asserting

these defenses, Defendants do not assume the burden of proof with respect to any issue as to

which applicable law places the burden of proof upon Plaintiffs.

### FIRST DEFENSE

The Complaint, and each and every claim stated therein, fails to state a claim

upon which relief can be granted.

### SECOND DEFENSE

The Complaint fails to plead fraud with the particularity required by Rule 9(b)

of the Federal Rules of Civil Procedure and the Private Litigation Securities Reform Act of

1995, 15 U.S.C. § 78u-4(b)(1), and otherwise fails properly to identify the alleged false or

misleading statements of which Plaintiffs complain.

### THIRD DEFENSE

The alleged misstatements and/or omissions are protected from liability under

the available statutory safe harbors, including the safe harbor for forward-looking statements.

### FOURTH DEFENSE

The Complaint fails to state with particularity facts that give rise to a strong

inference of scienter, as required by 15 U.S.C. § 78u-4(b)(2)-(3).

### FIFTH DEFENSE

Plaintiffs and any persons on whose behalf Plaintiffs purport to act did not

rely, or could not have reasonably or justifiably relied, upon the alleged misstatements or

omissions alleged in the Complaint.

## SIXTH DEFENSE

Defendants are not liable because they did not make a false or misleading statement of material fact or omission of material fact on which Plaintiffs relied and they are not responsible (in law or in fact) for any alleged false or misleading statements or omissions of material fact by others on which Plaintiffs are alleged to have relied.

## SEVENTH DEFENSE

Defendants are not liable because the alleged misrepresentations and omissions on which Plaintiffs base their claims were not material.

## EIGHTH DEFENSE

Defendants are not liable because certain alleged misstatements about which Plaintiffs complain concern nonactionable matters of opinion, or are puffery or soft information, rather than matters of material fact and because certain of the alleged misstatements were forward-looking and contained sufficient cautionary language and risk disclosure to be nonactionable under the Private Securities Litigation Reform Act and the bespeaks caution doctrine.

## NINTH DEFENSE

Defendants are not liable under Section 10(b) of the Securities Exchange Act of 1934, or Rule 10b-5 promulgated thereunder, for any statements not made by the Merck Defendants.

## TENTH DEFENSE

Plaintiffs, and any persons on whose behalf Plaintiffs purport to act, knowingly and/or recklessly assumed the risk of purchasing the securities described in the Complaint and such was the cause of their alleged damages.

## ELEVENTH DEFENSE

At all times, and with respect to all matters contained herein, Defendants acted in good faith, exercised reasonable care and did not know, and in the exercise of reasonable care could not have known, of the purported untruths, misstatements and/or omissions alleged in the Complaint.

## TWELFTH DEFENSE

Defendants are not liable because Plaintiffs knew or had reason to know of the truth of the alleged misrepresentations or omissions on which their claims are based.

## THIRTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the allegedly withheld information was known to the market.

## FOURTEENTH DEFENSE

Defendants are not liable because the alleged misrepresentations and omissions alleged in the Complaint did not affect the market price of Merck's securities.

## FIFTEENTH DEFENSE

Defendants are not liable because any losses suffered by Plaintiffs were not causally related to the misstatements alleged by Plaintiffs.

## SIXTEENTH DEFENSE

Defendant Reicin is not liable because the alleged misrepresentations or omissions by Defendant Reicin were based on good faith, and in reasonable reliance upon the work, opinions, information, representations and advice of others upon whom Defendant Reicin was entitled to rely.

## SEVENTEENTH DEFENSE

Defendant Reicin was not a "controlling persons" of Merck within the meaning of Section 20 of the Securities Exchange Act of 1934.

## EIGHTEENTH DEFENSE

Plaintiffs' claims are barred by the applicable statute of limitations.

## NINETEENTH DEFENSE

This action may not properly be maintained as a class action.

## TWENTIETH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

## TWENTY FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

## TWENTY SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, by reason of waiver.

## TWENTY THIRD DEFENSE

Defendants adopt and incorporate by reference any and all other defenses asserted or to be asserted by any other defendant to the extent Merck and Defendant Reicin may share in such defense.

## TWENTY FOURTH DEFENSE

Defendants reserve the right to raise any additional defenses not asserted herein of which they become aware through discovery or other investigation.

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray for judgment as follows:

1.    Dismissing with prejudice Plaintiffs' Complaint against them in its entirety; and

2.      For such other and further relief as the Court deems just and proper,

including, but not limited to, costs, disbursements and reasonable attorneys' fees incurred by

them in defending this action plus interest on any sums awarded thereunder.

July 1, 2013

CRAVATH, SWAINE & MOORE LLP

By

Evan R. Chesler
Robert H. Baron
Karin A. DeMasi

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

HUGHES HUBBARD & REED LLP
William R. Stein
Eric S. Parnes
1775 I Street, NW
Washington, DC 20006-2401
(202) 721-4600

*Counsel for Defendants Merck & Co.,
Inc. and Alise S. Reicin*

# EXHIBIT N

ORIGINAL

Southern District of Ga.
Filed in Office
_1:25_ P. M.
Nov 30 19 99
B. How
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| JILL MOCK NEVIL, et. al. | ) | CIVIL ACTION NO. CV294-15 |
| Plaintiffs, | ) | |
| | ) | DEFENDANT GENERAL TIRE, |
| v. | ) | INC.'S, MOTION FOR SANCTIONS |
| | ) | AND/OR MOTION TO SHOW |
| FORD MOTOR COMPANY, et. al. | ) | CAUSE WHY DENNIS CARLSON |
| Defendants. | ) | SHOULD NOT BE HELD IN |
| | ) | CONTEMPT |

Comes Now Dennis Carlson and responds to the motion as follows:

1.

Dennis Carlson has not made any non-permitted disclosures.

2.

The existent of the document which Dennis Carlson referred to is not privileged and is in fact listed as Exhibit 413 in the pretrial order in this case.

3.

He testified truthfully under oath as he was obligated to do. He spoke in general terms about what he read and did not disclose the identity of the manufacturer who generated it until asked specifically by defense counsel.

4.

He gave out no useful or harmful information regarding the document.

5.

General Tire has no right to hide from the public or any litigants the existence of the document in question.

6.

It is general knowledge that tread belt separations are lessened by nylon cap plys.

7.

Dennis Carlson has discharged in Chapter 7 for any claims of General Tire.

Accordingly, Dennis Carlson prays that the motion be dismissed.

This 30 day of November, 1999.

Killian & Boyd, P.C.

By:

Robert P. Killian
Georgia State Bar No.: 417575

506 Monk Street
Brunswick, Georgia 31520
phone (912) 265-5063
fax (912) 265-1209

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

This is to certify that I have this date served the within **Response to Motion** on the

Defendants by placing a copy of same by hand delivery to John Bumgartner.

This 30th day of November, 1999.

By: _____

Robert P. Killian

# EXHIBIT O

**ORIGINAL**

FILED
U.S. DIST COUR
BRU'

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

JILL MOCK NEVIL,                    )
                                    )
          Plaintiff,                )
                                    )
v.                                  )   CIVIL ACTION
                                    )   FILE NO. CV294-15
FORD MOTOR COMPANY and              )
GENERAL TIRE, INC.,                 )
                                    )
          Defendants.               )

### PROTECTIVE ORDER

Upon stipulation of the parties, it is hereby ordered
that all documents and other material produced by defendant
General Tire, Inc. ("General Tire"), voluntarily or by Order of
the Court, have been and will be produced under the following
conditions:

I.

A.   The parties recognize that discovery in this matter
may call for the production of materials containing confidential
and proprietary business information and other commercially
sensitive information of General Tire, and that General Tire has
a protected proprietary and property interest in those materials.

B.   Defendant General Tire shall designate those
documents and other material deemed to contain confidential or
proprietary information by stamping, marking, or otherwise
identifying such material as "Confidential Material." Such
designation shall make such items and all copies, prints,
summaries, or other reproductions of such material subject to
this Order.

C. When used in this Order, the word "Confidential"
means General Tire trade secrets, research, development and other
proprietary information.

D. When used in this Order, the term "Confidential
Material" means all written materials, computer documents,
videotapes, answers to interrogatories, responses to requests for
production, deposition transcripts and all other tangible items
which disclose "Confidential" information. In the case of a
deposition or oral examination, counsel for General Tire may,
during the deposition, designate that testimony involving
Confidential Material be held as Confidential. In that event,
the court reporter will transcribe such questions and answers
apart from the regular transcript and submit them directly to the
Court under seal.

E. Documents which have been produced by General Tire
to any governmental agency or body such as the National Highway
Traffic Safety Administration ("NHTSA") at any time, and deemed
by that agency or body to be confidential pursuant to 49 CFR
§ 512 or other similar regulations, constitute Confidential
Material for the purposes of this Protective Order and are, as
such, covered by its terms.

F. When used in this Order, the term "Covered Persons"
includes only the following: (1) the named Plaintiff and
Defendants, other than General Tire in this litigation; (2) the
named counsel for all parties other than General Tire in this
litigation, including members of counsel's legal or support staff

2

(e.g., in-house investigators, secretaries, legal assistants, paralegals and law clerks), to the extent reasonably necessary for such persons to render assistance in this litigation; (3) experts retained or consulted by counsel for any party other than General Tire to assist in the preparation, prosecution, or evaluation of this litigation; (4) other attorneys representing claimants or plaintiffs in cases either pending or under investigation and allegedly involving an in-service failure of a GT52S tire.

## II.

Absent a further order of the Court, those documents marked as Confidential Material, as described in paragraph IA, shall not be used for any purpose other than the prosecution or defense of this captioned action, and shall not be shown, disseminated or disclosed in any matter to anyone other than covered persons without the prior written agreement of General Tire or order of the Court after due notice to General Tire.

## III.

Before showing or divulging the contents of any Confidential Material or Confidential information to any covered person, counsel shall first obtain from each such person a signed "Written Assurance" in the form attached hereto as Exhibit "A." Counsel shall maintain a list of all such recipients of Confidential Material to whom this paragraph applies and the original of all Written Assurances required pursuant to this paragraph. Counsel shall provide this list and/or copies of the

3

Written Assurances to General Tire upon written request. However, parties shall not be required to disclose the actual identity of any expert retained or consulted by the party until it is determined that such expert will be a witness at trial. All "consulting" experts shall be required to execute the Written Assurance and counsel shall forward same to counsel for General Tire, along with all materials provided, at the conclusion of the litigation.

IV.

Information and documents subject to this Order and any duplicates thereof may not be used for any purpose other than the prosecution of this lawsuit or similar lawsuits as described in paragraph I.F(4) above.

V.

A.    If any Confidential Material is filed with this Court, including any pleading incorporating Confidential Material, it shall be filed in a sealed envelope on which the following legend shall prominently appear:

> JILL MOCK NEVIL v. FORD MOTOR COMPANY and GENERAL TIRE, INC., Civil Action No. CV294-15:  Confidential - This envelope contains documents or other material filed by [name of party]; it shall not be opened nor the contents thereof displayed or revealed except by the Order of this Court.

B.    Confidential Material may be introduced into evidence, if otherwise admissible, provided that plaintiff shall provide General Tire ten (10) days prior notice of its intent so

4

that General Tire may have adequate opportunity to seek _in camera_
treatment of such documents.

### VI.

At the conclusion of this litigation, all Confidential
Material shall be returned to General Tire through its counsel of
record.

### VII.

In the event counsel for any party, in good faith,
disputes the designation of any document as Confidential, he or
she shall notify counsel for General Tire in writing. General
Tire shall then seasonably apply to the Court for a determination
that the document is protected pursuant to F.R.C.P. 26(c). Until
a final determination by the Court, any disputed document will be
treated as Confidential Material pursuant to this Protective
Order.

### VIII.

This Order shall not preclude the parties from
exercising any rights or raising any objections otherwise
available to them under the rules of discovery and evidence.

MAGISTRATE Judge Presiding

Augut 5, 1994
Date

5

STIPULATED TO:

By: _____

Brinson Williams
JONES, OSTEEN, JONES & ARNOLD
Post Office Box 800
Hinesville, GA    31313

ATTORNEY FOR PLAINTIFF

By: _____

Ms. M. Diane Owens
LONG, WEINBERG, ANSLEY & WHEELER
999 Peachtree St., N.E., Suite 2700
Atlanta, GA    30309

ATTORNEY FOR FORD MOTOR COMPANY

By: _____

John E. Bumgartner
WHELCHEL, BROWN, READDICK & BUMGARTNER
Post Office Box 220
Brunswick, GA    31521

ATTORNEY FOR GENERAL TIRE, INC.