## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX ) | **MDL NO. 1657** |
| ) | |
| **PRODUCTS LIABILITY LITIGATION** ) | **SECTION: L** |
| ) | |
| ) | **JUDGE FALLON** |
| **THIS DOCUMENT RELATES TO:** ) | |
| *Com. of Kentucky v. Merck & Co., Inc.,* ) | |
| **No. 09-CI-1671 (Franklin Cir. Ct.)** ) | |
| ) | |
| **And formerly No. 2:10-cv-1115 (E.D. La.)** ) | |

## MERCK'S COMBINED REPLY IN SUPPORT OF ITS
## MOTION FOR SANCTIONS AGAINST DR. DAVID EGILMAN

Merck's motion is based on a simple fact:  Dr. Egilman promised that he would abide by the Protective Order entered by this Court (*see* PTO 13 ¶¶ 10(e), 12 ("Protective Order") (attached to Mot. as Ex. 1)), but then proceeded to break that promise by leaking confidential information to a reporter from the *Wall Street Journal*.  As summarized by that reporter, after Dr. Egilman had "an ***insider's look at various Merck documents that were designated confidential*** and, therefore, kept out of courtrooms, he says that raw study data, company emails and internal analyses 'provide ***new information*** on the health hazards of the drug and evidence of fraud in the conduct of the studies,'" and that he has "'been able to see ***documents few others have***.'"  (*See* Mot. Ex. 8 (emphases added).)

Dr. Egilman's opposition brief does not dispute that he disclosed this information to the *Wall Street Journal*.  In fact, Dr. Egilman admits that he offered the reporter "his general impressions of what" "***protected***" documents revealed.  (Egilman Opp'n at 21 (emphasis added).) These concessions are conclusive.  The litany of explanations offered by Dr. Egilman and the State of Utah for Dr. Egilman's conduct neither change the fact that Dr. Egilman leaked confidential information to a third party in contravention of the Protective Order nor excuse this misconduct.  This is particularly so because Dr. Egilman heard the Court say on February 28 that

any information designated as confidential in the MDL proceeding cannot be disclosed unless and until this Court determines that such information is not confidential. (Hr'g Tr. ("MDL Hr'g Tr.") 18:3-20:10, Feb. 28, 2014 (attached as Ex. 1).)

If Dr. Egilman's conduct goes unpunished, it could have far-reaching implications for other MDL proceedings, where confidentiality orders play a central role in facilitating large-scale discovery. Over time, plaintiffs and defendants have developed an expeditious process that helps counsel and experts gain access to documents that might otherwise be subjected to protracted confidentiality motion practice. The linchpin of this well-functioning system is the precept that everyone, including the experts, will abide by the confidentiality orders. If experts are permitted to unilaterally disregard confidentiality orders and talk publicly about the content of protected documents without any consequences, this consensual process will disintegrate, undermining the efficiency goal of the MDL system. Instead of receiving copies of confidential documents, experts may have to resort to cumbersome note-taking at central clearing houses. And in some cases, defendants may decide to litigate confidentiality issues at the outset of a case, delaying plaintiffs' access to factual material. Thus, Dr. Egilman's conduct threatens the integrity of the confidential-document protocol used in virtually every federal MDL proceeding.

For all of these reasons, Dr. Egilman's arguments are meritless, and he should be sanctioned for his conduct.

## <u>ARGUMENT</u>

## I.   <u>DR. EGILMAN VIOLATED THE PROTECTIVE ORDER IN THIS CASE.</u>

As set forth in Merck's opening brief, Dr. Egilman violated the Protective Order by disclosing specific information contained in confidential Merck documents to a third party. (*See* Mot. at 8.) In response, Dr. Egilman acknowledges that he disclosed his impressions of "protected" documents (Egilman Opp'n at 21) but offers a list of excuses for his conduct. None

1160164v1

of these explanations changes the fact that Dr. Egilman violated the Protective Order and should be sanctioned accordingly.

*First*, Dr. Egilman invokes the First Amendment.  Relying on *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), Dr. Egilman argues that his conduct was protected because the information he revealed to the *Wall Street Journal* was already "public" (*see* Egilman Opp'n at 10-11).  This argument is wrong for several reasons.  Most fundamentally, it contradicts what Dr. Egilman himself told the *Wall Street Journal*.  As the newspaper's reporter recounts, Dr. Egilman said that the confidential Vioxx documents on which he was basing his comments "'provide ***new*** information on the health hazards of the drug and evidence of fraud in the conduct of the studies,'" belying any claim that the information had already been publicly disclosed.  (*See* Mot. Ex. 8 (emphasis added).)  Nothing in the *Wall Street Journal* article even hints that any of the information disclosed by Dr. Egilman was based on documents previously made public.[1] While Dr. Egilman offers citations to various expert reports that analyzed internal Vioxx documents (*see* Egilman Opp'n at 18), none of those reports is mentioned as the source of "***new*** information" in the *Wall Street Journal* article, and there is no suggestion in the article that any of the information is based on those reports.  Merck filed its motion for sanctions based on what appeared in the article.  Dr. Egilman cannot now extricate himself from the specter of sanctions by claiming that the "***new***" information was actually made public long ago.[2]

In any event, even if the information conveyed to the reporter were already available in the public domain – which it was not – the First Amendment would not save Dr. Egilman from

[1]     Notably, although he points to a number of documents in his brief, Dr. Egilman's brief never states that he actually relied on or was summarizing any of these documents in his revelations to the *Wall Street Journal*.

[2]     Dr. Egilman's suggestion that the information revealed to the *Wall Street Journal* was already in the public domain also cannot be taken seriously in view of his request to de-designate approximately 12,000 documents in Kentucky state court.  It is hard to believe that Dr. Egilman would have mounted such a significant undertaking if the information in these documents were already publicly available.

his misconduct.  His principal authority – *Seattle Times* – holds that First Amendment protections apply in the fundamentally different context where a person subject to a protective order publishes information "gained through means ***independent of the court's processes***."  467 U.S. at 34 (emphasis added).  That reasoning clearly has no application here because the information that Dr. Egilman disclosed to the reporter was "gained through" the MDL court's processes (or those of other courts) – not some other mechanism.  Moreover, as other courts applying *Seattle Times* have made clear, a person subject to a protective order is not free to decide unilaterally that information protected under that order is public and publish it on that basis.  Rather, he must go to the court, invoke the process established by the order, and obtain a judicial determination that the information is public.  *See, e.g.*, *Harmston v. City of S.F.*, No. C 07-01186 SI, 2007 WL 3306526, at *6-7 (N.D. Cal. Nov. 6, 2007) (finding plaintiffs in contempt for violating protective order where they did not "follow[] the procedures laid out in the protective order" for seeking de-designation, despite argument that the designations infringed plaintiffs' First Amendment rights).[3]

Notably, Dr. Egilman should be well aware of this rule.  As Merck noted in its opening brief, this is not the first time Dr. Egilman has disregarded a protective over.  (*See* Mot. at 5.)  In addressing similar misconduct by Dr. Egilman and others in *Zyprexa*, Judge Weinstein rejected the notion that publication of information obtained through court processes is protected by the First Amendment, and he specifically noted that a process had been established to challenge confidentiality designations should the need arise.  *See In re Zyprexa Injunction*, 474 F. Supp. 2d

---

[3]        This line of cases comports with the Court's earlier pronouncement that any information designated as confidential in the MDL proceeding cannot be disclosed unless and until the Court determines that such information is not confidential.  (MDL Hr'g Tr. 18:3-20:10); *see also Schlafly v. Caro-Kann Corp.*, No. 98-1005, 1998 U.S. App. LEXIS 8250, at *9-10 (Fed. Cir. Apr. 29, 1998) (affirming denial of motion to compel production of "'every single piece of paper that's been produced in four other litigations plus an arbitration, many of which – in fact, all of which have protective orders in those cases, issued by other courts and judges'") (citation omitted).

385, 423-24 (E.D.N.Y. 2007) (issuing injunction to prevent further dissemination of documents by Dr. Egilman and others in violation of protective order, and rejecting First Amendment arguments; "[t]hose who can demonstrate a substantial need to know information contained in confidential documents must utilize CMO-3's declassification provisions"). More recently, Merck made the same point in responding to Dr. Egilman's counsel's letter to the Court invoking the First Amendment. (*See* Letter from John Beisner to Hon. Eldon E. Fallon at 4, Apr. 9, 2014 (attached as Ex. 2).) And even one of the cases cited in Dr. Egilman's opposition brief recognizes the need to "avail [one]self" of the Court's procedures to resolve confidentiality disputes. *See Grove Fresh Distribs., Inc. v. John Labatt Ltd.*, 888 F. Supp. 1427, 1442-43 (N.D. Ill. 1995) (cited in Egilman Opp'n at 13) (rejecting attorney's argument that information revealed was "independently available from a public source" because he "voluntarily chose not to avail himself of [the] procedure" put in place to resolve confidentiality disputes).[4] For all of these reasons, Dr. Egilman's post hoc invocation of the First Amendment is frivolous and should be rejected.

**Second**, Dr. Egilman devotes several pages of his brief to Merck's "profound lack of specificity" in moving for sanctions. (*See, e.g.*, Egilman Opp'n at 15.) But the *Wall Street Journal* article does not specify the documents Dr. Egilman was summarizing – it only states that he was summarizing confidential documents. Needless to say, contempt is not a game of hide and seek. Dr. Egilman cannot avoid accountability simply because he did not identify which confidential documents he was talking about to the newspaper reporter. As Dr. Egilman recognizes, the Fifth Circuit has previously affirmed a contempt judgment for violation of

---

[4]        Dr. Egilman's other authority, *Tavoulareas v. Washington Post Co.*, 111 F.R.D. 653 (D.D.C. 1986) (cited in Egilman Opp'n at 12), is similarly unhelpful to his cause. There, the newspaper seeking access to confidential information affirmatively moved to unseal protected documents – as opposed to unilaterally obtaining them and disseminating them to the public. *See Tavoulareas*, 111 F.R.D. at 662-65.

1160164v1

protective orders in the face of an argument that a motion for contempt failed to identify the specific confidential documents disclosed.  (*Id.* at 16 n.4 (citing *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 291 (5th Cir. 2002)).)  Dr. Egilman argues, based on the parties' briefs, that *Lyn-Lea* is not on point because there were "no legitimate collateral sources for the confidential information" in that case.  (Egilman Opp'n at 16 n.4 (internal quotation marks and citation omitted).)  But the Fifth Circuit did not even mention – much less address – whether collateral public sources of the information at issue existed in that case.  Rather, the Court of Appeals focused on the fact that the "protective orders prohibited the use of the confidential documents *for any purpose outside of the litigation*, thereby prohibiting revelation of the documents' contents as much as their existence."  *Lyn-Lea Travel*, 283 F.3d at 291 (emphasis added).  In any event, as discussed above, Dr. Egilman's claims of prior public disclosure are not credible.  Thus, *Lyn-Lea Travel* is fatal to Dr. Egilman's argument that he should be rewarded for his vagueness in specifying the source of the confidential information he betrayed to the *Wall Street Journal*.

**Third**, Dr. Egilman also contends that "basic principles of waiver compel the conclusion that public discussion by Merck of the subject documents forfeits any claim of their confidentiality."  (Egilman Opp'n at 19.)  This argument should be rejected for several reasons.  For one thing, as set forth above, Dr. Egilman is not the arbiter of whether Merck waived the confidential status of any documents.  The Protective Order provides a mechanism for resolving such disputes.  Because Dr. Egilman did not seek to bring his waiver argument to the Court, his waiver justification comes too late.

In any event, Dr. Egilman is wrong that Merck has waived anything.  According to Dr. Egilman, a mere "reference[] by Merck to confidential documents" in any public document

"constitute[s] a sufficient publication to waive confidentiality in the documents themselves."
(*Id.*)  There is no support for such a sweeping proposition.  Certainly, the cases Dr. Egilman cites
do not support this broad claim.  One case involved waiver when a confidential document itself
was entered into evidence (rather than merely "reference[d]").  *In re Cont'l Ill. Sec. Litig.*, 732
F.2d 1302, 1312-16 (7th Cir. 1984) (Egilman Opp'n at 19).  Another did not involve a protective
order but instead applied waiver against the backdrop of Connecticut statutory law.  *Charter
Practices Int'l, LLC v. Robb*, No. 3:12cv1768 (RNC), 2014 WL 273855, at *3 (D. Conn. Jan. 23,
2014) (Egilman Opp'n at 19).  Notably, courts have rejected the notion that mere reference to a
document constitutes waiver of protections of its contents.  *See, e.g.*, *Taylor v. Nix*, 451 F. Supp.
2d 1351, 1354 (N.D. Ga. 2006) ("the [state secrets] privilege was not waived merely by the
Board's reference to, and brief description of, a few privileged documents").  At bottom, Dr.
Egilman's view of waiver would render the Protective Order a nullity.  After all, under his logic,
any reference to the alleged cardiovascular risks of Vioxx would waive confidentiality as to any
and all documents that touch on that issue.  Such a result would be nothing short of absurd.[5]

     *Fourth*, Dr. Egilman also attempts to deflect attention away from his own misconduct by
accusing Merck of violating the Protective Order.  These arguments have nothing to do with
Merck's motion for sanctions.  If Dr. Egilman seeks judicial relief on any of these grounds, he
should seek it through a proper motion.

---

[5]     To the extent Dr. Egilman is urging the Court to apply a sort of subject-matter-waiver rule, that request
should be rejected.  As explained in Utah's submission, the theoretical basis for finding a broad waiver in the
privilege context based on a partial disclosure is one of completeness and litigation fairness.  (Utah Opp'n at 17 (the
"principle operating against partial disclosures is grounded on the unfairness 'for a client to disclose those instances
which please him and withhold all other occasions [sic]'") (citation omitted).)  This rationale does not translate to
confidentiality because the parties *do* have access to the confidential documents, irrespective of whether any part of
them is publicly disclosed.

In any event, Dr. Egilman's blame-shifting arguments are again without merit.  He first repeats his assertion that Merck did not abide by the Protective Order because it failed to designate as confidential Dr. Egilman's deposition and exhibits attached thereto in the Utah case (even though he never states that the confidential information he provided to the *Wall Street Journal* came from his deposition).  (*See* Egilman Opp'n at 23-24.)  Merck has previously addressed that issue in this Court and stands by its position that designation of an entire deposition as confidential obviates the need to send a letter specifying which portions are confidential.  (*See* Letter from John Beisner to Hon. Eldon E. Fallon, Mar. 25, 2014 (attached as Ex. 3).)  Nor is there any truth to Dr. Egilman's remaining argument that Merck has somehow disobeyed the Protective Order by failing to produce a confidentiality log.  (*See* Egilman Opp'n at 24-25.)  This Court was clear that it would need a log *if* a challenge to confidentiality designations was brought before it.  (Feb. MDL Hr'g Tr. 19:18-24 ("At least if it comes to me in a motion, I will need a log . . . .").)  That has not happened; indeed, Dr. Egilman has not even attempted to seek de-designation of confidential documents *in this Court* pursuant to *this Court's* Protective Order, underscoring that his argument lacks merit.

## II.   UTAH'S CONTENTION THAT DR. EGILMAN'S "NEW" INFORMATION WAS ACTUALLY BASED ON INFORMATION DISCLOSED IN AN EIGHT-YEAR-OLD REPORT IS FRIVOLOUS.

Utah's two lengthy briefs opposing Merck's motion for sanctions boil down to two arguments:  (1) that the "new" information Dr. Egilman touted to the *Wall Street Journal* was actually disclosed in the Martin Report in 2006; and (2) that Merck has waived confidentiality as to *every* designated document based on waiver principles from the context of the attorney-client privilege.  These arguments are frivolous and should be rejected.

*First*, Utah asserts that Dr. Egilman did not violate the Protective Order because his comments were based on "documents disclosed in the Martin [R]eport," and that public

dissemination of the Martin Report obviated the confidentiality accorded to documents under the Protective Order.  (Utah Opp'n at 17.)  This argument is baseless.  Dr. Egilman's statements in the March 26, 2014 *Wall Street Journal* article were expressly based on "'***new*** information'" that Dr. Egilman acquired from "'see[ing] documents ***few others have***.'"  (Mot. at 8 (emphases added).)  Indeed, as explained above, Dr. Egilman himself admits that his public statements were based on his impressions of documents that are "both ***protected*** and unprotected" under PTO 13.  (Egilman Opp'n at 21 (emphasis added).)  Hence, the comments could not have been from the Martin Report.  As Utah acknowledges, that Report is hardly "new" information:  it was publicly released on September 6, 2006 and was available on Merck's webpage "until the fall or winter of 2012-2013."  (Utah Opp'n at 7-8.)  In fact, at the time the Martin Report was released, the *Wall Street Journal* published an article discussing it and the findings of Mr. Martin's investigation.  *See* John Carreyrou and Heather Won Tesoriero, *Merck Vioxx Probe Clears Officials*, Sept. 7, 2006, http://online.wsj.com/news/articles/SB115756658145855354.  Thus, Utah's assertion that Dr. Egilman's statements were based on the Martin Report is completely implausible.[6]

> ***Second***, Utah's attempt to excuse Dr. Egilman's improper disclosure of confidential documents by suggesting that Merck "waived" confidentiality fares no better than Dr. Egilman's similar waiver argument, addressed above.

> For starters, Utah's novel waiver theory relies exclusively on cases discussing the waiver of attorney-client privilege or work-product protections for its contention that mere reference to a document constitutes waiver of its confidential status.  (Utah Opp'n at 13 (citing privilege and

---

[6]    It is also unsupported by evidence.  Like Dr. Egilman, Utah only insinuates that Dr. Egilman might have relied on the Martin Report; it has no evidence that he did.  *See Telecomm. Sys., Inc. v. Mobile 365, Inc.*, No. CIV.A. 3:06CV485, 2009 WL 5943235, at *6 (E.D. Va. Mar. 31, 2009) (rejecting plaintiff's "contention that some information was publicly known," thereby "obviat[ing] [defendant's] confidential designations," where plaintiff "d[id] not adequately support [that] claim but rather argue[d] generally that trial testimony on the same subject matter ma[de] documents publicly known and therefore waive[d] confidentiality").

work-product cases); *see also* Utah Suppl. Opp'n at 10 (citing more such cases).)  According to

Utah, such broad waiver is required because "Merck has turned this Court's confidentiality order

into a sword to attack anyone who questions [its] version of events instead of a shield protecting

documents properly as set out in FRCP 26."  (Utah Opp'n at 10.)  Thus, Utah asserts that "[t]here

are ***no*** confidential documents in the Utah litigation" and that "Utah is therefore free to use ***any***

***document in any way desired*."  (Utah Suppl. Opp'n at 11 (emphases added); *see also* Utah

Opp'n at 5 (arguing that PTO 13 would not cover any documents designated as confidential by

Merck because "it would be difficult to find a confidential document not referred to, cited or set

out in its entirety in the Martin [R]eport").)[7]

     This argument confuses the concepts of privilege and confidentiality.  As discussed

above, the waiver rule – under which disclosure of a portion of a privileged document waives

privilege as to the entire document – is a litigation fairness rule, intended to prevent a party from

using a helpful portion of a document while barring its opponent from seeing less helpful

portions of the same document.  *See, e.g.*, 3-502 Weinstein's Federal Evidence § 502.02A

("[s]ubject-matter waiver . . . 'is reserved for those unusual situations in which fairness requires a

further disclosure of related, protected information" in order to "prevent[] the privilege holder

from using privileged information both offensively and defensively at the same time") (citation

omitted); *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989) ("the attorney-client privilege is

---

[7]    Utah also contends that Merck "waived confidentiality" by: (1) using "confidential material in the depositions of the expert witnesses in this case"; (2) "not deny[ing] the existence of the [confidential] documents or their contents" in its "response to the Rule 9 pleading of the complaint"; and (3) failing to file its expert reports, which supposedly rely on confidential materials, under seal. (Utah Suppl. Opp'n at 6-8.) This argument makes no sense. The use of exhibits at deposition is not waiver because PTO 13 expressly permits a party to "show and deliver Confidential Information" to "any outside consultant or expert" who promises to abide by the terms of the Protective Order and "to any witness during a deposition, hearing, or trial" without waiving confidentiality. (*See, e.g.*, PTO 13 ¶¶ 10(e), 11.) And as detailed in the body of this brief, mere references to confidential documents in pleadings or court filings do not constitute waiver. Moreover, Utah does not identify any specific disclosure in any report. While it does reference one report by Lisa Rarick, Dr. Rarick's report does not quote or reproduce any confidential documents.

waived when a litigant 'place[s] information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party'") (citation omitted).  No similar concern arises with confidentiality designations pursuant to protective orders, under which the parties continue to have access to all portions of the affected documents.  *See, e.g.*, *Damiano v. Sony Music Entm't, Inc.*, 168 F.R.D. 485, 488, 493 (D.N.J. 1996) (although "all deposition transcripts and other discovery materials" were designated as confidential, the plaintiff was "free to utilize the materials in preparing and presenting this case in the judicial forum – not the forum of sensationalized media exposé").  Accordingly, the rationale underlying the waiver rule invoked in the cases on which Utah relies has no force here; rather, Utah has full access to all the confidential documents produced in the MDL proceeding and is "free to utilize the materials" to prepare for trial.[8]

    Even if Utah's waiver theory had any support in the law, it grossly overstates the overlap between the materials cited in the Martin Report and the documents designated confidential under this Court's Protective Order.  Utah claims that "all or nearly all" of the documents protected under the Protective Order are cited or paraphrased in the Martin Report.  (Utah Opp'n at 12.)  This statement is not even close to correct and not remotely supported by the evidence Utah cites in its brief.  Specifically, Utah attaches a spreadsheet that it claims covers "approximately half of the Martin [R]eport."  (*See id.* at 5; *id.* Ex. C.)  Even assuming all of the

---

[8]     Utah dedicates much of its supplemental submission to the absurd proposition that Utah state law governs this Court's construction and application of its Protective Order, issued by a federal court in the context of a federal multidistrict proceeding.  (*See generally* Utah Suppl. Opp'n.)  This argument is even more misguided than its others.  "Clearly, federal law governs [a] discovery dispute" in federal court.  *Broussard v. Lemons*, 186 F.R.D. 396, 397 (W.D. La. 1999).  But even assuming it were otherwise, Utah cites no authority suggesting that Utah law applies a broad waiver rule to confidentiality.  Rather, as with its first opposition, Utah's second opposition continues to rely on the wrong body of case law, which addresses privilege and work product, not confidentiality.  (*See generally* cases cited in Utah Suppl. Opp'n at 4, 7-10.)  Accordingly, this argument lacks merit for the same reasons as those Utah makes under federal law.

1160164v1

documents in the Martin Report were confidential – which they are not – the numbers do not add up.  The spreadsheet contains approximately 900 citations.  Even doubling this number (to account for Utah's arbitrary decision to document only half of the Martin Report) would yield only 1,800 documents, which is less than one-sixth of the more than 12,000 documents (including duplicates) that Dr. Egilman is challenging in Kentucky court.

Moreover, Utah's apparent assumption that all of the documents cited in the Martin Report were confidential is also wrong.  For example, Utah details four excerpts from the Martin Report that it claims contain just "[s]ome of the hundreds of examples of the disclosure of confidential documents."  (Utah Opp'n at 2.)  But many of the documents cited in these excerpts were *not* designated as confidential.  For instance, in Example A, Utah points to two documents cited in the Martin Report – a meeting agenda and an e-mail – and asserts that "Merck claims confidentiality for these documents."  (*Id.* at 2-3.)  That statement is simply wrong.  Both documents were produced in the MDL proceeding on August 11, 2005, and review of the documents themselves confirms that Merck did not claim either was confidential.[9]  And in Example C, Utah points to two safety reports cited in the Martin Report that it claims Merck designated confidential.  (*Id.* at 4.)  In fact, both safety reports were produced in the New Jersey proceedings, and later in the MDL proceeding, as not confidential.

In short, none of Utah's arguments has merit.  There is zero evidence that Dr. Egilman's disclosures have anything to do with the Martin Report, and even if they did, mere citation to a document in the Martin Report does not constitute waiver.  Moreover, the Martin Report hardly encompassed "all or nearly all" of the collection of documents designated confidential.  For all of

---

[9]    Although the email was originally produced as confidential in the New Jersey coordinated proceedings, its confidentiality designation was removed after it was admitted as a trial exhibit in *Grossberg v. Merck*.

these reasons, Utah's briefs do not undercut the propriety of assessing sanctions against Dr. Egilman.

## III.    JO LEVITT'S CLAIM THAT SHE IS NOT BOUND BY PTO 13 IS PATENTLY FRIVOLOUS.

Finally, Jo Levitt, a plaintiff with a suit pending against Merck in this MDL proceeding, has filed her own response asserting that she is not bound by PTO 13 because she has never signed a certification or otherwise agreed to be bound by it.  (*See* ECF No. 64,953, at 1.)

This argument misreads the order, which binds all parties to Vioxx litigation pending in this Court to its terms without requiring an express certification or consent.  Ms. Levitt need have looked no further than paragraph 1 of the order, which expressly defines its scope to include "all documents" and "information contained therein" that are "revealed . . . by ***any party*** in this Action (the "Supplying Party") to ***any other party or parties*** (the "Receiving Party").  (PTO ¶ 1 (emphases added).)  Although "***[t]hird parties***" like experts, doctors, and attorneys in other jurisdictions must consent to be bound through a certification (PTO ¶ 2 (emphasis added); *see also, e.g.*, *id.* ¶¶ 10(f)-(h), 12), there is no such requirement for ***parties*** to the litigation.  Instead, by its own force, PTO 13 compels a "Receiving Party" to "use confidential information only in connection with this Action" as "permitted by this Order," and such parties' counsel are required to "take all reasonable and necessary steps to assure the security of any Confidential Information" and to "limit access to Confidential Information to those persons authorized by this Order."  (*Id.* ¶¶ 14, 17; *see also id.* ¶ 28 ("It is expressly understood by and between the parties that in producing Confidential Information in this litigation, the parties shall be relying upon the terms and conditions of this Protective Order").)

In light of the confusion exhibited by Ms. Levitt and her counsel over these crystal clear provisions, Merck requests that the Court expressly reaffirm that all parties and their counsel in

litigation pending before this Court remain bound by PTO 13.  And to the extent Ms. Levitt or her counsel have published confidential documents based on their mistaken belief that they are not bound by PTO 13, they, too, would be in violation of the order and subject to sanction.

## CONCLUSION

For the foregoing reasons, as well as those set forth in Merck's opening brief, the Court should find that Dr. Egilman violated PTO 13, order Dr. Egilman to return any and all materials governed by the Protective Order and impose monetary sanctions to compensate Merck for its efforts in bringing this motion.

Dated:  June 4, 2014

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005

John H. Beisner
Jessica Davidson Miller
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005

ATTORNEYS FOR MERCK SHARP &
DOHME CORP.

1160164v1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing  reply has been served on  Liaison Counsel,

Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail,

upon Liaison Counsel Ann Oldfather by e-mail, and upon all parties by electronically uploading

the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8C, and

that the foregoing was electronically filed with the Clerk of Court of the United States District

Court for the Eastern District of Louisiana by using the CM/ECF system which will send a

Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 4th

day of June, 2014.

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

1160164v1