UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  VIOXX PRODUCTS<br>         LIABILITY LITIGATION | * |
| | * |
| | * |
| This Document Relates to: | *    Docket No.: MDL-1657 |
| | * |
| *Com. of Kentucky v. Merck & Co.,*<br>*Inc., No. 10-CV-1115* | *    Section "L" |
| | * |
| | *    New Orleans, Louisiana |
| | * |
| | *    June 6, 2014 |
| | * |
| * * * * * * * * * * * * * * * * * | |

MOTION HEARING BEFORE
THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For Dr. David Egilman:         ALEXANDER A. REINERT, ESQ.
                               Attorney at Law
                               55 Fifth Avenue, Room 1005
                               New York, New York  10003


For Merck & Co., Inc.:         Skadden Arps
                               BY:  JOHN H. BEISNER, ESQ.
                               1440 New York Avenue N.W.
                               Washington, D.C.  20005

1  <u>APPEARANCES</u>:

2  Official Court Reporter:          Jodi Simcox, RMR, FCRR
                                     500 Poydras Street
3                                    Room HB-406
                                     New Orleans, Louisiana 70130
4                                    (504) 589-7780

5

6

7  Proceedings recorded by mechanical stenography, transcript

8  produced by computer.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS**

**(June 6, 2014)**

**\*\*\*\*\*\***

(OPEN COURT)

**THE COURT:**  Be seated, please.

I have before me a couple of motions.  By way of background, let me mention that over the course of this multi-district litigation, Merck and the litigants have exchanged millions of pages of documents.  The last count was over 9 million documents had been exchanged, many of which have contained information that the parties on both sides of the "V" have felt they would like to keep confidential.  It's not unusual in a case of this sort.

From the plaintiff's standpoint, they have sued, many of them, 50,000 of them, claiming personal injuries.  When a person sues for personal injuries, they have to produce, when requested, all of their medical information.  There's no privilege to that, you waive your privilege, but they feel that some of it may be confidential.

Someone may have had an abortion, someone may have had a problem with their mental state, someone may have had some sexually transmitted disease, or whatever it is.  This may or may not be relevant; but in any event, they feel that it's confidential and they would not like the world to know it.

9:23AM 1          From the defendant's standpoint, they have some

9:23AM 2  information that may involve some information that would help

9:23AM 3  their competitors if the competitors knew about it.

9:23AM 4          In any event, the parties get together, not

9:23AM 5  unusual, in fact, the federal rules provide for it under Rule

9:23AM 6  26(c), and they enter into a protective order to protect this

9:23AM 7  information.

9:23AM 8          On May 24th, 2005, at the request of the

9:23AM 9  parties, and after discussions, the Court issued Pretrial

9:23AM 10  Order 13 to facilitate a timely and efficient discovery process

9:23AM 11  by addressing the various confidentiality concerns of all of

9:23AM 12  the parties.  Pretrial Order 13 governs all material and

9:23AM 13  information produced or disclosed by any party in the MDL.

9:24AM 14          A party may then designate such material and

9:24AM 15  information as, quote, confidential information.  It also

9:24AM 16  permits a party who has received confidential information to

9:24AM 17  show or deliver it to an outside expert, provided that expert

9:24AM 18  read and agree to be bound by the terms of Pretrial Order 13.

9:24AM 19  A party was permitted to use the confidential information in

9:24AM 20  the MDL or any other related action to the extent described in

9:24AM 21  Pretrial Order 13.

9:24AM 22          If disclosure not authorized by Pretrial

9:24AM 23  Order 13 were to occur, the receiving party was required to

9:24AM 24  notify the supplying party and also make all reasonable efforts

9:24AM 25  to prevent further disclosures by an unauthorized person.

9:24 AM   1            Merck alleges that a Dr. David Egilman, an

9:25 AM   2 expert witness retained by the states with actions pending

9:25 AM   3 against Merck in this MDL, recently made several statements to

9:25 AM   4 the *Wall Street Journal* purporting to summarize or suggest the

9:25 AM   5 contents of material in documents covered by the Court's

9:25 AM   6 protective order.

9:25 AM   7            Merck claims that these actions are in violation

9:25 AM   8 of the Court's protective order and brings this motion seeking

9:25 AM   9 an injunction, as well as sanctions, against Dr. Egilman.

9:25 AM  10            I'll hear from the parties at this time.

9:25 AM  11      **MR. BEISNER:**  Good morning, Your Honor.  John Beisner

9:25 AM  12 on behalf of defendant, Merck.

9:25 AM  13            Your Honor, as you just summarized, it's Merck's

9:25 AM  14 position that an injunction and sanctions should be imposed on

9:25 AM  15 Dr. Egilman because of his statements in the *Wall Street*

9:25 AM  16 *Journal*, which we believe constitute a clear breach of PTO 13.

9:26 AM  17            As Your Honor summarized, Dr. Egilman signed the

9:26 AM  18 confidentiality order, agreed to its terms as a condition of

9:26 AM  19 gaining access to the confidential documents in this

9:26 AM  20 proceeding.  Then in a conference call on February 28th that

9:26 AM  21 Merck requested because Dr. Egilman had raised questions

9:26 AM  22 basically saying, "Well, I think this order's been waived," as

9:26 AM  23 to a bunch of documents in connection with his deposition.

9:26 AM  24            He was on the call with Your Honor and you were

9:26 AM  25 very clear directly with him that nothing in these documents

9:26AM 1    should be revealed unless the Court says you can do so, that

9:26AM 2    they had to go through a process.

9:26AM 3              Yet, just a few weeks later, despite that

9:26AM 4    agreement, and despite the Court's admonitions, we see in the

9:26AM 5    *Wall Street Journal* blog that there has been a conversation

9:27AM 6    with a reporter, which we believe revealed the content of

9:27AM 7    certain documents.

9:27AM 8              The reporter summarized Dr. Egilman's

9:27AM 9    conversation as saying he had an insider's look at various

9:27AM 10   Merck documents that were designated confidential.  He said he

9:27AM 11   had raw study data, company e-mails, and internal analyses that

9:27AM 12   provide -- and the reporter is quoting Dr. Egilman here -- "new

9:27AM 13   information of health hazards of the drug and evidence of fraud

9:27AM 14   in the conduct of the studies," and he said that this new

9:27AM 15   information was based on -- and, again, quoting Dr. Egilman --

9:27AM 16   "documents few others have seen."

9:27AM 17             Now, Dr. Egilman doesn't deny that what I just

9:27AM 18   laid out isn't exactly what happened.  In fact, the opposition

9:27AM 19   to our motion is quite telling, because Dr. Egilman is nowhere

9:27AM 20   to be found.  There's no affidavit from Dr. Egilman denying

9:27AM 21   that our description of these events is what happened, denying

9:28AM 22   that he spoke with the *Wall Street Journal* reporter, or denying

9:28AM 23   that the reporter accurately summarized that conversation.

9:28AM 24             There's no declaration from Dr. Egilman

9:28AM 25   suggesting any extenuating circumstances or trying to explain

9:28AM  1    that conversation.  There's nothing from him expressing any
9:28AM  2    remorse for what has happened here.  Instead what we have are
9:28AM  3    his lawyers being left to offer a lot of rationales, which we
9:28AM  4    believe are weak and unsupported.  We'll get to that in a
9:28AM  5    moment.
9:28AM  6              But we think this case is quite analogous to the
9:28AM  7    *Neville* case that we cite, where even though we acknowledge
9:28AM  8    Dr. Egilman didn't hand documents to the reporter, but as in
9:28AM  9    *Neville*, the content of those documents, assertions about what
9:28AM  10   those documents indicate, were revealed, and his view of those,
9:28AM  11   his assertions about those documents.
9:29AM  12             We think that sanctions and the injunctive
9:29AM  13   relief we ask for is particularly appropriate here because we
9:29AM  14   believe that this is a demonstration of disrespect to the
9:29AM  15   Court's authority, and it's not the first time this has
9:29AM  16   happened.
9:29AM  17             As we laid out in the briefs, Judge Weinstein
9:29AM  18   had to deal with an issue very much like this involving
9:29AM  19   Dr. Egilman in his Zyprexa litigation, and he found that
9:29AM  20   Dr. Egilman had:  "... deliberately thwarted a federal court's
9:29AM  21   power to effectively conduct civil litigation."
9:29AM  22             This happened in a Colorado case as well.  And
9:29AM  23   although the sanctions in that case were reversed because of a
9:29AM  24   lack of notice in the process to Dr. Egilman, the court didn't
9:29AM  25   disturb the fact that actions inconsistent with the court's

9:29AM  1  orders with respect to the handling of information occurred.

9:29AM  2  Your Honor, it's not with any pleasure that we

9:29AM  3  bring this motion.  You have better things to do, we have

9:29AM  4  better things to do in dealing with the litigation, but,

9:30AM  5  frankly, we've got no choice.  These MDL proceedings, as Your

9:30AM  6  Honor is well aware, function efficiently -- or as efficiently

9:30AM  7  as possible by the use of these sorts of confidentiality orders

9:30AM  8  as you described.

9:30AM  9  And if people are permitted, especially

9:30AM  10  third-party experts, to just run off and divulge information,

9:30AM  11  especially when they've been warned, this system will collapse.

9:30AM  12  We can't agree as defendants, or as you noted, plaintiffs, to

9:30AM  13  provide confidential information unless everybody is

9:30AM  14  comfortable that the confidentiality orders will be honored.

9:30AM  15  There can be challenges -- maybe somebody

9:30AM  16  disagrees as to whether a document is confidential -- but

9:30AM  17  there's processes to be followed.  And if people just take the

9:30AM  18  law into their own hands, we can't use that process.  We're

9:30AM  19  going to have to require experts to come to a depository, don't

9:31AM  20  give them the documents, make them review documents there.

9:31AM  21  There will be fights at the beginning of the

9:31AM  22  process as to whether these documents ought to be produced at

9:31AM  23  all.  It will gum up the works.  But based on that trust that

9:31AM  24  we've developed among the parties, we've formed a system that

9:31AM  25  works reasonably well.  And if somebody decides they're going

| | | |
|---|---|---|
| 9:31AM | 1 | to just ignore that process, if the parties and the courts |
| 9:31AM | 2 | don't address that in some way, the confidence in that system |
| 9:31AM | 3 | will disappear, and that's why we're here on that. |
| 9:31AM | 4 | THE COURT:  Dr. Egilman takes the position that this |
| 9:31AM | 5 | information was in the public sphere, so to speak, that it was |
| 9:31AM | 6 | public information and that it wasn't any private information. |
| 9:31AM | 7 | How do you respond to that? |
| 9:31AM | 8 | MR. BEISNER:  Well, Your Honor, I think it boils down |
| 9:31AM | 9 | to the following, and I just find that that argument can't be |
| 9:31AM | 10 | credible.  He does not deny that this conversation occurred |
| 9:32AM | 11 | with the *Wall Street Journal* reporter.  Do we really think he |
| 9:32AM | 12 | called up and said, "Hey, I've got some old news to give you?" |
| 9:32AM | 13 | That's not what the representation was.  He said "confidential |
| 9:32AM | 14 | documents," "things nobody else had seen."  His admissions |
| 9:32AM | 15 | indicate that that is not the case. |
| 9:32AM | 16 | I know there's a reference to the Martin report. |
| 9:32AM | 17 | But as we've laid out in detail in the briefs, there's nothing |
| 9:32AM | 18 | about the Martin report that indicates that the documents that |
| 9:32AM | 19 | Dr. Egilman was talking about were at play, that is not linked. |
| 9:32AM | 20 | And this notion that somehow there was waiver with respect to |
| 9:32AM | 21 | these documents, there's a process for demonstrating it, Your |
| 9:32AM | 22 | Honor. |
| 9:32AM | 23 | They were designated as confidential, they |
| 9:32AM | 24 | remain confidential, and this Court's order said don't reveal |
| 9:32AM | 25 | them.  But this information was not public and that argument |

9:32AM  1    goes nowhere because his admissions, uncontested, to the

9:33AM  2    reporter was this is new information.

9:33AM  3             There's also, Your Honor, a concern expressed in

9:33AM  4    the brief that we haven't specified what documents were

9:33AM  5    revealed.  But what difference does that make?  He represented

9:33AM  6    to the reporter that he had confidential documents and that he

9:33AM  7    was revealing the content of those documents.

9:33AM  8             The fact that he was coy and didn't say

9:33AM  9    specifically which documents is beside the point.  We're now

9:33AM  10   having to deal with the fact that he represented to the

9:33AM  11   reporter, and it got published, what the content of those

9:33AM  12   documents are, in Dr. Egilman's view.

9:33AM  13            And so, Your Honor, the other argument that's

9:33AM  14   being made here is an argument that Merck violated the

9:33AM  15   protective order.  There are two points that are made.  One is

9:34AM  16   he said that he asked to join Merck in the process under the

9:34AM  17   pretrial order of engaging on some review of these documents.

9:34AM  18            But if you look at the correspondence, that's

9:34AM  19   what we brought to Your Honor's attention in that February

9:34AM  20   conference call, that didn't launch that process.  There was no

9:34AM  21   mention made there of wanting a response.  It was just an

9:34AM  22   assertion on his part that there had been a waiver.

9:34AM  23            There's also a reference to, well, there's no

9:34AM  24   log, that there's been a noncompliance with that part of the

9:34AM  25   PTO.  And, Your Honor, that log reference was a process agreed

9:34AM   1   upon by Merck and the PSC to process documents as they came

9:34AM   2   into the repository.  But if what he's asking for is a list of

9:35AM   3   the documents for which Merck has requested confidentiality or

9:35AM   4   made a confidentiality declaration, that exists.  That

9:35AM   5   information is there.  The PSC has the list, I think the states

9:35AM   6   have that information as well.

9:35AM   7            So the notion that there's been some "hide the

9:35AM   8   ball" about what documents have been declared confidential is

9:35AM   9   just wrong.  As Your Honor noted, if we get into a process of

9:35AM  10   reviewing confidential documents, then we'll have to be sure

9:35AM  11   that list is available, but I'm not sure what that has to do

9:35AM  12   with this issue, or that he's suggesting he somehow mistakenly

9:35AM  13   talked to the reporter about documents that have been stamped

9:35AM  14   confidential.  There's no suggestion of that here.

9:35AM  15            So, Your Honor, for all of these reasons, we

9:35AM  16   think that the relief that Merck has requested should be

9:35AM  17   granted.

9:35AM  18            THE COURT:  All right.  Let me hear from the

9:35AM  19   respondent.

9:36AM  20            MR. REINERT:  Good morning, Your Honor.  Alex Reinert

9:36AM  21   for Dr. David Egilman.

9:36AM  22            THE COURT:  Good morning.

9:36AM  23            MR. REINERT:  My pleasure to be here this morning.

9:36AM  24            THE COURT:  It's a pleasure to have you.

9:36AM  25            MR. REINERT:  Thank you.

9:36AM 1     Your Honor, there's one issue that Mr. Beisner

9:36AM 2 notably omits from his presentation and from Merck's reply

9:36AM 3 brief, which is that Merck has the burden in this proceeding.

9:36AM 4 And it's not just any burden, Your Honor, it's the burden to

9:36AM 5 establish by clear and convincing evidence that Dr. Egilman

9:36AM 6 disclosed documents protected by PTO 13.  That's what Merck has

9:36AM 7 the burden of showing.

9:36AM 8     Dr. Egilman's statement to the *Wall Street*

9:37AM 9 *Journal* doesn't come close to establishing that.  Merck says

9:37AM 10 that by our submission to this Court, to Your Honor, somehow

9:37AM 11 Dr. Egilman has conceded that he said he was talking about

9:37AM 12 confidential documents.  No, there's nothing in that *Wall*

9:37AM 13 *Street Journal* that says Dr. Egilman says he was talking about

9:37AM 14 confidential documents.

9:37AM 15     The *Wall Street Journal* arguably characterized

9:37AM 16 it, but his quotes don't say anything about confidential

9:37AM 17 documents, Your Honor.  He does say these are documents that

9:37AM 18 few other people have seen.  That could describe lots of

9:37AM 19 documents, confidential and nonconfidential.

9:37AM 20     I note that in Merck's reply to Your Honor -- to

9:37AM 21 our opposition submitted to Your Honor, Merck makes a point of

9:37AM 22 saying that at page 21 of our opposition we concede, they say,

9:37AM 23 that Dr. Egilman offered the reporter his general impression of

9:37AM 24 what protected documents reveal and that we used the words

9:37AM 25 "protected."  We did, Your Honor.

9:37AM  1      But if you look at the topic sentence of that

9:37AM  2 paragraph, we say, we spent 20 pages saying he didn't disclose

9:38AM  3 anything confidential, showing all the ways that he didn't

9:38AM  4 disclose anything confidential, none of which Merck disputes,

9:38AM  5 none of which.  And we say, even if -- even if -- he disclosed

9:38AM  6 something that's protected by PTO 13, Merck has not cited a

9:38AM  7 single case in which a disclosure of this kind has resulted in

9:38AM  8 sanctions.

9:38AM  9      So the argument that we say, if by chance the

9:38AM 10 Court finds that his statement was making reference to

9:38AM 11 protected documents, none of the cases Merck cites support

9:38AM 12 sanctions.  But let me step back for a moment, Your Honor,

9:38AM 13 because the basic question here, it's a very simple question,

9:38AM 14 it's one that Merck seeks to evade, is whether or not

9:38AM 15 Dr. Egilman can be sanctioned for saying something that Merck

9:38AM 16 and the parties already have revealed to the world.

9:38AM 17      And this isn't about the documents, Your Honor.

9:38AM 18 The only thing that's reflected in the *Wall Street Journal* is

9:38AM 19 his opinion about what the documents say.  Now, if he said in

9:38AM 20 the *Wall Street Journal*, "Merck documents show the moon is made

9:38AM 21 of green cheese," would we be here today?  We wouldn't, Your

9:38AM 22 Honor, because nobody believes that Merck's documents are made

9:38AM 23 of green cheese.

9:38AM 24      It doesn't matter what his opinion about what

9:39AM 25 the documents say; Merck has to show that he actually revealed

9:39AM   1    something secret contained in the documents.  And his opinion

9:39AM   2    about what the documents say, which I'm sure from Merck's

9:39AM   3    perspective is akin to saying, "The documents say the moon is

9:39AM   4    made of green cheese," because they don't think they engaged in

9:39AM   5    fraud, they don't think they engaged in misrepresentation, they

9:39AM   6    don't think they hid any health effects.

9:39AM   7             His opinions were submitted by Merck itself

9:39AM   8    twice in open court to a Kentucky judge.  And that's at -- I've

9:39AM   9    given Your Honor this binder and it's at Tab D, Your Honor.

9:39AM  10    It's Exhibit H to my affirmation, and I apologize for the

9:39AM  11    potential confusion.  But let's look at this

9:39AM  12    October 29th letter which Merck submits in open Court.  And I

9:39AM  13    take it we can all agree -- I hope we can all agree -- that if

9:39AM  14    there's a document that's in the public record, open to the

9:39AM  15    public, Dr. Egilman, as well as anyone, can say what's in that

9:39AM  16    document.

9:39AM  17             And here's what that document says, it's a

9:39AM  18    description by Dr. Egilman to Merck.  Now, Dr. Egilman didn't

9:40AM  19    publish this document; Merck chose to publish this document

9:40AM  20    twice before anything was said to the *Wall Street Journal*.  It

9:40AM  21    says:  "Some of these documents are evidence that Merck

9:40AM  22    provided fraudulent information.  Some of these documents are

9:40AM  23    relevant to the assessment of risks associated with

9:40AM  24    Cox II health effects in general."

9:40AM  25             If you read this, Your Honor, he says

9:40AM   1   specifically what he thinks the documents show.  Much more

9:40AM   2   specific than anything he says to the *Wall Street Journal*.  And

9:40AM   3   Merck was the one who put this into the public record.  So it's

9:40AM   4   hard to stand here and have Merck say he disclosed something

9:40AM   5   confidential that Merck itself didn't think was so confidential

9:40AM   6   that they couldn't put it in the public record.

9:40AM   7              Merck knows how to seal documents, Your Honor.

9:40AM   8   They've done it in Kentucky.  They just recently did it in

9:40AM   9   Kentucky.  They just did it before Your Honor in the *Levitt*

9:40AM  10   case.  When they filed their reply motion for summary judgment,

9:40AM  11   they asked that an exhibit be sealed.  They know how to seal a

9:40AM  12   document that they think contains confidential information.

9:40AM  13              If they think that Dr. Egilman's opinions about

9:41AM  14   what the documents show revealed confidential information, then

9:41AM  15   they could have asked to have this sealed when they submitted

9:41AM  16   it to the Court; they did not.  They did not.

9:41AM  17              **THE COURT:**  Well, should they take depositions of

9:41AM  18   Dr. Egilman?

9:41AM  19              **MR. REINERT:**  I'm sorry?

9:41AM  20              **THE COURT:**  Should they pursue Dr. Egilman and take

9:41AM  21   depositions from him?

9:41AM  22              **MR. REINERT:**  Well, Your Honor, at this point, as I

9:41AM  23   understand it, they have rested.  They have not presented any

9:41AM  24   evidence that he disclosed -- but my position is they've come

9:41AM  25   here to this Court asking this Court to invoke an extraordinary

9:41AM 1    remedy of sanctioning Dr. Egilman, and asking this Court to

9:41AM 2    find by clear and convincing evidence the specific fact that he

9:41AM 3    disclosed a confidential document, and they have not presented

9:41AM 4    a shred of evidence, not a shred.

9:41AM 5                  And they think that what they can rest on is his

9:41AM 6    statement -- his statement to the *Wall Street Journal*.  His

9:41AM 7    statement to the *Wall Street Journal* does not say, "I'm

9:41AM 8    disclosing PTO 13 protected documents."  It doesn't even say,

9:41AM 9    "I'm disclosing protected documents."

9:41AM 10                 Now, you can imagine from Dr. Egilman's

9:41AM 11   perspective, right, Merck puts this letter in the record twice.

9:41AM 12   So, from Dr. Egilman's perspective, does he think that Merck

9:42AM 13   thinks this is secret?

9:42AM 14                 From Dr. Egilman's perspective, if we went into

9:42AM 15   the expert report that was filed by the parties, again without

9:42AM 16   Merck's objection, on PACER, available to everybody, and which

9:42AM 17   Dr. Egilman goes through specific details of specific documents

9:42AM 18   and shows how they support in specific sort of -- specific

9:42AM 19   conclusions the very general things he said to the *Wall Street*

9:42AM 20   *Journal*.  All those things are in the public record already.

9:42AM 21   So it's hard to understand how Merck thinks anything secret was

9:42AM 22   divulged.

9:42AM 23                 We can, again, imagine a situation where the

9:42AM 24   *Wall Street Journal* reporter goes to the case file and picks

9:42AM 25   out this document and calls up Dr. Egilman and says, "I see you

9:42AM  1    wrote this letter to Merck.  It's in the public record.  I see

9:42AM  2    you wrote it.  Did you write it?"  If Dr. Egilman says yes, is

9:42AM  3    he violating PTO 13?  Okay.  I don't think he is.  "Well, did

9:42AM  4    you mean it when you wrote it?"  If Dr. Egilman says yes, is he

9:43AM  5    violating PTO 13?  I don't see how he could be.

9:43AM  6              THE COURT:  But isn't he the one that called the *Wall*

9:43AM  7    *Street Journal* and discussed things?  They didn't call him; he

9:43AM  8    called them.

9:43AM  9              MR. REINERT:  Well, there's no evidence of that, Your

9:43AM  10   Honor.

9:43AM  11             THE COURT:  And this is the same Dr. Egilman who

9:43AM  12   called the *New York Times* and was held in contempt of court or

9:43AM  13   enjoined and penalized for $100,000.  It's hard for me to

9:43AM  14   understand how having gone through that experience with Zyprexa

9:43AM  15   we would be here today with Vioxx.

9:43AM  16             MR. REINERT:  Well, so, Your Honor, if I may.

9:43AM  17             THE COURT:  Yes.

9:43AM  18             MR. REINERT:  There's no evidence that he did call

9:43AM  19   the *Wall Street Journal*.  So if Merck wants to introduce that

9:43AM  20   evidence, they can.  I don't think it matters.  It doesn't

9:43AM  21   matter to their question.  The question is -- whether he called

9:43AM  22   them or they called him, the question is:  Did he disclose

9:43AM  23   anything secret?

9:43AM  24             Now, the situation with Zyprexa, Your Honor, no

9:43AM  25   Court ever fined him $100,000.  He agreed to a separate

9:44AM 1  settlement.  The situation with Zyprexa is completely

9:44AM 2  different.  He was alleged to have actually provided documents,

9:44AM 3  actual documents.  And those are the cases that Merck cites,

9:44AM 4  people who have actually provided actual documents, specific

9:44AM 5  information.

9:44AM 6           That's not what Merck is saying he did here.

9:44AM 7  They can't say he did that here.  They can't say he did that

9:44AM 8  because he literally said exactly what they said in the public

9:44AM 9  record, in the public record, exactly what the parties have

9:44AM 10  said in the public record about what Dr. Egilman's opinions

9:44AM 11  are.

9:44AM 12           Now, Merck also says, we don't have to prove

9:44AM 13  anything because Dr. Egilman says he was relying on

9:44AM 14  confidential documents.  Now, as I said, it's actually --

9:44AM 15  there's no quote in the *Wall Street Journal* in which

9:44AM 16  Dr. Egilman says that.

9:44AM 17           But even if that's the case, Your Honor, this

9:44AM 18  points to the problem with their proof, which is, it doesn't

9:44AM 19  matter what Dr. Egilman thought he was commenting on.  We've

9:44AM 20  shown he wasn't commenting on confidential documents.

9:45AM 21           Exhibit D to my affirmation, which you can find

9:45AM 22  at Tab E -- I'm sorry, it's Exhibit -- well, yeah, it's

9:45AM 23  Exhibit D, which you can find at Tab E, is I've gone through --

9:45AM 24  I've gone through his expert report and I've categorized each

9:45AM 25  of the specific statements in his expert report, publically

9:45 AM  1    available expert report, fully supported by documents Merck
9:45 AM  2    concedes are nonconfidential, fully supported.  Merck doesn't
9:45 AM  3    make any reply to this.  None at all.
9:45 AM  4              So, Your Honor, I don't take it as a given that
9:45 AM  5    he disclosed any confidential documents.  But even if he
9:45 AM  6    thought he was disclosing confidential documents, let's imagine
9:45 AM  7    the converse, Your Honor, let's say Dr. Egilman says to the
9:45 AM  8    *Wall Street Journal*, "Hey, this document, and it's unprotected,
9:45 AM  9    it's not confidential, shows X.  It shows X and it's
9:45 AM  10   nonconfidential, so you can go ahead and print it."
9:45 AM  11             Now, it turns out he thought it was
9:45 AM  12   nonconfidential, but he was wrong.  It doesn't matter what his
9:45 AM  13   intent is, what his state of mind is, if he disclosed something
9:46 AM  14   secret, then he can be sanctioned under PTO 13.  But his
9:46 AM  15   description or his conception or his state of mind as to
9:46 AM  16   whether or not he was disclosing something secret, that's
9:46 AM  17   irrelevant.  The Fifth Circuit case law says that, Your Honor.
9:46 AM  18   So it cuts both ways, of course.
9:46 AM  19             **THE COURT:**  But doesn't PTO 13 also give an
9:46 AM  20   opportunity to amend it?  If he wants to talk to the *Wall*
9:46 AM  21   *Street Journal* and he's concerned or thinks or is not sure or
9:46 AM  22   even if he feels he's sure, why wouldn't he then come to the
9:46 AM  23   Court?  That's what PTO 13 says, you can come to the Court and
9:46 AM  24   get it amended, get permission to disclose it, get the same
9:46 AM  25   that you're going to disclose removed from confidentiality.

9:46 AM   1          **MR. REINERT:**  Certainly, Your Honor.  That's exactly

9:46 AM   2    what -- I don't mean to disagree with Your Honor as to the

9:46 AM   3    basic factual background, but that's exactly what Dr. Egilman

9:47 AM   4    has done.

9:47 AM   5          When Dr. Egilman comes here, Merck argues he

9:47 AM   6    doesn't have standing.  Dr. Egilman went to the Kentucky court.

9:47 AM   7    He wasn't engaging in forum shopping as Merck suggests.  But he

9:47 AM   8    went to the Kentucky court and the Kentucky court gave him

9:47 AM   9    standing to challenge the designation of the documents.

9:47 AM  10          But Dr. Egilman is not doing -- there's nothing

9:47 AM  11    in his statement to the *Wall Street Journal* that discloses the

9:47 AM  12    contents of any documents.  So he's not doing anything but what

9:47 AM  13    Your Honor described, which is, he has gone to the court and he

9:47 AM  14    has asked that they be de-designated.

9:47 AM  15          And his position in Kentucky is, even if they're

9:47 AM  16    de-designated in Kentucky, still Your Honor -- still Your Honor

9:47 AM  17    has the authority to consider whether or not they should be

9:47 AM  18    de-designated in the MDL.  We said that in our reply in

9:47 AM  19    Kentucky, we said that in oral argument in Kentucky, and when

9:47 AM  20    we hear the All Writs Act motion, I certainly can direct Your

9:47 AM  21    Honor's attention to those matters, but that has been

9:47 AM  22    Dr. Egilman's position the entire time.

9:47 AM  23          This isn't Zyprexa.  This isn't him going and

9:48 AM  24    handing a bunch of documents to the *Wall Street Journal*.  This

9:48 AM  25    is him, at most, telling the *Wall Street Journal* exactly --

9:48AM  1    exactly -- with less detail, what's already in the public
9:48AM  2    record, which is just his opinion.
9:48AM  3            THE COURT:  Well, let me ask you this:  Suppose he
9:48AM  4    told the *Wall Street Journal* just orally, not delivering
9:48AM  5    documents, but told them about documents that he had received
9:48AM  6    as a result of the discovery process and they were confidential
9:48AM  7    or marked confidential and he read it to them or summarized it
9:48AM  8    for them?
9:48AM  9            MR. REINERT:  That's a disclosure, Your Honor.
9:48AM  10           THE COURT:  That would be a disclosure.
9:48AM  11           MR. REINERT:  That's a disclosure.  But if I can make
9:48AM  12   another point about the Kentucky proceeding.  Another point
9:48AM  13   that's the problem with Merck's failure of proof is the
9:48AM  14   Kentucky proceeding, as Merck has conceded, involves at least
9:48AM  15   five different -- documents produced in at least five different
9:48AM  16   cases.
9:48AM  17           In terms of MDL documents, the MDL documents
9:48AM  18   that Merck asserts are confidential, it's about 10 percent of
9:48AM  19   what's at stake in the Kentucky litigation.
9:48AM  20           Now, it just so happens that even the documents
9:49AM  21   that Merck says are confidential, it turns out they told
9:49AM  22   Dr. Egilman some of them at a certain point weren't
9:49AM  23   confidential.  So one can understand, Dr. Egilman -- there's no
9:49AM  24   reason to think Dr. Egilman has any sort of conception of what
9:49AM  25   is confidential or what is not under PTO 13, or any conception

9:49AM  1    that this statement had anything do with anything that was

9:49AM  2    confidential under PTO 13.

9:49AM  3                    And I come back to the fact that they have to

9:49AM  4    provide evidence that he violated this protective order, this

9:49AM  5    protective order.

9:49AM  6              THE COURT:  What did he mean when he said, I'm going

9:49AM  7    to show you or discuss things or give you, or whatever it was,

9:49AM  8    things that few people have seen?  What was that?

9:49AM  9              MR. REINERT:  Your Honor, I --

9:49AM 10              THE COURT:  You don't know?

9:49AM 11              MR. REINERT:  -- in all honesty, don't know.  But the

9:49AM 12    fact that he said it does not prove that he was talking about

9:49AM 13    documents that were protected as confidential under PTO 13.  It

9:49AM 14    very easily could be, and probably, the vast majority of the

9:49AM 15    documents that are at stake in Kentucky are not protected under

9:50AM 16    PTO 13.

9:50AM 17                    So in any event, there is no -- you know, it's

9:50AM 18    like if someone walked into a police station and said, "I did

9:50AM 19    it, I killed Humpty Dumpty," and nobody can find the body, Your

9:50AM 20    Honor, the police can't arrest him on murder because he said he

9:50AM 21    admitted that he killed Humpty Dumpty.  They have to provide

9:50AM 22    evidence that he murdered somebody.  Merck has to provide

9:50AM 23    evidence that he disclosed some PTO 13 protected document, and

9:50AM 24    they've refused to.  They've completely sat on their rights.

9:50AM 25                    As to the waiver argument, Your Honor, this

9:50AM 1  is -- this is the report that Merck put on the Web by Judge
9:50AM 2  Martin, available to the public.  This is it.  Extensive
9:50AM 3  discussion of documents.  Their position is this doesn't
9:50AM 4  disclose anything, this document discloses nothing to the
9:50AM 5  public, and Dr. Egilman's three sentences to the *Wall Street*
9:50AM 6  *Journal*, quite general, don't say anything about any specific
9:50AM 7  document, somehow is a disclosure of everything that's been
9:50AM 8  produced and protected as confidential in this proceeding, Your
9:51AM 9  Honor.
9:51AM 10             Your Honor, Dr. Egilman has the utmost of
9:51AM 11 respect for this proceeding and this Court.  He has no
9:51AM 12 intention of disregarding this Court's orders, and everything
9:51AM 13 in these proceedings, and in Kentucky, speaks to that.  I
9:51AM 14 realize that from Merck's perspective -- from Merck's
9:51AM 15 perspective it is advantageous to remind the Court of the
9:51AM 16 Zyprexa matter.  But, Your Honor, I think they've played their
9:51AM 17 hand a little too forcefully.
9:51AM 18             And when one get to the Colorado case, Your
9:51AM 19 Honor, the Colorado case in which they say, "Well, the court
9:51AM 20 didn't find that any of the findings were not valid."  They
9:51AM 21 said that Dr. Egilman did not have notice and, therefore, it
9:51AM 22 violated his due process.  They didn't make any findings about
9:51AM 23 whether or not he, indeed, engaged in the behavior.
9:51AM 24             And, by the way, Your Honor, it turns out that
9:51AM 25 what happened in Colorado -- and this was established at

9:51 AM  1  deposition and a lawyer in Texas was sanctioned for this -- was

9:51 AM  2  the defense attorney snuck into Dr. Egilman's Web site, guessed

9:52 AM  3  the password for his Web site, and found these documents, and

9:52 AM  4  then said to the Court, "Look, Dr. Egilman's putting these

9:52 AM  5  documents on the Web."  That's what happened, and that's why

9:52 AM  6  they sought sanctions there.

9:52 AM  7          So Merck hasn't gone that far here, Your Honor,

9:52 AM  8  but they have not adhered to their burden under Fifth Circuit

9:52 AM  9  law or under the Supreme Court law, and they have not shown in

9:52 AM  10  any way that the documents here are confidential.

9:52 AM  11          And I think, with that, I'll rest.  I'll only

9:52 AM  12  say one thing about the issue with respect to Merck's

9:52 AM  13  compliance with PTO 13.  Your Honor, I leave it to Your Honor

9:52 AM  14  to sort of say what Your Honor meant at that

9:52 AM  15  February 28th conference where the Court said, "I need a log,"

9:52 AM  16  and where Merck's counsel, as I understand it, said, "We

9:52 AM  17  haven't produced a log in a long time."

9:52 AM  18          Now, again, I may be totally misunderstanding

9:52 AM  19  the facts.  I asked Merck's counsel for a log, they refused to

9:52 AM  20  give it to me.  They said we're not entitled to it, yet they

9:52 AM  21  want to sanction Dr. Egilman without specifying any of the

9:53 AM  22  documents that he allegedly disclosed or even which documents

9:53 AM  23  are confidential or not.

9:53 AM  24          I'll leave it to the Court to decide whether or

9:53 AM  25  not Merck has complied with that portion of its order.  With

9:53AM  1   respect to the designation of the deposition as confidential,

9:53AM  2   Your Honor, PTO 13 says you've got to send a letter within a

9:53AM  3   certain specified period of days.

9:53AM  4              And the same goes with PTO 13, Paragraph 23,

9:53AM  5   Your Honor.  I was in Your Honor's courtroom yesterday watching

9:53AM  6   Your Honor sentence a gentleman to federal prison.

9:53AM  7              I remember the Court going through the

9:53AM  8   sentencing guidelines with respect to a prior arrest, right,

9:53AM  9   and whether it counted.  And the Court was meticulous about

9:53AM 10   giving each word meaning.  And if you give each word meaning in

9:53AM 11   PTO 13, especially Paragraph 23, I don't understand how Merck's

9:53AM 12   position is tenable, Your Honor.

9:53AM 13              So, with that, I'll rest.

9:53AM 14         THE COURT:  Okay.  Thank you very much.

9:53AM 15              Let me hear a response.

9:53AM 16         MR. BEISNER:  Your Honor, I think the main point to

9:54AM 17   be made is there is a body here.  Humpty Dumpty does exist.

9:54AM 18   It's the article in the *Wall Street Journal*.  I don't know how

9:54AM 19   anyone can read this without understanding that what

9:54AM 20   Dr. Egilman did here was talk to a reporter about confidential

9:54AM 21   documents.

9:54AM 22              He is quoted in here as saying, and, Your Honor,

9:54AM 23   he doesn't dispute any of this.  There's nothing that says, "I

9:54AM 24   didn't do this.  I didn't make these statements."  It says:

9:54AM 25   "In general there's information" -- quoting him -- "on the

9:54AM 1 toxicity of the drug that's not been previously published by

9:54AM 2 Merck, and there's information that Merck published that

9:54AM 3 misrepresents the health effects of the drug."

9:54AM 4 The article later says, and this is quoting the

9:54AM 5 article:  "After having an insider's look at various Merck

9:55AM 6 documents that were designated confidential and, therefore,

9:55AM 7 kept out of courtrooms, he" -- referring to Dr. Egilman --

9:55AM 8 "says that raw study data, company e-mails, and internal

9:55AM 9 analyses" -- and now quoting him -- "provide new information on

9:55AM 10 the health hazards of the drug and evidence of fraud in the

9:55AM 11 conduct of the studies.  I've been able to see documents few

9:55AM 12 others have."

9:55AM 13 That's Humpty Dumpty, Your Honor.  You can't run

9:55AM 14 away from that, and he's offered no explanation of this

9:55AM 15 whatsoever except to try to say it doesn't say what it really

9:55AM 16 says.

9:55AM 17 Your Honor, I think the only other point that

9:55AM 18 warrants response is with respect to the statements about

9:55AM 19 compliance with -- Merck's compliance with the orders.  The log

9:55AM 20 that is referenced here is a complete red herring.  This was a

9:55AM 21 convenience device between Merck and those at the PSC who were

9:56AM 22 processing documents as they were produced to the depository as

9:56AM 23 a way to catalog those documents as they came in.

9:56AM 24 If what is being asked for here is a list of the

9:56AM 25 documents for which Merck has claimed confidentiality, it's

9:56AM  1  there.  I mean, the parties have access to that.  The PSC has
9:56AM  2  that.  It's derived from that log, but it exists.  I don't know
9:56AM  3  what that has to do with anything.  The doctor is not saying,
9:56AM  4  "Oh, I was confused about whether a particular document was
9:56AM  5  marked."  They are marked if they're confidential.  It just
9:56AM  6  doesn't seem to connect to this really at all.
9:56AM  7              So, thank you, Your Honor.
9:56AM  8          THE COURT:  All right.  Let me make a few comments.
9:56AM  9              First of all, as we all know, this is a
9:56AM 10  multi-district litigation.  Under the multi-district litigation
9:56AM 11  statute, the multi-district litigation court determines that
9:57AM 12  something is a multi-district case and sends it to one court to
9:57AM 13  handle the case, primarily discovery, but statistics show that
9:57AM 14  only two percent of the cases get remanded back to the
9:57AM 15  transferor judge.  So, by and large, the transferee judge
9:57AM 16  generally resolves the case one way or another.
9:57AM 17              This particular case involved some 50,000
9:57AM 18  claimants who came from all over the United States, and I might
9:57AM 19  say many of them had claimed from Europe also, but I granted
9:57AM 20  summary judgment on those.  But the 50,000 that claimed from
9:57AM 21  the United States claimed that they had consumed Vioxx and they
9:57AM 22  had some health problems as a result of Vioxx.
9:57AM 23              I started the discovery process.  The discovery
9:58AM 24  process involved production of some 90 million documents from
9:58AM 25  the plaintiffs as well as from the defendants.  I had over

9:58AM  1   1,000 discovery motions, which I handled myself.  I had, in

9:58AM  2   this case, over 1,000 depositions.  We then went into a trial

9:58AM  3   mode and I tried six bellwether cases.  Eventually, the case,

9:58AM  4   after three years, was resolved by Merck paying $4.85 billion,

9:58AM  5   billion with a "B."

9:58AM  6              There are other aspects to the case that has

9:58AM  7   continued.  In addition to those 50,000 cases, 26 class actions

9:58AM  8   came out of this litigation.  I had to deal with that.  In

9:58AM  9   addition, there were at least 26 states whose Attorney Generals

9:59AM  10  made claims for their Medicaid reimbursement.  In addition,

9:59AM  11  there were consumer claims which have been dealt with.

9:59AM  12             Throughout all this litigation, discovery is

9:59AM  13  going on.  An MDL judge recognizing the scope of this

9:59AM  14  discovery, and the amount of discovery that's necessary, has to

9:59AM  15  devise vehicles for streamlining it and also making the parties

9:59AM  16  comfortable with delivering material.

9:59AM  17             Now, I'm not talking about privileged

9:59AM  18  information, I'm talking about information that the parties

9:59AM  19  feel is private, confidential, and they would rather not

9:59AM  20  disclose, although they may have to disclose the contents.

9:59AM  21             In that type of a situation, what you would do

10:00AM 22  in a regular case is say, go to the warehouse, look at all the

10:00AM 23  documents, take notes, but don't take any documents with you.

10:00AM 24  That's not efficient in an MDL.  Because in an MDL, I have

10:00AM 25  1,000 attorneys in this MDL.  1,000 attorneys.  I can't have

10:00AM   1   everybody going to the warehouse.  I can't have all of the

10:00AM   2   notes being taken.  It's just not efficient.  I would still be

10:00AM   3   dealing with the 50,000 cases.  Instead of getting rid them in

10:00AM   4   three years, it would take me three decades to deal with it.

10:00AM   5                So you have to come up with some devices that

10:00AM   6   give comfort to the parties so that they will exchange

10:00AM   7   information, document form information, to each other so that

10:00AM   8   the case can proceed.  One of these vehicles is recognized by

10:01AM   9   the Federal Rules of Civil Procedure 26(c), which provides for

10:01AM  10   protective orders.

10:01AM  11                Generally, what a court does, and what I did in

10:01AM  12   this case, is to get the parties together and talk to them

10:01AM  13   about a protective order.  I either give them a draft of

10:01AM  14   protective orders that I have done before, or I invite them to

10:01AM  15   give me drafts.

10:01AM  16                Protective orders, they're designed to permit

10:01AM  17   the litigants, and the courts, to examine a party's internal

10:01AM  18   records, which may include private information with respect to

10:01AM  19   the individuals.  As I mentioned earlier today, the people who

10:01AM  20   file claims have to disclose all of their medical, and they do

10:01AM  21   so, and they have to do so.  But some of that medical may not

10:01AM  22   be relevant, but it could also be embarrassing.

10:01AM  23                As I say, there may be abortions in a person's

10:01AM  24   history, which they're embarrassed about or feel that it's very

10:02AM  25   private.  They may have some sexually transmitted diseases that

10:02AM 1  they feel is very private.  They may have a bout of depression,

10:02AM 2  or a visit to a psychiatrist, or something of that sort, that

10:02AM 3  they feel is very private, but they have to produce it.  They

10:02AM 4  have it cough it up, as they say, but they're reluctant to do

10:02AM 5  it.

10:02AM 6          With the defendants, they may have commercial

10:02AM 7  data.  They may have valuable business secrets that they may

10:02AM 8  have to produce because it's not privileged.  But they're

10:02AM 9  reluctant to do it.

10:02AM 10         And in order to get them in a position, both

10:02AM 11 sides, to which they're able, or willing, or can talk to their

10:02AM 12 clients about it with some comfort that it's going to be

10:02AM 13 private and not disclosed to the public.

10:03AM 14         Now, in those types of situations, what happens

10:03AM 15 is, is that a party, when asked to produce information, meets

10:03AM 16 and confers with the other party and says, "I feel this is

10:03AM 17 confidential."  If the other party objects and says, "It's not

10:03AM 18 confidential, it's open to the public," then they bring it to

10:03AM 19 me and I decide whether it's confidential or not.

10:03AM 20         If it is confidential, and either I decide, or

10:03AM 21 the parties decide, they stamp it as confidential.  That's what

10:03AM 22 was done in this particular case.  When that is done, then the

10:03AM 23 parties cannot only see that information, but they can utilize

10:03AM 24 that information in the preparation of their cases.

10:03AM 25         How do they utilize it?  They hire experts and

10:03 AM 1   they say, "Look at this information.  Tell me whether I've got
10:03 AM 2   a case."  The experts, before they receive the information, are
10:04 AM 3   expected to sign a document that says, "I will abide by the
10:04 AM 4   confidentiality order," which in this case is Pretrial
10:04 AM 5   Order 13.  The expert is not able to look at the material
10:04 AM 6   unless the expert signs that document and agrees to all of the
10:04 AM 7   tenets of the document.
10:04 AM 8              Now, the protective orders, it should include,
10:04 AM 9   and this one does, an opportunity for a person to request such
10:04 AM 10  information or de-designate the information as nonconfidential,
10:04 AM 11  it's no longer confidential, or they can amend the
10:04 AM 12  confidentiality order.  They bring it to me and say, "This is
10:04 AM 13  no longer confidential, Judge."  I hear from the other side, I
10:04 AM 14  make a decision as to whether or not to remove that stamp, and
10:04 AM 15  it's public at that point; but until I do so, it's
10:05 AM 16  confidential.
10:05 AM 17             It's helpful to the litigants to have protective
10:05 AM 18  orders.  The courts have long recognized that in all civil
10:05 AM 19  litigation, the parties to the civil litigation are able to get
10:05 AM 20  information solely by virtue of the trial court's discovery
10:05 AM 21  process.  You can't walk up in the real world to somebody and
10:05 AM 22  say, "Give me all your medical information."  They would laugh
10:05 AM 23  at you.  But in a lawsuit, you're able to do that; but you're
10:05 AM 24  able to do that because of the procedures, the discovery
10:05 AM 25  procedures, that are instituted and adopted by the courts.

10:05 AM  1    So as rules authorizing discovery are adopted by

10:06 AM  2  Congress, in this case, the discovery rules, or by states in

10:06 AM  3  other type litigation, the material received by the litigant is

10:06 AM  4  subject to those rules, and the litigant has no First Amendment

10:06 AM  5  right to access or disseminate information made available only

10:06 AM  6  as a result of the lawsuit and the vehicles involved in the

10:06 AM  7  lawsuit.

10:06 AM  8    The parties, or anyone involved, can, as I say,

10:06 AM  9  seek permission of the Court to amend to be exempt from it, to

10:06 AM 10  exempt certain documents.  No one should take it upon

10:06 AM 11  themselves, either defendant, plaintiffs, or expert witnesses,

10:06 AM 12  to say, "Well, this has been disclosed, it's public.

10:07 AM 13  Therefore, it's marked private, it's marked confidential, but

10:07 AM 14  I'm going to just assume that it's either been waived or that

10:07 AM 15  it's not necessary to get Court approval."

10:07 AM 16    Now, in this particular case, there's no

10:07 AM 17  discovery that has been made.  There's a report from the *Wall*

10:07 AM 18  *Street Journal*.  The expert witness, the doctor's counsel

10:07 AM 19  indicates that he doesn't concede that he even said it, and if

10:07 AM 20  he did say it, it's a little vague.

10:07 AM 21    So what I think is appropriate in this case is

10:07 AM 22  for me to enter a preliminary injunction and to set a date for

10:07 AM 23  hearing on the merits.  Therefore, I'm going to order that a

10:07 AM 24  preliminary injunction be and is hereby entered enjoining and

10:08 AM 25  prohibiting Dr. David Egilman, and those persons in active

10:08 AM 1 concert or participation with him, from:

10:08 AM 2 Number one, destroying, altering, erasing,

10:08 AM 3 secreting, or failing to preserve any and all of the

10:08 AM 4 confidential information which is covered by Pretrial Order 13

10:08 AM 5 and its progeny, because there's been several additions to

10:08 AM 6 that;

10:08 AM 7 Number two, from disclosing, disseminating,

10:08 AM 8 discussing, referencing, or using for his purpose, or any other

10:08 AM 9 purpose, the same confidential information, including, but not

10:08 AM 10 limited to, all of the material provided to Dr. Egilman in his

10:08 AM 11 capacity as an expert witness in this and other proceedings;

10:08 AM 12 And number three, assessing, studying, or taking

10:08 AM 13 notes regarding the same confidential information.

10:09 AM 14 I'm going to order the issuance of this

10:09 AM 15 preliminary injunction.  It's conditioned upon Merck's

10:09 AM 16 producing a bond in the amount of $5,000.  It's further ordered

10:09 AM 17 the preliminary injunction, unless extended for good cause,

10:09 AM 18 will expire within 14 days of the date of this issuance.

10:09 AM 19 I'm going to further order that a hearing on the

10:09 AM 20 merits to determine whether this Court should modify or make

10:09 AM 21 permanent the injunction, and also issue penalties, costs, and

10:09 AM 22 other penalties as a result of this would be held on June the

10:09 AM 23 20th.

10:09 AM 24 Now, I have to pick that date because of the

10:09 AM 25 rules.  But if the parties have a problem with that date, if

10:09AM   1   they need to do some discovery, or if they want to supplement

10:09AM   2   any of their material, they should get together and give me a

10:10AM   3   different date, and I'll work it out with you all.  I don't

10:10AM   4   want to infringe upon your plans or anything of that sort.  But

10:10AM   5   other than hearing from you, then I'll look forward to hearing

10:10AM   6   from you on June the 20th at 9:00 a.m.

10:10AM   7                   If we have to go more than one day, we do have

10:10AM   8   Saturday and Sunday that week that we can deal with it.  But if

10:10AM   9   you all have some other dates that would work better with your

10:10AM  10   schedule, why don't you meet and confer and just let me know.

10:10AM  11                   Thank you both very much.  Court will stand in

10:10AM  12   recess.

10:10AM  13            **MR. REINERT:**  Thank you, Your Honor.

10:10AM  14                   Your Honor, I'm sorry, will we hear argument on

10:10AM  15   the All Writs injunction next or...

10:10AM  16            **THE COURT:**  Well, I really want to fold both of those

10:10AM  17   into it.

10:10AM  18            **MR. REINERT:**  Okay.  All right.  Thank you, Your

10:10AM  19   Honor.

10:10AM  20            **MR. BEISNER:**  Thank you, Your Honor.

10:10AM  21            **THE DEPUTY CLERK:**  All rise.

        22            (WHEREUPON, the proceedings were concluded.)

        23

        24

        25

1                              *****

2                         **CERTIFICATE**

3          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

4    for the United States District Court, Eastern District of

5    Louisiana, do hereby certify that the foregoing is a true and

6    correct transcript, to the best of my ability and

7    understanding, from the record of the proceedings in the

8    above-entitled and numbered matter.

9

10

11                         *s/Jodi Simcox, RMR, FCRR*
                           Jodi Simcox, RMR, FCRR
12                         Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25