# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX
   PRODUCTS LIABILITY LITIGATION

MDL NO. 1657

SECTION L

JUDGE FALLON
MAG. JUDGE KNOWLES

THIS DOCUMENT RELATES TO:      *Linda Isner v. Seeger Weiss, LLP, et al.,* **12-2406**

## ORDER & REASONS

Before the Court is Defendants BrownGreer, PLC and Orran Brown's (collectively, "BrownGreer's") motion for summary judgment (Rec. Doc. 64823) and Defendants Hughes Hubbard & Reed, LLP and Ted Mayer's (collectively, "HHR's") motion for summary judgment (Rec. Doc. 64825). Having considered the parties' memoranda and the applicable law, the Court now issues this order.

## I.    BACKGROUND

To put this matter in perspective, a brief review of this multidistrict litigation ("MDL") is appropriate. This litigation involves products liability claims pertaining to the prescription drug Vioxx, known generically as Rofecoxib. Merck, a New Jersey corporation, researched, designed, manufactured, marketed and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On May 20, 1999, the Food and Drug Administration ("FDA") approved Vioxx for sale in the United States. Vioxx remained publicly available until September 30, 2004, when Merck withdrew it from the market after data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarction (that is, heart attack) and ischemic stroke. Thereafter, thousands of individual suits and numerous class actions were filed

against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims.

This Court then held six "bellwether" trials, with varying outcomes. Other trials were held in coordinated proceedings in New Jersey and California and in non-coordinated proceedings in Alabama, Illinois, Florida, and Texas. Following these trials, the negotiating plaintiffs' counsel ("NPC") and Merck's counsel engaged in protracted settlement discussions over the course of a year, conducting hundreds of in-person and telephone meetings. On November 9, 2007, the parties announced a $4.85 billion master settlement agreement ("MSA") that intended to—and actually did—resolve most Vioxx-related claims through a resolution program. In its recitals, the MSA expressly states that its purpose was to "establish a pre-funded, structured private settlement program . . . to resolve . . . claims against Merck involving heart attacks, ischemic strokes and sudden cardiac deaths." This was an "opt-in" program, meaning that an interested claimant had to first decide to join the program and then had to take affirmative steps to enroll in it. Qualifying claims were to be paid out of a fixed fund. The MSA set out a process for evaluating claims, which would be further refined by BrownGreer, the claims administrator. This resolution program eventually processed over 50,000 claims and dolled out the entire fund.

Although the MSA required that all plaintiffs in the coordinated proceedings be "registered" in the settlement program, *see id.* § 1.1, only eligible plaintiffs (that is, claimants who had qualifying injuries and satisfied the Vioxx use requirements) were allowed to "enroll."[1] *Id*. § 1.2. To enroll, claimants were required to submit a form in which they agreed to be bound by all of the terms and conditions of the MSA. *See id.* § 1.2.4. Under those terms, counsel was

---

[1] For claimants to be considered eligible, they had to (1) establish that they had a qualifying injury (that is, a myocardial infarction or ischemic stroke), (2) establish their duration of Vioxx use, and (3) establish the proximity of their injury to that use. MSA. § 2.2.

2

required to "exercise his or her independent judgment in the best interest of each client individually before determining whether to recommend enrollment." *Id* § 1.2.2.

Once submitted, an enrollment form was irrevocable in most circumstances and claimants could not unilaterally withdraw from the settlement program, either by revoking their form or seeking return of the associated release and stipulation of dismissal, except in accordance with the terms of the MSA. *Id*. § 1.2.3. The program then required claimants to submit a claims package, including pharmacy, event, and medical records, to the claims administrator. *Id*. § 1.3.1, -.3.2. For a claim to be paid, claimants had to pass through several gates: (1) they had to establish that they had a qualifying injury, (2) establish their duration of Vioxx use, and (3) establish the proximity of their injury to that use. *Id*. § 2.2. The claims administrator was responsible for deciding whether they had passed each of these "gates." *Id*. § 2.1, -.2, -.3. If a claimant did not pass any of these, a "gates committee," which included representatives of both Merck and the NPC, automatically conducted an additional review. *Id*. § 2.5. If the gates committee reached the same conclusion as the settlement administrator, the claimant could either appeal the decision to a special master or leave the settlement program. If the claimant chose to appeal to the special master, the special master's decision would become binding, final, and non-appealable. *Id*. § 2.6. However, if the claimant instead chose to exit the settlement program, the release and stipulation of dismissal were returned to the claimant provided they executed a future evidence stipulation ("FES") within 30 days or, if they did not, the release and stipulation of dismissal were supplied to Merck. *Id*. § 2.7.2, -.2. Stated differently, this allowed claimants to enroll in the settlement program without foreclosing the possibility of a later trial for a claimant who was deemed ineligible.  The trial, however, was defined by the future evidence stipulation.

Because the MSA contemplated a fixed fund of $4.85 billion, qualifying claims were initially assigned a point value rather than a monetary value. BrownGreer allocated points systematically using a methodology that considered a number of factors, including the severity of the claimant's injury, the length of the claimant's Vioxx use, and the claimant's risk factors. The claims administrator then notified each claimant of their aggregate point value. *Id*. § 3.2.3. This value could then be appealed to the special master for *de novo* review. *Id*. § 3.2.4. At the conclusion of the resolution program, after all claims had been processed, each claimant's aggregate point value was translated into a monetary value. *Id*. § 3.1. This constituted their "base" award.

To assist claimants in deciding whether they should enroll in the resolution program, the Court and BrownGreer created an interactive tool that allowed a claimant to apply the point allocation methodology to their claim. Claimants were cautioned that the precise monetary value of their claim could not be determined precisely until all claims had been assessed since this was a capped fund. In fact, those who chose to enroll in the resolution program were required to execute a release that clearly and expressly addressed this uncertainty.

In addition to the base award, certain claimants were also eligible to receive extraordinary injury ("EI") awards. A portion of the settlement fund was set aside specifically for this purpose. EI awards were to be provided where a claimant had experienced atypical medical injuries or economic injuries over $250,000. BrownGreer was charged with creating the process and criteria for evaluating EI claims. *Id*. § 4.2.7. However, it did not exercise this authority until after the enrollment period had concluded. As with the base awards, a claimant could not be certain of whether they would receive an EI award or how much that EI award would be.

BrownGreer eventually published a detailed instruction manual setting out the process and criteria for evaluating EI awards. (Rec. Doc. 64823-4). In addition to submitting an EI claim itself, each claimant was also required to submit certain substantiating documentation. After reviewing the EI claim and documentation, BrownGreer would issue a notice of assessment stating the amount of each claimant's EI award as well as an explanation of how that award had been determined. It also described the effect any missing documentation had on the award. After receiving the notice of assessment, a claimant was then permitted to submit additional documentation and seek a reassessment. Upon resubmission, BrownGreer would then issue a second notice of assessment. If the claimant remained unsatisfied, they could appeal to the special master. The special master's determination of the assessment then became binding and could not be appealed further.

On October 29, 2004, Mrs. Isner filed an action against Merck in state court in Massachusetts seeking to recover for the wrongful death of her husband, Dr. Jeffery Isner. Merck then removed to the United States District Court for the District of Massachusetts and then the JPML transferred the case to this Court for inclusion in the *Vioxx* MDL. Joseph Doherty, an attorney representing Mrs. Isner, expressed concern that the settlement agreement would not allow Mrs. Isner to recover for projected future income, which was a substantial component of her claim, given that Mr. Isner was 54 years old and was a physician with significant income. He then contacted Mr. Mayer, of the firm HHR, which represented Merck, as well as Mr. Brown, of the firm BrownGreer. Additionally, Mr. Doherty and Mrs. Isner participated in a October 20, 2008, conference held in New York City, for the purpose of providing additional information about the resolution program to potential claimants. Representatives from Merck, the NPC, and BrownGreer participated.

On October 21, 2008, Mr. Doherty e-mailed Mr. Mayer to follow up on a conversation

they had the previous day at the conference in New York.

> I have not been able to locate the specific provision that you
> confirmed yesterday, which addresses the fact that EI payments are
> _not_ limited to the time period from Dr. Isner's death to the date of
> the settlement on [November 9, 2007].
>      Would you please let me know where I can find the
> specific language that establishes the right to EI payments for _both
> past and future_ lost earnings through to the end of Dr. Isner's
> work-life expectancy?  . . . .
>           . . . .
>      Obviously, if [Mrs.] Isner will actually be entitled to
> recover dollar-for-dollar EI damages for all lost wages through the
> end of her husband's work-like [_sic_] expectancy, that would change
> our evaluation of the potential settlement amount substantially, and
> it might bring her "into the fold[,"] so to speak.
>      Before I can advise her further, I need specific confirmation
> of the fact that she will, in fact, be entitled to recover lost earnings
> by Dr. Isner throughout his entire work-life expectancy, from the
> date of his death, October 31, 2001, through the end of his work-
> life expectancy at age 70 . . . .
>      Please get back to me as soon as possible. Time is
> obviously running short.

(Rec. Doc. 64882-3 at 1 (emphasis in original)).

On October 22, 2008, Mr. Mayer responded to Mr. Doherty:

> The provision which [Mr.] Seeger and I were referring is
> [§] 4.2.6,  . . . which reads[,] "Each Qualifying Program Claimant
> that is eligible for, and properly and timely applies for an EI
> payment shall ([s]ubject to [§] 4.2.8 and to all other terms and
> conditions of [the MSA]) receive an EI payment according to a
> criteria to be determined by [BrownGreer]. EI Payments are in
> addition to the Final Settlement Payments pursuant to [§] 4.3."
> Under this provision, there is no individual cap on awards, nor are
> awards for qualifying claims limited to past lost earnings. The only
> cap on awards is the aggregate cap referred to in [§] 4.2.8, which
> provides for proration in the event the aggregation of individual MI
> EI awards exceeds the MI EI Payment Cap Amount of $195
> million. I have confirmed with [BrownGreer] that it agrees with
> this interpretation.
>      I did walk you through this provision in one of our prior
> calls, and I had left that prior call believing that your principal

6

continuing concern was the uncertainty regarding the likely extent of proration under the [MSA]. If I didn't' make the intended meaning of the provision clear in that call, I have myself to blame. [At the conference], I did not realize that you continued to interpret the [MSA] as prohibiting recovery for future lost wages until you spoke during our meeting with Judge Corodemus . . . .

As you know, [BrownGreer] has not yet established all the criteria for EI awards. What can be said with certainty is that for an otherwise qualifying claim, future earnings will be awarded without a cap, up to an age cutoff . . . . The awards will be dollar for dollar subject to 1) disability benefits . . . , 2) I believe, discount to present value as of the payment date . . . ., and 3) any proration that may prove necessary under [§] 4.2.8.

I hope this is helpful to you and provides comfort that Mrs. Isner will be treated fairly in the [Resolution] Program. The process does not allow prediction of the recovery amount with precision, but certainly provides vastly more certainty, more speed, and less stress than a return to the tort system with all elements of the claim at issue.

(*Id.* at 3.)

Later that day, Mr. Doherty spoke with Mr. Brown. According to Mr. Doherty, Mr. Brown told him that he would be entitled to a dollar-for-dollar recovery, limited only by the global cap and the age cap. Mr. Doherty contends that Mr. Brown told him that he should rely on the interpretation because Merck, NPC, and BrownGreer agreed it was accurate.

On October 23, 2008, Mr. Doherty responded further:

Thank you for getting back to me. I had a long telephone conference with [Mr.] Brown this afternoon. We resolved several issues, but we acknowledged that there were also many issues that involved "un-knowable" [*sic*] factors, at this time, which will not be resolved prior to October 30[, 2008].

For example, [Mr. Brown] confirmed, (as you similarly confirmed in your e-mail today), that the issue of whether EI damages will include *all* lost earnings/lost earning capacity throughout Dr. Isner's full work-life expectancy, (rather than from the date of his death up to the date of the [MSA]). [Mr. Brown] stated that although the complete criteria for allocate EI damages has not as yet been finalized or reduced to writing, this specific criteria, governing past as well as future lost earning capacity, has been conclusively established, in view of the fact that Merck, the

> [NPC], and [BrownGreer] all agree that the language of [§] 4.2.6 mandates such an interpretation. . . .
>
> In order for me to conduct a more complete analysis of the various "un-known" factors, I would truly appreciate receiving as much information, (as soon as possible) . . . .

(*Id*. at 6-8). Mr. Doherty then requested specific information about the number and nature of claims by claimants who had, thus far, elected to enroll in the resolution program. He then continued:

> If I can obtain this information, I will be able to prepare some reasonable extrapolations as to the likelihood of exceeding the $195 million global cap on EI damage awards and I can provide better estimates as to the range of potential amounts Mrs. Isner would be likely to receive if she were to agree to the settlement.
>
> . . . .
>
> . . . . I promise to be a pain in the neck to you sending daily e-mails and asking all sorts of complicated questions, in the hope that I can obtain enough information before October 30[, 2008] to provide my client with all of the specific established facts as well as a best case/worst case analysis of theunknown/unknowable [*sic*] facts. If I can make the "un-knowable" at least somewhat more predictable, I will be in a better position to make informed recommendations to Mrs. Isner and she will be in a better position to make an informed decision as to whether she will opt in or opt out of the proposed settlement.

(*Id*. at 6-8).

Mr. Mayer then responded:

> Let me address [your inquiries] on a confidential basis, to the extent we have information. The information that follows is not official in any way, but I will give you my best shot at the questions for what it may be worth to you in your deliberations with your client.

(*Id*. at 6). Subject to those qualifications, Mr. Mayer provided some specific information regarding the number and nature of claims. Specifically, he explained that the number of claims remained a "moving target," that he did not have aggregate age information for claimants, and that he did not have any information regarding the estimated number and nature of EI claims.

Mr. Doherty had sought out this information so that he could make his own evaluation of what

Mrs. Isner would likely receive if she chose to enroll in the resolution program.

 Following this interaction, Mrs. Isner decided to enroll in the resolution program. In

doing so, she executed a release on October 30, 2008, which barred:

> (1) any and all rights, remedies, actions, claims, demands, causes
> of actions, suits at law or in equity, . . . of any kind
> whatsoever . . . , which I . . . may have ever had, may now have or
> at any time hereafter may have . . . and (ii) any and all debts,
> liabilities, obligations, covenants, promises, contracts, agreements
> and/or obligations, of any kind whatsoever . . . , which any
> Released Party[2] may have ever had, may now have or at any time
> hereafter may have to me  . . . to any extent, or in any way, arising
> out of, relating to, resulting from and/or connected with VIOXX
> and/or with any injury I . . . have ever claimed, or may at any time
> hereafter claim, VIOXX caused in whole or in part.

(Rec. Doc. 64823-6 at 3). It also provided:

> ACKNOWLEDGMENT OF COMPREHENSION; NO
> GUARANTEE OF PAYMENT. I AM ENTERING INTO THIS
> RELEASE FREELY AND VOLUNTARILY, WITHOUT BEING
> INDUCED, PRESSURED OR INFLUENCED BY, AND
> WITHOUT RELYING ON ANY REPRESENTATION OR
> OTHER STATEMENT MADE BY OR ON BEHALF OF,
> MERCK OR ANY OTHER PERSON. . . . I ACKNOWLEDGE
> THAT I HAVE READ THIS RELEASE AND THE [MSA], AND
> I HAVE HAD AN OPPORTUNITY TO OBTAIN ADVICE
> FROM, AND ASK QUESTIONS OF, COUNSEL OF MY
> CHOOSING REGARDING THE TERMS AND LEGAL EFFECT
> OF THESE DOCUMENTS AND MY DECISION TO ENROLL
> TO PARTICIPATE IN THE [RESOLUTION] PROGRAM. . . . I
> FURTHER ACKNOWLEDGE THAT I UNDERSTAND THIS
> RELEASE AND THE [MSA] AND THAT THERE IS NO
> GUARANTEE THAT I WILL RECEIVE ANY SETTLEMENT
> PAYMENT OR, IF ANY SETTLEMENT PAYMENT IS MADE,
> THE AMOUNT THEREOF.

---

[2] The term "released party" is defined broadly as "all the parties, past, present and/or future, in any way and/or at any time connected with VIOXX and/or with any injury I . . . have ever claimed, or hereafter claim, VIOXX caused in whole or in part." (Id.). For instance, this specifically includes "attorneys" and "agents." (*Id*. at 4).

(*Id.*). In addition to Mrs. Isner's signature, the release also contained a certification signed by Mr. Doherty. In that certification, he stated that he had "discussed with [Mrs. Isner] the terms and legal effect" of the release and MSA and that neither had "any objection to the terms." (*Id.* at 11). Further, under the express terms of the MSA itself, claimants are barred from "institute[ing] any proceeding, judicial or otherwise, against Merck, the NPC or [BrownGreer] to enforce, or otherwise with respect to, [the MSA]." MSA § 16.9.2; *see also* MSA § 17.1.6.

After conducting a review of Mrs. Isner's claims, BrownGreer made a base award of $1,573,602.19. In addition, BrownGreer made a EI award of $5,359,316.74. Mrs. Isner then appealed to the special master. Specifically, she contended that her EI award was improperly reduced to maintain the relative standing among claimants and also improperly reduced to account for the uncertainty of future lost income. Her appeal was denied. Mrs. Isner then collected, accepted, and retained award.

Mrs. Isner then filed the present action in state court in Massachusetts. Like her previous action, it was removed and then transferred to this Court for inclusion in the *Vioxx* MDL. In her complaint, Mrs. Isner asserts BrownGreer's and HHR's negligent and fraudulent representations and violations of Massachusetts' consumer protection laws.

## II.   PRESENT MOTIONS

BrownGreer and HHR now move for summary judgment. (Rec. Docs. 64823, 64825). *First*, they argue that Mrs. Isner executed a release that bars any claims against BrownGreer and HHR, including those seeking enforcement of the settlement. *Second*, BrownGreer and HHR argue that, in her release, Mrs. Isner disclaimed that she had relied on representations or statements of others in enrolling in the resolution program and acknowledged that it was uncertain that she would receive any award or, if she did, what the amount of that award would be. *Third*, BrownGreer and HHR argue that no actionable misrepresentation occurred because

10

they had not made any sweeping assurances and that, even if the assurances they did make were considered sweeping, they were not false. *Fourth*, they argue that Mrs. Isner waived any right to challenge her award under the resolution program by accepting a $6,932,918.93 award. *Fifth*, BrownGreer and HHR argue that the award Mrs. Isner seeks exceeds the damages available under the controlling law "by a substantial measure." (Rec. Doc. 64823 at 3). Specifically, they suggest that, under Massachusetts law, projected future income is assessed at a net value (that is, after taxes) and is also reduced to present value. Under that approach, they contend that her $5,359,316.74 extraordinary injury award would have been discounted to $3,687,000.00. *Sixth*, BrownGreer and HHR also contend that Mrs. Isner's consumer protection claim fails because the underlying transaction is not commercial in nature and does not involve a tort.

Mrs. Isner responds. (Rec. Doc. 64882, 64883). *First*, she argues that BrownGreer and HHR "seek to trivialize [her] claims, in an apparent effort to justify or excuse their own wrongful conduct, by citing the specific dollar amount of the award [she] received . . . and asserting that [the award] exceeded amounts awarded to other claimants." (Rec. Doc. 64882 at 1-2). *Second*, Ms. Isner argues that, under Massachusetts law, her award may have been larger because it may have included punitive damages and loss of companionship, society, and support, not just projected future income. She also indicates that her award included only 50% of her projected future income, meaning that, even if reductions were made for net value and present value, she would still be entitled to twice the reduced value. *Third*, she argues that Massachusetts law, not New York law, governs the release and settlement. *Fourth*, Ms. Isner argues that there are genuine issues of material fact that preclude summary judgment. *Fifth*, she argues that neither the release nor the settlement agreement itself bar her claim that BrownGreer's and HHR's alleged tortious conduct induced her to enroll in the resolution program. *Sixth*, she argues that, under

Massachusetts law, a party may not rely on a release as a defense against claims of fraud or deceit. *Seventh*, Ms. Isner argues that BrownGreer and HHR did, in fact, make actionable misrepresentations because, under Massachusetts law, BrownGreer and HHR had superior knowledge about the matters about which the statements were made. *Eighth*, She argues that her acceptance of an award does not preclude her claim because she does not dispute the validity of that award. Instead, she asserts that her claim seeks recovery for the loss she incurred by enrolling in the resolution program on the basis of BrownGreer's and HHR's misrepresentations. *Ninth*, she argues that she is entitled to what she would have received if the misrepresentations had been true, not what she would have received if she had decided not to enter into the settlement agreement. *Tenth*, Ms. Isner argues that her consumer protection claim arises out of a business context because the misrepresentations were not motivated by personal reasons.

BrownGreer and HHR then jointly reply. (Rec. Doc. 64901). *First*, they argue that her claims are barred by the release and the settlement agreement itself. In fact, the release served as the consideration for her participation in the resolution program. *Second*, BrownGreer and HHR argue that the alleged misrepresentations were merely predictions that were not false when they were made. *Third*, they argue that Ms. Isner could not have reasonably relied on those alleged misrepresentations when she enrolled in the resolution program because her release expressly stated that she had not relied on any such representation. Even so, they argue that the representations were accurate. Ms. Isner responds further, largely reiterating her prior arguments. (Rec. Doc. 64911).

## III.   LAW & ANALYSIS

### A.   Standard of Review

Summary judgment is appropriate if the moving party can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a). Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). When the moving party has met its Rule 56(c) burden, the non-movant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster,* 227 F.3d 504, 508 (5th Cir. 2000). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986). Furthermore, "[t]he non-movant cannot avoid summary judgment . . . by merely making 'conclusory allegations' or 'unsubstantiated assertions.'" *Calbillo v. Cavender Oldsmobile, Inc.,* 288 F.3d 721, 725 (5th Cir. 2002) (quoting *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)). In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the non-movant. *Id.* at 255.

    **B.**    **Analysis**

       As a preliminary matter, it is necessary to determine whether the terms of the MSA bar Mrs. Isner's action. Under those terms, she agreed not to "institute any proceeding, judicial or otherwise, against Merck, the NPC or [BrownGreer] to enforce, *or otherwise with respect to*, [the MSA]." MSA § 16.9.2 (emphasis added); *see also id.* § 17.1.6. (The release itself incorporates the MSA.) Mrs. Isner unambiguously states that she considers both the MSA and the release enforceable. (Rec. Doc. 64882 at 23). Even though she does not seek relief under the terms of the MSA, Mrs. Isner's present action is clearly brought with respect to the MSA. Further, it is brought against HHR, a representative of Merck, and BrownGreer. As such, her claims are clearly barred by the terms of the MSA.

Even if her action were not barred by the express terms of the MSA, it would be precluded by her assertion that she had not relied on any alleged misrepresentation in enrolling in the resolution program. For Mrs. Isner to prevail, she would be required to demonstrate that any reliance on BrownGreer's or HHR's "representation was reasonable and justifiable." *Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 918 N.E.2d 36, 50 (Mass. 2009). This constitutes a "question of law where the undisputed facts permit only one conclusion." *Id*.; *see also Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1031, 521 (Mass. 2004). "[R]eliance on supposed misrepresentations that contradict the terms of the parties' agreement is unreasonable as a matter of law and so cannot support a fraudulent-inducement claim." *HSBC Realty Credit Corp. (USA) v. O'Neill*, 745 F.3d 564, 571 (1st Cir. 2014). Generally, a party that has engaged in negotiations "should not sign a contract that conflicts with [their] understanding of the agreement." *Turner v. Johnson & Johnson*, 809 F.2d 90, 97–98 (1st Cir. 1986). Here, Mrs. Isner, through Mr. Doherty, engaged in extensive negotiations with HHR and BrownGreer regarding the terms of the MSA. At the conclusion of those negotiations, she voluntarily agreed to be bound by the MSA and the release. Further, it is anything but apparent that BrownGreer and HHR's made any representation that Mrs. Isner would receive any specific recovery—never mind a dollar-for-dollar recovery—on her EI claim. In contrast, it appears that any representations were sufficiently couched in uncertainty about the criteria and process for evaluating EI claims—an uncertainty that Mr. Doherty freely and frequently acknowledged in his own communications. This uncertainty was further reinforced by the language of the release itself, which made clear that the amount of any award was undeterminable until the conclusion of the resolution program. However, even if the representations had been as authoritative as Mrs. Isner now suggests they were, she effectively disregarded those representations when she

14

expressly indicated that her decision to be bound by the terms of the MSA and the release was made "WITHOUT RELYING ON ANY REPRESENTATION OR OTHER STATEMENT MADE BY OR ON BEHALF OF, MERCK OR ANY OTHER PERSON." (Rec. Doc. 64823-6 at 3). This superseding act, which is recognized as valid under Massachusetts law, precludes any contention that she relied on the statements BrownGreer or HHR in enrolling in the resolution program. At the point she enrolled, it is clear that both she and Merck intended to be bound exclusively by the MSA and the release.

In addition, there is no indication that BrownGreer or HHR's statements to Mrs. Isner actually constituted misrepresentation. As discussed above, their communications were framed in the underlying uncertainty about the process and criteria for evaluating EI claims. Further, they indicated that they were interpreting the provisions of the MSA, primarily based on their own understanding of its language. Taken in context, it does not appear that Mrs. Isner or Mr. Doherty would have been reasonable in relying on those nebulous statements in concluding that they would receive the dollar-for-dollar recovery they now say they anticipated.

Mrs. Isner freely decided to enroll in the resolution program instead of proceeding in tort, which she was entitled to do. Had she proceeded in tort, it is likely she would have faced certain hurdles. For instance, as a cardiologist, it could be argued that Dr. Isner may or should have had knowledge of the risks caused by Vioxx. Mrs. Isner has also received the benefit of participation in the resolution program. The MSA, like all settlement agreements, is a compromise, and it was not intended to make Mrs. Isner whole. In consideration for Merck's promises to her, she made certain promises to Merck. Her release of claims against it and others—including her claims here—was one of those promises.

**IV.     CONCLUSION**

For the forgoing reasons, **IT IS ORDERED** that BrownGreer's motion for summary

judgment (Rec. Doc. 64823) and HHR's motion for summary judgment (Rec. Doc. 64825) are

**GRANTED** and Mrs. Isner's claims against them are **DISMISSED**.

New Orleans, Louisiana, this 2nd day of July, 2014.

UNITED STATES DISTRICT JUDGE