UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX<br>      PRODUCTS LIABILITY LITIGATION | MDL NO. 1657<br><br>SECTION L<br><br>JUDGE FALLON<br>MAG. JUDGE KNOWLES |

**THIS DOCUMENT RELATES TO:** *All Cases*

## ORDER & REASONS

Before this Court is Interested Attorney Richard Getty's Motion Seeking Direct Contact with Ineligible Claimants in the Vioxx Consumer Class. (Rec. Doc. 65061). The Court has reviewed the briefs and applicable law, and having heard oral argument on the motion, now issues this Order & Reasons.

**I.    BACKGROUND**

To put this matter in perspective, a brief overview of this litigation is appropriate. This multidistrict litigation ("MDL") involves the prescription drug Vioxx, known generically as Rofecoxib. Defendant Merck, a New Jersey corporation, researched, designed, manufactured, marketed, and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On May 20, 1999, the Food and Drug Administration ("FDA") approved Vioxx for sale in the United States. Vioxx remained publicly available until September 30, 2004, when Merck withdrew it from the market after data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions (heart attacks) and ischemic strokes. Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort,

fraud, and warranty claims. It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999, and September 30, 2004. Based on this estimate, it was thought that approximately 20 million patients have taken Vioxx in the United States.

On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("JPML") conferred MDL status on Vioxx lawsuits filed in federal court and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.,* 360 F. Supp. 2d 1352 (J.P.M.L. 2005). One month later, on March 18, 2005, this Court held the first status conference in the Vioxx MDL to consider strategies for moving forward with the proceedings. Shortly thereafter, the Court appointed a Plaintiffs' Steering Committee ("PSC") and Defendant's Steering Committee to represent the parties and to meet with the Court once every month or two to review the status of the litigation.

On August 2, 2005, the PSC filed a Purchase Claims Master Class Action Complaint ("Purchase Claims Complaint"), naming individual consumers who purchased Vioxx for themselves. (Rec. Doc. 790). The Purchase Claims Complaint states:

> 2. . . . Merck intentionally, recklessly, and/or negligently concealed, suppressed, omitted, and misrepresented the dangers, defects, and disadvantages of Vioxx, and advertised, promoted, marketed, sold, and distributed Vioxx as a safe prescription medication when, in fact, Merck had reason to know and did know that Vioxx was not safe for its intended purposes . . . .
> . . . .
> 9. In an elaborate and sophisticated manner, Merck aggressively marketed Vioxx directly to consumers . . . . Merck's marketing campaign specifically targeted third party payors, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of Vioxx.
> . . . .
> 11. Vioxx possessed dangerous and concealed or undisclosed side effects, including the increased risk of serious cardiovascular events, such as heart attacks, unstable angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes. In addition, Vioxx was no more effective than traditional and less expensive NSAIDs . . . .

>> 12. . . . . Merck's omission, suppression, and concealment of this important information enabled Vioxx to be sold to, and purchased, or paid for by, the End-Payors at a grossly inflated price.

(*Id.* at 3-6). The Purchase Claims Complaint sought relief under a myriad of laws, including state consumer protection statutes. (Rec. Doc. 790 at 60-75).

After substantial settlement negotiations spanning several years, the parties reached a compromise last year. The Court issued a Final Order and Judgment Certifying the Class for Purposes of Settlement and Approving of Class Action Settlement on January 3, 2014. (Rec. Doc. 64784). The Settlement allocated up to $23 million, from which Class Members could seek recovery for their out-of-pocket costs for purchasing Vioxx and up to $75.00 in connection with post-withdrawal medical consultation related to Vioxx use or a one-time payment of $50.00 with proof of a Vioxx prescription. Those amounts, however, were subject to a *pro rata* reduction if all claims, administrative, attorneys' fees, and other costs exceeded the $23 million cap.

In conjunction with the Consumer Class Settlement, the Court has twice ruled upon the adequacy of Notice under Rule 23 and its due process requirements: the Preliminary Certification of a Class (Rec. Doc. 64526) and the Final Order and Judgment Certifying the Class for Purposes of Settlement, Approving of Class Settlement, & Dismissing the Actions with Prejudice. (Rec. Doc. 64784). The Settlement Agreement called for the establishment of a settlement website, toll-free phone number, and post office box to serve as sites where Class Members could obtain or request detailed Notice. (Settlement Agreement ¶¶ 5.3-5.5; Rec. Doc. 64487 at 10). Moreover, Kinsella Media, LLC ("Kinsella") developed a Notice plan to alert the class to the settlement. This plan called for a direct mailing to all counsel for the putative consumer class, paid media advertising, including a mix of print, broadcast, and online media,

3

and a comprehensive online media campaign.  (Rec. Doc. 64502-3 ¶¶ 16-29).  Kinsella and BrownGreer worked together to implement the Notice plan.  (Rec. Doc. 64526).

Despite these efforts, the number of filed claims remained low, with only 3,137 claims filed by February 16, 2014 and an average of 131 claims filed per week.  To boost the number of filed claims, at the suggestion of the Court, the parties authorized BrownGreer to implement a Courtesy Reminder Campaign on February 12, 2014.[1]  Pursuant to this campaign, BrownGreer reached out again to those claimants who had indicated that they could be potential consumer claimants.  These efforts included direct mailings to claimants; emails to law firms who represented claimants; emails to claimants who had started the electronic form but had failed to complete the form; emails to claimants who had registered for Secure Claims Portal access but had not started a Claim Form; and direct mailing to claimants who had requested and were sent a hard copy of the form but had not completed a Claim Form.  Moreover, BrownGreer enhanced the call center by offering live operator call-backs, Spanish recorded messages, and Spanish-speaking representatives.  Finally, BrownGreer augmented the website capabilities by including a Claim Form on the home page, including a mailed Claim Form request; adding new language to the homepage; adding a "Do I Qualify for Payment" feature, which would ask potential claimants pointed questions to determine their eligibility; and finally, including a Spanish Claim Form and offering a Spanish version of the website.

These efforts were met with some success.  The average number of claims per week increased during this time from 131 per week to 312 per week.  By the time the claims period concluded on May 6, 2014, a total of 8,757 claims had been filed, with 5,620 claims having been filed after the implementation of the Courtesy Reminder Campaign.

---

[1] The details and figures contained within this section are largely based on Orran Brown, Sr.'s Declaration (Rec. Doc. 65070-1) and Orran Brown, Sr.'s presentation to this Court on December 16, 2014.

Of the 8,757 claims filed, BrownGreer deemed 2,284 claims to be ineligible. These determinations broke down as follows: 308 claimants provided no documents; 238 claimants included invalid documents; 314 claimants submitted an incomplete claim form, 916 were determined ineligible for multiple reasons; 110 were excluded; and 398 were found to be duplicates – they had filed more than one claim form. During Orran Brown, Sr.'s presentation to the Court on December 16, 2014, Mr. Brown explained that most of those determined "excluded" had either signed a release form in the Vioxx Personal Injury Settlement or were Missouri residents and therefore excluded from the Consumer Class.

In an effort to cure the ineligible claimant's problematic documentation and forms, BrownGreer issued a notice to those claimants. The notices took the form of email if the claimant had filed electronically and paper notice if the claimant had submitted a hard copy claim. The notices instructed the ineligible claimants to submit the missing documentation and/or forms within thirty days and included an email and toll free number to contact if the ineligible claimants had questions.

BrownGreer issued the first notice on August 22, 2014 and received 690 responses, a 29% response rate, of which 83% of those responses cured their problematic claims. The second notice went out on October 23, 2014, and BrownGreer received 344 responses constituting a 20% response rate. Eighty-four percent of those responses cured their ineligible claims.

The final period to cure any deficient claims has closed. As reported by BrownGreer, there are 7,366 payable claims, 988 ineligible claims, and 403 duplicate claims. The final number of claims total 8,757.

**II.   PRESENT MOTION**

Interested party, Richard Getty, filed the present motion asking the Court to direct BrownGreer or Class Counsel, or alternatively to allow the Getty Law Firm, to telephonically

5

contact claimants deemed ineligible to receive payment from the Consumer Class Settlement. (Rec. Doc. 65061).  Mr. Getty highlights the deficient, initial Notice campaign and how his firm, on behalf of claimant James Ratliff, quickly moved to notify the Court of this inadequate Notice. Mr. Getty cites the high percentage of ineligible claimants and underscores his law firm's successful efforts to reach Kentucky consumer claimants.  (Rec. Doc. 65061-1 at 2).  Despite these efforts, Mr. Getty contends that "the final claims rates for the Settlement [remains] extremely low—only a negligible percentage of eligible Class Members submitted claims under the Settlement, and the total amount claimed is but a fraction of the total value of the Settlement." (Rec. Doc. 65061-1 at 3).

Vioxx Consumer Class Counsel opposes the motion, arguing that the Court has already ruled twice upon the adequacy of Notice under Rule 23 and its due process requirements and that the Notice campaign utilized state-of-the-art methods to reach claimants.  (Rec. Doc. 65070). Class Counsel acknowledge that only a small percentage of the class have made claims but attribute this to "the age of the case at the time of settlement, the non-availability of records, and the relatively small payments offered to fully reimburse class members for their relatively small original payments to Vioxx."  (Rec. Doc. 65070 at 3).  Class Counsel also questions the effectiveness of such a campaign, citing BrownGreer's assertion that it would cost $15,000 to $20,000 to execute such a plan, and calls would likely only reach approximately 50% of those ineligible claimants.  (Rec. Doc. 65070 at 10-11).  Finally, Class Counsel contends that such action would delay the payment of those perfected claims, some of whom submitted their claims a year ago.[2]

---

[2] There is a pending Fifth Circuit appeal regarding the Consumer Class, so payment cannot be effectuated until that appeal is resolved.  Class Counsel acknowledges this but averred, along with Defense Steering Committee, that the parties would like to be in a position to inform the Fifth Circuit that payment can be made as soon as the Fifth Circuit renders a decision.

6

**III.    LAW & ANALYSIS**

Rule 23(c)(2)(B) requires that "the court must direct to class members the best notice that is practicable under the circumstances." Fed. R. Civ. Proc. 23(c)(2)(B). As recounted above, BrownGreer and Kinsella have undertaken a vast, state-of-the-art Notice campaign designed to reach claimants. This campaign embraced a variety of methods in order to reach the broadest breadth of potential claimants. Particular to those claimants deemed ineligible, the subject of this motion, BrownGreer issued two reminder notices and afforded two thirty-day grace periods during which those ineligible claimants could cure their problematic claims. The Court is persuaded that such action goes above and beyond the Rule 23 requirements.

Moreover, based on BrownGreer's representations, the potential benefits of direct telephone contact would not outweigh the costs associated with such an undertaking. BrownGreer estimates that the cost of direct calls would be $15,000 to $20,000 but avers that the likely payout would be around $30,000. Furthermore, such activity could delay the payment of perfected claims who submitted their claims a year ago. Although payment will not be executed until the pending appeal is resolved, the Court agrees that a communication to the Fifth Circuit that the claims are ripe for payment could encourage a quicker resolution of the appeal. Thus, based on the extensive notice campaign, the actual costs associated with direct phone contact, and the potential delayed payout to perfected claims, this Court finds that direct telephonic communication is not a worthwhile undertaking for ineligible Consumer Class claimants.

## IV.    CONCLUSION

Based on the foregoing reasons, **IT IS ORDERED** that Interested Attorney Richard Getty's Motion Seeking Direct Phone Contact with Ineligible Claimants is hereby **DENIED**.

New Orleans, Louisiana, this 19th day of December, 2014.

_____
UNITED STATES DISTRICT JUDGE