UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Case No. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | SECTION L |
| LITIGATION | * | |
| | * | JUDGE FALLON |
| *This document relates to* | * | |
| | * | MAGISTRATE JUDGE |
| *Jo Levitt v. Merck Sharp & Dohme Corp.*, | * | KNOWLES |
| 2:06-cv-09757-EEF-DEK | * | |
| | * | |

*********************************************************************

### DEFENDANT MERCK SHARP & DOHME CORP.'S MOTION FOR SUMMARY JUDGMENT REGARDING PROXIMATE CAUSATION AND INCORPORATED MEMORANDUM OF LAW

Defendant Merck Sharp & Dohme Corp. ("Merck") respectfully moves for summary judgment on all claims based on Plaintiff Jo Levitt's inability to establish proximate causation. Ms. Levitt claims that Vioxx caused her to experience two heart attacks. Merck previously filed a Motion for Summary Judgment based on Ms. Levitt's failure to proffer the required expert testimony on specific causation supporting her claim that Vioxx caused her to experience a heart attack. (Rec. Doc. 64878.) In response to that Motion, Plaintiff attempted to re-characterize her alleged injury to more broadly encompass a general exacerbation of her cardiovascular disease. (Rec. Doc. 64965; *see also* Rec. Doc. 64931 (Merck Reply).) Regardless of how her injury is characterized, however, Ms. Levitt's claims fail as a matter of law because Merck's alleged failure to warn of Vioxx's cardiovascular risks was not the proximate cause of her alleged injuries. The undisputed evidence shows that a different warning would not have changed the decision of her prescribing physician Dr. Arnold Katz to prescribe Vioxx to Ms. Levitt. Dr. Katz testified unequivocally that even if Vioxx had carried a black box warning for cardiovascular risk (the strongest category of all warnings), he would have prescribed it to a fibromyalgia patient

like Ms. Levitt. And, Dr. Katz's current prescribing habits corroborate that testimony. Dr. Katz continues to prescribe Celebrex, a COX-2 inhibitor like Vioxx with a cardiovascular safety profile that is indistinguishable from that of Vioxx, to fibromyalgia patients like Ms. Levitt notwithstanding its strongly worded black box warning. Under the applicable Missouri law, this testimony warrants a grant of summary judgment to Merck. *See Carr-Davis v. Bristol-Myers Squibb Co.*, Civ. A. No. 07-1098 (FLW), 2013 WL 322616, at *9 (D.N.J. Jan. 28, 2013) (manufacturer entitled to summary judgment under Missouri law when a prescribing "doctor's testimony makes clear that the additional warning . . . would have had no effect on the doctor's decision to prescribe").

## BACKGROUND

Ms. Levitt was diagnosed with fibromyalgia in October, 1999 by her rheumatologist, Dr. Arnold Katz. He prescribed Vioxx to Ms. Levitt to treat the pain associated with her condition. A few months after she started taking Vioxx, Ms. Levitt experienced some cardiovascular events that resulted in the placement of stents in March 2000, and ultimately led to bypass surgery in May 2000. Ms. Levitt continued to take Vioxx for another two years without incident.

In September, 2006, Ms. Levitt filed the present lawsuit alleging that Merck provided inadequate warnings of Vioxx's cardiovascular risks, and that she suffered two heart attacks as a result. *See* Compl. ¶¶ 17–18, 33, 35–36 (Case No. 2:06-cv-09757-EEF-DEK, Rec. Doc. 1-2). At the time of her cardiac events, Ms. Levitt and her husband owned two business enterprises— one that manufactured and sold high-end children's clothing and one that operated a hotel in Nebraska. The children's clothing business included several retail outlets around the country. Ms. Levitt claims that her cardiac events in the year 2000 rendered her unable to continue to work in those family businesses, and that her absence led to the failure and closure of those

1176598v1

businesses almost a decade later.[1]  Although the contemporaneous medical records show that Ms. Levitt fully recovered from her cardiac events, she attributes her inability to work entirely to the approximate six months of Vioxx usage that she says caused her cardiac events in 2000, rather than to the underlying debilitating fibromyalgia condition for which she was taking Vioxx.[2]

### Ms. Levitt's Medical History and Vioxx Usage

After experiencing several years of diffuse pain-related and fatigue-related ailments,[3] Ms. Levitt's primary care physician referred her to a rheumatologist, Dr. Arnold Katz.  Excerpts of Records of Dr. Arnold L. Katz ("Katz Records") at 1 (Ltr. from A. Katz to R. Hartman (Oct. 11, 1999)) (attached as Ex. E).[4]  Dr. Katz diagnosed Ms. Levitt with fibromyalgia in October, 1999.  *Id.*

---

[1]  Am. & Suppl. Pl. Profile Form at 12–13 (alleging inability to work from 2000 to 2009 due to Vioxx) (attached as Ex. A); *id.* at 30 (claiming loss of "Company cash flow & earnings," in addition to salary); Excerpts of the Deposition of Robert D. Bazan at 178:28 (hotel closure in December 2008) (attached as Ex. B); *id.* at 129:5–7 (Chocolate Soup clothing company closed in May 2010).

[2]  Although Ms. Levitt was eligible to enroll in the Vioxx Resolution Program, she opted not to do so.  She subsequently testified at her deposition that she stayed out of the settlement program because she believed that she would be able to get no more than $2 million through the program.  Excerpts of Deposition of Jo Levitt 203:9–204:5 (attached as Exhibit C).

[3]  Her specific complaints included hip pains; polyarthritis, left sciatica and hip dysfunction; depression; malaise; and fatigue.  *See* Excerpts of Records of Dr. Ronald B. Hartman (progress notes for Oct. 19, 1994; Nov. 4, 1994; June 9, 1995; Sept. 10, 1996; and Sept. 17, 1996) (attached as Ex. D).

[4]  Dr. Katz is a prominent rheumatologist who has participated in numerous clinical trials, consulted with various pharmaceutical companies, and has presented on various pain medications, including Vioxx.  He is currently participating in a long-term clinical trial relating to Celebrex that started in 2007.  Excerpts of the Deposition of Dr. Arnold L. Katz ("Katz Dep.") at 11:8–14:24 (attached as Ex. F).

Fibromyalgia is a chronic condition associated with pain and fatigue. *See* Katz Dep. (Ex. F) at 29:7–9, 32:10–20.[5] Although fibromyalgia is not a physically degenerative condition, if left untreated, it can be disabling.[6] *Id.* at 31:16–22. Because chronic pain is one of the primary characteristics of fibromyalgia, effective pain control for those patients is critical. *Id.* at 81:4–9. Dr. Katz has used, and continues to use, a variety of NSAIDs and other pain medications to treat his fibromyalgia patients. *Id.* at 23:23–25:17. He testified that it is important to have a variety of medications available to treat patients because different patients find different medications helpful to ease their pain. *Id.* at 23:13–22.

After evaluating Ms. Levitt, Dr. Katz determined that she required some type of NSAID to treat her pain, which he characterized as "moderate to severe." Katz Dep. (Ex. F) at 34:5–10, 76:12–23. He decided to prescribe Vioxx. Although Ms. Levitt had previously been prescribed Vioxx by Dr. Hartman, it had been prescribed on an "as needed" basis, and she was not taking it as of October, 1999. *Id.* at 27:6–24. Dr. Katz instructed Ms. Levitt to begin taking 25mg of Vioxx every day. *Id.* at 26:10–16. Dr. Katz based his decision to prescribe Vioxx to Ms. Levitt

---

[5] According to the National Institutes of Health ("NIH"), fibromyalgia syndrome is a common and chronic disorder characterized by widespread pain, diffuse tenderness, and a number of other symptoms. Fibromyalgia is not an arthritis-related condition because it is not a disease of the joints. Like arthritis, however, fibromyalgia can cause significant chronic pain and fatigue, and it can interfere with a person's ability to carry on daily activities. Fibromyalgia can also cause cognitive and memory problems. *See generally* "Questions and Answers about Fibromyalgia," July 2014 NIH Publication (attached as Exhibit G).

[6] Approximately 25 percent of Dr. Katz's practice consists of fibromyalgia patients. During his 35-plus years of practice he has treated thousands of fibromyalgia patients. Katz Dep. (Ex. F) at 32:21–33:7.

1176598v1

on his independent assessment and evaluation of her condition and what he thought would work best for her. *Id.* at 44:12–45:21.[7]

Vioxx worked for Ms. Levitt. It reduced her fibromyalgia pain, and Dr. Katz continued her on Vioxx for that reason. Katz Dep. (Ex. F) 76:23–77:4; Levitt Dep. (Ex. C) 72:19–20; *see also* Katz Records (Ex. E) at 2 (Dec. 27, 1999 Progress Note stating, "Vioxx has helped . . . . If she misses med, she has increased pain."). Although Ms. Levitt's pain improved after a couple of months of taking Vioxx, her chronic fatigue persisted. Katz Records (Ex. E) at 2 (Dec. 27, 1999 Progress Note). Ms. Levitt continued to take Vioxx until April 29, 2002, when her insurance stopped covering the medication.[8] Katz Dep. (Ex. F) at 65:7–9, 77:5–14; Katz Records (Ex. E) at 3 (Apr. 29, 2002 call note) ("Insurance won't cover Vioxx 25 mg"). She then switched to Bextra. Katz Records (Ex. E) at 4 (July 12, 2002 call note). Dr. Katz continued, however, to prescribe Vioxx to other fibromyalgia patients like Ms. Levitt until Merck voluntarily withdrew Vioxx from the market on September 30, 2004. Katz Dep. (Ex. F) 77:12–18.

### *Ms. Levitt's Cardiac Events and Subsequent Medical History*

Prior to taking Vioxx, Ms. Levitt had several substantial risk factors for cardiovascular disease. She had an extensive family history of cardiac issues on both sides of her family. *See* Excerpts of Mid-America Cardiology Associates Records ("Mid-America Records") at 2 (Mar. 10, 2000 Hospital History & Physical) (attached as Ex H). She also had high cholesterol and

---

[7]    At the time that Dr. Katz began treating Ms. Levitt, there were no medications on the market that had been specifically approved to treat fibromyalgia. FDA has now approved three such medications. Katz Dep. (Ex. F) at 37:2–13.

[8]    In the January/February 2000 time period, Ms. Levitt was switched to Relafen by her primary care doctor, but Ms. Levitt told Dr. Katz during a February 7, 2000 visit that she would would prefer to go back on Vioxx. Katz Dep. (Ex. F.) at 51:21–52:7.

5

hypertension, and an extensive smoking history. *See id.* at 4 (Mar. 11, 2000 DC Face Sheet). Although in 2000 she was noted as having stopped smoking several years prior, she had previously smoked 2 packs per day for almost 25 years. Excerpts of Records of Dr. James Neiburger ("Neiburger Records") at 1 (May 17, 1993 progress notes) (attached as Ex. I).

In early March 2000, approximately five months after Dr. Katz first prescribed Vioxx to her, Ms. Levitt experienced several cardiovascular episodes of unstable angina over the course of several days. Mid-America Records (Ex. H) at 1. On at least one occasion, Ms. Levitt called for an ambulance. When the ambulance arrived, however, she declined to go to the hospital. *Id.*

Later that week, on March 6, 2000, Ms. Levitt called Dr. Katz's office complaining of chest pressure. Katz Records (Ex. E) at 5; Katz Dep. (Ex. F) at 51:1–4. Notably, Ms. Levitt did not inform anyone in Dr. Katz's office about the earlier events that week. Specifically, she did not inform Dr. Katz that she had experienced severe heartburn on March 2, called 911, and refused instructions to go to the hospital. Katz Dep. (Ex. F) at 54:20–56:1.[9] Based on the information that Ms. Levitt provided to him on March 6, Dr. Katz was concerned that Ms. Levitt was experiencing reflux esophageal symptoms or other gastrointestinal issues. He instructed her to stop taking her NSAIDs, and call her primary care physician. *Id.* at 51:4–54:19.

Although Dr. Katz instructed Ms. Levitt to contact her primary care doctor, Katz Dep. (Ex. F) at 51:19–20, she waited several more days before doing so. On March 9, she went to see her primary care doctor, Dr. Hartman. Mid-America Records (Ex. H) at 1 (Mar. 10, 2000 Hosp. History & Physical). During that visit, Dr. Hartman observed abnormal patterns in her EKG and immediately sent her to the hospital. *Id.* Once admitted, Ms. Levitt was "ruled out for myocardial infarction." *Id.* Instead, she was diagnosed with unstable angina and coronary artery

---

[9] The first that Dr. Katz learned of the March 2 incident was when Ms. Levitt showed up for her March 13 appointment after receiving her stents. Katz Dep. (Ex. F) at 54:20–55:19.

disease. *Id.* at 4 (Mar. 11, 2000 DC Face Sheet). While in the hospital, she received angioplasty and two stents. *Id.*

Ms. Levitt recovered well from the cardiac procedures. At a follow-up cardiology visit on March 23, 2000, there was "no evidence for previous infarction" and her exercise echocardiogram "showed no ischemic ST segment changes." Mid-America Records (Ex. H) at 5 (Mar. 23, 2000 Office Visit). This test showed a "normal ejection fraction" at rest and a "normal response" to stress. *Id.* at 6.

About two months later, Ms. Levitt visited the hospital once again complaining of chest pain. Mid-America Records (Ex. H) at 7 (May 29, 2000 SLP Interval Letter). She received a diagnostic catheterization showing re-stenosis of one of her stents, and she received double bypass surgery. *Id.* According to contemporaneous medical records, Ms. Levitt recovered well from her bypass surgery. At a July 20, 2000 office visit, her cardiologist determined that all cardiac diagnostics were "unremarkable," and concluded that she was "doing well." *Id.* at 9 (July 20, 2000 Office Visit). She was instructed to start cardiac rehab. *Id.* at 10. By August 21, 2000, she was "back to regular activity." Neiburger Records (Ex. I) at 4 (Aug. 21, 2000 notes). A November 27, 2000 exam revealed "normal" resting and stress echocardiogram "without evidence for ischemia." Mid-America Records (Ex. H) at 11 (Nov. 27, 2000 Office Visit).

Ms. Levitt continued to take Vioxx for approximately two more years, until April 2002, when her insurance ceased covering the medication. Katz Dep. (Ex. F) at 65:7–9. During those additional years of Vioxx usage, Ms. Levitt did not experience any other cardiac events or any additional procedures related to her coronary artery disease. Indeed, all of Ms. Levitt's subsequent examinations over the years following her cardiac events in 2000 show that she did not sustain any permanent cardiac damage from those events. Every documented test shows no

evidence of ischemia of any kind.  *See, e.g.*, Excerpts of Kramer & Crouse Cardiology Records (Nov. 27, 2007 progress note noting that stress test "did not show any evidence of ischemia or infarct" and "[c]ompared to age and gender matched controls, the patient had good activity tolerance.") (attached as Ex. J).

In contrast, after Ms. Levitt stopped taking Vioxx in April, 2002, her fibromyalgia symptoms became more active.  Katz Dep. (Ex. F) at 65:10–66:2; Katz Records (Ex. E) at 4 (July 12, 2002 call note indicating "Fibro[myalgia] – ACTIVE!").  The increase in Ms. Levitt's fibromyalgia symptoms was not medically related to her 2000 cardiovascular problems.  Katz Dep. at (Ex. F) at 65:21–66:1.

### *Vioxx and Other NSAIDs*

Merck voluntarily withdrew Vioxx from the market on September 30, 2004, acting on preliminary data from one of its ongoing clinical trials—the APPROVe study.  Memorandum from John K. Jenkins, M.D., Dir. of Office of New Drugs, & Paul J. Seligman, M.D., M.P.H., OPaSS, U.S. Food & Drug Admin. to Steven Galson, M.D., M.P.H., Acting Dir., Ctr. for Drug Eval. & Research, U.S. Food & Drug Admin. (Apr. 6, 2005) ("2005 FDA Memo") at 18 (attached as Ex. K).  That data showed an increased occurrence of heart attacks after 18 months of use in the Vioxx arm of the trial.  The market withdrawal of Vioxx sparked widespread litigation in federal and state court.

Vioxx belonged to a class of pain medications known as nonsteroidal anti-inflammatory drugs ("NSAIDs").  2005 FDA Memo (Ex. K) at 1, 18.  Its mechanism of action differed from that of traditional NSAIDS in that it selectively-inhibited the COX-2 enzyme.  Thus, it and similar medications were known as "COX-2" medications.  *Id.* at 1 & n.2.  At the time of the

Vioxx withdrawal, the FDA had approved two other COX-2 medications, both manufactured by Pfizer—Celebrex and Bextra. Shortly after Merck withdrew Vioxx from the market, Pfizer announced the results of one of its own long-term clinical trials (CLASS) that, like Merck's APPROVe study, showed unfavorable cardiovascular results as to Celebrex. *See id.* at 1–2.

As a result of this changing landscape, the FDA convened an Advisory Committee to evaluate scientific evidence of cardiovascular risks associated with COX-2 inhibitors such as Celebrex and Vioxx, as well as other NSAIDs.[10] *See, e.g.*, 2005 FDA Memo (Ex. K) at 3. Based on the results of the Advisory Committee's review and a subsequent review of additional scientific evidence available to FDA, the FDA concluded that ***all*** COX-2 inhibitors showed an increased risk of adverse cardiovascular events as compared to placebo. *Id.* at 1. The FDA further determined that the available data did not permit a "rank ordering" of the medications according to the level of cardiovascular risk—that is, it was not possible based on the available data to say that any particular medication had a higher risk of cardiovascular side effects than another. *Id.* at 1, 10. *See also Vioxx*, 2010 WL 2649513, at *18. Specifically, FDA stated: "[W]e conclude that the three approved COX-2 selective drugs are associated with an increased risk of serious adverse CV events, at least at some dose, with reasonably prolonged use. We do not believe, however, that the currently available data allow for a rank ordering of the approved COX-2 selective drugs with regard to CV risk. 2005 FDA Memo (Ex. K) at 10. The FDA also summarized its review of the available data regarding traditional NSAIDS, and noted: "We also believe that it is not possible to conclude at this point that the COX-2 selective drugs confer an increased risk over non-selective NSAIDs in chronic use." *Id.*

---

[10]   This Court has previously explained the history of the Advisory Committee and the FDA's ensuing actions in *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2010 WL 2649513, at *9–10 (E.D. La. June 29, 2010).

9

As a result of these findings, FDA required *all* NSAIDs to carry "black box" warnings. 2005 FDA Memo (Ex. K) at 14. Black box warnings are recognized as the strongest warning for a risk that can appear on a label. *PLIVA Inc. v. Mensing*, 131 S. Ct. 2567, 2573 (2011) ("[T]he FDA ordered a black box warning—its strongest . . . ."); *Ackerman v. Wyeth Pharms.*, 526 F.3d 203, 211 n.12 (5th Cir. 2008) ("A 'black box' warning is the strongest warning that the U.S. Food and Drug Administration requires.").

One COX-2 inhibitor, Celebrex, currently remains on the U.S. market. The black box warning for Celebrex states:

> CELEBREX may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal. All NSAIDs may have a similar risk. This risk may increase with duration of use. Patients with cardiovascular disease or risk factors for cardiovascular disease may be at greater risk.

Celebrex Label (attached as Ex. L).

### Dr. Katz's Prescribing Habits

Dr. Katz, like most physicians, thinks it important that a wide range of alternatives for pain medication be available. Katz Dep. (Ex. F) at 81:4–16; FDA Memo (Ex. K) at 11–12 (emphasizing importance of a "range of options" of medications). Dr. Katz believes that "effective pain control for [fibromyalgia] patients is critical" and recognizes that "different patients respond differently to different medications." Katz Dep. (Ex. F) at 23:13–22, 81:7–9.

Although Ms. Levitt switched medications due to insurance issues, Dr. Katz continued to prescribe Vioxx to his fibromyalgia patients until it was withdrawn from the market and was no longer available for sale. Katz Dep. (Ex. F) at 77:15–78:5. When Vioxx was no longer available, Dr. Katz continued to prescribe another leading COX-2 inhibitor, Celebrex, to fibromyalgia patients even after the FDA determined that it must carry a black box warning. *Id.*

10

at 78:6–81:3.  Moreover, Dr. Katz agrees with the FDA's 2005 conclusions that Celebrex and Vioxx have similar cardiovascular safety profiles.  *Id.* at 83:4–16.  Thus, if Vioxx were on the market today and carried the same black box cardiovascular risk warning as Celebrex, he would still prescribe to fibromyalgia patients just like Ms. Levitt.  *Id.* at 85:17–86:1.

## THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks omitted).

## ARGUMENT

Ms. Levitt's claims focus on Merck's alleged failure to warn her about the risk of heart attack and other cardiovascular events associated with Vioxx.[11]  For Merck to be liable under this theory, Ms. Levitt must show that the allegedly defective warning was the proximate cause of her injury—that is, that an appropriate warning would have caused her prescribing physician,

---

[11] Although the Complaint alleges various causes of action, the facts pleaded show that her theories of liability rest on Merck's alleged failure to warn, contrasting Merck's public statements with what Merck allegedly knew. *See* Compl. ¶¶ 5, 13–35; *see also In re Norplant Contraceptive Prod. Liab. Litig.*, 955 F. Supp. 700, 709 (E.D. Tex. 1997), *aff'd*, 165 F.3d 374 (5th Cir. 1999) (finding that plaintiff's product liability claims, whether asserted under theories of strict products liability, negligence, breach of implied warranty of merchantability, misrepresentation, or state consumer fraud law, were all essentially failure to warn claims to which the learned intermediary doctrine applies because each of those theories "collapse[s] into a charge that the drug manufacturer failed to warn").  Moreover, to the extent Ms. Levitt attempts to assert a design defect claim that is based on something other than Merck's alleged failure to warn, any such claim is preempted because FDA regulations prohibit changes to an approved medication's formulation without FDA approval.  *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2475 (2013); *Booker v. Johnson & Johnson*, --- F. Supp. 3d ----, 2014 WL 5113305, at *5 (N.D. Ohio Oct. 10, 2014) (granting summary judgment for manufacturer on design defect claim in light of *Bartlett*).

Dr. Katz, not to prescribe her Vioxx.  Dr. Katz's testimony shows, however, that he would have. Thus, Ms. Levitt's failure-to-warn claims fail.

It is well established that in prescription drug cases, the plaintiff must not only demonstrate that the manufacturer's warning was inadequate but also "that the deficient warning proximately caused the alleged injury."[12]  Most courts construe this proximate cause requirement as one requiring proof that a different warning would have caused the doctor not to prescribe the drug or to prescribe it in a materially different way for the plaintiff.  *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1018 (10th Cir. 2001) ("[P]laintiffs must further establish proximate causation by showing that had defendant issued a proper warning to the learned intermediary, he would have altered his behavior and the injury would have been avoided." (quotation marks omitted)); *Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992) (judgment for defendant manufacturer required because "Dr. Credle would have prescribed the Cu-7 IUD no matter how carefully Searle refined the phrasing of its warning"); *Fought v. Hayes Wheels Int'l, Inc.*, 101 F.3d 1275, 1277 (8th Cir. 1996) (affirming judgment as a matter of law because defendant's failure to warn did not proximately cause plaintiff's injury); *Aetna Cas. & Sur. Co. v. Pilcher*, 424 S.W.2d 181, 183 (Ark. 1968) (reversing jury verdict in favor of plaintiff because alleged failure to warn did not, as a matter of law, proximately cause injury).[13]

---

[12]     *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815–16 (11th Cir. 2010); *In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 830 (E.D. Tex. 2002) ("Causation is a fundamental element of Plaintiffs' failure to warn claims."); *cf. Tuttle v. Lorillard Tobacco, Inc.*, 377 F.3d 917, 924–25 (8th Cir. 2004) (proximate cause constitutes essential element of failure to warn case).

[13]     *See also Stafford v. Wyeth*, 411 F. Supp. 2d 1318, 1321 (W.D. Okla. 2006) (no proximate cause where prescribing physician "would not have changed his decision to prescribe Pondimin to Plaintiff"); *Dyer v. Danek Med., Inc.*, 115 F. Supp. 2d 732, 741–42 (N.D. Tex. 2000) (the undisputed evidence showed that "Dr. Sekhavat's decision would have been unchanged even if warned"); *Dyson v. Winfield*, 113 F. Supp. 2d 35, 41 (D.D.C. 2000) ("[The prescribing physician] testified that, had the packaging contained an extra warning as to prenatal risks, he

1176598v1

Missouri law is no different. Under Missouri law, even if the manufacturer fails adequately to warn the prescribing physician, a defendant is entitled to summary judgment when the record establishes that the prescribing physician would have prescribed the medication even if properly warned. *See In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2009 WL 902351, at *2 (E.D. Pa. Apr. 2, 2009) (explaining under Missouri law "even assuming the warnings are inadequate, plaintiffs must show that a proper warning would have changed the decision of the treating physician, *i.e.* that but for the inadequate warning, the treating physician would not have used or prescribed the product." (internal quotation marks omitted)); *see also Ackerman v. Wyeth Pharm.*, 526 F.3d 203, 208 (5th Cir. 2008) (same observation under Texas law).

Ms. Levitt cannot establish the requisite proximate causation because undisputed evidence shows that Dr. Katz would have still prescribed Vioxx to Ms. Levitt and other similarly-situated fibromyalgia patients if it were still on the market, even if it carried a black box warning as to cardiovascular risks. More specifically, Dr. Katz testified that he continues to prescribe NSAIDs that have cardiovascular safety profiles comparable to Vioxx to his patients. Katz Dep. (Ex. F) at 78:6–8; *id.* at 83:9–16. Moreover, he testified that the cardiovascular safety profile of Vioxx could not be distinguished from that of its primary COX-2 competitor—

---

still would have prescribed it for the plaintiff."); *Lawson v. Smith & Nephew Richards, Inc.*, No. 4:96-CV-297, 1999 WL 1129677, at *6 (N.D. Ga. Sept. 30, 1999) (no proximate cause when physician "would have taken the same course of action in spite of the information Plaintiff contends should have been provided"); *In re Norplant Contraceptives*, 955 F. Supp. at 711 n.63 (granting summary judgment when physicians testified that no information plaintiffs alleged should have been provided would have changed their minds about whether to prescribe drug at issue); *Woulfe v. Eli Lilly & Co.*, 965 F. Supp. 1478, 1486 (E.D. Okla. 1997) ("Plaintiff has failed to carry his burden of establishing that Prozac would not have been prescribed for Woulfe had the German warning been provided as part of the package insert."); *Windham v. Wyeth Labs., Inc.*, 786 F. Supp. 607, 613 (S.D. Miss. 1992) ("Plaintiffs have failed to show that a more thorough or more explicit warning about the possibility of adverse reactions such as extrapyramidal symptoms would have altered Dr. Gillespie's decision to prescribe Phenergan to Mrs. Windham.").

Celebrex. He testified that it would be incorrect to assert that Celebrex has a better safety profile than Vioxx, or vice versa. Katz Dep. (Ex. F) at 83:9–16. With full knowledge of the existence of its strongly worded black box warning, Dr. Katz continues to prescribe Celebrex to his fibromyalgia patients. *Id.* at 20:21–21:17.

Moreover, consistent with his current prescribing practices, Dr. Katz testified that he would prescribe Vioxx to patients like Ms. Levitt, if it were available today:

> Q.  If Vioxx were available today and it had the same warning that we just read on the Celebrex label, would you continue to prescribe it?
>
> A.  Yes.
>
> Q.  Would you continue to prescribe it to fibromyalgia patients?
>
> A.  Yes.
>
> Q.  Patients like Mrs. Levitt?
>
> A.  Yes.

Katz Dep. (Ex. F.) at 85:17–86:1.

In sum, the record clearly establishes that even if Ms. Levitt could establish that Merck's warnings regarding Vioxx were deficient, any such alleged deficiencies were not the proximate cause of her alleged injuries. And, as numerous other courts have found, these facts warrant summary judgment. For example, in *Carr-Davis*, a case in the Plavix MDL, the court granted summary judgment under Missouri law based on physician testimony that enhanced warnings that taking Plavix with aspirin could present a risk of bleeding would not have changed the physician's decision to prescribe Plavix to the plaintiff. 2013 WL 322616, at *8. The prescribing physician testified that "he would not have prescribed anything different" to the plaintiff and that he "continue[d] to prescribe Plavix to patients . . . in similar circumstances" to the plaintiff. *Id.* Courts interpreting similar law in other states have reached the same result.

14

*See, e.g., Eck*, 256 F.3d at 1020 (affirming summary judgment where doctor would have made same prescribing decision of anti-seizure medication where risk of seizure outweighed risk of adverse reaction); *Odom*, 979 F.2d at 1003 (affirming summary judgment where prescribing physician testified that he would make same prescribing decision for IUD notwithstanding enhanced warning for risk of ectopic pregnancy); *supra* note 13 (collecting exemplar cases).[14] *See also In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2010 WL 2649513, at *18 (E.D. La. June 29, 2010) (state's response to the Celebrex black box warning was relevant because "[o]ne can determine what a reasonable department of health and hospitals would have done had it received different information about Vioxx by examining what [the plaintiff] actually did in a closely analogous situation"; because the state continued paying for Celebrex even after the black box warnings, whatever deficiencies may have existed in Vioxx's label before it was withdrawn were not responsible for the decision to pay for Vioxx).

Because Ms. Levitt cannot show that a changed Vioxx warning would have altered Dr. Katz's decision to prescribe Vioxx to her, no proximate cause exists for her claims. This alone warrants summary judgment.

---

[14] Because Dr. Katz's testimony establishes that enhanced warnings for Vioxx would not have changed his prescribing decision, Missouri's "heeding presumption" does not apply. To "'heed' in this context means only that the learned intermediary would have incorporated the additional risk into his decisional calculus," not that the doctor would have made a different prescribing decision. *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 814 (5th Cir. 1992) (internal citations omitted).

## **CONCLUSION**

For the foregoing reasons, judgment should be entered in favor of Merck.

Dated:  December 22, 2014                    Respectfully submitted,

By: */s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE, PIGMAN WALTHER
WITTMAN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone:  504-581-3200
Fax:     504-581-3361

*Defendants' Liaison Counsel*

—and—

Douglas R. Marvin
M. Elaine Horn
Jonathan L. Williams
WILLIAMS & CONNOLLY LLP
527 Twelfth Street, N.W.
Washington, D.C. 20005
Phone:  202-434-5000
Fax:     202-434-5029

*Attorneys for Merck Sharp & Dohme Corp.*

1176598v1

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Motion for Summary Judgment Regarding Proximate causation and Incorporated Memorandum of Law Request to File Certain Documents Under Seal has been served on Liaison Counsel, Russ Herman, Ann B. Oldfather, and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(C), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 22nd day of December, 2014.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel