1

2                    IN THE UNITED STATES DISTRICT COURT FOR

3                        THE EASTERN DISTRICT OF LOUISIANA

4                                AT NEW ORLEANS

5

6   IN RE:  VIOXX PRODUCTS              ) Case No. 05-md-1657 "L"
    LIABILITY LITIGATION                ) December 16, 2014
7                                       ) Status Conference
    _____)    and Motions
8

9

10                        TRANSCRIPT OF PROCEEDINGS

11                 BEFORE THE HONORABLE ELDON E. FALLON

12                     UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20   SUSAN A. ZIELIE, RPR, FCRR
     Official Court Reporter
21   HB 406
     500 Poydras Street
22   New Orleans, Louisiana 70130
     susan_zielie@laed.uscourts.gov
23   laedcourtreporter@gmail.com
     504.589.7781
24

25   Proceedings Recorded by Computer-aided Stenography.

```
 1   APPEARANCES:

 2

 3   For Liaison Counsel:          LEONARD DAVIS, ESQ.
                                   Herman Herman Katz
 4                                 820 O'Keefe Avenue
                                   New Orleans LA 70113
 5                                 ldavis@hhklawfirm.com
                                   504.581.4892
 6
     For the PSC:                  ELIZABETH J. CABRASER, ESQ.
 7                                 Lieff Cabraser Heimann
                                     & Bernstein LLP
 8                                 275 Battery Street, 29th Floor
                                   San Francisco CA 94111-3339
 9                                 ecabraser@lchb.com
                                   415.956.1000
10
     For the AG:                   DAWN M. BARRIOS, ESQ.
11                                 Barrios Kingsdorf & Casteix, LLP
                                   One Shell Square
12                                 701 Poydras Street, Suite 3650
                                   New Orleans LA 70139-3650
13                                 barrios@bkc-law.com
                                   504.524.3300
14
     For Merck:                    DOUGLAS MARTIN, ESQ.
15                                 Williams & Connolly
                                   725 12th Street NW
16                                 Washington DC 20005
                                   202.434.5000
17
                                   JOHN H. BEISNER, ESQ.
18                                 Skadden Arps Slate Meagher
                                     & Flom LLP
19                                 1440 New York Avenue NW
                                   Washington DC 20005
20                                 john.beisner@skadden.com
                                   202.371.7410
21

22

23

24

25
```

```
 1                 NEW ORLEANS, LOUISIANA; TUESDAY, DECEMBER 16, 2014

 2                           9:00 A.M.

 3              THE COURT:  Be seated, please.  Good morning, ladies

 4     and gentlemen.

 5                    Let's call the case, please.

 6              CASE MANAGER:  MDL 5697, in re:  VIOXX Products

 7     Litigation.

 8              THE COURT:  Counsel, make your appearances for the

 9     record, please.

10              MR. DAVIS:  Good morning.  Leonard Davis on behalf of

11     liaison counsel.

12              MR. MARTIN:  Douglas Martin for Merck.

13              THE COURT:  We're here for our now every two-month

14     status conference.  This is almost the tenth anniversary of this

15     claim.  We're at sort of tail end.  By tail end, I don't mean

16     less important.  We all know how good ox tail soup is, and ox

17     tail is the most valuable part of the ox.  So this is just the

18     latter part of the case where we have a couple of matters.

19                    One matter that we do have is a motion today on a

20     class action, the consumer class actions.  I'll defer that until

21     we finish with this meeting and then we'll take that motion up.

22                    So the first item on the agenda is government

23     actions.  Anything on government actions?

24              MR. DAVIS:  Your Honor, BrownGreer is here to make a

25     presentation on the status of the consumer, if you'd want to
```

1    defer.

2              THE COURT:  Not now.  We'll package it all together.

3                   And the government actions.  I know that Alaska,

4    Montana and Utah have been sent back to the federal courts in

5    Alaska, Montana and Utah.  I understand that there are some

6    remand motions to send those cases back to the state court.

7              MR. BEISNER:  Good morning, Your Honor.  John Beisner

8    for defendant Merck.

9                   Yes, Your Honor, that is correct.  In Alaska and

10   Montana, the briefing of the remand, jurisdictional remand

11   motions, supplemental briefing, has been complete and oral

12   argument date has been set in Alaska and Montana.  No date has

13   been set but the briefing is completed.

14                  In Utah, nothing has happened yet there except

15   that counsel have been speaking with the clerk's office here to

16   get the materials transmitted to that Court.  So I assume that

17   we'll have some activity in that matter soon.

18                  But, in any event, those cases are all back in

19   their original jurisdictions and proceeding.

20             THE COURT:  Okay.  If this Court can be of any help to

21   them, please make sure that they understand they can call me and

22   talk with me about it.

23             MR. BEISNER:  And, Your Honor, we will get to chambers

24   the identity of the federal district judges who have each of

25   those cases.

1           THE COURT:  That's fine.

2           We've had about twenty-six states originally in

3    this matter seeking recovery for certain expenses that they've

4    incurred, down now to only three.  So hopefully it will work for

5    the rest of the states and we'll see what happens to those

6    three.

7           Pending personal injury cases, anything on that?

8           MR. DAVIS:  Ms. Oldfather is here to address that.

9           MS. OLDFATHER:  Morning, Your Honor.  Morning, counsel.

10   Ann Oldfather, liaison counsel and lead counsel for certain

11   personal injury cases.

12          Your Honor, I can report just in general that

13   there are eighteen personal injury cases still on our case

14   census.  One of those is Jo Levitt, heart attack case.  And the

15   remaining actually -- sixteen, so a total of seventeen -- the

16   remaining sixteen are VTE cases.  Many the VTE cases have

17   resolved prior to and since the last status conference by

18   settlement.  There were six of the VTE cases that had been

19   submitted to the Court on motions for summary judgment on the

20   future evidence stipulation.  Three of those had previously

21   resolved by settlement and one of them is tentatively resolved

22   now with Merck pending working out the lien situation, that one

23   being Todd Jelden.  So we've got of the sixteen BTE cases that

24   are on the case census that I discussed earlier, twelve of those

25   are not yet in the resolved posture or tentatively resolved

```
1   posture.  Most of them are under active discussion with Merck's
2   counsel regarding settlement possibilities.
3                Beyond that, Your Honor, and in looking through
4   the joint status report, I can report that we are in
5   conversations with Mr. Davis and Mr. Birchfield about the
6   financial issues that address both the common benefit fee and
7   expense matters.  I've just addressed the pending summary
8   judgment motions.
9                The Jo Levitt case, Your Honor is familiar with
10  that.
11               I apologize to the Court because I meant to
12  discuss with Merck before we came in here the Byrd case which is
13  mentioned in here.  Mrs. Byrd died, and Merck filed a motion to
14  dismiss with prejudice based on her death.  I had thought that,
15  in October, Merck withdraw that opposition because Mr. Byrd had
16  appear and filed a motion to substitute.  But I may very well be
17  wrong about that and I haven't checked the transcript.  So I'm
18  not sure where that stands.  I think that's something that we
19  need to go back and check on.
20       THE COURT:  Take a look at that.  I do remember
21  something, I don't know whether it's the Byrd case or some other
22  case.  But I do remember that something was withdrawn.
23       MS. OLDFATHER:  I believe I reported back to Mr. Byrd
24  that he had now been allowed to move forward.  But that may have
25  been my error, and we will look into that and get back with
```

1    Merck.

2              And then the balance of the report on the pending

3    personal injury cases are clean-up motions that I'll allow Merck

4    to address.

5              THE COURT:  Okay.  One thing that we're going to have

6    to get to and I may have to convene a conference on the Stratton

7    matter.  We've been kicking that can down the roadway a bit.

8              MS. OLDFATHER:  Yes.

9              THE COURT:  I may need some suggestions from lead

10   counsel.

11             MS. OLDFATHER:  All right, Your Honor.

12             Thank you, if the Court has no further questions.

13             THE COURT:  Anything?

14             MR. BEISNER:  No, Your Honor.

15             THE COURT:  What about appeals, John, anything on that?

16             MR. BEISNER:  Your Honor, the one appeal that we have

17   pending is from the class action.  That matter was fully briefed

18   before the circuit at this point, including a suggestion that

19   that could be subject to summary disposition.  But no oral

20   argument has been scheduled in that matter at the moment, Your

21   Honor.

22             THE COURT:  Does that complete what we need to talk

23   about, other than the motion?

24             All right.  What's the new date?

25             CASE MANAGER:  February 26th.

 1              THE COURT:  February 26th.

 2                   And, at this stage, it may be more efficient to

 3    have these matters by telephone.  But I'll hear from the parties

 4    on that when we get a little closer.

 5                   Let's go then to the motion.

 6                   Dean, do we have to do anything with the phones?

 7              CASE MANAGER:  Yeah.  I have to get Mr. Getty on the

 8    phone, Judge.

 9              THE COURT:  Okay.  Hold on while we get Mr. Getty on

10    the phone, and then we'll go into the motion.

11                   (Proceedings in recess.)

12              THE COURT:  Be seated, please.

13                   We are here today on a motion filed by Mr. Richard

14    Getty involving this class action consumer class.

15                   Just by way of background, a consumer class are

16    those individuals who purchased VIOXX who did not have any

17    personal injuries from VIOXX.  And many of whom, I might say,

18    have over the years called the Court and expressed themselves

19    about the fact that VIOXX was taken off the market.  Somehow or

20    another, they attributed that to me, but it was off the market

21    before I got into the case.  They apparently got some benefit

22    out of VIOXX, or at least some of them did.  But they felt and

23    they had a claim that, had they known that VIOXX was

24    problematic, they would have -- their doctors would have

25    prescribed something else and they would have purchased

1    something else.  And, they did not know that it was problematic,

2    and so they were an innocent purchaser and they wanted their

3    money back.  And, in some states, the consumer protection laws

4    gave them more than that.

5              But, in any event, the claims were for the

6    consumers, primarily any claims growing out of their purchase of

7    VIOXX.  As I say, they didn't have any adverse effect of it, but

8    they did expend money and take the drug.

9              The parties began negotiations, and they were

10   difficult negotiations, nationwide, but they eventually came to

11   an agreement.  And, basically, the agreement was to give the

12   consumers back their provable costs that they spent for the drug

13   and also to reimburse them for any medical expense that they

14   incurred in getting another doctor or getting another drug for

15   their malady or problem.  And, when that settlement was

16   announced, the class action settlement was filed.  A part of the

17   class action settlement, a vital part of the class action

18   settlement, was to notify people.  And so we undertook various

19   methods of notifying the individuals.  We had language issues in

20   some states.  New Mexico, for example, we had to make sure that

21   the notice was in Spanish and disseminated to people in those

22   areas and those magazines and newspapers that they were

23   accustomed to reading.  In various other states, we also tried

24   to focus on the notice.

25              But the issue today is whether or not there ought

1    to be a supplemental or a second supplemental notice to go out.

2    So I'll hear from the parties at this time.

3                    Richard, you brought the motion.  Do you want to

4    speak on it?

5                MR. GETTY:  Yes, Your Honor.  I'll be very brief.

6                    As you know, we have done everything we thought

7    was possible to try and increase the claims rate.  And,

8    unfortunately, in hindsight, you look at this -- and I think one

9    of the reasons for the claims rate is that many of the people

10   who took this substance and would be eligible had passed because

11   of the time and the age of the people who were prescribed VIOXX.

12   I think, ten years earlier, the claims rate would have been much

13   greater.  But it is what it is.

14                    We've made efforts, at least with respect to the

15   Kentucky consumers, to increase or have either BrownGreer or

16   plaintiff's liaison counsel do everything to increase that rate,

17   and I think we're pleased with the fact that we've increased the

18   number of eligible claims six-fold really as a result of our

19   efforts to get better, more complete notice.

20                    The issue now is we've got a group of ineligible

21   claims that we believe maybe there ought to be some direct

22   contact in an effort to try and make them eligible.  There are

23   2,284, I guess, nationwide.  With respect to Kentucky, Kentucky

24   is a percentage of that.  And we would simply like to have some

25   direct conduct with the class members to see if their ineligible

1    claims can become eligible.

2              We've talked this through to some degree with

3    plaintiff's liaison counsel and with BrownGreer, who are to be

4    complimented on their efforts overall here.  And what we're

5    proposing is that the Court direct class counsel to utilize

6    BrownGreer for making direct telephone contact with the class

7    members whose claims remain ineligible.

8              The main point of that is that the BrownGreer

9    personnel have the claims files, and those who have the claims

10   files would be best suited to do that.  And that's basically it.

11         THE COURT:  All right.

12             Let me -- I can either hear from the plaintiffs in

13   response or from Orran Brown.

14             Orran, do you want to just tell us what's happened

15   so far, what have you done?

16             And, Richard, take a look at the material that

17   Orran sent to you as he goes through this with me at this time.

18         MR. GETTY:  Yes, Your Honor.  I have that.

19         THE COURT:  Okay, good.

20             Go ahead, Orran.

21         MR. BROWN:  Good morning, Your Honor.  Orran Brown, and

22   within me also from BrownGreer is Orran Brown, Junior, today.

23   We have been privileged to serve as the claims administrator in

24   the VIOXX consumer settlement.  And we're here today not as an

25   opposition to this motion but just to provide the information

1   for the context in which it occurs so the Court and the parties

2   have full information on what has happened up until now, the

3   claims that were received, what we did with them and what's

4   left, including the numbers that Mr. Getty just mentioned.

5                We have a presentation.  I left of a copy it on

6   the Court's desk and your law clerk's desk.  We had emailed it

7   to all the parties and Ms. Winters and Mr. Getty, who are on the

8   phone.  I have a couple of extra copies if anybody needs one.

9                But the goal, Your Honor, is to walk through these

10  topics which take us from the beginning of this program through

11  the efforts at notice, the claims we received and then our

12  review of them back and forth with the claimants to see which

13  ones, where we ended up with the claims that are payable or not

14  payable.

15               And we'll go through this, Your Honor.  This is a

16  lot of information, but this is our report essentially on the

17  entirety of this program and essentially is our final report

18  because we are finished reviewing all the claims.  Everybody is

19  in their final spot, pending the outcome of this motion today in

20  terms of further action.

21               And, also, we're unable to issue appeals

22  technically under the settlement agreement -- issue payments

23  under the settlement agreement until that one appeal is

24  concluded.  But we're prepared to issue payments as soon as

25  those two matters are cleaned up.

1           This program launched with the Court's preliminary

2    approval in August 2nd of 2013.  We immediately set up a public

3    website to provide information to the claimants and to the

4    public on copies of the settlement agreement, availability of

5    the claim form, further information that they could obtain on

6    the notice on the public website.

7           Then there was an extensive notice campaign, the

8    direct mailing notice campaign -- we'll talk about this in a

9    little more detail in a moment -- but this is the national

10   notice campaign that launched in early August of 2013 designed

11   by the notice agent Kinsella Media.  And we'll go over in a few

12   minutes a little bit more detail of what that include.

13          On September 1, 2013, we had up on the public

14   website an interactive online method to file a claim form so

15   that anyone who wanted to, a lawyer or a pro se claimant, could

16   go online and very quickly indicate that they wanted to submit a

17   claim for the benefits available under this settlement

18   agreement.

19          This Court had its final fairness hearing on

20   December 13th of 2013 and then issued its approval order of

21   January the 3rd of 2014.

22          By February, to boost claim participation, we

23   worked with the parties and the Court to develop a reminder

24   campaign for certain targeted segments of this claimant

25   population, and I'll go over that in a little more detail as

1    well.

2                 Then the final claim filing deadline was May the

3    6th of 2014.  So claimants had a period of nine months from the

4    time that this was approved to be able to submit a claim.

5                 The class notice that I mentioned that the notice

6    agent developed, Kinsella Media, included a mail notice to the

7    counsel of record in this MDL proceeding.  We mailed that notice

8    to sixty-six law firms.

9                 It also included what Kinsella and other notice

10   experts referred to as earn media campaign, which means press

11   releases.  You garner some media coverage at no cost through

12   that as news articles are written about the outcome of the

13   settlement or the pendency of the settlement.

14                And then there was an extensive publication notice

15   that involved print ads and notices in consumer magazines.

16   There was an internet online presence with search words and

17   keywords to facilitate finding the website online.  There were

18   newspaper ads and newspaper supplement ads.

19                The notice campaign that the Court approved on the

20   basis of the recommendation and declaration from Shannon

21   Wheatman at Kinsella Media ended up -- the parties spent over

22   $1.6 million, an extensive national notice campaign, in August

23   and September of 2013.

24                We also, on our part as claims administrator, we

25   did set that public website.  We immediately set up in August a

1    PO Box for claimants to send us material or send us questions.

2    And we also set up a toll-free number that was advertised on the

3    website for people to call us and ask for information.  It had

4    an automated system to where you could hear recorded messages,

5    you could ask for a copy of the settlement agreement.

6              Over the course of this program, we've had nearly

7    121,000 visits to this settlement website.  We've had over

8    18,000 calls that our people have fielded from claimants,

9    lawyers, other persons interested in this program at that

10   toll-free number.

11             The courtesy reminder campaign I mentioned is

12   something that was unique to this program.  We have not seen

13   this done much, though it is a positive development that should

14   be repeated in other programs.  In January/February of 2014, as

15   we were watching the claim volumes coming in, the parties talked

16   with us, class counsel and Merck's counsel, and asked us for

17   ideas about how to spur claimant participation in this program.

18   So we worked with them to design a more targeted notice, direct

19   notice effort, that was kind of a booster shot on the labyrinth

20   notice that had been done in the fall.  And we targeted these

21   groups that's shown in this slide for specific notice of this

22   program.  And what we were trying to do is find people who may

23   have had VIOXX used, may have had some interest in this program

24   that we could reach out to directly.

25             And so, this first group, this 11,226 people,

1    because we were the claims administrator in the VIOXX personal

2    injury settlement that this Court also presided over, we had

3    contact information for claimants who had come forth, registered

4    in that program but who had not signed a binding release in that

5    program.

6              Under this settlement, if you signed a release in

7    the VIOXX personal injury program, you released all your claims,

8    you could not participate in this consumer recovery.  That is I

9    think one reason that we did not have millions of people who

10   wanted to participate in this settlement, because a lot of the

11   people -- over 50,000 of them -- who had used VIOXX and felt it

12   caused them a problem went through the personal injury program,

13   signed a release and their claims were finished, so they could

14   not participate in this program.

15             But we did know of this 11,226 persons who had

16   registered in that program and had not signed a release or a

17   binding release.  So for these folks we developed a letter that

18   sent them -- and we mailed them a letter with a prefilled claim

19   form and a self-addressed envelope to send it back to us to

20   those 11,000 people.  This was part of the work that we did in

21   February of 2014 to try to spur activity among claimants.  And

22   we'll see in a moment the results of that.

23             We also had information on 411 law firms who had

24   represented claimants in the personal injury settlement, and we

25   emailed them the notice in this program.

1          We knew of 668 claimants who had gone on the

2   website and they had started a claim form but they hadn't

3   finished it.  They hadn't filled it out, they hadn't submitted

4   it.  So we emailed that group and encouraged them to fill out

5   their claim form and told them how to do it.

6          Row 4 here are persons who had gone to the

7   website, they had given us their name but they hadn't done

8   anything else yet.  They hadn't filled out the claim form.  So,

9   that 5,000 plus persons, we emailed them.  We had their email

10  and we could use the inactive portal to contact them through the

11  account they had set up with us.  We encouraged them to finish

12  their claim, go ahead and submit a claim in this program.

13         Then we also had, in Row 5, over 3,700 persons who

14  had called us or had emailed us or something and asked us for a

15  claim form, and we had mailed them a hard-copy claim form but

16  they had not sent it back.  So we mailed them a letter asking

17  them to go ahead and fill out the claim form and send it back.

18         All of this was going on in February of 2014 in an

19  effort to target these groups to encourage them to file claims.

20         At the same time, we upgraded some of the

21  functions that were available on the call center, the toll-free

22  number.  We added the option to have the person leave a request

23  for a live operator to call them back, one of our people to call

24  them back.  Up until this point and the settlement agreement had

25  called for an automated system where they hear recordings.  We

1    added a live touch to that so they could actually talk to

2    someone.

3              We also added all the messages in Spanish so that

4    if there were segments of this population who were dependent

5    upon the Spanish language they could hear everything on the

6    automated toll-free number in Spanish.  We had assigned some of

7    our Spanish-speaking representatives to return those calls to

8    Spanish-speaking claimants or persons interested in it.

9              Also along with this we upgraded some functions on

10   the website.  We moved the claim form to the home page, instead

11   of just a documents page, to make it easier to find, find it

12   immediately.

13             We added a function where you can go online and

14   ask that a claim form be mailed to you.

15             We added new language on the settlement website

16   that stressed the availability of payments and stressed that

17   under this Option 2 in this program you could receive $50 if you

18   could sign a declaration under oath that you bought VIOXX and

19   had not been paid back for it.

20             We were trying to encourage focus on the

21   availability of the payments.

22             We also added a function that was an online

23   interactive question-and-answer segment where a person could go

24   to the website and ask:  Do I qualify form payment?  And it

25   would take you through the questions about:  Did you purchase

1    VIOXX, was in the United States, have you already signed a

2    release or not?  And you'd end up with answer, yes or no, you

3    qualified, so you should or shouldn't file a claim.

4              All of these were efforts that we were doing to

5    upgrade the website and make it even more advantageous for

6    claimants to use than it already was.

7              We changed the way to file a claim form online.

8    Our ideal method for filing a claim form online is to have

9    someone set up an account, much the same way when you register

10   for an account with Amazon when you buy something.  So that then

11   we have their interactive contact and can go back and forth with

12   them.  So it's a two-step process:  Set up an account, fill out

13   the claim form.  We changed it to say, all right, if someone

14   doesn't want to do the two steps, just let them fill out the

15   claim form and that will be it.  We made it easier; one step

16   instead of two.

17             We added a Spanish claim to the website.  We added

18   an option to switch to an entire version of the website in

19   Spanish.

20             That reminder campaign did bear fruit for us.  As

21   you can tell from this slide, in the period before the campaign,

22   we were getting about 131 claims per week.  After the campaign,

23   we were getting 312 claims average per work.  It almost tripled

24   our claims weekly filings.

25             And look on the right here, in terms of total

1    claims filed, we got over 5,600 claims after this campaign

2    began.  Some of that is naturally attributable to the fact that

3    we were approaching a deadline.  But we got over sixty percent

4    of our claims after the time that we started this booster-shot

5    reminder campaign.

6               This Slide No. 10 shows us the total claims we

7    received.  We got 8,757 claims in this program.  Most of them or

8    way over half of them were done online.  Nearly all of these

9    claimants were unrepresented.  We only had three law firms that

10   submitted claims on behalf of a handful of claimants.  But, even

11   though this population was unrepresented, fifty-six percent of

12   them used the online function.  The other forty-three percent

13   plus we got in the mail in hard copy.

14               So, of those 8,757 claims, what did we do with

15   them?  We reviewed them to see if they qualified under the terms

16   of the settlement and had submitted the proof that they had to

17   submit to receive payment reimbursement for their VIOXX

18   prescriptions costs.

19               We started issuing notices to these claimants

20   about whether they were missing anything on August the 22nd of

21   2014.  The settlement agreement required us to notify claimants

22   if there was anything missing in their claim and give them

23   thirty days to supply it.  So we developed a notice that was in

24   clear language.  It's attached to my declaration that I filed

25   recently to report to the Court on our processing activity.

1    That notice explained to the claimant what was missing, what

2    they had to do next, the deadline, the thirty-day deadline.  It

3    gave them an email to email us with questions.  It provided a

4    toll-free number.  It encouraged them to call us or email us if

5    they had questions about what they had to do next.  It told them

6    exactly what they had to do to get their claim complete and gave

7    them thirty days to do it.  We mailed it to people if they had

8    sent us a hard copy claim form.  We posted it on their

9    interactive portal if they had set up an online account with us.

10   And, that way, we could monitor that they'd actually read that

11   notice.

12            At the same time the claimants then started

13   responding to us, we reviewed those materials.  The settlement

14   agreement required us to give them another notice.  If they were

15   still incomplete after that first round, we gave them another

16   notice, a final notice, same information about what was missing.

17   And another thirty days to complete their claim if they still

18   didn't have all of the information in it.

19            And then, as we got through the fall, those thirty

20   days, the first thirty days and the second thirty days where

21   claimants started to expire, we -- the first group, October 24,

22   was the last of the first thirty-day cure period.  And then

23   November 30, 2014 was the last of the second thirty-day cure

24   period.  So all of those notices and cure periods have passed

25   and we have reviewed all the claims and all the materials that

1    came in.

2                    Now I want to spend a few moments explaining to

3    the Court what changed, because it bears upon the analysis of

4    whether claimants have been told what they were missing, had an

5    opportunity to present it and then tried to do so.

6                    After our first reviews, before we sent them any

7    notices, this slide, No. 12, shows us that we found over 6,000

8    claimants that were payable for what they asked for.  That's Row

9    1.

10                   There were 288 people who were payable but they

11   did not prove all the amount they asked for.

12                   And then there were 131 people who were payable

13   for more than they requested.

14                   Now the parties instructed us that we were to

15   follow the proof.  In other words, if whatever the documents,

16   prescription records, the cancelled checks or the credit card

17   statements that claimants presented to us that showed amounts

18   that paid for VIOXX, we were to pay that amount.  Even if it

19   were more than they had asked for in the claim form.

20                   But these two groups right here, the 288 and the

21   131, we could not be certain what they really had paid in some

22   instances.  So the parties directed us to send them a notice

23   that said we got your claim, you're payable for a certain

24   amount, you might get paid more if you can fill in the rest; or,

25   if you -- if your proof showed more than you asked for, why

1    didn't you ask for more.  Because we felt and did find out in

2    some instances it was because their insurance had paid for part

3    of it.  So we didn't want to overpay.  So those two groups got a

4    notice and got the second thirty days to complete their picture

5    for us.

6              These claimants right here on Slide 13 are the

7    ones that were not payable anything after the first review.  And

8    this is a group we talk about when we start thinking about

9    incomplete claims, claims that were not payable because they

10   were missing vital information the settlement agreement

11   required.

12             The first row, no documents or people who hadn't

13   sent us anything.  They sent us a claim form but no proof of any

14   kind.

15             The second group, the invalid documents, are

16   people who had sent us something but it wasn't the right kind of

17   proof.  It was maybe a list of prescriptions but it didn't show

18   what they paid, didn't show how they'd actually spent money.

19             Then there were people who had started a claim

20   form but had left out information.  They hadn't signed it or

21   they hadn't completed it online, they had an incomplete claim

22   form.  There was a large group that had multiple reasons, they

23   had some of all of those things of why they were not payable.

24             And then the Row 5 is the 110 who were excluded.

25   Most of those were people who had submitted claims here and who

1   had signed the release in the VIOXX personal injury program.

2   There were some claimants who were excluded because they had

3   been residents of Missouri when they purchased VIOXX.  And the

4   members of the *Pluebell* settlement in Missouri the state class

5   action that were excluded this program.

6               And then there were 398 of all of our claim forms

7   that we determined that were duplicate, the same person filing

8   more than one claim form.  So we eliminated the 398.

9               We had, at the end of this, 2,284 claims that were

10  on the bubble that we could not pay.  We sent them the notices

11  that I described that told them what they were missing.  We got

12  responses.  Twenty-nine percent of them, as this pie chart

13  shows, responded.  We sent out 2,338 notices telling people

14  you're missing something, we can't finish your claim.

15  Twenty-nine percent of them responded.  Of those, eighty-three

16  of the responses cured.  So this first round of incomplete

17  notices cleaned up 562 claims.

18              After that, the amount total payable went up, as

19  you can tell, about $100,000.  And that's people finishing out

20  their claims, giving us information.  So the payable amounts go

21  up.

22              This slide shows us the second round of notices,

23  the final notices, the second thirty days, where we sent --

24  we're whittling the group down to fewer and fewer people.  We

25  sent out 1,764 of these final notices.  About twenty percent of

1    them responded.  This is fairly typical.  Sometimes it's higher

2    than this if the dollars involved are higher.  Sometimes it's

3    way lower than this if the dollars involved are lower.  But we

4    had another twenty percent of people responding.  Most of them,

5    eighty-four percent of them, could fix their issues with us.  We

6    ended up with another 300 people becoming payable or cured

7    through this second round of notices.  And the payable amount

8    that we have increased into over $706,000 of VIOXX costs

9    reimbursement in this program.

10              This Slide 18 shows us where we stand today in

11   terms of what's payable.

12              Option 1 is the option to submit your

13   reimbursement proof and get paid your actual reimbursement

14   amount.  The largest claim we have to pay under that is just

15   under $6,000.  People had proof that they had out-of-pocket

16   expenses for VIOXX at that level.

17              Option 2 are the claimants who had no proof of

18   payment and they could submit a pill bottle or they could submit

19   a declaration and receive $50.  You can see most of the folks in

20   this program end up in that proof level, they were receiving the

21   $50.  We end up with this amount, the $706,000 plus that's

22   payable today.

23              And these are the folks on this Slide 18 that bear

24   upon Mr. Getty and Ms. Winter's motion.  Because, as we stand

25   today, we have 1,391 claimants whom we cannot pay.  Some of

1    these are obviously not payable.

2                 The 403 people in Row 6, the duplicates, we're not

3    going to pay them.  There's nothing we can do to change that,

4    it's just an extra claim.  We don't want to pay them twice.

5                 The 110 people who are excluded in Row 5, we don't

6    think that's going to change even if we were to call them, we

7    could call them to make sure we've got it right, that they were

8    the same person who signed the VIOXX release.  But we don't they

9    think there's any doubt about that because we have the VIOXX

10   releases, we have the Social Security numbers, we can match up

11   those people.

12                So the ones in Rows 1 through 4 are the ones, the

13   claimants, who are still on the bubble, who, after all the

14   things I've described, did not complete their claims and have

15   not converted themselves into payment.  And, if we were to do

16   any calls now, it would be to these claimants in Rows 1 through

17   4 of Slide 19, the 224 with no documents, 2,338 who still

18   haven't given us a qualifying document, the 61 who still haven't

19   finished out their claim form or the 355 people who have several

20   things wrong.  That's a total of 878 people that might be

21   subject to calls.

22                Now, we have phone numbers for about eight-four

23   percent of those.  We don't have phone numbers for all of them.

24   I think we could call 738 people if the Court and the parties

25   directed us to on top of what's already happened.

1         So this group right here in these first four rows

2    are the ones that would be subject to any calls that we made now

3    to ask them further questions about their claim.

4         THE COURT:  What's your estimate of the costs of

5    something like that?

6         MR. BROWN:  Well, Your Honor, it's difficult to

7    predict, just like all costs are.  But we think it would cost

8    about ten to $15,000 in time.  The reason for that is, if we're

9    making seven to 800 phone calls, we will not reach them all

10   during business hours during the day.  There's usually at least

11   two or three call efforts to get back and for and talk to them,

12   so that takes time.  And then we're talking to them, that takes

13   time, and explaining things to them.

14         And then there will be claims handling.  We will

15   maybe get a few things in that we process and add to them, so

16   there's some time associated with that.

17         The best we can say is that ten to $15,000 time

18   costs handling for that.

19         And the success rate is also hard to predict, Your

20   Honor.  We will reach ultimately at least fifty percent of them.

21   Some of them, we cannot.  They won't call us back, we can't

22   reach them.  So we'll get probably fifty percent of them.  I

23   expect that -- and it's really kind of conjectural at this point

24   to say why haven't they finished by now after all of these

25   efforts.  I think part of it is they just don't have the proof.

1   Some of them may have ended up feeling like they don't want to

2   fool with it anymore or they don't -- didn't actually have any

3   out-of-pocket expenses that they want reimbursement for.

4   Because the bottom line is, if they sign a declaration that says

5   under oath that they used VIOXX and weren't repaid, this

6   settlement allows them $50.  And the eighty-five percent, eighty

7   percent of our payable claim is of that genre, they're getting

8   the $50 because they don't have the proof, can't demonstrate

9   actual out-of-pocket.

10          We would basically be encouraging these folks to

11  do that, if they can do it honestly under oath, to send in that

12  request for the $50.

13          And so, if you run out the numbers, Your Honor, we

14  might end with a with a couple of people who actually give us

15  hard proof to give us more than $50.  But, mostly, will end up

16  fifty percent or more of about 738 people who end up with $50 as

17  payment.

18          So the benefits that we could pay after all that

19  effort would end up being somewhere in the --

20          THE COURT:  Twenty to $30,000.

21          MR. BROWN:  Yes, sir.  Or less, depending upon how many

22  of them we can reach.

23          This final Slide No. 21 shows where we stand

24  today.  I've already said most of this.  The 8,750 claims that

25  we've received are all accounted for.  988 not payable today.

1    That includes the exclusions and the duplicates of 403.  And we

2    have 7,366 that are payable.  A total of 706,925.92.

3              And so that concludes that presentation, Your

4    Honor.  I apologize for being the longest speaker today but we

5    did want to have this opportunity to give the Court a full

6    context of everything we've done to date.

7              THE COURT:  Let me hear from Elizabeth in response to.

8              MS. CABRASER:  Thank you, Your Honor.  Elizabeth

9    Cabraser.

10             First, I would note -- and not in passing -- that

11   the very comprehensive presentation that BrownGreer just made to

12   the Court and parties is essentially a final report on claims

13   administration.  We would be submitting such report at the close

14   of any class action settlement program.  We believe that this is

15   sufficiently thorough to constitute a final report here and we

16   would respectfully move that this presentation be included in

17   the record of these proceedings.

18             We have spent the year since the settlement was

19   granted final approval by Your Honor in January in a series of

20   conference calls with Merck and with BrownGreer to devise and

21   implement the courtesy reminder program, which we sometimes call

22   a claims stimulation program, and it's been an iterative basis.

23   These programs are not required by Rule 23 but they are becoming

24   a best practice.  And we submit that this particular program,

25   this claims enhancement program, is state-of-the-art.  We've

```
 1   been able to use social media.  We've been able to use YouTube.
 2   We were able to use an email blast courtesy of AARP to reach a
 3   target population.  And we were also, based on BrownGreer's
 4   developing knowledge and familiarity with the claims program and
 5   the claimants themselves, to discuss and agree with Merck on
 6   additional features not only to reach the claimants and remind
 7   them of claims deadlines but to affirmatively assist them with
 8   claims.  And I won't repeat all of the futures of the program
 9   because they are in the presentation.
10             So, when we received Mr. Getty's motion for direct
11   phone contact with claimants, the utilization of phone contact
12   was certainly something that we had considered and discussed.
13   We had always considered that any such outreach ought to be done
14   by the claims administrator and the administrator's staff,
15   simply because although class counsel would be entitled to work
16   directly with claimants -- and we have -- typically what we do
17   when claimants contact us for assistance is that we refer them
18   back to the claims administrator.  Because that's where the
19   records and information are and frankly that's where the
20   expertise of working with claimants is.
21             And so, in our response to this motion, our
22   recommendation is that any further activity by the claims
23   administrator be by the claims administrator office.
24             Your Honor, whether or not this last effort by
25   telephonic outreach or otherwise to these remaining several
```

1    hundred claimants ought to be made is uniquely within your

2    discretion.  It was not contemplated by the settlement

3    agreement.  But frankly, these days, what happens in the

4    implementation phase, particularly of consumer class action

5    settlements -- and I'm involved in several right now -- is that,

6    with the cooperation and assistance of the settling defendants

7    and the claims administrator, we learn as we go and we use newly

8    available media and techniques to enhance the claims process.

9                    As you'll recall at the outset of the notice

10   program and at the final approval stage the concern was did we

11   have enough notice by publication.  We have learned over the

12   years that the increase to publish notice does not have a direct

13   relationship to the increase of claims.  Publishing more notice

14   does not generate more claims.  I wish that it did.  There are

15   other techniques that are more effective.  We believe throughout

16   this program we've tested and implemented and utilized all of

17   the effective techniques that are presently available,

18   particularly given the challenges of this class:  An older

19   population to begin with, a drug taken off the market over ten

20   years ago, a very, very effective and sizable settlement

21   personal injury and wrongful-death claims.  And the fact that

22   back in the beginning years of this century there weren't the

23   records that would exist today.  If we were starting a notice

24   program today on a drug that was taken off the market this year

25   or last year, I think you would see the same techniques that we

1    have been utilizing but you would probably see at least a

2    somewhat larger claims rate.

3              That is to say that we're at the point now in the

4    process where, as Mr. Brown discussed with Your Honor, we have

5    an opportunity to expend another $15,000 to generate possibly

6    another twenty to $30,000 worth of claims.  And it is difficult

7    to make an argument that this is a cost-effective effort to take

8    at this time, given the thoroughness and innovation of the

9    claims program to date.

10             On the other hand, as class counsel, it's always

11   our goal to do everything practicable to assist every claimant

12   again as long as the Court allows us to do so.  It's not a

13   matter of due process.  This program has gone way beyond due

14   process.  We think this program as we've developed it

15   establishes a model for other consumer class action settlements

16   and we appreciate that Your Honor gave us the opportunity and

17   encouraged us to do so.

18             We also appreciate that the settling defendant,

19   Merck, has agreed for the most part with all of the proposals

20   we've made, has agreed that settlement funds can be expended to

21   implement those innovations and that claims assistance, and in

22   doing so has taken responsibility for its product.  We deeply

23   appreciate that and we think Merck's attitude and conduct in the

24   course of this class action administration also sets a model.

25             So that leaves the question -- we appreciate that

1   Mr. Getty acknowledges the direct phone contact by anyone other

2   than the claims administrator would simply not be effective.

3            We appreciate also that we're asking the Court to

4   consider spending an amount of money that may equal or exceed

5   the amount of claims it generates.  That's a cost-benefit

6   analysis that is uniquely discretionary.  We think there's no

7   right answer to that question.  And so we respectfully submit

8   that to the Court.

9            THE COURT:  The problem is as I see it from the

10  standpoint of expenses, it looks like the expenses are about

11  fifteen to $20,000.  $15,000, at least.  The maximum that could

12  be gotten is about $30,000 if BrownGreer assumes that fifty

13  percent of that would respond.  That's down to $15,000.  So

14  you're spending $15,000 to get $15,000.  That concerns me.

15           It also concerns me that also that people can't

16  get paid, people that have put in their requests and have been

17  approved, can't get paid until this -- and as well there's an

18  appeal, I understand that.  And also they can't get paid until

19  that is resolved.

20           But does Merck have any input on this?

21           MR. BEISNER:  Yes, Your Honor.  Just a couple of

22  points.

23           I think we're in agreement that everything Ms.

24  Cabraser said to you on the subject, but I'd just note a couple

25  of points.

1          The first is, I wanted to clarify, Your Honor,

2    Elizabeth reminded me that we have indicated to the circuit that

3    we don't think there is a need for oral argument on this appeal.

4          So I think that, at this point, if we can advise

5    the circuit now that the claims process is complete and payment

6    is awaiting their ruling, it may help move that along.

7          And I also wanted to just note, Your Honor, that

8    we may have a law of diminishing returns on another respect as

9    well.  And that is some of these people put their claims in a

10   year ago.  The census statistics indicate that fifteen percent

11   of the US population moves every year.  I suspect it's less than

12   that here given the age of this population.  But we're going to

13   be losing people at the other end when you go to mail the check

14   where the address may have changed.  So I worry that we're just

15   at the point now that we've given opportunities to individuals

16   and we may lose some folks who did everything on time earlier

17   and be unable to get them paid on this as well.

18         THE COURT:  Yes, go ahead.

19         MS. CABRASER:  Your Honor, one other thing -- and that

20   is a good reminder.  The claims deadline was May 6th of this

21   year, and we do get calls from folks who have completed their

22   claims and are wondering when they will be paid.  The appeal

23   before the Fifth Circuit does not relate to any of the benefits

24   under the class action settlement.  It doesn't relate to claims

25   at all, and we would I think advise the Fifth Circuit that

1    claims, if and when claims administration is completed and we

2    would otherwise be able to send those checks to folks, we would

3    like to advise the Fifth Circuit that we're ready to go but for

4    the appeal before them which is on a complete different issue.

5              THE COURT:  Richard, do you have any rebuttal comments?

6              MR. GETTY:  Just real quickly.  I hadn't heard the

7    BrownGreer presentation, which I think was excellent.  Very

8    informative.

9                   I have mixed emotions, too.  I understand this is

10   discretionary.  I guess the only thing I'd say is that the lower

11   participation rate because of time passage, age of the users of

12   VIOXX or whatever, Merck has ended up spending a lot less money

13   than they ever anticipated.  And I guess the Court could

14   exercise its discretion and say, well, maybe we can get some

15   more participation using Merck's money.  Which I'm always in

16   favor of.  But I really have mixed emotions.

17             THE COURT:  I do, too.  We've tried all along to

18   accommodate the claimants.  In Kentucky particularly, but also

19   New Mexico with their unique problem.

20                  And, in this one, I had asked BrownGreer to give

21   us a periodic review.  That, I thought, was helpful.  And I hope

22   future courts do that.  Because we picked up earlier on that the

23   response level was lower than anticipated, and so early on we

24   kind of shook the tree a little bit and stimulated some

25   additional notices.  We didn't wait until the end.  And so that

1   is sort of plugged in to the system, too.

2              Let me think about this.  I'll come up with it,

3   but it seems to me that we've expended enough time and money and

4   effort on this matter.  The truth of the matter is, people have

5   moved on.  They don't -- also calls.  We've just been through an

6   election cycle and you hate to answer the phone.  People ask you

7   to do things, and you get angry with them because they call you

8   at crazy hours like dinnertime and in the morning when you're

9   trying to get off to work.  And so I don't know how much people

10  respond to the telephone anymore.  It looks like that's almost a

11  thing of the past, like the pigeon communications.

12       MR. GETTY:  I think that a lot of people any longer

13  don't have anything about a cellphone.

14       THE COURT:  That's right.  That's right.  It's one of

15  those by-gone things.  The idea of telephone booths being

16  something that's very, very private.  Heck, it was private

17  enough that that's where Superman went to change.  And now

18  people say things on their cellphones that you can't believe

19  they are saying on their cellphones.  You know more about them

20  now than probably their mothers did.

21              Okay.  I appreciate the time that all of you all

22  have spent.  And, Richard, I appreciate the vigor that you've

23  shown in this matter.  It's what lawyers should be doing, so I

24  compliment you on that.

25       MR. GETTY:  I appreciate that, Judge.  We just tried to

1   do everything we can to get the claim level up to the maximum.

2   That's always been our goal.

3              THE COURT:  I know that.

4              All right, folks.  Thanks very much.  See you all

5   next time.

6              CASE MANAGER:  All rise.

7              (10:00 a.m., proceedings concluded.)

8

9

10                         CERTIFICATE

11

12
            I, Susan A. Zielie, Official Court Reporter, do hereby
13   certify that the foregoing transcript is correct.

14

15
                         /S/ SUSAN A. ZIELIE, FCRR
16              _____
17                         Susan A. Zielie, FCRR

18

19

20

21

22

23

24

25

## $

**$100,000** [1] - 24:19
**$15,000** [7] - 27:8, 27:17, 32:5, 33:11, 33:13, 33:14
**$20,000** [1] - 33:11
**$30,000** [3] - 28:20, 32:6, 33:12
**$50** [8] - 18:17, 25:19, 25:21, 28:6, 28:8, 28:12, 28:15, 28:16
**$6,000** [1] - 25:15
**$706,000** [2] - 25:8, 25:21

## /

**/S** [1] - 37:15

## 0

**05-md-1657** [1] - 1:6

## 1

**1** [5] - 13:13, 22:9, 25:12, 26:12, 26:16
**1,391** [1] - 25:25
**1,764** [1] - 24:25
**1.6** [1] - 14:22
**10** [1] - 20:6
**10:00** [1] - 37:7
**11,000** [1] - 16:20
**11,226** [2] - 15:25, 16:15
**110** [2] - 23:24, 26:5
**12** [1] - 22:7
**121,000** [1] - 15:7
**12th** [1] - 2:15
**13** [1] - 23:6
**131** [3] - 19:22, 22:12, 22:21
**13th** [1] - 13:20
**1440** [1] - 2:19
**16** [2] - 1:6, 3:1
**18** [2] - 25:10, 25:23
**18,000** [1] - 15:8
**19** [1] - 26:17

## 2

**2** [2] - 18:17, 25:17
**2,284** [2] - 10:23, 24:9
**2,338** [2] - 24:13, 26:17
**20005** [2] - 2:16, 2:19
**2013** [5] - 13:2, 13:10, 13:13, 13:20, 14:23
**2014** [9] - 1:6, 3:1,

13:21, 14:3, 15:14, 16:21, 17:18, 20:21, 21:23
**202.371.7410** [1] - 2:20
**202.434.5000** [1] - 2:16
**21** [1] - 28:23
**224** [1] - 26:17
**22nd** [1] - 20:20
**23** [1] - 29:23
**24** [1] - 21:21
**26th** [2] - 7:25, 8:1
**275** [1] - 2:8
**288** [2] - 22:10, 22:20
**29th** [1] - 2:8
**2nd** [1] - 13:2

## 3

**3,700** [1] - 17:13
**30** [1] - 21:23
**300** [1] - 25:6
**312** [1] - 19:23
**355** [1] - 26:19
**3650** [1] - 2:12
**398** [2] - 24:6, 24:8
**3rd** [1] - 13:21

## 4

**4** [3] - 17:6, 26:12, 26:17
**403** [2] - 26:2, 29:1
**406** [1] - 1:21
**411** [1] - 16:23
**415.956.1000** [1] - 2:9

## 5

**5** [3] - 17:13, 23:24, 26:5
**5,000** [1] - 17:9
**5,600** [1] - 20:1
**50,000** [1] - 16:11
**500** [1] - 1:21
**504.524.3300** [1] - 2:13
**504.581.4892** [1] - 2:5
**504.589.7781** [1] - 1:23
**562** [1] - 24:17
**5697** [1] - 3:6

## 6

**6** [1] - 26:2
**6,000** [1] - 22:7
**61** [1] - 26:18
**668** [1] - 17:1

**6th** [2] - 14:3, 34:20

## 7

**7,366** [1] - 29:2
**701** [1] - 2:12
**70113** [1] - 2:4
**70130** [1] - 1:22
**70139-3650** [1] - 2:12
**706,925.92** [1] - 29:2
**725** [1] - 2:15
**738** [2] - 26:24, 28:16

## 8

**8,750** [1] - 28:24
**8,757** [2] - 20:7, 20:14
**800** [1] - 27:9
**820** [1] - 2:4
**878** [1] - 26:20

## 9

**94111-3339** [1] - 2:8
**988** [1] - 28:25
**9:00** [1] - 3:2

## A

**a.m** [1] - 37:7
**A.M** [1] - 3:2
**AARP** [1] - 30:2
**able** [5] - 14:4, 30:1, 30:2, 35:2
**accommodate** [1] - 35:18
**account** [5] - 17:11, 19:9, 19:10, 19:12, 21:9
**accounted** [1] - 28:25
**accustomed** [1] - 9:23
**acknowledges** [1] - 33:1
**action** [13] - 3:20, 7:17, 8:14, 9:16, 9:17, 12:20, 24:5, 29:14, 31:4, 32:15, 32:24, 34:24
**actions** [4] - 3:20, 3:23, 4:3
**active** [1] - 6:1
**activity** [4] - 4:17, 16:21, 20:25, 30:22
**actual** [2] - 25:13, 28:9
**add** [1] - 27:15
**added** [8] - 17:22, 18:1, 18:3, 18:13, 18:15, 18:22, 19:17
**additional** [2] - 30:6, 35:25

**address** [4] - 5:8, 6:6, 7:4, 34:14
**addressed** [2] - 6:7, 16:19
**administration** [3] - 29:13, 32:24, 35:1
**administrator** [9] - 11:23, 14:24, 16:1, 30:14, 30:18, 30:23, 31:7, 33:2
**administrator's** [1] - 30:14
**ads** [3] - 14:15, 14:18
**advantageous** [1] - 19:5
**adverse** [1] - 9:7
**advertised** [1] - 15:2
**advise** [3] - 34:4, 34:25, 35:3
**affirmatively** [1] - 30:7
**AG** [1] - 2:10
**age** [3] - 10:11, 34:12, 35:11
**agenda** [1] - 3:22
**agent** [2] - 13:11, 14:6
**ago** [2] - 31:20, 34:10
**agree** [1] - 30:5
**agreed** [2] - 32:19, 32:20
**agreement** [13] - 9:11, 12:22, 12:23, 13:4, 13:18, 15:5, 17:24, 20:21, 21:14, 23:10, 31:3, 33:23
**ahead** [4] - 11:20, 17:12, 17:17, 34:18
**aided** [1] - 1:25
**Alaska** [4] - 4:3, 4:5, 4:9, 4:12
**allow** [1] - 7:3
**allowed** [1] - 6:24
**allows** [2] - 28:6, 32:12
**almost** [3] - 3:14, 19:23, 36:10
**Amazon** [1] - 19:10
**amount** [9] - 22:11, 22:18, 22:24, 24:18, 25:7, 25:14, 25:21, 33:4, 33:5
**amounts** [2] - 22:17, 24:20
**analysis** [2] - 22:3, 33:6
**angry** [1] - 36:7
**Ann** [1] - 5:10
**anniversary** [1] - 3:14
**announced** [1] - 9:16
**answer** [4] - 18:23, 19:2, 33:7, 36:6

**anticipated** [2] - 35:13, 35:23
**apologize** [2] - 6:11, 29:4
**appeal** [6] - 7:16, 12:23, 33:18, 34:3, 34:22, 35:4
**appeals** [2] - 7:15, 12:21
**appear** [1] - 6:16
**APPEARANCES** [1] - 2:1
**appearances** [1] - 3:8
**appreciate** [8] - 32:16, 32:18, 32:23, 32:25, 33:3, 36:21, 36:22, 36:25
**approaching** [1] - 20:3
**approval** [4] - 13:2, 13:20, 29:19, 31:10
**approved** [3] - 14:4, 14:19, 33:17
**areas** [1] - 9:22
**argument** [4] - 4:12, 7:20, 32:7, 34:3
**Arps** [1] - 2:18
**art** [1] - 29:25
**articles** [1] - 14:12
**assigned** [1] - 18:6
**assist** [2] - 30:7, 32:11
**assistance** [3] - 30:17, 31:6, 32:21
**associated** [1] - 27:16
**assume** [1] - 4:16
**assumes** [1] - 33:12
**AT** [1] - 1:4
**attached** [1] - 20:24
**attack** [1] - 5:14
**attitude** [1] - 32:23
**attributable** [1] - 20:2
**attributed** [1] - 8:20
**August** [5] - 13:2, 13:10, 14:22, 14:25, 20:20
**automated** [3] - 15:4, 17:25, 18:6
**availability** [2] - 13:4, 18:16, 18:21
**available** [4] - 13:17, 17:21, 31:8, 31:17
**Avenue** [2] - 2:4, 2:19
**average** [1] - 19:23
**awaiting** [1] - 34:6

## B

**background** [1] - 8:15
**balance** [1] - 7:2
**BARRIOS** [1] - 2:10

**Barrios** [1] - 2:11
**barrios@bkc** [1] - 2:13
**barrios@bkc-law.com** [1] - 2:13
**based** [2] - 6:14, 30:3
**basis** [2] - 14:20, 29:22
**Battery** [1] - 2:8
**bear** [2] - 19:20, 25:23
**bears** [1] - 22:3
**become** [1] - 11:1
**becoming** [2] - 25:6, 29:23
**BEFORE** [1] - 1:11
**began** [2] - 9:9, 20:2
**begin** [1] - 31:19
**beginning** [2] - 12:10, 31:22
**behalf** [2] - 3:10, 20:10
**Beisner** [1] - 4:7
**BEISNER** [6] - 2:17, 4:7, 4:23, 7:14, 7:16, 33:21
**benefit** [3] - 6:6, 8:21, 33:5
**benefits** [3] - 13:17, 28:18, 34:23
**Bernstein** [1] - 2:7
**best** [3] - 11:10, 27:17, 29:24
**better** [1] - 10:19
**beyond** [2] - 6:3, 32:13
**binding** [2] - 16:4, 16:17
**Birchfield** [1] - 6:5
**bit** [3] - 7:7, 13:12, 35:24
**blast** [1] - 30:2
**boost** [1] - 13:22
**booster** [2] - 15:19, 20:4
**booster-shot** [1] - 20:4
**booths** [1] - 36:15
**bottle** [1] - 25:18
**bottom** [1] - 28:4
**bought** [1] - 18:18
**Box** [1] - 15:1
**brief** [1] - 10:5
**briefed** [1] - 7:17
**briefing** [3] - 4:10, 4:11, 4:13
**brought** [1] - 10:3
**Brown** [4] - 11:13, 11:21, 11:22, 32:4
**BROWN** [3] - 11:21,

27:6, 28:21
**BrownGreer** [11] - 3:24, 10:15, 11:3, 11:6, 11:8, 11:22, 29:11, 29:20, 33:12, 35:7, 35:20
**BrownGreer's** [1] - 30:3
**BTE** [1] - 5:23
**bubble** [2] - 24:10, 26:13
**business** [1] - 27:10
**buy** [1] - 19:10
**by-gone** [1] - 36:15
**Byrd** [5] - 6:12, 6:13, 6:15, 6:21, 6:23

---

## C

**CA** [1] - 2:8
**CABRASER** [3] - 2:6, 29:8, 34:19
**Cabraser** [3] - 2:7, 29:9, 33:24
**campaign** [13] - 13:7, 13:8, 13:10, 13:24, 14:10, 14:19, 14:22, 15:11, 19:20, 19:21, 19:22, 20:1, 20:5
**cancelled** [1] - 22:16
**cannot** [2] - 25:25, 27:21
**card** [1] - 22:16
**Case** [1] - 1:6
**case** [10] - 3:5, 3:18, 5:13, 5:14, 5:24, 6:9, 6:12, 6:21, 6:22, 8:21
**CASE** [4] - 3:6, 7:25, 8:7, 37:6
**cases** [14] - 4:6, 4:18, 4:25, 5:7, 5:11, 5:13, 5:16, 5:18, 5:23, 7:3
**Casteix** [1] - 2:11
**caused** [1] - 16:12
**cellphone** [1] - 36:13
**cellphones** [2] - 36:18, 36:19
**census** [3] - 5:14, 5:24, 34:10
**center** [1] - 17:21
**century** [1] - 31:22
**certain** [5] - 5:3, 5:10, 13:24, 22:21, 22:23
**certainly** [1] - 30:12
**CERTIFICATE** [1] - 37:10
**certify** [1] - 37:13
**challenges** [1] - 31:18
**chambers** [1] - 4:23

**change** [3] - 26:3, 26:6, 36:17
**changed** [4] - 19:7, 19:13, 22:3, 34:14
**chart** [1] - 24:12
**check** [2] - 6:19, 34:13
**checked** [1] - 6:17
**checks** [2] - 22:16, 35:2
**Circuit** [3] - 34:23, 34:25, 35:3
**circuit** [3] - 7:18, 34:2, 34:5
**claim** [44] - 3:15, 8:23, 13:5, 13:14, 13:17, 13:22, 14:2, 14:4, 15:15, 16:18, 17:2, 17:5, 17:8, 17:12, 17:15, 17:17, 18:10, 18:14, 19:3, 19:7, 19:8, 19:13, 19:15, 19:17, 20:22, 21:6, 21:8, 21:17, 22:19, 22:23, 23:13, 23:19, 23:21, 24:6, 24:8, 24:14, 25:14, 26:4, 26:19, 27:3, 28:7, 37:1
**claimant** [5] - 13:15, 13:24, 15:17, 21:1, 32:11
**claimants** [34] - 12:12, 13:3, 14:3, 15:1, 15:8, 16:3, 16:21, 16:24, 17:1, 18:8, 19:6, 20:9, 20:10, 20:19, 20:21, 21:12, 21:21, 22:4, 22:8, 22:17, 23:6, 24:2, 25:17, 25:25, 26:13, 26:16, 30:5, 30:6, 30:11, 30:16, 30:17, 30:20, 31:1, 35:18
**claims** [69] - 9:5, 9:6, 10:7, 10:9, 10:12, 10:18, 10:21, 11:1, 11:7, 11:9, 11:23, 12:3, 12:11, 12:13, 12:18, 14:24, 16:1, 16:7, 16:13, 17:19, 19:22, 19:23, 19:24, 20:1, 20:4, 20:6, 20:7, 20:10, 20:14, 21:25, 23:9, 23:25, 24:9, 24:17, 24:20, 26:14, 27:14, 28:24, 29:12, 29:22, 29:25, 30:4, 30:7, 30:8, 30:14, 30:18, 30:22, 30:23, 31:7, 31:8,

31:13, 31:14, 31:21, 32:2, 32:6, 32:9, 32:21, 33:2, 33:5, 34:5, 34:9, 34:20, 34:22, 34:24, 35:1
**clarify** [1] - 34:1
**class** [23] - 3:20, 7:17, 8:14, 8:15, 9:16, 9:17, 10:25, 11:5, 11:6, 14:5, 15:16, 24:4, 29:14, 30:15, 31:4, 31:18, 32:10, 32:15, 32:24, 34:24
**clean** [1] - 7:3
**clean-up** [1] - 7:3
**cleaned** [2] - 12:25, 24:17
**clear** [1] - 20:24
**clerk's** [2] - 4:15, 12:6
**close** [1] - 29:13
**closer** [1] - 8:4
**coming** [1] - 15:15
**comments** [1] - 35:5
**common** [1] - 6:6
**communications** [1] - 36:11
**complete** [9] - 4:11, 7:22, 10:19, 21:6, 21:17, 23:4, 26:14, 34:5, 35:4
**completed** [4] - 4:13, 23:21, 34:21, 35:1
**compliment** [1] - 36:24
**complimented** [1] - 11:4
**comprehensive** [1] - 29:11
**Computer** [1] - 1:25
**Computer-aided** [1] - 1:25
**concern** [1] - 31:10
**concerns** [2] - 33:14, 33:15
**concluded** [2] - 12:24, 37:7
**concludes** [1] - 29:3
**conduct** [2] - 10:25, 32:23
**conference** [4] - 3:14, 5:17, 7:6, 29:20
**Conference** [1] - 1:7
**conjectural** [1] - 27:23
**Connolly** [1] - 2:15
**consider** [1] - 33:4
**considered** [2] - 30:12, 30:13
**constitute** [1] - 29:15
**consumer** [10] - 3:20, 3:25, 8:14, 8:15, 9:3,

11:24, 14:15, 16:8, 31:4, 32:15
**consumers** [2] - 9:6, 9:12, 10:15
**contact** [9] - 10:22, 11:6, 16:3, 17:10, 19:11, 30:11, 30:17, 33:1
**contemplated** [1] - 31:2
**context** [2] - 12:1, 29:6
**convene** [1] - 7:6
**conversations** [1] - 6:5
**converted** [1] - 26:15
**cooperation** [1] - 31:6
**copies** [2] - 12:8, 13:4
**copy** [5] - 12:5, 15:5, 17:15, 20:13, 21:8
**correct** [2] - 4:9, 37:13
**cost** [4] - 14:11, 27:7, 32:7, 33:5
**cost-benefit** [1] - 33:5
**cost-effective** [1] - 32:7
**costs** [6] - 9:12, 20:18, 25:8, 27:4, 27:7, 27:18
**counsel** [15] - 3:11, 4:15, 5:9, 5:10, 6:2, 7:10, 10:16, 11:3, 11:5, 14:7, 15:16, 30:15, 32:10
**Counsel** [2] - 2:3, 3:8
**couple** [5] - 3:18, 12:8, 28:14, 33:21, 33:24
**course** [2] - 15:6, 32:24
**court** [1] - 4:6
**COURT** [27] - 1:2, 3:3, 3:8, 3:13, 4:2, 4:20, 5:1, 6:20, 7:5, 7:9, 7:13, 7:15, 7:22, 8:1, 8:9, 8:12, 11:11, 11:19, 27:4, 28:20, 29:7, 33:9, 34:18, 35:5, 35:17, 36:14, 37:3
**Court** [23] - 1:20, 4:16, 4:20, 5:19, 6:11, 7:12, 8:18, 11:5, 12:1, 13:19, 13:23, 14:19, 16:2, 20:25, 22:3, 26:24, 29:5, 29:12, 32:12, 33:3, 33:8, 35:13, 37:12
**Court's** [2] - 12:6, 13:1
**courtesy** [3] - 15:11,

29:21, 30:2
**courts** [2] - 4:4, 35:22
**coverage** [1] - 14:11
**crazy** [1] - 36:8
**credit** [1] - 22:16
**cure** [3] - 21:22, 21:23, 21:24
**cured** [2] - 24:16, 25:6
**cycle** [1] - 36:6

## D

**date** [5] - 4:12, 7:24, 29:6, 32:9
**DAVIS** [4] - 2:3, 3:10, 3:24, 5:8
**Davis** [2] - 3:10, 6:5
**DAWN** [1] - 2:10
**days** [9] - 20:23, 21:7, 21:17, 21:20, 23:4, 24:23, 31:3
**DC** [2] - 2:16, 2:19
**deadline** [5] - 14:2, 20:3, 21:2, 34:20
**deadlines** [1] - 30:7
**Dean** [1] - 8:6
**death** [2] - 6:14, 31:21
**December** [2] - 1:6, 13:20
**DECEMBER** [1] - 3:1
**declaration** [5] - 14:20, 18:18, 20:24, 25:19, 28:4
**deeply** [1] - 32:22
**defendant** [2] - 4:8, 32:18
**defendants** [1] - 31:6
**defer** [2] - 3:20, 4:1
**degree** [1] - 11:2
**demonstrate** [1] - 28:8
**dependent** [1] - 18:4
**described** [2] - 24:11, 26:14
**design** [1] - 15:18
**designed** [1] - 13:10
**desk** [2] - 12:6
**detail** [3] - 13:9, 13:12, 13:25
**determined** [1] - 24:7
**develop** [1] - 13:23
**developed** [4] - 14:6, 16:17, 20:23, 32:14
**developing** [1] - 30:4
**development** [1] - 15:13
**devise** [1] - 29:20
**died** [1] - 6:13
**different** [1] - 35:4
**difficult** [3] - 9:10, 27:6, 32:6

**diminishing** [1] - 34:8
**dinnertime** [1] - 36:8
**direct** [9] - 10:21, 10:25, 11:5, 11:6, 13:8, 15:18, 30:10, 31:12, 33:1
**directed** [2] - 22:22, 26:25
**directly** [2] - 15:24, 30:16
**discretion** [2] - 31:2, 35:14
**discretionary** [2] - 33:6, 35:10
**discuss** [2] - 6:12, 30:5
**discussed** [3] - 5:24, 30:12, 32:4
**discussion** [1] - 6:1
**dismiss** [1] - 6:14
**disposition** [1] - 7:19
**disseminated** [1] - 9:21
**district** [1] - 4:24
**DISTRICT** [3] - 1:2, 1:3, 1:12
**doctor** [1] - 9:14
**doctors** [1] - 8:24
**document** [1] - 26:18
**documents** [5] - 18:11, 22:15, 23:12, 23:15, 26:17
**dollars** [2] - 25:2, 25:3
**done** [8] - 10:6, 11:15, 15:13, 15:20, 17:7, 20:8, 29:6, 30:13
**doubt** [1] - 26:9
**DOUGLAS** [1] - 2:14
**Douglas** [1] - 3:12
**down** [4] - 5:4, 7:7, 24:24, 33:13
**drug** [5] - 9:8, 9:12, 9:14, 31:19, 31:24
**due** [2] - 32:13
**duplicate** [1] - 24:7
**duplicates** [1] - 26:2, 29:1
**during** [2] - 27:10

## E

**early** [2] - 13:10, 35:23
**earn** [1] - 14:10
**easier** [2] - 18:11, 19:15
**EASTERN** [1] - 1:3
**ecabraser@lchb. com** [1] - 2:9
**effect** [1] - 9:7
**effective** [5] - 31:15,

31:17, 31:20, 32:7, 33:2
**efficient** [1] - 8:2
**effort** [7] - 10:22, 15:19, 17:19, 28:19, 30:24, 32:7, 36:4
**efforts** [7] - 10:14, 10:19, 11:4, 12:11, 19:4, 27:11, 27:25
**eight** [1] - 26:22
**eight-four** [1] - 26:22
**eighteen** [1] - 5:13
**eighty** [4] - 24:15, 25:5, 28:6
**eighty-five** [1] - 28:6
**eighty-four** [1] - 25:5
**eighty-three** [1] - 24:15
**either** [2] - 10:15, 11:12
**ELDON** [1] - 1:11
**election** [1] - 36:6
**eligible** [4] - 10:10, 10:18, 10:22, 11:1
**eliminated** [1] - 24:8
**Elizabeth** [3] - 29:7, 29:8, 34:2
**ELIZABETH** [1] - 2:6
**email** [5] - 17:9, 21:3, 21:4, 30:2
**emailed** [1] - 12:6, 16:25, 17:4, 17:9, 17:14
**emotions** [1] - 35:9, 35:16
**encourage** [2] - 17:19, 18:20
**encouraged** [4] - 17:4, 17:11, 21:4, 32:17
**encouraging** [1] - 28:10
**end** [12] - 3:15, 19:2, 24:9, 25:20, 25:21, 28:14, 28:15, 28:16, 28:19, 34:13, 35:25
**ended** [5] - 12:13, 14:21, 25:6, 28:1, 35:12
**enhance** [1] - 31:8
**enhancement** [1] - 29:25
**entire** [1] - 19:18
**entirety** [1] - 12:17
**entitled** [1] - 30:15
**envelope** [1] - 16:19
**equal** [1] - 33:4
**error** [1] - 6:25
**ESQ** [5] - 2:3, 2:6, 2:10, 2:14, 2:17
**essentially** [3] - 12:16,

12:17, 29:12
**establishes** [1] - 32:15
**estimate** [1] - 27:4
**event** [2] - 4:18, 9:5
**eventually** [1] - 9:10
**evidence** [1] - 5:20
**exactly** [1] - 21:6
**example** [1] - 9:20
**exceed** [1] - 33:4
**excellent** [1] - 35:7
**except** [1] - 4:14
**excluded** [4] - 23:24, 24:2, 24:5, 26:5
**exclusions** [1] - 29:1
**exercise** [1] - 35:14
**exist** [1] - 31:23
**expect** [1] - 27:23
**expend** [2] - 9:8, 32:5
**expended** [2] - 32:20, 36:3
**expense** [2] - 6:7, 9:13
**expenses** [5] - 5:3, 25:16, 28:3, 33:10
**expertise** [1] - 30:20
**experts** [1] - 14:10
**expire** [1] - 21:21
**explained** [1] - 21:1
**explaining** [2] - 22:2, 27:13
**expressed** [1] - 8:18
**extensive** [3] - 13:7, 14:14, 14:22
**extra** [2] - 12:8, 26:4

## F

**facilitate** [1] - 14:17
**fact** [4] - 8:19, 10:17, 20:2, 31:21
**fairly** [1] - 25:1
**fairness** [1] - 13:19
**fall** [2] - 15:20, 21:19
**FALLON** [1] - 1:11
**familiar** [1] - 6:9
**familiarity** [1] - 30:4
**far** [1] - 11:15
**favor** [1] - 35:16
**FCRR** [3] - 1:20, 37:15, 37:16
**features** [1] - 30:6
**February** [5] - 7:25, 8:1, 13:22, 16:21, 17:18
**federal** [2] - 4:4, 4:24
**fee** [1] - 6:6
**felt** [3] - 8:22, 16:11, 23:1
**few** [3] - 13:11, 22:2, 27:15

**fewer** [2] - 24:24
**fielded** [1] - 15:8
**fifteen** [2] - 33:11, 34:10
**Fifth** [3] - 34:23, 34:25, 35:3
**fifty** [5] - 20:11, 27:20, 27:22, 28:16, 33:12
**fifty-six** [1] - 20:11
**file** [4] - 13:14, 17:19, 19:3, 19:7
**filed** [6] - 6:13, 6:16, 8:13, 9:16, 20:1, 20:24
**files** [2] - 11:9, 11:10
**filing** [3] - 14:2, 19:8, 24:7
**filings** [1] - 19:24
**fill** [5] - 17:4, 17:17, 19:12, 19:14, 22:24
**filled** [2] - 17:3, 17:8
**final** [12] - 12:17, 12:19, 13:19, 14:2, 21:16, 24:23, 24:25, 28:23, 29:12, 29:15, 29:19, 31:10
**financial** [1] - 6:6
**fine** [1] - 5:1
**finish** [3] - 3:21, 17:11, 24:14
**finished** [5] - 12:18, 16:13, 17:3, 26:19, 27:24
**finishing** [1] - 24:19
**firms** [3] - 14:8, 16:23, 20:9
**first** [13] - 3:22, 15:25, 21:15, 21:20, 21:21, 21:22, 22:6, 23:7, 23:12, 24:16, 27:1, 29:10, 34:1
**five** [1] - 28:6
**fix** [1] - 25:5
**Flom** [1] - 2:18
**Floor** [1] - 2:8
**focus** [2] - 9:24, 18:20
**fold** [1] - 10:18
**folks** [8] - 16:17, 25:19, 25:23, 28:10, 34:16, 34:21, 35:2, 37:4
**follow** [1] - 22:15
**fool** [1] - 28:2
**FOR** [1] - 1:2
**foregoing** [1] - 37:13
**form** [23] - 13:5, 13:14, 16:19, 17:2, 17:5, 17:8, 17:15, 17:17, 18:10, 18:14, 18:24, 19:7, 19:8, 19:13,

19:15, 21:8, 22:19, 23:13, 23:20, 23:22, 24:8, 26:19
**forms** [1] - 24:6
**forth** [3] - 12:12, 16:3, 19:11
**forty** [1] - 20:12
**forty-three** [1] - 20:12
**forward** [1] - 6:24
**four** [3] - 25:5, 26:22, 27:1
**Francisco** [1] - 2:8
**frankly** [2] - 30:19, 31:3
**free** [5] - 15:2, 15:10, 17:21, 18:6, 21:4
**fruit** [1] - 19:20
**full** [2] - 12:2, 29:5
**fully** [1] - 7:17
**function** [3] - 18:13, 18:22, 20:12
**functions** [2] - 17:21, 18:9
**funds** [1] - 32:20
**future** [2] - 5:20, 35:22
**futures** [1] - 30:8

## G

**garner** [1] - 14:11
**general** [1] - 5:12
**generate** [2] - 31:14, 32:5
**generates** [1] - 33:5
**genre** [1] - 28:7
**gentlemen** [1] - 3:4
**GETTY** [5] - 10:5, 11:18, 35:6, 36:12, 36:25
**Getty** [7] - 8:7, 8:9, 8:14, 12:4, 12:7, 25:24, 33:1
**Getty's** [1] - 30:10
**given** [6] - 17:7, 26:18, 31:18, 32:8, 34:12, 34:15
**goal** [3] - 12:9, 32:11, 37:2
**government** [3] - 3:22, 3:23, 4:3
**granted** [1] - 29:19
**greater** [1] - 10:13
**group** [9] - 10:20, 15:25, 17:4, 21:21, 23:8, 23:15, 23:22, 24:24, 27:1
**groups** [4] - 15:21, 17:19, 22:20, 23:3
**growing** [1] - 9:6
**guess** [3] - 10:23,

35:10, 35:13

## H

**half** [1] - 20:8
**hand** [1] - 32:10
**handful** [1] - 20:10
**handling** [2] - 27:14, 27:18
**hard** [5] - 17:15, 20:13, 21:8, 27:19, 28:15
**hard-copy** [1] - 17:15
**hate** [1] - 36:6
**HB** [1] - 1:21
**hear** [7] - 8:3, 10:2, 11:12, 15:4, 17:25, 18:5, 29:7
**heard** [1] - 35:6
**hearing** [1] - 13:19
**heart** [1] - 35:6
**heck** [1] - 36:16
**Heimann** [1] - 2:7
**help** [4] - 4:20, 34:6
**helpful** [1] - 35:21
**hereby** [1] - 37:12
**Herman** [2] - 2:3
**higher** [2] - 25:1, 25:2
**hindsight** [1] - 10:8
**hold** [1] - 8:9
**home** [1] - 18:10
**honestly** [1] - 28:11
**Honor** [30] - 3:24, 4:7, 4:9, 4:23, 5:9, 5:12, 6:3, 6:9, 7:11, 7:14, 7:16, 7:21, 10:5, 11:18, 11:21, 12:9, 12:15, 27:6, 27:20, 28:13, 29:4, 29:8, 29:19, 30:24, 32:4, 32:16, 33:21, 34:1, 34:7, 34:19
**HONORABLE** [1] - 1:11
**hope** [1] - 35:21
**hopefully** [1] - 5:4
**hours** [2] - 27:10, 36:8
**hundred** [1] - 31:1

## I

**idea** [1] - 36:15
**ideal** [1] - 19:8
**ideas** [1] - 15:17
**identity** [1] - 4:24
**immediately** [3] - 13:2, 14:25, 18:12
**implement** [2] - 29:21, 32:21
**implementation** [1] -

31:4
**implemented** [1] - 31:16
**important** [1] - 3:16
**IN** [2] - 1:2, 1:6
**inactive** [1] - 17:10
**include** [1] - 13:12
**included** [3] - 14:6, 14:9, 29:16
**includes** [1] - 29:1
**including** [2] - 7:18, 12:4
**incomplete** [4] - 21:15, 23:9, 23:21, 24:16
**increase** [5] - 10:7, 10:15, 10:16, 31:12, 31:13
**increased** [2] - 10:17, 25:8
**incurred** [2] - 5:4, 9:14
**indicate** [2] - 13:16, 34:10
**indicated** [1] - 34:2
**individuals** [3] - 8:16, 9:19, 34:15
**ineligible** [3] - 10:20, 10:25, 11:7
**information** [14] - 11:25, 12:2, 12:16, 13:3, 13:5, 15:3, 16:3, 16:23, 21:16, 21:18, 23:10, 23:20, 24:20, 30:19
**informative** [1] - 35:8
**injuries** [1] - 8:17
**injury** [10] - 5:7, 5:11, 5:13, 7:3, 16:2, 16:7, 16:12, 16:24, 24:1, 31:21
**innocent** [1] - 9:2
**innovation** [1] - 32:8
**innovations** [1] - 32:21
**input** [1] - 33:20
**instances** [2] - 22:22, 23:2
**instead** [2] - 18:10, 19:16
**instructed** [1] - 22:14
**insurance** [1] - 23:2
**interactive** [3] - 13:14, 18:23, 19:11, 21:9
**interest** [1] - 15:23
**interested** [2] - 15:9, 18:8
**internet** [1] - 14:16
**invalid** [1] - 23:15
**involved** [4] - 14:15, 25:2, 25:3, 31:5

**involving** [1] - 8:14
**issue** [6] - 9:25, 10:20, 12:21, 12:22, 12:24, 35:4
**issued** [1] - 13:20
**issues** [3] - 6:6, 9:19, 25:5
**issuing** [1] - 20:19
**item** [1] - 3:22
**iterative** [1] - 29:22

## J

**January** [2] - 13:21, 29:19
**January/February** [1] - 15:14
**Jelden** [1] - 5:23
**Jo** [2] - 5:14, 6:9
**John** [1] - 7:15
**JOHN** [1] - 2:17
**john** [1] - 4:7
**john.beisner@ skadden.com** [1] - 2:20
**joint** [1] - 6:4
**JUDGE** [1] - 1:12
**Judge** [2] - 8:8, 36:25
**judges** [1] - 4:24
**judgment** [2] - 5:19, 6:8
**Junior** [1] - 11:22
**jurisdictional** [1] - 4:10
**jurisdictions** [1] - 4:19

## K

**Katz** [1] - 2:3
**Kentucky** [4] - 10:15, 10:23, 35:18
**keywords** [1] - 14:17
**kicking** [1] - 7:7
**kind** [5] - 15:19, 23:14, 23:16, 27:23, 35:24
**Kingsdorf** [1] - 2:11
**Kinsella** [4] - 13:11, 14:6, 14:9, 14:21
**knowledge** [1] - 30:4
**known** [1] - 8:23

## L

**LA** [2] - 2:4, 2:12
**labyrinth** [1] - 15:19
**ladies** [1] - 3:3
**laedcourtreporter@ gmail.com** [1] - 1:23
**language** [4] - 9:19, 18:5, 18:15, 20:24

**large** [1] - 23:22
**larger** [1] - 32:2
**largest** [1] - 25:14
**last** [5] - 5:17, 21:22, 21:23, 30:24, 31:25
**latter** [1] - 3:18
**launched** [2] - 13:1, 13:10
**law** [5] - 12:6, 14:8, 16:23, 20:9, 34:8
**law.com** [1] - 2:13
**laws** [1] - 9:3
**lawyer** [1] - 13:15
**lawyers** [2] - 15:9, 36:23
**ldavis@hhklawfirm. com** [1] - 2:5
**lead** [2] - 5:10, 7:9
**learn** [1] - 31:7
**learned** [1] - 31:11
**least** [6] - 8:22, 10:14, 27:10, 27:20, 32:1, 33:11
**leave** [1] - 17:22
**leaves** [1] - 32:25
**left** [3] - 12:4, 12:5, 23:20
**Leonard** [1] - 3:10
**LEONARD** [1] - 2:3
**less** [4] - 3:16, 28:21, 34:11, 35:12
**letter** [3] - 16:17, 16:18, 17:16
**level** [4] - 25:16, 25:20, 35:23, 37:1
**Levitt** [2] - 5:14, 6:9
**LIABILITY** [1] - 1:6
**liaison** [4] - 3:11, 5:10, 10:16, 11:3
**Liaison** [1] - 2:3
**Lieff** [1] - 2:7
**lien** [1] - 5:22
**line** [1] - 28:4
**list** [1] - 23:17
**Litigation** [1] - 3:7
**LITIGATION** [1] - 1:6
**live** [2] - 17:23, 18:1
**LLP** [3] - 2:7, 2:11, 2:18
**longest** [1] - 29:4
**look** [5] - 6:20, 6:25, 10:8, 11:16, 19:25
**looking** [1] - 6:3
**looks** [2] - 33:10, 36:10
**lose** [1] - 34:16
**losing** [1] - 34:13
**LOUISIANA** [2] - 1:3, 3:1

**Louisiana** [1] - 1:22
**lower** [4] - 25:3, 35:10, 35:23

## M

**magazines** [2] - 9:22, 14:15
**mail** [3] - 14:6, 20:13, 34:13
**mailed** [6] - 14:7, 16:18, 17:15, 17:16, 18:14, 21:7
**mailing** [1] - 13:8
**malady** [1] - 9:15
**main** [1] - 11:8
**MANAGER** [4] - 3:6, 7:25, 8:7, 37:6
**market** [4] - 8:19, 8:20, 31:19, 31:24
**MARTIN** [2] - 2:14, 3:12
**Martin** [1] - 3:12
**match** [1] - 26:10
**material** [2] - 11:16, 15:1
**materials** [3] - 4:16, 21:13, 21:25
**matter** [10] - 3:19, 4:17, 5:3, 7:7, 7:17, 7:20, 32:13, 36:4, 36:23
**matters** [4] - 3:18, 6:7, 8:3, 12:25
**maximum** [2] - 33:11, 37:1
**MDL** [2] - 3:6, 14:7
**Meagher** [1] - 2:18
**mean** [1] - 3:15
**means** [1] - 14:10
**meant** [1] - 6:11
**Media** [3] - 13:11, 14:6, 14:21
**media** [4] - 14:10, 14:11, 30:1, 31:8
**medical** [1] - 9:13
**meeting** [1] - 3:21
**members** [3] - 10:25, 11:7, 24:4
**mentioned** [4] - 6:13, 12:4, 14:5, 15:11
**Merck** [14] - 2:14, 3:12, 4:8, 5:22, 6:12, 6:13, 6:15, 7:1, 7:3, 29:20, 30:5, 32:19, 33:20, 35:12
**Merck's** [4] - 6:1, 15:16, 32:23, 35:15
**messages** [2] - 15:4, 18:3

**method** [2] - 13:14, 19:8
**methods** [1] - 9:19
**Mexico** [2] - 9:20, 35:19
**might** [4] - 8:17, 22:24, 26:20, 28:14
**million** [1] - 14:22
**millions** [1] - 16:9
**minutes** [1] - 13:12
**missing** [8] - 20:20, 20:22, 21:1, 21:16, 22:4, 23:10, 24:11, 24:14
**Missouri** [2] - 24:3, 24:4
**mixed** [2] - 35:9, 35:16
**model** [2] - 32:15, 32:24
**moment** [3] - 7:20, 13:9, 16:22
**moments** [1] - 22:2
**money** [7] - 9:3, 9:8, 23:18, 33:4, 35:12, 35:15, 36:3
**monitor** [1] - 21:10
**Montana** [4] - 4:4, 4:5, 4:10, 4:12
**month** [1] - 3:13
**months** [1] - 14:3
**morning** [7] - 3:3, 3:10, 4:7, 5:9, 11:21, 36:8
**most** [8] - 3:17, 6:1, 20:7, 23:25, 25:4, 25:19, 28:24, 32:19
**mostly** [1] - 28:15
**mothers** [1] - 36:20
**motion** [14] - 3:19, 3:21, 6:13, 6:16, 7:23, 8:5, 8:10, 8:13, 10:3, 11:25, 12:19, 25:24, 30:10, 30:21
**motions** [5] - 4:6, 4:11, 5:19, 6:8, 7:3
**Motions** [1] - 1:7
**move** [3] - 6:24, 29:16, 34:6
**moved** [2] - 18:10, 36:5
**moves** [1] - 34:11
**MR** [17] - 3:10, 3:12, 3:24, 4:7, 4:23, 5:8, 7:14, 7:16, 10:5, 11:18, 11:21, 27:6, 28:21, 33:21, 35:6, 36:12, 36:25
**MS** [6] - 5:9, 6:23, 7:8, 7:11, 29:8, 34:19
**multiple** [1] - 23:22

## N

**name** [1] - 17:7
**national** [2] - 13:9, 14:22
**nationwide** [2] - 9:10, 10:23
**naturally** [1] - 20:2
**nearly** [2] - 15:6, 20:8
**need** [4] - 6:19, 7:9, 7:22, 34:3
**needs** [1] - 12:8
**negotiations** [2] - 9:9, 9:10
**NEW** [2] - 1:4, 3:1
**new** [2] - 7:24, 18:15
**New** [4] - 1:22, 2:4, 2:12, 2:19, 9:20, 35:19
**newly** [1] - 31:7
**news** [1] - 14:12
**newspaper** [2] - 14:18
**newspapers** [1] - 9:22
**next** [3] - 21:2, 21:5, 37:5
**nine** [3] - 14:3, 24:12, 24:15
**note** [3] - 29:10, 33:24, 34:7
**nothing** [2] - 4:14, 26:3
**notice** [36] - 9:21, 9:24, 10:1, 10:19, 12:11, 13:6, 13:7, 13:8, 13:10, 13:11, 14:5, 14:6, 14:7, 14:9, 14:14, 14:19, 14:22, 15:18, 15:19, 15:20, 15:21, 16:25, 20:23, 21:1, 21:11, 21:14, 21:16, 22:22, 23:4, 31:9, 31:11, 31:12, 31:13, 31:23
**notices** [12] - 14:15, 20:19, 21:24, 22:7, 24:10, 24:13, 24:17, 24:22, 24:23, 24:25, 25:7, 35:25
**notify** [2] - 9:18, 20:21
**notifying** [1] - 9:19
**November** [1] - 21:23
**number** [6] - 10:18, 15:2, 15:10, 17:22, 18:6, 21:4
**numbers** [5] - 12:4, 26:10, 26:22, 26:23, 28:13
**NW** [2] - 2:15, 2:19

## O

**O'Keefe** [1] - 2:4
**oath** [3] - 18:18, 28:5, 28:11
**obtain** [1] - 13:5
**obviously** [1] - 26:1
**occurs** [1] - 12:1
**October** [2] - 6:15, 21:21
**OF** [2] - 1:3, 1:10
**office** [4] - 4:15, 30:23
**Official** [2] - 1:20, 37:12
**older** [1] - 31:18
**Oldfather** [2] - 5:8, 5:10
**OLDFATHER** [4] - 5:9, 6:23, 7:8, 7:11
**one** [16] - 3:19, 5:14, 5:21, 5:22, 7:5, 7:16, 10:8, 12:8, 12:23, 16:9, 17:23, 19:15, 24:8, 34:19, 35:20, 36:14
**One** [1] - 2:11
**ones** [5] - 12:13, 23:7, 26:12, 27:2
**online** [12] - 13:14, 13:16, 14:16, 14:17, 18:13, 18:22, 19:7, 19:8, 20:8, 20:12, 21:9, 23:21
**operator** [1] - 17:23
**opportunities** [1] - 34:15
**opportunity** [4] - 22:5, 29:5, 32:5, 32:16
**opposition** [2] - 6:15, 11:25
**option** [5] - 17:22, 19:18, 25:12, 25:17
**Option** [1] - 18:17
**oral** [3] - 4:11, 7:19, 34:3
**order** [1] - 13:20
**original** [1] - 4:19
**originally** [1] - 5:2
**ORLEANS** [2] - 1:4, 3:1
**Orleans** [3] - 1:22, 2:4, 2:12
**Orran** [6] - 11:13, 11:14, 11:17, 11:20, 11:21, 11:22
**otherwise** [2] - 30:25, 35:2
**ought** [4] - 9:25, 10:21, 30:13, 31:1
**out-of-pocket** [3] -

25:15, 28:3, 28:9
**outcome** [2] - 12:19, 14:12
**outreach** [2] - 30:13, 30:25
**outset** [1] - 31:9
**overall** [1] - 11:4
**overpay** [1] - 23:3
**ox** [3] - 3:16, 3:17

## P

**package** [1] - 4:2
**page** [2] - 18:10, 18:11
**paid** [12] - 18:19, 22:18, 22:21, 22:24, 23:2, 23:18, 25:13, 33:16, 33:17, 33:18, 34:17, 34:22
**part** [9] - 3:17, 3:18, 9:16, 9:17, 14:24, 16:20, 23:2, 27:25, 32:19
**participate** [3] - 16:8, 16:10, 16:14
**participation** [4] - 13:22, 15:17, 35:11, 35:15
**particular** [1] - 29:24
**particularly** [3] - 31:4, 31:18, 35:18
**parties** [12] - 8:3, 9:9, 10:2, 12:1, 12:7, 13:23, 14:21, 15:15, 22:14, 22:22, 26:24, 29:12
**passage** [1] - 35:11
**passed** [2] - 10:10, 21:24
**passing** [1] - 29:10
**past** [1] - 36:11
**pay** [7] - 22:18, 24:10, 25:14, 25:25, 26:3, 26:4, 28:18
**payable** [19] - 12:13, 12:14, 22:8, 22:10, 22:12, 22:23, 23:7, 23:9, 23:23, 24:18, 24:20, 25:6, 25:7, 25:11, 25:22, 26:1, 28:7, 28:25, 29:2
**payment** [6] - 18:24, 20:17, 25:18, 26:15, 28:17, 34:5
**payments** [4] - 12:22, 12:24, 18:16, 18:21
**pendency** [1] - 14:13
**pending** [6] - 5:7, 5:22, 6:7, 7:2, 7:17, 12:19

people [42] - 9:18,
9:21, 10:9, 10:11,
15:3, 15:8, 15:22,
15:25, 16:9, 16:11,
16:20, 17:23, 21:7,
22:10, 22:12, 23:12,
23:16, 23:19, 23:25,
24:13, 24:19, 24:24,
25:4, 25:6, 25:15,
26:2, 26:5, 26:11,
26:19, 26:20, 26:24,
28:14, 28:16, 33:15,
33:16, 34:9, 34:13,
36:4, 36:6, 36:9,
36:12, 36:18
per [2] - 19:22, 19:23
percent [16] - 20:3,
20:11, 20:12, 24:12,
24:15, 24:25, 25:4,
25:5, 26:23, 27:20,
27:22, 28:6, 28:7,
28:16, 33:13, 34:10
percentage [1] - 10:24
period [4] - 14:3,
19:21, 21:22, 21:24
periodic [1] - 35:21
periods [1] - 21:24
person [4] - 17:22,
18:23, 24:7, 26:8
personal [11] - 5:7,
5:11, 5:13, 7:3, 8:17,
16:1, 16:7, 16:12,
16:24, 24:1, 31:21
personnel [1] - 11:9
persons [6] - 15:9,
16:15, 17:6, 17:9,
17:13, 18:8
phase [1] - 31:4
phone [10] - 8:8, 8:10,
12:8, 26:22, 26:23,
27:9, 30:11, 33:1,
36:6
phones [1] - 8:6
picked [1] - 35:22
picture [1] - 23:4
pie [1] - 24:12
pigeon [1] - 36:11
pill [1] - 25:18
plaintiff's [2] - 10:16,
11:3
plaintiffs [1] - 11:12
pleased [1] - 10:17
Pluebell [1] - 24:4
plugged [1] - 36:1
plus [3] - 17:9, 20:13,
25:21
PO [1] - 15:1
pocket [3] - 25:15,
28:3, 28:9
point [7] - 7:18, 11:8,

17:24, 27:23, 32:3,
34:4, 34:15
points [2] - 33:22,
33:25
population [7] - 13:25,
18:4, 20:11, 30:3,
31:19, 34:11, 34:12
portal [2] - 17:10, 21:9
positive [1] - 15:13
possibilities [1] - 6:2
possible [1] - 10:7
possibly [1] - 32:5
posted [1] - 21:8
posture [2] - 5:25, 6:1
Poydras [2] - 1:21,
2:12
practicable [1] - 32:11
practice [1] - 29:24
predict [2] - 27:7,
27:19
prefilled [1] - 16:18
prejudice [1] - 6:14
preliminary [1] - 13:1
prepared [1] - 12:24
prescribed [2] - 8:25,
10:11
prescription [1] -
22:16
prescriptions [2] -
20:18, 23:17
presence [1] - 14:16
present [1] - 22:5
presentation [7] -
3:25, 12:5, 29:3,
29:11, 29:16, 30:9,
35:7
presented [1] - 22:17
presently [1] - 31:17
presided [1] - 16:2
press [1] - 14:10
previously [1] - 5:20
primarily [1] - 9:6
print [1] - 14:15
private [2] - 36:16
privileged [1] - 11:23
pro [1] - 13:15
problem [4] - 9:15,
16:12, 33:9, 35:19
problematic [2] - 8:24,
9:1
proceeding [2] - 4:19,
14:7
proceedings [2] -
29:17, 37:7
PROCEEDINGS [1] -
1:10
Proceedings [2] -
1:25, 8:11
process [7] - 19:12,
27:15, 31:8, 32:4,

32:13, 32:14, 34:5
processing [1] - 20:25
product [1] - 32:22
Products [1] - 3:6
PRODUCTS [1] - 1:6
program [36] - 12:10,
12:17, 13:1, 15:6,
15:9, 15:12, 15:17,
15:22, 15:23, 16:4,
16:5, 16:7, 16:12,
16:14, 16:16, 16:25,
17:12, 18:17, 20:7,
24:1, 24:5, 25:9,
25:20, 29:14, 29:21,
29:22, 29:24, 29:25,
30:4, 30:8, 31:10,
31:16, 31:24, 32:9,
32:13, 32:14
programs [2] - 15:14,
29:23
proof [12] - 20:16,
22:15, 22:25, 23:13,
23:17, 25:13, 25:15,
25:17, 25:20, 27:25,
28:8, 28:15
proposals [1] - 32:19
proposing [1] - 11:5
protection [1] - 9:3
provable [1] - 9:12
prove [1] - 22:11
provide [2] - 11:25,
13:3
provided [1] - 21:3
PSC [1] - 2:6
public [5] - 13:2, 13:4,
13:6, 13:13, 14:25
publication [2] -
14:14, 31:11
publish [1] - 31:12
publishing [1] - 31:13
purchase [2] - 9:6,
18:25
purchased [3] - 8:16,
8:25, 24:3
purchaser [1] - 9:2
put [2] - 33:16, 34:9

Q

qualified [2] - 19:3,
20:15
qualify [1] - 18:24
qualifying [1] - 26:18
question-and-
answer [1] - 18:23
questions [6] - 7:12,
15:1, 18:25, 21:3,
21:5, 27:3
quickly [2] - 13:16,
35:6

R

rate [7] - 10:7, 10:9,
10:12, 10:16, 27:19,
32:2, 35:11
RE [1] - 1:6
re [1] - 3:6
reach [5] - 15:24,
27:9, 27:20, 27:22,
28:22, 30:2, 30:6
read [1] - 21:10
reading [1] - 9:23
ready [1] - 35:3
real [1] - 35:6
really [4] - 10:18,
22:21, 27:23, 35:16
reason [2] - 16:9, 27:8
reasons [2] - 10:9,
23:22
rebuttal [1] - 35:5
receive [3] - 18:17,
20:17, 25:19
received [5] - 12:3,
12:11, 20:7, 28:25,
30:10
receiving [1] - 25:20
recently [1] - 20:25
recess [1] - 8:11
recommendation [2] -
14:20, 30:22
record [3] - 3:9, 14:7,
29:17
recorded [1] - 15:4
Recorded [1] - 1:25
recordings [1] - 17:25
records [3] - 22:16,
30:19, 31:23
recovery [2] - 5:3,
16:8
refer [1] - 30:17
referred [1] - 14:10
regarding [1] - 6:2
register [1] - 19:9
registered [2] - 16:3,
16:16
reimburse [1] - 9:13
reimbursement [5] -
20:17, 25:9, 25:13,
28:3
relate [2] - 34:23,
34:24
relationship [1] -
31:13
release [8] - 16:4,
16:6, 16:13, 16:16,
16:17, 19:2, 24:1,
26:8
released [1] - 16:7
releases [2] - 14:11,
26:10

remain [1] - 11:7
remaining [3] - 5:15,
5:16, 30:25
remand [3] - 4:6, 4:10
remember [2] - 6:20,
6:22
remind [1] - 30:6
reminded [1] - 34:2
reminder [6] - 13:23,
15:11, 19:20, 20:5,
29:21, 34:20
repaid [1] - 28:5
repeat [1] - 30:8
repeated [1] - 15:14
report [10] - 5:12, 6:4,
7:2, 12:16, 12:17,
20:25, 29:12, 29:13,
29:15
reported [1] - 6:23
Reporter [2] - 1:20,
37:12
representatives [1] -
18:7
represented [1] -
16:24
request [2] - 17:22,
28:12
requested [1] - 22:13
requests [1] - 33:16
required [4] - 20:21,
21:14, 23:11, 29:23
residents [1] - 24:3
resolved [6] - 5:17,
5:21, 5:25, 33:19
respect [3] - 10:14,
10:23, 34:8
respectfully [2] -
29:16, 33:7
respond [2] - 33:13,
36:10
responded [3] - 24:13,
24:15, 25:1
responding [2] -
21:13, 25:4
response [4] - 11:13,
29:7, 30:21, 35:23
responses [2] - 24:12,
24:16
responsibility [1] -
32:22
rest [2] - 5:5, 22:24
result [1] - 10:18
results [1] - 16:22
return [1] - 18:7
returns [1] - 34:8
review [3] - 12:12,
23:7, 35:21
reviewed [3] - 20:15,
21:13, 21:25
reviewing [1] - 12:18

reviews [1] - 22:6
Richard [5] - 8:13,
 10:3, 11:16, 35:5,
 36:22
rise [1] - 37:6
roadway [1] - 7:7
round [4] - 21:15,
 24:16, 24:22, 25:7
row [2] - 17:6, 23:12
Row [5] - 17:13, 22:8,
 23:24, 26:2, 26:5
Rows [2] - 26:12,
 26:16
rows [1] - 27:1
RPR [1] - 1:20
Rule [1] - 29:23
ruling [1] - 34:6
run [1] - 28:13

**S**

San [1] - 2:8
scheduled [1] - 7:20
se [1] - 13:15
search [1] - 14:16
seated [2] - 3:3, 8:12
second [8] - 10:1,
 21:20, 21:23, 23:4,
 23:15, 24:22, 24:23,
 25:7
Security [1] - 26:10
see [10] - 5:5, 10:25,
 12:12, 16:22, 20:15,
 25:19, 31:25, 32:1,
 33:9, 37:4
seeking [1] - 5:3
segment [1] - 18:23
segments [2] - 13:24,
 18:4
self [1] - 16:19
self-addressed [1] -
 16:19
send [8] - 4:6, 15:1,
 16:19, 17:17, 22:22,
 28:11, 35:2
sent [13] - 4:4, 11:17,
 16:18, 17:16, 21:8,
 22:6, 23:13, 23:16,
 24:10, 24:13, 24:23,
 24:25
September [2] - 13:13,
 14:23
series [1] - 29:19
serve [1] - 11:23
set [10] - 4:12, 4:13,
 13:2, 14:25, 15:2,
 17:11, 19:9, 19:12,
 21:9
sets [1] - 32:24
settlement [34] - 5:18,

5:21, 6:2, 9:15, 9:16,
 9:17, 9:18, 11:24,
 12:22, 12:23, 13:4,
 13:17, 14:13, 15:5,
 15:7, 16:2, 16:6,
 16:10, 16:24, 17:24,
 18:15, 20:16, 20:21,
 21:13, 23:10, 24:4,
 28:6, 29:14, 29:18,
 31:2, 31:20, 32:20,
 34:24
settlements [2] - 31:5,
 32:15
settling [2] - 31:6,
 32:18
seven [1] - 27:9
seventeen [1] - 5:15
several [3] - 26:19,
 30:25, 31:5
Shannon [1] - 14:20
Shell [1] - 2:11
shook [1] - 35:24
shot [2] - 15:19, 20:4
show [2] - 23:17,
 23:18
showed [2] - 22:17,
 22:25
shown [2] - 15:21,
 36:23
shows [6] - 20:6, 22:7,
 24:13, 24:22, 25:10,
 28:23
sign [2] - 18:18, 28:4
signed [8] - 16:4,
 16:6, 16:13, 16:16,
 19:1, 23:20, 24:1,
 26:8
simply [3] - 10:24,
 30:15, 33:2
situation [1] - 5:22
six [5] - 5:2, 5:18,
 10:18, 14:8, 20:11
six-fold [1] - 10:18
sixteen [3] - 5:15,
 5:16, 5:23
sixty [2] - 14:8, 20:3
sixty-six [1] - 14:8
sizable [1] - 31:20
Skadden [1] - 2:18
Slate [1] - 2:18
slide [4] - 15:21,
 19:21, 22:7, 24:22
Slide [6] - 20:6, 23:6,
 25:10, 25:23, 26:17,
 28:23
Social [1] - 26:10
social [1] - 30:1
someone [3] - 18:2,
 19:9, 19:13
sometimes [3] - 25:1,

25:2, 29:21
somewhat [1] - 32:2
somewhere [1] -
 28:19
soon [2] - 4:17, 12:24
sort [2] - 3:15, 36:1
soup [1] - 3:16
Spanish [8] - 9:21,
 18:3, 18:5, 18:6,
 18:7, 18:8, 19:17,
 19:19
Spanish-speaking [2]
 - 18:7, 18:8
speaker [1] - 29:4
speaking [3] - 4:15,
 18:7, 18:8
specific [1] - 15:21
spend [1] - 22:2
spending [3] - 33:4,
 33:14, 35:12
spent [5] - 9:12,
 14:21, 23:18, 29:18,
 36:22
spot [1] - 12:19
spur [2] - 15:17, 16:21
Square [1] - 2:11
staff [1] - 30:14
stage [2] - 8:2, 31:10
stand [3] - 25:10,
 25:24, 28:23
standpoint [1] - 33:10
stands [1] - 6:18
start [1] - 23:8
started [6] - 17:2,
 20:4, 20:19, 21:12,
 21:21, 23:19
starting [1] - 31:23
state [3] - 4:6, 24:4,
 29:25
state-of-the-art [1] -
 29:25
statements [1] - 22:17
STATES [2] - 1:2, 1:12
States [1] - 19:1
states [5] - 5:2, 5:5,
 9:3, 9:20, 9:23
statistics [1] - 34:10
status [4] - 3:14, 3:25,
 5:17, 6:4
Status [1] - 1:7
Stenography [1] -
 1:25
step [2] - 19:12, 19:15
steps [1] - 19:14
still [6] - 5:13, 21:15,
 21:17, 26:13, 26:17,
 26:18
stimulated [1] - 35:24
stimulation [1] - 29:22
stipulation [1] - 5:20

Stratton [1] - 7:6
Street [4] - 1:21, 2:8,
 2:12, 2:15
stressed [2] - 18:16
subject [4] - 7:19,
 26:21, 27:2, 33:24
submit [9] - 13:16,
 14:4, 17:12, 20:17,
 25:12, 25:18, 29:24,
 33:7
submitted [5] - 5:19,
 17:3, 20:10, 20:16,
 23:25
submitting [1] - 29:13
substance [1] - 10:10
substitute [1] - 6:16
success [1] - 27:19
sufficiently [1] - 29:15
suggestion [1] - 7:18
suggestions [1] - 7:9
Suite [1] - 2:12
suited [1] - 11:10
summary [3] - 5:19,
 6:7, 7:19
Superman [1] - 36:17
supplement [1] -
 14:18
supplemental [3] -
 4:11, 10:1
supply [1] - 20:23
Susan [2] - 37:12,
 37:16
SUSAN [2] - 1:20,
 37:15
susan_zielie@laed.
 uscourts.gov [1] -
 1:22
suspect [1] - 34:11
switch [1] - 19:18
system [3] - 15:4,
 17:25, 36:1

**T**

tail [4] - 3:15, 3:16,
 3:17
target [2] - 17:19, 30:3
targeted [3] - 13:24,
 15:18, 15:20
technically [1] - 12:22
techniques [4] - 31:8,
 31:15, 31:17, 31:25
telephone [4] - 8:3,
 11:6, 36:10, 36:15
telephonic [1] - 30:25
ten [4] - 10:12, 27:8,
 27:17, 31:19
tentatively [2] - 5:21,
 5:25
tenth [1] - 3:14

terms [4] - 12:20,
 19:25, 20:15, 25:11
tested [1] - 31:16
THE [29] - 1:2, 1:3,
 1:11, 3:3, 3:8, 3:13,
 4:2, 4:20, 5:1, 6:20,
 7:5, 7:9, 7:13, 7:15,
 7:22, 8:1, 8:9, 8:12,
 11:11, 11:19, 27:4,
 28:20, 29:7, 33:9,
 34:18, 35:5, 35:17,
 36:14, 37:3
themselves [3] - 8:18,
 26:15, 30:5
they've [1] - 5:3
thinking [1] - 23:8
thirty [11] - 20:23,
 21:2, 21:7, 21:17,
 21:19, 21:20, 21:22,
 21:23, 23:4, 24:23
thirty-day [1] - 21:2,
 21:22, 21:23
thorough [1] - 29:15
thoroughness [1] -
 32:8
three [7] - 5:4, 5:6,
 5:20, 20:9, 20:12,
 24:15, 27:11
throughout [1] - 31:15
today [14] - 3:19, 8:13,
 9:25, 11:22, 11:24,
 12:19, 25:10, 25:22,
 25:25, 28:24, 28:25,
 29:4, 31:23, 31:24
Todd [1] - 5:23
together [1] - 4:2
toll [5] - 15:2, 15:10,
 17:21, 18:6, 21:4
toll-free [5] - 15:2,
 15:10, 17:21, 18:6,
 21:4
took [1] - 10:10
top [1] - 26:25
topics [1] - 12:10
total [6] - 5:15, 19:25,
 20:6, 24:18, 26:20,
 29:2
touch [1] - 18:1
transcript [2] - 6:17,
 37:13
TRANSCRIPT [1] -
 1:10
transmitted [1] - 4:16
tree [1] - 35:24
tried [4] - 9:23, 22:5,
 35:17, 36:25
tripled [1] - 19:23
truth [1] - 36:4
try [3] - 10:7, 10:22,
 16:21

**trying** [3] - 15:22, 18:20, 36:9
**TUESDAY** [1] - 3:1
**twelve** [1] - 5:24
**twenty** [7] - 5:2, 24:12, 24:15, 24:25, 25:4, 28:20, 32:6
**twenty-nine** [2] - 24:12, 24:15
**twenty-six** [1] - 5:2
**twice** [1] - 26:4
**two** [8] - 3:13, 12:25, 19:12, 19:14, 19:16, 22:20, 23:3, 27:11
**two-month** [1] - 3:13
**two-step** [1] - 19:12
**typical** [1] - 25:1
**typically** [1] - 30:16

## U

**ultimately** [1] - 27:20
**unable** [2] - 12:21, 34:17
**under** [13] - 6:1, 12:22, 12:23, 13:17, 16:6, 18:17, 18:18, 20:15, 25:14, 25:15, 28:5, 28:11, 34:24
**undertook** [1] - 9:18
**unfortunately** [1] - 10:8
**unique** [2] - 15:12, 35:19
**uniquely** [2] - 31:1, 33:6
**United** [1] - 19:1
**UNITED** [2] - 1:2, 1:12
**unrepresented** [2] - 20:9, 20:11
**up** [31] - 3:21, 7:3, 12:2, 12:13, 12:25, 13:2, 13:13, 14:21, 14:25, 15:2, 17:11, 17:24, 19:2, 19:9, 19:12, 21:9, 24:17, 24:18, 24:21, 25:6, 25:20, 25:21, 26:10, 28:1, 28:15, 28:16, 28:19, 35:12, 35:22, 36:2, 37:1
**upgrade** [1] - 19:5
**upgraded** [2] - 17:20, 18:9
**US** [1] - 34:11
**users** [1] - 35:11
**Utah** [3] - 4:4, 4:5, 4:14
**utilization** [1] - 30:11
**utilize** [1] - 11:5

**utilized** [1] - 31:16
**utilizing** [1] - 32:1

## V

**valuable** [1] - 3:17
**various** [2] - 9:18, 9:23
**version** [1] - 19:18
**vigor** [1] - 36:22
**VIOXX** [26] - 1:6, 3:6, 8:16, 8:17, 8:19, 8:22, 8:23, 9:7, 10:11, 11:24, 15:23, 16:1, 16:7, 16:11, 18:18, 19:1, 20:17, 22:18, 24:1, 24:3, 25:8, 25:16, 26:8, 26:9, 28:5, 35:12
**visits** [1] - 15:7
**vital** [2] - 9:17, 23:10
**volumes** [1] - 15:15
**VTE** [3] - 5:16, 5:18

## W

**wait** [1] - 35:25
**walk** [1] - 12:9
**Washington** [2] - 2:16, 2:19
**watching** [1] - 15:15
**website** [15] - 13:3, 13:6, 13:14, 14:17, 14:25, 15:3, 15:7, 17:2, 17:7, 18:10, 18:15, 18:24, 19:5, 19:17, 19:18
**week** [1] - 19:22
**weekly** [1] - 19:24
**Wheatman** [1] - 14:21
**whittling** [1] - 24:24
**Williams** [1] - 2:15
**winter's** [1] - 25:24
**winters** [1] - 12:7
**wish** [1] - 31:14
**withdraw** [1] - 6:15
**withdrawn** [1] - 6:22
**wondering** [1] - 34:22
**words** [2] - 14:16, 22:15
**worry** [1] - 34:14
**worth** [1] - 32:6
**written** [1] - 14:12
**wrongful** [1] - 31:21
**wrongful-death** [1] - 31:21

## Y

**year** [6] - 29:18, 31:24,

31:25, 34:10, 34:11, 34:21
**years** [5] - 8:18, 10:12, 31:12, 31:20, 31:22
**York** [1] - 2:19
**YouTube** [1] - 30:1

## Z

**ZIELIE** [2] - 1:20, 37:15
**Zielie** [2] - 37:12, 37:16