## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re:  VIOXX®** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| *This document relates to* | * | **JUDGE FALLON** |
| | * | |
| *Jo Levitt v. Merck & Co., Inc.* | * | **MAGISTRATE JUDGE KNOWLES** |
| **2:06-cv-09757-EEF-DEK** | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### PLAINTIFF'S RESPONSES CONTROVERTING
### MERCK'S STATEMENT OF MATERIAL FACTS

1.     Vioxx (rofecoxib) is a COX-2 selective non-steroidal anti-inflammatory drug ("NSAID"). Memorandum from John K. Jenkins, M.D., Dir. of Office of New Drugs, & Paul J. Seligman, M.D., M.P.H., OPaSS, U.S. Food & Drug Admin. to Steven Galson, M.D., M.P.H., Acting Dir., Ctr. for Drug Eval. & Research, U.S. Food & Drug Admin. (Apr. 6, 2005) ("2005 FDA Memo") 1, 18 (attached as Ex. K).

**Response: Not disputed for the purposes of this response.**

2.     Dr. Arnold Katz is a rheumatologist who estimates that he has treated thousands of patients during his more than 35 years of practice. Excerpts of the Deposition of Arnold L. Katz, M.D. ("Katz Dep.") at 32:21–33:7 (attached as Ex. F).

**Response: Not disputed for the purposes of this response.**

3.     Fibromyalgia is a chronic condition associated with pain and fatigue. Katz Dep. (Ex. F) at 29:7–9, 32:10–20.

**Response: Not disputed for the purposes of this response.**

4.     Fibromyalgia can be disabling if left untreated. Katz Dep. (Ex. F) at 31:16–22.

**Response: Plaintiff admits only that Dr. Katz's deposition supports the assertion that fibromyalgia can be disabling. However, Dr. Katz's deposition has no mention of "if left untreated," as such Plaintiff disputes this fact.**

5.      Dr. Katz believes that "effective pain control for [fibromyalgia] patients is critical." Katz Dep. (Ex. F) at 81:7–9.

**Response:  Not disputed for the purposes of this response.**

6.      Dr. Katz agrees that "different patients respond differently to different medications" and that a "typical medication might work for one patient but not provide relief for another patient." Katz Dep. (Ex. F) at 23:13–22.

**Response: Not disputed for the purposes of this response.**

7.      Dr. Katz prescribes a variety of anti-inflammatory medications to his patients. Katz Dep. (Ex. F) at 23:23–25:17.

**Response:  Not disputed for the purposes of this response.**

8.      Dr. Katz diagnosed Plaintiff Jo Levitt with fibromyalgia on October 11, 1999. Excerpts of Records of Dr. Arnold L. Katz ("Katz Records") at 1 (Ltr. from A. Katz to R. Hartman (Oct. 11, 1999)) (attached as Ex. E).

**Response: Plaintiff disputes this fact as she is unable to admit or deny that excerpts of Dr. Katz's records provide a diagnosis, as Merck has failed to attach medical records from October 11, 1999. Notwithstanding, Plaintiff admits only that the letter from Dr. Katz to Dr. Hartman, dated October 11, 1999 states that Ms. Levitt's history and physical findings were consistent with the diagnosis of fibromyalgia. Significantly, Dr. Katz's medical records have no mention of fibromyalgia until November 11, 1999.**

9.     Dr. Katz prescribed Vioxx to Plaintiff Jo Levitt starting in October 1999 to treat fibromyalgia-related pain. Katz Dep. (Ex. F) at 29:1–20.

**Response: Plaintiff disputes this fact. Dr. Katz's deposition does not state that he prescribed Vioxx to Ms. Levitt in October, 1999. Instead, Dr. Katz's deposition testimony explained that the first prescription for Vioxx he gave to Ms. Levitt was not until December 27, 1999 (*See* Exhibit 5, Deposition of Dr. Katz at 45:1-2).**

**MEDICALS:**

10.     Although Ms. Levitt had previously taken Vioxx, Dr. Katz independently decided that based on his "assessment and evaluation" of Ms. Levitt that it was "appropriate for her to start taking [Vioxx] daily." Katz Dep. (Ex. F) at 44:12–45:21.

**Response: Plaintiff disputes this fact which mischaracterizes Dr. Katz's deposition testimony, which merely states "Correct" to the leading question posed by counsel for Merck. Dr. Katz specifically testified as to how Ms. Levitt already had a prescription of Vioxx from *Dr. Hartman* on October 11, 1999, and how his first prescription of Vioxx to Ms. Levitt was not until December 27, 1999 (Exhibit 5, Katz Depo at 44:21-45:4). Dr. Katz's medical record from that date, when the first prescription sheet for Vioxx appears in his records, states: "Cont. *current meds*, including Vioxx. . . ." (12-27-99 medical record enclosed in Exhibit 7) (emphasis added). Additionally, Ms. Levitt testified in her deposition that that Dr. Katz *did not* tell her that he thought Vioxx would be an appropriate choice for her. Instead, she specifically asked him for Vioxx (Exhibit 5, deposition of Dr. Katz at 72:10-13).**

11.     Dr. Katz characterized Ms. Levitt's fibromyalgia as "moderate to severe." Katz Dep. (Ex. F) at 34:5–10.

**Response:**   **Plaintiff disputes this fact, which appears nowhere in the accompanying medical records. Furthermore, Plaintiff questions Dr. Katz's ability to even remember Ms. Levitt's fibromyalgia in order to now "characterize" it thirteen years later. Dr. Katz testified both that 1) he did not remember what Ms. Levitt's reaction was to the diagnosis of fibromyalgia (30:20-21) and 2) that it was "difficult [for him] to go back almost thirteen years into what [his] thinking was." (Exhibit 5, deposition of Dr. Katz at 59:21-22).**

12.     Dr. Katz and Ms. Levitt agree that Vioxx helped to ease Ms. Levitt's fibromyalgia pain. Excerpts of the Deposition of Jo Levitt at 72:19–24 (attached as Ex. C); Katz Dep. (Ex. F) at 76:23–77:4; Katz Records (Ex. E) at 2 ("Vioxx has helped . . . . If she misses med, she has increased pain.").

**Response: Plaintiff disputes this fact which mischaracterizes the deposition testimony of both Ms. Levitt and Dr. Katz. Ms. Levitt testified that she "probably wouldn't have continued to take it if [she] didn't feel like it was doing something for [her]." (Exhibit 5, deposition of Dr. Katz at 72:19-24). Additionally, Plaintiff objects to any inference that the cardiovascular risks associated with Vioxx were somehow offset by any potential benefits Vioxx provided for Ms. Levitt's fibromyalgia pain.**

13.     Ms. Levitt took Vioxx until April 2002, when her insurance stopped covering the medication. Katz Dep. (Ex. F) at 65:7–9, 77:5–14; Katz Records (Ex. E) at 3 (Apr. 29, 2002 call note).

**Response: Plaintiff disputes this fact.  Ms. Levitt testified in her deposition that Dr. Katz would not continue to refill her Vioxx prescription after the results of the VIGOR trial were published and the label on Vioxx was changed to reflect an increased cardiovascular**

risk—not because of anything related to her insurance coverage (**Exhibit 4, Deposition of Ms. Levitt at 130:23-131:14**). **See, also, Plaintiff's Statement of Facts no. 78.**

14.     Dr. Katz continued to prescribe Vioxx to his fibromyalgia patients until Merck voluntarily withdrew Vioxx from the market. Katz Dep. (Ex. F) at 77:12–78:5.

**<u>Response:</u> Plaintiff does not dispute that Dr. Katz may have continued to provide Vioxx to some of his other patients until he could no longer do so.**

15.     In 2005, the United States Food and Drug Administration ("FDA") concluded that there is "class effect of an increased risk of series adverse CV events for COX-2 selective and non-selective NSAIDs." 2005 FDA Memo (Ex. K) at 1.

**<u>Response:</u> Plaintiff controverts this fact, as the FDA has also reported that the risk of heart disease is increased 1.63-fold when taking Vioxx as compared to Celebrex (FDA Report, September 30, 2004, attached as Exhibit 3 at page 9). Plaintiff additionally disputes that page 1 of the attached Memo states the above language. Plaintiff was however able to find the quoted language on page 2 of the Memo.**

16.     In 2005, FDA concluded that "the three approved COX-2 selective drugs are associated with an increased risk of serious adverse CV events, at least at some dose, with reasonably prolonged use. We do not believe, however, that the currently available data allow for a rank ordering of the approved COX-2 selective drugs with regard to CV risk. We also believe that it is not possible to conclude at this point that the COX-2 selective drugs confer an increased risk over non-selective NSAIDs in chronic use." 2005 FDA Memo (Ex. K) at 10.

**<u>Response:</u> Plaintiff admits only that the attached Memo states this. Plaintiff controverts that the available data does not allow for a "rank ordering" as between Vioxx and Celebrex, as a study done on over *one million people* showed that cardiovascular risks are**

increased in patients treated with Vioxx compared to patients treated with Celebrex (FDA

Report, September 30, 2004, attached as Exhibit 3).

17.     Celebrex (celocoxib), like Vioxx, is a COX-2 inhibitor. 2005 FDA Memo at 1;

Celebrex Label at 1 (attached as Ex. L).

**Response: Plaintiff controverts that the FDA states this fact. Plaintiff additionally**

**controverts that page 1 of the attached Celebrex Label states this. Plaintiff was however**

**able to find the quoted language on page 4 of the Label.**

18.     The Celebrex label dated July 2005 carries the following black box warning for

cardiovascular risk:

> CELEBREX may cause an increased risk of serious cardiovascular thrombotic
> events, myocardial infarction, and stroke, which can be fatal. All NSAIDs may
> have a similar risk. This risk may increase with duration of use. Patients with
> cardiovascular disease or risk factors for cardiovascular disease may be at greater
> risk (see **WARNINGS** and **CLINICAL TRIALS**).

Celebrex Label (Ex. L) at 1.

**Response: Plaintiff admits only that the Celebrex label states this.**

19.     A black box warning is the strongest warning available on FDA-approved labels.

*E.g.*, *PLIVA Inc. v. Mensing*, 131 S. Ct. 2567, 2573 (2011).

**Response: Plaintiff admits only that the *PLIVA* case states this. However, there is no**

**singular "black box" warning.  Each one is unique and as such some may be stronger than**

**others.**

20.     Dr. Katz is aware of the Celebrex black box warning for cardiovascular risks, and

he continues to prescribe Celebrex to fibromyalgia patients. Katz Dep. (Ex. F) at 78:6–81:3.

**Response: Plaintiff does not dispute that Dr. Katz may prescribe Celebrex to some of his**

**other patients.**

6

21.     Dr. Katz believes that it is not possible to say that Vioxx or Celebrex has a better or worse cardiovascular risk profile relative to the other. Katz Dep. (Ex. F) at 83:4–16.

**Response: Plaintiff controverts that "it is not possible to say," as the FDA has already reported its study that concluded Vioxx has a "worse" cardiovascular risk profile than Celebrex (FDA Report, September 30, 2004, attached as Exhibit 3).**

22.     After reviewing the Celebrex warning for cardiovascular risk, Dr. Katz testified as follows:

> Q.     If Vioxx were available today and it had the same warning that we just read on the Celebrex label, would you continue to prescribe it?
>
> A.     Yes.
>
> Q.     Would you continue to prescribe it to fibromyalgia patients?
>
> A.     Yes.
>
> Q.     Patients like Mrs. Levitt?
>
> A.     Yes.

Katz Dep. (Ex. F) at 85:17–86:1.

**Response: Plaintiff admits that this testimony appears as quoted but disputes that "the same warning that we just read" refers to Celebrex's entire black box warning. Counsel for Merck did not read Dr. Katz the section of the black box warning that warns it is contraindicated for patients undergoing heart surgery, such as Ms. Levitt.**

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## WHICH PRESENT A GENUINE ISSUE

Pursuant to L.R. 56.2, Plaintiff presents the following materials facts in opposition to Merck Sharp & Dohme Corp.'s ("Merck") Statement of Material Facts as to Which There is No Dispute, which Plaintiff contends present a material issue:

## A.      Merck's Deceptive Behavior

**Merck's Knowledge of the Connection Between Vioxx and Increased Cardiovascular Risks**

1.      As early as 1996 Merck officials knew of the connection between Vioxx and cardiovascular problems. While discussing the drug that would later be known as Vioxx, Merck officials admitted that: "[a]dverse events of most concern were in the cardiovascular system (e.g. MI, unstable anginia. . . .) (Report of Dr. Egilman, attached as **Exhibit 1**, at ¶ 84, citing MRK-ABC0048699).

2.      Between May 1996 and January 1997 Merck funded a study of Vioxx, called Protocol 023. At the time, Merck conceded that the results of this study demonstrated that "[t]hese findings raised a concern about the potential for Vioxx to cause cardiovascular problems." (Exhibit 1 at ¶ 85, citing MRK-ABC0009946).

3.      In 1997, Merck began planning ways to hide Vioxx's increased risks of cardiovascular injuries. A physician working on the study for Merck wrote in an email to a senior Merck researcher:

> This is a no-win situation. The relative [GI] risk of even low-dose aspirin may be as high as 2-4 fold. Yet the possibility of increased CV events is of great concern—(I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients—i.e. those that have already have an MI, CABG, PTCA? This may decrease the CV even rate so that a difference between the two groups would not be evident.

(Exhibit 1 at ¶ 92, citing MRK-ABC0009946).

4.      Concerns regarding the connection between Vioxx and cardiovascular problems were recognized not only by internal Merck employees, but by external advisory boards and consultants as well. In May, 1998 Merck's Scientific Advisory Board commented to Merck that Vioxx could increase the risk of cardiovascular disease by inhibiting prostacyclin, an inhibitor of platelet aggregation. The Board explained that "more information is clearly needed to address

these hypotheses and the other questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality." (Exhibit 1 at ¶ 97, citing MRK-AEI0002734).

5.      Four months later, in September, 1998, an outside Merck advisor sent a letter to the company expressing the likelihood of four different possible adverse cardiovascular effects of COX-2 inhibitors like Vioxx, writing "I would suggest that it would be in the best interest of Merck to look into these issues as quickly and thoroughly as possible." (Exhibit 1 at ¶ 99, citing MRK-ABC0002199).

6.      Despite being put on notice that it needed to look into these issues quickly and thoroughly, Merck refused and insisted that they "would not be doing any clinical studies at this time. When these drugs are available many investigators will probably do such studies with or without our help/consent." (Exhibit 1 at ¶ 99, citing MRK-ABK0311068).

7.      Merck submitted its Vioxx NDA to the FDA in November 1998 with full knowledge of these warnings and concerns, largely withholding the issues raised by their Scientific Advisory Board and outside consultants. Instead, the General Safety Overview stated only that: "It is theoretically possible that use of MK-0966 without concomitant aspirin in patients at risk for cardiovascular events may not provide the cardiovascular benefits of aspirin." (Exhibit 1 at 100, citing MRK-ABS0066396).

8.      In April, 1999, in presenting information on Vioxx to the FDA Arthritis Advisory committee, Merck stated "it has been suggested that specific COX-2 inhibition might increase the risk for cardiovascular events due to the lack of platelet function inhibition. . . . there is no evidence, preclinically or clinically, to suggest that rofecoxib carries any increased risk for cardiovascular events." (Exhibit 1, Egilman's report, at ¶ 103, citing MRK-ACD0064937). This statement directly contradicted the beliefs of Merck's external scientific experts and consultants.

9.     Following FDA approval of Vioxx in May 1999, Merck became aware of cardiovascular-related adverse events. In fact, these very same events were reported in ongoing clinical trials, associating Vioxx with more cardiovascular adverse events than both placebo and active control groups (Exhibit 1 at ¶ 106, citing MRK-NJ0170152-274; MRK-ADJ0035003-8; MRK-NJ0220388-454).

### The VIGOR Trial

10.     Merck launched its Vioxx Gastrointenstinal Outcomes Research Study (VIGOR) in January of 1999. With more than 8,000 participants, it was the largest study ever done of Vioxx (Expert Report of Dr. Madigan, attached as **Exhibit 2** at ¶ 32).  Half of the study's participants took Vioxx, and the other took naproxen, an older painkiller.

11.     Merck announced the results of VIGOR in March, 2000—the same month Ms. Levitt underwent her first heart surgery. The trial revealed a substantial adverse cardiovascular signal against Vioxx compared with naproxen (Exhibit 2 at ¶ 2(b)).

12.     Despite the fact that VIGOR excluded patients at high risk for adverse cardiovascular events, the study's results still showed that patients on Vioxx were twice as likely to suffer "adverse cardiovascular events" (as defined by the study), and five times more likely to suffer myocardial infarction than patients receiving naproxen (*Id*.).

13.     Instead of responding to these results by pulling Vioxx from the shelves, changing the warning label, or at the very least with further studies into the cardiovascular risks, Merck simply called the results flawed and insisted that no further evaluation of Vioxx's cardiovascular safety was needed (Exhibit 1, Egilman's report at ¶ 23).

14.     Merck had known of these risks for four years now but continued to publically deny that they existed and insist that the results of VIGOR were due to naproxen's

cardioprotective effects—a fact that had never been proven or quantified (Exhibit 1, Egilman's report at ¶ 119; Exhibit 2, Madigan's report at ¶ 2(c)).

15.     Years later, the FDA's own internal study of over a million participants showed that naproxen was in fact *not* cardioprotective, but instead had the opposite result: "naproxen was not protective against serious coronary heart disease, but may actually confer an increase in risk." (FDA Report, September 30, 2004, attached as **Exhibit 3**, at 11).

16.     Merck published the VIGOR study "results" in the New England Journal of Medicine on November 23, 2000 (Exhibit 2 at ¶ 35). In the publication, Merck did not include all of the myocardial infarctions that had occurred in study subjects taking Vioxx (Exhibit 2 at page 43).

17.      Merck ordered 900,000 reprints of this false article, and sent the reprints to physicians across the country (Exhibit 1, Egilman's report at ¶ 126). It did not do the same for the New England Journal of Medicine's Expression of Concern, nor the Expression of the Concern Reaffirmed, nor any of the corrections to the misleading results (*Id*.).

18.     According to the VIGOR results, confirmed myocardial infarctions occurred in 0.4% of the Vioxx patients versus 0.1% of the naproxen patients, yielding a relative risk of 4.0 against Vioxx (Exhibit 2, Madigan's report at ¶ 35).

19.     Later, Merck finally admitted that an additional three heart attacks had occurred in patients taking Vioxx instead of naproxen, making the risk rate 0.5%, or five times more likely when taking Vioxx (*Id.*).

20.     Merck issued a press release on May 24, 2000, which misrepresented the results, ignored the risks that Merck was well aware of, and instead claimed that VIGOR's

cardiovascular results were "consistent with naproxen's ability to block platelet aggregation." This conclusion was not supported by the VIGOR data (Exhibit 2, Madigan's report at ¶ 38).

21.     In response to Merck's false statements and misrepresentations in its press release entitled "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx" (MRK-ABI0001969), the FDA sent Merck a letter urging it to correct the false impression Merck gave and warning Merck: ". . .you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties." (Exhibit 1, Egilman's report at ¶ 120, citing Warning Letter from Thomas Abrams, FDA to Raymon Gilmartin, Re: NDA21-042 Vioxx (Rofecoxib) tablets MACMIS ID#9456 Sent 2001).

22.     Despite telling the public, including physicians and its customers otherwise, Merck never developed evidence sufficient to rebut the significant adverse cardiovascular effects raised in the VIGOR trial (Exhibit 2, Madigan's report, at ¶ 237). Instead, the data in Merck's possession only continued to confirm again and again Vioxx's cardiovascular toxicity (*Id.*).

23.     After the VIGOR trial, the FDA proposed changes to the Vioxx label that would have emphasized the cardiovascular risks associated with Vioxx and placed them in the warnings section of the label. Merck fiercely fought this label change, and delayed the label change for more than a year (Exhibit 1, Egilman's report, ¶ 121).

24.     In April of 2002, the label was changed.  The new label did not include the Cardiovascular Warning suggested by the FDA (*Id.* at ¶ 123).

25.     The new label included some milder information from the VIGOR study on cardiovascular risk, but this new language was placed under the "precautions" section of the label, and not under "Warnings" (Exhibit 1 at ¶ 125).

26.     In an internal Merck document explaining to Merck employees how they should respond to the media regarding the label change, Merck emphasized this precaution v. warning distinction: "The new cardiovascular language in our label is not a 'warning;' it is a precaution. A warning is intended to describe serious adverse reactions and potential safety hazards. A precaution describes 'any special care to be exercised by the practitioner for the safe and effective use of the product." (*Id.*).

27.     Merck had an obligation to update the label anytime new safety concerns were raised yet Merck **never amended** the Vioxx labeling relating to cardiovascular risks between the issuance of the 1999 launch label and the April 2002 post-Vigor study label (Exhibit 1 at ¶ 108).


**The ADVANTAGE Study**

28.     Another study conducted by Merck comparing Vioxx and naproxen was a 6,000-patient study in patients with osteoarthritis, dubbed ADVANTAGE. The stated aim of the study was to assess the "gastrointestinal tolerability and effectiveness of rofecoxib (Vioxx) versus naproxen in the treatment of osteoarthritis" (Exhibit 1, Egilman's report at ¶ 175).

29.     During the study, a 73-year-old woman participating in the trial was found dead in her apartment (Exhibit 1 at ¶ 179, citing MRK-AAE0002414). She had reportedly called her son complaining of shortness of breath, but by the time her son arrived she had already died (*Id.*).

30.     The cause of her death was determined to be "hypertensive heart disease," and the case was not originally adjudicated by Merck in ADVANTAGE (Exhibit 1 at ¶ 180, citing MRK-NJ02212920).

31.     In July, 2001, the FDA reclassified the woman's case as a potential cardiovascular thrombotic event (Exhibit 1 at ¶ 181).

32.     The medical examiner's opinion was that "the cause of death for this patient was <u>sudden death</u>, which would in fact meet criteria for cardiovascular thrombotic event." (Exhibit 1, Egilman's report at ¶ 181, citing MRK-PUBLIC0000351).

33.     Merck in turn responded to this reclassification by stating that "the preferred term of the reported event—hypertensive heart disease—is not one of the vascular SAE terms eligible for case adjudication. . . . 'sudden death' was not a reported term for this patient." (Exhibit 1 at ¶ 182, citing MRK-AAF0004126). This is in direct contravention to the medical examiner's report.

34.     Included in the list of "The ADVANTAGE Study Group Investigators" under the State of Kansas is none other than a Dr. Arnold Katz—Jo Levitt's treating rheumatologist whose testimony Merck argues is fatal to Plaintiff's case (*See* Appendix to *Gastrointestinal Tolerability and Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis*, Annals of Internal Medicine, Vol. 139, Num. 7 October 7, 2003, attached as **Exhibit 14**).

## The APPROVe Study

35.     The Adenomatous Polyp Prevention on Vioxx (APPROVe) trial was the largest placebo-controlled trial of Vioxx (Exhibit 2, Madigan's report, ¶ 227).

36.     The APPROVe external safety monitoring board recommended <u>early termination</u> of the study on September 17, 2004 due to the imbalance in confirmed cardiovascular events between Vioxx and placebo (*Id.*).

37.     This recommendation, and the results from Merck's third Vioxx study, eventually led to Merck's withdrawal of Vioxx from the worldwide market on September 30, 2004 (*Id.*).

## Merck's Deceptive Marketing Practices

38.     In the April, 2000 press release that the FDA sent a warning letter about: "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx," Merck made false claims about the

drug's safety, stating that naproxen had the ability to block platelet aggregation (Exhibit 1, Egilman's report at ¶ 205, citing MRK-ABI0002231).

39.    Merck continued to issue press releases it knew were false that touted the cardiovascular safety of Vioxx in May, 2001 (MRK-ABI0003221); August, 2001 (MRK-ADJ0034997); and August, 2004 (MRK-AHE0061931) (Exhibit 1 at ¶ 205).

40.    Merck trained its marketing representatives to withhold safety information on Vioxx, contrary to its duty to warn (Exhibit 1 at ¶ 208).

41.    Merck was so concerned with ensuring that its sales representatives did not disclose the risks of Vioxx that it created programs such as "JeopardXX," a Jeopardy-based training exercise for Vioxx representatives (*Id.*).

42.    In order to avoid having its sales representatives accidently disclose truthful information about the risks of Vioxx, Merck conditioned its sales force to view physicians' routine questions and concerns as "obstacles." (*Id.*).

43.    Rather than providing complete, truthful, and accurate information when faced with an "obstacle" posed by a physician, Merck instructed its representatives to return with a question that would narrow or limit the amount of information the physician was requesting (*Id.*).

44.    In other training materials and communications with its sales force, Merck omitted information on the increased cardiovascular risks from the use of Vioxx. As late as 2001, a year after the VIGOR trial data was released, Merck spokesman wrote "First, let me reinforce that in our completed OA trials and ongoing clinical trials there were no differences in the incidence of cardiovascular events such as heart attacks among patients taking Vioxx, non-selective NSAIDs and placebo." (Exhibit 1 at ¶ 211, citing LEH0126989).

45.     Merck additionally used a video entitled "V-Squad" to train sales representatives how to destroy "obstacles to the sales of VIOXX" by using false data (Exhibit 1 at ¶ 213).

46.     Merck contracted for television commercials promoting Vioxx that failed to disclose to consumers the risk of Vioxx (Exhibit 1 at ¶ 215). Commercials featured celebrities such as Dorothy Hamill and a Larry King interview, as well as other commercials promoting Vioxx for *all* patients (Exhibit 1 at ¶ 215). These commercials additionally failed to convey the true risks of Vioxx to the public.

### Merck's Deception and Concealment Caught Up with It

47.     On September 30, 2004 Merck withdrew Vioxx from the market. (Exhibit 1, Egilman's report at ¶ 194).

48.      In December of 2011, Merck pled guilty to a misdemeanor for promoting Vioxx off-label for the treatment of rheumatoid arthritis between May 1999 to April 2002 (Exhibit 1, Egilman report, ¶ 225, citing *USA v. MERCK Sharp & Dohme*, Criminal No. 11-10384-PBS).

## B.      Background of Ms. Levitt's Vioxx Intake

49.     Ms. Levitt first heard of Vioxx directly from Merck (Deposition of Ms. Levitt, attached as **Exhibit 4** at 69:9-11).

50.     Ms. Levitt read papers such as Scientific America, the Wall Street Journal, and the New York Times, and from these magazines she gained the understanding that Vioxx was similar to a "super aspirin." (Exhibit 4 at 69:24-70:5).

51.     Due to Merck's direct-to-consumer marketing efforts, Ms. Levitt specifically asked her primary care physician, Dr. Hartman, to prescribe her Vioxx (Exhibit 4 at 69:13-18).

52.     Dr. Hartman first prescribed Ms. Levitt Vioxx (Exhibit 4, Levitt deposition at 71:8; **Exhibit 5**, Deposition of Dr. Katz at 44:21-45:4; medical records of Dr. Hartman attached hereto as **Exhibit 6**).

53.     On August 24, 1999, Dr. Hartman's notes mention that Ms. Levitt wanted to try Vioxx for her arthralgias (Exhibit 6 at JL-HMA-00016).

54.     In Plaintiff's Supplemental Plaintiff Profile Form, Ms. Levitt explained she asked Dr. Hartman to prescribe her Vioxx at her annual checkup (Exhibit A to Merck's Motion for Summary Judgment).

55.     Ms. Levitt's first visit to Dr. Katz was on October 11, 1999 (un-bates stamped record contained in **Exhibit 7**, medical records of Dr. Katz and Exhibit 5, deposition of Katz at 27:22-28:1).

56.     Dr. Katz did not write Ms. Levitt a new prescription for Vioxx but instead simply continued her already-existing Vioxx prescription.  He did this two months later on December 27, 1999, specifically stating "cont. current meds, including Vioxx. . ." (un-bates stamped record contained in Exhibit 7, medical records of Dr. Katz).

57.     Dr. Katz's testified that this date was the first day he prescribed Ms. Levitt Vioxx, directly contradicting earlier testimony (Exhibit 5, Depo of Katz at 44:21-45:4, directly contradicting his testimony at 26:15-16).

58.     Dr. Katz did not tell her that he thought Vioxx would be an appropriate choice for her. Instead, she specifically asked him for Vioxx. (Exhibit 4, Depo of Ms. Levitt at 72:10-13).

59.     Ms. Levitt did not receive any literature with her Vioxx prescription such as written warnings or patient information booklets (Exhibit 4, Depo of Ms. Levitt at 73:9-12).

60.     Dr. Hartman switched Ms. Levitt's prescription from Vioxx to Relafen—a clear example of how he was Ms. Levitt's true prescribing physician of the pharmaceutical (Exhibit 5, Depo of Katz 51.21-52:4).

61.     Dr. Katz was not included in, nor privy to, the decision to switch Ms. Levitt from Vioxx to Relafen (Exhibit 5, Depo of Katz 52:12-14).

62.     In February, 2000 Ms. Levitt told Dr. Katz that she would like to switch back to Vioxx from Relafen (Exhibit 7, medical records of Dr. Katz at JL-ASGKC-000016).

63.     On March 6, 2000 Dr. Katz specifically instructed Ms. Levitt to stop taking Vioxx until she could have further evaluation by Dr. Hartman—the physician who had originally prescribed Ms. Levitt Vioxx (un-bates stamped record contained in Exhibit 7, medical records of Dr. Katz).

64.     As explained above, multiple studies have been done analyzing cardiovascular events and Vioxx. The increased cardiovascular risk varies from study to study, but the study conducted by Merck itself, VIGOR, established a four-fold increase in cardiovascular risk after taking Vioxx (FDA Report, September 30, 2004, attached as Exhibit 3, page 11).

65.     Three days later, on March 9, 2000 Ms. Levitt presented to St. Luke's Hospital South with acute unstable angina (See 9/11/09 "External Correspondence: Pt. History; Dr. Rosamond, attached as **Exhibit 8**; Exhibit 6, medical records of Dr. Hartman at JL-HMA-000165).

66.     On March 10, 2000 Dr. Rosamond, a cardiologist, performed a diagnostic heart catheterization, which in retrospect Dr. Rosamond characterized as suggesting acute plaque rupture while Ms. Levitt was on Vioxx (*Id.*).

67.     On March 11, 2000, Dr. Rosamond's colleague Dr. Peter Tadros performed a percutaneous luminal angioplasty and placed a stent in Ms. Levitt's LAD and diagonal (*Id.*; Exhibit 6 of Dr. Hartman at JL-HMA-000162; Exhibit 7, medical records of Dr. Katz at JL-MATCS-000013).

68.     The APPROVe Study, funded by Merck, explained that after a patient's first symptomatic presentation (which occurred for Ms. Levitt in March, 2000), the cardiovascular risk goes up another 9.59 times the patient's baseline risk (Exhibit 1, Egilman report, at ¶ 83).

69.     On March 13, 2000, Dr. Katz was already putting Ms. Levitt back on Vioxx (Exhibit 7, medical records of Dr. Katz at JL-ASGKC-00015).

70.     On May 29, 2000, Dr. Rosamond, Ms. Levitt's cardiologist, found it striking that Ms. Levitt's LAD stent was severely re-narrowed to an approximate 95% greater stenosis. Her diagonal had also re-narrowed to 90% (Exhibit 6, medical records of Dr. Hartman at JL-HMA-000156).

71.     This severe stenosis necessitated bypass surgery. That same day, Dr. Rosamond's medical records state: "With this very high grade stenosis so early on after successful stent angioplasty we felt that she had very aggressive disease which required bypass surgery." (Exhibit 6, medical records of Dr. Hartman at JL-HMA-000156).

72.     Ms. Levitt had bypass surgery on May 28, 2000, in which she received a LIMA graft to the LAO, and a saphenous vein graft to the diagonal (Exhibit 6, medical records of Dr. Hartman at JL-HMA-000154).

73.     In 2009, after reviewing his own records and the history of events leading to Ms. Levitt's bypass surgery, Dr. Rosamond, her cardiologist, opined that "Given the course of events, it seems likely based upon her historical information and what we now know in retrospect about

Vioxx, that Vioxx likely contributed to her aggressive coronary artery presentation." (Exhibit 8, external correspondence from Dr. Rosamond).

74.    Dr. Katz's medical record from April 5, 2002 notes that Ms. Levitt "wants to cont[inue] Vioxx. . ." (Exhibit 7, medical records of Dr. Katz at JL-ASGKC-00006).

75.    Dr. Katz increased Ms. Levitt's dosage to 50 mg by at least April 5, 2002 (*Id.*).

76.    Another problem discovered by a FDA study comparing Vioxx to Celebrex (discussed *infra*), was that the risk for cardiovascular events became even higher once the dosage was increased from the baseline of 25 mg per day (FDA Report, September 30, 2004, attached as Exhibit 3, pages 4; 14).

77.    As explained above, Merck, after fierce negotiations with the FDA, amended the label on Vioxx in April, 2002 after the results of the VIGOR study showed an increase cardiovascular risk (Exhibit 2, Madigan's report at page 64; Exhibit 1, Egilman's report at ¶ 123, 125).

78.    Ms. Levitt's pharmacy, whose customary practice was to allow Ms. Levitt to pay for her prescriptions out-of-pocket and without requiring insurance coverage, informed her that Dr. Katz refused to refill her Vioxx prescription (Exhibit 9, Affidavit of Ms. Levitt at ¶ 7-9).

79.    Dr. Katz refused to refill Ms. Levitt's Vioxx prescription after the increased warning and label change on Vioxx occurred post-VIGOR (*Id.*; Exhibit 4, Deposition of Ms. Levitt at 130:23-131:14).

## C.  History of the Present Litigation

80.    Ms. Levitt—with the help of counsel—filed her Complaint against Merck in the Western District of Missouri on September 29, 2006 (See Complaint attached as **Exhibit 13**).

81.     Ms. Levitt's original attorneys withdrew from her case on March 5, 2006 (Rec. Doc. 13617).

82.     Ms. Levitt thus acted *pro se* from July 2008-March 2010 (Rec. Doc. 15658, Order Granting Motion to Withdraw; Rec. Doc. 37496, Notice of Entry of Appearance).

83.     Ann Oldfather entered her appearance on Ms. Levitt's behalf in March, 2010 (Rec. Doc. 37496).

84.     While Ms. Levitt was represented by counsel, Merck chose not to depose Plaintiff, her husband, her business associate, or any of her treating physicians (*See generally* Docket).

85.     On January 4, 2012, Ann Oldfather filed a Motion to Withdraw as Counsel of Record (Rec. Doc. 63618).

86.     From January of 2012 through July of 2013, Jo Levitt again represented herself – *pro se* (*See generally* Docket).

87.     Once Ms. Levitt was again representing herself *pro se*, Merck noticed the depositions of both Ms. Levitt and her husband in July, 2012 (Lexis E-Service No. 45371128).

88.     Once Ms. Levitt was again representing herself *pro se*, Merck noticed the deposition of Ms. Levitt's business associate, Robert Bazan, in January, 2013 (Lexis E-Service No. 48739522).

89.     Once Ms. Levitt was again representing herself *pro se*, Merck noticed the deposition of Dr. Katz, in January, 2013 (Lexis E-Service No. 48948510).

90.     Once Ms. Levitt was again representing herself *pro se*, Merck noticed the deposition of Dr. Mittleman, in January, 2013 (Lexis E-Service No. 49001342).

91.     Merck chose not to depose Plaintiff's primary care physician—and the physician who originally prescribed her Vioxx—Dr. Hartman (*See generally* Docket).

92.     Merck chose not to depose Plaintiff's cardiologist, who opined that Vioxx was the likely cause of her cardiovascular disease (*See generally* Docket).

93.     Merck chose not to depose the cardiovascular surgeon who completed Ms. Levitt's angioplasty and bypass surgery (*See generally* Docket).

94.     Discovery closed on May 15, 2013 (Rec. Doc. 64333, Order Regarding Extension of Deadlines Under PTO 58).

95.     On July 16, 2013, Humphrey, Farrington & McClain, P.C., the undersigned, filed its entry of appearance (Rec. Doc. 64482).

96.     On October 30, 2013, Plaintiff's counsel filed a Motion to Modify the Scheduling Order, explaining that discovery had already closed in Plaintiff's case by the time counsel was retained, and Plaintiff had not yet identified or produced her expert reports (Rec. Doc. 64668) (Suggestions in Support – Rec. Doc. 64669).

97.     The Motion was denied. Rec. Doc. 64688.

## D. <u>Material Facts Remain in Dispute</u>

### <u>A Material Fact Exists as to Dr. Katz's Credibility</u>

98.     Despite Plaintiff's inability to have an attorney present at Dr. Katz' deposition for cross-examination purposes, questions surrounding his credibility are nonetheless apparent. (*See generally* Exhibit 5, Deposition of Dr. Katz).

99.     Indeed, the second deposition of Dr. Katz lasted a mere 24 minutes (See deposition transcript of Katz, attached hereto as Exhibit 5). The deposition concluded directly following the line of questioning Merck argues is fatal to Plaintiffs' case, regarding whether Dr.

Katz would continue to prescribe Vioxx if it was still on the market today (Exhibit 5, Depo of Katz, pages 85-87).

100.    Even without the benefit of cross examination, Dr. Katz was able to provide inconsistent and contradictory testimony. For example, he testified that  he first prescribed Ms. Levitt Vioxx on October 11, 1999, even going so far as to "recall" that  his decision to prescribe her Vioxx on that day was based on his own assessment and evaluation of her condition (Exhibit 5, Depo of Katz at 26:12-16; 27:9-13).

101.    He later contradicted and discredited this testimony when he admitted that he did not prescribe Vioxx until December 27, 1999 (Exhibit 5, Depo of Katz at 44:21-45:4), and confessed that if a prior physician had prescribed Vioxx to her at an earlier time, he would take that into consideration: "if she felt she were doing well with Vioxx, I would probably tell—say we should continue it." (Exhibit 5, Depo of Katz at 27:14-21).

102.    Dr. Katz later conceded that it was in fact Dr. Hartman, and not himself, that first prescribed Ms. Levitt with Vioxx (Exhibit 5, Depo of Katz at 44:21-45:4).

103.    Dr. Katz acknowledged that his testimony might not be accurate or reliable because it is hard for him to remember the factual circumstances surrounding his care of Ms. Levitt, as they occurred so long ago: "So I believe it's always difficult to go back almost 13 years into what my thinking was." (Exhibit 5, Depo of Dr. Katz at 59:21-22).

104.    Dr. Katz testified that he was a member Speaker Bureau for Merck for several years, speaking specifically on Vioxx (Exhibit 5, at 13:4-11).

105.    Dr. Katz spoke on Vioxx both locally and outside of the Kansas City area (Exhibit 5, at 13:14).

106.    Dr. Katz testified that he advocated for Merck, specifically speaking on Vioxx up until the drug was completely withdrawn from the market (Exhibit 5, at 13:18-14:1).

107.    In fact, Dr. Katz was so closely connected to Merck that he appeared by name in a poem that was shared at a 2001 meeting of the Multi-disciplinary Advisory Board for Vioxx. (Exhibit 15, STI0078316).

108.    Throughout the entire time he was treating Plaintiff and prescribing her Vioxx, Katz never disclosed the fact that he was a paid speaker for the Defendant drug company (Exhibit 9, Levitt Affidavit).

109.    Dr. Katz did not stop speaking on Vioxx on behalf of Merck until it was completely withdrawn from the market in September, 2004 (Exhibit 5, Depo of Dr. Katz at 13:21-14:1; and 77:23-78:3).

110.    Dr. Katz testified that he is currently participating in a clinical trial, on one of its other COX-2 medications, Celebrex (Exhibit 5, Depo of Katz at 11:11-17).

111.    Section 6002 of the Patient Protection and Affordable Care Act (Public Law No. 111-148), entitled "Transparency Reports and Reporting of Physician Ownership or Investment Interests," requires that starting March 31, 2013, any manufacturer that provides payment to a physician must report the payment, or be subjected to a monetary penalty. This information submitted by the manufacturer shall then be published and made available to the public through an internet website (Public Law 111-148 attached as **Exhibit 10**).

112.    The government database is available at OpenPaymentsData.CMS.gov.

113.    The data in the database is collected by the Centers for Medicare and Medicare Services (CMS) (See printout attached as **Exhibit 11**).

114.    The database is reported in accordance with the statutory authority in Section 1128 G of the Social Security Act (*Id.*).

115.    A search for Dr. Katz on this internet database, maintained by the Centers for Medicare and Medicare Services, shows that Dr. Katz was paid over $17,500.00 in 2013 alone by pharmaceutical companies (*Id.*).

116.    The companies Dr. Katz received payments from in 2013 include AbbVie, Inc., Amgen, Inc., E.R. Squibb & Sons, LLC, Genentech USA, Inc., Janssen Biotech, Inc., LILLY USA, LLC, Pfizer Inc., Purdue Pharma LP, Questcor Pharmaceuticals, and UCB, Inc. (*Id.*).

117.    Had Ms. Levitt known that her treating rheumatologist was in the pockets of pharmaceutical companies, she would have stopped going to him entirely (Exhibit 9, Levitt affidavit).

## Vioxx and Celebrex Are Not the Same Thing

118.    An internal FDA report from 2004 entitled "Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with COX-2 Selective and Non-Selective NSAIDs" detailed a study conducted by the FDA to investigate the cardiovascular risk of two COX-2 selective NSAIDs—rofecoxib (Vioxx) and celecoxib (Celebrex)—the very two drugs discussed in Merck's Motion for Summary Judgment (Merck's Motion, pages 2, 9, 10, 14, and 15; Memorandum from David Graham, MD, MPH, Associate Director for Science, Office of Drug Safety to Paul Seligan, MD, MPH, Acting Director, Office of Drug Safety, September 30, 2004, attached as Exhibit 3).

119.    Merck wishes this Court to believe that Vioxx and Celebrex are similar, and that while they both cause increased cardiovascular risks, one is not riskier than the other. Merck puts forth this argument in order to utilize Dr. Katz's misguided testimony that he would prescribe

Vioxx to fibromyalgia patients today if it carried the same "black box" label as Vioxx (Merck's Motion, page 14).

120.    However, nothing could be farther from the truth. The attached FDA report explains how "risk of serious coronary heart disease with rofecoxib (all doses) was increased. . . 1.63-fold compared to celecoxib use." (FDA Report, Exhibit 3, at 9) (internal equation omitted).

121.    In the study, comprising of 1,394,764 participating patients, "risk was decreased with celecoxib and increased with standard-dose rofecoxib." (Exhibit 3 at 9). The FDA study has one of the largest numbers of cases exposed to Vioxx and Celebrex (Exhibit 3 at 13).

122.    This data led the internal FDA investigator to conclude: "Our data suggests that risk of serious coronary heart disease is increased in patients treated with rofecoxib compared with celecoxib use." (Exhibit 3 at 10).

123.    "*These cases would have been avoided had celecoxib [(Celebrex)] been used instead of rofecoxib [(Vioxx)].*" (Exhibit 3 at 10) (emphasis added).

124.    Furthermore, the Celebrex label provided to this Court as "Exhibit L" to Merck's Motion for Summary Judgment explains: "Celebrex is **contraindicated** for the treatment of peri-operative pain in the setting of coronary artery bypass graft (CABG surgery)." (Exhibit L to Merck's Motion, Celebrex Label, page 3).

125.    As explained more fully in Statements of Fact 71-72, above, Ms. Levitt underwent such bypass surgery on May 28, 2000 (Exhibit 6, medical records of Dr. Hartman at JL-HMA-000154).

## A Material Fact Exists as to Whether Dr. Katz's Prescribing Habits Would Have Changed with a Proper Warning From Merck

126.    Dr. Katz specifically testified that his prescribing habits have changed. Specifically, that his method of treating his fibromyalgia patients like Ms. Levitt has changed

over time, and today he prescribes products that are available and **more FDA approved** than the products he would have prescribed in the past (Exhibit 5, Depo of Katz at 38:20-39:5) (emphasis added).

### The Testimony of Both Ms. Levitt and Her Remaining Treating Physicians Shows that She Would Not Have Continued to Take Vioxx Had Merck Properly Warned of its Risks

127.   Ms. Levitt would not have taken Vioxx had she known of the risks the VIGOR trial disclosed—that she was 4-5 times more likely to develop cardiovascular injuries or events (Exhibit 9, Affidavit Jo Levitt).

128.   Ms. Levitt would not have taken Vioxx had Merck properly warned her treating physicians of the risks that Merck was aware of even before bringing Vioxx to market (*Id.*).

129.   Had Merck been honest and warned that cardiovascular injuries are a major risk of Vioxx, Ms. Levitt's treating physicians—including Dr. Katz—would have warned Ms. Levitt. Dr. Katz testified that he typically tries to provide information to his patients regarding the major risks associated with a particular product *that he is aware of* (Exhibit 5, Depo of Katz at 20:12-20).

130.   Ms. Levitt would not have taken Vioxx had Merck properly warned her of the cardiovascular risks Merck was aware of even before bringing Vioxx to market. (*Id.*).

131.   Ms. Levitt would not have taken Vioxx had Merck been forthright and truthful regarding the results of the VIGOR study (*Id.*).

132.   Ms. Levitt would not have taken Vioxx had stronger warnings specific to cardiovascular risks been present on the warnings section of the Vioxx label (*Id.*).

133.   Ms. Levitt would not have taken Vioxx had she known of the deceptive marketing scheme Merck employed to entice consumers like her to specifically request Vioxx from their physicians (*Id.*).

134.   Ms. Levitt's own cardiologist blames Vioxx for her heart disease (Exhibit 8, external correspondence from Dr. Rosamond).


Respectfully submitted,

**HUMPHREY**, **FARRINGTON** & **McCLAIN, P.C.**


/s/ Daniel A. Thomas
Kenneth B. McClain                        MO #32430
Daniel A. Thomas                          MO #52030
221 West Lexington, Suite 400
P.O. Box 900
Independence, MO 64051
(816) 836-5050 Telephone
(816) 836-8966 Facsimile

**ATTORNEYS FOR PLAINTIFFS**


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing **Statement of Material Facts Which Present a Genuine Issue** has been served on Defense Counsel, Jonathan Williams, and Defendant Liaison Counsel, Dorothy H. Wimberly, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 24th day of February, 2015.

/s/ Daniel A. Thomas
Kenneth B. McClain                MO #32430
Daniel A. Thomas                  MO #52030
HUMPHREY, FARRINGTON & McCLAIN, P.C.
221 West Lexington, Suite 400
P.O. Box 900
Independence, MO 64051
(816) 836-5050 Telephone
(816) 836-8966 Facsimile

**ATTORNEYS FOR PLAINTIFFS**