# EXHIBIT 1

# Egilman Report Jo Levitt

## Qualifications

1. My name is Dr. David Egilman. I am a medical doctor and Clinical Professor of Family Medicine at Brown University's Warren Alpert School of Medicine at. I am board certified in Internal Medicine and Preventive-Occupational Medicine. My curriculum vita sets forth more fully my qualifications.

2. I received a Bachelor of Science from Brown University in Molecular Biology in 1974. I received a medical degree from Brown University in 1978. I completed a three-year medical residency in Internal Medicine at Strong Memorial Hospital in Rochester, New York, in 1981. I completed a three-year training program in epidemiology, called the National Institutes of Health Epidemiology Training Program, in 1984. As part of this program, I completed a Master's in Public Health at the Harvard School of Public Health. At Harvard, I studied epidemiology, statistics, and occupational medicine, industrial hygiene, warnings and occupational and environmental law. I completed a third residency in preventative medicine in 1994.

3. I served two years at the National Institute for Occupational Safety & Health (NIOSH) designing and conducting small and large epidemiologic studies. I was responsible for interpreting and implementing aspects of the OSHA act of 1971.

4. I have an expertise in medical, scientific, and business ethics, which derives from a number of experiences and publications. I teach a course, "Science and Power; A Bioethical inquiry," that addresses various aspects of medical/scientific aspects, including the intersection of business and medicine.

5. I am a board member of Citizens for Responsible Care in Research, 1997-2011. This non-governmental organization deals with the ethical conduct of drug companies with respect to warnings and marketing. I am and have been a board member of Alliance for Human Research Protection, 2011-Present. These non-governmental organization deals with the ethical conduct of drug companies with respect to warnings, research and marketing.

6. Since 1978, I have published a variety of letters and medical articles on the issues that relate to the manner in which cause-effect determinations are made in medicine (the epistemology of medicine). I have discussed the normal, accepted process of casual determination in medicine in several peer reviewed articles.

7. My qualifications and opinions are also based in part on my clinical experience and awareness of the ways that normal physicians in normal medical practice make decisions

December 12, 2013

Page 2

about causal relationships that affect patients' lives every day. Much of my time is devoted to direct patient care and consulting for corporations. I served as an expert on state-of-the-art issues at the request of both injured individuals and companies.

8. In the course of doing research, publishing peer reviewed papers, my corporate consulting in public health including FDA policies and drug and medical device marketing and teaching courses, I base my opinions on the following sources of information:

      i. Review of medical literature
      ii. Medical journal articles
      iii. Medical meetings
      iv. Medical textbooks
      v. In order to review medical literature, I conducted computer searches of several different databases including:
            1. Index Medicus
            2. EPA
            3. Cancer Lit
            4. MedLine
      vi. Secret corporate studies conducted and/or controlled by MERCK or its paid consultants.
      vii. Depositions of experts and corporate officials

9. I have authored five peer-reveiwed papers related to MERCK's actions and Vioxx.

      i. Krumholz, HM, et al. What have we learnt from Vioxx? BBBMK. 2007, 334(7585): 120-3.
      ii. Ross, JS, et al. Guest authorship and ghostwriting in publications related to rofecoxib: a case study of industry documents from rofecoxib litigation. JAMA. 2008, 299(15):1800-12.
      iii. Hill KP, et al. The ADVANTAGE seeding trial: a review of internal documents. Ann Internal Med. 2008, 149(4):251-8.
      iv. Ross JS, et al. Pooled analysis of rofecoxib placebo-controlled clinical trial data: lessons for postmarket pharmaceutical safety surveillance. Arch Intern med. 2009, 169(21):1976-85.
      v. Ross JS, et al. Persistence of cardiovascular risk after rofecoxib discontinuation. Arch Internal Med. 2011, 171(4):305

10. In addition, I have authored multiple publications related to pharmaceutical condut in terms of development, promotion, and analysis. (See CV attached hereto).

December 12, 2013

Page 3

11. During the time Vioxx was on the market I was detained by MERCK sales representatives in order to see Vioxx (MRK-HUM0003536, MRK-HUM0003546, MRK-HUM0003549)). I was also sent a letter by MERCK in August of 2001 which contained false and misleading information from the VIGOR trial.

12. I have published a book chapter on the pharmaceutical industry and its conduct. (Egilman DS, Ardolinio E. The Pharmaceutical Industry, Disease Industry: A prescription for Illness and Death. In: Wiist W, editor. The Bottom Line or Public Health: Tactics Corporations Use to Influence Health and Health Policy, and What We Can Do to Counter Them: Oxford University Press; 2010)

13. I have reviewed the history of warnings from the published literature, and from internal corporate documents and organizational documents.   I presented a paper at the 2000 Annual Conference of APHA on warnings. I testified before Congress on the history and development of informed consent as well as current informed consent practices. I have been accepted as an expert by the court in *Keenan v, Parke-Davis et al*. PC &4-1667 (Rhode Island) on the issue of warnings and FDA policy. I have also been accepted as a witness on issues that relate to FDA warning policy in the case of *Vassallo v. Baxter Healthcare Corporation*, 428 Mass. I (1998). My affidavit on medical epistemology was cited by the court. I have reviewed corporate documents specifically having to do with warning practices throughout this century. I have studied the efficacy of warnings,

14. I have also studied, taught, and published articles on the history of medical ethics and the duty to warn. I published two chapters in textbook "Handbook of Warnings" on the history of warnings as well as the use of anti-warnings in the tobacco, beryllium and pharmaceutical industries.

15. I have reached the conclusions stated below to a reasonable degree of medical probability based on my review of the medical and scientific literature and based on my years of training and clinical experience as a physician.

## GENERAL OPINIONS

16. MERCK had a duty to know or determine the hazards of Vioxx and to warn patients and doctors of those hazards.

17. MERCK had an obligation not to undermine its own warnings and/or disclosures with anti-warnings. An anti-warning is information that that deliberately misrepresents dangerous products as safe in order to contradict publically available evidence that a drug

December 12, 2013

Page 4

is hazardous. In this case MERCK's undertook a campaign to discredit or pay physicians (to stop warnings) who had warned about Vioxx hazards called the "neutralization" program. The use of anti-warnings is a violation of a company's duty to warn. Anti-warnings often undermine disclosures and make them meaningless.

18. Given that knowledge of the risks of a drug form the basis for warning patients and physicians, MERCK was obligated to establish adequate knowledge on the risks of Vioxx before it was marketed.

19. MERCK failed to determine the full nature and extent of Vioxx's cardiovascular risks before launch. MERCK should have defined the CV risk prior to submitting an NDA.

20. MERCK was aware of nonclinical and clinical data linking increased incidences of cardiovascular events with Vioxx usage, prior to the release of the VIGOR findings.

21. MERCK should have amplified the Vioxx labeling to reflect the evolution of ongoing scientific efforts to address these and other potential mechanisms associated with cardiovascular concerns.

22. Vioxx should have been removed from the market after the VIGOR and Alzheimer (Protocols 091, 126 and 078) results became known internally at MERCK.

23. MERCK launched and sold Vioxx without informing patients or doctors that Vioxx increased CV risk and avoided further studying the CV risk.

24. MERCK misrepresented, concealed, suppressed, and omitted material facts regarding Vioxx's risks of causing and/or progressing Alzheimer's disease, CV disease, pulmonary edema, congestive heart failure, hypertension and respiratory illness.

25. Vioxx was defectively designed, and safer and less-expensive alternatives were available during the entire time period MERCK designed and marketed the product. Vioxx has no unique benefits for pain relief but did have unique risks. Vioxx was ostensibly designed to provide patients with a safer NSAID equal or superior in pain efficacy to available NSAIDs. In fact, Vioxx caused more deaths from GI and CV adverse events than traditional NSAIDs, including death from GI complications and vascular events. This is pointed out by Wright in his publication "The double-edged sword of COX-2 selective NSAIDS: "One striking finding from these trials is that despite the large size and duration (average 8 to 9 months), there was no decrease in the incidence of death due to gastrointestinal complications... there were 4 such deaths in the VIGOR study (3 patients receiving rofecoxib and 1 receiving naproxen). Cardiovascular events were the main cause of death in both trials (69% of 36 deaths in the CLASS and 46% of 37 deaths in the

December 12, 2013

Page 5

> VIGOR trial)." (Wright, JM. The double-edged sword of COS-2 selective NSAIDs. CMAJ. 2002 Nov 12; 167(10):1131-7.)

26. I discuss MERCK's action with respect its failure to comply with corporate community public health and other standards with respect to its duty to adequately test and/or warn and disclose all material positional and actual risks associated with the use of VIOXX in all populations including and especially in particularly vulnerable populations. Vulnerable refers to hazards to population with higher than average or unique risks e.g. history of GI bleed or MI or dementia and ability to understand and comply with safety precautions.

27. I have assumed the following facts, and provided my opinion as to the factors that contributed to Mrs. Levitt's development of heart disease.

28. Mrs. Jo Levitt was a 50 year old woman who was seen in Dr. Ronald Hartman's office beginning in 1993 for a number of complaints, including the musculoskeletal complaints of left knee pain, hip pain and polyarthralgias. She had fairly severe degenerative disc disease noted as far back as 1996.

29. She was 5 feet 6 inches tall and weighed 135 pounds. She was a runner three times a week until a knee injury stopped this activity. Mrs. Levitt did have a history of smoking cigarettes, but had stopped.

30. Laboratory studies noted hyperlipidemia in July 1999. She had some endocrine Issues with an elevated ACTH, AM cortisol elevated at 29.6. She had a negative ANA, rheumatoid factor and Lyme test. TSH was normal.

31. Because of her ongoing severe arthralgias, she requested and was started on Vioxx, 25 mg by Dr. Hartman on August 24, 1999.

32. She was referred to Arnold Katz, M.D. for a rheumatology consultation and her initial visit with him was on October 11, 1999 for migrating attacks of musculoskeletal pain. Dr. Katz advised Mrs. Levitt to take Vioxx 25 mg daily with food. He also started her on amitriptyline 25 mg nightly. Physical therapy twice weekly for three weeks was ordered.

December 12, 2013

Page 6

33. Mrs. Levitt was seen in followup on 11-15-99 by Dr. Katz with continued pain in spite of daily Vioxx taken in the evening. By her 12-27-99 followup visit it was noted that Vioxx was helping with the pain and if she missed her medication she had increased pain.

34. Mrs. Levitt was seen by Dr. Hartman on 1-27-00 for intense right calf pain for two days with the onset after walking up stairs. (Her weight is noted to be 146 on this visit.) A Doppler venogram was order to rule out right popliteal DVT. Lipitor 10 mg was ordered for increased lipids. Her other medications included Vioxx, Effexor, Humabid, Nasacort, Optichrom, Estratest, Premarin 0.9, aspirin and Estring.

35. A Doppler report dated 1-27-00 by Dr. Kooperman noted that although the Doppler exam was negative and no thrombus was seen, the physical findings were "suggestive of thrombophlebitis due to extreme tenderness on evaluating the calf region."

36. On the 2-7-00 office visit with Dr. Katz, he noted the events regarding the right calf pain. According to Dr. Katz' note from this visit, Mrs. Levitt had been switched from Vioxx to Relafen, but she preferred to go back on Vioxx. The right calf area pain had resolved.

37. This seems to be in conflict with some of the other records and Mrs. Levitt's memory. According to the St. Luke's ER intake from March 9, 2000 it states that "she called her rheumatologist who recommended discontinuing her Vioxx which she did." This phone call actually occurred on March 8, which is when Mrs. Levitt actually stopped taking Vioxx.  On pages 44 through 54 of Dr. Katz' deposition, he acknowledged that the Relafen note from February 7, 2000 was improperly charted by his office.  According to the pharmacy records, there is only one script for Relafen and that was filled two years later on April 29, 2002.

38. On 3-9-00 Mrs. Levitt was seen in the emergency department of St. Luke's South Hospital. History recorded states that she had been "having chest pain for approximately one week. She awoke a week ago in the morning with severe epigastric discomfort that was accompanied by nausea and diaphoresis with profound sweats that left her feeling cold and clammy. This remitted on its own over the next hour and she was able to get up and start her day. She continued to notice intermittent epigastric discomfort and chest pressure. She called her rheumatologist who recommended discontinuing her Vioxx which she did. However, her chest discomfort and chest pressure continued to occur mainly in the morning and evening throughout the week and she presented to our office for further evaluation. We obtained an EKG which did show flipped T waves in the anterior leads that were a definite change from her EKG noted just approximately one year ago, in July 1999, which had a normal tracing. She now had definite anterior lateral changes noted."

39. Dr. Thomas Rosamond saw Mrs. Levitt in consultation on 3-10-00. He recounted her history of increasing substernal chest pressure sensation that radiated towards both axilla and was actually quite severe, "reaching an '8' on a 10 scale." She noted some mild diaphoresis and mild shortness of breath and nausea. Emergency medical team was called but by the time they arrived her symptoms had resolved and she

December 12, 2013

Page 7

elected not to go to the hospital at that time, but over the ensuing days she had daily episodes of substernal chest pressure occurring primarily with mild exercise and relieved by rest. She tried aspirin and Zantac In an effort to relieve the symptoms without success. On March 9th she awoke for the first time because of chest discomfort.

40. He notes that the LAD lesion on cath was "somewhat variable, depending on the views, but I think probably in some frames was 80%, possibly with some intraluminal thrombus" and the "diagonal itself also had about 60% stenosis." Her other "coronary vasculature was without significant obstruction and her left ventricular ejection fraction was normal."

41. He notes her past medical history to include hyperlipidemia for which she was started on Lipitor four to six weeks prior. Her history of smoking two packs a day, with stoppage about ten years prior is noted.  Her history of low back pain and negative evaluation for Cushings' syndrome was also noted.

42. Dr. Rosamond notes that she has a positive family history for coronary artery disease and the patient carried a diagnosis of borderline hypercholesterolemia and was a smoker in the past. She did not have diabetes mellitus or hypertension.

43. His impression was, "In summary, Mrs. Levitt is a 56 year old female with symptoms that sound very dramatically like unstable angina with new EKG changes compatible with left anterior descending ischemia."

44. She underwent a diagnostic cardiac catheterization by Thomas Rosamond, M.D. which revealed: Ventriculography—Overall left ventricular function is normal with an estimated left ventricular ejection fraction of 60%. There is no significant mitral valve regurgitation. No regional wall motion abnormalities. Coronary angiography revealed a normal left main; 85% left anterior descending stenosis just beyond the first major diagonal which itself has perhaps 60-70% stenosis; and an unremarkable circumflex and right coronary artery technically dominant and without obstruction.

45. She was then transferred to St. Luke's Hospital for percutaneous intervention when stabilized.

46. A percutaneous luminal angioplasty with stent placement was performed by Peter Tadros, M.D.

47. His cath report of 3·10-00 notes:

48. "CLINICAL INDICATIONS: The patient is a 56 year old female with no significant past medical history who presented to Saint Luke's South Hospital with symptoms and signs consistent with unstable angina and had two inversions in the precordials [leads] consistent with a left anterior descending coronary artery lesion. She underwent diagnostic coronary arteriography at Saint Luke's South Hospital revealing high grade proximal left anterior descending coronary artery stenosis of 90% at the bifurcating diagonal branch. A 3.5 x 15 mm NC Ranger was used for the left anterior descending and a 3x18 mm TriStar stent was used in the LAD.

49. "PRE PROCEDURE DIAGNOSIS: Ninety percent stenosis at the bifurcation of the left anterior descending coronary artery and first diagonal branch (Lesion type 82).

50. POSTPROCEDURE DIAGNOSIS: Zero percent residual stenosis in the left anterior descending coronary artery and 40% residual stenosis in the ostial first diagonal branch."

December 12, 2013

Page 8

51. Mrs. Levitt was discharged from St. Luke's Hospital on 3·11-00 with discharge diagnoses of: 1. unstable angina 2. coronary artery disease 3. hypertension

52. Her discharge medications included Plavix 75 mg daily; enteric coated aspirin, 325 mg daily; Lipitor 1 tablet daily; Effexor 150 mg bid; Vioxx 25 mg daily; Premarin .625 mg daily; Estrin 2 mg; Entex LA 1 daily; Lopressor 25 mg bid; NTG sublingually prn. She was given a no added salt, low fat, low cholesterol diet.

53. Mrs. Levitt was seen in followup by Dr. Rosamond on 3·23-00 where she was doing well except for some persistent mid-back pain since leaving the hospital as well as some fatigue from the LoPressor 25, mg bid. She hadn't required nitroglycerin and she did not have any other cardiovascular symptomatology including shortness of breath, paroxysmal nocturnal dyspnea, palpitations, nausea, vomiting or diaphoresis. Examination revealed a blood pressure 104/72 in both arms A twelve lead EKG revealed normal sinus rhythm and the previously inverted T waves had resolved. She had a slightly delayed R wave progression but no evidence for a previous infarction. An exercise echo was performed and she walked for 6 minutes and 1 second on a standard Bruce protocol, with no ischemic ST segment changes. Her resting echo showed a normal ejection fraction and with stress, she has a normal response. Her mid-back pain continued unabated before and after the test but was not increased with exercise.

54. Mrs. Levitt next saw Dr. Rosamond on 4-21-00 where it was noted that she had continued complaints of fatigue from LoPressor and an exercise stress thallium study was ordered to assess her heart before stopping this.

55. The note also states that she was taking Vioxx 25 mg po bid. According to Mrs. Levitt's pharmacy records, however, she filled a script for Vioxx four days later, on April 25, 2000. This script was filled for thirty 25mg pills. This is consistent with her averaging approximately thirty, 25 mg pills per month as her prior script was filled on March 25 for thirty, 25 mg pills and the following script was filled June 11, 2000 for thirty, 25mg pills.

56. The stress thallium performed on 4-24-00 revealed an 86 maximum heart rate, normal ejection fraction and no ischemia.

57. On 5-26-00, Mrs. Levitt called Dr. Rosamond's office complaining of chest pain that woke her up the night before, that radiated across her chest through to her back and into her neck. It was not associated with diaphoresis or nausea although she did feel slightly short of breath. She stated that it felt similar to what she had before her PTCA/stent. She did take a nitroglycerin about 10 minutes ago which relieved her pain somewhat, but not totally. She took another nitroglycerin which relieved the chest pain, but not the back pain. She was told to go to the ER per Dr. Rosamond's instructions.

58. Upon arrival and evaluation at St. Luke's Hospital, and the ongoing chest pain despite nitroglycerin, Dr. Rosamond felt it best to re-cath the patient as she might be developing early restenosis.

59. The cardiac cath performed by Randall E Genton, M.D. revealed a 95% intrastent restenosis of the left anterior descending coronary artery with a 90% narrowing at the diagonal origin. There was 25% midcircumflex stenosis and the first obtuse marginal branch had mild plaquing at its origin. The dominant right artery revealed mild luminal plaquing but no significant obstructive stenosis.

December 12, 2013

Page 9

60. The impression was of critical left anterior descending coronary artery restenosis with critical left anterior descending diagonal bifurcation stenosis and mild to moderate ostial left main and circumflex disease.

61. It was felt that surgery was her best option and she underwent a double vessel coronary bypass with a left internal mammary to the left anterior descending and a vein graft to the diagonal on 5-28-00 by Dr. Michael Gorton. She did well postoperatively and was discharged on Atenolol25 mg per day, Tylenol, Vioxx, Paxil 20 mg per day, Lipitor 20 mg per day and aspirin, one tablet daily.

62. She was seen in followup with Dr. Gorton on 7-17-00. She was doing well and she released to full activities.

63. On 7-20-00, Mrs. Levitt had a followup visit with Dr. Rosamond. Her most prominent complaint was that of fatigue and a CBC was going to be checked. A stress thallium test was also ordered.

64. Mrs. Levitt was admitted to St. Luke's Hospital for shortness of breath, palpitations and tachycardia in conjunction with emotional stress. Evaluation by James L. Vacek, M.D. revealed that myocardial infarction was ruled out by serial cardiac enzymes. An echo Doppler revealed preserved left ventricular systolic function and no clinically significant pericardial effusion. A stress thallium did not reveal inducible ischemia. Cardiac Rehab was again suggested. It is noted that at the time of discharge her medications were noted to be Ecotrin 325 mg daily; Tenormin 25 mg bid; Lipitor 20 mg daily; Paxil 25 mg daily; Vioxx 25 mg daily and hormone supplementation of unknown strength.

65. Mrs. Levitt was next seen by Dr. Rosamond on 11-27-00 with symptoms of variable chest pain, some slight diaphoresis, a sense of indigestion and anxiety. Dr. Rosamond states that, "I couldn't really obtain from her an exertional angina type character to her symptoms." Because of these symptoms, a stress echocardiogram was performed. This showed a 50% ejection fraction. There were no regional wall abnormalities other than a mildly abnormal septal motion consistent with her previous bypass surgery. Valvular structures were unremarkable. There was no pericardial fluid. This was felt to be a normal stress echo without evidence for ischemia. Dr. Rosamond notes that, "from a cardiac standpoint her bypass conduits remain patent and her ejection fraction is well maintained. I don't have any evidence for a post-pericardiotomy syndrome."

66. On 8-3-01, Mrs. Levitt was seen by Dr. Katz who noted that she tried taking Vioxx on a prn basis but she had more pain. She was no longer doing cardiac rehab. She was told to call the cardiologist regarding her dyspnea on exertion.

67. On 4-5-02, it is noted by Dr. Katz that she wanted to continue with Vioxx and Soma.

68. On 7-12-02 Or. Katz states, "Vioxx stopped" and substituted Bextra 10 mg with food as she felt she needed an NSAID.

69. On 8-20-2002 a prescription was filled for 30 tablets of Bextra 10 mg once a day. That is the only documented prescription for Bextra.

70. Mrs. Levitt was seen in St. Luke's Hospital ER on 9-13-02 by Steven Laster, M.D. for complaints of brief sharp pain under her left breast that concerned her. She did report some exertional dyspnea but was able to go about her activities without any chest discomfort. On examination, her blood pressure was 120/70, heart rate 70, and her 12-

December 12, 2013

Page 10

     lead electrocardiogram revealed normal sinus rhythm and nonspecific T-wave abnormality. Cardiac enzyme testing was negative. Her current medications were: antibiotics for a sinus infection, Lipitor, Welchol, Atenolol, Humibid-LA, Premarin, "arthritis medication," and allergy medications.

71. A pharmacologic stress test was recommended but she took a beta blocker in the morning so she was to return for this test. Her current medications were: antibiotics for a sinus infection, Lipitor, Welchol, atenolol, Humibid-LA, Premarin, "arthritis medication," and allergy medications. She was discharged to office followup.

72. On 10-3-02, Mrs. Levitt had a Rest-Exercise TC-99M Sestamibi SPECT Scintigraphic test done by James O'Keefe, Jr., M.D. which revealed: normal myocardial perfusion, no definite evidence of myocardial ischemia; minor nontransmural injury in the anteroseptal regions near the apex; normal global systolic function, rest left ventricular ejection fraction 60%. The study falls into a low risk prognostic category.

73. On 11-5-02, Mrs. Levitt had an exercise stress test performed by Steven B. Laster, M.D. that revealed images of nontransmural injury in the anterior septum but no definite evidence of ischemia. Her left ventricular function was normal. It was felt "unlikely that she has significant ischemia." Dr. Laster suggested increasing Atenolol to 75 mg to provide extra beta blockade.

74. On 10-3-05, Mrs. Levitt was seen in consultation by Linda Crouse, M.D. at Kramer & Crouse for complaints of chest pain, chronic fatigue, left upper thigh pain and shortness of breath with activity. At the time of this evaluation her medications included Lipitor, Zetia 10 mg daily, Atenolol, Cymbalta 60 mg daily, Provigil 100 mg daily and 81 mg baby aspirin daily. Her blood pressure was 110/67, height 66 inches, weight 154 pounds. She has a stress echo that showed mild anteroseptal hypokinesis at rest which improved after exercise. No new wall motion abnormalities were noted. She did have some back pain on the treadmill. She was advised to continue her current medical regimen and return in 12 months for another stress echo. She was given nitroglycerin for back pain.

75. On 11-7-07 she had a transthoracic echo which disclosed mild hypokinesis of the mid-distal anteroseptal wall with mild hypokinesis of the apical wall. The ejection fraction was reported as 45%.

76. A Thallium Treadmill study on 11-26-07 was a follow-up to the echo at it showed no ischemia with a gated ejection fraction of 75%.

77. On 3-4-08 she was seen by Dr. Hartman, and he noted that she had depression (in part due to the illness and subsequent death of her son-in-law). She was (and had been) prescribed Provigil and Cymbalta. Her Ob/Gyn continued treating her with Premarin and Estring. Lipitor and Zetia were continued and Atenolol was given at 150 mg/qd. Her allergist prescribed medications which she used prn. She did continue her ASA.

78. It must be noted that her records report "HTN" however there is no record of her ever having documented HTN.

79. A bone scan (4-23-08), and later a bone density test ordered by her Ob disclosed some osteoporosis (DJD of the spine) and she was started on Fosamax.

December 12, 2013

Page 11

80. She thereafter saw Dr. Hartman sporadically. She had a physical exam on 3-23-09 and again on 2-28-11 but her medical condition had not significantly she changed. At that last appointment she had stopped her Zetia and Fosamax.

81. From 3-29-11 through 5-5-11 she was under the care of a psychiatrist, Kent Stevenson, MD but there was no substantial change in her medications or treatment.

# Opinion

82. Based on the hypothetical it is my opinion that Ms. Levitt's previous history of ASCVD and Vioxx contributed to the heart disease she suffered after taking Vioxx.

**83.** Her baseline 10 year risk based on the current NIH risk calculator (http://cvdrisk.nhlbi.nih.gov/evalData.asp) for a 56 year old female, with a total cholesterol of 205 and a systolic BP of 121 and a non-current smoker is 1% or one per hundred. Based on the Approve results her increase in risk prior to her first cardiac event (3/9/00) was 2.55 (0.92, 8.09) This is based on unpublished analysis of the Approve trial that Merck has not published. (Exhibits 13, 14 and 15 to the Quan deposition of 3/14/16, MRK-ABY0188384 and MRK-AHD0075800-1) Concurrent low dose aspirin consumption did not materially affect risk of MI for patients treated with Vioxx (1.89 off aspirin vs. 2.06 on aspirin.) Therefore contrary to information implied in the Merck label, Ms. Levitt's consumption of aspirin did not reduce her risk of ASCVD. Finally risk for patients who has symptomatic ASCVD prior to treatment had the highest increased risk of thrombotic events of any subgroup 9.59 (1.36 – 416.3). Therefore following her first symptomatic episode Vioxx consumption increased her risk of ASCVD by 9.59 fold. Thus Vioxx contributed to her second cardiac event on 5-26-00. Her Vioxx use thus was a significant contributing factor for her heart disease during and after Vioxx consumption. All Merck analyses of thrombotic risk evaluated risk after discontinuation of therapy. This period included at least one week of time where Vioxx would not be present in any patient's blood or serum. Also see, Ross JS, Madigan D, Konstam MA, Egilman DS, Krumholz HM, Arch Intern Med. 2010 Dec13;170(22):2035-6. Persistence of cardiovascular risk after rofecoxib discontinuation and Afilalo J, Coussa-Charley MJ, Eisenberg MJ. The Long-term risk of ischemic stroke associated with rofecoxib, Cardiovasc Drugs Ther. 2007 Apr;21(2):117-20, Baron JA, Sandler RS, Bresalier RS, Lanas A, Morton DG, Riddell R, Iverson ER, Demets DL. Cardiovascular events associated with rofecoxib: final analysis of the APPROVe Trial, Lancet. 2008 Nov 15;372:1756-64. The prolonged effect of Vioxx therapy on risk is also supported by the impact of systolic BP elevations on risk. It is unclear how much Bextra she consumed after 7/12/2002.

## Basis for Opinions

**Pre-VIGOR Results**

December 12, 2013

Page 12

84. On October 10, 1996, MERCK officials wrote, "[a]dverse events of most concern were in the cardiovascular system (e.g. MI, unstable angina....)." (MRK-ABC0048699) This conclusion was the result of a research management committee update evaluating a placebo-controlled high-dose study of Vioxx in Rheumatoid Arthritis (referred to as "Protocol 017"). Meanwhile, a table listing patients with non-fatal, serious clinical adverse experiences showed three thrombotic events, including heart attack, unstable anginas, and pulmonary blood clots in the Vioxx-treated patients and no thrombotic events in the placebo-treated patients (MRK-AKU0083901 at 4223-4226), which was submitted to the FDA in Protocol 017 (Table E-152 of MERCK's Integrated Safety Summary dated October 26, 1998). During a review of the trial at Research Management Committee meeting, it was stated, "Adverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina, rapid fall in hemoglobin and hematocrit in some subjects, and a small increase in blood pressure). We plan to evaluate MK-966 in a study where subjects are also given low dose aspirin." MERCK had substantial grounds to evaluate these findings further.

85. During May 1996 through January 1997, MERCK funded Protocol 023, a double-blind, placebo-controlled safety and pharmacokinetic study of Vioxx. In that study, a decrease was noted in the production of PGIM in urine, one of two metabolites of prostacyclin. Notes from a Vioxx project tream minutes in January 1998, noted that Vioxx "had no effect on systemic thromboxane," which is involved in promoting platelet aggregation and clotting. (MRK-ABC0009946). MERCK believed that "[t]hese findings raised a concern about the potential for VIOXX to cause cardiovascular problems." (MRK-ABC0009946)

86. Drs. Garrett FitzGerald, John A. Oates, and Carlo Patrono, MERCK's external advisors, each proposed additional research to further examine these "[a]dverse events of most concern", cardiovascular problems. (MRK-ABC0048699)

87. In October 1997, Dr. FitzGerald, a MERCK consultant and senior author on Protocol 023, suggested several preclinical and clinical studies to address Vioxx possible mechanism of inhibiting prostacyclin from a vascular source (MRK-NJ0051533).

88. Dr. Oates of Vanderbilt University wrote two letters, October 27 and November 17, 1997, to MERCK personnel expressing his interest in studying the implications of Vioxx inhibition of prostacyclin biosynthesis. In the second letter, Dr. Oates states that an evaluation of the beta-oxidation metabolite of prostacyclin "indicates a predominant localization of prostacyclin synthase in the vasculature, other smooth muscle such as bronchus, and in fibroblast cells in several organs." Dr. Oates also noted that "it seems quite unlikely that 2, 3-dinor-6-keto-PGF$_1$ a in the urine is derived primarily from the kidney." (MRK-NJ0152620; MRK-ABC0002150)

December 12, 2013

Page 13

89. According to Dr. Alan Nies, head of clinical pharmacology department at MERCK, instead of doing the animal studies Doctors Oates and Fitzgerald recommended, MERCK reviewed their clinical data to see if there was an actual CV risk. (deposition of Alan Nies 3-2-2005, Pages 143-151) This analysis was performed by physician's assistant Dr. (Ph.D.) Watson. This analysis showed that there was an elevated risk of CV events in both males and females. The rate in women was 2.16 (CL (1.14 -- 3 .94). This is statistically significant. The rate in men was 1.28 (CL .53 -- 2 .82). This is not statistically significant but is not reassuring; especially considering the fact that the group labeled Vioxx includes all patients in these trials whether or not they were in the placebo or the Vioxx arm. Despite their best efforts to bias their results, MERCK still found a statistically significant excess of CV SAEs in Vioxx treated patients.

90. In November of 1996, Thomas Musliner, Executive Director of Clinical Research, wrote a memo titled "Anticipated consequences of NSAID antiplatelet effects on cardiovascular events and effects of excluding low-dose aspirin use in the Cox-2 GI Outcomes Megatrial." The memo concluded that "If aspirin prophxlaxis is not permitted there is a substantial chance that significantly higher rates of CV AE events (MIs, angina, strokes, TIAs, etc.) will be observed in the selective Cox-2 inhibitor group compared to the standard NSAID group..."(MRK-AAX0002413-20)

91. In an email in February of 1997, Briggs Morrison, a senior MERCK researcher, in discussing the plan for a large GI outcomes trials commented on aspirin use in potential study design, "I know this has been discussed to death, but real world is everyone is on it, so why exclude AND [sic] without COX-1 inhibition you will get more thrombotic events and kill drug." (MRK-ABC0009946)

92. In response to the email from Briggs Morrison, Dr. Alice Reicin wrote, "This is a no-win situation. The relative [GI] risk of even low-dose aspirin may be as high as 2-4 fold. Yet the possibility of increased CV events is of great concern – (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients – i.e. those that have already had an MI, CABG, PTCA? This may decrease the CV event rate so that a difference between the two groups would not be evident." (MRK-ABC0009946)

93. By early 1997, MERCK found cardiovascular related concerns from unblinding the results of an osteoarthritis study complted in early 1996 (Protocol 010). Patients in the study were randomized to receive placebo, Vioxx 25 mg daily, or Vioxx 125 mg. daily. The results revealed that the Vioxx 125 mg and 25 mg groups had more cardiovascular adverse events than the placebo group, which had no cardiovascular adverse events. In addition, two patients, one in each Vioxx treatment group, discontinued the study due to transient ischemic events (TIAs) (MRK-OS420045657). Because these events occurred at higher doeses than those found at lower doses, this is an indication of a dose response phenomenon. It can also be hypothesized that MERCK lowered the dose to reduce the

December 12, 2013

Page 14

incidence of CV events. The fact that events occurred at higher doses than those found at lower exposures is evidence of a dose response phenomenon. In addition absent other evidence it appears that MERCK dropped the dose to reduce the incidence of these CV events.

94. A December 1997 meeting, attended by a MERCK representative and outside MERCK advisors, entitled "International consensus meeting on the mode of action of Cox-2 inhibition" included a discussion of Vioxx's potential to predispose for cardiovascular side effects. The executive summary from the meeting includes: "It was emphasized that the major reason for both the development of COX-2 inhibitors, and this meeting, was adverse events associated with NSAIDs. Although gastric intolerance was the most obvious, renal and cardiac toxicity were important and a probable link between these phenomena has been established. It is therefore important to monitor cardiac side effects with selective COX-2 inhibitors" (MRK-ABK0311053).

95. In a January 1998 memo to Drs. Scolnick, Shapiro, Nies and Spector, A.W. Ford-Hutchinson, urged MERCK to recommend low-dose aspirin use for all patients at risk of heart disease. His concern arose when MERCK found that Vioxx reduced urinary PGIM, which is a vascular endothelial metabolite of prostacyclin. Hutchinson stated that "the concerns about COX-2 involvement in cardiac disease are potentially valid" and added (MRK-ABC0000069): "It is likely that we can produce evidence in the dog that the inhibition of this metabolite follows that of other renal metabolites and that it is a common phenomena observed with all COX-2 inhibitors. However, as these studies were carried out in normal volunteers and not in patients with cardiac disease, who might be excreting systemic COX-2 derived metabolites, resolving this issue will not prevent the larger issue being raised by potential reviewers. Because of this it might be advisable in our label to recommend low-dose aspirin usage for all patients at risk of cardiac disease." MERCK did not include this disclosure or the reason it was needed in its label or press material; instead it issued an anti-warning press release, "MERCK Reaffirms the CV safety of Vioxx." This is an example of an anti-warning. It is unclear when MERCK first affirmed VIOXX's CV safety but whenever that was, MERCK had not tested the drug sufficiently to state this and they were in possession of data that directly contradicted this statement.

96. Dr. Harry Guess, an epidemiologist at MERCK, wrote an email on January 2, 1998, "As you recall, the reason why there is some concern about CVD events is that by inhibiting cyclooxygenase-s without inhibiting cyclooxygenase-1, one is at least partially inhibiting an anticlotting and vasodilating substance (PG12) WITHOUT inhibiting a potent vasoconstrictor (thromboxane). This combination is not found with other drugs; conventional NSAIDs would also inhibit thromboxane. Hence, it is biologically plausible

December 12, 2013

Page 15

that specific cyclooxygenase inhibitors could predispose to thrombotic events in a way that other drugs do not." (MRK-AVJ0005720)

97. On May 3-6, 1998, MERCK's Scientific Advisory Board noted that Vioxx may inhibit prostacyclin, an inhibitor of platelet aggregation. The Advisory Board commented to MERCK that this possibility could increase the risk of cardiovascular disease. The Advisory Board stated that "[b]y removing this potent inhibitor of platelet aggregation, the probability that a coronary plaque rupture would lead to myocardial infarction or ischemic ventricular fibrillation is enhanced. More information is clearly needed to address these hypotheses and the other questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality." (MRK-AEI0002734)  The Advisory Board stated, "[i]t is therefore proposed that coronary events be predetermined endpoints in all future controlled trials with Vioxx....It is proposed that these endpoints be assessed by a uniform set of criteria so that meta analysis of coronary and cerebral vascular events from all these can be performed." (MRK-AEI0002734)

98. By 1998 MERCK scientists examining levels of thromboxane and prostacyclin in human urine found that COX-2 inhibition suppressed PGIM (a metabolite that is an indicator of prostacyclin levels in the body) but not thromboxane, evidence that COX-2 inhibition could induce a pro-thrombotic state. "The data on prostacyclin in man seems clear," wrote Dr. Edward Scolnick in a 1998 email, "can we try in animals?" (MRK-ABH0014002) in an effort to explain the imbalance between thromboxane and prostacyclin, Dr. Scolnick ordered experiments on animal urine and tissue and human tissue to determine if prostacyclin was produced in those locations and if its production was suppressed by COX-2 inhibitors. (MRK-ABH0014002)

99. In September of 1998, Dr. Carlo Patrono, an outside MERCK advisor, sent a letter to the company expressing the likelihood of four possible cardiovascular adverse effects of COX-2 inhibitors, like Vioxx: a) Expression of COX-2 in macrophages/plaque monocytes as a potential source of aspirin-insensitive TXA2 production b) Expression of COX-2 by endothelial cells as a potential source of PGH2 for transcellular biosynthesis of TXA2 by aspirinated platelets c) COX-2-derived eiconsanoids as a potential factor in the local inflammatory process of unstable angina and ischemic complications d) COX-2-derived PGI2 as a potential contributor to local modulation of platelet activation. Dr. Patrono wrote, "I would suggest that it would be in the best interest of MERCK to look into these issues as quickly and thoroughly as possible." (MRK-ABC0002199)  In response to this letter, Alan Nies of MERCK wrote a note to his colleagues stating that Dr. Oates had raised similar concerns and "I told John we would not be doing any clinical studies at this time. When these drugs are available many investigators will probably do such studies with or without our help/consent." (MRK-ABK0311068)

100.      In November 1998, MERCK submitted its VIOXX NDA to the FDA. MERCK's scientists and MERCK consultants concerns were largely omitted from the General

December 12, 2013

Page 16

Safety Overview in the Clinical Documentation section, which included this statement: "It is theoretically possible that use of MK-0966 without concomitant aspirin in patients at risk for cardiovascular events may not provide the cardiovascular benefits of aspirin" (MRK-ABS0066396).

101.    Pharmaceutical manufacturers are often required and should always establish a system for pharmacovigilance activities to evaluate information about suspected adverse events. All relevant information, including reports and analyses of updated safety-related information, must be shared with the FDA. Post-marketing surveillance is critically important for the development of a safety database for the drug product. It has been shown that pre-marketing clinical trial data provide only initial and preliminary safety information for a new drug product and sometimes critical safety concerns are not observed until after an approved product has been commercially launched. Therefore, it is imperative that manufacturers closely monitor all available data, conscientiously review published literature, conduct necessary follow-up studies and fully explore all potential adverse events.

102.    Dennis Riendeau, of MERCK Frost in Canada conducted a dog urinary prostaglandin study in 1999 found that certain COX-2 inhibitors resulted in lower levels of urinary prostanoid metabolites, an indication that COX- 2 inhibitions suppressed prostacyclin production. (MRK-AEF0001034) Other studies reviewed by MERCK also found that COX-2 inhibition contributed to a prothrombotic state in animal tissue.(MRK-AAZ0006966) Despite the fact that these studies indicated that COX-2 inhibition limited prostacyclin and despite Scolnick's 1998 email, MERCK was careful not to use rofecoxib in these studies. (MRK-AEG0004962) MERCK also ignored the advice of Drs. Fitzgerald and Oates (the head of its science advisory panel) both of who recommended that MERCK conduct a series of animal tests of this hypothesis. Dr. Nies says MERCK elected to test the hypothesis in human beings first (he was apparently unaware that MERCK did not test this hypothesis on rofecoxib but on *other* COX-2 inhibitors in the above-mentioned studies).(Deposition of Alan Nies. 4-1-2005) It is better to cause adverse effects in animals before human beings are exposed to potentially toxic drugs. Human subjects assume, unless told otherwise, that animal tests regarding adverse effects have been done first. MERCK did not inform IRBs or patient volunteers of the order in which it chose to conduct tests. This is wrong.

103.    On April 20, 1999, MERCK presented information on VIoxx to the FDA Arthritis Advisory committee. MERCK did not mention that MERCK's scientific advisors suspicions that COX-2 inhibitors might be linked to adverse cardiovascular events (MRKAEI0002734). Rather, MERCK stated: "It has been suggested that specific COX-2 inhibition might increase the risk for cardiovascular events due to the lack of platelet function inhibition.  It is clear that rofecoxib does not inhibit platelet aggregation and would not, therefore, convey the cardioprotective properties attributed to low-dose aspirin. While this benefit is not offered by rofecoxib, there is no evidence, preclinically

December 12, 2013

Page 17

or clinically, to suggest that rofecoxib carries any increased risk for cardiovascular events" (MRK-ACD0064937). This statement contradicted the beliefs of MERCK's external scientific experts. MERCK did not explain the risk posed by upsetting the balance between the $TXA_2$ formed by platelets and the prostacyclin formed by blood vessels. (MRK-ABS0066396).

104.     In April of 1999, Dr. Juan Carlos Pelayo, an FDA Medical officer, completed a review of the cardiovascular (limited to hypertensive and edema related events) and renal safety database for Vioxx. He found that "[i]n the aggregate, the data allow to reach the conclusion that qualitatively the cardiovascular and rental "toxicity" of MK-0966…is readily distinguishable from placebo, but closely mimics that of other, already approved, nonselective     COX-1/COX-2     inhibitors."(FDACDER007847)     In     addition, "[q]uantitatively there is evidence, in most studies, for the aforementioned key cardiovascular and renal adverse findings to occur in a dose-dependent manner with the administration of MK-0966. Dose-response relationships are very helpful to establishing cause-effect relationships. (See MERCK's deletion of this argument from the draft 078 paper.)

105.     Dr. Pelayo also conducted that "The identified cardiovascular and renal toxicities associated with MK-0966, when administered at a dosage ranging from 25 to 50 mg/daily, occur at a higher rate than with the other tested comparators, i.e., ibuprofen, diclofenac, or nabumetone." (FDACDER007847) MERCK failed to disclose this. In fact MERCK put out anti-warnings claiming these were effects of the class but never disclosing that VIOXX was worst in the "class."

106.     Following the approval of Vioxx in May 1999, MERCK became aware of cardiovascular-related adverse events (Protocols 085, 090). In fact, these events were reported in ongoing clinical trials, which associated Vioxx with more cardiovascular adverse events than both placebo and active control groups (MRK-NJ0170152-274; MRK-ADJ0035003-8; MRK-NJ0220388-454)

107.     Congestive Heart Failure hypertension, pulmonary edema, and heart failure are all drug related adverse cardiac events, MERCK analyzed these event separately to conceal the true toxicity Of Vioxx. MERCK knew that these events should not be disaggregated from the general CV criteria. For example MERCK included them (all but hypertension) in the initial list of events from the SOP for "surveillance monitoring and adjudication of acute thromboembolic vascular events in clinical trials of COS-2 specific inhibitors." (MRK-Aja0175045) MERCK crossed them off the list in December 1999 and made the changes retroactive to October 1999 - the same time the DSMB became concerned about the CV outcomes in the VIGOR trial. It appears that they were crossed out because of "high volume but low yield of confirmed thromboembolic events". (MRK-AJA0137782) This unblinded change in the Data Analysis Plan (DAP) is scientifically improper. These CV adverse events which MERCK knew were related to Vioxx in all placebo trials were

December 12, 2013

Page 18

never adjudicated. This was despite that fact that Dr. Reicin (and almost any second year medical student) understands that these events could either be a result of or precipitate an MI. Dr. Ford Hutchinson predicted that Vioxx could cause confestive heart failure, acute coronary syndrome and myocardial infarction in January of 1998. (A.W. Ford Hutchinson deposition April 2012 at 171:8 to 173:2; MRK-ABC0000069)

108.    MERCK never amended the VIOXX labeling relating to cardiovascular risks between the issuance of the 1999 launch label and the April 2002 post-VIGOR "miracle" label. Specifically, CV events listed in the Adverse Reactions Section relating to rarely occurring (<0.1%) along with insect bites and hemorrhoids and other events that were known to be unrelated to VIOXX. According to Dr. Hirsch even this listing was in error since the CV rates were higher. (MRK-ABD0001986) Dr. Watson claimed that this constituted a CV warning. (Deposition of Doug Watson in Plubell and Ivey vs. MERCK 5-17-11 and 6-8-11.

109.    Thus according to him MERCK had a basis to warn of this risk at that time. I agree with Dr. Watson on this issue except for the fact that a listing in the adverse events section is not a warning or disclosure. A real disclosure goes in the warning section of the label not in Adverse Reactions Section which is a list of almost anything that happened to any patient in any trial irrespective of causation.

110.    MERCK updated the Vioxx label in October 1999 and May 2000 and they had the obligation to update the label at anytime for safety concerns.  They never did this adequately with respect to CV risk.

## VIGOR

111.    MERCK was aware that their study design posed a risk to patients. In a March 2000 email entitled "VIGOR results," Edward Scolnick, head of MRL, tells Deborah Shapiro, a MERCK employee and non-voting member of the VIGOR DSMB: "[D]eborah Thanks, and thanks for the call this morning. testing Vioxx 50 milligrams in RA patients with over half on steroids is one "h.." of a test for GI outcomes. I think it's like testing Mevacor for liver safety in patients with hepatitis. We will be fine / ed scolnick [sic]" Mevacor is a liver toxin and is lethal for patients with hepatitis. This is an analogy that reveals intent to injure patients in the VIGOR trial. It was never disclosed in any informed consent document or expressed in this form or anything close to this form to any IRB, FDA or anyone else.

112.    MERCK did not, and should have, disclosed to doctors that there were more deaths from GI bleeds in the Vioxx-treated group than the control group in VIGOR.

December 12, 2013

Page 19

(Wright JM. The double-edged sword of COX-2 selective NSAIDs. CMAJ 2002; 167(10):1131-1137.) While the data results show that Vioxx reduced the total number of GI bleeds, further analysis also reveals that the GI bleeds experienced on Vioxx led to more deaths because COS-2 is needed for GI healing. (FDA Div. of Anti-Inflammatory, **Analgesic and Ophthalmic Drug Products: Medical Officer Review, June 29 2000**) MERCK should have been forthright with this information by consistently disclosing it along with the former, more positive data in patient, physician and media and other communications.

113.    Dr. Scolnick's March 9, 2000 comments on VIGOR data, acknowledge that VIOXX induced CV events in the VIGOR trial. He noted that "[t]he CV events are clearly there.... It is a shame but it is a low incidence and it is mechanism based as we worried it was. Oates and Alan and Barry were right about the metabolite meanings, i.e., urine Pg [prostacyclin] data" (MRK-ABH0016219). In view of the concerns raised by consultants and within MERCK, a reasonable pharmaceutical company would have withdrawn Vioxx from the market after VIGOR was unblended. The risks outweighed the benefits. (MRK-ABH0016219). In view of the concerns raised by consultants and within MERCK, a reasonable pharmaceutical company would have withdrawn Vioxx from the market after VIGOR was unblinded. The risks outweighed the benefits.

114.    There is evidence that MERCK did not expect the MERCK appointed members of the Data Safety Monitoring Board (DSMB) for the VIGOR trial to complete its commitments in an unbiased manner. A 1999 email from Eric Mortensan, a clinical research director, stated: "The inclusion of a DSMB is always 50% scientific and 50% for appearances. There is a value to avoiding the appearance that we are hiding something...The group of statisticians, epidemiologists, gastroenterologists which John has worked with in the past have been very cooperative with the goal of completing studies and would not be anticipated to terminate the trial capriciously and thereby negatively affect out ability to obtain a label statement after three years of treatment..." (MRK-ABS0212130)

115.    In October of 2001, Dr. Marie Griffin, a member of the VIGOR GI Adjudication Committee, wrote to Dr. Goug Watson and expressed concern with continuing "to randomize patients at high-risk for gastrointestinal complications to chronic use of moderate or high doses of traditional NSAIDs without the addition of co-therapy (misoprostol, PPI, high does H2RA)." (MRK-ABT0013920) She went on to suggest that "it is time to urgently re-evaluate ongoing and planned clinical trials with regard to 'comparator drugs' for trial sof coxibs." MERCK should have disclosed this.

116.    Emails sent between MERCK Public Affairs executives and MRL researchers in March 2000, when VIGOR results were being released, demonstrate that both the company's scientific researchers and its public relations team were involved in misleading the public about the VIGOR results. In the first of a series of emails, Alise

December 12, 2013

Page 20

Reicin comments, "I do not think we should get into [CV event] rates and all – the data is preliminary. We can emphasize the rates look similar to our Phase III studies." In response, public affairs representative Dr. Larry Hirsh writes, "We all feel a little concerned about saying (if pressed) that any event rate, even in the Phase III OA studies, was 2%...The product circular indicates that cardiovascular events occurred in a much small proportion of patients – less than a fraction of a percent. We'd rather refer any questioner to the product labeling rather than say '2% of patients taking Vioxx had a CV event in Phase III'." (MRK-ABD0001986; MRK-ABD0001756) MERCK never disclosed that the label information on CV risk underestimated the true risk. This was intentional.

117.    Dr. Hirsch also edited a standby statement regarding "Vioxx and Cardiovascular Events in VIGOR". (MRK-ABD0001756; MRK-NJ0361687; MRK-NJ0281753) This standby statement came from the Public affairs department as is evidenced by the document. Dr. Hirsch suggested that when asked about the number of heart attacks and strokes in the VIGOR trial that "If pressed, may say something like, "less than 20?" Dr. Hirsch goes on to say that if asked if there was any difference in the overall mortality between the two treatments groups, "I'd say simply that it's too soon to speak to these details. If pressed, maybe we can say, "no." A further revision (version "6A") added to the mortality difference question includes, "Preliminary data suggest there was no difference in overall or cardiovascular mortality between the groups." (MRK-NJ0281753) The total number of events was much higher than 20. There were at least 24 MIs alone.

118.    It appears that Dr. Hirsch also changed the presentation of the results from "2-fold ~~increase~~" in events in patients taking Vioxx and instead replacing it with "decrease" in cardiovascular events in patients taking Naproxen. (MRK-NJ0361687) The later draft includes "There is an approximate 50% decrease in the risk of certain cardiovascular events, including myocardial infarctions and cerebrovascular events in these RA patients treated with naproxen 500 mg bid compared to VIOXX 50 mg." (MRK-NJ0281753) Dr. Hirsch suggested similar messages which were "better from a communications standpoint" for other public statements as well. (MRK-ACC0052545)

119.    MERCK wrote to the FDA on May 12, 2000, via FedEx. MERCK complained to the Division of Drug Marketing, Advertising and Communications (DDMAC) that Searle/Pfizer representatives were using marketing materials to misbrand VIOXX and CELEBREX. MERCK requested DDMAC take immediate action to halt Searle/Pfizer's activities. MERCK stated that by presenting VIGOR results for VIOXX only as a "statistically significant increase" in cardiovascular adverse events, Searle/Pfizer violated "201(n) of the Food, Drug and Cosmetic Act" by failing to reveal material facts, specifically that the significantly fewer heart attacks in patients taking naproxen were consistent with that drug's ability to block platelet aggregation so that the results of VIGOR do no indicate any increase in cardiovascular adverse reaction due to VIOXX.

December 12, 2013

Page 21

      MERCK contended that Searle/Pfizer violated the law since, even if they choose not to accept this rationale; there were required to at least acknowledge it. MERCK repeatedly asserted that the results of VIGOR were due to Naproxen's cardioprotective effects; MERCK created billions of media impressions conveying this message without acknowledging another interpretation of the VIGOR study – that VIOXX causes heart attacks. (MRK-ABI0002226; Deposition of Jan Weiner 102:18 to 107:21; 140:23 to 141:6; 154:24 to 155:15; 668:7 to 669:19)

120.      In a 2001 warning letter to MERCK CEO Raymond Gilmartin, the FDA objected to the use of this theory in a MERCK marketing materials and a press release proclaiming "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx." (MRK-ABI0001969) The warning letter reads: "…you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties." (Warning Letter from Thomas Abrams, FDA to Raymond Gilmartin, Re: NDA21-042 Vioxx (rofecoxib) tablets MACMIS ID#9456 Sent 17, 2001)

121.      After the VIGOR trial the FDA proposed label changes that would have emphasized the CV risks of Vioxx and placed them in the warnings section of the label. MERCK engaged in fierce negotiations with the FDA over the language and location of that language in the label. The negotiations alone delayed the label change for more than a year. (See below and attached Table 1) MERCK should have disclosed all the initial FDA recommendations and excluded the 078 CV data which was incomplete. The publication of the 078 CV data was the first and only time the FDA ever allowed interim study data to be used to give information on indicating that a drug was safe with respect to any potential adverse health effect.

122.      Attached in Table 1 is a listing of label suggestions by the FDA and MERCK's subsequent response to their suggestions along with the final label is also included.

123.      MERCK offered employment to Peter Honig, a senior FDA official, in December of 2001. (Honig Exhibit 2 Curriculum Vitae MRK-ACM0010245 TO 10251; Deposition of Peter Honig 55:25 to 56:17) Thereafter Honig participated in label discussions regarding Vioxx while still employed by FDA. (Honig deposition) Honig left the FDA and joined MERCK in early 2002. By April of 2002, MERCK had the label it wanted from FDA – a label that did not include the Cardiovascular Warning that FDA had originally proposed. (Deposition of Peter Honig 66:9 to 95:20)

124.      Internal MERCK emails make it clear that MERCK senior officials, in particular Ed Scolnick, President of MRL, had very low regard for the FDA. (MRK-GUE0008582 April 22 1999 Scolnick nearly strangled the FDA statistician and her supervisor; MRK-ABH0015578 May 14, 1999 Scolnick calls FDA dysfunctional; MRK-ACR0009151 April 4 2011 Scolnick says FDA review system is an anachronism, they cannot keep up

December 12, 2013

Page 22

with science given their hiring constraints, I will go see Janet and go beyond if I need to with contacts, I have never seen being nice to the FDA except on rare occasions pay off; MRK-ACT0018064 April 8, 2001 Scolnick says You made them look like grade d high school students and you won big huge and completely; MRK-ABW0004799 October 16, 2001 Anstice says FDA label is ugly, Scolnick replies it is ugly cubed, thye [sic] are bastards; MRK-ACR0009287 November 8 2001 Scolnick says I will not sign off on any label that had a cardiac warning, I am willing if needed to spend several hours one on one with anyone at the FDA going through the data until they in fact get it; MRK-ABI0005912 December 5 2001 Scolnick says he will boil [stover] in oil if he is at meeting; MRK-NJ0443267 Kim says the FDA reader is overworked, underpaid and short on time;) MERCK should have disclosed their position with respect to the FDA's ability to safeguard public health; instead, MERCK has defended its actions by claiming that the FDA approved these actions. However at the same time they believed that the FDA was incompetent and that MERCK could and did bully the FDA to accept MERCK's position on a variety of topics not limited to Vioxx. It is wrong and inappropriate to rely on an agency which they believed was incompetent and which they successfully bullied. MERCK's arguments are contradictory. As I told Mr. Ismail at my deposition, had MERCK complied with the FDA's initial post VIGOR warning, I would have few problems with the post VIGOR label. "In general, although I would not use MERCK's strong language I agree with the sense of MERCK's evaluation of the competence of the FDA. The FDA was not up to the task of dealing with MERCK in a way that protected public health. In addition FDA policies that permitted Dr. Honig to continue to supervise FDA decisions on Merck drugs while he was negotiating an employment contract with MERCK gives the impression that the review process was tainted."

125.     While the approved label in April of 2002 included some information from the VIGOR data on cardiovascular risk, edema and hypertension, and renal effects, the FDA did not require the new language to be placed in the "Warnings" section of the label; instead, it was placed under "Precautions," an important distinction in view of the differing weight with which physicians may consider the two sections. MERCK valued the difference in billions of dollars of lost sales which equated to lost lives. (2001 Long Range Operating Plan, MRK ABI0008659-8683)   In an internal document explaining how employees should respond to the media regarding the label change in April 2002, it carefully emphasized the distinction: "The new cardiovascular language in our label is not a 'warning;' it is a precaution. A warning is intended to describe serious adverse reactions and potential safety hazards. A precaution describes 'any special care to be exercised by the practitioner for the safe and effective use of the product.'"

126.     MERCK published the VIGOR results in the New England Journal of Medicine. MERCK ordered 900,000 reprints of the article, at a cost of millions of dollars, and sent the reprints to physicians in the United States. MERCK did not purchase reprints of the New England Journal of Medicine's Expression of Concern, nor of the Expression of Concern Reaffirmed, nor of the correction to the erroneous 18 month risk analysis

December 12, 2013

Page 23

suggested in MERCK's publication of the APPROVe study results, nor of the analysis of long term risk to study subjects in the APPROVe study published by the non-MERCK authors in 2008. All these should have been disclosed in the same manner MERCK disclosed other misleading data that helped sales.

127.     In footage from the video news release, Dr. Loren Laine, an author of the VIGOR paper expressed how in the paper they "were cagey" about the renal findings of the study: Interviewer: What were the renal findings in the study? Dr. Laine: Well, umm, that's actually not going to be, I mean the only thing that's in the New England journal article, says there's no difference in renal failure, or renal dysfunction. So I don't think you really want to go there, do you? Because, there are no data on blood pressure or hypert-excuse me, blood pressure or edema in the study. And the only thing it says specifically, **and we were cagey about this**, was related to renal failure, renal dysfunction. And that's not what you're looking at, so, I mean I would actually take that out, because I think you don't, no I mean I would just suggest that anything you do, just as an aside, I'm gonna talk to Alise in about an hour, but you don't wanna talk about that because if you start bringing up hypertension [and] edema it's nowhere in the study, so if you bring it up it's no     what's     in     the     article."     [Emphasis     added] (http://www.fda.gov/ohrms/dockets/ac/07/slides/2007-4290oph1-01-Egilman.ppt)

128.     MERCK strategically manipulated data to give MI data the "best face" possible. (MRK-AAC0128698) The common methodology for calculating all comparison rates consisted of patient-years as the denominator. Interestingly, mortality and MI rates were calculate differently. Analyzing the methodology for these two events, MI and mortality, it is evident that MERCK used the number of patients as the denominator for calculating these rates.

129.     MERCK chose a confusing method to present MI risk data from VIGOR. Ironically, all other rates were in person-years and actual numbers were provided. Thomas Capizzi, a MERCK statistician, who reviewed the VIGOR paper noted this issue and commented, "Should you not mention that for general safety analyses CL's on absolute differences rather than proportional differences were used to look for potential factors – the authors should be prepared to respond to referee queries on why relative risk estimates are being used for GI events but risk differences are being used for the cv comparisons. [sic]" (MRK-AAB0109420)

130.     In a Vioxx draft discussing the comparability of mortality and deaths due to GI events and cardiovascular causes, it stated "Overall mortality, as well as deaths due to GI events and cardiovascular causes were comparable in the 2 treatment groups. A significantly lower incidence of myocardial infarction was noted with naproxen as compared to rofecoxib: 0.1% vs. 0.4%. This absolute (I'm unconvinced that there are differences in relative risk) difference, as one might expect, was primarily accounted for by the 4% of the study population with the highest risk of an MI ie a past history of MI,

unstable, angina, stroke, TIA, angioplasty or CABG (in whom low-dose aspirin is indicated according to the U.S. product circular for aspirin). The difference in myocardial infarctions was much less pronounced and not significant (give me a break one barely has enough power (with just 21 events) to detect an overall difference with events so you probably have high 'power' to see a nonsignificant result in the low risk group when you break up the overall results into a high risk and low risk between rofecoxib and naproxen in the 96% of the population without indications for aspirin as secondary prophylaxis." (MRK-AAB0109428)

131.     Dr. Topol sent a draft publication on Vioxx toxicity to MERCK for comment. In it he presented the cardiovascular data as follows: "The results of the event-free survival analysis on the 66 cases showed that the relative risk of developing a cardiovascular event in rofecoxib treatment arm was 2.37 (1.39 – 4.06), p= .0016." (MRK-AAZ00015620) Dr. Reicin commented, "we prefer to flip the data and say it was reduced on naproxen." (MRK-AAZ0001569) Hui Quan, a senior MERCK statistician, explained that consistency in presentation of results is usually preferred and he described switching methodology as confusing. (Deposition of Dr. Hui Quan 2006 March 14.)

## Alzheimers

132.     On February 27, 2001, Dr. Scott Reines, head of the clinical neuroscience department, told top MERCK executives that the first Alzheimer's treatment trial, Protocol 091, showed no beneficial effect. (MRK-ACR0014272) At the time, Reines noted, "these data are confidential and will not be disclosed to the Project Team until we've decided on a course of action." (MRK-ACR00142720) By mid-March, MERCK's statistician, Frank Liu, had sent e-mails to upper management that revealed the death excess in Vioxx-treated AD study patients. (MRK-NJ0333224) This should have been disclosed in the warnings section of the label at this time.

133.     Dr. Gil Block informed Ed Scolnick, president of MERCK Research laboratories, of "an imbalance in the number of deaths observed, with more deaths occurring in the Vioxx group compared to the placebo group." (MRK-NJ0333224) The tables attached to his memo showed a statistically significant increase in deaths based on Intent-to-Treat (P 0.012) but just borderline On-Drug (P = 0.063). (MRK-NJ0333225) In addition, there were 6 CV-related deaths in the Vioxx group compared to 2 on placebo. (MRK-NJ0333225) Although Dr. Reines reported that Scolnick had already been informed, Scolnick expressed anger that he "was the last to know." (MRK-NJ0333224) Dr. Doug Greene, from the Clinical Scientific and Product Development department, attempted to reassure Dr. Scolnick that a plan was being formulated. (MRK-ACR0014502) Dr. Greene also told Scolnick that he and Dr. Alan Nies, the project manager for the Vioxx program,

wanted to look at more data, and were considering partially un-blinding 078 to check for an excess of deaths in that trial as well. (MRK-ACR0014502)

134.     Dr. Greene stated that he "expects" that MERCK would inform the FDA of the excess of deaths in Vioxx treated patients. (MRK-ACR0014502) Greene considered the impact of disclosure upon labeling negotiations, expressing the hope that the finding was, "truly a statistical fluke," which "may fade as we get more data." (MRK-ACR0014502) Approximately two weeks later, during the April 8th label negotiation meeting with the FDA, MERCK did not mention the Alzheimer's data despite Greene's attendance at this meeting. (MRK-NJ0155799) MERCK should have disclosed this to *everyone* especially the IRBs involved and the patients and their guardians

135.     On April 8, 2001, MERCK statistician, Joshua Chen, completed and distributed two extensive analyses of mortality. The first focused on the recently un-blinded, but still ongoing Protocol 078. This first analysis revealed the same results as seen in Protocol 091, a more than two-fold risk of death (21 vs. 9). The difference was statistically significant (P=0.015). (MRK-AAX0000752) The second was a combined analysis of 078 and 091, which showed that, when the intention to treat (ITT) analysis was completed, the negative outcomes of patients on Vioxx were even worse than Dr. Block's preliminary figures had suggested; in the ITT population, the difference was 13 deaths on Vioxx compared to 3 deaths on placebo. "The log rank comparison between MK-0966 [Vioxx] and Placebo indicates that survival was worse for patients receiving MK-0966 in Protocol 091 (p=0.010) and in Protocol 078 (p=0.015)."(MRK-AAX0000752) The risks of Vioxx continued to be shown to outweigh the benefits, and in view of the availability of other medicines for pain relief, a reasonable pharmaceutical company would have withdrawn Vioxx from the market.

136.     MERCK's AD Study 078 was an adequately powered, long term placebo controlled study, to detect prevention of AD in patients with Mild Cognitive Impairment (MCI.) (Assaid Exhibit 21, MRK-AHD0101257) The primary endpoint in Study 078 was clinically diagnosed Alzheimer's Disease, and MERCK designed an Adjudication Procedure to confirm that the diagnoses of AD were accurate; the Investigators considered a number of measures to diagnose AD. (Deposition of Christopher Lines, 39:12 to 40:11, 43:6 to 48:3; Lines Exhibit 7 MRK-AFW0010466) MERCK recognized that adjudication of AD is highly reliable. (Deposition of Christopher Lines, 67:4 to 69:6; Lines Exhibit 9 MRK-ARP0067555; Lines Exhibit 11 MRK-AFJ0003563 Salmon et al cite) Study 078 was a two tailed analysis, designed by MERCK to detect increased AD in either arm of the Study (placebo arm or Vioxx arm.) (Deposition of Scott Reines, 23:24

December 12, 2013

Page 26

> to 25:18, Thal et al.s Neuropsycholpharmacology (2005), 1-12) MERCK designed Study 078 to detect a 33% reduction in AD on Vioxx. (078 Study Protocol and Amendments MRK-0140029802 to 0140030008) MERCK conducted the Study according to Good Clincal Practices, which are designed to protect the safety of the patients enrolled by the sponsor in a Clinical Trial. (See, e.g., Deposition of Scott Reines, 61:18 to 62:1)

137.     Study 078 reached a statistically significant increase by 1999 for patients in the Vioxx arm on the primary endpoint, clinically diagnosed Alzheimer's Disease (Analysis of SAS Data by Dr. David Madigan). The risks of AD and dementia were permanently significant by December 1999, meaning they were unlikely to be due to chance. In Study 078 Vioxx caused a 46% increase in AD in less compliant patient, and a 72% increased risk in patients taking more of the study medication. (Email Assaid MRK-AHD0055888; MRK-AHD0055888 at 6019-6020) MERCK failed to report the early significance of the risks of dementia and AD, and the dose response data consistent with causation of clinically diagnosed AD, in the two published papers MERCK sponsored for Study 078. (Thal et als Neuropsychopharmacology (2005), 1-12; Aisen et als Current Alzheimer Research, 2008, 5, 73-82)

138.     This was not a surprising development. MERCK predicted the possibility in the design of the study by including a two tailed analysis. Deposition of Scott Reines, 54:19 to 55:21. O'Banion addressed the potential that Vioxx causes dementia by several possible mechanisms, including deposition of amyloid beta plaque, a factor known to be associated with AD since at least 1991. (O'Banion, Exp.Opin.Invest.Drugs 1999 8(10) 1521 at 1530, and references cited therein) These were red flags that required vigilance by MERCK, consistent with MERCK's responsibility to protect the study volunteers under the principles of Good Clinical Practice.

139.     MERCK continued to administer Vioxx to the elderly volunteers in the Study after the risk of AD was established; thereby harming patients on Vioxx without telling them, their doctors, the signers of the IC forms, or the IRBs that Vioxx caused AD and dementia. Conversely, MERCK persuaded study volunteers to continue to take Vioxx – even after the risks of AD and dementia were significant – enrolling them in a program called VIP which enabled study subjects to win prizes by staying in the study. (See eg. MRK-AFW0011197; MRK-AFW0011190; MRK-NJ0254099; MRK-ARP0129937 at 9988 where MERCK compares the VIP program to a "comparable American Express program."

140.     MERCK failed to revise the Informed Consent in Study 078. MERCK did not WARN the elderly patients, their doctors, or the IRBs of the risk of AD on Vioxx.

December 12, 2013

Page 27

MERCK never advised the families of the study volunteers who were injured in the study that they were entitled to compensation. MERCK's failure to protect the patients in Study 078 violated Good Clinical Practices which MERCK advised the doctors in the study governed the conduct of the company. (Deposition of Gilbert Block, 116:19 to 23, 118:16 to 119:20, Block Exhibit 9 MRK-AHD0001996 AT 2400-03) The law required MERCK to revise the Informed Consent in Study 078. (21 CFR 46, 46.102(e), 46.109, 46.116.)

141.     MERCK was required to report to the FDA data analyses from any ongoing clinical study that raised safety concerns. (CFR 314.32; CFR 314.56.) MERCK failed to do so.

142.     On May 8, 1998, a few weeks after MERCK enrolled the first patients, MERCK eliminated all external data monitoring committees, that had had sole control over the study data and sole responsibility to monitor safety data in the study; MERCK's cover letter to the FDA enclosing this change to the Protocol did not mention this change. (MRK-I2690000512; MRK-I2690000517) MERCK's senior clinical committee, called CDOC/CRRC, was designed within MERCK as the entity which decided whether MERCK Clinical Studies required a Data and Safety Monitoring Board (DSMB) to protect the safety of study volunteers. Deposition of Scott Reines, 171:1 to 8; Reines Exhibit 11, MERCK MAPP MRK-AFK0047772) The MERCK CDOC required a DSMB in Study 078 (Deposition of Scott Reines, pages 222 to 265; Reines Exhibits 16 through 21; MRK-ABP0003541, MRK-ABP0003859, MRK-AHF0072575, MRK-ABP0008950, MRK-ABK0329511, MRK-ABP0018562) but the company eliminated the DSMB before it was ever established.

143.     MERCK sent a letter to an IRB dated April 16, 1998, with a summary of changes to the Protocol for Study 078. (Block Exhibit 30, MRK-ARP0034606) which states "Please note that none of these changes affect safety monitoring or Informed Consent Aspects of the trial" and fails to advise the IRB that the Monitoring Committees had been deleted from the Protocol MERCK sent the IRBs a "protocol amendment" that stated that "The amendment addresses mainly procedural aspects of the study it does not affect the body of the consent form. However, please note that the protocol amendment number is 078-01 and the title of the protocol had been revised."(MRK-ARP0022841) MERCK sent the FDA a cover letter to the "protocol amendment" that stated, "The protocol title has been changed to, 'MK-0966 for the Treatment of Mild Cognitive Impairment and Prevention of Conversion to Alzheimer's Disease.' In addition, the interim data analysis has been deleted; the sequence of test administration at the In-Clinic Screening visit has

December 12, 2013

Page 28

been altered; treatment allocation will now be stratified according to the patient's Mini Mental State Examination score; and miscellaneous minor procedural changes and points of clarification have been made. (MRK-I26900000512) However the "amendment" included more than one dozen changes and a careful tracing of the line and page changes indicates that the revised protocol had eliminated the DSMB including the language above. MERCK did not explain the actual implication of the deletions nor did they provide any justification for the removal of the DSMB from the study.

144.    There is reason to believe that marketing influenced the decisions about the safety of patients in Protocol 078.   MERCK originally described 078 as a study of "***The Safety and*** Efficacy of MK-966 for the Prevention of Alzheimer's Disease in Patients at Risk." [Emphasis added]   MERCK's marketing division recommended that "safety" be deleted from the study title and the revised protocol followed this recommendation.(MRK-APE0022197)

145.    On April 19, 2001, an "urgent" teleconference was held by a group of MERCK officials, including Drs. Goldmann, Block, Gertz, Reines, Greene, and Reicin.(MRK-AFT005926) The meeting agenda was titled, "Need to Set Up a DSMB for Protocol # 078- VIOXX AD Prevention Study."[56] MERCK staff discussed whether or not they should establish an internal DSMB. Dr. Bonnie Goldmann, Senior Director of Regulatory Affairs, took handwritten notes on the meeting agenda. This is the only known document that we have located that discusses the outcome of this "urgent meeting" concerning research subject safety.  Goldmann's notes read: "I attended this meeting. Decision was that since we don't think there is a problem re imbalance, study is too far along. Original Group that has monitored to answer ? Klaus, Scott and Ray will monitor periodically." (MRK-AFT0005926) This never happened nor was any of this disclosed. (http://online.wsj.com/publich/resources/documents/MERCK-report-20060906.pdf)

146.    After VIGOR was unblinded in March 2000, MERCK unblinded the ongoing Alzheimer's studies multiple times. MERCK conducted three separate unplanned interim analyses of unblinded data from the ongoing Alzheimer's Studies in March 2000, September 2000, March 2001; MERCK personnel understood that unblinding ongoing data creates bias in the interpretation and reporting of the data, which is why corporate policy advised against unblinding ongoing studies. (Deposition of Gilbert Block, 125:1 to 133:6, Block Exhibit 10 MERCK MAPP MRK-AAU0000001-28; Nessly to others, MRK-AFV0297727; Reines to others MRK-NJ0136865)   MERCK represented in the medical literature that the Alzheimer's Studies were double blinded. These representations were false.

December 12, 2013

Page 29

147.     These unplanned, interim unblindings of the Alzheimers trials was not for the safety of any patient in the study, but rather for the data to support MERCK's "naproxen theory" and to save Vioxx while at the same time putting thousands of trail participants at risk of AD and CV events  (Deposition of Gilbert Block, 135:2 to 136:22, 147:12 to 19, 151:8 to 14)  MERCK ultimately persuaded the FDA to permit the inclusion of interim data from the Alzheimer's Studies, including the ongoing Study 078, in the revised label for VIOXX.

148.     MERCK also sought to strip the hypertension data from the Alzheimer's Studies to defend the drug at the February 2001 Advisory Committee Meeting. (Reines Exhibit 23 MRK-AQI0008457; Deposition of Scott Reines 305:8 to 307:9) This information should have been disclosed.

149.     After Protocol 091 was unblinded in 2001, MERCK terminated Protocol 126. Though it was a "long shot" that any benefit would be proven in Protocol 078, MERCK continued the study to collect the placebo long-term safety data as an upside to the company. (Reines Exhibit 24 emails February 2001, MRK-ACR0014270)  In August of 2001, in response to a suggestion that Study 078 be discontinued since MERCK already had enough CV data, Barry Gertz wrote that he was "reluctant to stop it early as this is the best placebo controlled data for the CV analysis that we have and in the end game I believe that the success of Vioxx will ultimately (sic) depend on such data. We need as much of it as we can possibly get...I still favor squeezing the most out of it as possible for the placebo data and CV." Gertz suggested that if necessary a financial analysis could be done to justify continuing the Study 078.  (Reines Exhibit 25 emails August 2001 MRK-AGU0006994)  At the time this email was written, the risks of Cardiovascular Mortality, All Cause Mortality, Alzheimer 's disease and Dementia were all statistically significant against VIOXX.  This decision favored financial considerations over the safety of human beings volunteering to take VIOXX. The study should have been stopped after 4 months. The study should have been stopped after Vioxx arm patients had a doubling of the all-cause mortality rate, which was statistically significant by August 24, 2000.

150.     On July 17, 2001, MERCK filed a Safety Update Report (SUR) with the FDA that contained false and misleading statements: "The 3 placebo-controlled studies in Alzheimer's Disease and Mild Cognitive Impairment (MCI) (Protocols 078, 091 and 126) document that the profile of serious clinical adverse experiences with rofecoxib is generally similar to that of placebo in a large cohort of patients, most of whom were older than 65 years of age.(MRK-01420145856)   Under the "key findings" MERCK noted: "The cumulative safety data available through 16-Mar-2001 are consistent with the

December 12, 2013

Page 30

originally reported safety profile....".(MRK-01420145856)  This is not a true statement. MERCK should have disclosed the truth: VIOXX was killing the patients.

151.      Even after the Alzheimer data was submitted to the FDA for use in the label, MERCK was aware of additional events which had occurred in the Alzheimer trials which should have been included in the safety update but MERCK did not supply these to the FDA at the time. On December 7, 2001, Dr. Dena Ramey, a MERCK epidemiologist, informed management that 41 additional CV/T events and deaths had occurred in trial 078 since data had last been submitted to the FDA. Four additional events had occurred in trial 126, which had already been stopped. (MRK-ABY0052349) On December 18, 2001, Robert Silverman, Senior Director of Regulatory Affairs, who was in charge of FDA-MERCK communications, informed MERCK personnel that this new information would not be reported to the FDA. He told MERCK personnel to cease e-mail communications and only communicate via voice mails: Note, this MVX [voice mail] is being sent privately in order to minimize unnecessary dissemination. If anyone would like to discuss this further, please call me directly and I would discourage any further email discourse on the issue."(MRK-ACD0118967)

152.      The same day, December 7, 2001, MERCK received FDA requests for information. The first request indicates that the FDA assumed the DSMB had never been deleted from the protocol and asked MERCK to address the excess of deaths in the AD trials.(MRK-AOJ00058560)

153.      MERCK's response written by Dr. Silverman on December 18, 2001, did not include information previously discussed internally at MERCK including 35 CV/T events and 13 deaths that had had not been included in the July SUR. Instead, MERCK informed the FDA that the 078 protocol did not include a DSMB and dismissed concerns about the deaths.[54] The company re-reported the death data, using a cut off of March 15, 2001, and included further updates on the deaths in all three studies. MERCK told the FDA that the statistically significant difference in deaths based on the March 2001 "are most consistent with chance fluctuations."[54] Silverman told the FDA, "Mortality in the Alzheimer's disease program was fully discussed in recent responses."(MRK-AOJ0005856) Silverman further claimed, "In fact, if there is any trend in the data on cardiovascular events, it is in favor of rofecoxib over placebo." (MRK-AOJ0005856) This shows an active effort not to comply with FDA requests for information.

154.      The FDA approved a new Vioxx label for MERCK in April 2002 with the on-drug cardiovascular death rate of 8/3 from the Alzheimers trials 091 and 078. The ITT

December 12, 2013

Page 31

cardiovascular deaths at this time was 17 in the Vioxx arm and 5 in placebo.[1] The AD conversion data in 078 was 107 conversions for Vioxx versus 82 in placebo.(MRK-I8940079159) MERCK never included these AD data in the product label. The final April 2002, approved label thus included Alzheimer's CV/T and mortality data that was more than one year old. The Alzheimer's data, as presented in the label, undermined the cardiovascular risk information from the VIGOR trial and falsely reassured physicians about the hazards of Vioxx.

155.     MERCK finally terminated 078 in October 2002, several months after gaining approval for the Precaution label, and admitted one reason for termination was the fact that there was "[l]imited ability of the trial [078] to provide additional safety data" (MRK-ABY0079740)

156.     MERCK submitted a DATA ANALYSIS PLAN (DAP) to FDA in December 2002/January 2003. (Deposition of Scott Reines 20; 2 to 18; Reines Exhibit 3 Statistical Data Analysis Plan dated November 25, 2002 MRK-AFV0043960; Reines Exhibit 4 letter MERCK to FDA dated January 7, 2003 MRK-AFV0043956.)

157.     The first report of the Efficacy data from Study 078 was prepared by MERCK biometrician Christopher Assaid and reported in a Memo dated June 12, 2003. (Deposition of Christopher Assaid 124:15 to 125:6; Assaid Exhibit 2 MRK-ARP0137370) The Data Analysis Plan (DAP) guided the statistical analysis of data from Study 078. (Deposition of Scott Reines 44:17 to 45:12) The DAP prespecified a Primary Analysis of Clinically Diagnosed Alzheimer's Disease; three Supportive Analyses, including Dementia; and several Other Analyses. (Deposition of Scott Reinses 43:17 to 44:7) There were no Secondary endpoints specified in the DAP. Deposition of Scott Reines 44:8 to 15)

158.     Assaid reported a statistically significant risk of the Primary Ansalysis.  (Assaid Exhibit 2, MRK-ARP0137370).  Assaid reported statistically significant risks on the Supportive Analysis (Assaid Exhibit 2, MRK-ARP0137370; Deposition of Scott Reines 87:7 to 88:23. MERCK's DAP states that "In order to evaluate the robustness of the findings from the primary efficacy analysis, the following supportive analyses will be performed." (DAP)  Through the Supportive Analyses were all significantly against Vioxx, none were reported in the medical literature published by MERCK in 2005 and 2008 (Thal, Aisen) MERCK also prespecified several other analyses in the DAP, which

---

[1] **Analysis of Dr. Madigan**

December 12, 2013

Page 32

all either trended against Vioxx or were Neutral and failed to show any beneficial treatment effect." (eg Deposition of Scott Reines 74:13 to 24; 76:3 to 22.)

159.    MERCK first submitted efficacy data to the FDA by cover of letters dated July 29, 2003. (MRK-I2220004818) five years after the Study began in April 1998, and almost four years after the risk of AD to patients on Vioxx became permanently statistically significant. MERCK stated to the FDA "the unexpected difference for rofecoxib compared to placebo was not confirmed by the secondary measures which found no statistically significant or clinically meaningful differences between treatment groups." This statement by MERCK to FDA was false. MERCK should have disclosed the truth.

160.    MERCK included a Dose Response analysis in early drafts of the published Paper describing the results of Study 078, arguing that the Dose Response data supported MERCK's effort to discredit the results of the Study:   "Since the above analyses all included patients whether or not they were taking study medication, we also performed a post hoc analysis excluding subjects who were less than 80% compliant with taking treatment, as well as those who were protocol violators, in order to determine whether the effect of rofecoxib was increased in this group with greater time-adjusted exposure to rofecoxib (as would be expected if the primary findings represented a true effect of rofecoxib). There was no evidence for an increased effect of rofecoxib in this analysis (hazard ratio = 1.45, P =0.052)." (Assaid Exhibit 5 MRK-AFV0431065)

161.    In November 2003 the MERCK biometrician Christopher Assaid discovers and reports his programming error on the compliance analysis.   (Email Assaid MRK-AHD0055888; MRK-AHD0055888 AT 6019-6020)  In his corrected analysis, Assaid finds that the hazard ratio in compliant patients does increase, from 1.46 to 1.72 (p=0.002).  Thereafter, beginning in December 2003, the drafts of the 078 paper delete the dose response data MERCK thought were favorable prior to discovery of the programming error. (eg MRK-AHD0022761)  The analysis of the dose response data never appeared in the published papers by MERCK authors, or in any reglulatory submission to FDA. (Thal, Aisen) Assaid indicated in an email that these data "dropped out" of MERCK's interactions with FDA surrounding the efficacy issues raised by the results of 078. (Assaid Exhibit 17, Email February 1 2005 MRK-ARP0105927)

162.    The published version of Protocol 078 was ghostwritten having been initially drafted by Chris Lines.  Initial draft included "External author?" as the lead author. (MRK-AFV0431065) In internal MERCK emails, which discuss where the paper should

December 12, 2013

Page 33

be published, Eric Yuen, from the clinical research departments emails Chris lines saying, "I think you should be the first author since you have done virtually all of the writing." (MRK-AAC0139936) Later Dr. Larry Hirsch writes that it "would certainly be preferable if we had an external lead on this — like it or not, it will be received more credibly than with all MERCK (or lead MERCK authors." MRK-AHD0057217)  The paper would eventually list Dr. Leon Thal, a non-MERCK employee as lead author. I have never met or heard of anyone who identifies him or herself as "External author?" Authors of papers should participate in writing the paper before it is drafted and should participate in all major decisions relating to the information that is in the published paper and should have access to all data.  With respect to VIOXX it appears that MERCK did not follow this procedure.  (See for example Lisse quotes to the New York Times regarding Advantage, Laine's letter to the NEJM concerning VIGOr and "External author" for 078.) MERCK should have described the real publication process in its papers. Had MERCK disclosed to the journals that published these ghostwritten papers that the papers were written absent authors' knowledge of the data, and that the papers were ghostwritten, they never would have been published.

163.    MERCK submitted the Clinical Study Report for Study 078 on December 17 2003, along with Combined Safety Report on combined data from Studies 078 and 091. (MRK-I2690008225, MRK-I2690008230, MRK-I2690008544).  MERCK stated in the cover letter that: "Overall, the final analyses do not substantively differ from the preliminary analyses", referring to the July 29, 2003 filing.  MERCK continued to misrepresent the efficacy data from Study 078 by adopting the representations about those data contained in the July 2003 submission.

164.    In March 2004 MERCK submitted a request for label change without CV ITT DEATH data or AD Efficacy data on Vioxx. (MRK-N0520018536)

165.    FDA representative Melanie Grifis called MERCK in February 2004 requesting track changes from the July 2003 MERCK Preliminary Report to the December 2003 Clinical Study Report.  (Assaid Exhibit 3 emails February 2004 MRK-AAD0384813) MERCK submitted these track changes with a cover letter dated March 12, 2004, in which MERCK continues to assert that there were no significant changes to the July 2003 submission, confirming again the statements that there were no secondary measures confirming the result of Study 078 on the primary endpoint of Clinically Diagnosed Alzheimer's Disease. (MERCK letter to FDA MRK-AAF0015398)

December 12, 2013

Page 34

166.     MERCK was to meet with FDA on September 27, 2004 to review the efficacy data from Study 078. Internal MERCK emails discuss the meeting and how to prepare, including concerns about whether FDA will ask about deposition of amyloid beta plaque due to effects of Vioxx. MERCK personnel recognize they have no data on the subject, that Cox inhibition in the setting of brain injury may exacerbate disease, and decide not to address the issue unless asked. (Lines Exhibits 18, 19 and 20; MRK-AHD0069267, MRK-AHD0069241, MRK-AHD0069615)

167.     On September 23 2004 MERCK submitted its Final Study 078 Efficacy Powerpoint to FDA, which omitted Supportive Analyses, Dose Response Data, and peer reviewed literature in support of the results of the primary analysis of data in Study 078. (Lines Exhibits 21 and 22, MRK-AAF0017362, MRK-AAF0017366) On September 27, 2004, on the day of the scheduled meeting with FDA, Ned Braunstein of MERCK Regulatory called the FDA to cancel the meeting because MERCK personnel involved in the meeting needed to stay on-site to work through the implications of the decision to stop the APPROVe Study. (MRK-AAF0017452)

168.     The FDA Medical Review Officer, Ranjit Mani, MD issued his report on the Efficacy Data in Study 078 on October 8, 2004, after Vioxx was off the market, and concluded that "the results of the primary efficacy analysis remain worthy of serious consideration, as they strongly suggest that administering Vioxx to patients with Mild Cognitive Impairment could be associated with an adverse outcome." (Assaid Exhibit 18 Mani Review 10-8-04 FDACDER 003071 to 003112)

169.     In November of 2004, Assaid completed an analysis of confirmed thrombotic CV events in the Alzheimers studies (078 and 091) "by whether they had any systolic BP >160 mmHg during the study." He concluded via email "that once a patient has a (drug-induced) elevation in SBP [systolic blood pressure], regardless of subsequent fluctuations, the risk of a thrombotic event for that patient has irreversibly increased." (MRK-AFO0276159 at 64) Quan reached a similar conclusion in his analysis of the APPROVe data. (Quan Exhibit 51 MRK-AGO0074482; Quan Exhibit 52 MRK-AGO0074485; Quan Memo October 7 2004 MRK-AFO0280964)

170.     Alzheimer's disease is an irreversible, progressive brain disease that slowly destroys memory and thinking skills and eventually, even the ability to carry out the simplest of daily tasks. It is the most common cause of dementia among older people. (Alzheimer's Disease, NIH Publication NO. 11-6423, July 2011 (Reprinted September 2012)) There is currently no cure for Alzheimer's disease; however, some medications

December 12, 2013

Page 35

may lessen or improve certain dementia symptoms for a period of time. Discrete changes throughout the brain are associated with the progression of Alzheimer's including the formation of abnormal deposits of protein fragments known as beta-amylod plaques; neurofibrillary tangles, made up of twisted tau proteins; and brain nerve cell, or neuron, damage and death. Over time, the brain of a person suffering from Alzheimer's undergoes extensive nerve cell death and tissue loss. In the final states of the disease, the brain shrinks and shrivels, and nearly all of the brain's functions are affected. (Alzheimer's Disease, NIH Publication No. 11-6423, July 2011 (Reprinted September 2012) 1-2)

171.     MERCK rushed to initiate a clinical program that would include both Alzheimer's treatment and prevention studies.     On February 3, 1998, Niklas Prager, MERCK Worldwide Human Health Marketing, issued an internall report to substantiate the company's interest in the development of Vioxx for an Alzheimer's indication.  At that time, a full fifteen months before the approval of the original Vioxx NDA, the Merck marketing group recommended "a rapid initiation of the proposed clinical research program for Vioxx in Alzheimer's Disease, designed to support a filing in 4Q/01 for both prevention and treatment of Alzheimer's Disease."  The report provides the financial incentive for rapidly pursuing an Alzheimer's indication stating that third year worldwide sales were estimated to reach $1.1 billion, increasing to $1.6 billion by the fifth year of marketing.  The report also states that: Alzheimer's is the fourth most common cause of death worldwide, an estimated 4 million Americans suffer from Alzheimer's, and that more than an estimated 100 million people will suffer from the illness by the mid-21[st] century. Chronic Vioxx use targeting the elderly was identified as a potential market, and Merck noted that "since chronic use and age are also major risk factors for NSAID type gastropathy, a drug with comparable efficacy but a superior GI side effect profile, like VIOXX, should be preferred in these patients over conventional NSAIDS. The marketing report also addresses a "Preliminary Outcomes Research Strategy."  Acknowledging the financial burden of Alzheimer's in this country, the report quotes Alzheimer's Association figures that the disease costs US society $80 – 100 billion per year, and that it is the third most expensive disease, following heart disease and cancer. Finally, the report acknowledges that in light of escalating healthcare costs, governments and other third-party payers are requiring outcomes information to make formulary and reimbursement decisions. (Block Exhibit14  MRK-ABS0294660)

172.     Aisen et al reported a trend against Vioxx on effect on cognitive function, compared to placebo and naproxen. (Aisen P, Schafer, K, Grundman M, et al. Effects of rofecoxib or naproxen vs placebo on Alzheimer disease progression.  JAMA 2003; 289(21) 2819-2826) Dr. John Breitner was a consultant to Merck on the 078 Study;

December 12, 2013

Page 36

Breitner et al have published two articles describing the results of Study 078 as an effect of Vioxx. (Breitner J, Baker L, Montine T, et al. Extended results of the Alzheimer's disease anti-inflammatory prevention trial. Alzheimer's & Dementia 7(2011) 402-411; Breitner J, et al. ADAPT Research Group, Results of a follow-up study to the randomized Alzheimer's Disease Anti-inflammatory Prevential Trial (ADAPT), Alzheimer's & Dementia (2013) 1-10.) Imbimbo et al have reported on the negative results of Study 078 in a review. (Imbimbo B, Solfrizzi V, Panza F. Are NSAIDs useful to treat Alzheimer's disease or mild cognitive impairment?  Frontiers in Aging Neuroscience. 2010. 2(19) 1-14) The authors of the Merck sponsored peer reviewed article (Thal L, Ferris S, Kriby L, et al. A randomized, double-blind, study of rofecoxib in patients with mild cognitive impairment. Neuropsychopharmacology (2005) 1-12) could not "exclude the possibility that Vioxx might accelerate conversion of MCI patients to AD." The Merck biometrician on Study 078 presented at a professional meeting that "a detrimental effect of Vioxx on progression to AD in MCI patients cannot be excluded." (Assaid Deposition Exhibit 21) The authors of a follow up paper sponsored by Merck stated "the present analyses...cannot exclude the possibility that such a risk might exist. The significance of the observation that rofecoxib increased the rate of conversion from MCI to AD remains uncertain." (Aisen P, Thal L, Ferris S., et al, Rofecoxib in Patients with Mild Cognitive Impairment: Further Analyses of Data from a Randomized, Double-Blind Trial. Current Alzheimer Research, 2008, 5, 73-82.) The FDA Medical Review Officer stated that "the results of the primary efficacy analysis remain worthy of serious consideration, as they strongly suggest that administering Vioxx patients with Mild Cognitive Impairment could be associated with an adverse outcome." (Mani, 2004) O'Banion predicted a negative effect of Vioxx on AD in 1999. (O O'Banion M. COX-2 and Alzheimer's disease: potential roles in inflammation and neurodegeneration. Exp.Opin Invest. Drugs (1999) 8(10): 1521-1536) The clinical diagnosis of AD, the primary endpoint in Study 078, was found to be highly reliable by investigators.  (Salmon et al 2002; MRK-AFJ0003563-569)

173.     MERCK should have disclosed the risk of AD and dementia based on the evidence of causation in Study 078.

174.     MERCK met with FDA on January 7, 2005, over three months after VIOXX was withdrawn from the market, to discuss the efficacy findings in Study 078, and presented a PowerPoint on the efficacy findings in Study 078.  Deposition of Christopher Assaid, 266:25 to 267:16; Assaid Exhibit 16, PowerPoint dated January 5, 2005, MRK-ARP0006819.  Neither this PowerPoint, nor the one MERCK had sent to FDA on September 23, 2004, contained the statistically significant results of MERCK's analysis

December 12, 2013

Page 37

of the pre-specified supportive analyses, the global CDR, or the dose response analysis that all supported the primary analysis. On January 15, 2005, Assaid and Michael Nessly, statisticians assigned to Study 078, described their Key Accomplishments since last months' report as follows: "A face to face meeting with the highest levels of FDA management to discuss the results of P078 was held on 07 Jan 2004. A cross-functional team from MERCK attended to present the primary findings as well as secondary and exploratory analyses. This meeting was successful in increasing the likelihood of preventing the AD efficacy results from diverting attention from CV safety at the Coxib ACM by obtaining agreement that the data need not be in the core presentation." (MRK-AFO0289839)

## ADVANTAGE

175.    The stated aim of the 1999-2000 ADVANTAGE study was to assess the "Gastrointestinal Tolerability and Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis." In reality, the trial was a year-long marketing operation, meant to introduce investigators to Vioxx. ADVANTAGE was designed and supported not by MERCK scientific researchers, but by the company's Marketing and Continuing Professional Development departments in conjunction with a contract research organization.(MRK-ADI0017766) In correspondence regarding the role of Public Affairs in the trial, Rebecca Higbee inserted comments (in bold) into a message to Public Affairs: "It seems to me that the study is not sufficiently different than any other CPD [Continuing Professional Development] I ELIMINATED THE REFERENCE TO SEEDING. IT MAY BE A SEEDING STUDY, BUT LET'S NOT CALL IT THAT IN OUR INTERNAL DOCUMENTS. study, so I'm hesitant to set expectations for Public Affairs' contributions too high…I've looked through materials that were developed to support LIFE—a Cozaar AGAIN, I ELIMINATED THE REFERENCE TO SEEDING STUDY that had a Public Affairs component (press release announcing start of the study, as well as Marketing Communications guide book for physicians). Using LIFE as a basis, as well as suggestions from Ogilvy, I propose the following response: BLOOMFIELD WILL BE AROUND ON MONDAY AND I'D ENCOURAGE YOU TO TALK TO HIM ABOUT THE WORK DONE ON THE LIFE STUDY. WE LEARNED SOME LESSONS, AND I'M SURE HE'LL BE GLAD TO PASS THEM ALONG. [sic]"(MRK-AFB0001598)

176.    MERCK did not inform the IRBs, the researchers or the patient volunteers who participated in the ADVANTAGE trial of the true nature of the "study." The informed consent form used to initiate patients into the ADVANTAGE trial emphasized that the purpose of the study was an investigation of the drug itself, rather than a marketing effort meant to promote its use.(MRK-AGV0003296)

December 12, 2013

Page 38

177.     MERCK used the ADVANTAGE trial to circumvent FDA marketing regulations. Although the results of the study were not published until 2003, the trial was started on March 27, 1999. This was before the FDA initially approved the Vioxx for sale on the market. Using this "trial," MERCK circumvented FDA regulations, promoting its drug pre-approval. (MRK-NJ0221292)

178.     The results of ADVANTAGE that were reported in a published article appearing in a 2003 issue of The Annals of Internal Medicine were incorrect.(Lisse, JR et al. Gastrointestinal tolerability and effectiveness of rofecoxib versus naproxen in the treatment of osteoarthritis: a randomized, controlled trial. Ann Intern Med. 2003 Oct 7;139(7):539-46) The paper only reported 5 MIs in the Vioxx arm of the trial and one in the naproxen group. The actual results were a statistically significant number of MI/Sudden deaths (8 vs 1) in the Vioxx arm compared to Naproxen. This has never been reported.

179.     On October 21, 1999 a 73 year-old woman in the ADVANTAGE trial identified as AN 5005 was found expired in her apartment. She had reportedly called her son with complaints of shortness of breath. When the son arrived the patient had already died. (MRK-AAE0002414)

180.     The cause of death was determined to be "hypertensive heart disease" and the case was not originally adjudicated by MERCK in the ADVANTAGE trial. (MRK-NJ02212920)

181.     In July of 2001, the FDA reclassified AN 5005 as a potential cardiovascular thrombotic event. In the opinion of the medical reviewer "the cause of death for this patient was sudden death, which would in fact meet criteria for cardiovascular thrombotic event." (MRK-PUBLIC0000351)

182.     MERCK responded to the FDA's reclassification of AN 5005 in a letter stating that the "the preferred term of the reported event – hypertensive heart disease – (which was the same as the actual reported term) is not one of the vascular SAE terms eligible for case adjudication... 'Sudden death' was not a reported term for this patient. (MRK-AAF0004126) This is not true.

183.     Following the publication of ADVANTAGE by Lisse et al. in 2003 I wrote a letter to the Annals of Internal Medicine calling into question MERCK's reported cardiovascular results, specifically the number of Myocardial infarction and sudden deaths. (Egilman, DS and Presler, AH. Report of specific cardiovascular outcomes of the ADVANTAGE trial. Ann Intern Med. 2006 May 16; 144(10):781)

December 12, 2013

Page 39

184.     The New York Times published a story on Patient 5005 in April of 2005. (Berenson A. Evidence in Vioxx Suits Shows Intervention by MERCK Officials. New York Times. April 24, 2005.)

185.     In July of 2005, Ned Braunstein, from MERCK's regulatory department and Adam Polis, a MERCK author on the ADVANTAGE publication, wrote a follow-up letter to Annals of Internal Medicine in an attempt to explain the story of AN 5005. They reiterated that "Although the term retrospectively proposed by the FDA reviewer would have met criteria as a potential thrombotic event eligible for adjudication if used by the investigator, the term *hypertensive heart disease* did not trigger adjudication in the existing standard operating procedure.   Therefore, this case was not prospectively adjudicated and is not included as a confirmed thrombotic event..." ( Braunstein N, Polis A. Report of specific cardiovascular outcomes of the advantage trial. Ann Intern Med; 2005 Jul 19; 143(2): 158-9.)

186.     The investigator and the contract-research organization (CRO) which ran the ADVANTAGE trial for MERCK, has files with "sudden death" listed as the initial reported term for patient 5005. (MRK-PLBAJ0000043, MRK-01420115583)

187.     This is in contrast Daryl Najarian, a MERCK employee who worked with the CRO has multiple versions of the WAES reports (a version 2 and version 5) which are different in the reported event. Version 2, presumably written before Version 5, lists "cardiac disorder" and "hypertension" as the reported adverse experience. Version 5 lists "hypertensive heart disease" as the adverse experience.(MRK-AOZ0000997, MRK-AAE0002414)

188.     Additionally, documents from Linda Hostelley, a MERCK epidemiologist, show that 5005 was listed as a cardiac disorder.(MRK-ACV0021094, MRK-ACV0020976, MRK-ACV0021014)

189.     The 5005 event should have been listed as a "sudden death" as per the initial investigator submission and it should (and of course was adjudicated by Dr. Barr not the "official adjudication" procedure) because it was a death and by 2000 Merck had decided that all deaths should be adjudicated. Reclassification to cardiac disorder (although this is really indistinguishable from "cardiovascular disorder" an SAE adjudicatable term) allowed Merck to misallocate this case. Had this not occurred the total combined number of MI/sudden deaths 8 in the Vioxx group (5 MI and 3 sudden deaths) compared to 1 (MI) in the naproxen group, a statistically significant result. Merck used Dr. Barr's altered unblinded re-adjudication of case 5005 in its internal secret MI analysis. Merck also used other Barr generated "adjudications" in its internal analysis and I believe that some of these ended up in Merck's series of published meta-analyses.

December 12, 2013

Page 40

190.     In May of 2001, Dr. Larry Hirsch pointed out the importance of the statistically significant MI/sudden death events in Vioxx compared to naproxen in the ADVANTAGE trial. In reviewing a public statement about the ADVANTAGE trial when asked "How can you explain the difference in statistical significance of cardiovascular events seen in VIGOR versus what you saw in this study?" Hirsch wrote, "what we should explain is that the naproxen effect, seen in VIGOR, was **negated** in ADVANTAGE by by [sic] the fact that patients were allowed to take aspirin. At least I think this should explain it???"[emphasis added] (MRK-ADI0009109)

191.     Dr. Hirsch also published a paper that attempted to neutralize three experts who had testified in this litigation. His criticism centered on the fact that none of us had disclosed the amount of money we were paid researching MERCK's conduct. This article was an ad hominem personal attack meant to discredit experts who unlike Dr. Hirsch told the truth about MERCK's conduct, since Dr. Hirsch never disclosed how much MERCK paid him to work on VIOXX and in fact never disclosed that he worked on VIOXX or that in written memos he suggested that MERCK lie about the information they had on the results of the VIGOR study.  MERCK was aware of his actions since he discussed the paper with more than 50 MERCK employees. He never disclosed those contacts either.

## Other Studies

192.     In 2001 MERCK conducted a trial (Study 136), that revealed that Vioxx users given low-dose aspirin to offset the CV risk of Vioxx lost the GI benefit of Vioxx. (MRK-NJ0291847)  MERCK told physicians to use aspirin with Vioxx but MERCK did not inform physicians of this important side effect promptly or properly. They should have sent a "Dear Doctor" letter, issued press releases, done OTC advertisements, hired celebrity spokesmen, provided lecture notes, trained their detail representatives to overcome the obstacle of physician ignorance of this and other side effects. In other words, MERCK should have made safety a priority equal to or higher than sales. The methods so carefully and expensively developed by MERCK to sell the drug should have been used to communicate the dangers of such use.

193.     Edward Scolnick, reacted to the results of study 136 in November of 2001 saying, "I think the question we should answer now is NOT whether Vioxx or any Coxib is safe for CV outcomes. I think the question NOW is what is the best antiplatelet regime to use with a Coxib. I think that is THE medical question and if we answer it, the problem will dissipate." (MRK-NJ0214478)  This indicates that Scolnick knew of the cardiovascular risks of Vioxx and its lack of benefit with aspirin.

194.     MERCK withdrew VIOXX from the market on September 30, 2004. Days later, senior MERCK personnel discussed the possibility of bringing a reformulated MERCK product to the market.  A.W. Ford Hutchinson wrote "I think this really scraping the

December 12, 2013

Page 41

barrel and does not fit in with our avowed mission of producing medically important products. Naproxen plus a generic PPI, as Peter Honig keeps reminding me, essentially fixes most of the issues. Tony" (Ford Hutchinson Exhibit 23, emails October 1, 2004, MRK-AAD0356476) MERCK was aware that naproxen plus a generic PPI was a cheaper and safer alternative to VIOXX.

195.    The FDA specifically requested that MERCK conduct adequate prospective trials with CV events as their endpoint. In February 2001 in her analysis of the cardiovascular results of the VIGOR trial, Dr. Shari Targum of the FDA's Division of Cardio-Renal Drug Products recommended that MERCK provide further cardiovascular data in patients regarding long-term exposure to rofecoxib in certain patients. (Targum, Shari. Memorandum: Consultation NDA 210-042, S-007 Review of Cardiovascular Safety Database (Rofecoxib), Food and Drug Administration. February 1, 2001.) MERCK never initiated such a trial, despite the acknowledgement by Edward Scolnick, the President of MERCK Research Laboratories, on September 13, 2001, that the ONLY ESSENTIAL STUDY for Vioxx was the CV outcome study. (MRK-ABH0013917)

196.    Despite the excessive risk in the myocardial infarction endpoint for VIGOR, MERCK's published 2001 meta-analysis, ostensibly designed to investigate the risk of MI's in all RCT's, obscured the risk of MI by using the APTC (Antiplatelet Trialists' Collaboration) endpoint. The APTC endpoint groups together and "includes CV, hemorrhagic, and unknown deaths; nonfatal myocardial infarctions; and nonfatal strokes."9 Thus, the meta-analysis could not detect risk in a specific CV subcategory, since any risk in one category might be offset by lack of risk in another subcategory. Given the VIGOR results, MERCK should have been looking specifically at MI and related events and should have presented these categories separately. The main adverse effects in VIGOR were MI and related events. Conflating the effect measure with acute CNS effects obscured the acute and sub-chronic cardiac thrombotic events.

197.    Dr. Alice Reicin, Vice-President of clinical research, and Deborah Shapiro, the VIOXX project statistician, created a list of outcome measures that could be used for a planned meta-analysis which would be published in response to the VIGOR results. The list compares the pros and cons of three different outcome measures that MERCK could use to analyze the results in this meta-analysis: 1) The original 1998 cardiovascular SOP, which was limited to "confirmed arterial and venous thromboembolic CV" [*sic] events, 2) the "APTC endpoint," which included both thrombotic and bleeding events including GI bleed and 3) a modified APTC which excluded bleeding events (MRK-NJ0363443-5)

198.    The memo lists a comparison of pros and cons for each outcome measure. The pros for the second option, the APTC definition of event, Reicin wrote, "The pros for the APTC endpoint included: Endpoint definition which is accepted by authorities worldwide, Ease of bench marking our results to other studies, does not mix arterial and venous and Only uses 'hard' endpoints—especially attractive for the interim analysis

December 12, 2013

Page 42

which will rely on events which have not yet been adjudicated". Reicin wrote that the cons of the APTC, "Include[s] 'bleeding' endpoints which mixes risk/benefit (could be seen as a pro since this could work in our favor)."(MRK-NJ0363443)

199.     MERCK had knowledge that MI risk alone was greater than risk measured by the APTC endpoint. For example, a MERCK preliminary meta-analysis of Rofecoxib v. NSAIDs prepared in October 2000 by Deborah Shapiro found a relative risk of 1.44 that was *not* statistically significant when using the APTC endpoint. When the endpoint for the same large group of patients was narrowed down to MIs only, the relative risk was 2.02 *and* statistically significant. (MRK-GUE0017779) MERCK dropped this analysis of MIs in their final meta-analysis published in *Circulation* in 2001. (Konstam, MA et al. Circulation. 2001 Nov 6; 104(19):2280-8.)

200.     In reviewing the 2001 meta-analysis before publication, Briggs Morrison, found that "the data appears to have been interpreted to support a preconceived hypothesis rather than critically reviewing the data to generate hypotheses." (MRK-NJ0201983)

## Marketing

201.     The company should have protected the integrity of its research by keeping marketing and research efforts separate. Instead, MERCK created an internal marketing atmosphere in which researchers were encouraged to create science to back marketing strategies. MERCK's cross-functional team, dubbed the Commercialization Team, included key researchers as well as marketing experts. This expectation created circumstances in which scientists, who felt a stake in sales efforts, were willing to twist scientific data to support marketing messages, putting scientific evidence pointing to potential risks of the drug in detriment and rushing the drug to market before adequate safety data was available.

202.     For example, 1997 notes from a MERCK HHPAC meeting state: "The purpose of the OA Outcomes Research (OR) Program is to *support marketing needs* for MK-0966 [Vioxx] with respect to pricing, reimbursement, market acceptance and promotion. The program is *designed to definitively demonstrate* the benefits related to the improved GI tolerability of MK-0966.[emphasis added]"(MRK-ABL0000041)

203.     Evidence of the same tendency is evident in a "Vioxx Stage IV Review" document dated March 20, 2011. In this document MERCK presents a table in which key marketing objectives are matched with scientific initiatives meant to realize them. (MRK-ABL0001231)  In other words the "science" was designed to enhance sales. Allowing such a bias to influence these initial studies not only places the approval process under question but demonstrates clear impropriety.

December 12, 2013

Page 43

204.  The marketing strategy laid out in MERCK's 2001 and 2002 Profit Plans for Vioxx emphasize MERCK's concern for sales and profit rather than patient safety. Examples of these strategies include: (a) The "neutralization" of safety data (b)The aggressive use of DTC advertising to "leverage the buying process" by inciting patients to request Vioxx from their physician  (c) The promotion of "dissatisfaction" among patients with similar, competing products such as Celebrex (d) The targeting of physician groups differentiated according to their prescribing tendencies  (MRK-AAO0000073, MRK-AAO0000119)

205.  In an April 26, 2000 press release entitled "MERCK Confirms Favorable Cardiovascular Safety Profile of Vioxx®," MERCK made egregious claims about is drug's safety, citing the claim that naproxen had the ability to block platelet aggregation. The press release emphasized the CV-related results of the completed osteoarthritis trials in which CV events were un-adjudicated. (MRK-ABI0002231) MERCK continued to issue press releases confirming the cardiovascular safety of VIOXX.  (May 22, 2001 MRK-ABI0003221; August 21, 2001  MRK-ADJ0034997; August 26, 2004 MRK-AHE0061931) MERCK was issued a Warning Letter by FDA on September 17, 2001 concerning the May 21, 2001 Press Release.  (MRK-ABI0003202)

206.  In September 2001, David Anstice contacted the entire MERCK sales force, saying, "I realize you don't hear directly from me very often, but this message is one that is so important that I felt compelled to deliver it myself." (MRK-ABW0000062) He went on to buoy representatives' spirits regarding criticism of Vioxx's safety profile, reminding them of the naproxen claim, which MERCK knew was false. (See paragraph 133) The MVX reminds sales force members of "resources" that the company had provided to help them counter doubts about Vioxx's CV profile, including "A CV Letter and Press Release in May...another CV Letter and Press Release in August." At the end of the paragraph was added, "We will continue to provide you updated, useful resources that fall within FDA guidelines." (MRK-abw0000062) Even though MERCK knew that it was in violation of FDA regulations to use Press Releases in detailing physicians Mr. Anstice promoted this practice in his MVX.

207.  MERCK misinformed its marketing representatives who, in turn, presented an unjustified favorable image of Vioxx to physicians. MERCK characterized the analgesic and anti-inflammatory (A&A) market, in which Vioxx fit, as "highly promotion sensitive and less science-based than other markets in which MERCK competes." (MRK-AAO0000073) MERCK based its marketing strategy on this analysis, creating a huge promotion effort that was not science based; to do so, MERCK not only trained its Vioxx marketing team in questionable techniques for instructing physicians on the use of Vioxx, but gave them incorrect or incomplete information regarding their product. Representatives learned to start each physician call with a "STRONG OFFENSE" and to emphasize  "Strength,  Safety,  QD  Simplicity."(MRK-AAR0010074),  MRK-

December 12, 2013

Page 44

AAR00095220) Unfortunately, the fact remains that Vioxx is no stronger and is not safer than other available drugs.

208.      MERCK trained its marketing representatives to withhold safety information on the drug. This is contrary to their duty to warn and violates their own ethics recommendations. Programs like JeopardXX, a Jeopardy-based training exercise for Vioxx representatives, taught members of the sales force to view physicians' routine questions and concerns as "obstacles." Rather than provide complete, comprehensive information when faced with an "obstacle" posed by a doctor, MERCK instructed its representatives to return with a question that would narrow or limit the amount of information the physician was requesting. For example, when faced with the comment, "I am concerned about the cardiovascular effects of VIOXX," representatives were not instructed to refer the physician to the relevant information on the approved label, but to "Provide a clarifying statement to uncover the physician's true obstacle," such as "What is your specific concern?"(LEH027226) Representatives would ultimately attempt to answer only the most specific question, thus concealing comprehensive information about risks from physicians.

209.      In the field sales team's Obstacles Response Guide, MERCK cautioned its representatives: "Many times, the customer may be vague in their statements, such as 'I understand Vioxx has some safety concerns at higher doses.' Statements like this could apply to three different issues, methotrexate, warfarin or edema. Unless you clarify, you might respond regarding edema when the physicians [sic] concern was warfarin. This approach would actually result in you creating an additional obstacle for yourself."(LEH0125527) Using this strategy of teaching its representatives to evade certain safety questions, MERCK shifted the burden for the acquisition of critical information onto the physician. The correct action would have been to answer a general question by providing information of the most serious and common health effects or by providing all information.

210.      Another training resource, a presentation entitled "Dodge Ball," sent a more concise and unsettling message: Dodge the question. This presentation, given to representatives at training meetings, listed likely questions from physicians, including, "Can Vioxx be used in patients using low dose aspirin?" and, "I am concerned about the cardiovascular effects of Vioxx." The questions, each labeled "Obstacle," were followed by just three words: "Dodge, Dodge, Dodge." (LEH0115297)

211.      In other training materials and continued communication with sales force members, MERCK omitted information on the increased risk of cardiovascular adverse events from the use of Vioxx. In a series of bulletins sent to field representatives called "In It to Win It Minutes," MERCK spokesman Jo Jerman misrepresented Vioxx's cardiovascular profile. As late as 2001, a year after the release of the VIGOR data, Jerman wrote, "First let me reinforce that in our completed OA trials and ongoing clinical

December 12, 2013

Page 45

    trials there were no differences in the incidence of cardiovascular events such as heart attacks among patients taking VIOXX, non-selective NSAIDs and placebo."(LEH0126989)

212.    MERCK should have told its marketing representatives to provide complete and comprehensive information in response to this question and no "game" the physician-MERCK interaction in a manner that was designed to mislead physicians about the true risks of the use of the product.

213.    MERCK used a Video called the "V-Squad" to train sales representatives how to destroy "obstacles to the sales of VIOXX by using false data, including the Cardiovascular Card. In the V-Squad video, the MERCK V-Squad destroys obstacles such as cardiovascular concerns by disintegrating them with laser beams from the Cardiovascular Card. Thus MERCK's training of sales representatives encouraged the use of false and misleading data to persuade physicians to prescribe VIOXX.

214.    MERCK prepared Video News Releases to help promote Vioxx. Outtakes from the film sessions of Drs. Loren Laine and Laura Demopoulos establish that MERCK knew they were being cagey with the New England Journal of Medicine in the reporting of safety data in the paper submitted and published; that the claims of gastrointestinal events and deaths MERCK made in the public domain were bogus, and that everyone at MERCK knew that VIOXX might cause heart attacks.

215.    MERCK contracted for television commercials promoting VIOXX that failed to disclose to consumers the risk of VIOXX. Commercials featuring Dorothy Hamill (and a Larry King interview) as well as other commercials promoting VIOXX for all patients, including elderly patients, were false and misleading and failed to convey the risks of VIOXX to the public.

216.    In January 2001 the HSA Scientific Council, meeting to discuss marketing implications of the VIGOR results, concluded that "our MERCK reps were not comfortable responding to physicians on issues related to cardio/renal difference of the COX-2 agents." They recommended that training be offered to sales force members, teaching them "to deliver a short/concise response on this issue, and immediately redirect discussions to a focus on efficacy." (MRK-AFI0010255) Failing to teach representatives to fully respond to physicians' concerns regarding cardiovascular and renal risk constitutes a failure to disclose material facts about VIOXX hazards. Companies have recognized that sales representatives are key to the issue of disclosure hazards. They are in the best position to inform customers. "In general," the report continued, "the HSAs believe the Reps should simply mention that cardio/renal effects of the COX-2 agents are 'class effects.'"(MRK-AFI0010255)  This response is not supported by scientific data or the label and deprived physicians of specific information on the risk of these effects.

December 12, 2013

Page 46

217.    MERCK attempted to silence scientists with unfavorable views of the safety or efficacy of Vioxx. This deprived patients and physicians of important information on the dangers of Vioxx and its relative efficacy. MERCK's "neutralization" strategy was an extension of its anti-warnings program. For example, on January 9, 2001, James Fries, a professor of medicine at Stanford University and principal investigator of ARAMIS, wrote a letter to the CEO of MERCK, Raymond Gilmartin. (MRK-GUE0058858) The letter began: "A series of serious events involving certain employees of, and possibly a policy of, MERCK & Co. has come to my attention rather accidentally...The result is harmful to the traditionally very fine MERCK public image and counter-productive to the Vioxx sales effort." The letter went on to detail the "systematic" intimidation and discrediting of prominent physicians involved in the coxib field and "suppression of data" by MERCK representatives.(MRK-GUE0058858)

218.    Dr. Fries described a phone call he had received on October 28th, 2001, from Louis Sherwood, MERCK senior vice president, complaining about the "anti-MERCK" bias of one of Dr. Fries's colleagues, Dr. Gurkirpal Singh, who was then giving medical education lectures on coxibs. Fries wrote, "Dr. Sherwood suggested that if this continued Dr. Singh would 'flame out' and there would be consequences for myself and for Stanford."(MRK-GUE0058858) In addition to Singh, Fries listed eight other physicians whom he knew had been harassed or targeted by MERCK with attempts to discredit them within their field. Dr. Fries outlined some of the consequences of these attempts as follows: "Dr. Simon believes that one of his two academic appointments has been jeopardized. Dr. McMillan believes that his VCF appointment at Hershey was revoked because of these accusations. Dr. Petri had a speaking engagement unprofessionally cancelled by MERCK and an unrenowned speaker substituted; he was also bothered by phone calls from MERCK persons alleging unbalanced presentations. Dr. Singh had a speaking engagement cancelled and the audience told that he had been fired...Dr. Lipsky, while at Southwestern, was forced to do a slide by slide justification of a CME program felt to be critical of Vioxx."(MRK-GUE0058858)

219.    Dr. Fries had in fact pinpointed a real MERCK strategy to reduce "the negative impact" of physicians critical to Vioxx; a strategy known within the company as "neutralization."(MRK-AFI0182292) Even before the approval of Vioxx, in 1999, a team of MERCK marketing professionals had identified 36 physicians who were "important from a business perspective in terms of influence and/or prescribing" but who were critical of MERCK or Vioxx and/or advocates for competing medications. These "physicians to neutralize" were carefully monitored by MERCK personnel, contacted frequently with updated data and information on Vioxx, invited to meetings and conferences and offered participation in "local and national initiatives, including HEL [Health Education Liaison] programs, field training, faculty training, consultants' meetings, clinical research, etc."(MRK-AFI0182292)

December 12, 2013

Page 47

220.     MERCK hired vendors DTW Market Research and Impact RX. DTW Market Research produced "Promotional Message Recall Data" (PMRD) and Impact RX produced Impact RX reports. These companies contracted with hundreds of physicians who in turn reported what MERCK"s detail representatives told them. The physicians submitted what the MERCK representatives told them into a computer database on or around the day they were detailed. These reports were and are commercial products that MERCK purchased. The reports were compiled and sent to MERCK bi-monthly. They were regularly reviewed by Adam Schechter (Vice President, MERCK Human Health Division, Arthritis & Analgesia Franchise Business Group), Wendy Dixon (Senior Vice President of Marketing for MERCK"s U.S. Human Health division) and other high management officials. I have attached a 2002 email listing the names of some of the MERCK management on the distribution list for receipt of the PMRD reports. That distribution list included MERCK"s legal team Susan Gregory (managing counsel), Ned Braunstein (Director and Senior Director in Regulatory Affairs), and Peter Honig, MD (Vice   President,   Worldwide   Product   Safety   and   Quality   Assurance). (MRKADM0115352)

221.     The MERCK employee responsible for tracking the PMRD and Impact RX reports, Michael Stanton, gave a deposition in the Missouri civil litigation. (Deposition of Michael Stanton September 21, 2011 in Plubell and Ivey vs. Merck ) He testified that the statements that MERCK"s detail representatives gave to doctors when discussing Vioxx were recorded and typed up by the physicians, and distributed and communicated to MERCK senior management. If the PMRD and Impact RX programs worked as Mr. Stanton stated, MERCK management was provided the reports and was aware of this activity. Mr. Stanton's discusses how MERCK executives learned about the statements being made to doctors by the company's detail representatives from the PMRD program:

                    Question: Now, with respect to who all was looking and analyzing the Vioxx PMRD data that you-all purchased, tell me, would you agree or disagree that all levels of the marketing team at MERCK were reviewing PMRD results?

                    Mr. Stanton: I think all levels, I can't answer. I can tell you that the market research team and the marketing team -- market research provided this data to the marketing team that generally consisted of marketing management and the directors. I don't know that the vice presidents or the extreme leadership saw this data, but I know that the senior director or executive director of marketing definitely saw it, and it's likely that the vice president would look at it. I don't know how routinely, but it's -- it's likely. So I would conclude, then, that most- - most levels had seen it on a routine basis. I don't know, you know, just because they received it, et cetera, if they look at it. But I know that some people very much did so look at it.

December 12, 2013

Page 48

Question: Fair enough. Now, with respect to who all was looking and analyzing the Vioxx PMRD data that you-all purchased, tell me, would you agree or disagree that all levels of the marketing team at MERCK were reviewing PMRD results?

Mr. Stanton: Based on what my experience and what I saw, there was a distribution to the marketing team that included marketing leadership down. Question: Okay. And you know that some of the higher-ups looked at it, and you also know that market research department provides it to many levels of folks in the marketing department, correct?

Mr. Stanton: Based on what my experience and what I saw, there was a distribution to the marketing team that included marketing leadership down.

Question: Do you know how often members of the various levels of the marketing department at MERCK reviewed the PMRD results for Vioxx?

Mr. Stanton: I know based on this document and others that the results are reported on a bi-monthly basis so that would mean every other month a report came in, and I will, therefore, conclude that somebody was looking at it every other month.

222.    Included in these PMRD reports are physicians reporting a better CV safety profile (MRK-PLBAH0028455, MRK-AKC0002879), slowing of Alzheimers (MRKPLBAH0000433, MRK-PLBAH1295, MRK-PLBAH2807), and GI safety (MRKPLBA14603)

## OTHER ISSUES

223.    According to their own informed consent standard, MERCK agreed to reimburse the survivors of and study participants who had died or been injured from any events that occurred during its trials for medical expenses whether or not they were on VIOXX or placebo. The informed consent form signed by patients entering the VIGOR trial states, "If you suffer any adverse drug experience resulting directly from the MERCK study drug, MERCK & Co., Inc. will provide reimbursement for the reasonable costs of medical treatment..."(MRK-NJ0232605). "MERCK actively tried to avoid compensating patients who suffered adverse drug reactions. Based on the data that I have reviewed MERCK never informed any research subject (or relative in case of death) that he or she suffered an adverse event. Thus as far as I am aware only one patient ever filed a claim for reimbursement."

224.    Vioxx was not the only drug which the FDA sent a warning about. Since the approval of Vioxx MERCK has received letters from the FDA regarding other products

December 12, 2013

Page 49

including Crixivan, Fosamax, Candias and Januvia. Most recently, MERCK has been found to have given money to a Norwegian physician who was conducting clinical trials. (http://jyllands-posten.dk/uknews/ECE5722791/doctor-illegally-accepted-money-rompharmaceutical- industry/)

225.     In December of 2011, MERCK plead guilty to misdemeanor for promoting Vioxx off-label for the treatment of rheumatoid arthritis between May of 1999 to April of 2002.(USA vs. MERCK Sharp & Dohme, Criminal No. 11-10384-PBS) This provides a further example of MERCK's focus on profits over patient safety.

# LABEL

226.     The label provided incorrect information on the number of patients who experienced MIs and CHF in the original OA NDA studies.

In the listing of events that occur between 0.1% and 1.9% in the OA Studies, the following are listed:

*Cardiovascular System: angina p*ectoris, atrial fibrillation, bradycardia, hematoma, irregular heartbeat; palpitation, premature ventricular, contraction, tachycardia, venous insufficiency.

In the listing of events that occur <0.1% the following are listed:

Cardiovascular:

cerebrovascular accident, congestive heart failure, deep venous thrombosis, myocardial infarction, pulmonary edema, pulmonary embolism, transient ischemic attack, unstable angina

This was false and misleading. Several events in the cardiovascular section reported as occurring <0.1% actually occurred >0.1%.

Am J Cardiol. 2002 Jan 15;89(2):204-9.Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs (ibuprofen, diclofenac, and nabumetone). Reicin AS, Shapiro D, Sperling RS, Barr E, Yu Q.

December 12, 2013

Page 50

| TABLE 3  Rofecoxib Versus Placebo* (summary of investigator-reported cardiovascular thrombotic events) | | |
|---|---|---|
| End-point Term | Rofecoxib (n = 2,253) | Placebo (n = 711) |
| Total patients with end-point term | 14 (0.62%) | 4 (0.56%) |
| Cardiac events | 0.31% | 0.42% |
|   Coronary artery disease | 0.09% | 0.00% |
|   Myocardial infarction | 0.13% | 0.28% |
|   Unstable angina | 0.09% | 0.14% |
| Cerebrovascular events | 0.27% | 0.14% |
|   Cerebrovascular accident | 0.18% | 0.14% |
|   Transient ischemic attack | 0.09% | 0.00% |
| Other events | 0.04% | 0.00% |
|   Deep venous thrombosis | 0.04% | 0.00% |

*Includes only studies with a placebo.
Note: Patients may be counted in >1 row, but are only counted once within a row.

This information remained in the label the entire time the drug was on the market despite the fact that Merck personnel knew this was in error and misleading. MRK-ABD0001986-7. In fact Merck personnel discussed how they could use this part of the label to mislead the public about the MI rates in the VIGOR trial.

## Conclusion

227.     In addition to this report I have set out other opinions in the other reports for cases related to Vioxx. This includes opinions from a Vioxx case in Missouri (Plubell and Ivey vs. Merck) within deposition (taken 8-9[th] of December of 2011) and report (see attached Appendix 1)

228.     I intend to review more corporate documents, including but not limited to Vioxx specific documents.

229.     I intend to review other depositions as they become available.

230.     As more information becomes available, I expect to supplement and/or modify the opinions set forth herein.

Signed,

David Egilman MD, MPH