# EXHIBIT 13

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| JO LEVITT<br>1247 W. 56th St.<br>Kansas City, MO 64113<br><br>Plaintiff,<br><br>v.<br><br>MERCK & CO., INC.<br>Serve Registered Agent:<br>The Corporation Company<br>120 South Central Avenue<br>Clayton, MO 63105<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. ____________ |

**COMPLAINT**

Plaintiff Jo Levitt, for her cause of action against Merck & Co., Inc. ("Merck"), alleges as follows:

**PARTIES**

1. Plaintiff Jo Levitt is a resident of Kansas City, Jackson County, Missouri and was prescribed and ingested Vioxx between the years of 1999 through 2001.

2. Defendant Merck is a New Jersey corporation with its principal place of business in White House Station, New Jersey. At all times relevant hereto, Merck was engaged in the business of testing, developing, manufacturing, distributing, licensing, labeling, and marketing, either directly or indirectly through third parties or related entities, the pharmaceutical drug Vioxx.

## JURISDICTION AND VENUE

1. Plaintiff seeks in excess of $75,000, excluding costs and interests. This Court has jurisdiction of this matter under 28 U.S.C 1332.

2. Venue is proper in this District pursuant to 28 U.S.C 1391.

## FACTS COMMON TO ALL COUNTS

3. Vioxx is the brand name of rofecoxib, one of a class of drugs called "prostaglandins," which work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain. Prostaglandins are COX (cyclooxygenase) inhibitors; COX enzymes metabolize arachidonic acid to produce prostaglandins.

4. Vioxx is a COX-2 inhibitor, which is designed to produce prostaglandins at inflammatory sites, and to produce prostacyclin, a vasodilator and an inhibitor of platelet aggregation.

5. In February of 1997, when Merck was developing Vioxx, an internal Merck e-mail warned that a proposed trial of the drug may show Vioxx patients having more blood clots than those taking another medication and such trial may "kill [the] drug."

6. Defendant Merck submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-042 by the FDA.

7. Defendant Merck also submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for oral suspension, at doses of 12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-052 by the FDA.

8. On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

9. At the time the drug was approved by the FDA the labeling for rofecoxib stated, in the section entitled "Special Studies -- Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

10. The "Warnings" section of the labeling for rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) Effects -- Risk of GI Ulceration, Bleeding, and Perforation."

11. Defendant Merck submitted sNDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for rofecoxib. In conjunction with the sNDA, Defendant Merck performed the Vioxx GI Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was performed from January 6,

1999 through March 17, 2000.

12. The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

13. In March of 2000, the VIGOR trial results were known inside Merck. These trial results showed that patients taking Vioxx in the study group had five times the rate of heart attacks as in the naproxen study group.

14. In March of 2000, a Merck research chief stated in an internal e-mail that cardiovascular problems "are clearly there" in the VIGOR trial and appear to be "mechanism based."

15. In April of 2000, Merck issued a misleading press release that the VIGOR trial results are consistent with the clot-preventing effects of naproxen.

16. In industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and stroke. Not only did Merck do nothing to further accurately publish these studies, or warn consumers, but it denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today, *Spin War Aside, Lessons Emerge From COX-2 Trials,* in August 2000, page 3.

17. Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping profits obtained through its non-disclosure and concealment. Merck engaged in a massive advertising and sampling program and gained continued increases in the market share,

which enhanced Merck's financial stability to the detriment of its consumers. As a result of Merck's scheme, it reaped more than $2 billion in profit in the year 2000 alone, and appropriated approximately 23 percent share of the market.

18. Merck continued to profit from its scheme by withholding information from Plaintiff, the consuming public, and the health care industry. For example, in November of 2000, Merck caused the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption.

19. In May of 2001, Merck issued a press release confirming "Favorable Cardiovascular Safety Profile of Vioxx."

20. In May of 2001, the FDA responded to Merck's press release that "Your claim in the press release is simply incomprehensible . . . . The implications that Vioxx cardiovascular profile is superior to other NSAIDS is misleading."

21. On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukhisjee, et al., showing what Merck had concealed that the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in Merck's trials, including VIGOR, at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. *See* Mukhisjee, D., *et al., Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors*, J.A.M.A. 286:8,

954-959, Aug. 22/29, 2001. In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users.

22. In the JAMA study, the authors stated that "by decreasing PGI2 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PGI2, potentially leading to an increase in thrombotic cardiovascular events." *Id.* at 957. In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor "tips the balance of prostacyclinlthromboxane in favor of thromboxane, leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M., *Why Do CycloOxygenase-2 Inhibitors Cause Cardiovascular Events?, J.A.C.C.*, 39:3, Feb. 6, 2002. This is further supported by studies completed at the University of Pennsylvania. Cheng, Y., et al., *Role of Prostacyclin in the Cardiovascular Response to Thrornboxane A2, Journal of* Science, V. 296:539-541, Apr. 19, 2002.

23. On September 17, 2001, Thomas W. Abrams, R.Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of Defendant Merck, relating to "promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets."

24. The Warning Letter stated that Defendant Merck had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

25. The eight (8) page Warning Letter outlines, in detail, the conduct of Defendant Merck that supports the FDA's issuance of the Warning Letter, and makes the following **"Conclusions and Requested Actions:"**

> The promotional activities and materials described above minimize the potentially serious Cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx / Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.
>
> Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.
>
> This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:
>
>> Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.
>>
>> Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.
>>
>> A written statement of your intent to comply with "1" and "2" above.

26. In January of 2002, Merck continued to deny safety concerns regarding Vioxx in the magazine "Circulation."

27. On April 11, 2002, the FDA approved a supplemental application for the use of Vioxx (rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain. The FDA also approved new labeling, a "Dear Doctor" letter, and a new patient package insert. The labeling and the "Dear Doctor" letter contained information concerning the results of the VIGOR study.

28. The revised labeling further states that the administration of Vioxx 50 mg, was associated with a higher incidence of gastrointestinal symptoms.

> **Clinical Studies in OA and BA with VIOXX 50 mg (Twice the highest dose recommended for chronic use)**
>
> In OA and RA clinical trials which contained VIOXX 12.5 or 25 mg as well as VIOXX 50 mg, VIOXX 50 mg OD was associated with a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn, nausea and vomiting), lower extremity edema, hypertension, serious adverse experiences and discontinuation due to clinical adverse experiences compared to the recommended chronic doses of 12.5 and 25 mg (see DOSAGE AND ADMINISTRATION).

29. Further, the "Dear Doctor" letter, approved in conjunction with the revisions to the Vioxx labeling, outlines the changes to the Vioxx labeling.

30. The revised "Patient Information" sheet does not add any information about the results of the VIGOR study."

31. The "Patient Information" sheet is the only written document that is provided to a patient for whom Vioxx is prescribed.

32. Both the initial labeling and the revised labeling are ineffective because they do not properly advise physicians and patients of the potential side effects of Vioxx.

33. Despite knowledge of the ineffectiveness of the warnings, and despite knowledge that Vioxx may cause serious side effects, Defendant Merck has concealed and/or downplayed the dangers associated with Vioxx, and continued to market the drug in the United

States and abroad until September 30, 2004. In its 2001 Annual Report, for example, Defendant Merck states:

> The Company also noted that a number of federal and state lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to *Vioxx*.... The lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these lawsuits are completely without merit and will vigorously defend them.

34. Further, in its January 23, 2001 8-K filing with the Securities and Exchange Commission, the Defendant fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

> "Our results reflect the strength of our growth strategy," Mr. Gilmartin said. "Our five key products, VIOXX, ZOCOR, COZAAR/HYZAAR*, FOSAMAX and SINGULAIR, drove Merck's performance for the year and created a powerful platform for growth." These products accounted for 57% of Merck's worldwide human health sales for 2000 and 61% for the fourth quarter.
>
> "Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said. VIOXX, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain. Since its extraordinarily successful 1999 launch, VIOXX has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest-selling medicine. In the United States, VIOXX now accounts for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to market in this class in the United States. VIOXX achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.
>
> A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR Study. This 8,000-patient gastrointestinal outcomes research study, in which VIOXX reduced the risk of serious gastrointestinal complications by half compared to the NSAID naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that VIOXX significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

35. Despite the foregoing, Defendant Merck continued until September 30, 2004 to represent to consumers that Vioxx is safe, and that any cardiovascular and/or cardiothrombotic side effects are not associated with the drug. The Defendant has also downplayed any potential gastrointestinal side effects of the drug, promoting it as safer and more efficacious than other medications approved for treatment of similar conditions.

36. As a direct and proximate result of Plaintiff's ingestion of Vioxx, Plaintiff suffered heart attacks in March 2001 and June 2001.

37. Merck acted in a willful, wanton, and/or fraudulent manner toward Plaintiff and other Vioxx consumers, and Plaintiff is therefore entitled to punitive damages.

**COUNT I**
**STRICT LIABILITY**

38. Plaintiff incorporates by reference the allegations in the above paragraphs.

39. Merck was engaged in the business of manufacturing, designing, testing, marketing, selling, advertising, warning, and distributing Vioxx. The Vioxx consumed by Plaintiff reached Plaintiff without substantial change in the condition in which it was sold by Merck.

40. Plaintiff used Vioxx in the manner for which it was intended and a manner which was reasonably foreseeable.

41. Plaintiff was not aware of, nor could she have discovered, the dangerous nature of Vioxx.

42. The Vioxx consumed by Plaintiff was in a defective condition and unreasonably dangerous in that it was defective in design, manufacturing, instructions and/or warnings to doctors, the FDA, and the consuming public, and such defects existed at the time the Vioxx was sold by Merck.

43. As a direct and proximate result of the defects in Vioxx, Plaintiff was injured.

WHEREFORE, Plaintiff demands judgment against defendant Merck for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all other such relief as the Court deems proper.

**COUNT II**
**NEGLIGENCE**

44. Plaintiff incorporates by reference the allegations in the above paragraphs.

45. Merck had a duty to use reasonable care in the manufacturing, design, testing, marketing, warning, and advertising of its product Vioxx.

46. Merck was negligent and breached its duty of reasonable care in that Merck:

a. Failed to adequately and properly test Vioxx so as to ascertain whether or not it was safe and proper for the purpose for which it was designed, manufactured and sold;

b. Failed to utilize and/or implement a reasonably safe design in the manufacture of Vioxx;

c. Failed to manufacture Vioxx in a reasonably safe condition for which it was intended;

d. Failed to adequately and properly warn doctors, the FDA, and the consuming public regarding the risks of complications in using Vioxx in a manner for which it was intended;

e. Failed to adequately and properly label Vioxx so as to warn doctors and the consuming public of the risks of complications in using Vioxx; and

f. Failed to adequately and properly label Vioxx so as to warn Plaintiff and doctors of the risk of heart attack and stroke with the use of Vioxx;

47. As a direct and proximate result of Merck's negligence, Plaintiff was injured.

WHEREFORE, Plaintiff demands judgment against Merck for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT III**
**NEGLIGENCE PER SE**

48. Plaintiff incorporates by reference the allegations in the above paragraphs.

49. Merck had an obligation to comply with the law in the manufacture, design, testing, production, research, distribution, marketing, labeling, and warning of the risks and dangers of Vioxx.

50. Merck violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, et seq., related amendments and codes of federal regulations provided thereunder, the Sherman Food, Drug and Cosmetic Law, and other applicable laws, statutes and regulations.

51. Plaintiff, as purchaser and consumer of Vioxx, is within the class of persons the statutes and regulations described above are designed to protect and plaintiff's injuries are the type of harm these statutes are designed to prevent.

52. Merck's actions constitute an adulteration and/or misbranding as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §331 and constitute a breach of duty subjecting Merck to civil liability for all damages arising therefrom.

53. Merck failed to meet the standard of care set by the following statute and regulations, which were intended for the benefit of individuals such as Plaintiff, making defendant negligent per se:

a. The labeling lacked adequate information on the use of the drug Vioxx (21 C.F.R. §201.56(a) and (d));

    b. The labeling failed to provide adequate warnings of severe and disabling medical conditions including, without limitation, thromboembolic events, primarily heart attacks or stroke, and other adverse medical conditions, as soon as there was reasonable evidence of their association with the drug (21 C.F.R. §201.57(e));

c. There was inadequate information for patients for the safe and effective use of Vioxx (21 C.F.R. §201.57(f)(2));

d. There was inadequate information regarding special care to be exercised by the doctor for safe and effective use of Merck's drug Vioxx (21 C.F.R. §201.57(f)(1)); and

e. The labeling was misleading and promotional (21 C.F.R. §201.56(b)).

54. As a direct and proximate result of Merck's violations of the statutes described above, plaintiff was injured.

WHEREFORE, plaintiff demands judgment against Merck for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT IV**
**BREACH OF EXPRESS WARRANTY**

55. Plaintiff incorporates by reference the allegations in the above paragraphs.

56. Merck expressly warranted to plaintiff, by and through statements made through authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that Vioxx was safe, effective, and fit and proper for its intended use.

57. In using Vioxx, plaintiff relied on the skill, judgment, representations and foregoing

expressed warranties made by Merck. Said warranties and representations were false in that Vioxx was not safe and was unfit for the use for which it was intended.

58. As a direct and proximate result of Merck's breaches of warranties, plaintiff was injured.

WHEREFORE, plaintiff demands judgment against Merck for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and such other relief as the Court deems proper.

**COUNT V**
**BREACH OF IMPLIED WARRANTY**

59. Plaintiff incorporates by reference the above paragraphs.

60. Prior to the time that Vioxx was used by the plaintiff, Merck impliedly warranted to plaintiff that Vioxx was of merchantable quality and safe and fit for the use for which it was intended.

61. Plaintiff was unskilled in the research, design and manufacture of Vioxx and reasonably relied entirely on the skill, judgment and implied warranty of Merck in using Vioxx.

62. Vioxx was neither safe for its intended use nor of merchantable quality in that it had dangerous propensities when put to its intended use and would cause injuries to the user.

63. As a direct and proximate result of Merck's breaches of warranties, plaintiff was injured.

WHEREFORE, plaintiff demands judgment against Merck for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all other such relief as the Court deems proper.

**REQUEST FOR JURY TRIAL**

64. Plaintiff requests a jury trial.

**DESIGNATION OF PLACE OF TRIAL**

Plaintiff hereby designates Kansas City, Missouri as the place of trial for the above and foregoing matter.

Respectfully submitted,

/s/ James P. Frickleton

James P. Frickleton MO # 31178
Bartimus, Frickleton, Et Al.,
11150 Overbrook Drive
Leawood, Ks 66211
(913) 266-2300
Fax (913) 266-2366

Thomas P. Cartmell MO #45366
Brian J. Madden MO #40637
Thomas J. Preuss MO #54923
WAGSTAFF & CARTMELL LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
(816) 701-1100
FAX (816) 531-2372

J. Scott Bertram MO #23715
The Bertram Law Firm, LLC
9229 Ward Parkway, Suite 107
Kansas City, MO 64114
(816) 523-2205
FAX (816) 523-8258

Wm. Dirk Vandever MO #24463
The Popham Law Firm, P.C.
323 W. 8th Street, Ste. 200
Kansas City, MO 64105
(816) 221-2288
FAX (816) 221-3999

Kirk Goza                     MO #32475
Brad Honnold                  MO #39818
Goza & Honnold, Llc
2630 City Center Square
1100 Main Street, P.O. Box 482355
Kansas City, Mo  64148-2355
(816) 512-2171
Fax (816) 512-2172

Grant L. Davis                MO #34799
Shawn Foster                  MO #47663
Davis Bethune & Jones, Llc
1100 Main Street, Suite 2930
P.O. Box 26250
Kansas City, Mo  64196
(816) 421-1600
Fax (816) 472-5972

Wayne S. Spivey               Atty ID #31017
Shrager, Spivey & Sachs
Two Commerce Square
32nd Floor
Philadelphia, Pa  19103
(800) 568-5868
Fax (215) 568-7495

ATTORNEYS FOR PLAINTIFF