UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: VIOXX | : | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
|  | : | JUDGE FALLON |
|  | : | MAG. JUDGE KNOWLES |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

**THIS DOCUMENT RELATES TO ALL CASES**

**ORDER & REASONS**

Before the Court is attorney Ann Oldfather's Motion to Refer Certain Fact-Finding in the Stratton Matter to the Special Master. (Rec. Doc. 65207). Having reviewed Ms. Oldfather's motion, the Court now issues this Order & Reasons.

**I.      FACTUAL BACKGROUND**

To put this matter in perspective, a brief review of this litigation is necessary.

**A.      Vioxx Litigation and Settlement**

This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib. Merck, a New Jersey corporation, researched, designed, manufactured, marketed, and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States. Vioxx remained publicly available until September 20, 2004, when Merck withdrew it from the market after data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the

risk of cardiovascular thrombotic events such as myocardial infarction (heart attack) and ischemic stroke.  Thereafter, thousands of individual lawsuits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims.  It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004.  Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.[1]

California was the first state to institute a consolidated state court proceeding on October 30, 2002.  New Jersey and Texas soon followed suit, on May 20, 2003 and September 6, 2005, respectively.  On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("MDL") conferred MDL status on Vioxx lawsuits filed in various federal courts throughout the country and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407.  *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005).  Even after the creation of this federal MDL, many cases remained pending in the various state courts, particularly the courts in California, New Jersey, and Texas.  It is estimated that the census of the litigation totaled over 50,000 claims.

On March 18, 2005, this Court held the first status conference in the Vioxx MDL to discuss procedures for moving this matter forward.  Shortly thereafter, the Court appointed steering committees of counsel to represent the parties.  In addition, the Court announced at monthly meetings that any attorney who was not appointed but who wished to do common

---

[1] For a more detailed factual background describing the events that took place before the inception of this multidistrict litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).

benefit work on behalf of Vioxx claimants could do so by joining a subcommittee. The Plaintiffs' Steering Committee ("PSC") was encouraged to establish subcommittees and include non-PSC members on these subcommittees.[2]

Furthermore, to give transparency to this litigation, the Court created a web site accessible to all counsel and the public at large. All motions, Court orders, opinions, recent developments, a calendar of scheduled events, transcripts of hearings, and various other matters were posted on this web site.[3] Throughout the litigation monthly status conferences were held in open court. Notice of the meetings were posted on the web site and were open to all. The Court established a call-in number for those unable to attend in person, and also posted transcripts of the conferences on its web site.

Discovery rapidly commenced. The common benefit attorneys were responsible for all aspects of pre-trial preparation, including document discovery, the taking of depositions, preparation of experts, motions practice, and to some extent, coordination of federal and state court proceedings. Over nine million documents were discovered and collated. Thousands of depositions were taken and at least 1,000 discovery motions were argued to the Court. After a reasonable period for discovery, the Court assisted the parties in selecting and preparing certain test cases for bellwether trials. Additionally, a number of similar trials were scheduled in state courts.

---

[2]The various consolidated state court proceedings also established similar management structures to coordinate the litigation.

[3]*MDL-1657 Vioxx Products Liability Litigation*, http://vioxx.laed.uscourts.gov/.

This Court conducted six Vioxx bellwether trials.[4]  The first of the bellwether trials took place in Houston, Texas, while this Court was displaced following Hurricane Katrina.  The five subsequent bellwether trials took place in New Orleans, Louisiana.  Only one of the trials resulted in a verdict for the plaintiff.  Of the five remaining trials, one resulted in a hung jury and four resulted in verdicts for the defendant.  During the same period that this Court was conducting six bellwether trials, approximately thirteen additional Vioxx-related cases were tried before juries in the state courts of Texas, New Jersey, California, Alabama, Illinois, and Florida.

After extensive discovery, after the bellwether trials were completed, and after a number of trials were completed in state courts, this Court and courts from Texas, New Jersey, and California met in New Orleans with a representative of the Board of Merck, their attorneys, and representatives of the PSC.  The Judges suggested that it was an appropriate time to explore a global resolution of this litigation.[5]  Negotiating Plaintiffs' Counsel ("the NPC") were appointed to explore and engage in settlement discussions with Merck.  Counsel for Merck and the NPC met together more than fifty times and held several hundred telephone conferences.  Although the parties met and negotiated independently, they kept this Court and the coordinate state courts

---

[4]*See Plunkett v. Merck & Co.*, No. 05-4046 (E.D. La. Filed Aug. 23, 2005) (comprising both the first and second bellwether trials, as the first trial resulted in a hung jury); *Barnett v. Merck & Co.*, No. 06-485 (E.D. La. Filed Jan. 31, 2006) (third bellwether trial); *Smith v. Merck & Co.*, No. 05-4379 (E.D. La. Filed Sept. 29, 2005) (fourth bellwether trial); *Mason v. Merck & Co.*, No. 06-0810 (E.D. La. Filed Feb. 16, 2006 (fifth bellwether trial); *Dedrick v. Merck & Co.*, No. 05-2524 (E.D. La. Filed June 21, 2005) (sixth bellwether trial).

[5]The Court once again expresses its thanks to Judge Carol E. Higbee of the Superior Court of New Jersey, Justice Victoria Chaney, formerly of the Superior Court of Los Angeles County in California and currently of the California State Court of Appeal, and Judge Randy Wilson of the 157th Civil District Court of Harris County, Texas for their efforts in bringing this litigation to completion.

of Texas, New Jersey, and California informed of their progress in settlement discussions.

On November 9, 2007, Merck and the NPC formally announced that they had reached a Settlement Agreement. *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657 (E.D. La. Nov. 9, 2007)  The private Settlement Agreement establishes a voluntary, opt-in pre-funded program for resolving pending or tolled state and federal Vioxx claims against Merck as of the date of the settlement, involving claims of heart attack ("MI"), ischemic stroke ("IS"), and sudden cardiac death ("SCD"), for an overall amount of $4.85 billion. *Id.* § "Recitals".[6]  Merck retained a walk away right to terminate the Settlement Program and Agreement if fewer than 85% of eligible participants enrolled in the Program. *See generally* art. 11.  The MSA was designed to provide a fair and efficient means to compensate claimants who could present objective evidence of Vioxx usage and an associated MI, IS, or SCD injury.  Claimants enrolled in the Program by signing a release, which would be delivered to Merck once the claim was paid or the claimant had elected to pursue other avenues for the amicable resolution of their claims pursuant to the terms of the MSA.  After enrolling, claimants or their primary attorneys gathered and submitted medical records to the Claims Administrator for processing and review, as set forth in the Agreement.  The deadlines for submitting records were extended several times.

Each claimant's records were assessed pursuant to three "Gates": Injury, Duration, and Proximity, which required the claimant to provide evidence of a qualifying MI, IS, or SCD injury; receipt of 30 Vioxx pills within a 60 day period prior to the injury; and use of those pills

---

[6]For a more detailed factual background of the various mechanics of the Settlement Agreement, including the provisions for the mandatory resolution of governmental liens, *see In re Vioxx Prods. Liab. Litig.*, 2008 WL 3285912 (E.D. La. Aug. 7, 2008) (denying motions to enjoin disbursement of interim settlement payments).

at a time close to the injury. There were multiple layers of review for eligibility, including initial review by the Claims Administrator, an opportunity to submit additional records, review by a Gates Committee consisting of counsel for claimants and counsel for Merck, and a further opportunity for Merck to include the claim in the Program. If after that process a claim did not pass one of the Gates, the claimant could appeal to the Court-appointed Special Master for a final and binding review, or alternatively get off of the Settlement tracks and resume their lawsuit by filing a Future Evidence Stipulation and proceeding to trial. Claimants who qualified for the program were assigned points based on objective risk factors and the nature and extent of their injury, and were entitled to similar review of those calculations. Thus, the Settlement Program included an exit opportunity and multiple layers of review to ensure that claims received ample process.

The Settlement Agreement expressly contemplates that this Court will oversee various aspects of the administration of settlement proceedings, including appointing a Fee Allocation Committee ("FAC"), allocating a percentage of the settlement proceeds to a Common Benefit Fund, approving a cost assessment, and modifying any provisions of the Settlement Agreement that are otherwise unenforceable.[7] This is consistent with the inherent duty of an MDL transferee court. Accordingly, this Court has exercised its inherent authority over the MDL proceedings, *see* Manual for Complex Litigation (Fourth) §§ 10.224, 14.215-16, 14.231-.216

---

[7]*See, e.g.,* Settlement Agreement § 9.2.4 (establishing that the Court shall appoint a Fee Allocation Committee); § 9.2.5 (establishing that the Court shall "provide appropriate notices governing the procedure by which [it] shall determine the common benefit attorneys' fees and reimbursement of common benefit expenses"); § 16.4.2 (establishing that the Court may modify any provision of the Agreement under certain limited circumstances if the Court determines that the provision "is prohibited or unenforceable to any extent or in any particular context but in some modified form would be enforceable").

(2004), in coordination with its express authority under the terms of the Settlement Agreement to ensure that the settlement proceedings move forward in a uniform and efficient manner.[8]

On July 17, 2008, Merck formally announced that it was satisfied that the thresholds necessary to trigger funding of the Vioxx Settlement Program would be met. *See Minute Entry, July 17, 2008*, Rec. Doc. 15362 (July 17, 2008). Merck further advised that it intended to waive its walk-away privileges and that it would commence funding the Vioxx Settlement Program by depositing an initial sum of $500 million into the settlement fund, clearing the way for distribution of interim payments to eligible claimants. *Id.* Eventually some 99.9% of all eligible claimants enrolled in the program.

The Settlement Program proceeded at a very rapid rate and Merck made additional payments in order to ensure that the claimants would receive funds in a timely fashion. Final payments to heart attack claimants were completed prior to October 14, 2009, final payments to stroke claimants were completed by June 14, 2010, and final extraordinary injury payments (i.e., payments to those who incurred or sustained extraordinary losses) were completed by June 29, 2010. Thus, in only 31 months, the parties to this MDL case were able to reach a global settlement and distribute Four Billion, Three Hundred and Fifty-three Million, One Hundred Fifty-two Thousand and Sixty-four Dollars ($4,353,152,064) to 32,886 claimants, out of a pool of 49,893 eligible and enrolled claimants. This efficiency is unprecedented in mass tort

---

[8] *See e.g.*, Pretrial Order No. 32, Rec. Doc. 13007 (Nov. 20, 2007) (exercising the Court's "inherent authority over this multidistrict litigation" as well as its express authority under Paragraph 9.2.4 of the Settlement Agreement to appoint a Fee Allocation Committee; reserving the right to "issue subsequent Orders governing the procedure by which the Allocation Committee shall carry out its function"; and providing that members appointed to the committee may not be substituted by other attorneys "except with the prior approval of the Court").

settlements of this size.  It was due in large part to the ability, industry, and professionalism of the attorneys for both sides, the plan administrators, the lien administrators, the pro se curator, and the special masters.

**B.      Procedures for Performing and Documenting Common Benefit Work**

   **1)      Pre-Settlement Procedures**

As previously mentioned, from the very beginning of this MDL, and before the Settlement Agreement was contemplated or announced, steps were taken to create a fair and open environment for all interested attorneys to perform work for the common benefit of the Vioxx plaintiffs and to create a transparent factual record for an eventual application for common benefit fees.

Twelve members, plus Plaintiffs' Liaison Counsel ("PLC"), were appointed to the PSC. Pretrial Order No. 6 (Apr. 8, 2005).  Appointment of a supervising Plaintiffs' Steering Committee was necessary to create centralized leadership and control of litigation of this magnitude.  But the Court, the plaintiffs, and the justice system in general also have an interest in broadening the range of attorney participation in MDL cases, lest the work be confined to a specialized bar of MDL attorneys which would result in exclusivity, unfairness, and discrimination, and inure to the disadvantage of litigants and their attorneys.  Therefore, as mentioned above, the Court authorized and encouraged the PSC to "organiz[e] subcommittees comprised of plaintiffs' attorneys not on the PSC and assign[] them tasks consistent with the duties of the PSC."  Pretrial Order 6 (Apr. 8, 2005).  All interested attorneys, including those in the state court litigations, were encouraged to coordinate with the PSC and to do work for the common benefit.  Over one hundred firms or attorneys availed themselves of the opportunity to

perform common benefit work.

To receive and vet records of the time spent and expenses incurred by attorneys performing common benefit work, the Court appointed a CPA, Phillip Garrett. *Id.* Those doing common benefit work and incurring common benefit expenses were ordered to report their hours and expenses contemporaneously to the Court-appointed CPA for review and reporting to the Court.[9] Time and Expense Guidelines were established to govern "all activities performed and expenses incurred by counsel that relate to matters common to all claimants in MDL 1657." *Id.* at 4.

Early in the litigation, the Court entered Pretrial Order No. 19, which established a Plaintiffs' Litigation Expense Fund to compensate and reimburse attorneys for services performed and expenses incurred for the common benefit. Pursuant to this Order, any case that was settled, compromised, dismissed, or otherwise reduced to judgment for monetary relief, with or without trial, was subject to an assessment. In order to avail themselves of the benefit of the initial work of the common benefit attorneys, individual plaintiffs' counsel could, for a limited time, enter into a contract that was to dictate the assessment amount. The "Full Participation Option," which was one such option, established an assessment of 2% of the recovery for fees and 1% of the recovery for costs. *See* Pretrial Order No. 19 (Aug. 4, 2005). Counsel were able to select the "Full Participation Option" within 90 days of the entry of Pretrial Order 19. Following that period, counsel could accept a "Traditional Assessment Option" providing for 6%

---

[9]After the Settlement Program was announced, the Court issued PTO 6C, establishing procedures for submission of contemporaneous or reconstructed time records and expense reports by attorneys who did not litigate in the MDL but litigated in state court and participated in the Settlement Program.

assessment of recoveries in MDL cases and 4% assessment of recoveries in state court cases.

As mentioned above, the case then proceeded through a period of extensive discovery, pretrial motions, *Daubert* hearings, six MDL bellwether trials, and over a dozen trials in state court. After several years, the settlement occurred.

### 2) Post-Settlement Procedures

When consummated, the Settlement Agreement modified the landscape regarding common benefit attorneys' fees for those interested in participating in the settlement. The Settlement Agreement provides for a common benefit fee assessment to create a common benefit fund, to "be administered by the Honorable Eldon E. Fallon," and to be awarded "upon due consideration by him in consultation with the Honorable Victoria G. Chaney, the Honorable Carol E. Higbee, and the Honorable Randy Wilson, and in accordance with established Fifth Circuit precedent." *Id.* § 9.2.3. Additionally, the Settlement Agreement states that this contractual common benefit fee assessment supersedes the assessments provided for in Pretrial Order No. 19. *Id.* ("The maximum 8% attorneys' fee assessment shall supersede the assessment provided to MDL common benefit attorneys pursuant to Pretrial Order No. 19."). Those who were not interested in participating in the settlement could proceed with their case and avail themselves of the common benefit work for the original assessment set forth in PTO 19.

The Settlement Agreement also addressed procedures regarding how the common benefit fund would be distributed, to which all parties to the Agreement consented. The Settlement Agreement called for appointment by the Court of a committee of plaintiffs' attorneys to recommend an allocation of common benefit fees:

> The Honorable Eldon E. Fallon will be asked to appoint a committee of eight plaintiffs' counsel which shall include all members of the [Negotiating Plaintiffs'

-10-

> Committee] and two additional plaintiffs' attorneys to be responsible for recommending ... the allocation of awards of attorneys' fees from the Settlement Fee and Cost Account. In making its recommendation, the "Allocation Committee" is to review the contemporaneous time records, or properly reconstructed time records and expense reports of all plaintiffs' counsel that request compensation for common benefit work, as audited by the CPA firm of Wegmann Dazet. The Allocation Committee shall take into consideration the common benefit work of counsel in the MDL, and the work of counsel in the state litigations in Texas, California and New Jersey. The Allocation Committee shall be guided by these objective measures of common benefit counsel's contributions, in addition to their subjective understanding of the relative contributions of counsel towards generating the Settlement Fund in accordance with established fee jurisprudence and subject to the approval of the Honorable Eldon E. Fallon in consultation with the Honorable Victoria G. Chaney, the Honorable Carol E. Higbee, and the Honorable Randy Wilson.

*Id.* at § 9.2.4. The Settlement also stated that the Court "provide appropriate notices governing the procedure by which [the Court] shall determine common benefit attorneys' fees ... including Common Benefit Attorneys' joint submission of papers by the PLC requesting compensation for their common benefit work .... [The Court] shall insure that there is ample opportunity for objections and comments to the application and a notice of hearing regarding the same." *Id.* at § 9.2.5.

The provisions of the Settlement Agreement correspond to the Court's inherent authority to award common benefit attorneys' fees out of a limited fund created by the work of those attorneys, *see* October 19, 2010 Order and Reasons, 760 F. Supp. 2d at 647-49, and the Court's inherent authority to appoint a committee of plaintiffs' attorneys to recommend an allocation of common benefit fees, *see In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 227 (5th Cir. 2008) ("*High Sulfur I*").

The Court exercised its inherent authority as well as its express authority under the MSA by appointing nine members to a Fee Allocation Committee ("FAC"). *See* Pre-Trial Order No.

32 (Nov. 20, 2007). The FAC appointees were heavily involved in the MDL and in the associated state-court litigations and had firsthand knowledge of the nature and extent of the common benefit work which was done and who did it. The Court appointed to the FAC some attorneys who were not on the PSC; thus, the FAC was comprised of both "insiders" and "outsiders" to the MDL leadership, who could bring a wide perspective to assessing all work done for the common benefit both in the MDL and in state court. The makeup of the FAC was intended to provide a broad range of experience and opinions to ensure that an eventual recommended allocation would not over- or under-emphasize the contribution of any attorney in any venue with respect to any aspect of the litigation.

The FAC was charged first with obtaining supporting evidence from every attorney or firm who had performed common benefit work and sought an award of common benefit attorneys' fees. On September 15, 2008, the Court issued Pre-Trial Order 6D, setting forth procedures and guidelines for the FAC to follow in preparing an eventual recommended allocation. Pursuant to PTO 6D, "any attorney wishing to have their time considered for an allocation of any common benefit award" was directed to submit a three-page written affidavit to the FAC articulating their contribution, with emphasis on factors including "substantial contribution to the outcome of the litigation," quality of work, "consistency quantum, duration, and intensity of ... commitment to the litigation," "level of partner participation," committee membership and leadership positions, the "jurisdiction in which non-MDL common benefit work occurred," "[a]ctivities surrounding trials of individual Vioxx claimants, including bellwether trials and non-MDL trials that impacted proceedings on a common benefit level," participation in ongoing work for the common benefit, involvement in Vioxx litigation prior to withdrawal of

Vioxx from the market or the MDL, contribution to funding of the litigation, commitment to the litigation after adverse verdicts, and any other relevant factors. Over one hundred firms or attorneys submitted common benefit time and costs to the Court-appointed CPA. The FAC received almost twenty-four hundred pages of affidavits and supporting documentation, all of which were entered into the record of this proceeding.

Also pursuant to PTO 6D, the FAC conducted in-person, on-the-record meetings at which all interested common benefit submitters were invited to "appear and present the reasons, grounds and explanations for their entitlement to common benefit fees and reimbursement of expenses." The FAC conducted hearings in the epicenters of Vioxx litigation in Atlantic City, New Jersey; New Orleans, Louisiana; Houston, Texas; and Los Angeles, California. Over forty-five firms out of the more than one hundred firms or attorneys that applied for common benefit fees availed themselves of this opportunity, and the hearings produced over eighteen hundred pages of transcripts from the common benefit fee applicants.

Finally, pursuant to PTO 6D and the MSA, the PLC moved on January 20, 2009 for a common benefit fee award of 8% of the $4.85 billion settlement amount. The PLC's motion was posted on the Court's website and on April 17, 2009, the Court invited any interested party to file a Notice of Objection on or before May 8, 2009. After receiving numerous objections, the Court concluded that it was appropriate to appoint a Liaison Counsel for the Common Benefit Fee Application Objectors ("Percentage-Fee Objectors"). Michael Stratton was the sole applicant and since his motion to be appointed liaison counsel was unopposed, he was appointed to the position of liaison counsel for the Percentage-Fee Objectors. *See* Pretrial Order No. 52 (Sept. 30, 2009). The Court did not set any fee for Mr. Stratton or provide that any fee received

by him would have to be approved by the Court.  The reason for this was that the Court recognized that the parties involved in such a fee issue (Mr. Stratton and the objector counsel) were all very experienced attorneys who were well able to look after themselves without any interference by the Court.   Mr Stratton apparently contacted the objector attorneys and reached an understanding as to a fee for his services.  In any event,  numerous status conferences were convened, discovery was taken, briefing was submitted, and arguments were heard.  As a result of that process, the Objectors withdrew their objections and the PLC reduced its request to a common benefit fee award to 7.5%.

The PLC's renewed motion was heard in open court.  After the hearing, the motion was taken under submission and on October 19, 2010, the Court issued an Order and Reasons setting the amount of common benefit fees to be awarded and allocated between attorneys who did common benefit work in the MDL and coordinated state litigations.  October 19, 2010 Order and Reasons, 760 F. Supp. 2d 640.  In fixing the common benefit fee, the Court analyzed the applicable law and concluded that a blended percentage approach to determining common benefit attorney's fees was appropriate.  *Id.* at 650-52.  After a thorough review of the common benefit fee awards and set-asides in comparable MDLs and consideration of the *Johnson* factors as required by the Fifth Circuit, the Court determined that 6.5% of the settlement amount was appropriate compensation for the common benefit work done in this case.  *See id.* at 652-58.  Thus a common benefit award of 6.5% of the total settlement, or a sum of $315,250,000.00, was rendered.  *See id.* at 658.  The common benefit fee was to come from the attorneys' fees of primary counsel and was not an additional fee borne by the litigants.  *Id.* at 655.

After following the procedures more fully discussed in *In re Vioxx Products Liab. Litig.*,

802 F. Supp. 2d 740 (E.D. La. 2011), the Court distributed the Common Benefit Fee among the appropriate attorneys. Mr Stratton deducted a fee from the proceeds allotted to the percentage objectors and distributed the ballance to them. Ms. Oldfather, an objector, took issue with Mr. Stratton's actions arguing that he violated the terms of the agreement he made with the objectors. After some discussion between the parties, the full nature and extent of which the Court is not privy to, Mr. Stratton remitted to Ms. Oldfather the fee he deducted from her portion of the proceeds.

## II.   PRESENT MOTION

Nevertheless, Ms Oldfather feels that Mr. Stratton should remit to the other objectors, none of whom has filed a complaint with the Court, all or a portion of the fees he deducted from their proceeds and brings the present motion seeking the Court's assistance. (Rec. Doc. 65207). She specifically requests that this Court refer the matter to Special Master Patrick Juneau. (Rec. Doc. 65207).

## III.   ANALYSIS

While her heart is pure and her actions and concern commendable, Ms. Oldfather's motion is misplaced. Mr. Stratton is no longer involved in the Vioxx MDL, and the Court has been advised that he has retired from the practice of law and resides in Connecticut. (Rec. Doc. 65214).

As mentioned, this Court did not set a fee for Mr. Stratton or put any constraints on him regarding any fee. Experienced counsel negotiated a fee with Mr. Stratton. If the other percentage-fee objectors take issue with Mr. Stratton's charges and have any interest in receiving a remittance of all or a portion of their fee on the basis that he violated his agreement with them,

they have a right to file a breach of contract claim against him in his resident jurisdiction. This Court is not the appropriate forum for such a dispute.  Moreover, there is a significant issue as to whether Ms. Oldfather has standing to bring such a motion.  Ms. Oldfather does not appear to have an injury in fact, because her fees have been refunded.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (defining injury in fact as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical'"); *see also Powers v. Ohio*, 499 U.S. 400, 411 (1991) (noting that third party standing requires injury in fact, a close relation to the third party, and some hindrance to the third party's ability to protect his or her own interests).  Accordingly, the motion is denied.

### IV.    CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Ms. Oldfather's Motion to Refer Certain Fact-Finding in the Stratton Matter to Special Master (Rec. Doc. 65207) is **DENIED**.

New Orleans, Louisiana, this 10th day of September, 2015.

_____

UNITED STATES DISTRICT JUDGE