UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX® | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| *This document relates to* | * | JUDGE FALLON |
| | * | |
| *Jo Levitt v. Merck & Co., Inc.* | * | MAGISTRATE JUDGE KNOWLES |
| 2:06-cv-09757-EEF-DEK | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF JO LEVITT'S REPLY IN SUPPORT OF HER
MOTION FOR LEAVE TO DEPOSE DR. ARNOLD KATZ**

Plaintiff Jo Levitt, through her counsel of record, submits the following Reply in Support of her Motion for Leave to Depose Dr. Arnold Katz:

**I.  INTRODUCTION**

On September 14, 2015, Plaintiff filed a Motion for Leave to Depose Dr. Arnold Katz. (Rec. Doc. 65253). On September 25, 2015, Merck filed an Opposition to Plaintiff's Motion for Leave to Depose Dr. Katz. (Rec. Doc. 65269). In its Opposition, Merck did not object to Plaintiff's request, however, Merck asked this Court to prospectively limit the scope of Plaintiff's inquiry of Dr. Katz. *Id.* at P. 1, ¶1. Specifically, Merck asks that Dr. Katz' deposition be limited to "credibility issues relating to whether Dr. Katz exercised his independent judgment when deciding to prescribe Vioxx to Ms. Levitt." Id. at P. 3, ¶ 6.

As more fully set forth below, Plaintiff objects to any such limitation of her right to depose Dr. Katz. Plaintiff also opposes Merck's request to be able to meet with Dr. Katz prior to his deposition, and/or to provide to provide copies of the pleadings and/or Orders from this case.

1

## II.   BACKGROUND REGARDING DR. KATZ

The credibility of Dr. Katz and the work he has done and continued to do—for pay—on behalf of Defendant Merck, was at the heart of Plaintiff's argument regarding the Learned Intermediary Doctrine.  In prior pleadings, Plaintiff provided this Court with evidence challenging Dr. Katz' presumed status as a "objective intermediary."  Such evidence includes but is not limited to:

a. Dr. Katz was paid by Merck to prescribe Vioxx to patients, including Plaintiff; (Plaintiff's Opposition to Merck's Motion for Summary Judgment Regarding Proximate Causation, P. 12).

b. Dr. Katz was one of Merck's investigators on the Vioxx ADVANTAGE study; (*Id*., P. 12).

c. Dr. Katz receives several benefits, monetary and otherwise, from Merck in order to encourage other physicians to prescribe Vioxx and other product.  (*Id*, P. 12).

d. Dr. Katz was paid by Merck to participate in its Vioxx trial, spoke on behalf of Merck to market Vioxx to other physicians,  (*Id*, P. 18)

e. Dr. Katz's deposition testimony directly contradicted Plaintiff's testimony; , his own testimony, and his own medical records. (*Id*, P. 18).

f. Dr. Katz continues to receive money and other payments from no fewer than ten pharmaceutical and drug companies according to the online database maintained by the Centers for Medicare and Medicare Services.  (*Id*, P. 18)

g. Throughout the entire time he treated Ms. Levit, Dr. Katz was on Merck's Speaker Bureau; (Rec. Doc. 64965, P. 5); and

    h.  Throughout the entire time he was treating Plaintiff, and prescribing her Vioxx, Dr. Katz never disclosed the fact that he was a paid speaker Merck. *Id.*

Plaintiff argued these facts presented a glaring issue regarding the credibility of Dr. Katz' testimony and whether he was truly an "objective mediator" at the time he prescribed Vioxx to Ms. Levitt.  This Court relied upon these arguments raised by Plaintiff in its Order denying Merck's Motion, to wit:

> Ms. Levitt also raises a genuine question of Dr. Katz's credibility, and a reasonable juror could question his testimony that he would prescribe Vioxx to Ms. Levitt with a black box warning. **Further fact investigation** into these alleged biases could ultimately thwart application of the learned intermediary doctrine and thus bolsters support for denial of summary judgment.

Rec. Doc. 65200, page 16 (emphasis added).

Plaintiff is simply asking to now conduct the further fact investigation contemplated by this Court. Plaintiff respectfully requests that this Court grant her Motion for Leave to Depose Dr. Katz, without the limitations requested by Defendant Merck.

### III.   ARGUMENT AND ANALYSIS

#### A.  Merck Cannot Define the Scope of Dr. Katz' Deposition.

Federal Rule 26(b)(1) establishes the broad scope of discovery in Federal Court:

> Parties may obtain discovery of any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence . . . .

Both of Merck's Motions for Summary Judgment relied heavily on Dr. Katz.  In fact, Merck's Motion for Summary Judgment on Proximate Cause relied almost exclusively on Dr. Katz's deposition testimony.  Plaintiff should be allowed to explore some of the statements Dr.

3

Katz has made regarding whether or not he would have still prescribed Vioxx to Ms. Levitt if a black box warning was in play; what information he would have provided to Ms. Levitt about the dangers of the taking Vioxx; the true reason he stopped prescribing Vioxx to Ms. Levitt; the basis of his opinions that Vioxx is just as safe as Celebrex, etc.

Plaintiff should also be allowed to explore what information Dr. Katz had concerning the dangers of Vioxx at the time he prescribed it to Ms. Sellek. Without providing Merck with an entire blue print of Plaintiff's plan for Dr. Katz' deposition, which would be work product, there are a multitude of issues that must be explored with this witness that go beyond questions regarding his credibility and objectivity.

Defendant Merck was previously granted unfettered access to Dr. Katz, and was able to both prepare him and depose him on any issues it pleased without Plaintiff or her legal representatives being present. Plaintiff should be afforded this same opportunity, to question Dr. Katz on any issues reasonably calculated to lead to the discovery of admissible evidence in this case. Just as Merck was not restricted in its questioning, Plaintiff should not be restricted.

B. **Merck's Cannot Meet with and/or Prepare Dr. Katz for His Deposition.**

1. **This Court Has Already Issued An Order Explicitly Prohibiting Merck From Engaging in Ex Parte Contact with Treating Physicians.**

On July 22, 2005, this Court issued an Order specifically prohibits Merck from engaging in ex parte contact. (Rec. Doc. 729) It has been reported that this Court's order is the most frequently cited decision regarding *ex parte* contact. How such a claim is verified is not clear, however, Westlaw does identify dozens of other Federal Courts and MDL Judges that have cited this Court's July 22, 2005 Order.

As the Court will recall, on June 6, 2005, the Court issued an Order which prohibited "unilateral interviews of prescribing physicians by any party." (Rec. Doc. 422) Soon after this Order was issued, Plaintiffs filed a Motion to Modify the Court's ruling. Primarily, it appears that Plaintiffs' were asking the Court to reconsider the portion of its Order which prohibited Plaintiffs from engaging in ex parte contact with their own treating physicians. In briefing and arguing this issue, however, the parties also addressed whether or not the proper remedy was to allow both sides unilateral ex parte access to treating physicians.

The Court recognized the unintended adverse consequences which had materialized as a result of restricting Plaintiffs from having contact with their own treating physicians. (Rec. Doc. 729, P. 5) The Court comfortably concluded that the interests of justice were best served by reversing course on this particular issue. *Id.* In doing so, however, the Court had to consider the more complex issue regarding whether or not to allow Merck to engage in ex parte contact with treating physicians. *Id.*

One of the principle concerns this Court had in granting Merck permission to engage in ex parte contact with prescribing physicians is that it would create a "direct conflict with the time honored doctor-patient confidential relationship which has been recognized and protected in both Western and Eastern civilization for over 2000 years." *Id.* at P. 6. The Court's Order goes through an eloquent yet important recitation regarding the history of doctor-patient privilege from a "code of ethics into a matter of law. *Id.*, Pp. 6-8.

Noting that there was no uniformity throughout the country regarding the scope of the physician-patient privilege, and bearing in mind the somewhat different perspective a prescribing physician is in, the court could not "justify destroying the physician-patient relationship and all of the concerns that arise because of that relationship." *Id.* at P. 9. In reversing its prior Order,

5

this court wisely felt that the "just option in this case is to protect the relationship between a doctor and patient by restricting defendants from conducting ex parte communications with Plaintiffs' treating physicians . . . ."[1] *Id.*

Merck has not identified any articulable, let alone justifiable basis upon which this Court should do anything other than stand by its Order.

### 2. **HIPPA Prohibits Ex Parte Contact with Treating Physicians.**

#### i. **Legislative Background of the Health Insurance Portability And Accountability Act (HIPAA).**

In 1996, the United States Congress enacted the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C.A. § 1320(d) et seq. (hereinafter referred to as "HIPAA"). *Smith v. American Home Products Corp. Wyeth-Ayerst Pharmaceutical, et al.*, 855 A.2d 608, 611 (N.J. 2003). One of the primary purposes of HIPAA is to standardize and increase the efficiency of common electronic transactions in health care through the "administrative simplification" provisions as well as to **protect** the security and privacy of individually identifiable health information ("IIHI"). *Id*.

Congress delegated to the Secretary of the Department of Health and Human Services the task of creating national standards to "ensure the integrity and confidentiality of the information" to be collected and disseminated. *Id*. (citing 42 U.S.C.A. § 1320d-2(d)(2)(A)). The regulations promulgating these standards as created by the Department of Health and Human Services became effective on April 14, 2003, and are collectively known as "the **Privacy Rule**." *Id.* (citing 45 C.F.R. §§160 *et. seq.*, 164 *et seq.*; 65 Fed. Reg. 82462 (Dec. 28, 2000)). The Privacy

---

[1] The Court also ordered that Plaintiffs' counsel could "engage in ex parte interviews with those doctors who have not been named as defendants." *Id.* Plaintiffs' counsel does not intend to engage in ex parte contact with Dr. Katz other than to arrange his deposition. Dr. Katz is not a defendant in this case.

6

Rule sets forth standards and procedures for the collection and disclosure of "protected health information" ("PHI"). *Id.* (citing 45 C.F.R. §160.103)).

PHI includes any information, whether oral or recorded in any form or medium, that (a) is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse and (b) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual. *Id.* at 612 (citing 45 C.F.R. §160.103)).

The Privacy Rule requires that health professionals implement various procedures regarding the use of and access to health care information. *Id.* It explicitly prohibits "covered entities" from using and disclosing PHI except as required or permitted by the regulations. *Id.* (citing 45 C.F.R. § 164.501 and 45 C.F.R. § 160.103)). Among the categories of "covered entities" are health care providers. *Id.* Health care provider means a "provider of services" (as defined in 42 U.S.C.A. 1395x(u)), a provider of "medical and other health services" (as defined in 42 U.S.C.A. 1395x(s)), and any other person or organization who furnishes, bills, or is paid for health care in the normal course of business. *Id.* (citing 45 C.F.R. § 160.103)).

The Privacy Rule **prohibits** a health care provider from using or disclosing PHI in any form oral, written or electronic, except as permitted under the Privacy Rule. *Id.* (citing 45 C.F.R. § 164.502(a)). "Use" and "disclosure" are defined very broadly. *Id.* (citing 45 C.F.R. § 164.501)). "Use" includes an examination of PHI. *Id.* (citing 45 C.F.R. § 164.501)). "Disclosure" includes divulging or providing access to PHI. *Id.* (citing 45 C.F.R. § 164.501)).

The Privacy Rule is grounded in the principal that, when using PHI or when requesting PHI from another covered entity, a covered entity must make reasonable efforts to **limit** PHI to

the **<u>minimum necessary</u>** to accomplish the intended purpose of the use, disclosure or request. *Id*. (citing 45 C.F.R. § 164.508). In other words, even if a use or disclosure of PHI is permitted, a covered entity must make reasonable efforts to disclose only the minimum necessary to achieve the purpose for which it is being used or disclosed. *Id*. The "minimum necessary" standard was implemented to prevent improper disclosure of PHI, yet to be flexible when a patient waives his or her privacy privilege for confidential medical information. *Id.*

### ii. The HIPAA Privacy Rule Prohibits *Ex Parte* Contact

HIPAA now regulates the methods by which a physician may release a patient's health information, including "oral" medical records. HIPAA authorizes obtaining medical records, not ex parte interviews, from healthcare providers by methods such as court orders, valid authorizations, subpoenas, or formal discovery requests pursuant to an adequate protective order. 45 C.F.R. 164.512(e).1

Under HIPAA, a healthcare provider can disclose a patient's medical records only upon receiving satisfactory assurance from the requesting party that (a) the plaintiff has received notice of the request and had the opportunity to have his objections resolved, or (b) the disclosure is subject to an adequate protective order or stipulation. 45 C.F.R. 164.512(e)(1)(ii).

In addition, HIPAA contemplated differences in state and federal law. By its express terms, HIPAA and the related provisions established in the Code of Federal regulations supercede any contrary provisions of state law, except as provided in 42 U.S.C.A. § 1320d-7(a)(1), 45 C.F.R. 160.203.2 Under the exceptions set forth in 42 U.S.C.A. § 1320d-7(a)(2), the only relevant circumstance under which HIPAA and its standards do not preempt state law is when the state law provides privacy protection that is "more stringent" than HIPAA's requirements. 42 U.S.C.A. § 1320d-7(a)(2)(B), 45 C.F.R. 160.203.

8

To be "more stringent" the court must determine whether the patient has the ability to withhold permission and effectively block disclosure. *Law v. Zuckerman*, 307 F.Supp. 705, 711 (S.D.Md. 2004)). If state law can force disclosure without a court order or the patient's consent, it is not more stringent than HIPAA regulations and, therefore, is preempted under the Act. *Id.*

### 3. Missouri Law Prohibits Ex Parte Contact with Treating Physicians.

#### i. Choice of Law

There is no consensus among Federal Courts on whether or not ex parte communications is governed by federal procedural law or state law. On one hand, Courts examine ex parte contacts as a procedural device designed to facilitate the discovery process. On the other hand, Courts consider ex parte contacts to be governed by state laws which address protected healthcare privileges. In the Zimmer Knee Nexgen Implant Litigation pending in the United States District Court for the Northern District of Illinois, Eastern Division, the Honorable Rebecca R. Pallmeyer provided an excellent survey/analysis of the choice of law analysis applied by numerous Federal Courts throughout the country. *See* Courtesy Copy of Order dated August 16, 2012 attached hereto.

Typically, Plaintiffs would engage in this classic choice of law analysis, however, this situation is different. Typically, a defendant is seeking to engage in ex parte contact purportedly as a discovery tool. In fact, this Court addressed that very issue in its Order of July of 2005. In this situation, Merck is not seeking to communicate with Dr. Katz for purposes of discovery. Indeed, Merck has all of Dr. Katz' medical records; Merck has already deposed Dr. Katz twice; and Merck has FAR MORE records on Dr. Katz than Plaintiff. Here, Merck wants to meet with Dr. Katz so it can prepare him for Plaintiff's deposition.

In this situation, there can be no doubt that state law concerning the sanctity of the doctor-patient relationship takes precedent over federal discovery procedures.

### ii. Analysis of Pertinent Missouri Law

Prior to the enactment of HIPAA and the Privacy Rule, the Missouri Supreme Court handed down two opinions arising out of the same facts and circumstances, *Brandt v. Pelican*, 856 S.W.2d. 658 (Mo.banc 1993) and *Brandt v. Medical Defense Associates,* 856 S.W.2d 667 (Mo. banc 1993). Both of the *Brandt* decisions concerned the issue of *ex parte* communications between a defendant and his representatives and a plaintiff's treating physicians.

In *Brandt v. Medical Defense Associates*, the Missouri Supreme Court held that an attorney for the patient's adversaries could participate in *ex parte* communications with the patient's treating physicians if the patient had put his or her physical condition at issue in a lawsuit. 856 S.W.2d 667, 671 (Mo. banc 1993). In *Brandt v. Pelican,* however, the Court held that the decision of whether to engage in *ex parte* discussions with the adversarial counsel "belongs solely to the physician, not to plaintiff or defendant." 856 S.W.2d. 658, 663 (Mo. 1993). The Court also expressly held that "we will **not** require the plaintiff to execute medical authorizations authorizing his treating physician to engage in *ex parte* discussions." *Id.* at 662 (reaffirming holding in *State ex rel. Woytus v. Ryan*, 776 S.W.2d. 389 (Mo. banc. 1989). (Emphasis added).

This is precisely what Merck is asking Plaintiff to do - sign a medical authorization that purports to authorize *ex parte* discussions. Absent such an authorization, Missouri law prohibits a physician from engaging in ex parte contact with a defense attorney.

Following the *Brandt* decisions, HIPAA was enacted and the rule of law regarding *ex parte* communications changed throughout the country and Missouri was no exception. In 2010,

the Missouri Supreme Court ruled that ex parte communications with treating physicians were absolutely prohibited pursuant to HIPAA's Privacy Rule. *Proctor v. Messina*, 320 S.W.3d 145, Pp. 153 - 156 (Mo. 2010). While federal preemption was the basis of the ban on ex parte contacts, the Court reiterated its prior ruling in *Woyfus*, *Brandt I* and *Brandt II* that a "plaintiff cannot be compelled to execute a medical authorization authorizing his treating physicians to engage in ex parte communications with the defendant . . . ." *Id.* at 157.

### 4. Public Policy Prohibits Ex Parte Contacts with Treating Physicians.

As the Court keenly observed in its Order from July of 2005, there are public policy concerns regarding ex parte communications which go the very heart of the nature of the physician-patient relationship.

In Missouri, the Courts supported a public policy which "discourages *ex parte* communication between defense counsel and plaintiff's physician" long before the regulatory protections of HIPAA. *Siever v. Liberty Mut. Ins. Co.*, 851 S.W.2d 529, 531 (Mo. Ct. App., 1992) (citing *State ex rel. Woytus v. Ryan* 776 S.W.2d 389 (Mo. banc 1989)). There is an obvious potential for abuse "that irrelevant, privileged medical information will be obtained through *ex parte* discussions." *Woytus* at 394 (quoting *Loudon*, 756 P.2d at 140).

While the courts recognized that defendants might bear more of a burden because of this restriction, any burden is "outweighed by the potential risks to the physician-patient relationship." *Woytus* at 395. Furthermore, a defendant cannot establish the existence of any such burden if "*ex parte* information may be legitimately obtained by other methods of discovery." *Id.* at 395. Again, this is not even a factor in this case because Merck is not trying to **obtain** *ex parte* information, Merck is trying to **convey** *ex parte* information to Dr. Katz.

Under federal law, there is no Rule of Civil Procedure explicitly permitting or prohibiting ex parte interviews between defendants and a plaintiff's treating physicians. *Horner v. Rowan Companies, Inc.,* 153 F.R.D. 597, 599 (S.D. Tex. 1994) (citing *Filz v. Mayo Found.,* 136 F.R.D. 165, 173 (D. Minn. 1991)). However, "many federal courts have had no trouble condemning the use of such undisclosed ex parte conferences." *Horner v. Rowan Companies, Inc.,* 153 F.R.D. 597, 600 (S.D. Tex. 1994). In *Neal v. Boulder,* 142 F.R.D. 325 (D.Colo.1992), the United States Magistrate Judge recognized the split of authority among different circuits, and held that "the better reasoned view of courts considering this issue is that the doctor-patient privilege is not completely abrogated when a plaintiff chooses to commence litigation. The treating physician should continue to be able deal with his or her patient within the parameters of the privilege." *Id*. at 328.

"Ex parte interviews between nonparty treating physicians and lawyers representing interests adverse to the patient open the door for improper or unethical conduct." *Harlan v. Lewis*, 141 F.R.D. 107, 113 (E.D. Ark. 1992) aff'd, 982 F.2d 1255 (8th Cir. 1993).

> An unauthorized ex parte interview could disintegrate into a discussion of the impact of a jury's award upon a physician's professional reputation, the rising cost of malpractice insurance premiums, the notion that the treating physician might be the next person to be sued, and other topics which might influence the treating physician's views. The potential for impropriety grows even larger when defense counsel represents the treating physician's own insurance carrier and when the doctor, who typically is not represented by his personal counsel at the meeting, is unaware that he may become subject to suit by revealing the plaintiff/patient's confidences which are not pertinent to the pending litigation.

*Id.* (citing *Crist v. Moffatt*, 389 S.E.2d 41, at 47 (N.C. 1990), quoting *Manion v. N.P.W. Medical Center, Inc.*, 676 F.Supp. 585, 594–95 (M.D.Pa.1987)).

### C. <u>Merck Cannot Provide Dr. Katz with Pleadings</u>

In addition to seeking permission to engage in ex parte contact, or perhaps in the alternative, Merck has requested permission to provide Dr. Katz with copies of Plaintiff's pleadings and the Court's Order which specifically discuss Plaintiff's concerns about Dr. Katz' partiality. Again, Merck cites to no case law or any other authority which supports such an absurd request. Instead, Merck feigns incredulity and squawks that "Plaintiff's briefs have been filled with insulting and inflammatory accusations against Dr. Katz." Merck's Reply at P. 3, ¶7. (Rec. Doc. 65269).

Plaintiff is fully aware of the fact that, if true, some of the concerns previously raised concerning Dr. Katz' conduct could establish a breach in the standard of care. There may even be an argument that such a breach may have been a proximate cause of Ms. Levitt's injuries. Nevertheless, Merck's benevolent concerns about Dr. Katz' potential liability is superfluous. In Missouri, claims for medical malpractice must "be brought within two years from the date of occurrence of the act of neglect complained of. . . ." Mo. Ann. Stat. § 516.105 (West).

Ms. Levitt filed suit against Merck in 2006 alleging damages for injuries she sustained as a result of two cardiac events which occurred in early 2000. Dr. Katz' medical records do not identify any treatment with Ms. Levitt since August of 2003. Plaintiff finds it hard to believe that Merck honestly believes that Missouri has a medical malpractice statute of limitations that excess 15 years.[2] Merck's arguments that Dr. Katz, as a potential Defendant, should have additional protections from an intrusive deposition should are simply unfounded.

---

[2] Statues of Limitations for medical malpractice actions typically range between one to three years throughout the country. In fact, upon information and belief, only three states in the entire country have statutes of limitations in excess of 3 years, the longest of which is North Dakota at six years.

13

## IV.     CONCLUSION

While there are a plethora of issues regarding the credibility and objectivity of Dr. Katz which must be explored, there are also additional topics concerning his care and treatment of Ms. Levitt which much also be explored.  Merck has already had two shots at Dr. Katz.  Plaintiff should be entitled to at least one shot under the same scope and the same rules.

Merck's request for ex parte contact is not an attempt to facilitate the discovery process. Instead, it is an attempt by Merck to unilaterally meet with Dr. Katz so he can be professionally prepared by Merck's lawyers in advance of the deposition.  If Merck is granted permission to unilaterally meet with Dr. Katz, there is little doubt that such meetings will be anything more than deposition rehearsals.  Merck should not be allowed to influence the testimony of Dr. Katz any more than it already has.

This Court's prior Order appropriately precluded Merck from engaging in *ex parte* contacts with treating physicians in appreciation of the sanctity of the ancient principles and laws governing the physician-patient relationship.  In the same spirit, the passage of HIPAA was an effort by the Federal Government to codify patients' right to privacy, not to provide "basic fairness" to industry-friendly defense attorneys.

Respectfully submitted,

**HUMPHREY**, **FARRINGTON** & **McCLAIN, P.C.**

/s/ Daniel A. Thomas
Kenneth B. McClain            MO #32430
Daniel A. Thomas              MO #52030
221 West Lexington, Suite 400
Independence, MO 64051
(816) 836-5050 Telephone
(816) 836-8966 Facsimile

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing **Plaintiff's Reply In Support of Her Motion to Depose Dr. Arnold Katz** has been served on Defense Counsel, Jonathan Williams, and Defendant Liaison Counsel, Dorothy H. Wimberly, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 10th day of October, 2015.

/s/ Daniel A. Thomas
Kenneth B. McClain                    MO #32430
Daniel A. Thomas                       MO #52030
HUMPHREY, FARRINGTON & McCLAIN, P.C.
221 West Lexington, Suite 400
P.O. Box 900
Independence, MO 64051
(816) 836-5050 Telephone
(816) 836-8966 Facsimile

**ATTORNEYS FOR PLAINTIFFS**