# EXHIBIT C

# Exhibit 7

Expert Report of David Egilman, MD, MPH



**David Egilman, M.D., M.P.H.**
**8 North Main Street, Suite 404**
**Attleboro, Massachusetts 02703**
**Phone 508-226-5091 Fax 425-699-7033**

# Report of David Egilman MD MPH

## Qualifications

1. My name is Dr. David Egilman. I am a medical doctor and Clinical Professor of Family Medicine at Brown University's Warren Alpert School of Medicine at. I am board certified in Internal Medicine and Preventive-Occupational Medicine. My curriculum vita sets forth more fully my qualifications.

2. I received a Bachelor of Science from Brown University in Molecular Biology in 1974. I received a medical degree from Brown University in 1978. I completed a three-year medical residency in Internal Medicine at Strong Memorial Hospital in Rochester, New York, in 1981. I completed a three-year training program in epidemiology, called the National Institutes of Health Epidemiology Training Program, in 1984. As part of this program, I completed a Master's in Public Health at the Harvard School of Public Health. At Harvard, I studied epidemiology, statistics, and occupational medicine, industrial hygiene, warnings and occupational and environmental law. I completed a third residency in preventative medicine in 1994.

3. I served two years at the National Institute for Occupational Safety & Health (NIOSH) designing and conducting small and large epidemiologic studies. I was responsible for interpreting and implementing aspects of the OSHA act of 1971.

4. I have an expertise in medical, scientific, and business ethics, which derives from a number of experiences and publications. I teach a course, "Science and Power; A Bioethical inquiry," that addresses various aspects of medical/scientific aspects, including the intersection of business and medicine.

5. I am a board member of Citizens for Responsible Care in Research, 1997-present. This non-governmental organization deals with the ethical conduct of drug companies with respect to warnings and marketing.

6. Since 1978, I have published a variety of letters and medical articles on the issues that relate to the manner in which cause-effect determinations are made in medicine (the

1

epistemology of medicine). I have discussed the normal, accepted process of causal determination in medicine in several peer reviewed articles.

7. My qualifications and opinions are also based in part on my clinical experience and awareness of the ways that normal physicians in normal medical practice make decisions about causal relationships that affect patients' lives every day. Much of my time is devoted to direct patient care and consulting for corporations. I served as an expert on state-of-the-art issues at the request of both injured individuals and companies.

8. In the course of doing research, publishing peer reviewed papers, my corporate consulting in public health including FDA policies and drug and medical device marketing and teaching courses, I base my opinions on the following sources of information:
   i. Review of medical literature
   ii. Medical journal articles
   iii. Medical meetings
   iv. Medical textbooks
   v. In order to review medical literature, I conducted computer searches of several different databases including:
      1. Index Medicus
      2. EPA
      3. Cancer Lit
      4. MedLine
   vi. Secret corporate studies conducted and/or controlled by MERCK or its paid consultants.
   vii. Depositions of experts and corporate officials

9. I have authored five peer-reviewed papers related to MERCK's actions and Vioxx
   i. Krumholz HM, et al. What have we learnt from Vioxx? BMJ. 2007, 334(7585): 120-3.
   ii. Ross, JS, et al. Guest authorship and ghostwriting in publications related to rofecoxib: a case study of industry documents from rofecoxib litigation. JAMA. 2008, 299(15): 1800-12.
   iii. Hill KP, et al. The ADVANTAGE seeding trial: a review of internal documents. Ann Intern Med. 2008, 149(4):251-8.
   iv. Ross JS, et al. Pooled analysis of rofecoxib placebo-controlled clinical trial data: lessons for postmarket pharmaceutical safety surveillance. Arch Intern Med. 2009, 169(21):1976-85.
   v. Ross JS, et al. Persistence of cardiovascular risk after rofecoxib discontinuation. Arch Intern Med. 2011, 171(4):305

10. In addition, I have authored multiple publications related to pharmaceutical conduct in terms of development, promotion, and analysis. (See CV attached hereto).

2

11. During the time Vioxx was on the market I was detailed by MERCK sales representatives in order to sell Vioxx (MRK-HUM0003536, MRK-HUM0003546, MRK-HUM0003549)). I was also sent a letter by MERCK in August of 2001 which contained false and misleading information from the VIGOR trial.

12. I have published a book chapter on the pharmaceutical industry and its conduct. (Egilman DS, Ardolino E. The Pharmaceutical Industry, Disease Industry: A Prescription for Illness and Death. In: Wiist W, editor. The Bottom Line or Public Health: Tactics Corporations Use to Influence Health and Health Policy, and What We Can Do to Counter Them: Oxford University Press; 2010.)

13. I have reviewed the history of warnings from the published literature, and from internal corporate documents and organizational documents. I presented a paper at the 2000 Annual Conference of APHA on warnings. I teach about warnings at Brown University, including FDA drug related warnings. I testified before Congress on the history and development of informed consent as well as current informed consent practices. I have been accepted as an expert by the court in *Keenan v, Parke-Davis et al.* PC &4-1667 (Rhode Island) on the issue of warnings and FDA policy. I have also been accepted as a witness on issues that relate to FDA warning policy in the case of *Vassallo v. Baxter Healthcare Corporation,* 428 Mass. I (1998). My affidavit on medical epistemology was cited by the court. I have reviewed corporate documents specifically having to do with warning practices throughout this century. I have studied the efficacy of warnings,

14. I have also studied, taught, and published articles on the history of medical ethics and the duty to warn. I published two chapters in textbook "Handbook of Warning" on the history of warnings as well as the use of anti-warnings in the tobacco, beryllium and pharmaceutical industries.

15. I have reached the conclusions stated below to a reasonable degree of medical probability based on my review of the medical and scientific literature and based on my years of training and clinical experience as a physician.

## GENERAL OPINIONS

16. MERCK had a duty to know or determine the hazards of Vioxx and to warn patients and doctors of those hazards.

17. MERCK had an obligation not to undermine its own warnings and/or disclosures with anti-warnings. An anti-warning is information that that deliberately misrepresents dangerous products as safe in order to contradict publically available evidence that a drug is hazardous. In this case MERCK's undertook a campaign to discredit or pay physicians (to stop warning) who had warned about Vioxx hazards called the "neutralization" program.  The use of anti-warnings is a violation of a company's duty to warn.  Anti-warnings often undermine disclosures and make them meaningless.

3

18. Given that knowledge of the risks of a drug form the basis for warning patients and physicians, MERCK was obligated to establish adequate knowledge on the risks of Vioxx before it was marketed.

19. MERCK failed to determine the full nature and extent of Vioxx's cardiovascular risks before launch. MERCK should have defined the CV risk prior to submitting an NDA.

20. MERCK was aware of nonclinical and clinical data linking increased incidences of cardiovascular events with Vioxx usage, prior to the release of the VIGOR findings.

21. MERCK should have amplified the Vioxx labeling to reflect the evolution of ongoing scientific efforts to address these and other potential mechanisms associated with cardiovascular concerns.

22. Vioxx should have removed from the market after the VIGOR and Alzheimer (Protocols 091, 126 and 078) results became known internally at MERCK.

23. MERCK launched and sold Vioxx without informing patients or doctors that Vioxx increased CV risk and avoided further studying the CV risk.

24. MERCK misrepresented, concealed, suppressed, and omitted material facts regarding Vioxx's risks of causing and/or promoting the progression of Alzheimer's disease, CV disease, pulmonary edema, congestive heart failure, hypertension and respiratory illness.

25. Vioxx was defectively designed, and safer and less-expensive alternatives were available during the entire time period MERCK designed and marketed the product. Vioxx has no unique benefits for pain relief but did have unique risks. Vioxx was ostensibly designed to provide patients with a safer NSAID equal or superior in pain efficacy to available NSAIDs. In fact, Vioxx caused more deaths from GI and CV adverse events than traditional NSAIDs, including death from GI complications and vascular events. This is pointed out by Wright in his publication "The double-edged sword of COX-2 selective NSAIDS: "One striking finding from these trials is that despite the large size and duration (average 8 to 9 months), there was no decrease in the incidence of death due to gastrointestinal complications… there were 4 such deaths in the VIGOR study (3 patients receiving rofecoxib and 1 receiving naproxen). Cardiovascular events were the main cause of death in both trials (69% of 36 deaths in the CLASS and 46% of 37 deaths in the VIGOR trial)." (Wright, JM. The double-edged sword of COX-2 selective NSAIDs. CMAJ. 2002 Nov 12;167(10):1131-7.)

26. I discuss MERCK's action with respect its failure to comply with corporate community public health and other standards with respect to its duty to adequately test and/or warn and disclose all material positional and actual risks associated with the use of VIOXX in all populations including and especially in particularly venerable populations. Venerable refers to hazards to population with higher than average or unique risks e.g. history of GI bleed or MI or dementia and ability to understand and comply with safety precautions. A

4

failure to warn also appears to violate provisions of the Utah False Claims Act in the following particulars:

    i. MERCK and its employee knowingly caused the submission of false claims to Utah Medicaid because the representations and omission made Vioxx appear to have a safety and efficacy profile that wholly or partially false, fictitious or fraudulent.

    ii. MERCK and its employees entered into an agreement or concerted action to keep knowledge of the true safety profile hidden from the medical profession, pharmacists, the general public and specifically Utah Medicaid.

    iii. MERCK and its employee made the false or incomplete submissions of documents required by the FDA with the intent that the FDA, the medical profession, the general public and Utah Medicaid would rely upon those false submissions

## Basis for Opinions

## Pre-VIGOR Results

27. On October 10, 1996, MERCK officials wrote, "[a]dverse events of most concern were in the cardiovascular system (e.g. MI, unstable angina…)."(MRK-ABC0048699) This conclusion was the result of a research management committee update evaluating a placebo-controlled high dose study of Vioxx in Rheumatoid Arthritis (referred to as "Protocol 017"). Meanwhile, a table listing patients with non-fatal, serious clinical adverse experiences showed three thrombotic events including heart attack, unstable anginas, and pulmonary blood clots in the Vioxx-treated patients and no thrombotic events in placebo-treated patients (MRK-AKU0083901 at 4223-4226), which was submitted to the FDA in Protocol 017 (Table E-152 of MERCK's Integrated Safety Summary dated October 26, 1998). During a review of the trial at Research Management Committee meeting, it was stated, "Adverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina, rapid fall in hemoglobin and hematocrit in some subjects, and a small increase in blood pressure). We plan to evaluate MK-966 in a study where subjects are also given low dose aspirin." MERCK had substantial grounds to evaluate these findings further.

28. During May 1996 through January 1997, MERCK funded Protocol 023, a double-blind, placebo-controlled safety and pharmacokinetic study of Vioxx. In that study, a decrease was noted in the production of PGIM in urine, one of two metabolites of prostacyclin. Notes from a Vioxx project team minutes in January 1998, noted that Vioxx "had no effect on systemic thromboxane," which is involved in promoting platelet aggregation and clotting. (MRK-ABC0009946). MERCK believed that "[t]hese findings raised a

concern about the potential for VIOXX to cause cardiovascular problems." (MRK-ABC0009946)

29. Drs. Garrett FitzGerald, John A. Oates, and Carlo Patrono, MERCK's external advisors, each proposed additional research to further examine these "[a]dverse events of most concern", cardiovascular problems.(MRK-ABC0048699)

30. In October 1997, Dr. FitzGerald, a MERCK consultant and senior author on Protocol 023, suggested several preclinical and clinical studies to address Vioxx possible mechanism of inhibiting prostacyclin from a vascular source (MRK-NJ0051533).

31. Dr. Oates of Vanderbilt University wrote two letters, dated October 27 and November 17, 1997, to MERCK personnel expressing his interest in studying the implications of Vioxx inhibition of prostacyclin biosynthesis. In the second letter, Dr. Oates states that an evaluation of the beta-oxidation metabolite of prostacyclin "indicates a predominant localization of prostacyclin synthase in the vasculature, other smooth muscle such as bronchus, and in fibroblast cells in several organs." Dr. Oates also noted that "it seems quite unlikely that 2, 3-dinor-6-keto-PGF$_1$ a in the urine is derived primarily from the kidney." (MRK-NJ0152620; MRK-ABC0002150)

32. According to Dr. Alan Nies, head of clinical pharmacology department at MERCK, instead of doing the animal studies Doctors Oates and Fitzgerald recommended, MERCK reviewed their clinical data to see if there was an actual CV risk. (deposition of Alan Nies 3-2-2005, Pages 143-151) This analysis was performed by physician's assistant Dr. (Ph.D.) Watson. This analysis showed that there was an elevated risk of CV events in both males and females. The rate in women was 2.16 (CL (1.14 -- 3 .94). This is statistically significant. The rate in men was 1.28 (CL .53 -- 2 .82). This is not statistically significant but is not reassuring; especially considering the fact that the group labeled Vioxx includes all patients in these trials whether or not they were in the placebo or the Vioxx arm. Despite their best efforts to bias their results, MERCK still found a statistically significant excess of CV SAEs in Vioxx treated patients.

33. In November of 1996, Thomas Musliner, Executive Director of Clinical Research, wrote a memo titled "Anticipated consequences of NSAID antiplatelet effects on cardiovascular events and effects of excluding low-dose aspirin use in the Cox-2 GI Outcomes Megatrial." The memo concluded that "If aspirin prophylaxis is not permitted there is a substantial chance that significantly higher rates of CV AE events (MIs, angina, strokes, TIAs, etc.) will be observed in the selective Cox-2 inhibitor group compared to the standard NSAID group…"(MRK-AAX0002413-20)

34. In an email in February of 1997, Briggs Morrison, a senior MERCK researcher, in discussing the plan for a large GI outcomes trials commented on aspirin use in potential study design, "I know this has been discussed to death, but real world is everyone is on it, so why exclude AND [sic] without COX-1 inhibition you will get more thrombotic events and kill drug."(MRK-ABC0009946)

6

35. In response to the email from Briggs Morrison, Dr. Alice Reicin wrote, "This is a no-win situation. The relative GI risk of even low-dose aspirin may be as high as 2-4 fold. Yet the possibility of increased CV events is of great concern – (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients – i.e. those that have already had an MI, CABG, PTCA? This may decrease the CV event rate so that a difference between the two groups would not be evident."(MRK-ABC0009946)

36. By early 1997, MERCK found cardiovascular related concerns from unblinding the results of an osteoarthritis study completed in early 1996 (Protocol 010). Patients in the study were randomized to receive placebo, Vioxx 25 mg daily, or Vioxx 125 mg daily. The results revealed that the Vioxx 125 mg and 25 mg groups had more cardiovascular adverse events than the placebo group, which had no cardiovascular adverse events. In addition, two patients, one in each Vioxx treatment group, discontinued the study due to transient ischemic events (TIAs) (MRK-OS420045657). Because these events occurred at higher doses than those found at lower doses, this is an indication of a dose response phenomenon. It can also be hypothesized that MERCK lowered the dose to reduce the incidence of CV events. The fact that events occurred at higher doses than those found at lower exposures is evidence of a dose response phenomenon. In addition absent other evidence it appears that MERCK dropped the dose to reduce the incidence of these CV events.

37. A December 1997 meeting, attended by a MERCK representative and outside MERCK advisors, entitled "International consensus meeting on the mode of action of COX-2 inhibition" included a discussion of Vioxx's potential to predispose for cardiovascular side effects. The executive summary of the meeting includes: "It was emphasized that the major reason for both the development of COX-2 inhibitors, and this meeting, was adverse events associated with NSAIDs. Although gastric intolerance was the most obvious, renal and cardiac toxicity were important and a probable link between these phenomena has been established. It is therefore important to monitor cardiac side effects with selective COX-2 inhibitors" (MRK-ABK0311053).

38. In a January 1998 memo to Drs. Scolnick, Shapiro, Nies and Spector, A.W. Ford-Hutchinson, urged MERCK to recommend low-dose aspirin use for all patients at risk of heart disease. His concern arose from the finding that Vioxx reduced urinary PGIM, which is a vascular endothelial metabolite of prostacyclin. Hutchinson stated that "the concerns about COX-2 involvement in cardiac disease are potentially valid" and added (MRK-ABC0000069): "It is likely that we can produce evidence in the dog that the inhibition of this metabolite follows that of other renal metabolites and that it is a common phenomena observed with all COX-2 inhibitors. However, as these studies were carried out in normal volunteers and not in patients with cardiac disease, who might be excreting systemic COX-2 derived metabolites, resolving this issue will not prevent the larger issue being raised by potential reviewers. Because of this it might be advisable in our label to recommend low-dose aspirin usage for all patients at risk of cardiac disease."

7

MERCK did not include this disclosure or the reason it was needed in its label or press material; instead it issued an anti-warning press release, "Merck Reaffirms the CV safety of Vioxx." This is an example of an anti-warning. It is unclear when MERCK first affirmed VIOXX's CV safety but whenever that was, MERCK had not tested the drug sufficiently to state this and they were in possession of data that directly contradicted this statement.

39. Dr. Harry Guess, an epidemiologist at MERCK, wrote in an email on January 2, 1998, "As you recall, the reason why there is some concern about CVD events is that by inhibiting cyclooxygenase-s without inhibiting cyclooxygenase-1, one is at least partially inhibiting an anticlotting and vasodilating substance (PGI2) WITHOUT inhibiting a potent vasoconstrictor (thromboxane). This combination is not found with other drugs; conventional NSAIDs would also inhibit thromboxane. Hence, it is biologically plausible that specific cyclooxygenase inhibitors could predispose to thrombolic events in a way that other drugs do not." (MRK-AVJ0005720)

40. On May 3-6, 1998, MERCK's Scientific Advisory Board noted that Vioxx may inhibit prostacyclin, an inhibitor of platelet aggregation, and commented to MERCK that this could possibly increase the risk of cardiovascular disease. The Advisory Board stated that "[b]y removing this potent inhibitor of platelet aggregation, the probability that a coronary plaque rupture would lead to myocardial infarction or ischemic ventricular fibrillation is enhanced. More information is clearly needed to address these hypotheses and the other questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality." (MRK-AEI0002734) The Advisory Board stated, "[i]t is therefore proposed that coronary events be predetermined endpoints in all future controlled trials with Vioxx....It is proposed that these endpoints be assessed by a uniform set of criteria so that meta analysis of coronary and cerebral vascular events from all these can be performed." (MRK-AEI0002734)

41. By 1998 MERCK scientists examining levels of thromboxane and prostacyclin in human urine found that COX-2 inhibition suppressed PGIM (a metabolite that is an indicator of prostacyclin levels in the body) but not thromboxane, evidence that COX-2 inhibition could induce a pro-thrombotic state. "The data on prostacyclin in man seems clear," wrote Dr. Edward Scolnick in a 1998 email, "can we try in animals?"(MRK-ABH0014002) in an effort to explain the imbalance between thromboxane and prostacyclin, Dr. Scolnick ordered experiments on animal urine and tissue and human tissue to determine if prostacyclin was produced in those locations and if its production was suppressed by COX-2 inhibitors. (MRK-ABH0014002)

42. In September of 1998, Dr. Carlo Patrono, an outside MERCK advisor, sent a letter to the company expressing the likelihood of four possible cardiovascular adverse effects of COX-2 inhibitors, like Vioxx: a) Expression of COX-2 in macrophages/plaque monocytes as a potential source of aspirin-insensitive TXA2 production b) Expression of COX-2 by endothelial cells as a potential source of PGH2 for transcellular biosynthesis of TXA2 by aspirinated platelets c) COX-2-derived eiconsanoids as a potential factor in

the local inflammatory process of unstable angina and ischemic complications d) COX-2-derived PGI2 as a potential contributor to local modulation of platelet activation. Dr. Patrono wrote, "I would suggest that it would be in the best interest of MERCK to look into these issues as quickly and thoroughly as possible." (MRK-ABC0002199)   In response to this letter, Alan Nies of MERCK wrote a note to his colleagues stating that Dr. Oates had raised similar concerns and "I told John we would not be doing any clinical studies at this time.  When these drugs are available many investigators will probably do such studies with or without our help/consent." (MRK-ABK0311068)

43. In November 1998, MERCK submitted the VIOXX NDA to the FDA.  MERCK's scientists and MERCK consultants concerns were largely omitted from the General Safety Overview in the Clinical Documentation section, which included this statement: "It is theoretically possible that use of MK-0966 without concomitant aspirin in patients at risk for cardiovascular events may not provide the cardiovascular benefits of aspirin" (MRK-ABS0066396).

44. Pharmaceutical manufacturers are often required and should always establish a system for pharmacovigilance activities to evaluate information about suspected adverse events. All relevant information, including reports and analyses of updated safety-related information, must be shared with the FDA.  Post-marketing surveillance (post hoc analysis) is critically important for the development of a safety database for the drug product.   It has been shown that pre-marketing clinical trial data provide only initial and preliminary safety information for a new drug product and sometimes critical safety concerns are not observed until after an approved product has been commercially launched. Therefore, it is imperative that manufacturers closely monitor all available data, conscientiously review published literature, conduct necessary follow-up studies and fully explore all potential adverse events.

45. Dennis Riendeau, of MERCK Frost in Canada conducted a dog urinary prostaglandin study in 1999 found that certain COX-2 inhibitors resulted in lower levels of urinary prostanoid metabolites, an indication that COX- 2 inhibitions suppressed prostacyclin production.(MRK-AEF0001034) Other studies reviewed by MERCK also found that COX-2 inhibition contributed to a prothrombotic state in animal tissue.(MRK-AAZ0006966) Despite the fact that these studies indicated that COX-2 inhibition limited prostacyclin and despite Scolnick's 1998 email, MERCK was careful not to use rofecoxib in these studies.(MRK-AEG0004962) MERCK also ignored the advice of Drs. Fitzgerald and Oates (the head of its science advisory panel) both of who recommended that MERCK conduct a series of animal tests of this hypothesis. Dr. Nies says MERCK elected to test the hypothesis in human beings first (he was apparently unaware that MERCK did not test this hypothesis on rofecoxib but on *other* COX-2 inhibitors in the above-mentioned studies).(Deposition of Alan Nies. 4-1-2005) It is better to cause adverse effects in animals before human beings are exposed to potentially toxic drugs. Human subjects assume, unless told otherwise, that animal tests regarding adverse effects have been done first. MERCK did not inform IRBs or patient volunteers of the order in which it chose to conduct tests. This is wrong.

9

46. On April 20, 1999, MERCK presented information on VIOXX to the FDA Arthritis Advisory committee. MERCK did not disclose the scientific advisors suspicions that COX-2 inhibitors might be linked to adverse cardiovascular events (MRK-AEI0002734). Rather, MERCK stated: "It has been suggested that specific COX-2 inhibition might increase the risk for cardiovascular events due to the lack of platelet function inhibition. It is clear that rofecoxib does not inhibit platelet aggregation and would not, therefore, convey the cardioprotective properties attributed to low-dose aspirin. While this benefit is not offered by rofecoxib, there is no evidence, preclinically or clinically, to suggest that rofecoxib carries any increased risk for cardiovascular events" (MRK-ACD0064937). This statement contradicted the beliefs of MERCK's external scientific experts.  MERCK did not explain the risk posed by upsetting the balance between the $TXA_2$ formed by platelets and the prostacyclin formed by blood vessels. (MRK-ABS0066396).

47. In April of 1999, Dr. Juan Carlos Pelayo, an FDA Medical officer, completed a review of the cardiovascular (limited to hypertensive and edema related events) and renal safety database for Vioxx. He found that "[i]n the aggregate, the data allow to reach the conclusion that qualitatively the cardiovascular and rental "toxicity" of MK-0966…is readily distinguishable from placebo, but closely mimics that of other, already approved, nonselective COX-1/COX-2 inhibitors."(FDACDER007847)  In addition, "[q]uantitatively there is evidence, in most studies, for the aforementioned key cardiovascular and renal adverse findings to occur in a dose-dependent manner with the administration of MK-0966. Dose-response relationships are very helpful to establishing cause-effect relationships. (See MERCK's deletion of this argument from the draft 078 paper.)

48. Dr. Pelayo also concluded that "The identified cardiovascular and renal toxicities associated with MK-0966, when administered at a dosage ranging from 25 to 50 mg/daily, occur at a higher rate than with the other tested comparators, i.e., ibuprofen, diclofenac, or nabumetone." (FDACDER007847)  MERCK failed to disclose this. In fact MERCK put out anti-warnings claiming these were effects of the class but never disclosing that VIOXX was worst in the "class."

49. Following the approval of Vioxx in May 1999, MERCK became aware of cardiovascular-related adverse events (Protocols 085, 090).  In fact, these events were reported in ongoing clinical trials, which associated Vioxx with more cardiovascular adverse events than both placebo and active control groups. (MRK-NJ0170152-274; MRK-ADJ0035003-8; MRK-NJ0220388-454)

50. Congestive Heart Failure hypertension, pulmonary edema, and heart failure are all drug related adverse cardiac events. MERCK analyzed these events separately which obscured the true toxicity of Vioxx. MERCK knew that these events should not be disaggregated from the general CV criteria. For example MERCK included them (all but hypertension) in the initial list of events from the SOP for "Surveillance monitoring and adjudication of acute thromboembolic vascular events in clinical trials of COX-2 specific

10

inhibitors."(MRK-aJA0175045) MERCK crossed them off the list in December 1999 and made the changes retroactive to October 1999 - the same time the DSMB became concerned about the CV outcomes in the VIGOR trial. It appears that they were crossed out because of "high volume but low yield of confirmed thromboembolic events". (MRK-AJA0137782) This unblinded change in the Data Analysis Plan (DAP) is scientifically improper. These CV adverse events which MERCK knew were related to Vioxx in all placebo trials were never adjudicated. This was despite the fact that Dr. Reicin (and almost any second year medical student) understands that these events could either be a result of or precipitate an MI.  Dr. Ford Hutchinson predicted that Vioxx could cause congestive heart failure, acute coronary syndrome and myocardial infarction in January of 1998.  (A.W. Ford Hutchinson deposition April 2012 at 171:8 to 173:2; MRK-ABC0000069)

51. MERCK never amended the VIOXX labeling relating to cardiovascular risks between the issuance of the 1999 launch label and the April 2002 post-VIGOR "miracle" label. Specifically, CV events listed in the Adverse Reactions Section relating to rarely occurring (<0.1%) along with insect bites and hemorrhoids and other events that were known to be unrelated to VIOXX. According to Dr. Hirsh even this listing was in error since the CV rates were higher. (MRK-ABD0001986) Dr. Watson claimed that this constituted a CV warning. (Deposition of Doug Watson in Plubell and Ivey vs. MERCK 5-17-11 and 6-8-11.

52. Thus according to him MERCK had a basis to warn of this risk at that time. I agree with Dr. Hirsch on this issue except for the fact that a listing in the adverse events section is not a warning or disclosure. A real disclosure goes in the warning section of the label not in Adverse Reactions Section which is a list of almost anything that happened to any patient in any trial irrespective of causation.

53. MERCK updated the Vioxx label in 1999 and 2000 and they had the obligation to update the label at anytime for safety concerns.  They never did this adequately with respect to CV risk.

## VIGOR

54. MERCK was aware that their study design posed a risk to patients. In a March 2000 email entitled "VIGOR results," Edward Scolnick, head of MRL, told Deborah Shapiro, a MERCK employee and non-voting member of the VIGOR DSMB: "[D]eborah Thanks, and thanks for the call this morning. testing Vioxx 50 milligrams in RA patients with over half on steroids is one "h.." of a test for GI outcomes. I think it's like testing Mevacor for liver safety in patients with hepatitis. We will be fine / ed scolnick [sic]" Mevacor is a liver toxin and is lethal for patients with hepatitis. This is an analogy that reveals intent to injure patients in the VIGOR trial. It was never disclosed in any informed consent document or expressed in this form or anything close to this form to any IRB the FDA or anyone else.

11

55. MERCK did not, and should have, disclosed to doctors that there were more deaths from GI bleeds in the Vioxx-treated group than the control group in VIGOR. (Wright JM. The double-edged sword of COX-2 selective NSAIDs. CMAJ 2002; 167(10):1131-1137.) While the data results show that Vioxx reduced the total number of GI bleeds, further analysis also reveals that the GI bleeds experienced on Vioxx led to more deaths because COX-2 is needed for GI healing. (FDA Div. of Anti-Inflammatory, **Analgesic** and Ophthalmic Drug Products: Medical Officer Review, June 29 2000) MERCK should have been forthright with this information by consistently disclosing it along with the former, more positive data in patient, physician and media and other communications.

56. Dr. Scolnick's March 9, 2000 comments on the VIGOR data, acknowledge that VIOXX induced CV events in the VIGOR trial.  He noted that "[t]he CV events are clearly there…. It is a shame but it is a low incidence and it is mechanism based as we worried it was.  Oates and Alan and Barry were right about the metabolite meanings, i.e., urine Pg [prostacyclin] data" (MRK-ABH0016219).  In view of the concerns raised by consultants and within MERCK, a reasonable pharmaceutical company would have withdrawn Vioxx from the market after VIGOR was unblinded.  The risks outweighed the benefits. (MRK-ABH0016219). In view of the concerns raised by consultants and within MERCK, a reasonable pharmaceutical company would have withdrawn Vioxx from the market after VIGOR was unblinded.  The risks outweighed the benefits.

57. There is evidence that MERCK did not expect the MERCK appointed members of the Data Safety Monitoring Board (DSMB) for the VIGOR trial to complete its commitments in an unbiased manner. A 1999 email from Eric Mortensan, a clinical research director, stated: "The inclusion of a DSMB is always 50% scientific and 50% for appearances. There is a value to avoiding the appearance that we are hiding something…The group of statisticians, epidemiologists, gastroenterologists which John has worked with in the past have been very cooperative with the goal of completing studies and would not be anticipated to terminate the trial capriciously and thereby negatively affect our ability to obtain a label statement after three years of treatment…" (MRK-ABS0212130)

58. In October of 2001, Dr. Marie Griffin,  a member of the VIGOR  GI Adjudication Committee, wrote to Dr. Doug Watson and expressed concern with continuing "to randomize patients at high-risk for gastrointestinal complications to chronic use of moderate or high doses of traditional NSAIDs without the addition of co-therapy (misoprostol, PPI, high dose H2RA)." (MRK-ABT0013920) She went on to suggest that "it is time to urgently re-evaluate ongoing and planned clinical trials with regard to 'comparator drugs' for trials of coxibs." MERCK should have disclosed this.

59. Emails sent between MERCK Public Affairs executives and MRL researchers in March 2000, when the VIGOR results were being released, demonstrate that both the company's scientific researchers and its public relations team were involved in misleading the public about the VIGOR results. In the first of a series of emails, Alise Reicin comments, "I do not think we should get into [CV event] rates at all – the data is preliminary. We can emphasize the rates look similar to our Phase III studies." In response, public affairs

representative Dr. Larry Hirsh writes, "We all feel a little concerned about saying (if pressed) that the event rate, even in the Phase III OA studies, was 2%...The product circular indicates that cardiovascular events occurred in a much smaller proportion of patients – less than a fraction of a percent. We'd rather refer any questioner to the product labeling rather than say '2% of patients taking Vioxx had a CV event in Phase III'." (MRK-ABD0001986; MRK-ABD0001756) MERCK never disclosed that the label information on CV risk underestimated the true risk. This was intentional.

60. Dr. Hirsch also edited a standby statement regarding "Vioxx and Cardiovascular Events in VIGOR". (MRK-ABD0001756; MRK-NJ0361687; MRK-NJ0281753) This standby statement came from the Public affairs department as is evidenced by the document. Dr. Hirsch suggested that when asked about the number of heart attacks and strokes in the VIGOR trial that "If pressed, maybe say something like, "less than 20?" Dr. Hirsch goes on to say that if asked if there was any difference in the overall mortality between the two treatments groups, "I'd say simply that it's too soon to speak to these details. If pressed, maybe we can say, "no." A further revision (version "6A") added to the mortality difference question includes, "Preliminary data suggest there was no difference in overall or cardiovascular mortality between the two groups." (MRK-NJ0281753) The total number of events was much higher than 20. There were at least 24 MIs alone.

61. It appears that Dr. Hirsch also changed the presentation of the results but cutting "2-fold ~~increase~~" in events in patients taking Vioxx and instead replacing it with "decrease" in cardiovascular events in patients taking Naproxen. (MRK-NJ0361687) The later draft includes "There is an approximate 50% decrease in the risk of certain cardiovascular events, including myocardial infarctions and cerebrovascular events in these RA patients treated with naproxen 500 mg bid compared to VIOXX 50 mg."(MRK-NJ0281753) Dr. Hirsch suggested similar messages which were "better from a communications standpoint" for other public statements as well.(MRK-ACC0052545)

62. MERCK wrote to FDA on May 12, 2000, via FedEx.  MERCK complained to the Division of Drug Marketing, Advertising and Communications (DDMAC) that Searle/Pfizer representatives were using marketing materials to misbrand VIOXX and CELEBREX.  MERCK requested DDMAC take immediate action to halt Searle/Pfizer's activities.  MERCK stated that by presenting VIGOR results for VIOXX only as a "statistically significant increase" in cardiovascular adverse events, Searle/Pfizer violated "201(n) of the Food, Drug and Cosmetic Act" by failing to reveal material facts, specifically that the significantly fewer heart attacks in patients taking naproxen were consistent with that drug's ability to block platelet aggregation so that the results of VIGOR do not indicate any increase in cardiovascular adverse reaction due to VIOXX. MERCK contended that Searle/Pfizer violated the law since, even if they choose not to accept this rationale; they were required to at least acknowledge it.  MERCK repeatedly asserted that the results of VIGOR were due to Naproxen's cardioprotective effects; MERCK created billions of media impressions conveying this message without acknowledging another interpretation of the VIGOR study – that VIOXX causes heart

13

attacks. (MRK-ABI0002226; Deposition of Jan Weiner 102:18 to 107:21; 140:23 to 141:6; 154:24 to 155:15; 668:7 to 669:19)

63. In a 2001 warning letter to MERCK CEO Raymond Gilmartin, the FDA objected to the use of this theory in a MERCK marketing materials and a press release proclaiming "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx."(MRK-ABI0001969) The warning letter reads: "…you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties." (Warning Letter from Thomas Abrams, FDA to Raymond Gilmartin, Re: NDA 21-042 Vioxx (rofecoxib) tablets MACMIS ID#9456 Sept 17, 2001)

64. After the VIGOR trial the FDA proposed label changes that would have emphasized the CV risks of Vioxx and placed them in the warnings section of the label. MERCK engaged in fierce negotiations with the FDA over the language and location of that language in the label. The negotiations alone delayed the label change for more than a year. (See below and attached Table 1) MERCK should have disclosed all the initial FDA recommendations and excluded the 078 CV data which was incomplete. The publication of the 078 CV data was the first and only time the FDA ever allowed interim study data to be used to give information on indicating that a drug was safe with respect to any potential health effect.

65. Attached in Table 1 is a listing of label suggestions by the FDA and MERCK's subsequent response to their suggestions along with the final label is also included.

66. MERCK offered employment to Peter Honig, a senior FDA official, in December of 2001. (Honig Exhibit 2 Curriculum Vitae MRK-ACM0010245 to 10251; Deposition of Peter Honig 55:25 to 56:17)  Thereafter Honig participated in label discussions regarding Vioxx while still employed by FDA. (Honig deposition)  Honig left the FDA and joined MERCK in early 2002.  By April of 2002, MERCK had the label it wanted from FDA – a label that did not include the Cardiovascular Warning that FDA had originally proposed. (Deposition of Peter Honig 66:9 to 95:20)

67. Internal MERCK emails make it clear that MERCK senior officials, in particular Ed Scolnick, President of MRL, had very low regard for the FDA.  (MRK-GUE0008582 April 22 1999 Scolnick nearly strangled the FDA statistician and her supervisor; MRK-ABH0015578 May 14, 1999 Scolnick calls FDA dysfunctional; MRK-ACR0009151 April 4 2001 Scolnick says FDA review system is an anachronism, they cannot keep up with science given their hiring constraints, I will go see Janet and go beyond if I need to with contacts, I have never seen being nice to the FDA except on rare occasions pay off; MRK-ACT0018064 April 8, 2001 Scolnick says You made them look like grade d high school students and you won big huge and completely; MRK-ABW0004799 October 16, 2001 Anstice says FDA label is ugly, Scolnick replies it is ugly cubed, thye [sic] are bastards; MRK-ACR0009287 November 8 2001 Scolnick says I will not sign off on any label that had a cardiac warning, I am willing if needed to spend several hours one on one

14

with anyone at the FDA going through the data until they in fact get it; MRK-ABI0005912 December 5 2001 Scolnick says he will boil [stover] in oil if he is at meeting; MRK-NJ0443267 Kim says the FDA reader is overworked, underpaid and short on time;)  MERCK should have disclosed their position with respect to the FDA's ability to safeguard public health; instead, MERCK has defended its actions by claiming that the FDA approved these actions. However at the same time they believed that the FDA was incompetent and that MERCK could and did bully the FDA to accept MERCK's position on a variety of topics not limited to Vioxx. It is wrong and inappropriate to rely on an agency which they believed was incompetent and which they successfully bullied. MERCK's arguments are contradictory. As I told Mr. Ismail at my deposition, had MERCK complied with the FDA's initial post VIGOR warning, I would have few problems with the post VIGOR label.

68. While the approved label in April of 2002 included some information from the VIGOR data on cardiovascular risk, edema and hypertension, and renal effects, the FDA did not require the new language to be placed in the "Warnings" section of the label; instead, it was placed under "Precautions," an important distinction in view of the differing weight with which physicians may consider the two sections.  MERCK valued the difference in billions of dollars of lost sales which equated to lost lives.  (2001 Long Range Operating Plan, MRK ABI0008659-8683) In an internal document explaining how employees should respond to the media regarding the label change in April 2002, it carefully emphasized the distinction: "The new cardiovascular language in our label is not a 'warning;' it is a precaution. A warning is intended to describe serious adverse reactions and potential safety hazards. A precaution describes 'any special care to be exercised by the practitioner for the safe and effective use of the product.'"

69. MERCK published the VIGOR results in the New England Journal of Medicine. MERCK ordered 900,000 reprints of the article, at a cost of $millions, and sent the reprints to physicians in the United States.  MERCK did not purchase reprints of the New England Journal of Medicine's Expression of Concern, nor of the Expression of Concern Reaffirmed, nor of the correction to the erroneous 18 month risk analysis suggested in MERCK's publication of the APPROVe study results, nor of the analysis of long term risk to study subjects in the APPROVe study published by the non-MERCK authors in 2008.  All these should have been disclosed in the same manner MERCK disclosed other misleading data that helped sales.

70. In footage from the video news release, Dr. Loren Laine, an author of the VIGOR paper expressed how in the paper they "were cagey" about the renal findings of the study: Interviewer: What were the renal findings in the study? Dr. Laine: Well, umm, that's actually not going to be, I mean the only thing that's in the New England journal article, says there's no difference in renal failure, or renal dysfunction. So I don't think you really want to go there, do you? Because, there are no data on blood pressure or hypert— excuse me, blood pressure or edema in the study. And the only thing it says specifically, **and we were cagey about this**, was related to renal failure, renal dysfunction. And that's not what you're looking at, so, I mean I would actually take that out, because I think you

don't, no I mean I would just suggest that anything you do, just as an aside, I'm gonna talk to Alise in about an hour, but you don't wanna talk about that because if you start bringing up hypertension [and] edema it's nowhere in the study, so if you bring it up it's not what's in the article."[Emphasis added] ( http://www.fda.gov/ohrms/dockets/ac/07/slides/2007-4290oph1-01-Egilman.ppt )

71. MERCK strategically manipulated data to give MI data the "best face" possible. (MRK-AAC0128698) The common methodology for calculating all comparison rates consisted of patient-years as the denominator. Interestingly, mortality and MI rates were calculated differently. Analyzing the methodology for these two events, MI and mortality, it is evident that MERCK used the number of patients as the denominator for calculating these rates.

72. Fundamental arithmetic teaches the smaller the numerator compared to the denominator, the answer will yield a lower number. This basic understanding was utilized in MERCK's calculations of MI rates. MERCK not only calculated the reciprocal of their conventional method, but they also used the number of patients as the dominator rather than patient-years used in all other comparisons. MERCK did not disclose this in the VIGOR publication nor did the paper provide the actual number of MIs. ( Reicin, A. Shapiro, D. To the editor. N Engl J Med. 2006 Feb 22; 354 (11):1199) Ironically, all other rates were in person-years and actual numbers were provided. Thomas Capizzi, a MERCK statistician, who reviewed the VIGOR paper noted this issue and commented, "Should you not mention that for general safety analyses CL's on absolute differences rather than proportional differences were used to look for potential factors – the authors should be prepared to respond to referee queries on why relative risk estimates are being used for GI events but risk differences are being used for the cv comparisions. [sic]"(MRK-AAB0109420)

73. In a Vioxx draft discussing the comparability of mortality and deaths due to GI events and cardiovascular causes, it stated "a significantly lower incidence of myocardial infarction was noted with naproxen as compared to rofecoxib: 0.1% vs. 0.4%." In response to this statement, this comment was noted: "I'm unconvinced that there are differences in relative risk"(MRK-AAB0109428)

74. Dr. Topol sent a draft publication on Vioxx toxicity to MERCK for comment. In it he presented the cardiovascular data as follows: "The results of the event-free survival analysis on the 66 cases showed that the relative risk of developing a cardiovascular event in rofecoxib treatment arm was 2.37 (1.39 - 4.06), p= .0016." (MRK-AAZ00015620) Dr. Reicin commented, "we prefer to flip the data and say it was reduced on naproxen."(MRK-AAZ0001569)  Hui Quan, a senior MERCK statistician, explained that consistency in presentation of results is usually preferred and he described switching methodology as confusing. (Deposition of Dr. Hui Quan 2006 March 14.)

## Alzheimers

75. On February 27, 2001, Dr. Scott Reines, head of the clinical neuroscience department, told top MERCK executives that the first Alzheimer's treatment trial, Protocol 091, showed no beneficial effect. (MRK-ACR0014272) At the time, Reines noted, "these data are confidential and will not be disclosed to the Project Team until we've decided on a course of action."(MRK-ACR00142720) By mid-March, MERCK's statistician, Frank Liu, had sent e-mails to upper management that revealed the death excess in Vioxx-treated AD study patients. (MRK-NJ0333224) This should have been disclosed in the warnings section of the label at this time.

76. Dr. Gil Block informed Ed Scolnick, president of MERCK Research laboratories, of "an imbalance in the number of deaths observed, with more deaths occurring in the Vioxx group compared to the placebo group."(MRK-NJ0333224) The tables attached to his memo showed a statistically significant increase in deaths based on Intent-to-Treat (P 0.012) but just borderline On-Drug (P = 0.063). (MRK-NJ0333225) In addition, there were 6 CV-related deaths in the Vioxx group compared to 2 on placebo. (MRK-NJ0333225) Although Dr. Reines reported that Scolnick had already been informed, Scolnick expressed anger that he "was the last to know."(MRK-NJ0333224) Dr. Doug Greene, from the Clinical Scientific and Product Development department, attempted to reassure Dr. Scolnick that a plan was being formulated. (MRK-ACR0014502) Dr. Greene also told Scolnick that he and Dr. Alan Nies, the project manager for the Vioxx program, wanted to look at more data, and were considering partially un-blinding 078 to check for an excess of deaths in that trial as well. (MRK-ACR0014502)

77. Dr. Greene stated that he "expects" that MERCK would inform the FDA of the excess of deaths in Vioxx treated patients. (MRK-ACR0014502) Greene considered the impact of disclosure upon labeling negotiations, expressing the hope that the finding was, "truly a statistical fluke," which "may fade as we get more data."(MRK-ACR0014502) Approximately two weeks later, during the April 8th label negotiation meeting with the FDA, MERCK did not mention the Alzheimer's data despite Greene's attendance at this meeting. (MRK-NJ0155799) MERCK should have disclosed this to *__everyone__* especially the IRBs involved and the patients and their guardians

78. On April 8, 2001, MERCK statistician, Joshua Chen, completed and distributed two extensive analyses of mortality. The first focused on the recently un-blinded, but still ongoing Protocol 078. This first analysis revealed the same results as seen in Protocol 091, a more than two-fold risk of death (21 vs. 9). The difference was statistically significant (P=0.015). (MRK-AAX0000752) The second was a combined analysis of 078 and 091, which showed that, when the intention to treat (ITT) analysis was completed, the negative outcomes of patients on Vioxx were even worse than Dr. Block's preliminary figures had suggested; in the ITT population, the difference was 13 deaths on Vioxx compared to 3 deaths on placebo. "The log rank comparison between MK-0966 [Vioxx] and Placebo indicates that survival was worse for patients receiving MK-0966 in Protocol 091 (p=0.010) and in Protocol 078 (p=0.015)."(MRK-AAX0000752) The risks of Vioxx continued to be shown to outweigh the benefits, and in view of the availability

17

of other medicines for pain relief, a reasonable pharmaceutical company would have withdrawn Vioxx from the market.

79. MERCK's AD Study 078 was an adequately powered, long term placebo controlled study, to detect prevention of AD in patients with Mild Cognitive Impairment (MCI.) (Assaid Exhibit 21, MRK-AHD0101257)  The primary endpoint in Study 078 was clinically diagnosed Alzheimer's Disease, and MERCK designed an Adjudication Procedure to confirm that the diagnoses of AD were accurate; the Investigators considered a number of measures to diagnose AD. (Deposition of Christopher Lines, 39:12 to 40:11, 43:6 to 48:3; Lines Exhibit  7 MRK-AFW0010466) MERCK recognized that adjudication of AD is highly reliable.  (Deposition of Christopher Lines, 67:4 to 69:6; Lines Exhibit 9 MRK-ARP0067555; Lines Exhibit 11 MRK-AFJ0003563 Salmon et al cite)  Study 078 was a two tailed analysis, designed by MERCK to detect increased AD in either arm of the Study (placebo arm or Vioxx arm.) (Deposition of Scott Reines, 23:24 to 25:18; Thal et al.s Neuropsychopharmacology (2005), 1-12) MERCK designed Study 078 to detect a 33% reduction in AD on Vioxx. (078 Study Protocol and Amendments  MRK-0140029802 to 0140030008)   MERCK conducted the Study according to Good Clinical Practices, which are designed to protect the safety of the patients enrolled by the sponsor in a Clinical Trial.  (See, e.g., Deposition of Scott Reines, 61:18 to 62:1)

80. Study 078 reached a statistically significant result against Vioxx on both the primary endpoint, clinically diagnosed Alzheimer's Disease, and on at least two other measures, dementia and CDR global scores by 1999.  (Analysis of SAS Data by Dr. David Madigan)  The risks of AD and dementia were permanently significant by December 1999, meaning they were unlikely to be due to chance. In Study 078 Vioxx caused a 46% increase in AD in less compliant patients, and a 72% increased risk in patients taking more of the study medication. (Email Assaid MRK-AHD0055888; MRK-AHD0055888 at 6019-6020) MERCK failed to report the early significance of the risks of dementia and AD, and the dose response data consistent with causation of clinically diagnosed AD, in the two published papers MERCK sponsored for Study 078.   (Thal et als Neuropsychopharmacology (2005), 1-12; Aisen et als Current Alzheimer Research, 2008, 5, 73-82)

81. This was not a surprising development.  MERCK predicted the possibility in the design of the study by including a two tailed analysis.  Deposition of Scott Reines, 54:19 to 55:21.  O'Banion addressed the potential that Vioxx causes dementia by several possible mechanisms, including deposition of amyloid beta plaque, a factor known to be associated with AD since at least 1991. (O'Banion, Exp.Opin.Invest.Drugs 1999 8(10) 1521 at 1530, and references cited therein) These were red flags that required vigilance by MERCK, consistent with MERCK's responsibility to protect the study volunteers under the principles of Good Clinical Practice.

82. MERCK continued to administer Vioxx to the elderly volunteers in the Study after the risk of AD was established; thereby harming patients on Vioxx without telling them, their

doctors, the signers of the IC forms, or the IRBs that Vioxx caused AD and dementia. Conversely, MERCK persuaded study volunteers to continue to take Vioxx – even after the risks of AD and dementia were significant – by enrolling them in a program called VIP which enabled study subjects to win prizes by staying in the study. (See eg MRK-AFW0011197; MRK-AFW0011190; MRK-NJ0254099; MRK-ARP0129937 at 9988 where MERCK compares the VIP program to a "comparable American Express program.")

83. MERCK failed to revise the Informed Consent in Study 078.  MERCK did not WARN the elderly patients, their doctors, or the IRBs of the risk of AD on Vioxx. MERCK never advised the families of the study volunteers who were injured in the study that they were entitled to compensation.  MERCK's failure to protect the patients in Study 078 violated Good Clinical Practices which MERCK advised the doctors in the study governed the conduct of the company.  (Deposition of Gilbert Block, 116:19 to 23, 118:16 to 119:20, Block Exhibit 9 MRK-AHD0001996 at 2400-03)  The law required MERCK to revise the Informed Consent in Study 078.  (21 CFR 46, 46.102(e), 46.109, 46.116.)

84. MERCK was required to report to the FDA data and analyses from any ongoing clinical study that raised safety concerns.  (CFR 314.32; CFR 314.56.)  MERCK failed to do so.

85. On May 8, 1998, a few weeks after MERCK enrolled the first patients, MERCK eliminated all external data monitoring committees, that had had sole control over the study data and sole responsibility to monitor safety data in the study; MERCK's cover letter to the FDA enclosing this change to the Protocol did not mention this change. (MRK-I2690000512; MRK-I2690000517)   MERCK's senior clinical committee, called CDOC/CRRC, was designated within MERCK as the entity which decided whether MERCK Clinical Studies required a Data and Safety Monitoring Board (DSMB) to protect the safety of study volunteers.  Deposition of Scott Reines, 171:1 to 8; Reines Exhibit 11, MERCK MAPP MRK-AFK0047772)   The MERCK CDOC required a DSMB in Study 078 (Deposition of Scott Reines, pages 222 to 265; Reines Exhibits 16 through 21; MRK-ABP0003541, MRK-ABP0003859, MRK-AHF0072575, MRK-ABP0008950, MRK-ABK0329511, MRK-ABP0018562) but the company eliminated the DSMB before it was ever established.

86. MERCK sent a letter to an IRB dated April 16, 1998, with a summary of changes to the Protocol for Study 078.  (Block Exhibit 30, MRK-ARP0034606) which states "Please note that none of these changes affect safety monitoring or Informed Consent Aspects of the trial" and fails to advise the IRB that the Monitoring Committees had been deleted from the Protocol MERCK sent the IRBs a "protocol amendment" that stated that "The amendment addresses mainly procedural aspects of the study it does not affect the body of the consent form. However, please note that the protocol amendment number is 078-01 and the title of the protocol had been revised."(MRK-ARP0022841) MERCK sent the FDA a cover letter to the "protocol amendment" that stated, "The protocol title has been changed to, 'MK-0966 for the Treatment of Mild Cognitive Impairment and Prevention of Conversion to Alzheimer's Disease.' In addition, the interim data analysis has been

deleted; the sequence of test administration at the In-Clinic Screening visit has been altered; treatment allocation will now be stratified according to the patient's Mini Mental State Examination score; and miscellaneous minor procedural changes and points of clarification have been made.(MRK-I26900000512) However the "amendment" included more than one dozen changes and a careful tracing of the line and page changes indicates that the revised protocol had eliminated the DSMB including the language above. MERCK did not explain the actual implication of the deletions nor did they provide any justification for the removal of the DSMB from the study.

87. There is reason to believe that marketing influenced MERCK decisions about the safety of patients in Protocol 078.  MERCK originally described 078 as a study of "***The Safety and*** Efficacy of MK-966 for the Prevention of Alzheimer's Disease in Patients at Risk." [Emphasis added] MERCK's marketing division recommended that "safety" be deleted from the study title and the revised protocol followed this recommendation.(MRK-APE0022197)

88. On April 19, 2001, an "urgent" teleconference was held by a group of MERCK officials, including Drs. Goldmann, Block, Gertz, Reines, Greene, and Reicin.(MRK-AFT0005926) The meeting agenda was titled, "Need to Set Up a DSMB for Protocol # 078- VlOXX AD Prevention Study."[56] MERCK staff discussed whether or not they should establish an internal DSMB post-hoc and post adverse events. Dr. Bonnie Goldmann, Senior Director of Regulatory Affairs, took handwritten notes on the meeting agenda. This is the only document that we have located that discusses the outcome of this "urgent meeting" concerning research subject safety.  Goldmann's notes read: "I attended this meeting. Decision was that since we don't think there is a problem re imbalance, study is too far along. Original Group that has monitored to answer ? Klaus, Scott and Ray will monitor periodically."(MRK-AFT0005926) This never happened nor was any of this      disclosed.      (http://online.wsj.com/public/resources/documents/MERCK-report-20060906.pdf )

89. After VIGOR was unblinded in March 2000, MERCK unblinded the ongoing Alzheimer's studies multiple times. MERCK conducted three separate unplanned interim analyses of unblinded data from the ongoing Alzheimer's Studies in March 2000, September 2000, March 2001; MERCK personnel understood that unblinding ongoing data creates bias in the interpretation and reporting of the data, which is why corporate policy advised against unblinding ongoing studies. (Deposition of Gilbert Block, 125:1 to 133:6; Block Exhibit 10 MERCK MAPP MRK-AAU0000001-28; Nessly to others, MRK-AFV0297727; Reines to others MRK-NJ0136865)  MERCK represented in the medical literature that the Alzheimer's Studies were double blinded. These representations were false.

90. These unplanned, interim unblindings of the Alzheimers trials was not for the safety of any patient in the study, but rather for the data to support MERCK's "naproxen theory" and to save Vioxx while at the same time putting thousands of trial participants at risk of AD and CV events  (Deposition of Gilbert Block, 135:2 to 136:22, 147:12 to 19, 151:8 to

14)  MERCK ultimately persuaded the FDA to permit the inclusion of interim data from the Alzheimer's Studies, including the ongoing Study 078, to be included in the revised label for VIOXX.

91. MERCK also sought to strip the hypertension data from the Alzheimer's Studies to defend the drug at the February 2001 Advisory Committee Meeting.  (Reines Exhibit 23 MRK-AQI0008457; Deposition of Scott Reines 305:8 to 307:9) This information should have been disclosed.

92. After Protocol 091 was unblinded in 2001, MERCK terminated Protocol 126.  Though it was a "long shot" that any benefit would be proven in Protocol 078, MERCK continued the study to collect the placebo long-term safety data as an upside to the company. (Reines Exhibit 24 emails February 2001, MRK-ACR0014270)  In August of 2001, in response to a suggestion that Study 078 be discontinued since MERCK already had enough CV data.  In response, Barry Gertz wrote that he was "reluctant to stop it early as this is the best placebo controlled data for the CV analysis that we have and in the end game I believe that the success of Vioxx will ultimately (sic) depend on such data.  We need as much of it as we can possibly get…I still favor squeezing the most out of it as possible for the placebo data and CV." Gertz suggested that if necessary a financial analysis could be done to justify continuing the Study 078. (Reines Exhibit 25 emails August 2001 MRK-AGU0006994) At the time this email was written, the risks of Cardiovascular Mortality, All Cause Mortality, Alzheimer 's disease and Dementia were all statistically significant against VIOXX.    This decision favored financial considerations over the safety of human beings volunteering to take VIOXX. The study should have been stopped after 4 months.

93. On July 17, 2001, MERCK filed a Safety Update Report (SUR) with the FDA that contained false and misleading statements: "The 3 placebo-controlled studies in Alzheimer's Disease and Mild Cognitive Impairment (MCI) (Protocols 078, 091 and 126) document that the profile of serious clinical adverse experiences with rofecoxib is generally similar to that of placebo in a large cohort of patients, most of whom were older than 65 years of age.(MRK-01420145856)  Under the "key findings" MERCK noted: "The cumulative safety data available through 16-Mar-2001 are consistent with the originally reported safety profile….".(MRK-01420145856) This is not a true statement. MERCK should have disclosed the truth: VIOXX was killing the patients.

94. Even after the Alzheimer data was submitted to the FDA for use in the label, MERCK was aware of additional events which had occurred in the Alzheimer trials which should have been included in the safety update but MERCK did not supply these to the FDA at the time. On December 7, 2001, Dr. Dena Ramey, a MERCK epidemiologist, informed management that 41 additional CV/T events and deaths had occurred in trial 078 since data had last been submitted to the FDA. Four additional events had occurred in trial 126, which had already been stopped. (MRK-ABY0052349)  On December 18, 2001, Robert Silverman, Senior Director of Regulatory Affairs, who was in charge of FDA-MERCK communications, informed MERCK personnel that this new information would not be

reported to the FDA. He told MERCK personnel to cease e-mail communications and only communicate via voice mails: "Note, this MVX [voice mail] is being sent privately in order to minimize unnecessary dissemination. If anyone would like to discuss this further, please call me directly and I would discourage any further email discourse on the issue."(MRK-ACD0118967)

95. The same day, December 7, 2001, MERCK received FDA requests for information. The first request indicates that the FDA assumed the DSMB had never been deleted from the protocol and asked MERCK to address the excess of deaths in the AD trials.(MRK-AOJ00058560)

96. MERCK's response written by Dr. Silverman on December 18, 2001, did not include information previously discussed internally at MERCK including 35 CV/T events and 13 deaths that had had not been included in the July SUR. Instead, MERCK informed the FDA that the 078 protocol did not include a DSMB and dismissed concerns about the deaths.[54] The company re-reported the death data, using a cut off of March 15, 2001, and included further updates on the deaths in all three studies. MERCK told the FDA that the statistically significant difference in deaths based on the March 2001 "are most consistent with chance fluctuations."[54] Silverman told the FDA, "Mortality in the Alzheimer's disease program was fully discussed in recent responses."(MRK-AOJ0005856) Silverman further claimed, "In fact, if there is any trend in the data on cardiovascular events, it is in favor of rofecoxib over placebo." (MRK-AOJ0005856) This shows an active effort not to comply with FDA requests for information.

97. The FDA approved a new Vioxx label for MERCK in April 2002 with the on-drug cardiovascular death rate of 8/3 from the Alzheimers trials 091 and 078. The ITT cardiovascular deaths at this time were 17 in the Vioxx arm and 5 in placebo.[1] The AD conversion data in 078 was 107 conversions for Vioxx versus 82 in placebo. (MRK-I8940079159) MERCK never included these AD data in the product label. The final April 2002, approved label thus included Alzheimer's CV/T and mortality data that was more than one year old. The Alzheimer's data, as presented in the label, undermined the cardiovascular risk information from the VIGOR trial and falsely reassured physicians about the hazards of Vioxx.

98. MERCK finally terminated 078 in October 2002, several months after gaining approval for the Precaution label, and admitted one reason for termination was the fact that there was "[l]imited ability of the trial [078] to provide additional safety data" (MRK-ABY0079740)

99. MERCK submitted a DATA ANALYSIS PLAN (DAP) to FDA in December 2002/January 2003. (Deposition of Scott Reines 20; 2 to 18; Reines Exhibit 3 Statistical Data Analysis Plan dated November 25, 2002 MRK-AFV0043960; Reines Exhibit 4 Letter MERCK to FDA dated January 7, 2003 MRK-AFV0043956.)

---

[1] Analysis of Dr. Madigan

100.  The first report of the Efficacy data from Study 078 was prepared by MERCK biometrician Christopher Assaid and reported in a Memo dated June 12, 2003. (Deposition of Christopher Assaid 124:15 to 125:6; Assaid Exhibit 2 MRK-ARP0137370)  The Data Analysis Plan (DAP) guided the statistical analysis of data from Study 078.  (Deposition of Scott Reines 44:17 to 45:12) The DAP prespecified a Primary Analysis of Clinically Diagnosed Alzheimer's Disease; three Supportive Analyses, including Dementia; and several Other Analyses. (Deposition of Scott Reines 43:17 to 44:7) There were no Secondary endpoints specified in the DAP.  Deposition of Scott Reines 44:8 to 15)

101.  Assaid reported a statistically significant risk on the Primary Analysis.  (Assaid Exhibit 2, MRK-ARP0137370).  Assaid reported statistically significant risks on the Supportive Analyses (Assaid Exhibit 2, MRK-ARP0137370; Deposition of Scott Reines 87:7 to 88:23.  MERCK's DAP states that "In order to evaluate the robustness of the findings from the primary efficacy analysis, the following supportive analyses will be performed."  (DAP)  Though the Supportive Analyses were all significantly against Vioxx, none were reported in the medical literature published by MERCK in 2005 and 2008 (Thal, Aisen) MERCK also prespecified several other analyses in the DAP, which all either trended against Vioxx or were Neutral. (eg Deposition of Scott Reines 74:13 to 24; 76:3 to 22.)

102.  MERCK first submitted efficacy data to the FDA by cover of letters dated July 29, 2003. (MRK-I2220004818) five years after the Study began in April 1998, and almost four years after the risk of AD and dementia in patients on Vioxx became permanently statistically significant.  MERCK stated to the FDA "The unexpected difference for rofecoxib compared to placebo was not confirmed by the secondary measures which found no statistically significant or clinically meaningful differences between treatment groups." This statement by MERCK to FDA was false.  MERCK should have disclosed the truth.

103.  MERCK included a Dose Response analysis in early drafts of the published Paper describing the results of Study 078, arguing that the Dose Response data supported MERCK's effort to discredit the results of the Study:  "Since the above analyses all included patients whether or not they were taking study medication, we also performed a post hoc analysis excluding subjects who were less than 80% compliant with taking treatment, as well as those who were protocol violators, in order to determine whether the effect of rofecoxib was increased in this group with greater time-adjusted exposure to rofecoxib (as would be expected if the primary findings represented a true effect of rofecoxib). There was no evidence for an increased effect of rofecoxib in this analysis (hazard ratio = 1.45, P =0.052)."  (Assaid Exhibit 5 MRK-AFV0431065)

104.  In November 2003 the MERCK biometrician Christopher Assaid discovers and reports his programming error on the compliance analysis.  (Email Assaid MRK-AHD0055888; MRK-AHD0055888 at 6019-6020)  In his corrected analysis, Assaid

finds that the hazard ratio in compliant patients does increase, from 1.46 to 1.72 (p=0.002). Thereafter, beginning in December 2003, the drafts of the 078 paper delete the dose response data MERCK thought were favorable prior to discovery of the programming error. (eg MRK-AHD0022761) The analysis of the dose response data never appeared in the published papers by MERCK authors, or in any regulatory submission to FDA. (Thal, Aisen) Assaid indicated in an email that these data "dropped out" of MERCK's interactions with FDA surrounding the efficacy issues raised by the results of 078. (Assaid Exhibit 17, Email February 1 2005 MRK-ARP0105927)

105. The published version of Protocol 078 was ghostwritten having been initially drafted by Chris Lines. Initial draft included "External author?" as the lead author. (MRK-AFV0431065) In internal MERCK emails, which discuss where the paper should be published, Eric Yuen, from the clinical research departments emails Chris lines saying, "I think you should be the first author since you have done virtually all of the writing."(MRK-AAC0139936) Later Dr. Larry Hirsch writes that it "would certainly be preferable if we had an external lead on this – like it or not, it will be received more credibly than with all MERCK (or lead MERCK authors."(MRK-AHD0057217) The paper would eventually list Dr. Leon Thal, a non-MERCK employee as lead author. I have never met or heard of anyone who identifies him or herself as "External author?" Authors of papers should participate in writing the paper before it is drafted and should participate in all major decisions relating to the information that is in the published paper and should have access to all data. With respect to VIOXX it appears that MERCK did not follow this procedure. (See for example Lisse quotes to the New York Times regarding Advantage, Laine's letter to the NEJM concerning VIGOR and "External author" for 078.) MERCK should have described the real publication process in its papers. Had MERCK disclosed to the journals that published these ghostwritten papers that the papers were written absent authors' knowledge of the data, and that the papers were ghostwritten, they never would have been published.

106. MERCK submitted the Clinical Study Report for Study 078 on December 17 2003, along with the Combined Safety Report on combined data from Studies 078 and 091. (MRK-I2690008225, MRK-I2690008230, MRK-I2690008544). MERCK stated in the Cover Letter that: "Overall, the final analyses do not substantively differ from the preliminary analyses", referring to the July 29, 2003 filing. MERCK continued to misrepresent the efficacy data from Study 078 by adopting the representations about those data contained in the July 2003 submission.

107. In March 2004 MERCK submitted a request for label change without CV ITT DEATH data or AD Efficacy data on Vioxx. (MRK-N0520018536)

108. FDA representative Melanie Grifis called MERCK in February 2004 requesting track changes from the July 2003 MERCK Preliminary Report to the December 2003 Clinical Study Report. (Assaid Exhibit 3 emails February 2004 MRK-AAD0384813) MERCK submitted these track changes with a cover letter dated March 12, 2004, in which MERCK continues to assert that there were no significant changes to the July 2003

submission, confirming again the statements that there were no secondary measures confirming the result of Study 078 on the primary endpoint of Clinically Diagnosed Alzheimer's Disease. (MERCK letter to FDA MRK-AAF0015398)

109. MERCK was to meet with FDA on September 27, 2004 to review the efficacy data from Study 078. Internal MERCK emails discuss the meeting and how to prepare, including concerns about whether FDA will ask about deposition of amyloid beta plaque due to effects of Vioxx. MERCK personnel recognize they have no data on the subject, that Cox inhibition in the setting of brain injury may exacerbate disease, and decide not to address the issue unless asked. (Lines Exhibits 18, 19 and 20; MRK-AHD0069267, MRK-AHD0069241, MRK-AHD0069615)

110. On September 23 2004 MERCK submitted its Final Study 078 Efficacy Powerpoint to FDA; which omitted Supportive Analyses, Dose Response Data, and peer reviewed literature in support of the results of the primary analysis of data in Study 078. (Lines Exhibits 21 and 22, MRK-AAF0017362, MRK-AAF0017366) On September 27, 2004, Ned Braunstein of MERCK Regulatory calls FDA on the day of the scheduled meeting with FDA to cancel the meeting because MERCK personnel involved in the meeting needed to stay on-site to work through the implications of the decision to stop the APPROVe Study. (MRK-AAF0017452)

111. The FDA Medical Review Officer, Ranjit Mani, MD issued his report on the Efficacy Data in Study 078 on October 8, 2004, after Vioxx was off the market, and concluded that "the results of the primary efficacy analysis remain worthy of serious consideration, as they strongly suggest that administering Vioxx to patients with Mild Cognitive Impairment could be associated with an adverse outcome." (Assaid Exhibit 18 Mani Review 10-8-04 FDACDER 003071 to 003112)

112. In November of 2004, Assaid completed an analysis of confirmed thrombotic CV events in the Alzheimers studies (078 and 091) "by whether they had any systolic BP >160 mmHg during the study." He concluded via email "that once a patient has a (drug-induced) elevation in SBP [systolic blood pressure], regardless of subsequent fluctuations, the risk of a thrombotic event for that patient has irreversibly increased." (MRK-AFO0276159 at 64) Quan reached a similar conclusion in his analysis of the APPROVe data. (Quan Exhibit 51 MRK-AGO0074482; Quan Exhibit 52 MRK-AGO0074485; Quan Memo October 7 2004 MRK-AFO0280964)

113. Alzheimer's disease is an irreversible, progressive brain disease that slowly destroys memory and thinking skills and eventually, even the ability to carry out the simplest of daily tasks. It is the most common cause of dementia among older people. (Alzheimer's Disease, NIH Publication No. 11-6423, July 2011 (Reprinted September 2012)) There is currently no cure for Alzheimer's disease; however, some medications may lessen or improve certain dementia symptoms for a period of time. Discrete changes throughout the brain are associated with the progression of Alzheimer's including the formation of abnormal deposits of protein fragments known as beta-amyloid plaques; neurofibrillary tangles,

25

made up of twisted tau proteins; and brain nerve cell, or neuron, damage and death. Over time, the brain of a person suffering from Alzheimer's undergoes extensive nerve cell death and tissue loss. In the final stages of the disease, the brain shrinks and shrivels, and nearly all of the brain's functions are affected. (Alzheimer's Disease, NIH Publication No. 11-6423, July 2011 (Reprinted September 2012) 1-2)

114.  MERCK rushed to initiate a clinical program that would include both Alzheimer's treatment and prevention studies.   On February 3, 1998, Niklas Prager, MERCK Worldwide Human Health Marketing, issued an internal report to substantiate the company's interest in the development of Vioxx for an Alzheimer's indication.  At that time, a full fifteen months before the approval of the original Vioxx NDA, the Merck marketing group recommended "a rapid initiation of the proposed clinical research program for Vioxx in Alzheimer's Disease, designed to support a filing in 4Q/01 for both prevention and treatment of Alzheimer's Disease."  The report provides the financial incentive for rapidly pursuing an Alzheimer's indication stating that third year worldwide sales were estimated to reach $1.1 billion, increasing to $1.6 billion by the fifth year of marketing.  The report also states that: Alzheimer's is the fourth  most common cause of death worldwide, an estimated 4 million Americans suffer from Alzheimer's, and that more than an estimated 100 million people will suffer from the illness by the mid-21st century.  Chronic Vioxx use targeting toward the elderly was identified, and it was noted that "since chronic use and age are also major risk factors for NSAID type gastropathy, a drug with comparable efficacy but a superior GI side effect profile, like VIOXX, should be preferred in these patients over conventional NSAIDS." The marketing report also addresses a "Preliminary Outcomes Research Strategy."  Acknowledging the financial burden of Alzheimer's in this country, the report quotes Alzheimer's Association figures that the disease costs US society $80 – 100 billion per year, and that it is the third most expensive disease, following heart disease and cancer. Finally, the report acknowledges that in light of escalating  healthcare costs, governments and other third-party payers are requiring outcomes information to make formulary and reimbursement decisions. (Block Exhibit14 MRK-ABS0294660)

115.  Aisen et al reported a trend against Vioxx on effect on cognitive function, compared to placebo and naproxen. (Aisen P, Schafer, K, Grundman M, et al. Effects of rofecoxib or naproxen vs placebo on Alzheimer disease progression. JAMA 2003; 289(21) 2819-2826)  Dr. John Breitner was a consultant to Merck on the 078 Study;  Breitner et al have published two articles describing the results of Study 078 as an effect of Vioxx. (Breitner J, Baker L, Montine T, et al. Extended results of the Alzheimer's disease anti-inflammatory prevention trial. Alzheimer's & Dementia 7(2011) 402-411; Breitner J, et al. ADAPT Research Group, Results of a follow-up study to the randomized Alzheimer's Disease Anti-inflammatory Prevention Trial (ADAPT), Alzheimer's & Dementia (2013) 1-10.) Imbimbo et al have reported on the negative results of Study 078 in a review. (Imbimbo B, Solfrizzi V, Panza F.  Are NSAIDs useful to treat Alzheimer's disease or mild cognitive impairment?  Frontiers in Aging Neuroscience. 2010. 2(19) 1-14)  The authors of the Merck sponsored peer reviewed article (Thal L, Ferris S, Kirby L, et al. A randomized, double-blind, study of rofecoxib in patients with mild cognitive impairment.

Neuropsychopharmacology (2005) 1-12) could not "exclude the possibility that Vioxx might accelerate conversion of MCI patients to AD." The Merck biometrician on Study 078 presented at a professional meeting that "a detrimental effect of Vioxx on progression to AD in MCI patients cannot be excluded." (Assaid Deposition Exhibit 21) The authors of a follow up paper sponsored by Merck stated "the present analyses …cannot exclude the possibility that such a risk might exist. The significance of the observation that rofecoxib increased the rate of conversion from MCI to AD remains uncertain." (Aisen P, Thal L, Ferris S., et al., Rofecoxib in Patients with Mild Cognitive Impairment: Further Analyses of Data from a Randomized, Double-Blind Trial. Current Alzheimer Research, 2008, 5, 73-82.) The FDA Medical Review Officer stated that "the results of the primary efficacy analysis remain worthy of serious consideration, as they strongly suggest that administering Vioxx to patients with Mild Cognitive Impairment could be associated with an adverse outcome." (Mani, 2004) O'Banion predicted a negative effect of Vioxx on AD in 1999. (O O'Banion M. COX-2 and Alzheimer's disease: potential roles in inflammation and neurodegeneration. Exp. Opin Invest. Drugs (1999) 8(10): 1521-1536) The clinical diagnosis of AD, the primary endpoint in Study 078, was found to be highly reliable by investigators. (Salmon et al 2002; MRK-AFJ0003563-569)

116.  MERCK should have disclosed the risk of AD and dementia based on the evidence of causation in Study 078.

117.  MERCK met with FDA on January 7, 2005, over three months after VIOXX was withdrawn from the market, to discuss the efficacy findings in Study 078, and presented a Powerpoint on the efficacy findings in Study 078. Deposition of Christopher Assaid, 266:25 to 267:16; Assaid Exhibit 16, Powerpoint dated January 5, 2005, MRK-ARP0006819. Neither this Powerpoint, nor the one MERCK had sent to FDA on September 23, 2004, contained the statistically significant results of MERCK's analysis of the pre-specified supportive analyses, the global CDR, or the dose response analysis that all supported the primary analysis. On January 15, 2005, Assaid and Michael Nessly, statisticians assigned to Study 078, described their Key Accomplishments since last months' report as follows:  "A face to face meeting with the highest levels of FDA management to discuss the results of P078 was held on 07 Jan2004. A cross-functional team from MERCK attended to present the primary findings as well as secondary and exploratory analyses. This meeting was successful in increasing the likelihood of preventing the AD efficacy results from diverting attention from CV safety at the Coxib ACM by obtaining agreement that the data need not be in the core presentation." (MRK-AFO0289839)

## ADVANTAGE

118.  The stated aim of the 1999-2000 ADVANTAGE study was to assess the "Gastrointestinal Tolerability and Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis." In reality, the trial was a year-long marketing operation, meant to introduce investigators to Vioxx. ADVANTAGE was designed and supported

not by MERCK scientific researchers, but by the company's Marketing and Continuing Professional Development departments in conjunction with a contract research organization.(MRK-ADI0017766) In correspondence regarding the role of Public Affairs in the trial, Rebecca Higbee inserted comments (in bold) into a message to Public Affairs: "It seems to me that the study is not sufficiently different than any other CPD [Continuing Professional Development] **I ELIMINATED THE REFERENCE TO SEEDING. IT MAY BE A SEEDING STUDY, BUT LET'S NOT CALL IT THAT IN OUR INTERNAL DOCUMENTS.** study, so I'm hesitant to set expectations for Public Affairs' contributions too high…I've looked through materials that were developed to support LIFE—a Cozaar **AGAIN, I ELIMINATED THE REFERENCE TO SEEDING STUDY** study that had a Public Affairs component (press release announcing start of the study, as well as Marketing Communications guide book for physicians). Using LIFE as a basis, as well as suggestions from Ogilvy, I propose the following response: **BLOOMFIELD WILL BE AROUND ON MONDAY AND I'D ENCOURAGE YOU TO TALK TO HIM ABOUT THE WORK DONE ON THE LIFE STUDY. WE LEARNED SOME LESSONS, AND I'M SURE HE'LL BE GLAD TO PASS THEM ALONG.** [sic]"(MRK-AFB0001598)

119.   MERCK did not inform the IRBs, the researchers or the patient volunteers who participated in the ADVANTAGE trial of the true nature of the "study." The informed consent form used to initiate patients into the ADVANTAGE trial emphasized that the purpose of the study was an investigation of the drug itself, rather than a marketing effort meant to promote its use.(MRK-AGV0003296)

120.   MERCK used the ADVANTAGE trial to circumvent FDA marketing regulations. Although the results of the study were not published until 2003, the trial was started on March 27, 1999. This was before the FDA initially approved the Vioxx for sale on the market. Using this "trial," MERCK circumvented FDA regulations, promoting its drug pre-approval.(MRK-NJ0221292)

121.   The results of ADVANTAGE that were reported in a published article appearing in a 2003 issue of The Annals of Internal Medicine were incorrect.(Lisse, JR et al. Gastrointestinal tolerability and effectiveness of rofecoxib versus naproxen in the treatment of osteoarthritis: a randomized, controlled trial. Ann Intern Med. 2003 Oct 7;139(7):539-46) The paper only reported 5 MIs in the Vioxx arm of the trial and one in the naproxen group. The actual results were a statistically significant number of MI/Sudden deaths (8 vs 1) in the Vioxx arm compared to Naproxen. This has never been reported.

122.   On October 21, 1999 a 73 year-old woman in the ADVANTAGE trial identified as AN 5005 was found expired in her apartment. She had reportedly called her son with complaints of shortness of breath. When the son arrived the patient had already died. (MRK-AAE0002414)

123. The cause of death was determined to be "hypertensive heart disease" and the case was not originally adjudicated by MERCK in the ADVANTAGE trial. (MRK-NJ02212920)

124. In July of 2001, the FDA reclassified AN 5005 as a potential cardiovascular thrombotic event. In the opinion of the medical reviewer "the cause of death for this patient was sudden death, which would in fact meet criteria for cardiovascular thrombotic event." (MRK-PUBLIC0000351)

125. MERCK responded to the FDA's reclassification of AN 5005 in a letter stating that the "the preferred term of the reported event – hypertensive heart disease – (which was the same as the actual reported term) is not one of the vascular SAE terms eligible for case adjudication...'Sudden death' was not a reported term for this patient." (MRK-AAF0004126) This is not true.

126. Following the publication of ADVANTAGE by Lisse et al. in 2003 I wrote a letter to the Annals of Internal Medicine calling into question MERCK's reported cardiovascular results, specifically the number of Myocardial infarction and sudden deaths. (Egilman, DS and Presler, AH. Report of specific cardiovascular outcomes of the ADVANTAGE trial. Ann Intern Med. 2006 May 16;144(10):781)

127. The New York Times published a story on Patient 5005 in April of 2005. (Berenson A. Evidence in Vioxx Suits Shows Intervention by MERCK Officials. New York Times. April 24, 2005.)

128. In July of 2005, Ned Braunstein, from MERCK's regulatory department and Adam Polis, a MERCK author on the ADVANTAGE publication, wrote a follow-up letter to the Annals of Internal Medicine in an attempt to explain the story of AN 5005. They reiterated that "Although the term retrospectively proposed by the FDA reviewer would have met criteria as a potential thrombotic event eligible for adjudication if used by the investigator, the term *hypertensive heart disease* did not trigger adjudication in the existing standard operating procedure. Therefore, this case was not prospectively adjudicated and is not included as a confirmed thrombotic event..."( Braunstein N, Polis A. Report of specific cardiovascular outcomes of the ADVANTAGE trial. Ann Intern Med; 2005 Jul 19;143(2):158-9.)

129. The investigator and the contract-research-organization (CRO) which ran the ADVANTAGE trial for MERCK, has files with "sudden death" listed as the initial reported term for patient 5005. (MRK-PLBAJ0000043, MRK-01420115583)

130. This is in contrast to other documents from Daryl Najarian, a MERCK employee who worked with the CRO who has multiple versions of the WAES reports (a version 2 and version 5) which are different in the reported event. Version 2, presumptively done before Version 5, lists "cardiac disorder" and "hypertension" as the reported adverse

experience. Version 5 lists "hypertensive heart disease" as the adverse experience.(MRK-AOZ0000997, MRK-AAE0002414)

131.   Additionally, documents from Linda Hostelley, a MERCK epidemiologist, show that 5005 was listed as a cardiac disorder.(MRK-ACV0021094, MRK-ACV0020976, MRK-ACV0021014)

132.   Regardless of whether the event is listed as "sudden death" or "cardiac disorder" both terms would have triggered adjudication by MERCK and thus would have been included in the listing of confirmed thrombotic events. This would make the total combined number of MI/sudden deaths 8 in the Vioxx group (5 MI and 3 sudden deaths) compared to 1 (MI) in the naproxen group, a statistically significant result.

133.   In May of 2001, Dr. Larry Hirsch pointed out the importance of the statistically significant MI/sudden death events in Vioxx compared to naproxen in the ADVANTAGE trial. In reviewing a public statement about the ADVANTAGE trial when asked "How can you explain the difference in statistical significance of cardiovascular events seen in VIGOR versus what you saw in this study?" Hirsch wrote, "what we should explain is that the naproxen effect, seen in VIGOR, was **negated** in ADVANTAGE by by [sic] the fact that patients were allowed to take aspirin. At least I think this should explain it???"[emphasis added] (MRK-ADI0009109)

134.   Dr. Hirsch also published a paper that attempted to neutralize three experts who had testified in this litigation.  His criticism centered on the fact that none of us had disclosed the amount of money we were paid researching MERCK's conduct. This article was an ad hominum personal attack meant to discredit experts who unlike Dr. Hirsch told the truth about MERCK's conduct, since Dr. Hirsch never disclosed how much MERCK paid him to work on VIOXX and in fact never disclosed that he worked on VIOXX or that in written memos he had suggested that MERCK lie about the information they had on the results of the VIGOR study.  MERCK was aware of his actions since he discussed the paper with more than 50 MERCK employees. He never disclosed those contacts either.

## Other Studies

135.   In 2001 MERCK conducted a trial (Study 136), that revealed that Vioxx users given low-dose aspirin to offset the CV risk of Vioxx lost the GI benefit of Vioxx. (MRK-NJ0291847) MERCK told physicians to use aspirin with Vioxx but MERCK did not inform physicians of this important side effect promptly or properly. They should have sent a "Dear Doctor" letter, issued press releases, done OTC advertisements, hired celebrity spokesmen, provided lecture notes, trained their detail representatives to overcome the obstacle of physician ignorance of this and other side effects. In other words, MERCK should have made safety a priority equal to or higher than sales. The methods so carefully and expensively developed by MERCK to sell the drug should have been used to communicate the dangers of such use.

136.   Edward Scolnick, reacted to the results of study 136 in November of 2001 saying, "I think the question we should answer now is NOT whether Vioxx or any Coxib is safe for Cv outcomes. I think the question NOW is what is the best antiplatelet regime to use with a Coxib.I think that is THE medical question and if we answer it, the problem will dissipate." (MRK-NJ0214478) This indicates that Scolnick knew of the cardiovascular risk of Vioxx and its lack of benefit with aspirin.

137.   MERCK withdrew VIOXX from the market on September 30, 2004.  Days later, senior MERCK personnel discussed the possibility of bringing a reformulated MERCK product to the market.  A.W. Ford Hutchinson wrote "I think this really scraping the barrel and does not fit in with our avowed mission of producing medically important products.  Naproxen plus a generic PPI, as Peter Honig keeps reminding me, essentially fixes most of the issues. Tony" (Ford Hutchinson Exhibit 23, emails October 1, 2004, MRK-AAD0356476) MERCK was aware that naproxen plus a generic PPI was a cheaper and safer alternative to VIOXX.

138.   The FDA specifically requested that MERCK conduct adequate prospective trials with CV events as their endpoint. In February 2001 in her analysis of the cardiovascular results of the VIGOR trial, Dr. Shari Targum of the FDA's Division of Cardio-Renal Drug Products recommended that MERCK provide further cardiovascular data in patients regarding long-term exposure to rofecoxib in certain patients. (Targum, Shari. Memorandum: Consultation NDA 210-042, S-007 Review of Cardiovascular Safety Database (Rofecoxib), Food and Drug Administration. February 1, 2001.) MERCK never initiated such a trial, despite the acknowledgement by Edward Scolnick, the President of MERCK Research Laboratories, on September 13, 2001, that the ONLY ESSENTIAL STUDY for Vioxx was the CV outcome study. (MRK-ABH0013917)

139.   Despite the excessive risk in the myocardial infarction endpoint for VIGOR, MERCK's published 2001 meta-analysis, ostensibly designed to investigate the risk of MI's in all RCT's, obscured the risk of MI by using the APTC (Antiplatelet Trialists' Collaboration) endpoint. The APTC endpoint groups together and "includes CV, hemorrhagic, and unknown deaths; nonfatal myocardial infarctions; and nonfatal strokes."9 Thus, the meta-analysis could not detect risk in a specific CV subcategory, since any risk in one category might be offset by lack of risk in another subcategory. Given the VIGOR results, MERCK should have been looking specifically at MI and related events and should have presented these categories separately. The main adverse effects in VIGOR were MI and related events. Conflating the effect measure with acute CNS effects obscured the acute and sub-chronic cardiac thrombotic events.

140.   Dr. Alice Reicin, Vice-President of clinical research, and Deborah Shapiro, the VIOXX project statistician, created a list of outcome measures that could be used for a planned meta-analysis which would be published in response to the VIGOR results. The list compares the pros and cons of three different outcome measures that MERCK could use to analyze the results in this meta-analysis: 1) The original 1998 cardiovascular SOP, which was limited to "confirmed arterial and venous thromboembolic CV" [*sic] events,

31

2) the "APTC endpoint," which included both thrombotic and bleeding events including GI bleed and 3) a modified APTC which excluded bleeding events (MRK-NJ0363443-5)

141.   The memo lists a comparison of pros and cons for each outcome measure. The pros for the second option, the APTC definition of event, Reicin wrote, "The pros for the APTC endpoint included: Endpoint definition which is accepted by authorities worldwide, Ease of bench marking our results to other studies, does not mix arterial and venous and Only uses 'hard' endpoints--especially attractive for the interim analysis which will rely on events which have not yet been adjudicated". Reicin wrote that the cons of the APTC, "Include[s] 'bleeding' endpoints which mixes risk/benefit (could be seen as a pro since this could work in our favor)."(MRK-NJ0363443)

142.   MERCK had knowledge that MI risk alone was greater than risk measured by the APTC endpoint. For example, a MERCK preliminary meta-analysis of Rofecoxib v. NSAIDs prepared in October 2000 by Deborah Shapiro found a relative risk of 1.44 that was *not* statistically significant when using the APTC endpoint. When the endpoint for the same large group of patients was narrowed down to MIs only, the relative risk was 2.02 *and* statistically significant. (MRK-GUE0017779) MERCK dropped this analysis of MIs in their final meta-analysis published in *Circulation* in 2001. (Konstam, MA et al. Circulation. 2001 Nov 6;104(19):2280-8.)

143.   In reviewing the 2001 meta-analysis before publication, Briggs Morrison, found that "the data appears to have been interpreted to support a preconceived hypothesis rather than critically reviewing the data to generate hypotheses." (MRK-NJ0201983)

## Marketing

144.   The company should have protected the integrity of its research by keeping marketing and research efforts separate. Instead, MERCK created an internal marketing atmosphere in which researchers were encouraged to create science to back marketing strategies. MERCK's cross-functional team, dubbed the Commercialization Team, included key researchers as well as marketing experts. This expectation created circumstances in which scientists, who felt a stake in sales efforts, were willing to twist scientific data to support marketing messages, putting scientific evidence pointing to potential risks of the drug in detriment and rushing the drug to market before adequate safety data was available.

145.   For example, 1997 notes from a MERCK HHPAC meeting state: "The purpose of the OA Outcomes Research (OR) Program is to *support marketing needs* for MK-0966 [Vioxx] with respect to pricing, reimbursement, market acceptance and promotion. The program is *designed to definitively demonstrate* the benefits related to the improved GI tolerability of MK-0966.[emphasis added]"(MRK-ABL0000041)

146.   Evidence of the same tendency is evident in a "Vioxx Stage IV Review" document dated March 20, 2001. In this document MERCK presents a table in which key marketing objectives are matched with scientific initiatives meant to realize them. (MRK-

ABL0001231) In other words the "science" was designed to enhance sales. Allowing such a bias to influence these initial studies not only places the approval process under question but demonstrates clear impropriety.

147.     The marketing strategy laid out in MERCK's 2001 and 2002 Profit Plans for Vioxx emphasize MERCK's concern for sales and profit rather than patient safety. Examples of these strategies include: (a) The "neutralization" of safety data (b)The aggressive use of DTC advertising to "leverage the buying process" by inciting patients to request Vioxx from their physician  (c) The promotion of "dissatisfaction" among patients with similar, competing products such as Celebrex (d) The targeting of physician groups differentiated according to their prescribing tendencies (MRK-AAO0000073, MRK-AAO0000119)

148. In an April 26, 2000 press release entitled "MERCK Confirms Favorable Cardiovascular Safety Profile of Vioxx®," MERCK made egregious claims about its drug's safety, citing the claim that naproxen had the ability to block platelet aggregation. The press release emphasized the CV-related results of the completed osteoarthritis trials in which CV events were un-adjudicated. (MRK-ABI0002231)  MERCK continued to issue press releases confirming the cardiovascular safety of VIOXX.  (May 22, 2001 MRK-ABI0003221; August 21, 2001 MRK-ADJ0034997; August 26, 2004 MRK-AHE0061931)  MERCK was issued a Warning Letter by FDA on September 17, 2001 concerning the May 21, 2001 Press Release.  (MRK-ABI0003202)

149.   In September 2001, David Anstice contacted the entire MERCK sales force, saying, "I realize you don't hear directly from me very often, but this message is one that is so important that I felt compelled to deliver it myself."( MRK-ABW0000062) He went on to buoy representatives' spirits regarding criticism of Vioxx's safety profile, reminding them of the naproxen claim, which MERCK knew was false. The MVX reminds sales force members of "resources" that the company had provided to help them counter doubts about Vioxx's CV profile, including "A CV Letter and Press Release in May…another CV Letter and Press Release in August." At the end of the paragraph was added, "We will continue to provide you updated, useful resources that fall within FDA guidelines."( MRK-ABW0000062) Even though MERCK knew that it was in violation of FDA regulations to use Press Releases in detailing physicians Mr. Anstice promoted this practice in his MVX.

150.   MERCK misinformed its marketing representatives who, in turn, presented an unjustified favorable image of Vioxx to physicians. MERCK characterized the analgesic and anti-inflammatory (A&A) market, in which Vioxx fit, as "highly promotion sensitive and less science-based than other markets in which MERCK competes."(MRK-AAO0000073) MERCK based its marketing strategy on this analysis, creating a huge promotion effort that was not science based; to do so, MERCK not only trained its Vioxx marketing team in questionable techniques for instructing physicians on the use of Vioxx, but gave them incorrect or incomplete information regarding their product.

Representatives learned to start each physician call with a "STRONG OFFENSE" and to emphasize "Strength, Safety, QD Simplicity."(MRK-AAR0010074, MRK-AAR00095220) Unfortunately, the fact remains that Vioxx is no stronger and is not safer than other available drugs.

151.    MERCK trained its marketing representatives to withhold safety information on the drug. This is contrary to their duty to warn and violates their own ethics recommendations. Programs like JeopardXX, a Jeopardy-based training exercise for Vioxx representatives, taught members of the sales force to view physicians' routine questions and concerns as "obstacles." Rather than provide complete, comprehensive information when faced with an "obstacle" posed by a doctor, MERCK instructed its representatives to return with a question that would narrow or limit the amount information the physician was requesting. For example, when faced with the comment, "I am concerned about the cardiovascular effects of VIOXX," representatives were not instructed to refer the physician to the relevant information on the approved label, but to "Provide a clarifying statement to uncover the physician's true obstacle," such as "What is your specific concern?"(LEH027226) Representatives would ultimately attempt to answer only the most specific question, thus concealing comprehensive information about risks from physicians.

152.    In the field sales team's Obstacles Response Guide, MERCK cautioned its representatives: "Many times, the customer may be vague in their statements, such as 'I understand Vioxx® has some safety concerns at higher doses.' Statements like this could apply to three different issues, methotrexate, warfarin or edema. Unless you clarify, you might respond regarding edema when the physicians [sic] concern was warfarin. This approach would actually result in you creating an additional obstacle for yourself."(LEH 0125527) Using this strategy of teaching its representatives to evade certain safety questions, MERCK shifted the burden for the acquisition of critical information onto the physician. The correct action would have been to answer a general question by providing information of the most serious and common health effects or by providing all information.

153.    Another training resource, a presentation entitled "Dodge Ball," sent a more concise and unsettling message: Dodge the question. This presentation, given to representatives at training meetings, listed likely questions from physicians, including, "Can Vioxx be used in patients using low dose aspirin?" and, "I am concerned about the cardiovascular effects of Vioxx." The questions, each labeled "Obstacle," were followed by just three words: "Dodge, Dodge, Dodge." (LEH0115297)

154.    In other training materials and continued communication with sales force members, MERCK omitted information on the increased risk of cardiovascular adverse events from the use of Vioxx. In a series of bulletins sent to field representatives called "In It to Win It Minutes," MERCK spokesman Jo Jerman misrepresented Vioxx's cardiovascular profile. As late as 2001, a year after the release of the VIGOR data, Jerman wrote, "First,

let me reinforce that in our completed OA trials and ongoing clinical trials there were no differences in the incidence of cardiovascular events such as heart attacks among patients taking VIOXX, non-selective NSAIDs and placebo."(LEH0126989)

155.   MERCK should have told its marketing representatives to provide complete and comprehensive information in response to this question and not "game" the physician-MERCK interaction in a manner that was designed to mislead physicians about the true risks of the use of the product.

156.   MERCK used a Video called the "V-Squad" to train sales representatives how to destroy "obstacles to the sales of VIOXX by using false data, including the Cardiovascular Card.  In the V-Squad video, the MERCK V-Squad destroys obstacles such as cardiovascular concerns by disintegrating them with laser beams from the Cardiovascular Card.  Thus MERCK's training of sales representatives encouraged the use of false and misleading data to persuade physicians to prescribe VIOXX.

157.   MERCK prepared Video News Releases to help promote Vioxx. Outtakes from the film sessions of Drs. Loren Laine and Laura Demopoulos establish that MERCK knew they were being cagey with the New England Journal of Medicine in the reporting of safety data in the paper submitted and published; that the claims of gastrointestinal events and deaths MERCK made in the public domain were bogus, and that everyone at MERCK knew that VIOXX might cause heart attacks.

158.   MERCK contracted for television commercials promoting VIOXX that failed to disclose to consumers the risks of VIOXX.  Commercials featuring Dorothy Hamill (and a Larry King interview) as well as other commercials promoting VIOXX for all patients, including elderly patients, were false and misleading and failed to convey the risks of VIOXX to the public.

159.   In January 2001 the HSA Scientific Council, meeting to discuss the marketing implications of the VIGOR results, concluded that "our MERCK reps were not comfortable responding to physicians on issues related to cardio/renal differences of the COX-2 agents." They recommended that training be offered to sales force members, teaching them "to deliver a short/concise response on this issue, and immediately redirect discussions to a focus on efficacy." (MRK-AFI0010255) Failing to teach representatives to fully respond to physicians' concerns regarding cardiovascular and renal risk constitutes a failure to disclose material facts about VIOXX hazards. Companies have recognized that sales representatives are key to the issue of disclosure of hazards. They are in the best position to inform customers.  "In general," the report continued, "the HSAs believe the Reps should simply mention that cardio/renal effects of the COX-2 agents are 'class effects.'"( MRK-AFI0010255) This response is not supported by scientific data or the label and deprived physicians of specific information on the risk of these effects.

35

160.   MERCK attempted to silence scientists with unfavorable views of the safety or efficacy of Vioxx. This deprived patients and physicians of important information on the dangers of Vioxx and its relative efficacy. MERCK's "neutralization" strategy was an extension of its anti-warnings program. For example, on January 9, 2001, James Fries, a professor of medicine at Stanford University and principal investigator of ARAMIS, wrote a letter to the CEO of MERCK, Raymond Gilmartin. (MRK-GUE0058858) The letter began: "A series of serious events involving certain employees of, and possibly a policy of, MERCK & Co. has come to my attention rather accidentally...The result is harmful to the traditionally very fine MERCK public image and counter-productive to the Vioxx sales effort." The letter went on to detail the "systematic" intimidation and discrediting of prominent physicians involved in the coxib field and "suppression of data" by MERCK representatives.(MRK-GUE0058858)

161.   Dr. Fries described a phone call he had received on October 28th, 2001, from Louis Sherwood, MERCK senior vice president, complaining about the "anti- MERCK" bias of one of Dr. Fries's colleagues, Dr. Gurkirpal Singh, who was then giving medical education lectures on coxibs. Fries wrote, "Dr. Sherwood suggested that if this continued Dr. Singh would 'flame out' and there would be consequences for myself and for Stanford."(MRK-GUE0058858) In addition to Singh, Fries listed eight other physicians whom he knew had been harassed or targeted by MERCK with attempts to discredit them within their field. Dr. Fries outlined some of the consequences of these attempts as follows: "Dr. Simon believes that one of his two academic appointments has been jeopardized. Dr. McMillan believes that his VCF appointment at Hershey was revoked because of these accusations. Dr. Petri had a speaking engagement unprofessionally cancelled by MERCK and an unrenowned speaker substituted; he was also bothered by phone calls from MERCK persons alleging unbalanced presentations. Dr. Singh had a speaking engagement cancelled and the audience told that he had been fired...Dr. Lipsky, while at Southwestern, was forced to do a slide by slide justification of a CME program felt to be critical of Vioxx."(MRK-GUE0058858)

162.   Dr. Fries had in fact pinpointed a real MERCK strategy to reduce "the negative impact" of physicians critical to Vioxx; a strategy known within the company as "neutralization."(MRK-AFI0182292) Even before the approval of Vioxx, in 1999, a team of MERCK marketing professionals had identified 36 physicians who were "important from a business perspective in terms of influence and/or prescribing" but who were critical of MERCK or Vioxx and/or advocates for competing medications. These "physicians to neutralize" were carefully monitored by MERCK personnel, contacted frequently with updated data and information on Vioxx, invited to meetings and conferences and offered participation in "local and national initiatives, including HEL [Health Education Liaison] programs, field training, faculty training, consultants' meetings, clinical research, etc."(MRK-AFI0182292)

163.   MERCK hired vendors DTW Market Research and Impact RX. DTW Market Research produced "Promotional Message Recall Data" (PMRD) and Impact RX produced Impact RX reports. These companies contracted with hundreds of physicians

who in turn reported what MERCK"s detail representatives told them. The physicians submitted what the MERCK representatives told them into a computer database on or around the day they were detailed. These reports were and are commercial products that MERCK purchased. The reports were compiled and sent to MERCK bi-monthly. They were regularly reviewed by Adam Schechter (Vice President, MERCK Human Health Division, Arthritis & Analgesia Franchise Business Group), Wendy Dixon (Senior Vice President of Marketing for MERCK"s U.S. Human Health division) and other high management officials. I have attached a 2002 email listing the names of some of the MERCK management on the distribution list for receipt of the PMRD reports. That distribution list included MERCK"s legal team Susan Gregory (managing counsel), Ned Braunstein (Director and Senior Director in Regulatory Affairs), and Peter Honig, MD (Vice President, Worldwide Product Safety and Quality Assurance). (MRK-ADM0115352)

164.  The MERCK employee responsible for tracking the PMRD and Impact RX reports, Michael Stanton, gave a deposition in the Missouri civil litigation. (Deposition of Michael Stanton September 21, 2011 in Plubell and Ivey  vs. Merck ) He testified that the statements that MERCK"s detail representatives gave to doctors when discussing Vioxx were recorded and typed up by the physicians, and distributed and communicated to MERCK senior management. If the PMRD and Impact RX programs worked as Mr. Stanton stated, MERCK management was provided the reports and was aware of this activity. Mr. Stanton's discusses how MERCK executives learned about the statements being made to doctors by the company's detail representatives from the PMRD program:

> Question: Now, with respect to who all was looking and analyzing the Vioxx PMRD data that you-all purchased, tell me, would you agree or disagree that all levels of the marketing team at MERCK were reviewing PMRD results?

> Mr. Stanton: I think all levels, I can't answer. I can tell you that the market research team and the marketing team -- market research provided this data to the marketing team that generally consisted of marketing management and the directors. I don't know that the vice presidents or the extreme leadership saw this data, but I know that the senior director or executive director of marketing definitely saw it, and it's likely that the vice president would look at it. I don't know how routinely, but it's -- it's likely. So I would conclude, then, that most -- most levels had seen it on a routine basis. I don't know, you know, just because they received it, et cetera, if they look at it. But I know that some people very much did so look at it.

> Question: Fair enough. Now, with respect to who all was looking and analyzing the Vioxx PMRD data that you-all purchased, tell me, would you agree or disagree that all levels of the marketing team at MERCK were reviewing PMRD results?

Mr. Stanton: Based on what my experience and what I saw, there was a distribution to the marketing team that included marketing leadership down.
Question: Okay. And you know that some of the higher-ups looked at it, and you also know that market research department provides it to many levels of folks in the marketing department, correct?

Mr. Stanton: Based on what my experience and what I saw, there was a distribution to the marketing team that included marketing leadership down.

Question: Do you know how often members of the various levels of the marketing department at MERCK reviewed the PMRD results for Vioxx?

Mr. Stanton: I know based on this document and others that the results are reported on a bi-monthly basis so that would mean every other month a report came in, and I will, therefore, conclude that somebody was looking at it every other month.

165.   Included in these PMRD reports are physicians reporting a better CV safety profile (MRK-PLBAH0028455, MRK-AKC0002879), slowing of Alzheimers (MRK-PLBAH0000433, MRK-PLBAH1295, MRK-PLBAH2807), and GI safety (MRK-PLBA14603)

## OTHER ISSUES

166.   According to their own informed consent standard, MERCK agreed to reimburse the survivors of and study participants who had died or been injured from any events that occurred during its trials for medical expenses whether or not they were on VIOXX or placebo. The informed consent form signed by patients entering the VIGOR trial states, "If you suffer any adverse drug experience resulting directly from the MERCK study drug, MERCK & Co., Inc. will provide reimbursement for the reasonable costs of medical treatment…"(MRK-NJ0232605)

167.   Vioxx was not the only drug which the FDA sent a warning about. Since the approval of Vioxx MERCK has received letters from the FDA regarding other products including Crixivan, Fosamax, Candias and Januvia. Most recently, MERCK has been found to have given money to a Norwegian physician who was conducting clinical trials. (http://jyllands-posten.dk/uknews/ECE5722791/doctor-illegally-accepted-money-from-pharmaceutical-industry/)

168.   In December of 2011, MERCK plead guilty to misdemeanor for promoting Vioxx off-label for the treatment of rheumatoid arthritis between May of 1999 to April  of 2002.(USA vs. MERCK Sharp & Dohme, Criminal No. 11-10384-PBS) This provides a further example of MERCK's focus on profits over patient safety.

## Conclusion

169.   In addition to this report I have set out other opinions in the other reports for cases related to Vioxx.

170.   I intend to review more corporate documents, including but not limited to Utah specific documents.

171.   I intended to review other depositions as they become available.

172.   As more information becomes available, I expect to supplement and/or modify the opinions set forth herein.


Signed,

_David S. Egilman MD, MPH_

_____

David S. Egilman, MD MPH

# Attachment

Merck-FDA Label Negotiations

**Merck-FDA Label Negotiations**

| Questioned Text | Comments | Final Label Text |
|---|---|---|
| Merck Delete: "Severe renal failure including fatalities and need for dialysis has been reported in post-marketing in association with VIOXX (see PRECAUTIONS)." (Clinical Pharmacology section) | "Merck proposes to delete. As for all NSAIDS, this information is provided in other parts of the circular." | "While renal insufficiency does not influence the pharmacokinetics of rofecoxib, use of VIOXX in advanced renal disease is not recommended, (see WARNINGS, *Advanced Renal Disease.*) |
| Merck Proposed: "In the VIGOR study, there was a significant difference in the incidence of serious cardiovascular thrombotic events between patients treated with VIOXX 50 mg once daily (twice the highest dose recommended for chronic use in OA) and patients treated with naproxen 500 mg twice daily (common therapeutic dose)."<br><br>FDA Proposed: "The VIGOR study demonstrated a significant increase in the risk of development of serious cardiovascular thrombotic events in patients taking VIOXX (n= 64) compared to naproxen (n= 32) (see Table 5)." | "Merck proposes new text regarding the CV safety in VIGOR." | "The VIGOR study showed a higher incidence of adjudicated serious cardiovascular thrombotic events in patients treated with Vioxx 50 mg once daily as compared to patients treated with naproxen 500 mg twice daily." |
| Merck Delete: "In addition to the CV/thrombotic events, VIOXX 50 mg had a higher incidence of discontinuations due to HTN- and edema-related events as well as congestive heart failure events as compared to naproxen." | "Merck proposes to delete. Hypertension- and edema-related events are adequately covered by NSAID class labeling. This section [Cardiovascular Safety in VIGOR] is not the appropriate place to discuss CHF...In addition, these AEs were not associated with cardiovascular thrombotic events in the VIGOR study." | Text not included in the final label |

| | | |
|---|---|---|
| Merck Proposed: "Ongoing Placebo-Controlled Studies"<br><br>"Three placebo-controlled studies (mean and median duration of approximately 1 year) in a total of 2899 patients (mean age 75 years) are being conducted with VIOXX 25 mg once daily in patients with Alzheimer's disease or mild cognitive impairment. There were 25 patients with serious cardiovascular thrombotic events (14 cardiac and 11 cerebrovascular) in the VIOXX 25 mg group compared to 39 patients with serious cardiovascular thrombotic events (20 cardiac, 16 cerebrovascular and 3 peripheral vascular) in the placebo group." | "Merck proposed addition of Alzheimer's Disease study data to include information on CV thrombotic events compared to placebo." | Text appeared under "PRECAUTIONS" section: "In a placebo-controlled database derived from 2 studies with a total of 2142 elderly patients (mean age 75; VIOXX n=1067, placebo n=1075) with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs 35 for patients treated with VIOXX 25 mg once daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for VIOXX versus placebo, respectively. The significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown. Prospective studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebo have not been performed." |
| Merck Delete: "Because of its lack of platelet effects, VIOXX is not a substitute for aspirin in patients requiring cardiovascular prophylaxis. (bold)" | "Merck proposes to relocate to PRECAUTIONS, Cardiovascular Effects." | Text appeared under "CLINICAL STUDIES" and "PRECAUTIONS" section: "Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis. (bold)" |

| Merck Delete: "WARNINGS Cardiovascular Disease" [Full Section] | "Merck proposes to revise and relocate to the PRECAUTIONS section." | Text appeared under "PRECAUTIONS" section |
|---|---|---|
| Merck Delete: "New onset of congestive heart failure, worsening of pre-existing congestive heart failure and severe pulmonary edema have been reported in post-marketing in association with the use of VIOXX at recommended doses." | "Merck proposes to delete. As for all NSAIDs, this information is provided in other parts of the circular. Merck agrees to add pulmonary edema to the ADVERSE REACTIONS section as a post-marketing AE." | Text not included in the final label. Pulmonary edema was listed in the ADVERSE REACTIONS section. |
| Merck Delete: "Thrombocytopenia has been reported in post-marketing in association with VIOXX." | "Merck proposes to delete proposed sentence. As for all NSAIDs, this information is provided in other parts of the circular." | Text not included in the final label. Thrombocytopenia was listed in the ADVERSE REACTIONS section. |
| Merck Delete: "VIOXX should be used with caution in patients with prior history of hypertension and heart disease." In PRECAUTIONS, *Hematological Effects* section. | "Merck proposes to delete for consistency with proposed CV PRECAUTION. This information is provided in other parts of the circular." | "The information below should be taken into consideration and caution should be exercised when Vioxx is used in patients with a medical history of ischemic heart disease." In PRECAUTIONS, *Cardiovascular Effects* section: "Vioxx should be used with caution, and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension, or heart failure." In PRECAUTIONS, *Fluid Retention, Edema and Hypertension* section. |

| | | |
|---|---|---|
| Merck Delete: "In acute pain studies, median time to re-medication was between 5.3 and 9.5 hours. VIOXX 50 mg should not be given more than once daily. If additional analgesia is needed within 24 hour of dose, alternatively therapy should be used. Chronic use of VIOXX 50 mg daily is not recommended." | "The Agency proposed additions of data on re-medication and the recommendation for dosing within the approved dosing interval are inconsistent with the labeling of other NSAIDS analgesics and are not based on any new analgesia data since the time the approved labeling was negotiated." | Text appears in DOSAGE AND ADMINISTRATION, *Management of Acute Pain and Treatment of Primary Dysmenorrhea* section: "Chronic use of VIOXX 50 mg daily is not recommended." |
| Merck Proposed: "Use with Aspirin"<br><br>"In 4 six- to twelve-week, double-blind, randomized clinical trials, VIOXX 12.5 mg or 25 mg was administered to osteoarthritis patients concomitantly with aspirin (less than or equal to 325 mg daily) (N=516). Among these 516 patients, there was 1 PUB. While low-dose aspirin may be used concomitantly with VIOXX, such concomitant use may result in an increased rate of GI ulceration or other complications, compared to use of VIOXX alone. (See PRECAUTIONS, *Cardiovascular Effects* and PRECAUSTIONS, *Drug Interactions, Aspirin*.)" | "Merck proposes to retain subsection that was submitted and update with current available information. Previous agreement with the Division was the concomitant use of VIOXX with aspirin in 100 patients or more would be sufficient to allow a recommendation for concomitant use. With the Agency's request to include ADVANTAGE data in the CLINICAL STUDIES section, data on concomitant use of VIOXX with aspirin now includes over 500 patients. This markedly enhances the experience of patients taking VIOXX concomitantly with aspirin to a level beyond that noted in labeling for other members of the class." | Text not included in the final label. |

| | | |
|---|---|---|
| Merck Delete: "In the VIOXX GI outcome research (VIGOR) study, the cumulative incidence of PUBs with VIOXX 50 mg – the approved dose for the treatment of acute pain and twice the maximum dose recommended for chronic use in osteoarthritis – was 1.8% over a median exposure of 9 months. (See CLINICAL STUDIES, Special Studies, Safety Studies, VIGOR.)"<br><br>Merck Proposed: "In the VIOXX GI outcomes research (VIGOR) study, the risk development of a PUB was 54% lower in rheumatoid arthritis patients treated with VIOXX 50 mg once daily (twice the highest dose recommended for chronic use in OA) than in patients treated with naproxen 500 mg twice daily (common therapeutic dose) (see CLINICAL STUDIES, *Special Studies*, VIGOR)." | "Merck proposes revisions as shown." | "Although the risk of GI toxicity is not completely eliminated with VIOXX, the results of VIOXX GI outcomes research (VIGOR) study demonstrate that in patients treated with VIOXX, the risk of GI toxicity with VIOXX 50 mg once daily is significantly less than with naproxen 500 mg twice daily." |
| Merck Proposed: "In a combined analysis of PUBs for all Phase llb/lll clinical trials in OA patients, the reduction in risk for a PUB in patients treated with VIOXX was similar to that described in RA patients in the VIGOR study. In these OA studies, most of the risk reduction in the patients treated with VIOXX occurred in the studies in which ibuprofen was the comparator." | "Merck proposes to retain 069 GI data as per prior agreement during the label negotiations for the initial VOIXX NDA. These results provide useful information that are consistent with the VIGOR data in a different patient population (OA) and with different comparators." | Text not included in the final label. |
| Merck Delete: "No safety information is available regarding the use of VIOXX in patients with advanced kidney disease. Therefore…In post-marketing experience, serious renal failure, including the need for dialysis and fatalities have been reported in patients with normal, as well as impaired renal function. These events may occur after the short-term therapy."<br><br>Merck Proposed: "Treatment with VIOXX is not recommended in patients <u>with advanced renal disease.</u>" | "Merck proposes to delete. As for all NSAIDs, this information is provided in other parts of the circular."<br><br>"Merck proposes to update based upon post-marketing data and for consistency with CLINICAL PHARMACOLOGY, *Special Populations, Renal Insufficiency*." | "Treatment with VIOXX is not recommended in patients with advanced renal disease. If VIOXX therapy must be initiated, close monitoring of the patient's kidney function is advisable (See PRECAUTIONS, *Renal Effects*." |

| | | |
|---|---|---|
| Merck Delete: "However, severe renal failure including fatalities and need for dialysis have been reported in post-marketing in association with VIOXX. (See WARNINGS, Advance renal disease)." | "Merck proposes to delete. Consistent with NSAID class labeling, this information is provided in other parts of the circular." | "Caution is also recommended in patients with pre-existing kidney disease (see WARNING, *Advanced Renal Disease*)." |
| Merck Delete: "New onset of congestive heart failure, worsening of pre-existed congestive heart failure and severe pulmonary edema have been reported in post-marketing in association with the use of VIOXX at recommended doses." | "Merck proposes to delete. Consistent with NSAID class labeling, this information is provided in other parts of the circular. Merck agrees to add pulmonary edema to the ADVERSE REACTIONS section as a post-marketing adverse experience." | Text not included in the final label. |
| Merck Proposed: "The risk of developing a serious cardiovascular thrombotic event in the VIGOR study was significantly different in patients treated with VIOXX 50 mg once daily (twice the highest dose recommended for chronic use in OA) as compared to patients treated with naproxen 500 mg twice daily (common therapeutic dose). This was largely due to the significant difference in the incidence of myocardial infarction between patients taking VIOXX 50 mg once daily (0.5%) and naproxen 500 mg twice daily (0.1%). (See CLINICAL STUDIES, *Special Studies*, *VIGOR*). In all other controlled clinical trials, the incidence of all serious cardiovascular thrombotic events, including myocardial infarction, was similar between VIOXX and placebo and between VIOXX and the nonselective NSAID comparators studied (ibuprofen, diclofenac, and nabumetone). The basis for the difference in cardiovascular event rates with VIOXX and placebo or other NSAID | "Merck proposes this relocation to PRECAUTIONS as in previous VIGOR proposal with revisions as shown." | Text appears in PRECAUTIONS, *Cardiovascular Effects*; however, text not included in the final label. |

| | | |
|---|---|---|
| comparators in other studies, is not understood. Prospective, well-powered, long-term studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebo have not been performed." | | |
| Merck Proposed: "Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis (bold). While low-dosage aspirin may be used concomitantly with VIOXX, such concomitant use may result in an increased rate of GI ulceration or other complications, compared to use of VIOXX alone. (See CLINICAL STUDIES, *Special Studies, Use with Aspirin and Platelets,* PRECAUTIONS, *Drug Interactions, Aspirin*)." | "Merck agrees to bold statement as requested by the Agency and proposes addition of new sentence." | Bolded text remains, but added sentence was not included in final label. |
| Merck Delete: "The excess of cardiovascular thrombotic events on VIOXX compared to naproxen was more marked in the subgroup of patients retrospectively identified as being at high risk for cardiovascular disease (see Table 6)." | "Merck proposes to delete. Updated data submitted to the Agency on 13 Oct 2000 demonstrate that the relative risk of an event for the rofecoxib relative to naproxen is not statistically different between the aspirin-indicated and aspirin-not-indicated sub-populations." | Text not included in the final label. |
| Merck Delete: "Patients should promptly report signs or symptoms of gastrointestinal ulceration or bleeding, skin rash, unexplained weight gain, or edema, chest pain or shortness of breath to their physicians." | "Merck proposes to re-instate the currently approved text. This text is NSAID class labeling." | Text not included in the final label. |

| | | |
|---|---|---|
| Merck Proposed: "VIOXX can be used concomitantly with low-dose aspirin." | "Merck proposes to include sentence regarding concomitant use of VIOXX with aspirin. This information has been supplemented with additional clinical trial data provided to the Agency from the ADVANTAGE study. This markedly enhances the experience of patients taking VIOXX concomitantly with aspirin to a level beyond that noted in labeling for other members of the class. Merck believes there are sufficient data to support this claim." | Text not included in the final label. |
| Merck Delete: "While no substantial differences in effectiveness were observed between these subjects and younger subjects, as with NSAIDs, elderly patients (over 75 years) or those with a prior history of ulcers or UGI bleeding taking VIOXX have a higher risk for developing a GI bleed than patients with neither of these risk factors (See GI WARNINGS section). Most spontaneous post-marketing reports of fatal GI events have been in the elderly. Most post-marketing reports of acute renal failure have also been in the elderly."<br><br>Merck Proposed: "No substantial differences in safety and effectiveness were observed between these subjects and younger subjects. Greater sensitivity of some older individuals cannot be ruled out. Dosage adjustment in the elderly is not necessary; however, therapy with VIOXX should be initiated at the lowest recommended dose." | "Merck proposes to re-instate the currently approved text. There are no new data regarding these issues and they are addressed in the WARNINGS, *GI Effects* and PRECAUTIONS, *Renal Effects* (as per NSAID class labeling.)" | Text not included in the final label.<br><br>Added a supplemental sentence. "As with other NSAIDs, including those that selectively inhibit COX-2, there have been more spontaneous post-marketing reports of fatal GI events and acute renal failure in elderly than in younger patients." |

| | | |
|---|---|---|
| Merck Proposed: "…the general safety profile of VIOXX 50 mg QD was otherwise similar to that reported at doses of VIOXX 12.5 mg and 25 mg." | "Merck accepts with revisions shown." | The language of the text was changed. |
| Merck Delete: "~~The 50 mg dose should be used only for acute pain or dysmenorrhea for five days or less. For safety data related to the 50 mg dose see VIGOR study.~~ (See WARNINGS, *Cardiovascular Safety*…)." | "Merck proposes to delete. This information is already covered in DOSAGE and ADMINISTRATION. The cross-reference covers other additional safety information. The VIGOR safety data were added below." | Text not included in the final label. |
| Merck Proposed: "Patients were not permitted to use concomitant aspirin or other antiplatelet drugs." | "Merck proposes revisions as shown." | |
| "PUBs ~~All clinical upper GI events (complicated upper GI events~~, symptomatic ulcers, <u>upper GI perforation, obstruction, major or</u> and minor <u>upper GI</u> bleeding). ~~Complicated upper GI events~~ (upper GI perforation, obstruction or major <u>upper GI</u> bleeding)." | | Text not included in the final label. |
| Merck Proposed: "For cardiovascular data from ~~three~~ 2 long-term placebo-controlled studies, see PRECAUTIONS, *Cardiovascular Effects*." | "Merck proposed revisions as shown." | Strikethrough text not included in the final label. |
| Merck Deleted:<br>*Overall Safety in VIGOR*<br><br>"No statistically significant differences were seen between VIOXX and naproxen in the overall incidences of death, withdrawals due to adverse events and serious adverse events (i.e. those causing hospitalization or felt to be life threatening or otherwise medically significant). | "Merck proposes to delete the "Overall safety in VIGOR" sub-section. This study was primarily designed to evaluate the GI safety of VIOXX at 2 times the maximum chronic dose. General safety information is provided in the ADVERSE REACTIONS section." | Text not included in the final label. |

| | | |
|---|---|---|
| Merck Proposed: "In a placebo-controlled trials database derived from 2 ~~3~~ studies in 2142 elderly patients (mean age 75) with a median ~~mean~~ duration of exposure of approximately 14 months ~~1 year~~, the number of patients with  serious cardiovascular thrombotic events and cardiovascular mortality were ~~similar~~ 21 vs 35 and 8 vs 5 ~~between~~ for patients treated with VIOXX 25 mg once daily versus ~~and~~ placebo, respectively, ~~(serious cardiovascular thrombotic events 25 vs 39; cardiovascular mortality 10 vs 6, VIOXX vs placebo, respectively).~~" | "Merck proposes revisions as shown. These new data are based upon data from Protocols 078 and 091 only." | Strikethrough text not included in the final label. |
| Merck Delete: "Prospective studies specifically designated to compare the incidence of serious CV events in patients taking VIOXX ~~or other NSAIDs that selectively inhibit COX-2~~ versus nonselective NSAID comparators or placebo have not been performed." | "Merck proposes revisions as shown." | Strikethrough text not included in the final label. |
| Merck Proposed: "In the VIGOR study ~~clinical studies~~ there were significantly fewer ~~episodes of~~ serious gastrointestinal events ~~bleeding~~ in patients taking VIOXX 50 mg once daily (twice the highest dose recommended for chronic use in OA and RA)…In 2 placebo-controlled studies, a difference in the incidence of serious cardiovascular thrombotic events was not observed between patients taking VIOXX and patients taking placebo." | No comments given. | GI events of 50 mg VIOXX vs 500 mg naproxen appeared under CLINICAL STUDIES. |

| VIOXX GI Clinical Outcomes Research (VIGOR Study) *Study Design* | "Merck accepts with revisions as shown." | Previously stated text deleted and language changed in remaining text: |
|---|---|---|
| Merck Proposed: "The VIGOR study was designed primarily to evaluate the comparative GI safety of VIOXX 50 mg once daily versus naproxen 500 mg twice daily. The GI safety endpoints included: the comparative rate of all clinical upper GI events, *complicated upper GI events ** and GI bleeding.***"<br><br>Merck Deleted: "The study included GI safety endpoints: the rate of complicated ulcers and the combined rate of complicated and uncomplicated* ulcers; and general safety endpoints.<br><br>*Complicated ulcers: upper GI perforations, obstruction or blood (PUB's) | | "The VIGOR study was designed to evaluate the comparative GI safety of VIOXX 50 mg once daily (twice the highest dose recommended for chronic use in OA and RA) versus naproxen 500 mg twice daily (common therapeutic dose). The general safety and tolerability of VIOXX 50 mg once daily versus naproxen 500 mg twice daily was also studied. VIGOR was a randomized, double-blinded study (median duration of 9 months) in 8076 patients with rheumatoid arthritis (RA) requiring chronic NSAID therapy (mean age 58 years). Patients were not per mitted to use concomitant aspirin or other antiplatelets drugs. Patients with a recent history of myocardial infarction or stroke and patients deemed to require low-dose aspirin for cardiovascular prophylaxis were to be excluded from the study. Fifty-sex percent of patients used concomitant oral corticosteroids. The GI safety endpoints (confirmed by a blinded adjudication committee) included: PUBs-symptomatic ulcers, upper GI perforation, obstruction, major or minor upper GI bleeding. Complicated PUBs (a subset of PUBs)-upper GI perforation, obstruction or major upper GI bleeding. |

| | | |
|---|---|---|
| Merck Proposed: "A similar safety advantage was seen in patients without any of these risk factors. (See Table 2.)" | "Merck accepts with revisions and proposes addition of second sentence." | Text not included in the final label. |
| Merck Proposed: "In 110 patients treated with VIOXX (average age approximately 65 years) in the post-orthopedic surgery pain study, the most commonly reported adverse experiences were constipation, fever, and nausea." | "Merck proposes to retain currently approved text as negotiated with the Agency because it accurately describes the adverse experience profile of VIOXX in this study." | Text not included in the final label. |
| Merck Proposed: <br> *Vigor Study* <br><br> "A total of 4047 patients with rheumatoid arthritis were treated with VIOXX 50 mg daily (2 times the maximum does recommended for chronic use) for a median of 9 months. The general safety profile of VIOXX 50 mg QD in the VIGOR study was similar to that reported for VIOXX 50 mg QD in the OA clinical trials. For specific details on GI and cardiovascular safety see CLINCIAL STUDIES. *Special Studies.* VIGOR and PRECAUTIONS. *Cardiovascular Effects.* | "Merck proposes to revise text as shown and add appropriate cross-reference." | Language change under the ***Clinical Studies in OA and RA with VIOXX 50 mg (Twice the highest dose recommended of chronic use)***. |

| Questioned Text | Comments | Final Label Text |
|---|---|---|

**Questioned Text:**

**Table 2**
**VIGOR-Summary of Patients with Serious Cardiovascular Thrombotic Adverse Events[1]**
**COMPARISON TO NAPROXEN**

| Serious cardiovascular thrombotic events | VIOXX 50 mg daily (N=4047)[2] n[3] (Rate[4]) | Naproxen 1000 mg daily (N=4029)[2] n[3] (Rate[4]) |
|---|---|---|
| Any CV thrombotic event | 45 (1.67)* | 19 (0.70) |
| Cardiac events | 28 (1.04)* | 10 (0.37) |
| Fatal MI/Sudden death | 5 (0.19) | 4 (0.15) |
| Non-fatal MI | 18 (0.67)* | 4 (0.15)[i] |
| Unstable angina | 5 (0.19) | 3‡ (0.0?11)‡ |
| Cerebrovascular | 11 (0.41) | 8 (0.30) |
| Ischemic stroke | 9 (0.33) | 8 (0.30) |
| TIA | 2 (0.07) | 0 (0.00) |
| Peripheral | 6 (0.22) | 1 (0.04) |

**Comments:**

"Merck proposes revisions as shown."

**Final Label Text:**

**Table 2**
**VIGOR-Summary of Patients with Serious Cardiovascular Thrombotic Adverse Events[1] Over Time**
**COMPARISON TO NAPROXEN**

| Treatment group | Patients Randomized | | 4 Months[2] | 8 Months[3] | 10 ½ months[4] |
|---|---|---|---|---|---|
| VIOXX 50 mg | 4047 | Total number of events | 17 | 29 | 45 |
| | | Cumulative Rate[†] | 0.46% | 0.82% | 1.81%* |
| Naproxen 1000 mg | 4029 | Total number of events | 9 | 15 | 19 |
| | | Cumulative Rate[†] | 0.23% | 0.43% | 0.60% |

[1]Confirmed by blinded adjudication committee, [2]Number of patients remaining after 4 months were 3405 and 3395 for VIOXX and naproxen respectively, [3]Number of patients remaining after 8 months were 2806 and 2798 for VIOXX and naproxen respectively, [4]Number of patients remaining were 531 and 514 for VIOXX and naproxen respectively.

†Kaplan-Meier cumulative rate.

* p-value <0.002 for the overall  relative risk compared to naproxen by Cox proportional hazard model

| | | |
|---|---|---|
| VIOXX® (rofecoxib tablets and oral suspension)<br><br>[1] Confirmed by blinded adjudication committee<br>[2] N=Patients randomized<br>[3] n=Patients with events<br>[4] Rate per 100 patient years<br>* p-value <0.05 for relative risk compared to naproxen<br>[†] In the naproxen group, 1 patient with ~~a non-fatal MI~~ unstable angina also had <u>unstable angina</u> ~~non-fatal MI~~. This patient is not included in the total for unstable angina.<br><br>For cardiovascular data from ~~three~~2 long-term placebo-controlled studies, see PRECAUTIONS, *Cardiovascular Effects*.<br>*Upper Endoscopy in Patients with Osteoarthritis and Rheumatoid Arthritis* | "Appropriate changes have been made to the title, rate and footnote." | "[1] Confirmed by blinded adjudication committee, [2] N=Patients randomized, [3] n=Patients with events<br>*p-value <0.002 and ** p-value ≤0.006 for relative risk compared to naproxen by Cox proportional hazard model" |



Attachment
Curriculum Vitae

# CURRICULUM VITAE
# DAVID STEVEN EGILMAN, MD, MPH

| | |
|---|---|
| Business Mailing Address: | Never Again Consulting<br>8 North Main St.<br>Attleboro, MA  02703 |
| Business Telephone Number: | 508-226-5091 |
| Business Fax Number: | 425-699-7033 |
| E-Mail: | degilman@egilman.com |

## EDUCATION

| | |
|---|---|
| Undergraduate | Brown University, Molecular Biology, BS 1974, Sigma Xi |
| Medical School | Brown University, 1974 – 1978, MD |
| Other Advanced Degrees | Harvard School of Public Health, 1981–1982, MPH 1982 |

## POSTGRADUATE TRAINING

| | |
|---|---|
| Internship and Residency | University of Rochester, Rochester, NY, Internship and Residency in Internal Medicine, 1978 – 1981 |
| NIH Training | National Institutes of Health, Washington DC, Epidemiology Training Program, 1981 – 1984 |
| Residency | Carney Hospital, Boston Massachusetts, Residency in Preventive Medicine, 1992 – 1993 |
| Residency | National Institute of Occupational Safety and Health, Residency in Occupational Medicine, 1983 – 1984 |

## UNIFORM SERVICE

US Public Health Service, 1981 – 1984

PROFESSIONAL LICENSES AND BOARD CERTIFICATION
Rhode Island State Medical License, No. 6742, 1985
Mississippi State Medical License, No. 8872, 1979
Massachusetts State Medical License, No. 56511, 1986
Diplomat of American Board of Preventive Medicine, Occupational Medicine, 1986
Diplomat of American Board on Internal Medicine, 1981
Diplomat of American Board of Medical Examiners, 1979


ACADEMIC APPOINTMENTS

Clinical Professor, Department of Family Medicine, Brown University, Providence, RI,
    July 2012 – Present
Clinical Associate Professor, Department of Family Medicine, Brown University,
    Providence, RI, 2009 – June 2012
Clinical Associate Professor, Department of Community Health, Brown University,
    Providence, RI, 1996 – 2009
Clinical Assistant Professor, Department of Community Health, Brown University,
    Providence, RI, 1990 – 1996
Clinical Instructor, Department of Community Health, Brown University, Providence, RI,
    1985 – 1990
Clinical Instructor in Health Sciences, Bouve College of Pharmacy and Health Sciences,
    Northeastern University, Boston, MA, 1995 – 2002


HOSPITAL APPOINTMENTS

Courtesy Staff, Memorial Hospital, 1987 – 2002, Physician
Courtesy Staff, Memorial Hospital, 2002 – Present, Senior Physician


OTHER APPOINTMENTS

Member, Committee on Health Based Exposure Limits to Toxic Substances, American
    Public Health, Association, 1988
Chairperson, Rhode Island Committee for Health Rights in Central America, 1986 –
    1989
Editor-in-Chief, International Journal of Occupational & Environmental Health 2008 –
Present
President of the Board, Global Health Through Education Training and Service, 2002 –
    Present
Board Member, Citizens for Responsible Care and Research, 1997 – 2011
Board Member, Alliance for Human Research Protection, 2011 – Present

MEMBERSHIP IN SOCIETIES

Institute of Food Technologists, The Society for Food Science and Technology, 2006 – 2007
American Society for Environmental History, 2003 – Present
American Medical Association, 1989 – Present
American Society of Internal Medicine, 1984 – 2008
American Public Health Association, 1979 – Present
Brown Medical Association, Board of Directors, 1978 – 1992
American College of Occupational and Environmental Medicine, 1992 – Present
Document Custodian Industrial Hygiene Foundation 2005 – Present

AWARDS

Volvo for Life Award Top 100, 2004
Rae Unzicker Award of The National Association for Rights Protection and Advocacy 2007

ORIGINAL PUBLICATIONS IN PEER-REVIEWED JOURNALS

1.  Egilman DS and Reinert AA. The Origin and Development of the Asbestos Threshold Limit Value: Scientific indifference and corporate influence. Int. J. Health Serv. 25:667-696, 1995.

2.  Durand K and Egilman DS. Possible Corruption Of IH Literature By DuPont: The Imron Respirator Studies, Am Ind. Hyg. Assoc. J. 56:817-825, August 1995.

3.  Egilman DS and Reinert AA. Asbestos Exposure and Lung Cancer: Asbestosis is Not Necessary. Am. J. Ind. Med. 30:398-406, 1996.

4.  Schnoor TM, Steenland K, Eglend GM, Boeniger M, and Egilman DS. Mortality of Workers Exposed to Toluene Diisocyante in the Polyurethane Foam Industry, Occ. Env. Med., 53:703-707, 1996.

5.  Egilman DS, Wallace W, Stubbs C, Mora-Corrasco F.  A Little Too Much of the Buchenwald Touch? Military Radiation Research at the University of Cincinnati, 1960-1972. Accountability in Research Vol. 6, pp. 63-102, 1998.

6.  Egilman D, Wallace W, Stubbs C, and Mora-Corrasco F. Ethical Aerobics: ACHRE's Flight from Responsibility. Accountability in Research Vol. 6, pp. 15-61, 1998.

7.  Egilman D, Wallace W, and Hom C. Corporate Corruption of the Medical Literature. Accountability in Research Vol. 6, pp.127-147, 1998.

8.  Egilman DS, Kim J, and Biklen M. Proving Causation: The Use and Abuse of Medical and Scientific Evidence Inside the Courtroom—An Epidemiologist's Critique of the Judicial Interpretation of the *Daubert* Ruling. Food and Drug Law Journal 58:2, 2003.

9.  Egilman DS, Fehnel C, and Bohme SR. Exposing the "Myth" of ABC: A Critique of the Canadian Asbestos Mining Industry-McGill Chrysotile Studies.  Amer J Ind Med 44:5, 2003.

10. Egilman DS, Bagley S, Biklen M, Golub AS, and Bohme SR.  The Beryllium "Double Standard" Standard. International Journal of Health Services 33:4, 2003, pages 769-812.

11. Egilman DS. Suppression Bias at the Journal of Occupational and Environmental Medicine. Int J Occup Environ Health 2005: 11: 202-204.

12. Egilman DS and Bohme SR. Guest Editors, Special Issue: The Corporate Corruption of Science. Int J Occup Environ Health 2005: 11(4).

13. Egilman DS and Bohme SR. Over a Barrel: Corporate Corruption of Science and Its Effects on Workers and the Environment. Int J Occup Environ Health 2005: 11(4), 331-337.

14. Egilman DS and Billings MA. Abuse of Epidemiology: The Automobile Manufacturers Manufacture a Defense to Asbestos Liability. Int J Occup Environ Health 2005: 11(4), 360-371.

15. Bohme SR, Zorabedian J, Egilman DS. Maximizing Profit and Endangering Health: Corporate Strategies to Avoid Litigation and Regulation Int J Occup Environ Health 2005: 11(4), 338-348.

16. Egilman DS and Scout. Corporate Corruption of Science: The Case of Chromium (VI). Int J Occup Environ Health 2006: 12(2), 184-191.

17. Egilman DS and Presler AH. Report of Specific Cardiovascular Outcomes of the ADVANTAGE Trial. Ann Intern Med 2006 144: 781-781.

18. Bailar JC et al. FIOH-sponsored newsletter misrepresents asbestos hazards in Zimbabwe, Int J Occup Environ Health. 2006 Jul-Sep;12(3):254-8.

19. Egilman DS, Mailloux CJ, and Valentin CS. Popcorn Worker Lung Caused by Corporate and Regulatory Negligence: An Avoidable Tragedy. Int J Occup Environ Health 2007. 13(1): 85-98.

20. Egilman DS and Howe S. Against Anti-health Epidemiology: Corporate Obstruction of Public Health via Manipulation of Epidemiology. Int J Occup Environ Health 2007. 13(1):118-124.

21. Krumholz HM, Ross JS, Presler AH, and Egilman DS. What have we learnt from Vioxx?  BMJ 2007 Jan 20; 334(7585):120-3.

22. Egilman DS, Scout, Kol L, Hegg L, and Bohme SR. Commentary: Manipulated Data In Shell's Benzene Historical Exposure Study. Int J Occup Environ Health 2007: 13(2), 222-232.

23. LaDou J, Teitelbaum DT, Egilman DS, Frank AL, Kramer SN, and Huff J. American College of Occupational and Environmental Medicine (ACOEM): a professional association in service to industry. Int J Occup Environ Health 2007 Oct-Dec;13(4):404-26.

24. De Maeseneer J, van Weel C, Egilman D, Mfenyana K, Kaufman A, and Sewankambo N. Strengthening primary care: addressing the disparity between vertical and horizontal investment. Br J Gen Pract 2008 Jan;58(546):3-4

25. De Maeseneer J, van Weel C, Egilman D, Mfenyana K, Kaufman A, Sewankambo N, and Flinkenflögel M. Funding for primary health care in developing countries. BMJ 2008 Mar 8;336(7643):518-9.

26. Ross JS, Hill KP, Egilman DS, and Krumholz HM. Guest authorship and ghostwriting in publications related to rofecoxib: a case study of industry documents from rofecoxib litigation. JAMA 2008 Apr 16;299(15):1800-12.

27. Hill KP, Ross JS, Egilman DS, and Krumholz HM. The ADVANTAGE Seeding Trial: A Review of Internal Documents. Ann Intern Med, Aug 2008; 149: 251 - 258.

28. Egilman DS, Bohme SR. IJOEH and the critique of bias. Int J Occup Environ Health 2008 Apr-Jun;14(2):147-51

29. Egilman DS. Ford, General Motors, Chrysler, asbestos and a "Sane appreciation of the risks." Int J Occup Environ Health 2009 Jan-Mar;15 (1):109-10.

30. Egilman DS. Fiber types, asbestos potency, and environmental causation: a peer review of published work and legal and regulatory scientific testimony. Int J Occup Environ Health 2009 Apr-Jun;15(2):202-28.

31. Swanson C, Mosley H, Sanders, D, Egilman D, De Maeseneer J, Chowdhury M, Lanata C, Dearden K, and Malcolm B, Commentary: Call for global health-systems impact assessments. Lancet, 2009 July 2.

32. Ross JS, Madigan D, Hill KP, Egilman DS, Wang Y, and Krumholz HM. Pooled analysis of rofecoxib placebo-controlled clinical trial data: lessons for postmarket pharmaceutical safety surveillance. Arch Intern Med. 2009 Nov 23;169(21):1976-85.

33. Egilman D and Menéndez LM. A case of occupational peritoneal mesothelioma from exposure to tremolite-free chrysotile in Quebec, Canada: A black swan case. Am J Ind Med. 2010 Aug 18.

34. Ross JS, Madigan D, Konstam MA, Egilman DS, and Krumholz HM. Persistence of Cardiovascular Risk After Rofecoxib Discontinuation. Arch Intern Med, Dec 13/27, 2010; 170: 2035 – 2036

35. Krumholz SD, Egilman DS, and Ross JS. Study of neurontin: titrate to effect, profile of safety (STEPS) trial: a narrative account of a gabapentin seeding trial. Arch Intern Med. 2011 Jun 27;171(12):1100-7.

36. Egilman DS, Schilling JH, and Menendez L. A Proposal for a Safe Exposure Level for Diacetyl. Int J Occup Environ Health 17(2), 2011.

37. Egilman DS and Druar NM. Corporate versus Public Interests: Community Responsibility to Defend Scientific Integrity. Int J Occup Environ Health 17(2), 2011.

38. Egilman D, Bird T, Mora F, and Druar N. Gets AIDS and survive? The "Perverse" Effects of Aid: addressing the social and environmental determinants of health, promoting sustainable primary care, and rethinking global health aid. Int J Occup Environ Health. 2011 Oct-Dec;17(4):364-82.

39. Egilman DS, Ardolino EL, Howe S, and Bird T. Deconstructing a State-of-the-Art Review of the Asbestos Brake Industry. New Solut. 2011 Jan 1;21(4):545-71.

40. Egilman D and Schilling H., Bronchiolitis obliterans and consumer exposure to butter-flavored microwave popcorn: a case series. Int J Occup Environ Health 18(1):29-42, 2012.

41. Egilman DS, Bird T, and Lee C. Metlife and its corporate allies: dust diseases and the manipulation of science. Int J Occup Environ Health 2013 (In press).

OTHER NON-PEER-REVIEWED PUBLICATIONS

1. Egilman D. Alcoholism and Liver Injury (letter). NEJM. 208:260, 1978.

2. Ahrenholz S and Egilman D. Health Hazard Evaluation - Wooster, Ohio: Report No. 82-223-1340. Cincinnati, Ohio: National Institute for Occupational Safety and Health, 1982.

3. Stephenson RL and Egilman DS. Health Hazard Evaluation - Rockport, Indiana: Report No. 82-359-1382. Cincinnati, Ohio: National Institute for Occupational Safety and Health, 1983.

4. Salisbury S and Egilman D. Health Hazard Evaluation - Port Gibson, Mississippi: Report No. 83-132-1508. Cincinnati, Ohio: National Institute for Occupational Safety and Health, 1984.

5. Egilman D and Lichty P. Cost and Benefits of Hepatitis Prophylaxis (letter), JAMA, 251:2794, 1984.

6. Kelly RM, Egilman DS, Gordon JE. Long Term Effects Following Isocyanate Exposure (letter), J. Occup. Med., 27(7):469-470, 1985.

7. Frumkin H, Egilman DS, Christiani D, Pepper L, Sprince N, and Himmelstein J. Asbestos Related Disease (letter), JAMA, 254(10):1307-1308, 1985.

8. Egilman DS and Greer DS. International exchange for medical training (letter), NEJM., 314:652, March 6, 1986.

9. Egilman DS and Greer DS. International Health Needs (commentary), International J. Of Dermatology, 26(6):351-353, 1987.

10. Schnorr T and Egilman DS. Health Effects of Toluene Diisocyanate. In: Zenz, Carl, Occupational Medicine, Principles and Practical Applications, 2nd ed., Year Book Medical Publishers, Chicago 1988.

11. Egilman DS. Ethics of Mandatory Masturbation (letter). JOM, 30; 12:992, December 1988.

12. Egilman DS. Missing Information-The Enemy of Chemical Safety. Industry November 1989.

13. Egilman DS. The Training Exchange: An opportunity to serve (letter). Am J Public Health 79(11):1570, November 1989

14. Egilman DS and Haag BJ. Guideline for Medical Surveillance. Industry, April 1989.

15. Egilman DS. The emperor has no clothes: TLV's and Corporate influence. Am Ind. Hyg. Assoc. J., 187-188, March 1990.

16. Hardy HL and Egilman DS. Corruption of Occupational Medical Literature: The Asbestos Example (letter). Am. J. Ind. Med. 20(1):127-129.1991.

17. Egilman DS. Public Health and Epistemology. Am. J. Ind. Med, 22:457-459, 1992.

18. Egilman DS. The Past Foretells the Future. Links 10(1):13 - 15.1993.

19. Egilman DS and Hardy HL. Manipulation of Early Animal Research on Asbestos Cancer (letter). Am. J. Ind. Med. 24:787-791.1993.

20. Ziem G, Cone J, Castleman B, Cunningham K, and Egilman D. Health-Based Exposure Limits. Draft 7, October 23, 1993, HEEL Committee.

21. Egilman DS and Reinert AA. "What Is Informed Consent?" Washington Post, January 14, 1994: P 24.

22. Ziem G, Cone J, Castleman B, Cunningham K, Egilman D. Chemical Exposure Guidelines, Version 9. San Jose, CA: APHA Committee on Occupational Safety and Health. October 1995.

23. Egilman DS and Reinert AA. Commentary: The Asbestos TLV: Early Evidence of Inadequacy. Am. J. Ind. Med., 30:369-370, 1996. Egilman D, Punnett L, Hjelm EW, Welch L. Evidence for work-related musculoskeletal disorders. J Occup Environ Med. 1996 Nov;38(11):1079-80; author reply 1083-4

24. Goldin G, Goldin A, and Egilman D. Mesothelioma an Unwarranted Causal Model (letter). JOM, 38:3,239-240, 1996.

25. Egilman D, Punnett L, Wigaeus Hjelm E, and Welch L. Keyboarding can cause Injury (letter). JOEM, 38:10 1079-1081, November 1996.

26. Egilman D and Stubbs C. Evaluating the Health Risks of Silicone Breast Implants. Letter to the editor, NEJM Vol 335, Number 315, October 10, 1996.

27. Egilman D and Hom C. Commentary: Corruption of the Medical Literature: A Second Visit. Am. J. Ind. Med., 34:4 401-404, October 1998.

28. Egilman D and Walta M. Letter to the Editor: Breast Implant Verdicts Resulted From Corporate Misconduct and Legitimate Science. Am. J. Pub. H., 89:11 1763-1764, November 1999.

29. Egilman D and Hornblum A. "Letter to the Editor: Guinea Pigs Behind Bars." *The Boston Globe*, November 29, 1999.

30. Egilman DS and Reinert AA. Letter to the Editor: Corruption of Previously Published Asbestos Medical Literature: The 1958 QAMA Miner Cancer Study. Archives Env. Health, Vol 55, No. 1, Jan/Feb 2000.

31. Egilman DS. Letter to the Editor: Re: Researchers Should Talk to Workers. Am. J. Ind. Med., 39:3 347, March 2001.

32. Ludwig ER, Madeksho L, and Egilman D. Letter to the Editor, Commentary, Re: Mesothelioma and Lung Tumors Attributable to Asbestos Among Petroleum Workers. Am. J. Ind. Med., 3

33. Egilman DS. Asbestos Screenings. Am. J. Ind. Med., 42:2, August 2002.

34. Egilman D, Bagley S, and Connolly S. Letter to the Editor: Anything But Beryllium:  The Beryllium Industry's Corruption of Safety Information, Am. J. Ind. Med., 42:3, September 2002.

35. Egilman D and Ehrle LH.  Letter: Handling Conflicts of Interest between Industry and Academia.  *JAMA*. 2003; 289;3240.

36. Axelson O, Balbus JM, Cohen G, Davis D, Donnay A, Doolittle R, Duran BM, Egilman D, et al.  Regulatory Toxicolgy and Pharmacology. Int J Occup Environ Health. 2003 Oct-Dec;9(4):386-9; author reply 389-90

37. Jacobson MF, Sharpe VA, Angell M, Ashford NA, Blum A, Chary LK, Cho M, Coull BC, Davis D, Doolittle RF, Egilman D, et al.  Editorial policies on financial disclosure. Nat Neurosci. 2003 Oct;6(10):1001.

38. Egilman DS and Bohme SR.  Threshold Limit Values:  Should We Trust Them? NECOEM Reporter 2:7, Spring 2003.

39. Angell, M et al. Letter to the Editor [Journal Should Strengthen Conflict of Interest Disclosure Policy] Nature Neuroscience 6: 10, October 2003.

40. Egilman DS and Bohme SR. Commentary: Attorney-directed screenings can be hazardous. Amer J Ind Med. 45:3, 2004, pages 305-307.

41. Egilman DS and Roberts ML. Letter to the Editor. RE: The Controlled Use of Asbestos.  Int J Occup Environ Health. 10:1, 2004, pages 99-103.

42. Egilman D, Tweedale G, McCulloch J, Kovarik W, Castleman B, Longo W, Levin S, and Bohme SR. P.W.J. Bartrip's attack on Irving J, Selikoff. Am J Ind Med. 2004 Aug;46(2):151-5

43. Breihl, Jaime et al.  Letter: Texaco and Its Consultants.  Int J Occ Env Health 11: 217-220, 2005.

44. Egilman DS and Bohme SR. In Reply. Int J Occup Environ Health 2005: 12(2), 182-186.

45. Egilman DS and Bohme SR.  Letter: Chevron-Texaco's Science. Int J Occ Env Health 11(4): 456-457.

46. Egilman DS and Bohme SR. Vioxx Marketing: Merck's Failure to Warn. International Ergonomics Association 2006 Conference Proceedings.

47. Bohme SR and Egilman DS. Pharmaceutical Warnings and "Direct to Consumer" Marketing. International Ergonomics Association 2006 Conference Proceedings.

48. Egilman DS and Billings MA. Differential Peeky Bias, .Int J Occup Environ Health. 2006 Jul-Sep;12(3):294.

49. Egilman DS and Howe S. In Reply. Int J Occup Environ Health 2007: 13(1), 134-136.

50. Egilman DS, Presler AH, and Valentin CS. Avoiding the Regulatory Capture of the FDA. Archives of Internal Medicine. 167:2007, page 732.

51. Bohme SR and Egilman DS. Beyond reputation: debate on the role of corporate influence in occupational and environmental medicine. New Solut. 2008;18(3):317-24.

52. Abdo KM, Camargo CA Jr, Davis D, Egilman D, Epstein SS, Froines J, Hattis D, Hooper K, Huff J, Infante PF, Jacobson MF, Teitelbaum DT, and Tickner JA. Letter to U.S. FDA commissioner. Questions about the safety of the artificial sweetener aspartame.

53. Egilman DS. Seeding Trials: Just Say No. BMJ 2009; 339 11/2/2009

54. Swanson RC, Mosley H, Sanders D, Egilman D, et al. Call for global health-systems impact assessments. Lancet. 2009 Aug 8;374(9688):433-5.

55. Takaro T, Davis D, Van Rensburg J, et al. Scientists appeal to Quebec Premier Charest to stop exporting asbestos to the developing world. Int J Occup Environ Health. 2010 Apr-Jun;16(2):241-8.

56. Egilman DS and Bohme SR. Small is not necessarily beautiful. Int J Occup Environ Health. 2010 Oct-Dec;16(4):542-3.

57. Egilman DS. Continued Controversy on Chrysotile Biopersistence. Response, Int J Occup Environ Health. 2011 Jam-Mar;17(1):99-102.

58. Egilman DS and Druar NM. Editorial: Corporate versus public interests: community responsibility to defend scientific integrity. Int J Occup Environ Health. 2011 Apr-Jun;17(2):181-5.

59. De Maeseneer J, Roberts RG, Demarzo M, Heath I, Sewankambo N, Kidd MR, van Weel C, Egilman D, Boelen C, Willems S. Tackling NCDs: a different approach is needed. Lancet. 2011 Sep 5.

60. Egilman DS. An elaboration of "proof" of peritoneal mesothelioma from tremolite free chrysotile. Am J Ind Med. 2011 Aug;54(8):647

61. De Maeseneer J, Egilman D, Burdick WP, and Kaufman A. Medical schools in sub-Saharan Africa. Lancet. 2011 Oct 8;378(9799):1294.

62. Egilman DS and Druar NM. Spin your science into gold: direct to consumer marketing within social media platforms. Work (Reading, Mass.). 2012 Jan 1; 41(0):4494-502.

63. Egilman DS. Report of a recent "brake" through in the fiber burden-mesothelioma dialogue. Inhal Toxicol. 2012;24(2):136-7.

64. Egilman DS and Schilling JH. Letter to the Editor regarding the Donovan et al. (2011) article. Crit Rev Toxicol. 2012 Feb;42(2):169-72.

65. Egilman DS. Report of a recent "brake" through in the fiber burden-mesothelioma dialogue. Inhal Toxicol. 2012; 24(2): 136-7.

66. Egilman DS and Longo WE. Egilman's assessment regarding exposures of auto mechanics to amphiboles is correct. Inhal Toxicol. 2012 Jul 27.

67. Egilman DS and Druar NM. Comments on Donovan et al., "Evaluation of take home (para-occupational) exposure to asbestos and disease: A review of the literature." Int J Occup Env Health 2013 (In press).


## BOOK CHAPTERS

1. Crossgrove W, Egilman D, Heywood P, et al. Colonialism, International Trade, and the Nation-state, In: Newman, L., Crossgrove, W., Kates, R., et al., Hunger in History: Food Shortage, Poverty and Deprivation. Cambridge, MA: Basil Blackwell Inc., 1990.

2. Egilman DS, Bohme SR.  "A Brief History of Warnings."  Handbook of Warnings, ed. Michael Wogalter.  Mahwah, NJ:  Lawrence Erlbaum Associates, 2006.

3. Bohme SR, Egilman DS. "Consider the Source:  Warnings and Anti-Warnings in the Tobacco, Automobile, Beryllium and Pharmaceutical Industries."  Handbook of Warnings, ed. Michael Wogalter.  Mahwah, NJ:  Lawrence Erlbaum Associates, 2006.

4. Egilman D, Ardolino E. The Pharmaceutical Industry, Disease Industry: A Prescription for Illness and Death., in The Bottom Line or Public Health: Tactics Corporations Use to Influence Health and Health Policy, and What We Can Do to Counter Them, William H. Wiist (Editor), Oxford University Press, USA; (March 2010)


## INVITED PRESENTATIONS

1. Egilman DS. Isocyanate Exposures in Spray Painting. APHA, Nov. 1982.

2. Egilman DS. Right To Know - How to Use the Information. APHA, Nov. 1983.

3. Kubetz S, Egilman D. Right To Know - Use of Media to Promote Use of the Law. APHA, Nov. 1983.

4. Egilman DS. Theories of Causation - A Comparison of the Tobacco Institute, Chemical Manufacturers and Bayesian Approaches. APHA, Nov. 1984.

5. Egilman DS. Occupational Malfeasance in Department of Energy Nuclear Weapons Production Facilities. APHA, Sept. 1986.

6. Egilman DS. International Health Work: First Do No Harm. Family Medicine Grand Rounds, Memorial Hospital of Rhode Island, Feb. 1991.

7. Egilman DS. Lead and Other Environmental Hazards. Grand Rounds, Charlton Memorial Hospital, Fall River, MA, Mar. 1991.

8. Egilman DS. Science, Epistemology, and The Law. Guest Lecture for Toxic Torts: Professor Daynard, Northeastern University Law School, Boston, MA, July 1991.

9. Egilman DS. The Making of an Occupational/Environmental Disaster: The Corruption of the Asbestos Literature. Family Medicine Grand Rounds, Memorial Hospital of Rhode Island, Mar. 1991.

10. Egilman DS and Reinert AA. Corruption Of The Asbestos Epidemiological Literature, APHA, Nov. 1991.

11. Duran K and Egilman DS. Corruption Of IH Literature By Chemical Companies, APHA, Nov. 1991.

12. Egilman DS and Reinert AA. The History Of The Asbestos TLV, APHA, Nov. 1991.

13. Egilman DS. Oral Testimony Before the Subcommittee on Energy and Commerce, US House of Representatives, January 18, 1994.

14. Aaberg AM, Lochner K, Battel J, Egilman D. Creating Partnerships: The Public Health Initiative of "Braintree Healthy People 2000." APHA, October 1994.

15. Egilman DS. Oral Testimony Before the President's Advisory Committee on Human Radiation Experiments, February 1995.

16. Egilman DS. Oral Testimony Before the President's Advisory Committee on Human Radiation Experiments, July 17, 1995.

17. Egilman DS and Stubbs C. Health Effects of Silicone Breast Implants. APHA, November 1996.

18. Egilman DS. Health Effects of Silicone Breast Implants: Corporate Misconduct, February 26, 1997.

19. Egilman DS.  Participant, Institute of Medicine, Division of Health Sciences Policy, Town Meeting on Clinical Research in the Public Interest, National Academy of Sciences, Washington, D.C. July 10-11, 1997.

20. Egilman DS.  Guest faculty, Appellate Judges Seminar Series, "Use of Expert Testimony", Portsmouth, NH, September 15,1998.

21. Egilman DS.  Presenting the State-of-the-Art Expert in a Defense Premises Liability Case, A Trial Demonstration, Andrews Publications Asbestos Litigation Conference, May 2000.

22. Egilman DS. The History Of Warnings By Asbestos Product Manufacturers: Who Warned When, About What, And Who Did Not. Andrews Publications Asbestos Litigation Conference, May 2000.

23. Egilman DS and Ludwig E. Asbestos Warnings: Who Knew What When and What They Said. APHA, November 2000.

24. Egilman DS. Role of Insurance Companies in Industrial Health: Example of the Asbestos Tragedy. APHA, October 2001.

25. Egilman DS. Chronic Beryllium Disease and the Politics of Occupational Health. APHA, October 2001.

26. Egilman DS. AIDS Behind Bars: HIV and Correctional Institutions. World AIDS Day Conference, Brown University December 2001.

27. Egilman DS. The Corporate Corruption of Epidemiologic Literature and Methods. Annual SER Meeting, June 2002.

28. Egilman DS and Bagley S. The Corporate Corruption of Epidemiology:   The Asbestos, Beryllium, Tobacco Industries and the Role of Attorneys and Public Relations Firms, IEA World Conference of Epidemiology, August 2002.

29. Egilman DS, Connolly S, and Golub A. QAMA/McGill Corruption of the Epidemiologic Literature on Canadian Asbestos Mining. IEA World Conference of Epidemiology, August 2002.

30. Greenberg JF and Egilman DS. Globalization and Occupational and Environmental Health: Developing the Human Resources to Address New Challenges. APHA, November 2002.

31. Greenberg JF and Egilman DS. Filling the Primary Care Gap: A Model for Promoting Community-Based Education in the Developing World. APHA, November 2002.

32. Egilman DS. Tobacco Marketing as an Anti-warnings Program. APHA, November 2002.

33. Egilman DS. Evidence of Continued Corruption of the Epidemiological Literature. APHA, November 2002.

34. Egilman DS. Social Causes of the Sexual Transmission Fallacy: Racism, Oligopoly, and Bureaucratic Inertia. Brown University.  May 2003.

35. Egilman DS. Written Testimony before the US Senate Subcommittee on Antitrust, Competition Policy and Consumer Rights Hearing, "Hospital Group Purchasing:  Has the Market Become More Open to Competition?" July 16, 2003.

36. Mugdal S, Hegg L, Egilman D, Goldman R, and Carel R.  Knowledge, Training and Practice of Occupational and Environmental Health among Network: TUFH Member Institutions. The Network: TUFH International Conference, October 2003.

37. Greenberg J, Hegg L, and Egilman DS. Safe Healthcare:  A Review of Models for Public and Health Professions Education. The Network: TUFH International Conference, October 2003.

38. Egilman DS, Greenberg J, and Fellini B. Global Health through Education, Training and Service (GHETS):  A Network: TUFH Development Program. The Network: TUFH International Conference, October 2003.

39. Egilman DS and Bohme SR. The suppression of science: How corporate interests hide the truth and how to stop them. Center for Science In the Public Interest Conference, July 2004.

40. Egilman DS and Falender J. GRAS and Popcorn Butter Flavoring. APHA, November 2004.

41. Egilman DS and Falender, J. OxyContin: How profits took priority over public health. APHA, November 2004.

42. Egilman DS, Presler A, Kol L. Petroleum Industry Influence on Benzene Science and Regulation. APHA, November 2004.

43. Bohme SR and Egilman DS. Occupational warnings: Protecting people or protecting profit. APHA, November 2004.

44. Egilman DS and Bohme SR. Vioxx Marketing: Merck's Failure to Warn. International Ergonomics Association Conference, July 2006.

45. Bohme SR and Egilman DS. Pharmaceutical Warnings and "Direct to Consumer" Marketing. International Ergonomics Association Conference, July 2006.

46. Egilman DS. Panel Member: From Practice to Science: How Application Guides Warning Research.  International Ergonomics Association Conference, July 2006

47. Billings M., Egilman D, Owens T. Revisionist history by tobacco companies: Old news that's not fit to publish. APHA, November 7, 2006.

48. Egilman DS, Scout. Epidemiologic techniques: How to hide a benzene cancer relationship. APHA, November 6, 2006.

49. Egilman DS. Lessons from Vioxx; testimony on Arcoxia. FDA Arthritis Advisory Committee, April 12, 2007.

50. Egilman DS. Testimony at FDA Endocrinologic and Metabolic Drugs Advisory Committee and the Drug Safety and Risk Management Advisory Committee on Avandia, July 30, 2007

51. Aragon A,  López L,  Ruíz M, Sandino R., Egilman DS, Forbes B, Bohme SR, and Billings M. Promoción de Salud y Seguridad de  Trabajadores (PROSSTRAB): A Union-Medical School Partnership for Improving Occupational Health in Nicaragua. APHA, November 5, 2007.

52. Egilman DS. What's wrong with current health aid practices. Simon Frasier University Symposium on International Health, Vancouver Canada, May 9, 2008.

53. Egilman DS. Roundtable on Vertical vs. Horizontal funding: Primum Non Nocere. Global Health Council's 35th Annual Conference, "Community Health: Delivering, Serving, Engaging, Leading," May 29, 2008 Washington, DC.

54. Egilman DS. Off-label drug use. Family Medicine Grand Rounds, Memorial Hospital of Rhode Island, September 2009.

55. Egilman DS. Occupational Health. Family Medicine Grand Rounds, Memorial Hospital of Rhode Island, December 2009.

56. Egilman DS. Determining a safe exposure level for diacetyl-containing butter flavoring. APHA, November 2010.

57. Egilman DS. Peritoneal mesothelioma found in a mine worker exposed to tremolite free asbestos in a Canadian mine. APHA, November 2010.

58. Egilman DS. Using Media to Promote Non-Corporate Science. APHA, November 2010.

59. De Maeseneer J and Egilman DS. Mini workshop on 15 by 2015: Strengthening Primary Health Care in Developing Countries. International Conference, Advancing quality through Partnerships of health Professions Education and Health Services Institutions, Kathmandu, Nepal, November 14, 2010.

60. Dettinger J and Egilman DS. Mini workshop on Grant Proposal Writing: A Basic Tutorial and Skill-Building Workshop, International Conference, Advancing Quality Through Partnerships of Health Professions Education and Health Services Institutions, Kathmandu, Nepal, November 14, 2010.

61. Egilman DS and Druar N. How to Cheat on an Epidemiologic Study. The 3rd North American Congress of Epidemiology, Montreal, Canada, June 22, 2011.

62. Egilman DS and Schilling JH. Tracking an occupational hazard down the food manufacturing chain: Flavorings-induced bronchiolitis obliterans in popcorn consumers. APHA, October 30, 2011.

63. Egilman DS. A Case Study in Unethical Conduct of Physicians and Hygienists at a Shipyard. APHA, October 30, 2011.

64. Egilman DS and Bird T. Get AIDS and Survive: Are We Making Things Worse By Doing "Good"? APHA, October 31, 2011.

65. Egilman D. The perverse effects of aid. GlobeMed Hilltop Global Health Conference at Middlebury College, October 27, 2012.

66. Egilman DS and Lee C. From development to withdrawal of Raptiva: A case study examining conflicts of interest in pharma-FDA relationships, inadequate safety studies, and circumvention of the physician intermediary. APHA, October 30, 2012.

## UNIVERSITY TEACHING ROLES

1992 – 1994; 2002 – 2003  Preceptor, Affinity Group Program, Brown University Medical School, Providence, RI.

1988 – 2010  Department of Community Health, Brown University.

2002 – Present.  Preceptor, Department of Family Medicine, Memorial Hospital, Brown University Medical School, Providence, RI.

2010 – Present  Department of Community Health, Brown University.

Various Courses at Brown University (1988 – 2010, 2012)

    Health and Politics in Latin America
    The Development of Scientific Knowledge in the Twentieth Century
    Science and Power: A Bioethical Inquiry

Summer 2006   Advisor for UTRA (Undergraduate Teaching and Research Award)
Project for Andrew Lipsky (2007)

2006 – 2007   Thesis Advisor for Khiet Ho (2007)

2006 – 2008   Thesis Advisor Susanna Bohme, PhD (2008)



# Attachment
Testimony

2009   Elizabeth Gerths vs Viking
      Fitzgerald vs AcandS Inc.
      Homayoon Enayati v Viking
      St. John vs Chrysler
      Picinic vs UCC
      Blood, et al. vs Givaudan, et al.
      Kuiper vs Givaudan
      David Robert Evans and Bonnie Evans v. Viking Pump

2010   Asbury vs Amercian Honda
      Newkirk vs ConAgra, et al.
      Khoury vs ConAgra, et al.
      Solis vs BASF Corp.
      Bankhead vs Abex

2011   Minton vs Exxon
      Morrison vs Warren Pumps
      DeBenidetto vs Dow
      Johnson vs Genentech
      Fenstermaker vs UCC
      Price vs Honeywell
      Hallock vs Polarome

2012   Pluebell vs Merck
      Velazquez  vs. Advanced Biotech
      Couscouris vs Lorillard
      Watson vs Kroger
      Daughetee vs Conagra
      Scott vs Ford
      Johnson vs Genentech

2013   Sawyer/Cook vs Lorillard

VanBebber vs KCP&L
Coffer et al. vs Danisco et al.
O'Dell vs UCC
State of Kentucky vs. Merck

# Attachment
Documents Relied Upon

## DOCUMENTS RELIED UPON

11.   MRK-HUM0003536
      MRK-HUM0003546
      MRK-HUM0003549

27.   MRK-ABC0048699
      MRK-AKU0083901 at 4223-4226
      Table E-152 of Merck's Integrated Safety Summary dated October 26, 1998

28.   MRK-ABC0009946

29.   MRK-ABC0048699

30.   MRK-NJ0051533

31.   MRK-NJ0152620
      MRK-ABC0002150

33.   MRK-AAX0002413-20

34.   MRK-ABC0009946

35.   MRK-ABC0009946

36.   MRK-OS420045657

37.   MRK-ABK0311053

38.   MRK-ABC0000069

39.   MRK-AVJ0005720

40.   MRK-AEI0002734

41.   MRK-ABH0014002

42.   MRK-ABC0002199
      MRK-ABK0311068

43.   MRK-ABS0066396

45.   MRK-AEF0001034
      MRK-AAZ0006966
      MRK-AEG0004962

46.  MRK-AEI0002734
     MRK-ACD0064937
     MRK-ABS0066396

47.  FDACDER007847

48.  FDACDER007847

49.  MRK-NJ0170152-274
     MRK-ADJ0035003-8
     MRK-NJ0220388-454

50.  MRK-AJA0175045
     MRK-AJA0137782
     MRK-ABC0000069

56.  MRK-ABH0016219

57.  MRK-ABS0212130

58.  MRK-ABT0013920

59.  MRK-ABD0001986
     MRK-ABD0001756

60.  MRK-ABD0001756
     MRK-NJ0361687
     MRK-NJ0281753

61.  MRK-NJ0361687
     MRK-NJ0281753
     MRK-ACC0052545

62.  MRK-ABI0002226

63.  MRK-ABI0001969

66.  Honig Exhibit 2 Curriculum Vitae MRK-ACM0010245 to 10251

67.  MRK-GUE0008582
     MRK-ABH0015578
     MRK-ACR0009151
     MRK-ACT0018064
     MRK-ABW0004799
     MRK-ACR0009287

2

MRK-NJ0443267

68.  2001 Long Range Operating Plan, MRK ABI0008659-8683

71.  MRK-AAC0128698

72.  MRK-AAB0109420

73.  MRK-AAB0109428

74.  MRK-AAZ00015620
     MRK-AAZ0001569

75.  MRK-ACR0014272
     MRK-ACR00142720
     MRK-NJ0333224

76.  MRK-Nj0333224
     MRK-NJ0333225
     MRK-ACR0014502

77.  MRK-ACR0014502
     MRK-NJ0155799

78.  MRK-AAX0000752

79.  Assaid, Exhibit 21, MRK-AHD0101257
     Lines Exhibit 7 MRK-AFW0010466-480
     Lines Exhibit 9 MRK-ARP0067555
     Lines Exhibit 11  MRK-AFJ0003563-569
     Thal et als Neuropsychopharmacology (2005), 1-12
     078 Study Protocol and Amendments MRK-0140029802 to 0140030008

80.  Email Assaid MRK-AHD0055888
     MRK-AHD0055888 at 6019-6020
     Thal et als Neuropsychopharmacology (2005), 1-12
     Aisen et als Current Alzheimer Research, 2008, 5, 73-82

81.  O'Banion, Exp.Opin.Invest.Drugs 1999 8(10) 1521 at 1530, and references cited therein

82.  MRK-AFW0011197
     MRK-AFW0011190
     MRK-NJ0254099
     MRK-ARP0129937 at 9988

83.         Block Exhibit 9 MRK-AHD0001996 at 2400-03
     21 CFR 46, 46.102(e), 46.109, 46.116.

84.     CFR 314.32; CFR 314.56

85.     MRK-I2690000512
        MRK-I2690000517
        Reines Exhibit 11, MERCK MAPP MRK-AFK0047772
        Reines Exhibit 16 - MRK-ABP0003541-614, Exhibit 17 - MRK-ABP0003859-939,
        Exhibit 18 - MRK-AHF0072575-690,  Exhibit 19 - MRK-ABP0008950-9158, Exhibit 20
        - MRK-ABK0329511-696, Exhibit 21 - MRK-ABP0018562-741

86.     Block Exhibit 30, MRK-ARP0034606
        MRK-ARP0022841
        MRK-I26900000512

87.     MRK-APE0022197

88.     MRK-AFT0005926

89.     Block Exhibit 10 MERCK MAPP MRK-AAU0000001-28
        Nessly to others, MRK-AFV0297727
        Reines to others MRK-NJ0136865

91.     Reines Exhibit 23 MRK-AQI0008457

92.     Reines Exhibit 24 emails February 2001, MRK-ACR0014270
        Reines Exhibit 25 emails August 2001 MRK-AGU0006994

93.     MRK-01420145856

94.     MRK-ABY0052349
        MRK-ACD0118967

95.     MRK-AOJ0005856

96.     MRK-AOJ0005856

97.     MRK-I8940079159

98.     MRK-ABY0079740

99.     Reines Exhibit 3 Statistical Data Analysis Plan dated November 25, 2002 MRK-
        AFV0043960
        Reines Exhibit 4 Letter MERCK to FDA dated January 7, 2003 MRK-AFV0043956.

100.    Assaid Exhibit 2 MRK-ARP0137370

101.   Assaid 2

102.   MRK-I2220004818

103.   Assaid Exhibit 5 MRK-AFV0431065

104.   Email Assaid MRK-AHD0055888
       MRK-AHD0055888 at 6019-6020
       MRK-AHD0022761
       Assaid Exhibit 17, Email February 1 2005 MRK-ARP0105927

105.   MRK-AFV0431065
       MRK-AAC0139936
       MRK-AHD0057217

106.   MRK-I2690008225
       MRK-I2690008230
       MRK-I2690008544

107.   MRK-N0520018536

108.   Assaid Exhibit 3 emails February 2004 MRK-AAD0384813
       MERCK letter to FDA MRK-AAF0015398

109.   Lines Exhibit 18 - MRK-AHD0069267-270, Exhibit 19 - MRK-AHD0069241-242 and
       Exhibit 20 - MRK-AHD0069615-617

110.   Lines Exhibits 21 - MRK-AAF0017362-365 and 22 - MRK-AAF0017366-429
       MRK-AAF0017452

111.   Assaid Exhibit 18 Mani Review 10-8-04 FDACDER 003071 to 003112

112.   MRK-AFO0276159 at 64
       Quan Exhibit 51 MRK-AGO0074482
       Quan Exhibit 52 MRK-AGO0074485
       Quan Memo October 7 2004 MRK-AFO0280964

114.   Block Exhibit 14 MRK-ABS0294660

115.   Assaid Deposition Exhibit 21
       Salmon et al 2002; MRKAFJ0003563-569

117.   MRK-AFO0289839

118.   MRK-ADI0017766
       MRK-AFB0001598

119.  MRK-AGV0003296

120.  MRK-NJ0221292

122.  MRK-AAE0002414

123.  MRK-NJ02212920

124.  MRK-PUBLIC0000351

125.  MRK-AAF0004126

129.  MRK-PLBAJ0000043
      MRK-01420115583

130.  MRK-AOZ0000997
      MRK-AAE0002414

131.  MRK-ACV0021094
      MRK-ACV0020976
      MRK-ACV0021014

133.  MRK-ADI0009109

135.  MRK-NJ0291847

136.  MRK-NJ0214478

137.  Ford Hutchinson Exhibit 23, emails October 1, 2004, MRK-AAD0356476

138.  MRK-ABH0013917

140.  MRK-NJ0363443-5

141.  MRK-NJ0363443

142.  MRK-GUE0017779

143.  MRK-NJ0201983

145.  MRK-ABL0000041

146.  MRK-ABL0001231

147.  MRK-AAO0000073

MRK-AAO0000119

148. MRK-ABI0002231
     MRK-ABI0003221
     MRK-ADJ0034997
     MRK-AHE0061931
     MRK-ABI0003202

149. MRK-ABW0000062

150. MRK-AAO0000073
     MRK-AAR0010074
     MRK-AAR00095220

151. LEH027226

152. LEH 0125527

153. LEH0115297

154. LEH0126989

156. "V-Squad" video

157. Video news releases

158. Television commercials

159. MRK-AFI0010255

160. MRK-GUE0058858

161. MRK-GUE0058858

162. MRK-AFI0182292

163. MRK-ADM0115352

165. MRK-PLBAH0028455
     MRK-AKC0002879
     MRK-PLBAH0000433
     MRK-PLBAH1295
     MRK-PLBAH2807
     MRK-PLBA14603

166. MRK-NJ0232605

168.    USA vs. Merck Sharp & Dohme, Criminal No. 11-10384-PBS

**Depositions**

Deposition of Alan Nies, March 2, 2005
Deposition of Alan Nies, April 1, 2005
Deposition of A.W. Ford Hutchinson, April 24, 2012
Deposition of Doug Watson in Plubel and Ivey vs. MERCK May 17, 2011 and June 8, 2011
Deposition of Jan Weiner, February 14, 2013
Deposition of Peter Honig
Deposition of Dr. Hui Quan, March 16, 2006
Deposition of Christopher Assaid, April 29, 2013
Deposition of Christopher Lines, June 18, 2013
Deposition of Scott Reines, May 14, 2013
Deposition of Gilbert Block, August 7, 2007 and October 30, 2007

**Articles/Texts**

Aisen et al, *Current Alzheimer Research*, 2008, 5, 73-82

Aisen P, Schafer, K, Grundman M, et al. Effects of rofecoxib or
naproxen vs placebo on Alzheimer disease progression. JAMA 2003; 289(21) 2819-
2826

Aisen P, Thal L, Ferris S., et al., Rofecoxib in Patients with Mild Cognitive Impairment: Further
Analyses of Data from a Randomized, Double-Blind Trial. Current Alzheimer Research, 2008, 5,
73-82

Baron, et al., *Cardiovascular events associated with rofecoxib: final analysis of the APPROVe
trial*, 372 The Lancet 1756-1764 (2008)

Bauer, et al., *Upper Gastrointestinal Tract Safety Profile of Alendronate*, 160 Archives of
Internal Medicine 517-525 (2000)

Berenson A., *Evidence in Vioxx Suits Shows Intervention by Merck Officials.* New York Times.
April 24, 2005.

Bhala, et al., *Vascular and upper gastrointestinal effects of non-steroidal anti-inflammatory
drugs: meta-analyses of individual participant data from randomised trials*, The Lancet,
doi:10.1016/S0140-6736(13)60900-9 (2013)

Black, et al., *Randomized Trial of Effect of Alendronate on Risk of Fracture in Women with
Existing Vertebral Fractures*, 348 The Lancet 1535-42 (1996)

Bombardier, et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*. 343 N Engl J. Med 1520-1528 (2000)

Braunstein N, Polis A., *Report of specific cardiovascular outcomes of the ADVANTAGE trial.* Ann Intern Med; 2005 Jul 19;143(2):158-9.

Bresalier, et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, 352 (11) N Engl J. Med 1092-1102 (2005)

Breitner J, Baker L, Montine T, et al. Extended results of the Alzheimer's disease anti-inflammatory prevention trial. Alzheimer's & Dementia 7(2011) 402-411

Breitner J, et al. ADAPT Research Group, Results of a follow-up study to the randomized Alzheimer's Disease Anti-inflammatory Prevention Trial (ADAPT), Alzheimer's & Dementia (2013) 1-10

Burleigh, et al., *Cyclooxygenase-2 Promotes Early Atherosclerotic Lesion Formation in LDL Receptor-Deficient Mice*, 105 Circulation 1816-1823 (2002)

Chalmers, et al., *A Method for Assessing the Quality of a Randomized Control Trial*, 2 Controlled Clinical Trials 31-49 (1981)

Cheng, et al., *Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2*, 296 Science 539-541 (2002)

Chow (Ed.), Encyclopedia of Biopharmaceutical Statistics, p. 245.

Curfman et al, *Expression of Concern:  Bombardier et al., Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," N Engl J Med 2000;343:1520-8*, 353 N Engl J. Med 2813-2814 (2005)

Curfman et al., *Expression of Concern Reaffirmed*, N Engl J. Med 10.1056 (2006)

DeVeaux, et al., *Stats, Data, and Models*, 3d ed. 513 (2011).

Egilman DS, Ardolino E., *The Pharmaceutical Industry, Disease Industry: A Prescription for Illness and Death.* In: Wiist W, editor. The Bottom Line or Public Health: Tactics Corporations Use to Influence Health and Health Policy, and What We Can Do to Counter Them: Oxford University Press; 2010.

Egilman, DS and Presler, AH., *Report of specific cardiovascular outcomes of the ADVANTAGE trial.* Ann Intern Med. 2006 May 16;144(10):781.

9

Feldman, et al., *Effects of Vesnarinone on Morbidity and Mortality in Patients with Heart Failure*, 329 No. 3 N Engl. J Med. 149-155

FitzGerald, et al., *Analysis of Prostacyclin and Thromboxane Biosynthesis in Cardiovascular Disease*, 67 No. 6 Circulation 1174-1177 (1983)

Friedman, et al., Fundamentals of Clinical Trials (4th edition). Springer, p. 281.

Gardner and D.G. Altman, *Confidence Intervals Rather than P Values: Estimation Rather than Hypothesis Testing*, 292 British Medical Journal 746-750 (1986)

Hermann, et al., *To the Heart of the Matter: Coxibs, Smoking, and Cardiovascular Risk*," 112 Circulation 941-945 (2005)

Imbimbo B, Solfrizzi V, Panza F. Are NSAIDs useful to treat Alzheimer's disease or mild cognitive impairment? Frontiers in Aging Neuroscience. 2010. 2(19) 1-14

Juni, et al., *Correspondence Author's Reply*, 365 The Lancet 26-27 (2005)

Juni, *Risk of cardiovascular events and rofecoxib: cumulative meta-analysis*, The Lancet (2004)

Konstam, et al., *Cardiovascular thrombotic events in controlled clinical trials of rofecoxib*, 104 Circulation, 2280-2288 (2001)

Lachin, *Statistical Considerations in the Intent-to-Treat Principle*, 21 Controlled Clinical Trials 167-189 (2000)

Lisse, JR et al., *Gastrointestinal tolerability and effectiveness of rofecoxib versus naproxen in the treatment of osteoarthritis: a randomized, controlled trial.* Ann Intern Med. 2003 Oct 7;139(7):539-46.

Lisse JR, Perlman M, Johansson G, Shoemaker JR, Schechtman J, Skalky CS, Dixon ME, Polis AB, Mollen AJ, Geba GP., *Gastrointestinal tolerability and effectiveness of rofecoxib versus naproxen in the treatment of osteoarthritis: a randomized, controlled trial.* Ann Intern Med; 2003 Oct 7;139(7):539-46.

Liu, *Rethinking Statistical Approaches to Evaluating Drug Safety*, 48 No. 6 Yonsei Med Journal 895-900 (2007)

Madigan, *Bayesian Graphical Models, Intent-to-Treat, and the Rubin Causal Model*, (1999)

Madigan, et al., *Does design matter? Systematic evaluation of the impact of analytical choices on effect estimates in observational studies*, Therapeutic Advances in Drug Safety 1-10 (2013)

Madigan, et al., *Under reporting of cardiovascular events in the rofecoxib Alzheimer Disease Studies,* 164 American Heart Journal 186-193 (2012)

Martin and H. Austin, *An efficient program for computing conditional maximum likelihood estimates and exact confidence limits for a common odds ratio*, 2 Epidemiology 359-362 (1991)

McAdam, et al., *Systemic biosynthesis of prostacyclin by cyclooxygenase (COX-2): The human pharmacology of a selective inhibitor of COX-2*, 96 PNAS 272-277 (1999)

O O'Banion M. COX-2 and Alzheimer's disease: potential roles in inflammation and neurodegeneration. Exp. Opin Invest. Drugs (1999) 8(10): 1521-1536

Oates, *Cardiovascular Risk Marker and Mechanisms in Targeting the COX Pathway for Colorectal Cancer Prevention*, 4 Cancer Prev Res. 1145-1148 (2011)

Pedersen, et al., *Follow-Up Study of Patients Randomized in the Scandinavian Simvastatin Survival Study (4S) of Cholesterol Lowering*, 86 Am J Cardiol 257-262 (2000)

Reicin, et al., *Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs*, 89 American Journal of Cardiology 204-209 (2002)

Reicin, A. Shapiro, D. *To the editor*. N Engl J Med. 2006 Feb 22; 354 (11):1199.

Rosner, *Fundamentals of Biostatistics* (7th ed.)

Ross, Editor's Correspondence: *Persistence of Cardiovascular Risk After Rofecoxib Discontinuation,*" 170, No. 22 Arch Intern Med. 2035-2036 (2010)

Ross, et. al., *Pooled Analysis of Rofecoxib Placebo-Controlled Clinical Trial Data: Lessons for Post-Market Pharmaceutical Safety Surveillance*, 169(21) Arch Intern Med. 1976–1985 (2009)

Rothman and S. Greenland, *Modern Epidemiology*, Lippincott Williams & Wilkins, , 2nd edition 254-5 (1998)

Salmon et al, *Alzheimer's disease can be accurately diagnosed in very mildly impaired individuals.* Neurology; 2002 Oct 1; 1002-28

Stevenson, *Diagnosis, prevention, and treatment of adverse reactions to aspirin and nonsteroidal anti-inflammatory drugs*, J Allergy Clin. Immunol., 617-622 (1984)

Targum, Shari. Memorandum: Consultation NDA 210-042, S-007 Review of Cardiovascular Safety Database (Rofecoxib), Food and Drug Administration. February 1, 2001

Thal, *A Randomized, Double-Blind, Study of Rofecoxib in Patients with Mild Cognitive Impairment*, 30 Neuropsychopharmacology 1204 (2005)

Thal et al, *Neuropsychopharmacology* (2005), 1-12

Tonino, et al., *Skeletal Benefits of Alendronate: 7-Year Treatment of Postmenopausal Osteoporotic Women*, 85, No. 9 The Journal of Clinical Endocrinology & Metabolism 3109-115 (2000)

Velentgas, et al. *Cardiovascular Risk of Selective Cyclooxygenase-2 Inhibitors and other Non-Aspirin Non-Steroidal Anti-Inflammatory Medications*, 15 Pharmacoepidemiology and Drug Safety 641-652 (2006)

Watson and P. M. Shenoi, *Drug-induced epistaxis?*, 83 Journal of the Royal Society of Medicine 162-164 (1990)

Watson, *Lower Risk of Thromboembolic Cardiovascular Events With Naproxen Among Patients With Rheumatoid Arthritis*, 162 Arch Intern Med 1105 (2002)

Weir, et al., *Selective COX-2 inhibition and cardiovascular effects: A review of the rofecoxib development program.* 146 American Heart Journal 591-604 (2003)

Winer, et al., *Statistical Principles in Experimental Design*, 3d ed. (1991)

Wright, JM. *The double-edged sword of COX-2 selective NSAIDs*. CMAJ. 2002 Nov 12;167(10):1131-7.

**Other Documents**

Alzheimer's Disease, NIH Publication No. 11-6423, July 2011 (Reprinted September 2012) 1-2

http://www.fda.gov/ohrms/dockets/ac/07/slides/2007-4290oph1-01-Egilman.ppt

http://jyllands-posten.dk/uknews/ECE5722791/doctor-illegally-accepted-money-from-pharmaceutical-industry/

http://online.wsj.com/public/resources/documents/merck-report-20060906.pdf

FDA Div. of Anti-Inflammatory, Analgesic and Ophthalmic Drug Products: Medical Officer Review, June 29 2000

Warning Letter from Thomas Abrams, FDA to Raymond Gilmartin, Re: NDA 21-042 Vioxx (rofecoxib) tablets MACMIS ID#9456 Sept 17, 2001

**Other Bates Documents**

MRK-S0420050655
MRK-S0420000030
MRK-NJ0450666
MRK-NJ0333225
MRK-NJ0333225
MRK-NJ0302920
MRK-NJ0291847
MRK-NJ0242455
MRK-NJ0232605
MRK-NJ0202875
MRK-NJ0089349
MRK-JAK0016040
MRK-JAH0007309
MRK-JAH0001017
MRK-JAH0000245
MRK-JAG0067408
MRK-JAG0061933
MRK-JAG0043451
MRK-JAG0000090
MRK-JAF0016264
MRK-I2690009293
MRK-I2690008953
MRK-EBEC002617
MRK-AZN0008357
MRK-ARP0067555
MRK-ARP0064499
MRK-ARP0034603
MRK-ARP0029905
MRK-ARP0009009
MRK-AQO0134670
MRK-AQO0085495
MRK-APE0016848
MRK-APC0021020
MRK-APC00205332
MRK-AOZ0039657
MRK-AOZ0027346
MRK-AOZ0025508
MRK-AOZ0025250
MRK-AOZ0025186
MRK-AOZ0024521
MRK-AOZ0021326
MRK-AOZ0014352
MRK-AOZ0014351
MRK-AOZ0014265

MRK-AOZ0013853
MRK-AOZ0008630
MRK-AOZ0008562
MRK-AOZ0008281
MRK-AOZ0008197
MRK-AOZ0008194
MRK-AOZ0008186
MRK-AOZ0007782
MRK-AOZ0007778
MRK-AOZ0007304
MRK-AOZ0004411
MRK-AOZ0004035
MRK-AOZ0003046
MRK-AOZ0002637
MRK-AOZ0002287
MRK-AOZ0001173
MRK-AOZ0001170
MRK-AOZ0001166
MRK-AOZ0001165
MRK-AOZ0001164
MRK-AOZ0001163
MRK-AOZ0001162
MRK-AOZ0001161
MRK-AOZ0001159
MRK-AOZ0000997
MRK-AOZ0000926
MRK-AOZ0000867
MRK-AOZ0000865
MRK-AOZ0000828
MRK-AOZ0000822
MRK-AOZ0000799
MRK-AOZ0000796
MRK-AOZ0000792
MRK-AOZ0000784
MRK-AOZ0000783
MRK-AOZ0000781
MRK-AOZ0000758
MRK-AOZ0000754
MRK-AOZ0000752
MRK-AOZ0000751
MRK-AOZ0000749
MRK-AOZ0000748
MRK-AOZ0000743
MRK-AOZ0000736
MRK-AOZ0000727
MRK-AOZ0000725

MRK-AOZ0000722
MRK-AOZ0000718
MRK-AOZ0000708
MRK-AOZ0000705
MRK-AOZ0000702
MRK-AOZ0000701
MRK-AOZ0000662
MRK-AOZ0000650
MRK-ANG0022879
MRK-AJE0083896
MRK-AJB0015932
MRK-AIZ0005855
MRK-AIU0343947
MRK-AHD0053414
MRK-AGV0003296
MRK-AGV0000684
MRK-AGU0006994
MRK-AGT0022071
MRK-AGO0026320
MRK-AGG002839
MRK-AFZ0004492
MRK-AFZ0004492
MRK-AFZ0000516
MRK-AFZ0000491
MRK-AFV0449748
MRK-AFV0349293
MRK-AFV0309033
MRK-AFV0043956
MRK-AFV0035530
MRK-AFS0004182
MRK-AFS0001698
MRK-AFO289839
MRK-AFO0315084
MRK-AFK0161519
MRK-AFH0025852
MRK-AEG0090303
MRK-ADN0151403
MRK-ADL0011655
MRK-ADG0035340
MRK-ACV0022137
MRK-ACV0021094
MRK-ACV0021014
MRK-ACV0020976
MRK-ACV0020238
MRK-ACR0014270
MRK-ACR00009295

MRK-ACM0000386
MRK-ACD0121618
MRK-ACD0046261
MRK-ACD0006054
MRK-ABX0043629
MRK-ABS0252327
MRK-ABH0024880
MRK-ABC0037090
MRK-AAF0015400
MRK-AAF0015398
MRK-AAD0356476
MRK-AAC0127059
MRK-AAB0105500
FDACDER010625
MRK-AFV0279037

See also additional documents lists attached.


**I reserve the right to rely upon the documents and interviews conducted by John Martin as set out in the report published by Merck.  I also reserve the right to review and comment upon any documents relied upon by any expert called by any party in the Multi-district litigation.**

Egilman
EXHIBIT NO. 4
Metropolitan
COURT REPORTERS

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT INDEPENDENCE

| | | |
|---|---|---|
| MARY PLUBELL and TED IVEY, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case Number: 04CV235817 |
| v. | ) ) | Division: 16 |
| MERCK & CO., INC., | ) ) | Class Action |
| Defendant. | ) ) | |

Dr. Egilman has been provided unlimited and unfettered access to the documents and materials outlined below in support of his opinions in this case.

| CASE | DOCUMENTS |
|---|---|
| Plubell v. Merck | All documents and data produced by Merck in this case; all depositions and deposition exhibits taken in this case; and all depositions and deposition exhibits taken in other Vioxx cases that were produced in this case. |
| Ernst v. Merck | All documents, data and programs produced by Merck; all depositions and deposition exhibits taken and/or produced in the case. |
| Cona/McDarby v. Merck | All documents, data and programs produced by Merck; all depositions and deposition exhibits taken and/or produced in the case. |
| Humeston v. Merck | All documents, data and programs produced by Merck; all depositions and deposition exhibits taken and/or produced in the case. |
| Stubblefield v. Merck | All documents, data and programs produced by Merck; all depositions and deposition exhibits taken and/or produced in the case. |

1

Dr. Egilman has also been provided unlimited and unfettered access to the discovery documents and materials in the Plubell v. Merck case outlined below in support of his opinions in this case.

## DEFENDANTS DISCOVERY RESPONSES

| INTERROGATORY PLEADINGS | DATE |
|---|---|
| Merck's Response & Objections | 10/15/08 |
| Merck's Response & Objections<br>Merck's Amended and Supplemental Response to Interrogatory #2 of Pltf. Second Interr. | 6/8/10<br>4/18/11 |
| Merck's Responses & Objections to Third Interr.<br>Chart of entitled Production Made by Third Parties in Vioxx Litigation | 12/14/10<br>12/29/10 |
| Merck's Supplemental Interrogatory Responses | 4/18/11 |
| Merck's Responses and Objections to:<br>4th Interrogatories | 9/19/11 |

| REQUEST FOR PRODUCTION PLEADINGS | DATE |
|---|---|
| Merck's Response & Objections to First Request for Production | 10/15/08 |
| Merck's Response & Objections to Second Request for Production<br>Amended & Supplemental Responses & Objections | 6/29/09<br><br>6/2/10 |
| Merck's Response & Objections to Third Request for Production | 6/8/10 |
| Merck's Responses & Objections to Fourth Request for Production | 7/26/10 |
| Merck's Responses & Objections to Fifth Request for Production | 12/14/10 |
| Defendant's Production of two lists<br>1. Merck Professional Representatives<br>2. Missouri Physicians | 12/3/10 |
| Merck's Responses and Objections to Supplemental Request for Production Nos. 7A & 7B | 12/17/10 |
| Merck's Response to Master's Discovery Order No. 2 | 2/14/11 |
| Merck's Responses and Objections to Plaintiff's 6th Request for Production | 9/19/11 |

2

| REQUEST FOR ADMISSIONS PLEADING | DATE |
|---|---|
| | **DATE** |
| Merck's Responses and Objections to First Request for Admissions | 9/19/11 |

## PLAINTIFF DISCOVERY RESPONSES

| INTERROGATORY PLEADING | DATE |
|---|---|
| Answers & Objections of Plaintiff Carol Green Richardson | 7/5/05 |
| Answers & Objections Mary Plubell | 12/1/05 |
| Answers & Objections Ted Ivy | 5/24/06 |
| Supplemental Answers & Objections Mary Plubell | 9/13/10 |
| Supplemental Answers & Objections Ted Ivy | 9/13/10 |
| Mary Plubell Answers & Objections to Supplemental Interrogatories | 7/19/10 |
| Ted Ivy Answers & Objections to Supplemental Interrogatories | 7/19/10 |
| Plaintiffs' Answers and Objections to Defendant's Second Supplemental Interrogatories | 10/1/10 |

| REQUEST FOR PRODUCTION PLEADINGS | DATE |
|---|---|
| Answers & Objections of Carol Green Richardson | 7/5/05 |
| Answers & Objections Mary Plubell | 12/1/05 |
| Answers & Objections Ted Ivy | 5/24/06 |
| Plubell and Ivy Responses to Defendant's Supplemental Request for Documents | 9/28/10 |

| REQUEST FOR ADMISSIONS PLEADING | DATE |
|---|---|
| | **DATE** |
| Plubell and Ivy Responses to Defendant's Request for Admissions | 9/28/10 |

## OTHER PLEADINGS AND MATERIALS

| DESCRIPTION | DATE |
|---|---|
| Second Amended Petition | 5/9/06 |
| Answer to Second Amended Petition | 6/26/06 |
| Trial Court's Class Certification Order | 6/12/08 |
| Appellate Court's Class Certification Order | 5/12/09 |
| Plaintiffs' Disclosure of Expert Testimony | 7/29/11 |
| Notice of Deposition of Dr. Egilman | 10/25/11 |
| Mo. Rev. Stat. § 407.020 and related regulations | |

In addition to the documents contained in the summary document identifying the subject matters of Dr. Egilman's testimony and the accompanying notebooks containing documents referenced therein, Dr. Egilman has also reviewed and/or relied upon the following documents:

| BATES NO./DESCRIPTION |
|---|
| DEPEX00001 |
| DEPEX00002 |
| DEPEX00003 |
| DEPEX00004 |
| DEPEX00005 |
| DEPEX00006 |
| DEPEX00007 |
| DEPEX00008 |
| DEPEX00009 |
| DEPEX00010 |
| DEPEX00011 |
| DEPEX00012 |
| DEPEX00013 |
| DEPEX00014 |
| DEPEX00015 |
| DEPEX00016 |
| DEPEX00017 |
| DEPEX00018 |
| DEPEX00019 |
| DEPEX00020 |
| DEPEX00021 |
| DEPEX00022 |
| DEPEX00023 |
| DEPEX00025 |
| DEPEX00027 |

4

| |
|---|
| DEPEX00031 |
| DEPEX00032 |
| DEPEX00033 |
| DEPEX00034 |
| DEPEX00035 |
| DEPEX00036 |
| DEPEX00037 |
| DEPEX00038 |
| DEPEX00039 |
| DEPEX00040 |
| DEPEX00041 |
| DEPEX00042 |
| DEPEX00043 |
| DEPEX00044 MRK-ABY0052462 |
| DEPEX00045 |
| DEPEX00048-001 |
| DEPEX00051-001 |
| DEPEX00052-001 |
| DEPEX00053-001 |
| DEPEX00056-001 |
| DEPEX00059-001 |
| DEPEX00060-001 |
| DEPEX00061-001 |
| DEPEX00062-001 |
| DEPEX00063-001 |
| DEPEX00064-001 |
| DEPEX00065-001 |
| DEPEX00066 |
| DEPEX00067-001 |
| DEPEX00068-001 |
| DEPEX00069-001 |
| DEPEX00070-001 |
| DEPEX00071-001 |
| DEPEX00072-001 |
| DEPEX00073 |
| DEPEX00074-001 |
| DEPEX00075-001 |
| DEPEX00076-001 |
| DEPEX00077-001 |
| DEPEX00078-001 |
| DEPEX00079-001 |

| |
|---|
| DEPEX00080-001 |
| DEPEX00081-001 |
| DEPEX00082 |
| DEPEX00083 |
| DEPEX00084-001 |
| DEPEX00085-001 |
| DEPEX00086-001 |
| DEPEX00088-001 |
| DEPEX00089-001 |
| DEPEX00090-001 |
| DEPEX00091-001 |
| DEPEX00092-001 |
| DEPEX00093-001 |
| DEPEX00094-001 |
| DEPEX00095-001 |
| DEPEX00096-001 |
| DEPEX00097-001 |
| DEPEX00099-001 |
| DEPEX00101-001 |
| DEPEX00102-001 |
| DEPEX00103-001 |
| DEPEX00104 |
| MRK-AAF0006968 |
| DEPEX00105-001 |
| DEPEX00106-001 |
| DEPEX00107-001 |
| DEPEX00108-001 |
| DEPEX00109-001 |
| DEPEX00110-001 |
| DEPEX00111 |
| DEPEX00112-001 |
| DEPEX00113-001 |
| DEPEX00114-001 |
| DEPEX00115-001 |
| DEPEX00116-001 |
| DEPEX00117-001 |
| DEPEX00118-001 |
| DEPEX00119-001 |
| DEPEX00120-001 |
| DEPEX00121-001 |
| DEPEX00122-001 |
| DEPEX00123-001 |
| DEPEX00124-001 |
| DEPEX00125-001 |

6

| | |
|---|---|
| DEPEX00126-001 | |
| DEPEX00127-001 | |
| DEPEX00128-001 | MRK-ABG0000069 |
| DEPEX00130-001 | |
| DEPEX00132-001 | |
| DEPEX00133-001 | |
| DEPEX00134-001 | |
| DEPEX00135-001 | |
| DEPEX00136-001 | |
| DEPEX00137-001 | |
| DEPEX00138-001 | |
| DEPEX00145-001 | |
| DEPEX00146-001 | |
| DEPEX00147-001 | |
| DEPEX00148-001 | |
| DEPEX00205 | |
| DEPEX00207 | |
| DEPEX0149-001 | |
| DEPEX150 | |
| MRK-01420029802 | |
| MRK-01420115559 | |
| MRK-AAB004563 | |
| MRK-AAB0060340 | |
| MRK-AAB0063679 | |
| MRK-AAB0064771 | |
| MRK-AAB0085871 | |
| MRK-AAB0109448 | |
| MRK-AAB0109412 | |
| MRK-AAB0109378 | |
| MRK-AAC0064734 | |
| MRK-AAC0150398 | |
| MRK-AAD0049074 | |
| MRK-AAD0076244 | |
| MRK-AAD0107004 | |
| MRK-AAD0107005 | |
| MRK-AAF0004865 | |
| MRK-AAF0005014 | |
| MRK-AAF0005794 | |
| MRK-AAF0007520 | |
| MRK-AAF0007786 | |
| MRK-AAO0000119 | |
| MRK-AAR0008327 | |
| MRK-AAR0010111 | |
| MRK-AAX0000710 | |

7

| |
|---|
| MRK-ABA0028398 |
| MRK-ABD0001756 |
| MRK-ABD0001986 |
| MRK-ABG0000070 |
| MRK-ABG0000246 |
| MRK-ABH0002007 |
| MRK-ABH0019975 |
| MRK-ABH0020000 |
| MRK-ABI0001411 |
| MRK-ABI0001779 |
| MRK-ABI0001949 |
| MRK-ABI0002226 |
| MRK-ABI0003479 |
| MRK-ABI0004844 |
| MRK-ABI0007205 |
| MRK-ABI0007213 |
| MRK-ABK0270929 |
| MRK-ABK0270938 |
| MRK-ABO0000220 |
| MRK-ABS0449820 |
| MRK-ABT0013927 |
| MRK-ABT0014818 |
| MRK-ABW0000408 |
| MRK-ABW0002605 |
| MRK-ABW0003071 |
| MRK-ABW0003690 |
| MRK-ABW0005607 |
| MRK-ABW0005623 |
| MRK-ABW0008912 |
| MRK-ABW0011826 |
| MRK-ABW0018150 |
| MRK-ABY0002041 |
| MRK-ABY0019481 |
| MRK-ABY0019476 |
| MRK-ABY0042603 |
| MRK-ABY0096739 |
| MRK-ABY0195918 |
| MRK-ACD0083803 |
| MRK-ACD0118967 |
| MRK-ACF0000001 |
| MRK-ACF0005697 |
| MRK-ACF0005753 |
| MRK-ACF0005855 |
| MRK-ACO0029917 |

8

| |
|---|
| MRK-ACR0009066 |
| MRK-ACR0009297 |
| MRK-ACR0040000 |
| MRK-ACV0020385 |
| MRK-ACW0015916 |
| MRK-ACW0034795 |
| MRK-ACX0002478 |
| MRK-ACX0012547 |
| MRK-ACZ0055448 |
| MRK-ADC0003298 |
| MRK-ADI0006314 |
| MRK-ADI0024344 |
| MRK-ADK0004945 |
| MRK-ADN0007755 |
| MRK-ADN0145885 |
| MRK-ADO0021258 |
| MRK-ADO0091168 |
| MRK-ADW0001373 |
| MRK-ADW0037574 |
| MRK-ADW0083417 |
| MRK-ADX0021501 |
| MRK-AFH0017256 |
| MRK-AFI0044837 |
| MRK-AFI0045236 |
| MRK-AFI0048262 |
| MRK-AFI0182292 |
| MRK-AFI0234357 |
| MRK-AFI0256863 |
| MRK-AFO0141653 |
| MRK-AFO0189111 |
| MRK-AFO0189484 |
| MRK-AFS0009330 |
| MRK-AFT0005926-5929 |
| MRK-AFV0056036 |
| MRK-AFV0210573 |
| MRK-AFV0210575 |
| MRK-AFV031065 |
| MRK-AFV0363599 |
| MRK-AGU0007003 |
| MRK-AHU0006773 |
| MRK-AID0002441 |
| MRK-AID0007283 |
| MRK-AIF0001195 |
| MRK-AIP0013053 |

9

| |
|---|
| MRK-AJT0003955 |
| MRK-AJA0137782 |
| MRK-AKE0018605 |
| MRK-AKU0114390 |
| MRK-Anstice-0026 |
| MRK-Anstice-0045 |
| MRK-Anstice-0160 |
| MRK-NJ0209457 |
| MRK-AOI0044900 |
| MRK-AOI0064092 |
| MRK-AOJ0011061 |
| MRK-ARP0034606 |
| MRK-AVG0021318 |
| MRK-AVJ0036950 |
| MRK-Baumgartner-0029 |
| MRK-BNN0000001 |
| MRK-BNN0000750 |
| MRK-BNP0000024 |
| MRK-BNP0000025 |
| MRK-BNP0000028 |
| MRK-BNP0000031 |
| MRK-Bold-0001 |
| MRK-BPN0000001 |
| MRK-CONAC0009648 |
| MRK-EAD0012604 |
| MRK-EAD0015802 |
| MRK-EBAD0099697 |
| MRK-EBBO0025336 |
| MRK-EBDW0001161 |
| MRK-EBDW0001848 |
| MRK-EBDW0002029 |
| MRK-EBDW0005244 |
| MRK-EBEF0028138 |
| MRK-EBES0042739 |
| MRK-GUE0054957 |
| MRK-JAG0002112 |
| MRK-JAK0000973 |
| MRK-JAK0022965 |
| MRK-JAK0054369 |
| MRK-LBL0000035 |
| MRK-LBL0000067 |
| MRK-MES0011356 |
| MRK-MEW0031405 |
| MRK-MFO0030195 |

| |
|---|
| MRK-N0520018572 |
| MRK-NJ0066804-66827 |
| |
| MRK-NJ0094478 |
| MRK-NJ0216535 |
| MRK-PLBAA0006502 |
| MRK-PLBAA0020478 |
| MRK-PLBAB0001894 |
| MRK-PLBAB0010185 |
| MRK-PLBAB0010314 |
| MRK-PLBAB0010397 |
| MRK-PLBAB0010424 |
| MRK-PLBAB0010461 |
| MRK-PLBAB0010898 |
| MRK-PLBAB0010910 |
| MRK-PLBAC0023160 |
| MRK-PLBAC0023429 |
| MRK-PLBAC0023504 |
| MRK-PLBAC0023693 |
| MRK-PLBAC0023837 |
| MRK-PLBAC0024224 |
| MRK-PLBAC0024429 |
| MRK-PLBAG0005434 |
| MRK-PLBAG0006338 |
| MRK-PLBAU0006787 |
| MRK-PLBAU0006954 |
| MRK-PLBAU0008475 |
| MRK-PLBAU0008484 |
| MRK-PLBAU0008623 |
| MRK-PLBAU000999 |
| MRK-PLBAU0013674 |
| MRK-PLBAU0013684 |
| MRK-PLBAU0013815 |
| MRK-PLBAU0015228 |
| MRK-PLBAU0015440 |
| MRK-PLBAU0015462 |
| MRK-PLBAU0015509 |
| MRK-PLBAU0015666 |
| MRK-PLBAU0016401 |
| MRK-PLBAU0022883 |
| MRK-PLBAU0023565 |
| MRK-PLBAU0042100 |
| MRK-PLBAU0045775 |
| MRK-AFS0001987 |
| MRK-PLBAU0046005 |

| |
|---|
| MRK-PLBAU0046104 |
| MRK-PLBAU007223 |
| MRK-PLBAV0000001 |
| MRK-PLBAV0000007 |
| MRK-PRL0000114 |
| MRK-S0420050655 |
| Effective Health Care Article Comparative Effectiveness and Safety of Analgesic for Osteoarthritis |
| Aleve Caplets |
| FDA Letter re: Zocor |
| FDA Letter re: Fosamax |
| Larry King Live - "What is the Best Way to Combat Arthritis?" |
| Cardiovascular Thrombotic Events in Controlled Clinical Trials of Rofecoxib |
| Back to an Asprin a Day? |
| FDA Advisory Committee Background Information |
| Marketing of Vioxx to Physicians |
| Naprosyn label |
| US Probes Merck's Marketing of 3 Drugs |
| All PMRD |
| All ImpactRx |
| MRK-ACX0010785; MRK-EBBA0032935; 32946; 9250; 32979; 33000; 33124; 33155; 33161; 32943; |
| Compilation of FDA Warning letters for non-Vioxx 1/16/97 – 7/19/01 |
| MRK-ACD0118967-MRK-ACD0119115 |
| MRK-ABP0016640 - MRK-ABP0016648 |
| MRK-NJ0333225-MRK-NJ0333235 |
| MRK-ADS0000513-MRK-ADS0000157 |
| MRK-AHD0001996-MRK-AHD0002435 |
| MRK-AAU0000001-MRK-AAU0000028 |
| MRK-AFT0005926-MRK-AFT0005927 |
| MRK-NJ0347581-MRK-NJ0347631 |
| MRK-AFT0005928 |
| MRK-NJ0186457 - MRK-NJ0186465 |
| MRK-AFV0056036 - MRK-AFV0056038 |
| MRK-ABW0004799 - MRK-ACR0009287 |
| MRK-ACR0009151 - MRK-ACR0009152 |
| MRK-AJU0002625 - MRK-AJU0002668 |
| MRK-ABY0079740 - MRK-ABY0079747 |
| MRK-NJ0155799 |
| MRK-I8940072038 - MRK-I8940072157, MRK-I4190002159 - MRK-I4190002181, MRK-I2220003389 - MRK-I2220003511, MRK-I2220003997 - MRK-I2220004120, MRK-AFK0145520 - MRK-AFK0145655, MRK-I41990003958 - MRK-I4190003983 |
| MRK-AFO0189484 - MRK-AFO0189488 |
| MRK-AAB0109412 |

| MRK-AAC0068928-MRK-AAC0069124 | |
|---|---|
| MRK-N0520018536- MRK-N0520018571 | |

Finally, Dr. Egilman has reviewed and searched various publicly available information and literature in support of his opinions in this case. A list of some of the publicly available information and scientific literature he has reviewed and searched is contained in the accompanying file folders labeled "Egilman Publications" and "Background of Rofecoxib."

- MRK-ADI0015004
- MRK-ADJ0002409
- MRK-ABC0000069
- MRK-AVJ0005720
- MRK-AAA0007958-62
- Be the Power video
- MRK-AFV0348435
- MRK-S0420050655
- MRK-ACM0000386
- MRK-GAR0001724
- MRK-AJA0201711
- MRK-JAK0056277
- MRK-JAK0013412
- MRK-AHD0086276
- MRK-JAK0000973
- February 17, 2012 – Warning letter regarding Januvia
- MRK-ACV0020238
- MRK-ABS0212961
- MRK-ACV0026087
- MRK-ABF0004419
- MRK-AAF0003094
- MRK-NJ0069724-726
- MRK-AAF0003140
- MRK-ABH0001076
- MRK-0420033160
- MRK-AAF0003171
- MRK-AAF0003308
- MRK-AAF0003351
- MRK-AAF0003431
- MRK-AAF0003433
- MRK-AAF0003697
- MRK-AAF0003713
- MRK-ACR0014272
- MRK-01420031266
- MRK-010090691-696
- MRK-ACD0043569
- MRK-NJ0265337
- MRK-01420090699
- MRK-AAF0003775
- MRK-NJ0333225
- MRK-AAF0003926
- MRK-AAF0003975
- MRK-AAF0003986
- MRK-AAF0003997

- MRK-AAF0004013
- MRK-AAF0004045
- MRK-ACD0075472
- MRK-01420154504
- MRK-AAF0004126
- MRK-AAF0004140
- MRK-AAF0004200
- MRK-ABW0008489
- MRK-ACD0075588
- MRK-AAF0004251
- MRK-AAF0004250
- MRK-01420163565
- MRK-01420163624
- MRK-01420163634
- MRK-BNN0000106
- MRK-BNN0000001
- MRK-BNN0000750
- MRK-BNN0000003
- MRK-BNN0001934
- MRK-BNO0000001
- MRK-BNP0000028
- MRK-BNP0000001
- MRK-BNP0000025
- MRK-BNP0000030
- MRK-BNP0000031
- MRK-BNP000024
- MRK-ABD0001756
- MRK-ABD0001986
- MRK-AAB0109412
- MRK-01420115559
- MRK-PLABJ0000001
- MRK-ARP002284
- MRK-ABY0019476-77
- MRK-AFT0005926-28
- MRK-ADS0000153
- MRK-JAK22965-6701
- MRK-ABW0005449
- MRK-AFI0182292
- MRK-AFI0201418
- MRK-S0420050655
- MRK-S0420000030
- MRK-NJ0450666
- MRK-NJ0333225
- MRK-NJ0333225

2

- MRK-NJ0302920
- MRK-NJ0291847
- MRK-NJ0242455
- MRK-NJ0232605
- MRK-NJ0202875
- MRK-NJ0089349
- MRK-JAK0016040
- MRK-JAH0007309
- MRK-JAH0001017
- MRK-JAH0000245
- MRK-JAG0067408
- MRK-JAG0061933
- MRK-JAG0043451
- MRK-JAG0000090
- MRK-JAF0016264
- MRK-I2690009293
- MRK-I2690008953
- MRK-EBEC002617
- MRK-AZN0008357
- MRK-ARP0067555
- MRK-ARP0064499
- MRK-ARP0034603
- MRK-ARP0029905
- MRK-ARP0009009
- MRK-AQO0134670
- MRK-AQO0085495
- MRK-APE0016848
- MRK-APC0021020
- MRK-APC00205332
- MRK-AOZ0039657
- MRK-AOZ0027346
- MRK-AOZ0025508
- MRK-AOZ0025250
- MRK-AOZ0025186
- MRK-AOZ0024521
- MRK-AOZ0021326
- MRK-AOZ0014352
- MRK-AOZ0014351
- MRK-AOZ0014265
- MRK-AOZ0013853
- MRK-AOZ0008630
- MRK-AOZ0008562
- MRK-AOZ0008281
- MRK-AOZ0008197

- MRK-AOZ0008194
- MRK-AOZ0008186
- MRK-AOZ0007782
- MRK-AOZ0007778
- MRK-AOZ0007304
- MRK-AOZ0004411
- MRK-AOZ0004035
- MRK-AOZ0003046
- MRK-AOZ0002637
- MRK-AOZ0002287
- MRK-AOZ0001173
- MRK-AOZ0001170
- MRK-AOZ0001166
- MRK-AOZ0001165
- MRK-AOZ0001164
- MRK-AOZ0001163
- MRK-AOZ0001162
- MRK-AOZ0001161
- MRK-AOZ0001159
- MRK-AOZ0000997
- MRK-AOZ0000926
- MRK-AOZ0000867
- MRK-AOZ0000865
- MRK-AOZ0000828
- MRK-AOZ0000822
- MRK-AOZ0000799
- MRK-AOZ0000796
- MRK-AOZ0000792
- MRK-AOZ0000784
- MRK-AOZ0000783
- MRK-AOZ0000781
- MRK-AOZ0000758
- MRK-AOZ0000754
- MRK-AOZ0000752
- MRK-AOZ0000751
- MRK-AOZ0000749
- MRK-AOZ0000748
- MRK-AOZ0000743
- MRK-AOZ0000736
- MRK-AOZ0000727
- MRK-AOZ0000725
- MRK-AOZ0000722
- MRK-AOZ0000718
- MRK-AOZ0000708

4

- MRK-AOZ0000705
- MRK-AOZ0000702
- MRK-AOZ0000701
- MRK-AOZ0000662
- MRK-AOZ0000650
- MRK-ANG0022879
- MRK-AJE0083896
- MRK-AJB0015932
- MRK-AIZ0005855
- MRK-AIU0343947
- MRK-AHD0053414
- MRK-AGV0003296
- MRK-AGV0000684
- MRK-AGU0006994
- MRK-AGT0022071
- MRK-AGO0026320
- MRK-AGG002839
- MRK-AFZ0004492
- MRK-AFZ0004492
- MRK-AFZ0000516
- MRK-AFZ0000491
- MRK-AFV0449748
- MRK-AFV0349293
- MRK-AFV0309033
- MRK-AFV0043956
- MRK-AFV0035530
- MRK-AFS0004182
- MRK-AFS0001698
- MRK-AFO289839
- MRK-AFO0315084
- MRK-AFK0161519
- MRK-AFH0025852
- MRK-AEG0090303
- MRK-ADN0151403
- MRK-ADL0011655
- MRK-ADG0035340
- MRK-ACV0022137
- MRK-ACV0021094
- MRK-ACV0021014
- MRK-ACV0020976
- MRK-ACV0020238
- MRK-ACR0014270
- MRK-ACR00009295
- MRK-ACM0000386

5

- MRK-ACD0121618
- MRK-ACD0046261
- MRK-ACD0006054
- MRK-ABX0043629
- MRK-ABS0252327
- MRK-ABH0024880
- MRK-ABC0037090
- MRK-AAF0015400
- MRK-AAF0015398
- MRK-AAD0356476
- MRK-AAC0127059
- MRK-AAB0105500
- MRK-ADI0008369-71
- MRK-KYZAA0000001-8
- MRK-ZAH0000305
- MRK-OS420057431-8138
- MRK-OS420081821-2242
- MRK-OS420085310-650
- MRK-AAF0003162
- MRK-ABC0016493
- MRK-AAF0003414
- MRK-AAF0004140
- MRK-ACR0009297
- MRK-ABY0010470
- MRK-I8940064858
- MRK-I8940064861
- MRK-NJ0196972
- MRK-V0000001
- MRK-V0000002
- MRK-V0000003
- MRK-V0000004
- MRK-V0000005
- MRK-V0000006
- MRK-V0000007
- MRK-V0000010
- MRK-V0000011
- MRK-V0000012
- MRK-V0000013
- MRK-V0000014
- MRK-V0000017
- MRK-V0000021
- MRK-V0000024
- MRK-V0000025
- MRK-V0000026

- MRK-V0000029
- MRK-V0000030
- MRK-V0000031
- MRK-V0000032
- MRK-V0000034
- MRK-V0000035
- MRK-V0000036
- MRK-V0000041
- MRK-V0000042
- MRK-V0000043
- MRK-V0000045
- MRK-V0000046
- MRK-A0001619-1621
- MRK-A0003260-3262
- P1.0008, MRK-AAR0019055
- P1.1155, MRK-01420090699-701
- P1.0021, MRK-01420099060-61
- P9.0142, MRK-PRL0000122-123
- P9.0145, MRK-ABI0003228-30
- P9.0146, MRK-PRL0000214-217
- P9.0147, MRK-PRL0000218
- P1.1132, MRK-00420008018-8123
- P1.1133, MRK-N0520004121-72
- P1.0017, MRK-NJ0070364-416
- P1.0079, MRK-AAX0000752-76
- P1.0022, MRK-01420101964-67
- P1.0023, MRK-01420145856-5961
- P1.0002, MRK-ABW0004799
- P1.0091, MRK-AAX0008561
- P1.0519, MRK-NJ0209457
- P1.1127, MRK-NJ0363443-45
- P1.0021, MRK-01420099060-61
- British 2003 Vioxx label
- http://www.merckresponsibility.com/focus-areas/ethics-and-transparency/home.htm
- Handbook of Warnings (Michael S. Wogalter ed., 2006)
- Chapter 7: The Pharmaceutical Industry, Disease Industry: A Prescription for Illness and Death, Egilman and Ardolino, The Bottom Line or Public Health, Wiist (2010), p. 198
- O'Banion, M.K. COX-2 and Alzheimer's disease: potential roles in inflammation and neurodegeneration. Exp. Opin. Invest. Drugs. (1999): 8(10): 1521-1536
- September 2002 and December 2004 deposition of Adam Schechter
- March 2005 and April 2005 deposition of Alan Nies
- March 2005 deposition of Alise Reicin
- October 2004 deposition of Beth Seidenberg
- October 2004 deposition of Brian Daniels

7

- December 2003 and February 2005 deposition of Carolyn Cannuscio
- August 2005 deposition of Charlotte McKines
- March 2005 deposition of David Anstice
- May 2006 deposition of David Graham
- October 2002, January 2005, February 2005 and June 2005 deposition of David Shapiro
- 2011 and 2012 Depositions in Plubell and Ivey v. Merck
- February 2005 and August 2005 deposition of Douglas Watson
- June 2002, March 2005, April 2005, May 2005 and June 2005 deposition of Edward Scolnick
- October 2004 deposition of Elliot Ehrich
- November 2005 deposition of Eric Topol
- November 2004 deposition of Gregory Bell
- November 2005 and January 2006 deposition of Gregory Curfman
- March 2004 deposition of Gergory Kulp
- March 2006 deposition of Hui Quan
- August 2005 deposition of Jan Weiner
- January 2005 deposition of Jennifer Ng
- February 2006 deposition of Laura Demopoulos
- February 2004 deposition of Linda Hostelley
- August 2005 and Feberuary 2006 deposition of Lisa Rarick
- September 2004 and December 2004 deposition of Louis Sherwood
- February 2006 deposition of Mary Blake
- July 2006 deposition of Ned Braunstein
- April 2006 deposition of Peter DiBattiste
- August 2005 deposition of Peter Hoing
- March, April and June 2005 depositions of Peter Kim
- March, April and June 2005 depositions of Raymond Gilmartin
- November 2004 deposition of Robert Silverman
- August 2004 deposition of Terry Jacklin
- November 2004 deposition of Thomas Musliner
- January 2005 deposition of Thomas Simon
- May 2005 deposition of Wayne Ray
- January and February 2005 deposition of Wendy Dixon
- Depositions taken in the *Merck & Co., Inc. Securities Litigation in Re: MDL 1658* case
- Depositions taken in the *State of Utah v. Merck Sharp & Dohme Corp.*, Civil Action No. 2:06-cv-09336 case
- 2007 testimony at Cona-McDarby v. Merck
- 2005 testimony at Ernst v. Merck
- 2007 testimony at Humeston v. Merck

- P1.0732. MRK-NJ0220388-454
- P1.0140. MRK-ABI0001556
- P1.0041. MRK-AAI0000001-60
- P1.0667
- P1.1102
- P1.0732. MRK-NJ02200388
- MRK-AGU7003
- Friedman LM, Furberg CD, DeMets DL., Fundamentals of Clinical Trials — Second edition.
- 1939 Manufacturing Chemists' Association Legal Principles
- (TAB #9) 9/30/2004 David Graham memo
- Kentucky Revised Statute § 367.110
- Kentucky Revised Statute § 367.120
- Kentucky Revised Statute § 367.170
- Kentucky Revised Statute § 367.190
- Kentucky Revised Statute § 367.990 (2)
- 21 CFR 202.1
- P.1328. MRK-NJ0092058-133
- PhRMA Code on Interactions with Healthcare Professionals
- Gifts to Physicians from Industry
- *Com. ex rel. Chandler v. Anthem Ins. Companies, Inc.,* 8 S.W.3d 48 (Ky. App. 1999)
- *Com. ex rel. Cowan v. Telecom Directories, Inc.,* 806 S.W.2d 638 (Ky. 1991)
- *Dare To Be Great, Inc. v. Com. ex rel. Hancock,* 511 S.W.2d 244 (Ky. App. 1974)
- *Wyeth v. Levine,* 555 U.S. 555, 129 S.Ct. 1187 (2009)
- P1.0042. MRK-AAI0000061-124
- Medicine, Science and Merck, Vagelos and Galambos (2004)
- P1.0041. MRK-AAI0000001-60
- P1.0155. MRK-ABI0004488-99
- P1.1135. MRK-ABI0008659-83
- P1.0009. MRK-AAO0000073-126
- P1.0966. MRK-ABW0005449-75
- MRK-ADF37273
- The Pharmaceutical Industry, Disease Industry: A Prescription for Illness and Death, Egilman and Ardolino, The Bottom Line or Public Health, Wiist (2010)
- Gilbert and Sarkar, Merck' Conflict and Change. Boston: Harvard Business School Publishing, 2005
- Responses of Merck to Notice of Deposition Duces Tecum in <u>Plubell</u>
- MRK-AKU0060816-7
- P1.0020. MRK-NJ0000862-69
- P1.0122. MRK-ABC0048699-706
- MRK-AIF0001195-1206
- P1.0004. MRK-NJ0315892
- P1.1584. MRK-NJ0260083

- P1.0019. MRK-NJ0152620-23
- P1.0106. MRK-ABC0002150
- P1.1585. MRK-ABY0199805
- MRK-ABY199807-8
- MRK-ABK311052
- MRK-ABP2676-9
- P1.0532. MRK-NJ0272249
- MRK-ABC0009946-9996
- MRK-MEW31405-35
- P1.0386. MRK-AEI0002734-46
- MRK-AMX51764-813
- MRK-ABS0214005
- P1.0208. MRK-ABS0295238-87
- P1.0108. MRK-ABC0002199-2200
- P1.0107. MRK-ABC0002198
- MRK-ABC27-40
- MRK-ABC16301-352
- MRK-AAA0007954-57
- MRK-OS420050262-65
- MRK-AAA0001245-54
- P1.0558. MRK-ANK-0000476-478
- Madigan PowerPoint
- Ross, et al. paper, "Pooled Analysis of Rofecoxib Placebo-Controlled Clinical Trial Data
- MRK-AAA0007958-62
- MRK-AAA0007963-67
- MRK-AAA0007968-72
- MRK-AAA0007702-949
- MRK-AAD0038795-9116
- MRK-AFK0253295
- DOJ Admission/Plea Agreement
- P1.0510. MRK-NJ0155912-16
- P1.1803. MRK-GUE0035229-30
- P1.0084. MRK-AAX0002759
- P1.0488. MRK-NJ0120172
- P1.0220. MRK-ABT0022637-38
- P1.0089. MRK-AAX0002908-11
- P1.1842. MRK-NJ0130074-77
- MRK-AKU81480-554
- P1.1201. MRK-00420027870-981
- P1.0132. MRK-ABH0016219
- P1.0494. MRK-NJ0121088-89
- P1.0118. MRK-ABC0033809
- MRK-12690002299

2

- P1.0143. MRK-ABL0000921-37
- P2.0032. MRK-ADJ0035003
- MRK-ADM0083746
- MRK-ABW0008912
- MRK-ABW277-278
- P1.0226. MRK-ABW0005623
- MRK-ABW5607
- MRK-ABW11826-27
- MRK-ADI6314-15
- P1.0229. MRK-ABW0011956-57
- MRK-ADC3298-3317
- P1.1141. MRK-NJ0214478
- MRK-ACD83803-08
- P1.1100
- MRK-ABY75447-450
- P1.0305. MRK-ACR0009297
- P1.1016. MRK-ABA0025859-60
- P1.1537. MRK-ABA0028398
- P1.1020. MRK-ABA0028655
- P1.0127. MRK-ABH0002007-24
- Egilman PowerPoint
- MRK-AAD49074
- MRK-ACT0000991
- MRK-PLBAB0001145
- MRK-AHU6773
- P1.1256. MRK-NJ0362784
- P2.0150. MRK-AAZ0000882-3
- MRK-ABC0052156
- MRK-AAB109448-492
- MRK-AAB109412-447
- P1.1349. MRK-AAB0109378-411
- P10.0098. Under-reporting of CV events in the rofecoxib Alzheimer disease studies.-Madigan
- MRK-ABH17386
- P1.0535. MRK-NJ0284590
- P1.0516. MRK-NJ0189508-9
- P1.0401. MRK-AFI0010255
- P1.0298. MRK-ACR0008985
- MRK-NJ0326037
- P1.0176. MRK-ABO0000250
- MRK-AFIO28
- MRK-ABG070-109
- P1.1465. EJT 000211-248
- P1.1084. MRK-ABW0000581-607

3

- P1.0009
- P1.4976
- MRK-ABD0001986-87
- MRK-PRL114-115
- P1.0152. MRK-ABI0003228-30
- P1.1131. MRK-ABW0000062-63
- P1.1531. MRK-ADW0000142-44
- P1.0158. MRK-ABI0005912-15
- MRK-ADW83417-22
- P1.0007. MRK-AAR19773-86
- P1.0064. MRK-AAR0010111-26
- MRK-KYAAK0028455
- MRK-AKC0002879
- MRK-PLBAI0004684
- MRK-PLBAI0007005
- MRK-I2690007857
- MRK-I86940073717
- MRK-12690005758
- MRK-AFV00431065
- MRK-ARP0064387
- MRK-AFK0004286
- MRK-AHD0014248
- MRK-ADM0150925-150926
- MRK-ABY0079604
- MRK-AWC0034045
- MRK-KYAAK433
- MRK- KYAAK1295-1838
- MRK-KYAAK1839
- MRK- KYAAK2807-3169
- MRK-KYAAK5545
- MRK-KYAAK1839-2459
- MRK-PLBAI8536
- MRK-AAF6403-4
- MRK-AAF6963-64
- MRK-AAF6988-89
- P1.0154. MRK-ABI0003291-93
- MRK-AAF0006965
- P1.1333. MRK-ABI0002226-29
- P1.1517. MRK-AAF0007286-91
- P1.0153. MRK-AAF0007786-87
- P1.0006. MRK-ABA0003277-84
- MRK-AVJ67038
- P1.1750. MRK-AJM0000056-63
- MRK-AAF7894-95
- January 16, 1997 DDMAC letter re: Zocor

- P1.0977 February 21, 1997 DDMAC letter re: Trusopt
- March 14, 1997 DDMAC letter re: Prinivil
- April 14, 1997 DDMAC letter re: Fosamax
- July 2, 1997 DDMAC letter re: Zocor
- July 2, 1997 DDMAC letter re: Fosamax
- August 6, 1997 DDMAC letter re: Fosamax
- August 26, 1997 DDMAC letter re: Coumadin
- September 22, 1997 DDMAC letter re: Zocor
- October 20, 1997 DDMAC letter re: Cozaar and Hyzaar
- January 26, 1998 DDMAC letter re: Zocor
- April 1, 1998 DDMAC letter re: Propecia
- April 23, 1998 DDMAC letter re: Cosopt
- May 11, 1998 DDMAC letter re: Aggrastat
- June 4, 1998 DDMAC letter re: Cozaar and Hyzaar
- P1.0976 June 16, 1998 DDMAC Warning Letter
- July 13, 1998 DDMAC letter re: Singulair
- July 30, 1998 DDMAC letter re: Propecia
- August 20, 1998 DDMAC letter re: Trusopt
- November 3, 1998 DDMAC letter re: Cosopt
- November 19, 1998 DDMCA letter re: Aggrastat
- December 22, 1998 DDMAC letter re: Cozaar and Hyzaar
- July 2, 1999 DDMAC letter re: Crixivan
- June 20, 2001 DDMAC letter re: Fosamax
- July 19, 2001 DDMAC letter re: Cancidas
- P1.0966. MRK-AA00000119
- P9.0299. MRK-ACR0009066
- MRK-ABH20001
- P1.0001. MRK-ACT0018064
- MRK-ABH19975-76
- P1.1416. MRK-NJ0209942
- MRK-ABY2041-53
- P1.0002. MRK-ABW0004799
- MRK-ABW408-452
- MRK-AAB4563
- P1.0305. MRK-ACR9297
- P1.1888. MRK-EAD15802
- P1.1017. MRK-AAF5794
- P1.0125. MRK-ABG0001226-43
- P1.0071. MRK-AAU0000029-94
- P1.0094. MRK-AAB29224-273
- MRK-AQI0005559-61
- P1.0282. MRK-ACF0005855-57
- P1.1144. MRK-ACD0105492
- P2.0236. NEJM000374-5

5

- P1.1344.2000NEMJ000001-2:5
- P1.1232. MRK-ABC0024527
- P2.0677
- MRK-NJ0120240
- Laine video news release re: VIGOR
- Demopoulis video news release re: VIGOR
- P1.0508. MRK-NJ0272583
- P1.0534. MRK-NJ0152895-904
- MRK-PLBAU22883
- P1.0357. MRK-ADI0024344-46
- MRK-01420115559-603
- MRK-AAE0002414-15
- MRK-AAF0004126-29
- MRK-NJ0124427
- MRK-AFV0210573
- Hill et al., The ADVANTAGE Seeding Trial: a Review of Internal Documents
- Braunstein's Response to Hill et al. article
- P1.1115. MRK-ACR0009150
- P1.0300. MRK-ACR0009151-2
- MRK-AJA0092876-98
- MRK- AFH0017256-63
- MRK-01420147597-632
- MRK-ARP34606-08
- MRK-AAF0000763
- MRK-APE0022197-202
- MRK-AAF0004865
- P1.0536. MRK-NJ0216535
- MRK-ABY0019476-77
- P1.0248. MRK-ABY0019481
- P1.0275. MRK-ACD0118967
- P1.0445. MRK-AFT0005926-28
- P1.0309. MRK-ACR0014502-3
- P1.0021. MRK-NJ0155799-818
- MRK-ACV0020639
- P1.0323. MRK-ACV0020238-41
- P1.0216. MRK-ABT0000856
- MRK-ACR0007849
- MRK-JAH0000493-500
- MRK-ABY0019476-7
- MRK-JAK22965-6701
- MRK-NJ0070073-74
- P1.0502. NJ0124427- 28
- P1.0501. NJ0123880-82
- P1.1481. MRK-ACF0005733-66

6

- August 15, 2007 deposition of Gilbert Block
- MRK-AFV0210573-77
- MRK-AAD0192390-91
- MRK-ANV0001201-13
- P1.0030. MRK-AAC0128698-99
- MRK-ABSO473022-25
- MRK-ADG0053307
- MRK-AG00001536
- P1.1127. MRK-NJ0363443-45
- MRK18940074883
- MRK-AFK0049363
- P1.1117. MRK-S0420051232
- MRK-AID0007283
- Response to MDL Discovery interrogatory # 10 (F)
- 1/2006 Graham article
- P1.0115. MRK-ABC0017484
- P2.0183. ABA0001301
- MRK-I8940074879
- MRK-I8940074883
- MRK-AFK-0065467
- P2.0094. MRK-ABY0004618-27
- MRK-ABY0018412
- Reicin Witness Statement at 33, 55
- P9.0299. MRK-LBL0000027-30
- 07/23/98 War Games for Vioxx
- P1.0177. MRK-AB00000257
- P1.0233. MRK-ABW0018150
- P1.0405. MRK-AFI0041638
- MRK-AFI0800014
- P1.1568. MRK-ACJ0004568-91
- MRK-KYAAK14536-928
- MRK-KYAAK0003170-3633
- MRK- KYAAK0019614-20103
- MRK- KYAAK0024854-955
- P1.0233. MRK-ABW0018150
- MRK-KYAAK3170
- MRK-PLBAI4603
- MRK-KYAAK24589
- P1.0414. MRK-AFI0174637
- P1.0299. MRK-ACR0009066
- P1.0412. MRK-AFI0048262
- P1.0329. MRK-ACX0005129-32
- P1.0184. MRK-ABO0002864-65
- P1.0409. MRK-AFI0045236
- P1.0175. MRK-ABOO0000220

- P1.0518. MRK-NJ0209299-301
- May 5, 2002 email from A. Nies to J. Oates re Vane Editorial in Science
- July 20, 2003 material faxed by McMillen to Egilman
- CSR 33
- August 18, 1999 DMRAB Presentation
- May 23, 2002 – P&T Advisory Committee Presentation
- February, 6, 2003 – P&T Advisory Committee Presentation
- May 4, 2004 – P&T Advisory Committee Presentation
- P9.0141. MRK-PRL0000114-15
- P9.0142. MRK-PRL0000122-23
- P9.0143. MRK-PRL0000124-27
- P9.0144. MRK-PRL0000214-17
- P9.0145. MRK-ABI0003228-30
- P9.0146. MRK-PRL0000114-15
- P9.0147. MRK-PRL0000218
- P9.0151. MRK-ADJ0042906-9
- P9.0154. MRK-ABW00018339-41
- P9.0156. MRK-EAD00002514-16
- P9.0157. MRK-EAD00002497-99
- P9.0158. MRK-EAD00003447-49
- P9.0159. MRK-ADW0005188-89
- P9.0161. MRK-ACB0019968-70
- P9.0162. MRK-PRL0000158-61
- P9.0164. MRK-ABW0016825-28
- P9.0165. MRK-ABW0017127-30
- P9.0166. MRK-ABX0026273-77
- P9.0167. MRK- ABX0066210-14
- P9.0169. MRK- ABX0052283-87
- P9.0170. MRK- ABX0052489-92
- P9.0278. MRK-LBL0000011-12
- P9.0279. MRK-LBL0000230-231
- P9.0280. MRK-LBL0000232-233
- P9.0281. MRK-LBL0000228-229
- P9.0282. MRK-LBL0000234-235
- P9.0283. MRK-LBL0000005-6
- P9.0285. MRK-LBL0000017-18
- P9.0286. MRK-LBL0000007-8
- P9.0287. MRK-LBL0000236-237
- P9.0288. MRK-LBL0000001-2
- P9.0289. MRK-LBL0000226-227
- P9.0290. MRK-LBL0000256-257
- P9.0291. MRK-LBL0000035-38
- P9.0292. MRK-LBL0000047-50
- P9.0293. MRK-LBL0000059-62
- P9.0294. MRK-LBL0000063-66

- P9.0295. MRK-LBL0000248-251
- P9.0297. MRK-LBL0000003-4
- P9.0299. MRK-LBL0000027-30
- P9.0300. MRK-LBL0000031-34
- P9.0301. MRK-LBL0000043-46
- P9.0302. MRK-LBL0000055-58
- P9.0304. MRK-LBL0000228-229
- P9.0305. MRK-LBL0000232-233
- P9.0306. MRK-LBL0000234-235
- P9.0307. MRK-LBL0000244-247
- P9.0309. MRK-LBL0000258-261
- P9.0171. MRK-A0000039
- P9.0172. MRK-A0000047
- P9.0173. MRK-A0000049
- P9.0174. MRK-A0000368
- P9.0175. MRK-A0000372
- P9.0176. MRK-A0000375
- P9.0177. MRK-A0000401
- P9.0179. MRK-A0000368
- P9.0180. MRK-A0000405
- P9.0181. MRK-A0000409
- P9.0182. MRK-A0001198
- P9.0183. MRK-A0001199
- P9.0184. MRK-A0001345
- P9.0185. MRK-A0001346
- P9.0186. MRK-A0001985
- P9.0187. MRK-A0001986
- P9.0188. MRK-A0001994
- P9.0189. MRK-A0001996
- P9.0190. MRK-A0002009
- P9.0191. MRK-A0002131
- P9.0192. MRK-A0002325
- P9.0193. MRK-A0002322
- P9.0194. MRK-A0002467
- P9.0195. MRK-A0002469
- P9.0196. MRK-A0002476
- P9.0197. MRK-A0002534
- P9.0198. MRK-A0002537
- P9.0199. MRK-A0002638
- P9.0200. MRK-A0002778
- P9.0201. MRK-A0002782
- P9.0202. MRK-A0002828
- P9.0203. MRK-A0002830
- P9.0204. MRK-A0002874

- P9.0205. MRK-A0002876
- P9.0206. MRK-A0002893
- P9.0207. MRK-A0003088
- P9.0208. MRK-A0003142
- P9.0209. MRK-A0003148
- P9.0210. MRK-A0003153
- P9.0211. MRK-A0003162
- P9.0212. MRK-A0003164
- P9.0213. MRK-A0003166
- P9.0214. MRK-A0003169
- P9.0215. MRK-A0003171
- P9.0216. MRK-A0003266
- P9.0217. MRK-A0003316
- P9.0218. MRK-A0003266
- P9.0219. MRK-A0003332
- P9.0220. MRK-A0003333
- P9.0221. MRK-A0003334
- P9.0222. MRK-A0003339
- P9.0223. MRK-A0003392
- P9.0224. MRK-A0003560
- P9.0225. MRK-A0003561
- P9.0227. MRK-A0003592
- P9.0228. MRK-A0003679
- P9.0229. MRK-A0003680
- P9.0230. MRK-A0003769
- P9.0231. MRK-A0003775
- P9.0232. MRK-A0003922
- P9.0233. MRK-A0003924
- P9.0234. MRK-A0003927
- P9.0235. MRK-A0003929
- P9.0236. MRK-A0004034
- P9.0237. MRK-A0004037
- P9.0238. MRK-A0004276
- P9.0239. MRK-A0004043
- P9.0240. MRK-A0004283
- P9.0241. MRK-A0004296
- P9.0242. MRK-A0004316
- P9.0243. MRK-A0004318
- P9.0244. MRK-A0003472
- P9.0245. MRK-A0004339
- P9.0246. MRK-A0004341
- P9.0247. MRK-A0004390
- P9.0248. MRK-A0004444
- P9.0249. MRK-A0004442

- P9.0250. MRK-A0004451
- P9.0251. MRK-A0004458
- P9.0252. MRK-A0004535
- P9.0253. MRK-A0004564
- P9.0254. MRK-A0004566
- P9.0255. MRK-A0004569
- P9.0256. MRK-A0004590
- P9.0257. MRK-A0004594
- P9.0258. MRK-A0004597
- P9.0259. MRK-A0004632
- P9.0260. MRK-A0004634
- P9.0261. MRK-A0004637
- P9.0262 .MRK-A0004715
- P9.0263. MRK-A0004096
- P9.0027. MRK-A0001151-54
- P9.0028. MRK-A0001183-97
- P9.0029. MRK-A0001200-08
- P9.0030. MRK-A0001214-25
- P9.0031. MRK-A0001226-34
- P9.0032. MRK-A0001894-97
- P9.0033. MRK-A0002432-46
- P9.0034. MRK-A0002455-56
- P9.0035. MRK-A0002457-58
- P9.0036. MRK-A0002459-60
- P9.0037. MRK-A0002461-66
- P9.0038. MRK-A0002489-96
- P9.0039. MRK-A0002540-47
- P9.0040. MRK-A0002548-64
- P9.0041. MRK-A0003114-33
- P9.0042. MRK-A0003253-59
- P9.0043. MRK-A0003323-31
- P9.0044. MRK-A0003806-19
- P9.0045. MRK-A0002459-60
- P9.0046. MRK-A0004411-18
- P9.0001. MRK-AAR0007515
- P9.0002. MRK-P0002475-81
- P9.0003. MRK-P0002733-39
- P9.0004. MRK-P0002740-44
- P9.0005. MRK-P0011253-59
- P9.0006. MRK-P0011429-39
- P9.0010. MRK-P0002613-19
- P9.0011. MRK-P0002615-16
- P9.0016. MRK-P0006353-59
- P9.0019. MRK-P0007492-97

- P9.0021. MRK-P0011358-63
- P9.0047. MRK-APW0000027-30
- P9.0048. MRK-APW0000031-34
- P9.0049. MRK-APW0000041-42
- P9.0050. MRK-APW0000052-53
- P9.0051. MRK-APW0000062-63
- MRK-AKT0214837
- MRK-AKT0677939
- MRK-AKT0679677
- MRK-AKT1161102
- MRK-AKT1055984
- MRK-AKT133965
- MRK-AKT1269225
- MRK-AKT1318580
- MRK-AKT1545613
- MRK-AKT0535764
- MRK-AKT4184667
- MRK-AKT4226385
- MRK-AKT4210186
- MRK-AKT4202693
- MRK-AKT4316348
- MRK-AKT1162584
- MRK-AKT2212776
- MRK-AKT2111797
- MRK-AKT4297216
- MRK-AKT2669786
- MRK-AKT2989966
- MRK-AKT3026746
- MRK-AKT0008490
- MRK-AKT2296095
- MRK-AKT1452480
- MRK-AKT1549344
- MRK-AKT00010326
- MRK-AKT0648656
- MRK-AKT1415434
- MRK-AKT0013483
- MRK-AKT2495168
- MRK-AKT2773884
- MRK-AKT2972452
- MRK-AKT1532535
- MRK-AKT1910427
- MRK-AKT0019151
- MRK-AKT217819
- MRK-AKT2135133

- MRK-AKT2115055
- MRK-AKT2497299
- MRK-AKT2690976
- MRK-AKT3001426
- MRK-AKT3001267
- MRK-AKT2722031
- MRK-AKT3292566
- MRK-AKT3424077
- March 17, 2005 deposition of David Anstice
- May 17, 2001 and July 27, 2011 depositions of Doug Watson
- May 12, 2001 and June 9, 2011 depositions of Peter Alberti
- March 24, 2005 deposition of Raymond Gilmartin
- March 8, 2013 deposition of Stephanie Gifford
- March 25, 2013 deposition of Allen Goldberg
- March 29, 2013 deposition of Jonathan Jaffe
- February 28, 2013 deposition of Nalise Pieratt
- March 22, 2013 deposition of Scott Summers

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 1 | 10/27/1994 | | | ICH Harmonized Tripartite Guideline: The Extent of Population Exposure to Assess Clinical Safety for Drugs Intended for Long-Term Treatment of Non-Life Threatening Conditions E1 |
| A 4 | 03/01/1995 | Public | | ICH-E1A Guideline for Industry: The extent of population Exposure to Assess Clinical Safety: For Drugs Intended for Long-term Treatment for Non-Life Threatening Conditions |
| A 13 | 11/21/1996 | MRK-AAB0024016 | MRK-AAB0024023 | Memorandum from T. Musliner to B. Friedman, et al. |
| A 15 | 01/16/1997 | MRK-I8940015949 | MRK-I8940015964 | Letter from MRL to FDA re: IND 46,894: MK-0966 (L-748,731) |
| A 22 | 02/02/1998 | MRK-AAD0046029 | MRK-AAD0046052 | Watson's CV Analysis - MRL Epidemiology Department Technical Report No. EPR7006.005.98 |
| A 23 | 02/02/1998 | | | Final Results of analysis of CV events in clincal trial |
| A 26 | 04/13/1998 | MRK-AAC0019509 | MRK-AAC0019519 | Dr. Alan Nies' Writeup for Meeting of Board of Scientific Advisors |
| A 27 | | 5/1/98 MRK-AEI0002734 | MRK-AEI0002746 | Scientific Advisors' Meeting May 3 - May 6, 1998 Programmatic Review Vioxx Program |
| A 30 | 06/08/1998 | MRK-ABH0014141 | MRK-ABH0014192 | Minutes from May VIOXX project team |
| A 38 | 10/22/1998 | MRK-AAC0041008 | MRK-AAC0041011 | Memo from Denis Riendeau to Don Nicholson and Mike Gresser re: Dog urinary prostaglandin study |
| A 40 | 10/26/1998 | MRK-OS420124072 | MRK-OS420124403 | 'E. Clinical Safety' Vioxx Clinical Documentation |
| A 41 | 10/26/1998 | MRK-OS420124440 | MRK-OS420124403 | Section of ISS dealing with Thromboembolic Cardiovascular Adverse Experiences. |
| A 43 | 11/23/1998 | MRK-OS420000001 | MRK-OS420166451 | Letter from MRL to FDA re: Original New Drug Application, NDA 21-042: VIOXX (rofecoxib) Tablets |
| A 44 | 11/23/1998 | MRK-OS420022527 | MRK-OS420022631 | Letter from MRL to FDA re: Original New Drug Application, NDA 21-042: VIOXX (rofecoxib) Tablets |
| A 47 | 12/01/1998 | MRK-AAR0017330 | MRK-AAR0017345 | Policy Letter No. 110 |
| A 48 | 12/01/1998 | MRK-AAR0017392 | MRK-AAR0017410 | Policy Letter No. 118 |
| A 51 | 12/16/1998 | MRK-I8940042881 | MRK-I8940042984 | Letter from MRL to FDA re: IND 46,894: VIOXX (Rofecoxib, MK-0966) Protocol Amendment – New Protocol |
| A 57 | 02/04/1999 | MRK-ACK0014359 | MRK-ACK0014370 | Memo from E. Ehrich and J. Giuliano to B. Seidenberg et al. re: 'MK-0966 Additional ECG Analysis' |
| A 59 | 02/21/1999 | MRK-ABC0006432 | MRK-ABC0006435 | Email from D. Riendeau to B. Gertz re: dog urinary study- preliminary |
| A 60 | 03/08/1999 | MRK-AAC0013130 | MRK-AAC0013132 | Memo from J.P. Falgueyret to Denis Riendeau re: Inhibition of the B-oxidation of 6-keto-PGF 1 in isolated hepatocytes by / COX-2 inhibitors |
| A 61 | 03/08/1999 | MRK-ABC0006396 | MRK-ABC0006404 | Memo to Denis Riendeau, et al. re: 'Exploratory analysis of urinary metabolites from the metabolism of 3H-6-keto-PGF 1a in anesthetized dogs treated with Celecoxib' |
| A 63 | 03/23/1999 | MRK-I8940046217 | MRK-I8940046311 | Letter from MRL to FDA re: IND 46,894: MK-0966 (L-748,731) Protocol Amendment - New Protocol |
| A 66 | 04/20/1999 | MRK-AAP0000649 | MRK-AAP0000788 | Arthritis Advisory Committee meeting, Silverman's Slides |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 67 | 04/20/1999 | MRK-AFT0002227 | MRK-AFT0002430 | "NDA 21-042: Vioxx Tablets NDA 21-052: Vioxx Oral Suspension (Rofecoxib) FDA Advisory Committee Background Information Presented to: Arthritis Advisory Committee April 20, 1999" |
| A 74 | 05/20/1999 | MRK-99420021411 | MRK-99420021434 | Letter from FDA to MRL re: NDA 21-042 |
| A 77 | 06/07/1999 | MRK-AEG0015642 | MRK-AEG0015644 | Memo from Denis Riendeau |
| A 79 | 08/30/1999 | MRK-AAB0029224 | MRK-AAB0029273 | CV SOP - Standard Operating Procedure for the Surveillance, Monitoring and Adjudication of Acute Thromboembolic Vascular Events in Clinical Trials of COX-2 Specific Inhibitors |
| A 81 | 09/02/1999 | MRK-I8940053887 | MRK-I8940053972 | Letter from MRL to FDA re: IND 46,894: VIOXX (Rofecoxib) Information Amendment – Clinical, Data Analysis Plan for Protocol 088 |
| A 88 | 10/06/1999 | MRK-99420023355 | MRK-99420023362 | Supplement – Changes Being Effected |
| A 100 | 01/01/2000 | MRK-00420019103 | MRK-00420019109 | Naproxen Label -- June 2000 |
| A 101 | 01/01/2000 | | | Aspirin Label |
| A 114 | 03/22/2000 | MRK-ABH0017550 | MRK-ABH0017551 | E-mail from D. Bjorkman to D. Shapiro |
| A 116 | 03/23/2000 | MRK-I8940060171 | MRK-I8940060238 | MRL letter to FDA re: IND 46,894: VIOXX (rofecoxib) Amendment to Pending Application |
| A 117 | 03/26/2000 | | | Dear Investigator Letter |
| A 119 | 03/27/2000 | MRK-PRL0000114 | MRK-PRL0000115 | Press release re preliminary results of GI outcomes study |
| A 120 | 03/27/2000 | MRK-I8940060167 | MRK-I8940060244 | Correspondence |
| A 125 | 04/21/2000 | MRK-00420003972 | MRK-00420003973 | Fax from FDA to MRL |
| A 135 | 05/18/2000 | MRK-I8940061593 | MRK-I8940061598 | MRL letter to FDA re: IND 46,894: VIOXX (rofecoxib) Response to FDA Request for Information |
| A 136 | 05/18/2000 | MRK-ERN0252799 | MRK-ERN0252802 | Letter to Robert Utiger from Claire Bombardier |
| A 138 | 05/24/2000 | MRK-AAC0023877 | MRK-AAC0023878 | A Report from Digestive Disease Week Congress |
| A 141 | 06/14/2000 | MRK-I8940062034 | MRK-I8940062034 | Fax from FDA to MRL |
| A 142 | 06/18/2000 | MRK-BAR0139719 - (Produced in CS - Barlow - Reicin Supp) Attachment: MRK-BAR0139722-MRK-BAR0139723 | MRK-BAR0139740 | Email from Dorothy Bolton re: Press Materials: EULAR Journalists Workshop |
| A 145 | 06/29/2000 | MRK-00420008017 | MRK-00420019547 | MRL letter to FDA re: NDA 21-042: VIOXX (rofecoxib tablets) Supplemental New Drug Application, VIOXX Gastrointestinal Outcomes Research Study (VIGOR) |
| A 147 | 07/15/2000 | MRK-ACR0011080 | MRK-ACR0011084 | Email string including Ned Braunstein and Ed Scolnick regarding report on APS patients   Memo Attached |
| A 150 | 08/07/2000 | MRK-00420021832 | MRK-00420021835 | Letter from MRL to FDA re: NDA 21-042/S-007 VIOXX (rofecoxib tablets) NDA 21-052/S-004 VIOXX (rofecoxib oral suspension) |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 155 | 10/13/2000 | MRK-00420027869 | MRK-00420027981 | Letter from MRL to FDA re: NDA 21-042/S-004: VIOXX (rofecoxib oral suspension) Safety Update Report VIOXX Gastrointestinal Outcomes Research Study (VIGOR) |
| A 157 | 11/27/2000 | MRK-00420028062 | MRK-00420028066 | Fax from FDA to MRL |
| A 160 | 12/18/2000 | MRK-00420029549 | MRK-00420029714 | Letter from MRL to FDA re: NDA 21-042/S-007: VIOXX (rofecoxib) Draft Background Package for Arthritis Advisory Committee |
| A 164 | 12/21/2000 | MRK-00420033153 | MRK-00420033163 | Letter from MRL to FDA re: NDA 21-042/S-007: VIOXX (rofecoxib tablets) Response to FDA Request for Information |
| A 166 | 12/29/2000 | MRK-AAF0003185 | MRK-AAF0003186 | Fax from FDA to MRL |
| A 173 | 01/08/2001 | MRK-I8940064922 | MRK-I8940065038 | Letter from MRL to FDA re: IND 46,894: VIOXX (rofecoxib) Response to FDA Request for Information |
| A 174 | 1/8/01 | MRK-I8940064858 | MRK-I8940064921 | Letter from R. Silverman to J. Bull re: IND 46,894: VIOXX (rofecoxib) Information Amendment – Clinical |
| A 178 | 01/17/2001 | MRK-01420019520 | MRK-01420019527 | Letter from MRL to FDA re: NDA 21-042/S-007: VIOXX (rofecoxib) Request for Agency Meeting |
| A 179 | 01/19/2001 | MRK-AAF0003308 | MRK-AAF0003310 | Letter from MRL to FDA re: NDA 21-042/S-007: VIOXX (rofecoxib tablets) Response to FDA Request for Information |
| A 183 | 10/2/04 | MRK-AFS0024487 | MRK-AFS0024488 | Email from Scott Zeger to Peter Kim re: APPROVe and Voluntary Withdrawal |
| A 185 | 02/02/2001 | MRK-ABO0002821 | MRK-ABO0002824 | DDMAC Letter to McMillen |
| A 186 | 02/04/2001 | MRK-ACT0009918 | MRK-ACT0009918 | Email from Harry Guess forwarding Scolnick's re praise for upcoming advisory committee; includes email string from E. Scolnick to A. Nies, A. Reicin, H. Guess |
| A 187 | 02/08/2001 | MRK-H005655 | MRK-H005888 | FDA Advisory Committee Hearing, Transcript |
| A 188 | 02/08/2001 | MRK-ABR0000214 | MRK-ABR0000349 | Merck Slide Show Presentation to FDA Advisory Committee |
| A 189 | 02/08/2001 | MRK-PRL0000170 | MRK-PRL0000172 | Press Release |
| A 190 | 02/27/2001 | MRK-01420031188 | MRK-01420031231 | Letter from MRL to FDA re: NDA 21-042/S-007: VIOXX (rofecoxib tablets) General Correspondence - Request for Meeting |
| A 194 | 03/00/2001 | MRK-AAR0012290 | MRK-AAR0012309 | Selling Clinics Leader's Guide |
| A 195 | 03/01/2001 | MRK-AAR0028794 | MRK-AAR0028813 | Selling Clinics |
| A 196 | 03/02/2001 | MRK-ACD0003158; MRK-N0520006108 | MRK-ACD0003185; MRK-N0520006163 | Letter from MRL to FDA re: NDA 21-042/S-007: VIOXX (rofecoxib tablets) Amendment to Supplemental New Drug Application |
| A 198 | 03/08/2001 | MRK-AAF0003963 | MRK-AAF0003965 | Regulatory Liaison FDA Conversation Record |
| A 199 | 03/15/2001 | MRK-01420090753 | MRK-01420090758 | Letter from MRL to FDA re: NDA 21-042/S-007 VIOXX (rofecoxib tablets) Response to FDA Request for Information |
| A 203 | 03/30/2001 | MRK-014200094336 | MRK-014200098951 | Letter from MRL to FDA re: NDA 21-042/S-007 VIOXX (rofecoxib tablets) Response to FDA Request for Information (ADVANTAGE CSR) |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 205 | 04/02/2001 | MRK-AAF0003835 | MRK-AAF0003836 | Email from R. Silverman to S. Folkendt re: NDA 21-042/S-007: ADVANTAGE CSR |
| A 207 | 04/06/2001 | MRK-01420099056 | MRK-01420099059 | Letter from FDA to MRL re: NDA 21-042/S-007 NDA 21-052/S-004 |
| A 208 | 04/16/2001 | MRK-01420099071 | MRK-01420099109 | Letter from MRL to FDA re: NDA 21-042/S-007 VIOXX (rofecoxib tablets) Response to FDA Request for Information (ADVANTAGE CSR- Item 11) |
| A 209 | 04/30/2001 | MRK-AAF0003926 | MRK-AAF0003927 | Letter from MRL to FDA re: NDA 21-042/S-007 VIOXX (Rofecoxib tablets) Response to FDA Request for Information (ADVANTAGE CSR - Item 12) |
| A 228 | 07/05/2001 | MRK-AAF0004093 | MRK-AAF0004093 | Fax from FDA to MRL re: NDA21-042/s007 Advantage, FDA April 6, 2001 Approvable letter |
| A 230 | 07/12/2001 | MRK-01420145843 | MRK-01420154245 | Letter from MRL to FDA re: NDA 21-042/S-007 VIOXX (Rofecoxib Tablets) Response to FDA Request for Information (Safety Update Report) |
| A 231 | 07/30/2001 | MRK-01420159554 | MRK-01420159658 | Letter from MRL to FDA re: NDA 21-042/S-007 VIOXX (Rofecoxib Tablets) Response to FDA Request for Information (Safety Update Report No. 2) |
| A 232 | 08/03/2001 | MRK-01420159659 | MRK-01420159686 | Letter from MRL to FDA re: NDA 21-042/S-007 VIOXX (Rofecoxib Tablets) Response to FDA Request for Information (Safety Update Report No. 3) |
| A 233 | 08/08/2001 | MRK-AAF0004145 | MRK-AAF0004146 | Fax from FDA to MRL re: NDA 21-042 Clinical Information Request |
| A 236 | 10/01/2001 | MRK-AAF0007803 | MRK-AAF0007853 | Anstice/Merck response to FDA Warning Letter |
| A 240 | 10/08/2001 | MRK-AAB004788 | MRK-AAB004803 | Letter from MRL to FDA re: NDA 21-042/S-007: Vioxx (Rofecoxib Tablets) Response to FDA Request for Information |
| A 241 | 10/15/2001 | MRK-AAF0004389 | MRK-AAF0004410 | Email from Barbara Gould to Robert Silverman re: VIOXX Draft Label |
| A 242 | 11/05/2001 | MRK-ADM0022362 | MRK-ADM0022366 | Letter from MRL to FDA re NDA 21-042/S-007: Vioxx (Rofecoxib Tablets) Response to FDA Request for Information |
| A 244 | 11/07/2001 | MRK-AAD0111414 | MRK-AAD0111414 | Email from E. Scolnick to A. Reicin |
| A 245 | 11/07/2001 | MRK-ABH0020163 | MRK-ABH0020216 | Email from A. Reicin to E. Scolnick |
| A 257 | 01/21/2002 | MRK-02420000100 | MRK-02420000195 | Letter from MRL to FDA re: NDA 21-042/S-007: VIOXX (Rofecoxib Tablets) NDA 21-052/S-004: VIOXX (Rofecoxib Oral Suspension) General Correspondence (Rofecoxib and Cardiovascular Events) |
| A 268 | 03/12/2002 | http://www.fda.gov/ohrms/ dockets/ac/05/briefing/200 5-4090B1_10_K-FDA-Tab-F-2.pdf Public | http://www.fda.gov/ohrm s/dockets/ac/05/briefing/ 2005-4090B1_10_K-FDA-Tab-F-2.pdf Public | Memorandum from M.L. Villalba to L. Goldkind re: Cardiovascular data in Alzheimer's studies |
| A 270 | 03/25/2002 | | | Amicus Curiae Brief of the United States of America in Support of Defendants/Respondents SmithKline Beecham Consumer Healthcase LP, et al. in Dowhal v. SmithKline Beecham |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 272 | 04/01/2002 | MRK-LBL0000067 | MRK-LBL0000070 | PI 9183811 |
| A 273 | 04/01/2002 | MRK-LBL0000063 | MRK-LBL0000066 | PI 9183810 - Vioxx Label April 2002 |
| A 277 | 04/11/2002 | MRK-AAF0005922 | MRK-AAF0005942 | Fax from Barbara Gould to Ned Braunstein re: Approval Letter for NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014 and NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009 |
| A 278 | 04/11/2002 | MRK-AAR0021560 | MRK-AAR0021721 | Bulletin COX 02-027 |
| A 283 | 04/22/2002 | MRK-02420002709 | MRK-02420002719 | Letter from MRL to FDA re: NDA 21-042: VIOXX (Rofecoxib Tablets) Final Printed Labeling For Approved Supplemental NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014 |
| A 285 | 05/22/2002 | MRK-S0420000029 | MRK-S0420000074 | Letter from MRL to FDA re: NDA 21-042: VIOXX (Rofecoxib Tablets) General Correspondence (Updated Cardiovascular Pooled Analysis) |
| A 288 | 07/22/2002 | MRK-I2690005334 | MRK-I2690005969 | Letter from N. Braunstein to R. Katz re: IND 55,296: MK-0966 Information Amendment - Clinical Clinical Study Reports (CSRs) 091 and 126 |
| A 298 | 05/29/2003 | MRK-I8940076901 | MRK-I8940076922 | Letter from MRL to FDA re: IND 46,894: VIOXX (Rofecoxib) New Epidemiologic Studies on MI Risk with Rofecoxib |
| A 299 | 06/11/2003 | MRK-I8940077723 | MRK-I8940077883 | Protocol/Amendment 203-00 |
| A 303 | 07/25/2003 | MRK-I8940077717 | MRK-I8940077883 | Letter from N. Braunstein to L. Simon re: IND 46,894: VIOXX (Rofecoxib) Protocol Amendment - New Protocol |
| A 313 | 12/05/2003 | MRK-AAF0015091 | MRK-AAF0015096 | Merck Sumits sNDA for JRA |
| A 314 | 12/17/2003 | MRK-I2690007514 | MRK-I2690008935 | Letter from MRL to FDA re IND 55,269: Rofecoxib (MK-0966) Response to FDA Request for Information |
| A 316 | 02/01/2004 | MRK-LBL0000244 | MRK-LBL0000247 | PI 9556414 Vioxx (rofecoxih tablets and oral suggestion) description |
| A 317 | 03/01/2004 | MRK-LBL0000248 | MRK-LBL0000251 | PI 9556415 |
| A 318 | 03/01/2004 | MRK-LBL0000252 | MRK-LBL0000255 | PI 9556416 Package Circular |
| A 319 | 03/22/2004 | MRK-I8940080062 | MRK-I8940080133 | Letter from MRL to FDA re: IND 46,894: VIOXX Information Amendment - Clinical |
| A 321 | 03/26/2004 | MRK-AAF0015434 | MRK-AAF00153436 | Letter from FDA to Merck |
| A 322 | 03/30/2004 | MRK-N052018572 | MRK-N052018621 | Merck submits sNDA to support VIOXX label with final CV safety data from Alzheimer's studies. |
| A 324 | 08/19/2004 | MRK-AAF0017139 | MRK-AAF0017168 | Letter from FDA to MRL re: NDA 21-042 |
| A 327 | 09/30/2004 | MRK-AFF0000202 | MRK-AFF0000202 | FDA Press Release |
| A 329 | 09/30/2004 | MRK-AFF0000053 | MRK-AFF0000055 | Dear Healthcare Provider Letter re: Merck Announce Voluntary Worldwide Withdrawal of VIOXX |
| A 334 | 01/24/2005 | MRK-S0420050740 | MRK-S0420050920 | Letter from MRL to FDA re: NDA 21-042: VIOXX (Rofecoxib Tablets) Advisory Committee Background Package (Revised) |
| A 337 | 03/15/2005 | MRK-S0420051232 | MRK-S0420051330 | APPROVe Trial Cardiovascular Safety Report |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 338 | 04/06/2005 | http://www.fda.gov/cder/dr ug/infopage/COX2/NSAID decisionMemo.pdf | http://www.fda.gov/cder/d rug/infopage/COX2/NSAI DdecisionMemo.pdf | Memo from J. Jenkins and P. Seligman to NDA files 20-998, 21-156, 21-341, 21-042 re. Analysis and recommendations for Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk |
| A 340 | 06/15/2005 | http://www.fda.gov/cder/dr ug/infopage/cox2/default.h tm | http://www.fda.gov/cder/d rug/infopage/cox2/default .htm | Letter from the FDA to sponsors of all non-steroidal anti-inflammatory drugs (NSAID) attaching the over-the-counter non-selective NSAIDs labeling template |
| A 341 | 06/15/2005 | http://www.fda.gov/cder/dr ug/infopage/cox2/default.h tm. Then click on: Prescription NSAID Products (6/15/2005) -- Supplemental Request Letter --Labeling Template --Medication Guide [PDF] [HTML] | http://www.fda.gov/cder/d rug/infopage/cox2/default .htm. Then click on: Prescription NSAID Products (6/15/2005) -- Supplemental Request Letter --Labeling Template --Medication Guide [PDF] [HTML] | Letter from the FDA to sponsors of all non-steroidal anti-inflammatory drugs (NSAID) attaching the prescription non-selective NSAIDs labeling template |
| A 343 | 08/22/2005 | MRK-I8940096388 | MRK-I8940096445 | Merck, Letter from P. Huang to B. Rappaport re Information Amendment – Clinical, and attachment |
| A 345 | 00/00/0000 | MRK-ABCT0000316 | MRK-ABCT0000316 | 'Theory of Cox-2 Inhibitors' 1 page Slide |
| A 348 | 00/00/0000 | | | Report of the Expert Advisory Panel on the Safety of Cox-2 Selective Non-steroidal Anti-Inflammatory Drugs (NSAIDS) |
| A 351 | 07/10/1998 | MRK-AEH0009025 | MRK-AEH0009093 | Memo attaching executive summary minutes of VIOXX Project Team Meeting for 6/9/98 |
| A 352 | 01/04/2001 | MRK-AFX0019242 | MRK-AFX0019402 | Letter from MRL to FDA re: NDA 21-042 /S-007: VIOXX (rofecoxib) VIGOR Advisory Committee Background Package Available for Public Disclosure |
| A 353 | 02/08/2001 | | | Questions considered by Arthritis Advisory Committee - February 8, 2001 |
| A 354 | 04/20/1999 | FDA website | | Transcript of Arthritis Advisory Committee Meeting |
| A 355 | 10/30/2000 | OATES 001412 | OATES 001415 | Prostaglandins Consultants Meeting agenda and questions |
| A 356 | 04/20/2001 | | | Email re Follow up to meeting |
| A 357 | 06/20/2001 | TOP1PRO0000285 | TOP1PRO0000311 | Email re: COX-2 manuscript |
| A 358 | 01/02/2002 | | | Letter re: NDA 21-042 Vioxx (rofecoxib) tablets. |
| A 365 | 05/03/2001 | | | Email re COX-2 Inhibitors in ACS |
| A 366 | 05/03/2001 | TOP1PRO0000282 | TOP1PRO0000283 | Email re COX-2 Inhibitors in ACS |
| A 367 | 10/25/2004 | | | Email from Goormastic to Topol re: help on stats. |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 368 | 11/12/2004 | | | Email from Goormastic to Topol re: one other comparison. |
| A 374 | 10/22/1998 | MRK-ABC0006422 | MRK-ABC0006425 | Memo from Denis Riendeau to Don Nicholson and M. Gresser re: Dog Urinary Prostaglandin Study |
| A 375 | 11/23/1998 | MRK-OS420040635 | MRK-OS420041257 | Clinical Documentation (Section 8 from NDA) |
| A 376 | 3/31/99 | MRK-ABK0342879 | MRK-ABK0342948 | Atherosclerosis Consultants' Meeting |
| A 381 | 2006 | Public | Public | American Heart Association. *Heart Disease and Stroke Statistics- 2006 Update.* Dallas, TX: American Heart Association; 2006. |
| A 384 | 5/5/00 | MRK-AAF0017702 | MRK-AAF0017703 | Form 2253 Submission to FDA |
| A 386 | 1/4/2001 | MRK-AFX0019242 | MRK-AFX0019402 | Letter from MRL to FDA re: NDA 21-042 /S-007: VIOXX (rofecoxib) VIGOR Advisory Committee Background Package Available for Public Disclosure Without Redaction |
| A 387 | 1/5/01 | MRK-ABW0000167 | MRK-ABW0000180 | Merck Response to 12/12/00 DDMAC Letter |
| A 388 | 1/23/01 | MRK-ABG0000024 | MRK-ABG0000025 | Letter from R. Gilmartin to J. Fries |
| A 389 | 1/28/2001 | MRK-ABI0007291 | MRK-ABI0007292 | Emails re: Dr. Singh |
| A 392 | 2/16/01 | MRK-ABI0007169 | MRK-ABI0007169 | Letter from Anstice to Fries re: Two Derns |
| A 395 | 3/2001 | MRK-AAR0019769 | MRK-AAR0019772 | West Point Selling Clinics, March 2001 |
| A 396 | 3/22/01 | MRK-ABI0007187 | MRK-ABI0007187 | Letter from R. Gilmartin to J. Fries |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 397 | 4/30/2001 | MRK-SO420093243 | MRK-SO420098951 | Letter from MRL to FDA re: NDA 21-042/S-007 VIOXX (Rofecoxib Tablets) Response to FDA Request for Information (ADVANTAGE CSR -- Item 12) |
| A 402 | 10/1/01 | MRK-AAR0020233; MRK-ACI0012982 | MRK-AAR0020234; MRK ACI0012984 | Reminder Bulletins re: Appropriate Conduct as to Speakers and VIGOR |
| A 403 | 11/19/01 | MRK-ACI0013233 | MRK-ACI0013246 | Letter from Thomas Casola to Thomas Abrams (FDA) |
| A 405 | 1/2/2002 | MRK-ACI0013248 | MRK-ACI0013248 | Letter from FDA to Merck re: NDA 21-042 Vioxx Rofecoxib tablets / MACMIS ID number 9456 |
| A 406 | 1/2/02 | MRK-AAF0007894-MRK-AAF0007895 | MRK-AAF0007894-MRK-AAF0007895 | Letter from L. Governale to T. Casola re: NDA 21-042 Vioxx (rofecoxib) tablets MACMIS ID# 9456 |
| A 407 | 4/11/2002 | MRK-AAR0021509 | MRK-AAR0021559 | Bulletin COX 02-027 |
| A 411 | 5/28/2003 | MRK-AAA0087359 | MRK-AAA0087359 | COX-1 Is the Major Isoform of Cyclooxygenase Co-Localizing with Prostacyclin Synthase in Normal Dog Aortic Endothelium |
| A 412 | 3/30/04 | MRK-SO420043176 | MRK-SO420044148 | Merck submits sNDA to support VIOXX label with final CV safety data from Alzheimer's studies. |
| A 413 | 8/2004 | Public | Public | VIOXX Label - PI 9556417 |
| A 416 | 9/30/2004 | MRK-AFF0000053 | MRK-AFF0000055 | Dear Healthcare Provider Letter re: Merck Announce Voluntary Worldwide Withdrawal of VIOXX |
| A 417 | 9/30/2004 | MRK-AFF0000052 | MRK-AFF0000052 | Dear VIOXX Patient Letter re: Merck Voluntarily Withdraws VIOXX |
| A 418 | 9/30/2004 | www.fda.gov | www.fda.gov | FDA/Vioxx Questions & Answers |
| A 442 | | | | Braunstein Letter to Editor |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 471 | | | | Letter from Helene Silverstein to Andrew Rogoff dated July 6, 2001 |
| A 474 | | MRK-I8940096388; MRK-18940096446 | MRK-I8940096445; MRK-18940096730 | Merck Submission to FDA dated August 22, 2005 |
| A 478 | 5/18/2000 | MRK-AAD0019335-MRK-AAD0019384 | MRK-AAD0019335-MRK-AAD0019384 | Letter from Bombardier, et al., to Utiger at New England Journal of Medicine, with manuscript attached |
| A 489 | | Available at http://www.fda.gov/cder/drug/advisory/COX2.htm; "Analysis and Recommendations for Agency Action Regarding Non-Steroidal Anti-Inflammatory Drugs and Cardiovascular Events," John Jenkins and Paul Seligman, Internal FDA Memorandum, (Apr. 6, 2005), et al. | Available at http://www.fda.gov/cder/drug/advisory/COX2.htm; "Analysis and Recommendations for Agency Action Regarding Non-Steroidal Anti-Inflammatory Drugs and Cardiovascular Events," John Jenkins and Paul Seligman, Internal FDA Memorandum, (Apr. 6, 2005), et al. | FDA Public Health Advisory, "FDA Announces Important Changes and Additional Warnings for COX-2 Selective and Non-Selective Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)," April 7, 2005. |
| A 490 | | MRK-AD10010978 | MRK-AD10010978 | Email regarding Media coverage of Vioxx, including quotes from Garrett Fitzgerald in Barron's article |
| A 491 | | Public | Public | FDA "Prescription Non-Steroid Anti-Inflammatory Drugs (NSAIDs)" |
| A 492 | | http://www.fda.gov/cder/drug/infopage/cox2/COX2qa.htm | http://www.fda.gov/cder/drug/infopage/cox2/COX2qa.htm | FDA "Questions and Answers - FDA Regulatory Actions for the COX-2 Selective and Non-Selective Non-Steroidal Anti-inflammatory drugs (NSAIDs)" |
| A 493 | | http://www.fda.gov/bbs/topic/news/2005/NEW01171.html | http://www.fda.gov/bbs/topic/news/2005/NEW01171.html | FDA News "FDA Annouces Series of Changes to the Class of Marketed Non-Steroidal Anti-inflammatory Drugs (NSAIDs)" |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 503 | 3/12/02 | | | Memo from M. Villalba to L. Goldkind re: Cardiovascular data in Alzheimer's studies |
| A 504 | 12/18/04 | | | Interum Review of Update of Cardiovascular thrombitic events in Alzheimer's studies 078 and 091 |
| A 511 | | MRK-AFV0041128-MRK-AFV0041131 | MRK-AFV0041128-MRK-AFV0041131 | Telecon Minutes |
| A 512 | | MRK-NJ0315784-MRK | MRK-NJ0315838 | GI Clinical Outcome Study Draft Protocol |
| A 517 | 3/16/1999 | MRK-AEH0010263-MRK-AEH0010270 | MRK-AEH0010263-MRK-AEH0010270 | Email from Denis Riendeau to Elizabeth Wong dated march 13, 1999 regarding Rabbit aorta prostacyclin study |
| A 518 | | MRK-I8940047467-MRK-I40047629 | MRK-I8940047467-MRK-I40047629 | MRL submitss Protocol Amendment to Protocol 088 |
| A 524 | 1/24/2000 | MRK-AAB-0059566; MRK-AAB-0033543 | MRK-AAB-0059567; MRK-AAB-0033543 | Email chain from Capizzi to Reicin et al., "RE: Clean File: VIGOR adjudicated CV events analysis procedures" |
| A 540 | 4/27/2000 | MRK-AFH0069026 | MRK-AFH0069093 | WAES Report for Patient 1657 |
| A 541 | 5/15/2000 | MRK-AFH0067907 | MRK-AFH0067946 | WAES Report for Patient 1997 |
| A 542 | 5/15/2000 | MRK-AFH0067825 | MRK-AFH0067860 | WAES Report for Patient 3895 |
| A 543 | 5/15/2000 | MRK-AFH0067740 | MRK-AFH0067774 | WAES Report for Patient 2214 |
| A 544 | 5/22/2000 | MRK-AFH0073296 | MRK-AFH0073324 | WAES Report for Patient 7670 |
| A 548 | 6/30/2000 | MRK-AAB0009854 | MRK-AAB0009856 | Letter from Marshall Kaplan of New England Journal of Medicine to Claire Bombardier re: reviewers comments |
| A 550 | 7/17/2000 | MRK-ABS0361865-66; MRK-ABS0361902 | MRK-ABS0361865-66; MRK-ABS0361911 | Letter from Claire Bombardier to Marshall Kaplan attaching response to reviewers comments |
| A 552 | 8/15/2000 | MRK-AAD0017914 | MRK-AAD0017915 | Fax from Robert Steinbrook to Claire Bombardier re: revision request |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 553 | 8/22/2000 | MRK-AAD0019399 | MRK-AAD0019402 | Letter from Claire Bombardier to Robert Steinbrook attaching response to reviewer comments |
| A 555 | 8/30/2000 | MRK-AAD019447 | MRK-AAD019450 | Letter from Claire Bombardier to Robert Steinbrook re: additional changes to manuscript |
| A 564 | 2/1/2001 | TopolE.20051122.0044.001 | TopolE.20051122.0044.001 | Memorandum, From: S. Targum, To: S. Cook and M. Villalba Subject: Consultation NDA 21-042, S-007, Review of Cardiovascular Safety Database |
| A 568 | 4/20/2001 | MRK-ABA0009274 | MRK-ABA0009274 | Email re: Follow up to meeting |
| A 574 | 06/20/2001 | TOP1PRO0000285 | TOP1PRO0000311 | Email re: COX-2 manuscript |
| A 615 | 4/2/2005 | MRK-P0003303 | MRK-P0003312 | Letter from J. Yates to Healthcare Professionals re:  VIGOR Label |
| A 619 | 3/24/2000 | MRK-00420018274 | MRK-00420018279 | Memo to RIBL from D. Watson:  Plan for the Adjudication and Analysis of Cardiovascular events in VIGOR (MK-0966 Protocols 088/089) |
| A 622 | | MRK-HUM0003709-10; MRK-HUM0003677-95; MRK-HUM0003696-99; MRK-HUM0003700-07; MRK-HUM0003708; MRK-HUM00003975-76; MRK-HUM0003645-50; MRK-HUM0003651; MRK-HUM0003652-54; MRK-HUM0003655-70; MRK-HUM0003671-74 | MRK-HUM0003709-10; MRK-HUM0003677-95; MRK-HUM0003696-99; MRK-HUM0003700-07; MRK-HUM0003708; MRK-HUM00003975-76; MRK-HUM0003645-50; MRK-HUM0003651; MRK-HUM0003652-54; MRK-HUM0003655-70; MRK-HUM0003671-74 | PIRs received by Plaintiff Expert Nicholas DePace |
| A 623 | 3/15/1999 | MRK-AFV0341027 | MRKS-AFV0341210 | Review of Data from Original NDA in Support of Management of Pain and Dysmenorrhea Indications |
| A 624 | 4/6/1999 | Public | Public | Division of Gastrointestinal and Coagulation Drug Products Consult Review re: the Effect of Vioxx on Platelet Function |
| A 625 | 4/30/1999 | Public | Public | Review of Cardiovascular and Renal Safety Database |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 626 | 4/30/1999 | Public | Public | Executive Summary of Review of Cardiovascular Safety Database [Part of 2005 ACM Briefing Information] |
| A 627 | 5/5/1999 | Public | Public | Division of Gastrointestinal and Coagulation Drug Products Consult Review re: GI Safety in Protocols 041, 044, 045, 050, 069 |
| A 628 | 5/20/1999 | MRK-PUBLIC0000156-MRK-PUBLIC0000283;MRK-ADI0005375-MRKS-ADI0005502 | MRK-PUBLIC0000156-MRK-PUBLIC0000283;MRK-ADI0005375-MRKS-ADI0005502 | Primary Review of OA Efficacy and Safety |
| A 629 | 5/20/1999 | Public | Public | Excerpts of Primary Review of OA Efficacy and Safety [Part of 2005 ACM Briefing Information] |
| A 630 | 2/1/2001 | Public | Public | Review of Cardiovascular and Renal Safety Database |
| A 631 | 2/3/2001 | Public | Public | Review of Drug Effects on Renal Safety |
| A 632 | 2/8/2001 | Public | Public | FDA Advisory Committee Briefing Documents |
| A 633 | 4/3/2001 | MRK-PUBLIC0000284 | MRK-PUBLIC0000340 | Review of Vioxx Gastrointestinal Outcomes Research Study (VIGOR) |
| A 634 | 4/3/2001 | Public | Public | Review of Vioxx GI Safety |
| A 635 | 4/3/2001 | Public | Public | Executive Summary of Review of Cardiovascular Safety Database [Part of 2005 ACM Briefing Information] |
| A 636 | 9/28/2001 | Public | Public | Consultative Review and Evaluation of Clinical Data from ADVANTAGE |
| A 637 | 12/10/2001 | MRK-PUBLIC0000351-MRK-PUBLIC0000413; MRK-AFV0444039-MRK-AFV04444094 | MRK-PUBLIC0000351-MRK-PUBLIC0000413; MRK-AFV0444039-MRK-AFV04444094 | Review of Complete Response to Approvable Letter from 21-042/S 007 and 21-052/S 004 |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 638 | 12/21/2001 | MRK-PUBLIC0000414 | MRK-PUBLIC0000547 | Review of Data in Support of RA Indication |
| A 639 | 5/28/2004 | Public | Public | Review of Data in Support of RA Indication |
| A 640 | 2/9/2005 | MRK-ACM0007659-MRK-ACM0007664;MRK-AFK0174529-MRKS-AFK0174534 | MRK-ACM0007659-MRK-ACM0007664;MRK-AFK0174529-MRKS-AFK0174534 | Preliminary Review of APPROVe Data - Background Package for February, 2005 AC meeting |
| A 641 | 2/9/2005 | Public | Public | Addendum to Food and Drug Administration Background Information for February 2005 AC meeting |
| A 642 | | http://www.merckhelps.com/uninsured/ | http://www.merckhelps.com/uninsured/ | Patient Assistance Program - Uninsured |
| A 643 | | http://www.merckhelps.com/patientassistance/ | http://www.merckhelps.com/patientassistance/ | Patient Assistance Program |
| A 644 | | MRK-AAI0000236 | MRK-AAI0000237 | Patient Assistance Program - River Blindness |
| A 645 | 12/29/2000 | MRK-00420033164 | MRK-00420022165 | FDA Request for Information - FDA Requests a Meta-Analysis of Anti-Platelet Trialist's Collaboration (APTC) endpoints |
| A 646 | 1/18/2001 | MRK-I890064858 | MRK-I890064921 | Information Amendment - Clinical MRL submits interim cardiovascular meta-analysis including CV data from ADVANTAGE. |
| A 647 | 2/16/2001 | MRK-01420030380 | MRK-01420030383 | MRL Response to FDA Request for Information MRL responds to 02/14/01 FDA request for information. 2. MRL still in the process of completing the CSR for ADVANTAGE and expects to submit the complete report within six to eight weeks. "Efforts are being made to further expedite the completion of this report." |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 648 | 3/30/2001 | MRK-AAF0003830 | MRK-AAF0003830 | FDA Request for Information FDA requests Items 11 and 12 for ADVANTAGE study. |
| A 649 | 4/16/2001 | MRK-01420099072- MRK-01420099182 | MRK-01420099072- MRK-01420099182 | MRL Response to FDA Request for Information MRL responds to 02/28/01 FDA request for information. MRL provides Item 11 of the ADVANTAGE study and resubmits full CSR. |
| A 650 | 4/30/2001 | MRK-01420118923- MRK-01420118925 | MRK-01420118923- MRK-01420118925 | MRL Response to FDA Request for Information MRL responds to 02/28/01 FDA request for information. MRL provides Item 12 of the ADVANTAGE study. |
| A 651 | | MRK-00420008018-MRK-00420008135; MRK-00420018004-MRK-00420019130 | MRK-00420008018-MRK-00420008135; MRK-00420018004-MRK-00420019130 | Letter to FDA regarding Supplemental New Drug Application - VIOXX Gastrointestinal Outcome Research Study (VIGOR) |
| A 652 | 6/1/02 | MRK-AKT2663283 | MRK-AKT2663284 | PIRs received by Plaintiff Expert Arnold Criscitiello |
| A 653 | 6/21/01 | MRK-AKT1230490 | MRK-AKT1230493 | PIRs received by Plaintiff Expert David Egilman |
| A 654 | 9/6/01 | MRK-AKT2102663 | MRK-AKT2102666 | PIRs received by Plaintiff Expert David Egilman |
| A 655 | 8/17/05 | MRK-ALX0000748 | MRK-ALX0000957 | Final Adjudication Package from August 17, 2005 for Protocol 145 |
| A 656 | 11/30/05 | MRK-ALX0000958 | MRK-ALX0001102 | Final Adjudication Package from November 30, 2005 for Protocol 145 |
| A 657 | 9/18/00 | MRK-AAF0008341 | MRK-AAF0008341 | Form 2253 Submission to FDA |
| A 658 | 12/4/00 | MRK-AAF0008371 | MRK-AAF000371 | Form 2253 Submission to FDA |
| A 659 | 4/15/02 | MRK-ABI0007136 | MRK-ABI0007137 | Email exchange between Adam Schechter and Ed Scolnick |
| A 660 | 1/24/00 | MRK-GUE013602 | MRK-GUE013602 | Letter from M. Weinblatt to A. Reicin, January 24, 2000 |
| A 661 | 2/7/00 | MRK-NJ0243645 | MRK-NJ0243646 | Letter from A. Reicin to M. Weinblatt, February 7, 2000 |
| A 662 | 7/5/00 | MRK-NJ0272446 | MRK-NJ0272458 | Memorandum from D. Shapiro to A. Reicin et al, July 5, 2000 |
| A 663 | 1/13/06 | MRK-MPF0010902 | MRK-MPF0010924 | Sample Distribution Chart |
| A 664 | | MRK-MPF0009007 | MRK-MPF0009008 | Healthcare Provider Letter for Dr. John Braun |
| A 665 | | MRK-MPF0010882 | MRK-MPF0010883 | Healthcare Provider Letter for Dr. Robert Bachman |
| A 666 | | MRK-MPF0010884 | MRK-MPF0010885 | Healthcare Provider Letter for Dr. Nahum Balotin |
| A 667 | | MRK-MPF0010886 | MRK-MPF0010887 | Healthcare Provider Letter for Dr. Daniel DePrince |
| A 668 | | MRK-MPF0010888 | MRK-MPF0010889 | Healthcare Provider Letter for Dr. Tina Josephson |
| A 669 | | MRK-P0002740 | MRK-P0002744 | Dear Healthcare Provider Letter dated August 2001 |
| A 670 | | MRK-P0003302 | MRK-P0003312 | Dear Healthcare Provider Letter dated April 2002 |
| A 671 | | MRK-P0002475 | MRK-P0002481 | Dear Doctor Letter |
| A 672 | | MRK-P0011253 | MRK-P0011259 | Dear Healthcare Professional Letter dated September 30, 2004 |

| EXHIBIT NO | DATE | FIRST BATES | LAST BATES | DESCRIPTION |
|---|---|---|---|---|
| A 673 | 5/19/1999 | MRK-ADI0005375 | MRK-ADI0005375 | FDA Medical Officer NDA Review of Vioxx |
| A 674 | 1/8/2001 | MRK-NJ0267715 | MRK-NJ0267777 | (rofecoxib) |
| A 675 | 7/6/2001 | MRK-01420145856 | MRK-01420145961 | Safety Update Report for Vioxx |
| A 676 | 11/26/2003 | MRK-I2690007833 | MRK-I2690008224 | Clinical Study Report for Protocol 078 |
| A 677 | 7/21/2001 | MRK-AFV0341732 | MRK-AFV0341794 | Approvable Letter |
| A 678 | 6/13/2002 | MRK-I2690005738 | MRK-I2690005969 | Clinical Study Report for Protocol 126 |
| A 679 | 6/4/2002 | MRK-I8940073691 | MRK-I8940074090 | MRL Clinical Study Report for Protocol 091 |
| A 680 | 3/21/2000 | MRK-AAR0009030 | MRK-AAR0003031 | Memo to Field Personnel from M. Carroll |
| A 681 | 5/22/2002 | MRK-ADG0059609 | MRK-ADG0059610 | Email to M. Krahe from T. Cannell |
| A 682 | 2/7/2002 | MRK-ADW0042083 | MRK-ADW0042083 | Email from R. Griffing to A. Schechter, et al. |
| A 683 | 2/2/2001 | MRK-ABI0007291 | MRK-ABI0007293 | Email from M. Carroll to D. Anstice |
| A 684 | 9/27/2001 | MRK-ABW0011834 | MRK-ABW0011836 | Email from D. Anstice to R. Gilmartin |
| A 685 | 10/13/2004 | MRK-ABX0052072 | MRK-ABX0052094 | Remarks from Peter Kim |
| A 686 | 9/30/2004 | MRK-ABX0052601 | MRK-ABX0052602 | Email from D. Davis to Jim Dunn |
| A 687 | 10/25/2002 | MRK-PRL0000294 | MRK-PRL0000298 | Merck Press Release |
| A 688 | 4/23/2002 | MRK-PRL0000262 | MRK-PRL0000267 | Merck Press Release |
| A 689 | 5/15/2002 | MRK-ADO0117471 | MRK-ADO0117476 | Email from D. Pakula to P. Abaza, et al. |
| A 690 | 4/12/2002 | MRK-AAC010038 | MRK-AAC010038 | Email from A. Schechter to P. Kim, et al. |
| A 691 | 4/11/2002 | MRK-PRL0000246 | MRK-PRL0000250 | Merck News Release |
| A 692 | 4/11/2002 | MRK-ADW0086174 | MRK-ADW0086177 | Vioxx "Label Change" |
| A 693 | 4/11/2002 | MRK-ADS0000216 | MRK-ADS0000233 | Vioxx Label Change - Question and Answers |
| A 694 | 4/11/2002 | MRK-ADK0007515 | MRK-ADK0007516 | Bulletin for Vioxx |
| A 695 | 4/12/2002 | MRK-ADK0007536 | MRK-ADK0007538 | Bulletin for Vioxx |
| A 696 | 4/12/2002 | MRK-ADK0007534 | MRK-ADK0007535 | Bulletin for Vioxx |
| A 697 | 4/12/2002 | MRK-ABX0025040 | MRK-ABX0025040 | Email from S. Iwicki to A. Schechter |
| A 698 | 4/12/2002 | MRK-AAF0008482 | MRK-AAF0008482 | 2253 Form |
| A 699 | 4/17/2002 | MRK-AAF0008483 | MRK-AAF0008483 | 2253 Form |
| A 700 | 4/12/2002 | MRK-AAF0008148 | MRK-AAF0008149 | Clean Running Text Script |
| A 701 | 12/20/1999 | MRK-AAX0002759 | MRK-AAX0002759 | Letter from M. Weinblatt to Alise Reicin |
| A 702 | 4/11/2002 | MRK-ADK0007532 | MRK-ADK0007533 | Bulletin for Vioxx |
| A 703 | 4/11/2002 | MRK-ADK0007522 | MRK-ADK0007525 | Bulletin for Vioxx |
| A 704 | 4/11/2002 | MRK-ADG0008202 | MRK-ADK0008203 | Email from R. Griffing to J. Dunn |
| A 706 | 12/15/2005 | Public | Public | An Open Letter from Merck |
| A 707 | | | | News articles from New Jersey relating to Vioxx |
| A 708 | | | | News articles from New Jersey relating to VIGOR |
| A 709 | 5/24/2000 | MRK-PRL0000124 | MRK-PRL0000127 | Press Release |
| A 710 | 12/10/2002 | MRK-PRL0000302 | MRK-PRL0000307 | Press Release |
| A 711 | | MRK-P0003315 | MRK-P0003337 | Annotated Prescribing Information |
| A 712 | | MRK-P0003338 | MRK-P0003357 | Detail pieces with CV VIGOR results |