# EXHIBIT D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX Products Liability Litigation | * | MDL No. 1657 |
| This Document Relates to: | * | SECTION L |
| State of Utah | * | JUDGE ELDON E. FALLON |
| v. | * | MAGISTRATE JUDGE KNOWLES |
| Merck Sharp & Dohme Corp. | * | |
| Civil Action No. 2:06-cv-09336 | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S NOTICE OF FILING CORRECTIONS TO EXPERT REPORT**

Comes now the State of Utah and hereby submits corrections to the expert report of Dr. David Egilman, attached hereto as Exhibit 1.

DATED this 11th day of November, 2013.

/S/
Joseph W. Steele
Kenneth D. Lougee
STEELE & BIGGS
5664 South Green Street
Salt Lake City, UT 84123


/S/
Eric H. Weinberg
The Law Offices of Eric H. Weinberg
149 Livingston Avenue
New Brunswick, NJ 08901

1

/S/
Richard W. Schulte (Ohio Bar No. 0066031)
812 E. National Road, Suite A
Vandalia, Ohio 45377
(937) 435-7500

*Attorneys for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing PLAINTIFF'S NOTICE OF FILING CORRECTIONS TO EXPERT EGILMAN'S REPORT has been served on Liaison Counsel, Russ Herman, Phillip Wittmann and Ann Oldfather, by U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(C) on this 11th day of October, 2013.

/S/
Joseph W. Steele
Kenneth D. Lougee
STEELE & BIGGS
5664 South Green Street
Salt Lake City, UT 84123

2

**EXHIBIT 1**



David Egilman, M.D., M.P.H.
8 North Main Street, Suite 404
Attleboro, Massachusetts 02703
Phone 508-226-5091 Fax 425-699-7033

November 6, 2013

Dr. David Egilman

Corrections to Report dated July 17, 2013

1. My name is Dr. David Egilman. I am a medical doctor and Clinical **Professor** of Family Medicine at Brown University's Warren Alpert School of Medicine. I am board certified in Internal Medicine and Preventive-Occupational Medicine. My curriculum vita sets forth more fully my qualifications. I provide the following corrections to my Expert Report.

2. Paragraph 5 of my Expert Report should read: I am a board member of Citizens for Responsible Care in Research, 1997-**2011**. This non-governmental organization deals with the ethical conduct of drug companies with respect to warnings and marketing. **I am and have been a board member of Alliance for Human Research Protection, 2011-Present.**

3. Paragraph 26 of my Expert Report change venerable to **vulnerable.**

4. Paragraph 52 of my Expert Report change Dr. Hirsch to **Dr. Watson.**

5. Paragraph 64 of my Expert Report add the word **adverse** between potential and health effect.

6. Paragraph 67 add these two sentences to the end of the paragraph, "**In general, although I would not use MERCK's strong language I agree with the sense of MERCK's evaluation of the competence of the FDA. The FDA was not up to the task of dealing with MERCK in a way that protected public health. In addition FDA policies that permitted Dr. Honig to continue to supervise FDA decisions on Merck drugs while he was negotiating an employment contract with MERCK gives the impression that the review process was tainted.**"

7.  Paragraph 73 ad the entire quote from the draft "Overall mortality, as well as deaths due to GI events and cardiovascular causes were comparable in the 2 treatment groups. A significantly lower incidence of myocardial infarction was noted with naproxen as compared to rofecoxib: 0.1% vs. 0.4%. This absolute (I'm unconvinced that there are differences in relative risk) difference, as one might expect, was primarily accounted for by the 4% of the study population with the highest risk of an MI ie a past history of MI, unstable, angina, stroke, TIA, angioplasty or CABG (in whom low-dose aspirin is indicated according to the U.S. product circular for aspirin). The difference in myocardial infarctions was much less pronounced and not significant (give me a break one barely has enough power (with just 21 events) to detect an overall difference with events so you probably have high 'power' to see a nonsignificant result in the low risk group when you break up the overall results into a high risk and low risk between rofecoxib and naproxen in the 96% of the population without indications for aspirin as secondary prophylaxis."

8.  Paragraph 80 change the first two sentences: Study 078 reached a statistically significant **increase** by 1999 **for patients in the Vioxx arm** on the primary endpoint, clinically diagnosed Alzheimer's Disease (Analysis of SAS Data by Dr. David Madigan).

9.  Paragraph 92 add this sentence to the end of the paragraph. The study should have been stopped **after Vioxx arm patients had a doubling of the all-cause mortality rate, which was statistically significant by August 24, 2000.**

10. Paragraph 101 end the last sentence with "**failed to show any beneficial treatment effect.**"

11. Paragraph 132 of my Expert Report should read: **The event should have been listed as a "sudden death" as per the initial investigator submission and it should (and of course was adjudicated by Dr. Barr not the "official adjudication procedure) because it was a death and by 2000 Merck had decided that all deaths should be adjudicated. Reclassification to cardiac disorder (although this is really indistinguishable from "cardiovascular disorder" an SAE adjudicatable term) allowed Merck to misallocate this case. Had this not occurred the total combined number of MI/sudden deaths 8 in the Vioxx group (5 MI and 3 sudden deaths) compared to 1 (MI) in the naproxen group, a statistically significant result. Merck used Dr. Barr's altered unblinded re-adjudication of case 5005 in its internal secret MI analysis. Merck also used other Barr generated "adjudications" in its internal analysis and I believe that some of these ended up in Merck's series of published meta-analyses.**

12. Paragraph 149 add **(See paragraph 133)** after the word false.

13. Paragraph 166 add to the end of the paragraph, "**MERCK actively tried to avoid compensating patients who suffered adverse drug reactions. Based on the data that I have reviewed MERCK never informed any research subject (or relative in case of**

death) that he or she suffered an adverse event. Thus as far as I am aware only one patient ever filed a claim for reimbursement."

14. **LABEL**

    The label provided incorrect information on the number of patients who experienced MIs and CHF in the original OA NDA studies.

    In the listing of events that occur between 0.1% and 1.9% in the OA Studies, the following are listed:

    *Cardiovascular System: angina* pectoris, atrial fibrillation, bradycardia, hematoma, irregular heartbeat; palpitation, premature ventricular, contraction, tachycardia, venous insufficiency.

    In the listing of events that occur <0.1% the following are listed:

    Cardiovascular:

    cerebrovascular accident, congestive heart failure, deep venous thrombosis, myocardial infarction, pulmonary edema, pulmonary embolism, transient ischemic attack, unstable angina

    This was false and misleading. Several events in the cardiovascular section reported as occurring <0.1% actually occurred >0.1%.

    Am J Cardiol. 2002 Jan 15;89(2):204-9.Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs (ibuprofen, diclofenac, and nabumetone). Reicin AS, Shapiro D, Sperling RS, Barr E, Yu Q.

| TABLE 3 Rofecoxib Versus Placebo* (summary of investigator-reported cardiovascular thrombotic events) | | |
|---|---|---|
| End-point Term | Rofecoxib (n = 2,253) | Placebo (n = 711) |
| Total patients with end-point term | 14 (0.62%) | 4 (0.56%) |
| Cardiac events | 0.31% | 0.42% |
|   Coronary artery disease | 0.09% | 0.00% |
|   Myocardial infarction | 0.13% | 0.28% |
|   Unstable angina | 0.09% | 0.14% |
| Cerebrovascular events | 0.27% | 0.14% |
|   Cerebrovascular accident | 0.18% | 0.14% |
|   Transient ischemic attack | 0.09% | 0.00% |
| Other events | 0.04% | 0.00% |
|   Deep venous thrombosis | 0.04% | 0.00% |

*Includes only studies with a placebo.
Note: Patients may be counted in >1 row, but are only counted once within a row.

| TABLE 2 Rofecoxib Versus Nonselective NSAIDs (summary of investigator-reported cardiovascular thrombotic events) | | |
|---|---|---|
| End-point Term | Rofecoxib (n = 3,357) | Nonselective NSAIDS (n = 1,564) |
| Total patients with end-point term | 32 (0.95%) | 16 (1.02%) |
| Cardiac events | 0.54% | 0.77% |
|   Angina pectoris | 0.06% | 0.26% |
|   Coronary artery disease | 0.12% | 0.13% |
|   Coronary vasospasm | 0.03% | 0.00% |
|   Myocardial infarction | 0.27% | 0.26% |
|   Sudden cardiac death | 0.00% | 0.13% |
|   Unstable angina | 0.06% | 0.00% |
| Cerebrovascular events | 0.27% | 0.19% |
|   Cerebrovascular accident | 0.18% | 0.19% |
|   Transient ischemic attack | 0.09% | 0.00% |
| Other events | 0.15% | 0.06% |
|   Arterial occlusion | 0.03% | 0.00% |
|   Deep venous thrombosis | 0.12% | 0.00% |
|   Vascular insufficiency | 0.00% | 0.06% |

This information remained in the label the entire time the drug was on the market despite the fact that Merck personnel knew this was in error and misleading. MRK-ABD0001986-7. In fact Merck personnel discussed how they could use this part of the label to mislead the public about the MI rates in the Vigor trial. (MRK-ABD-00001986-87)

15. UTAH PHARMACISTS' LETTER

Merck communicated directly with Utah Medicaid through a letter to the Utah Medicaid Pharmacists. That letter presented false and misleading evidence down playing the cardiovascular risks through the omission of data and analysis. (MRK-AKT2667937)

For example:
 i. It omitted Advantage CV risk information and Dr. Hirsch correct analysis that indicated that he Advantage study "negated" the naproxen theory.
 ii. It failed to provide 078 data that indicated an increased AD CV/T and overall death rates related to Vioxx use.
 iii. It provided outdated data non-ITT from the AD trial on CV/T deaths.
 iv. It omitted data from study 136.
 v. It omitted data on side effects from the Vigor trial.
 vi. It omitted data from the Shapiro MI only meta-analysis from 2000.

Signed,

*[signature: David Egilman MD, MPH]*

_____
David S. Egilman, MD MPH