# EXHIBIT E

**Table 1. Paragraphs of Dr. Egilman's Expert Report Supported by Documents Merck Concedes Are Not Protected In MDL**

| Par of Original Expert Report | Documents Referenced | Case and Source for Claim of Non-Confidentiality[1] |
|---|---|---|
| 16 | None | N/A |
| 17 | None | N/A |
| 18 | None | N/A |
| 19 | None | N/A |
| 20 | None | N/A |
| 21 | None | N/A |
| 22 | None | N/A |
| 23 | None | N/A |
| 24 | None | N/A |
| 25 | None | N/A |
| 26 | None | N/A |
| 27 | MRK-ABC0048699 | MDL -- 10/29/13 at 24 |
| 27 | MRK-AKU0083901 at 4223-4226 | MDL – 3/13/14 at 45 |
| 28 | MRK-ABC0009946 | MDL – 10/29/13 at 15 |
| 29 | MRK-ABC0048699 | MDL – 10/29/13 at 15 |
| 30 | MRK-NJ0051533 | NJ – 10/29/13 at 44 |
| 31 | MRK-ABC0002150 | MDL – 10/29/13 at 15 |
| 31 | MRK-NJ0152620 | NJ – 10/29/13 at 45 |
| 33 | MRK-AAX0002413-20 | MDL – 4/3/14 at 23 |
| 34 | MRK-ABC0009946 | MDL – 10/29/13 at 15 |
| 35 | MRK-ABC0009946 | MDL – 10/29/13 at 15 |
| 38 | MRK-ABC0000069 | MDL – 4/3/14 at 24 |
| 40 | MRK-AEIO002734 | MDL - 3/13/14 at 35 |
| 41 | MRK-ABHOOI4002 | MDL: - 10/29/13 at 16 |
| 42 | MRK-ABC0002199 | MDL - 4/3/14 at n24 |
| 42 | MRK-ABK0311068 | MDL - 4/3/14 at 27 |
| 49 | MRK-ADJ0035003-8 | MDL – 4/3/14 at 34 |
| 49 | MRK-NJ0170152-274 | NJ – 3/13/14 at 59 |
| 49 | MRK-NJ0220388-454 | NJ – 3/13/14 at 60 |
| 56 | MRK-ABH0016219 | MDL - 3/13/14 at 26 |
| 57 | MRK-ABS0212130 | MDL - 3/13/14 at 28 |
| 58 | MRK-ABT0013920 | MDL - 3/13/14 at 28 |
| 59 | MRK-ABD0001756 | MDL -- 10/29/13 at 16 |
| 59 | MRK-ABD0001986 | MDL -- 10/29/13 at 16 |
| 62 | MRK-ABIO002226 | MDL -- 3/13/14 at 26 |
| 63 | MRK-ABIO001969 | MDL -- 3/13/14 at 26 |

---

[1] All references are to Merck's Responses to Dr. Egilman's Requests for De-Designation, Found in Exhibit A to Reinert Declaration.

1

| Par of Original Expert Report | Documents Referenced | Case and Source for Claim of Non-Confidentiality[1] |
|---|---|---|
| 66 | Honig Exhibit 2 Curriculum Vitae MRK-ACM0010245 to 10251 | MDL - 3/13/14 at 31 |
| 67 | MRK-ABH0015578 | MDL - 10/29/13 at 16 |
| 67 | MRK-ABW0004799 | MDL - 4/9/14 at 3 |
| 67 | MRK-ACR0009151 | MDL - 10/29/13 at 22 |
| 67 | MRK-ACR0009287 | MDL -- 3/13/14 at 32 |
| 67 | MRK-ACT0018064 | MDL -- 4/3/14 at 32 |
| 67 | MRK-GUE0008582 | Guerra - 3/13/14 at 54 |
| 67 | MRK-NJ0443267 | NJ – 3/13/14 at 60 |
| 68 | 2001 Long Range Operating Plan, MRK ABIO008659-8683 | MDL -- 3/13/14 at 27 |
| 71 | MRK-AACOI28698 | MDL – 3/13/14 at 19 |
| 75 | MRK-ACROOI4272 | MDL - 3/13/14 at 32 |
| 75 | MRK-NJ0333224 | NJ – 3/13/14 at 60 |
| 76 | MRK-ACROOI4502 | MDL - 3/13/14 at 32 |
| 76 | MRK-NJ0333225 | NJ – 3/13/14 at 60 |
| 76 | MRlK-NJ0333224 | NJ – 3/13/14 at 60 |
| 77 | MRK-ACROOI4502 | MDL - 3/13/14 at 32 |
| 77 | MRK-NJ0155799 | NJ – 3/13/14 at 59 |
| 78 | MRK-AAX0000752 | MDL - 3/13/14 at 23 |
| 80 | Aisen et als Current Alzheimer Research, 2008, 5, 73-82 | Published Paper |
| 80 | Email Assaid MRK-AHD0055888 | MDL - 3/13/14 at 42 |
| 80 | MRK-AHD0055888 at 6019-6020 | MDL - 3/13/14 at 42 |
| 80 | Thal et als Neuropsychopharmacology (2005), 1-12 | Published Paper |
| 81 | O'Banion, Exp.Opin.Invest.Drugs 1999 8(10) 1521 at 1530, and references cited therein | Published Paper |
| 84 | CFR 314.32; CFR 314.56 | Federal Regulation |
| 87 | MRK-APE0022197 | MDL - 3/13/14 at 51 |
| 88 | MRK-AFT0005926 | MDL - 3/13/14 at 39 |
| 91 | Reines Exhibit 23 MRK-AQIO008457 | MDL - 3/13/14 at 51 |
| 92 | Reines Exhibit 24 emails February 2001, MRK-ACROO14270 | MDL - 4/3/14 at 32 |
| 93 | MRK-01420145856 | MDL - 3/13/14 at 13 |
| 95 | MRK-AOJ0005856 | MDL - 3/13/14 at 49 |
| 96 | Exhibit 21 - MRK-ABPOOI8562-741 | MDL - 3/13/14 at 28 |
| 96 | MRK-AOJ0005856 | MDL - 3/13/14 at 49 |

| Par of Original Expert Report | Documents Referenced | Case and Source for Claim of Non-Confidentiality[1] |
|---|---|---|
| 97 | MRK-I8940079159 | MDL - 3/13/14 at 56 |
| 99 | Reines Exhibit 3 Statistical Data Analysis Plan dated November 25,2002 MRKAFV0043960 | MDL - 3/13/14 at 39 |
| 99 | Reines Exhibit 4 Letter MERCK to FDA dated January 7, 2003 MRK-AFV0043956 | MDL - 3/13/14 at 39 |
| 100 | Assaid Exhibit 2 MRK-ARP0137370 | MDL - 3/13/14 at 52 |
| 101 | Assaid 2 | |
| 102 | MRK-12220004818 | MDL - 3/13/14 at 54 |
| 104 | Assaid Exhibit 17, Email February 1 2005 MRK-ARP0105927 | MDL - 3/13/14 at 52 |
| 104 | Email Assaid MRK-AHD0055888 | MDL - 3/13/14 at 42 |
| 104 | MRK-AHD0022761 | MDL - 3/13/14 at 42 |
| 104 | MRK-AHD0055888 at 6019-6020 | MDL - 3/13/14 at 42 |
| 108 | Assaid Exhibit 3 emails February 2004 MRK-AAD0384813 | MDL - 3/13/14 at 21 |
| 108 | MERCK letter to FDA MRK-AAF0015398 | MDL - 3/13/14 at 22 |
| 109 | Lines Exhibit 18 - MRK-AHD0069267-270 | MDL - 3/13/14 at 42 |
| 109 | Lines Exhibit 19 - MRK-AHD0069241-242 | MDL - 3/13/14 at 42 |
| 109 | Lines Exhibit 20 - MRK-AHD0069615-617 | MDL - 3/13/14 at 42 |
| 112 | MRK-AF00276159 at 64 | MDL -- 3/13/14 at 38 |
| 112 | Quan Exhibit 51 MRK-AG00074482 | MDL – 3/13/14 at 41 |
| 112 | Quan Exhibit 52 MRK-AG00074485 | MDL – 3/13/14 at 41 |
| 112 | Quan Memo October 7 2004 MRK-AF00280964 | MDL – 3/13/14 at 38 |
| 117 | MRK-AF00289839 | MDL -- 3/13/14 at 38 |
| 118 | MRK-ADIO017766 | MDL -- 3/13/14 at 33 |
| 118 | MRK-AFB0001598 | Boyd -- 3/13/14 at 35 |
| 119 | MRK-AGVOO03296 | MDL -- 3/13/14 at 41 |
| 120 | MRK-NJ0221292 | NJ – 3/13/14 at 60 |
| 122 | MRK-AAEOO02414 | MDL – 3/13/14 at 21 |
| 123 | MRK-NJ0221292 | NJ – 3/13/14 at 60 |
| 124 | MRK-PUBLICOOO0351 | MDL – 3/13/14 at 64 |
| 125 | MRK-AAFOO04126 | MDL – 3/13/14 at 21 |
| 130 | MRK-AAEOO02414 | MDL – 3/13/14 at 21 |
| 130 | MRK-AOZOOO0997 | MDL -- 3/13/14 at 50 |

| Par of Original Expert Report | Documents Referenced | Case and Source for Claim of Non-Confidentiality[1] |
|---|---|---|
| 131 | MRK-ACV0021094<br>MRK-ACV0020976<br>MRKACV0021014 | MDL -- 3/13/14 at 32 |
| 131 | MRK-ACV0020976 | MDL -- 3/13/14 at 32 |
| 131 | MRK-ACV0021014 | MDL -- 3/13/14 at 32 |
| 133 | MRK-ADIO009109 | MDL -- 3/13/14 at 33 |
| 136 | MRK-NJ0214478 | NJ – 3/13/14 at 60 |
| 137 | Ford Hutchinson Exhibit 23, emails October 1,2004, MRK-AAD0356476 | MDL - 3/13/14 at 21 |
| 138 | MRK-ABHOO13917 | MDL – 3/13/14 at 25 |
| 140 | MRK-NJ0363443-5 | NJ – 3/13/14 at 60 |
| 141 | MRK-NJ0363443 | NJ – 3/13/14 at 60 |
| 142 | MRK-GUEOO17779 | Guerra - 3/13/14 at 54 |
| 143 | MRK-NJ0201983 | NJ – 3/13/14 at 59 |
| 147 | MRK-AAOOOOO073 | MDL – 3/13/14 at 22 |
| 147 | MRK-AAOOOOOl19 | MDL – 3/13/14 at 23 |
| 148 | MRK- AHE0061931 | MDL - 3/13/14 at 42 |
| 148 | MRK-ABIOO02231 | MDL -- 3/13/14 at 26 |
| 148 | MRK-ABIOO03202 | MDL -- 3/13/14 at 26 |
| 148 | MRK-ABIOO03221 | MDL -- 3/13/14 at 26 |
| 148 | MRK-ADJOO34997 | MDL -- 3/13/14 at 34 |
| 149 | MRK-ABWOOOOO62 | MDL – 3/13/14 at 28 |
| 152 | LEH 0125527 | Lehr 4/3/14 at 7 |
| 153 | LEHOl15297 | Lehr 4/3/14 at 7 |
| 154 | LEH0126989 | Lehr 4/3/14 at 7 |
| 159 | MRK-AFIOO10255 | MDL -- 3/13/14 at 36 |
| 160 | MRK-GUE0058858 | Guerra - 3/13/14 at 54 |
| 161 | MRK-GUEOO58858 | Guerra – 4/3/14 at 54 |
| 162 | MRK-AFI0182292 | MDL -- 3/13/14 at 36 |
| 166 | MRK-NJ0232605 | NJ – 3/13/14 at 60 |
| 168 | 168. USA vs. Merck Sharp & Dohme, Criminal No. 11-10384-PBS | Public Record |
| Depo | Deposition of Doug Watson in Plubell and Ivey vs. MERCK May 17,2011 and June 8, 2011 | Plubell – 4/3/14 at 85 |
| Depo | Deposition of Scott Reines, May 14, 2013 | MDL – 4/3/14 at 85 |

4

**Table 2. Excerpts of Expert Report Related To *Wall Street Journal* Statement Regarding Toxicity ("In general, there's information on the toxicity of the drug that's not been previously published by Merck . . .")**

| Statements Contained in Original Expert Report Supported by Non-Confidential Documents |
|---|
| "MERCK was aware of nonclinical and clinical data linking increased incidences of cardiovascular events with Vioxx usage, prior to the release of the VIGOR findings." Egilman Report ¶ 20. |
| "MERCK should have amplified the Vioxx labeling to reflect the evolution of ongoing scientific efforts to address these and other potential mechanisms associated with cardiovascular concerns." *Id.* ¶ 21. |
| "During May 1996 through January 1997, MERCK funded Protocol 023, a double-blind, placebo-controlled safety and pharmacokinetic study of Vioxx. In that study, a decrease was noted in the production of PGIM in urine, one of two metabolites of prostacyclin. Notes from a Vioxx project team minutes in January 1998, noted that Vioxx 'had no effect on systemic thromboxane,' which is involved in promoting platelet aggregation and clotting. (MRK-ABC0009946). MERCK believed that '[t]hese findings raised a concern about the potential for VIOXX to cause cardiovascular problems.' (MRKABC0009946)." *Id.* ¶ 28. |
| In September of 1998, Dr. Carlo Patrono, an outside MERCK advisor, sent a letter to the company expressing the likelihood of four possible cardiovascular adverse effects of COX-2 inhibitors, like Vioxx: a) Expression of COX-2 in macrophages/plaque monocytes as a potential source of aspirin-insensitive TXA2 production b) Expression of COX-2 by endothelial cells as a potential source of PGH2 for transcellular biosynthesis of TXA2 by aspirinated platelets c) COX-2-derived eiconsanoids as a potential factor in the local inflammatory process of unstable angina and ischemic complications d) COX-2- derived PGI2 as a potential contributor to local modulation of platelet activation. Dr. Patrono wrote, 'I would suggest that it would be in the best interest of MERCK to look into these issues as quickly and thoroughly as possible.' (MRK-ABC0002199) In response to this letter, Alan Nies of MERCK wrote a note to his colleagues stating that Dr. Oates had raised similar concerns and 'I told John we would not be doing any clinical studies at this time. When these drugs are available many investigators will probably do such studies with or without our help/consent.' (MRK-ABK0311068)." *Id.* ¶ 42. |
| "MERCK did not, and should have, disclosed to doctors that there were more deaths from GI bleeds in the Vioxx-treated group than the control group in VIGOR. (Wright JM. The double-edged sword of COX-2 selective NSAIDs. CMAJ 2002; 167(10):1131-1137.) While the data results show that Vioxx reduced the total number of GI bleeds, further analysis also reveals that the GI bleeds experienced on Vioxx led to more deaths because COX-2 is needed for GI healing. (FDA Div. of Anti-Inflammatory, Analgesic and Ophthalmic Drug Products: Medical Officer Review, June 29 2000) MERCK should have been forthright with this information by consistently disclosing it along with the former, more positive data in patient, physician and media and other communications. *Id.* ¶ 55. |

5

| |
|---|
| Statements Contained in Original Expert Report Supported by Non-Confidential Documents |
| "On February 27, 2001, Dr. Scott Reines, head of the clinical neuroscience department, told top MERCK executives that the first Alzheimer's treatment trial, Protocol 091, showed no beneficial effect. (MRK-ACR0014272) At the time, Reines noted, 'these data are confidential and will not be disclosed to the Project Team until we've decided on a course of action.'(MRK-ACR00142720) By mid-March, MERCK's statistician, Frank Liu, had sent e-mails to upper management that revealed the death excess in Vioxxtreated AD study patients. (MRK-NJ0333224) This should have been disclosed in the warnings section of the label at this time." *Id.* ¶ 75. |
| "In November 2003 the MERCK biometrician Christopher Assaid discovers and reports his programming error on the compliance analysis. (Email Assaid MRKAHD0055888; MRK-AHD0055888 at 6019-6020) In his corrected analysis, Assaid finds that the hazard ratio in compliant patients does increase, from 1.46 to 1.72 (p=0.002). Thereafter, beginning in December 2003, the drafts of the 078 paper delete the dose response data MERCK thought were favorable prior to discovery of the programming error. (eg MRK-AHD0022761) The analysis of the dose response data never appeared in the published papers by MERCK authors, or in any regulatory submission to FDA. (Thal, Aisen) Assaid indicated in an email that these data 'dropped out' of MERCK's interactions with FDA surrounding the efficacy issues raised by the results of 078. (Assaid Exhibit 17, Email February 1 2005 MRK-ARP0105927)." *Id.* ¶ 104 |
| "In November of 2004, Assaid completed an analysis of confirmed thrombotic CV events in the Alzheimers studies (078 and 091) 'by whether they had any systolic BP >160 mmHg during the study.' He concluded via email 'that once a patient has a (druginduced) elevation in SBP [systolic blood pressure], regardless of subsequent fluctuations, the risk of a thrombotic event for that patient has irreversibly increased.' (MRK-AFO0276159 at 64) Quan reached a similar conclusion in his analysis of the APPROVe data. (Quan Exhibit 51 MRK-AGO0074482; Quan Exhibit 52 MRKAGO0074485; Quan Memo October 7 2004 MRK-AFO0280964)." *Id.* ¶ 112. |
| "MERCK should have disclosed the risk of AD and dementia based on the evidence of causation in Study 078." *Id.* ¶ 116. |
| "Edward Scolnick, reacted to the results of study 136 in November of 2001 saying, 'I think the question we should answer now is NOT whether Vioxx or any Coxib is safe for Cv outcomes. I think the question NOW is what is the best antiplatelet regime to use with a Coxib.I think that is THE medical question and if we answer it, the problem will dissipate.' (MRK-NJ0214478) This indicates that Scolnick knew of the cardiovascular risk of Vioxx and its lack of benefit with aspirin." *Id.* ¶ 136. |

| Statements Contained in Original Expert Report Supported by Non-Confidential Documents |
|---|
| "MERCK withdrew VIOXX from the market on September 30, 2004. Days later, senior MERCK personnel discussed the possibility of bringing a reformulated MERCK product to the market. A.W. Ford Hutchinson wrote 'I think this really scraping the barrel and does not fit in with our avowed mission of producing medically important products. Naproxen plus a generic PPI, as Peter Honig keeps reminding me, essentially fixes most of the issues. Tony' (Ford Hutchinson Exhibit 23, emails October 1, 2004, MRK-AAD0356476) MERCK was aware that naproxen plus a generic PPI was a cheaper and safer alternative to VIOXX." *Id.* ¶ 136. |

**Table 3.  Excerpts of Expert Report Related To *Wall Street Journal* Statement Regarding Health Hazards and Fraud ("[Dr. Egilman] says that raw study data, company emails and internal analyses 'provide new information on the health hazards of the drug and evidence of fraud in the conduct of the studies.'")**

| Statements Contained in Original Expert Report Supported by Non-Confidential Documents |
|---|
| "MERCK launched and sold Vioxx without informing patients or doctors that Vioxx increased CV risk and avoided further studying the CV risk."  Egilman Report ¶ 23. |
| "In an email in February of 1997, Briggs Morrison, a senior MERCK researcher, in discussing the plan for a large GI outcomes trials commented on aspirin use in potential study design, 'I know this has been discussed to death, but real world is everyone is on it, so why exclude AND [sic] without COX-1 inhibition you will get more thrombotic events and kill drug.'(MRK-ABC0009946).  In response to the email from Briggs Morrison, Dr. Alice Reicin wrote, 'This is a no-win situation. The relative GI risk of even low-dose aspirin may be as high as 2-4 fold. Yet the possibility of increased CV events is of great concern – (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients – i.e. those that have already had an MI, CABG, PTCA? This may decrease the CV event rate so that a difference between the two groups would not be evident.'(MRK-ABC0009946)"  *Id.* ¶¶ 34-35. |
| "By early 1997, MERCK found cardiovascular related concerns from unblinding the results of an osteoarthritis study completed in early 1996 (Protocol 010). Patients in the study were randomized to receive placebo, Vioxx 25 mg daily, or Vioxx 125 mg daily. The results revealed that the Vioxx 125 mg and 25 mg groups had more cardiovascular adverse events than the placebo group, which had no cardiovascular adverse events. In addition, two patients, one in each Vioxx treatment group, discontinued the study due to transient ischemic events (TIAs) (MRK-OS420045657). Because these events occurred at higher doses than those found at lower doses, this is an indication of a dose response phenomenon. It can also be hypothesized that MERCK lowered the dose to reduce the incidence of CV events. The fact that events occurred at higher doses than those found at lower exposures is evidence of a dose response phenomenon. In addition absent other evidence it appears that MERCK dropped the dose to reduce the incidence of these CV events." *Id.* ¶ 36. |
| "Following the approval of Vioxx in May 1999, MERCK became aware of cardiovascular-related adverse events (Protocols 085, 090). In fact, these events were reported in ongoing clinical trials, which associated Vioxx with more cardiovascular adverse events than both placebo and active control groups. (MRK-NJ0170152-274; MRK-ADJ0035003-8; MRK-NJ0220388-454).  *Id*. ¶ 49 |

8

| |
|---|
| Statements Contained in Original Expert Report Supported by Non-Confidential Documents |
| MERCK never amended the VIOXX labeling relating to cardiovascular risks between the issuance of the 1999 launch label and the April 2002 post-VIGOR 'miracle' label. Specifically, CV events listed in the Adverse Reactions Section relating to rarely occurring (<0.1%) along with insect bites and hemorrhoids and other events that were known to be unrelated to VIOXX. According to Dr. Hirsh even this listing was in error since the CV rates were higher. (MRK-ABD0001986) Dr. Watson claimed that this constituted a CV warning. (Deposition of Doug Watson in Plubell and Ivey vs. MERCK 5-17-11 and 6-8-11). *Id.* ¶ 51. |
| "There is evidence that MERCK did not expect the MERCK appointed members of the Data Safety Monitoring Board (DSMB) for the VIGOR trial to complete its commitments in an unbiased manner. A 1999 email from Eric Mortensan, a clinical research director, stated: 'The inclusion of a DSMB is always 50% scientific and 50% for appearances. There is a value to avoiding the appearance that we are hiding something…The group of statisticians, epidemiologists, gastroenterologists which John has worked with in the past have been very cooperative with the goal of completing studies and would not be anticipated to terminate the trial capriciously and thereby negatively affect our ability to obtain a label statement after three years of treatment…' (MRK-ABS0212130)." *Id.* ¶ 57. |
| "Assaid reported a statistically significant risk on the Primary Analysis. (Assaid Exhibit 2, MRK-ARP0137370). Assaid reported statistically significant risks on the Supportive Analyses (Assaid Exhibit 2, MRK-ARP0137370; Deposition of Scott Reines 87:7 to 88:23. MERCK's DAP states that 'In order to evaluate the robustness of the findings from the primary efficacy analysis, the following supportive analyses will be performed.' (DAP) Though the Supportive Analyses were all significantly against Vioxx, none were reported in the medical literature published by MERCK in 2005 and 2008 (Thal, Aisen) MERCK also prespecified several other analyses in the DAP, which all either trended against Vioxx or were Neutral. (eg Deposition of Scott Reines 74:13 to 24; 76:3 to 22.)." *Id.* ¶ 101. |

9

| |
|---|
| Statements Contained in Original Expert Report Supported by Non-Confidential Documents |
| "The stated aim of the 1999-2000 ADVANTAGE study was to assess the 'Gastrointestinal Tolerability and Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis.' In reality, the trial was a year-long marketing operation, meant to introduce investigators to Vioxx. ADVANTAGE was designed and supported not by MERCK scientific researchers, but by the company's Marketing and Continuing Professional Development departments in conjunction with a contract research organization.(MRK-ADI0017766) In correspondence regarding the role of Public Affairs in the trial, Rebecca Higbee inserted comments (in bold) into a message to Public Affairs: 'It seems to me that the study is not sufficiently different than any other CPD [Continuing Professional Development] I ELIMINATED THE REFERENCE TO SEEDING. IT MAY BE A SEEDING STUDY, BUT LET'S NOT CALL IT THAT IN OUR INTERNAL DOCUMENTS. study, so I'm hesitant to set expectations for Public Affairs' contributions too high…I've looked through materials that were developed to support LIFE—a Cozaar AGAIN, I ELIMINATED THE REFERENCE TO SEEDING STUDY study that had a Public Affairs component (press release announcing start of the study, as well as Marketing Communications guide book for physicians). Using LIFE as a basis, as well as suggestions from Ogilvy, I propose the following response: BLOOMFIELD WILL BE AROUND ON MONDAY AND I'D ENCOURAGE YOU TO TALK TO HIM ABOUT THE WORK DONE ON THE LIFE STUDY. WE LEARNED SOME LESSONS, AND I'M SURE HE'LL BE GLAD TO PASS THEM ALONG. [sic]'(MRK-AFB0001598)." *Id.* ¶ 118. |
| "MERCK did not inform the IRBs, the researchers or the patient volunteers who participated in the ADVANTAGE trial of the true nature of the 'study.' The informed consent form used to initiate patients into the ADVANTAGE trial emphasized that the purpose of the study was an investigation of the drug itself, rather than a marketing effort meant to promote its use.(MRK-AGV0003296)." *Id.* ¶ 119. |
| "The results of ADVANTAGE that were reported in a published article appearing in a 2003 issue of The Annals of Internal Medicine were incorrect.(Lisse, JR et al. Gastrointestinal tolerability and effectiveness of rofecoxib versus naproxen in the treatment of osteoarthritis: a randomized, controlled trial. Ann Intern Med. 2003 Oct 7;139(7):539-46) The paper only reported 5 MIs in the Vioxx arm of the trial and one in the naproxen group. The actual results were a statistically significant number of MI/Sudden deaths (8 vs 1) in the Vioxx arm compared to Naproxen. This has never been reported." *Id.* ¶ 121. |

10

| |
|---|
| Statements Contained in Original Expert Report Supported by Non-Confidential Documents |
| "On October 21, 1999 a 73 year-old woman in the ADVANTAGE trial identified as AN 5005 was found expired in her apartment. She had reportedly called her son with complaints of shortness of breath. When the son arrived the patient had already died. (MRK-AAE0002414).  The cause of death was determined to be 'hypertensive heart disease' and the case was not originally adjudicated by MERCK in the ADVANTAGE trial. (MRKNJ02212920). In July of 2001, the FDA reclassified AN 5005 as a potential cardiovascular thrombotic event. In the opinion of the medical reviewer 'the cause of death for this patient was sudden death, which would in fact meet criteria for cardiovascular thrombotic event.' (MRK-PUBLIC0000351). MERCK responded to the FDA's reclassification of AN 5005 in a letter stating that the 'the preferred term of the reported event – hypertensive heart disease – (which was the same as the actual reported term) is not one of the vascular SAE terms eligible for case adjudication…'Sudden death' was not a reported term for this patient.' (MRKAAF0004126) This is not true.  Following the publication of ADVANTAGE by Lisse et al. in 2003 I wrote a letter to the Annals of Internal Medicine calling into question MERCK's reported cardiovascular results, specifically the number of Myocardial infarction and sudden deaths. (Egilman, DS and Presler, AH. Report of specific cardiovascular outcomes of the ADVANTAGE trial. Ann Intern Med. 2006 May 16;144(10):781). The New York Times published a story on Patient 5005 in April of 2005. (Berenson . Evidence in Vioxx Suits Shows Intervention by MERCK Officials. New York Times. April 24, 2005.).  In July of 2005, Ned Braunstein, from MERCK's regulatory department and Adam Polis, a MERCK author on the ADVANTAGE publication, wrote a follow-up letter to the Annals of Internal Medicine in an attempt to explain the story of AN 5005. They reiterated that 'Although the term retrospectively proposed by the FDA reviewer would have met criteria as a potential thrombotic event eligible for adjudication if used by the investigator, the term *hypertensive heart disease* did not trigger adjudication in the existing standard operating procedure. Therefore, this case was not prospectively adjudicated and is not included as a confirmed thrombotic event…'( Braunstein N, Polis A. Report of specific cardiovascular outcomes of the ADVANTAGE trial. Ann Intern Med; 2005 Jul 19;143(2):158-9.) . . . Regardless of whether the event is listed as 'sudden death' or 'cardiac disorder' both terms would have triggered adjudication by MERCK and thus would have been included in the listing of confirmed thrombotic events. This would make the total combined number of MI/sudden deaths 8 in the Vioxx group (5 MI and 3 sudden deaths) compared to 1 (MI) in the naproxen group, a statistically significant result." *Id.* ¶¶ 122-32 (not including ¶¶ 129-31). |
| "The marketing strategy laid out in MERCK's 2001 and 2002 Profit Plans for        Vioxx emphasize MERCK's concern for sales and profit rather than patient safety. Examples of these strategies include: (a) The 'neutralization' of safety data (b)The aggressive use of DTC advertising to 'leverage the buying process' by inciting patients to request Vioxx from their physician (c) The promotion of 'dissatisfaction' among patients with similar, competing products such as Celebrex (d) The targeting of physician groups differentiated according to their prescribing tendencies (MRK-AAO0000073, MRK-AAO0000119)." *Id.* ¶ 147. |

11

**Table 4. Excerpts of Expert Report Related To *Wall Street Journal* Statement Regarding Misrepresentation ("[T]here is information that Merck published that misrepresents the health effects of the drug.")**

| Statements Contained in Original Expert Report Supported by Non-Confidential Documents |
| --- |
| "MERCK had an obligation not to undermine its own warnings and/or disclosures with anti-warnings. An anti-warning is information that that deliberately misrepresents dangerous products as safe in order to contradict publically available evidence that a drug is hazardous. In this case MERCK's undertook a campaign to discredit or pay physicians (to stop warning) who had warned about Vioxx hazards called the 'neutralization' program.." Expert Report of Dr. David Egilmand, ¶ 17. |
| "MERCK should have amplified the Vioxx labeling to reflect the evolution of ongoing scientific efforts to address these and other potential mechanisms associated with cardiovascular concerns." *Id.* ¶ 21. |
| "MERCK misrepresented, concealed, suppressed, and omitted material facts regarding Vioxx's risks of causing and/or promoting the progression of Alzheimer's disease, CV disease, pulmonary edema, congestive heart failure, hypertension and respiratory illness." *Id.* ¶ 24. |
| "MERCK and its employee knowingly caused the submission of false claims to Utah Medicaid because the representations and omission made Vioxx appear to have a safety and efficacy profile that [was] wholly or partially false, fictitious or fraudulent." *Id.* ¶ 26(i). |
| "MERCK and its employees entered into an agreement or concerted action to keep knowledge of the true safety profile hidden from the medical profession, pharmacists, the general public and specifically Utah Medicaid." *Id.* ¶ 26(ii). |
| "In a January 1998 memo to Drs. Scolnick, Shapiro, Nies and Spector, A.W. Ford-Hutchinson, urged MERCK to recommend low-dose aspirin use for all patients at risk of heart disease. His concern arose from the finding that Vioxx reduced urinary PGIM, which is a vascular endothelial metabolite of prostacyclin. Hutchinson stated that "the concerns about COX-2 involvement in cardiac disease are potentially valid" and added (MRK-ABC0000069): "It is likely that we can produce evidence in the dog that the inhibition of this metabolite follows that of other renal metabolites and that it is a common phenomena observed with all COX-2 inhibitors. However, as these studies were carried out in normal volunteers and not in patients with cardiac disease, who might be excreting systemic COX-2 derived metabolites, resolving this issue will not prevent the larger issue being raised by potential reviewers. Because of this it might be advisable in our label to recommend low-dose aspirin usage for all patients at risk of cardiac disease." MERCK did not include this disclosure or the reason it was needed in its label or press material; instead it issued an anti-warning press release, "Merck Reaffirms the CV safety of Vioxx." This is an example of an anti-warning. It is unclear when MERCK first affirmed VIOXX's CV safety but whenever that was, MERCK had not tested the drug sufficiently to state this and they were in possession of data that directly contradicted this statement. *Id.* ¶ 38. |

| |
|---|
| Statements Contained in Original Expert Report Supported by Non-Confidential Documents |
| "In November 1998, MERCK submitted the VIOXX NDA to the FDA. MERCK's scientists and MERCK consultants concerns were largely omitted from the General Safety Overview in the Clinical Documentation section, which included this statement: 'It is theoretically possible that use of MK-0966 without concomitant aspirin in patients at risk for cardiovascular events may not provide the cardiovascular benefits of aspirin' (MRK-ABS0066396)." *Id.* ¶ 43. |
| "Emails sent between MERCK Public Affairs executives and MRL researchers in March 2000, when the VIGOR results were being released, demonstrate that both the company's scientific researchers and its public relations team were involved in misleading the public about the VIGOR results. In the first of a series of emails, Alise Reicin comments, 'I do not think we should get into [CV event] rates at all – the data is preliminary. We can emphasize the rates look similar to our Phase III studies.' In response, public affairs representative Dr. Larry Hirsh writes, 'We all feel a little concerned about saying (if pressed) that the event rate, even in the Phase III OA studies, was 2%...The product circular indicates that cardiovascular events occurred in a much smaller proportion of patients – less than a fraction of a percent. We'd rather refer any questioner to the product labeling rather than say "2% of patients taking Vioxx had a CV event in Phase III".' (MRK-ABD0001986; MRK-ABD0001756) MERCK never disclosed that the label information on CV risk underestimated the true risk. This was intentional." *Id.* ¶ 59. |
| Study 078 reached a statistically significant result against Vioxx on both the primary endpoint, clinically diagnosed Alzheimer's Disease, and on at least two other measures, dementia and CDR global scores by 1999. (Analysis of SAS Data by Dr. David Madigan) The risks of AD and dementia were permanently significant by December 1999, meaning they were unlikely to be due to chance. In Study 078 Vioxx caused a 46% increase in AD in less compliant patients, and a 72% increased risk in patients taking more of the study medication. (Email Assaid MRK-AHD0055888; MRK-AHD0055888 at 6019-6020) MERCK failed to report the early significance of the risks of dementia and AD, and the dose response data consistent with causation of clinically diagnosed AD, in the two published papers MERCK sponsored for Study 078. (Thal et als Neuropsychopharmacology (2005), 1-12; Aisen et als Current Alzheimer Research, 2008, 5, 73-82)." *Id.* ¶ 80. |
| On July 17, 2001, MERCK filed a Safety Update Report (SUR) with the FDA that contained false and misleading statements: 'The 3 placebo-controlled studies in Alzheimer's Disease and Mild Cognitive Impairment (MCI) (Protocols 078, 091 and 126) document that the profile of serious clinical adverse experiences with rofecoxib is generally similar to that of placebo in a large cohort of patients, most of whom were older than 65 years of age.(MRK-01420145856) Under the 'key findings' MERCK noted: 'The cumulative safety data available through 16-Mar-2001 are consistent with the originally reported safety profile….'.(MRK-01420145856) This is not a true statement. MERCK should have disclosed the truth: VIOXX was killing the patients." *Id.* ¶ 93. |

13

| Statements Contained in Original Expert Report Supported by Non-Confidential Documents |
|---|
| "MERCK first submitted efficacy data to the FDA by cover of letters dated July 29, 2003. (MRK-I2220004818) five years after the Study began in April 1998, and almost four years after the risk of AD and dementia in patients on Vioxx became permanently statistically significant. MERCK stated to the FDA 'The unexpected difference for rofecoxib compared to placebo was not confirmed by the secondary measures which found no statistically significant or clinically meaningful differences between treatment groups.' This statement by MERCK to FDA was false. MERCK should have disclosed the truth." *Id.* ¶ 102. |
| "MERCK was to meet with FDA on September 27, 2004 to review the efficacy data from Study 078. Internal MERCK emails discuss the meeting and how to prepare, including concerns about whether FDA will ask about deposition of amyloid beta plaque due to effects of Vioxx. MERCK personnel recognize they have no data on the subject, that Cox inhibition in the setting of brain injury may exacerbate disease, and decide not to address the issue unless asked. (Lines Exhibits 18, 19 and 20; MRK-AHD0069267, MRK-AHD0069241, MRK-AHD0069615)." *Id.* ¶ 109 |