## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Case No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| *This document relates to* | * | JUDGE FALLON |
| | * | |
| *Jo Levitt v. Merck Sharp & Dohme Corp.*, | * | MAGISTRATE JUDGE |
| **2:06-cv-09757-EEF-DEK** | * | KNOWLES |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANT MERCK'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S BUSINESS DAMAGES CLAIMS

Approximately 40,000 Vioxx personal injury actions have been resolved through this MDL.  Only this one case remains.  One of the reasons why this case remains unresolved, after more than twelve years of litigation and multiple mediation efforts, is because the parties fundamentally disagree as to the scope of recoverable economic damages.  Ms. Levitt believes that she should recover up to $20 million for business losses sustained by her family's corporations.  But her own economic expert disavows that theory as too speculative and unreliable.  The expert estimates economic damages to be $1.4 million to $1.8 million.[1]  Notably, the Levitt family businesses, which were in the hospitality, clothing manufacturing, and retail industries, closed at the height of the 2008 financial crisis—at the same time that similar businesses throughout the country likewise failed.

Based on Missouri law and the relevant undisputed facts, Ms. Levitt cannot recover for her failed family businesses as part of her damages.  **First**, Missouri law does not permit a personal injury plaintiff to recover corporate losses.  The limited exception for such recovery

---

[1]  *See* Suppl. Report of John Ward (Jan. 19, 2016) ("Ward Suppl.") (Ex. 1) at 7.  All exhibits referenced herein are attached to Defendant's LR56.1 Statement of Material Facts As To Which There Is No Dispute, filed contemporaneously with this Motion.

when "personal service predominates" does not apply to the Levitt family businesses, which relied on substantial invested capital and outside labor. **Second**, Ms. Levitt cannot show with "reasonable certainty" that her family businesses would have been profitable if she had not experienced the cardiac events at issue, given economic pressures, such as local and foreign competition and a global recession, that were completely independent of Ms. Levitt's participation. And **third**, Ms. Levitt cannot provide a factual basis for determining the magnitude of any lost profits. Her economic expert explicitly declined to perform such a calculation, and her husband, to whom she otherwise defers, offers only optimistic speculation.

Any one of these reasons independently warrants partial summary judgment against Ms. Levitt's business loss damages. And if that were not enough, it turns out that Ms. Levitt negligently permitted all the relevant business records to be destroyed—years *after* filing this lawsuit. She should not be permitted to destroy the relevant evidence and then offer her own sanitized version of such evidence. Her claim for her business losses should be dismissed for this reason as well.

## BACKGROUND

### Ms. Levitt's Vioxx Usage and Cardiac Events

Ms. Levitt's rheumatologist diagnosed her with fibromyalgia in October 1999, and prescribed Vioxx to her to treat the pain associated with her condition. Deposition of Dr. Arnold L. Katz (Jan. 30, 2013) ("Katz Dep.") (Ex. 2) 26:10–13, 29:16–20. In March 2000, Ms. Levitt experienced unstable angina and had a stent placed; restenosis in May 2000 ultimately led to bypass surgery. *See* Records of Dr. Michael E. Gorton (Ex. 3) at 138. Ms. Levitt continued to take Vioxx for another two years without incident. *See* Katz Dep. (Ex. 2) 64:22–65:3.

### The Levitt Family Businesses

At the time of her cardiac events, Ms. Levitt and her family owned two businesses—one

that manufactured and sold high-end children's clothing, and one that operated a hotel in Nebraska.[2]  The children's clothing business included several retail outlets around the country.  Ms. Levitt claims that her cardiac events in 2000 rendered her unable to work, and that her absence led to the businesses' failure almost a decade later.

The Levitt family's clothing business, Chocolate Soup, centered on the manufacture and sale of high-end children's clothing.  The Levitts started operating the business around 1970 out of their home.  Deposition of Robert Bazan (Jan. 16, 2013) ("Bazan Dep.") (Ex. 5) at 45:7–9.  Over time, the business expanded significantly.  The Levitts established a manufacturing facility to produce the clothes and, as of 1999, they had fourteen retail outlets across the country.  *Id.* at 44:11; Deposition of James Levitt (Dec. 8 & 9, 2015) ("James Levitt 30(b)(6) Dep.") (Ex. 6) 129:4–17.  Collectively, Chocolate Soup Manufacturing and Chocolate Soup Retail employed approximately 120 to 200 people.  Bazan Dep. (Ex. 5) 177:19–178:7 (estimating 120); Deposition of Jo Levitt (July 23, 2012) ("Jo Levitt Dep.") (Ex. 7) at 22:7–11 (estimating 200).

In 1975, Jo and James Levitt purchased an existing hotel and theater complex in Lincoln, Nebraska from Ms. Levitt's father.  Jo Levitt Dep. (Ex. 7) 35:17–36:7; James Levitt 30(b)(6) Dep. (Ex. 6) 83:19–84:2.  At that time, James Levitt hired Bob Bazan, a CPA, to assist with the family businesses.  Bazan Dep. (Ex. 5) 42:4–7.  Mr. Bazan quickly became the Levitt's right-

---

[2]      The Levitt family operated their businesses through several corporate entities:  American XO, II, Inc., Chocolate Soup Manufacturing, and Chocolate Soup Retail.  The entity of II, Inc. owned and operated the Villager Motel in Lincoln, Nebraska.  Chocolate Soup Manufacturing owned the factory and production lines that manufactured the Levitts' proprietary designs.  Chocolate Soup Retail owned and operated the chain of retail outlets of Chocolate Soup stores.  American XO was a parent corporation that owned both II, Inc. and Chocolate Soup Manufacturing.  *See* Mission Bank Records (Ex. 4) at 1770 (describing corporate structure).  American XO was owned by Jo Levitt (45%), James Levitt (45%), and their daughter Ashley Levitt (10%).  *Id.* at 3557.  Chocolate Soup Retail was a Subchapter S Corporation owned by Jo Levitt (50%) and James Levitt (50%).  *Id.* at 792.

hand man and was a key manager and decision maker.  James Levitt 30(b)(6) Dep. (Ex. 6) 14:4–5; Bazan Dep. (Ex. 5) 126:7.

Although Ms. Levitt was the primary creative force behind the Chocolate Soup clothing designs, all of the financial and business aspects of the family companies were handled by her husband and Mr. Bazan.  Bazan Dep. (Ex. 5) 15:13–14 (Ms. Levitt "was the creative talent"); Deposition of James Levitt (July 24, 2012) ("James Levitt Dep.") (Ex. 8) 34:4–7 (Mr. Levitt "primarily responsible for . . . the financial end of the business"); *id.* at 95:20–23 (agreeing Ms. Levitt "just wasn't involved in the financial side"); *id* at. 95:1–2 (Mr. Bazan became a big part of the business as an executive); Jo Levitt Dep. (Ex. 7) 20:13–16.  Mr. Bazan also played a key role in purchasing the clothing items that were stocked in Chocolate Soup stores that were not based on Ms. Levitt's designs.  Bazan Dep. (Ex. 5) 33:23–34:15.[3]  Similarly, Mr. Bazan was centrally involved in the management and financial operations of the hotel.  Jo Levitt Dep. (Ex. 7) 36:24–37:6 (Mr. Bazan hired the hotel managers); James Levitt 30(b)(6) Dep. (Ex. 6) 198:12–14 (James Levitt "was never up there a lot" at the hotel).

In the mid to late 1990s, well before Ms. Levitt started taking Vioxx, Chocolate Soup sustained several years of substantial operating losses, attributable in part to an ill-fated foray into screen printing.  James Levitt 30(b)(6) Dep. (Ex. 6) 227:9–13; Bazan Dep. (Ex. 5) 107:4–109:2.  In addition to "the screen printing fiasco," James Levitt 30(b)(6) Dep. (Ex. 6) 227:11, the company's performance was significantly hurt by competition from foreign imports.  *Id.* at 225:22–23 ("there was such an influx of imports of better clothes"); Bazan Dep. (Ex. 5) 79:17–

---

3       By 1999, only about one-third of the merchandise sold in Chocolate Soup stores was based on original designs.  Bazan Dep. (Ex. 5) 92:14–20; James Levitt 30(b)(6) Dep. (Ex. 6) 135:17–22.  The remaining two thirds was purchased from other manufacturers.  Bazan Dep. (Ex. 5) 39:12–16.

19; Mission Bank Records (Ex. 4) at 1680 ("Margins are still getting squeezed as competition, particularly foreign made goods, has caused problems.").

Meanwhile, the Nebraska hotel operations experienced deteriorating financial performance.  While the property had been a "cash cow" in the mid-1990s, Bazan Dep. (Ex. 5) 75:15–19, by the end of that decade, the Levitts were struggling to maintain profitable operations.  *See* Affidavit of Bob Bazan (May 2, 2007) ("Bazan Aff.") (Ex. 9) ¶ 8 (By 1999, the hotel was experiencing negative cash flow.).[4]  Around this time, the Levitts began increasing the debt load being carried by the family businesses and the family.  *See* Mission Bank Records (Ex. 4) at 1770–71 (summarizing loan history from 1997–2005).

The downward trajectory that began in the late 1990s continued to spiral over the next several years.  *See* Mission Bank Records (Ex. 4) at 1848 (in 2001, insufficient operating income to service debt "primarily due to the poor performance of the Village Motor Inn").  The hotel's ongoing poor performance was exacerbated by increased competition from the opening of new hotels nearby.  *Id.* at 1777 (increased competition "hurt business in 2001" and "continued into 2002"); *id.* at 547 (losses continued into 2003 due to "an over-abundance of hotel rooms" resulting in occupancy rate "of less than 50%").  Ms. Levitt attributed a further decline in revenues to a major public works construction project, which "drastically inhibited public access to the Villager . . . [and] was in place from approximately 2003 to 2005."  Affidavit of Jo Levitt (May 2, 2007) ("Levitt Aff.") (Ex. 10) ¶ 17.  A city-wide smoking ban then went into effect on January 1, 2005, and, according to Ms. Levitt, drove away more customers from the property's food and beverage operation.  *Id.* ¶ 17 ("As such, the Villager lost the business of numerous

---

[4]     In 2007, both Ms. Levitt and Mr. Bazan provided testimony and affidavits in an age discrimination lawsuit filed against the hotel by a manager whom Ms. Levitt had terminated.

'smoking' patrons."); *see also* Bazan Aff. (Ex. 9) ¶ 14.  As the hotel manager noted "[t]he smoking ban had really hurt the business," and Ms. Levitt told him that she "d[id]n't see it getting any better."  Deposition of Jeff Ford (May 16, 2007) (Ex.11) 66:10–11.

By January 2005, the hotel was depleting the financial resources of all of the Levitts' businesses.  Mission Bank Records (Ex. 4) at 1775; *see also* Bazan Dep. (Ex. 5) 73:8–12; 30:5–7 (Chocolate Soup was "funding this venture up there for the negative cash flow.").  The businesses continued to struggle throughout 2007 and 2008.  *See* Mission Bank Records (Ex. 4) at 654 (2007 financial reports "continue to show the property is losing a significant amount of money."); *id.* at 716 (proposing operation of the hotel at partial capacity and total liquidation of clothing business).  Throughout this period, the Levitts substantially increased their debt levels to fund the continued operation of their businesses.  *See, e.g.*, *id.* at 1921 (June 2003 additional personal loan of $350,000); James Levitt 30(b)(6) Dep. (Ex. 6) 195:3–11 (taking out second mortgage on personal residence to put into companies); Citibank Loan Documents (Ex. 12) at 1882 (second mortgage of $500,000).  By February 2008, that debt fell into default.  *See* Mission Bank Records (Ex. 4) at 647 ("all of the loans are in default at this time.").

Ultimately, the Levitts decided to sell the hotel property.  *See id.* at 1775 ("Reportedly, the land the hotel resides on may be more valuable than the hotel itself."); *see also* Bazan Dep. (Ex. 5) 79:9–13; 91:17–92:8 ("If the hotel sold, all Chocolate Soup debt is wiped out, get a line of credit again, man, we're good.").  Unfortunately, shortly after a contract for the sale of the hotel was executed, the bottom fell out of the real estate and financial markets, and the sale collapsed.  James Levitt Dep. (Ex. 8) at 64:2–5; Bazan Dep. (Ex. 5) at 28:16–29:8.  In the absence of any influx of new capital, the Levitts were forced to abandon the hotel operation, and the deed was transferred to the bank in lieu of foreclosure.  James Levitt Dep. (Ex. 8) 113:6–8;

Bazan Dep. (Ex. 5) 114:3–5.  Subsequently, the assets of Chocolate Soup and the Levitts' other real estate investments were essentially assumed by lenders.  James Levitt Dep. (Ex. 8) 61:16–21.

### Ms. Levitt's Claims Regarding Economic Damages

Initially, in her 2006 Plaintiff Profile Form, submitted shortly after she filed this lawsuit, Ms. Levitt asserted that she was making a wage loss claim and noted that at the time of her injury she was earning $68,400 annually.  Pl. Profile Form (Nov. 12, 2006) (Ex. 13) at 3.  No reference was made to any business losses.  Three years later, when she submitted an Amended Plaintiff Profile Form in 2009, she expanded the scope of her damages to include lost "Company cash flow & earnings."  Am. & Suppl. Pl. Profile Form (Sep. 28, 2009) (Ex. 14) at 30.  When asked in discovery to provide the factual basis and a computation for each category of damages, she replied:  "In 2000 our net worth of approx 20 million.  I've lost my business and in process of losing my home."[5]  Pl. Resp. to Def. First Interrog. (Sep. 28, 2009) (Ex. 15) at 5.

In 2015, in response to follow-up discovery requests, Ms. Levitt stated that she "relied upon her husband's representation regarding net worth," and that any questions should "be directed to my expert witness."  Pl. Resp. to Def. Second Interrog. (Dec. 11, 2015) (Ex. 16) at 4.  Similarly, when asked for any evidence regarding any economic damages beyond those analyzed in Dr. Ward's 2013 report, Ms. Levitt stated that she "does intend to identify an expert witness to testify about her additional damages which include medical expenses and additional lost income."  Id. at 5.

No other expert, however, was identified.  The only economic expert that Ms. Levitt has designated in this case is Dr. John Ward, who submitted an initial report in 2013, an updated

---

[5]      As of the end of 2015, the Levitts were still in their home, but they were in foreclosure litigation with Citibank.  James Levitt 30(b)(6) Dep. (Ex. 6) 214:6–17.

report in 2016, and sat for deposition in 2016.  Dr. Ward expresses no opinions regarding business valuation or the Levitts' net worth.  Rather, he entirely restricts his opinions to assessing Ms. Levitt's lost earning capacity as a business executive.  Deposition of John Ward ("Ward Dep.") (Ex. 17) 15:7–17 ("My calculation's based upon her lost earnings capacity as opposed to the lost value of the business.").  He offered two alternate theories that yielded economic damages in the amount of approximately $1.4 million to $1.8 million.  Ward Suppl. (Ex. 1) at 7.

Dr. Ward expressly declined to provide any business loss calculations.  As he explained in writing to Ms. Levitt's counsel:  "One of the problems in looking at the corporation's net income is that in a personal injury case we calculate loss of earnings capacity to the injured person versus lost income to the corporation which is a return to capital.  *It would be hard to segregate losses of income due to her depression separate from returns to capital and returns to her husband's effort, as well as market conditions.*"  Fax from John Ward (Apr. 2, 2014) (Ex. 18) at 2 (emphasis added).  In his 2016 deposition, Dr. Ward confirmed that while the Levitts had hoped to obtain a valuation for their closed businesses, he did not see that as an appropriate measure of damages in this case:  "I didn't see any way to directly relate it to the incident in the year 2000 and subsequent events because there were other things happening, like the economy and many other things.  So I didn't -- we chose not to pursue that course."  Ward Dep. (Ex. 17) 46:20–47:8.

## ARGUMENT

Missouri law precludes Ms. Levitt from claiming any economic losses relating to the value of her family businesses in her personal injury lawsuit.  And, even if such damages were available, Ms. Levitt's attempt to link the 2008/2009 business closures to her cardiac events almost ten years earlier is based entirely on speculation.  Indeed, her own expert acknowledges

that.  Moreover, Ms. Levitt offers nothing but speculation and conjecture as to the amount of any potential business losses, rather than the facts and data that Missouri law requires.  Finally, Ms. Levitt's failure to preserve the relevant business records relating to her claimed damages should also preclude recovery of such damages.  Accordingly, Merck respectfully requests that this Court enter an order granting partial summary judgment as to Ms. Levitt's claimed damages for alleged business losses.

## I.  AN INDIVIDUAL PERSONAL INJURY PLAINTIFF CANNOT RECOVER DAMAGES ON BEHALF OF HER FAMILY'S CORPORATIONS.

The sole plaintiff in this action is Jo Levitt.  Under Missouri law, an individual personal injury plaintiff cannot recover lost business profits as an element of her damages.  *See Terry v. Houk,* 639 S.W.2d 897, 900 (Mo. Ct. App. 1982) (Personal injury plaintiff generally "may not recover the loss of business profits because such profits are wholly speculative, or because such profits arise, in whole or in part, from elements other than his personal efforts and earnings." (alteration and internal quotation marks omitted)).  In some exceptional circumstances, evidence of lost profits may be relevant to show the pecuniary value of a plaintiff's own individual personal services, but it is not the profits that are being recovered in such case, but rather the lost earning capacity.  *Id.*  Moreover, the exceptional circumstances allowing lost profits as essentially a proxy for personal earning capacity arise only when a plaintiff's personal services predominate in operation of the business—for instance, in a sole proprietorship.  By contrast, where a business turns in part on the labor of others and/or invested capital, the exception does not apply.  *Id.* (losses not recoverable where record failed to show that plaintiff operated his store as a one-man business with only a minor capital factor).

Ms. Levitt undoubtedly made substantial personal contributions to the family businesses.  But she was not alone.  Both businesses required substantial labor from many other people—

from top management (her husband James Levitt and Bob Bazan), to store and hotel managers,

all the way down to designers, seamstresses and pattern cutters who worked in the factory, store

clerks who worked the retail counters, the maids who cleaned hotel rooms, and the servers who

worked in the various food and beverage operations.  *See, e.g.*, Jo Levitt Dep. (Ex. 7) 24:11–20

("I didn't devote as much time on the retail side as far as day-to-day running of it, my husband

did more [of] that[.]"); *id.* at 25:19–26:8 (Chocolate Soup had other designers that worked under

Jo Levitt's direction.); *id.* at 19:16–21 ("a national retail manager" and "a crew here in Kansas

City" opened stores); James Levitt Dep. (Ex. 8) 94:24–95:2 ("[T]hat's why I hired Bazan to

begin with.  He became a big part of the business as an executive."); Bazan Dep. (Ex. 5) 124:12–

15 (on buying trips:  "It was a team effort."); *id.* at 126:7 ("I was their right-hand man."); *id.* at

179:14–18 (Jo "had a design staff"); Jo Levitt Dep. (Ex. 7) 36:14–17 ("Q. Did you have any

management role in the hotel?  A. No, I just was in charge of the design[.]"); *id.* at 37:1–15

(Bazan hired the hotel managers).  Collectively, the Levitt businesses employed hundreds of

people who performed functions necessary to keep the businesses running.  Jo Levitt Dep. (Ex.

7) at 22:10–23; Bazan Dep. (Ex. 5) 74:2–3.

Moreover, both businesses utilized substantial invested capital.  For instance, Chocolate

Soup purchased inventory from third parties that provided two-thirds of the merchandise in the

individual stores.  Jo Levitt Dep. (Ex. 7) 23:18–22 (retail stores sold other merchandise that she

did not design).  Both businesses had various large lines of credit used for working capital.

Mission Bank Records (Ex. 4) at 1770–71 (listing lines of credit).

To recover business losses, Ms. Levitt must show that the hotel business and the clothing

business were "*predominantly dependent*" upon her personal service, initiative and effort, and

that "*capital investment and labor were relatively insignificant*."  *See Terry*, 639 S.W.2d at 900

(emphases added).  The undisputed facts, however, show the contrary.  Thus, as a matter of law, Ms. Levitt cannot recover for the business losses she claims were caused by her cardiac events. *See id.* (plaintiff failed to meet the requirement of a "*substantial showing*" that the success of his business was predominantly dependent upon his own efforts); *Seymour v. House*, 305 S.W.2d 1, 4 (Mo. 1957) (business losses not recoverable where, in a construction business employing ten people, "the elements of invested capital, employed labor, and other variable factors in the plaintiff's business predominated over the element of personal service"); *see also Gaerte v. Great Lakes Terminal Transp. Corp.*, 506 F. Supp. 2d 271, 275 (N.D. Ind. 2007) (lost business profits only available where "plaintiff is the 'alter ego' of an S corporation," meaning in which "the only shareholder is so actively engaged in the company's day-to-day operations that he is akin to the entity's alter ego" (internal quotation marks omitted)) (applying similar Indiana law).[6] The Court should therefore enter an order of partial summary judgment as to all of Ms. Levitt's business loss claims for damages.

## II.    MS. LEVITT'S ALLEGED BUSINESS LOSSES ARE TOO SPECULATIVE.

The general rule in Missouri is that lost profits "are too remote, speculative, and too dependent upon changing circumstances to warrant a judgment for their recovery."  *Coonis v. Rogers*, 429 S.W.2d 709, 714 (Mo. 1968) (per curiam) (internal quotation marks omitted); *see also Metro. Express Servs., Inc. v. City of Kansas City*, 71 F.3d 273, 275 (8th Cir. 1995).  To escape this general rule, a plaintiff must cross two separate hurdles:  She must establish both that the alleged lost profits were caused by the defendant's conduct, *and* that there is specific data

---

[6]      *Cf. Seubert v. FFE Transp. Servs. Inc.,* 2013 WL 328674 (E.D. Mo. Jan. 29, 2013) (sole proprietor was owner, CEO and solely responsible for the generation of new business); *Laycock v. United Rys. Co. of St. Louis*, 235 S.W. 91, 95 (Mo. 1921) (en banc) (per curiam) (wholesale broom seller who "alone conducted his business, and its profits depended wholly upon his ability to personally go around and solicit orders for and sell and deliver the brooms").

available to make a rational estimate of those lost profits.  *Jarman v. Griggs*, 31 S.W.3d 465

(Mo. Ct. App. 2000); *Midwest Coal, LLC v. Cabanas*, 378 S.W.3d 367, 374 (Mo. Ct. App.

2012); *Handi Caddy, Inc. v. Am. Home Prods. Corp*., 557 F.2d 136, 139 (8th Cir. 1977)

(Missouri requires that alleged lost profits "are made reasonably certain by proof of actual facts,

with data for a rational estimate of their amount." (internal quotation marks omitted)).  Ms.

Levitt cannot make either showing.

  *First*, Ms. Levitt has no factual basis to assert with any "reasonable certainty" that—

absent her cardiac events in 2000—her increased participation in the business would have

prevented them from closing almost a decade later.  *Metro. Express Servs.*, 71 F.3d at 275.

  Both of the Levitt family's businesses already were experiencing economic difficulties at

the time of Ms. Levitt's cardiac events, and those same challenges continued after her cardiac

events.  For the clothing business, the Levitts were recovering from a disastrous foray into

screened printing and were attempting to fend off debilitating competition from overseas

imports.  James Levitt 30(b)(6) Dep. (Ex. 6) 231:24–233:6 (on screen printing: "it took us about

four years to get rid of the stuff."); *id.* at 234:15–19 (from 1996 to 1999 screen printing

accounted for about $1.5 million in losses); *id.* at 136:17–21 ("The imports eventually would

have just flat put us out of business.  I mean, you just can't compete with that.  There's no

manufacturing business left in this country for apparel.  And with good reason.").

  As for the hospitality business, it had begun losing money prior to Ms. Levitt's cardiac

events.  *See, e.g.*, Mission Bank Records (Ex. 4) at 1777–78 (noting "grossly deficient"

performance that "never reached the operating income used by the appraiser").  While Ms. Levitt

contends that, but for her cardiac problems, she would have devised solutions to these problems,

such as launching a French bakery at the motel, there is no evidence establishing with

"reasonable certainty" that any of these proposed strategies would have worked, as required under Missouri law.  Indeed, the French bakery idea foundered because the baker's visa didn't come through.[7]

Given all of the other economic factors at issue—increased competition from high quality foreign imports, increased competition from newer hotel properties, and the 2008 recession—it is impossible to say with ***reasonable certainty*** that the Levitt family businesses would have remained opened and realized net profits.  There is absolutely no evidence in the record demonstrating that any solution to the business problems would have worked—no data, no facts, nothing.  "Speculation, assumptions, and hopeful expectations as to future sales will not support a claim for lost profits." *Midwest Coal*, 378 S.W.3d at 375.  Accordingly, any attempt to link the 2008/2009 business closures (during a world-wide economic crisis) to Ms. Levitt's cardiac events almost ten years earlier is too speculative and attenuated to be legally sustainable.

Ms. Levitt's own expert agrees that her alleged business losses are too speculative and uncertain:

> I think there was an expectation on the part of Jo Levitt that the loss should include loss of value of business, destroyed business venture . . . .  I didn't see any way to directly relate it to the incident in the year 2000 and subsequent events because there were other things happening, like the economy and many other things.  So I didn't -- we chose not to pursue that course.

Ward Dep. (Ex. 17) 46:20–47:8.  When Dr. Ward was asked whether there was any basis to distinguish the Levitts' businesses from the many hospitality industry and retail industry businesses that failed during the 2008/2009 recession, he testified:

---

[7]     *See* Bazan Dep. (Ex. 5) 172:21–24 ("Q: And is it your understanding that if the baker had been able to get the visa, that that bakery would have gone forward?  A: Yeah."); Jo Levitt Dep. (Ex. 7) 173:22–175:20 (explaining frustration and dismay at inability to get the visa).

A:      No.  That's why I didn't try to put a value on their business.

Q:      Okay.  Because you have no basis to assume that their business would survive over someone else's business?

A:      Right. [ . . . ]

*Id.* at 139:14–21.

**Second**, Ms. Levitt cannot provide reliable evidence that establishes the ***amount*** of her alleged business losses.  Missouri courts are clear that a damage award based on lost profits cannot be based on speculation as to the amount of that loss, *and any recovery must be denied completely if the magnitude of the loss is pure conjecture.  Jarman*, 31 S.W.3d at 466–67 (affirming lower court that it "cannot, under Missouri law, engage in speculation in arriving at a damage amount"); *Gesellschaft für Geratebau v. GFG Am. Gas Detection Ltd.*, 967 S.W.2d 144 (Mo. Ct. App. 1998) (no recovery allowed where lost profits based on speculative projections).

Her own expert refuses to provide a valuation number, so Ms. Levitt relies on only her husband to fill in the gap.  *See* Pl. Resp. to Def. Second Interrog. (Ex. 16) at 4–5.  But that attempt fails because a business owner may testify as to the value of his business *only if* he has a factual basis for his valuation.  *Rich v. Eastman Kodak Co.,* 443 F. Supp. 32, 39 (E.D. Mo. 1977), *aff'd*, 583 F.2d 435 (8th Cir. 1978).  Mr. Levitt's testimony shows that he cannot provide the requisite factual basis.  For instance, when asked to explain how he had arrived at a valuation figure for Chocolate Soup and II, Inc. on a certain financial statement, Mr. Levitt replied:  "Well, I don't have the backup to arrive at that figure right now."  James Levitt 30(b)(6) Dep. (Ex. 6) 54:22–25.  When asked specifically about his various hotel valuations:  "I didn't do an asset analysis on the hotel . . . it was a number that I thought we could sell the hotel for minus the debt is what I attributed to the hotel."  *Id.* at 68:18–23.  When asked to explain why the valuations decreased $1.5 million between the December 1999 and April 2001 statements:  "I don't know.

14

This is years later.  I mean, obviously, I must have had a reason for it."  *Id.* at 73:7–74:7.  This is precisely the type of testimony that Missouri courts have found insufficient to support a claim for lost business profits.  *See Rich*, 443 F. Supp. at 39 (rejecting owner valuation where owner did not derive his valuation from data such as a multiple of earnings, the gross sales or any other factor); *Gesellschaft für Geratebau*, 967 S.W.2d at 147 ("The statements are admittedly projections that were calculated on neither any actual sales nor revenue.").

In sum, Ms. Levitt cannot satisfy the requirements of Missouri law for recovering alleged lost profits.  Summary judgment precluding this damages claim is warranted.

## III.    MS. LEVITT DESTROYED THE BUSINESS RECORDS THAT WOULD REFUTE HER CLAIM FOR BUSINESS LOSSES.

Ms. Levitt maintains that her family businesses were worth up to $20 million.  Yet she and her husband knowingly allowed the business records that could refute this claim to be destroyed *after* this lawsuit was filed.  Ms. Levitt had both the ability and an unambiguous duty to preserve these business records.  Merck has been prejudiced by the Levitts' destruction of these records.  The Levitts should not be permitted to rest their claims on their own self-serving testimony about their alleged business losses.

### A.    Plaintiff Failed To Preserve the Relevant Business Records.

The duty to preserve evidence arises when a party has notice that the evidence is relevant to litigation, or should have known that the evidence may be relevant to future litigation. *Zubulake v. UBS Warburg, LLC* (*Zubulake IV*), 220 F.R.D. 212, 216 (S.D.N.Y. 2003).  Here, there can be no doubt that Ms. Levitt was on notice of the relevance of the financial records of the Levitt businesses.  In November 2007, one year after Ms. Levitt filed her case and one year before her businesses were closed, this Court entered Pretrial Order No. 28 ("PTO 28"), requiring plaintiffs not participating in the settlement program to notify all of their employers (in

Ms. Levitt's case—her own companies) of the duty to preserve records relating to the plaintiff's claim pending collection by the plaintiff.[8]  *See* PTO 28 at I.A.5.  And in her interrogatory responses, submitted in September 2009—around the time that the documents were discarded— Ms. Levitt specifically identified the loss of her businesses and her alleged $20 million net worth as elements of her damages claims.  *See* Pl. Resp. to Def. First Interrog. (Ex. 15) at 5.  Despite this knowledge and the legal duty to preserve documents relating to a claim, the records were destroyed.

All of the financial records of the Levitt businesses were destroyed around the time the businesses closed in 2009 and 2010 (three years after this case was filed).  Mr. Levitt and Mr. Bazan testified that records relating to both the clothing and hotel businesses were stored at Chocolate Soup's manufacturing building in a "row of file cabinets," according to Mr. Bazan. Bazan Dep. (Ex. 5) 59:8–61:9; James Levitt 30(b)(6) Dep. (Ex. 6) 20:6–13.  These records included corporate tax returns, general ledgers, financial statements and associated documents, accounts payable records, sales and cost information, inventory listings, and other documents. Bazan Dep. (Ex. 5) 59:16–62:20.  Mr. Levitt testified that financial statements also were kept on computer databases stored in the Chocolate Soup warehouse.  James Levitt 30(b)(6) Dep. (Ex. 6) 58:11–60:3.

Lenders foreclosed on the Chocolate Soup facility in May 2009, and Ms. Levitt negotiated six months to vacate the building.  Bazan Dep. (Ex. 5) 133:19–136:10.  As Mr. Bazan testified, starting at that time, through October 2009, the company "got rid of" old records, equipment, and inventory by selling off items of value, and otherwise "pitching" things out.  *Id.*

---

[8]     Plaintiffs claiming loss of earnings or earning capacity were also required to produce all documents that evidence their income/earnings for each of the last ten years, or to explain why they did not possess such documents.  *See* Ex. A to PTO 28, at 37.

at 135:13–138:11.  As for the computer databases with financial records, Mr. Levitt recalled that sometime in late 2009, Mr. Bazan went to the office of Chocolate Soup one day after it had been sold to new owners, and the computers were gone.  James Levitt 30(b)(6) Dep. (Ex. 6) 59:12–60:3.  The Levitts made no effort to preserve these records during the six months period when they were shutting down their operations, and the records were either "pitched out" or abandoned, never to be recovered again.  By vacating their business facility while knowingly leaving the records behind, the Levitts caused these records to be destroyed just as if they had thrown them into the trash themselves.[9]

### B.    Merck Is Prejudiced By The Destruction of the Business Records.

The business records, had they been preserved, would have revealed contemporaneous information about the value of the businesses, the economic challenges they were facing, and the impact—or lack of impact—of Ms. Levitt's alleged injuries on the businesses.  While Merck has been able to obtain some limited documentation through third-party subpoenas, those documents account for only a fraction of the multiple file cabinets-worth of business records Plaintiff destroyed.  For instance, no back-up materials exist that correspond to the valuations that Mr. Levitt assessed on his personal net worth statements.  If the Levitts were permitted to testify about their business damages claims, Merck would not have available the destroyed material necessary for cross examination.

This prejudice is not speculative.  It was only through the third party productions in 2015 that Merck was able to discover that the Levitts *never* had the $20 million in net worth originally

---

[9]    Ms. Levitt was not a litigation novice.  During the same time period when she had the obligation to preserve records in this matter, she was engaged in the employment litigation involving the hotel in Nebraska.  *See supra* note 4.  Presumably the Levitts were required to search for and preserve documents relating to that litigation, and she should have been aware that she was required to preserve documents relating to this matter as well.

claimed in Plaintiff's initial interrogatory responses.[10]  In sum, the documents that Merck could have used to probe the accuracy of the Levitts' recollections about their businesses, or otherwise cross-examine them on these issues, have been destroyed in derogation of the Levitts' duty to preserve them.

### C.   The Court Should Preclude the Levitts From Offering Evidence About Their Alleged Business Losses.

At trial, Ms. Levitt would have a substantial and unfair advantage if she or her witnesses are allowed to offer testimony about the subject matter of the documents she failed to preserve—namely, the value of her businesses and the alleged impact of her cardiac events.  To level the playing field, the Levitts should be precluded from offering their own self-serving testimony about their alleged business damages and causation.

Courts in the Eighth Circuit (where Ms. Levitt's case will ultimately be tried) and elsewhere have employed this approach of excluding testimony relating to destroyed evidence. For example, *Dillon v. Nissan Motor Co.*, 986 F.2d 263 (8th Cir. 1993), involved a passenger who was injured while riding in vehicle manufactured by defendant, and who claimed his injuries were caused by a defective seat belt retractor.  *Id.* at 265.  Prior to trial, the plaintiffs had two experts examine and extensively photograph the car, after which it was towed to a salvage yard and ultimately destroyed.  The defendant moved to exclude the plaintiffs' evidence relating to the destroyed car.  *Id.*  The district court found that the defendant was prejudiced by the destruction of the evidence because it could not perform its own tests and examination on the car; thus, the court precluded plaintiffs' expert from testifying about the destroyed evidence or

---

[10]     The personal financial statements prepared by Mr. Levitt during the relevant time period show a purported family net worth ranging from $9 million to $11 million, though more than half of this net worth was attributed to the Levitts' other investments and assets, unrelated to Chocolate Soup or the hotel.  *See* Collection of Levitts' Financial Statements (Ex. 19).

offering related exhibits as evidence. *Id.* at 267. On appeal, the Eighth Circuit affirmed.

Although there was no finding that plaintiffs acted in bad faith, they "knew or should have

known" that the evidence would be relevant to imminent litigation. *Id.* The *Dillon* Court also

noted that Federal Rule of Civil Procedure 37 supported the exclusion of such evidence:

> [T]he destruction of evidence that a party knew or should have
> known was relevant to imminent litigation certainly justifies a
> sanction under the court's inherent power comparable to the Rule 37
> sanctions. When a party fails to cooperate or make discovery under
> Rule 37, the court may prohibit 'that party from introducing
> designated matters in evidence.' The exclusion of [the plaintiffs']
> evidence in [Dillon] was appropriate as the destruction of evidence
> is at least as serious as, if not more serious than, the failure to answer
> or respond to discovery requests.

*Id.* at 268–69 (citation omitted).[11]

The Court should employ a similar approach in this case, and preclude the Levitts from

offering any affirmative evidence about their alleged business damages. Again, Plaintiff's own

damages expert does not support her claims for the lost value of their businesses. Likewise, the

third-party documents that Merck obtained in discovery do not support Ms. Levitt's valuation of

her business losses of between $10 and $20 million. The only evidence to support Ms. Levitt's

---

[11]     In a similar case, *Bass v. General Motors Corp.*, 929 F. Supp. 1287 (W.D. Mo. 1996),
*aff'd*, 150 F.3d 842 (8th Cir. 1998), the plaintiffs sued General Motors alleging a defect in their
seatbelt caused the driver to sustain a permanent head injury in a car accident. *Id.* at 1288. After
examination by their own experts, plaintiffs allowed the car to be destroyed without first
allowing General Motors to examine it. *Id.* The district court precluded testimony from the
plaintiffs' experts who had examined the car prior to its destruction. *Id.* at 1289–90; *see also
Bass v. GMC*, 150 F.3d 842, 851 (8th Cir. 1998) (the Eighth Circuit affirming, and noting that
"[w]ithout question, General Motors was prejudiced" by the plaintiffs' failure to produce the
car); *Unigard Sec. Ins. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363 (9th Cir. 1992)
(excluding expert evidence regarding allegedly defective space heater that was destroyed);
*Perez-Velasco v. Suzuki Motor Co.*, 266 F. Supp. 2d 266 (D.P.R. 2003) (proper remedy for
negligent destruction of evidence was exclusion of expert's testimony and report relating to that
evidence); *N. Assur. Co. v. Ware*, 145 F.R.D. 281, 283 (D. Me. 1993) (appropriate remedy for
plaintiff's "reckless" destruction of key evidence was to exclude the testimony or conclusions of
its expert based on the evidence the plaintiff permitted to be destroyed).

claims for millions of dollars in lost business value is the uncorroborated self-serving testimony of the Levitts themselves.  Ms. Levitt and her husband, however, should not be permitted to fill in the gaping holes in their damages claims with their own self-serving testimony, free from any contradiction by the business records that she failed to preserve.

Because any business records that could have been used to probe or refute Ms. Levitt's unsubstantiated business damages claims were destroyed through her knowing inaction, the Court should preclude Ms. Levitt from offering any affirmative evidence supporting the claimed business losses.

## CONCLUSION

For the foregoing reasons, because the business loss damages claimed by Ms. Levitt are unavailable to her under Missouri law, Merck respectfully requests that this Court enter an order granting partial summary judgment as to those damages.  In addition, because Ms. Levitt knowingly allowed the relevant business documents to be destroyed, Merck respectfully requests that the Court preclude her from offering any affirmative evidence regarding her alleged business losses, and the absence of such evidence also warrants an order of partial summary judgment.

Dated:  June 27, 2016                    Respectfully submitted,

By: */s/ Dorothy H. Wimberly*
    Phillip A. Wittmann, 13625
    Dorothy H. Wimberly, 18509
    STONE PIGMAN WALTHER
    WITTMANN L.L.C.
    546 Carondelet Street
    New Orleans, LA 70130
    Phone: 504-581-3200
    Fax:    504-581-3361

*Defendants' Liaison Counsel*

—and—

Douglas R. Marvin
M. Elaine Horn
Emily Renshaw Pistilli
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Phone: 202-434-5000
Fax:     202-434-5029

*Attorneys for Merck Sharp & Dohme Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Motion for Partial Summary Judgment has been served on Liaison Counsel, Russ Herman, Ann B. Oldfather, and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 27th day of June, 2016.

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel