UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Case No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| *This document relates to* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| *Jo Levitt v. Merck Sharp & Dohme Corp.*, 2:06-cv-09757-EEF-DEK | * | |
| | * | |
| | * | |

*****************************************************************************

### DEFENDANT'S LR56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO DISPUTE

Pursuant to LR56.1, Defendant Merck Sharp & Dohme Corp., by undersigned counsel, hereby submits the following statement of material facts as to which there is no genuine issue to accompany its Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56:

1. Ms. Levitt's damages expert, Dr. John Ward, estimates the present discounted values of Mrs. Levitt's alleged economic loss at either $1,429,325, or $1,776,728. Suppl. Report of John Ward (Jan. 19, 2016) ("Ward Suppl.") (attached as Ex. 1) at 7.[1]

2. Ms. Levitt's rheumatologist, Dr. Arnold L. Katz, diagnosed her with fibromyalgia in October 1999, and prescribed Vioxx to her to treat the pain associated with her condition. Deposition of Dr. Arnold L. Katz (Jan. 30, 2013) ("Katz Dep.") (excerpts attached as Ex. 2) 26:10–13, 29:16–20.

3. In March 2000, Ms. Levitt experienced unstable angina had a stent placed. Following restenosis in May 2000, she underwent bypass surgery. *See* Records of Dr. Michael

---

[1] A Table of Exhibits is appended as Appendix I hereto for ease of reference.

E. Gorton (excerpts attached as Ex. 3) at 138.

4. Ms. Levitt continued to take Vioxx through April 2002, and she did not experience any further cardiac events following her May 2000 bypass surgery. *See* Katz Dep. (Ex. 2) 64:22–65:3.

5. At the time of Ms. Levitt's cardiac events in 2000, the Levitt family owned two businesses—one that manufactured and sold high-end children's clothing, and one that operated a hotel in Nebraska.

6. These businesses operated through several corporate entities: American XO, II, Inc., Chocolate Soup Manufacturing, and Chocolate Soup Retail. The entity of II, Inc. owned and operated the Villager Motel in Lincoln, Nebraska. Chocolate Soup Manufacturing owned the factory and production lines that manufactured the Levitts' proprietary children's clothing designs. Chocolate Soup Retail owned and operated a chain of retail outlets of Chocolate Soup stores. American XO was a parent corporation that owned both II, Inc. and Chocolate Soup Manufacturing. *See* Mission Bank Records (excerpts attached as Ex. 4) at 1770 (describing corporate structure).

7. American XO was owned by Jo Levitt (45%), James Levitt (45%), and their daughter Ashley Levitt (10%). *Id.* at 3557. Chocolate Soup Retail was a separate Subchapter S Corporation owned by Jo Levitt (50%) and James Levitt (50%). *Id.* at 792.

8. The Levitts started operating Chocolate Soup around 1970 out of their home. Deposition of Robert Bazan (Jan. 16, 2013) ("Bazan Dep.") (excerpts attached as Ex. 5) at 45:7–9; Deposition of James Levitt (Dec. 8 & 9, 2015) ("James Levitt 30(b)(6) Dep.") (excerpts attached as Ex. 6) at 145:9–11.

9. The Levitts subsequently established a manufacturing facility to produce their

2

clothing designs and, as of 1999, they had fourteen Chocolate Soup retail outlets across the country.  Bazan Dep. (Ex. 5) 44:11; James Levitt 30(b)(6) Dep. (Ex. 6) 129:4–17.

10. Collectively, Chocolate Soup Manufacturing and Chocolate Soup Retail employed approximately 120 to 200 people.  Bazan Dep. (Ex. 5) 177:19–178:7 (estimating 120); Deposition of Jo Levitt (July 23, 2012) ("Jo Levitt Dep.") (excerpts attached as Ex. 7) at 22:7–11 (estimating 200).

11. In 1975, the Levitts purchased an existing hotel and theater complex in Lincoln, Nebraska from Ms. Levitt's father.  Jo Levitt Dep. (Ex. 7) 35:17–36:7; James Levitt 30(b)(6) Dep. (Ex. 6) 83:19–84:2.

12. Around the time of the hotel purchase, James Levitt hired Bob Bazan, a CPA, to assist with running the Levitt businesses.  Bazan Dep. (Ex. 5) 42:4–7.  Mr. Bazan was a key manager and decision maker within the Levitt businesses, and he testified that he was the Levitts' "right-hand man."  James Levitt 30(b)(6) Dep. (Ex. 6) 14:4–5; Bazan Dep. (Ex. 5) 126:7.

13. The financial aspects of the Levitt family companies were handled by James Levitt and Bob Bazan, not Jo Levitt.  Deposition of James Levitt (July 24, 2012) ("James Levitt Dep.") (excerpts attached as Ex. 8) 34:4–7 (Mr. Levitt was "primarily responsible for . . . the financial end of the business."); *id.* at 95:20–23 (agreeing Ms. Levitt "just wasn't involved in the financial side"); *id* at. 95:1–2 (Mr. Bazan, a CPA, "became a big part of the business as an executive"); Jo Levitt Dep. (Ex. 7) 20:13–16 ("I was in charge of everything other than the financial part of it.").

14. By 1999, only about one-third of the merchandise sold in Chocolate Soup stores was based on Chocolate Soup original designs.  Bazan Dep. (Ex. 5) 92:14–20; James Levitt

3

30(b)(6) Dep. (Ex. 6) 135:17–22.  The remaining two thirds was purchased from other manufacturers at various buying shows in Las Vegas, New York, and elsewhere.  Bazan Dep. (Ex. 5) 39:12–16.

15. Mr. Bazan played a key role in purchasing the clothing items that were stocked in Chocolate Soup stores that were not based on Ms. Levitt's designs.  *Id.* at 33:23–34:15.

16. Mr. Bazan was also centrally involved in the management and financial operations of the hotel.  Jo Levitt Dep. (Ex. 7) 36:24–37:6 ("We've had different managers, . . . young guys that I didn't hire, Bob Bazan hired them."); James Levitt 30(b)(6) Dep. (Ex. 6) 198:12–14 (James Levitt "was never up there a lot" at the hotel).

17. Both the hotel and clothing businesses utilized substantial labor from many people other than Ms. Levitt.  The top management included her husband James Levitt and Bob Bazan.  They also employed numerous others at the manufacturing facility, in the retail stores, and at the hotel including store and hotel managers, designers, factory workers, store clerks who worked the retail counters, maids who cleaned hotel rooms, and servers who worked in the various food and beverage operations.  *See, e.g.*, Jo Levitt Dep. (Ex. 7) 24:11–20 ("I didn't devote as much time on the retail side as far as day-to-day running of it, my husband did more [of] that"); *id.* at 25:19–26:8 (Chocolate Soup had other designers that worked under Jo Levitt's direction.); *id.* at 19:16–21 ("[D]id I personally open [the new stores], some of them, but we had – you know, we hired people and we had a national retail manager and . . . she did some of the opening and then we had a crew here in Kansas City that would go out and open stores."); James Levitt Dep. (Ex. 8) 94:24–95:2 ("[T]hat's why I hired Bazan to begin with.  He became a big part of the business as an executive."); Bazan Dep. (Ex. 5) 124:12–15 (on buying trips:  "It was a team effort."); *id.* at 126:7 ("I was their right-hand man."); *id.* at 179:14–18 (confirms that a team

4

of people worked with Jo, "she had a design staff"); Jo Levitt Dep. (Ex. 7) 36:14:17 ("Q. Did you have any management role in the hotel?  A. No, I just was in charge of the design[.]"); Jo Levitt Dep. (Ex. 7) 37:1–15 (on series of hotel managers: "young guys that I didn't hire, Bob Bazan hired them.").

18. Collectively, the Levitt businesses employed hundreds of people who performed functions necessary to keep the businesses running.  Jo Levitt Dep. (Ex. 7) at 22:10–12 ("in Chocolate Soup a few hundred, maybe 200 . . . we had like 35 sewing machine operators, probably at the factory"); Bazan Dep. (Ex. 5) 74:2–3 (hotel had 60–70 employees).

19. Both the hotel and clothing businesses also utilized substantial invested capital. Chocolate Soup purchased inventory from third parties that provided two-thirds of the merchandise in the individual stores.  Jo Levitt Dep. (Ex. 7) 23:18–22.  Both businesses had various large lines of credit used for working capital.  Mission Bank Records (Ex. 4) at 1770–71 (listing lines of credit).

20. In the mid to late 1990s, Chocolate Soup sustained several years of substantial operating losses, attributable in part to an unsuccessful venture into screen printing.  James Levitt 30(b)(6) Dep. (Ex. 6) 227:9–13; Bazan Dep. (Ex. 5) 107:4–109:2.

21. Chocolate Soup's performance was also hurt by competition from foreign imports during this time frame.  James Levitt 30(b)(6) Dep. (Ex. 6) 225:22–23 ("there was such an influx of imports of better clothes"); Bazan Dep. (Ex. 5) 79:17–19 ("from the 2000s going forward here, that it was . . . prohibitively expensive to manufacture clothes in the United States"); Mission Bank Records (Ex. 4) at 1680 (James Levitt reported, "Margins are still getting squeezed as competition, particularly foreign made goods, has caused problems.").

22. The Nebraska hotel operations were described by Mr. Bazan as a "cash cow" in

5

the mid-1990s, Bazan Dep. (Ex. 5) 75:15–19, but by 1999, that business was experiencing negative cash flow. *See* Affidavit of Bob Bazan (May 2, 2007) ("Bazan Aff.") (Ex. 9) ¶ 8.

23. During this same time period, the Levitts began increasing the debt load being carried by the family businesses and the family. *See* Mission Bank Records (Ex. 4) at 1770–71 (summarizing loan history from 1997–2005).

24. By 2001, the ongoing poor performance of the Levitts' hotel business led to them taking in insufficient operating income to service their business debt. *See* Mission Bank Records (Ex. 4) at 1848 (in 2001, insufficient operating income to service debt "primarily due to the poor performance of the Village Motor Inn.").

25. The hotel's performance was also harmed by increased competition from the opening of new hotels nearby. *Id.* at 1777 (increased competition "hurt business in 2001" and "continued into 2002"); *id.* at 547 (losses continued into 2003 due to "an over-abundance of hotel rooms" resulting in occupancy rate "of less than 50%.").

26. Ms. Levitt attributed a further decline in hotel revenues to a major public works construction project, which "drastically inhibited public access to the Villager . . . [and] was in place from approximately 2003 to 2005." Affidavit of Jo Levitt (May 2, 2007) ("Levitt Aff.") Aff. (Ex. 10) ¶ 17.

27. A city-wide smoking ban then went into effect January 1, 2005, and, according to Ms. Levitt, drove away more customers from the hotel's food and beverage operation. *Id.* ¶ 17 ("As such, the Villager lost the business of numerous 'smoking' patrons."); *see also* Bazan Aff. (Ex. 9) ¶ 14. As the hotel manager noted "[t]he smoking ban had really hurt the business," and Ms. Levitt told him that she "d[id]n't see it getting any better." Deposition of Jeff Ford (May 16, 2007) (Ex. 11) 66:10–11.

6

28.     By January 2005, the hotel was depleting the financial resources of all of the Levitts' businesses.  Mission Bank Records (Ex. 4) at 1775; *see also* Bazan Dep. (Ex. 5) 73:8–12; 30:5–7 (Chocolate Soup was "funding this venture up there for the negative cash flow.").

29.     The Levitt businesses continued to struggle throughout 2007 and 2008.  *See* Mission Bank Records (Ex. 4) at 654 (2007 financial reports "continue to show the property is losing a significant amount of money."); *id.* at 716 (proposing operation of the hotel at partial capacity and total liquidation of clothing business).

30.     Throughout this period, the Levitts substantially increased their debt levels to fund the continued operation of their businesses.  *See, e.g.*, *id.* at 1921 (June 2003 additional personal loan of $350,000); James Levitt 30(b)(6) Dep. (Ex. 6) 195:3–11 (taking out second mortgage on personal residence to put into companies); Citibank Loan Documents (Ex. 12) at 1882 (second mortgage of $500,000).

31.     By February 2008, the Levitts' business debt fell into default.  *See* Mission Bank Records (Ex. 4) at 647 ("all of the loans are in default at this time").

32.     Ultimately, the Levitts decided to sell the hotel property.  *See id.* at 1775 ("[r]eportedly, the land the hotel resides on may be more valuable than the hotel itself."); *see also* Bazan Dep. (Ex. 5) 79:9–13; 91:17–92:8 ("If the hotel sold, all Chocolate Soup debt is wiped out, get a line of credit again, man, we're good.").

33.     They found a buyer, and executed a contract of sale in October of 2008.  Bazan Dep. (Ex. 5) 28:5.  But, shortly after the contract was executed, the sale collapsed.  Mr. Levitt and Mr. Bazan believe that this was due to crisis conditions in the national real estate and financial markets.  James Levitt Dep. (Ex. 8) at 64:2–5; Bazan Dep. (Ex. 5) at 28:16–29:8.

34.     After the sale failed to materialize, the Levitts abandoned the hotel operation, and

7

they transferred the deed to the bank in lieu of foreclosure. James Levitt Dep. (Ex. 8) 113:6–8; Bazan Dep. (Ex. 5) 114:3–5.

35. The assets of Chocolate Soup and the Levitts' other real estate investments were essentially assumed by lenders. James Levitt Dep. (Ex. 8) 61:16–21.

36. Business records relating to both the clothing and hotel businesses were stored at Chocolate Soup's manufacturing building in a "row of file cabinets." Bazan Dep. (Ex. 5) 59:8–61:9; James Levitt 30(b)(6) Dep. (Ex. 6) 20:6–13. These records included corporate tax returns, general ledgers, financial statements and associated documents, accounts payable records, sales and cost information, inventory listings, and other documents. Bazan Dep. (Ex. 5) 59:16–62:20.

37. Financial statements were also kept on computer databases stored in the Chocolate Soup warehouse. James Levitt 30(b)(6) Dep. (Ex. 6) 58:11–60:3.

38. Lenders foreclosed on the Chocolate Soup facility in May 2009, and Jo Levitt negotiated six months to vacate the building. Bazan Dep. (Ex. 5) 133:19–136:10. Starting at that time, through October 2009, the company "got rid of" old records, equipment, and inventory by selling off items of value, and otherwise "pitching" things out. *Id.* at 135:13–138:11.

39. As for the computer databases with financial records, sometime in late 2009, Mr. Bazan went to the office of Chocolate Soup one day after it had been sold to new owners, and the computers were gone. *Id.* at 59:12–60:3.

40. In her 2006 Plaintiff Profile Form, Ms. Levitt asserted that she was making a wage loss claim in this case, and noted that at the time of her injury she was earning $68,400 annually. Pl. Profile Form (Nov. 12, 2006) (Ex. 13) at 3. No reference was made to any business losses. *Id.*

41. Three years later, when she submitted an Amended Plaintiff Profile Form in 2009,

Ms. Levitt expanded the scope of her damages to include lost "Company cash flow & earnings." Am. & Suppl. Pl. Profile Form (Ex. 14) at 30. When asked to provide the factual basis and a computation for each category of damages, she replied: "In 2000 our net worth of approx 20 million. I've lost my business and in process of losing my home." Pl. Resp. to Def. First Interrog. (Sep. 28, 2009) (Ex. 15) at 5.

42. In 2015 discovery responses, Ms. Levitt stated that she "relied upon her husband's representation regarding net worth," and that any questions should "be directed to [her] expert witness." Pl. Resp. to Def. Second Interrog. (Dec. 11, 2015) (Ex. 16) at 4.

43. With respect to a valuation figure for Chocolate Soup and II, Inc. found on a financial statement that he had prepared, Mr. Levitt testified: "Well, I don't have the backup to arrive at that figure right now." James Levitt 30(b)(6) Dep. (Ex. 6) 54:22–25.

44. With respect to Mr. Levitt's valuations of the hotel at various times, he testified: "I didn't do an asset analysis on the hotel . . . it was a number that I thought we could sell the hotel for minus the debt is what I attributed to the hotel." *Id.* at 68:18–23.

45. When asked to explain why the valuations decreased $1.5 million between the December 1999 and April 2001 statements: "I don't know. This is years later. I mean, obviously, I must have had a reason for it." *Id.* at 73:7–74:7.

46. The personal financial statements prepared by Mr. Levitt during the relevant time period show a purported family net worth ranging from $9 million to $11 million, though more than half of that net worth was attributed to the Levitts' other investments and assets, unrelated to Chocolate Soup or the hotel. *See* Collection of Levitts' Financial Statements (attached as Ex. 19).

47. When asked for any evidence regarding any economic damages beyond those

9

analyzed in Dr. Ward's original report, Ms. Levitt stated that she "does intend to identify an expert witness to testify about her additional damages which include medical expenses and additional lost income." Pl. Resp. to Def. Second Interrog. (Dec. 11, 2015) (Ex. 16) at 5.

48. Dr. Ward expresses no opinions regarding business valuation or the Levitts' net worth. He entirely restricts his opinions to assessing Ms. Levitt's lost earning capacity as a business executive. Deposition of John Ward ("Ward Dep.") (Ex. 17) at 15:7–17 ("My calculation's based upon her lost earnings capacity as opposed to the lost value of the business.").

49. Dr. Ward declined to provide any business loss calculations. He explained to Ms. Levitt's counsel: "One of the problems in looking at the corporation's net income is that in a personal injury case we calculate loss of earnings capacity to the injured person versus lost income to the corporation which is a return to capital. *It would be hard to segregate losses of income due to her depression separate from returns to capital and returns to her husband's effort, as well as market conditions.*" Fax from John Ward (Apr. 2, 2014) (Ex. 18) (emphasis added).

50. In his 2016 deposition, Dr. Ward confirmed that while the Levitts had hoped to obtain a valuation for their closed businesses, he did not see that as an appropriate measure of damages in this case:

> I think there was an expectation on the part of Jo Levitt that the loss should include loss of value of business, destroyed business venture . . . . I didn't see any way to directly relate it to the incident in the year 2000 and subsequent events because there were other things happening, like the economy and many other things. So I didn't -- we chose not to pursue that course.

Ward Dep. (Ex. 17) 46:20–47:8.

10

51. When Dr. Ward was asked whether there was any basis to distinguish the Levitts' businesses from the many hospitality industry and retail industry businesses that failed during the 2008/2009 recession, he testified:

> A: No. That's why I didn't try to put a value on their business.
>
> Q: Okay. Because you have no basis to assume that their business would survive over someone else's business?
>
> A: Right. [ . . . ]

*Id.* at 139:14–21.


Dated: June 27, 2016

Respectfully submitted,

By: */s/ Dorothy H. Wimberly*
    Phillip A. Wittmann, 13625
    Dorothy H. Wimberly, 18509
    STONE PIGMAN WALTHER
    WITTMANN L.L.C.
    546 Carondelet Street
    New Orleans, LA 70130
    Phone: 504-581-3200
    Fax:   504-581-3361

Defendants' Liaison Counsel

  —and—

    Douglas R. Marvin
    M. Elaine Horn
    Emily Renshaw Pistilli
    WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, N.W.
    Washington, DC 20005
    Phone: 202-434-5000
    Fax:   202-434-5029

Attorneys for Merck Sharp & Dohme Corp.

## **APPENDIX I – TABLE OF EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Suppl. Report of John Ward (Jan. 19, 2016) ("Ward Suppl.") |
| Exhibit 2 | Deposition of Dr. Arnold L. Katz (Jan. 30, 2013) ("Katz Dep.") (excerpts) |
| Exhibit 3 | Records of Dr. Michael E. Gorton (excerpts) |
| Exhibit 4 | Mission Bank Records (excerpts) |
| Exhibit 5 | Deposition of Robert Bazan (Jan. 16, 2013) ("Bazan Dep.") (excerpts) |
| Exhibit 6 | Deposition of James Levitt (Dec. 8 & 9, 2015) ("James Levitt 30(b)(6) Dep.") (excerpts) |
| Exhibit 7 | Deposition of Jo Levitt (July 23, 2012) ("Jo Levitt Dep.") (excerpts) |
| Exhibit 8 | Deposition of James Levitt (July 24, 2012) ("James Levitt Dep.) (excerpts) |
| Exhibit 9 | Affidavit of Bob Bazan (May 2, 2007) ("Bazan Aff.") |
| Exhibit 10 | Affidavit of Jo Levitt (May 2, 2007) ("Levitt Aff.") |
| Exhibit 11 | Deposition of Jeff Ford (May 16, 2007) (excerpts) |
| Exhibit 12 | Citibank Loan Documents |
| Exhibit 13 | Pl. Profile Form (Nov. 12, 2006) |
| Exhibit 14 | Am. & Suppl. Pl. Profile Form (Sept. 28, 2009) |
| Exhibit 15 | Pl. Resp. to Def. First Interrog. (Sep. 28, 2009) |
| Exhibit 16 | Pl. Resp. to Def. Second Interrog. (Dec. 11, 2015) |
| Exhibit 17 | Deposition of John Ward ("Ward Dep.") (excerpts) |
| Exhibit 18 | Fax from John Ward (Apr. 2, 2014) |
| Exhibit 19 | Collection of Levitts' Financial Statements |

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing Statement of Material Facts has been served on Liaison Counsel, Russ Herman, Ann B. Oldfather, and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 27th day of June, 2016.

                                    */s/ Dorothy H. Wimberly*
                                    Dorothy H. Wimberly, 18509
                                    STONE PIGMAN WALTHER
                                    WITTMANN L.L.C.
                                    546 Carondelet Street
                                    New Orleans, LA 70130
                                    Phone:  504-581-3200
                                    Fax:      504-581-3361
                                    dwimberly@stonepigman.com

                                    Defendants' Liaison Counsel