UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | ) | MDL DOCKET NO. 1657 SECTION L |
| | ) | JUDGE FALLON |
| THIS DOCUMENT RELATES TO: | ) | MAGISTRATE JUDGE KNOWLES |
| JO LEVITT, Plaintiff, | ) | |
| vs. | ) | 2:06-cv-09757-EEF-DEK |
| MERCK & CO., INC., Defendant. | ) | |

DEPOSITION OF ROBERT D. BAZAN, a Witness, taken on behalf of the Defendant before Beverly A. Connell, CSR No. 834, CCR No. 768, RPR-RMR, CRR, pursuant to Notice on the 16th day of January, 2013, at the offices of Bryan Cave LLP, One Kansas City Place, 1200 Main Street, Suite 3500, Kansas City, Missouri.

APPEARANCES

NO APPEARANCE FOR THE PLAINTIFF.

APPEARING FOR THE DEFENDANT:
Jonathan L. Williams, Esquire
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
202-434-5000
jonathanwilliams@wc.com

INDEX

| WITNESS: | PAGE |
|---|---|
| ROBERT D. BAZAN | |
| Examination By Mr. Williams | 4 |

EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| 1 | 01-03-12 letter (Notice & Subpoena) | 8 |
| 2 | 10-03-08 letter (Real Estate Purchase Agreement) | 27 |
| 3 | Hand-drawn diagram | 50 |
| 4 | Financial statements | 55 |
| 5 | Summary of Financial Statements spreadsheet | 95 |
| 6 | E-mails | 128 |

INDEX
(Continued)

| EXHIBIT NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| 7 | 08-19-2010 letter re 401(k) plan | 143 |
| 8 | Chocolate Soup, Inc. 401(k) Profit Sharing Plan & Trust Annual Valuation for the 12-31-2009 Plan Year End | 144 |
| 9 | W-2 forms | 145 |
| 10 | Payroll "haircut" document | 146 |
| 11 | Employee Earnings Summaries | 149 |
| 12 | 2009 W-2s | 152 |
| 13 | Employer's Annual Reconciliation of Earnings Tax Withheld | 154 |
| 14 | American XO, Inc., documentation | 156 |
| 15 | Employee Earnings Summary | 181 |
| 16 | Federal Annual Form 940/Schedule A | 186 |

(Deposition commenced at 9:35 a.m.)

(Bazan Exhibit 1 was marked for identification.)

ROBERT D. BAZAN,

being first duly sworn, testified under oath as follows:

EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, Mr. -- is it Bazan or Bazan?

A. Bazan.

Q. Bazan. My name is Jonathan Williams and I represent Merck in this lawsuit. And I'm going to ask you some questions about Jo Levitt's lawsuit against the company today.

A. Okay.

Q. Could you first state your full legal name for the record, please?

A. Robert David Bazan, B-A-Z-A-N.

Q. And have you ever gone by any other names?

A. No.

Q. Would you tell me your date of birth, please?

A. 12/28/48.

Q. I won't ask any follow-up questions, don't worry.

And where were you born?

A. St. Joseph, Missouri.

Q. How far is that from here?

A. Sixty miles north.

Q. And you understand you've taken an oath to tell the truth today?

A. Yes.

Q. And that's the same oath that there would be in a courtroom?

A. Yes.

Q. And do you feel well enough to answer my questions today?

A. Yeah.

Q. There's no reason, any medications or anything like that that would make it difficult for you to give --

A. No.

Q. -- truthful answers?

A. Huh-uh.

Q. Have you had a deposition before?

A. Yes.

designer and the -- she ran the production, you know. They're everything to the business, you know. Centers around that function. If you're having -- you got -- clothes evolve, you know, fashions change. And she was that person that was the -- she was the one who made it go, you know.

Q. And did she stop -- strike that. Let me ask this again.

Did she slow down working immediately after her heart problems?

A. Yes. These people's personal lives are very private. There was a period in there where it was like where's Jo, you know, how's Jo, where's Jo, you know, we didn't see her. And then I'm thinking like this -- do you know when she had her heart attack?

Q. It was in 2000.

A. 2000?

Q. Uh-huh.

A. Oh, okay. Yeah, it was immediate impact after that. She just couldn't -- she couldn't work, you know. I saw some things firsthand, you know.

Q. And so it was immediately after her

heart attacks in 2000 she stopped working completely?

A. Pretty doggoned much, yeah. And then maybe in a very limited capacity if -- she would still go -- try to go on the buying trips with us. There's two parts to Chocolate Soup. There's the manufacturing side, and then there's the stuff that we buy that we don't make; blue jeans, coats, et cetera. Chocolate Soup was a unique look of appliqued clothing. That was our forte. And that was -- that was kind of like the movie. That's why they came to the movie, but -- excuse me, they'd buy the blue jeans, they'd buy the other stuff, which is the popcorn, so. Yeah, she was the creative talent. No doubt about it.

Q. And the applique clothing was the clothing that was manufactured by Chocolate Soup?

A. Yes.

Q. And then there were other clothes that were purchased and sold by Chocolate Soup?

A. Yes.

Q. Well, we'll get back to the business a little bit more.

Did you -- besides the Levitts, did you talk with anyone to prepare for this deposition?

A. No.

Q. Talk with any family members about it?

A. I told my boss I had to go today. And told my wife they're about as exciting as watching the Chiefs play, so.

Q. Now, you live at 1717 NE 80th Place; is that correct?

A. That is correct.

Q. And does anybody else live there with you?

A. My wife.

Q. Do you have any children?

A. She's in Springfield.

Q. How long have you lived at -- on NE 80th Place?

A. '92. Was that the year of the flood? We moved in the year of the flood. So '92, I think.

Q. But you were living there in 2000?

A. Yes.

Q. Do you have any plans to move?

A. Yes.

Q. When do you plan to move?

A. As soon as I can retire.

Q. Where do you plan to move?

A. I want to be with my family -- my daughter in Springfield. With my grandkids.

Q. Do you have any idea when that might be?

A. It's not up to me. Actually I want to work two years five months and 15 days, okay? That's my targeted --

Q. Good luck.

A. Targeted deadline.

Q. Good luck. What's the highest level of education that you've attained?

A. Bachelor of Science degree.

Q. And what was that degree in?

A. Accounting, with a minor in I guess business -- business administration.

Q. What college did you receive it from?

A. Northwest Missouri State University.

Q. And when was that?

A. Graduated in 1971.

Q. Have you taken any classes since then?

A. CPE classes.

Q. What does that stand for?

A. I'm sorry?

Q. What does that stand for?

Q. Is that correct?
A. Yes.
Q. Do you remember approximately when that was?
A. Yeah. Let me think about it a second.
(Brief pause.)
2008, Jim was getting pressure to sell it. Let me explain why. It was -- as far as Lincoln, Nebraska goes, the property was sitting at Main and Main.
Q. You're referring to the hotel?
A. I'm sorry?
Q. You're referring to --
A. Yes.
Q. -- the hotel?
A. I'm referring to the hotel. It was on 10.9 acres. So the -- the value of the property was at that point in time the dirt, you know. In 2008, he had -- it was under contract to sell. Don't ask me who to. I don't remember now. But it was under contract to sell for 8.5 million. Which would have been around 4.2 over mortgage at that point. Which would have been a nice influx of capital.
Q. Does Silver Offices, LLC, sound right?

A. What's that?
Q. Does Silver Offices, LLC, sound right as the buyer?
A. I still couldn't hear you.
Q. Silver Offices, LLC. Hold on.
A. I don't know.
MR. WILLIAMS: Let's mark -- we'll mark that as Exhibit 2, please.
(Bazan Exhibit 2 was marked for identification.)
BY MR. WILLIAMS:
Q. Have you seen this before? This was a -- it's marked as Levitt Win -- WinNRPDMedMisc-00003. This was given to us by the Levitts. Have you seen that before?
A. Yes.
Q. Is that related to the attempted sale that you're talking about now?
A. Yeah, this is the one for 8 and a half million.
Q. You can look at that if you want to just refresh your recollection before you keep talking.
A. 8.3 million. I thought it was 8.5.

Q. If you look at B 1, there's a $100,000 --
A. No. No. No. Yeah, the -- no, the actual total purchase price if the deal had went through would have been 8.5. There's paragraph B up at the top. Right there, the 8.5. Yeah, I've seen this.
Q. And you said that was about double what was on the mortgage at the time?
A. Yeah, the mortgage was 4.2. 4.2 or 4.3 mill.
Q. Well, what happened in that deal that caused it to fall through?
A. Interesting story. These people -- I had it marked on my calendar for like December 5th. They had 60 days, basically, to kick the tires. And December 6 came and we hadn't heard from them. Which, according to the contract, was we're closing I think within 45 days, or something like that. Very next day, this was the day after the 60-day period, we got a Fed-Ex letter from them, they walked. What they -- what their plans were with it, they were going to tear it completely down, because it -- again, it was 5200 O Street, which is pretty much

Main and Main, if you know what I'm saying. It's got great access, you know. These guys were going to develop it into a -- kind of an open area shopping center type thing. And I think they were even going to get some money from the city to do deck parking. It was a pretty grandiose plan they had. Well, guess what happens? That's the height of the real estate crash. Between the lines, I think one of their key -- keystone tenants backed out, so they started getting nervous and they just basically walked. And terrible deal.
Q. You think that if the economy had stayed strong, that deal would have happened?
A. Oh, yeah. Yeah.
Q. The hotel wasn't doing very well then, I guess?
A. In the latter few years, like 7 and 8, we were not cash flowing. Our plan there was Jo was trying to get up there, and the aspect on the plan there was to try to get the restaurant back up and running. At one point in time, I'm going to say in the 1990s, maybe early 2000s, this is off the top of my head, but we were doing million six, million and eight in food and beverage sales. And then, you

know, the restaurant started slipping. So the turnaround was to try to get at least enough additional revenue out of the revenue -- or out of the restaurant side that we at least covered debt service, you know. So Chocolate Soup wouldn't be funding this venture up there for the negative cash flow, to get to the point where we could sell it. That was kind of the game plan. That was their exit plan on it.

Q. And that was the exit plan starting in '99 or 2000? Or when?

A. No. She -- best guesstimate, '03-ish.

Q. And Jo was in charge of taking care of that?

A. I'm sorry?

Q. Jo Levitt was in charge of taking care of that?

A. Yeah. Yeah. And it was -- it never really got -- her plan for the restaurant -- well, okay, let me explain. We had the restaurant out front called Spike & Ollie's. It's all in this one building. We had a bar and a pan fried chicken restaurant called Sadie's. Sadie's -- we actually -- she made some progress with it and we got it --

revenues up in it. It was doing better. But the whole complex where it was a centralized kitchen because you've got banquet out the back, restaurant in the front, restaurant over here. So you got to look at the whole thing. The restaurant in the front was down to 300,000 of revenue maybe.

Q. This is in '03/'04?

A. No. No. No. No. In the latter years, 6, 7, and 8 probably. But in the early years, it was doing 800, 900 thousand. So when we weren't cash flowing, starting about 5 or 6, maybe 4, then -- well, you got to do something, you know, the business has got to evolve into something. And she tried to get a French bakery opened up there. And just for a lot of reasons, it just never happened, you know.

Q. Can you give me some of those reasons?

A. Yeah. It's kind of a political reason. She hired a guy from France that was a French pastry baker. And he was good. And we couldn't get him legalized to stay in this country.

Q. He couldn't get a visa?

A. No. No. I hate to say this, but if he would have came up probably from the south of the border, I bet he probably could have gotten one.

But this guy had a lot of talent, you know. And Mrs. Levitt worked on getting him with a 10-year work permit or whatever the visa is. Or a permanent residency. And couldn't do it.

Q. What did that work involve for her?

A. What's that?

Q. What did that work involve for her in trying to shift to a bakery?

A. Had to redo the whole front end of the restaurant. It was a major reconstruction, that front end, which she did the designing on. Painted the inside with a bright blue auto paint. The place was -- actually it was pretty cool. The lady had a lot of creative ideas, you know. And just about ready to open. And I don't remember if that was '06, '07, you know. But Frederick had to go back to France. That idea kind of went down the tubes.

Q. What did she do to design it? Did she work with someone, or?

A. We had -- we had a gentleman on the payroll up there by the name of Mark Moore, who was very good in construction. And he was very good in running the maintenance up there. So if Jo wanted something done as far as design layout, whatever, she

would basically communicate her ideas to Mark and they would do it, you know.

Q. So the restaurant was really her thing? Is that accurate?

A. (Indicating.)

Q. She was leading the charge on the restaurant. Is that accurate?

A. Leading the charge? As best she could. But she didn't have a lot of stamina. She didn't have any energy. There was times where she'd go to Lincoln and not come out of her room, you know. I had that same experience on some buying trips. It wasn't good.

Q. Did you talk with her about that at all?

A. Huh?

Q. Did you talk with her about those experiences at all?

A. (Indicating.)

Q. When she wouldn't come out of her room, did you ever have any conversations with her about that?

A. Well, I'll relate to you an experience that happened when we were in Vegas. We do two

buying trips a year. There's -- it's called the MAGIC show. It happens in February, happens in -- sometime in August. And we were working -- well, we were done working for the whole day. And it's a real grind. It's like eight to six. Because her and I basically went out -- at some point we started bringing a third lady -- or another lady with us, I'm sorry, to help do the picking. My side of the buying part of it, I was the numbers guy. I had a history of how we'd performed with each vendor, how margins were. I actually had pictures of everything that we'd bought from them, thumbnails. So when we were going to go work that line the next year at the booth, I mean, I could bring it out and show her visually what -- you know, what we did, whatever. Anyway, it scared the hell out of me. We started working at one booth and she was doing okay. I mean, she was in there picking. I thought, gosh, this is kind of the old Jo, you know. And about an hour later she just disappeared, you know. Well, I assumed she went to the bathroom. So I set there like an idiot for 15, 20 minutes thinking she's coming back, just waiting on her to come back. And she didn't come back.

Q. She didn't say anything before she left, to you?

A. No. So I went upstairs to the restroom area just to see if I could find her. You know, I didn't know if she had a relapse, if she had a heart problem, you know, I don't know. You know? And so I finally called Jim and said, Jim, I don't know where in the hell Jo went. And I said can you try to call her. I said I've called her cell phone, she won't answer, you know. So he called me back about a half hour later and says she's done. Do the best you can. So.

Q. Had you heard about anything like that happening with her before?

A. Yeah.

Q. Or seen it?

A. What's that?

Q. Or seen it?

A. Yeah, there was another buying trip where we'd walk -- we were standing at Bally's and we walked to Paris for dinner, which is not too far away.

Q. This is in Vegas as well?

A. Yeah. And we made it over there fine.

We had a good dinner, you know. I don't recall if we were with a vendor or not. But we walked back and about halfway back, she basically said I'm not feeling very well, and she started -- she looked real pale. We actually set down at one of the water fountains out there in front of Paris for, I don't know, 15 minutes, and I said do you want me to call 911, you know -- you know, what do you want me to do, you know. She said just get me back to the room. So we set there for a while. And she got better. And basically I wouldn't say I carried her back to the room, but I would -- you know, she was holding on, and I got her back to the room. And I don't believe she went to work the next day either, so.

Q. When do you think that was?

A. '06, '07. That's just my best guess.

Q. Six to seven years after she had her heart problems?

A. It might have been a few years after that. But it was definitely after she had her heart attack, yeah.

Q. What did it look like to her? Like she was -- to you? Did it just look like she was tired? Or how would you describe the state she

seemed to be in?

A. No stamina. Lack of energy.

Q. Did she seem depressed?

A. She was -- there were signs of depression, yeah. Yeah.

Q. What signs of depression are you thinking of?

A. Irritability, sadness, inability to function, if you know what I mean. I've seen depression my whole life, starting with my mother. And she had the symptoms of it, you know.

Q. Did you notice anything like that before 2000?

A. Oh, no. No. Jo? No. She was -- she was a energetic workaholic, you know.

Q. Did she ever take vacations before 2000?

A. I guess, yeah.

Q. And do you know about any of them?

A. Not really. Their -- their private lives -- or excuse me, their personal lives are very private. They don't tell a lot of people what they do or where they've been. They're very private about that. I always respected it.

Q. You just didn't want to pry?

A. What's that?

Q. You didn't want to pry?

A. They're the bosses, you know.

Q. You said she was a workaholic, I think?

A. Yeah.

Q. How much would she work?

A. Eight, 10-hour days. Or more. When we would go to -- on buying trips before -- before she had her heart problems, she'd wear me out. I mean, it was always, okay, let's go one more place, let's go here, let's do this, let's go see this line here. You know? It was like okay, you know. Okay, let's go do it, you know. But before she had the heart attack, we'd go to the shows. I mean, my God, we got there whenever it opened. If they opened at eight, we were there at eight. If they closed at 6:30 -- we were still working at 6:30, I mean, you know. The way the buying works, she was the picker, but I had all the analytical information and pictures from last year. And she basically would rate what she saw. She was always looking for trends, you know. She was a designer, you know, really good

buyer. Hell of a good buyer. And always looking for that leading edge trends in kids, you know. It doesn't change as much as it does in ladies. But, oh, yeah, there was times where we'd work 6:30 and, you know, some client would take us to -- not client sorry, vendor would take us to dinner and, you know, you'd get back to your room at 10:00 and you're up in the morning at 6:00 ready to go again. But yeah, she was a real trooper. She was really good at it.

Q. And you'd do those buying trips twice a year, is that what you said?

A. We used to do more in the -- I'm going to say I really got active in the buying somewhere in the mid '90s, I think. She and I used to do Vegas twice a year, New York three times a year. So we'd do five trips. And they were -- everybody said, oh, gosh, I wish I could go to New York and have all the fun you're having, and I'd go you're welcome to take my place any time you want to.

Q. Because you were working these six a.m. to who knows how late days?

A. Yeah. It was -- it was pretty involved. Jo's hell fire.

Q. Did she do a five-day week? Would she

work six or seven days? How many days a week was she doing these 8- to 10-hour days?

A. Full-time yeah.

Q. Full-time meaning?

A. Every day. Yeah.

Q. Every day five days a week, every day working on weekends?

A. Well, that I wouldn't know. You know, I knew on some occasions that she was there on the weekends, just from, you know -- from the production guy would come to me and said, oh, Jo must have came in because we've got a bunch of work that was released, you know.

Q. Let's back up and talk about your role at Chocolate Soup.

A. Okay.

Q. You started in about 1980?

A. Yeah, January 1980.

Q. And that was when the hotel had been purchased in Lincoln; right?

A. Yes.

Q. And so what was your -- well, strike that.

And you'd been doing some accounting

work for the Levitts before; is that right?

A. That is correct.

Q. And so did you approach them about working? Or how did that -- your hiring work?

A. Well, let's see. I was in public accounting, let's see, '74, '75. I was a young sprout, wanted to be -- make partner some day there, so this client I guess walked in the door and Mr. Donnelly pitched him to me and said, here, we've got this little company called Chocolate Soup, you know, see what you can do. You know, I took a look at it and filed some tax return -- corporate returns for them. And quite frankly, I didn't expect to get paid, you know. I thought, come on, you try to manufacture kids' clothes in the United States and you're trying to sell them in your own stores? I mean, kind of a, you know, novel idea. And next year he came in with a check for last year, I don't know, three or four thousand dollars, I don't remember what it was now. But he goes, oh, here, here's some money for this year. And through the financial statements at that point you could see that, you know, things were starting to happen. You know, they were -- back when I worked there in '74, '75, I think maybe they

had three stores, Kansas City, St. Louis, and maybe one other. And then I went to work for another company from '77 -- April of '77 through January of '80, I guess, as a controller. Jim called me out of the blue and said I just bought this hotel in Lincoln and would you like to come back -- would you like to come to work for us. And at that point, he made me the proverbial offer I couldn't refuse, so. It was a big financial raise for me, so I took it.

Q. Do you remember what your financial compensation was when you started at the company?

A. I started --

Q. When you started working with --

A. Forty thousand a year.

Q. And did you have any ownership interest?

A. No. Never have.

Q. And what was your salary in your previous job?

A. (Indicating.)

Q. What was your salary in your previous job?

A. Twenty-eight with a $2,000 bonus or something.

Q. So that's a big change?

A. Yes. Yeah.

Q. While you were working at Chocolate Soup, did you ever get bonuses?

A. They always came in the way of pay raises. You know? My ending salary, I was up to 130,000. They were very generous people.

Q. Aside from the Levitts, did anybody own Chocolate Soup or the hotel or any of the entities?

A. No.

Q. Can you just explain to me what the structure was -- my understanding is there's an American XO entity that owned II Incorporated, which owned the hotel. Are you familiar with that structure?

A. Sure.

Q. Could you describe that for me?

A. Yeah.

Q. Or maybe even draw it.

A. Okay. We had AXO. It's a holding company. 1/31 fiscal close, it had two subsidiaries, CS Manufacturing, then it had II, Inc., the hotel. Basically, I used -- I worked -- everybody worked --

or some of the people worked either here, here, or both. You know what I'm saying? So what we did, we used the AXO as a paymaster, so we had all our salaries in one place for W-2 reporting purposes with the IRS. But then we allocated out costs to here.

Then there's a third company, Chocolate Soup Retail, probably formed in 1984, somewhere off around there. And it was 100 percent owned by Jim and Jo. And it basically ran -- had ownership of all the retail stores. We've had anywhere from -- at its peak, we had 14 doors. Okay? So this entity, of course, would sell to here and then this entity bought other stuff. All the lease expenses, payroll and stuff associated with the retail of course were paid out of the retail.

Q. Back up just a second.

A. Okay.

Q. So you drew there a line from Chocolate Soup Manufacturing to Chocolate Soup Retail to indicate that Chocolate Soup Manufacturing would sell to Chocolate Soup Retail --

A. Right.

Q. -- is that right?

A. Yeah. It -- Chocolate Soup

Manufacturing never sold anywhere else. It was totally exclusive to the retail stores.

Q. Before -- was there ever a period when it wasn't -- Chocolate Soup Manufacturing, when it wasn't selling only to the Chocolate Soup Retail stores?

A. Yeah. Probably in the very, very -- they started the company like in '69 out of their garage. Jo designed appliques, which they, I guess, actually probably cut out in their garage. And Jim was kind of the salesman and would go to the -- like fabric stores. And he had a display that he always kind of thought was interesting. It actually took up one square foot of retail space. Okay? Well, if you know anything about retail, sales are measured in terms of sales per square foot. So that was his selling point. So he sold these applique kits, you know. Then somewhere in '71 opened a store here in Kansas City. Sometime shortly thereafter or a year later, in the '70s sometime. Then they opened in St. Louis. And another store from -- in Oak Brook, Illinois. And then, you know, may have added -- oh, then they went south. That's what it was. After that, then they went to Dallas and Houston. As the

what the business was worth?
A. Well, the -- the hotel had appraisals that -- around this time frame, '97, that's when we took out a mortgage on it. They appraised it at 7 and a half. Chocolate Soup -- the Chocolate Soup was earning 400 to 500 thousand a year. So if you use a 10 percent cap rate, 5,000,000. I know nothing about Shawnee Mission. I know nothing about Great Plains. Don't know anything about 44 Shawnee. Oh, yeah, right. 905, he actually owned the building. That was our manufacturing plant.
Q. This is 905 NE Colbern Road?
A. Yes. That was the manufacturing plant.
Q. Are you familiar with the process for obtaining a line of credit from the bank?
A. Sure.
Q. And in addition to materials like this, what would you generally have to give a bank --
A. Financial statements. Sometimes maybe tax returns, too. I don't know. Just depends. Whatever they wanted.
Q. Did Chocolate Soup have a line of

credit?
A. Yes.
Q. Okay. Did you participate in assembling the information required to get those lines of credit?
A. Actually Jim did.
Q. And were you part of that process?
A. Well, to the extent that I prepared the financial statements, yeah. Our internal financial statement.
Q. And those financial statements would have been part of the package to go to the bank to get the line of credit?
A. Yeah. Yeah. The bank got -- from us they got monthly financial statements.
Q. And would -- Chocolate Soup would have kept copies of the financial statements as well?
A. Yeah. Where they are today, I don't know.
Q. What kinds of records, beyond financial statements, would Chocolate Soup have had when you were working there?
A. I don't know if I understand your question. Well, anything associated with the

financial statements. If you have accounts payable, you've got a listing of who you owed. You've got inventory. We took physical inventory in the stores. We used to have stacks of inventory sheets that high (indicating).
Q. Were there file cabinets to keep records?
A. Yes.
Q. How many -- how much space did those cabinets take up?
A. Jim -- when we were out at the Colbern Road location, I'm not sure what year we moved in there, I guess it was sometime -- at least in front of '97. Yeah, Jim had a whole row of file cabinets, maybe eight three-drawer file cabinets.
Q. And it's -- as far as you know, those were records related to Chocolate Soup and the hotel?
A. And his other businesses. The -- the bank stuff, you know. Well, do I know what he had in his file cabinets? No. I never opened them. He had them locked, but.
Q. Were there computerized records as well?
A. What's that?

Q. Were there any computerized records?
A. Yes. Our -- I prepared monthly or quarterly, on our mainframe computer, reports that came out on green bar, the financial activity. And those basically -- I'd give him copies of them. The hotel, we absolutely did monthly financial statements. Copies of corporate returns, everything. He signed them. You know, there was copies there. He had the copies at some point, you know.
Q. Were you responsible for maintaining any records?
A. Well, yeah. All the payroll taxes, general ledgers. You know, it's on the mainframe, yeah, you got a piece of paper, but yeah, I had the financial statements, too. I had copies of them at one time.
Q. Those would have been computerized?
A. Yes.
Q. So there would have been information about sales at the different stores; is that right?
A. Sure. I really liked our system we had out there. It was -- it was a Pick, P-I-C-K, operating under Unix. That was our internal mainframe. It was a numbers cruncher. It was good

Q. Did you also keep track of what the costs were for the business?
A. Oh, yeah.
Q. What kinds of costs did the -- what categories of costs would be involved in manufacturing clothing?
A. Purchases of materials. Purchases of buttons and threads. Purchases of notions. Labor costs directly associated with it. We had a automatic cutting machine, so you would have costs associated with that, you know. Overhead cost. But your direct costs are the labor. You had direct labor, you have indirect labor. Then, you know, your materials costs. Yeah.
Q. And there would have been records of all of these costs?
A. Sure. Yeah, everything -- any transaction that we paid or whatever we paid was done automatically on -- through computer checks and was -- would go into generating financial statements.
Q. And was there an outside auditor?
A. He didn't do an audit. But yes, we had an outside accountant that did the corporate returns and issued a annual financial statement.

Q. And you would have provided financial information to that person?
A. Yes.
Q. And who was that?
A. The firm was C-Biz, C dash B-I-Z.
Q. The letter C?
A. What was that?
Q. The letter C?
A. Yeah. They're a fairly large firm. I think they're bigger than just the Kansas City area. Basically the way it worked, I would give them the general ledgers of all the companies. Okay? I would make adjustments for -- to adjust the inventory to actual year-end accruals, real estate tax accruals, everything that would go to it. And then ship those off to them. Then they had spreadsheets that they basically just took my numbers right down from general ledger and just entered them in and through the Excel spreadsheets generated financial statements.
Q. And the information that you were collecting to transmit, was that the same kind of process that you would have gone through as a CPA before you started working for the Levitts?

A. I don't think I understand what you mean.
Q. How did you know how to do what you were doing when you were putting together the information for the financial statements?
A. Oh, give them everything they would -- well, I gave them everything that I knew from being a CPA that they would need to prepare the financial statements.
Q. And then you would be --
A. Like -- if we had cash in hand or cash in the bank, I'd attach a bank reconciliation with it. So they could go tick, tick, tick, tick, tick right on down the line on the things. They maintained the depreciation schedules because the depreciation got complicated over the 30-year period I was there. But accounts payable, I gave them all the backup support for it. Yeah, I basically made a workpaper that I referenced into their trial balance that I'd give them, it was a backup. Like L1, they could find that on there, flip to L1 and find the backup supporting workpaper for it. I gave them everything that I would have gave if I -- or that I would want from a client for me to do the tax return.

Q. Did you give them the information in boxes?
A. Oh, yeah. Yeah.
Q. How many boxes a year would you be giving them?
A. Oh, I think we finally got it down to where we just sent them -- an annual green bar report would probably be four inches (indicating) thick per company. And then it had the financial statements on top of it, two or three pages. Supporting documents for accounts payable (indicating) maybe an inch thick, I don't know. I don't know. Backup on rental security deposits at the stores, you know, we'd have a list to tie it into the lease. Financial statement footnotes requires that you disclose lease information for five years so I'd help with the footnotes on that kind of stuff. I basically gave them what they needed to do to do the tax return and the financial statement.
Q. And this was information related to the manufacturing operation, the hotel, and the retail operation; is that right?
A. Yes. They -- they issued two reports a year. American XO consolidated. The first few

A. Okay.
Q. You'll see at the top it's dated November 15th, 2005. And the American XO, Inc., and Chocolate Soup Retail, Inc., is valued at $580,000. Is that what you see there?
A. Yes.
Q. If we can just turn to page 63.
A. Okay.
Q. You'll see the date there is July 1st, 2007. And the valuation for American XO and Chocolate Soup Retail is 5.2 million. Just over 5.2 million?
A. Yeah, I see that.
Q. That's a large increase -- or that's an increase in value; right?
A. Yes.
Q. Do you have any idea, based on your experience working at the company then, what could have accounted for a change like that?
A. You'd have to ask him, but I would -- I think I know the difference. I think that's probably -- we had an appraisal around that time frame for the bank loan. So I think he probably jumped it for the amount of the -- because he says

American XO. American XO would have owned II, Inc.
Q. Okay.
A. My -- my guess -- well, no, I hate to guess. I shouldn't guess. You should ask him that question. But that would be about the time that we had an appraisal. So if the appraisal went up, he probably took the number up.
Q. Setting aside these numbers here. Do you think that there was a big -- was there anything -- strike that.
Was there anything going on from 2005 to 2007 that would have made the business a lot more valuable, independent of somebody's outside appraisal of the business?
A. You'd have to ask him. But the only thing I can think of is that the land values in Lincoln -- this was in '07. The land values in Lincoln were going through the roof. I got a feeling he adjusted his personal financial statements to reflect the higher values for the land.
Q. Setting aside --
A. But you can ask him that question instead of me.
Q. But just setting aside his decision

and focusing on your familiarity with the company. Other than the increase in land value, was there anything else going on that would have resulted in improved financial condition of either the clothing business or the hotel?
A. Between 5 and -- between 2005 and 2007? I can't think of anything.
Q. How would you generally characterize the state of the hotel and clothing business during this 2005 to 2007 period?
A. Chocolate Soup was maybe making a little money. The hotel was starting to wane, you know. But the exit plan there, and I think this ties in why that number jumped, was he wanted her to get -- the restaurant was the big turnaround possibility.
Q. This is the bakery?
A. Yeah. You know, get it up from 300,000 sales back to 900,000 sales. We got enough cash flow at the two-thirds gross profit margin to pay the debt service to the bank, take our time, find a buyer, you know. And that was kind of the -- businesses constantly evolve. You know, IBM went through hard times way back when. Then, you know,

Lou Gerstner came on in the early '90s, turned the company on its head. Well, Chocolate Soup on a much, much smaller scale, you got the same thing. You're doing well financially and all of a sudden business conditions change, or whatever, so you have to adapt. You know? That was the plan on the hotel, was to get it up to where it -- the restaurant could cash flow.
Q. So was the clothing business subsidizing the hotel essentially at that time?
A. Well, as much as we could, sure. Yeah, but it was -- it was tough. Yeah. It was tough going.
Q. But you were responsible at various times for hiring managers at the hotel; is that right?
A. I'm sorry?
Q. Did you -- did you participate in hiring managers at the hotel?
A. Yes.
Q. Other than the manager, who worked at the hotel?
A. Well, you've got -- you have a head chef. You know, restaurant staff. You've got bartenders. You've got front desk clerks at a hotel.

Page 74

You've got 15, 20 maids. It was a 192 room hotel. Probably altogether there was probably 60 -- 60 to 70 employees up there in Lincoln.
Q. Did you --
A. And maybe -- go ahead.
Q. Well, keep going. Were there more kinds of employees?
A. Well, there was two that were paid off of American XO that specifically worked at the hotel. There was Tamela, with a funny last name. I'm not even going to attempt to spell her last name, because I'll have it wrong. But it's on the W-2 there. She was the hotel general manager. Made around 40, 43 thousand a year. Mark was the construction maintenance man.
Q. What was Mark's last name?
A. Moore, M-O-O-R-E.
Q. Can you give me a little background about the hotel, how the Levitts came to own it?
A. Their father's business.
Q. And do you know about when it was built?
A. Built in phases between '69 and '71.
Q. And they purchased it in '80 you said?

Page 75

A. No, November 15th, 1979.
Q. Who -- who was the clientele? Was it near an interstate and got travelers?
A. No. No. We were a mid-town location. It's -- O Street is the longest Running Street in Lincoln, Nebraska. It goes from the west side of town to the east side of town. We were at 52nd. So we were a little bit out of the downtown area, but right where the hub of retail and activity was. A giant Hy-Vee store next door and all kinds of good stuff.
Q. So --
A. It was a mid-town property would be a good description.
Q. If you were going to say a certain time period was the best time period for the hotel financially, when would that have been?
A. Oh, in the mid to late '90s, it was a cash machine. It was a cash cow.
Q. So what changed?
A. What changed? Well, competition, I guess, changed. You know? The restaurants were doing -- started to slip. That's when she was trying to make some efforts to get up there and do something

Page 76

about it. There was -- we did major renovations in '97 through '99. I mean major renovations to the facility.
Q. Were you involved in those renovations?
A. No. She -- it was her designs. I was involved to the extent that I paid the bills.
Q. Was that an architect?
A. No. She did it. This is what I want. Well. In all fairness, yes, if there was -- to meet code, city code, yeah, at some point -- some additions that we did required architectural drawings, yeah. They were just rubber stamping her ideas.
Q. Was the hotel branded? Was it a Best Western?
A. It was a Best Western.
Q. Was it a Best Western the entire time that you worked?
A. That got dropped in -- sometime in the early 2000s. We weren't getting much bang for the buck for it.
Q. You'd have to make a payment to Best Western to be a Best Western hotel?

Page 77

A. Yeah.
Q. Now, in the '90s when you said it was doing well, do you have any idea what the profits were?
A. Cash flowing a million bucks.
Q. And when you say cash flow, you mean?
A. EBITDA. E-B-I-T-D-A. Earnings before interest, tax, depreciation and amortization. And the debt service at that point was maybe 400,000 a year. So it was doing -- doing very good.
Q. Is that after the renovations?
A. Yes.
Q. And was the debt service primarily to -- for the cost of renovations?
A. Yes. Well. And the existing mortgage. The existing mortgage and the new money rolled into the -- rolled into it.
Q. And did both the hotels -- both the hotel and the restaurants decline in business? Or was it just one or the other?
A. Well, it just -- from its peak, the restaurants were doing -- the restaurant and banquet facility were doing in its heyday like a million eight. You know, it was pretty good profitable. The

hotel now when you get around to the 2000s, it started to slip, okay? The numbers speak for themselves if you'd have saw it. But -- so what's the plan? Well, their plan was, okay, the business needs to evolve. Well, let's get the restaurant back up to where it's covering debt service. Chocolate Soup then doesn't have this lug going over here on the hotel. We'll do fine over here on the soup side. You know? Just unfortunate she -- she just didn't have any get-up-and-go. I mean, it just -- no stamina, no -- no energy as versus pre-heart attack. I mean, pre-heart attack, that woman was a dynamo. She really was.

Q. Was there ever any conversation about, you know, hiring somebody to do the kinds of things that she did?

A. To replace Jo? I don't think you could replace Jo. No way. She was that good.

Q. But was there any -- accepting that everybody's unique, was there any thought, you know, we're not getting the same contribution that we -- we used to from Jo, maybe we need to find somebody else to help out on this?

A. No. We just needed more of her is

what we needed. She went off salary at some point. I'm going to say sometime in the early 2000s. Totally went off salary when she wasn't working. It was only Jim getting the salary. And then, you know, now we get to '06, '07, '08, you know, then Jim finally quit taking a salary. These people did everything they could to try to reorganize the business, you know, get it to survive, get the hotel sold. If the hotel would have sold for the 8.5 million, I'd still be working for them. I mean, it wiped out -- it would have wiped out all the debt at Chocolate Soup. We would have started with a fresh, clean slate. It was unfortunate that sale just didn't make it. So that was his out plan.

The other thing that the business was evolving in this -- in this time frame, I'm saying from the 2000s going forward here, that it was -- it's prohibitively expensive to manufacture clothes in the United States; i.e., there is next to none manufacturing in this country. Well, we started developing -- with her input, we started developing -- oh. When you went to the MAGIC show, there was two other shows, there was the off-price shows where you went to look for bargains, and then

there was an overseas trade show.

Q. These are shows to purchase clothing?

A. Yeah. They ran in conjunction with MAGIC. When you go to MAGIC, there's -- the MAGIC show stands for Men's Apparel Guild In California. But they have women's, ladies, kids retail booths -- not retail booths, vendor booths. Then they have an off-price show where there was bargains to go look for.

Q. And this is in Vegas?

A. Yes. And then in addition to that, they have an overseas manufacturing. We spent -- oh, we would go over there and -- we made some contacts. We actually got a -- what we wanted to do was, you know, basically wind down the manufacturing at Soup and start making with our label overseas. Okay?

Q. When did that thought start?

A. Early 2000s, I guess. You know? And constantly kind of going forward.

Q. Jo -- Ms. Levitt, when she testified, said that she had been in the Philippines when Imelda -- when Marcos fell. Do you remember anything about that?

A. I was there, too.

Q. You were?

A. Yeah.

Q. And so that wouldn't have been in the 2000s?

A. I don't know. If you know the year, that's fine. I don't know what year it was.

Q. It was -- I think it was in the '80s. In any event, it was --

A. '80s? Nah. I don't know.

Q. Well, do you remember, was that trip before the 2000s?

A. Oh, absolutely. Yeah.

Q. And that was related to the possibility of overseas manufacturing as well; is that right?

A. It actually related to one specific company. There was a -- some friends that we had in the business, they both have since passed. But I can't even think of their names. But they had a very nice line of smocked baby clothes made in the Philippines. It was called Rosie's Kids. And they were in their late 60s, maybe even in their 70s, they had no continuation plan for children or anything. And we were interested in buying Rosie Kids and

Jane worked there probably 30 years.
Q. Did she also live in Kansas -- in the Kansas City area?
A. Yeah.
Q. So is your recollection that -- then that the sales remained fairly consistent through the 2000s? Or were they falling off, or what?
A. They were -- they were falling off, but we were getting the gross profit up. Because we were bringing in these other lines now with bigger margins. Okay? We shopped hard. You know? So the sales -- the lack of sales or sales started to decrease, we had some increase in margins which offset that. But a lot of times I just didn't have the money to go buy something. You know? I mean, we passed on lines that, you know, I looked at them and go damn, I'd really like to have that. You know? But if you can't buy it, you can't buy it, you know. You don't have the money.
Q. So you were able to identify things that you had a very good feeling would sell well, but you just couldn't put the product in the stores because you didn't have enough money?
A. Yeah. What happens -- what happens

when you start paying your bills late in the rag business, okay? You get cut off on credit. So if you want the goods, CIA, cash in advance. So the minute you start playing that game, so now you're taking care of these set of vendors, and they're key vendors, but they got to be paid in advance. You got this group over here now that's not getting timely paid. You know, 'cause these are key. You know? So you've got to take care of them to survive. You know.
Q. So when did that problem start?
A. Oh, that was '07s, '08s, '09s. I mean, it -- you know, it -- I was paid a lot of money while I worked there. I took nasty calls from vendors all the time, you know. We did what we could. And you know, I could actually see the thing all coming back together. You know? If the hotel sold, all Chocolate Soup debt is wiped out, get a line of credit again, man, we're good.
Q. And that would have allowed you to make the purchases that you needed to have --
A. Yeah.
Q. -- a successful clothing business?
A. Yeah.

Q. But the idea was --
A. But when Peter is paying Paul to pay the mortgage, then, you know.
Q. So the idea was get rid of the hotel, focus on the clothing business, off -- offshore the production, and you'd have a sustainable entity that would be financially successful?
A. Right.
Q. During -- over time, did the percentage of Chocolate Soup branded goods versus other branded goods change?
A. Yes.
Q. How did -- how did that change?
A. It used to be Soup would run -- again, this is approximately. But counting the blouses in our Chocolate Soup line, probably 40 percent of sales. And then, because of the cost prohibitive, what we started to do was taking money out of the manufacturing and dropped it to where maybe it was about 25 percent of our sales and took that money that we were saving from not manufacturing, put it over here, trying to buy other clothes that had -- that we could make more money on.
Q. If you had been able to do more

manufacturing offshore, would the Chocolate Soup branded apparel have been a larger part of the sales? Was that the plan?
A. Well, at that point if you're not doing any manufacturing, you're doing what the Ralph Laurens of the world do. I mean, you have Ralph Lauren label, but it's made everywhere, you know. So the goal was we'll have the Chocolate Soup label and we'll have it made in various countries.
Q. And if you'd been able to reduce the costs of producing Chocolate Soup labeled apparel -- well, strike that.
I'm trying to understand was the percentage reduction in the apparel in the stores that was Chocolate Soup branded, was that because of the cost of production? Or were there other factors that caused that change?
A. Quite honestly, a lot of it was because Jo was in charge of the production, she was in charge of the designing, the creative ideas. When she couldn't work, things would sit in the plant that -- just waiting on somebody to put the okay on it so we could get it into production. You know? And so they would come to me and, you know, what do

Page 106

A. Yes.
Q. Okay.
A. What changed from 2001 going forward, I think the accounting changed. Doing the combined statement, that's a little tricky, quite frankly, to put together. They were -- they got it done. And then accounting kind of changed where they were more comfortable just issuing separate reports each year of American XO and Chocolate Soup Retail. Okay? In other words, these early years maybe accounting required it, I don't know. I wasn't in public practice at that time. The statements we got there was hotel, IE, with American XO and then a combined financial statement of the two. For an outside reader, if you looked at retail, but you know this guy manufactures, okay? It presents a better snapshot of the company's operations if you combine those two. So.
Q. And that's because you have one entity that sells everything to another entity?
A. Yes. Right. This looks like definitely something I would have prepared.
Q. You said a minute ago that 1992 was a good year. I think. Do you remember, was that the

Page 107

best year? Were there even better years before '92?
A. I would say the years before that were better, yeah.
Q. From 1996 there's an $855,168 loss in the combined net income column. And then off to the right it says 370,632 of extraordinary loss?
A. Yeah.
Q. What does that mean?
A. Well, included in the 850 is what's called an extraordinary high on the one time event that you show on the financials as a separate item. I'm trying to give you an example that you might understand. If you had a -- say you had three locations and one burnt to the ground, you know, you would show the continuing operations on the financial statements, and then this thing down here is an extraordinary expense or income. It could go either way. Do you understand what I'm saying?
Q. It's a one time thing?
A. Yeah. You got me. I have no idea what that would have been. I don't remember.
Q. There was a suggestion in Mr. Levitt's deposition that there might have been an experiment with screen printing at that time?

Page 108

A. Yeah, that might be it.
Q. What can you tell me about the screen printing foray?
A. That -- that could be it. I would -- I would go on whatever he told you. I don't know.
Q. What can you tell me about the screen printing?
A. It was something we were trying to -- Jo was trying to add in addition to the applique stuff. Okay?
Q. So it would have been a different line?
A. You decorate the garment with -- in kids' clothes you embellish it in certain fashions. Okay? You could do applique. You could do embroidery. You could do a combination of applique and embroidery. Or you can do screen printing. Cheap screen printing is like you go out and buy a T-shirt out here that says Kansas City Chiefs on it. Okay? The screen printing she was trying to do was very artsy, you know. Didn't work.
Q. It was just a flop and they stopped?
A. Had some success with it. But a lot more failures. It got -- well, it didn't sell. It

Page 109

didn't sell. You get rid of it. You know, mark it down, move it out.
Q. Do you know what inspired trying screen printing?
A. Well, like I say, she's the fashion person. Designs change over the years. If screen printing was hot in that year, then you try to come out with some product with screen printing on it. You know, tomorrow if they wanted plastic cameras or -- on the kids' clothes, I guess they would have figured out a way to start putting plastic cameras on kids' clothes, you know. I don't know.
Q. Just a matter --
A. Designer -- designer -- she was -- as designer, she was always looking at leading edge stuff. You know?
Q. So she thought screen printing would do well and it just turned out it didn't, and so that was stopped?
A. Yeah.
Q. And these numbers fluctuate year-to-year. And this might be an impossible question. But do you have any idea what would cause these fluctuations?

interest payments, so the idea was to try to reduce the payroll?

A. Yeah. Yeah. After '08 I -- you know, at the end of '08, by that point, the -- the hotel was gone. The bank repo'd it. If that deal would have went through in December of '08, it would have been really nice. So at the end of '08, then it was, you know, where do we go from here? Well, that did cut some of the interest load down. 'Cause we didn't have to have the mortgage debt to worry about anymore.

Q. But you went from thinking that you were going to make a profit of about $4,000,000-plus to just not having that hotel anymore, period; right? That's what happened when the bank repo'd it? And the sale fell through.

A. What's that now?

Q. You said earlier, I think, that there would have been $4,000,000 or so above the mortgage amount that would have -- could have been fused into the Chocolate Soup business if that --

A. Yes.

Q. -- sale had gone through? So once the bank took control of the hotel, you got rid of the

interest expenses, but you didn't have that $4,000,000 that you would have had?

A. That's right. So we still had -- we still probably had, oh, a couple million dollars in debt left on Soup. Our line of credit was always one and a quarter mill. American XO, I saw a financial statement around here, I think it had 400,000 on it.

Q. So that's 1.6, 1.7 or so?

A. Yeah, see, if it -- if the deal would have closed on December 6, then the proceeds would have totally taken the bank out of the picture. They would have taken our line of credit out of the 1,250,000, would have taken American XO's out that I think was around 400,000. And Jim probably had some money personally borrowed in there, too. But that was enough to clean up the whole -- whole debt. Hotel is gone at that point. We can focus back on Chocolate Soup, you know. Get it back to the degree of profitability.

Q. Had you made any, or anybody at Chocolate Soup made any kind of concrete plans about what the next steps would be after the sale went through? And during the time when you thought the sale was going to happen, were there steps that were

going to be taken as soon as that sale happened?

A. We could replenish inventory. We were -- we were -- inventory was down below levels that Jim thought was acceptable.

Q. And so that would have been step one?

A. Oh, yeah. It would have been a good step. 'Cause bear in mind at this point we now have developed some contacts with stuff overseas. So, you know, it could -- instead of spending 40,000 on something that you're going to sell for 65,000, you can spend that 40,000 overseas that might generate 150,000 in sales.

Q. So in addition to replenishing your inventory, were there other plans for what to do with that money?

A. Well, the stores were fairly modernized at that point. No. A shot in the arm in terms of working capital would have really done good things.

Q. And were there any challenges to the business going forward that you or anyone else perceived in 2008 that you thought would have threatened Chocolate Soup's model that you'd have to

respond to?

A. I don't think I understand what you're looking for here.

Q. By the time I reached the end of the question, I didn't understand it either. Let me try again. Were there any -- what kinds of challenges in addition to the inventory issue, if any, was Chocolate Soup looking at in 2008?

A. Well, credit issues. Which goes hand-in-hand with replenishing the inventory. If you're not paying your bills on time, then the vendors don't want to ship you.

Q. Were there issues that would not have been resolved by the sale of the hotel, broader market forces, anything like that, that Chocolate Soup would have had to deal with going forward that -- in addition to this inventory issue?

A. I'm having trouble seeing what you're asking me.

Q. Let me try one more time. So you had an inventory problem; right?

A. Lack of inventory.

Q. And that was going to be addressed by getting some cash?

based on this you need to get more pantsuits. Then she'd go back through what she picked and say, well, I like this one better, do this, this, and this. And then it became her and -- her and I. We traveled -- we dredged New York from mid '90s all the way up through 2001.

Q. And so your role was essentially to give her information about sales of previous year, negotiate prices, things like that?

A. Yeah, I was -- I would -- as far as I'm concerned, she's the boss.

Q. Uh-huh.

A. Okay? I'm the assistant. Yes, I supplied information to help her make good decisions. Okay? Or pick what she wants, you know. Like my example I gave you earlier on the jeans, she'd go, no, that's fine, this is the style that's in this year, but. And then a lot of that wears off when you work with somebody that long. And then, you know, obviously the last three or four years it was kind of me winging it, you know. I learned a lot from her.

Q. The -- did you feel like you knew enough to do it on your own?

A. No. I have. It took me a lot longer

than it would take her to do it. 'Cause I can look at history lessons, okay? And say we did very well with sundresses from Good Lad that are applique, you know. I was kind of a walking computer on prices, you know. If we needed sundresses, I'd go, well, let's go over there, I know they've got some for like seven bucks, you know. So I was good on the -- very good on the numbers ends of it. But it was a team effort with her and I. She does the picking. We used what was called a star system. Literally, she would go like this on a catalog or a picture that they gave us. Okay? And, you know, one star -- four stars meant we liked it better. Okay? Et cetera, et cetera. If she really liked something, she'd go like that (indicating). Okay? Well, then it was my job --

Q. When you say go like that, you marked down a whole bunch of stars there?

A. Yeah, a whole lot of stars. It was the star system we called it. Well, it was then my duty to convert that into quantities that I thought we could sell. In other words, if I thought -- here I probably wouldn't even order that. Just drop it out. Here maybe I'd try -- depending on the number

of stores we had, maybe I'd try seven -- six dozen. Depends on the vendor pack and quantity. Over here I'd go, well, she really likes it, okay, so I'd go back and go how deep can I really sell something that we really think's hot, you know. Okay, I like the price, that's a sharp price, compared to last year, yeah. Then I'd look at pace of sales. Pace of sales is if 120 come in and the first week they're on your floor you sell 80 of them, that's a hot seller. Okay? I also had systems -- programs that would show that to me. Okay? And I'd jump back on the vendor and see if we could get a reorder on it. Okay? It was a team effort. But she was -- she was the designer. She's the creative -- she's a creative person. She's looking at trends, you know. Fashions don't stay the same. They don't stay the same.

Q. Did you and she ever disagree about what ought to be purchased or how much ought to be purchased?

A. Oh, yeah.

Q. How would that interaction go?

A. She'd hear me out and I'd hear her out. I knew the order. She was the boss. And I worked there. And, you know, I wouldn't say I caved

in. But her -- she's so talented that I'm going to respect her opinion on how well she likes something more than I'm going to respect my opinion on how well I like it. Because women buy kids' clothes. Not men.

Q. Were there times where you convinced her not to buy something?

A. What's that?

Q. Were there times when you convinced her not to buy something?

A. Oh, yeah. Yeah.

Q. And what kind of arguments would you use to convince her not to buy something?

A. Had to be very tactful.

Q. But I assume you -- you weren't going to say -- or your primary role was not to say, well, actually I just think that's unattractive. You'd talk more about, well, certain things are selling in our stores and maybe that's not the kind of thing. Is that the kind of argument that you'd make?

A. Yeah. If -- again, they were the owners. Okay? I did not own any stock. So I got to kind of say, okay, it's their business. Okay? But if I didn't like something and I had -- had some

reasons why I didn't, I would talk to her about it. Sure, I didn't back down. I'm not afraid to talk to her.

Q. And presumably, that's why they had you working for them, they thought your opinion was useful?

A. I was their right-hand man.

Q. Did you ever express any interest in having an ownership stake with the companies?

A. No.

Q. Did you ever have an interest in having an ownership stake in the companies?

A. Nope.

Q. Why not?

A. Just pay me. Well, the tradeoff to that is I was making $130,000 a year. Okay?

Q. You weren't upset about your compensation?

A. No. No. With that kind of compensation, I was perfectly happy. You know? I got burned, you know? I personally got burned out of this thing.

Q. Burned by what you mean because your job now doesn't pay you as much as --

A. Oh, no. No. No. No. No. After -- state of Nebraska reared its ugly head from a 1999 audit. 1999, mind you. Didn't make any efforts to try to resolve the issue. We filed appeals with them -- it was about a $45,000 tax issue on an audit. And Nebraska's got its own version of sales tax up there.

Q. And that's where the hotel is; right?

A. Yes. Yeah, what was crazy about this thing, the barn door's closed. Any time the state could have put a lien on the property for the 45,000. Didn't do it for 10 years. I'm going to get a little hot here. Okay? After the horse is out of the barn and the bank has repossessed it and own it 100 percent, they come after the Levitts, first of all, to try to settle the sales tax issue from 19 -- I'm telling you, now we're in 2000 --

Q. 13.

A. Yeah, but it was -- when did they come after it? 2009. Okay? A year later, okay, because I was an officer, at least back in '99, okay, I wasn't at the time they made their jeopardy assessment up there, okay, they came after me. I'm out of work. I'm diabetic. Okay? I'm unemployed.

I can't make the mortgage payment. These assholes from Nebraska are coming after me. So I got nailed for 1,500 in legal fees and 7,500 to settle the damned thing for them to drop all issues against me. Yeah, this hasn't been a pretty picture. You know, that one e-mail in there from -- pertains to Texas, you know. Supposedly, Texas -- you really can't ever go out of business in Texas even if you're out of business in Texas unless you file 4,000 reports. That one (indicating).

Q. Is this what you're talking about?

A. Yes.

MR. WILLIAMS: Let's go ahead and mark it and then we can talk about it. We're marking this as Bazan 6.

(Bazan Exhibit 6 was marked for identification.)

(Off the record.)

BY MR. WILLIAMS:

Q. So you were referencing an e-mail that had to do with Texas. This is Bazan Exhibit No. 6. What were you thinking of about this e-mail? What's this e-mail about?

A. This e-mail?

Q. Yeah.

A. Well, it's a -- let's see, what's the date on the first one?

Q. March 5th, 2012.

A. Okay. Chocolate Soup officially closed -- the bank sold the assets off on March 15th, 2010. Okay? Chocolate Soup's out of business. They have no money, nothing. All right? This was the State of Texas looking for -- they don't have a state income tax down there. They have what's called a franchise tax. Okay? It's fairly sizeable. I don't know, it's -- I don't quite remember. But in the big scheme of things, it's maybe three or four thousand -- maybe $5,000 a year. And, well, I didn't -- I wasn't working at Chocolate Soup. Okay? And low and behold, they find me somehow and want me to come up with it. And fortunately, one of the -- one or two of the years -- how do I want to say this? I guess you have to have the State of Texas permission to go out of business and you got to file all these forms that you're no longer there, et cetera, et cetera. Dissolution of -- articles of dissolution, the whole bit. Well, it was like, hey, I'm not getting paid for this, what the hell do you want me to do? So

this guy wrote me and talked to him a couple of times on the phone and he goes -- and I said I can't sign those, I'm not an officer, I'm not going to sign them, you know. And I basically -- I couldn't find the actual tax report, but we sent them in two or three years, and I signed them as Robert D. Bazan, former employee, blah-blah-blah, on behalf of James J. Levitt. But they were -- had I not filed those, and had I not communicated with him, they were going to come after me for about eight grand.

Q. They being the State of Texas?

A. Yeah. Because what they say was, well, if you didn't file the report, we're going to estimate it based on your prior reports and we can't get ahold of Levitt, so we can get ahold of you, we want eight grand from you. So I was glad when that thing got taken care of.

Q. On the second page here -- you might need to unclip it for a second. You say "I hear his health is not good and he is financially struggling." I think you're referring to Mr. Levitt?

A. Yes.

Q. Do you have any knowledge of the Levitts' current financial situation?

A. It's not good. I don't know what they're living on.

Q. Do you know if either one of them is employed?

A. I have no idea. But I don't think so.

Q. Do you have any idea if they have any retirement savings?

A. Have any what?

Q. Any retirement savings in a 401(k) or something like that?

A. What they had I think is long gone. They took their money out in -- let me see. I'm going to say in early 2010 -- yes. When the bank was trying to sell the assets, they cashed out the 401 money. I'm thinking it was around 100,000, you know, both of them. It might have been more. I don't know. Which he was going to try to do a friendly purchase from the bank with some people that had some money. It just didn't work out. He went up -- the bank finally just sold it to these other people.

Q. Did --

A. He cashed that out -- I'm pretty sure he cashed that out early 2010.

Q. Do you know if the Levitts guarantied

any loans that were made to Chocolate Soup or --

A. Oh, absolutely. Yeah.

Q. Do you have any idea in total of how much their guaranties might have been?

A. Well, you had a 4.3 million mortgage on the hotel.

Q. Do you know if they guarantied the whole amount of that?

A. Yeah. The bank had personal guaranties on everything. Cross -- cross company guaranties. But they basically -- we had a 1.250, one and a quarter million operating line on Chocolate Soup. And American XO, 400, 450 thousand. Those were all guarantied.

Q. So when the companies weren't able to pay their money, then the effect was that the banks were in a position to go to the Levitts to pay the money; is that right?

A. Yeah. To the extent they have assets, yeah.

Q. Can you -- I think before you said that you worked for Chocolate Soup until 2010?

A. Yes.

Q. Is that correct?

A. Uh-huh.

Q. The hotel was taken over by Mission Bank in 2009; is that right?

A. No. December -- the deal fell through with the Lincoln guy for 8.5 million, that fell through on December 6 of 2008. Okay?

Q. Okay.

A. Jim was -- Jim tried to work something out with the bank, and I think finally the end of December he did a deed in lieu of foreclosure. I've never seen those papers. But subsequently from working with -- talking to the bank on liquidating the rest of the assets, I don't think he's going to get anything out of that deed in lieu, you know.

Q. So the deed in lieu happened and then Chocolate Soup clothing company was still operating then?

A. Yes.

Q. So what happened next with the clothing company?

A. We were out at 905 NE Colbern in about a 40,000 square foot building that was offices, plant. Could have been a warehouse. We had a secondary location. May of that year, North American

Savings Bank, we were paying Jim rents on the building. Jim owned the building personally. Okay? The 905 NE Colbern. Okay? By default they took it.

Q. The building, or the company?

A. They took the building out there.

Q. Because the company was no longer able to pay Jim, and then Jim wasn't able to pay --

A. Right.

Q. -- the bank? So when the bank took the building, what did the company do?

A. Well, we -- we got a 30-day notice to vacate.

Q. So they were going to evict because --

A. Yeah.

Q. -- the company wasn't paying the money?

A. Yeah. Yeah.

Q. Okay.

A. Yeah. I got -- I took the service on it out of Chocolate Soup. It was a done deal by the time I saw it. I mean, this was 30 days notice to vacate. I mean, you know. You know, if he got communication before that, I don't have any records of it.

Q. You weren't involved in any negotiations with either bank?

A. No. Never.

Q. That was all Jim?

A. Yeah.

Q. Do you know any other employees who might have been involved in negotiations with the banks?

A. No. Just him.

Q. So you get the 30-day notice to vacate. And that's approximately when?

A. May 2009.

Q. Okay. So what happened next? Is that the end?

A. Well, I'm going -- well, if you would have saw the place. We had -- we had a huge fabric inventory. Huge. Huge notions, huge buttons, huge zipper, huge everything. Huge thread inventory. Jo actually got ahold of whoever is president of North American Bank and said we can't get out of there in 30 days. Okay?

Q. Because there was too much stuff in there?

A. Yeah. I mean -- yeah. I mean. She

got a six-month extension, and I gave her high kudos, because I -- I thought we were just (indicating), you know, hit the street Charlie, we're out of there. So she got us a six-month extension. And phenomenal monthly rent of a thousand bucks. It was just kind of -- I don't know, I guess maybe they felt sorry for her, or the company, or whatever. But he was going to give us an orderly period to liquidate. So from May through September we started pitching all stuff. Stuff that we didn't need, you know.

Q. What kinds of things?

A. Oh, we used to -- well, sales tickets, for example, we used to do a three-part sales ticket in the store; one for the customer, one for the file, one for the store copy. Just started throwing that stuff away. Because it was -- I kept anything that was still open as far as the sales statute. But records from sales tax tickets that were taking up a lot of space, the size of this room, I mean, we started pitching things out. You know?

Q. Old records and things like that --

A. Yeah. Yeah. Yeah.

Q. -- were gotten rid of?

A. Yeah.

Q. And you used as your guide on what to retain and what to get rid of, though, in any statutory retention requirements?

A. We kept those at that point, sure.

Q. Okay. But other than that --

A. Yeah, if I had -- if I had bills from 1999 for the hotel, I, you know, threw them in the trash.

Q. And this was in -- this was then 2009?

A. Yeah, it was from May through October of 2009. Okay? Towards the end, what we did, we started -- the bank was pretty much calling the shots at this point.

Q. Okay.

A. I mean, they understood North American wanted us out of there.

Q. They being the Levitts understood that?

A. I'm sorry?

Q. You said they. You're referring to the Levitts understood that --

A. No, Mission Bank at that point knew that we needed to vacate. So I was in touch with the president and said, yeah, you know, we're starting to

liquidate the stuff. So we ran about a two or three week sale out at the factory. I mean, we had 120 sewing machines, you know? Anywhere from $200.00 to $10,000 in the right hands. So we -- pretty much I think it was like in October is when we did -- we opened it to the public. Oh, my God, people would come in and just -- so we got rid of all -- we got rid of everything. Sold it off. The bank got the proceeds. Sewing machines, unfortunately, were not a big commodity, because there isn't any production left in this country.

Q. If you would have been in China, you could have sold them?

A. Yeah. So we had -- I may have sold 10, 15 sewing machines. The rack system in the back that held all the fabric on tiers was -- I got 10 grand for that. And the 4x8 sheets of plywood probably went for 15, 20 dollars apiece. And I was able to sell a few machines. Fabric and stuff were whatever I could get, you know. A dollar, two dollars, three dollars a yard.

Q. So at this point you had -- Chocolate Soup had already started cutting back on salaries and staff; is that right?

A. Oh, yeah. Yeah. Oh, wow. Probably around May or June we let all the seamstresses go in the factory. I mean, it was close her down, sell it off, vacate the building, you know.

Q. So around May or so you and the Levitts had decided that it was over?

A. North American did. Just vacate the building, you know. I didn't see either one of them. You know, Jim came out one time 'cause I was asking him about -- you know, I wasn't sure on some of the fabric how to price it. You know? Some of this stuff if you bought it at retail, you'd -- you know, for small yardage they'd -- the fabric store people, they'd probably charge you 10, 20 dollars a yard for the fabric. But what do you do when you've got a 50 yard bolt, you know. How do you start taking off. So I just brought him out just to get some guidance on what he thought what I should do and stuff. But the proceeds less expenses went to the -- went to the bank. So at that point, we have no manufacturing plant. We've vacated there. We've carved out a small office out of a really crappy warehouse building, I mean a office about as big as this desk, and worked out of there from like October through

March when they found a guy to buy it.

Q. All three of you worked out of that office?

A. No. Me.

Q. Just you?

A. Yeah.

Q. So we at this point is you?

A. What's that?

Q. You were it as far as people working at that point?

A. Yeah.

Q. Okay. So you worked for the Levitts for about 30 years then; right?

A. Yes.

Q. Did you -- were you friends with them outside of work?

A. Not really.

Q. Did you ever go over to their house or anything?

A. I've been to their house, sure.

Q. For what kinds of occasions?

A. Oh. I was over there several times when that Kroh Brothers bankruptcy thing was going on. Because it was -- you know, we had to figure out

a plan of what we were going to do.

Q. That was business related?

A. Business related. On a social level, we may have went to dinner in 30 years once or twice. Their personal lives were very private. You know, they didn't -- they had friends, don't get me wrong. But they just didn't -- which is fine with me. You know, you don't want to get --

Q. Yeah, work was separate from personal and that was --

A. I agree with that.

Q. -- how it was?

A. Yeah.

Q. Okay. Did --

A. Went to their daughter's wedding. They didn't come to my daughter's wedding, but.

Q. Did you invite them?

A. Uh-huh.

Q. Did either one of the Levitts ever talk about conflicts they were having with their neighbor, Dr. Elman, E-L-M-A-N, about some renovations they wanted to do to their house?

A. I don't know anything about it. On their house?

was hoping you had it here today. The first time I ever even had an inkling Jo's sick, and these people don't go into details, was can we make a schedule of by year in the 2000s for what their salaries were. 'Cause there was a point I'm going to say '01/'02 where she went on zero salary because she wasn't really working. You know, I thought maybe you had a copy of that.

Q. You said --

A. It was kind of a history of what her salary were.

Q. And that would reflect roughly how much she was working?

A. Yeah, I probably had 10, 15 years on that, you know. It was real easy. It was 108 in '72 forever until about '01 or '02, somewhere in that area, where she didn't get a salary anymore.

Q. So the change to the salary wasn't driven by the financial health of the business, it was driven by how much she was working; is that right?

A. Well, she wasn't working and Jim took her off payroll.

Q. You've said that Jo was involved in

looking at overseas vendors; is that right?

A. Uh-huh.

Q. And that was during the 2000s? Included during the 2000s?

A. In year 2000? Or the 2000s?

Q. The 2000s.

A. Yes. Yeah. When we would go to the buying trips out in Vegas, there was another show you could go to for overseas trade.

Q. Do you know if she made any trips abroad to look at --

A. No. Huh-uh.

Q. You mentioned about the hotel, her efforts to change one of the restaurants into a bakery.

A. Uh-huh.

Q. And that was in the 2006 or so period?

A. Yes. Give or take.

Q. And what was she doing to do that?

A. Well, it was -- before that it was a full service restaurant. So you had totally different kitchen equipment in there. And it was seating for a restaurant. Well, she was converting it to a bakery with -- you had seats, but that's more

for if you bought stuff at the counter. Like from one person behind the counter, like a Panera or something like that. What changed in the back was a lot of the equipment had to go out of there and she bought, oh -- somewhere in that area she bought a very expensive steam injected oven, Italian made, and had that brought in there as part of the trying to get the -- that part of the restaurant business turned around.

Q. And she was making decisions about what to buy?

A. Yeah.

Q. Do you know if she was consulting other people?

A. She may have talked to the guy she -- the French baker. You know, they -- I would guess it probably went something like, hey, what kind of oven do we need, and he goes, oh, if you want the Cadillac, get this. I don't know, I wasn't there for the details of it.

Q. And is it your understanding that if the baker had been able to get the visa, that that bakery would have gone forward?

A. Yeah.

Q. You aren't aware of anything else holding it back?

A. That was the biggest thing. Without him, it's -- what good are you?

Q. Jim Levitt told me during his deposition about some problems with the managers at the hotel in the early 2000s. He mentioned that there were some -- I think some drug issues with one of the managers. Do you have any memory of that?

A. Drug issues? Did you say drug abuse issues with a manager?

Q. It wasn't clear if it was drug abuse issues with the manager, or drug problems at the hotel. Does any of that ring a bell?

A. That does not ring a bell with me, no.

Q. Were there ever problems with employees at the hotel taking antiques or other furniture at the hotel?

A. Oh, yeah.

Q. When did that happen?

A. Mid 2000s. There were -- Jo put -- she had some personal antiques that she owned, pianos, player piano, probably a whole bunch of other stuff I'm not thinking about, and she put -- oh,

yeah, the armoire. There was a real ornate hand-carved armoire. It was there on one of her visits. Okay? And the next visit we -- she got this -- well, I got it too, because I was with her on that trip. We got this big song and dance about that it was all -- it fell apart, broke into pieces, blah-blah, blah-blah, blah. Well, Jo dug her feet in. She was a bulldog. And she didn't believe anything what they were saying. And finally traced it down, yeah, the general manager had sold it.

Q. And taken the money?

A. Yeah.

Q. Did you fire the general manager?

A. Yes, we did.

Q. Did you --

A. And we actually got the armoire back, if I remember. He had to go buy it back.

Q. Were the police involved at all?

A. What's that?

Q. Were the police involved at all?

A. I don't think so.

(Off the record.)

BY MR. WILLIAMS:

Q. This is Exhibit No. 5.

A. Yeah, we looked at this before.

Q. Yeah, just a couple more questions about it.

A. Okay.

Q. There's no -- well, in the category of cost of goods sold, what would that -- what kind of expenses would fall into that category, do you know?

A. This is on the hotel?

Q. That's right.

A. That would be -- it would be liquor -- liquor purchases, beverage purchases, food purchases. And on hotel accounting, you would also include the cost to operate -- the direct operating costs of the room -- rooms rental. That would include front desk, maids, supplies for the room, soap, whatever. Whatever, whatever.

Q. Did the hotel advertise?

A. Sure.

Q. Billboards? What kind of --

A. We had billboards on -- the major highway up there is I-80. We had one or two billboards each direction on I-80. Had one on Highway 34, which is the way you get there if you're coming up from the South, like Kansas City.

Q. Anything else beyond billboards?

A. Well, the restaurants we'd run display ads in the newspapers. Big days in the banquets were like special cooked -- special things for like Christmas, Thanksgiving, Mother's Day. A lot of print.

And then Best Western was -- you got some ancillary benefit from being a member of Best Western. They had a book. You could go online. If somebody went online for the Best Western looking for Lincoln, you know, we'd pop up there.

Q. Now, my understanding is that the hotel has burned down?

A. Burnt down?

Q. Do you know about that?

A. There was a small fire when they were demolishing it.

Q. Okay.

A. But it didn't burn it completely down.

Q. So it was being demolished and then there was a fire?

A. Yeah, the guy that was demolishing it started a fire.

Q. Okay. And that was after --

A. That's on the bank's nickel, yeah.

Q. Okay.

MR. WILLIAMS: We can go off the record for a second.

(Off the record.)

BY MR. WILLIAMS:

Q. Just a couple more questions. Do you know how many employees Chocolate Soup had at its height working here in Kansas City?

A. Just in Kansas City?

Q. I mean, is that a breakdown -- if you know the whole number, that's fine, too.

A. You're talking about Chocolate Soup only here? Or do you want -- I'll just give you everything what I think at its -- at its peak.

Q. Okay. I'd like it if you could -- to the extent possible, if you could break it up between the hotel and Chocolate Soup.

A. Add Jim, Jo, and Bob wherever you want to. But at Chocolate Soup, at the Colbern Road location at its heyday, at its absolute peak, we probably had 60 to 65 employees.

Q. Approximately when would that have been?

A. Middle to late '90s.
Q. And then you had retail employees --
A. Right.
Q. -- around the country?
A. At its peak we had 14 doors. So if you add 14 managers. Oh, say three to four part-time people per store. Whatever that comes out to.
At the hotel it consistently ran about -- well, business is seasonal. In the off-season maybe 60 people. Again, this is full and part-time. More part-time than full. And then in the summer season, you know, maybe it'd goose up to 85 or 90 people.
Q. All right. And in 2009, do you know about how many employees were left?
A. Well, none at the factory. Hotel -- at what point in '09? Just right before we closed it?
Q. Yeah.
A. Okay. On December 8th -- I went up and closed the hotel on December 8th, 2008. Counting part-time people, probably 25.
Q. Did anybody go with you when you went up there in December?

A. (Indicating.)
Q. Just you?
A. (Nodded affirmatively.) Yeah. I was the hatchet man. Fun trip.
Q. Did you have a title while you were working at Chocolate Soup?
A. Early on I was vice president of finance. Towards the end when I was really doing more in buying than I was accounting, merchandise manager or assistant buyer. Just, you know, all our vendors knew the routine. She was the picker and I was the guy that was going to break your knees over prices and stuff.
Q. When Chocolate Soup wanted -- when there was going to be a new design for Chocolate Soup branded clothing, was there a team of people that would work with Jo?
A. Yeah, she had a design staff.
Q. How many people were doing that?
A. Oh. At its heyday? Have pattern maker, full -- mainly part-time. And two other ladies back there part-time, you know.
Q. Do you remember the name of the full-time pattern maker?

A. No, I do not.
Q. Are you in touch with anybody from Chocolate Soup?
A. Nope.
Q. Did you have relationships outside of work with any of the Chocolate Soup employees? Were you friends with any of them?
A. No. Not really. No. Christmas party maybe we'd go have a drink or something. But it was -- I kind of follow the same philosophy. I didn't want to know a lot about my employees, their kids, their health problems, their families. Because, you know, there was going to come a point in time that, you know, I was going to have to cut their pay or let them go. You don't -- I didn't -- I don't want to know. It's easier to make the decision if you just look at it, you know.
Q. It's just business?
A. You know what I'm saying?
Q. Yeah.
A. I don't know if you -- if you agree with that or not. But that -- even out at where I work now, I don't fraternize with the people there.
Q. I just realized there are two more

documents here. I need you to tell me what these are and we'll be done.
MR. WILLIAMS: We need to mark this as 15.
(Bazan Exhibit 15 was marked for identification.)
BY MR. WILLIAMS:
Q. So I'm handing you what's been marked as Bazan 15. It's an Employee Earnings Summary. Would this go -- would this be the same kind of document as the other Employee Earnings Summaries we looked at earlier?
A. Why this says January through December and the other one says January through March, just in case the people, after I left there, coded something to the wrong company, you know, their company had a different name, I just ran this out just to prove that during some other off months they didn't slip something accidentally in there that I needed to clean up before issuing the W-2s.
Q. Do you know the names of the people who took over Chocolate Soup?
A. Yes.
Q. Could you tell me?