James J. Levitt

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  VIOXX | ) MDL DOCKET NO. 1657 |
| PRODUCTS LIABILITY | ) SECTION L |
| LITIGATION | ) JUDGE FALLON |
| | ) MAGISTRATE JUDGE |
| THIS DOCUMENT RELATES TO: | ) KNOWLES |
| Jo Levitt, | ) |
|         Plaintiff, | ) |
| -v- | ) Case No.: |
| Merck Sharp & Dohme | ) 2:06-cv-09757-EEF-DEK |
| Corporation, | ) |
|         Defendant. | ) |
| _____ | ) |

December 8, 2015

DEPOSITION OF JAMES J. LEVITT,

Volume 1, produced, sworn and examined on behalf of the Defendant, pursuant to Notice, on Tuesday, the 8th day of December 2015, between the hours of 10:18 a.m. and 3:02 p.m. of that day, at the law offices of Humphrey Farrington & McClain, P.C., 221 West Lexington Avenue, Suite 400, in the City of Independence, in the County of Jackson, and the State of Missouri, before me, NAOLA C. VAUGHN, KS CCR 0895, CRR, RPR, a Certified Court Reporter, within and for the States of Missouri and Kansas.

James J. Levitt

Page 2

```
 1      A P P E A R A N C E S
 2
        For the Plaintiff:
 3         HUMPHREY FARRINGTON & McCLAIN, P.C.
           221 W. Lexington Avenue, Suite 400
 4         Independence, Missouri  64050
           816.398.7435
 5         BY:  DANIEL A. THOMAS, ESQUIRE
              dat@hfmlegal.com
 6
 7
 8      For the Defendant:
           WILLIAMS & CONNOLLY LLP
 9         725 Twelfth Street, N.W.
           Washington, D.C.  20005
10         202.434.5000
           BY:  EMILY RENSHAW PISTILLI, ESQUIRE
11              M. ELAINE HORN, ESQUIRE
              epistilli@wc.com
12            ehorn@wc.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            I N D E X
 2   WITNESS:  JAMES J. LEVITT
 3   Examination by Ms. Horn ........................ 4
 4
 5            EXHIBITS
 6   NUMBER   DESCRIPTION                        PAGE
 7   Exhibit 1 - Merck Sharp & Dohme Corp.'s Amended   8
              Notice and Subpoena for Videotaped
 8            Deposition of American XO Inc.
              Pursuant to Fed. R. Civ. P. 30(b)(6)
 9
     Exhibit 2 - Subpoena to Produce Documents,      17
10            Information, or Objects or to
              Permit Inspection of Premises in
11            a Civil Action
12   Exhibit 3 - Financial Statements               50
              LevittJ-WinNRPDMedMisc-00020 - 65
13
     Exhibit 4 - The American XO Group of Companies 76
14            Balance Sheet
              LevittJ-MissionBank-00719
15
     Exhibit 5 - The American XO Group of Companies 93
16            Combined Balance Sheets
              As of January 31
17            LevittJ-MissionBank-01712 - 01714
18   Exhibit 6 - The American XO Group of Companies 93
              Combined Financial Statements
19            For the Years Ended
              January 31, 1999 and 1998
20            LevittJ-MissionBank-04021 - 04043
21   Exhibit 7 - The American XO Group of Companies 93
              Consolidated Financial Statements
22            For the Years Ended
              January 31, 2003 and 2002
23            LevittJ-MissionBank-03926 - 03947
24   Exhibit 8 - 8/6/97 Proposed Commitment to Loan 113
              Discount Committee/Clay Coburn
25            LevittJ-MissionBank-01706 - 01715
```

Page 4

```
 1      EXHIBITS (Continued)
 2   NUMBER   DESCRIPTION                        PAGE
 3   Exhibit 9 - 5/12/98 Proposed Commitment to Loan 113
              Discount Committee/Clay Coburn
 4            LevittJ-MissionBank-01695 - 01705
 5   Exhibit 10 - 5/17/2000 Proposed Committment to  113
              Loan Discount Committee/Clay Coburn
 6            LevittJ-MissionBank-01687 - 01705
 7   Exhibit 11 - 10/4/89 letter to Robert Bazan from 119
              J.G. Blake
 8            LevittJ-CBIZAcctTaxAdvy-00573 - 00574
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            THE VIDEOGRAPHER:  We're now on the
 2   record.  My name is Jim Ross.  I'm the
 3   videographer with Golkow Technologies.  Today's
 4   date is December the 8th, 2015.  The time is
 5   10:18 a.m.  This video deposition is being held in
 6   Independence, Missouri, in the matter of Levitt v.
 7   Merck for the United States District Court,
 8   Eastern District of Louisiana.  The deponent is
 9   Jim Levitt, 30(b)(6) witness for American XO
10   Incorporated.
11            Counsel, will you please introduce
12   yourselves for the record.
13            MR. THOMAS:  Danny Thomas for
14   plaintiff.
15            MS. HORN:  Elaine Horn of Williams &
16   Connolly for Merck.
17            MS. PISTILLI:  Emily Pistilli, also
18   from Williams & Connolly for Merck.
19            THE VIDEOGRAPHER:  Okay.  The court
20   reporter is Naola Vaughn and will now swear the
21   witness.
22            JAMES J. LEVITT,
23   a witness, being first duly sworn, testified as
24   follows:
25
```

2 (Pages 2 to 5)

James J. Levitt

Page 14

1    A.  Jo Levitt was vice president,
2  secretary.  I think I might have been -- well, I'm
3  not sure whether I was treasurer or not.  Later
4  Bob Bazan, when he came to work for us, would have
5  been vice president.  Possibly he was treasurer.
6    Q.  Were there any other officers of
7  American XO at any point in time?
8    A.  No.
9    Q.  Did American XO have an office?
10   A.  It was always based where the
11 manufacturing business was.
12   Q.  Okay.  And as to -- did you have a
13 title separately for II Inc.?
14   A.  Probably due to legal accommodations.
15 I assume it made me president, but I don't really
16 know.
17   Q.  Was there a board of directors for
18 American XO?
19   A.  My wife and I.
20   Q.  Did you have actual -- did you ever
21 have an actual board of directors meeting?
22   A.  Well, that became an issue when we
23 were in a deposition one time.  Yeah, one way or
24 another we had it, but I mean, probably the board
25 of directors meetings were held as we were going

Page 15

1  to bed or something like that.
2    Q.  So my next question is:  Were there
3  ever any minutes from any board of directors
4  meeting for American XO and any of the other three
5  entities?
6    A.  Yeah, because you have to -- I think
7  you were required to do something.  But I don't
8  remember any of it.
9    Q.  So to the extent there were minutes
10 from meetings from board of directors meetings,
11 where would those be kept?
12   A.  Oh, they would have been kept at the
13 factory.
14   Q.  And I've been told that -- or we
15 believe that American XO was created in or around
16 1983.
17       Does that sound about right?
18   A.  Created in '83?
19   Q.  Yes.
20   A.  I got -- yeah.  That's possible.
21 That's -- that's possible, yeah.
22       MR. THOMAS:  That's when they filed
23 the creation documents with the Missouri Secretary
24 of State.
25       MS. HORN:  Okay.

Page 16

1    Q.  BY MS. HORN:  Did you draw a salary
2  from American XO?
3    A.  Did I?
4    Q.  I'm sorry.  Did you draw a salary from
5  American XO?
6    A.  I don't know who the salaries came
7  from.  I think it probably -- I mean, originally
8  there was one company, just Chocolate Soup, which
9  was everything.  We drew salaries from that.
10       And then when American XO was formed,
11 the -- Bob Bazan, who was in charge of the
12 payroll, would write the checks out of
13 American XO, but I don't think that he allocated
14 the salaries to American XO.
15       They probably were allocated between
16 the hotel and the manufacturing, however he saw
17 fit.  It wasn't really a relevant issue.
18   Q.  Okay.  So as you sit here today, do
19 you know whether or not you received separate
20 salaries from the different entities?
21   A.  From where?
22   Q.  From the different entities we're
23 talking about, American XO, II Inc., Chocolate
24 Soup Manufacturing, Chocolate Soup Retail.
25   A.  Yeah.  We received salaries from one

Page 17

1  of those entities.
2    Q.  But you're not sure how it was
3  allocated?
4    A.  I don't remember.
5    Q.  How was the salary determined in terms
6  of the amount of salary?
7    A.  My wife and I would decide what to pay
8  in salary.
9    Q.  And how often would that decision be
10 made?
11   A.  I don't know how often.  We didn't --
12 the purpose wasn't to pay big salaries, because if
13 we needed to get money out, we could get it out.
14 I mean, we would -- you know, if we needed money
15 for some reason, like I don't know if we did this
16 when we bought the house and needed a down
17 payment.  I don't think we even did a down
18 payment.  But we would have just increased the
19 salary that year.
20       So we didn't pay very high salaries.
21 But we knew the money was there if we needed it
22 one way or another.
23       In a sub S corporation, of course,
24 it's all attributable to the shareholder.
25   Q.  I'm going to mark as Exhibit 2 the

5 (Pages 14 to 17)

James J. Levitt

Page 18

1  subpoena to produce documents that we served on
2  American XO.
3       MS. HORN:  And I don't have a second
4  copy for you, Danny, but you can look at it before
5  I hand it.
6       (Exhibit 2 marked.)
7    Q.   BY MS. HORN:  You've been handed
8  Exhibit 2, which is a subpoena to produce
9  documents that was served on American XO in
10 November.
11   A.   Yes.
12   Q.   And can you turn in several pages.
13 Like the last -- the next-to-the-last page,
14 there's a list of documents that were requested.
15      MR. THOMAS:  I don't know if you saw
16 my email, but I did send an email after we just
17 now spoke confirming what you and I discussed.
18      MS. HORN:  You just want to state it
19 for the record?
20      MR. THOMAS:  Yeah.  Yeah.  I have --
21 as counsel for Jo and Jim Levitt, I have reviewed
22 the subpoenas for American XO Inc., II Inc.,
23 Chocolate Soup Retail Inc., and Chocolate Soup
24 Inc., and have confirmed that neither Jim or Jo
25 Levitt have any more documents in their

Page 19

1  possession, custody, or control responsive to the
2  subpoena, other than the documents they've already
3  provided or documents that are now in Merck's
4  possession, such as the Mission Bank documents and
5  the CBIB -- CBIF documents.
6       And so he doesn't -- he can confirm
7  that with his own testimony, but we did -- we did
8  do a search for the documents responsive to your
9  subpoenas.
10   Q.   BY MS. HORN:  Okay.  Well, I'll ask
11 you that.
12      When the -- have you seen the subpoena
13 before; do you recall?
14   A.   This subpoena?
15   Q.   Yes.  Or something like it with this
16 list of document requests.  You can just take your
17 time.
18   A.   Probably.  I don't really remember it
19 specifically.  But --
20   Q.   And did you search for documents that
21 would be responsive to these requests?
22   A.   Yes.  The original subpoena for
23 documents, going back further in the case.  I
24 mean, we searched everywhere, everything we could
25 find everywhere.

Page 20

1       And then when we hired them as
2  attorneys, we searched further, because they
3  wanted us to do a thorough.  So basically we
4  turned over all the documents that we had at that
5  time.
6    Q.   Okay.  So to the extent that these
7  documents existed, and we'll call them the books
8  and records, financial records for the company --
9  for the corporation, when the -- when the
10 corporation was in business, where were those
11 documents maintained?
12   A.   At the factory.  Manufacturing
13 facility.
14   Q.   And when you made the effort to search
15 for documents for this litigation, where did you
16 search?
17   A.   Our house.
18   Q.   And did you search anyplace else?
19   A.   Pardon?
20   Q.   Did you search anyplace else other
21 than your house?
22   A.   There really wasn't anywhere else to
23 search.  The manufacturing facility was foreclosed
24 upon.  And it happened to be at a period that I'd
25 had triple bypass surgery and wasn't in very good

Page 21

1  shape.  And I kept telling everybody that worked
2  for me, get the stuff out of there, but for
3  whatever reason they did not get the records.  And
4  we later then tried to get them from whomever
5  bought the building and couldn't.
6    Q.   And when you say you tried to get the
7  records but couldn't, when was that?
8    A.   Boy, I don't remember.  I'm going to
9  guess it's sometime in '09, '10.
10   Q.   And I just want to get one more
11 detail.  How did you try to get the records from
12 whomever bought the building?
13   A.   I think we called the -- I'm trying to
14 remember who bought it.  Maybe it was a church.
15 We just asked them, and they said they didn't have
16 anything anymore.  Whatever was in the building,
17 they had disposed of.
18   Q.   So it's your belief that the documents
19 or books and records were left in the building at
20 the time it was foreclosed upon?
21   A.   Pardon?
22   Q.   Is it your belief that the documents
23 for the corporation or corporations were left in
24 the building at the time the building was
25 foreclosed upon?

6 (Pages 18 to 21)

Golkow Technologies, Inc. - 1.877.370.DEPS

James J. Levitt

Page 54

1  the first page; is that correct?  Under
2  investments.  Under assets.
3      A.   Yeah.
4      Q.   Okay.  So of that approximately
5  $10 million, 4 million -- 4.75 million is
6  attributed to American XO and Chocolate Soup
7  Retail; correct?
8      A.   Correct.
9      Q.   And then the remainder of that
10 10 million is spread out over Shawnee Mission Bank
11 shares, Great Plains, and the other real estate;
12 is that right?
13     A.   Correct.
14     Q.   Focusing on the $4.7 million that's
15 attributed to American XO and Chocolate Soup
16 Retail, this would include the hotel at that time;
17 right?
18     A.   Yes.
19     Q.   And would that include the land that
20 the hotel sat on?
21     A.   Yes.
22     Q.   And how was that figure arrived at,
23 the $4.75 million?
24     A.   Well, I don't have the backup to
25 arrive at that figure right now.  But I mean,

Page 55

1  basically, I did an analysis of Chocolate Soup
2  Retail and an analysis of American XO.  These were
3  prepared for the bank, and the bank, of course,
4  had all the financial statements of all the
5  businesses.
6          And, yeah, they even visited the
7  locations and -- I mean, they did an analysis
8  probably at least once a year, if not somewhat
9  more often, to some degree, and so they had the
10 figures.
11     Q.   Okay.  But at the time that you
12 prepared this statement in 1997 and the ones that
13 follow, you were intending for the banks to rely
14 on them; right?
15     A.   Yes.
16     Q.   And you said you don't have the backup
17 for that.  What would --
18     A.   I don't have the backup right now to
19 tell you how it was allocated -- how the 4.750 was
20 allocated.
21     Q.   Okay.  What would the backup be to
22 figure that out?
23     A.   I would have written down -- I would
24 have figured out this much for, you know, the
25 Chocolate Soup operation and that much for the

Page 56

1  hotel.
2      Q.   And how would you have done that?
3      A.   I would have done it using all of our
4  internal figures and any financial statements we
5  had at the time and so on and so forth.  Same way
6  the bank does it.
7      Q.   And did anybody -- would anyone have
8  helped you figure that out?
9      A.   No.
10     Q.   And as between --
11     A.   Now, I should tell you up front on all
12 these statements, I -- we were private -- I wanted
13 to do my personal, private -- you know, I guess I
14 could have gotten an outside accountant and spent
15 a bunch of time and money and have a bigger
16 packet.
17          I didn't want to do that.  So I tended
18 to be real conservative on the values, and I know
19 the bank would take it from there.  That's why I
20 did them.  This was simple for me to do this in
21 this short form.
22          But there could have been backup.  I
23 want to give you -- for example, Great Plains
24 Financial, my partner, who was an exalted real
25 estate attorney before we went into this business,

Page 57

1  I mean, just on Great Plains Financial, he
2  probably gave the bank something that thick.  I
3  mean, he'd have MAI appraisals and have this and
4  have that.
5          All I would do is take his number and
6  take my percentage that I owned of the company and
7  then I -- I don't remember, but I'd probably
8  discount his number 20 percent or something like
9  that.
10     Q.   And why would you discount his number
11 by 20 percent?
12     A.   Because I wanted to be low on this --
13 because this was good enough to get what we
14 needed.  And I wanted to be conservative so the
15 bank wouldn't come back to me and say, well,
16 you're a little high on what you claim on your net
17 worth.
18          Plus the fact that, I mean, there is
19 a -- when you sign your name and mail something to
20 a bank, you could end up going to the slammer if
21 you put the wrong figures in there.  So I'd rather
22 be a little bit low than a little bit high.
23     Q.   Okay.  So if someone like me, for
24 instance, wanted to verify this 4.75 figure, what
25 would I do to -- how would I do that?

15 (Pages 54 to 57)

| Page 58 | Page 60 |
|---|---|

Page 58

1  A.  Well, the bank would have the data,
2  and it may very well be in the discovery that we
3  got from the bank.  I know they did -- when I
4  scanned through there -- and I didn't spend a lot
5  of time on it, but they had numbers where they put
6  values on each of these things themselves.
7     Q.  But they did not prepare this
8  particular statement.  This is your statement;
9  right?
10    A.  Right.
11    Q.  Okay.  So in terms of the documents
12  that you looked at, were they actual documents
13  that you looked at to prepare that number?
14    A.  Well, yeah, there were documents I
15  looked at, and we had an internal computer system.
16  I'd go like that and get a lot of this stuff.  We
17  had a database that I knew how to use and used
18  extensively.
19    Q.  And what happened to the computers in
20  the database?
21    A.  Well, the computer did get moved to
22  the warehouse because the whole operation moved to
23  the warehouse.  We had closed some stores.
24       We had about a 40,000-foot
25  manufacturing facility.  We obviously didn't need

Page 59

1  that anymore, anyway.  And then we had closed some
2  stores.  So the warehouse had some free space.  So
3  we moved the whole office over to the warehouse
4  that we rented in Raytown, and the computer was
5  moved over there.
6       But the computer didn't -- Bazan did
7  work, you know, like in QuickBooks and stuff like
8  that and could put -- I assume he could put
9  financial statements out there.  But our computer
10  didn't do formal type financial statements.  I
11  mean, the information was there.
12    Q.  And what ultimately happened to those
13  computers?
14    A.  What happened to the computer?
15    Q.  Yes.  That had the information.
16    A.  Bazan told me he went to work one day,
17  because he went to work for the people, and it was
18  gone.  And he asked what happened to it.  And I
19  don't remember what he told me, but he wasn't too
20  happy about it.
21    Q.  And when -- sorry.  Go ahead.
22    A.  Well, I was just going to say they
23  changed systems at some point and they just got
24  rid of the computer.
25    Q.  And when did that happen?

Page 60

1  A.  It probably -- yeah, it would have
2  been in -- I think it would have been in '09, late
3  '09.
4     Q.  Do you have a computer today?
5     A.  Do I have a computer today?
6     Q.  Yes.
7     A.  Yeah.  I have a computer today, and I
8  have the phone, and I have -- we have another
9  computer that we share.
10    Q.  And the -- so you have a -- you have
11  your own computer, and then you have the computer
12  you share with your wife.
13       Is that what you're saying?
14    A.  Yeah.
15    Q.  The computer that you have that's your
16  computer that you don't share, how long have you
17  had that?
18    A.  Probably three or four years.  I had a
19  computer back when the other people bought the
20  business.  I mean, I had a computer then.  I just
21  upgraded it at some point.
22    Q.  And what did you do with the old
23  computer?
24    A.  I transferred everything to the new
25  computer.

Page 61

1  Q.  So the computer that you have today,
2  does that have the information -- strike that.
3       The computer that you have today, how
4  far back does the information go on it?
5     A.  How far back is the information on?
6     Q.  Yes.
7     A.  Well, it would have been prior to the
8  business closing.  But that computer -- the
9  computer system that we used was a Unix system,
10  okay?  It didn't have any of the -- you know, it
11  didn't have -- didn't have spreadsheets.  It
12  didn't have financial statements, anything like
13  that.
14    Q.  So the computer that you have today,
15  the one that you have versus the one that you
16  share with your wife, what's the distinction
17  between those computers?
18    A.  What's the what?
19    Q.  What's the distinction between those
20  two computers?  What kind -- is there any --
21  strike that.  Let me start over.
22       What do you use your computer for
23  versus the one you share with your wife?
24    A.  What's it used for?
25    Q.  Yes.

Page 66

```
 1  anyway.
 2       But, yeah, they could -- they could be
 3  on her computer.  But then I'm not even sure about
 4  that because she had a laptop.  Did she get all --
 5  did she get all the stuff transferred?  I don't
 6  know.  But the email itself, I guess, yeah, the
 7  email just stayed there.
 8       But I did run into a problem with
 9  emails in that we had -- my email was
10  Jim@chocsoup.com, okay?  And then when the other
11  company bought the business, they just cut it off.
12  So we didn't even have access to our emails.
13       So what I'm saying, at the time the
14  company bought the business, a good portion of any
15  emails I had were gone.  And I squawked about it,
16  and I wanted to get them so I could somehow
17  transfer them and this and that, and they wouldn't
18  do it.
19     Q.   Going back to Exhibit 3 and a 1997
20  financial statement, the 4 million --
21  $4.75 million that's attributed to American XO and
22  Chocolate Soup, how much of that was related to
23  the hotel?
24     A.   I don't know right now.  It might be
25  in the bank analysis that the bank turned over.
```

Page 67

```
 1  At least some years, I think, are.  I think they
 2  do an analysis of the different assets.
 3     Q.   And for purposes of the $4.75 million
 4  on this particular financial statement, what was
 5  the basis for valuing Chocolate Soup Retail?
 6     A.   Chocolate Soup Retail, you know, had a
 7  substantial inventory.  And we knew if the
 8  inventory was liquidated, we could actually get
 9  more than we carried it on the books.  So I could
10  value -- I could value it on an asset basis, or if
11  it looked like we were going to be earning next
12  year, you could cap the earnings.  I just tried to
13  do kind of a meld of that.
14       The hotel -- can I go ahead and tell
15  you what we would do on the hotel?
16     Q.   Sure.  Yes.
17     A.   The hotel, I'd do on the basis of
18  determining approximately what the value of the
19  hotel was and deducting the debt.
20     Q.   And when you say determining
21  approximately the value of the hotel, what was
22  that based on?
23     A.   Earning -- generally cash flow caps.
24     Q.   And was there also some portion
25  attributed to the actual real estate?
```

Page 68

```
 1     A.   Was it what?
 2     Q.   Was there also something that you
 3  assigned -- some value assigned to the actual real
 4  estate that the hotel sat on?
 5     A.   I never assigned value to the land in
 6  those calculations, except I think you'll see
 7  probably at the end of this that, you know, we had
 8  a contract on the hotel.  So all of a sudden I
 9  factored that in.
10     Q.   The actual real estate that the hotel
11  in Lincoln, Nebraska, sat on, who owned the real
12  estate?
13     A.   It was owned by II Inc.
14     Q.   So it was an asset of II Inc.?
15     A.   Yes.
16     Q.   But you never assigned any value when
17  you prepared the financial statement?
18     A.   No.  When you say real estate, are you
19  talking about the land?  I mean, there's a -- no,
20  I didn't do an asset analysis on the hotel for
21  these -- financial statement.  Basically, it was a
22  number that I thought we could sell the hotel for
23  minus the debt is what I attributed to the hotel.
24     Q.   Okay.  And as you sit here today, for
25  this 1997 financial statement, do you recall how
```

Page 69

```
 1  much value you assigned to the hotel in 1997?
 2     A.   Yeah.  I really don't know at this
 3  stage of the game.  It wouldn't surprise me if it
 4  wasn't a couple million, but it would just be a
 5  guess on my part.  But, remember, that's not
 6  just -- that's value in the hotel less the debt.
 7     Q.   Okay.
 8     A.   The hotel could go up and down in
 9  value, but what flows down to here could change,
10  depending on the debt, because we might do a
11  remodeling and increase the debt.
12     Q.   For these -- if you need to look at
13  them, please do, but for these financial
14  statements that start in 1997 and go through 2007,
15  did you use the same method for valuing the
16  investments each year?
17     A.   I used the same method each year
18  except, if I'm remembering all the way back when
19  we turned these over a long time ago, well, in
20  2000 -- by 2006, I had started to take down the
21  Chocolate Soup portion significantly.
22       In fact, in 2005, if you look, you'd
23  see American XO and Chocolate Soup Retail Inc.
24  580,000; okay?  I think I took Chocolate Soup to
25  almost nothing.  And then -- and that's toward the
```

James J. Levitt

Page 70

1  end of 2005.
2        Then in 2007 all of a sudden this
3  thing jumps to 5,220,000.  That was due to the
4  contract on the hotel that was about
5  8-1/2 million.  And I'm going to back that up a
6  little bit.
7        It wasn't the contract at this point,
8  but what it was is we were -- we had a guy do an
9  analysis for us on the value of the land.  It's
10 the first time I'd done that.  Because the hotel
11 was doing terrible, so we might sell the hotel.
12 What is the land worth?  And so this is -- this
13 changed almost as if there is no hotel.  It's just
14 a land valuation.
15      Q.  And prior to 2007 the value assigned
16 to the hotel did not include any value for the
17 land?
18      A.  That's right.  That's why, if you get
19 all the way down to -- you know, Chocolate Soup
20 and the hotel together were 500 and some thousand
21 dollars.
22        The location of the land was the
23 primary reason for buying the hotel.  I will tell
24 you that.  I mean, Lincoln, Nebraska, is one main
25 street.  O street runs throughout the whole town.

Page 71

1  And we were right in the middle of it.  And at the
2  time we had a contract for the land, there was
3  hardly any land left on O Street, and ours was
4  prime.
5        And I talked to realtors up there, and
6  they were -- the prices just continually went up
7  because whenever land was bought by a developer,
8  they developed it immediately and had it leased
9  out from national tenants.  All of a sudden a
10 bunch of national tenants were coming to Lincoln,
11 Nebraska.
12       So had there not been a crash, that
13 deal would have gone through.  And I suspect that
14 land is worth that much or more today.
15     Q.  I'm looking forward to -- I'm just
16 flipping through the various statements.  So in
17 1997 there's -- for American XO and Chocolate Soup
18 Retail, there's a value assigned of $4.5 million.
19       Continuing forward, for 1998 the value
20 for American XO and Chocolate Soup Retail is also
21 $4.5 million; is that correct?
22     A.  In 1998?
23     Q.  Yes.
24     A.  4 million 5, yes.
25     Q.  Okay.  And then in 1999, the value for

Page 72

1  American XO and Chocolate Soup Retail is
2  $4.5 million; is that correct?
3      A.  Um-hum, yes.
4      Q.  And he seems to skip 2000.
5      A.  You say skip 2000?
6      Q.  No.  Do you see a financial statement
7  for 2000?
8      A.  Yes.  There's --
9      Q.  Which number?
10     A.  Well, no.  The reason is we had to do
11 these approximately once a year for bank
12 regulatory purposes.  And, you know, I'd do them
13 when the bank would ask for them.
14       So you got December 15th of '99.  Then
15 you got April 30th of 2001 was the next one.  So
16 it was, you know, 13 months or 14 -- whatever it
17 is.  You know, I guess 4 and 12.  So 15 months.
18 Sometimes it was shorter than a year when I did
19 the next one and sometimes longer, but they
20 averaged about once a year.
21     Q.  Okay.  So do you recall any specific
22 reason why there wasn't one prepared in calendar
23 year 2000?
24     A.  Probably they didn't ask for them.  I
25 generally made them up when they asked for them.

Page 73

1  I think the regulations were that they had to
2  have -- they were supposed to have something in
3  their file that was, like, current within a year.
4  And, of course, they all fudge on that.  I was a
5  banker, but you can't fudge two years.  You know,
6  they could be off a few months.
7      Q.  Okay.  So in December of 1999 the
8  value for American XO and Chocolate Soup is listed
9  as $4.5 million.  And then in April -- as of
10 April 30th, 2001, the value for American XO and
11 Chocolate Soup Retail is listed as $3 million; is
12 that right?
13     A.  Um-hum.
14     Q.  So there's a change of $1.5 million?
15     A.  1.5, yes.
16     Q.  Yes.  And what was the basis for
17 making that change?
18     A.  I don't know.  This is years later.  I
19 mean, obviously, it must have had a reason for it.
20       I know Chocolate Soup certainly didn't
21 have a good year and earn money in 2001.  But I
22 also remember there's a hotel -- about that time,
23 all of a sudden, because all these national
24 tenants and national businesses were coming to
25 Lincoln, Nebraska, there were a number of hotels

James J. Levitt

Page 74

1  that opened.
2       And I don't -- if you gave me that
3  thing with the operating results of American XO of
4  the hotel, which isn't -- the hotel -- my guess is
5  the hotel didn't have a great year because of all
6  the new properties that opened up, and I probably
7  valued the hotel lower.
8       Q.  So in 2000 there were new hotels that
9  came to Lincoln, Nebraska, that competed with your
10 property?
11      A.  There were some new hotels, yeah.
12      Q.  Prior to 2000, was there any
13 significant competition for the Lincoln hotel?
14      A.  There's a lot -- there's a lot of
15 competition.
16      And we'd been affected by new
17 competition before.  Generally what would happen
18 is, like, they opened a Residence Inn down the
19 street from us.  And they didn't do very well,
20 which was a problem for us, because they were --
21 you know, these are like apartments.  And they
22 were renting them out real cheap.
23      So they kind of hit our business.  And
24 then the year after that, it goes back up -- you
25 always figure you kind of crawl back to where you

Page 75

1  were when you get this kind of thing happening is
2  the norm.
3       Q.  So around this time, it's your
4  recollection that a Residence Inn opened near your
5  Lincoln property?
6       A.  Oh, there were others in earlier
7  years, but I don't remember specifically.
8       But, yeah, individual properties,
9  depending on where they were located, and if the
10 market was strong enough, it wouldn't have a big
11 effect on you, but when they opened a new hotel
12 and they weren't doing enough business and they
13 would -- if it was a good hotel, it was good or
14 better than ours, I mean, one that should get a
15 higher rate than we should, but they're offering
16 rates for less, that's going to affect your
17 business.  That's just the normal course of being
18 in the hotel business.
19      Q.  And a moment ago I believe you said
20 that you thought something like that happened in
21 2000 which drove down the value of the hotel in
22 your 2001 statement; right?
23      A.  Well, it drove down my estimate of the
24 value of the hotel.  I decided to be more
25 conservative.

Page 76

1       Q.  Well, I just wanted to nail down,
2  which hotel opened around that time you were
3  thinking of.
4       A.  I don't remember.  I think there was a
5  Courtyard Garden, there was a Hampton Inn, maybe a
6  Holiday Inn.  I can't remember.
7       (Exhibit 4 marked.)
8       Q.  BY MS. HORN:  What I've had marked as
9  Exhibit 4 is a one-page document.  The title at
10 the very top says The American XO Group of
11 Companies, the Combined Financial Statements of
12 American XO Inc., Chocolate Soup Inc., and II Inc.
13      A.  Right.
14      Q.  And there's various columns which span
15 the years 2002 through 2007; is that right?
16      A.  Yes.
17      Q.  Do you recognize this document?
18      A.  Pardon?
19      Q.  Do you recognize this document?
20      A.  Yes.
21      Q.  Who prepared this document?
22      A.  I'm assuming it was the bank.
23      Q.  And what's your understanding of
24 the -- where the information would have come from
25 to prepare this document?

Page 77

1       A.  From the financial statements that we
2  turned over to the bank.
3       As I recall, you know, it was Bazan's
4  job to do this.  I think that he turned over
5  monthly statements on the hotel to the bank; okay?
6  And this is on our old computer system where I
7  said you'd have a lot of trouble reading
8  everything else, on wide computer paper.  It's the
9  craziest balance sheet and income statement you
10 ever seen.  But he would turn them over to the
11 bank.
12      And on Chocolate Soup, for years, I
13 mean, we did well and the banks didn't demand
14 statements.  I think maybe we'd give them
15 statements every six months.  Whenever they wanted
16 them, we'd give them.  I'm not sure how often he'd
17 turn stuff over to the bank.  During this period I
18 assume they wanted the Chocolate Soup statements
19 more often as time wore on because of the
20 problems.
21      So, I mean, he could have given them
22 monthly statements, could have given them
23 quarterly statements, probably somewhere in that
24 range.
25      Q.  Okay.  Looking at this particular

20 (Pages 74 to 77)

James J. Levitt

Page 82

1    The hotel was doing poorly,
2 particularly in the food and beverage end of it.
3 I mean, really bad. The food and beverage
4 inventories were down.
5    You have depreciation, which knocks us
6 down every year. Depreciation is a non-cash
7 expense, but it's there, and it knocks it down
8 every year.
9    But, again, these statements, this
10 balance sheet has little to do with the value of
11 the property. Although it reflects, you know,
12 poor operating results. If we were earning a lot
13 of money, it wouldn't be 5 million 8 in total
14 assets. It would have been higher. We would have
15 had higher inventory and higher -- the receivables
16 wouldn't have been much different. The inventory
17 would have been different. You can see inventory
18 went from 307,000 in '08 to 151,000 in 2007.
19    The prepaid expenses were lower
20 because we didn't have any money to prepay the
21 expenses.
22    Depreciation knocks it down a little
23 each year.
24    Deferred income tax is -- that goes up
25 a little.

Page 83

1    And I don't -- I just can't remember
2 how the "due from affiliates" fit in there.
3    Could we go off the record a minute
4 and I could --
5    MS. HORN: Go ahead.
6    THE VIDEOGRAPHER: Okay. We're off
7 the record. It is 12:19 p.m.
8    (Discussion off the record.)
9    THE VIDEOGRAPHER: Okay. We're back
10 on the record. It is 12:21 p.m.
11    Q.   BY MS. HORN: So just to catch up. So
12 you were giving us a little bit of an overview of
13 how you were valuing the hotel --
14    A.   Yes.
15    Q.   -- while we were off the record.
16    Let's focus for a minute on the hotel.
17 You were referencing a point in time when you
18 first bought the hotel.
19    When did you first buy the hotel?
20    A.   I should know that. Let me try to
21 think how old my daughter was.
22    I'm going to guess that it was in the
23 '70s. It could have been '78. It could have been
24 '74. But I think it was in the '70s.
25    Q.   And from whom did you buy the hotel?

Page 84

1    A.   We bought it from Jo's father. He
2 actually developed it.
3    Q.   And just to -- just to clarify, you
4 bought it from Jo's father.
5    Did anyone else other than Jo's father
6 have an ownership interest in the hotel?
7    A.   No. But the company that owned it was
8 owned by his three children -- well, it was half
9 owned by him and half owned by his three children.
10    Q.   So the company that owned the hotel;
11 is that what you're referencing?
12    A.   Pardon?
13    Q.   I see -- strike that.
14    The company that was half owned by
15 Jo's father and half owned by the three children,
16 what was the name of that company?
17    A.   Cotneer Investment Corp.
18    Q.   Can you spell that, please?
19    A.   Cotneer, C-o-t-n-e-e-r, Investment
20 Corporation.
21    Q.   And that entity owned the hotel?
22    A.   Yes.
23    Q.   To your knowledge, did that entity own
24 anything other than the hotel?
25    A.   I believe it did. He had other

Page 85

1 investments. Whether they were in Cotneer or not,
2 I guess I don't know.
3    Q.   Was there a theatre in Lincoln that
4 was somehow in close proximity to the hotel?
5    A.   It was part of the hotel complex.
6    Q.   When you bought the hotel, did that
7 include the theatre?
8    A.   Yes.
9    Q.   What exactly was that theatre?
10    A.   A movie theatre.
11    Q.   Did you operate it as a movie theatre?
12    A.   No. No. It was Commonwealth theatre,
13 something like that. They used to be a public
14 company, had the theatre.
15    Q.   So what happened to it?
16    A.   Well, they -- you know, it was a
17 single theatre, not like -- they were opening
18 multi-theatres and stuff like that. We knew we
19 could get more rent. I mean, we wanted them to
20 leave, and we eventually made a deal with them and
21 paid them some amount of money and got them to
22 give it up. I mean, their lease was going to run
23 out in some years. Not too many years, anyway.
24 So I think -- it seems like we paid them $150,000
25 or something, and they just walked away from it.

22 (Pages 82 to 85)

Golkow Technologies, Inc. - 1.877.370.DEPS

James J. Levitt

Page 126

1  and then various other amounts assigned to Shawnee
2  Mission Bank shares, Great Plains, 4400 Shawnee
3  Mission Parkway, and Colbern Road and Greedco.
4     A.  Yes.
5     Q.  Okay.  So as of 1999, what do you
6  believe the value was of Chocolate Soup Retail?
7     A.  Well, again, I don't really know from
8  this.  Maybe a couple million.  I tried to be very
9  conservative.  I think during most of this period,
10 before things -- before Jo's heart attack, I was
11 very comfortable that we could liquidate things
12 for substantially more than American XO and
13 Chocolate Soup Retail from what I carried them on
14 my financial statement, very comfortable with
15 that.
16    Q.  Okay.  And putting the actual
17 financial statement aside for the moment, in 1999,
18 how much do you think Chocolate Soup Retail was
19 worth?
20    A.  Well, I think I just said a couple
21 million, 2-1/2 million.  A couple million, maybe.
22 I don't know.  This doesn't show the breakdown.
23    Q.  And as of this time period, in your
24 mind, was there any separate value that you would
25 attribute to Chocolate Soup Manufacturing?

Page 127

1     A.  Well, this is American XO and
2  Chocolate Soup Retail.  So, no, we -- we would put
3  it all together.  And you're right, if I included
4  the manufacturing, this probably -- could have
5  been 3 million to Chocolate Soup.
6        But all this was -- I was most
7  confident that I was really lowballing all of
8  this, anyway.  I didn't really care that much how
9  it broke down, as long as I was in the safe zone.
10    Q.  All right.  And how much of a discount
11 do you believe you're giving?
12    A.  I don't know what you're asking.
13    Q.  How much were you -- you're saying
14 that you're going for the low end of an estimate?
15    A.  For the land?
16    Q.  Strike that.  Strike that.
17       So you -- if I'm understanding you
18 correctly, you're saying this number is a
19 conservative number?
20    A.  Yes.  At that time.
21    Q.  At that time.
22       And what do you think the actual value
23 of the company was in 1999?
24    A.  Which company?
25    Q.  Chocolate Soup Retail.

Page 128

1     A.  Well, I can't believe that somebody
2  wouldn't have paid $5 million for that.  And my
3  definition, really -- because you couldn't sell
4  the retail separately from the manufacturing.  So
5  it would have been the manufacturing plus the
6  retail.  I can't imagine it would have been less
7  than $5 million.
8     Q.  And as of 1999, Chocolate Soup
9  Retail -- well, strike that.
10       What -- what would you be basing that
11 on, that figure on?  What would that figure be
12 based upon?
13    A.  I would be basing it on some
14 combination of the income and the fact that there
15 were people called all the time that had -- that
16 wanted to buy the company.  We didn't want to sell
17 the company.  So I don't know where we'd have
18 gotten.
19       We had people calling all the time
20 that wanted to buy the company or wanted to invest
21 in the company.  And some of these people were
22 pretty substantial people, too.  And we weren't
23 interested.
24       And furthermore, by virtue of the fact
25 that we knew we could liquidate stores for well

Page 129

1  over the inventory carrying value -- we made 150
2  to $200,000 when we did liquidate a store.  We
3  weren't looking at liquidating any here, but --
4     Q.  Do you recall how many retail stores
5  were in existence in 1999?
6     A.  I believe 14.
7     Q.  And am I correct that 14 was the most
8  that existed at one time?
9     A.  15.
10    Q.  15?  Was there a 15th store opened
11 after 1999 -- after 1999?
12    A.  No.
13    Q.  So there was one that existed before
14 '99 that was closed?
15    A.  Yes.
16    Q.  Which store was that?
17    A.  Washington, D.C.
18    Q.  Was that --
19    A.  Chevy Chase.  You know good old Chevy
20 Chase?
21    Q.  When was that store closed?
22    A.  I don't know.  It was -- could have
23 been in the early '80s.
24       THE REPORTER:  I need to go off the
25 record.

33 (Pages 126 to 129)

James J. Levitt

**Page 134**

1   to bite, Jo started buying clothes from other
2   resources. And it turned out that she was as good
3   a buyer as she was a designer. She knew what was
4   hot or would be hot.
5       Q. And approximately when did the
6   Chocolate Soup stores start carrying other
7   merchandise besides the Chocolate Soup designs?
8       A. I know we started the company. We got
9   up to 3 million in sales. We were very proud of
10  the fact we made like a million dollars before our
11  salary, 3 million in sales. We paid our people
12  more. And compared to our competitors with this
13  upstairs line, we sold the clothes for less. So I
14  mean, we were -- everybody was a winner.
15          And that's when the imports started to
16  bite. So you go down the line. Our sales growth
17  started to slip and then we started buying clothes
18  from other resources and would buy more each year.
19  And we ended up -- after a few years, we had
20  10 million in sales. And we made $1 million. It
21  took 10 million to make $1 million.
22          In other words, Jo competing against
23  American manufacturers could provide the highest
24  return on sales of anybody in the entire business.
25  I mean, we had the highest sales per square foot

**Page 135**

1   in our stores of anybody in the entire business.
2   That was all Jo.
3           But when it got to the point they
4   started making the more expensive, better stuff
5   overseas and it was a lot cheaper, it hurt us.
6       Q. So my question was: At what point in
7   time did Chocolate Soup Retail stores start
8   selling merchandise other than Chocolate Soup
9   designs?
10      A. Well, I'm guessing probably five, six
11  years after it started. I'm guessing. I mean,
12  this is a long time ago. But we also started kind
13  of small. In other words, Chocolate Soup was
14  100 percent of the sales. Then it was 80 percent.
15  Then it was 60 percent. And it just -- it kept
16  going down.
17      Q. So as of 1999, what percentage of the
18  sales were Chocolate Soup designs versus other
19  designs?
20      A. If I had to guess, and it would just
21  be a guess, maybe a third of the sales were
22  Chocolate Soup.
23      Q. Is there any document you could look
24  at that would help you figure out what percentage
25  of sales were Chocolate Soup designs versus the

**Page 136**

1   designs of others?
2       A. No. If I had access to the computer
3   we used in the business, I could tell exactly.
4   But, no, I don't have a document.
5           MR. THOMAS: We ready? All right.
6           MS. HORN: One more question.
7       Q. BY MS. HORN: And then in terms of
8   1999 and the value you assigned to Chocolate Soup
9   Retail, what were the top two or three negative
10  factors affecting the value?
11      A. In 19?
12      Q. '99.
13      A. 1999. The -- yeah. We were planning
14  to have some stuff made overseas, but I guess you
15  could say there wasn't -- you know, we had to get
16  it done.
17          The imports eventually would have just
18  flat put us out of business. I mean, you just
19  can't compete with that. There's no manufacturing
20  business left in this country for apparel. And
21  with good reason.
22          We lasted longer than anybody else
23  because, one, we were more efficient that anybody
24  else that did what we do, which was small run, you
25  know, high-priced kids wear.

**Page 137**

1           And number two, when you make your own
2   clothes and sell them in your own stores, you
3   miss -- I mean, about 20 percent of the normal
4   costs of these stores would be in marketing. We
5   didn't have any marketing costs.
6       Q. So in terms of the factors that would
7   have a negative impact on the value, you listed, I
8   believe, competition from imports; is that right?
9       A. A what?
10      Q. Would be the competition from imports.
11  That would be a --
12      A. Absolutely.
13      Q. And anything else you would list or
14  identify as a negative impact on value?
15      A. Absolutely.
16      Q. What would that be?
17      A. I'm sorry. What did you say?
18      Q. I'll withdraw that particular
19  question.
20          So what were the top factors that had
21  a negative impact on the value of Chocolate Soup
22  Retail in 1999?
23          I believe you listed or identified
24  imports.
25      A. Um-hum.

35 (Pages 134 to 137)

James J. Levitt

**Page 142**

```
 1   and so forth.  And he helped with that.
 2       Q.   Karen Deck?
 3       A.   Who?
 4       Q.   Who was Karen Deck?
 5       A.   Karen Deck was an office worker.
 6       Q.   Was she a controller?  Did she have
 7   the title of controller?
 8       A.   I don't understand.
 9       Q.   Controller.  Was she the controller?
10       A.   Oh, no.
11       Q.   No?
12       A.   No.  She was not there the last two,
13   three, four years that I was there.  She wasn't
14   there.  I wouldn't have called her the controller.
15   I think she did -- she did a lot of accounting
16   work.
17       Q.   And who was Dennis Ditch?  Who was
18   Dennis Ditch?
19       A.   Dennis Ditch was the computer guy.  He
20   was an electrical engineer from Rolla, Missouri,
21   and he was good.
22       Q.   So who was responsible for hiring
23   people who worked in the main office?
24       A.   Well, I would say we'd all get into it
25   sometimes, but -- but Bazan and I, we had such a
```

**Page 143**

```
 1   good office for so many years, it was a big deal
 2   to -- whenever we did have to hire, to hire
 3   somebody really good.  And we pretty much did
 4   that.  And I'd say Bazan and I cooperated a lot on
 5   that.
 6       Q.   The hotel, when it stopped being a
 7   Best Western, how was advertising, marketing,
 8   promotion handled?
 9       A.   How was it done?
10       Q.   Yeah.
11       A.   Well, we had the internet by then.  We
12   had signs on the highway.  We had a big sign in
13   the middle of O Street.  We might have belonged to
14   some -- I don't know what you called them, where
15   you got together on things where you --
16       Q.   Trade groups?
17       A.   -- were rated.
18            Yeah.  I mean, the problem with Best
19   Western was they didn't deliver much.  I mean, we
20   didn't get that much over their reservation
21   system.  That was the problem.  That's why we
22   considered going to Holiday Inn.
23       Q.   So who was responsible?  Was there
24   somebody that you identify as being responsible
25   for advertising, marketing, and promotion for the
```

**Page 144**

```
 1   hotel?
 2       A.   Well, we would -- you know, we booked
 3   small conventions and meetings and stuff like
 4   that.  So there would be somebody -- I don't think
 5   I mentioned there would be a manager for that.
 6   There was typically a manager for that that would
 7   manage that and what you put on the computer and
 8   that kind of stuff.  And we'd get involved in
 9   that, too.  And we were involved in setting the
10   rates.
11            And I forgot what you asked me.
12   Sorry.
13       Q.   That's okay.
14            Who was responsible for advertising,
15   promotion, and marketing for the hotel?
16       A.   Oh, if you're talking about marketing,
17   advertising, and promotion, that would be Jo.
18       Q.   So were there -- was there -- were
19   there things like print ads or television ads or
20   radio ads for the hotel?
21       A.   Well, there were -- there was stuff on
22   the internet.  There were printed materials
23   that -- you know, I mean, we tried to sell meeting
24   space, sell small conventions.  There were
25   pamphlets for that.  She basically designed that.
```

**Page 145**

```
 1       Q.   Originally when the Chocolate Soup
 2   designs started out, did they start out as
 3   appliqués, some kind of appliqués?
 4       A.   Pardon?
 5       Q.   The Chocolate Soup designs, did they
 6   start out as appliqués?
 7       A.   We started out making appliqués.
 8       Q.   And then what did it become?
 9       A.   We became Chocolate Soup.  We started
10   making the whole garment.  Started in our garage,
11   like Steve Jobs.
12       Q.   At any point in time were there any
13   assistant designers or people who helped Jo
14   actually come up with designs?
15       A.   Yes.  I mean, we tried to get talented
16   people.  We hired some pretty talented artists and
17   this and that.  But, I mean, basically we never
18   did get anybody that really produced stuff for us
19   without Jo, you know, being over them that was any
20   good.  We tried and tried and tried.  It was
21   just -- but we had people that were helpful.  We
22   had people working on the patterns and -- I mean,
23   she had a lot of people under her that --
24            I mean, she kept her thumb on them to
25   make sure she got -- I mean, she was a stickler.
```

37 (Pages 142 to 145)

James J. Levitt

Page 158

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX | ) MDL DOCKET NO. 1657 |
| PRODUCTS LIABILITY | ) SECTION L |
| LITIGATION | ) JUDGE FALLON |
| | ) MAGISTRATE JUDGE |
| THIS DOCUMENT RELATES TO: ) | KNOWLES |
| Jo Levitt, | ) |
| Plaintiff, | ) |
| -v- | ) Case No.: |
| Merck Sharp & Dohme | ) 2:06-cv-09757-EEF-DEK |
| Corporation, | ) |
| Defendant. | ) |
| _____ | ) |

December 9, 2015

DEPOSITION OF JAMES J. LEVITT,

Volume 2, produced, sworn and examined on behalf of the Defendant, pursuant to Notice, on Tuesday, the 8th day of December 2015, between the hours of 10:06 a.m. and 12:14 p.m. of that day, at the law offices of Humphrey Farrington & McClain, P.C., 221 West Lexington Avenue, Suite 400, in the City of Independence, in the County of Jackson, and the State of Missouri, before me, NAOLA C. VAUGHN, KS CCR 0895, CRR, RPR, a Certified Court Reporter, within and for the States of Missouri and Kansas.

Golkow Technologies, Inc. - 1.877.370.DEPS

James J. Levitt

Page 159

                APPEARANCES

    For the Plaintiff:
       HUMPHREY FARRINGTON & McCLAIN, P.C.
       221 W. Lexington Avenue, Suite 400
       Independence, Missouri  64050
       816.398.7435
       BY:  DANIEL A. THOMAS, ESQUIRE
       dat@hfmlegal.com


    For the Defendant:
       WILLIAMS & CONNOLLY LLP
       725 Twelfth Street, N.W.
       Washington, D.C.  20005
       202.434.5000
       BY:  EMILY RENSHAW PISTILLI, ESQUIRE
            M. ELAINE HORN, ESQUIRE
       epistilli@wc.com
       ehorn@wc.com

    Also present:  Jim Ross, videographer

Page 160

                  I N D E X
     WITNESS: JAMES J. LEVITT
     Examination by Ms. Horn .......................  161

                  EXHIBITS
     NUMBER   DESCRIPTION                          PAGE
     Exhibit 12 - Loan Summary Report               161
                  Review date:  June 28, 2004
                  MissionBank-001410 - 1490
     Exhibit 13 - 8/5/09 letter to Nebraska Department  206
                  of Revenue to Thomas King
                  LevittJ-CBIZAcctTaxAdvy-00473 - 00477
     Exhibit 14 - 2004 1040 for James J and M. Jo Levitt  216
                  LevittJ-MissionBank-01533 - 1569

     Exhibit 15 - 2007 1120 US Corporation Income    220
                  Tax Return
                  MissionBank-003535 - 3679

     Exhibit 16 - 6/13/01 Proposed Commitment for Loan  226
                  Discount Committee/Clay Coburn
                  LevittJ-MissionBank-01635 - 1643

     Exhibit 17 - Summary of Financial Statements    231

     Exhibit 18 - Merck Sharp & Dohme Corp.'s Amended  237
                  Notice and Subpoena For Videotaped
                  Deposition of Chocolate Soup Retail
                  Inc. Pursuant to Fed. R.
                  Civ. P. 30(b)(6)

     Exhibit 19 - Merck Sharp & Dohme Corp.'s Amended  237
                  Notice and Subpoena For Videotaped
                  Deposition of LL Inc. Pursuant to
                  Fed. R. Civ. P. 30(b)(6)
     Exhibit 20 - Merck Sharp & Dohme Corp.'s Amended  238
                  Notice and Subpoena For Videotaped
                  Deposition of Chocolate Soup Inc.
                  Pursuant to Fed. R. Civ. P. 30(b)(6)

Page 161

         THE VIDEOGRAPHER:  Okay.  We're back
on the record.  Today's date is December the 9th,
2015.  The time is 10:06 a.m.  This is Volume 2 of
the deposition of Jim Levitt, 30(b)(6) for
American XO Incorporated.
         If you'd please re-swear the witness.
            JAMES J. LEVITT,
a witness, being first duly sworn, testified as
follows:
         MS. HORN:  Okay.  I'm going to mark
Exhibit 12.
           (Exhibit 12 marked.)
         EXAMINATION (Continued)
BY MS. HORN:
    Q.   And I have had marked as Exhibit 12 a
collection of loan summary reports that were
produced in this litigation by Mission Bank.  And
I believe they are in reverse chronological order.
         And so, Mr. Levitt, I do have some
questions about the information that's in this
document, so but we're going to go in from the
back, working forward because it's reverse.
    A.   Um-hum.
    Q.   And if you want to take a moment to
look at it, that's fine.

Page 162

         Have you seen this before?
    A.   I don't know.  Probably haven't seen
it before because it looks like an internal bank
document.
    Q.   Okay.  Well, if you'd look at the
bottom, you'll see there's a set of Bates numbers
on each page that says Mission Bank and then a
hyphen and then a number, which we're going to use
that as page numbers.
         If you'd turn to -- towards the back
to the page marked 1483.
    A.   13.
    Q.   No.  1483.  1483.  And actually 1 --
start with 1484.
    A.   84?
    Q.   Yeah.  1484.
         And this particular report has a
review date of July 1st, 1998, and you'll see that
the title is "Loan Status Report," and the
borrower is listed as American XO by James Levitt,
President; II Inc., American XO and Chocolate Soup
Inc. by James Levitt, President.
         And if you flip through the document,
you see that there -- there's the summary of the
various loans that are in existence at that time

James J. Levitt

Page 195

```
 1   couple more in -- by 2007 I think we had closed
 2   six stores.
 3       Q.   And as the stores continued to lose
 4   money and the hotel continues to lose money, were
 5   you using your other personal assets to finance
 6   them?
 7       A.   We did use other personal assets when
 8   we had other personal assets to use.  One of the
 9   assets that we used is we took a second on our
10   house and -- for $500,000 and put it in the
11   companies.
12       Q.   Okay.  And then the last report in
13   this packet, which starts on page 1410, is
14   June 28th, 2004.
15       A.   I'm sorry.  1410?
16       Q.   Yes.  It's actually the first page of
17   the exhibit.  And just has a date for the final
18   report in this packet, June 28, 2004.
19            Do you see that?
20       A.   Well, I've done something because
21   I'm -- the first page I have here is 1478.  I
22   don't know, though.  This stuff has gotten turned
23   around.  I apologize.  But I'm going -- I'm
24   looking for 1410, which is going to be near the
25   bottom.  Is that right?
```

Page 196

```
 1       Q.   It was originally the first page of
 2   the exhibit.  So I'm not sure where it is right
 3   now.  But I just wanted you to see the date.
 4       A.   Well, what number --
 5       Q.   That it's 2004.
 6       A.   -- is on the first page?
 7       Q.   1410.
 8       A.   Is that -- I don't have a 1410.  Oh,
 9   wait.  Wait.  It's going down now.  Tried not to
10   get this mixed up.  Sorry.  There's some stuff in
11   here that shouldn't be here.
12            Okay.  I'm -- 1410.
13       Q.   And I just wanted you to see the date
14   for this report.  It's June 28th, 2004.
15       A.   Yes.
16       Q.   Is that right?  Okay.
17            And as you start going through the
18   report, instead of like the prior reports, but on
19   page 1418.
20       A.   I wish they would fix these pages.
21       Q.   Are they sticking together?
22       A.   Okay.  I'm at 1418.
23       Q.   And this is the -- the report is
24   discussing the performance of Chocolate Soup and
25   the hotels.
```

Page 197

```
 1            And do you see the section that says
 2   Collateral Coverage?  I want you to look at the
 3   paragraph right above that.  Starts, "President
 4   Coburn stated Mr. Levitt."  It's the second full
 5   paragraph from the bottom.
 6       A.   Oh, from the bottom.
 7       Q.   Do you see the paragraph?
 8       A.   I see what it says.
 9       Q.   Yes.  "President Coburn stated
10   Mr. Levitt is very optimistic regarding the hotel
11   performance.  A new general manager has been hired
12   and he is expected to improve operations."
13            Do you recall hiring a new general
14   manager in 2004?
15       A.   No.  I don't specifically recall it,
16   but we -- I told you we fired, I don't know, maybe
17   three managers at different times.  So could we
18   have hired one in 2004?  Yes.  Possible.
19       Q.   Who would have hired -- who would have
20   been the person to hire the general manager in
21   2004?
22       A.   Bazan, myself, and Jo.  In other
23   words, it was an important enough position that we
24   would have vetted him pretty thoroughly.
25       Q.   And who would he have reported to?
```

Page 198

```
 1       A.   He would have reported to the three of
 2   us, except that Jo was no longer very active in
 3   managing the property.  She was working on some
 4   remodeling.  He would have reported to the three
 5   of us.
 6       Q.   Did you ever personally ever go to the
 7   hotel property in the --
 8       A.   Did I what?
 9       Q.   Did you personally go to the hotel
10   property to supervise what was going on?
11       A.   Did I ever?  Occasionally.  Not often.
12            Bazan was up there a lot and Jo in
13   later years was up there a lot.  I was never up
14   there a lot.
15       Q.   So focusing on that time period of the
16   late -- of like 2004 time period, 2004-2005, what
17   interaction did you have with the general manager
18   at the hotel?
19       A.   I mean, I'm sure I talked to him on
20   the telephone.  I'm sure I talked to him when I
21   was up there.  I'm sure I talked to him when he
22   came to Kansas City.  And if I saw something I
23   thought we needed changing or something, I, you
24   know, would have called him directly and told him
25   what we wanted him to do, whenever it was.
```

11 (Pages 195 to 198)

Golkow Technologies, Inc. - 1.877.370.DEPS

James J. Levitt

Page 211

1  don't know where he comes up with a million and a
2  half dollars in Great Plains Financial because it
3  had been taken back by then. I didn't even own
4  it. So I don't know what it's doing on there.
5  The building, as far as I know -- well, I don't
6  know when they foreclosed on the building. So
7  you're right. I don't know for sure.
8      Q.   Okay. Let's -- to back up.
9           So in 2007 there was approximately
10 $7 million of assets beyond American XO and
11 Chocolate Soup Inc.?
12     A.   That's right.
13     Q.   Okay. What happened to those by
14 November of 2008?
15     A.   Well, we had the crash in the market.
16 Real estate was -- you couldn't finance a -- you
17 could not get a loan to buy real estate.
18 Therefore, real estate was in bad shape.
19          The bank was -- the banks were
20 foreclosing on us. That's not an opportune time
21 to sell your real estate.
22          So North American Savings took back
23 the Colbern Road property, which had had an MAI
24 appraisal of a million and a half. They took it
25 back from us. Okay. We got zero. The million

Page 212

1  and a half value became zero because we no longer
2  had the property. I mean, we got credit for some
3  moneys against the loan that we had, but it was
4  gone.
5           The Great Plains Financial stock,
6  through a -- negotiations, did a deed in lieu of
7  foreclosure. I was a minority partner. I was not
8  worried about it. I mean, my partner and I each
9  owned about a third of the company along with an
10 investment banker in New York. And I wasn't
11 treated as a minority partner.
12          But when I got in trouble and the bank
13 had the stock as collateral, had they put that
14 stock up for sale, I mean, what would somebody pay
15 for a minority position in an LLC -- or I don't
16 know if it was an LLC. I think we had it set up
17 as a sub S. I mean, I was lucky to get
18 2 million 8. They might have given me a million
19 and a half or something. I don't know how they
20 would have found a buyer for it, if they hadn't
21 taken it, but they gave me 2 million 8 in credit,
22 which we negotiated. Now, my guess is two, three,
23 four years later, the value is probably right back
24 up there. This is all real estate.
25     Q.   So wouldn't all of the -- strike that.

Page 213

1           If I understand what you're saying,
2  all -- basically all of the assets that are listed
3  on the 2007 financial statements were either taken
4  back or given back to satisfy debts. Is that --
5  is that right?
6      A.   That is correct.
7      Q.   When that happened, were all of the
8  debts satisfied?
9      A.   All what?
10     Q.   Were all of the debts satisfied?
11     A.   No.
12     Q.   Okay. So there was still -- it was
13 the bank's position there was still money owed
14 beyond the assets that were given up?
15     A.   My guess is, if I'm -- and I'm
16 guessing, because I've never gotten the final
17 figure from the bank of what they say I owe them,
18 the Mission Bank, but I'm guessing we ended up a
19 million and a half dollars in the hole. Should Jo
20 prevail in this lawsuit, the first money that she
21 gets will go to satisfy any people that we haven't
22 paid yet.
23          We never filed bankruptcy because we
24 don't believe in it. Our hope is to pay those
25 people back. So they'd get the first dollars that

Page 214

1  we get. And I -- if I'm -- I'm just guessing. My
2  guess is it's about a million and a half dollars.
3      Q.   You're -- where do you currently
4  reside? Where do you currently reside, your
5  house? Where do you live?
6      A.   1247 West 56th Street, Kansas City,
7  Missouri.
8      Q.   Is there litigation involving --
9      A.   There is --
10     Q.   -- the house?
11     A.   -- a litigation involving the house.
12     Q.   Is the litigation involving money owed
13 on the house?
14     A.   The house was foreclosed upon.
15     Q.   But you're still living there?
16     A.   And the litigation is involving that
17 foreclosure, yes, and we still live there.
18     Q.   Do you continue to pay a mortgage on
19 that property?
20     A.   No, we don't own it, because it was
21 foreclosed upon.
22     Q.   Okay. And how is it that you're still
23 living there?
24     A.   We're still living there because the
25 mortgager allows us to live there while they --

15 (Pages 211 to 214)

Golkow Technologies, Inc. - 1.877.370.DEPS

James J. Levitt

Page 223

1  this company, I would have said Jo and I. I
2  wasn't aware of -- I wasn't aware that Ashley
3  still had 10 percent of it, though -- although I
4  do now remember that we did make her 10 percent
5  shareholder at some time.
6      Q.  But you don't recall when that -- when
7  that first took place?
8      A.  Oh, no, I don't.
9      Q.  And was there -- did you -- at the
10 time the company went under, as far as you know,
11 was she still a 10 percent shareholder?
12     A.  At the time it went under what?
13     Q.  Was she still a 10 percent
14 shareholder?
15     A.  I don't -- I didn't know she was for
16 years.  I mean, this is the first that I've seen
17 this.  I never looked at this.  I just forgot
18 about it.
19     Q.  Okay.  So you never bought her out?
20     A.  No.
21     Q.  Okay.  Yesterday we talked a -- or I
22 asked you some questions about your valuations of
23 Chocolate Soup Retail for 1999 and 2000 time
24 period.
25         Do you remember that?

Page 224

1      A.  Yes.
2      Q.  And you said that your value would be
3  approximately $5 million; is that right?
4      A.  I just said that, in my own mind,
5  that's what it would have been.
6      Q.  And in your mind, what go -- what
7  would go into --
8      A.  In what -- what year did you just say?
9      Q.  The 1999-2000 period.
10     A.  Oh, okay.
11     Q.  And in your mind, what would go into
12 making a valuation assessment for a company such
13 as Chocolate Soup?
14     A.  Well, it was -- the history, the
15 goodwill, that people liked Chocolate Soup so
16 much, and the design.  The potential that if the
17 goods could have been manufactured offshore, I
18 mean, it would -- anybody would do great.  So that
19 gave it value.  It was Jo.  A lot of the value was
20 just Jo.  We talk about Jo's salary.  Jo would
21 have had no problem going out and getting a
22 quarter million, $300,000-a-year job putting
23 together lines for clothing companies.
24     Q.  Did Mrs. Levitt ever have a job
25 working for another company doing clothing design?

Page 225

1      A.  I'm sorry?
2      Q.  Did Mrs. Levitt ever have a job
3  designing clothes for another company?
4      A.  A job with another company?
5      Q.  Designing clothes.  Did she ever have
6  such a job?
7      A.  No.
8      Q.  And why do you think that she could go
9  out and get a job for $250,000 designing clothes?
10     A.  Because of -- she's so successful.  I
11 mean, there were -- you know, there were all kinds
12 of art.  We were rated by practically every
13 newspaper of every -- we had 14 stores.  That's --
14 in 14 different cities, all big cities like Dallas
15 and Houston and so on.  And in just about every
16 city, we were rated by the, you know, local paper,
17 whether it was Atlanta Constitution or whatever.
18 It was the number one kids store in the town.
19 Okay.  It was the reputation.  The goodwill.
20         The only problem that we had is that
21 every year it cost us more to make clothes, and
22 yet there was such an influx of imports of better
23 clothes.  The average price of kids' clothes was
24 actually going down of those types of clothes
25 instead of up.

Page 226

1         MS. HORN:  Mark this Exhibit 16.
2         (Exhibit 16 marked.)
3      Q.  BY MS. HORN:  What I had marked as
4  Exhibit 16 is another document that was produced
5  by Mission Bank.  And you'll see the first page is
6  a memo dated June 13, 2001, from Clay Coburn, Jr.
7  The loan discount committee.  And the subject line
8  reads "Chocolate Soup Retail and Chocolate Soup
9  Inc.," and it's involving a proposed line of
10 credit for a million dollars.
11        If you continue in, there's an
12 attachment which is a -- appears to be a financial
13 statement for Chocolate Soup.  And it's the
14 attachment I wanted to ask you about.
15        And the first question I have is this
16 particular document, the balance sheet, the
17 combined balance sheet document, is this something
18 that you prepared?
19     A.  No.
20     Q.  Do you know who --
21     A.  But it could have been something our
22 accountant prepared.
23     Q.  Okay.
24     A.  It may have come from the accounting
25 firm.

18 (Pages 223 to 226)

James J. Levitt

Page 227

1   Q.   So am I correct that this particular
2   document shows that the net operating income for
3   Chocolate Soup in 1999 was approximately $230,000?
4   A.   Well, it says net income, not net
5   operating income.  $230,000.  That's what it says
6   here.
7   Q.   Okay.  So --
8   A.   But I'm sure in '99, because I was
9   thinking about that yesterday, the -- we lost
10  about a million and a half when we went into the
11  screen printing fiasco thing.  And some of that
12  loss actually went -- you know, ended up
13  effectively being part of '99.  '99 would have
14  been a much better year if part of that hadn't
15  gone in there.
16  Q.   All right.  And am I correct that this
17  particular document shows a net operating income
18  for year 2000 for Chocolate Soup in the amount of
19  approximately $172,000?
20  A.   That's what it says.
21  Q.   And do you believe that to be an
22  accurate -- approximately an accurate figure?
23  A.   Well, accurate, you know, yes.
24  Approximately accurate.
25  Q.   Prior to the 1999-2000 time frame, did

Page 228

1   Chocolate Soup have a year in which it had a net
2   operating income that exceeded $230,000?
3   A.   Oh, yeah.
4   Q.   And which year was that?
5   A.   Well, probably throughout the '80s.  I
6   don't have the records.  They were all taken from
7   me, okay.
8        But probably throughout the '80s.
9   When you look at the net worth statements, just
10  remember we started Chocolate Soup with $5,000.
11  So we must have earned money sometime.
12  Q.   Do you recall any period in the '90s
13  in which Chocolate Soup's net operating income
14  exceeded $230,000?
15  A.   Well, all I saw here was '90 -- I
16  don't know.  Didn't they have stuff that started
17  in '92 here?
18  Q.   I'm not sure what you're referring to.
19  A.   Yeah.  I don't know.  All I saw here
20  was '92 on up.  So I don't know what '91 and '90
21  were, but we had years where we earned over
22  $1 million.
23  Q.   Do you have a -- do you have a
24  recollection in the 1990's of having a net
25  operating income that exceeded $230,000?

Page 229

1   A.   I don't have a recollection of any
2   earnings in 1990's.  I mean, I don't -- we don't
3   have 1990 or '91.  If you have it there, show me.
4   But I -- I saw stuff that the bank -- was it the
5   bank or the accountant sent that looked like it
6   was from '92 on up.  That's all I have.  I don't
7   have -- I don't have the memory to know what --
8   how much money we made in 1976 or something.  I
9   don't know.
10  Q.   Okay.  And what I'm just trying to
11  nail down is whether at any point in time -- and
12  we can use from 1992 forward.  Whether there was a
13  year from 1992 forward where the net operating
14  income exceeded that that's shown here for 1999?
15  A.   Okay.  What -- what we have here -- I
16  don't know right now.  But I think the figures are
17  in here.  I don't know why you wouldn't just put
18  the figures up here.  They are what they are.
19  Q.   Your reference to the foray into
20  screen printing, do you recall how much money was
21  lost on that?
22  A.   The screen printing?
23  Q.   Um-hum.
24  A.   I think it was probably a total of
25  about a million and a half.

Page 230

1   Q.   Okay.  And why do you think this was
2   still impacting your financial statement in 1999?
3   A.   Because we started writing it down in
4   one year, and then we took a lot more write-downs
5   the next year, and there were -- then we finally
6   just blew the rest -- whatever was left off in the
7   last year, and I think it was '99.
8   Q.   And just to clarify -- just to make
9   sure I'm not following you.
10       So you believe that write-offs from
11  prior years that were being carried over would be
12  reflected in the net operating income?
13  A.   Yes.  Because they were -- it was the
14  inventory.  We may have guessed wrong on how bad
15  it was going to hurt us.  You know, we had
16  inventory carryover from the screen printing, and
17  we were trying to reserve for it.  And I don't
18  think we reserved enough.  And the reserve was
19  more in our head, because basically it happens
20  when it occurs.
21       In other words, we don't -- we don't
22  say, we'll estimate our loss from the screen
23  printing and set up reserve.  That's not the way
24  we did it.  We liquidated the inventory and
25  determined the loss by that.  That was the only

19 (Pages 227 to 230)

James J. Levitt

Page 231

1  big mistake that Jo made in the entire time that
2  was actually -- I mean, she made other mistakes.
3  That was the only one that was a big one.  That's
4  not bad for, what, 40 years, 30 years, whatever.
5          MS. HORN:  Mark this as Exhibit 17.
6          (Exhibit 17 marked.)
7      Q.  BY MS. HORN:  What I am marking as
8  Exhibit 17 is a document that was produced in this
9  litigation from the plaintiff.  This particular
10 exhibit was previously marked in your personal
11 deposition and it was also marked in Bazan's
12 depositions.
13         Is this the document you're thinking
14 of when you were talking about the 1992 list of
15 numbers?
16     A.  Well, this is helpful.  So I could
17 answer your question now.
18     Q.  Okay.  Do you --
19     A.  If you ask me the same question, I can
20 answer it.
21     Q.  Okay.  Do you recall testifying about
22 this document in your prior deposition?
23     A.  I did, yes.
24     Q.  Okay.  The -- looking on the first
25 page, where there's a reference in 1996, there's a

Page 232

1  little notation that says $370,000 -- well,
2  $370,632 of extraordinary loss.
3          Do you see that?
4      A.  I do.
5      Q.  Is that the screen printing issue that
6  you're talking about?
7      A.  Is that the what?
8      Q.  Is that the screen printing issue?
9      A.  I have no idea what that is.  That
10 would be -- this is -- these came from Bazan's
11 figures.  I think Bazan made these documents up
12 because we requested him to, because they wanted
13 to supply stuff to the Merck attorneys or whatever
14 in the discovery.  And I have -- I don't know what
15 that -- what that is.
16         Did you ask him what that was?  He
17 probably would have told you.
18     Q.  Do you recall any extraordinary loss
19 other than the screen printing issue?
20     A.  Any other what?
21     Q.  Any other year in which you had an
22 extraordinary loss other than the year the screen
23 printing didn't work out?
24     A.  No.  Screen printing -- we never
25 experienced anything like that.  One time in all

Page 233

1  the years.
2          We had a lot of inventory that was
3  screen printed and, you know, started selling
4  it -- started out selling at this pace and then
5  that pace, and then that pace, and it took us
6  about four years to get rid of the stuff.
7      Q.  And when you're saying it took you
8  about four years to get rid of the stuff, I'm
9  looking here.  There's a column that says "total
10 combined net income."  And there's four
11 consecutive years that have a minus, 1995, 1996,
12 1997, and 1998.
13         Were those the years that you're
14 thinking about?
15     A.  Well, it's hard for me to read this.
16         I was probably thinking more in terms
17 of '97, '98, '99, 2000 conceivably.  It could have
18 gone into 2000.
19     Q.  Okay.  Well, to the extent that there
20 was a net operating loss in 1995, '96, '97, '98,
21 what was the reason for that?
22     A.  What?  What?
23     Q.  To the extent there was a net
24 operating loss in the years 1995, '96, '97, and
25 '98, what was responsible for that?

Page 234

1      A.  Well, I don't recall.  More of the
2  same problems.  I mean, we're constantly competing
3  with lower price upstairs garments that they're
4  pouring in from overseas.  And that's probably the
5  best explanation.  I didn't think we did the
6  screen printing in '95.  Maybe I'm wrong, but I
7  don't remember screen printing being part of the
8  '95.  I thought it started in '96.
9          But you asked me a question, did we
10 ever earn over 220,000 in 1990.  The answer is,
11 yes, we earned 500 and -- what is this?  It's hard
12 for me to read it.  560 in 1992 and 511 in 1993.
13     Q.  And then in 1995, '96, '97, and '98,
14 you lost money; is that correct?
15     A.  Yes.  But I think you could add --
16 from at least '96 through 1999 you could add about
17 a million and a half.  I mean, about a million and
18 a half of that was -- had to do with the screen
19 printing.
20         So let's see, 1 million 3 -- I wish I
21 could see this better.  350 -- I can't -- yeah.  I
22 mean, there would have been -- it would have been
23 small positive operating, if it hadn't been for
24 the screen printing, but they wouldn't have been
25 high figures.  Although '99 I think would have

20 (Pages 231 to 234)