Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION ) | MDL DOCKET NO. 1657 SECTION L |
| ) | |
| ) | JUDGE FALLON |
| THIS DOCUMENT RELATES TO: ) | |
| ) | MAGISTRATE JUDGE |
| JO LEVITT, ) | KNOWLES |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 2:06-cv-09757-EEF-DEK |
| ) | |
| MERCK & CO., INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

VIDEOTAPED DEPOSITION OF JAMES J. LEVITT, a Witness, taken on behalf of the Defendant before Shelby L. Mead, CSR No. 1472, CCR No. 940(G), pursuant to Notice on the 24th day of July, 2012, at the offices of Bryan Cave, LLP, One Kansas City Place, 1200 Main Street, Conference Room 37 North, Kansas City, Missouri.

James J. Levitt

Page 2

```
 1            APPEARANCES
 2
     PLAINTIFF APPEARING PRO SE
 3
 4
     APPEARING FOR THE DEFENDANT:
 5
         Jonathan L. Williams, Esquire
 6       M. Elaine Horn, Esquire
         Williams & Connolly, LLP
 7       725 Twelfth Street, N.W.
         Washington, D.C. 20005
 8       202-434-5000
         Jonathanwilliams@wc.com
 9
10
     VIDEOGRAPHER:
11
         Mr. Jeremy Martin
12
13
14
15             INDEX
16
17   WITNESS:                        PAGE:
18   JAMES J. LEVITT
19     Examination by Mr. Williams       3
20
21
22   EXHIBITS:
23     NOTES:  No exhibits were marked.
24
```

Page 3

```
 1           THE VIDEOGRAPHER:  This is the
 2   videotaped deposition of James Levitt, Case No.
 3   2:06-cv-09757-EEF-DEK.  Today's date is July 24 of
 4   2012.  The time is now 9:04 Central Time, we're going
 5   on the record.  Counsel, will you please state your
 6   appearances.
 7           MR. WILLIAMS:  Jonathan Williams of
 8   Williams & Connolly for Merck.
 9           MS. HORN:  Elaine Horn of Williams &
10   Connolly for Merck.
11           THE VIDEOGRAPHER:  Thank you.  Would
12   you please swear in the witness.
13           JAMES J. LEVITT,
14   being first duly sworn, testified under oath as
15   follows:
16             EXAMINATION
17   BY MR. WILLIAMS:
18       Q.   Morning, Mr. Levitt.  My name is
19   Jonathan Williams, I represent Merck.  I just have a
20   few questions about your wife's lawsuit against the
21   company today.  Before we start, could you state your
22   full legal name for the record?
23       A.   My full legal name?
24       Q.   Yes.
```

Page 4

```
 1       A.   James J. Levitt.
 2       Q.   And have you ever used any different
 3   names in the past?
 4       A.   No.
 5       Q.   Do you go by Jim sometimes; is that
 6   right?
 7       A.   Oh, people, call me Jim, yeah.
 8       Q.   Okay.  Well, I'll call you Mr. Levitt
 9   today.
10       A.   You can call me Jim, that's fine.  Go
11   ahead, I can --
12       Q.   You understand you've taken an oath to
13   tell the truth today?
14       A.   That what?
15       Q.   That you took an oath to tell the
16   truth today?
17       A.   Yes, I did.
18       Q.   And that it's the same oath you would
19   take in a courtroom if you were testifying there?
20       A.   I assume, I've never been in a
21   courtroom.
22       Q.   And do you feel well enough today to
23   answer questions about this case?
24       A.   Well enough to what?
```

Page 5

```
 1       Q.   Answer questions about this case?
 2       A.   Yeah.
 3       Q.   You are not taking any medicines that
 4   would affect your ability to remember?
 5       A.   Not any particular medicines, no, I'm
 6   a little bit hard of hearing.
 7       Q.   Okay.  I'll try to speak up for you
 8   and just as you've been doing if you can't hear me,
 9   ask me to repeat myself and I'll happily do that.
10       A.   Okay.
11       Q.   So there's no reason today, any
12   medication or any health condition you wouldn't be
13   able to answer questions?
14       A.   No, there isn't.
15       Q.   You've given a deposition before; is
16   that right?
17       A.   Yes, I have.
18       Q.   How many times have you given a
19   deposition?
20       A.   I don't know, ask him (indicating).  I
21   don't -- the last time I had difficulty figuring out
22   how many times because there were -- they were for
23   the most part pretty minor, I would guess four or
24   five times.
```

2 (Pages 2 to 5)

Page 34

1  doing something different even if it wasn't an area
2  she was interested in, I would certainly sit down and
3  discuss it with her before doing it.
4      Q.   Were there aspects of the business
5  that you were primarily responsible for?
6      A.   Yes, the financial end of the
7  business.
8      Q.   Well, when you say the financial end
9  of the business, does that include getting --
10 obtaining financing for the company?
11     A.   Yes.
12     Q.   And does that include overseeing
13 accounting?
14     A.   Overseeing what?
15     Q.   Accounting.
16     A.   I still didn't --
17     Q.   Accounting and taxes?
18     A.   Oh, overseeing the taxes?
19     Q.   Accounting and taxes?
20     A.   I'm not --
21     Q.   Overseeing the accounts and the income
22 for the business, does it include that?
23     A.   Well, you mean looking at the --
24 paying attention to the financial statements and the

Page 35

1  gross margins and so on?
2      Q.   Yeah, sorry, yes.
3      A.   Yes, that's the kind of things I did,
4  yes.
5      Q.   Were you involved in the decisions
6  about what kinds of goods to sell?
7      A.   Yes.
8      Q.   How much of your time did you spend on
9  deciding what products should be offered at the
10 stores?
11     A.   Well, basically that was taken care of
12 by my wife, but we would certainly discuss the
13 direction that we were going in, she would discuss
14 with me and I would have input like if she decided
15 that out of the blue argyle was going to be real hot
16 this year, then she would discuss it with me and we
17 would talk about how much we were going to buy and
18 when we're in the buying process, you know, I would
19 be involved in saying, you know, Well, you got that
20 much, do you want to go any further, I mean, so that
21 would be my involvement, but she was the primary
22 decision maker right down the line.
23     Q.   Now, your company, Chocolate Soup, it
24 manufactured clothing in addition to having retail

Page 36

1  stores; is that right?
2      A.   Yes.
3      Q.   Were those different business
4  functions part of the same entity or different
5  incorporated entities?
6      A.   We had two different incorporated
7  entities.  Initially it was all the same.
8      Q.   What were the different entities
9  called?
10     A.   Chocolate Soup retail was a sub S
11 corporation owned by my wife and I equally and
12 Chocolate Soup Manufacturing was a division of
13 American XO, which was just a holding company that
14 also owned II, Inc., that was the hotel.
15     Q.   And who were the owners of American
16 XO?
17     A.   My wife and I.
18     Q.   Did anyone else have an ownership
19 interest in American XO?
20     A.   No.
21     Q.   Did anyone else have an interest in
22 the manufacturing --
23     A.   The manufacturing was part of XO,
24 nobody had an interest in anything other than my wife

Page 37

1  and I.
2      Q.   And in addition -- strike that.  Did
3  you receive a salary from any of those entities?
4      A.   Yes.
5      Q.   How -- who determined what your salary
6  was?
7      A.   Me.
8      Q.   And which entities did you receive a
9  salary from?
10     A.   I believe it went through American XO.
11     Q.   Do you recall the highest salary you
12 ever received from American XO?
13     A.   You know, then you had the sub S too
14 that was the retail, so you just want to know the XO
15 side of it?
16     Q.   Just tell me between all of the
17 entities what the highest salary was -- the most that
18 you would receive?
19     A.   I don't know, maybe a million dollars.
20     Q.   And when was that?
21     A.   Probably, I don't know, it could've
22 been in the '80s for all I know or in the early '90s
23 or I don't remember.
24     Q.   Did the amount you receive -- strike

10 (Pages 34 to 37)

James J. Levitt

Page 58

1  Q. What were you working on -- how were
2  you trying to find a cure for your son-in-law?
3  A. Well, I would -- I would literally say
4  there were times when I probably -- there may have
5  been individual weeks where honest to God I may have
6  spent, you know, 110, 120 hours on the internet.
7  Q. Who was running your businesses at
8  that time?
9  A. Well, Jo was working on the hotel
10 except mostly she was up there asleep in a room and I
11 was running Chocolate Soup, which had downsized and
12 since we -- what we did is we had less production
13 people and only made some stuff that everybody knew
14 how to make that didn't really take any management,
15 so we got rid of the, you know, the factory manager
16 and so on and so that left the retail side, which,
17 you know, I still spent a lot of time on that, I
18 mean, but I was hooked into everything from home via
19 the computer like even the warehouse, which was in a
20 different location, I mean, I would know if they
21 packed a box. If they just started packing a box, I
22 would know from my computer that they had started
23 packing a box for Germantown and what was in that
24 box. I mean, I could -- given that we weren't

Page 59

1  manufacturing a lot, it was something that actually
2  didn't require me to be there.
3  Q. So who did you sell Great Plains to in
4  2010, your interest in it?
5  A. Well, I guess you would say the bank,
6  although they were negotiating with -- I mean, the
7  bank paid me actually probably more than they should
8  have. In the middle of all of that with my
9  brother -- or my son-in-law dying and me really not
10 feeling that good with 100 percent blockage of my
11 arteries, we had the crash in the market and Great
12 Plains, which had just been a straight-up success and
13 I had been offered millions for my position not long
14 before and refused it, you know, the value of it, I
15 mean, they just -- they started losing money and had
16 big problems.
17 Q. So how much did you receive from the
18 bank for it?
19 A. I think about 2.8 million.
20 Q. And did all of that money go -- what
21 did you do with that money?
22 A. It all went to the bank.
23 Q. For loans?
24 A. To pay off loans, yes.

Page 60

1  Q. Anything --
2  A. See, the other thing happened in the
3  crash even for companies that weren't doing so badly,
4  credit was just cut off. Well, that was not -- we
5  were not in a good position because I was walking
6  around, you know, son-in-law just died, I really need
7  a triple bypass, the only reason it was a triple
8  bypass was there wasn't enough to work with with the
9  other artery and we couldn't finance our business was
10 the big problem, I mean, we could've taken care of a
11 lot of it had we just not had -- we just continuously
12 had more credit cut off and as a consequence we
13 couldn't get enough inventory to even make -- we
14 would make an absolute killing whenever we sold -- I
15 mean, whenever we closed a store, but that's because
16 we couldn't get the inventory, we would actually lose
17 money, I mean, you have no choice, if you got to
18 close the store, but, I mean, we would lose money on
19 balance instead of making 150 or $200,000 per store
20 when we went out of business, we might loss $50,000
21 just because we couldn't get enough inventory in
22 there.
23 Q. Now --
24 A. So in a sense the bank shot themselves

Page 61

1  in the foot, but, you know, there just wasn't -- I
2  never experienced a time like that in all the years
3  I've been in business where it just cut off
4  completely.
5  Q. You don't own Chocolate Soup anymore;
6  is that correct?
7  A. That's correct -- oh, that's
8  incorrect. I do own the corporation that was
9  Chocolate Soup and it's still named Chocolate Soup.
10 Q. Does it have assets?
11 A. Does it what, assets?
12 Q. Yes.
13 A. No.
14 Q. Who owns the assets now?
15 A. Who what?
16 Q. Who owns the assets now?
17 A. The -- you know, we liquidate a lot of
18 stuff, you close stores, you get rid of inventory and
19 fixtures are gone, the -- like the factory assets are
20 probably spread far and wide and an individual bought
21 Chocolate Soup from the bank.
22 Q. Do you know who that was?
23 A. His name was Collin something.
24 Q. And do you know if --

16 (Pages 58 to 61)

James J. Levitt

Page 62

1  A. Pardon?
2  Q. Do you know if Chocolate Soup is still
3  being operated as --
4  A. Barely. I mean, he's just -- it has
5  just gone like that (indicating) and I think they
6  have -- I talked to somebody recently, I mean,
7  recently would be about three months ago. They have
8  two or three stores and they're like working out of
9  his garage or something, so, I mean, they're going to
10 be gone, I knew they were going to be gone early on.
11 Q. And when was the last year that you
12 and your wife were operating Chocolate Soup?
13 A. Well, Jo really was out of Chocolate
14 Soup quite a while before I was. She was no longer
15 involved in anything. She just couldn't do it and
16 let me think. First of all, Jo really did hardly
17 anything at Chocolate Soup after her heart operation,
18 I mean, she showed up, but that was about it and
19 didn't necessarily show up that often and believe me
20 when you got a wife that was a genius at that stuff,
21 I mean, she was incredible and the whole thing is
22 built around her and then she's just gone, so I --
23 she didn't have much involvement with Chocolate Soup
24 in the 2000s, I mean, after 2000.

Page 63

1  Q. But you remained involved?
2  A. What?
3  Q. You remained involved?
4  A. I did.
5  Q. Until what year?
6  A. I don't know, maybe -- let me see, my
7  son-in-law died in -- at the end of '08, so at least
8  into '09 and maybe even -- it might have been
9  early -- I know we were still running it until about
10 March of whatever year it was and maybe it might have
11 been 2010.
12 Q. And the hotel, when did you and your
13 wife stop running the hotel?
14 A. Around the same time, it may have been
15 later. No -- yeah -- no, it was around the same
16 time, it might have been before Chocolate Soup.
17 Q. And why did you stop running them?
18 A. Because it was losing, you know, like
19 half a million dollars a year, it was just going to
20 get worse because we didn't have the money to do what
21 we had to do and the big mistake I made because of
22 all of the stuff that was going on in my life and
23 Jo's life with my son-in-law and her just sometimes
24 sleep ing 20 hours a day, it was a great piece of

Page 64

1  land, forget the hotel, and my intention was to try
2  to sell it and I did finally put it up, signed a
3  contract that would have bailed out everything, okay,
4  and then the market crashed and there was no money
5  for real estate at all.
6  Q. But you said you had a contract to
7  sell it; is that right?
8  A. Yes.
9  Q. And what -- what did you do when the
10 buyer backed out?
11 A. Wasn't anything I could do. I mean,
12 real estate you don't -- it would be pretty rare that
13 you would sign a contract that the buyer didn't have
14 outs on, I mean, this was -- he signed the contract
15 and there was all kinds of due diligence and this and
16 that, environmental, all of that stuff had to be done
17 and it was -- I kept him on a short leash meaning it
18 was only -- he had like six months to perform,
19 normally it would be longer for a project like that
20 of that size and he backed out, which wasn't -- by
21 the time he backed out, you know, I was just glad the
22 phone wasn't ringing, but I knew he was going to back
23 out. I mean, the stuff that happened is real world
24 and overnight there was -- it was a great location

Page 65

1  and the reason that he was buying it, he was a local,
2  I mean, he had other people involved because they
3  basically had -- they're like, oh, God, I can't even
4  remember how much land now, at least ten acres of
5  land. They had the whole 80 percent of it probably
6  pre spoken for.
7  Q. And it was your view that you
8  couldn't --
9  A. But overnight they were all gone,
10 retailers just shut down their expansion.
11 Q. You've said a few times that your wife
12 didn't work much after her surgery, what's your
13 understanding of why she didn't work after that time?
14 A. Well, she's obviously real depressed
15 and she has no energy and it -- I thought I read
16 somewhere one time that people couldn't even sleep 20
17 hours in a row, but she has done that and more on a
18 number of occasions.
19 Q. Do you know if she ever spoke to a
20 doctor about these problems?
21 A. If she's what?
22 Q. If she ever spoke to a doctor about
23 these problems?
24 A. She has, but Jo was always real

17 (Pages 62 to 65)

Page 94

1  literally, say, over a three-month period do four
2  times the business we had done in the prior year if
3  we had the inventory.
4      Q.   Do you have any memory of closing
5  stores in 1997?
6      A.   Closing stores what?
7      Q.   In 1997?
8      A.   Oh, I don't even remember 199 -- I
9  mean, I couldn't tell you anything I did in 1997.
10     Q.   Did you close any stores before 2005?
11     A.   Well, I know we did because we closed
12 a couple of stores even when we were real profitable,
13 one being Washington, D.C., we had one in Washington
14 that was -- just never took off, actually it was in
15 Bethesda.
16     Q.   Going back to the records for a
17 second, when -- have you gotten rid of the records at
18 any point?
19     A.   I neither retained nor got rid of
20 records.
21     Q.   Did you have control of these records
22 at any point?
23     A.   Well, obviously or you wouldn't have
24 them.  I just didn't handle it, that's why I hired

Page 95

1  Bazan to begin with.  He became a big part of the
2  business as an executive, but he was a CPA.  He was
3  supposed to, you know, if you had to keep stuff or
4  whatever, I didn't want anything to do with it.
5      Q.   And so it was -- it was your
6  understanding when you were running Chocolate Soup,
7  Mr. Bazan would decide how to -- whether to retain or
8  get rid of records?
9      A.   Well, he had knowledge, he had been a
10 public accountant.
11     Q.   So you left it up to him; is that
12 right?
13     A.   Absolutely.
14     Q.   And to your knowledge did your wife
15 take the same approach?
16     A.   Did she what?
17     Q.   Did she take the same approach?
18     A.   Yeah, I mean, she never -- she
19 wouldn't keep track of anything.
20     Q.   She just wasn't involved in the
21 financial side?
22     A.   Right, right nor would she be.  She
23 would say, What's that produce, to keep your records.
24     Q.   So -- sorry, let's go back to some of

Page 96

1  these figures if you would and to the extent you can
2  remember I would like for you to kind of explain some
3  of the fluctuations here?
4      A.   What am I supposed to go back to?
5      Q.   This chart.  Between 2005 and 2004
6  there was what looks like about a $400,000 difference
7  in the combined net income?
8      A.   Uh-huh.
9      Q.   Do you have any idea what caused that?
10     A.   I mean, not offhand sitting here
11 today, but, you know, you can have -- this was not
12 the norm for this company.  We used to earn more.  I
13 think we earned a good deal more than what you see on
14 here before, but, I mean, there's just nothing
15 unusual about that.  Things went better for whatever
16 reason.
17     Q.   Do you have any recollection of if the
18 economy was bad at that time?
19     A.   No, the economy isn't that big of
20 deal.
21     Q.   What is it that -- what kind of issues
22 are a big deal that would explain a big deal like
23 that?
24     A.   Maybe Bazan kind of became the buyer,

Page 97

1  maybe he made a lot of good buys that year, I don't
2  know.  Maybe we -- I don't know, but I don't find
3  anything unusual about that.
4      Q.   I'm just curious what kinds of changes
5  might affect a change like that, what kinds of
6  changes in the business might result in a change in
7  net income year on year like that?
8      A.   Well, I'll tell you what a possibility
9  would be and I would think somehow or another I might
10 be able to find out, a possibility would be, and I
11 don't know that we did this then, but maybe we closed
12 a couple of stores, that could explain it.
13     Q.   Because there would have been that
14 increase in sales associated with the closing that
15 you referred to?
16     A.   Yeah, an increase in profit also, but
17 I don't know.
18     Q.   When did Mr. Bazan start serving as a
19 buyer for Chocolate Soup?
20     A.   Well, he like I is a numbers man, he
21 was always interested and wanted the opportunity,
22 but, I mean, he's a number cruncher, I'm a number
23 cruncher, but he's not Jo, you know, so, I mean, he
24 developed a real good feel as I could for what was

James J. Levitt

Page 110

1  restaurant a lot of things would change and I don't
2  know how many times even when we were doing well or
3  relatively well, how many times she had to go up
4  there when it -- we had to watch it close, it would
5  start to go down and she would have to go up there
6  and straighten everybody out and hire some new
7  people, whatever.
8      Q.  Who was in charge of the restaurant,
9  who in Lincoln was in charge of the day-to-day
10 operations at that time?
11     A.  Various people, various different
12 people.
13     Q.  How often did that change?
14     A.  Well, it started to change more in the
15 last ten years that we had the place.  We had a guy
16 that was super talented, productive individual who
17 was impossible to live with, but we figured out how
18 to live with him and I think he might have lasted ten
19 years and we really -- it's not that we made that
20 much money, although we were making money, we really
21 put out a good product and then we brought somebody
22 else in that was not that bad, but he lasted a couple
23 of years and then it got real bad.
24     Q.  So you owed debt from both -- strike

Page 111

1  that.  Both II, Incorporated and Chocolate Soup
2  entities owed debt in 2009 and 2010; is that right?
3      A.  They both what?
4      Q.  They both had debts to the banks in
5  2009 and 2010 or was it just the Chocolate Soup
6  company?
7      A.  No, the bank -- I did a deed in lieu
8  on the II.  You waiting for me?
9      Q.  Yes, I had asked you if both companies
10 had debts or if it was just one company that had debt
11 in 2009 and 2010?
12     A.  They both did, I mean, if they were
13 both still alive, they both had debt, everything has
14 debt.
15     Q.  Do you remember the approximate amount
16 of those debts?
17     A.  Well, it was actually lower, I
18 remember one time I remember going to the bank and
19 the president of the bank telling me that I was on
20 the hook for -- with all of the different stuff for
21 about 17 million, but that would've been -- I mean,
22 this would've been -- I have to guess, I guess 7, 8
23 million, I don't know.  All together, as far as we
24 were concerned it was all together because we were

Page 112

1  going to honor any debt we had, so it didn't make any
2  difference where it was.
3      Q.  Do you -- so there was debt in
4  addition to the amount that you were able to sell
5  your real estate interest for in Great Plains?
6      A.  Right.  What is it you're asking
7  though?
8      Q.  You had more debt than you could cover
9  with the sale from the -- your interest in Great
10 Plains; is that right?
11     A.  That's right.
12     Q.  And were you and your wife personally
13 liable for any of that debt?
14     A.  Yes.
15     Q.  Do you remain personally liable for
16 any of that debt?
17     A.  Yes.
18     Q.  Did -- for both companies?
19     A.  Well, I wouldn't guarantee any debts
20 on Chocolate Soup.
21     Q.  Did you guarantee any debts for II?
22     A.  Yeah, I think the hotel was -- I think
23 we personally guaranteed the mortgage, I'm not even
24 sure about that because it may have been that what we

Page 113

1  did is not personally guarantee the first mortgage,
2  but we may have had second or third mortgages or
3  whatever and personally guaranteed that and, I mean,
4  all that would mean is the first mortgage was covered
5  anyway and I just don't remember how it broke down.
6      Q.  Did I -- did you say that you did a
7  deed in lieu on the hotel?
8      A.  I believe I did.
9      Q.  So --
10     A.  I'm not a legal expert, I think that's
11 what I did.
12     Q.  Did you have any additional amount
13 that you owed once the bank --
14     A.  The bank hasn't come after me.
15     Q.  Have you signed anything with the bank
16 that says they can't?
17     A.  Have I signed anything with the bank
18 that says they can't come after me?
19     Q.  Yes.
20     A.  Not to my knowledge, although I was
21 not exactly with it in those days with my 100 percent
22 blocked arteries and my son-in-law dying and the
23 market crash.
24     Q.  Do you owe any additional debts

29 (Pages 110 to 113)