John O. Ward, Ph.D.

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  VIOXX | MDL DOCKET NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| | JUDGE FALLON |
| | MAGISTRATE JUDGE KNOWLES |

THIS DOCUMENT RELATES TO:

Jo Levitt v. Merck Sharp & Dohme Corp.,

2:06-cv-09757-EEF-DEK

_____

     VIDEOTAPED DEPOSITION OF JOHN O. WARD, Ph.D., produced, sworn and examined on behalf of the Defendant, pursuant to Notice, on Tuesday, the 9th day of February 2016, between the hours of 9:40 a.m. and 1:12 p.m. of that day, at the office of John Ward Economics, 8340 Mission Road, Suite 235, in the City of Prairie Village, in the County of Johnson, and the State of Kansas, before me, NAOLA C. VAUGHN, KS CCR 0895, CRR, RPR, a Certified Court Reporter, within and for the States of Kansas and Missouri.

Page 2

```
 1            A P P E A R A N C E S
 2   For the Plaintiff:
 3      HUMPHREY FARRINGTON & McCLAIN, P.C.
        221 West Lexington Avenue
 4      Suite 400
        Independence, Missouri  64050
 5      816.398.7435
        dat@hfmlegal.com
 6      BY:  DANIEL A. THOMAS, ESQUIRE
 7
     For the Defendant:
 8
        WILLIAMS & CONNOLLY, LLP
 9      725 Twelfth Street, N.W.
        Washington, D.C.  20005
10      202.434.5131
        ehorn@wc.com
11      BY:  M. ELAINE HORN, ESQUIRE
                and
12      epistilli@wc.com
        BY:  EMILY RENSHAW PISTILLI, ESQUIRE
13
14   Also Present:  Jim Ross, videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1               I N D E X
 2   WITNESS: JOHN O. WARD, PH.D.
 3   Examination by Ms. Horn ..........................   4
 4
 5               EXHIBITS
 6   NUMBER   DESCRIPTION                           PAGE
 7   Exhibit 1 - Notice of Videotaped Deposition of    8
 8        John O. Ward PhD
 9   Exhibit 2 - Retainer Agreement and Questionnaire 48
10   Exhibit 3 - 1/19/16 report                       57
11   Exhibit 4 - Year-Round, Full-Time Wage & Salary  79
12        Earnings in the United States
13        (2013 Dollars)
14        American Community Survey 2011-2013
15   Exhibit 5 - Revenue reports                     127
16   Exhibit 6 - Levitt Financial Timeline           141
17   Exhibit 7 - Handwritten notes                   141
18   Exhibit 8 - Handwritten notes                   144
19   Exhibit 9 - Itemized Statements of Earnings     144
20
21
22
23
24
25
```

Page 4

```
 1          THE VIDEOGRAPHER:  We're now on the
 2   record.  My name is Jim Ross.  I'm the
 3   videographer with Golkow Technologies.  Today's
 4   date is February the 9th, 2016.  The time is
 5   9:40 a.m.  This deposition is being held in
 6   Prairie Village, Kansas, in the matter of
 7   Levitt v. Merck, for the United States District
 8   Court of Louisiana.  The deponent is John Ward.
 9          Counsel, will you please identify
10   yourselves for the record.
11          MR. THOMAS:  Danny Thomas for
12   plaintiffs.
13          MS. HORN:  Elaine Horn from Williams
14   and Connolly for Merck.
15          MS. PISTILLI:  Emily Pistilli, also
16   from Williams and Connolly, for Merck.
17          THE VIDEOGRAPHER:  The court reporter
18   is Sam Vaughn and will now swear the witness.
19           JOHN O. WARD, Ph.D.,
20   a witness, being first duly sworn, testified as
21   follows:
22              EXAMINATION
23   BY MS. HORN:
24       Q.   Good morning.
25       A.   Good morning.
```

Page 5

```
 1       Q.   We're here today in the personal
 2   injury action for Joanne Levitt.
 3       A.   Right.
 4       Q.   And I know that you've been deposed
 5   many times.  So I'm not going to bother to go over
 6   the various rules.
 7       A.   Okay.
 8       Q.   But if you need a break or anything
 9   like that, just let me know, okay?
10       A.   Sure.
11       Q.   Did you meet with anybody today to
12   prepare for your deposition?
13       A.   No.
14       Q.   Have you met with anybody on any other
15   day to prepare for your deposition?
16       A.   No.
17       Q.   Did you spend any time preparing for
18   your deposition?
19       A.   Spent an hour going through the
20   file -- it was a pretty considerable file -- just
21   to familiarize myself with it.
22       Q.   And when you say "the file," are you
23   referring to the Redweld folder in front of you?
24       A.   Right.  It contains all the documents,
25   electronic format, CDs that we were provided to
```

John O. Ward, Ph.D.

Page 14

1  Q. I understand that you charge a flat
2  fee for your reports?
3  A. First report; right.
4  Q. Your first report. Notwithstanding
5  that, do you know or can you tell me how much time
6  you typically devote to such a report?
7  A. Yeah. It normally takes around six or
8  seven hours. This took a long time. Simply
9  because of the mass of documents to review, this
10 probably took 15 or 20 hours.
11      Since it is a flat fee, you can kind
12 of characterize this as being -- per hourly rate
13 was pretty low. But that's just the way it goes.
14 Q. And you're saying it took about 15 to
15 20 hours to prepare the first report in 2013?
16 A. Right.
17 Q. What is the mass of documents that you
18 looked at to prepare the 2013 report?
19 A. Well, financial documents that they
20 submitted. I have to review everything in the
21 file. We had a lot of financial documents, most
22 of which had to do with my calculation. I still
23 had to review them. We also had deposition and
24 other material that was provided to us. I had to
25 read them. So, yeah, there was a lot of

Page 15

1  documents.
2  Q. And it's your testimony that all of
3  this review took place in 2013?
4  A. Well, some of it was in 2013, and then
5  we kept getting documents and I kept reading them.
6  I mean, probably some of them are in 2014 as well.
7  Q. What are the financial documents that
8  you looked at in 2013 and 2014?
9  A. Oh, stuff -- they were largely tax
10 returns for the various entities, American XO,
11 Chocolate Soup. A lot of it had to do with the
12 company's performance, and that isn't really the
13 basis of my calculation.
14      My calculation's based upon her lost
15 earnings capacity as opposed to the lost value of
16 the business. So I didn't really use them in the
17 calculations.
18 Q. Were you -- at some point in time were
19 you asked to prepare a valuation for the
20 businesses?
21 A. No. We were simply asked to calculate
22 damages. It was our decision how we were going to
23 do it. Since there's a plaintiff here, and the
24 plaintiff is Jo Levitt, typically the loss is to
25 the plaintiff, and that would be their earnings

Page 16

1  capacity, as opposed to a suit filed by the
2  business, and I don't believe there is one here.
3  Q. So what's your understanding for why
4  you were sent documents for the actual
5  corporation?
6  A. Well, I mean, their belief is that I
7  assume the plaintiff is -- and when I say the
8  plaintiff, Jo Levitt and their husband -- that
9  they had suffered a considerable loss of wealth
10 from the collapse of American XO, as they
11 represented -- I don't have any opinions about
12 that -- after her cardiac event in the year 2000,
13 and her reduced work after that date and they
14 lost -- they had some business failures.
15      I really am not concerned with that
16 because that happened after the event. Certainly
17 it may have been attributed to her withdrawal from
18 the business. That may well be the case. I just
19 don't have the basis to make that calculation.
20 Q. Other than the tax returns that you
21 referenced, do you recall any other financial
22 documents that you reviewed for your 2013-2014
23 reports?
24 A. Well, I don't recall simply because I
25 didn't consider them. I mean, they're all in the

Page 17

1  file. There are all kinds of documents here.
2  Some are -- some are prepared by Mr. Baten, I
3  believe his name, who did some of the financial
4  work for the firm. They're all in the file.
5       The only thing that ultimately played
6  a part in my calculation were the Social Security
7  print of her earnings, which covers her entire
8  work history, which we used in our calculation.
9  The tax returns, personal tax returns as opposed
10 to corporate.
11      I did read the material and I
12 understand it. And responses in the questionnaire
13 with respect to household services that she claims
14 she lost as a result of her injury.
15      The second calculation is based upon
16 alternative earnings, based upon her content,
17 which would be as a CEO manager of a corporation.
18 Q. Okay. I'm still on the document --
19 A. Yeah. Well, okay.
20 Q. -- issue.
21      So you mentioned tax returns, personal
22 tax returns --
23 A. Yeah.
24 Q. -- of the Levitts. Did you review
25 those?

Page 46

1  after 2000, and after 2004 she basically ceased
2  working. And she lost earnings capacity that she
3  formerly had, and what is that lost earnings
4  capacity and what were the value of the lost
5  services that she suffered.
6       Whether you attribute it to Vioxx or
7  attribute it to natural causes, that's not my
8  problem. I'm simply calculating what the loss is.
9     Q.    And as you noted earlier, both you and
10 Dr. Krueger signed the report?
11    A.    Yeah.
12    Q.    Do you know what Dr. Krueger actually
13 contributed to the report?
14    A.    He read virtually all the material in
15 the file as well. I mean, not in the depth that I
16 did, but when I was done with it, I sent it over
17 to him. He -- he has an office both here and at
18 home. He has a disability. So a lot of times he
19 works out of his house.
20      That's about it. He did read the
21 reports, and we talked about it over the phone. I
22 think there was an expectation on the part of
23 Jo Levitt that the loss should include loss of
24 value of business, destroyed business venture,
25 both the hotel, the restaurant, and potentially

Page 47

1  Chocolate Soup, the company, and American XO. I
2  have no doubt that those -- those -- that
3  destruction occurred.
4       I didn't see any way to directly
5  relate it to the incident in the year 2000 and
6  subsequent events because there were other things
7  happening, like the economy and many other things.
8  So I didn't -- we chose not to pursue that course.
9     Q.    The invoices or bills that were in
10 your file from December 12th, 2013, and
11 January 20, 2016 --
12    A.    Yeah.
13    Q.    -- have these been paid?
14    A.    I don't know. Well, the first one
15 was, yeah. But we wouldn't allow a bill to be on
16 the books that long. The second one, I have no
17 idea.
18    Q.    And do you receive any form of
19 compensation from attorneys other than from bills?
20    A.    No. I had to think about that.
21    Q.    I want to keep your file complete. So
22 I'm going to hand that back to you.
23    A.    Okay. Sure.
24       (Exhibit 2 marked.)
25    Q.    BY MS. HORN: What I have marked as

Page 48

1  Exhibit 2 is a document that we pulled from the
2  copies of your file that was sent to us.
3     A.    Right.
4     Q.    And the very first page says John Ward
5  Economics, Attorney Retainer Agreement.
6     A.    Right.
7     Q.    Do you recognize this document?
8     A.    Yeah. That's the questionnaire I was
9  looking for. It's probably in here. Thank you
10 for finding it.
11      It's -- the first page is a Retention
12 Agreement. It was signed 12/5/13.
13    Q.    And then the -- what's the rest of
14 this document?
15    A.    Well, the next page is just a case
16 information list. So we know where it is. If
17 it's federal court, there are certain filing
18 requirements that we have to follow in federal
19 court and so on.
20      Next is the principals involved in the
21 litigation, Danny Thomas and Jo Levitt.
22      Starting at page 3 is just demographic
23 background information, largely, birth dates of
24 individuals, Jo Levitt and her husband, where they
25 lived. They had a large house, about 8500 square

Page 49

1  feet. Children. Just one adult.
2       The date of injury -- there was a
3  petition, and there was a response to
4  interrogatories, and it simply said look at it,
5  which we did for that background. And most of
6  this is replicated in my notes. Simply as I went
7  through it, I wrote it down in my notes.
8       Okay. So going on around page 7, we
9  get into her self-described employment history.
10 She started a company called Chocolate Soup in
11 1970. And she owned it. Designer. Her husband
12 worked at it as well. She took out money as
13 necessary. Had a 401(k).
14      Next page, sort of branched out from
15 there to another company called American XO, which
16 built a hotel in Nebraska and a restaurant. And
17 that continued till the mid-2000's, around 2008 or
18 so.
19      Page 11, description of impacts on
20 household services, all of which she's had large
21 impact. She -- basically, if you look at the
22 level, it's about an 80 percent loss, which is
23 level 2. In other words, she can't do about --
24 most anything that she said she used to do.
25      Household tasks on page -- the next

John O. Ward, Ph.D.

Page 138

1  and bond yields are going up as a result.
2       And secondly, the Fed is in the
3  process of attempting to raise interest rates on
4  loans to banks. Probably the next increase will
5  be sometime in March. So these rates likely will
6  go up, which means your loss will probably go down
7  somewhat, as the rates go up.
8       But in this particular case, we don't
9  know what those rates are, and so what we do in
10 all cases is we will rediscount all losses at time
11 of trial.
12      Q.   Now, the 2008 to 2010 time frame,
13 2008, 2009, there was a lot of economic distress
14 in the country.
15      A.   Right.
16      Q.   Are you aware of that?
17      A.   Yeah.
18      Q.   There was a recession; right?
19      A.   Right. So what are we looking at?
20      Q.   We're not looking --
21      A.   Oh, okay.
22      Q.   I'm switching gears --
23      A.   Oh, okay. Okay. Yeah. Yeah. Yeah.
24      Q.   -- for the moment.
25           In your mind, when was the last

Page 139

1  recession in this country?
2       A.   2008.
3       Q.   In 2008. And did a lot of businesses
4  fail during that time period?
5       A.   Sure.
6       Q.   And do you have -- do you know whether
7  or not a lot of hospitality -- strike that.
8            Do you know whether or not many
9  businesses in the hospitality industry failed?
10      A.   Sure.
11      Q.   And many businesses in the retail
12 industry failed?
13      A.   Sure.
14      Q.   Do you have any basis to distinguish
15 the Levitts' business from those businesses?
16      A.   No. That's why I didn't try to put a
17 value on their business.
18      Q.   Okay. Because you have no basis to
19 assume that their business would survive over
20 someone else's business?
21      A.   Right. But the value of her labor is
22 something that she possesses, and that does have a
23 value separate and distinct from the value of the
24 business. It's much smaller, obviously.
25           We're not talking about a $20 million

Page 140

1  business in terms of failure. We're talking about
2  73 to $120,000 a year of potential earnings
3  capacity using replacement cost or actual payment.
4       So there are two different
5  calculations.
6       Q.   Did you review the expert report
7  submitted on behalf of Merck from the Merck
8  economist?
9       A.   No. I don't have any such thing, no.
10      Q.   I just want to make sure we're talking
11 about the same thing. So there -- we had an
12 expert disclosure date in this case, recently, in
13 2016.
14      A.   Yeah. Yeah.
15      Q.   And there was a report that had been
16 prepared by Stephen Brown.
17      A.   Okay. I don't know who he is, but,
18 no.
19      Q.   And so you've never seen any report
20 like that?
21      A.   No.
22      Q.   Does your -- the written report that
23 was updated in January 2016, does that contain all
24 of the opinions that you intend to give at trial?
25      A.   Yeah. Other than if I'm asked about

Page 141

1  punitives, I'll simply read directly from the
2  Merck financials, but, yeah, correct.
3            MS. HORN: We can go off record.
4            THE VIDEOGRAPHER: Okay. We're off
5  the record. It is --
6            MS. HORN: We're almost done.
7            THE VIDEOGRAPHER: -- 1:02 p.m.
8            (A recess was taken.)
9            THE VIDEOGRAPHER: Okay. We're back
10 on the record. It is 1:05 p.m.
11           MS. HORN: I'd like to mark Exhibit 6.
12           (Exhibit 6 marked.)
13      Q.   BY MS. HORN: Dr. Ward, do you
14 recognize Exhibit 6?
15      A.   Yes. It's a -- what's described as a
16 Levitt Financial Timeline.
17      Q.   And is this a copy of the same
18 timeline that you were referencing earlier --
19      A.   Yes.
20      Q.   -- in your testimony?
21      A.   It is.
22           (Exhibit 7 marked.)
23      Q.   BY MS. HORN: And, Dr. Ward, you have
24 been handed Exhibit 7.
25      A.   Yeah.

36 (Pages 138 to 141)