## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Case No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| ***This document relates to*** | * | JUDGE FALLON |
| | * | |
| ***Jo Levitt v. Merck Sharp & Dohme Corp.***, | * | MAGISTRATE JUDGE |
| **2:06-cv-09757-EEF-DEK** | * | KNOWLES |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### DEFENDANT'S MOTION TO EXCLUDE EXPERT
### <u>OPINIONS OF DAVID MADIGAN, PH.D.</u>

The Court should exclude David Madigan's opinions concerning (i) subjects outside his expertise, including the adequacy of Merck's disclosures to healthcare professionals; (ii) factual narratives designed to describe Merck's "state of mind"; and (iii) an undisclosed statistical analysis that a different Plaintiff's expert, Dr. David Egilman, has testified he intends to rely on.

*First*, Madigan's report includes opinions on medical issues that fall well outside his area of expertise, including opinions that Merck disseminated misstatements about scientific studies to physicians and that the Company should have undertaken different or additional studies and analyses regarding Vioxx and its supposed risks.

*Second*, many of Madigan's supposed "opinions" are nothing more than factual narratives summarizing documents and other evidence that can and should be interpreted by the jury.

*Third*, Merck has reason to believe that Madigan may attempt to testify as to opinions not disclosed in his expert report or at his deposition concerning a statistical analysis conducted at the request of his fellow Plaintiff's expert, Dr. David Egilman.  Madigan should not be allowed to offer this analysis or express any opinions arising from it.

**BACKGROUND**

David Madigan is currently a Professor and Chair of Statistics at Columbia University. *See* Report of David Madigan (Dec. 13, 2013) ("Madigan Rep.") (attached as Ex. 1) ¶ 1.  He holds a bachelor's degree in Mathematical Sciences and a Ph.D. in Statistics.  *Id*. at ¶ 3. Madigan is not a medical doctor, he has no clinical background or experience, he has not held a position at a medical school, he has no expertise in weighing the risks and benefits of medicine in making a clinical decision to prescribe medicine, and he is not an expert in pharmacology, cardiology, rheumatology, gastroenterology, neurology, vascular biology, or any other medical discipline related to Vioxx.  *See* Deposition of David Madigan (Mar. 7, 2016) ("Levitt Madigan Dep.") (attached as Ex. 2) 27:15–24, 66:5–67:11; Deposition of David Madigan, *Commonwealth of Ky. v. Merck & Co.*,  (Ky. Cir. Ct. May 3, 2013) ("Ky. Madigan Dep.") (attached as Ex. 3) 62:17–64:10, 66:20–67:1; *see also* Madigan Rep. (Ex. 1) ¶ 1.  What's more, Madigan is not an epidemiologist and does not claim to have experience designing or conducting clinical drug trials.  *See* Deposition of David Madigan, *In re Merck & Co., Inc. Securities Derivative & "ERISA" Litigation* (D.N.J. May 11, 2011) ("ERISA Madigan Dep.") (excerpts attached as Ex. 4) at 10:20–21; Madigan Rep. (Ex. 1) ¶¶ 1, 3–6.  And while Madigan recently began serving on FDA Advisory Committees, he has never worked for the FDA and is not an expert on FDA labeling requirements or regulatory compliance.  *See* ERISA Madigan Dep. (Ex. 4) 12:9–21; Madigan Rep. (Ex. 1) ¶ 81.

Although Madigan's area of expertise is limited to statistics, he seeks to opine on whether the way Merck disclosed the results of its studies ***was misleading to physicians***.  For example, Madigan—who is *not* a medical doctor, an epidemiologist experienced in designing clinical trials, or an expert in FDA labeling—opines that:

- ***Merck misrepresented the results of its VIGOR trial, including in FDA-regulated drug labeling.*** Madigan generally believes that Merck presented the results of the Vioxx Gastrointestinal Outcomes Research ("VIGOR") study "in a way that, in [his] view, was scientifically misleading." Madigan Rep. (Ex. 1) ¶¶ 2(b), 234; *see also id.* ¶¶ 40–41 (Merck presented the results "in nonconventional ways" and "obfuscated the import of the VIGOR data from a scientific perspective."). Madigan also believes that Merck should have updated the Vioxx label on an ongoing basis as new cardiovascular data accumulated. *See id.* ¶ 221.

- ***Merck misrepresented the results of its arthritis and Alzheimer's studies.*** Madigan does not claim that Merck reported inaccurate data related to its arthritis and Alzheimer's studies, but rather criticizes Merck for how it chose to report these results to the medical community. In particular, Madigan claims that Merck presented the data, including in responding to FDA requests and on Vioxx's label, using "illegitimate" endpoints that, in his view, failed to capture Vioxx's true risk. *See, e.g., id.* ¶¶ 66, 69, 160, 198, 202, 215, 216, 221.

- ***Merck failed to disclose additional study results that would have been relevant to the medical community.*** Madigan also criticizes Merck for failing to disclose the results of other analyses whose results he contends would have been considered medically important. These include data from an observational analysis pre-dating FDA approval of Vioxx showing increased cardiovascular risks among female patients, which Madigan contends were "highly relevant to an assessment of Vioxx's cardiovascular risk" because female patients were "a population of interest given their disproportionate susceptibility to arthritis." *Id.* ¶ 233. As another example, Madigan opines that Merck did not disclose the results of the 2003 Ingenix epidemiological study on the cardiovascular safety of Vioxx and other NSAIDs. *Id.* ¶¶ 223–226. In this vein, Madigan repeatedly editorializes that certain studies were particularly "meaningful" or "relevant" to the medical community. *See e.g., id.* ¶ 2(e) (Merck's arthritis data was particularly "meaningful" because Vioxx was indicated to treat arthritis), ¶ 107 (Merck should have disclosed a pre-specified pooling analysis of arthritis data, "which was the most relevant measure of Vioxx's cardiovascular risk").

Madigan also veers into the field of epidemiology, offering opinions that:

- ***Merck should have conducted additional or different analyses when evaluating its arthritis and Alzheimer's data.*** Madigan faults Merck for failing to conduct additional studies or analyses, which in his post-hoc view would have indicated increased risks associated with Vioxx. *See, e.g., id.* ¶¶ 167, 187, 190. Additional analyses Madigan finds wanting include adjudications and analysis of "all cardiovascular events, both on and off drug" for Merck's Alzheimer's trials (*id.* ¶ 167) and an additional analysis of off-drug cardiovascular deaths, which Madigan contends should have been undertaken after Merck analyzed all-cause mortality in early 2001 (*id.* ¶ 175). Madigan also believes that Merck should have specifically analyzed and reported on placebo-controlled pooled arthritis data, which he assumes would have been particularly valuable to the medical community. *Id.* ¶ 109.

3

- ***Merck designed studies poorly and failed to follow study protocols.*** Madigan opines that certain of Merck's studies were flawed in design and that Merck violated its own protocols in certain studies. For example, he believes that Merck improperly compared Vioxx to diclofenac, "a drug Merck had reason to believe was cardiotoxic," and that Merck accordingly "should not, and could not, have taken comfort from" its results based on this comparison. *Id.* ¶¶ 101–02, 105. Madigan similarly opines that Dr. Watson's GPRD Study suffered as a result of "unusual design choices" and a failure to follow its protocol, errors that Madigan contends "could have skewed the results in Vioxx's favor and at the very least destroy" the study's "scientific integrity." *Id.* ¶¶ 60–61. Madigan further criticizes Merck's supposed failure to implement an external Data and Safety Monitoring Board in conjunction with one of the Alzheimer's studies. *Id.* ¶ 189. Madigan claims this was called for by that study's original protocol and would have been consistent with National Institute of Health guidelines and Merck's own ordinary practice for such trials. *Id.*

Finally, in addition to the opinions described above that exceed Madigan's statistical expertise, his report contains significant conjecture as to Merck's thought process, motivation or intent, as well as repeated narrative summaries of documents and deposition testimony (*id.* ¶¶ 2(e), 44, 54, 114), including his repeated opinion that Merck chose to report the results of studies in ways intended to "conceal" Vioxx's true risks (*id.* ¶ 202).

## ARGUMENT

Federal Rule of Evidence 702 sets forth the standard for admission of expert testimony. That rule provides that such evidence is admissible only if (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d).

The rule entails multiple requirements that are applicable here. First, the subject matter of expert evidence must be one that requires expert testimony as opposed to one "the untrained layman would be qualified to determine" without "specialized understanding." Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules. Second, the expert testimony must be

reliable, which entails "grounding in the methods and procedures of science" and "more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993) (announcing non-exclusive factors for evaluating reliability of expert testimony); *see also Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir. 1999) (additional factors). Moreover, the qualification prong of Rule 702 requires a foundation showing that the expert has special training or education and adequate knowledge on which to base an opinion. *See Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). While an expert might be qualified in a particular field, any opinions that fall outside that field of expertise must be excluded as unqualified expert testimony. *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009).

Plaintiffs have the burden of proving by a preponderance of the evidence that the testimony of their proffered experts is relevant and reliable. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275–76 (5th Cir. 1998) (en banc). As the "gatekeeper" of scientific evidence, the trial court has the obligation to ensure those standards are met. *Daubert*, 509 U.S. at 596–97; *Moore*, 151 F.3d at 276. As such, the court must make a "preliminary assessment of whether the reasoning or methodology . . . properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. When expert testimony is demonstrated to be speculative and lacking scientific validity, trial courts *must* exclude it, as courts in the Fifth Circuit routinely do. *See, e.g.*, *Food Lion, Inc.*, 171 F.3d at 313; *Moore*, 151 F.3d at 279; *Black v. Johnson & Johnson (In re Propulsid Prods. Liab. Litig.)*, 261 F. Supp. 2d 603, 616 (E.D. La. 2003).

## I.     MADIGAN IS NOT QUALIFIED TO OPINE ABOUT THE ADEQUACY OF MERCK'S DISCLOSURES OF VIOXX RISK INFORMATION TO DOCTORS.

In the absence of a medical degree or "expertise in an ancillary field," a proposed expert is "not qualified to give medical testimony." *Carlson v. Bioremedi Therapeutic Sys., Inc.*, --- F.3d ---, 2016 WL 2865256, at *3 (5th Cir. May 16, 2016); *see also Kourkounakis v. Dello*

*Russo*, 167 F. App'x 255, 257 (2d Cir. 2006) (affirming exclusion of testimony on medical issues where expert "did not appear to have a valid medical license"); *Gebhardt v. Mentor Corp.*, 15 F. App'x 540, 542 (9th Cir. 2001) (same, where expert "did not have a medical degree [or] medical training"); *Falcon v. State Farm Lloyds*, 2014 WL 2711849, at *20 (W.D. Tex. June 16, 2014) (same); *King v. Synthes (U.S.A.)*, 532 F. Supp. 2d 828, 833 (S.D. Miss. 2006) (same).[1] Unlike experts in medicine, statisticians are not qualified to offer medical testimony. *See United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 454 (D.D.C. 2006) (finding expert was "only a statistician and not qualified to address the subject of smoking and health"); *Edmonds v. Ill. Cent. Gulf R.R.*, 910 F.2d 1284, 1286–87 (5th Cir. 1990) (psychologist not qualified to offer medical testimony); *but see Dawsey v. Olin Corp.*, 782 F.2d 1254, 1262–63 (5th Cir. 1986) (allowing medical testimony by biochemist who specialized in phosgene research).

Medical testimony is required to opine about the adequacy of a manufacturer's disclosures to doctors. *See Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 265 n.5 (5th Cir. 2002) (holding that testimony "as to the adequacy of the warning contained in a drug label" need not extend to "expertise outside the treating physician's field" (citing *Mauldin v. Upjohn Co.*, 697 F.2d 655, 648 (5th Cir. 1983) (holding that relevant inquiry is the understanding and perception of "the medical practitioner"))). Accordingly, courts routinely bar testimony by

---

[1]    Federal courts have vigilantly enforced the qualification requirement and excluded proffered experts in a host of other contexts as well. *See, e.g.*, *Sullivan v. Rowan Cos.*, 952 F.2d 141, 144–46 (5th Cir. 1992) (witness not qualified despite "extensive practical experience" in material failure analyses to opine on metallurgical reasons for failure of metal socket absent additional academic experience in metallurgy); *Rosado v. Deters*, 5 F.3d 119, 122 (5th Cir. 1993) (witness with expertise in police procedures and training was properly precluded from giving expert testimony concerning how accident occurred because witness lacked qualifications as accident reconstructionist); *Estate of Stuller v. United States*, 811 F.3d 890, 895 (7th Cir. 2016) (although proffered expert had over 50 years of experience in training and breeding horses, his expertise did not extend to "the relevant field (i.e., the business and financial aspects of horse-breeding)").

experts purporting to opine about the adequacy of a manufacturer's disclosures about drug risks where—as here—the witness lacks requisite expertise. *See, e.g.*, *Chaplin v. City of Muskogee*, 2012 WL 768041, at *2 (E.D. Okla. Mar. 8, 2012) (finding that testimony by non-medical expert holding a Ph.D. "regarding medical care is outside of the expert's stated expertise"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 556–557 (S.D.N.Y. 2004) (excluding physician's expert testimony that "improperly second-guesses the FDA's decisions as to the adequacy of the Rezulin label" where expert's "surmising as to what physicians would do with different information is purely speculative and not based on scientific knowledge" (internal quotation marks omitted)); *Rheinfrank v. Abbott Labs., Inc.*, 119 F. Supp. 3d 749, 773 (S.D. Ohio) (excluding neurology expert's "testimony about what Defendants should have included in the label" as "fall[ing] outside the scope of his expertise"), *reconsideration denied*, 137 F. Supp. 3d 1035 (S.D. Ohio 2015); *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1243 (D. Colo. 1998) (organic chemist not qualified to testify as expert regarding labeling of breast implants in product liability litigation); *Hernandez v. Schering Corp.*, 958 N.E.2d 447, 456 (Ill. App. Ct. 2011) (excluding expert's labeling testimony because he "had no specialized knowledge to qualify him to testify as an expert on the adequacy of a side effects warning to prescribing physicians").

Madigan seeks to opine that Merck should have disclosed different cardiovascular risk data in various communications to doctors and the public—in particular, in the published literature and in the Vioxx labeling. For example, he focuses much of his report on criticizing Merck for using "illegitimate" endpoints in its Alzheimer's studies that, in his view, failed to capture the true risk of Vioxx. Madigan Rep. (Ex. 1) ¶¶ 60, 66, 69, 165, 172, 198, 202, 215, 216, 221. However, a statistician such as Madigan has no basis for opining as to whether a different

endpoint would have more adequately or meaningfully conveyed the risk of Vioxx to physicians. And while Madigan may believe that Merck's choice of a particular endpoint was designed to conceal Vioxx's risks (*id.* ¶ 202), he has no medical expertise upon which to base this criticism. As Madigan has admitted, he has no experience in designing or conducting clinical trials (ERISA Madigan Dep. (Ex. 4) 10:20–21), he lacks expertise in the field of medicine (*see, e.g.*, Levitt Madigan Dep. (Ex. 2) 66:5–12, 67:5–6; Ky. Madigan Dep. (Ex. 3) 63:23–64:1), he has never been involved in a prescribing decision for a patient and has no expertise in weighing the risks and benefits of a medication (Ky. Madigan Dep. (Ex. 3) 64:2–10), and he has never held an appointment at a medical school (Levitt Madigan Dep. (Ex. 2) 27:20–24; Ky. Madigan Dep. (Ex. 3) 65:11–13).

Madigan also finds fault in Merck's adjudication process for cardiovascular events, contending for example that Merck "should have adjudicated and analyzed all cardiovascular events in the Alzheimer's trials, both off drug and on drug, fatal and non-fatal events." Madigan Rep. (Ex. 1) ¶ 167.[2] But this opinion is beyond Madigan's qualifications for the same reasons as just described. As Madigan has admitted, he is not qualified to opine on Merck's adjudication decisions, since they are outside his area of expertise. *See* Levitt Madigan Dep. (Ex. 2) 64:7–12 ("Q: Do you believe that you have identified any . . . specific reported events that were misadjudicated? A: That's outside my expertise. I mean, for example, I identified some events – you know, it really is outside my expertise."); Ky. Madigan Dep. (Ex. 3) 209:20–23 (determining the correctness of any adjudication would be "outside [his] area of expertise" as a statistician).

---

[2] Adjudication in the clinical context involves review of reported events—including, for example, a reported heart attack or other cardiovascular event—by an independent party to ensure the accuracy of data generated in a clinical trial. *See* Madigan Rep. (Ex. 1) ¶ 17. Because the independent assessment of whether an individual suffered a heart attack or some other medical event requires medical judgment, adjudications must be performed by medical experts.

Madigan's report also extensively criticizes Merck's disclosures regarding the results of the VIGOR trial.  According to Madigan, Merck misrepresented these results by advancing a hypothesis that ostensibly adverse Vioxx results in the trial could be explained by the comparator drug naproxen's cardioprotective effects.  Madigan Rep. (Ex. 1) ¶ 234.  As part of his conclusion that the VIGOR data were poorly presented, Madigan opines that this so-called "naproxen hypothesis" was medically unfounded, but he bases this assessment on medical information that has nothing to do with statistics, including public statements by naproxen's manufacturer and the U.S. Agency for Healthcare Research and Quality.  *Id.* ¶¶ 56, 73.  Again, these opinions are improper because Madigan is not qualified to assess medical evidence.

For the same reasons, Madigan is unqualified to offer opinions that Merck misled the medical community by failing to publish the results of certain studies or analyses.  For example, Madigan believes that Merck "should have reported an analysis of its pooled placebo controlled arthritis data," which Madigan deems "the most relevant measure of Vioxx's cardiovascular risk," in part because placebo-controlled trials "represent a gold standard" in clinical research. *Id.* ¶¶ 109, 107, 114.  Similarly, Madigan opines that Merck should have disclosed the results of various studies because they were "meaningful" or "relevant" to the medical community.  *Id.* ¶¶ 2(e), 107.  These opinions are illustrative of Madigan's common approach of intermingling opinions ostensibly involving statistics with assertions requiring medical expertise.

Finally, Madigan's lack of expertise both in medicine and in epidemiology should bar him from opining that Merck designed certain studies poorly or failed to follow sound scientific practice in conducting its studies.  Madigan points to numerous incidents in which Merck purportedly failed to follow its study protocols.  Madigan Rep. (Ex. 1) ¶ 61 (GPRD study did not follow its protocols), ¶ 189 (Alzheimer's study conducted in violation of its protocols and

Merck's general practices), ¶ 216 (failure to report ITT data as called for by study protocol and DAPs).  Similarly, Madigan frequently opines that certain studies were poorly designed, leading to misleading results.  *Id.* ¶¶ 60–61 (GPRD study marred by "unusual design choices"), ¶¶ 101–102, 105 (NSAID comparator study improperly used cardiotoxic drug as comparator).  But Madigan does not have *any* experience designing clinical trials or epidemiological studies, and in any event has no basis to say whether supposed errors like these damaged the studies in ways that were meaningful to physicians.  Accordingly, he should not be allowed to present these opinions at trial.[3]

## II.   THE COURT SHOULD PROHIBIT MADIGAN FROM PROVIDING LENGTHY FACTUAL SUMMARIES OF DOCUMENTS AND OPINING ON MERCK'S STATE OF MIND BECAUSE SUCH TESTIMONY WILL NOT ASSIST THE TRIER OF FACT.

The Court should prohibit Madigan from offering "opinions" that amount to little more than narrative summaries of documents that a jury could read and interpret for itself.  Expert testimony is an inappropriate vehicle for such factual narrative because it is not based on "scientific, technical, or . . . specialized knowledge" that "will help the trier of fact" in determining a fact in issue.  Fed. R. Evid. 702(a); *see, e.g.*, *Theodile v. Delmar Sys., Inc.*, 2006 WL 1751226, at *1–3 (W.D. La. June 21, 2006) (citing *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 450 (5th Cir. 1990) (per curiam)) (excluding proposed expert's opinions where "[n]one of the opinions expressed . . . [were] based on any scientific or technical knowledge beyond the understanding of an ordinary person"); *In re Rezulin*, 309 F. Supp. 2d at 551 (excluding testimony that provided "merely a narrative of the case which a juror is equally capable of

---

[3]     Relatedly, Madigan lacks any expertise whatsoever as to the cause of Alzheimer's disease.  *See* Ky. Madigan Dep. (Ex. 3) 62:17–64:10, 66:20–67:1; ERISA Madigan Dep. (Ex. 4) 10:14–12:2; Madigan Rep. (Ex. 1) ¶¶ 1, 3–6.  His opinions that Merck misrepresented to the FDA the results of studies assessing the relationship between Vioxx and Alzheimer's (Madigan Rep. (Ex. 1) ¶¶ 232, 245) should therefore be excluded as well.

constructing" and was thus "properly presented through percipient witnesses and documentary evidence," not through experts (citation omitted)).  As one court put it, there are two separate bases for excluding narrative summaries by an expert:  (1) they are not "based on an expert's knowledge [or] expertise"; and (2) they "may easily invade the province of the jury."  *Travelers Indem. Co. v. Northrop Grumman Corp.*, 2014 WL 464769, at *3 (S.D.N.Y. Jan. 28, 2014).

For similar reasons, courts routinely exclude "expert" testimony that consists of little more than advocacy of the plaintiff's view of the facts.  *See, e.g.*, *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468–69 (S.D.N.Y. 2005) ("[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."); *O'Hara v. Premcor Ref. Grp., Inc.*, 2012 U.S. Dist. LEXIS 144792, at *3–4 (D. Del. Oct. 5, 2012) (noting that proffered testimony "is clearly inadmissible, as it simply consists of recitations of narrative reports and deposition testimony"); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1137–38 (E.D. Pa. 1981) (noting that the court had "excluded the great bulk of [certain] expert opinions" because "the experts, by providing a narrative factual description and summary of the evidence. . . were not utilizing any expertise in a manner helpful to the jury under Rule 702, but were instead acting not as economists but as conspiracyologists engaged in inadmissible 'oath helping'").  An expert witness must "bring to the jury more than the lawyers can offer in argument."  *Eymard v. Pan Am. World Airways (In re Air Crash Disaster at New Orleans)*, 795 F.2d 1230, 1233 (5th Cir. 1986).

Madigan's narrative summaries should be excluded for the same reasons.  Here, his purpose is that of an "'expert' witnesses whose intended role is more to argue the client's cause from the witness stand than to bring to the fact-finder specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit."  *In re Rezulin*, 309 F.

Supp. 2d at 538.  In an opinion excluding Madigan's opinions in a 2015 case, a New Jersey court found:  "Dr. Madigan's opinions aren't 'methodology based,' but rather are conclusion-driven. ***This is an expert on a mission***."  *In re Accutane Litigation*, 2015 WL 753674, at *19 (N.J. Super. Ct. Law Div. Feb. 20, 2015) (emphasis added).

Madigan's report contains repeated and lengthy exposition regarding what Merck employees concluded from or were told about Vioxx trials.  Madigan Rep. (Ex. 1) ¶¶ 2(e) (describing what "Merck employees observed, and were told by others" regarding differences in Merck's arthritis and Alzheimer's data), 44 (describing Merck personnel's conclusions from and steps taken in reaction to the VIGOR trials), 53–54 (describing emails, manuscript drafts and deposition testimony that Madigan interprets as criticizing the underpinnings of Merck's "4% hypothesis").  Madigan also repeatedly highlights testimony by Merck personnel as purported support for his own judgments about the relative value of different data.  *Id.* ¶ 114 (providing a bulleted list of excerpts from Merck personnel's testimony as to the value of placebo-controlled data).  But Madigan should not be permitted to summarize and synthesize the record for the jury, thereby usurping its role at trial.

Finally, Madigan's factual narrative frequently includes descriptions (or conjecture) about Merck's mental state.  For example, he advances the view that Merck reported on-drug endpoints in an effort to "conceal" Vioxx's risks.  *Id.* ¶ 202; *see also, e.g.*, *id.* ¶ 200 (describing Merck personnel's supposed "internal recognition" that an FDA information request sought ITT data).  Such testimony is improper, as federal courts have made clear that experts are not qualified to testify about a party's state of mind.  *See Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (excluding expert's assertions regarding party's state of mind); *Mounce v. Doe*, 2014 WL 2587698, at *8 (E.D. La. June 10, 2014) (excluding expert's opinions about defendant's

"indifference" and collecting similar cases (citation omitted)); *Beauregard Parish Sch. Bd. v. Honeywell, Inc.*, 2008 WL 821053, at *5 (W.D. La. Mar. 24, 2008) (holding that "[c]ourts do not permit experts to testify on the parties' state of mind or subjective intentions").

For these reasons, all of Madigan's inappropriate narrative opinions, including those seeking to divine Merck's state of mind, should be excluded.

## III.   THE COURT SHOULD PROHIBIT MADIGAN FROM TESTIFYING ABOUT AN UNDISCLOSED STATISTICAL ANALYSIS PERFORMED AFTER THE CONCLUSION OF HIS DEPOSITION.

Sometime after Madigan's deposition was completed, he conducted a statistical analysis of Vioxx data that was neither referenced in his expert report nor identified during his deposition.[4]  Deposition of David Egilman ("Egilman Dep.") (attached as Ex. 4 to Def.'s Mot. to Exclude Expert Ops. of David Egilman, M.D. ("Egilman Mot.")) 45:4–14 (testifying, at deposition thirty-six days *after* Madigan deposition, that Madigan had conducted the new ACS analysis in "last few days.").  Madigan's analysis was not performed in response to the emergence of any new data, but because Dr. Egilman asked him to.  *See id.* at 45:9–25 ("I asked [Madigan] if he had run an analysis of the criteria for ACS, and he said they hadn't done that, and I said could he, and he said yes, and did it.").  Merck learned about this additional analysis only when Egilman referred to it in his deposition.  *See id.* at 148:14–20.

In addition to the problems set forth in Merck's motion to exclude Dr. Egilman on this topic (Egilman Mot. at 12–13), the Federal Rules provide that an expert witness report "must contain" a statement of all the opinions the witness will express, the basis and reasons for those

---

[4]      Notably, Madigan's analysis is ***not*** particular to the cardiovascular event that Dr. Egilman says Ms. Levitt actually experienced, ***unstable angina***.  *See* Egilman Mot. at 12–13.  Instead, Madigan's calculations combine a subset of unstable angina data with other cardiovascular endpoints—namely, myocardial infarction and sudden cardiovascular death.  Egilman Dep. 46:14–17.  Dr. Egilman did not ask Madigan to perform any analyses specific to the issue of unstable angina.  Egilman Dep. 122:17–19.

opinions, and any exhibits that will be used to summarize or support them.  Fed. R. Civ. P. 26(a)(2)(B).  Such reports must be "'detailed and complete.'"  *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996) (quoting Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment).  Where a party fails to make required expert disclosures under Rule 26, exclusion of the undisclosed information is mandatory and automatic unless the party demonstrates substantial justification or harmlessness.  Fed R. Civ. P. 37(c); *Red Dot Bldgs. v. Jacobs Tech., Inc.*, 2012 WL 2061904 at *3 (E.D. La. June 7, 2012).

The courts of this circuit have routinely excluded expert testimony where parties failed to timely comply with Rule 26(a), as Plaintiff has with respect to Madigan.  *See Sierra Club*, 73 F. 3d at 571 (affirming district court's exclusion of untimely supplemental expert report); *Simmons v. Johnson*, 2008 WL 474203, at *2 (M.D. La. Feb. 14, 2008) (no substantial justification where the information available at time of original expert report was essentially "the same as the information he had  available at the time he issued his supplemental report"); *Cleave v. Renal Care Grp., Inc.*, 2005 WL 1629750, at *1 (N.D. Miss. July 11, 2005) (excluding supplemental expert affidavit produced in response to summary judgment motion where party "failed to identify any new records or information" which would prompt new opinions from the expert); *Avance v. Kerr-McGee Chem. LLC*, 2006 WL 3484246, at *7 (E.D. Tex. Nov. 30, 2006) (excluding untimely revisions to expert reports and explaining that "parties do not have infinite time to supplement their expert opinions with new information to respond to challenges to their experts' original evidence").

Here, the facts are even more problematic than in the cases cited above.  Madigan never submitted any supplemental expert report in connection with this analysis, leaving the nature, scope, and methodology to be half-explained at best, in a second-hand manner, by Dr. Egilman.

At his deposition, Madigan testified repeatedly that he had not done any such analyses, (Levitt

Madigan Dep. (Ex. 2) 38:18–39:1, 116:3–10 ("Q: Are you aware of . . . any studies that do show

a statistically significant relationship between Vioxx . . . and acute coronary syndrome?  A: . . .

"[N]ot that I can recall")), and that he would not be expressing any opinions on the subject.  *See*

*id.*  Indeed, Madigan made clear that he had in no way attempted to tailor his report to the facts

of the present case.  *See id.* at 8:12–20 (indicating that the expert report Madigan produced in the

Vioxx securities litigation was copied and pasted verbatim for this case).

 Because Madigan failed to comply with his discovery obligations, and because it would

be unfairly prejudicial to Merck to allow Madigan's analysis into evidence at trial, it should be

excluded.

<h2 style="text-align:center"><u>CONCLUSION</u></h2>

For the foregoing reasons, Merck respectfully requests that the Court grant its motion to

exclude the aforementioned opinions of Plaintiff's statistics expert David Madigan.  A proposed

order is filed herewith.


Dated:  June 27, 2016                                        Respectfully submitted,

By: */s/ Dorothy H. Wimberly*
    Phillip A. Wittmann, 13625
    Dorothy H. Wimberly, 18509
    STONE PIGMAN WALTHER
    WITTMANN L.L.C.
    546 Carondelet Street
    New Orleans, LA 70130
    Phone: 504-581-3200
    Fax:    504-581-3361

    *Defendants' Liaison Counsel*

    —and—

Douglas R. Marvin
M. Elaine Horn
Emily Renshaw Pistilli
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Phone: 202-434-5000
Fax:     202-434-5029

*Attorneys for Merck Sharp & Dohme Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Motion has been served on Liaison Counsel, Russ Herman, Ann B. Oldfather, and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 27th day of June, 2016.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel