David Madigan, Ph.D.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  VIOXX | ) MDL DOCKET NO. 1657 |
| PRODUCTS LIABILITY | ) SECTION L |
| LITIGATION | ) JUDGE FALLON |
| | ) MAGISTRATE JUDGE KNOWLES |
| THIS DOCUMENT RELATES TO: | ) |
| Jo Levitt, | ) |
|      Plaintiff, | ) |
| -v- | ) Case No.: |
| Merck Sharp & Dohme | ) 2:06-cv-09757-EEF-DEK |
| Corporation, | ) |
|      Defendant. | ) |
| _____ | ) |

March 7, 2016

Videotaped deposition of DAVID

MADIGAN, Ph.D., taken at the law offices of DLA

Piper, 51 John F. Kennedy Parkway, Suite 120,

Short Hills, New Jersey, 07078-2704, before

Patricia R. Frank, Certified Court Reporter and

Notary Public of the State of New Jersey,

commencing at 10:15 a.m., on the above date.

— — —

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

David Madigan, Ph.D.

Page 2

1  A P P E A R A N C E S:
2
3    HUMPHREY FARRINGTON & McCLAIN, P.C.
     BY: DANIEL A. THOMAS, ESQUIRE
4    221 W. Lexington Avenue, Suite 400
     Independence, Missouri 64050
5    816.398.7435
     dat@hfmlegal.com
6    Attorneys for Plaintiff
     (Mr. Thomas present via web conference)
7
     WILLIAMS & CONNOLLY LLP
8    BY: PAUL E. BOEHM, ESQUIRE
        and
9    BY: BENJAMIN GRAHAM, ESQUIRE
     725 Twelfth Street, N.W.
10   Washington, D.C. 20005
     202.434.5000
11   pboehm@wc.com
     bgraham@wc.com
12   Attorneys for Defendant
13
     ALSO PRESENT:
14
        HENRY MARTE, Videographer
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          I N D E X
2  Witness                          Page
3  DAVID MADIGAN, Ph.D
4    By Mr. Boehm                      5
5              – – –
6
7         E X H I B I T S
8     (Exhibits attached to transcript.)
9  Marked for I.D.                   Page
10 Exhibit 1  Document entitled, "Deposition
             and Trial Testimony Last Four
11           Years"                     6
12 Exhibit 2  Dr. Madigan's Curriculum
             Vitae dated January 1, 2106    7
13
   Exhibit 3  Dr. Madigan's report       9
14
   Exhibit 4  Expert Rebuttal Report of
15           Professor David Madigan, Ph.D.
             dated September 11, 2103      9
16
   Exhibit 5  Merck Sharp & Dohme Corp.'s Notice
17           of Videotaped Deposition of David
             Madigan, Ph.D.              16
18
   Exhibit 6  Document entitled, "Standard
19           Operating Procedure for the
             Surveillance, Monitoring, and
20           Adjudication of Acute Thrombotic
             and Embolic Vascular Events and
21           Deaths in Clinical Trials of
             COX-2 Specific Inhibitors"   108
22
   Exhibit 7  Dr. Madigan's report dated
23           March 21, 2011             158
24 Exhibit 8  Document entitled, "Pooled
             Analysis of Rofecoxib Placebo-
25           Controlled Clinical Trial Data"  160

Page 4

1  (Exhibits Cont'd.)
2  Marked for I.D.                   Page
3  Exhibit 9  Document entitled, "Under-
             reporting of cardiovascular events
4            in the rofecoxib Alzheimer disease
             studies"                   166
5              – – –
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1        THE VIDEOGRAPHER:  We are now on the
2  record.  My name is Henry Marte.  I am a
3  videographer for Golkow Technologies.  Today's date
4  is March 7, 2016, and the time is 10:15 a.m.  This
5  videotape deposition is being held at Cherry Hill,
6  New Jersey in the matter of In Re: Vioxx Products
7  Liability Litigation in the United States District
8  Court, Eastern District of Louisiana.  The deponent
9  is Dr. David Madigan.  Counsel will be noted on the
10 stenographic record.  Will the court reporter please
11 swear in the witness.
12
13        DAVID MADIGAN, Ph.D.,
14    having been duly sworn, was examined and
15    testified as follows:
16 BY MR. BOEHM:
17 Q.    Good morning, Dr. Madigan.
18 A.    Good morning, Paul.
19 Q.    It's very nice to see you again.
20 A.    Nice to see you.
21 Q.    You've been deposed many times before,
22 correct?
23 A.    Yes.
24 Q.    When was the most recent deposition for
25 you?

David Madigan, Ph.D.

Page 6

1    A.    January 18, I think.  No.  February 22.
2    Q.    And what litigation was that in?
3    A.    That was in the Depakote litigation.
4    Q.    Were you also deposed then in January?
5    A.    I was.
6         MR. BOEHM:  Do we have that, a list of
7    the most recent depositions?
8         MR. GRAHAM:  We don't have a current
9    one.
10   BY MR. BOEHM:
11   Q.    Do you have with you --
12   A.    I brought it with me, yes.
13   Q.    Oh, great.  Thank you so much.
14        MR. BOEHM:  Madam Court Reporter, let's
15   mark this document as Exhibit Number 1 to Dr.
16   Madigan's deposition.
17        (Exhibit 1 marked for identification.)
18   BY MR. BOEHM:
19   Q.    Dr. Madigan, I've had marked as Exhibit 1
20   for purposes of this deposition a paper that you
21   have just handed to me entitled, "Deposition and
22   Trial Testimony Last Four Years."  Is that correct?
23   A.    Yes.
24   Q.    Does this accurately represent the
25   testimony that you have given in various litigations

Page 7

1    either in deposition or at trial during the last
2    four years?
3    A.    I believe it does, yes.
4    Q.    Did you also bring with you an updated
5    curriculum vitae?
6    A.    I did.
7         MR. BOEHM:  Can we mark this as
8    Exhibit 2, please.
9         (Exhibit 2 marked for identification.)
10   BY MR. BOEHM:
11   Q.    Dr. Madigan, I have had marked as
12   Exhibit 2 a document entitled, "Curriculum Vitae
13   January 1, 2016."  Do you see that?
14   A.    Yes.
15   Q.    Does this document represent your most
16   updated version of your CV?
17   A.    Yes.
18   Q.    Have you brought with you any other
19   documents to today's deposition?
20   A.    So I brought, well, three documents, two
21   reports.  So one is the report -- my opening report
22   from the securities litigation, which I believe you
23   have a copy of, and I created a table of contents
24   yesterday.  And I also brought a copy of my rebuttal
25   report from the securities litigation and I also

Page 8

1    have a table of contents for that.  The only other
2    document I have is just the notice for the
3    deposition.
4    Q.    Okay.  Dr. Madigan, why did you bring
5    with you today these two reports from the securities
6    litigation?
7    A.    So I understand, it's my understanding,
8    that this -- my opening report from the securities
9    litigation is the report that was filed in this
10   case.  The rebuttal report I brought so I have it in
11   front of me if I need to reference it.
12   Q.    Understood.  Is it your understanding,
13   though, Dr. Madigan, that the opening expert report
14   that you prepared for the securities litigation for
15   Vioxx is the same report that was submitted for
16   purposes of this present case?
17   A.    That's my understanding.
18   Q.    You didn't make any changes to that
19   report for purposes of its submission in this case.
20   A.    I did not.
21   Q.    And then you said you created a table of
22   contents.  Do you mind if I take a look at that?
23   A.    Sure.
24        MR. BOEHM:  If you don't mind, Dr.
25   Madigan, we'll just mark this an exhibit --

Page 9

1         THE WITNESS:  Sure.
2         MR. BOEHM:  -- to make sure the record
3    is complete.
4         (Exhibit 3 marked for identification.)
5    BY MR. BOEHM:
6    Q.    Dr. Madigan, we have marked as Exhibit 3
7    for purposes of your deposition what I understand to
8    be your opening report in the Vioxx securities
9    litigation, including a two-page table of contents
10   that you created yesterday.
11   A.    Yes.
12   Q.    Is that correct?
13   A.    Yes.
14   Q.    And if I could just see this.  Did you
15   say this is your rebuttal report?
16   A.    It's the rebuttal report, yeah.
17   Q.    And did you similarly create a table of
18   contents for your rebuttal report?
19   A.    I did.
20        MR. BOEHM:  Madam Court Reporter, could
21   we have this marked as Exhibit 4.
22        (Exhibit 4 marked for identification.)
23   BY MR. BOEHM:
24   Q.    Dr. Madigan, for the record, we have now
25   marked as Exhibit 4 your rebuttal report in the

3  (Pages 6 to 9)

David Madigan, Ph.D.

Page 10

1 Vioxx securities litigation which now includes a
2 table of contents that consists of two pages that
3 you prepared yesterday, correct?
4     A.   Yes.
5     Q.   And we'll just put these here in the
6 middle --
7     A.   Sure.
8     Q.   -- and you're of course welcome to
9 reference them to the extent that is helpful for you
10 during the course of today's deposition.
11         When were you first approached by the
12 plaintiff's lawyers about the possibility of being
13 an expert in this case?
14     A.   I'm not entirely sure.  I think it was
15 late 2013.
16     Q.   Do you recall who first contacted you?
17     A.   No.
18     Q.   Do you know whether it was the current
19 counsel for the plaintiff in this case?
20     A.   I just don't know.
21     Q.   Do you recall when you agreed to serve as
22 an expert in this case?
23     A.   I sort of have a vague memory but I don't
24 recall the time or the person.
25     Q.   Did you review any materials related to

Page 11

1 this case before you agreed to serve as an expert?
2     A.   I did not.
3     Q.   Do you recall when you began doing work
4 as an expert in this case?  Let me back up.  I'll
5 withdraw that question and ask it slightly
6 differently.
7         Have you done any work that is specific
8 to this case?
9     A.   Other than preparing for today, no.
10    Q.   And what have you done to prepare for
11 today?
12    A.   So I read my report.  I read my rebuttal
13 report.  I read an earlier report that I had
14 prepared in a different case.  I read my deposition
15 transcript from the securities deposition.  I read
16 deposition transcripts from the litigation that was
17 in Kansas City.  I read some of the papers that I
18 wrote that I'm published concerning Vioxx.  That's
19 about it.  So generally I tried to review as much
20 material as I -- just to get it back into my mind
21 what the issues were.
22    Q.   In other words, if I understand you
23 correctly, you reviewed your opinions, whether it be
24 in the form of your expert reports or in your -- in
25 the form of your prior testimony, concerning issues

Page 12

1 that you have addressed in the securities litigation
2 or other prior cases that you've testified in?
3     A.   Yes.
4     Q.   Have you done any work that you would
5 consider to be specific to the facts of this case?
6     A.   No.
7     Q.   Do you know what case that you're
8 testifying in today?
9     A.   I understand that it's the case to do
10 with an individual by the name of Levitt, and beyond
11 that -- and it was somebody that I think chose not
12 to participate in a previous settlement.  Other than
13 that, I -- that's all I know.
14    Q.   You don't know any of the facts
15 surrounding this individual's medical history or
16 claims?
17    A.   I do not.
18    Q.   I take it then that you have not
19 performed any analyses that you consider to be
20 specific to or based on the specific facts of this
21 case, correct?
22    A.   That's correct.
23    Q.   And you've not reviewed Ms. Levitt's
24 medical records?
25    A.   I have not.

Page 13

1     Q.   Have you met with counsel for Ms. Levitt?
2     A.   Not in person.
3     Q.   Over the phone?
4     A.   I met with Mr. Thomas -- I had a phone
5 call with Mr. Thomas last week.
6     Q.   For how long did you speak with Mr.
7 Thomas by phone?
8     A.   Twenty minutes maybe, something like
9 that.
10    Q.   Other than the phone call that you had
11 with Mr. Thomas last week for approximately 20
12 minutes, have you met with counsel for this
13 plaintiff?
14    A.   No.
15    Q.   Have you ever had conversations with
16 counsel for this plaintiff other than the 20-minute
17 phone call last week?
18    A.   I don't believe so unless it was in other
19 contexts I was talking to -- I don't know who the
20 attorneys are that are involved.  I know Mr. Thomas.
21 I don't know who else is involved.  It's conceivable
22 that I interacted with others involved in earlier
23 years.  I don't know.
24    Q.   Not about this case.
25    A.   Not about this case.

David Madigan, Ph.D.

Page 14

1    Q.    Do you know what Ms. Levitt's alleged
2    injury or injuries are?
3    A.    I do not.
4    Q.    Do you have an opinion as to how, if at
5    all, the opinions that you've expressed in the Vioxx
6    securities litigation or some of these other
7    Vioxx-related cases that you've testified in might
8    relate or might not relate to Ms. Levitt?
9    A.    I mean my opinions -- the focus of my
10   prior work was on cardiovascular effects of Vioxx,
11   so I assume that's relevant here.
12   Q.    When you say cardiovascular effects, how
13   do you define that?  What do you mean?
14   A.    So I studied, extensively,
15   cardiovascular -- thrombotic cardiovascular risks of
16   Vioxx for the most part using a particular
17   definition of such events that Merck drafted.
18   Q.    So when you talk about cardiovascular
19   events, you're talking specifically about thrombotic
20   cardiovascular events?
21   A.    That's what I have studied primarily.
22   I've also studied, for example, all-cause mortality.
23   Q.    Anything else?
24   A.    Sure.  I'm aware of, you know, increased
25   risk of hypertension associated with Vioxx,

Page 15

1    hemorrhagic strokes.  They weren't the primary focus
2    of what I've done, although all-cause mortality I
3    have studied in some depth.
4    Q.    Anything else?
5    A.    Nothing comes to mind.
6    Q.    And you used hypertension as an example
7    because that's something that you recognize as
8    cardiovascular related but it's not a cardiovascular
9    thrombotic event, correct?
10   A.    Yeah, I believe that's correct, yes.
11   Q.    And I think you mentioned some kind of
12   stroke?
13   A.    Hemorrhagic stroke.
14   Q.    Hemorrhagic stroke.  Hemorrhagic stroke
15   is also not a cardiovascular thrombotic event,
16   correct?
17   A.    That's my understanding, it would not be
18   considered a thrombotic event.
19   Q.    What is your understanding of what it
20   means for an event to be thrombotic?
21   A.    So it's related to thrombosis or
22   clotting-type issues is my understanding.
23   Q.    I think you already answered this but
24   just to make sure it's clear, have you read any
25   depositions taken in this case?

Page 16

1    A.    I have not.
2    Q.    Now, you indicated, Dr. Madigan, that you
3    have with you and have had an opportunity to review
4    the notice for today's deposition; is that correct?
5    A.    Yes.
6    MR. BOEHM:  Can we have that marked as
7    Exhibit Number 5.
8    (Exhibit 5 marked for identification.)
9    BY MR. BOEHM:
10   Q.    You have in front of you a document
11   marked as Exhibit 5.  When did you receive this
12   document?
13   A.    I don't recall.  I looked at it for the
14   first time last week.
15   Q.    And this document, as we indicated, is
16   the notice for today's deposition, correct?
17   A.    Yes.
18   Q.    When you had an opportunity to look at
19   this last week, did you also review Exhibit A?
20   A.    I did.
21   Q.    And you know that this is a list of
22   materials that we have requested you make available
23   to us for purposes of today's deposition, correct?
24   A.    Yes.
25   Q.    Did you review this list carefully?

Page 17

1    A.    I reviewed it, yes.
2    Q.    Did you bring with you today any
3    materials in response to our request that you
4    provide to us the documents identified on Exhibit A?
5    A.    So I brought the documents that we've
6    already discussed.  And in terms of other documents
7    that are referenced in here, it's physically
8    impossible for me to assemble those in the time that
9    I had to do it.  It would take me many days to do
10   so, so I let Mr. Thomas know that I -- you know, I
11   can't do this in the time we have, and I believe he
12   notified -- I believe he notified your -- the
13   defense attorneys.
14   Q.    It's your understanding that Mr. Thomas
15   notified defense counsel that you didn't have
16   sufficient time to compile the materials we
17   requested?
18   A.    That's my understanding.
19   Q.    If you look at number two on Exhibit A,
20   do you see this request refers to billing
21   information, your time sheets, bills, invoices and
22   other costs relative to your work on this case.  Dr.
23   Madigan, do you keep records for purposes of billing
24   your time for your work on this case?
25   A.    So I keep a running tally of the total

5  (Pages 14 to 17)

David Madigan, Ph.D.

| Page 18 | Page 20 |
|---|---|

**Page 18**

1  hours.
2      Q.    And in what form do you keep that running
3  tally?
4      A.    I just literally keep a -- on a white
5  board in my office I keep a tally of what the total
6  hours are to date.
7      Q.    Have you brought with you today any
8  records indicating the amount of time that you've
9  spent working on this litigation?
10     A.    There are no such records.  There is just
11 a number.
12     Q.    It's on the white board in your office?
13     A.    Yes.
14     Q.    Did you make a mental note of how many
15 hours you spent working on the case?
16     A.    Twenty-five hours.
17     Q.    And when you say 25 hours, can you just
18 describe for me what that 25 hours includes?
19     A.    It's just the activities that I described
20 a few minutes ago.  So it's -- I spent about 25
21 hours -- not about 25 hours.  I have spent 25 hours
22 reviewing my reports and deposition transcripts and
23 what have you as I described earlier.
24     Q.    What is your current billing rate?
25     A.    My current billing rate is $700 an hour,

**Page 19**

1  although at the time I agreed to do this my rate was
2  $500 an hour.
3      Q.    What rate are you charging?
4      A.    I will charge $500 an hour because that's
5  what I said my rate was at the time.
6      Q.    Have you billed for the 25 hours that you
7  have spent working on this case?
8      A.    No, I have not.
9      Q.    You intend to do so.
10     A.    I do.
11     Q.    And do you have any current plans to do
12 any additional work related to this case after
13 today's deposition?
14     A.    No, I don't have any -- any such plans
15 unless I'm asked.
16     Q.    How much money have you made from your
17 work as an expert in various Vioxx-related cases up
18 to date?
19     A.    I have no idea.
20     Q.    Can you give me an approximation?
21         MR. THOMAS:  Objection.  Form.  Asked
22 and answered.
23         THE WITNESS:  I just don't know.  More
24 than 100,000, you know, I would guess, you know,
25 less than 500,000.

**Page 20**

1  BY MR. BOEHM:
2      Q.    What would we need to do to figure out
3  what the total amount of money you've made as an
4  expert in this case is?
5      A.    That's a good question.  I don't have
6  records.  My tax returns I guess might.  I might be
7  able to reconstruct it from tax returns.  Or we
8  might be able to reconstruct it from depositions,
9  from questions like yours at deposition.
10     Q.    Would you be able to, based on your tax
11 returns, separate out how many hundreds of thousands
12 of dollars you've made working as an expert in the
13 Vioxx-related cases as opposed to the work that
14 you've done on various other litigations for
15 plaintiffs?
16         MR. THOMAS:  Objection.  Form.
17         THE WITNESS:  Actually I don't prepare
18 my tax returns so I don't actually know.
19 BY MR. BOEHM:
20     Q.    Approximately what percentage of your
21 overall income is related to your work as an expert
22 for plaintiffs in litigation?
23     A.    In the last couple of years it's of the
24 order of 15 percent.
25     Q.    And what about other than the last couple

**Page 21**

1  of years?
2      A.    Maybe more like 20 or 25 in some earlier
3  years.
4      Q.    And how much of that?  What is that
5  number?  What is that 15, 20 percent that you would
6  typically make in a year as an expert?
7      A.    I mean in the last couple of years it's
8  of the order of 100,000.
9      Q.    And more than that in the years prior to
10 the last couple of years, correct?
11     A.    It varied.  It varied a lot from year to
12 year I won't deny.  Some years it may have been
13 more.  Some years it was probably less.
14         MR. THOMAS:  Hey, Paul?
15         MR. BOEHM:  Yep.
16         MR. THOMAS:  I need to run to the
17 bathroom.  I'm sorry, man.  I've been trying to hold
18 it.  I know we just got started.  Is it okay if we
19 take a quick break?
20         MR. BOEHM:  Of course.  Let's go off the
21 record.
22         THE VIDEOGRAPHER:  The time is 10:36
23 a.m.  We are going off the record.
24         (Brief recess.)
25         THE VIDEOGRAPHER:  The time is 10:47

6 (Pages 18 to 21)

David Madigan, Ph.D.

Page 22

1  a.m.  We are back on the record.
2  BY MR. BOEHM:
3      Q.   Dr. Madigan, I've brought with me the
4  report that was submitted on your behalf in this
5  case and it was submitted on December 13, 2013.
6  Now, if I understand correctly, you're telling me
7  that Exhibit --
8      A.   Three.
9      Q.   -- 3, which you now have in front of you,
10  is substantively identical to the report that was
11  submitted in this case on your behalf on December
12  13, 2013; is that correct?
13      A.   I believe that's correct.  Is it signed
14  the 8th of December?
15      Q.   Yes.
16      A.   Yeah, then I believe it's the same
17  report.
18      Q.   Who drafted this report?
19      A.   I did.
20      Q.   Did anybody help you to write it?
21      A.   No.
22      Q.   Did counsel for Ms. Levitt ask you to
23  review your report in connection with this case to
24  confirm that your opinions were the same or to alter
25  or reconsider any portion of your opinions?

Page 23

1      A.   I'm not entirely following.  You mean at
2  the time the report was filed?
3      Q.   Prior to the time that counsel submitted
4  this report on your behalf in this case, were you
5  ever asked to review your report or consider your
6  report in connection with this particular case?
7      A.   I don't believe I was.
8      Q.   Did counsel ever ask you to consider how
9  your opinions as articulated in your report apply or
10  don't apply to the facts of this case?
11      A.   I was not asked such questions.
12      Q.   Now, you said that you have had an
13  opportunity at least in the relative recent past to
14  re-read this report; is that correct?
15      A.   Yes.
16      Q.   In doing so, did you identify any
17  inaccuracies or ambiguities that you would like to
18  correct or clarify on the record now?
19      A.   Just one thing that I did notice.  On
20  Page 59, there are two references on this page to a
21  July 12, 2000 SUR.  That should be 2001.  And on the
22  previous page it's referred to correctly.
23      Q.   You're referring to Paragraph 185?
24      A.   Paragraph 185 and 186.
25      Q.   So where it says "July 12, 2000 SUR,"

Page 24

1  that should read, both in Paragraphs 185 and 186,
2  "July 12, 2001 SUR."
3      A.   Yes.
4      Q.   Any other corrections or clarifications
5  that you would want to make now that you've had a
6  chance to look back at this report?
7      A.   No.
8      Q.   If you look, Dr. Madigan, on Page 5 of
9  your report which is Paragraph 9 --
10      A.   Yes.
11      Q.   -- the last sentence of that paragraph
12  reads, "As I continue to review the data (or review
13  newly provided data), I reserve the right to
14  supplement and refine my report."  Do you see that?
15      A.   I see that.
16      Q.   Have you conducted any further review of
17  data or been provided new data such that you have
18  determined it would be appropriate to supplement or
19  refine your report?
20      A.   I've not.
21      Q.   Have you reviewed any other expert
22  reports in this case in connection with the opinions
23  that you intend to express?
24      A.   In the Levitt case, no, I have not.
25      Q.   You have in fact reviewed other

Page 25

1  plaintiff's experts' reports in various
2  Vioxx-related cases, correct?
3      A.   Correct.
4      Q.   Are there any that stand out to you as
5  those -- as reports that you are relying on for
6  purposes of the opinions that you're expressing?
7      A.   Hmm.  I don't think so.  I may have
8  relied in the past on Dr. Zipes, but I don't think
9  in this report there's any explicit reference to Dr.
10  Zipes' report I don't think.  I could be wrong but I
11  don't think there is.  Other than that, I don't -- I
12  don't -- so I'm a little bit uncertain about that,
13  but apart from that I don't think there's any
14  reliance on other expert reports.
15      Q.   Are you relying for purposes of your
16  opinions in this case on any testimony that has been
17  given by other plaintiff's experts in Vioxx-related
18  cases?
19      A.   I don't believe so.  I don't -- I don't
20  recall.  Unless it's referenced in my report, then
21  the answer would be no, and I don't think it is.
22      Q.   As part of the testimony that you expect
23  to give at trial in this case, if you in fact are
24  called to testify, do you intend to provide a
25  narrative of the events and the e-mails surrounding

David Madigan, Ph.D.

Page 26

1    Merck's analysis of Vioxx data?
2        A.    I mean the opinions that I would testify
3    about are represented in my report, and indeed my
4    report does make reference to e-mails and documents
5    and so on, so I think the answer is yes.
6        Q.    Your report has several paragraphs that
7    include your review and interpretation of various
8    internal e-mail correspondence, correct?
9        A.    Yes.
10       Q.    Just to be clear, you weren't involved in
11   any of that at the time, correct?
12       A.    I think the answer is no.  I'm not
13   entirely sure what you mean by -- prior to 2004 I
14   was not involved or I didn't have anything to do
15   with Vioxx whatsoever.
16       Q.    You had never studied Vioxx at any time
17   while it was on the market; is that correct?
18       A.    I believe that's correct.
19       Q.    Now, Dr. Madigan, you currently are
20   employed at Columbia University; is that correct?
21       A.    That's correct.
22       Q.    And if I understand correctly, you are
23   now working in the administration of the Arts and
24   Sciences department?
25       A.    Sure.  I continue to serve as a faculty

Page 27

1    member.  I teach and do research.
2        Q.    You still have a faculty position but you
3    also now have an administrative role at the
4    university?
5        A.    Yes.
6        Q.    How has your teaching responsibilities at
7    Columbia changed, if at all, since you took on this
8    new position in the administration?
9        A.    So I had been teaching typically two
10   courses a year.  In the last three years I've just
11   taught one course a year.
12       Q.    What course have you taught?
13       A.    I've taught an introductory applied
14   statistics course to environmental scientists.
15       Q.    In what department or departments do you
16   have an appointment?
17       A.    So in terms of academic departments, I
18   just have an appointment in the statistics
19   department.
20       Q.    Does Columbia have a medical school?
21       A.    Yes, it does.
22       Q.    Do you have an appointment in the medical
23   school at all?
24       A.    I do not.
25       Q.    I understand Columbia has a statistics

Page 28

1    department, correct?
2        A.    Yes.
3        Q.    Does Columbia also have a biostatistics
4    department?
5        A.    Yes.
6        Q.    Do you have an appointment in the
7    biostatistics department?
8        A.    I do not.
9        Q.    Have you ever?
10       A.    At Columbia, no.
11       Q.    Have you ever had an appointment at any
12   biostatistics faculty where the university had both
13   a statistics and a biostatistics department?
14       A.    Not precisely.  I was the director of the
15   Institute of Biostatistics at Rutgers University for
16   a period.
17       Q.    Does Rutgers have a statistics and a
18   biostatistics department?
19       A.    Back then it didn't.
20       Q.    I take it that it does today.
21       A.    I believe it does.  There was a merger of
22   some institutions and I believe there's now a
23   biostatistics department.
24       Q.    I'm looking at Exhibit 2 for purposes of
25   this deposition which is your most recently updated

Page 29

1    curriculum vitae.  Does this contain a complete list
2    of your academic publications?
3        A.    Yes.  Well, it's intended to.  I hope it
4    does.
5        Q.    You've made an effort to try to include
6    them.
7        A.    Yes.
8        Q.    For purposes of this litigation, in what
9    specific areas -- let me strike that.
10             For purposes of this case, in what
11   specific areas are you holding yourself out as an
12   expert?
13       A.    So I have expertise in statistics, in
14   biostatistics, in epidemiology, in clinical trials,
15   in pharmacoepidemiology.  I think that covers it.
16       Q.    Now, when you say pharmacoepidemiology,
17   just to be clear, you're not a pharmacologist,
18   correct?
19       A.    Correct.
20       Q.    You're not a toxicologist?
21       A.    I am not.
22       Q.    Are you holding yourself out as an expert
23   in vascular biology?
24       A.    No.
25       Q.    Fair to say that you'll not be offering

Golkow Technologies, Inc. - 1.877.370.DEPS

David Madigan, Ph.D.

Page 30

1   opinions on the subject of vascular biology in this
2   case.
3       A.   Correct.
4       Q.   You mentioned epidemiology.  Do you have
5   a degree in epidemiology?
6       A.   I do not.
7       Q.   Does Columbia have a department of
8   epidemiology?
9       A.   Yes.
10      Q.   Do you have an appointment in that
11  department?
12      A.   No, I do not.
13      Q.   In what way do you mean that you have
14  expertise in epidemiology?
15      A.   So I have worked in areas of epidemiology
16  for close to 20 years.  I've taught quite a lot of
17  short courses in epidemiology and published
18  extensively.
19      Q.   When you say you've published
20  extensively, do you mean to say that you have
21  published extensively on the topic of epidemiology
22  itself or you have just applied epidemiological
23  concepts in the publications that you have authored?
24      A.   Both, I think.  So I have published
25  methodology pieces in epidemiology journals and then

Page 31

1   I have published epidemiological analyses, if you
2   will.
3       Q.   You're not a cardiologist, correct?
4       A.   I am not.
5       Q.   Does your familiarity with thrombotic
6   events and what is and is not a thrombotic event and
7   so on, does that largely come from your work as an
8   expert in this case, or do you have expertise in the
9   field of cardiology independent of your work as an
10  expert for plaintiffs in Vioxx-related cases?
11      A.   So I have worked -- I have worked on some
12  issues related to cardiology in consulting contexts.
13  I'm trying to have I have ever worked in issues
14  related to cardiology in a research context.  Not
15  that I can recall.
16      Q.   You're not holding yourself out as an
17  expert in cardiology I take it.
18      A.   I am not.
19      Q.   Do you agree that you're not qualified to
20  express expert opinions about the mechanisms by
21  which cardiac conditions develop?
22      A.   I'm not an expert in such matters.
23      Q.   Your report sometimes uses the term
24  "adverse cardiovascular event."
25      A.   Okay.

Page 32

1       Q.   Does that sound familiar to you?
2       A.   Not immediately actually but I don't
3   doubt it.  It's possible I used that phrase.
4   Actually I see it right on Page 1.  Okay.
5       Q.   That's what I was looking to.  Can you
6   explain for the record what you mean when you use
7   the term "adverse cardiovascular event" in your
8   report.
9       A.   So I think it depends.  So, for example,
10  in the particular context on Page 1, Paragraph 2,
11  Subparagraph (b), "In March of 2000, Merck announced
12  results of the VIGOR trial, a large gastrointestinal
13  outcomes trial that revealed a substantial adverse
14  cardiovascular signal against Vioxx compared with
15  naproxen."
16           So there I'm referring to the imbalance
17  in MIs and also the imbalance in CVT events,
18  cardiovascular thrombotic events. I think we'd have
19  to go through it one by -- what I mean by the term
20  would depend on the context in which I'm using it in
21  general I think.
22      Q.   So it could refer to an imbalance in
23  myocardial infarction; is that right?
24      A.   Sure.  And that's, you know, one element
25  of a cardiovascular signal in the VIGOR trial.

Page 33

1       Q.   And then you also indicated that it might
2   also refer to an imbalance in cardiovascular
3   thrombotic events.
4       A.   Sure.
5       Q.   And so what I need to know is whether or
6   not -- other than MIs and cardiovascular thrombotic
7   events, when you use the term "adverse
8   cardiovascular event" in your report, are you
9   referring to anything other than MIs and thrombotic
10  events?
11      A.   So sometimes I may be referring to
12  cardiovascular mortality, although even then it's
13  generally -- the context would probably make it
14  clear it's thrombotic cardiovascular mortality.
15           THE WITNESS:  Actually, can you read
16  back the question so I just make sure I give the
17  right answer?
18           MR. BOEHM:  Of course, sure.
19           (The court reporter read back the
20  question as follows:  "And so what I need to know is
21  whether or not -- other than MIs and cardiovascular
22  thrombotic events, when you use the term "adverse
23  cardiovascular event" in your report, are you
24  referring to anything other than MIs and thrombotic
25  events?")

9  (Pages 30 to 33)

David Madigan, Ph.D.

Page 34

1　　　　THE WITNESS: I don't think so because
2　MI is a thrombotic event. So that's just a special
3　case. I don't think so but I'm not a hundred
4　percent certain.
5　BY MR. BOEHM:
6　　Q.　Do you know what atherosclerosis is?
7　　A.　Sure, in general terms.
8　　Q.　Do you know what atherogenesis is?
9　　A.　Sure, again in general terms.
10　　Q.　What is your understanding of what
11　atherosclerosis is?
12　　A.　Atherosclerosis refers to the buildup of
13　material in blood vessels that cause blockages.
14　　Q.　You can answer this question assuming you
15　have sufficient familiarity. If you don't know,
16　that's fine. Do you agree that atherosclerosis and
17　athero -- let me strike that and start over.
18　　　　Do you agree that atherosclerosis and
19　atherogenesis are not cardiovascular thrombotic
20　events?
21　　A.　I don't know.
22　　Q.　Does your -- do your analyses in your
23　report include an analysis of atherosclerosis or
24　atherogenesis?
25　　A.　Not explicitly, but I am aware of, you

Page 35

1　know, some discussion by experts about the
2　potential, you know, atherogenetic -- atherogenesis
3　effects of Vioxx.
4　　Q.　I understand that there may be some
5　experts who have expressed opinions about that, but
6　what I'm interested in right now is whether or not
7　your opinions and your report concern data related
8　to atherosclerosis and atherogenesis.
9　　A.　Not specifically. I didn't do any data
10　analysis on that matter, but it forms part of -- I
11　believe it forms part of, you know, the background,
12　you know, our background understanding of Vioxx and
13　potential mechanisms.
14　　Q.　In what way does atherosclerosis and
15　atherogenesis, in your mind, form part of the
16　background for the opinions that you have provided
17　in your report?
18　　A.　Well, I mean insofar as Vioxx could lead
19　to atherosclerosis, then that in turn, as I
20　understand it, could lead to thrombotic events.
21　　Q.　What is your understanding about how that
22　would work?
23　　A.　My understanding is very limited, but my
24　understanding would be that you can have plaque --
25　when you've got atherosclerosis, these plaques build

Page 36

1　up in arteries. These plaques can rupture and cause
2　blockages.
3　　Q.　Do you understand --
4　　A.　And clots can form around them.
5　　Q.　Do you understand the difference between
6　atherosclerosis and plaque rupture?
7　　A.　Sure. Well, I say sure. Yes, somewhat.
8　I don't have -- my expertise in all of this is
9　limited.
10　　Q.　Do you know enough to know that those are
11　two different things?
12　　A.　Sure.
13　　Q.　So just to hopefully close the loop on
14　this, your report is not expressing any opinions
15　that are specific to atherogenesis, atherosclerosis,
16　although you are aware that others have expressed
17　opinions on that topic; is that right?
18　　A.　Fair enough, yes. That characterizes it
19　reasonably well.
20　　Q.　Are you familiar with the term "stenosis"
21　or "restenosis?"
22　　A.　Somewhat.
23　　Q.　Do your opinions in this case concern the
24　issue of restenosis?
25　　A.　I don't believe so.

Page 37

1　　Q.　Do you know what unstable angina is?
2　　A.　I understand it is a cardiovascular
3　thrombotic event.
4　　Q.　When you say that in your opinion --
5　well, let me strike that.
6　　　　Are you expressing an opinion as an
7　expert that unstable angina is a thrombotic
8　cardiovascular event?
9　　A.　I don't have expertise myself in that
10　area, but I rely on a definition of "cardiovascular
11　thrombotic event" that Merck proposed, and that
12　includes unstable angina.
13　　Q.　So you're relying on your understanding
14　of a Merck document, correct?
15　　A.　I'm relying on two words where they
16　provide a definition of an event. Unstable angina
17　is listed as one of the events that comprise a
18　cardiovascular thrombotic event in their definition.
19　　Q.　Right. But you're not bringing to bear
20　your own independent expertise as a statistician to
21　provide testimony on in what way or how or when
22　unstable angina might be considered a thrombotic
23　event or might not be considered a thrombotic event;
24　is that correct?
25　　A.　I'm not, but I'm relying on -- I'm

10　(Pages 34 to 37)

David Madigan, Ph.D.

1  relying on Merck's definition.  I'm also relying on
2  Drs. Kostis and Krumholz who then encoded that
3  definition, chose the MedDRA terms that correspond
4  to that definition.  That includes unstable angina.
5      Q.    Have your analyses in this case looked
6  specifically at the issue of unstable angina and
7  what the data in the Vioxx studies show with respect
8  to unstable angina?
9      A.    I don't think I've ever separated it out.
10     Q.    Are you familiar with the term "acute
11  coronary syndrome?"
12     A.    Yes.
13     Q.    What is your understanding of what that
14  means?
15     A.    I don't really understand what -- in any
16  detail what it means.  It's some sort of acute
17  coronary event in the coronary arteries I assume.
18     Q.    Have you performed any analyses of the
19  Vioxx data on the subject of acute coronary
20  syndrome?
21     A.    In isolation.
22     Q.    Have you looked at that specific
23  endpoint, acute coronary syndrome?
24     A.    Only insofar as it's part of, you know, a
25  composite.  I don't even know sitting here this

1  minute whether it is or it isn't.
2      Q.    Is it fair to say then when you use the
3  term "adverse cardiovascular event" in your report,
4  you intend that to be synonymous with the term
5  "cardiovascular thrombotic event?"
6      A.    I'm not certain.  We'd have to -- I think
7  we'd have to look at the context.  It could be
8  context specific.  I think, generally speaking, yes,
9  but I'd need to go through the report and make sure
10  that I'm not using it in some other way somewhere.
11     Q.    Can you think of any opinions that you're
12  expressing in this case concerning adverse
13  cardiovascular non-thrombotic events?
14     A.    I can't think of any but I'm not certain
15  whether I'm always using it in precisely that way.
16     Q.    When did you last look at your report?
17     A.    This morning.
18     Q.    Do you recall seeing anything in your
19  report on the -- with respect to opinions you're
20  expressing on the subject of cardiovascular
21  non-thrombotic events based on your review of the
22  data?
23     A.    I don't recall.
24     Q.    Do you think that you did?  Because if
25  you did, I want to have you help me identify where

1  in your report you are doing that.
2      A.    I don't think so but it's an 80-page
3  report.  I'm not entirely certain.
4      Q.    Are there specific medical conditions
5  that you consider to be included when you use the
6  term "cardiovascular thrombotic events?"  Do you
7  want me to say it again?  You're looking at me
8  quizzically.
9      A.    No, no, no.  No.  I get the question.  I
10  mean I used Merck's definition.  That's what I used.
11  There's an extra step, which is the data in the
12  clinical trials are coded using, well, actually two
13  different dictionaries.  So there's an extra step
14  which is I need to know the dictionary terms that
15  encode the definition, but, yeah.  I mean have I
16  answered the question or -- I'm trying to answer the
17  question.
18     Q.    Let's try and do this step by step if we
19  could.
20     A.    Okay.
21     Q.    I'm looking at Page 9 of your report,
22  Paragraph 18.
23     A.    Okay.
24     Q.    I think you indicated, Dr. Madigan, that
25  there were -- there are multiple steps that one

1  needs to think about in order to understand your
2  definition of "cardiovascular thrombotic events."
3  You have indicated that you're relying on something
4  from Merck.  And if I understand correctly, what
5  you're referring to is what you've referenced in
6  Paragraph 18 of your report which is a list of 12
7  categories deemed to be thrombotic to use your
8  terms; is that right?
9      A.    That's right, yeah.  I don't like the
10  characterization of it as "your definition."  In no
11  sense is it my definition.  It's Merck's definition.
12  It's the definition that I used in my analysis but
13  it's not my definition of a thrombotic event.
14     Q.    These events that you've identified in
15  Paragraph 18 of your report come from a Merck
16  document, correct?
17     A.    Yes.
18     Q.    Are there any events that are not among
19  these 12 categories that you have included in your
20  analyses of thrombotic events?
21     A.    I -- this definition, these 12 event
22  categories, is what Drs. Krumholz and Kostis and
23  subsequently Dr. Ross looked at.  They chose
24  dictionary terms to encode these categories.  Beyond
25  that, any questions about it you'd have to ask them.

David Madigan, Ph.D.

Page 42

1    I just took what they gave me.
2        Q.    Will you tell me the names of those three
3    individuals once more?
4        A.    Dr. Krumholz, Harlan Krumholz, Dr. John
5    Kostis --
6        Q.    How do you spell that?
7        A.    K-O-S-T-I-S.  And then subsequently Dr.
8    Ross, Joseph Ross, was involved at a later stage.
9        Q.    You indicated earlier that the list that
10   you used to determine which events were thrombotic
11   came from Merck.  Do Dr. Krumholz, Dr. Kostis and
12   Dr. Ross work at Merck Research Laboratories?
13       A.    I don't believe so.
14       Q.    Who are those doctors?
15       A.    So Dr. Krumholz is a cardiologist at
16   Yale, Dr. Kostis is a cardiologist at Robert Wood
17   Johnson in New Brunswick, and Dr. Ross is now a
18   cardiologist at Yale.  Then I think he was at Mount
19   Sinai.
20       Q.    Am I correct that all three of these
21   individuals have been paid by plaintiff's lawyers in
22   Vioxx-related cases?
23       A.    Could be.  I don't know.
24       Q.    You don't know?
25       A.    I do not know.

Page 43

1        Q.    Is that something that you would want to
2    know about and take into account in terms of what
3    information you would want to rely upon?
4        A.    No.  I mean this was, you know -- I
5    sought to use Merck's definition.  There is a
6    practical problem which is these are not dictionary
7    terms.  So I need somebody to tell me what the
8    dictionary terms are that encode this definition.
9            And I looked to -- in the first instance
10   to two cardiologists who did this task
11   independently.  And then, insofar as they disagreed,
12   they converged on what they said was here, here is
13   the -- here is the list of terms that encode that.
14   You know, I have no hand, act or part in this, and I
15   understand they're both board certified
16   cardiologists and I have no reason to doubt the
17   integrity of what they did.
18           And I should say in nine or ten years or
19   whatever since they did that exercise, Merck has not
20   once said they included this and they shouldn't have
21   or they should have included something.  Merck has
22   had ample opportunity to quibble about the way they
23   did it and has never done so.
24           MR. BOEHM:  I'll just move to strike the
25   last part of that response with respect to what

Page 44

1    Merck has or hasn't done.
2    BY MR. BOEHM:
3        Q.    Dr. Madigan, is it your testimony that it
4    simply was not relevant to you that these
5    individuals were being paid by plaintiff's lawyers
6    in Vioxx cases when you relied upon the information
7    that they provided to you?
8        A.    It was not relevant to me in this task.
9    I have no reason to believe that they didn't do this
10   to the best of their ability and do it in a
11   straightforward way.
12       Q.    Have you ever made an effort to determine
13   what definition terms were used by Merck to populate
14   the categories that you've included in Paragraph 18
15   of your expert report?
16       A.    I have never found such a list.
17       Q.    Have you looked for one?
18       A.    Yes, I have, extensively.
19       Q.    Have you reviewed the cardiovascular
20   standard operating procedure, including its
21   attachments?
22       A.    Absolutely.
23       Q.    And you didn't find any list there?
24       A.    There is no list that encodes this.
25   There's a different list, which are the list of

Page 45

1    terms that trigger adjudication.  That's an entirely
2    different matter.  So there is no list that I've
3    been able to find.  I'd be happy -- if there is one,
4    I would like to have it and I'd be happy to use it.
5    I've never seen one.
6        Q.    When Merck was putting together its list
7    for purposes of triggering adjudication, do you
8    agree that Merck's purpose was to try and identify
9    which reported events were thrombotic and which ones
10   either weren't events at all or were not thrombotic?
11       A.    So it's my understanding that that was
12   for a different purpose.  So that was to cast a wide
13   net so that anything that might conceivably be
14   thrombotic could be looked at.  That's my
15   understanding.  And if -- I'm not finished yet.
16       Q.    Sorry.
17       A.    And Drs. Kostis and Krumholz also said to
18   me this is not an appropriate encoding of this
19   definition.  It's much broader than the definition.
20       Q.    Isn't it true that the list that Dr.
21   Krumholz and Kostis and then subsequently Dr. Ross
22   put together also encoded terms that in some cases
23   would not be considered thrombotic?
24       A.    I have no idea.  That's certainly not the
25   intention.

12  (Pages 42 to 45)

1    Q.   So your intention in relying on their
2  list was to only include thrombotic events, correct?
3    A.   My intention was to include events that
4  encode the 12 categories in Paragraph 18 of my
5  report. That was my intention, and that was what I
6  asked them to do.
7    Q.   Was it your intention for them to include
8  terms on the list that would not be considered
9  thrombotic by the medical community?
10    A.   My intention was to -- what I asked them
11  to do was to give me the dictionary terms that
12  encoded or that corresponded to the 12 categories
13  here in Paragraph 18. That's it. There's no more
14  to be said about it. This is what I asked them. I
15  said, this is Merck's definition. To do an analysis
16  I need to know the dictionary terms. Please tell me
17  what dictionary terms I should use.
18    Q.   Did you give any consideration to the
19  question of whether or not Drs. Krumholz, Kostis and
20  Ross, who were being paid by plaintiff's lawyers,
21  included on their list events that would not be
22  considered thrombotic?
23    A.   I asked them to give me the dictionary
24  terms that encoded this definition. Beyond that
25  you'd have to ask them.

1    MR. BOEHM: Madam Court Reporter, could
2  you just read back my question and give Dr. Madigan
3  a chance to hear it again.
4    (The court reporter read back the
5  question as follows: "Did you give any
6  consideration to the question of whether or not Drs.
7  Krumholz, Kostis and Ross, who were being paid by
8  plaintiff's lawyers, included on their list events
9  that would not be considered thrombotic?")
10    THE WITNESS: I did not give -- I did
11  not --
12    MR. THOMAS: Object to form. Go ahead.
13    THE WITNESS: I did not consider such a
14  question. I took it that they would give me the
15  correct list of dictionary terms.
16  BY MR. BOEHM:
17    Q.   And it was your understanding that the
18  list that they gave back to you would include
19  thrombotic events, correct?
20    A.   My understanding was that it encoded
21  the -- Merck's definition that's in Paragraph 18.
22  That's my -- the sum total of my understanding.
23    Q.   Is it relevant to you, as you sit here
24  today, whether or not the list that they gave to you
25  and that you relied upon for purposes of your

1  analysis included events that would not be
2  considered thrombotic?
3    A.   I -- it's beyond my expertise. I'm
4  relying on two board certified cardiologists and
5  that's it.
6    Q.   I understand, but you're expressing
7  opinions in this case, and what I need to know --
8  and I understand it's beyond your expertise, but for
9  purposes of the opinions that you're expressing, for
10  purposes of your ability to interpret your own
11  results --
12    A.   Um-hum.
13    Q.   -- based on your analysis --
14    A.   Yes.
15    Q.   -- is it relevant to you to understand
16  whether or not the list that you were provided by
17  these three doctors included events that would not
18  be considered to be thrombotic?
19    MR. THOMAS: Asked and answered.
20    THE WITNESS: What's -- again, I'm just
21  going to go back to what I said before. I asked
22  them to give me the dictionary terms that encoded
23  this definition. I do not have the expertise to
24  second-guess should they have included this, should
25  they not have included that. That's beyond my

1  expertise. I relied on it. They did it. I relied
2  on it.
3  BY MR. BOEHM:
4    Q.   I understand. And I just want to be
5  clear. That's not quite my question. So I
6  understand you relied on them for purposes of
7  creating the list, it's outside of your own
8  expertise to try and create such a list; but for
9  purposes of your interpretation of your own data, of
10  your own analysis, and the opinions that you're
11  expressing in this case, do you care to know whether
12  or not the list that they created included events
13  that would not be considered thrombotic?
14    A.   I would care if it included events that
15  were not germane to Merck's definition. That's what
16  I would care about. But I have nowhere to go here.
17  I went to two board certified cardiologists. They
18  gave me this list. I have nowhere else to go with
19  this. I'm not going to second-guess what they did.
20    Q.   And I'm not asking you to.
21    MR. BOEHM: Madam Court Reporter, would
22  you just go back up to the last question I asked. I
23  want to give Dr. Madigan one more chance to answer
24  this question.
25    MR. THOMAS: At this point it's become

David Madigan, Ph.D.

1  burdensome and harassing, and he's answered it three
2  times, just hasn't answered to the satisfaction of
3  counsel, which isn't grounds to keep repeating the
4  question. So I object, form, asked and answered.
5       MR. BOEHM: And now if you'd just read
6  back the question.
7       (The court reporter read back the
8  question as follows: "So I understand you relied on
9  them for purposes of creating the list, it's outside
10 of your own expertise to try and create such a list;
11 but for purposes of your interpretation of your own
12 data, of your own analysis, and the opinions that
13 you're expressing in this case, do you care to know
14 whether or not the list that they created included
15 events that would not be considered thrombotic?")
16      THE WITNESS: And my answer is what I
17 care about is not whether they're thrombotic per se.
18 What I care about is whether they are germane and
19 accurately encode Merck's definition. I do care
20 about that. But I've -- you know, I'm relying on
21 their accurate encoding of it.
22 BY MR. BOEHM:
23      Q.   So for purposes of the opinions you're
24 expressing, it doesn't matter to you whether or not
25 the list that you're relying on includes

1  non-thrombotic cardiovascular events.
2       A.   That's not what I said. What I said is I
3  do care whether they accurately encoded Merck's
4  definition. That's what I care about. I don't care
5  about anything else actually. What I care about is
6  is it an accurate encoding of these 12 categories.
7  And I have --
8       Q.   Sorry. Go ahead.
9       A.   Let me finish the thought. You know, I
10 have no way of critiquing that. That's beyond my
11 expertise. They did this exercise. I used their --
12 what they gave me and I relied on it.
13      Q.   If you learned today that in fact the
14 list that those three plaintiff's experts provided
15 to you included events that would not be considered
16 thrombotic, would that in any way affect the
17 opinions that you're expressing in this case?
18      A.   If it included events that were not
19 germane or relevant to these 12 categories, that
20 would be problematic. But I don't know -- I don't
21 know of a higher authority that I would go to to
22 give me such an opinion. I went to two board
23 certified, world-renowned cardiologists. I can't
24 see how I could have done anything different.
25      Q.   Is it relevant to you to know whether or

1  not -- let me strike that.
2       Dr. Madigan, you've referred repeatedly
3  to your reliance on these three doctors who have the
4  expertise that you do not have, right?
5       A.   Yes.
6       Q.   I'm asking you in terms of your own
7  ability to express opinions concerning the potential
8  risk of Vioxx and cardiovascular thrombotic events.
9  That's what I want to hear about. You've expressed
10 opinions in this case concerning your view based on
11 your analysis of the potential risk between the use
12 of Vioxx and cardiovascular thrombotic events,
13 correct?
14      A.   In general, yes, but you keep saying
15 cardiovascular thrombotic event. I keep pointing to
16 the 12 categories.
17      Q.   Yes, but I'm asking you about opinions --
18 not some technical term. I'm asking you, to the
19 extent you're expressing opinions -- maybe I should
20 just back up and ask it this way.
21      Are you expressing opinions in this case
22 based on analysis of data that you've reviewed about
23 any risk or potential risk as between the use of
24 Vioxx and cardiovascular thrombotic events?
25      A.   Sure, I am.

1       Q.   That's what I want to hear about. In
2  terms -- and you're relying for purposes of your own
3  opinions a risk or an alleged risk of cardiovascular
4  thrombotic events, you're relying on a list from
5  these three plaintiff's experts, correct?
6       A.   I am relying on their list, yes.
7       Q.   My question to you is whether you
8  consider it to be relevant. For purposes of the
9  opinions that you express concerning a supposed risk
10 of thrombotic events, would it be relevant to you to
11 know whether or not that list included events that
12 were not thrombotic?
13      A.   So what would be of relevance to me is if
14 it included events that were not germane or relevant
15 or associated with these 12 categories. That's what
16 I care about. This is Merck's definition. I should
17 say, by the way, in other situations, in some
18 analyses, I used Merck's events. I didn't use this
19 in every single case. I was forced to do this for a
20 so-called ITT analysis that I presume we'll talk
21 about at some point and so -- but for that purpose,
22 I used Merck's definition and I relied on two
23 cardiologists to tell me what the corresponding
24 dictionary terms are. I would be concerned if they
25 got that wrong. I have no reason to believe they

14  (Pages 50 to 53)

David Madigan, Ph.D.

Page 54

1    got it wrong.  I -- I'm relying on them.
2         Q.    Is it your understanding that all of the
3    events on the list that they provided to you are in
4    fact thrombotic events?
5         A.    It's my understanding that all of the
6    events are the -- they're the correct events to
7    encode the list of 12 categories that Merck
8    provided.
9         Q.    Do you know what ventricular fibrillation
10   is?
11        A.    Not especially I don't.  Some sort of
12   arrhythmia.
13        Q.    Do you consider ventricular fibrillation
14   to be a thrombotic event?
15        A.    I have no idea.  You're asking the wrong
16   person.
17        Q.    You don't know one way or another.
18        A.    Absolutely not.
19        Q.    Do you know what cardiac arrest is?
20        A.    I understand that to mean your heart
21   stops.
22        Q.    Do you consider cardiac arrest to be a
23   thrombotic event?
24        A.    I have no idea.  I relied on two
25   cardiologists.

Page 55

1         Q.    Have you ever heard of the term "septum
2    rupture?"
3         A.    I've heard of the term.
4         Q.    Do you know what it is?
5         A.    No, not in any -- it's the rupture of
6    some -- some object in the heart I believe.
7         Q.    Does that sound like a thrombotic event
8    to you?
9         A.    I have no idea.  You're asking the wrong
10   person.
11        Q.    Does this at least raise a question in
12   your mind -- if there are events that are not
13   thrombotic that are on this list that you relied
14   upon, does it at least raise a question in your mind
15   about the extent to which you can draw conclusions
16   concerning what you term a cardiovascular thrombotic
17   event risk?
18        A.    No, it doesn't.  You know, I went to two
19   cardiologists and I said tell me the dictionary
20   terms that encode this definition.  They went
21   through a process.  Here they are.  I'm not going to
22   second-guess what they gave me and that's outside my
23   expertise.
24        Q.    It doesn't even raise a question in your
25   mind when you see events here that don't seem to be

Page 56

1    thrombotic?
2         A.    I don't know if they're thrombotic or
3    not.  I just don't know.  It's outside of my
4    expertise.  I should add it's also been through a
5    peer-review process.
6         Q.    When you talk about this list that these
7    three plaintiff's experts provided to you, are you
8    referring to what is Appendix A to your report?
9         A.    I believe so.  Yes.
10        Q.    Did you ever consult with any
11   cardiologist not being paid by plaintiff's
12   lawyers -- I'm sorry.  I'm not quite done.
13              Did you ever consult with any
14   cardiologist not being paid by plaintiff's lawyers
15   to confirm in your mind that the list that you were
16   relying upon was accurate?
17        A.    So, first of all, you represent they were
18   paid by plaintiff's lawyers.  I don't actually know
19   that.
20        Q.    I will represent that to you for the
21   record.
22        A.    Okay.  But, no, I consulted with Drs.
23   Kostis and Krumholz in the first instance, and later
24   there were some small adjustments that were due to
25   Dr. Ross.

Page 57

1         Q.    What were those adjustments?
2         A.    So Dr. Ross discovered that there were
3    some -- a couple inconsistencies between the CRISP
4    terms and the MedDRA terms, and he consulted with
5    Drs. Kostis and Krumholz and they made some changes.
6    I don't even remember what they -- at this point I
7    don't remember what they were.
8         Q.    Is it fair to say that there were some
9    corrections that were needed and Dr. Ross helped
10   identify those?
11        A.    That's a reasonable characterization,
12   yep.
13        Q.    Approximately when were those mistakes
14   identified and those corrections made?
15        A.    Could I see my CV and I can give you a --
16   thank you.  Actually this doesn't help me very much.
17   So it was certainly prior to the publication of a
18   paper in 2009, but I can't remember how far in
19   advance of that.
20        Q.    Do you have Appendix A to your report in
21   front of you right now?
22        A.    I do.
23        Q.    It's on Page 79, correct?
24        A.    Yes.
25        Q.    As you look over that list, can you

15  (Pages 54 to 57)

David Madigan, Ph.D.

Page 58

1  identify events that appear to you not to be
2  thrombotic?
3      A.   No, I can't.
4      Q.   Have you made an effort to do that?
5      A.   No, I have not.
6      Q.   Is that just because even without looking
7  you know you don't have sufficient expertise to do
8  that?
9      A.   Yes.
10     Q.   Do you see in the right-hand column about
11 halfway down under "CRISP terms," do you see
12 electromechanical dissociation?
13     A.   I do.
14     Q.   Does that sound like a thrombotic event
15 to you?
16     A.   I have no idea.
17     Q.   But does it sound like a thrombotic event
18 to you?
19     A.   I have no idea.  No idea.  Outside my
20 expertise.
21     Q.   Do you know what -- I'm going to
22 pronounce this incorrectly -- asystole is?
23     A.   No, I do not.
24     Q.   Ever heard of that term before?
25     A.   Yes.

Page 59

1      Q.   Any idea what it is?
2      A.   Nope.
3      Q.   If there was an event reported that hit
4  on any term included on Appendix A of your report,
5  would that have been included in your analysis of
6  data?
7      A.   You've asked a very general question, I
8  mean, so if I'm doing an analysis of a particular
9  clinical trial or whatever, and I'm analyzing and
10 I'm counting events per Merck's definition, SOP
11 definition, yes, if a patient in that trial had an
12 event on one of these lists, it would count.  Am I
13 answering the question?
14     Q.   Can you just say that one more time for
15 me?
16     A.   So if I'm doing an analysis -- and I have
17 done such analysis -- of a clinical trial and I'm
18 using Merck's SOP definition of a cardiovascular
19 thrombotic event --
20     Q.   And just to be clear, when you talk about
21 Merck's SOP definition, you're referring to
22 Paragraph 9.
23     A.   Eighteen.
24     Q.   I'm sorry.  Yeah, Page 9, Paragraph 18,
25 of your report, correct?

Page 60

1      A.   Correct.
2      Q.   As modified by the list provided to you
3  by those three doctors who we've been talking about
4  and as listed on Appendix A; is that right?
5      A.   No.  So "modified" is not the right verb.
6  So it's encoded is -- this list encodes the
7  definition in Paragraph 18.  It's --
8      Q.   But this isn't Merck's list.  You keep
9  talking about -- this is a list that was created by
10 these three doctors, not by Merck, right?
11     A.   Correct.  It's an -- you know, I can't
12 use the definition in the raw, so to speak, because
13 I need to know the actual dictionary terms, and Drs.
14 Kostis and Krumholz provided those dictionary terms
15 to me.
16     Q.   And that's what I just want to make sure
17 is clear.  I don't want the record to be confused.
18 When you talk about Merck's SOP, are you talking
19 about the events that appear on Appendix A as
20 compiled by these three non-Merck doctors?
21     A.   Yes, insofar as the only way I have of
22 counting events is to use a set of dictionary terms,
23 and these are the dictionary -- as a matter of fact,
24 these are the dictionary terms I used.
25     Q.   And if there was an event in a study that

Page 61

1  matched one of the terms on this Appendix A created
2  by these three doctors you've talked about, then
3  that would have been pulled in to your statistical
4  analysis; is that correct?
5      A.   Well, pulled in.  I mean I think I
6  answered the question already.  I mean if I'm doing
7  an analysis of a clinical trial or pooled trials
8  where I'm analyzing how many events there were per
9  the definition in Paragraph 18, as a matter of fact
10 the way I did that was I looked to see if any of
11 these terms -- patient by patient, did any of these
12 terms occur.  And if one of these terms occurred,
13 then that would add one to the count of
14 cardiovascular thrombotic events in my analysis.
15     Q.   Well, just to make sure our language is
16 concise and correct, did you need to confirm that
17 the event occurred or did the event merely need to
18 have been reported for you to include it in your
19 analysis?
20     A.   In some cases I used adjudicated events
21 that Merck provided.  In other cases I -- for
22 various reasons I used investigator-reported events,
23 so it's what the investigator coded the event as is
24 what is used in my -- in some of my analysis.
25     Q.   So do you agree with me that it's more

16 (Pages 58 to 61)

David Madigan, Ph.D.

Page 62

1  precise in describing your analysis of the data to
2  use the term "reported," not "occurred," because in
3  some cases events do get reported but -- and they're
4  not reported accurately, correct?
5      A.  I don't know.
6      Q.  Well, you're familiar with that.
7      A.  And also I'm a little uncomfortable here.
8  You're saying in my analysis.  Which analysis?  We
9  should probably look at something.  You get my
10  point.  I mean you're asking questions about my
11  analysis.  I did various kinds of analyses.
12      Q.  Well, didn't you use Appendix A for
13  purposes of all of the actual statistical analysis
14  that you generated?
15      A.  No, I did not.  I did in some cases.  In
16  other cases I used Merck's events.
17      Q.  Tell me which are which.
18      A.  Literally go through?
19      Q.  Yeah, tell me in which -- well, why don't
20  we start by you telling me in which analysis that
21  you performed you used Appendix A.
22      A.  Sure.  Just give me a minute.  This is
23  going to take me a few minutes, okay?
24      Q.  No problem.  Take your time.
25      A.  So, for example, in Table 1, Page 14.

Page 63

1  Are we there?  In Table 1 I used -- rather to
2  describe this -- I used Appendix A, whereas in
3  Table 2 I did not.  These are both analyses that I
4  conducted, but in one case I used Appendix A, in the
5  other case I did not.
6      Q.  And you've identified Table 1 as
7  Investigator-Reported cardiovascular thrombotic
8  events using all available data, correct?
9      A.  Yes.
10      Q.  Whereas Table 2 has a different title,
11  correct?
12      A.  Yes, it does.
13      Q.  It's titled, Confirmed cardiovascular
14  thrombotic events using all available data, correct?
15      A.  Yes.
16      Q.  What's the distinction between
17  investigator-reported and confirmed events?
18      A.  So investigator-reported events are
19  events that are reported by the investigator in the
20  trial and that include a term from Appendix A.
21  Okay?  And confirmed events are events that
22  triggered an adjudication.  So these are events that
23  hit on actually a much larger list that Merck had
24  and that were then sent for adjudication.  And I
25  have some concerns about the adjudication process

Page 64

1  but, be that as it may, the adjudication process
2  either confirmed or failed to confirm an event.  So
3  if it survived the adjudication process, so to
4  speak, it would be included in Table 2.
5      Q.  Do you believe -- let me strike that and
6  start the question over.
7          Do you believe that you have identified
8  any reported -- any specific reported events that
9  were misadjudicated?
10      A.  That's outside my expertise.  I mean, for
11  example, I identified some events -- you know, it
12  really is outside my expertise.  I mean I identified
13  for example some events that were reported as MIs,
14  as myocardial infarctions, and that were not sent to
15  adjudication and I -- there are a significant number
16  of events -- I don't have the percentage at my
17  fingertips -- which went to adjudication but were
18  not confirmed because of insufficient data.  You
19  know, it seems to me to be problematic to simply
20  throw those away but -- actually I'm losing my
21  thread here.  What was the question?
22          (The court reporter read back the
23  question as follows:  "Do you believe that you have
24  identified any reported -- any specific reported
25  events that were misadjudicated?")

Page 65

1          THE WITNESS:  See, I think my answer
2  stands.  I mean it's largely outside my expertise.
3  BY MR. BOEHM:
4      Q.  You do not intend to be expressing any
5  opinions in this case that you have identified
6  specific instances where a reported event was
7  misadjudicated through the process that's outlined
8  in Merck's cardiovascular standard operating
9  procedure; is that correct?
10      A.  Well, I'm very uncomfortable with how the
11  process dealt with -- no, I'm answering the
12  question.  I'm very uncomfortable with the way the
13  process deals with events which there was
14  insufficient data.  So I believe some of those in
15  all likelihood were mis -- you know, were handled
16  incorrectly.  It was assumed that they were not
17  confirmed events and I believe that some of those
18  almost certainly should have been confirmed events.
19      Q.  Have you ever -- what specific events do
20  you believe were wrongly adjudicated by the blinded
21  independent medical doctors who reviewed those data?
22      A.  I can't tell you specific events.  I'm
23  just raising the issue that I have an opinion that
24  the way they dealt with the events which there was
25  insufficient information was not appropriate.

17 (Pages 62 to 65)

David Madigan, Ph.D.

Page 66

1    Q.   Have you ever been asked to serve as a
2 blinded adjudicator in the context of a randomized
3 controlled trial?
4    A.   No, I have not.
5    Q.   You're not a medical doctor, correct?
6    A.   I am not.
7    Q.   You don't have the medical expertise to
8 perform the tasks that were assigned to the blinded
9 independent adjudicators who reviewed the reported
10 events pursuant to the cardiovascular standard
11 operating procedure, correct?
12    A.   No.
13        MR. THOMAS:  Foundation.
14        THE WITNESS:  No.  I believe I do have
15 the expertise to opine on if something is reported
16 as a myocardial infarction but there isn't --
17 there's insufficient data, there's a missing
18 diagnostic test or whatever, to then toss that out
19 as if it never happened, I do believe I have the
20 expertise to opine that's not appropriate.
21 BY MR. BOEHM:
22    Q.   You've never actually taken a course in
23 cardiology, correct?
24    A.   I have not.
25    Q.   You're not an expert in what diagnostics

Page 67

1 are appropriate or most meaningful or less
2 meaningful or inappropriate or any of the above with
3 respect to reviewing events as reported to determine
4 whether or not they actually occurred, correct?
5    A.   I don't have clinical expertise, medical
6 expertise, but I believe I have enough expertise as
7 a statistician and experience with trials to offer
8 an informed opinion that simply because
9 documentation could not be found about a certain
10 event, that it should be assumed that it never
11 happened.  That seems anti-conservative to me.
12    Q.   It seems that way to you, but to be fair,
13 you don't have any training in what those diagnostic
14 tests mean or don't mean in the cardiology context,
15 correct?
16    A.   That's not -- my opinion is not based on
17 my expertise about the mechanism.  My opinion is
18 based on the fact that a clinician in a trial said
19 the patient had a myocardial infarction.  To then
20 proceed as if that never happened simply because
21 some documentation can't be found is not
22 appropriate.
23    Q.   Did you ever have any discussions with
24 the independent medical adjudicators of any of these
25 events?

Page 68

1    A.   I don't know who they are.
2    Q.   Have you ever asked anybody who played a
3 role in that process why they felt that some piece
4 of data was meaningful or not?
5    A.   I don't have access to those individuals.
6 I don't know who they are.
7    Q.   So now you're sitting here in 2016
8 second-guessing the medical judgment of independent
9 blinded adjudicators whereas you refuse, even when
10 looking straight at Appendix A, to say anything
11 about the nature of the events identified by the
12 three plaintiff's experts.
13    A.   Completely different situation.  I'm
14 refusing to --
15        MR. THOMAS:  Form.  Foundation.  Go
16 ahead, Doctor.
17        THE WITNESS:  Sorry.  I'm not offering
18 an opinion about the appropriateness of the terms
19 that the cardiologists selected.  That's outside my
20 expertise.  I am offering an opinion that the
21 adjudication process where it threw out, just
22 dismissed, events for which there was the inadequate
23 documentation, insufficient information, that that
24 is inappropriate.  And in many published studies
25 that is not what happens.  It's quite common for --

Page 69

1 to do it the other way around -- and I have some
2 references in my report -- to do it the other way
3 around, to assume if you can't -- if there isn't
4 adequate documentation, just assume that the
5 investigator got it right in the first place.
6 BY MR. BOEHM:
7    Q.   What specific events are you referring
8 to?
9    A.   None in particular, but there are a
10 significant number.  I don't know the percentage at
11 my fingertips.
12    Q.   So sitting here today, you can't identify
13 for me which events you believe fall into this
14 category?
15    A.   All of the events for which there was a
16 reported thrombotic event and it didn't -- there was
17 insufficient information to confirm it.
18    Q.   Yeah, but I'm asking you to tell me which
19 events so that I have an opportunity -- it's only
20 fair that I would get an opportunity to know what
21 you're talking about so that I could prepare to
22 respond to it.  So that's why we're having the
23 deposition, in part, is so you can identify for me
24 the basis of your opinions so that I have fair
25 notice of that, and that's what I'm asking you for.

18  (Pages 66 to 69)

David Madigan, Ph.D.

Page 70

1     A.    I can tell you how you to find them.
2  Obviously I don't know the patient numbers sitting
3  here this minute but I can tell you how to find
4  them. Go to the VEC database, which is the Vascular
5  Events Committee database I think, VEC, and in there
6  you can clearly identify events that were -- that
7  failed to be confirmed because of insufficient
8  information.
9     Q.    So, in your mind, that's all you need to
10  know is that any event that was failed to be
11  confirmed due to insufficient information, in your
12  mind that was -- without any further review or
13  analysis or thought, that was a wrong adjudication;
14  is that what you're telling us?
15     A.    I'm saying that it's not -- it's --
16  it's -- to simply throw those events away is to
17  diminish the power of any subsequent analysis and
18  it's -- at the very least Merck should have done an
19  analysis with and without those events.
20     Q.    Okay, but you're just not quite
21  responding to the question that I've asked you.
22     A.    Okay.  Try again.
23     Q.    Is it your view that any event during the
24  process of adjudication that was not included
25  because there wasn't information to confirm that

Page 71

1  event, that that by definition, without any further
2  analysis or thought or consideration of the specific
3  facts surrounding that case, was wrongly
4  adjudicated?
5     A.    That's not what I said.
6     Q.    Help me understand.
7     A.    So what I said was to simply throw those
8  away is anti-conservative.  It's not -- it does
9  not -- you're going to lose power in any subsequent
10  analysis.  So it seems reasonable to me to
11  conduct -- I'm not saying whether those events
12  really were thrombotic or not, but to throw them
13  away because of insufficient information is very
14  problematic.
15        So at the very least Merck should have
16  done analyses where they proceeded as if they were
17  thrombotic and, fine, do an analysis where they
18  proceed as if they're not thrombotic.  That would
19  have been a reasonable thing to do.  That's not what
20  they did.  They simply dismissed them.  So I have a
21  problem with the process.
22     Q.    So you're not expressing any opinion that
23  any particular event that was not included due to
24  insufficient information was wrongly adjudicated.
25     A.    Not necessarily, no.  I don't have the --

Page 72

1  I don't have the expertise to make that judgment,
2  but the process, I believe I do have the expertise
3  to opine about the process.
4     Q.    Do you agree that the adjudication
5  process was blinded?
6     A.    I don't know.
7     Q.    I'm surprised to hear you say that.  You
8  don't know whether the process was adjudicated or
9  not?
10     A.    I can't be sure if --
11        MR. THOMAS:  Asked and answered.
12        THE WITNESS:  I can't be sure if what
13  the adjudicators saw revealed the treatment or not.
14  I can't be sure.
15  BY MR. BOEHM:
16     Q.    So do you have any reason to believe that
17  the adjudication process was not blinded?
18     A.    No, I don't --
19        MR. THOMAS:  Asked and answered.
20        THE WITNESS:  I don't have any reason to
21  believe that.  You asked me a very bald question,
22  was it blinded.  I don't know.  They said it was
23  blinded but was it blinded?  I don't know.  I don't
24  know what they saw when --
25  BY MR. BOEHM:

Page 73

1     Q.    Well, you're not casting aspersions on
2  the integrity of the process.
3     A.    I am actually.  Not specifically about
4  blinding but I do have concerns about the integrity
5  of the process.
6     Q.    I'm asking you about whether or not it
7  was blinded.  And you know that the standard
8  operating procedure calls for blinded adjudication,
9  correct?
10     A.    Yes.
11     Q.    And you don't have any reason to believe
12  that it wasn't blinded, correct?
13     A.    I have no -- no, I have no -- I don't
14  know of any reason to believe that it was not
15  blinded.
16     Q.    So you're not casting aspersions on the
17  character of the medical doctors who independently
18  reviewed these events as reported, are you?
19     A.    Once again, you're mixing up several
20  things here.  So on blinding, you asked me was the
21  process blinded.  I don't know.  They said it was
22  blinded.  I don't know what information could have
23  leaked through in the medical records that were
24  provided.  I simply don't know.  I don't --
25     Q.    You would be purely speculating if you

19  (Pages 70 to 73)

David Madigan, Ph.D.

Page 74

1  were to sit here and suggest in any way that the
2  process was not blinded; isn't that true?
3      A.    That's true.  Yes, I just don't know.
4  It's the way you asked the question why I gave
5  you the answer I gave you --
6      Q.    Well --
7      A.    -- but in terms of having concerns about
8  the process, I do have other concerns about the
9  process which I've described in my report.
10         THE WITNESS:  Actually, Paul, could we
11  take a break soon?
12         MR. BOEHM:  Sure, we can do it now.  Off
13  the record.
14         THE VIDEOGRAPHER:  The time is 11:56
15  a.m.  This completes Tape Number 1.  We are going
16  off the record.
17         (Brief recess.)
18         THE VIDEOGRAPHER:  This marks the
19  beginning of Videotape Number 2.  The time is 12:05
20  p.m.  Back on the record.
21  BY MR. BOEHM:
22      Q.    Dr. Madigan, in your report when you use
23  the term "confirmed cardiovascular thrombotic
24  events" or "confirmation of cardiovascular
25  thrombotic events," are you referring to the

Page 75

1  adjudication process?
2      A.    Yes.
3      Q.    And specifically the adjudication process
4  that Merck put in place through its cardiovascular
5  standard operating procedure; is that correct?
6      A.    Sure, yes.
7      Q.    Have you yourself ever designed a
8  standard operating procedure for purposes of
9  adjudication of reported cardiovascular events in
10  randomized controlled studies?
11      A.    No.
12      Q.    Have you ever been consulted by the FDA
13  or by industry on the subject of designing a
14  standard operating procedure for the adjudication of
15  cardiovascular events as reported in randomized
16  controlled studies?
17      A.    Not that I can recall.  I've been
18  involved in some SOPs but not cardiovascular.
19      Q.    Have you ever had primary responsibility
20  for establishing a standard operating procedure for
21  purposes of adjudicating a clinical event in a
22  randomized controlled trial?
23      A.    No.
24      Q.    Have you ever published in that area?
25      A.    In that area.

Page 76

1      Q.    Have you ever published on the subject of
2  the establishment of standard operating procedures
3  for the adjudication of clinical events?
4      A.    No, I've not.
5      Q.    And certainly not on the subject of the
6  adjudication of cardiovascular clinical events,
7  correct?
8      A.    Correct.
9      Q.    Do you recall that the cardiovascular
10  standard operating procedure called upon the blinded
11  independent adjudicators to apply uniform criteria?
12      A.    I suppose it did.  I mean I don't have a
13  vivid memory of the language but, yeah, that sounds
14  about right.
15      Q.    Do you know what that means?
16      A.    What means?  Uniform criteria?
17      Q.    Yeah, the application of uniform criteria
18  for purposes of adjudicating reported events in the
19  context of a randomized controlled trial.
20      A.    Yeah, they were -- you know, they were
21  given -- I don't recall them sitting here this
22  minute, but they were given a set of instructions.
23      Q.    Do you understand what it means to apply
24  uniform criteria in the context of a standard
25  operating procedure for the adjudication of reported

Page 77

1  events in randomized controlled trials?
2      A.    I have some understanding but I'm --
3  I'm -- I want to stop short of sort of giving my
4  blessing to the way they did it.  I don't, you know,
5  have enough information to opine about that.
6      Q.    Well, you might be thinking two or three
7  questions ahead and I'm not even going there.
8      A.    Okay.
9      Q.    So just my question is, do you understand
10  what that concept means in the context of a standard
11  operating procedure for purposes of the adjudication
12  of reported events in the context of randomized
13  controlled trials?
14      A.    Yeah, I understand what the intent is.  I
15  mean I think there's a limit to the extent to which
16  this can be boiled down to an algorithm.  There's
17  some judgment involved.  But I understand the
18  concept.
19      Q.    And, again, you've never yourself served
20  as an adjudicator in a randomized controlled trial,
21  right?
22      A.    Correct.
23      Q.    Do you understand what the purpose of
24  having uniform criteria is in that context?
25      A.    The purpose -- I mean the hope would be

David Madigan, Ph.D.

Page 78

1    that you get higher quality data.  That would be the
2    hope.
3         Q.    We've talked about this concept of
4    blinded adjudication, correct?
5         A.    We have, yes.
6         Q.    What does that mean?
7         A.    So that means that the adjudicators, the
8    people looking at the medical records to try and
9    adjudicate whether an event -- a supposed event
10   occurred or not, should not know which treatment the
11   patient was on, which arm of a study they were in.
12        Q.    Do you agree that that is an important
13   feature of adjudication?
14        A.    Yes, in general, that you would expect
15   that -- yeah, in general that would be good
16   practice.
17        Q.    Can you imagine a context where you would
18   recommend -- I mean I know you've not been consulted
19   on this subject, but can you imagine a context where
20   you would recommend that the adjudication process of
21   cardiovascular events as reported in randomized
22   controlled trials not be blinded?
23        A.    No, I can't imagine such a situation.
24        Q.    What is the purpose of blinding
25   adjudicators, if you know?

Page 79

1         A.    The purpose.  I mean, so as to prevent
2    what we talked about a second ago, I mean it's to --
3    the concern would be that somehow if they knew which
4    arm of a study a patient was in it somehow might
5    influence what they're doing.
6         Q.    Do you agree that blinded adjudication of
7    investigated -- let me strike that and start over.
8              Do you agree that blinded adjudication of
9    investigator-reported events is an appropriate
10   methodology to follow when analyzing clinical data?
11        A.    So it all depends.  Depends on how the
12   adjudication is done.  It can be appropriate for
13   sure, but it all depends.
14        Q.    Well, all things being equal, do you
15   agree that blinded adjudication of
16   investigator-reported events is an appropriate
17   methodology to follow when analyzing clinical trial
18   data?
19        A.    I don't know how -- the "all things being
20   equal," I'm not entirely sure how to interpret it.
21   I mean certainly it can be appropriate, and it can
22   also be appropriate to analyze investigator-reported
23   events, and both are common.  And it also depends on
24   the specifics of how the adjudication is performed.
25   The actual specifics of the method that was followed

Page 80

1    matters, too.
2         Q.    Do you know if the individuals who were
3    assigned to adjudicate reported events pursuant to
4    Merck's cardiovascular standard operating procedure
5    were medical doctors?
6         A.    I don't know that for a fact.  I think
7    they were.
8         Q.    Is that relevant to you at all?
9         A.    Sure, I mean it's relevant to judging the
10   appropriateness -- I mean I have other concerns
11   about the adjudication process, but whether the
12   adjudicators have appropriate expertise certainly is
13   a consideration.
14        Q.    And what do you mean when you say
15   appropriate expertise?
16        A.    Well, the -- I don't -- I mean it would
17   depend on the particular situation, but the
18   appropriate medical backgrounds to be able to make
19   an informed judgment.
20        Q.    What do you mean by the appropriate
21   medical background?  Just for laypeople like us.
22        A.    I don't -- I don't know.  I mean I would
23   imagine it would need to be a medical doctor.  I
24   would imagine it would need to be a medical doctor
25   specializing in the appropriate area, but maybe

Page 81

1    there are other individuals who could do it.  I
2    don't know.
3         Q.    Are you expressing an opinion on the
4    question of the rate at which adjudicators pursuant
5    to Merck's CV SOP confirmed investigator-reported
6    events?
7         A.    Sorry.  I lost the thread.  Try again?
8         Q.    Yeah, sorry.  It's a little bit
9    complicated.  I'm trying to think of a simpler way
10   to put it.
11             Do you know the rate at which the blinded
12   adjudicators reviewing reported events of Vioxx
13   randomized clinical trial data confirmed the
14   reported events?
15        A.    I used to know.  I don't remember this
16   minute sitting here.  It's not something I've looked
17   at for several years.
18        Q.    Do you have any expertise or knowledge
19   about what the typical rate of confirmation is in
20   randomized controlled trials through the
21   adjudication process?
22        A.    I mean I have seen over the years many
23   such rates.  What's typical, I think it would depend
24   on the particular type of event that's being
25   adjudicated and so on, so I don't --

Page 82

1  Q.  What about in the context of reported
2  thrombotic events?
3  A.  I don't know.  I certainly haven't seen
4  enough of that particular kind to tell you what
5  would be an appropriate rate or not.  I mean there
6  were -- I do recall there were very strange trends
7  in the confirmation rate over time that I found sort
8  of inexplicable.
9  Q.  You found it inexplicable but, to be
10  fair, you don't have all the information, right?
11  You've not actually talked to the people who
12  adjudicated or done a deep dive as to the basis for
13  their adjudication decisions; isn't that fair?
14  A.  That's fair.  I didn't have enough
15  information.  I just raised it at some point.  It's
16  not in this report, but at some point some years ago
17  I just raised it as this is very strange, I don't
18  understand it.
19  Q.  In any event, sometimes the panel of
20  adjudicators would confirm an investigator-reported
21  event and sometimes they would reject an
22  investigator-reported event, correct?
23  A.  Sure.
24  Q.  And you mentioned earlier today that
25  events went to adjudication based on a relatively

Page 83

1  broad set of parameters.  Do you remember giving
2  testimony along those lines?
3  A.  Sure.
4  Q.  And do you know why that was the case?
5  A.  I presume the intention was not to miss
6  something.
7  Q.  Are you critical -- are you intending to
8  express opinions critical of Merck's general
9  approach to cast a wide net in terms of trying to
10  draw in reported events for purposes of
11  adjudication?
12  A.  No, not especially.  I mean it changed
13  over time which was a little disconcerting.
14  Q.  Well, to be fair, your list changed over
15  time, too, didn't it?
16  A.  Not to the same extent.  I mean there
17  were some very minor changes that mattered very
18  slightly to the analysis, whereas Merck, for
19  example, congestive heart failure used to -- early
20  on triggered adjudication and then they stopped
21  doing that so -- but to answer your question --
22  Q.  Are you -- just let me pause you there.
23  You're not an expert in congestive heart failure,
24  are you?
25  A.  I am not.

Page 84

1  Q.  Do you know if congestive heart failure
2  is technically a thrombotic event?
3  A.  I don't believe it is.
4  Q.  Sorry.  I didn't mean to cut you off.  I
5  just wanted to make sure we made that clear.  Was
6  there something more you wanted to add?
7  A.  No.  What I said was it was
8  disconcerting.  So, you know, presumably at the
9  outset somebody thought that this might pick up some
10  thrombotic events and, you know, it didn't.  Their
11  early experience was it didn't so they dropped it.
12  They didn't send those for adjudication anymore.
13  And I'm not -- I'm just saying that was an odd thing
14  to do, because the worry would be that they might
15  miss one later.
16  Q.  You're not an expert in that area, right?
17  A.  In what area?
18  Q.  In the relationship, if any, between
19  reports of congestive heart failure and confirmed
20  events of thrombosis.
21  A.  I'm not, but nor is it relevant to the
22  opinion I'm offering.  I'm just simply offering the
23  opinion that at some point they thought that they
24  should cast the net to include that, and then at
25  some other point they changed their mind and thought

Page 85

1  it shouldn't.
2  Q.  Well, to be fair, you're just recounting
3  your understanding of the fact; you're not offering
4  any expert opinion on that subject.
5  A.  Fair enough.  I'm saying -- well, I'm
6  offering -- okay.  It's not expert opinion, I
7  suppose.  I'm offering an opinion that it's
8  disconcerting.
9  Q.  It's disconcerting, it may be strange or
10  you don't understand the reasons, but you're not an
11  expert in that area.  That's my point.  Correct?
12  A.  Fair enough, yep.
13  Q.  Now, Merck had a broader set of terms
14  that would trigger adjudication, correct?
15  A.  Yes.
16  Q.  When we look at Appendix A to your report
17  on Page 79 --
18  A.  Right.
19  Q.  -- were these terms that would
20  adjudicate -- I'm sorry -- were these terms that
21  would trigger some further adjudication or analysis
22  of the reported events, or if a report matched one
23  of these terms, it automatically went to your
24  analysis?  Do you understand my question?
25  A.  I do.  Didn't I answer it already an hour

David Madigan, Ph.D.

Page 86

1  ago?
2       Q.    Maybe you did and if you did I apologize.
3       A.    So, no, when I conducted an analysis of a
4  clinical trial, I looked to see if certain events
5  occurred -- whether the events that occurred, let me
6  phrase it this way, whether the events that occurred
7  were on that list or not on that list, and if they
8  were, I counted them and, if not, I didn't count
9  them.
10      Q.    Without respect to any further analysis
11  of whether or not the reported event was actually
12  confirmed or whether the reported event was actually
13  thrombotic, correct?
14      A.    Well, it was thrombotic -- the
15  investigator reported it as thrombotic per that
16  list.
17      Q.    Well, we are already talked about the
18  fact that you don't know which events on this list
19  are in fact thrombotic.
20      A.    I'm relying on Drs. Krumholz and Kostis
21  who encoded Merck's list of cardiovascular
22  thrombotic categories.  So in that sense, they're
23  thrombotic.
24      Q.    Did Dr. Krumholz and Dr. Kostis tell you
25  specifically that all the events on Appendix A of

Page 87

1  your report are thrombotic events?
2       A.    They told me that these events, this list
3  of events, faithfully and accurately to the best of
4  their abilities encodes Merck's definition of a
5  cardiovascular thrombotic event.
6       Q.    That's not the question I asked you.  Did
7  Dr. Krumholz or Dr. Kostis ever tell you in a
8  conversation, in an e-mail, through any other
9  manner, that all of the terms listed on Exhibit A of
10  your report are in fact thrombotic events?  Not
11  about coding and definitions and I'm not asking you
12  about that.  Did they tell you that these terms were
13  thrombotic?
14      A.    Yes.  They told me these are the terms
15  that encode Merck's definition of a thrombotic
16  event.  That's it.
17      Q.    Well, you keep changing it, don't you?
18      A.    I changed nothing.  I've said the same
19  thing from first thing this morning until right now.
20  Merck has a definition, a set of 12 categories.  I
21  handed that to the two doctors.  I said, please tell
22  me the dictionary terms that correspond to those
23  categories.  Here they are, David.  I did my
24  analysis.
25      Q.    How did you come to work with those three

Page 88

1  doctors?  Did you identify them yourself and call
2  them up?
3       A.    I have no memory of how that happened.
4       Q.    Plaintiff's lawyers put you in touch,
5  right?
6       A.    I don't know.  Probably, yeah, probably.
7  I have no recollection of the initial contact.
8       Q.    Do you have a recollection of a specific
9  conversation with Dr. Kostis or Dr. Krumholz --
10      A.    Sure.  Sorry.
11      Q.    -- when they said to you, Dr. Madigan,
12  the events that we have encoded here and that we
13  believe correspond with the 12 events that are in
14  Paragraph --
15      A.    Eighteen.
16      Q.    -- 18 of your expert report are all
17  thrombotic?
18      A.    I don't recall them saying that
19  explicitly, but absolutely that was implicit.  That
20  was the intention.  Here's a definition of a
21  thrombotic event.  Here are the -- here they are.
22  They handed them to me, here are the terms that
23  encode that definition.
24      Q.    And you were relying upon that implicit
25  understanding when you conducted your analyses and

Page 89

1  when you reported your results and your opinions in
2  this report; is that correct?
3       A.    No.
4            MR. THOMAS:  Form.  Foundation.
5            THE WITNESS:  You're -- what I relied on
6  was it faithfully encoded Merck's definition.
7  That's all I care about.  That's all I care about.
8  You're going one step further.  You're asking me am
9  I certain that every one of those events is
10  thrombotic.  That's not the task at hand.  The task
11  was pick the dictionary terms that encode Merck's
12  categories.
13  BY MR. BOEHM:
14      Q.    You indicated just less than a minute ago
15  in your testimony that you had an implicit
16  understanding that the events on this list were
17  thrombotic events.
18      A.    Sure, because it's Merck's definition.
19  It's their definition of cardiovascular thrombotic
20  events.
21      Q.    Whatever your reason for having that
22  implicit basis, I'm asking you whether or not you
23  were relying on that implicit understanding for
24  purposes of interpreting the statistical analyses
25  that you performed.

23  (Pages 86 to 89)

David Madigan, Ph.D.

1    A.    No, I'm not.  I'm relying --
2        MR. THOMAS:  Asked and answered.
3        THE WITNESS:  I'm relying on the
4    faithfully encoded Merck's definition of a
5    cardiovascular thrombotic event.  That's what I'm
6    relying on.  I took Merck's definition.  I wanted to
7    use Merck's definition.  I asked these gentlemen to
8    give me the dictionary terms.  I used them.
9    BY MR. BOEHM:
10    Q.    Well, every time you do this I'm going to
11    have to make sure the record's clear.  Appendix A
12    was not generated by Merck, correct?
13    A.    That's correct.
14    Q.    It was generated by three plaintiff's
15    experts, correct?
16        MR. THOMAS:  Asked and answered.
17        THE WITNESS:  Correct.
18    BY MR. BOEHM:
19    Q.    Earlier in our deposition today, Dr.
20    Madigan, you directed me to Page 14, Tables 1 and 2
21    of your expert report.  Do you recall that?
22    A.    Yep.
23    Q.    Could you please identify for me the
24    other instances in which your analyses relied on the
25    terms listed in Appendix A of your report.

1    A.    Okay.  Figure 1, Page 15.  Do you want me
2    to -- do you want me to just identify where I do it
3    or do you want me to also identify where I don't?
4    Q.    Let's do both.  Yeah, that would be
5    great.  That would be helpful.  Thank you.
6    A.    So Figure 1, yes.  Table 3, no.  I just
7    do the tables and figures.  I may miss some things
8    by so doing but it would obviously take forever if I
9    tried to read the entire report.
10    Q.    Is it fair to say that the tables and
11    figures in your report roughly summarize your key
12    statistical analyses of the data?
13    A.    Roughly.  There are others buried in the
14    text in various places that may be quite important,
15    I'm not sure, but let's -- will I keep going -- just
16    go through the tables and figures at least to begin
17    with?  So Figure 2 actually represents the Merck
18    analysis but there that does not use Appendix A.
19    Q.    That's not your own analysis; that's
20    Merck's analysis, correct?
21    A.    Table 6.  Table 6 does not use
22    Appendix A.
23    Q.    Could you tell me what page you're
24    looking at?
25    A.    Table 6 on Page 41.  And then Figure 3 is

1    the corresponding figure, so it does not use
2    Appendix A.  I believe Table 8 -- Table 7 does not
3    use Table -- use Appendix A but Table 8 does.  Table
4    9 uses Appendix A, Page 45.
5    Q.    I'm sorry.  You said Table 9 does or does
6    not --
7    A.    Does.
8    Q.    -- rely on Appendix A?
9    A.    Does rely on Appendix A.  Table 11 on
10    Page 61 does not rely on Appendix A.  Table 12 on
11    Page 63, which it's spread over a few pages, Table
12    12 does not use Appendix A.  Figure 6 does not use
13    Appendix A.  That's on Page 68.  And then Tables 13,
14    14 and 15 use Appendix A.  And Figure 7.  And
15    Figure 8.  So Table 16 does not use Appendix A.  On
16    Page 75, Table 18 uses Appendix A and so does
17    Figure 9.  And Figure 10 does use Appendix A.
18    Q.    Generally speaking, how did you decide
19    when it was appropriate to use Appendix A and when
20    you didn't want to use Appendix A?  What was the
21    general thinking about that?
22    A.    Generally speaking, when I wanted to do
23    an ITT analysis, an intention-to-treat analysis, at
24    least in some situations I was forced to use -- I
25    had to use investigator-reported events, Appendix A,

1    because the only -- for events that occurred off
2    drug, only deaths were adjudicated.  So if I wanted
3    to do an ITT analysis, I couldn't use confirmed
4    events.
5    Q.    When you performed an ITT analysis and
6    you had adjudicated data for part of the study but
7    not for the off drug portion of the study, did you
8    use the adjudicated data available to you or did you
9    set that aside and use only the investigator-
10    reported data for the entirety of that study?
11    A.    So I did it both ways.  So I did it using
12    just investigator-reported and then I also did a
13    sensitivity analysis using confirmed events on drug
14    and investigator-reported events off drug.  The
15    issue there is you're kind of mixing apples and
16    oranges, so there's a downside to doing that, which
17    is you're now mixing two different kinds of events,
18    whereas if you just do purely investigator-reported,
19    then it's consistent throughout.
20    Q.    Is it your view, are you expressing an
21    opinion in this case, that it is more appropriate to
22    use investigator-reported data when you're doing an
23    ITT analysis even where you have adjudicated data
24    available at least to some extent?
25    A.    Yes, I think it's preferable to use --

David Madigan, Ph.D.

Page 94

1  uniformly use investigator-reported data.  It's
2  perfectly reasonable to look at the alternative as a
3  sensitivity analysis, but I -- my preference would
4  be to use a consistent endpoint definition.
5      Q.    Is that opinion that you're expressing
6  supported by medical literature, peer review, that
7  you can cite to us so that I know the basis for that
8  opinion?
9      A.    I have never seen anyone mix and match
10 confirmed events and investigator-reported events in
11 a single trial outside this context.  So I just have
12 never seen it.  There are lots of examples of people
13 using investigator-reported events; there are
14 examples of people using investigator-reported
15 events in context where there was adjudication; and
16 there are obviously examples where people use
17 confirmed events.  But I have never seen anyone mix
18 and match so I can't cite to a literature saying
19 don't do it but just I've never seen it.
20     Q.    Have you ever -- okay.  Whether you've
21 seen it or not, what I need to know is the basis for
22 your opinion that --
23     A.    The basis of my opinion is --
24     Q.    Hold on.  Hold on.  Let me just finish my
25 question.

Page 95

1      A.    Sorry.
2      Q.    What I need to know is whether or not you
3  can cite to any medical literature that's been peer
4  reviewed that suggests that it is methodologically
5  more appropriate to use investigator-reported data
6  even when adjudicated data is available.
7      A.    I have not, but you're asking me have I
8  seen literature that, you know, opines on something
9  that no one ever does and no, I have not.
10     Q.    Well, no.  I'm going to move to strike
11 the last part of the question, right, because I'm
12 personally aware of publications that do that and so
13 I would challenge you on that, but that's not the
14 point.
15     A.    Okay.
16     Q.    Okay?  I want to know, when you make an
17 opinion, when you make a statement like that,
18 whether or not you have support from the medical
19 literature on this topic.  So my question for you
20 is, can you -- are you aware of any medical
21 literature that's been peer reviewed or scientific
22 literature that's been peer reviewed that supports
23 your opinion that it is more appropriate to use
24 investigator-reported data even where adjudicated
25 data is available?

Page 96

1      A.    Like I said, I'm not aware of anyone
2  addressing that because I don't think it would
3  arise.  I will say that I have of course my own
4  peer-reviewed publications where I used
5  investigator-reported events and the reviewers knew
6  that there was adjudicated events available on drug.
7  So it passed peer review and my -- you know, what
8  I'm saying is my preferred approach did pass peer
9  review.
10     Q.    Some of your analyses in your report rely
11 on adjudicated data.  Some of your analyses set the
12 adjudicated data aside and rely instead on
13 investigator-reported data.  Is that fair?
14     A.    Yeah, but there are reasons why in each
15 case.
16     Q.    Understood.  I'm just asking you -- the
17 question is whether or not I fairly characterized
18 what your analyses do.
19     A.    Sure.  We just went through it, yeah.
20     Q.    In those instances where your analyses
21 rely on investigator-reported data even where
22 adjudicated data exists, is it fair to say that
23 you're exercising your judgment to set aside the
24 analysis performed by the blinded adjudicators who
25 reviewed the actual records of those individual

Page 97

1  cases?
2      A.    So I did it -- no.  I did it both ways.
3          MR. BOEHM:  You must not have heard my
4  question.  Madam Court Reporter, could you read it
5  back.
6          THE WITNESS:  That's fine.  I think I
7  know what you mean.  Sure, by definition, when I
8  conducted an investigator-reported analysis -- I
9  think I'm answering the question now -- when I
10 conducted an investigator-reported analysis, I did
11 not use the confirmed events.  I explained why just
12 a second ago.  I think I answered it this time,
13 right?
14 BY MR. BOEHM:
15     Q.    Have you reviewed the materials that the
16 blinded adjudicators, the medical doctors, reviewed
17 when they performed the adjudication process?
18     A.    No.
19     Q.    You're not expressing any opinions where
20 you are disagreeing with any particular judgment
21 rendered by the blinded independent adjudicators
22 with respect to any particular reported event; is
23 that fair?
24     A.    That's fair.  Not with any particular
25 one.  I do have concerns about the process.

25 (Pages 94 to 97)

David Madigan, Ph.D.

Page 98

1    Q.    Do you agree that it would be outside of
2   your expertise, given that you're not a
3   cardiologist, not a medical doctor, to come in
4   behind blinded adjudicators who have that expertise
5   and say they got it right or wrong in terms of the
6   exercise of their medical judgment?
7    A.    No, but I do believe I have the expertise
8   to offer informed opinions about the process.
9    Q.    So I'm sorry.  When you said "no" and
10   then "but," it didn't quite correspond with the way
11   I asked the question.
12    A.    I thought the "no" answered the question
13   and then I was clarifying or elaborating.
14         MR. BOEHM:  Let me just have it read
15   back to make sure we're understanding each other.
16         (The court reporter read back the
17   question as follows:  "Do you agree that it would be
18   outside of your expertise, given that you're not a
19   cardiologist, not a medical doctor, to come in
20   behind blinded adjudicators who have that expertise
21   and say they got it right or wrong in terms of the
22   exercise of their medical judgment?")
23         THE WITNESS:  Got it.  So, no, I do not
24   have the expertise to second-guess what a
25   reviewer -- what judgment they came to.

Page 99

1   BY MR. BOEHM:
2    Q.    For some of your analyses you included
3   events that never were adjudicated, correct?
4    A.    It's possible.  I don't know that.
5    Q.    Well, I thought I understood you to be
6   saying that some of your analyses drawed upon
7   non-adjudicated data.  Did I misunderstand you?
8    A.    I mean I used -- in some of my analyses I
9   used investigator-reported events as reported by the
10   investigators in the studies.  What I understand you
11   to ask just now is, you know, were there some of
12   those that ended up being counted per my
13   Appendix A -- okay.  Sorry.  Try again.  Try again.
14    Q.    Yeah, let me try it again.  For some of
15   your analyses you did include reported events that
16   never went through the adjudication process,
17   correct?
18    A.    Yeah, and I think I am answering your
19   question.  I don't know.  You know, many of them
20   probably did go through the adjudication process.
21   It wouldn't have been reflected in my analysis if
22   that's what you mean.
23    Q.    Some of your analyses pulled in data --
24   let me strike that and start over.  I didn't think
25   you were going to like the "pulled in" part.

Page 100

1         Some of your analyses included events
2   reported well after a particular patient was using
3   Vioxx, correct?
4    A.    Sure.  In some of my analyses, being
5   particularly the intention-to-treat analyses, the
6   events can and did occur after a patient stopped
7   taking the active medication.  Actually not the
8   active medication.  Taking whatever medication they
9   were assigned to.
10    Q.    Do you know the longest period of time
11   between a patient's use of Vioxx and an event that
12   you counted for purposes of your analyses?
13    A.    No.  I used to know.  I don't know
14   anymore.
15    Q.    Would it surprise you if there were
16   events that you've counted in your analysis that
17   occurred more than three years after a patient was
18   using Vioxx?
19    A.    Sure, could be.
20    Q.    So it wouldn't surprise you.
21    A.    No.
22    Q.    Would that be meaningful to you?
23    A.    Absolutely.  You know, you live or die by
24   randomization.  You know, it's analyzing the data as
25   randomized.  So I don't know if for any specific

Page 101

1   event whether it was caused by Vioxx or naproxen or
2   whatever.  That's not the nature of the analysis.
3   The nature of the analysis is, in the aggregate,
4   following randomization, is there an imbalance in
5   the events on both arms.  That's -- you know, that's
6   how this analysis works.  That's how we arrive at
7   causal conclusions, you know, and that's why we did
8   randomized trials and why intention-to-treat is the
9   dominant paradigm for analyzing clinical trials.
10    Q.    Would you agree that it is likely, if not
11   certain, that some of the investigator-reported
12   events that you include in your various analyses
13   were not actually events?
14    A.    They were events.
15         MR. THOMAS:  Form.  Foundation.
16         THE WITNESS:  They were events.  You
17   mean -- I shouldn't put words in your mouth.
18   BY MR. BOEHM:
19    Q.    Let me ask it in a slightly hopefully
20   better way.  Do you agree that it is likely, if not
21   certain, that some of the investigator-reported
22   events were not actually the events that had been
23   reported?
24         MR. THOMAS:  Foundation.
25         THE WITNESS:  I have no idea.  I have no

26  (Pages 98 to 101)

David Madigan, Ph.D.

Page 102

1  basis on which to offer an opinion about that.
2  BY MR. BOEHM:
3      Q.   You're not an expert in the adjudication
4  process so you can't really tell us an opinion about
5  the likelihood of investigator-reported events not
6  actually being the event that was reported, correct?
7      A.   Yeah, they're investigator reported by
8  definition.  So they are what the investigator in
9  the trial said happened and, beyond that, I don't
10  know.  I have no basis on which to evaluate -- to
11  answer your question.
12      Q.   They may actually be the event that the
13  investigator reported, or it's also possible that
14  those reported events were not the event that the
15  investigator-reported, correct?
16      A.   Could be.  I don't know.  The
17  investigator thought such-and-such an event
18  happened.  That's what went into the data file.
19  That's what I analyzed.  You know, it is what it is.
20      Q.   And that's why we have the adjudication
21  process is so that independent medical doctors who
22  are blinded can look at the information and render
23  an expert judgment about whether the event actually
24  occurred as reported, whether it was some different
25  event or otherwise, correct?

Page 103

1      A.   Sure.  That's the motivation behind
2  having adjudication.  I said I have reservations
3  about how it was implemented in this particular
4  case.  That's the motivation.  But I have
5  reservations, like they didn't adjudicate off drug
6  events, for example, except for deaths.
7      Q.   Okay.  And we've talked about your -- the
8  level of expertise or lack thereof that you bring to
9  the question of a standard operating procedure for
10  the adjudication of data of randomized clinical
11  trial reports, correct?  We've covered that?
12      A.   I have reservations that I think I have
13  the expertise to have opinions about, to have
14  informed opinions about.
15      Q.   You've never yourself designed -- just to
16  do this again -- let me make sure the record is
17  crystal clear.  You yourself have never been
18  responsible for designing a standard operating
19  procedure for purposes of adjudicating data as
20  reported in a randomized controlled trial, correct?
21      MR. THOMAS:  Asked and answered.
22      THE WITNESS:  Not for cardiovascular
23  events.  I've some experience in a consulting
24  context in other areas but not in a cardiovascular
25  context.

Page 104

1  BY MR. BOEHM:
2      Q.   In any context, has somebody come to you
3  and said, Dr. Madigan, we need you to design a
4  standard operating procedure for purposes of
5  adjudicating clinical medical events that are
6  reported in a randomized controlled trial?
7      A.   No, no one has ever asked me to do that
8  but --
9      Q.   And you've never been an adjudicator.
10      A.   I have never been an adjudicator.
11      Q.   And you're not a medical doctor.
12      A.   And I am not a medical doctor.
13      Q.   And, specifically, you're not a
14  cardiologist.
15      A.   I'm not a cardiologist.  But I can see
16  with my own two eyes they did not adjudicate events
17  off drug.  That's a problem.  That's got nothing to
18  do with whether I was ever an adjudicator or whether
19  I'm a cardiologist or not.
20      Q.   That's just something you're noticing as
21  a person with two eyes.
22      A.   Pretty much, yeah, combined with expert
23  statements that the risk that we now know, that it
24  does persist, and statements that this could
25  persist.

Page 105

1      Q.   Have you done your own analysis of data
2  to suggest the duration of which you think any
3  increased thrombotic risk persists after the
4  cessation of Vioxx use?
5      A.   Yes, I have.
6      Q.   And where can I find that in your report?
7      A.   It's not in my report.  It's a paper I've
8  published.  Could I point you at it?
9      Q.   Well, why don't you first tell me where
10  in your expert report in this case you've identified
11  that opinion.
12      A.   It might or might not be in here.  I'm
13  not sure.
14      Q.   I'll give you a minute to look.
15      A.   All right.  Paragraph 156.  So there's a
16  statement -- there isn't a huge amount here but
17  there's a statement bottom of Page 44 and beginning
18  of the next page.  "In short, the risk persisted
19  after Vioxx discontinuation."  Are you with me?
20  It's the bottom of Page 44 and then --
21      Q.   Forty-four?  I thought you said Paragraph
22  156.
23      A.   I'm sorry.  Hang on.  Never mind.  I'm
24  sorry.  Bottom of Page 51.  "Moreover" -- are you
25  with me -- "this concern is amplified by my previous

27 (Pages 102 to 105)

David Madigan, Ph.D.

Page 106

1    peer-reviewed finding (published with colleagues in
2    the Archives of Internal Medicine) that in Study
3    078, the cardiovascular risk persisted after Vioxx
4    discontinuation."  And there's a reference to the
5    paper, a citation to the paper.
6        Q.    Were you one of the authors of that
7    publication?
8        A.    Yes.
9        Q.    We'll turn back to this a little bit
10   later today, but just to be clear, this refers to
11   data specifically from Study 078, correct?
12       A.    Yes, that appears to be the case, yes.
13       Q.    And the language you use in this sentence
14   is "the cardiovascular risk."  Do you see that?
15       A.    I do.
16       Q.    Well, what are you talking about there?
17       A.    I'm talking about Appendix A.  If that's
18   what you mean.  That's an answer to your question,
19   right?  You know what I mean when I say that.
20       Q.    Any event that occurred and was coded
21   pursuant to the terms on Appendix A --
22       A.    Yes.
23       Q.    -- to your expert report would be
24   included in your analysis of this study as published
25   in 2010 by Ross, et al., correct?

Page 107

1        A.    I believe so, but actually I would like
2    to have it.  If we can get it, I'd like to have it
3    in front of me.  It's been a while since I've looked
4    at the thing.
5        Q.    Do you recall if you or any of the other
6    authors did any further analysis of the reported
7    events to determine whether in fact they were
8    thrombotic events or not?
9        A.    I have no idea what you have in mind.  I
10   mean I told you what we did.
11       Q.    Well, let's say for example you had a
12   report from this Study 078 -- and I'm just picking
13   one off the list -- of electromechanical
14   dissociation.
15       A.    Okay.
16       Q.    Would that reported event have been
17   included in your analysis --
18       A.    Absolutely.
19       Q.    -- for purposes of this publication?
20       A.    Yes.
21       Q.    So, in other words, you didn't -- neither
22   you nor any of the other authors of this publication
23   did any additional analysis of the specific reported
24   events to determine whether or not they actually
25   represented a thrombotic event.  You just took what

Page 108

1    the investigator report was and matched it up with
2    Appendix A; is that correct?
3        A.    That is correct, yeah.  I relied on the
4    list in Appendix A and I relied on the three
5    cardiologists to do that correctly.
6        Q.    Do you yourself -- let me strike that.
7              Do you consider yourself to be qualified
8    to render judgment about whether some
9    cardiovascular-related event is or is not a
10   thrombotic event?
11       A.    No, I don't have that expertise in
12   general.
13             MR. BOEHM:  Let's go off the record.
14             THE VIDEOGRAPHER:  The time is 12:55
15   p.m.  We are going off the record.
16             (Luncheon recess.)
17             (Exhibit 6 marked for identification.)
18             THE VIDEOGRAPHER:  The time is 1:49 p.m.
19   We are back on the record.
20   BY MR. BOEHM:
21       Q.    Dr. Madigan, earlier today you identified
22   for me those analyses in your report where you were
23   relying on Appendix A to your report.  Do you
24   remember going through the figures and tables to
25   identify those?

Page 109

1        A.    Yes.
2        Q.    If you can, what I'd like you to do now
3    is we'll go through that one more time --
4        A.    Okay.
5        Q.    -- and I'd like you to identify for me
6    which of those analyses where you relied upon
7    Appendix A where you used adjudicated data or where
8    you set the adjudicated data aside in favor of the
9    investigator-reported data.
10       A.    Okay.
11       Q.    So you tell me if I'm missing one, but
12   the first table where you are relying on Appendix A
13   is Table 1, correct?  And that's on Page 14.
14       A.    So Table 1 relies on the terms in
15   Appendix A.
16       Q.    For purposes of the analysis you
17   conducted as represented by Table 1, do you use
18   adjudicated data or only investigator-reported data?
19       A.    So in Table 1 it's purely
20   investigator-reported data.
21       Q.    If you turn the page to Page 15 of your
22   report, you'll find Figure 1.
23       A.    Okay.
24       Q.    You indicated that Figure 1 also relies
25   upon Appendix A.  Do you use adjudicated data for

David Madigan, Ph.D.

Page 110

1    purposes of your analysis as represented by
2    Figure 1?
3        A.    No.  This represents an analysis using
4    investigator-reported data only.  Did you want to go
5    through all of them or are you --
6        Q.    Well, my understanding is that for
7    Table 2, for example, on Page 14 you did not rely
8    upon Appendix A.
9        A.    Right.  So for Table 2 it only uses
10   adjudicated events.
11       Q.    Right.  But in that case you're not using
12   Appendix A, right?
13       A.    Correct.
14       Q.    Likewise, on Page 16 in Table 3 you're
15   not relying on Appendix A, correct?
16       A.    Correct.
17       Q.    And are you looking only at
18   investigator-reported data or are you using
19   adjudicated data for what's represented in Table 3?
20       A.    Just investigator-reported.
21       Q.    Did you have adjudicated data available
22   for these studies and chose not to use it for this
23   analysis, or were there no adjudicated data
24   available to you for purposes of the analysis in
25   Table 3?

Page 111

1        A.    So Table 3 shows an analysis of
2    myocardial infarction, hypertension and edema.
3    These were not -- the adjudication was, was it
4    cardiovascular thrombotic or not.  So these three
5    terms do not correspond to that adjudication
6    process.
7        Q.    With all due respect, that's not
8    adjudication, right?  When you say -- all you're
9    doing here in Table 3 is you're looking to see if an
10   investigator reported the event.  You're not looking
11   at the confirmed or adjudicated data for those
12   studies, correct?
13       A.    Right.  I'm agreeing with you.  I'm just
14   making the point that, you know, one couldn't.
15   There's no such thing as confirmed hypertension or
16   adjudicated hypertension, that's all.  That's all
17   I'm adding.
18       Q.    What about with respect to myocardial
19   infarction?
20       A.    So there's adjudicated confirmed --
21   events are adjudicated as being either cardiovasc --
22   CVT or not.  This is a specific sub -- you know, so
23   that -- the output of adjudication does not enable
24   you to do an analysis of myocardial infarction on
25   its own.

Page 112

1        Q.    When you're tallying up the numbers of
2    MIs as reported in Table 3, are you using the
3    adjudicated numbers or the investigator-reported
4    numbers?
5        A.    Investigator-reported.
6        Q.    But you had adjudicated numbers available
7    to you, but for this analysis you're using only the
8    investigator-reported numbers, correct?
9        A.    That's what my point is.  I don't have
10   adjudicated numbers available to me because an event
11   is either adjudicated as cardiovascular thrombotic
12   or not.  It's not adjudicated as an MI or not.
13       Q.    Pursuant to the cardiovascular standard
14   operating procedure?
15       A.    I mean the output of adjudication is it's
16   a thrombotic event or it's not a thrombotic event.
17       Q.    So is it your understanding that pursuant
18   to Merck's cardiovascular operating procedure, the
19   blinded adjudicators did not actually assign a
20   specific classification for the reported event but
21   rather just said thrombotic or not?
22       A.    I'm with you.  I'm sorry.  I didn't --
23   you're right.  Yeah, I've never looked at that.
24   I've never -- you're right.  They tick boxes in
25   terms of which cardiovascular thrombotic components

Page 113

1    are causing it to be confirmed as a thrombotic
2    event.  I've never looked at those.
3        Q.    So just to hopefully close the circle
4    here, for purposes of Table 3, and specifically the
5    myocardial infarction row, you would have had
6    adjudicated data available to you for MI, but for
7    this analysis you were looking only at the
8    investigator-reported numbers, not at the
9    adjudicated numbers, correct?
10       A.    The one hesitation I have is I'm not
11   actually sure what the subcategories are.  I just
12   don't remember.
13       Q.    You don't know if MI was one of the
14   categories that the adjudicators were looking for?
15       A.    It probably was but I can't be certain.
16   I'm not sure.
17       Q.    You didn't look into that one way or
18   another.
19       A.    No.
20       Q.    Is that true with respect to each of the
21   thrombotic events that were identified for purposes
22   of the CV SOP?
23       A.    Yes.  I only -- the only analysis that I
24   ever did of adjudicated events was simply at the
25   level of was it confirmed as a thrombotic event, yes

29 (Pages 110 to 113)

David Madigan, Ph.D.

Page 114

1    or no.
2        Q.    You never broke it down by what type of
3    thrombotic event.
4        A.    I never did.
5        Q.    Do you agree that even if one were to
6    come to the conclusion the data suggested Vioxx is
7    associated with an increased incidence of myocardial
8    infarction, for example, that doesn't mean that
9    Vioxx is associated with any other particular
10   cardiovascular event, correct?
11       A.    You mean like in isolation.  If I tell
12   you it's associated with an increased risk of MI and
13   tell you nothing else, sure, then I cannot -- I
14   don't know if it causes increases in other events.
15   I wouldn't know.
16       Q.    You understand that different
17   cardiovascular events have different mechanisms,
18   correct?
19       A.    I'm not entirely sure what you mean by
20   "different."  I mean they're different.  An MI is
21   not the same as a stroke.
22       Q.    And they occur by different mechanisms.
23       A.    I don't know.
24       Q.    You don't know.
25       A.    I don't know what that means,

Page 115

1    "mechanism."
2        Q.    Do you know that they have different risk
3    factors?
4        A.    Sure.
5        Q.    And there can be different causes.
6        A.    Sure.
7        Q.    And that's true with respect to any
8    particular thrombotic event, correct?
9        A.    I guess.  You're outside my expertise
10   here.  I don't know one -- I don't know for sure one
11   way or another if they have different causes.
12       Q.    Okay.  You have not performed an analysis
13   of the data on the question of whether Vioxx is
14   causally associated with unstable angina, correct?
15       A.    That's correct.  In isolation.
16       Q.    The same is true with respect to acute
17   coronary syndrome, correct?
18       A.    Sure.  I have not looked at that.
19       Q.    The same is true with respect to
20   atherosclerosis, correct?
21       A.    I have not looked at that, that's true.
22       Q.    The same is true with respect to
23   atherogenesis, correct?
24       A.    True, I've not looked at that.
25       Q.    The same is true with respect to the

Page 116

1    incidence of restenosis, correct?
2        A.    Yes, I've not looked at that.
3        Q.    Are you aware of or can point us to any
4    studies that do show a statistically significant
5    relationship between the use of Vioxx and the
6    incidence of unstable angina?
7        A.    Not that I can recall.
8        Q.    What about acute coronary syndrome?
9        A.    Same answer.  I mean I just -- not that I
10   can recall.
11       Q.    Are you aware of any studies that do show
12   a statistically significant relationship between the
13   use of Vioxx and the incidence of atherosclerosis or
14   atherogenesis?
15       A.    I'm not aware of -- I can't recall any
16   such study that ...
17       Q.    Are you aware of any study that does in
18   fact show a statistically significant relationship
19   between the use of Vioxx and the incidence of
20   restenosis?
21       A.    I am not aware of any such study.
22       Q.    Let's turn back to your report and
23   continue, if we could, to go through the tables and
24   figures.  I believe the next relevant table is
25   Table 6 on Page 41, but please correct me if I've

Page 117

1    missed one.
2        A.    Right.  We're skipping over analyses that
3    are not, quote, my analyses, right?
4        Q.    Right.
5        A.    Okay.  Yes, you're right.  The next one
6    is Table 6.
7        Q.    You indicated that you did not rely on
8    Appendix A for purposes of your analysis as shown in
9    Table 6, correct?
10       A.    That's correct.
11       Q.    Are you using investigator-reported data
12   or adjudicated data for purposes of the analysis as
13   shown in Table 6?
14       A.    So it's a combination.  So these are --
15   these are the events that Merck identified.  So in
16   the earlier studies there was no adjudication, and
17   in the later studies about half of them are
18   adjudicated and half of them are not.
19       Q.    So for purposes of the analysis described
20   in Table 6, you're using adjudicated data where that
21   data exists and investigator-reported data where
22   there are no adjudicated data; is that correct?
23       A.    Yes, yes.  They're just -- they're the
24   exact same events that Merck counted in the table
25   that was reproduced on the previous page.

David Madigan, Ph.D.

Page 118

1    Q.    But did I correctly describe that?
2    A.    I used -- I think you did.  I used
3  investigator-reported events from studies where
4  there was no adjudication, and in studies where
5  there was adjudication I used confirmed events in
6  this particular analysis.
7    Q.    And what is the relationship between
8  Table 6 and Figure 3 which is on the next page, Page
9  42?
10    A.    So Figure 3 corresponds to the last row
11  of Table 6.
12    Q.    Let's turn to Page 43 where you have
13  Tables 7 and 8.
14    A.    Yes.
15    Q.    You testified that Table 7 does not rely
16  on Appendix A, correct?
17    A.    I did.  Let me just double check that
18  I've got it right.  Yes, that's correct.
19    Q.    Are you looking at investigated -- let me
20  start over.
21        Are you looking at investigator-reported
22  events, adjudicated events, or some combination for
23  purposes of the analysis described in Table 7?
24    A.    So it's a combination.  So in those
25  studies where there is adjudication, I'm using it.

Page 119

1  In those studies where there is not, I'm using
2  investigator-reported.
3    Q.    With respect to your analysis in Table 8,
4  are you using investigator-reported data,
5  adjudicated data, or some combination?
6    A.    So it's a combination.
7    Q.    Are you again using adjudicated data
8  where you have those data and investigator-reported
9  data where adjudicated data are not available?
10    A.    Yes.
11    Q.    For the analysis depicted in Table 9 on
12  Page 45 of your report, you testified that you are
13  relying on Appendix A; is that correct?
14    A.    That's correct.
15    Q.    The title of Table 9 is "Investigator-
16  reported CVT events in NSAID-controlled arthritis
17  trials using all available data."  Do you see that?
18    A.    I see that.
19    Q.    Are you using only investigator-reported
20  events for purposes of the analysis depicted in
21  Table 9?
22    A.    Yes.
23    Q.    So you're setting aside adjudicated data
24  for purposes of this analysis, correct?
25    A.    For this particular analysis it is.  It

Page 120

1  just uses investigator-reported events.  Actually, I
2  confess, I don't know if the studies included here
3  were pre-adjudication or post-adjudication.  Just
4  sitting here this minute I can't remember.  So
5  actually that's probably maybe an important point.
6  So I don't know if I am -- if there were any
7  adjudicated data available for this analysis.  I
8  just don't know sitting here this minute.
9    Q.    Where can I go to see what studies you're
10  including in your analysis depicted in Table 9?
11    A.    I believe it's Table 16 in the 2003
12  Safety Update Report.
13    Q.    I'm sorry.  Would you say that to me one
14  more time?
15    A.    It's Table 16 from the 2003
16  Cardiovascular Safety Update Report that Merck
17  submitted to the FDA.
18    Q.    And you don't know sitting here today
19  whether or not there were adjudicated data available
20  for those studies; did I understand you correctly?
21    A.    That's right.  I'm just not certain.  I
22  just don't -- I might -- just to give a complete
23  answer to your earlier question, I'm not totally
24  certain whether there were -- there probably were,
25  but I'm not sure whether there were adjudicated

Page 121

1  studies in there.
2    Q.    In any event, in this case you've only
3  used investigator-reported data.
4    A.    For sure.  Keep going?
5    Q.    On Page 68 we find Figure 6 and you
6  indicated that --
7    A.    Do you want me to just check that study
8  is the next one just --
9    Q.    Yes.  Would you, please?  Thank you.
10    A.    Sixty-eight.
11    Q.    Oh, I did in fact miss one.  If you go to
12  Page 61?
13    A.    Yep, I'm there.
14    Q.    Thank you.  This is an analysis of the
15  Alzheimer's all-cause mortality studies, correct?
16    A.    Yes.
17    Q.    Are you using adjudicated data for
18  purposes of this analysis or investigator-reported
19  events?
20    A.    So this is death.  So there are no
21  adjudicated deaths so this uses investigator-
22  reported data but it's ...
23    Q.    The endpoint of death doesn't require
24  adjudication, fair?
25    A.    Not so much.

31 (Pages 118 to 121)

David Madigan, Ph.D.

Page 122

1    Q.    With respect to all-cause mortality, is
2  it fair to say that you are capturing any death for
3  any reason for purposes of this analysis?
4    A.    Yes.
5    Q.    So this could be a car accident or some
6  other cause of death totally unrelated to Vioxx; is
7  that fair?
8    A.    Well, no.  So it's "totally unrelated"
9  that is a little tricky.  So one of the things that
10  my analysis showed is that there was a statistically
11  significant increased conversion rate to Alzheimer's
12  on Vioxx as compared to placebo contrary to
13  expectation.  So there's evidence that Vioxx causes
14  Alzheimer's.  I don't know whether it does or it
15  doesn't but there's evidence from that study that it
16  does.
17    Q.    You're not expressing an opinion here
18  today as an expert that to a reasonable degree of
19  scientific certainty you've determined that Vioxx is
20  causally associated with the onset of Alzheimer's
21  disease, are you?
22    A.    I can opine about this.  We have a double
23  blind randomized --
24    Q.    Why don't you just answer my question and
25  then you can say whatever else you want.

Page 123

1         MR. THOMAS:  Objection.  You interrupted
2  him.
3         MR. BOEHM:  Would you go ahead and read
4  back my question.
5         (The court reporter read back the
6  question as follows:  "You're not expressing an
7  opinion here today as an expert that to a reasonable
8  degree of scientific certainty you've determined
9  that Vioxx is causally associated with the onset of
10  Alzheimer's disease, are you?")
11         THE WITNESS:  No.  Now do I go back to
12  the previous question?
13  BY MR. BOEHM:
14    Q.    Sure.  Go ahead and add whatever else
15  you'd like to.
16    A.    So there is evidence that Vioxx causes
17  Alzheimer's disease in my opinion, and that's
18  different than what you asked me a second ago,
19  right?  So I do believe there is evidence.  So, as
20  such, who knows whether people falling off ladders
21  or having car accidents was caused by Vioxx.  I
22  don't know.
23    Q.    You would have included any events of
24  mortality regardless of whether or not it was --
25  could be determined to have been caused by Vioxx or

Page 124

1  not, correct?
2    A.    Yes.
3    Q.    The next table I see is Table 12, Dr.
4  Madigan, on Page 63 of your report?
5    A.    Yes.
6    Q.    Is that the next one you see as well?
7    A.    Yes.
8    Q.    You testified that you are not relying on
9  Appendix A for this analysis, correct?
10    A.    That's correct.
11    Q.    Are you using investigator-reported
12  numbers, adjudicated numbers, or some combination
13  for purposes of the analyses depicted in Table 12?
14    A.    This is purely adjudicated.
15    Q.    Did you conduct a similar analysis that
16  looked purely at investigator-reported numbers using
17  these same studies?
18    A.    I don't believe so.  It's possible
19  sometime I did.  I don't believe I did.  But here
20  the -- because it's cardiovascular death,
21  cardiovascular thrombotic death and, you know, there
22  is full adjudication available because they
23  adjudicated all events on drug and off -- all deaths
24  on drug and off drug.
25    Q.    Okay.  So in this case, because you had

Page 125

1  all adjudicated data, you determined that it was
2  more reliable to use the adjudicated data than to
3  use investigator-reported data given the fact that
4  adjudication had taken place; is that fair?
5         MR. THOMAS:  Form.
6         THE WITNESS:  Yes.  So I could do an
7  analysis, an ITT analysis here, using purely
8  confirmed events and I chose to do so, as I could
9  have done and I may have done somewhere.  That's
10  what I'm not entirely sure of.  One could also do an
11  investigator-reported CVT death -- CVT mortality
12  analysis.  Here I chose to do -- to look at the
13  adjudicated deaths.
14  BY MR. BOEHM:
15    Q.    Why did you choose to look at the
16  adjudicated deaths for purposes of this analysis
17  instead of the investigator-reported numbers?
18    A.    Because I think it's what Merck would
19  have done, primarily.
20    Q.    Is there any other reason?
21    A.    No.  I mean it's -- I'm not opposed to
22  adjudication.  I have some concerns about the
23  adjudication process that Merck applied in this case
24  but, you know, I've done analyses here.  Depending
25  on the particular analysis, sometimes I'm using

32 (Pages 122 to 125)

David Madigan, Ph.D.

Page 126

1   adjudicated events, sometimes using
2   investigator-reported events.  Sometimes I'm forced
3   to use investigator-reported events.  This is a case
4   where one confirms the adjudicated events are
5   available for all deaths.
6       Q.   And because they're available, is it fair
7   to say that you did an analysis using the
8   adjudicated data because you considered that to be
9   the more reliable set of data?
10      A.   I don't -- I don't want to say that in as
11  black-and-white a fashion because I have real
12  concerns about the adjudication process that was
13  applied.
14      Q.   You've made that clear.  Now my question
15  is simply we're looking at a specific analysis, you
16  had adjudicated data available to you, and you have
17  reported your analysis based on the adjudicated
18  data, not based on the investigator-reported
19  numbers.  And if you did an investigator-reported
20  analysis, it's not something that you've referenced
21  in your report.  So I'm trying to understand why it
22  is that you've chosen to do it in that way.
23      A.   So I gave you an answer, which is one
24  reason for doing it this way is because this is what
25  Merck would have done had they chosen to do such an

Page 127

1   analysis, and I think they should.  That's certainly
2   one reason for doing it.  But, you know, I'm not
3   opposed either to doing an investigator-reported
4   analysis.
5       Q.   But I'm not asking whether you're
6   opposed.  My question to you is this.  Do you agree
7   that when you have adjudicated data available, as
8   you do for purposes of this analysis, it is more
9   reliable to use those data than it would be to use
10  only the investigator-reported data?
11      A.   No, not necessarily.  It would be if the
12  adjudication process were more -- were improved; but
13  given the concerns I have of the adjudication
14  process, then it's -- you know, I get it.  There are
15  advantages to using adjudicated data, but there's
16  something weighing against it, which is problems
17  with the adjudication process so --
18      Q.   We've been over that.  We've been over
19  that.  You didn't -- the bottom line here is, Dr.
20  Madigan, you didn't do an analysis of this data, at
21  least not one that you've shared with anybody, using
22  the investigator-reported data for these studies,
23  correct?
24      A.   I don't know if I've done an analysis of
25  investigator-reported cardiovascular mortality.  I'm

Page 128

1   just not sure.
2       Q.   Well, I'm going to give you as much time
3   as you need to look through your report, and if
4   there is such an analysis, identify for me where it
5   is.
6       A.   Oh, it's not in this report.  It's not in
7   this report, but I've written a half dozen reports
8   over ten years so I just don't know.  I've
9   certainly --
10      Q.   Why didn't you include in your report a
11  similar analysis of these studies but using the
12  investigator-reported numbers?
13      A.   Like I said, I mean I want to show --
14  part of the motivation here of using Merck's
15  definition, for example, is to do analyses that are
16  close to what Merck would have done.  That's
17  certainly a reason for showing this.
18      Q.   Is that true with respect to all your
19  analyses?  You crafted your analyses in a way that
20  you thought would best match what Merck did or --
21      A.   Yeah.
22      Q.   -- would have done?
23      A.   Yeah.  I mean that's why I used that --
24  you know, I used Merck's definition, and we've been
25  arguing about the implementation of that definition,

Page 129

1   if you will, but the intent was to use Merck's
2   definition and to do the analysis that Merck could
3   have done, should have done, I would argue, at
4   various points in time.
5       Q.   What I'm trying to understand, Dr.
6   Madigan, is why in some cases have you set aside
7   available adjudicated data and done analyses using
8   only investigator-reported numbers --
9       A.   Because I had no choice.
10      Q.   -- I'm sorry -- and in other cases you
11  have chosen to use adjudicated data and not use the
12  investigator-reported numbers.  Help me understand
13  that.
14      A.   Because in -- to conduct ITT analyses,
15  particularly the Alzheimer's studies -- it's more or
16  less a moot point for the arthritis studies because
17  there is very little off drug follow-up.  But for
18  the Alzheimer's studies, it's a significant issue
19  whether you do on drug analysis or ITT analysis.  So
20  to conduct ITT analyses, I did not have adjudicated
21  events off drug.  And as I've said before, I --
22  there's a trade-off.  You could use adjudicated on
23  drug and investigator-reported off drug, which is
24  mixing and matching apples and oranges.  I -- one
25  can do that.  Or you can just use

33 (Pages 126 to 129)

David Madigan, Ph.D.

Page 130

```
 1   investigator-reported, just what I did.
 2       Q.    You've done that in some cases, haven't
 3   you, used a combination of adjudicated data where
 4   you have it available and investigator-reported data
 5   where adjudicated data are not available?
 6       A.    So I did --
 7       Q.    In fact, we've identified several
 8   analyses in your report where you've done just that,
 9   correct?
10       A.    So for -- yes.  So in the case of OA and
11   R -- the OA and RA analysis we were looking at, I'm
12   using Merck's events.  Again, I'm trying to get as
13   close as possible to what Merck would have done.
14   This is what Merck did.  They used a combination of
15   investigator-reported and confirmed.
16            In the context of Alzheimer's, it's
17   trickier because one cannot do an ITT analysis using
18   Merck's confirmed events.  So either you mix and
19   match, which I did as a sensitivity analysis, or you
20   use pure investigator-reported events, and that's
21   what I chose to do in that context.  Here there are
22   confirmed events available.  There is a legitimate
23   choice here.  There are no trade-offs of the kind
24   of -- there's no concerns about mixing and matching
25   here.  You could do an IR cardiovascular
```

Page 131

```
 1   mortality -- investigator-reported cardiovascular
 2   mortality analysis, or you could do a confirmed
 3   analysis.  Here I'm presenting a confirmed analysis.
 4   Primary reason being that it's closest to what Merck
 5   would have done and -- but I'd be quite happy to
 6   look at the investigator-reported, too.  I mean I'm
 7   not -- it's not -- one is not -- one does not
 8   clearly trump the other in my mind.
 9       Q.    Are you expressing the opinion that, even
10   in cases where one has adjudicated data available,
11   it would be equally legitimate to look at
12   investigator-reported numbers in terms of performing
13   a statistical analysis?
14       A.    Given the concerns I have about the
15   adjudication process, perhaps yes.  If the
16   adjudication process were better, I would be
17   agreeing with you or disagreeing, whatever way you
18   phrased it.  I would agree with you that if the
19   adjudication process had been perfectly well
20   executed, well, I would argue that we should use
21   adjudicated events, but I have real concerns about
22   the adjudication process.  So that kind of takes the
23   edge off the advantage of using adjudicated events.
24       Q.    In spite of whatever concerns you purport
25   to have, in this instance, even though you had
```

Page 132

```
 1   investigator-reported numbers available, you chose
 2   to use the adjudicated data; am I correct?
 3       A.    It's adjudicated data and I explained
 4   why.
 5       Q.    Other than the fact that this is what you
 6   believe Merck would have been most likely to do, are
 7   there any other reasons why you made the choice --
 8   and you described it as a choice, correct?
 9       A.    Sure.  Yeah, it's a choice.
10       Q.    Are there any other reasons why you made
11   the choice to do the analysis using the adjudicated
12   data?
13       A.    There are real advantages to -- there can
14   be real advantages to adjudication, but what I'm
15   saying is the adjudication here is not -- my
16   concerns with it are such that it drags down my
17   support for -- you're shaking your head there.  I
18   really am trying to address your -- answer your
19   question.
20       Q.    My question is other -- I'm talking not
21   in some theoretical sense.  I'm talking about this
22   specific analysis that's on the page in your report.
23   Other than the fact that you say, in your opinion,
24   Merck would have been more likely to use the
25   adjudicated data for this analysis, is there
```

Page 133

```
 1   anything else that played in to your decision to do
 2   the analysis in this particular way, specifically
 3   using adjudicated data, not investigator-reported
 4   data?
 5       A.    So that is --
 6       Q.    Not in a theoretical sense.  I'm talking
 7   about this decision to do this analysis in this way.
 8       A.    So I believe I was answering that
 9   question.  So in its favor -- so we've got two
10   options here, right?  Confirmed.  Investigator-
11   reported.  Advantages and disadvantages to both.
12   The advantages for doing it the confirmed way, it's
13   closer to what I believe Merck would have done had
14   they done this analysis.  That's number one.  Number
15   two, it's adjudicated events.  In general, all
16   things being equal, whatever that means -- we
17   stumbled over that this morning -- but, you know, if
18   it's a very good adjudication process, I would
19   prefer to use adjudicated events.  So that's the
20   argument for doing confirmed.  The argument for
21   doing investigator-reported is it doesn't -- it
22   isn't subject to the flaws of the adjudication
23   process.  It's what the investigators said.  In this
24   particular instance, yeah, I probably -- given those
25   two, I think the two advantages that I described
```

34 (Pages 130 to 133)

David Madigan, Ph.D.

Page 134

1  outweigh the concerns about the adjudication
2  process.
3      Q.    Thank you.
4      A.    Slightly.
5      Q.    What is the relationship between Table 12
6  on Pages 63 and 64 and 65 and Figure 6 on Page 68?
7      A.    I don't quite know how to answer that. I
8  mean the figure simply shows how the -- let me back
9  up. If you look at the last line of Table 12, you
10  see there are 20 deaths, cardiovascular deaths, on
11  Vioxx and six on placebo. So the Figure 6 simply
12  shows how they accumulated over time. Am I making
13  sense? So in that sense they're related to each
14  other.
15      Q.    Turn with me, if you would, to Page 69.
16      A.    Yes.
17      Q.    Do you see Table 13?
18      A.    I do.
19      Q.    You did rely on Appendix A to your report
20  for purposes of the analysis described in Table 13,
21  correct?
22      A.    Yes.
23      Q.    Does this analysis use investigator-
24  reported numbers, adjudicated numbers, or some
25  combination?

Page 135

1      A.    It's purely investigator-reported.
2      Q.    Did you have adjudicated data available
3  to you and chose not to use it for purposes of this
4  analysis?
5      A.    So for the on drug events there was
6  adjudication data available, but there were no data
7  available for the off drug events. So here I chose
8  to use the uniform endpoint throughout.
9      Q.    Did you do a similar analysis that used
10  the adjudicated data that was available and the
11  reported data where adjudicated data was not
12  available?
13      A.    I have done -- you know, I don't think
14  it's in this report. I have done such an analysis
15  in the past.
16      Q.    But there's not one in this report,
17  correct?
18      A.    No, it appears not to be here.
19      Q.    Do you know why you didn't include it in
20  this report?
21      A.    I think it's just an oversight. There's
22  no -- I don't know why.
23      Q.    Do you recall what the specific numbers
24  were?
25      A.    No.

Page 136

1      Q.    Let's move ahead to Table 14. Both Table
2  14 and Table 15 rely upon Appendix A, correct?
3      A.    Yes.
4      Q.    Are you using investigator-reported
5  events, adjudicated events, or some combination for
6  purposes of your analyses in Table 14 and Table 15?
7      A.    So these are purely investigator-
8  reported, but by analogy with Table 13, if you will,
9  it's a breakout of the analysis in Table 13.
10      Q.    Did you have adjudicated data available
11  to you from the Alzheimer's trials that you could
12  have used for purposes of these analyses?
13      A.    So same answer. For the on drug events,
14  yes. For the off drug events, no. So one could mix
15  and match. Here I chose to just use pure
16  investigator-reported events as I did in Table 13.
17      Q.    Have you done an analysis similar to this
18  one but using the adjudicated data -- the
19  adjudicated numbers where you have adjudicated data
20  available?
21      A.    That I don't recall. I know I did at
22  some point the analogous table to Table 13 as a
23  sensitivity analysis. I'm not sure if I looked at
24  it over time. I just don't recall.
25      Q.    I want to make sure I was clear. I'm not

Page 137

1  asking you about looking at this issue over time.
2  My question to you is whether or not for purposes of
3  Table 14 or Table 15 if you did a similar analysis
4  except to use the adjudicated data where you have
5  adjudicated data available to you.
6      A.    You know, I think I did answer that
7  question. So the point is --
8      Q.    I might have misunderstood so please
9  explain again.
10      A.    Okay. So for Table 13 I used pure
11  investigator-reported events. One could do as a
12  sensitivity analysis confirmed on drug,
13  investigator-reported off drug. I believe I've done
14  that. I believe it's in some earlier report. And
15  Tables 14 and 15 is basically the same analysis but
16  it's done longitudinally. I am not sure if I did --
17  there's a parallel analysis one could have done of
18  14 and 15. I'm just not sure if I've done it.
19      Q.    It's not something certainly that is
20  reported anywhere in your report, correct?
21      A.    I don't -- yeah, it's not.
22          MR. THOMAS: Paul?
23          MR. BOEHM: Yes.
24          MR. THOMAS: Can we take a break? I
25  need to call in on this case management for this

35 (Pages 134 to 137)

David Madigan, Ph.D.

1    case.
2         MR. BOEHM:  How long do you expect that
3    to go?
4         MR. THOMAS:  I don't think it will last
5    very long at all.  They normally don't.  Maybe five,
6    ten minutes at most.
7         MR. BOEHM:  Okay.  I guess we have to do
8    that, so we'll take a break.
9         MR. THOMAS:  All right.  Thanks.
10        THE VIDEOGRAPHER:  The time is 2:27 p.m.
11   We are going off the record.
12        (Brief recess.)
13        THE VIDEOGRAPHER:  This marks the
14   beginning of Videotape Number 3.  The time is 2:44
15   p.m.  Back on the record.
16   BY MR. BOEHM:
17    Q.   Is there a relationship between the
18   tables on Page 70, Table 14 and 15, and Figure 8 on
19   Page 71 of your report?
20    A.   Ha.  So this is -- we talked about this
21   and I'd forgotten it was in here.  It was an
22   oversight.  So this is an analysis -- so no is the
23   answer, there isn't a relationship between Tables 14
24   and 15 and Figure 8.  Figure 8 and the corresponding
25   text in Paragraph 210 pertains to a sensitivity

1    analysis using confirmed or available and
2    investigator-reported where not available, and these
3    are the Kaplan-Meier curves corresponding to that
4    analysis.
5     Q.   I think I've got it.  So the data -- let
6    me start over.
7         So the analysis that you've described in
8    the text of Paragraph 210 and that is depicted in
9    Figure 8 on Page 71 is a look at adjudicated data
10   where you have those data available combined with
11   investigator-reported event numbers; is that
12   correct?
13    A.   Yes.  It's -- my earlier testimony wasn't
14   quite right.  It was what I alluded to in earlier
15   testimony and said was not in this report.  It
16   actually is in this report.  I knew I had done it.
17   I just didn't -- but to see what happened.
18    Q.   For purposes of this particular analysis,
19   did you use the adjudicated data wherever you had it
20   available?
21    A.   Yes.  So it's an apples and oranges type
22   analysis.  It mixes two types of events for better
23   or for worse.  So it uses confirmed events on drug
24   where they are available, and then where they're not
25   available, by necessity it uses investigator-

1    reported events.
2     Q.   I just want to be clear because you've
3    used this term "apples and oranges," and in modern
4    parlance the term "apples and oranges" typically
5    refers to things that are very, very different.  Are
6    you suggesting that confirmed versus reported
7    adverse events are really -- do you mean to be
8    suggesting that they're really apples and oranges?
9     A.   Fair enough.  It's probably too -- what's
10   the word -- too extreme a metaphor to be using.
11   They're different, you know, for sure but -- and
12   it's an odd -- it makes me slightly uneasy to do an
13   analysis where sometimes I'm using one and sometimes
14   I'm using the other, but it's -- you know, it's a
15   perfectly reasonable -- certainly a perfectly
16   reasonable sensitivity analysis to perform, which is
17   the spirit in which I did it here and earlier.
18    Q.   On the same page, Page 71 of your report,
19   you have Table 16.  Do you see that?
20    A.   I do.
21    Q.   This is an analysis that you performed
22   that does not rely on the terms in Appendix A,
23   correct?
24    A.   It does not.
25    Q.   Are you using investigator-reported or

1    adjudicated numbers for purposes of this analysis?
2     A.   These are -- these are investigator-
3    reported.
4     Q.   You're not using any adjudicated data for
5    purposes of this analysis?
6     A.   Just pause here a second.  I confess I'm
7    not entirely sure if this is my analysis or this is
8    just directly taken from Dr. Bain's document.  I
9    think it may not be mine.  I'm not sure.
10    Q.   Do you want to take a moment to review
11   this portion of your report to see if you can
12   determine that?
13    A.   I'd need the document.  I don't think I
14   can answer the question without the -- without the
15   document.  If you like, what we could do is how
16   about we -- you can ask me your questions.  We can
17   do it as if it were my analysis but maybe I could
18   confirm later whether it is or it isn't or --
19    Q.   It would be helpful for me to know, you
20   know, whether or not this is an analysis that you
21   conducted or whether you're really just copying and
22   pasting this from a document.
23    A.   I can't tell you that, but if you want --
24   you see what I'm saying.  If you want to ask me
25   questions conditional on it being an analysis I did

David Madigan, Ph.D.

Page 142

1  we can do that and I can verify later whether it
2  really is or isn't.
3      Q.    It's described as adverse events pulled
4  from the CTS database, March 15, 2000.  Do you see
5  that?
6      A.    I see that.
7      Q.    And it cites to in Footnote 293 some
8  documents that were produced in the litigation.
9      A.    So I would guess it's not my analysis.  I
10 don't have access to the CTS database would be my
11 guess.
12     Q.    Let's skip ahead to Page 75 of your
13 report which has Table 18.
14     A.    Yes.
15     Q.    Do you see that?
16     A.    I do.
17     Q.    Is this an analysis that you performed?
18     A.    Yes.
19     Q.    Did you rely on the data -- or I should
20 say did you rely on the terms listed on Appendix A
21 of your report for purposes of conducting this
22 analysis?
23     A.    I did.
24     Q.    Does this analysis set aside adjudicated
25 data and use only investigator-reported data?

Page 143

1      A.    So there are adjudicated -- there are
2  adjudications available for the on drug events.
3  There are not adjudications available for the off
4  drug events.  So if you want to use a single
5  endpoint, you are forced to use -- one is forced to
6  use investigator-reported if one wants to do an ITT
7  analysis, which is what I was doing here.
8          MR. BOEHM:  Madam Court Reporter, would
9  you please just read back my question, see if I can
10 get a clean answer on that.
11         (The court reporter read back the
12 question as follows:  "Does this analysis set aside
13 adjudicated data and use only investigator-reported
14 data?")
15         THE WITNESS:  The "set aside" is what
16 I'm stumbling over.  It doesn't use confirmed
17 events.
18 BY MR. BOEHM:
19     Q.    It uses only investigator-reported.
20     A.    Only investigator-reported events, yes.
21     Q.    And you don't disagree that you did have
22 adjudicated data available to you from this study,
23 but for purposes of this analysis you've used only
24 the investigator-reported numbers and not the
25 adjudicated numbers, correct?

Page 144

1      A.    Yeah, for the reasons we've been over
2  several times.  So it's because of this mixing and
3  matching -- I won't call it apples and oranges
4  anymore -- but it's because of the mixing and
5  matching you might choose to do it this way.  One
6  could do a sensitivity analysis, which again I think
7  I did -- I'm pretty sure it's not here this time --
8  where you use confirmed events on drug and
9  investigator-reported events off drug.  One can do
10 that and that's a reasonable thing to do.
11     Q.    You read my mind.  Did you in fact do
12 such an analysis where you used the available
13 adjudicated data?
14     A.    I believe I've done that for all three of
15 these.  For OA/RA, for Alzheimer's, and for APPROVe
16 I believe I've done it.
17     Q.    Is it somewhere in your report?
18     A.    I don't see it.
19     Q.    So it puts me at something of a
20 disadvantage because I don't -- I have this report.
21 I need to understand what you've done.  Can you tell
22 me where I can go to see the analysis that you're
23 referring to?
24     A.    I believe it's in some of the earlier
25 reports but I'm not -- I can't tell you which one.

Page 145

1      Q.    Can you tell me what the numbers showed?
2      A.    No.  It's very similar.  I do remember
3  it.  It makes very little difference.
4      Q.    Well, I'm looking for a quantitative, not
5  your post-op qualitative assessment.
6      A.    Understood.
7      Q.    Can you tell me what the numbers are?
8      A.    Nope.
9      Q.    Are the data depicted in Figure 9 of your
10 report another way of looking at the analysis you
11 conducted as described in Table 18?
12     A.    Sure.  I mean these are the Kaplan-Meier
13 curves corresponding to the analysis in Table 18.
14     Q.    What is the relationship, if any, between
15 Figure 10 and the data described in Table 18?
16     A.    So the lower panel in Figure 10 is
17 Figure 9, and the upper panel in Figure 10 I believe
18 earlier in the document is Figure 7.
19     Q.    Are you telling me that the lower panel
20 in Figure 10 on Page 76 is the same thing as
21 Figure 9 on Page 75?
22     A.    I'm pretty sure the labels are flipped.
23 So what's Alzheimer's should be APPROVe.  What's
24 APPROVe should be Alzheimer's.  So the -- let me
25 back up.  The upper one is labeled Alzheimer's.  It

37 (Pages 142 to 145)

David Madigan, Ph.D.

Page 146

1    should be labeled APPROVe in Figure 10.  The lower
2    one is labeled APPROVe.  It should be labeled
3    Alzheimer's in Figure 10.
4        Q.    Is that a correction you've ever made
5    before?
6        A.    It's not something that's ever been
7    pointed out before.
8        Q.    Do both panels that make up Figure 10
9    rely exclusively on investigator-reported event
10   numbers?
11       A.    Yes.
12       Q.    Is it your testimony today that the upper
13   panel of Figure 10 is the same thing as Figure 9?
14       A.    Yes.
15       Q.    Do you agree with me that just visually
16   they look different?
17       A.    No.  The vertical scale is different.
18       Q.    Well, that's what I mean.
19       A.    Yeah, so you got to --
20       Q.    Because the scale is different, it makes
21   it appear different to one's eye, correct?
22       A.    A little bit but, for sure, they're the
23   same.  If you look at the horizontal axis as well,
24   they align, the vertical axis and so on.  Yeah, they
25   are the same.  Figure 9 is the same as the upper

Page 147

1    panel in Figure 10.
2        Q.    I understand.  I'm just making kind of a
3    separate point, which is to somebody who's just
4    looking at these two depictions of the same data --
5        A.    Yes.
6        Q.    -- they might leave different
7    impressions, correct?
8        A.    Oh, I don't know.  I mean if you look at
9    them closely, they're obviously the same.  Maybe not
10   obviously.  So there's some information lost in
11   Figure 10.
12       Q.    With all due respect, some people might
13   disagree with you about that.
14       A.    Fair enough.
15       Q.    I didn't mean to interrupt you, though.
16   Go ahead --
17       A.    No, no.  I'm done.
18       Q.    -- if you were going to add something.
19       A.    No.
20       Q.    Have we went through all of the figures
21   and tables that depict the analyses that you
22   performed for purposes of your report?
23       A.    I believe we did, yes.
24       Q.    In those instances where you are using
25   investigator-reported data for analyses that do not

Page 148

1    rely on Appendix A, so there were some examples
2    where you said I'm not using Appendix A but I'm
3    using only investigator-reported numbers for
4    purposes of my analysis.
5        A.    I don't think there was any such thing.
6    There were analyses where I used investigator-
7    reported events and confirmed events because they
8    were Merck's events.  I don't think there's any
9    analysis where I did purely investigator-reported
10   that was not Appendix A.
11       Q.    If you'll turn with me to Page 16 of your
12   report.
13       A.    Yeah.  Yeah, I stand corrected, yeah.
14       Q.    So let's take Table 3, and as you've now
15   figured out, Table 3 is an instance where you
16   indicated that you were not relying on Appendix A
17   but you're only using investigator-reported data,
18   correct?
19       A.    Yes, I -- in my mind I was thinking of
20   the CVT endpoint but, you're right, in this
21   particular case, there's an analysis looking at a
22   few specific adverse events, adverse event terms,
23   that is investigator-reported.
24       Q.    In this case what reported terms are you
25   using to count the number of investigator-reported

Page 149

1    events?
2        A.    This is VIGOR so these are MedDRA terms.
3        Q.    But what specific MedDRA terms are you
4    relying on?
5        A.    Myocardial infarction, hypertension and
6    edema.
7        Q.    Just these three.
8        A.    Yeah.
9        Q.    No other MedDRA terms.
10       A.    No.
11       Q.    And no CRISP terms.
12       A.    I'm very confident that VIGOR used
13   MedDRA.  I could be wrong.
14       Q.    Would you turn to Page 43?
15       A.    Yes.
16       Q.    Do you see Table 7?
17       A.    I do.
18       Q.    In the case of Table 7, you testified
19   that you were not using the terms listed in
20   Appendix A to your report, correct?
21       A.    Correct.
22       Q.    Okay.  In this case you're using some
23   investigator-reported data and some adjudicated
24   data, correct?
25       A.    Yes.  I'm mimicking Merck's analysis on

38 (Pages 146 to 149)

Page 150

1 the previous page or whatever. I'm mimicking
2 Merck's analysis in Figure 2.
3    Q.    For purposes of the investigator-reported
4 events that you're including in this analysis, what
5 specific defined terms are you using to count those
6 numbers?
7    A.    So I didn't. I just used the terms --
8 there's a SAS data file that corresponds to Table 13
9 that corresponds to my Figure 2, and that identifies
10 the events that were included in Table 13, Merck's
11 Table 13 from the 2003 Safety Update Report.
12    Q.    What page are you looking at?
13    A.    I do not know what definition they used
14 to catch -- to capture those events. I wish I did.
15 It's something I've looked long and hard for, but I
16 have not been able to find, you know, what was the
17 algorithm, if you will, that they used to identify
18 the events that are accounted in Table 13. I just
19 don't know. So I just used the events as given to
20 me.
21    Q.    So you don't know what terms were used to
22 populate the investigator-reported events for
23 purposes of the analysis that you've depicted in
24 Table 7; is that correct?
25    A.    I know which events were included.

Page 151

1    Q.    No, that's not my question. My question
2 is, do you know what defined medical terms, event
3 terms, were used for purposes of capturing
4 investigator-reported events for purposes of the
5 analysis depicted in Table 7?
6    A.    I do not. So I assume there exists
7 something like my Appendix A but I've never found it
8 and I've asked for it.
9    Q.    You've asked who for it?
10    A.    I've asked in depositions if --
11    Q.    You asked people for it in depositions?
12    A.    Yes. I've asked defense attorneys if
13 they -- I'd be happy to use such a definition if I
14 had it.
15    Q.    What about outside of a deposition? Have
16 you asked plaintiff's counsel about that?
17    A.    Yes. This is -- this has been a
18 significant issue for me all along which is, you
19 know, I would prefer to use, you know -- I'd be
20 happy to use Merck's encoding of what's in the SOP.
21    Q.    What about Table 13 on Page 69? This is
22 another instance -- oh, I'm sorry. I'm sorry.
23 Strike that.
24        With respect to the analysis on Table 7,
25 you don't know to what extent --

Page 152

1    A.    Sorry. Where are you? What page?
2    Q.    I'm going back to what we were
3 discussing, Table 7, Page 43.
4    A.    Okay. I'm there.
5    Q.    You don't know to what extent the event
6 terms were used -- that were used to collect
7 investigator-reported events for purposes of this
8 analysis, to what extent they were included or not
9 included on what the three plaintiff's experts put
10 together for you that makes up Appendix A; is that
11 correct?
12    A.    That was a complicated question. So I
13 infer from -- from what's in my Figure 2, Merck's
14 Table 13, that they must have had a set of terms
15 that they looked for and said -- to decide which
16 events to include and not include in this table. I
17 have not -- I don't have that list and I don't
18 know -- I think I -- I'm going to answer your
19 question -- and I don't -- I have no way of knowing,
20 therefore, to what extent it overlaps with what's in
21 Appendix A. Maybe it's identical to what's in
22 Appendix A. I just have no idea.
23    Q.    You testified earlier today that you have
24 reviewed Merck's cardiovascular SOP, correct?
25    A.    Yes. You define it as if there's one

Page 153

1 document. There are many, many -- there are many
2 versions of the document but ...
3    Q.    You've seen the cardiovascular SOP and
4 various versions of it perhaps?
5    A.    Yes.
6    Q.    I've had marked as Exhibit 6 Merck's CV
7 SOP dated September 2003.
8    A.    Yep.
9    Q.    Do you recall that this document contains
10 a list of serious adverse event terms, both CRISP
11 and MedDRA terms, that, if reported, were eligible
12 for adjudication pursuant to Merck's cardiovascular
13 standard operating procedure?
14    A.    Sure.
15    Q.    In your view, how do the terms identified
16 on Appendix B and Appendix C of Exhibit 6, the CV
17 SOP, pages 21 through 26, compare with the list of
18 terms that were compiled and prepared for you by
19 some of plaintiff's experts and that is now
20 Appendix A to your report?
21    A.    I've never compared them. I've never
22 done an analysis like that. They look like these
23 are substantially larger lists but I've never done a
24 walk -- cross-walk between them to see how they
25 compare.

David Madigan, Ph.D.

Page 154

1    Q.    Do you have an understanding of the
2  purpose of the terms better identified on Appendix B
3  and C of the CV SOP?
4    A.    I do.
5    Q.    And what's your understanding?
6    A.    My understanding is that this was casting
7  a net, a fairly wide net, and to make -- to attempt
8  to ensure that no thrombotic event was missed.
9    Q.    Is it your understanding that there are
10  events listed on either Appendix B or Appendix C of
11  the CV SOP, which is Exhibit 6 for this deposition,
12  that are not thrombotic in nature?
13    A.    I don't know.  I mean angina pectoris,
14  for example, is on the list.  So that, as I
15  understand it, is pain.  So I don't think that is in
16  and of itself a thrombotic event, but in general I
17  wouldn't know.
18    Q.    Thank you.  You can set that one aside.
19          You've indicated a couple of times today
20  that you have submitted other reports in connection
21  with various Vioxx cases; is that correct?
22    A.    Yes.
23    Q.    Do you recall that one of those reports
24  was submitted in March 2011?
25    A.    No.

Page 155

1    Q.    I don't even think we need to mark it.
2  I'm just going to show it to you for now.  I'm
3  handing you a document that I'll represent for the
4  record, Dr. Madigan, appears to be a March 21, 2011
5  report from you --
6    A.    Okay.
7    Q.    -- in connection with your opinions about
8  Vioxx.
9    A.    Okay.
10    Q.    Do you see that?
11    A.    Yes.
12    Q.    Do you recall this report?
13    A.    No, not specifically, and I don't
14  remember what the context was.
15    Q.    It's not something that you've gone back
16  and looked at recently?
17    A.    I might have but I don't know.
18    Q.    Is this something that you would have
19  reviewed in the 25 or so hours that you spent
20  preparing for today's deposition?
21    A.    It could have been but I just can't be
22  certain if the report on that date is one that I
23  looked at.
24    Q.    If you turn to Paragraph 24 of your
25  report in this case --

Page 156

1    A.    Okay.
2    Q.    -- can you just read the first sentence
3  of Paragraph 24?
4    A.    I'm sorry.  Paragraph 24.  "The
5  possibility that Vioxx carried cardiovascular side
6  effects was raised before Merck learned the
7  cardiovascular results of VIGOR in 2000."  In the
8  right place?
9    Q.    Yes.  Thank you.  Now, I'd like you to
10  take the 2011 report that I just showed you and put
11  it side by side, roughly side by side, and if you
12  could turn to Page 6 of the 2011 report and look
13  specifically at Paragraph 17.
14    A.    Okay.
15    Q.    And in 2011 you wrote a similar sentence
16  but it's a little bit different.  Would you please
17  read for the record your first sentence in Paragraph
18  17 of your 2011 report.
19    A.    "The possibility of cardiovascular side
20  effects of Vioxx was well established before 2000."
21    Q.    And do you see that Paragraph 17 of your
22  2011 report and Paragraph 24 of your 2013 report
23  seem to be citing to the same sources for these
24  statements?
25    A.    Generally, yes.

Page 157

1    Q.    In 2011, you wrote that the possibility
2  of cardiovascular side effects of Vioxx was well
3  established before 2000.
4    A.    Yep.
5    Q.    In 2013, you changed the language to say
6  that the possibility that Vioxx carried
7  cardiovascular side effects was raised --
8    A.    I see that.
9    Q.    -- before Merck learned the CV results of
10  VIGOR in 2000.  Why did you change the language from
11  "well established" to "was raised?"
12    A.    I don't know.  I mean I think the
13  possibility was well established.  Perhaps I felt
14  that there was an implication there that the
15  reality -- you know, that the effect was well
16  established, and that clearly would not have been
17  true, so maybe that's why I softened it.
18    Q.    So, in other words you're saying that in
19  your mind the possibility by that point in time
20  would have been well established but the actual risk
21  would not have been well established by year 2000.
22    A.    That was the intent, and I think this may
23  have been misinterpreted in some context.
24    Q.    Okay.  You can set those aside.
25    A.    And you're not putting a number on that?

David Madigan, Ph.D.

Page 158

```
 1    Q.    I can if you want me to.
 2    A.    No, no.
 3         MR. BOEHM:  Actually you know what?
 4  Let's just mark it so there's no confusion later on.
 5         (Exhibit 7 marked for identification.)
 6  BY MR. BOEHM:
 7    Q.    In your report you cite to deposition
 8  testimony and trial testimony that various witnesses
 9  have given during the course of the Vioxx
10  litigation; is that fair?
11    A.    Yes.
12    Q.    What process did you use to identify
13  materials such as deposition or trial testimony that
14  you deemed to be relevant to the opinions that
15  you're offering in the case?
16    A.    So in the securities litigation I
17  actually attended several depositions.  I can't tell
18  you how many but quite a few.  Earlier than that I
19  asked for deposition transcripts of individuals that
20  I could see were actors, if you will, in the Vioxx
21  story.
22    Q.    In other words, if you saw somebody's
23  name in a document, then you would ask for a
24  deposition testimony --
25    A.    Yes.
```

Page 159

```
 1    Q.    -- transcript?
 2    A.    Yes.
 3    Q.    How did you go about determining which
 4  documents to look at for purposes of developing your
 5  opinions in the case?
 6    A.    I don't recall.  We're talking now eight,
 7  nine years ago, and I don't recall exactly who said
 8  what when, but in general I would put in requests,
 9  like I'd like to see all e-mails about Vioxx
10  exchanged between Alise Reicin and somebody else,
11  Deborah Shapiro or whatever.  I would ask for all
12  communications pertaining to Vioxx relating to
13  certain people.
14    Q.    To be fair, isn't it also true that
15  plaintiff's lawyers would just send you materials
16  even if you hadn't asked for them?
17    A.    I think -- I think there was, if you
18  will, a seed set.  I mean I started with a set of
19  documents that were handed to me, but thereafter I
20  asked for and received, you know, a very significant
21  number of documents.
22    Q.    You didn't conduct a search or review of
23  the database of documents yourself; is that correct?
24    A.    The answer is no generally.  I think I
25  did have access to -- there was something called
```

Page 160

```
 1  concordance; is that right?  Does that sound right
 2  as the name of a database?  I have a memory that I
 3  did have access to a database at a point in time,
 4  but be that as it may, in general --
 5    Q.    Do you know what was in that database?
 6    A.    All the documents, as I understand it,
 7  that were turned over as part of this litigation.
 8    Q.    You believe that you had access to a
 9  single database that contained every document
10  produced in the litigation?
11    A.    If you tell me that's not possible, I'll
12  believe you.  I just have this memory of accessing a
13  database at some point, but if you tell me that
14  that's wrong, then that's fine.
15    Q.    You don't know -- you can't sit here and
16  testify under oath that you know you had access to a
17  database that contained all the documents produced
18  in the litigation, correct?
19    A.    No.  I thought I did.  At a point in time
20  I thought I did have access to such a database but
21  I'm absolutely not certain.
22         MR. BOEHM:  Can we mark this as eight.
23         (Exhibit 8 marked for identification.)
24  BY MR. BOEHM:
25    Q.    Doctor, I've had marked a publication
```

Page 161

```
 1  that you were a coauthor of and it is Exhibit 8 for
 2  purposes of this deposition.  Do you have that in
 3  front of you?
 4    A.    Yes.
 5    Q.    Do you recognize this publication?
 6    A.    Yes.
 7    Q.    As an initial matter, can you identify
 8  which of the authors were being paid or are being
 9  paid by plaintiff's lawyers in Vioxx-related cases?
10    A.    No, but I can look at the financial
11  disclosures.
12    Q.    Well, you know David Egilman, for
13  example, has been an expert for plaintiff's counsel
14  for many years now?
15    A.    Sure.  In financial disclosures it says
16  that all the authors either are or were consultants
17  for -- consultants for plaintiffs in litigation
18  against Merck related to Vioxx.
19    Q.    Are you aware that Dr. Egilman has been
20  identified as an expert witness for plaintiff's
21  counsel in this case?
22    A.    Yes.
23    Q.    Have you discussed that with Dr. Egilman?
24    A.    No.
25    Q.    How is it that you're aware that Dr.
```

David Madigan, Ph.D.

Page 162

1  Egilman has been identified as an expert?
2      A.   Didn't you tell me?  No.
3      Q.   I don't think so.  You asked me if --
4      A.   I asked you if --
5      Q.   You asked me if I was going to take his
6  deposition.
7      A.   You know, I don't know.  I just don't
8  know.  I don't know how I know that.
9      Q.   When is the last time that you spoke with
10 Dr. Egilman?
11     A.   A couple of years.
12     Q.   When you last spoke with Dr. Egilman, was
13 it on the subject of Vioxx?
14     A.   No.
15     Q.   When is the last time you spoke with him
16 on the subject of Vioxx?
17     A.   Not since -- I'm sorry.  Let me just look
18 at my CV for a second.  I don't think it's since
19 2009 or maybe 2010.  I'm looking at the paper
20 actually, this paper.  I think this was probably the
21 last -- you know, our interactions related to this
22 paper were probably the last time we spoke about
23 Vioxx.  I could be wrong.  I don't recall anything
24 since then.
25     Q.   I understand.  If you turn to Page 2 of

Page 163

1  this publication by you and other plaintiff's
2  experts --
3      A.   Yes.
4      Q.   -- you'll see a header entitled, "Data
5  Source."
6      A.   I see that.
7      Q.   And looking at the sentence that carries
8  over from the left-hand column to the right-hand
9  column, the authors have written, "We excluded data
10 from 6 trials that did not include a placebo arm.
11 In addition, we excluded data from 2 large ongoing
12 trials that were terminated shortly after the
13 APPROVe trial and the market withdrawal of the
14 drug."  Do you see that?
15     A.   I do.
16     Q.   Why did you exclude data from VICTOR and
17 ViP?
18     A.   I don't recall exactly.  We may not have
19 had the VICTOR data at that time but I just don't
20 recall.
21     Q.   Do you recall when the APPROVe trial was
22 completed?
23     A.   Well, completed, I mean it --
24     Q.   It was terminated in 2004, correct?
25     A.   Right, but there was a follow-up then of

Page 164

1  at least about a year I think thereafter.  So the
2  patients were -- the study medication was
3  discontinued but the patients were followed for
4  another period of time, so the study in that sense
5  continued.
6      Q.   Right.  And with respect to VICTOR and
7  ViP, you and the other authors of this paper have
8  indicated that those two studies were terminated
9  shortly after the APPROVe trial, correct?
10     A.   Yeah.
11     Q.   That would have been 2004?
12     A.   Yes.
13     Q.   This publication was in 2009, correct?
14     A.   Yeah.  I mean I said -- you asked me why
15 weren't these included.  I don't remember.  I'm --
16     Q.   The reason I was saying that is because
17 you had kind of suggested that maybe it's because
18 you didn't have the data.
19     A.   Right.
20     Q.   But the data from VICTOR and ViP were
21 certainly available by 2009, correct?
22     A.   Not necessarily to me.  VICTOR in
23 particular because it came from Oxford.  And I do
24 have it now but I'm not at all sure I had it in
25 2009.  ViP I'm a whole lot fuzzier on -- I'm just

Page 165

1  not sure -- but VICTOR I did not have when I was
2  doing my early work.  I know that.  In 2006, 2007 I
3  certainly --
4      Q.   What about by 2009 when this
5  publication --
6      A.   I just don't know.
7      Q.   -- was completed?
8      A.   I don't know.
9      Q.   Are there any other reasons why you can
10 think of why you wouldn't have included VICTOR and
11 ViP?
12     A.   No.
13     Q.   As you sit here today, have you conducted
14 an analysis of the totality of the placebo
15 controlled data from Vioxx clinical trials with
16 respect to cardiovascular thrombotic risk.
17     A.   It depends on what you mean.  So I did at
18 some point.
19     Q.   Well, specifically what I mean just to be
20 clear so you know what I mean is, in part, have you
21 done an analysis that includes these two studies
22 that you didn't include in your 2009 publication
23 with other plaintiff's experts?
24     A.   No, I have not done such -- that specific
25 analysis I've not done.

42  (Pages 162 to 165)

David Madigan, Ph.D.

Page 166

1    Q.    You agree those are placebo controlled
2  data, right?
3    A.    Yes.  But, like I say, I'm not at all
4  sure I had them available to me at this time.
5    Q.    You started looking in your report.  I'm
6  talking about sitting here today have you done that
7  type of analysis that is comprehensive that looks at
8  the totality of the placebo randomized controlled
9  trial data for Vioxx?
10   A.    I don't believe so.  Happy to do it.
11   Q.    Okay.  You can set that one aside.
12         THE WITNESS:  I'm just going to get some
13  water.
14         MR. BOEHM:  Could you mark that, please.
15         (Exhibit 9 marked for identification.)
16  BY MR. BOEHM:
17   Q.    Dr. Madigan, I'm putting in front of you
18  a document marked as Exhibit 9 for purposes of
19  today's deposition, and I will represent for the
20  record that this is a publication by you and others
21  from 2012.  Do you recognize this document?
22   A.    Yes.
23   Q.    Which of the authors of this publication
24  have been paid as plaintiff's experts by plaintiff's
25  lawyers?

Page 167

1    A.    So I believe all of them except for Jerry
2  Avorn.
3    Q.    Now, I notice that there are some M.D.s
4  and Ph.D.s next to most of the names but there's one
5  name, Daniel Sigelman --
6    A.    Yes.
7    Q.    -- and there's not an M.D. next to that
8  name.  There's a J.D.
9    A.    Yes.
10   Q.    Can you explain that?
11   A.    Can I explain it?  He went to law school.
12  I mean I assume -- what do you mean can I explain
13  it?
14   Q.    Do you know who Daniel Sigelman is?
15   A.    Yes.
16   Q.    Is he a plaintiff's lawyer?
17   A.    No.  He was at one point.  He now works
18  for the FDA.
19   Q.    He was a plaintiff's lawyer at the time
20  that you were working with him on this publication,
21  correct?
22   A.    He was transitioning.  I think by the
23  time this paper appeared he was at the FDA.
24   Q.    Do you know if he worked as a plaintiff's
25  lawyer in the Vioxx litigation?

Page 168

1    A.    Yes, he did.
2    Q.    Why is an attorney who worked as a
3  plaintiff's lawyer in the Vioxx litigation one of
4  your coauthors on this publication?
5    A.    Because he participated in this project.
6    Q.    He contributed to the content of this
7  paper, correct?
8    A.    Sure.
9    Q.    Dr. Madigan, I know you've been deposed
10  many times before.  Have you ever given deposition
11  or trial testimony on behalf of defendant -- a
12  defendant in a case such as this?
13   A.    No.  I've never been asked to.
14   Q.    Earlier today I had asked you what your
15  hourly rate was.  Do you recall that?
16   A.    Yes.
17   Q.    Let me just show to you an e-mail that I
18  will represent for the record was provided to us by
19  plaintiff's counsel in the case.  And this appears
20  to be dated December 13, 2013.  It's an e-mail from
21  you to Diane Henderson.  Subject: Fee schedule.  Do
22  you see that?
23   A.    I do.
24   Q.    Does this refresh your recollection that
25  you in fact in 2013 informed plaintiff's counsel

Page 169

1  that you were charging $700 per hour for your time
2  working on this case?
3    A.    It does.  Thank you very much.  I'd
4  forgotten that I notified them that I had increased
5  my rate.
6    Q.    And is that the amount that you actually
7  intend to bill for on this case given the notice
8  that you provided to plaintiff's counsel back in
9  2013?
10   A.    Yes, given -- I'd forgotten that I'd
11  notified them.  So given that I've notified them,
12  yes, this is what I will charge.
13         MR. BOEHM:  Let's go off the record if
14  we could.
15         THE VIDEOGRAPHER:  The time is 3:31 p.m.
16  Off the record.
17         (Brief recess.)
18         THE VIDEOGRAPHER:  The time is 3:34 p.m.
19  Back on the record.
20         MR. BOEHM:  Dr. Madigan, thank you very
21  much for your time today, it's been a pleasure, and
22  I have no further questions.
23         THE WITNESS:  Thank you as well.
24         MR. THOMAS:  Nothing for me.
25         MR. BOEHM:  Thanks.

43 (Pages 166 to 169)

David Madigan, Ph.D.

Page 170

1         THE VIDEOGRAPHER:  Stand by, please.
2    This marks the end of today's deposition.  The time
3    is 3:34 p.m.  Going off the record.
4         THE COURT REPORTER:  Mr. Thomas, would
5    you like a copy of the deposition transcript?
6         MR. THOMAS:  Yes, please.  An E-Tran.
7              * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 171

1         C E R T I F I C A T I O N
2
3         I, Patricia R. Frank, a Certified Court
4    Reporter and Notary Public of the State of New
5    Jersey, do hereby certify that I reported the
6    deposition in the above-captioned matter; that the
7    said witness was duly sworn by me; that reading and
8    signing was not requested; that the foregoing is a
9    true and correct transcript of the stenographic
10   notes of testimony taken by me in the
11   above-captioned matter.
12        I further certify that I am not an
13   attorney or counsel for any of the parties, nor a
14   relative or employee of any attorney or counsel
15   connected with the action, nor financially
16   interested in the action.
17
18
19        Patricia R. Frank, CCR #XI01021
             Notary Public #2405975 Exp. 03/22/21
20
21   Dated:  March 15, 2016
22
23
24
25

44 (Pages 170 to 171)

Golkow Technologies, Inc. - 1.877.370.DEPS