## Page 1

```
           COMMONWEALTH OF KENTUCKY
             FRANKLIN CIRCUIT COURT
                   DIVISION I
                      ---
COMMONWEALTH OF           :
KENTUCKY,                 :
                          :
       Plaintiff,         :
   -vs-                   : CASE NO. 09-CI-1671
                          :
MERCK & CO., INC., n/k/a  :
MERCK SHARP & DOHME       :
CORPORATION,              :
                          :
       Defendant.         :
                      ---

        Deponent:  DAVID MADIGAN, Ph.D.
                  May 3, 2013
                   9:06 A.M.




Reported by: Jennifer K. Starner, RPR
```

## Page 2

```
 1            COMMONWEALTH OF KENTUCKY
 2              FRANKLIN CIRCUIT COURT
 3                      ---
 4    COMMONWEALTH OF           :
      KENTUCKY,                 :
 5                              :
            Plaintiff,          :
 6      -vs-                    : CASE NO. 09-CI-1671
                                :
 7    MERCK & CO., INC., n/k/a  :
      MERCK SHARP & DOHME       :
 8    CORPORATION,              :
                                :
 9          Defendant.          :
10                      ---
11       Videotaped deposition of DAVID MADIGAN, Ph.D., an expert
12    witness herein, taken by the Defendant as upon Cross-Examination
13    and pursuant to the Kentucky Rules of Civil Procedure and
14    Notice at the offices of Hare, Wynn, Newell & Newton, LLP,
15    200 West Vine Street, Suite 700, Lexington, Kentucky, on May 3,
16    2013 at 9:00 A.M., before Melinda Sindiong, video technician,
17    and Jennifer K. Starner, RPR, a Notary Public within and for
18    the Commonwealth of Kentucky.
19                      ---
```

## Page 3

```
 1   APPEARANCES:
 2
 3        On behalf of the Plaintiff:
              Matthew C. Minner, Esquire
 4        Hare, Wynn, Newell & Newton, LLP
              200 West Vine Street, Suite 700
 5            Lexington, Kentucky  40507
              (205) 328-5330
 6            matt@hwnn.com
 7
 8            William R. Garmer, Esquire
              Garmer & Prather, PLLC
 9            Opera House Building
              141 North Broadway
10            Lexington, KY  40507
              (859) 254-9351
11            bgarmer@garmerprather.com
12
13            LeeAnne E. Applegate, Esquire
              Commonwealth of Kentucky
14            Office of the Attorney General
              1024 Capital Center Drive, Suite 200
15            Frankfort, Kentucky  40601
              (502) 696-5503
16            LeeAnne.applegate@ag.ky.gov
17
18        On behalf of the Defendant:
              Tarek Ismail, Esquire
19            Goldman Ismail Tomaselli Brennan & Baum LLP
              564 West Randolph Street, Suite 400
20            Chicago, Illinois  60661
              (312) 681-6000
21            tismail@goldmanismail.com
22                      ---
```

## Page 4

```
 1              S T I P U L A T I O N S
 2       It is stipulated by and among counsel for the
 3   respective parties that the deposition of DAVID MADIGAN,
 4   Ph.D., an expert witness herein, called as upon
 5   Cross-Examination by the Defendant may be taken at this time
 6   and place pursuant to the Kentucky Rules of Civil procedure
 7   and Notice as to the time and place of taking said
 8   deposition; that the deposition was recorded in stenotypy by
 9   the court reporter, Jennifer K. Starner, RPR, and
10   transcribed out of the presence of the witness; and that
11   said deposition is to be submitted to the witness for his
12   examination and signature, and that signature may be affixed
13   out of the presence of the Notary Public.
14                      ---
```

Page 61

1  associated with it and then we probably spent three or four
2  hours here yesterday. And then I went back to my hotel and
3  I basically went through the documents myself.
4      Q    With whom did you meet yesterday?
5      A    With the two gentlemen who are here at
6  the table.
7      Q    Okay. And that's the first time you've
8  met in person either gentleman?
9      A    Yes.
10     Q    Do you recall if you had spoken with
11 either on the phone prior to today? Or prior to this week?
12     A    Yes. On some of the -- on some of the
13 earlier calls -- actually I should have said as well LeeAnne
14 was on the phone yesterday as well. She wasn't here in
15 person, but she was here on the phone.
16         MR. GARMER: Actually it wasn't for this
17     matter.
18     A    It wasn't? Okay. There's a reason I'm
19 getting confused. Okay. Oh, and Mr. McKenna was also
20 virtually here yesterday on that screen over there.
21     Q    You said -- so no one from the Attorney
22 General's Office was here in person with you yesterday,
23 correct?
24     A    Not in person, but on the phone.

Page 62

1      Q    So the first time you met in person any
2  attorney at the Attorney General's Office was this morning
3  when you met Miss Applegate?
4      A    That's the first time in person.
5      Q    With respect to your curriculum vitae,
6  Doctor, do you have any other formal education beyond which
7  is reflected on your CV?
8      A    No, not -- probably not -- you
9  use the adjective formal -- I mean, I take short
10 courses and conferences and stuff like that.
11     Q    In prior depositions, Doctor, you've
12 been asked to confirm your lack of expertise in certain
13 areas. I just want to make sure that's still up to date.
14 So we'll go through questions you've heard before on that
15 regard.
16     A    Okay.
17     Q    Doctor, do you agree you have no
18 expertise in the area of pharmacology?
19     A    I do not.
20     Q    Do you agree you have no expertise --
21     A    Do I agree. Yes, I agree.
22     Q    I think we had a double negative.
23 That's why I asked.
24     A    Okay.

Page 63

1      Q    Do you have any expertise in cardiology?
2      A    No, I do not.
3      Q    Any experience in rheumatology?
4      A    No.
5      Q    Any expertise in gastroenterology?
6      A    No.
7      Q    Any expertise in neurology?
8      A    No.
9      Q    Do you consider yourself an expert in
10 epidemiology?
11     A    Yes.
12     Q    Do you have -- do you consider yourself
13 an expert in the information physicians use to assess the
14 risks and benefits of medicines they prescribe?
15     A    That's a tough one. I consider myself
16 an expert in the statistical aspects that are involved in
17 that.
18     Q    You understand that in prescribing
19 medicines to patients physicians will do a clinical risk/
20 benefit analysis?
21     A    Sure. At least implicitly they will do
22 that, yes.
23     Q    And physicians -- you have no clinical
24 background or expertise, correct?

Page 64

1      A    Correct.
2      Q    You have never been a part of any
3  prescribing decision for any patient or group of patients,
4  correct?
5      A    Correct.
6      Q    So you have no expertise in weighing the
7  risks and benefits of medicine in making a clinical decision
8  to prescribe a medicine to a patient, correct?
9      A    Yeah. I think not the way you're
10 phrasing it, yeah.
11     Q    So you agree with my question?
12     A    I agreed with what you said, yes. I'm
13 not an expert in that. So the only one I disagreed with is
14 the epidemiology. Is that clear?
15     Q    Yes.
16     A    Yes.
17     Q    Thank you for that clarification. What
18 is your current professional appointment at Columbia?
19     A    So as of today, I'm professor in the
20 Department of Statistics and I'm the interim executive vice
21 president for Arts and Sciences. Dean of the faculty
22 basically.
23     Q    You have no appointment within the
24 medical school, correct?

Page 65

1    A    Correct.
2    Q    Is there an epidemiology department at
3  Columbia?
4    A    There is in the medical school -- in the
5  School of Public Health.
6    Q    Do you have any professional appointment
7  there?
8    A    No.
9    Q    Have you ever?
10   A    Nope.
11   Q    Have you ever held any appointment in any
12 medical school?
13   A    No.  I've held appointments in cancer
14 centers, but not medical schools.
15   Q    Which cancer centers did you hold --
16   A    The Fred Hutchinson Cancer Research
17 Center in Seattle.
18        THE COURT REPORTER:  I'm sorry.  Can you
19   say that again?
20   A    Fred Hutchinson Cancer Research Center.
21   Q    When was that?
22   A    When I was in Seattle.  The 1990's.
23        MR. GARMER:  Let the record reflect, he
24   is the former manager of the Cincinnati Reds.

Page 66

1         MR. ISMAIL:  Duly noted.
2    Q    Your CV reflects that you are an
3  associate or assistant professor in the statistics
4  department at University of Washington --
5    A    Right.
6    Q    -- from 1990 to 1999.  Is that what
7  we're talking about here, that period of time?
8    A    Yes.  Yes.
9    Q    And did you have a secondary appointment
10 at the Fred Hutchinson Cancer Center in Seattle?
11   A    Yes.
12   Q    Over what period of time?
13   A    Probably from the mid '90s to 1999.
14   Q    What was your appointment specifically?
15   A    So in -- in the -- that cancer center
16 actually it's common enough in cancer centers they have
17 assistant members, associate members and full members.  So I
18 was an assistant member and then an associate member.  It's
19 a courtesy type appointment.
20   Q    And you have not held any appointment at
21 any medical school or clinical institution over the last 14
22 years, correct?
23   A    My hesitation here is I was director of
24 the Institute of Biostatistics at Rutgers, but I think --

Page 67

1  the answer to your question is no, technically no.
2         MR. MINNER:  Please mark as Exhibit 3.
3         (Whereupon, Defendant's Exhibit 3 was
4         marked for identification purposes.)
5    Q    I don't think we'll stay long on this
6  document because it refers us to another one.  So I just
7  want to confirm what's reflected here.  Exhibit 3, Doctor,
8  is one of the two expert disclosures the Commonwealth served
9  in this case.  And you see that you're the first listed
10 individual here on Page 1?
11   A    Okay.
12   Q    Have you seen this document before?
13   A    I'm not sure.
14   Q    Well, let's just go through it and if it
15 looks familiar, let me know.  The paragraph under your name
16 says, "Dr. Madigan may be called upon to testify in the
17 trial of this matter.  Dr. Madigan's curriculum vitae,
18 setting forth his background, education, training and
19 experience is attached hereto as Exhibit 1."
20        I think we've marked as Exhibit 2 today
21 the updated copy of your CV.
22   A    Right.
23   Q    "To form his opinions, Dr. Madigan
24 reviewed documents, depositions and things."  Then

Page 68

1  there's -- explain more further in that paragraph.  Then it
2  says at the very last, "A summary of Dr. Madigan's opinions
3  and documents that support those opinions is attached hereto
4  as Exhibit 2."
5         Now having perused this paragraph, does
6  it refresh any recollection that you've seen it before?
7    A    I'm not sure.  I may or may not have
8  seen it.  I certainly didn't study it in any depth if I saw
9  it.
10   Q    All right.
11        MR. ISMAIL:  Please mark Exhibit 4.
12        (Whereupon, Defendant's Exhibit 4 was
13        marked for identification purposes.)
14   A    Thank you.
15   Q    Doctor, Exhibit 4 is a PowerPoint
16 entitled Commonwealth of Kentucky versus Merck & Co., Inc.
17 with your name.  It says, "April 15, 2003, Summary of
18 Opinions (based upon work performed to date)."
19   A    Yes.
20   Q    Is Exhibit 4 a copy of the PowerPoint
21 that we've been referring to thus far this morning?
22   A    Yes.
23   Q    Exhibit 4 is what was attached as
24 Exhibit 2 to the Commonwealth's disclosures.  Can you

Page 209

1  obviously did, but the analysis I'm not sure.
2      Q    All right.
3      A    Should have.
4      Q    If you go to Page 17, this is where you
5  claim that -- oh, here you say these are the data that
6  show a statisticlly significant increased cardiovascular
7  risk with Vioxx, correct?
8           Actually, go to Page 18, if you would.
9  Here you say that, "The adjudication of the ITT Alzheimer's
10 study threw out potential heart attacks and strokes and may
11 also have been biased in favor of Vioxx."  What do you mean
12 by "threw out"?
13     A    I'm specifically referring there to the
14 investigator-reported events where there was -- the
15 adjudicators deemed there was insufficient data.
16     Q    The adjudicators did that on a blinded
17 basis, correct?
18     A    Yeah.  I -- that was what the intention
19 was, as I understand it.
20     Q    Is there any event for which the blinded
21 adjudicators determined there was insufficient data that you
22 believe that was an erroneous conclusion?
23     A    That's outside my area of expertise.
24     Q    So as far as you know, the adjudication

Page 210

1  of the ITT data by the blinded adjudicators that resulted in
2  a certain number of events being deemed as having
3  insufficient data were entirely correct judgments to reach?
4      A    Well, by definition they didn't know
5  whether it was the right judgment or not.  I'm
6  sure the data were insufficient.  I mean, they didn't have
7  what they needed to have, but they didn't know whether it
8  really was a heart attack or stroke or whatever.
9      Q    I don't think that's what I was asking,
10 so let me rephrase it.  As far as you know, the
11 determination by the blinded adjudicators that any particular
12 event had insufficient information from which to do an
13 adjudication were entirely appropriate judgment to reach?
14     A    Maybe.  I don't know.
15     Q    And you don't have any evidence to
16 suggest that the blinded adjudicators were looking to throw
17 out events on Vioxx and not do so on placebo, correct?
18     A    I don't have any evidence?
19     Q    Right.
20     A    I do.  You're looking at it.
21     Q    You're looking at the result of
22 the adjudicators' determination that there was insufficient
23 data, right?
24     A    No.  No.  No.  No.  No.  No.  This

Page 211

1  is the confirmation rate.  That's what's on the
2  vertical axis here.
3      Q    Okay.  I think it's the -- well, I don't
4  want to argue with you about it.  The rates here are --
5  these are cumulative rates, right?
6      A    Yes.
7      Q    So as the -- the top line is placebo?
8      A    Yeah.  The solid line is placebo and the
9  dotted one is Vioxx.
10     Q    Okay.  So as that rate falls, that means
11 that for each block in time going forward the adjudication
12 rate is -- actually, tell me what's on the Y axis here.
13     A    So it's -- yeah.  It's not very
14 clearly labeled.  It's the fraction of events that are
15 confirmed.  So there's a higher fraction being confirmed on
16 placebo than on Vioxx.
17     Q    All right.
18     A    It's confusing.
19     Q    So as the placebo line falls, does
20 that mean a lower fraction of events are being confirmed
21 on placebo over time?
22     A    That's exactly what it means, but of
23 course what's of primary interest is the contrast between
24 the black line and the dotted line.

Page 212

1      Q    So if you actually plotted this as a
2  rate of confirmation rather than an a cumulative one, the
3  lines would cross, right?
4      A    I have no idea.  But what matters is the
5  cumulative.
6      Q    Is what I said true?
7      A    I don't know.  Might be.
8      Q    So if you looked at the period
9  February 2000 to October 2000, it's very likely during that
10 period that more Vioxx events were confirmed than placebo
11 events, right?
12     A    Why do you say that?  Where are
13 you?  Like in this --
14     Q    Yeah, the second time
15 period that you're looking at.  These are cumulative rates,
16 right?
17     A    Right.
18     Q    So the rate of -- I'm sorry.  The rate
19 of events in -- let me start over.
20          First of all, by the way, the cumulative
21 fraction of adjudicated events that are reflected here,
22 you're not suggesting that any one of these determinations
23 was done on an unblinded basis, are you?
24     A    I don't know.  No, I'm not