Thomas Rosamond, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  VIOXX                    MDL DOCKET NO. 1657
PRODUCTS LIABILITY LITIGATION    SECTION L

                                 JUDGE FALLON
                                 MAGISTRATE JUDGE KNOWLES

THIS DOCUMENT RELATES TO:

Jo Levitt v. Merck Sharp & Dohme Corp.,

2:06-cv-09757-EEF-DEK

_____


        DEPOSITION OF THOMAS ROSAMOND, M.D.,,

produced, sworn and examined on behalf of the

Defendant, pursuant to Notice, on Friday, the 11th

day of September 2015, between the hours of

8:25 a.m. and 11:21 a.m. of that day, at the

University of Kansas Medical Center, Room B440B,

3901 Rainbow Boulevard, in the City of Kansas City,

in the County of Johnson, and the State of Kansas,

before me, NAOLA C. VAUGHN, KS CCR 0895, CRR, RPR, a

Certified Court Reporter, within and for the States

of Kansas and Missouri.

Thomas Rosamond, M.D.

Page 2

 1        A P P E A R A N C E S
 2   For the Plaintiff:
 3        HUMPHREY FARRINGTON & McCLAIN, P.C.
          221 West Lexington Avenue
 4        Suite 400
          Independence, Missouri  64050
 5        816.398.7435
          dat@hfmlegal.com
 6        BY:  DANIEL A. THOMAS, ESQUIRE
 7
     For the Defendant:
 8
          WILLIAMS & CONNOLLY, LLP
 9        725 Twelfth Street, N.W.
          Washington, D.C.  20005
10        202.434.5131
          ehorn@wc.com
11        BY:  M. ELAINE HORN, ESQUIRE
12
     For the Witness:
13
          SIMPSON LOGBACK LYNCH NORRIS, PA
14        7400 West 110th Street
          Suite 600
15        Overland Park, Kansas  66210-2362
          913.342.2500
16        pglasser@slln.com
          BY:  PETER R. GLASSER, ESQUIRE
17
18
19
20
21
22
23
24
25

Page 3

 1             I N D E X
 2   WITNESS:  THOMAS ROSAMOND, M.D.
 3   Examination by Ms. Horn ........................ 4, 99
 4   Examination by Mr. Thomas .....................  90
 5
 6             EXHIBITS
 7   NUMBER   DESCRIPTION                    PAGE
 8   Exhibit 1 - Medical records              28
 9        LevittJ-GortonMMD-00001 - 151
10   Exhibit 2 - Medical records              68
11        LevittJ-CardioConsultMR-00001 - 107
12   Exhibit 3 - Medical Records              71
13        LevittJ-CrouseLindaMD-0001 - 0009
14   Exhibit 4 - Medical Records from Mid-America  73
15        Cardiology
16        LevittJ-WinCaseSPExpRpt-0001 - 0003
17
18
19
20
21
22
23
24
25

Page 4

 1              THOMAS ROSAMOND, M.D.,
 2   a witness, being first duly sworn, testified as
 3   follows:
 4
 5   (started at 8:25 a.m.)
 6              EXAMINATION
 7   BY MS. HORN:
 8      Q.   Okay.  Good morning, Doctor.
 9      A.   Nice to see you.
10      Q.   And I'll put on the record that I have
11   given your attorney a check for -- a preliminary
12   check for today.  If we go over, then just have
13   someone send us an invoice.  We will promptly pay
14   you.
15           MR. GLASSER:  Right.  And the rate
16   that was agreed upon, I believe, was $1,000 an
17   hour.
18           MS. HORN:  Yes, that's correct.  We'll
19   start with that.
20      Q.   BY MS. HORN:  Doctor, do you -- you're
21   here today testifying as a fact witness.  You're
22   not testifying -- let me start over.
23           You're here testifying because you
24   were a treating physician to Mrs. Levitt?
25      A.   Yes.

Page 5

 1      Q.   Are there times when you have given
 2   expert testimony?
 3      A.   No.
 4      Q.   Okay.  Have you ever been deposed
 5   before?
 6      A.   Yes.
 7      Q.   How many times?
 8      A.   Twice on the same case about 20 years
 9   ago.
10      Q.   Oh, wow.  You're very lucky.
11           Well, I'm going to ask you some
12   questions, and you see that we have a court
13   reporter here who's taking everything down.  And I
14   see you have your attorney.  So, you know, I won't
15   go too into details on all of the rules, but if
16   you are tired, need a break or anything, just let
17   me know.  Sometimes I start talking very quickly
18   and don't realize it.  So you could just tell me
19   to slow down or you need me to, you know, explain
20   or rephrase a question, I'll do so.
21           Aside from testifying or depositions,
22   have you done any type of expert work for
23   litigation?
24      A.   I did do some expert work for the
25   State of Kansas a number of years ago in regards

Thomas Rosamond, M.D.

Page 6

1   to a case in Western Kansas.  They wanted my
2   opinion about some technical features of the
3   imaging that was done at another hospital.  I
4   received a paycheck from them for X number of
5   dollars.
6       Q.   Okay.
7       A.   That's about all I remember about it.
8       Q.   And how long ago was that?
9       A.   Several years ago.  Maybe five, six
10  years ago.
11      Q.   Okay.  Other than the two depositions
12  that you've already told me about, have you ever
13  testified in court or testified in any other
14  proceeding for any reason?
15      A.   No.
16      Q.   Now, you and I have never met before
17  today; right?
18      A.   No.
19      Q.   Okay.  Before today have you spoken to
20  any of the attorneys for Mrs. Levitt?
21      A.   No.  No.
22      Q.   Either by phone or in person or in
23  writing?
24      A.   Not directly.
25      Q.   Okay.  Have you received any materials

Page 7

1   from attorneys for Mrs. Levitt?
2       A.   No.  Our office did receive a
3   litigation request for records from Bartimus back
4   in the early 2005 or '6, something like that.
5   Didn't come to me.  It came to our medical records
6   department.
7       Q.   Okay.  When is the last time that you
8   spoke with Mrs. Levitt?
9       A.   I have a letter in the electronic
10  record --
11      Q.   Um-hum.
12      A.   -- of an interaction.  That was the
13  last day.  In, I believe that was, 2009.
14      Q.   Okay.  To the best of your knowledge,
15  have you had any communications with any relative
16  of Mrs. Levitt?
17      A.   Her husband was with her that day.
18  Otherwise, no.
19      Q.   Other than your attorney, have you
20  spoken to anyone else about this litigation or the
21  fact that you're giving a deposition today?
22      A.   I've talked with my colleagues about
23  their experience with depositions.
24      Q.   Have you talked with anybody about the
25  substance of your testimony?

Page 8

1       A.   Other than my lawyer?
2       Q.   Other than your lawyer.
3       A.   Not of the substance.  I've chatted
4   with my colleagues about Vioxx in general.
5       Q.   And was that in relationship to this
6   deposition?
7       A.   Yes.  Yes.
8       Q.   And I just want to make sure I
9   understand.
10          So what was the nature of those chats?
11      A.   I asked them what their feeling was
12  about Vioxx from their memory.
13      Q.   And were these -- what types of
14  doctors were these?
15      A.   Cardiologists.
16      Q.   And what response did you receive?
17      A.   Mostly that they didn't remember.
18  That it was too long ago.
19      Q.   Did you ever -- to the best of your
20  recollection, did you ever prescribe Vioxx?
21      A.   I don't recall prescribing Vioxx.  I
22  think I have prescribed Celebrex.  But you would
23  have records, I'm sure, or someone would of my
24  prescribing performance.  I don't remember
25  prescribing Vioxx.

Page 9

1       Q.   Do you believe you've prescribed
2   Celebrex in the last 10 years?
3       A.   I would say probably, yes.
4       Q.   How often do you prescribe, like,
5   NSAIDs for your patients.
6          MR. THOMAS:  Prescribe what?
7          MS. HORN:  NSAIDs.
8          MR. THOMAS:  Oh.
9       Q   BY MS. HORN:  Have you spoken with any
10  of Mrs. Levitt's other providers in regards to her
11  case?
12      A.   No.  No.  Peter Tadros did the heart
13  cath, but I don't believe we've ever talked about
14  it.
15      Q.   Okay.
16      A.   Other than, for complete truth, at the
17  time of her heart cath, I'm sure we discussed her
18  case and how to do it, yeah.
19      Q.   Okay.  Did you do anything in
20  particular to prepare for your deposition today?
21  Review any documents or anything like that?  Do
22  any research?  Anything like that?
23      A.   Yes.
24      Q.   What did you do?
25      A.   I reviewed her records on our EMR.

3 (Pages 6 to 9)

Thomas Rosamond, M.D.

Page 10

1  The records we had available on our '02 EMR.
2      Q.   Did you review anything else other
3  than Mrs. Levitt's medical records?
4      A.   Yes.  I have notes from a couple of
5  years ago when this deposition was prepared at
6  that time that I had some literature review of
7  Vioxx.
8      Q.   And so at the time when you were
9  approaching the deposition a couple years ago, did
10 you conduct a literature search, or how did that
11 come about?
12     A.   I think I Googled Vioxx, probably.  To
13 refresh my memory because it was such a long time
14 ago that Vioxx was on the marketplace.
15     Q.   And so did you have -- do you have a
16 file of the materials that you found?
17     A.   No.  It might be stuck on my hard
18 drive somewhere, I suppose.
19     Q.   Okay.  So in regards to preparing for
20 your deposition today, did you do any Google
21 searches?
22     A.   Yes.
23     Q.   What did you do?
24     A.   Kind of a Wikipedia search.
25     Q.   A Wikipedia search of what?

Page 11

1      A.   Vioxx.
2      Q.   And why did you -- what were you
3  looking for when you did that?
4      A.   My feeling there was it was so long
5  ago, I wanted to refresh my memory about Vioxx.
6      Q.   Did you review any scientific articles
7  about Vioxx?
8      A.   No.
9      Q.   So other than the write-up that was
10 in -- on the Wikipedia page, did you click through
11 other links to get to other sites?
12     A.   I went to NPR.
13     Q.   And what did you find at NPR?
14     A.   There was a Timeline article on NPR.
15     Q.   And when did you do this?
16     A.   Oh, months ago.
17     Q.   So other than the NPR site, do you
18 recall visiting any other sites?
19     A.   I think Wikipedia has a Vioxx web
20 page.
21     Q.   Any other sites that you recall?
22     A.   Let see.  I think I asked -- I think I
23 asked my secretary to get me a copy of the JAMA
24 article from -- what was it?  2002, I believe.
25 Eric Topol's work with Steve Nissen and Deborah

Page 12

1  Mukherjee.
2      Q.   And did you read that article?
3      A.   Yes.
4      Q.   Okay.  And when did you read that
5  article?
6      A.   I seem to remember reading it when it
7  first came out, but also I read it, say, in the
8  last month or so.
9      Q.   Have you read any other scientific
10 articles regarding Vioxx?
11     A.   I haven't pulled them per se.  I know
12 there is an article in the New England Journal
13 about it from 2005, I believe.  The VIGOR study.
14 And there's also an article in The Lancet about
15 2007 about the number of deaths Vioxx may have
16 caused.  And there was one other article -- this
17 goes back a while.  What was that.  The APPROVe
18 study was published, I believe, in -- I don't
19 remember which journal it was in.
20     Q.   And you actually read the APPROVe
21 study -- the article related to the APPROVe study.
22     A.   No.
23     Q.   So did you read the article that
24 reported the results from the APPROVe study?
25     A.   It mentioned it in that NPR Timeline.

Page 13

1  I didn't pull the APPROVe article text myself to
2  read the original manuscript.
3      Q.   Other than your colleagues, have you
4  spoken to any other physicians or scientists
5  regarding Vioxx?
6      A.   No.
7      Q.   And when you reference the New England
8  Journal of Medicine article, The Lancet article,
9  and the JAMA article, do you have copies of those
10 materials?
11     A.   I do have a copy of the JAMA article
12 somewhere on my desk, in my office probably.
13     Q.   And do you have a CV?  I believe that
14 there may have been a request for a copy of your
15 CV.
16         MR. GLASSER:  I don't think so.
17         MS. HORN:  You don't think there was a
18 request?
19         MR. GLASSER:  I don't think so.
20     Q   BY MS. HORN:  Okay.  Other than the
21 medical records which are with the hospital, do
22 you have any other materials that are directly
23 related to Mrs. Levitt or your care of
24 Mrs. Levitt?
25     A.   In my possession?

4 (Pages 10 to 13)

Thomas Rosamond, M.D.

Page 14

1    Q.   We'll start with that, yes.
2    A.   No.
3    Q.   Okay.  When you're clarifying, are
4  there other documents to which you have access
5  concerning Mrs. Levitt or your care of
6  Mrs. Levitt?
7    A.   I'll give a brief answer.
8    Q.   Okay.
9    A.   The cath films, the cath report,
10  procedure reports are, I believe, in the
11  possession of St. Luke's Hospital, and I don't
12  have access to them.  Our EMR does not include, to
13  my knowledge, the cath reports or the angioplasty
14  reports, and I don't have the films to look at.
15    So those data points are probably in
16  the St. Luke's Hospital archives.
17    Q.   If we'll just get a brief -- the
18  nutshell version of your professional background.
19    Can you just tell me where you went to
20  college, medical school, and the highlights.
21    MR. THOMAS:  And the highlights.
22    A.   Yeah.  There are no highlights.
23    MR. THOMAS:  Including any social
24  clubs.
25    A.   I grew up in St. Louis.  Went to

Page 15

1  Parkway High -- Central High School.  Went to
2  college at Colorado State University.  These are
3  in sequence.
4    Q   BY MS. HORN:  And excuse me.
5    What year did you graduate from
6  college?
7    A.   '75.
8    Q.   Please continue.
9    A.   Had a BS in physical science.  I went
10  from there directly to the University of Missouri
11  Medical School.  I graduated from there in 1980,
12  which was a year late because I took a year off to
13  be the student body president.
14    Then from there I went to residency at
15  the University of Minnesota for three years.  And
16  then I did a year as a chief resident at the
17  VA Hospital in Minneapolis.
18    From there I went to Wash U Barnes
19  Hospital in St. Louis.  Washington University for
20  my cardiology fellowship.  It was a four-year
21  fellowship.  Two years in the research lab and two
22  years of clinical.
23    I graduated from there in 1988 and was
24  hired by Mid-America Cardiology that year and have
25  worked for them ever since.  In 2010 -- I

Page 16

1  misspoke.
2    In 2002 I did a fellowship in cardiac
3  MRI at Barnes Hospital with Sam Wickline's
4  program.
5    And then in 2010 I did a master's
6  degree in health economics, policy and management,
7  at the London School of Economics, and graduated
8  there in 2013.
9    And as far as my training, that brings
10  us up to date.
11    Q.   And you said that you've worked with
12  Mid-America Cardiology since 1988?
13    A.   Yes.
14    Q.   At one point -- so what's -- can you
15  explain to me the jump -- or the transition from
16  St. Luke's to the University of Kansas?
17    A.   It's a very long story, but the short
18  version is in -- I believe in 2000 we came over to
19  KU -- our whole group was bought by KU, and we
20  left St. Luke's Hospital and came over here.
21    There's a lot more to the story.
22    Q.   And that explains what I need to know.
23    And you said that in 2013 you
24  worked -- you did your master's degree at the
25  London School of Economics.  Is that correct?

Page 17

1    A.   Yes.
2    Q.   Can you tell me a little bit more
3  about what that was about?
4    A.   Do you mind if I look at this beep for
5  just a second?
6    Q.   Oh, of course not.
7    A.   I don't think it will get in my way.
8  The patient something named Elaine is having
9  trouble finding the room.  I'm sorry.  Would you
10  repeat the question?
11    Q.   So what was the master's degree that
12  you were working on at the London School of
13  Economics?
14    A.   It's in health economics, policy and
15  management.  It's like the English version of an
16  MBA in PH.
17    I did that because I'm the chairman of
18  our compensation committee for the last 10 years,
19  and I felt like I needed to have more expertise in
20  those areas.
21    Q.   Have you ever participated in the
22  clinical trials as a researcher?
23    A.   I'm sure I have.  I've been a PI on
24  one -- it's been years ago, though.  I don't want
25  to give you misinformation, but, yeah, I've

5 (Pages 14 to 17)

Thomas Rosamond, M.D.

Page 18

1 probably participated in some small way, perhaps.
2    Q.   All right.  Do you have any
3 publications in the last 10 years?
4    A.   Mostly case report type of stuff.
5    Q.   And have you ever done any work or
6 consulting for a pharmaceutical company?
7    A.   I gave a grant proposal about five or
8 six years ago to Astellas to do a study on
9 regadenoson.  It was not funded, however.
10   Q.   Have you ever done any work with the
11 FDA?
12   A.   No, I don't believe so.
13   Q.   Okay.  Have you ever -- or any work
14 with the FDA advisory committee?
15   A.   No.
16   Q.   And what type of cardiologist are you?
17 Preventative?  Interventional?  Like how would you
18 describe your practice?
19   A.   I started as an interventionalist and
20 imager when I first joined the group in '88.  Got
21 out of the invasive part about five or six years
22 ago.  And I'm mostly now a -- well, my title is
23 the director of advanced cardiovascular imaging.
24 So it's an imaging general cardiology sort of
25 practice.  I do nuclear, CT, MR, and some PET.

Page 19

1    Q.   And then your current
2 responsibilities, do you actually see patients?
3    A.   Yes.
4    Q.   Okay.  And how often do you see
5 patients?
6    A.   Several times a week.  Sometimes I'll
7 be rounding in the hospital for a weekend on the
8 weekends.  So, yes, I do see quite a few patients.
9    Q.   Do you see patients outside of rounds
10 on the hospital?
11   A.   Yes.
12   Q.   And so your practice is the
13 Mid-America Cardiology Group?
14   A.   Yes.
15   Q.   How many doctors are in that group?
16   A.   Around 30.
17   Q.   And has that changed over the past
18 10 years?
19   A.   Yes.
20   Q.   So let's say back in the year 2000,
21 2002 time period, approximately how many
22 physicians were in that group?
23   A.   Oh, I'm guessing maybe 20.  That's a
24 guess.
25   Q.   Do you recall your treatment of

Page 20

1 Mrs. Levitt?
2    A.   Yes, I have some memory of it.
3    Q.   Okay.  Is there anything in particular
4 that stands out about her for you?
5    A.   You mean -- on what level are you
6 asking about?  Or can you clarify that a little
7 bit?
8    Q.   Sure.  So you last treated
9 Mrs. Levitt; is that right?
10   A.   I saw her in 2009 as a patient in our
11 office.
12   Q.   Was it an actual office visit?
13   A.   No.  It was not in the traditional
14 sense.  But she did come to me for some requests.
15   Q.   Okay.  And what were those requests?
16   A.   She asked me if I would write a letter
17 summarizing her medical care and whether or not I
18 thought Vioxx was an issue.
19   Q.   And who was with her?
20   A.   Her husband.
21   Q.   Anyone else?
22   A.   No.
23   Q.   And where did this meeting take place?
24   A.   In our office upstairs on the first
25 floor.

Page 21

1    Q.   And approximately how long did it
2 last?
3    A.   Oh, wow.  Maybe 45 minutes to an hour,
4 maybe.
5    Q.   Were you provided any materials?
6    A.   No.
7    Q.   And did you write the letter that day?
8    A.   Yes.
9    Q.   And did you hand it to her that day?
10   A.   No.  I don't believe so.  I think we
11 mailed it to her.  But I'm uncertain about that --
12 how she got possession, but I'm sure we probably
13 dictated it that evening and sent it to her home,
14 I assume.
15   Q.   Okay.  Were you provided any samples
16 or guidelines as to what needed to be in the
17 letter?
18   A.   She asked me specifically if I would
19 comment on whether or not I thought Vioxx was an
20 issue.
21   Q.   Do you recall anything else being --
22 you were being asked to comment on?
23   A.   No.  I don't recall anything else.
24   Q.   Was there any information you were
25 asked to include or opinions you were asked to

6 (Pages 18 to 21)

Thomas Rosamond, M.D.

Page 22

1  include that you declined to do so?
2      A.   Can you repeat that question?  I'm not
3  sure.
4      Q.   Sure.  Were there any opinions or
5  information that you were asked to put in the
6  letter, staff to put in the letter that you
7  declined to do?
8      A.   No.  No.  I don't believe there were
9  any other requests.
10     Q.   And to the best of your recollection
11 have you received any other requests like that?
12     A.   In my whole practice or from her.
13     Q.   No.  Well, we'll start with from her.
14     A.   No.
15     Q.   And then have you received requests
16 like that from other patients?
17     A.   No.
18     Q.   And what was your understanding for
19 why this was being requested?
20     A.   My memory is fragmentary there, but I
21 recall that she said that it was part of a
22 probable lawsuit.
23     Q.   Anything else you recall about that?
24     A.   Can I ask my attorney a question here?
25         MS. HORN:  Yes.

Page 23

1         MR. GLASSER:  You want to step
2  outside?
3         THE DEPONENT:  Yes.
4         MR. GLASSER:  Thank you.
5         (The witness and Mr. Glasser
6          conferred outside the deposition
7          room from 8:49 a.m. to 8:50 a.m.)
8         THE DEPONENT:  What was the question?
9         MS. HORN:  Can you read it back?
10        (The reporter read the record as
11         requested.)
12     A.   No.  No.
13     Q   BY MS. HORN:  Did you do any research
14 to prepare the letter?
15     A.   No.  Other than I sat down and
16 reviewed everything in our records that we had in
17 order to craft the letter.  So I didn't go out and
18 search the literature before the letter was done.
19     Q.   Did you prepare any drafts of the
20 letter before you sent it to Mrs. Levitt?
21     A.   To my recollection, I just dictated it
22 over the phone.  And when it came to my desktop, I
23 signed it.
24     Q.   And who did you dictate it to?
25     A.   We have a transcription department

Page 24

1  that does all our transcription.
2      Q.   And that's typically done over the
3  phone?
4      A.   Yes.
5      Q.   Do you recall being asked to include
6  any opinions in your letter?
7      A.   Yes.
8      Q.   Okay.  What do you recall about the
9  opinions you were asked to include?
10     A.   She asked me to include my opinion
11 about whether Vioxx contributed to her medical
12 course.
13     Q.   Any other opinions that you were asked
14 to include?
15     A.   Not to my memory.
16     Q.   Other than the medical records --
17 strike that.
18         Did you review any medical records for
19 Mrs. Levitt that were created after you treated
20 her and when you were preparing this letter?
21     A.   I'm not sure exactly the question.
22 Can you restate that for me?
23     Q.   Sure.  In terms of the medical records
24 that you looked at to prepare the 2009 letter,
25 were there any medical records of Mrs. Levitt's

Page 25

1  other than the ones that were created in 2000?
2      A.   The records I had available were only
3  those that are within our electronic medical
4  record system.
5          So whatever predated that letter in
6  2009 would have been there.  But not the records
7  from St. Luke's Hospital per se, the cath film
8  reports.  The cath films were not in the EMR for
9  me to review.
10     Q.   Did you have access to or review any
11 cardiologists' records from outside the
12 Mid-America Cardiology Group?
13     A.   No.
14     Q.   Did Mrs. -- did the Levitt's provide
15 you with any medical records at any time?
16     A.   No.  No.
17     Q.   Did you review any materials
18 concerning Mrs. Levitt's medical care or treatment
19 after you stopped treating her?
20     A.   For this deposition I did go back and
21 look at all the entries from 2009.  And I believe
22 there were some correspondence from Bartimus's
23 group to our recordkeeping department that are in
24 there as a notification that they had been
25 requesting records.  But I don't -- I didn't see

7 (Pages 22 to 25)

Thomas Rosamond, M.D.

Page 26

1    her again after 2009.
2        Q.   Prior to 2009, when was the last time
3    you'd seen Mrs. Levitt?
4        A.   I'd have to go look it up to be
5    absolutely sure, but I believe the last time I saw
6    her was 2002.
7        Q.   And at the time that you were
8    preparing the 2009 letter, were you provided any
9    information about Mrs. Levitt's condition post
10   2002?
11       A.   No.  I recall having thought that -- I
12   was curious why she was coming to see me because I
13   hadn't really been involved in her care after
14   that, after 2002.  Check my dates.  There'll be a
15   date from my last office, though, that would
16   corroborate the dating.  But I don't I was aware
17   of any of her care between 2002 and 2009.
18       Q.   And in terms of the scope of
19   Mrs. Levitt's Vioxx usage, were you relying on
20   information that -- whatever she told you?
21       A.   The Vioxx information I included in my
22   letter was all taken directly from our EMR, not
23   from information she gave me at the time of the
24   letter in 2009.  Is that the question?
25       Q.   Yeah.  We'll --

Page 27

1        A.   Unless you want to clarify that.
2        Q.   Other than the meeting that you've
3    already spoken about with Mr. or Mrs. Levitt, have
4    you had any contact with any family members of
5    Mrs. Levitt since you last saw her in 2002?
6        A.   No.
7        Q.   Are there particular journals that you
8    subscribe to or view regularly?
9        A.   Journal of American College of
10   Cardiology, I think, is -- comes to my office
11   through my secretary, who handles all my
12   subscriptions.  I usually also get Journal of
13   American Society of Echo.  I believe I also get
14   the Journal of Computed Cardiac Tomography and
15   Geography.  Probably not the right title, but you
16   get the idea.
17            And intermittently over the years I've
18   subscribed to the New England Journal, but I don't
19   think I have an updated subscription to them now.
20            We have access to the literature
21   through updates on our web sites here.  The
22   university provides that.  And usually when I do a
23   research project, I go to the library or have my
24   administrative assistant do the literature search
25   for me.

Page 28

1            MS. HORN:  Okay.  I'd like to mark
2    this as Exhibit 1.
3            (Exhibit 1 marked.)
4        Q    BY MS. HORN:  And, Doctor, what I have
5    marked as Exhibit 1 are a collection of medical
6    records that we received from the -- well, strike
7    that.
8            Do you know Michael Gorton,
9    G-o-r-t-o-n?
10       A.   I do, yes.
11       Q.   Is he a member of the Mid-America
12   Cardiology Group?
13       A.   No.
14       Q.   Was he ever?
15       A.   No.  He was a member of the
16   Mid-America CT surgeons, which was a separate
17   group from MAC.
18       Q.   Okay.  Well, what I have marked as
19   Exhibit 1 is a collection of records that were
20   produced on behalf of Dr. Gorton's office, which
21   appear to include Mid-America Cardiology Group
22   records.
23            And if you look at the very bottom of
24   the page, you'll see a notation, which is
25   LevittJ-GortonMD and then some consecutive

Page 29

1    numbers, which we call Bates numbers.
2            MR. GLASSER:  These numbers, and the
3    pages are double sided.
4        Q    BY MS. HORN:  Yes.  Yes.  And for the
5    purposes of today's deposition, we're going to use
6    those numbers in the bottom right as page numbers.
7    In the bottom right.
8        A.   Yes.  Yes.
9        Q.   So in terms of the records that you
10   reviewed today, I notice that this particular
11   record is the very first page.  It's from
12   St. Luke's.
13            Is this something that would have been
14   outside of your review?
15       A.   Yes.  This -- I don't remember having
16   access to this document from our EMR.
17       Q.   Okay.  If you will skip forward for a
18   moment --
19       A.   Sure.
20       Q.   -- to -- on page 31, and it's labeled
21   as a November 28, 2000, phone note.
22            Do you recognize this type of
23   document?
24       A.   Yes.
25       Q.   Okay.  What is it?

8 (Pages 26 to 29)

Thomas Rosamond, M.D.

Page 30

1       A.   It's a nurse's note from our practice.
2       Q.   And is this something that you
3  would -- that you would typically see in the
4  ordinary course of your medical practice?
5       A.   Yes, I would say yes.
6       Q.   And how would it come to you?  Would
7  it come to you in an electronic form on a
8  computer?
9       A.   Yes.
10      Q.   Or some other way?
11      A.   It would appear on our computers, in
12  our EMR.
13      Q.   Okay.  And for the substance of the
14  note -- strike that.
15           It's assigned by Tish Ferazzi.
16           Who is Tish Ferazzi?
17      A.   She's one of the nurses in our
18  practice assigned to my practice.
19      Q.   Okay.  Is she still currently
20  employed?
21      A.   Yes.
22      Q.   And this particular note dated
23  November 22, 2000, references an office visit from
24  the prior day; is that correct?
25      A.   Yes.  Yes.

Page 31

1       Q.   And then if you page forward --
2  actually, strike that.
3           Maybe you can help me with something
4  else.  Turn to the next page, page 32.
5           What kind of record is this?
6       A.   That is another nurse's note.
7       Q.   And what does it document?
8       A.   It's listing her lipid profile blood
9  work.
10      Q.   So this would be documenting some lab
11  reports that were received on or about June 20th,
12  2001?
13      A.   6/28/2001, yes.
14      Q.   Okay.  And then the next page, which
15  has a July 23rd, 2001, date, what is that
16  documenting?
17      A.   We're talking about 33 --
18      Q.   Yes?
19      A.   Item 33?
20      Q.   Yes.
21      A.   This is a medication refill note.
22      Q.   And how would this come about?
23  Somebody was requesting a refill or what happened?
24      A.   I can't comment on what exactly
25  prompted the note, other than to say that it's a

Page 32

1  common note we'll get when we renew prescriptions.
2       Q.   So this is document -- I'm sorry.
3           So this is documentation of your
4  office or you renewing a prescription?
5       A.   That's right.  Yes.
6       Q.   Okay.  And in this case, what's the
7  prescription for?
8       A.   Atenolol 25 milligrams, once daily.
9       Q.   And is this prescription authorizing
10  approximately a five-month supply?
11      A.   Yes.
12      Q.   Okay.  And then if you turn to
13  page 43, what is that documenting?
14      A.   It's a prescription for nitroglycerin.
15      Q.   And this particular record is dated
16  October 8th, 2001; is that correct?
17      A.   Yes.
18      Q.   So this is documenting that you
19  renewed a prescription for nitroglycerin in
20  October of 2001; is that right?
21      A.   Yes.  Yes.
22      Q.   And then if you skip to the next page,
23  page 35?
24      A.   Yes.
25      Q.   September 30th, 2002, and it also

Page 33

1  referenced a prescription renewal.  You see that?
2       A.   Yes.
3       Q.   Okay.  And can you read for the record
4  that little note after -- or starting with "Fax to
5  Osco?
6       A.   It reads, "Called Mrs. Levitt about
7  office visit with TLR.  She has not been seen in
8  almost two years.  She voiced understanding and
9  will call back to make appointment after she looks
10  at her schedule."
11      Q.   Is the reference to TLR you?
12      A.   Yes.
13      Q.   And would you interpret this note to
14  mean that she had not been in your office for
15  almost two years?
16      A.   That's the way it reads.
17      Q.   Okay.  Does that refresh your
18  recollection as to the last time you'd actually
19  seen Mrs. Levitt prior to 2009?
20      A.   I would have to refer to the medical
21  record to look up when my last office visit was.
22  That would be the last time I saw her.
23      Q.   Okay.  Earlier when you indicated that
24  the last time you'd seen her, Mrs. Levitt, was in
25  2002, what were you basing that particular

Golkow Technologies, Inc. - 1.877.370.DEPS

Thomas Rosamond, M.D.

Page 34

1  recollection on?
2      A.   I looked through the chart in
3  preparation for our meeting today and tried to get
4  a feel for the timeline.  But it was totally based
5  upon whatever is in the EMR under her name.  So
6  that's where I'm coming from the timeline.  I
7  don't have any independent memory of the times and
8  dates other than what I see in our electronic
9  medical record.
10     Q.   Okay.  And would you page forward to
11 page 38.  And this is a phone note or a record
12 dated December 4th, 2003.
13     A.   Um-hum.
14     Q.   Can you read that for us?
15     A.   Chart sent to storage.
16     Q.   And what do you think that means?
17     A.   I think it means we're not seeing her
18 anymore.  But I'm not sure.  I don't know the
19 context.
20     Q.   Who was Linda Smith?
21     A.   I think she's one of our nurses, but
22 you better check that.  I'm not sure.
23     Q.   Do you currently have a nurse named
24 Linda Smith?
25     A.   I don't know.

Page 35

1      Q.   If you page forward to pages 40 and
2  41, and this is a record dated April 24th, 2000?
3      A.   Yes.
4      Q.   And you can just take a moment and
5  look it over.
6           But what type of record is this?
7      A.   This is a report of an exercise stress
8  myocardial perfusion image exam.
9      Q.   And why are those performed?
10     A.   They're performed to look for evidence
11 of ischemia or previous heart attack, infarction.
12     Q.   And what's the conclusion of this
13 particular --
14     A.   This study does not reveal evidence of
15 significant active inducible ischemia or prior
16 myocardial injury.
17     Q.   Okay.  So as of April 24th, 2000, had
18 this patient, which is Mrs. Levitt, had an MI?
19     A.   According to the report, there's been
20 no myocardial injury, which means no necrosis of
21 the myocardium, which is what we think of a
22 myocardial infarction.
23          But your definition of infarction is
24 important.  It's not the same as an acute coronary
25 syndrome.  It simply means there's been no star

Page 36

1  formation from a heart attack.
2      Q.   Okay.  And to the best of your
3  knowledge, as of -- strike that.
4           To the best of your knowledge, has
5  Mrs. Levitt ever been diagnosed with a myocardial
6  infarction?
7      A.   I'd like to set the context of that.
8           She, to my memory, did not ever have
9  cardiac enzymes in her blood to imply an
10 infarction.
11     Q.   And if someone has had a myocardial
12 infarction, you would expect to find cardiac
13 enzymes; would you not?
14     A.   Yes.
15     Q.   Focusing again on this April 24th,
16 2000, report, would these be considered normal
17 reports?
18     A.   May I review them slightly?
19     Q.   Oh, yes, please.
20     A.   You want to restate your question
21 again?
22     Q    BY MS. HORN:  Strike that.  Withdraw
23 the question.
24          Based on this April 24, 2000, report,
25 would these results be considered normal?

Page 37

1      A.   Yes.
2      Q.   And focusing on page 41, the number of
3  that little fifth point, that says, "Left
4  ventricular ejection fraction," and it says
5  "59 percent."
6           Do you see that?
7      A.   (Witness nods.)
8      Q.   How would you characterize that
9  ejection fraction?
10     A.   Normal.
11     Q.   And what's considered a normal
12 ejection fraction?
13     A.   It varies from authors to authors, and
14 it's actually recently been revised by AC -- by
15 the guidelines, but generally, it's considered to
16 be 55 to 70 percent.
17     Q.   And what was the recent revision?
18     A.   2014, echocardiographic guidelines
19 define it down, I believe -- and you'll have to go
20 look it up, but I think they defined it down to
21 52 percent.  I'm quoting from memory now.
22     Q.   And for a layperson, what exactly is
23 an ejection fraction?
24     A.   For a layperson?
25     Q.   Yes.

10 (Pages 34 to 37)

Thomas Rosamond, M.D.

Page 38

1     A.   I tell my patients it's a measure of
2   their horsepower.  How much horsepower does their
3   engine have.
4     Q.   So another way of saying how
5   powerfully their heart is beating?
6     A.   That's the general idea, yes.
7     Q.   So if you page forward to the next
8   page, page 42, we have the April -- strike that.
9       We have the May 31st, 2000, record.
10  And what is this a record of?
11    A.   On 42, it's an echo/Doppler exam,
12  cardiac echo.
13    Q.   Okay.  And based on this report,
14  what's Mrs. Levitt's ejection fraction?
15    A.   65 percent.
16    Q.   So, again, that's normal?
17    A.   Yes.
18    Q.   And on the next page, we have a
19  July 26th, 2000, report.
20       What type of exam is this documenting?
21    A.   This is a Bruce protocol.  Myocardial
22  perfusion imaging stress test.
23    Q.   And how does that differ from the
24  other types of reports that we looked at?
25    A.   It's very similar to the report from

Page 39

1   4/24/2000, on page 40.  The one on page 42 is an
2   echo, which is a different test entirely.
3     Q.   And the one that's July 26th, 2000, on
4   page 43, this is an exercise treadmill test?
5     A.   It's a Bruce protocol stress test with
6   myocardial imaging.
7     Q.   And that involves the use of an
8   exercise treadmill?
9     A.   Yes.
10    Q.   And what were the results of this
11  particular test?
12    A.   Should I quote?
13    Q.   No.  I'll withdraw the question.
14       Were the results of this particular
15  test normal?
16    A.   Yes.
17    Q.   All right.  And the very last
18  paragraph where it says Opinion, can you read that
19  for us?
20    A.   It states, "This study does not reveal
21  evidence of significant active inducible ischemia.
22  A slight decrease in anterior uptake is felt to be
23  most likely attributable to breast tissue
24  attenuation rather than prior myocardial injury.
25  Left ventricular systolic function is preserved.

Page 40

1     Q.   And looking up slightly to number 5,
2   where it rates the left ventricular ejection
3   fraction, what is that ejection fraction?
4     A.   59 percent.
5     Q.   And, again, that's normal; correct?
6     A.   Yes.
7     Q.   So based on this report, is it fair to
8   say that Mrs. Levitt's heart appeared to be fine?
9       MR. THOMAS:  No foundation.
10      MR. GLASSER:  You can answer.
11    A.   Depends on how you define fine.  But
12  it's a normal exam.
13    Q    BY MS. HORN:  Would this particular
14  report from July 26th, 2000, raise any concerns
15  for you?
16    A.   I'm scanning the document again.
17       Restate the question.
18    Q.   Read it back, please.
19       (The reporter read the record as
20        requested.)
21    A.   No.
22    Q    BY MS. HORN:  So can you page forward
23  to 128 and 129, please.
24       And the date on this particular record
25  is March 10th, 2000, and at the top of the page it

Page 41

1   says, "Provider:  Thomas L. Rosamond."
2       That's you; correct?
3     A.   Yes.
4     Q.   And so this is your note?
5     A.   Yes.
6     Q.   So is this a copy of a letter that you
7   sent to Mrs. Levitt's primary care physician,
8   Dr. Hartman?
9     A.   I believe, yes.
10    Q.   You want to take a moment?
11    A.   It's a long letter.
12    Q.   Well, let me rephrase that.
13       Would you have seen this particular
14  letter when you were doing your review, your
15  recent review of the electronic medical records?
16    A.   It's a long letter.  Let me --
17      MR. GLASSER:  Take your time and look
18  at it.
19    Q    BY MS. HORN:  Let me withdraw that
20  question and ask a different one.
21       When you were making a distinction
22  between St. Luke's records and other records that
23  you did not have access to, would this be a record
24  that you did have access to after you left
25  St. Luke's or not?

11 (Pages 38 to 41)

Thomas Rosamond, M.D.

Page 42

1     A.   The way it's labeled implies that it's
2  in our EMR.  The way to tell would be to pull up
3  the EMR right now and see if it's in that EMR that
4  I have access to.  But it looks to me like a
5  letter that would be in our EMR.
6     Q.   Okay.  I'm just giving you a moment to
7  look at it so you're familiar with it.
8           MR. GLASSER:  Yeah.  Take your time.
9     A.   It looks to me like a letter that I
10 crafted at St. Luke's South during her
11 hospitalization, during her acute event, preparing
12 her for her angioplasty and indicating that we had
13 informed consent.
14    Q   BY MS. HORN:  To the best of your
15 knowledge, had you seen Mrs. Levitt prior to this
16 acute event?
17    A.   As a patient?
18    Q.   Yes.
19    A.   My memory is the first time I saw her
20 was this hospital stay.
21    Q.   And how did you come to see her?  Was
22 it in the emergency room or in some other fashion?
23    A.   I don't remember the precise details
24 of it.  But I seem to recall that I was staffing
25 St. Luke's Hospital South and she came from

Page 43

1  Dr. Hartman's office, if I recall.  But that's
2  based upon memory --
3     Q.   Okay.
4     A.   -- of an event that occurred 15 years
5  ago.
6     Q.   Yes.  So what type of exam or
7  procedure did you perform?
8     A.   I'm working from memory.  My
9  recollection is that I saw her EKG, recognized it
10 as a severe abnormality, and that it was likely a
11 high grade stenosis of the LAD, and I believe I
12 did the heart cath at St. Luke's.  That's my
13 memory of her.
14         The next day, maybe -- I don't
15 remember exactly the way that the dates fall out,
16 but I remember seeing her, and I think I cathed
17 her at St. Luke's Hospital South.  Got the films,
18 reviewed them with Peter and transferred her to
19 St. Luke's main campus downtown.
20    Q.   And in terms of performing angioplasty
21 or inserting a stent, is that the type of
22 procedure that you have done?
23    A.   I have done them, but I was not
24 engaged in doing them at that time.  I was a -- I
25 was inter -- I was an invasive cardiologist, but

Page 44

1  not an interventionalist.
2     Q.   So had you done them prior to this
3  point in time and stopped and you didn't do them
4  again?
5     A.   I had done them prior and then stopped
6  doing them.
7     Q.   And at some point -- strike that.
8           Is there a difference between a
9  medicated stent and an unmedicated stent?
10    A.   Yes.
11    Q.   Okay.  What's a medicated stent?
12    A.   That's a stent that's coated with
13 medication designed to prevent restenosis.
14    Q.   And why does it have that coating?
15    A.   The coating has a drug in it that
16 inhibits plaque formation, whereas the bare metal
17 stents are just that.  They don't have any
18 medication coating the stent per se.
19    Q.   And today if someone were to have a
20 stent inserted, would it more likely than not be a
21 medicated stent?
22    A.   I don't know about more likely, but
23 the operating physician makes a decision whether
24 to put a bare metal or a coated stent in.
25    Q.   Do you know the reason why a surgeon

Page 45

1  would use a non-medicated stent as opposed to a
2  medicated stent?
3     A.   I would ask them that question.
4     Q.   Do you know -- strike that.
5           Do you recall approximately when
6  medicated stents became available for use?
7     A.   I think it was well after this event,
8  but I would have to go look it up.
9           MR. GLASSER:  We've been going about
10 an hour.  Are we at a convenient breaking point?
11         MS. HORN:  Yes.  If you want to do
12 that.
13         MR. GLASSER:  Okay.
14         MS. HORN:  Take a break.
15         (Recessed from 9:24 a.m. to
16         9:37 a.m.)
17    Q   BY MS. HORN:  And just for the record,
18 can you flip forward to the very last page of this
19 packet, page 151.  And this is an affidavit from
20 the custodian of records for Mid-America
21 Cardiology.  So this would clarify that these
22 documents were actually the ones that were
23 produced on behalf of Mid-America Cardiology,
24 notwithstanding the notation at the bottom.
25         Do you know Carol Skidgel?

12  (Pages 42 to 45)

Thomas Rosamond, M.D.

Page 46

1    A.  I do.
2    Q.  Okay.  Who is she?
3    A.  One of our nurses, and one of our
4  office supervisors.  She's now retired.
5         MR. GLASSER:  Can I point one thing
6  out to him?
7         MS. HORN:  Yes.
8         MR. GLASSER:  So this tells the total
9  pages.  I just noticed this.
10        THE DEPONENT:  Oh, it's more -- it's a
11 bigger number than this number.  That's a bigger
12 number than this number.
13        MS. HORN:  Correct.  You're noticing
14 this affidavit document is 143 payments, and that
15 this -- the set of -- the exhibit that I handed
16 you is 151 pages.
17        We could -- we could go through and
18 pick it out, but some of them are going to be
19 documents that are pages that are like the LMI
20 actual pages from the records requests, the actual
21 affidavit.  But thank you for that notation.
22        THE DEPONENT:  I'm sorry.
23    Q   BY MS. HORN:  All right.  We're going
24 to go backwards for just one second to page 13.
25 And does this particular record, which is dated

Page 47

1  March 11th, 2000 -- does this document
2  Mrs. Levitt's discharge from the hospital visit
3  that we were just talking about?
4    A.  It looks like a portion of a discharge
5  summary from her hospitalization in March of 2000.
6    Q.  All right.  And what were the
7  discharge diagnoses?
8    A.  I'm quoting now, number 1, unstable
9  angina.  2, coronary artery disease.  3,
10 hypertension.  4, hyperlipidemia.
11    Q.  And the last two, hypertension and
12 hyperlipidemia, those are both risk factors for
13 cardiovascular disease; is that right?
14    A.  Yes.  Yes.
15    Q.  Are they risk factors for -- strike
16 that.
17    A.  Okay.
18    Q.  And if you page forward to 131.
19        Can you describe this record for me?
20    A.  It's a letter to Dr. Hartman by Kit
21 Powers, a former colleague of mine.
22    Q.  And what was Dr. Powers' role?
23    A.  I'm scanning the document.
24    Q.  Oh, sure.  Please take your time.
25    A.  It's a discharge summary from her

Page 48

1  hospitalization in March of 2000.  And that's
2  typical for the practice at that time to send
3  personal letters to the referring physician
4  summarizing their care.
5    Q.  Okay.  And, again, this particular
6  letter documents that Mrs. Levitt had
7  cardiovascular risk factors of hypertension and
8  hyperlipidemia?
9    A.  It does.
10    Q.  And moving forward to page 136.  And
11 this particular record is dated April 21st, 2014.
12        Am I correct this is also a letter
13 that was prepared by you to Dr. Hartman?
14    A.  Yes.  It looks like an office visit
15 letter that I crafted 4/21/2000.
16    Q.  Was that your standard practice to
17 write a letter to a referring physician after an
18 office visit?
19    A.  Yes.
20    Q.  If you drop down four paragraphs,
21 where it reads, "Her other past medical history
22 has included the tentative diagnosis of depression
23 or fibromyalgia."
24        Do you see that?
25    A.  I do.

Page 49

1    Q.  What would be the source of that
2  information?
3    A.  Again, this is 15 years in retrospect.
4  And I don't want to speculate, but it's probably
5  from Dr. Hartman's records.
6    Q.  Would Dr. Hartman's records be
7  available to you through your electronic medical
8  records system?
9    A.  No.
10    Q.  How would records be available to you?
11    A.  I may have had them when I saw her in
12 the hospital initially and put it in my records.
13 And this is taken almost verbatim from an earlier
14 record.
15        I'm speculating again.  I shouldn't do
16 that.
17    Q.  And the characterization of a
18 tentative diagnosis, do you -- is that -- would
19 that be something that you were copying over,
20 where it would say it was a tentative diagnosis,
21 or is that something else?
22    A.  I don't have any memory of why I
23 crafted it in that particular phraseology.
24    Q.  Okay.  Do you know whether, at this
25 particular point in time, Mrs. Levitt had been

13 (Pages 46 to 49)

Thomas Rosamond, M.D.

Page 50

1  diagnosed with fibromyalgia?
2      A.   I don't recall.
3      Q.   If you move to the next page, and the
4  sixth paragraph down, could you read that for me?
5      A.   The sixth paragraph reads, "I would
6  like to get her off the Lopressor entirely, and if
7  her symptoms are not improved with that, consider
8  cardiovascular cardiac diagnosis, or perhaps
9  ongoing depression for her symptoms of chronic
10  fatigue the syndrome."
11      Q.   All right. Let's start with the
12  Lopressor. What type of medication is that?
13      A.   Beta blocker.
14      Q.   And why is that prescribed?
15      A.   It's usually prescribed as a secondary
16  preventative medication.
17      Q.   For hypertension?
18      A.   And for hypertension. And for heart
19  failure.
20      Q.   Do you know why it was being
21  prescribed her?
22      A.   It's standard after acute coronary
23  syndrome to start someone on a beta blocker.
24      Q.   And when it says, "and if her symptoms
25  are not improved with that, consider a cardiac

Page 51

1  diagnosis," what does that mean?
2      A.   If you go back further in the EMR,
3  there are documents stating that she was having
4  profound fatigue, sleeping all day long. She was
5  feeling that it was the Lopressor causing it. And
6  that's what this is referring to. She had,
7  quote -- I'm quoting from the medical record now
8  from Diane Kovich's office note, that "she was
9  having extreme fatigue since starting Lopressor."
10      Q.   Is that -- in your experience, is that
11  a common reaction to Lopressor?
12      A.   Yes.
13      Q.   And to when you write here, "if her
14  symptoms are not improved with stopping Lopressor,
15  consider a cardiac diagnosis," what does that
16  mean?
17      A.   I think it's -- I think it's a
18  misprint. Probably should read, consider a
19  non-cardiac diagnosis for her fatigue.
20      Q.   Could you turn to the next page,
21  please, May 29, 2000, record.
22      A.   Before you do that, I'm just rereading
23  a second here to make sure I don't want to change
24  that last -- the question about consider cardiac
25  diagnosis, I'm not exactly sure if that is a

Page 52

1  misprint or not. It's unusual phraseology. So I
2  should qualify my previous response.
3      Q.   Okay. Well, as you sit here today,
4  what do you think you meant when you said that?
5      A.   It's speculation what I meant, but in
6  the context I think I'm trying to imply, if it's
7  not better off Lopressor, then the Lopressor is
8  not because of her symptoms.
9      Q.   And are you also suggesting that the
10  cause is a cardiac diagnosis or a non-cardiac
11  diagnosis?
12      A.   I'm not sure my intent on that part of
13  the sentence, but I think the point is that if it
14  doesn't get better off Lopressor, then it's
15  something else.
16      Q.   And your suggestion in this paragraph
17  was it could be ongoing depression or chronic
18  fatigue syndrome; right?
19      A.   That's what I state, yes.
20      Q.   Could you turn to the next page,
21  page 138 of the document, which is 5/29/2000
22  record.
23          Am I correct this is also a letter
24  from you to Dr. Hartman?
25      A.   That's correct. Yes.

Page 53

1      Q.   You could take a moment and look at it
2  and then I have a couple of questions.
3      A.   Okay. Go ahead.
4      Q.   Okay. And this particular record
5  relates to Mrs. Levitt's restenosis; is that
6  correct?
7      A.   Yes.
8      Q.   And so after she had her -- strike
9  that.
10          So why don't you explain what
11  restenosis is.
12      A.   It's a narrowing in a segment of
13  artery that has been previously stented. It
14  doesn't necessarily imply whether the -- no. I'll
15  leave it at that.
16      Q.   How common is a restenosis?
17          MR. THOMAS: Objection. Form.
18  Foundation as to timeliness.
19          MR. GLASSER: You can answer.
20      A.   Okay. Say that question one more
21  time. What was it?
22          (The reporter read the record as
23          requested.)
24      A.   It's more common with balloon
25  angioplasty, stenting. The bare metal stents

14 (Pages 50 to 53)

Thomas Rosamond, M.D.

Page 54

1  reduce the frequency and coated stents reduce it
2  further. I'm sure there's precise details in the
3  literature about the percentages. We see it more
4  commonly in bare metal stents.
5      Q    BY MS. HORN: Can you tell from this
6  particular record whether Mrs. Levitt had a bare
7  metal stent or a medicated stent?
8      A.   Not from this letter, I can't.
9      Q.   What would you need to look at to tell
10 that?
11     A.   The cath report.
12     Q.   The actual -- the cath report for May
13 of 2000?
14     A.   For her angioplasty, which was in
15 March of 2000, I believe; wasn't it?
16     Q.   Yes.
17         And in your experience is it rare for
18 your patients who have had stents inserted to
19 experience restenosis?
20         MR. THOMAS: Asked and answered.
21     A.   Can you -- can you define rare?
22     Q    BY MS. HORN: Fair question.
23         In your experience, how often do your
24 patients who have stents inserted experience
25 restenosis?

Page 55

1      A.   Bare metal or coated?
2      Q.   Let's start with bare metal.
3      A.   Based upon my personal experience in
4  cardiology for 30 years, it's time dependent.
5  Probably maybe 10 percent in the first year.
6  Approximately. In broad terms.
7      Q.   And, again, in broad terms, what's
8  your experience in your patients with regards to
9  medicated stents?
10     A.   Much less frequently. Maybe less than
11 5 percent. I haven't done a survey from my actual
12 experience to give you a true number. This is
13 just a --
14     Q.   And, again, my understanding is these
15 are approximate numbers. And you can use whatever
16 time frame makes sense to you. I'm just going to
17 say in a year.
18         In a given, typical year, how many
19 patients would you see would they get stents
20 inserted? And if there's some other time frame
21 that makes more sense to you, like a month, a
22 week, please do so.
23     A.   Can you clarify the question a little
24 bit in context? You mean in all my patients or
25 just in previously stented patients? I'm a little

Page 56

1  unsure. Maybe you should rephrase the question.
2      Q.   Okay. How many of your patients come
3  to you, whether it's through the ER or some other
4  source, and end up having stents inserted?
5      A.   I would say quite frequently. It's
6  common in my practice for that to happen. I don't
7  have a percentage number. It's not 50 percent; I
8  can tell you that. It's less than that, of my
9  patients that get a stent, because of my patient
10 mix. But when I'm on call or rounding or
11 following up in the hospital office, it's not
12 unusual for me to see patients who have had stents
13 put in.
14     Q.   Staying with the same record, can you
15 read the fifth paragraph for us?
16     A.   It reads, "We are still not entirely
17 sure that her symptoms on presentation were
18 angina. She did not rule in for myocardial
19 infarction and there were no definitive EKG
20 changes. As you know, she has a history of
21 fibromyalgia that may be complicating her
22 presentation somewhat, but regardless, this very
23 high grade stenosis was fortuitously detected."
24     Q.   The first part of that sentence, "As
25 you know she has a history of fibromyalgia that

Page 57

1  may be complicating her presentation," what does
2  that mean?
3      A.   In the context of the letter, I'm -- I
4  think I'm saying that fibromyalgia can present
5  with chest pains that are not cardiac.
6      Q.   Do you have an actual recollection of
7  this particular acute event? Strike that.
8         Would you describe this as an acute
9  event?
10     A.   We're referring to her presentation in
11 May, and I would call -- it was an acute
12 presentation of symptoms, yes.
13     Q.   Okay. And do you have -- as you sit
14 here today, do you have a specific recollection of
15 this particular visit or encounter?
16     A.   I really don't.
17     Q.   And just moving out to the paragraph
18 that starts, "On May 26th, 2000, we were actually
19 somewhat surprised." You see that?
20     A.   Yes, I do.
21     Q.   Okay. My question is -- relates to
22 the description of the arteries that were
23 narrowed.
24     A.   Correct.
25     Q.   Those two references.

15 (Pages 54 to 57)

Thomas Rosamond, M.D.

Page 58

1    Are those both to -- are those both
2  referencing stents, or is there a narrowing of
3  other than stents that she previously had?
4    A.  It's not clear from the precise
5  details from my dictation here.  I didn't go into
6  the description of how many stents were placed and
7  their locations.  This is more of a brief summary
8  to the referring physician rather than an
9  elaboration of entire details.  So I can't tell
10  from this sentence and paragraph.
11    Q.  Page forward to page 146, please.  I'm
12  sorry.  Page 144.
13    And this is a July 26, 2000, letter
14  from Dr. Vacek to Dr. Hartman; is that correct?
15    A.  Yes.
16    Q.  And who is Dr. Vacek?
17    A.  He's one of my partners.
18    Q.  And does he have a specialty that's
19  different than yours?
20    A.  No.  He's a cardiologist.
21  Non-invasive cardiologist.
22    Q.  Do you recall reviewing this
23  particular record before?
24    A.  If this is in our '02 records, I
25  likely did review it.  Not 100 percent certain,

Page 59

1  but it's likely.
2    Q.  Okay.  Can you move forward to
3  page 146, please.  And this is a November 27,
4  2000, office visit.
5    And this one is a letter from yourself
6  to Dr. Hartman; is that right?
7    A.  Yes.
8    Q.  Page 146 and 147.
9    A.  Page 146.
10    Q.  And 147.  And if you could take a
11  moment to review it.
12    A.  Okay.  I recognize it.
13    Q.  Okay.  So on this particular date,
14  November 27th, 2000, you actually saw Mrs. Levitt
15  in your office; is that right?
16    A.  Yes.
17    Q.  And what kind of testing was done on
18  that date?
19    A.  From the letter, it implies a Bruce
20  protocol exercise stress echocardiogram was
21  obtained.
22    Q.  And the last paragraph, is that
23  describing the results of that Bruce protocol?
24  The last paragraph on page 146?
25    A.  On 146.  Yes, I believe so.

Page 60

1    Q.  And where it reads, "she reached 7
2  MET, what does that mean?
3    A.  METs is a measure of how much exertion
4  you attain, how intense the exertion is at peak
5  exercise.
6    Q.  And how would you characterize a
7  measurement of 7 METE?
8    A.  It's not great.  Not terrible.  Kind
9  of in between.
10    Q.  Okay.  And the next sentence which
11  reads, "There were no diagnostic ECG changes for
12  ischemia," what does that mean?
13    A.  That means the EKG didn't reflect any
14  blockage to the coronary arteries that would lead
15  to low blood flow and ischemia.
16    Q.  All right.  And then the last
17  sentence, "Indeed, the overall assessment of the
18  study was that it was a normal stress echo without
19  evidence or ischemia."
20    A.  That's right.  That's what it says.
21    Q.  And based on the record that you have
22  of her November 2000 visit, was there any damage
23  at that point in time to Mrs. Levitt's heart?
24    A.  The date I have in front of me from
25  that office visit would imply that the heart had

Page 61

1  no damage at that point.
2    Q.  Do you have reason to believe at some
3  later point her heart was damaged?
4    A.  I don't have any firsthand knowledge
5  of that.
6    Q.  And moving on to the last page of your
7  letter, page 147 --
8    A.  Yes.  Yes.
9    Q.  -- could you read the first sentence
10  for me?
11    A.  "In summary then, this is a
12  57-year-old lady now approximately six months
13  status post bypass surgery.  Her symptoms are
14  somewhat atypical, and I suspect they are not
15  anginal in character."
16    Q.  From a -- and if you need to read more
17  from that paragraph you can, but from this
18  particular examination, are there any lasting
19  cardiac issues from Mrs. Levitt's events in March
20  and May of 2000?
21    MR. THOMAS:  Form, foundation.
22    MR. GLASSER:  You can go ahead and
23  answer.
24    MS. HORN:  And I'm going to withdraw
25  and restate the question.

16 (Pages 58 to 61)

Thomas Rosamond, M.D.

Page 62

1      Q    BY MS. HORN:  As of November 27, 2000,
2  did Mrs. Levitt have any continued cardiac issues
3  from her events of March and May of 2000?
4      A.   Can I elaborate or do you want a yes
5  or no answer?
6      Q    BY MS. HORN:  You can answer and then
7  elaborate if you feel the need to.
8      A.   Can I just say --
9          MR. GLASSER:  You can answer.  Give
10  her your answer.
11      A.   The question is a complex one and has
12  a complex answer.
13          Her heart strength was normal and
14  receiving enough blood supply.  She is dealing,
15  though with a median sternotomy, and she'll carry
16  that with her.  So that's not really damage, but
17  it's something that she's had as a result of those
18  events.  But her heart strength was not damaged.
19      Q    BY MS. HORN:  And I'm sorry.  What was
20  the last thing that you -- what was that
21  phraseology that you used?  That term?
22      A.   She's dealing with a median
23  sternotomy.
24      Q.   What is that?
25      A.   That's where they cut open your chest

Page 63

1  and wire it back together.
2      Q.   From the bypass surgery?
3      A.   From the surgery.  Yeah.
4      Q.   And when you say she's dealing with
5  that, what do you mean?
6      A.   Well, there are post pericardiac, to
7  me, syndromes that can occur.  I mean, that's
8  speculation that would ever be a problem for her.
9  You can have infections in your sternum.  The
10  wires can pop out.  You know, unintended
11  consequences that I may not know about that
12  happened later.  I don't know.
13      Q.   But, again, I'm focusing on
14  November 2000.  Do you know of any of those issues
15  that you just identified happening with
16  Mrs. Levitt?
17      A.   No.
18      Q.   Now, if you had seen Mrs. Levitt in
19  your office after November 27th, 2000, should
20  there be another document that looks like this,
21  either a letter to Dr. Hartman or some other
22  physician?
23      A.   It's my normal modus operandi to send
24  a letter every time I see a patient.  It should be
25  there.  I don't have the record in front of me

Page 64

1  other than what you provide.
2          MR. GLASSER:  Can he look through?
3      MS. HORN:  Yes.  Please do.
4          MR. GLASSER:  And I just wanted to
5  bring this up.  So you asked him earlier about the
6  143-page certification.
7          MS. HORN:  Yes.
8          MR. GLASSER:  There are, it appears,
9  seven pages here that are not part of that record?
10  Is that --
11          MS. HORN:  That has a different
12  affidavit; correct.
13          MR. GLASSER:  Okay.
14          MS. HORN:  And for whatever reason
15  they were put together and Bates numbered as one
16  package, which is not your doing.
17          MR. GLASSER:  Right.  I just wanted to
18  make clear that when you were asking him about
19  that page 8 on -- or the records that relate to
20  the affidavit on page 151.  You were asking about
21  that earlier.
22          MS. HORN:  Okay.
23          MR. GLASSER:  Is that right?
24          MS. HORN:  So pages 1 through 7 of
25  this exhibit, the last two pages contain a

Page 65

1  certification by the custodian of records, from a
2  Jami Gwen, it looks like.  And the subsequent
3  pages, page 8 through 150, with 151 being the
4  affidavit from Carol Skidgel of Mid-America
5  Cardiology.
6          MR. GLASSER:  Right.
7          MS. HORN:  Those two sets together
8  make up the Exhibit 1.
9          MR. GLASSER:  Right.  Okay.  You can
10  look through these pages and get an idea of what
11  dates, right, you saw her.
12          So from -- essentially here on.
13      A.   Okay.  I'm looking through 150 pages
14  here of documents.
15      Q    BY MS. HORN:  And as you'll flip
16  through, you'll see that some of them are copies
17  of EKGs and not office notes.
18          MR. THOMAS:  Yeah.  But be careful.
19  They're not necessarily in any date order, either.
20      A.   Whether or not all these documents are
21  also in my electronic medical system for me to
22  review is -- would take -- I'd have to go down and
23  sort them all to be absolutely sure there weren't
24  others.  I don't see any definite documents that
25  seem out of place, but what can I say.  There's

17 (Pages 62 to 65)

Thomas Rosamond, M.D.

Page 66

1  quite a few of them.  I don't -- I don't know how
2  to respond to this unless you want to rephrase the
3  question.
4        MS. HORN:  Is there a pending
5  question?
6        (The reporter read the record as
7        requested.)
8     Q    BY MS. HORN:  Who is Diane Kovich?
9     A    She's one of my nurses.
10    Q    Okay.  And will you turn back to
11 page 35.
12    A    Okay.
13    Q    And you see this is the note where she
14 says she has not been seen in almost two years?
15    A    Uh-huh.
16    Q    Do you have any reason to believe that
17 statement by Ms. Kovich is not accurate?
18    A    I don't.  Unless it's just a typo.
19    Q    Okay.  But would you also agree that
20 November 26, 2000, is about two years prior to
21 September 30th, 2002?
22    A    Seems to fit.
23    Q    As of November 27th -- strike that.
24 I'm going to get that wrong.
25        As of November 27th, 2000, would you

Page 67

1  have any reason to believe that Mrs. Levitt was
2  disabled, was physically disabled?
3        MR. THOMAS:  Form.  Foundation.
4     A    No, I don't.
5     Q    BY MS. HORN:  Are you familiar with
6  the group Cardiovascular Consultants?
7     A    Yes.
8     Q    And what group is that?
9     A    They're a cardiology group,
10 independent of ours, at St. Luke's Hospital at the
11 time.
12    Q    Did they operate at St. Luke's at the
13 same time that Mid-America did?
14    A    Yes.
15    Q    So what would determine which group a
16 patient saw, if they came into the ER?
17    A    We took turns covering the ER during
18 that time frame, or the patient may request one
19 person or the other, or the referring physicians
20 may send them to one or the other.
21        So which ones come to us versus go to
22 them is depending upon the referring physicians
23 and the patient's desires.
24    Q    And are you familiar with
25 Kramer & Crouse Cardiology?

Page 68

1     A    Yes.
2     Q    And what is that?
3     A    It's an independent cardiology group.
4  I don't know if it's extant now.  They were part
5  of our group and broke off to form that group.
6     Q    Okay.  When were they part of your
7  group?  Or let me rephrase that.
8     A    Oh, God.
9     Q    When did they break off from your
10 group?
11    A    I believe it was prior to 2000.  I
12 believe -- I'm not prepared to answer, but I
13 believe -- I shouldn't speculate.  But I think
14 it's before 2000.
15        MS. HORN:  Mark this as Exhibit 2.
16        (Exhibit 2 marked.)
17    Q    BY MS. HORN:  And what I have marked
18 as Exhibit 2 is a collection of records that we
19 received from Cardiovascular Consultants.
20        Was Cardiovascular Consultants ever a
21 part of your group?
22    A    No.
23    Q    Were you ever part of Cardiovascular
24 Consultants?
25    A    No.

Page 69

1     Q    After your group left St. Luke's, did
2  Cardiovascular Consultants continue to operate at
3  St. Luke's to your knowledge?
4     A    Yes.
5     Q    If during the time -- strike that.
6        Can you move forward to page --
7  actually, strike that.
8        If somebody saw a cardiologist from
9  Cardiovascular Consultants at the same time that
10 you were operating at the -- your group was
11 operating at St. Luke's, would you have access to
12 those records?
13    A    Not now.
14    Q    Would you have at the time?
15    A    I could -- often we would call their
16 office and ask for their records.  There was no
17 EMR back then.
18    Q    Okay.
19    A    And there would be access to the
20 hospital records in the -- in their files.  But we
21 don't have immediate access to their office
22 letters and tests, no.
23    Q    Do you know any reason why Mrs. Levitt
24 would have started seeing a cardiologist at
25 Cardiovascular Consultants?

18 (Pages 66 to 69)

Thomas Rosamond, M.D.

Page 70

1      A.   Yes.
2      Q.   Why?
3      A.   Recall that we moved from St. Luke's
4  to KU around 2000; right contemporaneous with when
5  I saw her.  And it may be that she preferred not
6  to go to KU and preferred to go to St. Luke's
7  Hospital.
8      Q.   Okay.  Can you just turn to page 85.
9  This appears to be a letter from Dr. Steven Laster
10  to Dr. Hartman.
11         Do you know Dr. Laster?
12      A.   I know his name.  I don't know him
13  personally.
14      Q.   Okay.  And can you just take a moment
15  and look at this letter, a one-page letter?
16      A.   Yeah.  It's dated November 2002.
17         Okay.
18      Q.   Okay.  Would you agree this appears to
19  describe a normal stress echo test?
20      A.   And he's sending the signal that it's
21  a normal study.  I don't have the tracings to
22  review to confirm that, but I think he's implying
23  that it's a normal study.  Can I rephrase that?
24  He's implying it's a low risk study.
25      Q.   And what's the difference between a

Page 71

1  low risk study and a normal study.
2      A.   They can be the same, but you can have
3  a low risk study that's not normal.  That's my
4  only point.
5      Q.   Okay.  Is there anything about this
6  particular letter that suggests to her her results
7  were not normal?
8      A.   He states that she's still having
9  occasional chest pain relieved with nitroglycerin,
10  and he does increase her Atenolol, apparently,
11  based upon that.  But he specifically states that
12  diagnostic EKG changes were not seen.  He does
13  note images reveal a non-transmural injury in the
14  anterior septum, but no ischemia, and normal
15  ejection fraction.
16      Q.   At the time that you wrote the letter
17  for Mrs. Levitt in 2009, did you have access to
18  these records?
19      A.   No.
20         MS. HORN:  Can we mark this as
21  Exhibit 3?
22         (Exhibit 3 marked.)
23      Q    BY MS. HORN:  We've marked a
24  collection of records that we received from
25  Kramer & Crouse & Crouse Cardiology.  If you'll

Page 72

1  look on the first page what's printed October 3rd,
2  2005.
3         MR. GLASSER:  What page did you say?
4      Q    BY MS. HORN:  I was looking at the
5  first page, but that's not -- I'll just withdraw
6  that.
7         And you can take your time to look at
8  the document, but the first three pages appear to
9  be a report documenting another stress test in
10  2005.
11         Would you agree with that?
12      A.   Page 3 does document a stress test.
13         MR. GLASSER:  Off the record.  Can we
14  go off the record for a second?
15         (Discussion off the record.)
16      Q    BY MS. HORN:  We're back on.  I'm
17  sorry.  You're saying page 3 does?
18      A.   Yes.  I don't see that the stress
19  echo -- is -- I haven't taken a -- I think it's
20  first mentioned on page 3, isn't it, that she
21  had -- walked for 7 minutes on a Bruce protocol?
22      Q.   Yes.  And I'm sorry.  You agree this
23  appears to describe normal results?
24      A.   It shows no ischemia by echo criteria.
25  They don't actually comment on the EKG portion of

Page 73

1  the test; do they?  But the statement, "No new
2  wall motion abnormalities" implies there's no
3  ischemia after 7 minutes of exercise.  The mild
4  anteroseptal hypokinesis at rest improved, which
5  would imply to me it's just the normal/abnormal
6  septal motion after bypass surgery.
7      Q.   If you would forward to page 6 and 7.
8  Does this provide you any additional information
9  about that test?
10      A.   It states no ST segment changes in the
11  stress protocol listing at 82 percent max heart
12  rate.
13      Q.   And how would you characterize
14  82 percent max heart rate?
15      A.   Slightly submaximal.  Usually target
16  85 percent max heart rate.
17      Q.   And the date on this record appears to
18  be September -- approximately September of 2005.
19  Were you provided a copy of any of these records
20  at the time prepared your 2009 letter?
21      A.   No.  I was completely unaware of that.
22         MS. HORN:  Mark this as Exhibit 4.
23         (Exhibit 4 marked.)
24      Q    BY MS. HORN:  And this is a
25  September 11th, 2009, letter from you To Whom it

19 (Pages 70 to 73)

Thomas Rosamond, M.D.

Page 74

1  May Concern.
2      Do you recognize this document?
3      A.   I'm scanning.  It has the appearance
4  of my letter, as best I can tell.
5      Q.   And to clarify, this is the letter
6  that you prepared at Mrs. Levitt's request
7  regarding her lawsuit; is that right?
8      A.   Yes.
9      Q.   Did you want to take the time to read
10  it?
11      MR. GLASSER:  Just take some time.
12      A.   I'm a slow reader.  Go right ahead.  I
13  do a lot of reading off the record.
14      Q   BY MS. HORN:  No.  I meant just read
15  it to yourself, just to --
16      A.   Would you have altered it in any way?
17  I mean, is that likely?
18      Q.   Not to my -- no.  Certainly not
19  intentionally.
20      A.   I think this is my letter.
21      Q.   In the -- this particular letter, in
22  the second full paragraph, you note that
23  Mrs. Levitt began her Vioxx therapy, I believe, in
24  August 1999.
25      A.   Um-hum.

Page 75

1      Q.   Do you know how long Mrs. Levitt
2  continued to take Vioxx?
3      A.   After that date?
4      Q.   Yes.
5      A.   As far as I know, she was on Vioxx
6  during the whole time that I saw her, between the
7  initial presentation and our last office visit.
8      Q.   And do you know whether or not she
9  continued to take Vioxx after your last office
10  visit?
11      A.   I don't know.
12      Q.   See if you drop back down to the last
13  paragraph.
14      A.   On the second page?
15      Q.   First page.  I'm sorry.  The first
16  page.  It says, "Given the course of events it
17  seems likely, based upon her historical
18  information and what we now know in retrospect
19  about Vioxx, that Vioxx likely contributed to her
20  aggressive coronary artery presentation."
21      At the time that you treated
22  Mrs. Levitt for these events in March and May of
23  2000, did you believe that Vioxx had anything to
24  do with her acute presentation?
25      A.   No.

Page 76

1      Q.   When you're saying in this letter what
2  we now know in retrospect about Vioxx, to what are
3  you saying?
4      A.   Its subsequent removal from the
5  market.  And on the basis of higher cardiovascular
6  end point data, and the contemporaneous
7  coincidence that she was on it during that time of
8  her presentation.  Well, at the time -- the
9  letter's 2009.  So I would have been familiar with
10  several of the publications referring to Vioxx and
11  cardiovascular mortality in points at the time I
12  crafted this letter.
13      Q.   Vioxx and cardiovascular mortality --
14      A.   Cardiovascular events.
15      Q.   You referenced the APPROVe study
16  earlier.
17      A.   I don't remember that the APPROVe was
18  out at the time of '09.  It may have been, but the
19  one I'm talking about is -- I think Topol's
20  article was out in 2002, I think.  Well before
21  2009.  In JAMA.
22      Q.   Do you -- strike that.
23      Do you -- what's your understanding
24  for why Vioxx was removed from the market?
25      A.   Because of the increased

Page 77

1  cardiovascular end points on those taking Vioxx as
2  opposed to Naprosyn.
3      Q.   Are you thinking of a particular study
4  when you're saying a study that compares the Vioxx
5  and Naprosyn?
6      A.   Yes.  And there were some other
7  publications, too, in that time frame.  We see
8  there was a VIGOR study in the New England Journal
9  where they withheld three tests that were
10  cardiovascular in their report.  And there was a
11  controversy around that time, but I'm not
12  necessarily referring to that in my letter from
13  2009.  It's just that it was well-known by 2009
14  that Vioxx was implicated in increased
15  cardiovascular events.
16      Q.   Are you aware of any studies that show
17  increased cardiovascular events other than
18  myocardial infarctions?
19      A.   I think there was some data on
20  strokes, too, if I recall.  We'd have to go back
21  and look.  To be precise, and I didn't review that
22  for today's deposition.
23      Q.   Did you review it for preparing the
24  2009 letter?
25      A.   No.  This was done immediately after

20 (Pages 74 to 77)

Thomas Rosamond, M.D.

Page 78

1   my conclusion of my office that day.
2       Q.   Okay.  So when you prepared the
3   letter, you weren't -- you had not referred to any
4   scientific articles?
5       A.   Not on that day.  This was a -- this
6   was a dictation done the same day I met with her,
7   after an office filled with patients.  So I didn't
8   go search it out.
9       Q.   So based on this letter, you believe
10  that Mrs. Levitt had started taking Vioxx in 1999?
11      A.   That date was taken from my review of
12  the EMR the day it was dictated.  So there had to
13  be a note somewhere in the EMR that Dr. Hartman, I
14  believe, started Vioxx in August of 1999.
15      Q.   And do you know -- strike that.
16      The --
17      A.   Note that I say I believe in
18  August 1999.  So I'm stating what my impression
19  was at that time.
20      Q.   Would you be surprised to learn that
21  Mrs. Levitt continued to take Vioxx for two years
22  after the May 29, 2000, event?
23      A.   I would because it wasn't taken off
24  the market for some time after that.
25      Q.   I'm sorry.  Did you say you would be

Page 79

1   surprised or you wouldn't be surprised?
2       A.   I would not be surprised if she
3   continued to take it after the event in 2000.
4       Q.   And if she continued to take it for
5   another two years, would you expect her to
6   experience additional cardiac events?
7       A.   It's possible.
8       Q.   So is there anything other than the
9   fact that Mrs. Levitt was taking Vioxx in -- on
10  March and May -- March and May of 2000 that leads
11  you to believe that it was -- contributed to her
12  aggressive coronary artery presentation?
13      (The reporter read the record as
14      requested.)
15      MR. THOMAS:  Other than the research
16  he cited?
17      MS. HORN:  Well, he says he did no
18  review at the time he did this letter.
19      A.   I was aware of it, but I didn't stop
20  and go look it up and then go dictate the letter.
21  That was my point.
22      So what was the question again?
23      (The reporter read the record as
24      requested.)
25      A.   Yes.  I was aware of the research on

Page 80

1   Vioxx at the time of this letter.  It wasn't just
2   Vioxx in isolation that made me think that it
3   caused it.  It was -- and I state this
4   specifically in the letter, "We now know in
5   retrospect."  So "we now know" is based upon the
6   literature on Vioxx at the time in 2009 that I had
7   it in my mind.
8       Q.   BY MS. HORN:  Do you know of any
9   characteristics that Mrs. Levitt had in common
10  with the people who were in the studies that
11  you're thinking of?  So, for instance, do you know
12  whether or not the duration of time in which she
13  had been taking Vioxx was the same as the duration
14  in time that the persons involved in the clinical
15  studies you're thinking of had been taking Vioxx?
16      A.   There was a controversy at the time
17  well after I saw her that they had to be on it for
18  18 months after they had an event, but there was
19  some pushback that that event started earlier than
20  18 months of exposure on Vioxx.  I'm not an expert
21  in the statistical methods that determine that.
22      Q.   And this controversy that you're
23  referencing, when did you first learn about the
24  controversy?
25      A.   Gosh.  When did I first learn about

Page 81

1   it?
2       I think it was probably after this
3   letter was dictated, the timing interval.
4       Q.   And in terms of duration of use,
5   whether or not it's 18 months or some other time
6   period, do you know how any of -- any time period
7   compares to the time period that Mrs. Levitt took
8   Vioxx?
9       A.   That's also a complex question.  I'm
10  not really sure how to answer it.  Can you
11  simplify the question a bit?
12      Q.   I'll withdraw it.
13      Do you know whether there were any
14  differences in data among continuous users versus
15  non-continuous users of Vioxx?
16      A.   I'm not familiar with that data.
17      Q.   And do you know whether Mrs. Levitt
18  took Vioxx continuously prior to her March and
19  May 2000 events?
20      A.   Only in that it's listed in her
21  current medicines during that time.  That's the
22  only way I know.
23      Q.   Do you know whether she took it every
24  day?
25      A.   I don't.

21  (Pages 78 to 81)

Thomas Rosamond, M.D.

Page 82

1    Q.   Do you know why she was taking it?
2    A.   My understanding in my memory is that
3  it was osteoarthritis and back pain.
4    Q.   Are you -- strike that.
5        At the time you prepared the 2009
6  letter, are you aware of any data linking Vioxx --
7  short-term Vioxx use, let's say less than
8  12 months, with any cardiac events of any kind?
9    A.   I think the letter from 2009 does not
10  distinguish duration other than the fact that I
11  take the care to say that she started in August of
12  '99. So it was an issue to me that she had been
13  on it for, what, six months. So I guess my answer
14  is -- if I can remember the question now.
15        (The reporter read the record as
16         requested.)
17    A.   To the best of my knowledge, I don't
18  think so.
19    Q    BY MS. HORN:  And do you know
20  whether -- strike that.
21        Do you know at the time you wrote this
22  letter whether there's a difference in the data
23  between myocardial infarctions as an end point
24  versus other cardiac events?
25    A.   I don't think I was making that

Page 83

1  distinction.
2    Q.   Do you know whether that distinction
3  was made in the actual studies?
4    A.   I'd have to go back and review them.
5    Q.   Though you do agree that Mrs. Levitt
6  did not have a myocardial infarction?
7    A.   I do agree.
8    Q.   Were you compensated for preparing
9  this particular letter?
10    A.   No.
11    Q.   Do you know whether -- strike that.
12    A.   I don't think I even billed her for
13  the visit. But that's speculation. Sorry.
14    Q.   Can we go back to Exhibit 1 to page
15  129. And on page 129 where it's recapping
16  Mrs. Levitt's medical history --
17    A.   Yes.
18    Q.   -- can you read the first point for
19  us?
20    A.   Number 1. "Possible superficial
21  thrombophlebitis in the remote past (we do not
22  have any documentation) but a true deep vein
23  thrombosis was present."
24    Q.   Okay. What does that mean?
25    A.   There are two things that come

Page 84

1  immediately to my mind here.  One is:  Was this a
2  misprint?  In the context of the letter, perhaps
3  it should have read, "but a true deep vein
4  thrombosis was not present."  Why else would I say
5  it if it's superficial thrombophlebitis.  Or I may
6  have had data that she actually did have a deep
7  vein thrombosis.  The two are different.  They go
8  together sometimes.  Superficial is on the
9  external veins.  Deep vein thrombosis is a clot in
10  the deep venous structures.  Is that too long?
11    Q.   No, it's not.
12        So superficial thrombophlebitis is a
13  condition distinct from deep vein thrombosis; is
14  that correct?
15    A.   They're both thrombotic episodes, but
16  the deep vein thrombosis is much more dangerous.
17    Q.   And that involves some type of a
18  clotting mechanism; correct?
19    A.   Yes.
20    Q.   Is clot formation involved in
21  restenosis?
22    A.   The term "restenosis" is often loosely
23  applied to an angiographic narrowing seen after
24  angioplasty.  In my experience, in my opinion,
25  it's often a mixture of endothelial changes and

Page 85

1  acute thrombosis on the endothelium.
2    Q.   Are you aware of -- well, strike that.
3        As of the time of the letter in 2009,
4  were you aware of any data linking Vioxx to the
5  occurrence of non-thrombotic events?
6    A.   I don't remember clearly my mindset at
7  that time.  Again, this is in 2009.  I don't know
8  the state of my mind on that particular item at
9  the time.
10    Q.   As you sit here today, are you aware
11  of any data linking Vioxx to an increased rate of
12  non-thrombotic events?
13    A.   My understanding of the literature is
14  that it's mostly presumed to be a thrombotic
15  issue.
16    Q.   Give me just a minute.  Have you ever
17  been a clinical investigator in a placebo
18  controlled trial?
19    A.   I surely must have been at some point
20  along the way.
21    Q.   Okay.  Have you been a clinical
22  investigator in any clinical trials in the past
23  10 years?
24    A.   As a participant or as a PI?
25    Q.   What's the difference?

22 (Pages 82 to 85)

Thomas Rosamond, M.D.

Page 86

1    A.   Sometimes you enroll patients in the
2  investigation, but it's under the supervision of
3  another investigator, a PI, principal
4  investigator.
5        So I'm sure I've had patients that are
6  enrolled in clinical investigations that are
7  ongoing, that I know of.  For example, the
8  biodegradable stents.  I've been -- had a couple
9  of patients in that.  But I haven't been the
10 principal investigator.
11   Q.   Okay.  If you were to add up all the
12 time that you spent reviewing Vioxx literature,
13 how much time would that be?  The scientific
14 literature.
15   A.   On Vioxx?
16   Q.   Yes.
17   A.   In my whole life?
18   Q.   Sure.  Let's start with that.
19   A.   I don't know.  Maybe -- I don't put
20 myself on a clock, but I bet it's six to eight
21 hours, probably.
22   Q.   Do you have any knowledge as to how
23 the safety profile of Vioxx compares to other
24 NSAIDs?
25   A.   Safety in terms of cardiovascular end

Page 87

1  points or --
2    Q.   Yeah.
3    A.   -- GI bleed?
4    Q.   I'll withdraw -- important
5  distinction.  I'll withdraw the question.
6        Are you aware of how the safety
7  profile of cardiovascular events for Vioxx
8  compares to other NSAIDs?
9    A.   Some, yes.
10   Q.   And what's your understanding --
11 what's your knowledge?
12   A.   Naprosyn is the obvious one in that
13 head-to-head trial, Vioxx and Naprosyn.  Naprosyn
14 had a much lower cardiovascular end point.
15       In fact, Merck was claiming at the
16 time that Naprosyn was protective as compared to
17 Vioxx.  That was their premise.
18       Also Celebrex at lower doses has
19 probably not as much risk for cardiovascular end
20 points as Vioxx did.
21   Q.   And what are you basing that statement
22 on regarding Celebrex?
23   A.   Just what I've read in the -- over the
24 years.  I can't cite you a reference.
25   Q.   Are you aware whether or not the FDA

Page 88

1  conducted any comparative analysis as to the
2  safety protocols of the various NSAIDs?
3        MR. THOMAS:  Form.  Foundation.
4    A.   I'd have to go back and review.  I am
5  referring to that at least tangentially on the
6  Naprosyn/Celebrex part.  I think there were other
7  NSAIDs that were also compared.  I don't know if
8  it was the FDA or another research project.
9    Q.   BY MS. HORN:  Do you have any
10 knowledge of the current labeling of the NSAIDs
11 class, the FDA labeling -- strike that.  Let me
12 restate it.
13       Do you have any knowledge regarding
14 the current FDA approved labels for NSAIDs as a
15 class?
16   A.   As a class?  My general sense of
17 practice is to be careful with them, not use them
18 in high doses.  But I don't -- I couldn't quote
19 you line and verse.
20   Q.   Do you have any knowledge of the
21 current FDA approved labeling for Celebrex?
22   A.   I have some superficial knowledge of
23 it.
24   Q.   And what's that?
25   A.   As a functional knowledge, I almost

Page 89

1  never prescribe them.  And when I do, I only use
2  at a very low dose, when absolutely necessary.  So
3  I tend to stay away from them, as a class.
4    Q.   Do you know whether or not the current
5  Celebrex labeling has a black box?
6    A.   I'd have to look it up.
7    Q.   As you sit here now, you don't know?
8    A.   I don't know if there is a black box
9  on Celebrex at low dose.
10   Q.   Regardless of dose, do you know
11 whether or not there's a blood glucose box on
12 Celebrex?
13       MR. THOMAS:  Asked and answered.
14   A.   I'd have to look it up.
15   Q.   BY MS. HORN:  Okay.  Do you know
16 whether or not there's a black box warning as to
17 any other NSAID currently on the market?
18   A.   Any and all.  I would have to look.
19   Q.   Okay.  And where would you look?
20   A.   On the label.
21   Q.   And is there a -- do you have a -- do
22 you have a source that you usually look to when
23 you're looking for labels?
24   A.   Usually what I'll go is -- if I have a
25 question, I'll call the pharmacy and ask them.

23 (Pages 86 to 89)

Thomas Rosamond, M.D.

Page 90

1     MS. HORN: Okay. Can we go off the
2  record.
3          (Recessed from 10:51 a.m. to
4          10:52 a.m.)
5     Q   BY MS. HORN: And, Doctor, you can
6  feel free to look at the actual records.
7          But do you recall we took a look at a
8  record from 2002 and a record from 2005 from other
9  cardiologists?
10    A.   The Kramer Crouse and Cardiovascular
11 Consultants documents?
12    Q.   Yes. And based on the records that
13 you saw, did you observe anything that appeared to
14 be a cardiac decline over the time since you
15 you've last seen her?
16    A.   A cardiac decline?
17    Q.   And actually, I withdraw the question.
18    A.   Thank you.
19    MS. HORN: And I'll turn it over to
20 Mr. Thomas.
21          EXAMINATION
22 BY MR. THOMAS:
23    Q.   Okay. Doctor, my name's Danny Thomas,
24 and I represent Jo Levitt in her case against
25 Merck.

Page 91

1          Let me ask you real quick:
2  Hypothetically, Ms. Levitt has alleged fatigue and
3  inability to return to her full strength since her
4  cardiovascular surgery or procedures in 2000.
5          Do you have any understanding of
6  whether or not such a claim would be explainable
7  based on the reported cardiac history in 2000?
8     MS. HORN: Objection. Form.
9     A.   Does that mean I still should answer?
10    MR. GLASSER: Yeah. If you need to
11 look at your records, you can. You can answer the
12 question.
13    Q   BY MR. THOMAS: And just to be clear,
14 I'm not asking you to opine whether or not she
15 really is suffering from any long-lasting effects.
16 I'm just asking, based on your knowledge of these
17 kind of conditions and these kind of procedures,
18 if they can have those kinds of long-lasting
19 effects?
20    MS. HORN: Objection. Form, even as
21 elaborated.
22    MR. GLASSER: That's just to the
23 record. You can answer the question.
24    A.   Based upon my experience, many of the
25 patients who have bypass surgery never return to

Page 92

1  work. Why they don't return to work is
2  individualistic, but many of them don't.
3     Q.   Doctor, what is your current title
4  here at University of Kansas Medical Center?
5     A.   I'm a -- I guess my title would be
6  Director of Advanced Cardiovascular Imaging,
7  cardiologist. Consultant. We don't really carry
8  titles otherwise.
9     Q.   Thanks.
10          And if you answered this earlier, I
11 apologize.
12          I didn't hear -- I don't remember
13 hearing a question about board certifications.
14    A.   They didn't ask. I'm boarded in
15 internal medicine. I'm also boarded in
16 cardiovascular disease. I passed the boards in
17 nuclear. Haven't retaken them. 10 years ago. I
18 passed the boards in comprehensive
19 echocardiography. I haven't reupped them.
20          When I got my boards in medicine and
21 cardiovascular disease, you weren't required to
22 have to renew them like you are now. It was
23 grandfathered. We were the last group that didn't
24 have to retake them. Is that --
25    Q.   Yes, sir.

Page 93

1          I'll be candid with you. There has
2  been some confusion in this case from the prior
3  attorneys that were handling the case as to
4  whether or not Ms. Levitt actually suffered a
5  quote/unquote heart attack.
6          And you have testified that based on
7  the records that she didn't, in fact, suffer a
8  heart attack; correct?
9     A.   I said that she -- or meant to say she
10 didn't have a myocardial infarction. But a heart
11 attack is a lay term that people apply to any
12 acute coronary syndrome presentation. And she did
13 have that. And I remember that when I did her
14 heart cath, it appeared to me that she had active
15 thrombus in her LAD. So to me that's a heart
16 attack, but it's not an infarction.
17    Q.   That explains that so well for me.
18 Thank you very much.
19          If I was looking at the operative
20 report for the stent procedure that was originally
21 done in March of 2000, what verbiage would I look
22 for to tell me if this was a base metal stent
23 procedure or medicated or coated stent procedure?
24    A.   Couple things there. I don't think we
25 were using coated stents until after that time,

24 (Pages 90 to 93)

Thomas Rosamond, M.D.

Page 94

1  later on, maybe 2003, 2004. I'm not sure exactly.
2      Q.   Okay.
3      A.   But usually they'll state in the
4  diagnostic heart cath what type of stent it was.
5  That should tell you.
6      Q.   Okay.
7      A.   And I did not have the cath report in
8  my possession, nor do I now, from that heart cath.
9      Q.   Let me hand you some documents. It
10 sounds like more than likely it was a base
11 metal --
12     A.   A bare metal.
13     Q.   Bare metal. I'm sorry. Bare metal
14 device. But just for your -- I think it's more
15 for my own curiosity.
16     A.   I'm interested -- I'm curious, too.
17     Q.   I'm not going to mark it. I'm going
18 to identify it as -- I'll hand it to you, Doctor.
19 This is a document from St. Luke's Hospital,
20 Kansas City, dated March 10th, 2000,
21 electronically signed by Dr. Peter Tadros, and my
22 Bates numbering for it is JLSTLH 21 and 22.
23     A.   Okay. The key phrase is a tristar
24 stent in the LAD. Oh, sorry. I don't want to
25 mark it up.

Page 95

1      Q.   You can -- I don't care.
2      A.   Number 7. A 3 by 18-millimeter
3  tristar stent in the LAD. Looks like they just
4  did a balloon in the diagonal, but there's some
5  inconsistency because Dr. Powers mentions a
6  kissing balloon technique. Often that's with two
7  stents in each of the kissing balloons, but
8  suffice it to say -- and you've probably already
9  talked to Peter Tadros to find out for sure, but I
10 think a Tristar's a bare metal stent by my memory.
11     Q.   All right. Thank you.
12          Now, I don't want to make you go
13 through and find the exact verbiage of the chart,
14 but there was concern by the fact that within two
15 months of the stenting procedure Ms. Levitt had
16 restenosed, I believe, to 95 percent; is that
17 correct?
18     A.   Yes.
19     Q.   And Ms. Horn asked you questions about
20 is it normal or abnormal for patients to
21 restenose. And you'd indicated, you know,
22 depending on type of stent, within a year,
23 et cetera, et cetera.
24          But the question I have is: Is it
25 normal for a patient to restenose so substantially

Page 96

1  within a two-month time period?
2      A.   It's unusual, and I remember having a
3  conversation with Peter about this. I think he
4  brought up the point that he was surprised that
5  there'd be such a rapid change, stenosis. She
6  just had a stress test about a month before that
7  that was normal. So my presumption was it was
8  probably a thrombus on a plaque that ruptured, not
9  an endothelial growth phenomenon. But nowhere in
10 the record does it actually say that.
11     Q.   Okay. I saw something in my
12 St. Luke's records. See if I can find it.
13          While I'm looking, do you have any
14 knowledge of whether or not the concomitant use of
15 Vioxx along with statins can increase the risk of
16 cardiovascular events?
17          MS. HORN: Objection. Form.
18 Foundation.
19     A.   I don't recall if statins were used in
20 the Naprosyn/Vioxx trial in the test population or
21 not.
22     Q   BY MR. THOMAS: Okay. I'm going to
23 hand you -- again, I'm not going to mark this.
24 It's from St. Luke's South, Overland Park, Kansas,
25 records. My numbers are JLSLSH 6 through 7, and

Page 97

1  it's a document signed by you looks like
2  August 30th of 2000. I'll let you decide.
3          I'm going to hand this to you. I'm
4  going to let Elaine look at it first. I
5  apologize, Doctor.
6      A.   Okay. Let's see.
7          Can I -- should I -- is there a
8  question?
9      Q.   Yeah. I wanted you to familiarize
10 yourself with it first.
11     A.   Yeah. It's not my signature.
12     Q.   It's not. Okay.
13     A.   It's my dictation, and frequently the
14 partners would go to the medical records
15 department and sign all the documents for all the
16 doctors.
17     Q.   Okay.
18     A.   So it wouldn't be unusual.
19     Q.   Okay. The only question I had really
20 about it is, I did not see that particular note as
21 part of Exhibit 1, which is purportedly medical
22 records received from Mid-America Cardiology.
23          If I'm correct, is that because this
24 chart was entered through the St. Luke's system?
25     A.   Yes. I did not see this cath report

25 (Pages 94 to 97)

Thomas Rosamond, M.D.

Page 98

1  in our EMR.
2      Q.   Okay.
3      A.   If that's what you're asking.
4      Q.   Right.  So there may be records that
5  not only you reviewed but may have even authored
6  that are not necessarily in Mid-America
7  Cardiology's EMR; is that correct?
8      A.   I believe it is.
9      Q.   Okay.  You were shown medical records
10  from 2002 and 2005 from two other local cardiology
11  groups.  They were marked as Exhibit 2 and 3, and
12  the question was asked whether or not you were
13  aware of these medical records at the time you
14  authored your letter in 2009, and you indicated
15  you were not aware of them; correct?
16      A.   That's right.
17      Q.   Did the records that were gone over
18  today and the findings in these records in any way
19  effect the statements you made regarding her
20  clinical history in 2009?
21      A.   No.
22          MR. THOMAS:  Okay.  I have no further
23  questions, sir.
24          MS. HORN:  I have just a couple of
25  follow-ups.

Page 99

1          EXAMINATION
2  BY MS. HORN:
3      Q.   You were asked about the combination
4  use of Vioxx and statins.
5          Do you know any data information about
6  the results of taking Vioxx and aspirin at the
7  same time?
8      A.   I believe there was an issue about
9  that in the JAMA article that the Vioxx and
10  Naprosyn excluded aspirin uses in their patient --
11  they weren't entered into the study.  That's my
12  memory of it.
13      Q.   And you have no knowledge about taking
14  Vioxx with aspirin?
15      A.   Not as I sit here today.
16      Q.   What's your understanding as a
17  cardiologist why people are prescribed aspirin or
18  instructed to take aspirin?
19      A.   In the setting --
20          MR. THOMAS:  Form.  Foundation.
21      Q   BY MS. HORN:  Strike that.
22          Do you advise some of your patients to
23  take aspirin every day?
24      A.   Yes.
25      Q.   Why?

Page 100

1      A.   It can -- in layman's terms, it's a
2  very helpful blood thinner.  It inhibits platelet
3  aggregation, and that would be important in
4  patients with coronary disease.
5      Q.   Does it reduce -- is it intended to
6  reduce clotting?
7      A.   That's the theory.
8      Q.   And you're asking -- you were earlier
9  speaking about acute coronary presentation in lay
10  terms being referred to as a heart attack versus a
11  myocardial infarction, but you would agree that if
12  you're reading a journal article that they're
13  referring to an end point of myocardial
14  infarction, that that's the specific event they're
15  referring to, not a heart attack?
16          MR. THOMAS:  Form.  Foundation.
17      A.   Major adverse cardiovascular events
18  are quite specific about their terminology.  It
19  depends on the study exactly what they're
20  referring to, but the bottom line, a heart attack
21  is too generic of a term.  You need to be
22  specific.  Is it infarction?  Is it acute coronary
23  syndrome?  Is it a non-STEMI, whatever.
24          So my point about the distinction
25  between the two stands, they're not equivalent

Page 101

1  terms.
2      Q   BY MS. HORN:  Earlier in response to
3  Mr. Thomas' questions you were asked about whether
4  or not generally there are bypass patients, people
5  who have had bypass surgery who are unable to
6  return to work.
7          You remember that?
8      A.   Yes.
9      Q.   Okay.  Based on your review of your
10  records regarding Mrs. Levitt specifically, focus
11  on Mrs. Levitt, do you have any reason to know --
12  or would you believe she was unable to return to
13  work based upon her physical condition?
14      A.   She had a wide co-morbidity profile
15  that is part of the context, but her ejection
16  fraction is not impaired enough to make her
17  disabled, in my opinion.
18      Q.   And based on your records concerning
19  your treatment of Mrs. Levitt, do you have any
20  reason to attribute any continued extreme fatigue
21  to her prior cardiac events?
22      A.   That's a complex question.  I'll give
23  you a complex answer.
24          Most patients, after bypass surgery,
25  are quite fatigued.  It's notable that she had a

26 (Pages 98 to 101)

Thomas Rosamond, M.D.

| Page 102 |
| --- |

1  lot of fatigue in my records.  Many patients can't
2  go back to work for whatever reason, but if her
3  horsepower/ejection fraction implies to me that
4  she had enough reserve to go back to work.  But
5  that's my opinion.  I haven't seen her.  I haven't
6  evaluated her for seven or eight years.  And I was
7  not aware of the issues behind the lawsuit either.
8  So it's speculation whether or not she was really
9  disabled or not, from my perspective.
10     Q.   So as of the time that you last saw
11  her, if you were trying to attribute any ongoing
12  extreme fatigue to cardiac reasons versus -- I
13  think depression was listed, or fibromyalgia or
14  chronic fatigue syndrome, would you be more likely
15  to attribute the continued extreme fatigue to
16  something else non-cardiac?
17     A.   I don't think I can make that judgment
18  fairly one way or the other.  It's just too remote
19  and there are too many other factors.  I think
20  that question should be answered by her physicians
21  that are caring for her now.  She saw two
22  different cardiology groups after I saw her.  So
23  there had to be some ongoing issues or she
24  wouldn't go from doctor to doctor, you know, for
25  help.  So I'm not qualified to say if she's truly

| Page 103 |
| --- |

1  disabled, unable to go back to work.  Her ejection
2  fraction -- again, I've said this before -- was
3  not significantly reduced.
4     Q.   Do you recall the -- and we can pull
5  it out if you want to.  But do you recall the
6  record where you were discussing Mrs. Levitt's
7  fatigue?
8     A.   Yes.
9     Q.   And there was the idea that you were
10  going to discontinue the Lopressor --
11     A.   Yes.
12     Q.   And see if that helped.  Do you recall
13  that?
14          And in that particular paragraph
15  there's a reference to the depression or chronic
16  fatigue.
17          Do you recall that?
18     A.   Yes.
19     Q.   Why were you making reference to the
20  depression and chronic fatigue?
21     A.   Number one, her complaints of fatigue
22  were extreme fatigue, from my nurses, their phone
23  conversation with her.  Where she was -- couldn't
24  hardly do anything but sleep all day.  I've seen
25  that with Lopressor.  So I went through a process

| Page 104 |
| --- |

1  of eliminating Lopressor as the cause.  And the
2  idea there is, we get her off the Lopressor and
3  see what happened.  I was aware of the chronic
4  fatigue and other issues.  So I was trying to make
5  that distinction, you know, what's causing her to
6  be so fatigued because it was more than I
7  expected.
8          Her blood pressure, if you go through
9  at the time, was also borderline.  It was in the
10  90's systolic.  That's recorded in the nurse's
11  notes in my office visits at least one occasion
12  while she was on the beta blocker.  So I remember
13  thinking it's -- the antihypertensive effect of
14  the Lopressor that's making her be fatigued from
15  low blood pressure.
16     Q.   When you stopped the Lopressor, did
17  the extreme fatigue abate?
18     A.   We titrated it down.  So it went
19  50 percent -- which you're supposed to do.
20  50 percent, the fatigue persisted.  We titrated it
21  down again.  She was on a very low dose by then.
22  25 mgs a day, I think.  And there's a gap in the
23  record where we don't hear from her.  Presumably
24  she's doing better.  And then she has her second
25  event in May, comes in and has bypass surgery.

| Page 105 |
| --- |

1          So it -- I was struggling with why she
2  was so fatigued after her initial stent
3  angioplasty.
4          MS. HORN:  Okay.  Nothing else.
5          MR. THOMAS:  Nothing else from me,
6  sir.
7          MR. GLASSER:  You want him to read and
8  sign?
9          MS. HORN:  Do you want to read and
10  sign?
11          MR. GLASSER:  You have the opportunity
12  to do so.  That's a process that, when the
13  transcript's completed, it would be provided to
14  you to read over and correct any errors in either
15  the transcription or your testimony.
16          THE DEPONENT:  Can I make substantive
17  changes in it?  Could I take out sentences that I
18  feel sorry about now?
19          MR. THOMAS:  People do.  I mean --
20          MR. GLASSER:  Yeah.  People do.  But
21  it would give you an opportunity to make sure that
22  your testimony was accurate.
23          THE DEPONENT:  Sure.  I think I should
24  look at it just to be sure.
25          MR. GLASSER:  All right.  We'll read

Thomas Rosamond, M.D.

| Page 106 |
|---|

1  and sign.  Send it to me for signature.
2      (Deposition concluded at 11:21 a.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| Page 108 |
|---|

1        - - - - - -
          E R R A T A
2        - - - - - -
3  PAGE  LINE  CHANGE
4  ___  ____  _____
5     REASON: _____
6  ___  ____  _____
7     REASON: _____
8  ___  ____  _____
9     REASON: _____
10 ___  ____  _____
11    REASON: _____
12 ___  ____  _____
13    REASON: _____
14 ___  ____  _____
15    REASON: _____
16 ___  ____  _____
17    REASON: _____
18 ___  ____  _____
19    REASON: _____
20 ___  ____  _____
21    REASON: _____
22 ___  ____  _____
23    REASON: _____
24 ___  ____  _____
25    REASON: _____

| Page 107 |
|---|

1          REPORTER'S CERTIFICATE
2
3      I, NAOLA C. VAUGHN, a Certified Court
4  Reporter within and for the State of Kansas, hereby
5  certify that the within-name witness was first duly
6  sworn to testify the truth, and that the deposition
7  by said witness was given in response to the
8  questions propounded, as herein set forth, was first
9  taken in machine shorthand by me and afterwards
10 reduced to writing under my direction and
11 supervision, and is a true and correct record of the
12 testimony given by the witness.
13      I further certify that I am not a relative
14 or employee or attorney or counsel of any of the
15 parties, or a relative or employee of such attorneys
16 or counsel, or financially interested in the action.
17      WITNESS my hand and official seal at
18 Tonganoxie, Leavenworth County, Kansas, this 23rd
19 day of September 2015.
20
21
22        _____
23            NAOLA C. VAUGHN, CCR, CRR, RPR
            Kansas CCR No. 0895
24
25

| Page 109 |
|---|

1       ACKNOWLEDGMENT OF DEPONENT
2
         I,_____, do
3  hereby certify that I have read the
   foregoing pages, and that the same
4  is a correct transcription of the answers
   given by me to the questions therein
5  propounded, except for the corrections or
   changes in form or substance, if any,
6  noted in the attached Errata Sheet.
7
   _____
8  THOMAS ROSAMOND, M.D.          DATE
9
10
11
12
13
14
   Subscribed and sworn
15 to before me this
   _____ day of _____, 20____.
16
   My commission expires:_____
17
18 _____
   Notary Public
19
20
21
22
23
24
25