UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Case No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| *This document relates to* | * | JUDGE FALLON |
| | * | |
| *Jo Levitt v. Merck Sharp & Dohme Corp.*, | * | MAGISTRATE JUDGE |
| 2:06-cv-09757-EEF-DEK | * | KNOWLES |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**DEFENDANT'S MOTION TO EXCLUDE EXPERT
OPINIONS OF JAY N. SCHAPIRA, M.D.**

The Court should exclude Dr. Schapira's opinions concerning (i) causation, (ii) whether Ms. Levitt experienced a myocardial infarction, and (iii) subjects outside his expertise, including psychology, disability, and business analysis.

*First*, Dr. Schapira intends to express the opinion that Vioxx caused or contributed to Ms. Levitt's alleged cardiovascular injuries, but he has not reviewed the scientific studies necessary to do so. Of the dozens of clinical studies performed using Vioxx, Dr. Schapira was vaguely familiar with only *two* of them. Deposition of Jay N. Schapira (Apr. 26, 2016 & May 24, 2016) ("Schapira Dep.") (attached as Ex. 1) 126:7–127:11. Indeed, on the subject of causation, Dr. Schapira explicitly defers to other experts whose reviews of the data have been more comprehensive. *Id.* at 133:18–134:9. Reaching causation opinions to a reasonable degree of scientific reliability requires review of the available scientific data, something that Dr. Schapira definitively has not done. His opinions on this subject amount to little more than conjecture and should be excluded.

*Second*, Dr. Schapira is the only expert or fact witness in the case wishing to express the opinion that Ms. Levitt experienced a myocardial infarction. The lack of reliability underlying

Dr. Schapira's diagnostic methodology is laid bare by the ever-shifting sands upon which his opinion is built. Dr. Schapira's original report stated that Ms. Levitt experienced a myocardial infarction in March 2000. Report of Jay Schapira (Dec. 13, 2013) ("Schapira Rep.") (attached as Ex. 2) at 7. He then withdrew that opinion, supplementing his report in January 2016 for the sole purpose of striking any reference to myocardial infarction. Supplemental Report of Jay Schapira ("Schapira Suppl.") (attached as Ex. 3) at 1. Dr. Schapira's deposition took place over the course of two half-day sessions. On day one, Dr. Schapira once again changed his opinion to say that Ms. Levitt did have a myocardial infarction, but that it had occurred at an unknown time. Schapira Dep. (Ex. 1) 100:16–17. On day two, he changed his opinion yet again to say that Ms. Levitt experienced a myocardial infarction during a very narrow timeframe in early March 2000. *Id.* at 208:11–12. Dr. Schapira's repeated inconsistencies and self-contradictions about whether and when Ms. Levitt did (or did not) experience a myocardial infarction—to say nothing of his disregard for well-established diagnostic criteria for myocardial infarction—underscore the lack of scientific rigor underpinning this opinion.

*Third*, Dr. Schapira's opinions about Ms. Levitt's psychological health, related disability, and business ventures are wholly outside his area of expertise. Those opinions should be excluded because Dr. Schapira is not qualified to offer them.

## ARGUMENT

**I.    LEGAL STANDARD**

Federal Rule of Evidence 702 sets forth the standard for admission of expert testimony. That rule provides that such evidence is admissible only if (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d).

2

The rule entails multiple requirements that are applicable here. First, the subject matter of expert evidence must be one that requires expert testimony as opposed to one "the untrained layman would be qualified to determine" without "specialized understanding." Fed. R. Evid. 702, Advisory Committee's note to 1972 proposed rules. Second, the expert testimony must be reliable, which entails "grounding in the methods and procedures of science" and "more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993) (announcing non-exclusive factors for evaluating reliability of expert testimony); *see also Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir. 1999) (additional factors). Moreover, the qualification prong of Rule 702 requires a foundation showing that the expert has special training or education and adequate knowledge on which to base an opinion. *See Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). While an expert might be qualified in a particular field, any opinions that fall outside that field of expertise must be excluded as unqualified expert testimony. *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009).

Plaintiffs have the burden of proving by a preponderance of the evidence that the testimony of their proffered experts is relevant and reliable. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275–76 (5th Cir. 1998) (en banc). As the "gatekeeper" of scientific evidence, the trial court has the obligation to ensure those standards are met. *Daubert*, 509 U.S. at 596–97; *Moore*, 151 F.3d at 276. As such, the court must make a "preliminary assessment of whether the reasoning or methodology . . . properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. When expert testimony is demonstrated to be speculative and lacking scientific validity, trial courts *must* exclude it, as courts in the Fifth Circuit routinely do. *See, e.g.*, *Food Lion, Inc.*, 171 F.3d at 313; *Moore*, 151 F.3d at 279; *Black v. Johnson & Johnson (In re Propulsid Prods. Liab. Litig.)*, 261 F. Supp. 2d 603, 616 (E.D. La. 2003).

## II. DR. SCHAPIRA HAS NOT MEANINGFULLY REVIEWED AVAILABLE DATA REGARDING VIOXX AND THEREFORE SHOULD NOT BE ALLOWED TO EXPRESS OPINIONS CONCERNING CAUSATION.

Although Dr. Schapira is *willing* to offer causation opinions in this matter,[1] he concedes that he has not reviewed the scientific data required to do so. Dr. Schapira testified at his deposition:

> A. ***I have not gone back and re-analyzed the trials*** but I can tell you, to a reasonable medical probability, it's related, as an opinion from a practicing cardiologist.

Schapira Dep. (Ex. 1) 134:14–17 (emphasis added). But a practicing cardiologist cannot opine on causation merely by virtue of his degree or his profession. A doctor who has not endeavored to conduct a comprehensive review of the clinical data cannot opine on causation. *See Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 553–54 (E.D. La. 2015), *aff'd per curiam*, --- F. App'x ---, 2016 WL 2989261 (5th Cir. May 23, 2016); *see also Brock v. Merrell Dow Pharm., Inc.*, 874 F.2d 307, 313, 315 (5th Cir. 1989) (finding lack of support in epidemiological data "fatal" to causation theory). "[A] generally accepted methodology for determining general causation" entails that an expert "(1) identify ***all relevant studies***; (2) read and critically evaluate all the relevant studies; (3) ***evaluate all the data*** based upon recognized scientific factors" before exercising "best professional judgment in reaching a conclusion[.]" *Burst*, 120 F. Supp. 3d at 552 (emphases added). Dr. Schapira has undertaken none of these steps.

---

[1] Dr. Schapira intends to opine as to general causation that Vioxx is causally associated with an increased risk of myocardial infarction, unstable angina, and "the entire spectrum of acute coronary syndrome" events. *See* Schapira Rep. (Ex. 2) at 7; Schapira Dep. (Ex. 1) at 126:22–127:2. He intends to opine as to specific causation that (i) Vioxx "was a significant factor in the causation" of Ms. Levitt's coronary artery disease, Schapira Rep. (Ex. 2) at 7; (ii) Vioxx caused her to experience unstable angina, Schapira Dep. (Ex. 1) at 144:24–145:2; and (iii) Vioxx caused her to experience acute myocardial infarction, *id.* at 137:17–22.

"[A] district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Moore*, 151 F.3d at 278 (citation omitted). Dr. Schapira repeatedly suggests that he offers "an opinion from a practicing cardiologist." Schapira Dep. (Ex. 1) 134:16–17. In his mind, a practicing cardiologist in a clinical setting can reach a conclusion about Vioxx "absolutely, even though there's no study [he] can identify" to support that opinion. Schapira Dep. (Ex. 1) 134:18–22. But "speculation unconfirmed by epidemiologic proof cannot form the basis for causation in a court of law." *Brock*, 874 F.2d at 315. "Epidemiology provides the best evidence of general causation in toxic tort cases." *Burst v. Shell Oil Co.*, 2015 WL 3755953, at *4, (E.D. La. June 16, 2015), *aff'd per curiam*, --- F. App'x ---, 2016 WL 2989261 (5th Cir. May 23, 2016). As this Court has held, "[w]hether epidemiological studies support an expert's opinion on the question of general causation in a toxic tort case is critical to determining the reliability of the opinion." *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 799 (E.D. La. 2011); *see also Konrick v. Exxon Mobil Corp.*, 2016 WL 439361, at *5, *13 (E.D. La. Feb. 4, 2016) (citing *Wagoner* and excluding as unreliable expert opinions on causation that were unsupported by epidemiological literature).

Dr. Schapira has not considered the available body of epidemiological data. Indeed, he explicitly defers on the interpretation of the clinical studies of Vioxx:

> Q. Can you identify for me any clinical study . . . that shows a statistically significant increased incidence of unstable angina, that specific end point, in association with the use of Vioxx?
>
> . . .
>
> [A.] I would have to go back and review the data for that specific answer. I – and probably I would defer to Dr. Egilman for that question, not for the answer, but for the question. He would be more qualified than I to answer that question.

5

>    . . .
>
>    Q.   Why would Dr. Egilman be more qualified than you to answer that question?
>
>    A.   He's studied this – the statistics and the analyses and the details of the analyses and the re-analyses more than I have.

Schapira Dep. (Ex. 1) 133:18–134:9.

Dr. Schapira's expert report contains precisely one-and-a-half pages of opinions and supporting analysis. The remaining five-and-a-half pages are made up of an introduction and quoted excerpts from Ms. Levitt's medical records. The bibliography contains fourteen citations, only two of which relate to Vioxx and only one of those is actually cited in the body of his report. *See* Schapira Rep. (Ex. 2) at 7 (citing Jüni et al. (2004)); Schapira Dep. (Ex. 1) 126:3–11 (agreeing that "[t]here aren't any other articles that you reference in these paragraphs" of analysis). To the extent Dr. Schapira relies on those publications, he merely quotes them for a point estimate of generalized cardiovascular risk. *See* Schapira Dep. (Ex. 1) 274:20–21 (Jüni); 278:23–279:4 (APPROVe).

At his deposition, Dr. Schapira admitted his lack of familiarity even with the one article he cites in the body of his report. Asked whether Ms. Levitt's "presentation at any point in her medical history, as you've seen it, would have qualified to be counted as a myocardial infarction for purposes of the analysis performed by Peter Jüni, et al.[,]" Dr. Schapira didn't know. Schapira Dep. (Ex. 1) 275:10–22.

Dr. Schapira has not reviewed all the articles, analyzed the available clinical study data, or meaningfully evaluated the published literature concerning Vioxx. *See Burst*, 120 F. Supp. 3d at 552. Thus, he cannot reliably offer expert testimony concerning causation.

6

### III. DR. SCHAPIRA'S OPINION THAT MS. LEVITT EXPERIENCED A MYOCARDIAL INFARCTION IS UNRELIABLE.

Although Dr. Schapira ultimately settled on the view that Ms. Levitt experienced a myocardial infarction, the winding and internally inconsistent path he has traveled to arrive at this conclusion exposes a woefully unreliable—even unprincipled—methodology.

An expert's contradictory opinion, although subsequently withdrawn, "informs the Court about [an expert's] overall approach to choosing and analyzing data." *Burst v. Shell Oil Co.*, 104 F. Supp. 3d 773, 781 (E.D. La. 2015). Based on the same medical records, Dr. Schapira has articulated an array of starkly inconsistent opinions concerning Ms. Levitt's cardiovascular injury, that, when taken together, can only be described as incoherent. Dr. Schapira's meanderings include the following:

- Ms. Levitt **did** experience an "acute myocardial infarction on March 10, 2000." Schapira Rep. (Ex. 2) at 7.

- Ms. Levitt **did not** experience an acute myocardial infarction on March 10, 2000. *See* Schapira Suppl. (Ex. 3) at 1 (deleting sole reference to "acute myocardial infarction" and replacing with "acute coronary syndrome").

- Ms. Levitt did experience acute myocardial infarction "*sometime after March* of 2000." Schapira Dep. (Ex. 1) 100:16–17 (emphasis added).

- Ms. Levitt's myocardial infarction occurred **on either March 2 or March 3, 2000**. *Id.* at 170:18–171:2, 208:11–22.

An expert's opinion "'must be reliable *at each and every step* or else it is inadmissible.'" *Burst*, 104 F. Supp. 3d at 781 (emphasis added) (quoting *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007)). Dr. Schapira's opinions about the nature of Ms. Levitt's cardiovascular injuries, bouncing freely from theory to theory, "invite[] the inquiry on whether his final calculations bear sufficient indicia of reliability to present to a jury." *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 791 (S.D. Tex. 2000); *see also Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791, 807 (E.D. Wis. 2010) (excluding expert medical

7

testimony because, among other reasons, the expert offered two diagnoses that were "diametrically opposed").

The case of *Buxton v. Lil' Drug Store Products, Inc.* is instructive. *See Buxton*, 2007 WL 2254492, at *14 (S.D. Miss. Aug. 1, 2007), *aff'd per curiam*, 294 F. App'x 92 (5th Cir. 2008). There, the plaintiff sought to offer expert testimony that she had suffered a stroke—the sole adverse event with which the drug at issue had been causally associated through clinical trials and scientific literature. *Id.* at *3. The district court excluded the diagnosis of plaintiff's non-treating expert witness because (i) the opinion was contrary to the contemporaneous medical records and the opinions of the treating physicians and (ii) the expert's methodology was unreliable. *Id.* at *14. The plaintiff's treating cardiologist and treating neurologist both "concluded at the time of the event" that she had suffered a pulmonary embolism caused by cardiac arrest. *Id.* at *11. "[B]oth doctors were unequivocal that they did not believe plaintiff had suffered a stroke." *Id.* at *12. In addition, the expert's "opinion as to what exactly happened to plaintiff k[ept] changing." *Id.* at *14. The court found that the "shifting statements" as to the cause of the stroke and even the number of arteries involved "underscore the lack of reliability of [the expert's] opinion." *Id.* at *14. Dr. Schapira's opinions concerning the nature of Ms. Levitt's injury are even more suspect than those excluded in *Buxton*.

Dr. Schapira, like the expert in *Buxton*, stands alone in his opinion that Ms. Levitt experienced a myocardial infarction. No healthcare professional who actually treated Ms. Levitt during or after her cardiovascular events ever diagnosed her with acute myocardial infarction. *See* Schapira Dep. (Ex. 1) 105:2–5 (agreeing that Ms. Levitt has "never actually been diagnosed by any treating physician with an acute myocardial infarction"). No contemporaneous medical record evidences an acute myocardial infarction. *See* Schapira Dep. (Ex. 1) 229:25–230:7

8

(agreeing that every cardiac enzyme test performed on Ms. Levitt between 2000 and 2002 was negative, therefore ruling out a diagnosis of acute myocardial infarction). No other expert in this case—whether designated by Plaintiff or Defendant—agrees with Dr. Schapira.[2]

Even Dr. Schapira acknowledges that Ms. Levitt's most recent cardiovascular imaging reveals no sign of prior myocardial infarction:

> Q. Based on this 2007 nuclear stress test, there was no evidence of a non-transmural injury in the anteroseptal region correct?
>
> A. That's correct. That's not reported.
>
> Q. And it says review of the gated images showed left ventricular function with an overall estimated ejection fraction of 75 percent. Do you see that?
>
> A. Yes.
>
> Q. That's an excellent ejection fraction. Do you agree?
>
> A. Yes.
>
> Q. Under conclusion, it says, treadmill radioisotope cardiac stress test did not show any evidence of ischemia or infarct. Do you see that?
>
> A. Yes.
>
> Q. What does that mean?
>
> A. That means that they saw no defect.
>
> ***Q. Is there anything from this November 2007 nuclear stress test that you believe constitutes evidence that Mrs. Levitt has experienced myocardial infarction?***
>
> ***A. No.***

Schapira Dep. (Ex. 1) 248:13–249:11 (emphasis added); *see also id.* at 199:9–15 ("Q: And if

---

[2] The only other Plaintiff's expert to opine on the issue, Dr. David Egilman, expressly rules out that Ms. Levitt experienced a myocardial infarction. *See* Deposition of David Egilman (Apr. 12, 2016) (attached as Ex. 4 to Def.'s Mot. to Exclude Expert Ops. of David Egilman, M.D.) at 103:16–18.

there's been infarction, you wouldn't expect that to get better; is that right? I mean, could somebody have infarction and then five years later the heart regenerates itself and there's no more infarction? Is that possible? A: You typically don't see that. You typically will see a scar persist.").

Dr. Schapira's unsound methodology has led him, at various times, to opinions regarding Ms. Levitt's cardiovascular injuries that are diametrically opposed and flatly inconsistent. Because his methodology is unreliable, Dr. Schapira's opinion that Ms. Levitt experienced a myocardial infarction should be excluded.

### IV. DR. SCHAPIRA IS NOT QUALIFIED TO RENDER OPINIONS AS TO PSYCHOLOGICAL CONDITIONS OR BUSINESS ASSESSMENTS.

At his deposition, Dr. Schapira also offered opinions ranging far beyond cardiology. *See, e.g.*, Schapira Dep. (Ex. 1) 30:2–3 (opining on "depression and her cognitive issues"); 122:3–123:4 (opining on business analysis); 29:23–30:3 (opining on a "global disability" deriving from her depression, cognitive issues, and "co-morbidities of her cardiac situation").[3] None of these opinions appears in either his original or supplemental report. Dr. Schapira has no background or professional qualifications in psychology or psychiatry, and he is not an economist or accountant. He is simply unqualified to offer expert testimony on either Ms. Levitt's mental health or on the factors affecting her businesses.

Federal courts bar physicians from opining about specialized fields of medicine in which they do not regularly practice. *See, e.g.*, *Simmons v. Novartis Pharm. Corp. (In re Aredia & Zometa Prods. Liab. Litig.)*, 483 F. App'x 182, 187–89 (6th Cir. 2012 ) (affirming the district

---

[3]   A comorbidity is an independent condition occurring alongside, but not the result of, Ms. Levitt's cardiovascular health. *See Medical Definition of Comorbid*, Merriam-Webster, http://www.m-w.com/dictionary/comorbid (last visited June 20, 2016) ("existing simultaneously with and usually independently of another medical condition").

court's determination that the plaintiff's treating physician, a board-certified oral surgeon—who was not "an expert or specialist in epidemiology, endocrinology, pharmacology, toxicology, radiology, or pathology"—lacked sufficient qualifications to testify as to the etiology of his condition; similarly concluding that the plaintiff's other medical expert also lacked "the experience and knowledge" to testify as to causation because he had no "independent expertise" in the area); *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824–25 (7th Cir. 2010) (affirming the district court's determination that one of the plaintiff's medical experts—a board-certified neurologist and psychiatrist—was not qualified to testify as to certain issues pertaining to the plaintiff's multiple sclerosis because, among other reasons, "he had very limited experience with [multiple sclerosis] patients"); *Niles v. Owensboro Med. Health Sys., Inc.*, 2011 WL 1979309, at *2 (W.D. Ky. May 20, 2011) (granting the defendant's motion to exclude in part the testimony of the plaintiff's medical expert, who was retained to testify regarding obstetrical care, from testifying as an expert in the field of pediatrics; "[a]lthough obstetrics and pediatrics are necessarily related, qualification as an expert in one does not per se qualify a doctor as an expert in the other"); *Higgins v. Koch Dev. Corp.*, 997 F. Supp. 2d 924, 930 (S.D. Ind. 2014) (granting motion to exclude expert testimony regarding causation offered by doctor; "merely possessing a medical degree does not qualify its holder as an expert in all medical related fields" (citation omitted)), *aff'd*, 794 F.3d 697 (7th Cir. 2015).

The Fifth Circuit is no different. An expert may not "go beyond the scope of his expertise in giving his opinion." *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009). In *Copley v. Smith & Nephew, Inc.*, for instance, the court limited the testimony of a medical doctor to his specific field, excluding the neurological and orthopedic opinions of an anesthesiologist. *See Copley*, 2000 WL 223404, at *3 (S.D. Tex. Feb. 2, 2000); *see also Cadle*

*Co. v. Sweet & Brousseau, P.C.*, 2006 WL 435229, at *3 (N.D. Tex. Feb. 23, 2006) (finding attorney not qualified to opine on legal malpractice because the area is outside his specialty). In so ruling, the court rejected the notion that the expert was qualified to offer this opinion simply because he was a medical doctor. *Copley*, 2000 WL 223404, at *3 (citing *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1113 (5th Cir. 1991) (en banc) (per curiam) ("an M.D. degree . . . alone is not enough to qualify [an expert witness] to give an opinion on every conceivable medical question"), *abrogated on other grounds by Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)).[4] The court explained that the putative expert had "no specific education or experience" in orthopedic surgery or neurology; belonged "to no professional associations" and held "no certifications regarding these areas[;]" and had neither published, researched, nor taught on the topic. *Copley*, 2000 WL 223404, at *3. Because the expert could not demonstrate "the specialized knowledge, education, training or experience required," the court excluded his opinions under Rule 702. *Id.* at *4. Dr. Schapira is likewise unqualified to opine on matters beyond cardiology.

## CONCLUSION

For the foregoing reasons, Dr. Schapira should be precluded from any opinion testimony at trial as to general or specific causation related to Vioxx; Ms. Levitt's supposed myocardial infarction; and Ms. Levitt's psychological condition, related disability, or businesses. Merck respectfully requests that this Court enter an order prohibiting Plaintiff from offering such testimony at trial. A proposed order is filed herewith.

---

[4]     The reliance in *Christophersen* on *Frye*, see 939 F.2d at 1110, was overruled by *Daubert*, which announced a new standard for evaluating the *reliability* of expert testimony. *See Daubert*, 509 U.S. at 589 ("[T]he *Frye* test was displaced by the Rules of Evidence . . . under [which] the trial judge must ensure . . . scientific testimony or evidence admitted is . . . reliable."). The analysis of an expert's *qualification* under *Christophersen* is consistent with Rule 702 and was not overruled by *Daubert*.

Dated:  June 27, 2016                         Respectfully submitted,

By: /s/ Dorothy H. Wimberly
   Phillip A. Wittmann, 13625
   Dorothy H. Wimberly, 18509
   STONE PIGMAN WALTHER
   WITTMANN L.L.C.
   546 Carondelet Street
   New Orleans, LA 70130
   Phone: 504-581-3200
   Fax:    504-581-3361

*Defendants' Liaison Counsel*

  —and—

   Douglas R. Marvin
   M. Elaine Horn
   Emily Renshaw Pistilli
   WILLIAMS & CONNOLLY LLP
   725 Twelfth Street, N.W.
   Washington, DC 20005
   Phone: 202-434-5000
   Fax:    202-434-5029

*Attorneys for Merck Sharp & Dohme Corp.*

**CERTIFICATE OF SERVICE**

  I hereby certify that the above and foregoing Motion has been served on Liaison Counsel, Russ Herman, Ann B. Oldfather, and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 27th day of June, 2016.

                  */s/ Dorothy H. Wimberly*
                  Dorothy H. Wimberly, 18509
                  STONE PIGMAN WALTHER WITTMANN L.L.C.
                  546 Carondelet Street
                  New Orleans, LA 70130
                  Phone: 504-581-3200
                  Fax:  504-581-3361
                  dwimberly@stonepigman.com

                  Defendants' Liaison Counsel