Jay N. Schapira, M.D.

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

- - -

IN RE:  VIOXX PRODUCTS          :  MDL DOCKET NO. 1657
LIABILITY LITIGATION            :  SECTION L
                                :
THIS DOCUMENT RELATES TO:       :
                                :
Jo Levitt v. Merck Sharp &      :  NO.
Dohme Corp.                     :  2:06-cv-09757-EEK-DEK

- - -

VOLUME I
Tuesday, April 26, 2016

- - -

Videotaped deposition of JAY N. SCHAPIRA,

M.D., held at the offices of JAY N. SCHAPIRA, M.D.,

Cedars-Sinai Medical Towers, 8635 West Third Street,

Suite 750W, Los Angeles, California, commencing at

approximately 9:12 a.m., before Rosemary Locklear, a

Registered Professional Reporter, Certified Realtime

Reporter and California CSR (#13969).

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 Fax
deps@golkow.com

Jay N. Schapira, M.D.

---

Page 2

```
 1   APPEARANCES:
 2
 3      HUMPHREY FARRINGTON & MCCLAIN, P.C.
        BY:  DANIEL A. THOMAS, ESQUIRE (via
 4      videoconference)
        DAT@hfmlegal.com
 5      221 West Lexington, Suite 400
        Independence, Missouri 64050
 6      (816) 836-5050
        Appearing on behalf of the Plaintiff
 7
 8
        WILLIAMS & CONNOLLY, LLP
 9      BY:  PAUL E. BOEHM, ESQUIRE
        pboehm@wc.com
10      BY:  BENJAMIN W. GRAHAM, ESQUIRE
        bgraham@wc.com
11      725 Twelfth Street, N.W.
        Washington, DC 20005
12      (202) 434-5366
        Appearing on behalf of the Defendant
13
14
        ALSO PRESENT:
15
16
            JIM LOPEZ, Video Operator
17
18                - - -
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2
 3   WITNESS                        PAGE
 4
 5   JAY N. SCHAPIRA, M.D.
 6
 7        By Mr. Boehm            6
 8
 9                - - -
10
11           EXHIBIT INDEX
12   NUMBER                       MARKED
13
14   Schapira-1    4-page document dated 3/14/16    10
                   entitled "Merck Sharp & Dohme
15                 Corp.'s Amended Notice of
                   Videotaped Deposition of
16                 Jay N. Schapira, M.D."
17   Schapira-2    1-page document dated 12/19/13    11
                   entitled "Invoice," plus
18                 attachments
19   Schapira-3    20-page document entitled    49
                   "Mary Jo Levitt"
20
     Schapira-4    20-page document entitled    57
21                 "Mary Jo Levitt"
22
23
24
25
```

Page 4

```
 1           EXHIBIT INDEX (Continued)
 2   NUMBER                       MARKED
 3
 4   Schapira-5    8-page letter dated 12/12/13    80
                   to Ghada A. Anis from Jay N.
 5                 Schapira, plus attachments
 6   Schapira-6    1-page letter dated 11/5/02 to    107
                   Ronald B. Hartman, M.D., from
 7                 Steven B. Laster, M.D.
 8   Schapira-7    2-page document dated 10/3/02    110
                   entitled "Rest-Exercise TC-99M
 9                 Sestamibi Spect Scintigraphic
                   Report," JL-CC-000004 -
10                 JL-CC-000005
11   Schapira-8    8-page copy of handwritten    116
                   notes
12
     Schapira-9    2-page copy of handwritten    116
13                 notes entitled "Levitt"
14   Schapira-10   5-page copy of handwritten    116
                   notes
15
     Schapira-11   2-page copy of handwritten    116
16                 notes entitled "Jo Levitt"
17   Schapira-12   5-page copy of handwritten    116
                   notes entitled "Risk Factors
18                 for CAD"
19   Schapira-13   3-page copy of handwritten    116
                   notes
20
     Schapira-14   4-page document entitled    116
21                 "Levitt - Anti-Inflammatories"
22
23
24
25
```

Page 5

```
 1           EXHIBIT INDEX (Continued)
 2   NUMBER                       MARKED
 3
 4   Schapira-15   3-page document entitled    116
                   "Brief explanation of a 5 Axis
 5                 Diagnosis"
 6
 7   (Exhibits retained by the court reporter and attached to
     transcript.)
 8
 9
10                - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2  (Pages 2 to 5)

Jay N. Schapira, M.D.

Page 6

1       VIDEO OPERATOR:  We are now on the record.
2       My name is Jim Lopez.  I'm a videographer for
3   Golkow Technologies.  Today's date is April 26th, 2016,
4   and the time is approximately 9:12 a.m.
5       This video deposition is being held in Los
6   Angeles, California, in the matter of In Re:  Vioxx
7   Products Liability Litigation, MDL Docket Number 1657,
8   Section L, for the United States District Court, Eastern
9   District of Louisiana.
10      The deponent is Dr. Jay Schapira.
11      Counsel and all present, will you please
12  identify yourselves.
13      MR. BOEHM:  Paul Boehm and Benjamin Graham for
14  defendants.
15      THE WITNESS:  Jay Schapira.
16      MR. THOMAS:  Danny Thomas for plaintiff.
17      VIDEO OPERATOR:  Counsel will be noted on the
18  stenographic record.
19      The court reporter is Rosemary Locklear, and she
20  will now swear in the witness.
21      JAY N. SCHAPIRA, M.D., having been duly sworn,
22  was examined and testified as follows:
23              EXAMINATION
24  BY MR. BOEHM:
25  Q.    Good morning, Dr. Schapira.

Page 7

1   A.    Good morning.
2   Q.    You have been deposed many times before;
3   correct?
4   A.    Yes.
5   Q.    So you know how this works?
6   A.    Yes.
7   Q.    Okay.  I won't go through the whole spiel of
8   instructions that I'm sure you are accustomed to hearing
9   at the beginning of depositions due to your experience
10  in this area.
11      I will just note today and remind you as
12  appropriate throughout the day that we will do our best
13  mutually to not speak at the same time so that the
14  record remains clear.  Okay?
15  A.    Okay.
16  Q.    When were you first contacted by Miss Levitt's
17  lawyers about being an expert?
18  A.    If I remember correctly, it was in 2013.
19  Q.    Who contacted you?
20  A.    I don't recall.
21  Q.    Do you recall what law firm the attorney who
22  contacted you was from?
23  A.    I'm not sure.
24  Q.    Did you agree to serve as an expert in this case
25  in 2013 when you were contacted?

Page 8

1   A.    No, sir.  I agreed to review the records first
2   and consult on the case.
3   Q.    How much time did you spend reviewing records
4   before you agreed to consult as an expert for
5   plaintiff's counsel in this matter?
6   A.    I believe it was -- Mr. Boehm, I don't remember
7   exactly.  It was many hours.  As you can see, there's
8   voluminous records.  I didn't have all of these then,
9   but they sent a lot of records.
10  Q.    Did you request compensation for your time
11  reviewing materials prior to your formal engagement as
12  an expert?
13  A.    Yes.
14  Q.    And that would be reflected in the invoices that
15  you have submitted to plaintiff's counsel?
16  A.    Yes.
17  Q.    Have you ever done work for Mr. Thomas's law
18  firm in other cases?
19  A.    Refresh me on the name of his law firm, please.
20      MR. BOEHM:  Danny, will you give us the formal
21  name of your law firm?  Do you mind?
22      MR. THOMAS:  Yeah.  It is Humphrey Farrington &
23  McClain.
24      THE WITNESS:  Not that I recall, although I'll
25  tell you I don't recall every law firm I've reviewed

Page 9

1   cases for in the past.
2   BY MR. BOEHM:
3   Q.    What is your understanding about why you were
4   asked to be an expert in this matter?
5   A.    It's my understanding I was, first of all, asked
6   to consult because there are cardiology issues involved
7   in this case and that there was questions that required
8   analysis of relationship between medication she took,
9   namely Vioxx, and her cardiac issues and did it cause
10  her problems and how it caused her problems and what
11  were the consequences of those problems for her.
12  Q.    And have you prepared opinions on those subjects
13  in connection with your work on this case?
14  A.    Yes.
15  Q.    Have you ever been an expert in a Vioxx-related
16  matter before?
17  A.    I can't recall, Mr. Boehm.  I can't be 100
18  percent sure but I don't recall any by memory.
19  Q.    Have you ever been an expert in litigation
20  concerning a COX-2 inhibitor other than Vioxx?
21  A.    Not that I can recall.  I've been reviewing
22  cases for a number of years and I, frankly, can't
23  remember every case, but not that I can recall.
24  Q.    Have you read the Complaint in this case?
25  A.    Yes, sir.  Some time ago.

3  (Pages 6 to 9)

Jay N. Schapira, M.D.

Page 10

```
 1        MR. BOEHM:  Rosemary, would you mind marking
 2  this as Exhibit Number 1 to the deposition.
 3        (Exhibit Schapira-1 was marked for
 4  identification.)
 5        THE WITNESS:  I guess Danny doesn't know what
 6  this is, this document.
 7        MR. THOMAS:  Okay.
 8        MR. BOEHM:  It will -- it will be clear from the
 9  record.
10        THE WITNESS:  Oh, okay.  Great.
11  BY MR. BOEHM:
12  Q.    Dr. Schapira, I've placed in front of you a
13  document marked as Exhibit 1, which I will represent for
14  the record is a Notice to take today's deposition.
15        Have you seen this document before?
16  A.    Yes.
17  Q.    Have you reviewed it?
18  A.    Yes.
19        THE WITNESS:  May I take a second and turn my
20  phone off?  It just dinged.
21        VIDEO OPERATOR:  Do you want to go off?  Okay.
22        THE WITNESS:  It's just -- only my kids actually
23  know how to turn cell phones off.  There we go.
24  BY MR. BOEHM:
25  Q.    Have you reviewed this document before?
```

Page 11

```
 1  A.    Yes, sir.
 2  Q.    Did your review include the requests made in
 3  Exhibit A to the Deposition Notice, which you can see on
 4  the third page of the document?
 5  A.    That's this page (indicating).
 6        Yes.
 7  Q.    One of the things that we asked you to provide
 8  in advance of your deposition today were any invoices
 9  that you had submitted to plaintiff's counsel in
10  connection with your work on this case; correct?
11  A.    Yes.
12  Q.    And we have been provided by counsel for
13  plaintiff a collection of invoices that I would like to
14  mark as Exhibit 2.
15        (Exhibit Schapira-2 was marked for
16  identification.)
17  BY MR. BOEHM:
18  Q.    Do you see that you have in front of you the
19  document marked as Exhibit 2?
20  A.    Yes.
21  Q.    Do you see that this is a collection of invoices
22  provided to us by plaintiff's counsel?
23  A.    Well, I don't know who provided it to you but I
24  assume that's true, yes.
25  Q.    These are invoices that you submitted to
```

Page 12

```
 1  Mr. Thomas's law firm in connection with your work on
 2  this matter?
 3  A.    Yes, sir.
 4  Q.    Is this a complete set of the invoices that you
 5  have submitted to plaintiff's counsel?
 6  A.    I would have no way of knowing that for sure.
 7  He supplied them.  I assume that he sent you everything
 8  he had but that would just be an assumption on my part.
 9  Q.    Well, do you keep your own records about the
10  invoices that you submit --
11  A.    We do.
12  Q.    -- for the work that you do?
13  A.    We do, yes.
14  Q.    So you could review those if you needed to to
15  determine whether or not you've submitted invoices
16  beyond the ones that are included in Exhibit 2?
17  A.    I could, yes, sir.
18  Q.    Okay.  Just flipping through it, you're not able
19  to determine that.
20  A.    I don't recall the invoices.  I'm usually not
21  involved with the invoices, Mr. Boehm, and the invoices
22  go out from my staff to the law firm.
23  Q.    If you look at the last page of Exhibit 2, it's
24  an invoice dated April 20th, 2016.
25  A.    Yes, sir.
```

Page 13

```
 1  Q.    Do you see that?
 2  A.    Yes.
 3  Q.    And it says four hours for a video deposition to
 4  be held on April 26th, 2016.
 5  A.    That's --
 6  Q.    Do you see that?
 7  A.    That's correct.
 8  Q.    As far as you know, is this the last invoice
 9  that you submitted to plaintiff's counsel?
10  A.    You know, given that I don't submit them, I
11  don't know.  I just turn my hours over to my secretary,
12  my secretary then formulates them at some point in time
13  and submits them to the attorney.  I'm usually not
14  involved in this aspect of the cases.
15  Q.    Have these invoices been paid by plaintiff's
16  counsel?
17  A.    I assume so but I can't tell you for sure.
18  Q.    Have you done any work on this matter since
19  April 20th, 2016?
20  A.    Yes.
21  Q.    And what have you done since that time?
22  A.    I've reviewed medical records, I have looked at
23  literature, I have looked at depositions, I have looked
24  at reports, I have spoken with Mr. Thomas on the phone,
25  and I've just generally prepared for the deposition.
```

4 (Pages 10 to 13)

Jay N. Schapira, M.D.

Page 14

1    Q.    How many hours, approximately, did you spend
2    preparing for the deposition?
3    A.    Since the 20th?
4    Q.    Yes.
5    A.    Let's see.  The 20th would have been last
6    Thursday, I guess.  No.  It would have been last Friday.
7         I spent time on Friday and Saturday and Sunday
8    and yesterday.  So I'd say a few hours each day.  You
9    know, it may be five hours, four hours, three hours
10   different times.  I don't remember exactly.
11   Q.    Three to five hours each day?
12   A.    Roughly.  I -- you know, I couldn't be that
13   precise on it.  Just a few hours, I will tell you, each
14   day.  A few to several.  I just mark down the time, I
15   don't know if it's even accumulated yet.
16   Q.    Would you turn to the second-to-last page of
17   Exhibit 2, which is an invoice dated April 20th, 2016.
18   A.    Is that this one (indicating)?
19   Q.    Yes.
20        Now, do you see that this invoice reflects hours
21   that you have spent working on this case in the month of
22   April 2016?
23   A.    Yes.
24   Q.    You reference the review of records in
25   preparation for the deposition?

Page 15

1    A.    Yes.
2    Q.    What records are you referring to?
3    A.    Medical records.
4    Q.    Anything else?
5    A.    Usually when I use that terminology, it refers
6    to reports and all the records of the case.  It doesn't
7    just mean medical records, but it would be just the
8    general -- those hundred pounds of records sitting off
9    to my right here.
10   Q.    Are those -- we have not had an opportunity to
11   go through the three boxes that are sitting to your
12   right on the floor of your office.
13        Can you generally describe to us the materials
14   that are contained in those boxes?
15   A.    Sure.  So in the records there are depositions,
16   reports, there are exhibits to depositions, there are
17   analyses, there is literature, there are my notes, there
18   are a ton of medical records from a variety of
19   providers, there are some -- I guess that includes --
20   and some miscellaneous.
21   Q.    When you talk about reports, are you referring
22   to reports that appear in the plaintiff's medical
23   records or are you talking about reports from other
24   experts retained in this matter?
25   A.    All of the above.

Page 16

1    Q.    What reports of experts retained in this matter
2    have you reviewed in preparation for your deposition
3    today?
4    A.    I have seen reports from Dr. Egilman, I've seen
5    reports from Dr. Cordray, I've seen -- there's a report
6    in there of -- or a treatise written by Dr. Madigan.
7    There's more than one report, plural.
8         Some of the reports that come to mind at the
9    moment.  Maybe when we go through the records later, I
10   can double-check for you and see if there's any others.
11   Q.    Great.  I'd appreciate that.
12        VIDEO OPERATOR:  Excuse me, Counsel.
13        Counsel on the phone, if you could please mute
14   your phone.  We're getting a lot of feedback from you.
15        MR. THOMAS:  All right.  I'll do that.
16        VIDEO OPERATOR:  Thank you.
17   BY MR. BOEHM:
18   Q.    Have you reviewed the expert reports provided by
19   experts retained by defendants in this case?
20   A.    Can you give me some examples of some names?
21   Q.    Dr. Vaughan.
22   A.    How do you spell that?
23   Q.    Vaughan?  V-A-U-G-H-A-N.
24   A.    It does not ring a bell.
25   Q.    Do you know if you have been provided with any

Page 17

1    expert reports submitted on behalf of defendants or I
2    should say at the request of defendants?
3    A.    There is a report that I saw some time back from
4    a Dr. Pratt.
5    Q.    Okay.  Anything else?
6    A.    Not that I recall.
7    Q.    If you look at one of the time entries on this
8    April 20th, 2016, invoice, I'm looking specifically, Dr.
9    Schapira, at an April 18th, 2016, entry for 2.3 hours
10   where you obtained and reviewed reference articles
11   pertinent to this case.
12   A.    Yes.
13   Q.    Do you see that?
14   A.    Yes.
15   Q.    If you are relying on any scientific literature
16   in connection with your opinions in this case, is it
17   fair to say that you have identified what that
18   literature is in your expert reports in this case?
19        MR. THOMAS:  Objection.  Form.
20        THE WITNESS:  No, not necessarily.
21   BY MR. BOEHM:
22   Q.    So there may be material that you are relying on
23   in this matter that you have not in any way identified
24   for defendants; is that correct?
25   A.    There might be.

5 (Pages 14 to 17)

Jay N. Schapira, M.D.

1  Q.    What are those materials?  Because we have a
2  right to know that --
3  A.    Sure.
4  Q.    -- so that we can have a fair examination of
5  you --
6  A.    Yeah.
7  Q.    -- at today's deposition.
8  A.    There are --
9  Q.    So if you've not provided either in citation or
10 specifically in your report some indication that it's
11 something you're relying on, there's no way for us to
12 know that.
13 A.    They're --
14 Q.    Do you understand that?
15 A.    They're all sitting off to your right.  No; your
16 left, my right.  They're in these boxes.
17 Q.    You're relying on every document that is in
18 these three boxes sitting to your right on the floor?
19 A.    Not necessarily, no.
20 Q.    Okay.
21 A.    We have to go through it document by document.
22 Q.    You haven't done that for us already; correct?
23 A.    We just got started.
24 Q.    Well, you haven't done that in the form of your
25 report; correct?

1  A.    Correct.
2  Q.    In your report you did not make an effort to
3  identify for defense counsel the materials that you were
4  reviewing on for purposes of the opinions that you are
5  stating in this case.  True?
6  A.    My report is -- predates the date you just
7  picked out, 4/18/16, so that's correct, I did not
8  identify anything from 4/18/16 in a report that predates
9  that.
10 Q.    Have you provided a supplemental report --
11 A.    Yes.
12 Q.    -- to plaintiff's counsel since you sent one in
13 January of 2016?
14 A.    No.
15 Q.    Okay.  So the January of 2016 supplement is the
16 only supplement to your report that you have provided in
17 this case; correct?
18 A.    Correct.
19 Q.    Okay.  If you look at the original report that
20 you prepared and submitted and your January 2016
21 supplement to that report, is there anything that is not
22 referenced specifically in the contents of those two
23 documents that you are relying on for purposes of your
24 opinions in this case?
25 A.    I don't quite understand the question.  I'm

1  trying to figure it out.  Maybe you could restate it.
2        MR. BOEHM:  I'll just ask the court reporter to
3  read it back, if that's okay.
4        THE WITNESS:  Sure.
5        (The court reporter read back the requested
6  portion of the record.)
7        MR. THOMAS:  Objection.  Asked and answered.
8  BY MR. BOEHM:
9  Q.    You can answer the question.
10 A.    My core opinions, what I relied on for my core
11 opinions, as stated in my reports, does not depend on
12 any references that I obtained subsequent to that but I
13 did obtain references subsequent to those two reports
14 and that's what's contained herein.
15 Q.    When you talk about references that you obtained
16 subsequent to the reports that you have provided -- and
17 I guess that means subsequent to January 2016; correct?
18 A.    Right.  So three months ago.
19 Q.    Okay.  So when you talk about references that
20 you have obtained in the last three months or so since
21 you submitted the supplement to your expert report, what
22 references are you referring to?
23 A.    Literature.
24 Q.    What specific literature are you referring to?
25 A.    We'll have to go through the papers and show

1  you.
2  Q.    Where in your three boxes should we look to find
3  the medical literature that you have identified just in
4  the last three months since you submitted your
5  supplemental report?
6  A.    So you want me to show you?
7  Q.    Yeah.  Show me in the boxes.  I want to see in
8  the boxes where we can start to look --
9  A.    Sure.
10 Q.    -- so that we can begin the process of
11 understanding what additional material you may be
12 relying on.
13 A.    Sure.  Here we go.
14       MR. BOEHM:  Let's just go off the record.
15       VIDEO OPERATOR:  Okay.
16       Off the record at 9:29 a.m.
17       (Discussion off the record.)
18       VIDEO OPERATOR:  With the approval of counsel,
19 back on the record.
20       The time is approximately 9:35 a.m.
21 BY MR. BOEHM:
22 Q.    Dr. Schapira, you've referenced the fact that
23 there are three boxes sitting on the floor of your
24 office here where you're taking your deposition today,
25 and you have had an opportunity to look through those

Jay N. Schapira, M.D.

Page 22

1  three boxes and identify for us in response to my
2  request literature that you have found in the last three
3  months that you believe is relevant to your opinions in
4  this case.
5      Did I summarize that correctly?
6  A.  To some degree.  Some of it is -- is very
7  indirectly relevant, some of it is more relevant.
8  Q.  Okay.  And some of it is material that you've
9  had for more than three months; correct?
10  A.  In some -- well, it's hard to say.  You'll have
11  to ask me about the document itself.  Let's take a look
12  at --
13  Q.  Well, I'll give you just one example that stands
14  out.  It's the Juni publication that's referenced in
15  your expert report; correct?
16  A.  Yes, sir, I have had this one.
17  Q.  So that's something you've had for more than
18  three months.
19  A.  Yes, sir.
20  Q.  How much of this have you discovered just
21  recently and how much of it did you have at the time
22  when you were preparing your original and your
23  supplemental reports in this case?
24  A.  I think the vast majority is in the last three
25  months.

Page 23

1  Q.  Would you also agree that the vast majority of
2  it was published well before just the last three-month
3  time period?
4  A.  Yes.
5  Q.  Why did you wait until just the last three
6  months to search for these articles?
7  A.  I didn't see the need to spend the time to do
8  all of this work until I knew that we would have a
9  deposition and I would be deposed in this case.  I
10  wasn't sure that I'd be deposed in this case, and so why
11  do the work unless it's necessary?
12  Q.  You didn't see the need to do this work in
13  connection with your preparation of your expert report;
14  correct?
15  A.  I understood the case well enough to do my
16  report without getting all this stuff.
17  Q.  Well, this is stuff that you hadn't even seen
18  until the last three months; right?
19  A.  I was aware of this literature before.  I'd read
20  this.  Like you said, it's old stuff.
21  Q.  Okay.
22  A.  I've read this.
23  Q.  Okay.  Just so the record is clear, then, this
24  is material that you were already familiar with at the
25  time you prepared your report, you've just only in the

Page 24

1  last three months printed it out and collected it in
2  this form; is that right?
3  A.  Familiar with having read it, based -- as a
4  doctor taking care of patients when these were relevant
5  papers to the active care of patients, you know, in late
6  1990s and the early 2000s.
7  Q.  Right.  And there are many articles here in this
8  stack; correct?
9  A.  Yes.
10  Q.  And you're telling me that I would need to go
11  through each one of these articles one by one and ask
12  you whether or not it was something you were relying on
13  in this case in order for you to tell me one way or
14  another.  Is that true?
15  A.  Probably right.
16  Q.  With respect to the articles that you believe
17  you are relying on but did not include in your report,
18  why didn't you reference them in your report or in your
19  supplement to your report?
20  A.  They were not in my file, I had read these
21  articles a long time before, I read them when they were
22  relevant to the care of patients, care of my patients in
23  my practice, and so to just get them out for my opinions
24  when they were in my background and my education, I
25  didn't see the need to.

Page 25

1  Q.  Now, you have a folder here that you've
2  identified, and it looks like the words "Disability Lit"
3  is written on the manila folder; correct?
4  A.  Yes.
5  Q.  Did you write that?
6  A.  Yes.
7  Q.  Are you relying on any of the literature
8  contained in the manila folder that you've identified as
9  disability lit for purposes --
10  A.  Depends on what you ask me.  I mean, yes, in a
11  sense.  I mean, this is information I had before in my
12  mind, and I had a discussion with Danny with regard
13  to -- pardon me -- Mr. Thomas with regard to, does he
14  want me to have an opinion on that, and he said, well,
15  if they ask you, you can tell them.
16  Q.  Are you planning on expressing an opinion in
17  this matter about the extent of Miss Levitt's
18  cardiovascular disability?
19  A.  I might, yes.
20  Q.  Is that something that you included in your
21  expert reports in this case?
22  A.  I did not, no.
23  Q.  Okay.  But you're -- in spite of the fact that
24  you did not include any opinion in your expert reports
25  in this case, you do have opinions and you do hold out

7 (Pages 22 to 25)

Jay N. Schapira, M.D.

Page 26

1   the possibility of expressing those opinions?
2   A.    Well, that's two questions.  Number one, I do
3   have opinions.  She's a patient, she's a heart patient,
4   I see heart patients, and I have opinions.  Number two,
5   whether or not I express them or not is not up to me.
6   Q.    What's your understanding about who is that
7   up -- who that is up to?
8   A.    A, you, if you ask me questions about it; and,
9   B, if Mr. Thomas asks me questions about it.
10  Q.    Okay.  You also have a folder in here marked
11  "Depression."
12      Do you see that?
13  A.    Yes.
14  Q.    This folder contains precisely one article.
15      Do you see that?
16  A.    Yes.
17  Q.    Is this article by Mallik, M-A-L-L-I-K, et al.,
18  an article that you're relying on because of the
19  opinions you're expressing in this case?
20  A.    In a very indirect, background way.  This is
21  knowledge I had before, just is the basis of it.
22  Q.    You don't express any opinions in your expert
23  reports at all about Ms. Levitt's depression, do you?
24  A.    I would have to review it to -- I just -- I
25  can't recall any -- I don't think there are but to be

Page 27

1   sure I'd have to look at it.  You probably have reviewed
2   it more recently than I have.
3   Q.    Do you intend to express opinions about Ms.
4   Levitt's depression in connection with your work in this
5   case?
6   A.    If you ask, if Mr. Thomas asks, I will tell you
7   my opinion of the role of depression in her case as a
8   cardiologist, of course, not a psychiatrist.  I'm not a
9   psychologist, not a therapist, but this is an issue I
10  deal with in patients.
11  Q.    Well, if you intend to express opinions on that
12  subject, then I do intend to ask.  But it's not in your
13  report.
14  A.    Okay.  That would be --
15  Q.    So I'm showing up today and hearing for the
16  first time that you might have opinions about depression
17  and so I need to hear from you whether or not you intend
18  to express opinions about that topic in this case so
19  that I can fairly ask you questions about that if you
20  indeed do have that intention.
21  A.    Well, that might be a better question for
22  Mr. Thomas.
23  Q.    Well, but I'm asking you --
24  A.    Well --
25  Q.    -- because I don't get a chance to ask your

Page 28

1   counsel questions at this deposition.
2   A.    Okay.  Okay.  If you ask me a question about her
3   depression, I'll answer them.  If he asks me questions
4   at trial, I'll answer those.  Do I have opinions about
5   her depression?  To a limited degree, as a cardiologist,
6   yes.
7   Q.    What are your --
8   A.    As a psychiatrist, no.
9   Q.    What are your opinions about Miss Levitt's
10  depression?
11  A.    I think that Ms. Levitt had some degree of
12  depression before acute coronary syndrome and bypass
13  in the year 2000.  I think that, though, she was a fully
14  functional, high-level-functioning person with the level
15  of depression she had.
16      After those two events, her depression I believe
17  is worse, rendering her, to a large degree,
18  non-functional in her business and her personal life has
19  suffered and I think her general assessment of function
20  is lower.  I think that's been documented in her
21  psychiatric records, which I was provided and did
22  review.
23  Q.    Have you performed a comprehensive review of
24  Miss Levitt's psychiatric records for purposes of
25  expressing an opinion about the severity of her

Page 29

1   depression after 2000 compared to the severity of her
2   depression before the year 2000?
3   A.    I reviewed her psychiatric records in order to
4   assess what her functional capacity is, based upon her
5   cardiac situation.
6   Q.    I'm sorry, but that was not my question.
7       MR. BOEHM:  Can you please read back my
8   question.
9       (The court reporter read the requested portion
10  of the record.)
11      THE WITNESS:  Specifically, no, but that could
12  become a little bit relevant in terms of assessing her
13  functional abilities now.
14      MR. BOEHM:  I have very little understanding of
15  what you just said.
16  BY MR. BOEHM:
17  Q.    Can you clarify that for me?
18  A.    Okay.  Let me start with the bigger picture and
19  then maybe you'll understand.
20      So I'm a cardiologist.  I'm here to tell you
21  about her cardiac situation before and after March and
22  June of 2000.
23      She is disabled now.  She has a disability.  It
24  is a global disability.  It's related to her cardiac
25  problems, it's related partially to heart, it's related

Jay N. Schapira, M.D.

Page 30

1  partially to the co-morbidities of her cardiac
2  situation, which include her depression and her
3  cognitive issues.
4      As a cardiologist, I would identify that, I
5  would discuss it with the patient and refer them to a
6  psychiatrist if I were treating that patient. I'm a
7  clinician. But I would have to assess it and I would
8  have to evaluate it and I would have to have an opinion
9  about it.
10     I believe that Miss Levitt is just like a lot of
11 patients in my practice, and when I approached and
12 analyzed this case, I did it just like I was evaluating
13 a patient in my practice.
14 Q.   You have not yet done the analysis with respect
15 to Miss Levitt that you would need to do in order to
16 express expert opinions about how the level and severity
17 of her depression both before or after -- let me strike
18 that and start over.
19     You have not yet done the analysis that you
20 would need to do in order to express an expert opinion
21 about how the severity of Miss Levitt's depression after
22 2000 compares with the severity of her depression before
23 2000; correct?
24 A.   I can only tell you what I've read in the
25 records, and I do have a cardiac opinion of her global

Page 31

1  functioning right now that I can tell you about, and I
2  would like to, I'd be prepared to. So ask away.
3  Q.   We're going to ask, we're going to talk at
4  length about her cardiac function --
5  A.   Okay.
6  Q.   -- but that's not my question right now.
7  A.   I understand.
8  Q.   So I need you to answer my question.
9  A.   I didn't understand it.
10 Q.   Okay. You can just tell me that if you didn't
11 understand it.
12     My question is, you have not --
13 A.   Usually when I give you this answer that doesn't
14 make sense, it's because I didn't understand it. But
15 I'm trying to. So please excuse me for that.
16 Q.   You have not done the kind of analysis that you
17 would need to do in order to express an expert opinion
18 in this matter about how Miss Levitt's severity of
19 depression after her cardiac events in 2000 compare with
20 her depression prior to her cardiac events in 2000;
21 correct?
22 A.   As a cardiologist, I think I can.
23 Q.   You feel like you have done that type of
24 analysis.
25 A.   Yes. As a cardiologist, not as a psychiatrist.

Page 32

1  Q.   How would you describe the severity of Miss
2  Levitt's depression in her teenage years?
3  A.   She did have some issues with depression and --
4  in her teenage years.
5  Q.   Would you agree that her depression in her
6  teenage years was severe?
7  A.   I don't know that I would call it severe. I
8  don't think it's been characterized that way. I don't
9  know of any psychiatric evaluations that happened during
10 that period of time that would allow me to conclude
11 that.
12 Q.   You really can't conclude that one way or
13 another; correct?
14 A.   Correct.
15 Q.   How would you describe the severity of Miss
16 Levitt's depression in her 20s, 30s, and 40s?
17 A.   I believe there was some level of depression. I
18 believe -- however, as a cardiologist, I looked at her
19 functionality, and she was functional.
20     She was a high-functioning person, ran a big
21 business, businesses, plural, and was a big achiever, a
22 very high level of achievement, a very high level of
23 functioning. Despite the fact that she did have some
24 issues with depression, it did not affect her level of
25 functioning enough of a degree to really impair her

Page 33

1  in a business way. She was able to carry out her
2  business.
3  Q.   Okay. Have you seen those records from Ms.
4  Levitt's psychiatric treaters indicating that, in fact,
5  her depression and anxiety was impacting her daily
6  function in life?
7  A.   Not to the degree of making her profoundly
8  non-functional, no.
9      I have seen a deposition from Mr. Bazam, one of
10 her co-workers, who observed her both --
11 Q.   But that's not my question.
12 A.   -- before and after.
13 Q.   I didn't ask you about Mr. Bazam so --
14 A.   I know.
15 Q.   My question was about --
16 A.   But that was the -- that was part of a good
17 answer.
18 Q.   Well, it may have been what you wanted to talk
19 about, but the way the deposition works is I ask you a
20 question and you respond to that question. So I asked
21 you about psychiatric treatment records.
22 A.   Okay.
23     MR. THOMAS: Well, I'll object, respectfully,
24 Paul. You have to let him finish your answer -- his
25 answer, and if you don't -- you think that it's

9 (Pages 30 to 33)

Jay N. Schapira, M.D.

1   non-responsive --
2       MR. BOEHM:  That's fine.
3       MR. THOMAS:  -- then you can make a record and
4   re-ask it if you want.  But you at least have to let him
5   finish his answer, I believe.
6       MR. BOEHM:  That's -- that's fine.  I think Dr.
7   Schapira also knows that that wasn't responsive.  But
8   that's fine.
9       THE WITNESS:  No.  Dr. Schapira thinks it was
10  responsive, actually.
11  BY MR. BOEHM:
12  Q.    So you think that Dr. Bazam and his deposition
13  testimony shows up somewhere in Ms. Levitt's psychiatric
14  records?
15  A.    I don't think that, no.
16  Q.    Okay.
17  A.    I think Mr. Bazam addresses her functionality.
18  Q.    Is Mr. Bazam Miss Levitt's treating mental
19  health-care provider?
20  A.    No.
21  Q.    Do you know that Ms. Levitt had bulimia?
22  A.    Yes.
23  Q.    To what extent does that impact your opinions in
24  this case, if at all?
25  A.    It, in my opinion, did not affect her level of

1   functioning in her businesses prior to her heart
2   condition.
3   Q.    Is that it?
4   A.    That's it.
5   Q.    Does it tell you anything about the severity of
6   her mental health issues?
7   A.    Which ones?
8   Q.    Well, you --
9   A.    To clarify.
10  Q.    You've told me that you've reviewed her
11  psychiatric records; right?
12  A.    Yes.
13  Q.    So you know that she had depression; right?
14  A.    Yes.
15  Q.    You know that she had anxiety; correct?
16  A.    Yes.
17  Q.    You know that she was obsessed with her nasal
18  issues?
19  A.    I wouldn't call it an obsession, but she had
20  nasal issues.
21  Q.    And you know that the medical-care providers
22  described those as controlling her life.
23      Did you know that?
24  A.    You're going to have to -- I didn't -- you're
25  going to have to show me that entry.  I don't recall

1   that language.
2   Q.    If that was the case, would that impact your
3   opinions in this case?
4   A.    No, probably not.  It depends on the language,
5   though, so show me the language before I --
6   Q.    Okay.
7   A.    -- agree with that one.
8   Q.    Okay.  Well, if you had included -- in fairness,
9   if you had included any section in your report at all
10  about this, then I would have come prepared to talk
11  about the psychiatric records in this matter in a more
12  fulsome way than I've had an opportunity to do that.  So
13  I will see what I can find, but it's not something
14  that's at all referenced in your report.
15      And you know that Miss Levitt had bulimia;
16  right?
17  A.    Yes, sir.
18  Q.    Does the fact that she had that constellation of
19  mental health issues in any way impact your view about
20  the severity of Miss Levitt's depression prior to her
21  cardiac events in 2000?
22  A.    Again, the way I assessed the severity is that
23  she was able to be functional in her life, that she was
24  cognitively able to, functionally able to carry out her
25  business successfully.  As a cardiologist, I look at

1   functionality, and that's the way I analyzed the
2   situation is as a cardiologist.
3   Q.    Just turning back to the invoices that you have
4   provided to plaintiff's counsel and that plaintiff's
5   counsel has provided to us, I want to direct your
6   attention back to the April 20th, 2016, invoice, which
7   is the second-to-last page of Exhibit 2.
8       Are you there?
9   A.    Yes, sir.
10  Q.    Do you see that there is a reference to the
11  review of depositions of Arnold Katz and Donald Hartman?
12  A.    Yes.
13  Q.    And you indicate that you reviewed those
14  depositions on January 11th, 2016; correct?
15  A.    Yes.
16  Q.    Why was your time spent reviewing those
17  depositions not included in your January 18th, 2016,
18  invoice?
19  A.    I don't know.
20  Q.    You see that in your January 18th, 2016, invoice
21  you reference having spent 1.6 hours reviewing the
22  deposition transcript of Dr. Thomas Rosamond; correct?
23  A.    Yes.
24  Q.    But you do not reference in any way any review
25  of the depositions of Arnold Katz or Donald Hartman;

Jay N. Schapira, M.D.

Page 38

1 correct?
2 A.    Right; even though it took place two days later.
3      That's probably the systemic flow of the way
4 billing works in my office. Who knows? That's when the
5 work was done. Why it got billed later, I don't know.
6 Q.    Are all the deposition transcripts that you have
7 reviewed in connection with your work in this matter
8 referenced on the invoices that are provided to us in
9 the form of Exhibit 2?
10 A.    Mr. Boehm, I can't tell you that 100 percent for
11 sure. I can tell you that I can -- I try to bill
12 everything that I do. I sometimes do work and don't
13 bill for it, we make mistakes in the billing, so I can't
14 tell you exactly what I reviewed just from the billing.
15 I don't think that would be the most accurate way to
16 look at it.
17 Q.    How have you gone about deciding which
18 deposition transcripts to read and which not to read?
19 A.    I've read all of the ones that --
20      THE WITNESS: One second. I'm getting an error
21 I want to --
22      Which button should I push here, Jim?
23      VIDEO OPERATOR: What's going on?
24      THE WITNESS: There's a slow connection error,
25 which is, I'm sure, our slow connection but --

Page 39

1      MR. THOMAS: I'm still seeing you live.
2      THE WITNESS: Yeah.
3      MR. BOEHM: Why don't we just proceed. What's
4 the --
5      VIDEO OPERATOR: No, you don't want to --
6      THE WITNESS: All right. Good. Thank you.
7 Cool. Thanks.
8      VIDEO OPERATOR: Okay.
9      THE WITNESS: Question again, please, or read
10 back, whatever you prefer.
11      (The court reporter read the requested portion
12 of the record.)
13      THE WITNESS: -- were sent to me, to finish the
14 answer.
15 BY MR. BOEHM:
16 Q.    Sent to you by counsel for plaintiff.
17 A.    Yes.
18 Q.    Which of the deposition transcripts, if any, are
19 you specifically relying on for purposes of your
20 opinions in this case?
21 A.    I don't think I can answer that question. They
22 all go into the -- to the review. I can't extract
23 individual ingredients.
24 Q.    Have you reviewed the deposition transcript of
25 Dr. Egilman in this case?

Page 40

1 A.    Yes.
2 Q.    The one that was taken just a couple of weeks
3 ago?
4 A.    Yes.
5 Q.    When did you review that?
6 A.    Over the weekend.
7 Q.    Just this past weekend?
8 A.    Yes, sir.
9 Q.    Are you relying on Dr. Egilman's opinions for
10 purposes of your own opinions in this matter?
11 A.    I formulated my own opinions independently of
12 Dr. Egilman.
13 Q.    Okay. But that wasn't quite my question. You
14 understand that; right?
15 A.    Well, okay. Repeat your question again, then.
16 Let me try it one more time.
17      (The court reporter read the requested portion
18 of the record.)
19      THE WITNESS: No.
20 BY MR. BOEHM:
21 Q.    You had previously planned to have been deposed
22 sometime in 2014 in this case.
23      Do you recall that?
24 A.    No.
25 Q.    Did you ever know that the lawyers in this case

Page 41

1 were attempting to schedule your deposition in 2014?
2 A.    If I knew, I don't remember that I knew, so now
3 I don't know.
4 Q.    Are you aware that plaintiff's counsel informed
5 defense counsel in this case that they were withdrawing
6 you as an expert?
7 A.    No.
8 Q.    That's not something you had knowledge of before
9 right now.
10 A.    Correct.
11 Q.    I would ask you to turn, if you would,
12 Dr. Schapira, to the March 5, 2014, invoice that is part
13 of Exhibit 2.
14      Do you see the first entry on that invoice is a
15 2.4-hour entry where you have reviewed records in
16 preparation for the deposition?
17 A.    Correct.
18 Q.    Does this refresh your memory that, in fact, you
19 were planning on a deposition back in 2014?
20 A.    Yes, sir. It looks like it, yes.
21 Q.    Does this refresh your recollection?
22 A.    Well, I mean, I still don't remember having
23 scheduled it or cancelled it or having it cancelled.
24 It's just simply I can only read that it says, in
25 preparation for the deposition, then there is no --

11 (Pages 38 to 41)

Jay N. Schapira, M.D.

Page 42

1   apparently, no deposition that takes place, and it looks
2   like, you know, there's a flurry of activity there in
3   late February and early March and then stops.
4   Q.   Do you remember this time frame?
5   A.   No.
6   Q.   On March 1, 2014 --
7   A.   Well, I'm sorry.  Apologize.  I do remember the
8   time frame, I don't remember this particular event.  I
9   mean, I remember March of 2014.  It was a -- right.
10  Q.   On March 1, 2014, you had a 4.1-hour
11  teleconference with Dr. Egilman.
12       Do you see that?
13  A.   Yes.
14  Q.   What was the purpose of your call with Dr.
15  Egilman in March 2014?
16  A.   To hear what Dr. Egilman had to say.  He's done
17  a lot of work in this area of medicine, and to hear what
18  he had to say.
19  Q.   Did you ask for that teleconference?
20  A.   I don't remember how it came about.  I don't
21  remember the circumstances of it being arranged for.
22  Q.   Did Dr. Egilman conduct some kind of primer for
23  you during that four-hour conference?
24  A.   Primer.  Primer?  Primer?
25  Q.   Yeah.

Page 43

1   A.   Primer.
2   Q.   If you want to call it primer, that's fine.
3       Did Dr. Egilman conduct some kind of primer for
4   you in that four-hour telephone call?
5       MR. THOMAS:  Objection.  Form and foundation as
6   to primer, or primer.
7       THE WITNESS:  Okay.  You went to Yale.  Is it
8   primer or primer?
9       Primer goes inside of a bullet, a primer I think
10  is like an educational document.
11      But the answer is no.
12  BY MR. BOEHM:
13  Q.   What did Dr. Egilman talk to you about during
14  those four hours?
15  A.   He talked about his opinions on this case.
16  Q.   He told you what his opinions were in this case.
17  A.   Yes.
18  Q.   Did you ask him questions?
19  A.   I'm sure I did.
20  Q.   This took place -- strike that.
21      Did you already know Dr. Egilman --
22  A.   No.
23  Q.   -- before you had this telephone call?
24  A.   No.
25  Q.   Have you talked to Dr. Egilman since that

Page 44

1   telephone call?
2   A.   No.
3   Q.   At the time that you had this telephone call
4   with him did you know that he was being paid as an
5   expert by plaintiff's counsel?
6   A.   I don't think I asked one way or another.  I
7   knew that he was working with plaintiff counsel.  I
8   didn't know what the basis of the arrangements was.
9   Q.   What did Dr. Egilman tell you during that call?
10  A.   He just basically talked about the history of
11  the -- of Vioxx and -- and as he saw it and the
12  interworkings of its approval, its issues, the papers
13  published, and then its disapproval.
14  Q.   What do you mean, its disapproval?
15  A.   It was taken off the market.
16  Q.   It was voluntarily withdrawn from the market;
17  correct?
18  A.   Yeah.
19  Q.   Okay.
20  A.   But disapproval as far as studies coming out
21  showing problems with the drug.
22  Q.   Dr. Egilman told you all about that from his
23  perspective; correct?
24  A.   He did, yes.
25  Q.   Have you ever had similar types of

Page 45

1   communications with any other paid plaintiffs' experts?
2   A.   No.
3   Q.   Was there anything during that four-hour
4   telephone call with Dr. Egilman that you disagreed with?
5   A.   I don't recall.  I mean, there's nothing
6   standing out prominently.
7   Q.   On this same invoice you indicate that you
8   reviewed the reports of Dr. David Madigan; correct?
9   A.   Yes.
10  Q.   Have you ever communicated with Dr. Madigan?
11  A.   No.
12  Q.   Have you read Dr. Madigan's deposition in this
13  case?
14  A.   Not that I recall.
15  Q.   Did you know that Dr. Madigan has been deposed
16  as an expert in this matter?
17  A.   I don't know if I knew that or not.  I don't
18  recall that now.  Did I know it a year or two ago?  I
19  don't recall.
20  Q.   Counsel for plaintiff has not provided to you
21  Dr. Madigan's deposition transcript; correct?
22  A.   I don't believe I have that, no.
23  Q.   But counsel for plaintiffs did provide to you
24  Dr. Egilman's deposition transcript.
25  A.   Yes.

12  (Pages 42 to 45)

Jay N. Schapira, M.D.

Page 46

1  Q.     You indicate that you reviewed Dr. Egilman's
2  report.
3         Which Egilman report did you review?
4  A.     It's about 100-and-some-odd pages long, it's got
5  paragraphs that go, numbered 1 through, you know, 300
6  and something.  You know the one I'm talking about.
7  It's yay thick, yay thick.
8  Q.     Are you relying on Dr. Egilman's deposition
9  testimony for purposes of your opinions in this case?
10 A.     No.
11 Q.     Are you relying on the expert report of Dr.
12 Madigan for purposes of your opinions in this case?
13 A.     No.
14 Q.     What other expert reports, if any, are you
15 relying on for purposes of your opinions in this case?
16 A.     I don't believe -- I mean, I've read them all
17 but I've not -- I can't think of any that would respond
18 to your question.  I've formulated my own opinions based
19 upon the records and not based upon opinions of other
20 experts.
21 Q.     Why did you think it would be a good idea for
22 you to listen to Dr. Egilman speak for four hours about
23 his opinions in this case if you wanted your opinions to
24 be focused on your own review of the medical records
25 rather than on what another expert thought about that?

Page 47

1  A.     Okay.  Well --
2         MR. THOMAS:  Objection.  Form, compound, and
3  argumentative.
4  BY MR. BOEHM:
5  Q.     Go ahead.
6  A.     Okay.  So it was compound.  So just one
7  question, please.
8         MR. BOEHM:  Go ahead and read back the question.
9         I think that's one you can answer fine.
10        (The court reporter read the requested portion
11 of the record.)
12        THE WITNESS:  Okay.  So the question was not
13 about the four hours, it was about -- just restate it.
14 BY MR. BOEHM:
15 Q.     It was -- the question is, why did you want
16 to -- why did you think it would be appropriate to have
17 a four-hour call where you listened to Dr. Egilman talk
18 about his opinions in this case if you wanted to focus
19 your own opinions on your review of the medical records?
20 A.     Okay.  And here's the answer:  So, first of all,
21 I'm a cardiologist, he's not.  Number one, he knows a
22 lot about the FDA issues with Vioxx, which I don't.  I
23 knew a little bit, and Mr. Thomas thought it might be
24 educational for me to learn a little bit about that.
25        I could have, alternatively, gone out and read

Page 48

1  for a few weeks and gotten the same information.
2         And so he gave me some background information,
3  referring to documents and referring to publications
4  and -- and, you know, just basically giving me a review.
5  And I was not interested in his opinions as a
6  cardiologist because he's not a cardiologist.
7  Q.     Why is it important to you to note that you are
8  a cardiologist but Dr. Egilman is not a cardiologist?
9  A.     Because I analyzed this case as a cardiologist.
10 Q.     Are you saying that gives you some unique
11 perspective on the facts of this case?
12 A.     Probably, yes.
13 Q.     That somebody who's not a cardiologist wouldn't
14 have.  Fair?
15 A.     Right.  Just, you know, their perspective may be
16 equally valid but it's just not the same as mine.
17 Q.     You indicate that Dr. Egilman talked to you
18 about some of the regulatory issues and history with
19 respect to Vioxx; is that right?
20 A.     I don't know regulatory.  Just -- maybe that's
21 the right word.  But just some of the things that
22 happened with regard to publications and -- and the back
23 and forth of the negotiations and -- and when there was
24 a relabeling and when the studies came out and then
25 revised.  Just sort of navigate me through a lot of the

Page 49

1  literature, which is here in -- in -- I think here on
2  the table.
3  Q.     And you indicated that you could have went and
4  reviewed that yourself but it was faster to just have
5  Dr. Egilman tell you his thoughts about that?
6  A.     Well, then I did go out and review it myself
7  after he gave me sort of a preview.
8  Q.     I see.
9  A.     And he -- a lot of it was just, why don't you
10 look at this paper and why don't you look at that paper
11 and read it and see what you think.
12        You don't know Dr. Egilman so...
13 Q.     Oh, I do know Dr. Egilman, actually.
14 A.     I know you do.  I read your deposition
15 questions.
16 Q.     Yep.  He is a well-known figure.
17        Yesterday afternoon, I will represent,
18 plaintiff's counsel provided to us a document that
19 appears to be notes that you have taken in connection
20 with your review of materials in this matter.
21        MR. BOEHM:  Would you please mark that as
22 Exhibit 3, Rosemary.
23        (Exhibit Schapira-3 was marked for
24 identification.)
25        THE WITNESS:  Thank you.

13 (Pages 46 to 49)

Jay N. Schapira, M.D.

Page 50

1  BY MR. BOEHM:
2  Q.    Do you recognize this document that's been
3  marked as Exhibit 3?
4  A.    Yes.
5  Q.    Are these notes that you have taken in
6  connection with your work on this case?
7  A.    That I have created, yes.
8  Q.    Did you type this up?
9  A.    No.
10  Q.    Who typed it up?
11  A.    My secretary.
12  Q.    How did she know what to type up?
13  A.    I dictated it.
14  Q.    You dictated it into some kind of record -- some
15  type of recording device and then she typed from that?
16  A.    Yes.
17  Q.    When did you provide this to plaintiff's
18  counsel?
19  A.    At the end of last week or middle of last week
20  sometime.
21  Q.    Do you remember specifically?
22  A.    Not sure.
23  Q.    It was last week sometime.
24  A.    Yes.
25  Q.    What is this document?

Page 51

1  A.    Mr. Thomas asked me to provide my notes and --
2  of what I had at the time, and I gave it to my secretary
3  and she provided it to him. Whether she scanned it or
4  faxed it or mailed it, I don't know.
5  Q.    When you say these are your notes that you had
6  at the time, what time are you referring to?
7  A.    At the time I gave them to her, which was last
8  week.
9  Q.    When did you last update this document with your
10  thoughts?
11  A.    I've created notes since then, over the weekend.
12  Q.    Okay. We'll get to that in just a moment.
13       Right now my question is, when did you last
14  update the document that was provided to us by
15  plaintiff's counsel yesterday afternoon and that is now
16  marked as Exhibit 3?
17  A.    You mean when did I put more pencil marks on
18  here?
19  Q.    When did you last update it in any way?
20  A.    I -- probably last night or Sunday.
21  Q.    When was it sent to plaintiff's counsel?
22  A.    Last week.
23  Q.    Okay. So there -- you have made updates to what
24  has been marked as Exhibit 3 since you sent it to
25  plaintiff's counsel last week; correct?

Page 52

1  A.    Yes.
2  Q.    Do you have with you the most recent version --
3  A.    I do.
4  Q.    -- of what we've now marked as Exhibit 3?
5  A.    I do.
6       Are we done with this?
7  Q.    Well, we're done with it right for this moment.
8  A.    Okay. Why don't we sort of get these off to the
9  side so we have more space. Do you have space over
10  there?
11  Q.    Let's just leave them here because we may need
12  to refer back to them.
13  A.    All right.
14  Q.    Now, the record should reflect that Dr. Schapira
15  is currently flipping through a manila folder of
16  materials.
17       Are the markings on the document that you've
18  just handed across the table to me markings that you
19  have made just in the last few days?
20  A.    Yes. Well, some of the markings were there
21  before, Mr. Boehm, if you notice, some of them are not.
22  So it's --
23  Q.    Any markings that are not on what is Exhibit 3
24  are new markings.
25  A.    Right. All of my notes are a work in progress.

Page 53

1  So the minute I send something, I could add to it, you
2  know, two hours later just in the -- in the process of
3  preparation.
4  Q.    What else do you have here in this manila folder
5  you're flipping through?
6  A.    I have other notes that I've made over the
7  weekend.
8  Q.    Okay. Can I please see that folder?
9  A.    Sure. Absolutely.
10  Q.    Are all of the notes that are in this manila
11  folder ones that you've made just over this past
12  weekend?
13  A.    No. Some of them I think are things that were
14  sent to you and some of them are new.
15  Q.    This document marked as Exhibit 3 and that you
16  have updated just in the past few days with your
17  handwritten notes --
18  A.    And some additional pages.
19  Q.    You have new pages that are also added to the
20  document?
21  A.    I think so.
22  Q.    Okay. How did you go about deciding which
23  medical records to include in this summary and which not
24  to include?
25  A.    As a cardiologist and focusing on the cardiology

14  (Pages 50 to 53)

Jay N. Schapira, M.D.

Page 54

1  issues, I reviewed the medical records that I -- and
2  abstracted just for study purposes those things which I
3  thought would help me to remember the facts of the case.
4      It's kind of like study notes.  You remember
5  more than what's in your study notes but it just helps
6  to create a coherent, overall picture of the case.
7  Q.    At the top of the page on Exhibit 3 you have a
8  list of several doctors' names.
9      Do you see that?
10  A.    No.  Actually, let me borrow my original back.
11  Q.    Well, you have Exhibit 3 right there in front of
12  you.
13  A.    All right.
14  Q.    And I'll represent to you that the list of names
15  on Exhibit 3 does not differ in any way from the
16  document that you have just now handed to us.
17  A.    Okay.  Cool.
18  Q.    Okay.  Do you see that list?
19  A.    At the top?
20  Q.    Yes.
21  A.    Yes.
22  Q.    What is this list?
23  A.    It's sort of the -- roles of different
24  people and who they are and throughout just to help me
25  as a study guide to remember who is who as I go through

Page 55

1  the case.
2  Q.    It's like a cast of characters just to keep you
3  remembering who -- who each doctor is?
4  A.    Study notes, yes.
5  Q.    There's underlining throughout the document, you
6  have handwritten annotations in some -- in margins
7  throughout the document.
8      Are those all annotations that you made with
9  your own hand?
10  A.    I believe so, yes.  And there are some typos in
11  here and I, you know, tried to correct those as well.
12  Q.    We'll forgive you for any typos.
13  A.    I didn't type it.
14  Q.    I see.  So you're pointing the finger at your
15  assistant.
16  A.    Look, if I could point the finger, I'd do the
17  typing myself.
18  Q.    If you'd turn over to Page 5 of Exhibit 3.
19  A.    Page 5.
20  Q.    This is one of those pages that has some of your
21  handwritten annotations.
22      Do you see that?
23  A.    Right here (indicating)?
24  Q.    And the --
25  A.    Is this the page you're talking about?

Page 56

1  Q.    It's Page 5.  Yes.
2  A.    Yes.
3  Q.    Do you see at the bottom of the page you've
4  underlined --
5  A.    Yes.
6  Q.    -- a sentence that says, the LAD lesion --
7  A.    Yes.
8  Q.    -- was somewhat variable depending on the
9  views --
10  A.    Yes.
11  Q.    -- but I think in some frames was 80 percent,
12  possibly with some intraluminal thrombus.
13  A.    Yes.
14  Q.    Do you see that?
15  A.    Yes.
16  Q.    Why did you underline that?
17  A.    Okay.  And let me just complete an answer
18  earlier.  I also reviewed the angiogram films.  And I
19  have the disks in my boxes here.  So I just wanted to
20  let you know that.  I didn't mention that before
21  specifically.
22  Q.    Is that something that you had -- say in your
23  expert report?
24  A.    I would have to go back and look.  I don't
25  recall.

Page 57

1      Anyway, so why did I put the word "thrombus"
2  there?  Was that the question?
3  Q.    Yes.
4  A.    Just to emphasize that Dr. Rosamond noted
5  thrombus.  And I reviewed the films, and I agree with
6  him, there was thrombus there.
7  Q.    Okay.  In the document you've just handed across
8  the table -- which we might as well just mark as
9  Exhibit 4, if you don't mind.
10  A.    Not the original.  We're going to -- I'm going
11  to keep the originals in every instance and y'all can
12  have copies to attach.
13  Q.    That's fine.  But we're going to need to have a
14  copy so that we can know what's here.
15      Do you have --
16  A.    Do you want a copy now?
17  Q.    Yeah, we can do a copy now.
18  A.    Sure.
19      MR. BOEHM:  Let's go off the record.
20      THE WITNESS:  Yeah.  Absolutely.
21      VIDEO OPERATOR:  Off the record.
22      The time is approximately 10:16 a.m.
23      (Recess 10:16-10:40 a.m.)
24      (Exhibit Schapira-4 was marked for
25  identification.)

15 (Pages 54 to 57)

Jay N. Schapira, M.D.

Page 58

1      VIDEO OPERATOR:  With the approval of counsel,
2  back on the record.
3      The time is approximately 10:40 a.m.
4      MR. BOEHM:  During the break, Dr. Schapira
5  approached me to inform me that he would not be
6  available after 1:30 p.m. this afternoon.
7      This was the first time that anybody had
8  indicated to us that Dr. Schapira would not be available
9  for the full amount of time to which we are entitled
10  under the Federal Rules of Civil Procedure, and we have
11  expressed our view that we should have been informed of
12  this information much, much sooner than an hour-plus
13  into today's deposition and that, because we were not,
14  we traveled out here and spent money on flights and
15  hotels and that it should not have been handled in this
16  manner.
17      We obviously are entitled to a full day of
18  deposition.  We intend to complete this deposition when
19  Dr. Schapira is available for us to do that.
20      We would like to spend some time today off the
21  record trying to pin down a date when that can take
22  place and we request and will request that plaintiff's
23  counsel, out of, I would say, common courtesy and
24  decency and fairness, pay for our expenses in returning
25  to take the completion of Dr. Schapira's deposition.

Page 59

1      We will spend whatever time we can today asking
2  Dr. Schapira's -- asking Dr. Schapira questions and
3  doing as much as we can but it will not be the amount of
4  time to which we are entitled nor sufficient time to ask
5  Dr. Schapira the questions that we need to.
6  BY MR. BOEHM:
7  Q.    Dr. Schapira, when we went off the record, you
8  had indicated to me that you had updated the document
9  that was marked as Exhibit 3, which was a compilation of
10  your notes in connection with this matter, and I had
11  asked you to turn to Page 5 where you had underlined a
12  sentence near the bottom of that page.
13      Do you recall that?
14  A.    Yes.
15  Q.    And you wrote next to that sentence the word
16  "thrombus"?
17  A.    Correct.
18  Q.    Now, on Exhibit 4, which you have just made
19  photocopies for us here in your office -- and I will
20  just note for the record that the photocopy is of poor
21  quality, it does not capture with the same clarity what
22  is on the original and, therefore, Dr. Schapira, we ask
23  that you maintain the original document, Exhibit 4, in
24  its present state.  Okay?
25  A.    Okay.

Page 60

1  Q.    Do you see next to that paragraph near the
2  bottom of Page 5 on Exhibit 4 you have added the word
3  "hazy"?
4  A.    Yes.
5  Q.    And put that in a box.
6  A.    Yes.
7  Q.    What does that refer to?
8  A.    That refers to the angiographic appearance on
9  the actual digital images descriptively of what the
10  level of the left anterior descending coronary artery
11  where the diagonal takes off, the angiographic
12  appearance in that segment.
13  Q.    And what -- what specifically are you referring
14  to when you use the word "hazy"?
15  A.    Hazy is an appearance of the way it looks to
16  your eye.  The significance of that in the context of
17  this case is that it represents thrombus.
18  Q.    So when you see haziness, in your opinion, that
19  means thrombus.
20  A.    In the context of this case, yes.
21  Q.    Is that not always the case?
22  A.    I mean, there's other reasons for haziness
23  sometimes.
24  Q.    What are the other reasons for haziness?
25  A.    In general?

Page 61

1  Q.    Yes.
2  A.    Inadequate injection of contrast, overlap of
3  vessels, coronary spasm being present at the moment,
4  competing flow from another conduit.  There's a number
5  of other technical reasons for haziness to occur in
6  different contexts.
7  Q.    What did you do in this case to rule out the
8  possibility that the haziness that you believe you saw
9  and that you referred to in the bottom of Page 5 of
10  Exhibit 4 was caused for reasons other than a thrombus?
11  A.    Okay.  So, first of all, she doesn't have any
12  competing flow because she did not have a bypass at the
13  time of the March study, 2000; number two, it was an
14  adequate, an adequate injection, plenty of contrast;
15  and, number three, there was no spasm.
16  Q.    Anything else that you did to rule out other
17  possible explanations?
18  A.    I've looked at it several times.  And based
19  upon, you know, having done seven, eight thousand
20  angiograms and looked at probably double that amount,
21  that was my expert opinion.
22  Q.    Are you expressing an opinion in this case to a
23  reasonable degree of medical certainty that Miss Levitt
24  experienced an actual thrombus?
25  A.    At the time of this angiogram?

16 (Pages 58 to 61)

Jay N. Schapira, M.D.

Page 62

1    Q.    Yes.
2    A.    Yes.
3    Q.    Is there any other doctor who agrees with you on
4    that question, either experts or physicians who treated
5    Miss Levitt at the time?
6    A.    Dr. Rosamond.
7    Q.    You believe that Dr. Rosamond has concluded that
8    in fact she did have a thrombus or that she possibly had
9    a thrombus?
10   A.    He used the word "possible."
11   Q.    Well, possible is a meaningful word in that
12   context, isn't it?
13   A.    I think we'd have to ask him what he means by
14   possible.
15   Q.    Is it your opinion that she possibly had a
16   thrombus or is it your opinion that she in fact did have
17   a thrombus?
18   A.    I feel that she medically probably did have a
19   thrombus.
20   Q.    Are you expressing an opinion to a reasonable
21   degree of medical certainty that Miss Levitt in fact did
22   have a thrombus, not that she maybe did or probably did,
23   but are you expressing an opinion to a reasonable degree
24   of medical certainty that Miss Levitt in fact did have a
25   thrombus?

Page 63

1    A.    Yes.
2    Q.    Okay.  Is there any other physician related to
3    this case, either treaters who were taking care of Miss
4    Levitt at the time or other experts, who agreed with you
5    about that?
6    A.    I don't know that I've seen every expert's
7    opinion, first of all; and, number two, I haven't asked
8    them all nor have I seen them deposed or that question
9    addressed.  No, I haven't.
10   Q.    Are you aware of any other doctor who agrees
11   with you about that opinion?
12   A.    Dr. Rosamond.
13   Q.    Dr. Rosamond used the word "possibly," didn't
14   he?
15   A.    He did, yes.
16   Q.    And that's an important word.
17   A.    Right.
18         In his deposition he may have used different
19   words, though.  I would have to go back and review it.
20   I don't recall him saying possibly per se in his
21   deposition.
22   Q.    That's the word that he used at the time he was
23   treating Miss Levitt.
24   A.    Correct.
25   Q.    Are you disagreeing that -- with Dr. Rosamond's

Page 64

1    use of the word "possibly"?
2    A.    That's what he thought.  I don't disagree with
3    his using the word "possibly" but I think it is probably
4    thrombus.  It fits not only with the angiographic
5    appearance but with the clinical presentation of
6    unstable angina, also known as acute coronary syndrome.
7    That is in the vast majority of cases associated with
8    thrombus.  So it clinically correlates.
9    Q.    Did I just hear you express the opinion that in
10   the vast majority of cases -- well, strike that.  We're
11   going to get to that.
12         Other than the fact that you believe you saw
13   some haziness in your view of the angiogram or the
14   pictures, did you have any other basis for your
15   determination that there was a thrombus?
16   A.    The clinical presentation and the clinical
17   context.
18   Q.    Where do you talk about the thrombus in your
19   expert report?
20   A.    I would have to look at my --
21   Q.    Please do.
22   A.    -- report.
23   Q.    Do you have your expert report with you?
24   A.    Page 3, Paragraph 2.
25   Q.    Well, you're just quoting what Dr. Rosamond

Page 65

1    said; right?
2    A.    Correct.
3    Q.    Where he said, possibly with some intraluminal
4    thrombus.
5         Do you see that?
6         MR. THOMAS:  Asked and answered.
7         THE WITNESS:  That's what he says.
8         MR. BOEHM:  Yes.
9    BY MR. BOEHM:
10   Q.    Where do you express the opinion in your expert
11   report that Ms. Levitt, in your view, did in fact have a
12   thrombus?
13         MR. THOMAS:  Same objection.
14         THE WITNESS:  I don't think -- let me start
15   again, please.
16         I don't see where that is expanded on here.
17   BY MR. BOEHM:
18   Q.    When you say "expanded on," what you mean is
19   you've not expressed that opinion in your report
20   anywhere; correct?
21         MR. THOMAS:  Objection.  Form, foundation,
22   misstates his testimony.
23   BY MR. BOEHM:
24   Q.    Well, you tell me.  That's why I'm asking the
25   question.  If it's in your report, tell me where it's

17 (Pages 62 to 65)

Jay N. Schapira, M.D.

Page 66

1  at.
2  A.    Okay.
3  Q.    It's not in there, is it?
4  A.    I don't believe so.
5  Q.    I'd ask you to look back at Exhibit 4 and turn
6  to Page 14, please.
7  A.    Exhibit 4.
8  Q.    Again, these are your notes that you've updated
9  as recently as this weekend in connection with your
10 review of records in this case; correct?
11 A.    Yes.
12 Q.    On Page 14 at the top you've underlined and
13 written the word "fatigue."
14       Do you see that, the word "fatigue"?
15 A.    Yes.
16 Q.    And you've underlined questioning whether some
17 of the fatigue might be related to a delayed return to
18 her hemoglobin levels postoperatively.
19       Do you see that?
20 A.    Yes.
21 Q.    Why did you underline that?
22 A.    Because I wanted to remember to go back and
23 check her hemoglobin levels postoperatively to see if
24 they were low enough to explain her fatigue.
25 Q.    Did you do that?

Page 67

1  A.    I did.
2  Q.    And what did you discover?
3  A.    I didn't think that they were low enough to
4  explain her fatigue.
5  Q.    Okay. If you go down about three-quarters of
6  the way down Page 14, you've underlined under a record
7  referring to the July 25th, 2000, time frame,
8  impression: Anxiety/panic with hyperventilation.
9        You see that?
10 A.    Yes.
11 Q.    Why did you underline that?
12 A.    I thought that that was a manifestation of the
13 anxiety and panic that -- with the hyperventilation that
14 she was having secondary to her now cardiac condition
15 and part of her psychological reaction to her cardiac
16 condition.
17 Q.    Well, in fact, she was having an emotional
18 reaction to a rezoning hearing that was going on; right?
19       Do you remember that?
20 A.    I don't know that that's just the case.
21       I think that this was an anxiety/panic reaction
22 because she was under the care of the cardiologist again
23 with shortness of breath, palpitations, and tachycardia,
24 she had just been admitted to rule out coronary artery
25 disease and ischemia.

Page 68

1        And, you know, I can't tell you what's in her
2  mind, as you can't suggest to me that you know what's in
3  her mind, but she's just being evaluated by the
4  cardiologist for what looks like round three within six
5  months, within -- excuse me -- four months of her having
6  another acute cardiac syndrome and she doesn't know
7  what's in store for her so, you know, I think she's
8  anxious and panicked about it --
9  Q.    You can't --
10 A.    -- as most patients would be.
11 Q.    You can't read -- you don't know what was in her
12 mind at that time; right?
13 A.    Well, as a doctor, I'm probably best positioned
14 to understand what's in her mind, but you would have to
15 ask her what's in her mind.
16 Q.    Well, what about we just look at what the
17 medical records say about what was in her mind?
18 A.    Let's do it.
19 Q.    Okay. You'd agree that looking at the medical
20 records is a better source than you all these years
21 later trying to discern what was in her mind; correct?
22 A.    Right. But this is a -- not a psychiatric
23 record. This is a doctor, like physical doctor record
24 from Saint Luke's Hospital.
25 Q.    Right.

Page 69

1  A.    Yes. So they're --
2  Q.    You're not a psychiatrist either, though.
3  A.    I am not a psychiatrist.
4  Q.    So --
5  A.    Still not a psychiatrist.
6  Q.    So let's look at what this doctor said at
7  that -- at this time.
8  A.    Okay.
9  Q.    Is that fair?
10 A.    That's fair.
11 Q.    And you agree that that's more meaningful than
12 whatever you want to say now all these years later --
13       MR. THOMAS: Form, foundation.
14 BY MR. BOEHM:
15 Q.    -- about what was causing her distress at this
16 time.
17 A.    No, not necessarily.
18 Q.    Okay. Well, let's just look and see what it
19 says.
20       This is in July of 2000; correct?
21 A.    Yes.
22 Q.    And you indicated that they wanted to see if she
23 was having some ischemia at this time.
24 A.    Right.
25 Q.    Was she?

Jay N. Schapira, M.D.

Page 70

1  A.    She actually was not documented to have ischemia
2  at that time.
3  Q.    Right.  What she was having, according to the
4  doctors who treated her at this time, was emotional
5  distress occurring in connection with a rezoning
6  hearing.  True?
7  A.    I think that was not the impression of the
8  doctor.  If that's a Saint Luke's record, that's a
9  cardiology record.  I don't think that's what's really
10 happening right at this moment.
11       She's concerned about her heart, I think.  She
12 does have overlay, she did have symptoms at the rezoning
13 hearing where she became anxious and she had tachycardia
14 and palpitations but, again, her reaction to it is what
15 the problem is and her reaction is in the context of her
16 cardiac condition, where she's just had two major
17 adverse cardiac events in the past four months.
18 Q.    You see at the top of Page 15 it says, this was
19 associated with significant emotional distress occurring
20 at the time of a rezoning hearing.
21 A.    That's correct.
22 Q.    You underlined that.
23 A.    That's correct.
24 Q.    Why did you underline that?
25 A.    Because that was the trigger that set off the

Page 71

1  problem but the problem -- you know, she had had stress
2  before in her life, not, though, since two major adverse
3  cardiac events within the past four months that now puts
4  her in a mind-set that this stress is now affecting my
5  heart.  That's why she went to Saint Luke's Hospital.
6  Q.    But she wasn't having any cardiac symptoms
7  whatsoever at this time, was she?
8  A.    Sure, she was.  Tachycardia, palpitations and
9  shortness of breath.
10 Q.    Not related to the function of her heart;
11 correct?
12 A.    I can't say that, no.
13 Q.    Well, do you see right after the sentence we
14 read it says, the patient did not appear to have
15 ischemic chest pain?
16       THE WITNESS:  Your copies have arrived.
17       UNIDENTIFIED SPEAKER:  Yes.
18 BY MR. THOMAS:
19 Q.    Do you see that?
20 A.    One second, please.
21       Where are you reading?  What page are you on?
22 Q.    It's the sentence at the top of Page 15 just
23 after the one we read.  The patient did not appear to
24 have ischemic chest pain.
25       Do you see that?

Page 72

1  A.    That's what it was -- after her symptoms is what
2  it turned out to be.  But, realize, she had symptoms of
3  palpitations, shortness of breath, tachycardia,
4  diaphoresis, and nausea, and those are four very
5  clear-cut cardiac symptoms in a patient who has had two
6  major adverse cardiac events in four months.  Any
7  patient would think that this is my heart again.
8  Q.    I'm not asking you what you believe she thought
9  at this time.  I'm asking about what was actually
10 happening with respect to her cardiac condition.
11 A.    And that's what you're being told.
12 Q.    Do you believe that it's likely that Miss
13 Levitt's symptoms at this time were cardiac in etiology?
14 A.    I think they were, yes.
15 Q.    Let's look just right in the middle of Page 15.
16       Do you see square in the middle of it,
17 Dr. Schapira, it says, I think it unlikely that Mrs.
18 Levitt's symptoms were cardiac in etiology?  Do you see
19 that?
20 A.    Yes.
21 Q.    You disagree with that.
22 A.    I think that her symptoms were cardiac.  Were
23 they caused by anxiety?  Yes.  But they were cardiac.
24 Q.    You disagree with the statement by the treating
25 physician as written in July of 2000.

Page 73

1  A.    I think we're probably saying the same thing as
2  being primary versus secondary but her palpitations were
3  from her heart.  That I can tell you.
4  Q.    The doctor says, I believe she had an anxiety or
5  panic attack.
6       Do you see that?
7  A.    Yes.
8  Q.    Do you disagree with --
9  A.    No.
10 Q.    -- the doctor's conclusion?
11 A.    No.
12 Q.    You agree that it's likely that the symptoms she
13 was experiencing at this time, in July of 2000, were due
14 to an anxiety or panic attack.
15 A.    I think they were started by an anxiety or panic
16 attack at the rezoning hearing but then she had cardiac
17 symptoms as the manifestation of that anxiety.
18 Q.    You agree that those symptoms were not related
19 to her actual cardiac function; correct?
20 A.    The question makes no sense to me.
21 Q.    You know what cardiac function is; right?
22 A.    Yeah.
23 Q.    Okay.  So I'm asking you what I think is a
24 pretty simple question, particularly for somebody who's
25 a cardiologist, whether or not the symptoms that we're

19 (Pages 70 to 73)

Jay N. Schapira, M.D.

Page 74

1  discussing from July of 2000, in your view, were related
2  or not to her actual cardiac function.
3  A.    Okay.  I'll take a stab at what you mean by
4  that.
5       So here's the answer:  Palpitations, the
6  sensation of your heart beating fast to the point where
7  it's pathological to you, the patient, is a function of
8  your heart.  Diaphoresis, shortness of breath, nausea,
9  palpitations, tachycardia, all cardiac symptoms, which
10  are a function of the heart.
11  Q.    When somebody has what they feel is a cardiac
12  symptom but it's not cardiac in etiology, what does that
13  mean?
14  A.    That's too vague a question.  What cardiac
15  symptom?
16  Q.    Well, like tachycardia.
17  A.    Tachycardia is a cardiac symptom.
18  Q.    Or palpitations.
19  A.    It's a cardiac symptom.
20  Q.    Okay.  So you, at bottom, just disagree with the
21  cardiologist who was treating Miss Levitt at this time
22  who said that these symptoms were not cardiac in
23  etiology.
24  A.    You know, if you want me to explain to you what
25  he means, I will.

Page 75

1  Q.    You can't --
2  A.    Do we disagree?  No.
3  Q.    You can't tell me what this doctor means.
4  A.    I can read his record in full to you and we can
5  discuss it.  And I'm in a good position here to read
6  another cardiologist's notes and tell you what he means.
7  Q.    Well, how about we just take the actual words
8  that he said and wrote down on this page?
9  A.    But this is not the actual record.  This is just
10  my abstract of the record.  We could get the records
11  out.  HMA-148.  Could get out the whole record from the
12  whole -- whole admission.
13  Q.    I'll represent to you that when you wrote, I
14  think it unlikely that Mrs. Levitt's symptoms were
15  cardiac in etiology, that is taking that directly from
16  the medical record at issue in this case.  Okay?
17       MR. THOMAS:  Form and foundation.
18       THE WITNESS:  Our -- our level -- our level of
19  miscommunication here is that, were they primary cardiac
20  or secondary cardiac?  What the doctor is saying, he
21  believes that they were secondarily cardiac, not primary
22  cardiac.
23  BY MR. BOEHM:
24  Q.    He doesn't --
25  A.    That's the answer.

Page 76

1  Q.    He doesn't say that.  He says that the symptoms
2  were -- he does not believe that it's likely the
3  symptoms were cardiac in etiology.
4  A.    Then you should ask him and he would tell you
5  what I'm telling you.
6  Q.    Have you talked to him?
7  A.    No.  You should.
8  Q.    What does the word "etiology" mean?
9  A.    How is it used in a sentence?
10  Q.    What does the word "etiology" mean in medical
11  science?
12  A.    Cause.
13  Q.    If you'll turn to Page 19 of Exhibit 4, and
14  Exhibit 3 has similar language, near the bottom you have
15  underlined the words "which revealed non-transmural
16  injury in the anterior septum, comma, so it indicates
17  that she has had a prior infarct."
18       Do you see that?
19  A.    Yes.
20  Q.    Why did you underline that?
21  A.    Because there was some question when she came in
22  in March of 2000 as to whether or not that was a
23  subacute myocardial infarction versus acute coronary
24  syndrome.  Both are stated in the medical records.
25       I think, most likely, it was acute coronary

Page 77

1  syndrome but that includes an entire spectrum, including
2  unstable angina, non-ST segment elevation infarction, it
3  includes the entire spectrum of cardiac injury and
4  ischemia.
5       What this documented was, is that in fact she
6  had had injury, she had had a myocardial infarction.
7  Q.    Are you expressing the opinion in this case that
8  Miss Levitt did in fact experience an acute myocardial
9  infarction in connection with her medical events in
10  2000?
11  A.    Yes.
12  Q.    Do you know if any other Medical Doctor who
13  treated Miss Levitt at the time reached the conclusion
14  that Miss Levitt in fact experienced an acute myocardial
15  infarction in 2000?
16  A.    Besides the doctors who wrote this record?
17  Q.    The doctors who wrote this record, with all due
18  respect, and as I'm sure you know, did not reach the
19  conclusion that Miss Levitt suffered an acute myocardial
20  infarction.
21  A.    They said she had a myocardial infarction, not
22  acute.  That's what this means, injury in the
23  anteroseptal region.
24  Q.    Has anybody, to your knowledge, in this case
25  reached the conclusion that in March or any other time

20  (Pages 74 to 77)

Jay N. Schapira, M.D.

Page 78

1  in the year 2000 that Ms. Levitt experienced an acute
2  myocardial infarction?
3  A.    No one concluded it.
4         MR. THOMAS:  Asked and answered.
5         THE WITNESS:  No one -- no one concluded it in
6  that time frame.  There was some stress tests which were
7  abnormal and they were called breast attenuation,
8  which -- which I haven't seen those studies, may
9  actually reveal the same thing and are probably the same
10  conclusion.  But they were called breast attenuation.
11  That's what the record says.  It wasn't really figured
12  out what it was until the year 2002, which is on Page
13  19.
14  BY MR. THOMAS:
15  Q.    Dr. Schapira, other than the materials that you
16  have brought in the three boxes and the additional notes
17  that you have provided to us during the course of
18  today's deposition, are there any other materials that
19  we should know about that you're relying on for purposes
20  of your opinions in this case?
21  A.    I think we've got it all.
22  Q.    Boy, it took us a while to get there, didn't it?
23  A.    About half an hour to get all these boxes in
24  here this morning, yeah.
25  Q.    Do you have any idea what the Federal Rules of

Page 79

1  Civil Procedure require with respect to the
2  identification of materials an expert is relying on?
3         MR. THOMAS:  Objection.  Calls for a legal
4  conclusion.
5         THE WITNESS:  No.
6  BY MR. BOEHM:
7  Q.    Let's look at your report.
8         MR. BOEHM:  We'll have this marked as Exhibit 5.
9         THE WITNESS:  Okay.
10  May I suggest a little housekeeping first?
11         MR. BOEHM:  Okay.
12         THE WITNESS:  I'm going to distribute the copies
13  we made for you.
14         MR. BOEHM:  Great.  We can just take that and we
15  can sort that out while we can proceed.
16         THE WITNESS:  Okay.  So what I wanted to do is
17  reconstitute my note folder so that I can --
18         MR. BOEHM:  Let's go off the record.
19         THE WITNESS:  -- keep up with you.
20         MR. BOEHM:  Let's go off the record if we're
21  going to do that.
22         THE WITNESS:  All right.
23         VIDEO OPERATOR:  Off the record.
24         The time is approximately 11:09 a.m.
25         (Discussion off the record.)

Page 80

1         (Exhibit Schapira-5 was marked for
2  identification.)
3         VIDEO OPERATOR:  With the approval of counsel,
4  back on the record.
5         The time is approximately 11:12 a.m.
6  BY MR. BOEHM:
7  Q.    Dr. Schapira, we've marked as Exhibit 5 a
8  document that sits before you now.
9         Is this your expert report in the matter?
10  A.    Yes, sir.  Let me just -- what happened to the
11  original?  Do I have it?
12  Q.    I'm not sure what you're referring to, Doctor.
13  A.    Okay.  There was an original of this.
14         THE WITNESS:  Do you have it?
15         MR. GRAHAM:  I don't know what you're referring
16  to.
17         THE WITNESS:  The original of this report.
18         MR. GRAHAM:  I don't believe there was one in
19  that folder.
20         MR. BOEHM:  Would you mind if we just keep going
21  and then we can look for stray papers later?
22         THE WITNESS:  Okay.
23         MR. BOEHM:  Thanks.
24         THE WITNESS:  Here it is.  I found it.  Thanks.
25  We're good.

Page 81

1  BY MR. BOEHM:
2  Q.    Who was involved in the preparation of this
3  report?
4  A.    Besides myself, my secretary, who types.  And I
5  think that's everyone.
6  Q.    Did anybody else provide you any assistance at
7  all in the preparation of your expert report?
8  A.    No.
9  Q.    You indicated that your assistant types and you
10  don't and you mentioned earlier today that you have a
11  hand injury.
12         Which hand do you write with?
13  A.    My right hand.  And my left hand, actually.
14  Q.    Are you able to write with your right hand in
15  spite of the injury?
16  A.    Yes; to a limited amount.  And I sometimes use
17  my left hand.  I'm training my left hand to write.
18  Q.    I see.  Did you use your right hand to make the
19  notes that you did on Exhibits 3 and 4?
20  A.    It depends on when I made them.
21         I had an injury in '14.  If I made notes before
22  then, I used my right hand for sure.  Since that time,
23  it depends.  I could have used either one.  Right after
24  my injury, I didn't use my right arm for a long time,
25  but then I have used it more recently.

21 (Pages 78 to 81)

Jay N. Schapira, M.D.

Page 82

```
1   Q.    When did you last review your expert report?
2   A.    Over the weekend.
3   Q.    Did you identify any inaccuracies or ambiguities
4   that you would like to correct or clarify?
5   A.    There probably are, yes.
6   Q.    And what are those?
7   A.    I didn't mention in the records I reviewed that
8   I had reviewed the angiogram films.  I'm not sure I had
9   them at that time.  If you look at Paragraph 2 on
10  Page 1.
11  Q.    When did you review the angiogram films?
12  A.    I don't recall when I received them.
13  Q.    Did you review the angiogram films prior to
14  January 2016?
15  A.    I think I did.
16  Q.    You didn't reference your review --
17  A.    I think, but I'm not sure.  I'm not sure if I
18  did or not.
19  Q.    You didn't reference your review of the
20  angiogram films in your supplement to your report
21  either.
22  A.    That is correct.
23  Q.    Why not?
24  A.    I don't know.
25  Q.    Are there any other inaccuracies or ambiguities
```

Page 83

```
1   that you wish to correct in connection with your expert
2   report?
3         Dr. Schapira, you're taking some time to read
4   every word of your report and I know you just reviewed
5   it this weekend, so my question is, when you reviewed
6   your report this weekend, did you identify --
7         MR. THOMAS:  Objection.
8   BY MR. BOEHM:
9   Q.    -- any --
10        MR. THOMAS:  Sorry, Paul.
11        MR. BOEHM:  I'm sorry.  I'm not done.
12  BY MR. BOEHM:
13  Q.    -- any --
14        MR. THOMAS:  I object to you not letting him
15  respond to the question without doing what he needs to
16  do to properly respond.
17  BY MR. BOEHM:
18  Q.    Did you identify any inaccuracies or ambiguities
19  that you thought it would be appropriate to correct or
20  clarify?
21  A.    I didn't list those in my mind so now I'm trying
22  to recreate that question in my mind so I can answer it.
23  Q.    Okay.  If you're going to do that and you're
24  going to read every word of it, we're going to go off
25  the record for you to do that.
```

Page 84

```
1         VIDEO OPERATOR:  Is that okay?  Okay.
2         With the approval of counsel, going off the
3   record.
4         The time is approximately 11:16 a.m.
5         (Discussion off the record.)
6         VIDEO OPERATOR:  With the approval of counsel,
7   back on the record.
8         The time is approximately 11:18 a.m.
9         THE WITNESS:  Are we on?
10        So to answer your question, Mr. Boehm, I did not
11  expand on the issues concerning the intraluminal
12  thrombus that we touched on before, and when I reviewed
13  the angiogram done in March of 2000 by Dr. Rosamond
14  there was evidence for haziness and an intraluminal
15  thrombus, which was consistent with the context of her
16  recent onset of symptoms and consistent with the
17  prothrombotic effect of Vioxx and consistent with what
18  is the presenting pathoanatomy of patients with acute
19  coronary syndrome, that is, thrombus in the culprit
20  vessel.
21        And that's the way she presented, that's what
22  the vessel looked like and, therefore, I think that
23  there -- I believe that there was thrombus there and I
24  believe that that thrombus was caused and contributed to
25  by the Vioxx.
```

Page 85

```
1         Going on to the next point, I did not expand on
2   the fact that she -- I should -- this is a mistake --
3   she stopped smoking at age 40, which was 16 years
4   before, not 10 years before.  That's in Paragraph 3 on
5   Page 3.
6         Paragraph 4, the hypercholesterolemia is at
7   various times mentioned and not mentioned.  That's why I
8   put "borderline."  I think that just to be fair, you
9   could say borderline.
10        Her blood pressures in the past had been some
11  up, some down, she wasn't officially diagnosed with
12  hypertension, but I think you could fairly say that she
13  did have some elevation of blood pressures before.
14        The EKG changes in the anterior precordial leads
15  did confirm the ischemia in the anterior wall,
16  consistent with unstable angina, also consistent with
17  the haziness and intraluminal thrombus in the LAD.
18        I didn't mention in the report here but she did
19  have a TriStar stent, which is a bare-metal stent,
20  placed by Dr. Tadros.
21        She also took her prescribed aspirin and her
22  Plavix.
23  BY MR. BOEHM:
24  Q.    Just to be clear, I'm not asking you to just go
25  through and add additional facts.  I'm asking for any
```

22 (Pages 82 to 85)

Jay N. Schapira, M.D.

Page 86

1  additional changes or clarifications or corrections you
2  want to make about your opinions in this case.
3      MR. THOMAS:  Objection.  I believe that doctor
4  is answering your question, as he understands it,
5  and doing it appropriately.
6      MR. BOEHM:  Well, that's why I'm clarifying.
7  Because right now he's just reading through it and
8  reciting any random facts that seems to come to his
9  head.
10      MR. THOMAS:  Well, I don't want to argue with
11  you.  We've been down that road before.  Just note my
12  objections for the record.  And it seems like you're
13  trying to chill his testimony.
14      MR. BOEHM:  Not at all.  I just want to clarify
15  so that we're not wasting time.
16      MR. THOMAS:  I've made my record.
17      MR. BOEHM:  And my record is that this, for the
18  second deposition in a row from plaintiff's expert,
19  we've spent time purposefully filibustering so as to
20  wile away our time.
21      It's particularly problematic here, where just
22  this morning we found out that the doctor's availability
23  would be severely limited.
24      MR. THOMAS:  I respectfully disagree with your
25  characterization.

Page 87

1      THE WITNESS:  I did not also in here expand on
2  the disability issues, mention much of anything about
3  them, or the effect of her depression on her disability
4  issues then and the worsening of her depression after
5  her -- her major adverse cardiac events --
6      MR. BOEHM:  Right.
7  BY MR. BOEHM:
8  Q.    That's something you --
9  A.    -- in the year 2000.
10  Q.    I'm sorry.  Right.
11      That's something that you didn't reference at
12  all in your report; correct?
13  A.    That's right.  And so that's responsive to your
14  question.
15  Q.    No.  My -- no, actually, it's not.
16      My question is, in reviewing your report, did
17  you identify any inaccuracies or ambiguities that you
18  wanted to correct about what you included in your
19  report?  What you're trying to do now is expand the
20  opinions that you did not include.
21  A.    I heard "expand" in the original question.
22  Q.    Well, you misheard.
23  A.    And, basically, that I think that she is
24  disabled secondary to her -- her co-morbidities and the
25  morbidity of her major adverse cardiac events related to

Page 88

1  the use of Vioxx.
2  Q.    Have you ever met with Ms. Levitt?
3  A.    No.
4  Q.    Never seen her in person?
5  A.    Correct.
6  Q.    Have you ever communicated with her in any way?
7  A.    No.
8  Q.    So your conclusions are based entirely on your
9  review of the medical records in the case; correct?
10  A.    Correct.  And the other materials that we
11  reviewed earlier.
12  Q.    I don't know what you're talking about.
13  A.    Depositions.
14  Q.    So you are now relying on other people's
15  depositions?
16  A.    No.  I read her deposition.
17  Q.    Okay.  Oh, right.  Understood.  Okay.
18      You're not talking about other experts'
19  depositions; correct?
20  A.    Correct.
21  Q.    Attached to your report is a CV that's dated
22  from 2013.
23      Do you recall that?
24  A.    No.
25  Q.    Well, it's right in front of you so --

Page 89

1  A.    It is?  It's actually not in front of me.
2      MR. BOEHM:  Let's go off the record.  I thought
3  the --
4      MR. THOMAS:  I don't agree to go off the record.
5      MR. BOEHM:  No.  Okay.  That's fine.  We can
6  stay on the record.
7      We were just looking for the exhibit, Dan.
8  BY MR. BOEHM:
9  Q.    It's Exhibit 5 that I've directed you to.
10  A.    Oh, okay.
11  Q.    That's --
12  A.    Is there a CV here?
13  Q.    If you go to the back, you'll see that there is
14  a CV.
15  A.    Yeah.  Cool.  Thanks.
16  Q.    Is this your CV?
17  A.    Yes.
18  Q.    It's dated September 2013.
19  A.    Yes.
20  Q.    That's nearly three years ago.
21      Is this the most recent version of your
22  Curriculum Vitae?
23  A.    No.
24  Q.    Did you bring with you your updated CV?
25  A.    I can get it.  It's in the other room.

23  (Pages 86 to 89)

Jay N. Schapira, M.D.

Page 90

1  Q.   Okay.  It would be great if we could have that
2  today.
3  A.   Sure.
4  Q.   You also identified cases in which you have
5  provided testimony if you go a little bit further.
6  Unfortunately, the pages are not numbered but I -- but I
7  see that you've found the page that says Testimonial
8  History, Jay Schapira, June 5, 2013.
9       Do you see that?
10 A.   Yes.
11 Q.   And this appears to provide information about
12 cases in which you have given testimony from the years
13 2009 to 2012; is that right?
14 A.   Yes.
15 Q.   And I just did a quick count and it appears that
16 you testified over 100 times during this four-year
17 period.  Does that sound about right?
18 A.   I would have to count them, but I would trust
19 your count.
20 Q.   In the last four years, starting today and
21 looking back over the last four years, have you
22 continued to testify at a similar rate?
23 A.   No.
24 Q.   Have you testified more or less frequently?
25 A.   Less.

Page 91

1  Q.   Why is that?
2  A.   I had an injury in early '14 that caused me to
3  slow down.
4  Q.   Okay.  Do you continue to maintain a list of
5  deposition or trial testimony that you have provided?
6  A.   Yes.
7  Q.   We don't have that list.
8       Can you provide an updated list to us?
9  A.   Yes.  Could you make a list of all the things I
10 need to get for you, please --
11 Q.   Well, we have it on --
12 A.   -- so I can remember them?
13 Q.   Yeah, we can do that.  Sure.
14 A.   Okay.
15 Q.   That's something you can provide to us today?
16 A.   Don't know if I can get that today, but I can
17 get it for you.
18 Q.   How much have you slowed down since your injury
19 in 2014 in terms of your expert work?
20 A.   About half.
21 Q.   What percentage of your time is spent working as
22 an expert consultant in litigation?
23 A.   Before my injury, it was about 5 percent, a
24 little less.  Now it's less than that.
25 Q.   Working at only 5 percent of your overall time,

Page 92

1  you were able to testify over 100 times in a four-year
2  period as an expert?
3  A.   Yes.  Yes.
4  Q.   And you indicated in your CV that you are a
5  clinical professor; is that right?
6  A.   Yes.
7  Q.   Who do you report to in your capacity as a
8  clinical professor?
9  A.   Chief of medicine.
10 Q.   Who is that?
11 A.   That would be Dr. Paul Noble.
12 Q.   Noble?
13 A.   Uh-huh.
14 Q.   N-O-B-L-E?
15 A.   Yes.
16 Q.   Who is Dr. Noble?
17 A.   In what sense who?  I mean, nice guy.  What do
18 you mean by who is he?
19 Q.   What is his position?
20 A.   Okay.  He's chief of medicine at Cedars.  I
21 mean, you could also say he's a pulmonologist.  He does
22 research in pulmonary fibrosis, he does research in
23 immunological diseases of the lung.  That's all who, but
24 you probably don't want to hear about all that.
25 Q.   What percentage of your time is spent in your

Page 93

1  capacity as a clinical professor?
2  A.   It's diced up into small pieces, but I would say
3  about 20 percent of my time is in a teaching or
4  quasi-teaching capacity or research capacity,
5  educational capacity.
6  Q.   Do you teach any courses?
7  A.   I used to teach interventional cardiology.
8  Q.   Do you teach any courses?
9  A.   Currently, no; before, yes.
10 Q.   Well, when did you last teach a course?
11 A.   Probably I'd say three to four years ago.
12 Q.   Are you paid for your work as a clinical
13 professor?
14 A.   My arrangement is we do not exchange money, they
15 don't pay me a salary, and I don't give them money for
16 my practice.  So we have a non-exchange-of-money
17 agreement.
18 Q.   They do not pay you.
19 A.   That's correct.  They do not, and they do not
20 ask for money from me, from my practice.
21 Q.   Why would they ask you for money for your work
22 as a clinical professor?
23 A.   If I was their employee and I created RVUs and I
24 created, generated income, they would capture that and
25 pay me a salary or have some quasi or hybrid

24  (Pages 90 to 93)

Jay N. Schapira, M.D.

Page 94

1  arrangement.
2  Q.     But you are not compensated in any way for your
3  work as a clinical professor; correct?
4  A.     Compensated with money, no. I'm compensated in
5  other ways.
6  Q.     How are you compensated?
7  A.     Compensated by having access to research funds;
8  having access to research fellows; having access to
9  labs, facilities, a lot of expensive resources for my
10  research that I don't have to pay for. It's provided.
11  Q.     You're not a tenured professor; correct?
12  A.     Tenured. Well, they certainty can't fire me so
13  I guess I am.
14  Q.     I take it that that was meant to be some kind of
15  joke but I didn't understand it.
16  A.     Well, what do you mean by tenured? I mean, what
17  do you mean by tenured?
18  Q.     You're not a faculty professor; correct?
19  A.     I'm on the clinical faculty, yes.
20  Q.     You are not a tenured professor at the
21  university; correct? If we were to call up Paul Noble
22  and ask him --
23  A.     Uh-huh.
24  Q.     -- is Dr. Jay Schapira a tenured professor at
25  the university, would he say yes or no?

Page 95

1  A.     He would say --
2         MR. THOMAS: Speculation.
3         THE WITNESS: He would say he's a clinical
4  professor and he -- he -- I don't know what he would
5  say.
6  BY MR. BOEHM:
7  Q.     So he wouldn't respond to my question?
8  A.     Probably not. He'd probably smile like I am. I
9  don't know what you mean by tenured.
10  Q.     You don't know what tenure means?
11  A.     I think I know what the word means in some
12  context but I don't know how you're using it so I'm not
13  sure.
14  Q.     Of the hundred-plus cases on the list of your
15  testimonial history that we have, in what percentage,
16  approximately, did you testify on behalf of a plaintiff?
17  A.     I think the majority is for the plaintiff. I
18  would -- without counting it, I would just have to give
19  you a very, very rough approximation. I would say it's
20  probably 85 percent plaintiff, 15 percent defense.
21  Q.     Have you ever testified for a pharmaceutical
22  defendant?
23  A.     Possibly. I don't recall.
24  Q.     You can't recall ever having done that; correct?
25  A.     I can't recall all of my cases so I can't say

Page 96

1  one way or the other.
2  Q.     On Page 1 of your expert report you wrote, at
3  your request, I have reviewed records covering the
4  period of 1994 to 2007 and evaluated the case of Mrs. Jo
5  Levitt.
6         Do you see that?
7  A.     Yes.
8  Q.     What did you do to evaluate Ms. Levitt's case?
9  A.     Reviewed the materials sent to me.
10  Q.     Do you believe that Ms. Levitt failed -- I'm
11  sorry. Let me strike that and start over.
12         Do you believe that Ms. Levitt's doctors failed
13  to meet standards of medical care in any way?
14  A.     No.
15  Q.     If you'll turn with me to Page 7 of your expert
16  report, I want to direct your attention to something
17  that you write right in the middle of the page. It's
18  the second sentence in the second full paragraph.
19         You write, Vioxx is, therefore, a significant
20  risk factor for her to develop cardiovascular disease,
21  as demonstrated by her acute myocardial infarction on
22  March 10, 2000, that required angioplasty.
23         Do you see that?
24  A.     Yes.
25  Q.     Now, this is an opinion that you withdrew in

Page 97

1  January of 2016 and modified; correct?
2  A.     No.
3         MR. THOMAS: Objection. Form, foundation.
4  BY MR. BOEHM:
5  Q.     You didn't do that?
6  A.     No.
7  Q.     In January of 2016 you didn't withdraw that
8  sentence and change its wording?
9  A.     I changed one word, from "acute myocardial
10  infarction" to "acute coronary syndrome." Those three
11  words were changed.
12  Q.     Okay. Okay. So you did -- you did change this
13  sentence; correct?
14  A.     The opinion is the same but, as it turns out,
15  she did have a myocardial infarction that we just talked
16  about half an hour ago.
17  Q.     That's something that you must have, a
18  conclusion you must have reached sometime after you
19  supplemented your report in January of 2016?
20  A.     No. I was talking about acute myocardial
21  infarction on March 10th, which was not documented.
22  That was appreciated later, as we've discussed.
23  Q.     No. I'm sorry. I must not have been clear.
24         You supplemented your report in January of 2016.
25  A.     That's correct.

25 (Pages 94 to 97)

Jay N. Schapira, M.D.

Page 98

1  Q.   Right?
2      And in your supplement to your report, which was
3  just three months ago, you said, I would like to take
4  out the word "acute myocardial infarction" and in its
5  place put the words "acute coronary syndrome"; correct?
6  A.   That's correct.
7  Q.   Do you still think that that is an appropriate
8  modification?
9  A.   Yes.
10 Q.   Okay.  Why do you think that is an appropriate
11 modification?
12 A.   Because the information at that point in time,
13 in March of 2000, was that it was acute coronary
14 syndrome.  Even though some of the records did say
15 myocardial infarction, I thought it was more likely
16 acute coronary syndrome.  But if we look at later
17 records, we find evidence for myocardial infarction,
18 which may have occurred subsequent to March of 2000.
19 Q.   So when you prepared your report as originally
20 submitted in December 2013, it was your opinion that
21 Miss Levitt had suffered an acute myocardial infarction;
22 correct?
23 A.   Say that again.
24 Q.   When you submitted your report in December 2013
25 in this case, it was your opinion that Ms. Levitt had

Page 99

1  experienced an acute myocardial infarction; is that
2  correct?
3  A.   It was my opinion at that time that the records
4  did say that, yes, and that the records --
5  Q.   But you need to answer --
6  A.   And that the records also said acute coronary
7  syndrome and unstable angina.
8      MR. BOEHM:  Can you, Madam Court Reporter,
9  kindly read back my actual question.
10     (The court reporter read the requested portion
11 of the record.)
12 BY MR. BOEHM:
13 Q.   Did you listen?  Because you were busy laughing
14 there during the question being read back.  So I'm just
15 wondering if you heard the reading back of it or you
16 need to hear it again.
17 A.   I heard it fine.  Thank you.  I was smiling at
18 Mr. Thomas --
19 Q.   Okay.
20 A.   -- who smiled at me first.
21 Q.   That's fine.  Go ahead.
22 A.   He's smiling again, for the record.
23 Q.   Go ahead and answer.
24 A.   It was my impression at that time that both
25 phrases appeared in the medical record and that she did

Page 100

1  have that in the record, according to the doctors.  On
2  the other hand, she also had acute coronary syndrome.
3      I chose the word "myocardial infarction."  After
4  reflecting on more records, I thought more appropriate
5  to put in at that time "acute coronary syndrome" because
6  the myocardial infarction was only appreciated, as we
7  discussed, in 2002.
8  Q.   When you prepared and submitted your expert
9  report -- and I'll represent that it was given to
10 defense counsel in December of 2013 -- was it your
11 opinion that Ms. Levitt had experienced an acute
12 myocardial infarction?
13 A.   Yes; at some point in time.
14 Q.   When do you believe that Ms. Levitt experienced
15 an acute myocardial infarction?
16 A.   I do not -- I think that it was sometime after
17 March of 2000.
18 Q.   When?
19 A.   Specifically when?
20 Q.   Can you say?  Do you know?
21 A.   I don't know precisely when.  We only see the
22 scar there in 2002.
23 Q.   Do you have an opinion that you're expressing in
24 this case about when Ms. Levitt experienced an acute
25 myocardial infarction?

Page 101

1  A.   Between 2000 and 2002.
2  Q.   Are you expressing an opinion in this case that
3  Miss Levitt experienced an acute myocardial infarction
4  in March 2000?
5  A.   No.
6  Q.   Are you expressing an opinion in this case that
7  Miss Levitt experienced an acute myocardial infarction
8  in May, June, July of 2000?
9  A.   I can't tell you the exact date.
10 Q.   Is that a no to my question?
11 A.   I can't tell you the exact date is the answer.
12 Q.   My question to you is specific.  It's more
13 specific than whether you can tell me an exact date.
14     My question to you is whether or not you are
15 expressing an opinion in this case about whether Miss
16 Levitt experienced an acute myocardial infarction in May
17 or June of the year 2000.
18     MR. THOMAS:  Objection.  Asked and answered.
19 He doesn't need to answer it again.
20     THE WITNESS:  I can't give you a specific date,
21 and I can just tell you it's -- to a reasonable medical
22 certainty, it occurred between 2000 and 2002.
23 BY MR. BOEHM:
24 Q.   Are there any specific medical records that you
25 can direct us to and say that those are the records

Jay N. Schapira, M.D.

Page 102

1  where you believe Miss Levitt is being treated for a
2  myocardial infarction?
3  A.    I can't point to the time specifically when she
4  had it.  There's a number of possible points.  She was
5  evaluated many times, she had multiple symptoms during
6  that period of time, and it was picked up
7  retrospectively, it wasn't picked up in the acute phase,
8  that I've been able to pinpoint.  And that's not that
9  unusual in cardiology, as you know, I'm sure.
10  Q.    Do you agree that reasonable cardiologists could
11  disagree on the question of whether or not Miss Levitt
12  actually had an acute myocardial infarction between the
13  years 2000 and 2002?
14        MR. THOMAS:  Objection.  Form, foundation, calls
15  for speculation as to what other cardiologists would --
16        MR. BOEHM:  You can object to form.  Stop trying
17  to coach the witness.
18        MR. THOMAS:  I'm not.  I'm making objections all
19  morning --
20        MR. BOEHM:  Then object to form and leave it
21  there.
22        MR. THOMAS:  -- and that's typically what I do.
23        MR. BOEHM:  Object to form is the appropriate
24  objection, pursuant to the Court's Order.
25        MR. THOMAS:  Oh, I'm making appropriate

Page 103

1  objections and preserving the record, not coaching.
2        MR. BOEHM:  Then you say "object to form."  You
3  don't need to add on anything to that.  And you know
4  that.  And I'll ask you to stop that.
5        MR. THOMAS:  Go ahead and answer, Doctor.
6        THE WITNESS:  Question again read back or
7  repeated, please.
8        (The court reporter read the requested portion
9  of the record.)
10        THE WITNESS:  I think reasonable cardiologists
11  could disagree but I think that other person would just
12  be wrong, be a reasonable cardiologist but just be wrong
13  on that point.
14  BY MR. BOEHM:
15  Q.    Are there any time -- let me strike that.
16        Is there a time or are there times in Miss
17  Levitt's medical history when you think it's most likely
18  that she was experiencing an acute myocardial
19  infarction?
20  A.    Most likely, it was at the time she had her
21  bypass surgery.
22  Q.    I see.  You think that's most likely.
23        You're not expressing that to a degree of
24  medical certainty; correct?
25  A.    No.

Page 104

1        I just have to tell you, as I have tried to
2  express before, I can't tell you a spot in the medical
3  records where I can pinpoint it.  I just simply see the
4  scar there that's documented in the record, I believe in
5  the records of the cardiologist.  Or it could be later
6  on, too, in 2007, Dr. Crouse, who subsequently became a
7  treating cardiologist.
8  Q.    Do you know if Ms. Levitt was tested for a
9  possible acute myocardial infarction in May 2000 when
10  she appeared at the hospital for a cardiac treatment?
11  A.    You're referring to the time of her bypass
12  surgery?
13  Q.    Yes, that time or around that time.
14  A.    I don't recall.
15  Q.    You don't recall whether she was tested for an
16  acute myocardial infarction --
17  A.    I would have --
18  Q.    -- or not?
19  A.    I would have to go back and look at her troponin
20  enzymes for that admission.
21  Q.    Is that something that you agree would be
22  relevant to consideration of the question of whether or
23  not she experienced an acute myocardial infarction at
24  that time?
25  A.    It could help if that was the time of the

Page 105

1  infarct, yes.  I'd be happy to look at that.
2  Q.    You agree that Miss Levitt has never actually
3  been diagnosed by any treating physician with an acute
4  myocardial infarction.
5  A.    Acute part is correct.  Myocardial infarction is
6  not correct.
7  Q.    Do you know if at the time of any Miss
8  Levitt's cardiac symptoms in the year 2000 she was
9  tested for cardiac enzymes?
10  A.    What was the date again, please?
11  Q.    I said at any time in the year 2000 when she was
12  experiencing what she believed to be cardiac symptoms,
13  do you know whether Miss Levitt's cardiac enzymes were
14  ever measured?
15  A.    Yes, they were.
16  Q.    What were the results of that testing?
17  A.    In March they were within the normal range.  The
18  troponins were in the normal range.
19  Q.    Are you aware of her having had her cardiac
20  enzymes tested at any other time in the year 2000?
21  A.    I don't recall.
22  Q.    And do you agree that if the cardiac enzymes
23  were not indicative of a myocardial infarction, that
24  suggests that it's more likely than not that she was not
25  experiencing a myocardial infarction?

27 (Pages 102 to 105)

Jay N. Schapira, M.D.

Page 106

1    A.    It would just say it didn't happen at that time.
2    Q.    You agree that if the cardiac enzymes did not
3    indicate a myocardial infarction, that would tell us
4    that she was not at that time having a myocardial
5    infarction.
6    A.    At that very moment, for the few days of
7    sensitivity of that test, but not address the other
8    months and months.
9    Q.    Do you know if Ms. Levitt was tested for an
10   acute myocardial infarction in 2002?
11   A.    Your question, just specifically the year 2002;
12   correct?
13   Q.    Yes.
14   A.    She was tested in 2002, yes.
15   Q.    And what did that testing show?
16   A.    Non-transmural injury in the anteroseptal
17   region.
18   Q.    My question -- and you probably lost sight of it
19   because it took you a little bit to get to the answer --
20   was whether or not you know if Ms. Levitt was tested for
21   an acute myocardial infarction in the 2002 time frame.
22       Do you know if she was?
23   A.    She was.  And that was the answer I gave you
24   last answer.
25   Q.    So your understanding of that record that you're

Page 107

1    referring to now -- and I know -- I see that you're
2    looking at Exhibit 4 on Page 19, you believe that was
3    testing for an acute myocardial infarction?
4    A.    No.  That was testing for a myocardial
5    infarction.  Myocardial infarctions are acute, and if
6    you diagnose one, it was acute at some point in the
7    past, maybe not at that moment.
8        MR. BOEHM:  Rosemary, can we mark that as the
9    next exhibit, please.
10       (Exhibit Schapira-6 was marked for
11   identification.)
12   BY MR. BOEHM:
13   Q.    Dr. Schapira, I've placed in front of you a
14   document marked as Exhibit 6 for purposes of your
15   deposition.
16       Do you see that?
17   A.    Yes.
18   Q.    This is a November 5th, 2002, medical record
19   from Dr. Steven Laster.
20       Do you see that?
21   A.    Yes.
22   Q.    Is this the record that you're referring to with
23   respect to what you referred to on Page 19 of Exhibit 4,
24   the non-transmural injury in the anterior septum?
25   A.    That's one of the records.  That information

Page 108

1    appears in several different places.  That's one.
2    Q.    This record does not indicate -- strike that.
3        Does Dr. Laster reach the conclusion that Miss
4    Levitt experienced a myocardial infarction?
5    A.    Yes.
6    Q.    Are you referring only to his use of the
7    language "revealed non-transmural injury in the anterior
8    septum"?
9    A.    Yes.
10   Q.    In your view, that is Dr. Laster's diagnosis of
11   a prior myocardial infarction.
12   A.    Yes.
13   Q.    Do you agree that it's possible that Ms. Levitt
14   could have experienced an M -- whatever injury caused
15   the non-transmural injury in the anterior septum
16   sometime before 2000?
17   A.    I think that's highly unlikely.
18   Q.    Well, that wasn't my question.
19       Do you agree that it's possible that whatever
20   event caused Miss Levitt's non-transmural injury in the
21   anterior septum, as described by Dr. Laster, could have
22   occurred before the year 2000?
23   A.    In the realm of anything is possible in
24   medicine, in life, possible, yes, but very unlikely.
25   Q.    It's possible because you can't know when

Page 109

1    exactly whatever event caused the non-transmural injury
2    took place; correct?
3    A.    Yeah, I can.
4    Q.    Oh, you can know exactly when it took place.
5    A.    Well, I can tell you when it didn't take place
6    and, more likely than not, when it does take place.  The
7    standard is reasonable medical certainty.  In reasonable
8    medical certainty, it took place after her two major
9    cardiac events in the year 2000.
10   Q.    Why do you say that?
11   A.    Because she had no prior history.  Her EKG was
12   baseline the year before, in 1999.  She came in with
13   acute, new symptoms documenting ischemia, documenting a
14   lesion by EKG, by symptoms, by angiogram, which recurred
15   two months later, requiring bypass in two vessels, the
16   left anterior descending and the diagonal branch
17   requiring bypass surgery.  And there's more
18   documentation in the chart with regard to this
19   abnormality as well besides just this one document.
20   There's -- there's -- there's further testing down the
21   road.
22   Q.    So what further testing down the road are you
23   referring to that you think supports the idea that
24   whatever event caused a non-transmural injury in Miss
25   Levitt's anterior septum occurred sometime after her

28 (Pages 106 to 109)

Jay N. Schapira, M.D.

Page 110

1  cardiovascular events in March and May of the year 2000?
2  A.    Other than what I've told you?
3  Q.    Yeah.  You said there were other records.
4  A.    Yeah, there's records subsequent to this one.
5  Q.    Yes.  And that's what I'm asking you to tell me,
6  which records subsequent to this one?  Because you've
7  not put it in your report at all, so this is my chance
8  to ask you what additional records you believe support
9  that opinion as to the timing of whatever event caused
10  the non-transmural injury.
11  A.    Okay.  There's a document in October of 2002
12  from Cardiovascular Consultants signed by Dr. O'Keefe.
13  Q.    Okay.  So this is actually before, not
14  subsequent to the record; correct?
15  A.    Right.
16  Q.    And is that the record you're looking at right
17  now?
18  A.    That's what I'm looking at now, yes.
19  Q.    Can I see that, please?
20  A.    Sure.
21       MR. BOEHM:  Let's mark that as Exhibit 7.
22       (Exhibit Schapira-7 was marked for
23  identification.)
24  BY MR. BOEHM:
25  Q.    Other than the document that has now been marked

Page 111

1  as Exhibit 7, which I will for the record indicate is
2  Bates stamped JL-CC-000004, are there any other records
3  that you believe support your opinion as to the timing
4  of whatever event caused Miss Levitt to experience a
5  non-transmural injury in her anterior septum?
6  A.    Okay.  I mentioned her medical history.  I
7  mentioned her normal EKG the year before her events in
8  2000.  That was in 1999.  I mentioned her total lack of
9  symptoms prior to that time.
10       We also had an angiogram done in the year 2000
11  twice, neither of which showed an infarct at the time of
12  the angiograms that were done.  We can talk about that.
13  And then we had this finding in 2002.
14       I don't have anything specifically to more be
15  more specific about the date of the actual infarct.
16  Q.    And that's what I'm trying to get at so --
17  A.    I understand.
18  Q.    So there really isn't anything beyond these two
19  records that you would point me to specifically and say
20  they help you understand the likely timing of whatever
21  event caused the non-transmural injury.
22  A.    Well, there's other records that document the
23  infarct but not the timing.
24  Q.    Right.  Well, see, now we're just going in
25  circles.  Because you know what my question is; right?

Page 112

1  It's about the timing.
2       And so are there any other records besides what
3  now have been marked as Exhibit 6 and 7 that document --
4  A.    That I can recall, no.
5       MR. THOMAS:  Objection.  Argumentative.
6       Sorry, Paul.
7       Object.  It's argumentative and asked and
8  answered.
9  BY MR. BOEHM:
10  Q.    Go ahead.  Just make sure your answer is on the
11  record.
12       MR. BOEHM:  Did you get his response?
13       THE COURT REPORTER:  "That I recall, no."
14       THE WITNESS:  Okay.
15       MR. BOEHM:  Thank you.
16  BY MR. BOEHM:
17  Q.    What about Exhibit 7 do you believe sheds light
18  on the question of when you think Miss Levitt
19  experienced an acute myocardial infarction?
20  A.    Well, it's obviously before this date so, I
21  mean, it bookends the dates of after early 2000 and by
22  2002.  So it bookends the dates.
23  Q.    I understand what you're saying with respect to
24  the end of that period.  I don't understand what you
25  believe is your -- your record substantiating the front

Page 113

1  end of that time period.
2  A.    Well, we talked about her history, her EKG,
3  her -- she was an active lady, having no angina, no
4  symptoms like she came in with in early 2000 prior to
5  March of 2000.
6       We talked about the vessel actually being open,
7  you know, at the time, we talked about the angiographic
8  data in March of 2000 and in May of 2000.  And so that's
9  how we bookend it, not before her first presentation
10  with Dr. Rosamond and Dr. Tadros, when she got her
11  stent, not before that, and as far as afterwards, we
12  know it occurred by this time in 2002, which is October
13  of 2002.  So we have a range of dates there as to when
14  it occurred.
15  Q.    Just referring back to your supplemental report
16  that you provided on January 18th, 2016, it's in your
17  report so --
18  A.    I promise not to read your notes if I can look
19  at your copy.
20       Do you have a clean copy?
21  Q.    Is this it right here?
22  A.    No.  Is it?
23  Q.    It is.
24  A.    It is?
25  Q.    Yes.  It's Exhibit 5.

Jay N. Schapira, M.D.

Page 114

1  A.    Okay.  Is this Exhibit 5?
2  Q.    Uh-huh.
3  A.    It's in here?
4  Q.    Yes.
5  A.    Cool.
6        Got it.  Thanks.
7  Q.    You see it's -- this document is dated -- or I'm
8  sorry.  Let me strike that.
9        You see that your supplemental report, which is
10 a part of your Exhibit 5, is dated January 18th, 2016?
11 A.    Yes, sir.
12 Q.    It's very short; right?
13 A.    Yes.
14 Q.    You just say, after careful review of these
15 materials, I do not feel that any changes to my original
16 report are necessary.
17       That's what you said in January of 2016; right?
18 A.    Correct.
19 Q.    With the exception of a wording change --
20 A.    Correct.
21 Q.    -- on Page 7 --
22 A.    Right.
23 Q.    -- wherein I refer to an acute myocardial
24 infarction and feel that it is more properly stated as
25 acute coronary syndrome.

Page 115

1        Do you see that?
2  A.    Yes.
3  Q.    Now, an acute myocardial infarction is not the
4  same thing as acute coronary syndrome; correct?
5  A.    Acute coronary syndrome actually includes acute
6  myocardial infarction in the spectrum of definition.
7  Yes, it does.
8  Q.    Fair.  Acute coronary syndrome is an umbrella
9  term that includes a variety of different types of
10 cardiovascular events; correct?
11 A.    Yes; including acute myocardial infarction.
12 Q.    Including acute myocardial infarction, including
13 unstable angina; correct?
14 A.    Yes.
15 Q.    But they're not the same thing.  Acute coronary
16 syndrome is not the same thing as an acute myocardial
17 infarction.
18       Do you agree with that?
19 A.    I can't agree with that statement, no, because
20 that's just an artificial word, word statement that --
21 no.
22 Q.    An artificial word statement?
23 A.    Yeah.  I mean, you know, you're just trying to
24 mince words here, and that has no meaning to people that
25 take care of patients who have this.  That's --

Page 116

1  Q.    Acute coronary syndrome is an umbrella term that
2  encompasses different kinds of cardiovascular events;
3  correct?
4  A.    Acute cardiovascular events, yes.
5  Q.    What specific cardiovascular events does acute
6  coronary syndrome include?
7  A.    Unstable angina, acute myocardial infarction,
8  intermediate coronary syndrome, non-ST-segment-elevation
9  myocardial infarction, subendocardial myocardial
10 infarction, non-transmural myocardial infarction.
11       THE WITNESS:  This would be a great time to take
12 a little break.
13       MR. BOEHM:  Sure.  That's fine.
14       VIDEO OPERATOR:  With the approval of counsel,
15 going off the record.
16       THE WITNESS:  Thank you.
17       VIDEO OPERATOR:  The time is approximately 12:02
18 p.m.
19       (Recess, 12:02-12:25 p.m.)
20       (Exhibits Shapira-8 through Schapira-15 were
21 marked for identification.)
22       VIDEO OPERATOR:  With the approval of counsel,
23 back on the record.
24       The time is approximately 12:25 p.m.
25

Page 117

1  BY MR. BOEHM:
2  Q.    Dr. Schapira, it looks like you've had a little
3  bit of lunch but the rest of us have not been so
4  fortunate.
5  A.    Sorry.  It was only peanut butter.  You
6  shouldn't feel too bad.  Crunchy.
7  Q.    And fair enough.  And yet under normal
8  circumstances, we would take a break now and eat lunch
9  but given the unavailability that you've described for
10 us this morning, I think we should just keep rolling
11 here a little bit and we'll go until we just have to eat
12 and then I think, given the fact that you're no longer
13 available around 1:00 or a little bit after 1:00, we
14 will reconvene.  Okay?
15 A.    Okay.
16 Q.    I've placed in front of you several documents
17 that have been marked as exhibits to your deposition
18 starting with Exhibit 8 and going through Exhibit 15.
19       I'm just going to go through these one at a time
20 and ask you to tell us, just generally speaking, what
21 each document is.
22       Does that sound fair?
23 A.    Yes.
24 Q.    Okay.  The first document is Exhibit 8.
25       This appears to reference Dr. Clauw, is that

Jay N. Schapira, M.D.

Page 118

| | |
|---|---|
| 1 | right, at the top? |
| 2 | A.    Yes. |
| 3 | Q.    What is this document? |
| 4 | A.    Doctor -- what did you say? |
| 5 | Q.    Clauw? |
| 6 | A.    It appears? |
| 7 | Q.    That it appears to reference a doctor who's an |
| 8 | expert in this case, Dr. Clauw. |
| 9 | A.    Oh. Yes. |
| 10 | Q.    What is this document? |
| 11 | A.    I think it's just some notes I made from maybe |
| 12 | that depo or her depo. I can't remember which. |
| 13 | Q.    Whose depo? When you say "her depo," what do |
| 14 | you mean? |
| 15 | A.    Miss Levitt. |
| 16 | Q.    Okay. So you think this document which you had |
| 17 | stapled together -- |
| 18 | A.    Yes. |
| 19 | Q.    -- and now has been marked as Exhibit 8 is a |
| 20 | compilation of your notes, having read Dr. Clauw's |
| 21 | deposition? |
| 22 | A.    Right. |
| 23 | Q.    And possibly also having read the deposition of |
| 24 | Ms. Levitt. |
| 25 | A.    Yes. |

Page 119

| | |
|---|---|
| 1 | Q.    Anything else? |
| 2 | A.    No, sir. |
| 3 | Q.    Do you know when you made these notes? |
| 4 | A.    I would say sometime early in my review of this |
| 5 | case. |
| 6 | Q.    Are you expressing any opinion in this case as |
| 7 | to whether or not Miss Levitt experienced fibromyalgia |
| 8 | or suffers from fibromyalgia? |
| 9 | A.    I saw it in her records. I didn't question it. |
| 10 | Q.    Did you perform a differential diagnosis in this |
| 11 | case to determine the cause of Ms. Levitt's depression? |
| 12 | A.    Yes. |
| 13 | Q.    What are all the factors that you took into |
| 14 | account for purposes of your differential diagnosis to |
| 15 | identify the cause -- causes of Miss Levitt's |
| 16 | depression? |
| 17 | A.    At what point in time? |
| 18 | Q.    Did you -- for what points in time did you |
| 19 | conduct a differential diagnosis? |
| 20 | A.    Before and after her major adverse cardiac |
| 21 | events in the year 2000. |
| 22 | Q.    Where can I go to see your opinions about the |
| 23 | differential diagnosis that you've conducted vis-a-vis |
| 24 | Miss Levitt's depression? |
| 25 | A.    You can ask me. |

Page 120

| | |
|---|---|
| 1 | Q.    You didn't include that in your report. |
| 2 | A.    Did not. |
| 3 | Q.    Okay. You didn't indicate in any way that you'd |
| 4 | be expressing any opinions about Miss Levitt's |
| 5 | depression; correct? |
| 6 | A.    Correct. |
| 7 | Q.    With respect to Ms. Levitt's depression from the |
| 8 | years 2000 through today, did you conduct a differential |
| 9 | diagnosis to determine the cause or causes of Miss |
| 10 | Levitt's depression? |
| 11 | A.    Yes. |
| 12 | Q.    What are the factors that you took into account |
| 13 | in conducting that differential diagnosis? |
| 14 | A.    Well, I took -- I undertook a cardiologist's |
| 15 | analysis of all the factors, understanding that that |
| 16 | accumulated in some degree of depression prior to 2000. |
| 17 | We elaborated on those earlier today. |
| 18 | And I also then realized that she was a |
| 19 | functioning lady in terms of her depression before, |
| 20 | whereas, the factors that were added onto her situation |
| 21 | after her major adverse cardiac events were the facts of |
| 22 | the cognitive and depressive impairments that she had |
| 23 | afterwards -- |
| 24 | Q.    Do you know what a differential -- |
| 25 | A.    -- which were impacted -- |

Page 121

| | |
|---|---|
| 1 | Q.    -- diagnosis is? |
| 2 | A.    -- which were impacted by her unstable angina, |
| 3 | her -- twice and then her -- her episode of afterwards. |
| 4 | So the differential diagnosis of depression, in |
| 5 | my mind, is the underlying causes which would have led |
| 6 | to it, which I've elaborated on. |
| 7 | Q.    My question to you, just to -- so you have it in |
| 8 | mind, is what factors did you consider? What specific |
| 9 | factors -- |
| 10 | A.    Uh-huh. |
| 11 | Q.    -- did you consider when you conducted what you |
| 12 | are now describing as a differential diagnosis to |
| 13 | consider -- |
| 14 | A.    Yeah. |
| 15 | Q.    -- the cause or causes of her depression? |
| 16 | A.    I considered her childhood, her bulimia, her |
| 17 | stress of her business factors prior to her surgery, |
| 18 | her -- her cardiac events and the additional problems |
| 19 | that befell her after her cardiac events in 2000, |
| 20 | recognizing that those were co-morbidities on top of her |
| 21 | cardiac condition which contributed to her depression. |
| 22 | Q.    Did you consider the economic impacts -- let me |
| 23 | strike that. |
| 24 | Did you consider external economic factors that |
| 25 | impacted her business enterprise? |

31 (Pages 118 to 121)

Jay N. Schapira, M.D.

Page 122

1    A.    Yes.
2    Q.    Tell me about that.
3    A.    Okay.  So it's my understanding -- as a
4    cardiologist, I get into that a little bit with
5    patients -- that she was a manufacturer of apparel for
6    high school girls and that she had tried to maintain her
7    business and be competitive in that business and she was
8    very active in that business from really the bottom to
9    the top, both manufacturing, wholesale, retail, the
10   whole thing, through, you know, the late '90s and that
11   she had tried to maintain her manufacturing in this
12   country, that became to be a more competitive challenge
13   for her, and that she was in the business -- she was in
14   the process of morphing it to offshore manufacturing in
15   order to be able to become profitable and be competitive
16   with other people in the same business.
17         And so she had business pressures and she had to
18   change things a bit, and that required, you know,
19   some -- some skills that she had -- she had, and she had
20   to apply those skills.  And people can usually make the
21   transition.
22   Q.    Okay.  So you, as a cardiologist, are expressing
23   the opinion that people are usually capable to adjust to
24   the external economic forces that impact their
25   businesses; right?

Page 123

1    A.    That's not what I'm saying.
2    Q.    Well, you just said people usually can do that,
3    and that surprised me since you're a cardiologist, not
4    an economist or a business expert in this case.  So I
5    want to understand what you meant by that.
6    A.    Okay.
7          MR. THOMAS:  There's no question pending.  It's
8    just argument.
9    BY MR. BOEHM:
10   Q.    Go ahead.
11         THE WITNESS:  Say that again, please.
12         MR. BOEHM:  He just objected.
13         MR. THOMAS:  There's no question pending.  It's
14   just argument from counsel.
15         THE WITNESS:  Okay.  So I'm talking about
16   somebody like Miss Levitt, with her type of situation,
17   not people in general.
18         I'm talking about people -- I ask my patients
19   these questions, it takes me about three or four
20   minutes, to understand what their problems are.  They
21   just give me the basics.  I usually get it.  Sometimes I
22   don't but I usually do.
23         And I want to understand what their pressures
24   are.  And the people who can build a successful business
25   are usually very capable of adjusting and -- and -- and

Page 124

1    making it successful when they're given challenges.
2          I can see you now.  Danny, I can see you.
3          Oh, wait.  There's a -- there's an error message
4    up here.  What do I do?
5          VIDEO OPERATOR:  That's fine.
6          MR. BOEHM:  How about we just put that device
7    away?  Because it's just wasting our time.  We shouldn't
8    have to break every time you can or cannot see him on
9    the video screen.
10   BY MR. BOEHM:
11   Q.    You indicated that one of the factors that you
12   took into account with respect to the so-called
13   differential diagnosis that you did with respect to her
14   depression that's not in your report was the fact that
15   she had unstable angina twice; right?
16   A.    Yes.
17   Q.    What are the two times when you believe Miss
18   Levitt had unstable angina?
19   A.    March and June.
20   Q.    You mean March and June of the year 2000?
21   A.    Yes, sir.  At the time of her first presentation
22   and her second presentation.
23   Q.    Have you reviewed the medical literature on the
24   subject of whether or not Vioxx is causally associated
25   with an increased risk of unstable angina?

Page 125

1    A.    Yes.
2    Q.    Where can I read about that in your expert
3    report?
4    A.    It's not in there.
5    Q.    This is another opinion that you have in the
6    case that you've not included in your report.
7    A.    Well, actually, it is in there.
8    Q.    Okay.
9    A.    I take that back.  Let me revise that answer.
10   It is in there.
11   Q.    By all means, tell me where.
12   A.    It is in there.  Okay.
13         Since you've reorganized my records, let me find
14   it.
15   Q.    Well, with respect, I haven't reorganized any of
16   your records.
17   A.    Show me where it is, then.
18   Q.    Those are called exhibits to your deposition.
19   A.    Well, it was neat about two hours ago.
20         Page 7.
21   Q.    Can you be more specific than Page 7?
22   A.    Sure.  The first large paragraph.
23   Q.    I appreciate that.
24   A.    Last sentence.
25   Q.    The last sentence of the first full paragraph on

32 (Pages 122 to 125)

Jay N. Schapira, M.D.

Page 126

1   Page 7 of your expert report?
2   A.    Yes.  Let me show you.
3   Q.    So the sentence that reads, Vioxx was therefore
4   a significant factor leading to her acute coronary
5   syndrome and PCI?
6   A.    Yes.
7   Q.    My question to you was whether or not you have
8   discussed in your report the actual scientific data on
9   the subject of whether or not Vioxx is causally
10  associated with an increased incidence of unstable
11  angina and you've directed me to the sentence I've just
12  read; is that correct?
13  A.    Yes.  And the sentence -- and the paragraph
14  above and the paragraph below and below that.
15  Q.    Okay.
16  A.    And I've summarized it.  It's not exhaustive but
17  it's a summary.
18  Q.    You believe that the data that you've summarized
19  in these two paragraphs are data concerning the
20  incidence of unstable angina in association with the use
21  of Vioxx; is that right?
22  A.    I think it -- I think that this is the data that
23  talks about the total events associated with
24  atherothrombotic events in patients who are on Vioxx,
25  and that includes acute MI, that includes unstable

Page 127

1   angina, it includes the entire spectrum of acute
2   coronary syndrome.
3   Q.    The one article that's actually specifically
4   referenced in these two paragraphs is the Juni article
5   published in 2004 in The Lancet.
6   Do you see that?
7   A.    Yes.
8   Q.    Do you agree with that characterization?  There
9   aren't any other articles that you reference in these
10  paragraphs, is there?
11  A.    I think that's correct.
12  Q.    Okay.  So is that the article that you have in
13  mind when you referred to the data about the incidence
14  of unstable angina in association with the use of Vioxx?
15  A.    No.  I have other things in mind when I'm
16  thinking about that.
17  I know that unstable angina is mentioned in the
18  literature for Vioxx, the package insert, I know it's
19  mentioned in several other articles.  I think myocardial
20  infarction may be the end point in that particular Juni
21  article, although I have to look and it to be sure.
22  Q.    The Juni article actually doesn't use unstable
23  angina as an end point at all; correct?
24  A.    I think that's correct.
25  Q.    So my question, as you know, Dr. Schapira, has

Page 128

1   to do with unstable angina, and my question is quite
2   simple.  Okay?
3   Have you conducted a comprehensive review of the
4   medical literature on the subject of whether or not
5   Vioxx is causally associated with an increased incidence
6   of unstable angina?
7   A.    I have conducted a review and -- yes, I have.
8   Q.    Okay.  Tell me the articles that you think shed
9   light on that.  Because it's not in your report, is it?
10  A.    Okay.  I'd be happy to.  I don't have my
11  microphone on.  I will.
12  Here's the Vioxx literature.  Unstable angina is
13  listed under Cardiovascular Adverse Reactions.
14  Q.    It would be helpful if you'd identify with some
15  specificity what it is you're referring to, Doctor.
16  A.    Sure.  It says "Vioxx" and it's a registered
17  trademark of Merck & Company, Incorporated, Whitehouse
18  Station, New Jersey, U.S.A., copyright Merck & Company,
19  Inc., 1998, comma, 2002, all rights reserved.  So
20  package insert.
21  Q.    Well, you could have just said package insert;
22  right?
23  This is the package insert you're referring to?
24  A.    Yes.
25  Q.    And you're talking about the section of the

Page 129

1   label referred to as Adverse Reactions.
2   A.    Yes.  I think it's marked there.
3   Q.    Do you know what the adverse reactions of a
4   package insert is intended to cover?
5   A.    Yes.
6   Q.    Is it your understanding that the adverse
7   reactions section of a package insert indicates that
8   there has been some causal association established as
9   between the use of a medication and the particular event
10  that's listed?
11  A.    In some cases yes and in some no.
12  Q.    Do you -- are you familiar at all with the
13  regulatory standards for the inclusion or -- or -- or
14  the decision not to include an event in the adverse
15  reactions section of an FDA-approved label?
16  A.    I've never read the regulations.
17  Q.    Okay.  So you don't really know what the
18  standards are for including an event in this section;
19  correct?
20  A.    I wouldn't say I don't really know.  I just
21  haven't read the regulations.
22  Q.    What is your understanding of what the standard
23  is for the inclusion of an event in the adverse
24  reactions section of a package insert pursuant to
25  federal guidelines?

33 (Pages 126 to 129)

Jay N. Schapira, M.D.

Page 130

1    A.    Well, my understanding is if it's been
2    associated or reported, that it will be put into the
3    adverse reactions.
4    Q.    Okay.
5    A.    Or caused.
6    Q.    Are you confident about that as the standard?
7    A.    I think generally, yes.
8          I know that there's another mention in here
9    somewhere.  I didn't find it on the first pass through.
10   Do you want me to continue to look?
11   Q.    Well, you've taken already almost 6 minutes
12   looking through the stack of documents that were -- that
13   you brought with you to today's deposition but not
14   referenced in any way in your report.  I would like to
15   know --
16   A.    Oh, I'm sorry.
17   Q.    -- if you can identify --
18   A.    I've found it, yes.
19   Q.    -- literature for us.
20   A.    Found it for you.
21         So here's an article here by Dr. Mukherjee,
22   M-U-K-H-E-R-J-E-E.  This is from the Journal of the
23   American Medical Association.  And it's also authored by
24   Steven E. Nissen, N-I-S-S-E-N, and Eric J. Topol,
25   T-O-P-O-L.  This is published in the Journal of the

Page 131

1    American Medical Association, August 22nd slash 29,
2    comma, 2001, Volume 286, Number 8.
3          In here they talk about the results from the
4    VIGOR showed that the relative risk of developing a
5    confirmed, adjudicated thrombotic cardiovascular event,
6    parentheses open, myocardial infarction, comma, unstable
7    angina, comma, cardiac thrombus, comma, resuscitated
8    cardiac arrest, comma, sudden or unexplained death,
9    comma, ischemic stroke, stroke, comma, and transient
10   ischemic attacks with rofecoxib treatment compared with
11   Naprosyn was 2.38.
12   Q.    That's a composite end point.  That's a
13   composite point estimate that draws data from many
14   different cardiovascular end points; correct?
15   A.    Includes unstable angina.
16   Q.    That wasn't my question.
17   A.    Well, your question was originally about
18   unstable angina.
19   Q.    That's right.  And that's the one I want.
20   A.    Yeah.
21   Q.    That's the answer I want.
22   A.    That's the one you got.  It includes that.  So
23   they --
24   Q.    It's one of many cardiovascular events included
25   in that point estimate; correct?

Page 132

1    A.    They catalogued unstable angina, they catalogued
2    the other things as well.
3    Q.    Is it correct or is it not correct,
4    Dr. Schapira?
5    A.    What?
6    Q.    That the point estimate that you're referring to
7    in Mukherjee, et al., is a point estimate that refers to
8    many different cardiovascular end points, not specific
9    to unstable angina.
10   A.    No.  It refers to many different ones, including
11   unstable angina.
12   Q.    It's not specific.  That point estimate that you
13   just read from that article is not specific to unstable
14   angina; correct?
15   A.    Is your question the following:  Does this
16   article just refer to unstable angina?  Because if it
17   is -- and that's a good question, by the way, I just
18   asked myself -- the answer is no.  Does this refer to
19   unstable angina and a bunch of others?  Yes, it does.
20   Q.    Can you identify any published medical article
21   that establishes a statistically significant association
22   between the use of Vioxx and the specific end point of
23   unstable angina?
24   A.    That -- I don't believe that I could give you
25   that answer right now.  I think I would have to go back

Page 133

1    through this specifically to look for that.  I believe,
2    though, that -- that this data, if I analyze it, and
3    which would take far too long for you today, would
4    establish that but I -- I can't --
5    Q.    Do you believe that as an article of faith?  Or
6    why is it --
7    A.    No.
8    Q.    -- that you believe that without having
9    conducted the analysis?
10   A.    Because, as a cardiologist, not as an
11   epidemiologist or as a statistician, the basic problem
12   is atherothrombosis.  Atherothrombosis is the essential,
13   underlying, common mechanism for unstable angina, acute
14   coronary syndrome, and acute myocardial infarction so it
15   would stand to rigorous medical reason that all three of
16   those would be related to the same underlying thrombotic
17   pathophysiology.
18   Q.    Can you identify for me any clinical study --
19   A.    I think this one --
20   Q.    -- that shows a statistically significant
21   increased incidence of unstable angina, that specific
22   end point, in association with the use of Vioxx?
23         MR. THOMAS:  Asked and answered.  Argumentative.
24         THE WITNESS:  I would have to go back and review
25   the data for that specific answer.  I -- and probably I

34 (Pages 130 to 133)

Jay N. Schapira, M.D.

Page 134

1    would defer to Dr. Egilman for that question, not for
2    the answer, but for the question.  He would be more
3    qualified than I to answer that question.
4    BY MR. BOEHM:
5    Q.    Why would Dr. Egilman be more qualified than you
6    to answer that question?
7    A.    He's studied this -- the statistics and the
8    analyses and the details of the analyses and the
9    re-analyses more than I have.
10   Q.    That's not something that you have specifically
11   looked at --
12   A.    I have not --
13   Q.    -- so far; correct?
14   A.    I have not gone back and re-analyzed the trials
15   but I can tell you, to a reasonable medical probability,
16   it's related, as an opinion from a practicing
17   cardiologist.
18         So if I had a patient, just to finish my answer,
19   who came in to see me and said, Jay, I'm taking Vioxx
20   and I had unstable angina, should I stop the Vioxx, I
21   would tell him absolutely, even though there's no study
22   I can identify, no end point, even if there was not,
23   pretend there's not for a second --
24   Q.    We don't need to pretend.
25   A.    Well, we'll see.  We'll see.  But --

Page 135

1    Q.    The question is whether you can identify one --
2    A.    Just to finish my answer -- just to finish my
3    answer, would be that, you know, I would say, of course,
4    because the pathophysiology is the same, and whether
5    that clot totally blocked your artery or only 95 percent
6    blocked your artery, you better stop that Vioxx.  That's
7    the end.
8    Q.    Can you identify any specific clinical study
9    that shows a statistically significant -- let me strike
10   that and start over.
11         When you talk about acute coronary syndrome that
12   Miss Levitt experienced in March of 2000, are you
13   talking about -- do you believe -- let me strike that.
14   I'm sorry.  I'm having -- I want to just see if I can
15   refresh here.
16         When you talk about the fact that, in your
17   opinion, Miss Levitt experienced acute coronary syndrome
18   in March of 2000, what specific cardiovascular event do
19   you believe she experienced?  Is it the unstable angina?
20   A.    Acute coronary syndrome.
21   Q.    Right.  But I'm asking about what specific event
22   within the acute coronary syndrome umbrella do you
23   believe she experienced?
24   A.    An atherothrombotic event in her left anterior
25   descending and diagonal.

Page 136

1    Q.    Do you believe that she experienced a clot in
2    March of 2000?
3    A.    I think she had thrombus in her LAD, yes.
4    Q.    Are you expressing, to a reasonable degree of
5    medical certainty, any opinion on whether or not Miss
6    Levitt experienced plaque rupture in March of 2000?
7    A.    I believe she had plaque erosion.
8    Q.    Is that something I can read about in your
9    expert report?
10   A.    No, I don't think so.
11   Q.    Dr. Schapira, we seem to be coming back time and
12   time again to the fact that many of the things you're
13   saying today are not things that are anywhere in your
14   expert report.
15         Why didn't you include your opinions in your
16   expert report?
17   A.    You know, Mr. Boehm, I couldn't anticipate every
18   question you were going to ask me and so, therefore, I
19   assumed that certain things would be a given, and in
20   trying to give you a preview of my opinions, basic
21   submission of my opinions, I wrote this expert report.
22         I tried to be inclusive, not exclusive, and I
23   tried to put in there everything that I thought that
24   would be necessary to know.  Obviously, you want to know
25   more than I have and that's why we're here today, I

Page 137

1    guess, so you can ask me questions.  And I'm trying to
2    answer them as best I can.  And you asked me to go
3    through here and to give you extra information, which
4    I'm trying to do.
5    Q.    When you sent your supplement to your expert
6    report on January 18th, 2016, and you said you wanted to
7    take out the word "acute myocardial infarction" and
8    replace it with the words "acute coronary syndrome," was
9    it your opinion in January 2016 that Miss Levitt had in
10   fact experienced an acute myocardial infarction?
11         MR. THOMAS:  Asked and answered.
12         THE WITNESS:  Yes, but not in 2000.
13   BY MR. BOEHM:
14   Q.    When --
15   A.    It was only discovered in 2002, and I could not
16   say it was acute in 2000.  That was the issue.
17   Q.    Okay.  When you sent your first and your
18   supplement report to defendants, was it your opinion
19   that Vioxx caused Miss Levitt to experience an acute
20   myocardial infarction sometime between March of 2000 and
21   2002?
22   A.    Yes.
23   Q.    Okay.  And yet you never said that anywhere in
24   either of these reports; correct?
25   A.    It's not explicit.  You're right.

35 (Pages 134 to 137)

Jay N. Schapira, M.D.

Page 138

1  Q.    It didn't occur to you that that might be an
2  opinion that defendants would be interested in when you
3  were preparing your original and your supplement?
4       MR. THOMAS: Objection. Argumentative.
5       THE WITNESS: I -- you know, I didn't read your
6  mind properly, I guess.
7  BY MR. BOEHM:
8  Q.    The next document in front of you is Exhibit 9.
9  A.    So we're done with the articles for a while.
10 Q.    Well, I'll just note for the record that you've
11 flipped through the stack of medical literature that you
12 brought with you today, it's about four inches thick,
13 you identified two of them.  One is not actual medical
14 literature but just the label for Vioxx, the other is
15 the Mukherjee study.
16      Was there any other study that you wanted to
17 point us to?  You went through it one and a half times
18 so, apparently, you want to go through it once more.
19 A.    Well, I just want to be responsive to your
20 question.
21 Q.    How many times do you need to go through the
22 stack in order to do that?
23 A.    I'll let you know when I'm done.
24      I believe there was also another study, that I'll
25 have to find it, the Tennessee Medicaid study, that

Page 139

1  cataloged unstable angina.  And I'll just have to find
2  that report.
3  Q.    Is it your understanding that the Medicaid study
4  that you're referring to reflects a statistically
5  significant association between unstable angina and the
6  use of Vioxx?
7  A.    I don't know one way or another because I have
8  not read it to that level of granularity.
9  Q.    Okay.  Are you still reviewing documents?
10 A.    Yes.
11      You know, in the sense that acute coronary
12 syndrome includes acute MI and unstable angina is just
13 one of the subsets of acute coronary syndrome, you
14 just -- just to clarify your question, you just want me
15 to look at unstable angina and not acute coronary
16 syndrome; right?
17 Q.    Correct.  I'm asking about the specific end
18 point of unstable angina.
19 A.    Okay.  And none of its synonyms; correct?
20 Q.    It's not a synonym.  It's a different -- it's a
21 subset.  You know that.
22 A.    No.  It's a -- it's the --
23      MR. THOMAS: Objection. Argumentative.
24      THE WITNESS:  It is the same as acute coronary
25 syndrome.  We use them interchangeably in medicine all

Page 140

1  the time.
2       This is a medical deposition, not a word game.
3  It is the same thing.
4  BY MR. BOEHM:
5  Q.    So your opinion --
6  A.    Do you need further --
7  Q.    Just -- just --
8  A.    Do you need further clarification on that?
9  Q.    Just -- no.  That's fine.
10 A.    Okay.
11 Q.    I just want to make sure your opinion is clear.
12      In Dr. Schapira's mind, acute coronary syndrome
13 equals, it is the same thing as unstable angina.  Is
14 that your opinion?
15 A.    I think you could use them interchangeably.
16      MR. THOMAS: Objection. Asked and answered many
17 times.
18      THE WITNESS:  Synonyms.
19 BY MR. BOEHM:
20 Q.    If that's your opinion, that's your opinion.
21 A.    But I'm looking specifically for the word
22 "unstable angina."
23 Q.    That specific end point.
24      MR. BOEHM: The record should reflect that
25 Dr. Schapira continues to spend many minutes pouring

Page 141

1  over the same stack of documents that he's already been
2  through a couple of times.
3       MR. THOMAS: I don't know why you are so
4  argumentative.  The record --
5       MR. BOEHM: It's not argumentative.  I'm making
6  it clear for the record.
7       MR. THOMAS: I'm not done making my record.
8       MR. BOEHM: Danny, I'm making it clear for the
9  record.
10      MR. THOMAS: The doctor requested --
11      MR. BOEHM: It's not an argument.  He's spent
12 over ten minutes flipping through the same stack of
13 documents.
14      MR. THOMAS: This counsel has wasted so much
15 time today and is apparently attempting to purposely
16 drag his feet asking the same question over and over
17 again, arguing with the witness, being generally
18 unprofessional, discourteous.
19      MR. BOEHM: That's not remotely a fair
20 characterization.  What's discourteous is to have us
21 come out for a deposition all the way across the country
22 and then an hour and a half into it announce that we
23 can't complete it.  That's --
24      MR. THOMAS: I tried to contact Elaine --
25      MR. BOEHM: That is the high -- that is the high

36 (Pages 138 to 141)

Jay N. Schapira, M.D.

Page 142

1  point of discourtesy.
2  MR. THOMAS:  -- and ask for -- and relate
3  information --
4  MR. BOEHM:  No -- no -- no --
5  MR. THOMAS:  -- about the deposition --
6  MR. BOEHM:  That is --
7  MR. THOMAS:  -- and she didn't E-mail me back.
8  MR. BOEHM:  I'm sorry.  Danny, would you please
9  say that one more time?  Just make sure that's clear for
10  the record.
11  MR. THOMAS:  I made my record.
12  MR. BOEHM:  Did you get what he said, Madam
13  Court Reporter?
14  THE WITNESS:  I can't find any others.
15  MR. BOEHM:  Okay.  Thank you.
16  BY MR. BOEHM:
17  Q.  You can set that to the side.
18  I'm now showing you Exhibit 9.  These are more
19  notes of yours that you've brought to today's
20  deposition.  What are these?
21  A.  These are notes that I made I think early on in
22  the case when I was just sort of doing an overview of
23  it, trying to figure out what -- what was going on, just
24  generally.
25  Q.  Can you look at Exhibit 10 and tell us what that

Page 143

1  document is.
2  A.  This looks like some notes I made from Kansas
3  City Women's Cardiology, Dr. Bishop.
4  Q.  Do you know when you made these notes?
5  A.  Some time ago, I think.
6  Q.  And what do you mean by some time ago?
7  A.  Probably near around the time of my initial
8  review or when I first -- you know, when I wrote my
9  report.
10  Q.  Okay.  The next document is Exhibit 11.
11  Is that similar in that these are notes you made
12  near the beginning of your review of Miss Levitt's
13  medical records?
14  A.  Yes.
15  Q.  Exhibit 12 is next.  Tell us what that document
16  is.
17  A.  These are risk factors that, I just went through
18  her chart to determine risk factors that she had, the
19  strength of the evidence for the risk factors.  Some
20  people said she did have risk factors, some people said
21  she didn't.  I tried to look at everybody's opinion and
22  figure out what risk factors she truly had.
23  Like, for example, family history.  There was no
24  family history of premature coronary artery disease.
25  Apparently, her father had cardiac arrhythmias in his

Page 144

1  60s but there was really not premature coronary artery
2  disease.
3  Q.  What about Exhibit 13?
4  A.  Notes that I made with -- just in the last few
5  days, I think, just about thoughts on the case.
6  Q.  Can you tell us what Exhibit 14 is?  This is
7  titled "Levitt - Anti-Inflammatories."
8  A.  Right.
9  I went through pharmacy records and tried to
10  correlate them with clinical records to determine when
11  she was taking Vioxx and who was noting it and also try
12  to correlate that with some pharmacy records.
13  Q.  Is it your opinion that Miss Levitt's unstable
14  angina events in March and May of 2000 were caused by
15  her use of Vioxx?
16  A.  Acute coronary syndrome, yes.
17  Q.  Well, you already said that you thought she had
18  unstable angina at those times; correct?
19  A.  Okay.  Just as long as we can understand that
20  they're the same.  That's fine.
21  Q.  No.  Well, we don't have that mutual
22  understanding.  I know you've tried to adjust your
23  testimony in that regard.  I understand that.
24  Do you believe that Ms. Levitt's unstable angina
25  in March and her unstable angina in May of 2000 were

Page 145

1  caused by her use of Vioxx?
2  A.  Yes.
3  Q.  Do you know when Miss Levitt stopped using
4  Vioxx?
5  A.  2002.
6  Q.  When in 2002?
7  A.  I believe -- I believe around September.
8  Q.  So Ms. Levitt continued to use Vioxx for more
9  than two years after her last incidents of unstable
10  angina in May of 2000; correct?
11  A.  Yes.
12  Q.  What is your explanation, if any, for the fact
13  that Miss Levitt did not have any further incidents of
14  unstable angina between May 2000 until the end of her
15  Vioxx usage?
16  A.  Let me just go back.  The Vioxx she stopped
17  sometime in the summer to fall of '02.  I don't know
18  specifically it was September.  I know she was off all
19  NSAIDs at that time.
20  THE WITNESS:  Could I -- could you read back his
21  last question.  It was a good question but I was just
22  focused on the prior question.
23  I gave you credit for a good question.
24  MR. BOEHM:  I'll take it.
25  (The court reporter read the requested portion

Jay N. Schapira, M.D.

1  of the record.)
2      THE WITNESS:  I believe that when -- I think
3  it's just actually she did not have any other
4  significant atheromatous disease within her coronary
5  arterial tree that would be as susceptible to the
6  adverse effects of Vioxx as she did in that lesion that
7  she had in the LAD and in the first diagonal branch of
8  the LAD, so that Vioxx really acted adversely upon the
9  preexisting, most significant coronary lesion and not in
10  other -- any other place within her coronary bed.
11  BY MR. BOEHM:
12  Q.    Do you agree it's more likely than not that Miss
13  Levitt had atherosclerosis for many years before she
14  ever took Vioxx?
15  A.    I think that's true.
16  Q.    Do you have any way of determining how severe
17  Miss Levitt's existing atherosclerosis was prior to her
18  using Vioxx?
19  A.    Yes.  The -- she had no symptoms that were
20  anginal in nature, as we later defined them.  She had
21  normal EKG findings prior to 2000.  She was active, she
22  was a runner, and she had no symptoms associated with
23  that.  That was in her youth.  And she had no clinical
24  evidence of disease.  And we really didn't even know she
25  had disease until she became clinically apparent in

1  March of 2000.  So I think she went from subclinical to
2  clinical based upon her use of Vioxx.
3  Q.    Is there any way for you to reach an opinion as
4  to what extent her coronary arteries were occluded with
5  atherosclerosis prior to her use of Vioxx?
6  A.    Indirectly, yes.
7  Q.    What percentage of occlusion do you believe Miss
8  Levitt had prior to her using Vioxx?
9  A.    Less than 70.
10  Q.    What is your basis for that opinion?
11  A.    Patients typically develop ischemia, become
12  symptomatic at the threshold of 70 percent or greater
13  stenosis in a major artery.
14  Q.    Is there variation with respect to what
15  percentage of occlusion is required before symptoms
16  emerge?
17  A.    Well, there's always variation in medicine, so
18  it could be a little higher or a little lower in a given
19  patient but 70 is a good working number.
20  Q.    Well, in a given patient.  If we're just talking
21  about a particular patient, it could actually be much
22  greater than 70 percent without there being any symptoms
23  at all; correct?
24  A.    Again, are we talking about Miss Levitt or in
25  general?

1  Q.    The question, I think, is clear that it's not in
2  reference to Miss Levitt.
3      You said in a given patient it can vary from 70
4  percent occluded without there being any symptoms;
5  right?
6  A.    It can be a little more or a little less, yes.
7  Q.    And my question to you is, do you agree that in
8  a particular patient it's possible for a person to have
9  severe atherosclerosis, much greater than 70 percent,
10  without experiencing any symptoms?
11  A.    In certain types of patients that's possible,
12  yes.  Usually diabetics and other people with
13  neuropathy.
14  Q.    It's possible even in non-diabetics, isn't it
15  true?
16  A.    It's -- it's possible.  Not likely but possible.
17  Q.    Exhibit 15 is another document that you brought
18  with you here today that's not referenced in your
19  report.
20  A.    Yes, sir.
21  Q.    You've entitled it "Brief explanation of a 5
22  Axis Diagnosis."
23      See that?
24  A.    Yes.
25  Q.    Is this your document?  Did you prepare this?

1  A.    I printed it from a resource.
2  Q.    What is it?
3  A.    It talks about the global assessment of
4  functioning relating to her disability, which was
5  assessed by her psychiatrist or a psychiatrist.  I think
6  I saw it in the notes of -- I can show you -- I think
7  it's Dr. Stevenson, I'm not sure, where he assesses her
8  GAF at 55.  And so just to --
9  Q.    Are you relying on this document that's been
10  marked as Exhibit 15 for purposes of any of your
11  opinions that you're expressing in this case?
12  A.    Well, I just printed it out to check myself
13  because I thought that 50 -- a GAF of 55 was consistent
14  with moderate to severe functional abnormalities in a
15  patient, and so I took a look at it and it confirmed
16  what I thought and so I -- since I took a look at it, I
17  printed it out and read it and I thought I should bring
18  it, pursuant to what I'm supposed to bring you today.
19  Q.    How would you characterize Miss Levitt's current
20  cardiovascular function?
21  A.    From a functional cardiovascular point of view,
22  I believe that she is -- overall functions at about a
23  moderately impaired person, from just cardiac function
24  point of view.  I think her overall impairment is much
25  greater than moderate, but that's just from the cardiac

38  (Pages 146 to 149)

Jay N. Schapira, M.D.

Page 150

1   function point of view.
2   Q.      Have you reviewed the results of cardiovascular
3   testing that has been conducted on Miss Levitt since
4   2000?
5   A.      You mean stress testing, I think you're talking
6   about.
7   Q.      Stress testing, any actual kind of clinical
8   diagnostic testing that has been conducted on Miss
9   Levitt since 2000.  Have you reviewed those records?
10  A.      Yes.
11  Q.      Do you agree that those records indicate that
12  Miss Levitt's cardiovascular function is normal?
13  A.      Some do and some don't.
14  Q.      She has a normal ejection fraction; correct?
15  A.      In some tests she does and in some she doesn't.
16  Q.      In your view, there is an ejection fraction that
17  is abnormal after 2000?
18  A.      Yes.
19  Q.      And which -- which test are you referring to?
20  A.      There is a record in Dr. Crouse's cardiology
21  records that show an ejection fraction of 45 percent
22  with left ventricular hypokinesis of the mid-distal
23  anteroseptal wall and the apical wall.
24  Q.      What is the date of that record?
25  A.      I'd have to find the record.  I don't have the

Page 151

1   date written down.  I know she saw Dr. Crouse later, so
2   we'd have to look at Dr. Crouse's records and find
3   Page 16.
4   Q.      Do you know what her most recent estimated
5   ejection fraction percentage is?
6   A.      Can you give me a date on most recent?
7   Q.      Well, I'm looking right now at November 2007,
8   and I see an overall estimated ejection fraction of 75
9   percent.
10          Does that sound familiar to you?
11  A.      I've seen that study, yes.  I've seen that
12  report, rather, yes.
13  Q.      Do you agree that -- well, let me just ask you,
14  what is --
15  A.      May I just see that?
16  Q.      What is your interpretation of an estimated
17  ejection fracture of 75 percent?
18  A.      Well, I think that's with exercise, as I recall,
19  that she augmented to 75 percent.  That was not the
20  resting ejection fraction.  Your question was really
21  about a resting ejection fraction, not with exercise.
22  Q.      Well, I actually didn't clarify, but that's
23  fine.
24  A.      Should have.
25  Q.      What is your interpretation of the fact that in

Page 152

1   November of 2007, based on a treadmill radioisotope
2   cardiac stress test, Miss Levitt was found to have an
3   ejection fraction of 75 percent?
4   A.      That means that with stress, her ejection
5   fraction goes up.  But they don't put in that report
6   what the resting ejection fraction was, as I recall.
7   Q.      They do put in that point that the patient
8   walked on the treadmill for 7 minutes, 40 seconds and
9   achieved 10.1 METs.
10  A.      Yes.
11  Q.      Do you see that?
12  A.      Yes.
13  Q.      What's your interpretation of that capacity?
14  A.      I think that that is a -- that is a moderately
15  good exercise capacity.  It's not as good as she had
16  before, according to history, but it's moderately good.
17  Q.      Have you identified a record where her METs is
18  actually lower than 10.1 --
19  A.      Yes.
20  Q.      -- in testing?
21  A.      Yes.
22  Q.      When was that?
23  A.      She had some earlier tests where she -- her MET
24  achievement was 7.0, but she had actually angina at a
25  lower MET level.  They just pushed her additionally to

Page 153

1   complete the test beyond her threshold of angina.
2   Q.      How is 10.0 METs for a woman who's 64 years old?
3   A.      It's okay.  It's okay.
4   Q.      It's certainly within normal, healthy range;
5   correct?
6   A.      It shows conditioning and it shows that a person
7   is exercising and it -- it's okay.
8   Q.      It's okay?
9   A.      Yeah.  I mean, it's not spectacular but it's
10  okay.  10.1 METs is, you know, a Class I cardiac
11  functional classification.
12  Q.      What do you mean by Class I classification?
13  What does that mean?
14  A.      According to cardiac function, she's Class I.
15  Q.      What does it mean to be in Class I cardiac
16  function?
17  A.      That's the best class.  It goes from Class I to
18  Class IV on that test.
19  Q.      And she didn't experience any chest pain during
20  that test.
21          Do you recall that?
22  A.      I don't recall that report.
23  Q.      It says, the patient had no chest discomfort
24  during the procedure.
25          How would you interpret that finding?

39 (Pages 150 to 153)

Jay N. Schapira, M.D.

Page 154

1   A.      As no chest discomfort during the procedure.
2   Q.      But I'm asking you, as a cardiologist, how would
3   you interpret it, not just for you to read it back to
4   me.
5   A.      I didn't read it, I repeated it.
6           I would say that that means that she didn't
7   report any angina.
8   Q.      And you don't interpret that --
9   A.      No.  That's good.
10  Q.      -- in any way beyond just --
11  A.      No.  That's a good result.
12  Q.      -- stating the result?
13  A.      That's a good result.
14  Q.      Why is that a good result?
15  A.      Because she didn't have angina.
16  Q.      Why is that meaningful?
17  A.      It's meaningful because it is one of the factors
18  that goes into whether or not she had ischemia.
19  Q.      Why does it matter whether or not she had
20  ischemia?  What does that tell us?
21  A.      Well, it tells us that she -- the parts of her
22  heart that are alive, not the infarcted part but the
23  parts that are alive, are getting adequate perfusion and
24  are not causing angina.
25  Q.      Have you seen anything else in the record other

Page 155

1   than that one note that you identified or the two notes
2   that you identified in 2002 about Miss Levitt having
3   infarcted heart muscle?
4   A.      Yes.  Oh, other than those two notes.
5   Q.      Yeah.  Other than those two notes you identified
6   in 2002 which you believe suggest some infarction, are
7   there any other records that you've seen either during
8   that time or since that time or, frankly, before that
9   time that indicate that Miss Levitt had infarcted heart
10  muscle?
11  A.      There are some tests that talk about breast
12  attenuation.  We talked about this earlier.  And breast
13  attenuation means that there's a resting, non-reversible
14  defect in the anterior wall that they're calling breast
15  attenuation.  That was probably a manifestation of
16  the -- of the infarct at that time but it wasn't
17  interpreted as such so --
18          MR. BOEHM:  Can you just read back my question,
19  please, Madam Court Reporter.
20          (The court reporter read the requested portion
21  of the record.)
22          THE WITNESS:  She had an echo on November 27th,
23  2000, at Mid America with an ejection fraction of 50
24  percent, which is slightly under normal.
25          I believe that's the three studies.

Page 156

1           MR. BOEHM:  Okay.
2   BY MR. BOEHM:
3   Q.      So you're adding the 50 percent ejection
4   fraction --
5   A.      Yes.
6   Q.      -- as evidence of infarcted --
7   A.      Well, it's evidence of --
8   Q.      -- heart muscle?
9   A.      -- of left ventricular dysfunction.  We normally
10  speak of it as 55 and above as being normal.
11  Q.      So if you see a patient in your clinical
12  practice who has 50 percent ejection fraction, your
13  conclusion is that they've suffered a myocardial
14  infarction at some point?
15  A.      No.  It depends on the patient.
16  Q.      So that's not necessarily evidence of a
17  myocardial infarction; correct?
18  A.      It's evidence of some left ventricular
19  dysfunction.  And we know her problem is ischemic heart
20  disease so the conclusion is that it would be secondary
21  to the myocardial infarction.
22          MR. BOEHM:  Okay.  Let's go off the record.
23          VIDEO OPERATOR:  Off the record.
24          The time is approximately 1:24 p.m.
25          (Discussion off the record.)

Page 157

1           VIDEO OPERATOR:  Back on the record.
2           The time is approximately 1:25 p.m.
3   BY MR. BOEHM:
4   Q.      Dr. Schapira, it is now almost 1:30.
5           You indicated to us an hour and a half into
6   today's deposition that you would not be available after
7   1:30 this afternoon; is that correct?
8   A.      Yes.
9   Q.      And does that continue to be the case?
10  A.      Yes.
11  Q.      And if we were to sit here and continue to try
12  to conduct this deposition, you would be absent.  Is
13  that a correct characterization?
14  A.      Yes.
15          MR. BOEHM:  Okay.  So we'll just state for the
16  record --
17          THE WITNESS:  But that would be interesting.
18          MR. BOEHM:  We'll just state for the record once
19  again our objection to the way this has been handled.
20          We would not have come out here for today's
21  deposition if we had known that we were only going to
22  get a partial day of deposition testimony.
23          We had to fly across the country and stay at a
24  hotel here near Dr. Schapira's office in order to do
25  this.  It was not inexpensive to do that.

40  (Pages 154 to 157)

Jay N. Schapira, M.D.

Page 158

1    We are holding this deposition open and we
2 intend to complete it as soon as is practical.  And we
3 again will be asking that plaintiff's counsel compensate
4 us for our travel and for our hotel and we ask that
5 we -- plaintiff's counsel engage immediately in efforts
6 to schedule the completion of this deposition.
7        And that's all I have for right now.  We will be
8 back.
9        THE WITNESS:  That's a big term in California.
10       MR. BOEHM:  Thank you.
11       VIDEO OPERATOR:  Counsel online, ready to
12 conclude?
13       THE WITNESS:  Our Governor said that a few
14 times.
15       VIDEO OPERATOR:  With the approval of counsel,
16 this concludes today's video deposition.
17       Today's deposition consists of two recorded
18 files.
19       The time is approximately 1:26 p.m.
20       We are now off the record.
21       (Whereupon the deposition adjourned at 1:26
22 p.m.)
23            TESTIMONY ADJOURNED
24
25

Page 159

1 STATE OF CALIFORNIA        )
2 COUNTY OF LOS ANGELES      )
3        I, ROSEMARY LOCKLEAR, a Certified Shorthand
4 Reporter of the State of California, duly authorized to
5 administer oaths pursuant to Section 2025 of the
6 California Code of Civil Procedure, do hereby certify
7 that
8        JAY N. SCHAPIRA, M.D., the witness in the
9 foregoing deposition, was by me duly sworn to testify
10 the truth, the whole truth and nothing but the truth in
11 the within-entitled cause; that said testimony of said
12 witness was reported by me, a disinterested person, and
13 was thereafter transcribed under my direction into
14 typewriting and is a true and correct transcription of
15 said proceedings.
16        I further certify that I am not of counsel or
17 attorney for either or any of the parties in the
18 foregoing deposition and caption named, nor in any
19 way interested in the outcome of the cause named in
20 said deposition dated the_____ day of
21 _____, 2016.
22
23
24
25 ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969

Page 160

1            INSTRUCTIONS TO WITNESS
2
3
4        Please read your deposition over carefully and
5 make any necessary corrections.  You should state the
6 reason in the appropriate space on the Errata Sheet for
7 any corrections that are made.
8        After doing so, please sign the Errata Sheet
9 and date it.
10       You are signing same subject to the changes
11 you have noted on the Errata Sheet, which will be
12 attached to your deposition.
13       It is imperative that you return the original
14 Errata Sheet to the deposing attorney within thirty (30)
15 days of receipt of the deposition transcript by you.  If
16 you fail to do so, the deposition transcript may be
17 deemed to be accurate and may be used in court.
18
19
20
21
22
23
24
25

Page 161

1            E R R A T A
2            - - - - - -
3
4 PAGE LINE CHANGE
5 ____ ____ _____
6 REASON:_____
7
8 PAGE LINE CHANGE
9 ____ ____ _____
10 REASON:_____
11
12 PAGE LINE CHANGE
13 ____ ____ _____
14 REASON:_____
15
16 PAGE LINE CHANGE
17 ____ ____ _____
18 REASON:_____
19
20 PAGE LINE CHANGE
21 ____ ____ _____
22 REASON:_____
23
24
25

41 (Pages 158 to 161)

Jay N. Schapira, M.D.

```
                                    Page 162
 1              ACKNOWLEDGEMENT OF DEPONENT
 2
 3
 4        I, _____, do hereby certify
 5   that I have read the foregoing pages, and that the same
 6   is a correct transcription of the answers given by me to
 7   the questions therein propounded, except for the
 8   corrections or changes in form or substance, if any,
 9   noted in the attached Errata Sheet.
10
11
12
13   _____
14   JAY N. SCHAPIRA, M.D.             DATE
15
16   Subscribed and sworn
     to before me this
17   _____ day of _____, 20_____.
18
     My commission expires:_____
19
20   _____
     Notary Public
21
22
23
24
25
```

```
                                    Page 163
 1              LAWYER'S NOTES
 2   PAGE LINE
 3   _____ _____ _____
 4   _____ _____ _____
 5   _____ _____ _____
 6   _____ _____ _____
 7   _____ _____ _____
 8   _____ _____ _____
 9   _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22   _____ _____ _____
23   _____ _____ _____
24   _____ _____ _____
25   _____ _____ _____
```

Jay N. Schapira, M.D.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


- - -


IN RE:  VIOXX PRODUCTS          :   MDL DOCKET NO. 1657
LIABILITY LITIGATION            :   SECTION L
                                :
THIS DOCUMENT RELATES TO:       :
                                :
Jo Levitt v. Merck Sharp &      :   NO.
Dohme Corp.                     :   2:06-cv-09757-EEK-DEK


- - -


VOLUME II
Tuesday, May 24, 2016

- - -


        Continued videotaped deposition of JAY N.

SCHAPIRA, M.D., held at the offices of JAY N. SCHAPIRA,

M.D., Cedars-Sinai Medical Towers, 8635 West Third

Street, Suite 750W, Los Angeles, California, commencing

at approximately 9:06 a.m., before Rosemary Locklear, a

Registered Professional Reporter, Certified Realtime

Reporter and California CSR (#13969).




- - -



GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 Fax
deps@golkow.com

Jay N. Schapira, M.D.

Page 165

```
1    APPEARANCES:
2
3        HUMPHREY FARRINGTON & McCLAIN, P.C.
         BY:  DANIEL A. THOMAS, ESQUIRE
4        DAT@hfmlegal.com
         221 West Lexington, Suite 400
5        Independence, Missouri 64050
         (816) 836-5050
6        Appearing on behalf of the Plaintiff
7
8        WILLIAMS & CONNOLLY, LLP
         BY:  PAUL E. BOEHM, ESQUIRE
9        pboehm@wc.com
         BY:  BENJAMIN W. GRAHAM, ESQUIRE
10       bgraham@wc.com
         725 Twelfth Street, N.W.
11       Washington, DC 20005
         (202) 434-5366
12       Appearing on behalf of the Defendant
13
14   ALSO PRESENT:
15
16       DAVID LOWE, Video Operator
17
18           ---
19
20
21
22
23
24
25
```

Page 167

```
1            EXHIBIT INDEX (Continued)
2    NUMBER                         MARKED
3
4    Schapira-19    11-page article dated 3/17/05    278
                    entitled "Cardiovascular
5                   Events Associated with
                    Rofecoxib in a Colorectal
6                   Adenoma Chemoprevention Trial"
7
8    (Exhibits retained by the court reporter and attached to
     the transcript.)
9
10           ---
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 166

```
1              I N D E X
2
3    WITNESS                        PAGE
4
5    JAY N. SCHAPIRA, M.D.
6
7        By Mr. Boehm              169
8
9            ---
10
11        EXHIBIT INDEX
12   NUMBER                        MARKED
13
14   Schapira-16    Notebook              168
15   Schapira-17    280-page document dated 9/02    252
                    entitled "Detection,
16                  Evaluation, and Treatment of
                    High Blood Cholesterol in
17                  Adults (Adult Treatment Panel
                    III), Final Report"
18
     Schapira-18    9-page article dated 11/5/04    274
19                  entitled "Risk of
                    cardiovascular events and
20                  rofecoxib:  cumulative
                    meta-analysis"
21
22
23
24
25
```

Page 168

```
1        (Exhibit Schapira-16 was marked for
2    identification.)
3        VIDEO OPERATOR:  Good morning.
4    We are on the record.  The time is 9:06 a.m.
5    My name is David Lowe.  I am the legal
6    videographer representing Golkow Technologies.  This is
7    the second session of the videotaped deposition of
8    Jay N. Schapira, M.D.
9        Today is Tuesday, May 24th, 2016.  This
10   deposition is in the matter of Vioxx, that is, Levitt
11   versus Merck.  The case number is 2:06-CV-09757-EEK-DEK.
12       The deposition is taking place today at the
13   Cedars-Sinai medical office of Dr. Schapira.  It's
14   located at 8635 West 3rd Street, West Tower Building,
15   Suite 750, in Los Angeles, California, 99 -- 90048.
16       The deposition is being taken on behalf of the
17   defendants.
18       If I may have introductions of the counsels in
19   the room stating your name and whom you represent.
20       MR. BOEHM:  Paul Boehm, Benjamin Graham from
21   Williams & Connolly on behalf of defendants.
22       MR. THOMAS:  Danny Thomas for plaintiff.
23       VIDEO OPERATOR:  Any other counsels in the room?
24       Okay.  Then we will have Rosemary, our court
25   reporter, administer the oath and swear in the witness.
```

2 (Pages 165 to 168)

Jay N. Schapira, M.D.

Page 169

1      JAY N. SCHAPIRA, M.D., having been duly sworn
2   was examined and testified as follows:
3      VIDEO OPERATOR:  Thank you.  We may proceed.
4           EXAMINATION (Continued)
5   BY MR. BOEHM:
6   Q.   Good morning, Dr. Schapira.
7   A.   Good morning, Mr. Boehm.
8   Q.   It's very nice to see you again.
9   A.   Thank you.  Likewise.
10  Q.   We have marked a binder of medical records as
11  Exhibit 16 for purposes of your deposition.
12      If you'll pull that open and turn to Tab 1.  I'm
13  going to be taking you through some of the documents in
14  this binder and just asking you about your views on
15  certain statements therein.
16      The first document here behind Tab 1 is a
17  March 9th, 2000, hospital admission record from Dr.
18  Hartman.  You can see the admit date there at the bottom
19  right hand of the page.
20  A.   Oh, yes.  Thank you.  Yes.  Thank you very much.
21  Q.   At the bottom of the first paragraph, "History
22  of Present Illness," Dr. Hartman indicates that Ms.
23  Levitt will be admitted with subacute myocardial
24  infarction as her provisional diagnosis.
25      Do you see that?

Page 170

1   A.   Yes, sir.
2   Q.   Do you understand this to be Dr. Hartman's
3   initial impression of the condition that Miss Levitt was
4   experiencing at that time?
5   A.   Yes.
6   Q.   Do you agree that her troponin levels had not
7   yet been tested at this time?
8   A.   That is correct.
9   Q.   And subacute myocardial infarction was not her
10  final diagnosis; correct?
11  A.   Correct.
12  Q.   Now, if you'd turn to the next tab, Tab 2, this
13  is a March 10th, 2000, hospital record from Dr Rosamond.
14  And about three-quarters of the way down do you see the
15  paragraph that begins, you subsequently had her
16  transferred?
17  A.   Yes.
18  Q.   At the bottom of that same paragraph it says,
19  her cardiac enzymes were negative.  Because of the
20  convincing nature of her symptomatology, she was
21  admitted and ruled out for myocardial infarction.
22      Do you see that?
23  A.   Yes.
24  Q.   Do you agree that Miss Levitt was not
25  experiencing acute or subacute myocardial infarction at

Page 171

1   this time?
2   A.   Yes.
3   Q.   In the first paragraph of this same record Dr.
4   Rosamond indicates that Miss Levitt's symptoms were
5   compatible with unstable angina.
6      Do you see that?
7   A.   Yes.
8   Q.   Do you agree with Dr. Rosamond's diagnosis?
9   A.   Yes.
10  Q.   If you'd turn to the next page, I'll direct you
11  to the paragraph that begins, her past medical history
12  includes the following.
13  A.   Yes.
14  Q.   Do you see that?
15  A.   Yes.
16  Q.   Number one says, possible superficial
17  thrombophlebitis in the remote past.  We do not have any
18  documentation, comma, but a true deep vein thrombosis
19  was present.
20      Do you see that?
21  A.   I do see that.
22  Q.   Do you understand this to indicate that Miss
23  Levitt had experienced a deep vein thrombosis in the
24  past?
25  A.   I'm a little puzzled by that.  She had had a --

Page 172

1   I'm a little puzzled by that statement.
2   Q.   Why are you puzzled by it?
3   A.   I know that she'd had a scan of her veins that
4   didn't reveal any clots.  The radiologist had been
5   suspicious of it but he could not document it on the
6   ultrasound of her lower extremities.
7   Q.   Do you recall what time frame you were thinking
8   of when you think about that one instance where she had
9   a scan?
10  A.   I can check the date.  Off the top of my head --
11  Q.   Even if you can just approximate the date, that
12  would be fine.
13  A.   I think -- I wished I could.  I think -- I wish
14  I could tell you before or after this document.  But let
15  me just check and see.
16  Q.   Sure.
17  A.   If you know, just point me to the spot, if you
18  happen to know.
19  Q.   I just -- I'm not sure what time frame you have
20  in mind.
21  A.   Okay.  So on 2/7/2000 -- excuse me.  1/27/2000,
22  January 27th, 2000, which would be -- where's the date
23  on this document?
24  Q.   This is March 10th, 2000.
25  A.   March.  Okay.

3  (Pages 169 to 172)

Jay N. Schapira, M.D.

Page 173

1    So, in other words, two months before.
2  Q.   Uh-huh.
3  A.   So approximately two months before this, there
4  had been a venous Doppler done of the lower extremity
5  and there was no thrombus.  This was done by Dr.
6  Kooperman.
7  Q.   Do you know --
8  A.   With a K, Kooperman.
9       And there was no thrombus found.
10  Q.   Do you know if Ms. Levitt had experienced a deep
11  vein thrombosis at some time prior to January of 2000?
12  A.   Not that I can recall.
13  Q.   In your opinion, is there an association between
14  the incidence of deep vein thrombosis and unstable
15  angina?
16  A.   Indirectly, I think that there is an
17  association.
18  Q.   Do you agree that somebody who has a history of
19  deep vein thrombosis would be more likely to experience
20  unstable angina?
21  A.   I don't think that's what I had in mind, no.
22  Not in a patient like Ms. Levitt, no.
23  Q.   In your opinion, is there an association between
24  the incidence of deep vein thrombosis and myocardial
25  infarction?

Page 174

1  A.   There is.
2  Q.   What is that association?
3  A.   That patients who are hospitalized with
4  myocardial infarction and who are at bedrest for a
5  significant period of time are at increased risk for
6  DVT -- that's deep vein thrombophlebitis -- because of
7  their inactivity and their bedrest.  Typically, we treat
8  for that to try to prevent that.
9  Q.   In your opinion, is there -- is a patient who
10  has experienced a deep vein thrombosis at greater risk
11  of experiencing myocardial infarction than a patient who
12  has never been diagnosed with deep vein thrombosis?
13  A.   There probably is an association loosely but
14  it's not considered to be a risk factor for myocardial
15  infarction.  In other words, it's not that strong a
16  signal.
17  Q.   If you go down to the next paragraph, Dr.
18  Schapira, you see the paragraph that begins, her risk
19  factors for coronary artery disease.
20       Do you see that?
21  A.   Yes.  The next paragraph, yes.
22  Q.   And you agree that Miss Levitt had coronary
23  artery disease before March 2000; correct?
24  A.   Yes.
25  Q.   And you agree that atherosclerosis is a process

Page 175

1  that happens over many years and even decades; correct?
2  A.   Yes.
3  Q.   This paragraph that refers to Miss Levitt's risk
4  factors covers some of the risk factors for coronary
5  artery disease that Miss Levitt had; correct?
6  A.   Yes.
7  Q.   Do you agree that Miss Levitt's coronary artery
8  disease could reasonably be explained by her known risk
9  factors alone?
10       MR. THOMAS:  Misstates the document.
11       Go ahead, Doctor.
12       THE WITNESS:  Can I have the question, please,
13  again or repeat it, please.
14       MR. BOEHM:  If you don't mind, I'll just ask
15  Rosemary to read it back.
16       (The court reporter read the requested portion
17  of the record.)
18       THE WITNESS:  I'm sorry.  I think it won't ring
19  if I turn the power off.
20       Is that right, guys?
21       MR. THOMAS:  For sure.
22       MR. BOEHM:  Is that an iPhone?
23       THE WITNESS:  Let me just turn the power off.
24  This is ridiculous.  I'm sorry.
25       MR. BOEHM:  That's all right.

Page 176

1       THE WITNESS:  I had it fixed yesterday,
2  supposedly.
3       Power off.  That always does it.
4       Thank you.  Sorry.
5       I think you asked me if I recall -- sorry.
6       Just repeat it again, please, Rosemary.
7       (The court reporter read the requested portion
8  of the record.)
9       THE WITNESS:  Yes.
10  BY MR. BOEHM:
11  Q.   Do risk factors for coronary artery disease have
12  a multiplying effect on each other?
13  A.   It depends -- yes and no.  Some do, some don't.
14  It depends on which ones you do it, which ones you're
15  using and what framework you're using.
16       For example, the Framingham method of estimating
17  risk is additive.  It's arithmetic and additive.  But
18  then again, when you talk to -- talk about comparative
19  patients, a group of patients with a certain amount of
20  cardiac risk factors versus another group of patients
21  with the same amount of cardiac risk factors but with a
22  complicating factor like Vioxx, then you run into
23  multiplying, like relative risk, which is a multiplier,
24  not a -- it adds to it, of course, but it's a
25  multiplier.  So the answer is yes and no.

4  (Pages 173 to 176)

Jay N. Schapira, M.D.

Page 177

1    Q.    When you look at the paragraph here that
2    discusses Ms. Levitt's risk factors for coronary artery
3    disease in this particular record, do you see some risk
4    factors here that, in your view, have a multiplying
5    effect on each other?
6    A.    Not according to the framework of what I have in
7    mind, Framingham, no.
8    Q.    What about just setting Framingham aside?
9    A.    Not that I -- not that -- I don't think so, no.
10   Q.    Okay.  Do you treat people in a clinical setting
11   for unstable angina?
12   A.    Yes.
13   Q.    How many people a year would you approximate you
14   treat for unstable angina?
15   A.    I would say probably six a month, so it would be
16   70 to 80 per year.
17   Q.    You agree that people experience unstable angina
18   every day due to the same risk factors that we see that
19   Miss Levitt had as of March 2000; correct?
20   A.    Not quite every day.  She has less risk factors
21   than most of my patients who have unstable angina.  But
22   you can see it.  It's not the rule, though.
23   Q.    For many people, unstable angina is the first
24   indication that that person has existing coronary artery
25   disease; correct?

Page 178

1    A.    Yes.
2    Q.    And for some people, myocardial infarction is
3    the first indication that that person has existing
4    coronary artery disease; correct?
5    A.    Correct.
6    Q.    Can chronic or acute stress contribute to the
7    development of atherosclerosis?
8    A.    Yes.
9    Q.    Can chronic or acute stress trigger a plaque
10   rupture or plaque erosion?
11   A.    Yes.
12   Q.    Can hypertension contribute to the development
13   of atherosclerosis?
14   A.    Yes.
15   Q.    Can hypertension trigger a plaque rupture or
16   plaque erosion?
17   A.    Severe hypertension, yes; moderate, mild,
18   probably not.
19   Q.    If you would, Dr. Schapira, look in the final
20   paragraph on this same page.  This is GortonMMD-00129.
21   The last paragraph in the middle states, we even
22   discussed the technical aspects of the procedure and of
23   bypass surgery.
24        Do you see that?
25   A.    Yes, sir.

Page 179

1    Q.    Do you take this to mean that Dr. Rosamond had a
2    conversation with Mrs. Levitt and her husband about the
3    possibility of performing bypass surgery in March 2000?
4    A.    No.  Well, yes and no.
5         I think the context, sir, is that he's talking
6    about an angiogram and I think he's mindful of an
7    angioplasty stent placement, as he says in the paragraph
8    above, and that what he's doing is discussing bypass
9    surgery as a backup to an angioplasty stent placement in
10   case it's unsuccessful.
11        Surgical backup is necessary in less than 1
12   percent of the cases, where it becomes complicated or
13   there is a complication, but it's necessary to discuss
14   it in case it's needed as an emergency backup procedure.
15   Q.    In your view, would it have been reasonable if
16   Dr. Rosamond or whatever other team of physicians were
17   caring for Mrs. Levitt at this time had determined that
18   bypass surgery would have been appropriate in March of
19   2000?
20   A.    Could I hear the question again, please.
21        (The court reporter read back the requested
22   portion of the record.)
23        THE WITNESS:  At this point in time, that would
24   have been very surprising, yes, to me.
25        Was that the question?  Did I misinterpret your

Page 180

1    question?
2         MR. BOEHM:  Let me just --
3         THE WITNESS:  Say it again, please.
4         MR. BOEHM:  -- back up and try it again.
5         THE WITNESS:  Okay.
6    BY MR. BOEHM:
7    Q.    In your view, would it have been reasonable for
8    Mrs. Levitt's physicians in March of 2000 to have
9    determined that bypass surgery was the appropriate
10   course?
11   A.    I think it would have been unusual.  Is that the
12   question, unusual?
13   Q.    I think I used the word "reasonable."
14   A.    Reasonable?
15   Q.    Yeah.
16        Would it have been reasonable, in your view?
17   A.    I don't think so.  Not -- not -- certainly, not
18   before March the 9th, you know, or March the 10th, when
19   she had her angiogram, but I think it would not have
20   been a reasonable choice, based upon even her angiogram.
21        I think that clearly she was a good candidate
22   for angioplasty, should have had a very good response
23   and result from the angioplasty and should have not have
24   needed bypass surgery.
25   Q.    Why do you think that it would have been

5 (Pages 177 to 180)

Jay N. Schapira, M.D.

Page 181

1  unreasonable in March, on March 10th, 2000, if the
2  doctors had determined that bypass surgery was an
3  appropriate course?
4  A.   Was an appropriate course.  Okay.
5       In the year 2000, angioplasty was already a
6  method that could easily take care of her anatomy, with
7  regard to her left anterior descending coronary artery
8  and her diagonal coronary artery, and I would have
9  expected her to have a very high, high probability of a
10  permanent success from the angioplasty that Dr. Tadros
11  did for her.
12      I mean, notwithstanding the thrombus that was
13  there, but I would have expected a very good result and
14  not have expected to have seen an early recurrence of
15  lesion.
16  Q.   You referenced the angioplasty that was
17  performed on March 10th, 2000, and when we spoke last,
18  you indicated that you had had an opportunity to review
19  the films from that angiogram; is that correct?
20  A.   Yes, sir.
21  Q.   And you indicated to us that you believe that
22  you saw some haziness in one of the images that you took
23  for a thrombus; is that correct?
24  A.   Yes, sir.
25  Q.   In what image do you believe you saw that

Page 182

1  haziness that you take for a thrombus?
2  A.   It was present in multiple views.  It was
3  present -- I can't -- I don't have the film right in
4  front of me at the moment, but it was present in
5  multiple views.
6       And he also noticed -- just confirming my
7  observation is Dr. Tadros, who did the procedure, who
8  used ReoPro to -- which is a clot dissolver.  Its name
9  is abciximab.
10      And what it does is, we don't use it in patients
11  like the presentation in Miss Levitt on March the 10th
12  unless we see thrombus.
13      It does add some risk to the procedure, and
14  that's why we don't routinely use it, but he did use it
15  because -- to dissolve the thrombus, which was
16  appropriate.
17  Q.   Do you have the DVD or CD that has those images
18  here in your office?
19  A.   Probably do somewhere over there, yes.
20  Q.   I can't make it run.  I don't have the expertise
21  to get it up and running.  But would you mind at a break
22  just pulling it open -- we'll have some breaks during
23  the course of today -- and seeing if you can kind of
24  just tell us at what time and on what -- in which of the
25  views you see the haziness?

Page 183

1  A.   Yes, sir.  I'd be happy to.
2  Q.   That would be great.  Thank you.
3       Do you consider yourself to be an interventional
4  cardiologist?
5  A.   Up until two years ago, yes.
6  Q.   Due to the injury that we've discussed, you no
7  longer perform interventional cardiology work?
8  A.   As for now, that is true.  I'm doing my best to
9  come back, and I just hope I succeed.
10  Q.   How would you describe your, just in general
11  terms, I'm not looking for all the details, but how
12  would you describe the difference in your cardiovascular
13  practice in the last two years since you've been not
14  been able to do interventional type work?
15  A.   Well, I would describe it as I don't go to the
16  lab anymore and scrub and actually do the procedures but
17  I review the films on all my patients, I discuss it with
18  the doctors who do the procedures, I participate in all
19  the decisions with regard to what the patients are going
20  to have, what kind of treatment, whether surgery or
21  angioplasty, I discuss what technique they're going to
22  use down to the nitty-gritty of which stent, where, how
23  many, how long, and so all the technical.
24       So all the cognitive parts of interventional
25  cardiology I'm doing, I'm just not doing the technical

Page 184

1  parts.
2  Q.   Of the --
3  A.   Hands-on part.  Sorry.
4  Q.   Up until two years ago, you were doing the
5  hands-on interventional cardiology; is that correct?
6  A.   I was doing it all.  Yes.
7  Q.   Have you ever performed bypass surgery?
8  A.   No, sir.
9  Q.   Have you ever placed a stent?
10  A.   Yes.  That's part of angioplasty.
11  Q.   Is that something that you would do routinely --
12  A.   Yes.
13  Q.   -- up until two years ago?
14  A.   Yes, sir.
15  Q.   Okay.  Are you qualified to perform
16  catheterization procedures?
17  A.   Yes.
18  Q.   And you can do that without supervision of some
19  other physician; is that correct?
20  A.   Right.  Since 1978.
21  Q.   Do you perform angiograms?
22  A.   Yes.
23  Q.   Do you continue to do that?
24  A.   No.  That's a hands-on procedure that I'm not
25  hands on.  I'm brain on but not hands on.

6  (Pages 181 to 184)

Jay N. Schapira, M.D.

Page 185

1    Q.    Got it.
2          Basically, you don't do any invasive cardiology
3    as of the last couple of years.
4    A.    Well, if I could figure out how to do it one
5    handed, I would.  And I'm working on that one.
6          But as of right now, I'm still on the -- I'm not
7    off the team, I'm just on the bench is the way I put it.
8          And so I'm still in the cognitive part, I'm in
9    the team meetings, and -- but I'm not doing it because
10   of my hand.  And, hopefully, it will reverse.  But I'm
11   still involved in all the cognitive portions, making the
12   decisions with regard to the technique, who should go to
13   surgery, who shouldn't go to surgery, and things like
14   that.
15   Q.    Are you Boarded in cardiovascular disease?
16   A.    I am.
17   Q.    Are you Boarded in nuclear imaging?
18   A.    No.
19   Q.    Are you Boarded in comprehensive
20   echocardiography?
21   A.    No.
22   Q.    Have you ever been Boarded in nuclear imaging or
23   comprehensive echocardiography?
24   A.    No.
25   Q.    Have you ever sat for those Boards?

Page 186

1    A.    No.
2    Q.    If you would, Dr. Schapira, turn to the fourth
3    tab in the binder.
4          This is a report of the angioplasty and stent
5    placement performed by Dr. Rosamond on March 10th, 2000,
6    as I'm sure you'll recognize.
7          How would you characterize the degree of
8    complexity involved in Ms. Levitt's stent placement?
9    A.    Okay.  Just by way of insignificant correction,
10   it was actually performed by Dr. Tadros.
11   Q.    Oh, I'm sorry.  Did I say by Dr. Rosamond?
12   A.    That's okay.  It's --
13   Q.    I appreciate that.
14         Dr. Rosamond, I take it, was the attending
15   physician but not the one who performed this procedure.
16   A.    That's correct.
17         Now to your question.
18   Q.    Yes.  Thank you.
19         Did you get my question?
20   A.    Yes, sir.  You wanted to know about the
21   complexity, I think.
22   Q.    Yeah.  I asked, how would you characterize the
23   degree of complexity involved in Miss Levitt's stent
24   placement?
25   A.    Okay.  The answer to your question is slightly

Page 187

1    above-average complexity.
2    Q.    Uh-huh.  And why do you say it's slightly above
3    average?
4    A.    They had to do a kissing balloon technique, with
5    a good result, but that's a little bit above just
6    straight balloon, then stent delivery, and then done.
7    So there's a little bit of extra steps here.
8    Q.    Do you agree that the degree of -- the greater
9    the degree of complexity in the placement of a stent,
10   the greater the risk of re-stenosis?
11   A.    I could not agree with that in general, no.
12   Q.    Do you agree with that in some less general way?
13   A.    No.
14   Q.    You just don't agree with that statement at all?
15   A.    No.  I think it's just too broad to agree with
16   it.
17   Q.    Would you turn to Tab 7, which is a March 23rd,
18   2000, office visit with Dr. Rosamond.
19         And about three-quarters of the way down the
20   page there's a reference, Dr. Schapira, to an EKG --
21   A.    Can you point to --
22   Q.    -- that has been performed.  Yeah.
23   A.    12.
24   Q.    12-lead EKG.
25         Do you see that?

Page 188

1    A.    Yes, sir.
2    Q.    It says, 12-lead EKG shows normal sinus rhythm
3    and the previously inverted T-waves at the time of her
4    presentation had resolved.
5          And do you understand the time for presentation
6    to refer to the March 9th/March 10th presentation?
7    A.    Yes, sir.
8    Q.    She has slightly delayed R-wave progression but
9    no evidence of previous infarction.
10         Do you see that?
11   A.    Yes.
12   Q.    Do you agree with Dr. Rosamond's assessment as
13   of March 23rd, 2000, that there was not evidence that
14   Miss Levitt had experienced an infarction?
15   A.    I think it's a -- well, yes and no.  I know
16   that's not a definitive answer.
17         There are elements there that you could say
18   possible or even probable infarction, then you could
19   say -- and I think that Dr. Rosamond is hedging.
20   Instead of just saying it's normal, he's saying delayed
21   R-wave progression, which indicates an anterior
22   infarction.  So he's hedging a little bit.
23         So I think you would have to say it's
24   indeterminate.  I think the loss of R-wave, though, is a
25   clue that there may have been some damage, but he can't

7 (Pages 185 to 188)

Jay N. Schapira, M.D.

Page 189

1  tell for sure.
2  Q.    Do you believe as of March 23rd, 2000, that it
3  was probable that Miss Levitt had experienced myocardial
4  infarction?
5  A.    Not that we could for sure document, no.
6  Q.    If you'd turn to the next page of the same
7  record, I'm going to direct you to the paragraph that
8  begins, in summary.
9       Do you see that one?
10  A.    Yes.
11  Q.    The second sentence reads, she has some mid-back
12  pain that I suspect is musculoskeletal in character.
13  Indeed, she has had chronic low back discomforts as
14  well, and I wonder if that might be simply part of the
15  same process.  It does not appear to be anginal or
16  cardiac in nature at this time.
17       Do you see that?
18  A.    Yes.
19  Q.    And do you agree with Dr. Rosamond's assessment
20  here?
21  A.    Yes.
22  Q.    Would you turn to the next tab.  It's Tab 8.
23       And this is a report from the exercise echo
24  performed on March 23rd, 2000.
25       Now, you've seen this record before; right,

Page 190

1  Dr. Schapira?
2  A.    Yes, sir.
3  Q.    Do you agree that there is no evidence from this
4  exercise echo of March 23rd, 2000, to suggest that Miss
5  Levitt had experienced myocardial infarction as of this
6  date?
7  A.    Was there a second page to this report or is
8  this the --
9  Q.    No.  This is a one-page report.
10  A.    Okay.  Fair enough.
11       And the date of this was?
12  Q.    March 23rd, 2000.
13  A.    March 23rd.
14       And your question was, do I see any evidence for
15  an infarct?
16  Q.    Yeah.  Do you agree that there's no evidence
17  from this exercise echo of March 23rd, 2000, to suggest
18  that Miss Levitt had experienced myocardial infarction
19  as of this date?
20  A.    Yes.
21  Q.    These are findings you would expect to find in
22  someone with normal cardiac function.
23       Is that something you agree with?
24  A.    Yes.
25  Q.    Do you note -- strike that.

Page 191

1       Under resting 2-D echo, do you see that Miss
2  Levitt's left ventricular ejection fraction was
3  estimated to be 55 to 60 percent?
4  A.    Yes.
5  Q.    With what degree of precision do you believe an
6  exercise echo can estimate an individual's left
7  ventricular ejection fraction?
8  A.    Well, you're asking about the resting.  See, you
9  said exercise.  So you just want to address the --
10  Q.    Oh, good point.  Good point.  Yeah.
11  A.    Okay.
12  Q.    Let me just -- do you want me to try to just
13  re-ask that?
14  A.    Okay.
15  Q.    Yeah.  What is your view as to the degree of
16  precision with which an echo can estimate resting left
17  ventricular ejection fraction in an individual?
18  A.    Depends on the method.  I think it's precise,
19  within limits, and I think that there is some estimation
20  by some methods and more precision by other methods.
21       It depends on how it was done, whether it was
22  calculated using an algorithm for calculating volumes or
23  whether it's just eyeballed.  So I don't think it tells
24  us how it was done.  But I think it's a fairly good way
25  to estimate ejection fraction.

Page 192

1  Q.    What is your understanding of what a normal
2  ejection fraction range would be when using
3  echocardiography?
4  A.    55 to 75 percent.
5  Q.    What source are you looking to for your opinion
6  about what the normal range would be?
7  A.    Well, background, training, experience,
8  education, and I believe those are the general numbers
9  that are given in the textbooks.
10       I mean, there are people who would tell you that
11  they consider 50 percent.  I think they're probably in
12  the minority.  But usually we don't haggle over 5
13  percent one way or another.
14  Q.    Is there a particular textbook that you consider
15  to be kind of the seminal textbook that cardiologists
16  look to for answers to questions such as this?
17  A.    You know, we don't use textbooks that much
18  anymore.  I mean, there's a number of textbooks that
19  I've referred to.  But I don't think there's a single
20  seminal book but there's a number of them.
21  Q.    Are there one or two that you consider to be
22  kind of the most widely respected?
23  A.    Well, if you have a question, you go to a book,
24  sometimes you get it and sometimes you don't.  But where
25  I would look if I had a question, hoping but not

8  (Pages 189 to 192)

Jay N. Schapira, M.D.

<table>
<tr><td>

Page 193

1   necessarily guaranteed to get an answer, would be I
2   would look in Braunwald, B-R-A-U-N-W-A-L-D; I would look
3   in Hurst, H-U-R-S-T; I would look at then just a lot of
4   articles and guidelines and things like that.
5           But none of them are really authoritative in the
6   sense that they may be dated, which means old, or --
7   because textbooks don't come out all the time or they
8   may have not answered the question sometimes or answer
9   it in kind of an obscure way so as not to give you the
10  answer you want.
11          So it's a good place to look, though, and see if
12  you can get an answer.
13  Q.   Do you see under post-exercise echo toward the
14  bottom of this page it says, ejection fraction increases
15  with exercise?
16  A.   Yes.
17  Q.   What does that tell us?
18  A.   It tells us that the muscle became stronger with
19  exercise, that the muscle increased its contractility
20  with exercise, and that is considered to be a normal
21  response to exercise.
22  Q.   If one had experienced myocardial infarction,
23  would one expect to see ejection fraction increase with
24  exercise?
25  A.   You still could.  It depends upon the size and

</td><td>

Page 195

1   angioplasty, where the vessel is still open.
2   Q.   Okay.  Would you turn to Tab 10.  And you see
3   this is a report from an April 24th, 2000, nuclear
4   stress test performed by Dr. Vacek.
5           And, by the way, Dr. Schapira, would a normal
6   left ventricular ejection fracture be different when
7   measured by nuclear scanning technology, as compared to
8   echocardiography, or would you consider a normal range
9   to be the same regardless of which technique is being
10  used to estimate?
11  A.   There's going to be a difference.
12  Q.   And how is it different for nuclear imaging
13  relative to echocardiography?
14  A.   It's not a standard, constant relationship.  It
15  can be above, it can be below.
16  Q.   What would you consider to be a normal range of
17  left ventricular ejection fraction when using nuclear
18  stress test?
19  A.   Plus/minus 10 to 15 percent.
20  Q.   Relative to the 55 to 75?
21  A.   Yes.
22  Q.   I'm just going to do the math to make sure I
23  have this right.
24          So I believe you said that for echocardiography
25  a normal range would be, in your view, 55 to 75,

</td></tr>
<tr><td>

Page 194

1   type of infarct.  Sometimes if you have a non-transmural
2   infarct, you can, or a small infarct, you can.  If you
3   have a humongous infarct, you may not see that.  So it
4   depends.
5   Q.   Is a non-transmural infarct, as you understand
6   it, by definition, a small infarction?
7   A.   Sometimes yes, sometimes no.  It can be an
8   extensive non-transmural or a small non-transmural.
9   They come in different sizes.
10  Q.   Would you expect if there were a substantial
11  non-transmural infarction to see left ventricular
12  ejection fraction increase with exercise?
13  A.   Depending on the size, you may or may not.
14  Q.   And my question was if it -- assuming it's a
15  substantial one.
16  A.   Well, it depends upon the magnitude of
17  substantial.  I mean, a really big one, no, you would
18  not see an increase, but a moderate or small one you
19  probably would see an increase.
20  Q.   So your opinion is that if there were a
21  moderately sized non-transmural infarction, you would
22  likely see left ventricular ejection fraction increase
23  with exercise.
24          Did I understand that right?
25  A.   Yes, sir.  Especially after a successful

</td><td>

Page 196

1   approximately; correct?
2   A.   Yes.
3   Q.   And for nuclear scanning, plus or minus 10 to 15
4   on either end of that range?
5   A.   Yes.
6   Q.   Okay.
7   A.   Or you can look at it in the reverse fashion
8   that echo could be off the nuclear by 10 to 15.  You
9   can -- one is off the other or A is off of B or B is off
10  of A.
11  Q.   If you saw an ejection fraction of 40 percent
12  estimated using nuclear scanning, would you consider
13  that to be a normal ejection fraction?
14  A.   No.
15  Q.   Okay.  That's why I'm trying to understand the
16  relationship between the 55 percent and then the plus or
17  minus 10 to 15 percent.
18          Can you explain that a little pit more?
19  A.   Sure.  They look at the heart in different ways.
20  A nuclear test looks at more of a three-dimensional
21  model but it's subject to the error of something called
22  gating, G-A-T-I-N-G.
23          Echo looks at a two-dimensional slice, so it may
24  include all normal segments, which the heart looks
25  great, or includes all abnormal segments, in which case

</td></tr>
</table>

9 (Pages 193 to 196)

Jay N. Schapira, M.D.

Page 197

1    the heart can look terrible, or that slice can be some
2    normal and some abnormal or any variation in between.
3        So that's why you can have some variability on
4    both ends. Oftentimes, we'll find differences that we
5    have to try to reconcile with a third test, such as an
6    angiogram or some other method, to discern.
7    Q.    Okay. When using nuclear stress testing, what
8    would you consider to be a normal range for a left
9    ventricular ejection fraction?
10   A.    Well, 55 to 75. That's what's normal for the
11   heart, and it's just a matter of how well can these
12   tests estimate that.
13   Q.    Do you have a view as to whether or not
14   echocardiography or nuclear scanning is better at
15   estimating left ventricular ejection fraction?
16   A.    I think they're both good and I think if you
17   plot them versus angiogram, I think they're both
18   reasonably accurate.
19       I think studies have shown it both ways. One
20   study would show nuclear better, one study would show
21   echo better. Depends on how well it's done in the lab,
22   which patient. It's hard to make a blanket statement
23   which one is better.
24   Q.    Nuclear stress testing, such as the one
25   performed here on April 24th, 2000, involves perfusion

Page 198

1    analysis; correct?
2    A.    Yes.
3    Q.    Why is perfusion analysis helpful?
4    A.    It indicates the amount of blood flow reaching
5    the myocardium.
6    Q.    Why is that helpful, for those of us who are not
7    cardiologists?
8    A.    Sure. It tells you whether or not the vessels
9    to that segment of myocardium are open, whether or not
10   there's blood flow, are the vessels compromised or are
11   they not open.
12   Q.    Can perfusion analysis inform cardiologists as
13   to whether or not an individual has experienced
14   infarction to the myocardium?
15   A.    Yes.
16   Q.    And how does it do that? What's the
17   relationship between perfusion analysis and assessments
18   of infarction?
19   A.    You will see what's called a fixed defect when
20   there's an infarction and you will see this fixed
21   defect, which is probably the most sensitive way we have
22   of detecting an infarct.
23       In other words, if someone has had an infarct
24   and it's not huge, you may not see it on echo but you
25   can detect that scar on a nuclear study, but it won't be

Page 199

1    a reversible defect because the artery may well be open
2    but the dead tissue, the scar, the infarcted tissue,
3    will not take up the radionuclide tracer in the first
4    place and then, of course, when you image later at rest,
5    there will be no reversibility. It will be what we call
6    a fixed defect.
7    Q.    Meaning you still see the defect at rest?
8    A.    You see it at rest and with stress, yes.
9    Q.    And if there's been infarction, you wouldn't
10   expect that to get better; is that right?
11       I mean, could somebody have infarction and then
12   five years later the heart regenerates itself and
13   there's no more infarction? Is that possible?
14   A.    You typically don't see that. You typically
15   will see a scar persist.
16   Q.    Okay. If you go down to the Findings here for
17   this April 24th report, you see under "Exercise
18   Electrocardiogram" the doctor reported that Miss Levitt
19   experienced no chest pain and there was no diagnostic
20   ischemic EKG changes seen.
21       Do you see that?
22   A.    Yes.
23   Q.    What is your interpretation of that?
24   A.    That, well, no chest pain is no chest pain and
25   the EKG did not show changes associated with ischemia.

Page 200

1    Q.    What does it mean that the EKG showed no
2    ischemic changes?
3    A.    The EKG, which is a relatively insensitive
4    indicator of ischemia, didn't show any. I mean, it just
5    didn't show any ischemia. But that's the problem with
6    EKG is that it frequently does not.
7    Q.    Under "Scintigraphic planer and tomographic" --
8    A.    Yes.
9    Q.    -- you see the last sentence says, there does
10   appear to be evidence of breast tissue attenuation
11   overlying the anterior wall.
12       Do you see that?
13   A.    Yes.
14   Q.    What is your interpretation of this finding?
15   A.    My interpretation of that finding is that that
16   is probably not correct.
17   Q.    What do you mean?
18   A.    That is the following: They're seen over the
19   anterior wall. And to take this case in clinical
20   context, she came in on March the 9th with chest pain
21   and T-wave changes in anterior leads, indicating the
22   anterior part of the heart.
23       She then lost in that subsequent EKG you and I
24   read about in that letter from Dr. Rosamond, loss of
25   R-wave in V-2, which indicates infarct in the anterior

10  (Pages 197 to 200)

Jay N. Schapira, M.D.

Page 201

1  lead.
2      We then go on to now look at this, which is the
3  most sensitive way to find an infarct or a scar on the
4  heart, and there is a non-reversible defect, which means
5  scar; however, the alternative explanation is put in
6  that it's breast tissue attenuation. And that breast
7  tissue attenuation means that the breasts are large
8  enough to create a defect in the anterior wall.
9  However, that, I feel, is unlikely, given that this is
10 the type of scan that is done with computed tomography.
11 It's not a planar, P-L-A-N-A-R, but it's done with
12 computed tomography. And that normally takes out breast
13 attenuation. And I don't believe she's big-enough
14 busted to even call into focus breast attenuation as an
15 alternative explanation here.
16     So given that it does correlate with prior
17 findings, and we also know at this time that she had her
18 pathology in the left anterior descending and diagonal,
19 which is this very area of the anterior wall, that this
20 like -- more likely than not, represents an extra scar
21 on the heart from a prior infarct, as opposed to breast
22 attenuation.
23 Q.   Thank you.
24     Can you just explain what breast tissue
25 attenuation is as an artifact? What does that mean?

Page 202

1  A.   Okay. So you're imaging from the outside of the
2  body and from the outside of the body you are looking at
3  the heart through a camera doing multiple views. And in
4  some of the views, the breast tissue might be in the way
5  and in other views the breast tissue will not be in the
6  way because of the way you're looking. So that's why
7  it's done in multiple views.
8      We see breast tissue attenuation, frankly, in
9  women who are large-busted, like D cups and bigger, and
10 that can create what looks like a shadow, if you will,
11 you can call it a shadow, it's not a shadow, but it will
12 create a defect there and then you can say, well, maybe
13 that's breast tissue attenuation.
14     Due to the fact that that used to be a problem
15 with the old types of scans, planar, now we do the SPECT
16 scans, and the SPECT scans are the tomography, which
17 take that issue away, and the -- these scans with SPECT
18 eliminate that almost entirely and allow the doctor then
19 to try to then look at the clinical context and an
20 assessment clinically of whether or not that's breast
21 attenuation or not. And also, of course, with an
22 understanding of the lady's bust size.
23 Q.   Do I understand you correctly to be saying that,
24 in your view, SPECT imaging has eliminated breast tissue
25 attenuation as an artifact, basically, altogether?

Page 203

1  A.   I think it's --
2  Q.   I think you said almost entirely. I can
3  withdraw that and start over.
4      To what degree do you believe SPECT imaging has
5  eliminated the possibility of confusing breast tissue
6  attenuation for an actual injury to the myocardium?
7  A.   By utilizing multiple views.
8  Q.   And to what extent do you believe SPECT imaging
9  is still vulnerable to this artifact?
10 A.   I think there are some women who are so
11 large-busted that it's going to obscure the view from
12 each and every perspective.
13 Q.   Do you agree that breast attenuation artifacts
14 in women are sometimes difficult to distinguish from
15 perfusion abnormalities?
16 A.   I don't -- I think that by the year 2000, that
17 they were not, that they were not.
18 Q.   Are you relying on medical literature for that
19 opinion?
20 A.   I think that there is medical literature to that
21 effect. I'm relying just on experience.
22 Q.   Is there any particular article or any
23 particular textbook that you are relying on for purposes
24 of your opinion that by the year 2000, SPECT imaging and
25 the technology had largely eliminated the risk of

Page 204

1  confusing breast attenuation artifacts with perfusion
2  abnormalities?
3  A.   Not that comes to mind at the moment. I know
4  that in our laboratory we ask ladies their cup size,
5  their true cup size, before we do their studies so that
6  we'll know that if they're extraordinarily large-busted,
7  that that could be an issue.
8  Q.   Is it your opinion that the risk of confusing
9  breast attenuation artifact with perfusion abnormalities
10 is only existent in women with large breasts?
11 A.   Yes. In the days of SPECT imaging, yes.
12 Q.   Do you agree that in women attenuation artifacts
13 are caused by overlying breast tissue and are localized
14 in the anterior wall and the septum?
15 A.   No.
16 Q.   Okay.
17 A.   In my experience, it's anterior wall and apex.
18 Especially apex.
19 Q.   How does one go about distinguishing between
20 breast attenuation artifacts and actual perfusion
21 abnormalities due to infarction?
22 A.   Okay. So two principles: The first principle
23 is that the lady's breast is a constant. It's going to
24 be present on the stress images and it's going to be
25 present on the resting images. So that's a constant.

Jay N. Schapira, M.D.

Page 205

1      The variable is perfusion versus rest imaging.
2  And let's say that the breast artifact filters out some
3  of the signal.  That's what really happens is it filters
4  because you have most of soft tissue to image through.
5      So let's say that a lady has a normal heart,
6  absolutely normal heart, and large bust.  You're going
7  to see full perfusion in the rest and in the stress.
8  Okay?  So even though it may be a little bit decreased
9  overall, still, it will be the same in each.
10      Now, let's say that a lady has a reversible
11  defect.  There's still going to be the same amount of
12  breast artifact but you're still going to see, while
13  it's going to be less of a signal, you're going to see
14  still a difference between rest and stress.
15      So when you see the --
16  Q.    In terms of the perfusion?
17  A.    In terms of -- you're going to see a little
18  difference, yes, because the breast is the same.  It
19  won't be as much as it would be with small breasts or in
20  a man but it -- there will still be a difference.
21      But when you see no change between the two,
22  none, between one and the other, that indicates that
23  it's probably an infarct, especially if it correlates in
24  the clinical context.
25  Q.    Have the techniques and technologies for

Page 206

1  distinguishing between breast tissue attenuation and
2  actual perfusion abnormalities due to infarction
3  improved since the year 2000?
4  A.    They've improved with the advent of SPECT
5  imaging, which happened before 2000.  SPECT is
6  S-P-E-C-T.
7  Q.    In your view, have the techniques and
8  technologies for distinguishing between breast tissue
9  attenuation and perfusion abnormalities due to
10  infarction improved since the year 2000?
11  A.    Not in my experience.  It's about the same.
12  Q.    Okay.  Now, going back to the note here in this
13  record, do I understand it correctly that it is your
14  opinion that what is being described here as breast
15  tissue attenuation is actually the non-transmural injury
16  in the anteroseptal wall that was detected in October
17  2002?
18  A.    Yes.  You mean in the subsequent nuclear scan.
19  Q.    Yeah, we're going to get to that.
20  A.    Yes.
21  Q.    But you recall --
22  A.    Yes.
23  Q.    -- in October 2002 there's a note about
24  non-transmural injury in the anteroseptal wall?
25  A.    Yes.

Page 207

1  Q.    And so your opinion is that that was being
2  appreciated in October 2002 but that same injury is
3  actually being seen but being confused for a breast
4  tissue attenuation in April 2000?
5  A.    Well, no.  I think that this does represent an
6  infarct.  I think that if we look at the scan in 2002, I
7  think it's even more extensive than this.  And given
8  that there was, you know, more than one event affecting
9  this anterior wall, I think it was probably present at
10  this point in time and it's probably -- and it's just an
11  extension of it and more extensive in the subsequent
12  2002 scan.
13  Q.    Explain to me what you mean that it's more
14  extensive in 2002.
15  A.    Okay.
16  Q.    Do you believe that she had another infarction?
17  A.    I think there's an extension probably at the
18  time of surgery.
19  Q.    Okay.  So you believe that she had had an
20  infarction as of at least this date, April 24th, 2000,
21  and then at the time of her re-stenosis and bypass
22  surgery that injury was extended?
23  A.    I think it was extended.
24      I think that those scans are a little bit more
25  extensive in what they're describing and they properly

Page 208

1  identify it as being now not breast attenuation but now
2  injury.
3  Q.    And do you believe -- when you talk about an
4  extension in May of 2000, do you believe there was
5  additional infarction that occurred at that time?
6  A.    Yes.
7  Q.    When do you believe the infarction occurred that
8  is being detected in April of 2000, April 24th, 2000,
9  and mistaken for breast tissue attenuation?
10  A.    I believe it happened sometime in the week prior
11  to her coming in.  She had chest pain beginning on about
12  March 2nd, she finally came in the hospital I think
13  around March 9th, and she had chest pain all week.  And
14  I think that that's when she had the infarct, prior to
15  coming in.  She came in with the EKG changes and the
16  anatomy as we know it.
17  Q.    What is your understanding as to the length of
18  time that troponin levels stay elevated after an
19  individual experiences an acute myocardial infarction?
20  A.    It's around -- it's around 6 to 10 days.  Some
21  people will say 6 to 14, some people say 7 to 14.  It's
22  variable.  It depends upon the magnitude of the infarct.
23      If this were a big infarct with huge troponin
24  spike, then it would be longer.  Because I think this
25  was a relatively small infarct with a smaller troponin

12  (Pages 205 to 208)

Jay N. Schapira, M.D.

Page 209

```
1   spike, shorter.
2   Q.    Is there any particular textbook or medical
3   article that you're referring -- that you're relying on
4   for your opinion about the length of time that troponin
5   levels stay elevated after the onset of acute myocardial
6   infarction?
7   A.    There are.  I'd have to find that for you.
8   Q.    Nothing that comes to mind right now?
9   A.    Well, let me see.  Let me write down something
10  here.  Okay.
11        We could look in same references I mentioned
12  before, we could look in guidelines.
13  Q.    If you'll turn to the next page of this same
14  April 24th, 2000, report.
15  A.    We're still on Tab 10?
16  Q.    Yeah, still Tab 10.
17        At the top of that page there's a section
18  referred to as "Regional Wall Thickening Post Stress."
19  A.    Yes.
20  Q.    Do you see that?
21  A.    Yes.
22  Q.    And it indicates there that there appears to be
23  normal uptake and thickening of all segments.
24        Do you see that?
25  A.    Yes.
```

Page 210

```
1   Q.    When this refers to segments, that is referring
2   to all segments of the heart, apex, mid-ventricle, base,
3   vertical lung axis; correct?
4   A.    It's talking about segments, yes, all the
5   segments.
6   Q.    What is your interpretation of this finding that
7   there was normal uptake and thickening of all segments
8   of the heart in April 2000?
9   A.    It says that there was no transmural injury that
10  they could identify absent -- of course, except for the
11  breast artifact, that they called it.
12  Q.    In what part of the heart do you believe Miss
13  Levitt experienced infarction that's being detected, in
14  your opinion, on April 24th, 2000?
15  A.    Anterior wall.
16  Q.    Can you be more, any more specific than anterior
17  wall?
18  A.    I can just tell you what's in the report.  I
19  haven't seen the images.
20        Are the images available?  I haven't seen them.
21  Q.    What type of heart attack do you believe Ms.
22  Levitt experienced that's being detected in April 2000?
23  A.    I believe a non-transmural infarct.
24  Q.    Can you characterize it with any more detail
25  than that?
```

Page 211

```
1   A.    As far as small, medium, or large?  I would say
2   small.
3   Q.    In a person who has experienced infarction would
4   you typically expect to see normal uptake and thickening
5   of all segments of the heart?
6   A.    If it's transmural, no.  If it's non-transmural,
7   you may well, yes.
8   Q.    In a person who has experienced a non-transmural
9   infarction would you typically expect to see normal
10  uptake and thickening of all segments of the heart?
11  A.    Okay.  I heard two questions so let me break it
12  down.  So you asked about thickening and uptake so let's
13  just do one at a time.  Okay.
14        So the question was, in a non-transmural infarct
15  would you expect to see thickening in all segments of
16  the heart.
17  Q.    Normal thickening.
18  A.    Normal thickening.  Yes.  You may or may not.
19  It's not surprising if you do or if you don't.
20  Q.    What would you typically expect to see?
21  A.    I don't know.  There's no typical.  I think it
22  depends upon the magnitude.  If it's very small, you
23  will see normal thickening; if it's almost transmural,
24  you won't.  It depends upon the magnitude.
25  Q.    And then you wanted to break this question down
```

Page 212

```
1   as between normal thickening and normal uptake.
2   A.    Yes.  And the uptake is not normal here.  They
3   just call it a breast attenuation, and I don't think
4   she's that large-busted to lead to that type of thing.
5   Q.    So you just disagree with the conclusions of the
6   doctor here who indicated that the uptake was normal.
7   Is that fair?
8   A.    Well, show me what, exactly what you're reading.
9   Q.    It's Number 4 here on the second page of the --
10  A.    Okay.  I'm sorry.
11  Q.    You see it says, there appears to be normal
12  uptake and thickening of all segments.
13  A.    See, I don't agree with that, Mr. Boehm --
14  Boehm.  Boehm?  Boehm?  Boehm.
15  Q.    It's Boehm, but however you want to do it is
16  fine.
17  A.    Boehm.  I'm sorry.
18  Q.    It's okay.
19  A.    Like poem.  Poem.  Got you.
20  Q.    You know what?  That's what I say to people, and
21  you're the first person to actually get to that first.
22  A.    Okay.  Boehm.  Okay.  Mr. Boehm.
23        I don't think the uptake is normal because it's
24  explained away based upon the breast attenuation issue
25  which I don't think is an appropriate analysis here.
```

13  (Pages 209 to 212)

Jay N. Schapira, M.D.

Page 213

1    So at any rate, I don't think it's normal, and
2  it's explained away as to why it's not normal but it's
3  not normal, I mean, and that's on the Findings portion.
4  It's just that they say it's not normal but we're saying
5  it due to overlying breast.
6  Q.    Okay. Would you turn to Tab 11, please. This
7  is a report from the May 26th, 2000, catheterization,
8  ventriculography, and arteriography.
9         Actually, before we get into this particular
10  document, Dr. Schapira, have you reviewed the medical
11  literature on the incidence rate of re-stenosis in
12  patients receiving a stent in the setting of unstable
13  angina?
14  A.    Yes.
15  Q.    What is your understanding about what the
16  incidence rate of re-stenosis is in patients receiving a
17  stent in the setting of unstable angina?
18  A.    In what time frame? Any -- just all time
19  frames?
20  Q.    Well, let's start with today and then you're
21  foreshadowing.
22  A.    And --
23  Q.    Because I do want to ask you what you understand
24  the difference to be as between today's rate and the
25  rate in 2000, when Miss Levitt --

Page 214

1  A.    Yes, sir.
2  Q.    -- received her stent.
3  A.    Well, my qualification was a little bit
4  different. In the time frame for the rest of their life
5  or in the time frame of re-stenosis at a year, five
6  years, ten years post? So --
7  Q.    That's a fair clarification.
8         Why don't we just start with lifetime risk of
9  re-stenosis in individuals who have received a stent in
10  the setting of unstable angina, what is your
11  understanding about what that incidence rate is?
12  A.    A forever question. Over forever.
13  Q.    For the rest of that person's life.
14  A.    Their lives.
15  Q.    Yes.
16  A.    Yes. Okay. Good.
17         Less than 20 percent.
18  Q.    How much less than 20 percent?
19  A.    Oh, I think it's probably between 5 and 20. It
20  depends on a lot of factors. If it's a non-diabetic,
21  it's closer to 5. If it's someone who takes reasonable
22  care of themselves, it's closer to 5. If it's someone
23  who's a non-smoker at the time or hasn't smoked for
24  three years, it's less than 5. If it's someone who
25  doesn't have wildly crazy lipids and doesn't take

Page 215

1  anything for it, it's closer to 5.
2         The bad ones are the 20 of the patients who just
3  don't take care of themselves and have all the bad
4  qualifications and don't take their medicines and things
5  like that.
6  Q.    They have a greater risk profile.
7  A.    Yes, sir. The non-compliant patients have a
8  greater risk profile, yes.
9  Q.    How is that incidence rate different today,
10  compared to the time frame of 2000, when Mrs. Levitt
11  received her stent?
12  A.    It's about the same in her particular case.
13  Q.    Well, I'm asking in the year 2000, do you know
14  what the incidence rate was of re-stenosis in patients
15  receiving a stent in the setting of unstable angina?
16  A.    That was the answer I gave you before. And
17  nowadays, it's about the same.
18  Q.    All right. Now let's move to the shorter time
19  frame.
20  A.    I mean, in a patient like Miss Levitt, of
21  course, yes.
22         Okay. So now we're moving to current?
23  Q.    A shorter time frame --
24  A.    Oh, okay.
25  Q.    -- in terms of the risk of re-stenosis.

Page 216

1         What do you understand the risk of re-stenosis
2  to be in patients who have received a stent in the
3  setting of unstable angina over the next, you know,
4  five-year period after the placement of the stent?
5  A.    Okay. So like Miss Levitt? I would say less
6  than 10 percent. Closer to 5 percent in the patient
7  like her, less than 10 percent in general.
8  Q.    And is that number different or the same today,
9  as compared to the 2000 time frame?
10  A.    It's about the same.
11  Q.    Do you know if there were drug-eluting stents in
12  2000?
13  A.    I think that was just before we got them.
14  Q.    Do you know if Mrs. Levitt received a
15  drug-eluting stent?
16  A.    She had a bare-metal stent.
17  Q.    And do you agree that bare-metal stents are more
18  susceptible to re-stenosis than drug-eluting stents?
19  A.    Acutely, that's not true. Within the first 6
20  months, 12 months, not true. It's the longer-out
21  re-stenosis rates that are superior for the drug-eluting
22  stents.
23  Q.    Are you -- strike that.
24         Are you relying on any particular textbook or
25  medical literature for your opinion that in the first

14  (Pages 213 to 216)

Jay N. Schapira, M.D.

1  six months or a year after the placement of a stent
2  there's no difference in the rate of re-stenosis as
3  between bare-metal and drug-eluting stents?
4  A.    I can't think of a particular reference for you
5  off the top of my head but -- I can't think of any.
6  Q.    Can -- are you able --
7  A.    There are studies out there.  I just can't --
8  none come to mind.
9  Q.    Are you able to identify any clinical study that
10  you believe shows an association between Vioxx use and
11  an increased incidence of re-stenosis?
12  A.    After stenting.
13  Q.    Correct.
14       That's what re-stenosis refers to; right?
15  A.    Well, re-stenosis could be in lots of different
16  things, but just want to be sure this applies to a stent
17  re-stenosis.
18       I don't know of any --
19  Q.    Do you agree that Mrs. --
20  A.    Well -- well, give me just one second.
21  Q.    Sure.
22  A.    I don't know of any studies just like that.
23  Q.    Do you agree that Mrs. Levitt was not
24  experiencing a myocardial infarction at the time of this
25  May 26th, 2000, report?

1  A.    So we're back onto Tab 11?
2  Q.    Yeah, I'm still looking at the same report,
3  which is Tab 11.  It's JL-SLHS-000046.
4  A.    Yes.
5       Let me hear your question again, please.
6  Q.    Do you agree that Mrs. Levitt was not
7  experiencing a myocardial infarction at the time of this
8  May 26th, 2000, report?
9  A.    Yes.
10  Q.    You referred to this extension of infarction
11  earlier today.
12       Do you believe that the additional so-called
13  extension of infarcted myocardium that you believe may
14  have occurred in May 2000 occurred before or after Mrs.
15  Levitt underwent her CABG procedure?
16  A.    I think probably after.
17  Q.    And why do you say that, in your view, this
18  additional infarction occurred after the CABG procedure?
19  A.    Well, she had some runs of ventricular
20  tachycardia afterwards, she had some atrial
21  fibrillation, also an arrhythmia afterwards, and these,
22  too, contributed to, I think, my suspicion that it was
23  after the CABG surgery.
24  Q.    Do you believe that the CABG surgery itself
25  caused infarction?

1  A.    I think that it's -- it could have.  I mean, it
2  could have been an intraoperative infarction.
3  Q.    Do you have a view that it did?
4  A.    I can't tell you.  I don't actually have those
5  precise records.  I've requested them.
6  Q.    You've requested those records from plaintiff's
7  counsel?
8  A.    Yes.
9  Q.    And you have not received those?
10  A.    Not yet.
11  Q.    When a person undergoes a CABG procedure, it is
12  expected that their troponin levels will increase;
13  correct?
14  A.    To a certain degree, that's correct.
15  Q.    If you'll turn to Tab 15.  This is a report of
16  the May 31st, 2000, echocardiograph performed by Dr.
17  Rosamond.  It's just a one-page report.
18       Do you see in the Resting 2D Echo section
19  there's a reference to abnormal septal motion?  It's the
20  third line down in that section.
21  A.    Yes.
22  Q.    Do you agree that abnormal septal motion is
23  something that is commonly seen in patients after a CABG
24  procedure?
25  A.    Yes.

1  Q.    Do you believe that Miss Levitt's abnormal
2  septal motion was related to her CABG procedure?
3  A.    Yes.
4  Q.    Right after that the record indicates that the
5  septal wall thickens well.
6       Do you see that?
7  A.    Yes.
8  Q.    What does it tell us, that Mrs. Levitt's septal
9  wall was thickening well?
10  A.    It means it is probably an artifact of the
11  surgery and not due to infarction of the septum.
12  Q.    Do you agree that the result of this echo on
13  May 31, 2000, are what you would expect to see in a
14  person with normal cardiac function?
15  A.    As far as an echo can discern, it looks like a
16  reasonable echo, yes, after a bypass surgery.
17       MR. BOEHM:  Let's go off the record, take a
18  break, if we could.
19       VIDEO OPERATOR:  Off the record.
20       The time is 10:20 a.m.
21       (Recess, 10:20-10:35 a.m.)
22       VIDEO OPERATOR:  We are back on record.
23       The time is 10:35 a.m.
24       We may proceed.
25

15 (Pages 217 to 220)

Jay N. Schapira, M.D.

Page 221

1    BY MR. BOEHM:
2    Q.    Dr. Schapira, we're now looking at the document
3    that's behind Tab Number 16 to this exhibit, which is
4    marked Exhibit 16.
5         This is the July 25th, 2000, hospital admission
6    record. And I'm directing your attention right in the
7    middle of the History of Present Illness section. It
8    reads, the patient has done postoperatively -- and maybe
9    that means done well or done something postoperatively.
10   It looks like a typo to me.
11        The patient has done postoperatively but has
12   been under a continually stressful situation.
13   Apparently, she is involved in a rezoning controversy
14   and today was in court when she developed abrupt
15   shortness of breath, palpitations, tachycardia,
16   diaphoresis, nausea, and diarrhea as well as tingling
17   and numbness of the extremities. She did not develop
18   typical ischemic chest pain.
19        Do you see that?
20   A.    Yes.
21   Q.    Do you agree with this characterization from Dr.
22   Vacek or Vacek?
23   A.    It's a listing of his findings, and that's why
24   I -- accept what he's describing is just descriptive.
25   Q.    Okay. If you go down toward the bottom of the

Page 222

1    page, there's a section Impression.
2         Do you see that?
3    A.    Yes.
4    Q.    Number 2 is, probable anxiety/panic attack with
5    possible hyperventilation.
6         Do you see that?
7    A.    Yes.
8    Q.    Do you disagree with Dr. Vacek's diagnosis on
9    July 25th, 2000?
10   A.    Well, to this point, no. I mean, I do believe
11   that she did have an anxiety attack and she may have
12   hyperventilated and I believe that she had cardiac
13   symptoms and I think that he's -- appropriately needs to
14   rule out cardiac ischemia or injury so he's undergoing a
15   workup of a patient who he thought was significant
16   enough to put her in the hospital.
17   Q.    Do you agree that Ms. Levitt was not
18   experiencing a myocardial infarction at this time?
19   A.    I believe that that is correct.
20   Q.    Okay.
21   A.    That was unknown at this point but it was
22   subsequently determined, yes.
23   Q.    If you'll turn to Tab 18 with me. This is a --
24   A.    Let me just say -- I apologize -- an acute
25   myocardial infarction. She was not suffering an acute

Page 223

1    myocardial infarction at that time, correct.
2    Q.    Do you believe that Miss Levitt was suffering a
3    subacute myocardial infarction on July 25th, 2000?
4    A.    After the workup, no, but I thought it was
5    reasonable to put it in the differential as of the time
6    this note is written by Dr. Vacek.
7    Q.    Tab 18 is a report from a July 26th, 2000,
8    nuclear stress test similar to the one performed on
9    April 24th, 2000, same doctor, Dr. Vacek.
10        Do you see that?
11   A.    Yes.
12   Q.    Toward the bottom of the first page under
13   Findings, Number 3 is, scintigraphic planar and
14   tomographic.
15        Do you see that?
16   A.    Yes.
17   Q.    Dr. Vacek writes, there is evidence of breast
18   tissue attenuation overlying the anterior wall but no
19   evidence of significant perfusion defects.
20        Do you see that?
21   A.    In -- under Number 3?
22   Q.    Yes.
23   A.    Yes.
24   Q.    What is your interpretation of this finding from
25   Dr. Vacek?

Page 224

1    A.    That he thinks that there is a slight decrease
2    of perfusion and he attributes it to breast tissue
3    attenuation.
4    Q.    Do you agree with Doctor -- do you disagree with
5    Dr. Vacek's conclusion?
6    A.    I do.
7    Q.    Is your interpretation that this breast tissue
8    attenuation is actually the non-transmural injury that
9    you're referring to with respect to the April 24th,
10   2000, stress test?
11   A.    I think it probably is part of that, yes.
12   Q.    When you say "part of it," tell me what you
13   mean.
14   A.    Yes, I think it's related to it is what I mean.
15   Q.    Is it -- do you believe that this finding of
16   breast tissue attenuation is detecting what you believe
17   to be the same injury that was confused for breast
18   tissue attenuation on April 24th, 2000?
19   A.    Yes.
20   Q.    If you'd turn to the next page, right at the
21   top --
22   A.    This is Page 2?
23   Q.    This is Page 2, yes.
24   A.    Okay.
25   Q.    It's, the document is LevittJ-GortonMMD-00043

16  (Pages 221 to 224)

Jay N. Schapira, M.D.

Page 225

1    and 44.
2         At the top of the second page of this document
3    do you see it says, polar coordinate map analysis
4    reveals no statistically significant perfusion defects?
5         Do you see that?
6    A.    Yes.
7    Q.    Did you review the polar coordinate map analysis
8    in connection with either this nuclear stress test or
9    the nuclear stress test performed on April 24th, 2000?
10   A.    No, I do not have those images.
11   Q.    What does the polar coordinate map analysis tell
12   us?  What does it do?
13   A.    The polar analysis enables you to look at the
14   myocardium split into different segments that looks like
15   a coordinate map.  They're assigned different numbers
16   and different segment names and each one is analyzed
17   individually and also in whole as to the amount of
18   perfusion.
19   Q.    Do you agree that it would be helpful to review
20   the polar coordinate map analysis in trying to determine
21   whether or not there was an actual breast tissue
22   artifact, as opposed to a real perfusion defect?
23   A.    I think that it would be helpful to some degree,
24   yes.  I'd like to see it.
25   Q.    You recognize that Dr. Vacek clearly did review

Page 226

1    the polar coordinate map analysis; correct?
2    A.    It appears so, yes.
3    Q.    Dr. Vacek indicates under Number 4 of this
4    report, there appears to be normal thickening of all
5    segments.  The anterior wall demonstrates slightly
6    decreased uptake, probably attributable to breast tissue
7    attenuation, but this region does appear to thicken
8    normally.
9         Do you see that?
10   A.    Yes.
11   Q.    Do you agree that normal thickening of the
12   anterior wall suggests that Dr. Vacek has correctly
13   concluded that the decreased uptake he is seeing is due
14   to breast tissue attenuation?
15   A.    Not necessarily.  Because if it's a -- not a
16   huge infarct and it's non-transmural, that the
17   myocardium is so thickened normally, despite the fact
18   that there has been some injury there.
19   Q.    And how do you go about differentiating as
20   between the -- for purposes of this nuclear testing as
21   between the possibility of breast tissue artifact versus
22   actual perfusion defect?
23   A.    What I do is, first of all, I look at the
24   patient, I ask her had bra size, I examine her and see
25   how her breasts are sized and situated with regard to

Page 227

1    where the heart is.
2         And, I mean, some ladies' breasts -- I mean,
3    ladies are built in different ways.  I don't need to get
4    graphic with you.  But is it the type of breast tissue
5    that's going to cause an artifact in a study like this?
6         And that's what we do, because it's a very
7    important question of whether to say, oh, it's just
8    breast artifact versus, gee whiz, you have a problem
9    here to the lady.
10        And so we document cup size and we examine the
11   patient to see, you know, if this is going to make a
12   difference or not.
13   Q.    Anything else?
14   A.    And, you know, I think that needs to be done
15   before you just say it's breast attenuation.
16        I don't -- didn't see any documentation of that
17   in this study so I can't tell you any more.
18   Q.    Do you know whether Dr. Vacek had an opportunity
19   to examine Ms. Levitt?
20   A.    It doesn't appear that he does because when that
21   is done, it's stated usually, and I didn't see it
22   stated.
23   Q.    You don't know one way or another as you sit
24   here today whether or not Dr. Vacek had an opportunity
25   to examine Mrs. Levitt; isn't that correct?

Page 228

1    A.    I do not know.
2    Q.    If you'll turn to the next tab, Tab 19 of
3    Exhibit 16, I'm -- we're now looking at a November 27th,
4    2000, exercise echo report.  The report itself is just
5    the first page of the document.
6         You can have an opportunity to look at this, of
7    course, Dr. Schapira, but the question for you is, do
8    you believe that anything from this exercise echo
9    indicates that Mrs. Levitt had experienced myocardial
10   infarction as of November 27, 2000?
11   A.    I see some evidence for ischemia but I do not
12   see any abnormalities for infarction except for the
13   lower ejection fraction of 50 percent, as compared to
14   the prior ones where we talked about 55 and 55 to 60.
15   Q.    Do you believe that a finding of a left
16   ventricular ejection fraction of 50 percent alone is
17   enough to say that somebody has experienced myocardial
18   infarction?
19   A.    Alone, no, but it is suggestive and so it needs
20   to be further looked into.
21   Q.    Under --
22   A.    But it's suggestive.
23   Q.    Under "Post Exercise Echo" do you see it says,
24   ejection fraction improves with exercise?
25   A.    Yes, sir.

17  (Pages 225 to 228)

Jay N. Schapira, M.D.

Page 229

1  Q.    And it says, all walls appear to improve,
2  including septum.
3        Do you agree that this is what you'd expect to
4  see in a person with normal cardiac function?
5  A.    Function, yes.  Doesn't exclude a non-transmural
6  infarct, but function, yes.
7  Q.    When cardiologists refer to cardiac function,
8  what does that mean?
9  A.    Ejection fraction and overall performance of the
10  heart, so that the segments that are normal will all
11  improve.
12        Let's say that there's 30 segments and you have
13  29 improving, so the overall global ejection fraction
14  will improve even though you may have one that lags or
15  doesn't improve, but the overall performance will
16  improve.
17  Q.    If you'll turn to Tab 21, we're looking now at a
18  September 13th, 2002, hospital record.
19        As an initial matter, do you agree,
20  Dr. Schapira, that Miss Levitt was not experiencing
21  myocardial infarction at the time of this report?
22  A.    She appeared to have negative cardiac enzymes,
23  and so there was not an acute myocardial infarction at
24  that time.
25  Q.    Stepping back for a moment from this particular

Page 230

1  medical record, have you ever seen an occasion in Mrs.
2  Levitt's medical records where her cardiac enzymes were
3  elevated such that they indicated, in your opinion, that
4  she was experiencing at that time myocardial infarction?
5  A.    I haven't, but I don't know that I've seen them
6  all, particularly the postoperative ones, after her
7  bypass surgery.  But from what I have seen, no.
8  Q.    Do you agree that cardiac enzyme readings are
9  the primary manner in which cardiologists determine
10  whether or not a person is experiencing myocardial
11  infarction?
12  A.    It's one way.  There are other ways as well,
13  even in the absence of enzymes, because we know that
14  enzymes will miss some patients because of timing
15  issues.
16  Q.    Do you agree that cardiac enzyme levels is the
17  primary manner in which cardiologists determine whether
18  or not a person is experiencing an acute or subacute
19  myocardial infarction?
20  A.    That would say it's a primary but it's not the
21  primary.  There's three things, EKGs, symptoms and
22  enzymes, and two out of three usually makes a diagnosis
23  because of the timing issue on the cardiac enzymes.
24  Q.    Do you agree that if cardiac enzymes are not
25  elevated at a given point in time, it is a fair

Page 231

1  conclusion that that patient is not experiencing an
2  acute myocardial infarction at that time?
3  A.    Okay.  No.  No, I don't.
4  Q.    Why not?
5  A.    Okay.  Couple of reasons.  Number one, we know
6  that for the first six hours or maybe five or four when
7  someone is having an infarction, the enzymes will not be
8  elevated yet.
9        Number two, we know that in the year 2000 that
10  these assays for troponin were relatively insensitive
11  and there was a large percentage of infarcts that were
12  missed, probably 30 to 40 percent that were missed,
13  because -- and we know that now because now that we have
14  the ultrasensitive assays for troponin, we know that we
15  are picking up a lot of them that were previously called
16  normal, no infarct.
17        So that's why back in 2000, which is 16 years
18  ago, we did not rely that heavily on troponin to rule
19  things out so absolutely as we might do today.
20  Q.    Do you have an opinion to a reasonable degree of
21  medical certainty that Ms. Levitt's troponin readings in
22  the year 2000 were somehow inaccurate?
23  A.    I don't think that they were inaccurate, Mr.
24  Boehm, but I think that they were up to standard for the
25  year 2000.  But we -- but the biology hasn't changed but

Page 232

1  our ability to detect the abnormality has greatly been
2  enhanced by the ultrasensitive assays.
3  Q.    Going back to this document behind Tab 21, right
4  in the middle of that first paragraph do you see the
5  sentence that reads, she was admitted and ruled out for
6  a myocardial infarction --
7  A.    One second.  I'm not with you.  I'm sorry.
8  Q.    Right.
9  A.    Oh, got you.  Okay.  Thanks.
10  Q.    -- with a non-ischemic EKG and negative cardiac
11  enzymes.
12  A.    Okay.
13  Q.    We planned to do pharmacologic stress testing
14  the following morning; however, the patient drank coffee
15  that morning and was also on beta-blocker therapy.  As I
16  feel that her symptoms are likely non-cardiac, we will
17  dismiss her to return next week for stress testing.
18        Do you see that?
19  A.    Yes.
20  Q.    Do you disagree with Dr. Laster's conclusion
21  that Mrs. Levitt's symptoms were likely non-cardiac on
22  September 13th, 2002?
23  A.    I think it's indeterminate.  I -- you know, I
24  think it's indeterminate.  We can't tell for sure, I
25  mean, but he takes the prudent approach.  He brings her

18 (Pages 229 to 232)

Jay N. Schapira, M.D.

Page 233

1    back for more testing.
2    Q.    If you'll turn to Tab 24, we'll be looking now
3    at the October 3rd, 2002, nuclear stress test, similar
4    to the stress test performed in April of 2000 and July
5    of 2000.
6          If you look down in the middle, toward the
7    middle of the first page there, it says, "Exercise
8    Treadmill Findings."
9          Do you see that?
10   A.    Yes, sir.
11   Q.    Mrs. Levitt achieved 7.0 METS of activity.
12         How would you characterized 7.0 METS of
13   activity?
14   A.    It's not as good as she had done at other times
15   It is -- I think it's a moderate to good amount of
16   exercise.
17   Q.    Do you think it's within a normal range for
18   somebody of Mrs. Levitt's age?
19   A.    I think -- well, I know it's far below her
20   standard but it's -- I guess it's average for somebody
21   her age.
22   Q.    At the bottom of that same paragraph it says,
23   the patient experienced chest discomfort and leg
24   discomfort.
25         Do you see that?

Page 234

1    A.    Yes.
2    Q.    Is that the type of finding that a doctor would
3    just get from asking the patient? In other words, is
4    that just a self-reported finding?
5    A.    Well, the shortness of breath, I don't know if
6    you want to know about that too, but that's observed, of
7    course. And that's in the sentence before. The chest
8    discomfort, like any pain, is reported by the patient,
9    yes, and leg discomfort as well, yes.
10   Q.    The next section has to do with the EKG. It
11   said that there were shallow T-wave -- there was a
12   shallow T-wave inversion that persisted throughout the
13   six-minute cool-down period. These findings were
14   non-diagnostic due to baseline abnormalities.
15         What does it mean when EKG findings are
16   considered to be non-diagnostic due to baseline
17   abnormalities?
18   A.    It means the resting EKG is abnormal, and that
19   may shed some question on any other abnormalities that
20   may occur on the stress test but you've already got
21   your patient in the abnormal category, it's just a
22   question of how much incremental abnormality there is,
23   based upon the exercise.
24   Q.    Why would a cardiologist characterize that as
25   non-diagnostic? What does that term mean in that

Page 235

1    context?
2    A.    Non-diagnostic means non-diagnostic for ischemia
3    because when you have an abnormal resting EKG, it's
4    thought that further abnormalities of certain types may
5    be difficult to interpret, and so that's why the imaging
6    is done, to take any question out of whether it's
7    interpreted correctly or misinterpreted.
8    Q.    Just below that there's reference to the
9    scintigraphic findings. It says, the tomographic images
10   showed non-transmural injury in the anteroseptal region.
11   There was no definite evidence for ischemia and it
12   indicates that she had a 60 percent left ventricular
13   ejection fraction.
14         What is your understanding of what a
15   non-transmural injury in the anteroseptal region is?
16   A.    It's a myocardial infarction. Injury means
17   necrosis of tissue, the myocardium has died, and that
18   there's now evidence of injury, which is usually
19   represented by fibrosis or scar, as a result of that
20   infarct.
21   Q.    And as I understand your opinion here in this
22   case, you believe that this is the same non-transmural
23   injury that were -- that was confused as breast tissue
24   attenuation in the nuclear scans taken in 2000; is that
25   correct?

Page 236

1    A.    I think that this is that amount and perhaps
2    slightly more or at least the same contiguous area.
3    Q.    When you say "perhaps slightly more," what is
4    the basis for your opinion that the finding that you're
5    seeing in October of 2002 is somehow greater than what
6    was confused for breast tissue attenuation in the scans
7    in 2000?
8    A.    They mention apex in the current report, 2002,
9    and I don't think the word "apex" is used in the earlier
10   ones. I think it was anterior wall only, not out to the
11   apex.
12   Q.    Is a non-transmural injury of the anteroseptal
13   region a perfusion defect?
14   A.    In this context, yes.
15   Q.    If you flip over to Page 2 of this report, right
16   at the top in the summary section it says, clinical
17   response to exercise:  ischemic.
18         That refers to the fact that Ms. Levitt had
19   reported experiencing chest discomfort during the
20   exercise portion of the test; is that correct?
21   A.    And shortness of breath.
22         You know, women are not just small men who look
23   prettier. Women have a distinct characterization of
24   symptoms, of signs, of reactions, of complications, and
25   of particular ways of manifesting heart disease.

19  (Pages 233 to 236)

Jay N. Schapira, M.D.

Page 237

1    So we have to always remember that Ms. Levitt is
2  a woman. Women have a different subset of heart
3  disease. We now appreciate that. And not so much was
4  known about it in the year 2000 but we know it now. The
5  biology hasn't changed but our knowledge has changed so
6  our ability to analyze and to appreciate certain things
7  are more sophisticated and more accurately analytical.
8    So I think that shortness of breath is certainly
9  a manifestation of angina and of ischemia in a woman.
10  Q.    And under Number 3 it says, scintigraphic
11  response to exercise: non-ischemic.
12    Do you see that?
13  A.    Yes.
14  Q.    This refers to the fact that the scintigraphic
15  images did not provide any objective evidence of
16  ischemia; correct?
17  A.    Right. It was a fixed perfusion defect,
18  indicating scar and injury, as opposed to an area that
19  was still alive but supplied by a partially blocked
20  artery that showed more ischemia during exercise and
21  reversed or normalized during rest.
22  Q.    Okay. Do you recall whether a breast tissue
23  artifact was detected in connection with this
24  October 3rd, 2002, nuclear scan?
25  A.    Well, I do not see the invocation of the breast

Page 238

1  tissue artifact as the explanation for the abnormality,
2  which I think is appropriate. I don't think her -- as
3  far as I can tell, her breasts didn't get any smaller in
4  that interval of time, and so I think that they just
5  properly interpreted the scan.
6  Q.    Do you recall whether a breast tissue artifact
7  was detected in connection with the October 3rd, 2002,
8  nuclear scan?
9  A.    That's a hard question to answer. They saw the
10  defect, they said the defect is real injury, it's not
11  breast tissue. They saw the defect and they thought it
12  was a real defect.
13  Q.    Let me direct your attention to the polar
14  coordinate analysis that is the third page of this
15  report.
16    Have you looked at this polar coordinate
17  analysis before?
18  A.    Are you looking at this page (indicating)?
19  Q.    Yes.
20  A.    Yes.
21  Q.    This is Page LevittJ dash -- or I'm sorry.
22  Yeah, dash CardioConsultMR dash 00055.
23  A.    Yes. Long time ago.
24  Q.    And do you see in the upper right-hand corner of
25  this page a chart referring to the quality control of

Page 239

1  this nuclear scan?
2  A.    Yes.
3  Q.    And it says, breast artifact minor.
4  A.    Yes.
5  Q.    Do you see that?
6  A.    Yes.
7  Q.    Have you noticed that before?
8  A.    I did notice it before. I --
9  Q.    What is your interpretation -- I'm sorry. I
10  didn't mean to cut you off. Go ahead.
11  A.    I'm sorry. I cut you off. Please go ahead.
12  Q.    What is your interpretation of a finding, of
13  this finding of a minor breast artifact under the
14  quality control of this imaging?
15  A.    That they accounted for the breast and they did
16  not think it was an important factor in their
17  interpretation, it was of minor importance to them, and
18  that they could interpret this definite defect in the
19  context of a minor breast artifact.
20    So they thought about it, they considered it. I
21  haven't said that, but apparently, they recognized
22  that there was breast there and that wasn't the issue.
23  This was a real injury.
24  Q.    Do you know if the individual physicians fill
25  out the quality-control assessment in connection with

Page 240

1  the scan or if this is performed by the imaging software
2  itself?
3  A.    I think it's both. I -- you know, I think, yes,
4  it's by the imaging appearance but -- and whether they
5  evaluated the patient or a technologist evaluated the
6  patient I don't know for sure. I can tell you in our
7  laboratory we do both, we look at the image and we also
8  have somebody describe breast tissue, cup size, and body
9  habitus.
10  Q.    My question is, do you know whether or not in
11  this graph here that says quality control on the third
12  page of this report, when it says breast artifact
13  minor -- that indicates that there was some breast
14  artifact, as an initial matter; correct?
15  A.    Yes.
16  Q.    And do you know if the identification of this
17  breast artifact was done by the physician who was
18  performing the scan or whether or not the software, the
19  imaging software itself, identified the artifact?
20  A.    I think it's probably both.
21  Q.    You think both the physician and the software
22  identified this particular breast tissue artifact.
23  A.    I think the physician did. I think it could
24  have been the software as well. I think the physician
25  probably did.

20  (Pages 237 to 240)

Jay N. Schapira, M.D.

Page 241

1  Q.      Have you ever performed this kind of nuclear
2  stress test --
3  A.      Yes.
4  Q.      -- on a patient?
5  A.      Yes.
6  Q.      When is the last time you did that?
7  A.      Last week.
8  Q.      Sitting here today, Dr. Schapira, do you know
9  which walls of Mrs. Levitt's heart are perfused by her
10 left anterior descending coronary artery?
11 A.      Yes.
12 Q.      Which ones?
13 A.      The anterior wall, the apex, and the
14 anterolateral wall.
15 Q.      What about the inferior wall?
16 A.      No.
17 Q.      What about the inferolateral wall?
18 A.      No.
19 Q.      What about the inferoseptal wall?
20 A.      I don't think so.
21 Q.      What is the basis for your opinion that the
22 inferior, inferolateral, and inferoseptal walls of Mrs.
23 Levitt's heart are not perfused by the left anterior
24 descending coronary artery?
25 A.      Her anatomy on the coronary angiography.

Page 242

1  Q.      Do you agree that in a person who has suffered
2  an actual infarction you'd expect to see some degree of
3  wall motion abnormality in those territories of the
4  heart that correspond with the location of the
5  infarction?
6  A.      I'm sorry.  Can I hear that back, please?
7  Q.      Is it okay if I just have Rosemary read it?
8  A.      Yes.  Yes, sir.
9          (The court reporter read the requested portion
10 of the record.)
11         THE WITNESS:  Depends upon the type and
12 magnitude of the infarction.
13         With a transmural, yes; with a non-transmural,
14 like I believe she had, I would not expect to see
15 necessarily any wall motion abnormalities, especially
16 this far after where she had already had some positive
17 remodeling.
18 BY MR. BOEHM:
19 Q.      When you talk about Mrs. Levitt's positive
20 remodeling, can you explain what you mean by that?
21 A.      Yes.  What it means is that whenever there's
22 damage to the heart and there is scar tissue formed and
23 you have an area of heart muscle that's not working
24 properly, there will be recruitment of the segments
25 around it to do its work for it to make it look like

Page 243

1  it's working better than it actually is and to help it
2  to recover as much functionality.  You've still got a
3  scar there but that's working because of helping hands,
4  so to speak -- of course, a figure of speech -- from the
5  segments around it.
6  Q.      In a patient who's had a non-transmural injury,
7  as you believe Mrs. Levitt has, but who has no wall
8  motion abnormalities, does that impact your view of that
9  individual's cardiac prognosis moving forward?
10 A.      I think it's a sign that's good for them in
11 terms of their prognosis.  I mean, if they have -- the
12 better the function, the better the prognosis.
13 Q.      Do you agree that, based on this October 3rd,
14 2002, nuclear stress test, these are the results that
15 you would expect to see in an individual who has good
16 cardiac function?
17 A.      Overall global function, yes.
18 Q.      If you'll turn to Tab 25 of the binder.
19         This is a November 5th, 2002, letter --
20 A.      Yes.  Thank you.
21 Q.      -- about the October 3rd, 2002, nuclear stress
22 test.  It's from the doctor who performed the October
23 test.  You see there's a reference to the number of
24 minutes and the maximum heart rate that match with the
25 findings from the October stress test.

Page 244

1          This letter does not refer to a separate nuclear
2  stress test other than the October 3rd, 2002, test;
3  correct?
4  A.      The test we were just talking about.
5  Q.      Yes.
6  A.      Correct.
7  Q.      Dr. Laster in the middle of his letter to Dr.
8  Hartman writes, this was a low-risk study.
9          What does that mean?
10 A.      He's referring to what her risk is with regard
11 to ischemia and another infarct.  It's risk for major
12 adverse cardiac event in terms of another infarct.
13         A scar is a scar and it's not going to
14 re-infarct.  That heart attack is done, story over, for
15 that segment of myocardium.
16         He's talking about risk for subsequent acute
17 infarct, and that would be based upon the presence or
18 absence of ischemia.  He did not see ischemia so he
19 would say low risk.
20 Q.      Do you disagree with Dr. Laster's conclusion
21 that it was unlikely that she had significant ischemia?
22 A.      He concludes that unlikely she has significant
23 ischemia, and that I think is what he concluded based
24 upon the ability of that test to detect.
25         Still, she has chest discomfort with exertion,

21  (Pages 241 to 244)

Jay N. Schapira, M.D.

1    which is angina.  And many patients have angina pectoris
2    clinically, we treat them for it and we can't document
3    anything in terms of that test but we know they have
4    coronary disease, small vessel, endothelial dysfunction,
5    a number of things that may contribute to them still
6    having symptoms, so we still treat them for it.
7    Q.    Do you agree with Dr. Laster's conclusion from
8    November 5th, 2002, that it was unlikely Mrs. Levitt had
9    significant ischemia?
10   A.    Demonstrable on that study, yes.  Based upon the
11   study, I agree with that.
12   Q.    Turn to Tab 26, if you would, sir.
13         This is a September 29th, 2005, stress echo
14   report.
15         Now, a stress echo report does not involve
16   perfusion analysis; is that correct?
17   A.    Correct.  That is, yes, correct.
18   Q.    If you go down to the bottom of the page with me
19   to the echocardiographic interpretation, there's a
20   reference to mild hypokinesis of the mid to distal
21   anteroseptal wall.
22   A.    Yes.
23   Q.    Now, that is a reference to the same septal wall
24   defect that was appreciated in May 2000 right after Mrs.
25   Levitt's CABG procedure; correct?

1    A.    Well, no.  It's -- the "septal" part of the
2    word, yes; the "anterior" part of the word, no.  And the
3    more distal portion I don't think is referred to
4    earlier.
5    Q.    There was abnormal septal wall motion detected
6    on May 31st, 2000, right after Mrs. Levitt's CABG
7    procedure was performed; correct?
8    A.    Yes.
9    Q.    And are you -- do you believe this reference in
10   September 29th, 2005, to be reference to a different
11   defect than the one that was appreciated in May 2000?
12   A.    I think it's more extensive.  I think it
13   involves the anterior wall and the distal anterior wall.
14   Q.    And what is your basis for your conclusion that
15   this particular finding is more extensive than the
16   abnormal septal wall motion detected in May 2000?
17   A.    Because the septum is a circumscribed, distinct
18   area and these are now neighbors in the -- further down
19   the line in the distribution of the left anterior
20   descending coronary artery which have undergone injury.
21   And this hypokinesis documents it and confirms, because
22   it's a wall motion abnormality, the perfusion defect
23   that had been called breast tissue attenuation finally
24   had been to correctly identified on the last thallium,
25   nuclear, rather, that you and I spoke about, and now

1    this is -- it's referring to it again in terms of just
2    an echo wall motion study.
3         This is a more extensive area than it was
4    initially just with the, what we call the septal motion
5    artifact from the CABG procedure.
6    Q.    If you'd turn to the next page of this report,
7    toward the top do you see "Peak Stress"?
8    A.    Yes.
9    Q.    It refers to, at peak stress, mid to distal
10   anteroseptal wall improved.
11         Do you see that?
12   A.    Yes.
13   Q.    What does it tell you, that Mrs. Levitt's septal
14   wall improved at peak stress?
15   A.    It tells me that it's a non-transmural infarct,
16   that there's still some viable tissue in part of the
17   wall, even though part of the wall is infarcted, and
18   that the part that is still viable is working well and
19   is able to improve motion with exercise.
20   Q.    All right.  Let's turn to Tab 28, which I
21   believe is the last tab in this binder, which is a
22   record from November 28th, 2007, nuclear stress test.
23         Is this the most recent stress test for Mrs.
24   Levitt that you are aware of?
25   A.    Yes.

1    Q.    Okay.  And this analysis would have included
2    perfusion analysis; correct?
3    A.    Yes.  As far as I know.
4    Q.    If you look in the Findings section about
5    halfway down the page, there's a sentence that says,
6    review of the scintigraphic images.
7         Tell me if you see that.
8    A.    Got you.
9    Q.    Okay.  It says, review of the scintigraphic
10   images did not show any fixed or reversible defects.
11         Do you see that?
12   A.    Yes.
13   Q.    Based on this 2007 nuclear stress test, there
14   was no evidence of a non-transmural injury in the
15   anteroseptal region; correct?
16   A.    That's correct.  That's not reported.
17   Q.    And then it says, review of the gated images
18   showed left ventricular function with an overall
19   estimated ejection fraction of 75 percent.
20         Do you see that?
21   A.    Yes.
22   Q.    That's an excellent ejection fraction.  Do you
23   agree?
24   A.    Yes.
25   Q.    Under Conclusion it says, treadmill radioisotope

22  (Pages 245 to 248)

Jay N. Schapira, M.D.

Page 249

1  cardiac stress test did not show any evidence of
2  ischemia or infarct.
3       Do you see that?
4  A.   Yes.
5  Q.   What does that mean?
6  A.   That means that they saw no defect.
7  Q.   Is there anything from this November 2007
8  nuclear stress test that you believe constitutes
9  evidence that Mrs. Levitt has experienced myocardial
10 infarction?
11 A.   No.
12 Q.   Number 3 under Conclusion indicates that Miss
13 Levitt was found to have good activity tolerance.
14      Do you see that?
15 A.   Yes.
16 Q.   Do you have any reason to disagree with Dr.
17 Pasnoori's finding that Mrs. Levitt as of November 2007
18 had good activity tolerance?
19 A.   No.
20      MR. BOEHM: Let's just take a quick break.
21      VIDEO OPERATOR: There we go. We'll take a
22 break.
23      MR. BOEHM: I think we're probably about that
24 time; right? Timed it well.
25      VIDEO OPERATOR: We're off the record at 11:19

Page 250

1  a.m.
2       (Recess, 11:19-11:40 a.m.)
3       VIDEO OPERATOR: This is Disc Number 2
4  continuing today's videotaped testimony of Jay N.
5  Schapira, M.D.
6       We are back on record. The time is 11:40 a.m.
7       We may proceed.
8  BY MR. BOEHM:
9  Q.   Dr. Schapira, when we broke, we were asking you
10 about the November 28th, 2007, nuclear stress test.
11      What is your explanation, if any, for the fact
12 that in November 2007 there was no evidence of a
13 non-transmural injury in the anteroseptal region of Mrs.
14 Levitt's heart?
15 A.   I think that, you know, as happens with some
16 scars, assuming that, you know, this is true and
17 correct, I haven't seen the images, but just assume
18 that, that the scar tissue has been filled in with some
19 viable tissue that's now accepting the radionuclide
20 tracer once injected, that is, the 99m sestamibi, and
21 that it's now metabolizing it, and that this happens
22 sometimes.
23 Q.   What is your understanding as to whether or not
24 the medical community has improved its ability to
25 discern the difference between breast tissue attenuation

Page 251

1  and actual perfusion defect between the years 2002 and
2  2007?
3  A.   I think that the basic SPECT imaging is the
4  same. I think this was done at the same facility as the
5  prior one and I think the basic imaging is the same, and
6  they don't see any breast tissue artifact here in this
7  scan that we're talking about in 2007.
8       MR. BOEHM: If you don't mind, I'm going to ask
9  Rosemary just to read back the question.
10      And if your answer is the same, that's fine. I
11 just want to give you a chance to hear it again.
12      (The court reporter read the requested portion
13 of the record.)
14      THE WITNESS: I believe that the technology is
15 about the same, I believe that the interpretation is
16 about the same, and I believe that they did not see a
17 breast tissue artifact here because she didn't have --
18 she doesn't really have a breast tissue artifact as part
19 of her image.
20 BY MR. BOEHM:
21 Q.   And they also did not see any non-transmural
22 perfusion defect; correct?
23 A.   Correct.
24 Q.   And as you sit here today, you do not have any
25 basis to question that conclusion; correct?

Page 252

1  A.   No, not unless there's a subsequent test over
2  the past nine years that we don't have yet.
3  Q.   I'm going to direct you now to your report,
4  which is Exhibit 5. It was marked previously.
5  A.   Yes, sir.
6  Q.   Specifically if you'll turn to Page 6.
7       On Page 6 of your expert report you refer to a
8  document that is described as a Framingham/ATP
9  Detection, Evaluation, and Treatment of High Blood
10 Pressure, Cholesterol in Adult.
11 A.   Yes.
12 Q.   Do you recall that?
13 A.   Yes.
14      MR. BOEHM: I'm going to mark what I believe to
15 be the document to which you're referring.
16      That will be Exhibit 17.
17      (Exhibit Schapira-17 was marked for
18 identification.)
19      MR. THOMAS: I'll give you a copy that you can
20 look at. That's your copy, Doctor.
21      THE WITNESS: Oh, thank you.
22 BY MR. BOEHM:
23 Q.   Is this the document that you were referring to
24 on Pages 6 and 7 of your expert report? And I believe
25 it's Number 4 in the bibliography of your report.

23 (Pages 249 to 252)

Jay N. Schapira, M.D.

Page 253

1    MR. BOEHM:  It got marked on the wrong side.
2    Did you -- that's -- you have it backwards.
3    MR. THOMAS:  It's two-sided.
4    There you go.
5    MR. BOEHM:  Can we move that sticker so that
6    it's on the correct page?
7    Thank you.
8    BY MR. BOEHM:
9    Q.    Dr. Schapira, is this the document that you were
10   referring to on Pages 6 and 7 of your expert report and
11   that is Number 4 on the bibliography of your report?
12   A.    May I see the bibliography again, please?
13        Yes.
14   Q.    And, as I understand it, when you refer in your
15   report to the Framingham/ATP III score, you are
16   referring to risk estimates calculated pursuant to the
17   guidance set forth in this document; is that right?
18   A.    I'm not sure this is the document, actually.  I
19   beg your pardon.  I know that's listed in the biblio but
20   this is the Framingham/ATP III point scores.  So I'm not
21   sure it's the same document.
22   Q.    I'll direct your attention to Page 3231 of what
23   is now Exhibit 17, the Framingham/ATP III report.
24   A.    3231.
25   Q.    Are you there?

Page 254

1    A.    Yes.
2    Q.    You see Table III.1-6 refers to a ten-year risk
3    estimate for women, Framingham point score?
4        MR. THOMAS:  Move that water.
5        THE WITNESS:  Thank you.
6        Yes, I do.
7    BY MR. BOEHM:
8    Q.    Is this what you used to calculate an estimated
9    Framingham/ATP III risk score for Mrs. Levitt?
10   A.    What I used, Mr. Boehm, was the -- some -- an
11   article that looked different from this.  Maybe it's
12   just a different format.  I'm not sure.
13   Q.    If you'd turn to your report and look at the
14   bibliography.  You see Number 4?  You've referenced the
15   National Cholesterol Education Program Expert Panel on
16   Detection, Evaluation, and Treatment of High Blood
17   Cholesterol in Adults, Adult Treatment Panel III.
18   A.    Yes.
19   Q.    And then it says, Third Report of the National
20   Cholesterol Education Program on Detection, Evaluation
21   and Treatment of High Blood Cholesterol in Adults, Adult
22   Treatment Panel III, Final Report, published in
23   "Circulation," 2002; 106:3143.
24       Do you see that?
25   A.    Yes.

Page 255

1    Q.    That does, in fact, appear to be the document
2    that we have marked as Exhibit 17 to your deposition;
3    correct?
4    A.    I'm not sure it's the same document.  I don't
5    see the "Circulation" cite here --
6    Q.    If you --
7    A.    -- as being Volume 106, Page 3143.
8    Q.    If you look to the very last page, it's on the
9    very back --
10   A.    Oh, on the back.
11   Q.    -- of Exhibit 17.  It has the "Circulation"
12   literature reference.
13   A.    Perfect.  Thanks.
14   Q.    Okay.  So this is the document you were citing
15   in your report; correct?
16   A.    It looks different to me, from what I can
17   recall.  This was done some time ago.  But it looks like
18   the same document, just in a different format.
19   Q.    Okay.
20   A.    I mean, as best I can tell.
21   Q.    Okay.  So if you would, turn with me to
22   Page 3231.
23   A.    3231.  Okay.  Okay.
24   Q.    And this is Table III.1-6, ten-year risk
25   estimates for women, Framingham point scores.

Page 256

1        Do you see that?  Do you see that?
2    A.    You're talking about the top graph.
3    Q.    Yes.
4    A.    Yes.
5    Q.    And is this the ten-year risk estimate for women
6    that you were trying to apply to Mrs. Levitt's risk
7    factors?
8    A.    Yes.
9    Q.    Okay.
10   A.    I think so.  I think so, yes.
11   Q.    What risks specifically are you trying to
12   measure when you talk about the risk estimate?
13   A.    We are trying to talk about the ten-year risk
14   estimates for the development of coronary heart disease.
15   Q.    The Framingham point scores estimating risk of
16   developing coronary heart disease is for people who
17   don't already have established coronary heart disease;
18   correct?
19   A.    Yes.
20   Q.    This does not apply to people who are already
21   known to have coronary artery disease already; correct?
22   A.    Right.  So it includes those that have it and
23   those that don't have it.  And those that do have it
24   don't know they have it, so it's not established yet.
25   Q.    Right.  This is applied to people who have not

24 (Pages 253 to 256)

Jay N. Schapira, M.D.

Page 257

1  already been diagnosed with coronary artery disease;
2  correct?
3  A.    Yes.
4  Q.    And Framingham predicts absolute risk, not
5  relative risk; correct?
6  A.    Correct.
7  Q.    ATP is made up of a group of doctors and
8  researchers with specialized expertise; correct?
9  A.    I mean, the designers of the study and authors
10 have, I would expect so, yes.
11 Q.    Have you ever been invited to be on the Adult
12 Treatment Panel?
13 A.    No.
14 Q.    Do you know any of the people who are members of
15 ATP III?
16 A.    Tell me who's there and I'll --
17 Q.    If you look on the second page of Exhibit 17, it
18 says "Members."
19       Thank you for keeping your place on that other
20 page.
21       Do you see "Members" here at the top of the
22 page?
23 A.    Yes.
24 Q.    Do you know any of those physicians?
25       And it looks like there's at least one Ph.D., so

Page 258

1  do you know any of those individuals?
2  A.    I see one that I know.
3  Q.    And who is that?
4  A.    Antonio Gotto.
5  Q.    In what capacity do you know Dr. Gotto?
6  A.    Dr. Gotto was a -- when I was chief resident at
7  Methodist-Baylor in Houston, he was a faculty member and
8  a teacher.
9  Q.    Have you ever talked with Dr. Gotto about his
10 participation as a reviewer in connection with this ATP
11 III report?
12 A.    No.
13 Q.    If you'll turn back with me to the page that you
14 had marked, Dr. Schapira, which is Page 3231, I'd like
15 to go through the risk assessment that you performed
16 vis-à-vis Mrs. Levitt.
17       This ten-year risk estimate uses Framingham to
18 go through five different questions or risk factors to
19 come to a total number that corresponds with a ten-year
20 risk percentage; correct?
21 A.    Yes.
22 Q.    And the first of those factors is age.
23 A.    Yes.
24 Q.    And you indicate in your report that Mrs. Levitt
25 was 56 years old, which places her between 55 and 59 and

Page 259

1  gives her a point total of eight for that criterion;
2  correct?
3  A.    Yes.
4  Q.    And she was 56 years old as of March 2000;
5  correct?
6  A.    Yes.
7  Q.    Why did you use March 2000 as the date at which
8  you are assessing or estimating Miss Levitt's risk
9  score?
10 A.    Because that was the age at which the question
11 arose as to when she might be considered for coronary
12 heart disease, as opposed to never having been
13 considered in that regard before.
14 Q.    March 10th, 2000, was the date on which it was
15 determined that Miss Levitt did, in fact, have coronary
16 artery disease; correct?
17 A.    Yes.
18 Q.    All right. Let's go to the next one, total
19 cholesterol.
20       You took several of Mrs. Levitt's cholesterol
21 readings and averaged them together to come to a total
22 of 205.75; correct?
23 A.    Yes.
24 Q.    Which would place her in that third group and
25 give her four additional points; correct?

Page 260

1  A.    Give her five additional points.
2  Q.    And why is it that you determined that she
3  should get five additional points?
4  A.    Excuse me. It would be four additional points.
5  Wait a minute. It's -- no. Excuse me. It would be
6  four additional points.
7  Q.    Okay.
8  A.    Because that -- if you slot her age in at 56.
9  Q.    Okay. And in your report you say three points
10 but that's a mistake. You meant to say four points;
11 correct?
12 A.    Let's see how I did that.
13 Q.    You see at the bottom of your report here you
14 have total cholesterol, you have several readings that
15 you've listed for an average of 205.75 and then you
16 assign her three points.
17 A.    Correct. Should be four.
18 Q.    Okay. How did you go about determining which
19 cholesterol readings to use and which not to use for
20 purposes of your averaging?
21 A.    I just took a series of all I could find.
22 Q.    These are the four that you could find? You
23 couldn't find any others?
24 A.    Of the records I had at the time with me, those
25 are the ones I could find so I took those. They were

Jay N. Schapira, M.D.

Page 261

1  before we knew she had coronary disease.  I tried to
2  take early-on ones.  And before any treatment, of
3  course.
4  Q.    Okay.  So you tried to find her cholesterol
5  readings before she was treated for her high
6  cholesterol?
7  A.    Before she took any statin drugs or anything.
8  Q.    Okay.  Let's look at the next criterion, which
9  is about whether she's a smoker.
10        And as of March 2000, Mrs. Levitt reports that
11  she was not smoking; correct?
12  A.    Correct.  She hadn't smoked for 16 years.
13  Q.    So you give her zero points.
14  A.    I did, yes.  Uh-huh.
15  Q.    Does the Framingham analysis not account for
16  past smoking?
17  A.    The -- my concept is I -- I don't know how
18  they -- I can't remember how they define it in the
19  study.
20        I think that this was current smoking and
21  smoking within a certain number of years, and I thought
22  that 16 was over whatever number they chose for that
23  certain number.
24  Q.    Do you agree that remote smoking is a risk
25  factor for coronary artery disease?

Page 262

1  A.    I believe that that risk is, for events is gone
2  at three years, three years and over.
3        For coronary heart disease I don't think it's a
4  major factor beyond -- well, for the development of it
5  it may be.  For the purpose of this grid, I don't think
6  it would be considered at 16.
7  Q.    Do you agree that remote smoking is a risk
8  factor for the development and progression of
9  atherosclerosis?
10  A.    Progression, no; initial development during the
11  smoking, yes.
12  Q.    Okay.  Let's look at the next one, HDL.  Again,
13  you've taken some averages of various readings, put them
14  together -- I'm sorry.
15        You've taken some collection of various HDL
16  readings and averaged them together to come to 45.25; is
17  that right?
18  A.    Yes.
19  Q.    And you assign her, based on that average, one
20  additional point; correct?
21  A.    Yes.
22  Q.    And then let's look at systolic blood pressure,
23  which is the next factor.
24        And here again you have taken a collection of
25  various measurements and averaged them together to come

Page 263

1  to a single figure of 121.67; correct?
2  A.    Yes.
3  Q.    How far back in time do those hypertension
4  measurements go?
5  A.    I don't recall how far back I went.
6  Q.    Why not use the blood pressure readings that
7  were closest in time to March 2000?
8  A.    No specific reason.
9  Q.    But you --
10  A.    I'm not sure it would change the number of
11  points we had, but on the average.
12  Q.    Well, if you want to estimate her risk as of
13  March 2000, wouldn't it be more appropriate to use blood
14  pressure readings that are closer to that period in
15  time?
16  A.    I could.  I just -- I don't recall exactly how I
17  selected these.  I've just tried to look through old
18  records and to try not to use blood pressures that might
19  have been influenced by how she was feeling in March.
20        She had her event on March the 9th, when she
21  went in the hospital, she had problems for a week before
22  that.  I don't think that would be a fair blood pressure
23  to use that in that week when she's actually undergoing
24  the event of the acute coronary syndrome so I didn't use
25  those.  I specifically did not use those.  I thought

Page 264

1  those were a little bit biased.
2  Q.    As you sit here today, you're not able to
3  specifically recreate for us your decision-making
4  process with respect to each and every blood pressure
5  reading in Miss Levitt's records; is that correct?
6  A.    I possibly could.  Let me give it a try.
7  Q.    Would that require for you to review the
8  entirety of her medical records production?
9  A.    No.  No.  I have sort of a little chronology.
10  Q.    A little cheat sheet?
11  A.    Chronology, I call it.
12  Q.    Okay.  That's fine.
13  A.    I don't recall which -- how I selected the blood
14  pressures or from which dates.  I didn't put that down.
15  Q.    Okay.
16  A.    But I tried to be representative and I tried not
17  to take the highest ones, tried not to take the lowest
18  ones.  I just tried to take representative ones.
19  Q.    Now, the ATP III/Framingham point score
20  differentiates between blood pressure that is untreated
21  and blood pressure that is treated.
22        Do you see that?
23  A.    Yes.
24  Q.    Do you know why the distinction is made between
25  treated blood pressure or hypertension and untreated

Jay N. Schapira, M.D.

Page 265

1  hypertension?
2  A.     Yes.
3  Q.     What is that reason?
4  A.     If your blood pressure is elevated on treatment,
5  then it's a more significant problem than if it's
6  elevated on no treatment.
7  Q.     Did you look to see whether Mrs. Levitt was
8  being treated with medication that lowers blood
9  pressure?
10  A.     I don't believe she was at the times that those
11  blood pressures were selected.
12  Q.     Do you know whether Miss Levitt was using any
13  medication that lowers blood pressure in March 2000 at
14  the time you're assessing her risk score?
15  A.     I don't believe she was.
16  Q.     Okay.
17  A.     Like, for example, in January of 2000 she saw
18  Dr. Hartman. I don't believe she was.
19  Q.     You do agree that if Miss Levitt was using a
20  medication to lower hypertension or lower blood pressure
21  in March, in or around March 2000, then she would be
22  assigned, based on your averaging of various readings,
23  three points rather than just one point; correct?
24  A.     Well, I couldn't agree with that in its entirety
25  due to the fact that what was she taking and when and

Page 266

1  within a week of March, I mean, March 2nd is during her
2  acute phase. So I don't know how to respond to that
3  question, based upon I need more facts about what
4  medication and exactly what date you're --
5  Q.     For how long would she need to have been taking
6  a medication that lowers blood pressure for you to put
7  her in the treated category rather than the untreated
8  category?
9  A.     For the majority of the time prior to March the
10  9th, 2000.
11  Q.     The majority of her lifetime? The majority of
12  what time?
13  A.     The majority of the time where the pressures are
14  selected.
15  Q.     But you, sitting here today, can't tell us how
16  far back in time you've reached to find those remote
17  blood pressure readings. Is that true?
18  A.     Without going through the four boxes to my
19  right, I cannot.
20  Q.     Okay. All right. So you've assigned her one
21  additional point for systolic blood pressure; correct?
22  A.     Yes.
23  Q.     And if you add that up, you come to a score of
24  14 points.
25  A.     Yes.

Page 267

1  Q.     And if you look at the bottom of this page on
2  3231, do you see there's a point total on the left hand
3  and then corresponding with that point total is a
4  ten-year risk score put in percentage terms? Do you see
5  that?
6  A.     Yes.
7  Q.     And based on your calculation of 14 points, Mrs.
8  Levitt's ten-year risk score would be 2 percent, based
9  on this particular analysis; correct?
10  A.     Yes.
11  Q.     And in your report you indicate that Miss
12  Levitt's risk, ten-year risk, was 22 percent for
13  coronary heart disease.
14  A.     Right.
15  Q.     Can you explain how you put 22 percent instead
16  of 2 percent?
17  A.     Yes, sir. It's a typo.
18  Q.     Okay. So it should read on Page 7 of your
19  expert report, when Miss Levitt's points are totaled
20  according to the grid for women, this comes to a total
21  of 14 points, comma, which is a ten-year risk of 2
22  percent for coronary heart disease --
23  A.     Correct.
24  Q.     -- including myocardial infarction, coronary
25  death, or angina.

Page 268

1  A.     Yes.
2  Q.     Now, why do you include angina in that ten-year
3  risk?
4  A.     It's part of the coronary syndrome, it's part of
5  the symptomatology and manifestations of coronary heart
6  disease. That's how we could know that someone is
7  manifesting it, because they would have the symptom, and
8  that would be angina.
9  Q.     If you would, Dr. Schapira, turn back with me to
10  Page 3228 of Exhibit 17, this ATP III report, and look
11  in the bottom of the right-hand column on that page.
12        Do you see it says, risk assessment for
13  determining ten-year risk is carried out according to
14  Framingham risk scoring, Tables 3.1 through 5 for men
15  and 3.1 through 6 for women?
16        Do you see that?
17  A.     Yes.
18  Q.     And that Table 3.1 through 6 is what we were
19  just looking at; correct?
20  A.     Yes.
21  Q.     It then says, risk factor scoring in ATP III
22  derives from an update of the Framingham database and
23  methodology reported by Wilson, et al. The revised
24  scoring applies specifically to hard CHD.
25        Do you see that?

27 (Pages 265 to 268)

Jay N. Schapira, M.D.

Page 269

1  A.    Yes.
2  Q.    Do you know what hard CHD is defined as for
3  purposes of the Framingham/ATP III guidelines?
4  A.    It's usually a major adverse cardiac event, like
5  a myocardial infarction.
6  Q.    Does hard CHD include unstable angina?
7  A.    I would have to go back and look. I know it's
8  hard events, documented events. I don't even know if t
9  says in this document but it --
10  Q.    Yeah. Let's look at the next page, 3229.
11  A.    Okay.
12  Q.    About in the middle of the left-hand column it
13  says, the primary end point for ten-year risk assessment
14  in ATP III is hard CHD, parentheses, myocardial
15  infarction plus CHD death.
16  A.    That's right. And the previous one had included
17  unstable angina. That's my memory.
18  Q.    The guidelines set forth in Framingham/ATP III
19  do not include unstable angina in hard CHD; correct?
20  A.    Right. The previous did, the previous one did,
21  and that's why -- this doesn't look familiar to me. I
22  may have been looking at another format of this or
23  there's another iteration of this but --
24  Q.    Can you tell us what iteration you think you
25  were looking at?

Page 270

1  A.    You know, I -- it could have been II. It could
2  have been II, ATP II/Framingham, or a prior iteration of
3  Framingham.
4        And the reason I say that is because this
5  publication is from 2002, and I typically would not use
6  a 2002 publication to analyze a year 2000 event. I
7  think that would be utilizing it, something that didn't
8  exist at the time when that would be applied.
9        So I think that I would probably be using a
10  prior iteration of this format, a previous, a previous
11  Framingham study, to do this. And that's why this
12  doesn't look familiar to me. I don't think I used this
13  exact document.
14        I agree that this is in the biblio but I
15  don't --
16  Q.    Did you prepare the bibliography?
17  A.    No.
18  Q.    Who prepared the bibliography to your report?
19  A.    I had some help from my secretary. And I don't
20  recall exactly how we did this. I may have said, here,
21  just take these papers and put them in, and I may have
22  had this paper in there but this would not have been the
23  one that I used because it's the wrong date.
24  Q.    So is it your view that one should only use the
25  guidelines, even if they're old and outdated, that you

Page 271

1  should use the older, outdated guidelines for purposes
2  of assessing in a post hoc manner the risk score for a
3  patient who suffered a cardiovascular event?
4        THE WITNESS: Rosemary, let me hear that
5  question back again.
6        MR. BOEHM: If it doesn't make sense, just let
7  me know. I can try it again.
8        (The court reporter read the requested portion
9  of the record.)
10        THE WITNESS: I think you should use concurrent
11  ones, if you can, if they exist, and what was
12  appropriate and that was in print and available at the
13  time that you're doing the analysis, I think is the best
14  way to do it.
15  BY MR. BOEHM:
16  Q.    Why is that? Why wouldn't you use the more
17  updated science on that?
18  A.    Well, I think that we're trying to look at her
19  risk compared to something that was happening at that
20  point in time and I think that her risk is addressed by
21  the literature that's current at that time.
22        I think that to use something that was
23  subsequently developed may not be relevant to that
24  period of time and I just don't think that the doctors
25  treating her in the year 2000 had access to something

Page 272

1  that's published two years later.
2  Q.    Well, but for purposes of your opinions that
3  you're offering in this case wouldn't you want to use
4  the most updated science?
5  A.    I would probably pick the -- what was existent
6  at the time and try to apply that to her case, as
7  opposed to something that was developed later.
8  Q.    Why? For purposes of the opinions that you're
9  offering now, all these years later --
10  A.    Yes. Yes.
11  Q.    -- in this case, why would you use outdated
12  guidelines rather than the more up-to-date science?
13        MR. THOMAS: Asked and answered.
14        THE WITNESS: I think you could use either one.
15  I just always try to use the date-appropriate ones.
16  BY MR. BOEHM:
17  Q.    Any other reason why?
18  A.    I think that there's a doctor in this case named
19  Dr. Rosamond who also had an opinion about her risks and
20  her causations and I think that he made some statements
21  about what he thought things were related to and I think
22  that he would not be able to know literature from 2002.
23  So I was trying to put myself in his position and what
24  he would have seen at that time.
25        I mean, I put my -- try to put myself into the

28  (Pages 269 to 272)

Jay N. Schapira, M.D.

Page 273

1    position of the doctors treating the case at the time,
2    what they saw, how they saw the patient in the year
3    2000. So that's why I think it's fair to use in a case
4    like this literature which is available to be used by
5    the doctors at the time.
6    Q.    And that's the perspective that you're bringing
7    as an expert to this case. You're trying to put
8    yourself in the position of a treating physician circa
9    2000; is that right?
10   A.    No. I'm just trying to do the best I can with
11   regard to trying to pick the right dates to use for to
12   analyze some of the material here.
13         And, I mean, you could pick -- you know, I could
14   pick one from next year that's preprinted, maybe, or I
15   could pick one from, you know, way old. But I tried to
16   pick the one that was spot-on right date for this
17   particular case.
18   Q.    You agree that the ten-year risk that's being
19   referenced in the Framingham/ATP III report that you've
20   cited in your report does not include unstable angina in
21   the definition of hard CHD; correct?
22   A.    The one that is in the bibliography, no; the one
23   that I think I used, it did.
24   Q.    Let's look at an article that you cite in your
25   expert report on Page 7. It's the Juni, et al.

Page 274

1          MR. BOEHM: I need those papers back, Ben.
2          MR. GRAHAM: Yeah. They're right here.
3          MR. THOMAS: You've got about four minutes left.
4    What do you want to do? Do you want him to look at
5    those films?
6          MR. BOEHM: Let's go off the record, if we
7    could, unless you object.
8          VIDEO OPERATOR: Off the record at 12:15 p.m.
9          (Discussion off the record.)
10         (Exhibit Schapira-18 was marked for
11   identification.)
12         VIDEO OPERATOR: Back on record. The time is
13   12:18 p.m.
14         We may proceed.
15   BY MR. BOEHM:
16   Q.    Dr. Schapira, in your expert report on Page 7
17   you refer to an article by Peter Juni published in "The
18   Lancet" in 2004; correct?
19   A.    Yes.
20   Q.    And specifically you refer to a point estimate
21   of 2.3, based on that study; right?
22   A.    Yes.
23   Q.    Do you know what specific end point that point
24   estimate refers to?
25   A.    Myocardial infarctions, it appears.

Page 275

1          Let me just double-check that. One second,
2    please.
3    Q.    Sure. I'll refer you to Page 4 of the Juni
4    publication, right-hand column, toward the top.
5    A.    Appears myocardial infarction.
6    Q.    This point estimate does not refer to unstable
7    angina; correct?
8    A.    That's correct.
9    Q.    Do you know whether or not Ms. Levitt's
10   presentation at any point in her medical history, as
11   you've seen it, would have qualified to be counted as a
12   myocardial infarction for purposes of the analysis
13   performed by Peter Juni, et al.?
14   A.    I think you're asking me would -- okay. Just
15   one second. I think you're asking me would she have
16   been in his study?
17   Q.    Correct. Based on her medical history, do you
18   know whether or not Juni, et al., would have included
19   her as among the myocardial infarctions he's
20   considering?
21   A.    I don't know that I can say if she had been
22   included or not.
23         This is a meta-analysis, M-E-T-A-analysis, of
24   multiple trials and this is selected out by me to look
25   at.

Page 276

1          Myocardial infarction, it doesn't say if it's
2    acute, it doesn't say if it can be picked up based upon
3    analysis from a nuclear scan, like we spent an hour
4    talking about, it doesn't say exactly how they
5    established the diagnosis or gathered the data, and so I
6    can't -- I don't know for sure.
7          It would depend upon the criteria. But they
8    typically -- but they clearly just took myocardial
9    infarction as their only end point and not the other
10   aspects of atherothrombotic coronary disease.
11   Q.    Okay. In the middle of Page 7 on your expert
12   report you refer to Miss Levitt having an intrinsic
13   relative risk factor of 4.4.
14         Do you see that?
15   A.    Yes.
16   Q.    Is that from your Framingham/ATP III analysis?
17   A.    Well, what I did was I took her intrinsic risk
18   factor, which we talked about was 2 percent, and I
19   estimated that based upon this study and other studies,
20   that she had a relative risk increase of 2.3, which is
21   230 percent. So I multiplied 2.0 times 2.3 and came up
22   with 4.6. Probably the correct math was 4.6.
23   Q.    Do you believe that acute myocardial infarction
24   and acute coronary syndrome are synonyms that can be
25   used interchangeably?

Jay N. Schapira, M.D.

Page 277

1    A.    I believe that acute coronary syndrome includes
2   acute myocardial infarction in one end of the spectrum
3   and I believe that it's part of it and we usually can,
4   though, say then, just talk about that aspect of the
5   acute coronary syndrome.  So yes and no, it's part of it
6   but you can also talk about it separately.
7    Q.    And would the same be true with respect to
8   unstable angina and acute coronary syndrome?
9    A.    Unstable angina is also part of acute coronary
10   syndrome, yes, same.
11   Q.    And then your same answer with respect to
12   unstable angina as with respect to acute MI?
13   A.    Well, it's a different portion of the spectrum.
14   It's all under acute coronary syndrome.
15        They're all overlapping, intersecting, continuum
16   of atherothrombotic complications from coronary artery
17   disease, starting with unstable angina and going to
18   non-ST-segment myocardial infarction, which is also
19   known as a non-transmural infarction, and then going on
20   to ST-elevation myocardial infarction, which is the
21   farthest end of the spectrum, which is transmural
22   infarction.
23        So it's all part -- and they all overlap and
24   they're a continuum with no clear demarcating lines or
25   distinctions between the two.

Page 278

1    Q.    Do you believe that acute myocardial infarction
2   is a synonym for acute coronary syndrome and that those
3   terms can be used interchangeably?
4    A.    To some extent, they can.  It depends on the
5   context in which you're talking about the two syndromes.
6   They can in some respects, yes, and in others, no.
7    Q.    Just below that paragraph you refer to Ms.
8   Levitt's March 2000 first symptomatic presentation.
9        Do you see that?
10        And you say, her risk went up to 9.59 times her
11   baseline risk --
12   A.    Yes.
13   Q.    -- at that time.
14   A.    Yes.
15   Q.    And that's based on your review of the approved
16   study results?
17   A.    Yes.
18        MR. BOEHM:  Okay.  Can we have that marked as
19   Exhibit 19.
20        (Exhibit Schapira-19 was marked for
21   identification.)
22   BY MR. BOEHM:
23   Q.    Now, if you'd turn to Page 1097 of this
24   publication which is now Exhibit 19, I believe that is
25   where you found the 9.59 point estimate.  It's in the

Page 279

1   left-hand column about three-quarters of the way down
2    A.    Yes, sir.
3    Q.    Is that right?
4    A.    Yes, sir.
5    Q.    This point estimate is based on patients
6   enrolled in the approved study who had symptomatic
7   cardiovascular disease before they took any Vioxx;
8   correct?
9    A.    Give me a moment, please.
10        I don't think so.  I think it's just the
11   concurrence of Vioxx use with a history of symptomatic
12   atherosclerotic cardiovascular disease.  Of course, we
13   know Miss Levitt took it before, during, and after.
14   Q.    What is your basis for your understanding in
15   interpreting this particular group of patients in the
16   way that you do?
17   A.    In the study there were 1,287 patients assigned
18   to 25 milligrams of rofecoxib.  202 had adverse clinical
19   events subsequently.  So it appears --
20   Q.    Those 202 were discontinued from treatment;
21   right?
22   A.    I believe so.  But Miss Levitt wasn't.
23   Q.    Right.  For purposes of the point estimate of
24   9.59 that you refer to in your report, after having
25   carefully reviewed this publication do you agree that

Page 280

1   this estimate is based on patients who had symptomatic
2   cardiovascular disease before they took Vioxx?
3    A.    No.
4    Q.    Are you just not sure one way or another?
5    A.    No.  It says on Page 1097, left paragraph, left
6   column, middle, a high cardiovascular risk was defined
7   by history of symptomatic atherosclerotic cardiovascular
8   disease or the presence of at least two of the following
9   risk factors for coronary disease:  History of
10   hypertension, history of hypercholesterolemia, or
11   current cigarette use.
12        Well, we talked about her blood pressure and we
13   talked --
14   Q.    Do you understand -- oh, I'm sorry.  Go ahead.
15   A.    -- and we talked about her hypercholesterolemia.
16   So she would fulfill it from that criteria.
17   Q.    She would fit the criteria for high
18   cardiovascular risk; correct?
19   A.    Correct.
20   Q.    But do you understand high cardiovascular risk
21   to be the same thing as symptomatic atherosclerotic
22   cardiovascular disease?
23   A.    It's not the same thing, no.  It's just that it
24   says "or" in the criteria there.
25   Q.    The criteria for defining high cardiovascular

30  (Pages 277 to 280)

Jay N. Schapira, M.D.

Page 281

1  risk; right?
2  A.    Yes.
3  Q.    But that's not what the point estimate refers
4  to.  The point estimate refers specifically to
5  individuals who have a history of symptomatic
6  atherosclerotic cardiovascular disease; correct?
7  A.    In other words, your question is, does this
8  refer to a person who has symptomatic coronary artery
9  disease who then got Vioxx, is what you're saying.
10 Q.    The point estimate of 9.59 refers specifically
11 to patients who had symptomatic cardiovascular disease
12 before they ever took Vioxx; correct?
13 A.    Correct.  And that's why I'm referring to the
14 9.59 after -- from the Vioxx she's taking after March,
15 before May, because as of March, she is symptomatic
16 disease.
17 Q.    But she already had symptomatic cardiovascular
18 disease.
19 A.    Yeah.  And then she's taking Vioxx.
20 Q.    And she had already taken Vioxx; correct?
21 A.    Yeah.  And she's taking more.
22 Q.    Okay.
23       MR. THOMAS:  I don't know what Ben has got but
24 I've got you -- I've given you an extra 15 minutes, and
25 I'm not stopping you now, I'm just asking you what

Page 282

1  you've got.
2       MR. BOEHM:  I probably have another 15, 20.
3  just have this, few things.
4  BY MR. BOEHM:
5  Q.    Dr. Schapira, do you know the specific dates on
6  which Ms. Levitt started and stopped using Vioxx?
7  A.    I do.  It's in my notes.
8  Q.    Do you know in the three months prior to March
9  2000 when Ms. Levitt was and was not using Vioxx?
10 A.    She started Vioxx on 8/24/99 and around --
11 there's -- in February of 2000 there's a question that
12 Doctor -- there was a discussion about Relafen versus
13 Vioxx with Dr. Katz and she wanted to continue the
14 Vioxx.
15 Q.    There was a time when she was using Relafen
16 instead of Vioxx; correct?
17 A.    Yes.  Briefly.
18 Q.    Do you know when that was?
19 A.    I think it was around February of 2000.
20 Q.    Do you know for what period of time she was
21 using Relafen instead of Vioxx?
22 A.    I think it was a very brief time.  I think she
23 wanted -- she tried the Relafen, it didn't work well for
24 her, so she went back to Vioxx.
25 Q.    Do you know what specific period of time Ms.

Page 283

1  Levitt was using Relafen instead of Vioxx?
2  A.    I don't remember the precise dates.
3  Q.    Do you believe that NSAIDs other --
4  A.    I do know -- but just to -- I'm sorry.  I didn't
5  finish.
6  Q.    Go ahead.
7  A.    I do know that she was taking Vioxx when she was
8  admitted on 3/9.
9  Q.    Do you believe that NSAIDs other than Vioxx also
10 increase a patient's risk of adverse cardiovascular
11 outcomes?
12 A.    Other than, you said?  Yes, mostly.  Not
13 entirely.  Most.
14 Q.    I'm sorry.  Did you say not entirely?
15 A.    Not every single one of them.
16 Q.    Which NSAIDs do you think do not increase the
17 risk of cardiovascular events?
18 A.    I think it's debatable, but probably Naprosyn is
19 the most neutral.  Naproxen is the most neutral.
20 Q.    What is different about naproxen relative to
21 other NSAIDs?
22 A.    It's non-selective, compared to abciximab --
23 compared to rofecoxib.
24 Q.    Have you ever heard of the idea that naproxen
25 actually reduces the risk of cardiovascular outcomes?

Page 284

1  A.    I have.  I heard about that.
2  Q.    Do you have an opinion about that one way or the
3  other?
4  A.    I do.
5  Q.    What is your opinion about that?
6  A.    My opinion about that is this first came to my
7  attention in about the year 2000, and when I was being
8  marketed by Merck for Vioxx for my patients.  And I
9  remember a discussion, this came up, and I was being
10 asked to prescribe Vioxx for my cardiac population of
11 patients by the Merck rep, and I brought this issue up
12 and I was told that, well, it was compared to a
13 medication that provided protection so it was an unfair
14 comparison that I was really -- it was really not a
15 placebo, Naprosyn, it was really a risk reducer, as
16 opposed to just a neutral, and so it wasn't a fair
17 comparison.
18      And so I became interested in that.  I was
19 concerned about Vioxx, especially me being marketed to
20 prescribe Vioxx by Merck, and I ended up doing some
21 reading about it.
22      I -- what I discovered is that Naprosyn has been
23 discovered to probably be a neutral.  At the time it was
24 thought to have been perhaps, you know, protective but I
25 think subsequent studies have shown it probably to be a

31 (Pages 281 to 284)

Jay N. Schapira, M.D.

Page 285

1 neutral.
2 So that's sort of the story of how I became
3 interested in knowing about Naprosyn compared to Vioxx.
4 And this was in the year about 2000, 2001.
5 And then I -- when the article came out in the
6 "JAMA," by Nissen and Topol, that's when I realized that
7 Vioxx was just not for my patients at all.
8 Q. Have you considered the extent to which other
9 NSAIDs may have contributed to Miss Levitt's coronary
10 events?
11 A. Yes.
12 Q. Is that -- that's not something that's in your
13 report; right?
14 A. It's not.
15 Q. Do you have a view that other NSAIDs may have
16 contributed to Miss Levitt's coronary events?
17 A. I don't think that they have in any significant
18 way and no -- and in no way to the comparable effect,
19 high effect, of Vioxx.
20 Q. Do you know the symptoms of fibromyalgia?
21 A. Yes.
22 Q. Do you consider yourself to be an expert in the
23 area of fibromyalgia?
24 A. I'm not as much of an expert as a rheumatologist
25 but I know more than a layperson so, I mean, I do have

Page 286

1 some expertise.
2 Q. What percentage of your annual revenue comes
3 from your work as an expert?
4 A. Less than 5 percent.
5 Q. Less than 5 percent of your annual revenue comes
6 from your work as an expert?
7 A. Yes.
8 Q. Is that reflected on your income tax returns?
9 A. No.
10 Q. Why not?
11 A. I don't know.
12 Q. How do you report income in terms of your -- the
13 income you generate from your actual clinical practice
14 versus your work as an expert?
15 A. I give everything to my accountant, he fills out
16 the forms.
17 Q. Okay. And have you asked your accountant before
18 to calculate that, what percentage of your income is
19 coming from your expert work?
20 A. I've asked him that, yes.
21 Q. When did you last do that?
22 A. A few years ago.
23 Q. And he told you that it was less than 5 percent?
24 A. Yes.
25 Q. Have you ever had to produce your income tax

Page 287

1 reports in connection with your work as an expert
2 before?
3 A. I don't think so. Not that I recall.
4 Q. Do you agree that atherosclerosis is the
5 number-one cause of death for men and women in the
6 United States?
7 A. Yes.
8 Q. And that was true in the 1990s, before Vioxx was
9 ever sold; correct?
10 A. Yes.
11 Q. It's still true today; correct?
12 A. Yes.
13 Q. Do you agree that it is not good science to
14 cherry-pick some data here and some data there and
15 ignore the remainder of data when drawing conclusions
16 about the risks and benefits of a medicine?
17 MR. THOMAS: Foundation, form.
18 THE WITNESS: Yes.
19 BY MR. BOEHM:
20 Q. Do you agree that cherry-picking data is not a
21 good scientific method?
22 A. I think that that -- you know, that's a super
23 broad question that -- I mean, cherry-picking, in
24 general, is not a good idea in a circumscribed study.
25 When you are, though, Mr. Boehm, looking at

Page 288

1 studies and you find in a meta-analysis that you have
2 studies that are well done, well designed, and clearly
3 worthy of unbiased attention, you should include them,
4 regardless of the results.
5 Cherry-picking, sir, involves looking at the
6 results and liking it or not liking it and deciding to
7 cherry-pick it, but you can cherry-pick studies from the
8 standpoint of being a sound study, a good
9 methodological, methodological study, from the
10 standpoint of being analyzed properly, properly
11 controlled, records kept properly and things like that.
12 If you're doing a meta-analysis and you have a
13 study that's just a good study, regardless of results,
14 you need to put it in, positive, negative, or neutral.
15 If it's not a well-done study, then it probably needs to
16 be excluded because you can't trust what the results are
17 showing.
18 Q. When evaluating the safety and efficacy of a
19 medicine, do you agree that it's important to know how
20 frequently the medicine has been taken?
21 A. You mean by a population or by a patient?
22 Q. In a patient.
23 A. I think it depends upon the duration of
24 effectiveness or adverse effect of that medication.
25 Does it have a long-lasting, persistent effect

Jay N. Schapira, M.D.

Page 289

1  on a patient's biology after it was discontinued or is
2  it a medicine that's gone forever in six hours?  So it
3  depends upon the medication.
4  Q.    One consideration is whether or not a patient
5  has taken that medication continuously or has just taken
6  it on an irregular, as-needed basis; correct?
7  A.    It depends upon the medication.  I don't think
8  you could blanket answer that question.
9  Q.    If Ms. Levitt wasn't taking Vioxx in the weeks
10  or months before she died, you would agree it would be
11  pretty tough to conclude that Vioxx caused or
12  contributed -- I'm sorry.  Strike that.
13       If Ms. Levitt wasn't taking Vioxx in the weeks
14  or months before March 2000, when she was diagnosed with
15  unstable angina, you would agree it would be pretty
16  tough to conclude that Vioxx caused or contributed to
17  her unstable angina.
18       Do you agree?
19       MR. THOMAS:  Form.
20       THE WITNESS:  Let me have a read-back on that
21  one.  I'm still reeling from the prior question, which
22  you withdrew, I hope.
23       MR. BOEHM:  I withdrew it, yes.  Using some old
24  notes.
25       THE WITNESS:  I understand.

Page 290

1       Wishful thinking.
2       MR. BOEHM:  Not at all.
3       THE WITNESS:  Good.  I hope not.
4       (The court reporter read back the requested
5  portion of the record.)
6       THE WITNESS:  No.
7  BY MR. BOEHM:
8  Q.    Your view is that even intermittent use of Vioxx
9  could contribute to unstable angina?
10  A.    Yes.
11  Q.    Is there a particular study that you're relying
12  on for purposes of that analysis?
13  A.    There are some studies that show, even off of
14  it, that the persistence can be in the scope of four to
15  five years, that the effects of the prothrombotic
16  effects, the leading to atherothrombosis in coronaries
17  arteries can happen even with intermittent use.
18       It may not be as strong or as high a relative
19  risk as with continuous high-dose use but it will still
20  be there.
21  Q.    Dr. Schapira, is it correct that you currently
22  have a pending lawsuit against a pharmaceutical
23  manufacturer?
24  A.    No.
25  Q.    Are you currently or have you ever sued a

Page 291

1  pharmaceutical manufacturer?
2  A.    I have.
3  Q.    When was that?
4  A.    About two years ago.
5  Q.    That suit is no longer pending?
6  A.    Correct.
7  Q.    And you were alleging that some negligence on
8  the part of the pharmaceutical company caused you a
9  personal injury; is that correct?
10  A.    Their employees, yes.
11  Q.    And is that lawsuit resolved?
12  A.    Yes.
13  Q.    Was there a trial in connection with that suit?
14  A.    Yes.
15  Q.    Did a jury reach a verdict in that lawsuit?
16  A.    No.
17  Q.    Was there a settlement before a verdict was
18  reached?
19  A.    No.
20  Q.    What was the outcome of that case?
21       MR. BOEHM:  If you're allowed to talk about it.
22       MR. BOEHM:  Yeah.  Sure.
23       THE WITNESS:  I'm not really allowed to talk
24  about it --
25       MR. BOEHM:  There's a --

Page 292

1       THE WITNESS:  -- that I know for sure.
2       MR. BOEHM:  Okay.
3  BY MR. BOEHM:
4  Q.    But the suit is resolved but without a
5  settlement; is that right?
6  A.    I probably shouldn't say anything more.
7       MR. THOMAS:  Be careful.
8       I don't have a problem getting you that
9  information, if it's possible, but I don't want to mess
10  up something he has going on.
11       MR. BOEHM:  Sure.
12       MR. THOMAS:  And if it's some information that
13  he can disclose, get in touch with me through Elaine and
14  Emily or yourself or Ben or anybody and I'll get that
15  info to you.  But give him the courtesy --
16       MR. BOEHM:  Sure.
17       MR. THOMAS:  -- of just letting him check and
18  see what he can disclose.
19       MR. BOEHM:  Understood.  Understood.
20  BY MR. BOEHM:
21  Q.    When was that -- can I ask if -- you tell me if
22  I can ask, you can answer a question.
23       But can you tell me when it was resolved?
24  A.    I don't know what I'm supposed to tell you.
25  Q.    Okay.

33 (Pages 289 to 292)

Jay N. Schapira, M.D.

Page 293

1    A.    So...
2    Q.    As you sit here today, are you able to identify
3    any clinical study that demonstrates Vioxx causes
4    plaques to rupture or plaque erosion?
5    A.    Not that I know of.
6         MR. BOEHM: Let's go off the record.
7         We're going to just move the camera over now.
8         VIDEO OPERATOR:  Off the record at 12:47.
9         (Recess, 12:47-12:58 p.m.)
10        VIDEO OPERATOR:  We are back on the record.  The
11   time is 12:58 p.m.
12        We may proceed.
13   BY MR. BOEHM:
14   Q.    Dr. Schapira, earlier today I asked you about
15   your review of an angiogram taken on March 10th, 2000,
16   and specifically I asked you to identify for me in which
17   images and at what point or points in those images you
18   had identified what you believe to be haziness which you
19   take for a thrombus in Miss Levitt's angiogram as of
20   that date.
21        So we have now set up the camera so that it is
22   pointed in the direction of your computer screen so that
23   we can see the video of the angiogram and you are going
24   to direct us to those parts of the video that you
25   believe show that haziness or that thrombus; correct?

Page 294

1    A.    Yes.
2         As you can see, the computer is thinking.  We
3    didn't test this before.  We should have probably.
4    Q.    Are we looking here at --
5    A.    Here we go.
6    Q.    -- the first series?
7    A.    So this is actually the second one.  Let's go
8    back to the first one.
9         Here's the first one.  It's the injection of the
10   right coronary artery through a JR-4 catheter
11   illuminating and causing opacification of the right
12   coronary artery, which looks to be good right, it's got
13   two branches distally and free of any significant
14   obstructive disease.
15        I think the second injection is going to pop up
16   here in a second.  Here it is.  Here's a right coronary
17   artery in the RAO projection, right anterior oblique,
18   and it shows the right coronary with a high-rising acute
19   marginal branch and then the more distal vessel down at
20   the bottom of the screen.
21   Q.    Do you see any evidence of significant disease
22   in the second series?
23   A.    No, sir.
24        Here comes the third injection.  It's another
25   view of the right coronary, again, in a different angle,

Page 295

1    and it's more or less an AP view, anteroposterior, and
2    it shows, again, no significant obstructive disease in
3    the right coronary.
4         Next view is the first view of the left system,
5    and we see that the catheter is in the left vein,
6    bifurcates into the left anterior descending and the
7    left circumflex.  The left circumflex is non-dominant.
8    The left anterior descending is the large vessel that
9    comes and wraps around the apex, so that the apex and
10   the anterior wall is supplied by the left anterior
11   descending.
12   Q.    Do you see any evidence of disease there?
13   A.    Yes.  You can see that in the proximal portion
14   of the LAD near the take-off, the diagonal, there's a
15   haziness in there and there's also a narrowing of the
16   vessel.  It's probably not the best view we're going to
17   see but it is a view.
18   Q.    Do you see the haziness that you were referring
19   to on Exhibit 4 to your deposition, your notes, where
20   you note that there's some haziness in that series?
21   A.    Let me take a look here.  Let's go back.
22   Q.    And, by the way, we should just be clear for the
23   record which series we're looking at each time.
24   A.    Yes.
25   Q.    So if you don't mind, Dr. Schapira, when you

Page 296

1    fire up a series, just -- will you just say the number
2    of that series?
3    A.    Sure.
4         See how they're numbered here, 1000, 1001, 1002
5    1003, et cetera, down to 1012, I'll just refer to it
6    that way.
7    Q.    Perfect.
8    A.    So if we look in Series 1006, we see the
9    narrowing in the vessel, in the left anterior
10   descending, which I'm pointing to here with the arrow,
11   the cursor arrow, and you can see that it looks grayish,
12   as opposed to blackish, which it should look like this,
13   and that grayish we refer to as hazy.  So it's right
14   here in this area right there (indicating).
15   Q.    Do you take that haziness, what you referred to
16   as haziness, to be thrombus?
17   A.    Yes.
18        And it's also narrowed.  You can see here in
19   this frame, still in 1006, it is narrowed.  You can see
20   that the diameter of the vessel here is that size, at
21   the tip of the arrow, right here in the most narrow
22   portion, versus down here in the more normal portion of
23   the vessel.  So you can see that this is stenotic and
24   it's also a light gray, as opposed to a dark black.
25        We can see it here even slightly better, the

34  (Pages 293 to 296)

Jay N. Schapira, M.D.

Page 297

1  narrowed portion in the left anterior descending, and it
2  looks narrowed and also looks hazy and irregularly hazy
3  owing to thrombus.  And we see that the narrowed portion
4  of the vessel is the part that supplies the anterior
5  wall down to the apex.  And that's the correlation with
6  the studies that we discussed earlier with regard to the
7  nuclear studies and the echo.
8  Q.    Which series are you looking at right now?
9  A.    I'm looking at 1006.
10  Q.    Is the --
11  A.    This is --
12  Q.    Are you now looking at 1007?
13  A.    Yes.
14        And in 1007 we can see the left anterior
15  descending with its haziness just beyond the first
16  septal perforator, which is this vertical vessel going
17  down here, and we see the haziness and narrowing here in
18  the proximal left anterior descending.
19  Q.    Dr. Schapira, I've noticed that on many of these
20  images toward the bottom of the series there is kind of
21  a moon-shaped shadow?
22  A.    Yes.
23  Q.    Do you see what I'm pointing at right here
24  (indicating)?
25  A.    Yes.

Page 298

1  Q.    And on each of the scans we've seen that.
2        What are we seeing there?
3  A.    Diaphragm.  I know you were looking for breast
4  attenuation.
5  Q.    Just wondering what it was.
6  A.    That's diaphragm.
7        Let's see if we can go to the next one here.
8  Anyway, this one just, once again, shows the haziness as
9  well as the narrowing.
10        But it is a good point that you bring up.  I
11  think if there was a significant breast overlying image
12  problem, I think we'd see it here.
13  Q.    We're not looking at a nuclear scan right now,
14  are we?
15  A.    No.  We're looking at an x-ray, but it still
16  shows soft tissue overlying the heart.
17        Here's another view.  Again, we see that in the
18  area of the narrowing it's slightly grayer, looks
19  slightly hazy, as compared to the more black regions
20  that are normal.  Also shows the first diagonal branch,
21  which is involved, right here (indicating).
22  Q.    Dr. Schapira, do any of these images show, in
23  your view, a non-transmural perfusion defect in Miss
24  Levitt's heart?
25  A.    That would not be an appropriate question to ask

Page 299

1  of an angiogram.  An angiogram wouldn't give you that
2  information.
3        This is a lateral view that really does not show
4  the anatomy we're looking for.  It's just not the proper
5  view.
6  Q.    Just say what number you're looking at now, if
7  you will.
8  A.    Oh, 1009.
9        10010 (sic), the same, the proximal anatomy of
10  the LAD in the diagonal is not well demonstrated by
11  1010, 1010.
12        Right now we're looking at 1011, and we can see
13  some haziness in the LAD just after the diagonal.  LAD
14  stands for left anterior descending.
15  Q.    Just put your pointer, if you would, just right
16  at the point where you believe you see haziness.
17  A.    Right there (indicating).
18  Q.    And is that at the point where you believe there
19  is a thrombus?
20  A.    Yes.
21  Q.    And your determination that that is a thrombus
22  is based on the fact that you see the haziness?
23  A.    Yes.  And also the fact that two other doctors
24  saw it as well who were treating the patient
25  concurrently.

Page 300

1  Q.    Couldn't that just be a narrowing from the
2  plaque buildup in her coronary arteries?
3  A.    Well, there is a narrowing there, but a
4  narrowing normally doesn't look hazy like that.
5        This would make an angiographer, an experienced
6  angiographer, look at it and say, well, there's -- I
7  think that there's most likely thrombus there and so,
8  therefore, I'm going to give ReoPro, which is a
9  thrombolytic drug, or actually an antiplatelet drug,
10  where they -- helps to treat the thrombus.
11  Q.    Okay.  And which series are you looking at now,
12  Dr. Schapira?
13  A.    This is 1012.
14  Q.    What do you see on this series?
15  A.    This is the left ventriculogram.
16        Let me get back to that one here.  The last one
17  was just the left ventriculogram.
18  Q.    Is there anything of note that you see in the
19  left ventriculogram?
20  A.    I want to look and it one more time.  I've got
21  to get to that part where the -- unfortunately, this is
22  not the greatest program.  Somehow it's still working,
23  even though it says it's not responding.  So it's
24  scrolling through.  I wished I could jump to that one
25  but it's not going to let me.

35  (Pages 297 to 300)

Jay N. Schapira, M.D.

Page 301

1       Once again, this is 1007.  We see the haziness
2  probably best.  And the haziness won't appear the same
3  in every view.  It's going to be different in different
4  projections.  It's not a symmetrical affair.
5       It just shows that there's a lot of PVCs
6  associated with the injection into the left ventricle
7  and the ventricle appears to be a little sluggish in the
8  anterior wall, but it's hard to tell because of all the
9  PVCs, to be definite about that.
10  Q.    What are PVCs?
11  A.    Premature ventricular contractions.
12  Q.    Anything else you want to say about the
13  angiogram?
14  A.    I think that's it.  I think that's it.
15       MR. BOEHM:  Let's go off the record.
16       VIDEO OPERATOR:  Off the record.
17       The time is 1:15 p.m.
18       (Discussion off the record.)
19       VIDEO OPERATOR:  Back on record.  The time is
20  1:15 p.m.
21       We may proceed.
22       MR. BOEHM:  Dr. Schapira, thank you very much
23  for your time today.
24       THE WITNESS:  My pleasure.
25       MR. BOEHM:  We have no more questions at this

Page 302

1  time.
2       VIDEO OPERATOR:  We are going to go off record.
3  This concludes Dr. Schapira's testimony today.
4  This ends Disc Number 2 of 2.
5  We are off the record at 1:16 p.m.
6       (Whereupon the deposition concluded at 1:16
7  p.m.)
8              TESTIMONY CLOSED
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 303

1  STATE OF CALIFORNIA         )
2  COUNTY OF LOS ANGELES       )
3       I, ROSEMARY LOCKLEAR, a Certified Shorthand
4  Reporter of the State of California, duly authorized to
5  administer oaths pursuant to Section 2025 of the
6  California Code of Civil Procedure, do hereby certify
7  that
8       JAY N. SCHAPIRA, M.D., the witness in the
9  foregoing deposition, was by me duly sworn to testify
10  the truth, the whole truth and nothing but the truth in
11  the within-entitled cause; that said testimony of said
12  witness was reported by me, a disinterested person, and
13  was thereafter transcribed under my direction into
14  typewriting and is a true and correct transcription of
15  said proceedings.
16       I further certify that I am not of counsel or
17  attorney for either or any of the parties in the
18  foregoing deposition and caption named, nor in any
19  way interested in the outcome of the cause named in
20  said deposition dated the_____ day of
21  _____, 2016.
22
23
24
25  ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969

Page 304

1              INSTRUCTIONS TO WITNESS
2
3
4       Please read your deposition over carefully and
5  make any necessary corrections.  You should state the
6  reason in the appropriate space on the Errata Sheet for
7  any corrections that are made.
8       After doing so, please sign the Errata Sheet
9  and date it.
10       You are signing same subject to the changes
11  you have noted on the Errata Sheet, which will be
12  attached to your deposition.
13       It is imperative that you return the original
14  Errata Sheet to the deposing attorney within thirty (30)
15  days of receipt of the deposition transcript by you.  If
16  you fail to do so, the deposition transcript may be
17  deemed to be accurate and may be used in court.
18
19
20
21
22
23
24
25

36 (Pages 301 to 304)

Jay N. Schapira, M.D.

Page 305

```
 1              E R R A T A
 2              - - - - - -
 3
 4   PAGE  LINE  CHANGE
 5   ____  ____  _____
 6   REASON:_____
 7
 8   PAGE  LINE  CHANGE
 9   ____  ____  _____
10   REASON:_____
11
12   PAGE  LINE  CHANGE
13   ____  ____  _____
14   REASON:_____
15
16   PAGE  LINE  CHANGE
17   ____  ____  _____
18   REASON:_____
19
20   PAGE  LINE  CHANGE
21   ____  ____  _____
22   REASON:_____
23
24
25
```

Page 307

```
 1              LAWYER'S NOTES
 2   PAGE LINE
 3   ____ ____ _____
 4   ____ ____ _____
 5   ____ ____ _____
 6   ____ ____ _____
 7   ____ ____ _____
 8   ____ ____ _____
 9   ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
25   ____ ____ _____
```

Page 306

```
 1        ACKNOWLEDGEMENT OF DEPONENT
 2
 3
 4        I, _____, do hereby certify
 5   that I have read the foregoing pages, and that the same
 6   is a correct transcription of the answers given by me to
 7   the questions therein propounded, except for the
 8   corrections or changes in form or substance, if any,
 9   noted in the attached Errata Sheet.
10
11
12
13   _____
14   JAY N. SCHAPIRA, M.D.              DATE
15
16   Subscribed and sworn
     to before me this
17   _____ day of _____, 20____.
18
     My commission expires:_____
19
20   _____
     Notary Public
21
22
23
24
25
```

37  (Pages 305 to 307)