# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Case No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| *This document relates to* | * | JUDGE FALLON |
| | * | |
| *Jo Levitt v. Merck Sharp & Dohme Corp.*, | * | MAGISTRATE JUDGE |
| **2:06-cv-09757-EEF-DEK** | * | KNOWLES |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINIONS OF DAVID EGILMAN, M.D.

This motion asks the Court to prevent a legal free-for-all in which a single, ideologically-driven expert is allowed to opine on any topic of Plaintiff's choosing. Plaintiff's expert Dr. David Egilman—as is his custom—claims expertise in a wide variety of specialized subjects, including:

- cardiology;

- toxicology;

- molecular biology;

- neurology;

- psychiatry;

- prescription drug marketing;

- regulatory compliance;

- medical, scientific, and business ethics;

- corporate state of mind; and

- the law.

In reality, Dr. Egilman is a general-practice physician who does not conduct original scientific research and derives nearly all of his income through work as an expert witness.  Dr. Egilman effectively gave up his practice in family medicine many years ago to become a professional expert witness.  The Court should exclude Dr. Egilman's testimony for two reasons.

*First*, Dr. Egilman has no relevant expertise to support his opinions on any of the above-referenced topics.  As other courts have recognized in excluding Dr. Egilman's testimony, his opinions are grounded in a subjective bias against corporations, rather than any "expertise" that could be helpful to a jury.  *See Ballinger v. Brush Wellman Inc.*, 2001 WL 36034524, at *1 (Colo. Dist. Ct. June 22, 2001) (striking Dr. Egilman's trial testimony in its entirety after concluding that Dr. Egilman was "not a credible witness" and that his testimony was "motivated by his personal agenda and by his animosity, bias, prejudice, hostility and vindictiveness against defendant and defendant's law firm"), *aff'd in relevant part sub nom. Egilman v. Dist. Ct.*, 2002 WL 2027530 (Colo. App. Sept. 5, 2002); *Newkirk v. ConAgra Foods, Inc.*, 727 F. Supp. 2d 1006, 1029 (E.D. Wash. 2010) ("The bulk of Dr. Egilman's conclusions do not rise above 'subjective belief or unsupported speculation.'  His opinion testimony, therefore, is inadmissible under *Daubert* and Fed. R. Evid. 702.") (citation omitted), *aff'd*, 438 F. App'x 607, 608–09 (9th Cir. 2011) ("[W]e hold that the district court did not abuse its discretion in concluding that the 'analytical gap between the existing data and the opinion Dr. Egilman proffers' was too large." (citation omitted)).

*Second*, Dr. Egilman willingly concedes that Ms. Levitt **did not suffer a myocardial infarction**.  Yet the majority of his opinions—largely copied and pasted from his work in other Vioxx-related matters—concern data, analyses, and documents surrounding the issue of **myocardial infarction**.  Dr. Egilman should not be permitted to express opinions that he

concedes have no nexus to the facts at issue in this Plaintiff's case.

Because Dr. Egilman's testimony promises more in the form of sideshows than science, the Court should exclude his opinions and testimony in their entirety.

## ARGUMENT

Federal Rule of Evidence 702 sets forth the standard for admission of expert testimony.  That rule provides that such evidence is admissible only if (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(b)–(d).

The rule entails multiple requirements that are applicable here.  First, the subject matter of expert evidence must be one that requires expert testimony as opposed to one "the untrained layman would be qualified to determine" without "specialized understanding."  Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules.  Second, the expert testimony must be reliable, which entails "grounding in the methods and procedures of science" and "more than subjective belief or unsupported speculation."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993) (announcing non-exclusive factors for evaluating reliability of expert testimony); *see also Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir. 1999) (additional factors).  Moreover, the qualification prong of Rule 702 requires a foundation showing that the expert has special training or education and adequate knowledge on which to base an opinion. *See Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).  While an expert might be qualified in a particular field, any opinions that fall outside that field of expertise must be excluded as unqualified expert testimony.  *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009).

Plaintiffs have the burden of proving by a preponderance of the evidence that the testimony of their proffered experts is relevant and reliable. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275–76 (5th Cir. 1998) (en banc). As the "gatekeeper" of scientific evidence, the trial court has the obligation to ensure those standards are met. *Daubert*, 509 U.S. at 596–97; *Moore*, 151 F.3d at 276. As such, the court must make a "preliminary assessment of whether the reasoning or methodology . . . properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. When expert testimony is demonstrated to be speculative and lacking scientific validity, trial courts *must* exclude it, as courts in the Fifth Circuit routinely do. *See, e.g.*, *Food Lion, Inc.*, 171 F.3d at 313; *Moore*, 151 F.3d at 279; *Black v. Johnson & Johnson (In re Propulsid Prods. Liab. Litig.)*, 261 F. Supp. 2d 603, 616 (E.D. La. 2003).

Because Dr. Egilman's opinions do not satisfy the standards for admissible expert testimony, they should be excluded in their entirety.

## I.   DR. EGILMAN LACKS RELEVANT EXPERTISE ON SPECIALIZED MEDICAL MATTERS.

Federal courts bar physicians from opining about specialized fields of medicine in which they do not regularly practice. *See, e.g.*, *Simmons v. Novartis Pharm. Corp. (In re Aredia & Zometa Prods. Liab. Litig.)*, 483 F. App'x 182, 187–89 (6th Cir. 2012) (affirming the district court's determination that the plaintiff's treating physician, a board-certified oral surgeon—who was not "an expert or specialist in epidemiology, endocrinology, pharmacology, toxicology, radiology, or pathology"—lacked sufficient qualifications to testify as to the etiology of his condition; similarly concluding that the plaintiff's other medical expert also lacked "the experience and knowledge" to testify as to causation because he had no "independent expertise" in the area); *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824–25 (7th Cir. 2010) (affirming the district court's determination that one of the plaintiff's medical experts—a board-certified

neurologist and psychiatrist—was not qualified to testify as to certain issues pertaining to the plaintiff's multiple sclerosis because, among other reasons, "he had very limited experience with [multiple sclerosis] patients"); *Niles v. Owensboro Med. Health Sys., Inc.*, 2011 WL 1979309, at *2 (W.D. Ky. May 20, 2011) (granting the defendant's motion to exclude in part the testimony of the plaintiff's medical expert, who was retained to testify regarding obstetrical care, regarding the field of pediatrics; "[a]lthough obstetrics and pediatrics are necessarily related, qualification as an expert in one does not per se qualify a doctor as an expert in the other"); *Higgins v. Koch Dev. Corp.*, 997 F. Supp. 2d 924, 930 (S.D. Ind. 2014) (granting motion to exclude expert testimony regarding causation offered by doctor; "merely possessing a medical degree does not qualify its holder as an expert in all medical related fields") (internal quotation marks and citation omitted), *aff'd*, 794 F.3d 697 (7th Cir. 2015); *Evans v. Matrixx Initiatives, Inc.*, 2009 WL 2914252, at *9 (M.D. Fla. Feb. 18, 2009) (granting motion to exclude physicians' expert testimony because they "lack the specialized knowledge and training needed to properly opine on the toxicity of Zicam and zinc gluconate").

The Fifth Circuit is no different.  An expert may not "go beyond the scope of his expertise in giving his opinion."  *Goodman v. Harris County.*, 571 F.3d 388, 399 (5th Cir. 2009). For example, in *Copley v. Smith & Nephew, Inc.*, the court prevented an anesthesiologist from testifying regarding orthopedic surgery and neurology, noting "[a] medical degree alone . . . 'is not enough to qualify him to give an opinion on every conceivable medical question.'" (quoting *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1113 (5th Cir. 1991) (en banc) (per curiam), *abrogated on other grounds by Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579

(1993)).[1]  The expert possessed "no specific education or experience" in neurology or orthopedic surgery: he did not belong to any professional associations and held no certifications in either field, nor had he written, published, conducted studies or taught courses in those fields.  *Id.* at *3. Accordingly, the court concluded that the doctor did not have "the specialized knowledge, education, training or experience required to express an expert opinion" and excluded his opinion under Rule 702.  *Id.* at *4.  Where an expert lacks expertise in a specialized area about which he seeks to opine, the "district court should refuse to allow an expert witness to testify[.]"  *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).  Since Dr. Egilman lacks the requisite expertise, his testimony should be excluded in the areas discussed below.

### A.      Alzheimer's Disease, Dementia, and Cognitive Dysfunction

The Court should exclude Dr. Egilman's opinions regarding any alleged risk of Alzheimer's disease, dementia, or cognitive dysfunction posed by Vioxx because, as a non-practicing family physician, he lacks the expertise in the field of neurology that would be necessary to offer such opinions.

Dr. Egilman seeks to opine that one Alzheimer's disease study showed excess deaths among patients taking Vioxx, a finding that "should have been [immediately] disclosed in the warnings section of the [Vioxx] label" (Report of David Egilman (Dec. 13, 2013) ("Egilman Rep.") (attached as Ex. 1) ¶ 132); that another study "reached a statistically significant result against Vioxx on both the primary endpoint, clinically diagnosed Alzheimer's Disease, and on at least two other measures, dementia and CDR global scores by 1999" and that this result was

---

[1]      *Daubert* overruled *Frye*, on which *Christophersen* relied (see 939 F.2d at 1110), as to the test for expert **reliability**.  *Daubert*, 509 U.S. at 589 ("[T]he *Frye* test was displaced by the Rules of Evidence . . . under [which] the trial judge must ensure . . . scientific testimony or evidence admitted is . . . reliable.").  The analysis of an expert's **qualification** under *Christophersen*, however, is consistent with Rule 702 and was not overruled by *Daubert*.

"unlikely to be due to chance" nor "a surprising development" (*id.* ¶¶ 137–138); that the ongoing study of Vioxx "put[] thousands of trial participants at risk of AD and CV events" (*id.* ¶ 147); that Merck failed to "disclose[] the truth" about the results of its Alzheimer's studies (*id.* ¶ 150); and that Alzheimer's disease involves "[d]iscrete changes throughout the brain [that] are associated with the progression" of the disease, "including the formation of abnormal deposits of protein fragments known as beta-amyloid plaques; neurofibrillary tangles, made up of twisted tau proteins; and brain nerve cell, or neuron, damage and death" (*id.* ¶ 170).

Dr. Egilman is not qualified to opine on these matters because they require specialized neurological expertise, which he definitively lacks.  As Dr. Egilman admits, he is not a board-certified neurologist (Deposition of David Egilman, *In re: Vioxx*, 2:06-CV-03132 (Jan. 25, 2013) ("Mont. Egilman Dep.") (excerpts attached as Ex. 2) at 265:23–25); has never served as a clinical investigator in a trial regarding Alzheimer's (*id.* at 266:1–4) or conducted such a trial (*id.* at 266:9–11); has never held a leadership position in a neurology department at a medical school (*id.* at 266:5-8); and has never published on Alzheimer's (*id.* at 267:20–22).  Indeed, Dr. Egilman has admitted that "I wouldn't say I know more than almost anybody who is another physician" with respect to Alzheimer's disease and mild cognitive impairment.  *Id.* at 270:5–7.

Allowing Dr. Egilman to testify about cognitive impairment would contravene Rule 702 by admitting the testimony of an expert who is not experienced in applying the science in question to the specific issues in this case.  *See Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (preventing a polymer scientist from testifying about the cause of a particular tire's failure because "[i]t's the science's application to tires that concerns us here, and Moore has absolutely no experience applying polymer science to tires"); *see also Ralston v. Smith & Nephew Richard, Inc.*, 275 F.3d 965, 969–70 (10th Cir. 2001) (upholding trial court's

finding that orthopedic surgeon was not qualified to testify about intramedullary nailing because she was not familiar with that particular surgical technique).  Since Dr. Egilman does not have the appropriately specialized knowledge in neurology and cognitive dysfunction to make these claims, his testimony will be "[u]nhepful and therefore superfluous and a waste of time."  Fed. R. Evid. 702, advisory committee's note on proposed rule.

###### B.  Ms. Levitt's Psychiatric Health

The Court should exclude any of Dr. Egilman's opinions regarding Ms. Levitt's psychiatric health.  Dr. Egilman is not, nor has he ever been, qualified in the field of psychiatry and therefore is not qualified to offer such opinions.

In his supplemental report, Dr. Egilman purports to have conducted a differential diagnosis of her depression and concludes that "Mrs. Levitt's stent and CABG procedures were significant contributing factors in the development of her depression."  *See* Supplemental Report of David Egilman (May 9, 2014) ("Egilman Suppl.") (attached as Ex. 3) at 55.  Ultimately, he wishes to express the opinion that Ms. Levitt "lost her business as a result of depressive symptoms, fatigue, shortness of breath, and cognitive losses following—and caused by—her CABG."  *Id.*

The basis for Dr. Egilman's opinions in this area is his claim that, as a medical doctor, he "knows more than the layman" about psychiatry.  Deposition of David Egilman (Apr. 12, 2016) ("Egilman Dep.") (attached as Ex. 4) at 217:25.  But knowing "more than the layman" does not qualify one to offer expert opinions in a federal court of law.  To be qualified as an expert, witnesses must possess specialized knowledge, skill, experience, training, or education.  Fed. R. Evid. 702.  Dr. Egilman admits that he does not have any such qualifications in this area.  He has no degree in psychology (Egilman Dep. (Ex. 4) 220:16–17), he is not a board-certified psychiatrist (*id.* at 217:11–13), he has never performed any original research in the field of

psychiatry (*id.* at 217:14–16), and he has never been a member of a psychology of psychiatry faculty (*see* Curriculum Vitae of David Egilman (Dec. 2013) ("Egilman CV") (attached as Ex. 5) at 2).

Given Dr. Egilman's lack of qualifications in this area, he should not be permitted to testify concerning Ms. Levitt's psychiatric health.

### C.     Atherosclerosis and Restenosis

The Court should exclude Dr. Egilman's opinions regarding the alleged risk that Vioxx accelerates atherosclerosis or causes restenosis because, as a non-practicing family physician, he lacks the necessary expertise—in molecular biology, vascular biology, cardiology, or any other specialty—to offer such opinions.

Moreover, Dr. Egilman has identified no reliable scientific evidence—either in his report or at his deposition—to support the theory that Vioxx accelerates the development of atherosclerosis. Dr. Egilman's report states that "Vioxx ***may*** have contributed to [Ms. Levitt's] atherosclerosis." Egilman Suppl. (Ex. 3) at 53 (emphasis added). Dr. Egilman changed his opinion at his deposition to say that Vioxx, in his view, *did* contribute to Ms. Levitt's atherosclerosis. Egilman Dep. (Ex. 4) 167:9–13. But he was unable to identify any scientific data in support of that theory (*id.* at 168:1–169:6) ("Q: Are you relying on any particular animal studies or in vitro studies for your opinion in this case that Vioxx, to a reasonable degree of medical certainty, contributed to Ms. Levitt's development of atherosclerosis? A: Well, there are such studies. There are lots of mechanism studies."), and he testified that he would not address at trial any scientific studies concerning the alleged association between Vioxx and an increased incidence of atherosclerosis "at all, even in a most general way" (*id.* at 176:21–22).

Dr. Egilman should not be permitted to testify about the alleged risk that Vioxx accelerates atherosclerosis or causes restenosis in general, or that Vioxx caused Ms. Levitt's

atherosclerosis or restenosis in particular, because he has not identified any reliable scientific

basis for any such opinion, and because he testified that he would not address this topic at trial.

## II.     DR. EGILMAN SHOULD NOT BE PERMITTED TO OPINE ABOUT AN ALLEGED ASSOCIATION BETWEEN VIOXX AND UNSTABLE ANGINA.

Dr. Egilman agrees that the only cardiovascular injury that Ms. Levitt experienced in this

case is ***unstable angina***, chest discomfort caused by poor blood flow in the coronary arteries—in

Ms. Levitt's case, due to a decades-long build-up of atherosclerotic plaque.[2]  This restricted

blood flow is sometimes referred to as "ischemia."  *Medical Definition of Ischemia*, Merriam-

Webster, http://www.merriam-webster.com/dictionary/ischemia (last visited June 21, 2016).

Lest this important fact go unnoticed, unstable angina is ***not*** the same thing as a heart attack

("myocardial infarction"), a cardiovascular event that Dr. Egilman admits Ms. Levitt has ***never***

experienced.  Egilman Dep. (Ex. 4) 122:11–16 ("Q: Are you expressing an opinion to a

reasonable degree of medical certainty that Ms. Levitt experienced a specific underlying

cardiovascular event that can be described as acute coronary syndrome, other than unstable

angina?  A: ***No***." (emphasis added)); 103:16–18 ("Q: Are you expressing the opinion in this case

that Ms. Levitt suffered a myocardial infarction?  A: No.").[3]

Dr. Egilman concedes that he cannot identify a single randomized controlled trial that

shows a statistically significant association between unstable angina and the incidence of

---

[2]      Dr. Egilman lacks expertise in the field of cardiovascular science. He readily concedes that he is "not a board-certified cardiologist," (Egilman Dep. (Ex. 4) 111:13–15) and no physician in the United States has ever referred a patient to him for cardiovascular care (*id.* at 112:7–10).  Since Dr. Egilman does not have the specialized knowledge, experience, or skill to qualify as an expert in cardiology, he should not be permitted to testify about unstable angina.

[3]      The Court should prohibit Dr. Egilman from testifying as to data, documents, testimony or analyses concerning myocardial infarction because he concedes that Ms. Levitt ***never actually experienced a myocardial infarction***.  As such, there is no "fit" between scientific testimony about myocardial infarctions and the specific facts of this case, and Dr. Egilman should not be permitted to express opinions that he concedes have no nexus to the facts at issue in this case.

unstable angina.  Egilman Dep. (Ex. 4) 148:14–149:5.  Instead, Dr. Egilman intends to rely on analyses that ***combine*** a large number of cardiovascular events into a single statistical analysis. *See, e.g.*, *id.* at 136:1–138:16.

This approach is neither methodologically sound nor scientifically appropriate, and Dr. Egilman should not be permitted to advance such an opinion at trial.  The Fifth Circuit has consistently upheld the exclusion of studies (and opinions relying on such studies) that look at a composite risk for a broad set of adverse outcomes, rather than a *specific* connection between the particular exposure and the actual affliction experienced by plaintiff.  *See, e.g.*, *Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 585–86 (5th Cir. 2004) (affirming exclusion of expert testimony in part because expert offered "no studies which demonstrate a statistically significant link between [the carcinogen to which the plaintiff was exposed] and [the plaintiff]'s type of . . . cancer"); *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 197 (5th Cir. 1996) (affirming rejection of studies showing that exposure to carcinogen caused a different type of cancer than the one suffered by plaintiff because "a connection between EtO exposure and human lymphatic and hematopoietic cancers . . . is not probative on the causation of brain cancer"); *see also In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 2015 WL 3603624, at *2 (E.D. La. June 5, 2015) ("Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case." (citing *Daubert*, 509 U.S. at 593)).

Yet this is precisely what Dr. Egilman wants to do in this case.  He relies on risk calculations that include unstable angina as just *one* out of a long list of CV outcomes, including fatal and nonfatal myocardial infarction, sudden death, ischemic stroke, transient ischemic attack, peripheral arterial thrombosis, peripheral venous thrombosis, and pulmonary embolism.

Egilman Dep. (Ex. 4) 163:14–16 ("ACS is the hard point end point people use.  They are not using unstable angina.").  Notably, Dr. Egilman himself has recognized the inappropriateness of trying to use a composite endpoint as a substitute for looking at a particular injury of interest. *See* Egilman Rep. (Ex. 1) ¶ 41 ("The APTC endpoint groups together and 'includes CV, hemorrhagic, and unknown deaths; nonfatal myocardial infarctions; and nonfatal strokes.'  Thus, the meta-analysis ***could not detect risk in a specific CV subcategory***, since any risk in one category might be offset by lack of risk in another subcategory." (emphasis added) (citations omitted)).

Undeterred, Dr. Egilman focuses in particular on a statistical analysis performed by his fellow plaintiff's expert, David Madigan, sometime after Madigan's deposition.[4]  Egilman Dep. (Ex. 4) 148:14–20; *id.* at 163:4–9 (testifying that this is the analysis he ultimately intends to rely on for his opinions concerning an alleged association between Vioxx and unstable angina); *see also* Def.'s Mot. to Exclude Expert Ops. of David Madigan, Ph.D. at 12–14.  This analysis, however, like every other piece of data upon which Dr. Egilman relies for this opinion, is not specific to unstable angina.  Egilman Dep. (Ex. 4) 122:17–19.  Instead, Dr. Madigan's calculation combines a variety of cardiovascular outcomes—including heart attack, cardiac arrest, and sudden death (*id.* at 116:14–22)—that Dr. Egilman concedes Ms. Levitt never

---

[4]     Dr. Egilman made a mockery of Plaintiff's expert discovery obligations by failing to provide notice that he had in his possession—and at trial intended to rely on—this analysis.  It was appended to the back of an unrelated PowerPoint slide deck and shuffled into one of the hundreds of folders that Dr. Egilman brought to his deposition.  *See* Egilman Dep. (Ex. 4) 41:13–43:15.  It is a one-page summary of an analysis that Dr. Egilman asked Dr. Madigan to perform in the days leading up to Dr. Egilman's deposition, but after Dr. Madigan's.  *See id.* at 45:5–8.  Despite his reliance on this analysis, Dr. Egilman divulged its existence approximately an hour into his deposition, only after counsel asked exactly the right set of questions to elicit the fact of its existence.  *See id.* at 39–41.  This constitutes an additional ground to exclude any opinions that Dr. Egilman might wish to express about an alleged association between Vioxx and unstable angina.

experienced (*id.* at 119:4–120:6).  Indeed, Dr. Egilman has no idea what Dr. Madigan's analysis would have shown if he had focused his analysis to the specific injury Ms. Levitt experienced—unstable angina.  *Id.* at 127:13–16 ("Q: Do you know how these numbers would change if you were to use only the reported events of unstable angina to conduct this analysis?  A: No.").[5]

Dr. Egilman failed to review the unstable angina data, not because they were unavailable, but because he simply chose not to do so.  He freely concedes that the data necessary to conduct such an analysis are available (*id.* at 147:25–148:13); he simply has not done that analysis himself (*id.* at 154:11–17), nor has he seen such an analysis performed by anybody else (*id.* at 122:17–19).

Dr. Egilman's methodology falls far short of the standard required by *Daubert*, and his conclusions about an alleged association between Vioxx and unstable angina are unreliable.  Dr. Egilman should not be permitted to opine about an alleged association of Vioxx and unstable angina—using composite endpoints involving (and largely driven by) ***other*** cardiovascular endpoints—because he admits to not having examined the specific outcome, unstable angina, that Dr. Egilman agrees Ms. Levitt experienced.

---

[5]      Moreover, many federal courts have found that an expert, such as Dr. Egilman, cannot rely on an analysis performed by a different expert, such as Dr. Madigan's, where the relying expert has not, or cannot, critically evaluate the relied-upon analysis.  *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp. 3d 724, 741 n.6 (N.D. Ohio 2014) ("'A court also may reject expert testimony under Rule 703 where the witness relies on the findings of an expert in a different field and, because the witness is not an expert in that field, can only parrot and not critically evaluate those findings.'" (quoting 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6274 (1st ed. 1996))).  That is precisely the case here.  Dr. Egilman freely admits that he did nothing to evaluate or analyze Dr. Madigan's work.  Egilman Dep. (Ex. 4) 50:23–51:2 ("Q: Did you do anything to double-check Dr. Madigan's results as represented on this slide entitled ACS meta-analysis to determine that it had been conducted in a statistically appropriate way?  A: No.").

## III.    DR. EGILMAN IS NOT QUALIFIED TO OPINE ON MERCK'S STATE OF MIND.

The Court should exclude Dr. Egilman's opinions about Merck's alleged state of mind with respect to a broad range of Vioxx-related issues.

The Fifth Circuit has made clear that experts are not qualified to testify about a party's state of mind. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (expert's "conclusory assertions regarding [defendant's] state of mind are not admissible" because they "would not be helpful to a jury"); *see also, e.g.*, *Marlin v. Moody Nat'l Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007) (per curiam) (affirming exclusion of expert testimony of a bank worker because the trial court's assessment "comports with the Fifth Circuit's stance that an expert's conclusory assertions regarding a defendant's state of mind are not helpful or admissible").  Federal decisions likewise routinely exclude such opinions about state of mind or intent as either outside the witness's expertise, unhelpful nonexpert testimony, or both.  *See, e.g.*, *Powell v. Tosh*, 942 F. Supp. 2d 678, 703–04 (W.D. Ky. 2013) (expert's "conclusions as to Defendants' awareness, intent, choices, and knowledge are . . . state-of-mind opinions" and hence "not within the knowledge of any expert" (citation omitted)); *Lofton v. McNeil Consumer & Specialty Pharm.*, 2008 WL 4878066, at *6–7 (N.D. Tex. July 25, 2008) (excluding opinions about Defendant corporation's ethical obligations, motive, state of mind, asserted knowledge and alleged conduct because they lacked an "explanation of the reasoning or methodology" and "[did] not meet the *Daubert* requirements for reliability"); *AstraZeneca LP v. TAP Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 293 (D. Del. 2006) (excluding expert opinion of what a party "recognized," "felt," "concluded," or was "concerned" about because experts are not "permitted to testify . . . regarding [the defendant's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred") (internal quotation marks omitted); *In re Rezulin Prods. Liab. Litig.*, 309

F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (excluding expert testimony "on the intent, motives or states of mind of corporations" because they "have no basis in any relevant body of knowledge or expertise"); *ISP Chems. LLC v. Dutchland, Inc.*, 2011 WL 2651691, at *7 (W.D. Ky. July 6, 2011) ("A party's 'state of mind' is subjective and cannot be within [expert's] knowledge." (citation omitted)).

Dr. Egilman has testified in Vioxx matters that he holds himself out as an expert in "discerning a company's intent or an individual's intent based on [his] interpretation of an e-mail." Mont. Egilman Dep. (Ex. 2) 195:22–196:2; *see also* Egilman Dep. (Ex. 4) 147:20–24 (testifying that "Merck intentionally chose to eliminate unstable pectoris analysis from the published paper"). Based on this supposed expertise, Dr. Egilman seeks to testify at trial, among other things, that Merck "deliberately misrepresent[ed]" Vioxx as safe (Egilman Rep. (Ex. 1) ¶ 17); "Merck was aware of nonclinical and clinical data linking increased incidences of cardiovascular events with Vioxx usage, prior to the release of the VIGOR findings" (*id.* ¶ 20); Merck "intentional[ly]" "never disclosed that the label information on CV risk underestimated the true risk" (*id.* ¶ 116); "Merck strategically manipulated data" (*id.* ¶ 128); and Merck engaged in an "active effort not to comply with FDA requests for information" (*id.* ¶ 153). But Dr. Egilman is not more qualified than a jury to ascertain Merck's motivations for taking particular actions, and he may not offer testimony as to Merck's "awareness, intent, choices, and knowledge." *Powell*, 942 F. Supp. 2d at 703. Because Dr. Egilman has no special training on which to base an opinion concerning Merck's state of mind—and, indeed, because any such testimony is categorically outside the appropriate scope of an expert's function—the Court should exclude Dr. Egilman's state-of-mind testimony.

**IV.    DR. EGILMAN LACKS SUFFICIENT EXPERTISE TO SUPPORT HIS MARKETING AND ETHICS OPINIONS.**

Dr. Egilman also seeks to offer a range of opinions on the marketing of Vioxx, particularly that Merck's marketing of Vioxx violated ethical standards.  Once again, these opinions fall outside the expertise of a family physician.  Indeed, they are not the proper subject of expert testimony at all.

*First*, Dr. Egilman's marketing opinions (and other opinions speaking to ethical requirements) should be excluded because they are grounded in Dr. Egilman's personal view that Merck violated "ethical" requirements and thus do not qualify as expert testimony.

"Personal views on corporate ethics and morality are not expert opinions."  *In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1053–54 (D. Minn. 2007) (excluding expert's opinion regarding whether a drug manufacturer acted "ethically, irresponsibly or recklessly"); *see also In re Rezulin*, 309 F. Supp. 2d at 543 (excluding expert opinions concerning purported ethical standards and obligations of pharmaceutical companies as inadmissible under Rule 702).  Moreover, such opinions are irrelevant and would not assist the fact-finder in determining any factual dispute in the case.  Fed. R. Evid. 702; *see also In re Rezulin*, 309 F. Supp. 2d at 544 ("While the defendants may be liable in the court of public opinion, or before a divine authority for any ethical lapses, expert opinion as to the ethical character of their actions simply is not relevant to these lawsuits.").

The same is true here.  Many of Dr. Egilman's improper marketing opinions are couched in terms of nebulous ethical requirements that reflect nothing more than Dr. Egilman's "subjective beliefs and personal views."  Egilman Rep. (Ex. 1) ¶ 201 (Merck "should have protected the integrity of its research by keeping marketing and research efforts separate" but instead "created an internal marketing atmosphere in which researchers were encouraged to

create science to back marketing strategies."); *id.* ¶ 208 (opinion that Merck's marketing training "violate[d] [its] own ethics recommendations").[6]  These "opinions" are subjective rather than expert in character; because they are "inherently susceptible to subjective personal influence and lacking indicia of reliability" required by Rule 702, they must be excluded.  *In re Diet Drugs Prods. Liab. Litig.*, 2001 WL 454586, at *10 (E.D. Pa. Feb. 1, 2001).

**Second**, Dr. Egilman's marketing opinions are also inadmissible because he is not a marketing expert, and is therefore not qualified to offer them.  Notably, federal courts have routinely prohibited doctors who wish to wander outside their core area of expertise from opining about the marketing of a drug or other medical product because such matters lie outside their area of expertise.  *See, e.g.*, *Morales v. E.D. Etnyre*, 382 F. Supp. 2d 1252, 1271 (D.N.M. 2005) (deeming expert's testimony inadmissible because he had "limited experience upon which to formulate or ground his opinions as they relate to the marketing, sale, and/or distribution" of the product); *In re Diet Drugs*, 2001 WL 454586, at *9 (excluding expert testimony because "Dr. La Puma's expertise, garnered largely from the study of medical ethical issues in individual patient cases, simply does not qualify him to render opinions concerning the appropriate conduct of pharmaceutical companies in the manufacture and marketing of drugs"); *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1243 (D. Colo. 1998) (organic chemist not qualified to testify as expert regarding design, manufacture, marketing and labeling of breast implants in product liability litigation).

---

[6]      Dr. Egilman also couches some of his other opinions in terms of ethical requirements. *See, e.g.*, Egilman Rep. (Ex. 1) ¶ 16 (referring to a "duty to know or determine the hazards of Vioxx"), *id.* ¶ 17 (referring to "an obligation not to undermine [Merck's] own warnings and/or disclosures with anti-warnings"), *id.* ¶ 21 (claiming that "MERCK should have amplified the Vioxx labeling[.]"), *id.* ¶ 26 (averring that Merck "fail[ed] to comply with [unspecified] corporate community public health and other standards").  These opinions are inadmissible for the same reasons.

Dr. Egilman's marketing opinions should be excluded for these reasons as well.  Dr. Egilman does not have a degree in advertising, marketing or sales, and has never held a job in these fields.  *See* Egilman CV (Ex. 5).  Nevertheless, Dr. Egilman seeks to offer a laundry list of opinions regarding Merck's marketing of Vioxx, including, *inter alia*, that "contrary to their duty to warn," Merck "trained its marketing representatives to withhold safety information on the drug" (Egilman Rep. (Ex. 1) ¶ 208); and that Merck's commercials "were false and misleading and failed to convey the risks of Vioxx to the public" (*id.* ¶ 215).  Underscoring his lack of any expertise in this area, Dr. Egilman admitted at his deposition that he "rel[ied] on ***Merck's*** assessment of the impact of their own marketing on physician practice patterns," (Egilman Dep. (Ex. 4) 163:8–11 (emphasis added))—a telltale sign that he brings none of his own expertise to bear on the issue.  Accordingly, the Court should exclude Dr. Egilman's marketing opinions as outside his expertise.

## V.   DR. EGILMAN LACKS SUFFICIENT EXPERTISE TO SUPPORT HIS REGULATORY OPINIONS.

Dr. Egilman also seeks to testify about Merck's compliance with purported regulatory duties imposed by the FDA.  The Court should exclude these opinions because they fall outside Dr. Egilman's expertise.  *See, e.g.*, *In re Rezulin*, 309 F. Supp. 2d at 556–57 (excluding physician's expert testimony that "improperly second-guesses the FDA's decisions as to the adequacy of the Rezulin label" where expert's "surmising as to what physicians would do with different information is purely speculative and not based on scientific knowledge"); *Rheinfrank v. Abbott Labs., Inc.*, 119 F. Supp. 3d 749, 790 (S.D. Ohio) (excluding neurology expert's "testimony about what Defendants should have included in the label" as "fall[ing] outside the scope of his expertise"), *reconsideration denied*, 137 F. Supp. 3d 1035 (S.D. Ohio 2015); *In re*

*Diet Drugs*, 2001 WL 454586, at *20 (finding that "testimony about whether the labels met regulatory standards is beyond the expertise of both Drs. Barst and Rich").

For example, in *Rheinfrank v. Abbott Labs., Inc.*, a product liability suit involving an anti-epilepsy drug that allegedly caused birth defects, plaintiffs tendered a neurology expert to testify about the adequacy of the drug's label. *Rheinfrank*, 119 F. Supp. 3d at 749. The court held that the neurologist was "not qualified to opine on the regulatory aspects of the case," including "what Defendants should have included in the label or what materials should have been submitted to the FDA," because those opinions "fall[] under the regulatory component and [are] speculative." *Id.* at 773.

The same reasoning applies here. Like the expert in *Rheinfrank*, Dr. Egilman may have a medical background, but that does not qualify him to opine about regulatory matters. Undaunted by this lack of qualification, Dr. Egilman nonetheless seeks to offer opinions regarding Merck's regulatory compliance—for example, that Merck violated its obligation to "report to the FDA data and analyses from any ongoing clinical study that raised safety concerns" (Egilman Rep. (Ex. 1) ¶ 141); that Merck "filed a Safety Update Report . . . with the FDA that contained false and misleading statements" (*id.* ¶ 150); that "Merck used the ADVANTAGE trial to circumvent FDA marketing regulations" (*id.* ¶ 177); and that Merck engaged in an "active effort not to comply with FDA requests for information (*id.* ¶ 153). Dr. Egilman also testified more broadly at his deposition that if Merck had provided the data Egilman claimed it withheld, then "it might have driven [the FDA] to not approve [Vioxx] or . . . call for more study." Egilman Dep. (Ex. 4) 263:1–3. These are regulatory opinions that fall far outside the expertise of a family doctor turned expert-for-hire like Dr. Egilman. Accordingly, the Court should exclude Dr. Egilman's regulatory opinions as well.

## VI.     DR. EGILMAN'S LEGAL OPINIONS ARE INADMISSIBLE.

Dr. Egilman should be barred from offering legal opinions at trial because such opinions do not constitute proper expert testimony, and in any event, he is unqualified to offer them.

"[A]n expert may never render conclusions of law."  *Goodman v. Harris County.*, 571 F.3d 388, 399 (5th Cir. 2009).  The Federal Rules of Evidence do not permit an expert to testify regarding ultimate *legal* issues in a case.  *See* Fed. R. Evid. 704, advisory committee's note to 1972 proposed rules (Rules 701, 702, and 403 "stand ready to exclude opinions phrased in terms of inadequately explored legal criteria"); *see also United States v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003) (Rule 704(a) "does not allow a witness to give legal conclusions" (internal quotation marks omitted)); *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (Because it "is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of laws to the facts in evidence," as a general rule, an expert may not offer legal opinions).

Consistent with these principles, the Fifth Circuit has recognized that although an expert witness may properly testify as to an ultimate issue of fact, expert opinion that states a legal conclusion or applies the law to the facts is inadmissible.  *See McBroom v. Payne*, 478 F. App'x 196, 200 (5th Cir. 2012) (per curiam) (even though testimony that embraces an ultimate issue is not automatically objectionable, "that does not permit experts to offer legal conclusions" (citing *United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999))).  By the same token, an expert's opinions must be excluded when the expert invades the province of the jury and simply instructs the jury how to decide the case.  *See Askanase v. Fatio*, 130 F.3d 657, 673 (5th Cir. 1997) (affirming exclusion of the testimony of a corporate governance expert because the question of whether the officers and directors breached their fiduciary duty was "an issue for the trier of fact to decide").  Moreover, such testimony is also excludable under Rule 403 because the expert's

legal opinion could confuse the jury or unfairly prejudice the opposing party by suggesting a legal standard that is inapplicable to the case.  *See Willette v. Finn*, 778 F. Supp. 10, 11–12 (E.D. La. 1991) (excluding expert testimony on the law because "whatever value it might have is 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury'" (quoting Fed. R. Evid. 403 (1998) (amended 2011))).

Dr. Egilman has already been barred from offering opinions about legal standards under federal evidentiary principles.  In *Newkirk v. ConAgra Foods, Inc.*, Dr. Egilman was proffered as an expert to opine on numerous issues in a suit alleging that exposure to the defendant's microwave popcorn products caused the plaintiff to develop bronchitis obliterans and other respiratory maladies.  *Newkirk*, 727 F. Supp. 2d 1006, 1008 (E.D. Wash. 2010), *aff'd*, 438 F. App'x 607 (9th Cir. 2011).  The defendant moved to exclude Dr. Egilman's opinions, including his "legal conclusions" that the defendant had "failed to warn consumers or customers (retailers)" about the purported risks of diacetyl in popcorn.  *Id.* at 1026–27.  The court agreed that the legal opinions must be excluded, noting both that they improperly addressed "an ultimate issue of law" and that Dr. Egilman was not qualified to give them.  *Id.* at 1026 (stating that the statements were "actually legal conclusions" and that Dr. Egilman had "not presented any credentials to support his qualifications as a legal expert").

This Court should reach the same result.  Dr. Egilman seeks to testify, among other things, that Merck "had a duty to know or determine the hazards of Vioxx and to warn patients and doctors of those hazards" (Egilman Rep. (Ex. 1) ¶ 16); that Merck "misrepresented, concealed, suppressed, and omitted material facts regarding Vioxx's risks" (*id.* ¶ 24); that "a reasonable pharmaceutical company would have withdrawn Vioxx from the market after VIGOR was unbl[i]nded" (*id.* ¶ 113); and that the "law required MERCK to revise the Informed Consent

in Study 078" (*id.* ¶ 140 (citing 21 C.F.R. pt. 46 & §§ 46.102(e), 46.109, & 46.116)).[7]  Even if

the Federal Rules of Evidence did not bar such evidence—which they do—Dr. Egilman has no

"qualifications as a legal expert" and would be the wrong person to offer them.

For these reasons, the Court should exclude Dr. Egilman from opining on the legal

matters discussed in his report.

## CONCLUSION

Merck respectfully requests that the Court exclude the opinions and testimony of Dr.

David Egilman in their entirety.  A proposed order is filed herewith.

Dated:  June 27, 2016

Respectfully submitted,

By: */s/ Dorothy H. Wimberly*
    Phillip A. Wittmann, 13625
    Dorothy H. Wimberly, 18509
    STONE PIGMAN WALTHER
    WITTMANN L.L.C.
    546 Carondelet Street
    New Orleans, LA 70130
    Phone: 504-581-3200
    Fax:    504-581-3361

*Defendants' Liaison Counsel*

—and—

    Douglas R. Marvin
    M. Elaine Horn
    Emily Renshaw Pistilli
    WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, N.W.
    Washington, DC 20005
    Phone: 202-434-5000
    Fax:    202-434-5029

*Attorneys for Merck Sharp & Dohme Corp.*

---

[7]    21 C.F.R. 46 does not exist.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Motion has been served on Liaison Counsel, Russ Herman, Ann B. Oldfather, and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 27th day of June, 2016.

_/s/ Dorothy H. Wimberly_
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel