David Egilman, M.D.

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

_____

IN RE:  VIOXX PRODUCTS          )    MDL DOCKET NO. 1657

LIABILITY LITIGATION            )    SECTION L

                                )

THIS DOCUMENT RELATES TO:       )    Videotaped

                                )    Deposition of:

Jo Levitt v. Merck Sharp &      )

Dohme Corp., Case No:           )    DAVID EGILMAN, M.D.

2:06-cv-09757-EEF-DEK           )

_____

April 12, 2016

8:49 a.m.


Location:  Siegfried & Jensen

5664 South Green Street

Salt Lake City, UT  84123


Reporter:  Teri Hansen Cronenwett

Certified Realtime Reporter, Registered Merit Reporter

David Egilman, M.D.

## Page 2

1
2
   A P P E A R A N C E S

3  For the Plaintiff:    Kenneth B. McClain, Esq.
              HUMPHREY FARRINGTON & MCCLAIN, P.C.
              221 W Lexington Ave., Suite 400
4             Independence, MO 64050
              (816) 225-5444
5             (816) 836-5050
              KBM@HFMLEGAL.ocm
6
7  For the Defendant:    Paul E. Boehm, Esq.
              Benjamin Graham, Esq.
8             WILLIAMS & CONNOLLY LLP
              725 Twelfth Street, N.W.
9             Washington, D.C. 20005
              (202) 434-5366
10            (202) 434-5029 Fax
              pboehm@wc.com
11            bgraham@wc.com
12
   Also Present:    Kenneth Lougee, Esq.
13            SIEGFRIED & JENSEN
              5664 South Green Street
14            Salt Lake City, Utah  84123
              (801) 997-6995
15
16 Legal Videographer:    Amy Pollock
17
18
       I N D E X
19
   Witness                    Page
20
   DAVID EGILMAN, M.D.
21
     Examination by Mr. Boehm            5
22
23 PORTIONS REQUESTED TO BE MARKED
24   Page 25, line 17
25   Page 156, line 12

## Page 3

1
   E X H I B I T S
2  Number    Description            Page Marked
3  1    Findings, Conclusions, and Orders
          Ballinger v. Brush Wellman        31
4
   2    Green Folder: Acute Coronary Syndrome
5         PPT, "Cardiovascular Risks of NSAIDS
          in Patients after Hospitalization"    41
6
7  3    Red Folder: Depression & CABG,
          Articles starting with, "Incidence
8         and patterns of Depression following
          Coronary Artery Bypass Graft Surgery,"
          Timberlake, et al.            76
9
   4    Egilman Report Jo Levitt, 12-13-13    89
10
   5    Egilman Report, 5-9-14        89
11
   6    Egilman report, 3-13-14        90
12
   7    Handwritten notes, 2-20-14        93
13
   8    Mid-America Cardiology, 3-23-00,
14        Exercise Echo Doppler,
          LevittJ-GortonMMD-00039        201
15
   9    Mid-America Cardiology, 11-27-00,
16        Exercise Echo,
          LevittJ-GortonMMD-00046        204
17
   10   Mid-America Cardiology, 11-27-00,
18        Letter from Dr. Rosamond to Dr. Ron
          Hartman, LevittJ-GortonMMD-00146   210
19
   11   Kramer & Crouse, Nuclear Stress Test,
20        11-27-07, Dr. Pasnoori,
          LevittJ-HarMedAscMR-00027        214
21
   12   Box of documents in colored folders   264
22
   13   Box of documents in colored folders   264
23
   14   Box of documents in colored folders   264
24
   15   (Skipped)
25

## Page 4

1  16    John Martin Report, Vol. 1        270
2  17    John Martin Report, Vol. 2        270
3  18    John Martin Report, Vol. 3        270
4  19    John Martin Report, Vol. 4        270
5  20    Box of hard drives            272
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1      April 12, 2016          8:49 a.m.
2          P R O C E E D I N G S
3          THE VIDEOGRAPHER:  We are now on the record.
4  My name is Amy Pollock.  I am a videographer for Golkow
5  Technologies.  Today's date is April 12th, 2016, and the
6  time is 8:49 a.m.  This video deposition is being held
7  in Salt Lake City, Utah in the matter of Levitt vs.
8  Merck, for the U.S. District Court for the Eastern
9  District of Louisiana.  The deponent is David Egilman,
10 M.D.  Counsel, please identified yourself.
11         MR. BOEHM:  Paul Boehm and Ben Graham from
12 Williams and Connolly on behalf of Merck.
13         MR. MCCLAIN:  Ken McClain on behalf of the
14 plaintiffs.
15         THE VIDEOGRAPHER:  The court reporter is Teri
16 Cronenwett and will now swear in the witness.
17         DAVID EGILMAN, M.D.,
18 called as a witness at the instance of the defendant,
19 having been first duly sworn, was examined and testified
20 as follows:
21         EXAMINATION
22 BY MR. BOEHM:
23   Q.  Good morning, Dr. Egilman.
24   A.  Good morning.
25   Q.  You've been deposed many times before; is that

David Egilman, M.D.

Page 6

1    correct?
2        A.   Yes.
3        Q.   Do you understand that today you are
4    testifying in a lawsuit that has been brought by Miss Jo
5    Levitt?
6        A.   Yes.
7        Q.   When were you first contacted by plaintiff's
8    lawyers for Mrs. Levitt about the possibility of serving
9    as an expert in this case?
10       A.   Don't recall.
11       Q.   Can you tell me approximately?
12       A.   No.
13       Q.   Can you tell me the year?
14       A.   No.
15       Q.   Can you tell me the decade?
16       A.   This decade.
17       Q.   Who first contacted you?
18       A.   I don't recall.
19       Q.   Do you recall when you agreed to be an
20   expert --
21       A.   No.
22       Q.   -- on behalf -- I'm sorry.  I need to finish
23   my question, and then you can respond.  Do you recall --
24       A.   I'm sorry.  I thought your question was done.
25   By the way, I am not rolling here.

Page 7

1        Q.   Do you recall when you agreed to become an
2    expert in this matter?
3        A.   No.
4        Q.   Have you ever worked with plaintiff's lawyers
5    for Ms. Levitt before?
6        A.   Yes.
7        Q.   In what -- in what capacity?
8        A.   As a consulting expert.
9        Q.   Was that in a case other than the case for
10   Ms. Levitt?
11       A.   Yes.
12       Q.   When was that?
13       A.   Last year.
14       Q.   What was the case?
15       A.   Sheely vs. The NCAA.
16       Q.   What did the case concern?
17       A.   Mr. Sheely's death while playing football.
18       Q.   Can you provide a brief summary of your
19   testimony in that matter?
20       A.   No.
21       Q.   And why --
22       A.   I could provide a long summary of my testimony
23   in that matter.  I don't know what a brief summary
24   means.
25       Q.   When you say you don't know what a brief

Page 8

1    summary means, do you -- do you mean to say that you do
2    not understand what the term "brief summary" is meant to
3    indicate?
4        A.   Yeah.  I don't think there's a standard
5    definition for brief, and since part of the rules of the
6    road here is that I'm supposed to testify to the truth,
7    the whole truth and nothing but the truth, as I
8    understand is what I was sworn into at the beginning,
9    brief would seem to negate the ability to do so.  Unless
10   it's a yes or no question.
11       Q.   Okay.  And that's an interesting perspective.
12       A.   But I'll be glad to give you a long answer or
13   a short answer, as long as it's understood that the
14   short answer could be incomplete.
15       Q.   Yeah.  That's what -- I'm asking for just a --
16   a general summary of what your opinions were in that
17   matter.  For example, did your opinions in that matter
18   concern testimony about the medical care of the
19   plaintiff?
20       A.   To some extent, yes.
21       Q.   Did you review the medical records of that
22   individual?
23       A.   Yes.
24       Q.   Did you offer opinions in that matter about
25   cause or causes of that individual's injuries?

Page 9

1        A.   Yes.
2        Q.   Other than this case from last year, have you,
3    in any other matters, worked with plaintiff's lawyers
4    for Ms. Levitt?
5        A.   Yes.
6        Q.   Can you please tell me all of the cases that
7    you have worked with plaintiff's lawyers for Ms. Levitt
8    other than the present case?
9        A.   I don't think so.
10       Q.   Why not?
11       A.   I don't think I can remember them all.
12       Q.   How many have there been?
13       A.   I don't recall exactly.
14       Q.   Approximately how many have there been?
15       A.   Probably 15.
16       Q.   In each of those matters have you been
17   testifying -- have you testified on behalf of
18   plaintiffs?
19       A.   No.
20       Q.   How many of -- in -- in how many of the
21   approximately 15 matters in which you've been retained
22   by the plaintiff's counsel in this case have you
23   testified on behalf of other plaintiffs?
24       A.   None.  I'm not testifying in this case on
25   behalf of any plaintiff.

3  (Pages 6 to 9)

David Egilman, M.D.

Page 10

1      Q.  Okay.  You're drawing a distinction between
2  your testifying on behalf of plaintiffs and your having
3  been retained by plaintiff's counsel.  Do I understand
4  that correctly?
5      A.  I don't know what you understand.  I cannot
6  know what you understand.  I cannot read your mind.
7      Q.  Can you tell me what you mean?
8      A.  Yes.
9      MR. BOEHM:  Are we going to deal with this
10  type of gamesmanship all day, Mr. McClain?
11      MR. MCCLAIN:  Ask him a question.  What do you
12  want to know?
13      A.  You -- you asked me.
14      Q.  (By Mr. Boehm)  Go ahead.
15      A.  You asked me, can you tell me what you mean.
16      Q.  Go ahead.
17      A.  My answer was, yes.  I don't -- is -- is -- is
18  there some other -- is that an incomplete answer to that
19  question?
20      Q.  Okay.
21      A.  I don't understand your problem.
22      Q.  Okay.  Go ahead.  Go ahead.  Can you -- can
23  you please go ahead and tell me what you mean?
24      A.  What I mean about what?
25      Q.  Okay.

Page 11

1      MR. MCCLAIN:  What do you -- what do you want
2  to know?
3      MR. BOEHM:  I'll just -- I'll just --
4      MR. MCCLAIN:  What do you want to know?  I
5  mean --
6      MR. BOEHM:  That's fine.  That's fine.
7      MR. MCCLAIN:  I know you're -- you're having
8  difficulty.  I don't really understand it either.
9      MR. BOEHM:  You don't understand me or you
10  don't understand your witness's testimony?
11      MR. MCCLAIN:  I don't understand the
12  difficulty you're having.  I mean, you know, you come
13  into this knowing he's testified in a number of cases
14  for me.  You've got a whole list of those.  Just ask him
15  about those.  Don't -- don't play this, you know, hide
16  the ball stuff.  It won't work very well.  He will
17  answer questions, you know, that you ask.  So just tell
18  him what cases you think he testified for me in, and
19  he'll tell you about them.
20      MR. BOEHM:  Mr. McClain, I appreciate that.
21      MR. MCCLAIN:  I'm just trying to give you some
22  assistance.
23      MR. BOEHM:  Well, I think the most important
24  assistance you can provide to me today is that perhaps
25  at the next break you could have a candid conversation

Page 12

1  with the witness.
2      MR. MCCLAIN:  I refuse -- I refuse to have any
3  direction from you about it.  I just told you what --
4  what -- how I would do this, if I were you.
5      MR. BOEHM:  How about you not -- It's -- it's
6  your posture is that --
7      MR. MCCLAIN:  I'm not posturing at all.
8      MR. BOEHM:  Hold on.  Hold on.  Let me finish,
9  and then you can say whatever you'd like to say.
10      MR. MCCLAIN:  I don't want to say anything.
11  You go ahead and say whatever you want, and then go
12  ahead and ask him questions.
13      MR. BOEHM:  Okay.  If your posture that's
14  going to be that I can't make any suggestions to you,
15  I'll ask you not to make any suggestions to me.  How
16  about that?
17      MR. MCCLAIN:  I'm not directing this
18  deposition.  You are.
19      MR. BOEHM:  Correct.
20      MR. MCCLAIN:  Okay.  I was trying to help you
21  because you have the job to ask the questions.  Not me.
22  I don't care what you do.  It's your deposition.  You've
23  noticed it.  You get take it however you'd like.  I was
24  trying to assist you.  I'm not under any obligation to
25  do anything outside this room.  And I don't really

Page 13

1  intend to.  I'm just here enjoying the company --
2      MR. BOEHM:  Okay.  How about --
3      MR. MCCLAIN:  And the view.  So -- and the
4  coffee.  So just go ahead and ask whatever you would
5  like to --
6      MR. BOEHM:  Okay.
7      MR. MCCLAIN:  And I'll -- and I'll sit quietly
8  and let you flounder.  I was just trying to help you.
9      MR. BOEHM:  Who's going to have the longer
10  speeches today, you or the witness?
11      MR. MCCLAIN:  I wasn't planning on saying
12  anything.
13      MR. BOEHM:  Okay.  Stop.  Stop.
14      MR. MCCLAIN:  I tried to help you.  I tried to
15  help you.
16      MR. BOEHM:  Please stop, okay.  And I'll just
17  ask you not to engage in this kind of ridiculous
18  gamesmanship any further today.  We have a deposition to
19  take.  You're wasting my time.  It's on the record.
20  It's on video, and the court's going to see the way that
21  you and your witness are conducting yourself.
22      So I urge you to keep that in -- squarely in
23  mind.
24      MR. MCCLAIN:  Look, look, look, look, look
25  pal.  I -- I have done this before.  I don't know

4  (Pages 10 to 13)

David Egilman, M.D.

Page 14

1  whether you know that or not.  I have done this before.
2  I know how to take and defend depositions.  I was trying
3  to help you.  If you don't want any help, I won't do
4  that any more.  And I'll just sit here quietly and let
5  you flounder.
6        MR. BOEHM:  Thank you.
7        MR. MCCLAIN:  Okay.  Just go ahead.
8        MR. BOEHM:  Thank you.  You can -- you can
9  characterize it however you want.  But you're acting in
10 an inappropriate and unprofessional manner right now,
11 and I'd ask you to just sit over there.  If you need to
12 object, go ahead and object.  But your speechifying --
13       MR. MCCLAIN:  I don't need anything.
14       MR. BOEHM:  I'm sorry.  I'm not done speaking.
15       MR. MCCLAIN:  I don't need --
16       MR. BOEHM:  Your speechifying is not welcome
17 at today's deposition.
18       MR. MCCLAIN:  I don't need any more direction.
19 You're one of these guys who doesn't get enough
20 opportunities to stand in court, so you like to play
21 this out in these depositions and make these speeches
22 like they matter.  They don't matter.  Just ask a
23 question.  You're here to ask questions.
24       MR. BOEHM:  Please don't waste any more of my
25 time.

Page 15

1        MR. MCCLAIN:  Not to engage in -- not to
2  engage --
3        MR. BOEHM:  Stop.
4        MR. MCCLAIN:  -- with me.
5        MR. BOEHM:  I'm asking you to stop.  Thank
6  you.
7        Q.  (By Mr. Boehm)  In each of the 15 or so
8  matters, Dr. Egilman, in which you've been retained by
9  the plaintiff's lawyer in this case, did you testify and
10 offer opinions, pursuant to your having been retained by
11 the plaintiff's lawyers in those case -- in those cases?
12       MR. MCCLAIN:  Object to the form of the
13 question.  I don't know what it means.
14       MR. BOEHM:  You can object to the form and
15 then you can stop.  You need to read the orders in this
16 case.
17       MR. MCCLAIN:  Well, that was an objection as
18 to form.
19       MR. BOEHM:  Yeah, it was.  And then you added
20 something, didn't you?  Stop trying to be cute.
21       MR. MCCLAIN:  I'm not being cute.
22       Q.  (By Mr. Boehm)  Go ahead, Dr. Egilman, please
23 answer my question.
24       MR. MCCLAIN:  I don't know why you're so
25 hostile.

Page 16

1        MR. BOEHM:  Why are you still talking?
2        MR. MCCLAIN:  Because you --
3        MR. BOEHM:  Why are you still talking?
4        MR. MCCLAIN:  And the tape will disclose
5  you're yelling.  I don't understand your --
6        MR. BOEHM:  I, I have a deposition to take,
7  and you're trying kill my time, and I'm going to tell
8  you, we're going to go well past time.  I will call
9  the court.  I've done it before, and I'll do it today if
10 we have to.
11       MR. MCCLAIN:  Well, you're --
12       MR. BOEHM:  I'm asking you to stop.
13       MR. MCCLAIN:  You're real tough.  I guess
14 that's the point of yelling and these kind of
15 histrionics.
16       MR. BOEHM:  Are you going to stop or not?
17 Because if you're not going to stop, then we'll just
18 pause, we'll go off the record and I'll call the judge.
19       MR. MCCLAIN:  You're -- you're welcome to do
20 whatever you'd like.
21       MR. BOEHM:  Are you going to stop or not?
22       MR. MCCLAIN:  I don't know whether I'm going
23 to stop.  I don't -- it depends on what you do.
24       MR. BOEHM:  Okay, all right.  Well, I'm
25 just -- I'm just letting you know that if it continues,

Page 17

1  then that's what we'll do.
2        MR. MCCLAIN:  And I am just letting you know
3  that I'm here for the ride.
4        A.  Is it my turn now?
5        Q.  (By Mr. Boehm)  Do you have the question in
6  mind, Dr. Egilman?
7        A.  No.  I can go back a few pages and find it or
8  you can repeat it, whichever you like.
9        Q.  It might be easier if I just reask the
10 question.
11       A.  Sure.
12       Q.  Okay.  Have you ever testified for a defendant
13 in any matter?
14       A.  For, no.
15       Q.  Have you ever been retained by a defendant to
16 testify as an expert in a litigation matter?
17       A.  You just cut off my answer.  Okay.  For
18 previous answer was for, no.  At the request of, yes.
19 That's my previous answer before you cut it off.
20       Q.  In what matters have you been retained to
21 testify as an expert on behalf of defendants or in
22 matters where you have been retained by defense counsel?
23       MR. MCCLAIN:  Compound.
24       A.  I think an answer would be confusing because
25 it wouldn't say -- those are two different things in the

David Egilman, M.D.

Page 18

1    predicate, and the answer would not be clear as to which
2    I was answering.
3        Q.  (By Mr. Boehm)  What is your understanding
4    about why you were asked to be an expert in this case by
5    plaintiff's lawyers?
6        A.  Well, you understand that calls for a long
7    answer.  Just to let you know.
8        Q.  That -- that --
9        A.  I'll be glad to give you a long answer.  I'm
10   just saying that you asked for my understanding about
11   why I'm here, and it's not -- it's not a short answer.
12       Q.  Look --
13       A.  And I'll be glad to give it to you.
14       Q.  In my view it doesn't call for an exceedingly
15   long answer.  But look, it's -- it's your opportunity
16   to -- to do this however you'd like.  You have the
17   question.
18       A.  Okay.  Well, it's my understanding that I'm
19   here because of my training and expertise in evaluating
20   epidemiological studies, animal studies, and the
21   epistemology of determining cost effect -- cause --
22   cause/effect relationships.
23           That training and expertise includes, just to
24   save some time, everything that's on my CV, plus all of
25   my experience, my teaching and my consulting experience

Page 19

1    for corporations and others.  In addition, my training
2    as a physician in evaluating patients and determining
3    appropriateness of the care they get and the causes of
4    treatments of their diseases.
5           The second reason would be because, just to
6    get to this case, Merck began to market and develop a
7    drug called Vioxx, trade name, generic name Rocecoxif --
8    Rofecoxib, in the late nineties because they were
9    running out of patented medications and concerned about
10   profits.  They were in a hurry to get a new blockbuster
11   drug on the market.
12          And they were in competition with Searle,
13   which beat them to market with Celebrex.  And partly as
14   a result of that rush to market, they didn't adequately
15   test the product, and ignored red flag warning signs
16   about the fact that the product was toxic to people who
17   took it, and did inadequate human studies.
18          And then the rest of -- most of the rest of
19   the specific activities that I'm aware of that Merck did
20   that caused or contributed to Ms. Levitt's disease and
21   treatments and subsequent problems, I don't think I
22   delineated in my testimony in previous cases, about
23   seven or eight depositions, and my five or six published
24   papers on matters related to Vioxx, its toxicity and
25   Merck's corporate conduct.

Page 20

1        So I guess the second reason would be because
2    I'm familiar with that and have published on Merck's
3    conduct.  The third reason, I guess, is because I think
4    that Mr. McClain thinks I am a very good teacher.  And
5    so I think that's probably one of the reasons that he
6    retained me.
7            The fourth reason was at the time he retained
8    me, I had access to all of the underlying Merck
9    documents related to Vioxx.  So it made it more
10   convenient for him to have someone who was familiar with
11   the databases and documents rather than someone else.
12   Although, I know a whole world of other alternative
13   experts.
14           So that would be the short answer about why --
15   my understanding of why I'm sitting here today.
16       Q.  Were you asked to review any materials that
17   were specific to Ms. Levitt, the plaintiff in this case,
18   before agreeing to become an expert?
19       A.  I don't remember the order.
20       Q.  In front of counsel today is a large table,
21   and on that table are dozens and dozens of folders of
22   various colors that appear to have been identified with
23   a Sharpie.  Are you the -- the person who wrote the --
24   the words on the various folders that are on the tables
25   today?

Page 21

1        A.  Some of them.  Not all of them.
2        Q.  Who assisted you in that matter?
3        A.  Well, some of these come from my historical
4    files.  So it could be anybody who's worked for me in
5    the last 15 years that I've worked on this case.
6        Q.  Okay.  Do -- do the materials on the table --
7        A.  You want the list of those people?
8        Q.  Not right now.  I'll let you know if I do.  Do
9    the materials that are on the table come from your --
10   the files that you keep?
11       A.  No.  These are files -- well, no, I'm not
12   allowed to keep secret documents.  So these are files
13   that were previously prepared and were present here.
14       Q.  When you say "present here," you mean at the
15   office where we currently are conducting today's
16   deposition?
17       A.  Correct.  That's not all of them.  For
18   example, the Juni-specific materials and some of the
19   nonconfidential documents and the published literature,
20   obviously Merck allows me to look at that, wherever I
21   am.  So that -- that can travel with me.
22       Q.  You indicated that you are not allowed to look
23   at confidential materials in this case; is that correct?
24       A.  No.
25       Q.  Sorry.  You -- you -- let me -- let me try and

6 (Pages 18 to 21)

David Egilman, M.D.

Page 22

1  restate that.  Is my understanding correct that you are
2  not permitted to maintain, in your own files,
3  confidential materials pertaining to this litigation?
4      A.  Unless I have a plaintiff lawyer who is part
5  of the MDL present with those files.  So for example, if
6  Mr. McClain wanted to move into my office, I could have
7  anything I wanted.  We don't have space.
8          MR. MCCLAIN:  And I decline the offer.
9      Q.  (By Mr. Boehm)  You are aware that there is a
10  protective order in effect in this litigation, correct?
11      A.  Yes.
12      Q.  Are you familiar with that document?
13      A.  I've signed the document.
14      Q.  And by signing it, you agree to be bound by
15  the protective order, correct?
16      A.  That's correct.
17      Q.  You have been found to have violated the
18  protective order in this case before, correct?
19      A.  No.
20      Q.  Do you recall that in June 2014, Judge Fallon
21  entered a preliminary injunction against you?
22      A.  Yes.
23      Q.  Okay.  Do you understand that the reason that
24  Judge Fallon entered a preliminary injunction against
25  you related to your violation of terms of the protective

Page 23

1  order?
2      A.  No.
3      Q.  What is your understanding as to why Judge
4  Fallon entered a preliminary injunction against you in
5  June 2014?
6      A.  Because Merck claimed that I had released --
7  let's see.  That my general characterization of the
8  documents that were confidential was a breach of the
9  confidentiality order.  And they requested him enter
10  that order.  That order was later, I think, dismissed
11  pursuant to a -- an agreement with Merck.
12      Q.  Are -- are you referring to a stipulation that
13  was reached with Merck?
14      A.  I think it's an agreement.  I don't know.
15  Maybe there's a legal distinction.
16      Q.  Is that the stipulation that required you to
17  return all documents and data that were designated
18  confidential in the multi district litigation
19  proceedings?
20      A.  No, that's not correct.  That -- as I
21  understand the agreement.
22      Q.  Are you -- are there currently documents or
23  data that are confidential, pursuant to the protective
24  order in this case, that are in your possession, custody
25  or control?

Page 24

1          MR. MCCLAIN:  Object to the form of the
2  question.
3      A.  No.
4          MR. MCCLAIN:  Calls for a legal conclusion.
5      A.  Here, yes.
6      Q.  (By Mr. Boehm)  I didn't understand what you
7  meant when you said "here yes"?
8      A.  But, yes.  Yes.
9      Q.  Yes, you are?
10      A.  The documents in front of us are in my
11  custody, possession and control.
12      Q.  Other than the documents that are in front of
13  us on this large conference room table, are you --
14      A.  There's a hard drive behind me that has all of
15  the Merck documents on it as well, which is also in the
16  room.
17      Q.  Okay.  Is that a hard drive that you keep here
18  in this office?
19      A.  No.
20      Q.  Is that a hard -- hard drive that you take
21  with you?
22      A.  No.
23      Q.  Who keeps that hard drive?
24      A.  Alex Reinert.
25      Q.  Have you ever been found to have violated

Page 25

1  protective orders or confidentiality requirements in
2  matters other than the Vioxx litigation?
3          MR. MCCLAIN:  Asked and answered in the other
4  seven depositions.  Why do we need to waste time doing
5  this?
6          MR. BOEHM:  It's object to form.
7          MR. MCCLAIN:  It's object to form --
8          MR. BOEHM:  The order --
9          MR. MCCLAIN:  But I'm -- I'm asking you.
10  What's the purpose of this?  Just as a matter of
11  professional courtesy.  You already have the answers to
12  all these --
13          MR. BOEHM:  Hold on.
14          MR. MCCLAIN:  That -- that question.  Why --
15  why waste our time on that?
16          MR. BOEHM:  Just please mark this point in the
17  deposition transcript.
18          MR. MCCLAIN:  And please -- please do.
19  Because if you call the judge, I'd like to raise it.
20  You've asked this question in every one of the
21  depositions thus far, and so that why would you waste my
22  time to sit here that you could be asking about Levitt
23  to ask about things you already know the answer to?
24  That's my -- that's my request as a matter of
25  professional courtesy.  Why would you do that?

                                    7 (Pages 22 to 25)

David Egilman, M.D.

Page 26

1      MR. BOEHM:  And I'm happy to talk to you off
2  the record about that.
3      MR. MCCLAIN:  Okay.  Let's go --
4      MR. BOEHM:  Go ahead.
5      MR. MCCLAIN:  Let's off the record and you can
6  tell me about that.  Go ahead and tell me.  Let's go off
7  the record as he suggests.  Okay, please tell me.
8      MR. BOEHM:  I'd like to proceed.  We can do
9  that at a break.
10      MR. MCCLAIN:  Well, then let's defer that
11  question until later.  Let's talk about something
12  substantive here rather than things that you've already
13  asked about and know all the answers to.  Because I have
14  no interest in allowing you to bill worthless time here
15  and waste my time.  I really don't.  And I'm happy to go
16  off the record and discuss this with you.
17      MR. BOEHM:  You're not going to take over my
18  deposition.
19      MR. MCCLAIN:  I don't --
20      MR. BOEHM:  I have a question pending, and you
21  cannot stop in the middle of that question.  You know
22  that.
23      MR. MCCLAIN:  I -- I --
24      MR. BOEHM:  You told me yourself how
25  experienced you are.

Page 27

1      MR. MCCLAIN:  I, I didn't say that.
2      MR. BOEHM:  How many times you've done this.
3      MR. MCCLAIN:  I didn't say that.
4      MR. BOEHM:  And so you know -- you should know
5  it better than anybody.
6      MR. MCCLAIN:  I'm not doing --
7      MR. BOEHM:  That what you're doing right now
8  is inappropriate.
9      MR. MCCLAIN:  I've not made any claims.  I'm
10  just a simple lawyer from Independence, Missouri.
11      MR. BOEHM:  Okay.
12      MR. MCCLAIN:  And -- and -- and I just have
13  said that you know the answer to this question because I
14  read the depositions that you -- your law -- your law
15  offices conducted of Dr. Egilman in this case, just this
16  case.  So that's all I am saying is --
17      MR. BOEHM:  You're -- you're violating an
18  order of Judge Eagle -- Judge Fallon's in this case.
19      MR. MCCLAIN:  I would like to talk -- I
20  like Judge Fallon.  Judge Fallon's a very reasonable
21  fellow.  Every time I've been in front of him, he and I
22  have agreed on most everything.  So if you'd like to
23  call him, I'd like to explain my position on this, that
24  I think he would agree that you don't need to ask this
25  question.

Page 28

1      MR. BOEHM:  The only thing we would need to
2  call him about is the fact you are expressly violating
3  his order that objections be limited to objection to
4  form.
5      MR. MCCLAIN:  I would --
6      MR. BOEHM:  Now, you've launched into a
7  speech --
8      MR. MCCLAIN:  I would tell --
9      MR. BOEHM:  -- while there is a question
10  pending in the matter.  I agree that I would be happy to
11  discuss the matter off the record, but you delaying --
12      MR. MCCLAIN:  I said let's go.
13      MR. BOEHM:  -- my deposition and killing
14  time --
15      MR. MCCLAIN:  No.
16      MR. BOEHM:  -- purposefully --
17      MR. MCCLAIN:  No.
18      MR. BOEHM:  -- is inappropriate, it's
19  unprofessional, and it is an express violation of Judge
20  Fallon's order in this matter.
21      MR. MCCLAIN:  Honest to goodness, you came in
22  here to fight, and I'm not trying to fight.
23      MR. BOEHM:  Go ahead, Dr. Egilman.
24      MR. MCCLAIN:  Okay.  Go ahead through all this
25  answer.  I'll go get a cup of coffee because I've heard

Page 29

1  it as many times as he's read it.
2      MR. BOEHM:  Thanks.
3      A.  Do you want to repeat the question?
4      Q.  (By Mr. Boehm)  Sure.  Have you been found to
5  have violated protective orders or confidentiality
6  requirements in matters other than in the Vioxx
7  litigation?
8      A.  The answer to the first part of the question
9  is a no.  The answer to the second part of the question
10  is, I don't understand the question.
11      Q.  You were an expert in Ballinger v. Brush
12  Wellman in Colorado state court, correct?
13      A.  Correct.
14      Q.  In that case the court entered an order making
15  certain documents confidential and placing parties with
16  access to those documents under a gag order, correct?
17      A.  No.
18      Q.  You placed confidential documents from that
19  litigation on your web server, correct?
20      A.  No.
21      Q.  The court in that matter found that you had
22  flagrantly violated the protective order, correct?
23      A.  I don't recall a protective order in that
24  case.  You want to show me the order?  Because I
25  don't -- I mean this is in 2004, I think.  So why don't

8  (Pages 26 to 29)

David Egilman, M.D.

Page 30

1  you show me what you're asking about?
2      Q.  That's fine.  You -- you don't remember?
3      A.  I remember.  I have a vague recollection of
4  what happened.  It's different from what you said.  So
5  if you're reading from something, I don't want to make a
6  mistake.
7          So I recall -- I recall a gag order, not a
8  protective order.  Okay.  And there may also have been a
9  protective order, but that had nothing to do with the
10  violation.  The violation related to a gag order that
11  was not related to any confidential documents.
12      Q.  Is it your understanding that the court in
13  that matter found that you had flagrantly violated the
14  gag order?
15      A.  That would be my general understanding.  But I
16  don't want to answer the question unless you want to
17  show it to me.  You're asking me to comment on a
18  document that is not from this litigation, that occurred
19  over 10 years ago, and it's a -- it's a parsing of
20  important legal language, which I don't think I should
21  be commenting on unless you want to show it to me.
22          MR. MCCLAIN:  Ken, do you have a password for
23  the wireless?
24          MR. LOUGEE:  Oh here, yeah.  Let me get that.
25  I'm sorry.

Page 31

1          (Deposition Exhibit No. 1 was marked.)
2      Q.  (By Mr. Boehm)  Dr. Egilman, I've placed in
3  front of you the document that has been marked as
4  Exhibit 1 for purposes of your deposition.  Do you see
5  that?
6      A.  I do.
7      Q.  Do you see that these are the findings,
8  conclusions and orders concerning sanctions in the
9  Ballinger v. Brush Wellman matter that we've been
10  referring to?
11      A.  I do.  It's from -- pardon me -- 16 years ago.
12          MR. MCCLAIN:  Thanks.
13      A.  Is that correct?
14      Q.  (By Mr. Boehm)  Do -- do you see that, on the
15  first page, second paragraph?
16      A.  Uh-huh.
17      Q.  It says, "The Court finds that Dr. Egilman
18  knowingly --
19      A.  Wait, wait, wait, wait.  Where are you?  Oh,
20  yes.  Beginning of the paragraph.  Go right ahead.
21      Q.  "The Court finds that Dr. Egilman knowingly,
22  deliberately, intentionally -- intentionally and
23  willfully violated the court's May 30th, 2001, order
24  prohibiting certain extrajudicial statements."  Do you
25  see that?

Page 32

1      A.  I do.  So you misrepresented what this said in
2  your previous questions.  Go right ahead.  Glad I asked
3  for the document.  I thought you'd misrepresented it.
4  Now I'm sure you misrepresented it.  But you go right
5  ahead and ask another question.
6      Q.  You -- you don't disagree that these were the
7  findings of the Court in that matter with respect to
8  your conduct?
9      A.  The trial court?  Absolutely not.
10      Q.  Have you reviewed the complaint in this case,
11  in the Levitt case?
12      A.  I think so.
13      Q.  Do you recall when you did that?
14      A.  No.
15      Q.  Have you read any depositions that have been
16  taken in this matter?
17      A.  Yes.
18      Q.  Which?
19      A.  Well, I get, it's a coworker.  There's Katz.
20  Some other -- the psychiatrist.  So there's a whole -- I
21  think I've -- I think I've read them all.
22      Q.  Is it your understanding that you have read
23  all of the available deposition transcripts that have
24  been taken in this matter?
25      A.  I don't know.  I think I've read them all.  I

Page 33

1  don't know how many there are.
2      Q.  You indicate --
3      A.  I always ask people from Mr. McClain's office
4  or Mr. McClain to send me everything.  Now, often they
5  don't send me everything.  But I'm under the impression,
6  until proven otherwise, they've sent me everything.
7          You want me to return this to the court
8  reporter?
9      Q.  You can just set it down there, sure.  In the
10  middle of the table.
11          Are you expressing an opinion in this matter
12  about what specific cardiovascular injury or condition
13  Ms. Levitt experienced?
14      A.  Is that the end of the question?
15      Q.  It is.
16      A.  I'm expressing the opinions that I wrote down
17  in my two reports, which I believe include some of that
18  information.
19      Q.  What specific cardiovascular event or
20  condition do you believe, if any, Vioxx caused
21  Ms. Levitt to -- to suffer?
22      A.  Okay.  Can you -- Kenny, can you, there's
23  some -- there's some several folders named Levitt.
24  Would you get me those?  Here, I'll help.
25      Q.  If you can answer the question without

9  (Pages 30 to 33)

David Egilman, M.D.

Page 34

1    resorting to the dozens of folders that are on the
2    table, I'd ask you to do that.
3           MR. MCCLAIN:  There's Levitt reports there.
4           THE WITNESS:  Oh, yeah.  Here's some more key
5    documents.
6           MR. MCCLAIN:  I don't see --
7           THE WITNESS:  I got them.  I got them.  I got
8    them.
9           MR. MCCLAIN:  -- any on the folders down
10   there.
11      A.  I got them.
12      Q.  (By Mr. Boehm)  Dr. Egilman, do you have the
13   question in mind?
14      A.  I do.  Okay.  Let's start with she had a high
15   grade proximal LAD stenosis, which -- that's L-A-D, all
16   caps -- which was caused or contributed to by Vioxx.
17   This was located beyond the first diagonal, which by
18   itself had a 60 percent osteo stenosis and possibly some
19   intraluminal thrombus, suggesting acute plaque rupture
20   while she was on Vioxx.  I attribute that the Vioxx
21   caused, contributed to those.
22      Q.  When you say "to those," can you please be
23   more specific?
24      A.  Excuse me.  Can I finish my answer?  Can I
25   finish my answer?

Page 35

1       Q.  I'm just asking you to be more specific.
2       A.  I understand what you're doing.  But what you
3    did was, you just interrupted my answer.
4       Q.  I'm trying to --
5       A.  That's what you just did, you interrupted my
6    answer.  Okay.  You just interrupted my answer.  I --
7    please do not interrupt my answer.
8           I'll tell you what, if you're confused, I will
9    finish my answer, and I will say I am finished with my
10   answer when I'm done with my answer.
11          Now, if you would like to change the question,
12   I know you don't like to take suggestions, and change
13   the question to explain to you can tell me the first thing that
14   you find, and then I will stop and then you can ask
15   iterative questions.  But when you ask for all of the
16   things, I'm going to give you all of the things.
17      Q.  Okay.  And I would just ask in response that
18   you demonstrate a modicum of courtesy and decency as you
19   conduct yourself in the deposition.
20          MR. MCCLAIN:  Let's go off the record just for
21   a minute.  Let's just go off the record for a minute
22   please.
23          Counsel, I don't know why you want to be so --
24   so -- so combative.
25          MR. BOEHM:  Could we go talk for a minute?

Page 36

1           MR. MCCLAIN:  Yeah, sure.
2           THE VIDEOGRAPHER:  Do you want to go off the
3    record?
4           MR. MCCLAIN:  Sure.
5           MR. BOEHM:  Yes.
6           THE VIDEOGRAPHER:  Going off the record.  The
7    time is 9:24 a.m.
8           (Discussion off the record.)
9           THE VIDEOGRAPHER:  Going back on the record.
10   The time is 9:26 a.m.
11          THE WITNESS:  I think I was in the middle of
12   my answer.  Let me just stop the middle of my answer and
13   make a comment, since it was interrupted by someone who
14   called me discourteous and indecent.
15          MR. MCCLAIN:  Doctor, let's just go ahead and
16   finish -- finish the answer --
17          THE WITNESS:  I just want --
18          MR. MCCLAIN:  -- and he'll -- he'll -- he's
19   going to wait for you to answer your questions from now
20   on, and I think we've got a general understanding, and
21   then he's going to follow up.  So just go ahead --
22   answer fully.
23          THE WITNESS:  I -- I just -- I don't like to
24   be characterized.
25          MR. MCCLAIN:  I understand.  Go ahead, just

Page 37

1    answer.
2           THE WITNESS:  When I'm complaining about being
3    cut off.
4           MR. MCCLAIN:  Yeah, I understand.  Go ahead.
5       A.  Okay.  Then subsequent to those two events,
6    she had a coronary bypass graft, which was caused or
7    contributed to by her taking of Vioxx.  Subsequent to
8    that, she developed significant complaints of depression
9    and some mental status inability, which is a common side
10   effect of CABG surgery.  CABG is C-A-B-G.
11          That she developed class 3 by AI -- by AIHA
12   classification of functional capacity.  She had
13   shortness of breath and depression, particularly status
14   post CABG, and a variety of other physical and mental
15   effects that prevented her from running her business and
16   contributed to her losing her business.
17          That she had a stent placed as a result of her
18   developing coronary artery disease prior to the CABG.
19   That she lost cognitive abilities, became fatigued and
20   could not carry out her usual work.  For example, she
21   could not remember what people wore to high school
22   functions when she previously had total recall for
23   clothing since that was her business.  Those were
24   crucial skills that prevented her from operating her
25   business.

David Egilman, M.D.

Page 38

1       Aside from the details of the treatment, which
2   also would be as a result of the -- which I would be
3   glad to go through, but that's a pretty good summary.
4   In other words, I will be glad to tell you what medicine
5   she took when, which resulted from the previous
6   described events.  If you don't want me to do that, I
7   can stop here.
8       Q.   Well, it wouldn't be responsive to my question
9   because my question really was, I wanted you to,
10  Dr. Egilman, tell me what specific cardiovascular events
11  or conditions you believe were the result of Ms.
12  Levitt's Vioxx use.  And I grant that you identified
13  some conditions related to the heart, and then others
14  that I think might not be.  But -- but -- but let's --
15  let's keep moving.
16       Have you communicated with any of plaintiff's
17  experts in this case?
18       A.   I think I -- well, experts, no.  I don't know
19  if I know who all the other experts are.
20       Q.   That was going to be my next question.
21       A.   I may have but without knowing it.
22       Q.   Have you communicated with Dr. David
23  Madigan --
24       A.   Yes.
25       Q.   -- about his testimony in this case?

Page 39

1       A.   About his testimony in this case, no.  I
2   communicated with David Madigan.
3       Q.   Have you communicated with Dr. Madigan about
4   the facts of this case?
5       A.   Yes.
6       Q.   Have you communicated with Dr. Madigan about
7   the facts of this case insofar as those facts are --
8   specifically pertain to Ms. Levitt?
9       A.   Not sure I understand the question.  But I
10  think the answer is yes.
11       Q.   And what have you communicated with
12  Dr. Madigan about that you understand to be specific to
13  Ms. Levitt?
14       A.   Well, I got him to run the placebo data for
15  acute coronary syndrome over the -- all the placebo data
16  that he has from all the Merck studies.
17       Q.   When did you ask him to do that?
18       A.   This week.
19       Q.   Did he provide any results to you?
20       A.   He did.
21       Q.   From that analysis?
22       A.   Yes.
23       Q.   Did you bring those?
24       A.   Yes.
25       Q.   Those results with you here today?

Page 40

1       A.   Yes.
2       Q.   Can you give them to me?
3       A.   Yes.
4       Q.   Would you please?
5       A.   Sure.
6       Q.   What -- what would the folder say?
7       A.   There's a folder of PowerPoints on ACS.  But I
8   forgot what it's titled.  It's also the articles on ACS
9   are in a large green folder.
10       Q.   Should we go off the record?
11       A.   No, we don't have to go off the record.  I'm
12  just looking for it.
13       MR. BOEHM:  Kept --
14       A.   Here we go.  There should be a PowerPoint in
15  here.  I think.  Maybe this one.
16       MR. BOEHM:  Ken, I'm going to ask to go off
17  the record so -- because the -- the searching that --
18  that we're having to do is really just eating up the
19  time that I have today.
20       MR. MCCLAIN:  Well, we -- we can go off the
21  record, but you asked him to find the folder.  So I
22  think he's trying to do that.  If you don't want it,
23  then we can move on, but -- or find it at a break,
24  but --
25       THE WITNESS:  Right.  Yeah.

Page 41

1       MR. BOEHM:  Let's go off the record.  I
2   would -- I would like to have it.  Let's go off the
3   record.
4       THE WITNESS:  That's okay.  We can just
5   continue, because I don't want to take a break.
6       MR. BOEHM:  Let's go off the record.
7       THE VIDEOGRAPHER:  Going off the record.  The
8   time is 9:35 a.m.
9       (Recess from 9:35 a.m. to 9:44 a.m.)
10       THE VIDEOGRAPHER:  Going back on the record.
11  The time is 9:44 a.m.
12       (Deposition Exhibit No. 2 was marked.)
13       Q.   (By Mr. Boehm)  Dr. Egilman, when we went off
14  the record, you and Mr. McClain were in search of a
15  folder that you indicated contained the results of an
16  analysis that Dr. Madigan had performed at your request.
17  And after intensive efforts, you were able to identify a
18  green folder that has -- has the words "acute coronary
19  syndrome, PPT," written in Sharpie on the folder; is
20  that correct?
21       A.   Yes.
22       Q.   And we've marked the contents of that as
23  Exhibit 2.  The -- the contents of this green folder
24  can -- is a PowerPoint entitled Cardiovascular Risks of
25  Nonsteroidal Antiinflammatory Drugs in Patients after a

11  (Pages 38 to 41)

David Egilman, M.D.

Page 42

1  Hospitalization for Serious Coronary Disease; is that
2  correct?
3      A.  I don't know.
4      Q.  Do you see that?
5      A.  No.  That is the title of the first PowerPoint
6  in the package of about 20 PowerPoints.
7      Q.  Okay.  Thank you.  Can I please have it back?
8  Thank you.
9          So as I now understand it, this is a package
10  of several PowerPoint presentations; is that correct?
11     A.  Yes, possibly.
12     Q.  What do you mean "possibly"?
13     A.  I wouldn't characterize it as a PowerPoint
14  presentation.  I would characterize it as PowerPoint
15  presentation of data from a variety of studies.  Just
16  studies, I-E-S.
17     Q.  Did you compile these PowerPoints that are now
18  in the document we've marked as Exhibit 2?
19     A.  What do you mean by compile?
20     Q.  Did you put these slides together?
21     A.  I did not type those slides.
22     Q.  What is your source for these slides?
23     A.  I went through the articles.  I highlighted
24  what I wanted on the articles.  Put on the PowerPoints,
25  and I gave them to someone to type up.

Page 43

1      Q.  Somebody who works with you?
2      A.  Someone who works in my office.
3      Q.  The content of the PowerPoint slides then
4  represents what you wanted to have captured based on
5  your review of the scientific data that is covered in --
6  in these slides; is that fair?
7      A.  That's correct.
8      Q.  Just flipping through it, it looks like there
9  are approximately 30 or so slides, and the final of
10  which is entitled ACS metaanalysis.  Do you see that?
11     A.  Yes.
12     Q.  Who prepared this slide?
13     A.  I did.
14     Q.  What did you use to prepare this slide?
15     A.  Data that Dr. Madigan gave me.
16     Q.  Where are those data?
17     A.  Besides on those slides?  The data that he got
18  from his database of patient level Merck data from the
19  SAS files.
20     Q.  How did Dr. Madigan communicate to you the
21  results of his analysis?
22     A.  I think he sent me an e-mail.  May have done
23  it orally.
24     Q.  Do you still have the e-mail that Dr. Madigan
25  sent to you communicating the results of his analysis?

Page 44

1      A.  I don't think so.
2      Q.  What happened to it?
3      A.  I don't know.  I may still have it.  Usually,
4  I delete my e-mails.
5      Q.  Did you bring the e-mail that Dr. Madigan sent
6  to you communicating the results of his ACS metaanalysis
7  with you to today's deposition?
8      A.  No.
9      Q.  Have you provided that to counsel for
10  plaintiff?
11     A.  I don't recall.
12         MR. MCCLAIN:  I don't believe so.
13     Q.  (By Mr. Boehm)  Is it only the last slide that
14  captures the ACS metaanalysis that you had asked
15  Dr. Madigan to do, or -- or are there other slides in
16  this green folder, that has been now marked as Exhibit
17  2, that also capture Dr. Madigan's analysis that you
18  asked him to perform in connection with Ms. Levitt's
19  case?
20     A.  The former.
21         MR. MCCLAIN:  The former.
22     Q.  (By Mr. Boehm)  Why did you put this slide
23  together with the other materials that were in this
24  folder marked ACSPPT?
25     A.  Because it deals with that topic.  And not all

Page 45

1  of the slides in that folder deal with that topic from a
2  epidemiologic standpoint.  But all of the slides in that
3  packet deal with the issue of ACS and Vioxx.
4      Q.  When did you create this slide?
5      A.  Last few days.
6      Q.  When did you communicate with Dr. Madigan
7  about performing this analysis?
8      A.  Last few days.
9      Q.  What specifically did you ask Dr. Madigan to
10  do?
11     A.  Run the -- well, first I asked him if he had
12  run an analysis just for the criteria for ACS, and he
13  said they hadn't done that, and I said could he, and he
14  said yes, and he did it.
15     Q.  Did you provide to him the end points that you
16  thought were appropriate to use in this analysis for
17  ACS?
18     A.  I think I sent him, yeah.  Something.
19     Q.  You provided to Dr. Madigan a list of end
20  points that he could use for purposes of conducting this
21  metaanalysis?
22     A.  Yeah.  And then it was one he wasn't sure
23  about, which was cardiac arrest.  That's why you see two
24  PowerPoints there.  He then said, "Do you want me to do
25  it with cardiac arrest as well?"  And I said "Sure."

12  (Pages 42 to 45)

David Egilman, M.D.

Page 46

1    Q.  Did you bring with you today the e-mail that
2  you sent to Dr. Madigan communicating to him the end
3  points that you thought it was appropriate for him to
4  use to conduct these analyses?
5    A.  No.
6    Q.  Did you provide that e-mail to counsel for the
7  plaintiff?
8    A.  No.  We're talking about the same e-mail.
9    Q.  What do you mean, "We're talking about the
10  same e-mail"?
11    A.  It's an e-mail that went back and forth.  It
12  was iterative e-mails.  It was three or four questions,
13  back and forth.
14    Q.  What end points did you include in what you
15  asked Dr. Madigan to use for purposes of his
16  metaanalysis?
17    A.  MI, sudden death and -- and unstable angina.
18    Q.  Anything else?
19    A.  I don't think so.
20    Q.  Did you consult with anybody in order to come
21  up with the list of end points that you thought it would
22  be appropriate for Dr. Madigan to use for his
23  metaanalysis?
24    A.  No.
25    Q.  What was your methodology for determining

Page 47

1  the -- the three end points you've identified, MI,
2  sudden death and unstable angina were the appropriate
3  end points for a metaanalysis such as the one you asked
4  Dr. Madigan to conduct?
5    A.  I reviewed the literature on the definition of
6  ACS.
7    Q.  Did you do that within the last few days?
8    A.  I did that before.  But I did it again the
9  last few days.
10    Q.  What specific literature did you review and
11  use as a source in determining that those three specific
12  end points were the appropriate ones?
13    A.  Well, the literature that defines it in the
14  papers that you have in your hand, which I have in
15  another folder here.  The Merck manual.  And I think a
16  couple other papers that -- that define the ACS, which
17  are also someplace in here on the table.
18    Q.  Okay.  Can you tell me what those studies are?
19  Because we have, I don't know, probably at least a
20  hundred folders on the table, all color coded and marked
21  in various ways.
22    A.  Oh, I think we have 200 folders on the table.
23    Q.  Probably right.  Maybe more.
24    A.  Well, I mean, if I didn't have the folders,
25  I'd tell you what I just told you.  I mean, they're

Page 48

1  here.  You can, you know, mark them.
2    Q.  Okay.  Can you --
3    A.  I gave -- told you that -- that this folder
4  here has the underlying literature that goes with the
5  PowerPoints in your hand.  So that would be some of
6  them.
7    Q.  Thank you.
8    A.  And then perhaps, you know, and I can stand up
9  and look around for the other ones.
10    Q.  Was there any particular publication, or were
11  there any particular publications that you used as your
12  source for deciding that MI, sudden death and unstable
13  angina were the three appropriate end points to use for
14  a metaanalysis for ACS?
15    A.  I think that's what's defined in those papers
16  which you just have.  That's how the Merck manual
17  defines it.  And then there's papers that specifically
18  look at the question of ACS, and that's how they defined
19  it, as I recall.
20    Q.  Did you provide to Dr. Madigan a list of
21  MedDra terms he could use to capture possible events
22  that you believed met those three end points?
23    A.  No.  Because he has his own -- that -- that, I
24  mean, we -- we have done that before; and we have -- I
25  mean all of -- all of the end points, perhaps except

Page 49

1  for -- except for unstable angina, have already been
2  MedDra'd, CRISP'd and -- and otherwise evaluated by --
3  and we've reported on that evaluation in -- in published
4  papers that we have done.  So that process has already
5  been vetted for these particular Merck studies.
6    Q.  Did you discuss with Dr. Madigan what specific
7  MedDra terms he would be using to capture potential
8  events of MI, sudden death and unstable angina to
9  conduct this ACS metaanalysis?
10    A.  No.  Because they are previously published.
11    Q.  When you say, "They are previously published,"
12  you're referring to your own publication with
13  Dr. Madigan?
14    A.  No.  Actually, I -- I think they're in several
15  publications, one of which is the -- the paper that I am
16  on.  Another one is a 2012 paper that he did with other
17  people.  And so it's -- I mean, it's been vetted.  He's
18  been cross-examined on it.  He's -- they've -- Merck has
19  hired witnesses to critique it.
20      He's been deposed about it.  It's about the
21  best vetted set of data in existence in the world, I
22  think, if you believe that cross-examination is the --
23  is the best.  And I certainly think cross-examination is
24  much more effective at getting to the truth than peer
25  review.

13  (Pages 46 to 49)

David Egilman, M.D.

Page 50

1    Q.  You agree that's true if you can see the
2  underlying data and see the methodology and processes
3  that one undertook in order to reach statistical
4  conclusions, correct?
5    A.  I can't -- I don't understand what you're
6  talking about, that question.
7    Q.  You don't understand that?
8    A.  No.
9    Q.  Okay.  You're not a statistician, correct?
10   A.  Well, I took statistics in public health
11 schooling.  I know a fair amount of statistics.
12   Q.  You're not a statistician, correct?
13   A.  I'm -- I'm not a Ph.D. statistician.  I do
14 statistics in my work.  I teach statistics at Brown, as
15 part of my courses.  So by those definitions, I am a
16 statistician.  I certainly know more about statistics
17 than the layman.  So I would be an expert in statistics
18 from a perspective of some courts.
19        I've certainly been able to testify about
20 statistical issues.  I've published on statistical
21 issues related to metaanalysis and other things.  So I
22 guess, and I would call myself a statistician in part.
23   Q.  Did you do anything to double-check
24 Dr. Madigan's results as represented on this slide
25 entitled ACS metaanalysis to determine that it had been

Page 51

1  conducted in a statistically appropriate way?
2    A.  No.
3    Q.  Do you know if Dr. Madigan consulted with any
4  other individuals for purposes of conducting this
5  metaanalysis?
6    A.  No.
7    Q.  What specific studies did Dr. Madigan include
8  in this, what you're calling ACS metaanalysis?
9    A.  I think the ones -- the ones that he described
10 in his published paper.  That's the Merck set plus the
11 ones that Merck excluded from their metaanalysis.  That
12 means the four studies that compare Vioxx to Celebrex
13 and a placebo and a couple others.  But why don't you --
14 if you give me that green folder back, I can tell you
15 that.
16        Okay.  So the studies are 078, 091, 126, 118,
17 120, 121, and 125 and 129.  Those are the five studies
18 that Merck generally left out of its metaanalysis.  017,
19 also omitted from Merck metaanalysis, as I recall.  068,
20 096, 097, and for 097 he did not use the correction of
21 the fraudulent data that was -- because there was
22 fraudulent data in that study.
23        098, 103, 010, also omitted, as I recall, from
24 the Merck metaanalysis.  029, 033, 040, 044, 045, 058,
25 083, 085, 090, 112, 116, 136, 219, 220.

Page 52

1    Q.  Any others?
2    A.  I think that's it.  Did I say 122?  I think
3  so.
4    Q.  Dr. Egilman, would you kindly read for the
5  record the citation reference for this publication and
6  then identify also for the record the table or whatever
7  it is specifically you're looking at in this reading the
8  list of studies you just did -- that you just read?
9    A.  Table 2.  And the paper is Pooled Analysis of
10 Rofecoxib Placebo Clinical Controlled Data.  Lessons for
11 post -- post -- lessons for post market pharmaceutical
12 safety surveillance was published in Archives of
13 Internal Medicine, Volume 169, No. 21.  November 23,
14 2009.
15   Q.  Did Dr. Madigan limit his metaanalysis to
16 placebo controlled data?
17   A.  In that -- in what you have in front of you,
18 yes.  And in what I just read you, yes.  We have done
19 other metaanalysis that include non-placebo-controlled
20 data.
21   Q.  Did you discuss with Dr. Madigan the
22 possibility of conducting an ACS metaanalysis that would
23 include non-placebo-controlled data?
24   A.  No.
25   Q.  Did you ask him specifically to limit his

Page 53

1  analysis to placebo-controlled data?
2    A.  I don't know if I specifically asked him to.
3  Oh, yeah, yes.  Yeah, yeah.  Yeah, I did.  I did.  I
4  did.
5    Q.  Why did you ask him to only do
6  placebo-controlled data?
7    A.  Because I didn't want Merck to criticize it
8  for having naproxen controls, or any other kind of
9  creative argument against using non-placebo-controlled
10 data.
11   Q.  Did Dr. Madigan use investigator-reported
12 numbers from the studies you identified, or did he use
13 adjudicated data?
14   A.  I think he -- he used -- it's whatever we said
15 here, I think.  I think it's a mixture of both because
16 in the Alzheimer's trials, Merck did not adjudicate the
17 off -- off-drug events.  So we only had -- we used what
18 we had.
19   Q.  Is it your understanding that Dr. Madigan
20 included the VICTOR trial in the AC metaanalysis that
21 you asked him to perform?
22   A.  I don't think he did.
23   Q.  What about the VIP trial?
24   A.  I don't remember the numbers.  I don't think
25 he did.  I don't think VIP or VICTOR were included.  I'm

14  (Pages 50 to 53)

David Egilman, M.D.

Page 54

```
 1   not sure though.
 2       Q.  Other than the one PowerPoint slide that you
 3   have identified at the back of what is now Exhibit 2 to
 4   your deposition, do you have any other materials that
 5   explain the methodologies that you and Dr. Madigan
 6   discussed, and that Dr. Madigan implemented for purposes
 7   of conducting the ACS metaanalysis that you've been
 8   describing?
 9       A.  Besides the two papers I mentioned, and
10   perhaps some of the methodology was discussed in what we
11   did in the ADVANTAGe paper, Hill was the first author
12   of, no.
13       Q.  Dr. Egilman, do you have any objection to
14   providing to defendants in this case the e-mail exchange
15   that you had with Dr. Madigan concerning this, what
16   you're referring to as a metaanalysis?
17       A.  If I have it.
18       Q.  Is it your general practice to delete e-mails
19   as soon as you receive them?
20       A.  Yes.
21       Q.  And do you --
22       A.  Or soon thereafter.
23       Q.  And do you believe that that's what you did
24   with respect to the e-mail exchange you had with
25   Dr. Madigan concerning this ACS metaanalysis?
```

Page 55

```
 1       A.  I think so.  That's my general practice.  But
 2   I might not have, because it was recent.
 3       Q.  Why would you delete the e-mail exchange you
 4   had with Dr. Madigan concerning this so-called ACS
 5   metaanalysis?
 6       A.  Well, it's my practice to delete all my
 7   e-mails, and the re -- the why is, as you're aware,
 8   lawyers -- law firms representing Merck in this
 9   litigation participated in hacking my computer, which
10   resulted in the Ballinger ruling you were so kind to
11   make Exhibit -- what is it -- 1 or 2 in this case.
12           And so since law firms defending companies
13   have decided to hack my computer system, I think it's
14   prudent for me to delete my e-mails when -- and so now
15   that's a specific reason.
16           It's -- also, there's a general reason.  I
17   think e-mails should be deleted, and I tell everybody to
18   do that, and that's because I think it's commonly
19   understood that hacking is really quite easy these days.
20   And so if you want any measure of confidentiality, and a
21   lot of what I do is practice medicine, and things that
22   I -- or I do confidential consulting in cases like this.
23           And I would hate to be accused of releasing
24   confidential documents or other documents because
25   someone hacked my computer, which has happened in the
```

Page 56

```
 1   past.  We already read that.  We already read something
 2   about -- something about something like that in the
 3   Ballinger document.  So those are the reasons.
 4       Q.  Did the Ballinger case involve a Vioxx
 5   plaintiff?
 6       A.  No.
 7       Q.  In addition to this, what you're referring to
 8   as an ACS metaanalysis that you asked Dr. Madigan to
 9   conduct, what else, if anything, did you discuss with
10   Dr. Madigan about the Levitt case?
11       A.  I think I told him that Dr. Pratt was Merck's
12   witness in this case, and is of the opinion that Merck
13   has not been shown -- Vioxx has not been shown to cause
14   heart attacks or strokes, and that he was the previous
15   head of the FDA cardio renal panel.
16       Q.  Okay.  Did you discuss anything with
17   Dr. Madigan beyond that?
18       A.  No.
19       Q.  Did Dr. Madigan have a response when you told
20   him what you just described?
21       A.  No.
22       Q.  Do you know John Ward?  Ward, W-A-R-D?
23       A.  Not that I can recall.
24       Q.  Do you know Jay Schapira?  S-C-H-A-P-I-R-A?
25       A.  Not that I can recall.
```

Page 57

```
 1       Q.  Forgive me if I asked you this already.  I
 2   just am not sure.  Did you read the deposition
 3   transcript of Dr. Madigan in this case?
 4       A.  I don't recall.  I think so.  I read a lot of
 5   his deposition transcripts.  They all blur together.
 6       Q.  Did you read a deposition transcript from
 7   Dr. Madigan in the last couple of months?
 8       A.  I don't think so.  I -- I read -- I reread his
 9   report in the Utah case.
10       Q.  Did you read the deposition transcript of one
11   of defendant's experts Daniel Clauw, C-L-A-U-W?
12       A.  Can't recall.
13       Q.  Have you read the reports that have been
14   submitted by defense experts in this case?
15       A.  The ones that have been sent to me.
16       Q.  Which ones have been sent to you?
17       A.  Well, I know Dr. Pratt has been.  I don't know
18   about the others.
19       Q.  Where could I go, in either your report or the
20   materials that you have, to determine which of
21   defendant's expert's reports you have seen and reviewed?
22       A.  I think one of the attorneys from
23   Mr. McClain's office went over that with me and sent you
24   a list.  I don't have that.  Never did.
25       Q.  Dr. Egilman, earlier this morning you
```

15 (Pages 54 to 57)

David Egilman, M.D.

Page 58

1  referenced a stipulation that you had entered into with
2  Merck in connection with documents identified as
3  confidential in this matter.  Do you remember discussing
4  that with me briefly?
5      A.  Yes.
6      Q.  Have you, and are you currently abiding by the
7  terms of that stipulation?
8      A.  Yes.  That's why we're in Utah.
9      Q.  What is the nature of your affiliation with
10  Brown University?
11      A.  I am a clinical professor in the Department of
12  Family Medicine.
13      Q.  Is that a tenured position?
14      A.  There are no tenured positions at Brown, on
15  the faculty and medical schools.
16      Q.  When you say "clinical professor," is that as
17  to be distinguished with medical professors who are not
18  clinical professors?
19      A.  Yes.
20      Q.  What is that distinction?
21      A.  I don't know all the -- I don't know all of
22  the rules for that distinction.  If you're hired by
23  the -- Brown doesn't pay any medical faculty except for
24  the ones who are in administration.  So one
25  understanding I might have of that is that I teach in

Page 59

1  family medicine.
2          And then there are faculty who are nonclinical
3  faculty who teach at family medicine, who are paid for
4  by the hospital.  And they work more or less -- well,
5  their positions can be split so it can be complicated.
6  So they would put more time in generally.
7          But some of them could be similar to me in
8  that some of their salary might be paid by some outside
9  clinic, and some by the hospital, some by a grant.  It's
10  a mixture that's not well defined.
11      Q.  Do you receive salary of any kind for your
12  work as a clinical professor at Brown?
13      A.  I get to use the gym with a discount.  Used to
14  get it free.  And I get a library card, which is worth a
15  considerable amount of money.
16      Q.  Anything else?
17      A.  I get a discount at the faculty club.  I may
18  get a discount at the bookstore.  I get parking when I'm
19  teaching my course.  That's very valuable at Brown.
20  That's all I can think of.
21      Q.  Can you provide an accurate estimate of what
22  percentage of your professional time is spent working as
23  a paid expert in litigation matters?
24      A.  No.
25      Q.  Can you provide a rough estimate of that?

Page 60

1      A.  I can provide a guess, yes.
2      Q.  What's your rough estimate?
3      A.  Oh, probably 20, 25 percent.
4      Q.  What does that come to in terms of a dollar
5  figure?
6          MR. MCCLAIN:  I don't -- I don't understand
7  the question.
8          MR. BOEHM:  Yeah.  You're right.  I withdraw
9  the question.
10      Q.  (By Mr. Boehm)  What percentage of your annual
11  income would you estimate is related to your work as an
12  expert in litigation matters?
13      A.  Probably between 30 and 50 percent, depending
14  on the year.
15      Q.  What does that 30 to 50 percent roughly come
16  to in terms of a dollar figure?
17      A.  Well, my gross is about a million to million
18  two.
19      Q.  Do you maintain a clinical practice?
20      A.  Small one.  And I also see patients in family
21  medicine.
22      Q.  How would you characterize the size of your
23  clinical practice?
24      A.  Small.  I don't see very many patients.
25      Q.  Are you the primary care physician for any

Page 61

1  patients?
2      A.  No, most of what I would see would be -- well,
3  occasionally.  But mostly I would see consulting cases
4  where there is some question of toxicity to a substance.
5      Q.  Do you receive referrals from other physicians
6  when the health issues concern toxicity?  Is that what I
7  understood?
8      A.  Again, I can't know what you understand.
9      Q.  Did I understand that correctly?  Forgive me.
10      A.  I cannot understand what you understand.  I do
11  get referrals.
12      Q.  Do you typically receive referrals from other
13  physicians for health issues beyond toxicity?
14      A.  I don't know what you mean by "beyond."
15      Q.  Well, you identified that you -- you indicated
16  that physicians sometimes refer patients to you who
17  have -- have a toxicity related health issue, and I am
18  asking you now if there are other types of health issues
19  that other physicians typically recommend patients to
20  you for?
21      A.  I would say for the most part, the patient
22  might have a particular disease, but the -- the referral
23  to me would generally focus on whether or not there was
24  some cause of that disease that was related to some
25  exposure.

16  (Pages 58 to 61)

David Egilman, M.D.

Page 62

```
1      That would be the -- so I might be referred a
2  patient with asthma for an evaluation of asthma.  But in
3  general, that would be with the idea that I was going to
4  try to focus on finding a cause or causes of the asthma
5  rather than for treatment of the asthma, although it
6  wouldn't necessarily be specified in the referral.
7      And it depends where I am.  So in the United
8  States, that would be my answer.  I do do international
9  work, and when I do international work, I would be
10  seeing patients of a more general nature.  So I would
11  see patients with tuberculosis or heart disease or any
12  number of other diseases and might give talks about
13  those diseases in that context.
14      So domestically, probably not.  That is
15  probably not other than some idea, whether explicit or
16  implicit, that I'm looking for a toxin.
17      Q.  Do you have a -- oh, I'm sorry.  Go ahead.
18      A.  But internationally -- but internationally, I
19  would say I do much more general consulting.
20      Q.  Do you treat patients internationally?
21      A.  No.  But I'm often brought in to ask about
22  treatment of patients.  I'll make rounds
23  internationally.  And I'll help design -- what we do is
24  design curriculum in medical schools and nursing
25  schools.  So I will assist in the curriculum
```

Page 63

```
1  development.
2      And those curriculum development will -- will
3  not generally not deal with toxicity issues.  It will
4  deal with general medical issues.  Everything from
5  psychiatric interventions to -- to cardiac to any
6  internal medicine problem.  Sometimes pediatrics and
7  OB-GYN in fact.  So, you know, in the land of the blind,
8  the one-eyed man is king.
9      Q.  In your small clinical practice, when was the
10  last time you saw a patient and treated a patient?
11      A.  In the last couple of months.
12      Q.  Was it a couple of months ago approximately
13  that you last did that?
14      A.  Yes.
15      Q.  In what states are you licensed to practice
16  medicine?
17      A.  Rhode Island, Massachusetts and Mississippi.
18      Q.  Any other states?
19      A.  No.
20      Q.  Are you licensed to practice medicine in Utah?
21      A.  No.
22      Q.  You're -- you're not planning to see any
23  patients while you're here in Utah, are you?
24      A.  No.
25      Q.  Are you planning to make any rounds at any
```

Page 64

```
1  hospitals while you're here in Utah?
2      A.  I was going to try to go over to Intermountain
3  and talk to some people there.
4      Q.  What physicians were you going to consult with
5  at Intermountain Health Care System?
6      A.  I haven't decided.  I'm interested in the
7  organization of their health system.
8      Q.  Were you planning on doing rounds over at the
9  Intermountain Health Care?
10      A.  Don't know.
11      Q.  What physicians specifically do you know over
12  at Intermountain Health Care?
13      A.  I don't know any physicians there.  I was
14  going to call them up and try to explore, and see what I
15  could determine to do with respect to how their health
16  system is organized.  It's viewed as the most efficient,
17  well organized health system in the United States.
18      Q.  When were you planning to do that?
19      A.  Today.  Tomorrow.
20      Q.  Who were you planning to call?
21      A.  I don't know.  I haven't looked yet.  I have
22  lots of friends in Utah.  Some of them know physicians
23  there.  The lawyers here know physicians there.  I've
24  talked to them about it, but I haven't gotten a specific
25  name.  I will try to get you one if we take a break.
```

Page 65

```
1      Q.  Are you planning to stay in Utah for a few
2  days to -- to interact with Intermountain Health Care?
3      A.  I have -- do I plan?  I don't know.  I don't
4  have any plans right now.
5      Q.  Your organization, Never Again Consulting, is
6  not a medical clinical practice; is that correct?
7      A.  No.
8      Q.  Does that business generate revenue?
9      A.  Yes.
10      Q.  How much revenue approximately did that entity
11  earn in 2015?
12      A.  I don't know.  We haven't done our taxes yet.
13      Q.  Can you give me an approximation?
14      A.  Probably a million.  Million two.
15      Q.  Is it fair to say then that all of your
16  income, all of your revenue in a given year comes
17  through this entity, Never Again Consulting?
18      A.  No.
19      Q.  Okay.  So what other -- aside from the million
20  or million point two in revenue that you receive through
21  Never Again Consulting, what are your additional revenue
22  streams?
23      A.  I have investments.
24      Q.  Anything else besides investments?
25      A.  I don't think so.
```

17 (Pages 62 to 65)

David Egilman, M.D.

Page 66

1      Q.  Do you consider yourself to be a consumer
2  protection activist?
3      A.  What is that?
4      Q.  Do you have an -- appreciation of what that
5  term means, consumer protection activist?
6      A.  No.  That's what why I asked what is that.
7      Q.  Is that a term that you've ever used to
8  describe yourself?
9      A.  I don't think so.  It's possible, but I don't
10  think so.
11      Q.  Sitting here today, it doesn't seem like a
12  term that you would use to describe yourself.  Is that
13  what -- am I understanding you correctly?
14      A.  I don't know.  I mean, I have described myself
15  as fat, you know.  I've described myself as a not good
16  dresser.  I mean, there's a lot of ways I've described
17  myself.  I can't recall if I have used those terms in
18  any context about anything.  But it's possible.
19      Q.  And your testimony here today is, you don't
20  even understand what the term "consumer protection
21  activist" means; is that right?
22      A.  No.  I said, what do you mean by that?  I
23  don't think -- I don't -- I know I can't look that up in
24  a dictionary.  And I know we are here at a deposition,
25  in a court proceeding that's being recorded and

Page 67

1  videotaped.  So I asked for a more specific definition
2  of what you meant when you said that.
3      Q.  Do you have an understanding of what the term
4  "consumer protection activist" means?
5      A.  I have many definitions of that term.  It's --
6  I mean, it's -- it's a term that's vague and ambiguous.
7      Q.  Do you consider yourself to be a consumer
8  protection activist in -- in any of the ways that you
9  think that term might apply?
10      A.  I don't know.
11      Q.  When did you --
12      A.  It's not -- it's not certainly how -- it's not
13  certainly how I would prefer to describe myself.  Okay.
14  I mean, with respect to the general area, I -- I -- I
15  would characterize myself as an advocate for public
16  health.  Okay.
17          I would describe myself as someone who doesn't
18  think consumers should be misled about the health
19  hazards of the products they buy and consume.  I
20  would -- I would -- I would consider myself to be
21  someone who doesn't think corporations should lie in
22  their warnings on drugs.  I would consider myself
23  someone who doesn't think companies should not test
24  adequately the products they sell with respect to
25  health -- potential health hazards, into the public

Page 68

1  stream.
2          Now, if you want to call that, and other
3  things that I could go into, a consumer advocate, then I
4  am an advocate for those things, but that's what public
5  health is, what I just described.  Part of public
6  health.  But, you know, so I don't think we gain much
7  with pejoratives.
8      Q.  What percentage of your work as an expert has
9  involved allegations that a product has caused an injury
10  to a plaintiff or to plaintiffs?
11      A.  Well, all of it, I think.  Well, let me think.
12  No, no, no, no, I've done some environmental cases.  But
13  all -- other than environmental cases, maybe some other
14  cases too.  I did a -- I did a -- I've done things
15  that -- that don't relate to injuries.  The Missouri
16  litigation didn't relate to injuries.  So there are
17  fraud cases.  I think the Kentucky fraud case didn't
18  relate to injuries to plaintiffs.
19          And just to be clear, when I serve as an
20  expert at the request of companies that make products,
21  that also generally occurs in cases where there have
22  been allegations that the product has injured someone.
23  So -- so that the -- the question doesn't imply one side
24  or the other.
25      Q.  Have you ever been retained by defendants in a

Page 69

1  case involving allegations that a product has caused an
2  injury to a plaintiff or plaintiffs, and provided
3  deposition or trial testimony in that matter?
4      A.  Yes.
5      Q.  What case or cases are you referring to?
6      A.  Well, many cases.  Probably the first ones
7  were asbestos mesothelioma cases.  For Turner & Newell,
8  Flintco.  No, not -- not Flintco.  The protect was a
9  gasket.
10          So two or three cases, I testified in.  And
11  then over the past five or six years, I did a case
12  for -- well, before that I did a case for a boiler
13  company in Boston.  I've done other case -- when I was
14  working at the -- the clinic in Braintree, I did several
15  cases.
16          I was a consultant working for companies
17  consulting for companies, and I would see patients for
18  them.  And in some of those cases went to litigation and
19  I was a witness at their request in those cases.  And
20  then right now, I do a lot of cases for Viking Pump,
21  several other pump companies I've done cases for.  I
22  think I did a lead case for a company in Boston.
23      Q.  When is the last time you gave deposition or
24  trial testimony in a case where you had been retained by
25  defendants in a matter involving allegations that a

Golkow Technologies, Inc. - 1.877.370.DEPS

David Egilman, M.D.

Page 70

1  product had caused an injury to a plaintiff or to
2  plaintiffs?
3      A.  Probably last year.
4      Q.  What case was that?
5      A.  I don't remember the name of the case.  It was
6  a Viking Pump case.  I mean, I have one, I think,
7  scheduled for Viking Pump next week as well.  As I
8  recall.
9      Q.  Did you testify in that deposition or trial
10 that the product plaintiff had alleged had caused his or
11 her injury did not in fact cause the injury?
12     A.  Correct.
13     Q.  When is the last time you reviewed the reports
14 that you prepared for this case?
15     A.  Yesterday.
16     Q.  What did you do to prepare for today's
17 deposition?
18     A.  What did I do?  I read a lot of the things
19 front of you.
20     Q.  Did you meet with counsel?
21     A.  You mean Mr. McClain?
22     MR. MCCLAIN:  Never.  At all costs, never.  If
23 I can ever avoid it, the answer is no.  And I -- you can
24 swear me in on that.
25     A.  I met with Mr. McClain this morning, because I

Page 71

1  gave him a ride here.  I didn't meet with anybody else
2  from his firm either.  I was -- Mr. Lougee, who's not in
3  this case, was here during the time that I was here
4  preparing.  Because that's pursuant to the stipulation
5  he has to be here.
6      So but for the most part -- oh, we didn't
7  discuss this case except in a general manner.  We
8  certainly did discuss Merck and other things.  I mean a
9  lot of the things, a lot of the folders and things we
10 discussed.
11     Q.  How long did you spend preparing for today's
12 deposition?
13     A.  I think you interrupted my answer.  What did
14 you do to prepare for this case was the question.
15     Q.  For today's deposition was the question.
16     A.  What did you do to prepare for today's
17 deposition was the question.  That's correct.  So I
18 didn't finish the answer.
19     MR. MCCLAIN:  Go ahead and finish it.
20     A.  Okay.  Let's see.  Well, I looked at all the
21 documents on psychological impact of -- articles on
22 psychological impact of coronary bypass graft surgery
23 on -- and cognitive defects associated with coronary
24 bypass surgery, bygraft surgery and printed them off
25 looked at them.

Page 72

1      I put together these PowerPoints.  Reread
2  those articles that relate to the PowerPoints.  I did a
3  lot of work on the 5005 case.  Reread the 5005 and
4  ADVANTAGe protocols.  Looked for the informed consent
5  forms, for the ADVANTAGe trial, and the Vigor trial.
6  Let's see.
7      Created some of these folders.  Some of them
8  were there before.  When I created them, I also often
9  looked at them and reviewed them.  I reread the Madigan
10 report.  Created a PowerPoint based on the Madigan
11 report in the Utah case.  Oh, reread parts of the Martin
12 report.
13     The Martin report's supposed to be amongst the
14 stuff here.  It's a four volume Martin report here.  So
15 I reread parts of the Martin report.  Reread my reports.
16 Read Pratt's report.  Reread two of my depositions, the
17 ones by Goldman and Ismael.  Got some of the exhibits to
18 that, to the Ismael report.  That's generally it.
19     Q.  That's just the general answer?
20     A.  Right.
21     Q.  That's not the specific answer?
22     A.  Right.  Do you want the specific answer?  I'm
23 sorry.
24     MR. MCCLAIN:  I think you got a sense of what
25 he did.

Page 73

1      MR. BOEHM:  Oh, yeah, I -- I certainly did.
2      MR. MCCLAIN:  He was here for several days
3  preparing.
4      Q.  (By Mr. Boehm)  How many days were you here
5  preparing for today's deposition?
6      A.  I got here Thursday.
7      Q.  Did you prepare through the weekend?
8      A.  Did you mean do I work on weekends?  Yes.
9      Q.  So you -- did you prepare Thursday for the
10 deposition?
11     A.  Yes.
12     Q.  Did you prepare Friday for the deposition?
13     A.  Yes.
14     Q.  Saturday?
15     A.  Yes.
16     Q.  Sunday?
17     A.  Yes.
18     Q.  Did you prepare yesterday for the deposition?
19     A.  Yes.
20     Q.  You referenced having looked at articles
21 related to psychology and related to acute coronary
22 syndrome.  Are -- are all of the materials that you have
23 reviewed and relying upon for purposes of your opinions
24 in this case, specifically the ones that are related to
25 the conditions that Ms. Levitt has alleged to have

19  (Pages 70 to 73)

David Egilman, M.D.

Page 74

```
 1   suffered in connection with her use of Vioxx, all
 2   included in your reports in this case?
 3       A.  No.
 4       Q.  What medical literature are you relying on for
 5   your opinions in this case that you believe are
 6   specifically related to the allegations made by
 7   Ms. Levitt, and that are not already identified for us
 8   in your expert reports?
 9       A.  I can't recall, but I'm sure there's
10   something.
11       Q.  You can't tell us what those are as you sit
12   here right now?
13       A.  No.  But I mean, I've read thousands of
14   articles, okay.  I don't know what the questions are
15   going to be.  I think I have provided sufficient
16   literature in the reports and in the materials I brought
17   here to support my opinions, but I'm sure there's other
18   literature that I have read and relied on in the past
19   that I didn't put down.
20       Q.  You indicated in the last several days you had
21   found some medical literature or were relying on medical
22   literature related to psychology?
23       A.  No.  You misunderstood.
24       Q.  You -- you -- you're not relying on any
25   medical literature concerning psychology insofar as it
```

Page 75

```
 1   concerns your opinions in this case; is that correct?
 2       A.  Well, that's a vague and ambiguous question,
 3   but the answer to that is, as I understand it, no.  I am
 4   relying on such articles.
 5       Q.  Okay.  What are those articles?
 6       A.  They are in a pile here.  There's -- there's
 7   a -- there's a folder here with a bunch of articles on
 8   the psychologic and cognitive impact of CABG surgery.
 9       Q.  Are those articles that you have specifically
10   referenced in your expert reports in the Levitt case?
11       A.  I don't think so.  Not all of them.
12       Q.  Have you referenced any of them in your expert
13   reports?
14       A.  I don't recall.
15       Q.  Let's go off the record and take a break.
16       THE VIDEOGRAPHER:  Going off the record.  The
17   time is 10:40 --
18       THE WITNESS:  Whoa, whoa, whoa, whoa, whoa.
19   Why are we doing that?
20       MR. MCCLAIN:  Because he might want to use the
21   restroom.
22       MR. BOEHM:  Yeah.
23       THE VIDEOGRAPHER:  Going off the record.  The
24   time is 10:41 a.m.
25       (Recess from 10:41 a.m. to 11:01 a.m. )
```

Page 76

```
 1       THE VIDEOGRAPHER:  Going back on the record.
 2   This is the beginning of Tape 2.  The time is 11:01 a.m.
 3       (Deposition Exhibit No. 3 was marked.)
 4       Q.  (By Mr. Boehm) Dr. Egilman, when we broke we
 5   were discussing some of the efforts that you went to to
 6   prepare for today's deposition, and in the course of
 7   your description of those efforts, you indicated that
 8   you had identified certain publications and medical
 9   literature that you believe have bearing on Ms. Levitt's
10   claims in this case.
11       And specifically during the break you, with
12   plaintiff's counsel, identified for us a red folder that
13   has written on it, in what appears to be black Sharpie,
14   the words "depression and CABG."  And inside that folder
15   is a stack of material that's approximately two inches
16   tall, and appears to be medical literature.
17       Is it correct that the medical literature that
18   is in this folder and that we have now marked as Exhibit
19   3, for purposes of your deposition, is not literature
20   that you have referenced in your expert reports in this
21   case?
22       A.  I don't recall.
23       Q.  Did you provide to plaintiff's counsel in this
24   matter these materials, and indicate to plaintiff's
25   counsel that these were materials that you were relying
```

Page 77

```
 1   on for purposes of your opinion?
 2       A.  I don't recall.
 3       Q.  I was able to identify just through a quick
 4   skim, what appears to be some materials belonging to
 5   Siegfried and Jensen, that are the medical records of an
 6   individual.  I did not look any further than to indicate
 7   that -- and to determine that may be something that
 8   would not rightfully belong in this Exhibit 3.
 9       Would you like to look at that, Dr. Egilman,
10   and let me know if these are materials that you are
11   relying on?
12       A.  Yeah.  I don't know how these got in there.  I
13   don't know what these are.
14       Q.  I'll represent to you that these were in the
15   middle of this stack of pages --
16       A.  Oh, I know what is it.
17       Q.  -- provided to us?
18       A.  This is from this law firm.  I printed those
19   out here.  So this must have been on the printer when
20   they came out.  So they got put in that file because
21   this is Siegfried.  This is this firm.  So this is their
22   documents.
23       Q.  Yeah.  And it appears to contain confidential
24   health information of an individual who is not in any
25   way connected to this particular lawsuit.  So I think
```

20  (Pages 74 to 77)

David Egilman, M.D.

Page 78

1  it's probably in everybody's interest that we exercise
2  care and return those.
3        In fact, Dr. Egilman, unless you yourself have
4  some reason to be reviewing those medical records, as I
5  see you are doing now, I'm not sure that it would be
6  appropriate for you to do so.
7        MR. MCCLAIN:  Well, let's not give him any
8  instructions on anything.
9        MR. BOEHM:  Well, you can.  You're looking at
10 him.
11       MR. MCCLAIN:  I don't really have any.  I
12 don't have any dog in that fight either.  I mean,
13 they're not my -- not my clients.
14       MR. BOEHM:  Frankly, I'm trying to do him a
15 favor by --
16       MR. MCCLAIN:  Okay.  Well, I don't --
17       MR. BOEHM:  -- urging him not to review
18 confidential medical information.
19       MR. MCCLAIN:  Stay away from that then.  Can
20 you stay away from that kind of helpful stuff, and we'll
21 be better off.
22       MR. BOEHM:  Okay.
23    A.  Just to make the record clear, there's nothing
24 in these documents that say they're confidential.
25    Q.  (By Mr. Boehm)  Do those appear to be the

Page 79

1  medical records of an individual?
2    A.  I don't know.  You want me to review them and
3  tell you?
4    Q.  I just saw you reviewing them.
5    A.  Well, I didn't review them for that --
6    Q.  Let's, let's, let's, let's, let's just move on
7  to something else.
8    A.  Why don't we take a break so I can return
9  these to the law firm which they belong.
10   Q.  Okay.  Let's go off the record.
11       THE VIDEOGRAPHER:  Going off the record.  The
12 time is 11:05 a.m.
13       (Discussion off the record.)
14       THE VIDEOGRAPHER:  Going back on the record.
15 The time is 11:06 a.m.
16   Q.  (By Mr. Boehm)  Dr. Egilman, this
17 approximately two inch stack of materials, are these
18 materials that you're relying on for purposes of your
19 opinions in the -- in this Levitt case?
20   A.  They're materials that I've read, reviewed or
21 considered.
22   Q.  Did you read, review or consider these
23 materials just in the past few days that you've been
24 here at the office where we're currently conducting this
25 deposition?

Page 80

1    A.  No.
2    Q.  When did you read, review or consider these
3  materials?
4    A.  I don't know.  Some of them probably when they
5  were published.
6    Q.  How did you go about identifying them for
7  purposes of compiling the stack of -- of papers that is
8  now Exhibit 3 to your deposition?
9    A.  I probably did a PubMed search.
10   Q.  Have you read every article that's in here?
11   A.  That's my general recollection.  But I haven't
12 read them for a long time.
13   Q.  Why didn't you cite to these materials in your
14 two reports?
15   A.  I don't know.
16   Q.  Just for the record --
17   A.  Probably because I looked at them after the
18 reports were written.
19   Q.  Just for the record, this is a -- again, a two
20 plus inch stack of materials that is composed of many
21 articles in the published medical literature.  The first
22 two appear to be stapled.  After that they are not in
23 any way separated as between the various articles
24 included here.
25       It would be impossible for defendants to

Page 81

1  review these materials, or even some small portion of
2  these materials, in order to be able to cross-examine
3  Dr. Egilman with respect to what these articles say, or
4  in what manner in which he is relying upon them or how
5  in any way they factor into his opinions.
6        We just the fact that they have not been
7  identified for us until this very moment, at the
8  deposition, and we reserve all our rights with respect
9  to the improper manner in which these materials were
10 provided to us, and specifically the timing at which
11 they were provided to us.
12       Are there any other articles that you are
13 relying on as they relate to Ms. Levitt specifically,
14 similar to what we have here in Exhibit 3, that you have
15 here somewhere among the stacks of documents you
16 brought, but that have not been identified in your
17 expert reports?
18   A.  I don't think so.
19   Q.  Okay.  Is that a no?
20       MR. MCCLAIN:  It was an, "I don't think so."
21   Q.  (By Mr. Boehm)  Well, if we need to, we can go
22 off the record again and have you look through all the
23 folders, because I'm entitled to have that information.
24   A.  You certainly are, but I am not going off the
25 record to look.

21  (Pages 78 to 81)

David Egilman, M.D.

```
1        Q.  Okay.
2        A.  You can either take the answer I gave or you
3   can -- I'll look at them on the record.
4        Q.  Let's go off the record.
5        THE VIDEOGRAPHER:  Going off the record.  The
6   time is 11:09 a.m.
7        (Discussion off the record.)
8        THE VIDEOGRAPHER:  Going back on the record.
9   The time is 11:09 a.m.
10       MR. BOEHM:  I have made a request of the
11  witness and of plaintiff's counsel, that if there are
12  additional materials similar to what has now been marked
13  as Exhibit 3, namely medical literature not identified
14  in the witness's expert reports, but upon which the
15  expert is relying on for purposes of his opinions as
16  they relate to Ms. Levitt, that those materials be
17  identified for us.
18       There are, as I've noted, a couple of times
19  during today's deposition, large stacks of folders of
20  various materials.  And I have asked them to undertake
21  to find any of that might fit into the category of my
22  request.  Both the witness and plaintiff's counsel have
23  declined to do that.
24       MR. MCCLAIN:  No.  That's not accurate.  What
25  I said was, is the answer was that he didn't think they
```

```
1   existed.  And I said that if you want him to go on a
2   wild goose chase and have him spend the time doing that,
3   he would do it.  But I thought that that answer was
4   sufficient to preserve your rights in light of the
5   record that you've already made in that regard.
6        Now, that's what we said.  So it's not that I
7   declined.  I said, I thought you were sufficiently
8   covered by the record that you made, and that we decline
9   to do it off the record.  He will do it on the record,
10  but not willingly do it off the record.
11       MR. BOEHM:  Well, the -- the reason why I have
12  requested that that be done off the record is because of
13  the many, many materials that have been brought.
14       MR. MCCLAIN:  Now, Counsel, just to be --
15       MR. BOEHM:  I'm sorry.  Let me just finish,
16  and then you can go ahead and say what you want to say.
17       Because of the many materials that have been
18  brought to the conference room and each time so far, at
19  least many of the times so far, when we've had to go in
20  search of materials, which plaintiff's counsel himself
21  has described as a "wild goose chase," it has taken us
22  some period of time.
23       I do not think it's appropriate for defendants
24  to be penalized in the manner of having our allotted
25  time wind away while we watch witness -- the witness and
```

```
1   plaintiff's counsel go in search of materials that
2   frankly should have been provided to us far in advance
3   of this morning.
4        So my request stands.  I ask that it be done.
5   I ask that it be done off the record.  I think that's
6   the fair and appropriate manner in which that my request
7   should be responded to.  If it's plaintiff's position
8   and the witness's position that you simply will not
9   undertake to do so, then that's fine.  But if you have
10  some other position, go ahead and let me know.
11       MR. MCCLAIN:  Well, my position is that your
12  objection is kind of like the boy that kills his parents
13  crying that he's an orphan.  The fact that Dr. Egilman
14  does not have access to these documents, except in this
15  Byzantine fashion, in his opinion, is -- is ridiculous,
16  particularly on a drug that cannot be used in the United
17  States, except to give to people on death row as lethal
18  injections.
19       Having said that, it has not been a wild goose
20  chase when we've looked for things.  We have found
21  everything that he's identified when we've gone off the
22  record and handed it to you.  What he has done in this
23  instance, however, is tell you that it would not be
24  profitable to go through here and find an article here
25  or there that might be within these folders.
```

```
1        I suspect you will copy every folder that's in
2   here, as you do in every one of these cases, and take it
3   back and give it to the minions that you have working at
4   Williams and Connolly, who will examine every single
5   page of every document, and bill Merck for it.
6        Having said all that, the position I took off
7   the record is correct.  If you would like him to look on
8   the record, because you have to know now if there's an
9   article or two within this massive group of papers, many
10  of which you have reviewed previously, he will do it.
11       If you don't want to do that because he
12  suggested it was not necessary in order for him to give
13  his full and complete testimony here today, in his view,
14  then I would suggest we move on, and ask him questions
15  so that your time can be used more effectively.
16       MR. BOEHM:  Okay.  Well, I do agree that it's
17  not a good waste -- it's not a good use of our time to
18  spend on the record, to -- to put on the record, the
19  witness's efforts to go in search of materials that
20  are -- have been laid out on the conference room table
21  in various stacks.
22       I will note that I'm requesting literature,
23  published medical literature.  So -- so plaintiff's
24  counsel's points about confidentiality designation
25  simply do not apply to the request that I'm currently
```

22 (Pages 82 to 85)

David Egilman, M.D.

Page 86

1   making.  I -- I take --
2         MR. MCCLAIN:  Is it your --
3         MR. BOEHM:  I'm sorry.  I take plaintiff's
4   counsel and the witness's declining of my -- my request
5   they find materials that fit into the category that I
6   have now very clearly described as substantiation of
7   what I understood you to be saying when we were off the
8   record.
9         MR. MCCLAIN:  Okay.
10        MR. BOEHM:  I concede on that basis.
11        MR. MCCLAIN:  But -- but Counsel, I mean, here
12   you've -- you've made an important concession.  Are you
13   stipulating and agreeing that all of the designations of
14   published literature which Merck has made and still is
15   considering confidential, and that are subject to this
16   protective order that we all labor under, should be
17   dedesignated at this time?
18        MR. BOEHM:  I'm not having a conversation
19   about that at all.
20        MR. MCCLAIN:  Well, then you can't --
21        MR. BOEHM:  The materials that are Exhibit
22   3 --
23        MR. MCCLAIN:  Yes.
24        MR. BOEHM:  -- to this deposition do not
25   include a single document that has been marked

Page 87

1   confidential under the protective order --
2         MR. MCCLAIN:  Well, not on --
3         MR. BOEHM:  -- under the protective order in
4   this case.
5         MR. MCCLAIN:  Not on those copies, because
6   Dr. Egilman printed them off.
7         Q.  (By Mr. Boehm)  Are there other materials,
8   Dr. Egilman, that you have printed off in the last
9   several days that you believed were specific to Ms.
10   Levitt's alleged injuries that you have somewhere on
11   this conference room table in the, you know, what you
12   described as maybe over 200 folders?
13        MR. MCCLAIN:  Now we're into the same
14   discussion, let's not go back there.  We've already
15   explained that to you, that there may be an article or
16   two.  I'm not going to go through that discussion again.
17        Q.  (By Mr. Boehm)  Go ahead, Dr. Egilman.  Go
18   ahead.
19        MR. MCCLAIN:  Oh boy.
20        A.  Can you repeat the last question?
21        MR. MCCLAIN:  Are there any other articles
22   that are published, that -- that you reviewed in -- in
23   the last several days that are not in that folder?  That
24   might be here on the table.
25        MR. BOEHM:  Not quite.  Not quite.

Page 88

1         Q.  (By Mr. Boehm)  My question, Dr. Egilman, is
2   whether or not in the last several days, as you've been
3   preparing for your deposition, you have printed out
4   other articles, here at this law firm, similar to what
5   is now Exhibit 3 in your deposition, because you found
6   these articles and believed them to be somehow important
7   to the opinions that you're offering in this case.
8         For example, is there a folder that's been
9   labeled, similar to this one, depression and CABG,
10   and it -- that it contains --
11        MR. MCCLAIN:  Collected articles.
12        Q.  (By Mr. Boehm)  -- collected published articles
13   on some other subject matter that you believe is
14   specific to Ms. Levitt's claims in this case?
15        A.  To the extent that I understand the question,
16   no.  Other -- other than what I've already identified.
17        Q.  What you've already identified in what is now
18   Exhibit 3 to your deposition?
19        A.  No, I gave you a folder -- yes, plus the
20   folder, the green folder, that's in front of me.  So I
21   think those were already identified.  And I think
22   that's --
23        MR. MCCLAIN:  Dr. Madigan's folder that we
24   previously identified.
25        A.  Yeah, I think that's it.

Page 89

1         Q.  (By Mr. Boehm)  Have you met Ms. Levitt in
2   person?
3         A.  Yes.
4         Q.  How many times?
5         A.  Once.
6         Q.  When was that?
7         A.  I think it's on the -- the date is on the
8   report.
9         Q.  Your recollection is that you state in your
10   expert report the date on which you met with Ms. Levitt?
11        A.  I think so.
12        Q.  Well, let's mark your two reports in this case
13   as the next two exhibits.
14        (Deposition Exhibit Nos. 4 and 5 were marked.)
15        MR. MCCLAIN:  Aren't there four?
16        MR. BOEHM:  I'm aware of two.
17        MR. MCCLAIN:  There are four.
18        MR. BOEHM:  The two that I'm referring to
19   which have now been marked as Exhibits 4 and 5.
20        Well, let me describe Exhibit 4 first.  This
21   is entitled Egilman Report Jo Levitt.  It has an
22   e-service date of September 13, 2013.
23        Exhibit 5 is a May 9th, 2014, report.  It is
24   in the form of a letter, To Whom It May Concern.  And I
25   have placed both of those two documents in front of you,

23  (Pages 86 to 89)

David Egilman, M.D.

Page 90

1    and I will just note that what has been entitled Egilman
2    Supplemental Report Jo Levitt, which is not dated, but
3    is signed by Dr. Egilman is part of what is Exhibit 4 to
4    this deposition.
5        Q.   (By Mr. Boehm)  Have you prepared an expert
6    report for the Levitt case in addition to the materials
7    that have now been marked as Exhibits 4 and 5?
8        A.   You got this March 15, 2014, report?
9        Q.   Do you mind just showing me what you're
10   referring to?
11           Let's mark this as Exhibit 6.
12           (Deposition Exhibit No. 6 was marked.)
13           MR. MCCLAIN:  Counsel, coming back to your
14   question.  The May 9th, 2014, says that it's based on
15   interviews with Mr. and Mrs. Levitt.  Do you see that?
16           MR. BOEHM:  I do.
17           MR. MCCLAIN:  That was what you were asking to
18   find reference to in the report.  That's at least one.
19           MR. BOEHM:  Does that -- does that, Counsel,
20   say when that meeting took place?
21           MR. MCCLAIN:  No.  It -- this is the May 9th.
22   It might, I don't know.  I just -- I just saw that in
23   the stuff that I had here, because I was trying to look
24   at something else for you.  I'm sure that there is a
25   reference in here because there's nothing but dates.

Page 91

1            MR. BOEHM:  That's -- that's the question that
2    I believe is pending.
3            MR. MCCLAIN:  Okay.  What was the date of that
4    meeting?
5        Q.   (By Mr. Boehm)  When did you meet with
6    Ms. Levitt?
7        A.   Okay.  So it would have to be between these
8    two reports, based on the reports.  And --
9        Q.   Can you tell me with any more specificity when
10   it was you met with Ms. Levitt?
11       A.   I can, I can, I can.  I'm looking.  2-28-14.
12       Q.   Is that somewhere in your expert report?
13       A.   No, I don't think so.  I don't know.  Do you
14   want me to read the whole thing and check?
15       Q.   No.  Well, you were looking at something when
16   you came up with that date.  And I wondered if you were
17   looking at your --
18       A.   You didn't ask what I was looking at.  You
19   asked if it was in the report.
20       Q.   I was asking if -- if what you were looking at
21   was in the report.
22       A.   No.
23       Q.   For how long did you meet with Ms. Levitt on
24   February 28th, 2014?
25       A.   Two or three hours.

Page 92

1        Q.   Did you conduct a medical examination of
2    Ms. Levitt?
3        A.   Yes.
4        Q.   Where did that meeting take place?
5        A.   In my office.
6        Q.   Did you create any records, notes or otherwise
7    in connection with your meeting with Ms. Levitt in
8    February of 2014?
9        A.   Yes.
10       Q.   Where are those notes?
11       A.   Well, some of it's incorporated into the
12   reports, and then I have a page here with the date on it
13   of the exam.  So that's this.  I think there was another
14   note in one of these files.
15       Q.   Okay.
16       A.   Here is that date one.
17       Q.   And I'm looking at the page you've just handed
18   across the table, which appears to be about a half page
19   of notes on a piece of notepad paper, that is dated, it
20   looks like, either February 28th or February 20th.  But
21   you've indicated that that's an eight, not a zero?
22       A.   Ken, can you get that please?  I think so.
23       Q.   Other than this half page of notes, did you
24   create any other record of your meeting with Ms. Levitt
25   in February 2014?

Page 93

1        A.   Yes.
2        Q.   And -- and where are those?
3        A.   Those are incorporated into the reports.
4        Q.   Anything else?
5        A.   There may be another page of notes here.  I
6    thought I looked and saw.  Let me look.
7            (Deposition Exhibit No. 7 was marked.)
8        Q.   (By Mr. Boehm)  While you're looking, I'll
9    just indicate for the record that the half page of notes
10   that you have provided to us has now been marked as
11   Exhibit 7 for purposes of your deposition.
12       A.   I don't see it now.  I thought there was
13   another page of notes.  But I can't find right now.
14       Q.   So if there -- if there is another page of
15   notes, it's not something you can provide to us right
16   now; is that right?
17       A.   I'm looking for it.  I don't think so.  And I
18   could be wrong.
19       Q.   Were you done with your looking, Dr. Egilman?
20       A.   I'm done.
21       Q.   And you weren't able to find anything else?
22       A.   Correct.
23       Q.   I'm going to hand back to you Exhibit 7, which
24   is the half page of notes that you have indicated you
25   took in February 2014 when you met and examined

24  (Pages 90 to 93)

David Egilman, M.D.

Page 94

1  Ms. Levitt. Could you please just read what that page
2  says so that we can know what your handwriting was
3  intended to communicate?
4      A.  Well, it wasn't intended to communicate
5  anything. Jo Levitt. It's a phone number. Date.
6  Feels awful. Now very stressed. The situation has gone
7  on and on and on, as stressful as original coronary
8  artery disease. Foreclosed on business two weeks ago.
9      She is angry. She feels sad and sorry for
10 herself. She does not like feeling sorry for herself.
11 She was not like this before her CABG. Looks like lost
12 her houses due to shortness of breath, depression.
13 Status post CABG.
14     Q.  Thank you. You can set that back in the stack
15 of materials that is now at the center the table. Since
16 the time of your meeting in February of 2014 with
17 Ms. Levitt, have you communicated with Ms. Levitt by
18 phone, by e-mail or otherwise?
19     A.  Yeah, I think so.
20     Q.  When was that?
21     A.  I don't recall.
22     Q.  Approximately when was that?
23     A.  Sometime after I -- prob -- probably I talked
24 to her before the visit, I think, to give her
25 directions. And I think I made one or two phone

Page 95

1  conversations in follow-up.
2      Q.  What did you --
3      A.  To see.
4      Q.  I'm sorry. Go ahead.
5      A.  Sorry. I answered the question. I'm sorry.
6      Q.  What did you discuss with her in your
7  subsequent phone conversations?
8      A.  Her status. Medical status.
9      Q.  Did you take any notes?
10     A.  No.
11     Q.  Did you keep any record at all of those
12 telephone calls that you had with Ms. Levitt after
13 February of 2014?
14     A.  They would have been incorporated into the
15 report. In other words, I probably followed up with her
16 after the exam, if I had follow-up questions before
17 preparing a report. So the results of those
18 conversations would have been incorporated into the
19 report.
20     Q.  You believe that you had the two subsequent
21 telephone conversations with Ms. Levitt?
22     A.  I can't recall. I think I had at least one.
23 Maybe two. But I may not have.
24     Q.  Sitting here today, can you remember any
25 specific subject matter that you discussed with

Page 96

1  Mr. Levitt during those telephone calls?
2      A.  First, I'm not sure I had them. But if I had
3  them, they would have been related to the -- her
4  psychiatric problems after the CABG.
5      Q.  Is it fair to say that anything that you
6  deemed to be material, based on your meeting in person
7  and then subsequent telephone calls with Ms. Levitt,
8  would be incorporated into your expert reports?
9      A.  No.
10     Q.  Okay. What additional material information
11 did you gain from your in-person meeting, or your
12 telephone conversations with Ms. Levitt, that you have
13 not incorporated into your expert report so that it
14 could be seen and understood by the parties in the case?
15     A.  Nothing.
16     Q.  Well, you -- I -- I might just not be
17 communicating clearly enough. But I think I am. I --
18 understood to say that there were material findings
19 or facts that you gleaned from your meeting and
20 telephone conversations with Ms. Levitt that were not
21 incorporated into your expert report.
22     So my question is simply, what are those
23 additional findings or facts that you gained from those
24 communications that you did not put into your reports?
25     A.  I lost the real time. I think nothing. I

Page 97

1  think that was not the previous question, however.
2      Q.  Okay. So to sum it up --
3      A.  Can you hang on one second, because my real
4  time's not working.
5      COURT REPORTER: Oh. Should I go off the
6  record? I mean, it's up to you. I think it got bumped.
7  It said it wasn't working, so I'd have to probably --
8      MR. BOEHM: Okay. Let's go off the record.
9      THE VIDEOGRAPHER: Going off the record. The
10 time is 11:30 a.m.
11     (Discussion off the record.)
12     THE VIDEOGRAPHER: Going back on the record.
13 The time is 11:32 a.m.
14     Q.  (By Mr. Boehm) Have you ever communicated
15 with Ms. Levitt by e-mail?
16     A.  No.
17     Q.  Did you run any tests on Ms. Levitt during
18 your in-person meeting?
19     A.  No.
20     Q.  Have you requested or suggested that any tests
21 be run on Ms. Levitt?
22     A.  I can't recall.
23     Q.  Do you believe that the medical doctors
24 providing care to Ms. Levitt have in any way failed to
25 meet standards of care?

25 (Pages 94 to 97)

David Egilman, M.D.

Page 98

1    A.  Yes.
2    Q.  In what way?
3    A.  Well, Dr. Katz didn't disclose his
4    relationship to Merck, which I think is a standard of
5    care.
6    Q.  Disclose his relationship -- I'm sorry.  Go
7    ahead.
8    A.  And -- so I think that's an ethical breach.
9    And otherwise, no.
10   Q.  Dr. Egilman, we received from plaintiff's
11   counsel a May 9th, 2014, report, that has now been
12   marked, I believe, as Exhibit 5 for purposes of your
13   deposition.  Do you see Exhibit 5 in front of you?
14   A.  I do.
15   Q.  Now, at today's deposition, you have produced
16   to us a document we have now marked as Exhibit 6, which
17   appears to be dated March 15th, 2014.  Is it your
18   understanding that this March 15th, 2014, report is
19   something that was provided to defendants in this case?
20   A.  I don't recall.  Could have been another
21   earlier draft of what's here.
22   Q.  Can you just --
23   A.  What's the date of that?  March.
24   Q.  The date of this is March 15th, 2014.
25   A.  What do I have here?  I got May.  What's the

Page 99

1    first one?  First one's December 2013.  So it could have
2    been an earlier version of this.  It might have been
3    provided to them.
4    Q.  Is it --
5    A.  I don't -- I don't recall.
6    Q.  Is it fair to say that the May 9th, 2014,
7    report is the -- is the latest and most complete of your
8    expert reports and opinions insofar as they concern
9    Ms. Levitt?
10   A.  No.
11   Q.  Why is that not a fair statement?
12   A.  Because there are different things in
13   different reports.  The first report has much more on
14   Merck conduct and citations that's not present or
15   repeated in the -- in the May 9th report.  And I
16   don't -- so there -- so there are things in the earlier
17   report that are not repeated in the later report.  And
18   then I don't know what you have in front of you.  I
19   don't know how that compares.
20   Q.  Your report that's stamped December 13, 2013
21   is entitled Egilman Report Jo Levitt.  Do you see that?
22   A.  I do.
23   Q.  Other than in the title of this expert report,
24   is there another time when you refer to Ms. Levitt
25   specifically, or to any of her medical conditions, that

Page 100

1    you can recall?
2    A.  In --
3    Q.  In the December 13th, 2013, report, which you
4    described as being more kind of generally related to
5    Merck, do you have a section in here that is specific to
6    Ms. Levitt?
7    A.  Yes.
8    Q.  What section is that?  Can you identify that
9    for me please?
10   A.  Sure.  Page 5, begins at page 5, goes to page
11   11.
12   Q.  Thank you.  Are there any other sections of
13   this report -- and I'll just let you know, I -- I was
14   not myself able to identify anything beyond the sections
15   you've now just identified, pages 5 to 11, that are
16   specific to Ms. Levitt.  Can you recall any such
17   sections?
18   A.  Could you define specific to Ms. Levitt?
19   Q.  I mean, having to do with her specific claims
20   or specific alleged injuries.
21   A.  Okay.  Well, a lot of the comments I have
22   about what the Merck studies showed are relevant to
23   that.
24   Q.  Oh --
25   A.  For example, I have a section that shows that

Page 101

1    taking Vioxx decreases cognitive function.
2    Q.  I'm sorry.  Let me just clarify.
3    A.  Which -- which --
4    Q.  I'm going to alter my question.
5    A.  Can I just finish --
6    Q.  Let me -- let me just, if you want me to I'll
7    withdraw it, might -- might be -- because I want to make
8    sure you understand the question I'm asking.
9        My question is just whether or not there's
10   another section of this report that's stamped December
11   12, 2013, that you believe -- where -- where you
12   undertake to apply your own -- your opinions about the
13   general Vioxx data to Ms. Levitt specifically.
14   MR. MCCLAIN:  Okay.  Now you want him to
15   answer the question?
16   MR. BOEHM:  Yes.
17   MR. MCCLAIN:  All right.  Then don't interrupt
18   him again.  Let him answer the full thing.
19   A.  Okay.  Yes.  So yes is a --
20   MR. BOEHM:  Just -- let's just have a degree
21   of cordiality.  I've been -- I've been trying to do
22   that.  I just don't appreciate --
23   MR. MCCLAIN:  That's the first thing I've said
24   in an hour.
25   MR. BOEHM:  I know.  I appreciate that.

26  (Pages 98 to 101)

David Egilman, M.D.

Page 102

```
1          MR. MCCLAIN:  That's the first thing I said.
2   So I'm just -- I'm just trying to help you actually.
3   Just let him answer that question.
4          MR. BOEHM:  Let's just keep it that way.
5   Let's just keep it that way.
6          MR. MCCLAIN:  You've been doing fine.
7          MR. BOEHM:  I know, we've been doing great.
8   Let's just keep it that way.
9          MR. MCCLAIN:  What I'm telling you is now, let
10  him answer the question.
11         MR. BOEHM:  Let's just keep it that way, Ken.
12  A.  I answered the question.
13  Q.  (By Mr. Boehm) I'm sorry.  I didn't un --
14  A.  I answered the question.
15         MR. BOEHM:  Can you read back his answer to
16  the question, Madam Court Reporter, because I did not
17  hear it.
18         (Answer was read back.)
19  Q.  (By Mr. Boehm)  In what sections of your
20  December 2013 report do you -- other than what you have
21  already identified on pages 5 through 11, do you
22  specifically undertake to apply the data related --
23  relating to Vioxx to Ms. Levitt?
24  A.  Okay.  The sections that deal with the fact
25  that Vioxx in and of itself can cause cognitive
```

Page 103

```
1   dysfunctions.  So that's under the Alzheimer's section.
2          The sections that talk about Merck's, the risk
3   from taking Vioxx and myocardial infarction and acute
4   coronary syndrome.  The information on the label that
5   indicates that Vioxx causes heart attacks.  And then the
6   mechanism stuff that's in the supplement, the first
7   supplement which would be dated December 8, 2011.
8          Some of the material on pages 5 through 8.
9   Not all of it, but some of it.  That relates to the
10  mechanism of action of Vioxx in causing coronary artery
11  disease and acute coronary syndrome.  The material on
12  page 12, which is probably mostly repeated in the
13  previous section on -- on Alzheimer's disease and
14  cognitive dysfunction as a result of taking Vioxx.
15  That's it.
16  Q.  Are you expressing the opinion in this case
17  that Ms. Levitt suffered a myocardial infarction?
18  A.  No.
19  Q.  Are you expressing an opinion in this case
20  that Ms. Levitt had Alzheimer's disease?
21  A.  No.
22  Q.  Are you expressing an opinion in this case
23  that Ms. Levitt has dementia?
24  A.  No.
25  Q.  Would you please look at your May 9th, 2014,
```

Page 104

```
1   report that's been marked as Exhibit --
2   A.  Five.
3   Q.  -- Five.  Thank you.  I believe you indicated
4   that you reread this report as recently as yesterday?
5   A.  No, I skimmed it.
6   Q.  Skimmed it?
7   A.  I reread more of one of the other -- the one
8   with the stickies on it.
9   Q.  You're identifying Exhibit 6?
10  A.  Could be.  And then some of the other reports
11  which are listed as supplements.
12  Q.  I don't -- can you just tell me what you mean
13  when you say "some of the other reports that are listed
14  as supplements"?
15  A.  Sure.  These two reports here.  You see where
16  the stickies there, reports in other cases.  I think I
17  refer to them somewhere in my other reports.
18  Q.  You're pointing me to a document that's
19  entitled report of Dagel -- David Egilman at Never Again
20  Consulting Incorporated at the top.  Is this a case --
21  is this a -- is this a document that you submitted in
22  connection with your opinions in the Levitt case?
23  A.  I think it's one referred to.  I think.
24  Q.  And it has highlighting in it?
25  A.  Correct.
```

Page 105

```
1   Q.  Did you do the highlighting?
2   A.  Sure.
3   Q.  It has notes in it?
4   A.  Right.
5   Q.  Did you write the notes?
6   A.  I don't know.  I can't see.
7   Q.  And there's one more report that you pointed
8   to.
9   A.  That's the same as the one you already marked.
10  Just got some stickies in it.
11  Q.  Is this the May 9th report?  Or, I'm sorry.
12  Is this the -- the December 2013 report?
13  A.  No, I think that's this report right here.
14  Isn't it?  It looks the same as this one.
15  Q.  That's -- yeah, the December 2013?
16  A.  Right.  That looks the same as that one.
17  Q.  Okay.  But you only skimmed what is Exhibit 5,
18  your May 9th -- May 9th, 2014, report; is that right?
19  A.  No, I probably -- I may have skimmed them all.
20  I don't really remember which ones I skimmed.
21  Q.  Okay.  But I'm asking you right now
22  specifically about this May 9th, 2014, report that's
23  marked Exhibit 5.
24  A.  Okay.
25  Q.  Okay.  Did you read this report in the last
```

27 (Pages 102 to 105)

David Egilman, M.D.

Page 106

1  several days?
2      A.  Not cover to cover.
3      Q.  You skimmed it?
4      A.  I think so.
5      Q.  On pages 2 through 31 of this report, you
6  provide a summary of Ms. Levitt's medical records; is
7  that correct?
8      A.  Yes.
9      Q.  And then on page -- strike that.
10         Do these paragraphs on pages 2 through 31
11 reflect any of your own expert opinions, or is this
12 merely an effort to summarize the medical records as you
13 reviewed them?
14     A.  I don't remember.  I think it's mostly a
15 summary.  But I may have used -- used my expertise in
16 interpreting what the words were on the record.
17     Q.  On page 32 of this report -- actually, it
18 looks like for me at the least on page 31 and carries
19 over to 32.
20     A.  Correct.
21     Q.  Do you see a chart that you've identified as
22 daily activities questions?
23     A.  Yes.
24     Q.  Is this a list of questions that you prepared?
25     A.  I think this is a standard list of questions

Page 107

1  that are used to evaluate someone for the American Heart
2  Association class -- classification system.
3      Q.  Where would that -- where would one go to find
4  this chart, or this list of questions from the American
5  Heart Association?
6      A.  Well, you could go to the library.  I think
7  they may be on the web.  There may be published papers.
8  You could go a lot of places.
9      Q.  Did you take the list of questions word for
10 word from a source, or did you modify or add to this
11 list in any way?
12     A.  My recollection is word for word.
13     Q.  Do you recall where you got these -- got these
14 questions from?  What was your source?
15     A.  No, I don't recall specifically.  But it was
16 probably something on the American Heart Association
17 website.
18     Q.  Did you ask -- I'm sorry.
19     A.  I may have had a -- I may have had an article
20 that I took this from, a medical article.  I can't
21 remember which.
22     Q.  Sitting here today, you simply don't remember
23 what your source was for this chart; is that right?
24     A.  Correct.
25     Q.  Did you ask Ms. Levitt these questions?

Page 108

1      A.  Yes.
2      Q.  Did you do that during your in-person meeting
3  in, I believe, it was February 2014?
4      A.  Yes.
5      Q.  Did she fill out this form?
6      A.  No.  I asked her the questions, and I filled
7  out the form.
8      Q.  Did you do that on a notepad?
9      A.  I don't recall.  Probably I did it on the
10 computer.  I have a computer in my office.  I'll often
11 go from the patient to the computer.
12     Q.  I see.  Do you think --
13     A.  Without any intermediate step.
14     Q.  Do you think that you just took what she said
15 and typed it right into your draft report?
16     A.  I don't have a specific recollection.  But I
17 think that's what happened.
18     Q.  Below the chart on pages 31 and 32, you appear
19 to have copied and pasted a large excerpt from the
20 deposition of Mr. Bazan; is that correct?
21     A.  Well excerpts.
22     Q.  Excerpts.  It's not -- it's not contiguous.
23 You -- you took clips throughout the deposition; is that
24 right?
25     A.  Yes.  That should be evident by the fact that

Page 109

1  there is a page number and then words, and then another
2  page number and other words.  That would be in the form
3  of taking things from different page numbers from a
4  deposition and cutting and pasting into this report.
5      Q.  Do these pages where you have cut and pasted
6  excerpts from Mr. Bazan's report include any analysis or
7  expert opinions from you?
8      A.  Could be, yes.
9      Q.  Can you show me where among these excerpts
10 that you have cut and pasted from Mr. Bazan's deposition
11 transcript, where you, if anywhere, have performed
12 analysis or provided expert opinions?  It looks to me
13 like it goes from page 32 to page 53.
14     A.  Well, the expert opinion or analysis comes
15 from what I chose to excerpt.  In other words, I used my
16 expertise to excerpt things that I thought were relevant
17 to determine the extent of her impairment.  This --
18 these were not random selections.
19         And so therefore, for example, if I had my dog
20 randomly hit keys and come up with selections, it would
21 be different.  Because he wouldn't use analysis.  He's
22 passed away now.  At the time.
23     Q.  Aside from your exercise of judgment as to
24 which excerpts you decided to include and which excerpts
25 you decided to exclude from your report, did you conduct

David Egilman, M.D.

Page 110

1  any analysis or express any expert opinions on pages 32
2  through 53 with respect to the excerpts you cut and
3  pasted from Mr. Bazan's deposition testimony?
4        MR. MCCLAIN: Outside of whatever that needed
5  to make those excerpts, right? So we don't have to
6  listen to all that again, correct? That's the --
7        MR. BOEHM: I already -- I put that -- I said
8  that in my question.
9        MR. MCCLAIN: I don't think you did.
10       MR. BOEHM: Yeah, I did.
11       MR. MCCLAIN: Okay.
12       A.  Well, no, you did not. But that's fine. I'll
13  answer the question you asked. Yes. Do you want help?
14  I'll be glad to help you.
15       Q.  (By Mr. Boehm) I understand that you
16  exercised discretion, right? In deciding which excerpts
17  to include and which not to include.
18       MR. MCCLAIN: Not -- not discretion.
19  Expertise.
20       MR. BOEHM: Your expertise.
21       MR. MCCLAIN: He said that.
22       MR. BOEHM: Okay, sorry. Excuse me.
23       Q.  (By Mr. Boehm) If you want to use expertise
24  instead of discretion, that's fine with me. I don't --
25  I don't have a problem with that. You exercised your --

Page 111

1  your view of your expertise in determining what
2  deposition excerpts to include and which to exclude.
3        My question is really quite simple. I, I
4  think any fair minded person would understand what I'm
5  asking you. And it's simply whether or not in addition
6  to including excerpts or not, based on what you read in
7  that deposition transcript, have you included any
8  additional analysis, or offered any expert opinions
9  amidst these excerpts on -- from pages 32 to page 53?
10       A.  No.
11       Q.  Thank you. You are not a cardiologist; is
12  that correct, sir?
13       A.  I am not a board certified cardiologist. I
14  take care of patients with heart disease and have in the
15  past.
16       Q.  Do you consider yourself a nonboard certified
17  cardiologist?
18       A.  I'm an internist. Internists take care of
19  cardiac patients.
20       Q.  Do you consider your cardio -- I'm sorry. I
21  thought you were done. Go ahead.
22       A.  Part of a practice of internal medicine is
23  cardiology. So to the extent that I'm trained in
24  cardiology, and I have treated patients for cardiac
25  problems, I consider myself a cardiologist. I'm not a

Page 112

1  board certified cardiologist, and I do not restrict my
2  past or present practice to cardiology.
3        Q.  Have you ever performed, for example, a CABG
4  procedure?
5        A.  No, but that would not be cardiology either.
6  That would be cardiac surgery.
7        Q.  Has a physician who thought that an individual
8  might be having an acute cardiac event ever referred
9  that patient to you for cardio -- cardiovascular care?
10       A.  Not in the United States.
11       Q.  You referenced earlier the term CABG, which
12  stands for coronary artery bypass graft, correct?
13       A.  Yes.
14       Q.  What is a CABG procedure used to treat? Why
15  do people get a CABG as a general matter?
16       A.  In general, it's used -- the most common
17  reason it's used is to treat coronary artery disease.
18       Q.  Do you agree that a coronary artery bypass
19  graft is not itself a cardiovascular condition, but is
20  rather a treatment for a cardiovascular condition?
21       A.  In general, yes. But there are exceptions.
22       Q.  Help me out. What -- what is an exception
23  where in your mind a coronary artery bypass graft would
24  be a cardiovascular condition in and of itself, rather
25  than a treatment for a cardiovascular condition?

Page 113

1        A.  A graft can clot off, and, either during
2  surgery or post surgery. Very common actually.
3  Relatively common. So then you would be treating the
4  graft, and the stenosed graft, or the clotted graft,
5  would be the medical condition that would be treated.
6        Q.  Got it. Anything else that you would put into
7  that category?
8        A.  No.
9        Q.  You also referred to a stent earlier today.
10  Do you remember that?
11       A.  One other -- you could you have a tear of the
12  graft, or a leak of the graft. Okay. For example, it
13  could be put in, stitched in. And the stitching might
14  not be done properly, and it could leak. And then the
15  graft itself would be the diseased part of the entity.
16  So those are two things where the graft itself -- sorry,
17  I forgot the second one.
18       Q.  Earlier today you referred to a stent. Do you
19  recall that?
20       A.  I do.
21       Q.  I take it you've never placed a stent
22  yourself?
23       A.  Correct.
24       Q.  A stent is also a treatment for a
25  cardiovascular condition. A stent is not a

29 (Pages 110 to 113)

David Egilman, M.D.

Page 114

1  cardiovascular condition in and of itself, correct?
2    A.  Same answer as before.  Yes.
3    Q.  In other words -- sorry about that.
4    A.  In general yes, but there are exceptions.
5    Q.  So in other words, there -- you -- you might
6  consider the stent itself as a cardiovascular condition
7  if there are complications surrounding the stent itself?
8    A.  There are many stents that have been withdrawn
9  from the market because they break off in the body.  And
10  when they break off in the coronary artery, the stent
11  itself becomes the pathologic feature that causes the
12  death of the patient or the injury to the patient.
13    Q.  Are you expressing any opinion in this case
14  that Ms. Levitt's stent broke off?
15    A.  No.
16    Q.  On page 53 of your May 9th, 2014, report,
17  marked Exhibit 5, you write, "differential diagnosis for
18  Mrs. Leavitt's CABG and stent."  Do you see that?
19    A.  I do.
20    Q.  What is your understanding of what the term
21  "differential diagnosis" means?
22    A.  It lists -- well, there are a variety of --
23  there are a variety of interpretations of differential
24  diagnosis.  Sometimes -- some portions of a differential
25  diagnosis are the causes for the disease.  All possible

Page 115

1  causes.  And then inductive reasoning to rule -- is used
2  to rule them out.
3      Sometimes the deferential diagnosis can be
4  used to try to distinguish the causes of a disease.  The
5  cause -- I'm sorry.  The first one should be causes of a
6  series of complaints.  Or a particular complaint.
7      Sometimes a differential diagnosis, and these
8  can be mixed in within the same differential
9  diagnosis -- diagnosis, the causes for a particular
10  diagnosis that's agreed to.  So for example, someone
11  might have mesothelioma.
12      The differential diagnosis for the cause of
13  the mesothelioma might be erionite, asbestos, nano
14  exposure.  On the other hand, one might have something,
15  presentation of chest pain, and then the differential
16  diagnosis would be, ulcer, anxiety, coronary artery
17  disease, angina, spasm, et cetera.  And those are not
18  exclusive.  You could have more than one.
19      So those would be lots of ways that
20  differential diagnosis are used.  And often in medicine
21  they're not dis -- distinguished.
22    Q.  Here on page 53 of your report, you suggest
23  that you have conducted a differential diagnosis for
24  Ms. Levitt's CABG and stent?
25    A.  Correct.

Page 116

1    Q.  What do you mean by that?
2    A.  I mean these are the things that could
3  possibly have caused her to have a CABG and stent.
4    Q.  Okay.  But I -- I just want to be clear.
5  Are -- are you advancing -- the -- the CABG and the
6  stent are the treatments for the underlying condition
7  that Ms. Levitt experienced at that time, correct?
8    A.  Correct.
9    Q.  Okay.  So are you advancing any opinion in
10  this case about what specific adverse cardiovascular
11  event or conditions caused Ms. Levitt to require a CABG
12  and a stent?
13    A.  Yeah.  Acute coronary syndrome.
14    Q.  Earlier today when I was asking you about
15  Dr. Madigan, what you were describing as a metaanalysis,
16  you indicated there were three end points that he
17  included in that metaanalysis.  MI, sudden death, and
18  unstable angina.
19    A.  Correct.
20    Q.  Is that correct?  With respect to your
21  differential diagnosis --
22    A.  Well, and then -- then he added cardiac arrest
23  in the second alternative, which generally would be
24  considered a heart attack.  But -- so that's why I had
25  him include that.

Page 117

1    Q.  Okay.
2    A.  But that's one of those CRISP metric term
3  conditions.  In other words MI and sudden death tracked
4  one way.  The way Merck had done their data, cardiac
5  arrest was classified separately.
6    Q.  When you offer opinions about Ms. Levitt's
7  underlying ACS, what specific condition are you
8  referring to, vis-à-vis Ms. Levitt?
9    A.  Well, I think her acute coronary syndrome was
10  caused by an imbalance in the amount of oxygen that
11  could be carried to her heart, and the needs -- the
12  metabolic needs of her heart, and that that imbalance
13  was caused by a narrowing of the vessels.  And in
14  addition, the acute event that caused her
15  hospitalization may have been contributed to by plaque
16  breakage.  But that's not clear.  But that's, I think,
17  more likely than not.  There was some plaque involved.
18    Q.  Okay.  Let's break that down.
19    A.  That precipitated the acute episode.
20    Q.  Thank you.  That's helpful.  Let's -- let's
21  see if we can just break that down a little bit more.
22  You -- you mentioned the -- the lack of, I think you
23  said it was lack of oxygen that was getting to the heart
24  muscle.  Is that a fair characterization, or did I mess
25  that up?

30  (Pages 114 to 117)

David Egilman, M.D.

Page 118

```
 1        A.  Well, the -- the overview issue is that
 2   there's not enough oxygen getting to heart muscle.
 3        Q.  And is that sometimes described as unstable
 4   angina?
 5        A.  No.  That over -- well, yes, but many other
 6   things.  In other words, you could have a heart attack
 7   as a result of that imbalance.  You could -- you don't
 8   have to have -- you can -- you can go from that
 9   imbalance to an MI.  You can go from that imbalance to
10   arrhythmia without passing through an MI or unstable
11   angina.
12        Twenty to 40 percent of heart attacks are --
13   are silent, in that there are no symptoms, particularly
14   in diabetics.  So someone might not have pain, might
15   have, if you could monitor them, spasm and then have a
16   heart attack.  But you wouldn't know about the spasm
17   part.
18        Someone can -- does experience pain, a
19   nondiabetic, then you're going to get the acute coronary
20   syndrome which is going to be pain.  In either case you
21   could have shortness of breath accompanying it.  And arm
22   pain, I mean, all kinds of things.  Back pain.  There
23   was lots of other symptoms that can come with having a
24   heart attack.
25        Q.  All right.  Let's just go through the --
```

Page 119

```
 1        A.  Or -- or precipitant angina.  Pectoris.
 2        Q.  Okay.  Are you done?  Sorry.
 3        A.  Go right ahead.
 4        Q.  Let's go through the four end points that you
 5   asked Dr. Madigan to include in his analysis.  Are you
 6   expressing an opinion in this case?  And I believe I
 7   already asked you this, so forgive me, but I want to
 8   make sure it's clear.
 9        Are you expressing an opinion in this case
10   that Ms. Levitt experienced a myocardial infarction?
11        A.  No.
12        MR. MCCLAIN:  He's already talked about that
13        Q.  (By Mr. Boehm)  Are you expressing an opinion
14   in this case that Ms. Levitt experienced sudden death?
15   That was obvious.
16        MR. MCCLAIN:  Don't answer it.  I instruct you
17   not to answer that question.
18        MR. BOEHM:  Are you --
19        MR. MCCLAIN:  It's embarrassing.
20        Q.  (By Mr. Boehm)  Are you -- are you expressing
21   an opinion in this case --
22        A.  Excuse me.  I don't listen to him.
23        Q.  Okay.  Go ahead.
24        A.  Unless you want to withdraw the question.
25        Q.  No, go ahead.  You can answer it if you like.
```

Page 120

```
 1        A.  I do not think that she died.
 2        Q.  Are you expressing an opinion in this case
 3   that Ms. Levitt experienced cardiac arrest?
 4        A.  That would be the same as dying.  So once you
 5   have established that she didn't die, she neither had
 6   sudden death or cardiac arrest.
 7        Q.  So the last of the four end points that you
 8   had told Dr. Madigan to use for his acute coronary
 9   syndrome metaanalysis would be unstable angina, correct?
10        A.  Yes and no.
11        Q.  You earlier today told me that you told
12   Dr. Madigan to use three cardiovascular end points for
13   his acute coronary syndrome pooled analysis,
14   metaanalysis, and then he volunteered to add one more.
15   Cardiac arrest, correct?
16        A.  He offered one and I accepted his offer.
17        Q.  Okay.  Okay.  Is it your opinion that
18   Ms. Levitt experienced unstable angina?
19        A.  Yes.
20        Q.  Is there any other underlying acute coronary
21   syndrome condition that you are saying to a reasonable
22   degree of medical certainty Ms. Levitt experienced?
23        A.  My previous answer is -- needs to be
24   explained.  I said yes, okay, to the question:  Is it
25   your opinion that Ms. Levitt experienced unstable
```

Page 121

```
 1   angina?  The answer is yes, and acute coronary syndrome.
 2   Since acute coronary syndrome is defined as those three
 3   events.  As a syndrome.  So if you have an MI, sudden
 4   death, or unstable angina, either of them, you have
 5   acute coronary syndrome.  Okay.
 6        That is -- so let me see if I can come up with
 7   an analogy.  If you're dressed, okay, then you are
 8   not -- you're dressed because you have a shirt on and
 9   pants, and a hat.  Okay.  So you can only have a hat on.
10   Well, how about only shirt on and you're dressed.  Okay.
11   But you also could have -- you -- you have these other
12   things that could also be contributing to being dressed
13   and it's one syndrome.  Being dressed.
14        Q.  Other than unstable --
15        A.  Not the best analogy.  I'll have to come up
16   with something better.
17        Q.  Other than unstable angina, are you expressing
18   an opinion to a medical -- to a degree of medical
19   certainty that Ms. Levitt experienced any other symptom
20   or cardiovascular condition under the umbrella of acute
21   coronary syndrome in connection with her use of Vioxx?
22        A.  Yes.
23        Q.  What?
24        A.  She had anxiety and she had shortness of
25   breath.
```

31 (Pages 118 to 121)

David Egilman, M.D.

Page 122

1    Q.  Is anxiety, in your mind, a condition that
2  fits under the umbrella term of acute coronary syndrome?
3    A.  No, it's an associated syndrome along with
4  shortness of breath.
5    Q.  Okay.  So my question --
6    A.  It's not one of the diagnosis.  It's not a
7  diagnosis that fits the definition of acute coronary
8  syndrome, but it can accompany acute coronary syndrome.
9    Q.  Okay.  But my question was about any
10  underlying -- let me just reask the question, okay.
11       Are you expressing an opinion to a reasonable
12  degree of medical certainty that Ms. Levitt experienced
13  a specific underlying cardiovascular event that can be
14  described as acute coronary syndrome, other than
15  unstable angina?
16    A.  No.
17    Q.  Did you ask Dr. Madigan to perform analysis of
18  Vioxx data specific to unstable angina?
19    A.  No.
20    Q.  Why not?
21    A.  Because Dr. Pratt thought she had acute
22  coronary syndrome.  So I thought, that was -- that's the
23  number one reason.  So I figured, why don't I look for
24  what he claims she has, which he says there isn't any
25  data to support Vioxx as causing it.  That seems to be

Page 123

1  the question to answer.
2       Secondly, as Merck has noted, many of Merck
3  experts, well, employees and their own internal experts
4  have noted, angina, unstable angina, is a very
5  wishy-washy diagnosis.  Much, much, much less.  Much
6  more variable and in fact was excluded in the, I think,
7  was excluded from some -- when -- when you looked at
8  the -- the APTC criteria, I think it's exclude -- why
9  don't you look for the APTC folder here.  APTC.
10       Because there's a chart, and it's unstable
11  angina is not on -- I think unstable angina is not on
12  the APTC, but is on the acute coronary events.  And I
13  think one of the reasons the -- one of the
14  backwards-looking reasons that Merck claims they used
15  APTC was that it didn't look at -- it didn't look at --
16  it excluded unstable angina.
17       I think it's a thin one, and I think it's
18  yellow.  You could foresee it.  I'll just fill it in
19  later.
20    Q.  Why did you describe unstable angina as a
21  wishy-washy diagnosis?
22    A.  Well, did I say that?
23    MR. MCCLAIN:  Yeah.  You just did.
24    A.  I think I referred -- I think -- I think -- I
25  think -- well, that's -- that's what the -- I think

Page 124

1  that's a quote from a Merck document.  So, I mean, you
2  could -- it's a diagnosis that's easily made, but it can
3  be mistaken for other things more easily than a heart
4  attack or death.
5    Q.  (By Mr. Boehm)  What other things can unstable
6  angina be mistaken for?
7    A.  Heart attack.  Most common.
8    Q.  What else?
9    A.  That would be the most common one.
10    Q.  Do you recall in Ms. Levitt's medical records
11  where doctors discussed symptoms that she was
12  experiencing and wondering whether or not they in fact
13  were not unstable angina but might be related to other
14  conditions, namely psychological conditions?
15    A.  Sure.  But that's true for all people who
16  present with chest pain.
17    Q.  What do you mean that that's true with respect
18  to all people who present with chest pain?
19    A.  It's -- it's part of the differential
20  diagnosis for someone who comes into the emergency room
21  with chest pain.  Anxiety is like right up there, just
22  like ulcer.  That's where -- I mean you got, you know,
23  is it an ulcer?  Is it anxiety?  Is it heart disease?
24  Is it, you know, a -- a dissection of the aorta?  That's
25  the bad one to miss.  So, I mean, it's part of the

Page 125

1  differential always.
2    Q.  Do you agree that anxiety induced chest pain
3  can sometimes be mistaken for unstable angina?
4    A.  Yes.  But I don't know what sometimes is.
5    Q.  Do you have any idea how regularly that
6  occurs?
7    A.  I haven't seen any studies on that.
8    Q.  It's not something that you undertook to
9  investigate for purposes of your opinions in this case;
10  is that correct?
11    A.  I don't think there are any studies on that.
12  I mean, I looked at a lot of papers on unstable angina,
13  and I didn't see any that distinguished -- in order to
14  do that study, it's a very hard study to do.  You would
15  have to, you know, do angiograms on everybody who came
16  into the emergency room who complained of chest pain.
17  And I don't think you could do that ethically.
18    Q.  I'm looking back, Dr. Egilman, at the
19  PowerPoint slides that you identified for us this
20  morning and that are now been marked as Exhibit 2 for
21  purposes of your deposition.  And specifically the final
22  slide in that stack was this summary that you prepared
23  of Dr. Madigan's ACS metaanalysis?
24    A.  Correct.
25    Q.  Do you know to what extent the results of his

David Egilman, M.D.

Page 126

1  statistical analysis are driven by MI?  Do you need me
2  to re -- did you understand that?
3      A.  I understand that.  But --
4      Q.  Oh.
5      A.  I mean, I don't think he broke that down.  But
6  you might be able to -- I'm thinking about where -- I
7  mean, we did -- we did report MI, sudden death, I think,
8  in some of the papers.  I'd have to go and look.  I
9  think -- I think that's -- that's reported.  So we could
10 break it down then by looking at how the rate ratio
11 moved or how the confidence limits moved.
12     Q.  But my question for you right now is, do you
13 know, as you sit here today, to what extent the risk
14 ratios that Dr. Madigan has calculated in this, what you
15 call ACS metaanalysis are driven by MI events?  Do you
16 know?
17     A.  I'd have to go look at the papers is what I
18 said.
19     Q.  Okay.
20     A.  I mean, I think I have the papers here.  I
21 think we might be able to figure it out.
22     Q.  Do you know if you would be able to figure out
23 how these risk ratios would change if you were to look
24 specifically at unstable angina events, and -- and --
25 and -- and not look at the other MI, sudden death, and

Page 127

1  other events that fit under the ACS header?
2      A.  I don't -- based on the Merck data, I don't
3  think it could be done because Merck would only -- if
4  someone had unstable angina and then had an MI, they
5  wouldn't put it down as an unstable angina.  If -- if --
6  if you read most of the way they classified things in
7  their summary tables, and maybe even in the data, you
8  only get to be one -- one -- reported once in one
9  category in most of the tables.
10     I have an example of that in the APTC thing
11 which Ken didn't find.  And so I am not sure if it's
12 doable the way Merck did the data.
13     Q.  Do you know how these numbers would change if
14 you were to use only the reported events of unstable
15 angina to conduct this analysis?
16     A.  No.
17     MR. BOEHM:  Let's go off the record.
18     THE VIDEOGRAPHER:  Going off the record.  The
19 time is 12:19 p.m.
20     (Lunch recess from 12:19 p.m. to 1:38 p.m.)
21     THE VIDEOGRAPHER:  Going back on the record.
22 This is the beginning of Tape No. 3.  The time is 1:38
23 p.m.
24     Q.  (By Mr. Boehm)  Dr. Egilman, did you have any
25 assistance in the preparation of the expert reports you

Page 128

1  have provided in this case?
2      A.  Sure.
3      Q.  Who assisted you in drafting these reports?
4      A.  Nobody, but somebody abstracted the -- the
5  abstracting was done jointly by me and my staff.
6      Q.  Are you referring to the abstracting of the
7  medical records that relate to Ms. Levitt?
8      A.  Correct.
9      Q.  And when you say that that was done jointly by
10 you and your staff, can you describe what your
11 respective roles were in the abstracting of the --
12     A.  Yeah, I picked -- I
13     Q.  -- Levitt medical records?
14     A.  Yes.
15     Q.  Would you do so?
16     A.  Sure.  I told him what to do, and he typed it
17 in.
18     Q.  What did you tell him to do?
19     A.  Well, I said, "See for this record, I want you
20 to type this and this and this.  See for this record, I
21 want you to type this and this and this.  See for this
22 record, I want you to type this and this and this."  And
23 he did.
24     Q.  So for every record in Ms. Levitt's file, you
25 specifically directed your staff as to what to write

Page 129

1  down in your expert report?
2      A.  Correct.
3      MR. MCCLAIN:  Pretty much -- if you have ever
4  witnessed the process, pretty much as he is describing.
5      Q.  (By Mr. Boehm)  And who was it on your staff
6  who performed that task?
7      A.  I think Nick Druar.
8      Q.  I am sorry.
9      A.  Nick Druar.
10     Q.  Drewark?
11     A.  D-R-U-A-R.
12     Q.  Other than Mr. Druar, did anybody else assist
13 you in the preparation of your expert reports in this
14 case?
15     A.  Sure.
16     Q.  Who else?
17     A.  Anybody who has worked for me since 2001.
18     Q.  They have all assisted you in some way or
19 another?
20     A.  Sure.  I didn't put this together just for
21 this case.  This is a project that's taken 15 years.
22     Q.  Have you performed a comprehensive review of
23 the scientific data on the subject of whether the use of
24 Vioxx is causally associated with an increased incidence
25 of unstable angina?

33 (Pages 126 to 129)

David Egilman, M.D.

Page 130

1    A.  Yes.
2    Q.  Are you expressing an opinion in this case on
3  the question of whether or not Vioxx is causally
4  associated with an increased incidence of unstable
5  angina?
6    A.  Yes.
7    Q.  What is your opinion?
8    A.  Yes.
9    Q.  What specific studies are you relying on for
10  the opinion that Vioxx is causally associated with an
11  increased incidence of specifically unstable angina?
12    A.  Okay.  That answer is going to take the rest
13  of the day.  I don't mind giving you that answer.  I am
14  just telling you.  I don't want to be cut off in the
15  middle of that answer.  Okay.  I just want -- you want
16  to answer that question, I am going to give you the
17  answer to that question.
18    Q.  I don't think --
19    A.  I have no problem with that.
20    Q.  Well, I don't think anybody would fairly
21  interpret my question to call for an answer that would
22  require the rest of today's deposition time to answer.
23  My question is simply, what specific -- just identify
24  for me the specific studies that you are relying on for
25  the opinion that Vioxx is causally associated with

Page 131

1  specifically the adverse event of unstable angina.
2    A.  Okay.  I repeat.  That will take me the rest
3  of the day.  I have no problem with that.  You should
4  understand that.
5    MR. BOEHM:  Ken, should we go off the record
6  and talk about this for a minute.  Could I --
7    MR. MCCLAIN:  Sure.
8    MR. BOEHM:  -- ask you to do that.
9    MR. MCCLAIN:  You can -- you can do it.
10    THE VIDEOGRAPHER:  Going off the record.  The
11  time is 1:42 p.m.
12    (Discussion off the record.)
13    THE VIDEOGRAPHER:  Going back on the record.
14  The time is 1:43 p.m.
15    Q.  (By Mr. Boehm ) Dr. Egilman, would you please
16  identify for me the specific publications, the specific
17  studies that address the specific end point of unstable
18  angina that you are relying on for purposes of your
19  opinion that Vioxx is causally associated with an
20  increased incidence of unstable angina.
21    A.  Despite the help, it didn't work.  Unstable
22  angina is a result of narrowing of the coronary arteries
23  and/or plaque release.  If you want me to answer the
24  question, I'll offer you help on the record since when I
25  offer it otherwise, you don't take it.

Page 132

1    If you want to ask the question, which studies
2  specifically use the term unstable angina in the paper,
3  that's a different question than the one you just asked.
4    MR. MCCLAIN:  That's the one he wants to ask.
5    A.  Is that the one you want to ask?
6    Q.  (By Mr. Boehm) I asked about the specific end
7  point of up stable angina.  So that's what I am asking
8  you.
9    A.  No, no, that's a different question.  That's a
10  different question.  If you want the papers that just
11  list the term "unstable angina" in the paper, I will
12  give you those.  And that's a narrower answer.  But
13  that's different from the question you asked.
14    MR. MCCLAIN:  Start there and then ask
15  whatever you want to follow up.  That will get you
16  closer than our arguing about this point.
17    MR. BOEHM:  Okay.
18    MR. MCCLAIN:  Just ask him to answer that
19  question.
20    A.  Sure.  You want to give me the pile of
21  articles back?
22    Q.  (By Mr. Boehm) I don't know which pile you
23  have in mind, but whatever you --
24    A.  The ones that were marked unstable.  ACS.  The
25  ACS articles are.  It's a marked exhibit.

Page 133

1    Q.  Is that perhaps in front of you?  Is that a
2  red folder?
3    MR. GRAHAM:  The PowerPoint?
4    Q.  (By Mr. Boehm) You are talking about the
5  PowerPoint?
6    A.  It's the one that goes with the PowerPoints.
7    Q.  You are referring to Exhibit 2?
8    A.  No.  The articles that go with it.  Those
9  PowerPoints come from a pile of articles that you
10  already marked.
11    Q.  I don't believe so, Doctor.  We didn't mark a
12  pile of articles that go along with Exhibit 2.
13    A.  Well, they are here.  I pulled them out and
14  gave them to you.  Let's start with the -- let's start
15  with the --
16    MR. MCCLAIN:  You hand that over here and see
17  if --
18    THE WITNESS:  That's it.
19    MR. MCCLAIN:  That's it.
20    Q.  (By Mr. Boehm) This is a folder entitled Vioxx
21  and CV risks, medical literature.  It's a stack of
22  documents two or three inches tall.
23    A.  Okay.  Here is Braunstein's PowerPoint.  I
24  think this is 2000 and -- well, no.  It must be from a
25  2005 meeting.  Okay.

34  (Pages 130 to 133)

David Egilman, M.D.

Page 134

1   Q.  Is that from a published article?
2   A.  You didn't put published article in the
3   question.
4   Q.  Oh, I understand.  I was -- I was just asking
5   you, trying to understand what you are referring to.
6   A.  Then you were interrupting my answer
7   inappropriately.  Get it?  Right?  Get it?  You don't
8   get to just interrupt questions.  If you want to know --
9   I will give you the advice again.  Give me the first
10  example of a paper that deals with unstable angina,
11  then I'll give you that one.  And I'll stop and you can
12  ask questions.
13      When you ask for all of the papers, right, and
14  you don't specify published, unpublished, I am going to
15  give you all of them as part of the answer.  And if you
16  interrupt me, it makes the answer incomplete because
17  then we go off on some other tangent.  And someone
18  reading the transcript might have thought that my answer
19  was done and you interrupted me.
20      So it's a real problem in a real way because
21  someone might try to cross-examine me and say, you know,
22  you only said that one paper in here.  You only did that
23  one little snippet.  Okay?  I have been cross-examined
24  with snippets before.  Okay.  And I am not adverse to
25  snippets, as long as the question calls for a snippet.

Page 135

1       You want me to continue my answer now?
2   Q.  I do, but I just want to note so that you
3   understand what I might -- what I intended to do, and I
4   certainly didn't mean you any offense at all, and I am
5   frankly surprised by your reaction.  I was simplify
6   seeking to clarify something that you had said during a
7   pause after you had identified that.
8       It is not uncommon at all in depositions such
9   as this to do that.  I have never had a reaction such as
10  the one you just did.
11      MR. MCCLAIN:  Now you are inviting a
12  discussion about --
13      MR. BOEHM:  I'm just trying to help him trying
14  to understand what I was trying to do, Ken.  I think you
15  agree with me.
16      MR. MCCLAIN:  I don't -- you are not helping.
17  Just, just ask the question.  Let him start again.  If
18  you want him to do it only on published papers, modify
19  the question, and he will talk about published papers.
20  If you want all his papers, let him go through the list
21  and then you can say --
22      MR. BOEHM:  Fair enough.
23  Q.  (By Mr. Boehm)  You have identified the
24  Braunstein PowerPoint.  You can go ahead and continue to
25  answer.

Page 136

1   A.  In the Braunstein PowerPoint on page 43,
2   that's the data from the APPROVe trial.  Unstable angina
3   pectoris pulled out.  Not pulled out like that in the
4   published paper.  Probably the data in VICTOR.  Okay.
5       Just to be clear, could have been any of the
6   Merck publications where they use the APTC end point
7   because the APTC end point doesn't include unstable
8   angina pectoris.  So Merck chose to not report the
9   results for unstable angina pectoris.  So I'd have to go
10  back through all those metaanalysis and other studies
11  that Merck presented because unstable angina pectoris
12  was intentionally deleted because APTC gave a more
13  favorable cardiovascular result than the SOP criteria.
14      This is a paper by Velentgas, V-L-E-N-T-G-A-S,
15  which I think I previously read on to the record.  It's
16  Cardiovascular Risk of Selective COX-2 Inhibitors and
17  other Nonaspirin Nonsteroidal Antiinflammatory
18  Medications.  It includes a specific rate ratio for ACS
19  which includes unstable angina pectoris.
20      Okay.  This is another Merck study, the
21  Ingenix study, which is the previous one.  This is other
22  data from another publication from Ingenix, I think.
23  Nope.  Wrong.  Same one.  Hang on a second.  Same one,
24  just two doses.
25      Okay.  This Bjorn.  Get ready to spell this

Page 137

1   one.  Bjorn is B-J-O-R-N.  Last name capital
2   G-U-T-B-J-O-R-N-S-S-O-N, et al.  Rofecoxib but not
3   Celecoxib Increases the risk of Thromboembolic
4   Cardiovascular Events in Young Adult, a Nationwide
5   Registry Database Study.
6       Okay.  The underlying data in VICTOR because
7   in Merck's publication of VICTOR, which includes
8   unstable angina pectoris, the table's put together in a
9   way that if you had an MI after unstable angina
10  pectoris, you would show up as a myocardial infarction.
11  So the only people here who are unstable angina pectoris
12  are those who didn't go on to have an MI.
13      This is Bresalier, which is the publication of
14  the approved data.  Has the same problem with the -- but
15  there is unstable angina pectoris reported.  It's about
16  two to one against Vioxx.  Merck did not report the
17  statistics on that event separately from acute coronary
18  syndrome.
19      Okay.  The underlying data in APPROVe, which
20  was collected by Merck, but they specifically excluded
21  unstable angina in their report of the data, both by
22  excluding it from this case CVT and APTC.  Oh, pardon
23  me.  Unstable angina is in here as part of APTC -- as
24  part of CVT.
25      With respect to the last one, that's another

35 (Pages 134 to 137)

David Egilman, M.D.

Page 138

1    study that Merck chose not to approve -- not to report
2    unstable angina pectoris separately, although they had
3    the data.
4           Mukherjee, M-U-K-H-E-R-G -- J-E-E.  This is
5    2001.  Unstable angina combined is the outcome measure
6    with other CVT events.
7           Okay.  That's it, except with this addendum.
8    Every paper that deals with MI or sudden death or
9    cardiac arrest can be used for the purpose of
10   determining unstable angina pectoris since there is an
11   established relationship between having an MI and having
12   unstable angina pectoris.  More or less, 60 percent of
13   people who have MI's would have a diagnosis of unstable
14   angina pectoris, potentially before they have their MI,
15   since it's part of the continuum that leads to MI's and
16   sudden death.
17   Q.   Okay.  Are you done?
18   A.   Yep.
19   Q.   Okay.  We just kept an unofficial clock here.
20   You spent 22 minutes and 17 seconds reviewing what you
21   believe are your materials to support your opinion about
22   unstable angina, that specific end point.  But I looked
23   in your reports, and I did not see anywhere in any of
24   the reports that we discussed today where you
25   specifically walk through unstable angina as an end

Page 139

1    point or the data from the Vioxx studies that discuss
2    unstable angina as a specific end point.
3           Is that correct, or did I miss something in
4    your reports where you specifically look at the end
5    point of unstable angina?
6           MR. MCCLAIN:  What's that question even mean?
7    That's a different question totally.
8           MR. BOEHM:  That's enough.  You can object to
9    the form.  You know that, Ken.  Object to the form and
10   then that's sufficient.
11          MR. MCCLAIN:  But the accusatory tone of your
12   questions merely incite further discussion.
13          MR. BOEHM:  No.  It's just that we spent 22
14   minutes, and I want to know --
15          MR. MCCLAIN:  You asked him a question.
16          MR. BOEHM:  That's right, and I want to
17   know --
18          MR. MCCLAIN:  And he answered the question
19   exactly as you asked.  And then you ask a question as if
20   he created an issue when you asked the question.
21          MR. BOEHM:  My question really is -- listen,
22   Ken.  You can tell me if you want.  I'll accept your
23   representation.  Is the -- where in the report is there
24   a discussion of unstable angina as a specific end point
25   and the data that Dr. Egilman purports to believe

Page 140

1    establishes a causal association between the use of
2    Vioxx and incidence of unstable angina?
3           MR. MCCLAIN:  I just must be taking crazy
4    pills, because I have no idea what we're even doing.  I
5    mean, you asked him a question.  He answered it, and now
6    you are asking me a question about what's in the report.
7    I have no idea.
8           MR. BOEHM:  Ken, if I --
9           MR. MCCLAIN:  I have no idea what this -- -you
10   want me to sit down and read the report and then me
11   take -- go under oath?  I don't -- okay.  I'll do that
12   if you would like me to do that.  Hand me the report.
13          MR. BOEHM:  I can't really determine at this
14   point which of you is more abusive of this process.
15          MR. MCCLAIN:  I'll -- well, you asked me a
16   question, and you want my representation.  Hand me the
17   report.  I'll read it, and I'll answer your question.
18          MR. BOEHM:  I had a question to Dr. Egilman.
19   You didn't like it.  You didn't think the form of it was
20   appropriate.
21          MR. MCCLAIN:  I did --
22          MR. BOEHM:  No, no, Ken.  Let me finish.  Just
23   let me for once finish before you jump in and have to
24   say what you have to say.
25          MR. MCCLAIN:  I thought the tone --

Page 141

1           MR. BOEHM:  Let me finish please.
2           MR. MCCLAIN:  -- was provocative.
3           MR. BOEHM:  I plead with you.
4           MR. MCCLAIN:  That's all I am saying is the
5    tone was provocative.
6           MR. BOEHM:  Okay.  Well, you can object to the
7    form of the question then.  You know that's the
8    appropriate thing --
9           MR. MCCLAIN:  No, it's not --
10          MR. BOEHM:  Not to go on to your, your --
11          MR. MCCLAIN:  It's not a form objection.  The
12   form of the question was not the problem.  It was the
13   tone of the way you asked it.
14          MR. BOEHM:  You are just giving a speech right
15   now, and it's inappropriate, and you shouldn't do it.
16   And I'm just asking you not to.
17          MR. MCCLAIN:  I have sat here for hours.
18          MR. BOEHM:  I am just very humbly asking you
19   not to do that.
20          MR. MCCLAIN:  I have sat here for hours --
21          MR. BOEHM:  Would you please.
22          MR. MCCLAIN:  -- and said nothing.  I was
23   merely trying to say, now you are -- now you are being
24   overtly provacative, and that's probably not helpful.
25          MR. BOEHM:  I just don't agree with the

David Egilman, M.D.

Page 142

1  characterization.
2       MR. MCCLAIN:  You don't --
3       MR. BOEHM:  That's fine -- the record will
4  speak for itself in that regard.  Right?
5       MR. MCCLAIN:  Ask whatever question you want.
6       MR. BOEHM:  Yeah, okay.  Thanks.  I do
7  appreciate that.
8       A.  Excuse me.  I think I didn't answer a
9  question.
10      Q.  (By Mr. Boehm)  I don't --
11      A.  Didn't you make a statement about how much
12  time it took me to answer the last question?  Was that a
13  question?
14      Q.  I just noted on the record that we have kept
15  an --
16      A.  Okay.  I didn't know you get to note things on
17  the record.  I thought we were in a question and answer
18  session here.  If you have a question, please ask it.
19  If you have a comment about me or my behavior or
20  something else, okay, please keep that to yourself.  All
21  right?
22      So I mean, I don't -- I don't understand.
23  Were you just talking, okay, saying things, and it's not
24  a question and answer.
25      Q.  You took over 22 minutes to answer my last

Page 143

1  question.  That's fine.  I am just noting that's how
2  much time it took you to do it.  And my question for you
3  now is, why didn't you just go through that information
4  in your expert report for Ms. Levitt, given that your
5  opinion is that she experienced unstable angina?
6       A.  My opinion is the same as Dr. Pratt's opinion,
7  that she had acute coronary syndrome.  That's number
8  one.  Okay.  Angina is -- unstable angina is one
9  component of acute coronary syndrome.  There is a reason
10  that all of these papers call it -- studied the outcome
11  measure of acute coronary syndrome.  Do you know what it
12  is?  It's doctors understand that there are three things
13  that relate to each other.  Angina pectoris, unstable,
14  MI, and death from heart attack.  They are related.
15  They often follow in a common pattern.  People present
16  to the hospital with unstable angina, that they go on to
17  have an MI.  The reason you treat someone with unstable
18  angina or are concerned about them is because they might
19  have an MI and die.
20      So it is a syndrome where -- of different
21  components.  I mean, it's as if you said, oh, she had
22  pain in her left arm.  Show me the studies that show
23  that Vioxx causes pain in the left arm.  There aren't
24  any.  I am sure that if you looked at the Vioxx studies
25  and Merck had asked, "Did you experience pain in your

Page 144

1  left arm prior to your death and your heart attack?"
2  Okay.  The answer would be yes, and it would be a
3  statistically significant increase.
4       And unstable angina pectoris is the same as
5  pain in your left arm.  Now, not everybody with pain in
6  their left arm who is going to have a heart attack or
7  has heart disease actually has a heart attack.  And so
8  it's part of the syndrome which Dr. Pratt diagnosed her
9  as having.
10      I don't -- so I didn't look for -- I mean, it
11  would be like saying, "Did she have a shirt on?"  And my
12  opinion is she was dressed with a shirt on.  And now,
13  your question is, "Well, show me the studies that say a
14  blue shirt is a shirt."  Okay.  All right.  There are no
15  studies that say blue shirt's a shirt because doctors
16  understand it's a syndrome.  That's why it's used as the
17  outpoint in a combined way in all these studies.  And
18  that's why it's not separated out.  Because in most
19  people who have unstable angina pectoris, actually go on
20  to have an MI.  And when people write it down, MI being
21  a harder outcome as we have discussed before, then
22  unstable angina pectoris, people put down MI.
23      So that's why I didn't try to separate
24  unstable angina.  It's actually impossible without
25  getting the patient level data and medical information

Page 145

1  from Merck, okay, which we have, which is how I could
2  produce it in more or less, how Madigan can produce it.
3  Because he could look at your underlying data and get
4  that answer.
5       But you had the same data.  Merck had the same
6  data.  Merck published their data many times, never
7  separated it out.  Didn't mean it didn't exist.  What it
8  did mean, except for parsing and game playing and
9  litigation, it didn't matter.  Because everybody
10  understands that acute coronary syndrome means a bad
11  thing happened to your heart, and those are the three
12  bad things that generally happen.
13      Q.  In Ms. Levitt's case the bad thing
14  specifically that happened in your opinion is unstable
15  angina, correct?
16      A.  No.  The bad thing that happened to Ms. Levitt
17  was coronary artery disease, which manifested clinically
18  initially as unstable angina pectoris.  It could have
19  manifested as a heart attack.  It could have manifested
20  as pain in her left arm.  It could have manifested as
21  pain in her back.  Okay.
22      That's how she presented her coronary artery
23  disease.  It's just a symptom of coronary artery
24  disease.  So that's why I didn't think it was necessary,
25  to finish my answer, to parse out acute, you know,

David Egilman, M.D.

Page 146

1  angina pectoris or unstable angina pectoris.
2      Q.  Are you expressing an opinion in this case
3  that Vioxx is causally associated with the incidence of
4  coronary artery disease?
5      A.  Sure.  It causes heart attacks.  The
6  underlying cause of heart attacks is coronary artery
7  disease.  It also probably contributes to plaque
8  instability.  Okay.  Less sure, but probably.  Okay.
9  And so that -- those are the probable mechanisms.
10         It also causes heart attacks by putting into
11  congestive heart failure, putting more stress on your
12  heart.  So there are a variety of ways Vioxx can kill
13  you through your heart.  But in terms of the symptom of
14  unstable angina pectoris.  It's generally coronary
15  artery disease progression or plaque release.
16      Q.  Are you expressing an opinion in this case to
17  a reasonable degree of medical certainty that
18  Ms. Levitt's use of Vioxx caused her atherosclerosis?
19      A.  Caused or contributed to.  Most likely
20  contributed to.  She has other risk factors for
21  atherosclerosis, as does everyone else in the world.  So
22  -- who has atherosclerosis.  It's not the sole cause.
23  It's a contributing factor that caused it to increase or
24  -- and/or caused a plaque to break off, causing her
25  unstable angina.

Page 147

1      Q.  Do you agree with the following statement with
2  respect to the specific end point of unstable angina:
3  There is no randomized, controlled trial that shows a
4  statistically significant increased risk of unstable
5  angina in association with the use of Vioxx?
6      A.  No.
7      Q.  What specific randomized, controlled trial do
8  you believe shows a statistically significant increased
9  risk of unstable angina in association with the use of
10  Vioxx?
11      A.  Well, the ones I just did, the Madigan ones.
12  Those are all randomized controlled trials combined.
13  Study 203 probably, which is the same idea, just with
14  limited size, probably also shows that.  So if study 203
15  is a randomized controlled trial that Merck was
16  proposing to use to study cardiovascular risk, then
17  Madigan's combined placebo-controlled results is the
18  same thing.
19      Q.  Okay.
20      A.  And also also, other -- the other Merck
21  studies where Merck intentionally chose to eliminate
22  unstable pectoris analysis from the published paper.
23  They also are studies, some of which probably would be a
24  yes answer to that question.
25      Q.  My question for you is, can you identify, as

Page 148

1  you sit here today, a specific randomized, controlled
2  trial that you believe to show a statistically
3  significant increased risk of unstable angina in
4  association with the use of Vioxx?
5      A.  I think it's probably in some of the larger
6  trials.  But in order to get the answer, we have to go
7  out and re -- redo the data tables that Merck did
8  because of the way Merck conflated the tables.
9         In other words, if you had unstable angina MI,
10  you were categorized as MI.  So you would have to
11  actually go back to the patient charts and get the data.
12  I think that's probably doable.  I don't think that's
13  necessary.
14      Q.  Do you agree that, as you sit here today, you
15  are not able to specifically identify a randomized
16  controlled trial that shows a statistically significant
17  increased risk of unstable angina in association with
18  the use of Vioxx?
19      A.  No, I just gave you one.  I handed you one at
20  the beginning of the day.  That's Madigan's.
21      Q.  So you are now referring to Exhibit 2 and
22  specifically the final slide in what we have marked as
23  Exhibit 2?
24      A.  Correct.
25      Q.  Okay.  Other than Dr. Madigan's analysis that

Page 149

1  you asked him to perform, because I am asking about
2  specific randomized controlled trial.  Can you identify
3  any specific randomized control trial that shows a
4  statistically significant increased risk of unstable
5  angina in association with the use of Vioxx?
6      A.  Maybe APPROVe.
7      Q.  You are not sure about APPROVe?
8      A.  Because Merck didn't publish the statistics on
9  the results.  It's seven to four against Vioxx.  Okay.
10  It's a large study.  I wouldn't be surprised if it
11  wasn't statistically significant, particularly if you
12  did a one tale test, which would be the appropriate tale
13  at the time that that was published.  No reasonable
14  hypothesis that Vioxx reduces angina pectoris, unstable
15  or otherwise.
16      Q.  Do you think it would be -- strike that.  Let
17  me start over.
18         For purposes of assessing the question of
19  whether or not an increased risk of unstable angina is
20  associated with the use of Vioxx, do you believe it
21  would be appropriate or inappropriate to review data
22  from non-placebo-controlled trials?
23      A.  Always appropriate to review everything.  It
24  depends what the non-placebo is.
25      Q.  Are there --

David Egilman, M.D.

Page 150

1    A.  In other words, if it's naproxen control,
2  probably basically the same as doing.
3       A placebo control.  If it's a diclofenac
4  control, then -- and you find a finding, okay, then it's
5  really important because diclofenac itself has a high
6  risk of causing MI's or unstable angina pectoris.  So it
7  depends on the control.
8       In other words, I would agree you should
9  review it all.  But how you interpret it depends on what
10  the control is and what the other -- what other factors
11  relate to the study.
12    Q.  Do you agree with the following statement with
13  respect to the specific end point of unstable angina:
14  There is no randomized controlled trial that shows a
15  statistically significant increased risk of unstable
16  angina in association with the use of Vioxx in studies
17  comparing Vioxx to other NSAIDs?
18    A.  I don't think that's correct, but I'm not
19  sure.  I certainly wouldn't agree with it.  The best I
20  would do for you is, I think as I was going through
21  these studies, some of them are large epidemiologic
22  studies where diclofenac is the control.  And there was
23  an increase in ACS, I think one or two of these, which
24  would include unstable angina pectoris.
25       Still don't have a good analogy.  Have to be

Page 151

1  working on this.
2    Q.  In your report that's been marked as Exhibit 5
3  for purposes of today's deposition, that's your May 9th,
4  2014 report, do you have that in front of you?
5    A.  I do.
6    Q.  You write in the middle of the next to the
7  last paragraph, down toward the bottom --
8    A.  What page?
9    Q.  -- of 53.
10    A.  Okay.
11    Q.  You see the paragraph that begins, "She did
12  not have"?
13    A.  I do.
14    Q.  Right in the middle of that paragraph, you
15  write, "Vioxx was the only NSAID that she was taking
16  prior to and following her procedures."  You see that?
17    A.  Yes.
18    Q.  Do you stand by that?
19    A.  I think there's a question in the records of
20  whether she was taking Relafen at some point.  I think
21  it's unclear.  I think there's somebody who says she was
22  taking it, and somebody else says, no, she was on Vioxx.
23       So that that's probably too strong.  The
24  records aren't strong enough to say that.  It's
25  ambiguous in some of the records whether she was on

Page 152

1  Relafen.
2    Q.  If this --
3    A.  Maybe other NSAIDs as well.
4    Q.  If this statement that I just read from your
5  report on page 53 turned out not to be correct, whether
6  it's Relafen, Relafen and others, or just others, would
7  that potentially change your opinions in this case?
8    A.  Not based on my understanding of the range of
9  variability.  In other words, the primary drug she was
10  on during this time period was Vioxx.  If she was on
11  Relafen for a one or two week period at some point in
12  time, that wouldn't make a difference.
13       I wouldn't be willing to sit here and say that
14  two weeks of Relafen was a significant contributing
15  factor on a more likely than not basis, based on the
16  fact that she was on Vioxx for the entire time period
17  other than that or one other drug.
18    Q.  How much use of another NSAID would it require
19  for you to say that it was a contributing factor to her
20  cardiovascular events?
21    A.  I don't know.  It's also an incomplete
22  hypothetical.
23    Q.  You have referenced the ADVANTAGe study in
24  various reports.
25    A.  That I have.

Page 153

1    Q.  Did you review the unstable angina data from
2  the ADVANTAGe study for purposes of developing your
3  opinions in this case?
4    A.  I -- with respect to -- not with respect to
5  doing the analysis because of the problem in reporting
6  and labelling.  In fact, I did review it for that, and I
7  have -- I think I had that in this pile here at the
8  beginning.
9       So I think the answer to that would be yes, I
10  got it here.  And then I got it here, which is from the
11  data from the -- that's not -- that's different from
12  what was reported in the published paper.
13       So I tried to review that, but I couldn't
14  figure out how to classify.  This is one of those
15  multiple diagnoses, and I couldn't figure out which ones
16  got boxed the way they boxed them, except it looks like
17  there's an error.
18       But -- in other words, the published chart
19  says there were two unstable anginas and a control.  The
20  underlying data says there was one unstable angina and a
21  control.  But there's a myocardial -- there's two
22  myocardial ischemias.  And there's -- there's a coronary
23  artery stenosis.
24       The only one that makes sense is if they
25  classified coronary artery stenosis as an unstable

39 (Pages 150 to 153)

David Egilman, M.D.

Page 154

1   angina or if this second alleged unstable angina was a
2   readjudicated something else.  But I don't know.  I
3   can't figure out where this second unstable angina came
4   from.  I just noticed that as I was preparing.
5        This is from Braunstein and Polus, you know,
6   in response to the release of the 5005 New York Times
7   story.  And they report two unstable anginas, but this
8   is -- the underlying data there's only one.  So I don't
9   know.  That's one of my problems in doing this analysis.
10  I can't fill figure out how they collapsed this.
11       Q.  For purposes of developing your own opinions
12  in this case with respect to the potential question
13  that -- of whether Vioxx is causally associated with an
14  increased incidence of unstable angina, did you,
15  yourself try to pool together data from various studies
16  and perform any kind of statistical analysis?
17       A.  No, just asking Madigan to do it on your data.
18  You have got the best data.  I mean, you have the most
19  data on -- you have all the Vioxx placebo trials.  They
20  are all yours.  So that's the only data set that exists
21  that it can be done on.  He's got the data.
22       Q.  Let's go off the record.  I just need a quick
23  break.
24       THE VIDEOGRAPHER:  Going off the record.  The
25  time is 2:31 p.m.

Page 155

1        (Recess from 2:31 p.m. to 2:38 p.m.)
2        THE VIDEOGRAPHER:  Going back on the record.
3   The time is 2:38 p.m.
4        Q.  (By Mr. Boehm) Are you holding yourself out as
5   an expert in this case on the subject of biological
6   mechanisms and processes of atherogenesis?
7        A.  I don't know what you mean by holding myself
8   out as.  I certainly will talk about that.  That's --
9   I've got demonstrative exhibits that relate to that.
10       Q.  Have you ever -- sorry, go ahead.
11       A.  I think that I know a lot more than the layman
12  about that.  And so -- but I am not -- "holding myself
13  out for" is not a phrase I am familiar with.
14       Q.  Have you ever conducted any original research
15  on the subject of the biological mechanisms and
16  processes of atherogenesis?
17       A.  No.
18       Q.  Have you ever published on that subject?
19       A.  Material related to that's probably in some of
20  the -- we've probably talked about that in some of the
21  papers, maybe even the first paper, the lessons learned
22  paper.
23       Q.  Have you ever published, based on your own
24  research on the subject of biological mechanisms and
25  processes of atherogenesis?

Page 156

1        A.  You mean based on a study I conducted on a
2   mouse or something?
3        Q.  A mouse or otherwise, yes.
4        A.  No.
5        Q.  What in your opinion are the well established
6   factors in the development of atherosclerosis?
7        MR. MCCLAIN:  Other than taking Vioxx?
8        MR. BOEHM:  Completely inappropriate, Ken.
9   You really should know better.
10       MR. MCCLAIN:  Yeah, maybe I should.  But I was
11  trying to get a clarification.
12       MR. BOEHM:  Just mark that, please.
13       A.  Genetics, cholesterol, lipids, lack of
14  exercise, male gender, age.  Then we go to some -- not
15  taking statins.  Okay.  There is some relationship
16  between COX-1, COX-2, and let me -- I have got a
17  demonstrative on this, but let me just find that.
18       It should be.  It should be demonstratives.
19       MR. MCCLAIN:  Marked demonstratives?
20       THE WITNESS:  Yeah.  It may not be called
21  demonstratives.  It's in -- it's an article on this
22  issue with demonstratives in it.  Let me see.  Ah, here
23  we go.  No, there's another one.  This is just one.  See
24  that yellow one that has mechanism?  Swell.
25       A.  The rest are going to deal with COX-1 and

Page 157

1   COX-2 and mostly by destabilizing athero -- atheromas,
2   which causes larger atheromas to occur.  That's the
3   major ones I talk about.  Hang on one second.  Let me go
4   through the rest of the differential diagnosis for
5   Levitt.
6        Q.  (By Mr. Boehm)  Can I see that so I know what
7   you are referring to?
8        A.  You want to pass me that, Levitt's report.
9   Remember where that differential diagnosis was?  Which
10  report that was on?
11       Q.  Are you referring, Dr. Egilman, to page 53 of
12  your May 9th, 2014 report?
13       A.  That's what I am referring to, except I can't
14  find that report in my pile.  But I think it's probably
15  in my pile.  What's on the bottom there?  That's not it.
16  That's it.
17       Q.  This is March 15, 2014.
18       A.  I think it will be the same.
19       Q.  This is Exhibit -- you are calling for Exhibit
20  6, the March 15th, 2013 --
21       A.  I am calling for five.  But I can't find five,
22  so we're going for six.  I need five.
23       Q.  I'm certain it's in front of you.  We were
24  looking at it not too long ago.
25       A.  That we were.  Ah, here it is.  Diabetes

David Egilman, M.D.

Page 158

1 hypertension, that's it.
2    Q.  Are you familiar with studies investigating
3 COX-2 inhibition and the development of atherosclerotic
4 lesions in mice?
5    A.  Some.
6    Q.  Do you address those studies in your reports?
7 Let me just make it -- let me withdraw that and see if I
8 can make it a little easier potentially.
9       Are you expressing any opinions in this case
10 on the subject of studies investigating COX-2 inhibition
11 and the development of atherosclerotic lesions in mice?
12    A.  No.
13    Q.  Are you familiar with the term "flow-mediated
14 dilation"?
15    A.  I think so.  Bit it depends on the context.
16    Q.  All right.  I am asking you if you are
17 familiar with the term "flow-mediated dilation" in the
18 context of the process of atherosclerotic growth or
19 progression.
20    A.  I think so.
21    Q.  What is your understanding of what that means
22 in that context?
23    A.  So relationship between flow and progression
24 of blood through the -- as, as blood slows, you can get
25 more atherosclerosis.

Page 159

1    Q.  Do you consider flow-mediated dilation to be
2 relevant to the process of atherosclerotic growth or
3 progression?
4    A.  I don't have an opinion.
5    Q.  You referenced the possibility that Ms. Levitt
6 had a plaque rupture a couple of times during today's
7 deposition.  Dr. Egilman, are you advancing an opinion
8 in this case to a reasonable degree of medical certainty
9 that Ms. Levitt experienced plaque rupture?
10    A.  No.
11    Q.  Are you familiar with the term "system
12 redundancy" in the context of the process of
13 atherosclerotic growth and progression?
14    A.  Maybe.
15    Q.  What do you mean, maybe?
16    A.  I probably have seen it somewhere, but it's
17 not part of what I would be talking about in this case.
18    Q.  Okay.  Are you familiar with the term "system
19 redundancy" as used in the medical science in the
20 context of the process of plaque rupture?
21    A.  Oh, now I think we are talking about the
22 mechanism of plaque rupture.  I think so, yes.
23    Q.  Are you expressing any opinions in this case
24 on the subject of system redundancy as it applies to the
25 process or mechanism of plaque rupture?

Page 160

1    A.  No.
2    Q.  Are you expressing any opinions in this case
3 as to what you believe the specific risk ratio to be of
4 the increased incidence of unstable angina in
5 association with the use of Vioxx?
6    A.  That statement, that question makes no sense.
7 There is no single rate ratio for risk for Vioxx for
8 anything.  Okay.  It's probably one of the best
9 stratified drugs out there.
10       There are different risks, ratios for people
11 with different underlying disease patterns.  So the risk
12 ratio for people who are at high risk, more than two
13 risk factors, more than three risk factors, are quite
14 high.  The risk ratio for people with -- it's always a
15 rate ratio of -- well, the rate ratio always stays about
16 the same.  But it tends to go up a little bit with the
17 number of underlying.
18       Close to the -- you know, this is the, close
19 to the cliff construct.  The more risk factors you have,
20 the more likely it is you are going to die.  The risk
21 ratio always stays between 1.5, I think, and 3.  But it
22 does change based on underlying risk factors.  So
23 there's not a single number for anything.  Okay.
24       The only risk ratios that I have for this --
25 for pulling out angina pectoris is the one you have got

Page 161

1 in front of you from the Merck studies done by Madigan.
2 And he didn't stratify by underlying risk factors.
3    Q.  And he also did not look at the specific end
4 points that fall into the acute coronary syndrome
5 classification, correct?
6    A.  If any.  That's not true.  He -- they MedDra
7 Crisped the data, okay, before they did any -- before we
8 published in '09 and before he published in '12.  So
9 they tried to coordinate.
10       Remember, that Merck changed the
11 classification system for diseases in, in, in their
12 studies, during the studies.  And so you know, Madigan
13 and Krumholz and I think Konstam, maybe somebody else,
14 did the best they could to try to assign the correct
15 CRISP terms to the correct diagnosis in the end.  And
16 MedDra terms.
17    Q.  Right.  I am asking you right now about this
18 one particular PowerPoint slide that is at the end of
19 Exhibit 2, which is your summary of Dr. Madigan's
20 statistical analysis of placebo-controlled Vioxx trials.
21       And my -- I am simply asking you -- I think
22 you -- I think this is clear, but I just want to make
23 sure there is no ambiguity.  Dr. Madigan, in performing
24 metaanalysis, did not do any additional analyses to
25 break down the risk ratios within end points that fit

David Egilman, M.D.

Page 162

1    within the acute coronary syndrome classification,
2    correct?
3        A.   As far as I know.  I didn't ask him to.
4        Q.   You referenced a risk ratio of 1.5 to 3.0, and
5    I apologize.  I just didn't catch what you were
6    referring to.  Can you explain that to me?
7        A.   Well, basically that's -- you asked for a
8    single risk ratio for the -- and I wasn't talking about
9    ACS or unstable angina.  I was talking about the hardest
10   outcome, which is MI, sudden death, that there is a
11   range depending on your -- as I recall generally, of
12   risk ratios that go from 1.5 to 3 as you look at
13   different risk factors.  That's my general recollection.
14       So the absolute risk is usually different.
15   Okay.  So that's -- in other words, 12 or 13
16   percent risk at the high end.  And there's a, you know,
17   one point something risk at the low end, if any.  In
18   other words, I think there's probably not a high risk or
19   not any risk, or not a measurable risk that you can find
20   in the study.  Because it would be so slow -- so low
21   for a 12-year-old taking Vioxx because their underlying
22   risk is so low.
23       And then and at some point in time that starts
24   to increase because age is such a -- such an
25   overwhelming risk factor.

Page 163

1        Q.   Are you expressing any opinions in this
2    case -- strike that.  I think I might be able to
3    simplify this.  I am going to hope.  Fingers crossed.
4        Are you expressing any opinions in this case
5    about what you believe the range of magnitude of risk is
6    for the increased incidence of unstable angina in
7    association with the use of Vioxx?
8        A.   I am going to use the ACS risk rates, risk
9    ratios to apply to unstable angina.
10       Q.   Are you referring to the slide that is at the
11   end of Exhibit 2?
12       A.   Yeah, and others.  I mean, there are other ACS
13   papers.  I wouldn't -- we already went through those.
14   Every one that talked about angina was basically talking
15   about -- ACS is the hard end point people use.  They are
16   not using unstable angina.
17       Q.   Well, do you recall that in fact in the
18   cases -- in the literature that you did cite, that they
19   do use unstable angina as an end point?
20       A.   No.  They use it as combined.  It's combined.
21       Q.   Well, based on your recollection --
22       A.   Well, except for the -- except for the ones,
23   the APPROVe is seven to four.  But remember that -- that
24   of those events, there are, I'm sure, more unstable
25   angina events that are classified in that study as MI's.

Page 164

1    Someone has unstable angina, they have an MI, they get
2    classified as an MI.
3        Because you only get -- this is for sure.  Per
4    event, you only get one diagnosis, and if you have
5    unstable angina and MI, they are not going to write down
6    unstable angina.  Or if you have unstable angina and
7    sudden death, they are not going to write down unstable
8    angina.  So for sure there are more cases.
9        But have to go back to the medical record.  I
10   am not even sure you can get that because it didn't come
11   out in the adjudication procedure as far as I know.
12   They wouldn't get the medical records that would show
13   the unstable angina.
14       Q.   Was there ever a time during your work as an
15   expert in this case when it was your opinion that
16   Ms. Levitt had in fact suffered a myocardial infarction?
17       A.   I don't recall.
18       Q.   Did you conduct a differential diagnosis in an
19   effort to determine what was the cause or causes of
20   Ms. Levitt's atherosclerosis?
21       A.   Yes.
22       Q.   Is that somewhere in your report?
23       A.   Page 53.
24       Q.   Okay.  So when you refer to, on page 53, to a
25   differential diagnosis for Ms. Levitt's CABG and stent,

Page 165

1    are you referring to her atherosclerosis?
2        A.   Yes, and her unstable angina pectoris.
3        Q.   Okay.  Is there any --
4        A.   And everything else related to heart disease.
5        Q.   Okay.  So, so --
6        A.   That she was treated for.
7        Q.   So when you use -- when you, on page 53, say
8    you are performing a differential diagnosis for
9    Ms. Levitt's CABG and stent, what you mean by that is
10   that you are performing a differential diagnosis as to
11   atherosclerosis development, as to the possibility of
12   plaque rupture, as to unstable angina pectoris; is that
13   correct?
14       MR. MCCLAIN:  Compound.
15       A.   What I am doing -- I think, no.
16       Q.   (By Mr. Boehm)  Okay.  I heard you just say a
17   minute ago that you were -- that this differential
18   diagnosis had application to every cardiovascular
19   condition that Ms. Levitt had suffered.  Did I
20   misunderstand you?
21       A.   I don't know what you understand.  I am not
22   sure what you are referring to in the text of the
23   deposition.  It's a differential diagnosis, as it says,
24   for the CABG and the stent.
25       Now, what led to the CABG and the stent and

42  (Pages 162 to 165)

David Egilman, M.D.

Page 166

1  what part of the differential diagnosis is -- part of
2  the differential diagnosis is atherosclerosis that
3  contributed to her getting the angina and the stent.
4  All those other things are possible things that may also
5  have contributed to her getting the CABG and the stent.
6  Okay.
7       Some of those things I think she had.  Some of
8  those things I didn't think she had.  So those are the
9  things I ruled in or ruled out as contributing factors
10 in her getting the CABG and the stent and the subsequent
11 side effects of that surgery.
12      But you can substitute, you know, acute angina
13 pectoris for CABG and stent, and it's going to be the
14 same differential diagnosis.  If that helps.
15 Q.  Thank you.  I am directing you right now to,
16 again, to page 53 of your report.  It is Exhibit 5 to
17 this deposition.  It's your May 9th, 2014, report.
18 A.  It's gone again.
19 Q.  We need to find it.
20 A.  There it is.  Lost and found department.
21 Okay.  I am there.
22 Q.  In the paragraph toward the bottom that
23 begins, "She did not have," do you see that?
24 A.  Yes.
25 Q.  About a third of the way into that paragraph

Page 167

1  you write, "Vioxx may have contributed to her
2  atherosclerosis."
3  A.  Correct.
4  Q.  Do you see that?
5  A.  Yes.
6  Q.  Why do you say may have?
7  A.  I think that was a reasonable choice of words.
8  I can't be a hundred percent sure.
9  Q.  Are you advancing the opinion in this case
10 that to a reasonable degree of medical certainty
11 Ms. Levitt's Vioxx use contributed to her
12 atherosclerosis?
13 A.  I think so.  I think so.  That seems to be
14 what the treaters thought because her progression was so
15 rapid, according to the treater.  So that would lead me
16 to think that if she had a rapid progression after the
17 drug was taken, that that would have been the -- I mean,
18 it's possible she had -- she threw a plaque as well that
19 caused her angina pectoris.
20      But it looks like there was progression, as
21 you read the patency numbers on her arteries, that was
22 fairly rapid.  That's unusual, I think.
23 Q.  Are you -- I'm sorry.  I thought you were
24 done.  Go ahead.
25 A.  So I think so.  Yes.  Go ahead.

Page 168

1  Q.  Other than your interpretation of one of
2  Ms. Levitt's treating physician statements about what
3  contributed to her atherosclerosis, what specific
4  material or data are you relying on to reach the
5  conclusion to a reasonable degree of medical certainty
6  that Vioxx contributed to Ms. Levitt's atherosclerosis?
7  A.  Well, Vioxx causes heart attacks and sudden
8  death from cardiac events.  And the underlying cause of
9  those heart attacks are progression of atherosclerosis
10 and -- and/or plaque release.  So by process of
11 elimination, Vioxx does one or both of those.
12      But I don't need to really know how something
13 happens to know that if it happens, it happens.  And
14 whatever Vioxx does, it causes people to get disease in
15 their coronary vessels that, in the main diseases we
16 know about, that cause heart attacks are atherosclerosis
17 and plaque release.
18      So those are -- Ken's watching movies.  So
19 it's got to be one or the other.  I think there's better
20 evidence here, based on the physician comments and the
21 data from the stent -- the data from the size changes in
22 her vessels, that it's atherosclerosis.
23 Q.  Are you relying on any particular animal
24 studies of in vitro studies for your opinion in this
25 case that Vioxx, to a reasonable degree of medical

Page 169

1  certainty, contributed to Ms. Levitt's development of
2  atherosclerosis?
3  A.  Well, there are such studies.  There are lots
4  of mechanism studies.  I don't have any in -- intention
5  of testifying about any of them or using them in front
6  of a jury.
7  Q.  Now, when you referred a moment ago to
8  statements, as you understood them, from Ms. Levitt's
9  treating physician, were you referring to the issue of
10 her restenosis or to the original development of
11 atherosclerosis in her coronary arteries?
12 A.  The restenosis.
13 Q.  Okay.  Are you expressing an opinion in this
14 case to a reasonable degree of medical certainty that
15 Vioxx contributed to Ms. Levitt's development of
16 atherosclerosis?
17 A.  Yes.
18 Q.  During what --
19 A.  Both, both.
20 Q.  During what time frame do you believe Vioxx
21 contributed to Ms. Levitt's progression of
22 atherosclerosis?
23 A.  From when she started taking the pills.
24 Q.  In your opinion that occurred from day one; is
25 that right?

David Egilman, M.D.

Page 170

1    A.  From day one.
2    Q.  What specific data can you point me to to
3  suggest that from day one, when somebody is using Vioxx,
4  that causes an increase in the progression of
5  atherosclerosis?
6    A.  Well, it causes an increase in the risk of
7  getting an MI from day one.  I think there was some day
8  one cases.  And so that that -- the risk is, when you do
9  a study, is generally viewed as continuous over the
10  course of the study unless there's some statistical
11  discontinuity.  And so the risk begins when you start
12  taking the pill.
13        And atherosclerosis will be one of the ways
14  that that pill would increase the risk over time.  The
15  day one cases are probably not atherosclerosis, or they
16  may be.  They are more likely to plaque instability,
17  but nobody knows, and there's a wide genetic variability
18  in the population after all, as I said, and other risk
19  factors relate.
20        So if you are 12 years old, even if you are
21  genetically susceptible to getting heart disease, you
22  take Vioxx, you are not likely to have a heart attack,
23  day one or day 365.
24    Q.  I think I get it.  Your view is that Vioxx
25  increases the risk of MI, and it does that from day one.

Page 171

1  And because Vioxx increases the risk of MI right away,
2  it must be that Vioxx increases the progression of
3  atherosclerosis?
4    A.  And/or plaque formation.
5    Q.  And/or plaque formation?
6    A.  But I think if it increases the progression of
7  atherosclerosis, which I think it does, that would start
8  at day one.  There's no reason to think that you
9  would -- it would wait two minutes.  Is there a
10  threshold for that effect?  Not that I am aware of.
11        So, you know, it's not -- there's no reason to
12  think to be a threshold based on what we know about the
13  mechanism.  Only if there was a threshold and a fixed
14  latent period would it be otherwise.
15    Q.  I think I got it.  Setting aside your view
16  that the fact that Vioxx in your view increases the risk
17  of MI, and so it must cause either atherosclerosis or
18  plaque rupture or both, are there any --
19    A.  Or, or something else we don't know about.
20  Right?  We don't -- okay.  We don't -- we don't know
21  everything, right?  So, okay.  And it may be some -- it
22  may only occur in people with certain genetic factors
23  which we don't know.
24    Q.  Okay.
25    A.  But for sure not everybody who takes Vioxx

Page 172

1  gets an MI, even long-term takers.  So there's a
2  certain -- not everybody who has high risk factors gets
3  an MI taking Vioxx.  So there are certain -- it's a
4  statistical phenomenon only because we don't know all of
5  the things that cause it.
6        In other words, if we knew everything about
7  why cigarette smoking causes lung cancers, I could tell
8  somebody, "You can go ahead and smoke three packs a day.
9  You will not get lung cancer."  And I can tell somebody
10  else, "100 percent you are going to get lung cancer."
11        The same thing with Vioxx.  We don't know all
12  of the things.  It's complicated.  The human body is a
13  little complicated.  That's why we had this problem in
14  this first place with this drug.  It turns out when you
15  push one part of the body, it's like a balloon.
16  Something else gets messed up.  So the same thing is
17  true for the mechanism of this disease.  In the legal
18  parlance, egg shell scum.
19    Q.  Thank you.  Just to go back to the question
20  and try and sum this up, setting aside your view that
21  Vioxx increases the risk of MI, and because of that, it
22  must cause atherosclerosis and/or plaque rupture and/or
23  some other unknown phenomenon that's related to MI --
24    A.  Well, the other --
25    Q.  I'm sorry.  Let me just finish.  Are there any

Page 173

1  other specific studies that you are relying on, animal
2  data, invitro or otherwise, to support your opinion that
3  in this case Vioxx to a reasonable degree of medical
4  certainty contributed to Ms. Levitt's atherosclerosis?
5    A.  Sure.  But let me -- I left one thing out in
6  that causal chain.
7    Q.  That's fine.  I just want you to go back and
8  answer any question that's pending.
9    A.  I know, but I have to fix the previous answer
10  because I left something out.
11        MR. BOEHM:  Can you mark it so we can quickly
12  go back to my question when he's -- when Dr. Egilman is
13  done.
14    A.  Okay.  Remember, you have the whole, you know,
15  platelet instability construct that it blocks the --  it
16  blocks the prostaglandins in the vessel, which then
17  precip -- which then makes it more likely that you are
18  going to have a clot form.  So that's -- I mean, that
19  was the main initial theory of how Vioxx caused heart
20  attacks.  So that's -- and that could be from day one.
21  That mechanism can be from day one.
22        So hang on.  Sure, there are other -- there
23  are other animal studies that support all of those
24  things that -- I mean, you can start with -- you can
25  start with 023, for example.

44 (Pages 170 to 173)

David Egilman, M.D.

Page 174

1    Q.  What specific data, what specific such studies
2  are you relying on for purposes of your opinion that
3  Ms. Levitt's use of Vioxx contributed to her development
4  of atherosclerosis?
5    A.  I don't have a list, but we could go through
6  the ones that Merck did.  We could go through the --
7  start with 023, which is a human study.  And then, you
8  know -- then there are other -- there's a lot of
9  literature on the, if you -- will you give me that
10  Antman paper, I can give you the cites there.  Can you
11  pass me that, the one that --
12    Q.  You will just have to --
13    A.  The one that's in the -- you know, the one
14  with the pictures.  The one I gave you when you asked
15  about mechanism atherosclerosis.
16    Q.  I don't know what you have in mind
17  specifically.  Is it this one here?
18    A.  That one there.  Yeah.  Titled mechanism.
19  Just underlying folder.
20       Okay.  So this paper's got about 100 cites.
21  Probably 40 or 50 of them are animal data that support
22  either the plaque thrombosis construct or
23  atherosclerosis or plaque.  You have got the -- I mean,
24  if you start with the Merck stuff, with the scientific
25  advisor meeting in 1997 where they threw out one

Page 175

1  possibility is that COX-2 causes atherosclerosis.
2       And that was based on animal data.  I don't
3  think they cited particular animal data then.  But you
4  know it exists before that as well.
5    Q.  Well, to be clear, my question doesn't concern
6  theoretical questioning of possible events.  I am asking
7  about specific data that you are relying on that you
8  believe establish that Vioxx is causally associated with
9  an increased incidence of the development of
10  atherosclerosis.
11    A.  That's one of the general theories about how
12  it works.  There's no -- there's no, quote,
13  establishment, closed quote.  There's more likely than
14  not.  And that's based on a variety of animal studies
15  that indicate that it increases the progression of
16  atherosclerosis in animals.  And also, I think an
17  understanding of the mechanism.
18       Some of those animal studies are in -- are
19  cited in this Antman paper.
20    Q.  Just for the record, would you please read the
21  reference.
22    A.  Sure.  It's cyclo oxygen -- maybe not.
23  Cyclooxygenase Inhibition and Cardiovascular Risk.  It's
24  by Antman, DeMets and Loscalzo, L-O-S-C-A-L-Z-O.  And
25  it's Circulation 2005, 112, 759 to 770.

Page 176

1    Q.  Is it your opinion that Ms. Levitt's unstable
2  angina was caused by her atherosclerosis?
3    A.  I don't know exactly why.  I think
4  atherosclerosis progression is probably one of the
5  things that contributed to it.  She may also have had
6  plaque instability or thrown a plaque.
7       She may also have had clot formation, and
8  COX-2 inhibition prevented the normal cycle that would
9  stop clot formation from stopping by blocking COX-2 in
10  the -- in the artery.  This could be a combination of
11  those things.  I -- you know, no one knows.  No one is
12  going to be able to answer questions like that.
13    Q.  Dr. Egilman, you have helpfully pointed us to
14  the Antman publication and provided that reference for
15  the record.  Are there other specific studies that you
16  are relying on for purposes of your opinion that Vioxx
17  is causally associated with an increased incidence of
18  atherosclerosis?
19    A.  There are a lot.  There's probably thousands.
20  But I'm not -- I am not -- I am not going to use any of
21  those at the trial.  Nor am I going to be talking about
22  this, I don't think, at all, even in a most general way.
23    Q.  If a patient -- I'm sorry.  Go ahead.
24    A.  Go ahead.  But you know, I don't have a list
25  of them here.  I can certainly attach a list.  I think

Page 177

1  it's -- I think I have discussed it and presented
2  literature in some of the other reports, in some of the
3  other depositions.
4    Q.  Do you agree that a patient can have
5  atherosclerosis and not develop unstable angina?
6    A.  Absolutely.
7    Q.  Do you know in what proportion of patients
8  with atherosclerosis unstable angina does not develop?
9    A.  It probably doesn't develop in a hundred
10  percent of people with atherosclerosis who are 14 years
11  old.  Okay.  And it probably develops -- and then if you
12  go up in age and up in other risk factors, it's a much
13  higher percentage.  So there's no single number.
14       Age would be the main driver, but then you
15  have got to combine diabetes, hypertension, all the
16  other things.  You know, eating at McDonald's, all the
17  other things that contribute to atherosclerosis.  The
18  more likely to have atherosclerosis, the more likely it
19  is you have unstable angina.
20    Q.  Are you familiar with any publications of
21  medical literature that have looked at the question of
22  the rate at which individuals with atherosclerosis
23  develop unstable angina?
24    A.  I don't think you could answer that question.
25  You would have to do it by -- you have to stratify by

45 (Pages 174 to 177)

David Egilman, M.D.

Page 178

1  age or risk factor or -- I am not familiar with it.  I
2  don't see any.  I reviewed the -- I did searches to look
3  for unstable angina studies, and I didn't see any.
4  Where that's the single outcome measure?
5      Q.  If a patient has unstable angina, does that
6  necessarily mean that she also has atherosclerosis?
7      A.  I think so.  I mean, you could throw a plaque.
8  Well, actually that's not true.  You could have spasm
9  and not have atherosclerosis.  That's rare.  But you
10  could have that.
11      You could throw a clot and not have
12  atherosclerosis except for the clot, from, say -- let's
13  say you had a -- this would be unusual.  But let's say
14  you had a myocardial thrombus, and the thrombus gets
15  thrown through a clot.  The clot could cause unstable
16  angina.  But you otherwise are -- your arteries would be
17  clean.  I don't know if that's possible.
18      You could have -- you could have a myxoma, a
19  cardiac tumor, and part of the tumor might break off and
20  cause unstable angina.  I left that out of my
21  differential diagnosis.  Okay.  I don't know if it's
22  ever happened but it's certainly possible.  So those are
23  the ways it could happen at least.
24      Q.  Are you advancing the opinion in this case to
25  a reasonable degree of medical certainty that

Page 179

1  atherosclerosis caused Ms. Levitt to experience unstable
2  angina?
3      A.  I think it contributed to it.
4      Q.  And you're reaching that conclusion to a
5  reasonable degree of medical certainty?
6      A.  Yes.
7      Q.  Okay.
8      A.  We know she had atherosclerosis.  If we didn't
9  know anything about her, if I didn't -- I would still
10  say that because, you know, more likely than not,
11  everybody who gets -- more than 50 percent of the people
12  with angina, unstable angina, have atherosclerosis.  Way
13  more, probably closer to a hundred percent, you know.
14  So...
15      But knowing that she has some stenosis and a
16  lot of stenosis, it's for sure a contributing factor.
17  It's not -- nothing is a hundred percent.  But it's way
18  more likely than not.
19      Q.  To a reasonable degree of medical certainty,
20  are you advancing the opinion in this case that anything
21  other than atherosclerosis directly caused Ms. Levitt to
22  experience unstable angina?
23      A.  As the cause, yeah.  She might have had plaque
24  formation.  She might have had a thrombus form because
25  Vioxx blocked COX-2 in the -- in the artery wall setting

Page 180

1  up a, you know, a thromboxane, unrebutted with
2  thromboxane response.  Any of those is possible.
3      She didn't have any evidence of clot by damage
4  to the heart, based on enzymes or anything else, or EKG
5  changes.  But she could still have had it.
6      Q.  You are saying it's possible?
7      A.  All of this is possible.
8      Q.  Right.  But my question --
9      A.  And some combination of this happened.  Okay.
10  I don't know.  These are the three things that in
11  combination happened.  If you want to pick out each and
12  every one, I can't say that's what did it.  It's one of
13  -- it's probably a combination of more than one of those
14  things.
15      If I had to pick one, I would say the one we
16  know she had is atherosclerosis.  You can't know about
17  the other two because no one was there looking in her
18  artery when the -- when an event occurred, so you
19  couldn't see it clot.  Clots can dissipate, and you
20  don't find them, even when you do an angiogram.  So you
21  can't know about that, and there's no way to know -- you
22  can't put a probe in and test the relationship of
23  prostacyclin and thromboxane in the vessel wall when she
24  is having the angina to determine whether that's gone
25  on.  So that's always going to be purely theoretical as

Page 181

1  to a particular individual.
2      Q.  Are you familiar with the concept of systemic
3  inflammation?
4      A.  Sure.
5      Q.  What's your understanding of what that term
6  means, generally speaking?
7      A.  I don't have a general understanding.  Some
8  people call, you know, lupus a systematic disease.
9  Rheumatoid arthritis can be a systematic disease.  So
10  you have inflammation in multiple organs, multiple
11  joints.  Scleroderma may be sometimes.  Mixed connective
12  tissue disease.
13      Q.  Are there biological markers of systemic
14  inflammation?
15      A.  It depends what disease -- I mean, there's
16  no -- there's no disease entity known as systemic
17  disease.  What was that term you used in the question?
18      Q.  Systemic inflammation.
19      A.  Inflammation.  That's no -- that's not a
20  disease.  Some people might say, lupus indicates
21  system -- if lupus that's systematic indicates
22  systematic inflammation because it's in more than one
23  organ, more than one organ system.  But I mean, I am
24  not -- it's a really general category.
25      Q.  Have you performed a comprehensive review of

David Egilman, M.D.

Page 182

1  the medical literature on the subject of the
2  relationship, if any, between COX-2 inhibition and
3  markers of systematic inflammation?
4      A.  Sure.  I have looked at that, like elevated
5  sed rate or other things.
6      Q.  I don't mean to interrupt but --
7      A.  Go ahead.
8      Q.  You say you looked at it, but my question was
9  a little bit different.  Do you consider yourself to
10  have performed a comprehensive review of the medical
11  literature on the subject of the relationship, if any,
12  between COX-2 inhibition and the markers of systematic
13  inflammation?
14      A.  I think so, a long time ago.
15      Q.  Are you intending in any way to offer opinions
16  in this case on the subject of the relationship, if any,
17  between COX-2 inhibition and markers of systemic
18  inflammation?
19      A.  No.
20      Q.  Dr. Egilman, could you turn back to page 53 of
21  your May 9th, 2014, report.  It's Exhibit 5.
22      A.  Okay.
23      Q.  I want to look with you again at the -- what
24  you refer to as a differential diagnosis for
25  Ms. Levitt's CABG and stent.  Do you see there's a list

Page 183

1  of 17 items?
2      A.  Right.
3      Q.  How did you go about generating this list of
4  17 items?
5      A.  I don't recall.
6      Q.  Okay.
7      A.  Probably from medical school.
8      Q.  Okay.  So there wasn't a textbook or a
9  particular publication or a handbook for cardiologists
10  that you used as a source for this list?
11      A.  I probably looked at literature too.  This
12  would be the same diag -- same diagnosis, same
13  differential for MI, more or less.  Oh, I left out
14  smoking, but it's here.
15      Q.  It's not on the list of 17 items, but you
16  reference it?
17      A.  No.  It's nicotine addiction.  That would be
18  smoking.  Although, that may -- at this time it would be
19  smoking.  Now I guess it -- well, yeah, it's smoking
20  even if you are smoking E-cigarettes.  Cigarette smoking
21  would be another cause of atherosclerosis too probably.
22      Q.  Does one begin to develop atherosclerosis on
23  day one of smoking?
24      A.  Probably.  If you are going to develop it.
25  Not everybody who smokes has progressive

Page 184

1  atherosclerosis.  I mean, you have got people, like, who
2  get Berger's disease.  Okay.  So you have a real.  There
3  you got a real subset of people who, if they smoke, they
4  get an arteritis.  They lose their fingers and toes.  So
5  they have a particular genetic response to cigarette
6  smoking that most people don't get.
7          And in those people, I am sure it occurs early
8  because -- and then it's acute.  In other words, if they
9  stop smoking, it goes away.  They smoke one to two
10  cigarettes, it comes right back.
11          Okay.  Why don't we take a break so I can get
12  a drink.
13          MR. MCCLAIN:  Sure.
14          THE WITNESS:  Ken, do you want to --
15          THE VIDEOGRAPHER:  Going off the record.  The
16  time is 3:32 p.m.
17          (Recess from 3:32 p.m. to 3:42 p.m.)
18          THE VIDEOGRAPHER:  Going back on the record.
19  This is the beginning of Tape 4.  The time is 3:42 p.m.
20      Q.  (By Mr. Boehm)  Dr. Egilman, on page 53 of
21  your report marked Exhibit 5, just below the list of 17
22  items you identify a number of conditions that
23  Ms. Levitt in your view did not have, correct?
24      A.  Correct.
25      Q.  What was your methodology for determining

Page 185

1  which conditions to include on the list of Ms. Levitt's
2  conditions that you believe she did not have?
3      A.  Review of her medical records.
4      Q.  What is coronary artery vasospasm in general
5  terms?
6      A.  Spasm of the coronary artery, acute narrowing.
7      Q.  What are the symptoms that a patient
8  experiences typically if they have a coronary artery
9  vasospasm?
10      A.  Chest pain.
11      Q.  Anything else?
12      A.  You could have shortness of breath.  You could
13  have an MI.  MI is not a symptom.  Arm pain.  All the
14  same symptoms you could get from a heart attack.  Jaw
15  pain.  Ear pain.  Back pain.  You can have referred pain
16  to epigastrium.
17      Q.  Do you have an understanding of the
18  pathogenesis of coronary artery vasospasm?
19      A.  Genetically related.  Idiopathic as far as I
20  know.
21      Q.  I am sorry.  I just --
22      A.  Idiopathic as far as I know.  We don't know
23  any known causes.  I mean, in the sense when it's the
24  only thing that's going on.  Usually it happens to A
25  young person, relatively young person.

47 (Pages 182 to 185)

David Egilman, M.D.

Page 186

1      Q.  Have you ever --
2      A.  In other words, it could be -- there is
3  always -- there is often vasospasm associated with an
4  acute MI.  But that's not what I am talking about here.
5  I am talking about larger, higher up in the vessel where
6  a spasms closes down acutely.
7          Nitroglycerin can sometimes -- almost always
8  causes it to release.  And it's patent, and there's
9  nothing -- in other words, it's an arterial narrowing
10 that's acute that's not caused by a clot or
11 atherosclerosis.
12     Q.  Have you ever treated a patient who was
13 experiencing an acute coronary vasospasm?
14     A.  Maybe in my residency.
15     Q.  Nothing comes to mind?
16     A.  I can't remember a particular case, but you
17 know, I was in the ER.  I was a doc in the ER.  Lots of
18 people come in with chest pain.  Some of them may have
19 had coronary vasospasm.  Some of them ended up in the
20 intensive care unit.  I did rotate on the cardiac, the
21 CCU.  I did, you know, a couple of months in both of
22 those or three, four months in those.
23         I -- it would be hard for me to believe there
24 was no case ever during that time period of coronary
25 artery vasospasm.

Page 187

1      Q.  How many years ago was your residency?
2      A.  It ended in '81.
3      Q.  Do you know what the treatment is for a
4  coronary vasospasm?
5      A.  Nitroglycerin.  Sometimes intravenous but
6  usually start with oral, sublingual.
7      Q.  If a patient experiencing acute coronary
8  vasospasm receives nitroglycerin, what is the expected
9  effect from the nitroglycerin?
10     A.  The treatment relieves the spasm.  The pain
11 goes away.  Just to be clear, the sine qua non of
12 vasospasm is, there's no underlying atherosclerosis.
13     Q.  Okay.  Tell me what you mean by that.
14     A.  I mean, if you had atherosclerosis and
15 vasospasm, you would say the person had atherosclerosis.
16 And you might have some spasm around the acute
17 information related to an MI.  Both could be relieved by
18 nitroglycerin.  But you wouldn't diagnose someone with
19 coronary vasospasm generally, if they had clean
20 arteries.  I'm sorry.  If they had bad with arteries.  I
21 got that wrong.  Got that exactly 100 percent wrong.
22     Q.  Are you saying that a patient who has
23 atherosclerosis would never be diagnosed with acute
24 coronary vasospasm?
25     A.  If I ever say never to anything to do with

Page 188

1  medicine, I withdraw the answer.  I am sure it's
2  happened.
3      Q.  In your view, would it be inappropriate to
4  diagnose a patient who has atherosclerosis with an acute
5  coronary vasospasm?
6      A.  No.  You can have both theoretically.  But you
7  wouldn't dia -- you wouldn't put -- you wouldn't -- on
8  the discharge diagnoses, you would put coronary
9  vasospasm atherosclerosis.  You would put them both down
10 as diagnosis, whereas what I am talking about here is
11 someone who leave the hospital with only coronary artery
12 vasospasm as a diagnosis.
13     Q.  Do you know whether Ms. Levitt received
14 nitroglycerin treatment during her coronary events?
15     A.  I don't recall specifically.  I assume she
16 did.  It's probably in the summary.
17     Q.  Do you know whether the nitroglycerin had any
18 impact on Ms. Levitt's symptoms?
19     A.  I don't recall specifically.
20     Q.  If the nitroglycerin relieved Ms. Levitt's
21 symptoms during the course of her acute coronary events,
22 how would you interpret -- how would you interpret that?
23 Would that have any meaning to you?
24     A.  Yeah, it would have meaning.  It would mean
25 that nitroglycerin relieved her symptoms, which means

Page 189

1  that it was dilation of the artery secondary to the
2  nitroglycerin, which means that whatever narrowing she
3  had from either plaque or atherosclerosis was relieved
4  enough so that she no longer suffered chest pain.
5      Q.  If Ms. Levitt's symptoms were relieved by the
6  administration of nitroglycerin, would that tell you
7  anything in your opinion about the nature of her acute
8  event?
9      A.  No.  Well, maybe.  I mean, certainly
10 compatible.  Yes, it would.  I mean, you would generally
11 rule out GI or noncardiac events or tend to lead you
12 more to a cardiac event.  Although, I mean, you could --
13 and we're talking cardiac artery event.
14         For example, I don't know of any cases, but
15 I'm sure there are cases where someone was having a
16 dissection of the aorta and they got nitroglycerine,
17 they got better too.  There could be a psychological
18 impact because it shouldn't have anything to do with
19 that.  So I mean, it kind of helps you a little bit
20 ruling out some certain things.
21         You wouldn't expect if there was a timely
22 response, particularly more than one response, that it
23 was anxiety.  In other words, nitroglycerin working
24 means it's much -- it's not anxiety.  It means it's
25 probably not an ulcer.  Means it's probably not a stone.

48  (Pages 186 to 189)

David Egilman, M.D.

Page 190

1  It means it's probably not pancreatitis.
2      So any, any of those things are in the
3  differential diagnosis for chest pain.  And the fact
4  that nitroglycerin works, it's -- and if it worked more
5  than once, it leads you to believe that it's an -- it's
6  an artery problem.
7  Q.  Okay.  Anything else?
8  A.  Not that I can think of.
9  Q.  We have discussed the fact that Ms. Levitt had
10  a stent placed in March 2000.  Do you recall that?
11  A.  Yes.
12  Q.  Do you know if stents in coronary arteries
13  generally are intended to be permanent?
14  A.  Yes, unless it's one of the ones that was sold
15  that don't work, which there are a lot of those.  In
16  other words, the ones that break, but generally it's
17  hard to remove them anyways, if not impossible.
18  Q.  We've also discussed, in passing so far, and I
19  would like to spend more time on the subject of
20  Ms. Levitt's restenosis.  You know what restenosis is,
21  correct?
22  A.  Yes.
23  Q.  What is your understanding of what restenosis
24  is?
25  A.  You have stenosis.  It gets relieved by a

Page 191

1  procedure, and then you get more stenosis, or it comes
2  again.
3  Q.  In patients who are treated with a placement
4  of a stent, do you know in what percentage restenosis
5  occurs?
6  A.  It depends when and what stent.
7  Q.  Well, let's start with today.  And just across
8  the board, are you familiar with data informing the
9  medical community about in what percentage of patients
10  who are treated with a placement of a stent restenosis
11  occurs?
12  A.  I can't recall a specific number.
13  Q.  Do you know roughly what it was or what it is?
14  A.  What it is?
15  Q.  Yeah.
16      MR. MCCLAIN:  Don't guess.
17  A.  It depends on time frame.  Okay.  In other
18  words, the longer you follow someone, the more likely it
19  is to restenose.  So usually you are going to have
20  restenosis within a time frame, within six months, a
21  year, two years, five years.  So there's a lot of data
22  points.  I haven't committed any of them to memory.
23  Q.  (By Mr. Boehm)  Okay.  Do you know what the
24  published medical literature indicates with respect to
25  the percentage of restenosis in patients treated with

Page 192

1  the placement of a stent in and around the year 2000?
2  A.  No.  And it depends on the kind of stent.
3  More or less different stent companies had higher rates.
4  Q.  Okay.  Do you know what those rates were with
5  respect to stents compiled together or any one
6  individual stent?
7  A.  No.  I -- well, I think the latter wasn't
8  published much.  I don't -- I don't know what the
9  restenosis rate was by type of stent.
10  Q.  Have you searched of the medical literature to
11  look at the question of what percentage of patients
12  experienced restenosis in and around 2000 and those
13  treated with a placement of a stent?
14  A.  No.
15  Q.  Do you know what the risk factors for
16  restenosis are?
17  A.  Same as the original risk factors.  The more
18  risk factors you have, the more likely you have -- you
19  know, all the same risk factors I have got, except for
20  the obvious ones that don't relate.
21      In other words, myocarditis, Kawasaki disease,
22  certain drugs that increase the risk.  That's going to
23  count.  Hypertension, hypercholesterolemia,
24  hyperlipidemia.  Those are going to all increase.
25  Diabetes.  Usually diabetes acts, by the way, through

Page 193

1  one of those other vehicles.  Genetics.
2  Q.  Have you performed a review of the medical
3  literature on the subject of what the risk factors are
4  for the development of restenosis?
5  A.  I think I just gave them to you.
6  Q.  My question was, have you performed a review
7  of the medical literature with an eye to determining
8  what the risk factors are for restenosis?
9  A.  Yes.
10  Q.  And is that medical literature captured
11  somewhere in your expert reports?
12  A.  No.
13  Q.  Do you have an opinion as to whether or not
14  Ms. Levitt's female sex was a risk factor or a
15  protective factor, for that matter, for her restenosis?
16  A.  It's protective compared to being a male.
17  Q.  So your opinion is that the male sex is a --
18  having male sex is a risk factor for the development of
19  restenosis?
20  A.  Compared to female, that's my general
21  recollection.
22  Q.  Do you understand the difference between --
23  A.  That's going to depend on age.
24  Q.  Do you -- okay.  Is there an age at which you
25  believe that changes, as between men and women?

49 (Pages 190 to 193)

David Egilman, M.D.

Page 194

1    A.  Sure.
2    Q.  At what age?
3    A.  Two ages.
4    Q.  At what age or ages?
5    A.  Well, the first age would be puberty, okay.
6  So below puberty it's going to be the same.  And then
7  after menopause, it will be more or less the same.
8  Women may still have a less risk.  But they approach
9  asymptotically each over, and it depends on other things
10  how closely -- how -- when they narrow.
11    Q.  Are you relying on any medical literature that
12  you can identify for us for that opinion?
13    A.  Not as I sit here today, but I'm sure there's
14  literature on that.
15    Q.  Does the complexity of the stent placement
16  affect the risk of restenosis?
17    A.  Yes.
18    Q.  Do you have an opinion as --
19    A.  Well, not necessarily the complexity but the
20  difficulty of placing the stent.  In other words, if
21  you -- if it's a complex, for some reason, stent
22  placement, per se, it doesn't mean it was done and
23  damaged the vessel wall.  So if it's complex, it's more
24  likely to damage the vessel wall, which is more likely
25  to lead to acute stenosis or restenosis.

Page 195

1    Q.  Are you expressing any opinion as to the
2  complexity of Ms. Levitt's stent placement?
3    A.  No.
4    Q.  Are you --
5    A.  Just a suggestion.  If you want to start with,
6  am I going to testify about it first, then we don't have
7  to go through it all because most of these, I am not
8  going to testify about anything related to mechanism.
9    Q.  I'm sorry.  Say -- I just didn't hear the last
10  thing you said.
11    A.  I said, if you change the order of the
12  question, right, to am I going to express any opinions
13  about, and start with that.  And I'll say no.  Then -- I
14  mean, you can do it any way you want but --
15    Q.  Okay.
16    A.  You know, if not going to give any opinions
17  about it.  You are certainly entitled to inquire about
18  what I know.
19    Q.  Okay.
20    A.  But I am just -- I am suggesting it might be
21  faster.
22    Q.  I appreciate that.  Are you intending to
23  express any opinions on the subject of the mechanisms
24  that underlie restenosis?
25    A.  No.

Page 196

1    Q.  Are you intending to express any opinions in
2  this case as to what specifically caused Ms. Levitt's
3  restenosis?
4    A.  Yes.
5    Q.  What is your opinion on that subject?
6    A.  Well, it's going to be all her other risk
7  factors and Vioxx.
8    Q.  Anything else that you would add to the list
9  of things that you believe caused Ms. Levitt's
10  restenosis?
11    A.  No.
12    Q.  Have you ever heard of a drug-eluting stent?
13    A.  Yes.
14    Q.  Do you know if Ms. Levitt received a
15  drug-eluting stent or not?
16    A.  I don't think she did.
17    Q.  What is a drug-eluting stent?
18    A.  It releases something that prevents blood
19  clots formation.
20    Q.  Do you know if drug-eluting stents reduce the
21  risk of restenosis?
22    A.  That's what the companies say.
23    Q.  Do you have an opinion on that subject?
24    A.  I haven't seen long-term follow-up data.
25    Q.  You will not be expressing any opinions on

Page 197

1  that subject in this case?
2    A.  Correct.  Let me just say with respect to
3  that, that's on direct examination.  I can't predict
4  what you or somebody else is going to ask.  Or what the
5  judge might ask.  And I know Mr. McClain ain't going to
6  ask.
7    Q.  I'm sorry?
8    A.  I know Mr. McClain is not going to ask.
9    Q.  Okay.  Are you familiar with a test known as
10  the Bruce protocol stress echocardiogram?
11    A.  Sure.
12    Q.  What is your understanding as to what that
13  Bruce protocol stress echocardiogram tests?
14    A.  Well, it's a stress test, except the measure
15  is, instead of looking -- well, you would also look at
16  the EKG changes.  But you are looking at the cardiac
17  function through -- with an echo.
18    Q.  Do you know if Ms. Levitt underwent a Bruce
19  protocol stress echocardiogram?
20    A.  I don't recall.  I don't recall.
21    Q.  Do you recall what tests Ms. Levitt has
22  undergone for purposes of determining her current or
23  since 2000, cardio -- state of cardiovascular health?
24    A.  It's whatever I have in the summary.
25    Q.  Do you remember what those tests were?

50  (Pages 194 to 197)

David Egilman, M.D.

Page 198

1    A.  I have not committed it to memory.
2    Q.  Okay.
3    A.  That's why I wrote it down.
4    Q.  Have you ever performed an echocardiogram?
5    A.  No.
6    Q.  Have you ever performed a nuclear stress test?
7    A.  No.
8    Q.  Have you ever performed a resting two
9    dimensional echocardiogram?
10   A.  No.
11   Q.  Have you ever performed an exercise-induced
12   wall motion test?
13   A.  No.
14   Q.  Do you have an understanding as to what the
15   most common measures of heart function are?
16   A.  Yes.
17   Q.  What is your understanding on that subject?
18   A.  Well, stress tests, including the ones we have
19   gone over.  Angiograms.  You can do stress tests with
20   nuclear.  You can do stress tests with echo.  You can do
21   stress tests just with EKG, and you can do angiograms.
22        You can also now do MRIs.  You can do stress
23   MRIs.  You can do straight-up MRIs looking for calcium
24   deposits in the arteries.  That's -- you can do an EKG
25   straight flat.  You can walk somebody around the room.

Page 199

1    You can walk them around the, around the block.  Poor
2    man's stress test.
3    Q.  As a board certified internist, would you
4    typically rely on a cardiologist to interpret the
5    results of a stress test and angiogram stress MRI or an
6    EKG?
7    A.  No.  Poorly formed question.
8    Q.  Perhaps.  I have never professed to be
9    perfect.
10   A.  I am just letting you know.  The answer is
11   vague and ambiguous because the question is.
12   Q.  Okay.
13   A.  Do you want me to give you the answer?
14   Q.  Sure, thanks.
15   A.  Okay.  EKGs I used to do in my office all the
16   time.  I didn't send them to a cardiologist unless I had
17   some particular question about it.  Okay.  Stress test
18   results I would generally interpret, if it was EKG-based
19   stress test results.
20        Angiogram stress test, generally cardiologists
21   would do that because I am not there -- they can see a
22   moving picture of the vessels.  And that's sometimes
23   more helpful.  They can also inject things to try to
24   stimulate narrowing, and they can be there, and they can
25   also -- they got the patient on the table so the patient

Page 200

1    can answer whether they are having pain during parts of
2    the test.
3         So that's certain -- that's one of those, you
4    got to be there tests.  So I would certainly rely on
5    whoever was doing that test for that result.  And I
6    think that answered your question.
7    Q.  Okay.  I take it you are familiar with a
8    measure called ejection fraction?
9    A.  Yes.
10   Q.  Ejection fraction is one measure of cardiac
11   performance, correct?
12   A.  Yes.
13   Q.  Do you know what ejection fraction measures?
14   A.  Sure.  The percentage of blood that is ejected
15   from the left ventricle into the aorta.
16   Q.  What does the medical community, if you know,
17   consider to be a healthy ejection fraction range for
18   somebody of Ms. Levitt's age?
19   A.  Above 60 percent.
20   Q.  And when you say above 60 percent, are you
21   relying on medical literature?  Text book?  What are you
22   relying on?
23   A.  I am relying on my memory.
24   Q.  Okay.
25   A.  So usually it's age dependent.  I mean, in

Page 201

1    order to know -- I mean that's my best estimate.  It
2    could be off by 20 percent, okay, but...
3    Q.  Have you ever heard of a test called a
4    metabolic equivalent of task, an M-E-T?
5    A.  Of task?
6    Q.  That's my understanding, metabolic equivalent
7    of task, M-E-T, is the acronym.  Have you heard of that?
8    A.  Nope.
9    Q.  Do you think I am getting the T wrong?  You
10   said "of task."  So maybe I have just got the wrong word
11   there.
12   A.  I have no idea.
13   Q.  Have you ever heard of an MET in the context
14   of cardiovascular performance measurements?
15   A.  It's not something that I order.  It's not
16   something I use.
17   Q.  Okay.  Dr. Egilman, I know that you reviewed
18   some, if not all, of the test results for Ms. Levitt
19   concerning her cardiovascular performance, the stress
20   test angiograms and so on; is that correct?
21   A.  Yes.
22        (Deposition Exhibit No. 8 was marked.)
23        THE WITNESS:  He doesn't need it.
24        MR. MCCLAIN:  I don't need it.
25   A.  Okay.  I have Exhibit 8.  You have a question?

51 (Pages 198 to 201)

David Egilman, M.D.

Page 202

1    Q.  (By Mr. Boehm)  Dr. Egilman, you have in front
2   of you a document marked as Exhibit 8 for today's
3   deposition.  And I'll represent that it is a March 2000
4   test result and exercise echo Doppler procedure
5   performed on Ms. Levitt.  Do you see that?
6    A.  I do.
7    Q.  Have you reviewed this medical record before?
8    A.  I think so.
9    Q.  Do you agree that the resting two dimensional
10   echocardiogram showed no abnormalities?
11    A.  Yes.  And I agree that I was correct about the
12   correct ejection fraction.
13    Q.  Do you agree that an ejection fraction of 55
14   to 60 percent is a healthy result?
15    A.  Yes.
16    Q.  Do you agree --
17    A.  Well, I agree it's normal.
18    Q.  Do you --
19    A.  Healthy gets more complicated.
20    Q.  Okay.  You agree it's a normal result?
21    A.  Yes.
22    Q.  Do you agree that the medical records show
23   Ms. Levitt experienced no chest pain during the Bruce
24   protocol test performed on March 3rd, 2000?  If you
25   look about two thirds of the way down, you see Bruce

Page 203

1   protocol.
2    A.  I do.  I am looking for the no chest pain.  I
3   see.  Yes.  Correct.
4    Q.  And do you see that Ms. Levitt achieved a work
5   load of 10.1 MET's on the Bruce --
6    A.  Right.
7    Q.  -- protocol stress test?
8    A.  Right, okay.  So now, that's a MET.  That's --
9   if that's what you were asking before, that's a measure
10   of work based on how far you go on the Bruce protocol.
11   Okay.  So it's not an independent test.  That's where I
12   am confused.
13    Q.  Got it.
14    A.  That's a measure of energy expended during the
15   protocol.
16    Q.  Okay.  Do you see that Ms. Levitt achieved a
17   work load of 10.1 MET's?
18    A.  I do.
19    Q.  What is your interpretation of Ms. Levitt
20   having achieved a work load of 10.1 MET's on this March
21   2000 Bruce protocol --
22    A.  It's a normal test.
23    Q.  -- stress EECG?
24    A.  Normal.  Are you done with this one?
25    Q.  I believe so.

Page 204

1    A.  Since we have such trouble.  Are you coming
2   back to this report so I can put it back in the pile and
3   we don't lose it any more?
4    Q.  That one you should probably keep at least
5   somewhat close.
6    A.  No problem, no problem.  Just asking.  I tend
7   to lose this for some reason today.  So I just want to
8   make sure I keep track.
9    Q.  Fair enough.  Do you agree that the results of
10   Ms. Levitt's March 23rd, 2000, cardiovascular testing
11   indicate that she had normal heart function?
12    A.  Yes.  Based on that, with respect to that
13   test.
14      (Deposition Exhibit No. 9 was marked.)
15    Q.  (By Mr. Boehm)  Dr. Egilman, this is Exhibit
16   9.  It's a November 27th, 2000, exercise echo report.
17   Do you see that?
18    A.  I do.
19    Q.  Have you reviewed this medical record before?
20    A.  I think so.
21    Q.  Do you agree that the resting two dimensional
22   echocardiogram from this test showed no abnormalities?
23    A.  Yes.
24    Q.  And do you agree again that --
25    A.  Except, except --

Page 205

1    Q.  Sorry, go ahead.
2    A.  No.  Actually not.  She had PVCs which -- with
3   the test, which is abnormal.  And she also described
4   chest pressure.
5    Q.  Are you referring to the statement, abnormal
6   septal motion consistent with status post-operative
7   cardiac surgery?
8    A.  Where are you looking?
9    Q.  I'm looking about halfway down the list under
10   the header, resting two dimensional echo.
11    A.  Yeah.  That's not what I was referring to.
12   There's several things I was referring to.  Do you want
13   me to just tell you?
14    Q.  Yeah, please.
15    A.  Okay.  If you look under Bruce protocol
16   stress, the last two lines, PVC is noted in early
17   recovery.  That's ventricular premature contractions.
18   That's not normal.  Then you have nonspecific ST-T wave
19   changes with stress.  That means with the test.
20      And the no diagnostic ischemic changes means
21   there wasn't any drop in the -- weren't any EKG changes
22   compatible with ischemia, which is generally QRS
23   changes.  And then what else?  And then -- that's --
24   only additional abnormality is under summary where it
25   says, chest pressure was described with stress.  So

David Egilman, M.D.

Page 206

1    those three things are not a hundred percent normal.
2        Q.   What is your interpretation, if any, of the
3    nonspecific ST-T changes with stress?
4        A.   Well, they say, and I don't have the whole
5    cardiogram that goes with this, which is what you would
6    need to do the interpretation.  That there were no
7    diagnostics ischemic changes, so she didn't have enough
8    of an ST-T wave depression, which is usually a
9    millimeter, to diagnose ischemia.
10       But the changes are compatible with some
11   ischemia.  Also compatible with postoperative irritation
12   from having a CABG surgery done.  So that's my
13   interpretation.
14       Q.   Do you see in the summary the physician who
15   performed this testing wrote, "Normal stress echo
16   without evidence for ischemia"?
17       A.   That's part of what he wrote.
18       Q.   Do you see where, where that's written?
19       A.   He wrote -- that's part of what he wrote in
20   his summary.
21       Q.   Right.  And I am asking you about the first
22   sentence there.  Normal stress echo without evidence --
23       A.   Yeah, and I -- that's part -- you said what
24   did he write in the summary, and you read that sentence
25   And I said yes, that's part of what he wrote in the

Page 207

1    summary.
2        Q.   Do you disagree with that sentence written by
3    Dr. Vacek?
4        A.   No.
5        Q.   And do you see that there is a ejection
6    fraction of 50 percent?
7        A.   Right.  That's lower than it was before.
8        Q.   Do you know whether or not a 50 percent
9    ejection fraction for someone of Ms. Levitt's age is in
10   the normal range?
11       A.   Yeah.  It's in the normal range.  But
12   remember, these things are categorized by people, not
13   normal -- not statistical people.  So in other words, if
14   she -- it's like pulmonary function tests.  If you start
15   out with really big lungs and you lose 10 or 15 percent,
16   you are still within normal range, but you lost 10 or 15
17   percent of lung function.
18       I think before it was 55 to 60.  Now it's 50.
19   Now, on a single test, I wouldn't make a big deal out of
20   that.  But it's not -- it does show there's potentially
21   some decrease.  Now, this could be just because she just
22   had surgery, or it could be normal variation in the
23   test.  Or it could be that she has lost some cardiac
24   output.
25       Q.   What if years later she had an increase in her

Page 208

1    estimated ejection fraction?
2        MR. MCCLAIN:  Just keep going.  He can defend
3    himself.
4        A.   Same thing.  In other words, it could be any
5    -- it could be any of those things.  It could be just --
6    these numbers are not precise measurements.  They are
7    variable depending on the test.  Patient -- it's a
8    work-based test.  And normally -- you ever had a stress
9    test?  It's not fun.  They scream at you.  You got to go
10   far and fast.
11       And so you don't go necessarily as far or as
12   fast every time you take the test, just because of how
13   you feel, time of day.  It could be anything.  Okay.
14   And so there's going to be variability in ejection
15   fraction.
16       Q.   Just so the record is clear, plaintiff's
17   counsel has left the room and indicated that we should
18   proceed.  I just -- if that's what plaintiff's counsel
19   wants us to do, and the witness is -- also agrees that
20   that's what he would like us to do, then we will.  But I
21   just -- it's not my standard practice to proceed with an
22   expert deposition without opposing counsel present for
23   my questioning.
24       A.   Go right ahead.  You have met Mr. McClain.  It
25   would be my preference to do it without him all the

Page 209

1    time.  Go a lot faster.  And he's back anyway.
2        Q.   I am looking now --
3        MR. MCCLAIN:  Did I miss anything?
4        THE WITNESS:  Yeah.  He didn't want to go
5    ahead without you, but I said it was okay because it
6    goes faster when you are not here.
7        MR. MCCLAIN:  Yeah.  A lot of times it's not
8    necessary.
9        A.   Got an idea how much more you got there?
10   Hour?  Two hours?
11       Q.   (By Mr. Boehm)  We're making pretty good
12   progress now.
13       A.   I know, but I am looking for a time.  Don't
14   worry.  I am here for seven hours.  You are not
15   committed.
16       Q.   I, I don't know.  The next break I'll be happy
17   to give you some -- my best estimate.
18       A.   Okay.
19       Q.   But it really depends in part on the answers
20   too.
21       A.   Okay.  So we'll take a break now then.
22       Q.   Okay.  Sure, that's fine.
23       THE VIDEOGRAPHER:  Going off the record.  The
24   time is 4:18 p.m.
25       (Recess from 4:18 p.m. to 4:41 p.m.)

53  (Pages 206 to 209)

David Egilman, M.D.

1      (Deposition Exhibit No. 10 was marked.)
2      THE VIDEOGRAPHER:  Going back on the record.
3   The time is 4:41 p.m.
4      Q.  (By Mr. Boehm) Dr. Egilman, you have in front
5   you Exhibit 10 to this deposition.  It's a November
6   27th, 2000, letter on the subject of the exercise echo
7   report that we just reviewed and that was marked as
8   Exhibit 9.  Do you see that?
9      A.  Yes.
10     Q.  Have you reviewed this letter before?
11     A.  Yes.
12     Q.  Do you see on the second page of Exhibit 10
13  Dr. Rosamond writes -- I am sorry.  Let's actually
14  start, if you would, Dr. Egilman, at the very bottom of
15  the first page.  He writes, "Indeed the overall
16  assessment of the study was that it was a normal stress
17  echo without evidence of ischemia."  See that?
18     A.  You read that sentence correctly.
19     Q.  And if you flip over to the next page,
20  Dr. Rosamond references the approximately six months
21  that had passed since Ms. Levitt's bypass surgery.  And
22  he writes, "Her symptoms are somewhat atypical, and I
23  suspect that they are not angina in character."  Do you
24  see that?
25     A.  You read that sentence correctly.

1      Q.  Do you agree with that assessment by
2   Dr. Rosamond?  Actually, let me make it easier on you
3   possibly.
4      Are you expressing any opinions in this case
5   on the subject of whether or not Dr. Rosamond's
6   assessment, as recorded in this letter, is accurate or
7   inaccurate?
8      A.  I have to read it to know.  I agree with his
9   assessment of her cardiac status with respect to the
10  functioning of her heart and vessels.
11     Q.  Okay.  Let's go back then to the sentence that
12  I read to you, which is on the second page of the
13  letter, where it says, "Her symptoms are somewhat
14  atypical, and I suspect they are not angina in
15  character."  Do you agree with that statement by
16  Dr. Rosamond?
17     A.  Yes.
18     Q.  He goes on to say, "Indeed I suspect that
19  Dr. Vacek was right in July that her symptoms are more
20  likely to be nonspecific musculoskeletal complaints or
21  perhaps panic anxiety episodes."  Do you see that?
22     A.  Yes.
23     Q.  Do you agree with that?
24     A.  No.
25     Q.  You disagree with that statement from

1   Dr. Rosamond?
2      A.  Yes.  I agree that that's part of the
3   differential diagnosis.
4      Q.  Why do you disagree with Dr. Rosamond and
5   Dr. Vacek that Ms. Levitt's symptoms in July were more
6   likely to be nonspecific musculoskeletal complaints or
7   perhaps panic anxiety episodes?
8      A.  No ep -- no evidence that she has panic
9   anxiety episodes from the psychiatrist's perspective or
10  from her medical records or from my interview.  There is
11  no episode that she has -- no evidence from her exams or
12  my exam that she had nonspecific musculoskeletal
13  complaints.
14     In addition he writes, which could explain
15  those symptoms, "She has had a long road with this
16  problem over the past year.  And I am sure she is under
17  considerable stress."
18     I agree with that.  That's objective, more or
19  less.  And that stress was related to the fact that she
20  had the coronary symptoms, stents, etc.  So I think that
21  her symptoms that he is describing are more likely
22  related to what he notes in that sentence than to the
23  differential diagnosis without evidence provided above.
24     Q.  Your meeting with Ms. Levitt was in 2013
25  correct?

1      A.  Correct.
2      Q.  You didn't meet with her in or around November
3   2000, correct?
4      A.  Correct.
5      Q.  You didn't meet with her in or around July of
6   2000?
7      A.  Correct.
8      Q.  Is your assessment of Ms.  -- do you -- let me
9   strike that and start over.  When you indicated that
10  your opinion with respect to Dr. Rosemond's statement in
11  this November 2000 letter was in part informed by your
12  meeting about Ms. Levitt 2013, could you help me
13  understand what you meant by that?
14     A.  Sure.  I went over her whole history,
15  including this time period with her, and with respect
16  to -- that answered the question.
17     Are we done with this one?
18     Q.  Not quite.  You -- you read on from where we
19  left off, Dr. Egilman.  But you didn't quite get to the
20  sentence where Dr. Rosamond wrote, "But it appears that
21  from a cardiac standpoint her bypass conduits remain
22  patent and her ejection fraction is well maintained."
23     Do you see that?
24     A.  I do.
25     Q.  You agree with that, correct?

Page 214

1    A.  Yes.
2    Q.  And he writes, "I don't have any evidence for
3  a post pericardiectomy syndrome.  And I will plan to
4  continue her current medical regimen."  See that?
5    A.  Yes.
6    Q.  Is there anything that you disagree with in
7  that statement?
8    A.  No.  The only thing left is sincerely yours so
9  I think we're done.
10       (Deposition Exhibit No. 11 was marked.)
11    Q.  (By Mr. Boehm)  Dr. Egilman, you have in front
12  you a document marked as Exhibit 11, which is a report
13  of nuclear stress testing performed on Mrs. -- I'm
14  sorry, on Ms. Levitt in November 2007.  Can you see
15  that?
16    A.  I do.
17    Q.  Is this a document that you have reviewed
18  before?
19    A.  Yes.  I think.  On all these documents, I
20  don't have specific recollection.  I haven't seen the
21  document.  But I reviewed all the medical records.  I
22  think these are probably all summarized in my report,
23  which means I have seen them before.
24    Q.  If you look about a third of the way down the
25  page, under the header examination, the second sentence

Page 215

1  states, "Patient walked on the treadmill for seven
2  minutes 40 seconds and achieved 10.1 MET's."
3    A.  Correct.
4    Q.  You see that?
5    A.  You read that correctly.
6    Q.  What is your interpretation, if any, of the
7  fact that Ms. Levitt in November 2007 underwent nuclear
8  stress testing which revealed that she was able to walk
9  on the treadmill for 7 minutes 40 seconds and achieve
10  10.1 MET's?
11    A.  Compared to age and gender-matched controls,
12  she had good activity tolerance.
13    Q.  Do you agree that whatever cardiovascular
14  events Ms. Levitt experienced in 2000, there is not
15  evidence that those events caused a lasting effect on
16  her cardiovascular health?
17    A.  Well, as of this -- as of the date of this
18  test, that's correct.
19    Q.  Do you --
20    A.  Let me just correct that.
21    Q.  Sorry, go ahead.
22    A.  As of the date of this test, from a
23  measurement of her physiologic function, of her
24  cardiovascular system, that is correct.  I still think
25  she has underlying atherosclerosis.

Page 216

1    Q.  Do you know when Ms. Levitt first developed
2  atherosclerosis in her life?
3    A.  No.
4    Q.  Do you agree that it's more likely than not
5  that Ms. Levitt had atherosclerosis well before she ever
6  took Vioxx?
7    A.  Sure.
8    Q.  Do you know if Ms. Levitt has underwent any
9  nuclear stress testing, angiograms, stress MRIs, since
10  November 2007?
11    A.  I don't recall.
12    Q.  So as you sit here today, to the extent there
13  are any such tests, you are not expressing any opinions
14  about those tests in this matter; is that correct?
15       MR. MCCLAIN:  How could he?
16    A.  No.  It's to the extent that I don't recall.
17  I'd have to check my report.  If it's nothing in my
18  report, the answer is yes.  Okay.  If there's something
19  else in my report or any other tests or any other tests
20  that I have seen, the answer might be no.  I don't know
21  what the answer would be.
22    Q.  (By Mr. Boehm)  Okay.  I'll -- let's go ahead
23  and just take a minute.  You can look at your report and
24  see if you, in fact, intend to offer opinions about any
25  cardiovascular testing that postdate November 2007.

Page 217

1    A.  What month was that in 2007?  November?
2    Q.  Exhibit 11 is dated November 28th, 2007.
3    A.  I see that, uh-huh.  I have no other tests in
4  my report.
5    Q.  And as a result, you do not intend to be
6  offering opinions about any additional cardiovascular
7  testing or assessment of Ms. Levitt that postdates
8  November 28th, 2007, for purposes of your opinions in
9  this case, correct?
10    A.  Unless they exist and I haven't seen them.
11    Q.  Dr. Egilman, you are not, as I understand it,
12  a board certified psychiatrist, correct?
13    A.  Correct.
14    Q.  Have you ever performed any original research
15  in the area of psychiatry?
16    A.  No.
17    Q.  Do you consider yourself to be an expert in
18  the field of psychiatry?
19    A.  Yes.
20    Q.  Is -- and what is the basis for your opinion
21  that you are an expert in the field of psychiatry?
22    A.  Well, we can start with my understanding of
23  the definition of expert.
24    Q.  What is your definition of the word "expert"?
25    A.  Knows more than the layman.  Okay.  And do you

David Egilman, M.D.

Page 218

1  want me to give you more?
2     Q.  Sure.
3     A.  Okay.  Well, I had psychiatric training in
4  medical school and in my residency, and that's in my
5  residency in internal medicine.  I also practiced
6  medicine for a considerable length of time, and I
7  treated a lot of patients for psychiatric illness.
8         And always psychiatry, psychiatric illness,
9  and emotional response to disease is always a part of
10  every patient that I saw, was always part of my
11  interview of every patient that I saw, was part of my
12  history of every patient that I saw.
13         And when interventions were required, medical
14  interventions or others, I either provided them myself
15  or coordinated care for the patient.  Most patients who
16  have psychiatric disease do not see psychiatrists for
17  any number of reasons.  Most see primary care doctors
18  like myself.
19     Q.  Are you done?
20     A.  Done.
21     Q.  Have you ever been accepted as an expert in
22  the field of psychiatry by any federal or state court
23  judge in a litigation matter?
24     A.  Well, I have certainly testified about death
25  and dying and the emotional impact of death and dying in

Page 219

1  many cases.  And some people would consider that to be
2  psychiatric diseases.  I have certainly testified about
3  emotional components to diseases.  I'll probably -- in
4  every case I have ever testified in.
5         I don't think I have ever been challenged on
6  that issue, ability to give that testimony.  And there
7  may have been some objections overruled on the death and
8  dying issue.  Some of those are legal.  That is, if you
9  die, you don't get pain and suffering in some states.
10  But I think I still talked about pain and suffering with
11  respect to loss of consortium and other things.  So I
12  have done a lot, probably every case I have testified.
13     Q.  Now, you indicated that you talked about death
14  and dying.  Was it your understanding that you were
15  being presented to the court as an expert in psychiatry
16  in those cases where you talked about death and dying?
17     A.  No.  I was giving you as an example.  I have
18  also testified about other emotional components of
19  diseases.  I thought that was clear in the previous
20  answer.
21     Q.  Okay.  In those -- on those occasions when you
22  have given testimony related to the emotional impact of
23  various diseases, was it your understanding that you
24  were being presented to the court as an expert in
25  psychiatry?

Page 220

1     A.  Well, I certainly think that an objection
2  could have been made that my testimony required
3  psychiatric expertise.  I don't recall specifically that
4  objection ever being made.  But certainly, the opinions
5  I gave certainly related to psychiatry.
6         I talked about people being depressed.  I
7  talked about them crying.  I talked about the emotional
8  impact of the disease and their relationships with other
9  people.  I talked about the symptoms of depression.
10         I mean, all these things I talked about, they
11  are part of general practice of family medicine,
12  internal medicine, every medicine.  So I don't recall
13  anybody objecting to my expertise.  So I can't say that
14  there's an order on there saying I can give the
15  testimony.
16     Q.  Do you have a degree in psychology?
17     A.  No.
18     Q.  Do you consider yourself a specialist in the
19  field of psychology?
20     A.  By the definition of knowing more than a
21  layman, probably, yes.
22     Q.  Well, that's a standard that I am not sure
23  quite what that means.  Do you consider yourself a
24  specialist, is what I am asking you, in the field?  I am
25  not asking you whether you might know something and

Page 221

1  something more than some random person on the street.
2         My question is, do you consider yourself a
3  specialist in the area of psychology?  If you do, that's
4  fine.
5     A.  I don't think there's a board certification.
6  I'm not sure what the board -- I mean, what do you mean?
7  I don't only deal with psychological issues.
8     Q.  You don't specialize in psychological issues,
9  correct?
10     A.  I don't only deal in psychological issues as a
11  unique, single field.  I certainly deal with
12  psychological issues as I see patients in my regular
13  practice of medicine and have historically, and I am
14  familiar with this -- that literature.
15     Q.  You don't specialize in the field of
16  psychology, correct?
17     A.  I don't only practice psychology as a unique
18  field where that's all I do.
19     Q.  When you say you don't only practice
20  psychology, you are not a psychologist, correct?
21     A.  I am not a -- I am not a Ph.D. psychologist,
22  that's correct, or a master psychologist.
23     Q.  Let me just ask you, for purposes of the
24  opinions that you are offering in this case, are you
25  claiming to be a specialist on the subjects of

56  (Pages 218 to 221)

David Egilman, M.D.

Page 222

1  psychiatric or psychological disorders?
2      A.  Well, for the purpose of the opinions I am
3  offering in this case, I am offering opinions that
4  relate to the psychological impact of coronary artery
5  disease and CABG on a patient.  And I gave you about
6  three pounds of literature on that.  And my report deals
7  with that, so that's what I am doing in this case.
8      Q.  When you refer to the three pounds of
9  literature that you have provided to us on the subject
10  of psychological impact of cardiovascular events, are
11  you referring to this folder you have titled Depression
12  and CABG which we marked as Exhibit 3?
13      A.  Yes.  You think it weighs less or more than
14  three pounds?
15      Q.  More for sure.
16      A.  Okay.  Well, I underestimated.  I tend to
17  underestimate weight.  Probably obvious why I want to do
18  that.
19          MR. MCCLAIN:  It's a defense mechanism.
20      Q.  (By Mr. Boehm)  Do you consider yourself to be
21  an expert in bulimia?
22          MR. MCCLAIN:  Bulimia?
23      A.  She had bulimia.
24          MR. MCCLAIN:  I know that, but why?  Is there
25  a specialty in bulimia?  Just news to me.  Expert in

Page 223

1  bulimia.
2      A.  I certainly read a lot of literature about
3  bulimia.  I have treated bulimic patients.
4          MR. BOEHM:  Would you just read back my
5  question.
6          (Record read back.)
7      A.  Okay.  Well, I answered that question.
8      Q.  I didn't ask you -- oh, whoa.  Are we being
9  kicked out?  Let's go off the record.
10          THE VIDEOGRAPHER:  Going off the record.  The
11  time is 5:03 p.m.
12          (Discussion off the record.)
13          THE VIDEOGRAPHER:  Going back on the record
14  the time is 5:04 p.m.
15      Q.  (By Mr. Boehm)  Dr. Egilman, you told me that
16  you have treated patients who -- in your life who have
17  had bulimia.  My question is different.  I am asking
18  whether or not you consider yourself to be an expert on
19  the subject of bulimia.
20      A.  Well, I don't think nonexperts treat people
21  for bulimia.  I think -- I gave you the -- we need to --
22  it's always -- as we have interact on this expert
23  question, we have had -- we don't have a consensus on a
24  definition.  So I thought I would explain what I do.
25  And then it could be in the eye of the beholder.

Page 224

1      If you disagree that my experience and patient
2  care does not indicate expertise, then that's your
3  opinion.  Okay.  And then my opinion would be it does.
4      Q.  The ex -- I'm sorry.  Were you done?
5      A.  That's no problem.  Then the judge will have
6  his opinion if we make a motion, so we'll get at least
7  three opinions.
8      Q.  Okay.  And again, the standard that you are
9  applying when you're asked questions about whether you
10  are an expert is that you know some -- something more
11  than a lay person, correct?
12      A.  No.  That's the legal standard as I understand
13  it.  Okay.  I am -- I am willing to take any definition
14  you want to give me.  Okay.  But you didn't -- you
15  didn't give me a definition.  Okay.  I started with that
16  definition.  Okay.  And then it turns out the definition
17  of expert is nontrivial.
18      And so I'll take whatever -- however you want
19  to frame the definition of expert, I'll be glad to
20  accept that definition and answer appropriately.
21      Q.  You indicated that you have treated patients
22  who have bulimia.  Did I understand that correctly?
23      A.  Correct.
24      Q.  On those occasions when you have treated
25  patients who have had bulimia, have you been the

Page 225

1  physician primarily in charge of treating the
2  psychiatric condition of bulimia?  Or have you referred
3  those patients for more specialized psychiatric
4  treatment?
5      A.  Or both.
6      Q.  Both?
7      A.  Both have happened.
8      Q.  You have your realtime in front of you, much
9  to my chagrin and much to the delay of our deposition,
10  so you can look back to my question.  But I don't think
11  both would be an answer that's possible based on how I
12  framed it.  I am happy to ask you again if you want me
13  to.
14      A.  The question is, have you been the physician
15  primarily in charge of treating the psychiatric
16  condition of bulimia, or have you referred those
17  patients for more specialized psychiatric treatment.
18  Both.
19      Q.  Okay.  So your, your --
20      A.  Both have occurred.
21      Q.  Sorry.  You're testifying that you --
22      A.  There were two questions there.
23      Q.  Is it your testimony today that you have been
24  the physician primarily responsible for the care and
25  treatment of a patient's psychiatric condition of

David Egilman, M.D.

Page 226

1  bulimia?
2      A.  Yes.  In some cases.  The -- for example, now,
3  I am not sure if there are cases of bulimia where they
4  never saw a psychiatrist and only saw me.  That may have
5  occurred.  You know, it's a range of bulimia.  It's not
6  everybody is 42 pounds.  Okay.
7          So you know, 42 pounds, I would send to a
8  psychiatric hospital.  Okay.  But the 160 pounders who
9  potentially vomit, I wouldn't send -- who weighed -- who
10  are, you know, five foot five, I wouldn't necessarily
11  send them right away to a psychiatrist.  I would try to
12  work with them myself first.  And if it was working,
13  then I would have treated them.
14          There are others who have seen psychiatrists
15  and then I picked up their care when they were more or
16  less stable.  I might maintain their drugs, and so I
17  might treat them most of the year.  Some of them might
18  have seen a psychiatrist once a year, you know, the way
19  I might treat a diabetic, okay.  All year long, and they
20  might see a specialist once.  All right.  But I am doing
21  the primary treatment.  Okay.  So that's what would
22  happen.
23      Q.  Have you ever done any original research in
24  the area of sleep disorders?
25      A.  No.

Page 227

1      Q.  Do you agree that bulimia is associated with a
2  large number of serious psychiatric disorders?
3      A.  In general, yes.  Not always.
4      Q.  Do you agree that in the case of Ms. Levitt,
5  her bulimia was associated with other psychiatric
6  disorders?
7      A.  Well, she had other psychiatric disorders, and
8  she had bulimia.  So she had both.  "Associated with"
9  kind of gets into kind of a parsing of the causal
10  relationship.  In other words, was the bulimia secondary
11  to her depression or was it an independent entity?  And
12  I haven't parsed that.
13      Q.  Dr. Egilman, are you expressing an opinion in
14  this matter to a reasonable degree of medical certainty
15  that Ms. Levitt's use of Vioxx directly caused her to
16  suffer cognitive dysfunction?
17      A.  Oh, I -- I think it's more likely than not
18  that it did.
19          MR. BOEHM:  Can you read back my question.
20  need you to answer the question I asked.
21          (Record read back.)
22      A.  Caused or contributed to, yes.
23      Q.  (By Mr. Boehm)  Okay.  So it's your opinion in
24  this matter -- okay.  We're going to go all seven hours.
25      A.  What?

Page 228

1      Q.  It's your opinion in this matter that Vioxx,
2  to a reasonable degree of medical certainty, caused
3  Ms. Levitt to directly suffer cognitive dysfunction?
4      A.  Caused or contributed to.
5      Q.  Okay.  So we are going to have to talk about
6  that.
7          MR. MCCLAIN:  We don't have to.
8          MR. BOEHM:  I know, but we certainly do.
9          MR. MCCLAIN:  It's up to you.
10      A.  You got about an hour left.
11      Q.  (By Mr. Boehm)  Where in your report do you
12  specifically state that it is your opinion that
13  Ms. Levitt's use of Vioxx directly caused or contributed
14  to her cognitive dysfunction, as you describe it?
15      A.  Well, I must review the 078 results, right?
16  And I reviewed Ainsen's, Ainsen's paper as I recall.  So
17  I think I -- I'm sure I reviewed the fact that the
18  Alzheimer's trials -- the Alzheimer's 078 trial showed
19  that there's a statistically significant causal
20  relationship between taking Vioxx and cognitive
21  dysfunction, but specifically progression to Alzheimer's
22  disease from dementia.  And then there's an Ainsen paper
23  that I think I cited that was cognitive dysfunction in
24  Vioxx.
25      Q.  When do you believe Ms. Levitt began to suffer

Page 229

1  cognitive dysfunction?
2      A.  I don't have a time.  She expressed -- I think
3  we read this.  I read part of this into the -- into the
4  record where she was -- after she had her procedures,
5  her memory was not as good as it was.  And for that
6  reason, she -- that contributed to her losing the
7  business.  I think I read that in.
8          I don't recall a specific date.  But it was
9  after the -- after this year of cardiac treatments and
10  events.
11      Q.  Tell me roughly when in your opinion, if you
12  can, you believe Ms. Levitt began to suffer cognitive
13  dysfunction.
14      A.  I don't have a time -- a date.  I told you.  I
15  mean, I just -- I read it into the record before again.
16  Do you want me to look through all the records?  It's
17  the first time that she started to express difficulty
18  with memory.  Let me see what I got in my record.  So
19  after her CABG.
20      Q.  Is it your opinion that immediately after
21  Ms. Levitt's CABG, she began to experience cognitive
22  dysfunction?
23      A.  That's what I have for the history.  Not
24  immediately but at some point in time after that.  I
25  don't have a date, and I don't think I could get a date,

58  (Pages 226 to 229)

David Egilman, M.D.

| Page 230 | Page 232 |
|---|---|

**Page 230**

1  and I don't think there is a date. It's an insidious
2  process.
3      Q.  Are you expressing an opinion in this case, to
4  a reasonable degree of medical certainty, as to when in
5  your opinion Ms. Levitt began to suffer symptoms of
6  cognitive dysfunction?
7      A.  Only generally after the CABG. I don't have a
8  day or a month.
9      Q.  Or a year?
10     A.  No. I think it's within the year after, as I
11 recall. It's, it's sometime around when she had the
12 CABG after the CABG.
13     Q.  So --
14     A.  Within that year I think, as I recall.
15     Q.  And what specifically are you relying on from
16 the factual record in this case for your opinion to a
17 reasonable degree of medical certainty that Ms. Levitt
18 began to experience symptoms of cognitive dysfunction in
19 the year 2000?
20     A.  Okay. That's just the cognitive dysfunction
21 part. That's the symptoms that she described with her
22 inability to remember things that I got from my history
23 from her, and that was a continuing problem afterwards.
24 The psychiatrist documents those things as well.
25     Q.  Are you done?

**Page 231**

1      A.  Yeah.
2      Q.  So you first indicated that that is in part
3  based on your interview with Ms. Levitt in 2014,
4  correct?
5      A.  Correct.
6      Q.  Okay. And then secondly, you indicated that
7  you have seen psychiatric records that indicate that she
8  began to experience cognitive dysfunction in the year
9  2000?
10     A.  Or the deposition. That's my recollection.
11 Sometime. I'm not sure of the dates, but I think around
12 that time.
13     Q.  Can you -- can you show me what medical
14 records you are referring to that you believe establish
15 that Ms. Levitt began to experience cognitive function
16 in 2000?
17         MR. MCCLAIN: Cognitive dysfunction. Is that
18 your question?
19         MR. BOEHM: Yeah. Did I misspeak?
20         MR. MCCLAIN: I thought you said cognitive
21 function.
22         MR. BOEHM: I can restate it.
23         MR. MCCLAIN: No. That's -- I made the
24 correction for you. Move along.
25     A.  Let's see. My date is 8-28-2000. So I am

**Page 232**

1  sorry, 5-28-2000. So I need to -- this is where I put
2  some of my history in, in combination to -- with what
3  was in the medical record. So I need to see the medical
4  record from 5-28-2000.
5      Q.  (By Mr. Boehm) That's my question for you. I
6  am not asking about things that you believe you have
7  learned from your conversation with Ms. Levitt, you
8  know, 13 years or 14 years later.
9          I am asking you if it's your opinion that are
10 psychiatric records from 2000 that establish to a
11 reasonable degree of medical certainty or even suggest
12 that she has experienced cognitive dysfunction.
13     A.  Right. That's why I am asking to see that
14 record, 5-28-2000.
15     Q.  So as you sit here today, you can't tell me
16 one way or another whether that record in fact indicates
17 that that psychiatric record from May 28, 2000,
18 indicates that Ms. Levitt was experiencing cardiac --
19 I'm sorry, cognitive dysfunction, correct?
20     A.  Yeah. I need to look at it.
21     Q.  This is one of the entries in the summary of
22 Ms. Levitt's medical records where you inserted your own
23 commentary, correct?
24     A.  Correct.
25     Q.  Any other psychiatric records? I shouldn't

**Page 233**

1  say any other. Are there any psychiatric records that
2  you can point to?
3      A.  I don't think that was a psychiatric record.
4  You didn't ask for psychiatric records. I mean, I don't
5  have these segregated out.
6      Q.  I had asked for psychiatric records,
7  Dr. Egilman, because you indicated you were relying on
8  psychiatric records from that time period for purposes
9  of your opinion that Vioxx use had in some way
10 contributed to Ms. Levitt's supposed cognitive
11 dysfunction. That's why I am referring to psychiatric
12 records.
13     A.  Hang on.
14         MR. BOEHM: The record should reflect that
15 Dr. Egilman is scanning up his Live Note feed so that he
16 can review something from earlier in today's deposition.
17         MR. MCCLAIN: Is that a problem?
18         MR. BOEHM: I think it's a problem, yes. And
19 I know of at least one court who has agreed with me
20 expressly with respect to Dr. Egilman's use of Live Note
21 at deposition.
22         MR. MCCLAIN: I am unaware of it.
23         THE WITNESS: So am I.
24         MR. BOEHM: Well, it's true.
25         MR. MCCLAIN: So you are just trying to set

Page 234

1  him up in other words.  That's part of the strategy.
2      MR. BOEHM:  You can characterize it however
3  you want.
4      MR. MCCLAIN:  Set him up on Live Note.
5      MR. BOEHM:  I am not interested in engaging
6  with you right now.
7      MR. MCCLAIN:  I am just interested in getting
8  done with this foolishness.  What a waste of a day.
9      MR. BOEHM:  You have proven yourself to, to
10 not be able to conduct yourself with common courtesy
11 that should come naturally --
12     MR. MCCLAIN:  That's not true.
13     MR. BOEHM:  -- in this profession.
14     MR. MCCLAIN:  Probably sum total of five
15 comments I have made all day.  I am just telling you
16 just as a matter of professional development that you
17 have really not used your time very well.
18     MR. BOEHM:  I think the record -- I think the
19 record will speak for itself on that.
20     MR. MCCLAIN:  I do too.  I doubt there's five
21 questions in this whole thing today that can be used at
22 trial.  Five.  That's being generous.
23     A.  Okay.  I don't have them segregated out.  So
24 unless you want to show me the psychiatric records
25 separately, I can't do it from memory.

Page 235

1      Q.  (By Mr. Boehm)  And you don't specifically
2  identify any psychiatric records in your report that you
3  believe show that she was having cognitive dysfunction
4  in 2000, correct?
5      A.  I don't know.  I'd have to read the entire
6  report.  You want me to do that?
7      Q.  You'd have to read the entire report in order
8  to answer that question?
9      A.  Right, because I haven't memorized the report.
10     Q.  Well, the question wasn't as to --
11     A.  It's two years old, the report.  Okay.  So you
12 know, there is -- so yeah.  I haven't memorized it.
13     Q.  Okay.  With respect to data you identified as
14 Alzheimer studies, correct?
15     A.  Correct.
16     Q.  Do you know in what patients the Alzheimer
17 studies were conducted?
18     A.  Patients with cognitive defects to start.
19     Q.  These are patients who already had cognitive
20 dysfunction or dementia, correct?
21     A.  Some, yes.
22     Q.  Do you know if Ms. Levitt already -- when you
23 say some, is it your opinion that the Alzheimer's
24 studies included patients who did not have any cognitive
25 dysfunction?

Page 236

1      A.  No.  You said cognitive dysfunction and
2  dementia.  They were not all demented.  Some had -- some
3  had cognitive dysfunction.
4      Q.  Is it your opinion that Ms. Levitt had
5  preexisting cognitive dysfunction prior to her use of
6  Vioxx?
7      A.  No.
8      Q.  Other than the Alzheimer studies, are you
9  aware of any other clinical trial data that in your
10 opinion establish to a medical degree -- to a reasonable
11 degree of medical certainty that Ms. Levitt experienced
12 cognitive dysfunction as a result of her use of Vioxx?
13     A.  I don't understand that question.
14     Q.  Setting aside the Alzheimer's data, are you
15 expressing an opinion in this case that there is other
16 randomized controlled trial data that you believe
17 supports the idea that Ms. Levitt's use of Vioxx caused
18 or contributed to cognitive dysfunction in 2000?
19     A.  Not of Vioxx.
20     Q.  Not Vioxx data?
21     A.  There's no other Vioxx data.  That was the
22 Vioxx study.
23     Q.  So it's only that study that you are looking
24 to?
25     A.  That's the only study that looked at the issue

Page 237

1  on Vioxx.
2      Q.  What is -- do you have an opinion in this case
3  as to the degree of Ms. Levitt's cognitive dysfunction
4  as of today?
5      A.  No.  I haven't seen recent testing.
6      Q.  When is -- what is the last recent testing you
7  have seen of Ms. Levitt's cognitive function?
8      A.  I don't recall.
9      Q.  What specific testing of Ms. Levitt's
10 cognitive function have you seen?
11     A.  I don't recall seeing any.
12     Q.  Do you know if Ms. Levitt has ever underwent
13 testing of cognitive function?
14     A.  No.
15     Q.  So when you offer opinions in this matter as
16 to Ms. Levitt's cognitive function, you are relying on
17 things that she has told you about her cognitive
18 function, correct?
19     A.  And, and things that are from her husband and
20 from her coworkers.
21     Q.  Okay.
22     A.  Things in the depositions taken in this case.
23     Q.  Anything else?
24     A.  No.
25     Q.  As of your last conversation with Ms. Levitt,

60  (Pages 234 to 237)

David Egilman, M.D.

Page 238

1   did you develop an opinion about the degree of severity
2   of Ms. Levitt's alleged, by you at least, cognitive
3   dysfunction?
4       A.   Yes.
5       Q.   Would you please describe for us what you
6   believe Ms. Levitt's degree of cognitive dysfunction to
7   have been as of your last communications with her?
8       A.   Well, functionally, it, it made her unable to
9   run her business.
10      Q.   Anything else?
11      A.   No.
12      Q.   Setting aside Ms. Levitt's ability or
13  inability to run her business, are there any other
14  effects of her cognitive dysfunction that you are
15  offering as an opinion in this matter?
16      A.   No.  That's the only one that I can think of
17  that I might offer at trial.
18      Q.   To what ex -- did you perform a differential
19  diagnosis of Ms. Levitt's cognitive dysfunction?
20      A.   Only as it was included in the -- in the
21  differential diagnosis of her depression, which
22  cognitive dysfunction can be a symptom of.
23      Q.   Do you believe with respect to Ms. Levitt that
24  her cognitive dysfunction is a symptom of her
25  depression?

Page 239

1       A.   I think -- I think her depression probably
2   contributes to a cognitive dysfunction.  I don't think
3   it can be tweezed out, so I think that they are related.
4       Q.   Do you think that Ms. Levitt's cognitive
5   dysfunction is something more than just a symptom of her
6   depression?
7       A.   Yes.  I think the Vioxx contributed as well.
8       Q.   Okay.  To the extent you are offering the
9   opinion that Ms. Levitt has suffered from cognitive
10  dysfunction independent from her depression, have you
11  performed a differential diagnosis of that cognitive
12  dysfunction?
13      A.   The differential diagnosis for the depression
14  would cover cognitive dysfunction, so yes.
15      Q.   So that doesn't make any sense.
16      A.   The same differential diagnosis.  The same
17  things that can cause depression can cause cognitive
18  disfunction.
19      Q.   Okay.  So your opinion in this case is that
20  the risk factors and causes of depression are the very
21  same things?
22      A.   They are largely --
23      Q.   Hold on.  I am not done.  Are the very same
24  things as for cognitive dysfunction?  Is that your
25  testimony?

Page 240

1       A.   They largely overlap.  That's right.
2       Q.   I didn't ask you if they largely overlapped.
3       A.   Well, there is no very same things.  They are
4   not identical.  Okay.  I am sure you could get
5   differential diagnoses, multiple differential diagnosis
6   just if you looked up cognitive dysfunction in different
7   textbooks, etc.  So what I am saying is that the -- they
8   overlap.
9       Q.   Did you perform a differential diagnosis
10  specific to Ms. Levitt's alleged cognitive dysfunction?
11      A.   No, not apart from the differential diagnosis
12  for her depression.
13      Q.   And the differential diagnosis for
14  Ms. Levitt's depression that you refer to is on pages 53
15  and 54 of your expert report.
16      A.   And 55.
17      Q.   And carries over to page 55; is that correct?
18      A.   Yes.
19      Q.   You specifically identify five factors for
20  purposes of your differential diagnosis for depression,
21  correct?
22      A.   No.
23      Q.   Well, I am looking at pages 53 and 54 where
24  you write, "The differential diagnosis for depression
25  includes,' and then you identify five things.

Page 241

1       A.   Yes, and each of those things has multiple
2   subthings which are subsequently evaluated and listed on
3   pages 54 and 55.
4       Q.   Okay.  And we'll get to that but you --
5       A.   Well, I mean, you can get to that whenever you
6   want.  But when you say, I only identified five things,
7   that's five things.  There's three pages of things.
8   Okay, not five things.
9       Q.   Did you write this report?
10      A.   Yes.
11      Q.   Did you put the numbers one, two, three, four,
12  five next to the factors that you put under differential
13  diagnosis for depression?
14      A.   I did.
15      Q.   Okay.  And then you go on to discuss each of
16  those five things, correct?
17      A.   That's correct.  Why don't we go off the
18  record and take a break.
19      Q.   Sure.
20          THE VIDEOGRAPHER:  Going off the record.  The
21  time is 5:33 p.m.
22          (Recess from 5:33 p.m. to 5:42 p.m.)
23          THE VIDEOGRAPHER:  Going back on the record.
24  This is beginning of Tape 5.  The time is 5:42 p.m.
25      Q.   (By Mr. Boehm) Dr. Egilman, what is the

61  (Pages 238 to 241)

David Egilman, M.D.

Page 242

1  source for the five factors you have identified in your
2  depression differential diagnosis on pages 53 and
3  carrying over to the top of page 54?
4      A.  I don't know.
5      Q.  You don't know where you got that?
6      A.  Medical school, books, articles, Merck manual.
7  I like to use the Merck manual, you know.
8      Q.  You use --
9      A.  Excuse me.  Yeah, hi, Joe.  I'm in the middle
10  of a deposition.  No.  No, what do you want?  What's
11  going on?  Shall -- we should go off the record for this
12  phone call.
13          COURT REPORTER:  Okay.
14          THE VIDEOGRAPHER:  Going off the record.  The
15  time is 5:43 p.m.
16          (Discussion off the record.)
17          THE VIDEOGRAPHER:  Going back on the record.
18  The time is 5:44 p.m.
19          THE WITNESS:  Let me just put on the record
20  that the rest of the answer to the previous question was
21  me taking a phone call.  That's after Merck, after --
22  starting with "excuse me."
23      Q.  (By Mr. Boehm)  Were your otherwise finished
24  with your answer?
25      A.  I was.

Page 243

1      Q.  Do you hold an opinion to a reasonable degree
2  of medical certainty as to whether or not Ms. Levitt
3  suffers from depression?
4      A.  Yes.
5      Q.  Is your opinion that she in fact does suffer
6  from depression?
7      A.  Yes.
8      Q.  What is your opinion, if any, as to how long
9  Ms. Levitt has suffered from depression?
10      A.  She certainly had it long before she had her
11  Vioxx.
12      Q.  Do you know how long before she ever took
13  Vioxx Ms. Levitt suffered from depression?
14      A.  I don't recall how many years.
15      Q.  Is it fair to say that Ms. Levitt has suffered
16  from depression for her entire adult life?
17      A.  I don't know.
18      Q.  In any of the other cases where you have
19  served as an expert for plaintiffs in Vioxx-related
20  matters, have you offered opinions about a plaintiff
21  suffering from depression, or is this the first time you
22  have done that?
23      A.  Oh, I'm sure I have done that many times.  And
24  it's not for plaintiffs.  It's at the request of
25  plaintiffs.

Page 244

1      Q.  You have done that many times, you say?
2      A.  Yes.  At the request of plaintiffs.
3      Q.  You say at the bottom of page 55 of your
4  report, "Post stent and CABG depression is well
5  recognized."
6      A.  Yes.
7      Q.  You see that?
8      A.  Yes.
9      Q.  You don't offer any citations in support of
10  that statement, correct?
11      A.  Not there, but you have a pile in front of you
12  now.
13      Q.  That's the pile that you provided to us for
14  the first time this morning, correct?
15      A.  That's when I gave it to you.  That's right.
16      Q.  Did you provide this pile to plaintiff's
17  lawyers before today?
18      A.  It's possible.
19      Q.  Can't say one way or another?
20      A.  Correct.
21      Q.  In your review of Ms. Levitt's medical
22  records, did you consider the notes from Dr. Burras with
23  respect to her history of depression?
24      A.  Did I note them in my report?
25      Q.  (Nods.)

Page 245

1      A.  I can't recall.
2      Q.  Is it your opinion -- I'm sorry.  Strike that.
3          Are you -- are you telling us today that the
4  articles that are now Exhibit 3, this two inches or so
5  stack of documents you provided to us for the first time
6  this morning, are all articles that support the idea
7  that Ms. Levitt's depression is related to the
8  cardiovascular procedures that she had performed in the
9  year 2000?
10          MR. MCCLAIN:  Vague and ambiguous.
11      A.  Yes and no.
12      Q.  (By Mr. Boehm)  In what way yes and in what
13  way no?
14      A.  No because she obviously had depression before
15  the procedure.  Yes because I think the procedure made
16  her depression worse.
17      Q.  Where in your report do you compare the
18  severity of her depression post-2000 with the severity
19  of her depression pre-2000?
20      A.  Well, one place would be the section that I
21  was reading you before, and another place would be
22  6-10-24 -- 6-10-2000, page 25.
23          Another place would be 3-4-2004, page 25.
24  Another place would be 4-29-2004.  Another place would
25  be 6-11-2004, 10-15-2004, 10-4-2006, 5-1-2007, page 3.

David Egilman, M.D.

| Page 246 | Page 248 |
|---|---|

**Page 246**

1     And my note on 5-28-2000. That's the first
2 one that I referenced. But I didn't give the date.
3 That's the date.
4     Q.  Are you done?
5     A.  No.
6     Q.  Are you guys consulting about another matter
7 while we're on the record?
8         MR. MCCLAIN:  No, I asked him what your name
9 was.  What's your name?
10         MR. BOEHM:  Are you talking to me?
11         MR. MCCLAIN:  Yeah.
12         MR. BOEHM:  You, you can do me the favor of
13 just speaking in a more respectful manner --
14         MR. MCCLAIN:  I just asked him off the record.
15         MR. BOEHM:  -- instead of screaming at me.
16         MR. MCCLAIN:  No.
17         MR. BOEHM:  My name is Paul Boehm.
18         MR. MCCLAIN:  Paul what?
19         MR. BOEHM:  Boehm.
20         MR. MCCLAIN:  Boehm.
21         MR. BOEHM:  The record should reflect that
22 Dr. Egilman has now started on his second round through
23 his report.
24         THE WITNESS:  The record should now reflect
25 that the lawyer who just made that comment has not a

**Page 247**

1 clue where I am in the report, and I am not on the
2 second round of going through the report. And I don't
3 appreciate comments in the middle of answers,
4 particularly when they are --
5         MR. BOEHM:  I'm just.
6         THE WITNESS:  Let the record reflect that the
7 lawyer's about seven feet from me. Okay. And I didn't
8 start reviewing the report at the beginning. I started
9 in the middle, and I went back to the beginning, let the
10 record reflect.
11     A.  1-24-2003.
12     Q.  (By Mr. Boehm)  Okay. I am going to withdraw
13 the question. This is a clear attempt to filibuster and
14 not respond to my question. So I will just withdraw it,
15 and we can continue on. Dr. Egilman, you --
16     A.  Excuse me. Excuse me. You can withdraw my
17 question you want, but I don't appreciate your comments
18 on my answer.
19     Q.  You took 15 minutes to answer a simple
20 question.
21     A.  Excuse me. Can I finish? I let you make all
22 your nasty comments without interrupting you.
23         MR. MCCLAIN:  All day long.
24     Q.  (By Mr. Boehm)  Okay.
25     A.  All day long I have heard nothing but comments

**Page 248**

1 from you.
2     Q.  That's not true. Go ahead.
3     A.  Okay. I am tired of it. All right. The
4 question was, find every reference in your record that
5 supports your view of when it got worse. So I had to
6 read the report --
7     Q.  That actually wasn't the question, which
8 probably is at the root of your failing to answer the
9 question I asked you. But that's okay. It's withdrawn,
10 so I'd ask that we just move ahead.
11         You indicate on page 55 of your report that
12 Ms. Levitt's stent surgery made it so that she couldn't
13 work for two or three weeks at her usual work load. Do
14 you recall that?
15     A.  No. I don't recall that.
16     Q.  At the bottom of page 55.
17     A.  Right.
18     Q.  What is your basis for that statement?
19     A.  My history.
20     Q.  The history that you took with Ms. Levitt in
21 in person?
22     A.  Yes.
23     Q.  Any other source for that statement, or is
24 that just based on your conversation with Ms. Levitt
25 herself?

**Page 249**

1     A.  I don't know. I need to look at the records.
2     Q.  You can't think of anything as you sit here
3 today, right?
4     A.  I haven't committed the records to memory. I
5 would need to look at the records.
6     Q.  You indicated earlier today that Ms. Levitt's
7 cognitive dysfunction, as you put it, is related to her
8 depression. Do you recall that?
9     A.  No. I don't think that's exactly what I said.
10     Q.  Do you -- is it your opinion that Ms. Levitt's
11 cognitive dysfunction, as you understand it, is related
12 to her depression?
13     A.  I think her cognitive dysfunction has three or
14 four possible causes, one of which is her side effect of
15 her depression, which was made worse by her cardiac
16 disease.
17     Q.  Do you believe that Ms. Levitt is suffering
18 from dementia?
19     A.  No.
20     Q.  You indicate on pages 55 and carrying over to
21 56, you write, these -- I'm sorry. Are you at page 55?
22     A.  Yes.
23     Q.  You write, "These were crucial skills for the
24 operation of her businesses." Do you see that?
25     A.  Yes.

63 (Pages 246 to 249)

David Egilman, M.D.

Page 250

1      Q.  What are you relying on for your opinions in
2  this case about what skills are required for the
3  operation of Ms. Levitt's businesses?
4      A.  Her history and her coworkers' testimony and I
5  think also her husband.
6      Q.  Did you conduct any assessment of the Levitts'
7  businesses?
8      A.  Certainly some.
9      Q.  What was the nature of your own assessment of
10  the Levitt's business enterprises?
11         MR. MCCLAIN:  I object to the form of the
12  question.  It's vague and ambiguous.
13      A.  It was based on interviewing and reading
14  depositions.
15      Q.  (By Mr. Boehm)  Okay.  Anything else?
16      A.  No.
17      Q.  I take it you have never operated a hotel.
18  Fair?
19      A.  That's correct.
20      Q.  And you have never operated a children's
21  clothing store?
22         MR. MCCLAIN:  She didn't operate children's
23  clothing store either.
24      A.  That's correct.
25      Q.  (By Mr. Boehm)  Do you know when Ms. Levitt

Page 251

1  started her businesses?
2      A.  I don't recall the exact year, no.
3      Q.  Do you recall approximately when she started
4  her businesses?
5      A.  No.
6      Q.  Did you conduct an assessment of the economic
7  forces that may or may not have impacted the success or
8  failure of Ms. Levitt's businesses?
9      A.  No.
10      Q.  You were not an economist, correct?
11      A.  Correct.
12      Q.  Do you consider yourself an expert?  Do you
13  consider yourself an expert economist?
14      A.  Define expert.
15      Q.  We can define it however you would like.  I
16  mean, do you --
17         MR. MCCLAIN:  Let's just go with this one.
18  Just say yeah.  No.  Just move on.  Let's just go --
19      Q.  (By Mr. Boehm) Do you consider yourself an
20  expert economist?
21         MR. MCCLAIN:  I don't want to go through this
22  discussion again.
23      A.  I don't think I give -- I am certainly not
24  qualified to give economic advice about investments to
25  third parties.  But I do invest money and am in charge

Page 252

1  of investing money.
2      Q.  (By Mr. Boehm)  Are you holding yourself out
3  as an expert in economics in this case?
4      A.  No.
5      Q.  Are you an accountant?
6      A.  No.
7      Q.  Are you an auditor?
8      A.  No.
9         MR. MCCLAIN:  He's already said no, he is not
10  offering the opinion.
11         MR. BOEHM:  Ken, just please --
12         MR. MCCLAIN:  Why do you want to --
13         MR. BOEHM:  For heaven's sake.
14         MR. MCCLAIN:  -- just antagonize everybody?
15  He gave you the answer you wanted.  Move on.
16         MR. BOEHM:  Ken, I have seen the schtick from
17  you and your types a million times.  It's not
18  impressive.
19         MR. MCCLAIN:  Me and my types?
20         MR. BOEHM:  It doesn't do anything to advance
21  your cause.
22         MR. MCCLAIN:  Me and my types.  You have never
23  met anybody like me in your life, so go ahead and ask
24  whatever questions you would like.
25         MR. BOEHM:  You are a pretty special guy?

Page 253

1         MR. MCCLAIN:  I'm pretty special.  You are
2  damn right.  Yes, I am.
3         MR. BOEHM:  Okay.  So special you don't have
4  to follow court orders?
5         MR. MCCLAIN:  What court orders am I not
6  following?
7         MR. BOEHM:  The parameter of your objections
8  have been wildly --
9         MR. MCCLAIN:  I am planning on -- I am
10  planning on taking your comments to the court because
11  you are the rudest lawyer that I have been in --
12  involved with in some time.  Your comments have been
13  nothing but antagonistic and smart and snide, every time
14  along the way.
15         So don't, don't start lecturing me about
16  conduct in here.  I tried to have a nice discussion with
17  you off the record and advised you not to do that.  You
18  can't help yourself.  You just can't help yourself.
19         MR. BOEHM:  I just completely disagree with
20  the characterization that you have just tried to --
21         MR. MCCLAIN:  Go ahead.
22         MR. BOEHM:  -- put on.
23         MR. MCCLAIN:  Ask whatever question you got.
24  You got a half hour.
25         MR. BOEHM:  The statements you make speaks for

64 (Pages 250 to 253)

David Egilman, M.D.

Page 254

1    themselves throughout day.
2         MR. MCCLAIN:  Ten minutes?
3         THE WITNESS:  Something like that.  How much
4    time you got, Amy?
5         THE VIDEOGRAPHER:  Got about 29 minutes left.
6         THE WITNESS:  29, wow.
7         Q.  (By Mr. Boehm)  I take it you have not
8    performed any of the functions of an economist or an
9    accountant or an auditor for purposes of the opinions
10   that you are offering in this case; is that correct?
11        A.  I think I -- that's correct.
12        Q.  Have you --
13        A.  Hang on one second.  I think I lost real time
14   here.
15        Q.  Go ahead.
16        A.  No?  Okay.  Great.  Go right ahead.
17        Q.  Have you reviewed any of the business records
18   for Ms. Levitt's businesses?
19        A.  I don't think so.
20        Q.  Have you looked at her investment decisions?
21        A.  No.
22        Q.  Or the investment decision of her businesses?
23        A.  No.
24        Q.  Have you assessed her business's tax returns?
25        A.  No.

Page 255

1        Q.  Had Ms. Levitt not been depressed, are you
2    expressing the opinion to a reasonable degree of
3    certainty that her businesses would have survived?
4        A.  I don't think I have an opinion about that.
5        Q.  Are you expressing an opinion in this case
6    that the CABG has been shown to be causally associated
7    with cognitive dysfunction?
8        A.  Yes.
9        Q.  Are those studies that are -- you have
10   included in what has been marked as Exhibit 3 in this
11   case?
12        A.  I think so.  But if not, there are lots of
13   those studies.  I mean, there's a lot.  I mean, you cut
14   off your circulation to the brain, so, you know, it's --
15   that's well known.
16        Q.  Do you believe that in Ms. Levitt's case the
17   CABG procedure caused her to suffer cognitive impairment
18   and dysfunction, and are you expressing that opinion to
19   a reasonable degree of medical certainty?
20        A.  I think there are about, as I said, three or
21   four things that caused her to lose cognitive function.
22   And I can't tell you which of those is more important
23   than the other or whether or not they all contributed.
24        There are three or four things, the CABG, the
25   Vioxx, the, the emotional impact of having the CABG, per

Page 256

1    se, just from blood loss, blood flow problems, the CABG
2    because of post-CABG depression and anxiety because of
3    having heart disease.  Those are all the things that
4    contributed.
5        Q.  Are you offering any opinions in this case on
6    the subject of Ms. Levitt's fibromyalgia?
7        A.  No.
8        Q.  Do you have an opinion on whether or not
9    Ms. Levitt suffers or has suffered from fibromyalgia?
10        A.  No.
11        Q.  On page 56 of your report, that's of course
12   the last page of your report, you reference sinus
13   problems.
14        A.  Right.
15        Q.  And you indicate that her sinus problems did
16   not limit her work.  Do you see that?
17        A.  Yes.
18        Q.  What is your basis for that statement?
19        A.  Probably my history with her and medical
20   records.
21        Q.  Okay.  Do you recall medical records that
22   described her sinus problems -- strike that.
23        Do you recall medical records in which
24   Ms. Levitt describes her sinus problems as controlling
25   her life?

Page 257

1        A.  I don't recall that.  If you want to show me
2    the record, I wouldn't deny that exists.  I haven't
3    memorized the records for every quote.
4        Q.  Sorry?
5        A.  I haven't memorized the records for every
6    parsed quote.
7        Q.  Would that change your opinions in this matter
8    in any way?
9        A.  I don't think so.
10        Q.  If it were in fact the case that Ms. Levitt's
11   sinus problems were, at least at times, controlling her
12   life, would that potentially change your opinion that
13   her sinus problems did not limit her work?
14        A.  It depends how she defined that, that parse.
15   I mean, things can control your life and not impact on
16   you at work in some people's -- that's a subjective
17   comment about the impact of something on your life which
18   some people exclude work from.  So it's too
19   idiosyncratic an expression to be able to make a
20   conclusion about work without more -- without
21   interviewing her more extensively.
22        Q.  How do you know that Ms. Levitt's sinus
23   problems did not interfere with her life?  I'm sorry.
24   Strike that.  I misspoke.  How do you know that
25   Ms. Levitt's sinus problems did not limit or interfere

David Egilman, M.D.

Page 258

1  with her work?
2      A.  I didn't see any records that indicated that
3  was so.  And I think I asked her about that.  That's why
4  I have that in my report.  I mean, I didn't make this
5  up.  That would be based on my conversation with her.  I
6  would have asked her the question.  She would told me
7  that, as the answer.
8      Q.  Can sinus problems be associated with
9  shortness of breath?
10     A.  I am sure there's some possible relationship
11 somewhere.  It may not be causal.
12     Q.  Can sinus problems be associated with fatigue?
13     A.  Yes.
14     Q.  Did you do a differential diagnosis to
15 determine the causes of Ms. Levitt's fatigue?
16     A.  No.
17     Q.  You indicated in your report that Ms. Levitt
18 is not malingering.  Do you remember that?  Why did
19 you -- I'm sorry?
20     A.  Yes.
21     Q.  Why did you include that in your report?
22     A.  I think it came up in somebody's medical
23 record someplace.  I think, but I don't recall
24 specifically.
25     Q.  I apologize.  I just couldn't hear what you

Page 259

1  just said.
2      A.  I think it was mentioned somewhere as a
3  possibility in the medical records, maybe, I think.  Let
4  me see.
5      Q.  You mean in Ms. Levitt's medical records?
6      A.  I think so.  That's a general recollection.
7  Where is it in my report?  Oh, I see.  Near the end.
8  Maybe not.  Maybe I just put it in.
9      Q.  Did you conduct any testing for Ms. Levitt to
10 reach the conclusion that she is not malingering?
11     A.  No.  I gave the basis for that in the
12 sentence.  I don't know of any objective tests for
13 malingering.
14     Q.  Dr. Egilman, you agree that Vioxx was approved
15 by the FDA as safe and effective, correct?
16     MR. MCCLAIN:  Jeez, how many times are you
17 going to ask that question?
18     A.  Yes.
19     Q.  (By Mr. Boehm)  Do you believe that the FDA
20 was wrong to approve Vioxx as safe and effective?
21     MR. MCCLAIN:  Same objection.
22     A.  By the way, the safe and effective, just to be
23 clear, is not for the pill.  It's for the pill and the
24 warnings, package insert.  Just to be clear.
25     When it was initially approved in May of 1999,

Page 260

1  yes.  I think the information in the Pelayo report with
2  respect to the degree and extent of hypertension and
3  congestive heart failure associated with Vioxx which
4  distinguished it from the comparators in their own
5  trials should have been put into the label.  And the FDA
6  knew that.  Merck's responsible for the label.  But the
7  FDA could have rejected the label without that
8  information.
9      The 50 milligram dose, which was approved
10 without limitation, I think initially, should have
11 been -- should have had a limitation on it.  Whenever
12 that -- they put something of a limitation on them, I
13 think either in the 2002 change, but it should have been
14 earlier.
15     And since there was an indication that the
16 drug could cause heart problems, and the 069 premarket
17 testing certainly was not reassuring on that point.  But
18 because the studies were primarily short term and
19 because the controls were primarily diclofenac shouldn't
20 have been sufficient to have approved the drug, period,
21 without further testing.
22     Q.  Anything else?  Are you done?
23     A.  Let me look at the label negotiations on that.
24 Hang on.  Someplace here I have the label negotiations
25 in one of these reports.  Let's see what I have -- if I

Page 261

1  have anything about that.  Well, I think all the
2  information that Merck had about -- let's see.  There's
3  a -- hiding, Merck hiding folder here.
4      So hang on a second.  So the things that were
5  in the Merck hiding folder that Merck had before the
6  label came out should have been given to the FDA and
7  prohibited the FDA from assessing the product
8  completely.  Let me find that.
9      Q.  Okay.  Let's go off the record if you are
10 going to go in search of materials.
11     THE VIDEOGRAPHER:  Going off the record.  The
12 time is 6:16 p.m.
13     (Discussion off the record.)
14     THE VIDEOGRAPHER:  Going back on the record.
15 The time is 6:17 p.m.
16     A.  Okay.  The information on toxicity and concern
17 about toxicity that the FDA didn't have that they should
18 have had, which would have allowed them to make a more
19 decision about whether to approve the drug in 1999
20 included the Watson study, which showed a statistically
21 significant increase in cardiovascular disease, SAEs, in
22 using a created placebo control that actually favored
23 Vioxx where the rate ratio was 2.16, which was
24 statistically significant in women.
25     It was not -- neither the concern that drove

66  (Pages 258 to 261)

David Egilman, M.D.

Page 262

1    Merck to do that study nor the study itself was given to
2    the FDA.  That information should have been in a label
3    as part of the safe and effective.  It wasn't because
4    they didn't have it.
5         Then you have the scientific advisory meeting
6    in 1997 where Merck's scientific advisors tell them
7    three or four things about the possible toxicity of
8    Vioxx, and that comm -- that information was not
9    communicated in the NDA application to the FDA, so they
10   couldn't assess it or evaluate it for purposes of
11   approving the drug.
12        Then there's the changes that were made to
13   study 023 where, I think, was it Briggs Morrison got
14   Fitzgerald to alter the study as it was reported to the
15   FDA and the NDA?  They should have given them -- Merck
16   should have given the study as written by Fitzgerald
17   without modification and with emphasis, rather than
18   deemphasizing it by placing it someplace in the back in
19   an appendix.
20        So the FDA's label should have included some
21   of this information.  They couldn't do that.  So I can't
22   be critical of the FDA because they didn't have this
23   information.  But in terms of whether it was correct for
24   them to approve it, it wasn't because they didn't have
25   this information.  I think some of this information

Page 263

1    might have driven them to not approve it or -- at the
2    time and call for more study.
3         Q.  Dr. Egilman, what is your current hourly rate?
4         A.  For deposition, $650 an hour.
5         Q.  Does that rate differ from your nondeposition
6    time?
7         A.  It does.
8         Q.  How so?
9         A.  My general rate otherwise is $600 an hour.
10        Q.  Great.  Let's go off the record for a minute.
11        THE VIDEOGRAPHER:  Going off the record.  The
12   time is 6:20 p.m.
13        (Recess from 6:20 p.m. to 6:25 p.m.)
14        THE VIDEOGRAPHER:  Going back on the record.
15   The time is 6:25 p.m.
16        MR. BOEHM:  I don't have any other questions
17   at this time.
18        THE WITNESS:  Okay.
19        MR. BOEHM:  Ken, do you have any questions?
20        MR. MCCLAIN:  Dr. Egilman, oh.  The -- but no,
21   except how are we going to handle marking all these
22   exhibits?  And Ken has agreed to be responsible for
23   copying them for us so we all can save money.  But I
24   want to make sure we have some method by which we can
25   mark these that we agree on.

Page 264

1         And what I would suggest we do -- and I don't
2    care what order they go in the boxes.  Just mark each
3    box as one exhibit.
4         THE WITNESS:  Can we go off the video record
5    while --
6         MR. MCCLAIN:  Yeah, we can do that, yeah.
7         THE WITNESS:  -- while I eat my jerky?
8         THE VIDEOGRAPHER:  Going off the record.  That
9    concludes today's video.  The time is 6:26 p.m.
10        MR. MCCLAIN:  Then they will be organized as
11   Exhibit 1, and they we will then have each of these
12   folders in Exhibit 1 and Exhibit 2, etc.  Does that make
13   any sense, Ken?
14        COURT REPORTER:  I'm still on the record, on
15   my record, but may I suggest that we start with 12,
16   because we're up to 11 here.
17        MR. MCCLAIN:  That's fine.
18        THE VIDEOGRAPHER:  Should we go off the record
19   and talk about this and then we can put it on the record
20   what we agreed to?
21        MR. MCCLAIN:  Sure.
22        (Discussion off the record.)
23        (Deposition Exhibit No. 12, 13, 14 were
24   marked.)
25        MR. BOEHM:  As has been discussed during the

Page 265

1    course of today's deposition, Dr. Egilman had on
2    conference room table today many materials.  By
3    agreement of counsel we have placed these materials in
4    boxes, and I am going to be reading off the names of the
5    folders.  I believe that Dr. Egilman is the one who
6    named these folders.
7         I will start with the first of those boxes,
8    which is Exhibit 12.  The folders are Duty to Warn.
9    Sudden coronary death.  NSAIDS.  COX-2 and thrombosis.
10   No COX-2 selective inhibitors.  Missing DSMB.  Medical
11   officer review.  Villalaba, V-I-L-L-A-L-B-A.  Vioxx
12   causes pneumonia.  Responses to FDA for info.
13        Red flag studies.  To treat harm, slash help.
14   Chen dash discontinued.  Musliner Memo, M-U-S-L-I-N-E-R.
15   FDA advisory committee, April 1999.  Lessons from Vioxx.
16   Vioxx efficacy and safety.  078 efficacy results.
17   Review of CV and renal safety.  CV card, tattletale.
18   CV card PPT.  Barr adjudication.  Duty to
19   warn.  VIGOR SUR and drafts.  FDA warning letter.  Green
20   e-mail, in parenthesis, must tell FDA.  Data hidden from
21   FDA.  Vioxx medical officer review.  Vioxx versus
22   comparator drugs.  Animal model of thrombosis.  VIGOR
23   sudden deaths.  GI outcomes.  NSAID PPT.  APPROVe study
24   CV safety data.  Atherosclerosis.
25        Purple folder that is not -- oh, I'm sorry.

67 (Pages 262 to 265)

David Egilman, M.D.

Page 266

1  It's titled on one side, ITT data. Lessons from Vioxx.
2  Approve and ACS. Acute pain case studies. Advantage
3  study background. Missing ALZ events.
4  VIGOR-ADG/nonADG.
5      Barr and Ricen 5,005. PMRD-GI safety. Hidden
6  analyses. 078 deaths. Seidenberg. Mental status.
7  Hidden. Vioxx prelim CV metaanalysis, comma, Shapiro.
8  Deaths and distortions. Merck PPT VIGOR advantage. N.
9  report. Safety first. Topol paper, T-O-P-O-L.
10      Critique of Konstam, K-O-N-S-T-A-M. GI safety
11  label. Statistical review. Hirsch, H-I-R-S-C-H.
12  Medical dictionary for regulatory activities. Other
13  lessons from Vioxx. Efficacy results. ALZ. CVALZ
14  data. Villalba. COX-2 AD causation. Dr. Christopher
15  James report. Vaughan, V-A-U-G-H-A-N, which appears to
16  contain the November 8th, 2013, transcript of
17  Dr. Vaughan's deposition.
18      Merck PPT for pain. Merck and Dr. Wallace.
19  Unreliable safety data. VIGOR defense bogus. VIGOR
20  heart attack statements. What's wrong with the data?
21  203. 136. FDA drug regulation controversy PPT. FDA
22  untitled letter, 12-16-99. NYT drug safety. Schultz
23  senate testimony. FDA approval. 078 and 01 -- I'm
24  sorry, 078 and 091 data analysis. 2005 Vioxx COX-2
25  advisory committee. Waxman.

Page 267

1      Those are the contents of the first box which
2  has been labeled Exhibit 12. Now, turning to the second
3  box, which will be Exhibit 13, I suppose.
4      (Discussion off the record.)
5      MR. BOEHM: Okay. APPROVe PPT. Advertising
6  impact. Adjudication. Abuse of confidentiality.
7  5,005. Another 5,005. 2002 CV update. Anti warnings.
8  Alaska versus Merck. Advantage PPT. AD campaign. AD
9  lie to FDA. Bayesian defense. Bain ALZ memo.
10  Arrhythmias. Label negotiations.
11      Securities. NDA studies. Description. Wow,
12  two exclamation points, wow, two exclamation points,
13  wow, two exclamation points. Woodcock-NYT article.
14  Manipulation of data. Vioxx warning program. VIGOR.
15  NSAID mechanism. Daniels and Seidenberg. GI deaths
16  from NSAIDs. COX-2 mechanism. Sales reports.
17  Warnings. VICTOR and Pratt.
18      FDA-overworked and biassed. Death. Labeling.
19  Timeline. Misrepresentations to FDA. VIGOR timeline.
20  FDA and CV risk. FDA criticism. Incompetence of FDA
21  Merck manual-MI. VIGOR deaths. EU. Unpublished
22  placebo data. SOP revision approval. Merck knowledge.
23  Speaking with investigators. Emergency 078 DSMB
24  meeting. VIGOR SUR Alzheimer's. FDA advisory
25  committee, February 8th, 2001.

Page 268

1      Publications. Cheating. Lessons from Vioxx.
2  Demonstrative. Manipulation of adjudication. Fooling
3  the FDA. Harmonization. Duty. Marketing response to
4  knowledge. Medical officer review, Vioxx. Merck FDA --
5  can't read it. Merck to CV risk. Vioxx FDA arthritis
6  advisory committee. Reliance materials. Multiple
7  comparison.
8      Response to KN, review of CV data safety
9  database. VIGOR and FDA class advisory. ITT
10  Alzheimer's. 14 day rule. VIGOR draft Capizzi.
11  Naproxen not true. Those are the contents of the second
12  box, Exhibit 13.
13      Now turning to the third box. Merck's good
14  deeds, in quotes. Safety first. A couple loose papers.
15  Unethical Griffin. 2002 label. The rest I cannot read.
16  Jo Levitt PPT. Advantage CV response to knowledge,
17  advertisements. Juni papers. Hirsch. CV adjudication
18  SOP VIGOR. Clinical trial, safety. CV safety study
19  plans. Kentucky dep. Merck plays dodgeball. Label.
20  Madigan. CV.
21      IRR in CVT events dash 2002. Adjudication
22  packet. Mechanism. Vioxx and CV risks, in parenthesis,
23  medical literature. Label negotiations. Watson PPT.
24  Patrono, P-A-T-R-O-N-O. Dr. Pratt report. VIP.
25  Villalba GI review. Shapiro metaanalysis. Larry King,

Page 269

1  Jenner, Himill, H-I-M-I-L-L.
2      Vioxx U.S. long range operating plan. Ethics.
3  Advantage. Montana versus Merck. KN and response time.
4  Aspirin interaction presentation. Alzheimer's
5  adjudication. Missouri and Kentucky reports. Rarick,
6  M.D., depo. Utah. Warning letter. Worry to death for
7  a year. Can't read the rest.
8      Things to be asked. PreVIGOR something.
9  Interactions with investigators. Merck dash FDA
10  warnings and admonishments. DTC ads. Duty to warn.
11  Fraud, Merck organization chart. Short-term risk. To
12  clot or not to clot, that is the question. VIGOR
13  postmortem data. Coordination feedback. Merck
14  communication plans. Marketing trumps medicine.
15      GI message workshop. Warnings failure.
16  Informed consent. Neutralize. Paul Aisen, A-I-S-E-N,
17  M.D. VIGOR dishonesty. MI data - best face. Vioxx
18  papers. Egilman PIR. Deaths in MK-0966 studies. 2003
19  medicines compendium. 090 report synopsis. 085 report
20  synopsis. Merck FDA correspondents time line.
21      And that's all we have in Box 3, which is
22  Exhibit 14. All three boxes, Exhibits 12, 13, and 14,
23  are full.
24      Let's go off the record for a second.
25      (Discussion off the record.)

David Egilman, M.D.

Page 270

1          (Deposition Exhibit Nos. 16, 17, 18, and 19
2     were marked.)
3          MR. BOEHM:  The witness also brought with him
4     today four large binders that have been labeled John S.
5     Martin report.  The first of those binders is Volume 1
6     of 4 according to the side of the binder, and that we
7     have marked as Exhibit 16.  The second binder, Volume 2
8     of 4, of John S. Martin report has been marked as
9     Exhibit 17.  The third binder, Volume 3 of 4 of the John
10    S. Martin report is Exhibit 18, and four of four is
11    Exhibit 19.
12         MR. MCCLAIN:  Now, let's -- now we are not
13    going to copy any of those, correct?  I am just going to
14    be -- I am going to maintain possession of those?
15         MR. LOUGEE:  Well, those are --
16         MR. MCCLAIN:  Oh, those are yours.
17         MR. LOUGEE:  Yeah, those are mine.
18         MR. MCCLAIN:  Oh, okay.  Then Ken will
19    maintain possession of them, and they will be here if
20    anybody wants reference to them.  There are some
21    additional things on the table.
22         MR. BOEHM:  Ken is going to, just to be clear,
23    is going to maintain possession of Exhibits 16, 17, 18,
24    19, these four binders.
25         MR. MCCLAIN:  This Ken.

Page 271

1          MR. LOUGEE:  Lougee.
2          MR. BOEHM:  The law firm of Siegfried and
3     Jensen is going to maintain possession of the four
4     binders we have marked as Exhibit 16, 17, 18 and 19,
5     correct?
6          MR. LOUGEE:  Right.  If anyone wants copies.
7     I mean, I am sending this out for copying.  I presume
8     you want a copy, and I presume you want a copy.
9          MR. MCCLAIN:  Well, who is going to take
10    possession of the original folders?  Me?
11         MR. LOUGEE:  No, the original folders -- well,
12    I can send you the original folders.  That's fine.  I
13    will just make one --
14         MR. MCCLAIN:  If that's all right with you,
15    then I am going to be in possession of the original
16    folders.
17         MR. BOEHM:  That's okay.  That's okay with us.
18    We consent to that.  Just for the record, nothing that
19    we are discussing or doing right now is in any way
20    intended or should change the confidentiality
21    designations of any of the materials that are included
22    in what we have just been referencing.
23         Of course, we have not had an opportunity to
24    review them, so I don't know to what extent these
25    materials contain materials identified as confidential,

Page 272

1     but I presume there are at least some.
2          MR. LOUGEE:  Yeah.  I wouldn't know.
3          (Deposition Exhibit No. 20 was marked.)
4          MR. MCCLAIN:  All right.  In regard to the --
5     there are hard drive materials that were previously in
6     possession of Alex Reinert, attorney at law, at the
7     Benjamin Cardozo School of Law.  And there is a letter
8     in the documents which describe their contents.
9          We are going to put these into a box and mark
10    it as Exhibit 20, and they will be shipped to my office,
11    and I will maintain possession of them in this form that
12    they were brought here today, for whatever reason.
13         (Deposition Exhibit No. 20 was marked.)
14         MR. MCCLAIN:  There were some other documents
15    that we got out during the deposition that, one was the
16    Cox inhibition and coagulation, which was probably --
17    should have been in one of those folders in the box.  So
18    it can just go into one of the boxes.  We have now
19    identified it.  Just tell me which box are putting it
20    in, Counsel.
21         MR. BOEHM:  I am going to put it in box marked
22    Exhibit 14.
23         MR. MCCLAIN:  And we will also put in Levitt
24    key drafts, Jo Levitt reports.  And then there are --
25    there is, also there is a -- that should go in the Jo

Page 273

1     Levitt report binder.  There is an empty folder here
2     called COX-2 teaching PPT.  There is a document called
3     pooled analysis, original investigation that was
4     referred to.  There are some handwritten notes.
5          All of those are going to go into this COX-2
6     teaching PPT file, and they will be placed in exhibit --
7     what was that?
8          MR. BOEHM:  14.
9          MR. MCCLAIN:  14, okay.  And I think with
10    that, we have cleaned the stable.
11         MR. LOUGEE:  No.  And I want to make it clear
12    on the record that none of these hard drives or whatever
13    they may be have been connected to any computer since
14    they left the possession of Professor Reinert.
15         MR. MCCLAIN:  Nor will they at my office
16    either, I don't believe.
17         MR. BOEHM:  Okay.
18         MR. MCCLAIN:  So --
19         MR. BOEHM:  Two last things.  Provisionally we
20    will designate the deposition transcript today as
21    confidential, and then of course, we will review it for
22    purposes of furthering any confidentiality designations.
23         And then also, we had requested in connection
24    with our deposition notice today, Ken, that we be
25    provided with updated -- an updated CV for Dr. Egilman,

69 (Pages 270 to 273)

David Egilman, M.D.

Page 274

```
 1  updated, and an updated list of his testimony over the
 2  last four years.  And we did not receive that.  We
 3  received objections to those requests.
 4        MR. MCCLAIN:  Well, I'll try to work through
 5  those with you.  I think we can probably come up with
 6  certainly the CV and some approximation of his
 7  testimony.
 8        MR. BOEHM:  Thank you.  We can discuss that
 9  later then.  Thank you very much.
10
11        (The deposition concluded at 6:53 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 275

```
 1              C E R T I F I C A T E
    STATE OF UTAH     )
 2  COUNTY OF SALT LAKE )
 3      THIS IS TO CERTIFY that the deposition of DAVID
 4  EGILMAN, M.D. was taken before me, Teri Hansen
 5  Cronenwett, Certified Realtime Reporter, Registered
 6  Merit Reporter, and Notary Public in and for the State
 7  of Utah.
 8      That the said witness was by me duly sworn to
 9  testify; that the testimony was reported by me in
10  Stenotype, and thereafter transcribed by computer, and
11  that the foregoing pages, numbered 5 through 274 are a
12  full, true, and correct transcription.
13      That the original transcript of the same was
14  delivered to the witness for reading and signature
15  before a Notary Public, and to be returned within 30
16  days of the date hereon.
17      I certify that I am not of kin or otherwise
18  associated with any of the parties to said cause of
19  action, and that I am not interested in the event
20  thereof.  WITNESS MY HAND and official seal at Salt Lake
21  City, Utah, this 13th day of April, 2015.
22  My commission expires:
    January 19, 2019
23
24        _____
          Teri Hansen Cronenwett, CRR, RMR
25        License No. 91-109812-7801
```

Page 276

```
 1          - - - - - -
 2           E R R A T A
 3          - - - - - -
 4  PAGE  LINE  CHANGE
 5  ____  ____  _____
 6        REASON:  _____
 7  ____  ____  _____
 8        REASON:  _____
 9  ____  ____  _____
10        REASON:  _____
11  ____  ____  _____
12        REASON:  _____
13  ____  ____  _____
14        REASON:  _____
15  ____  ____  _____
16        REASON:  _____
17  ____  ____  _____
18        REASON:  _____
19  ____  ____  _____
20        REASON:  _____
21  ____  ____  _____
22        REASON:  _____
23  ____  ____  _____
24        REASON:  _____
25
```

Page 277

```
 1
 2        ACKNOWLEDGMENT OF DEPONENT
 3
 4      I,_____, do
 5  hereby certify that I have read the
 6  foregoing pages, and that the same is
 7  a correct transcription of the answers
 8  given by me to the questions therein
 9  propounded, except for the corrections or
10  changes in form or substance, if any,
11  noted in the attached Errata Sheet.
12
13
14  _____
15  DAVID EGILMAN, M.D.          DATE
16
17
18  Subscribed and sworn
    to before me this
19  _____ day of _____, 20____.
20  My commission expires:_____
21
    _____
22  Notary Public
23
24
25
```