## Victim Impact Statement

Court Docket Number: 11-10384-PBS
Case Name: United States v. Merck Sharp & Dohme Corp.
Victim's Name: David Egilman
Mailing Address: 8 North Main Street,
City:    Attleboro              State:   Massachusetts  Zip Code: 02703
Phone Numbers: 508-472-2809
Email Address: degilman@gmail.com

I would like to thank the court for allowing me to submit a victim impact statement.  I am a practicing physician in Massachusetts and am also licensed to practice medicine in Rhode Island and Mississippi.  It is my privilege to serve as a Clinical Associate Professor of Family Medicine at Brown University and as the Editor-in-Chief of the International Journal of Occupational & Environmental Health. My statement relates to the portion of the instructions that reads:

"Submitting a victim impact statement is the crime victim's opportunity to be part of the sentencing process."

From approximately June 1999 to September 2002, Merck detail representatives visited me at my office in Braintree, Massachusetts, on Vioxx over 30 times and left over 90 Vioxx samples. Merck repeatedly wasted my valuable professional time by detailing me with false and misleading information.  As a result of this conduct, Merck undermined the trust that my patients place in me and in the medical system. Both of these resulted in monetary damages by directly causing me to spend more professional time than would otherwise have been necessary with my physician's assistant and with Merck's detail representatives.

As part of the settlement of the matter presently before this Court, I seek restitution for the value of my professional time which was wasted and misspent as a result of Merck's conduct.  I also seek as restitution the fair application of the law and public disclosure of Merck's bad acts and one dollar for my time.

With the guiding principles of punishment and deterrence in mind, I would like to ask the Court to consider requiring at least the following:

1. The perpetrators of the crime (both the truly responsible Merck corporate entity and the Merck executives and employees who were aware of and controlled the illegal activity) should be identified and exposed the way other criminals are;

2. The documents and depositions that describe (apart from pricing related materials) that describe Merck's illegal conduct should be exposed to sunlight. This drug has been off the market for seven years; there are no legitimate trade secrets.

As a preliminary matter, as the Court evaluates both the settlement agreement and the representations made during the Rule 11 proceedings, I ask the Court to consider three guiding principles:

1. It is of crucial importance that this settlement punishes the culpable parties for their past bad conduct to deter those parties – and other pharmaceutical companies and executives – from engaging in future illegal and reckless conduct.

2. Punishment must adequately address the fact that Merck (and other pharmaceutical companies) view drug-caused patient injuries as nothing more than the cost of doing business.

3. The plea agreement and related courtroom colloquy should accurately reflect the events that occurred.

Justice is denied if it is influenced by the amount of money that is demanded for restitution or the status of the perpetrator – corporation vs. human being. When large monetary payment penalties are used as justifications for not meting out penalties like incarceration or debarment, the entire system of justice, and public confidence in it, is undermined along with the founding principles of our society which included fairness. For example at the March 16 , 2012, hearing, the United States Attorney (USA) claimed that the court should consider the fact that the states "need the money" as a reason to hurry a decision:

"It's all the money that's not going back to these programs, and we're getting a lot of interest from programs who are at this point in dire straits because of the economic uncertainties, and I've had calls from different Attorney General's offices, 'When's it coming? When's it coming? What's taking so long?'"

The rush to push this settlement through, without appropriate evaluation, is completely due to the fact that the amount of restitution is so large. A criminal should not be advantaged – when it comes to being punished – because the criminal is rich and can afford to pay a large fine or a large amount of restitution. Stealing huge amounts of money should not advantage the thief just because the restitution is so large that government agencies depend on it to function. The rich and corporations should be treated like the destitute and no better or worse. When the poverty-stricken commit drug-related crimes they go to jail – often with long sentences. When the penniless steal three times, even if the value of goods stolen is minuscule compared to amounts in the case, they can qualify for a mandatory life sentence.  This Court should not permit this plea agreement to support the argument that pronounces that if you have enough money, you can buy your way out of incarceration or debarment. I urge the Court to treat Merck as it were a citizen with limited education and financial resources when it evaluates the merits of this plea agreement.

The FDA itself has stressed that absent deterrence, we will never make real progress in protecting victims from illegal practices. Eric Blumberg, the agency's deputy chief of litigation, commented in reference to the Pfizer/Neurontin settlement, part of which was approved by this Court:

"It's clear ***we're not getting the job done with large, monetary settlements***. Unless the government shows more resolve to criminally charge individuals at all levels in the company, we cannot expect to make progress in deterring off-label promotion."[1] [Emphasis added].

A settlement that fails to provide both punishment and deterrent disserves both the Vioxx victims and the victims of future illegal marketing campaigns, which might otherwise have been prevented.

---

[1] http://www.allgov.com/Top_Stories/ViewNews/FDA_Hints_at_Prosecution_of_Drug_Executives_101018, http://www.nj.com/business/index.ssf/2010/10/drug_firms_get_warning_over_of.html

Before continuing with this discussion, I would like to make the Court aware of the fact that the FDA twice reprimanded Merck for violations in February 2012; one was a warning letter. The actions described are violations of Merck's 2008 Corporate Integrity Agreement (CIA).[2] (See Exhibit 1)  On February 14, 2012, the FDA issued a warning letter to Merck Sharp & Dohme (MSD) documenting a two year history of failure to comply with a FDA order which required that Merck conduct post-marketing studies of side effects of their drug Januvia®.[3] (See Exhibit 2) These violations occurred during the pendency of Merck's CIA occurring between 2010 and 2012. These violations of FDA regulations occurred before Merck signed the plea agreement in this case. Two weeks later on February 28, 2012, the FDA cited Merck for off-label marketing of Saphris® citing FD&C Act, 21 U.S.C. 352(f)(1), (n). (Exhibit 3)

During the December 16, 2011 hearing this Court asked: "So Merck has otherwise a clean record?" (p. 19 line 15) Neither Merck nor the USA mentioned either of these violations, although the USA did mention another civil violation (an AWP pricing violation) that resulted in the 2008 CIA.  Under the 2008 CIA, Merck certainly had an obligation to inform the HHS Office of Inspector General (OIG) about the FDA's charges and the eventual warning letter. This indicates that either Merck failed to properly comply with the monitoring and reporting requirements of the CIA and/or that OIG's  supervision of Merck's conduct was inadequate. In either case it indicates that Merck has not changed its conduct and that HHS is incapable of enforcing CIAs. The OIG keeps all filings secret and never issues ongoing reports on compliance. As far as I know, the OIG has never cited or fined a company for violating a CIA. The 2008 CIA calls for a meager penalty of $1000 per day; the OIG has not even fined Merck a symbolic penny. I have summarized additional aspects of Merck's record below. Neither the OIG nor Merck has a "clean record" – I urge this court to please retain control of Merck's probation through a CIA monitored by a special master who reports to this Court, paid

---

[2] Relevant sections: "Merck & Co., Inc. now enters into this Unified CIA with the OIG of HHS to promote compliance with the statutes, regulations, and written directives of  Federal health care program requirements and the statutes, regulations, and written directives of the Food and Drug Administration (FDA) (FDA Requirements)." Page 2 paragraph 4

"Merck's commitment to full compliance with all Federal health care program requirements and FDA Requirements, including its commitment to comply with all requirements relating to Government Pricing and Contracting Functions and to promote, sen, advertise, and market its products in accordance with Federal health care program requirements and FDA Requirements;"(page 3 section a)
[3] http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2012/ucm293490.htm

by Merck. The CIA in this case calls for up to $5000 per day per violation. Violations of the CIA should result in daily multimillion dollar penalties to be commensurate with the actual penalties applied in this case.

To complete the record, these are some recent Merck settlements:[4]

| Parties | Date | Amount | Description |
| --- | --- | --- | --- |
| United States ex rel. Steinke v. Merck & Co., E.D. Pa., No. 00-CV-6158 | February 2008 | $650 million settlement ($355.5 million for federal government and $293.5 to states) | Merck failed to pay proper rebates to Medicaid and other government health care programs and paid illegal remuneration to health care providers to induce them to prescribe the company's products |
| United States Internal Revenue Service and Merck | February 2007 | $2.3 billion settlement | Tax issues from avoiding financial loss of shifting comparable book income to subsidiary non-US bank |
| United States EPA, PA Department of Environmental Protection and Merck | December 2007 | $20 million settlement ($4.5 million to state department of Environmental protection and $4.5 million to the EPA and invest $10 million in plant upgrades) | Illegal 2006 chemical release into a Montgomery county Pennsylvania sewer system |

My victim impact statement is limited by the fact that Merck continues to maintain that most of the documents and depositions produced in Vioxx litigation are confidential. The USA has informed me that all documents and depositions relating to this investigation including the documents quoted in the plea agreement are confidential. **Amazingly, this means that Merck has asserted and the USA has agreed that documents and depositions that serve as the evidence of Merck's criminal behavior are trade secrets.** Such a situation is beyond the realm of Kafka.

1. The role and conduct of the perpetrators of the crime (both the true Merck corporate entity and the executives and employees who were aware of and controlled the illegal activity) should be revealed and described accurately.

This case and the investigation surrounding it are now more than a decade old. One might expect it would be a simple matter to identify the persons and corporate entities responsible for the illegal marketing of Vioxx. Unfortunately, that

---

[4] IRS- http://www.irs.gov/newsroom/article/0,,id=167773,00.html
$650- http://www.justice.gov/opa/pr/2008/February/08_civ_094.html
Pennsylvania- http://www.ens-newswire.com/ens/dec2007/2007-12-13-092.html

is not the case. As a result of corporate shuffling done by the various Merck entities while the Vioxx cases were pending-- the waters of responsibility have been considerably muddied.

Indeed this Court itself has expressed justifiable confusion over which corporation perpetrated the crime and which corporation is taking the guilty plea in this case: "All right, but I got a little confused in reading the papers. Which is the company that committed the crime?" (Transcript of Plea hearing dated December 16, 2011, at 6: 3 to 6).

In eventual answer to the Court's direct–and seemingly simple and fundamental question–-Mr. Kuhlik, referring to Merck Sharp & Dohme (MSD), said, "I don't know how many employees are part of the subsidiary…. We don't think of it that way. We think of it as Merck & Co., Inc., which is the entire company."

Mr. Kuhlik's revealing admission (which can be found at T.12/16/11 at 6-7) finds support in Merck's 10K filings, which clearly state that Merck & Company is the current operating entity, not MSD:

> "On November 3, 2009, Merck and Schering-Plough completed the Merger. In the Merger, Schering-Plough acquired all of the shares of Merck, which became a wholly-owned subsidiary of Schering-Plough and was renamed Merck Sharp & Dohme Corp ("MSD"). Schering-Plough continued as the **surviving public company and was renamed Merck & Co….**" [Emphasis added] pg 91"

The 10K goes on to confirm that:

> "As a result of the Transactions, Wyeth and MSD no longer exist as publicly traded entities and ceased all trading of their common stock as of the close of business on their respective merger dates. Wyeth and MSD have been permanently removed from the peer group index." (Page 40 footnote [attached as Exhibit 4])

Mr. Kuhlik represents both MSD and Merck & Company. With those comments, he has affirmed on the record–as an officer of the Court–that MSD is the same as Merck & Company, and that the corporations themselves view the facts that way. Again, his admission is consistent with the above-quoted statements from Merck & Co.'s annual 10K filings submitted to the SEC. To eliminate all confusion, and to ensure that the correct entities and executives are punished, this Court should take Mr. Kuhlik – and MSD/Merck– at their word and ensure that any final settlement agreement makes clear that the guilty plea is being entered on behalf of *both* entities. That is the only way to clear the waters muddied by Merck's corporate shuffling.

This will require a change to the current plea agreement that limits the signer to MSD which is defined as:

-6-

"Currently, Merck Sharp & Dohme Corp. is the operating company in the United States for the pharmaceutical business formerly conducted by Merck & Co., Inc." (See, Plea Agreement at Page 15-16 25 1-7)

**Recommendation 1:**

**Both Merck & Company and MSD should both sign the plea agreement to make it consistent with Mr. Kuhlik's assertion that "We think of it [MSD and Merck & Co.] as Merck & Co., Inc., which is the entire company."**

2. Representations of Merck's conduct should be comprehensive and complete.

At the December 16, 2012, hearing, the USA referred the VIGOR trial and stated that approval for rheumatoid arthritis (RA) "… was based on that 8,000 randomized controlled study that was actually published in the New England Journal of Medicine and did support, if you will, the effectiveness in RA." However in that publication Merck intentionally misled the journal editors and the medical community by omitting important cardiovascular side effects including heart attacks, evidence of congestive heart failure, hypertension and renal adverse events.[1] The journal editors published a public condemnation of this Merck publication. In short, the approval for RA was based on a fraudulent publication. Merck's used this article to misrepresent the safety of the Vioxx which is part of the basis for the civil settlement:

> " (ii) from April 2000 through September 30, 2004, when Merck withdrew Vioxx® from the market, Merck promoted the cardiovascular safety of Vioxx® with certain statements by representatives and promotional speakers in written materials that were inaccurate, misleading, and inconsistent with the approved labeling for the drug, in violation of the FDCA, 21 U.S.C. §§ 331(k), 333(a)(I); and 352(t)(1); and that through the sale and distribution of a misbranded product, Merck obtained proceeds and profits to which it was not entitled…"

Approvals are based on an analysis of risks and benefits. Merck hid the risks. The FDA specifically cited misuse of this article in a warning letter to Merck, and Merck sent a Physician Information Release (PIR) to me on August 28, 2001, in response to my safety inquiries that misrepresented the data in this article.[5] (Exhibit 5)

---

[1] Gregory D. Curfman, M.D., Stephen Morrissey, Ph.D., and Jeffrey M. Drazen, M.D., Expression of Concern Reaffirmed N Engl J Med 2006; 354:1193, , Ross JS, Madigan D, Hill KP, Egilman DS, Wang Y, Krumholz HM, Pooled analysis of rofecoxib placebo-controlled clinical trial data: lessons for post market pharmaceutical safety surveillance. Arch Intern Med. 2009 Nov 23;169(21):1976-85

[5] The PIR stated that the cardiovascular event rate was .4% when it was actually 4 times higher.

The FDA's warning letter to Merck specifically reprimanded about misrepresentations related to the VIGOR study. (Exhibit 6)

> As part of its routine monitoring and surveillance program, the Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed your promotional activities and materials and has concluded that they are false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations. See 21 U.S.C. §§ 331(a) and (b), 352(a), (f), and (n), and 355 (a).
>
> You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen). Although the exact reason for the increased rate of MIs observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties. …
>
> *Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile*. [Emphasis Added]

**Recommendation 2:**

**The warning letter the FDA warning letter regarding Merck's intentional misrepresentation of the results of the VIGOR trial should be added to the record.**

**Recommendation 3:**

**The documents and depositions (apart from pricing-related materials) that describe Merck's illegal conduct should be exposed to sunlight. This drug has been off the market for seven years; there are no legitimate trade secrets. The document and depositions in this litigation should be unsealed – none qualify as trade secrets.**

The settlement should completely and accurately describe what Merck and its executives did, what they are being punished for, and what we are trying to prevent Merck and other companies from doing in the future. But Merck continues to misrepresent the facts about its conduct, as confirmed by the evidence discovered during the litigation.

The settlement should reflect the facts as they are, not as Merck would wish them to be. This is important, in part, so that Merck cannot "spin" its guilty plea as being something less than what it is.

Merck continues to misrepresent two key facts. First, it continues to maintain that high-level Merck executives were unaware of the illegal off-label marketing of Vioxx for rheumatoid arthritis. Such misrepresentations have been made to this Court by Mr. Cinquegrana, who stated that:

> "I believe it is the understanding between the government and the company that although those matters did occur in the field, that the government does not have any evidence that management condoned or approved or was even aware of the sales representatives' representations in the field." (T12/16/11 at 16:23 -8)

Mr. Cinquegrana's statement was artfully worded. He did not deny that management "condoned", "approved", or was "aware" of sales representatives' representations in the field. Merck employee George Stanton (see below) testified that Merck management was aware of the statements sales representatives made in the field. They certainly had the power to stop off-label statements, and their failure to do so indicates that they condoned these statements.

3. The record evidence demonstrates that Merck executives were well aware of the illegal off-label marketing of Vioxx for rheumatoid arthritis.

The record evidence developed in the civil litigation contradicts Mr. Cinquegrana's assertion that Merck management did not know about the off-label marketing of Vioxx for rheumatoid arthritis. Due to the fact that Merck has claimed these are trade secrets, I have not referred to any information in these documents; instead I rely on the deposition of Mr. George Stanton the Merck employee who was in charge of the program. Merck has not designated his deposition to be confidential.

Depositions, but not the exhibits I have provided to the United States Attorney, show clearly that both senior management and the legal department at Merck engaged in a corporate effort to keep specific track of the language that Merck's detail representatives used when meeting with physicians to discuss the merits of their drugs, including Vioxx. Merck claims that the relevant exhibits which reveal the information its detail representatives told physicians is a "trade secret" despite the fact that Merck purchased this information from commercial vendors ($220,000 per year). To this

end, Merck hired vendors DTW Market Research and Impact RX. DTW Market Research produced PMRD and Impact RX produced Impact RX reports. These companies contracted with hundreds of physicians who in turn reported what Merck's detail representatives told them. The physicians submitted what the Merck representatives told them into a computer database on or around the day they were detailed.  These reports were and are commercial products that Merck purchased. The reports were compiled and sent to Merck bi-monthly. They were regularly reviewed by Adam Schechter (Vice President, Merck Human Health Division, Arthritis & Analgesia Franchise Business Group), Wendy Dixon (Senior Vice President of Marketing for Merck's U.S. Human Health division) and other high management officials. I have attached a 2002 email listing the names of some of the Merck management on the distribution list for receipt of the PMRD reports. That distribution list included Merck's legal team Susan Gregory (managing counsel), Ned Braunstein (Director and Senior Director in Regulatory Affairs), and Peter Honig, MD (Vice President, Worldwide Product Safety and Quality Assurance). (Exhibit 7)

The Merck employee responsible for tracking the PMRD and Impact RX reports, George Stanton, gave a deposition in the Missouri civil litigation.  He testified that the statements that Merck's detail representatives gave to doctors when discussing Vioxx were recorded and typed up by the physicians, and distributed and communicated to Merck senior management.  Merck has claimed that the physician reports sold to them by third party vendors are confidential "trade secrets". Merck has admitted that its detail representatives illegally promoted Vioxx for RA. If the PMRD and Impact RX programs worked as Mr. Stanton stated, Merck management was provided the reports and was aware of this activity. Review of the PMRD and Impact RX is crucial to the evaluation of the accuracy of Mr. Cinquegrana's court statements concerning corporate knowledge, control and participation. Merck has agreed to permit me to attach a Bates number list of the most important of these documents. (Attached as Exhibit 8)

I would like to highlight the key portions of Mr. Stanton's testimony but must first note an important side issue. (Exhibit 9) Merck's confidence that it can get away with making misstatements like those offered by Mr. Cinquegrana is rooted in large part in the confidentiality orders behind which it has sought to conceal important evidence from the

public and investigating authorities.  There is a confidentiality order in place for the case in which Mr. Stanton testified, though his deposition was not marked confidential.  I will therefore quote directly from that deposition.

**Mr. Stanton's discusses how Merck executives learned about the statements being made to doctors by the company's detail representatives from the PMRD program:**

> Question: Now, with respect to who all was looking and analyzing the Vioxx PMRD data that you-all purchased, tell me, would you agree or disagree that all levels of the marketing team at Merck were reviewing PMRD results?
>
> **Mr. Stanton**:  I think all levels, I can't answer.  I can tell you that the market research team and the marketing team -- market research provided this data to the marketing team that generally consisted of marketing management and the directors. I don't know that the vice presidents or the extreme leadership saw this data, but I know that the senior director or executive director of marketing definitely saw it, and it's likely that the vice president would look at it.  I don't know how routinely, but it's --   it's likely. So I would conclude, then, that most -- most levels had seen it on a routine basis.  I don't know, you know, just because they received it, et cetera, if they look at it. But I know that some people very much did so look at it.
>
> Question: Fair enough. Now, with respect to who all was looking and analyzing the Vioxx PMRD data that you-all purchased, tell me, would you agree or disagree that all levels of the marketing team at Merck were reviewing PMRD results?
>
> **Mr. Stanton:** Based on what my experience and what I saw, there was a distribution to the marketing team that included marketing leadership down.
>
> Question: Okay. And you know that some of the higher-ups looked at it, and you also know that market research department provides it to many levels of folks in the marketing department, correct?
>
>  **Mr. Stanton**: Based on what my experience and what I saw, there was a distribution to the marketing team that included marketing leadership down.
>
>  Question: Do you know how often members of the various levels of the marketing department at Merck reviewed the PMRD results for Vioxx?
>
> **Mr. Stanton:** I know based on this document and others that the results are reported on a bi-monthly basis so that would mean every other month a report came in, and I will, therefore, conclude that somebody was looking at it every other month.

**Recommendation 4:**

**The record should reflect the fact that the government has evidence that management condoned or approved or was even aware of the sales representatives' representations in the field. Merck should be required to publish a press release contracting its current press release that sates that: "As part of the plea agreement, the United States acknowledged that there was no basis for a finding of high-level management participation in the violation."[6] Merck should issue another Dear Healthcare Provider letter that specifies and describes its civil and criminal malfeasance and includes the previous language on corporate participation. In light of the new evidence that I have provided the Court should determine if corporate officials or Merck should be penalized for example through debarment of sales of Merck versions of generic drugs which are available from other companies and thus not jeopardize  patient care while punishing the company.**

---

[6] http://www.merck.com/newsroom/news-release-archive/corporate/2011_1122.html

In my role as a journal editor and thus member of the press I ask the court to de-privilege all Vioxx documents, study data and depositions that have been taken in this matter that do not relate to product pricing.

As the Supreme Judicial Court has noted: "There is a well-established common law right of access to the judicial records of civil proceedings ... The presumption of access facilitates 'the citizen's desire to keep a watchful eye on the workings of public agencies,' permits the media to 'publish information concerning the operation of government,' Nixon v. Warner Communications, Inc., [435 U.S. 589 (1978)] ... at 598, and supports the public's right to know 'whether public servants are carrying out their duties in an efficient and law-abiding manner.' [citing, George W. Prescott Publ. Co., v. Register of Probate for Norfolk County, 395 Mass. 274, 279]. Access to otherwise unrestricted records of judicial proceedings may therefore be viewed as an essential component of the general principle of publicity: 'the public often would not have a "full understanding" of the proceedings and therefore would not always be in a position to serve as an effective check on the system' if it were denied access to judicial records." Globe Newspaper Co. v. Pokaski, 868 F.2d 497,502 (1st Cir.1989).The Boston Herald, Inc. v. Sharpe, 432 Mass. 593,606 (2000).

Unless the public is made fully aware of the nature of pharmaceutical company practices they will continue to repeat these practices. To paraphrase George Santayana, "Those who are unaware of the past are condemned to repeat it." As Justice Brandeis noted, "Sunlight is the best disinfectant."

Justice should be blind. Corporations are people under the law and should be treated as a person who committed crimes that resulted in deaths and injuries would be treated. I have been unable to find any case where a human being whose criminal restitution amounted to $321.6 million did not serve time in jail, were debarred and/or plead to a felony. Perhaps Merck or the USA can find one or more. If not, Merck is being given preferential treatment because they are a corporation.  In addition they have violated the plea agreement they signed in November 2011. Mr. Cinquegrana noted that Merck implemented part of this agreement on December 16, 2011, when they mailed Dear Healthcare Provider letters to 360,000 physicians describing the agreement at issue here. (December 16, 2011 hearing pg 25 lines 4-12). I

never received a copy of this letter. The letter itself is self-serving and fails to describe Merck's specific conduct. (Exhibit 10)

As a result of my research interest in marketing practices and corporate influence of science, I began serving as an expert witness in the Vioxx litigation in 2002. In 2005, I testified in court in the first Vioxx case to go to trial--*Ernst v. Merck & Co.*, and I currently serve as an expert at the request of plaintiffs in the Missouri consumer fraud class action. In this role I have access to (and base some of my comments on) depositions and documents that have been produced in that case but not marked confidential. Merck has refused to permit me to divulge to your Honor Merck documents that are crucial to this case that were exhibits to depositions in the Missouri litigation. I do not believe that this Court cannot fully evaluate the merits of the plea agreement absent review of these documents.

Relying on the limited set of documents that were released as a result of litigation, I have been able to co-author six peer-reviewed publications about Vioxx, five of which have been published in highly respected scientific journals like the British Medical Journal, JAMA, Annals of Internal Medicine and Archives of Internal Medicine. [7]

In closing I would like to be sure that this Court is aware of the fact that Merck has a program that was sanctioned and run by high corporate officials and designed to "Discredit" and "Neutralize" physicians who disagreed with Merck's approach to marketing Vioxx. This program included interference with academic appointments, spreading false rumors

---

[7] Krumholz, HM, Ross JS, Presler, AH, Egilman DS. What have we learnt from Vioxx?, BMJ 2007 Jan 20; 334(7585):120-3., Egilman D.S. Bohme S.R. Vioxx Marketing: Merck's Failure to Warn. International Ergonomics Association 2006 Conference Proceedings, Ross JS, Hill KP, Egilman DS, Krumholz HM. Guest authorship and ghostwriting in publications related to rofecoxib: a case study of industry documents from rofecoxib litigation. JAMA. 2008 Apr 16;299(15):1800-12. Kevin P. Hill, Joseph S. Ross, David S. Egilman, and Harlan M. Krumholz, The ADVANTAGE Seeding Trial: A Review of Internal Documents. Ann Intern Med, Aug 2008; 149: 251 – 258, Ross JS, Madigan D, Hill KP, Egilman DS, Wang Y, Krumholz HM, Pooled analysis of rofecoxib placebo-controlled clinical trial data: lessons for post market pharmaceutical safety surveillance. Arch Intern Med. 2009 Nov 23;169(21):1976-85., Ross, JS, Madigan D , Konstam MA, Egilman DS, Krumholz HM, Persistence of Cardiovascular Risk After Rofecoxib Discontinuation. Arch Intern Med, Dec 13/27, 2010; 170: 2035 – 2036

about academic credentials, and bribery.[8] This is how one Merck official expressed his suggested approach to doctors whose opinions on Vioxx were unfavorable:  **"We may need to seek them out and destroy them where they live."**

Thus, should Merck respond to my victim's statement with an effort to neutralize and discredit me, I ask the Court to consider such conduct when the Court determines whether Merck corporate executives (not its lawyers) show any remorse in connection with taking the criminal plea, the way a human criminal would be expected to show.

Finally, I hope that this impact statement serves in some small way as a voice for the most seriously affected victims of Merck's wrongful conduct who cannot present a victim's statement - they are dead.

**FINANCIAL IMPACT**

Merck repeatedly wasted my valuable professional time by detailing me with false and misleading information.  As a result of this conduct, Merck undermined the trust that my patients place in me and in the medical system. Both of these resulted in monetary damages by directly causing me to spend more professional time than would otherwise have been necessary with my physician's assistant and with Merck's detail representatives.

Amount of loss: $1.00

Explanation of financial loss: Compensation for lost time.

Summary of recommendations:

**Recommendation 1:**
**Both Merck & Company and MSD should both sign the plea agreement to make it consistent with Mr. Kuhlik's assertion that "We think of it [MSD and Merck & Co.] as Merck & Co., Inc., which is the entire company."**
**Recommendation 2:**

**The warning letter the FDA regarding Merck's intentional misrepresentation of the results of the VIGOR trial should be added to the record.**

---

[8] http://www.theaustralian.com.au/drug-company-drew-up-doctor-hit-list/story-fna7dq6e-1225693586492
http://query.nytimes.com/gst/fullpage.html?res=9C0CEFD9173AF932A25751C0A9639C8B63&pagewanted=all

**Recommendation 3:**

**The documents and depositions (apart from pricing-related materials) that describe Merck's illegal conduct should be exposed to sunlight. This drug has been off the market for seven years; there are no legitimate trade secrets. The document and depositions in this litigation should be unsealed – none qualify as trade secrets.**

**Recommendation 4:**

**The record should reflect the fact that the government has evidence that management condoned or approved or was even aware of the sales representatives' representations in the field. Merck should be required to publish a press release contracting its current press release that sates that: "As part of the plea agreement, the United States acknowledged that there was no basis for a finding of high-level management participation in the violation."[9] Merck should issue another Dear Healthcare Provider letter that specifies and describes its civil and criminal malfeasance and includes the previous language on corporate participation. In light of the new evidence that I have provided the Court should determine if corporate officials or Merck should be penalized for example through debarment of sales of Merck versions of generic drugs which are available from other companies and thus not jeopardize patient care while punishing the company.**

*[signature: David Egilman MD, MPH]*

David Egilman Md, MPH

---

[9] http://www.merck.com/newsroom/news-release-archive/corporate/2011_1122.html