UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case Number: 11 CR 10384-PBS |
| ) | |
| MERCK, SHARP & DOHME CORP. ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S SECOND STATUS REPORT ON RESTITUTION ISSUES
AND POSITION ON DR. EGILMAN'S REQUEST REGARDING DOCUMENTS**

The United States submits this additional status report to briefly address the current state of the restitution issues before the Court. In Section III.C. below, the United States also provides its position on Dr. Egilman's request to file documents under seal "in support" of his victim impact statement and request that the Court then lift the seal on those documents.

**I.    Pennsylvania Has Withdrawn Its Objection to This Court Sentencing Merck
as Contemplated in the Fed. R. Crim. P. 11(c)(1)(C) Plea Agreement.**

By letter dated April 4, 2012, the Commonwealth of Pennsylvania withdrew its objection to the sentencing of Merck going forward as contemplated in the Fed. R. Crim. P. 11(c)(1)(C) plea agreement. While Pennsylvania argues that the Court has discretion to award restitution for violations of the Federal Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 331, the Court need not reach that issue because Pennsylvania has withdrawn its claim.

Should the Court decide to nonetheless consider the availability of restitution in an FDCA misdemeanor case resolved by a Fed. R. Crim. P. 11(c)(1)(C) plea, the United States incorporates by reference its Status Report on Restitution Issues (Docket No. 22). In that regard, the United States notes that Pennsylvania relies on a District Court opinion in United States v. Guidant LLC,

1

708 F. Supp. 2d 903, 918 (D. Minn. 2010) that finds discretion to order restitution under the Crime Victims Right Act ("CVRA"), 18 U.S.C. § 3771. That case is inconsistent with First Circuit authority that suggests that the "the right to full and timely restitution *as provided in law,*" 18 U.S.C. § 3771(a)(6)(emphasis added), constitutes a procedural mechanism to assert substantive rights with regard to restitution, as opposed to separate substantive rights. United States v. Aquirre-Gonzalez, 597 F.3d 46, 48 n. 2 (1st Cir. 2010). The United States believes that the only restitution the Court has discretion to order in this case is to the extent agreed by the parties in the plea agreement pursuant to 18 U.S.C. § 3663(a)(3); there is no separate substantive right to restitution under the crime of conviction. As the plea agreement makes no provision for additional restitution beyond that agreed by the parties, there is accordingly no legal basis upon which to base any award of restitution that is not within the four corners of the plea agreement.

Accordingly, to the extent that Court believes additional restitution appropriate, its sole option is to reject the Fed. R. Crim. P. 11(c)(1)(C) plea agreement, an outcome that is contrary to the public interest, including the interests of a large number of sovereign states. The United States urges the Court to accept the agreement and impose sentence consistent therewith on April 19, 2012, because (1) there is a serious need for the monies provided through this resolution to the federal and state health care programs, programs which otherwise may recover nothing, or recover nothing for many years if Merck voids the deal;[1] (2) a restitution hearing for Pennsylvania would unduly complicate and prolong the sentencing process, if Merck permitted

---

[1] The United States understands from conversations with a representative of the National Association for Medicaid Fraud Control Units that numerous states expect to file a letter with the Court this week regarding the importance of these monies to their state Medicaid programs, the federal and state taxpayer funded program for the poor and disabled, and to urge the Court to sentence Merck in accord with the terms of the plea agreement at the earliest possible time.

the remainder of the deal to go forward; and (3) a restitution hearing in this proceeding is not warranted because Pennsylvania has an adequate remedy at law in the MDL Action.

II.     **Dr. Egilman is Not a Victim Within the Meaning of the Restitution Statutes and, Even if He Were, Restitution Is Not Available for His Claims.**

A victim impact statement was also submitted in this case by Dr. David Egilman. Dr. Egilman's efforts to insert himself into this proceeding as a "victim" are legally and factually deficient for the reasons set forth below. In addition, given that Dr. Egilman has served for years as a retained expert for plaintiffs in the Vioxx civil litigation, his effort to acquire victim status bears particular scrutiny. Even if Dr. Egilman were a victim, which the United States believes he is not, restitution is not available to him under the restitution statutes for the offense of conviction; moreover, to provide even the one dollar in restitution which Dr. Egilman requests, this Court would be required to reject the Fed. R. 11(c)(1)(C) plea agreement, and as a result, potentially deprive the federal and state care programs of hundreds of millions of dollars in funding for health care services for the most vulnerable in our society.

A "crime victim" is a person "directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e). As courts considering the issue have noted, "[f]or a person to be considered a victim under § 3663, the act that harms the individual must be ... conduct underlying an element of the offense of conviction...." In re Doe, 264 Fed. Appx. 260 (4th Cir. 2007) (individual who claimed harm resulting by using Oxycontin not a victim in case where company pled guilty to introducing misbranded drug into interstate commerce) (quoting United States v. Blake, 81 F.3d 497, 506-07 (4th Cir. 1996)). In the First Circuit, the government must "show not only that a particular loss would not have occurred 'but

3

for' the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." United States v. Cutter, 313 F.3d 1, 7 (1st Cir. 2002); United States v. Vaknin, 212 F.3d 579, 589 (1st Cir. 1997).

The Federal offense at issue in this proceeding (as was at issue in the Oxycontin proceeding) is a misbranding violation of the FDCA, 21 U.S.C. § 331(a). Here, the illegal off-label promotion involved marketing Vioxx for rheumatoid arthritis ("RA") before approval for that indication was obtained from the FDA in April 2002. While noting that Merck sales representatives visited him multiple times during the period June 1999 to September 2002, Dr. Egilman does not demonstrate that his lost professional time was directly or proximately caused by Merck. Dr. Egilman was not forced to listen to detailing by Merck sales representatives; nor was he required to accept free samples of Vioxx. Moreover, Dr. Egilman made no attempt to show that he was ever detailed by any Merck sales representative about the use of Vioxx for RA (the crime of conviction). Dr. Egilman claims he was subjected to "false and misleading" statements during the detail visits, but the only allegedly false and misleading statements he identified in his statement relate to the cardiovascular safety of Vioxx, not to the use of Vioxx for RA. Egilman Statement, pp. 7-8. In addition, when Dr. Egilman requested information from Merck about the VIGOR trial, the written physician information response he received from Merck expressly stated that "VIOXX is not indicated for the treatment of RA." Egilman Statement, Exhibit 5. As such, Merck's written response to his question appears to have plainly and accurately set forth that the use of Vioxx for the treatment of RA was off-label, and contradicts his contention that he was a victim. Furthermore, Dr. Egilman does not claim that he prescribed Vioxx for any patient for treatment of RA; or that he when he did, he would not have

4

done so but for the improper promotion of Vioxx for RA by a Merck sales representative. Finally, Dr. Egilman makes no real effort to quantify any loss from improper detailing on RA, if it happened at all. Without more, Dr. Egilman simply has not shown he was directly or proximately harmed in any way as a result of the crime of conviction. His request for only one dollar in restitution for his professional time simply underscores that point.

Even if he were harmed, which he has not shown, violations of the FDCA are not one of the enumerated offenses for which restitution is authorized under 18 U.S.C. §§ 3663(a)(1) or 3663A(a)(1), (c)(1). See, Government Status Report on Restitution Issues. Moreover, the types of loss compensable under the restitution statutes are loss or destruction of property or costs related to bodily injury, none of which were suffered by Dr. Egilman. See, 18 U.S.C. § 3663(b); 18 U.S.C. § 3663A(b). The only extent to which restitution can be ordered in connection with this Fed. R. Crim. P. 11(c)(1)(C) plea agreement is that agreed by the parties as part of the plea agreement. 18 U.S.C. §3663(a)(3). Finally, for all the reasons discussed in connection with the now-withdrawn claim by the Commonwealth of Pennsylvania, to entertain Dr. Egilman's claim to restitution would also unduly prolong and complicate sentencing, and is not in the interests of justice.

**III. The Requests for Relief by Dr. Egilman Are Outside The Scope of Appropriate Restitution and Should be Denied.**

The four "recommendations" or forms of relief that Dr. Egilman requests in his submission appear to relate more to the ongoing civil litigation in which he is participating as a plaintiff's expert than to the sentencing hearing before this Court. None of his "recommendations" have anything to do with restitution, or can properly be considered as

compensation for any loss or destruction of property or costs related to bodily injury. See, 18 U.S.C. § 3663(b); 18 U.S.C. § 3663A(b). See also, Hughey v. United States, 495 U.S. 411, 420 (1990) (holding that restitution is limited to the loss caused by the conduct underlying the offense of conviction); United States v. Thomas, 635 F.3d 13, 21 (1st Cir. 2011) (discussing the definition of restitution, citing Hughey). Nonetheless, despite the legal bar to any restitution beyond that agreed by the parties in the proposed plea, and the fact that Dr. Egilman is not a victim for statutory restitution purposes, the government will briefly address the lack of substantive merit in each of Dr. Egilman's recommendations in turn.

### A. Require a Second Entity to Sign the Plea Agreement.

Dr. Egilman recommends that this Court require a second corporate entity to sign the plea agreement. Why this issue is of concern to him is unclear. This Court addressed which entity was responsible for the offense of conviction at the plea hearing. If, for some reason, Merck did not complete its material obligations under the plea agreement, the United States could declare the agreement null and void, and proceed to prosecute Merck. Based upon its own research, the United States believes the signatures on the current documents are sufficient for purposes of binding Merck; Dr. Egilman fails to explain why they are deficient in any respect. Using his alleged victim status as a means to obtain admissions for use in civil litigation in which he is currently serving as a paid expert is improper, and well beyond the purposes for which the restitution statutes are intended.

### B. Publicize the September 2001 Warning Letter.

In his second recommendation, Dr. Egilman asks this Court to make the FDA's warning letter from September 2001 public. Egilman Statement, Exhibit 5. That warning letter was

publicly posted by the FDA on September 21, 2001:

> http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM166383.pdf.

The September 2001 Warning Letter has always been public, and remains so. Accordingly, in addition to being beyond the scope of permissible restitution, Dr. Egilman's second request is moot.

### C. Remove the Trade Secret Designation and Make Documents and Depositions Public.

Dr. Egilman's third recommendation is that "documents and depositions (apart from pricing related materials) that describe Merck's illegal conduct should be exposed to sunlight." He specifically seeks a waiver of the trade secret designation made by Merck, whether here or in any other forum. The documents and discovery taken in civil litigation are subject to the civil protective orders in those Courts, and are not appropriately before this Court for consideration. To the extent he wishes to seek any part of the documents or material obtained as part of the criminal investigation, Dr. Egilman has not employed the necessary processes to have his requests evaluated by the government, whether by Freedom of Information Act request, or by valid subpoena issued in connection with the cases on which he currently collaborates. As statutory and regulatory mechanisms exist for private parties to request government documents, as well as for courts to review those requests – none of which have been pursued by Dr. Egilman – this request is both premature and beyond the scope of legitimate restitution.

In addition, Dr. Egilman has filed a request to file documents "in support" of his victim

7

impact statement under seal, and thereafter to lift the order sealing those documents. Dr. Egilman was informed by U.S. Probation that he did not have authority to file material under seal; and the United States is aware of no authority permitting a victim to file anything other than a victim impact statement. Through this motion, Dr. Egilman seeks to make public documents that are otherwise subject to protective orders in civil litigation where Dr. Egilman has been retained as an expert. Such an end run around the authorities of those jurisdictions should not be countenanced. While the government has no objection to the Court looking at any document the Court wishes to see, the United States does not assent to Dr. Egilman's effort to use this proceeding for purposes other than seeking restitution, if he were actually entitled to it, which he is not.

     **D.     Admit High Level Management Participation in the Crime.**

Dr. Egilman's fourth recommendation contains three parts. The first part seeks to require Merck to publicly admit high level management participation in the crime of conviction. In connection with his statement, Dr. Egilman filed a list of documents by bates-range, consisting of approximately 13,000 pages, documents that he claims show high level management participation in the illegal off-label promotion of Vioxx for RA.[2] Egilman Statement, Exhibit 8.

---

[2] These approximately 13,000 pages of material include the initial press release and announcement about the initial VIGOR findings, various clinical trial reports from certain Vioxx studies, and many monthly marketing reports including verbatims (many of these reports are over one hundred pages long). The release, announcement and clinical trial results have nothing to do with off-label promotion for RA. The monthly marketing reports were purchased by the marketing department for research purposes. Included, among others, were questions about what features of the drug mattered to the doctor (e.g. cost, dosing, drug interactions, onset of action, use in specific age groups); what did the doctors recall about what sales representatives said; whether the doctors would use more, stay the same, or use less of the drug in the future; perceptions of relative efficacy of one drug to another. Each of the reports was lengthy, and contained many hundreds of individual pieces of data.

With the exception of one, non-relevant document, the United States obtained all of the approximately 13,000 pages of documents referenced during the course of its investigation; upon receipt of Dr. Egilman's statement, the government reviewed them again. In addition, through appropriate processes during the criminal investigation, the United States had access to all of the Merck managers of whom the government wished to inquire. None of the material to which Dr. Egilman refers changes the United States' conclusion that if the U.S. Sentencing Guidelines applied, U.S.S.G. § 8C2.5(b) would not apply to the crime of conviction because no individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense; or tolerance of the offense by substantial authority personnel was pervasive throughout the organization.

The marketing reports on which Dr. Egilman bases his charge of upper management involvement were purchased by Merck and distributed within the marketing department, and copied on marketing managers and, at some times, attorneys. Out of the hundreds of individual pieces of information in any marketing report, occasionally there was a reference to RA.[3] Instead of supporting Dr. Egilman's claim, the infrequency of those references supports the United States' conclusion that the illegal off-label promotion occurred in the field, and not as the result of any tolerance or involvement by substantial authority or high level personnel. The United States has no evidence that anyone within high-level personnel ever noticed the references to RA

---

[3] The attachment to Dr. Egilman's supplementary statement dated April 10, 2012, is a good example. He attaches one page from a document consisting of over 100 pages. On that page, only one entry of approximately 20 entries contains a reference to RA: "Safe and Effective RX for OA, RA, and Acute Pain." There is no evidence of which the government is aware that anyone noticed that single entry in June 2000, much less any high level or substantial authority personnel. Also of note – the box at the bottom of the document and the highlighting on the document were added by Dr. Egilman and are not on the original document.

in some of the marketing reports, much less condoned or participated in the illegal off-label promotion of Vioxx for RA. It is true that had Merck audited the verbatims or the call notes for compliance with its policies, instances of individual sales representative misconduct would have been discovered that would have warranted remedial training. However, twelve years ago, such compliance activities were not underway at any pharmaceutical company of which the government is aware; those improvements to standard compliance practices began in earnest following the first significant off-label pharmaceutical prosecution in this District, United States v. Warner Lambert Company, LLC, 04-CR-10150-RGS (June 9, 2004)(neurontin).

Moreover, contrary to Dr. Egilman's suggestion of high level knowledge and involvement, Merck affirmatively instructed its sales representatives not to discuss RA after the release of the VIGOR results in the Spring of 2000. In Cox Bulletin 00-019 (March 27, 2000), Merck's first communication to the sales representatives about VIGOR, the representatives were specifically told "[d]o not discuss or respond to questions about the treatment of rheumatoid arthritis with Vioxx." In Cox Bulletin 00-046 (May 24, 2000), Merck reinforced that communication by providing sample questions and answers relating to the VIGOR study. In response to a question about RA, the sales force was told to tell physicians "VIOXX is not indicated for RA and because the study is not in the label, I cannot discuss the details with you." In mandatory sales conferences for the sales force in May 2000, the sales force was told "[d]o not promote or suggest that Vioxx is effective in the treatment of RA. Vioxx is not indicated for RA." These specific instructions were consistent with Merck's overarching policies and training which required sales representatives to stay on-label in any discussion with health care professionals. See, Policy Letter No. 110 (December 1, 1998 and January 1, 2001)("Professional

10

Representatives will discuss product information in strict conformance with the labeling . . ."); Policy Letter No. 118 (December 1, 1998 and January 1, 2001)("It is essential that you remain strictly within approved claims and never minimize any of the risks associated with the use of a product.").

Simply put, Dr. Egilman's claim of high level participation in the crime of conviction is unfounded. Instead, the evidence on which he relies lends further support to the United States' conclusion that if the U.S. Sentencing Guidelines applied, Section 8C2.5 would be inapplicable.

### E. Send New Healthcare Provider Letter.

The second request that is contained in Dr. Egilman's fourth recommendation is that this Court require Merck to send out a new letter to doctors laying out more information about the resolution. Merck's letter was entirely sufficient to provide physicians notice about the global resolution; that letter specifically included information about the crime of conviction -- to wit, that unlawful promotion of Vioxx for a use not approved by the Food and Drug Administration was involved -- and referenced multiple websites at the U.S. Attorney's Office, the Department of Justice, and Merck, where more information, including all of the relevant public documents, could be found.

### F. Debar Merck From Selling Generic Drugs.

Dr. Egilman's third request contained in the fourth recommendation is to have this Court debar Merck from selling generic drugs if another company can make the drug. That request would require the Court to reject the pending plea agreement and the state and federal health care programs to forego substantial monetary recoveries they desperately need, and simultaneously inject the Court into the administrative and regulatory process of determining who can properly

11

produce a given drug. This relief would be both a wholesale departure from decades of administrative practice, and an invasion of the executive branch's administrative competency (through the FDA and the Department of Health and Human Services) to license and regulate the manufacture of pharmaceuticals. There is simply no basis for this extraordinary request on the basis of a private, un-litigated, and untested citizen complaint, and it is unwarranted.

**IV.     General Compliance Issues Raised by Dr. Egilman.**

In part of his statement, Dr. Egilman complains about various compliance related issues.

**A.     FDA Warning Letter and Untitled Letter.**

Both of these letters were received by Merck after the plea hearing on December 16, 2011. The FDA Warning Letter to Merck was dated February 17, 2012 and involved Merck's failure to meet certain milestone dates to conduct certain testing relating to a signal for pancreatitis in connection with use of Januvia and Janumet. Egilman Statement, Exhibit 2. The FDA insisted that Merck provide a final study protocol for a 3-month rodent study and proposed timetable for completion; and to have obtained agreement with the FDA on the study protocol and initiated the study within six months. Merck informed the government of this Warning Letter after it was issued by the FDA, but the Government did not and does not view it as relevant to the illegal off-label promotion by the sales forces that is at issue in this case.

Merck also informed the United States of the untitled letter shortly after it was received on or about February 28, 2012. That letter involved a complaint by FDA that a Merck-sponsored speaker suggested an off-label use for Saphris as adjunctive therapy for major depressive disorder during a speaking event on April 26, 2011. Egilman Statement, Exhibit 3. Merck provided the United States with information (that Merck also provided to the FDA) about the remediation it

12

voluntarily undertook when the company learned of the off-label promotion by this speaker. The physician at issue had been a speaker for Schering-Plough, prior to the merger with Merck. The doctor had signed a contract with Schering-Plough, and thereafter with Merck, agreeing not to speak off-label. Upon learning of the violation, and prior to receipt of the untitled letter, Merck removed the physician from its speaker panel for Saphris and cancelled a program at which he was scheduled to speak. Merck also developed a program to retrain its speakers in connection with Merck Medical Forum discussions, the type discussion at which the physician was speaking. Contrary to Dr. Egilman's suggestion that a Warning Letter is imminent, the undersigned conferred with the FDA after learning of the untitled letter, and learned that the FDA was satisfied with the remediation activity that had been initiated voluntarily by Merck, and that the agency had no further concern. Merck has since been notified by the FDA that the FDA has closed its file on this incident.

      **B.    Cardiovascular Safety Information and VIGOR**

Dr. Egilman also contends that he seeks to make a complete record, and the record he wishes to make focuses on the cardiovascular safety of Vioxx, the subject of the civil litigation in which he has been retained as a plaintiff's expert. He alleges the VIGOR article published in the New England Journal of Medicine was fraudulent, and that Merck hid the safety risks of Vioxx. Egilman Statement, p. 7-8. The concerns that he raises were resolved in the federal civil settlement, and related NAMFCU state civil agreements, that are part of this global resolution. The government made certain allegations in connection with that civil settlement, which allegations Merck denied. That civil settlement is not at issue in this proceeding except (a) to the extent restitution is provided through that civil settlement to the federal and state health care

13

programs for the crime of conviction, and (b) to the extent the civil settlement will not go forward if the criminal plea is not accepted and sentence imposed consistent therewith. Accordingly, neither the allegations in that settlement, nor Dr. Egilman's views regarding them, are relevant for restitution purposes.

V. **Completing These Proceedings Is Urgently Needed for the Federal and State Health Care Programs**.

Contrary to being a rush to judgment, this investigation was careful and thorough, accomplished over many years after taking testimony from many dozens of witnesses, and reviewing literally millions of documents. The negotiations were complex, hard-fought, and ultimately achieved a global resolution that addresses both criminal misconduct and civil allegations and returns badly needed money to the state and federal health care programs. Even after the handshake was reached, significant additional time was required to effectively and appropriately craft the vehicles through which the settlement was to be achieved. Finally, the plea papers were filed with this Court in November.

The need of the state Medicaid programs for the nearly $200 million in restitution that will go directly back to funding health care for the poor and disabled is real. The United States anticipates that the Court will receive input from the participating states, likely this week. The states will speak for themselves. Dr. Egilman, who is not actually a victim, seeks to undo a resolution that is very much in the interests of justice, the taxpayers, and the poor. The concerns he has about Merck given his involvement in the civil litigation, as well as his interest in publishing various papers involving the pharmaceutical industry, are simply not appropriate in the context of this plea and sentencing.

14

                                                        Respectfully submitted,
                                                        CARMEN M. ORTIZ
                                                        United States Attorney

By:

                                                        /s/ Susan G. Winkler
                                                        SUSAN G. WINKLER
                                                        JEREMY STERNBERG
                                                        ZACHARY A. CUNHA
                                                        Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: April 12, 2012                             /s/ Susan G. Winkler
                                                    SUSAN G. WINKLER
                                                     Assistant U.S. Attorney