UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX® | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| *This document relates to* | * | JUDGE FALLON |
| | * | |
| *Jo Levitt v. Merck & Co., Inc.* | * | MAGISTRATE JUDGE KNOWLES |
| **2:06-cv-09757-EEF-DEK** | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE
<u>EXPERT OPINIONS OF DR. JAY N. SCHAPIRA, M.D.</u>**

Respectfully submitted,

**HUMPHREY**, **FARRINGTON** & **McCLAIN, P.C.**

*/s/ Daniel A. Thomas*
                           

| | |
|---|---|
| Kenneth B. McClain | MO #32430 |
| Daniel A. Thomas | MO #52030 |

221 West Lexington, Suite 400
P.O. Box 900
Independence, MO 64051
(816) 836-5050 Telephone
(816) 836-8966 Facsimile

**ATTORNEYS FOR PLAINTIFFS**

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................... 4

II.   LEGAL STANDARD ............................................................................................. 4

III.   ARGUMENT ......................................................................................................... 5

   1.  Dr. Schapira's Opinions Are Sufficiently Supported ........................................... 5

   2.  Dr. Schapira's Opinions Have Remained Consistent ........................................ 10

   3.  Dr. Schapira is Qualified to Render His Opinions ............................................ 15

IV.   CONCLUSION ................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**

*Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307 (5th Cir. 1989) .............................. 10

*Bureau v. State Farm Fire & Cas. Co.*, 129 Fed. Appx. 972 (6th Cir. 2005) ............................... 5

*Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547 (E.D. La. 2015)........................................................... 9

*Buxton v. Lil' Drug Store Products, Inc.*, 2:02CV178KS-MTP, 2007 WL 2254492 (S.D. Miss.

    Aug. 1, 2007) ............................................................................................................. 15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d

    469 (1993)................................................................................................................. 4, 5

*Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777 (3d Cir. 1996) ....................................... 18, 19

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).. 5

*Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791 (E.D. Wis. 2010)............ 14

*McDarby v. Merck & Co., Inc*, 401 N.J. Super. 10, 949 A.2d 223 (App. Div. 2008) ................... 6

*Ullman v. Auto-Owners Mut. Ins. Co.*, 502 F. Supp. 2d 737 (S.D. Ohio 2007) ............................ 5

*United States v. Martinez*, 588 F.3d 301 (6th Cir. 2009)................................................................. 5

**Rules**

Fed. R. Evid. 702 ............................................................................................................... 4, 19

## I.    INTRODUCTION

Plaintiff's retained expert Dr. Jay N. Schapira, M.D. is a nationally recognized cardiologist who has been practicing cardiology, interventional cardiology, and internal medicine for thirty-eight years on a full-time basis (Dr. Schapira's CV, attached as **Exhibit A**). Dr. Schapira is board-certified in internal medicine, and the subspecialty of cardiovascular disease (Deposition of Dr. Schapira, attached to Merck's Motion as Exhibit 1, at 185:15-16) and treats adult patients with coronary artery disease on a daily basis. Dr. Schapira currently holds a dual-professorship, and is a Clinical Professor of Medicine at UCLA and an Assistant Clinical Professor of Nursing at the UCLA School of Nursing (Dr. Schapira's CV, **Exhibit A**). Dr. Schapira is additionally a Professor for the Cedars Sinai Heart Institute, and is an attending physician at both the Ronald Reagan UCLA Medical Center and the Cedars-Sinai Medical Center, both in Los Angeles, California (*Id.*).

Merck has now moved to exclude Dr. Schapira's opinions, arguing that he has failed to review the necessary data, that his opinions are unreliable, and that he is unqualified to opine to subjects outside of what he learned in medical school forty years ago. For all the reasons explained more fully below, Merck's Motion should be denied in full.

## II.    LEGAL STANDARD

To be admissible, expert testimony must be relevant and reliable. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Expert testimony is relevant if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Relevant expert testimony is admissible if offered by "a witness qualified as an expert by knowledge, skill, experience, training, or education" and "if (1) the testimony is

based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.*

The "trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Bureau v. State Farm Fire & Cas. Co.*, 129 Fed. Appx. 972, 975 (6th Cir. 2005) quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). However, the Court's role as a "gatekeeper" is not intended to replace the adversary system contemplated by a jury trial. *Ullman v. Auto-Owners Mut. Ins. Co.*, 502 F. Supp. 2d 737, 743 (S.D. Ohio 2007) citing *Daubert*, 509 U.S. at 596. Cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the appropriate means for attacking admissible evidence, the weight of which is ultimately determined by a jury. *Id.; United States v. Martinez*, 588 F.3d 301 (6th Cir. 2009) citing *Daubert*, 509 U.S. at 596.

**III.    ARGUMENT**

**1.    <u>Dr. Schapira's Opinions Are Sufficiently Supported</u>**

Merck's first argument in support of its Motion to Exclude Dr. Schapira's opinions is that he has not reviewed the scientific data necessary to support his opinion that Ms. Levitt's Vioxx intake caused or contributed to cause her cardiovascular injuries. Merck alleges that because Dr. Schapira has not reviewed every single article or published literature concerning Vioxx, he cannot offer a reliable causation opinion in this case (Merck's Motion, page 6). To the contrary, the studies cited in Dr. Schapira's Report are sufficient to support his admissible causation opinions in this case.

Merck complains that the bibliography to Dr. Schapira's Report only contains two citations to Vioxx-related publications. Those two publications are: "Cardiovascular Safety Report for APPROVe Study," published by Merck, and "Risk of Cardiovascular Events and Rofecoxib: Cumulative Meta-Analysis," written by Juni, Nartey, Reichenbach, Sterchi, Dippe, and Egger, and published in The Lancet in 2004 (See Dr. Schapira's Report attached to Merck's Motion as Exhibit 2, page 9). As explained in the body of Dr. Schapira's report, the article published in The Lancet considered <u>eighteen</u> randomized control trials and <u>eleven</u> observational studies (*Id.*, page 7). While Merck wishes to paint this meta-analysis as "one study," in reality it summarizes twenty-nine separate studies before drawing its conclusions, and has been relied upon and cited by prior Vioxx cases in other jurisdictions. *See McDarby v. Merck & Co., Inc*, 401 N.J. Super. 10, 34, 949 A.2d 223, 237, 248 (App. Div. 2008) ("Dr. Topol also cited a 2004 study by Peter Juni that demonstrated that a progressive meta-analysis of the combined patient populations of the VIGOR and the 090 study would have disclosed a statistically significant cardiovascular risk for Vioxx earlier than Merck recognized.")("Although the Juni study was severely challenged by Merck at trial, plaintiffs' expert, Dr. Krumholz, spoke approvingly of the article and stated that the authors had used proper statistical techniques in reaching their conclusions, which were consistent with the FitzGerald hypothesis.").

Dr. Schapira additionally brought numerous articles and publications that he had reviewed, researched, and relied upon to his deposition. Counsel for Merck chose to not question Dr. Schapira about these materials, and did not mark the materials as an Exhibit. Merck's strategic choice to keep Dr. Schapira's reviewed materials out of the record in this case should not benefit it (*See* Dr. Schapira's deposition attached to Merck's Motion as Exhibit 1 at 15:5-9 ("Usually when I use that terminology, it refers to reports and all the records of the case. It

doesn't just mean medical records, but it would be just the general—**those hundred pounds of records sitting off to my right here**.") (emphasis added); *Id.* at 15:15-20 ("So in the records there are depositions, reports, there are exhibits to depositions, **there are analyses, there is literature,** there are my notes, there are a ton of medical records from a variety of providers, there are some—I guess that includes—and some miscellaneous.") (emphasis added)).

While Merck attempts to focus on only the literature cited in Dr. Schapira's Report, he readily admitted at his deposition that he relied on studies and literature not included in the bibliography to his report:

> Q.    If you are relying on any scientific literature in connection with your opinions in this case, is it fair to say that you have identified what that literature is in your expert reports in this case?
>
> A.    No, not necessarily.
>
> Q.    So there may be material that you are relying on in this matter that you have not in any way identified for defendants; is that correct?
>
> A.    There might be.

(Deposition of Dr. Schapira, attached to Merck's Motion as Exhibit 1, at 17:15-25). Dr. Schapira then referred counsel to Merck to the boxes of material—specifically including Vioxx-related literature—that he had brought with him to his deposition.

> Q.    Okay.  Just so the record is clear, then, this is material that you were already familiar with at the time you prepared your report, you've just only in the last three months printed it out and collected it in this form; is that right?
>
> A.    Familiar with having read it, based -- as a doctor taking care of patients when these were relevant papers to the active care of patients, you know, in late 1990s and the early 2000s.
>
> Q.    Right.  **And there are many articles here in this stack**; correct?
>
> A.    Yes.

7

(*Id.* at 23:23-24:9) (emphasis added). As such, Dr. Schapira provided Merck with all the literature and studies he believed he had reviewed in his experience as a cardiologist specific to Vioxx. Merck made a strategic choice not to mark or question Dr. Schapira about any of the literature he brought with him to the deposition. This was a calculated tactical decision by Merck, and Plaintiff should not be penalized merely because Merck intentionally sat on its hands.[1]

As for Merck's suggestion that Dr. Schapira was not familiar with the meta-analysis which appeared in The Lancet, the actual testimony was as follows:

Q.    The Juni article actually doesn't use unstable  angina as an end point at all; correct?

A.    I think that's correct.

(Deposition of Dr. Schapira, attached to Merck's Motion as Exhibit 1, at 127:22-24).

Q.    And specifically you refer to a point estimate of 2.3, based on that study; right?

A.    Yes.

Q.    Do you know what specific end point that point estimate refers to?

A.    Myocardial infarctions, it appears. Let me just double-check that.   One second, please.

Q.    Sure.  I'll refer you to Page 4 of the Juni publication, right-hand column, toward the top.

A.    Appears myocardial infarction.

Q.    This point estimate does not refer to unstable angina; correct?

A.    That's correct.

Q.    Do you know whether or not Ms. Levitt's presentation at any point in her medical history, as you've seen it, would have qualified to be counted as a

---

[1] For purposes of the record, see the list of the research and literature Dr. Schapira brought to his deposition and offered to Merck's counsel, attached as Exhibit A to Dr. Schapira's Affidavit (**Exhibit B**).

> myocardial infarction for purposes of the analysis performed by Peter Juni, et al.?

A.   I think you're asking me would -- okay.  Just  one second.  I think you're asking me would she have been in his study?

Q.   Correct.  Based on her medical history, do you know whether or not Juni, et al., would have included her as among the myocardial infarctions he's considering?

A.   I don't know that I can say if she had been included or not. This is a meta-analysis, M-E-T-A-analysis, of multiple trials and this is selected out by me to look at.   Myocardial infarction, it doesn't say if it's acute, it doesn't say if it can be picked up based upon analysis from a nuclear scan, like we spent an hour talking about, it doesn't say exactly how they established the diagnosis or gathered the data, and so I can't -- I don't know for sure. It would depend upon the criteria.  But they typically -- but they clearly just took myocardial infarction as their only end point and not the other aspects of atherothrombotic coronary disease.

(*Id.* at 274:20-276:10). As such, in answering a question posed by counsel for Merck which clearly asked Dr. Schapira to speculate as to what types of patients the authors of The Lancet study included, Dr. Schapira explained the reason why he—or any physician—would be unable to tell. It is not, as Merck suggests, the case that he "didn't know." (Merck's Motion page 6).

Additionally, as has become typical in this case, Merck cites distinguishable caselaw. In *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547 (E.D. La. 2015), the plaintiff's expert opined that benzene, including gasoline could cause AML, and claimed that he had reviewed the medical and scientific literature on benzene. *Id.* at 552. However, the expert had only reviewed benzene-specific scientific literature, but not studies pertaining to gasoline exposure, which was the product relevant to the lawsuit. *Id.* The Court held: "[Plaintiff's expert] has made no attempt to demonstrate why benzene-specific studies can reliably support the conclusion that gasoline can cause AML." *Id.* This holding is clearly distinguishable as well. It is not the case that Dr. Schapira reviewed and cited literature on some other medication causing cardiovascular events.

He reviewed VIOXX-specific studies, including a study conducted by Merck itself and a meta-analysis of over twenty-nine different studies that supported his conclusion. He cited two of them at the time he wrote his report in 2013, and brought many more articles to his deposition, Merck merely chose not to go through them.

In *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307 (5th Cir. 1989), also cited by Merck, the Court held that the expert's "theory regarding the effects of doxylamine on acetylcholine, the nervous system and, ultimately, tissue development is nothing more than unproven medical speculation lacking any sort of consensus. Assuredly, one day in the future, medical science may have a clearer understanding of the mechanics of tissue development in the fetus. However, that is not the case today, and speculation unconfirmed by epidemiologic proof cannot form the basis for causation in a court of law." *Id.* at 314-15. Here, Dr. Schapira's opinion that Vioxx causes cardiovascular events does not lack a consensus. The link is proven, and has been studied dozens of times and written in numerous published papers—even by Merck itself in its VIGOR and APPROVe trials—the latter of which was specifically cited by Dr. Schapira in his Report. *Brock* is distinguishable and does not help Merck.

Merck has failed to explain how Dr. Schapira's opinion that Vioxx caused Jo Levitt's cardiovascular injuries is unsupported. While Merck tries to argue that Dr. Schapira has insufficient science or data supporting his causation opinion, that simply is not true. Dr. Schapira relied on scientific studies and literature—including the study conducted by Merck itself. Merck's Motion should be denied.

### 2.  Dr. Schapira's Opinions Have Remained Consistent

Dr. Schapira's opinions in this case have remained consistent. He has not changed his opinion regarding Vioxx causing Ms. Levitt's cardiovascular injuries. Merck's argument that his

opinions have changed is flawed, and none of the cases Merck cites hold what it argues here—that merely because an expert's opinion evolves or is more fully explained, that alone is sufficient to exclude the entire opinion.

Merck's argument here is similar to arguments it raised in its Motions to Exclude the Opinions of two of Plaintiff's other expert witnesses, Dr. Egilman and Dr. Madigan. Both Motions suffer from the same fatal flaw—they argue that myocardial infarction and acute coronary syndrome are two separate and distinct injuries. Merck makes this argument in the context of studies and statistical analysis, as well as diagnoses of Ms. Levitt. As explained at length in Plaintiff's Opposition to Merck's Motion to Exclude the Opinions of Dr. Egilman, myocardial infarction is one of three potential outcomes of acute coronary syndrome. You cannot have an infarction without also having ACS ("[A]cute coronary syndrome is defined as those three events. As a syndrome. So if you have MI, sudden death, or unstable angina, either of them, you have acute coronary syndrome." (Deposition of Dr. Egilman, 121:2-4, attached as **Exhibit C**).

Merck misleadingly claims to this Court that Dr. Schapira made "starkly inconsistent opinions" (Defendant's Motion, page 7) that are "diametrically opposed and flatly inconsistent" (*Id*., page 10) and first opined that "Ms. Levitt *did* experience an acute myocardial infarction," and then changed his mind to opine that Ms. Levitt "***did not*** experience an acute myocardial infarction" (*Id*., page 8). Even a cursory review of Dr. Schapira's reports, however, shows this is simply not true. Dr. Schapira's two reports, attached to Merck's Motion as Exhibits 2 and 3, respectively, show that Dr. Schapira later amended his report, not to say that Ms. Levitt "***did not*** experience an acute myocardial infarction," but rather to clarify his opinion that she had suffered acute coronary syndrome. As previously explained, this is a very similar diagnosis to that of

11

myocardial infarction, but merely includes other outcomes as well. To clarify, the terminology as used by cardiologists who evaluate and treat patients such as Ms. Levitt (as Dr. Schapira does) on a regular basis, acute coronary syndrome is an inclusive term that includes acute myocardial infarction and unstable angina which are clinical conditions relevant to Ms. Levitt.

> Q.   In January of 2016 you didn't withdraw that sentence and change its wording?
>
> A.   I changed one word, from "acute myocardial infarction" to "acute coronary syndrome." Those three words were changed.
>
> Q.   Okay. Okay. So you did -- you did change this sentence; correct?
>
> A.   **The opinion is the same** but, as it turns out, she did have a myocardial infarction that we just talked about half an hour ago.

(Deposition of Dr. Schapira, attached to Merck's Motion as Exhibit 1, at 97:7-16) (emphasis added). Again, contrary to Merck's intentional misstatements, Dr. Schapira has <u>never</u> opined in this case that Jo Levitt "***did not*** experience a myocardial infarction," as brazenly misquoted by Merck (*Id.* at 77:7-11; first report attached to Merck's Motion as Exhibit 2, page 7; second report attached to Merck's Motion as Exhibit 3).

Similarly untrue is Merck's claim that Dr. Schapira changed his opinion regarding the timing of Ms. Levitt's myocardial infarction. While counsel for Merck attempted to corner Dr. Schapira into a specific date for when Ms. Levitt's myocardial infarction occurred, Dr. Schapira specifically testified that he was unable to provide a specific date:

> Q.   When do you believe that Ms. Levitt experienced an acute myocardial infarction?
>
> A.   I do not -- I think that it was sometime after March of 2000.
>
> Q.    When?
>
> A.   Specifically when?

Q.      Can you say?  Do you know?

A.      **I don't know precisely when.**  We only see the scar there in 2002.

Q.      Do you have an opinion that you're expressing in  this case about when Ms. Levitt experienced an acute myocardial infarction?

A.       Between 2000 and 2002.

Q.     Are you expressing an opinion in this case that Miss Levitt experienced an acute myocardial infarction in March 2000?

A.      No.

Q.      Are you expressing an opinion in this case that Miss Levitt experienced an acute myocardial infarction in May, June, July of 2000?

A.      **I can't tell you the exact date.**

Q.      Is that a no to my question?

A.      **I can't tell you the exact date is the answer.**

Q.      My question to you is specific.  It's more specific than whether you can tell me an exact date. My question to you is whether or not you are expressing an opinion in this case about whether Miss Levitt experienced an acute myocardial infarction in May or June of the year 2000.

A.      **I can't give you a specific date**, and I can just tell you it's -- to a reasonable medical certainty, it occurred between 2000 and 2002.

(Deposition of Dr. Schapira, attached to Merck's Motion as Exhibit 1, 100:14-101:22) (emphasis added).

Another misstatement of fact is Merck's assertion that "No healthcare professional who actually treated Ms. Levitt during or after her cardiovascular events **ever** diagnosed her with acute myocardial infarction. No contemporaneous medical record evidences an acute myocardial infarction." Both of these statements are categorically false.  As explained by Dr. Schapira in his deposition, based on the medical records of Ms. Levitt:

Because there was some question when she came in in March of 2000 as to whether or not that was a subacute myocardial infarction versus acute coronary syndrome.  Both are stated in the medical records. I think, most likely, it was acute coronary  syndrome but that includes an entire spectrum, including unstable angina, non-ST segment elevation infarction, it includes the entire spectrum of cardiac injury and ischemia. **What this documented was, is that in fact she had had injury, she had had a myocardial infarction.**

(*Id.* at 76:21-77:6) (emphasis added).

Contrary to Merck's assertions that Ms. Levitt was **never** diagnosed with acute myocardial infarction, and **no** medical records evidence a myocardial infarction, in reality, the medical records from St. Luke's South Hospital from March 9, 2000 specifically state: "she will be admitted with subacute myocardial infarction as her provisional diagnosis." (Medical records attached hereto as **Exhibit D** at bates number JL-SLHS-000001); "She has subacute myocardial infarction." (*Id.* at bates number JL-SLHS-000002). While it is true that this "provisional diagnosis" was not made absolute until later when the scar of her myocardial infarction was defined in subsequent cardiac testing, this is not inconsistent with Dr. Schapira's testimony.

Dr. Schapira's opinions are not contradictory, nor do they bounce freely from theory to theory. As usual, Merck's cited precedent is distinguishable from the present scenario. In *Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791 (E.D. Wis. 2010), the "diagnosis that is diametrically opposed to the original diagnosis" was when the plaintiff's expert witness originally diagnosed her with reactive airways dysfunction syndrome, which necessarily requires the absence of a history of asthma, and also provided the alternative diagnosis of an "exacerbation of preexisting asthma." *Id.* at 806-07. Here, as explained previously at length, Dr. Schapira has not changed his diagnosis of Jo Levitt. He merely clarified his original opinion of only "myocardial infarction" to "acute coronary syndrome," which necessarily includes myocardial infarction. He has not therefore, provided "diametrically opposed" diagnoses.

In *Buxton v. Lil' Drug Store Products, Inc.*, 2:02CV178KS-MTP, 2007 WL 2254492 (S.D. Miss. Aug. 1, 2007), aff'd, 294 F. App'x 92 (5th Cir. 2008), the Court excluded the diagnosis made by plaintiff's expert because:

> the court notes that in the three affidavits offered by Dr. Ramsey, his opinion as to what exactly happened to plaintiff keeps changing. In his first affidavit, Dr. Ramsey stated that PPA "caused a massive vasoconstriction of all arteries...." In the second affidavit, Dr. Ramsey changed his opinion to state that PPA "caused or contributed to the cause of a massive vasoconstriction of arteries...." In the Supplemental Affidavit, Dr. Ramsey states that PPA "caused or contributed to the cause of a massive vasoconstriction of more than one (1) of the cerebral arteries...." These shifting statements underscore the lack of reliability of Dr. Ramsey's opinion.

*Id*. at *14. Here, it is not the case that Dr. Schapira's opinions "are even more suspect than those excluded in *Buxton*." (Merck's Motion, page 8). The only opinion of Dr. Schapira's that has ever "changed" is his clarification to expand his diagnosis of myocardial infarction to acute coronary syndrome. Dr. Schapira has never taken back his opinion that Ms. Levitt's Vioxx intake caused her to suffer a myocardial infarction. As such, Merck's Motion should be denied.

### 3.  Dr. Schapira is Qualified to Render His Opinions

Merck lastly claims that Dr. Schapira is not qualified to opine as to the depression, cognitive issues, a "global disability" associated with Ms. Levitt's cardiovascular injuries. Merck argues that Dr. Schapira "is simply unqualified to offer expert testimony on [ ] Ms. Levitt's mental health. . . ." (Merck's Motion, page 10). This is not true. Dr. Schapira has been a practicing physician for thirty-eight years. He routinely diagnoses his own patients with depression and other cognitive issues associated with their cardiovascular injuries (See affidavit of Dr. Schapira, attached hereto as **Exhibit B**). Dr. Schapira treats his patients' depression and cognitive issues with medications, counselling, and sometimes referral to specialists. *Id.* He inquires as to their lifestyle, functionality, occupation, disabilities, and much more in making his

15

diagnosis. *Id.* While it may be true, as Merck cites, that courts bar physicians from opining about fields of medicine in which they do not regularly practice, Dr. Schapira <u>does</u> regularly practice and treat patients with depression. Furthermore, the psychological aspects of cardiovascular disease are included as a separate chapter in major cardiology textbooks as evidence of the cardiologist involvement with these issues (See Table of Contents to Braunwald's Heart Disease: A Textbook of Cardiovascular Medicine, chapter 86, attached as **<u>Exhibit E</u>**).

Q.    Okay.  But you're -- in spite of the fact that you did not include any opinion in your expert reports in this case, you do have opinions and you do hold out the possibility of expressing those opinions?

A.    Well, that's two questions.  Number one, I do have opinions.  She's a patient, she's a heart patient, I see heart patients, and I have opinions.  Number two whether or not I express them or not is not up to me.

Q.    What's your understanding about who is that up -- who that is up to?

A.    A, you, if you ask me questions about it; and, B, if Mr. Thomas asks me questions about it.

Q.    Okay.  You also have a folder in here marked "Depression."   Do you see that?

A.    Yes.

Q.    This folder contains precisely one article. Do you see that?

A.    Yes.

Q.    Is this article by Mallik, M-A-L-L-I-K, et al., an article that you're relying on for purposes of the opinions you're expressing in this case?

A.    In a very indirect, background way.  This is knowledge I had before, just is the basis of it.

Q.    You don't express any opinions in your expert reports at all about Ms. Levitt's depression, do you?

A.    I would have to review it to -- I just – I can't recall any -- I don't think there are but to be sure I'd have to look at it.  You probably have reviewed it more recently than I have.

Q.    Do you intend to express opinions about Ms. Levitt's depression in connection with your work in this case?

A.    If you ask, if Mr. Thomas asks, I will tell you my opinion of the role of depression in her case **as a cardiologist, of course, not a psychiatrist. I'm not a psychologist, not a therapist, but this is an issue I deal with in patients.**

(Deposition of Dr. Schapira attached to Merck's Motion as Exhibit 1, at 25:23-27:10) (emphasis added).

Clearly, Dr. Schapira readily admits that he is not a psychologist, but that he deals with depression issues with his own patients, and will be offering his opinions from his own experience as a cardiologist. Dr. Schapira testified similarly regarding his opinion that Ms. Levitt now suffers from a "global disability:"

Q.    Have you performed a comprehensive review of Miss Levitt's psychiatric records for purposes of expressing an opinion about the severity of her depression after 2000 compared to the severity of her depression before the year 2000?

A.    I reviewed her psychiatric records in order to assess what her functional capacity is, based upon her cardiac situation.

Q.    I'm sorry, but that was not my question.

A.    Specifically, no, but that could become a little bit relevant in terms of assessing her functional abilities now.

Q.    Can you clarify that for me?

A.    Okay. Let me start with the bigger picture and then maybe you'll understand. So I'm a cardiologist. I'm here to tell you about her cardiac situation before and after March and June of 2000. She is disabled now. She has a disability. It is a global disability. It's related to her cardiac problems, it's related partially to heart, it's related partially to the co-

> morbidities of her cardiac situation, which include her depression and her
> cognitive issues. As a cardiologist, I would identify that, I would discuss it
> with the patient and refer them to a psychiatrist if I were treating that
> patient. I'm a clinician. But I would have to assess it and I would have to
> evaluate it and I would have to have an opinion about it. I believe that
> Miss Levitt is just like a lot of patients in my practice, and when I
> approached and analyzed this case, I did it just like I was evaluating a
> patient in my practice.

(*Id.* at 28:23-30:13).

Under Rule 702, a proffered witness must be an expert. This requirement has been liberally construed. "We have held that a broad range of knowledge, skills, and training qualify an expert as such, and have eschewed imposing overly rigorous requirements of expertise." *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 781 (3d Cir. 1996) (internal citations omitted).

The official Notes of the Advisory Committee on Rule 703 provide that:

> [A] physician in his own practice bases his diagnosis on information from
> numerous sources and of considerable variety, including statements by patients
> and relatives, reports and opinions from nurses, technicians and other doctors,
> hospital records, and X-rays. Most of them are admissible in evidence, but only
> with the expenditure of substantial time in producing and examining various
> authenticating witnesses. The physician makes life-and-death decisions in reliance
> upon them. His validation, expertly performed and subject to cross-examination,
> ought to suffice for judicial purposes.

In *Holbrook*, the trial court had prevented the plaintiff's treating physician, who specialized in internal medicine, from testifying regarding the plaintiff's mesothelioma because the expert was not an oncologist or specialist in cancer diagnosis. *Id.* The Court explained:

> Because of our liberal approach to admitting expert testimony, most arguments
> about an expert's qualifications relate more to the weight to be given the expert's
> testimony than to its admissibility. Thus, witnesses may be competent to testify as
> experts even though they may not, in the court's eyes, be the "best" qualified.
> Who is "best" qualified is a matter of weight upon which reasonable jurors may
> disagree.

18

*Id.* at 782. The Court further explained that "insistence on a certain kind of degree or background is inconsistent with our jurisprudence in this area. The language of Rule 702 and the accompanying advisory notes make it clear that various kinds of 'knowledge skill, experience, training or education,' Fed.R.Evid. 702, qualify an expert as such." *Id.* (internal citation omitted). "Following this logic, it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Id.*

The fact that Dr. Schapira is not a psychologist or psychiatrist does not disqualify him from opining to Ms. Levitt's depression or cognitive issues associated with her cardiovascular injuries. This is something Dr. Schapira does with his own patients, as would any cardiologist. The issue of whether Dr. Schapira is the "best qualified" to opine to these injuries is an issue for the jury.

Lastly, while testimony regarding "business analysis" was elicited at Dr. Schapira's deposition, he does not intend to testify to this issue at trial, unless specifically asked to by Merck's counsel, as he was in his deposition.

As explained above, Dr. Schapira is qualified to render his opinions regarding Ms. Levitt's cognitive issues in this case, due to his own experience, knowledge, and training as a practicing cardiologist. Dr. Schapira readily admitted in his deposition that his opinions are from his standpoint as a cardiologist, not as a psychiatrist. While Merck may argue that Dr. Schapira is not the "best" qualified to opine to Ms. Levitt's cognitive state or global disability, that is an issue for the jury to determine what weight to afford Dr. Schapira's testimony. He is qualified as an expert however, so Merck's Motion should be denied.

## IV.     CONCLUSION

Dr. Jay Schapira is qualified to provide expert opinions in this case. His causation opinion that Ms. Levitt's Vioxx intake caused or contributed to cause her cardiovascular injuries is sufficiently supported by scientific literature, peer-reviewed studies, and Merck's own APPROVe study. Dr. Schapira's opinions have remained consistent—that Ms. Levitt's Vioxx intake caused her acute coronary syndrome, an outcome of which is myocardial infarction. Lastly, Dr. Schapira is qualified to opine to Ms. Levitt's depression and cognitive issues, as he does with his cardiovascular patients in his everyday practice. For all these reasons, Plaintiff respectfully requests that this Court deny Merck's Motion to Exclude the Opinions of Dr. Schapira.

/s/ Daniel A. Thomas
Kenneth B. McClain                      MO #32430
Daniel A. Thomas                        MO #52030
HUMPHREY, FARRINGTON & McCLAIN, P.C.
221 West Lexington, Suite 400
P.O. Box 900
Independence, MO 64051
(816) 836-5050 Telephone
(816) 836-8966 Facsimile

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing **Plaintiff's Opposition To Defendant's Motion to Exclude the Expert Opinions of Dr. Jay N. Schapira, M.D.** has been served on Defense Counsel, Elaine Horn and Emily Pistilli and Defendant Liaison Counsel, Dorothy H. Wimberly, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 27th day of July, 2016.

/s/ Daniel A. Thomas

Kenneth B. McClain        MO #32430
Daniel A. Thomas          MO #52030
HUMPHREY, FARRINGTON & McCLAIN, P.C.
221 West Lexington, Suite 400
P.O. Box 900
Independence, MO 64051
(816) 836-5050 Telephone
(816) 836-8966 Facsimile

**ATTORNEYS FOR PLAINTIFFS**