**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  VIOXX® | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| *This document relates to* | * | **JUDGE FALLON** |
| | * | |
| *Jo Levitt v. Merck & Co., Inc.* | * | **MAGISTRATE JUDGE KNOWLES** |
| **2:06-cv-09757-EEF-DEK** | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## PLAINTIFF'S RESPONSES CONTROVERTING
## MERCK'S STATEMENT OF MATERIAL FACTS

1.     Ms. Levitt's damages expert, Dr. John Ward, estimates the present discounted values of Mrs. Levitt's alleged economic loss at either $1,429,325, or $1,776,728. Suppl. Report of John Ward (Jan. 19, 2016) ("Ward Suppl.") (attached as Ex. 1) at 7.

**RESPONSE:  Admitted to the extent that the economic loss numbers set forth by Dr. Ward represent a portion of Ms. Levitt's personal economic loss.  Denied to the extent that these figures represent Ms. Levitt's economic losses in total. Dr. Ward's supplemental report is limited to Earning Capacity and Household work services and specifically provides that "any other claimed damages should be reported and then appraised by the trier of fact using its own judgment as to value." (Defendant's Ex. 1, at 7).**

2.     Ms. Levitt's rheumatologist, Dr. Arnold L. Katz, diagnosed her with fibromyalgia in October 1999, and prescribed Vioxx to her to treat the pain associated with her condition. Deposition of Dr. Arnold L. Katz (Jan. 30, 2013) ("Katz Dep.") (excerpts attached as Ex. 2) 26:10–13, 29:16–20.

**RESPONSE:  Admitted.**

3.      In March 2000, Ms. Levitt experienced unstable angina had a stent placed. Following restenosis in May 2000, she underwent bypass surgery. *See* Records of Dr. Michael E. Gorton (excerpts attached as Ex. 3) at 138.

**RESPONSE:  Admitted.**

4.      Ms. Levitt continued to take Vioxx through April 2002, and she did not experience any further cardiac events following her May 2000 bypass surgery. *See* Katz Dep. (Ex. 2) 64:22–65:3.

**RESPONSE: Denied. The testimony cited by Merck does not support the fact stated—that Ms. Levitt did not experience any cardiac events following her bypass surgery, as her retained expert cardiologist specifically testified that Ms. Levitt had a presentation of unstable angina in June 2000 (*See* deposition of Dr. Schapira, attached hereto as Exhibit "A" at 124:17-22).**

5.      At the time of Ms. Levitt's cardiac events in 2000, the Levitt family owned two businesses—one that manufactured and sold high-end children's clothing, and one that operated a hotel in Nebraska.

**RESPONSE:  Admitted.**

6.      These businesses operated through several corporate entities: American XO, II, Inc., Chocolate Soup Manufacturing, and Chocolate Soup Retail. The entity of II, Inc. owned and operated the Villager Motel in Lincoln, Nebraska. Chocolate Soup Manufacturing owned the factory and production lines that manufactured the Levitts' proprietary children's clothing designs. Chocolate Soup Retail owned and operated a chain of retail outlets of Chocolate Soup stores. American XO was a parent corporation that owned both II, Inc. and Chocolate Soup

Manufacturing. *See* Mission Bank Records (excerpts attached as Ex. 4) at 1770 (describing corporate structure).

**RESPONSE:  Admitted.**

7.     American XO was owned by Jo Levitt (45%), James Levitt (45%), and their daughter Ashley Levitt (10%). *Id*. at 3557. Chocolate Soup Retail was a separate Subchapter S Corporation owned by Jo Levitt (50%) and James Levitt (50%). *Id*. at 792.

**RESPONSE:  Admitted.**

8.     The Levitts started operating Chocolate Soup around 1970 out of their home. Deposition of Robert Bazan (Jan. 16, 2013) ("Bazan Dep.") (excerpts attached as Ex. 5) at 45:7–9; Deposition of James Levitt (Dec. 8 & 9, 2015) ("James Levitt 30(b)(6) Dep.") (excerpts attached as Ex. 6) at 145:9–11.

**RESPONSE:   Plaintiff admits that Robert Bazan testified that the Levitts started the company in 1969 out of their garage (*See* Deposition of Robert Bazan, attached hereto as Exhibit "B" at 45:8-9).**

9.     The Levitts subsequently established a manufacturing facility to produce their clothing designs and, as of 1999, they had fourteen Chocolate Soup retail outlets across the country. Bazan Dep. (Ex. 5) 44:11; James Levitt 30(b)(6) Dep. (Ex. 6) 129:4–17.

**RESPONSE:  Admitted.**

10.     Collectively, Chocolate Soup Manufacturing and Chocolate Soup Retail employed approximately 120 to 200 people. Bazan Dep. (Ex. 5) 177:19–178:7 (estimating 120); Deposition of Jo Levitt (July 23, 2012) ("Jo Levitt Dep.") (excerpts attached as Ex. 7) at 22:7–11 (estimating 200).

**RESPONSE:  Admitted.**

11.     In 1975, the Levitts purchased an existing hotel and theater complex in Lincoln, Nebraska from Ms. Levitt's father. Jo Levitt Dep. (Ex. 7) 35:17–36:7; James Levitt 30(b)(6) Dep. (Ex. 6) 83:19–84:2.

**RESPONSE:  Admitted.**

12.     Around the time of the hotel purchase, James Levitt hired Bob Bazan, a CPA, to assist with running the Levitt businesses. Bazan Dep. (Ex. 5) 42:4–7. Mr. Bazan was a key manager and decision maker within the Levitt businesses, and he testified that he was the Levitts' "right-hand man." James Levitt 30(b)(6) Dep. (Ex. 6) 14:4–5; Bazan Dep. (Ex. 5) 126:7.

**RESPONSE:  Admitted that the Levitts hired Bob Bazan to assist with running the Levitt businesses.  Denied to the extent that he was a key manager and decision-maker. Mr. Levitt described Mr. Bazan as "just another executive with our company." (*See* Deposition of James Levitt, 7/24/2012, attached hereto as Exhibit "C" at 21:11-14).  Mr. Bazan deferred to Ms. Levitt as the decision maker and acknowledged her role as his boss.  Mr. Bazan testified, "as far as I'm concerned, she's the boss."  Exhibit "B," Bazan Dep. at 122:10-11.  Mr. Bazan further testified, "[s]he was the boss.  And I worked there.  And, you know, I wouldn't say I caved in.  But her – she's so talented that I'm going to respect her opinion on how well she likes something more than I'm going to respect my opinion on how I like it."  *Id*. at 124:24 – 125:4**

13.     The financial aspects of the Levitt family companies were handled by James Levitt and Bob Bazan, not Jo Levitt. Deposition of James Levitt (July 24, 2012) ("James Levitt Dep.") (excerpts attached as Ex. 8) 34:4–7 (Mr. Levitt was "primarily responsible for . . . the financial end of the business."); *id.* at 95:20–23 (agreeing Ms. Levitt "just wasn't involved in the financial side"); *id* at 95:1–2 (Mr. Bazan, a CPA, "became a big part of the business as an

executive"); Jo Levitt Dep. (Ex. 7) 20:13–16 ("I was in charge of everything other than the financial part of it.").

**RESPONSE:  Admitted that Ms. Levitt was not involved in the financial aspects of the companies.  Plaintiff denies any implications that the success of the family companies was not predominantly dependent upon Ms. Levitt's personal effort, service, and initiative.**

**Additionally, see Plaintiff's Statement of Facts Nos. 12, 15 – 17.**

14.     By 1999, only about one-third of the merchandise sold in Chocolate Soup stores was based on Chocolate Soup original designs. Bazan Dep. (Ex. 5) 92:14–20; James Levitt 30(b)(6) Dep. (Ex. 6) 135:17–22. The remaining two thirds was purchased from other manufacturers at various buying shows in Las Vegas, New York, and elsewhere. Bazan Dep. (Ex. 5) 39:12–16.

**RESPONSE:   Denied. While the Chocolate Soup original designs may not have made up the entire store, they were the more valuable inventory.  Mr. Bazan testified as follows:**

> **"There's two parts to Chocolate Soup.   There's the manufacturing side, and then there's the stuff that we buy that we don't make; blue jeans, coats, et cetera.  Chocolate Soup was a unique look of appliqued clothing.  That was our forte. And that was – that was kind of like the movie.  That's why they came to the movie, but – excuse me, they'd buy the blue jeans, they'd buy the other stuff, which is the popcorn."**

**Exhibit "B," Bazan Dep. at 15:5-13.**

15.     Mr. Bazan played a key role in purchasing the clothing items that were stocked in Chocolate Soup stores that were not based on Ms. Levitt's designs. *Id.* at 33:23–34:15.

**RESPONSE:   Denied. Mr. Bazan "didn't make a lot of decisions when Jo was actively involved."  Exhibit "C," James Levitt Dep. at 98:20-22.  Ms. Levitt "was in charge**

of all of the buying." Deposition of Jo Levitt, attached hereto as Exhibit "D" at 20:6-16. See also Exhibit "C," James Levitt Dep. at 98:20 – 99:4; 30(b)(6) Deposition of James Levitt, attached hereto as Exhibit "E" at 148:9-12. James Levitt further testified, "Jo started buying clothes from other resources. And it turned out that she was as good a buyer as she was a designer. She knew what was hot or would be hot." *Id*. at 133:25 – 134:4.

Mr. Bazan testified that

"the way the buying works, she was the picker, but I had all the analytical information and pictures from last year. And she basically would rate what she saw. She was always looking for trends, you know. She was a designer, you know, really good buyer. Hell of a good buyer."

Exhibit "B," Bazan Dep. at 38:20 – 39:1.

Mr. Bazan further testified,

"But it was a team effort with her and I. She does the picking. We used what was called a star system. Literally, she would go like this on a catalog or a picture that they gave us….Well it was then my duty to convert that into quantities that I thought we could sell."

*Id*. at 123:8 – 22.

16. Mr. Bazan was also centrally involved in the management and financial operations of the hotel. Jo Levitt Dep. (Ex. 7) 36:24–37:6 ("We've had different managers, . . . young guys that I didn't hire, Bob Bazan hired them."); James Levitt 30(b)(6) Dep. (Ex. 6) 198:12–14 (James Levitt "was never up there a lot" at the hotel).

**RESPONSE:** **Admitted that Mr. Bazan was involved in the financial operations of the hotel. Denied that Mr. Bazan was centrally involved in the management of the hotel. Further denied as to any implication that Ms. Levitt was not centrally involved in the**

6

management of the hotel.  Mr. Bazan testified that he was "involved to the extent that [he] paid the bills."  Exhibit "B," Bazan Dep. at 76:6-7.   Ms. Levitt fired personnel, investigated thefts at the hotel, and gave directions.  *Id*. at 173:16 – 174:14.   Deposition of James Levitt, 12/9/2015, attached hereto as Exhibit "F" at 200:14-19.  Although the hotel had managers, they took directions from Ms. Levitt.  Mr. Bazan testified that, "if Jo wanted something done as far as design layout, whatever, she would basically communicate her ideas to [the maintenance manager] and they would do it, you know."  Exhibit "B," Bazan Dep.  at 32:23 – 33:2.  Mr. Levitt testing that Jo "was the only one that could deal with those people."  Exhibit "C," James Levitt Dep. at 109:13-16.

17.     Both the hotel and clothing businesses utilized substantial labor from many people other than Ms. Levitt. The top management included her husband James Levitt and Bob Bazan. They also employed numerous others at the manufacturing facility, in the retail stores, and at the hotel including store and hotel managers, designers, factory workers, store clerks who worked the retail counters, maids who cleaned hotel rooms, and servers who worked in the various food and beverage operations. *See, e.g.*, Jo Levitt Dep. (Ex. 7) 24:11–20 ("I didn't devote as much time on the retail side as far as day-to-day running of it, my husband did more [of] that"); *id.* at 25:19–26:8 (Chocolate Soup had other designers that worked under Jo Levitt's direction.); *id.* at 19:16–21 ("[D]id I personally open [the new stores], some of them, but we had – you know, we hired people and we had a national retail manager and . . . she did some of the opening and then we had a crew here in Kansas City that would go out and open stores."); James Levitt Dep. (Ex. 8) 94:24–95:2 ("[T]hat's why I hired Bazan to begin with. He became a big part of the business as an executive."); Bazan Dep. (Ex. 5) 124:12–15 (on buying trips: "It was a team effort."); *id.* at 126:7 ("I was their right-hand man."); *id.* at 179:14–18 (confirms that a team of

people worked with Jo, "she had a design staff"); Jo Levitt Dep. (Ex. 7) 36:14:17 ("Q. Did you

have any management role in the hotel? A. No, I just was in charge of the design[.]"); Jo Levitt

Dep. (Ex. 7) 37:1–15 (on series of hotel managers: "young guys that I didn't hire, Bob Bazan

hired them.").

**RESPONSE:  Admitted that the Levitts' businesses operated with the assistance of
managers, employees, and other staff.  Denied as to any implication that the success of the
family companies was not predominantly dependent upon Ms. Levitt's personal effort,
service, and initiative.  See Plaintiff's Statement of Facts Nos. 12 – 17.**

18.    Collectively, the Levitt businesses employed hundreds of people who performed

functions necessary to keep the businesses running. Jo Levitt Dep. (Ex. 7) at 22:10–12 ("in

Chocolate Soup a few hundred, maybe 200 . . . we had like 35 sewing machine operators,

probably at the factory"); Bazan Dep. (Ex. 5) 74:2–3 (hotel had 60–70 employees).

**RESPONSE:  Admitted that the Levitts businesses operated with the assistance of
managers, employees and other staff.  Denied as to any implication that the success of the
family companies was not predominantly dependent upon Ms. Levitt's personal effort,
service, and initiative.  See Plaintiff's Statement of Facts Nos. 12 – 17.**

19.    Both the hotel and clothing businesses also utilized substantial invested capital.

Chocolate Soup purchased inventory from third parties that provided two-thirds of the

merchandise in the individual stores. Jo Levitt Dep. (Ex. 7) 23:18–22. Both businesses had

various large lines of credit used for working capital. Mission Bank Records (Ex. 4) at 1770–71

(listing lines of credit).

**RESPONSE:  Admitted as to the Levitts using lines of credit for working capital.
Denied as to any implication that the Chocolate Soup line was not valuable inventory.**

8

**While the Chocolate Soup original designs may not have made up the entire store, they were the more valuable inventory.  Mr. Bazan testified as follows:**

> **"There's two parts to Chocolate Soup.   There's the manufacturing side, and then there's the stuff that we buy that we don't make; blue jeans, coats, et cetera.   Chocolate Soup was a unique look of appliqued clothing.   That was our forte. And that was – that was kind of like the movie.   That's why they came to the movie, but – excuse me, they'd buy the blue jeans, they'd buy the other stuff, which is the popcorn."**

**Exhibit "B," Bazan Dep. at 15:5-13.**

20.      In the mid to late 1990s, Chocolate Soup sustained several years of substantial operating losses, attributable in part to an unsuccessful venture into screen printing. James Levitt 30(b)(6) Dep. (Ex. 6) 227:9–13; Bazan Dep. (Ex. 5) 107:4–109:2.

**RESPONSE:  Admitted that Chocolate Soup sustained operating losses in the years 1995 – 1998 due to an unsuccessful venture into screen printing.   Denied as to any implication that Chocolate Soup's future earnings would result in continued losses. Further denied as to any implication that Chocolate Soup's ultimate failure was as a result of the venture into screen printing.   Chocolate Soup's operating losses decreased from 1996 – 1998 (from -$855,168 in 1996 to -$10,477 in 1998).   *See* Summary of Financial Statements, attached hereto as Exhibit "G."   However, Chocolate Soup returned to earning a net income of $153,726 in 1999, $230,858 in the year 2000, and $172,335 in the year 2001.   *Id*.**

**Additionally, see Plaintiff's Statement of Facts Nos. 12 – 17.**

21.      Chocolate Soup's performance was also hurt by competition from foreign imports during this time frame. James Levitt 30(b)(6) Dep. (Ex. 6) 225:22–23 ("there was such an influx of imports of better clothes"); Bazan Dep. (Ex. 5) 79:17–19 ("from the 2000s going forward here, that it was . . . prohibitively expensive to manufacture clothes in the United States");

Mission Bank Records (Ex. 4) at 1680 (James Levitt reported, "Margins are still getting squeezed as competition, particularly foreign made goods, has caused problems.").

**RESPONSE: Admitted that Chocolate Soup had competition from foreign imports. Denied as to any implication that foreign imports would impact Chocolate Soup's future solvency or future earnings. Further denied as to any implication that Chocolate Soup's ultimate failure was as a result of foreign imports and not as a result of Ms. Levitt's injuries caused by Vioxx.**

**Mr. Levitt testified that "if the goods could have been manufactured offshore, I mean, it would – anybody would do great." Exhibit "F" James Levitt Dep. at 224:14-18. Ms. Levitt had plans and made efforts to venture into overseas manufacturing to keep up with increased competition and lower margins. Ms. Levitt had hand-smocked clothing being made in Vietnam. *See* Exhibit "B," Bazan Dep. 80:11-19; 83:5-18.**

**Additionally, see Plaintiff's Statement of Facts Nos. 12 – 17.**

22. The Nebraska hotel operations were described by Mr. Bazan as a "cash cow" in the mid-1990s, Bazan Dep. (Ex. 5) 75:15–19, but by 1999, that business was experiencing negative cash flow. *See* Affidavit of Bob Bazan (May 2, 2007) ("Bazan Aff.") (Ex. 9) ¶ 8.

**RESPONSE: Admitted that the business was experiencing a negative cash flow. Denied as to any implication that the hotel operation would not have rebounded.**

**Ms. Levitt understood that businesses must evolve and had plans to reinvent the hotel. She began to renovate the hotel and update it. She had plans to redo the front end of the restaurant and create a French bakery. She made "some progress" with Sadie's and got revenues up. *See* Exhibit "B," Bazan Dep. at 30:16–31:1; 31:8-15; 32:9-15; 76:1-3. *See***

*also* Exhibit "F," James Levitt Dep. at 183:22-184:4 and Exhibit "D," Jo Levitt Dep. 36:14-23; 37:16-38:3.

Additionally, see Plaintiff's Statement of Facts No. 15.

23.     During this same time period, the Levitts began increasing the debt load being carried by the family businesses and the family. *See* Mission Bank Records (Ex. 4) at 1770–71 (summarizing loan history from 1997–2005).

**RESPONSE:  Denied as worded, as "during this same time period" is vague and ambiguous. Additionally, the cited Mission Bank Records show that the companies' debt load was actually decreased in 1997, but later modified and increased. Lastly, the cited Mission Bank Records appear to be entirely regarding the family businesses, and not "the family," as Merck states (*See* Mission Bank Records, Defendant's Ex. 4 at 1770–71).**

24.     By 2001, the ongoing poor performance of the Levitts' hotel business led to them taking in insufficient operating income to service their business debt. *See* Mission Bank Records (Ex. 4) at 1848 (in 2001, insufficient operating income to service debt "primarily due to the poor performance of the Village Motor Inn.").

**RESPONSE:  Admitted that the hotel business was no longer profitable after 2001. Denied as to any implication that the hotel operation would not have rebounded.**

**Ms. Levitt understood that businesses must evolve and had plans to reinvent the hotel.  She began to renovate the hotel and update it.  She had plans to redo the front end of the restaurant and create a French bakery.  She made "some progress" with Sadie's and got revenues up.  *See* Exhibit "B," Bazan Dep. at 30:16–31:1; 31:8-15; 32:9-15; 76:1-3.  *See* *also* Exhibit "F," James Levitt Dep. at 183:22-184:4 and Exhibit "D," Jo Levitt Dep. 36:14-23; 37:16-38:3.**

Additionally, see Plaintiff's Statement of Facts Nos. 12, 15 – 17.

25.     The hotel's performance was also harmed by increased competition from the opening of new hotels nearby. *Id.* at 1777 (increased competition "hurt business in 2001" and "continued into 2002"); *id.* at 547 (losses continued into 2003 due to "an over-abundance of hotel rooms" resulting in occupancy rate "of less than 50%.").

**RESPONSE:  Admitted that the Levitts attributed some of the hotel's performance to increased competition and decreased occupancy rates.  Denied as to any implication that the hotel operation would not have rebounded.  Further denied as to any implication that hotel's ultimate failure was as a result of increased competition and not as a result of Ms. Levitt's injuries caused by Vioxx.**

**Mr. Levitt testified they had been "affected by new competition before" but "then the year after that, it goes back up."  Exhibit "E," James Levitt 30(b)(6) Dep. at 74:16 – 75:2.**

**Ms. Levitt understood that businesses must evolve and had plans to reinvent the hotel.  She began to renovate the hotel and update it.  She had plans to redo the front end of the restaurant and create a French bakery.  She made "some progress" with Sadie's and got revenues up.  *See* Exhibit "B," Bazan Dep. at 30:16–31:1; 31:8-15; 32:9-15; 76:1-3.  *See also* Exhibit "F," James Levitt Dep. at 183:22-184:4 and Exhibit "D," Jo Levitt Dep. 36:14-23; 37:16-38:3.**

Additionally, see Plaintiff's Statement of Facts Nos. 12, 15 – 17.

26.     Ms. Levitt attributed a further decline in hotel revenues to a major public works construction project, which "drastically inhibited public access to the Villager . . . [and] was in

place from approximately 2003 to 2005." Affidavit of Jo Levitt (May 2, 2007) ("Levitt Aff.")
Aff. (Ex. 10) ¶ 17.

**RESPONSE:  Admitted that Ms. Levitt attributed some of the losses of the hotel's restaurant, Sadie's, to the public works project, which lasted only two years.  Denied as to any implication that the hotel operation would not have rebounded.  Further denied as to any implication that hotel's ultimate failure was as a result of the public works project and not as a result of Ms. Levitt's injuries caused by Vioxx.**

**Ms. Levitt understood that businesses must evolve and had plans to reinvent the hotel.  She began to renovate the hotel and update it.  She had plans to redo the front end of the restaurant and create a French bakery.  She made "some progress" with Sadie's and got revenues up.  *See* Exhibit "B," Bazan Dep. at 30:16–31:1; 31:8-15; 32:9-15; 76:1-3.  *See also* Exhibit "F," James Levitt Dep. at 183:22-184:4 and Exhibit "D," Jo Levitt Dep. 36:14-23; 37:16-38:3.**

**Additionally, see Plaintiff's Statement of Facts Nos. 12, 15 – 17.**

27.    A city-wide smoking ban then went into effect January 1, 2005, and, according to Ms. Levitt, drove away more customers from the hotel's food and beverage operation. *Id.* ¶ 17 ("As such, the Villager lost the business of numerous 'smoking' patrons."); *see also* Bazan Aff. (Ex. 9) ¶ 14. As the hotel manager noted "[t]he smoking ban had really hurt the business," and Ms. Levitt told him that she "d[id]n't see it getting any better." Deposition of Jeff Ford (May 16, 2007) (Ex. 11) 66:10–11.

**RESPONSE:  Admitted that Ms. Levitt attributed some of the losses of the hotel's food and beverage operation to the city-wide smoking ban.  Denied as to any implication that the hotel operation would not have rebounded.  Further denied as to any implication**

that hotel's ultimate failure was as a result of the city-wide smoking ban and not as a result of Ms. Levitt's injuries caused by Vioxx.

Ms. Levitt understood that businesses must evolve and had plans to reinvent the hotel.  She began to renovate the hotel and update it.  She had plans to redo the front end of the restaurant and create a French bakery.  She made "some progress" with Sadie's and got revenues up.  *See* Exhibit "B," Bazan Dep. at 30:16–31:1; 31:8-15; 32:9-15; 76:1-3.  *See also* Exhibit "F," James Levitt Dep. at 183:22-184:4 and Exhibit "D," Jo Levitt Dep. 36:14-23; 37:16-38:3.

Additionally, see Plaintiff's Statement of Facts Nos. 12, 15 – 17.

28.     By January 2005, the hotel was depleting the financial resources of all of the Levitts' businesses. Mission Bank Records (Ex. 4) at 1775; *see also* Bazan Dep. (Ex. 5) 73:8–12; 30:5–7 (Chocolate Soup was "funding this venture up there for the negative cash flow.").

**RESPONSE:  Admitted that the hotel was requiring additional financial resources. Denied as to any implication that the financial resources that were the main reason that the businesses were failing. The main reason the businesses were failing was because of Ms. Levitt's cardiovascular injuries caused by her intake of Vioxx. Ms. Levitt was described as the "driving force" behind the companies, that "she was the business," and "creative talent."  Deposition of John Ward, attached hereto as Exhibit "H" at 65:17-19; Deposition of Jennifer Ashley Anderson, attached hereto as Exhibit "I" at 74:9-16; Exhibit "B," Bazan Dep.at 15:13-14. Mr. Bazan testified, "[Ms. Levitt] was the one who made it go, you know." Exhibit "B," Bazan Dep. at 14:5-6.**

Additionally, see Plaintiff's Statement of Facts Nos. 12, 15 – 17.

29.    The Levitt businesses continued to struggle throughout 2007 and 2008. *See* Mission Bank Records (Ex. 4) at 654 (2007 financial reports "continue to show the property is losing a significant amount of money."); *id.* at 716 (proposing operation of the hotel at partial capacity and total liquidation of clothing business).

**RESPONSE:   Admitted that the businesses were struggling in 2007 and 2008. Denied as to any implication that the financial problems of the businesses were the main reason that the businesses were failing.  The main reason the businesses were failing was because of Ms. Levitt's cardiovascular injuries caused by her intake of Vioxx.**

**Additionally, see Plaintiff's Statement of Facts Nos. 12 – 17.**

30.    Throughout this period, the Levitts substantially increased their debt levels to fund the continued operation of their businesses. *See, e.g.*, *id.* at 1921 (June 2003 additional personal loan of $350,000); James Levitt 30(b)(6) Dep. (Ex. 6) 195:3–11 (taking out second mortgage on personal residence to put into companies); Citibank Loan Documents (Ex. 12) at 1882 (second mortgage of $500,000).

**RESPONSE:   Admitted to the extent the Levitts increased their debt levels to fund their business.  Denied to the extent that this "statement of fact" suggests that business debt was the main reason that the businesses were failing.  The main reason the businesses were failing was because of Ms. Levitt's cardiovascular injuries caused by her intake of Vioxx.**

**Additionally, see Plaintiff's Statement of Facts Nos. 12, 15 – 17.**

31.    By February 2008, the Levitts' business debt fell into default. *See* Mission Bank Records (Ex. 4) at 647 ("all of the loans are in default at this time").

**RESPONSE:  Admitted.**

32.     Ultimately, the Levitts decided to sell the hotel property. *See id.* at 1775 ("[r]eportedly, the land the hotel resides on may be more valuable than the hotel itself."); *see also* Bazan Dep. (Ex. 5) 79:9–13; 91:17–92:8 ("If the hotel sold, all Chocolate Soup debt is wiped out, get a line of credit again, man, we're good.").

**RESPONSE:  Admitted.**

33.     They found a buyer, and executed a contract of sale in October of 2008. Bazan Dep. (Ex. 5) 28:5. But, shortly after the contract was executed, the sale collapsed. Mr. Levitt and Mr. Bazan believe that this was due to crisis conditions in the national real estate and financial markets. James Levitt Dep. (Ex. 8) at 64:2–5; Bazan Dep. (Ex. 5) at 28:16–29:8.

**RESPONSE:   Denied.   Although the sale of the hotel fell through, Mr. Bazan attributes it to a key tenant backing out of the buyer's plan to develop an open area shopping center and the buyers "getting nervous and they just basically walked."  Exhibit "B," Bazan Dep. at 29:2-11.**

34.     After the sale failed to materialize, the Levitts abandoned the hotel operation, and they transferred the deed to the bank in lieu of foreclosure. James Levitt Dep. (Ex. 8) 113:6–8; Bazan Dep. (Ex. 5) 114:3–5.

**RESPONSE:  Admitted.**

35.     The assets of Chocolate Soup and the Levitts' other real estate investments were essentially assumed by lenders. James Levitt Dep. (Ex. 8) 61:16–21.

**RESPONSE:  Admitted.**

36.     Business records relating to both the clothing and hotel businesses were stored at Chocolate Soup's manufacturing building in a "row of file cabinets." Bazan Dep. (Ex. 5) 59:8–61:9; James Levitt 30(b)(6) Dep. (Ex. 6) 20:6–13. These records included corporate tax returns,

general ledgers, financial statements and associated documents, accounts payable records, sales and cost information, inventory listings, and other documents. Bazan Dep. (Ex. 5) 59:16–62:20.

**RESPONSE:  Admitted.**

37.     Financial statements were also kept on computer databases stored in the Chocolate Soup warehouse. James Levitt 30(b)(6) Dep. (Ex. 6) 58:11–60:3.

**RESPONSE:  Denied.  Mr. Levitt testified that "our computers didn't do formal type financial statements" and that he "assumed [Bazan] could have put financial statements" there.  Exhibit "E," James Levitt 30(b)(6) Dep. at 59:6-11.**

38.     Lenders foreclosed on the Chocolate Soup facility in May 2009, and Jo Levitt negotiated six months to vacate the building. Bazan Dep. (Ex. 5) 133:19–136:10. Starting at that time, through October 2009, the company "got rid of" old records, equipment, and inventory by selling off items of value, and otherwise "pitching" things out. *Id.* at 135:13–138:11.

**RESPONSE:  Denied.  The Levitts were given a 30-day notice from North American Savings Bank to vacate the 40,000 square foot Chocolate Soup building, which was filled with a huge fabric inventory, huge thread inventory, and a huge notions inventory, as well as company records.  Ms. Levitt was able to negotiate a six month extension on the building, but the bank was "pretty much calling the shots at this point" and "wanted us out of there."  Exhibit "B," Bazan Dep. 133:19 – 137:16.  Mr. Bazan did not throw away all company records and maintained anything that was required to be saved pursuant to the sales statute. *Id.***

39.     As for the computer databases with financial records, sometime in late 2009, Mr. Bazan went to the office of Chocolate Soup one day after it had been sold to new owners, and the computers were gone. *Id.* at 59:12–60:3.

**RESPONSE:   Plaintiff objects to this "statement of fact," which is unverified hearsay, as Merck cites to James Levitt's deposition testimony for what Mr. Bazan allegedly told him happened to the computers. James Levitt himself testified that at the time the facility was foreclosed upon he had had triple bypass surgery and was not in good shape, and while he kept telling his employees to get the records out of the facility, for whatever reason, the records were not saved.  Exhibit "E," James Levitt 30(b)(6) Dep. at 20:20-21:5.  The Levitts later tried to obtain the records from the people who bought the building, but they were unable to do so.  *Id*.**

40.     In her 2006 Plaintiff Profile Form, Ms. Levitt asserted that she was making a wage loss claim in this case, and noted that at the time of her injury she was earning $68,400 annually. Pl. Profile Form (Nov. 12, 2006) (Ex. 13) at 3. No reference was made to any business losses. *Id.*

**RESPONSE:   Denied.  Plaintiff admits that no reference was made to any business losses.  However, Plaintiff filled out a Plaintiff Profile Questionnaire, which consisted of yes/no questions and limited-scope questions sought to garner specific information such as military service, family history, Vioxx prescription information, and medical history.  The questions regarding to wage loss claims were limited to name of employer, employer for the past ten years, whether the Plaintiff was making a wage loss claim, and the *amount of annual income*.  There was not a question in the limited questionnaire about business losses, and the questionnaire does not contain instructions for including additional claims not covered by the basic questionnaire.**

41.     Three years later, when she submitted an Amended Plaintiff Profile Form in 2009,

Ms. Levitt expanded the scope of her damages to include lost "Company cash flow & earnings." Am. & Suppl. Pl. Profile Form (Ex. 14) at 30. When asked to provide the factual basis and a computation for each category of damages, she replied: "In 2000 our net worth of approx. 20 million. I've lost my business and in process of losing my home." Pl. Resp. to Def. First Interrog. (Sep. 28, 2009) (Ex. 15) at 5.

**RESPONSE:  Denied.  Plaintiff admits that her scope of damages was expanded to include "Company cash flow & earnings."  However, the Plaintiff Profile Form completed in 2009 asked for the *amount of income that you claim you lost*.  The scope of the question was expanded from the prior questionnaire.**

42.     In 2015 discovery responses, Ms. Levitt stated that she "relied upon her husband's representation regarding net worth," and that any questions should "be directed to [her] expert witness." Pl. Resp. to Def. Second Interrog. (Dec. 11, 2015) (Ex. 16) at 4.

**RESPONSE:  Admitted.**

43.     With respect to a valuation figure for Chocolate Soup and II, Inc. found on a financial statement that he had prepared, Mr. Levitt testified: "Well, I don't have the backup to arrive at that figure right now." James Levitt 30(b)(6) Dep. (Ex. 6) 54:22–25.

**RESPONSE:  Plaintiff admits that the cited testimony states this. However, James Levitt further testified that he had prepared the analysis for the bank, and the bank had all the financial statements of all the businesses, and the bank did its own analysis to support the figures he found.  Exhibit "E," James Levitt 30(b)(6) Dep. at 54:24-55:10.**

44.     With respect to Mr. Levitt's valuations of the hotel at various times, he testified: "I didn't do an asset analysis on the hotel . . . it was a number that I thought we could sell the hotel for minus the debt is what I attributed to the hotel." *Id.* at 68:18–23.

**RESPONSE:  Plaintiff admits that the cited testimony states this. However, James Levitt further testified that these values did not include any value for the land. Exhibit "E," James Levitt 30(b)(6) Dep. at 69:24 – 70:18.**

45.    When asked to explain why the valuations decreased $1.5 million between the December 1999 and April 2001 statements: "I don't know. This is years later. I mean, obviously, I must have had a reason for it." *Id.* at 73:7–74:7.

**RESPONSE:  Plaintiff admits that the cited testimony states this. However, James Levitt further testified that that hotel "didn't have a great year" and he probably lowered the hotel value. Exhibit "E," James Levitt 30(b)(6) Dep. at 73:7 – 74:7.**

46.    The personal financial statements prepared by Mr. Levitt during the relevant time period show a purported family net worth ranging from $9 million to $11 million, though more than half of that net worth was attributed to the Levitts' other investments and assets,  unrelated to Chocolate Soup or the hotel. *See* Collection of Levitts' Financial Statements (attached as Ex. 19).

**RESPONSE:  Admitted.**

47.    When asked for any evidence regarding any economic damages beyond those analyzed in Dr. Ward's original report, Ms. Levitt stated that she "does intend to identify an expert witness to testify about her additional damages which include medical expenses and additional lost income." Pl. Resp. to Def. Second Interrog. (Dec. 11, 2015) (Ex. 16) at 5.

**RESPONSE:  Admitted.**

48.    Dr. Ward expresses no opinions regarding business valuation or the Levitts' net worth. He entirely restricts his opinions to assessing Ms. Levitt's lost earning capacity as a business executive. Deposition of John Ward ("Ward Dep.") (Ex. 17) at 15:7–17 ("My

calculation's based upon her lost earnings capacity as opposed to the lost value of the business.").

**RESPONSE:   Admitted that Dr. Ward expressed no opinions regarding business valuation.   Denied as to implication that Ms. Levitt did not sustain a loss of earnings due to the failure of her family businesses.**

49.   Dr. Ward declined to provide any business loss calculations. He explained to Ms. Levitt's counsel: "One of the problems in looking at the corporation's net income is that in a personal injury case we calculate loss of earnings capacity to the injured person versus lost income to the corporation which is a return to capital. *It would be hard to segregate losses of income due to her depression separate from returns to capital and returns to her husband's effort, as well as market conditions.*" Fax from John Ward (Apr. 2, 2014) (Ex. 18) (emphasis added).

**RESPONSE:   Admitted to the extent Dr. Ward expressed no opinions regarding business valuation.   Denied as to implication that Ms. Levitt did not sustain a loss of earnings due to the failure of her family businesses.**

50.   In his 2016 deposition, Dr. Ward confirmed that while the Levitts had hoped to obtain a valuation for their closed businesses, he did not see that as an appropriate measure of damages in this case:

> I think there was an expectation on the part of Jo Levitt that the loss should include loss of value of business, destroyed business venture . . . . I didn't see any way to directly relate it to the incident in the year 2000 and subsequent events because there were other things happening, like the economy and many other things. So I didn't -- we chose not to pursue that course.

Ward Dep. (Ex. 17) 46:20–47:8.

**RESPONSE**:  **Admitted to the extent Dr. Ward expressed no opinions regarding business valuation.  Denied as to implication that Ms. Levitt did not sustain a loss of earnings due to the failure of her family businesses.**

51.     When Dr. Ward was asked whether there was any basis to distinguish the Levitts' businesses from the many hospitality industry and retail industry businesses that failed during the 2008/2009 recession, he testified:

> A:      No. That's why I didn't try to put a value on their business.
>
> Q:      Okay. Because you have no basis to assume that their business would survive over someone else's business?
>
> A:      Right. [ . . . ]

*Id.* at 139:14–21.

**RESPONSE**:  **Admitted to the extent Dr. Ward expressed no opinions regarding business valuation.  Denied as to implication that Ms. Levitt did not sustain a loss of earnings due to the failure of her family businesses.**

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## WHICH PRESENT A GENUINE ISSUE

### Jo Levitt's Contribution to Her Businesses

1.      Jo Levitt was the visionary behind Chocolate Soup and the hotel business.  Ms. Levitt was described as the "driving force" behind the companies, that "she was the business," and "creative talent."  *See* Exhibit "B," Bazan Dep.at 15:13-14; Exhibit "H," Ward Dep. at 65:17-19, 90:22-91:3; Exhibit "I," Anderson Dep. at 74:9-16.  Mr. Bazan testified, "[Ms. Levitt] was the one who made it go, you know."  Exhibit "B," Bazan Dep. at 14:5-6.  *See also* Exhibit "C," James Levitt Dep. at 40:9-15.

2.      Jo Levitt oversaw all creative and quality aspects of Chocolate Soup.  *See* Exhibit "B," Bazan Dep. at 13:21-23, 15:13-14, 93:18-23, 94:16-23; Exhibit "D," Jo Levitt Dep. at 23:2-6, 25:19–26:2; Exhibit "E," James Levitt 30(b)(6) Dep. at 145:24–146:7, 148:7-12, 150:12-20; Exhibit "H," Ward Dep. at 84:8-12; Exhibit "I," Anderson Dep. at 74:9-16, 86:11–87:3.

3.      Jo Levitt was in charge of all purchasing for Chocolate Soup, including fabric for the Chocolate Soup clothing line, and non-Chocolate Soup clothing sold in the boutiques. She was the "primary decision maker right down the line."  Exhibit "C," James Levitt Dep. at 35:8-22.  *See* Exhibit "B," Bazan Dep. at 38:20–39:1, 123:8-22; Exhibit "E," James Levitt 30(b)(6) Dep. at 145:24–146:7, 148:7-12, 150:12-20.

4.      In the 1980s, the Levitts received an offer from a New York Stock Exchange firm to buy Chocolate Soup for $7 million.  Exhibit "E," James Levitt 30(b)(6) Dep. at 48:15-20.

5.      Jo Levitt knew the hotel had to evolve to keep up with competitors and the times and plans to reinvent the property, including renovating the property and opening a French bakery.  She oversaw all of these projects.  *See* Exhibit "B," Bazan Dep. at 29:17-39:9; 76:6-7;

Exhibit "C," James Levitt Dep. at 23:15-17, 24:7-13, 31:4-11; Exhibit "D," Jo Levitt Dep. at 36:14-23, 37:16–38:3; Exhibit "F," James Levitt Dep. at 184:5-185:15, 186:24-187:3.

6.      Jo Levitt was a workaholic, devoting 10-12 hours per day, 6-7 days per week to the success of her businesses. *See* Exhibit "B," Bazan Dep. at 37:2-15, 38:5–39:9, 78:9-13, 161:20-24; Exhibit "D," Jo Levitt Dep. at 21:22–22:2.

### Jo Levitt's Injuries and the Subsequent Decline of Her Businesses

7.      Jo Levitt was considered productive, energetic, a real go-getter, a dynamo, and the type would run everyone else ragged.  *See* Exhibit "B," Bazan Dep. at 37:2-15, 38:5-39:9, 78:9-13, 161:20-24; Exhibit "C," James Levitt Dep. at 69:22–70:10; Exhibit "D," Jo Levitt Dep. at 21:22 – 22:2;  Exhibit "I," Anderson Dep. at 143:10-18.

8.      The decline of the businesses began in 2001 as a result of Jo Levitt's health problems. *See* Exhibit "B," Bazan Dep. at 95:4-7; Exhibit "H," Ward Dep. at 16:16-18, 131:6-18.

9.      After experiencing the unstable angina and undergoing bypass surgery, Jo. Levitt no longer had the same energy to work as she had prior to the cardiac events.  *See* Exhibit "B," Bazan Dep. at 33:8-13, 37:2-15; 95:4-6, 161:20-24; Exhibit "C," James Levitt Dep. at 27:2-14, 65:11-18; 69:22-70:10; 78:8-10; Exhibit "D," Jo Levitt Dep. at 93:22-94:13; 94:22-96:3; Exhibit "I," Anderson Dep.at 81:3-6, 87:18-21, 88:6-13, 142:21-143:18.

10.     Jo Levitt's daughter, Ashley Anderson, testified that before the cardiac events, Jo Levitt was a "go-getter."  After the cardiac events "she's just not my same mom anymore." Exhibit "I," Anderson Dep. at 143:10-18.

11.     James Levitt testified that he "didn't know what depression was until after [Jo Levitt] had that heart operation.  Now I know what depression is."  Exhibit "C," James Levitt Dep. at 78:8-10.

12.     Mr. Bazan testified that Ms. Levitt's heart attack had an immediate impact on her work, and she could no longer work at the same level she had before her heart attack.  Exhibit "B," Bazan Dep. at 14:9-23.

13.     Many of her projects sat in limbo for extended periods of time waiting for her approval. *See* Exhibit "B," Bazan Dep. at 93:18-23.

14.     The quality and production levels of Chocolate Soup went down.  *See* Exhibit "E," James Levitt 30(b)6) Dep. at 146:17-22.

15.     Ms. Levitt's failing health prevented her from being able to follow through with her plans for the hotel.  Ms. Levitt would travel to Lincoln, Nebraska to work on the on-going projects for the hotel for two to three weeks at a time.  However, she would end up in her room sleeping for most of the time.  The hotel still had a lot more renovating to do at the time of Ms. Levitt's heart attack.  *See* Exhibit "F," James Levitt Dep. at 174:17-19; 183:22-185:15.

16.     Ms. Levitt was irreplaceable. "I don't think you could replace Jo.  No way.  She was that good."  Exhibit "B," Bazan Dep. at 78:14-79:1.  "We just needed more of her is what we needed."  *Id*.  *See also* Exhibit "I," Anderson Dep. at 87:4 – 87:23.

17.     Mr. Bazan attributes the success of the business to Ms. Levitt and believes that the businesses would have been successful had Ms. Levitt's health allowed her to continue to be the powerhouse behind the businesses. "We just needed more of her is what we needed."  Exhibit "B," Bazan Dep. 78:14–79:1.  "Things changed dramatically when her health went south.  I mean, it just wasn't the same."  *Id*. at 95:4-6.  "Well, you know, I guess I go back to if – the

other half of the equation was if we could have got – if Jo's health would have been good enough in 2009 to come back and work like she did pre-heart attack, yeah, things would have been different." *Id*. at 118:9-14.

## The Loss of Jo Levitt's Business Records

18.     In May 2009, Plaintiffs were given a 30-day notice to vacate the building which held all of the Chocolate Soup inventory and financial records.  Ms. Levitt was able to negotiate a six-month extension.  However, the bank was "calling the shots at this point."   Exhibit "B," Bazan Dep. at 135:10-140:1.

19.     Also during this period, Jim Levitt underwent triple bypass surgery and "wasn't in very good shape."  Exhibit "E," James Levitt 30(b)(6) Dep. at 20:20–22:1.

20.     Jim Levitt instructed everyone who worked for him to "get the stuff out of there." Exhibit "E," James Levitt 30(b)(6) Dep. at 20:20–22:21.

21.     The Levitts' bank, Mission Bank, retained hundreds of pages of the financial records and documentation for Plaintiff's businesses, including balance sheets, income statements, statements of operations, statements of changes in shareholders' equity, cash flow statements, statements of retained earnings, and schedules of costs of goods sold (See extensive financial documentation attached collectively as Exhibit "J," produced by Mission Bank in response to Merck's subpoena).

## Jo Levitt's Business Income

22.     All of the income from the S Corporation, Chocolate Soup Retail, passed through to the Levitts.  *See* Exhibit "B," Bazan Dep. at 49:23-50:1.

23.     The Levitts owned 100% of American XO.   *See* Exhibit "B," Bazan Dep. at Bazan 47:18-20.

24.     The Levitts owned 100% of the stock of the holding company, which meant they owned 100% of the subsidiary corporations *See* Exhibit "B," Bazan Dep. at Bazan 51:14-18. "It's all the Levitts in the end."  *Id*. at Bazan 51:19-20.

25.     Jim Levitt testified that between all of the entities, the highest salary he and Jo would have received from the company businesses was approximately $1 million dollars. Exhibit "C," James Levitt Dep. at 37:16-19; 39:14-21.

26.     Jim Levitt further testified that the salaries he and Jo would receive from their businesses would not be consistent amounts from year to year, because while they were paid a certain salaries, since they owned a subchapter S corporation, their income would depend on what the sub S Corporation would earn.  Exhibit "C," James Levitt Dep. at James Levitt, 37:24-38:6.

27.     The Levitts did not allocate themselves large salaries, because if they needed more money, they could get it out of their companies.  *See* Exhibit "E," James Levitt 30(b)(6) Dep. at 17:5-24.

28.     Ms. Levitt received a salary from her businesses in the amount of $72,000 because that was the amount she decided to pay herself Jim.  *See* Exhibit "E," James Levitt 30(b)(6) Dep. at 17:5-24; Exhibit "H," Ward Dep. at 62:12-15, 89:13-90:13.

29.     Dr. John Ward testified that Jo Levitt's $72,000 salary was a "very low number, given the magnitude of sales of the company and the profitability of the company."  Exhibit "H," Ward Dep. at 63:18-21.

30.     In Dr. Ward's deposition, counsel for Merck cross-examined him extensively on whether the value of Ms. Levitt's salary was more or less than what she and her husband decided to pay her, and whether her salary would be dependent on how much her companies were

27

earning, or on how long her companies had been in existence.  See Exhibit "H," Ward Dep. at 89:13–93:11.

31.     Dr. Ward opined in his report that "Mrs. Levitt had historically earned substantial business profits and financial gains in the assets that she purchased and then later sold. Mr. and Mrs. Levitt are best suited to report those past financial economic losses directly to the trier of fact."  Report of John Ward, Ph.D., attached hereto as Exhibit "K" at page 2.

32.     While in Dr. Ward's Report his largest estimate of Ms. Levitt's lost earnings was based on the median annual wage earnings of a Chief Executive, he testified that

> The role of the chief executive is the creative force of the company, makes the company work, as opposed to a department head that's in charge of a line function, like accounting, or production, or whatever it might be. She was actually involved in all aspects.  She was involved in creation of the designs, the manufacturing, supervision of manufacturing.  She did all those sorts of things, according to her.   Now, could you hire someone for that -- $123,000 to perform all those functions? I really doubt it.   That's a very low salary for a chief executive.  But that is the one that's reported at the median level.  That's the one we use.

Exhibit "H," Ward Dep. at 84:3-18.

33.     Ms. Levitt's salary was not always at the $72,000 amount, and was actually $109,000 in 1991 and $118,000 in 1992.  *See* Exhibit "H," Ward Dep. at 62:24-25; Social Security Earnings Summary attached hereto as Exhibit "L."

34.     Jo Levitt could have had a job that paid $250,000-$300,000 per year putting together lines for clothing companies.  *See* Exhibit "F," James Levitt Dep. at 224:11-23.

35.     Dr. Ward's estimate of Ms. Levitt's lost capacity to work was limited to the base salary that Ms. Levitt chose to pay herself, although historically, Ms. Levitt had "earned substantial business profits and financial gains in the assets that she purchased and later sold." Exhibit "K," Ward Report at Page 2.

36.     The Levitts personally guaranteed loans that were made to their companies. Exhibit "B," Bazan Dep. at 131:24-132:6.

37.     The Levitts personally guaranteed the entire $4.3 million dollar mortgage on the hotel.  Exhibit "B," Bazan Dep. at 132:3-6.

38.     Mr. Bazan estimated that the Levitts personally guaranteed two loans for Chocolate Soup, one in the amount of $1.25 million, and one in the amount of $250,000.  Exhibit "B," Bazan Dep. at 132:7-14.

39.     Bank records show that the Levitts personally guaranteed a loan in the amount of $500,000 to American XO in 1997.  *See* Letter dated July 31, 1997 regarding loan guarantee, attached hereto as Exhibit "M".

40.     When the Levitts' companies—Chocolate Soup and American XO—were not able to pay their bills, the effect was that the banks were in a position to go after the Levitts directly for the money.  Exhibit "B," Bazan Dep. at 132:15-20.

41.     Jim Levitt prepared yearly financial statements that summarized the Levitts' Assets and Liabilities at the request of their banks.  Exhibit "E," James Levitt 30(b)(6) Dep. at 51:4-21.

42.     Each financial statement would have prepared around the time each statement is dated.  Exhibit "E," James Levitt 30(b)(6) Dep. at 51:22-52:2.

43.     Each financial statement had an "investment schedule," that listed the Levitts' investments for each year, combining their investments in American XO Inc. and Chocolate Soup Retail, Inc. Exhibit "E," James Levitt 30(b)(6) Dep. at 52:15-53:11. *See also* Financial Statements attached collectively hereto as Defendant's Ex. 19.

44.     In 1999, the year before Jo Levitt's heart attacks, the Levitts' combined investments in their two businesses was valued at $4,500,000. *See* Financial Statements attached as Defendant's Ex. 19, at bates number 00027.

45.     In 2001, the year after Jo Levitt's heart attacks, the Levitts' combined investments in their two businesses was valued at $3,000,000. *See* Financial Statements attached as Defendant's Ex. 19, at bates number 00030.

46.     In 2005, the Levitts' combined investments in their two businesses was valued at $580,000. *See* Financial Statements attached as Defendant's Ex. 19, at bates number 00060.

## APPENDIX I – TABLE OF PLAINTIFF'S EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | Deposition of Dr. Schapira, Vol. I, dated 4/26/2016 |
| B | Deposition of Robert Bazan, dated 1/16/2013 |
| C | Deposition of James Levitt, dated 7/24/2012 |
| D | Deposition of Jo Levitt, dated 7/23/2012 |
| E | 30(b)(6) Deposition of James Levitt, dated 12/8/2015 |
| F | Deposition of James Levitt, dated 12/9/2015 |
| G | Summary of Financial Statements |
| H | Deposition of John Ward, dated 2/9/2016 |
| I | Deposition of Jennifer Ashley Anderson, dated 11/19/2015 |
| J | Mission Bank Records Produced in Response to Merck's Subpoena |
| K | Dr. Ward's Expert Report |
| L | Social Security Earnings Summary |
| M | Letter Regarding Loan Guarantee, dated 7/31/1997 |

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing **Plaintiff's Statement of Material Facts Which Present a Genuine Issue** has been served on Defense Counsel, Elaine Horn and Emily Pistilli and Defendant Liaison Counsel, Elaine Horn and Emily Pistilli and Defendant Liaison Counsel, Dorothy H. Wimberly, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 27th day of July, 2016.

/s/ Daniel A. Thomas
Kenneth B. McClain                  MO #32430
Daniel A. Thomas                    MO #52030
HUMPHREY, FARRINGTON & McCLAIN, P.C.
221 West Lexington, Suite 400
P.O. Box 900
Independence, MO 64051
(816) 836-5050 Telephone
(816) 836-8966 Facsimile

**ATTORNEYS FOR PLAINTIFFS**

32