# Exhibit H

**Page 1**

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE: VIOXX          MDL DOCKET NO. 1657
     PRODUCTS LIABILITY LITIGATION    SECTION L
 4
               JUDGE FALLON
 5             MAGISTRATE JUDGE
                  KNOWLES
 6
 7   THIS DOCUMENT RELATES TO:
 8   Jo Levitt v. Merck Sharp & Dohme Corp.,
 9   2:06-cv-09757-EEF-DEK
10   _____
11
12
13        VIDEOTAPED DEPOSITION OF JOHN O. WARD,
14   Ph.D., produced, sworn and examined on behalf of the
15   Defendant, pursuant to Notice, on Tuesday, the 9th
16   day of February 2016, between the hours of 9:40 a.m.
17   and 1:12 p.m. of that day, at the office of John
18   Ward Economics, 8340 Mission Road, Suite 235, in the
19   City of Prairie Village, in the County of Johnson,
20   and the State of Kansas, before me, NAOLA C. VAUGHN,
21   KS CCR 0895, CRR, RPR, a Certified Court Reporter,
22   within and for the States of Kansas and Missouri.
23
24
25
```

**Page 2**

```
 1             A P P E A R A N C E S
 2   For the Plaintiff:
 3      HUMPHREY FARRINGTON & McCLAIN, P.C.
        221 West Lexington Avenue
 4      Suite 400
        Independence, Missouri  64050
 5      816.398.7435
        dat@hfmlegal.com
 6      BY: DANIEL A. THOMAS, ESQUIRE
 7
     For the Defendant:
 8
        WILLIAMS & CONNOLLY, LLP
 9      725 Twelfth Street, N.W.
        Washington, D.C.  20005
10      202.434.5131
        ehorn@wc.com
11      BY: M. ELAINE HORN, ESQUIRE
             and
12      epistilli@wc.com
        BY: EMILY RENSHAW PISTILLI, ESQUIRE
13
14   Also Present: Jim Ross, videographer
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1               I N D E X
 2   WITNESS: JOHN O. WARD, PH.D.
 3   Examination by Ms. Horn ..........................  4
 4
 5               EXHIBITS
 6   NUMBER    DESCRIPTION                        PAGE
 7   Exhibit 1 - Notice of Videotaped Deposition of    8
 8       John O. Ward PhD
 9   Exhibit 2 - Retainer Agreement and Questionnaire 48
10   Exhibit 3 - 1/19/16 report                       57
11   Exhibit 4 - Year-Round, Full-Time Wage & Salary  79
12       Earnings in the United States
13       (2013 Dollars)
14       American Community Survey 2011-2013
15   Exhibit 5 - Revenue reports                     127
16   Exhibit 6 - Levitt Financial Timeline           141
17   Exhibit 7 - Handwritten notes                   141
18   Exhibit 8 - Handwritten notes                   144
19   Exhibit 9 - Itemized Statements of Earnings     144
20
21
22
23
24
25
```

**Page 4**

```
 1            THE VIDEOGRAPHER:  We're now on the
 2   record.  My name is Jim Ross.  I'm the
 3   videographer with Golkow Technologies.  Today's
 4   date is February the 9th, 2016.  The time is
 5   9:40 a.m.  This deposition is being held in
 6   Prairie Village, Kansas, in the matter of
 7   Levitt v. Merck, for the United States District
 8   Court of Louisiana.  The deponent is John Ward.
 9            Counsel, will you please identify
10   yourselves for the record.
11            MR. THOMAS:  Danny Thomas for
12   plaintiffs.
13            MS. HORN:  Elaine Horn from Williams
14   and Connolly for Merck.
15            MS. PISTILLI:  Emily Pistilli, also
16   from Williams and Connolly, for Merck.
17            THE VIDEOGRAPHER:  The court reporter
18   is Sam Vaughn and will now swear the witness.
19            JOHN O. WARD, Ph.D.,
20   a witness, being first duly sworn, testified as
21   follows:
22               EXAMINATION
23   BY MS. HORN:
24       Q.  Good morning.
25       A.  **Good morning.**
```

John O. Ward, Ph.D.

Page 13

1   report January 19th.  I don't even think we've got
2   our bills -- usually we put them out at the end of
3   the month.  And since this was coming up for depo,
4   we probably held it.
5          So we'll have additional work toward
6   preparation of the second report for 2016.  I
7   would imagine it will be about 2-1/2 hours or so.
8          There'll also be work toward the
9   collection of the financial documents and Merck
10  off their 10Ks and other documents.  I'll bill for
11  that.  That was about an hour.
12         And then preparation for this
13  deposition, which will be about another hour.  So
14  I suspect there'll be at least four additional
15  hours billed, will be about $2,000.
16      Q.   And of those four hours -- four hours
17  or so you just summarized, was any of that time
18  expended by Dr. Kelsey?
19      A.   No.
20      Q.   So was all of that time that you just
21  described your personal time?
22      A.   Pretty -- yeah, I mean, there was,
23  again, some clerical, and Kurt Krueger transmitted
24  some stuff in spreadsheets, but nothing
25  substantive.

Page 14

1       Q.   I understand that you charge a flat
2   fee for your reports?
3       A.   First report; right.
4       Q.   Your first report.  Notwithstanding
5   that, do you know or can you tell me how much time
6   you typically devote to such a report?
7       A.   Yeah.  It normally takes around six or
8   seven hours.  This took a long time.  Simply
9   because of the mass of documents to review, this
10  probably took 15 or 20 hours.
11         Since it is a flat fee, you can kind
12  of characterize this as being -- per hourly rate
13  was pretty low.  But that's just the way it goes.
14      Q.   And you're saying it took about 15 to
15  20 hours to prepare the first report in 2013?
16      A.   Right.
17      Q.   What is the mass of documents that you
18  looked at to prepare the 2013 report?
19      A.   Well, financial documents that they
20  submitted.  I have to review everything in the
21  file.  We had a lot of financial documents, most
22  of which had to do with my calculation.  I still
23  had to review them.  We also had deposition and
24  other material that was provided to us.  I had to
25  read them.  So, yeah, there was a lot of

Page 15

1   documents.
2       Q.   And it's your testimony that all of
3   this review took place in 2013?
4       A.   Well, some of it was in 2013, and then
5   we kept getting documents and I kept reading them.
6   I mean, probably some of them are in 2014 as well.
7       Q.   What are the financial documents that
8   you looked at in 2013 and 2014?
9       A.   Oh, stuff -- they were largely tax
10  returns for the various entities, American XO,
11  Chocolate Soup.  A lot of it had to do with the
12  company's performance, and that isn't really the
13  basis of my calculation.
14         My calculation's based upon her lost
15  earnings capacity as opposed to the lost value of
16  the business.  So I didn't really use them in the
17  calculations.
18      Q.   Were you -- at some point in time were
19  you asked to prepare a valuation for the
20  businesses?
21      A.   No.  We were simply asked to calculate
22  damages.  It was our decision how we were going to
23  do it.  Since there's a plaintiff here, and the
24  plaintiff is Jo Levitt, typically the loss is to
25  the plaintiff, and that would be their earnings

Page 16

1   capacity, as opposed to a suit filed by the
2   business, and I don't believe there is one here.
3       Q.   So what's your understanding for why
4   you were sent documents for the actual
5   corporation?
6       A.   Well, I mean, their belief is that I
7   assume the plaintiff is -- and when I say the
8   plaintiff, Jo Levitt and their husband -- that
9   they had suffered a considerable loss of wealth
10  from the collapse of American XO, as they
11  represented -- I don't have any opinions about
12  that -- after her cardiac event in the year 2000,
13  and her reduced work after that date and they
14  lost -- they had some business failures.
15         I really am not concerned with that
16  because that happened after the event.  ==Certainly==
17  ==it may have been attributed to her withdrawal from==
18  ==the business.  That may well be the case.==  I just
19  don't have the basis to make that calculation.
20      Q.   Other than the tax returns that you
21  referenced, do you recall any other financial
22  documents that you reviewed for your 2013-2014
23  reports?
24      A.   Well, I don't recall simply because I
25  didn't consider them.  I mean, they're all in the

John O. Ward, Ph.D.

|  | 61 |
|---|---|
| 1 | Q.  -- not Chocolate Soup or American XO, |
| 2 | that that would not be part of Mrs. Levitt's loss? |
| 3 | A.  Absolutely.  Sure.  And I didn't even |
| 4 | try to get involved in that, because, you know, |
| 5 | they're running a business.  They're sharing |
| 6 | profits.  He attributes almost all of the activity |
| 7 | to her; that she's the driving force.  He's sort |
| 8 | of involved in it, but in a secondary fashion.  I |
| 9 | don't try to sort that out.  I'm only looking at |
| 10 | what she lost. |
| 11 | Q.  Okay.  But -- so, for instance, if |
| 12 | there is a -- this is a hypothetical.  I don't |
| 13 | know if there's an actual number. |
| 14 | If there's a number that says |
| 15 | $12 million of net worth -- |
| 16 | A.  Yeah. |
| 17 | Q.  -- if $6 million of that is from |
| 18 | Jim Levitt's real estate business that she's not |
| 19 | involved in, you would agree that shouldn't be |
| 20 | part of her loss calculation? |
| 21 | A.  Absolutely. |
| 22 | Q.  And were you provided with any |
| 23 | information about any activities that Mr. Levitt |
| 24 | was involved with that did not involve |
| 25 | Mrs. Levitt? |

|  | 62 |
|---|---|
| 1 | A.  No.  Some are commingled.  Some are |
| 2 | not.  And I don't even try to sort it out, no. |
| 3 | Q.  And in terms -- I want to focus now on |
| 4 | the analysis you did based on the reported |
| 5 | earnings to Social Security. |
| 6 | A.  Yeah. |
| 7 | Q.  And you used the figure of 72,000 -- |
| 8 | A.  Right. |
| 9 | Q.  -- is that right? |
| 10 | Do you know; was there something -- |
| 11 | strike that. |
| 12 | ==Do you know what went into that figure== |
| 13 | ==to making it -- making her salary $72,000?== |
| 14 | ==A.  That's what she decided to pay== |
| 15 | ==herself.== |
| 16 | Q.  Do you know of any reason that a |
| 17 | business owner would pick that particular figure |
| 18 | versus some other figure? |
| 19 | A.  No.  And she had other figures in the |
| 20 | past.  I mean, according to her husband's |
| 21 | deposition and her deposition, she wanted to tie |
| 22 | her compensation to her contribution to the |
| 23 | business and to the future of the business. |
| 24 | So, for example, back in 1991, it was |
| 25 | 109,000.  It was 118 the next year. |

|  | 63 |
|---|---|
| 1 | Q.  And what are you looking at? |
| 2 | A.  I'm looking at an actual Social |
| 3 | Security printout of her earnings, as reported. |
| 4 | Now, these are -- in some years |
| 5 | they're probably kept by Social Security |
| 6 | requirements.  That you can -- beyond a certain |
| 7 | level, you don't pay Social Security.  So |
| 8 | whatever's reported as Social Security earnings. |
| 9 | She could have been earning much more than that; I |
| 10 | wouldn't know it.  But the 72,000 is consistent |
| 11 | from 1998 up through 2004. |
| 12 | You know, it's -- it's not uncommon |
| 13 | that a business -- you can take compensation in |
| 14 | one of two forms.  You can take it in the form of |
| 15 | profits or you can take it in the form of |
| 16 | compensation.  Depends on whether you're a C or an |
| 17 | S cooperation. |
| 18 | ==She chose to take out $72,000.  That's== |
| 19 | ==certainly a very low number, given the magnitude== |
| 20 | ==of sales of the company and the profitability of== |
| 21 | ==the company.==  And, you know, some years there's |
| 22 | 170,000 just for the -- I guess it's called |
| 23 | America II.  I assume it's an accurate reflection |
| 24 | of what she was worth.  She declared that to the |
| 25 | federal government for purposes of taxes. |

|  | 64 |
|---|---|
| 1 | But that's only one of two |
| 2 | calculations.  I mean, one is based on what the |
| 3 | corporation paid her, which is $72,000 a year. |
| 4 | She stopped claiming that as compensation when she |
| 5 | said, according to her deposition and her husband, |
| 6 | she could no longer effectively work. |
| 7 | Q.  And focusing again on the Social |
| 8 | Security calculation -- |
| 9 | A.  Right. |
| 10 | Q.  -- you referenced a distinction |
| 11 | between an S corporation and a C corporation? |
| 12 | A.  Right. |
| 13 | Q.  And how is that relevant? |
| 14 | A.  Well, it's relevant in terms of |
| 15 | pass-through.  If you're an S corporation, the |
| 16 | money directly passes through to you.  You don't |
| 17 | have to worry about declaring it.  This is |
| 18 | obviously a C corporation. |
| 19 | Q.  Do you have -- strike that. |
| 20 | Why do you say it's obviously a |
| 21 | C corporation? |
| 22 | A.  Because she's paid herself a salary. |
| 23 | If you're a partnership or an S corp, you don't |
| 24 | pay yourself a salary.  The net profit of the |
| 25 | corporation flows directly to you. |

John O. Ward, Ph.D.

65

1  Q. And for your second calculation, it
2  was an analysis based on various figures you have
3  for CEO compensation; is that right?
4  A. Right.
5  Q. Now, why would you use the CEO
6  designation?
7  A. That's what she was.
8  Q. Actually, I believe that the testimony
9  in all the documents in this case --
10  A. It isn't CEO. It's called chief
11  executive. And the chief executive is the
12  operator, the person who's running the company.
13  And that's basically what she's described as
14  doing.
15      Now, she had someone else who was
16  involved in the business, and she had her husband.
17  ==But all of them described her as the==
18  ==driving force behind the business. Certainly I==
19  ==would characterize her as a chief executive.==
20  Q. So do you recall testimony regarding
21  Mr. Levitt's actual role in the company?
22  A. Oh, at some point, sure.
23  Q. And do you recall testimony to the
24  effect that Mr. Levitt was actually the person
25  running the business, because he's the

66

1  businessperson?
2  A. Well, there were the business aspects.
3  She was the creative force behind the company.
4  She is described as the creative force behind the
5  company. So I assume she was, in fact, filling
6  out that role.
7  Q. And you mentioned reviewing Mr. -- and
8  if he's Dr. Cordray, I apologize.
9  A. No. He's Mr. Cordray.
10  Q. You read Mr. Cordray's report?
11  A. Yeah.
12  Q. Do you recall how he characterized her
13  job?
14  A. Gosh, I'd have to -- after this
15  period, no. I can look and see.
16      Yeah, he had several different
17  reports.
18      Well, the last report, he really
19  doesn't say much about her job at all. He simply
20  says she's totally vocationally disabled. Maybe
21  he said something in earlier reports. I don't
22  know.
23  Q. If Mrs. Levitt's role in the company
24  were more the equivalent of a marketing executive,
25  are there salary figures that you could use for

67

1  that category of employment?
2  A. Sure.
3  Q. And where would you find those?
4  A. Same source. Full-time earnings in
5  the United States, 2/'11 to '13.
6  Q. And do you know how the salary numbers
7  for marketing executives compares to the salary
8  numbers for CEOs?
9  A. They're probably not much different.
10  These numbers are pretty small. We're looking at
11  chief executive, $120,000 a year. You probably
12  don't find too many chief executives for 120.
13  That's at the low end. That's the median because
14  there's so many small businesses where the -- you
15  know, it's Joe's Garage, and Joe defines himself
16  as the CEO of his garage or whatever.
17      The Department of Labor collects the
18  data, and it's low-ended. So you're not going to
19  find probably too many people at that level of
20  earnings in a chief executive position or in a
21  chief of marketing position.
22      So, for example, we have her using
23  that median at $123,000 a year.
24  Q. And are there salary figures for other
25  job titles, such as a purchasing manager or a

68

1  fashion designer?
2  A. Sure. Sure.
3  Q. And how do those salary numbers
4  compare to the CEO salary numbers?
5  A. I'd have to look. I don't know.
6  Q. And where would you look?
7  A. Same place. You know, the numbers --
8  what -- it's a linear calculation. You can
9  substitute any number you want. If you think it
10  ought to be 100, then take 100 and divide it by
11  123 and multiply it out. You'll get -- you'll
12  come pretty close to what the answer is at any of
13  those salary levels.
14      I don't -- she characterized herself
15  and her husband characterized herself as a, quote,
16  chief executive, the operational force, creative
17  force behind the company.
18  Q. Well, I don't want to get into an
19  argument about it.
20  A. Yeah. Yeah. No, but, I mean, if she
21  isn't and you want to ask me what would it be if
22  it was 100,000 a year or 90,000 a year, I can tell
23  you what it would be.
24  Q. And there's some easy way to make that
25  transformation?

                                                                                             81
1    in your table?
2         A.   Because it's provided that way.  In
3    other words, when we do earnings losses for, let's
4    say, a child who is African-American as opposed to
5    Caucasian, there is data published for earnings of
6    African-Americans.  It's lower than Caucasians.
7    We don't use it because it's a product of
8    discrimination.  So we don't use it.  The same
9    applies for women.
10        Q.   Well, this is --
11        A.   The distinction between men and women
12   respectively at the level of a CEO.
13        Q.   Well, this is a table that you're
14   citing in your report.  And this is a table that
15   you put -- that your company put together; is that
16   correct?
17        A.   We report -- we show what the data
18   shows, but we don't use it.
19        Q.   Were company founders excluded from
20   the CEO numbers that form the basis of this table?
21        A.   Well, since these are people who work
22   for other people, it doesn't -- she is not -- she
23   is above this category in the sense that she's an
24   owner and she's a chief executive.  She's both.
25        Q.   Are owners excluded from this data?

                                                                                             82
1         A.   They -- typically, yes -- well, are
2    they?  Largely, yes, because this represents
3    people that are working for salaries for somebody
4    else.
5         Q.   And is there other separate data that
6    relates to people who started their own companies?
7         A.   Probably not.  Well, I mean, if you
8    take someone like Bill Gates, what was he?  He was
9    a CEO and he was an owner of the corporation.
10   What he would report in the information that would
11   be contained here would be salaries that were paid
12   to Bill Gates by the corporation.  If it was a
13   C corporation, he was probably paid a salary.
14        Now, this -- you know, the -- there's
15   no distinction between C corporations and
16   S corporations in this data.  There can be
17   S corporations where you have a chief executive
18   who is paid a salary.  It's not an owner, and
19   there's no distinction between the two.
20        What we're trying to do is get a
21   picture of what would it take either a man or a
22   woman to replace her.  In other words, it's a
23   replacement cost for her.
24        If you were trying to replace her in
25   the company, what she meant to the company in the

                                                                                             83
1    year 2004, it wouldn't matter whether you hired a
2    man or you hired a woman.  It's the replacement of
3    her function.  It's not the replacement of her.
4    She can't -- you can't replace her.  It's the
5    replacement of her function.  And for replacement
6    of the function, it's whether she is a man or a
7    woman.
8         You wouldn't go out and say, well, we,
9    you know, she -- she can't work anymore.  We got
10   to replace Jo, but it's got to be a woman, because
11   she is a woman.  No.  You just got to go out and
12   hire somebody to replace her.  It's the
13   replacement cost for a chief executive, and it
14   doesn't matter whether it's a man or a woman.
15   That's why we use both sexes.
16        Q.   And in terms of the selection of the
17   job category, chief executive --
18        A.   Um-hum.
19        Q.   -- who made that decision?
20        A.   I did, because that's really what --
21   she was more than just a general or -- in fact,
22   her husband was more of an operation manager on
23   the financial end of it.  She was the person who
24   made the creative decisions, and we use chief
25   executive.

                                                                                             84
1         Q.   What -- what, in your mind, is the
2    role of chief executive?
3         A.   The role of the chief executive is the
4    creative force of the company, makes the company
5    work, as opposed to a department head that's in
6    charge of a line function, like accounting, or
7    production, or whatever it might be.
8         ==She was actually involved in all==
9    ==aspects.  She was involved in creation of the==
10   ==designs, the manufacturing, supervision of==
11   ==manufacturing.  She did all those sorts of things,==
12   ==according to her.==
13        Now, could you hire someone for
14   that -- $123,000 to perform all those functions?
15   I really doubt it.  That's a very low salary for a
16   chief executive.  But that is the one that's
17   reported at the median level.  That's the one we
18   use.
19        Q.   In her questionnaire that we
20   believe -- strike that.
21        In the questionnaire that was filled
22   out for this case --
23        A.   Right.
24        Q.   -- the section where it says, describe
25   your job --

**89**

1    Warren Buffett?  No, obviously not.
2         Q.   Why not?
3         A.   Well, how much would you have to pay
4    to replace Warren Buffett in terms of what he does
5    in terms of the enterprises he runs.  You'd have
6    to spend millions of dollars.  You could look at
7    salaries of other chief executives that run large
8    financial empires, and it would be more than
9    $2,000 a year.
10             So you're looking at what's a fair
11   evaluation for the roles that she performed in
12   running these companies, these entities.
13        Q.   And do you have any indication that
14   the value of what she did varied markedly from
15   what she and her husband decided to pay her?
16        A.   Yeah.  By their self-declarations and
17   by the declarations of -- in the depositions of
18   Robert Bezan and how they came up with the
19   salaries.  Basically, you can look at past
20   salaries that she paid herself.
21             They were starting a new venture, the
22   restaurant and the hotel.  You know, she lowers
23   her salary, she raises her salary according to
24   what she feels the company can afford and still
25   expand.

**90**

1              So it's $72,000.  I could pay myself
2    whatever I want to pay myself for my company.  She
3    could probably do the same.  And in the past she
4    had.  She paid herself upwards of 100,000.  Her
5    husband had taken out, in one year, 180,000.
6              And, you know, it -- what you're
7    looking at is the skill content that she possessed
8    and how much it was worth in the open market.  And
9    I think the best estimate would be as a chief
10   executive to replace her, what -- given all the
11   jobs that she said she had and all the other
12   principals in her deposition said she had, that
13   would be a fair representation.
14        Q.   And you've made several references to
15   starting a hotel and starting a restaurant.
16        A.   Yeah.
17        Q.   And how does that relate to the
18   actual -- the calculation that you performed?
19        A.   It doesn't.
20        Q.   Okay.  How does that relate to your
21   opinion?
22        A.   Well, it -- the only way it relates to
23   my opinion, beyond the $72,000 a year that she
24   paid herself, is that they were involved in an
25   expansion effort of the business, and she was --

**91**

1    played an integral part in that expansion.  And
2    after 2004, certainly, she was not able to
3    participate in it.
4         Q.   And what's the expansion effort that
5    you're referring to?
6         A.   Well, they were in the process of --
7    Chocolate Soup of reorganizing it, looking at
8    outsourcing of production.  They were looking
9    at -- obviously, 1998, 1999 forward, they were
10   looking at the expansion and success of the hotel
11   and restaurant in Nebraska.
12        Q.   In your testimony, you made several
13   references to other CEOs like Bill Gates and
14   Warren Buffett, and whatnot.
15        A.   No.  Not for $123,000 a year.
16        Q.   No.  That wasn't my question.
17             Where I was going with this is:  Do
18   you have any indication that the sales or profits
19   generated by Mrs. Levitt's companies compared to
20   the companies run by Bill Gates and Warren
21   Buffett?
22        A.   Well, no one -- and I'm sure Bill
23   Gates would want more than $123,000 a year for his
24   efforts.  Now, in fact, he takes -- he took
25   nothing for his efforts and he ultimately

**92**

1    outsourced it to somebody else.
2              Probably the -- what -- in terms of
3    the people that are being paid to run Microsoft
4    today, compared to what Bill Gates took out as a
5    salary, it's probably much greater.  I mean --
6         Q.   Is it fair to compare Microsoft to
7    Mrs. Levitt's company?
8         A.   Of course not.  But by the same token,
9    it's not fair to compare $123,000 to $123 million.
10   We're looking at a replacement cost, very minor in
11   terms of chief executive salaries of $123,000.  I
12   don't think you can hire one to run a business of
13   that size for $123,000 as it stood in the year
14   2000.
15        Q.   Would you agree that the amount a
16   company could pay its CEO is dependent on how much
17   it's earning?
18        A.   Yeah.  We don't know what it will be.
19   Because after 2000 -- okay.  So the harm occurs.
20   The question is what could the business have done
21   after 2000 had she not been harmed?  I don't know.
22             She thinks it could have been a great
23   success.  Her husband thinks it could have been a
24   great success; that it suffered by her absence.
25   And certainly, by the year 2004 she was out of the

John O. Ward, Ph.D.

93

1  business. So we don't know what would have been.
2      Q.   And as of the year 2000, how long had
3  the company been in existence?
4      A.   1970.
5      Q.   And do you have information as to the
6  profits -- or the highest profits in a given year
7  that the company generated?
8      A.   Well, somewhere I had it here, sure.
9      Q.   And what are you looking at?
10     A.   I'm looking at the Levitt financial
11 timeline prepared by the company.
12     Q.   Excuse me. You're looking at a
13 document prepared by the company?
14     A.   Yeah.
15     Q.   By which company?
16     A.   Prepared by the -- this is the
17 attorney work product that was provided to me by
18 a -- prepared by the client. It's a
19 representation of the financial worth of the
20 company at various points.
21     Q.   And is it your understanding that
22 that's a document prepared by someone working for
23 the company or counsel -- or by counsel?
24     A.   A combination of both. I have no
25 idea.

94

1      Q.   And those aren't actual -- you're not
2  looking at financial documents; correct? You're
3  looking at a timeline, a chronology?
4      A.   I'm looking at the time line, and in
5  the timeline, there are representations of net
6  income for various entities that were owned by the
7  Levitts.
8      Q.   You've never seen any backups for
9  those numbers; have you?
10     A.   Backups, no, I haven't.
11     Q.   Okay. And so what's the time range
12 that's covered by that particular document?
13     A.   Oh, 1969.
14     Q.   Is there a year-by-year statement of
15 how much the company earned on that document?
16     A.   How much it earned? No. It varies
17 from year to year. For example, in 19 -- I can
18 look at a year 1993, net income, Chocolate Soup,
19 is 510, and II income, which was the other
20 entities, there's another 200. So it's about
21 $700,000 of net income. I don't know what their
22 sales were, gross sales were, but that's what they
23 reported as net income.
24     Q.   Are there any years where they're
25 reporting a net loss?

95

1      A.   Sure.
2      Q.   What years are those?
3      A.   1995. II reported 167. Chocolate
4  Soup reported a negative 42. Chocolate Soup,
5  yeah, they had years where they lost money, years
6  they made money.
7           In the year 2000 Chocolate Soup made
8  $230,000 in net income, according to this, and the
9  II income, which is the last year the hotel
10 produced a profit, was 51. So it's about $280,000
11 of net income.
12     Q.   And when you say II, you're referring
13 to the II Inc.?
14     A.   Yeah.
15     Q.   And is the most recent data available
16 in terms of full-time wage and salary earnings
17 from 2013?
18     A.   Well, we used the most recent
19 available, yeah. It's an average from 2011 to
20 2013.
21     Q.   Was there data available from the
22 Bureau of Labor Statistics for 2014 or 2015?
23     A.   Certainly not for 2015. 2014 would
24 probably be coming out now.
25     Q.   And how often is this chart that's

96

1  Exhibit 4 updated?
2      A.   Well, we produce it every year.
3      Q.   Okay. And is the version I have,
4  which is Exhibit 4 -- can you tell if this is the
5  most recent version?
6      A.   Sure. I mean, we would have -- this
7  report was done January 19th. We haven't had one
8  come out since then, no.
9      Q.   And I'm sorry. I actually was
10 referencing Exhibit 4, which is not part
11 of your -- which is not attached to your report.
12 Doesn't have a date when it was printed.
13     A.   Yeah. We use 2011 to '13; right.
14 That's the most recent, as far as I know.
15     Q.   So in your report, you have a number
16 for life expectancy?
17     A.   Yeah. It's on the first page.
18     Q.   And how did you come up with that
19 number?
20     A.   Just look at the U.S. Life Tables.
21 Most recent, 2011.
22     Q.   And what did you -- what did you --
23 which number did you pick out?
24     A.   Well, we picked out the one for a
25 white female, Jo Levitt, who was age 72.63 at the

John O. Ward, Ph.D.

### 129

1  Q. All right. So this collectively
2  should be Exhibit 5. No, it's not.
3  A. There's a stapler there. No, no.
4  Clip it.
5  Q. All right. So in your 2013 report,
6  you did not opine on the value -- any valuation of
7  the -- Ms. Levitt's businesses; is that correct?
8  A. No, I didn't.
9  Q. And you're not -- and you're not
10 intending to make any such valuation now; is that
11 right?
12 A. Right. Correct.
13 Q. You have no opinion as to what the
14 value of her business was?
15 A. Right.
16 Q. And do you have any understanding of
17 whether or not either Mr. or Mrs. Levitt has the
18 professional expertise to value the business in
19 terms of assigning a number?
20 A. Well, he was with a bank before. He's
21 probably done that sort of thing before. I don't
22 think she did.
23        So to answer your question, I don't --
24 I don't see anything in her background that would
25 indicate that. But in his background, he may have

### 130

1  had that skill. It's a little too close to home.
2  I mean, you -- people valuing their own business
3  is kind of sketchy.
4  Q. So if you were going to value the
5  business, what would you look at?
6  A. Well, I don't do that sort of thing,
7  but if I was valuing lost profits and you were
8  coming up with market -- market capitalization as
9  a value of the business, it would be a multiple of
10 net income over some period of time, or multiple
11 cash flow.
12        You know, the difference -- the
13 problem with that is you've got companies like
14 Facebook that may have no cash flow at all, yet
15 are worth $200 billion.
16        So, market -- the best value of a
17 business is an open market transaction for the
18 value of the business. Absent that, it's
19 guesswork, quite frankly.
20 Q. You have mentioned reviewing the
21 interrogatory responses that were served in this
22 case.
23 A. Yeah.
24 Q. And I believe one of those responses
25 assigns a value of $20 million to the Levitt

### 131

1  businesses.
2  A. Yeah.
3  Q. Have you seen any evidence to support
4  such a valuation?
5  A. No.
6  Q. And you're not actually opining that
7  there's any causal link between Mrs. Levitt's
8  health problems in 2000 and the failure of her
9  businesses in 2008 and 2009?
10 A. Directly, no, I'm not.
11 Q. Are you opining that there's some
12 indirect connection?
13 A. Well, indirect that she was taken out
14 of the business, and maybe -- certainly, if she
15 had been a driving force behind the business, it
16 could affect the survival of the business. But
17 that's simply a common sense observation. It's
18 not a professional opinion.
19 Q. And you're assuming that the reason
20 she left the business was because of health issues
21 related to this litigation?
22 A. That's her assumption; right. I mean,
23 I'm not making any assumption.
24 Q. And are you actually opining that
25 there's a link between Mrs. Levitt's exit from the

### 132

1  business operation in 2004 and their subsequent
2  closure in 2009?
3  A. Neither one way or the other. I'm
4  really not forming any opinion about it, other
5  than the fact that --
6  Q. I'm just trying to confirm that that's
7  not part of your opinion.
8  A. That's not what I'm going to be
9  talking about, no. I'm going to be talking about
10 her earnings capacity, period.
11       MS. HORN: We need to change the tape,
12 so this is a good time to take a break.
13       THE DEPONENT: Okay.
14       THE VIDEOGRAPHER: Okay. This ends
15 tape No. 2. It is 12:39 p.m., and we're off the
16 record.
17       (A recess was taken.)
18       THE VIDEOGRAPHER: Okay. This begins
19 tape No. 3. It is 12:50 p.m. We're back on the
20 record.
21 Q. BY MS. HORN: All right. I wanted to
22 turn to the section of your report which deals
23 with future growth and discount rates.
24 A. Sure. Sure.
25 Q. Why do you use the lowest marginal