## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX® | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| *This document relates to* | * | **JUDGE FALLON** |
| | * | |
| *Jo Levitt v. Merck & Co., Inc.* | * | **MAGISTRATE JUDGE KNOWLES** |
| **2:06-cv-09757-EEF-DEK** | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE
### <u>EXPERT OPINIONS OF DR. DAVID EGILMAN, M.D.</u>

Respectfully submitted,

**HUMPHREY, FARRINGTON & McCLAIN, P.C.**

<u>/s/ Daniel A. Thomas</u>
Kenneth B. McClain                    MO #32430
Daniel A. Thomas                       MO #52030
221 West Lexington, Suite 400
P.O. Box 900
Independence, MO 64051
(816) 836-5050 Telephone
(816) 836-8966 Facsimile

**ATTORNEYS FOR PLAINTIFF**

## TABLE OF CONTENTS

I.    INTRODUCTION .......................................................................................................... 3

II.   DR. EGILMAN'S QUALIFICATIONS........................................................................ 3

III.  LEGAL STANDARD.................................................................................................... 6

IV.   ARGUMENT ................................................................................................................. 7

   A.   Dr. Egilman is Qualified to Offer His Opinions ............................................... 8

   B.   Merck's Arguments Regarding Dr. Egilman's Lack of Expertise are Disingenuous .... 10

      1.   Dr. Egilman is Qualified to Opine Regarding Ms. Levitt's Depression..................... 11

      2.   Dr. Egilman Does Not Opine to Merck's State of Mind ............................................ 12

      3.   Dr. Egilman Will Not Offer Ethics Opinions, and He Is Qualified to Discuss  Merck's
           Marketing and Warnings ........................................................................................... 14

      4.   Dr. Egilman is Qualified to Opine to Merck's Regulatory Duties ............................ 18

      5.   Dr. Egilman Does Not Offer Improper Legal Conclusions....................................... 20

   C.   Dr. Egilman May Rely on Dr. Madigan's Analysis Showing an Association Between
        Vioxx Use and Acute Coronary Syndrome.................................................................. 22

V.    CONCLUSION............................................................................................................. 27

## I.      INTRODUCTION

Merck asks this Court to exclude the majority of Dr. Egilman's opinions in this case. Merck argues that Dr. Egilman lacks the requisite education, knowledge, and training to testify on matters he has extensively published on.  In a desperate attempt to portray Dr. Egilman as an "ideologically driven" fanatic, Merck dismisses the decades of training and experience that Dr. Egilman has. He is qualified in the fields of internal medicine, public health, research design, and epidemiology. Lastly, Merck neglects to inform this Court that courts across the country have admitted Dr. Egilman's opinions and have allowed him to testify on the very subjects he will speak to in the present case. Notably, Dr. Egilman testified as an expert witness in the very first Vioxx trial in Texas – *Ernst v. Merck & Co.,* Case Number 19961*BH02 (Dist. Ct. Bazoria County Tex.). Dr. Egilman's training, scholarship and experience render him eminently qualified to render his opinions in this case. This Court should deny Defendant Merck's Motion to Exclude his expert opinions and allow him to testify.

## II.      DR. EGILMAN'S QUALIFICATIONS

Dr. Egilman received a bachelor of science degree in Molecular Biology and a degree in medicine at Brown University (Egilman *Curriculum Vitae*, attached as **Exhibit A**).  Dr. Egilman completed a residency in internal medicine in 1981.  After that residency, Dr. Egilman did a multi-year program at the National Institute of Health ("NIH") called the Epidemiology Training Program which included three years of study in epidemiology, statistics, occupational medicine, industrial hygiene, warnings, risk communication, and regulatory policy including FDA policy (Egilman Report, attached as **Exhibit B**, ¶ 2). The first year of this program was  training at Harvard University's School of Public Health where he was awarded a Master of Public Health (*Id*.). Dr. Egilman spent the second two years completing an additional  residency in Preventive-

Occupational Medicine at the National Institute for Occupational Safety and Health ("NIOSH") serving as a medical officer where he was responsible for implementing parts of the OSHA act, and conducted more than six (6) epidemiologic studies (*Id*. at ¶ 3). He subsequently completed a third residency in Preventive Medicine at Carney Hospital (Ex. A, CV). Dr. Egilman is board-certified in internal medicine and preventive occupational medicine (*Id*.).

Dr. Egilman's educational and professional background, including in public health, has fostered the development of his expertise related to warnings (Ex. B, Report at ¶ 2). He has extensively studied how warnings play a role in preventing illnesses and the current best practices for providing warnings. Dr. Egilman has published two chapters in the major textbook relating to warning and risk communication, "Handbook of Warnings."[1]

Since completing his study at the Harvard School of Public Health more than thirty years ago, Dr. Egilman has become a renowned and recognized expert in numerous areas of medicine. He has published widely on "medical epistemology," the study of cause-and-effect determinations in medicine; on medical ethics; and on corporate responsibilities to test products and warn of health hazards.[2] He has twice testified before Congress on the proper conduct of medical research, including study design and informed consent; corporate responsibility to test products and publish study results; and has published peer-reviewed papers on these topics.[3]

---

[1] David Egilman & Susana Rankin Bohme, *A Brief History of Warnings,* in HANDBOOK OF WARNINGS 11, 11-20., (Michael S. Woglater ed., 2006); Susana Rankin Bohme and David Egilman, *Consider the Source: Warnings and Anti-Warnings in the Tobacco, Automobile, Beryllium and Pharmaceutical Industries A Brief History of Warnings,* in HANDBOOK OF WARNINGS 635, 635-44., (Michael S. Woglater ed., 2006).
[2] Egilman DS, Presler AH, Valentin CS. *Avoiding the regulatory capture of the Food and Drug Administration*. Arch Intern Med. 2007 Apr 9;167(7):732-3. PubMed PMID: 17420438.
[3] Egilman DS, *Oral Testimony Before the Subcommittee on Energy and Commerce*, US House of Representatives, US Government funded Radiation Experiments, January 18, 1994; Egilman DS, *Oral Testimony Before the Subcommittee Administrative Law and Government Relations*, Judiciary Committee, US House of Representatives, Experiments Conducted at the University Of Cincinnati, April 11, 1994.

Dr. Egilman has also published articles on conflicts of interests in the context of public health; on the techniques used to manipulate scientific studies; on post-market safety surveillance; on "guest authorship" and "ghost-writing" in the pharmaceutical industry; and on seeding trials in peer-reviewed medical journals.[4]  Dr. Egilman is the Editor in Chief of a major journal: The International Journal of Occupational & Environmental Heath  (See Ex. A, CV). To date, Dr. Egilman has published six peer-reviewed papers and one book chapter analyzing various aspects of the development and marketing of Vioxx.  In addition, he has presented this material in testimony before the FDA.[5] Almost every opinion contained in his expert report related to these issues has been presented in the peer-reviewed published medical literature. These opinions include Merck's disregard of warnings that Vioxx presented cardiovascular risks years before the product was marketed, manipulation of study results, ghostwriting and guest authoring of publications, and FDA policy and actions.[6] These peer-reviewed materials include:

- Egilman DS and Bohme SR. *Vioxx Marketing: Merck's Failure to Warn*. International Ergonomics Association 2006 Conference Proceedings.
- Krumholz HM, Ross JS, Presler AH, and Egilman DS. *What Have we Learnt from Vioxx*? BMJ 2007 Jan 20; 334(7585):120-3 (Attached hereto as **Exhibit C**).
- Ross JS, Madigan D, Konstam MA, Egilman DS, Krumholz HM. *Persistence of Cardiovascular Risk After Rofecoxib Discontinuation.* Arch Intern Med. 2010 Dec 13;170(22):2035-6.
- Ross JS, Madigan D, Hill KP, Egilman DS, Wang Y, Krumholz HM. *Pooled Analysis of Rofecoxib Placebo-Controlled Clinical Trial Data: Lessons for Postmarket Pharmaceutical Safety Surveillance.* Arch Intern Med. 2009 Nov 23;169(21):1976-85.
- Hill KP, Ross JS, Egilman DS, Krumholz HM. *The ADVANTAGE Seeding Trial: A Review of Internal Documents.* Ann Intern Med. 2008 Aug 19;149(4):251-8.

---

[4] Seeding trials are fake studies designed to evaluated marketing strategies or are in and of themselves marketing strategies. In the latter case, companies pay physicians to enroll patients in a "trial" to enhance market share. Merck is an expert in such strategies, as Dr. Egilman intends to testify at trial.
[5] Egilman DS, *Lessons from Vioxx; Testimony on Arcoxia*. FDA Arthritis Advisory Committee, April 12, 2007.
[6] He has also published on seeding trials performed by other companies. Krumholz SD, Egilman DS, Ross JS, *Study of Neurontin: Titrate to Effect, Profile of Safety (STEPS) Trial: A Narrative Account of a Gabapentin Seeding Trial*. Arch Intern Med. 2011 Jun 27;171(12):1100-7.

- Ross JS, Hill KP, Egilman DS, Krumholz HM. *Guest Authorship And Ghostwriting In Publications Related To Rofecoxib: A Case Study Of Industry Documents From Rofecoxib Litigation.* JAMA. 2008 Apr 16;299(15):1800-12.

Additional book chapters and letters by Dr. Egilman specifically related to Vioxx include:

- Egilman DS, Presler AH. *Report of Specific Cardiovascular Outcomes of The ADVANTAGE Trial.* Ann Intern Med. 2006 May 16;144(10):781. Ann Intern Med. 2006 Jun 20;144(12):943.
- Egilman D, Ardolino E. *The Pharmaceutical Industry, Disease Industry: A Prescription For Illness And Death., In The Bottom Line Or Public Health: Tactics Corporations Use To Influence Health And Health Policy, And What We Can Do To Counter Them*, William H. Wiist (Editor), Oxford University Press, USA; (March 2010) (Attached as **Exhibit D**).

Dr. Egilman is a clinical professor in the Department of Family Medicine at the Alpert School of Medicine at Brown University (Ex. A, CV). He has taught undergraduate and medical school courses on the subjects he will testify about in this case including warnings, physician obligations to warn, efficacy of warnings, study design, and the history of the development and marketing of Vioxx. In addition, he supervises and teaches on the clinical treatment of patients in the Family Medicine Department at Brown. He ran a community health center for fifteen years where he often treated patients with NSAIDS, rarely Vioxx. He treated patients with cardio-vascular disease and depression regularly. Thirty years of practical experience and prestigious scholarship uniquely qualify Dr. Egilman to present the testimony Merck seeks to exclude here.

## III.  LEGAL STANDARD

In seeking to exclude Dr. Egilman, Merck misstates the federal standard for expert testimony. Federal Rule of Evidence 702 requires that an expert be qualified to testify by virtue of his "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702; *see also Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013); *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).  The rule expressly provides that a witness' expertise is not limited to subjects in which they have received formal education or training, but includes

6

subjects in which the expert has knowledge, skill, or experience. *See United States v. Hernandez-Palacios*, 838 F.2d 1346, 1350 (5th Cir. 1988) (formal education not required; practical experience may suffice). Numerous courts recognize that, as the First Circuit has held, "[t]he fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it." *Mitchell v. United States*, 141 F.3d 8, 15 (1st Cir. 1998), *accord Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion*, 345 F.3d 15, 24 (1st Cir. 2003) ("[t]he proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline."); *see also McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004) (same); *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993) (witness' "lack of particularized expertise goes to the weight accorded her testimony, not to the admissibility of her opinion as an expert"); *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (doctor need not be a specialist in the precise area of medicine implicated by the plaintiff's injury); *Huss v. Gayden*, 571 F.3d 442, 455 (5th Cir. 2009) (finding abuse of discretion in exclusion of testimony of specialist in internal medicine concerning cause of plaintiff's cardiomyopathy; although doctor was neither cardiologist nor toxicologist, as a medical professional, he was qualified to read medical studies and interpret them for the jury).

## IV.    ARGUMENT

Merck's Motion to Exclude Dr. Egilman's Expert Opinions misconstrues both the actual content of his testimony and the breadth of his expertise. As explained more fully below, Dr. Egilman is fully qualified to express an opinion on a wide range of subjects, not merely on issues regarding "family medicine." Merck continually fails to accurately describe Dr. Egilman's report and deposition transcript, apparently hoping that this Court will not actually review the record in

this case. As shown below, Dr. Egilman's opinions are properly supported by scientific and medical literature, his own experience and knowledge, and by Merck's own internal documents. Merck's Motion should therefore be denied.

### A. Dr. Egilman is Qualified to Offer His Opinions

Contrary to Merck's representations, Dr. Egilman is more than qualified to render opinions in this case. Merck mischaracterizes Dr. Egilman as a "non-practicing family physician" (Merck's Motion, page 9) however, this is in no way an accurate portrayal of Dr. Egilman's qualifications. Merck attempts to taint the Court's opinion of Dr. Egilman from the beginning of its Motion by citations to other courts that allegedly held that "his opinions are grounded in a subjective bias against corporations, rather than any 'expertise' that could be helpful to a jury." (Merck's Motion, page 2).

Merck cites two opinions in support: *Ballinger v. Brush Wellman Inc.*, a 2001 District of Colorado opinion, and *Newkirk v. ConAgra Foods, Inc.*, a 2010 Eastern District of Washington opinion. Merck improperly cites the *Ballinger* decision with *aff'd in relevant part sub nom Egilman v. Dist. Ct.* (Merck's Motion, page 2). Merck's citation is so off-base as to render it entirely unpersuasive. The *Ballinger* court's holding striking Dr. Egilman's testimony was <u>not</u> "affirmed in relevant part," as Merck tells this Court, but rather was **<u>vacated</u>** "to the extent that it affects the future ability of [Dr. Egilman] to appear before the trial court," because Dr. Egilman was denied due process (*Egilman v. District Court* Order attached hereto as **<u>Exhibit E</u>**, page 5) ("the sanctions order was entered against [Dr. Egilman] in violation of his rights to procedural due process."). *Ballinger* does not aid Merck in its opposition to Dr. Egilman's testimony.[7]

---

[7] *Ballinger*'s Order striking Dr. Egilman was not even regarding the admissibility of Dr. Egilman's testimony or on any of the issues presently before this Court. Indeed, the *Ballinger* court had previously found Dr. Egilman qualified as an expert and permitted him to testify. *See Ballinger v. Brush Wellman*, 96-CV-2532, *transcript* (Co. Cir. Ct. June 7, 2001) (testimony of Dr. Egilman in his capacity as a qualified expert witness) (Attached as **<u>Exhibit F</u>**).

The second case cited by Merck for its proposition that Dr. Egilman is a biased expert witness, *Newkirk*, is an outlier in the over 25 diacetyl trials in which Dr. Egilman has testified. Exposure to diacetyl—the butter flavoring chemical contained in microwave popcorn—causes an irreversible lung disease, bronchiolitis obliterans. Dr. Egilman has testified in 25 trials regarding the causal link between exposure to diacetyl and development of the lung disease. For example, in *Kuiper v. Givaudan, Inc.*, 602 F. Supp. 2d 1036, 1050 (N.D. Iowa 2009), a diacetyl lawsuit, the defendant argued, much as Merck does here, that Dr. Egilman's opinions should have been excluded because he was a "zealous advocate for his own personal agenda" and was not a proper objective expert.  The court rejected this challenge and held that Dr. Egilman's opinions were admissible.  It noted that he "is a physician, with a master's degree in public health, who is board certified in internal and occupational medicine with a specialty in occupational lung disease, has published dozens of articles over a wide array of health topics, and has been qualified to testify in numerous state and federal courts in the United States." *Kuiper*, 602 F. Supp. 2d at 1051.

Similarly, in *Watson v. Dillon Companies, Inc.*, 797 F. Supp. 2d 1138, 1156 (D. Colo. 2011), another diacetyl lawsuit, the court rejected the defendants' Daubert challenges to Dr. Egilman's expertise.  Significantly, the opinions that Dr. Egilman offered in *Watson* – and that the court there found to be admissible – were nearly identical to those excluded in *Newkirk*, the year before.  *Compare Watson*, 797 F. Supp. 2d at 1156 (finding reliable and admissible Dr. Egilman's testimony on general and specific causation that butter flavoring vapors in microwave popcorn can cause lung disease and caused plaintiff's disease) *with Newkirk*, 727 F. Supp. 2d at 1015–29, *aff'd*, 438 F. App'x 607 (9th Cir. 2011) (excluding Dr. Egilman's general and specific causation opinions that butter flavoring vapors in microwave popcorn cause lung disease).

More recently, in *Stults v. Int'l Flavors & Fragrances, Inc.*, 31 F. Supp. 3d 1015, 1021 (N.D. Iowa 2014), another diacetyl lawsuit, defendants sought to exclude Dr. Egilman's testimony about what the defendants "knew or should have known" regarding the dangers of diacetyl. The court denied the motion, holding that "[t]o the extent that an expert adequately demonstrates a basis for an opinion about what the defendants knew or should have known from such information that was within the defendants' possession, then such an opinion may be admissible at trial. . . ."  (See excerpts from *Stults* Order attached hereto as **Exhibit G**, page 8).

These are just a few citations of the many courts across the country that have found Dr. Egilman's opinions admissible based on his knowledge, expertise and training.[8] This Court should rule in accordance with these courts and find Dr. Egilman qualified to testify as an expert witness in this case.

## B.  Merck's Arguments Regarding Dr. Egilman's Lack of Expertise are Disingenuous

Merck misquotes and omits relevant portions of Dr. Egilman's testimony in a misleading attempt to avoid his scientifically grounded conclusions. Merck asserts that Dr. Egilman is "not qualified" or "lacks relevant experience" to render his opinions in this case. As explained below, Dr. Egilman is **uniquely qualified** to opine on these subjects,[9] and Merck's Motion should therefore be denied.

---

[8] *See also Dunn v. Owens-Corning Fiberglass*, 774 F. Supp. 929, 942 (D.V.I. 1991), *aff'd in pertinent part sub nom. Dunn v. HOVIC*, 1 F.3d 1362 (3d Cir. 1993), *modified on other grounds*, 13 F.3d 58 (3d Cir. 1993), *and vacated in part on other grounds sub nom. Dunn v. HOVIC*, 1 F.3d 1371 (3d Cir. 1993), *modified*, 13 F.3d 58 (3d Cir. 1993) (Dr. Egilman permitted to testify regarding what an asbestos company knew or should have known about the risks of asbestos); *Pittsburgh Corning Corp. v. Walters*, 1 S.W.3d 759 (Tex. App. 1999) (Tex. App. 1999 (same, and noting, in particular, Dr. Egilman's expertise medical literature); *Hall v. Babcock & Wilcox Co.*, 69 F. Supp. 2d 716 (W.D. Pa. 1999) (W.D. Pa. 1999 (finding Dr. Egilman qualified to testify regarding the risk of cancer with radiation); *Owens-Corning Fiberglas Corp. v. Stone*, 03-94-00449-CV, 1996 WL 397435 (Tex. App. July 17, 1996) (Tex. App. July 17, 1996 (affirming trial court ruling permitting Dr. Egilman to testify regarding the known risks of asbestos and the defendant's influence over the Navy's mechanical specifications which required the use of asbestos).

[9] With respect to Merck's arguments regarding Dr. Egilman's "Alzheimer's opinions," Dr. Egilman is only testifying about the contents of his published paper on Merck's Alzheimer's disease trial which Dr. Egilman has shown to be ghost written and guest authored. Dr. Egilman does not intend to opine at trial concerning Alzheimer's beyond Merck's disease trial.

### 1. *Dr. Egilman is Qualified to Opine Regarding Ms. Levitt's Depression*

Merck claims that Dr. Egilman is not qualified to offer opinions regarding Ms. Levitt's psychiatric health because his only qualification in this area is that he "knows more than a layman about psychiatry." (Merck's Motion, page 8). Once again, Merck deceptively cites only snippets of Dr. Egilman's deposition that suit its purposes, and completely ignores the extensive testimony that contradicts its argument. When asked for the basis of his expertise in psychiatry, Dr. Egilman testified as follows:

> Well, I had psychiatric training in medical school and in my residency, and that's in my residency in internal medicine. I also practiced medicine for a considerable length of time, and I treated a lot of patients for psychiatric illness.
> And always psychiatry, psychiatric illness, and emotional response to disease is always a part of every patient that I saw, was always part of my interview of every patient that I saw, was part of my history of every patient that I saw.
> And when interventions were required, medical interventions or others, I either provided them myself or coordinated care for the patient. Most patients who have psychiatric disease do not see psychiatrists for any number of reasons. Most see primary care doctors like myself.

(Egilman Deposition, **Exhibit H**, 218:3-18).

Dr. Egilman further explained that he has testified in other lawsuits about the emotional impact of death and dying and has further testified about emotional components to disease (*Id*. at 218:24-219:3). Dr. Egilman explained that his prior testimony given in other cases regarding depression, emotional impact of disease, and relationships with others, while all related to psychiatry, are also all "part of general practice of family medicine, internal medicine." (*Id*. at 220:1-12). Further, Dr. Egilman provided Merck with a number of articles on the subject of the psychological impact of cardiovascular events (*Id*. at 222:2-18).

It is simply not the case that Dr. Egilman merely "knows more than a layman." He has researched and studied the correlation between psychological effects such as depression and

cardiac events and has treated his own patients for psychological issues. He has provided Merck with the bases for his opinions in the peer-reviewed literature. He is qualified to discuss Ms. Levitt's depression in this case. Merck's Motion to exclude his opinions in this area should therefore be denied.

### 2. Dr. Egilman Does Not Opine to Merck's State of Mind

Merck next alleges that this Court should exclude opinions about Merck's state of mind. Dr. Egilman's "opinions" that Merck identifies as relating to its state of mind are again taken out of context from what Dr. Egilman actually stated in his deposition and in his report. Dr. Egilman does not intend to testify on Merck's state of mind at trial.

Merck cites to a 2013 deposition of Dr. Egilman from another case, and quotes a question posed by Merck's own attorney (See Exhibit 2 to Merck's Motion). There, Dr. Egilman was testifying about an email from a Merck employee, comparing the VIGOR trial of Vioxx in patients with risk of cardiovascular disease to "testing Mevacor on patients with hepatitis," when Mevacor is a drug that is contraindicated in patients with hepatitis. (*Id.* at 194:1-15). Dr. Egilman was testifying regarding Merck's own internal documents. This testimony, carefully crafted and elicited by Merck, does not render Dr. Egilman unqualified to testify regarding Merck's actions.

Merck next makes blatant representations about Dr. Egilman's Report:

| **What Merck Claims Dr. Egilman's Report Says** | **What Dr. Egilman's Report Actually Says** |
|---|---|
| "that Merck 'deliberately misrepresent[ed] Vioxx as safe" (Merck's Motion, page 15, citing Dr. Egilman's Report, ¶ 17). | "An anti-warning is information that deliberately misrepresents dangerous products as safe in order to contradict publically available evidence that a drug is hazardous." (Exhibit B, Report, ¶ 17). |
| "Merck 'intentional[ly] never disclosed that the label information on CV risk underestimated the true risk" (Merck's Motion, page 15, citing Dr. Egilman's Report, ¶ 116). | "Emails sent between MERCK Public Affairs executives and MRL researchers in March 2000, when VIGOR results were being released, demonstrate that both the company's scientific researchers and its public relations team were involved in misleading the public about the VIGOR results. In the first of a series of emails, Alise Reicin comments, 'I do not think we should get into [CV event] rates and all - the data is preliminary. We can emphasize the rates |

| | |
|---|---|
| | look similar to our Phase III studies.' In response, public affairs representative Dr. Larry Hirsh writes, 'We all feel a little concerned about saying (if pressed) that any event rate, even in the Phase III OA studies, was 2%...The product circular indicates that cardiovascular events occurred in a much small proportion of patients - less than a fraction of a percent. We'd rather refer any questioner to the product labeling rather than say '2% of patients taking Vioxx had a CV event in Phase IIP.' (MRK-ABD0001986; MRK-ABD0001756) MERCK never disclosed that the label information on CV risk underestimated the true risk. This was intentional." (*Id.*, ¶ 116). |
| "Merck strategically manipulated data" (Merck's Motion, page 15, citing Dr. Egilman's Report, ¶ 128). | "MERCK strategically manipulated data to give MI data the "best face" possible. (MRK-AACO 128698) The common methodology for calculating all comparison rates consisted of patient-years as the denominator. Interestingly, mortality and MI rates were calculate differently. Analyzing the methodology for these two events, MI and mortality, it is evident that MERCK used the number of patients as the denominator for calculating these rates." (*Id.*, ¶ 128). |
| "Merck engaged in an 'active effort not to comply with FDA requests for information." (Merck's Motion, page 15, citing Dr. Egilman's Report, ¶ 153). | "MERCK's response written by Dr. Silverman on December 18, 2001, did not include information previously discussed internally at MERCK including 35 CV/T events and 13 deaths that had had not been included in the July SUR. Instead, MERCK informed the FDA that the 078 protocol did not include a DSMB and dismissed concerns about the deaths. The company re-reported the death data, using a cut off of March 15, 2001, and included further updates on the deaths in all three studies. MERCK told the FDA that the statistically significant difference in deaths based on the March 2001 "are most consistent with chance fluctuations." Silverman told the FDA, "Mortality in the Alzheimer's disease program was fully discussed in recent responses."(MRKAOJ0005856) Silverman further claimed, "In fact, if there is any trend in the data on cardiovascular events, it is in favor of rofecoxib over placebo." (MRK-AOJ0005856) This shows an active effort not to comply with FDA requests for information." (*Id.*, ¶ 153). |

Dr. Egilman's last "opinion" that Merck complains about is the statement in his report that "Merck was aware of nonclinical and clinical data linking increased incidences of cardiovascular events with Vioxx usage, prior to the release of the VIGOR findings." This "opinion" is not at all directed towards Merck's "state of mind," but is a simple statement of fact based on Merck's own internal documents and the timing of when Merck published the results of the VIGOR study. The New England Journal of Medicine ("NEJM") accused Merck of hiding

relevant cardiovascular data.[10] As is clear, Dr. Egilman is not seeking to discuss Merck's state of mind, but is rather providing a summary of Merck's own internal documents and a published rebuke from the NEJM.

This Court should reserve ruling on the issue of Dr. Egilman opining as to "Merck's state of mind" until such opinions are presented at the time of trial if, in fact they ever are, as Plaintiff does not plan to elicit them. This has been the common practice of this Court in prior Vioxx litigation. *See In re Vioxx Products Liab. Litig.*, 401 F. Supp. 2d 565, 587 (E.D. La. 2005) (Fallon) ("Merck challenges Professor Ray's qualifications to testify as to what Merck should have done or as to Merck's state of mind. The Court will reserve ruling on these issues until such time as they are presented at trial. At that time, the Court will have a clearer basis for making its ruling."); *Id.* at 595 ("regarding Merck's state of mind, Dr. Kapit may not testify as to what Merck was thinking. Instead, his testimony should focus on the significance of certain documents and how these documents fit into the FDA's regulatory scheme. If Dr. Kapit attempts to testify at trial as to Merck's state of mind, Merck should raise this objection at that time. Until then, the Court reserves ruling on this issue."). Merck's Motion regarding Dr. Egilman's opinions as to its state of mind should be denied, or deferred until the time of Dr. Egilman's testimony consistent with the Court's prior rulings.

### 3. Dr. Egilman Will Not Offer Ethics Opinions, and He Is Qualified to Discuss Merck's Marketing and Warnings

Merck next seeks to exclude Dr. Egilman's opinion that Merck's marketing of Vioxx violated ethical standards, concluding such an opinion would "fall outside the expertise of a family physician." (Merck's Motion, page 16). Dr. Egilman is a board certified internist, not a

---

[10]*See* Curfman G, Morrissey S, Drazen J, *Expression of Concern: Bombardier et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis,"* N. Engl. J. Med (2000), found at http://www.nejm.org/doi/full/10.1056/NEJMe058314#t=article.

family physician, and has specific expertise on medical warnings.  He took a course on warnings as risk communication at the Harvard School of Public Health including the history and efficacy of warnings; he has published several papers on warnings; and he has co-authored two textbook chapters on warnings including "A Brief History of Warnings" and "Consider the Source: Warnings and Anti-Warnings in the Tobacco, Automobile, Beryllium and Pharmaceutical Industries."[11] He has published a book chapter (Exhibit D) and two of his peer reviewed papers specifically address Merck's warnings on Vioxx.[12]

More importantly, Dr. Egilman teaches about medical warnings in his course "Science and Power: A Bioethical Inquiry" at the Brown University medical school—a course he has taught for over 20 years that addresses various medical/scientific aspects including the intersection of business and medicine (Ex. B, Report at ¶ 4). Dr. Egilman regularly teaches Family Medicine residents on warnings and risk communication in the clinical setting. He has published on the subject of post-market safety surveillance and on pharmaceutical marketing.[13] His extensive work on pharmaceutical marketing includes publications concerning FDA-mandated warnings including issues related to FDA approval of Vioxx.[14] In his course at Brown University he teaches specifically in the area of FDA drug-and medical advice related warnings and regulation. His paper on "regulatory capture" of the FDA was published in the *Archives of*

---

[11] *Warnings and Risk Communication* by Kenneth R. Laughery (Author), Michael S. Wogalter (Editor), Dave DeJoy (Editor), Kenneth R. Laughery (Editor) Mahwah, NJ: Lawrence Erlbaum Associates, 2006.

[12] Exhibit D, Egilman D, Ardolino E. *The Pharmaceutical Industry, Disease Industry: A Prescription for Illness and Death., in The Bottom Line or Public Health: Tactics Corporations Use to Influence Health and Health Policy, and What We Can Do to Counter Them*, William H. Wiist (Editor), Oxford University Press, USA; (March 2010); Egilman DS and Bohme SR., *Vioxx Marketing: Merck's Failure to Warn*. Int. Ergonomics Ass. 2006 Conference.

[13] Ross JS, Madigan D, Hill KP, Egilman DS, Wang Y, Krumholz HM.  *Pooled Analysis of Rofecoxib Placebo-Controlled Clinical Trial Data: Lessons for Postmarket Pharmaceutical Safety Surveillance*. Arch Intern Med. 2009

[14] Exhibit D, Egilman D, Ardolino E. *The Pharmaceutical Industry, Disease Industry: A Prescription for Illness and Death., in The Bottom Line or Public Health: Tactics Corporations Use to Influence Health and Health Policy, and What We Can Do to Counter Them*, William H. Wiist (Editor), Oxford University Press, USA; (March 2010)

*Internal Medicine* in 2007.[15] He is on the board of directors of the nonprofit organization, Alliance for Human Research Protection (AHRP), which deals with the ethical conduct of drug companies with respect to warnings and marketing (Ex. B, Report at ¶ 5).

Dr. Egilman is qualified to offer his opinions based on his knowledge and experience with the FDA and its warnings requirements.  His opinions are not his "personal views on corporate ethics," as Merck argues, but rather learned opinions gained from years of experience. Each opinion Merck complains about in its Motion (pages 16-17) in reality deals with Merck's <u>marketing</u>, not its ethics. As explained above, Dr. Egilman is qualified to offer his expertise on medical warnings and risk communication. Merck's attempt to paint these opinions as "ethical requirements" fails, and Dr. Egilman will not opine regarding Merck's ethical obligations at trial.

The cases cited by Merck are distinguishable from Dr. Egilman's <u>marketing</u> opinions here. In *In re Baycol Products Litig.*, 532 F. Supp. 2d 1029, 1054 (D. Minn. 2007), the Court explained:

> Defendants do not dispute that generally, an expert may offer testimony as to the appropriate standard of care. But to the extent that Plaintiffs' intend to offer Dr. Kapit's opinions about Defendants' supposed ethical obligations in the guise of an opinion on the standard of care, Defendants move the exclusion is nonetheless appropriate.
>
> The Court finds that while Dr. Kapit may be allowed to testify as to the standard of care for pharmaceutical companies, he may not infuse his personal views as to whether Bayer acted ethically, irresponsibly or recklessly.

Appropriately, what Dr. Egilman seeks to offer here is his expert opinion of the standard of care for pharmaceutical companies in their marketing and warning efforts. He will not opine as to whether Merck acted ethically, irresponsibly, or recklessly.

In *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.* the

---

[15] Egilman DS, Presler AH, Valentin CS. *Avoiding the regulatory capture of the Food and Drug Administration.* Arch Intern Med. 2007 Apr 9;167(7):732-3. PubMed PMID: 17420438.

expert there was a "family practice physician," unlike Dr. Egilman who is a board certified internist.  The expert in *Yasmin* additionally studied "about research design, epidemiology, and statistics," wrote a book and peer reviewed articles on the subject, and lectured at Harvard Medical School about health policy and pharmaceutical policy.  No. 3:09-MD-02100-DRH, 2011 WL 6302287, at *6 (S.D. Ill. Dec. 16, 2011). These qualifications are strikingly similar to those of Dr. Egilman's, and the *Yasmin & YAZ* Court held that the experts "knowledge, skill, experience, training, and education qualif[ied] him as an expert about the marketing of prescription drugs." *Id.*

Additionally, in *In re Rezulin Products Liab. Litig.*, also cited by Merck, three of plaintiffs' expert witnesses "admitted that their opinions concerning purported ethical standards [were] based on their personal, subjective views." 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004). Again, Dr. Egilman will not be opining regarding ethical standards, and his opinions are not his personal, subjective views, but rather gained from years of education, training, skill, knowledge and experience, in compliance with the federal rules and *Daubert* standard.

As previously held in the 5th Circuit regarding an expert's opinion relating to a defendant's marketing efforts:

> [Plaintiff's expert's] opinions about [Defendant's] marketing involve a comparison of [Defendant's] marketing messages and what the (*sic*) he opines the underlying scientific research actually showed. He is more than qualified to make this comparison due to his expertise in the area of the influence of marketing on medical decisions and also because of his specific training and expertise in research design and the interpretation of scientific data. His testimony is helpful to the fact finder. . . . because he is interpreting complex scientific data to assess the truth of [Defendant's]  marketing claims.

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Products Liab. Litig.*, 3:11-MD-2244-K, 2014 WL 3557345, at *7 (N.D. Tex. July 18, 2014). The same can be said for the case at bar here. Dr. Egilman is more than qualified to compare Merck's marketing messages with what the

underlying scientific research actually showed. This testimony will be helpful to a jury, and Merck's Motion regarding Dr. Egilman's marketing opinions should thus be denied.

### 4.  *Dr. Egilman is Qualified to Opine to Merck's Regulatory Duties*

Merck next complains that Dr. Egilman's medical background does not qualify him to opine about regulatory matters (Merck's Motion, page 19).

> Although experts cannot supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence, and while generally an expert's testimony on issues of law is inadmissible, courts admit expert testimony regarding companies' compliance with FDA regulations.

*In re Mirena IUD Products Liab. Litig.*, 13-CV-6586 (CS), 2016 WL 890251, at *46 (S.D.N.Y. Mar. 8, 2016), citing *Wells v. Allergan, Inc.*, CIV-12-973-C, 2013 WL 7208221, at *1 (W.D. Okla. Feb. 4, 2013) (finding expert testimony about FDA regulations would not "usurp" the role of the trial judge); *In re Yasmin and YAZ (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*, 2011 WL 6302287, at *25 (discussing FDA regulations and finding that "[t]o the extent [the expert] does offer legal conclusions, the Court finds that [the expert's] testimony is permissible because of the complex nature of the process and procedures and the jury needs assistance understanding it. [The expert's] testimony will assist the trier of fact in understanding the federal regulations, and the jury will be instructed that that the Court, not [the expert] nor any other witness, will instruct the jury on the law in this case."); *In re Fosamax Products Liab. Litig.*, 645 F. Supp. 2d 164, 191 (S.D.N.Y. 2009) (denying motion to preclude expert from "testifying about general FDA regulatory requirements and procedures or offering an opinion as to [the defendant's] compliance therewith"); *Pfizer Inc. v. Teva Pharmaceuticals USA, Inc.*, 461 F. Supp. 2d 271, 278–79 (D.N.J. 2006) (finding admissible expert testimony regarding pharmaceutical company's "compli[ance] with the FDA's statutory and regulatory requirements") (explanatory parentheticals in original) (internal citations omitted).

Ironically, Merck was also the defendant in *Fosamax* where it lost the very argument it asserts here:

> To the extent Merck seeks to preclude Dr. Parisian from testifying about general FDA regulatory requirements and procedures or offering an opinion as to Merck's compliance therewith, the motion is DENIED. A lay jury cannot be expected to understand the complex regulatory framework that informs the standard of care in the pharmaceutical industry. Dr. Parisian's assessment of the reasonableness of Merck's conduct in light of her experience and her understanding of FDA regulations will be helpful to the jury. An expert may offer testimony embracing an ultimate issue of fact that the jury will decide. Fed.R.Evid. 704(a). Cross-examination and competing expert testimony by Merck's regulatory experts will ensure that the jury carefully weighs her testimony.

*In re Fosamax Products Liability Litigation*, 645 F. Supp. 2d at 191.

Merck's cited cases are simply not applicable to the present case. The Court excluded an expert's testimony regarding the FDA's decisions as to the adequacy of a drug label in *In re Rezulin Products Liab. Litig.*, not because the physician was unqualified to opine on regulatory matters as Merck argues here, but because his opinions were speculative as to whether other physicians would have prescribed the drug at issue if different information about the drug had been made available. 309 F. Supp. 2d 531, 556 (S.D.N.Y. 2004). Dr. Egilman does not intend to testify as to what a different warning would have caused doctors to do. He is entitled, however, to testify "about general FDA regulatory requirements and procedures or [to]offer[…] an opinion as to Merck's compliance therewith." *In re Fosamax Products Liability Litigation*, 645 F. Supp. 2d at 191.

Merck heavily relies on *Rheinfrank*, where it was found that the plaintiff's expert lacked "specialized FDA product-labeling knowledge, skill, experience, training, or education." *Rheinfrank v. Abbott Laboratories, Inc.*, 119 F. Supp. 3d 749, 772 (S.D. Ohio 2015). In contrast, Dr. Egilman clearly <u>does</u> have such specialized knowledge, which qualifies him to render his regulatory opinions in this case. As explained below and shown in his CV, Dr. Egilman has

19

"been accepted as an expert" by the court in *Keenan v, Parke-Davis et al.* PC &4-1667 (Rhode Island) on the issue of warnings and FDA policy. He has also been accepted as a witness on issues that relate to FDA warning policy in the case of *Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1, 12, 696 N.E.2d 909, 917 (1998) ("The judge may also have relied on the affidavit of the plaintiffs' epidemiological expert, Dr. David S. Egilman, who identified several examples in which disease causation has been established based on animal and clinical case studies alone to demonstrate that "doctors utilize epidemiological data as one tool among many.").

Dr. Egilman is qualified to render opinions regarding Merck's regulatory compliance and his opinions on regulatory compliance have been admitted by other courts. As such, its Motion to Exclude should be denied on this point as well.

### 5. *Dr. Egilman Does Not Offer Improper Legal Conclusions*

Merck also argues that Dr. Egilman may not provide legal opinions as an expert witness. Dr. Egilman's opinions cited by Merck in its Motion, however, are not legal opinions, but rather public health opinions, a subject in which Dr. Egilman has a degree from Harvard. As previously explained, Dr. Egilman provides valuable guidance on the scope of FDA regulations as applied to clinical trials and informed consent. FDA regulations, especially those in the area of informed consent, are complex and not within the knowledge of the average juror. Nor does it infringe on the province of the Court for Dr. Egilman to illustrate for the jury the standard of care applicable to this case, because Merck's failure to properly obtain informed consent for the trials on which it based its marketing claims is distinct from the issues to be decided by the jury.  Moreover, Dr. Egilman has specific expertise precisely in this area.  He has published and testified before Congress on the issue of informed consent.[16] Dr. Egilman's testimony about Merck's violations

---

[16] Egilman DS, *Oral Testimony Before the Subcommittee on Energy and Commerce*, US House of Representatives, US Government funded Radiation Experiments, January 18, 1994; Egilman DS, *Oral Testimony Before the*

of various health care compliance standards is similarly within the scope of his expertise and does not infringe on the area of legal standards reserved to the Court.

Once again, Merck's cited cases are distinguishable. Merck cites multiple cases to support its assertion that Dr. Egilman cannot offer legal opinions, but as previously stated, Merck's recasting of Dr. Egilman's opinions as "legal" is a mere rhetorical device. While the cases it cites do deal with legal opinions, they have nothing to do with Dr. Egilman's testimony here. In *United States v. Williams*, cited by Merck, it was held that "Reasonableness under the Fourth Amendment or Due Process Clause is a legal conclusion." 343 F.3d 423, 435 (5th Cir. 2003). In *McBroom v. Payne*: "whether an officer's use of his firearm was unreasonable for purposes of the Fourth Amendment is a legal conclusion." 478 F. App'x 196, 200 (5th Cir. 2012). Neither of these holdings are applicable to any of Dr. Egilman's opinions in this case.

In *Jimenez v. City of Chicago* the defendants argued that an expert's opinions regarding reasonable police practices were intertwined with probable cause, a legal standard, and thus the testimony should have been excluded. 732 F.3d 710, 721 (7th Cir. 2013). The Court *disagreed* with the defendants, holding that the expert did not offer any opinion as to probable cause, but testified only about "reasonable investigative procedures and ways in which evidence from other witnesses did or did not indicate departures from those reasonable procedures." *Id.* In *Jimenez*, even though the expert's opinions "had direct implications for applying legal standards such as probable cause and, even more to the point, whether [defendant] deliberately failed to comply with his obligations under *Brady v. Maryland* and the Due Process Clause of the Fourteenth Amendment. **That's why his testimony was relevant."** *Id.* (emphasis added).

Merck's cited cases only hurt its argument here. As in *Jimenez*, Dr. Egilman's opinions

*Subcommittee Administrative Law and Government Relations*, Judiciary Committee, US House of Representatives, Experiments Conducted at the University Of Cincinnati, April 11, 1994.

21

may have direct implications for applying legal standards such as a pharmaceutical company's duties to warn and obtaining informed consent, and that is why his testimony is relevant. These are not legal opinions, but scientific and medical opinions. It is up to the jury to connect the law—as explained to them by this Court—with the standards opined to by both Dr. Egilman and Merck's own experts. Dr. Egilman's testimony is within the scope of his expertise and outside the scope of legal standards reserved to the Court. As such, Merck's Motion should be denied.

## C. Dr. Egilman May Rely on Dr. Madigan's Analysis Showing an Association Between Vioxx Use and Acute Coronary Syndrome

In this case, expert witnesses for both Plaintiff and Defendant <u>agree</u> that Jo Levitt suffers from Acute Coronary Syndrome ("ACS"). ACS is "a term used to describe a range of conditions associated with sudden, reduced blood flow to the heart. One condition under the umbrella of acute coronary syndrome is myocardial infarction (heart attack).[17] ACS "is a term that encompasses a variety of clinical presentations that are mediated by coronary artery disease and myocardial ischemia. It runs a spectrum of disorders from unstable angina to non-Q-wave infarction to Q-wave infarction." (**Exhibit I**, Deposition of Merck's cardiology expert, Douglas E. Vaughan, 26:21-27:3). "[A]cute coronary syndrome is defined as those three events. As a syndrome. So if you have MI, sudden death, or unstable angina, either of them, you have acute coronary syndrome." (Egilman Deposition, Ex. H, 121:2-4). Merck's own research defined ACS as the sum of myocardial infarction, acute myocardial infarction, and unstable angina (Merck's Manual,[18] attached as **Exhibit J**; Egilman Deposition, Ex. H, 48:10-19).

While Merck focuses its attention in its Motion on the fact that Ms. Levitt's "only cardiovascular injury" was unstable angina (Merck's Motion, page 10), Merck's own studies

---

[17]*Acute Coronary Syndrome*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/acute-coronary-syndrome/home/ovc-20202307 (last visited July 5, 2016).

[18] Accessed at http://www.merckmanuals.com/home/heart-and-blood-vessel-disorders/coronary-artery-disease/acute-coronary-syndromes-heart-attack-myocardial-infarction-unstable-angina

never reported results for this injury alone. As Dr. Egilman explained at his deposition, Merck's studies only recorded one cardiac outcome per patient, so if a patient had both unstable angina and a myocardial infarction, only the myocardial infarction would be recorded (Egilman Deposition, Ex. H, Ex. H, 127:2-9). As such, as a result of the design of Merck's own study and analysis, ACS and its component symptom of myocardial infarction were the only outcome measures that could be evaluated by Dr. Egilman or anyone else.

Merck argues in its Motion that it was improper for Dr. Egilman to "rely on analyses that combine a number of cardiovascular events into a single statistical analysis" (Merck's Motion, page 11), even though that is precisely what Merck did in its own studies. As previously explained, ACS includes a combination of three separate coronary outcomes, including unstable angina (which Plaintiff Jo Levitt had), myocardial infarction, and sudden death. Each of these three injuries have a common underlying cause of insufficient blood flow to the heart muscle (Egilman Deposition, Ex. H, 117:6-16). In its own epidemiologic studies, Merck relied on only the most severe cardiac outcome of ACS and thus chose not to record unstable angina in a patient who had also suffered a myocardial infarction or sudden death.[19]

Merck makes the contradictory arguments that Dr. Egilman should not be able to opine regarding Ms. Levitt's unstable angina because Merck's data was not specific to unstable angina, and that also Dr. Egilman cannot rely on Dr. Madigan's analysis, which was specific to unstable angina. Merck should not be able to have it both ways. As noted above, Merck did not record the diagnosis of unstable angina in patients who went on to suffer another cardiac event. While Merck states in its Motion that "Dr. Egilman failed to review the unstable angina data, not because they were unavailable, but because he simply chose not to do so" (Merck's Motion, page

---

[19] **Exhibit L**, Cardiovascular risk of selective cyclooxygenase-2 inhibitors and other non-aspirin non-steroidal anti-inflammatory medications{Priscilla Velentgas PhD1*, William West PhD1, Carolyn C. Cannuscio ScD3, Douglas J. Watson PhD2 and Alexander M. Walker MD, DrPH1pharmacoepidemiology and drug safety 2006; 15: 641–652).

13), this is simply another distortion of the truth.

As explained in Dr. Egilman's deposition, "in order to get the answer, we have to go out and redo the data tables that Merck did because of the way Merck conflated the tables. . . So you would have to actually go back to the patient charts and get the data." (Egilman Deposition, Ex. H, 148:6-11). Currently, Dr. Egilman does not have access to these charts, which were compiled in the year 2000. Merck is the only one who is able to retrieve these charts. To date, Merck has chosen not to do so. As such, Dr. Egilman had to have his own analysis conducted by Dr. Madigan to look at the instances of ACS in all of Merck's placebo trials. This analysis generated a statistically significant excess of ACS in patients taking Vioxx versus ACS in patients taking a placebo (Results from Dr. Madigan's study, attached hereto as **Exhibit K** summarized by Dr. Egilman) (Egilman Deposition, Ex. H, 43:8-23).

As experts for both Plaintiff and Defendant Merck agree that Plaintiff suffered from ACS, Dr. Madigan's study is clearly relevant to this case. Dr. Egilman is entitled to rely on Dr. Madigan's study, contrary to Merck's representations. While Merck argues "Dr. Egilman cannot rely on an analysis performed by a different expert" (Merck's Motion, page 13, f.n. 5), the case it cites for this proposition simply does not support its argument. In *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.,* the court granted the plaintiffs' motion to strike the defendants' expert witness in part, and denied the motion to strike in part. 45 F. Supp. 3d 724, 741 (N.D. Ohio 2014). Specifically, the expert sought to opine both that: "(1) [another expert's] statistical analysis is valid and correct; and (2) that it supports his own opinion. [The expert] may say the latter but, as a non-statistician, he is unqualified to say the former." *Id*. The Court held that "while [the expert] may not parrot or vouch for [the other expert's] analysis and opinions, **he is permitted to state that [the other expert's] conclusions dovetail with and support his**

24

**own**." *Id.* (emphasis added).

Here, Dr. Egilman testified at deposition that he asked Dr. Madigan "to run the placebo data for acute coronary syndrome over the—all the placebo data that he has from all the Merck studies." (Egilman Deposition, Ex. H, 39:14-16). Therefore, the *Whirlpool* holding cited by Merck supports Plaintiff's position here. Plaintiff is not attempting to offer Dr. Egilman as an expert to opine that Dr. Madigan's analysis is valid and correct. Rather, Dr. Egilman is opining that Dr. Madigan's analysis supports his own opinion. This Court should follow the precedent cited by Merck and decline Merck's request to exclude Dr. Egilman's opinion on this ground.

Merck additionally argues that Dr. Madigan's study should be excluded and Dr. Egilman not be allowed to opine on the results of Dr. Madigan's study because the study combines multiple cardiovascular events into a single statistical analysis (Merck's Motion, page 11). As previously indicated, this is precisely what Merck did in its own studies. In order for Plaintiff's experts to be able to conduct any studies or analysis, they necessarily must rely on the only data for Vioxx patients available—the data collected by Merck itself. It bears repeating that Merck's data combined cardiovascular events, and would only report the most serious event that a patient suffered. As such, it is simply <u>impossible</u> for Plaintiff and her experts to conduct a study regarding <u>only</u> unstable angina, unless of course Merck is willing to make the charts of the participants in its studies available to Plaintiff's experts.

In support of its argument that Dr. Madigan's analysis should have been specific to unstable angina <u>only</u>, Merck cites three cases, alleging that those cases support the exclusion of studies "that look at a composite risk for a broad set of adverse outcomes, rather than a specific connection between the particular exposure and the actual affliction experienced by the plaintiff." (Merck's Motion, page 11). The cited cases, however, do not support this argument.

In *Burleson,* a prison inmate argued that exposure to welding fumes had caused his throat cancer. *Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577 (5th Cir. 2004). There, the Court excluded the plaintiff's expert opinion when the expert was unable to offer any studies which showed a statistically significant link between the fumes the plaintiff was exposed to and his specific type of cancer. *Id.* at 585. Here, Dr. Egilman <u>is</u> able to offer studies which show a statistically significant link between Vioxx use and ACS, a condition that experts for both Plaintiff and Merck agree Plaintiff Jo Levitt had. A list of these studies, which were previously provided to Merck at the deposition of Dr. Egilman, is attached hereto as **<u>Exhibit M</u>**.

In the second case relied upon by Merck, *Allen v. Pa. Eng'g Corp.*, the Court found it significant that "not a single scientific study has revealed a link between human brain cancer and EtO exposure." 102 F.3d 194, 197 (5th Cir. 1996). As is clear from the list above, Drs. Egilman and Madigan are not the first to opine that there is a causal link between ACS and Vioxx. In the last case cited by Merck, *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, the Court excluded an expert—who was qualified in the field of mathematical and statistical analysis— from testifying as to methods of remediation of real property. 2015 WL 3603624, at *2 (E.D. La. June 5, 2015). This case likewise does not help Merck.

Each of the three cases cited by Merck excluded experts because their opinions correlated different injuries (in some instances, different types of cancers) with different causal mechanisms or concerned topics the expert was not qualified to opine on. In this case, the opposite is true. As explained above and in length at Dr. Egilman's deposition, the composite outcome of ACS includes a <u>combination</u> of events (unstable angina, which Jo Levitt had, myocardial infarction, and sudden death) (Egilman Deposition, Ex. H, 179:19-181:1). Merck agrees that ACS includes this combination, as its own studies and analysis show. As shown above, Dr. Egilman is

qualified to opine to Ms. Levitt's injuries caused by her Vioxx intake.

Again, Merck itself admits that Ms. Levitt suffered from ACS. There has been a long line of scientific studies analyzing the link between ACS and Vioxx. While Merck wishes to exclude Dr. Egilman's opinions regarding Plaintiff's unstable angina—one of many outcomes of ACS—the two are impossible to separate due to Merck's decision to combine the two in its studies and data collection. Unless and until Merck wishes to share the files of the patients from its studies, Dr. Madigan will be unable to be any more specific in his analysis. For purposes of this motion, however, such specificity is not required.

## V.     CONCLUSION

As the above discussion makes plain, Dr. Egilman is uniquely qualified to offer his opinions in this case. He has published multiple peer-reviewed articles on the issues he seeks to address here and courts across the country have found him qualified to render the opinions that Merck seeks to exclude. As this Court can see, Dr. Egilman is not a mere "non-practicing family physician." Again and again Merck cites distinguishable case law, misquotes Dr. Egilman's deposition testimony, and takes his expert report out of context in a clear attempt to confuse and distract this Court. A clear and thorough review of these materials shows that Dr. Egilman's opinions should not be excluded in this case. His Report and Opinions are properly supported, and he should be permitted to rely on Merck's own documents in comparing what Merck knew about Vioxx with what it actually did by way of warning or failing to warn. Dr. Egilman may properly rely on Dr. Madigan's analysis, and no one but Merck will be able to separate out the instances of unstable angina from acute coronary syndrome because only Merck has the files of the patients from its own studies. For all these reasons, Merck's Motion should be denied.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing **Plaintiff's Opposition to Defendant's Motion to Exclude the Expert Opinions of Dr. David Egilman, M.D.** has been served on Defense Counsel, Elaine Horn and Emily Pistilli and Defendant Liaison Counsel, Dorothy H. Wimberly, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 27th day of July, 2016.

Respectfully submitted,

**HUMPHREY**, **FARRINGTON** & **McCLAIN, P.C.**

*/s/ Daniel A. Thomas*
Kenneth B. McClain                    MO #32430
Daniel A. Thomas                      MO #52030
HUMPHREY, FARRINGTON & McCLAIN, P.C.
221 West Lexington, Suite 400
P.O. Box 900
Independence, MO 64051
(816) 836-5050 Telephone
(816) 836-8966 Facsimile

**ATTORNEYS FOR PLAINTIFF**