# EXHIBIT D

THE BOTTOM LINE OR PUBLIC HEALTH

WIIST

OXFORD

# 7

# The Pharmaceutical Industry, Disease Industry: A Prescription for Illness and Death

*David Egilman and Emily Ardolino*

Bob Ernst was a healthy, active 59-year-old man who lived happily with his wife Carol. Bob enjoyed swimming, rollerblading, and cycling. He ran 3–4 miles every day and collected finisher's medals for competing in the Dallas White Rock Marathon in 1995, 1996, and 1997. He and his wife often took long bike rides together, and in April 2001 they rode a tandem bike over 60 miles in the Beauty and the Beast bicycle tour of Tyler, Texas.

Bob's only physical limitation was an annoying and painful problem with arthritis in his hands. For his discomfort, Bob took Vioxx—a new nonsteroidal anti-inflammatory drug (NSAID) marketed as a safer and more powerful alternative to drugs like naproxen and aspirin.

Merck, the multibillion dollar pharmaceutical giant headquartered in Whitehouse Station, New Jersey, manufactured Vioxx. Merck developed Vioxx to perform the same anti-inflammatory function as other existing pain relievers, but with the added benefit that it caused fewer gastrointestinal (GI) bleeds than its competitors

Dr. Egilman has served as a paid consultant for patients suing Merck (Vioxx) Lilly (Zyprexa) and Pfizer ( Neurontin). He also served as an unpaid consultant to the US Attorney investigating Lilly for Off-label marketing of Zyprexa.

(Bombardier et al., 2000).[1] The NSAID became one of Merck's most profitable and successful drugs with sales reaching $2.5 billion in the year before they withdrew it from the market (Cnnmoney, 2005).

Anticipating that Vioxx, a relatively specific Cox-2 enzyme inhibitor, might produce an increased risk of dangerous cardiovascular events, Merck's Vigor trial, their largest clinical trial of Vioxx, minimized the appearance of such side effects by selecting study participants who were unlikely to have heart attacks (Daniels, 1997; Krumholz, 2007).[2] Nonetheless, Vioxx use resulted in a five fold increase in heart attacks compared to naproxen (Bombardier et al., 2000). The Vigor data also showed that, although Vioxx patients suffered fewer GI bleeds, more patients on Vioxx *actually died* as a result of GI bleeding (Bombardier et al., 2000). Merck, however, combined fatal and trivial bleeds into one adverse event category and emphasized the fact that Vioxx patients suffered fewer *total number* of bleeds than patients on the comparator drug. Despite the fact that more Vioxx than control patients died because of GI bleeds, Merck used the Vigor results to gain Food and Drug Administration (FDA) approval to advertise that Vioxx was safer than traditional NSAIDs because it reduced the overall risk of bleeding (Bombardier et al., 2000).

Merck also designed a "seeding" trial they called Advantage. Unlike the Vigor trial, which was organized by Merck's research department, Advantage was orchestrated by the marketing department in order to expose doctors, many of whom were specifically targeted as key opinion leaders or otherwise influential figures in their fields, to Vioxx by giving them the chance to prescribe it to their patients for free for a period of several months. The trial was essentially a marketing ploy disguised as research; however, to Merck's chagrin, the results of the trial further implicated Vioxx as a risk increase for cardiovascular events.

Merck omitted some Vioxx-caused cardiovascular events from both the Vigor results they published in the *New England Journal of Medicine* (Curfman et al., 2005) and the published results of the Advantage trial (Egilman & Presler, 2006; Lisse et al., 2003). Faced with questions about cardiovascular risks, Merck misled doctors and the public by claiming during their marketing campaign that the Vigor trial "confirmed the cardiovascular safety of Vioxx" (Waxman, 2005).

Merck then promoted the "safety benefits" of Vioxx—the fact that it reduced the *overall* risk of GI bleeds—and marketed it to "blockbuster" status.[3] To achieve this level of sales, Merck spent hundreds of millions of dollars on direct-to-consumer (DTC) advertising involving television and

magazine advertisements starring celebrities such as figure skater Dorothy Hamill and track athlete Bruce Jenner. In 2000, Merck spent more money ($160 million) advertising Vioxx to consumers, who could not even buy the drug without a prescription than PepsiCo spent advertising Pepsi ($125 million) and Budweiser spent advertising their signature beer ($146 million) (Anstice, 2005). The FDA sent Merck a formal warning letter noting that Merck's marketing minimized the serious cardiovascular findings of the VIGOR trial and "made unsubstantiated superiority claims" against other less expensive NSAIDs (Abrams, 2001).

Merck also spent hundreds of millions more on educational programs, free samples, gifts, meals, and vacations for prescribing physicians. They employed salespeople (detail representatives) who visited doctors in their offices to "educate" them about the benefits of Vioxx. Detail representatives were trained to dodge questions concerning drug side effects and mitigate doctors' concerns about the risks of Vioxx (Anstice, 2005; Horner et al., 2006).[4] Physicians received regular visits from Merck's detail representatives and had their questions and concerns about the new drug answered by individuals whose livelihoods depended on the number of Vioxx prescriptions that were written. Merck's aggressive and expensive marketing program for Vioxx embellished the drug's safety and efficacy in comparison to other commonly used drugs and omitted the company's knowledge of the fact that Vioxx caused heart attacks and strokes.

Merck's DTC advertising convinced Ernst that Vioxx was a better medication and encouraged him to approach his physician, Dr. Wallace, to request to switch to Vioxx. Dr. Wallace, whose information about Vioxx came from Merck salespeople and adulterated medical literature saw no reason to deny him a prescription in place of the naproxen he had previously recommended. Ernst, a healthy, active man with no prior history or risk of heart disease, took Vioxx for 8 months before dying in his sleep of a heart attack.

Though Ernst's death and the trial that followed attracted substantial media attention, his story was just one of thousands. Over 20 million people had already taken Vioxx between its release in 1999 and its withdrawal from the market in 2004. Thousands of cases were filed by the victims of Vioxx-induced heart attacks and strokes or by their surviving relatives. Because Vioxx caused such significant injuries and the company acted so recklessly, Merck agreed to pay $4.85 billion to settle the lawsuits (Berenson, 2008). But no amount of money will adequately compensate injured patients and the families who lost loved ones.

196   CORPORATE TACTICS

## A Public Health Crisis

Hundreds of thousands of lives were devastated by Vioxx, and Vioxx is itself one of dozens of unsafe drugs inappropriately marketed by pharmaceutical companies. Millions of patients have become ill or needlessly lost their lives because of a breakdown in a system that has now grown into a public health crisis (Lazarou et al., 1998). Lazarou et al. (1998) estimated that adverse reactions to prescription and over-the-counter medications are the fourth leading cause of death in America. Between 1969 and 2002, over 75 drugs were removed from the market for safety reasons (Wysowski & Swartz, 2005). During that time period, special prescription requirements or restricted distribution programs have been instituted for at least 11 other pharmaceuticals on account of postapproval discovery of adverse events, and numerous other drug reactions have been "identified and added to the product labeling as boxed warnings, warnings, precautions, contraindications, and adverse reactions" (Wysowski & Swartz, 2005). This trend has continued over the past 5 years with several more black box warnings issued, label changes enforced, and drugs—including Vioxx—withdrawn from the market. New drugs are marketed without adequate testing and result in unnecessary death and disease. Every day, executives from corporations spanning the pharmaceutical and medical device industry, preoccupied with increasing profits and maintaining status as viable competitors in the industry, knowingly market unsafe or inadequately tested drugs and medical devices to raise their bottom line (Angell, 2005; Brody, 2007).

Over the past few years, a plethora of academics, economists, journalists, and public health professionals have rightly noted that the alarming tendency of medical products to hinder health (though they are supposedly designed to improve it) is not a series of random events (Angell, 2005, 2008, 2009a, 2009b; Angell & Relman, 1988; Brody, 2007; Carpenter, 2004; Dangerous Prescription, 2003; Hill et al., 2008; Krumholz, 2007; Lurie et al., 2006; Peterson, 2008; Wolfe, 2005; Wolfe et al., 2002/5; Wysowski & Swartz, 2005). These failures are the predictable consequence of an economic system that gauges success exclusively in terms of profits and has few, if any, real consequences for socially irresponsible behavior. Yet dangerous drugs and devices, unnecessary diagnostics, and inefficient interventions continue to flood the practice of medicine with relatively little challenge from policy makers, doctors, and patients.

Critics of the drug and device industries—or, more broadly, the disease industry[1]—have pointed to capitalism and corporate culture to explain how these tragedies occur. Joel Bakan describes the distorted morality of a

THE PHARMACEUTICAL INDUSTRY, DISEASE INDUSTRY   197

corporation, a morality defined by law, which makes a corporation responsible only to its shareholders' monetary interests and prohibits it from sacrificing these interests for any reason.[2] He argues that all activities of a corporation are necessarily aimed at increasing profit. This means that all research and development, education and services provided by the medical industry to the medical profession and the general public are aimed at cutting production costs, edging out competitors, and selling more products to more customers. In this system, the quality of products, the corporation's impact on society, the interests of the corporation's employees, and those of its clients are prioritized only when they coincide with shareholders' interest in increased profits. Of course, a corporation's drive for profit often does coincide with the interests of employees, clients, and society as a whole. For example, employee benefits, higher pay, and increased flexibility for workers sustain morale in the workplace and may increase worker productivity and efficiency. Likewise, developing truly beneficial products can increase profits through sales to satisfied customers, and developing more energy-efficient processes can save money and attract positive attention from environmentally concerned customers. However, these interests are not a driving force behind corporate activity and are easily sacrificed in favor of higher profits. As Bakan writes:

> Unlike public institutions, whose only legitimate mandate is to
> serve the public good, corporations are legally required always to put
> their own interests above everyone else's. They may act in ways that
> promote the public good when it is to their advantage to do so, but
> they will just as quickly sacrifice it—it is their legal obligation to do
> so—when necessary to serve their own ends. (Bakan, 2004)

Economists refer to the effects of corporate activity focused on raising their bottom line as "externalities." While some economists, such as Milton Friedman, argue that corporations often produce positive externalities, such as creating new jobs or making useful, inexpensive products widely available, most think of externalities as the burdensome costs of production that corporations project, or "externalize," onto consumers, environment, and society. According to economist Robert Monks, a corporation "tends to be more profitable to the extent it can make other people pay the bills for its impact on society" (Monks & Minow, 1991). In other words, to the extent that corporations can shift costs to others they can increase profits. For example, if a factory saves $10 million in production costs by foregoing the installation of a smokestack emission control system, the company externalizes that cost onto the surrounding community and the environment in the form of pollution. The cost of the resultant industrial pollution may, and in the real

world often does, far exceed the cost of preventing it (compare $10 million for pollution control to hundreds of millions of dollars in medical expenses for those who are injured by it), and the community, not the company, bears these costs.

Even though the amount of money saved by companies when they externalize costs may pale in comparison to the costs suffered by those onto whom they are externalized, incentives for companies to pay these costs themselves are virtually nonexistent, and externalization can be advantageous, if not necessary, to remain competitive in today's deregulated market economy. In the case of warnings and product safety, "ethical" companies are at a disadvantage. For example, if a drug manufacturer makes an antidepressant that is addictive and warns of this side effect adequately, they put themselves at a competitive disadvantage to other drug manufacturers that make similar antidepressants that are not advertised as addictive. Likewise, since FDA regulatory policies require minimal safety testing and do not require long-term studies before they approve drugs or devices, companies that perform premarketing or post-marketing tests for long-term adverse effects waste time and resources that could put them at a competitive disadvantage. Though failure to test and failure to warn adequately of product hazards may eventually result in legal liability and large amounts paid in compensation to those injured by the product, the penalties paid by the offending corporations generally do not come close enough to their profits to discourage them from externalizing costs.

A closer look at Merck's motives for aggressively marketing and selling Vioxx reveals the corporate survivalist, profit-seeking notions that governed their unethical behavior, and shows that patients' deaths were, in fact, an externalized cost of selling Vioxx. Merck is one of many pharmaceutical corporations struggling to keep afloat amongst a sea of powerful competitors. Like its competitors, Merck makes pharmaceuticals as cheaply as possible and sells them for as much as they can to as many customers as they can manage. The individuals pulling the strings at Merck are heavily rewarded for their ability to increase the company's bottom line. The ability to return large profits to shareholders defines success and results in professional advancement in this market.

In the late 1990s, Merck was a "successful" corporation; they made lots of money. However, some executives realized that their profits were in danger because the patents on six of their top-selling drugs were due to expire in the first years of the new millennium. This meant that Merck would lose exclusive rights to sell those drugs and prices of the drugs (and consequently Merck's revenue from them) would fall as other companies competed to sell them. If

Merck lost all of this revenue, its stock would plummet and the company might be subject to takeover by other, more powerful corporations. In order to stay afloat, Merck needed a lifesaver, and it needed one quick.

That lifesaver was Vioxx. Instead of taking the risk of putting their resources into discovering new drugs that might not turn enough profit for the company to survive, Merck took a conservative approach, putting over $1 billion into promoting one single drug they believed could become a blockbuster. From an economic standpoint, Vioxx was a good choice for several reasons. First, it was a drug to *alleviate pain* from a medical condition, not a drug that would *cure* a condition. This ensured that Vioxx would have continuous sales, unlike other drugs, such as antibiotics, that are used only for short periods of time to cure ailments. Second, the target sales market of patients suffering chronic pain from arthritis was very large. Third, Vioxx could be sold as a prescription drug, allowing Merck to charge many times more per pill than the cost of manufacture because consumers with insurance are not deterred by price. Vioxx was thus an ideal drug for making money.

At the million-dollar private corporate launch party for Vioxx sales staff, Merck CEO, Ray Gilmartin, emphasized the importance of Vioxx sales:

> The major drugs going off patent in 2000 and 2001—VASOTEC, MEVACOR, PRINIVIL and PEPCID, plus our share of PRILOSEC—together represent a significant percentage of our sales. So producing replacement revenue through the launch of new products like VIOXX is very important for us (Vioxx Product Release Meeting Ray Gilmartin Dinner Speach Talking Points, 1999)

Merck's former top scientist, Ed Scolnick, wrote that Merck would be a "completely different company" if it could not make Vioxx a commercial success (Scolnick et al., 1997).

Needless to say, Merck did not inform the FDA, physicians, or patients of their priorities. Merck's public pronouncements conveyed that their product development was based on charitable motives, citing its founder's claim that "[the company is] driven by the idea that medicine is and always will be for the people and not for profits" (Working at Merck Frosst, 2008). Merck described their commitment to "the highest level of scientific excellence" and "improving human and animal health and the quality of life" while they simultaneously designed studies that exaggerated the efficacy of Vioxx and diminished its negative side effects (Working at Merck Frosst, 2008). The FDA noted a disconnect between Merck's conduct and its proclaimed objectives. In a 1999 letter, the agency expressed its concern that Merck's "promotional materials

demonstrate[ed] a continuing pattern and practice of widespread corporate behavior to avoid compliance with regulations concerning disclosing risk information" (Baylor-Henry, 1999).

Following the completion of the Vigor trial in 2000, Merck entered into negotiations with the FDA to establish their right to advertise Vioxx as a "safer" pain reliever based on evidence that it reduced the overall incidence of GI bleeds. However, the data from Vigor and other trials such as Advantage confirmed the cardiovascular risks associated with Vioxx, and the FDA called for a revision of the Vioxx label that would include a warning about these side effects. Merck recognized the impact that a cardiovascular side effect warning would have on sales. Their 2002 Profit Plan calculated that Merck would lose $229 million in Vioxx sales if the label revisions were released in October 2001 instead of February 2002 (Profit Plan 2002 Merck A & A Franchise, 2002). During this time, Merck delayed the submission of unfavorable Advantage results and entered into 9 months of job negotiations with the FDA official who was responsible for overseeing the trial data submissions on which the warnings were to be based (Curriculum Vitae of Peter Honig, 2003; Scolnick, 1997, 2002). By the time the FDA approved the final version of the Vioxx label in 2002, which so understated the drug's cardiovascular side effects that Merck officials described it as a "miracle," it was too late for thousands of other Vioxx users who had already died (Scolnick, 2002).

The Vioxx debacle incited public outrage at the irresponsible behavior of pharmaceutical companies and the regulatory system that allowed this behavior to go unchecked. Jurors interviewed after the Ernst verdict said they were shocked that Merck had known of the dangers of Vioxx and sold the drug anyway. One juror declared, "That was the main thing that struck me at the time—they knew and they still put it out anyway" (Girion & Calvo, 2005). The jury awarded $229 million in punitive damages to reflect the "cost" that Merck externalized by delaying the label change.

The verdict was short-lived. Several months later, a Texas appellate court reversed the jury's decision. Though determinations about factual disputes among experts, such as whether Bob Ernst suffered a heart attack or not is the responsibility of the jury, the Texas Appellate Court decided that as a "matter of law," the impartial coroner and the other plaintiff experts who determined that Ernst had died of a heart attack had insufficient evidence to even present their opinions to the jury. Having dispensed with the plaintiff experts, the Court ruled that the jury could not find for the plaintiff.

Carol Ernst, who had already lost her husband, also lost her chance to assign responsibility to Merck. Merck, on the other hand, lost nothing, except

for a momentary decline in stock price that steadily rebounded over the next year. Even after settling all pending Vioxx injury claims for $4.85 billion dollars, Merck still managed to make over $5 billion in profit from selling a drug that according to one estimate caused between 88,000 and 139,000 heart attacks out of which about one-third were fatal (Curtis, 2007; Graham, 2006; Graham et al., 2005). Despite Merck's unethical conduct and the price they paid for it, Vioxx still furthered their goal of providing high returns to shareholders and large payouts to its executives.[8]

### The Problem Is Systematic. How Is the System Maintained?

Why do bad drugs and devices gain approval and continued use despite widespread recognition that their risks far outweigh their benefits? The disease industry problem implicates not just the corporate profit model, but also complex social and psychological factors that keep the system in place (Culp & Berry, 2007). These factors range from pervasive ideas and cultural assumptions about the nature of science and medicine to fraud and coercion carried out by corporations. Moreover, these phenomena are themselves interrelated: cultural assumptions often disguise or legitimize disease industry marketing while subtle marketing tactics framed as "research and development" and "medical education" covertly influence popular ideology. We have outlined these relations in a flow chart (Figure 7.1) that provides a framework for understanding the interactions between disease industry marketing, the practice of medicine, policy, and cultural understandings of health and disease.

Antonio Gramsci's theory of hegemony, which describes how ideology and cultural values influence or create a "common sense" that is reinforced through what he terms "civil society"—popular culture, media, schools, family, religion, and other institutions that are part of the everyday life experiences of individuals in a society, provides a useful framework for understanding how corporate externalities have worked their way into American society and why they so often go unchallenged. Gramsci's theory recognizes that the dominant social order's power derives not from force or overt manipulation but rather from the "consent" of the governed as determined and legitimized by a value system that appears to be "common sense." The theory of hegemony attributes political power to a ruling group's ability to conform to the values and ideology of those it rules, and, in practice, ruling groups use dominant ideology to legitimize their power and prevent consideration of other political orders (Jones, 2006). Gramsci used this theory to explain how agreement over fundamental



FIGURE 7.1. Hegemonic ideas that block reform and how they remain dominant.

values permitted the bourgeoisie to maintain political dominance over other classes. This chapter frames disease industry activity within the construct of hegemony to explain the persistence of corporate externalities. In this framework, we show how prevalent ideas and assumptions shape both popular and professional views in support of disease industry activity. We also show how the industry itself shapes these ideas covertly through research and marketing and also, at times, coercively through threats and reprisals. Ultimately, common sense notions about medicine and the role of disease industry products in health care create a certain blindness to and tolerance of disease industry externalities.

## Common Sense about Health and Medicine

Common sense about health, disease, and medicine in America includes widespread assumptions about the nature of science and the practice of medicine.

Scientific inquiry is at the root of modern western allopathic medicine (Legal Status of Traditional Medicine and Complementary/Alternative Medicine: A Worldwide Review, 2001). Popular perceptions of medicine associate doctors with lab coats, experiments, biological mechanisms, and rationality while spirituality, culture, social organization, lifestyle, and politics are generally excluded from the domain of medicine. Though there are many definitions of science and various interpretations of what constitutes a "scientific endeavor," all agree that, in theory, science is characterized by observation, skepticism, and experimentation and that conclusions reached by scientific experiments must be replicable to have value (Latour, 1987). The public identifies science as a process that strives to avoid bias and pursues the truth. However, scientific processes are not inherently objective because they spring from human reasoning that is bound by culture (Feyerabend, 1975; Kuhn, 1962; Latour, 1987). As Gunnar Myrdal noted, "Prior to answers there must be questions. In the questions raised the viewpoint has (already) been chosen and the valuations implied" (Myrdal, 1978). Scientists determine which questions are asked, which observations are made, and how experiments are designed. These decisions are, for the most part, subjective and may depend on a variety of factors—such as funding, utility, prior knowledge of the issue, and incentives—that are independent of science itself (Latour, 1987). Popular conceptions of science, however, associate the field with objectivity and a dispassionate search for the truth. The public projects these notions onto medicine, which is considered to be scientific in this sense. Americans associate doctors with microscopes, laboratory tests, and high-tech equipment and believe that medical decisions and innovations are always based on thorough scientific investigation and knowledge of the biologic mechanisms of illness (Freidson, 1970).

While these assumptions are not entirely misguided, the practice of medicine, and even science itself, is nuanced and often uncertain. For example, it is common for surgeons to develop surgical techniques through trial and error, rather than through systematic investigation, and many treatments—such as aspirin for headaches—are commonly administered and effective even though doctors are uncertain of the exact biological mechanism that allows them to work. Gigerenzer et al. (2007) report regional differences in recommended medical interventions for the same disease signaling that factors independent of what has been "scientifically determined" play into the practice of medicine. The fact that allopathic medicine is not purely science based or objective in nature does not necessarily devalue its utility or effectiveness. Doctors make sound and beneficial clinical decisions everyday even though they are not based in or vetted by "science." However, the widespread perception that doctors depend solely on

objective methods that are not influenced by their own biases or other circumstances can lend unmerited credibility to physician decision making and masks the influence of disease industry marketing and manipulation.

Furthermore, science and western medicine are associated with technology and innovation. The idea that "new" means "improved" and that "cutting-edge" implies "better" greatly affects the way in which Americans view medical interventions. While in many cases developments in medicine are, in fact, genuine improvements, new drugs and procedures are often unquestioningly promoted as preferable to previously employed interventions, and long-standing or "traditional" solutions are often overlooked. Phase III clinical trials for new pharmaceuticals rarely test drugs for more than a few months, and the study subjects rarely reflect the clinical profiles of the patient population to whom the drugs will be administered after marketing. Despite this, doctors rapidly adopt new drugs as "better" interventions (Graham, 2002; Rosenheck, 2005). Often, as was the case with Vioxx, new drugs and devices rapidly supplant inexpensive, established, and effective therapies. Hydrochlorothiazide is an example of a relatively safe, effective, and well-established treatment for hypertension that has been used for 50 years. Though it is economical and effective, doctors underutilize it in favor of more expensive, minimally tested patented alternatives (Knight et al., 2000). The preference for new treatments is derived from a value judgment that is inherent in the American conscious. New pills, devices, and tests developed in laboratories are treated with little or no skepticism and warrant nearly immediate acceptance because their newness is associated with improvement through "scientific methods." While some new products are genuine improvements, the rapid adoption of all things "new" is, at least in part, a cultural and marketing phenomenon because complete "scientific evidence" of efficacy and safety develops over time and is missing for new drugs (Rosenheck, 2005).

Faith in innovation and the objectivity of medicine leads patients and doctors alike to believe that the treatment they give or receive is the best there is to offer because it is based on cutting-edge, scientifically derived "truth" about biological systems. These assumptions are important in legitimizing disease industry activity because the preference for innovation gears Americans toward accepting products that have been minimally tested and allows manufacturers to redesign and remarket new versions of old products, practices that significantly reduce production costs and increase profits. The assumption of scientific objectivity not only increases trust and acceptance of disease industry products but also cloaks marketing strategies and manipulation of research in the guise of scientific truth.

A larger and, consequently, less apparent bias in today's medical industry is its focus on treating individuals with pharmaceuticals and devices and its exclusion of large-scale social changes that have been proven to improve health and quality of life—such as improving sanitation and food systems, educating and empowering citizens, and increasing community solidarity. The neglect of these other, less commonly acknowledged, approaches to healthcare—many of which are, ironically, supported by scientific research—indicates a bias toward the treatment of individual patients and the prevalent preference for intervention through drugs and devices in today's medical system (Bruhn & Wolf, 1979; Kass, 1970). This critique of western medicine should not suggest that the treatment of individuals with drugs and devices has no place or benefit but rather that this approach should be recognized as one of many possible interventions that can improve health. For example, interventions such as agricultural policies that decrease the use of pesticides on food, economic changes that make high caloric fast food less desirable, and school programs that encourage active lifestyles could be equally, if not more, effective at preventing death and disease than prescription drugs and surgeries. They would undoubtedly be less costly.

In most cases, the medical establishment continues to operate under the basic individualistic premise of "doctor treating patient." Increasingly, the medical profession is becoming so specialized that doctors no longer focus on treating whole patients but, instead, treat specific organs or body systems or even just particular symptoms or aspects of a disease. Large-scale social and policy changes are not considered formal medicine and are left to the "unscientific" and "subjective" realms of politics and social science regardless of the fact that many of these initiatives are backed by strong research findings. The common sense assumption that science is objective gives more value to medical procedures discovered in laboratories while deemphasizing the importance and potential of interventions that are not. Ironically, the most important health care breakthrough in the past 40 years in the United States was not a scientifically derived, innovative disease industry product; it was a tax on tobacco (Kristof, 2008).

As Marcuse noted, the success of the system is to make unthinkable the possibility of alternatives (Marcuse, 1964). The following section describes how the disease industry contributes to the formation and promotion of common sense notions about health and medicine and uses dominant ideology to advance their single-minded, profit-making objectives and externalize production costs onto individuals and society with the "consent" of the people.

*Disease Industry Influences the Practice of Medicine*
*and Reinforces Popular Ideology*

The disease industry did not invent medicine's individual treatment paradigm, create faith in the objectivity of science, or equate technology with progress. These dominant ideological constructs are sociocultural phenomena and are hegemonic in the American value system and way of life. However, as Gramsci put it, "common sense is not something rigid and immobile, but is continually transforming itself" as society evolves, agendas change, and different intellectual leaders come into prominence (Gurevitch, 1982). The root of hegemonic influence derives from an individual's interaction with "civil society"— the media, schools, churches, family, and other institutions—whose values and ideologies are explored and consecrated through everyday experience. The extent to which disease industry marketing, the cooption of academic researchers, and influence over government by the disease industry permeates civil society determines the amount of influence that industry has on creating our collective common sense.

We interact with the disease industry through nearly all venues of civil society, especially the media and, most importantly, the medical establishment. The disease industry's relationship with the medical community is perhaps the single most important factor in its ability to exploit and influence hegemonic constructs that permit corporations to sell their products and externalize their costs while averting much skepticism and rebuke from society. Medical institutions, key opinion leaders, regulatory agencies like the FDA, and prescribing doctors serve as intermediaries between corporate, profit-driven manufacturers of pharmaceuticals and medical devices and the end users of their products. Corporations use their influence over the medical community to control ideas surrounding the definition of disease, the necessity of diagnostic tests, and treatment standards. More importantly, respected and trusted intermediaries (i.e., physicians, hospitals, medical universities, government agencies, medical journals, etc.) blur the distinction between disease industry marketing and professional judgment, giving legitimacy to disease industry propaganda and providing alternative explanations for their profit-driven failures.

The prominent caricaturist Al Hirshfeld was well known for hiding his daughter's name, *Nina*, in his cartoons. Though visible to the informed eye, uninformed readers focused on the figures, objects and political messages in the artwork; the image of her name only became apparent to those who were aware of the game and looked for it. In the same way, the disease industry's influence on thought and practice in the medical community is ever present, though often camouflaged. Essentially, all activities of a corporation are necessarily

aimed at developing and marketing products and services that can be sold for a profit, and this holds true for products intended to treat patients. The activities, advertisements, education, research, and development sponsored by disease industry corporations are profit driven. However, what distinguishes medical product marketing from the marketing of commercial products such as clothing, cars, and snack foods is that much of it is conducted within the medical industry itself. In the case of hospitals, doctors and insurance companies stand between disease industry products (medical devices, diagnostics, and pharmaceuticals) and their end users (patients). The medical community, therefore, represents a crucial target market for disease industry products, and selling to this community requires that companies influence medical discourse in such a way as to ensure that there is the perception of a "need" for their products and that their products are regarded as filling that need. Alastair Matheson describes this discourse as the creation of a "drug narrative … in which a drug typically provides the 'solution' to a 'problem'" (Matheson, 2008).

The disease industry influences popular as well as professional perceptions of health care by controlling the definition of disease, supplying methods for diagnosis of disease, and deciding what is acceptable and/or necessary treatment or intervention. Controlling the demarcation between health and disease allows drug companies and device manufacturers to determine the size of their markets. Lynn Payer named this phenomenon "disease mongering," which refers to the convergence of interests of doctors, drug companies, and media in exaggerating both the severity of illness and the efficacy of drugs:

> Since disease is such a fluid and political concept, the providers can
> essentially create their own demand by broadening the definitions of
> diseases in such a way as to include the greatest number of people,
> and by spinning out new disease (Payer, 1992).

According to Payer, disease mongering often involves the "medicalization" of what were previously considered normal laboratory results, behaviors, or feelings. Though cramping and mood swings during menstruation, loss of sexual stamina in males with age and flighty, energetic behavior in children are natural aspects of the everyday lives of millions, these normal variations have been redefined as "premenstrual dysphoric disorder," "erectile dysfunction," and "attention deficit hyperactivity disorder." Excessive retail spending and extreme shyness have been dubbed as "compulsive shopping disease" and "social anxiety disorder." Awareness campaigns backed by disease industry companies convince healthy people to consider the vagaries of everyday

life as medical problems that can be solved by disease industry products. Pharmaceutical company-sponsored "awareness campaigns" are designed to convince healthy people that they are sick and sick people that they are very sick. The 1997 best seller *Listening to Prozac* gave voice to this fashion when its medical author asserted that selective serotonin reuptake inhibitors (SSRIs) could make people "better than well" (Kramer, 1997).

Henry Gadsden, president of Merck, explained the concept from a strategic perspective, stating that it is more advantageous for a pharmaceutical company to sell to everyone as opposed to being confined to selling to just sick people (Moynihan & Cassels, 2005). Vince Parry a marketing executive described the practice:

> The idea behind 'condition branding' is relatively simple: If you can define a particular condition and its associated symptoms in the minds of physicians and patients, you can also predicate the best treatment for that condition (Parry, 2003).

When disease industry companies establish the legitimacy or requirement for a diagnostic test, they bias medical practice toward "high-tech" solutions, conflate the idea of "prevention" with "early detection" and promote the idea that *earlier* treatment and *more* treatment is the most appropriate form of medical practice (Starfield et al., 2008). Diagnostic equipment manufacturers influence the choice of diagnostic equipment or tests that "should" be performed to diagnose diseases. Sometimes they promote the use of a test to diagnose an abnormality before there is any evidence that the "abnormality" should be treated. For example, computerized tomography (CT) scans detect cardiovascular variations in patients who are subsequently treated with cardiac bypasses or drugs; however, there is no evidence that these procedures prolong life or prevent disease in these patients (Redberg & Walsh, 2008). Regardless, CT scan manufacturers, along with the radiologists, cardiologists, and cardiac surgeons who make money from the scans, have aggressively promoted the use of CT for evaluation of heart disease. It is now a standard screening procedure for cardiovascular risks. Recently, the Centers for Medicare and Medicaid Services (CMS)—the organization that determines whether or not federal health insurance programs will pay for a particular procedure—proposed to disallow payment for CT scans because there was no evidence that the screenings improved health (Redberg & Walsh, 2008).

Deciding which interventions are "indicated treatments" as opposed to "quackery" allows the disease industry to advance the sale of its products as solutions to health problems and ensures demand for them by blocking out other alternatives. For example, drug companies fund researchers who write

clinical practice guidelines (CPGs) which are written by groups of "expert" clinicians and usually endorsed by specialty societies. Doctors follow CPGs to determine diagnostic tests, devices, and drug treatments for various diseases. Choudhry et al. found that 87% of physicians who developed CPGs had received funding from drug companies whose drugs they were to evaluate. Fifty-eight percent had received financial support to perform research, 38% had served as employees or consultants for a pharmaceutical company, and 6% had equity interest in the pharmaceutical company (Choudhry et al., 2002).

Medicare and insurance companies pay for off-label (unapproved) uses for many drugs. They base their reimbursement decisions on "compendiums." The writers and editors of these private compendiums are not government employees. Medicare is essentially obliged to pay for any drug as long as at least one compendium approves it as treatment even if the FDA has specifically ruled that the drug should not be used for that disease. These compendiums have close financial ties to the drug industry and many conflicts of interest. Dr. Allan Korn, the chief medical officer for the Blue Cross and Blue Shield Association told the New York Times, "We have very little faith that those indications that make it into the compendia are safe, let alone effective." For example, the National Comprehensive Cancer Network guidelines and drug listings are written by experts, at least 47% of whom received more than $10,000 per year of drug company funding (http://www.nccn.org/disclosures/default.asp). A drug company can pay a $50,000 fee to the Foundation for Evidence-Based Medicine compendium to expedite review (but not guarantee inclusion) of their drug within 3 months (Abelson & Pollack, 2009).

In theory, establishing the medical community along with regulatory agencies as intermediaries in the sale of disease industry products to end users should protect patients by ensuring that qualified individuals (doctors) make informed decisions about health care with patients' best interests in mind. In many cases, this process works. The FDA keeps some dangerous drugs and devices off the market and doctors negotiate risks, benefits, and contraindications when prescribing a drug or recommending a procedure. This system works under the assumption that the medical establishment functions independently of the commercial pressures exerted by the disease industry and prioritizes patients' best interests. However, these sectors are *not* outside disease industry influence, and corporations utilize their influence over these intermediaries to justify the use of and lend credibility to their products. Disease industry corporations market their products by funding research and controlling discourse within the medical community, and many end users of their products, and often members of the medical community themselves, are blind to their influence (Matheson, 2008). Like the *Ninas* hidden in Hirschfeld's

210   CORPORATE TACTICS

cartoons, disease industry marketing permeates the medical establishment yet remains hidden, unless you know what to look for.

In the following section, we highlight the specific methods employed by corporations to shape the discourse surrounding issues of health and health care, paying specific attention to the role of the medical community in accepting and perpetuating this influence and its effects on related policy and the popular conscious. Disease industry marketing flows to doctors, hospitals, and other caretakers through research and development, medical education, and increasingly to the general public through traditional and unconventional advertising.

*Corporate Framing of Research Questions and Manipulation of Results*

Since all activities of a corporation are driven by profits, the marketing of disease industry products begins with research and development. Corporations that make and sell pharmaceuticals and medical devices are usually the entities responsible for testing the appropriateness, efficacy, and safety of those products. Employment at a corporation or the receipt of corporate funding gives doctors and scientists conducting research a strong incentive to produce results that are favorable to a corporation's products. Contrary to popular belief about the objectivity of science, there are many ways to design scientific experiments that skew the data in a specific direction. These methods, which can be either intentional or unintentional, include designing the study with an inherent bias and reporting only favorable results (Greenland, 2009). Table 7.1 is a list of some of the specific techniques disease industry corporations employ that distort science and affect results.

*Medical Education*

In addition to influencing and subtly (or not so subtly) biasing research and development toward disease industry agendas, corporations also exert influence over the medical profession in the guise of medical education. Table 7.2 is a list of the main "educational venues" through which the disease industry asserts ideas and initiatives to control the hegemonic constructs that determine what is considered disease, proper methods of diagnosis, and expected treatments.

*Direct Influence of Community Ideas about Health and Medicine*

Direct influence of the community is the primary means through which the disease industry creates a consensus about medicine and disease and

**TABLE 7.1.** Chart of Methods Companies Use that Distort Results of Randomized Control Trials.

| General Method | Specific Technique | How This Occurs | Examples |
|---|---|---|---|
| Design fails to examine expected adverse side effects | Choosing who gets studied | The chosen study subjects are less likely to show an adverse side effect than the populations most likely to use the drug or device. | In the Vioxx Vigor Trial, Merck scientists chose participants who were at low risk for cardiovascular events (i.e., 80% of participants were women, and the average age was 55 years) as opposed to older male and female patients who are most likely to be using the drug given its indication for arthritis (Morrison, 1997). |
| | Small studies | Studies are conducted on cohorts that are too small to demonstrate a side effect. For example, if a study has 1,000 participants and a side effect occurs once in every 5,000 patients, it is likely that no patient in the study will demonstrate the side effect. However, the effect might become serious when the drug is marketed and used by millions. | Merck conducted nine studies that constituted its new drug application for Vioxx to the Food and Drug Administration in 1998. None of these studies were large enough (50–250 patients) to properly evaluate cardiovascular risk which caused one extra heart attack for every 197 patients at low doses and one extra heart attack per year for every 75 patients at the high dose (Krumholz et al., 2007; Graham et al. 2005). |
| | Short-term studies | The majority of preapproval Phase III trials last between 6 weeks and 6 months, and there is no length requirement set by the FDA. This amount of time is rarely long enough for adverse side effect to appear, especially slow-developing cancers and other chronic diseases such as diabetes. | Eli Lilly's application and FDA's approval of Zyprexa for treatment of schizophrenia, a chronic condition, was based on short-term (4–6 week) studies (Physician's Desk Reference, 2009).The short-term trial data, which was provided to doctors, thus, did not show that Zyprexa use resulted in weight gain and hyperglycemia after months of use, though other data from longer trials—publication on which was delayed—showed this to be true (Zyprexa Highlights of Prescribing Information, 2009). |

*(Continued)*

211

TABLE 7.1. Continued

| General Method | Specific Technique | How This Occurs | Examples |
|---|---|---|---|
| Study shows exaggerated/favorable results. | Selection of the study dose | High doses used for the drug to be tested and low doses for the competitor drug to show exaggerated effectiveness in comparison. | Drug companies sponsored multiple trials of their NSAID drugs in head to head comparisons with generics or competitor's drug. The sponsor's drug was administered in higher doses than the competitor drug. The difference in effectiveness between cohorts was then used to support marketing claims that the sponsor's drug was more effective (Rochon et al., 1994). |
| Study uses an endpoint that does not predict efficacy for outcome of interest | Study evaluates surrogate outcomes | The effect of a drug is measured against a risk factor or other indicator/symptom (surrogate) of a disease instead of against morbidity or mortality caused by the disease. | Nifedipine was tested and approved to treat high blood pressure, a risk factor for MIs and strokes; however, it was later found to increase the incidence of these events even though it effectively reduced blood pressure (Furberg et al., 1995). |
| Reporting results | Important side effects are lumped with unimportant side effects in a "composite endpoint." | Important side effects (such as heart attack deaths) combined with related, but less serious, side effects (such as hypertension or edema) to create a single outcome measure. | Ferreira-Gonzalez et al. reviewed over 92 studies and found that this practice was widespread and that as a result readers often overemphasized the drug's benefits. Outcomes, such as fatal MI and nonfatal MI are grouped and are reported as "reduces fatal and nonfatal MI" when almost all events are reported (Ferreira-Gonzalez et al., 2007). |
| Selective Publication | Results favorable to a product are more likely to be published | Drug and device manufacturers retain publication rights over the studies they fund. They often bias the medical literature by publishing favorable studies while burying those that are unfavorable. | Turner et al. (2008) reported that companies reported negative results on their antidepressant drugs to the FDA (as required by law) but correctly published 36 of 37 studies with favorable results, 3 of 25 negative trials and 11 other negative trials in a way that made them appear positive. |

212

TABLE 7.2. Influencing Medicine by Masking Marketing as Education.

| Form of "Education" | Explanation |
|---|---|
| Detailing | Product detail representatives, marketers from disease industry corporations, personally engage physicians through visits to their offices. Though these detail representatives are first and foremost salesmen and saleswomen whose primary goal is to influence doctors' prescribing habits toward their products, they are introduced to physicians as providers of important facts and information about disease industry products. Visits from detail representatives often involve incentives for physicians such as free drug samples, meals, tickets to shows or sports events, and in some extreme cases vacation getaways and outings to strip joints. Moreover, detail representatives are steeped in face-to-face marketing skills and trained in how to avoid answering critical questions about product safety and efficacy. |
| Peer-reviewed journals | Publication in peer-reviewed journals is the primary mode of establishing credibility and disseminating information throughout the medical community. Most medical professionals consider publication in a peer-reviewed scientific or medical journal a sign of credibility of study results. However, underlying data is infrequently audited, and publishing false results, a biased, ghostwritten, or otherwise defective study is a common occurrence (Hill et al., 2008). |
| Non-peer reviewed journals | Publication of misleading scientific literature is even easier to accomplish in non-peer-reviewed journals. Although there is less credibility associated with non-peer-reviewed literature, many of these "throwaways" are distributed for free to physicians across the country without subscription. |
| Medical journal advertisements | Pharmaceuticals and medical devices are advertised through traditional paper advertisement schemes in medical journals with large physician readerships. |
| Product handouts and monographs | Companies distribute "information" or "educational" handouts that double as marketing materials for their products. The information on these handouts is not reviewed by anyone other than the companies themselves and may contain misleading information and/or ghostwritten supplements that appear to be legitimate including the creation of journals that were secretly conceived and funded by pharmaceutical companies. |
| Company-sponsored symposia, medical specialty meetings, and hospital lectures | Companies sponsor education programs at hospitals and medical schools, scientific research, publications, and professional meetings. At many medical professional organization conventions, the programs include promotional material about the sponsor's products. The Pharma-funded CME industry employs more than 30,000 people. Company advertising is the main source of income for the AMA. This is now true for most medical specialty organizations. |
| Continuing Medical Education (CME) | Practicing physicians are generally required to attend CME lectures or take CME courses online in order to refresh their medical knowledge and stay up-to-date on trends in their fields. Disease industry companies sponsor and design courses of study for many of these programs. |

(Continued)

213

214   CORPORATE TACTICS

TABLE 7.2.  Continued

| Form of "Education" | Explanation |
| --- | --- |
| Gifts to physicians, medical students, and residents | Companies routinely provide doctors with breakfasts, lunches and "educational dinners" at expensive restaurants. Under the threat of a congressional ban in 2008, the pharmaceutical companies published a voluntary guideline that banned small gifts like pens, pads, and mugs. The code did not limit the millions of dollars spent on speaking and consulting payments that drug makers have with tens of thousands of doctors. |
| Hiring physicians as consultants | Disease industry corporations hire practicing and research physicians as consultants, establishing financial ties between their interests and the interests of individuals in the medical community who are responsible for making medical decisions or influencing opinions. Consulting is often simply a way for companies to entice physicians financially under a guise of legitimacy, such as when detail representatives pay "consulting fees" to physicians for "preceptorships" in order to observe their patient examinations with the goal of having them use their company's drug. |
| Key opinion leaders (KOLs) | Disease industry corporations identify "key opinion leaders" in the medical profession, those physicians who are well known and respected in their field. They often hire them as consultants and pay them large sums of money to advocate for disease industry products by giving lectures, writing papers, or signing ghostwritten articles, and creating clinical practice guidelines. Companies will often share patent royalties with KOLs to give them incentive to support their products. |

acceptance of their products outside of the medical profession. Table 7.3 is a partial compilation of the schemes companies use to influence individuals and entities that play a role in shaping medical and health policy, including the government and insurance companies.

*Corporate Influence on Regulatory Processes*

The FDA is the organization that oversees the approval of all medical drugs and devices. The agency is government sponsored and was designed to be an independent evaluator of the effectiveness and safety of disease industry products. However, the FDA is not, in actuality, isolated from corporate influence. Regulatory capture refers to the phenomenon where companies gain control over and/or influence agencies that are established to regulate their conduct. This aligns the regulatory agency's objectives with those of the corporations whose products they are vetting. As Graham put it:

---

THE PHARMACEUTICAL INDUSTRY, DISEASE INDUSTRY   215

TABLE 7.3.  Ways Corporations Seek to Influence Public Constructs.

| General Method | Specific Methods | Examples |
| --- | --- | --- |
| Direct-to-consumer advertising | Television, radio, internet, and magazine advertisements | These are traditional marketing schemes and involve common advertising tricks such as sex appeal, bandwagon, celebrity endorsement, and others. Often DTC advertisements include lists of symptoms for self-diagnosis, which may further disease mongering by encouraging healthy people to identify normal variations in health (such as frequent urination, shyness, anxiety, or restless legs) as conditions that are treatable with medicine or medical devices (Angell, 2004a; Bell et al., 1999a, 1999b, 2000; Silverman, 2008). |
| Attempting to influence "independent" media and organizations | Paying media hosts | Corporations provided "speaker fees" of over one million dollars to the host of the "The Infinite Mind" radio program broadcast on public radio stations (Harris, 2008). This show legitimized "new disorders" like shoplifting and shyness and off-label use of drugs for these and other "medical disorders" (http://www.nccn.org/disclosures/default.asp). |
| Attempting to influence "independent" Non-profit Organizations | Disease-specific advocacy organizations | Disease industry corporations often sponsor or fund organizations that are viewed as independent and beneficent advocacy organizations. These "legitimate" organizations routinely promote new therapies and lobby the FDA to approve them (Carpenter, 2004; Front Groups, 2008). |

The [FDA] culture also views industry as the client. They're serving industry rather than the public. In fact, when a former office director for the Office of Drug Safety criticized me and tried to get me to change a report I'd written on another drug—Arava—he said to me and to a colleague who was a coauthor on this report that 'industry is our client.' (Loudon, 2005)

The FDA, at its discretion, appoints "expert panels" to review new drug applications for controversial or innovative products. In 73% of FDA meetings, at

least one advisory committee member reported a financial link to a drug's maker or a competitor (Lurie et al., 2006). There is much job transfer between middle and upper level management at the FDA and disease industry corporations (Revolving Door). For example, Merck entered into job discussions with the FDA Director of the Office of Post-Marketing Drug Risk Assessment that spanned approximately 9 months. During this period, the official (according to a memorandum) attended a meeting where the FDA discussed its position on the Vioxx label and met off-the-record with Merck representatives on FDA "Organizational changes and the status of regulatory documents and policies" (Memo from Goldmann B. to Dray M., Subj: Highlights of WRLG meeting with P. Honig MD, Director OPDRA, CDER, September 18, 2001). The official left the FDA and immediately took a position at Merck (Curriculum Vitae of Peter Honig, 2003; Rarick Honig FDA Label Meetings, 2001; Scolnick, 2002a). He later testified in the Vioxx civil litigation that he had "tried" to "distance" himself from Merck-related matters at the FDA while he was being considered for a position with the company (Deposition of Peter Honig, 2005).

Corporations hide adverse side effects and other unfavorable study results by submitting them to the FDA along with reams of unimportant information. Important data is often lost in the mix. Approval by the FDA, like endorsement by physicians, lends credibility to disease industry products that companies then use to dispute responsibility for injuries caused by their products.[9]

*Corporate Use of Coercion*

The disease industry controls the practice and acceptance of medicine primarily by "consent." Biasing research, disguising marketing as medical education, advertising directly to consumers, and meddling in regulatory processes masks industry influence and bolsters disease industry constructs of health and medicine through tacit influence of "civil society."[10] However, occasionally, consent cannot be maintained exclusively through normal civil society processes and corporations resort to direct coercion in order to gain approval for their views and products and prevent the consideration of noncommercial alternatives (see Table 7.4).

Conclusion

Companies in the disease industry are subject to the same incentives and structural constraints as all corporations, namely, the single-minded responsibility to provide high returns for their shareholders. In today's largely deregulated

TABLE 7.4:  Examples of Alleged Coercive Acts.

| Victim | Drug/Company | Story |
|---|---|---|
| Dr. David Graham | Vioxx/Merck (FDA) | FDA researcher Dr. David Graham conducted independent Vioxx trials that revealed Vioxx's cardiovascular risks. Upon complaint by Merck about his research, senior-level FDA managers allegedly orchestrated a campaign to discredit Dr. Graham by asking Lancet not to publish his work. They attempted to prevent Senator Grassley from calling him as a witness in a Vioxx investigation, and, according to Graham, the acting commissioner of the FDA offered him a promotion in order to "preempt" his testimony (Loudon, 2005). |
| Dr. John Buse | Avandia (rosiglitazone)/SmithKline and Beecham | GlaxoSmithKline (GSK) called his department chair at the University of North Carolina and told him that Buse needed to retract his adverse comments on Avandia or they would sue the university for $4 billion in lost sales. GSK wrote a "retraction letter" for Buse to copy onto his own letterhead and sign, stating that he was wrong about his claims against Avandia. Buse eventually signed a letter that indicated he would not further discuss the issue (Glaxo CEO Knew Doc Was Intimidated, 2007). |
| Dr. Mary Money | Avandia (rosiglitazone)/SmithKline and Beecham (which later merged to form GlaxoSmithKline) | Smith Kline employees visited her at her job to tell her that her conclusions were incorrect, stating that perhaps she was unable to read accurately echocardiograms. SmithKline executives contacted Washington County's Chief of Staff and demanded that he make Dr. Money stop speaking out against Avandia (More on Pharma Intimidation of Doctors, 2008). |

market, competition from other corporations and the prospect of mergers and hostile takeovers gives ample incentive for corporations to maintain competitive advantages by externalizing some of the costs of production onto consumers and society. Disease industry externalities are a special case of corporate externalizing behavior because of the direct effects they have on human health and well-being and, more importantly, because of the industry's ability to hide externalities within the context of the practice of medicine.

In accordance with Gramsci's theory of hegemony, the disease industry exercises influence and avoids criticism by exploiting common sense notions about health, medicine, and the role of disease industry products in everyday life. They further their profit-oriented agendas with public "consent" that derives from apparent endorsement by the media, the medical profession, and regulatory agencies. Moreover, these institutions, especially the medical community and the government, lend credibility to disease industry goals and ideas to an exceptional degree because they give the appearance of legitimacy.

The disease industry exploits the ideas that science is objective, that technological advances are more valuable than long-standing therapies, and that keeping people healthy involves treating individuals in order to create the perception that their products are needed and represent the best medical solutions. However, they violate the tenets of the "common sense" they rely on by intentionally biasing and manipulating scientific research, creating "new" technologies that are no better or worse than old ones and creating consensus around medical diagnostic and treatment options that are wasteful and expensive when more cost-effective alternatives exist. The second part of this chapter shed light on some of the specific techniques disease industry corporations use to infiltrate "civil society" and influence common sense.

The disease industry exploits existing ideologies and cultural assumptions while simultaneously reinforcing and recreating them through the guise of legitimacy afforded to them by medical, regulatory, and public interest intermediaries. This cyclical reinforcement is what allows disease industry externalities to go effectively unchallenged, if not unnoticed (like the *Ninas* hidden in Hirschfeld's cartoons), by patients and society who bear the exaggerated costs of corporate misconduct.

## NOTES

1 We ascribe actions and knowledge to the corporation as a whole, which under US law, is a "person."
2 Most NSAID pain relievers, like aspirin and ibuprofen, work by inhibiting both Cox-2 and Cox-1 enzymes. Inhibition of Cox-1 increases the risk of GI bleeding and protects against heart attacks. Vioxx primarily inhibits the Cox-2 enzyme and, thus, produced fewer cases of GI bleeds and ulcers. However, the Cox-2 enzyme is required for GI healing, so by blocking it, Vioxx increased the likelihood that a bleed would be severe if it occurred (Wright, 2002).
3 "Blockbuster" is a Wall Street term reflecting a drug or device with more than one billion dollars in annual sales.
4 Merck trained their representatives with a game called "Dodge Ball" which involved practicing methods to avoid answering questions about Vioxx side effects

including heart attacks. In this training game, prospective detail representatives could only move onto the next round if they gave Merck-approved answers to possible doctor's questions about Vioxx safety or dodged such questions altogether.
5 We use the term "disease industry" to refer collectively to those companies that sell products and services designed to diagnose, treat and prevent disease such as pharmaceuticals, medical devices and diagnostic equipment.
6 Legal precedent gives corporations the status of persons under the law under the premise that corporations procure important benefits for society. However, the justification for this right is faulty. Unlike human beings who have moral responsibilities to other individuals and society that are enforced by both society and the law, corporations, legally, have no responsibility to society or individuals other than their shareholders, and—as we will develop in this chapter—the law and society rarely hold them accountable for their trespasses. There is growing evidence that some defense strategy in litigation.
7 The price of Vioxx was as much as $3 per pill. Comparatively, generic versions of other equally effective (and safer) arthritis pain medications retailed for around $0.06 per pill (Vioxx, 2008).
8 Former CEO Raymond Gilmartin earned $54 million during the five year period of Vioxx sales. By 2001 he had over $181 million dollars in unexercised stock options and had more than 102 million in pension benefits (Bebchuk and Jackson, 2005).
9 In February 2008, the United States Supreme Court issued a 6–3 ruling against a pharmaceutical manufacturer's right to claim preemption from liability for a defective product under the premise that the product had been approved by the FDA. Though the court ruled against preemption, FDA approval remains an attempted legal defense strategy in litigation.
10 In Gramsci's discussion of hegemony, he distinguishes government from civil society. However, when we apply the theory of hegemony to the disease industry, it is important to note that the government (i.e., the FDA and governmental health policy) actually becomes part of civil society along with the medical profession, popular media, etc. because it is a supposedly independent institution through which ideas about health and medicine are perpetuated in ways that affect the everyday lives of citizens.

## REFERENCES

Abelson R, Pollack A. Medicare widens drugs it accepts for cancer. *New York Times*, January 26, 2009.
Abrams TW. Food and Drug Administration, Division of Drug Marketing, Advertising and Communications Warning Letter re: NDA 21-042 Vioxx (rofecoxib) tablets Warning Letter to Gilmartin, R. 2001. http://www.fda.gov/CDER/warn/2001/9456.pdf. Accessed March 29, 2009.

Angell M. Drug companies & doctors: a story of corruption. *The New York Review of Books.* January 15, 2009a.

Angell M. Drug companies & doctors: a story of corruption. *The New York Review of Books.* 2009b:56.

Angell M. Industry-sponsored clinical research: a broken system. *JAMA.* 2008;300:1069–1071.

Angell M. *The Truth About the Drug Companies: How They Deceive Us and What to Do About It.* New York: Random House Trade Paperbacks; 2005.

Angell M, Relman AS. Fraud in biomedical research: a time for congressional restraint. *N Engl J Med.* 1988;318:1462–1463.

Anstice D. Testimony in Ernst v. Merck Vioxx Litigation in the District Court of Brazoria County, Texas Case No. 619 3/18/2005. 2005.

Bakan J. *The Corporation: The Pathological Pursuit of Profit and Power.* New York: Free Press; 2004.

Baylor-Henry M. FDA Warning Letter to Anstice D.; 1999. http://dida.library.ucsf.edu/pdf/oxx12q10. Accessed March 29, 2009.

Bebchuk LA, Jackson RJ Jr. Executive compensation. *J Corp Law.* 2005;30:32.

Bell RA, Kravitz RL, Wilkes MS. Direct-to-consumer prescription drug advertising and the public. *J Gen Intern Med.* 1999;14:651–657.

Bell RA, Wilkes MS, Kravitz RL. Advertisement-induced prescription drug requests: patients' anticipated reactions to a physician who refuses. *J Fam Pract.* 1999;48:446–452.

Bell RA, Wilkes MS, Kravitz RL. The educational value of consumer-targeted prescription drug print advertising. *J Fam Pract.* 2000;49:1092–1098.

Berenson A. Courts reject two major Vioxx verdicts. *The New York Times,* May 8, 2008.

Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. *N Engl J Med.* 2000;343:1520–1528.

Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. VIGOR Study Group. *N Engl J Med.* 2000;343:8.

Bradford WD, Kleit AN, Nietert PJ, Steyer T, McIlwain T, Ornstein S. How direct-to-consumer television advertising for osteoarthritis drugs affects physicians' prescribing behavior. *Health Aff (Millwood).* 2006;25:1371–1377.

Brody H. *Hooked: Ethics, the Medical Profession, and the Pharmaceutical Industry.* New York: Rowman & Littlefield Publishers, Inc.; 2007.

Bruhn JG, Wolf S. *The Roseto Story: An Anatomy of Health.* Norman: University of Oklahoma; 1979.

Carpenter D. The political economy of FDA drug review: processing, politics, and lessons for policy. *Health Aff.* 2004;23:52–63.

Choudhry NK, Stelfox HT, Detsky AS. Relationships between authors of clinical practice guidelines and the pharmaceutical industry. *JAMA.* 2002;287:612–617.

Culp D, Berry I. Merck and the Vioxx Debacle: deadly loyalty. *St John J Legal Comment.* 2007;22:34.

Curfman GD, Morrisey S, Drazen JM. Expression of Concern: Bombardier et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis. N Engl J Med. 2000;343:1520–1528. *N Engl J Med.* 2005: NEJMe058314.

Curriculum Vitae of Peter Honig MD. 2005. Available at: http://vioxxdocuments.com/Documents/Oxford/Honig%20CV.pdf. Accessed March 29, 2009.

Curtis G. Merck's Vioxx Settlement a Relief for Investors. 2007. Available at: http://research.investopedia.com/news/IA/2007/Mercks_Vioxx_Settlement_A_Relief_For_Investors_MRK.aspx?ad=IA_RSS_11142007&partner=rss-advisor. Accessed March 16, 2009.

Dangerous Prescription. 2003. Available at: http://www.pbs.org/wgbh/pages/frontline/shows/prescription/. Accessed March 29, 2009.

Daniels B. Email to Simon, T. Ehrich, E.. Morrison, B., Reicin, A.. re: GI Outcomes trial protocol. 1997. Available at: http://dida.library.ucsf.edu/pdf/oxx03f10. Accessed March 29, 2009.

Dennis A. What's next in corporate pay practices? *J Account.* 2004;198.

Deposition of Peter Honig, M.D., In re Vioxx Litigation, Case No. 619, Superior Court of New Jersey, Atlantic Count, August 8, 2005:69–72.

Egilman DS, Presler AH. Report of specific cardiovascular outcomes of the ADVANTAGE trial. *Ann Intern Med.* 2006;144:781.

Families USA Publication. Off the Charts: Pay, Profits and Spending by Drug Companies. 2001. Available at: http://www.policyarchive.org/bitstream/handle/10207/6386/offthecharts6475.pdf?sequence=1. Accessed March 30, 2009.

Ferreira-Gonzalez I, Busse JW, Heels-Ansdell D, et al. Problems with use of composite end points in cardiovascular trials: systematic review of randomised controlled trials. *BMJ.* 2007;334:786.

Feyerabend P. *Against Method: Outline of an Anarchistic Theory of Knowledge.* London: Humanities Press; 1975.

Freidson E. *Profession of medicine: a study of the sociology of applied knowledge.* New York: Dodd, Mead; 1970.

Front Groups. 2008. Available at: http://www.sourcewatch.org/index.php?title=Front_group. Accessed September 11, 2009.

Furberg CD, Psaty BM, Meyer JV. Nifedipine: dose-related increase in mortality in patients with coronary heart disease. *Circulation.* 1995;92:1326–1331.

Gigerenzer G, Gaissmaier W, Kurz-Milcke E, Schwartz L, Woloshin S. Helping doctors and patients make sense of health statistics. *Psychol Sci Public Inter.* 2007;8:43.

Girion L. Calvo D. Merck Loses Vioxx Case. *Los Angeles Times.* 2005. August 20, 2005;Sect. A-1.

Glaxo CEO Knew Doc Was Intimidated. 2007. Available at: http://www.pharmalot.com/2007/09/avandiagate-ip-knew-doctor-was-intimidated/. Accessed December 22, 2008.

Graham DJ, Campen D, Hui R, et al. Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study. *Lancet.* 2005;365:475–4781.

Graham DJ. COX-2 inhibitors, other NSAIDs, and cardiovascular risk: the seduction of common sense. *JAMA.* 2006;296:1653–1656.

Graham GK. Postmarketing surveillance and black box warnings. *JAMA.* 2002;288:955–956; author reply 8–9.

Greenland S. Accounting for uncertainty about investigator bias: disclosure is informative: How could disclosure of interests work better in medicine, epidemiology and public health? *J Epidemiol Community Health.* 2009;63: 593–598.

Gurevitch M. *Culture, Society, and the Media.* London; New York: Methuen; 1982.

Harris G. Radio host has drug company ties. 2008. *New York Times,* November 21, 2008.

Hill KP, Ross JS, Egilman DS, Krumholz HM. The ADVANTAGE seeding trial: a review of internal documents. *Ann Intern Med.* 2008;149.251–258.

Horner B, Hartwell M, Levin A. "DODGEBALL" The Pharmaceutical Companies' Direct Marketing to Doctors and the Impact on Health Care Costs and Patient Safety. 2006.

Jones S. *Antonio Gramsci.* London: Routledge; 2006.

Kass EH. Infectious diseases and social change. *Antimicrob Agents Chemother (Bethesda).* 1970;10:1–5.

Knight EL, Glynn RJ, Levin R, Ganz DA, Avorn J. Failure of evidence-based medicine in the treatment of hypertension in older patients. *J Gen Intern Med.* 2000;15:702–709.

Kramer P. *Listening to Prozac.* New York: Penguin; 1997.

Kristof N. Miracle tax diet. *New York Times.* December 8, 2008.

Krumholz HM, Ross JS, Presler AH, Egilman DS. What have we learnt from Vioxx? *BMJ.* 2007;334:120–123.

Kuhn TS. *The Structure of Scientific Revolutions.* 1st ed. Chicago: University of Chicago Press; 1962.

Latour B. *Science in Action.* Cambridge, MA: Harvard University Press; 1987.

Lazarou J, Pomeranz BH, Corey PN. Incidence of adverse drug reactions in hospitalized patients: a meta-analysis of prospective studies. *JAMA.* 1998;279:1200–1205.

Legal Status of Traditional Medicine and Complementary/Alternative Medicine: A Worldwide Review 2001. Available at: http://whqlibdoc.who.int/hq/2001/WHO_EDM_TRM_2001.2.pdf.

Lisse JR, Perlman M, Johansson G, et al. Gastrointestinal tolerability and effectiveness of rofecoxib versus naproxen in the treatment of osteoarthritis: a randomized, controlled trial. *Ann Intern Med.* 2003;139:539–546.

Loudon M. The FDA Exposed: An Interview With Dr. David Graham, the Vioxx Whistleblower. 2005. Available at: http://www.naturalnews.com/011401.html. Accessed March 19, 2009.

Lurie P. Almeida CM, Stine N, Stine AR, Wolfe SM. Financial conflict of interest disclosure and voting patterns at Food and Drug Administration Drug Advisory Committee meetings. *JAMA.* 2006;295:1921–1928.

Marcuse H. *One-dimensional Man: Studies in the Ideology of Advanced Industrial Society.* Boston: Beacon Press; 1964.

Matheson A. Corporate science and the husbandry of scientific and medical knowledge by the pharmaceutical industry. *BioSocieties.* 2008;3:355–382.

Monks R, Minow N. *Power and Accountability.* New York: HarperCollins; 1991.

More on Pharma Intimidation of Doctors. 2008. Available at: http://www.healthyskepticism.org/library/ref.php?id=15421. Accessed November 19, 2008.

Morrison B. Email to Simon T, et al Gi Outcomes Trial Protocol. 2/25/1997. Available at: http://dida.library.ucsf.edu/pdf/oxx03f10. Accessed September 12, 2009.

Moynihan R, Cassels A. *Selling Sickness: How the World's Biggest Pharmaceutical Companies Are Turning Us All into Patients.* New York, NY: Nation Books; 2005.

Myrdal G. Institutional economics. *J Econ Iss.* 1978;12:771–783.

National Comprehensive Cancer Network, (NCCN), Identification and Disclosure of Relationships with External Entities. Available at: http://www.nccn.org/disclosures/default.asp. Accessed July 7, 2009.

Parry V. The art of branding a condition. Medical Marketing and Media.pgs 42–49 May, 2003. Available at: http://findarticles.com/p/articles/mi_q3535t/is_200305/ai_n21330426/ accessed September 12, 2009.

Payer L. *Disease-Mongers: How Doctors, Drug Companies, and Insurers Are Making You Feel Sick.* New York: J. Wiley; 1992.

Peterson M. *Our Daily Meds.* New York: Sarah Crichton Books; 2008.

Physician's Desk Reference. Montvale, NJ: Medical Economics. 2000:1973–1978.

Profit Plan 2002 Merck A & A Franchise. 2002. Available at: http://dida.library.ucsf.edu/tid/0/x/x/oxx08w10/original.pdf. Accessed March 29, 2009.

Paula L, Meeting Minutes Regulatory Briefing minutes Subject: Safety Profile of Cox 2 Drugs. 9/21/2001. Available at: http://dida.library.ucsf.edu/pdf/oxx18d10. Accessed September 12, 2001.

Redberg RF, Walsh J. Pay now, benefits may follow—the case of cardiac computed tomographic angiography. *N Engl J Med.* 2008;359:2309–2311.

Rochon PA, Gurwitz JH, Simms RW, et al. A study of manufacturer-supported trials of nonsteroidal anti-inflammatory drugs in the treatment of arthritis. *Arch Intern Med.* 1994;154:157–163.

Rosenheck R. The growth of psychopharmacology in the 1990s: evidence-based practice or irrational exuberance. *Int J Law Psychiatry.* 2005;28:467–483.

Sedrick E. Email to Goldmann, B., Greene, D., Kim, P., Re: Vioxx Label. 2002. Available at: http://dida.library.ucsf.edu/pdf/oxx12a10. Accessed March 15, 2009.

224   CORPORATE TACTICS

Scolnick E. Email to Blois, D, Goldmann, B., Slater, E,. Perlmutter, R., Subject: Vioxx Vs circular Exhibit 5 Deposition Testimony Ernst v Merck 2005. 1997. Available at: http://vioxxdocuments.com/Documents/Oxford/Exhibits5%20-completely%20different%20company.pdf. Accessed March 29, 2009.

Silverman, ed. dtc-ads-were-the-worst-decision-roche-exec. 2008. Available at: http://www.pharmalot.com/2008/12/dtc-ads-were-the-worst-decision-roche-exec/. Accessed March 29, 2009.

Starfield B, Hyde J, Gervas J, Heath I. The concept of prevention: a good idea gone astray? *J Epidemiol Community Health.* 2008;62:580–583.

Swartz M. Texas tort reform: Hurt? Injured? Need a Lawyer? Too bad! . In: Texas Monthly: Caperton v A.T. Massey Coal Company, Inc., October 2005.

Turner EH, Matthews AM, Linardatos E, Tell RA, Rosenthal R. Selective publication of antidepressant trials and its influence on apparent efficacy. *N Engl J Med.* 2008;358:252–260.

Vioxx Lawsuits Snowballed in 2Q. Cnnmoney, 2005. Available at: http://money.cnn.com/2005/07/21/news/fortune500/merck_lawsuits/index.htm. Accessed March 29, 2009.

Vioxx Product Release Meeting Ray Gilmartin Dinner Speach Talking Points. 1999. Available at: http://dida.library.ucsf.edu/tid/0/x/x/0xx05t10/original.pdf. Accessed March 15, 2009.

Vioxx. 2008. Available at: http://www.prescriptionaccess.org/lawsuitssettlements/current_lawsuits?id=0028. Accessed September 11, 2009.

Waxman HA. The lessons of Vioxx—drug safety and sales. *N Engl J Med.* 2005;352:2576–2578.

Wolfe F, Flowers N, Burke TA, Arguelles LM, Pettitt D. Increase in lifetime adverse drug reactions, service utilization, and disease severity among patients who will start COX-2 specific inhibitors: quantitative assessment of channeling bias and confounding by indication in 6689 patients with rheumatoid arthritis and osteoarthritis. *J Rheumatol.* 2002/5;29:1015–1022.

Wolfe SM. *Worst Pills, Best Pills: A Consumer's Guide to Avoiding Drug-Induced Death or Illness.* New York: Pocket Books; 2005.

Working at Merck Frosst. 2008. Available at: http://www.merckfrosst.ca/mfcl/en/corporate/careers/workatmerck/discover_our_culture.html. Accessed December 31, 2008.

Wright JM. The double-edged sword of COX-2 selective NSAIDs. *Can Med Assoc J.* 2002;167:1131–1137.

Wysowski DK, Swartz L. Adverse drug event surveillance and drug withdrawals in the United States, 1969–2002: the importance of reporting suspected reactions. *Arch Intern Med.* 2005;165:1363–1369.

Zyprexa Highlights of Prescribing Information. Warnings and Precautions: 5.4 and 5.5. Updated March 2009. Available at: http://pi.lilly.com/us/zyprexa-pi.pdf. Accessed September 11, 2009.