# EXHIBIT F

1

1    DISTRICT COURT, JEFFERSON COUNTY, STATE OF COLORADO

2    Case No. 96CV2532                    Division 5

3    _____

4    REPORTER'S TRANSCRIPT - VOLUME II
     _____

5    MICHAEL D. BALLINGER, ET AL.,

6    Plaintiffs,

7    v.

8    BRUSH WELLMAN, INC., ET AL.,

9    Defendants.
     _____

10
             Be it remembered on June 7, 2001, the
11   above-entitled matter came on for trial before the
     HONORABLE FRANK PLAUT, Judge of the District Court.
12

13                      A P P E A R A N C E S

14

15   For the Plaintiffs:     STEVE JENSEN, ESQ., ALLEN
                             STEWART, ESQ., ALICIA BUTLER,
16                           ESQ., ANN SAUCER, ESQ. and
                             JAMES HECKBERT, ESQ.
17
     For the Defendant:      SYDNEY McDOLE, ESQ., THOMAS E.
18                           DOWNEY, JR., ESQ., ROBERT
                             FAXON, ESQ., JEFF JOYCE, ESQ.,
19                           ROY ATWOOD, ESQ., and KATE
                             KNICKREHM, ESQ.
20

21

22

23

24

25

```
1               W I T N E S S   I N D E X

2   WITNESS              DIRECT  CROSS  REDIRECT RECROSS

3   David Egilman          8      53      60

4   James Tooley          61      83      99

5               E X H I B I T   I N D E X

6   Exhibit No.    Referenced  Offered  Admitted  Rejected
7
    P45              8
8
    P250            28
9
    P191            34
10
    P257            36
11
    P740            37
12
    P739            39
13
    P389            42
14
    P6              45
15
    D1763           54
16
    P837A                      78       78
17
    D1007.1                    98       98
18
    D1011.1                    98       98
19
    D193                       98       98
20
    D194                       98       98
21
    D195                       98       98
22
    D1685.1                    99       99
23
    D187                       99       99
24
    D837B                     100                100
25
```

```
 1              (WHEREUPON, the following proceedings were
 2      had:)
 3              THE COURT:  I haven't been in the courtroom,
 4      ladies and gentlemen, but I have been working on this
 5      case.  I am distraught beyond description that I can't
 6      get you each a key to a witness room that you can use
 7      as your home base.  I have, again, talked to the
 8      judicial administrator.  I have just come from talking
 9      to the chief judge, who seems to think this is less
10      important than his 2 o'clock meeting with the chief
11      justice.  I don't know why he feels that way.  But
12      we're dealing with a bureaucracy here, folks.  I'm
13      trying my best.  It is not right for you to have to be
14      in the situation you're in.  I'm very sorry that it's
15      happened, which is different than apologizing, because
16      I don't think I have anything to apologize for.  I sure
17      have tried, but I'm hoping maybe sooner or later we can
18      get something to happen.  In the meantime, I guess
19      we'll all just have to live with it.
20              I know you may have other matters before we
21      bring the jury in.  I have received a motion for
22      protective order with regard to an attorney, Michael
23      Patrick.  Have either/or both counsel seen that?
24              MR. JOYCE:  Your Honor, that's been worked
25      out with plaintiffs.  Mr. Patrick was going to be out
```

4

1    of town during the trial, and we're going to use the

2    deposition, and we've communicated about that.

3         THE COURT:  Anything else before --

4         MS. McDOLE:  Your Honor, may the record

5    reflect we renew our objection to the Trichopoulos

6    deposition.  The fact that he was being called by

7    plaintiffs, since he was our expert; and in light of

8    the Court's ruling, we wanted to make sure our

9    objections are a matter of record.

10        THE COURT:  I don't believe you've made a

11   record on that yet, and you probably want to do that at

12   this time.  Mr. Faxon, is that deposition to be used?

13        MR. FAXON:  I have objections to the Powers

14   deposition.

15        THE COURT:  Try and take care of Trichopoulos

16   first.

17        MS. McDOLE:  Your Honor, why don't we proceed

18   with Mr. Powers, and I'll get the information for Dr.

19   Trichopoulos.

20        THE COURT:  All right.  Dr. Egilman, if you'd

21   be more comfortable sitting somewhere else, you may or

22   you can just stay where you are.

23        MR. FAXON:  Your Honor, yesterday we raised

24   an objection to reading lines 117.1 through 134.3,

25    Volume 2 of the -- excuse me.  This is the Zenczak

                                                          5

 1    deposition, 13816 through 14218 of the Zenczak

 2    deposition.  The objection was based on our first

 3    amendment right to petition the government and to seek

 4    redress from the government which we have been

 5    referring to as the Noerr Pennington doctrine in this

 6    case.

 7          We also objected to lines from Volume 5,

 8    page 467, line 15, through 468, 14, on the grounds of

 9    relevance.  And that it was an improper hypothetical to

10    a lay witness and called for speculation.

11          Yesterday I also read into the record a

12    number of exhibits from the Powers' deposition.  Upon

13    reviewing the daily transcript, I learned that I had

14    misspoken on one of those numbers, and I wanted to

15    correct it at this time.  I had stated we are

16    introducing Exhibit 181A.  The correct number is

17    1181.1.

18          THE COURT:  Thank you.  It's the Court's

19    view, and I know there are other issues to make a

20    record on, and this is a good time to be doing that,

21    it's the Court's view that unless things have been

22    going on that the Court is not aware of, the record is

23    not complete or good as to the portions of the various

24    videotape depositions that have been shown to the

25    jury.  Now, it may be that counsel had dealt with that

                                                              6

1    directly with the reporter without the Court's

2    knowledge, and I don't want to mention it any more than

3    once.  We all have to understand that I'm not going to

4    be worrying about making your record for it, and maybe

5    somebody can tell me whether this is being taken care

6    of or not.

7              MR. JENSEN:  Your Honor, I don't know whether

8    we have already taken care of it, but I know that at

9    the very least we either have or will have shortly, and

10   we have kept track of what was the O.P. Preuss record,

11   and if we have not already done it, then we will

12   certainly present that to defense counsel so they can

13   review it.

14             MR. ATWOOD:  I believe we have dealt with

15   witnesses they put on.  They provided us with

16   transcripts to make sure that the right portions are to

17   be put in.

18             THE COURT:  Just so it gets to the reporter.

19   Otherwise we don't have an adequate record.  What else

20   can we accomplish?

21             MS. McDOLE:  Your Honor, I have the page and

22   line designation for Dr. Trichopoulos.  In addition to

23   our general objection that he be used at all, we object

24   to the testimony at page 62, lines 6 to 17, as an

25   improper hypothetical without a foundation and assuming

7

1   facts not in evidence; pages 63, line 2 to 64, line 21,

2   again, an improper hypothetical; and pages 213, line 6

3   to 218, line 2, irrelevant, relates to articles on

4   cancer that violates ruling on motion in limine.   Thank

5   you.

6                THE COURT:   Thank you.   Anything else?

7                MR. STEWART:   Your Honor, I have one thing,

8   just a question on court procedure.   I would like to

9   use the board to write on or have the witness write

10   on.   Does the Court have a problem with that?

11                THE COURT:   No problem.

12                MR. STEWART:   Where would you like the board?

13                THE COURT:   I think where it is is probably

14   going to be best for the jury, but that means that I,

15   again, need to remind defense counsel if they need to

16   get up and move around, I would suggest that over by

17   where the easel is at, the leading edge of the jury

18   box, if you will, or, again, whoever needs to see it,

19   please just feel free to move to wherever in the court

20   you need to to see it.   But my experience is that the

21   board where Mr. Stewart has it placed is probably best

22   for the jury.   So that's the way we'll proceed.

23                Anything else before we bring in the jury?

24                MR. STEWART:   I don't think so, Your Honor.

25          THE COURT:  All right.  Let's bring in the

                                                           8


 1    jury.

 2              Okay, Dr. Egilman, if I could have you come

 3    back up, please.

 4              (In the presence of the jury.)

 5              THE COURT:  Good afternoon, ladies and

 6    gentlemen.  We're ready to go again.  And Dr. Egilman

 7    and the rest of the courtroom may be seated.  Dr.

 8    Egilman has been qualified, and I think we're prepared

 9    to proceed with direct examination.  Mr. Stewart.

10              MR. STEWART:  Thank you, Your Honor.

11                        DIRECT EXAMINATION

12    BY MR. STEWART:

13         Q.   Dr. Egilman?

14         A.   Yes, sir.

15         Q.   I'd like to ask you some questions generally

16    about medicine and beryllium.  First, what is

17    beryllium, Doctor?

18         A.   Beryllium is a metal, and on a molecular

19    weight basis it is the most deadly metal to mankind.

20         Q.   Okay.

21              MR. STEWART:  Pam, could you put up for me,

22    please, Plaintiffs' Exhibit 45?  This will be the

23    untreated document.

24         A.   It's on the second page.

25      Q.   (BY MR. STEWART)   Second page.   Thank you.

9

1            Doctor, what's the basis for your statement?

2       A.   That particular statement originates in the

3   1949 document prepared by the medical director of Brush

4   Wellman in preparatory introduction to a document that

5   was to be mailed out with attached medical articles.

6       Q.   Dr. Egilman, in your opinion, from an

7   occupational medicine and public health point of view,

8   is this the kind of information that would be important

9   to be published in the medical and scientific

10  literature?

11      A.   Yes.

12      Q.   Why is that, Doctor?

13      A.   Well, there are two things that are important

14  to know about a substance.  One is does it cause health

15  problems, and what those are, and the second is, how

16  much of the material causes people to get sick.  And in

17  this particular case, as you can see from the document,

18  at that time and now, this particular material causes

19  disease at a level of exposure that is -- there is too

20  little of this that causes disease.  It's the least

21  amount of any substance that can cause disease.

22           MS. McDOLE:   Objection, Your Honor.   Beyond

23  the scope of the question.

24           THE COURT:   Sustained.   Well, again, the

25    scope of the objection, or nonresponsive is the Court's

10

1    objection, but the Court adopts it, and the answer is

2    stricken.

3         Let's proceed.

4    Q.  (BY MR. STEWART)  Dr. Egilman, we were talking

5    about this document.  What I would like to know, sir,

6    is with the information that's in that document, is

7    that the kind of information that a doctor like you

8    would go to the medical literature and if it was there

9    would review and rely on?

10   A.  Yes.

11   Q.  Now, Doctor, in the world of public health

12   and occupational medicine, where do doctors like

13   yourself generally look for guidance when trying to

14   ascertain whether or not certain chemicals or metals

15   are hazardous or not?

16   A.  There are about six sources of information,

17   the most important of which is the -- generally the

18   manufacturing company or producer of the material.

19   Q.  Okay.  And why do you say that the most

20   important place to look is the manufacturer or producer

21   of the material?

22   A.  Because the manufacturer or producers of the

23   material are those most likely to have had their own

24   experience with their own workers.

25          MS. McDOLE:  Objection, Your Honor.  It's way

                                                11

1   beyond the scope of what's being asked, and I think

2   there is no foundation that this witness can say that.

3          THE COURT:  Well, objection sustained.  The

4   answer is stricken.  The jury is instructed to

5   disregard it.

6     Q.  (BY MR. STEWART)  Doctor, when you as an

7   occupational physician are looking in the medical and

8   scientific literature for information on a particular

9   toxin, is there some literature that is viewed as more

10  valuable than other literature?

11    A.  Yes.

12    Q.  Okay.  Now, if you could, please, Doctor, in

13  your opinion, what is the most valuable kind of

14  literature that can be available or the source of that

15  information that can be available in the medical and

16  scientific literature?

17    A.  Information that comes from the company that

18  manufactures the products.

19    Q.  And why, in your opinion, is that the most

20  important type of information?

21    A.  Because manufacturers have the most

22  experience in determining the health effects of the

23  materials with which they work and produce.

24        Q.   And what's --

25             MS. McDOLE:  Objection.  No foundation for

                                                         12


 1   that, Your Honor.

 2             THE COURT:  Overruled.

 3        Q.   (BY MR. STEWART)  I was going to ask what's

 4   the basis for you making that statement, Doctor?

 5        A.   A comparison of information available to

 6   companies with information available in the medical

 7   literature.

 8        Q.   Okay.  Could you please tell me one kind of

 9   information that you believe a manufacturer could have

10   that the medical and scientific community would not

11   have?

12        A.   Specific dose information on the amount of

13   exposure it took to get workers sick.

14        Q.   Why would a manufacturer have that and not

15   the general medical and scientific community?

16        A.   A manufacturer would be able to obtain that

17   information on their own workers during the

18   manufacturing process, and that information is

19   frequently not available in the medical literature.

20        Q.   Can you think of, Doctor, other -- another

21   kind of information that a manufacturer would have

22   about the health effects of a particular substance that

23   they were using that would not be available to the

24    general medical and scientific communities?

25        A.    Yes.

                                                        13


 1        Q.    What is that, Doctor?

 2        A.    The extent or type of disease that might be

 3    caused by exposures to substances they manufacture.

 4        Q.    And why is it that a manufacturer would have

 5    that kind of information and the general medical and

 6    scientific community not have it?

 7        A.    Because the manufacturers own workers

 8    frequently are the ones who are first exposed to the

 9    products and who first get sick, and they become aware

10    of the disease through their own experience with their

11    own workers.

12        Q.    Has it been your experience, Doctor, as an

13    occupational physician and as an expert in public

14    health, that manufacturers publish in the medical and

15    scientific literature all the information about the

16    health effects of substances they're using in their

17    plants?

18        A.    No.

19        Q.    In this case, Dr. Egilman, the jury has

20    already heard some evidence about a beryllium

21    registry.  Are you familiar with the beryllium

22    registry?

23      A.   Yes.

24      Q.   Would you please briefly explain to the

25 ladies and gentlemen of the jury what a registry is and

14

1 what the beryllium registry was specifically?

2       A.   A registry is a place where physicians,

3 companies, and others submit examples of workers who

4 have gotten sick so that they can be collected to

5 determine information about the disease and the amount

6 of material that causes the disease.  The beryllium

7 registry was specifically established for that purpose

8 with respect to beryllium.

9       Q.   Okay.  And with the beryllium registry, did

10 you personally know anyone affiliated with the

11 beryllium registry?

12      A.   Yes.

13      Q.   And who was that, sir?

14      A.   Dr. Harriet Hardy.

15      Q.   Now, Dr. Egilman, is it a requirement that

16 companies or manufacturers of products report the

17 health effects of chemicals or metals that are in their

18 plant, the health effects they're causing to particular

19 registries?

20      A.   No.

21      Q.   And in this case, Doctor, have you reviewed

22 the corporate documents from Brush Wellman in this case?

23        A.   Many of them, not all of them.

24        Q.   Now, Dr. Egilman, for the documents that you

25    have reviewed in this case, were you able to determine

15

 1    whether or not Brush Wellman reported its cases of

 2    chronic beryllium disease to the beryllium registry?

 3             MS. McDOLE:   Objection, Your Honor.   It's

 4    arguing facts.

 5             THE COURT:   Reask the question, please.

 6             MR. STEWART:   Certainly.

 7        Q.   (BY MR. STEWART)   Dr. Egilman, from reviewing

 8    Brush Wellman's documents, were you able to ascertain

 9    whether or not Brush Wellman was reporting its chronic

10    beryllium disease cases to the beryllium registries?

11             THE COURT:   I'll sustain on the basis of lack

12    of foundation at this point.

13             MR. STEWART:   Okay.

14        Q.   (BY MR. STEWART)   Dr. Egilman, when you were

15    looking -- Doctor, when you were looking at Brush

16    Wellman's documents, can you please tell us the kinds

17    of things that you were looking for?   Give me one kind

18    of thing that you were looking for in the Brush Wellman

19    documents.

20        A.   Communications to the beryllium registry.

21        Q.   Okay.   And in looking for communications to

22    the beryllium registry, did you find any documents that

23    spoke to that issue?

24        A.   Documents and other material, yes.

25        Q.   Okay.  And when you say other materials, what

                                                    16


 1    would that other material be, Doctor?

 2        A.   Testimony of Brush Wellman employees and

 3    consultants and published literature.

 4        Q.   And did you review any information to

 5    ascertain whether or not Brush Wellman was reporting

 6    its beryllium -- beryllium cases in its plants to the

 7    beryllium registry?

 8        A.   Yes.

 9        Q.   What did you ascertain, Doctor?

10             MS. McDOLE:  Objection.  He's interpreting

11    documents and demeanor and trying to argue the

12    evidence.

13             THE COURT:  Objection is sustained.

14        Q.  (BY MR. STEWART)  Doctor, did you come across,

15    when you were reviewing the documents, any information

16    that led you -- strike that.

17             With respect to the beryllium registry, you

18    said that you knew Harriet Hardy, correct?

19        A.   Yes.

20        Q.   And she's deceased?

21        A.   Yes.

22        Q.   Doctor, with respect to the chronic beryllium

23   registry, are you aware of whether or not the chronic

24   beryllium registry was successful in collecting all the

25   data from manufacturing plants that were available on

17

1   CBD in their plants?

2          MS. McDOLE:  Your Honor, I think that the

3   answer might be more than a yes or no.  I think we have

4   to lay a foundation.

5          THE COURT:  I'm going to sustain it on the

6   basis of the form of the question and foundation.

7          MR. STEWART:  Okay.

8      Q.  (BY MR. STEWART)  Dr. Egilman, have you

9   reviewed documents to determine whether or not the

10  beryllium registry that was run by Harriet Hardy was

11  100 percent successful in collecting information?  I'll

12  change the question.

13         Dr. Egilman, tell me whether or not you have

14  reviewed documents on the success rate of the chronic

15  beryllium registry collecting data in manufacturing

16  plants.

17         MS. McDOLE:  Same objection, Your Honor.

18         THE COURT:  Same ruling.

19     Q.  (BY MR. STEWART)  What is beryllium disease,

20  Doctor?

21     A.  Beryllium -- chronic beryllium disease?

22     Q.  What is CBD?  Thank you.

23        A.    Chronic beryllium disease is a lung disease

24   that is caused by inhalation of beryllium in various

25   forms or beryllium metal; that is, there are various

                                                            18


1    chemical industries of beryllium where it's combined

2    with other products.  Those may cause the disease as

3    well as just the pure metal.

4         Q.    Okay.  Now, can you please tell me what

5    beryllium sensitization is?

6         A.    It is and has been felt that the disease of

7    chronic beryllium disease occurs in people who are, for

8    some reason that is unknown still to date, sensitive to

9    the material so that they get sick at levels of

10   exposure that are below the levels of exposure that

11   make most people sick.  It's a little -- it's the same

12   phenomenon that occurs with everything, but it is more

13   noticeable with beryllium.

14        Q.    What is latency, Doctor?

15        A.    Latency is the time between the first time

16   when it's exposed to a substance and the time when one

17   is diagnosed with a disease or develops symptoms of a

18   disease.

19        Q.    And is chronic beryllium disease known as a

20   latent disease?

21        A.    In general, it is latent, yes.

22        Q.    And why do you say in general it is latent?

23        A.    Well, because the period within which

24   following exposure one may get chronic beryllium

25   disease ranges from 30 to 60 days to 20 or more years.

                                                            19


1    So the term "latent disease" usually is limited to

2    diseases that take ten or more years in the common

3    parlance of occupational medicine.  So that a disease

4    that occurs within 30 to 60 days would be kind of a

5    subacute, not really a latent phenomena.

6         Q.    Okay.  With beryllium disease, does it depend

7    on the size of the particles that one breathes in as to

8    whether or not -- let me rephrase the question.  Is

9    chronic beryllium disease --

10        A.    Yes.

11        Q.    Okay.  Why is particle size a factor in

12   chronic beryllium disease?

13        A.    I have a demonstrative that I could use to

14   try to show that.

15             MR. STEWART:  Why don't we approach and see

16   if the Court is comfortable with demonstrative.

17             (Discussion at the bench out of the hearing

18   of the court reporter.)

19        Q.    (BY MR. STEWART)  Okay, Dr. Egilman.  Dr.

20   Egilman, if you would please use your demonstrative to

21   show why size is important to CBD.

22      A.   Okay.   The lung has tubes, and beryllium

23   comes in many sizes of spheres.   We use this as a tube

24   example.   If beryllium is small, it can get into the

25   lung, go through the tube.   If the beryllium, when it's

                                                            20


1   machined or worked with, is too large to get through

2   the tube, it can't get in the lung, and it won't cause

3   disease.   So particle size determines whether or not a

4   particular type of beryllium can cause the disease.

5      Q.   Okay.   Thank you, Doctor.

6           Dr. Egilman, have you reviewed the literature

7   in this case to make a determination of whether or not

8   different sampling, air sampling methods used through

9   time and by different institutions with respect to the

10   measurement airborne beryllium?

11           MS. McDOLE:   Your Honor, are we talking about

12   published literature?   If --

13           THE COURT:   I think that is an objection to

14   the form of the question.   Sustained.

15      Q.   (BY MR. STEWART)   Doctor, have you reviewed

16   medical and scientific literature that is available on

17   the different air sampling methods that were used

18   through time and by different institutions with respect

19   to airborne beryllium?

20      A.   I think there's two questions.

21      Q.   I don't mean there to be --

22      A.    I think the answer is yes to both.

23      Q.    Okay.  And in addition, Doctor, have you also

24  reviewed documents, Brush Wellman documents to

25  determine how those sampling methods or whether there

                                                    21


1  were sampling methods in those documents that differed

2  from sampling methods that were in the medical and

3  scientific literature?

4           MS. McDOLE:  Objection against interpreting

5  documents.

6           THE COURT:  Sustained.

7      Q.  (BY MR. STEWART)  Doctor, here's what I would

8  like to do:  After reviewing the medical and scientific

9  literature, have you reached an opinion as to whether

10  or not there was a uniform standard for measuring

11  airborne beryllium over time?

12      A.    Yes.

13      Q.    And what is your opinion, Doctor?

14      A.    There were various sampling methods both in

15  terms of the location of sampling, the frequency of

16  samples, and whether or not you would determine the

17  particle size of the beryllium between the late 1940s

18  and to date, and that at many points in time there were

19  more than one set of recommendations for how to sample

20  for beryllium at the same time.

21      Q.    And from an industrial hygiene standpoint,

22    Doctor, do you have an opinion as to whether or not

23    that fact has an impact on the ability to enforce the

24    standard?

25              MS. McDOLE:  Objection.  No foundation.  We

                                                          22


1    don't have a basis for any of these opinions.

2              THE COURT:  Overruled.

3         A.   Yes.

4         Q.   (BY MR. STEWART)  And what is your opinion,

5    Doctor?

6         A.   Yes, it has an impact on the ability of a

7    hygienist to interpret the standard.

8         Q.   What is that impact?

9         A.   It's confusion.

10         Q.   In your opinion, Doctor, if there is not a

11    standard way to measure a threshold limit value, is it

12    possible for the threshold limit value to be used as an

13    accurate measure of workers' exposure?

14         A.   No.

15         Q.   Dr. Egilman, with respect to the threshold

16    level for beryllium, what is your understanding,

17    Doctor, of what the threshold limit value for beryllium

18    was over time?  Let's start with 1949.  What is your

19    understanding of what the threshold limit value was --

20    for airborne beryllium was in 1949?

21         A.   It depends.  There's more than one answer to

22      that question.

23           Q.    Okay.  Tell me why there's more than one

24      answer to that question.

25           A.    Well, at that time there was a level -- there

                                                        23


1       were many levels that were recommended, particularly in

2       that year, at least three.

3            Q.    Okay.  And what were those three levels?

4            A.    There was a community level, which was

5       originally recommended to be .0025 micrograms per meter

6       cubed, which was later on that year changed to .01,

7       four times higher micrograms per meter cubed.  There

8       was a recommended level for exposures to workers'

9       particle size, a factor in beryllium disease,

10      which was 2 micrograms per meter cubed, and in

11      addition, there was no standard way to determine what

12      was being measured or how often it should be measured.

13               MR. STEWART:  Can we approach for a second,

14      Your Honor?

15               THE COURT:  Sure.

16               (Discussion at the bench out of the hearing

17      of the court reporter.)

18           Q.    (BY MR. STEWART)  All right, Doctor.  In the

19      field of occupational medicine and industrial hygiene,

20      is it the normal and ordinary course of someone in your

21    profession to review corporate documents of a

22    particular plant to determine what the exposures were

23    to those individuals if that information is there?

24        A.   Yes.

25        Q.   And is part of the normal ordinary course and

24

1    practice of occupational physicians and industrial

2    hygienists to review corporate documents, to try and

3    determine where men who worked in a plant and what

4    their exposures might be to airborne contaminants or

5    any other contaminants?

6        A.   Yes.

7        Q.   And did you do that same course and are -- in

8    looking at Brush Wellman documents to determine whether

9    or not certain Brush Wellman employees were exposed to

10   levels of beryllium in excess of the TLV?

11       A.   Yes.

12       Q.   And is that something that you would do in

13   the ordinary course and practice of your profession as

14   an occupational medicine physician and someone who's an

15   expert in industrial hygiene?

16       A.   Yes.

17       Q.   Okay.  Now, in connection with doing that,

18   Dr. Egilman, did you prepare a chart that set out what

19   your findings were with respect to the employees of

20   Brush Wellman and what their exposures -- some of the

21    employees and what their exposures were at Brush

22    Wellman facilities?

23          A.    Of workers who developed chronic beryllium

24    disease, yes.

25          Q.    Yes.    Thank you.

                                                          25


1              Now, before we get to that issue you, Dr.

2     Egilman, I want to ask you if in the medical and

3     scientific literature on the subject of chronic

4     beryllium disease, there was a recognition of a

5     standard that was safe for exposing people to amounts

6     of beryllium to keep them from getting chronic

7     beryllium disease?

8          A.    In the literature?

9          Q.    Yes, sir.

10         A.    Yes.

11         Q.    Okay.  And what was that conclusion, sir?

12         A.    Well, for community residents -- there were

13    two, one for community residents, one for workers.  The

14    community residents level was .301 microgram per meter

15    cubed, and for workers it was 2 micrograms per meter

16    cubed.  To illustrate what that amount is --

17         Q.    Let me ask another question.

18               MS. McDOLE:  Judge, objection.

19         Q.    (BY MR. STEWART)  Those amounts that you have

20    just mentioned, is there a manner in which you can

21   illustrate that so that it would be more visual for the

22   jurors?

23        A.   Yes.

24        Q.   Could you do that, please?

25        A.   Yes.   2 micrograms of beryllium would fit on

26

1    the tip of a pencil and contaminate a room up to the

2    allowable limit that was a football field long, hundred

3    yards, 50 yards wide, 65 feet, so the ability

4    of beryllium to reach the 2 microgram level would fit

5    on the end of a pencil.

6         Q.   Okay.  And would that level of beryllium in

7    the air be visible?

8         A.   No.

9         Q.   Would it be -- could you taste it?

10        A.   No.

11        Q.   Could you smell it?

12        A.   No.

13        Q.   Are you aware of any way, as an occupational

14   medicine physician, that a worker could appreciate

15   whether or not they were in an area where the 2

16   microgram standard was being exceeded or not?

17        A.   Yes.

18        Q.   And what is the manner in which a worker

19   would know that?

20        A.   An alarm would go off from a monitor.

21        Q.   And those kinds of monitors that you are

22   speaking of, are those used in the manufacturing

23   practice in operations that use toxic chemicals?

24        A.   Yes.

25        Q.   What is the name of those monitors?

                                                    27


 1        A.   It's a measuring device attached to a --

 2   there are various commercial companies that make them.

 3   It's an alarm.

 4        Q.   Is it an alarm that sounds?

 5        A.   Yes, and usually it will have a light as

 6   well.

 7        Q.   Dr. Egilman, in terms of the level of

 8   toxicity of certain compounds, is the level of

 9   protection that's provided to a worker, does it vary

10   with the toxicity of the compound in question?

11        A.   Yes.

12        Q.   And why is that?

13        A.   Well, the smaller the amount of material that

14   makes one sick, the more protection that must be

15   provided to the workers.  At some levels, you must use,

16   for example, gloved boxes and gloves if the exposures

17   at very low levels might make someone sick.

18        Q.   And when you say very low levels, in your

19   opinion, does below 2 micrograms per cubic meter on a

20   daily weighted average fall into that category?

21      A.   Yes.

22      Q.   Dr. Egilman, are you aware of how long gloved

23 boxes have been available to manufacturers who were

24 working with toxic chemicals?

25      A.   In this industry, yes.

                                                    28

                             .

1       Q.   And how long is that, sir?

2       A.   In the 1940s, when the industry began.

3            MR. STEWART:  Could you please put up Exhibit

4  250 for me?

5       Q.   (BY MR. STEWART)  Dr. Egilman, are you

6  familiar with this article that's in the medical and

7  scientific literature on beryllium?

8       A.   Yes.

9       Q.   And are you familiar with who the author of

10 that article is?

11      A.   Yes

12      Q.   And who is the author of that article?

13      A.   Well, he worked with both Brush Wellman and

14 NIOSH at different points in time as a hygienist.

15           THE COURT:  Again, Doctor, the question was

16 who is the author of that article.  Would you answer

17 that question, please, and then wait for the next

18 question?

19           THE WITNESS: I'm sorry, Your Honor.

20      A.   Harry M. Donaldson.

21      Q.  (BY MR. STEWART)  And at this time, in 1964,

22  do you know who Mr. Donaldson worked for?

23      A.   I believe it was Brush Wellman, yes.

24      Q.   Now, this document states, to the best of our

25  knowledge there has not been one single case of acute

                                                    29


1  or chronic beryllium lung disease where the exposure

2  did not exceed the standards established for control of

3  airborne beryllium.

4          Sir, in what was available in the medical and

5  scientific literature, would you agree or disagree with

6  that statement -- with that statement?

7          MS. McDOLE:  Objection, Your Honor.  There's

8  no foundation about what he's talking about when he

9  says the medical and scientific.

10         THE COURT:  Would you lay a foundation,

11  please?

12      Q.  (BY MR. STEWART)  Dr. Egilman, as far as the

13  medical and scientific literature with respect to

14  beryllium, how far back does it go?

15      A.   Starts in the '30s.

16      Q.   Have you read that literature?

17      A.   Not all from the '30s.

18      Q.   Have you read the English studies that are

19  about beryllium in the '30s?

20      A.   Yes, they start really in the '40s.

21        Q.    Have you read the English versions of

22   beryllium medical and scientific literature in the '40s?

23        A.    Yes.

24        Q.    Have you read that literature in that same

25   category in the '50s?

                                                        30

1         A.    Yes.

2         Q.    Have you read it in the '60s?

3         A.    Yes.

4         Q.    In the '70s?

5         A.    Yes.

6         Q.    In the '80s?

7         A.    Yes.

8         Q.    '90s?

9         A.    Yes.

10        Q.    Up to the present?

11        A.    Yes.

12        Q.    Okay.  Now, Doctor, in reading that

13   literature, what I would like to know is, at this time,

14   from the other information that was available in the

15   medical and scientific literature, is this an accurate

16   statement?

17        A.    It accurately reflects what was in the

18   medical and scientific literature.

19        Q.    Okay.  Now, sir, I had asked you earlier if

20    you had had occasion to review the Brush Wellman

21    documents and make a table that talks about or tries to

22    assess whether or not Brush Wellman employees were

23    getting chronic beryllium disease at below the 2

24    microgram standard; do you recall that?

25          A.   Yes.

                                                      31


1           Q.   All right.  Sir, does this statement

2     accurately reflect the information that you found in

3     Brush Wellman's files with respect to chronic beryllium

4     disease?

5                MS. McDOLE:  No foundation objection, and

6     also it is a question of interpreting documents.  He

7     hasn't established where the documents are.

8                THE COURT:  Counsel, you're going to have to

9     phrase it in a different way.

10          Q.   (BY MR. STEWART)  Dr. Egilman, when you

11    reviewed the Brush Wellman documents, did you review

12    Brush Wellman documents in the same manner that you

13    would as an occupational medicine physician to

14    determine whether or not workers were getting sick at

15    below the 2 microgram standard?

16          A.   Yes, but I have more information than I

17    usually have.

18          Q.   Okay.  What other information did you review

19    in order to reach your conclusions?

20      A.    I read deposition testimony of hygienists, of

21  medical directors, of personnel who worked at Brush

22  Wellman, of consultants, so I usually don't have that

23  kind of information when I do a normal evaluation of a

24  workplace.

25      Q.    Okay.  But when you do normal evaluating of a

                                                        32


1   workplace, is it your standard procedure to try and

2   gather up as much information as you can that is

3   available to try and determine what air sampling levels

4   were?

5       A.    Yes.

6       Q.    To try to gather, as you have, as much

7   initial information that is available where men worked?

8       A.    Yes.

9       Q.    And did you do that in this case?

10      A.    Yes.

11      Q.    Did you do that for the workers that you

12  could find who had chronic beryllium disease in the

13  1940s that were available?

14      A.    Yes.

15      Q.    Did you do that for workers that were --

16  records were available for the 1950s?

17      A.    Yes.

18      Q.    Did you do that for records that were

19  available in the 1960s?

20      A.   Yes.

21      Q.   Did you do that with records that were

22   available in the 1970s?

23      A.   Yes.

24      Q.   The '80s?

25      A.   Yes.

                                                    33


1       Q.   The '90s?

2       A.   I think at some point early in the '90s I

3    stopped.

4       Q.   And after having reviewed that information

5    that was available to you, did you reach conclusions

6    about whether or not Brush Wellman workers in the '50s,

7    the '60s, the '70s, and '80s were contracting CBD below

8    2 micrograms?

9            MS. McDOLE:   Objection, Your Honor.   Again,

10   this witness' ability to interpret documents has been

11   confined to medical records.   We have no foundation as

12   to what medical records he may be referring to here.

13   Sounds like it's something --

14           THE COURT:   Why don't counsel, approach.

15           (Discussion at the bench out of the hearing

16   of the court reporter.)

17      Q.   (BY MR. STEWART)   Doctor, after your review

18   of the Brush Wellman documents, did you find

19   information that contradicted this statement by Harold

20   Donaldson in 1964?

21          MS. McDOLE:  Objection to the record, Your

22   Honor.

23          THE COURT:  I'm sorry, I was focused

24   elsewhere.  Could you try it again.

25          MR. STEWART:  I asked a question that I think

                                                    34


1   you're going to let me ask.  I'll ask it again.

2          THE COURT:  Maybe that's why I was focused

3   somewhere else.

4          MR. STEWART:  Try it again.

5      Q.  (BY MR. STEWART)  Dr. Egilman, after reviewing

6   Brush Wellman's records and documents, did you find

7   information that contradicted this statement by Harry

8   Donaldson in 1964?

9          THE COURT:  Do you have an objection?

10          MS. McDOLE:  Objection, for the record, Your

11   Honor, interpretation of documents.

12          THE COURT:  Overruled.

13      A.  Yes.

14      Q.  (BY MR. STEWART)  Okay.

15      A.  Okay.

16          MR. STEWART:  Could you please pull up for me

17   Exhibit 191?

18      Q.  (BY MR. STEWART)  Are you a member of the

19   American Ceramics Society?

20          A.    Yes.

21                MR. STEWART:   And could you go to the author

22   of that document?

23          Q.   (BY MR. STEWART)   Do you know who Joseph

24   DeNardi was, Doctor?

25          A.    Yes.

                                                        35


1           Q.   Who was that?

2           A.    He's a physician in Lorain who served as the

3    medical director for Brush Wellman.

4           Q.    Do you know who H.S. VanOrdstrand was,

5    Doctor?

6           A.    Yes.

7           Q.    Who was he?

8           A.    He was a physician at the Cleveland Clinic

9    who served as a consultant to Brush Wellman.

10          Q.    Are you familiar with who George H. Curtis

11   was?

12          A.    He was a hygienist.

13          Q.    And are you familiar with who John Zielinski

14   was?

15          A.    He was a hygienist for Brush Wellman.

16          Q.    And, Doctor, as well --

17          A.    I'm sorry.  Dr. Zielinski served initially as

18   a hygienist and then later as a physician.  And Curtis

19   was a physician.  I'm sorry.

20      Q.   It states, "As in all diseases in man, the

21  keynote is prevention, and we are convinced from our

22  experience in Ohio that the medical problem of

23  beryllium is now being prevented.  This is being

24  accomplished by the obtainment of safety levels as

25  recommended by Eisenbud's advisory committee of the

                                                        36


1  United States Atomic Energy Commission in 1949."

2           My first question, Doctor, having reviewed

3  the medical and scientific literature during this

4  period of time, is this a statement that is in

5  agreement with what was available in the medical and

6  scientific literature?

7      A.   Yes.

8      Q.   Doctor, after your review of the Brush

9  Wellman documents, did you find information and

10  evidence which contradicts this statement?

11     A.   Yes.

12          MS. McDOLE:  Objection.  Foundation and

13  interpretation of evidence.

14          THE COURT:  Overruled.

15          MR. STEWART:  Could you please pull up

16  Exhibit 257, please?  And could you go up to who wrote

17  that document, please?

18     Q.   (BY MR. STEWART)  Doctor, have you reviewed

19  this document?

20      A.   Yes.

21           MR. STEWART:   Could you please go to the

22   date?

23      A.   The date's not on it.

24           MR. STEWART:   Could you go down to the

25   highlight, please?

                                              37


1       Q.   (BY MR. STEWART)   It says, "Summary, our

2    cumulative experience wherein we operated beryllium

3    extraction facilities both under virtually uncontrolled

4    conditions for almost two decades and under the AEC

5    recommended levels for approximately 15 years has led

6    us to conclude that the AEC standards occupational and

7    outplant were quite conservative but unquestionably

8    effective considering first the occupational standards

9    there is no evidence of a single case of illness,

10   chronic or acute, resulting from exposures at or below

11   the AEC recommended levels."

12           Now, Doctor, do you have an understanding of

13   the approximate date of this document?

14      A.   1965.

15      Q.   Okay.  And in connection with this document,

16   is it stating the position that was generally available

17   in the medical and scientific literature?

18      A.   Yes.

19      Q.   Doctor, from your review of Brush Wellman's

20    documents and records, did you find evidence that this

21    statement is false?

22        A.    Yes.

23             MR. STEWART:   Can you pull up Exhibit 740 for

24    me, please?  And could you go to the title?

25        Q.    (BY MR. STEWART)   Doctor, do you know who O.P.

                                                            38


1    Preuss was?

2        A.    Yes.

3        Q.    And who was he?

4        A.    At the time of this article, he was the

5    medical director of Brush Wellman.  He prepared work at

6    the Euclid Clinic in Cleveland.

7             MR. STEWART:   Could you please go to the

8    highlighted portion of this document?  What page is

9    that?

10        A.    Page 353 of the document.

11        Q.    (BY MR. STEWART)   353 of the document?

12        A.    Of the document.

13        Q.    Doctor, this document says, "None of the

14    workers continuously exposed to concentrations below 2

15    micrograms has ever acquired CBD.  Only respirable

16    dust, fumes or vapors can produce the disease.

17    However, the exposure has to be high, at least 20 times

18    the TLV or significantly more short-term and must

19    involve a pre-diseased and sensitized individual."

20          My first question, Doctor, are you aware of

21     who were the original sponsors in the medical and

22     scientific literature of paragraph C, "the exposure has

23     to be high, at least 20 times the TLV"?

24          A.   This is the only place that I'm familiar with

25     this appearing here, and in an engineer plan, an

                                                    39

1      article that appeared in a German publication, it was

2      Dr. Preuss' publication, there was -- well, I think

3      it's in both places.

4           Q.   And, Dr. Egilman, after reviewing Brush

5      Wellman documents and records, did you find evidence

6      that these statements were false?

7           A.   Yes.

8                MR. STEWART:   If you could go to Exhibit 739,

9      please.

10          Q.   (BY MR. STEWART)  Have you read this book,

11     Doctor?

12          A.   Yes.

13          Q.   And it says edited by Milton Rossman, O.P.

14     Preuss and Martin Powers.  Do you know who Dr. Rossman

15     was?

16          A.   Yes.

17          Q.   Who was he?

18          A.   He's still alive.

19          Q.   So who is he?  I'm sorry.

20      A.   He's a lung specialist in Philadelphia.

21      Q.   And who is Martin B. Powers?

22      A.   He's the head of health and safety

23   corporatewide for Brush Wellman.

24      Q.   This book, does it have a trade name?

25      A.   It's called the Green Book.  It's green.   We

                                                        40

1   have a copy.

2      Q.   And in book -- thank you.

3           Are you aware of the distribution or

4   circulation of this book?

5      A.   Yes.

6      Q.   Who is it?

7      A.   Well, the book was distributed to medical

8   schools and companies and I think workers all over the

9   country.  It is an organized plan to distribute it to

10   libraries and medical schools throughout the country.

11      Q.   And are you aware of when this book was

12   published approximately?

13      A.   1990 -- 1991.

14           MR. STEWART:  Could you go to the selected

15   the portion?

16      Q.   (BY MR. STEWART)  The book states, "There has

17   not been a case of occupational CBD where the

18   documented exposures were at or below the 2 microgram

19   standard."  Let me stop there.

20          Is that statement consistent with what was

21     being published in the medical and scientific

22     literature at this time?

23          A.   Yes.

24          Q.   After your review of the Brush Wellman

25     documents and records, did you find evidence that that

                                                              41


1     statement was false?

2          A.   Yes.

3          Q.   "The few cases cited in the literature that

4     question the foregoing statements have upon close

5     review to be discounted."  Do you know what cases

6     they're talking about there?

7          A.   Those referred to two published papers, one

8     by Cotes, and the other by Cullen.

9          Q.   "Each of these reports revealed an undue

10     reliance on average beryllium concentrations, disregard

11     of significant exposure peaks that had occurred, but

12     were hidden in the mean exposures."  Do you agree with

13     that statement?

14          A.   Yes.

15          Q.   "Such peaks must be taken into account

16     because CBD, asbestosis or silicosis does not require

17     continued exposures for years or months."  Do you agree

18     with that statement?

19          A.   Yes.

20        Q.    "It may result from excessive exposures

21    lasting no longer than hours, days or weeks, depending

22    on their magnitude."  Do you agree with that statement?

23        A.    Yes.

24        Q.    Now, Dr. Egilman, do you have an opinion as

25    to what the amount or magnitude of exposure to

                                                            42

1    beryllium needs to be for an individual to contract

2    chronic beryllium disease?

3        A.    Yes.

4              MS. McDOLE:  Objection.  No foundation.

5              THE COURT:  Overruled.

6        Q.    (BY MR. STEWART)  And what is your opinion,

7    Doctor?

8        A.    There is no safe level for exposure to

9    prevent chronic beryllium disease.  The safe exposure

10    level is no exposure.

11        Q.    And what is the basis for that opinion,

12    Doctor?

13        A.    The fact that the disease has been shown to

14    occur in individuals who have been exposed at levels of

15    exposure that are way below 2 micrograms per meter

16    cubed, and that in -- because of our understanding of

17    the disease process, there's no reason to think that

18    some individuals might not -- in fact, there's a lot

19    of reasons to believe that some individuals could be

20    sensitive to develop disease from trivial exposures.

21         MR. STEWART:  Could you please pull up for me

22    Exhibit 389?

23         Q.  (BY MR. STEWART)  Are you familiar with this

24    document, Doctor?

25         A.   Yes.  This is a book, actually.

                                                    43


1          Q.   And this book, what is the reputation of

2     Patty's Industrial Hygiene and Toxicology in the

3     occupational medicine field?

4          A.   It is the standard textbook in occupational

5     industrial hygiene.

6          MR. STEWART:  Could you go to the highlighted

7     portion, please?  Actually, could you go up a little

8     bit?  Can you highlight up, put it in context?

9          Q.  (BY MR. STEWART)  Can you tell the ladies and

10    gentlemen of the jury just briefly what the context of

11    this article is?

12         A.   Well, it's written by Dr. Stokinger, who is

13    the head of the committee, that voluntary committee

14    called the American Conference of Governmental

15    Industrial Hygienists and made recommendations for

16    exposure guidelines for workers exposed to toxic

17    substances, and this is the chapter on beryllium.

18         Q.   And when he is talking about in this chapter

19    where it states "these recommendations appear greatly

20    out of line," what is he talking about?

21        A.    He's talking about the recommended safe

22    exposure levels to beryllium.

23        Q.    Now, this statement says, "These

24    recommendations appear greatly out of line with

25    statements presented at OSHA beryllium hearings in

                                                          44


1     August 1977 by Dr. O.P. Preuss, corporate medical

2     director of Brush Wellman, Inc.   After an epidemiologic

3     review of cases of beryllium disease covering a 35-year

4     period involving eight beryllium plants and including

5     acute and chronic respiratory disease and cancer, it

6     was concluded that, quote, none of our chronic cases

7     had exposures lower than 30 micrograms."

8             Dr. Egilman, after reviewing the Brush

9     Wellman documents and records, did you find evidence

10    that this statement by Dr. O.P. Preuss was false?

11            MS. McDOLE:   Objection, Your Honor.   May we

12    approach?

13            THE COURT:   No.   The objection is overruled.

14        A.    Yes, it was false.

15        Q.   (BY MR. STEWART)   Now, Dr. Egilman, with

16    respect to this Patty's, can you please tell me whether

17    or not you have an opinion about this document -- let

18    me rephrase the question.

19            Does this document give an illustration of

20    how medical and scientific literature is passed down

21    over time?

22         A.   Yes.

23         Q.   Okay.  And for the ladies and gentlemen of

24    the jury, how does that work?

25         A.   Well, in general, information first

                                                        45


1    becomes -- with respect to occupational information, it

2    first becomes available, as I said, to the companies to

3    see that their own workers are getting sick, then

4    usually the process is the company or companies will

5    meet to discuss the exposures.  Sometimes they'll

6    publish their rules.  Sometimes they will not.

7    Sometimes community physicians and others become aware

8    of it and publish it in the medical literature.  After

9    it is published in the medical literature, it usually

10   takes three to five years before it would enter a book,

11   and then the books would get reviewed every three to

12   five years.

13        MS. McDOLE:  Objection, Your Honor.  This is

14   a lecture.

15        THE COURT:  Well, it's responsive to the

16   question.  The objection is overruled.

17        Q.   (BY MR. STEWART)  Go ahead, Doctor.

18        A.   That was it.

19      Q.   Okay.

20           MR. STEWART:   Can you please pull up Exhibit

21   6, please, for me, and can you --

22      Q.   (BY MR. STEWART)   Have you read this document,

23   Doctor?

24      A.   Yes.

25           MR. STEWART:   Would you go to the highlighted

                                                            46


1    portion?  Can you go to the name, please?  Thank you.

2    And then could you go to the highlighted portion?

3       Q.   (BY MR. STEWART)   Under the heading Dose

4    Response Relationship, this document states, "Those who

5    did contract CBD had high stimulation indices which

6    were at least 15 times higher than the present TLV of 2

7    micrograms per cubic meter, but in many instances

8    lasted only days or weeks."

9            Doctor, after reviewing Brush Wellman's

10   documents and records, did you find evidence that that

11   statement was false?

12      A.   Yes.

13      Q.   Doctor, what's the date of this document?

14      A.   I believe it's mid-'80s, but I missed it when

15   you went through it.

16           THE COURT:   You'll have to keep your voice

17   up, Doctor.

18      A.   I'm sorry.  I missed -- I know it's in the

19    mid-'80s.  If you'll go back to the first page.

20              MR. STEWART:  Can you go to the bottom for

21    me?

22         A.   It's 1986.

23         Q.   (BY MR. STEWART)  Thank you.

24              MR. STEWART:  Pam, can you go back to that

25    same document?  I don't think I made it all the way

                                                              47


1     through that one, the heading under "Dose Response."

2          Q.   (BY MR. STEWART)  The next sentence says,

3     "From these observations, it becomes obvious that the

4     development of CBD requires a prolonged exposure period

5     but a predisposition of sensitization by beryllium

6     response and a minimum exposure of approximately 30

7     micrograms."

8               Dr. Egilman, after reviewing Brush Wellman's

9     records and documents, did you find evidence that that

10    statement is false?

11         A.   Yes.

12         Q.   Dr. Egilman, are you aware of where this

13    article was published?

14         A.   Yes.  It's in the Textbook of Occupational

15    Medicine.  The editor is Senz.  I had a chapter in the

16    same book.

17              THE COURT:  The last sentence was, "I had a

18    chapter in the same book."  Please keep your voice up.

19          THE WITNESS:  Sorry, Your Honor.

20          MR. STEWART:  Can you go to the next --

21          THE COURT:  We're going to take a break in

22  about a minute, Mr. Stewart, so is this a good time?

23          MR. STEWART:  Yeah, why don't we do it now.

24          THE COURT:  We'll be in recess until 3

25  o'clock.

                                              48


1           (Jury leaves courtroom.)

2           (Recess taken.)

3           (In the presence of the jury.)

4           THE COURT:  Dr. Egilman, please remember that

5   you're still under oath.

6           Let's proceed.  The jury is back in the

7   courtroom.

8       Q.  (BY MR. STEWART)  Dr. Egilman, you are

9   familiar with the ACGIH?

10      A.  Yes.

11      Q.  And what does that acronym stand for?

12      A.  The American Conference of Governmental

13  Industrial Hygienists.

14      Q.  Now, is that a governmental body?

15      A.  No.

16      Q.  Who is the American Conference of

17  Governmental Industrial Hygienists made up of?

18      A.  It's a voluntary organization that includes

19    some hygienists, some physicians like myself, some

20    corporate representatives, researchers.

21         Q.   The jury, I believe, has heard about the

22    preamble to some American Conference of Governmental

23    Industrial Hygienist threshold limit values from 1970

24    and some other years.  Are you familiar with that

25    preamble?

                                                      49

1          A.   Yes.

2          Q.   And are you familiar with the portion of the

3     preamble that states essentially that there is -- TLVs

4     are not designed for hypersensitive people?  And if

5     I've misstated, could you state it correctly for me?

6          A.   Well, you misstated in not dating it.

7          Q.   Okay.

8          A.   Since it's changed over time.

9          Q.   Okay.  I'm reading from the preface to

10    threshold limit values for 1970.  "Because of wide

11    variations in individual susceptibility, a small

12    percentage of the workers.  It says individual

13    susceptibility; however, a small percentage of workers

14    may experience -- may experience discomfort from some

15    substances at concentrations at or below the threshold

16    limit.  A smaller percentage may be affected more

17    seriously by aggravation of a preexisting condition or

18    by development of an occupational illness."

19          You're familiar with that language, preamble?

20     A.   Yes.

21     Q.   Now, Dr. Egilman, do you believe that that

22     statement applies to chronic beryllium disease?

23     A.   Yes.

24     Q.   And tell the ladies and gentlemen of the jury

25     why you believe that statement applies to chronic

                                                        50


1      beryllium disease?

2      A.   Because the threshold limit value in that

3      booklet was 2 micrograms per meter cubed, and people

4      get sick at levels of exposure below that, and those

5      are people who are hypersensitive or more sensitive

6      than the average person in the population.

7      Q.   After reviewing the contents of the Brush

8      Wellman documents and records, do you have an opinion

9      as to whether or not Brush Wellman was able to

10     influence the medical and scientific literature on the

11     subject of the 2 microgram standard?

12          MS. McDOLE:  Objection, Your Honor.  There's

13     no foundation at this point.

14          THE COURT:  Sustained.

15     Q.   (BY MR. STEWART)  With respect to the American

16     Conference of Governmental Industrial Hygienist number

17     or statement that we just talked about from 1970, from

18     your review of the medical and scientific literature,

19    was Brush Wellman saying something different?

20              MS. McDOLE:  Objection.

21              THE COURT:  What's the legal basis?

22              MS. McDOLE:  The question was from the review

23    of the medical and scientific literature was Brush

24    Wellman saying something.

25              THE COURT:  That's an objection to form.  The

                                                        51

1     objection is sustained.

2         Q.  (BY MR. STEWART)  From your review of the

3     medical and scientific literature, was Brush Wellman

4     saying something different than the information that

5     was contained in the preamble that was just read?

6               MS. McDOLE:  Objection, foundation.

7               THE COURT:  Overruled.

8         A.    Yes.

9         Q.  (BY MR. STEWART)  And from your review, what

10    were they saying, sir?

11              MS. McDOLE:  Objection, interpretation.

12              THE COURT:  Sustained.

13        Q.  (BY MR. STEWART)  I'm sorry.  From your review

14    of the medical and scientific literature, what was

15    Brush Wellman saying in the medical and scientific

16    literature?

17        A.    That people would not get sick even at

18    exposure levels 15 times higher than 2 micrograms per

19      meter cubed, and that it would protect everyone.

20          Q.   Dr. Egilman, do you have an opinion as to

21      whether the medical and scientific published literature

22      from 1949 to today, the prevailing opinion, accurately

23      reflects the Brush Wellman beryllium health

24      experience?

25              MS. McDOLE:  Objection, no foundation.

52

1               THE COURT:  Sustained.

2           Q.  (BY MR. STEWART)  Dr. Egilman, from your

3       review of the Brush Wellman records and documents, do

4       you have an opinion as to whether or not Brush Wellman

5       put false information into the medical and scientific

6       literature?

7               MS. McDOLE:  Objection, interpretation of

8       documents.

9               THE COURT:  Well, it's not an opinion

10      question, and so the Court's going to sustain it on the

11      basis noted and on the basis of the form of the

12      question.

13          Q.  (BY MR. STEWART)  Previously, Doctor, you had

14      made a statement about a 1949 standard, and I had asked

15      you about what the standards were in 1949.

16          A.   Yes.

17          Q.   At the break you told me you thought you

18      needed to correct that for the record.  Would you do

19    that?

20          A.    The levels that I gave were the levels that

21    were designed or intended to protect against chronic

22    beryllium disease.   The recommended standards at that

23    time included other levels for different points in

24    time, a maximum of 125 as a peak, and also included the

25    need to use respirators and information about when and

                                                            53


1     how long a plant should be shut down or an operation

2     shut down, so it's a more complicated standard than

3     what I gave you, but I gave you the basis of what was

4     designed to protect against CBD, which I thought that

5     question was, which I remembered it wasn't.

6                THE COURT:   You drop your voice at the end of

7     your sentence.   Please try to keep your voice up.

8                MR. STEWART:   Dr. Egilman, I think that's all

9     the questions I have for you at this time.

10               THE COURT:   Cross-examination.

11                         CROSS-EXAMINATION

12    BY MS. McDOLE:

13          Q.   Dr. Egilman, how many times have you

14    testified in depositions or in court in the last four

15    years?

16          A.   Probably 60 or 70.

17          Q.   How about 97?   Does that sound more likely?

18          A.   It's possible.

19      Q.   Do you have the report that you submitted in

20   this case?

21      A.   No.

22      Q.   I'll hand this to you so you can just take a

23   look at the list in the back that you provided.

24      A.   It's not at the very back.

25      Q.   Let me make it easier for you if I can.  Let

                                                   54

1   me show you Defendant's Exhibit 1763.  Do you recognize

2   this as the list of cases that you gave us that you've

3   testified in in the last four years, at least as of

4   December of 2000?

5      A.   Yes.

6      Q.   Okay.  And would you believe me if I told you

7   there were 97 cases there?

8      A.   Sure.

9      Q.   Okay.  And you've testified a great deal for

10   plaintiffs' law firms, haven't you?

11      A.   At the request of, not for.

12      Q.   I beg your pardon.

13      You've testified about 30 or 40 times for

14   plaintiffs' law firms, haven't you?

15      A.   At the request of.

16      Q.   All right.  You've testified at the

17   plaintiffs' attorneys' request in about 30 or 40 cases

18   in the last few year; is that right?

19       A.   Yes.

20       Q.   And how much have you been paid, paid either

21   directly or indirectly for your services on this case?

22   And by that I mean with respect to any payments that

23   they have made for you to others.

24       A.   I've been paid directly approximately

25   $18,000.  At my request, the law firm of Baron & Budd

                                                        55


1   has donated, I think, $28,000 to a group of students

2   who were doing a research project in South Africa this

3   year.

4       Q.   Anything else, Dr. Egilman?

5       A.   I think that's it.  Maybe there's something

6   else.  I don't know.

7       Q.   Well, while we're looking for that, you

8   can -- I think you testified -- strike that.

9            You are able to call Baron & Budd up, aren't

10   you, and get money whenever you think that you need it?

11       A.   No, I don't think so.

12       Q.   How much are you charging for your testimony?

13       A.   Today?

14       Q.   Today.

15       A.   I'm not charging.  I've asked Baron & Budd to

16   make a donation to nonprofit organizations.

17       Q.   How much have you asked them to make?

18        A.   Not a specific amount, but my usual charges

19   for testimony are $375 an hour.

20        Q.   Is that testimony in court or testimony in a

21   deposition?  You referred to court and -- and for your

22   normal services, how much is it?

23        A.   I don't know what normal services -- I don't

24   know what --

25        Q.   Your work as an expert, Dr. Egilman, other

                                                        56


1    than testifying in court.

2         A.   Oh, my work as an expert, I'm on retainer to

3    one company for a quarter of a million dollars a year

4    to do consulting work.  I have another retainer

5    agreement with another company for $50,000 a year, and

6    I charge generally $375 an hour.

7         Q.   Dr. Egilman, don't you charge $400 an hour

8    for your work outside for, for example, testifying in a

9    deposition?

10        A.   My deposition charges are $400 an hour.

11        Q.   Now, isn't it a fact that you've received, at

12   least as of March of this year, 40 or 50 thousand

13   dollars for your work on this case?

14        A.   No.

15        Q.   Okay.  Do you remember being asked in your

16   deposition, "And what amount of fees have you received

17   to date, with the exception of the check that you

18    received this morning in connection with your work on

19    this case?"  Do you remember your answer?

20         A.   Sure.  It was 40 or 50 thousand dollars.

21         Q.   Thank you.

22         A.   That was an estimate.

23         Q.   Did you characterize it as an estimate in

24    your deposition, sir?

25         A.   I did two things in my deposition with

                                                        57


1    respect to the --

2         Q.   The question was, did you characterize it as

3    an estimate in your deposition when you had told you

4    would -- that you had been paid 40 or $50,000 in this

5    case?

6         A.   Oh, yes.

7         Q.   And your deposition in March, were you asked

8    this question and did you give this answer:  "And what

9    amount of fees have you received to date with the

10   exception of the check that you received this morning

11   in connection with your work on this case?

12            "40 or 50 thousand dollars," is that your

13   answer?

14        A.   Could I see the next page?

15        Q.   Sure.  "And what percentage of that amount

16   has been donated to a charitable organization?

17            "Don't recall.

18          "Have you generated any statements that

19   you've presented to Baron & Budd in connection with

20   your work on this case?

21          I don't know.

22          THE COURT:  Slow down, please.

23   Q.   (BY MS. McDOLE)  "How is it that Baron & Budd

24   would know how much to pay you for your services on

25   this case?

                                                 58


1          Answer:  Well, I would -- we would generate

2   a statement or I would call them up and say I will

3   spend some time working on this case.  Would you send

4   me a check for X amount of money to compensate me for

5   my time.

6          Question:  And they don't ask you for any

7   documentation as to the length of your services or the

8   nature of your activities?

9          Answer:  Could you repeat the question?"  It

10   was read back.  And you said "Not written necessarily.

11   They would ask me to tell them what I'm doing.

12   Sometimes it's obvious, and I -- I don't deal with

13   this, so I'm not sure."

14          Do you want anything else read?

15   A.   The rest of that answer.

16   Q.   Okay.  I don't have any more of that right

17   now, but we'll go ahead and get it.

18              MR. STEWART:  Could you tell us what page

19     that was?

20              MS. McDOLE:  Certainly.  35.

21        Q.   (BY MS. McDOLE)  At the end of that answer on

22     the next page, page 36, Dr. Egilman, "Not written

23     necessarily.  They would ask me to tell them what I'm

24     doing.  Sometimes it's obvious, and I don't -- I don't

25     deal with this.  I'm not sure.  They may do that,"

                                              59


1      okay?

2         A.   Well --

3         Q.   And in connection with your deposition in

4      this case, did you have several people come to the

5      deposition from the East Coast?

6         A.   Yes, several of my students came to the

7      deposition.

8         Q.   Are these also your employees, part-time at

9      least?

10        A.   Some were.  Some were doing -- helping

11     with -- I think we had about a hundred boxes there.

12        Q.   And how many people were there all together?

13        A.   Six or seven.

14        Q.   Did they become temporary Baron & Budd

15     employees?

16        A.   Baron & Budd paid them for time that they

17     were helping and moving boxes and work related to

18    preparing.

19        Q.    And they paid for their airfare back and

20    forth for your deposition?

21        A.    That's correct.

22        Q.    And for hotel for several times in addition,

23    correct?

24        A.    Two nights, yes.

25              MS. McDOLE:  Thank you.  I have nothing else.

                                                          60


1               THE COURT:  Redirect.

2                       REDIRECT EXAMINATION

3     BY MR. STEWART:

4         Q.    Dr. Egilman, the 40, 50 thousand dollars that

5     you were asked about in your deposition, could you

6     explain that, please?

7         A.    Sure.  That was my estimate, and later on in

8     the deposition at the request of counsel for Brush

9     Wellman, Mr. Jensen from Baron & Budd produced the

10    actual bills at the deposition, and the actual bills

11    were $17,500.  So that's why I said I was paid $17,500.

12              MR. STEWART:  That's all the questions I

13    have, Dr. Egilman.  Thank you.

14              THE COURT:  Any recross?

15              MS. McDOLE:  No.

16              THE COURT:  Thank you, Doctor.  You may be excused.