# EXHIBIT H

David Egilman, M.D.

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX PRODUCTS | ) | MDL DOCKET NO. 1657 |
| LIABILITY LITIGATION | ) | SECTION L |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Videotaped |
| | ) | Deposition of: |
| Jo Levitt v. Merck Sharp & | ) | |
| Dohme Corp., Case No: | ) | DAVID EGILMAN, M.D. |
| 2:06-cv-09757-EEF-DEK | ) | |

April 12, 2016

8:49 a.m.

Location: Siegfried & Jensen

5664 South Green Street

Salt Lake City, UT  84123

Reporter: Teri Hansen Cronenwett

Certified Realtime Reporter, Registered Merit Reporter

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 38

1  Aside from the details of the treatment, which
2  also would be as a result of the -- which I would be
3  glad to go through, but that's a pretty good summary.
4  In other words, I will be glad to tell you what medicine
5  she took when, which resulted from the previous
6  described events. If you don't want me to do that, I
7  can stop here.
8      Q. Well, it wouldn't be responsive to my question
9  because my question really was, I wanted you to,
10 Dr. Egilman, tell me what specific cardiovascular events
11 or conditions you believe were the result of Ms.
12 Levitt's Vioxx use. And I grant that you identified
13 some conditions related to the heart, and then others
14 that I think might not be. But -- but -- but let's --
15 let's keep moving.
16     Have you communicated with any of plaintiff's
17 experts in this case?
18     A. I think I -- well, experts, no. I don't know
19 if I know who all the other experts are.
20     Q. That was going to be my next question.
21     A. I may have but without knowing it.
22     Q. Have you communicated with Dr. David
23 Madigan --
24     A. Yes.
25     Q. -- about his testimony in this case?

Page 39

1      A. About his testimony in this case, no. I
2  communicated with David Madigan.
3      Q. Have you communicated with Dr. Madigan about
4  the facts of this case?
5      A. Yes.
6      Q. Have you communicated with Dr. Madigan about
7  the facts of this case insofar as those facts are --
8  specifically pertain to Ms. Levitt?
9      A. Not sure I understand the question. But I
10 think the answer is yes.
11     Q. And what have you communicated with
12 Dr. Madigan about that you understand to be specific to
13 Ms. Levitt?
14     A. Well, I got him to run the placebo data for
15 acute coronary syndrome over the -- all the placebo data
16 that he has from all the Merck studies.
17     Q. When did you ask him to do that?
18     A. This week.
19     Q. Did he provide any results to you?
20     A. He did.
21     Q. From that analysis?
22     A. Yes.
23     Q. Did you bring those?
24     A. Yes.
25     Q. Those results with you here today?

Page 40

1      A. Yes.
2      Q. Can you give them to me?
3      A. Yes.
4      Q. Would you please?
5      A. Sure.
6      Q. What -- what would the folder say?
7      A. There's a folder of PowerPoints on ACS. But I
8  forgot what it's titled. It's also the articles on ACS
9  are in a large green folder.
10     Q. Should we go off the record?
11     A. No, we don't have to go off the record. I'm
12 just looking for the folder.
13         MR. BOEHM: Kept --
14     A. Here we go. There should be a PowerPoint in
15 here. I think. Maybe this one.
16         MR. BOEHM: Ken, I'm going to ask to go off
17 the record so -- because the -- the searching that --
18 that we're having to do is really just eating up the
19 time that I have today.
20         MR. MCCLAIN: Well, we -- we can go off the
21 record. But you asked him to find the folder. So I
22 think he's trying to do that. If you don't want it,
23 then we can move on, but -- or find it at a break,
24 but --
25         THE WITNESS: Right. Yeah.

Page 41

1          MR. BOEHM: Let's go off the record. I
2  would -- I would like to have it. Let's go off the
3  record.
4          THE WITNESS: That's okay. We can just
5  continue, because I don't want to take a break.
6          MR. BOEHM: Let's go off the record.
7          THE VIDEOGRAPHER: Going off the record. The
8  time is 9:35 a.m.
9          (Recess from 9:35 a.m. to 9:44 a.m.)
10         THE VIDEOGRAPHER: Going back on the record.
11 The time is 9:44 a.m.
12         (Deposition Exhibit No. 2 was marked.)
13     Q. (By Mr. Boehm) Dr. Egilman, when we went off
14 the record, you and Mr. McClain were in search of a
15 folder that you indicated contained the results of an
16 analysis that Dr. Madigan had performed at your request.
17 And after intensive efforts, you were able to identify a
18 green folder that has -- has the words "acute coronary
19 syndrome, PPT," written in Sharpie on the folder; is
20 that correct?
21     A. Yes.
22     Q. And we've marked the contents of that as
23 Exhibit 2. The -- the contents of this green folder
24 can -- is a PowerPoint entitled Cardiovascular Risks of
25 Nonsteroidal Antiinflammatory Drugs in Patients after a

David Egilman, M.D.

Page 42

1  Hospitalization for Serious Coronary Disease; is that
2  correct?
3      A.  I don't know.
4      Q.  Do you see that?
5      A.  No.  That is the title of the first PowerPoint
6  in the package of about 20 PowerPoints.
7      Q.  Okay.  Thank you.  Can I please have it back?
8  Thank you.
9          So as I now understand it, this is a package
10 of several PowerPoint presentations; is that correct?
11     A.  Yes, possibly.
12     Q.  What do you mean "possibly"?
13     A.  I wouldn't characterize it as a PowerPoint
14 presentation.  I would characterize it as PowerPoint
15 presentation of data from a variety of studies.  Just
16 studies, I-E-S.
17     Q.  Did you compile these PowerPoints that are now
18 in the document we've marked as Exhibit 2?
19     A.  What do you mean by compile?
20     Q.  Did you put these slides together?
21     A.  I did not type those slides.
22     Q.  What is your source for these slides?
23     A.  I went through the articles.  I highlighted
24 what I wanted on the articles.  Put on the PowerPoints,
25 and I gave them to someone to type up.

Page 43

1      Q.  Somebody who works with you?
2      A.  Someone who works in my office.
3      Q.  The content of the PowerPoint slides then
4  represents what you wanted to have captured based on
5  your review of the scientific data that is covered in --
6  in these slides; is that fair?
7      A.  That's correct.
8      Q.  Just flipping through it, it looks like there
9  are approximately 30 or so slides, and the final of
10 which is entitled ACS metaanalysis.  Do you see that?
11     A.  Yes.
12     Q.  Who prepared this slide?
13     A.  I did.
14     Q.  What did you use to prepare this slide?
15     A.  Data that Dr. Madigan gave me.
16     Q.  Where are those data?
17     A.  Besides on those slides?  The data that he got
18 from his database of patient level Merck data from the
19 SAS files.
20     Q.  How did Dr. Madigan communicate to you the
21 results of his analysis?
22     A.  I think he sent me an e-mail.  May have done
23 it orally.
24     Q.  Do you still have the e-mail that Dr. Madigan
25 sent to you communicating the results of his analysis?

Page 44

1      A.  I don't think so.
2      Q.  What happened to it?
3      A.  I don't know.  I may still have it.  Usually,
4  I delete my e-mails.
5      Q.  Did you bring the e-mail that Dr. Madigan sent
6  to you communicating the results of his ACS metaanalysis
7  with you to today's deposition?
8      A.  No.
9      Q.  Have you provided that to counsel for
10 plaintiff?
11     A.  I don't recall.
12         MR. MCCLAIN:  I don't believe so.
13     Q.  (By Mr. Boehm)  Is it only the last slide that
14 captures the ACS metaanalysis that you had asked
15 Dr. Madigan to do, or -- or are there other slides in
16 this green folder, that has been now marked as Exhibit
17 2, that also capture Dr. Madigan's analysis that you
18 asked him to perform in connection with Ms. Levitt's
19 case?
20     A.  The former.
21         MR. MCCLAIN:  The former.
22     Q.  (By Mr. Boehm)  Why did you put this slide
23 together with the other materials that were in this
24 folder marked ACSPPT?
25     A.  Because it deals with that topic.  And not all

Page 45

1  of the slides in that folder deal with that topic from a
2  epidemiologic standpoint.  But all of the slides in that
3  packet deal with the issue of ACS and Vioxx.
4      Q.  When did you create this slide?
5      A.  Last few days.
6      Q.  When did you communicate with Dr. Madigan
7  about performing this analysis?
8      A.  Last few days.
9      Q.  What specifically did you ask Dr. Madigan to
10 do?
11     A.  Run the -- well, first I asked him if he had
12 run an analysis just for the criteria for ACS, and he
13 said they hadn't done that, and I said could he, and he
14 said yes, and he did it.
15     Q.  Did you provide to him the end points that you
16 thought were appropriate to use in this analysis for
17 ACS?
18     A.  I think I sent him, yeah.  Something.
19     Q.  You provided to Dr. Madigan a list of end
20 points that he could use for purposes of conducting this
21 metaanalysis?
22     A.  Yeah.  And then it was one he wasn't sure
23 about, which was cardiac arrest.  That's why you see two
24 PowerPoints there.  He then said, "Do you want me to do
25 it with cardiac arrest as well?"  And I said "Sure."

Page 46

1  Q. Did you bring with you today the e-mail that
2  you sent to Dr. Madigan communicating to him the end
3  points that you thought it was appropriate for him to
4  use to conduct these analyses?
5  A. No.
6  Q. Did you provide that e-mail to counsel for the
7  plaintiff?
8  A. No. We're talking about the same e-mail.
9  Q. What do you mean, "We're talking about the
10 same e-mail"?
11 A. It's an e-mail that went back and forth. It
12 was iterative e-mails. It was three or four questions,
13 back and forth.
14 Q. What end points did you include in what you
15 asked Dr. Madigan to use for purposes of his
16 metaanalysis?
17 A. MI, sudden death and -- and unstable angina.
18 Q. Anything else?
19 A. I don't think so.
20 Q. Did you consult with anybody in order to come
21 up with the list of end points that you thought it would
22 be appropriate for Dr. Madigan to use for his
23 metaanalysis?
24 A. No.
25 Q. What was your methodology for determining

Page 47

1  the -- the three end points you've identified, MI,
2  sudden death and unstable angina were the appropriate
3  end points for a metaanalysis such as the one you asked
4  Dr. Madigan to conduct?
5  A. I reviewed the literature on the definition of
6  ACS.
7  Q. Did you do that within the last few days?
8  A. I did that before. But I did it again the
9  last few days.
10 Q. What specific literature did you review and
11 use as a source in determining that those three specific
12 end points were the appropriate ones?
13 A. Well, the literature that defines it in the
14 papers that you have in your hand, which I have in
15 another folder here. The Merck manual. And I think a
16 couple other papers that -- that define the ACS, which
17 are also someplace in here on the table.
18 Q. Okay. Can you tell me what those studies are?
19 Because we have, I don't know, probably at least a
20 hundred folders on the table, all color coded and marked
21 in various ways.
22 A. Oh, I think we have 200 folders on the table.
23 Q. Probably right. Maybe more.
24 A. Well, I mean, if I didn't have the folders,
25 I'd tell you what I just told you. I mean, they're

Page 48

1  here. You can, you know, mark them.
2  Q. Okay. Can you --
3  A. I gave -- told you that -- that this folder
4  here has the underlying literature that goes with the
5  PowerPoints in your hand. So that would be some of
6  them.
7  Q. Thank you.
8  A. And then perhaps, you know, and I can stand up
9  and look around for the other ones.
10 Q. Was there any particular publication, or were
11 there any particular publications that you used as your
12 source for deciding that MI, sudden death and unstable
13 angina were the three appropriate end points to use for
14 a metaanalysis for ACS?
15 A. I think that's what's defined in those papers
16 which you just have. That's how the Merck manual
17 defines it. And then there's papers that specifically
18 look at the question of ACS, and that's how they defined
19 it, as I recall.
20 Q. Did you provide to Dr. Madigan a list of
21 MedDra terms he could use to capture possible events
22 that you believed met those three end points?
23 A. No. Because he has his own -- that -- that, I
24 mean, we -- we have done that before; and we have -- I
25 mean all of -- all of the end points, perhaps except

Page 49

1  for -- except for unstable angina, have already been
2  MedDra'd, CRISP'd and -- and otherwise evaluated by --
3  and we've reported on that evaluation in -- in published
4  papers that we have done. So that process has already
5  been vetted for these particular Merck studies.
6  Q. Did you discuss with Dr. Madigan what specific
7  MedDra terms he would be using to capture potential
8  events of MI, sudden death and unstable angina to
9  conduct this ACS metaanalysis?
10 A. No. Because they are previously published.
11 Q. When you say, "They are previously published,"
12 you're referring to your own publication with
13 Dr. Madigan?
14 A. No. Actually, I -- I think they're in several
15 publications, one of which is the -- the paper that I am
16 on. Another one is a 2012 paper that he did with other
17 people. And so it's -- I mean, it's been vetted. He's
18 been cross-examined on it. He's -- they've -- Merck has
19 hired witnesses to critique it.
20     He's been deposed about it. It's about the
21 best vetted set of data in existence in the world, I
22 think, if you believe that cross-examination is the --
23 is the best. And I certainly think cross-examination is
24 much more effective at getting to the truth than peer
25 review.

Page 114

1 cardiovascular condition in and of itself, correct?
2    A. Same answer as before. Yes.
3    Q. In other words -- sorry about that.
4    A. In general yes, but there are exceptions.
5    Q. So in other words, there -- you -- you might
6 consider the stent itself as a cardiovascular condition
7 if there are complications surrounding the stent itself?
8    A. There are many stents that have been withdrawn
9 from the market because they break off in the body. And
10 when they break off in the coronary artery, the stent
11 itself becomes the pathologic feature that causes the
12 death of the patient or the injury to the patient.
13    Q. Are you expressing any opinion in this case
14 that Ms. Levitt's stent broke off?
15    A. No.
16    Q. On page 53 of your May 9th, 2014, report,
17 marked Exhibit 5, you write, "differential diagnosis for
18 Mrs. Leavitt's CABG and stent." Do you see that?
19    A. I do.
20    Q. What is your understanding of what the term
21 "differential diagnosis" means?
22    A. It lists -- well, there are a variety of --
23 there are a variety of interpretations of differential
24 diagnosis. Sometimes -- some portions of a differential
25 diagnosis are the causes for the disease. All possible

Page 115

1 causes. And then inductive reasoning to rule -- is used
2 to rule them out.
3         Sometimes the deferential diagnosis can be
4 used to try to distinguish the causes of a disease. The
5 cause -- I'm sorry. The first one should be causes of a
6 series of complaints. Or a particular complaint.
7         Sometimes a differential diagnosis, and these
8 can be mixed in within the same differential
9 diagnosis -- diagnosis, the causes for a particular
10 diagnosis that's agreed to. So for example, someone
11 might have mesothelioma.
12         The differential diagnosis for the cause of
13 the mesothelioma might be erionite, asbestos, nano
14 exposure. On the other hand, one might have something,
15 presentation of chest pain, and then the differential
16 diagnosis would be, ulcer, anxiety, coronary artery
17 disease, angina, spasm, et cetera. And those are not
18 exclusive. You could have more than one.
19         So those would be the two kinds of ways that
20 differential diagnosis are used. And often in medicine
21 they're not dis -- distinguished.
22    Q. Here on page 53 of your report, you suggest
23 that you have conducted a differential diagnosis for
24 Ms. Levitt's CABG and stent?
25    A. Correct.

Page 116

1    Q. What do you mean by that?
2    A. I mean these are the things that could
3 possibly have caused her to have a CABG and stent.
4    Q. Okay. But I -- I just want to be clear.
5 Are -- are you advancing -- the -- the CABG and the
6 stent are the treatments for the underlying condition
7 that Ms. Levitt experienced at that time, correct?
8    A. Correct.
9    Q. Okay. So are you advancing any opinion in
10 this case about what specific adverse cardiovascular
11 event or conditions caused Ms. Levitt to require a CABG
12 and a stent?
13    A. Yeah. Acute coronary syndrome.
14    Q. Earlier today when I was asking you about
15 Dr. Madigan, what you were describing as a metaanalysis,
16 you indicated that there were three end points that he
17 included in that metaanalysis. MI, sudden death, and
18 unstable angina.
19    A. Correct.
20    Q. Is that correct? With respect to your
21 differential diagnosis --
22    A. Well, and then -- then he added cardiac arrest
23 in the second alternative, which generally would be
24 considered a heart attack. But -- so that's why I had
25 him include that.

Page 117

1    Q. Okay.
2    A. But that's one of those CRISP metric term
3 conditions. In other words MI and sudden death tracked
4 one way. The way Merck had done their data, cardiac
5 arrest was classified separately.
6    Q. When you offer opinions about Ms. Levitt's
7 underlying ACS, what specific condition are you
8 referring to, vis-à-vis Ms. Levitt?
9    A. Well, I think her acute coronary syndrome was
10 caused by an imbalance in the amount of oxygen that
11 could be carried to her heart, and the needs -- the
12 metabolic needs of her heart, and that that imbalance
13 was caused by a narrowing of the vessels. And in
14 addition, the acute event that caused her
15 hospitalization may have been contributed to by plaque
16 breakage. But that's not clear. But that's, I think,
17 more likely than not. There was some plaque involved.
18    Q. Okay. Let's break that down.
19    A. That precipitated the acute episode.
20    Q. Thank you. That's helpful. Let's -- let's
21 see if we can just break that down a little bit more.
22 You -- you mentioned the -- the lack of, I think you
23 said it was lack of oxygen that was getting to the heart
24 muscle. Is that a fair characterization, or did I mess
25 that up?

David Egilman, M.D.

### Page 118

1  A. Well, the -- the overview issue is that
2  there's not enough oxygen getting to heart muscle.
3  Q. And is that sometimes described as unstable
4  angina?
5  A. No. That over -- well, yes, but many other
6  things. In other words, you could have a heart attack
7  as a result of that imbalance. You could -- you don't
8  have to have -- you can -- you can go from that
9  imbalance to an MI. You can go from that imbalance to
10 arrhythmia without passing through an MI or unstable
11 angina.
12         Twenty to 40 percent of heart attacks are --
13 are silent, in that there are no symptoms, particularly
14 in diabetics. So someone might not have pain, might
15 have, if you could monitor them, spasm and then have a
16 heart attack. But you wouldn't know about the spasm
17 part.
18         Someone can -- does experience pain, a
19 nondiabetic, then you're going to get the acute coronary
20 syndrome which is going to be pain. In either case you
21 could have shortness of breath accompanying it. And arm
22 pain, I mean, all kinds of things. Back pain. There
23 was lots of other symptoms that can come with having a
24 heart attack.
25 Q. All right. Let's just go through the --

### Page 119

1  A. Or -- or precipitant angina. Pectoris.
2  Q. Okay. Are you done? Sorry.
3  A. Go right ahead.
4  Q. Let's go through the four end points that you
5  asked Dr. Madigan to include in his analysis. Are you
6  expressing an opinion in this case? And I believe I
7  already asked you this, so forgive me, but I want to
8  make sure it's clear.
9         Are you expressing an opinion in this case
10 that Ms. Levitt experienced a myocardial infarction?
11 A. No.
12    MR. MCCLAIN: He's already talked about that.
13 Q. (By Mr. Boehm) Are you expressing an opinion
14 in this case that Ms. Levitt experienced sudden death?
15 That was obvious.
16    MR. MCCLAIN: Don't answer it. I instruct you
17 not to answer that question.
18    MR. BOEHM: Are you --
19    MR. MCCLAIN: It's embarrassing.
20 Q. (By Mr. Boehm) Are you -- are you expressing
21 an opinion in this case --
22 A. Excuse me. I don't listen to him.
23 Q. Okay. Go ahead.
24 A. Unless you want to withdraw the question.
25 Q. No, go ahead. You can answer it if you like.

### Page 120

1  A. I do not think that she died.
2  Q. Are you expressing an opinion in this case
3  that Ms. Levitt experienced cardiac arrest?
4  A. That would be the same as dying. So once you
5  have established that she didn't die, she neither had
6  sudden death or cardiac arrest.
7  Q. So the last of the four end points that you
8  had told Dr. Madigan to use for his acute coronary
9  syndrome metaanalysis would be unstable angina, correct?
10 A. Yes and no.
11 Q. You earlier today told me that you told
12 Dr. Madigan to use three cardiovascular end points for
13 his acute coronary syndrome pooled analysis,
14 metaanalysis, and then he volunteered to add one more.
15 Cardiac arrest, correct?
16 A. He offered one and I accepted his offer.
17 Q. Okay. Okay. Is it your opinion that
18 Ms. Levitt experienced unstable angina?
19 A. Yes.
20 Q. Is there any other underlying acute coronary
21 syndrome condition that you are saying to a reasonable
22 degree of medical certainty Ms. Levitt experienced?
23 A. My previous answer is -- needs to be
24 explained. I said yes, okay, to the question: Is it
25 your opinion that Ms. Levitt experienced unstable

### Page 121

1  angina? The answer is yes, and acute coronary syndrome.
2  Since acute coronary syndrome is defined as those three
3  events. As a syndrome. So if you have an MI, sudden
4  death, or unstable angina, either of them, you have
5  acute coronary syndrome. Okay.
6         That is -- so let me see if I can come up with
7  an analogy. If you're dressed, okay, then you are
8  not -- you're dressed because you have a shirt on and
9  pants, and a hat. Okay. So you can only have a hat on.
10 Well, how about only shirt on and you're dressed. Okay.
11 But you also could have -- you -- you have these other
12 things that could also be contributing to being dressed
13 and it's one syndrome. Being dressed.
14 Q. Other than unstable --
15 A. Not the best analogy. I'll have to come up
16 with something better.
17 Q. Other than unstable angina, are you expressing
18 an opinion to a medical -- to a degree of medical
19 certainty that Ms. Levitt experienced any other symptom
20 or cardiovascular condition under the umbrella of acute
21 coronary syndrome in connection with her use of Vioxx?
22 A. Yes.
23 Q. What?
24 A. She had anxiety and she had shortness of
25 breath.

Page 126

1  statistical analysis are driven by MI? Do you need me
2  to re -- did you understand that?
3      A. I understand that. But --
4      Q. Oh.
5      A. I mean, I don't think he broke that down. But
6  you might be able to -- I'm thinking about where -- I
7  mean, we did -- we did report MI, sudden death, I think,
8  in some of the papers. I'd have to go and look. I
9  think -- I think that's -- that's reported. So we could
10 break it down then by looking at how the rate ratio
11 moved or how the confidence limits moved.
12     Q. But my question for you right now is, do you
13 know, as you sit here today, to what extent the risk
14 ratios that Dr. Madigan has calculated in this, what you
15 call ACS metaanalysis are driven by MI events? Do you
16 know?
17     A. I'd have to go look at the papers is what I
18 said.
19     Q. Okay.
20     A. I mean, I think I have the papers here. I
21 think we might be able to figure it out.
22     Q. Do you know if you would be able to figure out
23 how these risk ratios would change if you were to look
24 specifically at unstable angina events, and -- and --
25 and -- and not look at the other MI, sudden death, and

Page 127

1  other events that fit under the ACS header?
2      A. I don't -- based on the Merck data, I don't
3  think it could be done because Merck would only -- if
4  someone had unstable angina and then had an MI, they
5  wouldn't put it down as an unstable angina. If -- if --
6  if you read most of the way they classified things in
7  their summary tables, and maybe even in the data, you
8  only get to be one -- one -- reported once in one
9  category in most of the tables.
10        I have an example of that in the APTC thing
11 which Ken didn't find. And so I am not sure if it's
12 doable the way Merck did the data.
13     Q. Do you know how these numbers would change if
14 you were to use only the reported events of unstable
15 angina to conduct this analysis?
16     A. No.
17        MR. BOEHM: Let's go off the record.
18        THE VIDEOGRAPHER: Going off the record. The
19 time is 12:19 p.m.
20        (Lunch recess from 12:19 p.m. to 1:38 p.m.)
21        THE VIDEOGRAPHER: Going back on the record.
22 This is the beginning of Tape No. 3. The time is 1:38
23 p.m.
24     Q. (By Mr. Boehm) Dr. Egilman, did you have any
25 assistance in the preparation of the expert reports you

Page 128

1  have provided in this case?
2      A. Sure.
3      Q. Who assisted you in drafting these reports?
4      A. Nobody, but somebody abstracted the -- the
5  abstracting was done jointly by me and my staff.
6      Q. Are you referring to the abstracting of the
7  medical records that relate to Ms. Levitt?
8      A. Correct.
9      Q. And when you say that that was done jointly by
10 you and your staff, can you describe what your
11 respective roles were in the abstracting of the --
12     A. Yeah, I picked --
13     Q. -- Levitt medical records?
14     A. Yes.
15     Q. Would you do so?
16     A. Sure. I told him what to do, and he typed it
17 in.
18     Q. What did you tell him to do?
19     A. Well, I said, "See for this record, I want you
20 to type this and this and this. See for this record, I
21 want you to type this and this and this. See for this
22 record, I want you to type this and this and this." And
23 he did.
24     Q. So for every record in Ms. Levitt's file, you
25 specifically directed your staff as to what to write

Page 129

1  down in your expert report?
2      A. Correct.
3         MR. MCCLAIN: Pretty much -- if you have ever
4  witnessed the process, pretty much as he is describing.
5      Q. (By Mr. Boehm) And who was it on your staff
6  who performed that task?
7      A. I think Nick Druar.
8      Q. I am sorry.
9      A. Nick Druar.
10     Q. Drewark?
11     A. D-R-U-A-R.
12     Q. Other than Mr. Druar, did anybody else assist
13 you in the preparation of your expert reports in this
14 case?
15     A. Sure.
16     Q. Who else?
17     A. Anybody who has worked for me since 2001.
18     Q. They have all assisted you in some way or
19 another?
20     A. Sure. I didn't put this together just for
21 this case. This is a project that's taken 15 years.
22     Q. Have you performed a comprehensive review of
23 the scientific data on the subject of whether the use of
24 Vioxx is causally associated with an increased incidence
25 of unstable angina?

David Egilman, M.D.

| Page 146 | Page 148 |
|---|---|
| 1  angina pectoris or unstable angina pectoris.<br>2  Q. Are you expressing an opinion in this case<br>3  that Vioxx is causally associated with the incidence of<br>4  coronary artery disease?<br>5  A. Sure. It causes heart attacks. The<br>6  underlying cause of heart attacks is coronary artery<br>7  disease. It also probably contributes to plaque<br>8  instability. Okay. Less sure, but probably. Okay.<br>9  And so that -- those are the probable mechanisms.<br>10  It also causes heart attacks by putting into<br>11  congestive heart failure, putting more stress on your<br>12  heart. So there are a variety of ways Vioxx can kill<br>13  you through your heart. But in terms of the symptom of<br>14  unstable angina pectoris. It's generally coronary<br>15  artery disease progression or plaque release.<br>16  Q. Are you expressing an opinion in this case to<br>17  a reasonable degree of medical certainty that<br>18  Ms. Levitt's use of Vioxx caused her atherosclerosis?<br>19  A. Caused or contributed to. Most likely<br>20  contributed to. She has other risk factors for<br>21  atherosclerosis, as does everyone else in the world. So<br>22  -- who has atherosclerosis. It's not the sole cause.<br>23  It's a contributing factor that caused it to increase or<br>24  -- and/or caused a plaque to break off, causing her<br>25  unstable angina. | 1  you sit here today, a specific randomized, controlled<br>2  trial that you believe to show a statistically<br>3  significant increased risk of unstable angina in<br>4  association with the use of Vioxx?<br>5  A. I think it's probably in some of the larger<br>6  trials. But in order to get the answer, we have to go<br>7  out and re -- redo the data tables that Merck did<br>8  because of the way Merck conflated the tables.<br>9  In other words, if you had unstable angina MI,<br>10  you were categorized as MI. So you would have to<br>11  actually go back to the patient charts and get the data.<br>12  I think that's probably doable. I don't think that's<br>13  necessary.<br>14  Q. Do you agree that, as you sit here today, you<br>15  are not able to specifically identify a randomized<br>16  controlled trial that shows a statistically significant<br>17  increased risk of unstable angina in association with<br>18  the use of Vioxx?<br>19  A. No, I just gave you one. I handed you one at<br>20  the beginning of the day. That's Madigan's.<br>21  Q. So you are now referring to Exhibit 2 and<br>22  specifically the final slide in what we have marked as<br>23  Exhibit 2?<br>24  A. Correct.<br>25  Q. Okay. Other than Dr. Madigan's analysis that |
| **Page 147** | **Page 149** |
| 1  Q. Do you agree with the following statement with<br>2  respect to the specific end point of unstable angina:<br>3  There is no randomized, controlled trial that shows a<br>4  statistically significant increased risk of unstable<br>5  angina in association with the use of Vioxx?<br>6  A. No.<br>7  Q. What specific randomized, controlled trial do<br>8  you believe shows a statistically significant increased<br>9  risk of unstable angina in association with the use of<br>10  Vioxx?<br>11  A. Well, the ones I just did, the Madigan ones.<br>12  Those are all randomized controlled trials combined.<br>13  Study 203 probably, which is the same idea, just with<br>14  limited size, probably also shows that. So if study 203<br>15  is a randomized controlled trial that Merck was<br>16  proposing to use to study cardiovascular risk, then<br>17  Madigan's combined placebo-controlled results is the<br>18  same thing.<br>19  Q. Okay.<br>20  A. And also, also, other -- the other Merck<br>21  studies where Merck intentionally chose to eliminate<br>22  unstable pectoris analysis from the published paper.<br>23  They also are studies, some of which probably would be a<br>24  yes answer to that question.<br>25  Q. My question for you is, can you identify, as | 1  you asked him to perform, because I am asking about<br>2  specific randomized controlled trial. Can you identify<br>3  any specific randomized control trial that shows a<br>4  statistically significant increased risk of unstable<br>5  angina in association with the use of Vioxx?<br>6  A. Maybe APPROVe.<br>7  Q. You are not sure about APPROVe?<br>8  A. Because Merck didn't publish the statistics on<br>9  the results. It's seven to four against Vioxx. Okay.<br>10  It's a large study. I wouldn't be surprised if it<br>11  wasn't statistically significant, particularly if you<br>12  did a one tale test, which would be the appropriate tale<br>13  at the time that that was published. No reasonable<br>14  hypothesis that Vioxx reduces angina pectoris, unstable<br>15  or otherwise.<br>16  Q. Do you think it would be -- strike that. Let<br>17  me start over.<br>18  For purposes of assessing the question of<br>19  whether or not an increased risk of unstable angina is<br>20  associated with the use of Vioxx, do you believe it<br>21  would be appropriate or inappropriate to review data<br>22  from non-placebo-controlled trials?<br>23  A. Always appropriate to review everything. It<br>24  depends what the non-placebo is.<br>25  Q. Are there -- |

David Egilman, M.D.

Page 178

age or risk factor or -- I am not familiar with it. I don't see any. I reviewed the -- I did searches to look for unstable angina studies, and I didn't see any. Where that's the single outcome measure?

Q. If a patient has unstable angina, does that necessarily mean that she also has atherosclerosis?

A. I think so. I mean, you could throw a plaque. Well, actually that's not true. You could have spasm and not have atherosclerosis. That's rare. But you could have that.

You could throw a clot and not have atherosclerosis except for the clot, from, say -- let's say you had a -- this would be unusual. But let's say you had a myocardial thrombus, and the thrombus gets thrown through a clot. The clot could cause unstable angina. But you otherwise are -- your arteries would be clean. I don't know if that's possible.

You could have -- you could have a myxoma, a cardiac tumor, and part of the tumor might break off and cause unstable angina. I left that out of my differential diagnosis. Okay. I don't know if it's ever happened but it's certainly possible. So those are the ways it could happen at least.

Q. Are you advancing the opinion in this case to a reasonable degree of medical certainty that

Page 179

atherosclerosis caused Ms. Levitt to experience unstable angina?

A. I think it contributed to it.

Q. And you're reaching that conclusion to a reasonable degree of medical certainty?

A. Yes.

Q. Okay.

A. We know she had atherosclerosis. If we didn't know anything about her, if I didn't -- I would still say that because, you know, more likely than not, everybody who gets -- more than 50 percent of the people with angina, unstable angina, have atherosclerosis. Way more, probably closer to a hundred percent, you know. So...

But knowing that she has some stenosis and a lot of stenosis, it's for sure a contributing factor. It's not -- nothing is a hundred percent. But it's way more likely than not.

Q. To a reasonable degree of medical certainty, are you advancing the opinion in this case that anything other than atherosclerosis directly caused Ms. Levitt to experience unstable angina?

A. As the cause, yeah. She might have had plaque formation. She might have had a thrombus form because Vioxx blocked COX-2 in the -- in the artery wall setting

Page 180

up a, you know, a thromboxane, unrebutted with thromboxane response. Any of those is possible.

She didn't have any evidence of clot by damage to the heart, based on enzymes or anything else, or EKG changes. But she could still have had it.

Q. You are saying it's possible?

A. All of this is possible.

Q. Right. But my question --

A. And some combination of this happened. Okay. I don't know. These are the three things that in combination happened. If you want to pick out each and every one, I can't say that's what did it. It's one of -- it's probably a combination of more than one of those things.

If I had to pick one, I would say the one we know she had is atherosclerosis. You can't know about the other two because no one was there looking in her artery when the -- when an event occurred, so you couldn't see it clot. Clots can dissipate, and you don't find them, even when you do an angiogram. So you can't know about that, and there's no way to know -- you can't put a probe in and test the relationship of prostacyclin and thromboxane in the vessel wall when she is having the angina to determine whether that's gone on. So that's always going to be purely theoretical as

Page 181

to a particular individual.

Q. Are you familiar with the concept of systemic inflammation?

A. Sure.

Q. What's your understanding of what that term means, generally speaking?

A. I don't have a general understanding. Some people call, you know, lupus a systematic disease. Rheumatoid arthritis can be a systematic disease. So you have inflammation in multiple organs, multiple joints. Scleroderma may be sometimes. Mixed connective tissue disease.

Q. Are there biological markers of systemic inflammation?

A. It depends what disease -- I mean, there's no -- there's no disease entity known as systemic disease. What was that term you used in the question?

Q. Systemic inflammation.

A. Inflammation. That's no -- that's not a disease. Some people might say, lupus indicates system -- if lupus that's systematic indicates systematic inflammation because it's in more than one organ, more than one organ system. But I mean, I am not -- it's a really general category.

Q. Have you performed a comprehensive review of

## Page 218

1  want me to give you more?
2  Q. Sure.
3  A. Okay. Well, I had psychiatric training in
4  medical school and in my residency, and that's in my
5  residency in internal medicine. I also practiced
6  medicine for a considerable length of time, and I
7  treated a lot of patients for psychiatric illness.
8      And always psychiatry, psychiatric illness,
9  and emotional response to disease is always a part of
10 every patient that I saw, was always part of my
11 interview of every patient that I saw, was part of my
12 history of every patient that I saw.
13     And when interventions were required, medical
14 interventions or others, I either provided them myself
15 or coordinated care for the patient. Most patients who
16 have psychiatric disease do not see psychiatrists for
17 any number of reasons. Most see primary care doctors
18 like myself.
19 Q. Are you done?
20 A. Done.
21 Q. Have you ever been accepted as an expert in
22 the field of psychiatry by any federal or state court
23 judge in a litigation matter?
24 A. Well, I have certainly testified about death
25 and dying and the emotional impact of death and dying in

## Page 219

1  many cases. And some people would consider that to be
2  psychiatric diseases. I have certainly testified about
3  emotional components to diseases. I'll probably -- in
4  every case I have ever testified in.
5      I don't think I have ever been challenged on
6  that issue, ability to give that testimony. And there
7  may have been some objections overruled on the death and
8  dying issue. Some of those are legal. That is, if you
9  die, you don't get pain and suffering in some states.
10 But I think I still talked about pain and suffering with
11 respect to loss of consortium and other things. So I
12 have done a lot, probably every case I have testified.
13 Q. Now, you indicated that you talked about death
14 and dying. Was it your understanding that you were
15 being presented to the court as an expert in psychiatry
16 in those cases where you talked about death and dying?
17 A. No. I was giving you as an example. I have
18 also testified about other emotional components of
19 diseases. I thought that was clear in the previous
20 answer.
21 Q. Okay. In those -- on those occasions when you
22 have given testimony related to the emotional impact of
23 various diseases, was it your understanding that you
24 were being presented to the court as an expert in
25 psychiatry?

## Page 220

1  A. Well, I certainly think that an objection
2  could have been made that my testimony required
3  psychiatric expertise. I don't recall specifically that
4  objection ever being made. But certainly, the opinions
5  I gave were certainly related to psychiatry.
6      I talked about people being depressed. I
7  talked about them crying. I talked about the emotional
8  impact of the disease and their relationships with other
9  people. I talked about the symptoms of depression.
10     I mean, all these things I talked about, they
11 are part of general practice of family medicine,
12 internal medicine, every medicine. So I don't recall
13 anybody objecting to my expertise. So I can't say that
14 there's an order on there saying I can give the
15 testimony.
16 Q. Do you have a degree in psychology?
17 A. No.
18 Q. Do you consider yourself a specialist in the
19 field of psychology?
20 A. By the definition of knowing more than a
21 layman, probably, yes.
22 Q. Well, that's a standard that I am not sure
23 quite what that means. Do you consider yourself a
24 specialist, is what I am asking you, in the field? I am
25 not asking you whether you might know something and

## Page 221

1  something more than some random person on the street.
2      My question is, do you consider yourself a
3  specialist in the area of psychology? If you do, that's
4  fine.
5  A. I don't think there's a board certification.
6  I'm not sure what the board -- I mean, what do you mean?
7  I don't only deal with psychological issues.
8  Q. You don't specialize in psychological issues,
9  correct?
10 A. I don't only deal in psychological issues as a
11 unique, single field. I certainly deal with
12 psychological issues as I see patients in my regular
13 practice of medicine and have historically, and I am
14 familiar with this -- that literature.
15 Q. You don't specialize in the field of
16 psychology, correct?
17 A. I don't only practice psychology as a unique
18 field where that's all I do.
19 Q. When you say you don't only practice
20 psychology, you are not a psychologist, correct?
21 A. I am not a -- I am not a Ph.D. psychologist,
22 that's correct, or a master psychologist.
23 Q. Let me just ask you, for purposes of the
24 opinions that you are offering in this case, are you
25 claiming to be a specialist on the subjects of

### Page 222

1 psychiatric or psychological disorders?
2   A. Well, for the purpose of the opinions I am
3 offering in this case, I am offering opinions that
4 relate to the psychological impact of coronary artery
5 disease and CABG on a patient. And I gave you about
6 three pounds of literature on that. And my report deals
7 with that, so that's what I am doing in this case.
8   Q. When you refer to the three pounds of
9 literature that you have provided to us on the subject
10 of psychological impact of cardiovascular events, are
11 you referring to this folder you have titled Depression
12 and CABG which we marked as Exhibit 3?
13   A. Yes. You think it weighs less or more than
14 three pounds?
15   Q. More for sure.
16   A. Okay. Well, I underestimated. I tend to
17 underestimate weight. Probably obvious why I want to do
18 that.
19       MR. MCCLAIN: It's a defense mechanism.
20   Q. (By Mr. Boehm) Do you consider yourself to be
21 an expert in bulimia?
22       MR. MCCLAIN: Bulimia?
23   A. She had bulimia.
24       MR. MCCLAIN: I know that, but why? Is there
25 a specialty in bulimia? Just news to me. Expert in

### Page 223

1 bulimia.
2   A. I certainly read a lot of literature about
3 bulimia. I have treated bulimic patients.
4       MR. BOEHM: Would you just read back my
5 question.
6       (Record read back.)
7   A. Okay. Well, I answered that question.
8   Q. I didn't ask you -- oh, whoa. Are we being
9 kicked out? Let's go off the record.
10       THE VIDEOGRAPHER: Going off the record. The
11 time is 5:03 p.m.
12       (Discussion off the record.)
13       THE VIDEOGRAPHER: Going back on the record
14 the time is 5:04 p.m.
15   Q. (By Mr. Boehm) Dr. Egilman, you told me that
16 you have treated patients who -- in your life who have
17 had bulimia. My question is different. I am asking
18 whether or not you consider yourself to be an expert on
19 the subject of bulimia.
20   A. Well, I don't think nonexperts treat people
21 for bulimia. I think -- I gave you the -- we need to --
22 it's always -- as we have interact on this expert
23 question, we have had -- we don't have a consensus on a
24 definition. So I thought I would explain what I do.
25 And then it could be in the eye of the beholder.

### Page 224

1 If you disagree that my experience and patient
2 care does not indicate expertise, then that's your
3 opinion. Okay. And then my opinion would be it does.
4   Q. The ex -- I'm sorry. Were you done?
5   A. That's no problem. Then the judge will have
6 his opinion if we make a motion, so we'll get at least
7 three opinions.
8   Q. Okay. And again, the standard that you are
9 applying when you're asked questions about whether you
10 are an expert is that you know some -- something more
11 than a lay person, correct?
12   A. No. That's the legal standard as I understand
13 it. Okay. I am -- I am willing to take any definition
14 you want to give me. Okay. But you didn't -- you
15 didn't give me a definition. Okay. I started with that
16 definition. Okay. And then it turns out the definition
17 of expert is nontrivial.
18       And so I'll take whatever -- however you want
19 to frame the definition of expert, I'll be glad to
20 accept that definition and answer appropriately.
21   Q. You indicated that you have treated patients
22 who have bulimia. Did I understand that correctly?
23   A. Correct.
24   Q. On those occasions when you have treated
25 patients who have had bulimia, have you been the

### Page 225

1 physician primarily in charge of treating the
2 psychiatric condition of bulimia? Or have you referred
3 those patients for more specialized psychiatric
4 treatment?
5   A. Or both.
6   Q. Both?
7   A. Both have happened.
8   Q. You have your realtime in front of you, much
9 to my chagrin and much to the delay of our deposition,
10 so you can look back to my question. But I don't think
11 both would be an answer that's possible based on how I
12 framed it. I am happy to ask you again if you want me
13 to.
14   A. The question is, have you been the physician
15 primarily in charge of treating the psychiatric
16 condition of bulimia, or have you referred those
17 patients for more specialized psychiatric treatment.
18 Both.
19   Q. Okay. So your, your --
20   A. Both have occurred.
21   Q. Sorry. You're testifying that you --
22   A. There were two questions there.
23   Q. Is it your testimony today that you have been
24 the physician primarily responsible for the care and
25 treatment of a patient's psychiatric condition of