UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Vioxx | * | MDL Case No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| ***This document relates to*** | * | JUDGE FALLON |
| | * | |
| ***Jo Levitt v. Merck Sharp & Dohme Corp.***, | * | MAGISTRATE JUDGE |
| **2:06-cv-09757-EEF-DEK** | * | KNOWLES |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINIONS OF DAVID EGILMAN, M.D.

Plaintiff's opposition brief argues that Dr. David Egilman is qualified to opine about, among other things, pharmaceutical marketing and warnings. Plaintiff relies in part on "his course at Brown University," in which, she says, he "teaches specifically in the area of FDA drug-and [sic] medical advice related warnings and regulation." Opp'n 15. The course is called "Science and Power: A Bioethical Inquiry." *Id.* Its online description explains that it consists of "a semester-long discussion" about how "our deeply-held but historically-specific ideas about the family, nation, gender, money, race, the market, etc. affect how we conceptualize and attempt to solve health problems." *BIOL 6506: Science and Power: A Bioethical Inquiry*, Brown Univ. Alpert Med. Sch., http://tinyurl.com/brown-biol-6506. The topics covered include "the use of human research subjects, the corporate use and corruption of science, health and development, and the science of gender and reproduction." *Id.* Pharmaceutical marketing and warnings are not listed.

This demonstrates the problem with all of Dr. Egilman's testimony. On the surface, his credentials may appear sufficient. Opp'n 3–6. But closer examination reveals that his supposedly relevant experience has nothing to do with the opinions he offers. Dr. Egilman has

made a living out of attacking the pharmaceutical industry—especially Merck—in the capacity of a retained plaintiffs' expert.  See Opp'n 5.  But that does not qualify him to opine about cardiology, toxicology, molecular biology, neurology, psychiatry, prescription drug marketing, regulatory compliance, ethics, corporate state of mind, or the law.  Plaintiff points to "Dr. Egilman['s] testi[mony] as an expert in the very first Vioxx trial in Texas" as proof to the contrary, Opp'n 3, but she fails to mention that the Texas Court of Appeals in fact *rejected* that testimony as irrelevant.  See *Merck & Co. v. Ernst*, 296 S.W.3d 81, 96 (Tex. App. 2009).

Merck respectfully asks this Court, as other courts have, to put a stop to Dr. Egilman's charade.

**ARGUMENT**

**I.    DR. EGILMAN LACKS RELEVANT EXPERTISE ON SPECIALIZED MEDICAL MATTERS.**

To qualify as an expert, a witness must have formal education or "skill, experience, [or] training" in the subject matter on which he seeks to opine.  Fed. R. Evid. 702; *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).  Here, Dr. Egilman offers opinions about the relationship between Vioxx and several particular illnesses, including Alzheimer's disease, atherosclerosis, restenosis, and depression.  Lacking any specialized knowledge or experience with those diseases, Dr. Egilman is not qualified to discuss them.

**A.    Plaintiff Does Not Dispute That Dr. Egilman is Unqualified to Opine About Alzheimer's Disease, Dementia, Cognitive Impairment, Atherosclerosis, or Restenosis.**

Merck moved to disqualify Dr. Egilman from testifying about Alzheimer's disease, atherosclerosis, restenosis, dementia, and cognitive impairment.  Mot. 6–8, 9–10.  Plaintiff's opposition brief does not so much as mention the last four of those illnesses, much less refute Merck's arguments about Dr. Egilman's qualifications.  Any claim that he may testified about

2

these matters thus is waived.  *E.g.*, *Jones v. Jefferson Parish*, Civ. No. 12-2191, 2013 WL 871539, at *3 (E.D. La. Mar. 8, 2013).  And Plaintiff's opposition brief mentions Alzheimer's disease only to represent that Dr. Egilman will not express any medical opinions about it.  *See* Opp'n 10 n.9.  Merck asks this court to enter an order barring testimony from Dr. Egilman on these topics to avoid the need to litigate this issue again at a later time.

        **B.**        **Dr. Egilman is Not Qualified to Opine About Ms. Levitt's Psychiatric Health.**

Dr. Egilman is an internist who practiced family medicine.  Opp'n 14; *see* Egilman Levitt Dep. 60:20–21 (Mot. Ex. 4); Egilman Report ¶ 1 (Mot. Ex. 1).  He has no degree in psychology; no residency in psychiatry; and no board certification, original published research, or faculty appointments in either field.  *See* Mot. 6.  Still, he seeks to testify not only about Ms. Levitt's clinical depression and alleged cognitive decline, but also that Levitt's bypass surgery was the specific cause of her depression that ultimately resulted in the loss of her job.  *See* Egilman Suppl. Report 55–56 (Mot. Ex. 3).

Plaintiff claims that Dr. Egilman's "psychiatric training in medical school," "in [his] residency," and in "treat[ing] his own patients" qualifies him to offer these opinions.  Opp'n 11, 12.  That is incorrect.  Even if Dr. Egilman can *treat* depression, that does not mean he can testify as an expert witness about its *underlying cause*.  "[T]he ability to diagnose and to treat a disease is substantially different from the expertise required to assess its genesis to a reasonable degree of scientific certainty."  *Morin v. United States*, 534 F. Supp. 2d 1179, 1185 (D. Nev. 2005), *aff'd*, 244 F. App'x 142 (9th Cir. 2007); *see Cunningham v. Masterwear, Inc.*, Civ. No. 04-1616, 2007 WL 1164832, at *9–10 (S.D. Ind. Apr. 19, 2007); *Sutera v. Perrier Grp. of Am. Inc.*, 986 F. Supp. 655, 667 (D. Mass. 1997).

3

Plaintiff contends that Egilman's prior testimony about "the emotional impact of death and dying" demonstrates his expertise in psychiatry. *Id*. Dr. Egilman did not think so in his deposition:

> Q.     . . . .   Was it your understanding that you were being presented to the court as an expert in psychiatry in those cases where you talked about death and dying?
>
> A.     No. . . .

Egilman Levitt Dep. 219:13–17 . She adds that he "researched and studied the correlation between psychological effects such as depression and cardiac events." Opp'n 11–12.  Yet Dr. Egilman—who is neither a psychiatrist nor a cardiologist—has never performed "any original research in the area of psychiatry." Egilman Levitt Dep. 217:14–16. Nor does Dr. Egilman having asked past patients about psychiatric illness as "part of [his] history of every patient" demonstrate specialized knowledge. *Id.* at 218:11–12. A general practitioner may discuss a patient's family history of cancer, but that does not make him an expert in oncology.

Finally, Plaintiff suggests, Dr. Egilman should be allowed to opine on the psychological impact of cardiovascular events because he "provided" defense counsel "with a number of articles on the subject" at his deposition. Opp'n 11. That is one way to put it. Another is that Dr. Egilman dumped on Merck "more than three pounds" of psychological literature not cited in his report. *See* Egilman Levitt Dep. 222:2–18. The purpose of expert reports, of course, is to disclose "the basis and reasons" for an expert's opinions in a "complete and detailed" manner. Fed. R. Civ. P. 26(a)(2)(B)(i); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996). Plaintiff's argument, unfortunately, reflects an undisguised disregard for the rules of expert discovery.

In any event, merely identifying literature published by other authors does not satisfy the methodology requirements set forth by *Daubert*. "[L]isting numerous articles is hardly a

substitute for setting forth a reasoned, scientific analysis of how [an expert] drew [his] conclusions from the documents, literature, and studies cited." *Eggar v. Burlington N. R. Co.*, Civ. No. 89-159, 1991 WL 315487, at *6 (D. Mont. Dec. 18, 1991), *aff'd*, 29 F.3d 499 (9th Cir. 1994).  Dr. Egilman has not provided a reasoned analysis, much less linked it to the literature he provided.  *See* Egilman Suppl. Report 55–56.  His opinion on Ms. Levitt's psychiatric health, therefore, is inadmissible and should be excluded.

## II. DR. EGILMAN SHOULD NOT BE PERMITTED TO OPINE ABOUT AN ALLEGED ASSOCIATION BETWEEN VIOXX AND UNSTABLE ANGINA.

Dr. Egilman opines that Vioxx use is associated with unstable angina.  The Court should exclude this opinion for two reasons.  First, as discussed below, the analysis Dr. Egilman relies on—David Madigan's acute coronary syndrome ("ACS") meta-analysis—is not specific to unstable angina.  Second, Dr. Egilman cannot establish that Madigan produced his analysis using reliable scientific methodology.

### A. Acute Coronary Syndrome Is Not Unstable Angina.

In his deposition, Dr. Egilman discussed a statistical analysis performed by Madigan that compares the rates of acute coronary syndrome in patients taking Vioxx to those taking placebo.  According to Dr. Egilman, Madigan's analysis showed a statistically significant excess of ACS—not unstable angina—in Vioxx users.  Egilman Levitt Dep. 43:8–23.

ACS is an "umbrella" term comprised of three different cardiovascular injuries: unstable angina, myocardial infarction, and sudden cardiac death.  Opp'n 22; Egilman Levitt Dep. 121:2–4.  In this way, ACS mirrors a term like "fruit": there are apples, there are oranges, and there are bananas.

Imagine that we want to determine which of two competing grocery stores has the most apples.  Could we determine which store has the highest percentage of apples by looking at

which store has the most fruit? No, of course not. If we wanted to know who had the most *apples*, then we would need to look at the number of . . . ***apples***.

This is the problem with Madigan's meta-analysis (and Dr. Egilman's opinion based on it). If a person has experienced an injury that falls under the ACS umbrella, describing his injury as "ACS" says nothing about which particular injury the person had; just as looking at all fruits doesn't tell us about any particular *type* of fruit. An analysis of ACS does not speak to any particular ACS-subsumed injury.

The Fifth Circuit has made clear that statistical analyses like Madigan's must isolate the *particular* injury suffered by a plaintiff, not merely the umbrella category containing that injury. *See Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 585–86 (5th Cir. 2004); *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 195–98 (5th Cir. 1996). Notably, the Fifth Circuit isn't alone in criticizing attempts to measure particulars based on general categories as methodologically unsound. Dr. Egilman himself has stated that a "meta-analysis" focusing on multiple cardiovascular injuries "c[an]not detect risk in a specific [cardiovascular] subcategory." Egilman Report ¶ 196. So it is curious to say the least that Dr. Egilman, in this case, *directed* Madigan to obscure the analysis in exactly this way:

> Q. What end points did you include in what you asked Dr. Madigan to use for purposes of his metaanalysis?
>
> A. MI, sudden death and -- and unstable angina.

Egilman Dep. 46:14–17.

Plaintiff offers two justifications. *First*, Plaintiff asserts that "Merck's own studies never reported results for this injury alone." Opp'n 22–23. That is flatly incorrect. *Every* study reported unstable angina separately. *See, e.g.*, Kerr et al., *Rofecoxib and Cardiovascular Adverse Events in Adjuvant Treatment of Colorectal Cancer*, 357 New Eng. J. Med. 360, 365 (2007)

(reporting incidence of unstable angina in Merck's VICTOR clinical trial).  Indeed, Merck's expert Dr. Douglas Vaughan submitted a report, which Plaintiff received, that specifically lists the incidence of unstable angina for each Vioxx trial.  *See* Report of Douglas Vaughan, M.D. ¶ 83 (Jan. 19, 2016) (attached as Exhibit 1).

*Second*, Plaintiff contends that when Merck conducted the Vioxx clinical trials, it recorded data in a way that made it impossible to disaggregate unstable angina from other injuries that fall under ACS.  Specifically, Plaintiff's opposition brief stated that Merck "only recorded one cardiac outcome per patient."  Opp'n 23.  That too is incorrect.  The Standard Operating Procedure for Merck's trials instructed that an *event* only be reported once, not that only one *outcome* must be reported.  *See, e.g.*, MRK-S0420052338 (attached as Exhibit 2).  A patient might report to the hospital with chest pain and be recorded as experiencing unstable angina.  If that patient then experienced myocardial infarction after being admitted, an independent panel of adjudicators would determine whether that constituted one clinical event.  If so, then myocardial infarction was recorded.  If not, then both myocardial infarction *and* unstable angina were recorded.

In any event, it is Plaintiff's burden to show "there is an appropriate fit between the scientific testimony and the specific facts of the case."  *In re Vioxx Products Liab. Litig.*, 401 F. Supp. 2d 565, 573 (E.D. La. 2005); *see Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).  Dr. Egilman's opinion based on Madigan's analysis does not "fit" because it does not—nor was it designed to—show whether Vioxx use is associated with unstable angina, the outcome that Dr. Egilman agrees was Ms. Levitt's *actual* injury.  *See Burleson*, 393 F.3d at 585; *Allen*, 102 F.3d at 195.  Dr. Egilman's testimony about Madigan's analysis is not reliable

and should not be admitted.  *Vioxx*, 401 F. Supp. 2d at 573.  Not only does it not "fit" the facts of this case, it obscures them.

### B. There is No Foundation for Madigan's Meta-Analysis.

Federal Rule of Evidence 703 permits an expert to rely on "the kinds of facts or data" on which "experts in the particular field would reasonably rely on . . . in forming an opinion."  This has not been established with respect to Madigan's meta-analysis.  At his deposition, Dr. Egilman was unable to testify about the methodology Madigan used to produce the ACS meta-analysis.

- He could not remember the method or format by which the results were communicated to him.  *Id*. at 43:22–23.
- He could not produce any record to verify that the results in his one-page summary correctly summarized Madigan's findings.  *Id*. at 43:24–44:4.
- And he could not describe the design or statistical methodology used to perform the analysis, which was allegedly done at his direction.  *Id*. at 48:20–54:12.

Dr. Egilman cannot "be the mouthpiece of a scientist in a different specialty." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002); *see id.* at 612–16.  At least one court has excluded an expert for attempting to do almost exactly what Dr. Egilman seeks to do here. *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664–66 (S.D.N.Y. 2007).  Merck respectfully asks this Court to do the same.

### III. DR. EGILMAN'S OPINIONS ABOUT MERCK'S STATE OF MIND ARE NOT ADMISSIBLE.

The Fifth Circuit, like other federal courts, has taken a clear "stance that an expert's conclusory assertions regarding a defendant's state of mind are not helpful or admissible." *Marlin v. Moody Nat'l Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007) (citing *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992)); *see* Mot. 14–15 (collecting cases).  As Plaintiff's opposition brief makes clear, Dr. Egilman offers opinions on Merck's state of mind.  For

example, Dr. Egilman says that "Merck never disclosed that the label on [cardiovascular] risk underestimated the true risk. *This was intentional*." Opp'n 13 (emphasis added). "'[I]ntent' denotes [a] state of mind." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1933 (2016). Dr. Egilman says that "Merck *strategically* manipulated data *to give MI data the 'best face' possible*." Opp'n 13 (emphasis added). This is a statement of willfulness and purpose, both of which speak to state of mind. *See Halo Elecs.*, 136 S. Ct. at 1933 (willfulness); *United States v. Bailey*, 444 U.S. 394, 404–05 (1980) (purpose). Dr. Egilman says that some of Merck's interactions with the FDA "show[] an *active effort* not to comply with FDA requests for information." Opp'n 13 (emphasis added). This is a statement of intent. Dr. Egilman says that "[an] anti-warning is information that deliberately misrepresents dangerous products as safe *in order to contradict publically available evidence that a drug is harzardous*." Opp'n 13 (emphasis added). In the same paragraph quoted there, Dr. Egilman says that "Merck's [sic] *undertook a campaign to discredit or pay physicians* (to stop warnings) who had warned about Vioxx hazards." Egilman Report ¶ 17 (emphasis added). These are statements of intent and purpose. And Dr. Egilman says that "Merck was *aware* of nonclinical and clinical data linking increased incidences of cardiovascular events." Opp'n 13 (emphasis added). Awareness, also called knowledge, refers to a state of mind. *Black's Law Dictionary* 1003 (10th ed. 2014) (defining "knowledge"); *see Bailey*, 444 U.S. at 405.

Aside from claiming that none of these opinions relate to state of mind, Plaintiff's opposition grapples with only one of Merck's arguments. Dr. Egilman's statement that Merck was "aware" of certain adverse data, Plaintiff argues, is only "a simple statement of fact based on Merck's own internal documents" and an article in *The New England Journal of Medicine*. Opp'n Br. 13–14. Whether one accepts that characterization or not, Dr. Egilman is no more

9

qualified than the jurors to read documents and assess what Merck did or did not know.  Dr. Egilman's testimony would not be "helpful to the jury."  *Salas*, 980 F.2d at 305.

In the alternative, Plaintiff suggests, the Court should reserve ruling on this issue.  Opp'n 14.  Merck disagrees.  To be sure, this Court has before reserved ruling on *Daubert* motions seeking to exclude an expert's testimony about Merck's state of mind.  *See In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565, 587, 596 (E.D. La. 2005).  But the facts now differ from before in one key way:  this Court may not be trying Ms. Levitt's case should it reach that stage.  A decision to reserve ruling here will mean that, if Dr. Egilman does attempt to testify about Merck's state of mind, Merck will have to re-raise, re-brief, and re-argue this issue before a different court that has never considered the arguments, forfeiting the efficiencies that this process has been designed to advance.  That may very well disrupt the flow of trial, and undercuts the entire point of having pretrial procedures consolidated into an MDL, where a single judge brings efficiency and, in this instance, experience from many years of managing similar litigation.

## IV.  DR. EGILMAN'S ETHICS AND MARKETING OPINIONS ARE INADMISSIBLE.

Dr. Egilman offers opinions about Merck's corporate ethics and marketing related to Vioxx.  Both categories of opinions are inadmissible.  Egilman's ethics opinions stem from his own "personal views," so they actually "are not expert opinions."  *In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1053 (D. Minn. 2007); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543–44 (S.D.N.Y. 2004).  Moreover, Dr. Egilman also has no degree in marketing, no training in marketing, no professional license in marketing, and no work experience in marketing; he simply is not qualified to opine about marketing matters.

10

Plaintiff claims that "Dr. Egilman will not be opining regarding ethical standards." Opp'n 17.  But Dr. Egilman's expert report makes broad claims about Merck's violation of various "dut[ies]," "obligation[s]," and "corporate community public health and other standards."  Egilman Report ¶¶ 16, 17, 26.  It also makes claims that Merck's practices were "wrong."  *Id.* ¶ 102, 124.  Merck asks the Court to enter an order precluding this testimony, in accordance with Plaintiff's concessions about the limits of the opinions Dr. Egilman will offer at trial and to avoid the need to litigate this issue later.

As for marketing, Plaintiff argues that Dr. Egilman is fully qualified to opine about matters in that field because of his experience surrounding pharmaceutical warnings.  To start, it is unclear that Egilman has any experience concerning the *adequacy* of warnings.  His publications appear to relate mostly to the *history* of warnings and are based on his belief that "the corporate profit model" and "complex social and psychological factors" have corrupted the pharmaceutical industry.  Opp'n 15 & n.11; Opp'n Ex. D, at 201.  And, as noted above, his course entitled "Science and Power: A Bioethical Inquiry" does not pertain to the factual issues in this case.

More to the point, Dr. Egilman's marketing opinions do not relate to warnings at all.  They concern, among other things, Merck's "internal marketing atmosphere" and "marketing strategy," Egilman Report ¶¶ 201–04, its training of marketing representatives, *id.* ¶¶ 207–13, its interactions with non-Merck scientists, *id.* ¶¶ 217–19, and its use of market-research vendors, *id.* ¶¶ 220–22.  "[N]othing in" Dr. Egilman's "background shows specialization related to the kind of" marketing opinion "he attempts."  *Hathaway v. Bazany*, 507 F.3d 312, 318 n.2 (5th Cir. 2007).  (This explains why Dr. Egilman does not once mention any methodology he used to reach his marketing opinions.)

11

Plaintiff responds by citing two cases—each dealing with the same expert—that she believes demonstrate the admissibility of Egilman's marketing opinions.  They do not.  *In re DePuy Orthopaedics Hip Implant Litigation*, MDL No. 11-2244, 2014 WL 3557345, at *6 (N.D. Tex. July 18, 2014), involved an expert who merely "analyz[ed] scientific data and studies and compare[ed] them to [a medical-product manufacturer's] marketing."  Dr. Egilman goes further by opining on how Merck should have structured, managed, and trained its marketing department.  In the other case, *In re Yasmin & YAZ Products Liability Litigation*, MDL No. 09-2100, 2011 WL 6302287, at *5–7 (S.D. Ill. Dec. 16, 2011), the expert opined on how a company's marketing efforts would have affected physicians if the drug in fact posed a certain risk.  Again, Dr. Egilman's opinions far exceed these bounds and venture into areas that require actual marketing experience.  Dr. Egilman has none.  No case to Merck's knowledge permits someone without marketing experience to offer expert opinion on these kinds of matters.

**V.     DR. EGILMAN LACKS SUFFICIENT EXPERTISE TO SUPPORT HIS REGULATORY OPINIONS.**

In his report, Dr. Egilman opines that Merck violated FDA reporting obligations and "circumvent[ed] FDA marketing regulations."  Egilman Report ¶¶ 141, 177.  Dr. Egilman added at his deposition that, had Merck fully complied with FDA regulations, "it might have driven [the agency] to not approve [Vioxx] or . . . call for more study."  Egilman Levitt Dep. 263:1–3.  Dr. Egilman is not qualified to offer these opinions.  He has no apparent experience with FDA submissions, marketing regulations, or internal practice.  *See, e.g.*, *Rheinfrank v. Abbott Labs., Inc.*, 119 F. Supp. 3d 749, 773 (S.D. Ohio 2015); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 556–57 (S.D.N.Y. 2004).

Plaintiff's responses fall short.  She first argues that "courts admit expert testimony regarding companies' compliance with FDA regulations."  Opp'n 18.  Yes, of course.  Merck

itself has retained an expert on FDA regulations in this case.  The problem with Dr. Egilman is not that expert testimony on FDA regulations is generally inadmissible.  The problem is that he lacks the credentials to offer that testimony.  Indeed, in *all but one case* Plaintiff cites for the proposition that courts permit regulatory expert testimony, the admitted expert previously worked in high-level positions at the FDA.  *In re Mirena IUD Prods. Liab. Litig.*, Civ. No. 13-6586, ___ F. Supp. 3d ___, 2016 WL 890251, at *43 (S.D.N.Y. Mar. 8, 2016); *Wells v. Allergan, Inc.*, Civ. No. 12-973, 2013 WL 7208221, at *1 n.* (W.D. Okla. Feb. 4, 2013); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 190 (S.D.N.Y. 2009); *Pfizer Inc. v. Teva Pharm. USA, Inc.*, 461 F. Supp. 2d 271, 278 (D.N.J. 2006); *see* Expert Report of William B. Shultz, at 2, *Pfizer*, Civ. No. 04-754 (D.N.J. Oct. 6, 2006) (Rec. Doc. 58-6).  And in the outlier case, the regulatory expert, in her work as a senior regulatory officer at several pharmaceutical companies, was "responsible for . . . the securing of pre-marketing approvals for over 100 prescription drugs from the FDA, including the design, execution, and interpretation of pivotal preclinical and clinical trials.  She also directed all phases of interactions with the FDA relating to the prosecution of New Drug Applications."  *In re Yasmin & YAZ Prods. Liab. Litig.*, MDL No. 09-2100, 2011 WL 6302287, at *23 (S.D. Ill. Dec. 16, 2011).  Dr. Egilman has nowhere near this kind of expertise.

Plaintiff insists, however, that Dr. Egilman's background will suffice.  Yet the only regulatory experience she highlights is expert testimony on "FDA policy" in two state-court cases.  *See Vassallo v. Baxter Healthcare Corp.*, 696 N.E.2d 909 (Mass. 1998); *Keenan v. Parke-Davis Pharm.*, No. 84-1667 (R.I. Super. Ct.).  In *Vassallo*, Dr. Egilman did not serve as a regulatory expert, but rather as "the plaintiffs' epidemiological expert."  Opp'n 20 (quoting 696

N.E.2d at 917).  It is unclear what opinions Dr. Egilman gave in *Keennan*, but suffice it to say, testifying once about "FDA policy" does not a regulatory expert make.

Nor does Dr. Egilman's curriculum vitae reveal any further regulatory experience. Again, Dr. Egilman's medical-school course pertains to the sociology of the medical industry, not its regulatory regime.  And his "paper" on regulatory capture is in reality a one-column letter to the editor opining as to how the FDA can avoid an "imbalanced relationship" with the pharmaceutical industry.  *See* Egilman, Pressler & Valentin, *Avoiding the Regulatory Capture of the Food and Drug Administration*, 167 Arch. Intern. Med. 732–33 (2007).  Dr. Egilman does not qualify as a regulatory expert.

## VI. DR. EGILMAN'S LEGAL CONCLUSIONS ARE INADMISSIBLE.

"[A]n expert may never render conclusions of law."  *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009).  They may "offer[] an opinion relevant to applying a legal standard," but their role is "limited to describing sound professional standards and identifying departures from them."  *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013).

Dr. Egilman's opinions exceed these bounds.  He claims that Merck "misrepresented, concealed, suppressed, and omitted material facts regarding Vioxx's risks."  Egilman Report ¶ 24.  That states a claim of "intentional malice, trickery, or deceit," as required to sustain an award of punitive damages.  *Werremeyer v. K.C. Auto Salvage Co.*, 134 S.W.3d 633, 635 (Mo. 2004); *see, e.g.*, Compl., at 14 (Rec. Doc. 1) (seeking punitive damages).  Egilman also states that "Vioxx was defectively designed."  Egilman Report ¶ 25.  That reaches one ultimate legal conclusion in a strict products-liability lawsuit.  *Dorman v. Bridgestone/Firestone, Inc.*, 992 S.W.2d 231, 236 (Mo. Ct. App. 1999); *see* Compl. ¶¶ 38–42 (pleading a strict-liability claim). And Dr. Egilman says that "a reasonable pharmaceutical company" in Merck's position "would have withdrawn Vioxx from the market" earlier than Merck actually did.  Egilman Report

14

¶¶ 113, 135; *see id.* ¶ 22.  That applies the standard for the breach of the ordinary duty of care.  *O.L. v. R.L.*, 62 S.W.3d 469, 476 (Mo. Ct. App. 2001); *see* Compl. ¶¶ 44–47 (pleading a negligence claim).  All of this goes well beyond "describing sound professional standards and identifying departures from them," *Jimenez*, 732 F.3d at 721; Dr. Egilman is applying the ultimate legal standard to the facts.  He may not do that.

## CONCLUSION

For these reasons, Merck respectfully requests that the Court exclude Dr. David Egilman's opinions and testimony in their entirety.  Merck filed a proposed order with its initial motion.  Rec. Doc. 65390.

Dated:  August 10, 2016    Respectfully submitted,

By: /s/ *Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130
Phone: 504-581-3200
Fax:    504-581-3361

*Defendants' Liaison Counsel*

—and—

Douglas R. Marvin
M. Elaine Horn
Emily Renshaw Pistilli
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Phone: 202-434-5000
Fax:    202-434-5029

*Attorneys for Merck Sharp & Dohme Corp.*

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing Reply has been served on Liaison Counsel, Russ Herman, Ann B. Oldfather, and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 10th day of August, 2016.

                                        */s/ Dorothy H. Wimberly*
                                        Dorothy H. Wimberly, 18509
                                        STONE PIGMAN WALTHER
                                        WITTMANN L.L.C.
                                        546 Carondelet Street
                                        New Orleans, LA  70130
                                        Phone:  504-581-3200
                                        Fax:     504-581-3361
                                        dwimberly@stonepigman.com

                                        *Defendants' Liaison Counsel*