# Exhibit 2

C-2SI Vascular Events Monitoring and Adjudication SOP                    R17-Sep-03

Standard Operating Procedure for the Surveillance, Monitoring, and Adjudication
of Acute Thrombotic and Embolic Vascular Events and Deaths in Clinical Trials
of COX-2 Specific Inhibitors

Confidential Property of Merck & Co., Inc.

MRK-S0420052323

C-2SI Vascular Events Monitoring and Adjudication SOP                                        R17-Sep-03

# Table of Contents

**EXECUTIVE SUMMARY** ...........................................................................................................................1

**I.    INTRODUCTION AND PURPOSE**.............................................................................................3

**II.   BACKGROUND**.............................................................................................................................3

**III.  ADMINISTRATION**......................................................................................................................4

A.   MEMBERSHIP AND ROLE OF THE VASCULAR EVENT COMMITTEE ..........................................4
B.   THE MRL VASCULAR EVENT COORDINATING CENTER .............................................................5
C.   CLINICAL TRIALS COVERED BY THE STANDARD OPERATING PROCEDURES ............................6

**IV   METHODS**......................................................................................................................................6

A.   OVERVIEW OF APPROACH TO SURVEILLANCE, MONITORING, AND ADJUDICATION OF EVENTS.............6
B.   VASCULAR SERIOUS ADVERSE EVENT SURVEILLANCE...............................................................7
C.   ASSEMBLY OF DOCUMENTATION ...............................................................................................8
D.   SUBMISSION OF DATA TO THE MRL COORDINATING CENTER....................................................9
E.   DATA REQUIRED FOR CLINICAL EVENT EVALUATION.................................................................9
F.   RECEIPT OF DATA / DOCUMENTATION BY THE MRL VEC COORDINATING CENTER ...............10
G.   THE VASCULAR EVENT DATABASE .........................................................................................10
H.   MRL COORDINATING CENTER ASSEMBLY AND REVIEW OF THE VASCULAR EVENT DATA PACKAGE ...10
I.   LOGGING THE CONTENTS OF THE VASCULAR EVENT DATA PACKAGE ....................................11
J.   SHIPMENT OF THE VASCULAR EVENT DATA PACKAGES ...........................................................11
K.   CLASSIFICATION OF  EVENTS AND ADJUDICATION CRITERIA....................................................11
L.   DEFINITION OF VASCULAR EVENT DATE...................................................................................12
M.   MULTIPLE EVENTS IN ONE PATIENT..........................................................................................13
N.   TERM CHANGE ........................................................................................................................13
O.   PRELIMINARY VASCULAR EVENT ADJUDICATION.....................................................................13
P.   FINAL VASCULAR EVENT ADJUDICATION .................................................................................14
Q   RECEIPT OF ADDITIONAL INFORMATION FROM WPS&E OR INVESTIGATOR AFTER ADJUDICATION .......15
R.   BLINDING.................................................................................................................................16
S.   QUALITY CONTROL OF THE VASCULAR EVENT DATA BASE .....................................................16
T.   QUALITY ASSURANCE..............................................................................................................16
U   VASCULAR EVENTS FOR ANALYSIS...........................................................................................16

**REFERENCES** ........................................................................................................................................18

**APPENDIX A**..........................................................................................................................................19

VASCULAR EVENTS COMMITTEE MEMBERSHIP...............................................................................19

**APPENDIX B** ..........................................................................................................................................21

VASCULAR SAE TERMS (CRISP BROADER TERM) ..........................................................................21

**APPENDIX C**..........................................................................................................................................23

LIST OF CV TERMS (BASED ON MEDDRA) ELIGIBLE FOR ADJUDICATION ....................................23

**APPENDIX D**..........................................................................................................................................27

INVESTIGATOR CHECKLISTS ............................................................................................................27

**APPENDIX E**..........................................................................................................................................34

CLINICAL INVENTORIES ...................................................................................................................34

C-2SI Vascular Events Monitoring and Adjudication SOP                    R17-Sep-03

**APPENDIX F** ..................................................................................................................**38**

VASCULAR EVENT ADJUDICATION PACKAGE COVER .............................................................38

**APPENDIX G** .................................................................................................................**40**

ADJUDICATION WORKSHEETS ............................................................................................40

**APPENDIX H** .................................................................................................................**47**

ADJUDICATION GUIDELINES FOR CARDIAC EVENTS...............................................................47

**APPENDIX I**...................................................................................................................**52**

ADJUDICATION GUIDELINES FOR PERIPHERAL VASCULAR EVENTS ...........................................52

**APPENDIX J**...................................................................................................................**56**

ADJUDICATION GUIDELINES FOR CEREBROVASCULAR EVENTS..................................................56

**APPENDIX K** ................................................................................................................**61**

FINAL ADJUDICATION FORM..............................................................................................61

Confidential Property of Merck & Co., Inc.
\\USWSAP0100\VintzTempDir\aFD9.tmp.doc

C-2SI Vascular Events Monitoring and Adjudication SOP                    R17-Sep-03

## EXECUTIVE SUMMARY

This document describes a standard operating procedure (SOP) for the surveillance, monitoring, and adjudication of potential acute thrombotic and embolic vascular (cardiac, cerebrovascular, and peripheral vascular) events (hereafter referred to as vascular events) among patients in cyclooxygenase-2-specific inhibitor (C-2SI: MK-0966, MK-0663, and future compounds) trials and their extensions. It contains standard procedures to be used in all eligible trials for event surveillance, monitoring, documentation, and adjudication by a blinded, external, Vascular Event Committee (VEC). The purpose of this SOP is to provide standardized data for pooled analyses of the incidence of vascular events in patients treated with a C-2SI compound and of patients treated with one or more comparator agents. These procedures apply to all trials of MK-0966, MK-0663, and future C-2SI compounds which are of $\geq$4 weeks duration, and include all events occurring on treatment or within 14 days following the discontinuation of treatment. Depending on the pre-specified adjudication guidelines set forth in a given study's design, for some studies, events beyond 14 days may be included. The scope of this SOP includes trials and trial extensions conducted by MRL, CDP, and CDSP. Trials which are done in normal, healthy volunteers and post-marketing surveillance (PMS) studies, regardless of duration of the study, are excluded. This SOP is not restricted to specific indications.

This document also extends the SOP to include surveillance, monitoring, and adjudication of deaths, regardless of cause, among patients in cyclooxygenase-2-specific inhibitor (C-2SI: MK-0966, MK-0663, and future compounds) trials and their extensions to all eligible studies which began after, or are ongoing as of 01March2001. Deaths from all causes, not just potential vascular events, will be adjudicated by a blinded external Vascular Event Committee. The reason for the broadening of the scope of the SOP is to provide standardized data on the incidence of deaths from acute thrombotic or embolic vascular events including potential cases where the cause of death was reported by the investigator to be non-vascular in nature. The committee will determine whether each death is due to a thrombotic or embolic event and where the death is adjudicated as non-thromboembolic will adjudicate the cause of death or indicate that the cause of death is unknown. These procedures apply to all trials of MK-0966, MK-0663, and future C-2SI compounds which are of $\geq$4 weeks duration, and include all deaths occurring on treatment or within 14 days of discontinuation. Depending on the pre-specified adjudication guidelines set forth in a given study's design, all deaths or deaths that have eligible CV terms which occur more than 14 days after discontinuation may be adjudicated. Deaths between screening and randomization will be adjudicated if there is any possibility that blinded study therapy was administered. This applies to trials and trial extensions conducted by MRL, CDP, and CDSP. Trials which are done in normal, healthy volunteers and post-marketing surveillance (PMS) studies, regardless of the duration of the study, are excluded. This SOP is not restricted to specific indications.

The Vascular Event Committee (VEC) is composed of three separate subspecialty committees: one each for cardiac events, cerebrovascular events, and peripheral (pulmonary, abdominal/pelvic and extremities) vascular events. The members of the three committees are, respectively, cardiologists, neurologists, and vascular specialists who are expert in the treatment of ischemic syndromes as well as the medical aspects of clinical trials. Each subspecialty committee contains three active members. Adjudications are performed in a blinded manner using pre-specified event definitions and adjudication guidelines.

Confidential Property of Merck & Co., Inc.                                                    1
\\DSWSAPOI90\VintzTempDir\aFD9.tmp.doc

C-2SI Vascular Events Monitoring and Adjudication SOP                                R17-Sep-03

All deaths reported as potential vascular events and any deaths which appear (by virtue of meeting pre-specified criteria) to be cardiac, cerebrovascular, or peripheral vascular in nature, will be adjudicated by the appropriate subspecialty committee (cardiology, cerebrovascular, peripheral vascular). All deaths which were reported to be non-vascular in nature will be sent to the cardiology committee for adjudication.

The MRL Vascular Event Coordinating Center, within the Department of Epidemiology, is responsible for the overall administration of the SOP, using the following methods. Surveillance for vascular clinical events and all deaths (regardless of cause) is performed by continuous active review, by personnel within Worldwide Product Safety and Epidemiology (WPS&E), of the Worldwide Adverse Experience System (WAES) database of all serious cardiovascular SAE reports and all deaths for all eligible trials. WAES reports using pre-specified dictionary AE terms and all deaths are identified and listed for the VEC Liaison. After confirming that an event meets the eligibility criteria, the Coordinating Center logs the event into the Vascular Event Database, and a sequential case number is assigned.

The Clinical Monitor or other assigned member of the clinical team responsible for the trial is notified that the event is eligible for adjudication. The Clinical Monitor or designee brings the event to the attention of field personnel who request data and documentation from the investigator. The investigator completes the appropriate worksheets, and assembles supporting source documentation. The forms and documents are sent to the responsible clinical team member in MRL, CDP or CDSP who reviews the package for completeness and consistency and sends it to the Clinical Monitor, who again reviews the documentation package.

**Information received indicating a new, previously unreported SAE or additional information on a previously reported SAE obtained through this process will be submitted to WPS&E in full compliance with MAPP 13 procedures for SAE reporting**.

Following clinical review, the documentation is sent to the Coordinating Center. The Coordinating Center logs the receipt of the documentation, masks all patient identifiers, assembles a standard Vascular Event Data Package, and sends the package to the appropriate subspecialty committee for preliminary adjudication. The VEC members independently perform the preliminary adjudication. If the preliminary adjudication is not unanimous, the VEC members discuss the case to try to reach consensus. If consensus is not reached, final adjudication is by majority vote. The Coordinating Center enters the preliminary and final adjudications in a secure database, and maintains backup files and paper records in secure locations. The Coordinating Center is also responsible for quality control of the database and in some cases for providing data files for analysis. MRL Clinical Quality Assurance is responsible for quality assurance of the database.

Analyses will be performed on blocks of studies grouped according to study design, indication and the timing of their completion. In general, the objective of the statistical analyses are to estimate the incidence of vascular events in patients treated with a specific C-2SI compound and that of patients treated with comparator NSAIDs or placebo. For each such analysis, a data analysis plan (DAP) will be created or a DAP for a previous study or objectives will be used.

MRK-S0420052327

## I.    INTRODUCTION AND PURPOSE

This document describes a standard operating procedure (SOP) for the prospective surveillance, monitoring, and blinded adjudication of potential acute thrombotic or embolic vascular (cardiovascular, cerebrovascular, and peripheral vascular) events (vascular events) among patients in cyclooxygenase-2-specific inhibitor (C-2SI: MK-0966, MK-0663, and future compounds) trials and their extensions. It contains standard procedures to be used in all eligible trials. The purpose of this procedure is to provide standardized data for pooled analyses of the incidence of vascular events in patients treated with a C-2SI compound, and in patients treated with one or more comparator agents.

This document also extends the SOP to include surveillance, monitoring, and blinded adjudication of deaths among patients in C2SI trials and their extensions to all eligible studies which began after or are ongoing as of 01March2001. Deaths from all causes, not just potential vascular events, will be adjudicated by a blinded external Vascular Event Committee. The reason for broadening the scope of the SOP is to provide standardized data on the incidence of deaths from acute thrombotic or embolic vascular events including potential cases where the cause of death was reported by the investigator to be non-vascular in nature. The committee will determine whether each death is due to a thrombotic or embolic event and where the death is adjudicated as non-thromboembolic will adjudicate the cause of death or will indicate that the cause of death is unknown.

## II.    BACKGROUND

Merck's COX-2 specific agents efficiently suppress COX-2 activity, as measured in ex vivo assays of lipopolysaccharide (LPS)-induced leukocyte prostaglandin E2 production. In contrast to nonsteroidal anti-inflammatory drugs (NSAIDs), which are dual COX-1/COX-2 inhibitors, COX-2 specific inhibitors do not suppress serum levels of thromboxane B2 , a product of platelet-derived COX-1, and thus do not prolong platelet aggregation, as measured by bleeding time.

In MK-0966 Protocol 023 (A Double-Blind, Placebo-Controlled, Parallel-Group Study to Evaluate and Compare the Effects of L-748,731 [MK-0966], Indomethacin, and Placebo on Urinary Sodium Excretion and Other Parameters of Renal Function in Subjects Consuming a 200 mEq Sodium Diet), MK-0966 (50 mg daily), and indomethacin (50 mg 3 times daily) were both found to significantly reduce the urinary excretion of PGI-M compared to placebo. However, MK-0966 had no effect on systemic thromboxane production (largely platelet derived) as assessed by measurements of serum thromboxane B2 and the urinary metabolite, 11-dehydro-thromboxane B2. It was felt that the reduction in urinary PGI-M likely reflects both a reduction in renal PGI2 generation, as supported by an observed decrease in urinary 6-keto PFG1$\alpha$, and, to some undefinable extent, a decrease in systemic PGI2 synthesis.[1] PGI2 is synthesized ubiquitously in blood vessel walls from arachidonate derived from either the vessel wall or the platelet. It is the most potent of all inhibitors of platelet aggregation, and has vascular dilatory properties as well. Conversely, thromboxane A2, a potent platelet aggregator and vasoconstrictor, is synthesized primarily by the platelet.[2] The clinical implications of partially inhibiting the production of PGI2 without inhibiting thromboxane generation systemically are unknown. In general, oral administration of VIOXX has been safe and well-tolerated to date.

At the time this SOP was initiated (1998), clinical study data with the COX-2 inhibitor rofecoxib demonstrated no evidence for differences in investigator-reported thrombotic cardiovascular events between rofecoxib and the nonselective NSAIDs ibuprofen, diclofenac or nabumetone. Subsequent to the initiation of this SOP, one study demonstrated a significant difference between rofecoxib and its

Confidential Property of Merck & Co., Inc.                    3
\\JSWSAP010\VirtuTempDir\aFD9.tmp.doc

C-2SI Vascular Events Monitoring and Adjudication SOP                          R17-Sep-03

NSAID comparator (naproxen) in the risk of CV thrombotic events. [Bombardier et al. *N Engl J Med* 2000;343:1520-8]  A combined analysis of individual patient data was undertaken to determine whether there was an excess of CV thrombotic events in patients treated with rofecoxib compared with those treated with placebo or nonselective NSAIDs. [Konstam et al. *Circulation*. 2001;104:r15-r23]  This analysis, using data developed with this SOP, provided no evidence for an excess of CV events for rofecoxib relative to placebo.  It also reported the data alluded to above comparing rofecoxib to the non-naproxen NSAIDs that were studied. The authors concluded that differences observed between rofecoxib and naproxen were likely the result of the antiplatelet effects of the latter agent.  Subsequent rofecoxib studies and studied performed with etoricoxib have yielded similar data for a difference between COX-2 inhibitors and naproxen, but no discernible difference between COX-2 inhibitors and either placebo or the non-naproxen NSAIDs studied.

The purpose of this SOP is to continue to provide data to more precisely quantify thrombotic/embolic CV event rates for COX-2 inhibitors and comparators in Merck clinical trials.

## III.   ADMINISTRATION

### A.    *Membership and Role of the Vascular Event Committee*

The Vascular Event Committee (VEC) is composed of three separate subspecialty committees: one each for cardiac events, cerebrovascular events, and peripheral vascular events.  Fatal vascular events are adjudicated by the appropriate committee; all other deaths are adjudicated by the cardiology committee.  The members of the three subspecialty committees are, respectively, cardiologists, neurologists, and peripheral vascular specialists who are expert in the treatment of ischemic syndromes as well as the medical aspects of clinical trials.  The members of the VEC may not be employees of Merck & Co., Inc.  No member of the VEC may be an investigator for any of the clinical trials covered by this SOP or involved in the conduct of the studies in any capacity.  The current membership of the VEC is listed in **Appendix A**.

The total VEC membership consists of a minimum of nine members at all times, three for each subspecialty. Membership may change over time.   One of the three members from each subspecialty is designated Chair for that subspecialty committee.

The VEC members are responsible for:

- Reading and understanding the contents of the current version of this SOP
- Understanding and accepting the current clinical event definitions and adjudication guidelines contained in the SOP
- Suggesting changes to the clinical event definitions and/or adjudication guidelines contained in the SOP based on updated clinical guidelines from US or international professional organizations, changes in diagnostic tests, etc.
- Completion of the "Adjudication SOP Review and Acknowledgment Form"
- Identification of an assistant to facilitate communications with MRL
- Thorough review of all Vascular Event Data Packages in a timely manner (or communication that review will be delayed)
- Completion and return of the Preliminary Adjudication worksheet in a timely manner (or communication that preliminary adjudication will be delayed)
- Attendance at regularly scheduled teleconferences or meetings for the final adjudication of events and the conduct of committee business, as needed

MRK-S0420052329

C-2SI Vascular Events Monitoring and Adjudication SOP                    R17-Sep-03

In addition to the VEC Member responsibilities listed above, the VEC subspecialty chair is responsible for:

- The overall scientific integrity of the clinical event adjudication process (with assistance from the MRL Vascular Event Coordinating Center)
- The orderly conduct of teleconferences and meetings (with assistance from the MRL Vascular Event Coordinating Center)
- Mediation of disputes among members of the subspecialty committee concerning the evidence for a clinical event
- Signing the completed Final Clinical Event Adjudication Form, as representative for the subspecialty committee

### B.     The MRL Vascular Event Coordinating Center

The MRL Vascular Event Coordinating Center (hereafter referred to as the Coordinating Center), within the Department of Epidemiology, is responsible for the overall administration of the SOP. These responsibilities include:

- Participation in surveillance for vascular SAEs
- Requesting vascular event documentation from MRL clinical, CDP, or CDSP
- Tracking of the status of all events
- Receipt, logging, handling, and copying of clinical event documentation
- Review of clinical event documentation for completeness and requests for additional documentation as needed
- Preparation, distribution and tracking of event documentation
- Receipt and logging of preliminary and final adjudication data
- Scheduling and conduct of final adjudication meetings
- Creation and maintenance of a database with the results of the preliminary and final adjudications for each case
- Communications with the VEC Chairs and Members
- Communications with members of the COX-2 Product Development Team(s) on matters relating to the conduct of the SOP
- Submission of a copy of each adjudicated vascular event package to the relevant official regulatory file.
- Creation of data sets for statistical analyses

An MRL Epidemiologist serves as director of the Coordinating Center and Liaison to the VEC (hereafter referred to as the VEC Liaison). This person has overall responsibility for the functioning of the Coordinating Center. An Epidemiology Program Coordinator (hereafter referred to as the VEC Coordinator) assists the VEC Liaison and is responsible for the management of the administrative details of the procedures and the maintenance of the Vascular Events database. The VEC Coordinator also schedules, provides documentation for, and prepares minutes of all meetings.

Members of MRL Cardiovascular Clinical Research, Clinical Neurosciences, Immunology and Analgesia, and WPS&E serve as internal consultants to the Coordinating Center on an as needed basis.

MRK-S0420052330

C-2SI Vascular Events Monitoring and Adjudication SOP                                    R17-Sep-03

### C.    Clinical Trials Covered by the Standard Operating Procedures

These procedures for adjudication of vascular events, including vascular deaths, apply to all trials of MK-0966, MK-0663, and future C-2SI compounds which are of ≥4 weeks duration, and which began during 2Q98 or later. The procedures for adjudication of non-vascular deaths apply to all C-2SI trials which are ≥4 weeks duration, which began after or which were ongoing as of 01Mar2001. These procedures apply to trials and trial extensions conducted by MRL, CDP, and CDSP. Included trials are not restricted to specific indications. Trials which are done in normal, healthy volunteers and post-marketing surveillance (PMS) studies, regardless of duration of the study, are excluded. The determination as to which studies are pooled for analysis, and the timing of those analyses, will be addressed in Data Analysis Plans (found under separate cover).

## IV    METHODS

### A.    Overview of Approach to Surveillance, Monitoring, and Adjudication of Events

This section provides an overview of the approach to the surveillance, monitoring, and adjudication of events. The sections that follow provide the specifics of the process.

Surveillance for vascular events and deaths is performed by continuous active review of the WAES database for all serious vascular SAE reports and deaths from eligible trials. Surveillance for non-vascular deaths occurring prior to 01Mar2001 in eligible trials was performed by retrospective review of the WAES database. This review is performed by personnel within Worldwide Product Safety and Epidemiology (WPS&E). Completed reports of events using pre-specified dictionary AE terms and reports of all deaths are forwarded to the VEC Liaison. WAES reports are printed and patient and treatment identifiers masked by an Epidemiology staff member who is not associated with the adjudication process.

After confirming that an event meets the eligibility criteria, the event is logged into the vascular event database and a sequential case number is assigned. The VEC Coordinator notifies the Clinical Monitor (MRL & CDP or designee of the Clinical Monitor) or Medical Affairs Director (CDSP, hereafter referred to under the term Clinical Monitor) responsible for the trial that the event qualifies for adjudication. The monitor requests data and documentation from the investigator or brings it to the attention of a member of the field team who makes the request of the investigator. The investigator compiles the appropriate worksheets, requests medical records from hospitals or other medical providers, and assembles the supporting source documentation. The investigator also masks all patient identifiers before submitting the package. The forms and documents are sent to the Clinical Monitor (U.S. sites) or Local Medical Director (non-U.S. subsidiaries). For events at non-U.S. subsidiaries, the Local Medical Director arranges for translation of pertinent documents as necessary and sends completed documentation (including original language documents) to the Clinical Monitor for review. The Clinical Monitor reviews the completed documentation for consistency and completeness, completes and signs the VE Inventory and sends the VE data package to the Coordinating Center. If the package does not include all documents necessary for adjudication, further information is requested from the investigator before submitting the package to the Coordinating Center.

The Coordinating Center logs the receipt of the documentation, masks any patient identifiers that may have been missed, and reviews the package for completeness. If the package does not include all documents necessary for adjudication, the VEC coordinator informs the Clinical Monitor. If the package is complete, the VEC Coordinator assembles a standard Vascular Event

MRK-S0420052331

Data Package (VEDP). On a periodic basis, the VEDPs are sent for preliminary adjudication by the appropriate subcommittee. The VEC members independently perform the preliminary adjudications and return the completed adjudication forms to the Coordinating Center by fax or overnight courier. Final adjudication of each case is reached by majority vote during a meeting or teleconference in cases where the preliminary adjudications are not unanimous. The Coordinating Center enters the preliminary and final adjudications in a secure database, and maintains backup files and paper records in secure locations. The Coordinating Center also sends copies of the final adjudication forms to the committee chair for signature and copies the adjudication packages for submission to the WORF. The Coordinating Center constructs files for analysis and supplies them to BARDS as needed.

### B.   *Vascular Serious Adverse Event Surveillance*

**Identification of eligible vascular events:** Surveillance for serious vascular clinical events is performed by continuous active review of the WAES database for all serious cardiovascular AE reports of events occurring on therapy or within 14 days of discontinuation of study therapy from eligible trials. For some studies, events beyond 14 days of discontinuation of study therapy may be included. This will be specified in the protocol if applicable, and appropriate surveillance will support such protocol specific needs. This review is performed by personnel within Worldwide Product Safety and Epidemiology. Completed WAES reports of eligible events using selected dictionary terms are forwarded to the VEC Liaison on at least a weekly basis. All subsequent versions of a WAES report with an eligible term are sent to the VEC liaison to allow for identification of term changes, additional terms describing a single clinical event, additional clinical events, etc.

**Identification of deaths:** Surveillance for all deaths is performed by continuous active review of the WAES database for deaths from all causes in all eligible trials. This review is performed by personnel within WPS&E. Completed WAES reports of all deaths are forwarded to the VEC Liaison on at least a weekly basis.

**Eligible dictionary terms:** From 1998 until April 2002, CRISP preferred terms were used (Appendix B). The selected items were chosen in consultation with Clinical Neurosciences and Cardiovascular Clinical Research by review of cardiovascular conditions in the medical condition dictionary. The goal in selecting items was to define the broadest set of relevant terms in order to identify all potential vascular events of interest. Effective October 3, 1999, in consultation with Cardiovascular Clinical Sciences, a revised list of eligible events was put into effect (Appendix B).

Effective April 2002 when WPS&E converted to the Medical Dictionary for Regulatory Activities (MedDRA), MedDRA preferred terms have been used to determine eligible serious cardiovascular AE reports (Appendix C). MedDRA terms for inclusion were chosen by mapping the list of CRISP terms directly to MedDRA and reviewing the MedDRA dictionary for additional terms that were consistent with the existing terms. Additions, spelling changes, and deletions to Appendix C will be maintained with the date of the relevant change.

Periodically, it will be necessary to add additional MedDRA terms to the list of terms eligible for adjudication. This will be done using the following methods. If a newly identified term is synonymous with or extremely similar to an eligible MedDRA term, the new term will be added to the list of eligible terms without formal review. This decision will be made by the VEC

MRK-S0420052332

liaison in consultation with Clinical Research. Newly identified terms which are not equivalent to an eligible MedDRA term will be reviewed on a periodic basis (at least semiannually) by a committee consisting of representatives from epidemiology, clinical research (Immunology and Analgesia, Cardiovascular, and Clinical Neurosciences), Worldwide Product Safety and Epidemiology, and Regulatory liaison to determine whether they represent potential thrombotic or embolic events of interest. Additions to Appendix C will be maintained with the date of the relevant change. When terms are added to the list of eligible MedDRA terms after the date the term was implemented in MedDRA, a retrospective review for cases with the term will be performed for all protocols that are ongoing where feasible. If this is not done for a given protocol, a memo to the program files will document the decision and rationale. This might occur, for example, if a study lasts more than a few years and terms are added very late in the study or if a study is close to completion (e.g., close to Last Patient Out) when terms are added.

**Identification of events without eligible terms:** During the course of routine medical review of all SAEs, the Clinical Monitor for the trial will review each event and identify any reports that describe a potentially eligible event which may not be on the list of terms pre-specified as eligible for adjudication. In these cases, the blinded Clinical Monitor will confer with the investigator who reported the SAE to clarify the patient's clinical course and reportable adverse experiences. Based on thorough review and medical judgment, the Clinical Monitor (while still blinded to study therapy) may elect to consider the report eligible for adjudication even if the term(s) listed on the WAES report have not been pre-specified as eligible for adjudication. Additional consideration will be given to including this term in the updated list of eligible terms. If the term subsequently changes to an eligible term, the term will be changed in the data base; and the revised term will not result in creation of a separate event.

**Processing of WAES reports:** WAES reports are printed by an Epidemiology staff member who is not associated with the adjudication process. This person masks any patient identifiers that may have been missed as well as information pertaining to unblinding of therapy prior to forwarding the report to the VEC Liaison or VEC Coordinator. The VEC Liaison confirms that the event is eligible for adjudication based on the SAE terms and the timing of the event. All SAE's with eligible terms occurring on treatment or within 14 days following the discontinuation of treatment will be eligible for adjudication. For some studies, events occurring beyond 14 days may be included. If there is any question about the timing of an event relative to the discontinuation date, it is discussed with the Clinical Monitor responsible for the trial.

All deaths occurring on treatment or within 14 days of discontinuation will be eligible for adjudication regardless of cause. For some studies, all deaths or deaths that have eligible CV terms which occur more than 14 days after discontinuation will also be adjudicated. Deaths occurring between screening and randomization will be adjudicated if there is any possibility that blinded study therapy was administered.

All eligible events are logged into the vascular event database and a sequential case number is assigned. The VEC Coordinator notifies the Clinical Monitor or designee responsible for the trial that the event qualifies for adjudication. The dates of all major steps in the processing of each case are tracked in the vascular event database.

### C.    Assembly of Documentation

The flow of documentation requests and information varies depending on whether the trial is sponsored by MRL, CDP or CDSP, and whether the trial is U.S. based or non-U.S. based.

Confidential Property of Merck & Co., Inc.                                              8
%USWSAP0190\VirtuTempDir\aFD9.tmp.doc

MRK-S0420052333

The Clinical Monitor (or designee) reviews the event with the investigator or brings it to the attention of the appropriate field personnel who discusses the clinical evaluation and documentation of the event with the investigator. The Monitor may request that additional clinical evaluation be considered. He/she also requests that standard source data (e.g., medical records) be sought. The appropriate worksheets (from scheduled and unscheduled visits) and the documentation required to adjudicate the event is assembled (**Appendix D**). Standard instructions are supplied to sites and clinical teams for these procedures including a checklist indicating the supporting documentation needed for a particular type of event. The investigator should mask all patient identifiers before submitting the package. Once the appropriate or available documentation has been collected, the investigator sends the package to the Clinical Monitor (U.S. sites) or Local Medical Director (non-U.S. sites). The Local Medical Director has the critical documents translated if necessary, and reviews them for completeness and consistency, and forwards the original language documents as well as the translation to the responsible clinical team member in MRL, CDP, or CDSP. The package is reviewed for consistency and completeness and any deficiencies are brought to the attention of the investigator or subsidiary personnel for resolution. The package is then sent to the Clinical Monitor who again reviews the documentation for consistency and completeness. If the documentation is not complete, further information is requested from the investigator before submitting the package to the coordinating center.

**Information received indicating a new, previously unreported SAE or additional information on a previously reported SAE obtained through this process will be submitted to WPS&E in full compliance with MAPP 13 procedures for SAE reporting**.

### D. Submission of Data to the MRL Coordinating Center

Once the event documentation is complete, the Clinical Monitor completes and signs a Vascular Event Data Inventory sheet (**Appendix E**), and sends it with the documentation to the Coordinating Center.

### E. Data Required for Clinical Event Evaluation

All available relevant data and documentation of an event received by the Coordinating Center will be made available to the adjudicators. This will include, but not be limited to: standard worksheets for past medical history; concurrent medications; Serious Adverse Experience report (without administrative information); and source data/documentation (e.g. 12-lead ECG tracings, laboratory test results); clinical summaries (hospital admission histories and physical examinations, discharge summaries); reports of diagnostic tests (cardiac catheterizations, echocardiograms, stress tests, nuclear imaging, ECG monitoring, arteriograms, CT/MRI scans); diagnostic, consultative, and therapeutic reports; operative notes, progress notes; and any other pertinent source data/documentation supportive of the event (**Appendix D**).

For deaths, the documentation should also include death certificates, autopsy reports, and any other pertinent source data/documentation (e.g., ER reports, nursing home reports, investigator notes from conversations with the family).

If any key documents are not available, the investigator will be asked to document attempts to obtain the information and will provide a narrative summarizing what is known regarding the contents of the missing documents.

C-2SI Vascular Events Monitoring and Adjudication SOP                    R17-Sep-03

Non-relevant documentation that is received (e.g., hospital administrative forms, medication administration notes, reports from unrelated hospitalizations, etc.) will not be provided to the adjudicators, but will be maintained in the case file within the Coordinating Center.

All documentation sent to the Coordinating Center should have all patient identifiers removed.

### F.    Receipt of Data / Documentation by the MRL VEC Coordinating Center

Upon receipt of the documentation for an event, the VEC Coordinator logs receipt of the package into the Vascular Event database (VE Database).   An Epidemiology staff member not associated with the adjudication process masks any patient identifiers that may have been missed as well as any treatment information. Originals with masked information are copied and the original is destroyed.   The Vascular Event Data Inventory sheet and documentation are reviewed and inventoried by the VEC Coordinator, who also verifies that the documentation for each case appears to be complete.  If the package is not complete, the Clinical Monitor is asked to obtain additional information from the investigator.

### G.    The Vascular Event Database

The Vascular Event Database (VE database) is maintained as a secure ACCESS database,, and electronic back-ups are performed on a regular basis by both Research Information Systems and Epidemiology personnel.  Database entries are identified and linked by the VEC Case Number. Other identifiers are also entered for purposes of cross-referencing documents. Access to the database is restricted to key Coordinating Center personnel.  The database is one of the data sources for analyses.

### H.    MRL Coordinating Center Assembly and Review of the Vascular Event Data Package

The date that the Coordinating Center review of the VEDP begins is entered in the VE database. The documentation is assembled in a logical order as a Vascular Event Data Package (VEDP). All documents are labeled with the case number and sequentially page numbered.  The VEDP contains the following:

- Vascular Event Adjudication Package Cover (**Appendix F**) identifying the reported event (verbatim and broader terms), date of onset and documentation included in the package.

- The appropriate Vascular Event Adjudication Worksheet (**Appendix G**):
  - Cardiac Death/Vascular Event
  - Cerebrovascular Death/Vascular Event
  - Peripheral Vascular Death/Vascular Event

- Worldwide Serious Adverse Experience Report (excluding administrative and reporter information)

- Event Documentation Inventory Form (Cardiac, Cerebrovascular, or Peripheral Vascular)

- Investigator Documentation Request Form (Cardiac, Cerebrovascular, or Peripheral Vascular)

MRK-S0420052335

C-2SI Vascular Events Monitoring and Adjudication SOP                    R17-Sep-03

- Supportive worksheets

- Supportive source documentation (e.g., medical records) in a standard order

A masked copy of the VEDP is reviewed by the VEC Coordinator or Liaison for completeness and logical flow, and to ensure that the minimal documentation requirements for adjudication of the event are met. If the VEDP is, in the opinion of the reviewer, as complete as possible, it is prepared for distribution to the VEC. If the reviewer finds that the VEDP is not complete, a request for additional information will be sent to the Clinical Monitor or Medical Program Clinical Specialist.

In those cases where information is retrieved or clarified, the information is forwarded to the Coordinating Center. New information is inventoried and entered in the VEDP database. All new information is numbered with the Case Number and inserted into the existent VEC file. The updated case is reviewed again by the VEC Liaison. In those cases where the requested information is unavailable, the Clinical Monitor states this in writing and this information is logged and conveyed to the VEC Liaison. This information is also numbered and inserted into the existent VEC file. All copies of the VEDP are made from the masked copy.

### I.    *Logging the Contents of the Vascular Event Data Package*

The VEC coordinator enters information on the contents of the package into the Vascular Event database. This contains detailed information concerning the types of documents and number of pages in the package and indicates any documents that are not available and documents that will not be sent to the adjudicators.

### J.    *Shipment of the Vascular Event Data Packages*

The following procedures are followed for distribution of the VEDP for preliminary adjudication:

1.  Copies of the numbered, inventoried, reviewed (in-house), masked VEDP are made.

2.  A standard Adjudication Package Cover Sheet (**Appendix F**) and the appropriate Adjudication worksheet (**Appendix G**) are attached to the front of each VEDP.

3.  The contents of the VEDP are indicated on the cover sheet.

4.  On a periodic basis, but at least quarterly, all completed VEDPs are shipped by overnight courier, to the appropriate VEC subspecialty committee members. Committee members are asked to return the completed preliminary adjudication worksheets to the Coordinating Center via Fax.

5.  Shipping dates are tracked in the VE database.

### K.    *Classification of Events and Adjudication Criteria*

Events of interest for analysis are classified (and adjudicated by the designated subspecialty committee) according to the schema below. Guidelines for adjudication are defined in **Appendices H** (Cardiology Subcommittee events), **I** (Peripheral Vascular Subcommittee events) and **J** (Cerebrovascular Subcommittee events).

MRK-S0420052336

C-2SI Vascular Events Monitoring and Adjudication SOP                                        R17-Sep-03

**A. Coronary -** *Cardiology*

    1.  Acute MI (fatal or non-fatal)

        a.  Spontaneous

        b.  Secondary to an antecedent stressor (major surgery, GI bleed)

        c.  Complication of PTCA or coronary revascularization procedure

    2.  Unstable angina pectoris

    3.  Cardiac (atrial or ventricular) thrombus

    4.  Resuscitated cardiac arrest (without identified cause listed elsewhere)

    5.  Sudden or unexplained death

**B. Peripheral** (other than cardiac or cerebrovascula*r*) **vascular** – *Peripheral Vascular*

    1.  Pulmonary embolism (fatal or non-fatal)

        a.  Spontaneous

        b.  Secondary to an antecedent stressor

    2.  Peripheral venous thrombosis

        a.  Spontaneous

        b.  Secondary to an antecedent stressor

    3.  Peripheral arterial thrombosis/thromboembolism (fatal or non-fatal)

**C. Cerebrovascular** – *Cerebrovascular*

    1.  Ischemic cerebrovascular stroke (fatal or non-fatal) with adequate documentation to subclassify etiology as follows:

        a.  Large-artery atherosclerosis

        b.  Cardioembolism

        c.  Small-artery occlusion (lacune)

        d.  Other determined etiology

    2.  Ischemic cerebrovascular stroke (fatal or non-fatal) without adequate documentation to subclassify etiology

    3.  Hemorrhagic cerebrovascular stroke or hemorrhagic change (fatal or non-fatal)

    4.  Transient ischemic attack

    5.  Cerebrovascular venous thrombosis (fatal or non-fatal)

**D. Non-Thromboembolic event**

**E. Insufficient Data / Other reason unable to adjudicate**

The VEC Liaison will determine the categorization of an event for purposes of sending it to the appropriate subspecialty committee for adjudication. If necessary, the Clinical Monitor will be consulted regarding the appropriate committee. In cases where the appropriate subspecialty categorization is unclear, an ad hoc subcommittee consisting of members of two or more subspecialties may be asked to adjudicate the case.

*L.*    *Definition of Vascular Event Date*

For all events, the vascular event date is defined as the onset date as recorded on the WAES report. For deaths, the date of death is also recorded.

MRK-S0420052337

C-2SI Vascular Events Monitoring and Adjudication SOP                                R17-Sep-03

### M.     Multiple Events in One Patient

In the case of multiple eligible events reported in one patient, the VEC Liaison determines if the events comprise a single clinical event or represent separate clinical events. The Clinical Monitor may be consulted in making this determination. If the events are determined to be multiple separate clinical events (e.g., a myocardial infarction and a cerebrovascular accident during a single hospitalization or two myocardial infarctions a month apart), each event will be assigned a unique case number, and a separate VEDP will be sent to the appropriate subspecialty committee for each event. If the events are determined to represent a single clinical event (e.g., coronary artery disease, unstable angina, and a myocardial infarction all reported with onset dates within a one week period), the date of onset will be recorded as the onset date of the initial event as recorded on the WAES report. If an adjudicator disagrees with the original determination of an event as representing a single event or multiple clinical events, this is noted in the comments section of the adjudication worksheet. If a majority of the committee determines there is only one event, the events are combined in the database. If a majority of the committee determines that an event should be split into multiple events, an additional event is added to the database. During the course of a trial, an individual patient can have multiple cardiovascular events; however, each separate clinical event as determined by the appropriate adjudication committee will only be counted once for analysis.

### N.     Term Change

During the process of investigating and reporting on SAE's, changes in SAE terms occur. Once a WAES report has an eligible term, all subsequent versions of that report will be sent to Epidemiology for review regardless of whether the report contains any eligible terms. New versions of a WAES report are compared to prior versions to determine if there are any term changes, additional terms describing the same clinical event, or additional clinical events. A term change or an additional term for a previously reported clinical event will not result in creation of a new case.

If an event initially has an eligible term, but the term is changed to an ineligible term prior to adjudication, the Clinical Monitor is consulted to confirm that the event should now be considered "ineligible". If the Clinical Monitor still believes the event should be adjudicated, the event will remain eligible. If the term for an event is changed after adjudication, the original term is retained in the data base if the event was confirmed. If the event was not confirmed and the term is ineligible, the event is marked as ineligible. All correspondence and decisions pertaining to changes in terms is documented in the VE database.

### O.     Preliminary Vascular Event Adjudication

Each VEC subspecialty member reviews each VEDP independently. Each event is reviewed against the pre-specified Adjudication Guidelines for the specific type of event (**Appendices H, I, J**). The adjudicator will determine whether an event meets the criteria based on the supportive documentation. If the event does not fulfill all of the criteria but the clinical picture is strongly suggestive of an event of interest, the adjudicators may use good clinical judgment to confirm the event. The adjudicator will indicate whether an event was confirmed strictly by criteria or based on clinical judgment on the adjudication worksheet and will document the reasons for his/her decision.

MRK-S0420052338

C-2SI Vascular Events Monitoring and Adjudication SOP                         R17-Sep-03

If the reviewer has no questions, he/she completes the Adjudication Worksheet and returns it to the Coordinating Center in the pre-addressed overnight courier envelope or by Fax. The date the VEC receives the completed, signed Adjudication Worksheet is entered in the Vascular Event database.

If the reviewer has questions or requires additional information, he/she may indicate the additional information that is required in the Comments section of the Adjudication worksheet. The VEC Coordinator attempts to answer the questions or supply additional information, with the help of the Clinical Monitor, as needed. If relevant additional information is identified, the VEC Members are notified and the additional information is sent to each member for addition to the VEDP. The dates of these occurrences are entered in the Vascular Event Database.

If a subspecialty committee decides that the event is not appropriate for their adjudication this is communicated to the Coordinating Center, and the preliminary adjudications may be directed to another subspecialty committee, or an ad hoc committee may be formed from existing members of the various subcommittees to adjudicate the case.

The results from the adjudication worksheets (as noted by each VEC member) are entered by the VEC Coordinator into the Vascular Events Database. The original, completed Adjudication worksheets are filed in a secure file cabinet.

### P.    *Final Vascular Event Adjudication*

Final adjudication of events occurs by teleconference or in face-to-face meetings. All cases undergo final adjudication with all three subspecialty VEC Members present. The VEC Liaison and the VEC Coordinator are also present, but do not participate in the adjudication of events. All VEC members are supplied, if necessary with packages for each case undergoing final adjudication. Final adjudication occurs with all personnel involved (including MRL CC staff) blinded to the treatment allocations of the patients.

For each case to be adjudicated, the following steps occur:

- The VEC Liaison reads the tally of the preliminary adjudication votes.

- If the preliminary vote was unanimous, the VEC Liaison indicates this fact to the VEC members. The VEC members' acceptance of the decision is recorded in the minutes, and the VEC Coordinator prepares the Final Adjudication Form (**Appendix K**) for the subspecialty VEC Chair's Signature.

- If the preliminary vote was not unanimous, the VEC Liaison reads the vote tally to the VEC members. The subspecialty VEC Chair leads a discussion to reach final adjudication. When final adjudication is reached (by majority ruling) the VEC Liaison reads the Final Adjudication to the VEC members. The VEC members' acceptance of the decision is recorded in the minutes, and the VEC Coordinator prepares the Final Adjudication Form for the subspecialty VEC Chair's Signature.

- A decision is made as to whether the adjudication of the event was confirmed by guidelines or was based on clinical judgment. This is indicated on the final adjudication form. The rationale for a decision based on good clinical judgment is also indicated on the final adjudication form.

MRK-S0420052339

C-2SI Vascular Events Monitoring and Adjudication SOP                    R17-Sep-03

- If the committee determines that the event is not a thrombotic or embolic event (does not fit the guidelines for any of the vascular events defined in Section K above), the event will be classified in the "Non-thromboembolic event" category. The rationale for the decision to adjudicate a case as non-thromboembolic is recorded on the final adjudication form.

- If the committee determines that additional information is needed to adjudicate a case, the case will be deferred until the information is obtained. If all available information has been provided to the committee and they are unable to determine whether the event is thrombotic or embolic (e.g., where the work-up was inadequate or the patient died outside of a medical facility and no autopsy was performed), the event can be adjudicated as "insufficient data".

- In the case of all deaths, a determination is made as to whether the event is an APTC endpoint. The end point as defined by The Antiplatelet Trialists' Collaboration (APTC) consists of the combined incidence of 1) CV, hemorrhagic, and unknown cause of death; 2) nonfatal MI; and 3) nonfatal stroke.[3, 4] This end point was chosen for this analysis because it is the most common and widely accepted end point used in quantifying the overall CV impact of anti-thrombotic compounds in clinical trials. This is recorded on the final adjudication from. Table 1 below defines which events are included in the APTC endpoint.

- In the case of non-thromboembolic deaths, the committee will indicate their judgment as to the cause of death or indicate that the cause of death is unknown..

After the meeting or teleconference, the final adjudication data are entered by the VEC Coordinator into the Vascular Events Database. In some cases, the final adjudication data are also entered into CTS. The completed Final Adjudication forms are generated by the VEC Coordinator from the database and sent by overnight courier to the subspecialty VEC Chair for signature. The signed, dated forms are returned via overnight courier (the VEC Coordinator provides a self-addressed Federal Express package to the subspecialty VEC Chair). If the chair notes any discrepancies between the decisions at the meeting/teleconference and the final adjudication forms, these are brought to the VEC Coordinator's attention, corrected in the database, and a new form is generated for signature by the VEC Chair.

The original, completed Final Adjudication Form, signed and dated by the subspecialty committee chairmen is sent with a copy of the adjudication package, and a cover sheet to RIBL for date stamping and scanning for possible inclusion in regulatory submissions, The date the adjudication package is sent to RIBL is recorded in the VE database. The original Final Adjudication form and cover sheet will be forwarded to the WORF. Copies of the complete package including a copy of the final adjudication form will be securely retained in the Coordinating Center.

### Q.    *Receipt of additional information from WPS&E or Investigator after Adjudication*

If additional information is received from WPS&E or the investigator site after an event has been adjudicated, the new information is reviewed by the VEC coordinator and/or VEC liaison to determine its potential impact on the adjudication. If the new information would not have any impact on the adjudication (e.g., change in date that does not effect event eligibility, change in concomitant medication, information added to the WAES report that was available in the medical

MRK-S0420052340

records), the new information is filed with the case with a memo to file indicating that the event does not need to be readjudicated. If the new information could impact the adjudication, the new information is added to the VEDP and the entire package is re-sent to the committee members for adjudication, and the new adjudication results supersede the old results. If there is any question regarding whether an event should be readjudicated, the issue is discussed with the committee chair.

### R.    Blinding

Not all adjudications will occur prior to the end of the study (Frozen file date) from which the event was reported. However, the VEC, the MRL Vascular Coordinating Center, and the MRL Quality Assurance auditors will remain blinded to the treatment allocations of all the patients whose events are being adjudicated. Every effort will be made to get packages for all events assembled and submitted to the Vascular Event Coordinating Center prior to frozen file. If a package must be assembled after frozen file, assembly and review of the package must be done by blinded personnel in clinical. All patient and treatment identifiers are masked on the WAES report by an Epidemiology staff member who is not associated with the adjudication process. All copies of the WAES report are made from the original masked copy. The responsible statistician(s) will not have access to the adjudication data until after the Vascular Events Database is declared clean and frozen for a given analysis. At no time does the vascular event database include treatment assignment.

### S.    Quality Control of the Vascular Event Data Base

Review and clean-up of the VEC Adjudication Results database is done by the VEC Coordinator. Data from the completed Adjudication Worksheets and Final Adjudication Forms is compared to the Vascular Events Database. This is done for each vascular event prior to a clean file date established for the analysis containing that event. A record of errors discovered and corrections made during data review and clean-up is kept.

Discrepancies between the WAES database and the final adjudication decisions are not reconciled. Final adjudication decisions are also not reconciled with CTS SAE terms. Reports will provide listings of the original WAES report terms and the final adjudication decisions on a patient-by-patient basis.

### T.    Quality Assurance

In the case of a regulatory submission of the data, QA will be provided by Worldwide Clinical Quality Assurance Resources (WCQAR). This will be accomplished by comparison of the final adjudication of the event as recorded in the data file prepared for statistical analysis with the final adjudication forms maintained in the Worldwide Official Regulatory File (WORF). Audit findings will be resolved and changes applied to the data file as necessary.

### U.    Vascular Events for Analysis

The two primary endpoints of interest for analysis are confirmed thrombotic cardiovascular events and APTC endpoints. The specific adjudication categories included in each endpoint are provided in the table below.

In addition, the various individual events may be combined in various ways to explore areas of particular interest, as described in Data Analysis Plans (under separate cover).

MRK-S0420052341

C-2SI Vascular Events Monitoring and Adjudication SOP                          R17-Sep-03

Serious Adverse Events Included in the Thrombotic Cardiovascular
Serious Adverse Experience and APTC[†] Combined Endpoints

| Adjudication Committee Categories for Cardiovascular Events | Thrombotic Cardiovascular Event | APTC[†] Combined Endpoint |
|---|---|---|
| **_Thrombotic Events_** | | |
| **Cardiac Events** | | |
| Acute MI | √ | √ |
| Fatal Acute MI | √ | √ |
| Unstable Angina Pectoris | √ | |
| Sudden and/or Unexplained Death† | √ | √ |
| Resuscitated Cardiac Arrest | √ | √ |
| Cardiac Thrombus | √ | |
| **Peripheral Vascular Events** | | |
| Pulmonary Embolism | √ | |
| Fatal Pulmonary Embolism | √ | |
| Peripheral Arterial Thrombosis | √ | |
| Fatal Peripheral Arterial Thrombosis | √ | √ |
| Peripheral Venous Thrombosis | √ | |
| **Cerebrovascular Events** | | |
| Ischemic Cerebrovascular Stroke | √ | √ |
| Fatal Ischemic Cerebrovascular Stroke | √ | √ |
| Cerebrovascular Venous Thrombosis | √ | |
| Fatal Cerebrovascular Venous Thrombosis | √ | √ |
| Transient Ischemic Attack | √ | |
| **_Other Events_** | | |
| Hemorrhagic Cerebrovascular Stroke | | √ |
| Fatal Hemorrhagic Cerebrovascular Stroke | | √ |
| Fatal GI Hemorrhage | | √ |
| Fatal Vascular Rupture | | √ |
| Other Fatal Hemorrhagic Events[§] | | √ |
| Unknown Cause of Death‡ | | √ |
| [†] APTC = Antiplatelet Trialists' Collaboration.. | | |

†-Sudden and/or unexplained death is defined as witnessed instantaneous or near-instantaneous death that occurs without warning or within one hour of non-diagnostic symptoms, or as an unwitnessed, unexpected death in which criteria for a fatal coronary or cerebrovascular event are not met.

‡Unknown cause of death is defined as a death that is judged to be non-thromboembolic, but where a specific cause of death cannot be determined from the available documentation.

§Based on additional clarification of the APTC endpoint definition received from the Antiplatelet Trialists' Collaboration coordinating center at Oxford on October 16, 2003, one change has been made to the APTC definition for all studies governed by this SOP that have not

MRK-S0420052342

C-2SI Vascular Events Monitoring and Adjudication SOP                                 R17-Sep-03

yet reached frozen file as of that date: hemorrhagic deaths which are documented to have been due to trauma or are post-surgical will not be included as APTC endpoints.

### V. *Statistical Analysis*

Data will be abstracted from the vascular event data base or CTS for analysis. Final determination of whether an event occurred on study drug or within 14 days of discontinuation (or within the appropriate time window for a particular study) will be based on the prime therapy dates in CTS.

Analysis will be performed on blocks of studies grouped according to study design, indication, and the timing of their completion. In general, the objectives of the statistical analyses are to estimate the incidence of vascular events in patients treated with a specific C-2SI compound and that of patients treated with comparator NSAIDs or Placebo. For each such analysis, a Data Analysis Plan (DAP) will be created or a DAP for a similar previous study or objective(s) will be employed.

### REFERENCES

1.  Draft CSR for MK-0966 Protocol 023 (A Double-Blind, Placebo-Controlled, Parallel-Group Study to Evaluate and Compare the Effects of L-748,731 [MK-0966], Indomethacin, and Placebo on Urinary Sodium Excretion and Other Parameters of Renal Function in Subjects Consuming a 200 mEq Sodium Diet).

2.  Merck Manual. Section 22. Clinical Pharmacology, Chapter 285. Prostaglandins, Thromboxanes, And Leukotrienes: Biologic Actions, Hematologic Effects.

3.  Antiplatelet Trialists' Collaboration. Collaborative overview of randomized trials of antiplatelet therapy, I: prevention of death, myocardial infarction, and stroke by prolonged antiplatelet therapy in various categories of patients. *BMJ*. 1994;308:81–106.

4.  Antiplatelet Trialists' Collaboration. Secondary prevention of vascular disease by prolonged antiplatelet treatment. *BMJ*. 1998;296:320 –331.

MRK-S0420052343

C-2SI Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

# Appendix A

## Vascular Events Committee Membership
### As of January 5, 1999

### CARDIOLOGY VASCULAR EVENTS SUBCOMMITTEE
**GEORGE W. VETROVEC, M.D - CHAIR.**
Chairman, Division of Cardiology
Medical College of Virginia
Richmond, VA

**BERNARD R. CHAITMAN, M.D.**
Director of Cardiology
Professor of Medicine
Division of Cardiology
St. Louis University School of Medicine
St. Louis, MO

**LEONARD S. DREIFUS, M.D.**
Professor of Medicine
University of S. Florida, Tampa
Heathrow, FL

### PERIPHERAL VASCULAR EVENTS SUBCOMMITTEE
**THOM ROOKE, M.D. - CHAIR**
Associate Professor of Medicine
Department of Vascular Medicine
Mayo Clinic
Rochester, MN

**JEFFREY GINSBERG, M.D.**
Professor
Department of Medicine
Thromboembolism Unit
McMaster University
Hamilton, Ontario

**CLIVE KEARON, PHD, FRCP**
Associate Professor of Medicine
Thrombosis and Respiratory Medicine
McMaster University Clinic
Henderson General Hospital
Hamilton, Ontario, Canada

Confidential Property of Merck & Co., Inc.                    19
\\DSWSAP0190\Vista\Temp\Dir\aFD9.tmp.doc

C-2SI Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

## Vascular Events Committee Membership (cont).

### CEREBROVASCULAR EVENTS SUBCOMMITTEE
**JUSTIN A. ZIVIN, M.D. - CHAIR**
Professor
Department of Neurosciences
UCSD School of Medicine
La Jolla, CA

**JAY P. MOHR, M.D.**
Sciarra Professor of Neurology
Director of Stroke Center
Neurologic Institute
Department of Neurology
Columbia University College of Physicians and Surgeons
New York, NY 10032

**HAROLD P. ADAMS, M.D.**
Division of Cerebrovascular Medicine
Department of Neurology
University of Iowa
Iowa City, IA 52242

MRK-S0420052345

C-2SI Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

## Appendix B

## Vascular SAE Terms (CRISP Broader Term)

### Eligible for Case Adjudication

Vascular SAE Terms which are no longer eligible for case adjudication are marked in strikethrough font. For additions and deletions to the list, the date of the change is indicated after the SAE term.

acute myocardial infarction
angina pectoris
anterior spinal artery obstruction
~~aortic atherosclerosis~~ 3Oct1999
~~aortic disorder~~ 3Oct1999
aortoiliac obstruction
arterial embolism
arterial occlusion
arterial thrombosis
~~asystole~~ 3Oct1999
~~atherosclerosis~~ 3Oct1999
~~atrial fibrillation~~ 3Oct1999
~~atrial flutter~~ 3Oct1999
basilar artery obstruction
brachial artery occlusion
~~bundle branch block~~ 3Oct1999
~~cardiac aneurysm~~ 3Oct1999
cardiac arrest
cardiac catheter complication
~~cardiac dyskinesia~~ 3Oct1999
~~cardiac output low~~ 3Oct1999
cardiac stress test abnormality
cardiac thrombosis
cardiogenic shock
~~cardiomyopathy~~ 3Oct1999
cardiovascular disorder
cardiovascular hemodynamics abnormality
carotid artery disorder
carotid artery obstruction
cerebellar artery obstruction
cerebellar hemorrhage
cerebral artery obstruction
cerebral atherosclerosis
cerebral hypoxia
cerebral infarction
cerebral ischemia
cerebral thrombosis
cerebrovascular accident
cerebrovascular disorder

~~congestive heart failure~~ 3Oct1999
~~cor pulmonale~~ 3Oct1999
coronary artery disease
coronary artery occlusion
coronary artery stenosis
coronary vasospasm
coronary vessel surgery complication
cyanosis
deep venous thrombosis
electrocardiographic abnormality
~~electromechanical dissociation~~ 3Oct1999
embolic stroke
embolism
endocardial disorder
endocardial thrombus
extracranial artery obstruction
extradural hemorrhage
femoral artery occlusion
gangrene
~~idioventricular rhythm~~ 3Oct1999
iliac artery occlusion
~~incomplete left bundle branch block~~ 3Oct99
intermittent claudication
intracranial hemorrhage
intracranial venous sinus phlebitis
ischemic heart disease
lacunar infarction
~~left bundle branch block~~ 3Oct1999
lower extremity arterial occlusion
lower extremity ischemia
myocardial infarction
myocardial infarction complication
myocardial reinfarction
myocardial rupture
non-Q-wave myocardial infarction
nonspecific ST-T change
old myocardial infarction
papillary muscle disorder
~~peripheral atherosclerosis~~ 3Oct1999-

MRK-S0420052346

C-2SI Vascular Events Monitoring and Adjudication SOP                    30-Aug-1999

peripheral ischemia
peripheral pulse absent
peripheral pulse decreased
peripheral vascular disorder
popliteal artery occlusion
~~pulmonary edema~~ 3Oct1999
pulmonary embolism
pulmonary infarction
pulmonary thrombosis
pulmonary vascular disease
pulmonary veno-occlusive disease
pulse absent
Q-wave abnormality
Q-wave myocardial infarction
QRS complex abnormality
shock
sinus thrombosis
small vessel disease
ST segment abnormality
ST segment depression
ST segment elevation
ST-T change compatible with ischemia
subclavian steal syndrome
sudden death
superior vena cava thrombosis
T-wave abnormality
T-wave flat
T-wave inversion
thromboembolic stroke

thromboembolism
thrombolysis
thrombophlebitis
thrombophlebitis migrans
thrombosis
thrombotic microangiopathy
transient ischemic attack
ulnar artery occlusion
unstable angina
upper extremity arterial occlusion
upper extremity ischemia
~~varicosity~~ 3Oct1999
vascular disorder
vascular graft occlusion
vascular insufficiency
vascular occlusion
vasospasm
venous compression
venous disorder
~~venous insufficiency~~ 3Oct1999
venous occlusion
venous thrombosis
ventricular fibrillation
ventricular flutter
ventricular tachycardia
ventricular thrombus
vertebral artery obstruction
vertebrobasilar insufficiency

Confidential Property of Merck & Co., Inc.
\\USWSAP0190\VintaTempDir\afD9.tmp.doc                                          22

*C-2SI Vascular Event Surveillance and Adjudication*                    R-28Jan04

**Appendix C**

# List of CV Terms (based on MedDRA) Eligible for Adjudication

Acute coronary syndrome
Acute myocardial infarction
Age indeterminate myocardial infarction
Amaurosis (1/04)
Amaurosis fugax (1/04)
Angina pectoris
~~Angina pectoris aggravated~~ (1/04)
Angina unstable
Angiopathy (11/03)
Anterior spinal artery syndrome
Aortic artery blockage
Aortic embolus
Aortic occlusion (11/03)
Aortic thrombosis
Arterial embolism limb
~~Arterial embolism NOS~~ (11/03)
Arterial insufficiency (11/03)
~~Arterial occlusion~~ (12/02) (1/04)
~~Arterial occlusion NOS~~ (12/02)
Arterial occlusive disease (1/04)
Arterial thrombosis limb
~~Arterial thrombosis NOS~~ (11/03)
Arterial thrombosis (11/03)
Arteriospasm coronary (1/03)
Arteriovenous fistula occlusion (11/03)
Arteriovenous fistula thrombosis (12/02)
~~Arterio-venous fistula thrombosis~~ (12/02)
Arteriovenous graft thrombosis (11/03)
Atherosclerosis (10/03)
Atherosclerosis obliterans
Atrial thrombosis
Axillary vein thrombosis
Basilar artery occlusion
~~Blood creatine phosphokinase abnormal NOS~~ (9/03) (11/03)
Blood creatine phosphokinase abnormal (11/03)
Blood creatine phosphokinase increased (9/03)
~~Blood creatine phosphokinase MB abnormal NOS~~ (9/03) (11/03)
Blood creatine phosphokinase MB abnormal (11/03)
Blood creatine phosphokinase MB increased (8/02)
Brain hypoxia

Brain stem haemorrhage
Brain stem infarction
Brain stem ischaemia
Brain stem thrombosis (11/03)
Cardiac arrest
Cardiac death (9/03)
~~Cardiac disorder NOS~~ (11/03)
Cardiac disorder (11/03)
Cardiac enzymes increased (9/03)
~~Cardiac fibrillation NOS~~ (11/03)
Cardiac fibrillation (11/03)
Cardiac stress test abnormal
Cardiac ventricular thrombosis
Cardiogenic shock
Cardio-respiratory arrest
~~Cardiovascular disorder NOS~~ (11/03)
Cardiovascular disorder (11/03)
Carotid aneurysm rupture
Carotid arterial embolus
Carotid artery atheroma (8/03)
~~Carotid artery disease NOS~~ (11/03)
Carotid artery disease (11/03)
Carotid artery occlusion
Carotid artery stenosis
Carotid artery thrombosis
Catheter related complication
Cerebellar artery occlusion
Cerebellar artery thrombosis
Cerebellar haemorrhage
Cerebellar infarction
Cerebral arteriovenous malformation haemorrhagic (12/02)
~~Cerebral arteriovenous malformation hemorrhagic~~ (12/02)
Cerebral artery embolism
Cerebral artery occlusion
Cerebral artery thrombosis
Cerebral atherosclerosis
Cerebral circulatory failure
Cerebral haematoma
Cerebral haemorrhage
Cerebral infarction
Cerebral ischaemia
Cerebral perfusion pressure decreased
~~Cerebral thrombosis NOS~~ (11/03)
Cerebral thrombosis (11/03)

Merck & Co., Inc. Whitehouse Station, New Jersey, USA

MRK-S0420052348

*C-2SI Vascular Event Surveillance and Adjudication*                                R 28Jan04

Cerebral venous thrombosis
Cerebrovascular accident
~~Cerebrovascular disorder NOS~~ (11/03)
Cerebrovascular disorder (11/03)
Cerebrovascular insufficiency (11/03)
Chordae tendinae rupture
Circulatory collapse (11/03)
Coronary artery atherosclerosis (2/03)
~~Coronary artery disease NOS~~ (11/03)
Coronary artery disease (11/03)
Coronary artery embolism
Coronary artery insufficiency
Coronary artery occlusion
Coronary artery stenosis
Coronary artery thrombosis
Coronary bypass thrombosis (11/03)
~~Cyanosis NOS~~ (11/03)
Cyanosis (11/03)
~~Cyanosis peripheral~~ (11/03)
~~Death NOS~~ (9/03) (11/03)
Death (11/03)
Death unexplained (9/03)
Deep vein thrombosis (12/02)
~~Deep venous thrombosis NOS~~ (12/02)
Dressler's syndrome (1/04)
ECG signs of myocardial ischaemia (11/03)
~~Electrocardiogram abnormal NOS~~ (11/03)
Electrocardiogram abnormal (11/03)
~~Electrocardiogram change NOS~~ (2/03)
    (11/03)
Electrocardiogram change (11/03)
Electrocardiogram Q wave abnormal
Electrocardiogram QRS complex abnormal
Electrocardiogram ST segment abnormal
Electrocardiogram ST segment depression
Electrocardiogram ST segment elevation
~~Electrocardiogram ST-T change NOS~~
    (11/03)
Electrocardiogram ST-T change (11/03)
Electrocardiogram T wave abnormal

Electrocardiogram T wave amplitude
    decreased
Electrocardiogram T wave inversion
Embolic cerebral infarction (11/03)
Embolic stroke
~~Embolism NOS~~ (11/03)
Embolism (11/03)
Embolism venous (11/03)
~~Endocardial disease NOS~~ (11/03)
Endocardial disease (11/03)
~~Endocardial ischaemia~~ (1/04)
Extradural haematoma
Femoral artery occlusion
~~Gangrene NOS~~ (11/03)
Gangrene (11/03)
Haemorrhage intracranial (11/03)
Haemorrhagic cerebral infarction
Haemorrhagic stroke
Haemorrhagic transformation stroke
~~Hepatic vein obstruction~~ (11/03)
Hepatic vein occlusion (11/03)
Iliac artery embolism
Iliac artery thrombosis
Iliac vein occlusion (11/03)
Iliac vein thrombosis
~~Infarction NOS~~ (11/03)
Infarction (11/03)
Infective thrombosis (11/03)
~~Inferior vena caval obstruction~~ (11/03)
Inferior vena caval occlusion (11/03)
Intermittent claudication
Interventricular septum rupture
Intracardiac thrombus
~~Intracranial haemorrhage NOS~~ (11/03)
Intracranial tumour haemorrhage
~~Intracranial venous sinus thrombosis NOS~~
    (11/03)
Intracranial venous sinus thrombosis
    (11/03)
~~Intraventricular haemorrhage NOS~~ (11/03)
Intraventricular haemorrhage (11/03)

Confidential Property of Merck & Co., Inc.
\\USWSAP0190\VintaTempDir\aFD9.tmp.doc

24

*C-2SI Vascular Event Surveillance and Adjudication*                    R 28Jan04

Ischaemia NOS (11/03)
Ischaemia (11/03)
Ischaemic cerebral infarction (11/03)
Ischaemic limb pain (11/03)
Ischaemic stroke NOS (11/03)
Ischaemic stroke (11/03)
Jugular vein thrombosis
Lacunar infarction
Lateral medullary syndrome
Leriche syndrome
Meningorrhagia
Myocardial infarction
Myocardial ischaemia
Myocardial reinfarction (11/03)
Myocardial rupture
Necrosis ischaemic
Noninfective thrombotic endocarditis (11/03)
Obstetrical blood-clot embolism
Paget-Schroetter syndrome
Papillary muscle disorder NOS (11/03)
Papillary muscle disorder (11/03)
Papillary muscle infarction
Pelvic venous thrombosis
Peripheral embolism NOS (11/03)
Peripheral embolism (11/03)
Peripheral ischaemia (12/02)
Peripheral ischaemia NOS (12/02)
Peripheral occlusive disease (4/03)
Peripheral vascular disorder NOS (11/03)
Peripheral vascular disorder (11/03)
Periphlebitis (11/03)
Phlebitis NOS (11/03)
Phlebitis (11/03)
Phlebothrombosis (9/03)
Portal vein occlusion (11/03)
Post infarction angina (11/03)
Post myocardial infarction syndrome (1/04)
Precerebral artery occlusion NOS (12/02)
   (11/03)
Precerebral artery occlusion (11/03)
Pre-cerebral artery occlusion NOS (12/02)

Prinzmetal angina (11/03)
Pulmonary embolism
Pulmonary infarction
Pulmonary microemboli
Pulmonary thrombosis NOS (11/03)
Pulmonary thrombosis (11/03)
Pulmonary vascular disorder NOS (11/03)
Pulmonary vascular disorder (11/03)
Pulmonary veno-occlusive disease
Pulse abnormal NOS (11/03)
Pulse abnormal (11/03)
Pulse absent
Retinal artery occlusion (11/03)
Retinal vein occlusion (11/03)
Reversible ischaemic neurological deficit
   (3/03)
Ruptured cerebral aneurysm
Shock
Shunt thrombosis (11/03)
Silent myocardial infarction
Spinal artery embolism
Spinal cord ischaemia
Subarachnoid haemorrhage NOS (11/03)
Subarachnoid haemorrhage (11/03)
Subclavian artery embolism
Subclavian artery thrombosis
Subclavian steal syndrome
Subclavian vein thrombosis
Subdural haematoma
Subendocardial ischaemia (1/04)
Sudden cardiac death (9/03)
Sudden death
Superior sagittal sinus thrombosis
Superior vena caval occlusion (11/03)
Thromboembolic stroke (11/03)
Thromboembolism (12/02)
Thromboembolism NOS (12/02)
Thrombolysis
Thrombophlebitis (04/03)
Thrombophlebitis deep (11/03)
Thrombophlebitis migrans

MRK-S0420052350

*C-2SI Vascular Event Surveillance and Adjudication*                                    R 28Jan04

Thrombophlebitis of vena cava
Thrombophlebitis pelvic vein
Thrombophlebitis superficial
Thrombosed varicose vein
Thrombosis (12/02)
~~Thrombosis NOS~~ (12/02)
Thrombosis in device (11/03)
~~Thrombotic microangiopathy NOS~~ (11/03)
Thrombotic microangiopathy (11/03)
Thrombotic stroke
Transient ischaemic attack
Transverse sinus thrombosis
Troponin increased (9/03)
Troponin I increased (9/03)
Troponin T increased (9/03)
Trousseau's syndrome (11/03)
Truncus coeliacus thrombosis (11/03)
~~Vascular disorder NOS~~ (11/03)
Vascular graft occlusion
Vascular insufficiency
Vascular occlusion
Vasospasm
~~Vein compression~~ (1/04)
~~Vein disorder NOS~~ (11/03)

Vein disorder (11/03)
Vena cava embolism
Vena cava thrombosis
~~Venoocclusive disease NOS~~ (11/03)
Venoocclusive disease (11/03)
~~Venous embolism NOS~~ (11/03)
~~Venous obstruction~~ (11/03)
Venous occlusion (11/03)
~~Venous thrombosis deep limb~~ (1/04)
~~Venous thrombosis NOS~~ (1/04)
~~Venous thrombosis NOS limb~~ (11/03)
Venous thrombosis limb (11/03)
~~Venous thrombosis superficial limb~~ (1/04)
Ventricle rupture
Ventricular asystole
Ventricular fibrillation
Ventricular flutter
Ventricular tachycardia
Vertebral artery occlusion
Vertebral artery thrombosis (11/03)
Vertebrobasilar insufficiency
Visceral arterial ischaemia
Wallenberg syndrome

Confidential Property of Merck & Co., Inc.
\\JSWSAP0190\VintzTempDir\aFD9.tmp.doc                                    26

*C-2SI Vascular Event Surveillance and Adjudication*

# Appendix D

*Investigator Checklists*

MRK-S0420052352

*C-2SI Vascular Event Surveillance and Adjudication*

**Restricted** R ◇ **Confidential** *limited access*

| **Forward to Investigator Site** |
| --- |

## CARDIAC EVENT – INVESTIGATOR DOCUMENTATION REQUEST FORM

| To be completed by Merck | DATE: | 2 Pages |
| --- | --- | --- |
| To: INVESTIGATOR:_____ | | |
| FAX Number: _____ | | |

| Re: Case #: | Protocol #: | Site #: |
| --- | --- | --- |
| Allocation #: | Baseline #: | WAES #: |
| Reported Event: | | |
| Preferred Term: | | |
| SAE Onset Date: | Hospitalization Date: | |
| Date of Initial Report: | | |

**Investigator Instructions:**

- Refer to your "Instructions for Investigator Sites for Documentation of Serious Vascular Adverse Events in Trials of Cox-2 Specific Inhibitors".

- Request the entire hospital chart related to the SAE. In particular, see the list below regarding documentation required for cardiac events and deaths. Complete the checklist below, indicating the documentation you have collected. If any of the required documents are not available, provide a narrative summarizing known information pertaining to the subject.

- After assembling the package, copy all materials (including this sheet) and send one copy of the entire package to the Monitor or MPC responsible for the study. Keep a copy of the entire package for the patient file.

| **Baseline/On Treatment CRF Worksheets (Do not submit blank CRFs or CRFs from visits greater than 6 months prior to SAE unless pertinent to event.)** |
| --- |

☐ Medical history
☐ Prior therapy/Concurrent meds
   Physical examinations
   Procedures

☐ Vital signs
☐ ECG results/tracings (Send regardless of date)
☐ Pertinent laboratory pages (w/ reference values)

| **Documentation for Cardiac Events and Deaths (Please ensure that all subject information is blinded.)** |
| --- |

   *Hospital discharge summary
   Admission summary or notes
   ER or ED summary or notes (if applicable)
   Consult reports
   *Death certificate (if applicable)
   Autopsy report (if applicable)
   CT/MRI scan reports

☐ *ECG tracings (event related)
☐ *Cardiac enzyme results
☐ Cardiac revascularization procedure reports
☐ Cardiac catheterization reports
☐ Cardiac stress test reports
☐ Nuclear imaging reports

\* Indicates a required document.

IT IS NOT NECESSARY TO SUBMIT THE FOLLOWING DOCUMENTATION: Nursing notes, vital sign charts, medication administration orders, hospital administrative forms

MRK-S0420052353

*C-2SI Vascular Event Surveillance and Adjudication*

| Re: Case #: | Protocol #: | Site #: |
|---|---|---|
| Allocation #: | Baseline #: | WAES #: |

**Documentation known to be unavailable:**

_____

_____

_____

_____

**Use this section to record information about your request for the hospital record for this event.**

Date Hospital Record Requested:      _____ / _____ / _____
                                               DD     MMM     Year

Requested of:      _____
                                     Name or Hospital

Date Hospital Record Obtained:      _____ / _____ / _____
                                  DD     MMM     Year

**Comments:**

_____

_____

_____

_____

_____

_____

_____    _____    _____

**Investigator's Name**    **Staff Initials**    **Date**

MRK-S0420052354

*C-2SI Vascular Event Surveillance and Adjudication*

| Forward to Investigator Site |
|---|



## CEREBROVASCULAR EVENT - INVESTIGATOR DOCUMENTATION REQUEST FORM

| **To be completed by Merck** | **DATE:** _____ | **2 Pages** |
|---|---|---|

**To: INVESTIGATOR:** _____

**FAX Number:** _____

| Re: Case #: | Protocol #: | Site #: |
|---|---|---|
| Allocation #: | Baseline #: | WAES #: |

**Reported Event:**

**Preferred Term:**

**SAE Onset Date:**          **Hospitalization Date:**

**Date of Initial Report:**

### Investigator Instructions:

- Refer to your "Instructions for Investigator Sites for Documentation of Serious Vascular Adverse Events in Trials of Cox-2 Specific Inhibitors".

- Request the entire hospital chart related to the SAE. In particular, see the list below regarding documentation required for cardiac events and deaths. Complete the checklist below, indicating the documentation you have collected. If any of the required documents are not available, provide a narrative summarizing known information pertaining to the subject.

- After assembling the package, copy all materials (including this sheet) and send one copy of the entire package to the Monitor or MPC responsible for the study. Keep a copy of the entire package for the patient file.

**Baseline/On Treatment CRF Worksheets (Do not submit blank CRFs or CRFs from visits greater than 6 months prior to SAE unless pertinent to event.)**

- ☐ Medical history
- ☐ Prior therapy/Concurrent meds
- ☐ Physical examinations
- ☐ Procedures

- ☐ Vital signs
- ☐ ECG results/tracings (Send regardless of date)
- ☐ Pertinent laboratory pages (w/ reference ranges)

**Documentation for Cerebrovascular Events and Deaths (Please ensure that all subject information is blinded.)**

- ☐ *Hospital discharge summary
- ☐ Admission summary or notes
- ☐ ER or ED summary or notes (if applicable)
- ☐ Consult reports
- ☐ *Death certificate (if applicable)

- ☐ *CT/MRI scan reports
- ☐ Arteriogram reports
- ☐ Carotid/cranial ultrasound reports
- ☐ Digital intravenous angiography reports
- ☐ *Autopsy report (if applicable)

*Indicates a required document.

IT IS NOT NECESSARY TO SUBMIT THE FOLLOWING DOCUMENTATION: Nursing notes, vital sign charts, medication administration orders, hospital administrative forms.

MRK-S0420052355

*C-2SI Vascular Event Surveillance and Adjudication*



## CEREBROVASCULAR EVENT - INVESTIGATOR DOCUMENTATION REQUEST FORM

| Re: Case #: | Protocol #: | Site #: |
|---|---|---|
| Allocation #: | Baseline #: | WAES #: |

**Documentation known to be unavailable:**

_____

_____

_____

**Use this section to record information about your request for the hospital record for this event.**

Date Hospital Record Requested:   _____ / _____ / _____
                                                        DD        MMM      Year

Requested of:   _____
                                        Name of Hospital

Date Hospital Record Obtained:   _____ / _____ / _____
                                                      DD        MMM      Year

**Comments:**

_____

_____

_____

_____

_____

_____

_____        _____        _____
**Investigator's Name**              **Staff Initials**              **Date**

Confidential Property of Merck & Co., Inc.                                    31
\\USWSAP0190\VistaTempDir\aFD9.tmp.doc

*C-2SI Vascular Event Surveillance and Adjudication*

| Forward to Investigator Site |
|---|



### PERIPHERAL VASCULAR EVENT – INVESTIGATOR DOCUMENTATION REQUEST FORM

| <u>To be completed by Merck</u> | DATE: _____ | <u>2 Pages</u> |
|---|---|---|

**To: INVESTIGATOR:**_____

**FAX Number:**_____

| Re: Case #: | Protocol #: | Site #: |
|---|---|---|
| Allocation #: | Baseline #: | WAES #: |

**Reported Event:**

**Preferred Term:**

**SAE Onset Date:**          **Hospitalization Date**:

**Date of Initial Report:**

**Investigator Instructions:**

- Refer to your "Instructions for Investigator Sites for Documentation of Serious Vascular Adverse Events in Trials of Cox-2 Specific Inhibitors".

- <u>Request the entire hospital chart related to the SAE.</u>  In particular, see the list below regarding documentation required for cardiac events and deaths.  Complete the checklist below, indicating the documentation you have collected.  If any of the required documents are not available, provide a narrative summarizing known information pertaining to the subject.

- After assembling the package, copy all materials (including this sheet) and send one copy of the entire package to the Monitor or MPC responsible for the study. Keep a copy of the entire package for the patient file.

| **Baseline/On Treatment CRF Worksheets (Do not submit blank CRFs or CRFs from visits greater than 6 months prior to SAE unless pertinent to event.)** |
|---|

| ☐ Medical history | ☐ Vital signs |
|---|---|
| ☐ Prior therapy/Concurrent meds | ☐ ECG results/tracings (Send regardless of date) |
|  Physical examinations | ☐ Pertinent laboratory pages (w/ reference ranges) |
|  Procedures |  |

| **Documentation for Peripheral Vascular Events and Deaths (Please ensure that all subject information is blinded.)** |
|---|

|  *Hospital discharge summary | ☐ Spiral CT scan reports |
|---|---|
|  Admission summary or notes | ☐ Ankle or toe brachial index results |
|  ER or ED summary or notes (if applicable) | ☐ Diagnostic arterial pressures |
|  Consult reports | ☐ Arteriography reports |
|  *Death certificate (if applicable) | ☐ CT scan reports |
|  *Autopsy report (if applicable) | ☐ MRI reports |
|  *Ventilation/perfusion scan (P/Q scans) | ☐ Venogram reports |
|  Pulmonary angiography reports | ☐ *Ultrasound or Doppler reports |

* Indicates a required document.

IT IS NOT NECESSARY TO SUBMIT THE FOLLOWING DOCUMENTATION: Nursing notes, vital sign charts, medication administration orders, hospital administrative forms

Confidential Property of Merck & Co., Inc.                                                    32
\\USWSAP0190\VistaTempDir\aFD9.tmp.doc

*C-2SI Vascular Event Surveillance and Adjudication*



### PERIPHERAL VASCULAR EVENT – INVESTIGATOR DOCUMENTATION REQUEST FORM

| | | |
|---|---|---|
| **Re: Case #:** | **Protocol #:** | **Site #:** |
| **Allocation #:** | **Baseline #:** | **WAES #:** |

**Documentation known to be unavailable:**

_____

_____

_____

**Use this section to record information about your request for the hospital record for this event.**

Date Hospital Record Requested: _____ / _____ / _____
DD      MMM      Year

Requested of: _____
Name of Hospital

Date Hospital Record Obtained: _____ / _____ / _____
DD      MMM      Year

**Comments:**

_____

_____

_____

_____

_____

_____

_____      _____      _____
**Investigator's Name**      **Staff Initials**      **Date**

Confidential Property of Merck & Co., Inc.                                33
\\USWSAP0190\VistaTempDir\aFD9.tmp.doc

*C-2SI Vascular Event Surveillance and Adjudication*



# Appendix E
## Clinical Inventories

MRK-S0420052359



*C-2SI Vascular Event Surveillance and Adjudication*

### CARDIAC EVENT DOCUMENTATION INVENTORY (Merck Clinical)

| | | |
|---|---|---|
| **Case #:** | **Protocol #:** | **Site #:** |
| **Allocation #:** | **Baseline #:** | **WAES #:** |
| **Reported Event:** | | |
| **Preferred Term:** | | |
| **SAE Onset Date:** | **Hospitalization Date**: | |
| **Date of Initial Report:** | | |

**Instructions:**
- Refer to "*Standard Procedures for Surveillance and Monitoring of Serious Vascular Adverse Events in Trials of COX-2 Specific Inhibitors*".
- Review documentation submitted from the site using the list below as a guide. Make sure that a discharge summary and results of tests or procedures referred to in the discharge summary (e.g. ECGs with legible dates, cardiac enzyme levels, MRI or CT scans) are included in the documentation package. If they are not included, request the information from the site.
- Indicate documents that are known to be unavailable.
- **Sign** and attach this checklist to the document package and **send to Vascular Event Coordinating Center, BL 1-7.**

**Baseline/On Treatment CRF Worksheets (Do not submit blank CRFs or CRFs from visits greater than 6 months prior to SAE unless pertinent to event.)**

| | |
|---|---|
| Medical history | Vital signs |
| Prior therapy/Concurrent meds | ECG results/tracings (Send regardless of date) |
| Physical examinations | Pertinent laboratory pages (w/ reference values) |
| Procedures | |

**Documentation for Cardiac Events and Deaths (Please ensure that all subject information is blinded.)**

| | |
|---|---|
| *Hospital discharge summary | *ECG tracings (event related) |
| Admission summary or notes | *Cardiac enzyme results |
| ER or ED summary or notes (if applicable) | Cardiac revascularization procedure reports |
| Consult reports | Cardiac catheterization reports |
| *Death certificate (if applicable) | Cardiac stress test reports |
| Autopsy report (if applicable) | Nuclear imaging reports |
| CT/MRI scan reports | |

* Indicates a required document.
IT IS NOT NECESSARY TO SUBMIT THE FOLLOWING DOCUMENTATION:
Nursing notes, vital sign charts, medication administration orders, hospital administrative forms

**Documentation known to be unavailable**

In the event that key documentation is not available, the investigator should submit a narrative describing all known information pertaining to the subject.

_____

_____

_____    _____
**Clinical Monitor signature**                **Date completed**
**For questions, contact:** Tim Fitzgerald (484) 344-7804, Epidemiology, BL 1-7

Merck & Co., Inc. Whitehouse Station, New Jersey, USA

\\CRBL0F05\737\EP07006 (VIOXX)\007\VEdata\accessdb\cardiac forms.doc          35

MRK-S0420052360

*C-2SI Vascular Event Surveillance and Adjudication*

## CEREBROVASCULAR EVENT DOCUMENTATION INVENTORY (Merck Clinical)

| | | |
|---|---|---|
| Case #: | Protocol #: | Site #: |
| Allocation #: | Baseline #: | WAES #: |
| Reported Event: | | |
| Preferred Term: | | |
| SAE Onset Date: | Hospitalization Date: | |
| Date of Initial Report: | | |

**Instructions:**

- Refer to "*Standard Procedures for Surveillance and Monitoring of Serious Vascular Adverse Events in Trials of COX-2 Specific Inhibitors*".

- Review documentation submitted from the site using the list below as a guide. Make sure that a discharge summary and results of tests or procedures referred to in the discharge summary (e.g. ECGs with legible dates, cardiac enzyme levels, MRI or CT scans) are included in the documentation package. If they are not included, request the information from the site.

- Indicate documents that are known to be unavailable.

- **Sign** and attach this checklist to the document package and **send to Vascular Event Coordinating Center, BL 1-7.**

**Baseline/On Treatment CRF Worksheets (Do not submit blank CRFs or CRFs from visits greater than 6 months prior to SAE unless pertinent to event.)**

| | |
|---|---|
| Medical history | Vital signs |
| Prior therapy/Concurrent meds | ECG results/tracings (Send regardless of date) |
| Physical examinations | Pertinent laboratory pages (w/ reference ranges) |
| Procedures | |

**Documentation for Cerebrovascular Events and Deaths (Please ensure that all subject information is blinded.)**

| | |
|---|---|
| *Hospital discharge summary | *CT/MRI scan reports |
| Admission summary or notes | Arteriogram reports |
| ER or ED summary or notes (if applicable) | Carotid/cranial ultrasound reports |
| Consult reports | Digital intravenous angiography reports |
| *Death certificate (if applicable) | *Autopsy report (if applicable) |

* Indicates a required document.

IT IS NOT NECESSARY TO SUBMIT THE FOLLOWING DOCUMENTATION:

Nursing notes, vital sign charts, medication administration orders, hospital administrative forms

**Documentation known to be unavailable**

**In the event that key documentation is not available, the investigator should submit a narrative describing all known information pertaining to the subject.**

_____

_____

_____     _____
**Clinical Monitor signature**                                **Date completed**
**For questions, contact:** Tim Fitzgerald (484) 344- 7804, Epidemiology, BL 1-7

Confidential Property of Merck & Co., Inc.                                                          36
\\3\WSAF0190\VistaTempDir\aFD9.tmp.doc

Restricted
R ◇ Confidential
limited access

*C-2SI Vascular Event Surveillance and Adjudication*
**PERIPHERAL VASCULAR EVENT DOCUMENTATION INVENTORY (Merck Clinical)**

| | | |
|---|---|---|
| **Case #:** | **Protocol #:** | **Site #:** |
| **Allocation #:** | **Baseline #:** | **WAES #:** |
| **Reported Event:** | | |
| **Preferred Term:** | | |
| **SAE Onset Date:** | **Hospitalization Date:** | |
| **Date of Initial Report:** | | |

**Instructions:**
- Refer to "*Standard Procedures for Surveillance and Monitoring of Serious Vascular Adverse Events in Trials of COX-2 Specific Inhibitors*".

- Review documentation submitted from the site using the list below as a guide. Make sure that a discharge summary and results of tests or procedures referred to in the discharge summary (e.g. ECGs with legible dates, cardiac enzyme levels, MRI or CT scans) are included in the documentation package. If they are not included, request the information from the site.

- Indicate documents that are known to be unavailable.
- **Sign** and attach this checklist to the document package and **send to Vascular Event Coordinating Center, BL 1-7.**

**Baseline/On Treatment CRF Worksheets (Do not submit blank CRFs or CRFs from visits greater than 6 months prior to SAE unless pertinent to event.)**

| | |
|---|---|
| Medical history | Vital signs |
| Prior therapy/Concurrent meds | ECG results/tracings (Send regardless of date) |
| Physical examinations | Pertinent laboratory pages (w/ reference ranges) |
| Procedures | |

**Documentation for Peripheral Vascular Events and Deaths (Please ensure that all subject information is blinded.)**

| | |
|---|---|
| *Hospital discharge summary | Spiral CT scan reports |
| Admission summary or notes | Ankle or toe brachial index results |
| ER or ED summary or notes (if applicable) | Diagnostic arterial pressures |
| Consult reports | Arteriography reports |
| *Death certificate (if applicable) | CT scan reports |
| *Autopsy report (if applicable) | MRI reports |
| *Ventilation/perfusion scan (P/Q scans) | Venogram reports |
| Pulmonary angiography reports | *Ultrasound or Doppler reports |

* Indicates a required document.
IT IS NOT NECESSARY TO SUBMIT THE FOLLOWING DOCUMENTATION:
Nursing notes, vital sign charts, medication administration orders, hospital administrative forms.

**Documentation known to be unavailable**

**\*In the event that key documentation is not available, the investigator should submit a narrative describing all known information pertaining to the subject.**

_____        _____

Clinical Monitor signature                                   Date completed

**For questions, contact:**  Tim Fitzgerald (484) 344-7804, Epidemiology, BL 1-7

Merck & Co., Inc. Whitehouse Station, New Jersey, USA

MRK-S0420052362

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP



# Appendix F

Vascular Event Adjudication Package Cover

MRK-S0420052363

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP

**Vascular Event Adjudication Package Cover**

R ⬧ Restricted Confidential limited access

**VEC Member:** _____

**VEC Case No:** _____

**Date of Onset:** _____      **Date of Hospitalization:** _____

**Standard Term:** _____

**Reported Term:** _____

**Sent for Adjudication:** _____/_____/_____

**Adjudication Worksheet Form:**     Cardiology        Cerebrovascular        Peripheral Vascular

| | |
|---|---|
| NA* 1. **Adverse Event Reports** | # pg |
| SAE CRF Worksheet | _____ |
| Adverse Event Report | _____ |
| 2. **Admission and Discharge Summaries** | |
| Admission summaries | _____ |
| Discharge summaries | _____ |
| 3. **Consult Reports** | _____ |
| 4. **Cardiac Serum Markers** | _____ |
| 5. **Laboratory results** | |
| Pre treatment | _____ |
| On treatment | _____ |
| Event related | _____ |
| 6. **ECGs** | |
| Pre treatment | _____ |
| On therapy | _____ |
| Event related | _____ |
| 7. **Imaging Reports** | |
| CT reports | _____ |
| MRI reports | _____ |
| Ultrasound reports | _____ |
| Radiograph reports | _____ |
| Other imaging reports | _____ |
| 8. **Procedure Reports** | _____ |
| 9. **Autopsy Reports** | _____ |
| 10.**Other hospital records** | |
| _____ | l___l |
| _____ | l___l |
| _____ | l___l |
| 11.**Case Report Form Worksheets** | |
| Pre-treatment | _____ |
| On Treatment | _____ |

_____        _____
**MRL Liaison**                                                  **Date**

| * NA indicates that information is known to be unavailable |
|---|

Merck & Co., Inc. Whitehouse Station, New Jersey, USA

MRK-S0420052364

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP



<br/><br/><br/>

## Appendix G

Adjudication Worksheets

MRK-S0420052365

*C-2SI Vascular Events Surveillance and Adjudication*   **VEC #**        **WAESNUM**



## ADJUDICATION WORKSHEET
### Cardiovascular Events

VEC MEMBER
REPORTED EVENT
STANDARD TERM
EVENT ONSET:
DATE OF :
HOSPITALIZATION

---

**Adjudication Instructions**:  Review the event documentation and determine whether the event meets the criteria based on the supportive documentation.   If the event does not fulfill all of the criteria but the clinical picture is strongly suggestive of an event of interest, you may use good clinical judgment to confirm the classification of the event.  Justify your decision in the space provided.

---

**Indicate the event(s) for which criteria are met.** Include comments as to the criteria or clinical features most relevant to your decision.  <u>For specified events, indicate if the event was fatal</u>.  **If no event criteria are met**, skip to page 2.

---

### Acute Myocardial Infarction

**Fatal**         **Non-fatal**                    **By criteria**          **Based on clinical judgment**
Major STRESSOR RELATIONSHIP   (CHECK ONE BOX):
        Complication of a cardiac revascularization procedure
        Related (major stressor antecedent to the MI)
        <u>NOT</u> Related (MI occurred spontaneously)
        Uncertain relationship

Criteria/comments:_____

_____

### Unstable Angina Pectoris                        **By criteria**          **Based on clinical judgment**

Criteria/comments:_____

_____

### Sudden and/or Unexplained Death                  **By criteria**          **Based on clinical judgment**
Criteria/comments:_____

_____

### Resuscitated Cardiac Arrest (without identified cause listed elsewhere)
                                                    **By criteria**          **Based on clinical judgment**
Criteria/comments:_____

_____

### Cardiac (atrial or ventricular) Thrombus          **By criteria**          **Based on clinical judgment**
Criteria/comments:_____

_____

---

☐   **This event should be considered an APTC endpoint (unknown, sudden, cardiovascular, or hemorrhagic death, myocardial infarction, or stroke).**

| Compound | Protocol | Study Site | Baseline | AN |
|----------|----------|------------|----------|-----|
|          |          |            |          |     |

Merck & Co., Inc. Whitehouse Station, New Jersey, USA

*C-2SI Vascular Events Surveillance and Adjudication*   **VEC #**   **WAESNUM**



## ADJUDICATION WORKSHEET
### Cardiovascular Events

☐ Death throwback (applicable to specified studies only): Cases where the patient has a nonfatal SAE that starts on study drug or within a study-specified number of days (e.g., 14 or 28) after discontinuation of study therapy that is related (a precursor) to the fatal SAE that is the cause of death AND the death date and start date of the fatal SAE occur greater than the study specified number of days after discontinuation of study therapy.

**Reason unable to adjudicate:**

    Not a Thrombo-embolic event (e.g. pneumonia, cancer)
      **Fatal**        **Non-fatal**
    Insufficient data
    Requires adjudication by other subcommittee:
      Cerebrovascular
      Peripheral vascular
    Other (Specify):_____

_____

**NOTES:** (Including additional documentation required for adjudication)
_____
_____
_____
_____
_____
_____

**SIGNATURE:** _____   **DATE:** _____

For questions - contact:
Tim Fitzgerald
tel: (484) 344-7804
fax: (484) 344-2992
email: timothy_fitzgerald@merck.com

- page 2 -

| Compound | Protocol | Study Site | Baseline | AN |
|----------|----------|------------|----------|-----|
|          |          |            |          |     |

Merck & Co., Inc. Whitehouse Station, New Jersey, USA

MRK-S0420052367

*C-2SI Vascular Events Surveillance and Adjudication*   VEC #   WAESNUM

**R** Restricted ⟡ Confidential *limited access*

## ADJUDICATION WORKSHEET
### Cerebrovascular Events

VEC MEMBER:

REPORTED EVENT:

STANDARD TERM:

EVENT ONSET:

DATE OF
HOSPITALIZATION:

**Adjudication Instructions**: Review the event documentation and determine whether the event meets the criteria based on the supportive documentation. If the event does not fulfill all of the criteria but the clinical picture is strongly suggestive of an event of interest, you may use good clinical judgment to confirm the classification of the event. Justify your decision in the space provided.

**Indicate the event(s) for which criteria are met.** Include comments as to the criteria or clinical features most relevant to your decision. <u>For specified events, indicate if the event was fatal</u>. **If no event criteria are met**, skip to page 2.

☐ **Ischemic Cerebrovascular Stroke with adequate documentation to subclassify etiology:**
    ☐ **Fatal**    ☐ **Non-fatal**      ☐ **Confirmed by criteria**    ☐ **Based on clinical judgment**
    <u>Indicate the subtype of Ischemic Cerebrovascular Stroke</u>
    ☐ Large-artery atherosclerosis    ☐ Small-artery occlusion (lacune)
    ☐ Cardioembolism    ☐ Other determined etiology
    Criteria/comments:_____

☐ **Ischemic Cerebrovascular Stroke without adequate documentation to subclassify etiology**
    ☐ **Fatal**    ☐ **Non-fatal**      ☐ **Confirmed by criteria**    ☐ **Based on clinical judgment**
    Criteria/comments:_____

☐ **Hemorrhagic Cerebrovascular Stroke or hemorrhagic change**
    ☐ **Fatal**    ☐ **Non-fatal**      ☐ **Confirmed by criteria**    ☐ **Based on clinical judgment**
    Criteria/comments:_____

☐ **Cerebrovascular Venous Thrombosis**
    ☐ **Fatal**    ☐ **Non-fatal**      ☐ **Confirmed by criteria**    ☐ **Based on clinical judgment**
    Criteria/comments:_____

    **Transient Ischemic Attack**      ☐ **Confirmed by criteria**    ☐ **Based on clinical judgment**
    Criteria/comments:_____

    **Ocular Vascular Event**      ☐ **Confirmed by criteria**    ☐ **Based on clinical judgment**
    Criteria/comments:_____

☐ **This event should be considered an APTC endpoint (unknown, sudden, cardiovascular, or hemorrhagic death, myocardial infarction, or stroke).**

| Compound | Protocol | Study Site | Baseline | AN |
|----------|----------|------------|----------|-----|
|          |          |            |          |     |

Merck & Co., Inc. Whitehouse Station, New Jersey, USA

*C-2SI Vascular Events Surveillance and Adjudication*    VEC #    WAESNUM

**Restricted**
**R** **Confidential**
***limited access***

## ADJUDICATION WORKSHEET
### Cerebrovascular Events

☐ Death throwback (applicable to specified studies only): Cases where the patient has a nonfatal SAE that starts on study drug or within a study-specified number of days (e.g., 14 or 28) after discontinuation of study therapy that is related (a precursor) to the fatal SAE that is the cause of death AND the death date and start date of the fatal SAE occur greater than the study specified number of days after discontinuation of study therapy.

**Reason Unable to adjudicate:**

☐    Not a thromboembolic event (Event unrelated to thrombotic / thromboembolic conditions – e.g., pneumonia, cancer, subarachnoid hemorrhage from aneurysm or trauma)

     ☐ **Fatal**      ☐ **Non-fatal**

     Insufficient data
☐    Requires adjudication by other subcommittee:
     ☐ Cardiovascular
     ☐ Peripheral vascular

☐    Other (Specify):_____

**NOTES:** (Including additional documentation required for adjudication)

_____
_____
_____
_____

**SIGNATURE:** _____     **DATE:** _____

For questions - contact:
Tim Fitzgerald
tel: (484) 344-7804
fax: (484) 344-2992
email: timothy_fitzgerald@merck.com

-    Page 2 –

| Compound | Protocol | Study Site | Baseline | AN |
|----------|----------|------------|----------|-----|
|          |          |            |          |     |

Merck & Co., Inc. Whitehouse Station, New Jersey, USA

\\USWSAP0190\VistaTempDir\aFD9.tmp.doc

MRK-S0420052369

*C-2SI Vascular Events Surveillance and Adjudication*   VEC #   **WAESNUM**

Restricted
R ⊗ Confidential
limited access

### ADJUDICATION WORKSHEET
### Peripheral Vascular Events

VEC MEMBER
REPORTED EVENT
STANDARD TERM
EVENT ONSET:
DATE OF :
HOSPITALIZATION

**Adjudication Instructions**:  Review the event documentation and determine whether the event meets the criteria based on the supportive documentation.  If the event does not fulfill all of the criteria but the clinical picture is strongly suggestive of an event of interest, you may use good clinical judgment to confirm the classification of the event.  Justify your decision in the space provided.

**Indicate the event(s) for which criteria are met.** Include comments as to the criteria or clinical features most relevant to your decision.  For specified events, indicate if the event was fatal.  **If no event criteria are met**, skip to page 2.

☐ **Pulmonary Embolism**
   ☐ **Fatal**   ☐ **Non-fatal**   ☐ **Confirmed by criteria**   ☐ **Based on clinical judgment**

   Major STRESSOR RELATIONSHIP  (CHECK ONE BOX):
   ☐   Spontaneous (PE occurred spontaneously)
   ☐   Secondary to antecedent stressor (e.g. surgery, trauma or underlying malignancy)
   ☐   Uncertain relationship
   Criteria/comments:_____

_____

_____

☐ **Peripheral Arterial Thrombosis/Thromboembolism** (e.g. mesenteric thrombus/embolus)

   ☐ **Fatal**   ☐ **Non-fatal**   ☐ **Confirmed by criteria**   ☐ **Based on clinical judgment**
   Criteria/comments:_____

_____

_____

☐ **Peripheral Venous Thrombosis** (e.g. mesenteric thrombus/embolus)
   ☐ **Confirmed by criteria**   ☐ **Based on clinical judgment**

   Major STRESSOR RELATIONSHIP (CHECK ONE BOX):
   ☐   Spontaneous (Thrombosis occurred spontaneously)
   ☐   Secondary to antecedent stressor (e.g. surgery, trauma or underlying malignancy)
   ☐   Uncertain relationship
   Criteria/comments:_____

_____

_____

| Compound | Protocol | Study Site | Baseline | AN |
|---|---|---|---|---|
|  |  |  |  |  |

Merck & Co., Inc. Whitehouse Station, New Jersey, USA

\\USWSAP0190\VistaTempDir\aFD9.tmp.doc

*C-2SI Vascular Events Surveillance and Adjudication*   VEC #   **WAESNUM**



### ADJUDICATION WORKSHEET
### Peripheral Vascular Events

☐ **This event should be considered an APTC endpoint (unknown, sudden, cardiovascular, or hemorrhagic death, myocardial infarction, or stroke).**

☐ Death throwback (applicable to specified studies only): Cases where the patient has a nonfatal SAE that starts on study drug or within a study-specified number of days (e.g., 14 or 28) after discontinuation of study therapy that is related (a precursor) to the fatal SAE that is the cause of death AND the death date and start date of the fatal SAE occur greater than the study specified number of days after discontinuation of study therapy.

**Reason Unable to Adjudicate:**
  ☐  Not a thromboembolic event  (e.g. pneumonia, cancer)
      ☐ **Fatal**      ☐ **Non-fatal**
  ☐  Insufficient data
  ☐  Requires adjudication by other subcommittee:
      ☐ Cardiovascular
      ☐ Cerebrovascular
  ☐  Other (Specify):_____

**NOTES:** (Including additional documentation required for adjudication)

_____

SIGNATURE: _____     DATE: _____

For questions - contact:
Tim Fitzgerald
tel: (484) 344-7804
fax: (484) 344-2992
email: timothy_fitzgerald@merck.com

- page 2 -

| Compound | Protocol | Study Site | Baseline | AN |
|----------|----------|------------|----------|-----|
|          |          |            |          |     |

Merck & Co., Inc. Whitehouse Station, New Jersey, USA

\\USWSAP0190\VistaTempDir\aFD9.tmp.doc

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP



# Appendix H

Adjudication Guidelines for Cardiac Events

**(CARDIOLOGY SUBCOMMITTEE)**

47

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP



## Appendix H

### Adjudication Guidelines for Cardiac Events

**Adjudication Instructions**:  Review the event documentation and determine whether the event meets the criteria based on the supportive documentation and good clinical judgment.  If the event does not fulfill all of the criteria but the clinical picture is strongly suggestive of an event of interest, you may use good clinical judgment to classify the event as meeting the criteria.  Justify your decision on the Adjudication Worksheet.

#### NON-FATAL EVENTS

#### Acute myocardial infarction

Acute MI (in patients not undergoing invasive cardiac revascularization procedures) is defined as:

1.   New pathological Q waves (>0.03 sec wide) in two contiguous leads, *OR*

2.   Signs or symptoms consistent with ischemia such as chest pain, acute dyspnea, pulmonary edema, or hemodynamic instability requiring need for volume replacement or vasopressors *OR* new ischemic ST-T-wave changes (ST depression or ST elevation or T-Wave inversion) in two or more contiguous leads *AND* one or more of the following abnormal enzyme profiles:

   a)   A rise in serum creatine kinase MB (CK-MB) to >2 times the upper limit of normal when measured in mass units or if baseline value is already elevated, a characteristic decline to the normal range *OR*

   b)   A rise in serum creatine kinase (CK) to >2 times the upper limit of normal, and abnormal CK-MB when measured in activity units or if baseline value is already elevated, a characteristic decline to the normal range *OR*

   c)   A rise in serum CK of >2 times the upper limit of normal when CK-MB unavailable, and no other cause of elevated CK is present or if baseline value is already elevated, a characteristic decline to the normal range *OR*

   d)   A rise in serum cardiac troponin >2 times the threshold that a given lab considers diagnostic for infarction or if baseline value is already elevated, a characteristic decline to the normal range.

   e)   MI may be negated based on clinical judgment in the presence of a normal cardiac troponin and an elevated CK-MB, if both studies are measured simultaneously.

   f)   If cardiac troponin and CKMB are both greater than upper normal limits, and the cardiac troponin value is less than the value a lab considers diagnostic for MI, the enzymatic criteria for MI are considered satisfied.

   g)   Patients who are admitted for an acute coronary syndrome with hyperacute ECG changes who do not demonstrate abnormal cardiac enzymes after PCI or acute medical management will be considered to have unstable angina.  If the enzyme

MRK-S0420052373

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP



## Appendix H

## Adjudication Guidelines for Cardiac Events

sampling is incomplete, other criteria such as subsequent evolutionary changes of the electrocardiograms, or the presence of a thrombus on angiography or necropsy studies, should be considered. In general, without enzyme confirmation or ECG confirmation, such events will be categorized as "unstable angina" based on clinical judgment.

In patients undergoing invasive cardiac revascularization procedures, a new acute MI is defined by the following guidelines:

1.    In patients following PTCA, atherectomy, or stent:

   a)   CK-MB >3 times the upper limit of normal within 24 to 36 hours after the PTCA, *OR*

   b)   In the absence of CK-MB data, CK of >3 times the upper limit of normal, *OR*

   c)   Cardiac troponin I or T >5 times the upper limit of normal.

2.    In patients following CABG:

   a)   The development of new pathologic Q-waves (>0.03 sec in 2 contiguous leads) on the ECG within 48 hours post-CABG.

   b)   After 48 hours post-CABG, a new MI can be diagnosed as for patients not undergoing cardiac revascularization procedures.

### Stressor Relationship

For acute MI, the adjudicator is asked to make a determination as to any possible association between the MI and antecedent "major stressors", specifically cardiac revascularization procedures (i.e. PTCA, atherectomy, stent, or CABG), GI bleeds, or major surgery. The following guidelines should be used in making these determinations:

1.    Complication of a cardiac revascularization procedure: an MI that, in the clinical judgment of the adjudicator, occurred coincident with (or within 72 hours following) and was probably a complication of an antecedent cardiac revascularization procedure.

2.    Other major-stressor-related (excludes cardiac revascularization procedures): an MI that, in the clinical judgment of the adjudicator, occurred coincident with (or within 48 hours following) and was probably a complication of an antecedent major stressor such as GI bleed or major surgery.

3.    Not major-stressor-related: an MI that, in the clinical judgment of the adjudicator, occurred spontaneously and was not associated with an antecedent major stressor.

MRK-S0420052374

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP



## Appendix H

## Adjudication Guidelines for Cardiac Events

4.  Unclear major-stressor-relationship: an MI that, in the clinical judgment of the adjudicator, was of uncertain temporal relationship to a major stressor.

### Unstable angina pectoris

UAP is defined as new or accelerating symptoms of myocardial ischemia (prolonged and/or repetitive anginal-like chest discomfort, anginal pain at rest, or ischemia-mediated hemodynamic instability) accompanied by new ischemic ST-T-wave changes (ST depression or ST elevation or T-wave inversion). In addition, such an event does not qualify as a myocardial infarction as defined above.

Available ECGs include ST-T wave changes as follows:

a)  Persistent or transient ST-segment depression >0.5 mm (0.08 seconds after the J-point) in two contiguous leads, not known to be old, *OR*

b)  Persistent or transient T-wave inversion (>1 mm) in two contiguous leads, , not known to be old, *OR*

c)  Pseudonormalization of the T wave in two contiguous leads

d)  Persistent or transient ST segment elevation >1 mm in two contiguous leads, not associated with elevated markers and not known to be old.

### Cardiac (atrial or ventricular) thrombus

The diagnosis of cardiac thrombosis must be made on the basis of confirmatory evidence by echocardiography, MRI, CT scan, or ventriculography or autopsy.

### Resuscitated cardiac arrest

A resuscitated cardiac arrest is defined as the occurrence of verified hemodynamic collapse of cardiac origin (i.e. tachyarrhythmia, bradyarrhythmia, electromechanical dissociation) in which criteria for non-fatal acute MI, or PE are not met, and following which the patient survives for at least 24 hours as a result of cardioversion and/or electrical or pharmacologic CPR.

MRK-S0420052375

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP



## Appendix H

## Adjudication Guidelines for Cardiac Events

### FATAL EVENTS

#### Fatal MI

A fatal MI is one as defined above and that is documented to directly result in death within 30 days of the onset of the signs or symptoms of the event, or a death with an autopsy report of findings consistent with an acute MI.

#### Sudden Death and/or Unexplained Death

Sudden and/or unexplained death is defined as witnessed instantaneous or near-instantaneous death that occurs without warning or within one hour of non-diagnostic symptoms, or as an unwitnessed, unexpected death in which criteria for a fatal coronary or cerebrovascular event are not met.

Deaths which are considered to be non-thromboembolic and which are judged to be from unknown causes do not meet the criteria for "sudden and/or unexplained death". Such deaths will be adjudicated as " Event unrelated to thrombotic/ thromboembolic conditions" and the adjudicators will indicate that the cause of death is unknown.

MRK-S0420052376

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP

## Appendix I

Adjudication Guidelines for Peripheral Vascular Events

**(PERIPHERAL VASCULAR SUBCOMMITTEE)**

52

C-2SI Vascular Events Monitoring and Adjudication SOP

## Appendix I

## Adjudication Guidelines for Peripheral Vascular Events

**Adjudication Instructions**:  Review the event documentation and determine whether the event meets the criteria based on the supportive documentation and good clinical judgment.  If the event does not fulfill all of the criteria but the clinical picture is strongly suggestive of an event of interest, you may use good clinical judgment to classify the event as meeting the criteria.  Justify your decision on the Adjudication Worksheet.

**NOTE**:  For purposes of this classification, peripheral is defined as arterial and venous vascular beds other than cardiac or cerebrovascular, as defined herein.  These include the aorta as well as central vascular beds supplying the lungs, intraperitoneal and retroperitoneal organs (e.g., renal, hepatic, mesenteric vein), the pelvic organs, and the extremities.

### NONFATAL EVENTS

### Pulmonary embolism

> An event which consists of documented signs and symptoms of pulmonary embolism confirmed by objective laboratory evidence.  Clinical signs and symptoms should include one or more of the following:
>
> - Presence of venous thrombus *OR* the predisposition for venous thrombosis
> - Hypoxemia
> - Dyspnea
> - Tachypnea
> - Chest pain
> - Tachycardia
> - Hypotension or syncope
> - Cyanosis
> - Cor pulmonale (jugular venous distention, an S3 gallop, right ventricular heave, tachypnea, tachycardia).
>
> Other diseases which manifest similar clinical signs and symptoms should be excluded (including pneumonia, pneumothorax, myocardial infarction, ventricular septal rupture, aortic dissection, and pericardial tamponade).
>
> Supportive laboratory documentation must include at least one of the following:
> - Ventilation-perfusion (V-Q) lung scan suggesting (1) high probability for pulmonary embolism *OR* (2) abnormal scan only in and the presence of peripheral venous thrombosis
> - Spiral (ultrafast) CT
> - Pulmonary angiography
> - Autopsy evidence
> - Transesophageal echocardiography
>
> For pulmonary embolism the adjudicator is asked to make a determination as to any possible association between the pulmonary embolism and antecedent "major stressors, e.g. surgery, trauma, hypoxia, or underlying malignancy.  The following guidelines should be used in making these decisions:

MRK-S0420052378

C-2SI Vascular Events Monitoring and Adjudication SOP

## Appendix I

## Adjudication Guidelines for Peripheral Vascular Events

Major-stressor-related: a pulmonary embolism, that, in the clinical judgment of the adjudicator, occurred coincident with (or within 1 month following) a major stressor.

1. Not major-stressor-related: a pulmonary embolism that, in the clinical judgment of the adjudicator, occurred spontaneously and was not associated with an antecedent major stressor.

2. Unclear major-stressor-relationship: a pulmonary embolism that, in the clinical judgment of the adjudicator, was of uncertain temporal relationship to a major stressor.

### Peripheral deep venous thrombosis

An event which consists of documented signs and symptoms of peripheral or central venous occlusion supported by objective laboratory evidence. In symptomatic cases, signs and symptoms of pain, tenderness, swelling, discoloration, venous distention, prominence of superficial veins, and/or the presence of palpable cord may be present. In asymptomatic patients, a positive venogram would be considered more compelling evidence to make the diagnosis. For events in veins supplying central structures and extremities, objective laboratory evidence includes venography or duplex Doppler ultrasound, or CT scan, or magnetic resonance imaging or pathological specimens, or autopsy findings.

For peripheral venous thrombosis, the adjudicator is asked to make a determination as to any possible association between the peripheral venous thrombosis or pulmonary embolism and antecedent "major stressors: e.g., surgery, trauma, or underlying malignancy. The following guidelines should be used in making these decisions:

1. Major-stressor-related: a peripheral venous thrombosis that in the clinical judgment of the adjudicator, occurred coincident with (or within 1 month following) a major stressor.

2. Not major-stressor-related: a peripheral venous thrombosis that, in the clinical judgment of the adjudicator, occurred spontaneously and was not associated with an antecedent major stressor.

3. Unclear major-stressor-relationship: a peripheral venous thrombosis that, in the clinical judgment of the adjudicator, was of uncertain temporal relationship to a major stressor.

### Peripheral arterial thrombosis/thromboembolism

Hospitalization for documented signs and symptoms of new onset or accelerating arterial occlusion in a peripheral artery, supported by objective laboratory or surgical evidence.

For events in arteries supplying the extremities, there should be a new onset or accelerating pain with physical findings of ischemia (involving at least one of the following: absent pulse, cool temperature, neurologic deficit, cyanosis or pallor). For events in arteries supplying central structures and extremities, objective laboratory abnormalities include ankle/brachial pressure index or toe/brachial pressure index or duplex Doppler ultrasound or arteriography, CT scan, or magnetic resonance imaging or pathological specimens, or autopsy findings.

Confidential Property of Merck & Co., Inc.                                        54
\\35WSAP0190VistaTempDir\aFD9.tmp.doc

C-2SI Vascular Events Monitoring and Adjudication SOP

## Appendix I

## Adjudication Guidelines for Peripheral Vascular Events

### FATAL EVENTS

#### Pulmonary embolism

A fatal PE is one as defined above and that is documented to directly result in death.

#### Peripheral arterial thrombosis/thromboembolism

A fatal peripheral arterial thrombosis/thromboembolism is an event as defined above and that is documented to directly result in death.

MRK-S0420052380

# Appendix J

Adjudication Guidelines for Cerebrovascular Events

**(CEREBROVASCULAR SUBCOMMITTEE)**

Confidential Property of Merck & Co., Inc.

MRK-S0420052381

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP

## Appendix J

## Adjudication Guidelines for Cerebrovascular Events

**Adjudication Instructions**:  Review the event documentation and determine whether the event meets the criteria based on the supportive documentation and good clinical judgment.  If the event does not fulfill all of the criteria but the clinical picture is strongly suggestive of an event of interest, you may use good clinical judgment to classify the event as meeting the criteria. Justify your decision on the Adjudication Worksheet.

### NON-FATAL EVENTS

### Stroke with adequate documentation to subclassify etiology as follows

A stroke is defined as focal neurological disturbance of the central nervous system affecting higher integrated functioning, cranial nerves, motor, sensory, brainstem, cerebellar or spinal cord, alone or in combination in the absence of witnessed epileptic seizure or known history of migraine.  Signs and symptoms persist longer than 24 hours.

### Ischemic vs. Hemorrhagic Stroke

A diagnosis of ischemic stroke can be made provided brain imaging done within 48 hours discloses no sign of hemorrhage.

### Etiology of Ischemic stroke

Subtypes of ischemic stroke are as follows:

#### 1.   Ischemic Stroke due to large-artery atherosclerosis

These patients will have clinical and brain imaging findings consistent with stenosis or occlusion of a major brain artery or branch cortical artery, presumably due to atherosclerosis.

#### 2.   Ischemic Stroke due to cardioembolism

This category includes patients with arterial occlusions *AND* at least one cardiac source for an embolus.  (Table 1)

Confidential Property of Merck & Co., Inc.
\\USWSAP0190\VistaTempDir\aFD9.tmp.doc

57

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP

## Appendix J

## Adjudication Guidelines for Cerebrovascular Events

**Table 1.**     **Sources of Cardioembolism**

Mechanical prosthetic valve
Mitral stenosis
Atrial fibrillation
Left atrial/atrial appendage thrombus
Sick sinus syndrome
Myocardial infarction ( <6 months)
Left ventricular thrombus
Dilated cardiomyopathy
Akinetic left ventricular segment
Atrial myxoma
Infective endocarditis
Mitral valve prolapse
Mitral annulus calcification
Atrial septal aneurysm
Patent foramen ovale


Atrial flutter
Bioprosthetic cardiac valve
Nonbacterial thrombotic endocarditis


Hypokinetic left ventricular segment

3.     Small-artery occlusion (lacune)

This category includes patients whose strokes exhibit one of the traditional syndromes:

- Pure motor hemiplegia: hemiplegia with or without dysarthria; CT or MRI usually reveals a lesion in the territory of the lenticulostriate artery (i.e. internal capsule, corona radiata).

- Pure sensory lacune: a pure sensory lacune will exhibit hemisensory deficit with usual CT or MRI evidence of a lacune in the lateral thalamus or parietal white matter.

- Dysarthria/clumsy hand syndrome: severe dysarthria, central facial weakness and associated dysarthria and clumsiness of the affected hand. The CT or MRI usually shows a lacune in the contralateral pons.

- Ataxic Hemiparesis: characterized by ataxia and weakness of the leg more than in the arm. The degree of ataxia is out of proportion to the weakness. The lesion is located in the corona radiate near the internal capsule or the ventral pons

Confidential Property of Merck & Co., Inc.
\\USWSAP0190\VistaTempDir\aFD9.tmp.doc

58

MRK-S0420052383

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP

## Appendix J

## Adjudication Guidelines for Cerebrovascular Events

4. Ischemic Stroke of other determined etiology

This category includes patients lacking evidence of other major ischemic stroke categories and lacking evidence of non-atherosclerotic vasculopathies, hypercoagulable states or hematologic disorders**.**

**Ischemic Stroke without Adequate Documentation to subclassify etiology**

The subtype cause of ischemic stroke cannot be classified based on existing documentation.

**Cerebrovascular venous thrombosis**

An event which consists of documented signs and symptoms of occlusion of an intracranial vein or venous sinus, supported by CT, MRI or angiography.

**Transient Ischemic Attack**

An event which consists of documented focal neurologic deficit which resolves completely within 24 hours without residua and is not associated with a new abnormality on brain imaging.

**Hemorrhagic Stroke or Hemorrhagic Change**

An event with a focal neurologic deficit with documented evidence of intracranial blood products on imaging studies or spinal fluid analysis.

**FATAL EVENTS**

**Ischemic Stroke with adequate documentation to subclassify etiology**

A fatality due to any type of ischemic stroke as defined above that in best clinical judgment is the most likely cause of death.

**Ischemic Stroke without adequate documentation to subclassify etiology**

A fatality due to an ischemic stroke as defined above that in best clinical judgment is the most likely cause of death.

**Cerebrovascular Venous Thrombosis**

A fatal cerebrovascular venous thrombosis as defined above that in best clinical judgment is the most likely cause of death.

Confidential Property of Merck & Co., Inc.
\\USWSAP0190\Vista\TempDir\aFD9.tmp.doc

59

MRK-S0420052384

C-2SI VASCULAR EVENTS MONITORING AND ADJUDICATION SOP

## Appendix J

## Adjudication Guidelines for Cerebrovascular Events

### Hemorrhagic stroke or hemorrhagic change

A hemorrhagic stroke or hemorrhagic change as defined above that in best clinical judgment is the most likely cause of death.

Confidential Property of Merck & Co., Inc.

\\USWSAP01909\VistaTempDir\aFD9.tmp.doc

MRK-S0420052385

C-2SI Vascular Events Monitoring and Adjudication SOP

## Appendix K

Final Adjudication Form

Confidential Property of Merck & Co., Inc.
\\USWSAP01909\VistaTempDir\aFD9.tmp.doc

61

MRK-S0420052386

| Compound | Protocol | Study Site | Baseline | AN | WAES # | Restricted ◇ Confidential limited access |
|----------|----------|-----------|----------|-----|--------|------------------------------------------|
|          |          |           |          |     |        | R                                        |

## VASCULAR EVENT FINAL ADJUDICATION FORM

VEC CASE NO.

DATE OF ADJUDICATION

REPORTED EVENT

STANDARD TERM

DEATH ☐

EVENT ONSET

EVENT SEQUENCE

**Indicate the event(s) for which criteria are met**. For specified events, indicate if the event was fatal. **If no event criteria are met**, skip to page 2.

| CARDIAC EVENTS | Confirmed strictly by criteria | Based on clinical |
|----------------|--------------------------------|-------------------|
| **judgment** ☐ ☐ Acute Myocardial Infarction | | ☐ |
| ☐ **Fatal**  ☐ **Non-fatal** | | |
| MI STRESSOR RELATIONSHIP  (CHECK ONE BOX): | | |
| ☐ Complication of PTCA/revascularization procedure | | |
| ☐ Related (major stressor antecedent to the MI) | | |
| ☐ NOT Related (MI occurred spontaneously) | | |
| ☐ Uncertain relationship | | |
| ☐ Unstable Angina Pectoris | ☐ | ☐ |
| ☐ Sudden and/or Unexplained Death | ☐ | ☐ |
| ☐ Resuscitated Cardiac Arrest (without identified cause listed elsewhere) | ☐ | ☐ |
| ☐ Cardiac (atrial or ventricular) Thrombus | ☐ | ☐ |

| PERIPHERAL VASCULAR EVENTS | Confirmed strictly by criteria | Based on clinical |
|----------------------------|--------------------------------|-------------------|
| **judgment** ☐ Pulmonary Embolism | ☐ | ☐ |
| ☐ **Fatal**  ☐ **Non-fatal** | | |
| Major STRESSOR RELATIONSHIP  (CHECK ONE BOX): | | |
| ☐ Spontaneous (PE occurred spontaneously) | | |
| ☐ Secondary to antecedent stressor | | |
| ☐ Uncertain relationship | | |
| ☐ Peripheral Arterial Thrombosis/Thromboembolism | ☐ | ☐ |
| ☐ **Fatal**  ☐ **Non-fatal** | | |
| ☐ Peripheral Venous Thrombosis | ☐ | ☐ |
| MAJOR STRESSOR RELATIONSHIP  (CHECK ONE BOX): | | |
| ☐ NOT Related (occurred spontaneously) | | |
| ☐ Related (related to surgery or trauma) | | |
| ☐ Uncertain relationship | | |

Confidential Property of Merck & Co., Inc.

\\USWSAP0190\VistaTempDir\aFD9.tmp.doc

62

| Compound | Protocol | Study Site | Baseline | AN | WAES # | Restricted |
|----------|----------|------------|----------|-----|--------|-----------|
|          |          |            |          |    |        | R ◇ Confidential limited access |

## VASCULAR EVENT FINAL ADJUDICATION FORM

| NEUROLOGY EVENTS | Confirmed strictly by criteria | Based on clinical judgment |
|------------------|-------------------------------|--------------------------|
| ☐ Ischemic Cerebrovascular Stroke with adequate documentation to subclassify etiology | ☐ | ☐ |
| ☐ Fatal   ☐ Non-fatal | | |
| Subtype of Ischemic CVA | | |
| ☐ Due to large-artery atherosclerosis   ☐ Small artery occlusion (Lacune) | | |
| ☐ Due to cardioembolism   ☐ Other determined etiology | | |
| ☐ Ischemic Cerebrovascular Stroke without adequate documentation to subclassify etiology | ☐ | ☐ |
| ☐ Fatal   ☐ Non-fatal | | |
| ☐ Hemorrhagic Cerebrovascular Stroke or hemorrhagic change | ☐ | ☐ |
| ☐ Fatal   ☐ Non-fatal | | |
| ☐ Cerebrovascular Venous Thrombosis | ☐ | ☐ |
| ☐ Fatal   ☐ Non-fatal | | |
| ☐ Transient Ischemic Attack | ☐ | ☐ |
| ☐ Ocular Vascular Event | ☐ | ☐ |

**NON THROMBO-EMBOLIC EVENT**

☐ Event unrelated to thrombotic/ thromboembolic conditions
(e.g. pneumonia, cancer, subarachnoid hemorrhage from aneurysm or trauma)
☐ Fatal   ☐ Non-fatal

**UNABLE TO ADJUDICATE:**
☐ Insufficient data
☐ Other: (specify):

**ENDPOINT/ADJUDICATION NOTES:**

- 2 -

Confidential Property of Merck & Co., Inc.
\\USWSAP0190\VistaTemp\Dir\aFD9.tmp.doc

63

| Compound | Protocol | Study Site | Baseline | AN | WAES # | Restricted |
|----------|----------|------------|----------|-----|--------|------------|
|          |          |            |          |     |        | R ◇ Confidential limited access |

## VASCULAR EVENT FINAL ADJUDICATION FORM

**CV ENDPOINTS**

☐ Investigator-reported cardiovascular event.

☐ Confirmed thrombotic cardiovascular event.

☐ APTC endpoint (unknown, sudden, cardiovascular, or hemorrhagic death, myocardial infarction, or stroke).

             Other APTC Term:

☐ Cardiovascular death.

☐ Confirmed thrombotic cardiovascular death.

☐ Death throwback (applicable to specified studies only): Cases where the patient has a nonfatal SAE that starts on study drug or within a study-specified number of days (e.g., 14 or 28) after discontinuation of study therapy that is related (a precursor) to the fatal SAE that is the cause of death AND the death date and start date of the fatal SAE occur greater than the study specified number of days after discontinuation of study therapy.

VEC Chair: _____     DATE: _____

- 3 -

Confidential Property of Merck & Co., Inc.
\USWSAP0190\VistaTempDir\aFD9.tmp.doc

64

MRK-S0420052389