# Exhibit E

Arnold L. Katz, M.D.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION ) | MDL DOCKET NO. 1657 SECTION L |
| ) | |
| ) | JUDGE FALLON |
| THIS DOCUMENT RELATES TO: ) | |
| ) | MAGISTRATE JUDGE |
| JO LEVITT, ) | KNOWLES |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 2:06-cv-09757-EEF-DEK |
| ) | |
| MERCK & CO., INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

VOLUME II

DEPOSITION OF ARNOLD L. KATZ, M.D., a Witness, taken on behalf of the Defendant before Lindi E. Cooney, CSR No. 0919, CCR No. 1089, pursuant to Notice on the 8th day of May, 2013, at the offices of Dr. Arnold Katz, M.D., 10550 Quivira Road, Suite 320, Lenexa, Kansas.

Arnold L. Katz, M.D.

| Page 69 | Page 71 |
|---|---|
| 1  APPEARANCES | 1  since our last deposition? |
| 2 | 2    A.  No. |
| 3  NO APPEARANCE FOR THE PLAINTIFF: | 3    Q.  In any case? |
| 4 | 4    A.  No. |
| 5  APPEARING FOR THE DEFENDANT: | 5    Q.  Since our last deposition in January |
| 6     M. Elaine Horn, Esquire | 6  have you had any communications with Mrs. Levitt? |
|       Jonathan L. Williams, Esquire | 7    A.  I have not. |
| 7     Williams & Connolly, LLP | 8    Q.  Or any member of her family? |
|       725 Twelfth Street N.W. | 9    A.  My staff could probably tell you this |
| 8     Washington, D.C. 20005 | 10  better. But I believe she called to make an |
|       202-434-5000 | 11  appointment. But that appointment was not made or |
| 9     elainehorn@wc.com | 12  kept. |
|       jonathanwilliams@wc.com | 13   Q.  Do you know why she was making an |
| 10 | 14  appointment? |
| 11    INDEX | 15   A.  I'll see if there's any documentation. |
| 12  WITNESS:              PAGE: | 16  Here is the note from March 29, 2013 that my staff |
| 13  ARNOLD L. KATZ, M.D. | 17  made. (Handing document to Ms. Horn.) |
| 14    Examination By Ms. Horn      70 | 18   Q.  Would it be possible to get a copy of |
| 15 | 19  this and mark it as an exhibit? |
| 16    EXHIBITS | 20   A.  Yes. |
| 17  EXHIBIT              PAGE | 21   Q.  Other than that phone message from |
| 18  NUMBER  DESCRIPTION  IDENTIFIED | 22  your staff have you had any other communications with |
| 19   4   Celebrex Label       78 | 23  Ms. Levitt? |
| 20   5   4/6/05 Memorandum    81 | 24   A.  No. |
| 21   6   3/29/13 Office Memo  85 | |
| 22 | |
| 23  NOTE: Katz Exhibits 4, 5 and 6 were attached to the | |
| 24  original transcript. | |

| Page 70 | Page 72 |
|---|---|
| 1     (Deposition commenced at 9:01 a.m.) | 1    Q.  Or anyone on her behalf? |
| 2        ARNOLD L. KATZ, M.D., | 2    A.  No. And I didn't speak to her. |
| 3  being first duly sworn, testified under oath as | 3    Q.  What is your understanding for why |
| 4  follows: | 4  some drugs are dispensed by prescription versus some |
| 5         EXAMINATION | 5  drugs you can buy over the counter? Why is there |
| 6  BY MS. HORN: | 6  that distinction? |
| 7    Q.  Good morning. | 7    A.  I'm not sure I understand that |
| 8    A.  Good morning. | 8  question. |
| 9    Q.  As you know, this is a continuation of | 9    Q.  I'll withdraw it. You prescribe |
| 10  a deposition that we started in January. I believe | 10  medication, correct? |
| 11  at that deposition that you waived signature. | 11   A.  Yes. |
| 12   A.  Yes. | 12   Q.  And generally the medication that you |
| 13   Q.  Not withstanding that, did you have | 13  prescribed, they are not available over the counter, |
| 14  any reason or opportunity to review the transcript? | 14  or they are not available in the dose that you |
| 15   A.  None. | 15  prescribe them over the counter, is that right? |
| 16   Q.  Since the first day of our deposition | 16   A.  That's correct. |
| 17  have you looked at any documents concerning this | 17   Q.  Is there a general reason why some |
| 18  case? | 18  medications are available only by prescription? |
| 19   A.  No. | 19   A.  They are available by prescription |
| 20   Q.  You have Mrs. Levitt's chart before | 20  partly it's my understanding because of patent laws. |
| 21  you. Have you looked at the chart since the last | 21  Companies have developed these drugs to sell as |
| 22  deposition? | 22  prescription medications. As they become older and |
| 23   A.  No. | 23  perhaps generic at lower doses, for business reasons |
| 24   Q.  Have you had any other depositions | 24  companies try to market them as over the counter |

2 (Pages 69 to 72)

Arnold L. Katz, M.D.

Page 73

1  preparations rather than as prescription medications.
2      Q.   Would you agree that there's an
3  exercise of medical judgment that's essential to
4  allowing people access to prescription medications
5  that -- I'll rephrase.  Would you agree that in terms
6  of dispensing prescriptions to patients generally,
7  would you agree there's some exercise of medical
8  judgment that goes into that?
9      A.   Yes.
10     Q.   And we went over this last time, that
11 you prescribed numerous medications in your practice.
12 Would you agree that for each of the medications that
13 you personally prescribe that you exercise your
14 medical judgment in making that determination?
15     A.   Yes.
16     Q.   And when you're making that
17 determination do you try to familiarize yourself with
18 the label and the safety information that's available
19 about that product?
20     A.   Yes.
21     Q.   And other than the label or the
22 prescribing information that comes with the
23 medication, are there other sources of information
24 that you look to to get safety information about

Page 74

1  drugs?
2      A.   Yes.
3      Q.   What would those be?
4      A.   I certainly review our major journals.
5  I may engage in discussion with the pharmaceutical
6  rep.  I may attend a program that further discusses a
7  specific product.
8      Q.   So like an educational program?
9      A.   Yes.
10     Q.   Do you subscribe to the Physician's
11 Desk Reference, the PDR?
12     A.   It's sent every year.
13     Q.   Are there journals that you read more
14 frequently than others?
15     A.   Arthritis and Rheumatism is the most
16 frequently read journal for me.
17     Q.   And do you also attend medical
18 conferences where medications are discussed?
19     A.   Yes.
20     Q.   And from time to time do you confer
21 with your medical colleagues about different
22 medications?
23     A.   Yes.
24     Q.   And you draw upon all that information

Page 75

1  when you decide to write a prescription, is that
2  right?
3      A.   Yes.
4      Q.   It's true that information that's
5  available about any individual drug, it changes over
6  time, again more as it's used you get more
7  information, is that right?
8      A.   Yes.
9      Q.   And as more and more patients and
10 doctors are exposed to the medication sometimes the
11 information about the safety profile changes, is that
12 right?
13     A.   That's true.
14     Q.   And so even though there are clinical
15 trials that may have been done prior to approval,
16 sometimes there are risks that are so small they
17 can't be detected until the medications are in
18 widespread use?
19     A.   That is true.
20     Q.   As new information becomes available
21 typically that's incorporated into some type of a
22 label change, is that right?
23     A.   Yes.
24     Q.   And do you make an effort to keep up

Page 76

1  to date on label changes?
2      A.   Yes.
3      Q.   From time to time do you receive Dear
4  Doctor letters, or Dear Health Care Professional
5  letters in your office?
6      A.   Yes.
7      Q.   How are those handled?
8      A.   They come to my desk and I read them.
9      Q.   You read them personally?
10     A.   Yes.
11     Q.   Switching gears for a moment.  Back to
12 Mrs. Levitt.  We already went over her diagnosis and
13 everything before.  But I wanted to clarify a couple
14 things.  When she came to you, you diagnosed her with
15 fibromyalgia, is that right?
16     A.   Yes.
17     Q.   And in light of her condition in that
18 time period -- I believe it was 1999, is that right?
19     A.   Yes.
20     Q.   Would you agree that she required some
21 type of NSAID to treat her pain?
22     A.   Yes.
23     Q.   And when you prescribed Vioxx to her
24 she did well on it, her pain responded well to it, is

3 (Pages 73 to 76)

Page 77

1  that correct?
2     A.  Well, after starting the medication I
3  have indicated in the chart that she clinically
4  improved with the Vioxx.
5     Q.  And you continued to prescribe it to
6  her until April 2002 when her insurance coverage
7  changed, is that right?
8     A.  April 5, 2002 I said continue Vioxx.
9     Q.  I believe if you keep looking for a
10 phone message from April 29 regarding her insurance
11 coverage.
12    A.  (Examines document.) April 29th,
13 2002, yes. Insurance won't cover Vioxx, is there
14 something else. We switched to that Nabumetone.
15    Q.  And after you switched Mrs. Levitt you
16 continued to prescribe Vioxx to other patients, is
17 that right?
18    A.  Yes.
19    Q.  Including other fibromyalgia patients
20 like Mrs. Levitt?
21    A.  Yes.
22    Q.  And Merck voluntarily withdrew Vioxx
23 from the market in September of 2004. Am I correct
24 you continued to prescribe Vioxx up until it was

Page 78

1  withdrawn?
2     A.  Yes.
3     Q.  And you continued to prescribe it to
4  fibromyalgia patients like Mrs. Levitt?
5     A.  Yes.
6     Q.  As we sit here today you will
7  prescribe Celebrex to patients, is that right?
8     A.  Yes.
9         (Katz Exhibit 4 was marked
10 for identification.)
11    Q.  (By Ms. Horn)  I'm handing you what
12 we've mark as Exhibit 4, which is a copy of the most
13 recent Celebrex label that's available on their
14 website. And you're familiar with -- generally
15 familiar with this label, is that fair to say?
16    A.  Yes.
17    Q.  And today this label has a Big
18 Box warning, right?
19    A.  Yes.
20    Q.  And if you could take a moment and
21 look at the warning. I have a couple questions about
22 the language in the box.
23    A.  Yes.
24    Q.  That first bullet point, can you just

Page 79

1  read it into the record for me, the one under
2  cardiovascular risks?
3     A.  Celebrex may cause an increased risk
4  of serious cardiovascular thrombotic events,
5  myocardial infarction, and stroke, which can be
6  fatal. All NSAIDs may have a similar risk. The risk
7  may increase with duration of use. Patients with
8  cardiovascular disease or risk factors for
9  cardiovascular disease may be at greater risk. See
10 warnings in clinical trials.
11    Q.  You would agree that's a pretty strong
12 warning?
13    A.  Yes.
14    Q.  If you turn to Pages 9 and 10, which
15 is the section that describes clinical trials. Go
16 down to the bottom. I'm not going to try to
17 pronounce that. Can you read that?
18    A.  Adenomatous polyp prevention studies.
19    Q.  Can you take a moment and read that
20 description to yourself and then I have a couple
21 questions.
22    A.  Yes.
23    Q.  And is it fair to say that to
24 summarize that for a layperson, that's describing a

Page 80

1  trial in which Celebrex was compared to placebo and
2  it was shown to have an increased risk of serious
3  cardiovascular events?
4     A.  Yes.
5     Q.  Drop down two more paragraphs to the
6  section clinical trials of other COX-2. Could you
7  just read that?
8     A.  Clinical trials of other COX-2
9  selective and non selective NSAIDs of up to three
10 year duration have shown an increased risk of serious
11 cardiovascular thrombotic events, myocardial
12 infarction and stroke which can be fatal. As a
13 result all NSAIDs are considered potentially
14 associated with this risk.
15    Q.  Knowing of this safety information you
16 continue to prescribe Celebrex to appropriate
17 patients?
18    A.  Yes.
19    Q.  And some of those patients include
20 your fibromyalgia patients?
21    A.  Yes.
22    Q.  And the warning here references other
23 NSAIDs. Do you continue to prescribe other NSAIDs to
24 your fibromyalgia patients?

Page 81

1   A. Yes.
2   Q. Patients like Mrs. Levitt?
3   A. Yes.
4   Q. Is it true that one of the key
5   characteristics of fibromyalgia is the chronic pain?
6   A. Yes.
7   Q. And so effective pain control for
8   those patients is critical?
9   A. Yes.
10  Q. And there are different types of pain
11  medications other than NSAIDs, correct?
12  A. Yes.
13  Q. But do you find it important to have
14  the class of NSAIDs available to use as a tool for
15  your patients?
16  A. Yes.
17  Q. Have you ever participated on an FDA
18  Advisory Committee?
19  A. No.
20         (Katz Exhibit 5 was marked
21  for identification.)
22  Q. (By Ms. Horn)  What we have marked as
23  Exhibit 5 is a memorandum dated April 6, 2005 from
24  John K. Jenkins and Paul Seligman who are FDA

Page 82

1   personnel to various NDA files.  And I'll represent
2   these are NDA files for various COX-2s.  Have you
3   seen this document before?
4   A. I don't believe so, no.
5   Q. Do you recall that at some point after
6   Vioxx was gone from the market there was an FDA
7   Advisory Committee to discuss all COX-2s?
8   A. Yes.
9   Q. And eventually all NSAIDs?
10  A. Yes.
11  Q. And as a result of those meetings the
12  warnings for the entire class was strengthened?
13  A. Yes.
14  Q. I'll direct your attention to certain
15  parts of it.  Although if you want to read the whole
16  thing you're free to do so.  Under executive summary,
17  the first bullet that starts the three approved COX-2
18  selective NSAIDs.
19  A. Yes.
20  Q. Can you read that for us?
21  A. The three approved COX-2 selective
22  NSAIDs, in other words, Celecoxib, Rofecoxib, and
23  Valdecoxib, are associated with an increased risk of
24  serious adverse cardiovascular events comparable to

Page 83

1   placebo.  The available data do not permit a rank
2   ordering of these drugs with regard to cardiovascular
3   risks.
4   Q. Would you agree that that means that
5   the available data means that it's not possible to
6   say one COX-2 is better or worse than another COX-2
7   with respect to CV risk?
8   A. That's correct.
9   Q. So one could not say there's some
10  available data that Celebrex has a better safety
11  profile with respect to CV risk than Vioxx?
12  A. That would be correct.
13  Q. And nor could anyone say the converse,
14  that Vioxx had a better safety profile for CV risk
15  than Celebrex?
16  A. That's true.
17  Q. If you turn to Page 4, which includes
18  a summary of the then available data for Celecoxib,
19  which is Celebrex, is that right?  Do you see the
20  section?
21  A. Yes, I do.
22  Q. And Celecoxib is Celebrex, is that
23  right?
24  A. Correct.

Page 84

1   Q. And I want to highlight a sentence for
2   you.  In the first paragraph under the Celecoxib
3   heading, that in the APC trial a two to threefold
4   increased risk of adverse CV events was seen for
5   Celecoxib compared to placebo after a mean duration
6   of treatment of 33 months.  Is that right?
7   A. Yes.
8   Q. And if you turn the page and there's a
9   summary of information about Rofecoxib.  Do you see
10  that?
11  A. Yes.
12  Q. And Rofecoxib is Vioxx, is that right?
13  A. Yes.
14  Q. And if you go about three lines down
15  it talks about approved, the approved trial in which
16  Rofecoxib 25 milligrams once daily was compared to
17  placebo for up to three years.  A relative risk of
18  approximately two was seen for Rofecoxib compared to
19  placebo for serious adverse CV events.  Do you see
20  that?
21  A. Yes.
22  Q. Would you agree that the description
23  and risks for those two medications are comparable?
24  A. Different studies, but the number is

5 (Pages 81 to 84)

Arnold L. Katz, M.D.

Page 85

1  approximately the same.
2      Q.   And if you return to Page 2, the
3  second paragraph of this memo -- the second bullet
4  point.  It reads, pending the availability of
5  additional long-term controlled clinical trial data
6  the available data are best interpreted as being
7  consistent with a class effect of an increased risk
8  of serious adverse CV events for COX-2 selective and
9  non selective NSAIDs?
10     A.   Yes.
11     Q.   Do you agree with that conclusion?
12     A.   Yes.
13     Q.   As we know, Vioxx was voluntarily
14  withdrawn from the market by Merck before the date of
15  this memo.  If Vioxx were available today and it had
16  the same warning that we just read on the Celebrex
17  label, would you continue to describe it?
18     A.   Yes.
19     Q.   Would you continue to describe it to
20  fibromyalgia patients?
21     A.   Yes.
22     Q.   Patients like Mrs. Levitt?
23     A.   Yes.
24         MS. HORN:  Off the record.

Page 86

1         (Katz Exhibit 6 was marked
2  for identification.)
3         MS. HORN:  Back on the record.
4      Q.   (By Ms. Horn)  What we are marking as
5  Exhibit 6 is the note that you referenced earlier
6  about a phone call from Mrs. Levitt March 29th, 2013?
7      A.   Yes.
8      Q.   It looks look there was writing made
9  at two different times.  And I see the second entry
10 there's a 4/1.  Does it look like there were two
11 calls?  Or how would you interpret that?
12     A.   It looks like there was a call to us,
13 and the front desk receptionist wrote the note.  And
14 then another member of my staff -- this looks like
15 the writing of the office manager, called her back,
16 and that's what she documented.
17     Q.   Okay.  Was any attempt made to call
18 Mrs. Levitt back after this?
19     A.   I think the April 1st is an indication
20 of what was discussed between the office manager and
21 Mrs. Levitt.  I did not speak to her.
22     Q.   As far as you know nothing else ever
23 happened after that?
24     A.   As far as I know that is correct.

Page 87

1         MS. HORN:  We're done.  Thank you very
2  much for your time.
3         (Deposition concluded at 9:25 a.m.)
4         (Whereupon, it was stipulated by
5  counsel and the witness that submission of the
6  transcribed deposition to the witness for
7  examination, reading and signing is waived and that
8  said deposition shall possess the same force and
9  effect as though read and signed by the witness.)

Page 88

1         C E R T I F I C A T E
2         I, Lindi E. Cooney, a Certified Shorthand
3  Reporter of the State of Kansas, do hereby certify:
4         That prior to being examined the witness
5  was by me duly sworn;
6         That said deposition was taken down by me
7  in shorthand at the time and place hereinbefore
8  stated and was thereafter reduced to writing under my
9  direction;
10        That I am not a relative or employee or
11 attorney or counsel of any of the parties, or a
12 relative or employee of such attorney or counsel, or
13 financially interested in the action.
14        WITNESS my hand and seal this 8th day of
15 May, 2013.

                    _____
                    Lindi E. Cooney
                    CSR No. 0919, CCR No. 1089

6 (Pages 85 to 88)

Golkow Technologies, Inc. - 1.877.370.DEPS