```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2    *******************************************************************

3    IN RE:  VIOXX PRODUCT                 Docket No. 05-1657
     LIABILITY LITIGATION                  Section "L"
4                                          New Orleans, Louisiana
                                           Wednesday, August 17, 2016
5    *******************************************************************

6    THIS DOCUMENT RELATES TO:

7    JO LEVITT V. MERCK SHARP & DOHME CORP.
     2:06-CV-9757
8    *******************************************************************

9
                     TRANSCRIPT OF MOTION PROCEEDINGS
10            HEARD BEFORE THE HONORABLE ELDON E. FALLON
                     UNITED STATES DISTRICT JUDGE
11


12
     APPEARANCES:
13
     FOR JO LEVITT:                HUMPHREY FARRINGTON & McCLAIN
14                                 BY:  KENNETH B. McCLAIN, ESQ.
                                   221 W. Lexington Ave., Suite 400
15                                 Independence, MO 64050

16

17   FOR MERCK:                    WILLIAMS & CONNOLLY
                                   BY:  PAUL E. BOEHM, ESQ.
18                                      M. ELAINE HORN, ESQ.
                                        BENJAMIN W. GRAHAM, ESQ.
19                                      RICHARD W. SCHULTE, ESQ.
                                   725 Twelfth St., N.W.
20                                 Washington, D.C. 20005

21

     Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR, RMR
22                                 500 Poydras Street, Room HB-406
                                   New Orleans, Louisiana 70130
23                                 (504) 589-7776

24

       Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

<u>P R O C E E D I N G S</u>

(WEDNESDAY, AUGUST 17, 2016)

(MOTION PROCEEDINGS)

09:50:08 5    (OPEN COURT.)

09:50:08 6         THE COURT:  Be seated, please.  Good morning, ladies and

09:50:10 7    gentlemen.  Let's call the case.

09:50:11 8         THE DEPUTY CLERK:  MDL 1657, *in re:  Vioxx Products*

09:50:15 9    *Liability Litigation*.

09:50:18 10        THE COURT:  Will counsel make their appearance for the

09:50:20 11   record, please.  First for the plaintiff.

09:50:20 12        MR. McCLAIN:  For the plaintiff, Kenneth McClain, your

09:50:23 13   Honor, for Ms. Levitt.

09:50:25 14        THE COURT:  Okay, Mr. McClain.  For the defendant.

09:50:27 15        MR. BOEHM:  Good morning, your Honor, Paul Boehm for

09:50:28 16   Merck.

09:50:29 17        THE COURT:  Okay.  This is a matter that grows out of the

09:50:33 18   Vioxx litigation.  Ms. Jo Levitt indicates that she consumed Vioxx

09:50:42 19   in accordance with a prescription given to her by her doctor.  She

09:50:47 20   claims that over the period she's had some issues, cardiovascular

09:50:54 21   issues, and she's filed suit against Merck.  This grows out of the

09:51:03 22   MDL litigation.

09:51:07 23        The motions before me today, I have a number of *Daubert*

09:51:12 24   motions, but counsel has given me well-crafted briefs on each side,

09:51:18 25   as well as depositions, as well as the reports of the doctors or

09:51:26  1    the individuals that are the subject of *Daubert* motions, and I

09:51:33  2    really don't need any oral argument on that.  I understand it and

09:51:36  3    I'll be ruling on that.

09:51:38  4         But there is another motion and that is a partial summary

09:51:43  5    judgment motion regarding Ms. Levitt's business losses; in addition

09:51:53  6    to personal injuries and in addition to medical expenses, she

09:51:58  7    claims various business losses.  And Merck takes the position that

09:52:05  8    as a matter of law, these losses are not recoverable.  The

09:52:10  9    plaintiff takes issue with that and feels that they are.  So I'll

09:52:14 10    hear from the parties now.

09:52:17 11         MR. BOEHM:  Good morning, your Honor, this is Paul Boehm.

09:52:19 12    As your Honor is aware and just referenced, there are five motions

09:52:22 13    before the Court.  We have seen and I am mindful of the Court's

09:52:25 14    order asking that we focus on Merck's summary judgment motion, and

09:52:28 15    we propose that we start with that.  My partner Ms. Horn will spend

09:52:32 16    whatever time the Court would like addressing that motion.

09:52:35 17         We did just want to note that we are also prepared to

09:52:38 18    discuss anything that might be on the Court's mind or questions

09:52:41 19    with respect to the expert-related motions, in particular if the

09:52:44 20    Court has any preliminary views or questions that could lead to the

09:52:47 21    denial of those motions, we would appreciate the opportunity to

09:52:50 22    address those issues or questions.

09:52:52 23         At a minimum, your Honor, we did not receive your order

09:52:56 24    until we were on the tarmac to leave Washington yesterday

09:53:00 25    afternoon.  We prepared some materials in connection with our

09:53:03  1   anticipated argument on those expert-related motions that I would

09:53:05  2   like to hand up to the Court.

09:53:06  3        THE COURT:  Okay, that's fine.  And also send a copy to

09:53:09  4   the plaintiff so that they have it.

09:53:11  5        MR. BOEHM:  We will e-mail those right away.  Thank you,

09:53:14  6   your Honor.

09:53:15  7        THE COURT:  Okay.  Good.

09:53:17  8        MS. HORN:  Good morning, your Honor.  Elaine Horn from

09:53:20  9   Williams and Connolly here on behalf of Merck on the motion for

09:53:23 10   partial summary judgment as to damages.  Specifically as to

09:53:27 11   business damages that Mrs. Levitt seeks to recover in this case.

09:53:31 12        And as you know, this is the last case, last personal

09:53:35 13   injury case; and one of the reasons that we're still here is that

09:53:37 14   there is a vast disparity between the parties' views as to what

09:53:41 15   types of damages can be recovered in this case.

09:53:43 16        Ms. Levitt would like to recover for certain businesses

09:53:47 17   that closed after about eight years after her cardiac events, and

09:53:51 18   it's Merck's position that Missouri law does not permit that.

09:53:54 19        Now, just a handful of key facts that are pertinent to

09:53:58 20   this particular motion.  Mrs. Levitt had her cardiac events in

09:54:03 21   March and May of 2000, those are the events that are the subject of

09:54:06 22   this particular litigation.  And at that time she had an ownership

09:54:10 23   interest in several different businesses.  She had a 50 percent

09:54:15 24   ownership in a business known as Chocolate Soup Retail, which is a

09:54:19 25   corporation that owned a chain of high end children's clothing

09:54:23  1   stores, there are 14 different locations in major cities across the

09:54:26  2   country; she owned a 45 percent interest in a holding company that

09:54:30  3   also owned a corporation called Chocolate Soup Manufacturing, which

09:54:36  4   was the company that actually created clothing that was based on

09:54:40  5   Mrs. Levitt's designs; and then that same holding company also

09:54:44  6   owned a hotel in Lincoln, Nebraska that she had purchased from her

09:54:49  7   father some years ago.

09:54:50  8          Now, all of those businesses continued to operate for

09:54:54  9   eight years after she had her events.  They did not close until the

09:54:58  10  2008-2009 time period, which was the same time period which you may

09:55:03  11  recall there was a great recession, financial crisis, lots of

09:55:07  12  economic difficulties in the country at that same time.

09:55:10  13         So we raise a number of issues in our brief.  I would

09:55:13  14  like to focus on two of them, either one of which would warrant

09:55:18  15  granting Merck's motion.  The first is that there was a clear case

09:55:22  16  that we cite in our brief that as a general rule a personal injury

09:55:27  17  plaintiff cannot recover for lost profits in business in a personal

09:55:30  18  injury action.

09:55:31  19         THE COURT:  And we're dealing with Missouri law here

09:55:33  20  because that's where she lives and that's where the drug was

09:55:36  21  consumed.

09:55:38  22         MS. HORN:  Correct.  And there is a limited exception to

09:55:44  23  that general rule in which lost profits can be used as a proxy for

09:55:50  24  a personal injury plaintiff's lost earning capacity, and it's that

09:55:54  25  limited exception that's the focus of dispute here.  The Levitts

09:56:00  1   would like to squeeze within that exception, and the undisputed

09:56:05  2   facts in this case clearly show that that exception does not apply.

09:56:10  3        And the key element of that particular exception is that

09:56:14  4   the plaintiff must make a substantial showing that the businesses

09:56:18  5   for which she seeks to recover lost profits did not rely on in any

09:56:27  6   significant fashion on invested capital or the labor of others.

09:56:30  7   And we cite numerous cases that talk about that.  And here that's

09:56:34  8   the determining factor because we have companies that employed

09:56:38  9   hundreds of people, all across the country.  She very well, as they

09:56:42 10   have put out in their briefs, she was one of the founders and much

09:56:46 11   of the clothing operation was based on her designs.  But it was not

09:56:49 12   a sole proprietorship, it was not a one-woman show.  And she may

09:56:54 13   have been the most important person in the company, but it still

09:56:57 14   required hundreds of people.

09:56:58 15        And you can look at the plaintiff's response to our

09:57:00 16   statement, our Rule 56.1 statement, statement of undisputed facts,

09:57:04 17   and the admissions in there clearly show that that exception does

09:57:07 18   not apply.

09:57:08 19        THE COURT:  How do you see the exception tailored?  Is it

09:57:12 20   that the plaintiff must show that it was not personal services

09:57:20 21   predominating?

09:57:21 22        MS. HORN:  Well, it's two:  She must show that personal

09:57:25 23   services dominate and make a substantial showing that invested

09:57:29 24   capital and the labor of others was relatively insignificant.  So

09:57:34 25   as applied here, you would need to show that the millions of

dollars invested in these business and the labor of hundreds of
other people across the country was relatively insignificant to the
operation of this business.  And her own admission showed that
that's just not the case.

In the statement of Rule 56.1 statement she admitted that
the multiple family businesses relied on the labor of hundreds of
other individuals, that was her response to No. 10 and No. 17.  She
admitted that hundreds of individuals performed functions, and I
quote, "necessary to keep the businesses running."  That's response
to No. 18.  And she admitted that both the hotel and the clothing
businesses utilized substantial invested capital, that's response
to No. 19.  And those issues alone take this case outside of the
exception.  And so for that reason alone, Merck's motion should be
granted.

But there's another reason that independently warrants
granting the motion.  And that's under Missouri law:  To recover
lost profit, you must show with reasonable certainty there is a
connection between the lost profits that you seek to recover and
the alleged wrongful conduct of the defendant.  So in this case
Mrs. Levitt needed to show with reasonable certainty there is a
connection between the cardiac events she suffered in March and May
of 2000 that she attributes to Merck and her businesses closing
eight or nine years later.  And she offers nothing but speculation,
there's no reasonable certainty.  She can't point to any facts that
support with reasonable certainty that those businesses would have

09:59:02  1   survived a worldwide economic crisis.

09:59:05  2        And, in fact, here, Mrs. Levitt has designated an expert

09:59:11  3   to opine on damages.  And he does, he provides a full report.  And

09:59:15  4   he testified that there is no basis to distinguish Mrs. Levitt's

09:59:18  5   business from the hundreds of other similar businesses that closed

09:59:22  6   during the same time period.  So since she can't point to any

09:59:26  7   reasonable -- any facts that showed reasonable certainty that there

09:59:29  8   is a connection, that's another reason to grant our motion.

09:59:32  9        THE COURT:  Okay.  Thank you very much let me hear from

09:59:35  10   the plaintiff on those issues.

09:59:38  11        MR. McCLAIN:  Yes, Judge.  Judge, you've heard more about

09:59:44  12   this case probably than you've wanted to.  And I appreciate the

09:59:52  13   Court's willingness to let me appear by phone, as you told me you

09:59:57  14   would in court two weeks ago.

10:00:00  15        THE COURT:  Yes.

10:00:00  16        MR. McCLAIN:  Ms. Levitt, this is a very unique

10:00:03  17   circumstance.  This Chocolate Soup company that she started and was

10:00:10  18   the driving force in, you know, like Reggie Jackson said, she was

10:00:17  19   the straw that stirred the drink.  It was a very big deal here in

10:00:26  20   Kansas City when it was running full speed, and she was the belle

10:00:33  21   of the ball in the media in regard to its creation and its vitality

10:00:42  22   and its effect on the local community of entrepreneurs here, and Jo

10:00:49  23   Levitt was the reason for that excitement.  She was the designer of

10:00:54  24   the clothing that was involved, she was the motivator of the other

10:01:03  25   individuals involved in the enterprise.  And so this is not the

10:01:12   1   type of situation that is talked about in the cases where one

10:01:13   2   individual is not consequential to the overall success of the

10:01:19   3   business.  In fact, she was the business.  And when she was taken

10:01:22   4   out of it, the business failed.

10:01:24   5          The suggestion by Ms. Horn that it required millions of

10:01:29   6   dollars of capital is correct, it was her money.  The business was

10:01:36   7   started with $5,000 and it was not a situation where it was a

10:01:43   8   public offering of stock or some other things that these cases talk

10:01:48   9   about, this is money that was generated by the company and put back

10:01:53  10   in; but also borrowed by she and her husband, which ultimately

10:01:58  11   forced them into bankruptcy.

10:02:01  12          So the investment part of this actually goes in her favor

10:02:05  13   as the cases discuss this issue in terms of her overall necessity

10:02:10  14   to the success of this business.

10:02:12  15          In addition to that, the fact that they had hundreds of

10:02:16  16   employees is true from time to time, but those people were

10:02:22  17   relatively at low levels of the success of this company.  And the

10:02:28  18   executive -- people that were, you know, employed to sew or to work

10:02:34  19   in the retail stores or other things that they operated, not to

10:02:40  20   denigrate their contribution because they did have some, but those

10:02:43  21   contributions were easy to replace.  Much easier than Ms. Levitt.

10:02:47  22   And the people in the executive decision making said we were really

10:02:55  23   responding to what Jo told us to do.

10:02:57  24          That's what the accountant said, that's what her husband

10:02:59  25   said, and it's demonstrated by the fact that when she was taken out

10:03:04 1   of businesses it collapsed.  It was a slow collapse but it was

10:03:09 2   because she had built up a substantial infrastructure around her.

10:03:13 3   But when she was not able to adjust to changing market conditions

10:03:18 4   because she no longer had the strength and vitality to do it, and,

10:03:24 5   you know, extensive discussion about her lack of energy caused

10:03:28 6   projects that used to be done in a short period of time because she

10:03:32 7   worked 70 to 90 hours a week, seven days a week before these heart

10:03:38 8   events that it would take months and months and months to do simple

10:03:43 9   tasks that she used to do in a short period of time.

10:03:46 10          So the testimony from our witnesses has been that, in

10:03:50 11   fact, her inability to react caused the company to fail because it

10:03:56 12   could not adjust to the changing circumstances that were

10:04:00 13   surrounding her.

10:04:03 14          THE COURT:  But, Counsel, but your opponent says that

10:04:06 15   your expert said that he felt it was too speculative.  How do you

10:04:10 16   deal with that?

10:04:11 17          MR. McCLAIN:  Well, Judge, what he said was that as an

10:04:15 18   economist, I am not able to differentiate within this business

10:04:24 19   other businesses that I see from a paper analysis.  But Ms. Levitt,

10:04:28 20   he said, may, in fact, be able to do that; and I am relying upon

10:04:32 21   her to discuss those damages, those are not within the scope of

10:04:35 22   what I am able to do.

10:04:39 23          So we fall back, Judge, on -- and she points out and as

10:04:43 24   you've recognized on a number of these issues, you know, a Judge in

10:04:47 25   Missouri may be in a better position to judge these things than

10:04:52 1   would appear on the surface.  I can remember -- I was trained at

10:04:57 2   the University of Michigan Law School.  When I first heard judges

10:05:03 3   telling me from the bench that a plaintiff can always testify to

10:05:06 4   their own damages in Missouri -- and in fact, that was on the bar

10:05:09 5   exam -- as a matter of Horn book law, it sounded foreign to me.

10:05:14 6   But it is so ingrained in our law, Judge, that it comes tripping

10:05:19 7   off the tongue of everyone that practices here.

10:05:21 8          And looking at the cases, Judge, you can see that

10:05:27 9   throughout -- and I just would give you an example.  This is a 2006

10:05:33 10  case and we didn't cite it because it wasn't the focus.  But I am

10:05:37 11  going to give it to the Court if that would be okay over the phone.

10:05:40 12          THE COURT:  Yes, go ahead.

10:05:42 13          MR. McCLAIN:  The case is *Parshall v. Buetzer*, and it's a

10:05:47 14  Court of Appeals decision, Western District of Missouri, July 11,

10:05:54 15  2006.  The Southwest site is 195, SW 3d, 515, 2006.  It was joined

10:06:06 16  in by our chief justice currently Judge Breckenridge on our Supreme

10:06:13 17  Court, so it's pretty current law, I think, on this issue.  And

10:06:17 18  reiterate this point, you know, here is the quote I would cite you:

10:06:22 19  "A business owner's testimonial evidence sufficient to provide the

10:06:26 20  trier of fact with a rational basis for estimating damages to the

10:06:29 21  plaintiff, including lost profits is sufficient."

10:06:34 22          So in other words, the testimony of a business owner

10:06:37 23  about their lost profits is even being sufficient in Missouri

10:06:42 24  without the need of an expert.  And here we have a woman who

10:06:47 25  testified, look.  At the start of this case my businesses were

worth $20 million.  I can support that by the fact that I submitted

financial statements to banks who lent me money based upon them

after reviewing all of the statements that I provided to them, and

following my illness I was bankrupt.  And she can document all of

the different iterations of financial statements that were provided

to the bank thereafter, which she ties to her illness.

So I think that there is a sufficient basis that is

contemporaneous with the events, documented with statements and

other things from the bank files during this time period, which

she, frankly, attributes to her illness, as do the other people

that were involved with the actual business at the time.

Now, Dr. Ward says as an economist, that's something that

I am not able to do, but you can establish that through the

testimony.  I am going to leave that to the plaintiff.  And that's

how I deal with that issue.

THE COURT:  All right.  Let me hear a response.  He says

that it's a question of fact because the plaintiff's going to say

that I am a key person, it's my personal services predominated, and

that all of the capital was my own.

MS. HORN:  Well, let's start with the last piece, all of

the capital was my own.  The source of the capital isn't the issue,

it's the fact that the profits that are generated from the business

are a return on capital and not a return on the individual's labor.

The cases in which this exception applies where you can use profit

as a proxy for earning capacity, this is where the business is all

10:08:40  1  about that person.  So like where you have a solo practitioner as

10:08:44  2  an attorney or doctor.  The cases that we cite, we had cases where

10:08:47  3  you had have very small construction company of ten people where

10:08:50  4  the main person was the plaintiff and that wasn't enough, that was

10:08:55  5  too much, there was too many people too much capital.  Here we have

10:08:58  6  hundreds.

10:08:59  7          THE COURT:  Or a doctor, for example, a doctor's office.

10:09:02  8          MS. HORN:  Correct, if you take the doctor out, the

10:09:05  9  business is all about that particular personal service.

10:09:08 10          I am not familiar with the specific case that Mr. McClain

10:09:12 11  referenced, but I know that cases that we found which talked about

10:09:17 12  whether or not a business owner -- the fact that a business owner

10:09:20 13  could testify to the value of his or her company, those were

10:09:23 14  largely cases in which the business itself was a party.  And so

10:09:27 15  here we're at the threshold question of not how much you want to

10:09:31 16  value the business at, but whether or not you even get there,

10:09:34 17  whether or not these are the type of losses that you can pursue

10:09:39 18  under on individual personal injury.

10:09:40 19          And under Missouri law they're not, they're just not.

10:09:42 20  And there is a very limited exception and it's not just that the

10:09:46 21  fact that Mrs. Levitt was so important, we are not trying to

10:09:50 22  dispute that.

10:09:50 23          I'll take a step back.  Mr. McClain started by staying

10:09:54 24  Ms. Levitt was like the star that stirred the drink.  Well, that's

10:09:57 25  good but you still need the drink.  Like you still need the people

10:10:00  1    to actually cut the clothes, make the clothes, sell the clothes,

10:10:03  2    you need people to do whatever they were doing with the hotel.  And

10:10:06  3    she could be Wonder Woman but she couldn't do all of that by

10:10:09  4    herself.

10:10:10  5          And so all of these millions of dollars in profit that

10:10:12  6    they wanted to recoup that required the capital and labor of

10:10:15  7    others, and because of that it's outside of the exception.

10:10:18  8          THE COURT:  All right.  I understand both positions.  Do

10:10:21  9    you want to respond to that case that he mentioned?  Do you feel

10:10:26 10    that that's necessary?  Do you feel it's necessary to respond?

10:10:31 11          MS. HORN:  No.

10:10:32 12          THE COURT:  Okay.  While I've got you all, give me your

10:10:35 13    thinking on Dr. Edelson (VERBATIM).

10:10:48 14          MR. BOEHM:  Do you mean Dr. Egilman, your Honor?

10:10:50 15          THE COURT:  Yes.  I am familiar with Dr. Egilman, but I

10:10:55 16    would like your thoughts on that.

10:10:57 17          MR. BOEHM:  And, your Honor, as I mentioned, we brought

10:10:59 18    with us some slides that we prepared in anticipation.  We will not

10:11:02 19    by any means go through all of these slides.

10:11:05 20          THE COURT:  Just Dr. Egilman's.  You can hand those out.

10:11:13 21          MR. BOEHM:  And we e-mailed those to Mr. Thomas.

10:11:17 22          MR. McCLAIN:  We can't get them to download.

10:11:24 23          MR. BOEHM:  I think we sent two versions, one is the full

10:11:27 24    size and one is cut in half so it's small enough that it should

10:11:31 25    come through.  We can try again, we'll do that now.

10:11:35   1          THE COURT:  I just need Dr. Egilman.  Dean, can you put

10:11:38   2   the screen down?

10:11:49   3          MR. BOEHM:  I am not anticipating using -- putting any

10:11:52   4   slides up on the screen, your Honor, unless you would like me to do

10:11:53   5   that.

10:11:53   6          THE COURT:  No, that's okay.

10:11:54   7          MR. BOEHM:  I was just going to direct your attention to

10:11:57   8   certain slides on the hard copy that I provided to you.

10:12:00   9          I want to focus on two specific arguments that plaintiff

10:12:05  10   has made with connection with Dr. Egilman.  And of course any other

10:12:05  11   that are on the Court's mind.

10:12:08  12          I'll direct the Court's attention to slide No. 4.  The

10:12:13  13   first plaintiff's argument that I wanted to address:  The idea that

10:12:16  14   Dr. Egilman already has been accepted as an expert in other Vioxx

10:12:32  15   cases, and I guess the implication being that that is -- stands for

10:12:36  16   his qualifications to testify in this particular case.

10:12:39  17          To be clear, Dr. Egilman has been designated and has been

10:12:45  18   permitted to testify in one Vioxx case, that was the *Ernst* case,

10:12:49  19   which plaintiff's counsel correctly pointed was the first Vioxx

10:12:53  20   trial that took place in 2005 in Texas state court.  Plaintiff did

10:12:57  21   not in their opposition brief, however, mention the appeal of that

10:13:00  22   case.  The appellate court singled Dr. Egilman out and specifically

10:13:06  23   rejected his testimony.

10:13:09  24          Dr. Egilman in that case was testifying based on the

10:13:12  25   presumption that the plaintiff had experienced myocardial

10:13:16  1   infarction.  His report was focused on myocardial infarction data,

10:13:21  2   his opinions were based on myocardial infarction related data and

10:13:25  3   information, and he expressed opinions on that basis.  The

10:13:28  4   appellate court said that was an unwarranted assumption and because

10:13:35  5   of that, his testimony should be rejected.  In fact, we have on

10:13:38  6   slide 5 of what you have in front of you an excerpt from the

10:13:41  7   opinion in that matter.  The same thing is happening here.

10:13:46  8   Plaintiff --

10:13:47  9            MR. McCLAIN:  Can we just stop.  This is catching me by

10:13:50  10  surprise in light of what we were told to prepare for and in light

10:13:54  11  of the fact that this was not -- you can't download what they sent

10:13:57  12  us and it's not cited in their brief.

10:14:00  13            MR. BOEHM:  Actually it is cited in our brief.

10:14:02  14            THE COURT:  Well, let's do it this way.  Don't refer to

10:14:06  15  any documents, just tell me your argument just from the

10:14:12  16  standpoint --

10:14:13  17            MR. BOEHM:  Sure, that's fine, your Honor.

10:14:18  18            In that opinion, the Court determined that Dr. Egilman's

10:14:21  19  opinions were not appropriate because he was relying on assumptions

10:14:25  20  about myocardial infarction in a case where the plaintiff did not

10:14:28  21  experience myocardial infarction.

10:14:29  22            In this case Dr. Egilman concedes that Ms. Levitt did not

10:14:34  23  experience myocardial infarction.  He expressly testified in his

10:14:37  24  deposition that she did not have a myocardial infarction, but

10:14:41  25  rather that the injury that he had identified was that of unstable

10:14:47  1    angina.

10:14:48  2                THE COURT:  Doesn't that go to his conclusions and not

10:14:52  3    excluding him from testifying?

10:14:54  4                MR. BOEHM:  Your Honor, no, it doesn't.  It goes directly

10:14:56  5    to his methodology.  An expert who is relying on data that

10:15:02  6    concerned one particular type of cardiovascular injury to express

10:15:05  7    opinions about a different type of injury goes directly to the

10:15:10  8    issue of methodology.  That is an unsound and unreliable

10:15:15  9    methodology to express opinions, particularly causation opinions,

10:15:19 10    about an entirely different injury.  Dr. Egilman should not be

10:15:22 11    allowed to testify to a jury using data and documents about

10:15:27 12    myocardial infarction when he himself agrees that Ms. Levitt didn't

10:15:30 13    experience that injury.

10:15:31 14                And that's the same kind of issue that was identified by

10:15:34 15    the appellate court in *Ernst*.  And we're asking the Court to

10:15:39 16    exclude Dr. Egilman's opinions about myocardial infarction data or

10:15:42 17    relying on analyses of myocardial infarction data in this

10:15:46 18    particular case.

10:15:46 19                Now, plaintiff's counsel has suggested that Dr. Egilman

10:15:53 20    can look at something called acute coronary syndrome and that

10:15:57 21    stands in for unstable angina, the event, the specific type of

10:16:01 22    event that Ms. Levitt experienced.  Nobody actually disagrees in

10:16:07 23    this case that acute coronary syndrome and unstable angina are two

10:16:13 24    different things.  Acute coronary syndrome, as plaintiffs say in

10:16:18 25    their own opposition brief with respect to Dr. Egilman, is a

10:16:23  1   combination of three separate coronary outcomes; including unstable

10:16:30  2   angina, which plaintiff Jo Levitt had, myocardial infarction and

10:16:35  3   sudden death.  I am reading verbatim from page 23 of the

10:16:40  4   plaintiff's opposition brief.  They say the same thing on page 26

10:16:44  5   of their opposition brief.  Dr. Egilman also says acute coronary

10:16:48  6   syndrome is actually just an umbrella term that refers to multiple

10:16:51  7   coronary events.  They are not the same thing.

10:16:53  8          And the Fifth Circuit has made it clear that it is

10:16:57  9   unsound methodology to use a composite end point to try and reach

10:17:03 10   causal associations or conclusions about a particular type of

10:17:06 11   injury.  There are two cases that we cited in particular in the

10:17:09 12   brief, one is the *Burleson* case, one is the *Allen* case, they're

10:17:13 13   cited in the briefs, they're on slides 14 and 15 in what's been

10:17:17 14   provided to the Court.  We urge the Court to read those opinions.

10:17:22 15          Those are cases where plaintiff is alleging that causal

10:17:25 16   associations had been found as between an exposure and cancer stood

10:17:32 17   in for causal associations between an exposure and a particular

10:17:37 18   type of cancer.  The Fifth Circuit said, no, you can't do that.

10:17:42 19   You have to look at the specific type of injury.  And that's

10:17:45 20   exactly what we have here.  And Dr. Egilman concedes he has not

10:17:49 21   looked at unstable angina.

10:17:51 22          Now, the plaintiffs have suggested that it wasn't

10:17:53 23   possible for them to do that because of the way the data was

10:17:55 24   collected.  That's just incorrect for the reasons that we've said

10:17:59 25   in the -- stated in the brief.  And Dr. Egilman himself in his

10:18:02   1   testimony said that that could have been done, that Dr. Madigan had

10:18:07   2   the data to do that.  He just did not ask Dr. Madigan to do it in

10:18:13   3   that way, he asked him to look at the composite end point, which as

10:18:15   4   you know includes sudden death and myocardial infarction.

10:18:22   5          THE COURT:  Was he involved in the treatment?  I wasn't

10:18:25   6   clear as to whether or not he was involved in the treatment of Jo

10:18:28   7   Levitt.

10:18:29   8          MR. BOEHM:  You know I was confused by that when I read

10:18:30   9   the report the first time as well.  Your Honor, Dr. Egilman had no

10:18:34  10   involvement in the actual treatment of Ms. Levitt.  He does purport

10:18:38  11   to have met with her on an occasion and had a conversation with her

10:18:42  12   about, you know, how she is feeling now and what's going on in her

10:18:45  13   life.

10:18:46  14          THE COURT:  Did he refer her to anybody for treatment?

10:18:49  15          MR. BOEHM:  I'm sorry, would you say that one more time?

10:18:52  16          THE DEFENDANT:  Did he refer her to anyone for treatment?

10:18:56  17          MR. BOEHM:  No, he did not, your Honor.  We asked him

10:18:57  18   that question, he did not refer her to anyone for treatment.

10:19:03  19          Now, the last point I would make with respect to

10:19:07  20   Dr. Egilman is this idea that because he's been accepted in a

10:19:09  21   variety of other litigations as an expert talking about a variety

10:19:12  22   of different subject matters, then that shows that he is qualified

10:19:16  23   to talk about a host of issues in this case.  Your Honor -- in

10:19:22  24   particular, plaintiff points us to the example of his work in the

10:19:25  25   popcorn lung litigation, the so-called popcorn lung litigation that

10:19:29 1   Mr. McClain is involved in.  We would advance the idea that his

10:19:35 2   work in that case actually illustrates the problem.  In that case

10:19:40 3   Dr. Egilman purports to be a specialist in occupational medicine

10:19:44 4   with a particular specialty in occupational lung disease.  In this

10:19:49 5   case, of course he says he has a particular specialty in vascular

10:19:53 6   biology and cardiology and psychiatry and state of mind and

10:19:58 7   warnings and marketing and the law.

10:20:03 8          The point is you can't just take an expert's word for it.

10:20:07 9   That's particularly true for an expert who is claiming to be a

10:20:10 10  specialist in virtually every area where an expert testimony might

10:20:14 11  be called for in this case.

10:20:17 12         I'll just use one example:  The regulatory opinions.

10:20:22 13  Dr. Egilman is by no measure an expert in the FDA.  The cases that

10:20:27 14  Dr. Egilman's counsel has cited in their opposition brief stand for

10:20:31 15  the undisputed proposition that there are such things as FDA

10:20:36 16  experts.  But those people invariably are individuals who have

10:20:40 17  spent many years working in the regulatory process at the FDA or in

10:20:44 18  one instance somebody who spent many, many years leading the

10:20:47 19  regulatory department of a pharmaceutical company involved in this

10:20:53 20  industry.

10:20:54 21         This is illustrative of a pattern, and I am happy, your

10:20:57 22  Honor, to discuss any one of these areas:  Psychiatry, neurology,

10:21:01 23  vascular biology, marketing, and so on.

10:21:04 24         THE COURT:  No.  I've got it.  Thank you.  Let me ask the

10:21:08 25  plaintiff to respond to anything.  From Dr. Egilman, what's your

10:21:12  1   view as to, first, whether he's qualified; and if so, on what?

10:21:18  2        MR. McCLAIN:  Judge, you know, yes, we think he's

10:21:21  3   qualified and we lay that out for the Court.  He has written eight

10:21:25  4   peer reviewed articles on Vioxx.  Eight peer reviewed articles

10:21:29  5   which shouldn't, you know, according to the *Daubert* case itself is

10:21:36  6   the hallmark of an expert, that he relies upon peer reviewed

10:21:40  7   literature, he wrote it.

10:21:42  8        You know, he did testify and I think that the Court

10:21:46  9   correctly identifies the issue, whatever the Court of Appeals says

10:21:50 10   about what was accepted or not accepted goes to the evidence and

10:21:54 11   the weight of the evidence and is left to the trial judge to

10:21:57 12   decide, not at this stage to decide he is not qualified.  The Court

10:22:00 13   did not say he wasn't qualified to testify in that case.

10:22:05 14        So, you know, Judge, just to back up regarding his

10:22:10 15   qualifications.  Dr. Egilman received his medical education at

10:22:15 16   Brown University, he went on to receive a master of public health

10:22:22 17   from Harvard, and worked for the National Institute of Occupational

10:22:28 18   Safety and Health as a uniformed officer in their epidemiology

10:22:34 19   section before going into practice and becoming a professor at

10:22:40 20   Brown University Medical School where he currently still teaches.

10:22:47 21   His involvement has extended into publishing chapters on warnings,

10:22:54 22   particularly on warnings related to drugs.  And so, has

10:23:01 23   demonstrated expertise in general medicine involving epidemiology

10:23:12 24   and including warnings and as they relate to the process of

10:23:17 25   approval of drugs, which he has published some extensive literature

10:23:22  1   on.

10:23:24  2          Page 4, Judge, of our brief as an example, of the brief

10:23:32  3   entitled Plaintiff's Opposition to Defendant's Motion to Exclude

10:23:35  4   Dr. Egilman, you know, he has twice testified before Congress on

10:23:40  5   the proper conduct of medical research, including design and

10:23:44  6   informed consent, corporate responsibility to test products and

10:23:48  7   publish study results as well.

10:23:51  8          So we think that he has *Daubert* permissible credentials

10:24:01  9   to testify and has testified extensively about Vioxx and studied

10:24:09  10  it, in addition to his testimonial credentials.

10:24:15  11         So you come down to the specific opinions that they want

10:24:21  12  to challenge that he renders regarding acute coronary syndrome and

10:24:26  13  its relation to MI, which they agree that their studies demonstrate

10:24:33  14  a causal link between MI's and Vioxx.  The problem with their

10:24:38  15  argument is that their own internal data from their own studies --

10:24:41  16  and this is what Dr. Egilman points out -- includes both MI's and

10:24:45  17  unstable angina -- in other words, acute coronary syndrome --

10:24:51  18  undifferentiated in their own data.

10:24:52  19         And so it was impossible for them to differentiate

10:24:56  20  between those two events within their own data at the same time

10:25:04  21  they were advocating its use to the general public.  And both of

10:25:08  22  our experts, other experts besides Dr. Egilman agree with

10:25:12  23  Dr. Egilman's analysis of the data as it relates to acute coronary

10:25:17  24  syndrome, which includes both MI and unstable angina.

10:25:21  25         So he explained this extensively in his deposition, it's

10:25:24  1    not an off the cuff opinion, it is based upon an epidemiological

10:25:28  2    review of their own data and the conclusions drawn therefrom.

10:25:33  3         So once again, Judge, this goes back to the initial point

10:25:38  4    that you discussed.  This is a question for the trial judge in

10:25:42  5    regard to admissibility after hearing the testimony about the basis

10:25:46  6    of the opinion that he draws, not something to be decided on the

10:25:48  7    papers; because he does have a basis to opine and the credentials,

10:25:56  8    you know, that should make his opinion admissible in this instance.

10:26:01  9         THE COURT:  Okay.  All right.  I've read his depositions

10:26:09 10    and I've got it, and the other material, too, that you all have

10:26:13 11    sent to me.  I mean, I have a package of it that I've been going

10:26:17 12    through, and I really -- I understand the issues.

10:26:23 13         Okay.  Let's leave it at that.  I'll be ruling on it

10:26:27 14    shortly.  This case, I want to try to get it back to the judge as

10:26:31 15    quickly as I can for you all so that you can try the case.  It's

10:26:35 16    been a long time.  I know counsel for both sides have been working

10:26:39 17    on it hard and have been trying to resolve it.  Not every case can

10:26:46 18    get resolved unfortunately, and that's just the way it is.

10:26:49 19         MS. HORN:  Your Honor, we did have one more question

10:26:51 20    about the motions in limine schedule.  In our proposed schedule we

10:26:55 21    had a little astrict where we asked if it would be possible to have

10:26:59 22    the motions in limine be due 30 days after whenever you rule on

10:27:03 23    these pending motions?

10:27:05 24         THE COURT:  What's the motions in limine?

10:27:07 25         MS. HORN:  We haven't filed them yet.  We wanted to wait

10:27:10  1   until we saw how the case played out after you ruled on these

10:27:15  2   motions.

10:27:16  3            THE COURT:  All right.  But, you know, for the most part

10:27:19  4   if I can help either side on motions in limine to make it easier

10:27:23  5   for you, I'll do so.  But the motions in limine oftentimes are best

10:27:28  6   handled by the judge who is going to try the case, but I'll do

10:27:33  7   that.  I'll let you file them so that -- and if the plaintiff has

10:27:38  8   any motions in limine that you want me to deal with.  I guess I've

10:27:43  9   been with this case so long now I may know as much about it as any

10:27:48  10  judge, so if I can be of help or service to either one of you all,

10:27:53  11  I'll do that.  But we have to get this case back to trial because

10:27:57  12  it looks to me like it has to be tried.

10:28:00  13            MR. BOEHM:  Your Honor, the Court's current order has a

10:28:03  14  deadline for motions in limine that is I believe September 17th.

10:28:06  15            THE COURT:  Okay.

10:28:07  16            MR. BOEHM:  What Ms. Horn is suggesting is that rather

10:28:10  17  than necessarily stand by that particular date, it would be helpful

10:28:12  18  to us to have rulings on, for example, Dr. Egilman and whether he

10:28:16  19  is going to be able to testify about myocardial infarction.

10:28:19  20            THE COURT:  That's fair, I'll do that, 30 days after I

10:28:21  21  rule on it.  I'll give you all an opportunity, both sides, if you

10:28:23  22  have any motions in limine that you need me to deal with, send

10:28:27  23  them.  If I can, I'll do it; if not, then I'll just send it to the

10:28:32  24  judge that I am sending your case to.  Thank you very much.

10:28:35  25            MR. McCLAIN:  Judge, could I ask one thing before we get

10:28:37  1    off the phone?

10:28:38  2            THE COURT:  Sure.

10:28:39  3            MR. McCLAIN:  Judge, I would point out, and I'm sure the

10:28:42  4    Court's aware, we lay out in our briefs what opinions we're seeking

10:28:48  5    from him and which ones we're not.  The defendants have stated in

10:28:53  6    their pleadings they want you to rule that he can't testify about

10:28:54  7    the things we're not asking him to testify about.  I would prefer

10:28:58  8    that that not be done, because you know how orders get misused all

10:29:02  9    over the place; and if we're not offering him on those opinions, I

10:29:05 10    would prefer that we just have a stipulation we are not offering

10:29:08 11    him to offer opinions about those areas as opposed to the Court

10:29:11 12    ruling he can't offer opinions on things we're not seeking to have

10:29:15 13    him offered, if you know what I mean.

10:29:17 14            THE COURT:  Let's do it this way.  Why don't you meet

10:29:20 15    with counsel and see whether or not you can do a stipulation.  If

10:29:23 16    not, then I'll deal with it.

10:29:26 17            MR. McCLAIN:  All right.

10:29:27 18            THE COURT:  If you can enter into a stipulation that both

10:29:30 19    of you all are comfortable with, then that's fine.  If you can't,

10:29:34 20    then I'll rule on it.

10:29:35 21            MR. McCLAIN:  All right.

10:29:36 22            MR. BOEHM:  Thank you.

10:29:37 23            THE COURT:  Let's get together soon on it, two weeks

10:29:41 24    enough for you?

10:29:42 25            MR. McCLAIN:  Oh, yeah.

10:29:43  1          MR. BOEHM:  Yes, that would be great, thank you, your

10:29:45  2   Honor.

10:29:45  3          THE COURT:  Let me hear from you, then, in two weeks and

10:29:47  4   then I'll rule on it if you can't reach it.

10:29:50  5          Oftentimes a stipulation is sometimes better because the

10:29:58  6   Court that you're going to be trying the case before will have the

10:30:04  7   benefit of a stipulation as opposed to interpreting my ruling.  So

10:30:10  8   give it a shot.  If you can't, I'll rule on it.

10:30:14  9          But let me hear from you all within two weeks as to

10:30:17 10   whether or not you're able to have a stipulation.  Otherwise, I'll

10:30:20 11   deal with it.  Okay?

10:30:21 12          MR. BOEHM:  Yes, your Honor.

10:30:22 13          MR. McCLAIN:  Thank you, Judge.

10:30:23 14          THE COURT:  All right.  Folks, thanks very much.  Thanks

10:30:25 15   for coming down.  And I heard you well on the phone, so you came on

10:30:28 16   just as if you were here.

10:30:29 17          MR. McCLAIN:  Well, thank you, Judge.  I appreciate -- I

10:30:33 18   have to be down in Clinton, Missouri for a pretrial this afternoon

10:30:37 19   or I would have loved to have been there.

10:30:39 20          THE COURT:  All right.  Thank you.  The court will stand

10:30:41 21   in recess.

10:30:41 22      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

         23

         24                    * * * * * *

         25

REPORTER'S CERTIFICATE

I, Karen A. Ibos, CCR, Official Court Reporter, United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.


                         /s/ Karen A. Ibos

                    Karen A. Ibos, CCR, RPR, CRR, RMR

                    Official Court Reporter