UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  VIOXX PRODUCTS              MDL No. 1657
LIABILITY LITIGATION               Section "L"
                                   New Orleans, Louisiana
                                   Wednesday, March 15, 2017


*****************************************************************
**TRANSCRIPT OF THE MOTION HEARING**
**BEFORE THE HONORABLE ELDON E. FALLON,**
**UNITED STATES DISTRICT JUDGE.**

*****************************************************************



**APPEARANCES:**

For Plaintiffs:                    Leonard Davis, Esq.
                                   Ann Oldfather, Esq.
                                   Elizabeth Cabraser
                                   Russ Herman
                                   Richard Getty
                                   Matthew English
                                   Dawn Barrios
                                   James Lyle.




For Defendants:                    Douglas Marvin, Esq.
                                   John Beisner, Esq.




**REPORTED BY:**   Mary Thompson, RMR, FCRR
                   500 Poydras Street, Room B275
                   New Orleans, Louisiana  70130
                   (504)589-7783

**P R O C E E D I N G S**

1
2                                        (Call to order of the court.)
3          THE COURT:  Be seated, please.
4          Good morning, ladies and gentlemen.
08:30:54    5          Dean, let's call the case, please.
6          THE CASE MANGER:  MDL 1657, *In Re: Vioxx Products*
7    *Liability Litigation.*
8          THE COURT:  Counsel, make your appearances for the
9    record.
08:31:01   10          MR. HERMAN:  Good morning, Judge Fallon.
11          May it please the Court:
12          Russ Herman for plaintiffs.  Mr. Getty will make the
13    initial argument to the Court and I'm reserving ten minutes to
14    follow.
08:31:18   15          THE COURT:  Okay.
16          MR. GETTY:  Good morning, Your Honor.  Richard Getty.
17          THE COURT:  Right.
18          MS. OLDFATHER:  Morning, Your Honor.  Ann Oldfather,
19    Plaintiff Steering Committee and lead counsel on special claims.
08:31:29   20          THE COURT:  Okay.  Good.
21          MS. CABRASER:  Good morning, Your Honor.  Elizabeth
22    Cabraser, Plaintiff Steering Committee.
23          MR. DAVIS:  Leonard Davis, Herman, Herman & Katz.
24          THE COURT:  Do y'all want to make an appearance and --
08:31:38   25    you're monitoring it?

 1              MS. BARRIOS:  Dawn Barrios for Plaintiff Steering

 2    Committee.

 3              THE COURT:  Thanks.

 4              MR. GETTY:  Your Honor, also present -- I brought him

 5    along because he helped immeasurably with the presentation and

 6    the Aggregate Fee Petition and memorandum -- is Matt English with

 7    the Herman Firm.

 8              THE COURT:  Welcome to the court.

 9              Do you want to make a --

10              MR. MARVIN:  Good morning, Your Honor.  Doug Marvin.

11              THE COURT:  Okay.

12              MR. BEISNER:  Good morning, Your Honor.  John Beisner.

13              THE COURT:  Okay.  This is --

14              MR. LYLE:  Good morning, Your Honor.  This is

15    James Lyle.

16              THE COURT:  Excuse me.  Right.  Thanks for being with

17    us.  I hope you haven't had that bad weather that the East Coast

18    has been having.

19              MR. LYLE:  Well, it's not the weather, it's a family

20    issue.  Parents getting older, that's all.

21              THE COURT:  Okay.

22              This is the Vioxx matter.  We've been having this now

23    since 1995, I think -- was it 1995?

24              THE LAW CLERK:  2005.

25              THE COURT:  February 16, 2005.  The case is

1    multi-faceted.  The first aspect of the case involves some 50,000

2    individual claimants who alleged that they had taken Vioxx and as

3    a result received various and sundry physical problems.

4           In addition to that, we had about 26 states that made

08:33:04    5    claims for their Medicare and Medicaid.  And we had other claims

6    in addition to that.

7           And then finally we had the consumer claims.

8           One aspect that is problematic with the MDL structure

9    is that when one judge handles that scope of litigation, the

08:33:25   10    problem is you have to prioritize.  You can't get to everything

11    at one time because it's simply impossible.  And because the

12    lawyers handle many of the matters, it makes it very difficult to

13    have various judges handling it because it's the same lawyers

14    that would handle various aspects of the case, so prioritizing is

08:33:49   15    the only mechanism that works.

16           The difficulty with prioritizing is that the people who

17    are on the last aspect of that sphere, so to speak, have to wait

18    a considerable length of time and that presents some issues.

19           In this particular case, it seemed to me that the

08:34:12   20    consumers had to stay last in line because they were individuals

21    who took the drug but had no adverse effects from the drug.  Had

22    they had adverse effects, they would have been further up the

23    line.  They would have been one of the 50,000.

24           So they did not have any adverse effects from the drug,

08:34:37   25    but they indicate that, had they known that this drug was

1  potentially problematic, even though they didn't have any

2  effects, they perhaps would not -- or they would not have taken

3  the drug, and, therefore, they wanted their costs back for taking

4  the drug and any other costs that might be related to it.

08:35:00

5          The lawyers spent a considerable period of time and

6  rendered yeoman's service to the consumers.  It was very

7  expensive to notify everybody.  We had different languages in

8  New Mexico, Spanish and English.  And we put the word out -- the

9  notice out in various formats, not only in newspapers, which you

08:35:32
10  generally do, but in various electronic formats in both English

11  and Spanish, and even adjusted it to include more notices than

12  are normal.

13          Notwithstanding that, the people who had purchased the

14  drug, not many of them came forward.  In any event, the case was

08:36:03
15  resolved but a certain amount was put up potentially available to

16  the plaintiffs had they made claims, but not many of them made

17  claims.

18          Now, I think that it's not due to the efforts of the

19  lawyers.  They worked very hard.  And it's certainly not due to

08:36:28
20  the notice.  The notice was really the first of its kind in so

21  many different formats.  It's just the fact that it took about

22  eight, nine -- ten years before the focus could be placed on

23  those individuals.

24          There was some momentum in some cases, class actions

08:36:48
25  and whatever in various states, particularly Kentucky, that kept

1  the matter to some extent on the front burner; but even that,

2  after a period of time people moved on with their lives.

3  They had an opportunity, under the terms of the

4  settlement, to get back all the costs that they -- if they could

08:37:12  5  prove that they spent it for the drug.  If they couldn't and they

6  could show that they at least took the drug, they would --

7  without any proof, if they showed that they took the drug, they

8  would get something like $50 or something in addition to the cost

9  of a medical examination if they had to go to another doctor to

08:37:34  10  get a substitute for the drug.  So through the efforts of

11  counsel, they were able to be made whole, so to speak, and that

12  was well and good except that the numbers didn't come forward.

13  So we're here today -- after the litigants have gotten

14  paid, we're here today to address the fees that the attorneys

08:38:05  15  feel they are entitled to receive.

16  I made sure that their costs were paid, but the fees

17  now are a subject for the Court.

18  I'll hear now from counsel.  Mr. Getty.

19  MR. GETTY:  Thank you, Your Honor.

08:38:21  20  Before I begin, I do want to not forget to say how much

21  of a pleasure it's been to appear in front of you.  It truly has

22  been a great experience and quite an honor.

23  THE COURT:  Well, I appreciate you being here.  We've

24  visited over the years and I know your skill and your efforts,

08:38:41  25  and it's a pleasure for me to work with you also.

1          MR. GETTY:  Thank you, Your Honor.

2          Obviously I'm here to talk about the motion that we

3     filed.  We've filed an aggregate fee petition asking that the

4     remaining amount of slightly over $7 million be allocated for

08:38:58   5     attorneys' fees.  And I know the Court may have some reluctance

6     to award that amount, but I'm here to hopefully present some

7     arguments to you that justify that and assuage any reluctance

8     that the Court might have.

9          You know, the point of the motion is obviously to

08:39:21   10    establish an amount of the fees.  I know this is an important

11    issue for the Court.  It's obviously an important issue for all

12    the fee applicants, including my firm.  We alone spent ten years

13    plus litigating with Merck.

14         And I have to say, in the hallway I was talking to

08:39:38   15    Doug -- and I have to compliment both John Beisner and

16    Doug Marvin.  They're true gentlemen.  They're competent lawyers.

17    They're with fantastic firms.  And we were talking about

18    John's -- or Doug's earlier experience in life and his

19    opportunity to sit in a courtroom and work with a man like

08:40:02   20    Edward Bennett Williams which I'm sure he will cherish always.

21         But we fought with Merck and its superb lawyers for ten

22    years.  I've canvassed sort of the history of the other firms

23    that are involved, and they threw everything at us, and these

24    other firms, but the kitchen sink.  They fought hard, as they are

08:40:38   25    bound to do.

08:40:59

```
 1              One of the things that you have to think about, or
 2     realize, I think, here, is that if you look at the fact of how
 3     the litigation unfolded through this roughly 10-year period, and
 4     the hours that -- you've seen the hours we've submitted to you
 5     from the various firms and what they amount to.  When you're met
 6     with that kind of opposition, that results in those hours.
 7              I can tell you that most of these firms are like my
 8     firm, a small firm or a medium-size firm, and if they are not
 9     awarded reasonably for their efforts in bringing about this
10     overall resolution for the consumers, it could be a horrendous,
11     bitter result after their stepping up to the plate to pursue
12     these claims.
13              The other thing I would note is that when we voted --
14     and I will also say it was an honor to serve on the fee
15     committee.  It was a pleasure working with Russ and Lenny and
16     Dawn and Elizabeth and Jim Lyle, and everyone worked hard and
17     tried to do the right thing.  And when it came time -- looking at
18     all the factors, looking at the history of the case, and looking
19     at what the firms had had to go through to pursue these claims
20     and help contribute to the ultimate result that Merck agreed to,
21     we voted unanimously that all $7,360,000 minus the expenses paid
22     should be set aside by the Court for a possible award.
23              I believe that is reasonable under the circumstances
24     and let me tell you why.
25              First of all, if you look at the settlement agreement,
```

08:41:18

08:41:42

08:42:04

08:42:29

1  Section 2.5, Merck set aside $23 million, $7,360,000 of which, or
2  32 percent, was allocable to attorneys' fees and expenses.  2.5
3  clearly says that all reasonable attorneys' fees "will be paid."
4  It doesn't say "may be paid," it says "will be paid from the
5  common fund and will be counted toward the settlement amount."

6  Section 14.1 states that the total aggregate amount for
7  all such counsel shall not exceed 32 percent of the maximum up to
8  $23 million or $7,360,000.

9  The key point here is that Merck agrees not to oppose
10 an application for fees and litigation expenses consistent with
11 that limitation.

12 It also notes that class notice and other
13 administrative expenses under 2.5 are not -- and, you know, I
14 would underline the word "not" -- included in fees and litigation
15 expenses.

16 So we've come to you with an aggregate fee petition and
17 asked you to consider that the common fund was the $23 million,
18 32 percent of which is the fees that are allocable here.

19 And we've cited you cases that say that, you know, the
20 total benefit to the claimants should be measured by the entire
21 settlement amount.  Obviously we and others, I'm sure, have cited
22 the *Boeing v Van Gemert* case which says that the award should be
23 based on the size of the entire fund as opposed to the portion of
24 the claims approved.

25 We've also cited you other cases.  I'll just run

1   through *Dell* in the Fifth Circuit; *Waters* in the Eleventh,

2   *Williams* in the Ninth Circuit; and in my circuit, the Sixth

3   Circuit, the recent case involving a gym entity, the *Gascho* case.

4          So the major point that I would want the Court to think

08:44:40   5   about as it deliberates on this is, you know, we did -- we and

6   other firms fought vigorously on behalf of these consumers, and

7   we were met by two of the largest and finest law firms in the

8   country.  The defendants would benefit unjustly -- Merck would

9   benefit unjustly if a reasonable fee award is not granted to

08:45:08   10   these lawyers.

11          In these consumer cases, Your Honor, who's going to

12   take these cases?  If you rule that $700,000, or whatever the

13   amount was, the lawyers get a percentage of that, there are

14   several law firms that will be devastated, my own included.  You

08:45:32   15   know, we'll all survive regardless of the result, hopefully, but

16   it is inherently unfair under the facts of this situation to not

17   consider a reasonable award that is in line with what we have

18   requested.

19          You know, rhetorically, who's going to step up to the

08:45:59   20   plate and handle the next products liability pharmaceutical case

21   and lock horns with big pharma or a big, giant U.S. corporation?

22   I mean, that's why all these consumer statutes, including in

23   New Mexico, Louisiana, California, and Kentucky, all have an

24   attorneys' fee award provision under the consumer statutes.  What

08:46:25   25   lawyer would ultimately buy into a case with years of

1   uncompensated work, hundreds of thousands in expenses, all at the

2   risk of being paid based upon the amount of claims in a situation

3   like this where the case drug on for ten years?

4          And I think this has become, to some degree -- and you

5   probably know this better than me because you have other cases

6   like this where products are involved, the Chinese drywall and

7   other situations -- you know, the main game plan of a lot of

8   these corporate defendants is drag this out as long as you can.

9          In this situation, most of the people who took Vioxx

10  were in their 50s and 60s, if not older, so by the time ten years

11  comes around and you send the notice provision out, a lot of them

12  have passed away or many have moved.  We're a mobile society.

13  And I think that's a factor that I hope the Court will consider

14  completely.

15          Just anecdotally, I went and looked and compared the

16  sort of situations in some of these other situations involving

17  these fee applicants.  In our case, we opposed successfully no

18  less than three efforts to mandamus our judge to the Court of

19  Appeals in Kentucky.  We were successful on every one, but that

20  ate up time and delayed our litigation so that by the time we

21  joined here in the MDL and we reached a settlement with Merck,

22  we're standing here nearly at ten years.

23          I looked at the Indiana case involving -- and I don't

24  want to mention any names because the fee applicants' names are

25  confidential and under seal, but there were motions to stay

1   proceedings and it took a year to get a remand, there were

2   motions to strike amended complaints, and several interlocutory

3   appeals, all of which were unsuccessful for Merck but which

4   bought up and ate up time and delay.  You know, that's the game

08:48:36   5   plan that was played here.

6        And if you look at this situation -- you know, you have

7   the right to use either method looking at a common fund or a

8   loadstar.  If you use the fee -- the hours that have been

9   approved by the Garrett firm, it's 9,631.99 hours times the same

08:49:02   10   rate you used in the main case, $443.  That comes to $4,266,900.

11   That's a low multiplier of 1.75 for the amount that's involved.

12        If you use the gross hours -- because a number of the

13   fee applicants have not submitted -- and I assume they will ask

14   the Court's permission to have Mr. Garrett approve their fees for

08:49:26   15   their hours, but that amounts to 18,000 hours times that rate is

16   $7,900,000, which is a negative multiplier here of 0.89.  And,

17   you know, most firms are small to medium, and they simply want,

18   you know, like our firm, to be reasonably compensated and not

19   face some horrible result after fighting hard with Merck and

08:49:55   20   prevailing after ten years.

21        THE COURT:  Do you have, in Kentucky, a consumer fee

22   structure?

23        MR. GETTY:  Yes, we do.  Our statute allows a

24   prevailing party a reasonable fee award.  So does California,

08:50:11   25   according to my understanding.  So does New Mexico.

1       We actually submitted a short paper on that at some

2  point.  Jim Lyle and I took the responsibility for doing that at

3  the request of the fee committee.  Virtually all of these

4  states -- I think it was something like over 30 out of the 50

08:50:33  5  states have those kinds of awards.

6       But what I'm basically saying is the facts of how Merck

7  defended, when compared or considering the number of hours of

8  those who pursued those claims, I believe it's a reasonable

9  request that we've made.

08:50:54  10       In summary, I would say that, you know, Merck agreed to

11  set aside $7,360,000 for fees and expenses.  There were ten years

12  of delay of obstructive tactics.  The request is justified by the

13  hours expended and the difficulty pursuing those claims.

14       And the hours were made higher, I think -- I know in

08:51:18  15  our case, and it appears in the Indiana and some of the other

16  cases, that the tactic utilized -- you know, if you remember back

17  to the beginning, we had a product that was questioned, that

18  might be harmful to individuals.  And smartly, I suppose, from

19  the corporate side, the studies that questioned and raised

08:51:42  20  concerns were basically opposed or squelched for at least two

21  years.  How much money did Merck make in that two years?

22       Once this product was finally pulled off the market,

23  you know, there are a number of firms, like ours and the Indiana

24  firm and Jim Lyle, who stepped up to the plate to represent these

08:52:04  25  consumers and fought hard for them.  It would be tragic, in my

1  opinion, if they are not given a reasonable level of compensation

2  here.

3        It would be a disincentive to attorneys in these kinds

4  of situations, and I just want to read you -- there's an article

08:52:26  5  that's in the -- I think it's in the UCLA Law Review.  These

6  comments I think are prescient.  It says (as read):  All these

7  benefits pertain to class actions of any type, but in the area of

8  small claims consumer class actions, perhaps the most compelling

9  reason for allowing fees based on a fund is the need to create an

08:52:49  10  incentive for class counsel to bring such actions.  In cases

11  where each individual class member suffered only a small degree

12  of harm, it's possible, if not likely, that few class members

13  will step forward to claim their portion of the total

14  reversionary fund.  Limiting class counsel to a fee based on a

08:53:04  15  percentage of what the class members actually claim, will, in

16  many instances, result in a fee that is so small as to prevent

17  class action attorneys from pursuing such cases which serve

18  primarily a regulatory and deterrent function, not a compensatory

19  function.

08:53:21  20        It also said, in closing, that compensating plaintiffs

21  is one factor, but also deterring both the defendant and other

22  similarly situated entities from resuming the same or similar

23  wrongful practices is critical in these cases.

24        I believe firms like ours serve a purpose that is

08:53:44  25  valuable in our society, and all we ask is that we be reasonably

1    compensated, all the fee applicants.  And I'm proud to stand up

2    here and ask you to not be reluctant to consider all these

3    factors, including the delay and the efforts that had to go into

4    this to reach this result.

5            I have a few comments on Ms. Meloy's objections which

6    maybe I'll run through real quickly.

7            She offered five objections.  The first two were that

8    she couldn't check the reasonableness of class counsels' loadstar

9    because fee declarations were under seal.

10           Number two, she said she believes there's a lot of

11   duplication and unnecessary work.

12           First, she's not entitled to review the detailed

13   billing records.  There's plenty of cases on that.  We cited you

14   the DeHoyas v Allstate Corporation, 240 FRD 269 (W.D. Tex 2007),

15   which says determining proper fees is entrusted to the sound

16   discretion of the Court, and that objectors have failed to

17   explain how they would qualify to pass judgment on the daily time

18   records in a complex class action.

19           Secondly, her speculation about duplicate of effort is

20   insufficient.  We cited the *Cendant Corp.* litigation.

21           But these concerns are alleviated.  Mr. Garrett

22   reviewed these hours and he found them to be reasonable.

23           THE COURT:  How much did the litigants receive --

24   actually receive, Richard?

25           MR. GETTY:  The claimants?

08:54:05

08:54:24

08:54:45

08:55:02

08:55:19

1           THE COURT:  Yeah.  How much did they --

2           MR. GETTY:  Slightly over $700,000 was the final

3 amount.

4           THE COURT:  Look, you don't need to make a case to me

08:55:33  5 about the work that you-all have done.  I'm well aware of that.

6           As you know, as is typical with our cases, we appoint a

7 CPA who has developed various software which allows the parties

8 to list what time they've put in and specifically what they've

9 done with that time.  I monitor it on a monthly basis with him so

08:56:01  10 I know the work that you put in and your colleagues put in.  I

11 know the expenses.  It took over $100,000 of expenses that you

12 incurred in travel and discovery and filings and things of that

13 sort.

14           There's no question that you particularly put in a lot

08:56:24  15 of time.  And I know Mr. Lyle did also in his area, as well as

16 various members of the PSC.  They put in a great amount of time.

17 Elizabeth was very helpful with the notice.  Dawn was checking

18 with everybody and making sure that the states were getting

19 service properly.  Lenny and Russ put in their efforts.  So it

08:56:53  20 was a team effort, and I know the time that you put in.

21           And I know the -- what you're up against, very fine

22 lawyers that are very skilled in what they did.  And they handled

23 themselves properly representing their clients and did a good job

24 of it.

08:57:16  25           Some of this may be moot, frankly.  As you know, a bill

1    was passed through the House last week so it's headed for the
2    Senate now; and I don't know whether it's going to pass or not,
3    but it deals with class actions and MDLs and limits it.  They
4    have a provision in the fee that says any attorneys' fees award
08:57:37    5    that is attributable to monetary recovery shall be limited to a
6    reasonable percentage of any payments directly distributed to and
7    received by class members.

8         Specifically with the MDLs, they say that in no event
9    will the lawyers receive more than 20 percent of the fee.  And
08:58:08    10    the amendments are retroactive, so it's due to -- I don't know
11    whether it's going to pass today or tomorrow or whatever.  If it
12    does, I know the President will sign it in a minute.  So some of
13    this may be moot.

14         Also I'm aware that Vioxx has gotten a lot of
15    attention, both academically as well as in the press, and so this
08:58:29    16    aspect of the case, I'm advised, that the committees in this
17    particular area are interested in it.  So it's one of those
18    things that is just very difficult to deal with.

19         You know, I know just from personal experience when I
08:59:01    20    was a practicing lawyer with a contingent fee, on the cases that
21    I lost -- I spent more time dealing with those cases than the
22    cases I won.  And the unfortunate thing in the ones that I lost,
23    I didn't get anything.  And I also lost my costs.  It's sort of
24    the life of the contingent-fee lawyer, unfortunately.  And I'm
08:59:25    25    sure everybody in this room who handles those type of cases can

1    recall that the cases that you lost, you spent so much time on

2    them, and they stick with you forever tugging at your mind

3    throughout.  You blame yourself for losing them.  But in any

4    event, you know, the jury says, Sorry, come back another day with

08:59:47    5    another case, and you leave.

6        You don't even get paid for your costs.  The client

7    doesn't have any money to pay you.  He wants to pay you but he

8    doesn't have any money.  That's why he's in court.

9        So you just -- you know, that's --

09:00:05    10    MR. GETTY:  Well, we hope --

11    THE COURT:  -- the contingent fee.

12    MR. GETTY:  We hope that this will not make it through

13    the Senate.

14    THE COURT:  I know.  It's one of those things that's

09:00:12    15    very, very difficult, because I know you put in time.  Everybody

16    on the left-hand side of the docket put in a lot of time on this

17    case.

18        MR. GETTY:  And I think it's an opportunity for this

19    Court to do the right thing, and, you know, hopefully not be

09:00:26    20    reluctant and award a reasonable fee.  We'll have to deal one way

21    or the other with what they pass in Congress or don't pass in

22    Congress, but I think this is deserving.

23        The only other thing I will say -- and we have really

24    addressed Ms. Meloy in the reply brief that we filed.  I've taken

09:00:46    25    more time than I should have, but hopefully you understand our

1  position.

2          THE COURT:  No, I do.

3          MR. GETTY:  And I trust the Court will be fair --

4          THE COURT:  Okay.

*09:00:54*

5          MR. GETTY:  -- in the situation.

6          THE COURT:  I'll do the best I can.

7          Russ, do you have a comment?

8          MR. HERMAN:  Yes, Your Honor.  And I'll try to keep my

9  remarks brief, although brevity is something I'm not very

*09:01:08*

10  familiar with.  Ms. Cabraser will have something to say.

11          First of all, the claimants that submitted fee

12  affidavits are the Barrios firm, the Bingham firm, the Getty

13  firm, the Hawk firm, our firm, the Johnson firm, Keller, Lyle,

14  Cabraser, Oldfather, Sanford, and Whitfield.

*09:01:37*

15          May it please the Court:

16          This matter did not drag on.  As a matter of fact, it

17  began in 2005 and Katrina happened.  Your Honor moved your court

18  to Houston where there were trials in Houston.  There were an

19  additional five trials in the MDL, as I recall.  I attended all

*09:02:00*

20  of them.  There were trials in New Jersey; I attended two of

21  those.  This was a steady march so I don't want to deal with

22  delay.  I think that's a false sort of issue.

23          Now, it's true that the consumer cases were tail-ended,

24  but there was another reason they were tail-ended.  First of all,

*09:02:27*

25  most of those cases were dismissed, and they were dismissed in

1  just about every venue where they were tried.  We were able,

2  through cooperation, to keep California and New Jersey alive.

3          We repeatedly attempted to get Merck to discuss with us

4  settling consumer cases, and finally at an MDL class action

09:02:53

5  conference in Philadelphia, Doug Marvin asked that I come up and

6  I did.  There was a willingness to resolve this matter.  It took

7  some time to resolve on paper.  The paperwork was actually done

8  by Merck, and any ambiguity should be construed against it.

9          There is a 7-0 or 5-0 vote -- a unanimous vote in your

09:03:25

10  appointed fee committee, but we have different reasons for that

11  vote.

12          Essentially I can state that Ms. Barrios, Ms. Cabraser,

13  and I, after numerous conversations, felt that no money ought to

14  be returned to Merck; that that would be unfair and it would be

09:03:45

15  unjust.

16          I'm very familiar with the legislation now pending

17  before the Senate sponsored by the American Tort Reform

18  Association and the U.S. Chamber of Commerce.  It's inherently

19  unfair when it's reported that the firms that defend these cases,

09:04:04

20  the partners are making $1500 an hour win or lose, payment on the

21  barrel here.

22          So essentially what I say to Your Honor is whatever

23  Your Honor decides, you have the discretion to decide.  There is

24  a movement we're familiar with in MDLs, in class actions, in

09:04:27

25  judicial conferences, at the conferences at Duke and other

1  places, that attorneys' fees should not exceed the amount awarded

2  to the claimants.

3          We say to Your Honor there are several alternatives in

4  the event that Your Honor does not award the full amount of the

*09:04:53*  5  $7 million.  It should not go to Merck under any circumstances.

6  This is not the cy-pres situation where the money belongs to the

7  consumers or claimants, and therefore should be cy-pres'd to

8  pro bono projects, indigent defender projects, or the bar

9  foundation because it is lawyer fee money.

*09:05:19*  10          And I certainly don't want Merck and its cohorts

11  standing up in a Senate committee and arguing, Look what happened

12  in New Orleans.  You know, the consumers got 700 -- between $700-

13  and $800,000, and they walked away with these fees.

14          On the other hand, it shouldn't go back to Merck.  And

*09:05:43*  15  it was never negotiated on the basis of any money going back to

16  Merck.  And I'm willing to take the stand and testify to it

17  because I negotiated it and I know what the language says.  And,

18  frankly, I'm offended that Merck wants some of this money back if

19  you don't award it.

*09:06:05*  20          Now, what can be done with it?

21          Well, it can go to pro bono projects.  It could go to

22  indigent defender projects.  Dawn has made a survey of

23  health-related institutions that can use the money.  Elizabeth

24  will address that.

*09:06:26*  25          There's a Louisiana article on what happens when there

1  are funds left.  They go to whoever was supposed to get the fund,
2  which is the lawyers.  So I say if the money's left,
3  Your Honor -- whatever Your Honor awards as fair and equitable,
4  reasonable under all the circumstances, and if you have funds
5  left, good.  Award those funds, we'll pay the taxes on them, and
6  we'll make the charitable contributions that have to be made to
7  the foundation and the pro bono project and the indigent defender
8  projects and the health communities so that no one can claim that
9  plaintiff lawyers took money that they shouldn't have taken, but
10  on the other hand, Merck doesn't get a windfall.

11       And I can't say strongly enough that there are
12  alternative ways, if there are funds left, than giving those
13  funds back to Merck.  They haven't earned them, they didn't
14  negotiate them, and it would be grossly unfair to folks that
15  claimed fees who don't get fees because there weren't enough
16  consumer funds paid and the money goes back to Merck just like a
17  reward to Merck, a very crafty situation engineered where
18  plaintiff lawyers suffer either way.

19       If you make a full award, it gives representatives of
20  the chamber of commerce to stand in the Senate committee under
21  oath and say, Look what happened; greedy plaintiff lawyers.

22       On the other hand, if you don't award the funds fully,
23  it still cuts against the grain of those lawyers that did the
24  work except in a situation where those funds are used for a
25  legitimate purpose that any lawyer would support.

1       And then the debate changes -- the debate changes.
2   It's no longer those greedy lawyers trying to take all the money;
3   it's a greedy manufacturer trying to get money that it's not
4   entitled to.

09:08:47
5       And so, Your Honor, those are my remarks.  I hope I
6   didn't take too long.

7       The Louisiana section -- I want to thank Dawn for this.
8   It's the Uniform Unclaimed Property Act of 1997.  It has been
9   amended once, but it's essentially the same, and it's Title 9

09:09:13
10  Civil Code Ancillary.  And there is similar language in the other
11  states involved.

12      And Ms. Cabraser now will address the Court.

13      MS. CABRASER:  May it please the Court:

14      Elizabeth Cabraser for the PSC.

09:09:43
15      I stand before Your Honor in an attitude of gratitude.
16  First, for having the opportunity to represent plaintiffs
17  throughout this MDL.  It's really the thing that we, in private
18  civil litigation, are most proud to be able to do, because it
19  matters not only to the plaintiffs in this MDL, but of course

09:10:11
20  MDLs make policy, as Your Honor is fully aware, and it's an
21  opportunity to advance and develop the law for everyone in
22  practice.

23      I'm very grateful to the members of the purchase claims
24  committee, which I chaired over the years, because every time

09:10:30
25  they were asked to step forward and do work and spend money and

1   make efforts on behalf of the consumer claims in this litigation,

2   they did so.  Not out of a sense of entitlement or even

3   expectation, but because they were asked, because they cared, and

4   because the consumer issues in this case were and are important

5   to them.

6          And I'm very grateful to both Mr. Getty and Mr. Herman,

7   not only for having been able to work with them in this case, but

8   because they stepped forward to make the arguments for attorneys'

9   fees.  Your Honor, we're always ready, willing, and able to

10  advocate for others.  It's most difficult to advocate for

11  ourselves, and they took on that burden which I appreciate.

12         We appreciate this Court's attention over the years to

13  the consumer claims.  I stood up and argued against the dismissal

14  of those claims in February of 2006, I think it was.  And your

15  observations about the consumer's place in the constellation of

16  claims in this MDL has never been one we could disagree with, but

17  was always one that we were able to advocate for.  The consumer

18  claims were and are important here.  They are the gateway through

19  which, unfortunately, many thousands of plaintiffs suffered

20  personal injury or death.  We appreciate that you never forgot

21  the consumers and the policy reasons why those claims matter.

22         As you noted, we spent considerable time, effort, and

23  ingenuity on the notice program here.  We were before Your Honor

24  many times with Merck.  Merck certainly did cooperate in terms of

25  getting a good notice out to the class members.  The notice costs

1    alone were nearly $1.7 million in this settlement.  And of course
2    BrownGreer did excellent work administering the claims and
3    distributing the money to the claimants and incurred over
4    $1.5 million to do so.

09:12:45    5        As a result of all of that innovative and hard work, as
6    Your Honor noted, the actual payments to claimants totaled
7    approximately $700,000, and that creates the situation that we
8    find ourselves in today.  It's a difficult one.  There are
9    competing policy considerations.  And of course when things are
09:13:06    10   most difficult, they are given to the broad discretion and
11   ultimate determination of Your Honor.

12        I wish there were a way that I could make this easier
13   for the Court, it's not an easy question, but I will note just a
14   couple of things.

09:13:26    15        First of all, in terms of policy decisions -- and MDLs
16   make policies, not only for the circumstances before them but for
17   other cases.  In the context of the state law consumer claims,
18   which were the claims that were settled in this class action
19   settlement, as Mr. Getty noted, most of the states, through their
09:13:49    20   legislatures, have made the policy decision that, like civil
21   rights cases, consumer rights cases provide for awards of
22   attorneys' fees.  It's not necessarily as a percentage of funds
23   recovered and made available, but with respect to time, which is
24   why the fee committee has, in confidence, time records, and is
09:14:18    25   using those to make whatever determinations Your Honor allows us

1   to make.  So that's a policy decision that's been made out there

2   by many state legislatures and repeated over the years.

3          The other thing that I would say is that just like the

4   personal injury and wrongful death claims, the importance in

09:14:39   5   value of these consumer claims does not repose entirely on the

6   amount of money that the consumers have stepped forward to claim.

7   The value of this case to them, to their fellow consumers who

8   bought and took Vioxx, and all consumers everywhere is much

9   greater.  This case and its prosecution and its defense and its

09:15:03   10   ultimate settlement stands for the proposition that companies

11   should be accountable to their consumers, to their customers, and

12   that customers have the right to make informed decisions about

13   their health based on full and accurate information.

14          So this is a matter of accountability.  And the

09:15:22   15   structure of the settlement, as Mr. Herman noted, enables this

16   Court to enforce and implement that full accountability to the

17   total some of $23 million through a number of means.  One is the

18   attorneys' fee award, and that is entirely up to you, and others

19   are through other decisions about the use and distribution of the

09:15:48   20   funds rather than having them revert.

21          As Mr. Herman noted, we -- and by "we" I mean primarily

22   Dawn Barrios, which is usually what we mean when we say "we."  We

23   mean Dawn did it -- has surveyed health-related charitable and

24   not-for-profit organizations in this area that would be

09:16:16   25   appropriate, we believe, recipients were the Court to see fit to

1    make such a distribution.  And those include, for example:

2             The Jefferson Parish Human Services Authority, which

3    does primary care and deals with behavioral health/substance

4    abuse, pain killer abuse, which is highly appropriate here.

5             The Safe Haven Project, which is a health campus that

6    does a comprehensive health continuum of care.  It seeks to

7    relieve the strain on local ERs, local emergency departments,

8    which are not really equipped to deal with individuals coming in

9    with substance abuse disorders or other mental illness.

10            The Arch Diocese of New Orleans which runs nursing

11   homes, runs the Wynhoven Healthcare Center, and the Notre Dame

12   Hospice, the Padua Community Services, which has -- does

13   specialized care for children and adults with disabilities as

14   well as all-inclusive care for the elderly.

15            The Veterans Justice Fellowship:  Leave No Veteran

16   Behind, under the New Orleans Bar Foundation.

17            The St. Thomas Community Health Center.

18            We're happy to provide additional information on these

19   organizations to the Court, but we would submit that to complete

20   the purpose of this settlement, to stand for accountability to

21   consumers of medical products and drugs, to put funds not awarded

22   to attorneys to the highest and best use, a distribution to these

23   organizations, or organizations like them, that can do so much

24   with the money they are given to promote general health and

25   welfare, we would recommend that Your Honor seriously consider.

 1          And, again, thank you for the opportunity to serve on

 2     the PSC in this case.

 3          THE COURT:  Okay.  Thank you, Elizabeth.

 4          Anything else?

 5          MS. OLDFATHER:  May it please the Court and counsel on

 6     both sides of the aisle:

 7          Your Honor, I am not here speaking on behalf of the fee

 8     allocation committee as have the very eloquent persons who

 9     preceded me.

10          By the way, Ann Oldfather.

11          I'm here speaking as a claimant and also in my role as

12     lead counsel and liaison counsel for certain personal injury

13     claims.

14          And the Court might say, Well, why are you here as a

15     claimant, Ms. Oldfather?  And obviously as a claimant, my

16     interests would be that the fee allocation committee has the

17     funds available under the settlement to decide how those should

18     be allocated; and, therefore, I'm speaking specifically from that

19     interest, but also from the same broader interests that you heard

20     Ms. Cabraser, Mr. Herman, and Mr. Getty address.

21          In terms of my particular interest, Your Honor, of the

22     18,000 hours that are the total of those 12 affidavits, 4,666 are

23     from my small firm.  That's 25 percent of those hours.  Our firm

24     serves as one of the pillars, the twin pillars, on which the

25     consumer class's ability to recover was based in terms of

1  establishing general causation.  The PSC took the main laboring

2  role on that and established it for the heart attack and stroke

3  cases.  My firm came along and we established it for the venous

4  injuries.

09:20:07

5         So, in sum, that is why I'm here.

6         But, Your Honor, when I listened to the comments that

7  have been made here, particularly by Your Honor about the bill

8  that's pending before the House, what I think of is the

9  independence of the judiciary and the independence that Your

09:20:25

10 Honor has always shown.  How many bills have never passed?  How

11 many bills have never become law?  Why do we care?  Why do we

12 care?

13        This is a settlement that was negotiated between these

14 parties.  It's a done deal.  Not is it just a done deal, but it's

09:20:46

15 a deal that's been approved by this Court.  This Court has

16 already approved the provision in this settlement, 2.5, that say

17 that the attorneys will be paid a reasonable fee for the services

18 that were rendered in connection with the consumer class

19 litigation.  That has already happened.

09:21:08

20        And I echo Mr. Getty's comments about dealing with

21 whatever might happen to be passed by the Senate and ultimately

22 perhaps signed by the President.  That is not Your Honor's

23 concern.

24        Also the other thing that I think of as I sat back here

09:21:24

25 and I listened, and I listened particularly to Ms. Cabraser's

salient comments about the purpose of consumer litigation, I
think why are we running -- why is anyone running from the amount
that was taken or paid to the claimants?  That is a shame.
Your Honor has already said it was a shame.

09:21:49          I agree completely with Mr. Herman.  This case was not
ever delayed.  I mean, measure 2005 to the master settlement
agreement in 2007, that's awesome -- awesome work.  But
Your Honor said it when you sat down, things have to be
prioritized.  You cannot do it all at once.  And you cannot do it
09:22:09  all at once with the same counsel.

          So something has to come at the end, but I think from
everything I've ever heard Your Honor say, just because something
comes at the end doesn't mean that it's any less important.

          And the fair resolution of the consumer class work that
09:22:28  was done is as important as the payments that this Court has
already resolved back in 2010 to the Plaintiff Steering Committee
from the $312 million that was approved by the Court there.  And
as Your Honor carefully analyzed, going from that 8 percent to
the 6 percent to the 6 and a half.

09:22:47          So my view, Your Honor, for whatever it's worth, is
that you have a signed deal that you've approved by which Merck
committed that all reasonable attorneys' fees would be paid.  And
we know that the amount was to be $7.3 million.  We know that two
ways.  Number one, we know because they withdrew their objection
09:23:09  to the full $7.3-.  But more importantly, we know because these

1    are stars in the legal field.  They know how to draft an
2    agreement.
3            And the amount of the fee is not 32 percent of the
4    valid claims paid, which is referenced in certain other parts of
09:23:35
5    the agreement.  Valid claims paid can be prorated if more are
6    submitted than the $16 million that's available to pay them.
7    It's 32 percent of the settlement amount, the defined term
8    "settlement amount," which is the $23 million that was
9    negotiated.
09:23:53
10           And the only question is are there enough hours and
11   reasonable fees to get up to that full $7.3 million?  And as of
12   right now, Your Honor knows from the fee allocation committee
13   that there are.
14           Now, Merck -- and I'm not here to speak on the deal
09:24:12
15   itself, but as I understand it, there's $15 million that Merck
16   either will get back or perhaps that's where Mr. Herman is
17   arguing there should be a cy-pres.  But the notion that there is
18   less value to the legal work that was done on the consumer class
19   than there was to the legal work that was done in the science
09:24:39
20   committee, the legal work that was done on *Daubert*, the legal
21   work that was done at bellwether trials, the legal work that was
22   done on BTE, is a notion that just seems completely inapposite to
23   what I've seen in this courtroom.
24           The lawyers that did this work, Your Honor -- and this
09:24:57
25   might be too light of an analogy.  I tried to think of a better

1  one, but I couldn't.  The lawyers that did this work -- oh, and

2  by the way, Judge, I've been a contingent-fee lawyer since 1984,

3  before that I was with a big firm, and I know what you say about

4  the cases that you've lost.  I remember those, and the lessons

09:25:19  5  I've learned from those are the most valuable lessons I've

6  learned.

7         This is not a loss.  Kentucky was not a loss.

8  $23 million is not a loss.  And there was a boatload of work.

9         Your Honor says we don't have to go over that, but the

09:25:46  10  analogy is I'll just say it's like planning a great party.  You

11  don't know how many people are going to come, but you have to

12  have all the food, you have to have the drinks, you have to have

13  the venue and the entertainment, because it's your job to throw

14  this really quality party.  And then you make the invitation to

09:26:08  15  the people that are entitled to attend, and your job, their job,

16  our job, the 18,000-hour job, was to make it available.

17         And that happened, Judge.  That work was done.  That

18  $23 million was a win.

19         And the first person that took Vioxx in 1999, that was

09:26:33  20  15 years before they had an opportunity to submit a claim under

21  this settlement.  This was a wasting class by definition, but

22  that didn't make the people that still wanted to submit a claim

23  any less important to this Court.  And there is an opportunity

24  here, Your Honor, for you to do symmetry.  I read your opinion

09:26:56  25  from 2010, and I read how you got there with the percentage

1    approach, not the time value approach but you double-checked

2    against all of that.  And you talked about the Fifth Circuit and

3    where it stood.  Two years later the Fifth Circuit said, You can

4    do either one, you get to choose.  You can do percentage, and

09:27:15    5    this is in the *Dell* case, or you can do time value.

6          And Your Honor recently anticipated all that and has a

7    very carefully reasoned decision where you ended up saying, When

8    we double-check this against time value, we have an average

9    hourly rate of $443 an hour with a 1.29 multiplier.

09:27:37    10          And when I step back and look at this, I think there is

11    the opportunity for this Court to say, I value the work that was

12    done by my consumer class committee, and by those members who did

13    common-fund-type work like the BTE work that has not yet been

14    compensated -- because we have not yet been compensated unlike

09:28:00    15    the PSC's work on the general causation on heart attacks.  That

16    $443 an hour at the 1.29 multiplier is almost exactly how this

17    18,000 hours could be compensated from the $7.3- if my 25 percent

18    of that time is backed out.

19          And my 25 percent of that time could be backed out

09:28:29    20    because there are adequate funds available, approximately

21    $7 million, that will be addressed in a couple of weeks on the

22    motion that I've made for those fees to be set, too.

23          And where do we end up if something like that happens?

24          We end up with this Court saying one more thing besides

09:28:49    25    what Ms. Cabraser so elegantly argued about the importance of the

consumer class.  Yes, it's important for deterrence.  Yes, it's important for the policy reasons that each state that allows this recovery has already expressed.  Regardless of what a new House might do in the future, those pro bono/publico reasons existed when this litigation was filed and prosecuted.

So for all of those reasons the Court can say, Yes, that work is as valued as it is for the fact that it was done and not measured solely by how many people came forward.

There's one more reason the Court can hold on to the result that I'm asking for here, and that is because it allows symmetry of treatment.  You will have treated all of the claimants that came before you as equally important, regardless of the priority in which their claims were addressed because the work that their lawyers did will be equally valued.

THE COURT:  Thank you.

MS. OLDFATHER:  Thank you, Your Honor.

MR. HERMAN:  Your Honor, may I clarify one thing, please?

THE COURT:  Yes.

MR. HERMAN:  First of all, my remarks are not directed to the fund to pay consumer claims.

THE COURT:  Yeah, I understand.  It was --

MR. HERMAN:  Secondly, Your Honor, I want to make it clear that I don't advocate in any way that there should be a double payment.  If we did work in the Vioxx main case, we were

1  compensated for it.  We can't -- we don't intend -- at least our

2  firm doesn't intend to bring those hours into the consumer issue.

3  And I just want to make that clear for the record.

4          THE COURT:  Okay.  Anything else?

09:30:43
5          MR. GETTY:  Your Honor, I really don't want to make an

6  argument, I just want to make an observation real quickly.

7          THE COURT:  Yeah, sure.

8          MR. GETTY:  In every courtroom that I have ever stepped

9  into, I have never looked over my shoulder, I have never worried

09:30:56
10 about criticism, about what my peers or my colleagues would say.

11 I have been there to represent my client.  And the only thing I

12 would say is that neither the Court, nor any of these lawyers who

13 represented these claimants, should do anything but hold our head

14 up high and we shouldn't worry about criticism.

09:31:20
15         I was trying to think of the -- it was Louis Brandeis

16 who hailed from Kentucky, actually, who made a comment -- I wish

17 I could have found it precisely, but it was something to the

18 effect that we would never accomplish a thing or do the right

19 thing if we looked over our shoulder constantly and worried about

09:31:45
20 not doing what was right.

21         The Court should do here what is right.  We have done

22 what we thought was right, and I trust this Court will ultimately

23 do that.

24         THE COURT:  Okay.

09:31:57
25         MR. GETTY:  Thank you.

09:32:07

1      THE COURT:  All right.  Thank you.  Anything from
2  anybody else?

3          (No response.)

4      THE COURT:  I'll take all the material which you have
5  given to me and all of the comments.  I appreciate your views.
6  I'll come out shortly with my opinion.

7          Thank you very much.

8                          (Proceedings adjourned.)

9

10                  *  *  *  *

11                  **CERTIFICATE**

12

13      **I hereby certify this 20th day of March, 2017, that the**
14  **foregoing is, to the best of my ability and understanding, a true**
15  **and correct transcript of the proceedings in the above-entitled**
16  **matter.**

17

18                          */s/ Mary V. Thompson*
19                  **Official Court Reporter**

20

21

22

23

24

25